**Hearing Date and Time: July 25, 2016 at 10:00 a.m. (Prevailing Eastern Time)**

**HOGAN LOVELLS US LLP**
Pieter Van Tol, Esq.
M. Shane Johnson, Esq.
875 Third Avenue
New York, NY 10022
Telephone:  (212) 918-3000
Facsimile:  (212) 918-3100
Email: pieter.vantol@hoganlovells.com
Email: shane.johnson@hoganlovells.com

*Attorneys for Dr. Thomas Marsoner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| | **Case No. 08-13555 (SCC)** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | **(Jointly Administered)** |
| Debtors. | |

**PRE-HEARING BRIEF OF DR. THOMAS MARSONER IN SUPPORT OF MOTION TO DEEM PROOFS OF CLAIM TO BE TIMELY FILED BY THE CLAIMS BAR DATE**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF FACTS ...................................................................4

    I.     Dr. Marsoner's Work as a Senior Advisor to Lehman Brothers ...........................4

    II.    Lehman's Investment in F1 and Dr. Marsoner's F1 Advice ...............................4

    III.   Dr. Marsoner Provided the F1 Advice in Exchange for his Standard
        Success Fee................................................................6

    IV.    F1 Revenues ...............................................................8

    V.     F1 Conversations with Jeremy Isaacs and Dick Fuld ............................8

    VI.    BAWAG Acquisition.......................................................9

    VII.   Dr. Marsoner Never Received Actual Notice of the Claims Bar Date ..................9

    VIII.  LBEL Claim ..............................................................11

    IX.    LCPI Sale of F1 Interests to LBI Group Inc....................................12

ARGUMENT..............................................................................12

    I.     Dr. Marsoner was a Known Creditor Entitled to Actual Notice of the
        Claims Bar Date...........................................................13

    II.    Dr. Marsoner did not Receive Actual Notice of the Claims Bar Date.................15

    III.   Contractual or Quantum Meruit Claims........................................17

        A.    Statute of Limitations ..........................................17

        B.    Choice of Law ...............................................18

## TABLE OF AUTHORITIES

Page(s)

**Cases**

Baker v. Latham Sparrowbush Assocs,
    72 F.3d 246 (2d Cir. 1995) .................................................................................15

Battino v. Cornelia Fifth Ave., LLC,
    861 F. Supp. 2d 392 (S.D.N.Y. 2012) ...............................................................15

Benedetti v. Sawiris
    [2013] ...................................................................................................................19

Berlinger v. Lisi,
    288 A.D.2d 523 (3d Dep't 2001) .......................................................................20

In re BGI, Inc.,
    476 B.R. 812 (Bankr. S.D.N.Y. 2012) aff'd, 772 F.3d 102 (2d Cir. 2014)...........13

Matter of Bombardier Transp. (Holdings) USA, Inc. v Telephonics Corp.,
    14 A.D.3d 358 (1st Dep't 2005) ........................................................................18

In re Brunswick Hosp. Ctr., Inc.,
    No. 892-80487-20, 1997 WL 836684 (Bankr. E.D.N.Y. Sept. 12, 1997).............15

In re Chateaugay Corp. Reomar, Inc.,
    No. 86 B 11270 BRL, 2009 WL 367490 (Bankr. S.D.N.Y. Jan. 14, 2009).........13

Chemetron Corp. v. Jones,
    72 F.3d 341 (3d Cir. 1995) .................................................................................14

Eisen v. Feder,
    307 A.D.2d 817 (1st Dep't 2003).......................................................................17

Fieger v. Pitney Bowes Credit Corp.,
    251 F.3d 386 (2d Cir. 2001) ..............................................................................18

In re Gaston & Snow,
    243 F.3d 599 (2d Cir. 2001) .........................................................................17, 18

Grant v. U.S.H. Corp. of N.Y. (In re U.S.H. Corp. of N.Y.),
    223 B.R. 654 (Bankr. S.D.N.Y. 1998) ...............................................................13

Greyhound Lines, Inc. v. Rogers (In re Eagle Bus Mfg., Inc.),
    62 F.3d 730 (5th Cir. 1995) ...............................................................................16

Guilbert v. Gardner,
    480 F.3d 140 (2d Cir. 2007) ............................................................................... 18

LeBoeuf, Lamb, Greene & MacRae, L.L.P. v Worsham,
    185 F.3d 61 (2d Cir. 1999) ................................................................................. 19

Levin v. Maya Constr. (In re Maya Constr. Co.),
    78 F.3d 1395 (9th Cir. 1996) ........................................................................ 13, 15

In re Motors Liquidation Co.,
    529 B.R. 510 (Bankr. S.D.N.Y. 2015) ............................................................... 15

Sharab v. HRH Al-Saud
    [2013] ................................................................................................................. 19

Shu Lun Wu v. May Kwan Si, Inc.,
    508 B.R. 606 (S.D.N.Y. 2014)............................................................................ 13

Sven Salen AB v. Jacq. Pierot, Jr., & Sons, Inc.,
    559 F. Supp. 503 (S.D.N.Y. 1983) aff'd sub nom. Salen AB v. Pierot & Sons,
    Inc., 738 F.2d 419 (2d Cir. 1984)........................................................................ 17

In re XO Commc'ns, Inc.,
    301 B.R. 782 (Bankr. S.D.N.Y. 2003), aff'd, No. 04 CIV. 01489LAK, 2004
    WL 2414815 (S.D.N.Y. June 14, 2004) ......................................................... 13, 14

Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,
    84 N.Y.2d 309 (1994)..................................................................................... 18, 19

**Statutes**

11 U.S.C. § 105.......................................................................................................... 12

Fed. R. Bankr. P. 9024 ............................................................................................... 12

N.Y. C.P.L.R. 203(a)................................................................................................... 17

N.Y. C.P.L.R. 213(2) .................................................................................................. 17

N.Y. C.P.L.R. 302(a)(1) .............................................................................................. 17

Dr. Thomas Marsoner ("Dr. Marsoner") hereby submits this brief in advance of the evidentiary hearing on the *Motion of Dr. Thomas Marsoner to Deem Proofs of Claim to be Timely Filed by the Claims Bar Date* [Docket No. 47859] (the "Motion") to commence on July 25, 2016 at 10:00 a.m. (Prevailing Eastern Time). For the reasons set forth below and based on the evidence to be heard at the evidentiary hearing, the Motion should be granted.

## PRELIMINARY STATEMENT

1.      The evidence will show that (1) Dr. Marsoner was a known creditor entitled to receive actual notice of the September 22, 2009 deadline to file claims (the "Claims Bar Date") against Lehman Brothers Holdings, Inc. ("LBHI", and together with the other debtors in the above-captioned case, the "Debtors"); and (2) the Debtors could have, and should have, sent such notice to Dr. Marsoner's last known address, which was reasonably ascertainable from an advisory agreement to which the Debtors had access.  Indeed, similarly situated advisors received notices from the Debtors and the inexplicable failure to follow the same practice with respect to Dr. Marsoner should not be used as an excuse to deprive Dr. Marsoner of his advisory fees, which relate to a transaction that resulted in approximately $1.5 billion in net revenues for Lehman Commercial Paper Inc.'s ("LCPI") estate.

2.      The Motion stems from Dr. Marsoner's investment banking advisory services that he provided with respect to the FIA Formula One World Championship ("F1 Advice") that led to Lehman's reinvestment in F1 in 2005 and 2006 (the "F1 Reinvestment").

3.      Dr. Marsoner's F1 Advice was valuable and well known to high-level executives at LBHI and LCPI. Numerous high-level LBHI or LCPI employees had knowledge that Dr. Marsoner provided the F1 Advice, including:

> i.      Vittorio Pignatti, a former Officer of LBHI and Dr. Marsoner's contact person who approved transactions under the Advisory Agreement between Dr. Marsoner and Lehman Brothers Europe Limited ("LBEL") dated

February 13, 2004 (the "2004 Advisory Agreement"), who not only knew Dr. Marsoner provided the valuable F1 Advice but asked him to provide it and expected he would be paid for it;

ii.   Ruggero Magnoni, a former Officer of LBHI, who knew Dr. Marsoner provided the F1 Advice and expected he would have been paid his standard 10% fee;

iii.  Richard "Dick" Fuld, the former Chairman and CEO of LBHI, who knew that Dr. Marsoner provided the F1 Advice and expected to be paid for it;

iv.   Jeremy Isaacs, a former Senior Vice President of LBHI and LBHI's CEO of Europe, Asia, Middle East and Asia-Pacific, who knew that Dr. Marsoner provided the F1 Advice and expected to be paid for it;

v.    Steve Hannan, a former Vice President and later a Managing Director and Director of LCPI, who was aware that Dr. Marsoner provided the F1 Advice; and

vi.   Peter Sherratt, a former Officer of LBHI that was later appointed to the Board of Directors of the F1 holding companies by LCPI, who knew that Dr. Marsoner provided the F1 Advice and believed it was "very, very useful information."

4.    Other LBHI employees knew that Dr. Marsoner was a Lehman Brothers[1] advisor who was paid success fees for his advice, including:

i.    Peter Calistri, a former Director/Senior Vice President of LBHI, and

ii.   Mona Adler, a former Manager/Vice President and later a Director/Senior Vice President of LBHI, who both knew that Dr. Marsoner continued working for Lehman Brothers after the 2004 Advisory Agreement expired

---

[1] "Lehman Brothers" is used to refer to Lehman Brothers generally as opposed to a specific Lehman Brothers entity.

2

and approved payment of his quarterly fees and expenses for the time that he worked without a written Advisory Agreement; and

  iii. Michael Odrich, a former Managing Director/Vice President of LBHI, who knew that Dr. Marsoner was paid a 10% success fee on the BAWAG Acquisition (as defined below).

  5. In addition, LBHI received invoices submitted for work Dr. Marsoner performed under the Advisory Agreements (as defined below), and it paid Dr. Marsoner his fees under the Advisory Agreements.

  6. In short, the Debtors cannot claim that they were unaware of Dr. Marsoner's work as a paid advisor for Lehman Brothers or the valuable F1 Advice that he gave.

  7. There is no doubt that the Debtors also knew how to provide notice to Dr. Marsoner.  They had in their books and records:  (i) an Advisory Agreement dated October 5, 2007 between Dr. Marsoner and LBEL (the "2007 Advisory Agreement") indicating that Dr. Marsoner was a consultant to the "Lehman Group" and listing his Austria Address (as defined below); and (ii) a draft of the Advisory Agreement dated May 5, 2006 between Dr. Marsoner and LBEL (the "2006 Advisory Agreement") that also listed his Austria Address.  The evidence shows that, with respect to other consultants (including those with agreements with LBEL and other European Lehman Brothers entities), the Debtors searched their records thoroughly and provide notice to the address in the contracts.

  8. In this case, however, the Debtors failed to send notice of the Claims Bar Date to the correct (and last known) address, which was the Austrian Address listed on the 2007 Advisory Agreement. Instead, the Debtors inexplicably sent the notice to Dr. Marsoner's temporary vacation addresses and LBEL's former address, neither of which constitutes sufficient notice. Because Dr. Marsoner did not receive actual notice at his last known address (which the Debtors could have easily ascertained), the Court should deem his claims to be timely filed.

**STATEMENT OF FACTS**

I.    **Dr. Marsoner's Work as a Senior Advisor to Lehman Brothers**

9.    From April 2001 through September 15, 2008 Dr. Marsoner was employed as a senior advisor to Lehman Brothers pursuant to advisory services agreements with LBEL that he entered into on March 21, 2001, July 24, 2002, February 13, 2004, May 5, 2006, and October 5, 2007 (collectively the "Advisory Agreements"). See Marsoner Ex. 1, Marsoner Dep. Tr. 17:9-11; see also Marsoner Ex. 2.[2]

10.    During his time as a senior advisor to Lehman Brothers, Dr. Marsoner advised them on numerous investment opportunities, with a focus on transactions in Austria, Germany, and Switzerland. See Marsoner Dep. Tr. 18:15-22. Lehman Brothers recognized Dr. Marsoner's expertise in these areas as demonstrated by the 2002 Advisory Agreement, which provided that Dr. Marsoner was "experienced in financial markets in European countries and particularly Germany, Switzerland and Austria, and Lehman Brothers wishes to avail itself of the experience" of Dr. Marsoner. Marsoner Ex. 2; see also Marsoner Ex. 3, Pignatti Dep. Tr. 10:12-21.

II.    **Lehman's Investment in F1 and Dr. Marsoner's F1 Advice**

11.    The origin of Lehman Brothers' investment in F1 began when Ruggero Magnoni, Johann Rupert, and Dr. Marsoner attended the Monte Carlo Grand Prix in 1998 and met with Bernie Ecclestone, the head of F1. See Marsoner Dep. Tr. 30:24-31:18.

12.    After that meeting Lehman Brothers was looking to invest in F1 and eventually provided Leo Kirch with a $300 million loan—JP Morgan ("JPM") provided an additional $300 million and Bayerische Landesbank provided $1 billion—to acquire 75% of the F1 holding company. See id. at 31:23-32:6. After Kirch defaulted on the loan in 2002, Lehman Brothers enforced against its collateral and became a 17% equity stakeholder in F1. See id. at 32:7-11.

13.    At the request of Vittorio Pignatti, an Officer of LBHI, between 2002 and 2004 Dr. Marsoner monitored F1 very closely for Lehman Brothers. See id. at 45:14-46:12; see also

---

[2] The exhibits referred to as "Marsoner Ex. __" are attached to the accompanying Declaration of Pieter Van Tol.

Marsoner Ex. 4. This involved analyzing and discussing potential threats and opportunities for Lehman Brothers with Pignatti and Ruggero Magnoni, who also served as an Officer of LBHI. <u>See</u> Marsoner Dep. Tr. at 46:4-12; 47:3-20; <u>see also</u> Marsoner Ex. 4.

14.    In 2005 when CVC Capital Partners bought Bayerische Landesbank's stake in F1, Dr. Marsoner received information from his F1 racing connections that Ron Dennis from McLaren was supportive of the deal. <u>See</u> Marsoner Dep. Tr. at 49:13-50:6, 51:11-23. This was very valuable information. McLaren and Ferrari were the two dominant F1 teams over the prior 20 years, and McLaren had continuously threatened to start a new racing series with a number of other F1 teams (sometimes referred to as the GPWC teams), which would have decimated the value of F1. <u>See id.</u> at 49:21-51:7. F1 was a highly profitable racing series whose value was depressed because of the lingering threat of a competing racing series. <u>See id.</u>

15.    Vittorio Pignatti coordinated for Dr. Marsoner to communicate this information to the F1 decision makers at Lehman Brothers. <u>See</u> Pignatti Dep. Tr. 26:17-28:14. Tom Bernard, the Head of Global Credit Businesses at Lehman Brothers Inc. ("<u>LBI</u>"), immediately recognized its value and stated in an internal email sent to Steve Hannan (a former Vice President and later a Managing Director and Director of LCPI), Patrick Schmitz-Morkramer, and Peter Sherratt (a former Officer of LBHI that was later appointed to the Board of Directors of the F1 holding companies by LCPI) that this information was "huge", and that as a result he was "almost certain [Lehman Brothers] were staying in [F1]." <u>See</u> Marsoner Ex. 5; <u>see also</u> Marsoner Ex. 6; Marsoner Ex. 4; Marsoner Ex. 7. Even Peter Sherratt, the Debtors' sole witness, recognized that Dr. Marsoner was knowledgeable about F1 and that his F1 Advice was "helpful" and "very, very useful." <u>See</u> Marsoner Ex. 8, Sherratt Dep. Tr. 13:11-12, 109:16-22.

16.    Before Dr. Marsoner's F1 Advice others within Lehman Brothers were inclined to follow JPM and sell their stake in F1, but the McLaren information dispelled any doubts about retaining the F1 investment. <u>See</u> Marsoner Dep. Tr. 56:5-18, 57:5-23; <u>see also</u> Marsoner Ex. 9,

Magnoni Dep. Tr. 23:23-24:2 ("And thank God [Tom Bernard] decided not to sell, I understand by leaning a lot Thomas' vision, which was the only completely in favor vision within the firm because I wasn't sure what was good to do."), 25:4-12 ("McLaren was the strongest team at that time and it had just won the championship, they had a great engine. . . . So critical was to assert whether McLaren was going to stay with Bernie or go with the splinter group. . . . And I understand Thomas went to war on that. And he turned what was a widespread skepticism by many of the senior guys into the very bold decision by Bernard, which I think must have consulted Dick. . . ."), 28:12-16 ("without Thomas I doubt the firm would have stayed into Formula 1. That is my impression, I don't have any, how would you call it, evidence. But the level of understanding of Formula 1 was so feeble at the firm, because the Americans didn't know Formula 1."), 28:21-24 ("I know Thomas called everyone from Jeremy [Isaacs] down in Europe to make sure that we would consider very, very seriously CVC's proposal as being totally inadequate."), 30:15-18 ("And Peter Sherratt, who is a friend and a very -- I have lots of time for him, was really very conservative, and basically was saying let us cut, let's cut our losses and go home.").

III.    **Dr. Marsoner Provided the F1 Advice in Exchange for his Standard Success Fee**

17.    From 2001 to September 2008 Dr. Marsoner worked seamlessly as a senior advisor to Lehman Brothers even when an Advisory Agreement had technically expired. See Marsoner Dep. Tr. 40:4-12. During the periods when an Advisory Agreement was no longer in effect, the rules of the prior Advisory Agreement would govern the relationship between Dr. Marsoner and Lehman Brothers, and Dr. Marsoner would still be paid for his advisory work. See id. at 40:13-19; see also Marsoner Ex. 10; Marsoner Ex. 7 [listing the positions of Mona Adler and Peter Calistri]. Thus, even though the 2004 Advisory Agreement had expired when Dr. Marsoner provided the F1 Advice, its terms still governed.

18.    Dr. Marsoner's fees, which were paid by LBHI, see Marsoner Ex. 11, were set forth in the Advisory Agreements. Under the Advisory Agreements, in addition to quarterly fixed

fees, Dr. Marsoner was entitled to a "success fee" (i) equal to 10% of Total Revenues;[3] or (ii) 20% of Net Investment Banking Revenues.[4] See Marsoner Ex. 2. Accordingly, under either formula Dr. Marsoner is entitled to 10% of the F1 Reinvestment's net revenues.[5]

19.    Moreover, Dr. Marsoner clearly intended his F1 Advice to be in return for his standard advisory fee of 10% of firm revenues that had been outlined in his Advisory Agreements, and Lehman Brothers agreed to pay him this amount by requesting his advice. See Marsoner Dep. Tr. 58:7-22, 59:14-60:4, 67:14-25; see also Magnoni Dep. Tr. 28:9-31:4, 32:20-33:4 ("[I]t was always if you are a success, we will give you part of what we make. And usually, because I knew afterwards, that was about 10 percent of banking or 20 percent of banking or 10 percent of the firm's, was what normally was given to advisers. It was given to me, too, afterwards."), 56:13-57:7 ("Particularly at Lehman, we had a 10 percent approach. So it was well known by everyone from Jeremy [Isaacs] and Roger Nagioff and I am sure, I can say myself, that that was the norm and therefore was pretty well understood by everyone.").

20.    Vittorio Pignatti, who signed Dr. Marsoner's 2004 Advisory Agreement on behalf of LBEL, and others within Lehman Brothers also understood that Lehman Brothers intended

---

[3] The 2004 Advisory Agreement defines Total Revenues as "(i) for financing products, (A) the sum of Lehman Brothers' management fees, sales credits, net underwriting fees and/or (B) **the amount of any market gains made by Lehman Brothers for its own account**, less the amount of any market losses incurred by Lehman Brothers for its own account and less the amount of any unre-imbursed out of pocket and other expenses; and (ii) for advisory transactions any retainer and success fees, less the amount of any unre-imbursed out of pocket or other expenses." (emphasis added)

[4] The 2004 Advisory Agreement defines Net Investment Banking Revenues as "(i) for financing products, the share that the Lehman Brothers' Investment Banking Division receives (this is currently 50% for most transactions) of (A) the sum of Lehman Brothers' management fees, sales credits, net underwriting fees and/or (B) the amount of any market gains made by Lehman Brothers for its own account, less the amount of any market losses incurred by Lehman Brothers for its own account and less the amount of any unre-imbursed out of pocket and other expenses; and (ii) for advisory transactions, the share that the Lehman Brothers' Investment Banking Division receives (this is currently 100%) of any retainer and success fees, less the amount of any unreimbursed out of pocket or other expenses."

[5] If the Court employs the first formula, Total Revenues—calculated as "(A) the sum of Lehman Brothers' management fees, sales credits, net underwriting fee and/or (B) the amount of any market gains made by Lehman Brothers"—are approximately $1.51 billion, and 10% of Total Revenues is $151 million. If the Court employs the second formula, Net Investment Banking Revenues—calculated as "the share that the Lehman Brothers' Investment Banking Division receives (this is currently 50% for most transactions) of (A) the sum of Lehman Brothers' management fees, sales credits, net underwriting fees and/or (B) the amount of any market gains made by Lehman Brothers"—are approximately $755 million, and 20% of Net Investment Banking Revenues is $151 million. Dr Marsoner believes that the approximately $4 million (£2.5 million) he received from LBEL as part of his settlement in the U.K. proceeding should be deducted from this sum, leaving a net claim of $147 million.

to pay Dr. Marsoner a "success fee" for his advisory services similar to those included in the 2004 Advisory Agreement. See Pignatti Dep. Tr. 30:20-24 ("I think, yes, he would be, he would have been paid, I would say, in retrospect."), 62:1-63:12, 66:24-67:1 ("But I certainly made sure that if they utilized the referral from an adviser at the investment bank they would have to pay."), 68:3-24.

**IV.    F1 Revenues**

21.    As discussed above, Lehman Brothers' initial investment in F1 was a $300 million loan to Leo Kirch to purchase a stake in F1. See Marsoner Dep. Tr. 31:23-32:6. In 2006, Lehman Brothers participated in a refinancing that returned an approximately $300 million dividend, essentially recouping the initial investment. See id. at 74:9-75:7. Profits only materialized for Lehman Brothers in 2012 when another refinancing occurred after CVC sold half of its stake to Waddell & Reed, Blackrock, and the Norwegian Sovereign Wealth Fund. See id. at 73:2-5, 79:5-80:7. It was standard practice for an advisor to only receive their "success fee" upon Lehman Brothers' receiving revenues. See Pignatti Dep. Tr. 86:15-21.

**V.    F1 Conversations with Jeremy Isaacs and Dick Fuld**

22.    In July 2007, Dr. Marsoner met with Jeremy Isaacs, a former Senior Vice President of LBHI and LBHI's CEO of Europe, Asia, Middle East and Asia-Pacific, to discuss a potential investment opportunity and to remind Isaacs of his role in Lehman Brother's F1 investment. See Marsoner Dep. Tr. 25:11-27:9; see also Marsoner Ex. 4; Marsoner Ex. 7. This discussion and Dr. Marsoner's subsequent email that attached his original email exchange with Tom Bernard were meant to "prepare the ground for a later claim." Marsoner Dep. Tr. 26:10-12; 111:16-112:11; see also Marsoner Ex. 12. Dr. Marsoner implied in both his conversation with Isaacs and his email that he believed he should be compensated for his F1 Advice. See Marsoner Dep. Tr. 113:2-8.

23.    Similarly, in August 2008 Dr. Marsoner met with Dick Fuld, the former Chairman and CEO of LBHI, to among other things, lay the groundwork for an eventual claim on F1 once it became profitable. See id. at 76:14-77:25; see also Marsoner Ex. 4. During this meeting Dick

Fuld thanked Dr. Marsoner for his F1 Advice, which he was already aware of because of regular updates that he received from Magnoni. See Marsoner Dep. Tr. 77:12-16, 97:18-99:17.

24.     The conversations with Jeremy Isaacs and Dick Fuld were part of a larger effort by Dr. Marsoner to "make sure it was widely known that around F1 and Lehman, [his] hat was in the ring", meaning he wanted people at Lehman Brothers to remember the key role he played in the F1 investment so he could receive his standard 10% fee when Lehman Brothers received revenues. Id. at 119:11-18.

## VI.   BAWAG Acquisition

25.     Cerberus' acquisition of BAWAG, an Austrian bank, for approximately $3.6 billion (the "BAWAG Acquisition") best exemplifies the course of dealing between Lehman Brothers and Dr. Marsoner when a transaction was not specifically itemized in any Advisory Agreement. Dr. Marsoner was instrumental in working with Lehman Brothers to advise Cerberus on the BAWAG Acquisition from April 2006 to May 2007. See Marsoner Dep. Tr. 100:22-102:23; see also Pignatti Dep. Tr. 66:9-17. In June 2007, after Dr. Marsoner provided Lehman Brothers with valuable advisory services related to the BAWAG Acquisition, Lehman Brothers paid Dr. Marsoner 20% of the investment banking revenues from the BAWAG Acquisition. These revenues included 50% of two market gains made by Lehman Brothers. See Marsoner Ex. 13; see also Marsoner Ex. 14; Marsoner Ex. 7 [listing the position of Michael Odrich]. LBHI paid Dr. Marsoner for the BAWAG Acquisition after the 2007 Advisory Agreement's effective date on February 1, 2007, although the BAWAG Acquisition had never been formally cited in any of the Advisory Agreements. See Marsoner Dep. Tr. 102:18-23; see also Marsoner Ex. 2.

## VII.   Dr. Marsoner Never Received Actual Notice of the Claims Bar Date

26.     Dr. Marsoner has resided at 20 Earls Terrace, London W8 6LP since April 2002. See Marsoner Dep. Tr. 14:4-8. His last known address to the Debtors and his current domicile under UK tax law is Andreas Hofer Strasse 43, 6020 Innsbruck, Austria (the "Austria Address"),

\\NY - 045382/000001 - 5229868 v6

which Dr. Marsoner listed as his address on his final Advisory Agreement with LBEL in 2007. <u>See</u> <u>id.</u> at 14:11-14; <u>see also</u> Marsoner Ex. 15. The Debtors also knew about Dr. Marsoner's Austria Address because, on October 27, 2008, Dr. Marsoner sent an e-mail to Allyson Carine at Barclays Capital, the person tasked with overseeing termination notices for LBCC transactions, which listed his Austria Address as his contact address. <u>See</u> Marsoner Ex. 16.

27.     Dr. Marsoner was not the only consultant that entered into agreements with LBEL to provide advisory services, yet unlike these other consultants Dr. Marsoner did not receive notice of the Claims Bar Date at the address listed on his final agreement. <u>See</u> Marsoner Ex. 17.

28.     Epiq Bankruptcy Solutions, LLC ("<u>Epiq</u>") confirmed that it attempts to send notice of the Claims Bar Date to a person's last known address. <u>See</u> Marsoner Ex. 18, Bowdler Dep. Tr. 14:10-13.

29.     Despite Epiq's policy, the Debtors' actual knowledge of the Austria Address and their ability to obtain the correct address from their book and records, the Debtors attempted to serve Dr. Marsoner notice of the Claims Bar Date at "Casa Andreas, 16 Trig Sant' Andrrija Lija BLZ10 Malta" and "Casa Andreas 16 Triq Sant' Andrija Lija BLZ10 Malta" (collectively the "<u>Malta Addresses</u>"), "Casa Pelicanos Costa Careyes Mexico" (the "<u>Mexico Address</u>"), "Casa Carpione Parco San Giacomo Gargnano 25084 Italy" (the "<u>Italy Address</u>"), and "One Broadgate 5th Floor London EC2M 7HA United Kingdom" (the "<u>London Address</u>"). <u>See</u> Corrected Affidavit of Service [Docket No. 9395].

30.     Alvarez & Marsal ("<u>A&M</u>"), who was responsible for creating the master mailing list to mail notice of the Claims Bar Date, did not check whether addresses were vacation addresses or even whether the addresses were working addresses. <u>See</u> Marsoner Ex. 19, Kotarba Dep. Tr. 51:3-9. Similarly, Epiq did not perform any independent check on the validity of the addresses or whether any additional addresses existed for Dr. Marsoner in the Debtors' books and records. <u>See</u> Bowdler Dep. Tr. 18:9-19:23.

31.   A&M also did not include Dr. Marsoner's Austria Address even though they included addresses based merely on "interactions" with the Debtors, and should have included every one of Dr. Marsoner's addresses known to the Debtors. See Kotarba Dep. Tr. at 48:14-21, 14:2-15 ("I agree with your earlier statement, that typically if we have two addresses we would serve both addresses."), 40:23:-41:15; see also Bowdler Dep. Tr. 17:7-25 ("in general, we pull every address available for the creditor, or the financial advisor would do so.").

32.   Dr. Marsoner never received notice of the Claims Bar Date at any of these addresses because they are either temporary addresses that Dr. Marsoner has not stayed at since 2006, or in the case of the London Address it is the former address of LBEL. The Italy Address was the address of Dr. Marsoner's father's vacation home, which does not have a mail box for deliveries. See Marsoner Dep. Tr. at 140:25-141:18. The Malta Addresses were the address of a friend's house where Dr. Marsoner stayed once in 2004. See id. at 61:14-18, 139:16-24. The Mexico Address was the address of a house he rented one time for a vacation. See id. at 140:11-16. And the London Address was LBEL's address until it moved in 2002. See Kotarba Dep. Tr. 51:10-24. The Italy Address, the Malta Addresses, and the Mexico Address were all listed on invoices purely for U.K. tax appearance reasons, which Dr. Marsoner's contacts at Lehman Brothers were well aware of. See Marsoner Dep. Tr. at 61:19-62:17. Dr. Marsoner's contacts at Lehman Brothers were also well aware of his Austria Address and his residence in London, but he did not receive notice of the Claims Bar Date at either address. See id.

## VIII.   **LBEL Claim**

33.   In LBEL's U.K. insolvency proceeding Dr. Marsoner entered into a settlement agreement with LBEL's Administrators that the U.K. court approved, which provided Dr. Marsoner with a general unsecured claim in the amount of £2.5 million (approximately $4 million). See Marsoner Ex. 20. The Consent Order expressly provides that "Any person who is not a party to this Agreement shall have no right . . . to enforce or enjoy the benefit of any term of this Agreement." See

id. As non-parties to the settlement agreement, LCPI and LBHI were not released by the court's Consent Order.

## IX.    LCPI Sale of F1 Interests to LBI Group Inc.

34.    Unbeknownst at the time to Dr. Marsoner, on July 17, 2009, the Court entered an order approving the sale of LCPI's interest in Delta Topco Limited and Delta Prefco Limited (collectively "Delta"), the holding companies of Alpha Topco Limited and Beta Topco 1 Limited, which hold the rights to F1, to LBI Group Inc., a wholly owned indirect subsidiary of LBHI. See Order Approving Sale of Delta Shares [Docket No. 4435]. Under the terms of the Purchase Agreement, in exchange for transferring all of its right, title and interest in Delta, LCPI will receive the net proceeds from LBI Group Inc. with respect to its F1 holdings. See Motion to Sell Delta Shares, Exhibit A [Docket No. 4162]. After June 30, 2014, LCPI also has the right under the Purchase Agreement to demand that LBI Group Inc. pay the fair value of its interest in F1 to LCPI. See id.

## ARGUMENT

35.    Dr. Marsoner seeks entry of an order consistent with Due Process and pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9024 deeming the Proofs of Claim to be timely filed by the Claims Bar Date because as a known creditor, Dr. Marsoner was entitled to receive actual notice of the Claims Bar Date.

36.    Dr. Marsoner has included the legal basis for his claims because they are interrelated with whether he was a known creditor, and the deposition testimony included the merits of Dr. Marsoner's claims.

37.    Dr. Marsoner has a claim against LBHI because it acted as the paymaster that would have paid Dr. Marsoner for the F1 Advice. In addition, unlike other transactions where Dr. Marsoner's advice benefitted LBEL, LBHI would not have indirectly re-charged any payment to Dr. Marsoner for the F1 Advice back to LBEL as an intercompany payable because the advice benefitted

\\NY - 045382/000001 - 5229868 v6

LCPI, not LBEL. Dr. Marsoner's claim against LCPI arises from the net revenues from the F1 investment that benefitted LCPI's estate.

**I.    Dr. Marsoner was a Known Creditor Entitled to Actual Notice of the Claims Bar Date.**

38.    Due process requires that known creditors must receive <u>actual</u> notice of the bar date in order for the debtor to discharge their claims. See <u>Levin v. Maya Constr. (In re Maya Constr. Co.)</u>, 78 F.3d 1395, 1399 (9th Cir. 1996) ("Generally, if a known contingent creditor is not given formal notice, he is not bound by an order discharging the bankruptcy's obligations."); <u>Shu Lun Wu v. May Kwan Si, Inc.</u>, 508 B.R. 606, 614 (S.D.N.Y. 2014) ("If plaintiffs did not have notice of the Bar Date, their claims were not discharged under the plan."); <u>Grant v. U.S.H. Corp. of N.Y. (In re U.S.H. Corp. of N.Y.)</u>, 223 B.R. 654, 658 (Bankr. S.D.N.Y. 1998) ("[I]f a creditor is not given reasonable notice of the bankruptcy proceeding and the relevant bar dates, its claim cannot be constitutionally discharged."); <u>In re XO Commc'ns, Inc.</u>, 301 B.R. 782, 791-92 (Bankr. S.D.N.Y. 2003) ("Before a debtor can obtain a discharge of a claim in bankruptcy, however, the Due Process Clause of the Fifth Amendment dictates that a debtor's creditors receive notice of the debtor's bankruptcy case and applicable bar date so that creditors have an opportunity to make any claims they may have against the debtor's estate."), <u>aff'd</u>, No. 04 CIV. 01489LAK, 2004 WL 2414815 (S.D.N.Y. June 14, 2004); <u>In re Chateaugay Corp. Reomar, Inc.</u>, No. 86 B 11270 BRL, 2009 WL 367490, at *5 (Bankr. S.D.N.Y. Jan. 14, 2009) (same).

39.    The first issue is therefore whether Dr. Marsoner is a "known creditor" entitled to actual notice, or whether he is an "unknown creditor" entitled only to publication notice. <u>See In re BGI, Inc.</u>, 476 B.R. 812, 820 (Bankr. S.D.N.Y. 2012) <u>aff'd</u>, 772 F.3d 102 (2d Cir. 2014).

40.    A "known" creditor includes "both a claimant whose identity is **actually known to the debtor** or a claimant whose identity is 'reasonably ascertainable' **by the debtor**." <u>Id.</u> (emphasis added) (quoting <u>Chemetron Corp. v. Jones</u>, 72 F.3d 341, 346 (3d Cir. 1995)). "[A] creditor is 'reasonably ascertainable' if the debtor can uncover the identity of that creditor through 'reasonably

diligent efforts.'" <u>XO Commc'ns, Inc.</u>, 301 B.R. at 793. "The requisite search . . . focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are generally not required. Only those claimants who are identifiable through a diligent search are 'reasonably ascertainable' and hence 'known' creditors." <u>Chemetron</u>, 72 F.3d at 347.

41.     Two Officers of LBHI, including Dr. Marsoner's contact under the 2004 Advisory Agreement who coordinated the F1 Advice, not only knew Dr. Marsoner provided valuable F1 Advice but expected he would have been paid for his advice. <u>See</u> Pignatti Dep. Tr. 30:20-24, 62:1-63:12; <u>see also</u> Magnoni Dep. Tr. 28:9-31:4, 32:20-33:4, 56:13-57:7. Furthermore, the Chairman and CEO of LBHI and the CEO of Europe, Asia, Middle East and Asia-Pacific for LBHI both knew that Dr. Marsoner provided the F1 Advice and expected to be paid for it. <u>See</u> Marsoner Dep. Tr. 26:7-27:9, 76:14-77:25, 97:18-99:17.

42.     It is also undisputed that Dr. Marsoner's F1 Advice was valuable. <u>See</u> Pignatti Dep. Tr. 30:20-24, 62:1-63:12; <u>see also</u> Magnoni Dep. Tr. 28:9-31:4; Marsoner Ex. 5. Peter Sherratt, who was an Officer of LBHI and was appointed to the Board of Directors of the F1 holding companies by LCPI, admitted that Dr. Marsoner was knowledgeable about F1 and that his F1 Advice was "helpful" and "very, very useful." <u>See</u> Sherratt Dep. Tr. 13:11, 109:16-22, 46:1-4, 48:16-17.

43.     Pursuant to the course of dealing with Lehman Brothers, the contact person under the Advisory Agreement had the ability to request Dr. Marsoner's advice for transactions not listed in the Advisory Agreement. <u>See</u> Pignatti Dep. Tr. 12:16-18 ("[Lehman Brothers] had a possibility to bring under [the 2004 Advisory Agreement], subject to my green light, I think, other [transactions]."). The standard and well-known fee for Dr. Marsoner's advisory services, whether a transaction was specifically covered by an Advisory Agreement or not—as was the case with the BAWAG transaction, was 10% of Lehman Brothers' net revenues. <u>See</u> Marsoner Dep. Tr. 67:18-69:9, 100:22-102:23, 198:22-199:12; <u>see also</u> Magnoni Dep. Tr. 56:13-57:7; Marsoner Ex. 14; Pignatti Dep. Tr. 18:9-21 ("So there were times when the level of activity with one adviser did not

\\NY - 045382/000001 - 5229868 v6

warrant a contract with a fixed amount, and so on. So we would, say, **use as a guideline the past but on specific transactions you have to come to me and I will sign off and sort of rejuvenate the old agreements**. . . . [I]n the case of Thomas and a few others, after a decade together we could live with, sort of a play it by ear system.") (emphasis added). Furthermore, LBHI had in its books and records Dr. Marsoner's 2007 Advisory Agreement indicating that he was a consultant to the "Lehman Group", see Marsoner Ex. 15; see also Marsoner Ex. 21, Behnke Dep. Tr. 29:5-14, and invoices submitted for work Dr. Marsoner performed under the Advisory Agreements. See Marsoner Ex. 22.

44.    "The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation." Baker v. Latham Sparrowbush Assocs, 72 F.3d 246, 255 (2d Cir. 1995) (citation omitted); Battino v. Cornelia Fifth Ave., LLC, 861 F. Supp. 2d 392, 405 (S.D.N.Y. 2012). In addition, in In re Motors Liquidation Co., 529 B.R. 510, 557 (Bankr. S.D.N.Y. 2015) the court held that the knowledge of the debtor's engineers, senior managers, and attorneys was sufficient in holding that the owners of vehicles with faulty ignition switches were known creditors entitled to actual notice of the deadline to file proofs of claim.

45.    LBHI and LCPI therefore knew Dr. Marsoner was a creditor and should have sent him actual notice of the Claims Bar Date at his last known address, which it had in its books and records.

**II.    Dr. Marsoner did not Receive Actual Notice of the Claims Bar Date.**

46.    Even though Dr. Marsoner participated in LBEL's U.K. insolvency and was generally aware of U.S. proceedings, as a "known creditor" Dr. Marsoner was entitled to actual notice of the Claims Bar Date. See Maya Constr., 78 F.3d at 1399 ("The fact that a creditor has actual knowledge that a Chapter 11 bankruptcy proceeding is going forward involving a debtor does not obviate the need for notice."); In re Brunswick Hosp. Ctr., Inc., No. 892-80487-20, 1997 WL 836684, at *5 (Bankr. E.D.N.Y. Sept. 12, 1997) ("[T]he burden is on the Chapter 11 debtor to cause formal notice to be given to creditors. A creditor who is not given notice, even if it has actual knowledge of

15

the reorganization, does not have a duty to investigate or inject itself into the proceedings.") (internal citations omitted).

47.    The Debtors did not meet their burden because Dr. Marsoner did not receive actual notice of the Claims Bar Date, even though they had his Austria Address in their books and records and Dr. Marsoner had communicated his Austria Address to Allyson Carine at Barclays Capital, the person tasked with overseeing termination notices for LBCC transactions.[6]

48.    Courts have held that notice sent to the "last known address of a creditor satisfies due process because it is 'reasonably calculated' to inform the creditor of the bar date for filing Proofs of Claim." Greyhound Lines, Inc. v. Rogers (In re Eagle Bus Mfg., Inc.), 62 F.3d 730, 736 (5th Cir. 1995) (citation omitted). Neither the Malta Addresses, the Italy Address, the Mexico Address nor the London Address was Dr. Marsoner's last known address. See Marsoner Dep. Tr. at 14:11-14; see also Marsoner Ex. 2. None of these addresses were even remotely adequate.

49.    The London address was the former address of LBEL until it moved in 2002 to 25 Bank Street in London, approximately seven years before the Claims Bar Date. The Debtors cannot credibly argue that this was adequate notice when they knew this was no longer the correct address for LBEL or Dr. Marsoner. It is not Dr. Marsoner's responsibility to inform them that one of its affiliates has changed its address.

50.    The other addresses were all temporary addresses that Dr. Marsoner could not have received mail at in 2009. See Marsoner Dep. Tr. at 139:16-141:18; 61:14-18. In addition, the Debtors could have easily sent Dr. Marsoner notice of the Claims Bar Date at the Austria Address on his 2007 Advisory Agreement just like they did with other advisors that had agreements with LBEL and other European Lehman Brothers entities that were also in the Debtors' books and records. See Marsoner Ex. 17.

---

[6] Dr. Marsoner was listed on the Schedules of Lehman Brothers Commercial Corporation (Case No. 08-13901) with the incorrect London Address as the holder of a derivative contract that is entirely unrelated to the claims asserted in this Motion, but not on the Schedules of LBHI or LCPI.

\\NY - 045382/000001 - 5229868 v6

## III.   Contractual or Quantum Meruit Claims

51.     Dr. Marsoner's claims against LCPI and LBHI are either contractual or quantum meruit claims for investment advice related to Lehman Brother's F1 Reinvestment. As discussed above, Dr. Marsoner's F1 Advice ultimately led to approximately $1.51 billion in net revenues for LCPI. As part of the parties' consistent and well-established course of dealing, as demonstrated by the payments to Dr. Marsoner for his advisory services on the BAWAG Acquisition, Dr. Marsoner is entitled to 10% of the F1 revenues.

### A.     Statute of Limitations

52.     LBHI and LCPI are Delaware corporations with their principal places of business in New York. See Voluntary Petition, Case No. 08-13555, [Docket No. 1]; see also Voluntary Petition, Case No. 08-13900, [Docket No. 1]. Dr. Marsoner is an individual domiciled at Andreas Hofer Strasse 43, 6020 Innsbruck, Austria. See Marsoner Dep. Tr. 14:11-14. New York has personal jurisdiction over LBHI and LCPI because they have their principal places of business in New York and both transacted business within New York. See N.Y. C.P.L.R. 302(a)(1).

53.     The Second Circuit has applied the New York statute of limitations to actions brought in bankruptcy court based on state law. See, e.g., In re Gaston & Snow, 243 F.3d 599, 608 (2d Cir. 2001). In New York, a quantum meruit claim must be brought within six years. N.Y. C.P.L.R. 213(2); Eisen v. Feder, 307 A.D.2d 817, 818 (1st Dep't 2003). However, the limitations period only begins to run from the time the cause of action accrued. N.Y. C.P.L.R. 203(a). Courts applying New York law have held that when a contract or quasi-contract claim is based on the defendant's enrichment or future payment, the claim does not accrue until the defendant has been enriched or the plaintiff demands payment. Sven Salen AB v. Jacq. Pierot, Jr., & Sons, Inc., 559 F. Supp. 503, 506-07 (S.D.N.Y. 1983) aff'd sub nom. Salen AB v. Pierot & Sons, Inc., 738 F.2d 419 (2d Cir. 1984) (holding that the services provided by the plaintiff did not enrich the defendant until the defendant received its commission, and therefore "the quantum meruit claim in this case could not

have been maintained and therefore did not accrue until [the defendant] received its commission."); Matter of Bombardier Transp. (Holdings) USA, Inc. v Telephonics Corp., 14 A.D.3d 358, 359 (1st Dep't 2005) (holding that the right to payment did not accrue until the work was invoiced). Here, Dr. Marsoner's quantum meruit claims did not accrue until LCPI first realized a profit from the F1 Reinvestment on or about October 2012—less than three years from the date Dr. Marsoner filed his Motion—because before that time the Debtors did not owe Dr. Marsoner a "success fee."

54.     Furthermore, if "a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew." Guilbert v. Gardner, 480 F.3d 140, 150 (2d Cir. 2007) (citing Bulova Watch Co. v. Celotex Corp., 46 N.Y.2d 606, 608 (1979)). The Advisory Agreements contemplated a continuing contract whereby Dr. Marsoner would continue to serve as a Senior Advisor under the most recent Advisory Agreement until the parties entered into a new agreement, and Lehman Brothers would continue to pay Dr. Marsoner 10% of the net revenues based on Dr. Marsoner's investment advice.

B.    Choice of Law

55.     As for the substantive law that will apply to Dr. Marsoner's claims, the Second Circuit has held "that bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state." Gaston & Snow, 243 F.3d at 601-02. In another Second Circuit case the court applied New York's choice-of-law analysis for contract claims to a quantum meruit claim. See Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 394 (2d Cir. 2001). Under New York's "center of gravity" or "grouping of contacts" choice-of-law analysis approach for contracts, courts must decide "which State has 'the most significant relationship to the transaction and the parties.'" Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 317 (1994) (citing Restatement [Second] of Conflict of Laws § 188[1]). In making this determination, "[t]he Second Restatement, in addition to the traditionally determinative choice of law factor of the place of contracting, offers four other factors to be considered in establishing this 'most significant

relationship': the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties." Id.

56.     The State with the most significant relationship to the transaction and parties is either New York or the U.K. Dr. Marsoner rendered the services to representatives of LBEL, an English corporation, and LBHI, under a technically expired Advisory Agreement that provides English law governs, but was paid by LBHI and the transaction benefited LCPI, which both had their principal places of business in New York. Dr. Marsoner has cognizable quantum meruit claims under either English or New York law.

57.     Under English law, to the extent that the terms on which Dr. Marsoner's advice may not have been spelled out orally or in writing, there is an implied obligation to pay a reasonable sum or quantum meruit for the completed work. See Sharab v. HRH Al-Saud [2013] EWHC 2324 (Ch); see also Benedetti v. Sawiris [2013] UKSC 50. In Benedetti, the Court held that the starting point for valuing the services was the objective market value of the services provided. This should be determined by considering what a reasonable person in the position of the defendant would have agreed to pay for them. Benedetti v. Sawiris [2013] UKSC 50 [15]-[17]. In our case, the objective market value of Dr. Marsoner's advisory services had been established by the Advisory Agreements to be 10% of net revenues from the transaction, and thus that is the amount he is entitled to receive for his advisory services on the F1 Reinvestment.

58.     "To recover in quantum meruit under New York law, a party must establish '(1) the performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" LeBoeuf, Lamb, Greene & MacRae, L.L.P. v Worsham, 185 F.3d 61, 66 (2d Cir. 1999) (quoting Martin H. Bauman Assocs., Inc. v H & M Int'l Transp., Inc., 171 A.D.2d 479, 484 (1st Dep't 1991)). Similarly, "[a]s a general rule, the performance and acceptance of services can give

\\NY - 045382/000001 - 5229868 v6

rise to the inference of an implied contract to pay for the reasonable value of such services." <u>Berlinger v. Lisi</u>, 288 A.D.2d 523, 524-25 (3d Dep't 2001) (citation omitted).

59.     Dr. Marsoner satisfies these elements because (1) he performed the consulting services in good faith; (2) Lehman Brothers accepted and acted upon the advice by reinvesting in F1; (3) Dr. Marsoner expected compensation and it was the understanding of LBHI executives that Lehman Brothers would pay Dr. Marsoner for his F1 Advice; and (4) it was established from the parties' course of dealing that he was entitled to 10% of the net revenues from the F1 Reinvestment. Moreover, Dr. Marsoner did, of course, not provide his advisory services gratuitously. His advisory relationship with Lehman Brothers was his main professional activity and source of income at the time.

WHEREFORE, for the reasons set forth herein, Dr. Marsoner respectfully requests that the Court enter an order (i) permitting Dr. Marsoner to file Proofs of Claim against LBHI and LCPI within five (5) business days of the entry of the order, and (ii) granting such other and further relief as this Court deems just and equitable.

Dated: July 20, 2016
New York, New York

**HOGAN LOVELLS US LLP**

By:  /s/ Pieter Van Tol
Pieter Van Tol, Esq.
M. Shane Johnson, Esq.
875 Third Avenue
New York, NY 10022
Telephone:  (212) 918-3000
Facsimile:  (212) 918-3100
Email: pieter.vantol@hoganlovells.com
Email: shane.johnson@hoganlovells.com

*Attorneys for Dr. Thomas Marsoner*

\\NY - 045382/000001 - 5229868 v6