# Exhibit 1

Dr. Thomas Marsoner - December 15, 2015

1

2                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
3        _____

4        In re                        )

5        LEHMAN BROTHERS HOLDING INC., )   Chapter 11

6        et al.,                       )

7                      Debtors.        )   Case No.

8        _____)   08-13555 (SCC)

9

10

11

12            VIDEOTAPED DEPOSITION OF DR. THOMAS

13              TUESDAY, DECEMBER 15, 2015

14                    9:45 a.m.

15

16

17

18

19            Video deposition of DR. THOMAS

20       MARSONER, taken by Lehman Brothers Holdings Inc.

21       and Lehman Brothers Commercial Paper Inc., at

22       the offices of Hogan Lovells, 875 Third Avenue,

23       New York, New York, before Brandon Rainoff, a

24       Federal Certified Realtime Reporter and Notary

25       Public of the State of New York.

Dr. Thomas Marsoner - December 15, 2015

```
 1
 2                    A P P E A R A N C E S
 3
 4
 5     WEIL, GOTSHAL & MANGES LLP
 6     Attorneys for Lehman Brothers Holdings Inc. and
 7     Lehman Brothers Commercial Paper Inc.
 8            767 Fifth Avenue
 9            New York, New York  10153-0119
10            212.310.8000
11     BY:   DENISE ALVAREZ, ESQ.
12            212.310.8965
13            denise.alvarez@weil.com
14            JACQUELINE MARCUS, ESQ.
15            212.310.8130
16            jacqueline.marcus@weil.com
17            MAURICE HORWITZ, ESQ.
18            212.310.8883
19            maurice.horwitz@weil.com
20
21
22
23
24
25
```

Dr. Thomas Marsoner - December 15, 2015

```
 1
 2              A P P E A R A N C E S  (continued)
 3
 4
 5     HOGAN LOVELLS
 6     Attorneys for Dr. Thomas Marsoner
 7            875 Third Avenue
 8            New York, New York 10022
 9            212.918.3000
10     BY:    PIETER VAN TOL, ESQ.
11            212.909.0661
12            pieter.vantol@hoganlovells.com
13            M. SHANE JOHNSON, ESQ.
14            212.918.3775
15            shane.johnson@hoganlovells.com
16
17
18     ALSO PRESENT:
19     THOMAS E. HOMMEL, ESQ., Lehman Brothers
20     EDDIE ARCHILLA, Videographer
21
22
23
24
25
```

Dr. Thomas Marsoner - December 15, 2015

1

2        I N D E X   O F   E X A M I N A T I O N

3

4

5    Witness:

6    Dr. Thomas Marsoner

7

8

9    Examination:

10   By Ms. Alvarez........................Page 12

11   By Mr. Van Tol........................Page 192

12   By Ms. Alvarez........................Page 202

13

14

15      Index of Exhibits.....................Page 5

16

17

18   Discovery Requests

19   By Ms. Alvarez........................Page 66

20   By Ms. Alvarez........................Page 115

21   By Ms. Alvarez........................Page 164

22   By Ms. Alvarez........................Page 165

23

24

25

Dr. Thomas Marsoner - December 15, 2015

Page 5

1

2                          E X H I B I T S

3

4        Exhibit 1 ...................................35

5        Single-page e-mail from Thomas Bernard to Vittorio

6        Pignatti and others, dated Thursday, October 3, 2002,

7        Bates stamped LEH_0000415

8

9        Exhibit 2 ...................................41

10       Single-page e-mail from Denise Calus to Thomas

11       Bernard, dated Monday, October 7, 2002, Bates stamped

12       LEH_0000225

13

14       Exhibit 3 ...................................43

15       Single-page e-mail from Thomas Bernard to Vittorio

16       Pignatti and others, dated Tuesday, October 8, 2002,

17       Bates stamped LEH_0000412

18

19       Exhibit 4 ...................................60

20       Multipage document bearing the heading Lehman

21       Brothers, dated 13th February 2004, addressed to

22       Thomas Marsoner, and bearing no Bates stamps

23

24

25

Dr. Thomas Marsoner - December 15, 2015

```
1

2      Exhibit 5 ..................................85

3      Five-page document entitled Declaration of Dr. Thomas

4      Marsoner in Support of the Motion of Dr. Thomas

5      Marsoner to Deem Proofs of Claim to be Timely Filed

6      by the Claims Bar Date, with cover page labeled

7      Exhibit B, and bearing no Bates stamps

8

9      Exhibit 6 ..................................88

10     Multipage e-mail chain bearing at the top of the

11     first page an e-mail from Thomas Marsoner to Thomas

12     Bernard, dated Thursday, December 1, 2005, and Bates

13     stamped LEH_0000214 through 217

14

15     Exhibit 7 ..................................104

16     Two-page e-mail chain bearing at the top of the first

17     page an e-mail from Thomas Marsoner to Thomas

18     Bernard, dated December 1, 2005, and Bates stamped

19     LEH_0000201 and 202

20

21     Exhibit 8 ..................................107

22     Single-page e-mail from Vittorio to David Stonberg

23     and others, dated Thursday, May 24, 2007, and Bates

24     stamped LEH_0000203

25
```

Dr. Thomas Marsoner - December 15, 2015

1

2      Exhibit 9 ..................................110

3      Two-page e-mail chain bearing on the top of the first

4      page an e-mail from Thomas Marsoner to Jeremy Isaacs,

5      dated Wednesday, July 4, 2007, and Bates stamped

6      Marsoner00000159 and 160

7

8      Exhibit 10 .................................117

9      Two-page e-mail chain bearing on the top of the first

10     page an e-mail from Thomas Marsoner to Dan

11     Schwarzmann, dated Monday, December 3, 2012, and

12     Bates stamped Marsoner00000157 and 158

13

14     Exhibit 11 .................................125

15     Multipage document entitled Consent Order, bearing

16     the hand-written date at the top of the page 19th

17     June, 2014, and Bates stamped Marsoner00000217

18     through 227

19

20     Exhibit 12 .................................129

21     Multipage document entitled Lehman Brothers Europe

22     Limited - In Administration, Joint Administrators'

23     progress report for the period 23 September 2009 to

24     22 March 2010, dated 20 April 2010, and bearing no

25     Bates stamps

Dr. Thomas Marsoner - December 15, 2015

1

2      Exhibit 13 ................................145

3      Multipage document bearing on the first page an

4      e-mail from Tom Bernard to Thomas Marsoner, dated

5      December 12, 2014, and Bates stamped Marsoner00000032

6      through 41

7

8      Exhibit 14 ................................152

9      Single-page e-mail from Tom Bernard to Thomas

10     Marsoner, dated February 3, 2015, with single-page

11     attachment, Bates stamped Marsoner00000042 and 43

12

13     Exhibit 15 ................................158

14     Two-page e-mail chain bearing at the top of the first

15     page an e-mail from Christian Meissner to Thomas

16     Marsoner, dated January 28, 2015, with single-page

17     attachment, Bates stamped Marsoner000000624 through

18     626

19

20     Exhibit 16 ................................166

21     Two-page letter from Vittorio Pignatti Morano to

22     Judge Chapman, United States Bankruptcy Court,

23     Southern District of New York, dated January 7, 2015,

24     and bearing no Bates stamps

25

Dr. Thomas Marsoner — December 15, 2015

1

2       Exhibit 17 .................................167

3       Multipage e-mail chain bearing at the top of the

4       first page an e-mail from Vittorio Pignatti to Thomas

5       Marsoner, dated December 4, 2002, with multipage

6       attachment, Bates stamped Marsoner 00000008 through

7       31

8

9       Exhibit 18 .................................174

10      Two-page letter from Vittorio Pignatti Morano to

11      Judge Chapman, United States Bankruptcy Court,

12      Southern District of New York, dated January 6, 2015,

13      Bates stamped Marsoner00000622 and 623

14

15      Exhibit 19 .................................184

16      Single-page letter from Ruggero Magnoni to Judge

17      Chapman, United States Bankruptcy Court, Southern

18      District of New York, dated January 14, 2015, and

19      bearing no Bates stamp

20

21      Exhibit 20 .................................186

22      Single-page e-mail from Thomas Marsoner to Ruggero

23      Magnoni, dated January 14, 2015, with single-page

24      attachment, Bates stamped Marsoner00000071 and 721

25

Dr. Thomas Marsoner - December 15, 2015

1

2      Exhibit 21 ...............................188

3      11-page document entitled Plan Administrators' First

4      Set of Document Requests to Dr. Thomas Marsoner

5      Pursuant to Rules 7026 and 7034 of the Federal Rules

6      of Bankruptcy Procedure, bearing no Bates stamps

7

8      Exhibit 22 ...............................195

9      Multipage document entitled Notice of Hearing on

10     Motion of Dr. Thomas Marsoner to Deem Proofs of Claim

11     to be Timely Filed by the Claims Bar Date, with

12     multiple attachments, and bearing no Bates stamps

13

14

15

16

17

18

19

20

21

22

23

24

25

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2                 *    *    *
3              P R O C E E D I N G
4          Tuesday, December 15, 2015
5              New York, New York
6                  9:45 a.m.
7                 *    *    *
8          THE VIDEOGRAPHER:  This is media unit
9    number one in the deposition of Thomas Marsoner
10   in the matter of In Re Lehman Brothers Holdings
11   Inc.
12             This deposition is being held at Hogan
13   Lovells, located at 875 Third Avenue, New York,
14   New York, on December 15, 2015, at approximately
15   9:45 a.m.
16             My name is Eddie Archilla.  I am the
17   video specialist.  The court reporter is Brad
18   Rainoff, in association with Gregory Edwards,
19   located at 1120 Connecticut Avenue, Washington,
20   D.C.
21             For the record, counsel please
22   introduce themselves.
23             MS. ALVAREZ:  My name is Denise
24   Alvarez with Weil, Gotshal & Manges representing
25   Lehman Brothers Holdings Inc. and Lehman
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2     Commercial Paper Inc.

 3            MR. HORWITZ:  Maurice Horwitz, Weil

 4     Gotshal & Manges, representing Lehman Brothers

 5     Holdings Inc. and Lehman Commercial Paper Inc.

 6            MS. MARCUS:  Jacqueline Marcus, Weil,

 7     Gotshal & Manges, representing Lehman Brothers

 8     Holdings Inc. and Lehman Commercial Paper Inc.

 9            MR. HOMMEL:  Thomas Hommel,

10     representative of Lehman Brothers Holdings Inc.

11            MR. VAN TOL:  Pieter Van Tol from

12     Hogan Lovells representing Dr. Thomas Marsoner.

13            MR. JOHNSON:  Shane Johnson from Hogan

14     Lovells representing Dr. Thomas Marsoner.

15            THE VIDEOGRAPHER:  Now would the court

16     reporter please swear in the witness.

17     DR. THOMAS MARSONER,

18              having been duly sworn, was examined and

19              testified as follows:

20     EXAMINATION

21     BY MS. ALVAREZ:

22        Q.    Good morning, Mr. Marsoner.

23              I have a few instructions for you, but

24     before that, have you been deposed before?

25        A.    Have I been deposed before?  Yes, on
```

Dr. Thomas Marsoner - December 15, 2015

1                           MARSONER

2     one occasion in the US, yes.

3          Q.     Just once?

4          A.     Just once in the US, yes.

5          Q.     So I'm just going to remind you of

6     some -- a few basic instructions.

7                 I'm going to ask questions and then

8     I'd like you to answer them.  If you don't

9     understand a question, just let me know that you

10    didn't understand it and I will repeat it, I'll

11    clarify.  If you answer a question, I'm going to

12    assume that you understood it.

13                Also, when answering questions, let's

14    answer verbally:  "Yes," "no."  You know,

15    don't -- sometimes we go:  "Hm-hmm," "uh-huh,"

16    you know.  The court reporter can't take that

17    down.

18                If at any point you want a break and

19    you need to use the restroom or you need to just

20    take a break, just let us know and we'll find a

21    good time to stop and break.

22                Did you understand those instructions?

23         A.     I did.  Thank you.

24         Q.     Okay.  Great.

25                Would you -- let's start with your

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER

2    address.  Please state your address for the

3    record?

4         A.    My resident address is number 20 Earls

5    Terrace, London W8 6LP.

6         Q.    How long have you lived there?

7         A.    Since April 2002.

8         Q.    April 2002.

9               Have you had any other addresses since

10   April 2002 or have you been in the same place?

11        A.    Yes, I've always had an Austrian

12   address, known under UK tax law as my domicile,

13   and that address is Andreas-Hofer-Strasse No.

14   43, 6020 Innsbruck, Austria.

15        Q.    Any other addresses?

16        A.    No addresses where one could serve

17   anything on me.

18        Q.    Okay.  Any vacation addresses?

19        A.    I have generally spent my vacations in

20   hotels, on boats, occasionally with friends or

21   relatives.  But certainly no useful

22   correspondence addresses other than these two.

23        Q.    Are there any other addresses that you

24   characterize any other way, any other -- any

25   other place where you have spent your time
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2       whether it's vacation or business where it's not

3       a hotel?

4                 MR. VAN TOL:  Object to the form.  You

5       may answer.

6            A.    Sorry, I didn't really understand that

7       question.

8            Q.    Are there any other addresses where

9       you have spent some time that is not a hotel or

10      a vacation address?

11                MR. VAN TOL:  Same objection.  You may

12      answer.

13           A.    Okay, I think I've answered that

14      before.  Certainly there have been boats.  There

15      have been friends' houses.  I have been in

16      family's houses.  Occasionally I might have

17      rented a house for a week or a couple of weeks.

18                So, yes, I have certainly spent time

19      in places other than those two good permanent

20      addresses of mine, but they are not addresses

21      where I would have ever taken delivery of

22      anything.

23           Q.    Where are you currently employed?

24           A.    At M&M Capital Ltd. with a registered

25      address of 13 David Mews, London W1.

Dr. Thomas Marsoner - December 15, 2015

```
 1                        MARSONER

 2          Q.     What's your position at the company?

 3          A.     I'm the chief executive of this small

 4   M&A boutique.

 5          Q.     What are your responsibilities as

 6   chief executive?

 7          A.     The company has one employed secretary

 8   and has one chairman who lives in Italy.  So

 9   pretty much anything and everything that goes on

10   at the company is my responsibility.

11          Q.     What's the name of the chairman?

12          A.     The chairman is Ruggero Magnoni.

13          Q.     What is his -- what are his

14   responsibilities at the company?

15          A.     He chairs board meetings when we have

16   them roughly once a year.  The way the setup

17   works is that we share expenditures, but we have

18   completely separate accounts for our revenues.

19   So transactions that I work on, my part of the

20   company is allocated the revenues, transactions

21   Ruggero is working on his part of the company is

22   allocated the revenues.

23          Q.     How long have you been at M&M Capital?

24          A.     Since I left Nomura, so that would

25   have been 2013.
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                        MARSONER

 2          Q.     What was your position at Nomura?

 3          A.     At Nomura I was vice chairman in

 4   investment banking and the managing director.

 5          Q.     When did you start at Nomura?

 6          A.     I started at Nomura in June of 2009.

 7          Q.     Where did you work prior to June of

 8   2009?

 9          A.     I was, from April 2001 until September

10   15, 2008, a senior advisor to Lehman Brothers,

11   self-employed senior advisor.

12          Q.     Okay.

13          A.     But I did not advise anybody other

14   than Lehman Brothers during those years.

15          Q.     How did you end up at Nomura?

16          A.     After Lehman went bankrupt, the

17   European and the Asian operations of Lehman were

18   bought by Nomura and a couple of my old friends

19   at Lehman asked me whether I would be prepared

20   to come on board again full-time to help them

21   build things up in the new Nomura world.

22          Q.     Who were those old friends at Lehman?

23          A.     Primarily Christian Meissner and

24   Michael Bonacker.

25          Q.     I'm sorry, what was the second name?
```

Dr. Thomas Marsoner – December 15, 2015

```
1                        MARSONER
2        A.    Bonacker, B-O-N-A-C-K-E-R, who
3   approached me, who had the original idea that it
4   would make sense for me to join them on a
5   full-time basis again.
6        Q.    So Meissner, Christian Meissner was
7   working at Nomura --
8        A.    Yes.
9        Q.    -- as well?
10            And Michael Bonacker was as well?
11       A.    Yes.
12       Q.    You testified that you were senior
13  advisor at Lehman Brothers from April 2001 to
14  September 15, 2008.
15            What were your responsibilities as
16  senior advisor?
17       A.    They were relatively varied and
18  relatively wide.   There was certainly a focus
19  geographically in areas where I was known to
20  have an expertise and speak the language,
21  specifically, of course, Austria, Germany,
22  Switzerland.
23            My last full-time job at Lehman had
24  been head of industry coverage, so all the
25  industry groups reported to me.   Financial
```

Dr. Thomas Marsoner - December 15, 2015

1                           MARSONER

2      institutions is my own specialty.  I used to run

3      the financial institutions group, but a whole

4      number of other groups like consumer retail,

5      energy, telecom also reported to me.

6                   And so I did have expertise in a whole

7      number of additional industries.

8           Q.    Who did you report to?

9           A.    Originally my contractual counter

10     party was Vittorio Pignatti through and

11     including the 2004 agreement, and that changed

12     when Pignatti changed jobs to Christian Meissner

13     from '06 to the end of Lehman.

14          Q.    Do you know what Christian Meissner's

15     position was at Lehman?

16          A.    At the time when he and I interacted

17     in that -- the contractual relationship, he was,

18     I think, co-head of European investment banking,

19     later became head.

20          Q.    Other than Mr. Pignatti and Mr.

21     Meissner, did you work primarily for any other

22     individuals at Lehman?

23          A.    If I may, I'd like to characterize

24     that I worked with other people.

25          Q.    Okay.

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2        A.     It was a very collegial place, and
 3   when there was an opportunity that I had either
 4   identified and thought useful to pursue, or
 5   sometimes when Lehman had an opportunity where
 6   Lehman thought that my expertise would be
 7   useful, we would form teams ad hoc and would
 8   work together on those.  There were a whole
 9   number of generally senior Lehman investment
10   bankers that I worked with over the years.
11        Q.     Can you identify a couple of them?
12        A.     Well, certainly Vittorio Pignatti,
13   himself.  In the years when he was my
14   contractual counterpart, by definition I did
15   nothing that wasn't coordinated with him.  That
16   then later changed, and later that was Christian
17   Meissner.
18           But in the years we're talking about,
19   it was certainly Vittorio Pignatti who was my
20   direct interlocutor on essentially everything,
21   certainly worked closely with Ruggero Magnoni as
22   well.  Always had a very high regard for him.
23           There were other professionals like
24   Jonathan Rouner that in those years I worked
25   quite a bit with.  Certainly Michael Bonacker
```

Dr. Thomas Marsoner — December 15, 2015

```
1                        MARSONER

2     who had the German brief.  So he certainly

3     entered the picture relatively frequently.   And

4     others.   I could go for a long time.

5          Q.     Where was -- what was Jonathan

6     Rouner's position at Lehman?

7          A.     At the time he had an automotive M&A

8     brief, not for race cars but for general

9     automotive manufacturing.   There was a specific

10    Canadian company that was a client of his where

11    I knew one of the senior board members who was

12    Austrian, actually several of them very well.

13    It was called Magna International, and Rouner

14    and I worked relatively closely on a number of

15    ideas for Magna International.

16         Q.     Where was Rouner based?

17         A.     He was US based.

18         Q.     Did you work with -- we are going to

19    get into the details, but did you work with

20    Rouner on Formula One?

21         A.     Not with Rouner, no.

22         Q.     What position did Bonacker hold with

23    the company?

24         A.     He was head of German investment

25    banking.
```

Dr. Thomas Marsoner - December 15, 2015

Page 22

```
1                        MARSONER

2         Q.    So he was based in Europe?

3         A.    He was based in Frankfurt.

4         Q.    I want to backtrack a little and

5    understand what have you done to prepare for the

6    deposition today.

7         A.    I spent my entire life since age ten

8    on the subject matter is the honest answer.

9               Have I spoken to these two gentlemen

10   yesterday?  Of course I have.

11        Q.    Okay.  Have you spoken to anybody else

12   about this deposition other than your lawyers?

13        A.    No.

14        Q.    I just want to confirm, have you

15   spoken to Pignatti?

16        A.    After Pignatti's deposition I thanked

17   him for having taken the time.

18        Q.    Did you ask Pignatti about the

19   deposition, what happened at his deposition?

20        A.    No.  No, I have read it.

21        Q.    What about Magnoni, when is the last

22   time --

23        A.    Exactly the same thing.  After his

24   deposition I thanked him for it.  I read it.  No

25   further details were discussed with either.
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2          Q.    Have you discussed this matter with

 3    Tom Bernard?

 4          A.    Not in a very long time, not until

 5    just before he sent the letter that he kindly

 6    sent.

 7          Q.    Have you spoken since he sent the

 8    letter?

 9          A.    No, I have not spoken to Tom Bernard

10    since he sent the letter.

11          Q.    What about Christian Meissner, have

12    you discussed this matter with him?

13          A.    I have discussed this matter with him

14    once when I got the e-mail that you recently

15    quoted from Peter Sherratt in which Peter

16    claimed that Christian Meissner agreed that I

17    had no claim.  I was on the phone to Christian

18    the next day and asked him why he would say

19    that, to which he said:  I didn't, I told him it

20    was before my time.

21          Q.    Did Christian Meissner say anything

22    else than:  That was before my time?

23          A.    He told me in that conversation that

24    he had told him you are taking an in-house

25    lawyer along, there was a Linklaters person, it
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2     was a conference recall, and he -- Christian
 3     told me that he told them he had nothing to add
 4     on the Marsoner F1 matter because it was before
 5     his time.
 6              I then, for completeness sake, in
 7     preparation of the US proceedings, I did contact
 8     him again and asked Christian whether he would
 9     be prepared to write a letter along the lines of
10     Marsoner F1 was before my time, and he responded
11     to that that the little draft I had prepared for
12     him -- Marsoner was before my time -- was
13     perfectly okay.
14              He replied in German to that, so he
15     had no problems with that text, but would I
16     please understand he now is head of global
17     corporate and investment banking at Bank of
18     America, Merrill Lynch.  Huge job.  Last
19     distraction he needs is to be deposed, God
20     forbid, publicly portrayed as involved in
21     litigation concerning Lehman.  And I obviously
22     respected his wish not to be bothered.
23        Q.    Okay.  Have you spoken to him about
24     this matter since then?
25        A.    No.
```

Dr. Thomas Marsoner - December 15, 2015

1                      MARSONER

2          Q.    Have you spoken to Peter Sherratt

3     about this matter?

4          A.    I attended, as you will recall, his

5     deposition.  My communication with him

6     beforehand you have, and on the way out

7     exchanged one or two civilized words.

8          Q.    What about any phone calls with Peter

9     Sherratt?

10         A.    No.

11         Q.    Have you discussed this matter with

12    Jeremy Isaacs?

13         A.    I once went to see Jeremy around this.

14    This was, I believe, still around the UK

15    proceedings when I had come across my e-mail to

16    Jeremy Isaacs thanking him for the coffee and

17    telling him that the most significant thing I

18    had done for him was F1.

19              So I thought that I'd go see him with

20    my little evidence book, told him my story.  He

21    hummed, you hawed, he told me he would take a

22    look at the book and I have never heard from him

23    since.  And I respected his request for privacy

24    as well.

25         Q.    Had you filed a claim in the UK

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2     proceedings by that point?

3          A.     Honestly I do not recall whether it

4     was before or after.  I would assume that I had

5     gone to see him before I filed the UK claim but

6     that I'm not sure about.

7          Q.     Okay.  Did Jeremy Isaacs know that you

8     expected to be paid by Lehman Brothers Europe at

9     that time?

10         A.     You have the e-mail.  With that e-mail

11    it was my full intention to prepare the ground

12    for a later claim.  I prepared that ground not

13    only with him but also with Bonacker and also

14    with Dick Fuld in August of '08, but that's all

15    I did.

16               It was well understood, it's

17    understanding, by many at Lehman at that time

18    that I was going to make a claim around that.

19         Q.     It was well understood by Jeremy

20    Isaacs?

21         A.     It was well understood by a whole

22    number of people at Lehman that I would make a

23    claim.  That is why I attached to my thank you

24    e-mail to Jeremy Isaacs what I think is the

25    salient exchange with Tom Bernard.

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER

2        Q.    Did Jeremy Isaacs know that you were

3   going to assert a claim against Lehman Brothers

4   Holdings Inc. or Lehman Commercial Paper Inc.?

5        A.    The way Lehman worked, the way the

6   living Lehman worked, individual legal entities

7   were not considered material.  He certainly

8   understood that I was going to make a claim

9   against Lehman.

10       Q.    At that point you had informed him

11  that you were asserting a claim in the UK

12  proceedings, correct?

13            MR. VAN TOL:  Object to the form, lack

14  of foundation.

15       A.    I told you, I'm sorry, I do not have

16  that time line clear in my head.  I do not know

17  whether, when I went to see Jeremy with my

18  little evidence book, whether I had already

19  filed the UK proceedings or I had not.  I

20  suspect I had not because, as I think about it,

21  it was just an evidence book.

22            I'm not -- I'm not sure about the

23  timeline.

24       Q.    Okay.

25       A.    But we can actually look it up because
```

Dr. Thomas Marsoner - December 15, 2015

```
1                          MARSONER

2       I think I have one copy of my UK evidence book,

3       and if it includes the claim then it was after.

4       I think it does not but I'm not certain.

5            Q.    We'll go through -- this is just

6       introduction, but we'll go through e-mails and

7       documents that could refresh your recollection.

8            A.    Sure.

9            Q.    Had you discussed this matter with

10      Steve Hannan?

11           A.    I do not know him.

12           Q.    Is there anyone else that I haven't

13      covered with whom you've discussed this matter

14      other than your attorneys?

15           A.    I think you've -- I certainly can't

16      remember anybody right now.

17           Q.    Did you review any documents to

18      prepare for this deposition?

19           A.    I certainly reread the US claim and

20      its attachments as well as the letters that were

21      written in support of my claim.

22           Q.    Did you review any other documents to

23      prepare for this deposition?

24                 MR. VAN TOL:  Objection.  That's a yes

25      or no answer.
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                         MARSONER

 2         A.     Yes, I did flip through the old UK

 3   evidence book, the one that I showed Mr. Isaacs.

 4         Q.     What other documents did you review to

 5   prepare for this deposition?

 6               MR. VAN TOL:  Object to the form.

 7               You haven't established foundation for

 8   asking which particular documents he looked at.

 9         Q.     You can answer.

10         A.     I do not remember --

11               MR. VAN TOL:  Don't --

12               THE WITNESS:  Oh, sorry.

13               MR. VAN TOL:  That's privileged until

14   they establish foundation.

15   BY MS. ALVAREZ:

16         Q.     Did you review any other documents to

17   prepare for this deposition?

18               MR. VAN TOL:  Yes or no, please.

19   Answer only yes or no, please.

20         A.     Did I review documents to prepare for

21   this deposition?  The answer is yes.

22         Q.     What other documents did you review?

23               MR. VAN TOL:  Object to the form.

24               To the extent you are asking for the

25   particular documents, you haven't established a
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2     foundation yet.  That's privileged information.
 3              MS. ALVAREZ:  To the extent he
 4     reviewed documents in preparation for this
 5     deposition, we are entitled to know what he
 6     reviewed.
 7              MR. VAN TOL:  That's correct, if you
 8     can establish that it refreshed his
 9     recollection.  That's the test.  You haven't
10     established that.
11     BY MS. ALVAREZ:
12          Q.    Do you remember reviewing documents in
13     preparation for this deposition?
14          A.    I just told you what documents I had
15     reviewed.  I remember reviewing those.
16          Q.    Okay.  Are there any other documents
17     you remember reviewing?
18          A.    I do not remember any other documents.
19          Q.    Let's talk a little bit about Formula
20     One.
21              Please tell us how you came to work
22     on -- start from the beginning -- how you came
23     to work on Lehman's Formula One investment?
24          A.    The origin of the Lehman Formula One
25     contact was when Ruggero Magnoni, Johann Ruppert
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER

2     and I went, at my suggestion, to the Monte Carlo

3     Grand Prix in 1998.  I was still a full time

4     employee of Lehman at the time.  This was the

5     time when the various Bernie Ecclestone

6     stratagems first became public.

7              So I suggested to a number of the

8     senior people at Lehman that this was likely

9     going to grow into a business opportunity for

10    Lehman.  Ruggero is a close friend of Johann

11    Ruppert.  Johann Ruppert owned a company called

12    Rothman at the time.  Rothman sponsored the

13    Williams team, and Johann Ruppert and Ruggero

14    Magnoni had long planned to attend a Grand Prix

15    together, so we went there together which is

16    when Ruggero first met Bernie Ecclestone.  I had

17    met Bernie before.  And that is the moment when

18    it all started.

19        Q.    How did that moment lead to Lehman's

20    investment in Formula One?

21        A.    There were a whole number of different

22    transactions contemplated in various ways.

23    Ultimately Lehman financed Leo Kirch, the TV

24    rights entrepreneur and sports rights

25    entrepreneur, in his acquisition of 75 percent
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2       of the -- call it the Bernie Ecclestone company.

 3                Lehman underwrote $300 million of the

 4       $1.6 billion loan.   JPMorgan underwrote the

 5       other 300, and Bayerische Landesbank, the house

 6       bank of Mr. Kirch, underwrote a billion.

 7                Relatively soon after that loan was

 8       given, Mr. Kirch's business went bankrupt and

 9       Lehman managed to enforce the collateral and

10       took delivery at the time of the 17 percent

11       stake in Formula One.   This is about 2002.

12           Q.    What was your role in that financing

13       to Kirch?

14           A.    Luckily for me, none, for the simple

15       reason that I had been asked what I thought of

16       Mr. Kirch and I truthfully responded that all my

17       German banking clients and friends had a very

18       low opinion of Mr. Kirch.

19                So I had no involvement whatsoever in

20       the loan itself, which is probably one of the

21       reasons why, when the loan had gone belly up, I

22       got the call, in that case it was Pignatti, who

23       used the words:  Thomas, we're thinking about

24       intensifying our relationship with you again.

25                I had done as an advisor already, I
```

Dr. Thomas Marsoner – December 15, 2015

1                           MARSONER

2      had done one or two things that they liked.  And

3      so Pignatti called me in and told me that they

4      had the idea that they needed somebody who knew

5      the space, who didn't scare easily, to help them

6      and JPMorgan in their dealings with Bernie

7      Ecclestone who they found incredibly difficult

8      to work with.

9          Q.    Did Pignatti explain to you how long

10     they would need your assistance?

11         A.    That was planned to be several years.

12     Essentially the plan was to help them get as

13     much money out of the stake they had gotten into

14     involuntarily as I could, and that was going to,

15     obviously visible at the time, be a multiyear

16     project.

17         Q.    At this time were payment terms

18     discussed for your assistance?

19         A.    That did not quite happen at that time

20     because the first thing that needed to be

21     discussed was whether JPMorgan would share the

22     view of the Lehman people that I would be useful

23     in this context.

24              So this was an in principle

25     discussion.  Obviously it was not going to be a

Dr. Thomas Marsoner - December 15, 2015

1                     MARSONER

2      pro bono assignment but a serious assignment,

3      also a time commitment, so exposure.

4            Then I went to see a few gentlemen at

5      JPMorgan, Rick Gildea particularly comes to

6      mind, with whom I had from my point of view

7      perfectly decent discussions.

8            As you see from the e-mails I wrote at

9      the time, my own sort of concern was that more

10     than one of them asked me whether I was not too

11     close to Lehman to be able to represent both US

12     houses in this case which was -- which in truth

13     was not a completely stupid concern to have.

14     But other than that, they were very -- very,

15     very friendly discussions.

16           Next I heard was that Pignatti again

17     called me into his office and told me that

18     JPMorgan had decided not to avail themselves of

19     my services but to put their own "Rolls Royce

20     team" on to this assignment and would I please

21     help Lehman.

22           MS. ALVAREZ:  Okay.  I want to look at

23     a few documents from that time period.  We can

24     take a look at the first exhibit.  It's Lehman

25     415 is the Bates stamp.

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2              (Marsoner Exhibit 1, Single-page
3      e-mail from Thomas Bernard to Vittorio Pignatti
4      and others, dated Thursday, October 3, 2002,
5      Bates stamped LEH_0000415, marked for
6      identification)
7  BY MS. ALVAREZ:
8         Q.    Dr. Marsoner, I would like you to look
9      at what's been marked Exhibit 1.  It is an
10     e-mail from Thomas Bernard to Vittorio Pignatti,
11     Peter Sherratt, Steve Hannan, and it's dated
12     October 3rd, 2002.
13              Do you see that?
14        A.    Hm-hmm.
15        Q.    We talked a little bit about these
16     individuals, but let's clarify a little.
17              Who is Tom Bernard?
18        A.    Tom Bernard I have known for a long
19     time.  He was a teacher in my Salomon training
20     class in 1985 when Michael Lewis called him the
21     human piranha.  So he is still famous for that.
22     Actually loves that.
23        Q.    What was his role in F1?
24        A.    He was originally or at the time the
25     head of our global credit businesses, and when
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2     the Kirch loan became a workout situation, Dick

 3     Fuld, I think through Jeff Vanderbeek, asked Tom

 4     Bernard to run the workout.

 5          Q.     Where was he based?

 6          A.     New York.  New York, if not Aspen,

 7     Colorado.  Certainly US-based.

 8          Q.     What was -- we talked a little about

 9     Pignatti.  What was his title, do you know?

10          A.     He was at the time head of European

11     M&A.

12          Q.     What was his -- we've already talked

13     about his role in F1, we'll get into more detail

14     in a minute.

15                And Peter Sherratt, who was he?

16          A.     He was counsel, he was in-house

17     counsel to Lehman in Europe.

18          Q.     What was his role in F1?

19          A.     He was the lawyer.  There were -- the

20     original corporate governance was that Bernie

21     Ecclestone ran F1 with his 25 percent against 75

22     percent minorities of the three banks.

23                So the very first thing they had to do

24     him was sue him in Jersey which Peter was

25     involved in and Vittorio -- to get something
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2     approaching normal governance into the F1

3     situation.  Peter was critical around all that.

4         Q.    I know you said you didn't know Steve

5     Hannan, but do you know what his role was in F1?

6         A.    I have since learned, but this is

7     relatively recent, that he was the first guy

8     that Lehman hired to become a professional

9     workout person of bad loans.

10             Lehman wasn't much in the lending

11    business then, so it didn't have many bad loans.

12    And when they started accumulating bad loans,

13    apparently they hired Steve Hannan to help them

14    work those loans out.

15        Q.    Do you know where Steve Hannon was

16    based?

17        A.    New York, I believe, but as I said I

18    do not believe I've ever met him.

19        Q.    Let's look at the text of this e-mail.

20             Here Tom Bernard is actually

21    forwarding an e-mail originally sent by Vittorio

22    Pignatti on October 3rd, 2002, and Pignatti

23    stated in the e-mail:  Spoke with Thomas

24    Marsoner who is in principle interested and

25    ready to hear more.  He is available in person

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER

2    on Monday afternoon in London.  Let me know how

3    you want to proceed.

4              Now, I recognize you are not copied on

5    this e-mail chain, but do you know what

6    conversation Pignatti was referring to?

7    A.     Yeah, that was the one when he called

8    me in and said:  We would like to intensify the

9    relationship, would you be able to help us on

10   F1?

11   Q.     Was this an in-person conversation?

12   A.     This was an in-person conversation,

13   yes.

14   Q.     Was anyone -- anyone else there?

15   A.     No.

16   Q.     At this point I believe you testified

17   compensation terms weren't discussed?

18   A.     No.

19   Q.     Then this e-mail also refers to a

20   meeting possibly Monday afternoon in London.

21             Did that meeting take place?

22   A.     I only recall telephoning

23   conversations with Tom Bernard at the time.

24   Q.     Was anyone else on the phone other

25   than Tom Bernard?
```

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2        A.     The conversations that I remember

3   having with Tom were always just Tom and I.

4        Q.     What was discussed with Tom?

5        A.      It was essentially him satisfying

6   himself that what he had heard from Pignatti,

7   which is Marsoner knows the space, was true.   So

8   I gave him the lay of the land in F1 as I saw it

9   at the time.

10       Q.     At this point was compensation

11  discussed?

12       A.     Again, there was no reason to discuss

13  compensation.   I had my relationship with

14  Lehman, that was a paid advisory relationship,

15  and this was not a situation where one would

16  need to discuss compensation.

17       Q.     When you say you had a paid advisory

18  relationship with Lehman, are you referring to

19  the consultancy agreements?

20       A.     Yes, of course.

21       Q.     None of those consultancy

22  agreements --

23              MR. VAN TOL:  I think --

24       A.     Sorry, may I please finish?

25       Q.     Did I cut you off?  I'm sorry, go
```

Dr. Thomas Marsoner – December 15, 2015

1                        MARSONER

2    ahead.

3        A.    Yes, of course I refer to the

4    consultancy agreements, but what I really refer

5    to is the whole seven-year period during which I

6    worked seamlessly as a senior advisor to Lehman.

7            Since those were seven years and there

8    were only five consultancy agreements that only

9    ever had the span of one year, there were a

10   whole number of periods in which technically the

11   formal consultancy agreement was not in force.

12   It had expired or whatever.

13           Nothing changed in my dealings with

14   Lehman during the period when those did not

15   exist.  The way it worked was with the rules of

16   the old agreement were carried forward until

17   such time as a new agreement was signed.

18           So this was a seamless seven-year

19   advisory relationship on a for-fees basis.

20       Q.    Those consultancy agreements

21   identified which transactions you would be

22   assisting Lehman with, correct?

23       A.    They identified some but by far not

24   all.

25       Q.    We're going to go through those

Dr. Thomas Marsoner - December 15, 2015

```
1                      MARSONER

2      consultancy agreements as well, and when we go

3      through them I'd like to go through what

4      transactions are not covered by those

5      agreements.

6              MS. ALVAREZ:  So let's take a look at

7      what we'll mark as Exhibit 2.  What we are

8      marking as Exhibit 2 is labeled Lehman 225 on

9      the bottom right-hand corner.

10             If you take a look at it, it is an

11     e-mail from Denise Callas to Tom Bernard dated

12     October 7, 2002, and the subject line reads:

13     Conference call between yourself, Peter Sherratt

14     and Thomas Marsoner.

15             (Marsoner Exhibit 2, Single-page

16     e-mail from Denise Calus to Thomas Bernard,

17     dated Monday, October 7, 2002, Bates stamped

18     LEH_0000225, marked for identification)

19  BY MS. ALVAREZ:

20        Q.    Who is Denise Callas?

21        A.    I do not know her.  I assume reading

22     the e-mail she is the assistant to Peter

23     Sherratt.  Do not remember ever meeting her.

24        Q.    Now, the text of the e-mail reads:

25     Tom, Peter has asked me to organize the above
```

Dr. Thomas Marsoner — December 15, 2015

Page 42

```
1                    MARSONER

2    conference call.  Thomas Marsoner is only

3    available this afternoon London time and no

4    other time this week.  Would you have any time

5    available today?

6              Then he just -- he goes through trying

7    to schedule this call.

8              Do you know what this call was about?

9         A.   I cannot pinpoint what this call

10   exactly was about.  I assume from the date that

11   it was the follow-on to the first one.

12             My recollection before I went to see

13   the JPMorgan people, I had one relatively

14   detailed telephone conversation with Tom

15   Bernard.  I do not remember Peter Sherratt

16   having been on that call, but I can't rule it

17   out either.

18        Q.   Is this the call that you described

19   for me a few minutes ago?

20        A.   Yes.

21        Q.   Did you have any other calls with Tom

22   Bernard?

23        A.   No, there was one detailed one and

24   then, as I recall it, then I went to see the

25   JPMorgan people.
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                      MARSONER

 2        Q.    Okay.

 3              MS. ALVAREZ:  So let's mark the next

 4     exhibit.

 5              This e-mail is Bates stamped Lehman

 6     412.  This exhibit, Exhibit 3, is marked Lehman

 7     412 on the bottom right-hand side.  It is an

 8     e-mail from Tom Bernard dated October 8th, 2002,

 9     and it is to Vittorio Pignatti, Peter Sherratt

10     and Steve Hannan.

11              (Marsoner Exhibit 3, Single-page

12     e-mail from Thomas Bernard to Vittorio Pignatti

13     and others, dated Tuesday, October 8, 2002,

14     Bates stamped LEH_0000412, marked for

15     identification)

16   BY MS. ALVAREZ:

17        Q.    Now, you are not copied on this

18     e-mail, Dr. Marsoner.  Let's look at the text.

19              The first line reads:  Spoke to Jeff

20     V. about retaining Marsoner.  With numerous

21     caveats, told him we were thinking 200 million

22     salary plus a success fee of 250 million plus 2

23     percent of recovery above 225 million.

24              Do you see that?

25        A.    I see that.  I would have accepted
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                        MARSONER

 2      that in a flash.

 3              MR. VAN TOL:  I would, too.

 4      A.    It's 200,000.

 5      Q.    Oh, it's 200,000.  Okay.

 6            Who is Jeff V., do you know?

 7      A.    Jeff Vanderbeek.

 8      Q.    Who is Jeff Vanderbeek?

 9      A.    It could have been chief of staff to

10      Dick Fuld or something like that, very senior

11      role at corporate in New York, or could have

12      been head of global fixed income.  There were

13      others more qualified than me in the room.

14      Q.    Was this offer ever made to you, the

15      200,000 salary?

16      A.    No, the first time I saw this was when

17      I saw this e-mail in discovery.

18      Q.    Were any compensation terms discussed

19      with you with regard to the possible joint

20      retention by JPMorgan at Lehman Brothers?

21      A.    No.

22            MR. VAN TOL:  Ms. Alvarez, we have

23      been going about 55 minutes, so at a convenient

24      time it would be great to have a break.

25            MS. ALVAREZ:  Yeah, this would
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2    actually be okay to take a break now.
3             THE VIDEOGRAPHER:  The time is 10:37
4    a.m. and we are going off the record.
5             (Recess)
6             THE VIDEOGRAPHER:  This begins media
7    unit number two.  The time is 10:49 a.m. and we
8    are back on the record.
9    BY MS. ALVAREZ:
10        Q.    Okay, Dr. Marsoner.  I'd like to talk
11   to you a little bit more about your role in
12   Lehman's Formula One investment.
13             I want to divide it up by time period.
14   So between -- before 2005, between 2002 and
15   2004, what was your role on Formula One for
16   Lehman?
17        A.    At Vittorio Pignatti's request, I
18   watched the space very carefully, and when I saw
19   either a pitfall for Lehman or an opportunity, I
20   would either call Pignatti or send him an
21   e-mail.  I think some thirty of those e-mails
22   have been dug out that I have sent to him,
23   sometimes copying Sherratt over the time period
24   between JPMorgan passing on my help and the
25   critical realization and exchange with Tom
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2   Bernard.  So I was, in my self-perception,
 3   working on this very regularly.
 4        Q.     How often would you speak to Pignatti
 5   about Formula One?
 6        A.     Depends on -- depends on whether there
 7   was anything urgent going on.  When there was a
 8   development that looked like it was either an
 9   opportunity or a threat, could have been, you
10   know, on a weekly basis.  During quiet periods I
11   might not have spoken to him about it for
12   months.
13        Q.     You mentioned that you copied Peter
14   Sherratt on some of the e-mails.
15        A.     Yeah.
16        Q.     Did you speak to Peter Sherratt about
17   Formula One?
18        A.     If at all, then very little.  The
19   reason he was, my perception, involved in those
20   years is because there were so many little legal
21   pitfalls in the governance structure of F1.  So
22   that for the banks just to go somewhere close to
23   exercising the 75 percent voting power that they
24   had, required very heavy duty legal lifting, and
25   there Sherratt was very involved and very good
```

Dr. Thomas Marsoner - December 15, 2015

```
1                         MARSONER
2    and very successful.
3         Q.    Other than Pignatti and Sherratt, were
4    you in touch with anyone else at Lehman
5    regarding Formula One during this time period?
6         A.    Yes, Magnoni to a much lesser degree.
7         Q.    Anyone else?
8         A.    No.  I certainly can't recall anybody
9    else at this stage.
10        Q.    Did you participate in any meetings
11   regarding Formula One during this time period?
12        A.    Beyond the group that I mentioned,
13   which was primarily Pignatti and Magnoni with
14   whom I would meet periodically, and certainly in
15   those years I cannot recall a single meeting
16   with any of them where Formula One did not come
17   up, also because they had things to share with
18   me that I wasn't so privy to.  The whole Ferrari
19   relationship was one where they were closer than
20   I was.  So we certainly compared notes.
21        Q.    Now, Pignatti was based in Europe,
22   correct?
23        A.    Yes.
24        Q.    So was Magnoni?
25        A.    Yes.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2           Q.     And Peter Sherratt was based in

3     Europe?

4           A.     Yes.   But Magnoni and Pignatti were

5     also officers of LBHI.

6           Q.     How do you know that?

7           A.     Because I read it in the annual report

8     of LBHI, and because they were very proud of

9     those titles.

10          Q.     During this time period was there a

11    dedicated F1 team at Lehman?

12          A.     I do not know exactly at what point in

13    time the Patricks, who were relatively junior

14    bankers at the time, that is, Patrick

15    Schmitz-Morkramer and Patrick Bierbaum, got

16    involved.  Since I now have seen that it was

17    actually Patrick Bierbaum who wrote the job

18    description of mine that they were submitting to

19    JPMorgan, I assume that they were involved at

20    the time.

21                 I certainly think highly of them, and

22    I have certainly interacted with Patrick,

23    Schmitz-Morkramer, that is, on a number of

24    issues, but their role was a data gathering and

25    data analysis role.   Theirs was not a strategic
```

Dr. Thomas Marsoner - December 15, 2015

```
1                   MARSONER
2    role.
3         Q.    Do you know where Patrick Bierbaum was
4    based?
5         A.    In London, I believe, if not in
6    Frankfurt.  I do not know.  With him I did not
7    interact.  Schmitz-Morkramer was originally in
8    London and then in Frankfurt.
9         Q.    Okay.  So now let's take us to the
10   2005 time period.
11               What was your role in F1 from 2005
12   forward?
13        A.    In 2005 after a number of not so happy
14   occurrences for the banks, including, which is
15   important here, a complete break down in their
16   discussions with both the teams and Ecclestone
17   in '04, there certainly surfaced first the rumor
18   and then the announcement that CVC had reached
19   agreement with Bayerische Landesbank to buy
20   Bayerische Landesbank's stake in F1.
21               That was huge news because the whole
22   crux of the issue was the longevity of the
23   franchise.  Everybody always knew that F1 was
24   highly profitable year in, year out, but the big
25   risk that everybody saw was that this party
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2      could end at any year end, really.  And when I

3      picked up that CVC was going to buy, I picked up

4      at the same time through my Austrian racing

5      connections that Ron Dennis of McLaren was fully

6      supportive of the CVC deal.

7              That was a financially, strategically

8      truly huge development, as Tom Bernard put it,

9      because if you looked at the world championships

10     for the 20 years leading up to 2005, about

11     two-thirds of them were either Ferrari victories

12     or McLaren victories.  So Ferrari versus McLaren

13     was the race.

14             In the Ecclestone years, when

15     Ecclestone was essentially fighting the banks

16     from '02 to '05 after the breakdown in '04,

17     Ecclestone essentially bought off Ferrari.  He

18     knew Ferrari was the team.  Without Ferrari,

19     very difficult to run a championship.  He

20     essentially cut them an annual check for $50

21     million, which remained secret at the time, but

22     with that cash payment he broke Ferrari out of

23     the GPWC consortium.  So the senior team in the

24     GPWC consortium was McLaren.

25             The moment it became clear that

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2     McLaren was supportive of CVC, the big value
 3     impact in Formula One had gone away
 4     automatically.  What used to be -- what used to
 5     be an annual circus had suddenly become a
 6     multiyear circus with corresponding tremendous
 7     uplift in value.
 8           That was my -- I was the first to call
 9     that, certainly at Lehman, and that was my major
10     contribution.
11        Q.    How did you learn that McLaren was
12     supportive of CVC?
13        A.    Originally from the Austrian circles.
14     More specifically it was something like Ron
15     Dennis telling Nicky Lauder telling my uncle
16     telling me.  That was essentially my -- my
17     unique access to nonpublic information.
18           In addition to that, through my
19     watching brief on this for a number of years, I
20     knew fairly precisely which of the racing
21     journalists in which papers had good information
22     and which ones had bad information.  So I could
23     triangulate quite well.
24        Q.    One thing you said a couple minutes
25     ago was that F1 was a big risk -- that it was a
```

Dr. Thomas Marsoner - December 15, 2015

| | |
|---|---|
| 1 | MARSONER |
| 2 | big risk and everyone saw it as a big risk? |
| 3 | A.     Yeah, up to that moment, yes. |
| 4 | Q.     I'm just focusing on the word |
| 5 | "everyone" because I want to understand who are |
| 6 | you referring to when you said everyone. |
| 7 | A.     Everybody involved with an idea of |
| 8 | what was going on.  Goldman Sachs were advising |
| 9 | GPWC.  Purely technically they had the |
| 10 | wherewithal and the financial resources to set |
| 11 | up a separate series.  Separate series happened |
| 12 | all the time in motor sport.  In the US it is |
| 13 | split between Indy and NASCAR.  In boxing there |
| 14 | are competing series.  It is very useful and |
| 15 | very value accretive for a global sport to be |
| 16 | essentially a monopoly, and the risk of split is |
| 17 | very real at all times.  And in those years, the |
| 18 | risk of split for F1 was very, very real. |
| 19 | Q.     You mentioned earlier that Tom Bernard |
| 20 | was heading out -- heading up the workout team |
| 21 | at Lehman? |
| 22 | A.     Yeah. |
| 23 | Q.     Who else was on that team? |
| 24 | A.     My perception was that Tom Bernard was |
| 25 | the man. |

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER

2          Q.    Did you know if there was anyone else

3    on that team?

4          A.    I have since, you know, I have since

5    heard, of course, of Steve Hannan who I did not

6    know at the time.   I certainly knew that Peter

7    Sherratt was involved as a lawyer.   And in my

8    perception, certainly through the end of my

9    discussions with Bernard in '05, Vittorio

10   Pignatti was also fully involved.

11         Q.    And Pignatti was your main contact?

12         A.    Pignatti was the main contact, yes.

13         Q.    Did you ever communicate with Tom

14   Bernard, other than the telephone calls we

15   talked about earlier, did you ever communicate

16   with Tom Bernard separately from Pignatti?

17              MR. VAN TOL:  Object to the form.

18   It's vague as to time.

19         Q.    I'm really talking about this 2005

20   forward time period.

21         A.    We all have the salient e-mail

22   exchange which starts me briefing Pignatti,

23   copying Sherratt.   And when I then realized that

24   I really had critical, urgent, huge, as Bernard

25   calls it, information, I sent the e-mail
```

Dr. Thomas Marsoner - December 15, 2015

1                    MARSONER

2      directly to Bernard.  And if you go through that

3      exchange you'll see that at the end he asks me

4      for my number again, and we then spoke on the

5      phone a couple of times also.

6          Q.    What did you discuss on the phone?

7          A.    Very much the detail to where I -- how

8      certain was I of my sources, which by then was a

9      no-brainer because by then the McLaren statement

10     had become public, how the risk analysis would

11     work.  If you look at the e-mail you'll see that

12     Tom Bernard found the spelling of McLaren

13     somewhat challenging.

14                If you'll allow me, it's a little bit

15     like putting Europeans in charge of a baseball

16     organization.  Americans and F1 is not a natural

17     fit.  If you look at my e-mail with Tom Bernard,

18     for example, it asked me why would CVC be so

19     welcome.  My response was that they have done

20     such a good job running Moto GP, the motorbike

21     racing series.  So he asked me whether Mercedes

22     was racing motorbikes.

23                So between his spelling of McLaren and

24     whether Mercedes was a motorbike manufacturer,

25     there was a relatively large amount of factual

Dr. Thomas Marsoner - December 15, 2015

```
1                      MARSONER
2    F1 racing knowledge that he at that time had a
3    curiosity for where I was in a position to fill
4    the gaps in his knowledge.
5             So it was very much a, you know, a --
6    an invited significant knowledge and knowhow
7    transfer from me to him.  And he reacted very
8    positively.  He was very, very grateful and, as
9    he also wrote, he accepted my advice.
10       Q.    When you spoke to him on the phone,
11   did he tell you whether Lehman had decided to
12   sell its stake in F1?
13       A.    The words he mentioned to me that
14   stuck in my mind are words like:  Thank you
15   very, very much, that's very, very, very useful,
16   inclined to follow your advice but we are still
17   in discovery mode.
18             He did not have the offer from CVC at
19   that time.
20       Q.    You said he said Lehman was still in
21   discovery mode?
22       A.    Yes.
23       Q.    So they were deciding -- they were
24   still considering what to do?
25       A.    They were absolutely going to make
```

Dr. Thomas Marsoner - December 15, 2015

Page 56

```
1                        MARSONER
2      their ultimate decision once the -- once the bid
3      was on the table which, of course, it wasn't
4      when I briefed him.
5          Q.    Did Bernard tell you whether anyone at
6      Lehman was advising Lehman to sell its stake in
7      F1?
8          A.    I do not know if it was Bernard, but I
9      was told at the time that the CVC coverage
10     banker, trying to do CVC a favor, was very much
11     in favor of selling to CVC.  CVC was a very
12     important client of the firm, so doing CVC a
13     favor was certainly something that was popular
14     with those who made their living off of the CVC
15     relationship.
16         Q.    Who told you that?
17         A.    I believe it was Pignatti but I'm not
18     sure.
19         Q.    Do you know if Pignatti was advising
20     Lehman to sell its stake?
21         A.    Pignatti was fully aligned with me.
22         Q.    Do you know whether Pignatti ever
23     informed anyone at Lehman that they should --
24     that it was his opinion that Lehman --
25         A.    I'd be surprised if he had been.
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2        Q.    -- should sell it's stake?

 3              You'd be very surprised -- I'm sorry?

 4        A.    I would be very surprised if Pignatti

 5    had advised Lehman to sell.  The -- the

 6    financial impact of this coordination with

 7    McLaren was huge.  You have a one or two-year

 8    cash flow expectation of significant cash flows

 9    that suddenly becomes, given that they are now

10    all in on it, a certainly seven, but probably 14

11    or 21-year proposition.

12              At that moment the value of Formula

13    One multiplied then and there.  That was my

14    call.  Pignatti understood it for sure.  Magnoni

15    understood it for sure.  Bernard understood it.

16    I had heard that there was opposition to it, but

17    it was mathematically so compelling that what

18    could have got wrong is if I hadn't gotten my

19    advice in immediately and if the CVC offer had

20    shown up first, there is a risk that some people

21    trying to curry favors with CVC would have said

22    nice things to CVC that the firm might have then

23    found difficult to retract.

24        Q.    At the point that you were providing

25    this advice, did you discuss with anyone the
```

Dr. Thomas Marsoner – December 15, 2015

1                          MARSONER

2     possibility of being compensated for it?

3          A.    I didn't have to.  I was a paid

4     advisor.  Terms were very clear.

5          Q.    Because of the advisory services

6     agreements?

7          A.    Yeah, absolutely, the 10 percent of

8     firm revenues had been set in stone from the

9     outset, and as the Cerberus BAWAG deal showed,

10    which was probably the second most important

11    thing I had done for Lehman, there was no

12    necessity to document that any further.

13         Q.    So Lehman had agreed to pay you ten

14    percent of firm revenues for your advice in

15    Formula One?

16         A.    Absolutely, for the simple reason that

17    those rules existed, were well understood by

18    everybody, and I was asked officially to help

19    out by one of the most senior people in Lehman

20    investment banking, Vittorio Pignatti.  There

21    was nothing further that I needed to do or would

22    have actually been inclined to do.

23                Might Pignatti, in the way he

24    described it, have used the high negotiating

25    power that Lehman had to negotiate me down at

Dr. Thomas Marsoner - December 15, 2015

Page 59

1                        MARSONER

2     some point in the future, he might well have.

3     Christian Meissner did not do that in BAWAG

4     Cerberus, and I'd like to sort of make it very

5     clear that while I am trying always to be very

6     constructive, the negotiation that would have

7     negotiated me down from the well established

8     general rule never took place, and a bankrupt

9     Lehman does not have the negotiating power that

10    the living Lehman would have had.

11            So the rules were in place.  I was

12    officially asked to work on it.  That is all

13    that matters.

14    Q.    Where is this general rule that you

15    would be paid 10 percent documented?

16            MR. VAN TOL:  Objection, asked and

17    answered.  You can answer again.

18    A.    Yeah.  In every one of the agreements,

19    the specific one that was in force, the specific

20    one whose rules were in force at the time is the

21    '04 agreement.  It says very clearly 20 percent

22    of the IBD fees, which in the case of M&A fees

23    means 20 percent of M&A fees, in the case of

24    financing fees it means 10 percent of firm

25    revenues, and in the case of holding gains, net

Dr. Thomas Marsoner - December 15, 2015

```
1                           MARSONER
2       of holding losses, it means 10 percent of those
3       net gains.  The contract says that very, very
4       clearly.
5                   MS. ALVAREZ:  Why don't we take a look
6       at it?
7                   (Marsoner Exhibit 4, Multipage
8       document bearing the heading Lehman Brothers,
9       dated 13th February 2004, addressed to Thomas
10      Marsoner, and bearing no Bates stamps, marked
11      for identification)
12      BY MS. ALVAREZ:
13          Q.    So we have marked as Exhibit 4 the
14      letter agreement between Lehman Brothers Europe
15      Limited and Dr. Marsoner dated February 13,
16      2004.
17                  This is the 2004 agreement that you
18      were just referring to?
19          A.    I'm just looking at it.
20                  (Pause)
21          Q.    I'll represent this was attached as
22      Exhibit C to your motion as you can tell from
23      the header.
24          A.    Sorry --
25                  MR. VAN TOL:  That was for us.  Don't
```

Dr. Thomas Marsoner - December 15, 2015

Page 61

```
 1                    MARSONER
 2    worry.
 3            (Pause)
 4       Q.    I don't need you to look at the
 5    provision now, I just want to make sure this is
 6    the correct agreement.
 7       A.    Yes.
 8       Q.    And this agreement is dated February
 9    13, 2004?
10       A.    Correct.
11       Q.    Then under the date I see your name
12    and an address?
13       A.    Hm-hmm.
14       Q.    What address is this?
15       A.    This is the house of a friend of mine
16    in Malta where I stayed for a few days in that
17    time period, in the '04 time period.  I have not
18    stayed since.
19            If I may digress, I'll tell you why
20    the first agreement had the Austrian address and
21    the last two had the Austrian address, but the
22    middle two had different addresses.  It is
23    entirely UK tax driven.  In the UK, perfectly
24    legally, for non-UK citizens would distinguish
25    between onshore income and offshore income.
```

Dr. Thomas Marsoner - December 15, 2015

Page 62

```
1                    MARSONER

2         Q.    Okay.

3         A.    And it -- particularly in this time

4    period I did not want to have a cosmetic piece

5    of paper out there that suggested that I was --

6    that this income, which was classic legal

7    offshore income for UK purposes, was either

8    Austrian taxable or UK taxable.  Has nothing to

9    do with the substance.  This was just cosmetic.

10              Everybody at Lehman knew where to find

11   me, everybody at Lehman knew both my Austrian

12   domiciliary address and my London residency

13   address, and everybody at Lehman also knew that

14   this was tax cosmetics.

15        Q.    When you say everybody at Lehman, you

16   are referring to your contacts on F1?

17        A.    My contacts there, yes.

18        Q.    So if you look at this agreement, it

19   is between Lehman Brothers Europe Limited and

20   you, correct?

21        A.    I believe the whole Lehman Group is

22   encompassed by it, represented by Lehman

23   Brothers Europe Limited.  You see in line 5 that

24   it says I will provide advice and assistance

25   also to other members of the Lehman Brothers
```

Dr. Thomas Marsoner - December 15, 2015

```
1                       MARSONER

2      group.  So the way I have always looked at these

3      agreements was that I was advising all of Lehman

4      worldwide.  Lehman Brothers Europe Limited was

5      the point of contact.

6            Q.    And Lehman Brothers Europe Limited was

7      the signatory to the agreement, they actually

8      signed the agreement?

9            A.    Europe Limited was indeed -- it was

10     the corporate finance advisory company, was

11     indeed the signatory on behalf of the Lehman

12     Group.

13           Q.    Is that Pignatti's signature?

14           A.    That is Pignatti's signature, yes.

15           Q.    Were there any amendments to this

16     agreement?

17           A.    Can you define the word "amendments"

18     for me so I understand it better?

19           Q.    Sure.  Were there ever any supplements

20     to this agreement negotiated and executed?

21           A.    The way I look at it in substance, my

22     conversation, my e-mail conversation with Tom

23     Bernard was very much certainly in the spirit of

24     such an amendment:  Inclined to take your

25     advice, accept your advice, while this is huge
```

Dr. Thomas Marsoner — December 15, 2015

```
 1                    MARSONER
 2   and all that.
 3        Q.    Other than that e-mail, was that --
 4   you called it a spirit of an amendment -- ever
 5   documented?
 6        A.    Other than in the e-mail it wasn't and
 7   it didn't have to be.
 8        Q.    Let's look at the terms more
 9   specifically of this agreement.
10              Let's look at Section 3 which is
11   entitled:  Compensation Payable to the
12   Consultant.
13              Do you see that?
14        A.    Yeah.
15        Q.    Now, this Section 3 identifies the
16   compensation that you would be paid under this
17   agreement?
18        A.    Hm-hmm.
19        Q.    And Section 3(i) states that a fee of
20   150,000 pounds --
21              MR. VAN TOL:  Euros.
22        Q.    Euros would be paid to you?
23        A.    I'm sorry -- yeah, I see that, yeah.
24        Q.    Was that paid to you?
25        A.    I believe so, yes.
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                      MARSONER

 2         Q.    Section 3(ii) identifies the quarterly

 3    fees that you would be paid under the agreement?

 4         A.    Hm-hmm.

 5         Q.    Were those paid to you?

 6         A.    I believe so.

 7         Q.    Then if you look at Sections (iii) --

 8    (iii) through almost the end of it, through

 9    (viii), these provisions identify various

10    transactions that you were working on with

11    Lehman, correct?

12         A.    That's correct, yes.

13         Q.    And they identify how much you would

14    be paid by Lehman for each of the transactions?

15         A.    Yes.

16         Q.    Now, Formula One is not identified in

17    any of these paragraphs, correct?

18         A.    It is not and it doesn't have to

19    because there is the catchall clause nine.

20         Q.    So let's look at the catchall clause

21    nine.  I'm just going to read it for the record:

22              In relation to any other agreed

23    transaction provided that A -- and it's a little

24    cut off so I'm doing my best here, correct me if

25    I state anything wrong -- (A) such transaction
```

Dr. Thomas Marsoner - December 15, 2015

Page 66

```
1                    MARSONER
2    completes during the payment period and (B) the
3    consultant provides substantial services to
4    Lehman Brothers in relation to such agreed
5    transaction, Lehman Brothers shall pay the
6    consultant a -- I assume it would -- says fee
7    based on a to be agreed upon percentage of the
8    net banking revenues which are both earned and
9    received by Lehman Brothers.
10            Then the rest of this page is cut off.
11            Do you see that?
12       A.   I see it, yes.
13            MR. VAN TOL:  Just a correction.  It
14    says:  Net investment banking revenues.
15            MS. ALVAREZ:  Okay.
16       Q.   Do you have a copy of this agreement
17    that's not cut off?
18       A.   I hope so.  I did not have it in
19    London when you asked last week.  I have these
20    in the file in Austria and when I find it you
21    will immediately get it.
22                 DISCOVERY REQUEST
23    ------------------------------------------------
24            MS. ALVAREZ:  We would call for the
25    production of the document.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2              I'll tell you that a few of these --
3     this is not the only one that's cut off, some of
4     the other -- the 2002, I think, and the 2006 are
5     cut off as well, so if you can look for the
6     full, complete copies.
7              MR. VAN TOL:  We'll make the same
8     request to you.
9              THE WITNESS:  Yeah.
10             MR. VAN TOL:  Not to you, we are
11    making the same request to Lehman for a copy of
12    its own agreement.
13    BY MS. ALVAREZ:
14       Q.    Right here -- so it says:  Lehman
15    Brothers shall pay the consultant a fee based on
16    a to be agreed upon percentage of the net
17    investment banking revenue.
18             Was a percentage agreed upon between
19    Lehman and you for F1?
20       A.    The percentage, 10 percent of firm
21    revenues is the default percentage that has been
22    in force at all times during the consultancy
23    period.  It didn't have to be specifically
24    agreed another time.  It was the well understood
25    fee for which I provided my services.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                      MARSONER

2          Q.    Where does it state in this agreement

3     that 10 percent was the default fee that you

4     would be paid under the consultancy?

5          A.    If you look at all the agreements, you

6     will find 20 percent of IBD fees everywhere,

7     including in this one and the prior ones.

8          Q.    Well, point it out to me.  Where does

9     it say that you would be paid 10 percent as the

10    default role?

11         A.    I'm trying to point out to you that it

12    was the agreed percentage, and the best place

13    for you to see that is probably the Graham

14    Wilson e-mail to me at the end of BAWAG Cerberus

15    which is appended as an exhibit to our motion

16    here.  That is also not specifically captioned

17    in any one paragraph here, but that reflects

18    exactly the rule I just told you:  20 percent of

19    M&A fees, 10 percent of financing fees, 10

20    percent of net holding gains.

21         Q.    So the Graham Wilson e-mail would be

22    the best place to look, not the actual

23    agreement?

24         A.    The Graham Wilson e-mail is the best

25    place to look how, even without a specific
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2      reference in any one of the five agreements,

3      Lehman Brothers very happily paid the

4      agreed-upon percentages in a relatively major

5      transaction when this was a hundred million fees

6      and -- to Lehman, and nearly ten to me, without

7      it having been captioned in any one of those

8      individual points in any one of the individual

9      agreements.

10          Q.     Other than BAWAG which we'll talk

11     about, what other transactions have you been

12     paid for that are not covered by your advisory

13     services agreements?

14          A.     That I do not currently know.  There I

15     would have to go back to my banking records.

16     Certainly BAWAG was the only major one.  There

17     may well have been smaller ones, but I do not

18     currently -- I do not currently know that

19     offhand.  I certainly know that the two biggest,

20     F1 and BAWAG Cerberus, were not in any paragraph

21     of any individual formal document.

22          Q.     Let's take a look at this paragraph 39

23     that we were just looking at, and it refers to

24     in relation to any other agreed transaction.

25               Do you see that?

Dr. Thomas Marsoner — December 15, 2015

1                          MARSONER

2          A.     Hm-hmm.

3          Q.     What would you consider -- well, let's

4     look at the definition of agreed transaction,

5     actually.

6                 On the very next page do you see it

7     says:  Agreed transaction means any transaction

8     which Lehman Brothers -- I assume that word is

9     "has" but correct me if I am wrong because it's

10    cut off -- has specifically designated in

11    writing to the consultant as falling within the

12    ambit of this agreement.

13                Do you see that?

14         A.     Hm-hmm.

15         Q.     And Formula One -- you have no

16    separate writing designating Formula One as an

17    agreed transaction, correct?

18         A.     I consider my e-mail exchange with Tom

19    Bernard, that designation in writing.  And I

20    certainly considered the formal oral request by

21    Pignatti to advise them on F1, mutually, in good

22    faith, as a very material matter, too.

23         Q.     Now, Pignatti never agreed in an

24    e-mail to pay you 10 percent for your work on

25    Formula One, correct?

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER
2         A.    Pignatti in a letter to the court
3    correctly compares it to my work for BAWAG
4    Cerberus which triggered the 10 percent.
5         Q.    You know, that was not my question.
6               My question was, Pignatti never agreed
7    to pay you 10 percent in an e-mail, correct?
8         A.    Pignatti never tried to negotiate the
9    usual 10 percent down.  He didn't have to write
10   me an e-mail reconfirming them.  They were
11   mutually usually agreed.
12        Q.    So, then, there was no e-mail?
13        A.    There was no e-mail by Pignatti trying
14   to negotiate me down, that is correct.
15        Q.    Was there an e-mail from anyone at
16   Lehman agreeing to pay you 10 percent for your
17   services on F1?
18        A.    There did not have to be an e-mail by
19   anybody.  This was the well-established course
20   of dealings between Lehman and me.
21        Q.    So no e-mail?
22        A.    There was no e-mail negotiating me
23   down, absolutely not.
24        Q.    And no advisory services agreement
25   identifying Formula One as a transaction for
```

Dr. Thomas Marsoner - December 15, 2015

Page 72

```
1                        MARSONER

2    which you would be paid?

3               MR. VAN TOL:  Object to the form.

4               You may answer.

5         A.    Could you just rephrase that, please?

6         Q.    Sure.  Could you just repeat the

7    question so I can hear it?

8               (Question read)

9         A.    There was, of course -- we all have

10   the documents -- no reference to Formula One

11   specifically in any one of these five.  That

12   does not mean that Lehman did not ask me to

13   provide services at the usual generally agreed

14   terms.

15        Q.    Okay.  I understand that.

16              I just want to make sure -- are there

17   any other consultancy agreements that we don't

18   have?

19        A.    There were these five.

20        Q.    Were there any amendments or addendums

21   to any of these consultancy agreements?

22        A.    I do not recall any amendments or

23   addendums, no.

24        Q.    Did you ever ask that Formula One be

25   added to any one of these agreements?
```

Dr. Thomas Marsoner — December 15, 2015

```
1                    MARSONER

2        A.    I never did because I never needed to.

3    All I did is prepare the ground for such time as

4    revenues would become visible, which it turns

5    out only happened in 2012.

6        Q.    So between 2005 and 2012, you never

7    put down in writing -- put down in writing how

8    much you would be paid by Lehman Brothers for

9    your assistance on F1?

10            MR. VAN TOL:  Object to the form.

11            You may answer.

12       A.    What I did put down in one of the

13   e-mails to Bernard and Pignatti and so on was a

14   sentence to the fact of -- that my senior advice

15   would continue to be available at the usual

16   modest percentage, something along those lines.

17   But that was not the request, that was a

18   statement of fact.

19            My prepare-the-ground conversation

20   with Jeremy Isaacs in 2007 then led to a

21   conversation between Sherratt and me.  As I came

22   out of the room he asked me:

23            How did your chat with Jeremy go,

24   Thomas?

25            I said:  Very well.  And by the way,
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                          MARSONER

 2        the F1 thing that we both worked on looks pretty

 3        good these days, doesn't it, Peter?

 4              To which he said:  Yes, but we've also

 5        had very high costs here.

 6              And I reflected on that a little bit,

 7        actually in fairly great detail, and I ended up

 8        agreeing with him, which you see in the way I

 9        presented my claim:  A living Lehman in reality

10        only got its 300 million that it originally

11        invested in Kirch, plus a little bit of money

12        for interest and costs back.

13              So as long as Lehman was alive, no

14        firm revenues that would have triggered a fee of

15        mine had actually occurred.  My source for that

16        was Sherratt after the conversation with Isaacs

17        and I actually agree.  In fairness Lehman had

18        put 300 in and got a little bit more than 300

19        out but hadn't actually earned any cash before

20        its bankruptcy.

21        Q.    What about -- were you aware of the

22        refinancing that occurred in 2006?

23        A.    That's exactly what I meant with the

24        312 million or whatever the number is that is in

25        my statement of claim.
```

Dr. Thomas Marsoner - December 15, 2015

Page 75

1                          MARSONER

2          Q.    So during -- as a result of the

3     refinancing, the shareholders were paid

4     dividends, correct?

5          A.    The shareholders were paid dividends

6     and Lehman got its 300 million back.  That's

7     right.

8          Q.    At that point did Lehman provide you

9     any compensation for your work on F1?

10         A.    I didn't ask for it.  Lehman had only

11    gotten its money back, 300 in, a bit more than

12    300 out.  It could be argued that after interest

13    Lehman was actually still in the hole on F1 as

14    it went bankrupt.

15         Q.    At that point --

16         A.    There was certainly no profit that

17    would have, in fairness, triggered my fee.

18         Q.    At that point you didn't raise with

19    anyone at Lehman the possibility of getting any

20    of that?

21              MR. VAN TOL:  Objection.

22    Mischaracterizes evidence.

23              You may answer.

24         A.    I very much prepared the ground.  You

25    have the Jeremy Isaacs e-mail.  You now have --

Dr. Thomas Marsoner — December 15, 2015

```
1                    MARSONER

2        apologies, I had not searched for that

3        earlier -- the Bonacker e-mail.  But the history

4        of the Bonacker e-mails, there are actually two,

5        was interesting.

6             Bonacker, who at one point complained

7        to me that young Schmitz-Markramer was running

8        around the firm taking victory laps for F1.  So

9        I said -- and that was difficult for Bonacker,

10       so I sent Bonacker those two e-mails to -- with,

11       I think -- I mean, you have them -- words to the

12       effect of:  Look who really deserves the credit

13       for F1.

14            And then ultimately in August 2008 I

15       went to see Dick Fuld in New York about --

16       originally came to pass, it's in disclosure,

17       that he kindly called me after the Cerberus

18       people had told me, that it was actually I who

19       had done the Cerberus BAWAG deal.

20            And so, longer story, he ultimately

21       invited to come see him in New York City in

22       August of 2008, of all time periods.  That's one

23       of those meetings one doesn't easily forget.  As

24       I walked into his office he hugged me.  I have

25       been relatively close to Dick in the past, but
```

Dr. Thomas Marsoner - December 15, 2015

```
1                          MARSONER

2      we have not really been on hugging terms before.

3             We then discussed a number of things,

4      particularly with my financial institution's

5      hat.  And ultimately he said:  So what else have

6      you been up to?

7             To which I said:  Oh, Dick, in

8      addition to the essentially hundred million that

9      I made you on BAWAG Cerberus and a few other

10     things, by far the most important thing that

11     I've done for you was your F1 investment.

12            To which he -- and I see it in front

13     of me -- used a -- an old fashioned thank you

14     gesture as one does in old movies, followed by:

15     Now, Thomas, you'll forgive me, I have another

16     50,000 things to do.

17            And I left his office.  So that was

18     exactly three weeks before Lehman filed.

19        Q.    And --

20        A.    So -- so -- but I certainly -- also

21     then that was certainly the last prepare the

22     groundwork that I had done.  It certainly would

23     not have occurred to me in any way to ask Dick

24     to pay me a fee, and the chief reason for that

25     was that no revenues were visible.
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2              It's in your discovery that the

 3      Pignatti-Rouner e-mail says exactly at one -- at

 4      what point we actually put pen to paper, so I

 5      was working on a lot of things that -- on

 6      nowhere here also because they never

 7      materialized.

 8              So if we had always captured

 9      everything that I was working on in one of these

10      agreements, all we would have done is write

11      agreements and never done any real work.

12         Q.    Other than BAWAG which we have talked

13      about and Formula One which we have talked

14      about, what other things were you working on

15      that never materialized that were not covered by

16      these agreements?

17              MR. VAN TOL:  There is a lot of

18      negatives.  I'm going to object to the form.  I

19      don't understand the question.

20              If you understand you may answer.

21         A.    I think I do understand the question.

22         Q.    Okay.

23         A.    And if I may, I would like to go back,

24      give you a list.  There were a whole number of

25      things that one works on and that -- and where
```

Dr. Thomas Marsoner - December 15, 2015

```
1                         MARSONER
2      revenues never become visible, and then some die
3      and then there is no point in ever putting them
4      in.
5              In F1, revenues became visible for the
6      first time in 2012.  In May 2012 and in August
7      2012 I made my claim to my contractual
8      counterpart LBEL.
9      Q.     That claim was filed in the UK
10     proceedings, right?
11     A.     It was first just filed with the UK
12     administrator.  It was only after the UK
13     administrator rejected it that I commenced
14     proceedings.
15     Q.     What happened in May 2012?
16     A.     There was a very visible sell down by
17     CVC to a US asset management firm called Waddell
18     Reed who was joined by Blackstone and, I
19     believe, the Norwegian Sovereign Wealth Fund
20     that essentially took half of the CVC stake.
21             At the same time there was another big
22     refinancing.  The details are in the landscape
23     piece of paper that I attached to my motion.  It
24     was at that point that a valuation of F1 became
25     visible from the outside for the first time.
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2               And if I may add, Mr. Mackenzie, the
 3     senior CVC partner, in about 2012 in one of the
 4     Bernie Ecclestone legal proceedings, stated
 5     under oath that as late as 2011 he, Mackenzie of
 6     CVC, still thought that his stake may be worth
 7     zero.
 8               MS. ALVAREZ:  Why don't we take
 9     another break.
10               THE VIDEOGRAPHER:  The time is 11:44
11     a.m.  We are going off the record.
12               (Recess)
13               THE VIDEOGRAPHER:  This begins media
14     number three.  The time is 12:09 p.m.  We are
15     back on the record.
16  BY MS. ALVAREZ:
17     Q.    Dr. Marsoner, I would like to go back
18     and take a look at Exhibit 4 which was your 2004
19     consultancy agreement with Lehman.
20               Is this the agreement you rely -- is
21     this the agreement you rely on as the basis for
22     your claim?
23     A.    It's the contents of the agreement
24     that I rely upon.  Technically it had, of
25     course, expired, and technically it was
```

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2    abrogated by the next one, but in the

3    interregnum period, during which I worked with

4    Lehman seamlessly, there had to have been rules

5    that governed the mutual behavior.  And I

6    contend that the rules were exactly those that

7    were in here because this is the way it had also

8    happened when agreements before had expired.

9         Q.    Do you rely on the contents of the

10   2006 agreement for your claim?

11        A.    No, I couldn't, because the salient

12   aspect of F1 was my exchange with Tom Bernard,

13   and that predates the '06 agreement materially.

14        Q.    So, then, you don't rely on the

15   contents of the 2007 agreement either?

16        A.    I do not rely on the contents of the

17   2007 agreement either, no.  It is the contents

18   of the 2004 agreement that I rely on for the --

19   for the formal -- the contract part of my claim.

20             Additional and separate to that is, of

21   course, the quantum meruit part of my claim.

22        Q.    If you can turn to Section 3 again of

23   Exhibit 4 which is the compensation provision or

24   the compensation section.  As you see, it states

25   that you would be paid a retainer and a
```

Dr. Thomas Marsoner - December 15, 2015

```
1                         MARSONER
2    quarterly fee.
3              Do you see that?
4         A.    Hm-hmm.
5         Q.    Were you typically paid retainers when
6    you executed these consultancy agreements?
7         A.    I am not sure about the early ones,
8    but, yes, I mean, typically I think the way you
9    phrase it is correct.  Typically I was paid
10   retainer fees which were in all cases fully
11   applicable against the success fees.
12        Q.    What was the purpose of these retainer
13   fees?
14        A.    Retainer fees in the investment
15   banking business are essentially earnest fees.
16   They are just -- they are certainly more
17   symbolic than actual, and they are certainly not
18   intended to be compensation for services
19   rendered.  They -- I think earnest fee is a good
20   way to describe it, retainer fee in the
21   investment banking world.
22              We are being real with each other.
23   Here is some money which obviously then gets
24   deducted from what you really work for, the
25   success fee, but just so we are all -- so we all
```

Dr. Thomas Marsoner - December 15, 2015

Page 83

```
1                         MARSONER
2    know that we mean it seriously with each other.
3              Of course, it creates a moral
4    obligation on my side to actually do something,
5    not just sit here, collect retainer.
6         Q.    So it essentially makes it official
7    that you are being retained as an advisor for
8    Lehman Brothers --
9         A.    I'm trying to think about that a
10   little bit, but I think when I say earnest fee
11   and you say makes it official that I'm a
12   retained paid advisor, then I think we are
13   talking about the same thing, yeah.
14        Q.    Well, let's clarify.
15             You said, you know, it gave you a
16   moral obligation.
17             To do what?
18        A.    To find deals.
19        Q.    Were you paid a retainer under the
20   2006 agreement as well?
21        A.    I believe so.  We have it here -- I
22   believe there were retainers.  I'm not sure
23   about the very first ones, but I believe that
24   there were retainers most of the time if not all
25   the time.
```

Dr. Thomas Marsoner - December 15, 2015

Page 84

1                            MARSONER

2          Q.     Do you have a claim that Lehman owes

3     you a retainer under any of your agreements?

4          A.     Do you mean do I have a claim in

5     bankruptcy against Lehman or --

6          Q.     Let me rephrase.

7                 Do you contend that Lehman owes you a

8     retainer under any of the agreements that has

9     not been paid?

10         A.     Oh, at this point do I claim that -- I

11    believe that the last fees that LBEL paid me,

12    which were sort of BAWAG derivative fees, were

13    paid net -- were either paid net of retainer or

14    inclusive of a retainer that hasn't been paid.

15                So, no, I do not -- so as I think

16    about this, I do not think that Lehman owes me

17    any retainer fees at this stage.

18         Q.     And if you look at paragraph three,

19    (ii), it refers to a quarterly fee that would be

20    paid to you, correct?

21         A.     Hm-hmm.

22         Q.     What was the purpose of a quarterly

23    fee?

24         A.     Same thing.  Up front retainer,

25    quarterly retainer, is the same thing.

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER
2          Q.    Were you typically paid quarterly fees
3     under the agreements?
4          A.    Yeah, I believe so.  Fairly classic,
5     up front and quarterly.
6                MS. ALVAREZ:  Let's take a look at
7     your declaration which we'll mark as the next
8     exhibit.
9                (Marsoner Exhibit 5, Five-page
10    document entitled Declaration of Dr. Thomas
11    Marsoner in Support of the Motion of Dr. Thomas
12    Marsoner to Deem Proofs of Claim to be Timely
13    Filed by the Claims Bar Date, with cover page
14    labeled Exhibit B, and bearing no Bates stamps,
15    marked for identification)
16    BY MS. ALVAREZ:
17         Q.    If you just take a look, this is the
18    declaration that you submitted in support of
19    your motion, correct?
20         A.    Hm-hmm.
21         Q.    We covered a lot of the information
22    that's in here already, so I think we can jump
23    down to paragraph eight, and in this declaration
24    you state:  In 2005 I advised Lehman in my role
25    as senior advisor in both e-mails and in
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2       telephone conversations to continue Lehman's

3       investment in F1, which service I explicitly

4       provided in exchange for 10 percent of Lehman's

5       revenues related to the transaction as was

6       customary under the agreements.  Lehman agreed

7       both orally and by e-mail to this fee in

8       exchange for my F1 advice.

9              Do you see that?

10         A.    I see that, yes.

11         Q.    When you say Lehman agreed orally to

12      the 10 percent fee, what are you referring to?

13         A.    The retention of my services by

14      Pignatti originally.

15         Q.    So these -- the telephone calls with

16      Pignatti?

17         A.    The meeting when he told me that

18      JPMorgan didn't require my services which cost

19      them a billion dollars, and when he then said:

20      But certainly we want to continue to work with

21      you on this, Thomas.

22         Q.    During that meeting did Pignatti tell

23      you:  We will pay you 10 percent of Lehman's

24      revenues related to the transaction?

25         A.    He used the word to "deepen" the

Dr. Thomas Marsoner - December 15, 2015

1                    MARSONER

2    relationship.  The relationship was well

3    defined.  When he said "I want to deepen it," it

4    was very clear what he meant.

5         Q.    Okay.  Did anyone else at Lehman

6    Brothers tell you orally that they would pay you

7    10 percent of Lehman's revenues related to the

8    transaction?

9         A.    The course of dealings was so well

10   established within BAWAG Cerberus, you saw how

11   that found its way on to a piece of paper, the

12   10 percent, the 20 percent that we have now been

13   through quite a few times.

14            So against that background, whoever I

15   dealt with at Lehman, whether it was Pignatti or

16   later Bonacker or Meissner, the ground rule was

17   my services come in exchange for 10 percent of

18   firm revenues.

19        Q.    Okay.  So no one specifically said to

20   you you'll be paid 10 percent for Formula One?

21        A.    Nobody had to tell me that

22   specifically.

23        Q.    Okay.  You also say here -- you said

24   Lehman agreed both orally, and then you said:

25   And by e-mail to this fee in exchange for my F1

Dr. Thomas Marsoner - December 15, 2015

Page 88

1                    MARSONER

2    advice.

3            What e-mail are you referring to or

4    e-mails?

5        A.    I refer to the Tom Bernard e-mail

6    exchange in which I said -- in which I wrote:

7    My senior advice continues to be available,

8    which was just a reminder, a factual statement

9    of fact, and where Tom Bernard responds:  We are

10   inclined to accept your advice.

11       Q.    Are you relying on any other e-mails

12   for the statement?

13       A.    The Bernard e-mail exchange is the

14   main in writing part that I rely on.

15           MS. ALVAREZ:  So we will take a look

16   at it.

17           (Marsoner Exhibit 6, Multipage e-mail

18   chain bearing at the top of the first page an

19   e-mail from Thomas Marsoner to Thomas Bernard,

20   dated Thursday, December 1, 2005, and Bates

21   stamped LEH_0000214 through 217, marked for

22   identification)

23   BY MS. ALVAREZ:

24       Q.    You can take a look at this.  It's a

25   long e-mail string, but let me know if the

Dr. Thomas Marsoner - December 15, 2015

Page 89

```
1                    MARSONER
2     e-mail you are referring to is here.  This is
3     marked Lehman 214 through Lehman 217.
4         A.    I believe that is it, yes.
5         Q.    Well, let's start at the bottom of the
6     e-mail string which would be the first e-mail
7     which actually starts on the bottom of Lehman
8     215.
9               If you take a look it is an e-mail
10    from you to Vittorio Pignatti dated November 25,
11    2005.  Subject reads:  F1 group sold to CVC
12    Capital Partners for undisclosed sum.
13              Now, in the very first sentence you
14    say:  If this is the deal I suspect it is, my
15    senior advice is strongly against selling now.
16              Do you see that?
17        A.    Yeah, I see that.
18        Q.    Then you provide -- you have three
19    numbers here, so you provide three reasons for
20    your advice.  Then -- so this is what you were
21    referring to when you advised Lehman Brothers
22    not to sell its stake in Formula One?
23        A.    This is where I started.  It's the
24    next one when I had the hard information.  The
25    first one I suspected it because there was no
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2     way CVC would buy a one-year earnings quality

3     business, and in the next one I had heard that

4     Ron Dennis was supportive.  At that point I knew

5     that they had done a deal.

6          Q.    So, now, this first e-mail, the

7     November 25th, you sent to Pignatti only?

8          A.    Hm-hmm.

9          Q.    Then the second e-mail that you are

10    referring to is dated November 26.  You also

11    sent it to Peter Sherratt and Tom Bernard?

12         A.    Hm-hmm.

13         Q.    Why did you add Peter Sherratt to the

14    e-mail?

15         A.    Well, there are obviously legal

16    implications, and Peter has been around this

17    from the outset.  So it was essentially Pignatti

18    was my direct interlocutor.  The first one I

19    think you might want to consider an ordinary

20    course of dealings where I share my suspicion

21    with the guy I deal with all the time.  The next

22    one starts with:  Erat demonstrandum.

23              There I had hard information, and

24    that, I thought, I should send officially to the

25    group, that as far as I was concerned, was

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2    looking after Lehman's F1 stake.
 3        Q.    Okay.  And I assume you copied Tom
 4    Bernard for the same reason?
 5        A.    Yeah, yeah.  Tom has always been
 6    described to me from the -- discussed in '02 as
 7    the decision maker on F1.
 8        Q.    So when you sent the e-mail on
 9    November 25, had Pignatti asked for your advice
10    on whether to sell its stake, whether Lehman
11    should sell its stake in Formula One?
12        A.    This is probably the thirtieth in the
13    series commencing with:  Sorry, Thomas, JPMorgan
14    have no interest, but please continue to work
15    for us on this.
16              And then -- I mean, there are -- there
17    is a whole stack somewhere in the documents, and
18    I just provided updates.  This was a pretty
19    important update, but it wasn't yet crucial.
20        Q.    I want to make sure I understand.
21              So you said there was an e-mail from
22    Pignatti asking you to continue --
23        A.    No, that was the conversation I told
24    you about when he called me into his office
25    after he had learned that JPMorgan thought they
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2     knew it all anyway.

 3         Q.    And that conversation occurred prior

 4     to November 25?

 5         A.    Oh, yeah, that occurred three years

 6     prior to November 25th of '02 -- of '05.  It

 7     occurred in '02 at the end of the JPMorgan

 8     discussion.

 9         Q.    So, then, if you look -- if you can

10     look at Lehman 216 which is the bottom of the

11     November 25th e-mail, the second to last

12     paragraph states:  Needless to say, if a fresh

13     face were helpful to facilitate things here,

14     mine continues to be available for a very modest

15     percentage participation in LB's gain upon

16     eventual sale.

17              Do you see that?

18         A.    Yes, I see that.

19         Q.    What did you mean by the statement?

20         A.    It is a factual statement just

21     reconfirming that I was working here for my

22     usual modest percentage, ten to be precise.

23         Q.    Did Pignatti respond to this e-mail?

24         A.    There was one response by him

25     somewhere in this chain which was a two-word
```

Dr. Thomas Marsoner - December 15, 2015

```
1                         MARSONER

2   response with the words "the devil."

3         And what that was was Pignatti making

4   fun of a young colleague of ours called Makram

5   Azar, who sort of two days after we had

6   essentially done all the material stuff that

7   needed to be done and needed to be discussed,

8   offered to start working on it.

9         So there is a -- it's somewhere in the

10  disclosure, there is a written acknowledgment by

11  Pignatti to very much have received and read

12  these e-mails by making fun of somebody that

13  offered his services way after the fact.

14      Q.   Is there written acknowledgment from

15  Pignatti agreeing to pay you a very modest

16  percentage participation in LB's gain upon

17  eventual sale?

18      A.   There didn't have to be.  The terms

19  were clear from the outset.

20      Q.   So nothing in writing?

21      MR. VAN TOL:  Object to the form.

22      A.   The course of dealings between

23  Pignatti and me, between Lehman and me was very

24  clearly established.  It did not require any

25  further repetition.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                         MARSONER

2           Q.    So let's look -- let's look at the

3    November 26 e-mail which is on Lehman 215.  This

4    is the e-mail we were discussing a few minutes

5    ago where you sent it to Pignatti, Peter

6    Sherratt and Tom Bernard, and again you provide

7    some more information regarding F1.

8                 And then in the second paragraph you

9    state:  Hence, don't also panic, keep your stake

10   and don't be spooked if JPM does a BayLaBa.  As

11   a matter of fact, JPM selling out would make it

12   easier to admit LP to the top (Alpha Prema)

13   table.

14                Then you state in the third paragraph:

15   If conversely you want to get LB out of the F1

16   headlines (or feel your relationship with Bernie

17   has become too bad), a Marsoner family company

18   previously involved in consumer products would

19   happily consider taking it on if it comes with a

20   to-be-agreed financing package fairly sharing

21   risks and rewards.

22                Do you see that?

23         A.    I see that, yes.

24         Q.    What did you mean by that?

25         A.    That was an offer that turned out to
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2       be completely unnecessary because Lehman was

3       very happy to stay invested and have its name as

4       a shareholder.

5             So that was just an alternative offer

6       that it turns out was not necessary and -- and

7       therefore it was neither taken up nor discussed.

8       Has nothing to do with my advisory relationship.

9       This was a principal offer.

10            Q.    An offer by whom?

11            A.    Well, the company's name would have

12      been Getranke Management, a -- that was a client

13      of Lehman's publicly known to have been involved

14      in the great Austrian beer wars where Pignatti

15      actually advised us, the Marsoner family, who

16      were the principals at the time, in a whole

17      series of difficult discussions that have no

18      bearing on this topic, but it's a -- it was so

19      well known and it was the largest shareholder of

20      the largest brewer in the country which had 56

21      percent market share, so it's a substantial

22      company that would have been credible as an

23      investor if they had needed it.  But nothing to

24      do with my advisory relationship.

25            Q.    Now, you call it a Marsoner family

Dr. Thomas Marsoner - December 15, 2015

Page 96

```
1                        MARSONER
2    company?
3         A.    Yeah.
4         Q.    What interest do you have in this
5    company or did you have at the time?
6         A.    This was primarily my dad's company.
7    I -- my interest in it sort of evolved over
8    time.  What it was at that point in time I don't
9    remember, but it's best described as a Marsoner
10   family company.
11        Q.    Now, had Lehman taken you up on the
12   offer and this Marsoner family company purchased
13   Lehman's stake, how would you, as Lehman's
14   advisor, have been compensated?
15             MR. VAN TOL:  Objection, calls for
16   speculation.
17        A.    That would have required a complete
18   new set of negotiations.  It never came to it.
19        Q.    So you would have had to have
20   negotiated your fee at that point?
21        A.    If this had come to pass, obviously a
22   potential conflict of interest would have
23   arisen.  That potential conflict of interest,
24   which never did arise because it never came to
25   pass, would have had to be managed in some way,
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER

2      just as it was managed when years before I was

3      still a Lehman employee recusing myself of all

4      beer matters and acting only -- and acting only

5      as a principal with Pignatti advising me.

6            We were always very careful to

7      precisely document in those years what I did as

8      an employee and what I would have done for this

9      company.  But, again, it's not material here.

10     It was an offer that I made because I did sense

11     that a staid bank and a shareholder in Formula

12     One doesn't necessarily go together very easily.

13           As we have seen from JPMorgan getting

14     out, as we've seen from Bayerische Landesbank

15     getting out, F1 is high publicity, high drama,

16     not an obvious investment for a bank, although

17     as it turns out, a fantastic one.

18     Q.     Other than your conversations with Tom

19     Bernard and Pignatti, did you have conversations

20     with anyone else at Lehman about whether Lehman

21     should retain its stake in Formula One?

22     A.     During that time?

23     Q.     Yes.

24     A.     Magnoni for sure.

25     Q.     Anyone else?
```

Dr. Thomas Marsoner — December 15, 2015

```
1                        MARSONER
2          A.     Through Magnoni, by definition with
3     Dick Fuld.  Magnoni was closest by far of all
4     the characters involved to Dick Fuld.  Dick and
5     Magnoni spoke a lot, so I certainly made sure
6     that Magnoni was fully apprized of my views at
7     the time so as to make sure that Dick would know
8     about it.
9          Q.     Did Magnoni ever --
10         A.     Dick Fuld.
11         Q.     I'm sorry, I didn't mean to cut you
12    off.
13                Did Magnoni ever tell you that he told
14    Dick Fuld?
15         A.     Oh, yeah.  The history, I think, some
16    of this has been -- has been said in previous
17    depositions, the history of this investment was
18    a personally somewhat difficult one for both
19    Dick Fuld and Ruggero Magnoni, because when
20    originally the Kirch loan was extended, my
21    understanding is that Ruggero proposed it in the
22    European Capital Commitments Committee or Credit
23    Committee or whatever actually turned it down,
24    whereupon Ruggero got on the plane to New York
25    and convinced Dick to do it anyway because it
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2     was so well collateralized, at which point Dick
3     overruled the committee and Lehman gave the
4     loan.
5          When that then blew up, it was not an
6     easy situation, certainly not for Ruggero, and,
7     you know, probably even something that Dick
8     didn't completely disregard.
9     Q.    Okay.  Then how do you know that
10    Magnoni kept Dick Fuld apprized of the advice
11    you were giving on F1?
12          MR. VAN TOL:  Objection, asked and
13    answered.  Go ahead.
14    A.    Magnoni told me.  Well, I know it from
15    Magnoni, but when I mentioned it to Dick at my,
16    for me, important meeting with him in August of
17    '08, Dick did not sound in the least surprised.
18          MS. ALVAREZ:  I think it might be
19    lunch is there.  Instead of me starting a new
20    subject, might as well take a break.
21          THE VIDEOGRAPHER:  The time is 12:40
22    p.m. and we are off the record.
23              *    *    *
24          L U N C H   R E C E S S
25              *    *    *
```

Dr. Thomas Marsoner – December 15, 2015

Page 100

```
1                    MARSONER
2                *    *    *
3         A F T E R N O O N   S E S S I O N
4                   *    *    *
5           THE VIDEOGRAPHER:  The time is 1:44
6     p.m.  We are back on the record.
7     BY MS. ALVAREZ:
8           Q.    Good afternoon, Mr. Marsoner.  If we
9     could take a look at Exhibit 5 which is your
10    declaration that we previously marked.
11          If we could take a look at paragraph
12    ten, you state in the declaration:  I later
13    advised Lehman on Cerberus' acquisition of
14    BAWAG, an Austrian bank, from April 2006 to
15    December 2006 for which LBHI paid me 20 percent
16    of the investment banking revenues generated
17    from the transaction, despite the fact that no
18    formal agreement expressly covered the BAWAG
19    transaction.
20          Do you see that?
21          A.    I see that, yes.
22          Q.    Would you please describe the BAWAG
23    transaction that you are referring to?
24          A.    BAWAG is a significant bank in
25    Austria, the fourth largest, which the owner,
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2     the Austrian trade union organization, had to

 3     sell for a number of complicated reasons that

 4     don't matter here.

 5            Lehman Brothers advised by me, advised

 6     Cerberus on this acquisition which was

 7     tactically relatively complicated and required a

 8     relatively significant amount of prior knowledge

 9     of how the Austrian trade union system worked,

10     how the bank worked.

11            It ended up as a three-party auction

12     where our client Cerberus competed with

13     Bayerische Landesbank and Lone Star, the other

14     US -- it is a distressed debt buying hedge fund.

15            My role, very similar to the F1 case,

16     was one where I really knew the in and outs and

17     the history that had led to the problems that

18     triggered the sale, and so I was able to

19     position Cerberus very early, again, very

20     similar to the F1 case because I saw that this

21     could only be in that case solved by a sale to a

22     new owner, just like F1 in November or so of

23     2005.  Very, very fast paced.

24            It was no time for any sort of legal

25     niceties like drawing big advisory agreements.
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2     We had to work in a team.  I contributed my
 3     experience, and our client won the bid, was
 4     very, very happy with us, actually even -- which
 5     I am told is pretty rare in this business --
 6     voluntarily increased the fee that Cerberus was
 7     due to pay Lehman, and the -- when the closing
 8     came around, Graham Wilson, who was the chief
 9     administrative officer for Lehman in Europe,
10     essentially sent me an e-mail with a spreadsheet
11     which was part of the record here which totaled
12     up what I was due to receive which is 20 percent
13     of the M&A fee, being 10 percent of the very
14     significant financing fee, and also 10 percent
15     of two principal gains by Lehman, both around
16     swaps, then deducted from that the quarterly and
17     other retainer fees.
18               And I didn't have to negotiate that.
19     I didn't have it in any of the agreements,
20     didn't -- we didn't have to negotiate.  It was
21     just an implementation of the established course
22     of dealings between Lehman and me completely,
23     you know, completely problem free.
24          Q.   Now, you have told me a lot here so
25     we'll take it step by step.
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                        MARSONER

 2        A.      Sure.

 3        Q.      When did you start working on BAWAG?

 4        A.      Very much in parallel to what I told

 5     you about F1, that I really started working on

 6     F1 at age ten.  On BAWAG I started working when

 7     Susan Gutfreund, the wife of my then boss John

 8     Gutfreund, the CEO of Salomon Brothers, called

 9     me up and said:  So, Thomas, there is this

10     Austrian in New York City.  His name is Wolfgang

11     Flottl.  He's a billionaire, he says.  What do

12     you know about him?

13              This must have been in 1990.  Wolfgang

14     Flottl was the son of the CEO of BAWAG and who

15     went through the world for years looking like a

16     billionaire.  Years later it became obvious that

17     the source of his hedge fund was purely loans

18     from daddy's bank which had the additional

19     problem that daddy didn't own the bank, so it

20     was most obviously a highly unstable situation

21     that I had, for lack of a better word, sniffed

22     around for many years until it culminated in a

23     legal situation some of you may have been

24     involved in, Revco was the name of the company

25     in New York that went to the wall, pretty much
```

Dr. Thomas Marsoner - December 15, 2015

MARSONER

1

2    took BAWAG with it.  BAWAG was saved by the

3    state, and at that point it became clear that my

4    16 years following this situation might come to

5    a good use.

6        Q.    When did you start working

7    specifically on the Cerberus acquisition?

8        A.    I think what's written here with April

9    2006 is probably quite correct.  The deal only

10   closed in early May of '07, but it got signed on

11   New Year's Eve, 2006.

12           MS. ALVAREZ:  Let's look at an

13   exhibit, Lehman 201, 202.

14           (Marsoner Exhibit 7, Two-page e-mail

15   chain bearing at the top of the first page an

16   e-mail from Thomas Marsoner to Thomas Bernard,

17   dated December 1, 2005, and Bates stamped

18   LEH_0000201 and 202, marked for identification)

19   BY MS. ALVAREZ:

20       Q.    If we look at this, it's an e-mail

21   string between several individuals at Lehman.

22   And we'll go through the e-mails.

23           The very first e-mail is on the bottom

24   of the second page and it is an e-mail from you

25   to Vittorio Pignatti dated December 23rd, 2008,

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2     subject:  BAWAG sweat equity.

3              Do you see that?

4        A.    Yes.

5        Q.    The text of your e-mail reads:  What,

6     please, is my sweat equity in your investment

7     if, on top of, one, creating the opportunity in

8     the first place; two, convincing my buddy plus

9     disciple David to admit you; three, I

10    demonstrably kill the GMAC structure?  Please

11    advise.  Thanks.  T.

12              What did you mean by your sweat

13    equity?

14       A.    It was an additional request that I

15    made over and above the fees that were agreed

16    which was turned down by Peter Sherratt,

17    actually.

18       Q.    So at this point you already had a

19    conversation with Lehman about your fees in

20    BAWAG?

21       A.    No, I did not have to have a

22    conversation about the fees.  This was -- for

23    the reason I set out here, there was an

24    additional component of economics that was made

25    available which was essentially call options,
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2    stock options, and I raised my hand and said:
3    Could I please have some of those as well, and
4    that was turned down.
5         Q.    So this has nothing --
6         A.    But that had nothing to do with the
7    agreed fees which were paid with no discussion
8    and no problems.
9         Q.    Okay.  So this had nothing to do with
10   the 20 percent of the investment banking
11   revenues?
12        A.    Not at all, this was something that I
13   was asking because I thought it would be fair to
14   get a little extra.  The firm thought otherwise
15   and it didn't happen.
16        Q.    Okay.  Let's look at another document.
17   Let's look at Lehman 203.
18        A.    Maybe I could describe it even more
19   precisely now, having precisely reread it.
20              What was completely non-contentious
21   was my advisory work.  Here this is Pignatti had
22   moved on.  He was no longer my counterpart in --
23   as head of M&A he had taken a merchant banking
24   role.  And in this merchant banking role, his
25   merchant banking fund got to invest into this
```

Dr. Thomas Marsoner - December 15, 2015

Page 107

```
1                         MARSONER
2    deal.
3              MS. ALVAREZ:  This would be eight.
4    This is a one-page document labeled Lehman 203.
5              (Marsoner Exhibit 8, Single-page
6    e-mail from Vittorio to David Stonberg and
7    others, dated Thursday, May 24, 2007, and Bates
8    stamped LEH_0000203, marked for identification)
9    BY MS. ALVAREZ:
10       Q.    This is an e-mail from Pignatti to
11   David Stonberg.  Cc'd are Michael Odrich and
12   Anthony Tutrone.  It's dated May 24th, 2007.
13             I recognize, Dr. Marsoner, that you
14   are not copied here, but have you seen this
15   e-mail before?
16       A.    I believe it was produced by your
17   clients in discovery, right?
18       Q.    That's right.
19             Do you know who David Stonberg is?
20       A.    I'm afraid I don't know him, I don't
21   think I've ever met him nor do I recognize the
22   name.
23       Q.    What about Michael Odrich?
24       A.    I believe, although I'm not certain,
25   that he at the time was the head of Lehman
```

Dr. Thomas Marsoner — December 15, 2015

```
1                         MARSONER
2       Global Merchant Banking where Pignatti was the
3       head of Lehman European Merchant Banking.  That
4       is sort of principal investments out of funds.
5            Q.     What about Anthony Tutrone?
6            A.     I do not know him.
7            Q.     Now, in this e-mail Pignatti states:
8       In addition, an XLB, Thomas Marsoner, who is a
9       consultant for Austria, gave us a lot of help in
10      assessing the political dangers, management role
11      of post office in getting a board seat.  For him
12      a three hundred to $400 carry would be money
13      well spent as he has been retained by Cerberus
14      as permanent senior advisor to BAWAG, and he has
15      been, and will be if we give him carry, a more
16      accessible source of info on BAWAG than the
17      Cerberus guys.
18              Do you see that?
19           A.     I see that, yes.
20           MR. VAN TOL:  I think it's three
21      hundred to $400,000.
22           A.     It's -- it concerns --
23           MR. VAN TOL:  Wait for a question.
24      BY MS. ALVAREZ:
25           Q.     I don't know if I mentioned, the
```

Dr. Thomas Marsoner - December 15, 2015

```
1                       MARSONER
2    subject line says:  BAWAG IBD fee.
3             Do you see that?
4       A.    Yes.
5       Q.    What does IBD stand for?
6       A.    Investment banking department.
7       Q.    Do you know what Pignatti meant by the
8    three hundred to $400,000 carry?
9       A.    I can suspect that what he meant is
10   the sweat equity that we discussed before which
11   never happened.
12      Q.    So this was never offered to you?
13      A.    It was discussed but I was never -- I
14   was never given this.  Also, I have never been
15   retained by Cerberus as a permanent senior
16   advisor to BAWAG, so there is a fairly important
17   part of this sentence here which is just
18   factually false.
19      Q.    When were you paid for your work on
20   BAWAG?
21      A.    Sorry, when was I paid?  I was paid
22   after the closing, relatively soon after the
23   closing, but I don't know what the date of the
24   Graham Wilson e-mail is.  Must be something like
25   either May or June of 2007.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                       MARSONER
2           Q.    Who at Lehman were you working with on
3     that transaction?
4           A.    Christian Meissner, Michael Bonacker,
5     Biergen Kreiger.
6           Q.    Anyone else?
7           A.    No, most of my work was done directly
8     with the Cerberus people.
9           Q.    Okay.  We are going to shift gears a
10    bit.
11          MS. ALVAREZ:  We are going to mark
12    another exhibit.  It is Marsoner 159.  This one
13    was produced by Dr. Marsoner labeled Marsoner
14    159 and 160.
15          (Marsoner Exhibit 9, Two-page e-mail
16    chain bearing on the top of the first page an
17    e-mail from Thomas Marsoner to Jeremy Isaacs,
18    dated Wednesday, July 4, 2007, and Bates stamped
19    Marsoner00000159 and 160, marked for
20    identification)
21          THE WITNESS:  Could I just, on this
22    sweat equity, make one clarifying statement?
23          MS. ALVAREZ:  Sure.
24          THE WITNESS:  This whole sweat equity
25    thing concerns an aspect of this transaction
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2      that was less than 5 percent of it.  Cerberus

3      bought BAWAG for 3.6 billion Euros, and this

4      fund that Pignatti ran co-invested 150 million.

5      So this was a 5 percent co-invest --

6                MS. ALVAREZ:  Okay.

7                THE WITNESS:  -- that --

8                MS. ALVAREZ:  Okay.  Thank you.

9      BY MS. ALVAREZ:

10         Q.    So if you look at this Exhibit 9, it

11     is an e-mail from you to Jeremy Isaacs dated

12     July 4th, 2007.  The subject line reads:  Thanks

13     for the coffee.

14               I think we covered this, but I'm going

15     to ask again.

16               Who is Jeremy Isaacs?

17         A.    He was at the time the chief executive

18     officer of Lehman Brothers in Europe.

19         Q.    Why did you send him this e-mail?

20         A.    Primarily, of course, because I sent

21     thank you notes after people invite me for

22     coffee, and my well disclosed and blatantly

23     obviously visible ulterior motive was, of

24     course, the usual, call it victory laps, call it

25     bragging, call it positioning.  I would probably

Dr. Thomas Marsoner - December 15, 2015

1                         MARSONER

2      prefer the word positioning, in which I just

3      wanted to put on the record that the Formula One

4      investment that was already looking very good.

5      At that point in time was really primarily based

6      on my timely and correct advice that the senior

7      guy, with all due modesty, in my view correctly

8      characterized as:  That's huge.

9            So it was to prepare the ground for an

10     eventual fee claim when and if revenues would

11     become visible.

12           Q.    Did you tell Jeremy Isaacs that you

13     were expecting to be paid for Formula One?

14           A.    This was a coffee with a very senior

15     guy.  He had invited me.  To the best of my

16     knowledge it was very clear to him what I meant

17     both over the coffee and then when I, you know,

18     set it out.  But I certainly remained both

19     polite and there was no reason to jump the gun.

20     Revenues were not then visible.

21           Q.    So, then, at this point in time you

22     didn't say anything to him about -- or you are

23     saying dropping the gun, you didn't drop the

24     gun, you didn't tell him that you expected to be

25     paid?

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2        A.    I think one can say things quite
 3   clearly without putting them prematurely and
 4   impolitely.  I think by appending my claim to
 5   fame e-mails I made very clear what I was
 6   implying here.  But I didn't do more than imply
 7   it, I didn't want to do more, didn't need to do
 8   more.  It wasn't the time.
 9              But I did feel -- I did feel the need
10   to establish with the senior decision makers at
11   Lehman that the way I looked at it, the F1
12   investment was very much my deal.  The reason I
13   was so motivated to make that point at the time
14   was because at least at the time I had come to
15   the conclusion that both Jeremy, chief executive
16   Europe, and certainly Dick Fuld, had heard not
17   from my dear colleagues at Lehman about my role
18   in Cerberus BAWAG, but from the Cerberus guys.
19        Q.    Looking at the text of your e-mail,
20   you identify three transactions, Formula One
21   being the third transaction.
22              The first one you identify is Telecom
23   Austria, right?
24        A.    Yeah.
25        Q.    Was Telecom Austria covered by an
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2    advisory services agreement?

3         A.     There were a whole number of

4    transactions around Telecom Austria that in some

5    ways I was involved in, in some cases more, in

6    some cases less.  Some were covered, some were

7    not.

8         Q.     Which ones were you referring to in

9    this e-mail?

10        A.     Lehman made good money out of

11   certainly some equity issuance there.  There was

12   also at least one M&A deal that Lehman made

13   money on, and I was involved.  He knew that I

14   was involved, a major Austrian company.

15        Q.     Did he know that you were involved in

16   Formula One before sending this e-mail?

17        A.     I do not know.  I do not know.

18        Q.     What about number two, the sale of

19   60,000 apartments for the Republic of Austria,

20   were those covered by an advisory services

21   agreement?

22        A.     Those -- that specific assignment was

23   definitely covered.  Yes, it was multiyear.

24   Generated something like a 10 million Euro fee

25   for Lehman.

Dr. Thomas Marsoner — December 15, 2015

Page 115

```
1                        MARSONER
2              Q.    Did Jeremy Isaacs respond to this
3       e-mail?
4              A.    No, he did not.
5              Q.    Did you have a telephone conversation
6       with Jeremy Isaacs after you sent this e-mail?
7              A.    After this e-mail I do not believe
8       that I had one, no.  I saw no reason.
9              Q.    Have you discussed Formula One with
10      Jeremy Isaacs since July 4th, 2007?
11             A.    Yes.  You asked me earlier and I told
12      you that at some point I now believe before
13      launching the UK proceedings, I went to see him
14      with my evidence book.
15                       DISCOVERY REQUEST
16      ------------------------------------------------------
17             MS. ALVAREZ:  I would just like to
18      note for the record that Dr. Marsoner testified
19      that he reviewed the evidence book in
20      preparation for this deposition and we don't
21      have a copy, so we would call for its
22      production.
23             MR. VAN TOL:  Consider your request.
24      I don't know if it was called for.
25             MS. ALVAREZ:  Well, it's called for
```

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER
2        now, and we'll follow up in correspondence.
3    BY MS. ALVAREZ:
4        Q.    In this e-mail with Jeremy Isaacs you
5        mention that you thank him for his advice on
6        your little asset management project?
7        A.    Hm-hmm.
8        Q.    What was this asset management
9        project?
10       A.    I had the idea to launch, and
11       ultimately did launch an enhanced index fund,
12       asset management approach, which I called
13       Indexceed Limited which is essentially -- the
14       strategy is essentially a passive strategy
15       slightly optimized around various edges which
16       gave certainly top quartile performance.  I
17       spent a number of years on it, but I never
18       managed to raise any significant funds for it so
19       ultimately folded it again.
20       Q.    Okay.
21            MS. ALVAREZ:  We'll move on to the
22       next exhibit, then, which is Marsoner 157 to
23       158.
24
25
```

Dr. Thomas Marsoner — December 15, 2015

```
1                          MARSONER
2                    (Marsoner Exhibit 10, Two-page e-mail
3       chain bearing on the top of the first page an
4       e-mail from Thomas Marsoner to Dan Schwarzmann,
5       dated Monday, December 3, 2012, and Bates
6       stamped Marsoner00000157 and 158, marked for
7       identification)
8    BY MS. ALVAREZ:
9         Q.    This is being marked as Exhibit 10.
10      If you could take a look at it.
11               So this is an e-mail from you, Dr.
12      Marsoner, to Dan Schwarzmann at PwC.  It's dated
13      December 3rd, 2012, and it looks like you are
14      forwarding to him an e-mail from Bruce Matthews
15      to you, or it's really an e-string between you
16      and Bruce Matthews in August 2009.
17               Do you see that?
18        A.    Yes, I see that.
19        Q.    Well, let's look at the original
20      e-mail which is actually on 158 the next page.
21               That e-mail is from you to Bruce
22      Matthews dated August 10, 2009.  It reads:  Who
23      at your shop oversees the Lehman investment in
24      the CVC group in Formula One, please?  I have
25      had a fair amount to do with LB making that
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                        MARSONER

 2      investment and would like to just find out where

 3      you stand on it so we can see if a project of

 4      mutual interest could ensue.

 5              Do you see that?

 6      A.      I see that, yes.

 7      Q.      Who is Bruce Matthews?

 8      A.      He was a colleague of mine on the

 9      credit risk committee of Lehman Brothers Europe

10      Limited.

11      Q.      Why did you send this e-mail to him?

12      A.      Because he is an employee Alvarez &

13      Marsal.

14      Q.      Why did you want to send this to an

15      employee of Alvarez & Marsal?

16      A.       I suspected that Alvarez & Marsal

17      would have some involvement with the Lehman

18      investment in Formula One.

19      Q.      Where was Bruce Matthews based, do you

20      know?

21      A.       I believe in London, certainly at the

22      time I think he was based in London.

23      Q.      Why would A&M have any involvement in

24      Lehman's investment in F1?

25      A.      Because A&M were the -- what's it
```

```
1                          MARSONER

2       called -- the administrator equivalent of Lehman

3       in the US.

4           Q.     You say in the e-mail that you would

5       like to just find out where you stand on it to

6       see if a project of mutual interest could ensue.

7                  What project of mutual interest are

8       you referring to?

9           A.     There were a whole number that were

10      imaginable including, but not limited to selling

11      the stake again.  And I will not -- I will not

12      hesitate to freely admit that a part of the

13      motivation of writing this e-mail was the same

14      motivation that led me to write the Isaacs

15      e-mail, the Bonacker e-mail, the Fuld

16      conversation, just make sure it was widely known

17      that around F1 and Lehman, my hat was in the

18      ring.

19          Q.     Did you inform Bruce Matthews that you

20      expected to be paid for Formula One?

21          A.     Again, revenues were a long way from

22      visible at the time.  Just like with all the

23      other prepare-the-ground conversations, there

24      was nothing that I could charge my 10 percent

25      on.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER

2        Q.    Did you inform Bruce Matthews that you

3    eventually expected to be paid by Lehman when

4    revenues were realized?

5        A.    I do not believe that I said that

6    explicitly at the time, just like I didn't say

7    it explicitly in all the other

8    prepare-the-ground communications.

9        Q.    And Bruce Matthews responds:  Happy to

10   introduce you to our guys responsible for the F1

11   position.  Can you advise me what capacity you

12   have been involved and would consider being

13   involved so I can set that up properly?

14            Do you see that?

15       A.    I see that, yes.

16       Q.    Then you respond to that e-mail on

17   August 11, 2009, which is the same date, and you

18   respond:  My involvement goes back to my

19   full-time years at Lehman pre-2002 when CVC

20   bought out BayernLB, my early understanding that

21   this deal was pre-agreed with all the key then

22   warring F1 parties was, I believe -- you say

23   related e-mails exist -- the original reason to

24   for LB to stay invested at that time.  At this

25   stage I would like to help you guys maximize
```

Dr. Thomas Marsoner - December 15, 2015

```
1                      MARSONER
2   value here.
3             How did you expect to help Lehman
4   maximize value?
5        A.    Well, if Alvarez & Marsal had picked
6   up on this, there were a whole number of ways in
7   which I could have helped them since I really
8   knew the space better than most, just -- just
9   for example what I wrote here.  I could have
10  helped them to sell it had they wanted to sell
11  it early, I could have helped them vis-a-vis
12  CVC.
13            There were a number of things that I
14  could have done in addition to what I already
15  had done in '05 which I obviously wanted to make
16  sure that they were -- I think I used the word
17  institutionally aware of.
18       Q.    Did Bruce Matthews take you up on your
19  offer?
20       A.    Absolutely not, nothing tangible ever
21  came back from either Bruce or Alvarez & Marsal.
22       Q.    Then Bruce Matthews responds on August
23  13, 2009:  That F1 guy is in the US.  I was due
24  to go out next week and was going to brief him,
25  but then may postpone now, so I will get in
```

Dr. Thomas Marsoner - December 15, 2015

```
1                      MARSONER

2      touch and introduce you.

3              Do you see that?

4      A.    I see that, yes.

5      Q.    Did you ever get in touch with the US

6      guys responsible for F1?

7      A.    I do not even know his identity to

8      this day.

9      Q.    Did you try and learn their -- or his

10     or her identity?

11     A.    I think I followed up often enough

12     with Bruce Matthews to understand that they had

13     no interest in taking this forward with me.

14     Q.    So you didn't follow up?

15     A.    I followed up on a number of

16     occasions.  So long as he was on the creditors

17     committee of LBEL, I asked him every time I saw

18     him.

19     Q.    Did you at any point tell him:

20     Listen, I expect to be paid for this?

21     A.    It was premature.  It was premature.

22     There were no visible revenues at the time.

23     Q.    And during your -- by the way, were

24     your follow-ups by e-mail?

25     A.    Since I sent this to Dan Schwarzmann
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2     who was the decision maker/administrator at

 3     LBEL, I assume that this is -- that this is the

 4     core of the relevant e-mail traffic.

 5          Q.    Dan Schwarzmann is the administrator

 6     of Lehman Brothers Europe Limited?

 7          A.    Europe Limited, yes.  He works for PwC

 8     and is the senior administrator for LBEL.

 9          Q.    Okay.  So in your conversations with

10     Bruce Matthews, what did he tell you about the

11     Formula One investment?

12          A.    That it wasn't him.  There was some

13     other guy he was going to produce which never

14     happened.

15          Q.    Did he tell you why the guy was in the

16     US?

17          A.    No, I didn't particularly -- I mean,

18     Alvarez & Marsal is a US firm so I wasn't

19     surprised that the guy would be in the US.

20          Q.    So you didn't ask:  Why is this guy in

21     the US dealing with a European investment?

22          A.    It's a US firm.  I did not know where,

23     upon reinvestment, the F1 stake was held.  Could

24     have been in Europe, some island in between,

25     could have been the US.  I did not know.  I
```

Dr. Thomas Marsoner - December 15, 2015

1                      MARSONER

2       surmised that Alvarez & Marsal would have

3       something to do with it and I surmised that they

4       would want to talk to me.  It turns out they did

5       not.

6               But revenues have not crystalized.

7       Revenues crystalized in May of 2012, and I put

8       my claim in in August of 2012, and this is still

9       the period during which I was hoping to come to

10      a -- an agreement with Dan Schwarzmann of PwC

11      and LBEL.

12              So I shared with him a whole number of

13      things that I thought were pertinent and that

14      would show him that in fairness I was owed some

15      money here.

16      Q.      Did you tell him that you were owed

17      some money?

18      A.      To Dan Schwartzman?

19      Q.      Hm-hmm.

20      A.      Oh, very much.  I put down a hundred

21      million on the original claim in August and

22      revised that to 150 million when I heard more

23      data.  Proof of claim is the name of that form

24      and the very first one had a hundred million in

25      it.

Dr. Thomas Marsoner - December 15, 2015

1                         MARSONER

2           Q.     This is a proof of claim against

3     Lehman Brothers Europe Limited?

4           A.     My contractual partner, yes.

5           Q.     Why did you increase the claim from a

6     hundred million to 150 million?

7           A.     Because I got more data on the -- on

8     the cash that had actually come out and on the

9     valuation that was reasonable.

10          Q.     You ultimately settled this claim with

11    Lehman Brothers Europe, correct?

12          A.     That is correct, yes.

13                 MS. ALVAREZ:  Let's just take a look

14    at it.  It's Marsoner 217.  We'll mark this

15    Exhibit 11.

16                 (Marsoner Exhibit 11, Multipage

17    document entitled Consent Order, bearing the

18    hand-written date at the top of the page 19th

19    June, 2014, and Bates stamped Marsoner00000217

20    through 227, marked for identification)

21    BY MS. ALVAREZ:

22          Q.     Dr. Marsoner, if you could just look

23    at Exhibit 11.

24                 Is this a copy of the order approving

25    your settlement with Lehman Brothers Europe

Dr. Thomas Marsoner - December 15, 2015

```
1                      MARSONER

2    Limited?

3         A.    I believe it is.

4         Q.    Attached to the order is the actual

5    settlement agreement, is that right?

6         A.    That is correct.

7         Q.    And the settlement is dated June 5,

8    2014?

9         A.    That is so.

10        Q.    How did it come to be that you settled

11   this claim?

12        A.    I was advised by my QC, Gabriel Moss,

13   that my claim was very solid in substance, but

14   that it had the significant problem that the one

15   and a half billion dollars in profits that I was

16   basing my claim on was sitting outside the UK

17   jurisdiction.  And the way UK bankruptcy law

18   works, it would have been exceedingly difficult

19   to enforce a positive verdict in this UK case

20   against a US entity.

21              Essentially, essentially here -- and

22   please forgive me, I am rapidly getting out of

23   my depth legally, but as I understood it, I had

24   a really good chance that the UK court would

25   ultimately say yes, you are owed your 10 percent
```

Dr. Thomas Marsoner - December 15, 2015

1                        MARSONER

2      of the 1.5 billion, but so sorry Thomas, we

3      don't have the money here.

4            Q.     When did your -- you say QC.

5                   When did your QC advise you that the

6      profits were sitting outside of the UK

7      jurisdiction?

8            A.     That wasn't -- that -- I don't

9      remember when, but in the course of the UK

10     proceeding, I forget when exactly that was,

11     there must be e-mails to that effect still, it

12     was the administrators, PwC administrators who

13     said:  Look, we don't have the money here, it is

14     in the US, not in the UK.

15           Q.     So this was prior -- prior to June 5,

16     2014, prior to --

17           A.     Yeah, very much, it was -- other than

18     generally not being a very litigious person, to

19     be honest, knowing that I had a good chance to

20     win this but that the victory would have a very

21     high risk of being an empty one was the single

22     most important consideration for me to settle

23     this at all and particularly to settle this at

24     so low a number.

25           Q.     So at that point were you considering

Dr. Thomas Marsoner — December 15, 2015

Page 128

```
 1                        MARSONER
 2      filing a claim against the Lehman US entities?
 3          A.    Yes, of course.
 4              MS. ALVAREZ:  We can take a
 5      two-minute --
 6              THE VIDEOGRAPHER:  The time is 2:26
 7      p.m.  We are going off the record.
 8              (Recess)
 9              THE VIDEOGRAPHER:  This begins media
10      unit number four.  The time is 2:40 p.m. and we
11      are back on the record.
12      BY MS. ALVAREZ:
13          Q.    Dr. Marsoner, Lehman Brothers Holdings
14      Inc. filed for bankruptcy in September 15, 2008,
15      correct?
16              It was a very public filing, right,
17      the largest in history?
18              So you were aware when Lehman Brothers
19      Holdings filed for bankruptcy?
20          A.    I was very aware when Lehman Brothers
21      Holdings Inc. filed for bankruptcy.
22          Q.    You didn't file a claim against Lehman
23      Brothers Holdings Inc. by the bar date, correct?
24          A.    I did not even know that a bar date
25      existed under US bankruptcy law.  Under UK
```

Dr. Thomas Marsoner — December 15, 2015

```
 1                    MARSONER

 2      bankruptcy law, LBEL we just received the new 4

 3      billion Euro claim two weeks ago.

 4          Q.    So you didn't know a bar date existed

 5      in the US?

 6          A.    No, I did not.  I had never had any

 7      dealings with US bankruptcy law before.

 8          Q.    Okay.

 9              MS. ALVAREZ:  We are going to mark a

10      document as an exhibit.  Mark this as Exhibit

11      12.

12              (Marsoner Exhibit 12, Multipage

13      document entitled Lehman Brothers Europe Limited

14      - In Administration, Joint Administrators'

15      progress report for the period 23 September 2009

16      to 22 March 2010, dated 20 April 2010, and

17      bearing no Bates stamps, marked for

18      identification)

19      BY MS. ALVAREZ:

20          Q.    This is a progress report filed by

21      Lehman Brothers Europe Limited in

22      administration.  It says:  Joint administrators'

23      progress report for the period September 23rd,

24      2009, to March 22, 2010, and the date of the

25      report is April 20, 2010.
```

Dr. Thomas Marsoner – December 15, 2015

Page 130

```
 1                      MARSONER
 2             Have you seen this report before?
 3      A.    I do not know.
 4      Q.    You testified earlier that you were on
 5   the Creditors Committee of Lehman Brothers
 6   Europe, correct?
 7      A.    That is correct, yes.
 8      Q.    In fact, if you look at page 2 of the
 9   report, you are identified here as a member of
10   the Creditors Committee of Lehman Brothers
11   Europe.
12             Do you see that?
13      A.    That is correct, yes, I can see that.
14      Q.    If we flip to page 4, under
15   intercompany debtors, it states in a bullet
16   point:  Submitted direct and guaranteed claims
17   into the estate of Lehman Brothers Holdings
18   Inc., totaling 1.4 billion by the prescribed bar
19   date.
20             Do you see that?
21      A.    I can see that now, yes.
22      Q.    So at the time, Lehman Brothers Europe
23   Limited had submitted a claim in LBHI's
24   bankruptcy by the bar date, correct?
25      A.    That is what is written here.  I would
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2     not have understood the word "bar date."

3          Q.     Was this discussed -- was the bar date

4     discussed among the Creditors Committee?

5          A.     Absolutely not.   I was -- this has

6     come up once before and I actually circulated

7     the minutes of the one Creditors Committee

8     meeting that took place during that first year

9     as I now know, and those minutes very clearly

10    show that nothing remotely approaching or

11    resembling a US bar date was discussed.

12         Q.     How involved were you in the Creditors

13    Committee?

14         A.     In the Creditors Committee at Lehman

15    Brothers Europe Limited I was very much

16    involved, yes.   The focus of our work at the

17    time was to compensate PwC.   I was very involved

18    in the negotiation to compensate PwC.   I came up

19    with the idea of paying them a success fee which

20    has worked well for Lehman Brothers Europe

21    Limited, I believe.

22              And the other big topic we discussed

23    at the time was a relatively large pool of

24    assets that was sitting at JPMorgan, and it

25    wasn't entirely clear which Lehman entity had

Dr. Thomas Marsoner - December 15, 2015

Page 132

1                    MARSONER

2      the best claim on that.

3          Q.    Now, $1.4 billion is a significant

4      amount, significant claim that Lehman Brothers

5      Europe had against Lehman Brothers Holdings

6      Inc., correct?

7          A.    Not necessarily.  I mean, this is a

8      600 billion bankruptcy, and to this day,

9      literally to this day 10 billion tactical claims

10     are filed by one company on the other company

11     and back again.  That was not the work of the

12     committee, that was the work of the

13     administrator.

14         Q.    So the committee had no -- the

15     Creditors Committee had no interests in whether

16     the administrator filed a claim against Lehman

17     Brothers Holdings Inc.?

18             MR. VAN TOL:  Could I have that read

19     back, please?

20             (Question read)

21             MR. VAN TOL:  Object to the form to

22     the extent you are asking this witness to

23     testify about what an entire committee thought.

24             You may answer.

25         A.    It was absolutely not the focus of my

Dr. Thomas Marsoner - December 15, 2015

1                           MARSONER

2     work at the time on the committee.  I told you

3     what the two focus areas were, compensating PwC

4     and finding out where the famous account 28

5     JPMorgan pledge matter stood.  I was totally

6     focused on that.

7              What went on between LBEL and the US

8     back and forth I simply do not remember.  It was

9     not anything I focused on at the time.

10        Q.    Did you review these progress reports

11    that were put out by Lehman Brothers Europe?

12        A.    The part that I reviewed was always

13    the last page.

14        Q.    So you only reviewed the last page?

15        A.    There is a lot of boilerplate in the

16    earlier pages that for the non-bankruptcy lawyer

17    and the nonpracticing lawyer are relatively

18    dark.  Were then and are now.

19        Q.    So you have never seen this before?

20              MR. VAN TOL:  Objection, asked and

21    answered.

22        A.    I think my most accurate answer which

23    I believe I have given before is the one that if

24    I did see it -- and I do not recall seeing this

25    paragraph at all -- if I had seen it, I

Dr. Thomas Marsoner - December 15, 2015

Page 134

1                    MARSONER

2      certainly wouldn't have understood it.  I did

3      not know what the prescribed bar date meant.

4         Q.    You never had discussions while you

5      were on the Creditors Committee about getting in

6      a claim at Lehman Brothers Holdings by a

7      prescribed deadline?

8         A.    Absolutely not.  Absolutely not.  As I

9      tried to say, it is a concept that is alien to

10     UK bankruptcy law.

11        Q.    You filed a claim against Lehman

12     Brothers Inc., correct?

13        A.    I presume that you are referring to my

14     currency collar, and in that context that is

15     correct, yes.

16        Q.    And that claim you filed by the bar

17     date?

18        A.    I have no idea when I filed it, and

19     whether there was or wasn't a bar date I do not

20     recall.  The substance of this matter was that

21     it was a $5 million currency collar where I had

22     money on a margin account and where there was a

23     risk that the collar would expire against me.

24              And so I was trying to make -- I was

25     trying to get a hundred thousand dollars over

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2      there that was -- that was sitting in this

3      margin account back.  That's when I filed a

4      claim.

5          Q.    Were you represented by counsel or did

6      you file that on your own?

7          A.    I filed that on my own.  I was sent

8      paperwork.  This was relatively simple.  I did

9      involve counsel in that matter once, my Austrian

10     counsel, because I received a phone call at some

11     point from somebody at Lehman.  Basically I

12     think that was after the expiration of the

13     collar.  I believe it had expired $200,000 or so

14     in the money against me.  And there somebody

15     called me, I referred the matter to my Austrian

16     counsel who I think then wrote a personal letter

17     back.

18         Q.    Did you receive a bar date notice from

19     Lehman Brothers Inc.?

20         A.    I do not recall seeing a bar date

21     notice ever until my first conversations with

22     Hogan Lovells where I asked them to show me this

23     piece of paper.  I looked at it and it has very

24     ugly, very big disclosure language at the bottom

25     that I have absolutely never seen before.
```

Dr. Thomas Marsoner - December 15, 2015

Page 136

```
1                      MARSONER
2         Q.    How did you find that form?
3         A.    These gentlemen gave it to me.
4         Q.    In connection with your LBI claim,
5    your claim against the --
6         A.    Yeah, here, I was looking at --
7              MR. VAN TOL:  Object to the form.
8              THE WITNESS:  Sorry.
9              MR. VAN TOL:  Repeat that.  I think
10   you are getting confused.
11             Repeat that question, please.
12             MS. ALVAREZ:  Just to clarify, he was
13   pointing to his attorneys.  I don't know if
14   that's clear for the record.
15             (Record read).
16             MR. VAN TOL:  Okay.
17   BY MS. ALVAREZ:
18        Q.    How did you find the proof of claim
19   form that you submitted in LBI's case, the
20   actual proof of claim form?
21        A.    LBEL.
22        Q.    I'm sorry, Lehman Brothers Inc.?
23             THE WITNESS:  Again, I'm sorry, this
24   is -- are we somewhere in attorney-client
25   privilege land where I should not digress here?
```

Dr. Thomas Marsoner — December 15, 2015

1              MARSONER

2         MR. VAN TOL:  If you are just

3    testifying about where you got a form you can

4    say, but don't divulge any advice you were given

5    about such a form.

6    A.    I believe so -- forgive me, this is

7    alien territory for me.  Obviously on the -- on

8    the US claim, as one would expect, I have relied

9    on my US attorneys.

10         Is that something I can say?

11   Q.    Sure.  I'm confused because you

12   testified that you handled this claim on your

13   own, that you did it yourself.

14   A.    No, no, that was the previous one, the

15   one with the currency collar.  There I was

16   sent -- I mean, this came in the mail in the

17   currency, because very easy to fill in.

18        MR. VAN TOL:  That's why I asked the

19   questions read back.  We have got our entities

20   messed up between LBI and LCC and others.

21        MS. ALVAREZ:  Okay.

22        MR. VAN TOL:  This firm did not

23   represent Dr. Marsoner in connection with this

24   currency collar claim.

25        MS. ALVAREZ:  Okay.

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER
2              THE WITNESS:  With my hundred thousand
3       dollar margin account balance, that --
4              MS. ALVAREZ:  Got it.
5              THE WITNESS:  That I did myself.
6     BY MS. ALVAREZ:
7         Q.    And that claim was against which
8       entity?
9         A.    I believe it was against LBCC.
10        Q.    Okay.  Here we go.
11              So, then, you were represented by
12      counsel in connection with your claim against
13      Lehman Brothers Inc.?
14        A.    No, I was not.  I was not.  I thought
15      that I had filled in the right piece of paper to
16      get my margin account money back from LBCC.  The
17      reason I thought that -- whether the paperwork I
18      filled in at the time was headed LBCC or LB Inc.
19      was immaterial because my broker with whom I
20      entered into this LBCC currency collar was LB
21      Inc.
22        Q.    Okay.  So, then, with regard to LBCC,
23      did you receive a bar date notice from LBCC?
24        A.    I don't think I ever got anything from
25      LBCC which is why I filled in the LBI paperwork
```

Dr. Thomas Marsoner - December 15, 2015

Page 139

```
 1                      MARSONER

 2    to get my LBCC margin balance back.

 3          Q.    I want to ask you about a couple of

 4    addresses.

 5               Do you recognize the address -- and I

 6    may not pronounce these right, I probably

 7    won't -- Casa Andreas 16 Trig Sant Adrija Lija

 8    BLZ10 Morocco.

 9               Do you recognize that address?

10          A.    Well, absolutely not.   That is

11    definitely a nonexisting address because it has

12    elements of the Maltese address that is on my

13    '04 agreement, but it obviously also has the

14    country Morocco that is relatively far away from

15    Malta.

16          Q.    So let's focus on the Maltese address.

17               What is that an address to?

18          MR. VAN TOL:   Objection, asked and

19    answered.   You may answer again.

20          A.    That's the address of the house of a

21    friend of mine in Malta.

22          Q.    Okay.

23          A.    Where I happened to be once in the '04

24    time period.

25          Q.    Do you know if a bar date notice
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER

2    arrived at that house?

3         A.    I never got anything from that house.

4    I used, as I described to you, as a non-UK,

5    non-Austrian address for pure tax cosmetics

6    purposes.

7         Q.    Does your friend still live in that

8    house?

9         A.    I do not know.  I do not know if he

10   still owns it.

11        Q.    Do you recognize the address Casa

12   Peliganos, Costa Keretas?  Do you recognize that

13   as an address?

14        A.    That I recognize.  That is a house

15   that at one point I had rented in Mexico for a

16   three-week family holiday.

17        Q.    Did you use that address on any

18   contracts with Lehman Brothers?

19        A.    I'm not sure that I used it on any

20   contract, but I would assume that I or rather my

21   secretary must have put it on an invoice or two

22   that I probably sent -- sent to Lehman, where,

23   again, for tax cosmetic purposes I preferred a

24   non-UK, non-Austrian address.

25        Q.    Okay.  What about the address Casa
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER

2   Carrion Parco, San Giacomo?

3            Do you recognize that?

4        A.    That's the address of a holiday flat

5   of my -- then of my father's, only Garda in

6   northern Italy.

7        Q.    Did you ever stay there?

8        A.    I occasionally stayed there for

9   periods never exceeding a few days and only

10  during the summer.  No mail is received there.

11  There is not even a mailbox or a -- there is not

12  even a sort of a slit in the door where one

13  could put mail in because it would be pointless.

14       Q.    Did you ever include that address on

15  any contracts with Lehman Brothers?

16       A.    I do not believe I put that on a

17  contract but, again, I may well have put it on

18  an invoice.

19            If I was in the general area at the

20  time, I might well have told my assistant for

21  the often enough discussed tax cosmetic purposes

22  to put that address on the invoice.

23       Q.    Does your father still own that flat?

24       A.    My father had two flats in that house

25  which a year ago he gave to his two sons.
```

Dr. Thomas Marsoner - December 15, 2015

1                           MARSONER

2           Q.     Are you one of those sons?

3           A.     Yes.

4           Q.     Who lives there now?

5           A.     Nobody lives there now.  Those are

6      still holiday flats that get used in the summer

7      occasionally.  In my case practically not

8      because I have a summer house on an Austrian

9      lake, Lake Millstatt where my wife is from, and

10     so the flat of those two flats that I own

11     generally gets used for guests that my brother

12     has.

13          Q.     When did your father give you that

14     flat?

15          A.     About a year ago.

16          Q.     So in 2009 it still belonged to your

17     father?

18          A.     Absolutely.

19          Q.     Do you know if you ever received a bar

20     date notice at that address?

21          A.     I have never seen any mail received at

22     either of those flats.

23               MS. ALVAREZ:  I think this might be a

24     good time for a break.

25               THE VIDEOGRAPHER:  The time is 3:03

Dr. Thomas Marsoner - December 15, 2015

Page 143

```
 1                    MARSONER

 2      p.m.  We are going off the record.

 3            (Recess)

 4            THE VIDEOGRAPHER:  The time is 3:32

 5      p.m.  We are back on the record.

 6  BY MS. ALVAREZ:

 7      Q.    Dr. Marsoner, I would like to turn

 8  back to what's been marked as Exhibit 10.  This

 9  is the e-mail string between you and Bruce

10  Matthews?

11      A.    Yeah.

12      Q.    You testified earlier that you had

13  e-mailed Bruce Matthews about Formula One

14  because he was at A&M?

15      A.    Yes.

16      Q.    You also testified that he was on the

17  Creditors Committee of Lehman Brothers Europe,

18  correct?

19      A.    Europe Limited, yes.

20      Q.    In what capacity did he serve on the

21  Creditors Committee?

22      A.    I presume that he represented one of

23  the US entities, but I'm not certain that it was

24  that.  The reason you see me hesitate is that

25  the cast of characters from A&M has changed over
```

Dr. Thomas Marsoner – December 15, 2015

1                    MARSONER

2      the years.  Bruce Matthews has been out of the

3      picture for quite a few years now and -- so I

4      assume it was one of the US entities, but I

5      cannot be certain of that.

6           Q.    So you e-mailed Bruce Matthews -- you

7      sent him this e-mail in Exhibit 10 because you

8      believed he was on the Creditors Committee

9      representing one of the US entities?

10          A.    I knew he was on the Creditors

11     Committee because he and I coordinated carefully

12     around the question of how do we compensate PwC.

13     We've developed a good working relationship with

14     each other on that committee.

15               And as an Alvarez & Marsal person, as

16     an administrator to Lehman, I thought there had

17     to be somebody at his shop involved in or

18     overseeing the Formula One investment.  I

19     couldn't be certain then that that was a US

20     person or not a US person.  I guess the balance

21     of probabilities was that it would be a US

22     person, but I could certainly not be certain of

23     that.

24          Q.    What I'm trying to understand is why

25     did you think there was someone at his shop

Dr. Thomas Marsoner — December 15, 2015

1                        MARSONER

2       watching over this investment?

3            A.     Because there were two shops that were

4       overlooking Lehman.   In Europe it was PwC.

5       Pretty sure that I would have asked the same

6       question to one of the PwC people who told me

7       not us, so since there were only two

8       administrators to my then knowledge involved, I

9       assumed it had to be somewhere in the Alvarez &

10      Marsal ambit.

11               MS. ALVAREZ:  I think we can mark the

12      next exhibit.  This is labeled Marsoner 32 to

13      41.  I believe this is Exhibit 13.

14               (Marsoner Exhibit 13, Multipage

15      document bearing on the first page an e-mail

16      from Tom Bernard to Thomas Marsoner, dated

17      December 12, 2014, and Bates stamped

18      Marsoner00000032 through 41, marked for

19      identification)

20      BY MS. ALVAREZ:

21           Q.     Exhibit 13 is labeled Marsoner 32

22      through Marsoner 41.  If you take a look, it's

23      an e-mail string between you and Tom Bernard.

24               Now, there are various e-mails here,

25      some may be in order, some may be out of order,

Dr. Thomas Marsoner - December 15, 2015

Page 146

```
1                    MARSONER

2      it's a little bit confusing, but what I would

3      like to discuss with you first is on Marsoner

4      34.

5             Here this is an e-mail halfway --

6      about the middle of the page is an e-mail from

7      you to Tom Bernard dated December 7, 2014, and

8      the subject line is shared history.

9             Do you see that?

10     A.    Yes, I see that.

11     Q.    You say in the -- I'll say third

12     paragraph in the middle of the paragraph:  I'd

13     love to catch up with you at your convenience

14     for half an hour at some point in the next few

15     months primarily to chat about Formula One

16     wherever convenient for you, New York, Rockies

17     or London.

18            Do you see that?

19     A.    I see that, yes.

20     Q.    What with regard to Formula One did

21     you want to discuss with Tom Bernard?

22     A.    The Peter Sherratt allegation in the

23     e-mail that you shared with Peter Sherratt in

24     which he had written that Christian and Tom, Tom

25     Bernard, agreed with his notion that I had no
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2   claim.
3         Q.    Were you able to schedule a meeting
4   with Tom Bernard?
5         A.    No, I ended up only being able to
6   speak to him on the phone and exchange a few
7   e-mails, all of which you have.
8         Q.    What did you discuss on the telephone
9   with him?
10        A.    Very much -- I told him very openly
11  that -- what I wrote here, that I was a little
12  bit troubled and -- so it -- did he really say
13  that he thought that I had no claim, and his
14  response was that he, of course, did not say
15  that.  He knew I was a paid advisor, he didn't
16  know more, he didn't know less was essentially
17  the substance of it.
18        Q.    Did he say anything about whether he
19  thought you should be paid for Formula One?
20        A.    You know, ultimately, as you know, I
21  gave him a sort of suggestion of what he could
22  write, and ultimately he wrote something that
23  is -- you know, that I would characterize as
24  being middle of the road along the lines of the
25  Peter Sherratt allegation that Bernard agrees
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2     that I should not be paid, certainly a notion

3     that he did not share.  But at the same time he

4     pointed out to me in those conversations that

5     while he was aware of the fact that I was a paid

6     advisor, he was not in charge of the Lehman

7     relationship with me.

8          Q.    Okay.  Just looking through these

9     e-mails, if you look at Marsoner 33 there is an

10    e-mail from you to Tom Bernard dated December 9,

11    2014, and it says:  In preparation for our call

12    later this week, please find enclosed my best

13    estimate of the 1.5 billion or so F1 profit that

14    I think we both materially contributed to.

15          Do you see that?

16          A.    Yes, I see that.

17          Q.    Was this -- did you send this e-mail

18    before you had that call with him that you

19    just -- the call that you just described?

20          A.    I believe so, yes.  I believe so.

21          Q.    You say:  Please find enclosed my best

22    estimate.

23          What was attached to this e-mail?

24          A.    The landscape analysis that you have

25    that shows that before bankruptcy, Lehman had

Dr. Thomas Marsoner - December 15, 2015

MARSONER

2  put in 300, got out 312, and then since

3  bankruptcy Lehman made about a billion five of

4  which a little less than half in cash and a

5  little more than half fair value of the stock.

6      Q.    When you spoke to Bernard, did you

7  discuss that landscape analysis?

8      A.    You see the -- his e-mail up there in

9  which he responds.  I certainly -- I certainly

10 would have explained it to him, yes.

11     Q.    What did he say about it?

12     A.    Just factual, just what it says, just

13 what I just said in terms of what the net firm

14 revenues would Lehman made out of F1 most

15 probably amounted to by now.

16     Q.    In this e-mail, and I'm referring to

17 the December 9 e-mail from you to Tom Bernard

18 that we were just talking about, you say:  Since

19 you were in many ways even closer than me to the

20 situation, you may have better information.

21          What did you mean by that statement?

22     A.    You know, I wanted to establish a

23 factual base for the discussion of what has

24 happened since he and I last spoke and -- and

25 particularly after '05, both Pignatti and my

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2    involvement had been very slight.

3              I assumed he might still know more

4    about it, but no particular agenda, just

5    establishing -- establishing a factual base on

6    which to discuss the matter.

7         Q.    And then Tom Bernard responds on

8    September 12:  Hi, Thomas, this is way more

9    information than I have.

10             What is Tom Bernard referring to

11   there?

12        A.    The landscape analysis.  Particularly

13   he did not have the '012 numbers which he had

14   moved out of that whole thing since he got fired

15   in '09.  What I had gleaned from public sources

16   had happened in '012 he was not actively aware.

17             MR. VAN TOL:  For the record, I think

18   you said September.  It's December 2014.

19             MS. ALVAREZ:  Okay.  Yeah, I see that.

20        Q.    So during this time when you were

21   exchanging e-mails with Tom Bernard and you had

22   a telephone conversation with him, did he say

23   anything about Lehman agreeing to compensate you

24   10 percent of revenues for F1?

25        A.    Tom Bernard very clearly made the

Dr. Thomas Marsoner - December 15, 2015

```
                          MARSONER
 1
 2    point that he knew I was a paid advisor, he knew
 3    that I had pertinent and useful F1 knowledge,
 4    but my relationship with the firm had never been
 5    his business.
 6           I think he has been very clear on
 7    that, certainly throughout the phone
 8    conversations that I had with him, and I think
 9    that's also what the letter that he kindly
10    ultimately submitted says.
11       Q.   So he wouldn't know -- are you saying
12    he wouldn't know whether Lehman had agreed to
13    compensate you for F1?
14       A.   He knew -- he always told me he knew I
15    was a paid advisor and he knew that my F1
16    knowledge was very pertinent, and he actually --
17    he very kindly repeated essentially what he had
18    written in the e-mail at the time, both to me
19    and internally to the team that worked on it.
20           But beyond that, he said,
21    understandably, that he was not involved in the
22    details of the Lehman relationship with me.
23           MS. ALVAREZ:  Let's mark the next
24    exhibit, and this is Marsoner 42 to 43.
25
```

Dr. Thomas Marsoner - December 15, 2015

Page 152

```
1                        MARSONER
2                  (Marsoner Exhibit 14, Single-page
3        e-mail from Tom Bernard to Thomas Marsoner,
4        dated February 3, 2015, with single-page
5        attachment, Bates stamped Marsoner00000042 and
6        43, marked for identification)
7        BY MS. ALVAREZ:
8             Q.    This is an e-mail from Tom Bernard to
9        Tom Marsoner dated February 3rd, 2014.
10                 Attached to the e-mail appears to be a
11       draft letter to the Southern District of New
12       York Bankruptcy Court.
13                 Do you see that?
14            A.    Yeah, I see that.
15            Q.    Is this a copy of the letter that you
16       had prepared for Tom Bernard?
17            A.    I don't know.  I mean, I certainly
18       remember making a convenience draft available to
19       him.  I mean, it was very kind of him to take
20       the time to talk to me in the first place, so I
21       tried to lighten his load as much as I could.
22                 And just like in all other cases, I
23       told him no pride of authorship, please write
24       whatever you feel correctly reflects reality.
25       What exactly he did or whether there were more
```

Dr. Thomas Marsoner - December 15, 2015

Page 153

```
 1                         MARSONER

 2    than one draft, I do not recall.

 3         Q.    Do you recall if he made any he edits

 4    to the draft that you sent him?

 5         A.    I assume he would made edits, yes.

 6         Q.    Did you have a conversation with him

 7    about the edits he was making?

 8         A.    I may well have, but as in all cases

 9    under our e-mails, I think from me to Pignatti,

10    Magnoni, where I always explicitly said please

11    write only what you are comfortable with, the

12    decision was always entirely that of the person

13    who wrote it.

14         Q.    What did he say about the edits he was

15    making to the letter?

16         A.    I don't remember what he said about

17    any specifics.

18         Q.    If you look at this e-mail from Tom

19    Bernard to you, the subject line reads:  Does

20    this work?

21              Do you know what he's referring to?

22         A.    Yeah, whether that would be a helpful

23    statement to counteract the, as he agreed,

24    incorrect claim by Sherratt that Tom agreed that

25    I deserved nothing.
```

Dr. Thomas Marsoner - December 15, 2015

Page 154

```
1                    MARSONER
2         Q.    Did you have a follow-up conversation
3    with Tom Bernard after he sent you this draft?
4         A.    I -- I do not remember that detail.
5    The draft that ultimately he signed and sent in
6    was the one he was comfortable with.  How
7    exactly he came up with that and whether we
8    discussed it once or twice, I do not recollect.
9              In some ways, to be honest, most
10   urgent thing for me was to really have the --
11   that huge sentence on the record above his
12   signature.  E-mails are e-mails, but this is a
13   real letter in which he specifically says that
14   he wrote that.
15             I also got a chuckle out of the fact
16   that the spelling of McLaren has remained the
17   same since the outset, so in many ways my -- my
18   main objective here -- looking for fairness
19   here, and for Tom Bernard to really repeat that
20   very material e-mail exchange in a letter served
21   the main purpose that I was after.
22        Q.    Let's take a look back at Exhibit 13.
23             If you look at Marsoner 36 --
24        A.    I'm sorry?
25        Q.    Marsoner 36.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                      MARSONER

2         A.    36?

3         Q.    Yes.  If you look at the e-mail in the

4    center of the page, it's an e-mail from you to

5    Tom Bernard dated February 2nd, 2015.

6              Do you see that?

7         A.    Hm-hmm.

8         Q.    You say to Tom Bernard:  Because your

9    text ("When the F1 team at Lehman learned of

10   BLB's sale of its stake to CVC, our immediate

11   unanimous reaction was that the price was far

12   too low") otherwise reads like I had nothing to

13   do with realization that it was too low.  In the

14   proper sequencing it is what it is, material.

15             Can you explain what you meant by

16   this?

17        A.    I think what I meant by this has

18   become completely clear in discovery when your

19   client produced the e-mail in which Tom Bernard

20   turned around and sent my e-mail to the entire

21   team at the point in time when the price was not

22   known and said:  If true, what Thomas is saying

23   is huge.

24             So in the proper sequencing that I was

25   looking for here, and which he kindly agreed to
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2    reflect in his letter, it was clear that my call

3    was the first.  He correctly diagnosed it as

4    huge.  He told the team that he is almost fully

5    resolved to stay in, and when they then also saw

6    the press, it was easy to reach the decision to

7    stay in.

8              So this was a factual comment on the

9    correct sequencing and he kindly agreed with the

10   factual comment.

11        Q.    And this text in parenthesis was --

12   sentence that Tom Bernard had added to the draft

13   letter?

14        A.    I think that's -- yeah.  I would

15   assume that that is -- that that is something

16   that he drafted, yes.

17        Q.    Do you know if that sentence remained

18   in the final letter?

19        A.    I believe so, I believe it's at the

20   end.

21        Q.    As you know, Vittorio Pignatti and

22   Ruggero Magnoni also submitted letters to the

23   bankruptcy court, correct?

24        A.    Yeah.

25        Q.    They also made themselves available to

Dr. Thomas Marsoner - December 15, 2015

```
 1                      MARSONER

 2      be deposed in London, correct?

 3           A.    Yes, correct.

 4           Q.    Did you ask Tom Bernard whether he was

 5      willing to be deposed?

 6           A.    Tom Bernard in my phone conversations

 7      with him said that if there was any way he could

 8      be spared a deposition he would be most

 9      grateful.

10           Q.    Did you ask -- despite that statement,

11      did you ask him whether he would make himself

12      available?

13           A.    No.  No, in every single case, when

14      people either gave me no answer or told me

15      please leave me alone with this even though you

16      are right, as in the case of Christian Meissner,

17      I respected their wishes.  I mean, it's very

18      kind of Tom to even have spent the time to

19      write -- to write the letter he wrote.  To

20      further impose upon him I wouldn't have

21      thought -- I wouldn't have thought right.

22                 MS. ALVAREZ:  Well, let's take a look

23      at -- we will mark this Exhibit 15.

24

25
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2              (Marsoner Exhibit 15, Two-page e-mail
 3    chain bearing at the top of the first page an
 4    e-mail from Christian Meissner to Thomas
 5    Marsoner, dated January 28, 2015, with
 6    single-page attachment, Bates stamped
 7    Marsoner000000624 through 626, marked for
 8    identification)
 9  BY MS. ALVAREZ:
10         Q.    I'll need your help with this one
11    because it's in German.
12         A.    Sure.
13         Q.    So Exhibit 15 is marked on the bottom
14    right-hand side Marsoner 624 to 626.   It is an
15    e-mail string between you and Christian Meissner
16    in January of 2015.
17              Do you see that?
18         A.    Yes, I see that.
19         Q.    We have already discussed who
20    Christian Meissner is so we won't go there
21    again.
22              Why did you reach out to -- it appears
23    attached to this e-mail is a draft letter to the
24    court to be signed by Christian Meissner.
25              Is this a draft letter that you sent
```

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2    to Mr. Meissner?

3         A.    Yes, absolutely.

4         Q.    Why did you send him this draft?

5         A.    Because Peter Sherratt in the e-mail

6    that you made him read out during his deposition

7    had made the claim that Christian Meissner and

8    Tom Bernard agreed with him that I deserved

9    nothing.

10              Christian is a good friend of mine.

11   Very first thing I did when I read that e-mail,

12   somewhat in shock, I picked up the phone and

13   said:  Christian, guess what e-mail I just got?

14   What happened?

15              So he said:  Ah, yes, there were --

16   there was a call from Linklaters, and I forget,

17   I sat down with them or I got on the phone with

18   them, and I told them that the F1 matter

19   predated my aegis.  "Meine agide" was the German

20   exact word.  So it predates my time in charge of

21   European investment banking.

22              He then went on to say that Linklaters

23   tried in various different ways to get him to

24   say that him not knowing about it must mean that

25   Marsoner has no claim, to which Christian told
```

Dr. Thomas Marsoner - December 15, 2015

Page 160

```
1                       MARSONER
2      me very specifically that he told Linklaters
3      very specifically no, that is not what it means.
4      It means it predates my time, and I was simply
5      not involved with Marsoner on F1 matters.
6              So that my take on the e-mail by Peter
7      Sherratt to me is that in the case of Meissner
8      for sure it is a straight misrepresentation.
9          Q.    Okay.
10         A.    And that straight misrepresentation I
11     wanted to get to the bottom of and to crystalize
12     matters with Christian.   This is the -- this is
13     the correspondence that followed between
14     Christian and me.   And I believe I've already
15     said what the main point was.
16         Q.    Well, if you look at Marsoner 625, the
17     e-mail is from you to Christian Meissner dated
18     January 14th, 2015?
19         A.    Yeah.
20         Q.    It says -- it starts off:  Further to
21     my voice mail.
22         A.    Yes.
23         Q.    What did that voice mail concern?
24         A.    I believe this matter.
25         Q.    What did you say in the voice mail?
```

Dr. Thomas Marsoner - December 15, 2015

Page 161

```
1                        MARSONER

2          A.    A shorter version of what I wrote

3    here.

4          Q.    Can you explain it to me?

5          A.    Ah, sure.  Should I try to --

6          Q.    You don't need to translate it word

7    for word, I just want to get a general

8    understanding of what the voice mail was about.

9          A.    Basically -- I am basically telling

10   him here I have settled the UK case amicably,

11   relatively cheaply.  Main argument, as I said

12   earlier today, that the 1.5 billion had accrued

13   in the US and the UK estate cannot pay out

14   revenues in the US.

15              But then I realized that I had a case

16   in the US, particularly because the claims bar

17   date of end 2002 has never been served upon me.

18   In the UK proceedings, the other side has

19   bothered you and Tom Bernard and then passed on

20   your statements very selectively in an effort to

21   avoid that this time I'd like to ask you to

22   please have a look at the enclosed draft letter,

23   corrected where and however you think necessary,

24   and to please then send me a scanned version of

25   your final version.
```

Dr. Thomas Marsoner – December 15, 2015

Page 162

```
1                        MARSONER

2              I would then pass it on to the New

3    York bankruptcy court.  I have well understood

4    that it is your understandable preference to

5    have as little as possible to do with any

6    litigation, but against the background, how much

7    your statement, as you recall, was falsified by

8    the other side, I think that you might minimize

9    your involvement by making very clear from the

10   beginning what you were not dealing with.

11   Additionally you would help me with this and I

12   would be very grateful.

13             In case you have any interest I would,

14   of course, happily send you my motion to the New

15   York bankruptcy court.

16        Q.    Thank you.

17        A.    That's my best effort at an English

18   translation of my German.

19        Q.    So you mentioned that his statements

20   were passed on, I think you said selectively in

21   the UK proceedings.

22             What did you mean by that?

23        A.    I beg your pardon?

24        Q.    At one point -- maybe we can look at

25   your exact language -- you said in the UK
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2      proceedings the other side has bothered you and

3      Tom Bernard, and then passed on your statements

4      very selectively?

5          A.     Yes.

6          Q.     What did you mean by that?

7          A.     That Peter Sherratt was -- either

8      Peter Sherratt or Linklaters were

9      misrepresenting what Tom Bernard and Christian

10     Meissner had said.  I just worded it politely

11     and carefully.

12         Q.     Okay.  I see that Christian Meissner

13     responded here by e-mail, but -- did you have a

14     conversation with him about this on the phone?

15         A.     Not on this occasion, no, it was when

16     I first got the Sherratt e-mail with the

17     misrepresentation, then he and I had a

18     conversation on the phone.  I was a little

19     upset, but he was very clear.  And this was

20     essentially to crystalize matters one more time.

21             And then he says:  Thank you for the

22     e-mail, I'm sorry that we have not spoken yet.

23     Davos -- this annual bigwig gathering -- Davos

24     and yearend bonus process are a difficult

25     combination.

Dr. Thomas Marsoner - December 15, 2015

Page 164

```
1                    MARSONER

2           Then he says the decisive sentence:

3    To that letter, although it is really

4    unproblematic, I would rather not get involved.

5    I do not believe that I want to be on the radar

6    screen of a US court to Lehman topics, and don't

7    want to sort of essentially be bothered with

8    process and depositions, could lead into other

9    topics I have had in other contexts.

10          He implies unhappy experiences with

11   Lehman topics and wants to gain as much distance

12   to Lehman as possible.  I hope you understand

13   that.  Happy to talk.  Cordial regards,

14   Christian.

15       Q.    Okay.  Thank you.

16             Did you respond to this e-mail?

17       A.    I believe I did.  I think I told him:

18   Perfectly okay.  Just if you can't testify for

19   me, then please stay out of it altogether, or

20   something to that effect.

21       Q.    Okay.

22                  DISCOVERY REQUEST

23   -----------------------------------------------

24          MS. ALVAREZ:  I don't believe we have

25   this e-mail, so to the extent we don't have it
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2       we call for its production.
3    BY MS. ALVAREZ:
4        Q.    Did you have a conversation with
5       Christian Meissner about F1 after January 28,
6       2015?
7        A.    I do not think so.  And this is an
8       e-mail that I may have only composed in my head.
9       I'll look it up.  Or I may have composed it and
10      decided not to send it.  I'll look for it.  I'll
11      look for it.  But the substance is he says this
12      letter is unproblematic, and I certainly -- when
13      he made clear he did not want to get involved, I
14      didn't bother him with it any more.
15                    DISCOVERY REQUEST
16      ------------------------------------------------------
17           MS. ALVAREZ:  I will say that even if
18      it's a draft e-mail that's sitting on your
19      computer, we would call for its production.
20           THE WITNESS:  I will absolutely look
21       for it.
22           MS. ALVAREZ:  Okay.  Thank you.
23           The next document I would like to mark
24      is the letter that Pignatti submitted to the
25      court.  This we'll mark as Exhibit 16.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER
2                   (Marsoner Exhibit 16, Two-page letter
3        from Vittorio Pignatti Morano to Judge Chapman,
4        United States Bankruptcy Court, Southern
5        District of New York, dated January 7, 2015, and
6        bearing no Bates stamps, marked for
7        identification)
8     BY MS. ALVAREZ:
9          Q.    Is this the letter that Vittorio
10       Pignatti submitted to the bankruptcy court that
11       you referenced earlier?
12         A.    I believe so, yes.
13         Q.    How did it come to be that Mr.
14       Pignatti submitted a letter to the court?
15         A.    I asked him to please do so.  He had
16       already submitted one in the UK proceeding.
17         Q.    Did you prepare this letter?
18         A.    I, as in the two other cases, prepared
19       a convenience draft for him inviting him to mark
20       it up in whatever way he felt like it.
21         Q.    And did he mark it up?
22         A.    I believe he did, yes.  I believe he
23       did.
24         Q.    Do you recall what his edits were?
25         A.    I do not remember the details of -- he
```

Dr. Thomas Marsoner - December 15, 2015

1                        MARSONER

2     was perfectly fine.   The end product was, you

3     know, perfectly fine and totally supportive.   I

4     was very happy with it.

5          Q.    Do you recall how many drafts were

6     exchanged?

7          A.    I believe that in the Pignatti case I

8     don't think there was -- there was an exchange.

9     I believe it took him a little bit to put pen to

10    paper, but what he then submitted he submitted,

11    and I do not believe that I commented on his

12    draft.

13             I can't be absolutely certain, but my

14    best recollection is that I gave him a

15    convenience copy, he marked it up however he

16    wanted to, and the end product was perfectly

17    fine and very supportive.

18             MS. ALVAREZ:   We are going to mark

19    another document.

20             (Marsoner Exhibit 17, Multipage e-mail

21    chain bearing at the top of the first page an

22    e-mail from Vittorio Pignatti to Thomas

23    Marsoner, dated December 4, 2002, with multipage

24    attachment, Bates stamped Marsoner 00000008

25    through 31, marked for identification)

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER
2    BY MS. ALVAREZ:
3         Q.    This document was produced by you, Dr.
4    Marsoner, and it's marked Marsoner 8 through
5    Marsoner 31.  It is a compilation of e-mails
6    between you and Mr. Pignatti.
7              What I would like you to focus on is
8    if you turn to the top of Marsoner 20, it
9    actually starts on the way bottom of Marsoner 19
10   to the top of 20, and it is an e-mail from you
11   to Vittorio Pignatti with Ruggero Magnoni cc'd
12   dated January 14, 2015.
13             Do you see that?
14        A.    Sorry, that is on 18 or 19?
15        Q.    It starts on the bottom of 19?
16        A.    Starts on the bottom of 19.  Okay.
17        Q.    You see how --
18        A.    It's from me to Pignatti, cc Magnoni.
19        Q.    Yeah, you got it.
20        A.    Right?
21        Q.    You got it.
22        A.    Yeah.
23        Q.    So in the very first paragraph you
24   inform Pignatti, you say:  I have decided to
25   pursue a claim in respect of the LB F1 matters.
```

Dr. Thomas Marsoner - December 15, 2015

Page 169

```
1                        MARSONER

2              Do you see that?

3      A.     I see that, yes.

4      Q.     Then in the second paragraph you

5  state:  With reference to our discussions around

6  this, I would be very grateful if you could

7  please look at the draft letter attached, check

8  to confirm it reflects reality accurately, mark

9  it up wherever you think it might not and send a

10 scanned version back to me.

11             Do you see that?

12     A.     Yes, I see that.

13     Q.     When you say "with reference to our

14 discussions," what discussions are you referring

15 to?

16     A.     I think I'm referring to discussions

17 with him all the way back to 2002.  Pignatti and

18 I have had tons of discussions around F1

19 matters.

20     Q.     Prior to sending him this e-mail, had

21 you informed him that you were pursuing a claim

22 with regard to F1?

23     A.     For sure, because he kindly also wrote

24 the supported letter to the -- in the UK case.

25     Q.     Prior to sending him this e-mail, had
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2    you informed him that you were pursuing a claim

3    against the US entities with regard to F1?

4         A.    I do not know.  I do not know whether

5    I -- I may well have called him ahead and left

6    him a voice mail.

7         Q.    But you don't recall if you had that

8    conversation with him about it?

9         A.    I absolutely do not recall whether I

10   had a conversation with him about it, no.

11        Q.    You say in this e-mail that there is a

12   draft letter attached.

13              Was this the first time that you sent

14   him a draft letter regarding -- a draft letter

15   to be submitted to the bankruptcy court?

16        A.    I just see on the page 19 resending as

17   discussed, so I would -- that was on the 28th of

18   January, so I would assume that whether the

19   draft was sent to me on the 14th of January

20   was with us such draft that I sent him.

21        Q.    Do you have a copy of this draft, the

22   first draft that you sent him?

23        A.    I have certainly given it together

24   with all other relevant correspondence to

25   counsel on or about August 1 as I now recall.

Dr. Thomas Marsoner - December 15, 2015

Page 171

```
1                      MARSONER
2          Q.    So to your knowledge, this draft was
3     produced to Lehman Brothers?
4              MR. VAN TOL:  Object to the form.
5     Calls for knowledge he may not have.
6     BY MS. ALVAREZ:
7          Q.    I said to your knowledge was it
8     produced to Lehman Brothers?
9          A.    I have forwarded to my lawyers so that
10    they would forward it to Lehman Brothers, yes,
11    of course.
12                  DISCOVERY REQUEST
13    ------------------------------------------------
14             MS. ALVAREZ:  It's not clear to me
15    that we have this particular draft, so to the
16    extent we don't have it, we call for its
17    production.
18    BY MS. ALVAREZ:
19         Q.    So, now, let's look at Pignatti's
20    response which is actually Marsoner 19, on
21    Marsoner 19.  It is an e-mail from Pignatti to
22    you dated January 31, 2015.
23             Do you see -- do you see that?
24         A.    I see that, yes.  And I remember it.
25    I was a little bit shocked when I got it.
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2        Q.    Okay.  It states:  Dear Thomas, I
 3   can't sign, risking perjury, sign a statement
 4   that presents facts that I was not involved with
 5   like the matters related to the sale of CVC of
 6   LB's stake in Formula One.  People who were
 7   involved have a different recollection and if
 8   asked by the court will air it.  Not sure if
 9   there is much upside for you but I do see some
10   downside.  Sorry.  V.
11            What specifically did you find
12   shocking?
13        A.    That he would think that I would even
14   dream of asking him to risk perjury.
15        Q.    Did you have a further conversation
16   with him about what he meant by that?
17        A.    Yeah, I made -- I mean, I made very
18   clear to him what I have always made very clear
19   that he should please only write what he really
20   remembered and what he felt comfortable with.
21   I'm absolutely certain that I cleared up his
22   misunderstanding that risking perjury was
23   anywhere in the realm of the possible or
24   desired.
25        Q.    Did Pignatti send you a revised draft?
```

Dr. Thomas Marsoner - December 15, 2015

1                    MARSONER

2        A.    This is a -- an e-mail by him to his

3    assistant on page number 20 where he instructs

4    his secretary to send -- to basically .pdf his

5    text which is down here, Dear Judge Chapman, all

6    the way to it was my understanding that Marsoner

7    would have been paid by Lehman Brothers for his

8    services concerning the F1 investment or I would

9    not have asked him to help.

10        He certainly did not elicit any

11    comments of mine on this text of his.  He copied

12    me on his instruction to his secretary to .pdf

13    it and use his stamped signature.

14        So I made a suggestion.  He reworded

15    it however he felt fit and kindly submitted it.

16        Q.    Did you have a conversation with Mr.

17    Pignatti about the edits that he made to the

18    letter?

19        A.    No.   No.   No.   The letter is perfectly

20    fine.

21        MS. ALVAREZ:  Let's take a look at

22    Marsoner 622 through 623.

23

24

25

Dr. Thomas Marsoner - December 15, 2015

Page 174

1                        MARSONER

2                        (Marsoner Exhibit 18, Two-page letter

3           from Vittorio Pignatti Morano to Judge Chapman,

4           United States Bankruptcy Court, Southern

5           District of New York, dated January 6, 2015,

6           Bates stamped Marsoner00000622 and 623, marked

7           for identification)

8    BY MS. ALVAREZ:

9           Q.    I'll represent to you that this

10          document was produced by you very recently, I

11          believe it was November 24th after Mr. Pignatti

12          had already been deposed, so Lehman Brothers did

13          not have the opportunity to ask Mr. Pignatti

14          about this document.

15                 To me, and you can tell me if I'm

16          right or not, but this looks like a draft letter

17          from Mr. Pignatti to the bankruptcy court

18          regarding your claim on F1.

19                 Is that correct?

20          A.    That is correct, yes.

21          Q.    Do you know if this is the original

22          draft that you had sent to Mr. Pignatti?

23          A.    I absolutely do not know it, but since

24          it is dated 6 January and the final letter is

25          dated 7 January, the conclusion that this is the

Dr. Thomas Marsoner - December 15, 2015

1                     MARSONER

2      prior version, and his text here on e-mail dated

3      7 January and there on letterhead dated 7

4      January, would be his version after he has made

5      whatever markups he saw fit.

6           Q.    As I state, this was produced to us on

7      November 24th.

8                 Had you searched for this letter prior

9      to November?

10          A.    Yeah, not only searched for it, I gave

11     it to my lawyers, and then in August with a full

12     intention of it to be disclosed to you.  I have

13     nothing to hide in my conversations with any of

14     the three people that submitted letters on my

15     behalf.

16          Q.    Okay.

17          A.    I find it very kind of them to have

18     taken the time and I gave them convenience

19     drafts so as to minimize the amount of time they

20     would have to spend.

21          Q.    Okay.  What I would like to do is

22     let's look at this draft letter and the final

23     letter side by side so we can compare Exhibit 18

24     to Exhibit 16.

25                If you look -- if you look at the

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2      draft, in the second paragraph, second sentence,

3      it states -- well, we'll start with the -- yeah,

4      second sentence, second paragraph:  Previously I

5      was the head of European M&A and vice chairman

6      of Lehman Brothers Europe Limited from 2000 to

7      2006.

8                The second paragraph, second line of

9      the final letter which is Exhibit 16 states:

10     Previously I was the head of European M&A and

11     vice chairman of Lehman Brothers Holdings Inc.

12     from 1999 to 2006.

13               Do you know -- he originally stated he

14     was vice chairman of Lehman Brothers Europe

15     Limited.

16               Do you know why he changed that to

17     Lehman Brothers Holdings Inc.?

18               MR. VAN TOL:  Object to the form.

19     Misstates evidence.

20         A.    We have to assume that the 6 January

21     draft is a draft produced by my lawyers.  The 7

22     January letter is one that Pignatti himself

23     marked up and instructed his secretary to sign.

24               So Pignatti corrected my lawyer's

25     false understanding that he was a VC of Europe
```

Dr. Thomas Marsoner - December 15, 2015

```
1                     MARSONER

2    Limited and put in the correct reality that he

3    was a VC of Lehman Brothers Holdings Inc.  I

4    told you earlier both Pignatti and Magnoni were

5    very, very proud of their US roles.  It was rare

6    for Europeans to have very senior US roles at

7    Lehman.

8         Q.    Did you have a conversation with

9    Pignatti about this change?

10        A.    No.  No.

11        Q.    If you look at the fifth paragraph of

12   the draft letter which is Exhibit 18, the last

13   two sentences of the paragraph:  As was

14   customary, when a transaction was not explicitly

15   covered by one of the contracts, Lehman still

16   intended to pay Dr. Marsoner a success fee for

17   his F1 advice.  Lehman accepted Dr. Marsoner's

18   requested remuneration by e-mail and orally.

19             Do you see that?

20        A.    Yeah.

21        Q.    Now, let's look at the same paragraph,

22   paragraph five of the final letter which is

23   Exhibit 16.  The last two lines read:  As was

24   customary, when a transaction was not explicitly

25   covered by specific advisory contract with a
```

Dr. Thomas Marsoner - December 15, 2015

1                        MARSONER

2       person like Dr. Marsoner who is a former

3       employee and recurrent provider of services,

4       Lehman still intended to pay Dr. Marsoner a

5       success fee for his advice.

6              Do you see that?

7       A.     I see that, yes.

8       Q.     Now, the sentence:  Lehman accepted

9       Dr. Marsoner's requested remuneration by e-mail

10      and orally was removed from the original draft

11      and not included in the final draft.

12             Do you see that?

13      A.     Not entirely.  Pignatti just stated it

14      more elegantly.  He stated it in this letter in

15      the same way he stated it at his deposition.

16             Lehman still intended to pay Dr.

17      Marsoner a success fee for his F1 advice.  These

18      are his words, not a draft that I or my lawyers

19      submitted to him.  And it was more clumsy

20      wording saying essentially the same thing, and

21      he presented a more elegant wording.  That's

22      great.

23      Q.     Did you have a conversation with Mr.

24      Pignatti why he deleted the statement:  Lehman

25      accepted Dr. Marsoner's requested remuneration

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER

2    by e-mail and orally?

3         A.    No, you see here how he decided this.

4    He marked it up, instructed his secretary to

5    .pdf it and print it out.  I was not consulted.

6         Q.    Unfortunately, Dr. Marsoner, we didn't

7    have a chance to ask Mr. Pignatti about this

8    because we didn't have the document during his

9    deposition.

10             MR. VAN TOL:  We understand that.

11    That's the third time you said it.  Doesn't make

12    it any more true or less true.

13             MS. ALVAREZ:  That's fine.

14         Q.    So I am going -- I have a few more

15    questions about this letter.

16         A.    I understand.

17         Q.    If you don't know, that's fine.  I

18    understand why you wouldn't know.

19             The last -- actually the sixth

20    paragraph, last sentence of the draft states:

21    Without Dr. Marsoner's advice, Lehman may well

22    not have reinvested in F1, and instead may well

23    have sold most of its interests at the same time

24    as JPMorgan.

25             Do you see that?
```

Dr. Thomas Marsoner - December 15, 2015

```
1                       MARSONER

2         A.      Hm-hmm.

3         Q.      If we can look at Exhibit 16, same

4    paragraph, that line reads:  Without Dr.

5    Marsoner's advice, Lehman may well not have

6    reinvested in F1, and instead may well have sold

7    all of its interests at the same time as

8    JPMorgan.

9              Do you know why Mr. Pignatti changed

10   the word "most" in Exhibit 18 to the word "all"

11   in Exhibit 16?

12        A.      Because he obviously knew more than I

13   did and knew that Lehman was actively

14   contemplating selling all of its interest.

15              My point in the draft letter was

16   simply mirroring the JPMorgan action.  JPMorgan

17   sold down from 17 percent to 3 percent, and I

18   assumed that it would have been sort of an

19   obvious course of action for Lehman to follow as

20   well, but Pignatti actually tightened up that

21   wording and said the alternative to staying in

22   was to get outdoor together which would have

23   been even more expensive than the JPMorgan

24   course of action.

25        Q.      Did you have a conversation with Mr.
```

Dr. Thomas Marsoner - December 15, 2015

1                        MARSONER

2       Pignatti about this edit?

3            A.    No, I did not.

4            Q.    Let's look at the last sentence of the

5       draft letter which again is Exhibit 18.

6                 The last sentence in the draft reads:

7       It was always my understanding that Lehman would

8       pay Dr. Marsoner 10 percent of Lehman's gross

9       revenues from the F1 investment.

10                Do you see that?

11           A.    I can see that, yes.

12           Q.    The last sentence of the final letter

13      which is Exhibit 16 reads:  It was my

14      understanding that Dr. Marsoner would have been

15      paid by Lehman Brothers for his services

16      concerning the F1 investment or I would not have

17      asked him to help.

18                Do you see that?

19           A.    I see that, yes.

20           Q.    Do you see how the final letter does

21      not state that Lehman would pay Dr. Marsoner 10

22      percent of the gross revenues?

23           A.    I don't see that at all.  It says it

24      much more elegantly.

25           Q.    Where does it say in this final letter

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2     that Lehman would pay Dr. Marsoner 10 percent of

3     Lehman's gross revenues from the F1 investment?

4          A.     It says it in the paragraph above:  F1

5     services similar in nature to the BAWAG.

6     Marsoner received approximately 10 percent.

7                 And then in Pignatti's customary

8     elegance he got rid of the tautology of the last

9     sentence here, and in his own words, Pignatti,

10    unprompted, said:  Would have been paid or I

11    would not have asked him to help.

12                With that he confirms my contention

13    that Pignatti actively in his capacity, as he

14    made clear, vice chairman of Lehman Brothers

15    Holdings Inc., asked me to help on F1 and fully

16    intended to pay me.

17                He also confirms that my services were

18    similar to BAWAG where I got 10 percent.  The

19    way I read this, he could not have been clearer.

20         Q.     Well, this letter says -- the final

21    letter states that you received 10 percent of

22    Lehman's gross revenues in BAWAG, correct?

23         A.     The final letter says, yes, for

24    similar services to F1 I got 10 percent.

25         Q.     And the draft letter states that it

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2     was Pignatti's understanding that Lehman would

3     pay Dr. Marsoner 10 percent of Lehman's gross

4     revenues from F1, correct?

5          A.    Redundant.  His letter is more

6     concise, more elegant and, if anything, says it

7     more strongly.

8          Q.    But the draft letter does state that

9     Dr. Marsoner -- that you would receive 10

10    percent of the Lehman's gross revenues from the

11    F1 investment?

12               MR. VAN TOL:  Objection, asked and

13    answered twice.

14               You can answer it again.

15          Q.    Answer the question, please.

16          A.    The draft is clumsy, redundant and

17    tautological.  The final version is elegant and

18    says exactly what I'm contending in Vittorio

19    Pignatti's own words.

20          Q.    Did you have a conversation with Mr.

21    Pignatti about how he made the -- why he made

22    these changes?

23          A.    No.  No.  You had seen that I was not

24    consulted.  He instructed his secretary

25    directly, and just did me the courtesy of
```

Dr. Thomas Marsoner - December 15, 2015

Page 184

```
1                      MARSONER

2      letting me have a copy.

3            MS. ALVAREZ:  I think the videographer

4      needs to switch tapes.

5            THE VIDEOGRAPHER:  The time is 4:35

6      p.m. and we are going off the record.

7            (Recess)

8            THE VIDEOGRAPHER:  This begins media

9      unit number five.  The time is 4:54 p.m. and we

10     are back on the record.

11     BY MS. ALVAREZ:

12          Q.    I'm going to mark another document as

13     an exhibit.  This will be Exhibit 19.

14            (Marsoner Exhibit 19, Single-page

15     letter from Ruggero Magnoni to Judge Chapman,

16     United States Bankruptcy Court, Southern

17     District of New York, dated January 14, 2015,

18     and bearing no Bates stamp, marked for

19     identification)

20     BY MS. ALVAREZ:

21          Q.    This is the letter that Mr. Magnoni

22     submitted to the bankruptcy court, and it is

23     dated January 14, 2015.

24            Do you see that, Dr. Marsoner?

25          A.    I see that, yes.
```

Dr. Thomas Marsoner - December 15, 2015

Page 185

```
 1                        MARSONER
 2          Q.    How did it come to be that Ruggero
 3   Magnoni submitted this letter to the bankruptcy
 4   court?
 5          A.    I asked him to do so and I provided
 6   the usual convenience draft for him.
 7          Q.    Did Mr. Magnoni make any edits to the
 8   draft you provided to him?
 9          A.    I do not remember exactly, but I
10   believe that if he made edits they were very
11   light.  He may well not have made any.
12          Q.    Do you remember how many drafts were
13   exchanged?
14          A.    Again, I do not remember precisely,
15   but I suspect he may just have accepted the
16   draft I submitted to him.  I do not remember any
17   comments from him and I certainly do not
18   remember discussing this with him in any way.
19               MS. ALVAREZ:  Let's take a look at the
20   next exhibit which is Marsoner 71 to 72, and
21   this will be Exhibit 20.
22
23
24
25
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2                (Marsoner Exhibit 20, Single-page

 3      e-mail from Thomas Marsoner to Ruggero Magnoni,

 4      dated January 14, 2015, with single-page

 5      attachment, Bates stamped Marsoner00000071 and

 6      721, marked for identification)

 7      BY MS. ALVAREZ:

 8          Q.    Now, this is Bates stamped Marsoner 71

 9      to 72.  It is an e-mail from you, Dr. Marsoner,

10      to Ruggero Magnoni, with Vittorio Pignatti cc'd,

11      dated January 14, 2015.

12                Do you see that?

13          A.    I see that, yes.

14          Q.    In the -- well, the first paragraph

15      you state:  Having discovered along the way that

16      I ought to have a claim in the US for the

17      services I provided, I have decided to pursue a

18      claim in respect of the LB/F1 matters.

19                Do you see that?

20          A.    Yeah.

21          Q.    Now, in the second paragraph you

22      state:  With reference to our discussions around

23      this, I would be very grateful if you could

24      please look at the draft letter attached, check

25      to confirm it reflects reality accurately, mark
```

Dr. Thomas Marsoner - December 15, 2015

1              MARSONER

2     it up wherever you think it might not, and send

3     a scanned, signed version back to me.

4              Do you see that?

5          A.     I see that, yes.

6          Q.     What are you referring to when you

7     say:  With reference to our discussions?

8          A.     Just like in the Pignatti case,

9     Magnoni and I have been discussing F1 since

10    1998.  Magnoni had also kindly put in a letter

11    for me in the UK case and I would assume that I,

12    you know, that I was -- preannounced this e-mail

13    before I sent it, either in a conversation or

14    leaving him a voice mail or something along

15    those lines.

16         Q.     Do you recall what conversation you

17    had with him about asserting a claim against

18    Lehman US prior to sending him this e-mail?

19         A.     No, I -- no, nothing beyond what that

20    e-mail says.

21         Q.     Did you have a conversation with

22    Magnoni after you sent him this draft?

23         A.     No, I do not think I did.  I do not

24    think I did.  I think the facts in this letter

25    are very, very clear and very uncontentious.  My

Dr. Thomas Marsoner - December 15, 2015

Page 188

```
1                        MARSONER
2        best recollection is he just accepted the draft,
3        signed it and sent it back.
4             Q.    Okay.
5                   MS. ALVAREZ:  We will mark hopefully
6        the final exhibit this is Exhibit 21.
7                   (Marsoner Exhibit 21, 11-page document
8        entitled Plan Administrators' First Set of
9        Document Requests to Dr. Thomas Marsoner
10       Pursuant to Rules 7026 and 7034 of the Federal
11       Rules of Bankruptcy Procedure, bearing no Bates
12       stamps, marked for identification)
13   BY MS. ALVAREZ:
14            Q.    Exhibit 21 is entitled:  Plan
15       administrators' document request to Dr. Thomas
16       Marsoner pursuant to rules 7026 and 7024 of the
17       Federal Rules of Bankruptcy Procedure.
18                  Have you seen this document before,
19       Dr. Marsoner?
20            A.    I do believe so.  I hope you will
21       understand that I cannot be certain because
22       there is an awful lot of language in here that
23       to a nonpracticing lawyer looks like legalese
24       boilerplate that you experts are here to
25       understand.
```

Dr. Thomas Marsoner - December 15, 2015

Page 189

```
 1                      MARSONER

 2          Q.     Do you understand what this is, what

 3     Exhibit 21 is?

 4          A.     Yeah, I believe that this is --

 5     further asks me to produce all the relevant

 6     documents in my possession, particularly here

 7     the, you know, Pignatti, Magnoni and Bernard

 8     correspondence, all of which I, of course,

 9     immediately produced to counsel.

10          Q.     Do you see how starting on page 8

11     through page 10, specific categories or types of

12     documents are described and called for

13     production?

14          A.     Yeah, yeah, I mean, I see that there

15     is a lot of stuff in here.

16          Q.     When was the first time that you saw

17     Exhibit 21?

18          A.     I think it was in the summer as an

19     attachment to an e-mail, but I cannot recall

20     exactly on what date that was.

21          Q.     Did you conduct a search to locate

22     documents that are requested?

23          A.     Yes, of course.  Yes, of course I did.

24          Q.     What did you do to locate responsive

25     documents?
```

Dr. Thomas Marsoner - December 15, 2015

Page 190

1                        MARSONER

2          A.     I used the key words here, Magnoni,

3     Pignatti and so on, and then forwarded those in

4     one bunch to counsel.  And in terms of older

5     things, being through this exercise once before

6     for the UK case, I asked Hogan Lovells US to get

7     ahold of the Hogan Lovells UK file.

8          Q.     So those key words that you put

9     together, what did you -- how did you use those

10    key words?

11         A.     I mean, specifically, you know,

12    Bernard, Pignatti, Magnoni words, to be honest I

13    was a little bit surprised seeing that, this is

14    my first sort of full blown US court case,

15    punched them in, up came the whole

16    correspondence and forwarded it.

17         Q.     What I'm trying to understand is where

18    did you punch them in?  Are you talking about

19    e-mails?

20         A.     My laptop, yeah.

21         Q.     So you were searching e-mails on your

22    laptop?

23         A.     Yes.  Yes.

24         Q.     What about your hard drive, did you

25    search your hard drive?

Dr. Thomas Marsoner - December 15, 2015

1                    MARSONER

2          A.     I do not -- I mean, I have a laptop

3     which is connected to iCloud.   I do not have a

4     server as such.

5          Q.     What about thumb drives or any other

6     type of media where you may have stored

7     documents?

8          A.     You have seen from this case, I am

9     hard of hearing.   I do an awful lot of stuff by

10    e-mail, so I would not, other than in my e-mail,

11    I would really not know where to look for

12    things.

13         Q.     Did you look through paper files?

14         A.     You know, yes, of course, I looked

15    through my paper files, but those paper files

16    nowadays tend to be printouts of things that

17    were sent by e-mail.

18         Q.     Where were those paper files located?

19         A.     I have some in my home office in

20    London, I have some in our house in Lake

21    Millstatt in Austria.   Those are the two main

22    desks that I have where I have -- where I still

23    have paper files, yes.

24         Q.     So just to confirm, you searched your

25    paper files in London?

Dr. Thomas Marsoner - December 15, 2015

Page 192

```
1                        MARSONER

2         A.    Yes.

3         Q.    And you searched your paper files in

4    Austria?

5         A.    Yes.  Yes.

6         Q.    Do you have paper files anywhere else?

7         A.    No.

8               MS. ALVAREZ:  We're done with our

9    questioning.  Thank you, Dr. Marsoner.

10              THE VIDEOGRAPHER:  The time is --

11              MR. VAN TOL:  I have questions.

12   EXAMINATION

13   BY MR. VAN TOL:

14        Q.    Dr. Marsoner, could you please turn to

15   Exhibit 7 that was marked today?

16              You may recall seeing this earlier,

17   this is the e-mail chain regarding sweat equity.

18        A.    Yes.

19        Q.    I would like to draw your attention to

20   the first page which is LEH 201.

21        A.    Yes.

22        Q.    In the middle of the page do you see

23   there is a March 5 e-mail from Mr. Meissner to

24   Mr. Pignatti, the time is 16:36:37?

25        A.    Yes.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2        Q.    In the second paragraph Mr. Meissner
3   writes:  He is supposed to get a significant --
4   and there is a missing word, probably fee --
5   from IBD for his work which he deserves in my
6   opinion.
7            Do you know to whom Mr. Meissner is
8   referring there?
9        A.    That's referring to me.
10       Q.    In the next sentence Mr. Meissner
11  says:  IBD fees (net) should be in the region of
12  25 million, so he'll expect around 2.5 million,
13  and I'm okay with that given his contribution.
14           Do you have an understanding of what
15  is meant there?
16       A.    That's the margin loan, financing fee
17  of which the established practice is that I
18  would get 10 percent, yes.
19       Q.    All right.  And let's go to the e-mail
20  above that which is Mr. Pignatti's response.
21           Do you see Mr. Pignatti says:  "So
22  let's compensate him with 10 percent and
23  eventually throw in extra 100K."
24           Do you see that?
25       A.    Yeah, I see that.
```

Dr. Thomas Marsoner — December 15, 2015

```
 1                    MARSONER
 2         Q.     Do you have an understanding what Mr.
 3    Pignatti means there?
 4         A.     He just confirms the 10 percent of
 5    financing fees that Meissner states as a matter
 6    of fact, and then he says, as I understand it,
 7    as an extra tip for the extra work on the small
 8    co-investment that the Lehman fund Pignatti ran
 9    would make, let's give him an extra tip of a
10    hundred thousand.   Euros, I presume.
11         Q.     How if at all does the 10 percent
12    referred to in Marsoner 7 relate to the 2004
13    agreement to your understanding?
14         A.     It's the result of the math that gives
15    me 20 percent of IBD fees which in the case of
16    financing would be 20 percent of half of the
17    financing fees, which would translate to 10
18    percent of the firm revenues in the case of
19    financings and principal investments.
20              MR. VAN TOL:  I would like to have
21    this marked as Marsoner 22, please.
22
23
24
25
```

Dr. Thomas Marsoner — December 15, 2015

```
1                     MARSONER
2                (Marsoner Exhibit 22, Multipage
3     document entitled Notice of Hearing on Motion of
4     Dr. Thomas Marsoner to Deem Proofs of Claim to
5     be Timely Filed by the Claims Bar Date, with
6     multiple attachments, and bearing no Bates
7     stamps, marked for identification)
8     BY MR. VAN TOL:
9          Q.    Dr. Marsoner, several times during
10    today's testimony you have referred to an e-mail
11    from a Graham Wilson.
12               Who is Graham Wilson?
13         A.    Graham Wilson was the chief
14    administrative officer of Lehman Brothers
15    investment banking in Europe.
16         Q.    You also referred to a spreadsheet
17    that Mr. Wilson prepared, do you recall that?
18         A.    I recall that.
19         Q.    I would like to turn your attention in
20    Marsoner 22 to Exhibit F.
21               Are you there?
22         A.    Yes, I can see that.
23         Q.    What is this document?
24         A.    It's an e-mail from Graham Wilson to
25    me apologizing for a delay, but now authorized
```

Dr. Thomas Marsoner - December 15, 2015

```
1                      MARSONER

2       to agree and move forward with processing the

3       payment, and attached to that e-mail is the

4       spreadsheet that shows precisely how my fees for

5       the various components of the Cerberus BAWAG

6       acquisition was calculated.

7            Q.    Could you explain this schedule for

8       us, please?

9            A.    Sure.  Starting with what we just

10      discussed earlier, the 25 million that Meissner

11      had estimated turned out to have been 22,154,688

12      Euros.

13           Q.    Could you tell us where you see that

14      number?  Could you describe it for us?

15           A.    It's in the second line:  Cerberus

16      BAWAG leveraged financing fees.

17           Q.    Okay.  Please continue.

18           A.    Financing fees were shared 50-50

19      between the fixed income department and the

20      investment banking department.  Where it then

21      says net IB revenues, there is something like 11

22      million.  20 percent of those 11 million amount

23      to 2.215 million Euros.

24                So that shows in two steps how the 10

25      percent of firm revenues that were the
```

Dr. Thomas Marsoner - December 15, 2015

1                         MARSONER

2      established standard between Lehman and me came

3      about in financing fees.

4           Q.      Underneath there there is a box that

5      says less, L-E-S-S.  It lists several things.

6                   Can you explain what the function of

7      those numbers is?

8           A.      Yes.   Retainer fees, the earnest fees

9      that we discussed earlier were always deducted

10     from eventual success fees, and this shows --

11     this shows how those quarterly retainer fees

12     that I was paid, how those were deducted from

13     the success fee so that I would be paid a net

14     success fee.

15                  Those are the two top --

16          Q.      Are those the same retainer fees that

17     we saw referred to earlier in the 2004

18     agreement?

19          A.      Oh, yeah, absolutely.

20          Q.      Is there anything else on this chart

21     that you want to explain to us or have we

22     covered it all?

23          A.      There is one very important thing,

24     that is, on line 4 and 5, you'll see two

25     principal gains.  One is FX hedging where the

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2       firm made $388,000 in that case, and another

3       principal gain out of a notional interest rate

4       swap by the firm again made $552,000.

5               As per the formula in the '04

6       agreement -- by the way, also know the other

7       agreements -- that principal gain was, again,

8       divided 50-50 between the fixed income

9       department and investment banking, 20 percent

10      thereof, or 10 percent of firm revenues produced

11      the amount that I was owed.

12      Q.      In the third line down in the top box

13      there is a reference to M&A fee.

14              Could you explain what that is?

15      A.      The M&A fee is the mergers and

16      acquisitions fee.  That belonged to the

17      investment banking department alone.  Fixed

18      income had no share in that, and my 20 percent

19      of M&A fees remained 20 percent, so that in this

20      case I was paid nearly 2.8 million Euros out of

21      the M&A fee that Lehman made for Cerberus BAWAG.

22      Q.      Why did you refer to the Graham Wilson

23      spreadsheet several times during your testimony

24      today?

25      A.      Because it shows so very clearly that
```

Dr. Thomas Marsoner - December 15, 2015

1              MARSONER

2    these percentages did not have to be in any

3    specific formal agreement.  These percentages

4    were agreed between Lehman and me throughout our

5    advisory relationship.  This was not in the '04

6    agreement, this was not in the '06 agreement.

7    It was exactly, like Formula One, governed by

8    the text and spirit of the '04 agreement and, as

9    you can also see in the previous discussion

10   between Pignatti and Meissner not involving me

11   in any way, completely noncontroversial between

12   all of various senior Lehman decision makers.

13       Q.    Let's go back to that exhibit, please,

14   Exhibit 7, the e-mail exchange you were just

15   talking about.

16       A.    Yeah.

17       Q.    Do you see that in this e-mail

18   exchange there is at least two e-mails from you,

19   correct?  There is the original one from you to

20   Mr. Pignatti, and then there is one on page 201

21   from, again, you to Mr. Pignatti, correct?

22       A.    That's right, yes.

23       Q.    I don't see any reference in those to

24   10 percent.

25             Why did you not say to Mr. Pignatti:

Dr. Thomas Marsoner - December 15, 2015

```
1                      MARSONER

2    I would like 10 percent?

3         A.    I didn't have to.  What I was asking

4    Vittorio here was something completely unrelated

5    to what the Graham Wilson e-mail states.  Here I

6    was looking for something extra on a little

7    extra deal that happened around the big BAWAG

8    Cerberus deal where I thought I had provided

9    additional services on something other than

10   Cerberus BAWAG.

11              Ultimately I got nothing for that,

12   which is okay.  Sweat equity would have become

13   worthless.  It was not a very successful

14   investment originally.

15        Q.    Now I would like to move on to another

16   topic.

17              We discussed earlier your claim

18   relating to LBI, LBCC and the collar, do you

19   recall that?

20        A.    I recall it, yes.

21        Q.    Do you recall when that claim was

22   submitted?

23        A.    That must have been very soon after

24   the Lehman bankruptcy in September of '08.

25        Q.    At that time did you have US counsel
```

Dr. Thomas Marsoner - December 15, 2015

Page 201

1                          MARSONER

2       advising you on the submission of that claim?

3            A.    No, not at all.

4            Q.    When did you hire this firm, Hogan

5       Lovells LLP, to assist with the claim that's at

6       issue in this case?

7            A.    Relatively soon after the UK

8       settlement.  The UK settlement was, I believe,

9       in June of 2014, so I believe I hired Hogan

10      Lovells US in September, October of 2014.

11           Q.    My last set of questions has to do

12      with Marsoner Exhibit 12, if you would like to

13      turn to that.

14           A.    Yeah.

15           Q.    I want to draw your attention to the

16      first page of this exhibit.

17                 Do you see that it's a progress report

18      and that it's dated April 20, 2010?

19           A.    Yes.  I can see that.

20           Q.    Do you know -- when you were asked

21      earlier about the bar date in this US

22      proceeding, do you know when the bar date was?

23           A.    To this day I do not know it

24      precisely, but it must be in our motion.

25           Q.    Sure.  Let me see if I can just -- oh,

Dr. Thomas Marsoner - December 15, 2015

Page 202

```
 1                    MARSONER
 2     we have it marked here.
 3              Let me just show you, to speed things
 4     up, this is page 3 of our motion, paragraph two.
 5              Do you see a reference to a September
 6     22, 2009 bar date?
 7         A.   Yes.  I can see it, yes.
 8         Q.   So do you see that the bar date is in
 9     fact before the progress report dated April 20,
10     2010?
11         A.   By more than half a year.
12              MR. VAN TOL:  Thank you.  Subject to
13     any other redirect, that's all I have at this
14     time.
15              MS. ALVAREZ:  We have a couple more
16     questions.
17     EXAMINATION
18     BY MS. ALVAREZ:
19         Q.   Dr. Marsoner, if you go back to the
20     Graham Wilson e-mail which is Exhibit F to the
21     document marked Exhibit 22 during this
22     deposition?
23         A.   Yeah.
24         Q.   If you could take a look at it.
25              I'm just reading the text of the
```

Dr. Thomas Marsoner - December 15, 2015

Page 203

```
 1                      MARSONER
 2    e-mail:  Thomas, apologies for the delay, am now
 3    authorized to agree with you and move forward
 4    with processing the payment.
 5              Do you see that?
 6        A.    Yes, I see that.
 7        Q.    Now, you testified that this e-mail
 8    concerned your compensation for your work on
 9    BAWAG, is that right?
10        A.    Most of it, yes.
11        Q.    Graham Wilson here states that he is
12    now authorized to agree this with you.
13              Do you know who authorized this?
14        A.    No, I do not.
15        Q.    Does a similar e-mail exist with
16    regard to your work on F1?
17        A.    Does --
18              MR. VAN TOL:  If it does, please
19    produce it.
20              I'm sorry, you may answer.
21        A.    This -- sorry, your question is does
22    the equivalent of this e-mail exist relating to
23    my work on F1?
24        Q.    That's right.
25        A.    That, with respect, is an
```

Dr. Thomas Marsoner - December 15, 2015

Page 204

```
1                      MARSONER
2      impossibility.   The fees, the gross revenues
3      that are shown here for BAWAG Cerberus in the F1
4      case only materialized in May or June of 2012 at
5      which point Lehman had been bankrupt for more
6      than four years.
7           Q.   Does there exist an e-mail indicating
8      payment had been authorized by Lehman to you for
9      F1?
10          A.   It's the same answer.   Revenues had to
11     crystalize first, only then could such an
12     attachment or such a cover e-mail be produced.
13               The earliest date it could have been
14     produced would have been May or June of 2012.
15     At that point Lehman wasn't around any more.
16               MS. ALVAREZ:   That's all we have.
17               (Pause)
18               MR. VAN TOL:   We have no further
19     questions either, thank you.
20
21
22
23
24
25
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                      MARSONER
 2              THE VIDEOGRAPHER:  The time is 5:24
 3      p.m. on December 15, 2015 and this completes
 4      today's video deposition of Thomas Marsoner.
 5                      *    *    *
 6            E N D   O F   P R O C E E D I N G
 7                 Time noted 5:24 p.m.
 8                      *    *    *
 9
10
11
12            _____
13                 DR.  THOMAS MARSONER
14
15      Subscribed and sworn to before me
16      this_____day of_____, 2015.
17
18
19      _____
20                 NOTARY PUBLIC
21
22
23      My Commission expires:
24
25
```

Dr. Thomas Marsoner - December 15, 2015

Page 206

```
 1
 2                    E R R A T A
 3   STATE OF NEW YORK
 4   COUNTY OF NEW YORK
 5        I wish to make the following changes, for the
 6   following reasons:
 7   PAGE LINE
 8   ____ ____   CHANGE: _____
 9              REASON: _____
10   ____ ____   CHANGE: _____
11             REASON: _____
12   ____ ____   CHANGE: _____
13             REASON: _____
14   ____ ____   CHANGE: _____
15             REASON: _____
16   ____ ____   CHANGE: _____
17             REASON: _____
18   ____ ____   CHANGE: _____
19             REASON: _____
20   ____ ____   CHANGE: _____
21             REASON: _____
22
23
24             _____
25                    DR. THOMAS MARSONER
```

Dr. Thomas Marsoner - December 15, 2015

Page 207

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK

4    COUNTY OF NEW YORK

5

6              I, BRANDON RAINOFF, a Federal Certified

7    Realtime Reporter and Notary Public within and for

8    the State of New York, do hereby certify:

9              That  DR. THOMAS MARSONER, the witness

10   whose  deposition is hereinbefore set forth, was duly

11   sworn by me and that such deposition is a true record

12   of the testimony given by the witness.

13             I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage, and that I am in no way interested in the

16   outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto set

18   my hand this 15th day of December, 2015.

19

20

21             _____

22                  BRANDON RAINOFF, FCRR, RMR, CRR

23

24

25

Dr. Thomas Marsoner - December 15, 2015

1

2                                    E R R A T A

3    STATE OF NEW YORK

4    COUNTY OF NEW YORK

5        I wish to make the following changes, for the following reasons:

6    PAGE LINE

7    __17__  __4__    CHANGE:    **"the" to "a"**

8                     REASON:    **Dr. Marsoner was not the only managing director.**

9    __24__  __2__    CHANGE:    **"recall" to "call"**

10                    REASON:    **The correct phrase is "conference call"**

11   __25__  __21__   CHANGE:    **"you" to "he"**

12                    REASON:    **"he" is the correct pronoun**

13   __30__  __25__   CHANGE:    **"Ruppert" to "Rupert"**

14                    REASON:    **Misspelled name**

15   __31__  __11-13__ CHANGE:   **"Ruppert" to "Rupert"**

16                    REASON:    **Misspelled name**

17   __37__  __15__   CHANGE:    **"Hannon" to "Hannan"**

18                    REASON:    **Misspelled name**

19   __38__  __22__   CHANGE:    **"telephoning" to "telephone"**

20                    REASON:    **Misspelled word**

21   __40__  __15__   CHANGE:    **"with" to "that"**

22                    REASON:    **Incorrect word**

23   __44__  __12__   CHANGE:    **"were" to "are"**

24                    REASON:    **Incorrect word**

25

Dr. Thomas Marsoner - December 15, 2015

1

2                                 E R R A T A

3    STATE OF NEW YORK

4    COUNTY OF NEW YORK

5         I wish to make the following changes, for the following reasons:

6    PAGE LINE

7    __51__ __15__   CHANGE:   **"Nicky Lauder" to "Niki Lauda"**

8                    REASON:   **Misspelled name**

9    __57`__ __18__  CHANGE:   **"got" to "gone"**

10                   REASON:   **Incorrect word**

11   __61__ __24__   CHANGE:   **Delete "for"**

12                   REASON:   **Unnecessary word**

13   __79__ __18__   CHANGE:   **"Blackstone" to "Blackrock"**

14                   REASON:   **Incorrect company**

15   __90__ __22__   CHANGE:   **Insert "Quod" before "Erat"**

16                   REASON:   **Incorrect phrase**

17   __102__ __13__  CHANGE:   **Delete "being"**

18                   REASON:   **Unnecessary word**

19   __103__ __24__  CHANGE:   **"Revco" to "Refco"**

20                   REASON:   **Incorrect company name**

21   __110__ __5__   CHANGE:   **"Biergen Kreiger" to "Jürgen Krieger"**

22                   REASON:   **Misspelled name**

23   __118__ __9__   CHANGE:   **"credit risk committee" to "creditors' committee"**

24                   REASON:   **Dr. Marsoner and Bruce Matthews served on the creditors'**

25                             **committee**

Dr. Thomas Marsoner - December 15, 2015

1

2                               E R R A T A

3    STATE OF NEW YORK

4    COUNTY OF NEW YORK

5        I wish to make the following changes, for the following reasons:

6    PAGE LINE

7    <u>124</u>  <u>22</u>   CHANGE:   <u>"heard" to "had"</u>

8              REASON:   <u>Incorrect word</u>

9    <u>136</u>  <u>21</u>   CHANGE:   <u>"." after "LBEL" to "?"</u>

10             REASON:   <u>Dr. Marsoner was asking whether Ms. Alvarez meant LBEL</u>

11                       <u>because he is only aware of the LBEL proof of claim form, not</u>

12                       <u>the LBI proof of claim form</u>

13   <u>137</u>  <u>17</u>   CHANGE:   <u>Delete "because"</u>

14             REASON:   <u>Unnecessary word</u>

15   <u>140</u>  <u>11-12</u> CHANGE:   <u>"Casa Peliganos, Costa Keretes" to "Casa Pelicanos Costa</u>

16                       <u>Careves"</u>

17             REASON:   <u>Incorrect address</u>

18   <u>140-41</u> <u>25-2</u> CHANGE:   <u>"Casa Carrion Parco, San Giacomo" to "Casa Carpione Parco</u>

19                       <u>San Giacomo"</u>

20             REASON:   <u>Incorrect address</u>

21   <u>141</u>  <u>5</u>    CHANGE:   <u>"only" to "Lake"</u>

22             REASON:   <u>Incorrect word</u>

23   <u>153</u>  <u>5</u>    CHANGE:   <u>Insert "have" after "would"</u>

24             REASON:   <u>Necessary word</u>

25

Dr. Thomas Marsoner - December 15, 2015

1

2                                  E R R A T A

3   STATE OF NEW YORK

4   COUNTY OF NEW YORK

5        I wish to make the following changes, for the following reasons:

6   PAGE LINE

7   **159**  **19**   CHANGE:   **"Meine agide" to "Meine Aegide"**

8                     REASON:   **Misspelled word**

9   **161**  **17**   CHANGE:   **"2002" to "2009"**

10                    REASON:   **Incorrect year**

11  **161**  **23**   CHANGE:   **"corrected" to "correct it"**

12                    REASON:   **Incorrect word**

13  **169**  **24**   CHANGE:   **"supported" to "supporting"**

14                    REASON:   **Incorrect word**

15  **180**  **22**   CHANGE:   **"outdoor together" to "out altogether"**

16                    REASON:   **Incorrect phrase**

17  **198**  **6**    CHANGE:   **"know" to "in"**

18                    REASON:   **Incorrect word**

19

20

21                       DR. THOMAS MARSONER

22

23

24

25

\NY - 045382/000001 - 4656772 v1