# Exhibit 3

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


- - - - - - - - - - - - - - - - - -

  IN THE MATTER OF

      IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL.,

                          Debtors.


- - - - - - - - - - - - - - - - - -

                DEPOSITION OF VITTORIO PIGNATTI

                        VOLUME I

                Monday, November 16th, 2015

                     AT:  3:30 p.m.

                    Taken at:

                  Hogan Lovells
                  50 Holborn Viaduct
                       London
                     EC1A 2FG
                       London
                  United Kingdom


                  CONFIDENTIAL

Court Reporter:

Chris Lang
Accredited Real-time Reporter

```
 1                   A P P E A R A N C E S

 2    Appearing for Lehman Brothers:

 3            MAURICE HORWITZ, ESQ.
              DENISE ALVAREZ, ESQ.
 4            WEIL, GOTSHAL & MANGES LLP
              767 FIFTH AVENUE
 5            NEW YORK, NY 10153-0119

 6

 7

 8

 9    Appearing for Dr Thomas Marsoner:

10            M. SHANE JOHNSON, ESQ.
              PIETER VAN TOL, ESQ.
11            HOGAN LOVELLS LLP
              875 THIRD AVENUE
12            NEW YORK, NY 10022

13

14

15

16    Appearing for the Debtors:

17            THOMAS E. HOMMEL, ESQ.
              LEHMAN BROTHERS HOLDINGS INC.
18            1271 AVENUE OF THE AMERICAS
              NEW YORK, NY 10020
19

20

21    NOTARY: MICHELLE SCOTT-BRYAN

22    VIDEOGRAPHER:

23            WENDY VINER

24            Videographer

25
```

                                                              Page 3

1

   VITTORIO PIGNATTI (Sworn) ...........................5
2

        Examination by MR. JOHNSON  ......................5
3

        Examination by MS. ALVAREZ  ....................34
4

        Examination by MR. JOHNSON  ...................128
5

6    Exhibit                   Page

7
     Pignatti 1 ...............36
8
     Pignatti 2 ..............46
9
     Pignatti 3 ..............50
10
     Pignatti 4 ..............77
11
     Pignatti 5 ..............81
12
     Pignatti 6 ..............92
13
     Pignatti 7 ..............98
14
     Pignatti 8 ............102
15
     Pignatti 9 ............110
16
     Pignatti 10 ...........119
17

18

19

20

21

22

23

24

25

1                                    Monday, November 16th, 2015

2      (3:40 p.m.)

3      THE VIDEOGRAPHER:  Here begins the videotaped deposition of

4           Vittorio Pignatti in the matter of, In Re: Lehman

5           Brothers Holding Inc., et al., in the United States

6           Bankruptcy Court Southern District of New York case

7           number 08-13555SCC.  Today's date is November 16, 2015

8           and the time is 3:40 p.m.  The video operator today is

9           Wendy Viner.  This video deposition is taking place at

10          Hogan Lovells, 50 Holborn Viaduct, London EC1 UK.

11          Counsel would you please identify yourselves and state

12          who you represent.

13     MR. JOHNSON:  Shane Johnson from Hogan Lovells for Dr. Thomas

14          Marsoner.

15     MS. ALVAREZ:  Denise --

16     MR. VAN TOL:  Pieter Van Tol from Hogan Lovells -- sorry

17          Denise -- for Dr. Thomas Marsoner.

18     MS. ALVAREZ:  Sure, sorry about that.

19          Denise Alvarez from Weil, Gotshal & Manges for

20          Lehman Commercial Paper Inc. and Lehman Brothers

21          Holdings Inc.

22     MR. HORWITZ:  Maurice Horwitz from Weil, Gotshal & Manges

23          for Lehman Brothers Holdings Inc and Lehman Commercial

24          Paper Inc.

25     THE VIDEOGRAPHER:  Could I ask the notary to please swear in

Page 5

1         the witness and we can proceed.

2                       VITTORIO PIGNATTI

3    having been Sworn testified as follows:

4    BY MR JOHNSON:

5         Q.   And Mr. Pignatti, I wanted to start with your work

6         experience.  So when did you begin working at Lehman

7         Brothers?

8         A.   March 1989.

9         Q.   March 1989?

10        A.   1989 and I finished working for the liquidator of

11        Lehman Brothers in, I think it was April 2009.

12        Q.   And what jobs did you have whilst you were at

13        Lehman Brothers?

14        A.   I started as head of investment banking for Italy

15        then I was promoted in 1998, relocated to London and

16        became the head of mergers and acquisitions advisory for

17        Europe and then at the end of 2006, or some time in

18        2006, I became Vice Chairman, maybe the year before, but

19        I was assigned to be responsible for private equity for

20        non-US.

21        Q.   Okay.  And what were your responsibilities in those

22        positions?

23        A.   In the last position I was responsible for

24        non-listed balance sheet investments and Lehman Brothers

25        private equity funds, which included the buy out funds,

Page 6

1      the real estate funds, the credit funds, the funds of

2      funds, and so on.

3        Q.  Now, could I ask that Mr. Pignatti be given the

4      2007 annual report, please.  If you look at this, it is

5      the 2007 Lehman Brothers annual report and if you see in

6      the bottom right-hand corner it says Marsoner and then

7      has numbers after it?

8        A.  Mm-hm.

9        Q.  If you turn to page 606, please.

10   MS. ALVAREZ:  I just want to clarify, are we using the same

11      exhibit that was marked in Peter Sherratt's deposition?

12   MR. JOHNSON:  Yes.

13   DENISE ALVAREZ:  Okay.

14        A.  Six.

15   MS. ALVAREZ:  Are you marking it as exhibit 1 as it is a new

16      deposition?

17   MR. JOHNSON:  Using the same exhibit marks.

18   MS. ALVAREZ:  Okay, what was this in Peter Sherratt's

19      deposition?

20   THE COURT REPORTER:  Exhibit 1.

21   MS. ALVAREZ:  Okay.

22   BY MR JOHNSON:

23        Q.  Do you see your name listed --

24        A.  Mm-hm.

25        Q.  -- in the column "other officers"?

Page 7

1    A.  Yes.

2    Q.  And is that because you were an officer of Lehman

3    Brothers Holdings Inc.?

4    A.  Yes.  Here it says Lehman Brothers Inc.  I don't

5    see the "Holdings".  I say Lehman because it was a very

6    complex global organization.  The various bookings or

7    transactions, contracts and so on, was not under my

8    domain, but it was really done by technical people on

9    the legal and tax side.

10   Q.  Sure.  And could you actually turn back on that

11   same page.

12   A.  Mm-hm.

13   Q.  And identify other people that you worked with at

14   Lehman Brothers?

15   A.  If you give me the page again.

16   Q.  606.

17   A.  Dick Fuld, Jasjit Bhattal, Erin M Callan.  I can

18   tell you who I didn't work with, which is probably

19   easier.  Given that I spent, by 2007, 18 years in the

20   group there weren't that many people that I didn't work

21   with.

22   Q.  Okay.

23   A.  I didn't deal much with Burton, Gatto, Robatyn,

24   Safreno, Taussig.

25   Q.  Everyone else listed you worked with?

Page 8

1        A.  Between senior management and other officers, the

2    board members, I didn't have much relationship with

3    other than two.

4        Q.  Okay.  And to your understanding was it common for

5    members of Lehman Brothers' leadership to serve multiple

6    roles?

7        A.  Absolutely.

8        Q.  Now, how do you know Dr. Thomas Marsoner?

9        A.  I know him because when he joined Lehman Brothers

10   I was one of the managing directors of the firm, so

11   I participated in the hiring of that team, because he

12   didn't come on his own, he came with a group from

13   Soloman Brothers.

14       Q.  And did he work as an adviser to Lehman Brothers at

15   a certain point?

16       A.  Yes, after many years as an investment banker

17   within the ranks of the firm he sort of moved on to be

18   an adviser.

19       Q.  And are you aware of his advisory agreements?

20       A.  I am aware of his advisory agreements for as long

21   as I was the person responsible for any adviser to the

22   investment bank.

23       Q.  Okay.  And specifically were you involved in the

24   negotiation of Dr. Marsoner's 2002 agreement?

25       A.  Yes.  So I became, I was in charge of that division

Page 9

1      from 1998 until 2006.

2          Q.  So that means you were involved in the 2004

3      agreement as well?

4          A.  Yes.

5          Q.  And did you sign both of these agreements?

6          A.  Yes, I think I did.

7          Q.  Did you sign both on behalf of Lehman Brothers

8      Europe Limited?

9      MS. ALVAREZ:  Objection to form.

10         Q.  You can still answer.

11         A.  Okay.

12         Q.  Do you want me to repeat the question?

13         A.  If I signed on behalf of Lehman Brothers?

14         Q.  Europe Limited?

15         A.  I think so, but it must say, I mean the contracts

16     are available, so if it says Lehman Brothers.  I would

17     be given, if it was companies on whose board I sat,

18     within Lehman I would sign because I had powers of

19     attorney, jointly with some other officers of the firm,

20     or individually for some contracts.  If it wasn't

21     I would be told, you know, this one had better go into

22     this company, this one had better go.  They would tell

23     me whether I had specific powers or I wouldn't sign it

24     at all, it would be someone else who was actually on the

25     board of that company.

1        Q.  Okay.  To your understanding why did Lehman

2     Brothers want to hire Dr. Marsoner as an adviser?

3  MS. ALVAREZ:  Objection to form.

4        A.  Mr. Marsoner continued his previous involvement, so

5     it was an evolution, it wasn't a hiring process, which

6     was quite normal with senior people who departed a full

7     time position at Lehman, they seldom -- unless they went

8     to work for a competitor, they were offered a choice to

9     stay on as an adviser, some with retainers, you know, we

10    had a lot of freedom on how to calibrate their

11    involvement.

12       Q.  Did Dr. Marsoner have certain expertise?

13  MS. ALVAREZ:  Objection to form.

14       A.  Yes he did.  By sector and by geography.  He had

15    spent almost his entire working career dealing with

16    Germany and Austria and financial institutions, which

17    gave him a, for a firm that was not particularly strong

18    in that part of the world, considerable senior hedge in

19    terms of relationships and understanding of situations

20    that were not obvious, especially in situations of work

21    outs or complicated deals.

22       Q.  And what about F1?

23       A.  F1 was a complicated deal.  So he met those

24    criterias and there were German banks involved.

25       Q.  And is it correct that you were a contact person

Page 11

1       under the 2004 agreement?

2   MR. HORWITZ:  Objection to form.

3       A.  Absolutely.

4       Q.  And what did this entail?

5       A.  This entailed that any decision with -- these

6       contracts were rather general in terms of which

7       transactions would be covered and so on, and I was the

8       person on behalf of the firm where these decisions would

9       be centralized; what was in it, the exact terms, we used

10      to give a grade in terms of how much the person would be

11      entitled to be paid and then, you know, for the

12      avoidance of doubt and we would interpret on a case by

13      case basis.

14      Q.  Could you please look at Dr. Marsoner's motion.

15  MS. ALVAREZ:  Do you have extra copies?  We didn't bring

16      Sherratt's deposition exhibits with us -- we just

17      happened to have an extra copy of the 2007 annual

18      report -- since this is a separate deposition.  Thank

19      you so much.  And this is exhibit?

20  THE COURT REPORTER:  It should say on the front.  Exhibit --

21      A.  4.

22  BY MR JOHNSON:

23      Q.  Could you turn to exhibit C, please.

24      A.  Okay.

25      Q.  And then page 22, if you see at the top, page 22 of

Page 12

1        42.

2        A.  Okay.  Spotted it.  22, yes.

3        Q.  You see listed February 13, 2004?

4        A.  Mm-hm.

5        Q.  And section 3, if you turn the page.

6        A.  Mm-hm.

7        Q.  Entitled "compensation payable to the consultant".

8        A.  Yes.

9        Q.  Could you explain this section of the agreement?

10       A.  The section of this agreement, this was the second

11       one.  There was a prior one so, you know, this was

12       stepping in.  So we had decided to take part of his

13       time, so we paid an up front fee and then we paid

14       a quarterly fee and then went through the specifics of

15       the transactions that were covered and then, if I am

16       right, we had a possibility to bring under this

17       contract, subject to my green light, I think, other

18       things.  So at that time we had the role in Austria, and

19       Germany, Oyagi (sic) was a distressed bank, Telekom

20       Austria were two transactions which eventually, I think,

21       all of them got done while the Donatzeinmagi (sic), as

22       I can recall, didn't happen.

23        Q.  And if you turn back to the page before,

24       section 1D.

25        A.  Yes.

1      Q.  Is that the section you referenced?  I believe you

2      referenced --

3  MS. ALVAREZ:  Objection to form.

4      Q.  -- that there were other transactions?

5      A.  Yes, absolutely.  He would attend.  I mean I was,

6      I had hundreds of people under me, so I was following,

7      as the person responsible of the advisory mergers and

8      acquisitions, I was following all of the transactions.

9      But if I can recall, Telekom Austria was under my direct

10     watch, the Republic of Austria, maybe, 50 percent, the

11     BAWAG, partially, zero personal involvement, but I would

12     monitor and ask the various teams whether he was doing

13     his job.

14     Q.  Mm-hm.

15     A.  You know, whether he was attending the meetings.

16     These meetings would probably be mostly in Austria,

17     Germany and so on so I wouldn't attend every single

18     meeting but I get through the Monday morning meeting

19     where each of the teams who kind of report back, find

20     out, and then I would speak with Thomas whenever needed.

21     I mean sometimes it would be three times a week,

22     sometimes it would be every two weeks.

23     Q.  And how is his pay determined?

24     A.  His pay was determined through negotiations with

25     him and then an approval by the committee of investment

1      banking which was Skip McGee and another number of other

2      people.

3       Q.  And that included you?

4       A.  That included me, yes.  I was the proponent, so we

5      sat through and I had, you know, to approve any

6      expenditure, any commitment of the firm I would report

7      on and seek approval prior to signing.  But he was not

8      the only consultant to the group.

9       Q.  Okay, what would happen when one of the agreements

10     was no longer in effect?

11      A.  Normally, if it was no longer in effect we would

12     have a moment of truth as to whether the person was, and

13     I am talking in general not about Mr. Marsoner

14     specifically, I would establish whether the team felt,

15     or parts of the team that were interacting with the

16     senior adviser, would be interested in maintaining that

17     relationship and likewise I would check with the person

18     who was giving us the advice on whether they had

19     interest in providing the same level of commitment,

20     a higher level of commitment or a lower level of

21     commitment.  So we would start the new contract.  If

22     there was no change, we would roll it over.

23      Q.  Could you please hand Mr. Pignatti the October 13,

24     2015 email.

25   THE COURT REPORTER:  That is exhibit 7.

Page 15

1   MS. ALVAREZ:  Sherratt exhibit 7?

2   THE COURT REPORTER:  Yes.

3   MS. ALVAREZ:  Do you have an extra copy?

4   MR. JOHNSON:  I do not.

5   MS. ALVAREZ:  What is the Bates?

6   MR. JOHNSON:  LEH58.

7   MS. ALVAREZ:  Those exhibits were marked for Mr. Sherratt's

8       deposition so we didn't know the numbers would carry

9       over into a new deposition, so we don't have a copy.

10  MR. JOHNSON:  I might have an extra copy.

11  MS. ALVAREZ:  Shall we go off the record for two minutes.

12  MR. JOHNSON:  Yes, let's go off the record.

13  THE VIDEOGRAPHER:  We are going off the record.  The time is

14      4 p.m.

15  (4:00 p.m.)

16                          ((Break taken)

17  (4:01 p.m.)

18  THE VIDEOGRAPHER:  We are back on the record.  The time is

19      4: 01 p.m.

20  BY MR. JOHNSON:

21    Q.  And Mr. Pignatti, you see this October 13, 2005

22      email, from you to Jonathan Rouner, copying Christian

23      Meissner?

24    A.  Mm-hm.

25    Q.  Could you explain this email, please?

```
 1      A.  Sure.  Christian Meissner had become, I can't

 2   remember what he was, he was either the head of Germany

 3   or of investment banking at the time, and one of his

 4   team members, a managing director, Mr. Rouner, interacts

 5   with Mr. Marsoner, as I had encouraged all of the teams

 6   to use our senior advisers, relaying to me any specific

 7   new project and so on.  But they could just get on with

 8   it, they wouldn't have to come to me and I wouldn't go

 9   on every single thing.  So here I am writing, well, the

10   issue is did they do it?  No.  I mean, people get

11   carried away, one is in Germany, one is in Austria and

12   so on, and I find myself a few weeks behind.  So I would

13   spend a day a week tracking the utilization of all of

14   the senior advisers and making sure that I wouldn't find

15   myself in front of a fait accompli of someone who had

16   agreed something and so on.  So this is a classic email

17   clarification to a team leader where I am saying

18   I received the call directly from the senior adviser,

19   Mr. Marsoner, who says that he could get us into

20   a situation with a certain client, who would hire us

21   through his good auspices.  Do we agree (a) that we want

22   to do it, so is this the type of client that you want,

23   you know, because he would be responsible for that

24   segment, sector, whatever.  And if so, please guide me

25   on the terms.  You know, how important?  Is this a very
```

1    visible mandate?  We are talking advisory here, not

2    capital, this is advisory, which in Europe, unless we

3    have a million people, are not necessarily easy to get

4    when you go below the top ten clients per each sector

5    and then you use consultants to help you monitor.

6    Q.  And you start by saying: "Thomas' contract with me

7    has expired."

8    A.  Mm-hm.

9    Q.  Is that correct?

10   A.  Absolutely.

11   Q.  But you were still covering his expenses?

12   A.  Yes, on a deal by deal.  So whenever he came to me

13   and said "I am working with your guy in Austria on this

14   possibility", and so on, "do you approve?", you know,

15   verbally, and then let's see.  I can't remember, because

16   I had a lot of them, I had almost 300 people in the

17   advisory group and everything.

18   Q.  Mm-hm.

19   A.  And I don't know how many advisers.  I can't

20   remember what the situation of Thomas was; whether he

21   wanted to do less or more, I truly cannot remember.  So

22   I didn't have enough to go to our investment committee

23   and say yes, we have another, you know, Dr. Marsoner

24   wants to commit for the next several years on this

25   specific economics and I didn't know, maybe I didn't

1      have enough traction from my teams to say yes, because

2      we had a budget we could spend so much on advisers.  So

3      if we took one, we wouldn't have another one to maybe

4      start the new vertical, maybe to cover another country.

5  THE COURT REPORTER:  Sorry, could you repeat the last bit?

6       A.  We would have to decide as a team, the advisory M&A

7      team, how to spend the budget, being the person in

8      charge, it was in the end my duty to present the annual

9      budget, but also to manage the budget.  So there were

10     times when the level of activity with one adviser did

11     not warrant a contract with a fixed amount, and so on.

12     So we would, say, use as a guideline the past but on

13     specific transactions you have to come to me and I will

14     sign off and sort of rejuvenate the old agreements with

15     the caveat that it may be without a fixed amount, with

16     a cap, you know, depending deal by deal.

17         I preferred, generally, to have contractors on,

18     because I had so many of them, just to remember what you

19     were doing with one or the other but it was, in the case

20     of Thomas and a few others, after a decade together we

21     could live with, sort of a play it by ear system.  But

22     I would always go back to the person within Lehman, sort

23     of full time Lehman MD, and check that the work was

24     being done, that it was a realistic request.

25       Q.  And so when his agreement expired how would his pay

1     be determined?

2      A.  His pay would be determined the way that I do it

3     with this email, and I don't know if Jonathan responded

4     to me, but I would say these are the guidelines, this is

5     the deal, do you want me to confirm to the adviser that

6     he is on and, if so, within the usual sort of Lehman

7     scale, which I, for the avoidance of doubt repeat to

8     him; where would you place his services?  Because this

9     would come off the bonus pool.  So if we were introduced

10    to a deal by someone -- someone, by one of the senior

11    advisers -- we would use the net revenues for the team,

12    not the gross, so it was a team cost, it wasn't just

13    money that was flying around.  So I wanted the buy in

14    not to be told at the end of the year I made

15    USD 10 million.  Sorry, it is USD 8 million, because two

16    went to -- so they tended to forget on a personal basis

17    the expenses associated with the deals.

18     Q.  Do you know Peter Sherratt?

19     A.  Of course.

20     Q.  Was he involved in determining Dr. Marsoner's pay?

21     A.  No.

22     Q.  And changing topics, are you familiar with

23    Cerberus' acquisition of BAWAG?

24     A.  Yes.

25     Q.  Was Dr. Marsoner involved in that transaction?

Page 20

1        A.  Yes.

2        Q.  What was his involvement?

3        A.  His involvement was that he knew BAWAG, being his

4    job.  He was the head of Lehman FIG practice, Financial

5    Institutions Group, and knew all of the Austrian banks

6    and the German banks and when Cerberus -- actually

7    I can't remember who came up with the BAWAG idea,

8    whether it was us or Cerberus.  But any way, internally

9    we were not equipped to provide advice on a complicated

10   work out.  This bank was distressed and the idea was to

11   buy it.  But it was in a form of bankruptcy and so on,

12   so it required a lot of local knowledge that we didn't

13   possess post Mr. Marsoner's departure as a full time MD.

14   And, you know, my decision at the time when he decided

15   to depart was that Austria was not that strategic, so,

16   that it was cheaper to have someone like him stay part

17   time than to start again and have a full time person

18   for -- you know, of course when you make these decisions

19   and all of the business comes from Austria all of a

20   sudden.

21       Q.  And was he paid for this work?

22       A.  For BAWAG?

23       Q.  Yes.

24       A.  Yes, I think he was.

25       Q.  Now, were you involved with Lehman's F1 investment?

1         A.   I was involved with Formula 1 in what I would not

2    call an investment.  As part of my duties Lehman Europe

3    would bring to me, as head of advisory and on the

4    industry groups, all of the busted loans, which ended up

5    not as a fixed income work out, but as a sale of the

6    whole company.  So among those when Kirch, the media

7    group, went bankrupt, Peter Sherratt on the legal side

8    and a hundred law firms and so on helped us on a huge

9    exposure from the fixed income division and other parts

10   of the firm to grab as much collateral as we could.

11   Then they brought it to me to manage, you know, because

12   this collateral was shares in companies with board

13   sheets that required decision making.  Among those one

14   of the few that actually turned out to be valuable was

15   the Formula 1.  This is out of the Kirch group.  So

16   I ended up following Formula 1, not because the firm had

17   made an investment but because the firm had lent money

18   to Kirch, who had pledged a stake in Formula 1 to three

19   banks, one of which was a German bank, and was getting

20   Thomas' assistance on that relationship; BLB, the

21   Berliner Landesbank, JP Morgan and us.  Ended up with

22   slightly more the Germans and then JP and us the same

23   sort of thing, with a stake which theoretically was the

24   largest, so the controlling stake in Formula 1, but that

25   opens a whole other chapter because the "minority

1    shareholder" was actually calling all of the shots, it

2    was Bernie Ecclestone.

3    Q.  What time period was this?

4    A.  I have lost my -- but it should be public

5    information, I am sure you have all of the documents.

6    Unfortunately it wasn't the only work out that I did --

7    Q.  Sure.

8    A.  -- for Lehman, especially that vintage was the same

9    time as Meridian Hotels and Tele Columbus, I got all of

10   them, but I didn't count them as investments.

11   Q.  And who else did you work with on F1?

12   A.  On F1 I had a team of Germans.  The Patricks,

13   Patrick Schmitz-Morkramer, who then had a career at

14   Lehman and became the head of Germany, and Patrick

15   Bierbaum, who maybe at the time was VP and senior

16   executive director who were working for me on this, plus

17   there was a supervision.  I mean I think at the peak our

18   exposure was 700 million Euros, which for Lehman in

19   Europe was a lot of money, with no cash flow.  So the

20   collateral was not yielding anything.  So -- I followed

21   it for as long as I was head of mergers and

22   acquisitions, so until 2006.  But not at the time when

23   it became "an investment".  Okay, it wasn't really

24   an investment, but it was a sale where Lehman decided

25   that, you know, they were happy to continue to hold

1      an exposure to the asset rather than selling completely.

2      So at that time of the decision I was no longer dealing,

3      I was on the asset management side running private

4      equity all of the funds and so on, with a different

5      reporting line.  But I remained the vice chairman of the

6      firm, a member of the operating committee, and sort of

7      the go to guy when opinions were mixed on what to do.

8      You know, especially if it was assets that I had

9      something to do the year before, because I think we are

10     talking about a year after I stepped down from M&A,

11     which went under Christian Meissner and others.  But

12     I think here it was Peter Sherratt on the legal side,

13     Jeremy Isaacs and Christian.

14      Q.  And were there any other significant F1

15     transactions you participated in?

16      A.  There were many other things associated, yes, to

17     Formula 1.

18      Q.  Was one of them after CVC Capital Partners bought

19     a controlling interest?

20  MS. ALVAREZ:  Objection to form.

21      A.  No.  The CVC acquisition, I was no longer the head

22     of mergers and acquisitions at that time, I had already

23     moved to the other.  So I was involved in the sense

24     I was on the investment committee of the firm and on the

25     operating committee of Europe, so I would be made aware

Page 24

1       and asked, but it was not my decision to do something or

2       not to do.

3           Q.  Was Dr. Marsoner involved?

4    MS. ALVAREZ:  Objection to form.

5           A.  Yes he was.  I am aware, because at times we

6       interacted because I was in a senior position at the

7       firm and because I had an affiliation with that specific

8       transaction in the past.

9           Q.  Do you know how he became involved?

10          A.  He became involved because he continued after me,

11      he negotiated other agreements with Christian Meissner

12      and therefore sort of continued in that role.  And I was

13      also involved as a member of the investment committee

14      because I need divestiture or investment on the firm

15      would go through it, but it was really a yes or no type

16      of opinion, not, I was not the proponent, the one who

17      was saying let's buy 30 percent of Formula 1.

18          Q.  And did you request Dr. Marsoner's advice after CVC

19      Capital Partners bought a controlling interest?

20   MS. ALVAREZ:  Objection to form.

21          A.  After they bought?  After they bought I do not

22      recall whether I had any involvement with, you know,

23      Thomas on this specific subject.  This would be, and

24      remind me of the date, 2000 and?

25          Q.  The dates of when CVC Capital Partners --

Page 25

1       A.  Yes.

2       Q.  I was referring to late 2005/early 2006.

3       A.  I don't recall.

4    MS. ALVAREZ:  May we -- I don't mean to interrupt you Sir,

5       I am sorry.

6       A.  Sure.

7    MS. ALVAREZ:  I would just like to know what you are looking

8       at?

9       A.  What I am looking at is I have made myself some

10      notes as to the dates, the things, because I am bad with

11      dates.

12   MS. ALVAREZ:  Okay.  I think what we need to do is put the

13      notes aside and you should testify based on your memory

14      and to the best of your recollection.

15      A.  As you wish.

16   MR. VAN TOL:  This is Pieter Van Tol.  That is not a proper

17      instruction.  The witness can use whatever he likes.  If

18      you need to mark it as an exhibit.

19      A.  It is actually not helping much, I can't recall the

20      dates, I didn't write the right stuff.

21   MR. VAN TOL:  Okay, I appreciate that.  I am objecting to

22      that instruction, it is not a proper instruction, you

23      don't represent the witness.  He can look at whatever he

24      looks at to refresh his recollection.

25   MS. ALVAREZ:  Okay.  Then I would request a copy of what he

Page 26

1        is looking at.

2    BY MR. JOHNSON:

3        Q.  Can I have you look at the supplemental declaration

4        of Dr. Thomas Marsoner.

5    THE COURT REPORTER:  That is exhibit 6.

6    MS. ALVAREZ:  Exhibit 6 to Peter Sherratt's deposition.

7        What exhibit was that to his motion?

8    MR. JOHNSON:  It was a supplemental declaration.

9    MS. ALVAREZ:  Okay.  Are you going to point him to his

10       letter?

11   MR. JOHNSON:  I am going to point him to his affidavit.

12   MS. ALVAREZ:  The one he submitted to the court.

13       A.  Mm-hm.

14   MR. JOHNSON:  Do you recognize --

15   MR. HORWITZ:  Just a minute, I have a copy of that.

16   BY MR. JOHNSON:

17       Q.  Do you see your letter dated January --

18       A.  Yes, yes, yes, yes, then I am getting the dates.

19       Q.  Do you see the --

20       A.  Yes.

21       Q.  Well, just one second.  Do you see the fifth

22       paragraph?

23       A.  Five, yes.

24       Q.  Does it say:

25           "With regards to the investment in Formula 1,

Page 27

1        I specifically requested Dr. Marsoner's advice ... after

2        JP Morgan had rejected my suggestion of jointly

3        retaining him."

4        A.  Yes, yes, yes.

5        Q.  Is that an accurate statement?

6        A.  Yes.  I now remember the, yes, the occurrence.  But

7        this is prior to the actual closing of the CVC deal.

8        Now I remember.  There were two stages.  The first, CVC

9        took the stake and then the two banks opted out after

10       BLB.  If you remind me how the transaction went, because

11       I can't recall it, because we were three shareholders

12       plus Bernie Ecclestone.  When CVC did the transaction

13       who did they buy out first?

14       Q.  Well, let me just ask you a question.  So you

15       referred to two banks?

16       A.  JP Morgan, Lehman Brothers and BLB were the three

17       investors in, or investors who had seized the shares

18       from Kirch.  CVC acquired control of Formula 1 and then

19       subsequently acquired an additional stake.

20       Q.  Why did you request Dr. Marsoner's advice?

21       A.  At the time there was a dilemma as to what to do,

22       whether to accept the proposal, but I can't remember if

23       it was the first purchase or the second purchase,

24       because the clients of Formula 1 and the teams headed

25       by, they were using Goldman Sachs at the time, but they

Page 28

```
 1      were voicing and saying that they did not intend to

 2      continue with Formula 1 and they wanted to create

 3      a rival event which technically they could have possibly

 4      done, and obviously the value of Formula 1 would have

 5      been completely different if some or most of the teams

 6      migrated to another event.

 7          So the issue was strategically was this asset going

 8      to be a difficult one or was this all posturing, and all

 9      it took was to tweak the margins and have them make

10      a little bit more money and change the team versus

11      Formula 1 split.  And this had been going on for some

12      time, I recall.  But when CVC came in it became even

13      more antagonistic from Mercedes, from, you know, the

14      leading teams.

15        Q.  And who were the leading teams?

16        A.  The leading teams were Mercedes, McLaren, Ferrari

17      to some extent, but at least it was the only one where

18      I had my direct contacts.  But I didn't, because the

19      firm was not very strong in automotive, we didn't have

20      direct links, especially with the Germans and then

21      Goldman was trying its best to make sure we didn't have

22      access to anybody who sang outside of the choir.

23      I asked Thomas, and the other thing that I needed to

24      know from, you know, to give the firm some advice, was

25      where things stood with BLB, because, you know, it
```

1      became a very big issue and even at the time there were

2      issues around it.  And that is where he was kind of

3      fished out.  But now, this is 2005.  I can't remember if

4      he was still under the mandate or not, maybe it was,

5      which of the various mandates that Thomas had, whether

6      it was covered or not.

7          Q.  Do you remember the advice that he provided?

8          A.  He provided, he took some time to provide it, but

9      he managed to speak directly with, I think McLaren was

10     one of the ones where we didn't have an clue as to, you

11     know, how to contact them because they were not --

12     Mercedes, at least you do fixed income with them.

13     McLaren is not an entity that we were banking.  But also

14     through the banking circles in Germany it is hard to

15     understand where things stood with the teams, whether

16     they were prepared.  Because the migration to a new

17     event would have meant, for the auto manufacturers who

18     decided to do that, probably taking three steps back in

19     terms of visibility and so on, before it was up and

20     running and, you know, Formula 1 had already been going

21     for decades at the time.  So he was instrumental in

22     understanding whether it was a bluff or it was real.

23         Q.  So in your view did Dr. Marsoner provided

24     invaluable advice?

25   MS. ALVAREZ:  Objection to form.

1       A.  Obviously in retrospect at the time the advice was

2       his understanding of the situation.  In retrospect it

3       was right.

4       Q.  To your understanding did Lehman Brothers rely on

5       Dr. Marsoner's advice?

6       A.  I think this was debated at the investment

7       committee and as the pros and cons, and I think it was

8       one of the elements, certainly not the only element.  If

9       I remember correctly the way that it was presented, as

10      I was saying before, it wasn't me presenting it, it was

11      either Jeremy Isaacs or Meissner.

12      Q.  Okay.

13      A.  As it was a European issue, where it was how much

14      money do we have this investment on the books at?  How

15      much are we getting back, if we do at all?  How much are

16      we getting, and they did the calculation how much, you

17      know, the firm needed as a capital gain -- capital gain;

18      writing back of an investment -- and how much we could

19      afford to, you know, take a punt on future values.

20      Q.  And in your view do you believe Dr. Marsoner should

21      be paid for that advice?

22  MS. ALVAREZ:  Objection to form.

23      A.  I think, yes, he would be, he would have been paid,

24      I would say, in retrospect.  I don't know the ins and

25      outs of what specific authorizations he, you know,

1        worked at the time but I think the firm would have taken

2        -- you see our agreements were the senior advisers were

3        very one sided.  So I mean once there was a negotiation,

4        we could say okay, it is between X and Y, but then it

5        would be the sole discretion of the firm how much to

6        pay, and if you liked it you stayed, if you didn't like

7        it that was the way we worked.  But on the other hand we

8        never left, we never asked for any advice, work and so

9        on to then not pay anything.  It was just not done and

10       certainly under my watch it never happened.  The

11       amounts, though, would be determined, even post facto.

12         Q.  Was the type of advice he provided on F1 similar to

13       in the BAWAG transaction?

14   MS. ALVAREZ:  Objection to form.

15         A.  It was similar.  It was similar in terms of advice.

16       The difference was that here it was an exit or not

17       an exit of an existing position.  BAWAG was really

18       driven as an advisory mandate.  You know, it was more of

19       an investment bank.  Here, the firm owned a position,

20       willingly or unwillingly, and he provided advice in

21       terms of tactics, the same as BAWAG, but for a different

22       purpose.

23         Q.  Do you know the Lehman entity used to reinvest in

24       F1?

25         A.  No.  I mean do I know it, maybe I knew, because --

1      but they all sounded the same so I don't know which one

2      finance mainly chose as, but I am sure it had something

3      to do with where the losses were.

4       Q.  Okay.

5       A.  So it wouldn't have been decided on a hierarchical

6      because it is this division that has made -- well,

7      nobody had made the investment, it came out of fixed

8      income, mainly, having done a collateralized loan on

9      which there was a default and I would assume they would

10     have reinvested.  But I am out of my depth.  That they

11     would have used the same entity that suffered the loss

12     in, you know, realizing any capital gain in the same

13     entities to use it.  But --

14  MR. JOHNSON:  Do you want to take a ten minute break?

15     I want to read my notes to see if I have anything else.

16  MS. ALVAREZ:  Okay, that sounds good.

17  THE VIDEOGRAPHER:  We are going off the record.  The time is

18     4:29 p.m.

19  (4:29 p.m. )

20                          (Break taken.)

21  (4:46 p.m. )

22  THE VIDEOGRAPHER:  We are back on the record.  The time is

23     4:47 p.m.

24  BY MR. JOHNSON:

25      Q.  Mr. Pignatti, I have a couple more questions for

Page 33

1     you.

2     A.  Sure.

3     Q.  Could you please turn back to the October 14, 2005

4     email.  It is from you to Jonathan Rouner.

5     A.  Yes.

6     Q.  Do you remember seeing or sending this email?

7     A.  I remember the content, yes.

8     Q.  And do you see that you are listed as the person

9     who sent the email?

10    A.  Mm-hm.

11    Q.  Was this document sent in the scope of your

12    business activity at Lehman Brothers?

13    A.  Absolutely.

14    Q.  Do you have any reason to dispute that this

15    document came from Lehman Brothers' files?

16    A.  No.

17    Q.  Do you have any reason to dispute that it was part

18    of Lehman Brothers' business activity to maintain

19    records of emails?

20    A.  No.

21    Q.  Okay.  Now, could we please look at November 26,

22    2005 email -- previously marked?

23    THE COURT REPORTER:  Exhibit 5.

24    MS. ALVAREZ:  Exhibit 5 of Sherratt's deposition, was it

25    marked?

Page 34

```
 1    MR. JOHNSON:  Yes.

 2    MS. ALVAREZ:  Okay.

 3    BY MR. JOHNSON:

 4       Q.  This is the November 26, 2005 email from Thomas

 5       Bernard to Steve Hannan, Patrick Schmitz-Morkramer and

 6       Peter Sherratt.

 7       A.  Mm-hm.

 8       Q.  Do you see where it says:

 9          "FYI, if McClaren is true, it's huge."

10       A.  Which part?

11       Q.  It should be the top, the top of the email.

12       A.  Mm-hm.

13       Q.  And do you ever remember seeing an email that said

14       that the McLaren information wasn't huge?

15    MS. ALVAREZ:  Objection to form.

16       A.  No.

17       Q.  Okay, thank you.  That is it.

18    MS. ALVAREZ:  Are you done with your questioning?

19    MR. JOHNSON:  Yes.

20    MS. ALVAREZ:  Okay.

21    BY MS. ALVAREZ:

22       Q.  Good afternoon Mr. Pignatti.  I want to thank you

23       again for agreeing to sit with us today.

24          Before I get into our questions, I want to lay down

25       some basic ground rules for depositions.  First of all
```

Page 35

1    have you been deposed before?

2     A.  No.

3     Q.  No, okay.  I will do that.  I am going to ask you

4    questions.  If you don't understand what I am asking or

5    you are confused about anything I would like you to tell

6    me what your question is, and let me know how I can

7    clarify the question for you.  If you answer a question

8    I am going to assume that you understood it.

9         Make sure, the court reporter here is taking

10   everything down, so just make sure that you answer

11   verbally yes, no, or whatever explanation you need to

12   give.  Sometimes people nod or shake their heads.  The

13   court reporter can't take that down.  So just make sure

14   you use your voice.

15        You know, common sense; we are going to try not to

16   talk over each other since the court reporter is taking

17   it down, so I will ask the questions and you can give me

18   your answers and we will do it that way.

19        If at any point you need to take a break, use the

20   rest room, that is fine.  Just let us know.  The only

21   time you can't take a break is when a question is

22   pending.  You will have to answer the question and then

23   we can break.

24        Were those instructions clear?

25    A.  Yes, thank you.

Page 36

1      Q.  Okay, great.

2          So what I would like to start off with, I would like

3      to mark as exhibit 1 to Mr. Pignatti's declaration,

4      Lehman's notice of deposition.

5      THE COURT REPORTER:  You need to have the one I have marked.

6          (Exhibit Pignatti 1 marked for identification)

7      Q.  This is a notice of deposition of Vittorio

8      Pignatti-Morano, it is signed by Jacqueline Marcus of

9      Weil, Gotshal & Manges.  Have you seen this before,

10     Mr. Pignatti?

11     A.  Yes I believe I was sent it.

12     Q.  Okay, I just wanted to make sure that you saw it.

13     At the end it says LBHI intends to cross-examine the

14     witness for approximately 3 hours, do you see that?

15     A.  Yes.

16     Q.  We are hoping to do it in less time.  We will try

17     our best.

18         You told us a little bit about your employment at

19     Lehman Brothers earlier today.  I want to clarify, did

20     you hold a board position at Lehman Brothers?

21     A.  I was on the operating committee.  I was on the

22     board of some of the companies.

23     Q.  Okay.  Were you on the board of Lehman Brothers

24     Holdings Inc?

25     A.  No.

1      Q.  Okay.  What about Lehman Commercial Paper Inc?

2      A.  No.

3      Q.  Okay.  So I would like to talk to you a little bit

4      about how you prepared for this deposition today.  What

5      did you do to prepare for the deposition?

6      A.  I went through the two contracts that I had, just

7      to remind myself of the time frame, and that is pretty

8      much it.

9      Q.  Okay.  Did you speak with anybody about the

10     deposition?

11     A.  No.  I was asked to do it.

12     Q.  Okay.

13     A.  Mr. Marsoner told me roughly why.  He felt it was

14     needed and I agreed, given that we worked together and

15     I was, you know, happy to give my side of my

16     contribution to the dispute.

17     Q.  What did Mr. Marsoner say about the matter?

18     A.  The matter?  That it was concerning, you know, the

19     advice given in the period when I was responsible and

20     afterwards.

21     Q.  Okay.  Did he tell you anything specifically about

22     the agreements?

23     A.  The agreements he didn't need to tell me much

24     specifically; I signed them so I can answer on those.

25     And he gave me some background that the dispute is also

1        on Formula 1, and the advice that was given in my time

2        and after.

3        Q.   Okay.  And what did he say about that advice?

4        A.   Whether I remembered you know, that he had given

5        advice at the time and I answered that I did.

6        Q.   Okay.  Did you talk about whether he ever requested

7        payment for Formula 1?

8        A.   No, I have not discussed that with him.

9        Q.   Okay did he ask you?  Do you remember whether you

10       talked about payment terms?

11  MR. JOHNSON:  Objection to form.

12       A.   No.

13       Q.   Okay.  Did you discuss whether Lehman ever agreed

14       to pay him for Formula 1?

15  MR. JOHNSON:  Objection to form.

16       A.   I discussed with him the need for me to answer

17       about our relationship and the advice given in my

18       capacity as the head of mergers and acquisitions and

19       therefore the nominated person at the time.

20       Q.   Okay.

21       A.   And afterwards anything else I remembered.

22       Q.   Okay.  Did you talk about Tom Bernard's view of the

23       matter?

24  MR. JOHNSON:  Objection to form.

25       A.   No, but I looked up, you know, the old sort of

1       emails, but I have not spoken with Tom Bernard in the

2       last three, four years.

3          Q.  Okay.  What about, did you talk about Magnoni's

4       email, Mr. Magnoni's view of the matter?

5    MR. JOHNSON:  Objection to form.

6          Q.  Ruggero Magnoni.

7          A.  No, I talked to Ruggero Magnoni because he asked me

8       whether I was under, you know, I was going to do this,

9       some months ago.

10         Q.  You spoke to Magnoni about that?

11         A.  Yes.

12         Q.  Okay.

13         A.  He asked me whether I was doing something and

14      whether I possessed information, or remembered.  You

15      know, we are talking about things that happened ten

16      years ago.

17         Q.  Okay.  And when did you speak to Magnoni?

18         A.  A few months ago.  I speak with Magnoni regularly.

19         Q.  Okay, but you haven't spoken to him about Formula 1

20      for a few months?

21         A.  Not recently, no.

22         Q.  Okay.  When you have spoken to Dr. Marsoner about

23      Formula 1, have you spoken about the differences between

24      the various Lehman entities?

25    MR. JOHNSON:  Objection to form.

Page 40

1          A.  No.

2          Q.  Have you spoken to Mr. Magnoni about the

3      differences between the various Lehman entities?

4   MR. JOHNSON:  Objection to form.

5          A.  No.

6          Q.  Okay.  Did you look for any documents in your

7      possession that could refresh your recollection?

8          A.  I did and I found the two contracts that I had

9      signed and some accompanying emails.  And I bought

10     a business from Lehman.  Everything came with it so

11     I have possession of all of my emails from the server at

12     the time.

13         Q.  Okay.

14         A.  I only have mine and the received and sent, so

15     I won't have anything else.

16         Q.  Okay.  I just want to make sure I understood.  You

17     do have access to emails that you received and sent?

18         A.  Yes.  Most of them.  So I did a global search but

19     I didn't look through the whole thing, I looked for the

20     contracts and picked up a few other things just to

21     recollect what we were talking about.

22         Q.  Okay.  Did you do this on your own or did

23     Dr. Marsoner ask you to look for documents?

24         A.  No, I did it on my own.

25   MR. JOHNSON:  Objection to form.

Page 41

1      Q.  Okay.  Is there anything else about Formula 1 or

2    this matter that you had discussed with Dr. Marsoner

3    that we haven't covered?

4      A.  No.

5      Q.  No.  Okay.  Was there anything else regarding

6    Formula 1 or this matter that you discussed with

7    Mr. Magnoni that we haven't covered?

8      A.  Not that I can remember.

9      Q.  Okay.  You said the last time you spoke to Magnoni

10    was a few months ago?

11      A.  On this, it was a few months ago.  I think probably

12    at the time of this --

13    THE COURT REPORTER:  Sorry, could you keep your voice up

14    a little bit.

15      A.  Yes, sure.

16        No, this is more recent.  It must have been before

17    the summer.

18      Q.  Okay.  What did Mr. Magnoni say about this matter?

19      A.  He was trying to recollect the sort of years when

20    it happened, and what his role was at the time.

21      Q.  And what was his recollection?

22      A.  Well, his recollection was really based on

23    remembering what it was, because he just remembered that

24    I was the head of M&A in those years.

25      Q.  Mm-hm.

Page 42

1      A.  And he had a big involvement in Formula 1 in the

2      very beginning, because he at the time was responsible

3      for principal investing and he had unfortunately made

4      the investment in Kirch so he, after a period of time,

5      when it stopped breathing, the investment did, as it

6      typically was with the firm, the responsibility was

7      moved to M&A advisory rather than having the person who

8      made the "bad investment" also deal with it.  So when it

9      went into administration, it became evident that it

10     wasn't going to be a matter of weeks or months.  So it

11     was moved on.  And his involvement remained that of

12     a senior person at Lehman, but no longer on a day by day

13     basis.

14     Q.  Okay.  You said a lot there, so I want to make sure

15     I got it.  You said that Mr. Magnoni was involved in the

16     deal with Kirch from early in the beginning?

17     A.  Yes, all of the way.

18     Q.  All of the way.

19     A.  To the bankruptcy of Kirch.

20     Q.  Okay.

21     A.  And then he remained, one of the most senior people

22     at Lehman.

23     Q.  Mm-hm.

24     A.  With, you know, various responsibilities within the

25     group.

Page 43

1      Q.  Mm-hm.

2      A.  So he was obviously informed throughout but he was

3      not responsible as to how, it was always separate.  So

4      he was not indifferent to the outcome of, having clearly

5      been associated with the original investment, which was

6      not the entire thing.  In fact the Formula 1 came from

7      a loan that was given by JP Morgan, BLB and Lehman.

8      Q.  Mm-hm.

9      A.  The fixed income department; a large loan.  And

10     then there was an additional amount to be

11     "recovered" which unfortunately was an equity investment

12     in the Kirch holding company, where the amount recovered

13     in the end was negligible.

14     Q.  Okay.

15     A.  So overall when you look at the firm's point of

16     view on the whole Formula 1 saga, it wasn't just a gain

17     on having recovered the collectively 1 billion-dollar

18     loan, where Lehman must have been maybe 300.

19     Q.  Okay.

20     A.  I think those are the -- 300, JP 300, balance BLB.

21     THE COURT REPORTER:  I am really struggling to hear you,

22     Mr. Pignatti, could you keep your voice up.

23     A.  Okay, I will look your way.

24     THE COURT REPORTER:  If you look at the camera, that's fine.

25     A.  So we kind of recollected the events.  Clearly he

Page 44

1     knew his part; a large organization, he knew the equity

2     investment, which was hundreds of millions of Euros, had

3     gone really badly and there was a positive recovery on

4     the loan.

5     Q.  Okay.  And when you were looking for documents to

6     prepare this deposition, did you look for any documents

7     showing that Lehman would pay Dr. Marsoner for

8     Formula 1?

9     A.  No.  I actually was looking at -- the documents

10    that I have were all of the ones under my watch.  So

11    I would have known what Lehman, I represented Lehman.

12    Q.  Mm-hm.

13    A.  To a large extent.  So I was looking to see what

14    exactly were -- sort of brushing up on the course of

15    events and in which years was I working on --

16    Q.  Okay.  Did you look for any agreements that covered

17    Formula 1 with Dr. Marsoner?

18    A.  Yes.

19    Q.  And did you find any?

20    A.  No, not under my watch.  It was not specifically

21    mentioned.  I found some emails on sort of advice

22    provided.  Prior to the sale to CVC there was the dates

23    confusion.

24    Q.  Okay.

25    A.  And the events with CVC was done in 2006.  That was

Page 45

1       the time when I changed jobs within Lehman, so this was

2       across, the discussion was prior, and it took, I think,

3       a long time between handshake and actually doing the

4       agreement with CVC.

5         Q.  Okay.  And we are going to go through some

6       documents which will hopefully help you with the

7       timeframe as well.

8         A.  Sure.

9         Q.  I would like to take a look at the letter you had

10      submitted to the bankruptcy court, which was marked

11      exhibit 6 to Peter Sherratt's deposition that we looked

12      at earlier.

13        A.  January 7?

14        Q.  Yes, January 7.  Let us mark this as exhibit 1 to

15      your deposition, just so that we have a uniform set.

16    THE COURT REPORTER:  2.

17    MS. ALVAREZ:  Oh, the notice was 1.  Okay, we will mark this

18      as exhibit 2.

19        A.  Want to put the label?  I am getting the gist of

20      it.  It is already labeled as 6.  Do you want to remove

21      it?

22    THE COURT REPORTER:  No.  It is already labeled from the

23      previous deposition.  Do you want another label on it?

24    MR. VAN TOL:  This is Pieter.  I don't understand why you

25      are remarking the exhibits have already been marked,

Page 46

1        that doesn't make any sense and will lead to some

2        confusion.

3    MS. ALVAREZ:  Was it just the letter that was marked as

4        exhibit 6 or was it a compilation of the letters?

5    MR. JOHNSON:  It was the entire declaration.

6    MS. ALVAREZ:  I just wanted to mark Mr. Pignatti's letter as

7        exhibit 2, not the entire compilation.

8    MR. VAN TOL:  I understand.

9            (Exhibit Pignatti 2 marked for identification)

10   BY MS. ALVAREZ:

11       Q.  Mr. Pignatti, are you ready?

12       A.  Okay.

13       Q.  Mr. Pignatti, did you draft this letter?

14       A.  Yes.

15       Q.  Okay.  Dr. Marsoner sent you this letter to sign,

16       correct?  Did you draft it, did you type it up yourself?

17       A.  I actually, you know, received some indications of

18       what the theme was and so on, and then I edited this

19       version and did it myself, yes.

20       Q.  So you edited a version that Dr. Marsoner had sent

21       you?

22       A.  It was, I think, there were some suggestions on the

23       things, the events that had to be described, and then

24       I wrote it.

25       Q.  Okay.  Do you -- and he sent it to you via email?

1      How did he send you the ideas that he wanted you to

2      include in the letter?

3       A.  Maybe by email, I can't remember.

4       Q.  Okay.  I don't think we have a copy of that.  So we

5      will actually request a copy of that email from

6      Dr. Marsoner, sending you information that he wanted in

7      the letter.  And I just want to confirm, this is your

8      signature on this letter, correct?

9       A.  Yes.

10      Q.  Okay.  What edits did you make, what information

11      did he give you, let us try --

12  MR. JOHNSON:  Objection to form.

13      Q.  -- to think a little here.  Okay, I will clarify.

14      When Dr. Marsoner sent you the information that he

15      suggested would be included in this letter what was

16      there, what information was there?

17  MR. JOHNSON:  Objection to form.

18      Q.  Do you understand the question?

19      A.  Yes, yes, I am trying to remember.  Frankly,

20      I think there was some things that were not really

21      concerning me or at the time at which I was responsible

22      for this so that I limited the letter to the things that

23      I knew.

24      Q.  Okay.  Do you recall what was in there that you

25      didn't know, that you didn't include in this letter?

Page 48

1      A.  I think the thing that I didn't know was whether

2      the amount had already been decided in case of success,

3      or, you know, anything, because it was done subsequently

4      to my new role.

5      Q.  Was there anything else that you didn't know about

6      that you didn't include in this letter?

7      A.  I think it was also on the exclusivity of Lehman,

8      whether the information that he had provided and so on

9      was the exclusive reason and I said that I remember it

10     was an important theme, but it is very difficult to say

11     whether a decision is made exclusively in the end.  The

12     people who made decisions, they were very senior people

13     in the firm who do not necessarily share the bases.

14     They don't need, like judges, to come out and explain

15     their resolution.

16     Q.  Okay.  When you say exclusive reason, you are

17     referring to whether Dr. Marsoner's advice was the

18     exclusive reason for Lehman retaining its shares in

19     Formula 1?

20     A.  Absolutely.

21  MR. JOHNSON:  Objection to form.

22     A.  Absolutely.

23     Q.  Okay.  And what you are trying to say is that while

24     Dr. Marsoner's advised was a factor, it was not the

25     exclusive reason for Lehman's decision?

Page 49

1    MR. JOHNSON:  Objection to form.

2        A.  As I say, we did not issue, it was difficult enough

3        to decide, we did not need two and certainly they were

4        senior people, the whole firm was involved in making the

5        decisions, because as I said before, there was lots of

6        egg on our face and a huge amount for Europe especially.

7        It was one of the few big losses in Europe and therefore

8        there was a lot of attention and decisions were taken in

9        a collegiate way but without needing an explanation.

10       Q.  Okay.  And after Lehman had acquired these shares

11       as a result of Kirch's default, a team, a work out team,

12       was put together to handle this investment, correct?

13       A.  Yes.

14       Q.  And --

15       A.  For many years, because it must have been 2002/3

16       that we exercised the pledge, jointly with JP, BLB.

17       Q.  Okay.

18       A.  And then for a number of years we discovered that

19       the governance was very opaque.  But the key people, you

20       saw them listed before were people working in my

21       department called Patrick Schmitz-Morkramer and Patrick

22       Bierbaum and on the legal side Peter Sherratt.

23       Q.  Okay.  And I would like to mark this next document

24       as Pignatti 3, the Bates range on the document is Lehman

25       222 through Lehman 224.

Page 50

1          (Exhibit Pignatti 3 marked for identification)

2      Q.  And just take a look at it, Mr. Pignatti.  This is

3    an email from Patrick Bierbaum to Peter Sherratt,

4    yourself, Stephen Sleigh and copied as CCs are Tom

5    Bernard, Steve Hannan, Patrick Schmitz-Morkramer and the

6    subject line is "scope of responsibility description for

7    Thomas Marsoner", do you see that?

8      A.  Yes.

9      Q.  Okay.  Now, I am just going to read the text of the

10   email.  It says:

11        "Please find attached the scope of responsibility

12   description for Thomas Marsoner for your comments.  We

13   are intending to use it to convince JPM that Klaus

14   Diederichs will not be able to fulfill all duties

15   an operating director of Formula One due to his fulltime

16   position at JPM."

17     A.  Mm-hm.

18     Q.  Okay.  Before we get into the detail of the

19   substance, you probably told me already, but I am going

20   to ask you, who is Patrick Bierbaum?

21     A.  Patrick Bierbaum was at the time an associate,

22   maybe.  So intermediate level, the youngest in the team,

23   who was doing the day by day.  If I remember correctly

24   I think Sleigh was the originator in fixed income of the

25   loan.

Page 51

1      Q.  Okay.

2      A.  So he was kept informed.  But just like Magnoni had

3      been taken out of the day by day decision making, so the

4      fixed income for the originated loan likewise.

5      Q.  Okay.

6      A.  Steve Hannan, I don't remember what his role was.

7      Patrick Schmitz-Morkramer was the boss of Bierbaum.  He

8      reported to me.  To, he had a dual task, to ideally help

9      the firm recover both on the equity investment, so this

10     was not the only assignment they had, but at least on

11     the equity investment we were on our own, we didn't have

12     a JP Morgan and BLB.  Instead on this one we had Klaus

13     Diederichs of JP Morgan and, even worse, the BLB

14     executives, who did not necessarily see eye to eye with

15     us.  So every decision had to reach first the quorum

16     among the banks and then be discussed.  So that is what

17     took up most of Patrick Bierbaum's time.

18     Q.  Okay, and Peter Sherratt is identified here as

19     well.  He was legal counsel?

20     A.  Absolutely.

21  MR. JOHNSON:  Objection.  Leading.

22     A.  Hmm?

23  MR. JOHNSON:  I just made an objection.

24     Q.  You can answer the question.  Peter Sherratt was

25     legal counsel, correct?

Page 52

1    MR. JOHNSON:  Objection.  Leading.

2        A.  Correct, to the firm in Europe and particularly to

3        the thorny transactions like this one that involved

4        everything, including reputation.  As I said, this was

5        not an investment, this was a work out.

6        Q.  Okay.  And Tom Bernard was the lead of the work out

7        team?

8    MR. JOHNSON:  Objection.  Leading.

9        A.  Tom Bernard was one of the most senior people on

10       the principal investment in New York, and sort of

11       trusted by the top of the firm to supervise any

12       complicated recovery.  He was also supervising the Prop

13       Principal Investments.  So actually, functionally, his

14       interests should have been more on the equity investment

15       that had turned sour than the fixed income, but given

16       that in the end they resulted in one big mess, we kind

17       of pooled the working team.

18       Q.  Okay.

19       A.  But he was instrumental in getting sort of New

20       York's buy in into any decision that Europe made.

21       Q.  Okay, at the time this email was

22       prepared, October 22, 2002, around that time, Lehman and

23       JP Morgan were considering jointly retaining

24       Dr. Marsoner?

25   MR. JOHNSON:  Objection.  Leading.

1        A.  I think so, but if you ask me do I remember ten

2        years ago the step by steps, I would be lying.  But

3        I think, you know, the evidence by this email must have

4        been the first time when we suggested that, you know,

5        the work out team, especially the two big American

6        banks, who I must say, saw eye to eye, so we tended,

7        although we were junior to BLB, together we had

8        a quorum.  So I remember suggesting that because both

9        Klaus and I had a lot of other things to do in life, it

10       was good to have -- and the Patricks were relatively

11       young.  Technically they were fantastic and so on, but

12       they could not go and meet Bernie Ecclestone and tell

13       him what to do.  So we thought that it would have been

14       okay if neither firm had a very senior, dedicated

15       German, and especially one who maybe knew well the

16       German bank, with whom neither I nor my counterpart,

17       Klaus, had a honeymoon from the start.  So first the

18       language.  Well, in the case of Klaus not, but in my

19       case, the language, we didn't build a relationship and

20       became relatively acrimonious in terms of who, we had

21       one seat, so who got the seat?  BLB.  Who did they send?

22       Someone both Klaus and I thought was not equipped.  So

23       I think I proposed, I said do we have a senior German?

24       Yes.

25       Q.  Okay, and --

Page 54

```
 1        A.  But I can't remember if it was my idea or the

 2        Patricks, or --

 3        Q.  Okay.  So the idea was, what you were considering

 4        was retaining Dr. Marsoner to represent the interests of

 5        the banks in Formula 1.

 6        A.  Yes, to follow it.

 7   MR. JOHNSON:  Objection.  Leading.

 8        A.  We did not delegate any decision making and so on,

 9        but to be there at every meeting, to go and spend

10        afternoons in Berlin and talk to them and explain to

11        them how things work.  That was, all of the agreements

12        that we found in case of repossession of the stake of

13        Formula 1, which was the most convoluted Jersey or

14        Guernsey holding company with trusts and everything

15        else, and we were represented in that by a German bank

16        that didn't have very deep knowledge of these matters.

17        Obviously Peter Sherratt was providing that.  But they

18        were not necessarily volunteering to listen.

19        Q.  Okay.  So --

20   MR. VAN TOL:  Mr. Pignatti, this is Pieter Van Tol again.

21        Could you make sure that you pause between the question

22        and the answer, in case Mr. Johnson needs to interpose

23        an objection?

24        A.  Yes, sure.

25   MR. VAN TOL:  Thank you very much.
```

Page 55

 1   BY MS. ALVAREZ:

 2      Q.  So at this point in time Lehman was not planning on

 3      selling its stake in Formula 1.

 4   MR. JOHNSON:  Objection.  Leading.

 5      A.  That is correct.  We had just got it and in fact we

 6      were trying to secure that the stake would have

 7      a meaning, you know, in terms of control.  Because when

 8      the firm inherited this stake by executing a pledge --

 9      Q.  Mm-hm.

10      A.  -- the governance had not been negotiated with the

11      other shareholder.

12      Q.  Okay.

13      A.  And the other shareholder, the trust, apparently

14      controlled by Mr. Ecclestone --

15      Q.  Mm-hm.

16      A.  -- did not say okay, welcome, you know, to the new

17      shareholder and so on.  This is our business, if you

18      want to come, you know, to board meetings every once in

19      a while, you know, be my guest.  It was not a smooth

20      relationship because it was not negotiated in advance.

21      We had not paid a price to Mr. Ecclestone, or anything

22      you know, so frankly he did not owe us anything to

23      change the way in which things were run.

24      Q.  Okay.  At this point you weren't advising Lehman to

25      sell its stake either?

1   MR. JOHNSON:  Objection.  Leading.

2       A.  My task was a different task.  Okay, at that time

3       the stake was unsaleable.

4       Q.  Okay.  Thank you.

5       A.  We owned 75 percent interest in a holding company

6       that an agreement with another holding company in

7       Guernsey and so on, and Peter Sherratt, give him credit,

8       and us, the banking team in three years would change

9       that situation.  Not smoothly, you know, through even

10      court cases and so on.  We at one point to eliminate the

11      BLB representative, who in theory was working on our

12      behalf, and finally some changes took place.

13      Q.  Okay.

14      A.  Which then led Bernie Ecclestone to become much

15      more amenable to a sale.  Rather than having three banks

16      being difficult and so on, they saw that we were quite

17      effective in making his life not so easy.

18      Q.  Okay.

19      A.  Had it been only BLB, I think he would still now

20      age 84 control the company with 25 percent and make all

21      of the decisions single-handedly.

22      Q.  Okay.  So at this point you considered retaining

23      Dr. Marsoner.  The decision was made not to retain him

24      in 2002, correct?

25  MR. JOHNSON:  Objection.  Leading.

1        A.  That is correct.  I think JP came back saying,

2     well, you know, for us, you know, JP, Lehman and we take

3     a Lehman guy, you know, it sounds like we are giving you

4     the keys and so on.  You know, if you want to, we would

5     be delighted if you add him to the team at your expense.

6        Q.  Okay.

7   MR. JOHNSON:  Just to point out the objection to leading is

8     based on the fact that he is not a hostile witness, he

9     is an ex employee of Lehman Brothers.

10  MS. ALVAREZ:  You can take that position.  We are taking the

11    position that he is a friendly witness to Dr. Marsoner

12    so he would be a hostile witness to Lehman Brothers.  He

13    is no longer employed with Lehman Brothers.

14  MR. JOHNSON:  He is an ex employee, though.

15  MS. ALVAREZ:  That is fine.

16  MR. VAN TOL:  This is Pieter.  And unless you establish

17    a foundation, none of your questions are admissible.

18  MS. ALVAREZ:  Well, that is really for the court to decide.

19    So we will move on.

20  BY MS. ALVAREZ:

21       Q.  I want to jump head, that is 2002.  I want to jump

22    ahead three years, let us jump ahead to 2005.  In 2005

23    you learned that CVC Capital was considering making

24    an offer to Lehman to purchase the Formula 1 shares,

25    correct?

Page 58

1    MR. JOHNSON:  Objection.  Leading.

2        A.  Yes, I don't remember the months, when it happened,

3        when it closed.  So it was between 5 and 6.

4        Q.  Okay.  And --

5        A.  For sure.

6        Q.  And you, as an investment banker, you were

7        providing advice to Lehman at this time on the Formula 1

8        shares?

9    MR. JOHNSON:  Objection.  Leading.

10       A.  Yes.  I was still involved in the transaction, but

11       less so because it had now reached the stage where we

12       had sufficient governance and there was maybe

13       a possibility to sell.

14       Q.  Okay.  And by sufficient governance, you meant CVC

15       was going to come in as a controlling shareholder?

16       A.  I mean before that.

17       Q.  Objection.  Leading.

18       A.  The three banks had reached an understanding so

19       that their influence on the company was something that

20       CVC would have been interested in.  CVC was not

21       interested in a passive minority governance, owning 75

22       percent of the company.

23       Q.  So CVC was interested in having an active role in

24       ensuring the profitability of Formula 1?

25   MR. JOHNSON:  Objection.  Leading.

Page 59

1     A.  Profitability or not, having on paper the ability

2     to change things if they were not happy to act as owners

3     of the business, which is not the way in which we

4     entered.

5     Q.  Okay.  So CVC coming in, establishing this, more of

6     a corporate structure, made the investment, the

7     Formula 1 investment, more valuable for Lehman, correct?

8   MR. JOHNSON:  Objection.  Leading.

9     A.  The course of events when we were talking was prior

10    to the CVC investment.  I can't remember when in 2006

11    they actually step in.

12    Q.  Okay.

13    A.  Okay.

14    Q.  So once they did, so let us say it's 2005/2006?

15    A.  Okay.

16    Q.  Once CVC stepped in, the investment became even

17    more valuable for Lehman, correct?

18  MR. JOHNSON:  Objection.  Leading.

19    A.  The investment became more valuable, or the

20    company, Lehman, when CVC came in, sold part of its

21    stake.

22    Q.  Okay.

23    A.  Okay.  But CVC was able to acquire, operate and

24    control the group.  That in itself gave it a value that

25    prior to that was really encumbered by a minority

Page 60

1        discount.

2        Q.  Okay.  So now that this value was no longer

3        encumbered by the minority discount, you weren't

4        advising Lehman to sell its stake, were you?

5    MR. JOHNSON:  Objection.  Leading.

6        A.  I was not advising Lehman to sell its stake.  It

7        depends when.  I mean the last opinion that I gave was

8        when the transaction was closed and Lehman sold part of

9        its stake and retained -- technically that was done as

10       a new investment for tax purposes, in fact instead of

11       selling it is entire stake, as JP Morgan elected to,

12       Lehman decided in the end to keep.  Obviously if it had

13       kept its entire stake it would have been better.  So in

14       terms of value creation for Lehman, I mean in retrospect

15       easier to say it would have been not to have sold the

16       stake altogether.

17       Q.  So that's --

18       A.  Which was technically not possible, because Lehman

19       needed to show some recovery of its money on, you know,

20       at the time of closing with CVC.  And it was able to

21       retain a stake and, you know, it turned out to be

22       a positive decision rather than the JP Morgan one, who

23       just didn't want to hear about it.

24       Q.  Okay.

25       A.  They had a different balance sheet to Lehman.

Page 61

1     Q.  Okay.  At the time Lehman retained that stake that

2     JP Morgan didn't want anything to do with you weren't

3     advising Lehman to let go of it, were you?

4  MR. JOHNSON:  Objection.  Leading.

5     A.  That was no longer my task at that point.  But if

6     not, tangentially as a member of the investment

7     committee and a senior executive of the firm.

8     Q.  Okay.  And whose task was it?

9     A.  Jeremy Isaacs first, as head of Europe, and

10    therefore probably the largest exposure that they had.

11    In Europe we didn't have a huge balance sheet like the

12    US.  This was a very meaningful decision that was not

13    pure asset management.  Either we had the capital to

14    keep it or we didn't have the capital to keep it, and it

15    was his call.

16    Q.  Okay.  And were you advising Jeremy Isaacs?

17 MR. JOHNSON:  Objection to form.

18    A.  I was, I was giving him suggestions.  We used to

19    meet every Monday and discuss the most topical things.

20    Q.  Okay.

21    A.  And Christian Meissner, as the person who took over

22    the responsibility, who on top was also German.  And

23    therefore certainly more, closer to the situation, post

24    I moved to the asset management division.

25    Q.  Okay.

Page 62

1        Now, I want to look at what has been marked as

2    Pignatti exhibit 2, which is the letter you submitted to

3    the court, Mr. Pignatti, could we look at it again.  And

4    on the second page, the very last paragraph, you state:

5        "It was my understanding that Dr. Marsoner would

6    have been paid by Lehman Brothers for his services

7    concerning the F1 investment or I would not have asked

8    him to help."

9        What was the basis for your understanding?

10    A.  My understanding is that, as I think I mentioned

11    before, we had a long consolidated relationship with our

12    senior advisers which was regulated by contracts but

13    they were completely one sided.  You might have read

14    them.

15    Q.  Mm-hm.

16    A.  It says if the firm decides that you had a major

17    involvement in a transaction.  So completely left to our

18    discretion, the firm's discretion.  And therefore we

19    were instructed to use this power, not

20    opportunistically, but bearing in mind that we had

21    a name, a future and we had to keep our senior advisers,

22    you know, happy.

23    Q.  Mm-hm.

24    A.  But within, you know, the boundaries of the

25    economic interests of Lehman.  And therefore, as you can

1      see from previous emails and so on, any time we utilized

2      the senior adviser, not just myself, but also other

3      people on the team, and it was a large organization,

4      I wanted it to be flagged, because if we agreed to use

5      we would then remunerate.  I cannot tell you how much,

6      it depended on our good will, on a discussion with

7      a person and so on, but we wouldn't utilize someone

8      outside of the contract to tell them thank you very

9      much, it was free help, and so on.  Otherwise we would

10     not have been as successful as we were in retaining very

11     high caliber people for relatively low fixed amounts of

12     money.

13      Q.  Okay.  So when you got to that point, you realized

14     that someone needed to be remunerated, you would have

15     a conversation with that person about how much?

16  MR. JOHNSON:  Objection.  Leading.

17      A.  Absolutely.  I would have discussed the specifics

18     of something that was not in the contract and would have

19     had an internal discussion and then I would have gone

20     back with a response.  It was a negotiation to a certain

21     point.

22      Q.  Okay.  And then ultimately you would need to get

23     approval from someone more senior?

24  MR. JOHNSON:  Objection.  Leading.

25      A.  Depending on if it was the acquisition of a M&A

Page 64

1   advisory and so on.  I had my guidelines and I could

2   move on.  I would specify, because in an advisory

3   mandate you are getting a success fee and a retainer

4   fee.  So it is all, you are sharing profits with a third

5   party and I would have documented that and the contract

6   would have been seen and approved by Peter Sherratt and

7   others, and we actually had a person under Peter in our

8   division, in legal.  So everything would be documented.

9   But it wasn't a payment that came from the balance sheet

10  of the firm, it was a forgone revenue, because they were

11  all success based.  And the fixed amount would be

12  budgeted in my division, so at the beginning of the year

13  I get so many millions in external expenditures; so much

14  for travel, so much for advisers and so on.  The

15  variable part would be a deduction of revenues, so quote

16  unquote, since my guys were all on a percentage bonus

17  pool calculated, so obviously it was an investment made

18  by my division and I had the authority within those

19  boundaries to use my best judgment.

20      Q.  Okay.

21      A.  Okay.  If, on the other hand, it was the sale of

22  an asset owned by the firm -- there weren't that many --

23  and that would have been always remunerated but dealt

24  with in a different conceal.

25      Q.  Okay.

Page 65

1      A.  So someone who brought an advisory mandate, you

2      know, we would pay 10 to 20 percent.  There were no

3      specific incremental costs associated to it and we would

4      consider the standard or 10 percent range.  If it was

5      a percentage of a gain, then you would be talk about 1

6      or 2 percent, so it was a completely different scale.

7      Q.  Okay.

8      A.  Because there was a risk associated if it was a new

9      principal investment or in the case of something on

10     balance sheet it normally came from a loss, so imagine

11     it was an additional investment in.  So that would have

12     been approved ad hoc.

13     Q.  Okay.  I want to make sure I understand the

14     difference.  So where there is an advisory mandate,

15     an example of that would be the BAWAG transaction in

16     2006?

17     A.  BAWAG.

18  MR. JOHNSON:  Objection.  Leading.

19     A.  BAWAG had, a dual, I think, we can look it through,

20     had two components, because in BAWAG it was a major

21     advisory mandate that we would not have gotten unless we

22     had, for example, Thomas Marsoner in, a person on site

23     in Vienna dealing with the politics, the bankruptcy and

24     so, so it was better to pay him 10 percent of the

25     revenues than not to get the mandate.

Page 66

```
 1      Q.  Okay.

 2      A.  The second component of BAWAG was that the

 3   mezzanine fund of the firm intended to invest, and if

 4   they invested they were willing to pay a fee, sort of

 5   a finders fee, for having been brought into this

 6   investment opportunity, but that would have been 1

 7   percent, or -- I can't remember what the amount was.  So

 8   those were the orders of magnitude.

 9      Q.  Okay.  So it sounds like Dr. Marsoner was

10   instrumental in that BAWAG transaction?

11      A.  He was.  First, in securing a mandate for which we

12   were probably not the best qualified without him.  And

13   then the mandate lasted for a long time.  He managed to

14   bring to the Lehman mezzanine fund a position in the

15   financing.  That was a typical thing that happened with

16   advisory mandates, many times, led to additional firm

17   revenues which were not in advisory.

18      Q.  Okay.

19      A.  Okay.  Those were remunerated because the egg came

20   before the chicken and therefore, you know, the same

21   scale did not apply.  So that would have been outside of

22   my powers, to add a fee for another division, risking

23   capital, because it was really up to them to say whether

24   they could afford, and how much.  But I certainly made

25   sure that if they utilized the referral from an adviser
```

Page 67

1        at the investment bank they would have to pay.  I would

2        participate in the negotiation but I couldn't force them

3        to pay out of their budget more or less.

4          Q.  Okay.  So when the BAWAG transaction was completed,

5        Lehman and Dr. Marsoner came to an agreement regarding

6        how much he would be paid for his help?

7    MR. JOHNSON:  Objection.  Leading.

8          A.  Yes.

9          Q.  Now, you mentioned when you were explaining the

10        differences to me --

11         A.  Mm-hm.

12         Q.  -- that the sale of an asset situation is

13        different?

14         A.  Yes.

15         Q.  Formula 1, would that fall into that category of

16        transaction, sale of an asset?

17    MR. JOHNSON:  Objection.  Leading.

18         A.  It was the sale of an asset and therefore there

19        wasn't a mandate originating fees for -- you know, we

20        were not getting paid, you know, inside of the

21        investment banking division there wasn't an advisory fee

22        of 3 million that Formula 1 was paying to Lehman.

23        Because we owned the company, or co-owned, we couldn't

24        charge any fees, so it would have come out of pocket

25        from the firm.  Therefore it happened, you know, several

Page 68

1    times.

2      Q.  Mm-hm.

3      A.  So it would have been calculated and it wouldn't

4    have been zero, you know, otherwise the firm would never

5    -- if I had received an email from a discontinued

6    adviser telling me "I want to do this", you know, "let

7    me give you advice", I would stop him straight away and

8    say I am sorry, but we spoke three weeks ago.  I have

9    now socialized with the operating committee, I think we

10   have moved on.  So I wouldn't use people for free,

11   especially if they had been with the firm for 10,

12   15 years --

13     Q.  Mm-hm.

14     A.  -- to lead them on.  I would be quite firm and say

15   thank you very much, you know, bring it to Goldman

16   Sachs, these are great ideas, thanks.  We wouldn't use

17   free help --

18     Q.  Right.

19     A.  -- from people with whom we had a relationship that

20   we still treasured in any shape or form.  On the

21   advisory side we wanted to be promoted as the right bank

22   in an area or geography where we were not strong, we

23   wouldn't short change them or use them on something we

24   had no intention to use them, and that is my statement.

25     Q.  Right, I understand that.  So with Formula 1, who

Page 69

1    would decide whether Dr. Marsoner would get paid for

2    Formula 1?

3     A.  Specifically on Formula 1, it would have been

4    Bernard, Isaacs, Meissner.

5     Q.  What about Peter Sherratt?

6     A.  Peter Sherratt on the legal side, obviously he

7    would have been one of the most listened to people in

8    Europe and so on, but he didn't -- of course, being

9    a member of the operating committee, the one who oversaw

10   anything signed by a Lehman executive, you know, myself,

11   copy would go to, you will find it in the internal memos

12   of Lehman where everything went and to which companies,

13   to who and everything else.  If something jumped to the

14   eye, Peter would call the person saying, you know, what

15   is going on here.  Normally we pay 10 percent but here

16   you have paid 35 percent, you know, let us get to the

17   root of that.  He wouldn't be leading, you know, he

18   would be objecting that something was either unethical,

19   or, you know, he would check whether anybody we paid as

20   a senior adviser was in conflict of interest because

21   maybe he was working for the company that was being

22   advised, or things like that.

23    Q.  Okay.  Thank you, that is very helpful.

24        I want to look at another document that I believe

25   has been marked.  Lehman 204.  I am just trying to get

Page 70

1        a record of the exhibit number.  I believe it was marked

2        during Peter Sherratt's deposition and you used it

3        earlier.  You don't need to mark it, he has one copied.

4        Exhibit 5 should be in front of you somewhere.  Okay.

5        This is an email string.  We have three emails there.

6        The top email is dated November 26, 2005 from Tom

7        Bernard.  I would like to focus on the email at the

8        bottom of the string which would have been the first

9        email that we sent.  It is from Thomas Marsoner

10       dated November 25, 2005.  It is to you, Mr. Pignatti --

11       A.  26th?

12       Q.  Oh, the 25th, the email on the bottom of the page.

13       A.  Okay, sorry.

14       Q.  Do you see it is from Marsoner to you?

15       A.  Mm-hm.

16       Q.  Okay.  The very first line says:

17          "If this is the deal I suspect it is, my senior

18       advice is (strongly) against selling out now."

19          Do you see that?

20       A.  Mm-hm, yes.

21       Q.  And then Dr. Marsoner identifies the reasons why he

22       would not sell out?

23       A.  Mm-hm.

24       Q.  Okay.  And then at the very second to last

25       paragraph, the paragraph that begins "needless to

Page 71

1       say" it says:

2          "Needless to say, if a "fresh face" were helpful to

3       facilitate things here, mine continues to be available

4       for a very modest percentage participation in LB's gain

5       upon eventual sale."

6          Do you see that?

7       A.  Yes.

8       Q.  Okay, I want to make sure I understand.

9       A.  Yes.

10      Q.  Dr. Marsoner here was offering to be what he called

11      a fresh face in coordinating a response --

12   MR. JOHNSON:  Objection.  Form.

13      Q.  -- for all of the banks?

14   MR. JOHNSON:  Objection.  Form.

15      A.  He was offering to say if -- I see, 25 November,

16      yes.  What he is saying is if you have reached the stage

17      where you want to do a sale, then do a total sale and if

18      you agree I will be more than happy and, because he was

19      not covered by advisory, specifies that it would be

20      a small percentage and so on, because even if we had,

21      you know, at the time, I can't remember if it was still

22      the old agreement or whatever, it wasn't going to fall

23      into an investment banking advisory agreement.  That

24      much he knew.

25   MR. JOHNSON:  Just for the record, Pieter has left the video

Page 72

1        conference.  He is going to be dialing in soon.

2   MS. ALVAREZ:  Okay.

3   BY MS. ALVAREZ:

4        Q.  So Dr. Marsoner was offering to coordinate

5        a response to CVC?

6   MR. JOHNSON:  Objection.  Leading.

7        A.  I think it was more offered internally to see

8        whether the deal could be, you know, improved, limiting

9        the size of the stake that was being sold.

10       Q.  Okay.  And he was suggesting that he would do this

11       for what he called a modest fee?

12  MR. JOHNSON:  Objection.  Leading.

13       A.  Yes.

14       Q.  So he is offering to facilitate things in exchange

15       for a percentage upon LB's eventual sale?

16  MR. JOHNSON:  Objection.  Form.

17       Q.  You never took him up on this offer, correct?

18  MR. JOHNSON:  Objection.  Leading.

19       A.  I never took him up.  I think I passed on the

20       information to the people --

21       Q.  To whom?

22       A.  To Bernard, and, you know, and the others.  Maybe

23       verbally on a call, and I said guys, this is a view.

24       And that was a time when this was, you know, a debated

25       issue at Lehman as to what to do.

Page 73

1        Q.  And to your knowledge, Tom Bernard never took him

2    up on the offer, correct?

3    MR. JOHNSON:  Objection.  Leading.

4        A.  I don't know.  There certainly was an exchange of

5    emails with Tom Bernard.

6        Q.  Do you know if Tom Bernard retained Dr. Marsoner to

7    coordinate a response to CVC?

8        A.  I don't know.

9    MR. JOHNSON:  Objection.  Form.

10       Q.  Peter Sherratt didn't take him up on the offer,

11   correct?

12   MR. JOHNSON:  Objection.  Leading.

13       A.  I don't think it would have been Peter Sherratt's

14   task to sign up a non-legal adviser.

15       Q.  Well Jeremy Isaacs didn't take him up on the offer?

16   MR. JOHNSON:  Objection.  Leading.

17       A.  Okay, that would have been the sort of person.

18   I don't see Christian Meissner.  Maybe it was before he

19   stepped in.

20       Q.  Did Jeremy Isaacs take him up on the offer?

21       A.  Not that I know.

22   MR. JOHNSON:  Objection.

23       A.  He is the only one who could have retained

24   an adviser for corporate Europe, for example.  That

25   would be him.

Page 74

1      Q.  Okay.  Thank you.

2           In exhibit 2, which is your letter to the court

3      again, and we are going to be referring to it a few

4      times during this deposition.

5      A.  Mm-hm.

6      Q.  In the very last line on the first page, you say:

7           "Lehman may well not have reinvested."

8           You know what, I think we have covered that.  Let's

9      cover -- it is actually, okay, it is the fifth

10     paragraph, the last line:

11          "Lehman still intended to pay Dr. Marsoner a success

12     fee for his F1 advice."

13          Do you see that?

14     A.  Yes.

15     Q.  Okay.  You never discussed paying Dr. Marsoner

16     a success fee with anyone at Lehman Commercial Paper

17     Inc., correct?

18  MR. JOHNSON:  Objection.  Leading.

19     A.  Just a caveat.  Internal companies and so on at

20     Lehman were not part of the information flow.  So I was

21     not speaking with Tom Bernard because he was such and

22     such company of Lehman and so on.  Lehman would work on

23     the basis of committees and divisions.  And then

24     transactions and contracts were booked with companies

25     and most of the people on the board of these companies

Page 75

1      were people from finance, legal, so on and not the line

2      managers.

3          Q.  Okay, that's fair.  So regardless of Lehman

4      entity --

5          A.  Mm-hm.

6          Q.  -- you have no writings indicating that Lehman

7      agreed to pay Dr. Marsoner for Formula 1, correct?

8    MR. JOHNSON:  Objection.  Leading.

9          A.  That is correct.  I used in this sentence my

10     experience and the fact that I received information from

11     Mr. Marsoner.  I distributed it and it created

12     a dialogue with a follow up.  So he didn't get an email

13     saying thank you very much, as I would have done in the

14     same situations in my division.  If there was an adviser

15     that I thought was no longer going to be utilized

16     I would not have exploited that person, I would have cut

17     the mail flow by saying thank you very much,

18     I appreciate it.  It sounds like a great idea.  Feel

19     free to take it where ever.  In this case, obviously,

20     that didn't apply because who could this idea -- it

21     could only be sold to Lehman or JP Morgan.

22         Q.  And normally you would have eventually documented

23     an agreement to pay?

24         A.  Yes, absolutely.

25         Q.  In writing?

Page 76

1    MR. JOHNSON:  Objection.  Leading.

2      A.  Even post facto in the sense, as I told you,

3    because we operated with a completely one sided

4    methodology, and therefore I didn't need to document

5    things immediately.  I did because it is my practice to

6    do these things, but it was not necessary because if we

7    wanted we would do it.  But the policy of the firm was

8    if we used someone considerably, we would then price the

9    services.  If it was someone that was a trusted adviser

10   with other contracts and so on, we would not have them

11   work unless we intended to remunerate them.  That

12   doesn't define the amount.

13     Q.  And then eventually you would negotiate a price

14   with the adviser?

15   MR. JOHNSON:  Objection.  Leading.

16     A.  Basically we would tell the adviser what the price

17   was going to be.

18     Q.  And document it in writing?

19     A.  Yes.

20   MR. JOHNSON:  Objection.  Leading.

21     A.  We would not pay not inconsiderable amounts without

22   a valid reason and all documentation.

23     Q.  And getting approval from the senior people at

24   Lehman?

25   MR. JOHNSON:  Objection.  Leading.

Page 77

1        A.  In this particular case it was only the senior

2        people in Lehman dealing with the person, so it was

3        a matter of putting it down on paper and we would be

4        told which company it would be and then, you know, we

5        could make the payment.  We could not make a payment

6        without any form of contract or anything, but in many

7        cases it would just be if there was an existing contract

8        pertaining to a general adviser and so on, then we would

9        write an addendum to that contract, dating it and so on,

10       and saying as per point six we consider the BAWAG

11       transaction a success and therefore associated with this

12       the fee of 1 percent in the scale provided in, you know,

13       and then we would pay.

14        Q.  Okay.  I want to make the declaration of

15       Dr. Marsoner as the next exhibit.  We are getting close

16       to a break.  What number is this?

17        (Exhibit Pignatti 4 marked for identification)

18   THE COURT REPORTER:  4.

19        Q.  Okay.  That is the document exhibited by

20       Dr. Marsoner, it is actually exhibited to his motion.

21       Have you seen this before, Mr. Pignatti?

22        A.  No.

23        Q.  No.  I want to focus on a particular paragraph.  If

24       you go to paragraph E on the bottom of page 2.

25        "In 2005 I advised Lehman in my role as senior

1       adviser, both in emails and in telephone conversations,

2       to continue Lehman's investment in F1, which service

3       I explicitly provided in exchange for 10 percent of

4       Lehman's revenues related to the transaction, as was

5       customary under the agreements.  Lehman agreed, both

6       orally and by email, to this fee in exchange for my F1

7       advice."

8          Do you see that?

9       A.  Mm-hm.

10      Q.  Do you know who agreed orally to pay Dr. Marsoner

11      10 percent of Lehman's revenues?

12   MR. JOHNSON:  Objection.

13      A.  No I don't.

14      Q.  Do you have any emails where Lehman agreed to pay

15      Dr. Marsoner 10 percent of Lehman's revenues on F1?

16   MR. JOHNSON:  Objection.

17      A.  No I don't.

18      Q.  Did Dr. Marsoner ask you to search for any such

19      emails?

20   MR. JOHNSON:  Objection.

21      A.  No.

22      Q.  Did he ask you to search for any documents

23      indicating that he would be paid 10 percent of Lehman's

24      revenues for F1?

25   MR. JOHNSON:  Objection.

Page 79

1        A.  No.

2   MS. ALVAREZ:  Okay, I think we are ready for a break.

3   THE VIDEOGRAPHER:  We are going off the record.  The time is

4        5:52 p.m.

5   (5:52 p.m.)

6                        (Break taken.)

7   (6:07 p.m.)

8   THE VIDEOGRAPHER:  We are back on the record.  The time is

9        6:07 p.m.

10  BY MS. ALVAREZ:

11       Q.  Mr. Pignatti, you testified earlier that you were

12       involved in the negotiations of Dr. Marsoner's 2002 and

13       2004 executive advisory agreements, is that right?

14       A.  Yes.

15       Q.  Okay.  Did you negotiate many of these agreements

16       for Lehman Brothers?

17       A.  Mm-hm.

18       Q.  Okay.  The purpose of this agreement is to set

19       forth the terms of the agreement, is that correct?

20  MR. JOHNSON:  Objection.  Leading.

21       A.  Yes.

22       Q.  The term determine or and duration of the

23       retention?

24  MR. JOHNSON:  Objection.  Leading.

25       A.  Yes.

Page 80

```
 1       Q.  The responsibility of the consultants?

 2       A.  Yes.

 3   MR. JOHNSON:  Objection.  Leading.

 4       Q.  Also the responsibilities of Lehman Brothers would

 5       be laid out in a consultant agreement correct?

 6   MR. JOHNSON:  Objection.  Leading.

 7       A.  You have the agreements.  They are standard

 8       agreements that specify the restrictions on the side of

 9       the adviser and not many on the side of the firm.

10       Q.  Okay.

11       A.  But they do specify the framework and then they

12       have a sentence, all of them, that says anything else

13       that comes out will have to be interpreted by the firm

14       within the guidelines of the contract.

15       Q.  Okay.  And agreed to in writing, correct?

16   MR. JOHNSON:  Objection.  Leading.

17       A.  Yes.  But we have the contracts, we can go through

18       them.

19       Q.  We are going to look at them in a moment.

20       A.  Mm-hm.

21       Q.  I just want to get an understanding of how these

22       agreements generally work.  Let us talk about the 2004

23       advisory agreement.  The 2002, I am sorry.  I don't

24       believe it has been marked yet so we will go ahead and

25       mark it.  What number are we on?
```

Page 81

1    THE COURT REPORTER:  5.

2    MS. ALVAREZ:  Okay.

3        (Exhibit Pignatti 5 marked for identification)

4    BY MS. ALVAREZ:

5        Q.  Now I represent to you that this exhibit was

6        attached as exhibit C to Dr. Marsoner's motion.

7        A.  Mm-hm.

8        Q.  This is the 2002 agreement between Lehman Brothers

9        Europe Limited and Thomas Marsoner, correct?

10       A.  Yes.

11       Q.  The date of the agreement is July 24, 2002?

12       A.  Yes.

13       Q.  One thing I was curious about, if you look at the

14       bottom of the first page it says "page 71".  Do you know

15       why this agreement starts at page 71?

16       A.  I have no idea.

17       Q.  Okay.

18          Now, this agreement was signed by you on behalf of

19       Lehman Brothers Europe Limited, correct?

20       A.  Mm-hm.

21       Q.  Correct?

22       A.  Yes.

23       Q.  Dr. Marsoner signed on his own behalf?

24    MR. JOHNSON:  Objection.  Form.

25       Q.  Let's look at it.  It says page 79 on the bottom.

Page 82

1      A.  Yes.

2      Q.  Okay.  And the period of this agreement, the

3   commencement date, was March 1, 2002.  And you can turn

4   to, it is the second page of the agreement.

5      A.  Mm-hm.  Yes.

6      Q.  And the agreement terminated on March 1, 2003.  And

7   you can see that on page 77.  Do you see that?

8   Section 10.1 says:

9      "This agreement shall expire automatically on the

10   first anniversary of the commencement date."

11      A.  Yes.

12  MR. JOHNSON:  Objection.  Form.

13      Q.  Okay.  Now, the information --

14      A.  If you notice, also, 10.3.

15      Q.  "Notwithstanding clause 10.1 of this agreement,

16   either party may terminate this agreement by giving 4

17   weeks' notice writing."

18      I see that.

19      A.  Mm-hm.

20      Q.  Did anybody terminate this agreement prior to the

21   termination date?

22      A.  No.  This is to point out the nature of these

23   agreements and the flexibility, when I said it was

24   totally one sided and therefore we did not need, you

25   know, to really pre-agree everything when in the

Page 83

 1      nebulous world of investment banking -- because all of

 2      the ammunitions, I mean you can see that everything

 3      could be terminated four weeks.  This is not

 4      a standard -- it is a standard for this industry.

 5      Q.  So it is a standard agreement that Dr. Marsoner --

 6      standard consultancy agreements contain provisions like

 7      this?

 8      A.  Yes.

 9  MR. JOHNSON:  Objection.

10      A.  The value in the agreement is in the relationship

11      with the firm because, being totally one sided, he was

12      certainly used to the fact the parameters overall were

13      spelt out.  But his entitlement was totally

14      discretionary on the firm's side.

15      Q.  Okay.  Well, let's take a look at section 3 of this

16      agreement.  Section 3 describes the payments that would

17      be made by Lehman Brothers Europe to Dr. Marsoner,

18      correct?

19      A.  Payments, mm-hm, yes.

20      Q.  Is that a yes?

21      A.  Yes.

22      Q.  Okay.  If you look at 3.1.1, provides that Lehman

23      Brothers Europe would pay Dr. Marsoner a retainer fee of

24      USD 200,000.

25      A.  Yes.

Page 84

1       Q.  Right.  Okay.

2           3.1.2 identifies what Lehman Brothers Europe would

3       pay Dr. Marsoner in connection with Telekom Austria,

4       which was a specific transaction?

5       A.  Yes.

6       Q.  Alright.  The next provision, 3.1.3, identifies

7       what Lehman Brothers Europe would pay in connection with

8       BWBG, correct?

9   MR. JOHNSON:  Objection.  Form.

10      A.  Yes.

11      Q.  Okay.  Section 3.2.1 states:

12          "In the event that Lehman Brothers requires the

13      Advisor to provide the Services pursuant to this

14      Agreement in relation to specific transactions other

15      than those referred to in clauses 3.1 [I assume it is 2,

16      it looks like this draft is cut off] and 3.1.3 above,

17      then Lehman Brothers and the Advisor shall agree in

18      writing the amount and terms of any payments to be made

19      to the Advisor for such Services, provided that any such

20      additional payment will be based on the Advisor's

21      contribution, measured in terms of the fee-income

22      generated to ... "

23          And then it looks like this agreement is cut off, do

24      you see that?

25      A.  Yes.  I am very familiar, because you can imagine

Page 85

1     how many I signed over the decade that I was

2     responsible.

3         Q.  Okay.

4         A.  This is the catch all that I was describing before.

5         Q.  Mm-hm.

6         A.  As the agreement, you will agree with me, is

7     totally one sided.  We would have annual agreements.

8     You know how long it takes for these major transactions

9     to move ahead or not move ahead.

10        Q.  Mm-hm.

11        A.  So it would be too tedious to do a continuous

12    negotiation on everything that comes up.  What you do is

13    you list the major things that were covered because they

14    are probably -- I think Telekom Austria was probably

15    already a year old, from the previous agreement if there

16    was one.  It was the privatization of a major telecom

17    company, and BAWAG took a year to get done.

18        During this period there would be many things where

19    the adviser would say "can I work on this?"  I would ask

20    team members, and this is on the advisory side --

21        Q.  Mm-hm.

22        A.  -- does this really make sense?  Are you really

23    going to use him?  What is the contribution and

24    monitoring?  And so on.  And then I would ratify what

25    I thought, in my judgment or, if more people were

Page 86

1      involved, in our judgment, was the contribution and in

2      the following contract, or even in this one, I would say

3      as per 3.2.1 we now agree to pay you, you know,

4      a million dollars for securing the Formula 1 advisory

5      mandate, okay, something like that.

6          Q.  Okay.

7          A.  Not necessarily when it happened, the day, or don't

8      lift your pen until I have sent you a confirmation and

9      so on, okay.

10         Q.  Okay.

11         A.  But this refers to advisory contracts which were,

12     as I said, within my powers because my division was

13     paying it out of revenues, okay.  So here the

14     USD 200,000 would have come out of my annual budget,

15     because it was a guarantee.  And then anything else, you

16     will see, is really a success fee and therefore, which

17     is actually paid the moment the client sends the money

18     to settle the invoice.  You know, so unless Telekom

19     Austria paid us the, I don't know, 7 million Euro

20     advisory fee, of which 700,000 would go to Mr. Marsoner

21     a month later, okay.  But first the cash came in.

22         Q.  Okay.

23         A.  Okay.  So --

24         Q.  Let me ask you, you said the agreement is

25     dated July 24, 2002?

Page 87

1      A.  Yes.

2      Q.  At this point had Lehman acquired the shares, the

3      Formula 1 shares?

4      A.  Yes.

5      Q.  Okay.

6      A.  I think so.  I go without -- because I can't use my

7      notes.

8      Q.  Okay.

9      A.  It is public information.

10     Q.  Okay, I will look it up.  I want you to base it on

11     what you remember.

12     A.  Yes.  On what I remember, yes.

13     Q.  Okay so --

14     A.  But we were doing fixed income, legal troublemaking

15     work.

16     Q.  Okay.

17     A.  So it didn't need a senior adviser to say on this

18     article of association in Guernsey we actually have the

19     right to do this and therefore, you know, and start.

20     That was really Sherratt and the two Patricks who would

21     say we have a right to verify the accounts, we have

22     a right and we would exercise any right we had until we

23     were able to modify.

24     Q.  Okay.  So Formula 1 wasn't added to this agreement?

25     A.  No, because at that point it was not really part of

Page 88

1      the core business of my division, was advisory.  Seeking

2      new paid assignments to provide intelligence, solutions

3      and so on.

4      Q.  Okay.

5      A.  And you see the nature of these engagements, one is

6      a telecom deal, the other is a financial institution,

7      both in Austria.  And we didn't have any senior Austrian

8      after Mr. Marsoner retired from full service and

9      therefore I retained his services.

10     Q.  Okay did. Dr. Marsoner ask for Formula 1 to be

11     added to this agreement?

12  MR. JOHNSON:  Objection.  Form.

13     A.  He probably did in that sense.  But he was probably

14     told there was nothing tangible and unless JP Morgan and

15     us had a budget at the corporate level, because there

16     wouldn't be investment banking pay out of goodwill for

17     the mistake of another division, so we were servicing

18     this but I didn't have a budget to -- in fact I would go

19     to Peter Sherratt and say legal, we need this, because

20     the expenses would be billed upstairs, he sat on the

21     floor above me.

22     Q.  Okay.

23     A.  So my division was not even paying for the travel

24     to go and see Formula 1 and so on, because we didn't

25     have a matching revenue.

Page 89

1      Q.  Okay.  So if Dr. Marsoner had asked would you be

2      the person that he would have asked?

3   MR. JOHNSON:  Objection.  Leading.

4      A.  For the advisory side, yes.

5      Q.  Okay.  Do you recall whether he asked you to add

6      Formula 1 here?  Even though I understand that it

7      wouldn't be appropriate did, he ever ask you?

8   MR. JOHNSON:  Objection.  Form.

9      A.  I think he did --

10     Q.  Okay.

11     A.  -- say "can I work on Formula 1?" and I said it

12     isn't a profit center for me, so what we have do is

13     reach an understanding, it is a consortium.  We have

14     a few pooled expenses because for example legal we were

15     sharing with the three banks.  So any expense, we only

16     had 25 percent of the loan.  So with that we didn't pay

17     for anything 100 percent, because it would have been

18     disproportionate.

19     Q.  Mm-hm.

20     A.  So I said don't even bother with the Germans,

21     because they didn't agree to anything.  But at least

22     with JP if I get them in, I will speak about it

23     internally and see if we can add it.  Maybe it wouldn't

24     have been part of this, because this was one of our

25     companies in advisory, but we would have done something.

Page 90

```
 1        As it happens, it was kind of blocked.

 2       Q.  Okay.

 3       A.  I think I still retained some advice on Formula 1

 4       specifically, not because I wanted to short change

 5       Thomas in any way, but because I was still paying him

 6       a retainer of 200,000, which covered, as you can see in

 7       the agreement, whatever he agreed to provide, you know.

 8       Even without, you know, in the normal course of

 9       business.  But not high intensity thing.  But he did

10       provide intelligence on this Concordia agreement which

11       was the break out of the teams create their own

12       Formula 1.

13       Q.  And the Concorde agreement, just to clarify, that

14       was later on, that was in 2008?

15  MR. JOHNSON:  Objection.  Leading.

16       A.  It started already.  The moment the banks

17       repossessed, and so on, as you can imagine, the teams

18       revisited their contribution in because they were losing

19       money in Formula 1, and Formula 1 it became apparent was

20       making money, so they started to wonder whether, you

21       know, something could be renegotiated.  First they went

22       to Bernie and then they sent Goldman Sachs our way, as

23       if we could have done, not that we were interested in

24       paying them more, but even if we did agree to pay them

25       more we did not have the tools to change the agreements
```

1     because we realized that we had some negative powers but

2     not positive powers to tell Bernie what to do.

3     Q.  Okay.

4     A.  So that is why we didn't go for immediate sale, we

5     didn't do anything, because we had little to sell.  We

6     had an economic interest in Formula 1.  Without even the

7     ability to distribute dividends.

8     Q.  Okay.

9     A.  To force the distribution of dividends.

10    Q.  Okay.  Let us look --

11    A.  So he did some advisory things, covered by this,

12    and, you know, to be officialized in a different way.

13    Q.  And you paid Dr. Marsoner, Dr. Marsoner was paid

14    a retainer for this 2002 agreement?

15    A.  He was paid for the agreement and the agreement

16    reflects the services.

17    Q.  Do you know if there was ever an allotment made in

18    Lehman's revenues for payment to Dr. Marsoner for

19    Formula 1?

20 MR. JOHNSON:  Objection.  Leading.

21    A.  I have no idea.

22    Q.  Okay.  Let us look --

23    A.  Because the accounting was completely separate from

24    the banking division.

25    Q.  Okay.  So let us let's take a look at the 2004

Page 92

 1       agreement.  Would that be exhibit 6?

 2   THE COURT REPORTER:  Yes.

 3       (Exhibit Pignatti 6 marked for identification)

 4       Q.  This agreement was also exhibit C to Dr. Marsoner's

 5       motion.  We will mark it exhibit 6.  Just for the record

 6       this agreement also begins in the middle, it is page 64,

 7       just so we are clear.  It is dated February 13, 2004 and

 8       the agreement is between Thomas Marsoner and Lehman

 9       Brothers Europe Limited, do you see that?

10       A.  Mm-hm, yes.

11       Q.  Okay.  You, as you testified earlier, also

12       negotiated agreement, correct?

13       A.  Yes.

14       Q.  Who else was involved in the negotiations?

15       A.  On this one I think it was just myself and then

16       I was liaising with or reporting to the executive

17       committee for investment banking who was made aware of

18       all, I mean I wouldn't have a session just on the

19       Marsoner agreement, but we would go through, you know,

20       the budgeting and February sounds like a classic date in

21       investment banking as bonuses are paid as of 31 January.

22       So in February you finalize the budget for the year and

23       you put in everything and I probably had, you know, the

24       approval for this and all of the other mandates because

25       they were annual so we got them all rolled over and then

Page 93

1      went through, maybe with some of my team members, to get

2      their opinion as to the size of the retainer and

3      I noticed that it had gone down.  So --

4          Q.  I am going to ask you, was Aaron Johari involved in

5      the negotiations of this agreement?

6          A.  Yes.

7          Q.  What about Peter Sherratt?

8          A.  No, not at this level.  Peter was involved in

9      negotiations whenever -- I think in different

10     situations, when someone was asked to step down as

11     a managing director or something and so on, and then it

12     was suggested to me that we as part of their severance

13     retain them.  So it wasn't really part of the divisional

14     strategy and certainly I didn't want that in my budget.

15         Q.  What about Marco Roggero?

16         A.  Marco Roggero was, yes.

17         Q.  What was his role in the negotiations?

18         A.  His role in the negotiations was to help me with --

19     I mean I wouldn't actually write the contract myself,

20     I would just give the bullet points.

21         Q.  Mm-hm.

22         A.  And Marco Roggero would make sure we got all of the

23     signatures deciding which company was going do it,

24     making sure that it was coherent with the overall budget

25     so that all of them added to the amount that we had

Page 94

1     agreed.

2     Q.  Mm-hm.

3     A.  And not exceeded.  So it was the COO of investment

4     banking.

5     Q.  Okay.  What about William McKeown?

6     A.  McKeown?

7     Q.  McKeown.

8     A.  He is the equivalent of Marco Roggero in New York.

9     Q.  Okay.

10    A.  So the way New York used Marco Roggero as chief

11    operating of investment banking so that they would then

12    do the budget for the two, because we were completely

13    separate from the US.  So they just added everything up

14    and made sure, for example, that if we paid this kind of

15    money to the European advisers, the Americans got

16    something similar.

17    Q.  And Graham Wilson?

18    A.  Graham Wilson was on the finance side.  So there

19    was, you know, it is 350 people in investment banking

20    Europe.  And they did everything, and I was also a line

21    manager.  I used to get mandates, execute them and so

22    on, and do this, supported by a lot of people.

23    Q.  Okay.  Do you know if Tom Marsoner ever asked you

24    -- before we get there, let us look at section 3 of this

25    agreement.  So we are looking at section 3 of exhibit 6.

Page 95

1    A.  Yes.

2    Q.  It is titled "compensation payable to the

3    consultant", correct?

4    A.  Yes.

5    Q.  Section 3 lays out how much Dr. Marsoner would be

6    paid under the terms of this agreement, correct?

7    A.  Absolutely.  And you will find that, in terms of

8    set up, identical to the previous one with a fixed

9    amount which has now been reduced.

10   Q.  Mm-hm.

11   A.  And I don't recall whether we didn't do well the

12   year before so they cut my budget overall or Austria was

13   less interesting, you know, these things depended on

14   many things.

15   Q.  Mm-hm.

16   A.  Then you have the identified transactions.

17   Q.  And Formula 1 is not identified in any of these

18   paragraphs, correct?

19   A.  No.

20 MR. JOHNSON:  Objection.

21   Q.  Do you recollect whether Dr. Marsoner requested to

22   be added to this agreement?

23 MR. JOHNSON:  Objection.

24   A.  I do not, I do not remember.

25   Q.  Your role in this agreement, as in the 2002, was to

Page 96

1        talk, to go back and forthwith Marsoner with the

2        agreement, correct?

3    MR. JOHNSON:  Objection.  Leading.

4         A.  Back and forth in the sense that pretty much

5        I would be on, you know, I have long conversation was

6        the team on each of the projects, okay, some of which

7        I was directly involved, others I was not.  I would form

8        an important opinion and then I would do one session

9        with him, maybe for an hour, and tell him what was on

10        offer.  It is not that I was in a position where the

11        world would end, you know, without Dr. Marsoner.

12         Q.  But he would review a draft and provide you

13        comments, right?

14         A.  Absolutely.

15    MR. JOHNSON:  Objection.  Leading.

16         Q.  And did he ever request that Formula 1 be added to

17        the agreement?

18    MR. JOHNSON:  Objection.

19         A.  I do not remember.  In many cases we do the meeting

20        with Marco Roggero and Graham Wilson and so on, and then

21        I say okay, done, next and then they would make sure, do

22        the back and forth, not even with me, you know, up to

23        or, and/or, these things I did not deal with.

24         Q.  Right.  But would they communicate with

25        Dr. Marsoner about the agreement?

Page 97

```
 1        A.  Yes, they would, directly.  Johari as well.

 2        Q.  Okay.  If Dr. Marsoner had requested that Formula 1

 3    be added to the agreement would they bring that request

 4    over to you?

 5   MR. JOHNSON: Objection.  Leading.

 6        A.  He wouldn't ask them.  They wouldn't even know what

 7    Formula 1 was.

 8        Q.  So he would ask you?

 9        A.  It would have to be me.  I would speak to the

10    various teams and so on.  The COO of finance and so on

11    just worked, taking for granted that these were the

12    transactions and that was the economics, and then making

13    sure the contract was correct, the dates were right and

14    so on, but he wouldn't negotiate on, you know,

15    situations.  Everything was covered by high

16    confidentiality in some cases.  Only I and Marco Roggero

17    had the names of the companies for which we were

18    engaged.

19        Q.  Okay.  But you don't recall him asking you that, to

20    add Formula 1?

21   MR. JOHNSON: Objection.

22        A.  I don't recall, that doesn't mean he didn't do it.

23        Q.  That is okay.  Okay, so Dr. Marsoner also executed

24    similar agreements in 2006 and 2007 with Lehman Brothers

25    Europe, correct?
```

Page 98

1        A.  You are telling me.  In this sense I was no longer,

2        you know, at that point responsible for that division

3        and therefore I would have known about it, in fact I was

4        aware, because I was on the operating committee and

5        therefore I was still informed of every significant

6        transaction that Lehman was involved with and including

7        who was following it.

8        Q.  Okay.  I do want to show you a copy of the 2006

9        agreement, so we will mark this as exhibit 7.  And keep

10       that one close, because I am going to want to you

11       compare the two in a minute.

12          (Exhibit Pignatti 7 marked for identification)

13       Q.  Now I understand you didn't negotiate that

14       agreement, correct?

15   MR. JOHNSON:  Objection.  Leading.

16       A.  No.

17       Q.  This would have been Christian Meissner?

18   MR. JOHNSON:  Objection.  Leading.

19       A.  Yes, and the same team of people.

20       Q.  Okay.  Christian Meissner would have been the one

21       having the conversations with Dr. Marsoner about what to

22       include and what not to include?

23   MR. JOHNSON:  Objection.  Leading.

24       A.  Yes.

25       Q.  Okay.  Let us look at paragraph 3, which is similar

Page 99

```
 1        to -- I should say section 3, which is similar to

 2        section 3 from the 2004 agreement, which is exhibit 6,

 3        which you have kept in front of you.

 4        A.  Yes.

 5        Q.  Okay.  I want you to focus on what you called the

 6        catch all provision which is paragraph 3.7 in the 2006

 7        agreement, do you see that?

 8   MR. JOHNSON:  Objection.

 9        A.  Mm-hm.

10        Q.  Now, I would like to you take a look at the catch

11        all provision in the 2006 agreement that you did

12        negotiate?

13        A.  Mm-hm.

14        Q.  That one is paragraph 3.9.  And that is in

15        exhibit 6.  So paragraph 3.9 in exhibit 6, which falls

16        on page 66 of this document, do you see how the last

17        line is cut off?

18        A.  3.9.

19        Q.  3.9, you see how it is cut off there?

20        A.  Yes, "after the date of this agreement --"

21        Q.  3.9.

22        A.  Yes.

23        Q.  Right, you see how that very last line is cut off?

24        A.  Mm-hm.

25        Q.  I really can't tell if there was more there.  If
```

Page 100

1      you look, I would like to compare that with the catch

2      all provision in the 2006 agreement?

3      A.  Which would be VII.

4      Q.  VII.

5      A.  Yes, it seems like it is capped at 2.5 million.

6      Q.  Right.  Is there a similar cap in the 2007

7      agreement?

8      A.  You are asking me.  It is ten years later.  One of

9      our advisers, which, I wish I knew.  It wasn't my --

10     I wouldn't have capped it.

11     Q.  Okay.

12     A.  In the sense that I had complete discretion, as you

13     read it, to do whatever I wanted, why cap it.  I mean

14     some of the advisory contracts, the Telekom Austria, we

15     must have made, maybe 25 million Euros, so 10 percent

16     would have been okay.  But --

17     Q.  Do you have another copy of this agreement that

18     might not be cut off?  The 2004 agreement?

19     A.  I should have the -- I will have to go and check on

20     the server whether I have the, you know, the original

21     email, because it must have been sent to me.  Whether

22     I have the signed copy, the answer is no.

23     Q.  Okay.

24     A.  Because I didn't need to.  Marco Roggero and so on,

25     they would store all of the official and so on, they

1       wouldn't send me back a signed copy.

2        Q.  Okay.  We would, to the extent that Dr. Marsoner

3       has a copy, this agreement if you flip through the pages

4       is cut off on the bottom on almost every page.

5        A.  Mm-hm.

6        Q.  We would request a copy that is not cut off.  Thank

7       you, Mr. Pignatti.

8           So I want to move away from these agreements

9       a little and talk about BAWAG.

10       A.  Mm-hm.

11       Q.  You testified earlier that this was an investment

12      banking transaction that took place in 2006, correct?

13       A.  Correct.

14       Q.  And Dr. Marsoner advised Lehman Brothers Europe on

15      Cerberus' acquisition of BAWAG?

16       A.  Absolutely.

17       Q.  Is that right?

18       A.  Yes.

19       Q.  And Lehman Brothers Europe agreed to pay Marsoner

20      for his assistance with BAWAG?

21       A.  Yes.

22       Q.  Correct.

23       A.  A percentage of the advisory fee.  So just to

24      clarify his role, he was an adviser to Lehman Brothers

25      in the sense that we were paying him and we had signed

Page 102

1          a contract with Cerberus to provide advisory service to

2          Cerberus.  In reality, he was interacting directly with

3          Cerberus.

4              Q.  Okay, okay.  And it was typical to pay an adviser

5          a percentage of those advisory --

6      MR. JOHNSON:  Objection.  Leading.

7              A.  In investment banking, yes.

8              Q.  Okay.  Let us look at another exhibit.  It is

9          Lehman LEH 203, is the Bates number.  This may have been

10         marked during Sherratt's deposition, I don't recall.

11         But we will mark this as exhibit 8.

12             (Exhibit Pignatti 8 marked for identification)

13             Q.  Mr Pignatti, this is an email from you to David

14         Stonberg.  Michael Odrich and Anthony Tutrone are CC'd

15         on the email?

16         A.  Mm-hm.

17             Q.  It is dated May 24, 2007 and the subject line is

18         "BAWAG IBD fee", do you see that?

19         A.  Yes.

20         Q.  What is IBD?

21         A.  Investment banking division.

22             Q.  So these are the investment banking fees you were

23         referring to?

24         A.  Er, there is --

25     MR. JOHNSON:  Objection.  Leading.

1      A.  It is so small I am trying to decipher the text,

2      and I will answer in a second.

3      Q.  Okay.

4      A.  Yes, I do remember the whole thing.  It explains

5      a bit how we work.  So this was me --

6      Q.  Mm-hm.

7      A.  -- writing to people on the principal side, okay,

8      those responsible for the Lehman Brothers funds.  By

9      then I had joined them, so this was like a flashback,

10     saying to them I had entered on behalf of the investment

11     banking division into an advisory contract, which you

12     have seen, which basically spells out exclusively the

13     sharing of this adviser on the advisory fees.  In

14     addition, this person was instrumental to getting other

15     pieces of the bank, including yours, involved in

16     a transaction that closed.  So here you find Stonberg is

17     the head of co-investments, because the co-investment

18     fund put money with Cerberus in the BAWAG deal.

19     Mike Odrich was the American head of all of the funds

20     and Anthony Tutrone was his deputy.  So what I am asking

21     them is to accept, you know, to pay a fee to

22     Mr. Marsoner to for bringing in other parts of the bank.

23     So it was not included.  I wouldn't have paid it out of

24     my investment banking budget, because I didn't

25     receive -- you know, plus at that point they had made

Page 104

 1    an investment, it wasn't even clear.  It didn't turn out

 2    to be a good investment, either, no.  But it was common

 3    not to utilize, because Marsoner couldn't say "you know

 4    what, there are many funds around the world.  I am

 5    interested in keeping the relationship with Cerberus,

 6    frankly, why should I bother alerting the Lehman funds

 7    of the opportunity, inviting them to Austria, doing the

 8    management presentation and so on", which he did.

 9        Q.  Mm-hm.

10        A.  And they, I think, decided to pay something less

11    than this, but they did pay him something.  That is what

12    I was referring to before.  So I would do this before

13    the transaction closed to make sure that I wasn't

14    misrepresenting and the adviser felt cheated because he

15    had done extra work and so on.  This I did with every

16    other division, including head office upstairs, you

17    know.  So if there was something and I was using

18    an adviser who was paid by investment banking, I would

19    make sure that they wanted to chip in or I would say

20    candidly to the adviser, you know what, they don't

21    really think you are adding value so you won't get paid.

22    Do what you want but don't come back to me.

23        Q.  Okay.  You didn't send a similar email seeking

24    approval of Dr. Marsoner's payment for Formula 1?

25  MR. JOHNSON:  Objection.  Leading.

Page 105

```
 1       A.  No I did not.  Although I did convey the

 2       information and things, but then it was no longer my

 3       responsibility to even sign these agreements with him.

 4       I was no longer the nominated person with whom he had to

 5       get everything approved.  So apart from the fact that we

 6       had known each other for a long time and so on, I wasn't

 7       going to step in and create a mess by having someone who

 8       was running another division, who was making agreements

 9       on services, it was too big an organization for that.

10       Q.  Okay, so you weren't the guy who could approve

11       payment to Marsoner on Formula 1?

12  MR. JOHNSON:  Objection.  Leading.

13       A.  Not after, you know, the advisory services were

14       rendered, but for advice on whether to sell a principal

15       position on inherited from a bad loan.  In selling it

16       who was in investment banking or the funds not exposed

17       to the asset, say here is a million.  What I would have

18       done is I would have conveyed the information to Tom

19       Bernard, you know, and the people who had to make

20       a decision, and to the best of my knowledge, they did

21       take up --

22       Q.  Okay.

23       A.  -- the information.  They didn't say sorry, we

24       don't know who this guy is, we don't care what he says

25       and so on.  I kind of left it to them and said this is
```

1        a credible adviser that we have had for a long, long

2        time and this is his opinion.  And to the best of my

3        knowledge that opinion was not thrown away and everybody

4        said you know, we know exactly what is happening and we

5        have decided to sell and so on.

6            Q.  But to your knowledge was payment to him, payment

7        of ten percent of Lehman's revenues on Formula 1,

8        approved?

9    MR. JOHNSON:  Objection.  Form.

10           A.  I have absolutely no idea.  My own impression is

11       that 10 percent is more of an advisory type of agreement

12       when you are sharing revenues.  In this particular case

13       I wouldn't call the sale of Formula 1 a revenue, you

14       know, in the sense that we had not been repaid

15       300 million loan for 2002 to 2006, 8 years of interest

16       accrued and so on.

17           Q.  Mm-hm.

18           A.  So it wasn't -- you know, it sounds to me like,

19       well, first of all it would be very difficult to define

20       on Formula 1 the gain.

21           Q.  Okay.

22           A.  What you can do is a first derivative of the gain

23       and say had we sold we would have made less than had we

24       not sold, and therefore this is the implied gain.  But

25       in absolute accounting terms it would have been a much

1       more complicated exercise.  So I doubt that -- a fixed

2       amount of what?

3          Q.  Right, okay.  So let us talk about Formula 1 in

4       2006.  We are going to jump one year head, okay?

5          A.  6.

6          Q.  Formula 1 had refinanced its debt in 2006, that's

7       correct?

8    MR. JOHNSON:  Objection.  Leading.

9          A.  Yes.

10         Q.  There was a bond offering in 2001 by Formula 1?

11   MR. JOHNSON:  Objection.  Leading.

12         A.  I believe so.  This was by then completely out of

13      my domain.  I mean I never did fixed income, so the bond

14      issue would be the fixed income.

15         Q.  But it was pretty public, the bond offering?

16         A.  Sure.

17   MR. JOHNSON:  Objection.  Leading.

18         Q.  And that bond offering resulted in dividends being

19      paid out to shareholders of Formula 1?

20   MR. JOHNSON:  Objection.  Leading.

21         A.  Sure it was a --

22         Q.  We established earlier that Lehman Commercial Paper

23      was a shareholder at that point?

24   MR. JOHNSON:  Objection.  Leading.

25         Q.  Yes or no?

1       A.  You are telling me?  I didn't follow who.

2       Q.  I am --

3   MR. JOHNSON:  We didn't establish it.

4       Q.  Let me ask you the question.  I think you answered,

5       but you are nodding so we need to verbalize it.  There

6       was a bond offering by Formula 1 in 2006?

7       A.  Yes.

8   MR. JOHNSON:  Objection.  Leading.

9       A.  I remember the bond offering was to finance among

10      other things a dividend distribution.  I do not know

11      which Lehman entity booked the transaction, how much

12      they received and so on.

13      Q.  Okay.

14      A.  Because it was not part of my domain any more.

15      Q.  Okay, I understand that.  But Lehman Brothers did

16      receive a dividend distribution as a result of that bond

17      offering?

18  MR. JOHNSON:  Objection.  Leading.

19      A.  Leading.  I don't know.

20  MS. ALVAREZ:  You still need to answer the question.

21  MR. JOHNSON:  You said asked and answered.

22  MS. ALVAREZ:  No, you said asked and answered.

23  THE COURT REPORTER:  One at a time, please.

24  MS. ALVAREZ:  I am hearing two people.

25  MR. JOHNSON:  Could you read back please.

Page 109

1   THE COURT REPORTER:

2       "Question:  Formula 1 had refinanced its debt in

3   2006, that's correct?

4       "MR. JOHNSON:  Objection.  Leading.

5       "Answer:  Yes.

6       "Question:  There was a bond offering in 2001 by

7   Formula 1?

8       "MR. JOHNSON:  Objection.  Leading.

9       "Answer:  I think so.  This was by then completely

10  out of my domain.  I mean I never did fixed income, so

11  the bond issue would be the fixed income.

12      "Question:  But it was pretty public?

13      "Answer:  Sure.

14      "MR. JOHNSON:  Objection.  Leading.

15      "Answer:  And that bond offering resulted in

16  dividends being paid out to bondholders of F1.

17      "MR. JOHNSON:  Objection.  Leading."

18      "Answer:  Sure it was a --"

19   A.  Not bondholders; shareholders.

20  THE COURT REPORTER:

21      "Question:  We established earlier that Lehman

22  Commercial Paper was a shareholder at that point?

23      "MR. JOHNSON:  Objection.  Leading.

24      "Question:  Yes or no?

25      "Answer:  You are telling me?"

Page 110

1    THE COURT REPORTER:  And that is when everyone started

2        talking over each other.

3    MS. ALVAREZ:  At the time of the bond offering Lehman held

4        shares in Formula 1, correct?

5    MR. JOHNSON:  Objection.  Leading.

6        A.  Yes.

7        Q.  So Lehman received distributions in form of

8        dividend as a result of the bond offering?

9    MR. JOHNSON:  Objection.  Leading.

10       A.  I assume so.

11       Q.  It was a very public bond offering?

12   MR. JOHNSON:  Asked and answered.

13       A.  You know as much as I.

14       Q.  To your knowledge, was Dr. Marsoner compensated for

15       Lehman's recovery of dividends as a result of the bond

16       offering.

17   MR. JOHNSON:  Objection.  Form.

18       A.  I have no idea.

19       Q.  Okay.  Let us take a look at another document that

20       was produced by Dr. Marsoner.  It is labeled Marsoner 8

21       through 31.  And I have now lost count.  Is this 9?

22   MR. HORWITZ:  9, yes.

23   MS. ALVAREZ:  Okay, so we will mark this as exhibit 9.

24       (Exhibit Pignatti 9 marked for identification)

25   BY MS. ALVAREZ:

Page 111

1        Q.  If you turn to, it starts at the bottom of Marsoner

2    19 to the top of Marsoner 20.  The bottom of Marsoner 19

3    is an email from Dr. Marsoner to Mr. Pignatti.  Magnoni,

4    Ruggero Magnoni is CC'd and it is dated January 14,

5    2013?

6        A.  You are on page?

7        Q.  Marsoner 19 on the bottom.  If you look at how it

8    is labeled.  The email starts on the very bottom and the

9    text of the email continues on Marsoner 20?

10       A.  Okay.

11       Q.  So the email is from Dr. Marsoner to Mr. Pignatti.

12   Mr. Magnoni is CC'd?

13       A.  15, sorry, it is now?

14       Q.  Yes, a recent one.

15       A.  This year, yes.

16       Q.  January 14, 2015.  I am just going to read this

17   into the record, Dr. Marsoner says:

18          "Having discussed along the way that I --"

19       A.  Having discovered.

20       Q.  "Having discovered along the way that I ought to

21   have a claim in the US for the services that I have

22   provided I have decided to pursue a claim in respect of

23   the LB/F1 matters.  Though it will be a late filing,

24   I believe that I will be able to sustain a claim in the

25   US, primarily since no bar date has ever validly been

Page 112

1    served upon me."

2        And then in the next paragraph he says:

3        "With reference to our discussions around this,

4    I would be very grateful if you could please look at the

5    draft letter attached, check to confirm it reflects

6    reality accurately, mark it up where ever you think it

7    might not, and send the scanned, signed version back to

8    me."

9    A.  Yes.

10   Q.  Do you see that?

11   A.  Mm-hm.

12   Q.  Is this when Dr. Marsoner sent you his notes on

13   what might be included in a submission to the court?

14   A.  Yes, I believe it is.

15   Q.  Okay.  Would they have been attached to this email,

16   would his notes have been attached to the email?

17   A.  I actually don't recall.  Is this the text that was

18   actually submitted?

19   Q.  We can compare it.  Take a moment and look at it.

20       You see this text follows an email from you to

21   someone named Asha?

22   A.  Mm-hm.

23   Q.  Saying:

24       "Asha could you send the text below to Dr. Marsoner

25   with my stamped signature."

Page 113

1      A.  I am just checking if, because I know that I made

2      substantial changes to --

3      Q.  Okay.

4      A.  So I don't know at what stage.  I was probably

5      traveling.  So my assistant does the -- January 7, and

6      this is, this one that I have is dated January 7.

7      Q.  Mm-hm.

8      A.  But the email seems to be February.

9      Q.  I see that.  The email is February 10, 2015.

10     A.  Mm-hm.

11     Q.  The signed letter submitted to the court is

12     dated January 7, 2015.  It looks to me that this text is

13     the same as what is in the final?

14     A.  Yes, it looks to me as well, but I haven't done,

15     you know, line by line.

16     Q.  Okay.  What I am trying to figure out is whether

17     Dr. Marsoner would have sent you his thoughts attached

18     to the email dated January 14, 2015 that starts on the

19     bottom of Marsoner 19 and continues to the top of

20     Marsoner 20.

21   MR. JOHNSON:  Objection.  Form.

22     A.  To Marsoner 20.  28 January.  This is 10 February,

23     so it is two weeks later.  I would need to check.

24     Q.  Okay.

25     A.  Because I remember doing changes on the basis of --

Page 114

1        Q.  Okay.

2        A.  -- other texts.

3        Q.  We have in the past requested from Dr. Marsoner

4    this document, I am sure, so we would renew our requests

5    to Dr. Marsoner.

6    MR. JOHNSON:  You have done.

7    MS. ALVAREZ:  I am sorry?

8    MR. JOHNSON:  You have done.

9    MS. ALVAREZ:  Well, we don't have Dr. Marsoner's notes or

10       suggestions and what he would have suggested

11       Mr. Pignatti to include in his letter, so we are

12       renewing that --

13   MR. JOHNSON:  Yes you do have them.

14   MS. ALVAREZ:  I'm still talking.

15   MR. JOHNSON:  Okay.

16   MS. ALVAREZ:  We are renewing our request and we would

17       request that you confirm you have done a reasonable

18       search of Dr. Marsoner's records for these documents.

19   MR. JOHNSON:  You have these letters, that is what I am

20       saying.

21   MS. ALVAREZ:  We will put our requests in another letter --

22   MR. JOHNSON:  Okay.

23   BY MS. ALVAREZ:

24       Q.  Mr. Pignatti, the second paragraph on the tomorrow

25       of email, Marsoner 120, begins "with reference to our

1     discussions around this".  What discussions did have you

2     with Dr. Marsoner about this?

3  MR. JOHNSON:  Asked and answered.

4     A.  Hmm?

5  MS. ALVAREZ:  You can go ahead and answer the question.

6  MR. JOHNSON:  It is asked and answered.

7  MS. ALVAREZ:  And that is for the record.  The witness can

8     go ahead and answer the question.  The record is clear.

9     A.  The reference to our discussion was that I

10    forewarned individually.  This is copied to two people

11    of his past.

12    Q.  Okay.

13    A.  Prior, I had received a phone call from him, who

14    had explained how these things work and that a court, it

15    has to be done, and whether I would be prepared in case

16    they had a follow up.  It might have been

17    a considerable, you know, request so that I wouldn't

18    take it too lightly and just, you know, assuming it was

19    going to be done with three paragraphs and so on.

20    Q.  Okay.

21    A.  And then he said would you be, you know, amenable

22    to do this and I said yes, and I got Mr. Magnoni, who

23    had had the same request, asking, you know, what did

24    I recall, because it was out of the blue after ten

25    years.  Not that I had lost, completely, contact with

Page 116

1    Thomas, but it was certainly not frequent.  And then we

2    agreed to do it.  And I can't remember in which form

3    I was given a gist of what pertained to my deposition,

4    but I remembered that there were certain things that

5    I said, you know, this I am not in agreement with, in

6    the sense that I don't know because it was after my

7    days.

8    Q.  Okay.

9    A.  Okay.

10   Q.  So if you take a look, you responded to this email

11   on January 31, 2015.  Your response is actually on the

12   prior page, on Marsoner 19.  Do you see there is

13   an email from you to Dr. Marsoner dated January 31,

14   2015.  Do you see that?

15   A.  This is in Marsoner 20.

16   Q.  Right.

17   A.  Page?

18   Q.  The original email was Marsoner 20.

19   A.  Mm-hm.

20   Q.  The email from Dr. Marsoner to you?

21   A.  Okay.

22   Q.  And then on Marsoner 19 is your response to his

23   email, do you see that?

24   A.  I see a 10 February.

25   Q.  Your email response is January 31.

1          "Dear Thomas, I can't sign... risking perjury...

2     sign a statement."

3          Do you see that?  It is on Marsoner 19.  Right

4     there, you have it.

5     A.  31 January.

6     Q.  Yes.

7     A.  Mm-hm.

8     Q.  If you see, Dr. Marsoner sends his original email

9     on 14 January?

10    A.  Okay, so it is the --

11    Q.  Was the email dated January 31 your response?

12    A.  I can't remember.  There was a, sort of a back and

13    forth of texts and then I gave my green light to a text

14    amended, which is the one that went.

15    Q.  Okay, so you and Dr. Marsoner exchanged text

16    messages on the subject?

17    A.  No, no, no, not text messages, I don't know which

18    format.  Maybe he gave me --

19    Q.  Oh.

20    A.  -- something looking like this, or in bullet

21    points, or with dates, and then he came with, I said not

22    this, it came with something, a draft.

23    Q.  Okay.

24    A.  And then I made a final correction, saying I am not

25    going to sign it as is because I think it is not correct

Page 118

1          and then we arrive to this.

2            Q.  Okay.  So did you have any conversations with

3          anyone other than Dr. Marsoner about his request prior

4          to finalizing the letter?

5      MR. JOHNSON:  Asked and answered.

6            A.  Magnoni.

7            Q.  What did you discuss with Magnoni?

8            A.  No, he asked me what I recalled, whether we

9          recalled the same thing and so on, because he was also

10         lost in the decades; what happened?  When did we

11         repossess?  Because he was following it from the outside

12         he couldn't remember anything, the names of the people

13         involved, who was who.  And he said, you know, this is

14         going to be, you know, potentially complicated.  He

15         doesn't have anything because he exited Lehman.

16         I bought a business from Lehman, including the servers.

17         He did not, so he was not privy of any of the

18         information.

19           Q.  Okay.  I think we can move on.

20             You also submitted a letter on Dr. Marsoner's behalf

21         to the joint administrators of Lehman Brothers Europe,

22         correct?

23           A.  Dated?

24           Q.  I will get it for you.

25           A.  Thanks.

Page 119

1        Q.  This document is stamped with LEH 1036.  He needs

2        to mark it first and then you will get it right back.

3             (Exhibit Pignatti 10 marked for identification)

4        Q.  This letter is dated January 13, 2014, correct?

5        A.  Yes.

6        Q.  Okay.  Is that your signature on the bottom?

7        A.  Yes.

8        Q.  Okay.  This letter was submitted to Daniel

9        Schwarzman, the joint administrator of Lehman Brothers

10       Europe Limited in administration at

11       PricewaterhouseCoopers, correct?

12       A.  Yes.

13       Q.  Okay.  What I would like to do is focus on the last

14       paragraph.

15       A.  Mm-hm.

16       Q.  You know what, let us start from the beginning.

17       You say:

18            "I, Vittorio Pignatti, Chairman of Trilantic Capital

19       Partners, former head of European M&A and Vice Chairman

20       of Lehman Brothers hereby confirm that ..."

21            And then you lay out three paragraphs.

22            The first paragraph states:

23            "Dr. Marsoner provided at Lehman Brothers' request

24       advice with regard to its investment in F1 and its

25       beneficial realization.

Page 120

```
 1          "2.  The advice was delivered not only in emails but

 2     also in oral discussions with Lehman staff, including

 3     myself.

 4          "3.  The advice was intended to be rewarded by

 5     Lehman Brothers on the basis of the beneficial outcome

 6     of steps taken or omitted to be taken on the basis of

 7     the advice."

 8          Do you see that?

 9     A.  Yes.

10     Q.  You submitted -- when you said in the third

11     paragraph:

12          "The advice was intended to be rewarded by Lehman

13     Brothers."

14          You were referring to Lehman Brothers Europe

15     Limited?

16  MR. JOHNSON:  Objection.  Leading.

17     Q.  Correct?

18     A.  I was referring in my capacity.

19     Q.  To Lehman Brothers Europe Limited?

20  MR. JOHNSON:  Objection.  Leading.

21     A.  As I said before, corporate structures at Lehman

22     Brothers were not my decision as to which company would

23     be rewarding whom.

24     Q.  Okay.

25     A.  It was not within my domain to say that this
```

Page 121

1       adviser will be booked on this P&L and so on, because

2       these were things that were done by other departments.

3       Q.   Okay.   You submitted this letter to the joint

4       administrators of Lehman Brothers Europe Limited,

5       correct?

6       A.   Mm-hm, yes.

7       Q.   To support Dr. Marsoner's claim against Lehman

8       Brothers Europe?

9       A.   I would assume so, yes.

10      Q.   Okay.   So Lehman Brothers Europe would compensate

11      Dr. Marsoner for Formula 1, correct?

12  MR. JOHNSON:   Objection.   Asked and answered.

13      A.   Well, Formula 1 was on the books of Europe, which

14      company I was not aware of, but certainly assumed that

15      it was under the umbrella of Lehman Brothers Europe.

16      Q.   Well, you were submitting that so that Lehman

17      Brothers Europe --

18      A.   Yes.

19      Q.   -- would compensate Dr. Marsoner for Formula 1?

20  MR. JOHNSON:   Objection.   Asked and answered.

21      A.   Because the asset was the European asset.

22      Q.   I missed it over the objection.   Was the answer

23      yes?

24  MR. JOHNSON:   Asked and answered.

25      A.   Yes.

1      Q.  Okay.  How much were you compensated for your work

2      on Formula 1?

3      A.  I was paid as an executive of Lehman Brothers.

4      Q.  Specifically for Formula 1?

5      A.  No, no, no.  I was not paid on success.

6      Q.  So you were salaried?

7      A.  Salary, bonus, shares, long term incentive plans

8      and so on.

9      Q.  Okay.

10      A.  But none of the people, So the vice chairmen of

11      Lehman were operating, unless you left the firm, in

12      which case you would be remunerated with certain

13      formulas like Mr. Marsoner and so on.  But if you were

14      an executive of the firm there was a sort of grade and

15      a bonus structure and so on, but not linked to specific

16      transactions.

17      Q.  Okay.  Dr. Marsoner settled his claim with Lehman

18      Brothers Europe, correct?

19   MR. JOHNSON:  Objection.  Leading.

20      A.  I have no idea.

21      Q.  You don't know if Dr. Marsoner settled his claim

22      with Lehman Brothers Europe?

23   MR. JOHNSON:  Objection.  Asked and answered.

24      A.  No.

25      Q.  Let us take out the exhibit.

Page 123

```
 1        A.  Not that I remember.

 2        Q.  Okay, we will refresh your recollection.

 3        A.  What do you mean the claim, specifically on

 4    Formula 1.

 5        Q.  Yes.

 6  MR. JOHNSON:  Objection.

 7        A.  I am not aware.

 8        Q.  Okay, we will refresh your recollection.  It has

 9    been marked already.  It is exhibit 9.

10        A.  In this one?

11        Q.  Yes.  Let us turn to Marsoner 24.  In the center of

12    the page is an email from you to Dr. Marsoner

13    dated November 26, 2014.  Do you see that?

14        A.  Mm-hm.

15        Q.  Your email states:

16        "Hi Thomas.  What did you settle amicably with LBEL?

17    Look forward for you to win this one so you can invest

18    in our fund."

19        Do you see that?

20        A.  Yes.

21        Q.  So Dr. Marsoner settled his claim with

22    Lehman Brothers Europe, correct?

23  MR. JOHNSON:  Objection.  Leading.

24        A.  Yes, I think what we -- the question you had asked

25    is whether I knew that he had settled vis-a-vis
```

Page 124

1        Formula 1, which I do not know.  I think he was, unlike

2        me, I had no claims with Lehman Brothers, any Lehman

3        Brothers.  In his case he was an adviser so maybe he

4        wasn't paid on certain things, which were, you know,

5        invoices or his expenses and so on.

6        Q.  Mm-hm.

7        A.  And that is what I read this to be; that he had

8        been paid for -- I mean I had many colleagues who were

9        on an advisory contract who had matured relatively large

10       sums, and had not been paid.

11       Q.  Okay.  But you knew that he had settled a claim

12       with Lehman Brothers?

13       A.  A claim.

14   MR. JOHNSON:  Objection.

15       A.  I thought it was his employee claim.

16       Q.  Okay.

17       A.  We are talking November 2014.

18       Q.  Okay.

19       A.  Okay, this is eight months after this.  Correct?

20       Q.  Yes.

21       A.  Okay.  So when I wrote this he had not, I assume,

22       settled.

23       Q.  When you had written exhibit 10?

24       A.  Exhibit 10.  I think I was not aware of anything.

25       Q.  Okay.

Page 125

1       A.  Okay.  So if your question was, I think your

2    question was were you aware of anything?  The answer

3    remains no.  Then a number of months later I was

4    informed of what I thought were -- I mean it is

5    business, he was asking for a favor, and he tells me

6    that he has resolved the LBEL, which many of the people

7    that I employ, as well, had claims, because they are

8    salaries had not been paid, because their pension was

9    wiped out and so on.  So that is what I thought it was.

10      Q.  Okay.  So now that he had settled the claim,

11   a claim, with LBEL, you were looking forward for him to

12   invest in one of your funds?

13   MR. JOHNSON:  Objection.  Leading.

14      A.  This is a humorous sentence in the sense that the

15   smallest investor in my fund has, I think, 17 million

16   Euros invested in the fund.  You know what they say, you

17   are a rich man, back on your feet post bankruptcy, not

18   that I was actually counting on his personal

19   contribution.

20      Q.  Did he end up investing in one of your funds?

21   MR. JOHNSON:  Objection.

22      A.  No, we don't take individuals.

23      Q.  And will you be compensated if he recovers from the

24   US estate?

25      A.  Absolutely not.

Page 126

1       Q.  What is M&M Capital Limited?

2       A.  Marsoner --

3   MR. JOHNSON:  Objection.

4       A.  -- and Marsoner.  I don't know how he came up with

5       the name.  It is an advisory company he has set up as

6       his personal --

7       Q.  Did do you know do any business with M&M Capital?

8       A.  Er --

9   MR. JOHNSON:  Objection.

10      A.  -- no, although he does come up with investment

11      ideas for my fund.  We have not, I am not really focused

12      with our fund on Austria and certainly not financial

13      institutions which was his sort of --

14      Q.  Does M&M Capital have him on retainer?

15  MR. JOHNSON:  Objection.  Form.

16      A.  Does M&M Capital?

17      Q.  I am sorry, I am confusing the entities.  Have you

18      retained at Trilantic, have you retained M&M Capital?

19      A.  No.

20      Q.  What is Mr. Magnoni's relationship with

21      M&M Capital?

22  MR. JOHNSON:  Objection.  Form.

23      A.  I think he is a partner, or was a partner.

24      Q.  Do you have any other business relations with

25      Dr. Marsoner?

Page 127

1      A.  No.

2   MR. JOHNSON:  Objection.  Form.

3      A.  It is not other.  I have no business relations

4      with.

5      Q.  Do you have a social relationship with

6      Dr. Marsoner?

7   MR. JOHNSON:  Objection.

8      A.  Yes, we have known each other for 15 years and

9      certainly I would not have, sort of agreed to establish

10     the facts in this process if I did not have

11     a relationship.

12  MS. ALVAREZ:  Okay.  I think we can go off the record and we

13     would like to take a few minutes.

14  MR. JOHNSON:  You are almost done?

15  MS. ALVAREZ:  I think we might be, but I need to take a few

16     minutes.

17  MR. JOHNSON:  Okay.

18  THE VIDEOGRAPHER:  We are going off the record.  The time is

19     7:12 p.m.

20  (7:12 p.m.)

21                        (Break taken )

22  (7: 18 p.m.)

23  THE VIDEOGRAPHER:  We are back on the record.  The time is

24     7:18 p.m.

25  MS. ALVAREZ:  At this point Lehman Brothers has no further

Page 128

1        questions.

2   BY MR. JOHNSON:

3        Q.  I have a couple of additional questions for you,

4        Mr. Pignatti.

5           Would it be normal to agree on a consultant's

6        success fee before any profits were realized?

7   MS. ALVAREZ:  Objection to form.

8        A.  If the advice was accepted by the firm, or

9        stipulated, yes.  Or, rephrasing the question, did

10       Lehman pay advisers on a percentage of profits in my

11       20 years at Lehman Brothers?  The answer is yes, many

12       times.

13       Q.  But would they pay before they had received any

14       profits?

15       A.  Would they be paid?  No.

16       Q.  I believe you testified earlier that you know

17       Peter Sherratt?

18       A.  Yes.

19       Q.  Was Mr. Sherratt aware that success fees were paid?

20   MS. ALVAREZ:  Objection to form.

21       A.  Absolutely.

22       Q.  Even where there was no agreement covering the

23       transaction?

24   MS. ALVAREZ:  Objection to form.

25       A.  No.  I think I said earlier that no payment was

1      ever done unless there was a documented agreement.  So

2      especially substantial amounts, which were not just

3      reimbursements of expenses or reimbursements of expenses

4      but anything formulaic, based on a success would be

5      either regulated by a framework agreement to which

6      an addendum would be done, specifying and for this

7      transaction we have decided to pay the following amount,

8      but it would be a documented amount.

9        Q.  And on Dr. Marsoner's F1 advice, isn't it true that

10     such an addendum wouldn't have been made until profits

11     were realized?

12   MS. ALVAREZ:  Objection to form.

13       A.  It could have been done before or after.  As you

14     see, an email that was previously shown from me to our

15     colleagues on the fund side, you know, the transaction

16     had already been done.  Which is subsequent to the BAWAG

17     advisory.  A transaction was also originated for another

18     department in the absence of any sort of documentation

19     and so on, because the marginal cost to the adviser who

20     was working on a bigger transaction to channel a piece

21     of business to our funds would not have probably merited

22     a pre-approval by that division.  So the adviser took

23     the risk of sort of notifying his will or his request at

24     a later stage and it was approved.  So you have

25     an example of that.

Page 130

1      Q.  And on BAWAG -- let me restate.  Is BAWAG included

2      in any of Dr. Marsoner's agreements?

3      A.  Yes.  But the advisory piece was included in

4      an existing agreement.  The amount of my email, the

5      300,000 to 400,000 and so on, would not have been

6      specifically covered in that agreement and therefore

7      I asked the proper department to include it in to a --

8      you know, otherwise I couldn't have paid the amount.

9      Q.  Can you point to where Cerberus' acquisition of

10     BAWAG is included in Dr. Marsoner's agreements?

11     A.  It is either in the 2004, it should be.  I believe

12     it is this BWBG.

13  MS. ALVAREZ:  What exhibit are you referring to, so that it

14     is clear?

15     A.  I am not looking at an exhibit, but it is the

16     Lehman Brothers advisory contract that I signed, dated

17     13 February 2004.

18  MS. ALVAREZ:  Mm-hm.  Thank you.

19  BY MR. JOHNSON:

20     Q.  Where are you looking at on that?

21     A.  I am looking at page 66.3 VII.  But I may be wrong

22     and that is not the one and that was done by --

23     Q.  That doesn't say Cerberus anywhere, does it?

24     A.  No, but I read Cerberus somewhere.

25     Q.  Could it be that it wasn't included?

Page 131

1        A.  Well, if we don't find it then it wasn't included.

2        But I remember that he was paid --

3        Q.  Right.

4        A.  -- and it was officially documented.

5        Q.  Okay.

6        A.  But I can't remember if it was in one of the

7        contracts, or under the catch all was then included --

8        Q.  Okay.

9        A.  -- to one of the contracts.

10       Q.  So it may have been in a catch all provision?

11       A.  Yes, because as I explained, the way that we used

12       to work was to list, you know, normally they would be

13       renewed in February, whatever it was live in February,

14       and I don't remember when BAWAG came out, you know.  So

15       it would have been included in the following or sort of

16       an email circulated among the decision makers, saying as

17       per this adviser's retainer, should the BAWAG deal

18       happen X percent will be paid.

19       Q.  Okay.  Could you refer back to the declaration, of

20       Dr. Thomas Marsoner?

21   MS. ALVAREZ:  Which is exhibit 4.

22   BY MR. JOHNSON:

23       Q.  Turn to paragraph 8, which I believe we discussed

24       before.

25       A.  In 2005 I advised Lehman?

Page 132

1      Q.  Correct.

2      A.  Mm-hm.

3      Q.  And we looked at the sentence that says:

4         "Lehman agreed both orally and by email to this fee

5      in exchange for my F1 advice."

6      A.  Yes.

7      Q.  Is it possible that he agreed that fee with someone

8      else besides you?

9   MS. ALVAREZ:  Objection to form.

10     A.  It is possible.  I can confirm that he did provide

11     assistance, some of it in the period of 2002 but prior

12     to sort of 2005, relating to the investment banking

13     aspects.  But they wouldn't have been at the time my

14     sort of duty.  To negotiate --

15     Q.  And do you -- sorry.

16     A.  To negotiate the 10 percent and X percent, and so

17     on.

18     Q.  Right.

19        We also talked about the dividend recap in 2006.  Do

20     you remember this discussion earlier?

21     A.  I remember the discussion, yes.

22     Q.  But you weren't involved in F1 at that point any

23     more?

24   MS. ALVAREZ:  Objection to form.

25     A.  No.

Page 133

1      Q.  So you don't know about profits that might or might

2      not have resulted?

3  MS. ALVAREZ:  Objection to form.

4      A.  No.

5      Q.  And lastly could we turn back to your letter to the

6      court?

7      A.  Mm-hm.

8  MS. ALVAREZ:  Are we talking exhibit 2?

9  MR. JOHNSON:  I think it has been marked as multiple

10     exhibits.

11 MS. ALVAREZ:  I just want to make sure it is clear for the

12     record what we are looking at.

13     A.  Yes.

14 BY MR. JOHNSON:

15     Q.  Is it correct that the first sentence says:

16         "I declare under penalty of perjury under the laws

17     of The United States of America that the foregoing is

18     true and correct."

19     A.  Yes.

20     Q.  Is everything in this letter true and correct?

21     A.  Yes.

22     Q.  And have you slanted your testimony in favor of

23     Dr. Marsoner today?

24 MS. ALVAREZ:  Objection to form.

25     A.  Have I slanted?

Page 134

1      Q.  Have you provided testimony in favor of

2   Dr. Marsoner or have you told the truth?

3      A.  I have told the truth.

4   MR. JOHNSON:  Those are all my questions.

5   MS. ALVAREZ:  Okay, I think we are done but let me just take

6      two minutes just to confirm.

7   THE VIDEOGRAPHER:  We are going off the record.  The time is

8      7: 30 p.m.

9   (7:30 p.m.)

10                          (Break taken.)

11  (7:31 p.m.)

12  THE VIDEOGRAPHER:  We are back on the record.  The time is

13     7:31 p.m.

14  MS. ALVAREZ:  Lehman also has no further questions right now

15     for Mr. Pignatti.

16     I would like to state on the record that this

17  deposition and the testimony given during this

18  deposition shall remain confidential.  Shall not be

19  discussed with third parties.  This is pursuant to

20  paragraphs 8 and 9 of the protective order that was

21  entered by the Bankruptcy Court, docket number 50584.

22     Once the parties receive the final version of the

23  transcript we shall have ten days to designate certain

24  portions confidential if we so choose.  But before that

25  time period has been completed the entire, all of the

Page 135

1      testimony provided here by Mr. Pignatti shall be

2      confidential.

3   MR. JOHNSON:  Okay.

4   THE VIDEOGRAPHER:  Okay.  This concludes the deposition.  We

5      are going off the record.  The time is 7:32 p.m.

6   (7:32 p.m.)

7          (Whereupon, the deposition concluded at 7:32 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 136

1

2                    CERTIFICATE OF DEPONENT

3

4    I, VITTORIO PIGNATTI, hereby certify that I have read the
     foregoing pages, numbered 1 through 136, of my deposition of
5    testimony taken in these proceedings on Monday, November
     16th, 2015 and, with the exception of the changes listed on
6    the next page and/or corrections, if any, find them to be a
     true and accurate transcription thereof.

7

8

9

10

11   Signed:  ........................

12   Name:    VITTORIO PIGNATTI

13   Date:    ........................

14

15

16

17

18

19

20

21

22

23

24

25

Page 137

1                    CERTIFICATE OF REPORTER

2    STATE OF NEW YORK   )

3          ss           )

4    COUNTY OF NEW YORK  )

5

6            I, Chris Lang, an Accredited Real-time Reporter,

7    do hereby certify:

8    That VITTORIO PIGNATTI, the witness whose deposition is

9    hereinbefore set forth, was duly sworn by me and that such

10   deposition is a true record of the testimony given by the

11   witness.

12           I further certify that I am not related to any of

13   the parties to this action by blood or marriage, and that I

14   am in no way interested in the outcome of this matter.

15           IN WITNESS WHEREOF, I have hereunto set my hand

16   this 16th day of November, 2015.

17

18

19           _____

20           Chris Lang

21

22

23

24

25

Page 138

```
 1                        ERRATA SHEET

 2   Case Name:         Re: Lehman Brothers Holdings Inc.
     Witness Name:      VITTORIO PIGNATTI
 3   Date:    11/16/15

 4   Page/Line          From                To

 5   ____/_____        _____   _____

 6   ____/_____        _____   _____

 7   ____/_____        _____   _____

 8   ____/_____        _____   _____

 9   ____/_____        _____   _____

10   ____/_____        _____   _____

11   ____/_____        _____   _____

12   ____/_____        _____   _____

13   ____/_____        _____   _____

14   ____/_____        _____   _____

15   ____/_____        _____   _____

16   ____/_____        _____   _____

17   ____/_____        _____   _____

18   ____/_____        _____   _____

19   ____/_____        _____   _____

20   ____/_____        _____   _____

21   Subscribed and sworn to before

22   me this date    day of month          , 2015

23           _____

24        VITTORIO PIGNATTI

25
```

**A**

**Aaron** 93:4
**ability** 59:1 91:7
**able** 50:14 59:23
  60:20 87:23
  111:24
**absence** 129:18
**absolute** 106:25
**absolutely** 8:7 11:3
  13:5 17:10 33:13
  48:20,22 51:20
  63:17 75:24 95:7
  96:14 101:16
  106:10 125:25
  128:21
**accept** 27:22
  103:21
**accepted** 128:8
**access** 28:22 40:17
**accompanying**
  40:9
**accompli** 16:15
**accounting** 91:23
  106:25
**accounts** 87:21
**Accredited** 1:19
  137:6
**accrued** 106:16
**accurate** 27:5
  136:6
**accurately** 112:6
**acquire** 59:23
**acquired** 27:18,19
  49:10 87:2
**acquisition** 19:23
  23:21 63:25
  101:15 130:9
**acquisitions** 5:16
  13:8 22:22 23:22
  38:18
**acrimonious** 53:20
**act** 59:2
**action** 137:13
**active** 58:23
**activity** 18:10
  33:12,18
**actual** 27:7

**ad** 65:12
**add** 57:5 66:22
  89:5,23 97:20
**added** 87:24 88:11
  93:25 94:13 95:22
  96:16 97:3
**addendum** 77:9
  129:6,10
**adding** 104:21
**addition** 103:14
**additional** 27:19
  43:10 65:11 66:16
  84:20 128:3
**administration**
  42:9 119:10
**administrator**
  119:9
**administrators**
  118:21 121:4
**admissible** 57:17
**advance** 55:20
**advice** 14:18 20:9
  24:18 27:1,20
  28:24 29:7,24
  30:1,5,21 31:8,12
  31:15,20 37:19
  38:1,3,5,17 44:21
  48:17 58:7 68:7
  70:18 74:12 78:7
  90:3 105:14
  119:24 120:1,4,7
  120:12 128:8
  129:9 132:5
**advised** 48:24
  69:22 77:25
  101:14 131:25
**adviser** 8:14,18,21
  10:2,9 14:16
  16:18 18:10 19:5
  63:2 66:25 68:6
  69:20 73:14,24
  75:14 76:9,14,16
  77:8 78:1 80:9
  85:19 87:17
  101:24 102:4
  103:13 104:14,18
  104:20 106:1

**adviser's** 131:17
**advisers** 16:6,14
  17:19 18:2 19:11
  31:2 62:12,21
  64:14 94:15 100:9
  128:10
**advising** 55:24 60:4
  60:6 61:3,16
**Advisor** 84:13,17
  84:19
**Advisor's** 84:20
**advisory** 5:16 8:19
  8:20 13:7 17:1,2
  17:17 18:6 21:3
  31:18 42:7 64:1,2
  65:1,14,21 66:16
  66:17 67:21 68:21
  71:19,23 79:13
  80:23 85:20 86:4
  86:11,20 88:1
  89:4,25 91:11
  100:14 101:23
  102:1,5 103:11,13
  105:13 106:11
  124:9 126:5
  129:17 130:3,16
**affidavit** 26:11
**affiliation** 24:7
**afford** 30:19 66:24
**afternoon** 34:22
**afternoons** 54:10
**age** 56:20
**ago** 39:9,16,18
  41:10,11 53:2
  68:8
**agree** 16:21 71:18
  84:17 85:6 86:3
  89:21 90:24 128:5
**agreed** 16:16 37:14
  38:13 63:4 75:7
  78:5,10,14 80:15
  90:7 94:1 101:19
  116:2 127:9 132:4
  132:7
**agreeing** 34:23

**agreement** 8:24 9:3
  11:1 12:9,10
  18:25 45:4 56:6
  67:5 71:22,23
  75:23 79:18,19
  80:5,23 81:8,11
  81:15,18 82:2,4,6
  82:9,15,16,20
  83:5,10,16 84:14
  84:23 85:6,15
  86:24 87:24 88:11
  90:7,10,13 91:14
  91:15,15 92:1,4,6
  92:8,12,19 93:5
  94:25 95:6,22,25
  96:2,17,25 97:3
  98:9,14 99:2,7,11
  99:20 100:2,7,17
  100:18 101:3
  106:11 116:5
  128:22 129:1,5
  130:4,6
**agreements** 8:19
  8:20 9:5 14:9
  18:14 24:11 31:2
  37:22,23 44:16
  54:11 78:5 79:13
  79:15 80:7,8,22
  82:23 83:6 85:7
  90:25 97:24 101:8
  105:3,8 130:2,10
**ahead** 57:22,22
  80:24 85:9,9
  115:5,8
**al** 1:5 4:5
**alerting** 104:6
**allotment** 91:17
**Alright** 84:6
**altogether** 60:16
**Alvarez** 2:3 3:3
  4:15,18,19 6:10
  6:13,15,18,21 9:9
  10:3,13 11:15
  13:3 15:1,3,5,7,11
  23:20 24:4,20
  25:4,7,12,25 26:6
  26:9,12 29:25

**30**:22 31:14 32:16
  33:24 34:2,15,18
  34:20,21 45:17
  46:3,6,10 55:1
  57:10,15,18,20
  72:2,3 79:2,10
  81:2,4 108:20,22
  108:24 110:3,23
  110:25 114:7,9,14
  114:16,21,23
  115:5,7 127:12,15
  127:25 128:7,20
  128:24 129:12
  130:13,18 131:21
  132:9,24 133:3,8
  133:11,24 134:5
  134:14
**amenable** 56:15
  115:21
**amended** 117:14
**America** 133:17
**American** 53:5
  103:19
**Americans** 94:15
**AMERICAS** 2:18
**amicably** 123:16
**ammunitions** 83:2
**amount** 18:11,15
  43:10,12 48:2
  49:6 64:11 66:7
  76:12 84:18 93:25
  95:9 107:2 129:7
  129:8 130:4,8
**amounts** 31:11
  63:11 76:21 129:2
**and/or** 96:23 136:6
**anniversary** 82:10
**annual** 6:4,5 11:17
  18:8 85:7 86:14
  92:25
**answer** 9:10 35:7
  35:10,22 37:24
  38:16 51:24 54:22
  100:22 103:2
  108:20 109:5,9,13
  109:15,18,25
  115:5,8 121:22

125:2 128:11
**answered** 38:5
108:4,21,22
110:12 115:3,6
118:5 121:12,20
121:24 122:23
**answers** 35:18
**antagonistic** 28:13
**Anthony** 102:14
103:20
**anybody** 28:22
37:9 69:19 82:20
**apart** 105:5
**apparent** 90:19
**apparently** 55:13
**Appearing** 2:2,9,16
**apply** 66:21 75:20
**appreciate** 25:21
75:18
**appropriate** 89:7
**approval** 13:25
14:7 63:23 76:23
92:24 104:24
**approve** 14:5 17:14
105:10
**approved** 64:6
65:12 105:5 106:8
129:24
**approximately**
36:14
**April** 5:11
**area** 68:22
**arrive** 118:1
**article** 87:18
**Asha** 112:21,24
**aside** 25:13
**asked** 24:1 28:23
31:8 37:11 39:7
39:13 62:7 89:1,2
89:5 93:10 94:23
108:21,22 110:12
115:3,6 118:5,8
121:12,20,24
122:23 123:24
130:7
**asking** 35:4 97:19
100:8 103:20

115:23 125:5
**aspects** 132:13
**asset** 23:1,3 28:7
61:13,24 64:22
67:12,16,18
105:17 121:21,21
**assets** 23:8
**assigned** 5:19
**assignment** 51:10
**assignments** 88:2
**assistance** 21:20
101:20 132:11
**assistant** 113:5
**associate** 50:21
**associated** 19:17
23:16 43:5 65:3,8
77:11
**association** 87:18
**assume** 32:9 35:8
84:15 110:10
121:9 124:21
**assumed** 121:14
**assuming** 115:18
**attached** 50:11
81:6 112:5,15,16
113:17
**attend** 13:5,17
**attending** 13:15
**attention** 49:8
**attorney** 9:19
**auspices** 16:21
**Austria** 16:16
12:18,20 13:9,10
13:16 16:11 17:13
20:15,19 84:3
85:14 86:19 88:7
95:12 100:14
104:7 126:12
**Austrian** 20:5 88:7
**authority** 64:18
**authorizations**
30:25
**auto** 29:17
**automatically** 82:9
**automotive** 28:19
**available** 9:16 71:3
**AVENUE** 2:4,11

2:18
**avoidance** 11:12
19:7
**aware** 8:19,20
23:25 24:5 92:17
98:4 121:14 123:7
124:24 125:2
128:19

## B

**back** 7:10 12:23
13:19 15:18 18:22
29:18 30:15,18
32:22 33:3 57:1
63:20 79:8 96:1,4
96:22 101:1
104:22 108:25
112:7 117:12
119:2 125:17
127:23 131:19
133:5 134:12
**background** 37:25
**bad** 25:10 42:8
105:15
**badly** 44:3
**balance** 5:24 43:20
60:25 61:11 64:9
65:10
**bank** 8:22 12:19
20:10 21:19 31:19
53:16 54:15 67:1
68:21 103:15,22
**banker** 8:16 58:6
**banking** 5:14 14:1
16:3 29:13,14
56:8 67:21 71:23
83:1 88:16 91:24
92:17,21 94:4,11
94:19 101:12
102:7,21,22
103:11,24 104:18
105:16 132:12
**bankrupt** 21:7
**bankruptcy** 1:1 4:6
20:11 42:19 45:10
65:23 125:17
134:21
**banks** 10:24 20:5,6

21:19 27:9,15
51:16 53:6 54:5
56:15 58:18 71:13
89:15 90:16
**bar** 111:25
**base** 87:10
**based** 25:13 41:22
57:8 64:11 84:20
129:4
**bases** 48:13
**basic** 34:25
**basically** 76:16
103:12
**basis** 11:13 19:16
42:13 62:9 74:23
113:25 120:5,6
**Bates** 15:5 49:24
102:9
**BAWAG** 13:11
19:23 20:3,7,22
31:13,17,21 65:15
65:17,19,20 66:2
66:10 67:4 77:10
85:17 101:9,15,20
102:18 103:18
129:16 130:1,1,10
131:14,17
**bearing** 62:20
**beginning** 42:2,16
64:12 119:16
**begins** 4:3 70:25
92:6 114:25
**behalf** 9:7,13 11:8
56:12 81:18,23
103:10 118:20
**believe** 13:1 30:20
36:11 69:24 70:1
80:24 107:12
111:24 112:14
128:16 130:11
131:23
**beneficial** 119:25
120:5
**Berlin** 54:10
**Berliner** 21:21
**Bernard** 34:5 39:1
50:5 52:6,9 69:4

70:7 72:22 73:1,5
73:6 74:21 105:19
**Bernard's** 38:22
**Bernie** 22:2 27:12
53:12 56:14 90:22
91:2
**best** 25:14 28:21
36:17 64:19 66:12
105:20 106:2
**better** 9:21,22
60:13 65:24
**Bhattal** 7:17
**Bierbaum** 22:15
49:22 50:3,20,21
51:7
**Bierbaum's** 51:17
**big** 29:1 42:1 49:7
52:16 53:5 105:9
**bigger** 129:20
**billed** 88:20
**billion-dollar** 43:17
**bit** 18:5 28:10
36:18 37:3 41:14
103:5
**BLB** 21:20 27:10
27:16 28:25 43:7
43:20 49:16 51:12
51:13 53:7,21
56:11,19
**blocked** 90:1
**blood** 137:13
**blue** 115:24
**bluff** 29:22
**board** 8:2 9:17,25
21:12 36:20,22,23
55:18 74:25
**bond** 107:10,13,15
107:18 108:6,9,16
109:6,11,15 110:3
110:8,11,15
**bondholders**
109:16,19
**bonus** 19:9 64:16
122:7,15
**bonuses** 92:21
**booked** 74:24
108:11 121:1

bookings 7:6
books 30:14 121:13
boss 51:7
bother 89:20 104:6
bottom 6:6 70:8,12
  77:24 81:14,25
  101:4 111:1,2,7,8
  113:19 119:6
bought 23:18 24:19
  24:21,21 40:9
  118:16
boundaries 62:24
  64:19
break 15:16 32:14
  32:20 35:19,21,23
  77:16 79:2,6
  90:11 127:21
  134:10
breathing 42:5
bring 11:15 12:16
  21:3 66:14 68:15
  97:3
bringing 103:22
Brothers 1:5 2:2,17
  4:5,20,23 5:7,11
  5:13,24 6:5 7:3,4
  7:14 8:9,13,14 9:7
  9:13,16 10:2
  27:16 30:4 33:12
  36:19,20,23 57:9
  57:12,13 62:6
  79:16 80:4 81:8
  81:19 83:17,23
  84:2,7,12,17 92:9
  97:24 101:14,19
  101:24 103:8
  108:15 118:21
  119:9,20 120:5,13
  120:14,19,22
  121:4,8,10,15,17
  122:3,18,22
  123:22 124:2,3,12
  127:25 128:11
  130:16 138:2
Brothers' 8:5 33:15
  33:18 119:23
brought 21:11 65:1

66:5
brushing 44:14
budget 18:2,7,9,9
  67:3 86:14 88:15
  88:18 92:22 93:14
  93:24 94:12 95:12
  103:24
budgeted 64:12
budgeting 92:20
build 53:19
bullet 93:20 117:20
Burton 7:23
business 20:19
  33:12,18 40:10
  55:17 59:3 88:1
  90:9 118:16 125:5
  126:7,24 127:3
  129:21
busted 21:4
buy 5:25 19:13
  20:11 24:17 27:13
  52:20
BWBG 84:8
  130:12

_____
C
_____

C 2:1 11:23 81:6
  92:4
calculated 64:17
  68:3
calculation 30:16
caliber 63:11
calibrate 10:10
call 16:18 21:2
  61:15 69:14 72:23
  106:13 115:13
Callan 7:17
called 49:21 71:10
  72:11 99:5
calling 22:1
camera 43:24
candidly 104:20
cap 18:16 100:6,13
  120:18
capital 17:2 23:18
  24:19,25 30:17,17
  32:12 57:23 61:13

61:14 66:23
  119:18 126:1,7,14
  126:16,18,21
capped 100:5,10
care 105:24
career 10:15 22:13
carried 16:11
carry 15:8
case 4:6 11:12,13
  18:19 48:2 53:18
  53:19 54:12,22
  65:9 75:19 77:1
  106:12 115:15
  122:12 124:3
  138:2
cases 56:10 77:7
  96:19 97:16
cash 22:19 86:21
catch 85:4 99:6,10
  100:1 131:7,10
category 67:15
caveat 18:15 74:19
CC'd 102:14 111:4
  111:12
CCs 50:4
center 89:12
  123:11
centralized 11:9
Cerberus 20:6,8
  102:1,2,3 103:18
  104:5 130:23,24
Cerberus' 19:23
  101:15 130:9
certain 8:15 10:12
  16:20 63:20 116:4
  122:12 124:4
  134:23
certainly 30:8
  31:10 49:3 61:23
  66:24 73:4 83:12
  93:14 116:1
  121:14 126:12
  127:9
CERTIFICATE
  136:2 137:1
certify 136:4 137:7
  137:12

chairman 5:18
  23:5 119:18,19
chairmen 122:10
change 14:22 28:10
  55:23 56:8 59:2
  68:23 90:4,25
changed 45:1
changes 56:12
  113:2,25 136:5
changing 19:22
channel 129:20
chapter 21:25
charge 8:25 18:8
  67:24
cheaper 20:16
cheated 104:14
check 14:17 18:23
  69:19 100:19
  112:5 113:23
checking 113:1
chicken 66:20
chief 94:10
chip 104:19
choice 10:8
choir 28:22
choose 134:24
chose 32:2
Chris 1:19 137:6
  137:20
Christian 15:22
  16:1 23:11,13
  24:11 61:21 73:18
  98:17,20
circles 29:14
circulated 131:16
claim 111:21,22,24
  121:7 122:17,21
  123:3,21 124:11
  124:13,15 125:10
  125:11
claims 124:2 125:7
clarification 16:17
clarify 6:10 35:7
  36:19 47:13 90:13
  101:24
classic 16:16 92:20
clause 82:15

clauses 84:15
clear 35:24 92:7
  104:1 115:8
  130:14 133:11
clearly 43:4,25
client 16:20,22
  86:17
clients 17:4 27:24
close 77:15 98:10
closed 58:3 60:8
  103:16 104:13
closer 61:23
closing 27:7 60:20
clue 29:10
co-investment
  103:17
co-investments
  103:17
co-owned 67:23
coherent 93:24
collateral 21:10,12
  22:20
collateralized 32:8
colleagues 124:8
  129:15
collectively 43:17
collegiate 49:9
Columbus 22:9
column 6:25
come 8:12 16:8
  18:13 19:9 48:14
  55:18 58:15 67:24
  86:14 104:22
  126:10
comes 20:19 80:13
  85:12
coming 59:5
commencement
  82:3,10
comments 50:12
  96:13
Commercial 4:20
  4:23 37:1 74:16
  107:22 109:22
commit 17:24
commitment 14:6
  14:19,20,21

committee 13:25
17:22 23:6,24,25
24:13 30:7 36:21
61:7 68:9 69:9
92:17 98:4
committees 74:23
common 8:4 35:15
104:2
communicate
96:24
companies 9:17
21:12 36:22 69:12
74:19,24,25 89:25
97:17
company 9:22,25
21:6 43:12 54:14
56:5,6,20 58:19
58:22 59:20 67:23
69:21 74:22 77:4
85:17 93:23
120:22 121:14
126:5
compare 98:11
100:1 112:19
compensate 121:10
121:19
compensated
110:14 122:1
125:23
compensation 12:7
95:2
competitor 10:8
compilation 46:4,7
complete 100:12
completed 67:4
134:25
completely 23:1
28:5 62:13,17
65:6 76:3 91:23
94:12 107:12
109:9 115:25
complex 7:6
complicated 10:21
10:23 20:9 52:12
107:1 118:14
component 66:2
components 65:20

conceal 64:24
concerning 37:18
47:21 62:7
concluded 135:7
concludes 135:4
Concorde 90:13
Concordia 90:10
conference 72:1
confidential 1:17
134:18,24 135:2
confidentiality
97:16
confirm 19:5 47:7
112:5 114:17
119:20 132:10
134:6
confirmation 86:8
conflict 69:20
confused 35:5
confusing 126:17
confusion 44:23
46:2
connection 84:3,7
cons 30:7
consider 65:4
77:10
considerable 10:18
115:17
considerably 76:8
considered 56:22
considering 52:23
54:3 57:23
consolidated 62:11
consortium 89:13
consultancy 83:6
consultant 12:7
14:8 80:5 95:3
consultant's 128:5
consultants 17:5
80:1
contact 10:25
29:11 115:25
contacts 28:18
contain 83:6
content 33:7
continue 22:25
28:2 78:2

continued 10:4
24:10,12
continues 71:3
111:9 113:19
continuous 85:11
contract 12:17
14:21 17:6 18:11
63:8,18 64:5 77:6
77:7,9 80:14 86:2
93:19 97:13 102:1
103:11 124:9
130:16
contractors 18:17
contracts 7:7 9:15
9:20 11:6 37:6
40:8,20 62:12
74:24 76:10 80:17
86:11 100:14
131:7,9
contribution 37:16
84:21 85:23 86:1
90:18 125:19
control 27:18 55:7
56:20 59:24
controlled 55:14
controlling 21:24
23:19 24:19 58:15
conversation 63:15
96:5
conversations 78:1
98:21 118:2
convey 105:1
conveyed 105:18
convince 50:13
convoluted 54:13
COO 94:3 97:10
coordinate 72:4
73:7
coordinating 71:11
copied 50:4 70:3
115:10
copies 11:15
copy 11:17 15:3,9
15:10 25:25 26:15
47:4,5 69:11 98:8
100:17,22 101:1,3
101:6

copying 15:22
core 88:1
corner 6:6
corporate 59:6
73:24 88:15
120:21
correct 10:25 17:9
46:16 47:8 49:12
51:25 52:2 55:5
56:24 57:1,25
59:7,17 72:17
73:2,11 74:17
75:7,9 79:19 80:5
80:15 81:9,19,21
83:18 84:8 92:12
95:3,6,18 96:2
97:13,25 98:14
101:12,13,22
107:7 109:3 110:4
117:25 118:22
119:4,11 120:17
121:5,11 122:18
123:22 124:19
132:1 133:15,18
133:20
correction 117:24
corrections 136:6
correctly 30:9
50:23
cost 19:12 129:19
costs 65:3
counsel 4:11 51:19
51:25
count 22:10 110:21
counterpart 53:16
counting 125:18
country 18:4
COUNTY 137:4
couple 32:25 128:3
course 19:19 20:18
44:14 59:9 69:8
90:8
court 1:1,18 4:6
6:20 11:20 14:25
15:2 18:5 26:5,12
33:23 35:9,13,16
36:5 41:13 43:21

43:24 45:10,16,22
56:10 57:18 62:3
74:2 77:18 81:1
92:2 108:23 109:1
109:20 110:1
112:13 113:11
115:14 133:6
134:21
cover 18:4 74:9
covered 11:7 12:15
29:6 41:3,7 44:16
71:19 74:8 85:13
90:6 91:11 97:15
130:6
covering 17:11
128:22
create 28:2 90:11
105:7
created 75:11
creation 60:14
credible 106:1
credit 6:1 56:7
criterias 10:24
cross-examine
36:13
curious 81:13
customary 78:5
cut 75:16 84:16,23
95:12 99:17,19,23
100:18 101:4,6
CVC 23:18,21
24:18,25 27:7,8
27:12,18 28:12
44:22,25 45:4
57:23 58:14,20,20
58:23 59:5,10,16
59:20,23 60:20
72:5 73:7

_____

**D**

Daniel 119:8
date 4:7 24:24
81:11 82:3,10,21
92:20 99:20
111:25 136:13
138:3,22
dated 26:17 70:6
70:10 86:25 92:7

102:17 111:4
113:6,12,18
116:13 117:11
118:23 119:4
123:13 130:16
**dates** 24:25 25:10
25:11,20 26:18
44:22 97:13
117:21
**dating** 77:9
**David** 102:13
**day** 16:13 42:12,12
50:23,23 51:3,3
86:7 137:16
138:22
**days** 116:7 134:23
**deal** 7:23 10:23
17:12,12 18:16,16
19:5,10 27:7 42:8
42:16 70:17 72:8
88:6 96:23 103:18
131:17
**dealing** 10:15 23:2
65:23 77:2
**deals** 10:21 19:17
**dealt** 64:23
**Dear** 117:1
**debated** 30:6 72:24
**debt** 107:6 109:2
**Debtors** 1:6 2:16
**decade** 18:20 85:1
**decades** 29:21
118:10
**decide** 18:6 49:3
57:18 69:1
**decided** 12:12
20:14 22:24 29:18
32:5 48:2 60:12
104:10 106:5
111:22 129:7
**decides** 62:16
**deciding** 93:23
**decipher** 103:1
**decision** 11:5 20:14
21:13 23:2 24:1
48:11,25 51:3,15
52:20 54:8 56:23

60:22 61:12
105:20 120:22
131:16
**decisions** 11:8
20:18 48:12 49:5
49:8 56:21
**declaration** 26:3,8
36:3 46:5 77:14
131:19
**declare** 133:16
**dedicated** 53:14
**deduction** 64:15
**deep** 54:16
**default** 32:9 49:11
**define** 76:12
106:19
**delegate** 54:8
**delighted** 57:5
**delivered** 120:1
**Denise** 2:3 4:15,17
4:19 6:13
**depart** 20:15
**departed** 10:6
**department** 43:9
49:21 129:18
130:7
**departments** 121:2
**departure** 20:13
**depended** 63:6
95:13
**depending** 18:16
63:25
**depends** 60:7
**DEPONENT** 136:2
**deposed** 35:1
**deposition** 1:8 4:3
4:9 6:11,16,19
11:16,18 15:8,9
26:6 33:24 36:4,7
37:4,5,10 44:6
45:11,15,23 70:2
74:4 102:10 116:3
134:17,18 135:4,7
136:4 137:8,10
**depositions** 34:25
**depth** 32:10
**deputy** 103:20

**derivative** 106:22
**described** 46:23
**describes** 83:16
**describing** 85:4
**description** 50:6,12
**designate** 134:23
**detail** 50:18
**determine** 79:22
**determined** 13:23
13:24 19:1,2
31:11
**determining** 19:20
**dialing** 72:1
**dialogue** 75:12
**Dick** 7:17
**Diederichs** 50:14
51:13
**difference** 31:16
65:14
**differences** 39:23
40:3 67:10
**different** 23:4 28:5
31:21 56:2 60:25
64:24 65:6 67:13
91:12 93:9
**difficult** 28:8 48:10
49:2 56:16 106:19
**dilemma** 27:21
**direct** 13:9 28:18
28:20
**directly** 16:18 29:9
96:7 97:1 102:2
**director** 16:4 22:16
50:15 93:11
**directors** 8:10
**discontinued** 68:5
**discount** 60:1,3
**discovered** 49:18
111:19,20
**discretion** 31:5
62:18,18 100:12
**discretionary**
83:14
**discuss** 38:13 61:19
118:7
**discussed** 38:8,16
41:2,6 51:16

63:17 74:15
111:18 131:23
134:19
**discussion** 45:2
63:6,19 115:9
132:20,21
**discussions** 112:3
115:1,1 120:2
**disproportionate**
89:18
**dispute** 33:14,17
37:16,25
**distressed** 12:19
20:10
**distribute** 91:7
**distributed** 75:11
**distribution** 91:9
108:10,16
**distributions** 110:7
**District** 1:2 4:6
**divestiture** 24:14
**dividend** 108:10,16
110:8 132:19
**dividends** 91:7,9
107:18 109:16
110:15
**division** 8:25 21:9
32:6 61:24 64:8
64:12,18 66:22
67:21 75:14 86:12
88:1,17,23 91:24
98:2 102:21
103:11 104:16
105:8 129:22
**divisional** 93:13
**divisions** 74:23
**docket** 134:21
**document** 33:11,15
49:23,24 69:24
76:4,18 77:19
99:16 110:19
114:4 119:1
**documentation**
76:22 129:18
**documented** 64:5,8
75:22 129:1,8
131:4

**documents** 22:5
40:6,23 44:5,6,9
45:6 78:22 114:18
**doing** 13:12 18:19
39:13 45:3 50:23
87:14 104:7
113:25
**dollars** 86:4
**domain** 7:8 107:13
108:14 109:10
120:25
**Donatzeinmagi**
12:21
**doubt** 11:12 19:7
107:1
**Dr** 2:9 4:13,17 8:8
8:24 10:2,12
11:14 17:23 19:20
19:25 24:3,18
26:4 27:1,20
29:23 30:5,20
39:22 40:23 41:2
44:7,17 46:15,20
47:6,14 48:17,24
52:24 54:4 56:23
57:11 62:5 66:9
67:5 69:1 70:21
71:10 72:4 73:6
74:11,15 75:7
77:15,20 78:10,15
78:18 79:12 81:6
81:23 83:5,17,23
84:3 88:10 89:1
91:13,13,18 92:4
95:5,21 96:11,25
97:2,23 98:21
101:2,14 104:24
110:14,20 111:3
111:11,17 112:12
112:24 113:17
114:3,5,9,18
115:2 116:13,20
117:8,15 118:3,20
119:23 121:7,11
121:19 122:17,21
123:12,21 126:25
127:6 129:9 130:2

130:10 131:20
133:23 134:2
**draft** 46:13,16
84:16 96:12 112:5
117:22
**driven** 31:18
**dual** 51:8 65:19
**due** 50:15
**duly** 137:9
**duration** 79:22
**duties** 21:2 50:14
**duty** 18:8 132:14

### E

**E** 2:1,1,17 77:24
**ear** 18:21
**earlier** 36:19 45:12
70:3 79:11 92:11
101:11 107:22
109:21 128:16,25
132:20
**early** 42:16
**easier** 7:19 60:15
**easy** 17:3 56:17
**EC1** 4:10
**EC1A** 1:14
**Ecclestone** 22:2
27:12 53:12 55:14
55:21 56:14
**economic** 62:25
91:6
**economics** 17:25
97:12
**edited** 46:18,20
**edits** 47:10
**effect** 14:10,11
**effective** 56:17
**egg** 49:6 66:19
**eight** 124:19
**either** 16:2 30:11
55:25 61:13 69:18
82:16 104:2 129:5
130:11
**elected** 60:11
**element** 30:8
**elements** 30:8
**eliminate** 56:10
**email** 14:24 15:22

15:25 16:16 19:3
33:4,6,9,22 34:4
34:11,13 39:4
46:25 47:3,5 50:3
50:10 52:21 53:3
68:5 70:5,6,7,9,12
75:12 78:6 100:21
102:13,15 104:23
111:3,8,9,11
112:15,16,20
113:8,9,18 114:25
116:10,13,18,20
116:23,25 117:8
117:11 123:12,15
129:14 130:4
131:16 132:4
**emails** 33:19 39:1
40:9,11,17 44:21
63:1 70:5 73:5
78:1,14,19 120:1
**employ** 125:7
**employed** 57:13
**employee** 57:9,14
124:15
**employment** 36:18
**encouraged** 16:5
**encumbered** 59:25
60:3
**ended** 21:4,16,21
**engaged** 97:18
**engagements** 88:5
**ensuring** 58:24
**entail** 11:4
**entailed** 11:5
**entered** 59:4
103:10 134:21
**entire** 10:15 43:6
46:5,7 60:11,13
134:25
**entities** 32:13 39:24
40:3 126:17
**entitled** 11:11 12:7
**entitlement** 83:13
**entity** 29:13 31:23
32:11 75:4 108:11
**equipped** 20:9
53:22

**equity** 5:19,25 23:4
43:11 44:1 51:9
51:11 52:14
**equivalent** 94:8
**Er** 102:24 126:8
**Erin** 7:17
**ERRATA** 138:1
**especially** 10:20
22:8 23:8 28:20
49:6 53:5,15
68:11 129:2
**ESQ** 2:3,3,10,10,17
**establish** 14:14
57:16 108:3 127:9
**established** 107:22
109:21
**establishing** 59:5
**estate** 6:1 125:24
**et** 1:5 4:5
**Euro** 86:19
**Europe** 5:17 9:8,14
17:2 21:2 22:19
23:25 49:6,7 52:2
52:20 61:9,11
69:8 73:24 81:9
81:19 83:17,23
84:2,7 92:9 94:20
97:25 101:14,19
118:21 119:10
120:14,19 121:4,8
121:10,13,15,17
122:18,22 123:22
**European** 30:13
94:15 119:19
121:21
**Euros** 22:18 44:2
100:15 125:16
**event** 28:3,6 29:17
84:12
**events** 43:25 44:15
44:25 46:23 59:9
**eventual** 71:5
72:15
**eventually** 12:20
75:22 76:13
**everybody** 106:3
**evidence** 53:3

**evident** 42:9
**evolution** 10:5
**ex** 57:9,14
**exact** 11:9
**exactly** 44:14 106:4
**Examination** 3:2,3
3:4
**example** 65:15,22
73:24 89:14 94:14
129:25
**exceeded** 94:3
**exception** 136:5
**exchange** 72:14
73:4 78:3,6 132:5
**exchanged** 117:15
**exclusive** 48:9,16
48:18,25
**exclusively** 48:11
103:12
**exclusivity** 48:7
**execute** 94:21
**executed** 97:23
**executing** 55:8
**executive** 22:16
61:7 69:10 79:13
92:16 122:3,14
**executives** 51:14
**exercise** 87:22
107:1
**exercised** 49:16
**exhibit** 3:6 6:11,15
6:17,20 11:19,20
11:23 14:25 15:1
25:18 26:5,6,7
33:23,24 36:3,6
45:11,14,18 46:4
46:7,9 50:1 62:2
70:1,4 74:2 77:15
77:17 81:3,5,6
92:1,3,4,5 94:25
98:9,12 99:2,15
99:15 102:8,11,12
110:23,24 119:3
122:25 123:9
124:23,24 130:13
130:15 131:21
133:8

**exhibited** 77:19,20
**exhibits** 11:16 15:7
45:25 133:10
**existing** 31:17 77:7
130:4
**exit** 31:16,17
**exited** 118:15
**expenditure** 14:6
**expenditures** 64:13
**expense** 57:5 89:15
**expenses** 17:11
19:17 88:20 89:14
124:5 129:3,3
**experience** 5:6
75:10
**expertise** 10:12
**expire** 82:9
**expired** 17:7 18:25
**explain** 12:9 15:25
48:14 54:10
**explained** 115:14
131:11
**explaining** 67:9
**explains** 103:4
**explanation** 35:11
49:9
**explicitly** 78:3
**exploited** 75:16
**exposed** 105:16
**exposure** 21:9
22:18 23:1 61:10
**extent** 28:17 44:13
101:2
**external** 64:13
**extra** 11:15,17 15:3
15:10 104:15
**eye** 51:14,14 53:6,6
69:14

### F

**F1** 10:22,23 20:25
22:11,12 23:14
31:12,24 62:7
74:12 78:2,6,15
78:24 109:16
119:24 129:9
132:5,22
**face** 49:6 71:2,11

facilitate 71:3
72:14
fact 43:6 55:5 57:8
60:10 75:10 83:12
88:18 98:3 105:5
facto 31:11 76:2
factor 48:24
facts 127:10
fair 75:3
fait 16:15
fall 67:15 71:22
falls 99:15
familiar 19:22
84:25
fantastic 53:11
favor 125:5 133:22
134:1
February 12:3 92:7
92:20,22 113:8,9
113:22 116:24
130:17 131:13,13
fee 12:13,14 64:3,4
66:4,5,22 67:21
72:11 74:12,16
77:12 78:6 83:23
86:16,20 101:23
102:18 103:21
128:6 132:4,7
fee-income 84:21
Feel 75:18
fees 67:19,24
102:22 103:13
128:19
feet 125:17
felt 14:14 37:13
104:14
Ferrari 28:16
fifth 2:4 26:21 74:9
FIG 20:4
figure 113:16
files 33:15
filing 111:23
final 113:13 117:24
134:22
finalize 92:22
finalizing 118:4
finally 56:12

finance 32:2 75:1
94:18 97:10 108:9
financial 10:16
20:4 88:6 126:12
financing 66:15
find 13:19 16:12,14
44:19 50:11 69:11
95:7 103:16 131:1
136:6
finders 66:5
fine 35:20 43:24
57:15
finished 5:10
firm 8:10,17 9:19
10:17 11:8 14:6
21:10,16,17 23:6
23:24 24:7,14
28:19,24 30:17
31:1,5,19 42:6
48:13 49:4 51:9
52:2,11 53:14
55:8 61:7 62:16
64:10,22 66:3,16
67:25 68:4,11,14
76:7 80:9,13
83:11 122:11,14
128:8
firm's 43:15 62:18
83:14
firms 21:8
first 27:8,13,23
34:25 51:15 53:4
53:17 61:9 66:11
70:8,16 74:6
81:14 82:10 86:21
90:21 106:19,22
119:2,22 133:15
fished 29:3
Five 26:23
fixed 18:11,15 21:5
21:9 29:12 32:7
43:9 50:24 51:4
52:15 63:11 64:11
87:14 95:8 107:1
107:13,14 109:10
109:11
flagged 63:4

flashback 103:9
flexibility 82:23
flip 101:3
floor 88:21
flow 22:19 74:20
75:17
flying 19:13
focus 70:7 77:23
99:5 119:13
focused 126:11
follow 54:6 75:12
108:1 115:16
followed 22:20
following 13:6,8
21:16 86:2 98:7
118:11 129:7
131:15
follows 5:3 112:20
force 67:2 91:9
foregoing 133:17
136:4
forewarned 115:10
forget 19:16
forgone 64:10
form 9:9 10:3,13
11:2 13:3 20:11
23:20 24:4,20
29:25 30:22 31:14
34:15 38:11,15,24
39:5,25 40:4,25
47:12,17 48:21
49:1 61:17 68:20
71:12,14 72:16
73:9 77:6 81:24
82:12 84:9 88:12
89:8 96:7 106:9
110:7,17 113:21
116:2 126:15,22
127:2 128:7,20,24
129:12 132:9,24
133:3,24
format 117:18
former 119:19
Formula 21:1,15
21:16,18,24 23:17
24:17 26:25 27:18
27:24 28:2,4,11

29:20 38:1,7,14
39:19,23 41:1,6
42:1 43:6,16 44:8
44:17 48:19 50:15
54:5,13 55:3
57:24 58:7,24
59:7 67:15,22
68:25 69:2,3 75:7
86:4 87:3,24
88:10,24 89:6,11
90:3,12,19,19
91:6,19 95:17
96:16 97:2,7,20
104:24 105:11
106:7,13,20 107:3
107:6,10,19 108:6
109:2,7 110:4
121:11,13,19
122:2,4 123:4
124:1
formulaic 129:4
formulas 122:13
forth 79:19 96:4,22
117:13 137:9
forthwith 96:1
forward 123:17
125:11
found 40:8 44:21
54:12
foundation 57:17
four 39:2 83:3
frame 37:7
framework 80:11
129:5
frankly 47:19
55:22 104:6
free 63:9 68:10,17
75:19
freedom 10:10
frequent 116:1
fresh 71:2,11
friendly 57:11
front 11:20 12:13
16:15 70:4 99:3
Fuld 7:17
fulfill 50:14
full 10:6 18:23

20:13,17 88:8
fulltime 50:15
functionally 52:13
fund 66:3,14
103:18 123:18
125:15,16 126:11
126:12 129:15
funds 5:25,25 6:1,1
6:1,2 23:4 103:8
103:19 104:4,6
105:16 125:12,20
129:21
further 127:25
134:14 137:12
future 30:19 62:21
FYI 34:9

## G

gain 30:17,17 32:12
43:16 65:5 71:4
106:20,22,24
Gatto 7:23
general 11:6 14:13
77:8
generally 18:17
80:22
generated 84:22
geography 10:14
68:22
German 10:24 20:6
21:19 53:15,16,23
54:15 61:22
Germans 21:22
22:12 28:20 89:20
Germany 10:16
12:19 13:17 16:2
16:11 22:14 29:14
getting 21:19 26:18
30:15,16 45:19
52:19 64:3 67:20
76:23 77:15
103:14
gist 45:19 116:3
give 7:15 11:10
28:24 35:12,17
37:15 47:11 56:7
68:7 93:20
given 6:3 7:19 9:17

37:14,19 38:1,4
38:17 43:7 52:15
116:3 134:17
137:10
**giving** 14:18 57:3
61:18 82:16
**global** 7:6 40:18
**go** 9:21,22 15:11,12
16:8 17:4,22
18:22 23:7 24:15
45:5 53:12 54:9
61:3 69:11 77:24
80:17,24 86:20
87:6 88:18,24
91:4 92:19 96:1
100:19 115:5,8
127:12
**going** 15:13 26:9,11
28:7,11 29:20
32:17 35:3,8,15
39:8 42:10 45:5
50:9,19 58:15
69:15 71:22 72:1
74:3 75:15 76:17
79:3 80:19 85:23
93:4,23 98:10
105:7 107:4
111:16 115:19
117:25 118:14
127:18 134:7
135:5
**Goldman** 27:25
28:21 68:15 90:22
**good** 16:21 32:16
34:22 53:10 63:6
104:2
**goodwill** 88:16
**Gotshal** 2:4 4:19,22
36:9
**gotten** 65:21
**governance** 49:19
55:10 58:12,14,21
**grab** 21:10
**grade** 11:10 122:14
**Graham** 94:17,18
96:20
**granted** 97:11

**grateful** 112:4
**great** 36:1 68:16
75:18
**green** 12:17 117:13
**gross** 19:12
**ground** 34:25
**group** 7:20 8:12
14:8 17:17 20:5
21:7,15 42:25
59:24
**groups** 21:4
**guarantee** 86:15
**Guernsey** 54:14
56:7 87:18
**guest** 55:19
**guide** 16:24
**guideline** 18:12
**guidelines** 19:4
64:1 80:14
**guy** 17:13 23:7 57:3
105:10,24
**guys** 64:16 72:23

**H**

**hand** 14:23 31:7
64:21 137:15
**handle** 49:12
**handshake** 45:3
**Hannan** 34:5 50:5
51:6
**happen** 12:22 14:9
131:18
**happened** 11:17
31:10 39:15 41:20
58:2 66:15 67:25
86:7 118:10
**happening** 106:4
**happens** 90:1
**happy** 22:25 37:15
59:2 62:22 71:18
**hard** 29:14
**head** 5:14,16 16:2
20:4 21:3 22:14
22:21 23:21 38:18
41:24 57:21 61:9
103:17,19 104:16
107:4 119:19
**headed** 27:24

**heads** 35:12
**hear** 43:21 60:23
**hearing** 108:24
**hedge** 10:18
**held** 110:3
**help** 17:5 45:6 51:8
62:8 63:9 67:6
68:17 93:18
**helped** 21:8
**helpful** 69:23 71:2
**helping** 25:19
**hereinbefore** 137:9
**hereunto** 137:15
**Hi** 123:16
**hierarchical** 32:5
**high** 63:11 90:9
97:15
**higher** 14:20
**hire** 10:2 16:20
**hiring** 8:11 10:5
**Hmm** 51:22 115:4
**hoc** 65:12
**Hogan** 1:13 2:11
4:10,13,16
**Holborn** 1:13 4:10
**hold** 22:25 36:20
**holding** 4:5 43:12
54:14 56:5,6
**Holdings** 1:5 2:17
4:21,23 7:3,5
36:24 138:2
**HOMMEL** 2:17
**honeymoon** 53:17
**hopefully** 45:6
**hoping** 36:16
**Horwitz** 2:3 4:22
4:22 11:2 26:15
110:22
**hostile** 57:8,12
**Hotels** 22:9
**hour** 96:9
**hours** 36:14
**huge** 21:8 34:9,14
49:6 61:11
**humorous** 125:14
**hundred** 21:8
**hundreds** 13:6 44:2

**I**

**IBD** 102:18,20
**idea** 20:7,10 54:1,3
75:18,20 81:16
91:21 106:10
110:18 122:20
**ideally** 51:8
**ideas** 47:1 68:16
126:11
**identical** 95:8
**identification** 36:6
46:9 50:1 77:17
81:3 92:3 98:12
102:12 110:24
119:3
**identified** 51:18
95:16,17
**identifies** 70:21
84:2,6
**identify** 4:11 7:13
**imagine** 65:10
84:25 90:17
**immediate** 91:4
**immediately** 76:5
**implied** 106:24
**important** 16:25
48:10 96:8
**impression** 106:10
**improved** 72:8
**incentive** 122:7
**include** 47:2,25
48:6 98:22,22
114:11 130:7
**included** 5:25 14:3
14:4 47:15 103:23
112:13 130:1,3,10
130:25 131:1,7,15
**including** 52:4 98:6
103:15 104:16
118:16 120:2
**income** 21:5,9
29:12 32:8 43:9
50:24 51:4 52:15
87:14 107:13,14
109:10,11
**inconsiderable**
76:21

**incremental** 65:3
**indicating** 75:6
78:23
**indications** 46:17
**indifferent** 43:4
**individually** 9:20
115:10
**individuals** 125:22
**industry** 21:4 83:4
**influence** 58:19
**information** 22:5
34:14 39:14 47:6
47:10,14,16 48:8
72:20 74:20 75:10
82:13 87:9 105:2
105:18,23 118:18
**informed** 43:2 51:2
98:5 125:4
**inherited** 55:8
105:15
**ins** 30:24
**inside** 67:20
**institution** 88:6
**institutions** 10:16
20:5 126:13
**instructed** 62:19
**instruction** 25:17
25:22,22
**instructions** 35:24
**instrumental** 29:21
52:19 66:10
103:14
**intelligence** 88:2
90:10
**intend** 28:1
**intended** 66:3
74:11 76:11 120:4
120:12
**intending** 50:13
**intends** 36:13
**intensity** 90:9
**intention** 68:24
**interacted** 24:6
**interacting** 14:15
102:2
**interacts** 16:4
**interest** 14:19

23:19 24:19 56:5
69:20 91:6 106:15
**interested** 14:16
58:20,21,23 90:23
104:5 137:14
**interesting** 95:13
**interests** 52:14
54:4 62:25
**intermediate** 50:22
**internal** 63:19
69:11 74:19
**internally** 20:8
72:7 89:23
**interpose** 54:22
**interpret** 11:12
**interpreted** 80:13
**interrupt** 25:4
**introduced** 19:9
**invaluable** 29:24
**invest** 66:3 123:17
125:12
**invested** 66:4
125:16
**investing** 42:3
125:20
**investment** 5:14
8:16,22 13:25
16:3 17:22 20:25
21:2,17 22:23,24
23:24 24:13,14
26:25 30:6,14,18
31:19 32:7 42:4,5
42:8 43:5,11 44:2
49:12 51:9,11
52:5,10,14 58:6
59:6,7,10,16,19
60:10 61:6 62:7
64:17 65:9,11
66:6 67:1,21
71:23 78:2 83:1
88:16 92:17,21
94:3,11,19 101:11
102:7,21,22
103:10,24 104:1,2
104:18 105:16
119:24 126:10
132:12

**investments** 5:24
22:10 52:13
**investor** 125:15
**investors** 27:17,17
**inviting** 104:7
**invoice** 86:18
**invoices** 124:5
**involved** 8:23 9:2
10:24 19:20,25
20:25 21:1 23:23
24:3,9,10,13
42:15 49:4 52:3
58:10 79:12 86:1
92:14 93:4,8 96:7
98:6 103:15
118:13 132:22
**involvement** 10:4
10:11 13:11 20:2
20:3 24:22 42:1
42:11 62:17
**Isaacs** 23:13 30:11
61:9,16 69:4
73:15,20
**issue** 16:10 28:7
29:1 30:13 49:2
72:25 107:14
109:11
**issues** 29:2
**Italy** 5:14

——————
**J**
——————
**Jacqueline** 36:8
**January** 26:17
45:13,14 92:21
111:4,16 113:5,6
113:12,18,22
116:11,13,25
117:5,9,11 119:4
**Jasjit** 7:17
**Jeremy** 23:13
30:11 61:9,16
73:15,20
**Jersey** 54:13
**job** 13:13 20:4
**jobs** 5:12 45:1
**Johari** 93:4 97:1
**Johnson** 2:10 3:2,4
4:13,13 5:4 6:12

6:17,22 11:22
15:4,6,10,12,20
26:2,8,11,14,16
32:14,24 34:1,3
34:19 38:11,15,24
39:5,25 40:4,25
46:5 47:12,17
48:21 49:1 51:21
51:23 52:1,8,25
54:7,22 55:4 56:1
56:25 57:7,14
58:1,9,25 59:8,18
60:5 61:4,17
63:16,24 65:18
67:7,17 71:12,14
71:25 72:6,12,16
72:18 73:3,9,12
73:16,22 74:18
75:8 76:1,15,20
76:25 78:12,16,20
78:25 79:20,24
80:3,6,16 81:24
82:12 83:9 84:9
88:12 89:3,8
90:15 91:20 95:20
95:23 96:3,15,18
97:5,21 98:15,18
98:23 99:8 102:6
102:25 104:25
105:12 106:9
107:8,11,17,20,24
108:3,8,18,21,25
109:4,8,14,17,23
110:5,9,12,17
113:21 114:6,8,13
114:15,19,22
115:3,6 118:5
120:16,20 121:12
121:20,24 122:19
122:23 123:6,23
124:14 125:13,21
126:3,9,15,22
127:2,7,14,17
128:2 130:19
131:22 133:9,14
134:4 135:3
**joined** 8:9 103:9

**joint** 118:21 119:9
121:3
**jointly** 9:19 27:2
49:16 52:23
**Jonathan** 15:22
19:3 33:4
**JP** 21:21,22 27:2
27:16 43:7,20
49:16 51:12,13
52:23 57:1,2
60:11,22 61:2
75:21 88:14 89:22
**JPM** 50:13,16
**judges** 48:14
**judgment** 64:19
85:25 86:1
**July** 81:11 86:25
**jump** 57:21,21,22
107:4
**jumped** 69:13
**junior** 53:7

——————
**K**
——————
**keep** 41:13 43:22
60:12 61:14,14
62:21 98:9
**keeping** 104:5
**kept** 51:2 60:13
99:3
**key** 49:19
**keys** 57:4
**kind** 13:19 29:2
43:25 52:16 90:1
94:14 105:25
**Kingdom** 1:15
**Kirch** 21:6,15,18
27:18 42:4,16,19
43:12
**Kirch's** 49:11
**Klaus** 50:13 51:12
53:9,17,18,22
**knew** 20:3,5 31:25
44:1,1 47:23
53:15 71:24 100:9
123:25 124:11
**know** 8:8,9 9:21
10:9 11:11 12:11
13:15 14:5 15:8

16:23,25 17:14,19
17:23,25 18:16
19:3,18 20:14,18
21:11 22:25 23:8
24:9,22 25:7
28:13,24,24,25
29:11,20 30:17,19
30:24,25 31:18,23
31:25 32:1,12
35:6,15,20 37:15
37:18 38:4,25
39:8,15 42:24
46:17 47:25 48:1
48:3,5 53:3,4 55:7
55:16,18,19,22
56:9 57:2,2,3,4
60:19,21 62:22,24
65:2 66:20 67:19
67:20,25 68:4,6
68:15 69:10,14,16
69:17,19 71:21
72:8,22,24 73:4,6
73:8,21 74:8 77:4
77:12 78:10 81:14
82:25 85:8 86:3
86:18,19 87:19
90:7,8,21 91:12
91:17 92:19,23
94:19,23 95:13
96:5,11,22 97:6
97:14 98:2 100:20
103:21,25 104:3
104:17,20 105:13
105:19,24 106:4,4
106:14,18 108:10
108:19 110:13
113:1,4,15 115:17
115:18,21,23
116:5,6 117:17
118:13,14 119:16
122:21 124:1,4
125:16 126:4,7
128:16 129:15
130:8 131:12,14
133:1
**knowledge** 20:12
54:16 73:1 105:20

106:3,6 110:14
**known** 44:11 98:3
105:6 127:8

**L**

**label** 45:19,23
**labeled** 45:20,22
110:20 111:8
**laid** 80:5
**Landesbank** 21:21
**Lang** 1:19 137:6,20
**language** 53:18,19
**large** 43:9 44:1,13
63:3 124:9
**largest** 21:24 61:10
**lasted** 66:13
**lastly** 133:5
**late** 25:2 111:23
**law** 21:8
**laws** 133:16
**lay** 34:24 119:21
**lays** 95:5
**LB's** 71:4 72:15
**LB/F1** 111:23
**LBEL** 123:16
125:6,11
**LBHI** 36:13
**lead** 46:1 52:6
68:14
**leader** 16:17
**leadership** 8:5
**leading** 28:14,15,16
51:21 52:1,8,25
54:7 55:4 56:1,25
57:7 58:1,9,17,25
59:8,18 60:5 61:4
63:16,24 65:18
67:7,17 69:17
72:6,12,18 73:3
73:12,16 74:18
75:8 76:1,15,20
76:25 79:20,24
80:3,6,16 89:3
90:15 91:20 96:3
96:15 97:5 98:15
98:18,23 102:6,25
104:25 105:12
107:8,11,17,20,24

108:8,18,19 109:4
109:8,14,17,23
110:5,9 120:16,20
122:19 123:23
125:13
**learned** 57:23
**led** 56:14 66:16
**left** 31:8 62:17
71:25 105:25
122:11
**legal** 7:9 21:7 23:12
49:22 51:19,25
64:8 69:6 75:1
87:14 88:19 89:14
**LEH** 102:9 119:1
**LEH58** 15:6
**Lehman** 1:5 2:2,17
4:4,20,20,23,23
5:6,11,13,24 6:5
7:2,4,5,14 8:5,9
8:14 9:7,13,16,18
10:1,7 18:22,23
19:6 20:4 21:2
22:8,14,18,24
27:16 30:4 31:23
33:12,15,18 36:19
36:20,23 37:1
38:13 39:24 40:3
40:10 42:12,22
43:7,18 44:7,11
44:11 45:1 48:7
48:18 49:10,24,25
52:22 55:2,24
57:2,3,9,12,13,24
58:7 59:7,17,20
60:4,6,8,12,14,18
60:25 61:1,3 62:6
62:25 66:14 67:5
67:22 69:10,12,25
72:25 74:7,11,16
74:20,22,22 75:3
75:6,21 76:24
77:2,25 78:5,14
79:16 80:4 81:8
81:19 83:17,22
84:2,7,12,17 87:2
92:8 97:24 98:6

101:14,19,24
102:9 103:8 104:6
107:22 108:11,15
109:21 110:3,7
118:15,16,21
119:9,20,23 120:2
120:5,12,14,19,21
121:4,7,10,15,16
122:3,11,17,22
123:22 124:2,2,12
127:25 128:10,11
130:16 131:25
132:4 134:14
138:2
**Lehman's** 20:25
36:4 48:25 78:2,4
78:11,15,23 91:18
106:7 110:15
**lent** 21:17
**let's** 15:12 17:15
24:17 74:8 81:25
83:15 91:25
**letter** 26:10,17 45:9
46:3,6,13,15 47:2
47:7,8,15,22,25
48:6 62:2 74:2
112:5 113:11
114:11,21 118:4
118:20 119:4,8
121:3 133:5,20
**letters** 46:4 114:19
**level** 14:19,20,20
18:10 50:22 88:15
93:8
**liaising** 92:16
**life** 53:9 56:17
**lift** 86:8
**light** 12:17 117:13
**lightly** 115:8
**liked** 31:6
**likes** 25:17
**likewise** 14:17 51:4
**limited** 9:8,14
47:22 81:9,19
92:9 119:10
120:15,19 121:4
126:1

**limiting** 72:8
**line** 23:5 50:6 70:16
74:6,10 75:1
94:20 99:17,23
102:17 113:15,15
**linked** 122:15
**links** 28:20
**liquidator** 5:10
**list** 85:13 131:12
**listed** 6:23 7:25
12:3 33:8 49:20
136:5
**listen** 54:18
**listened** 69:7
**little** 28:10 36:18
37:3 41:14 47:13
91:5 101:9
**live** 18:21 131:13
**LLP** 2:4,11
**loan** 32:8 43:7,9,18
44:4 50:25 51:4
89:16 105:15
106:15
**loans** 21:4
**local** 20:12
**London** 1:14,15
4:10 5:15
**long** 8:20 22:21
45:3 62:11 66:13
85:8 96:5 105:6
106:1,1 122:7
**longer** 14:10,11
23:2,21 42:12
57:13 60:2 61:5
75:15 98:1 105:2
105:4
**look** 6:4 11:14
25:23 26:3 33:21
40:6,19,23 43:15
43:23,24 44:6,16
45:9 50:2 62:1,3
65:19 69:24 80:19
81:13,25 83:15,22
87:10 91:10,22,25
94:24 98:25 99:10
100:1 102:8
110:19 111:7

112:4,19 116:10
123:17
**looked** 38:25 40:19
45:11 132:3
**looking** 25:7,9 26:1
44:5,9,13 94:25
117:20 125:11
130:15,20,21
133:12
**looks** 25:24 84:16
84:23 113:12,14
**losing** 90:18
**loss** 32:11 65:10
**losses** 32:3 49:7
**lost** 22:4 110:21
115:25 118:10
**lot** 10:10 17:16
20:12 22:19 42:14
49:8 53:9 94:22
**lots** 49:5
**Lovells** 1:13 2:11
4:10,13,16
**low** 63:11
**lower** 14:20
**lying** 53:2

**M**

**M** 2:10 7:17
**M&A** 18:6 23:10
41:24 42:7 63:25
119:19
**M&M** 126:1,7,14
126:16,18,21
**magnitude** 66:8
**Magnoni** 39:6,7,10
39:17,18 40:2
41:7,9,18 42:15
51:2 111:3,4,12
115:22 118:6,7
**Magnoni's** 39:3,4
126:20
**mail** 75:17
**maintain** 33:18
**maintaining** 14:16
**major** 62:16 65:20
85:8,13,16
**makers** 131:16
**making** 16:14

21:13 49:4 51:3
54:8 56:17 57:23
90:20 93:24 97:12
105:8
**man** 125:17
**manage** 18:9 21:11
**managed** 29:9
66:13
**management** 8:1
23:3 61:13,24
104:8
**manager** 94:21
**managers** 75:2
**managing** 8:10
16:4 93:11
**mandate** 17:1 29:4
31:18 64:3 65:1
65:14,21,25 66:11
66:13 67:19 86:5
**mandates** 29:5
66:16 92:24 94:21
**Manges** 2:4 4:19,22
36:9
**manufacturers**
29:17
**March** 5:8,9 82:3,6
**Marco** 93:15,16,22
94:8,10 96:20
97:16 100:24
**Marcus** 36:8
**marginal** 129:19
**margins** 28:9
**mark** 25:18 36:3
45:14,17 46:6
49:23 70:3 80:25
92:5 98:9 102:11
110:23 112:6
119:2
**marked** 6:11 15:7
33:22,25 36:5,6
45:10,25 46:3,9
50:1 62:1 69:25
70:1 77:17 80:24
81:3 92:3 98:12
102:10,12 110:24
119:3 123:9 133:9
**marking** 6:15

**marks** 6:17
**marriage** 137:13
**Marsoner** 2:9 4:14
4:17 6:6 8:8 10:2
10:4,12 14:13
16:5,19 17:23
19:25 24:3 26:4
29:23 30:20 37:13
37:17 39:22 40:23
41:2 44:7,17
46:15,20 47:6,14
50:7,12 52:24
54:4 56:23 57:11
62:5 65:22 66:9
67:5 69:1 70:9,14
70:21 71:10 72:4
73:6 74:11,15
75:7,11 77:15,20
78:10,15,18 81:9
81:23 83:5,17,23
84:3 86:20 88:8
88:10 89:1 91:13
91:13,18 92:8,19
94:23 95:5,21
96:1,11,25 97:2
97:23 98:21 101:2
101:14,19 103:22
104:3 105:11
110:14,20,20
111:1,2,3,7,9,11
111:17 112:12,24
113:17,19,20,22
114:3,5,25 115:2
116:12,13,15,18
116:20,22 117:3,8
117:15 118:3
119:23 121:11,19
122:13,17,21
123:11,12,21
126:2,4,25 127:6
131:20 133:23
134:2
**Marsoner's** 8:24
11:14 19:20 20:13
24:18 27:1,20
30:5 48:17,24
79:12 81:6 92:4

104:24 114:9,18
118:20 121:7
129:1 130:2,10
**matching** 88:25
**matter** 1:4 4:4
37:17,18 38:23
39:4 41:2,6,18
42:10 77:3 137:14
**matters** 54:16
111:23
**matured** 124:9
**Maurice** 2:3 4:22
**McClaren** 34:9
**McGee** 14:1
**McKeown** 94:5,6,7
**McLaren** 28:16
29:9,13 34:14
**MD** 18:23 20:13
**mean** 9:15 13:5,21
16:10 22:17 25:4
31:3,25 58:16
60:7,14 83:2
92:18 93:19 97:22
100:13 107:13
109:10 123:3
124:8 125:4
**meaning** 55:7
**meaningful** 61:12
**means** 9:2
**meant** 29:17 58:14
**measured** 84:21
**media** 21:6
**meet** 53:12 61:19
**meeting** 13:18,18
54:9 96:19
**meetings** 13:15,16
55:18
**Meissner** 15:23
16:1 23:11 24:11
30:11 61:21 69:4
73:18 98:17,20
**member** 23:6 24:13
61:6 69:9
**members** 8:2,5
16:4 85:20 93:1
**memory** 25:13
**memos** 69:11

**mentioned** 44:21
62:10 67:9
**Mercedes** 28:13,16
29:12
**mergers** 5:16 13:7
22:21 23:22 38:18
**Meridian** 22:9
**merited** 129:21
**mess** 52:16 105:7
**messages** 117:16
117:17
**met** 10:23
**methodology** 76:4
**mezzanine** 66:3,14
**Michael** 102:14
**MICHELLE** 2:21
**middle** 92:6
**migrated** 28:6
**migration** 29:16
**Mike** 103:19
**million** 17:3 19:15
19:15 22:18 67:22
86:4,19 100:5,15
105:17 106:15
125:15
**millions** 44:2 64:13
**mind** 62:20
**mine** 40:14 71:3
**minority** 21:25
58:21 59:25 60:3
**minute** 26:15 32:14
98:11
**minutes** 15:11
127:13,16 134:6
**misrepresenting**
104:14
**missed** 121:22
**mistake** 88:17
**mixed** 23:7
**mm-hm** 6:8,24
7:12 12:4,6 13:14
15:24 17:8,18
26:13 33:10 34:7
34:12 41:25 42:23
43:1,8 44:12
50:17 55:9,15
62:15,23 67:11

68:2,13 70:15,20
70:23 74:5 75:5
78:9 79:17 80:20
81:7,20 82:15,19
83:19 85:5,10,21
89:19 92:10 93:21
94:2 95:10,15
99:9,13,24 101:5
101:10 102:16
103:6 104:9
106:17 112:11,22
113:7,10 116:19
117:7 119:15
121:6 123:14
124:6 130:18
132:2 133:7
**modest** 71:4 72:11
**modify** 87:23
**moment** 14:12
80:19 86:17 90:16
112:19
**Monday** 1:10 4:1
13:18 61:19 136:5
**money** 19:13 21:17
22:19 28:10 30:14
60:19 63:12 86:17
90:19,20 94:15
103:18
**monitor** 13:12 17:5
**monitoring** 85:24
**month** 86:21
138:22
**months** 39:9,18,20
41:10,11 42:10
58:2 124:19 125:3
**Morgan** 21:21 27:2
27:16 43:7 51:12
51:13 52:23 60:11
60:22 61:2 75:21
88:14
**morning** 13:18
**motion** 11:14 26:7
77:20 81:6 92:5
**move** 57:19 64:2
85:9,9 101:8
118:19
**moved** 8:17 23:23

42:7,11 61:24
68:10
**multiple** 8:5 133:9

---

### N

**N** 2:1
**name** 6:23 62:21
126:5 136:12
138:2,2
**named** 112:21
**names** 97:17
118:12
**nature** 82:22 88:5
**nebulous** 83:1
**necessarily** 17:3
48:13 51:14 54:18
86:7
**necessary** 76:6
**need** 24:14 25:12
25:18 35:11,19
36:5 37:23 38:16
48:14 49:3 63:22
70:3 76:4 82:24
87:17 88:19
100:24 108:5,20
113:23 127:15
**needed** 13:20 28:23
30:17 37:14 60:19
63:14
**needing** 49:9
**needless** 70:25 71:2
**needs** 54:22 119:1
**negative** 91:1
**negligible** 43:13
**negotiate** 76:13
79:15 97:14 98:13
99:12 132:14,16
**negotiated** 24:11
55:10,20 92:12
**negotiation** 8:24
31:3 63:20 67:2
85:12
**negotiations** 13:24
79:12 92:14 93:5
93:9,17,18
**neither** 53:14,16
**net** 19:11
**never** 31:8,8,10

**new** 1:2 2:5,12,18
4:6 6:15 14:21
15:9 16:7 18:4
29:16 48:4 52:10
52:19 55:16 60:10
65:8 88:2 94:8,10
137:2,4
**nod** 35:12
**nodding** 108:5
**nominated** 38:19
105:4
**non-legal** 73:14
**non-listed** 5:24
**non-US** 5:20
**normal** 10:6 90:8
128:5
**normally** 14:11
65:10 69:15 75:22
131:12
**notary** 2:21 4:25
**notes** 25:10,13
32:15 87:7 112:12
112:16 114:9
**notice** 36:4,7 45:17
82:14,17
**noticed** 93:3
**notifying** 129:23
**Notwithstanding**
82:15
**November** 1:10 4:1
4:7 33:21 34:4
70:6,10 71:15
123:13 124:17
136:5 137:16
**number** 4:7 14:1
49:18 70:1 77:16
80:25 102:9 125:3
134:21
**numbered** 136:4
**numbers** 6:7 15:8
**NY** 2:5,12,18

---

### O

**objecting** 25:21
69:18

**objection** 9:9 10:3
10:13 11:2 13:3
23:20 24:4,20
29:25 30:22 31:14
34:15 38:11,15,24
39:5,25 40:4,25
47:12,17 48:21
49:1 51:21,23
52:1,8,25 54:7,23
55:4 56:1,25 57:7
58:1,9,17,25 59:8
59:18 60:5 61:4
61:17 63:16,24
65:18 67:7,17
71:12,14 72:6,12
72:16,18 73:3,9
73:12,16,22 74:18
75:8 76:1,15,20
76:25 78:12,16,20
78:25 79:20,24
80:3,6,16 81:24
82:12 83:9 84:9
88:12 89:3,8
90:15 91:20 95:20
95:23 96:3,15,18
97:5,21 98:15,18
98:23 99:8 102:6
102:25 104:25
105:12 106:9
107:8,11,17,20,24
108:8,18 109:4,8
109:14,17,23
110:5,9,17 113:21
120:16,20 121:12
121:20,22 122:19
122:23 123:6,23
124:14 125:13,21
126:3,9,15,22
127:2,7 128:7,20
128:24 129:12
132:9,24 133:3,24
**obvious** 10:20
**obviously** 28:4 30:1
43:2 54:17 60:12
64:17 69:6 75:19
**occurrence** 27:6
**October** 14:23

15:21 33:3 52:22
**Odrich** 102:14
103:19
**offer** 57:24 72:17
73:2,10,15,20
96:10
**offered** 10:8 72:7
**offering** 71:10,15
72:4,14 107:10,15
107:18 108:6,9,17
109:6,15 110:3,8
110:11,16
**office** 104:16
**officer** 7:2
**officers** 6:25 8:1
9:19
**official** 100:25
**officialized** 91:12
**officially** 131:4
**Oh** 45:17 70:12
117:19
**okay** 5:21 6:13,18
6:21 7:22 8:4,23
9:11 10:1 11:24
12:2 14:9 22:23
25:12,21,25 26:9
30:12 31:4 32:4
32:16 33:21 34:2
34:17,20 35:3
36:1,12,23 37:1,3
37:9,12,21 38:3,6
38:9,13,20,22
39:3,12,17,19,22
40:6,13,16,22
41:1,5,9,18 42:14
42:20 43:14,19,23
44:5,16,24 45:5
45:17 46:12,15,25
47:4,10,13,24
48:16,23 49:10,17
49:23 50:9,18
51:1,5,18 52:6,18
52:21 53:14,25
54:3,19 55:12,16
55:24 56:2,4,13
56:18,22 57:6
58:4,14 59:5,12

59:13,15,22,23
60:2,24 61:1,8,16
61:20,25 63:13,22
64:20,21,25 65:7
65:13 66:1,9,18
66:19 67:4 69:23
70:4,13,16,24
71:8 72:2,10
73:17 74:1,9,15
75:3 77:14,19
79:2,15,18 80:10
80:15 81:2,17
82:2,13 83:15,22
84:1,11 85:3 86:5
86:6,9,10,13,21
86:22,23 87:5,8
87:10,13,16,24
88:4,10,22 89:1,5
89:10 90:2 91:3,8
91:10,22,25 92:11
94:5,9,23 96:6,21
97:2,19,23,23
98:8,20,25 99:5
100:11,16,23
101:2 102:4,4,8
103:3,7 104:23
105:10,22 106:21
107:3,4 108:13,15
110:19,23 111:10
112:15 113:3,16
113:24 114:1,15
114:22 115:12,20
116:8,9,21 117:10
117:15,23 118:2
118:19 119:6,8,13
120:24 121:3,10
122:1,9,17 123:2
123:8 124:11,16
124:18,19,21,25
125:1,10 127:12
127:17 131:5,8,19
134:5 135:3,4
**old** 18:14 38:25
71:22 85:15
**omitted** 120:6
**once** 31:3 55:18
59:14,16 134:22

ones 29:10 44:10
opaque 49:19
opens 21:25
operate 59:23
operated 76:3
operating 23:6,25
  36:21 50:15 68:9
  69:9 94:11 98:4
  122:11
operator 4:8
opinion 24:16 60:7
  93:2 96:8 106:2,3
opinions 23:7
opportunistically
  62:20
opportunity 66:6
  104:7
opted 27:9
oral 120:2
orally 78:6,10
  132:4
order 134:20
orders 66:8
organization 7:6
  44:1 63:3 105:9
original 43:5
  100:20 116:18
  117:8
originated 51:4
  129:17
originating 67:19
originator 50:24
ought 111:20
outcome 43:4
  120:5 137:14
outs 10:21 30:25
outside 28:22 63:8
  66:21 118:11
overall 43:15 83:12
  93:24 95:12
oversaw 69:9
owe 55:22
owned 31:19 56:5
  64:22 67:23
owners 59:2
owning 58:21
Oyagi 12:19

**P**

P 2:1,1
P&L 121:1
p.m 1:11 4:2,8
  15:14,15,17,19
  32:18,19,21,23
  79:4,5,7,9 127:19
  127:20,22,24
  134:8,9,11,13
  135:5,6,7
page 3:6 6:9 7:11
  7:15 11:25,25
  12:5,23 62:4
  70:12 74:6 77:24
  81:14,14,15,25
  82:4,7 92:6 99:16
  101:4 111:6
  116:12,17 123:12
  130:21 136:6
Page/Line 138:4
pages 101:3 136:4
paid 11:11 12:13
  12:13 20:21 30:21
  30:23 55:21 62:6
  67:6,20 69:1,16
  69:19 78:23 86:17
  86:19 88:2 91:13
  91:13,15 92:21
  94:14 95:6 103:23
  104:18,21 107:19
  109:16 122:3,5
  124:4,8,10 125:8
  128:15,19 130:8
  131:2,18
paper 4:20,24 37:1
  59:1 74:16 77:3
  107:22 109:22
paragraph 26:22
  62:4 70:25,25
  74:10 77:23,24
  98:25 99:6,14,15
  112:2 114:24
  119:14,22 120:11
  131:23
paragraphs 95:18
  115:19 119:21
  134:20

parameters 83:12
part 10:18 12:12
  20:16 21:2 33:17
  34:10 44:1 59:20
  60:8 64:15 74:20
  87:25 89:24 93:12
  93:13 108:14
partially 13:11
participate 67:2
participated 8:11
  23:15
participation 71:4
particular 77:1,23
  106:12
particularly 10:17
  52:2
parties 134:19,22
  137:13
partner 126:23,23
Partners 23:18
  24:19,25 119:19
parts 14:15 21:9
  103:22
party 64:5 82:16
passed 72:19
passive 58:21
Patrick 22:13,14
  34:5 49:21,21
  50:3,5,20,21 51:7
  51:17
Patricks 22:12
  53:10 54:2 87:20
pause 54:21
pay 13:23,24 18:25
  19:2,20 31:6,9
  38:14 44:7 65:2
  65:24 66:4 67:1,3
  69:15 74:11 75:7
  75:23 76:21 77:13
  78:10,14 83:23
  84:3,7 86:3 88:16
  89:16 90:24
  101:19 102:4
  103:21 104:10,11
  128:10,13 129:7
payable 12:7 95:2
paying 67:22 74:15

86:13 88:23 90:5
  90:24 101:25
payment 38:7,10
  64:9 77:5,5 84:20
  91:18 104:24
  105:11 106:6,6
  128:25
payments 83:16,19
  84:18
peak 22:17
pen 86:8
penalty 133:16
pending 35:22
pension 125:8
people 7:8,13,20
  10:6 13:6 14:2
  16:10 17:3,16
  35:12 42:21 48:12
  48:12 49:4,19,20
  52:9 63:3,11
  68:10,19 69:7
  72:20 74:25 75:1
  76:23 77:2 85:25
  94:19,22 98:19
  103:7 105:19
  108:24 115:10
  118:12 122:10
  125:6
percent 13:10
  24:17 56:5,20
  58:22 65:2,4,6,24
  66:7 69:15,16
  77:12 78:3,11,15
  78:23 89:16,17
  100:15 106:7,11
  131:18 132:16,16
percentage 64:16
  65:5 71:4,20
  72:15 101:23
  102:5 128:10
period 22:3 37:19
  42:4 82:2 85:18
  132:11 134:25
perjury 117:1
  133:16
person 8:21 10:25
  11:8,10 13:7

14:12,17 18:7,22
  20:17 33:8 38:19
  42:7,12 61:21
  63:7,15 64:7
  65:22 69:14 73:17
  75:16 77:2 89:2
  103:14 105:4
personal 13:11
  19:16 125:18
  126:6
pertained 116:3
pertaining 77:8
Peter 6:11,18 19:18
  21:7 23:12 26:6
  34:6 45:11 49:22
  50:3 51:18,24
  54:17 56:7 64:6,7
  69:5,6,14 70:2
  73:10,13 88:19
  93:7,8 128:17
phone 115:13
picked 40:20
piece 129:20 130:3
pieces 103:15
Pieter 2:10 4:16
  25:16 45:24 54:20
  57:16 71:25
Pignatti 1:8 3:1,7,8
  3:9,10,11,12,13
  3:14,15,16 4:4 5:2
  5:5 6:3 14:23
  15:21 32:25 34:22
  36:6,10 43:22
  46:9,11,13 49:24
  50:1,2 54:20 62:2
  62:3 70:10 77:17
  77:21 79:11 81:3
  92:3 98:12 101:7
  102:12,13 110:24
  111:3,11 114:11
  114:24 119:3,18
  128:4 134:15
  135:1 136:4,12
  137:8 138:2,24
Pignatti's 36:3 46:6
Pignatti-Morano
  36:8

**place** 4:9 19:8
56:12 101:12
**planning** 55:2
**plans** 122:7
**play** 18:21
**please** 4:11,25 6:4
6:9 11:14,23
14:23 15:25 16:24
33:3,21 50:11
108:23,25 112:4
**pledge** 49:16 55:8
**pledged** 21:18
**plus** 22:16 27:12
103:25
**pocket** 67:24
**point** 8:15 26:9,11
35:19 43:15 55:2
55:24 56:10,22
57:7 61:5 63:13
63:21 77:10 82:22
87:2,25 98:2
103:25 107:23
109:22 127:25
130:9 132:22
**points** 93:20
117:21
**policy** 76:7
**politics** 65:23
**pool** 19:9 64:17
**pooled** 52:17 89:14
**portions** 134:24
**position** 5:23 10:7
24:6 31:17,19
36:20 50:16 57:10
57:11 66:14 96:10
105:15
**positions** 5:22
**positive** 44:3 60:22
91:2
**possess** 20:13
**possessed** 39:14
**possession** 40:7,11
**possibility** 12:16
17:14 58:13
**possible** 60:18
132:7,10
**possibly** 28:3

**post** 20:13 31:11
61:23 76:2 125:17
**posturing** 28:8
**potentially** 118:14
**power** 62:19
**powers** 9:18,23
66:22 86:12 91:1
91:2
**practice** 20:4 76:5
**pre-agree** 82:25
**pre-approval**
129:22
**preferred** 18:17
**prepare** 37:5 44:6
**prepared** 29:16
37:4 52:22 115:15
**present** 18:8
**presentation** 104:8
**presented** 30:9
**presenting** 30:10
**pretty** 37:7 96:4
107:15 109:12
**previous** 10:4
45:23 63:1 85:15
95:8
**previously** 33:22
129:14
**price** 55:21 76:8,13
76:16
**Pricewaterhouse...**
119:11
**primarily** 111:25
**principal** 42:3
52:10,13 65:9
103:7 105:14
**prior** 12:11 14:7
27:7 44:22 45:2
59:9,25 82:20
115:13 116:12
118:3 132:11
**private** 5:19,25
23:3
**privatization** 85:16
**privy** 118:17
**probably** 7:18
13:16 29:18 41:11
50:19 61:10 66:12

85:14,14 88:13,13
92:23 113:4
129:21
**proceed** 5:1
**proceedings** 136:5
**process** 10:5
127:10
**produced** 110:20
**profit** 89:12
**profitability** 58:24
59:1
**profits** 64:4 128:6
128:10,14 129:10
133:1
**project** 16:7
**projects** 96:6
**promoted** 5:15
68:21
**Prop** 52:12
**proper** 25:16,22
130:7
**proponent** 14:4
24:16
**proposal** 27:22
**proposed** 53:23
**pros** 30:7
**protective** 134:20
**provide** 20:9 29:8
84:13 88:2 90:7
90:10 96:12 102:1
132:10
**provided** 29:7,8,23
31:12,20 44:22
48:8 77:12 78:3
84:19 111:22
119:23 134:1
135:1
**provides** 83:22
**providing** 14:19
54:17 58:7
**provision** 84:6 99:6
99:11 100:2
131:10
**provisions** 83:6
**public** 22:4 87:9
107:15 109:12
110:11

**punt** 30:19
**purchase** 27:23,23
57:24
**pure** 61:13
**purpose** 31:22
79:18
**purposes** 60:10
**pursuant** 84:13
134:19
**pursue** 111:22
**put** 25:12 45:19
49:12 92:23
103:18 114:21
**putting** 77:3

**Q**

**qualified** 66:12
**quarterly** 12:14
**question** 9:12
27:14 35:6,7,7,21
35:22 47:18 51:24
54:21 108:4,20
109:2,6,12,21,24
115:5,8 123:24
125:1,2 128:9
**questioning** 34:18
**questions** 32:25
34:24 35:4,17
57:17 128:1,3
134:4,14
**quite** 10:6 56:16
68:14
**quorum** 51:15 53:8
**quote** 64:15

**R**

**R** 2:1
**range** 49:24 65:4
**ranks** 8:17
**ratify** 85:24
**reach** 51:15 89:13
**reached** 58:11,18
71:16
**read** 32:15 50:9
62:13 100:13
108:25 111:16
124:7 130:24
136:4

**ready** 46:11 79:2
**real** 6:1 29:22
**Real-time** 1:19
137:6
**realistic** 18:24
**reality** 102:2 112:6
**realization** 119:25
**realized** 63:13 91:1
128:6 129:11
**realizing** 32:12
**really** 7:8 22:23
24:15 31:17 41:22
43:21 44:3 47:20
57:18 59:25 66:23
82:25 85:22,22
86:16 87:20,25
93:13 99:25
104:21 126:11
**reason** 33:14,17
48:9,16,18,25
76:22
**reasonable** 114:17
**reasons** 70:21
**recall** 12:22 13:9
24:22 25:3,19
27:11 28:12 47:24
89:5 95:11 97:19
97:22 102:10
112:17 115:24
**recalled** 118:8,9
**recap** 132:19
**receive** 103:25
108:16 134:22
**received** 16:18
40:14,17 46:17
68:5 75:10 108:12
110:7 115:13
128:13
**recognize** 26:14
**recollect** 40:21
41:19 95:21
**recollected** 43:25
**recollection** 25:14
25:24 40:7 41:21
41:22 123:2,8
**record** 15:11,12,13
15:18 32:17,22

70:1 71:25 79:3,8
92:5 111:17 115:7
115:8 127:12,18
127:23 133:12
134:7,12,16 135:5
137:10
**records** 33:19
114:18
**recover** 51:9
**recovered** 43:11,12
43:17
**recovers** 125:23
**recovery** 44:3
52:12 60:19
110:15
**reduced** 95:9
**refer** 131:19
**reference** 112:3
114:25 115:9
**referenced** 13:1,2
**referral** 66:25
**referred** 27:15
84:15
**referring** 25:2
48:17 74:3 102:23
104:12 120:14,18
130:13
**refers** 86:11
**refinanced** 107:6
109:2
**reflects** 91:16
112:5
**refresh** 25:24 40:7
123:2,8
**regard** 119:24
**regarding** 41:5
67:5
**regardless** 75:3
**regards** 26:25
**regularly** 39:18
**regulated** 62:12
129:5
**reimbursements**
129:3,3
**reinvest** 31:23
**reinvested** 32:10
74:7

**rejected** 27:2
**rejuvenate** 18:14
**related** 78:4 137:12
**relating** 132:12
**relation** 84:14
**relations** 126:24
127:3
**relationship** 8:2
14:17 21:20 38:17
53:19 55:20 62:11
68:19 83:10 104:5
126:20 127:5,11
**relationships** 10:19
**relatively** 53:10,20
63:11 124:9
**relaying** 16:6
**relocated** 5:15
**rely** 30:4
**remain** 134:18
**remained** 23:5
42:11,21
**remains** 125:3
**remarking** 45:25
**remember** 16:2
17:15,20,21 18:18
20:7 27:6,8,22
29:3,7 30:9 33:6,7
34:13 38:9 41:8
47:3,19 48:9
50:23 51:6 53:1,8
54:1 58:2 59:10
66:7 71:21 87:11
87:12 95:24 96:19
103:4 108:9
113:25 116:2
117:12 118:12
123:1 131:2,6,14
132:20,21
**remembered** 38:4
38:21 39:14 41:23
116:4
**remembering**
41:23
**remind** 24:24
27:10 37:7
**remove** 45:20
**remunerate** 63:5

76:11
**remunerated** 63:14
64:23 66:19
122:12
**rendered** 105:14
**renegotiated** 90:21
**renew** 114:4
**renewed** 131:13
**renewing** 114:12
114:16
**repaid** 106:14
**repeat** 9:12 18:5
19:7
**rephrasing** 128:9
**report** 6:4,5 11:18
13:19 14:6
**reported** 51:8
**reporter** 1:18,19
6:20 11:20 14:25
15:2 18:5 26:5
33:23 35:9,13,16
36:5 41:13 43:21
43:24 45:16,22
77:18 81:1 92:2
108:23 109:1,20
110:1 137:1,6
**reporting** 23:5
92:16
**repossess** 118:11
**repossessed** 90:17
**repossession** 54:12
**represent** 4:12
25:23 54:4 81:5
**representative**
56:11
**represented** 44:11
54:15
**Republic** 13:10
**reputation** 52:4
**request** 18:24
24:18 25:25 27:20
47:5 96:16 97:3
101:6 114:16,17
115:17,23 118:3
119:23 129:23
**requested** 27:1
38:6 95:21 97:2

114:3
**requests** 114:4,21
**required** 20:12
21:13
**requires** 84:12
**resolution** 48:15
**resolved** 125:6
**respect** 111:22
**responded** 19:3
116:10
**response** 63:20
71:11 72:5 73:7
116:11,22,25
117:11
**responsibilities**
5:21 42:24 80:4
**responsibility** 42:6
50:6,11 61:22
80:1 105:3
**responsible** 5:19,23
8:21 13:7 16:23
37:19 42:2 43:3
47:21 85:2 98:2
103:8
**rest** 35:20
**restate** 130:1
**restrictions** 80:8
**result** 49:11 108:16
110:8,15
**resulted** 52:16
107:18 109:15
133:2
**retain** 56:23 60:21
93:13
**retained** 60:9 61:1
73:6,23 88:9 90:3
126:18,18
**retainer** 64:3 83:23
90:6 91:14 93:2
126:14 131:17
**retainers** 10:9
**retaining** 27:3
48:18 52:23 54:4
56:22 63:10
**retention** 79:23
**retired** 88:8
**retrospect** 30:1,2

30:24 60:14
**revenue** 64:10
88:25 106:13
**revenues** 19:11
64:15 65:25 66:17
78:4,11,15,24
86:13 91:18 106:7
106:12
**review** 96:12
**revisited** 90:18
**rewarded** 120:4,12
**rewarding** 120:23
**rich** 125:17
**right** 12:16 25:20
30:3 68:18,21,25
79:13 84:1 87:19
87:21,22,22 96:13
96:24 97:13 99:23
100:6 101:17
107:3 116:16
117:3 119:2 131:3
132:18 134:14
**right-hand** 6:6
**risk** 65:8 129:23
**risking** 66:22 117:1
**rival** 28:3
**Robatyn** 7:23
**Roggero** 93:15,16
93:22 94:8,10
96:20 97:16
100:24
**role** 12:18 24:12
41:20 48:4 51:6
58:23 77:25 93:17
93:18 95:25
101:24
**roles** 8:6
**roll** 14:22
**rolled** 92:25
**room** 35:20
**root** 69:17
**roughly** 37:13
**Rouner** 15:22 16:4
33:4
**Ruggero** 39:6,7
111:4
**rules** 34:25

run 55:23
running 23:3 29:20
105:8

**S**

**S** 2:1
Sachs 27:25 68:16
90:22
Safreno 7:24
saga 43:16
salaried 122:6
salaries 125:8
Salary 122:7
sale 21:5 22:24
44:22 56:15 64:21
67:12,16,18 71:5
71:17,17 72:15
91:4 106:13
sang 28:22
sat 9:17 14:5 88:20
saw 36:12 49:20
53:6 56:16
saying 16:17 17:6
24:17 28:1 30:10
57:1 69:14 71:16
75:13,17 77:10
103:10 112:23
114:20 117:24
131:16
says 6:6 7:4 9:16
16:19 34:8 36:13
50:10 62:16 70:16
71:1 80:12 81:14
81:25 82:8 105:24
111:17 112:2
132:3 133:15
scale 19:7 65:6
66:21 77:12
scanned 112:7
Schmitz-Morkra...
22:13 34:5 49:21
50:5 51:7
Schwarzman 119:9
scope 33:11 50:6,11
SCOTT-BRYAN
2:21
search 40:18 78:18
78:22 114:18

seat 53:21,21
second 12:10 26:21
27:23 62:4 66:2
70:24 82:4 103:2
114:24
section 12:5,9,10
12:24 13:1 82:8
83:15,16 84:11
94:24,25 95:5
99:1,2
sector 10:14 16:24
17:4
secure 55:6
securing 66:11
86:4
see 6:5,23 7:5 11:25
12:3 15:21 17:15
26:17,19,21 31:2
32:15 33:8 34:8
36:14 44:13 50:7
51:14 63:1 70:14
70:19 71:6,15
72:7 73:18 74:13
78:8 82:7,7,18
83:2 84:24 86:16
88:5,24 89:23
90:6 92:9 99:7,16
99:19,23 102:18
112:10,20 113:9
116:12,14,23,24
117:3,8 120:8
123:13,19 129:14
seeing 33:6 34:13
seek 14:7
seeking 88:1
104:23
seen 36:9 64:6
77:21 103:12
segment 16:24
seized 27:17
seldom 10:7
sell 55:25 58:13
60:4,6 70:22 91:5
105:14 106:5
selling 23:1 55:3
60:11 70:18
105:15

send 47:1 53:21
101:1 104:23
112:7,24
sending 33:6 47:6
sends 86:17 117:8
senior 8:1 10:6,18
14:16 16:6,14,18
19:10 22:15 24:6
31:2 42:12,21
48:12 49:4 52:9
53:14,23 61:7
62:12,21 63:2,23
69:20 70:17 76:23
77:1,25 87:17
88:7
sense 23:23 35:15
46:1 76:2 85:22
88:13 96:4 98:1
100:12 101:25
106:14 116:6
125:14
sent 33:9,11 36:11
40:14,17 46:15,20
46:25 47:14 70:9
86:8 90:22 100:21
112:12 113:17
sentence 75:9
80:12 125:14
132:3 133:15
separate 11:18
43:3 91:23 94:13
serve 8:5
served 112:1
server 40:11
100:20
servers 118:16
service 78:2 88:8
102:1
services 19:8 62:6
76:9 84:13,19
88:9 91:16 105:9
105:13 111:21
servicing 88:17
session 92:18 96:8
set 45:15 79:18
95:8 126:5 137:9
137:15

settle 86:18 123:16
settled 122:17,21
123:21,25 124:11
124:22 125:10
severance 93:12
shake 35:12
Shane 2:10 4:13
shape 68:20
share 48:13
shareholder 22:1
55:11,13,17 58:15
107:23 109:22
shareholders 27:11
107:19 109:19
shares 21:12 27:17
48:18 49:10 57:24
58:8 87:2,3 110:4
122:7
sharing 64:4 89:15
103:13 106:12
sheet 5:24 60:25
61:11 64:9 65:10
138:1
sheets 21:13
Sherratt 15:1
19:18 21:7 23:12
34:6 49:22 50:3
51:18,24 54:17
56:7 64:6 69:5,6
73:10 87:20 88:19
93:7 128:17,19
Sherratt's 6:11,18
11:16 15:7 26:6
33:24 45:11 70:2
73:13 102:10
short 68:23 90:4
shots 22:1
show 60:19 98:8
showing 44:7
shown 129:14
sic 12:19,21
side 7:9 21:7 23:3
23:12 37:15 49:22
68:21 69:6 80:8,9
83:14 85:20 89:4
94:18 103:7
129:15

sided 31:3 62:13
76:3 82:24 83:11
85:7
sign 9:5,7,18,23
18:14 46:15 73:14
105:3 117:1,2,25
signature 47:8
112:25 119:6
signatures 93:23
signed 9:13 36:8
37:24 40:9 69:10
81:18,23 85:1
100:22 101:1,25
112:7 113:11
130:16 136:11
significant 23:14
98:5
signing 14:7
similar 31:12,15,15
94:16 97:24 98:25
99:1 100:6 104:23
single 13:17 16:9
single-handedly
56:21
Sir 25:4
sit 34:23
site 65:22
situation 16:20
17:20 30:2 56:9
61:23 67:12
situations 10:19,20
75:14 93:10 97:15
six 6:14 77:10
size 72:9 93:2
Skip 14:1
slanted 133:22,25
Sleigh 50:4,24
slightly 21:22
small 71:20 103:1
smallest 125:15
smooth 55:19
smoothly 56:9
social 127:5
socialized 68:9
sold 59:20 60:8,15
72:9 75:21 106:23
106:24

**sole** 31:5
**Soloman** 8:13
**solutions** 88:2
**soon** 72:1
**sorry** 4:16,18 18:5
  19:15 25:5 41:13
  68:8 70:13 80:23
  105:23 111:13
  114:7 126:17
  132:15
**sort** 8:17 18:14,21
  18:22 19:6 21:23
  23:6 24:12 38:25
  41:19 44:14,21
  52:10,19 66:4
  73:17 117:12
  122:14 126:13
  127:9 129:18,23
  131:15 132:12,14
**sounded** 32:1
**sounds** 32:16 57:3
  66:9 75:18 92:20
  106:18
**sour** 52:15
**Southern** 1:2 4:6
**speak** 13:20 29:9
  37:9 39:17,18
  89:22 97:9
**speaking** 74:21
**specific** 9:23 16:6
  17:25 18:13 24:7
  24:23 30:25 65:3
  84:4,14 122:15
**specifically** 8:23
  14:14 27:1 37:21
  37:24 44:20 69:3
  90:4 122:4 123:3
  130:6
**specifics** 12:14
  63:17
**specifies** 71:19
**specify** 64:2 80:8
  80:11
**specifying** 129:6
**spells** 103:12
**spelt** 83:13
**spend** 16:13 18:2,7

54:9
**spent** 7:19 10:15
**split** 28:11
**spoke** 39:10 41:9
  68:8
**spoken** 39:1,19,22
  39:23 40:2
**Spotted** 12:2
**ss** 137:3
**staff** 120:2
**stage** 58:11 71:16
  113:4 129:24
**stages** 27:8
**stake** 21:18,23,24
  27:9,19 54:12
  55:3,6,8,25 56:3
  59:21 60:4,6,9,11
  60:13,16,21 61:1
  72:9
**stamped** 112:25
  119:1
**standard** 65:4 80:7
  83:4,4,5,6
**start** 5:5 14:21 17:6
  18:4 20:17 36:2
  53:17 87:19
  119:19
**started** 5:14 90:16
  90:20 110:1
**starts** 81:15 111:1
  111:8 113:18
**state** 4:11 62:4
  134:16 137:2
**statement** 27:5
  68:24 117:2
**states** 1:1 4:5 84:11
  119:22 123:15
  133:17
**stay** 10:9 20:16
**stayed** 31:6
**step** 53:2 59:11
  93:10 105:7
**Stephen** 50:4
**stepped** 23:10
  59:16 73:19
**stepping** 12:12
**steps** 29:18 53:2

120:6
**Steve** 34:5 50:5
  51:6
**stipulated** 128:9
**Stonberg** 102:14
  103:16
**stood** 28:25 29:15
**stop** 68:7
**stopped** 42:5
**store** 100:25
**straight** 68:7
**strategic** 20:15
**strategically** 28:7
**strategy** 93:14
**string** 70:5,8
**strong** 10:17 28:19
  68:22
**strongly** 70:18
**structure** 59:6
  122:15
**structures** 120:21
**struggling** 43:21
**stuff** 25:20
**subject** 12:17 24:23
  50:6 102:17
  117:16
**submission** 112:13
**submitted** 26:12
  45:10 62:2 112:18
  113:11 118:20
  119:8 120:10
  121:3
**submitting** 121:16
**Subscribed** 138:21
**subsequent** 129:16
**subsequently** 27:19
  48:3
**substance** 50:19
**substantial** 113:2
  129:2
**success** 48:2 64:3
  64:11 74:11,16
  77:11 86:16 122:5
  128:6,19 129:4
**successful** 63:10
**sudden** 20:20
**suffered** 32:11

**sufficient** 58:12,14
**suggested** 47:15
  53:4 93:12 114:10
**suggesting** 53:8
  72:10
**suggestion** 27:2
**suggestions** 46:22
  61:18 114:10
**summer** 41:17
**sums** 124:10
**supervise** 52:11
**supervising** 52:12
**supervision** 22:17
**supplemental** 26:3
  26:8
**support** 121:7
**supported** 94:22
**sure** 4:18 7:10 16:1
  16:14 22:5,7 25:6
  28:21 32:2 33:2
  35:9,10,13 36:12
  40:16 41:15 42:14
  45:8 54:21,24
  58:5 65:13 66:25
  71:8 93:22,24
  94:14 96:21 97:13
  104:13,19 107:16
  107:21 109:13,18
  114:4 133:11
**suspect** 70:17
**sustain** 111:24
**swear** 4:25
**sworn** 3:1 5:3
  137:9 138:21
**system** 18:21

———————
**T**
**tactics** 31:21
**take** 12:12 30:19
  32:14 35:13,19,21
  45:9 50:2 57:2,10
  73:10,15,20 75:19
  83:15 91:25 99:10
  105:21 110:19
  112:19 115:18
  116:10 122:25
  125:22 127:13,15
  134:5

**taken** 1:12 15:16
  31:1 32:20 49:8
  51:3 79:6 120:6,6
  127:21 134:10
  136:5
**takes** 85:8
**talk** 35:16 37:3
  38:6,22 39:3
  54:10 65:5 80:22
  96:1 101:9 107:3
**talked** 38:10 39:7
  132:19
**talking** 14:13 17:1
  23:10 39:15 40:21
  59:9 110:2 114:14
  124:17 133:8
**tangentially** 61:6
**tangible** 88:14
**task** 51:8 56:2,2
  61:5,8 73:14
**Taussig** 7:24
**tax** 7:9 60:10
**team** 8:11 14:14,15
  16:4,17 18:6,7
  19:11,12 22:12
  28:10 49:11,11
  50:22 52:7,17
  53:5 56:8 57:5
  63:3 85:20 93:1
  96:6 98:19
**teams** 13:12,19
  16:5 18:1 27:24
  28:5,14,15,16
  29:15 90:11,17
  97:10
**technical** 7:8
**technically** 28:3
  53:11 60:9,18
**tedious** 85:11
**Tele** 22:9
**telecom** 85:16 88:6
**Telekom** 12:19
  13:9 84:3 85:14
  86:18 100:14
**telephone** 78:1
**tell** 7:18 9:22 35:5
  37:21,23 53:12

63:5,8 76:16 91:2
96:9 99:25
**telling** 68:6 98:1
108:1 109:25
**tells** 125:5
**ten** 17:4 32:14
39:15 53:1 100:8
106:7 115:24
134:23
**tended** 19:16 53:6
**term** 79:22 122:7
**terminate** 82:16,20
**terminated** 82:6
83:3
**termination** 82:21
**terms** 10:19 11:6,9
11:10 16:25 29:19
31:15,21 38:10
53:20 55:7 60:14
79:19 84:18,21
95:6,7 106:25
**testified** 5:3 79:11
92:11 101:11
128:16
**testify** 25:13
**testimony** 133:22
134:1,17 135:1
136:5 137:10
**text** 50:9 103:1
111:9 112:17,20
112:24 113:12
117:13,15,17
**texts** 114:2 117:13
**thank** 11:18 34:17
34:22 35:25 54:25
56:4 63:8 68:15
69:23 74:1 75:13
75:17 101:6
130:18
**thanks** 68:16
118:25
**theme** 46:18 48:10
**theoretically** 21:23
**theory** 56:11
**thereof** 136:6
**thing** 16:9 21:23
28:23 40:19 43:6

48:1 66:15 81:13
90:9 103:4 118:9
**things** 12:18 23:16
25:10 28:25 29:15
39:15 40:20 46:23
47:20,22 53:9
54:11 55:23 59:2
61:19 69:22 71:3
72:14 76:5,6
85:13,18 91:11
95:13,14 96:23
105:2 108:10
115:14 116:4
121:2 124:4
**think** 5:11 9:6,15
12:17,20 20:24
22:17 23:9,12
25:12 29:9 30:6,7
30:23 31:1 41:11
43:20 45:2 46:22
47:4,13,20 48:1,7
50:24 53:1,3,23
56:19 57:1 62:10
65:19 68:9 72:7
72:19 73:13 74:8
79:2 85:14 87:6
89:9 90:3 92:15
93:9 104:10,21
108:4 109:9 112:6
117:25 118:19
123:24 124:1,24
125:1,15 126:23
127:12,15 128:25
133:9 134:5
**third** 2:11 64:4
120:10 134:19
**Thomas** 2:9,17
4:13,17 8:8 13:20
17:20 18:20 24:23
26:4 28:23 29:5
34:4 50:7,12
65:22 70:9 81:9
90:5 92:8 116:1
117:1 123:16
131:20
**Thomas'** 17:6
21:20

**thorny** 52:3
**thought** 53:13,22
75:15 85:25
124:15 125:4,9
**thoughts** 113:17
**three** 13:21 21:18
27:11,16 29:18
39:2 56:8,15
57:22 58:18 68:8
70:5 89:15 115:19
119:21
**thrown** 106:3
**time** 4:8 5:17 10:7
12:13,18 15:13,18
16:3 18:23 20:13
20:14,17,17 22:3
22:9,15,22 23:2
23:22 27:21,25
28:12 29:1,8,21
30:1 31:1 32:17
32:22 35:21 36:16
37:7 38:1,5,19
40:12 41:9,12,20
42:2,4 45:1,3
47:21 50:21 51:17
52:21,22 53:4
55:2 56:2 58:7
60:20 61:1 63:1
66:13 71:21 72:24
79:3,8 105:6
106:2 108:23
110:3 127:18,23
132:13 134:7,12
134:25 135:5
**timeframe** 45:7
**times** 13:21 18:10
24:5 66:16 68:1
74:4 128:12
**titled** 95:2
**today** 4:8 34:23
36:19 37:4 133:23
**Today's** 4:7
**Tol** 2:10 4:16,16
25:16,16,21 45:24
46:8 54:20,20,25
57:16
**told** 9:21 19:14

36:18 37:13 50:19
76:2 77:4 88:14
134:2,3
**Tom** 38:22 39:1
50:4 52:6,9 70:6
73:1,5,6 74:21
94:23 105:18
**tomorrow** 114:24
**tools** 90:25
**top** 11:25 17:4
34:11,11 52:11
61:22 70:6 111:2
113:19
**topical** 61:19
**topics** 19:22
**total** 71:17
**totally** 82:24 83:11
83:13 85:7
**tracking** 16:13
**traction** 18:1
**transaction** 19:25
24:8 27:10,12
31:13 58:10 60:8
62:17 65:15 66:10
67:4,16 77:11
78:4 84:4 98:6
101:12 103:16
104:13 108:11
128:23 129:7,15
129:17,20
**transactions** 7:7
11:7 12:15,20
13:4,8 18:13
23:15 52:3 74:24
84:14 85:8 95:16
97:12 122:16
**transcript** 134:23
**transcription** 136:6
**travel** 64:14 88:23
**traveling** 113:5
**treasured** 68:20
**Trilantic** 119:18
126:18
**troublemaking**
87:14
**true** 34:9 129:9
133:18,20 136:6

137:10
**truly** 17:21
**trust** 55:13
**trusted** 52:11 76:9
**trusts** 54:14
**truth** 14:12 134:2,3
**try** 35:15 36:16
47:11
**trying** 28:21 41:19
47:19 48:23 55:6
69:25 103:1
113:16
**turn** 6:9 7:10 11:23
12:5,23 33:3 82:3
104:1 111:1
123:11 131:23
133:5
**turned** 21:14 52:15
60:21
**Tutrone** 102:14
103:20
**tweak** 28:9
**two** 8:3 12:20 13:22
15:11 19:15 27:8
27:9,15 37:6 40:8
49:3 53:5 65:20
87:20 94:12 98:11
108:24 113:23
115:10 134:6
**type** 16:22 24:15
31:12 46:16
106:11
**typical** 66:15 102:4
**typically** 42:6

---
**U**

**UK** 4:10
**ultimately** 63:22
**umbrella** 121:15
**understand** 29:15
35:4 45:24 46:8
47:18 65:13 68:25
71:8 89:6 98:13
108:15
**understanding** 8:4
10:1,19 29:22
30:2,4 58:18 62:5
62:9,10 80:21

89:13
**understood** 35:8
40:16
**unethical** 69:18
**unfortunately** 22:6
42:3 43:11
**uniform** 45:15
**United** 1:1,15 4:5
133:17
**unquote** 64:16
**unsaleable** 56:3
**unwillingly** 31:20
**upstairs** 88:20
104:16
**USD** 19:15,15
83:24 86:14
**use** 16:6 17:5 18:12
19:11 25:17 32:13
35:14,19 50:13
62:19 63:4 64:19
68:10,16,23,24
85:23 87:6
**usual** 19:6
**utilization** 16:13
**utilize** 63:7 104:3
**utilized** 63:1 66:25
75:15

### V

**valid** 76:22
**validly** 111:25
**valuable** 21:14
59:7,17,19
**value** 28:4 59:24
60:2,14 83:10
104:21
**values** 30:19
**Van** 2:10 4:16,16
25:16,16,21 45:24
46:8 54:20,20,25
57:16
**variable** 64:15
**various** 7:6 13:12
29:5 39:24 40:3
42:24 97:10
**verbalize** 108:5
**verbally** 17:15
35:11 72:23

**verify** 87:21
**version** 46:19,20
112:7 134:22
**versus** 28:10
**vertical** 18:4
**Viaduct** 1:13 4:10
**vice** 5:18 23:5
119:19 122:10
**video** 4:8,9 71:25
**Videographer** 2:22
2:24 4:3,25 15:13
15:18 32:17,22
79:3,8 127:18,23
134:7,12 135:4
**videotaped** 4:3
**Vienna** 65:23
**view** 29:23 30:20
38:22 39:4 43:16
72:23
**VII** 100:3,4 130:21
**Viner** 2:23 4:9
**vintage** 22:8
**vis-a-vis** 123:25
**visibility** 29:19
**visible** 17:1
**Vittorio** 1:8 3:1 4:4
5:2 36:7 119:18
136:4,12 137:8
138:2,24
**voice** 35:14 41:13
43:22
**voicing** 28:1
**VOLUME** 1:9
**volunteering** 54:18
**VP** 22:15

### W

**want** 6:10 9:12
10:2 16:21,22
19:5 32:14,15
34:22,24 36:19
40:16 42:14 45:19
45:20,23 47:7
55:18 57:4,21,21
60:23 61:2 62:1
65:13 68:6 69:24
71:8,17 77:14,23
80:21 87:10 93:14

98:8,10 99:5
101:8 104:22
133:11
**wanted** 5:5 17:21
19:13 28:2 36:12
46:6 47:1,6 63:4
68:21 76:7 90:4
100:13 104:19
**wants** 17:24
**warrant** 18:11
**wasn't** 9:20 10:5
19:12 22:6,23
30:10 34:14 42:10
43:16 64:9 67:19
67:21 71:22 87:24
93:13 100:9 104:1
104:13 105:6
106:18 124:4
130:25 131:1
**watch** 13:10 31:10
44:10,20
**way** 19:2 20:8 30:9
31:7 35:18 42:17
42:18 43:23 49:9
55:23 59:3 90:5
90:22 91:12 94:10
111:18,20 131:11
137:14
**week** 13:21 16:13
**weeks** 13:22 16:12
42:10 68:8 83:3
113:23
**weeks'** 82:17
**Weil** 2:4 4:19,22
36:9
**welcome** 55:16
**Wendy** 2:23 4:9
**went** 10:7 12:14
19:16 21:7 23:11
27:10 37:6 42:9
69:12 90:21 93:1
117:14
**weren't** 7:20 55:24
60:3 61:2 64:22
105:10 132:22
**WHEREOF**
137:15

**whilst** 5:12
**William** 94:5
**willing** 66:4
**willingly** 31:20
**Wilson** 94:17,18
96:20
**win** 123:17
**wiped** 125:9
**wish** 25:15 100:9
**witness** 5:1 25:17
25:23 36:14 57:8
57:11,12 115:7
137:8,11,15 138:2
**wonder** 90:20
**work** 5:5 7:18,20
8:14 10:8,20
18:23 20:10,21
21:5 22:6,11 31:8
49:11 52:5,6 53:5
54:11 74:22 76:11
80:22 85:19 87:15
89:11 103:5
104:15 115:14
122:1 131:12
**worked** 7:13,25
31:1,7 37:14
97:11
**working** 5:6,10
10:15 17:13 22:16
44:15 49:20 52:17
56:11 69:21
129:20
**world** 10:18 83:1
96:11 104:4
**worse** 51:13
**wouldn't** 9:23
13:17 16:8,8,14
18:3 32:5 63:7
68:3,10,16,23
69:17 88:16 89:7
89:23 92:18 93:19
97:6,6,14 100:10
101:1 103:23
106:13 115:17
129:10 132:13
**write** 25:20 77:9
93:19

**writing** 16:9 30:18
75:25 76:18 80:15
82:17 84:18 103:7
**writings** 75:6
**written** 124:23
**wrong** 130:21
**wrote** 46:24 124:21

### X

**X** 31:4 131:18
132:16

### Y

**Y** 31:4
**year** 5:18 19:14
23:9,10 64:12
85:15,17 92:22
95:12 107:4
111:15
**years** 7:19 8:16
17:24 39:2,16
41:19,24 44:15
49:15,18 53:2
56:8 57:22 68:12
100:8 106:15
115:25 127:8
128:11
**yielding** 22:20
**York** 1:2 2:5,12,18
4:6 52:10 94:8,10
137:2,4
**York's** 52:20
**young** 53:11
**youngest** 50:22

### Z

**zero** 13:11 68:4

### 0

**01** 15:19
**08-13555SCC** 4:7

### 1

**1** 3:7 6:15,20 21:1
21:15,16,18,24
23:17 24:17 26:25
27:18,24 28:2,4
28:11 29:20 36:3

36:6 38:1,7,14
39:19,23 41:1,6
42:1 43:6,16,17
44:8,17 45:14,17
48:19 54:5,13
55:3 57:24 58:7
58:24 59:7 65:5
66:6 67:15,22
68:25 69:2,3 75:7
77:12 82:3,6 86:4
87:3,24 88:10,24
89:6,11 90:3,12
90:19,19 91:6,19
95:17 96:16 97:2
97:7,20 104:24
105:11 106:7,13
106:20 107:3,6,10
107:19 108:6
109:2,7 110:4
121:11,13,19
122:2,4 123:4
124:1 136:4
**10** 3:16 19:15 65:2
65:4,24 68:11
69:15 78:3,11,15
78:23 100:15
106:11 113:9,22
116:24 119:3
124:23,24 132:16
**10.1** 82:8,15
**10.3** 82:14
**100** 89:17
**10020** 2:18
**10022** 2:12
**10153-0119** 2:5
**102** 3:14
**1036** 119:1
**11/16/15** 138:3
**110** 3:15
**119** 3:16
**120** 114:25
**1271** 2:18
**128** 3:4
**13** 12:3 14:23 15:21
92:7 119:4 130:17
**136** 136:4
**14** 33:3 111:4,16

113:18 117:9
**15** 68:12 111:13
127:8
**16** 4:7
**16th** 1:10 4:1 136:5
137:16
**17** 125:15
**18** 7:19 127:22
**19** 111:2,2,7 113:19
116:12,22 117:3
**1989** 5:8,9,10
**1998** 5:15 9:1
**1D** 12:24

---
**2**
---
**2** 3:8 45:16,18 46:7
46:9 62:2 65:6
74:2 77:24 84:15
120:1 133:8
**2.5** 100:5
**20** 65:2 111:2,9
113:20,22 116:15
116:18 128:11
**200,000** 83:24
86:14 90:6
**2000** 24:24
**2001** 107:10 109:6
**2002** 8:24 52:22
56:24 57:21 79:12
80:23 81:8,11
82:3 86:25 91:14
95:25 106:15
132:11
**2002/3** 49:15
**2003** 82:6
**2004** 9:2 11:1 12:3
79:13 80:22 91:25
92:7 99:2 100:18
130:11,17
**2005** 15:21 29:3
33:3,22 34:4
57:22,22 70:6,10
77:25 131:25
132:12
**2005/2006** 59:14
**2005/early** 25:2
**2006** 5:17,18 9:1
22:22 25:2 44:25

59:10 65:16 97:24
98:8 99:6,11
100:2 101:12
106:15 107:4,6
108:6 109:3
132:19
**2007** 6:4,5 7:19
11:17 97:24 100:6
102:17
**2008** 90:14
**2009** 5:11
**2013** 111:5
**2014** 119:4 123:13
124:17
**2015** 1:10 4:1,7
14:24 111:16
113:9,12,18
116:11,14 136:5
137:16 138:22
**203** 102:9
**204** 69:25
**22** 11:25,25 12:2
52:22
**222** 49:25
**224** 49:25
**24** 81:11 86:25
102:17 123:11
**25** 56:20 70:10
71:15 89:16
100:15
**25th** 70:12
**26** 33:21 34:4 70:6
123:13
**26th** 70:11
**28** 113:22
**2FG** 1:14

---
**3**
---
**3** 3:9 12:5 36:14
49:24 50:1 67:22
83:15,16 94:24,25
95:5 98:25 99:1,2
120:4
**3.1** 84:15
**3.1.1** 83:22
**3.1.2** 84:2
**3.1.3** 84:6,16
**3.2.1** 84:11 86:3

**3.7** 99:6
**3.9** 99:14,15,18,19
99:21
**3:30** 1:11
**3:40** 4:2,8
**30** 24:17 134:8
**300** 17:16 43:18,20
43:20 106:15
**300,000** 130:5
**31** 92:21 110:21
116:11,13,25
117:5,11
**34** 3:3
**35** 69:16
**350** 94:19
**36** 3:7

---
**4**
---
**4** 3:10 11:21 15:14
15:19 77:17,18
82:16 131:21
**4:00** 15:15
**4:01** 15:17
**4:29** 32:18,19
**4:46** 32:21
**4:47** 32:23
**400,000** 130:5
**42** 12:1
**46** 3:8

---
**5**
---
**5** 3:1,2,11 33:23,24
58:3 70:4 81:1,3
**5:52** 79:4,5
**50** 1:13 3:9 4:10
13:10
**50584** 134:21

---
**6**
---
**6** 3:12 26:5,6 45:11
45:20 46:4 58:3
92:1,3,5 94:25
99:2,15,15 107:5
**6:07** 79:7,9
**606** 6:9 7:16
**64** 92:6
**66** 99:16
**66.3** 130:21

---
**7**
---
**7** 3:13 14:25 15:1
45:13,14 86:19
98:9,12 113:5,6
113:12 127:22
134:8
**7:12** 127:19,20
**7:18** 127:24
**7:30** 134:9
**7:31** 134:11,13
**7:32** 135:5,6,7
**700** 22:18
**700,000** 86:20
**71** 81:14,15
**75** 56:5 58:21
**767** 2:4
**77** 3:10 82:7
**79** 81:25

---
**8**
---
**8** 3:14 19:15 102:11
102:12 106:15
110:20 131:23
134:20
**81** 3:11
**84** 56:20
**875** 2:11

---
**9**
---
**9** 3:15 110:21,22,23
110:24 123:9
134:20
**92** 3:12
**98** 3:13