# EXHIBIT A

Dr. Thomas Marsoner - December 15, 2015

Page 1

1

2              UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF NEW YORK
3        _____

4     In re                        )

5     LEHMAN BROTHERS HOLDING INC., )   Chapter 11

6     et al.,                       )

7              Debtors.            )   Case No.

8        _____)   08-13555 (SCC)

9

10

11

12      VIDEOTAPED DEPOSITION OF DR. THOMAS MARSONER

13           TUESDAY, DECEMBER 15, 2015

14                 9:45 a.m.

15

16

17

18

19         Video deposition of DR. THOMAS

20    MARSONER, taken by Lehman Brothers Holdings Inc.

21    and Lehman Brothers Commercial Paper Inc., at

22    the offices of Hogan Lovells, 875 Third Avenue,

23    New York, New York, before Brandon Rainoff, a

24    Federal Certified Realtime Reporter and Notary

25    Public of the State of New York.

Dr. Thomas Marsoner - December 15, 2015

```
 1

 2                     A P P E A R A N C E S

 3

 4

 5    WEIL, GOTSHAL & MANGES LLP

 6    Attorneys for Lehman Brothers Holdings Inc. and

 7    Lehman Brothers Commercial Paper Inc.

 8          767 Fifth Avenue

 9          New York, New York  10153-0119

10          212.310.8000

11    BY:   DENISE ALVAREZ, ESQ.

12          212.310.8965

13          denise.alvarez@weil.com

14          JACQUELINE MARCUS, ESQ.

15          212.310.8130

16          jacqueline.marcus@weil.com

17          MAURICE HORWITZ, ESQ.

18          212.310.8883

19          maurice.horwitz@weil.com

20

21

22

23

24

25
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2      address.  Please state your address for the

 3      record?

 4           A.     My resident address is number 20 Earls

 5      Terrace, London W8 6LP.

 6           Q.     How long have you lived there?

 7           A.     Since April 2002.

 8           Q.     April 2002.

 9                  Have you had any other addresses since

10      April 2002 or have you been in the same place?

11           A.     Yes, I've always had an Austrian

12      address, known under UK tax law as my domicile,

13      and that address is Andreas-Hofer-Strasse No.

14      43, 6020 Innsbruck, Austria.

15           Q.     Any other addresses?

16           A.     No addresses where one could serve

17      anything on me.

18           Q.     Okay.  Any vacation addresses?

19           A.     I have generally spent my vacations in

20      hotels, on boats, occasionally with friends or

21      relatives.  But certainly no useful

22      correspondence addresses other than these two.

23           Q.     Are there any other addresses that you

24      characterize any other way, any other -- any

25      other place where you have spent your time
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                      MARSONER

 2          Q.    What was your position at Nomura?

 3          A.    At Nomura I was vice chairman in

 4     investment banking and the managing director.

 5          Q.    When did you start at Nomura?

 6          A.    I started at Nomura in June of 2009.

 7          Q.    Where did you work prior to June of

 8     2009?

 9          A.    I was, from April 2001 until September

10     15, 2008, a senior advisor to Lehman Brothers,

11     self-employed senior advisor.

12          Q.    Okay.

13          A.    But I did not advise anybody other

14     than Lehman Brothers during those years.

15          Q.    How did you end up at Nomura?

16          A.    After Lehman went bankrupt, the

17     European and the Asian operations of Lehman were

18     bought by Nomura and a couple of my old friends

19     at Lehman asked me whether I would be prepared

20     to come on board again full-time to help them

21     build things up in the new Nomura world.

22          Q.    Who were those old friends at Lehman?

23          A.    Primarily Christian Meissner and

24     Michael Bonacker.

25          Q.    I'm sorry, what was the second name?
```

Dr. Thomas Marsoner — December 15, 2015

```
1                       MARSONER

2          A.     Bonacker, B-O-N-A-C-K-E-R, who

3     approached me, who had the original idea that it

4     would make sense for me to join them on a

5     full-time basis again.

6          Q.     So Meissner, Christian Meissner was

7     working at Nomura --

8          A.     Yes.

9          Q.     -- as well?

10                And Michael Bonacker was as well?

11         A.     Yes.

12         Q.     You testified that you were senior

13    advisor at Lehman Brothers from April 2001 to

14    September 15, 2008.

15                What were your responsibilities as

16    senior advisor?

17         A.     They were relatively varied and

18    relatively wide.  There was certainly a focus

19    geographically in areas where I was known to

20    have an expertise and speak the language,

21    specifically, of course, Austria, Germany,

22    Switzerland.

23                My last full-time job at Lehman had

24    been head of industry coverage, so all the

25    industry groups reported to me.  Financial
```

Dr. Thomas Marsoner — December 15, 2015

```
 1                    MARSONER

 2          Q.    Have you spoken to Peter Sherratt

 3     about this matter?

 4          A.    I attended, as you will recall, his

 5     deposition.  My communication with him

 6     beforehand you have, and on the way out

 7     exchanged one or two civilized words.

 8          Q.    What about any phone calls with Peter

 9     Sherratt?

10          A.    No.

11          Q.    Have you discussed this matter with

12     Jeremy Isaacs?

13          A.    I once went to see Jeremy around this.

14     This was, I believe, still around the UK

15     proceedings when I had come across my e-mail to

16     Jeremy Isaacs thanking him for the coffee and

17     telling him that the most significant thing I

18     had done for him was F1.

19                So I thought that I'd go see him with

20     my little evidence book, told him my story.  He

21     hummed, you hawed, he told me he would take a

22     look at the book and I have never heard from him

23     since.  And I respected his request for privacy

24     as well.

25          Q.    Had you filed a claim in the UK
```

Dr. Thomas Marsoner — December 15, 2015

```
 1                        MARSONER
 2      proceedings by that point?
 3          A.    Honestly I do not recall whether it
 4      was before or after.  I would assume that I had
 5      gone to see him before I filed the UK claim but
 6      that I'm not sure about.
 7          Q.    Okay.  Did Jeremy Isaacs know that you
 8      expected to be paid by Lehman Brothers Europe at
 9      that time?
10          A.    You have the e-mail.  With that e-mail
11      it was my full intention to prepare the ground
12      for a later claim.  I prepared that ground not
13      only with him but also with Bonacker and also
14      with Dick Fuld in August of '08, but that's all
15      I did.
16                It was well understood, it's
17      understanding, by many at Lehman at that time
18      that I was going to make a claim around that.
19          Q.    It was well understood by Jeremy
20      Isaacs?
21          A.    It was well understood by a whole
22      number of people at Lehman that I would make a
23      claim.  That is why I attached to my thank you
24      e-mail to Jeremy Isaacs what I think is the
25      salient exchange with Tom Bernard.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2         Q.    Did Jeremy Isaacs know that you were
3    going to assert a claim against Lehman Brothers
4    Holdings Inc. or Lehman Commercial Paper Inc.?
5         A.    The way Lehman worked, the way the
6    living Lehman worked, individual legal entities
7    were not considered material.  He certainly
8    understood that I was going to make a claim
9    against Lehman.
10        Q.    At that point you had informed him
11   that you were asserting a claim in the UK
12   proceedings, correct?
13              MR. VAN TOL:  Object to the form, lack
14   of foundation.
15        A.    I told you, I'm sorry, I do not have
16   that time line clear in my head.  I do not know
17   whether, when I went to see Jeremy with my
18   little evidence book, whether I had already
19   filed the UK proceedings or I had not.  I
20   suspect I had not because, as I think about it,
21   it was just an evidence book.
22              I'm not -- I'm not sure about the
23   timeline.
24        Q.    Okay.
25        A.    But we can actually look it up because
```

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2        foundation yet.   That's privileged information.

3                MS. ALVAREZ:   To the extent he

4        reviewed documents in preparation for this

5        deposition, we are entitled to know what he

6        reviewed.

7                MR. VAN TOL:   That's correct, if you

8        can establish that it refreshed his

9        recollection.   That's the test.   You haven't

10       established that.

11       BY MS. ALVAREZ:

12           Q.    Do you remember reviewing documents in

13       preparation for this deposition?

14           A.    I just told you what documents I had

15       reviewed.   I remember reviewing those.

16           Q.    Okay.   Are there any other documents

17       you remember reviewing?

18           A.    I do not remember any other documents.

19           Q.    Let's talk a little bit about Formula

20       One.

21                Please tell us how you came to work

22       on -- start from the beginning -- how you came

23       to work on Lehman's Formula One investment?

24           A.    The origin of the Lehman Formula One

25       contact was when Ruggero Magnoni, Johann Ruppert
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2    and I went, at my suggestion, to the Monte Carlo

 3    Grand Prix in 1998.  I was still a full time

 4    employee of Lehman at the time.  This was the

 5    time when the various Bernie Ecclestone

 6    stratagems first became public.

 7              So I suggested to a number of the

 8    senior people at Lehman that this was likely

 9    going to grow into a business opportunity for

10    Lehman.  Ruggero is a close friend of Johann

11    Ruppert.  Johann Ruppert owned a company called

12    Rothman at the time.  Rothman sponsored the

13    Williams team, and Johann Ruppert and Ruggero

14    Magnoni had long planned to attend a Grand Prix

15    together, so we went there together which is

16    when Ruggero first met Bernie Ecclestone.  I had

17    met Bernie before.  And that is the moment when

18    it all started.

19         Q.    How did that moment lead to Lehman's

20    investment in Formula One?

21         A.    There were a whole number of different

22    transactions contemplated in various ways.

23    Ultimately Lehman financed Leo Kirch, the TV

24    rights entrepreneur and sports rights

25    entrepreneur, in his acquisition of 75 percent
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2     of the -- call it the Bernie Ecclestone company.
 3            Lehman underwrote $300 million of the
 4     $1.6 billion loan.  JPMorgan underwrote the
 5     other 300, and Bayerische Landesbank, the house
 6     bank of Mr. Kirch, underwrote a billion.
 7            Relatively soon after that loan was
 8     given, Mr. Kirch's business went bankrupt and
 9     Lehman managed to enforce the collateral and
10     took delivery at the time of the 17 percent
11     stake in Formula One.  This is about 2002.
12     Q.     What was your role in that financing
13     to Kirch?
14     A.     Luckily for me, none, for the simple
15     reason that I had been asked what I thought of
16     Mr. Kirch and I truthfully responded that all my
17     German banking clients and friends had a very
18     low opinion of Mr. Kirch.
19            So I had no involvement whatsoever in
20     the loan itself, which is probably one of the
21     reasons why, when the loan had gone belly up, I
22     got the call, in that case it was Pignatti, who
23     used the words:  Thomas, we're thinking about
24     intensifying our relationship with you again.
25            I had done as an advisor already, I
```

Dr. Thomas Marsoner — December 15, 2015

```
1                    MARSONER
2    ahead.
3        A.    Yes, of course I refer to the
4    consultancy agreements, but what I really refer
5    to is the whole seven-year period during which I
6    worked seamlessly as a senior advisor to Lehman.
7            Since those were seven years and there
8    were only five consultancy agreements that only
9    ever had the span of one year, there were a
10   whole number of periods in which technically the
11   formal consultancy agreement was not in force.
12   It had expired or whatever.
13           Nothing changed in my dealings with
14   Lehman during the period when those did not
15   exist.  The way it worked was with the rules of
16   the old agreement were carried forward until
17   such time as a new agreement was signed.
18           So this was a seamless seven-year
19   advisory relationship on a for-fees basis.
20       Q.    Those consultancy agreements
21   identified which transactions you would be
22   assisting Lehman with, correct?
23       A.    They identified some but by far not
24   all.
25       Q.    We're going to go through those
```

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2      actually be okay to take a break now.

3              THE VIDEOGRAPHER:  The time is 10:37

4      a.m. and we are going off the record.

5              (Recess)

6              THE VIDEOGRAPHER:  This begins media

7      unit number two.  The time is 10:49 a.m. and we

8      are back on the record.

9      BY MS. ALVAREZ:

10             Q.    Okay, Dr. Marsoner.  I'd like to talk

11     to you a little bit more about your role in

12     Lehman's Formula One investment.

13             I want to divide it up by time period.

14     So between -- before 2005, between 2002 and

15     2004, what was your role on Formula One for

16     Lehman?

17             A.    At Vittorio Pignatti's request, I

18     watched the space very carefully, and when I saw

19     either a pitfall for Lehman or an opportunity, I

20     would either call Pignatti or send him an

21     e-mail.  I think some thirty of those e-mails

22     have been dug out that I have sent to him,

23     sometimes copying Sherratt over the time period

24     between JPMorgan passing on my help and the

25     critical realization and exchange with Tom
```

Dr. Thomas Marsoner — December 15, 2015

Page 46

```
1                       MARSONER
2        Bernard.  So I was, in my self-perception,
3        working on this very regularly.
4            Q.    How often would you speak to Pignatti
5        about Formula One?
6            A.    Depends on -- depends on whether there
7        was anything urgent going on.  When there was a
8        development that looked like it was either an
9        opportunity or a threat, could have been, you
10       know, on a weekly basis.  During quiet periods I
11       might not have spoken to him about it for
12       months.
13           Q.    You mentioned that you copied Peter
14       Sherratt on some of the e-mails.
15           A.    Yeah.
16           Q.    Did you speak to Peter Sherratt about
17       Formula One?
18           A.    If at all, then very little.  The
19       reason he was, my perception, involved in those
20       years is because there were so many little legal
21       pitfalls in the governance structure of F1.  So
22       that for the banks just to go somewhere close to
23       exercising the 75 percent voting power that they
24       had, required very heavy duty legal lifting, and
25       there Sherratt was very involved and very good
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2    and very successful.
 3         Q.    Other than Pignatti and Sherratt, were
 4    you in touch with anyone else at Lehman
 5    regarding Formula One during this time period?
 6         A.    Yes, Magnoni to a much lesser degree.
 7         Q.    Anyone else?
 8         A.    No.  I certainly can't recall anybody
 9    else at this stage.
10         Q.    Did you participate in any meetings
11    regarding Formula One during this time period?
12         A.    Beyond the group that I mentioned,
13    which was primarily Pignatti and Magnoni with
14    whom I would meet periodically, and certainly in
15    those years I cannot recall a single meeting
16    with any of them where Formula One did not come
17    up, also because they had things to share with
18    me that I wasn't so privy to.  The whole Ferrari
19    relationship was one where they were closer than
20    I was.  So we certainly compared notes.
21         Q.    Now, Pignatti was based in Europe,
22    correct?
23         A.    Yes.
24         Q.    So was Magnoni?
25         A.    Yes.
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                      MARSONER
 2   role.
 3        Q.    Do you know where Patrick Bierbaum was
 4   based?
 5        A.    In London, I believe, if not in
 6   Frankfurt.  I do not know.  With him I did not
 7   interact.  Schmitz-Morkramer was originally in
 8   London and then in Frankfurt.
 9        Q.    Okay.  So now let's take us to the
10   2005 time period.
11              What was your role in F1 from 2005
12   forward?
13        A.    In 2005 after a number of not so happy
14   occurrences for the banks, including, which is
15   important here, a complete break down in their
16   discussions with both the teams and Ecclestone
17   in '04, there certainly surfaced first the rumor
18   and then the announcement that CVC had reached
19   agreement with Bayerische Landesbank to buy
20   Bayerische Landesbank's stake in F1.
21              That was huge news because the whole
22   crux of the issue was the longevity of the
23   franchise.  Everybody always knew that F1 was
24   highly profitable year in, year out, but the big
25   risk that everybody saw was that this party
```

Dr. Thomas Marsoner - December 15, 2015

1                         MARSONER

2       could end at any year end, really.  And when I

3       picked up that CVC was going to buy, I picked up

4       at the same time through my Austrian racing

5       connections that Ron Dennis of McLaren was fully

6       supportive of the CVC deal.

7              That was a financially, strategically

8       truly huge development, as Tom Bernard put it,

9       because if you looked at the world championships

10      for the 20 years leading up to 2005, about

11      two-thirds of them were either Ferrari victories

12      or McLaren victories.  So Ferrari versus McLaren

13      was the race.

14             In the Ecclestone years, when

15      Ecclestone was essentially fighting the banks

16      from '02 to '05 after the breakdown in '04,

17      Ecclestone essentially bought off Ferrari.  He

18      knew Ferrari was the team.  Without Ferrari,

19      very difficult to run a championship.  He

20      essentially cut them an annual check for $50

21      million, which remained secret at the time, but

22      with that cash payment he broke Ferrari out of

23      the GPWC consortium.  So the senior team in the

24      GPWC consortium was McLaren.

25             The moment it became clear that

Dr. Thomas Marsoner - December 15, 2015

```
 1              MARSONER
 2     McLaren was supportive of CVC, the big value
 3     impact in Formula One had gone away
 4     automatically.  What used to be -- what used to
 5     be an annual circus had suddenly become a
 6     multiyear circus with corresponding tremendous
 7     uplift in value.
 8              That was my -- I was the first to call
 9     that, certainly at Lehman, and that was my major
10     contribution.
11        Q.    How did you learn that McLaren was
12     supportive of CVC?
13        A.    Originally from the Austrian circles.
14     More specifically it was something like Ron
15     Dennis telling Nicky Lauder telling my uncle
16     telling me.  That was essentially my -- my
17     unique access to nonpublic information.
18              In addition to that, through my
19     watching brief on this for a number of years, I
20     knew fairly precisely which of the racing
21     journalists in which papers had good information
22     and which ones had bad information.  So I could
23     triangulate quite well.
24        Q.    One thing you said a couple minutes
25     ago was that F1 was a big risk -- that it was a
```

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2         their ultimate decision once the -- once the bid

3         was on the table which, of course, it wasn't

4         when I briefed him.

5              Q.    Did Bernard tell you whether anyone at

6         Lehman was advising Lehman to sell its stake in

7         F1?

8              A.    I do not know if it was Bernard, but I

9         was told at the time that the CVC coverage

10        banker, trying to do CVC a favor, was very much

11        in favor of selling to CVC.  CVC was a very

12        important client of the firm, so doing CVC a

13        favor was certainly something that was popular

14        with those who made their living off of the CVC

15        relationship.

16             Q.    Who told you that?

17             A.    I believe it was Pignatti but I'm not

18        sure.

19             Q.    Do you know if Pignatti was advising

20        Lehman to sell its stake?

21             A.    Pignatti was fully aligned with me.

22             Q.    Do you know whether Pignatti ever

23        informed anyone at Lehman that they should --

24        that it was his opinion that Lehman --

25             A.    I'd be surprised if he had been.
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2        Q.    -- should sell it's stake?

 3              You'd be very surprised -- I'm sorry?

 4        A.    I would be very surprised if Pignatti

 5    had advised Lehman to sell.  The -- the

 6    financial impact of this coordination with

 7    McLaren was huge.  You have a one or two-year

 8    cash flow expectation of significant cash flows

 9    that suddenly becomes, given that they are now

10    all in on it, a certainly seven, but probably 14

11    or 21-year proposition.

12              At that moment the value of Formula

13    One multiplied then and there.  That was my

14    call.  Pignatti understood it for sure.  Magnoni

15    understood it for sure.  Bernard understood it.

16    I had heard that there was opposition to it, but

17    it was mathematically so compelling that what

18    could have got wrong is if I hadn't gotten my

19    advice in immediately and if the CVC offer had

20    shown up first, there is a risk that some people

21    trying to curry favors with CVC would have said

22    nice things to CVC that the firm might have then

23    found difficult to retract.

24        Q.    At the point that you were providing

25    this advice, did you discuss with anyone the
```

Dr. Thomas Marsoner – December 15, 2015

```
1                    MARSONER
2    possibility of being compensated for it?
3         A.    I didn't have to.  I was a paid
4    advisor.  Terms were very clear.
5         Q.    Because of the advisory services
6    agreements?
7         A.    Yeah, absolutely, the 10 percent of
8    firm revenues had been set in stone from the
9    outset, and as the Cerberus BAWAG deal showed,
10   which was probably the second most important
11   thing I had done for Lehman, there was no
12   necessity to document that any further.
13        Q.    So Lehman had agreed to pay you ten
14   percent of firm revenues for your advice in
15   Formula One?
16        A.    Absolutely, for the simple reason that
17   those rules existed, were well understood by
18   everybody, and I was asked officially to help
19   out by one of the most senior people in Lehman
20   investment banking, Vittorio Pignatti.  There
21   was nothing further that I needed to do or would
22   have actually been inclined to do.
23             Might Pignatti, in the way he
24   described it, have used the high negotiating
25   power that Lehman had to negotiate me down at
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                      MARSONER
 2    some point in the future, he might well have.
 3    Christian Meissner did not do that in BAWAG
 4    Cerberus, and I'd like to sort of make it very
 5    clear that while I am trying always to be very
 6    constructive, the negotiation that would have
 7    negotiated me down from the well established
 8    general rule never took place, and a bankrupt
 9    Lehman does not have the negotiating power that
10    the living Lehman would have had.
11              So the rules were in place.  I was
12    officially asked to work on it.  That is all
13    that matters.
14        Q.    Where is this general rule that you
15    would be paid 10 percent documented?
16              MR. VAN TOL:  Objection, asked and
17    answered.  You can answer again.
18        A.    Yeah.  In every one of the agreements,
19    the specific one that was in force, the specific
20    one whose rules were in force at the time is the
21    '04 agreement.  It says very clearly 20 percent
22    of the IBD fees, which in the case of M&A fees
23    means 20 percent of M&A fees, in the case of
24    financing fees it means 10 percent of firm
25    revenues, and in the case of holding gains, net
```

Dr. Thomas Marsoner - December 15, 2015

Page 60

                              MARSONER

1

2     of holding losses, it means 10 percent of those

3     net gains.  The contract says that very, very

4     clearly.

5                   MS. ALVAREZ:  Why don't we take a look

6     at it?

7                   (Marsoner Exhibit 4, Multipage

8     document bearing the heading Lehman Brothers,

9     dated 13th February 2004, addressed to Thomas

10    Marsoner, and bearing no Bates stamps, marked

11    for identification)

12    BY MS. ALVAREZ:

13        Q.    So we have marked as Exhibit 4 the

14    letter agreement between Lehman Brothers Europe

15    Limited and Dr. Marsoner dated February 13,

16    2004.

17              This is the 2004 agreement that you

18    were just referring to?

19        A.    I'm just looking at it.

20              (Pause)

21        Q.    I'll represent this was attached as

22    Exhibit C to your motion as you can tell from

23    the header.

24        A.    Sorry --

25                   MR. VAN TOL:  That was for us.  Don't

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2    worry.
 3              (Pause)
 4         Q.    I don't need you to look at the
 5    provision now, I just want to make sure this is
 6    the correct agreement.
 7         A.    Yes.
 8         Q.    And this agreement is dated February
 9    13, 2004?
10         A.    Correct.
11         Q.    Then under the date I see your name
12    and an address?
13         A.    Hm-hmm.
14         Q.    What address is this?
15         A.    This is the house of a friend of mine
16    in Malta where I stayed for a few days in that
17    time period, in the '04 time period.  I have not
18    stayed since.
19              If I may digress, I'll tell you why
20    the first agreement had the Austrian address and
21    the last two had the Austrian address, but the
22    middle two had different addresses.  It is
23    entirely UK tax driven.  In the UK, perfectly
24    legally, for non-UK citizens would distinguish
25    between onshore income and offshore income.
```

Dr. Thomas Marsoner - December 15, 2015

1                    MARSONER

2          Q.    Okay.

3          A.    And it -- particularly in this time

4    period I did not want to have a cosmetic piece

5    of paper out there that suggested that I was --

6    that this income, which was classic legal

7    offshore income for UK purposes, was either

8    Austrian taxable or UK taxable.  Has nothing to

9    do with the substance.  This was just cosmetic.

10              Everybody at Lehman knew where to find

11   me, everybody at Lehman knew both my Austrian

12   domiciliary address and my London residency

13   address, and everybody at Lehman also knew that

14   this was tax cosmetics.

15         Q.    When you say everybody at Lehman, you

16   are referring to your contacts on F1?

17         A.    My contacts there, yes.

18         Q.    So if you look at this agreement, it

19   is between Lehman Brothers Europe Limited and

20   you, correct?

21         A.    I believe the whole Lehman Group is

22   encompassed by it, represented by Lehman

23   Brothers Europe Limited.  You see in line 5 that

24   it says I will provide advice and assistance

25   also to other members of the Lehman Brothers

Dr. Thomas Marsoner - December 15, 2015

```
1                     MARSONER
2              I'll tell you that a few of these --
3       this is not the only one that's cut off, some of
4       the other -- the 2002, I think, and the 2006 are
5       cut off as well, so if you can look for the
6       full, complete copies.
7              MR. VAN TOL:  We'll make the same
8       request to you.
9              THE WITNESS:  Yeah.
10             MR. VAN TOL:  Not to you, we are
11      making the same request to Lehman for a copy of
12      its own agreement.
13      BY MS. ALVAREZ:
14         Q.   Right here -- so it says:  Lehman
15      Brothers shall pay the consultant a fee based on
16      a to be agreed upon percentage of the net
17      investment banking revenue.
18              Was a percentage agreed upon between
19      Lehman and you for F1?
20         A.   The percentage, 10 percent of firm
21      revenues is the default percentage that has been
22      in force at all times during the consultancy
23      period.  It didn't have to be specifically
24      agreed another time.  It was the well understood
25      fee for which I provided my services.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2           Q.    Where does it state in this agreement
3    that 10 percent was the default fee that you
4    would be paid under the consultancy?
5           A.    If you look at all the agreements, you
6    will find 20 percent of IBD fees everywhere,
7    including in this one and the prior ones.
8           Q.    Well, point it out to me.  Where does
9    it say that you would be paid 10 percent as the
10   default role?
11          A.    I'm trying to point out to you that it
12   was the agreed percentage, and the best place
13   for you to see that is probably the Graham
14   Wilson e-mail to me at the end of BAWAG Cerberus
15   which is appended as an exhibit to our motion
16   here.  That is also not specifically captioned
17   in any one paragraph here, but that reflects
18   exactly the rule I just told you:  20 percent of
19   M&A fees, 10 percent of financing fees, 10
20   percent of net holding gains.
21          Q.    So the Graham Wilson e-mail would be
22   the best place to look, not the actual
23   agreement?
24          A.    The Graham Wilson e-mail is the best
25   place to look how, even without a specific
```

Dr. Thomas Marsoner — December 15, 2015

```
 1                    MARSONER

 2      reference in any one of the five agreements,

 3      Lehman Brothers very happily paid the

 4      agreed-upon percentages in a relatively major

 5      transaction when this was a hundred million fees

 6      and -- to Lehman, and nearly ten to me, without

 7      it having been captioned in any one of those

 8      individual points in any one of the individual

 9      agreements.

10          Q.    Other than BAWAG which we'll talk

11      about, what other transactions have you been

12      paid for that are not covered by your advisory

13      services agreements?

14          A.    That I do not currently know.  There I

15      would have to go back to my banking records.

16      Certainly BAWAG was the only major one.  There

17      may well have been smaller ones, but I do not

18      currently -- I do not currently know that

19      offhand.  I certainly know that the two biggest,

20      F1 and BAWAG Cerberus, were not in any paragraph

21      of any individual formal document.

22          Q.    Let's take a look at this paragraph 39

23      that we were just looking at, and it refers to

24      in relation to any other agreed transaction.

25                Do you see that?
```

Dr. Thomas Marsoner — December 15, 2015

Page 73

```
 1                    MARSONER
 2        A.    I never did because I never needed to.
 3     All I did is prepare the ground for such time as
 4     revenues would become visible, which it turns
 5     out only happened in 2012.
 6        Q.    So between 2005 and 2012, you never
 7     put down in writing -- put down in writing how
 8     much you would be paid by Lehman Brothers for
 9     your assistance on F1?
10              MR. VAN TOL:  Object to the form.
11              You may answer.
12        A.    What I did put down in one of the
13     e-mails to Bernard and Pignatti and so on was a
14     sentence to the fact of -- that my senior advice
15     would continue to be available at the usual
16     modest percentage, something along those lines.
17     But that was not the request, that was a
18     statement of fact.
19              My prepare-the-ground conversation
20     with Jeremy Isaacs in 2007 then led to a
21     conversation between Sherratt and me.  As I came
22     out of the room he asked me:
23              How did your chat with Jeremy go,
24     Thomas?
25              I said:  Very well.  And by the way,
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2     the F1 thing that we both worked on looks pretty

 3     good these days, doesn't it, Peter?

 4              To which he said:  Yes, but we've also

 5     had very high costs here.

 6              And I reflected on that a little bit,

 7     actually in fairly great detail, and I ended up

 8     agreeing with him, which you see in the way I

 9     presented my claim:  A living Lehman in reality

10     only got its 300 million that it originally

11     invested in Kirch, plus a little bit of money

12     for interest and costs back.

13              So as long as Lehman was alive, no

14     firm revenues that would have triggered a fee of

15     mine had actually occurred.  My source for that

16     was Sherratt after the conversation with Isaacs

17     and I actually agree.  In fairness Lehman had

18     put 300 in and got a little bit more than 300

19     out but hadn't actually earned any cash before

20     its bankruptcy.

21         Q.    What about -- were you aware of the

22     refinancing that occurred in 2006?

23         A.    That's exactly what I meant with the

24     312 million or whatever the number is that is in

25     my statement of claim.
```

Dr. Thomas Marsoner - December 15, 2015

Page 75

1                           MARSONER

2          Q.    So during -- as a result of the

3    refinancing, the shareholders were paid

4    dividends, correct?

5          A.    The shareholders were paid dividends

6    and Lehman got its 300 million back.  That's

7    right.

8          Q.    At that point did Lehman provide you

9    any compensation for your work on F1?

10         A.    I didn't ask for it.  Lehman had only

11   gotten its money back, 300 in, a bit more than

12   300 out.  It could be argued that after interest

13   Lehman was actually still in the hole on F1 as

14   it went bankrupt.

15         Q.    At that point --

16         A.    There was certainly no profit that

17   would have, in fairness, triggered my fee.

18         Q.    At that point you didn't raise with

19   anyone at Lehman the possibility of getting any

20   of that?

21              MR. VAN TOL:  Objection.

22   Mischaracterizes evidence.

23              You may answer.

24         A.    I very much prepared the ground.  You

25   have the Jeremy Isaacs e-mail.  You now have --

Dr. Thomas Marsoner — December 15, 2015

```
1                  MARSONER

2     apologies, I had not searched for that

3     earlier -- the Bonacker e-mail.  But the history

4     of the Bonacker e-mails, there are actually two,

5     was interesting.

6              Bonacker, who at one point complained

7     to me that young Schmitz-Markramer was running

8     around the firm taking victory laps for F1.  So

9     I said -- and that was difficult for Bonacker,

10    so I sent Bonacker those two e-mails to -- with,

11    I think -- I mean, you have them -- words to the

12    effect of:  Look who really deserves the credit

13    for F1.

14              And then ultimately in August 2008 I

15    went to see Dick Fuld in New York about --

16    originally came to pass, it's in disclosure,

17    that he kindly called me after the Cerberus

18    people had told me, that it was actually I who

19    had done the Cerberus BAWAG deal.

20              And so, longer story, he ultimately

21    invited to come see him in New York City in

22    August of 2008, of all time periods.  That's one

23    of those meetings one doesn't easily forget.  As

24    I walked into his office he hugged me.  I have

25    been relatively close to Dick in the past, but
```

Dr. Thomas Marsoner – December 15, 2015

```
1                    MARSONER

2        we have not really been on hugging terms before.

3                We then discussed a number of things,

4        particularly with my financial institution's

5        hat.  And ultimately he said:  So what else have

6        you been up to?

7                To which I said:  Oh, Dick, in

8        addition to the essentially hundred million that

9        I made you on BAWAG Cerberus and a few other

10       things, by far the most important thing that

11       I've done for you was your F1 investment.

12                To which he -- and I see it in front

13       of me -- used a -- an old fashioned thank you

14       gesture as one does in old movies, followed by:

15       Now, Thomas, you'll forgive me, I have another

16       50,000 things to do.

17                And I left his office.  So that was

18       exactly three weeks before Lehman filed.

19          Q.    And --

20          A.    So -- so -- but I certainly -- also

21       then that was certainly the last prepare the

22       groundwork that I had done.  It certainly would

23       not have occurred to me in any way to ask Dick

24       to pay me a fee, and the chief reason for that

25       was that no revenues were visible.
```

Dr. Thomas Marsoner - December 15, 2015

Page 79

1                          MARSONER

2      revenues never become visible, and then some die

3      and then there is no point in ever putting them

4      in.

5                     In F1, revenues became visible for the

6      first time in 2012.  In May 2012 and in August

7      2012 I made my claim to my contractual

8      counterpart LBEL.

9          Q.    That claim was filed in the UK

10     proceedings, right?

11         A.    It was first just filed with the UK

12     administrator.  It was only after the UK

13     administrator rejected it that I commenced

14     proceedings.

15         Q.    What happened in May 2012?

16         A.    There was a very visible sell down by

17     CVC to a US asset management firm called Waddell

18     Reed who was joined by Blackstone and, I

19     believe, the Norwegian Sovereign Wealth Fund

20     that essentially took half of the CVC stake.

21                     At the same time there was another big

22     refinancing.  The details are in the landscape

23     piece of paper that I attached to my motion.  It

24     was at that point that a valuation of F1 became

25     visible from the outside for the first time.

Dr. Thomas Marsoner — December 15, 2015

| | |
|---|---|
| 1 | MARSONER |
| 2 | And if I may add, Mr. Mackenzie, the |
| 3 | senior CVC partner, in about 2012 in one of the |
| 4 | Bernie Ecclestone legal proceedings, stated |
| 5 | under oath that as late as 2011 he, Mackenzie of |
| 6 | CVC, still thought that his stake may be worth |
| 7 | zero. |
| 8 | MS. ALVAREZ:  Why don't we take |
| 9 | another break. |
| 10 | THE VIDEOGRAPHER:  The time is 11:44 |
| 11 | a.m.  We are going off the record. |
| 12 | (Recess) |
| 13 | THE VIDEOGRAPHER:  This begins media |
| 14 | number three.  The time is 12:09 p.m.  We are |
| 15 | back on the record. |
| 16 | BY MS. ALVAREZ: |
| 17 | Q.   Dr. Marsoner, I would like to go back |
| 18 | and take a look at Exhibit 4 which was your 2004 |
| 19 | consultancy agreement with Lehman. |
| 20 | Is this the agreement you rely —— is |
| 21 | this the agreement you rely on as the basis for |
| 22 | your claim? |
| 23 | A.   It's the contents of the agreement |
| 24 | that I rely upon.  Technically it had, of |
| 25 | course, expired, and technically it was |

Dr. Thomas Marsoner — December 15, 2015

1                        MARSONER

2    just as it was managed when years before I was

3    still a Lehman employee recusing myself of all

4    beer matters and acting only -- and acting only

5    as a principal with Pignatti advising me.

6              We were always very careful to

7    precisely document in those years what I did as

8    an employee and what I would have done for this

9    company.  But, again, it's not material here.

10   It was an offer that I made because I did sense

11   that a staid bank and a shareholder in Formula

12   One doesn't necessarily go together very easily.

13             As we have seen from JPMorgan getting

14   out, as we've seen from Bayerische Landesbank

15   getting out, F1 is high publicity, high drama,

16   not an obvious investment for a bank, although

17   as it turns out, a fantastic one.

18        Q.    Other than your conversations with Tom

19   Bernard and Pignatti, did you have conversations

20   with anyone else at Lehman about whether Lehman

21   should retain its stake in Formula One?

22        A.    During that time?

23        Q.    Yes.

24        A.    Magnoni for sure.

25        Q.    Anyone else?

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2          A.    Through Magnoni, by definition with

 3    Dick Fuld.  Magnoni was closest by far of all

 4    the characters involved to Dick Fuld.  Dick and

 5    Magnoni spoke a lot, so I certainly made sure

 6    that Magnoni was fully apprized of my views at

 7    the time so as to make sure that Dick would know

 8    about it.

 9          Q.    Did Magnoni ever --

10          A.    Dick Fuld.

11          Q.    I'm sorry, I didn't mean to cut you

12    off.

13                Did Magnoni ever tell you that he told

14    Dick Fuld?

15          A.    Oh, yeah.  The history, I think, some

16    of this has been -- has been said in previous

17    depositions, the history of this investment was

18    a personally somewhat difficult one for both

19    Dick Fuld and Ruggero Magnoni, because when

20    originally the Kirch loan was extended, my

21    understanding is that Ruggero proposed it in the

22    European Capital Commitments Committee or Credit

23    Committee or whatever actually turned it down,

24    whereupon Ruggero got on the plane to New York

25    and convinced Dick to do it anyway because it
```

Dr. Thomas Marsoner – December 15, 2015

```
 1                    MARSONER

 2    was so well collateralized, at which point Dick

 3    overruled the committee and Lehman gave the

 4    loan.

 5              When that then blew up, it was not an

 6    easy situation, certainly not for Ruggero, and,

 7    you know, probably even something that Dick

 8    didn't completely disregard.

 9         Q.    Okay.  Then how do you know that

10    Magnoni kept Dick Fuld apprized of the advice

11    you were giving on F1?

12              MR. VAN TOL:  Objection, asked and

13    answered.  Go ahead.

14         A.    Magnoni told me.  Well, I know it from

15    Magnoni, but when I mentioned it to Dick at my,

16    for me, important meeting with him in August of

17    '08, Dick did not sound in the least surprised.

18              MS. ALVAREZ:  I think it might be

19    lunch is there.  Instead of me starting a new

20    subject, might as well take a break.

21              THE VIDEOGRAPHER:  The time is 12:40

22    p.m. and we are off the record.

23                   *    *    *

24              L U N C H   R E C E S S

25                   *    *    *
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2              *    *    *

 3        A F T E R N O O N   S E S S I O N

 4              *    *    *

 5            THE VIDEOGRAPHER:  The time is 1:44

 6      p.m.  We are back on the record.

 7    BY MS. ALVAREZ:

 8        Q.    Good afternoon, Mr. Marsoner.  If we

 9      could take a look at Exhibit 5 which is your

10      declaration that we previously marked.

11            If we could take a look at paragraph

12      ten, you state in the declaration:  I later

13      advised Lehman on Cerberus' acquisition of

14      BAWAG, an Austrian bank, from April 2006 to

15      December 2006 for which LBHI paid me 20 percent

16      of the investment banking revenues generated

17      from the transaction, despite the fact that no

18      formal agreement expressly covered the BAWAG

19      transaction.

20            Do you see that?

21        A.    I see that, yes.

22        Q.    Would you please describe the BAWAG

23      transaction that you are referring to?

24        A.    BAWAG is a significant bank in

25      Austria, the fourth largest, which the owner,
```

Dr. Thomas Marsoner — December 15, 2015

```
1                    MARSONER
2       the Austrian trade union organization, had to
3       sell for a number of complicated reasons that
4       don't matter here.
5               Lehman Brothers advised by me, advised
6       Cerberus on this acquisition which was
7       tactically relatively complicated and required a
8       relatively significant amount of prior knowledge
9       of how the Austrian trade union system worked,
10      how the bank worked.
11              It ended up as a three-party auction
12      where our client Cerberus competed with
13      Bayerische Landesbank and Lone Star, the other
14      US -- it is a distressed debt buying hedge fund.
15              My role, very similar to the F1 case,
16      was one where I really knew the in and outs and
17      the history that had led to the problems that
18      triggered the sale, and so I was able to
19      position Cerberus very early, again, very
20      similar to the F1 case because I saw that this
21      could only be in that case solved by a sale to a
22      new owner, just like F1 in November or so of
23      2005.  Very, very fast paced.
24              It was no time for any sort of legal
25      niceties like drawing big advisory agreements.
```

Dr. Thomas Marsoner - December 15, 2015

1                    MARSONER

2       We had to work in a team.  I contributed my

3       experience, and our client won the bid, was

4       very, very happy with us, actually even -- which

5       I am told is pretty rare in this business --

6       voluntarily increased the fee that Cerberus was

7       due to pay Lehman, and the -- when the closing

8       came around, Graham Wilson, who was the chief

9       administrative officer for Lehman in Europe,

10      essentially sent me an e-mail with a spreadsheet

11      which was part of the record here which totaled

12      up what I was due to receive which is 20 percent

13      of the M&A fee, being 10 percent of the very

14      significant financing fee, and also 10 percent

15      of two principal gains by Lehman, both around

16      swaps, then deducted from that the quarterly and

17      other retainer fees.

18             And I didn't have to negotiate that.

19      I didn't have it in any of the agreements,

20      didn't -- we didn't have to negotiate.  It was

21      just an implementation of the established course

22      of dealings between Lehman and me completely,

23      you know, completely problem free.

24             Q.    Now, you have told me a lot here so

25      we'll take it step by step.

Dr. Thomas Marsoner — December 15, 2015

```
 1                      MARSONER

 2       that was less than 5 percent of it.  Cerberus

 3       bought BAWAG for 3.6 billion Euros, and this

 4       fund that Pignatti ran co-invested 150 million.

 5       So this was a 5 percent co-invest --

 6                 MS. ALVAREZ:  Okay.

 7                 THE WITNESS:  -- that --

 8                 MS. ALVAREZ:  Okay.   Thank you.

 9   BY MS. ALVAREZ:

10            Q.    So if you look at this Exhibit 9, it

11       is an e-mail from you to Jeremy Isaacs dated

12       July 4th, 2007.  The subject line reads:  Thanks

13       for the coffee.

14                 I think we covered this, but I'm going

15       to ask again.

16                 Who is Jeremy Isaacs?

17            A.    He was at the time the chief executive

18       officer of Lehman Brothers in Europe.

19            Q.    Why did you send him this e-mail?

20            A.    Primarily, of course, because I sent

21       thank you notes after people invite me for

22       coffee, and my well disclosed and blatantly

23       obviously visible ulterior motive was, of

24       course, the usual, call it victory laps, call it

25       bragging, call it positioning.  I would probably
```

Dr. Thomas Marsoner - December 15, 2015

Page 112

```
 1                    MARSONER
 2      prefer the word positioning, in which I just
 3      wanted to put on the record that the Formula One
 4      investment that was already looking very good.
 5      At that point in time was really primarily based
 6      on my timely and correct advice that the senior
 7      guy, with all due modesty, in my view correctly
 8      characterized as:  That's huge.
 9               So it was to prepare the ground for an
10      eventual fee claim when and if revenues would
11      become visible.
12          Q.      Did you tell Jeremy Isaacs that you
13      were expecting to be paid for Formula One?
14          A.      This was a coffee with a very senior
15      guy.  He had invited me.  To the best of my
16      knowledge it was very clear to him what I meant
17      both over the coffee and then when I, you know,
18      set it out.  But I certainly remained both
19      polite and there was no reason to jump the gun.
20      Revenues were not then visible.
21          Q.      So, then, at this point in time you
22      didn't say anything to him about -- or you are
23      saying dropping the gun, you didn't drop the
24      gun, you didn't tell him that you expected to be
25      paid?
```

Dr. Thomas Marsoner — December 15, 2015

```
 1                    MARSONER
 2         A.     I think one can say things quite
 3     clearly without putting them prematurely and
 4     impolitely.  I think by appending my claim to
 5     fame e-mails I made very clear what I was
 6     implying here.  But I didn't do more than imply
 7     it, I didn't want to do more, didn't need to do
 8     more.  It wasn't the time.
 9             But I did feel -- I did feel the need
10     to establish with the senior decision makers at
11     Lehman that the way I looked at it, the F1
12     investment was very much my deal.  The reason I
13     was so motivated to make that point at the time
14     was because at least at the time I had come to
15     the conclusion that both Jeremy, chief executive
16     Europe, and certainly Dick Fuld, had heard not
17     from my dear colleagues at Lehman about my role
18     in Cerberus BAWAG, but from the Cerberus guys.
19         Q.     Looking at the text of your e-mail,
20     you identify three transactions, Formula One
21     being the third transaction.
22             The first one you identify is Telecom
23     Austria, right?
24         A.     Yeah.
25         Q.     Was Telecom Austria covered by an
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2    called -- the administrator equivalent of Lehman
3    in the US.
4         Q.    You say in the e-mail that you would
5    like to just find out where you stand on it to
6    see if a project of mutual interest could ensue.
7              What project of mutual interest are
8    you referring to?
9         A.    There were a whole number that were
10   imaginable including, but not limited to selling
11   the stake again.  And I will not -- I will not
12   hesitate to freely admit that a part of the
13   motivation of writing this e-mail was the same
14   motivation that led me to write the Isaacs
15   e-mail, the Bonacker e-mail, the Fuld
16   conversation, just make sure it was widely known
17   that around F1 and Lehman, my hat was in the
18   ring.
19        Q.    Did you inform Bruce Matthews that you
20   expected to be paid for Formula One?
21        A.    Again, revenues were a long way from
22   visible at the time.  Just like with all the
23   other prepare-the-ground conversations, there
24   was nothing that I could charge my 10 percent
25   on.
```

Dr. Thomas Marsoner — December 15, 2015

```
1                       MARSONER
2      to get my LBCC margin balance back.
3           Q.    I want to ask you about a couple of
4      addresses.
5                Do you recognize the address -- and I
6      may not pronounce these right, I probably
7      won't -- Casa Andreas 16 Trig Sant Adrija Lija
8      BLZ10 Morocco.
9                Do you recognize that address?
10          A.    Well, absolutely not.   That is
11     definitely a nonexisting address because it has
12     elements of the Maltese address that is on my
13     '04 agreement, but it obviously also has the
14     country Morocco that is relatively far away from
15     Malta.
16          Q.    So let's focus on the Maltese address.
17                What is that an address to?
18                MR. VAN TOL:  Objection, asked and
19     answered.  You may answer again.
20          A.    That's the address of the house of a
21     friend of mine in Malta.
22          Q.    Okay.
23          A.    Where I happened to be once in the '04
24     time period.
25          Q.    Do you know if a bar date notice
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2    arrived at that house?
 3         A.    I never got anything from that house.
 4    I used, as I described to you, as a non-UK,
 5    non-Austrian address for pure tax cosmetics
 6    purposes.
 7         Q.    Does your friend still live in that
 8    house?
 9         A.    I do not know.  I do not know if he
10    still owns it.
11         Q.    Do you recognize the address Casa
12    Peliganos, Costa Keretas?  Do you recognize that
13    as an address?
14         A.    That I recognize.  That is a house
15    that at one point I had rented in Mexico for a
16    three-week family holiday.
17         Q.    Did you use that address on any
18    contracts with Lehman Brothers?
19         A.    I'm not sure that I used it on any
20    contract, but I would assume that I or rather my
21    secretary must have put it on an invoice or two
22    that I probably sent -- sent to Lehman, where,
23    again, for tax cosmetic purposes I preferred a
24    non-UK, non-Austrian address.
25         Q.    Okay.  What about the address Casa
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2       Carrion Parco, San Giacomo?
3               Do you recognize that?
4       A.    That's the address of a holiday flat
5       of my -- then of my father's, only Garda in
6       northern Italy.
7       Q.    Did you ever stay there?
8       A.    I occasionally stayed there for
9       periods never exceeding a few days and only
10      during the summer.  No mail is received there.
11      There is not even a mailbox or a -- there is not
12      even a sort of a slit in the door where one
13      could put mail in because it would be pointless.
14      Q.    Did you ever include that address on
15      any contracts with Lehman Brothers?
16      A.    I do not believe I put that on a
17      contract but, again, I may well have put it on
18      an invoice.
19               If I was in the general area at the
20      time, I might well have told my assistant for
21      the often enough discussed tax cosmetic purposes
22      to put that address on the invoice.
23      Q.    Does your father still own that flat?
24      A.    My father had two flats in that house
25      which a year ago he gave to his two sons.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER

2    firm made $388,000 in that case, and another

3    principal gain out of a notional interest rate

4    swap by the firm again made $552,000.

5           As per the formula in the '04

6    agreement -- by the way, also know the other

7    agreements -- that principal gain was, again,

8    divided 50-50 between the fixed income

9    department and investment banking, 20 percent

10   thereof, or 10 percent of firm revenues produced

11   the amount that I was owed.

12       Q.    In the third line down in the top box

13   there is a reference to M&A fee.

14           Could you explain what that is?

15       A.    The M&A fee is the mergers and

16   acquisitions fee.  That belonged to the

17   investment banking department alone.  Fixed

18   income had no share in that, and my 20 percent

19   of M&A fees remained 20 percent, so that in this

20   case I was paid nearly 2.8 million Euros out of

21   the M&A fee that Lehman made for Cerberus BAWAG.

22       Q.    Why did you refer to the Graham Wilson

23   spreadsheet several times during your testimony

24   today?

25       A.    Because it shows so very clearly that
```

Dr. Thomas Marsoner — December 15, 2015

1                      MARSONER

2       these percentages did not have to be in any

3       specific formal agreement.  These percentages

4       were agreed between Lehman and me throughout our

5       advisory relationship.  This was not in the '04

6       agreement, this was not in the '06 agreement.

7       It was exactly, like Formula One, governed by

8       the text and spirit of the '04 agreement and, as

9       you can also see in the previous discussion

10      between Pignatti and Meissner not involving me

11      in any way, completely noncontroversial between

12      all of various senior Lehman decision makers.

13           Q.    Let's go back to that exhibit, please,

14      Exhibit 7, the e-mail exchange you were just

15      talking about.

16           A.    Yeah.

17           Q.    Do you see that in this e-mail

18      exchange there is at least two e-mails from you,

19      correct?  There is the original one from you to

20      Mr. Pignatti, and then there is one on page 201

21      from, again, you to Mr. Pignatti, correct?

22           A.    That's right, yes.

23           Q.    I don't see any reference in those to

24      10 percent.

25                 Why did you not say to Mr. Pignatti:

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


- - - - - - - - - - - - - - - - - -

IN THE MATTER OF

    IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL.,

                  Debtors.


- - - - - - - - - - - - - - - - - -

DEPOSITION OF RUGGERO MAGNONI

VOLUME I

Tuesday, November 17th, 2015

AT:  2:30 p.m.

Taken at:

Hogan Lovells
50 Holborn Viaduct
London
EC1A 2FG
London
United Kingdom


CONFIDENTIAL

Court Reporter:

Chris Lang
Accredited Real-time Reporter

Page 2

1                A P P E A R A N C E S

2    Appearing for Lehman Brothers:

3            MAURICE HORWITZ, ESQ.
             DENISE ALVAREZ, ESQ.
4            WEIL, GOTSHAL & MANGES LLP
             767 FIFTH AVENUE
5            NEW YORK, NY 10153-0119

6

7

8

9    Appearing for Dr Thomas Marsoner:

10           M. SHANE JOHNSON, ESQ.
             PIETER VAN TOL, ESQ.
11           HOGAN LOVELLS LLP
             875 THIRD AVENUE
12           NEW YORK, NY 10022

13

14

15

16   Appearing for the Debtors:

17           THOMAS E. HOMMEL, ESQ.
             LEHMAN BROTHERS HOLDINGS INC.
18           1271 AVENUE OF THE AMERICAS
             NEW YORK, NY 10020
19

20

21   NOTARY: MICHELLE SCOTT-BRYAN

22   VIDEOGRAPHER:

23           WENDY VINER

24           Videographer

25

1    a view and I know that a lot of people at the firm

2    wanted to just sell and get rid of it.  It was also the

3    years where we were making truck loads of money so

4    losing 300, having already put them in the books, kind

5    of, in a firm that was making billions, was not very

6    important.  So I know this as being a very pointed

7    discussion.  Tom Bernard was the person I wanted to tell

8    you before.

9       Q.  Okay.

10      A.  Tom was really the arbiter in the end of what to

11   do, because he was a very senior guy.  He had been the

12   head of credit at the firm.  He was retiring, I think in

13   the Rocky Mountains, if I remember, to stay with a kid

14   that wasn't well or something.  There was some family

15   reason why.  And the firm basically, like with Thomas,

16   said please stay on, even if you are in Aspen, or

17   whatever, Sand Valley, I don't know where it was.

18   Please, stay on, follow some of the difficult deals that

19   we have inherited for the bank, because you know the

20   history, you are the top, senior guy in the firm, stay

21   with us, don't disappear.  And from there, I think,

22   I remember calls to the Rockies, and he was formulating a

23   vision of whether to hold or sell.  And thank God he

24   decided not to sell, I understand by leaning a lot

25   Thomas' vision, which was the only completely in favor

1     vision within the firm because I wasn't sure what was

2     good to do.   I don't know if you asked Patrick

3     Schmitz-Morkramer, he was involved.  I don't think any

4     of us were sure what was better for the firm.  There was

5     this maniac called Thomas Marsoner who called everyone

6     saying "no, we can't sell, this is going to be the best

7     thing in the world.  We can't sell it."  I know that

8     there was a threat at that point that the famous

9     Concorde agreement, which was the pact between Ferrari

10    and the other major squads, the teams, and Bernie, who

11    was a very peculiar character, I must say, I know him

12    very well.

13      Q.  You are talking about Bernie Ecclestone?

14      A.  Yes.

15      Q.  Okay.

16      A.  Very peculiar, very strange bird.  And, you know,

17    you can't trust him, 100 percent, or 50 percent.  You

18    really have to have your own opinion.  The basic reason,

19    I am really telling you guys because I am strong on it,

20    the thing could have been worth zero or a lot and it

21    depended at that moment on whether the Goldman led

22    group, which was called GPW, Grand Prix World or

23    whatever, was an association of the smaller teams, which

24    excluded Ferrari, which by the way, Ferrari is like 50

25    percent of Formula 1, Luca di Montezemolo, an old friend

1    of mine, had agreed to stay with Bernie.  The point was

2    what the others would do, because you can't race against

3    yourself; by definition, race meaning having opponents.

4        McLaren was the strongest team at that time and it

5    had just won the championship, they had a great engine,

6    da, da, da.  So critical was to assert whether McLaren

7    was going to stay with Bernie or go with the splinter

8    group.  I don't know.  And I understand Thomas went to

9    war on that.  And he turned what was a widespread

10   skepticism by many of the senior guys into the very bold

11   decision by Bernard, which I think must have consulted

12   Dick, it must have told him look, there is a chance of

13   making 10 times, or losing 300 million, what would you

14   go?  Because that was the type of bet.  We didn't know

15   ten times, but there is a way to make a lot more, or,

16   you know, basically crystallize a bad loan, Ruggero's

17   bad loan; mine.

18       So I heard back that that was going on and actually

19   I was asked what I thought and I said I didn't really

20   know which way to go.  And I know that that decision,

21   2005, was very, I would call it fatale, very important,

22   and not obvious.  So that is, that answers your

23   question?

24   Q.  Yes, thank you.

25   A.  You didn't want me to say, why were you against?

Page  28

1      Spain to a smaller extent, or Benelux, or Scandinavia,

2      Germany.  The truth is that Thomas acted as our senior

3      German speaking and very well plugged in partner, even

4      if he wasn't any more a member of the firm to speak of.

5         Q.  And you mentioned the Concorde agreement and

6      McLaren information that Dr. Marsoner provided?

7   MS. ALVAREZ:  Objection to form.

8         A.  Yes.

9         Q.  In your view was this valuable information?

10  MS. ALVAREZ:  Objection to form.

11        A.  Okay, I think I said before, and I wanted to say

12     very clear, without Thomas I doubt the firm would have

13     stayed into Formula 1.  That is my impression, I don't

14     have any, how would you call it, evidence.  But the

15     level of understanding of Formula 1 was so feeble at the

16     firm, because the Americans didn't know Formula 1.  The

17     Europeans here were just only mildly interested.  It was

18     Thomas banging on everybody's doors to tell them what

19     was going to happen with McLaren and I remember I was

20     involved in that discussion.  Again, I didn't have

21     a strong opinion either way, but I know Thomas called

22     everyone from Jeremy down in Europe to make sure that we

23     would consider very, very seriously CVC's proposal as

24     being totally inadequate.

25        Q.  And at this point were people across different

1        Lehman entities involved in the F1?

2    MS. ALVAREZ:  Objection to form.

3        A.  I can't remember.  Because we acted as one, you

4    know.  Entities didn't make any sense to us, you know,

5    Commercial Paper, or, you know, I was vice chairman of

6    the group.  Period.  So I couldn't really remember who

7    booked what, where.  Remember, we were a fraternity of

8    partners working like, really, a pack to go out and get

9    things done and in the best interests of the firm.

10        I don't know who was where in the structure.  I couldn't

11    care less, to tell you the truth.

12        Q.  Right.

13        A.  There was one boss.  An executive committee.  And

14    we were all involved in creating value for our

15    shareholders and for ourselves.

16        Q.  And did the F1 investment end up being profitable?

17    MS. ALVAREZ:  Objection to form.

18        A.  So let us go back a second.  So we transformed

19    a busted loan, because that is what it was, Kirch Media

20    couldn't pay back its loans into securities.  The others

21    were worthless because the companies below, ProSieben,

22    Premiere, needed more money and the firm wasn't willing,

23    that is why I am saying Formula 1, if it wasn't for

24    Thomas, probably we would not have kept it, because in

25    both cases, ProSieben, which is worth a fortune now and

1      is the most successful private broadcaster in Germany,

2      and Premiere, which is Sky, were both calling for

3      capital increases, rights offerings.  And the firm

4      didn't want to participate, against my strong advice.

5      Because I wanted to and just, they told me, look, you

6      already lost 500 million, would you please not knock at

7      our door.  Go out and make money and try to clean your

8      reputation up, right.  Dick used to call me and say

9      "Ruggero, I know you are down, but I have lost much more

10     money than you in my life and if you don't lose money

11     you are never going to make money".  Yes, but I feel

12     terrible.  He said "go, just make more money for us".

13     It was a stain in my curriculum.  I saw the firm not

14     willing, not being willing to follow me on all of these

15     recovery roads.  And Peter Sherratt, who is a friend and

16     a very -- I have lots of time for him, was really very

17     conservative, and basically was saying let us cut, let's

18     cut our losses and go home.  So nobody really wanted to

19     double up on the pieces that we had received from

20     Kirch's busted loan.  That is why I am saying that

21     I don't think that we would have kept Formula 1 if

22     JP Morgan, whom we thought knew more than us, and

23     generally they did as a team, knew more, if it wasn't

24     for Thomas and I think Patrick, also, Schmitz-Morkramer,

25     who was young but very smart, and people thought he was,

1    so there was a strong opinion by those two that we

2    shouldn't sell.  So is it profitable?  I think it is

3    a profitable investment.  I don't know exactly when we

4    are going to get out -- we meaning the Lehman estate --

5    THE COURT REPORTER:  Sorry, could you repeat that?

6        A.   Whatever has been paid so far and I know because

7    Ferrari, I know all of the guys, I am close friend of

8    the Mercedes guys, and I was very close to the former

9    chairman of and COO of Mercedes, still appear am, but he

10   is former, he is not any more, Jurgen Schrempp, and I am

11   a close, not as close friend as Jurgen Schrempp, very

12   close, a personal friend, and his successor, Dieter

13   Zetsche, who I know very well, and I am the chairman of

14   the Italian chapter of the foundation called Laureus,

15   who is jointly financed by Daimler and Richemont, which

16   I am on the board of.  So any way, that gives me -- so

17   I knew, and I have always been close to Laureus so

18   I know how important it is for Mercedes so I know how

19   much the business creates.  And in the years I maintain

20   a good relationship with Bernie because Bernie called me

21   several times in the last few years to see whether

22   I could find a buyer of the CVC stake.  So I went back

23   to see, you know, the murder scene and I know how much

24   they make, so it is a profitable venture, for sure.

25       Q.   Okay.  I wanted to go back to the advisory

Page 32

1   agreements, Thomas' advisory agreements.  You said you

2   were aware of them.

3    A.  I was aware that Thomas had been retained by my

4   friend Vittorio, who was a very important person in our

5   firm from 2003.  So let me tell you again, because you

6   have to understand.  Telecom Italia, we helped to buy

7   Telecom Italia in 1999.  In 2001, our man, our guy,

8   Colannino, was booted out by Pirelli and Benetton.  We

9   stopped being the bankers to Telecom Italia.  And that

10   freed me and Vittorio from a very profitable day to day

11   job, because it was one of the most active M&A clients

12   in the firm.  So Vittorio moved back to London, I moved

13   back to London to do, me principal, he M&A.  Okay.

14   Germany being our weak point, I knew, and we discussed

15   it with Vittorio, that he wanted to maintain Thomas on

16   board as an adviser.  I haven't seen the papers,

17   because, you know, that was his responsibility, but

18   I knew that Thomas continued as our adviser across the

19   board.

20    Q.  Do you know how he was paid under those agreements?

21    A.  We had a standard deal with our advisers.

22    Q.  Okay.

23    A.  Which would, may, vary in the proportion, in the

24   share.  But it was always if you are a success, we will

25   give you part of what we make.  And usually, because

Page 33

1       I knew afterwards, that was about 10 percent of banking

2       or 20 percent of banking or 10 percent of the firm's,

3       was what normally was given to advisers.  It was given

4       to me, too, afterwards.

5          Q.  Okay.

6          A.  So that is a kind of a standard --

7          Q.  Okay.

8          A.  -- piece of paper.  But no, I have not seen his

9       actual engagement.

10         Q.  Okay.  Now, are you receiving anything from

11      Dr. Marsoner in exchange for this deposition here today?

12         A.  You are offending me.  You are kidding, right?  No,

13      the answer is no, and I would never have done anything

14      of that type.

15         Q.  Why are you providing testimony today?

16         A.  Because he asked me to say the truth.  He wrote me

17      about two years ago.  He asked me about two years ago to

18      say what I knew.  And Vittorio also, you know, Vittorio

19      and I are very close friends, really very close.  And he

20      told me to say if I knew that what he was saying was

21      true, which I did at that time, in 2004, I think.  And

22      then 2015, I was asked to say more clearly, and I did.

23         Q.  Okay.  Could we hand Mr. Magnoni exhibit 6, please.

24      MS. ALVAREZ:  From which deposition?

25      MR. JOHNSON:  The first one.

Page 56

1       particular year, so it was so big that quite a big

2       number of people were involved, but I can't remember.

3           Q.  Okay.  Now, at this point you were not involved in

4       the day to day with regards to Formula 1?

5   MR. JOHNSON:  Objection.  Leading.

6           A.  At that point I was, in that point I was.  As

7       I said, slowly new people were added and only after, as

8       I said, I think, it is taped, I believe one year later

9       I was asked by the firm, by Jeremy and Dick, to loosen

10      up a bit, leave it to the guys in the recovery to try to

11      get the money back, because it was not a good use of my

12      valuable origination time.

13          Q.  Okay.  Let's take a look at the last sentence in

14      the letter you submitted to the court.  It says:

15          "It was well understood by the Lehman decision

16      makers that Dr. Marsoner's fees normally amounted to 10

17      percent of firm's revenues."

18          Do you see that?

19          A.  Yes.

20          Q.  Who did you mean by Lehman decision makers?

21          A.  The ones that I have told you before, anybody --

22      when we do, when we decided to have advisers we knew

23      that there was a share.  The normal share of the firm

24      was 10 percent.  Now, 10 percent gross, 20 net, I don't

25      know.  But there was an understanding that to have

Page 57

1    advisers and finders there was a standard agreement, to

2    tell you the truth, around investment banking in Wall

3    Street and the City.  Particularly at Lehman, we had

4    a 10 percent approach.  So it was well known by everyone

5    from Jeremy and Roger Nagioff and I am sure, I can say

6    myself, that that was the norm and therefore was pretty

7    well understood by everyone.

8        Q.  Did you negotiate any consultancy agreements for

9    any advisers?

10       A.  Including mine, yes.

11       Q.  Did you negotiate, were you involved in the

12   negotiations of Dr. Marsoner's?

13       A.  No.

14       Q.  So you don't know if he was ever retained for

15   Formula 1?

16       A.  I don't know.

17   MR. JOHNSON:  Objection.  Leading.

18       A.  I assumed, like everybody else, that if he was

19   working willingly with us, and Vittorio was the entry

20   point of that negotiation, that normally would have had

21   -- I didn't know.

22       Q.  Did you ask anyone whether Lehman would pay

23   Dr. Marsoner?

24       A.  Not at all.

25   MR. JOHNSON:  Objection.  Leading.

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


- - - - - - - - - - - - - - - - - -

IN THE MATTER OF

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL.,

Debtors.


- - - - - - - - - - - - - - - - - -

DEPOSITION OF VITTORIO PIGNATTI

VOLUME I

Monday, November 16th, 2015

AT:  3:30 p.m.

Taken at:

Hogan Lovells
50 Holborn Viaduct
London
EC1A 2FG
London
United Kingdom


CONFIDENTIAL

Court Reporter:

Chris Lang
Accredited Real-time Reporter

```
 1                     A P P E A R A N C E S

 2    Appearing for Lehman Brothers:

 3            MAURICE HORWITZ, ESQ.
              DENISE ALVAREZ, ESQ.
 4            WEIL, GOTSHAL & MANGES LLP
              767 FIFTH AVENUE
 5            NEW YORK, NY 10153-0119

 6

 7

 8

 9    Appearing for Dr Thomas Marsoner:

10            M. SHANE JOHNSON, ESQ.
              PIETER VAN TOL, ESQ.
11            HOGAN LOVELLS LLP
              875 THIRD AVENUE
12            NEW YORK, NY 10022

13

14

15

16    Appearing for the Debtors:

17            THOMAS E. HOMMEL, ESQ.
              LEHMAN BROTHERS HOLDINGS INC.
18            1271 AVENUE OF THE AMERICAS
              NEW YORK, NY 10020
19

20

21    NOTARY: MICHELLE SCOTT-BRYAN

22    VIDEOGRAPHER:

23            WENDY VINER

24            Videographer

25
```

1        Q.   Okay.   To your understanding why did Lehman

2    Brothers want to hire Dr. Marsoner as an adviser?

3    MS. ALVAREZ:   Objection to form.

4        A.   Mr. Marsoner continued his previous involvement, so

5    it was an evolution, it wasn't a hiring process, which

6    was quite normal with senior people who departed a full

7    time position at Lehman, they seldom -- unless they went

8    to work for a competitor, they were offered a choice to

9    stay on as an adviser, some with retainers, you know, we

10   had a lot of freedom on how to calibrate their

11   involvement.

12       Q.   Did Dr. Marsoner have certain expertise?

13   MS. ALVAREZ:   Objection to form.

14       A.   Yes he did.   By sector and by geography.   He had

15   spent almost his entire working career dealing with

16   Germany and Austria and financial institutions, which

17   gave him a, for a firm that was not particularly strong

18   in that part of the world, considerable senior hedge in

19   terms of relationships and understanding of situations

20   that were not obvious, especially in situations of work

21   outs or complicated deals.

22       Q.   And what about F1?

23       A.   F1 was a complicated deal.   So he met those

24   criterias and there were German banks involved.

25       Q.   And is it correct that you were a contact person

1      42.

2      A.  Okay.  Spotted it.  22, yes.

3      Q.  You see listed February 13, 2004?

4      A.  Mm-hm.

5      Q.  And section 3, if you turn the page.

6      A.  Mm-hm.

7      Q.  Entitled "compensation payable to the consultant".

8      A.  Yes.

9      Q.  Could you explain this section of the agreement?

10     A.  The section of this agreement, this was the second

11     one.  There was a prior one so, you know, this was

12     stepping in.  So we had decided to take part of his

13     time, so we paid an up front fee and then we paid

14     a quarterly fee and then went through the specifics of

15     the transactions that were covered and then, if I am

16     right, we had a possibility to bring under this

17     contract, subject to my green light, I think, other

18     things.  So at that time we had the role in Austria, and

19     Germany, Oyagi (sic) was a distressed bank, Telekom

20     Austria were two transactions which eventually, I think,

21     all of them got done while the Donatzeinmagi (sic), as

22     I can recall, didn't happen.

23     Q.  And if you turn back to the page before,

24     section 1D.

25     A.  Yes.

Page 18

1      have enough traction from my teams to say yes, because

2      we had a budget we could spend so much on advisers.  So

3      if we took one, we wouldn't have another one to maybe

4      start the new vertical, maybe to cover another country.

5      THE COURT REPORTER:  Sorry, could you repeat the last bit?

6          A.  We would have to decide as a team, the advisory M&A

7      team, how to spend the budget, being the person in

8      charge, it was in the end my duty to present the annual

9      budget, but also to manage the budget.  So there were

10     times when the level of activity with one adviser did

11     not warrant a contract with a fixed amount, and so on.

12     So we would, say, use as a guideline the past but on

13     specific transactions you have to come to me and I will

14     sign off and sort of rejuvenate the old agreements with

15     the caveat that it may be without a fixed amount, with

16     a cap, you know, depending deal by deal.

17          I preferred, generally, to have contractors on,

18     because I had so many of them, just to remember what you

19     were doing with one or the other but it was, in the case

20     of Thomas and a few others, after a decade together we

21     could live with, sort of a play it by ear system.  But

22     I would always go back to the person within Lehman, sort

23     of full time Lehman MD, and check that the work was

24     being done, that it was a realistic request.

25          Q.  And so when his agreement expired how would his pay

Page 26

1        is looking at.

2    BY MR. JOHNSON:

3        Q.  Can I have you look at the supplemental declaration

4        of Dr. Thomas Marsoner.

5    THE COURT REPORTER:  That is exhibit 6.

6    MS. ALVAREZ:  Exhibit 6 to Peter Sherratt's deposition.

7        What exhibit was that to his motion?

8    MR. JOHNSON:  It was a supplemental declaration.

9    MS. ALVAREZ:  Okay.  Are you going to point him to his

10       letter?

11   MR. JOHNSON:  I am going to point him to his affidavit.

12   MS. ALVAREZ:  The one he submitted to the court.

13       A.  Mm-hm.

14   MR. JOHNSON:  Do you recognize --

15   MR. HORWITZ:  Just a minute, I have a copy of that.

16   BY MR. JOHNSON:

17       Q.  Do you see your letter dated January --

18       A.  Yes, yes, yes, yes, then I am getting the dates.

19       Q.  Do you see the --

20       A.  Yes.

21       Q.  Well, just one second.  Do you see the fifth

22       paragraph?

23       A.  Five, yes.

24       Q.  Does it say:

25           "With regards to the investment in Formula 1,

1       I specifically requested Dr. Marsoner's advice ... after

2       JP Morgan had rejected my suggestion of jointly

3       retaining him."

4           A.  Yes, yes, yes.

5           Q.  Is that an accurate statement?

6           A.  Yes.  I now remember the, yes, the occurrence.  But

7       this is prior to the actual closing of the CVC deal.

8       Now I remember.  There were two stages.  The first, CVC

9       took the stake and then the two banks opted out after

10      BLB.  If you remind me how the transaction went, because

11      I can't recall it, because we were three shareholders

12      plus Bernie Ecclestone.  When CVC did the transaction

13      who did they buy out first?

14          Q.  Well, let me just ask you a question.  So you

15      referred to two banks?

16          A.  JP Morgan, Lehman Brothers and BLB were the three

17      investors in, or investors who had seized the shares

18      from Kirch.  CVC acquired control of Formula 1 and then

19      subsequently acquired an additional stake.

20          Q.  Why did you request Dr. Marsoner's advice?

21          A.  At the time there was a dilemma as to what to do,

22      whether to accept the proposal, but I can't remember if

23      it was the first purchase or the second purchase,

24      because the clients of Formula 1 and the teams headed

25      by, they were using Goldman Sachs at the time, but they

1    were voicing and saying that they did not intend to

2    continue with Formula 1 and they wanted to create

3    a rival event which technically they could have possibly

4    done, and obviously the value of Formula 1 would have

5    been completely different if some or most of the teams

6    migrated to another event.

7        So the issue was strategically was this asset going

8    to be a difficult one or was this all posturing, and all

9    it took was to tweak the margins and have them make

10   a little bit more money and change the team versus

11   Formula 1 split.  And this had been going on for some

12   time, I recall.  But when CVC came in it became even

13   more antagonistic from Mercedes, from, you know, the

14   leading teams.

15   Q.  And who were the leading teams?

16   A.  The leading teams were Mercedes, McLaren, Ferrari

17   to some extent, but at least it was the only one where

18   I had my direct contacts.  But I didn't, because the

19   firm was not very strong in automotive, we didn't have

20   direct links, especially with the Germans and then

21   Goldman was trying its best to make sure we didn't have

22   access to anybody who sang outside of the choir.

23   I asked Thomas, and the other thing that I needed to

24   know from, you know, to give the firm some advice, was

25   where things stood with BLB, because, you know, it

Page 30

1    A.   Obviously in retrospect at the time the advice was

2    his understanding of the situation.   In retrospect it

3    was right.

4    Q.   To your understanding did Lehman Brothers rely on

5    Dr. Marsoner's advice?

6    A.   I think this was debated at the investment

7    committee and as the pros and cons, and I think it was

8    one of the elements, certainly not the only element.   If

9    I remember correctly the way that it was presented, as

10   I was saying before, it wasn't me presenting it, it was

11   either Jeremy Isaacs or Meissner.

12   Q.   Okay.

13   A.   As it was a European issue, where it was how much

14   money do we have this investment on the books at?   How

15   much are we getting back, if we do at all?   How much are

16   we getting, and they did the calculation how much, you

17   know, the firm needed as a capital gain -- capital gain;

18   writing back of an investment -- and how much we could

19   afford to, you know, take a punt on future values.

20   Q.   And in your view do you believe Dr. Marsoner should

21   be paid for that advice?

22   MS. ALVAREZ:   Objection to form.

23   A.   I think, yes, he would be, he would have been paid,

24   I would say, in retrospect.   I don't know the ins and

25   outs of what specific authorizations he, you know,

1      worked at the time but I think the firm would have taken

2      -- you see our agreements were the senior advisers were

3      very one sided.  So I mean once there was a negotiation,

4      we could say okay, it is between X and Y, but then it

5      would be the sole discretion of the firm how much to

6      pay, and if you liked it you stayed, if you didn't like

7      it that was the way we worked.  But on the other hand we

8      never left, we never asked for any advice, work and so

9      on to then not pay anything.  It was just not done and

10     certainly under my watch it never happened.  The

11     amounts, though, would be determined, even post facto.

12        Q.  Was the type of advice he provided on F1 similar to

13     in the BAWAG transaction?

14   MS. ALVAREZ:  Objection to form.

15        A.  It was similar.  It was similar in terms of advice.

16     The difference was that here it was an exit or not

17     an exit of an existing position.  BAWAG was really

18     driven as an advisory mandate.  You know, it was more of

19     an investment bank.  Here, the firm owned a position,

20     willingly or unwillingly, and he provided advice in

21     terms of tactics, the same as BAWAG, but for a different

22     purpose.

23        Q.  Do you know the Lehman entity used to reinvest in

24     F1?

25        A.  No.  I mean do I know it, maybe I knew, because --

1          Now, I want to look at what has been marked as

2     Pignatti exhibit 2, which is the letter you submitted to

3     the court, Mr. Pignatti, could we look at it again.   And

4     on the second page, the very last paragraph, you state:

5          "It was my understanding that Dr. Marsoner would

6     have been paid by Lehman Brothers for his services

7     concerning the F1 investment or I would not have asked

8     him to help."

9          What was the basis for your understanding?

10     A.  My understanding is that, as I think I mentioned

11     before, we had a long consolidated relationship with our

12     senior advisers which was regulated by contracts but

13     they were completely one sided.   You might have read

14     them.

15     Q.  Mm-hm.

16     A.  It says if the firm decides that you had a major

17     involvement in a transaction.  So completely left to our

18     discretion, the firm's discretion.   And therefore we

19     were instructed to use this power, not

20     opportunistically, but bearing in mind that we had

21     a name, a future and we had to keep our senior advisers,

22     you know, happy.

23     Q.  Mm-hm.

24     A.  But within, you know, the boundaries of the

25     economic interests of Lehman.   And therefore, as you can

1    see from previous emails and so on, any time we utilized

2    the senior adviser, not just myself, but also other

3    people on the team, and it was a large organization,

4    I wanted it to be flagged, because if we agreed to use

5    we would then remunerate.  I cannot tell you how much,

6    it depended on our good will, on a discussion with

7    a person and so on, but we wouldn't utilize someone

8    outside of the contract to tell them thank you very

9    much, it was free help, and so on.  Otherwise we would

10   not have been as successful as we were in retaining very

11   high caliber people for relatively low fixed amounts of

12   money.

13       Q.  Okay.  So when you got to that point, you realized

14   that someone needed to be remunerated, you would have

15   a conversation with that person about how much?

16   MR. JOHNSON:  Objection.  Leading.

17       A.  Absolutely.  I would have discussed the specifics

18   of something that was not in the contract and would have

19   had an internal discussion and then I would have gone

20   back with a response.  It was a negotiation to a certain

21   point.

22       Q.  Okay.  And then ultimately you would need to get

23   approval from someone more senior?

24   MR. JOHNSON:  Objection.  Leading.

25       A.  Depending on if it was the acquisition of a M&A

1    Q.  Okay.

2    A.  The second component of BAWAG was that the

3    mezzanine fund of the firm intended to invest, and if

4    they invested they were willing to pay a fee, sort of

5    a finders fee, for having been brought into this

6    investment opportunity, but that would have been 1

7    percent, or -- I can't remember what the amount was.  So

8    those were the orders of magnitude.

9    Q.  Okay.  So it sounds like Dr. Marsoner was

10   instrumental in that BAWAG transaction?

11   A.  He was.  First, in securing a mandate for which we

12   were probably not the best qualified without him.  And

13   then the mandate lasted for a long time.  He managed to

14   bring to the Lehman mezzanine fund a position in the

15   financing.  That was a typical thing that happened with

16   advisory mandates, many times, led to additional firm

17   revenues which were not in advisory.

18   Q.  Okay.

19   A.  Okay.  Those were remunerated because the egg came

20   before the chicken and therefore, you know, the same

21   scale did not apply.  So that would have been outside of

22   my powers, to add a fee for another division, risking

23   capital, because it was really up to them to say whether

24   they could afford, and how much.  But I certainly made

25   sure that if they utilized the referral from an adviser

1     at the investment bank they would have to pay.   I would

2     participate in the negotiation but I couldn't force them

3     to pay out of their budget more or less.

4        Q.   Okay.   So when the BAWAG transaction was completed,

5     Lehman and Dr. Marsoner came to an agreement regarding

6     how much he would be paid for his help?

7     MR. JOHNSON:   Objection.   Leading.

8        A.   Yes.

9        Q.   Now, you mentioned when you were explaining the

10    differences to me --

11       A.   Mm-hm.

12       Q.   -- that the sale of an asset situation is

13    different?

14       A.   Yes.

15       Q.   Formula 1, would that fall into that category of

16    transaction, sale of an asset?

17    MR. JOHNSON:   Objection.   Leading.

18       A.   It was the sale of an asset and therefore there

19    wasn't a mandate originating fees for -- you know, we

20    were not getting paid, you know, inside of the

21    investment banking division there wasn't an advisory fee

22    of 3 million that Formula 1 was paying to Lehman.

23    Because we owned the company, or co-owned, we couldn't

24    charge any fees, so it would have come out of pocket

25    from the firm.   Therefore it happened, you know, several

Page 68

1      times.

2         Q.   Mm-hm.

3         A.   So it would have been calculated and it wouldn't

4      have been zero, you know, otherwise the firm would never

5      -- if I had received an email from a discontinued

6      adviser telling me "I want to do this", you know, "let

7      me give you advice", I would stop him straight away and

8      say I am sorry, but we spoke three weeks ago.  I have

9      now socialized with the operating committee, I think we

10     have moved on.  So I wouldn't use people for free,

11     especially if they had been with the firm for 10,

12     15 years --

13        Q.   Mm-hm.

14        A.   -- to lead them on.  I would be quite firm and say

15     thank you very much, you know, bring it to Goldman

16     Sachs, these are great ideas, thanks.  We wouldn't use

17     free help --

18        Q.   Right.

19        A.   -- from people with whom we had a relationship that

20     we still treasured in any shape or form.  On the

21     advisory side we wanted to be promoted as the right bank

22     in an area or geography where we were not strong, we

23     wouldn't short change them or use them on something we

24     had no intention to use them, and that is my statement.

25        Q.   Right, I understand that.  So with Formula 1, who

1    involved, in our judgment, was the contribution and in

2    the following contract, or even in this one, I would say

3    as per 3.2.1 we now agree to pay you, you know,

4    a million dollars for securing the Formula 1 advisory

5    mandate, okay, something like that.

6       Q.  Okay.

7       A.  Not necessarily when it happened, the day, or don't

8    lift your pen until I have sent you a confirmation and

9    so on, okay.

10      Q.  Okay.

11      A.  But this refers to advisory contracts which were,

12   as I said, within my powers because my division was

13   paying it out of revenues, okay.  So here the

14   USD 200,000 would have come out of my annual budget,

15   because it was a guarantee.  And then anything else, you

16   will see, is really a success fee and therefore, which

17   is actually paid the moment the client sends the money

18   to settle the invoice.  You know, so unless Telekom

19   Austria paid us the, I don't know, 7 million Euro

20   advisory fee, of which 700,000 would go to Mr. Marsoner

21   a month later, okay.  But first the cash came in.

22      Q.  Okay.

23      A.  Okay.  So --

24      Q.  Let me ask you, you said the agreement is

25   dated July 24, 2002?

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -

IN THE MATTER OF

   IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL.,

                    Debtors.

- - - - - - - - - - - - - - - - - - -

DEPOSITION OF PETER SHERRATT

VOLUME I

Friday, November 13th, 2015

AT:  1:00 p.m.

Taken at:

Hogan Lovells
50 Holborn Viaduct
London
EC1A 2FG
London
United Kingdom


CONFIDENTIAL

Court Reporter:

Chris Lang
Accredited Real-time Reporter

Page 2

```
 1                    A P P E A R A N C E S

 2    Appearing for the Deponent:

 3            MAURICE HORWITZ, ESQ.
              DENISE ALVAREZ, ESQ.
 4            WEIL, GOTSHAL & MANGES LLP
              767 FIFTH AVENUE
 5            NEW YORK, NY 10153-0119

 6

 7

 8

 9    Appearing for Dr Thomas Marsoner:

10            M. SHANE JOHNSON, ESQ.
              PIETER VAN TOL, ESQ.
11            HOGAN LOVELLS LLP
              875 THIRD AVENUE
12            NEW YORK, NY 10022

13

14

15

16    Appearing for the Debtors:

17            THOMAS E. HOMMEL, ESQ.
              LEHMAN BROTHERS HOLDINGS INC.
18            1271 AVENUE OF THE AMERICAS
              NEW YORK, NY 10020
19

20

21
      NOTARY: MICHELLE SCOTT-BRYAN
22
      VIDEOGRAPHER:
23
              WENDY VINER
24            Videographer

25
```

1      A.  Well, I can only read what you can read.  I mean,

2   I am not sure what you are asking me for here.  It does

3   do that, according to how I read it.

4      Q.  Were you not involved in those discussions to have

5   Dr. Marsoner?

6      A.  Yes, indeed, I was, I would have been very happy

7   with Marsoner representing the three banks.

8      Q.  And this is October 2002?

9      A.  Yes.  I remember, because Thomas and I got on well

10  and I respected him.

11     Q.  And you thought he was knowledgeable about F1?

12     A.  Yes.

13  MR. JOHNSON:  Please mark that as exhibit 3.

14          (Exhibit 3 marked for identification)

15     Q.  This is an October 22nd, 2002 email from Patrick

16  Bierbaum to Peter Sherratt, Victoria Pignatti and

17  Stephen Sleigh, at Lehman Brothers, copied Thomas

18  Bernard, Steve Hannan, and Patrick Schmitz-Morkramer.

19  And are you familiar with this document?

20     A.  Well, this is the same as my last answer.

21  I haven't seen this since I left Lehman.  I may well

22  have seen this at the time.  It is very likely I would

23  have read this at the time.

24     Q.  And do you see that you are listed as an addressee

25  on this email?

1      A.  That was the entity, Alpha Topco originally and

2      then Delta Topco were the entities that I joined as

3      a director and they were the entities that owned

4      Formula 1.

5      Q.  And I think you just said that, but you were

6      appointed as a director of Delta Topco Limited and Delta

7      Prefco Limited?

8      A.  Yes, I was appointed to what you might broadly call

9      the board of Formula 1, but it was the holding company,

10     the relevant holding company.

11     Q.  And you were appointed by Lehman Commercial Paper

12     Inc.?

13     A.  I think technically you were appointed by the

14     company, so you join the board of the company as

15     an individual.  But I did that representing the

16     shareholder, which was LCPI.

17         (Exhibit 8 marked for identification)

18     Q.  This is a motion made by Lehman Commercial Paper

19     Inc. in the United States bankruptcy case to sell shares

20     of Delta Topco Limited and Delta Prefco Limited.  Could

21     you please turn to exhibit B.  This is a draft

22     consulting agreement?

23     A.  Yes it is.

24     Q.  Was a final executed version ever entered into?

25     A.  Yes, I did enter into a consulting agreement.

Page 48

1    MR. HORWITZ:  Objection to form.

2        A.  I did, yes.

3        Q.  If you will go to exhibit C.

4        A.  Yes.

5        Q.  It is a letter agreement.

6        A.  Mm-hm.

7        Q.  Lehman Commercial Paper Inc.

8        A.  Yes.

9        Q.  Did you execute a letter of agreement substantially

10   similar to this one?

11   MR. HORWITZ:  Objection to form.

12       A.  Did I execute myself?  Um, this looks like

13   a statement in which they will nominate me as a member

14   of the board.

15       Q.  Sorry, yes.  Did you know if --

16       A.  I think LCPI did nominate me, yes, absolutely, and

17   I was appointed by those boards.  I think it looks like

18   Jack McCarthy may have executed this.

19       Q.  And are you still a director of these entities?

20       A.  No I am not, no.

21       Q.  When were you replaced?

22       A.  I resigned in 2012.  Although I did resign also for

23   a period, if you want the full -- to be, give you full

24   detail on that, I had a short period after the

25   bankruptcy in which I dropped out of the board because

Page 49

1    I felt that it was, there was a potential serious

2    conflict of interest being on the board at a time when

3    other shareholders had the right to exercise their right

4    to buy out Lehman Brothers at that point.  So I did

5    resign for a short period then and went back then on the

6    board in 2009, so there was a short break.  But between

7    2006 and 2012 I was on the board, except for that short

8    break.

9        Q.  Why did you resign in 2012?

10       A.  Because I wanted to focus on my charitable

11   interests.  I have a portfolio which is very time

12   consuming and I felt that I couldn't give enough time to

13   Formula 1.

14       Q.  So isn't it correct that as a director of Delta

15   entities you were permitted to share certain information

16   with LCPI employees?

17   MR. HORWITZ:  Objection to form.

18       A.  I believe I was allowed to share some information,

19   but you would have to, I am afraid I would have to

20   recollect precisely what that information sharing

21   arrangement was.  But I think there was an arrangement

22   there.

23       Q.  See paragraph D of the letter agreement.

24   MR. HORWITZ:  Objection to form.

25       A.  Yes, the company's consent to the sharing by

Page 105

1      Q.  Could you turn to page 7 of the motion --

2      A.  Yes.

3      Q.  -- and look at paragraph 16.  I am going to read

4   the first sentence of paragraph 16.  It says:

5      "It is in fact undisputed that Dr. Marsoner provided

6   invaluable advisory services related to F1 that Lehman

7   could not have obtained from another source and that

8   based primarily on this advice Lehman reinvested in F1

9   in 2006."

10     Did I read that correctly?

11     A.  You did.

12     Q.  Do you agree that Thomas Marsoner provided

13  invaluable advisory services related to F1?

14     A.  I think it was helpful to hear from Thomas.  But

15  the primary reasons for reinvesting were this is a very

16  attractive company from a financial perspective.  This

17  is a company with a potential for refinancing, if the

18  proper corporate governance could be put in place and

19  harmony could be restored in Formula 1, so it was able

20  to act with one voice rather than having three banks as

21  disparate shareholders.  So CVC coming in was the

22  primary reason for reinvesting in my mind.  Clearly we

23  had to do a lot of financial analysis around that, of

24  which the investment bankers, like

25  Patrick Schmitz-Morkramer, were really valuable in

1    understanding the value of the asset.  And certainly it

2    was that hard nosed analysis of the asset that was the

3    most important decision in deciding whether to stay in.

4         We also respected CVC enormously and we knew that

5    they had a strong track record of private equity

6    investment and so that for me was a very significant

7    advantage in reinvesting.

8         So, you know, when I was thinking about it myself

9    and when I was briefing other people, they were the

10   things that I focused on.  That was absolutely key.

11        But was there uncertainty about whether teams would

12   continue or have a breakaway series?  Yes, there is

13   always that uncertainty and there was at that time.  And

14   was it helpful in the overall picture?  Yes it was.  Was

15   it the primary reason?  No it wasn't.

16   Q.  Could you turn to exhibit E of that motion.  We

17   will give you time to find it.

18   A.  Yes.

19   Q.  Could you turn to page 2 of exhibit E.  I am sorry,

20   could you turn to page 3 of exhibit E.

21   A.  Mm-hm.

22   Q.  Do you see at the top of the email to Vittorio

23   Pignatti, to you and to Thomas Bernard?

24   A.  Yes.

25   Q.  It is dated November 26, 2005.  Do you recognize

1    reveal where we were on it, because clearly that could

2    influence other people that we were negotiating with.

3    So yes, he would want to be quite guarded about it.

4    I think it means what it says.

5        Q.  Did this email influence your decision not to sell

6    your stake in Formula 1?

7        A.  My personal?

8        Q.  Or Lehman, the work out team's?

9        A.  The one going from Thomas -- Tom Bernard to Thomas?

10       Q.  The one from Thomas to Tom Bernard.

11       A.  Which?

12       Q.  Tom Bernard says "we're inclined to take your

13   advice".

14       A.  Yes.

15       Q.  Did that advice influence your decision?

16       A.  I think the position with Thomas' input was that it

17   was helpful.  It is very, very useful when you are

18   looking, as Tom said, you are in the discovery mode when

19   you're looking at it, absolutely, it is very, very

20   useful to take into account all of your different

21   sources and you would need to ask Tom what his balance

22   of opinion was.  But all I can say is that from our

23   perspective and from the people that I spoke to, I was

24   never in any doubt that we should stay in and I know it

25   sounds easy to say that now, but that is what happened,

Page 110

1    because I thought CVC would bring the corporate

2    governance that Formula 1 so badly needed.

3        Q.  Okay, I am going to show you just one other

4    document that has not been marked as an exhibit yet.  We

5    will mark this exhibit 9.

6            (Exhibit 9 marked for identification)

7    MR. HORWITZ:  Do you need another copy?

8    MR. JOHNSON:  No.

9        A.  This is then exhibit, is it?  I keep that one and

10   I give it you back at the end.

11   THE COURT REPORTER:  Yes.

12   BY MR HORWITZ:

13       Q.  If you turn to the second page of this document, do

14   you see on the bottom right-hand corner of the document,

15   it says "Marsoner 00000197"?

16       A.  Yes I do.

17       Q.  Can you turn to the second page.  There is an email

18   in the middle of the page from you and it is

19   dated October 3, 2014 and it says, starts on the second

20   paragraph:

21       "My view is that the claim on LBEL isn't justified.

22   We both know there was no agreement to pay you relating

23   to F1.  You are a highly intelligent and meticulous

24   person, and would have put in a claim years ago if you

25   believed in it."

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Chapter 11 Case
CASE NO. 08:13555 (SCC)
Ref. Docket Nos. 4271, 4349


IN RE:

LEHMAN BROTHERS HOLDINGS INC., et al.,

        Debtors.
-------------------------------------------


TRANSCRIPT OF
DEPOSITION OF ANGHARAD BOWDLER




        TRANSCRIPT of the stenographic

notes of the proceedings in the

above-entitled matter, as taken by and

before TAB PREWETT, a Registered

Professional Reporter, a Certified

Shorthand Reporter, a Certified LiveNote

Reporter, and Notary Public, held at the

Offices of WEIL, GOTSHAL & MANGES LLP, 767

Fifth Avenue, New York, New York, on

Wednesday, December 2, 2015, commencing at

1:15 p.m.

Page 2

```
 1

 2    A P P E A R A N C E S:

 3

 4            WEIL GOTSHAL & MANGES LLP
              BY:   MAURICE HORWITZ, ESQ.
 5                  DENISE ALVAREZ, ESQ.
              767 Fifth Avenue
 6            New York, New York  10153-0119
              Attorneys for
 7            Lehman Brothers Holdings, Inc.

 8

 9

10

              HOGAN LOVELLS LLP
11            BY:  M. SHANE JOHNSON, ESQ.
              875 Third Avenue
12            New York, New York  10022
              Attorneys for Dr. Thomas Marsoner
13

14

15

16

17

     ALSO PRESENT:
18

              Mark Euler, Esq.
19            Senior Legal Counsel
              EPIQ Systems
20            Present Telephonically

21

22

23

24

25
```

Page 14

1              Angharad Bowdler

2    incorrectly listed.  Yes.

3         Q     Isn't it possible that there

4    were other errors in the service of party

5    notice?

6              MR. HORWITZ:  Objection to the

7         form.

8         A     I am not aware of any other

9    errors.

10        Q     Now, EPIQ attempts to send

11   notice to a creditor's last known address,

12   correct?

13        A     That's correct.

14             (Exhibit No. 4, E-Mail with

15        attachment, E-Mail dated 7/19/08 from

16        Aaron O. Johari to Guy Reynolds and

17        others, Bates Nos. LEH 384 to 395, is

18        marked by the reporter for

19        identification.)

20        Q     This is an E-Mail from Aaron

21   Johari at Lehman Brothers to a number of

22   people at Linklaters and Bruce Railton and

23   Marco Pierettori at Lehman Brothers, dated

24   September 19, 2008.

25             This was after LBHI had filed

Page 16

1               Angharad Bowdler

2       Q       If you flip to the second page,

3   there's an attachment to the E-Mail.  It's

4   an agreement with Dr. Thomas Marsoner and

5   Lehman Brothers Europe Limited, dated

6   October 5, 2007.

7               Do you see that?

8       A       Yes.

9       Q       Do you see the address listed

10  in the top left-hand corner for Thomas

11  Marsoner?

12      A       Yes.

13      Q       But he wasn't sent notice at

14  this address; is that correct?

15      A       Just a minute.  Let me make

16  sure.  No, he was not.

17      Q       But this agreement was in

18  Lehman Brothers's E-Mails; is that correct?

19              MR. HORWITZ:  Objection to the

20      form.

21      A       From the E-Mail that you have

22  presented, I can see that, but I have never

23  seen this document before.

24      Q       Shouldn't he have been sent

25  notice at this address?

Page 17

1                    Angharad Bowdler

2                    MR. HORWITZ:  Objection to the

3          form.

4          A       I actually don't know the

5   answer to that.  Some creditors have

6   multiple addresses, and noticing addresses

7   and attorneys that represent them -- in

8   general, we pull every address available

9   for the creditor, or the financial advisor

10  would do so.

11         Q       So Alvarez didn't pull this

12  address for you?

13                  MR. HORWITZ:  Objection.

14         A       This address was not provided

15  to EPIQ to my knowledge.

16         Q       Do you know why it wasn't

17  provided?

18         A       No, I do not.

19         Q       If Alvarez had sent this

20  address to you, would you have sent

21  Dr. Marsoner notice at this address?

22                  MR. HORWITZ:  Objection to the

23         form.

24         A       Yes, if it was provided, we

25  would have sent it to this address.

Page 18

1                    Angharad Bowdler

2          Q      Okay.  Does EPIQ consider it

3    good practice to send notice to vacation

4    addresses?

5          A      We are not aware of different

6    addresses and what they represent for the

7    creditor, so I don't have an opinion on

8    that.

9          Q      So in other words, you don't

10   check if an address is a vacation address?

11         A      No.

12         Q      You don't check if it's a

13   temporary address?

14         A      No, nor is that information

15   provided to us.

16         Q      Well, I mean, you don't do an

17   independent check?

18         A      No, we do not.

19         Q      So the same could be said for

20   addresses that are no longer valid?

21                MR. HORWITZ:  Objection to the

22         form.

23         A      I'm sorry.  I am not sure what

24   the question is.

25         Q      You don't do an independent

1                    Angharad Bowdler

2   check on the validity of an address?

3                    MR. HORWITZ:  Objection to the

4       form.

5        A      We don't confirm that the

6   address is correct for that creditor.  If

7   solely a name is provided or a partial

8   address that would not be mailable, that we

9   may send back to the party that provided it

10  to us to request additional detail.

11       Q      So if you are provided a full

12  address, you don't independently check it?

13       A      That's correct.

14       Q      Would you check to make sure

15  you are not sending a notice to a former

16  affiliate's address, former affiliate of

17  Lehman Brothers?

18       A      No, we would not check that.

19       Q      Because essentially Alvarez

20  provides you the addresses, and, as long as

21  they are full address, you don't check

22  them?

23       A      That's correct.

24       Q      If you could look at Exhibit 3,

25  "Corrected Affidavit of Service," in the

IN THE UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------x

IN THE MATTER OF

IN RE:

LEHMAN BROTHERS HOLDINGS INC.,

et al.,

                Debtors.

--------------------------------x

                December 22, 2015

                9:28 a.m.


     Deposition of STEVEN KOTARBA, held at

the offices of Weil, Gotshal & Manges LLP,

767 Fifth Avenue, New York, New York 10153,

before Roberta Caiola, a Shorthand Reporter

and Notary Public within and for the State

of New York.

Page 2

```
 1   A P P E A R A N C E S:

 2

 3   Appearing for Lehman Brothers:

 4   MAURICE HORWITZ, ESQ.

 5   DENISE ALVAREZ, ESQ.

 6   WEIL, GOTSHAL & MANGES LLP

 7         767 Fifth Avenue

 8         New York, New York 10153-0119

 9

10   Appearing for Dr. Thomas Marsoner:

11   M. SHANE JOHNSON, ESQ.

12   PIETER VAN TOL, ESQ.

13   HOGAN LOVELLS LLP

14         875 Third Avenue

15         New York, New York 10022

16

17

18

19

20

21

22

23

24

25
```

Page 14

1              Steven Kotarba (12-22-15)

2          Q.      If you identify a person as going

3   on the master mailing address and you find

4   another address for them, would you include that

5   as well?

6              MR. HORWITZ:  Objection to form.

7          A.      Typically we would, yes.

8          Q.      Why wouldn't you in all instances?

9          A.      Again, it's hard to give absolute

10  answers.  If for some reason there was an

11  indication that that address, you know, wasn't

12  accurate or shouldn't be used we wouldn't

13  include it.  But I agree with your earlier

14  statement, that typically if we have two

15  addresses we would serve both addresses.

16         Q.      In compiling this master mailing

17  address you said that you spoke with Lehman

18  Brothers' employees?

19             MR. HORWITZ:  Objection to form.

20         A.      Certain employees with respect to

21  the filing debtors, yes.

22         Q.      Does this also include former

23  employees?

24         A.      I don't believe.  It's difficult to

25  recall.  I don't believe we talked to former

Page 40

1                 Steven Kotarba (12-22-15)

2    from.

3         Q.     Do you see the person listed in the

4    from?

5         A.     I do.

6         Q.     That's a Lehman Brothers' employee?

7                MR. HORWITZ:  Objection to form.

8         A.     It appears to be, yes.

9         Q.     So wouldn't this be in Lehman

10   Brothers' records?

11               MR. HORWITZ:  Objection to form.

12        A.     I have no way to tell that sitting

13   here today.  It likely would be, but I don't

14   know.

15        Q.     Wouldn't emails from employees be

16   in the records?

17               MR. HORWITZ:  Objection to form.

18        A.     I don't handle Lehman's email

19   systems.

20        Q.     Do you have any reason to doubt

21   that this came from Lehman Brothers' files?

22        A.     No.

23        Q.     I believe you testified earlier

24   that when you compile names and addresses for

25   the master mailing list, you include every

Page 41

```
 1                Steven Kotarba (12-22-15)

 2     address that Alvarez comes across for an

 3     individual?

 4          A.     I would say as a rule that's

 5     accurate, yes.

 6          Q.     So this address should have been

 7     listed in the master mailing list?

 8                 MR. HORWITZ:  Objection to form.

 9          A.     If we would have come across it we

10     likely would have included it.

11          Q.     You testified earlier that Alvarez

12     checks Lehman Brothers' books and records for

13     addresses?

14          A.     Yes, the books and records are the

15     filing entities.

16          Q.     If you can turn back to Behnke's

17     declaration, Exhibit 4?

18          A.     I'm there.

19          Q.     Turn to paragraph 6.  It says,

20     "Since the commencement of LBCC's Chapter 11

21     case, Marsoner has never contacted LBCC with

22     respect to an executory contract, the Trade

23     Confirm or any other contract or transaction."

24     Do you see where it says that?

25          A.     I do.
```

Page 48

1                Steven Kotarba (12-22-15)

2                MR. JOHNSON:  Who headed those two

3    categories I guess.

4        Q.    Earlier I believe you also

5    testified that the criteria for including

6    somebody on the master mailing list was any

7    interaction with the debtors, is that correct?

8        A.    I don't know if I would categorize

9    it that way.  We ask certain questions of

10   certain people to prepare the mailing list, if

11   we receive responsive information we would then

12   include them on the master mailing list.

13                (Record read.)

14       Q.    So then it's true that interactions

15   were the key to being on the master mailing

16   list?

17                MR. HORWITZ:  Objection to form.

18       A.    Interactions that were identified

19   to us were one of the criteria that would lead

20   to being listed on the mailing list, that's

21   correct.

22       Q.    I believe earlier you also

23   testified that when Alvarez found an address it

24   would be included, unless the address were

25   incorrect?

Page 51

1                    Steven Kotarba (12-22-15)

2      expect that they would have done that, yes.

3            Q.      So Alvarez doesn't check to

4      determine if an address is a vacation address?

5            A.      That's correct.

6            Q.      It doesn't check if it's a working

7      address, is that correct?

8            A.      Other than my previous comments,

9      that's correct.

10           Q.      If you could turn back to the

11     Corrected Affidavit of Service, Exhibit 3.

12                   Do you see on the last page, page

13     611 of 1048, an entry for Marsoner Thomas, S. is

14     listed at the very bottom?

15           A.      I see that.

16           Q.      The address is listed as One

17     Broadgate, 5th floor, London, EC2M 7HA United

18     Kingdom?

19           A.      That's correct.

20           Q.      Isn't this LBEL's former address?

21           A.      I believe that's correct, yes.

22           Q.      So they were no longer at that

23     address in 2009?

24           A.      I don't believe they were.

25           Q.      Yet, this address was still

Page 1

Thomas A. Behnke

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------- X

IN RE:                                    )
                                             Case No:08:13555
LEHMAN BROTHERS HOLDINGS, INC.,           )  (SCC)
et al
                                          )  Ref Docket Nos:
                                             4271, 4349
                                          )

-------------------------------- X


DATE:  January 11, 2016

TIME:  9:30 a.m.


          DEPOSITION OF THOMAS A. BEHNKE, held

at the offices of Weil Gotshal & Manges, LLP, 767

Fifth Avenue, New York, New York, pursuant to

Notice, before Hope Menaker, a Shorthand Reporter

and Notary Public of the State of New York.

Page 2

1                        Thomas A. Behnke

2      A P P E A R A N C E S

3      WEIL GOTSHAL & MANGES, LLP

4      Attorneys for Lehman Brothers Holdings, Inc.

5          767 Fifth Avenue

6          New York, New York  10153-0119

7      BY:  MAURICE HORWITZ, ESQ.
            DENISE ALVAREZ, ESQ.
8

9      HOGAN LOVELLS, LLP

10     Attorneys for Dr. Thomas Marsoner

11         875 Third Avenue

12         New York, New York  10022

13     BY:  M. SHANE JOHNSON, ESQ.
            PIETER VAN TOL, ESQ.
14

15

16

17

18

19

20

21

22

23

24

25

Page 29

1                    Thomas A. Behnke

2        A.      I have no reason to dispute that it

3    was an invoice sent to Lehman Brothers Europe

4    Limited which is the party to this contract.

5        Q.      So isn't it true that the Debtors did

6    have access to an agreement between Dr. Marsoner

7    and LBEL?

8        A.      No, I can't say it is true, but if

9    you say that this was produced by us --

10       Q.      Yes, that is what I have said; that

11   it was produced by your counsel in this

12   proceeding.

13       A.      Then I guess they had access to this

14   in an e-mail form.

15       Q.      Thank you.

16              If we could look at Paragraph 6 of

17   your declaration, it says, "Since the commencement

18   of LBCC's Chapter 11 case, Marsoner has never

19   contacted LBCC with respect to an executory

20   contract, the trade confirm or any other contract

21   or transactions."

22              Do you see where it says that?

23       A.      That's correct.

24       Q.      I think you testified earlier you

25   don't have personal knowledge of the mailing of