# EXHIBIT D

```
 1                    IN THE UNITED STATES BANKRUPTCY COURT
 2                        SOUTHERN DISTRICT OF NEW YORK
 3
 4      - - - - - - - - - - - - - - - - - -
 5          IN THE MATTER OF
 6
 7            IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL.,
 8
 9                                    Debtors.
10
11      - - - - - - - - - - - - - - - - - -
12                    DEPOSITION OF PETER SHERRATT
13                            VOLUME I
14                    Friday, November 13th, 2015
15                        AT:  1:00 p.m.
16                          Taken at:
17                        Hogan Lovells
18                          50 Holborn Viaduct
19                            London
20                              EC1A 2FG
21                            London
22                            United Kingdom
23
24                          CONFIDENTIAL
25      Court Reporter:
26      Chris Lang
27          Accredited Real-time Reporter
28
29
30
31
32
33
34
```

1                                          Friday November 13th, 2015

2        (1:04 p.m.)

3     THE VIDEOGRAPHER:  Here begins the videotaped deposition of

4        Peter Sherratt.  In the matter of, In Re: Lehman Brothers

5        Holdings Inc. et al., in the United States Bankruptcy

6        Court, Southern District of New York, case number

7        08-1355 SCC.  Today's date is November 13th, 2015 and

8        the time is 1:04 p.m.  The video operator today is Wendy

9        Viner.  The video deposition is taking place at Hogan

10       Lovells, 50 Holborn Viaduct, London EC1 UK.

11          Counsel, would you please identify yourself and

12       state who you represent.

13    MR. JOHNSON:  I am Shane Johnson from Hogan Lovells

14       representing Dr. Thomas Marsoner.

15    MR. VAN TOL:  Pieter Van Tol from Hogan Lovells representing

16       Thomas Marsoner.

17    MR. HORWITZ:  Maurice Horwitz, Weil Gotshal Manges,

18       representing Peter Sherratt.

19    MS. ALVAREZ:  Denise Alvarez, also with Weil Gotshal Manges.

20    THE VIDEOGRAPHER:  Thank you.  Could I ask the notary to

21       please swear in the witness and we can proceed.

22                       PETER SHERRATT

23    having been Sworn, testified as follows:

24    BY MR JOHNSON:

25       Q.  Okay.  Good afternoon Mr. Sherratt.  So I want to

1          start with your background at Lehman.  So could you

2          please tell me what Lehman entities employed you and

3          what were your titles?

4              A.  I joined what was then Shearson Lehman Brothers in

5          1986.  And joined as legal counsel as part of a three

6          person legal department, two of which were qualified

7          lawyers, and we also had a highly talented paralegal.

8          I became a senior legal counsel during the next several

9          years.  And then in 1991 I became the European legal

10         director, which was the most senior lawyer in Europe.

11         In 1994 I became managing director and also had

12         responsibility for other matters.  I had joined the

13         management committee.  I had responsibility for

14         compliance, for internal audit, for corporate

15         communications and legal.  I also spent a lot of time on

16         the commitment committee and new products committee.  So

17         I had a broad range of duties by 1994.  They were

18         extended to include Asia, and by the way when we say

19         Europe we also mean Middle East and Africa, in reality.

20         So in 1998 I had responsibility for what you might call

21         legal and related matters for Europe and Asia.

22             Then in 2007, I became a vice chairman of the firm.

23         Q.  The firm, by the firm, you mean Lehman Brothers?

24         A.  Lehman Brothers.

25         Q.  I am sorry?

1          A.   Lehman Brothers.

2          Q.   Not any particular entity in Lehman Brothers?

3          A.   Well, I was employed, obviously legal entities

4      within the group are very different pre bankruptcy and

5      after bankruptcy.  The employer, which was Lehman

6      Brothers Limited, was just the normal service company.

7   THE COURT REPORTER:  Sorry, with the rain could I ask you to

8          keep your voice up a little bit.

9          A.   I am sorry, of course.

10         So the employment letter is from October 1986 so

11     I think we would have to go back into the file.  I don't

12     think it was called Lehman Brothers then, but it was

13     a predecessor company to Lehman Brothers Limited.  That

14     is just the service company.  It seconds the employees

15     to many other companies within the Lehman group.

16         Q.   So you considered yourself an employee of Lehman

17     Brothers generally?

18         A.   Yes, absolutely.  With responsibilities that were

19     focused on Europe.  But obviously as a manager in the

20     firm you think about the firm as a whole, especially

21     when you think about the long term issues, you know,

22     presented to the firm.

23         Q.   So isn't it correct that you served multiple roles

24     at Lehman Brothers?

25         A.   Indeed.  I mean as I have said, those sort of

1          titles, and at different times I tended to get involved,

2          or I mentioned crisis management.  So when a large

3          crisis comes along, and I expect we will talk about this

4          later, because Formula 1 was obviously one of those, but

5          for example when the Russian debt crisis hit in 1998 it

6          was my responsibility to try to recover as much as we

7          could from the Russian debt problems.  So yes, as chief

8          legal officer it was my duty to take on matters which

9          the chief executive of Europe felt was appropriate, you

10         know, for someone, you know, with my experience.

11         Q.  And was one of those roles as an officer of Lehman

12         Brothers Holdings?

13         A.  Well, yes.  That is very true.  I think I was

14         a vice chairman of holdings Inc. right at the very end.

15         Q.  Okay.

16         A.  But obviously I thought about the firm as a whole.

17         Q.  Sure.

18         A.  I tended to think about Lehman Brothers rather than

19         Lehman Brothers Holdings Inc.  That is obviously the top

20         firm.

21         Q.  And you were an officer of Lehman Brothers Holdings

22         Inc.?

23         A.  I believe I was, as vice chairman of the firm.

24         Q.  Okay.  I would like to mark this as exhibit 1,

25         please.

1                    (Exhibit 1 marked for identification)

2          Q.   And this is the Lehman Brothers 2007 annual report?

3          A.   Mm-hm.

4          Q.   And do you see the Bates stamps in the bottom

5     right-hand corner, the Marsoner and then a number?

6          A.   Yes I do.

7          Q.   Would you please turn to page 606.

8          A.   Yes.

9          Q.   Do you see your name listed in the column that says

10    "other officers"?

11         A.   Yes I do.

12         Q.   And do you see it also says under your name "vice

13    chairman Lehman Brothers Inc."?

14         A.   Yes I do.

15         Q.   Okay, thank you.  Wasn't it common for members of

16    Lehman Brothers' senior leadership to serve multiple

17    roles with different Lehman entities?

18         A.   Yes, absolutely.

19         Q.   And in your work, isn't it true that you regularly

20    communicated and worked with individuals at Lehman

21    entities in the US and in Europe?

22         A.   Yes.

23         Q.   Including other officers, and members of Lehman

24    Brothers Holdings Inc's senior leadership?

25         A.   Yes.

1        MR. HORWITZ:   Objection, form.

2            Q.   Now, as far as F1, when did you first begin working

3        on Lehman's F1 investment?

4            A.   Well, I first came across it in connection with the

5        commitment committee consideration of a loan to Kirch so

6        that would have been in 2001, I believe.   But the F1

7        investment if you mean at what point did I become

8        involved in the F1 investment directly, that would have

9        been in 2002.   Because before then, we were simply

10       a lender to Kirch, who had made the investment in

11       Formula 1.

12           Q.   And when you became directly involved in 2002, what

13       was your role?

14           A.   I was part of the team to try to recover what we

15       could from the loan to Kirch.

16           Q.   And who else were you working with at the time on

17       the F1 investment?

18           A.   A big team.   Ruggero Magnoni, Vittorio Pignatti

19       came over, Joe Cohen spent a lot of time on it.   And we

20       obviously had a significant group of people working on

21       it.   The head of the German office was involved.   He

22       would accompany me to meetings in Bavaria, because

23       Bayerische Landesbank, as you know, is a half state-owned

24       company.

25           Q.   And who was that?

1          A.  Well, I can only read what you can read.  I mean,

2       I am not sure what you are asking me for here.  It does

3       do that, according to how I read it.

4          Q.  Were you not involved in those discussions to have

5       Dr. Marsoner?

6          A.  Yes, indeed, I was, I would have been very happy

7       with Marsoner representing the three banks.

8          Q.  And this is October 2002?

9          A.  Yes.  I remember, because Thomas and I got on well

10      and I respected him.

11         Q.  And you thought he was knowledgeable about F1?

12         A.  Yes.

13      MR. JOHNSON:  Please mark that as exhibit 3.

14             (Exhibit 3 marked for identification)

15         Q.  This is an October 22nd, 2002 email from Patrick

16      Bierbaum to Peter Sherratt, Victoria Pignatti and

17      Stephen Sleigh, at Lehman Brothers, copied Thomas

18      Bernard, Steve Hannan, and Patrick Schmitz-Morkramer.

19      And are you familiar with this document?

20         A.  Well, this is the same as my last answer.

21      I haven't seen this since I left Lehman.  I may well

22      have seen this at the time.  It is very likely I would

23      have read this at the time.

24         Q.  And do you see that you are listed as an addressee

25      on this email?

1          a broad ranging question.  Are you happy if we talk

2          a little bit about that?  Are you talking now about

3          2002?

4              Q.  I am talking about over the time that he advised

5          Lehman Brothers --

6      MR. HORWITZ:  Objection to form.

7              Q.  -- on F1, did you think he was a valuable adviser?

8              A.  I thought it was always interesting to see.

9              Q.  That is a yes or no question.

10             A.  I am just trying is to give what you I thought.

11             Q.  That is not what I asked for.  I said isn't it true

12         that Dr. Marsoner was a valuable adviser on F1?

13     MR. HORWITZ:  Objection to form.

14             A.  I wouldn't be so harsh as to say no.

15             Q.  So yes?

16             A.  It is, the valuableness is not a yes/no situation,

17         is it, it is a spectrum.  Some people are more valuable

18         than others.  You can have some value, not very much or

19         you can have a lot of value.  It is a spectrum, isn't

20         it, of value.  It is not a yes/no situation, so if you

21         allow me to explain the context, I can help you get to

22         the truth here.

23             Q.  Well, he had some value as an adviser on F1?

24     MR. HORWITZ:  Objection to form.

25             A.  I believe that he did have some value.

1        Q.  Okay, thank you.

2        A.  As an --

3        Q.  That is good, thank you.

4        A.  Okay.

5        Q.  And isn't it correct that you knew Dr. Marsoner was

6    a paid adviser to Lehman?

7    MR. HORWITZ:  Objection to form.

8        A.  That he was a paid adviser to Lehman.  Yes, I did

9    know that, just not in relation to Formula 1.

10       Q.  That is not what I asked.  You were aware

11   Dr. Marsoner had agreements to serve as an adviser with

12   LBEL, Lehman Brothers Europe Limited?

13       A.  Yes, I didn't make that specific question in

14   relation to LBEL, because you don't tend to in terms of

15   precise legal entities when you are involved in

16   an investment bank across the firm.  But, yes, if you

17   had asked me which company entered into a consultancy

18   agreement with Thomas then I would have guessed that it

19   was LBEL.

20       Q.  Okay, but you were definitely aware that he had

21   advisory agreements with Lehman Brothers?

22       A.  Yes.

23       Q.  Okay.  Did you sign any of Dr. Marsoner's advisory

24   services agreements?

25       A.  Not that I recall, but I would have to check the

1      A.  Yes I do.

2        Q.  If you turn to page 28 of exhibit C do you see that

3      it is signed by Vittorio Pignatti on behalf of Lehman

4      Brothers Europe Limited?

5        A.  Yes I do.

6        Q.  Okay, thank you.  Were you aware that this

7      agreement included success fees?

8        A.  I mean frankly I wasn't aware of any details of

9      this agreement at the time, as far as I can remember.

10       Q.  You didn't help negotiate it?

11       A.  I don't recall doing so.  I think that would have

12     been a lawyer inside my department who would have been

13     involved, rather than -- I wouldn't normally get

14     involved in consultancy agreements.

15       Q.  So --

16       A.  This isn't something that I kept a big record of at

17     the time.  And I don't recall.

18       Q.  You didn't negotiate the commercial terms,

19     certainly, then?

20       A.  I don't think so, I don't think so.

21       Q.  And then you never determined the success fee that

22     Dr. Marsoner would be paid under the advisory

23     agreements?

24       A.  Personally, no.  I don't recall doing so.

25       Q.  Do you see in paragraph 1 of the 2004 agreement

1      that it says:

2          "Dr. Marsoner will assist Lehman Brothers and the

3      Lehman Group."

4      A.  Yes I do.

5      Q.  So he wasn't just advising Lehman Brothers Europe

6      Limited, he was advising the entire group.

7   MR. HORWITZ:  Objection to form.

8      A.  Sorry, are you asking me for a legal interpretation

9      of this language?

10     Q.  Well, it doesn't, does it, say Lehman Brothers

11     Europe Limited?

12     A.  It says "assist Lehman Brothers and the Lehman

13     group".

14     Q.  Okay.

15     A.  Was it a question around that, or?

16     Q.  That is it.

17     A.  Okay.

18     Q.  On the F1 reinvestment, is it true that in late

19     2005 CVC Capital Partners bought a controlling interest

20     in F1?

21     A.  Yes, they certainly made the offer in 2005.  I am

22     just trying to remember the exact closing date, but it

23     was the end of 2005 that they came into Formula 1, yes.

24     Q.  And isn't it correct that Vittorio Pignatti worked

25     on the reinvestment for Lehman Brothers?

1        A.   He may well have done.   I mean certainly all of

2        these things are team efforts.   I don't recall Vittorio

3        being involved, but he may well have done.

4             Q.   And was Thomas Bernard involved?

5             A.   Yes, absolutely.   Thomas Bernard and Steve Hannan

6        and I had many conversations and had worked together

7        closely over the life of the Formula 1 investment,

8        because it was our job to manage that investment.

9             Q.   And was Ruggero Magnoni involved?

10            A.   Well, like Vittorio, they were on the investment

11       banking side, so as you will know, there was

12       an agreement put in place in which Lehman Brothers was

13       hired as an investment banking adviser.   But there is

14       a slight but nevertheless significant difference between

15       managing the investment and advising on the managing of

16       the investment.   And the role of Bernard, Hannan and

17       I was to manage the investment, of which Tom Bernard was

18       the most senior of the three of us.

19            (Exhibit 5 marked for identification)

20       Q.   This is an email of November 26, 2005 from Thomas

21       Bernard to Steve Hannan, Patrick Schmitz-Morkramer and

22       Peter Sherratt.

23       A.   Mm-hm.

24       Q.   Are you familiar with this document?

25       A.   Well, you say familiar, there was obviously one

1          meetings and went to see Bernie Ecclestone, and that

2          kind of management.  And Vittorio, absolutely would have

3          been a very important, valuable person in all of this.

4          It is just that the work out team was really Bernard,

5          Hannan and myself.

6               Q.  So Bernard's opinion on whether to reinvest or not

7          was very important?

8               A.  Certainly important.  Along with other senior

9          members of the firm, of course, the people more senior

10         to him.  But it was important.

11              Q.  And do you see in this email it says "If McLaren is

12         true, it is huge" from Thomas Bernard?

13              A.  Yes, I do see that.  Absolutely.

14              Q.  Isn't it correct that McLaren was one of the oldest

15         active F1 teams?

16              A.  Yes.

17              Q.  McLaren has been a very successful F1 team, is that

18         right?

19              A.  It has.

20              Q.  Won a lot of races and championships?

21              A.  Yes, it has.

22              Q.  It is fair to say that McLaren is an important F1

23         racing team?

24              A.  Yes, it is one of the important ones.  Ferrari is

25         clearly the key one for the purposes of F1.  But McLaren

1        is also, in general, an important team.

2            Q.   It is important to the financial well being of F1

3        that they remain in F1?

4            A.   It is it is one, as I said, it is one of the

5        important teams in F1.   I mean F1 itself is a business

6        that survives comings and goings of teams, and it can

7        always do that.

8            Q.   Isn't it correct that F1 is --

9    MR. HORWITZ:   Let him finish the answer to the question.

10   MR. JOHNSON:   I believe it was a yes or no question.

11   MR. HORWITZ:   What was the question?

12   MR. JOHNSON:   Is McLaren important to the financial well

13       being of F1.

14           A.   It is one of the teams that is important to --

15           Q.   Okay.

16           A.   -- F1.

17           Q.   Isn't it correct that F1 is more valuable with

18       McLaren as a team?

19           A.   Yes.

20           Q.   Isn't it correct that McLaren as well as other

21       racing teams had threatened to leave F1 and form their

22       own racing series?

23           A.   They had, all of them at one point or another.

24           Q.   And McLaren was de facto leader of these teams that

25       had threatened to leave?

1       MR. HORWITZ:   Objection to form.

2           A.   I am not sure about that.   I think it is much more

3       complicated, I think, than that.

4           Q.   Okay.   But therefore it would have been important

5       to know whether McLaren would continue with F1 after

6       CVC's purchase, is that right?

7           A.   It would be one factor.   It depends on your point

8       of view about how attracted you are by the reinvestment

9       before you know that piece of information.

10          Q.   Well, if McLaren had left F1, it would have been

11      less valuable, correct?

12          A.   Yes, but you still might have reinvested.

13          Q.   Okay, but it would have been less valuable?

14          A.   True, but you still might have reinvested.

15          Q.   I am just asking if it would have been less

16      valuable.

17      MR. HORWITZ:   Asked and answered.

18      MR. JOHNSON:   Has he answered it?

19      MS. ALVAREZ:   Can we have the court reporter read back.

20          A.   I am sorry, do you want the court reporter to read

21      it back, or do you want to ask the question again?

22      MR. JOHNSON:   Well, I asked the question, your counsel

23      objected.

24      MR. HORWITZ:   I think he has answered three times.

25      MR. JOHNSON:   Is the answer yes?

1              "MR. HORWITZ:  I think he has answered

2         three times.

3              "MR. JOHNSON:  Is the answer yes?

4          "Answer:  I think I will stand by my previous

5       answer."

6              Do you want me to continue?

7      MR. JOHNSON:  Okay, that's fine.

8      BY MR JOHNSON:

9          Q.  And had other teams, other racing teams left F1, F1

10     would have been less valuable?

11         A.  Yes, in general, that's right.  Again, you still

12     might have reinvested.

13         Q.  Therefore it is important to know whether McLaren

14     would continue with F1 after CVC's purchase, is that

15     right?

16     MR. HORWITZ:  Objection to form.

17         A.  It was a factor, and that is why it was nice to

18     hear from Thomas that McLaren would be likely to stay.

19         Q.  So the information that Dr. Marsoner provided about

20     McLaren was valuable?

21         A.  It was useful, if you are on the fence it is

22     useful, of course, to hear information.

23         Q.  And did you already know that information?

24         A.  No, I didn't.

25         Q.  Do you agree with Thomas Bernard that this

1        Q.   Including LBHI?

2        A.   Were they employed by LBHI, I don't know.  That was

3        a matter for the US.  As you will recall I was chief

4        legal officer for the areas outside the US.  So

5        distinctions between -- if you are trying to trip me,

6        like, on whether it is LBHI or whether it is LBI or

7        LCPI, then I am sorry, I don't recall which entities

8        they were employed by.

9        Q.   But you worked with officers of LBHI?

10       A.   I worked with the individuals who may also have

11       been officers, but I didn't work with them because they

12       were officers.

13       Q.   That is fine.  You worked with them?

14       A.   Well, you would have to give me the names --

15   MR. HORWITZ:  Objection to form.

16       A.   -- of the people and I would show you which ones

17       I had worked with.

18   MR. JOHNSON:   Can we bring back the 2007 annual report?

19   THE COURT REPORTER:   This one?

20   MR. JOHNSON:   Yes.

21   BY MR JOHNSON:

22       Q.   Page 606 again.

23       A.   606, right.

24       Q.   I think you testified you worked Vittorio Pignatti?

25       A.   Yes, I worked a lot with Vittorio Pignatti, yes,

1          over many years, before Thomas arrived, in fact.

2          Q.   And do you see he is listed as an other officer?

3          A.   Yes I do.

4          Q.   I believe you said you worked Ruggero Magnoni?

5          A.   Yes, absolutely, he is another person I respected

6     enormously.

7          Q.   And do you see him listed as another officer?

8          A.   Yes.

9          Q.   And you worked with Jeremy Isaacs?

10         A.   Yes, would it be helpful for me to go down the

11    entire list or you going to guess which ones I worked

12    with, which would you rather?

13         Q.   Go down the list and tell me which ones you worked

14    on F1.

15         A.   In relation to F1 specifically?

16         Q.   Yes, F1.

17         A.   Well, I recall one time in Munich, around the

18    Kirch, when Dick Fuld was involved, when he and I spoke

19    about it.

20         Q.   And that is Richard Fuld, chairman and chief

21    executive officer?

22         A.   Yes.   Around F1 there would be issues in relation

23    to the valuation of F1, so I probably spoke to Dave

24    Goldfarb when he was CFO, and was in a senior finance

25    position.   I probably spoke at some point with Joe

1       Gregory, on F1 I certainly spoke to Jeremy Isaacs on F1,

2       of course, because he was the chief executive officer

3       for Europe.   I probably spoke to Ian Lowitt about F1 at

4       some point.   Tom Russo, Chris O'Meara.

5          Q.   I am sorry, what was the last one?

6          A.   Chris O'Meara.

7          Q.   Okay.

8          A.   Ruggero, Vittorio, I don't recall speaking to

9       anyone else about F1.   But bear in mind that it was

10      a very significant investment by the firm, so I could

11      not say for certain at this point, you know, ten years

12      on, you know, who exactly was involved.

13         Q.   Okay.   And you are aware that Pignatti and Bernard

14      asked Dr. Marsoner for his advice regarding the F1

15      reinvestment?

16         A.   I am aware that they received advice.   Um, I don't

17      know the situation as regards what they asked for, I am

18      afraid.   I don't think I was party to those discussions.

19         Q.   Do you disagree with Pignatti and Magnoni that

20      Dr. Marsoner should be paid for his F1 advice?

21         A.   I don't believe --

22      MR. HORWITZ:   Objection to form.

23         A.   I don't believe at this point that it is right to

24      make a claim in relation to F1.   I think if he had

25      wanted to be paid, expected to be paid, in relation to

1   F1, that would have been agreed at the time and I think

2   he is too smart not to know that, so I do, I don't know

3   what Vittorio's and Ruggero's position is right now.

4   But it strikes me as unusual to say the least that we

5   should have a claim coming in now in relation to

6   something which happened so long ago.

7       Q.  So your main issue with his claim is the timing of

8   it?

9   MR. HORWITZ:   Objection to form.

10      A.  I think timing reveals a more underlying problem in

11  the sense that I think if it had been intended that he

12  would have been paid any significant sum, then I think

13  everyone would have agreed that up front in the normal

14  way and then there would have been appropriate provision

15  made for it.  And that is how any normal accounting, you

16  know, procedure is followed.  That is a proper

17  procedure.

18          (Exhibit 6 marked for identification)

19      Q.  This is a declaration of Dr. Thomas Marsoner that

20  was submitted to the US bankruptcy court which attached

21  affidavits from Vittorio Pignatti, Ruggero Magnoni, and

22  Tom Bernard.

23      A.  Mm-hm.

24      Q.  Turn to the last paragraph of Vittorio Pignatti's

25  affidavit, please.

1       A.  Mm-hm.  "He would have been paid..."

2       Q.  Do you see that Vittorio Pignatti said that it was

3    his understanding that "Dr. Marsoner would have been

4    paid by Lehman Brothers for his services concerning the

5    F1 investment or I would not have asked him to help."

6       A.  I can see that.  Sorry, was there a question in

7    relation to it, or is it just whether I can see that.

8       Q.  There will be, just a second.

9       A.  Okay.

10      Q.  If you turn to Ruggero Magnoni, the last paragraph

11   of his affidavit?

12      A.  Mm-hm.

13      Q.  Do you see it was said:

14         "It was well understood by the Lehman decision

15   makers that Dr. Marsoner's fees normally amounted to 10

16   percent of firm revenues."

17   MR. HORWITZ:  Objection to form.

18      A.  I can see that.

19      Q.  But you disagree with Pignatti and Magnoni that

20   Dr. Marsoner should have been paid for his advice?

21   MR. HORWITZ:  Objection to form.

22      A.  Should have been paid at the time in what,

23   2005/2006 --

24      Q.  No.

25      A.  -- are you saying, or should have been paid at what

1        point?  I don't quite understand.
2          Q.  That he should have been paid when profits were
3        realized.
4          A.  I don't think there was any agreement, so in my
5        work I was just used to having agreements and I was used
6        to situations where people were paid for things that
7        they had been, it was agreed that they would be paid in
8        respect of.  I don't think there was any agreement, as
9        far as I know.  I may be wrong, but as far as just I am
10       aware, there was no agreement to pay Thomas.  But
11       clearly if there was another agreement somewhere else in
12       the firm then I would like to see it and I would respect
13       that.
14         Q.  Did you have any role in server's acquisition of
15       Bawag?
16         A.  I don't believe I did, but again, I might have been
17       aware of it.  You are slightly catching me off guard,
18       Cerberus' investment in Bawag, did you say?
19         Q.  Yes.
20         A.  No, I believe Bawag was a client of, I may be wrong
21       on this, but I think Bawag was a client of Thomas' when
22       he was at Lehman, I am not sure.  That is all I remember
23       of it.  There are probably many details which if
24       I refresh my memory I would remember, but not now.
25         Q.  Would it surprise you to learn that he was paid

1          a success fee for that transaction?

2      MR. HORWITZ:  Objection to form.

3          A.  Um, I have no, I don't know the background of it,

4      I don't know anything about it.  So I think the way you

5      phrase your question is would I be surprised to hear he

6      had been paid a success fee.  I am neither surprised nor

7      not surprised, you know, not surprised if you see what

8      I mean, I just don't know the context.

9          Q.  Let me rephrase it slightly.  Would you be

10     surprised he was paid a success fee on a transaction not

11     covered in an agreement?

12         A.  That would surprise me.  Normally you would have,

13     and that was the sort of ABC of consulting agreements,

14     you would write down the clients that the consulting

15     arrangement relates to.  So that was one of the first

16     things that, when I started off as a junior lawyer,

17     I did some consulting agreements and naturally had

18     responsibility for them.  One of the key things is to

19     try to avoid that kind of uncertainty.  But, it would,

20     that would surprise me.  But I don't know the

21     circumstances.

22         Q.  Would it change your mind about Dr. Marsoner's F1

23     claim?

24     MR. HORWITZ:  Objection to form.

25         A.  Sorry, what would change my mind about Dr. --

1          Q.  If --

2          A.  Are you talking about a transaction which I know

3     very little about and don't I know the circumstances and

4     you are asking me whether that would change my mind in

5     relation to Formula 1?

6          Q.  Well, you said earlier that your objection to

7     Thomas' claim is that it wasn't written in any of the

8     agreements, is that correct?

9          A.  I think I said a number of things, but certainly it

10    was a -- you would normally expect a consultant to have

11    a list of clients and that would be the basis upon which

12    people would normally be paid, so that was my

13    understanding.  Now, clearly if that didn't happen, then

14    that didn't happen.  What can I say.  But my normal --

15    if you are asking me what my state of surprise, or my

16    state of understanding about consultancy agreements is

17    concerned, then normally in a consulting arrangement you

18    normally list the clients that the consultant is going

19    to be paid in respect of, otherwise you have uncertainty

20    and it makes it very difficult to keep proper accounting

21    records.

22         Q.  But you wouldn't have determined if Dr. Marsoner

23    was due a success fee?

24    MR. HORWITZ:   Objection to form.

25         A.  Not unless it related to something I was

1       specifically involved in.  But no, his main contact

2       would have been investment banking and that is

3       completely natural, it wouldn't have been into the

4       legal, it wouldn't be into the chief legal officer.

5           Q.  And that was Vittorio Pignatti?

6           A.  Well, clearly as you have shown me earlier, he was

7       the principal contact for Thomas, so Vittorio Pignatti

8       would have been the natural person Thomas would talk to

9       about which clients to include in his agreement.

10          Q.  And he would have decided that Dr. Marsoner was due

11      a success fee?

12  MR. HORWITZ:  Objection to form.

13          A.  He would decide which clients go into that

14      agreement.  If you want to pay somebody outside of

15      an agreement, I would imagine, but I wasn't aware of

16      this practice, but I would imagine that he would need to

17      socialize that decision more widely, because clearly if

18      you pay somebody outside of your normal obligations,

19      then it is, you know, you would normally expect that to

20      be a wider decision than any one individual, especially

21      if it is any significant sum of money, clearly.  There

22      would need to be quite a few individuals involved.  You

23      know, no one person has autocracy to spend large amounts

24      of the firm's money, unless it is under a contract.

25  MS. ALVAREZ:  We are hitting the one hour mark.  You tell us

1          when is a good time, but we should take a brief break,

2          just a few minutes.

3     MR. JOHNSON:  Yes, I have one or two questions on this point

4          and then I think that would be a good time to break.

5     MS. ALVAREZ:  Okay.

6               (Exhibit 7 marked for identification)

7     BY MR. JOHNSON:

8          Q.  This is an email from Vittorio Pignatti to

9          Jonathan Rouner, Lehman Brothers, copying

10         Christian Meissner; an October 13, 2005 email.  Do you

11         see that this email says:

12             "Thoma's contract with me has expired and I am just

13         covering his expenses on projects that I approve.  When

14         projects become real I agree with him on the % of

15         revenues he will be entitled to."

16         A.  I can see that.

17         Q.  Doesn't this contradict what you just said about

18         one person not deciding --

19     MR. HORWITZ:  Objection to form.

20         Q.  -- payment?

21         A.  It says:

22             "... I am just covering his expenses on projects

23         that I approve.  When projects become real I agree with

24         him on the % of revenues he will be entitled to."

25             Yes, of course he will say that but it doesn't mean

1      that he hasn't cleared it internally with the relevant

2      people.  It's shorthand.  He might say "I am determining

3      this" or he might say "we are determining this", it is

4      shorthand.  Clearly as the principal contact point

5      Vittorio would be the natural person to figure out what

6      projects Thomas is working on.  That would be completely

7      appropriate.

8          Q.  Even if the contract has expired?

9          A.  As the principal --

10   MR. HORWITZ:  Objection to form.

11         A.  As the principal contact point, if a contract has

12     expired, I mean, we are really dealing with

13     hypotheticals, aren't we, and you are asking me to put

14     myself in the position of Vittorio at that point.

15     I guess what I am saying is that Vittorio, my guess is

16     that if he is paying money or he is committing to large

17     sums of money by the firm which are not in a contract,

18     Vittorio, being a good team player as he was, would have

19     needed to have that agreed with other people in the

20     firm.  It would be very rare for one person to say "I am

21     now going to make a large financial commitment", for it

22     not to be kept in any records, and then to say to the

23     firm "well, I just did that off my own back".  It would

24     be pretty rare for someone to do that and Vittorio was

25     a very, very professional person.

1          he was CC'd on emails.

2          A.  Because I was involved in the investment of F1.

3          Would you like me to go back through my involvement from

4          the start, or is that just a --

5          Q.  No, no, that was it.

6          A.  Okay.

7          Q.  We talked about how Pignatti would potentially give

8          success fees.  Were there any written guidelines for

9          contacting people such as Pignatti?

10         MR. HORWITZ:  Objection to form.

11         A.  Not that I recall.

12         Q.  Okay.  Now isn't it correct that Lehman Commercial

13         Paper Inc. was the Lehman entity used to reinvest in F1?

14         A.  It was, it was the entity that had originally made

15         the loan out of fixed income.  So that was, it was

16         an entity that was commonly involved in high yield

17         business and so it was the entity, I believe, that held

18         the shares in Speed, and therefore it made sense when it

19         sold those shares to be the entity to reinvest in Alpha

20         Topco.

21         Q.  And that is a US entity?

22         MR. HORWITZ:  Objection to form.

23         A.  LCPI is a US entity.  Are you thinking of Alpha

24         Topco or Speed?

25         Q.  No.

1      A.   LCPI.

2      Q.   Yes, LCPI?

3      A.   LCPI, yes, absolutely, yes.

4      Q.   And Lehman Brothers Europe Limited didn't have any

5      interest in F1?

6      A.   No, it was a -- obviously its employees were

7      obviously involved in advising on F1, absolutely.   But

8      it didn't have a direct financial interest as an entity,

9      no, as far as I know.   That wouldn't have been

10     appropriate, it was a service entity, LBEL.

11     Q.   I believe you just mentioned one of these entities,

12     but are you familiar with Delta Topco Limited and Delta

13     Prefco Limited?

14     A.   Yes.

15     Q.   Is it correct that these companies hold the

16     ordinary shares and debt of Alpha Topco Limited and Beta

17     Topco 1 Limited?

18     A.   I would need to go back to understanding the

19     structure of the Formula 1 group to tell you that.   Are

20     you talking about as of now?   Because -- or as of any

21     particular date, are you talking about?   If you are

22     saying were they, was Delta Topco or Alpha Topco the top

23     group that held the Formula 1 business generally, then

24     yes.

25     Q.   Okay.

1       A.   That was the entity, Alpha Topco originally and
2       then Delta Topco were the entities that I joined as
3       a director and they were the entities that owned
4       Formula 1.
5       Q.   And I think you just said that, but you were
6       appointed as a director of Delta Topco Limited and Delta
7       Prefco Limited?
8       A.   Yes, I was appointed to what you might broadly call
9       the board of Formula 1, but it was the holding company,
10      the relevant holding company.
11      Q.   And you were appointed by Lehman Commercial Paper
12      Inc.?
13      A.   I think technically you were appointed by the
14      company, so you join the board of the company as
15      an individual.   But I did that representing the
16      shareholder, which was LCPI.
17              (Exhibit 8 marked for identification)
18      Q.   This is a motion made by Lehman Commercial Paper
19      Inc. in the United States bankruptcy case to sell shares
20      of Delta Topco Limited and Delta Prefco Limited.   Could
21      you please turn to exhibit B.   This is a draft
22      consulting agreement?
23      A.   Yes it is.
24      Q.   Was a final executed version ever entered into?
25      A.   Yes, I did enter into a consulting agreement.

1        MR. HORWITZ:  Objection to form.

2              A.  I did, yes.

3              Q.  If you will go to exhibit C.

4              A.  Yes.

5              Q.  It is a letter agreement.

6              A.  Mm-hm.

7              Q.  Lehman Commercial Paper Inc.

8              A.  Yes.

9              Q.  Did you execute a letter of agreement substantially

10       similar to this one?

11       MR. HORWITZ:  Objection to form.

12             A.  Did I execute myself?  Um, this looks like

13       a statement in which they will nominate me as a member

14       of the board.

15             Q.  Sorry, yes.  Did you know if --

16             A.  I think LCPI did nominate me, yes, absolutely, and

17       I was appointed by those boards.  I think it looks like

18       Jack McCarthy may have executed this.

19             Q.  And are you still a director of these entities?

20             A.  No I am not, no.

21             Q.  When were you replaced?

22             A.  I resigned in 2012.  Although I did resign also for

23       a period, if you want the full -- to be, give you full

24       detail on that, I had a short period after the

25       bankruptcy in which I dropped out of the board because

1        legal entities are of course incredibly important.  But

2        in terms of the way that individuals dealt with each

3        other, especially when individuals were operating

4        themselves for several legal entities, they wouldn't go

5        round with one particular hat on and say "I am a LBL

6        employee" or "I am a LBI employee".  That would be a --

7        that wouldn't be the normal course of business, because

8        it would be impractical, because there were hundreds of

9        Lehman Brothers companies.

10       Q.  And so people, individuals at Lehman Brothers,

11       regularly shared information, even if they weren't

12       employed by the same legal entity?

13  MR. HORWITZ:  Objection to form.

14       A.  The sharing of information would depend on function

15       rather than form in terms of legal entity.  So the legal

16       department's employee wouldn't share information to

17       a member of the trading desk if that information was

18       sensitive and related to legal issues.  Equally a member

19       of the trading desk wouldn't share his trading book

20       information with someone in a different part of the firm

21       unless there is a specific legal reason.  I shouldn't

22       say legal reason, a specific reason why it came within

23       his authority to share information.  So sharing of

24       information is really done by function rather than by

25       the legal entity that the person is employed by.

1        Because if you had the legal entity as the determining

2        factor you would not be able to operate things like

3        Chinese walls appropriately, where you may have two

4        people who are employed by the same legal entity but

5        being in different parts of a, you know, having

6        different pieces of information which you may not want

7        to be connected together for legal reasons.  So you have

8        to do it by form not by legal entity.

9            Q.   But you personally, did you share information with

10       US employees?

11           A.   I did, indeed it was my obligation to do so as a,

12       you know, I had -- there were senior employees in the

13       States and if they asked me for information it would

14       have been irresponsible of me to keep it secret from

15       them.

16           Q.   So as a parent of LCPI, isn't it true that LBHI

17       also had access to the F1 documents?

18       MR. HORWITZ:   Objection to form.

19           A.   Are you talking pre bankruptcy now?

20           Q.   Yes.

21           A.   Would LBHI have -- well, LBHI is the overall group

22       company.   So I am not sure LBHI probably ever requested

23       anything from LCPI, it may have done, but I think what

24       actually occurs in practical terms is that the senior

25       person, it might be the senior management, would ask for

1      information of more junior managers.  It wouldn't be

2      a question of LBHI asking for LCPI for information.

3          Q.  As a director of the Delta entities, you personally

4      had access to LCPI's F1 documents?

5    MR. HORWITZ:  Objection to form.

6          A.  So we are now talking about post bankruptcy.  Did

7      I have access to LCPI documents?  In general, no.

8      Naturally, I spoke to people who I think were probably

9      employed by LCPI, or related to LCPI, people like Jack

10     McCarthy.  So naturally I talked to them, but I did not

11     have any access to LCPI records generally.

12         Q.  How would you provide them advice if you couldn't

13     see any of their records?

14   MR. HORWITZ:  Objection to form.

15         A.  Because my role was to go to the board meetings of

16     Formula 1 and to understand what is happening, to engage

17     in conversations with CVC, to talk, to, you know,

18     understand what was happening.  And where appropriate to

19     share that information with the relevant people who as

20     a consultant I sort of reported to, within LCPI.  It was

21     not my role to run LCPI; I was a consultant.  So I think

22     it would have been inappropriate for me to have had

23     access to all of the records, just as anyone advising

24     a company doesn't necessarily have access to all of the

25     records within that company.

1       F1?

2        A.  No I don't, no, and never have done.  You are

3       talking directly, there, are you, or are you talking

4       about do I have any interests in whether F1, because

5       clearly if I am working for a company and the company

6       benefits, that is good.  So I have an interest in that

7       sense.  I worked for Lehman Brothers and Lehman Brothers

8       profited from F1, so I was happy that it had profited.

9       But if you are saying did I have an interest in F1

10      itself, no I didn't hold any shares, I didn't hold any.

11      You know, Formula 1 certainly never paid me anything.

12       Q.  And you are still employed by Lehman Brothers?

13       A.  No, I am a consultant.  Obviously the concept of

14      Lehman Brothers is a bit more complicated these days.

15      I am still a consultant to a Lehman Brothers entity in

16      the UK and I attend the creditor committees in the UK.

17       Q.  Do you still receive payment in that role?

18       A.  I do from LBIE, yes.  Again, the amounts are not

19      large and it is some time since I last received, but yes

20      I do, absolutely, I am a consultant of LBIE.

21       Q.  Are you receiving payment for this deposition?

22       A.  No, certainly not.  I have no financial interest in

23      this matter at all.

24       Q.  If Lehman had not reinvested in 2005, isn't it

25      correct that they would have lost out on future profits?

1              A.   Absolutely.

2         MR. JOHNSON:  Do you want to take a ten minute break?  I may

3              be close.

4         MS. ALVAREZ:  Okay.

5         THE VIDEOGRAPHER:  We are going off the record.  The time is

6              2:49 p.m.

7         (2:49 p.m.)

8                        (break taken )

9         (3:06 p.m.)

10        THE VIDEOGRAPHER:  We are back on the record.  The time is

11             3:06 p.m.

12        MR. JOHNSON:  I am finished with my questions.

13        MR. HORWITZ:  Okay.

14   BY MR. HORWITZ:

15             Q.   Please state your name for the record.

16             A.   Peter Sherratt.

17             Q.   Could you tell us about your educational

18        background?

19             A.   I went to a state school in Warwickshire.  Did

20        jurisprudence at Oxford University specializing in

21        company law and international trade and then a masters

22        degree at Cambridge University specializing in corporate

23        and securities law and trade.  I studied at the Bar and

24        qualified as a barrister working in the chambers of

25        1 Essex Court.

1          Q.   Where are you currently employed?

2          A.   I currently work as an executive chairman for

3     a charity called Against Malaria Foundation in which we

4     supply bed nets to people in sub Saharan, largely sub

5     Saharan Africa.   I have a number of other assignments.

6     I chair two governing bodies of schools in the inner

7     city; one primary school, one secondary school.   I am on

8     the business advisory council of Oxford University

9     Business School and I have various other charitable

10    interests and from time to time I act as a consultant to

11    LBIE in Europe.

12    THE COURT REPORTER:   Before we continue, could you go back

13         to how you were sitting before.   When you are facing the

14         attorney it is difficult to hear.

15         A.   I am so sorry.

16    BY MR. HORWITZ:

17         Q.   When did you start working for Lehman Brothers?

18         A.   In 1986.

19         Q.   And what was your title?

20         A.   Legal counsel.

21         Q.   What were your responsibilities?

22         A.   Well, I joined a very small team.   There were only

23    two lawyers and one very highly talented paralegal.   And

24    the three of us had responsibility for all legal matters

25    and setting up the legal department in Europe and the

1           middle east and we also set up the compliance
2           department.  So I got involved in most of the legal
3           issues that were significant for what was then
4           Shearson Lehman Brothers, because I had worked on a case
5           for Shearson as a young lawyer, and that was the
6           background to me coming over to join Shearson Lehman.
7           So I worked on many things from the start just because
8           there were so few of us.
9             Q.  Did your title and responsibilities change over
10          time?
11          A.  Yes they did.  The most significant change was in
12          1991, when I was asked to become the European legal
13          director, that is the most senior lawyer in Europe, and
14          to manage the legal function and, you know, to interact,
15          obviously, with the chief executive and the other senior
16          managers of the firm.  So from that time I was heavily
17          involved, particularly in you know, some of the largest
18          issues of the day, it tended to be if there was
19          a particular crisis the most senior lawyer would be
20          expected to get involved and to try to resolve that
21          crisis to the best of his ability.  Obviously working in
22          a team, you know, with other people you have to be
23          a corporate, good corporate citizen.  As chief legal
24          counsel that is one of the most essential attributes.
25             In 1994 I became the managing director and took on

1       formal responsibility for compliance and audit and

2       corporate communications and philanthropy.  In 1998

3       I believe, I would need to check precise dates, around

4       1998 I was given the same responsibilities in relation

5       to the other non-American jurisdictions, that is Asia.

6       So I would spend time in Asia from 1998 onwards, and in

7       2007 I was appointed as a vice chairman of the firm.

8          But there were various different responsibilities

9       during that time, as I mentioned in cross-examination.

10      The 1998 Russia crisis was a particular focus.  It was

11      a large financial exposure for the firm and needed a

12      kind of work out type of experience, and we didn't have

13      a work out group.  There weren't significant numbers of

14      loans that defaulted in Lehman Brothers in Europe, so we

15      didn't have an employed work out group.  So we tended to

16      do things by involving the legal department, and of

17      course any businesses that had expertise in relation to

18      the issue.  But we didn't have a formal work out group

19      to which, for example, assets were sold and then exited

20      from.

21      Q.  And you testified earlier that you were on the

22      commitment committee.  What was that?

23      A.  The commitment committee was involved in approving

24      major transactions in Europe.  And for fairly long

25      periods of my career I was on the commitment committee

1       and I chaired it for a number of years.  I would need to

2       go back to my records to tell you precisely what years,

3       but I was involved in the commitment committee, heavily,

4       and can remember, you know, the major transactions that

5       went through the commitment committee.  But clearly

6       there are dozens and dozens of transaction that do go

7       through.  But I hired someone to take over the

8       chairmanship of the commitment committee from me,

9       although he still reported to me.  He continued to run

10      the commitment committee under my supervision.  There is

11      a natural fit, commitment committee to the other what

12      you might call control functions, and in the US the

13      chairman of the commitment committee, Stephen

14      Berkenfeldt, made the same progression from the legal

15      department to chair of the commitment committee.

16      Q.  What would you say is the most senior role you had

17      in Lehman Brothers?

18      A.  Well, I suppose the most senior role I had was

19      probably right at the very end in September 2008 when

20      I had to choose the legal firm and the bankruptcy firms

21      to be involved in wind down.  But prior to then, I was

22      essentially doing a similar type of job for about

23      17 years; from 1991 through to 2008, as the most senior

24      lawyer.  But over that time I did gradually get more

25      senior so I wasn't demoted, I sort of ended on a, you

1          know, on a senior level.

2              Q.   What role, what were your responsibilities as chief

3          legal officer?

4              A.   Well, they did vary over time.   It would be to

5          oversee the legal department, to set it up, to hire it,

6          you know, hire the relevant people.   To supervise on any

7          major issues and make judgments, make judgment calls on

8          significant legal issues.   It would be in relation to

9          the compliance department, so to make sure the firm

10         stays within the regulatory rules applied to it as far

11         as you can.   And internal audit, to make sure that the

12         internal audit was done well.   Corporate communications

13         was in relation to dealings with media.   That corporate

14         communications function I had for periods and then

15         didn't have for periods and then had for other periods,

16         so things varied over time.   And in relation to crisis

17         management it would really depend upon the crisis.   So

18         when we did contingency planning, for example, in the

19         event of a major virus outbreak or major, you know,

20         crisis in the city I would be very involved in taking

21         part in those planning exercises, for example.   And so

22         when crises developed you know it would be, I would feel

23         responsible for getting involved to try to resolve those

24         crises, obviously along with the chief executive at the

25         time.

1      Q.   When you said earlier you were vice chairman of the

2      firm, by the firm do you mean LBHI?

3      A.   I mean Lehman Brothers, certainly as I understood

4      it, the most senior, certainly the most senior company

5      within the Lehman Brothers group was LBHI and I was

6      appointed as the vice chairman, but as we have talked

7      about before, the specific legal entities were less

8      important than thinking about the firm as a whole and

9      thinking about how the firm works, so I was vice

10     chairman of what I thought of as Lehman Brothers in the

11     broadest sense.

12     Q.   Let us switch gears and talk about Formula 1.   What

13     is Formula 1?

14     A.   Formula 1 is a company that exists to organize

15     a race calendar to manage the commercial rights, and to

16     generally run the business of Formula 1, which is

17     a racing series which takes place over typically 19 or

18     20 races, it varies a little over the years, in which

19     teams compete for prize money and take part in the

20     profits in general of Formula 1.

21     Q.   Did Lehman have any connection with Formula 1 ever?

22     A.   Prior to 2001 are you talking about?

23     Q.   At any time.

24     A.   At any time.   In 2001 it lent USD 300 million as

25     part of a USD 1.6 billion total loan to be provided by

1          three financial institutions.  And it lent that money to

2          an organization called Kirch which bought 75 percent of

3          Formula 1 and the remaining 25 percent being retained

4          by, as I remember it, Bambino.  The loan was made to

5          Kirch with three types of collateral of which, post

6          Kirch bankruptcy, Formula 1 was the most valuable.  And

7          so in organizing the bankruptcy of Kirch and attending

8          the creditors meetings, which I did on behalf of Lehman

9          Brothers, what we were trying to do was make sure that

10         the collateral that would come to Lehman Brothers was as

11         valuable as possible.  And so I worked extensively in

12         Munich in 2001 in relation to Kirch, but that was very

13         much in relation to Formula 1, because Formula 1 was the

14         largest piece of collateral.  And that is where

15         Ruggero Magnoni was enormously helpful and, you know,

16         a very, very valuable colleague and we worked together

17         a lot.  Joe Cohen, another investment banker with very

18         strong private equity understanding, as it would

19         essentially become a private equity investment.  He had

20         a particular understanding of that field.  And there was

21         a whole team of people.  Obviously we had legal counsel,

22         we had internal legal counsel, we had investment bankers

23         involved in that from the start, because it was a very

24         large loan default for Lehman Brothers to solve.

25         Q.  You mentioned the bankruptcy of Kirch, what is

1          that, and when did that take place?

2            A.   I am sorry, Kirch was a media company in Germany

3          and Kirch wanted to buy 75 percent of Formula 1 from the

4          current holders of Formula 1.   So it looked to financial

5          institutions to raise that USD 1.6 billion that was

6          necessary.   So Bayerische Landesbank, Lehman Brothers

7          and another bank which became JP Morgan, together loaned

8          USD 1.6 billion.   And then when Kirch the media company

9          went into bankruptcy itself, the three banks needed to

10         realize the value of their collateral so that they each

11         ended up being shareholders in Formula 1 in place of

12         Kirch.

13           Q.   Now, you mentioned Ruggero Magnoni, who was he?

14           A.   Ruggero Magnoni was the person who had run the

15         Italian office of Lehman Brothers and was a senior and

16         well respected investment banker working in Italy for

17         Lehman Brothers.   He was a long time Lehman Brothers

18         employee.

19           Q.   You also mentioned Joe Cohen, who was he?

20           A.   Joe Cohen was a particular expert at detailed

21         financial analysis.   And when we were working on the

22         Kirch matter, Joe was extremely strong in his detailed

23         analysis of how Kirch should be wound up to our

24         satisfaction and how Formula 1 should fit within that.

25           Q.   Now, you've been saying "we".   What was your role

1        at this time in connection with Formula 1?  This time

2        meaning at the time of the bankruptcy?

3         A.  At the time of the bankruptcy of Kirch.  Well, this

4        fitted into the work out issue that I was talking about

5        earlier.  Just as in previous crises, and it would take

6        too long to go through them all, but from time to time

7        investment banks go through, they have difficult

8        problems to solve and so when in 2001 Kirch went into

9        bankruptcy, it was naturally a concern for the people

10       who had lent the money, which was the fixed income

11       department of the firm, and they and I talked

12       extensively about it.  The chief executive was very

13       interested in, you know, how it would be resolved,

14       because there was a significant financial delta between

15       it resolving successfully and unsuccessfully.  And it

16       went right to the top of the firm in terms of the

17       monitoring of it.

18            With such a large amount at stake, it was very

19       common at Lehman Brothers to have someone in corporate

20       involved to protect the corporation as a whole and

21       because we didn't have a work out team, that was

22       a fairly natural role for Lehman counsel to play.  So it

23       was very much done in collaboration with people in fixed

24       income, because they were the people holding the -- you

25       know, they were the ones with the biggest amount of

1        risk, so Stephen Sleigh, who appears on various emails,

2        you know, he was in the leverage finance part of fixed

3        income, which was the area that held the investment and,

4        you know, it was important for me to work, you know,

5        with them.  But in terms of the person who went over to

6        Munich to sit around the table with the other creditors,

7        that fell to me and Ruggero also spent time in Munich

8        and Joe Cohen spent a lot of time in Munich.  So

9        I suppose, you know, the fixed income department, still,

10       it stayed very much involved but slightly more from

11       a stance at that point.

12        Q.  What was your involvement in connection with F1

13       prior to the bankruptcy?

14        A.  Well, I had seen it at commitment committee,

15       because there had been a lot of discussion around

16       whether Formula 1 would be an appropriate asset to hold

17       as collateral on a loan.  And there was significant

18       feeling within the firm, particularly in Europe, that

19       Formula 1 was in fact an excellent asset.  But it is

20       an unusual asset.  Clearly it is highly cash generative,

21       but it is dependent upon a single, you know, it has one

22       important chief executive and the public flotation of

23       Formula 1 is not simple.  So there is no easy, instant

24       route to exit.

25        Q.  You mentioned a team and then a number of

1      individuals.  Can you tell us what this team was?

2          A.  Well, in 2001, when we went through, going through

3      the bankruptcy of Kirch, and it was recognized that

4      Formula 1 really was the major asset, a team was formed

5      of three people to do sort of what you might call the

6      work out from the team.  That was not to exclude other

7      people, other people had enormous amounts of expertise,

8      on Formula 1 and they would absolutely be involved as

9      much as possible.  But there was a need for some people

10     who would be involved on a day to day basis who would

11     actually, you know, spend time with the chief executive

12     of Formula 1 and interact with the other shareholders of

13     Formula 1 and that team that was put together was

14     a three man team, Tom Bernard, Steve Hannan and myself.

15     So the three of us would regularly discuss how Formula 1

16     could be managed.  All of the various issues within

17     Formula 1, which were many, because Formula 1 had

18     a significant corporate governance problem, and that was

19     very much a feature of the relationship between the

20     three banks.  On the one hand they had issues in their

21     relationship and there were also issues between some of

22     those banks and the chief executive.  They have been

23     well documented, but that was also as I saw it.

24     Q.  Who was Tom Bernard?

25     A.  Tom Bernard was a very respected person from within

1        background.

2            Q.   You mentioned investment bankers.   Who are the

3        investment bankers at this time?

4            A.   It is quite a large team that got involved from the

5        time when Formula 1 was turned into an asset by Lehman

6        Brothers.   The people I remember most are

7        Patrick Schmitz-Morkramer, who tended to lead what you

8        might call the day to day work, investment, advisory

9        business side of it, you know, on the F1 matters.

10       Patrick Bierbaum was I think in investment banking but

11       he was in a sense seconded over to work for Tom, Steve

12       and I.   But Patrick Schmitz-Morkramer was the senior

13       banker involved.   Clearly Vittorio and Ruggero.   Ruggero

14       had been involved from a very early time on the Formula

15       1 matter.   Vittorio is somebody who may well have been

16       involved early on, but he certainly became involved

17       after we were out in Munich and we decided it would be

18       very valuable to have Vittorio's insightful analysis.

19       And then there was a team, there is a whole team of

20       people behind Patrick Schmitz-Morkramer who would do the

21       financial analysis.   That team changed over time and you

22       would have some junior people coming and going, but

23       Patrick was pretty constant throughout.   They would do

24       the analysis on, for example, how much could be obtained

25       on exit by refinancing, particularly.

1        a strong financial interest in it, particularly fixed

2        income, were aware of what was happening, because they

3        were the people who would take most of the profit or the

4        loss.  So there was a lot of interest in fixed income.

5        I mentioned Bart McDade, but obviously the senior folks

6        in fixed income were very interested in what was

7        happening in Formula 1 so we needed to keep them

8        involved.

9            Investment banking.  Clearly they had a lot of

10       expertise and could give us a lot of advice on that, and

11       that would be incredibly valuable to the firm to have

12       them advise on what the possibilities were for

13       Formula 1.

14       Q.   Was fixed income a separate group like the

15       investment banking team?

16       A.   Fixed income, yes, they didn't have such a formal

17       group because they didn't have an engagement.  They held

18       the investment, so they had it within their P&L.  It was

19       on their books, so the fixed income department had made

20       the original loan, you know, from their leverage finance

21       group so they were key.  But investment bankers,

22       certainly, they are obviously very knowledgeable, and we

23       operated as a, in a collegiate fashion, across the

24       piste, including with Thomas when he had provided, you

25       know, his input.

1        It is a term commonly used within the industry to

2        describe the internal records of the investment bank to

3        show whether it was profitable, doing well, or not doing

4        well in any particular area.

5        Q.  What were -- were there any significant

6    transactions involving Formula 1 investments after the

7    bankruptcy in 2002?

8        A.  Yes there were.  After we had taken it on as a sort

9    of direct shareholding, there were clearly many issues

10   that arose during the next few years.  As I said, there

11   are many disputes, many issues, but in terms of

12   transactions for the term in relation to Formula 1

13   investments themselves, in 2005 we were approached by

14   CVC, who had already approached Bayerische Landesbank

15   and they may well have approached JP Morgan.  They

16   approached us to see if we would sell to them and we

17   were very mindful of who CVC was and their interests.

18   Obviously it was very nice to see their interest.

19   I personally were very excited, because I had a high

20   regard for CVC.

21   Q.  Who were CVC?

22   A.  CVC was a private equity firm formed by senior

23   individuals from Citigroup including Don Mackenzie and

24   other senior individuals at Citigroup, and they formed

25   a private equity group which became very successful and

1        they named it CVC.

2            Q.  What was CVC's interests from then on?

3            A.  CVC I think could see the opportunity, it could see

4        that Formula 1 was a profitable firm, which is a company

5        which generates significant amounts of cash.  It has

6        contracted revenues from TV companies and from sponsors

7        who hold races and it also has money from advertisers

8        and hospitality and freight.  So it is an attractive

9        development for a private equity firm.  It is also

10       an attractive investment to refinance, which I can go

11       into more detail if you wish.  But in any private equity

12       transaction it is normal for a private equity firm to

13       look at refinancing as an opportunity to realize their

14       money.  And Formula 1, given its structure, is a good

15       company to go through a refinancing transaction.

16           Q.  What happened after CVC approached you in 2005?

17           A.  Clearly we were excited.  We could see there had

18       been many problems at Formula 1.  We could see the value

19       of the asset but clearly there were many issues, so it

20       was very good see that a company that we respected was

21       coming in to buy it and certainly I was particularly

22       excited by the fact, and perhaps I would be, but I was

23       particularly excited by the fact that I thought that

24       this would bring harmony and good governance to

25       Formula 1, because CVC would know how to structure

1       Formula 1 in such a way as to make it attractive to the

2       refinancing markets and those refinancing markets needed

3       proper governance, proper structure, because if a bank

4       is lending large amounts of money to a company and then

5       issuing bonds, you need to have proper structures to

6       make sure that the bondholders are paid.  So CVC

7       approaching us was very attractive.  It also indicated

8       that they had confidence in the long term future of

9       Formula 1, which was very nice to see.

10      Q.  What happened after they approached you in 2005?

11      A.  Well, we had various discussions about whether we

12      should stay in, or whether we should exit.  And I am

13      struggling to think of anyone who advocated exit, but

14      naturally you should, in all conscience, make sure that

15      we looked at it carefully because if we got it wrong

16      then the firm could lose significant amounts of money.

17      So what we were all clear on is that we did not have

18      a short term time horizon on this, we had a long term

19      horizon.  So we were looking to maximize receipts over

20      the long term.  And so we looked, too, at the fact that

21      if we exited and sold and then reinvested alongside CVC,

22      we would be able to align our interests more with CVC.

23      We wanted to have the opportunity to reinvest at the

24      holding company level.  What this would do was realize

25      the possibility of a number of ways of increasing

1          Formula 1's revenues and we had a number of acquisitions

2          that Formula 1 could make that we thought would be

3          strategically very attractive.  One had been discussed

4          a lot before, but had never been consummated and that

5          was to buy the hospitality business, and we felt it had

6          never been possible to agree on something like that

7          whilst the banks were owning Formula 1.  So it was good

8          to see that CVC had that possibility.

9              CVC, if they were the major shareholder were in many

10         ways running the firm, obviously along with the chief

11         executive, but they would be much more able to be nimble

12         and realize those possible opportunities.  So that

13         another very significant reason.  So we discussed that

14         and that was, you know, those discussions took place.

15         They were on a fairly tight timescale, I think, and

16         I don't recall the precise, you know, contents of those

17         discussions.  All I really recall is how I felt and

18         whether there was any real doubt about staying in.

19         I think certainly I didn't have any doubts and I don't

20         know any senior person who had any doubt, or any junior

21         person for that matter.  I don't recall doubts about

22         staying in.  I can't vouch, of course, for everybody's

23         point of view on that.  There may well have been other

24         doubters within the firm and that may well have been

25         true.

1      Q.  Was the decision made, then, about whether to stay

2      in or get out?

3      A.  Yes, there was.  And I think we all felt that this

4      was the right -- you know, CVC were buying, we didn't

5      want to sell, and it was our job then to make sure that

6      this was agreed by the most senior manager of the firm.

7      I would need to speak to Jeremy Isaacs, and Tom Bernard

8      would need to speak to his folks in New York and we

9      would need to make sure that they were agreed, and on my

10     side that was cleared very quickly, and quite rightly.

11     And I don't know the details of the discussions in New

12     York.

13     Q.  Were there any significant transactions after this

14     transaction occurred in 2005?

15     A.  Yes.  Well, clearly CVC was, had been thinking

16     the same way that we had been thinking and the analysis

17     we had done on refinancing they had done as well, of

18     course, and they brought the company to the bond markets

19     in late 2006 with a bond holding, with a bond offering

20     of just short of USD 2 billion, I think it was around

21     1.9, USD 1.95 billion, something like that.  And so the

22     bulk of that would be paid as the dividend to the

23     shareholders.  So that was, you know, clearly

24     an agreement that we liked and by that time I was

25     obviously on the board of Formula 1 and we -- you know,

```
 1            investment banking group of the firm, worked on it.  But

 2            the bond offering itself, you know, it was not, the

 3            bonds had been widely traded, so there was no secret to

 4            it.

 5              Q.   So in 2006 who made the decision, would have made

 6            the decision?  Who made the decision to go forward with

 7            this refinancing?

 8              A.   Well, that was a decision, of course, for

 9            Formula 1.  But the shareholders of Formula 1 had to be

10            comfortable with it and indeed CVC, one would expect,

11            proposed it, and they obviously would have told me at

12            that time.  So although it was a decision for the

13            company, the shareholders would need to be on board and

14            clearly the investment banks retained, in this case

15            Lehman Brothers and RBS, needed to have done the work to

16            prepare the company and make sure that it was ready for

17            the bond offering.  And they did extensive work to make

18            that happen.

19              Q.   What was your role at this time?  Now we are

20            talking about in 2005 with respect to Formula 1?

21              A.   In 2005 I was part of a group of three, along with

22            Tom Bernard and Steve Hannan, to manage the work out,

23            you know, to manage the Formula 1 investment.  But would

24            work along side, you know, listen to and take into

25            account views expressed from anybody who offered them,
```

1    all around the firm.  As you can imagine, Formula 1 is

2    an incredibly public matter.  It was probably the

3    hottest, you know, most interesting investment done by

4    the firm in Europe.  So many people asked questions,

5    offered their opinions, but of course the opinions that

6    really mattered were the ones from, you know, who had

7    a strong insight into Formula 1.

8        Q.  And what was your role in 2006 when the refinancing

9    occurred.

10       A.  Well, by that time I think Tom had either left the

11   firm or was no longer involved in Formula 1.  He stopped

12   being involved after the CVC transaction.  So after the

13   2005 transaction it was my responsibility to manage that

14   as, I was on the board of that.  But again I would

15   obviously speak to, I don't want to pretend I had

16   a monopoly of knowledge, I would speak regularly with

17   the chief executive about it and I would listen very

18   carefully to others and naturally make sure that the

19   right people were informed, you know, taking into

20   account Chinese walls, which restrict the flow of

21   information.  It was my, it was my responsibility to try

22   and make sure our shareholding in Formula 1 retained its

23   value.

24       Q.  What was Ruggero Magnoni's role in 2005?

25       A.  He was senior investment banker.  He stayed in and

1    around the Formula 1 investment.  He was always useful

2    to listen to, because he had some tremendous insights

3    because he knew Formula 1 from a long time before.  You

4    know, he had been involved, you know, back as long ago

5    as anybody, you know, back end of 2001, and possibly

6    before then.  Ruggero was somebody I respected

7    enormously.  We would talk about Formula 1.  I don't

8    think I would naturally have talked to him about what

9    was going on on the board of Formula 1, I think that

10   might have not been a normal process.  I may have done

11   from time to time, but I would have wanted to respect

12   the confidentiality of Formula 1, obviously, within the

13   confines of having been nominated to sit on a board by

14   Lehman Brothers and obviously I was recognized as

15   directly representing the shareholders of Lehman

16   Brothers.  But that didn't mean I could speak to any

17   single person at Lehman Brothers.  But I would want to

18   speak to the appropriate senior people within Lehman

19   Brothers.

20   Q.  What was Ruggero Magnoni's role in 2006 when the

21   refinancing occurred?

22   A.  Well, again, he was the sort of senior person in

23   the background.  He -- I was obviously on the board but

24   the investment banking team at that time was led by

25   a chap, a person called Richard Atterbury, and the

1        reason for that was that he had had a relationship with

2        CVC prior to them becoming involved in Formula 1.  And

3        so he was the natural relationship partner who would

4        deal with CVC if it came to refinancing.  So Richard

5        Atterbury at investment banking was an important person

6        and I would speak often to him.  Patrick

7        Schmitz-Morkramer was also actively involved in

8        investment banking, he played a significant role, and

9        Vittorio Pignatti, I am sure, kept an eye on what was

10       happening.  I don't recall many conversations with

11       Vittorio, but he knew the Formula 1 asset very well.

12       Q.  What was Vittorio's role in 2005?

13       A.  Like Ruggero.  Ruggero and Vittorio often worked

14       closely together.  They would often be in the same

15       situation that they would offer their views and their

16       advice and I would listen to them carefully, as would

17       Tom and Jeremy Isaacs and I am sure that they would

18       listen to Ruggero and Vittorio and I would think that

19       they, you know, they clearly added value.  They had some

20       excellent insights into how to realize the value of the

21       Formula 1 investment.

22       Q.  And what was Vittorio's role in 2006?

23       A.  It would be similar.  Perhaps a little less,

24       because once of course CVC took over, CVC was really in

25       the driving seat, pardon the pun, of Formula 1.  And

 1          he -- the issue for Lehman Brothers was much less, was

 2          much less live and dynamic after 2006, because

 3          essentially proper corporate governance was put in place

 4          by CVC.  So it was a matter of, I wouldn't say merely

 5          attending the board meetings, it was more than that, it

 6          was discussions outside of it, but there weren't key

 7          decisions to be made, there wasn't the same conflict

 8          between the shareholders, there wasn't the need to have

 9          regular meetings with Bernie Ecclestone, for example, as

10          there was prior to that.  So although I would obviously

11          see Mr. Ecclestone at the board meetings, I wouldn't

12          normally have, you know, many meetings outside of those

13          with him.  But I would keep in regular contact with CVC.

14          Whereas prior to 2006 naturally all of the banks needed

15          to integrate with the chief executive as it was proper

16          for them to do.

17          Q.  Did Lehman Brothers ever retain any outside

18          advisers in connection with the Formula 1?

19          A.  Not that I know of, not Lehman Brothers.  Apart

20          from, I suppose, if you call -- during the period after

21          the bankruptcy of Kirch, the three banks together, and

22          then it may well have then just become JP Morgan and

23          Lehman Brothers, but they retained Lehman Brothers as

24          an adviser.  So it was recognized that there should be

25          appropriate payment for the investment banking team

1       working on it and they pitched and were awarded the

2       mandate.  And that was the team headed up by

3       Patrick Schmitz-Morkramer.  So they were given retainer,

4       fees, in relation to Formula 1.  So Lehman Brothers and

5       the other banks, particularly JP Morgan, had retained

6       Lehman Brothers, but post 2005 the only retentions that

7       were then done of Lehman Brothers were done by Formula 1

8       itself in doing the refinancing and the other matters.

9        Q.  Now I want to talk about the movement in this

10      proceeding, Thomas Marsoner.  What was Thomas Marsoner's

11      role, if anything, in connection with Lehman's

12      investment with Formula 1?

13       A.  Well, Thomas provided us with insights on

14      Formula 1.  And he at one time was discussed within

15      Lehman Brothers, and I was part of those discussions,

16      and we were interested in the banks potentially having

17      a sort of a point person who might be able to work on

18      this pretty well full time.  So we had various

19      discussions with JP Morgan around this as a possibility

20      and, you know, we thought Thomas might be a good person

21      to do that.  And Thomas is somebody that I have worked

22      with since the time when he joined Lehman and he had

23      come over as a senior banker from Salomon Brothers, and

24      so I had no problem with that.  I liked Thomas and

25      I thought that he had interesting insights.  And he was

1    somebody that we proposed to JP Morgan to be hired as

2    an adviser.  But that didn't in fact take place.

3      Q.  When did these discussions take place?

4      A.  I think it was quite early on.  It was back in, it

5    would have been after the main bankruptcy work around

6    Kirch but well before the CVC, you know, purchase of

7    some parts of Formula 1.  It would have been, I think,

8    in 2002.

9      Q.  This role that was discussed, what did it have to

10   do with exiting the Formula 1 investment?

11   A.  Well, I must admit I think we were thinking at that

12   time of sort of managing our -- obviously every firm

13   wants to realize the gain on its investment, that is

14   obviously the end game.  But what we were interested in

15   at that point was that we thought that this would be

16   a long haul, because there was no immediate buyer on the

17   horizon.  There was no certainly no prospect of

18   an immediate sale to the public market.  So the

19   likelihood was, and that was our analysis, that

20   refinancing was likely to be our means of recovering our

21   money.  And so you have to be in it then for the long

22   haul.

23      So our focus, really, was on just managing the day

24   to day interactions with Princess Gate, which is where

25   the chief executive had his office, and perhaps

1           smoothing over the relationships between the banks,

2           because that was one of the issues that had arisen,

3           there was a different philosophy between the banks,

4           particularly on the one hand you have two American

5           financial institutions, on the other hand you have

6           a partly state owned organization in Germany and the

7           philosophies that they approached this with were

8           different.  It is not to say that one was better than

9           the other, but we had many differences of opinion.

10          Q.  Who was the state owned bank?

11          A.  Bayerische Landesbank.  They were the largest

12          shareholder.

13          Q.  Who decided to not retain Thomas Marsoner in 2002?

14          A.  Well, JP Morgan weren't interested, they didn't

15          want the extra layer of communications, and I don't

16          think they wanted the expense of it, either.  They

17          decided that they didn't want to do that.

18          Q.  Was there a discussion within Lehman of retaining

19          Thomas Marsoner any way?

20          A.  Not that I know of.

21          Q.  Why was there a decision made not to retain Thomas

22          Marsoner in 2002?

23          A.  Well, I think it is largely a matter for JP Morgan,

24          but I think from memory that they had a problem with

25          another -- they wanted direct access to the chief

1       executive, which obviously is valuable.  And they

2       recognized that they were perhaps a little short of

3       resources on that.  Because it is a heavily resourced

4       issue.  We are all very busy.  Tom Bernard is over in

5       the States.  I have my, sort of, job to do.  From

6       Lehman's stand point it would perhaps have been nice to

7       have someone, but there we are.  And from a JP Morgan

8       perspective they decided to, I think, put more resources

9       on it internally.

10      Q.  Was there ever an advisory agreement signed between

11      Lehman and Marsoner in connection with Formula 1?

12      A.  Not to my knowledge.

13      Q.  Have you ever seen any of Thomas Marsoner's

14      advisory agreements?

15      A.  Not -- well, not until this litigation.  I mean

16      I have now seen a -- I am not quite sure when, I am not

17      sure which exact advisory agreement it was, but I have

18      now seen an advisory agreement.  But at the time I don't

19      think I was involved.  As I said, on the

20      cross-examination I can't be absolutely sure, because

21      I did have responsibility for the legal department which

22      was involved in all consultancy agreements, so it is

23      absolutely possible that I may have seen it, but I don't

24      recall seeing any agreement with Thomas.  But, you know,

25      consultancy agreements, they did come across my desk

1      from time to time.

2         Q.  You said "this litigation", you mean this

3      proceeding?

4         A.  Yes, I mean this proceeding, yes.

5         Q.  Have you been involved in any other legal

6      proceedings relating to Thomas Marsoner's involvement in

7      F1?

8         A.  Well, he did bring a similar claim in the UK for

9      this same, on this same subject.

10        Q.  Did you ever see any copies of his advisory

11     agreements in connection with that proceeding?

12        A.  I did, yes.

13        Q.  Did --

14        A.  I mean I saw, I have seen a draft of, in those

15     proceedings.  I guess, is there a confidentiality issue

16     here for the other, for the legal proceedings?

17     I believe they have been settled.  But do you --

18        Q.  I don't know.

19        A.  I obviously need to be aware of my confidentiality

20     obligations in relation to those proceedings.

21        Q.  Do you know if Thomas Marsoner was engaged within,

22     for any other Lehman clients?

23        A.  Yes, absolutely.  I think he was.  I can't remember

24     which ones now, but I think he was involved in, as of

25     when he left the firm, I think he was hired as

1  a consultant.  So I knew that Thomas had other clients,

2  absolutely.

3   Q.  Were there advisory agreements entered into in

4  connection with those clients?

5   A.  Well, again, I don't think I saw the consultancy

6  agreements that he entered into.  So that wouldn't be

7  normal for me to sit and look at individual consultancy

8  agreements, because my job was to manage all of the

9  legal, regulatory matters across Europe and Asia.  So

10  that takes in quite a lot of issues, and it wouldn't

11  have been right for me to personally manage those

12  consultancy agreements, they should be done by

13  investment banking and legal specialists.

14   Q.  So were you involved in negotiating any of his

15  advisory agreements?

16   A.  I don't think so, no.  I don't remember that.  I

17  knew Thomas and I liked him, and I wished him well and

18  I was glad he was a consultant.  I felt we always got on

19  well but I don't remember being involved in negotiating

20  his consultancy agreement.

21   Q.  When you did retain advisers, would you have

22  entered into an advisory agreement with them?

23   A.  Consultancy, yes.  I mean when you hire

24  a consultant, just as if I retained now, I would enter

25  a consultancy, you would have a consultancy agreement.

1       In fact the first consultancy agreement for what was

2       then Shearson Lehman Brothers, was one that I drafted,

3       I did the basic draft, I think, upon which the

4       subsequent ones were based.  So yes, the consultancy

5       agreements, it is important because it affects, you

6       know, huge amounts of things, whether it is

7       confidentiality, whether it is pay, whether it is, you

8       know, intellectual property rights, there is a whole

9       raft of things which make it very important to have

10      a consultancy agreement if place.

11      Q.   Who would have been responsible for negotiating

12      those agreements?

13      A.   That was done by the relevant business, which ever

14      it was, because clearly you have consultancy agreements

15      in all sorts of different businesses.  You have

16      technology consultants, you have, on the one hand and

17      you can have investment banking consultants on the other

18      hand.  You have lots of consultants in between.  So HR

19      would need, would be the sort of area that would

20      normally keep the consultancy agreement.  And it would

21      be, they would be originally negotiated by the relevant

22      business who was hiring the consultant.  And then that

23      business would then have a procedure in place to make

24      sure that it would involve the legal department and, as

25      I said, the HR department to make sure that it was in

1    accordance with the firm's standard requirements on

2    consultancy agreements.  Because clearly there are

3    minimum standards that you have to have on any well run

4    firm to make sure you don't have people signing all

5    kinds of different agreements, you know, that is the

6    sort of ABC of hiring.  It is a bit like employment

7    agreements, you have to have the standard form and you

8    have to make sure that people can follow them.

9         Q.  Why is it so important with advisory agreements?

10        A.  Well, you don't want people thinking that they

11   should be paid when they, when it has not been agreed.

12   That is one reason.  But another reason is that you want

13   to make sure that people have confidentiality and you

14   want to make sure that intellectual property, if it is,

15   particularly with technology consultants, is retained by

16   the firm rather than given to the consultant.

17        Q.  Based on your work on the commitment committee, the

18   management committee, can you tell us how Lehman

19   accounted for its investment in Formula 1 in its books

20   and records?

21        A.  I am afraid that is a big question, because

22   obviously it changed over time.  What would happen is

23   that in each year end we would, because we were filing

24   our annual accounts, and they would be audited annual

25   accounts, we needed to make sure absolutely sure that

1          Brothers in connection with Lehman Brothers?

2          A.  I don't know that myself.  I don't know, I don't

3     have personal knowledge of that.

4          Q.  I want to show you one of the exhibits that we

5     looked at that was marked exhibit 5 by Dr. Marsoner's

6     counsel.  It is the email.

7          A.  It is that one, okay.

8          Q.  This is the email where you see it says at the top

9     from Bernard Thomas E, sent Saturday, November 2005?

10         A.  Yes.

11         Q.  To Steve Hannan, Patrick Schmitz-Morkramer, Peter

12    Sherratt and the subject is "F1 group sold to CVC

13    Capital Partners for undisclosed sum".  The first line

14    of the email says:

15         "FYI.  If McLaren is true it is huge.  I am almost

16    certain we are staying in."

17         What is McLaren?

18         A.  McLaren is a team.  It is one of approximately ten

19    teams in Formula 1 who were participating in the 2005

20    season, which I think was won by Renault, if I remember.

21    But yes it was a team in Formula 1.

22         Q.  The email right below it, second paragraph, says,

23    in the second sentence:

24         "Keep your stake and don't be spooked if JPM does

25    a BayLaBa."

1              What is BayLaBa?

2          A.  BayLaBa is Bayersriche Landesbank.

3          Q.  Do you know what doing a BayLaBa is?

4          A.  Well, I don't know quite what he meant, but

5       Bayerische Landesbank sold to CVC, sold their stake to

6       CVC, and did not reinvest as far as I know.  Perhaps

7       they may have reinvested a small amount, but as far as

8       I know they didn't reinvest.

9          Q.  The third paragraph says:

10          "If, conversely, you want to get LB out of the F1

11      headlines (or feel your relationship with Bernie has

12      become too bad) a Marsoner family company previously

13      involved in consumer products would happily consider

14      taking it on if it comes with a to-be-agreed financing

15      package fairly sharing risks and rewards."

16          Do you know what this means?

17         A.  Well, I think this means that Thomas was prepared

18      to organize a purchase of the Lehman Brothers stake by

19      a Marsoner Family company, and he would like a financing

20      package, in other words he would like help with raising

21      the money to be able to do that and he wanted a fair

22      share of risks and rewards as a result.

23         Q.  The email right below it is an email

24      dated November 25, 2005, from Thomas Marsoner to

25      Vittorio Pignatti.

1          A.   Mm-hm.

2          Q.   The second to last paragraph says:

3               "Needless to say, if a "fresh face" were helpful to

4          facilitate things here, mine continues to be available

5          for a very modest percentage participation in LB's gain

6          upon eventual sale."

7               Did I read that correctly?

8          A.   Yes.

9          Q.   Was this fresh face offer ever accepted by Lehman

10         Brothers?

11         A.   No, no.  For the same reason as before.  It was

12         very nice to have Thomas' input, of course.  It is

13         always useful to hear opinions from everywhere.  And his

14         insights, you know, particularly the Austrian scene,

15         were well respected.  But we didn't want to hire him and

16         I don't think we would have.  No, we didn't want to do

17         that.

18         Q.   The first line of the email says:

19              "If this is the deal I suspect it is, my senior

20         advice is (strongly) against selling now."

21         A.   Yes.

22         Q.   "Selling out now."

23              Did I read that correctly?

24         A.   Yes you did.  He was right, we shouldn't sell it.

25         And we didn't think we should.

1          reveal where we were on it, because clearly that could

2          influence other people that we were negotiating with.

3          So yes, he would want to be quite guarded about it.

4          I think it means what it says.

5               Q.  Did this email influence your decision not to sell

6          your stake in Formula 1?

7               A.  My personal?

8               Q.  Or Lehman, the work out team's?

9               A.  The one going from Thomas -- Tom Bernard to Thomas?

10              Q.  The one from Thomas to Tom Bernard.

11              A.  Which?

12              Q.  Tom Bernard says "we're inclined to take your

13         advice".

14              A.  Yes.

15              Q.  Did that advice influence your decision?

16              A.  I think the position with Thomas' input was that it

17         was helpful.  It is very, very useful when you are

18         looking, as Tom said, you are in the discovery mode when

19         you're looking at it, absolutely, it is very, very

20         useful to take into account all of your different

21         sources and you would need to ask Tom what his balance

22         of opinion was.  But all I can say is that from our

23         perspective and from the people that I spoke to, I was

24         never in any doubt that we should stay in and I know it

25         sounds easy to say that now, but that is what happened,

1          because I thought CVC would bring the corporate

2          governance that Formula 1 so badly needed.

3              Q.  Okay, I am going to show you just one other

4          document that has not been marked as an exhibit yet.  We

5          will mark this exhibit 9.

6                  (Exhibit 9 marked for identification)

7      MR. HORWITZ:  Do you need another copy?

8      MR. JOHNSON:  No.

9              A.  This is then exhibit, is it?  I keep that one and

10         I give it you back at the end.

11     THE COURT REPORTER:  Yes.

12     BY MR HORWITZ:

13             Q.  If you turn to the second page of this document, do

14         you see on the bottom right-hand corner of the document,

15         it says "Marsoner 00000197"?

16             A.  Yes I do.

17             Q.  Can you turn to the second page.  There is an email

18         in the middle of the page from you and it is

19         dated October 3, 2014 and it says, starts on the second

20         paragraph:

21             "My view is that the claim on LBEL isn't justified.

22         We both know there was no agreement to pay you relating

23         to F1.  You are a highly intelligent and meticulous

24         person, and would have put in a claim years ago if you

25         believed in it."

1              Did I read that correctly?

2         A.   Yes.

3         Q.   In the second paragraph starts:

4              "I do feel a lot of loyalty to old colleagues,

5         especially those I've know for a very long time...  But

6         helping on the claim would not only be wrong --"

7         A.   "Like you".

8         Q.   I am sorry.

9              "...Like you.  But helping on the claim would not

10        only be wrong but involve giving false evidence, which

11        is of course a criminal offence in England.  Just fyi,

12        Linklaters have spoken to Tom and Christian, who share

13        the view the claim is unjustified."

14             Have I read that correctly?

15        A.   Yes.

16        Q.   Do you recall sending this email?

17        A.   I do.  It is relatively recent; as in 2014.

18        Q.   Who is Tom that you reference in the email?

19        A.   Bernard.

20        Q.   Tom Bernard?

21        A.   Tom Bernard.

22        Q.   Who is Christian?

23        A.   Christian Meissner.

24        Q.   Who is Christian Meissner?

25        A.   He became the head of investment banking.  So he

1          was the person to whom the investment bankers sort of

2          reported to in Europe.

3     MR. HORWITZ:  We are done.  You can go off the record.

4     THE VIDEOGRAPHER:  We are going off the record.  The time is

5          4:31 p.m.

6     (4:31 p.m.)

7                              (Break taken.)

8     (4.46 p.m.)

9     THE VIDEOGRAPHER:  We are back on the record.  The time is

10         4: 46 p.m.

11    BY MR. JOHNSON:

12         Q.   Did Lehman Brothers work closely with JP Morgan in

13         its investment in F1?

14         A.   Yes.

15         Q.   Did JP Morgan sell its stake in F1 in 2005 after

16         CVC came in?

17         A.   Sold most of it, yes.

18         Q.   Did JP Morgan have Dr. Marsoner's advice?

19    MR. HORWITZ:  Objection to form.

20         A.   I don't know, but I would guess not.

21         Q.   Because he worked for Lehman Brothers?

22    MR. HORWITZ:  Objection to form.

23         A.   He had worked for Lehman Brothers for a long time

24         and was obviously a friend, and trusted person by Lehman

25         Brothers.  I don't know if he knew the people at

```
 1           JP Morgan.  He may have done, but I don't know that.
 2           Q.  I believe that you stated that USD 1.9 billion came
 3      into Lehman Brothers -- strike that.  USD 1.9 billion in
 4      2006, is that a correct number?
 5           A.  Yes.  The reason I can't be sure is that the amount
 6      -- it is a matter of public record so you can check
 7      this, but it was around about, I think USD 1.95 billion
 8      was the total amount of the refinancing in 2006.
 9           Q.  What percent of F1 did Lehman hold at the time?
10           A.  Approximately 15 percent.
11           Q.  15 percent of USD 1.9 billion?
12           A.  Approximately, yes.  As I said, the shareholding
13      changed slightly over time because of the management
14      shares issued and I would have to go back and check
15      precisely what the numbers were.  But it was in the
16      region of 15, maybe 16, percent of Formula 1.
17           Q.  So that is a little over 300 million?
18           A.  That's right, yes.
19           Q.  How much did Lehman originally invest?
20           A.  300 million in the original loan, but the
21      reinvestment was a little bit more complicated.  So if
22      you are talking about the 2005 transaction that is a
23      slightly more complicated an issue.  But the amount that
24      Lehman had put into the loan was 300 million.
25      MR. JOHNSON:  Okay.  That is it.  Those are all of my
```

1          IN THE UNITED STATES BANKRUPTCY COURT

2             SOUTHERN DISTRICT OF NEW YORK

3

4       - - - - - - - - - - - - - - - - - -

5    IN THE MATTER OF

6        IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL.,

7                      Debtors.

8

9       - - - - - - - - - - - - - - - - - -

10           DEPOSITION OF VITTORIO PIGNATTI

11                   VOLUME I

12           Monday, November 16th, 2015

13              AT:  3:30 p.m.

14               Taken at:

15              Hogan Lovells

16             50 Holborn Viaduct

17                London

18                EC1A 2FG

19                London

20              United Kingdom

21

22              CONFIDENTIAL

23   Court Reporter:

24   Chris Lang

25      Accredited Real-time Reporter

26

27

28

29

30

31

1         the witness and we can proceed.

2                           VITTORIO PIGNATTI

3    having been Sworn testified as follows:

4    BY MR JOHNSON:

5         Q.   And Mr. Pignatti, I wanted to start with your work

6    experience.  So when did you begin working at Lehman

7    Brothers?

8         A.   March 1989.

9         Q.   March 1989?

10        A.   1989 and I finished working for the liquidator of

11   Lehman Brothers in, I think it was April 2009.

12        Q.   And what jobs did you have whilst you were at

13   Lehman Brothers?

14        A.   I started as head of investment banking for Italy

15   then I was promoted in 1998, relocated to London and

16   became the head of mergers and acquisitions advisory for

17   Europe and then at the end of 2006, or some time in

18   2006, I became Vice Chairman, maybe the year before, but

19   I was assigned to be responsible for private equity for

20   non-US.

21        Q.   Okay.  And what were your responsibilities in those

22   positions?

23        A.   In the last position I was responsible for

24   non-listed balance sheet investments and Lehman Brothers

25   private equity funds, which included the buy out funds,

1        the real estate funds, the credit funds, the funds of

2        funds, and so on.

3           Q.  Now, could I ask that Mr. Pignatti be given the

4        2007 annual report, please.  If you look at this, it is

5        the 2007 Lehman Brothers annual report and if you see in

6        the bottom right-hand corner it says Marsoner and then

7        has numbers after it?

8           A.  Mm-hm.

9           Q.  If you turn to page 606, please.

10   MS. ALVAREZ:  I just want to clarify, are we using the same

11        exhibit that was marked in Peter Sherratt's deposition?

12   MR. JOHNSON:  Yes.

13   DENISE ALVAREZ:  Okay.

14           A.  Six.

15   MS. ALVAREZ:  Are you marking it as exhibit 1 as it is a new

16        deposition?

17   MR. JOHNSON:  Using the same exhibit marks.

18   MS. ALVAREZ:  Okay, what was this in Peter Sherratt's

19        deposition?

20   THE COURT REPORTER:  Exhibit 1.

21   MS. ALVAREZ:  Okay.

22   BY MR JOHNSON:

23           Q.  Do you see your name listed --

24           A.  Mm-hm.

25           Q.  -- in the column "other officers"?

1       A.   Yes.

2       Q.   And is that because you were an officer of Lehman

3       Brothers Holdings Inc.?

4       A.   Yes.   Here it says Lehman Brothers Inc.  I don't

5       see the "Holdings".   I say Lehman because it was a very

6       complex global organization.   The various bookings or

7       transactions, contracts and so on, was not under my

8       domain, but it was really done by technical people on

9       the legal and tax side.

10      Q.   Sure.  And could you actually turn back on that

11      same page.

12      A.   Mm-hm.

13      Q.   And identify other people that you worked with at

14      Lehman Brothers?

15      A.   If you give me the page again.

16      Q.   606.

17      A.   Dick Fuld, Jasjit Bhattal, Erin M Callan.  I can

18      tell you who I didn't work with, which is probably

19      easier.  Given that I spent, by 2007, 18 years in the

20      group there weren't that many people that I didn't work

21      with.

22      Q.   Okay.

23      A.   I didn't deal much with Burton, Gatto, Robatyn,

24      Safreno, Taussig.

25      Q.   Everyone else listed you worked with?

```
1          A.   Between senior management and other officers, the
2          board members, I didn't have much relationship with
3          other than two.
4          Q.   Okay.   And to your understanding was it common for
5          members of Lehman Brothers' leadership to serve multiple
6          roles?
7          A.   Absolutely.
8          Q.   Now, how do you know Dr. Thomas Marsoner?
9          A.   I know him because when he joined Lehman Brothers
10         I was one of the managing directors of the firm, so
11         I participated in the hiring of that team, because he
12         didn't come on his own, he came with a group from
13         Soloman Brothers.
14         Q.   And did he work as an adviser to Lehman Brothers at
15         a certain point?
16         A.   Yes, after many years as an investment banker
17         within the ranks of the firm he sort of moved on to be
18         an adviser.
19         Q.   And are you aware of his advisory agreements?
20         A.   I am aware of his advisory agreements for as long
21         as I was the person responsible for any adviser to the
22         investment bank.
23         Q.   Okay.   And specifically were you involved in the
24         negotiation of Dr. Marsoner's 2002 agreement?
25         A.   Yes.   So I became, I was in charge of that division
```

1        from 1998 until 2006.
2            Q.   So that means you were involved in the 2004
3        agreement as well?
4            A.   Yes.
5            Q.   And did you sign both of these agreements?
6            A.   Yes, I think I did.
7            Q.   Did you sign both on behalf of Lehman Brothers
8        Europe Limited?
9        MS. ALVAREZ:   Objection to form.
10           Q.   You can still answer.
11           A.   Okay.
12           Q.   Do you want me to repeat the question?
13           A.   If I signed on behalf of Lehman Brothers?
14           Q.   Europe Limited?
15           A.   I think so, but it must say, I mean the contracts
16       are available, so if it says Lehman Brothers.  I would
17       be given, if it was companies on whose board I sat,
18       within Lehman I would sign because I had powers of
19       attorney, jointly with some other officers of the firm,
20       or individually for some contracts.  If it wasn't
21       I would be told, you know, this one had better go into
22       this company, this one had better go.  They would tell
23       me whether I had specific powers or I wouldn't sign it
24       at all, it would be someone else who was actually on the
25       board of that company.

1        Q.   Okay.   To your understanding why did Lehman

2        Brothers want to hire Dr. Marsoner as an adviser?

3    MS. ALVAREZ:   Objection to form.

4        A.   Mr. Marsoner continued his previous involvement, so

5        it was an evolution, it wasn't a hiring process, which

6        was quite normal with senior people who departed a full

7        time position at Lehman, they seldom -- unless they went

8        to work for a competitor, they were offered a choice to

9        stay on as an adviser, some with retainers, you know, we

10       had a lot of freedom on how to calibrate their

11       involvement.

12       Q.   Did Dr. Marsoner have certain expertise?

13   MS. ALVAREZ:   Objection to form.

14       A.   Yes he did.   By sector and by geography.   He had

15       spent almost his entire working career dealing with

16       Germany and Austria and financial institutions, which

17       gave him a, for a firm that was not particularly strong

18       in that part of the world, considerable senior hedge in

19       terms of relationships and understanding of situations

20       that were not obvious, especially in situations of work

21       outs or complicated deals.

22       Q.   And what about F1?

23       A.   F1 was a complicated deal.   So he met those

24       criterias and there were German banks involved.

25       Q.   And is it correct that you were a contact person

1          under the 2004 agreement?

2      MR. HORWITZ:   Objection to form.

3          A.   Absolutely.

4          Q.   And what did this entail?

5          A.   This entailed that any decision with -- these

6      contracts were rather general in terms of which

7      transactions would be covered and so on, and I was the

8      person on behalf of the firm where these decisions would

9      be centralized; what was in it, the exact terms, we used

10     to give a grade in terms of how much the person would be

11     entitled to be paid and then, you know, for the

12     avoidance of doubt and we would interpret on a case by

13     case basis.

14         Q.   Could you please look at Dr. Marsoner's motion.

15     MS. ALVAREZ:   Do you have extra copies?  We didn't bring

16     Sherratt's deposition exhibits with us -- we just

17     happened to have an extra copy of the 2007 annual

18     report -- since this is a separate deposition.   Thank

19     you so much.  And this is exhibit?

20     THE COURT REPORTER:   It should say on the front.   Exhibit --

21         A.  4.

22     BY MR JOHNSON:

23         Q.   Could you turn to exhibit C, please.

24         A.  Okay.

25         Q.   And then page 22, if you see at the top, page 22 of

1          42.

2          A.   Okay.  Spotted it.  22, yes.

3          Q.   You see listed February 13, 2004?

4          A.   Mm-hm.

5          Q.   And section 3, if you turn the page.

6          A.   Mm-hm.

7          Q.   Entitled "compensation payable to the consultant".

8          A.   Yes.

9          Q.   Could you explain this section of the agreement?

10         A.   The section of this agreement, this was the second

11    one.  There was a prior one so, you know, this was

12    stepping in.  So we had decided to take part of his

13    time, so we paid an up front fee and then we paid

14    a quarterly fee and then went through the specifics of

15    the transactions that were covered and then, if I am

16    right, we had a possibility to bring under this

17    contract, subject to my green light, I think, other

18    things.  So at that time we had the role in Austria, and

19    Germany, Oyagi (sic) was a distressed bank, Telekom

20    Austria were two transactions which eventually, I think,

21    all of them got done while the Donatzeinmagi (sic), as

22    I can recall, didn't happen.

23         Q.   And if you turn back to the page before,

24    section 1D.

25         A.   Yes.

1          Q.  Is that the section you referenced?  I believe you
2          referenced --
3     MS. ALVAREZ:  Objection to form.
4          Q.  -- that there were other transactions?
5          A.  Yes, absolutely.  He would attend.  I mean I was,
6          I had hundreds of people under me, so I was following,
7          as the person responsible of the advisory mergers and
8          acquisitions, I was following all of the transactions.
9          But if I can recall, Telekom Austria was under my direct
10         watch, the Republic of Austria, maybe, 50 percent, the
11         BAWAG, partially, zero personal involvement, but I would
12         monitor and ask the various teams whether he was doing
13         his job.
14         Q.  Mm-hm.
15         A.  You know, whether he was attending the meetings.
16         These meetings would probably be mostly in Austria,
17         Germany and so on so I wouldn't attend every single
18         meeting but I get through the Monday morning meeting
19         where each of the teams who kind of report back, find
20         out, and then I would speak with Thomas whenever needed.
21         I mean sometimes it would be three times a week,
22         sometimes it would be every two weeks.
23         Q.  And how is his pay determined?
24         A.  His pay was determined through negotiations with
25         him and then an approval by the committee of investment

1        banking which was Skip McGee and another number of other

2        people.

3          Q.   And that included you?

4          A.   That included me, yes.  I was the proponent, so we

5        sat through and I had, you know, to approve any

6        expenditure, any commitment of the firm I would report

7        on and seek approval prior to signing.  But he was not

8        the only consultant to the group.

9          Q.   Okay, what would happen when one of the agreements

10       was no longer in effect?

11         A.   Normally, if it was no longer in effect we would

12       have a moment of truth as to whether the person was, and

13       I am talking in general not about Mr. Marsoner

14       specifically, I would establish whether the team felt,

15       or parts of the team that were interacting with the

16       senior adviser, would be interested in maintaining that

17       relationship and likewise I would check with the person

18       who was giving us the advice on whether they had

19       interest in providing the same level of commitment,

20       a higher level of commitment or a lower level of

21       commitment.  So we would start the new contract.  If

22       there was no change, we would roll it over.

23         Q.  Could you please hand Mr. Pignatti the October 13,

24       2015 email.

25       THE COURT REPORTER:  That is exhibit 7.

1          have enough traction from my teams to say yes, because

2          we had a budget we could spend so much on advisers.  So

3          if we took one, we wouldn't have another one to maybe

4          start the new vertical, maybe to cover another country.

5     THE COURT REPORTER:  Sorry, could you repeat the last bit?

6          A.  We would have to decide as a team, the advisory M&A

7          team, how to spend the budget, being the person in

8          charge, it was in the end my duty to present the annual

9          budget, but also to manage the budget.  So there were

10         times when the level of activity with one adviser did

11         not warrant a contract with a fixed amount, and so on.

12         So we would, say, use as a guideline the past but on

13         specific transactions you have to come to me and I will

14         sign off and sort of rejuvenate the old agreements with

15         the caveat that it may be without a fixed amount, with

16         a cap, you know, depending deal by deal.

17              I preferred, generally, to have contractors on,

18         because I had so many of them, just to remember what you

19         were doing with one or the other but it was, in the case

20         of Thomas and a few others, after a decade together we

21         could live with, sort of a play it by ear system.  But

22         I would always go back to the person within Lehman, sort

23         of full time Lehman MD, and check that the work was

24         being done, that it was a realistic request.

25         Q.  And so when his agreement expired how would his pay

1        be determined?

2            A.   His pay would be determined the way that I do it

3        with this email, and I don't know if Jonathan responded

4        to me, but I would say these are the guidelines, this is

5        the deal, do you want me to confirm to the adviser that

6        he is on and, if so, within the usual sort of Lehman

7        scale, which I, for the avoidance of doubt repeat to

8        him; where would you place his services?  Because this

9        would come off the bonus pool.  So if we were introduced

10       to a deal by someone -- someone, by one of the senior

11       advisers -- we would use the net revenues for the team,

12       not the gross, so it was a team cost, it wasn't just

13       money that was flying around.  So I wanted the buy in

14       not to be told at the end of the year I made

15       USD 10 million.  Sorry, it is USD 8 million, because two

16       went to -- so they tended to forget on a personal basis

17       the expenses associated with the deals.

18           Q.   Do you know Peter Sherratt?

19           A.   Of course.

20           Q.   Was he involved in determining Dr. Marsoner's pay?

21           A.   No.

22           Q.   And changing topics, are you familiar with

23       Cerberus' acquisition of BAWAG?

24           A.   Yes.

25           Q.   Was Dr. Marsoner involved in that transaction?

1          is looking at.

2      BY MR. JOHNSON:

3          Q.  Can I have you look at the supplemental declaration

4          of Dr. Thomas Marsoner.

5      THE COURT REPORTER:  That is exhibit 6.

6      MS. ALVAREZ:  Exhibit 6 to Peter Sherratt's deposition.

7          What exhibit was that to his motion?

8      MR. JOHNSON:  It was a supplemental declaration.

9      MS. ALVAREZ:  Okay.  Are you going to point him to his

10         letter?

11     MR. JOHNSON:  I am going to point him to his affidavit.

12     MS. ALVAREZ:  The one he submitted to the court.

13         A.  Mm-hm.

14     MR. JOHNSON:  Do you recognize --

15     MR. HORWITZ:  Just a minute, I have a copy of that.

16     BY MR. JOHNSON:

17         Q.  Do you see your letter dated January --

18         A.  Yes, yes, yes, yes, then I am getting the dates.

19         Q.  Do you see the --

20         A.  Yes.

21         Q.  Well, just one second.  Do you see the fifth

22         paragraph?

23         A.  Five, yes.

24         Q.  Does it say:

25             "With regards to the investment in Formula 1,

1        I specifically requested Dr. Marsoner's advice ... after

2        JP Morgan had rejected my suggestion of jointly

3        retaining him."

4        A.   Yes, yes, yes.

5        Q.   Is that an accurate statement?

6        A.   Yes.   I now remember the, yes, the occurrence.   But

7        this is prior to the actual closing of the CVC deal.

8        Now I remember.   There were two stages.   The first, CVC

9        took the stake and then the two banks opted out after

10       BLB.   If you remind me how the transaction went, because

11       I can't recall it, because we were three shareholders

12       plus Bernie Ecclestone.   When CVC did the transaction

13       who did they buy out first?

14       Q.   Well, let me just ask you a question.   So you

15       referred to two banks?

16       A.   JP Morgan, Lehman Brothers and BLB were the three

17       investors in, or investors who had seized the shares

18       from Kirch.   CVC acquired control of Formula 1 and then

19       subsequently acquired an additional stake.

20       Q.   Why did you request Dr. Marsoner's advice?

21       A.   At the time there was a dilemma as to what to do,

22       whether to accept the proposal, but I can't remember if

23       it was the first purchase or the second purchase,

24       because the clients of Formula 1 and the teams headed

25       by, they were using Goldman Sachs at the time, but they

1      were voicing and saying that they did not intend to

2      continue with Formula 1 and they wanted to create

3      a rival event which technically they could have possibly

4      done, and obviously the value of Formula 1 would have

5      been completely different if some or most of the teams

6      migrated to another event.

7          So the issue was strategically was this asset going

8      to be a difficult one or was this all posturing, and all

9      it took was to tweak the margins and have them make

10     a little bit more money and change the team versus

11     Formula 1 split.  And this had been going on for some

12     time, I recall.  But when CVC came in it became even

13     more antagonistic from Mercedes, from, you know, the

14     leading teams.

15     Q.  And who were the leading teams?

16     A.  The leading teams were Mercedes, McLaren, Ferrari

17     to some extent, but at least it was the only one where

18     I had my direct contacts.  But I didn't, because the

19     firm was not very strong in automotive, we didn't have

20     direct links, especially with the Germans and then

21     Goldman was trying its best to make sure we didn't have

22     access to anybody who sang outside of the choir.

23     I asked Thomas, and the other thing that I needed to

24     know from, you know, to give the firm some advice, was

25     where things stood with BLB, because, you know, it

1          became a very big issue and even at the time there were

2          issues around it.  And that is where he was kind of

3          fished out.  But now, this is 2005.  I can't remember if

4          he was still under the mandate or not, maybe it was,

5          which of the various mandates that Thomas had, whether

6          it was covered or not.

7              Q.  Do you remember the advice that he provided?

8              A.  He provided, he took some time to provide it, but

9          he managed to speak directly with, I think McLaren was

10         one of the ones where we didn't have an clue as to, you

11         know, how to contact them because they were not --

12         Mercedes, at least you do fixed income with them.

13         McLaren is not an entity that we were banking.  But also

14         through the banking circles in Germany it is hard to

15         understand where things stood with the teams, whether

16         they were prepared.  Because the migration to a new

17         event would have meant, for the auto manufacturers who

18         decided to do that, probably taking three steps back in

19         terms of visibility and so on, before it was up and

20         running and, you know, Formula 1 had already been going

21         for decades at the time.  So he was instrumental in

22         understanding whether it was a bluff or it was real.

23             Q.  So in your view did Dr. Marsoner provided

24         invaluable advice?

25     MS. ALVAREZ:  Objection to form.

1      A.   Obviously in retrospect at the time the advice was

2      his understanding of the situation.   In retrospect it

3      was right.

4      Q.   To your understanding did Lehman Brothers rely on

5      Dr. Marsoner's advice?

6      A.   I think this was debated at the investment

7      committee and as the pros and cons, and I think it was

8      one of the elements, certainly not the only element.   If

9      I remember correctly the way that it was presented, as

10     I was saying before, it wasn't me presenting it, it was

11     either Jeremy Isaacs or Meissner.

12     Q.   Okay.

13     A.   As it was a European issue, where it was how much

14     money do we have this investment on the books at?   How

15     much are we getting back, if we do at all?   How much are

16     we getting, and they did the calculation how much, you

17     know, the firm needed as a capital gain -- capital gain;

18     writing back of an investment -- and how much we could

19     afford to, you know, take a punt on future values.

20     Q.   And in your view do you believe Dr. Marsoner should

21     be paid for that advice?

22  MS. ALVAREZ:   Objection to form.

23     A.   I think, yes, he would be, he would have been paid,

24     I would say, in retrospect.   I don't know the ins and

25     outs of what specific authorizations he, you know,

```
 1          worked at the time but I think the firm would have taken
 2          -- you see our agreements were the senior advisers were
 3          very one sided.  So I mean once there was a negotiation,
 4          we could say okay, it is between X and Y, but then it
 5          would be the sole discretion of the firm how much to
 6          pay, and if you liked it you stayed, if you didn't like
 7          it that was the way we worked.  But on the other hand we
 8          never left, we never asked for any advice, work and so
 9          on to then not pay anything.  It was just not done and
10          certainly under my watch it never happened.  The
11          amounts, though, would be determined, even post facto.
12              Q.  Was the type of advice he provided on F1 similar to
13          in the BAWAG transaction?
14      MS. ALVAREZ:  Objection to form.
15              A.  It was similar.  It was similar in terms of advice.
16          The difference was that here it was an exit or not
17          an exit of an existing position.  BAWAG was really
18          driven as an advisory mandate.  You know, it was more of
19          an investment bank.  Here, the firm owned a position,
20          willingly or unwillingly, and he provided advice in
21          terms of tactics, the same as BAWAG, but for a different
22          purpose.
23              Q.  Do you know the Lehman entity used to reinvest in
24          F1?
25              A.  No.  I mean do I know it, maybe I knew, because --
```

1        Q.   Okay, great.

2            So what I would like to start off with, I would like

3        to mark as exhibit 1 to Mr. Pignatti's declaration,

4        Lehman's notice of deposition.

5    THE COURT REPORTER:   You need to have the one I have marked.

6            (Exhibit Pignatti 1 marked for identification)

7        Q.   This is a notice of deposition of Vittorio

8        Pignatti-Morano, it is signed by Jacqueline Marcus of

9        Weil, Gotshal & Manges.   Have you seen this before,

10       Mr. Pignatti?

11       A.   Yes I believe I was sent it.

12       Q.   Okay, I just wanted to make sure that you saw it.

13       At the end it says LBHI intends to cross-examine the

14       witness for approximately 3 hours, do you see that?

15       A.   Yes.

16       Q.   We are hoping to do it in less time.   We will try

17       our best.

18            You told us a little bit about your employment at

19       Lehman Brothers earlier today.   I want to clarify, did

20       you hold a board position at Lehman Brothers?

21       A.   I was on the operating committee.   I was on the

22       board of some of the companies.

23       Q.   Okay.   Were you on the board of Lehman Brothers

24       Holdings Inc?

25       A.   No.

1      Q.   Okay.   What about Lehman Commercial Paper Inc?

2      A.   No.

3      Q.   Okay.  So I would like to talk to you a little bit

4      about how you prepared for this deposition today.  What

5      did you do to prepare for the deposition?

6      A.   I went through the two contracts that I had, just

7      to remind myself of the time frame, and that is pretty

8      much it.

9      Q.   Okay.  Did you speak with anybody about the

10     deposition?

11     A.   No.  I was asked to do it.

12     Q.   Okay.

13     A.   Mr. Marsoner told me roughly why.  He felt it was

14     needed and I agreed, given that we worked together and

15     I was, you know, happy to give my side of my

16     contribution to the dispute.

17     Q.   What did Mr. Marsoner say about the matter?

18     A.   The matter?  That it was concerning, you know, the

19     advice given in the period when I was responsible and

20     afterwards.

21     Q.   Okay.  Did he tell you anything specifically about

22     the agreements?

23     A.   The agreements he didn't need to tell me much

24     specifically; I signed them so I can answer on those.

25     And he gave me some background that the dispute is also

1          knew his part; a large organization, he knew the equity

2          investment, which was hundreds of millions of Euros, had

3          gone really badly and there was a positive recovery on

4          the loan.

5          Q.   Okay.   And when you were looking for documents to

6          prepare this deposition, did you look for any documents

7          showing that Lehman would pay Dr. Marsoner for

8          Formula 1?

9          A.   No.   I actually was looking at -- the documents

10         that I have were all of the ones under my watch.   So

11         I would have known what Lehman, I represented Lehman.

12         Q.   Mm-hm.

13         A.   To a large extent.   So I was looking to see what

14         exactly were -- sort of brushing up on the course of

15         events and in which years was I working on --

16         Q.   Okay.   Did you look for any agreements that covered

17         Formula 1 with Dr. Marsoner?

18         A.   Yes.

19         Q.   And did you find any?

20         A.   No, not under my watch.   It was not specifically

21         mentioned.   I found some emails on sort of advice

22         provided.   Prior to the sale to CVC there was the dates

23         confusion.

24         Q.   Okay.

25         A.   And the events with CVC was done in 2006.   That was

1        the time when I changed jobs within Lehman, so this was

2        across, the discussion was prior, and it took, I think,

3        a long time between handshake and actually doing the

4        agreement with CVC.

5          Q.   Okay.  And we are going to go through some

6        documents which will hopefully help you with the

7        timeframe as well.

8          A.   Sure.

9          Q.   I would like to take a look at the letter you had

10       submitted to the bankruptcy court, which was marked

11       exhibit 6 to Peter Sherratt's deposition that we looked

12       at earlier.

13         A.   January 7?

14         Q.   Yes, January 7.  Let us mark this as exhibit 1 to

15       your deposition, just so that we have a uniform set.

16   THE COURT REPORTER:   2.

17   MS. ALVAREZ:   Oh, the notice was 1.  Okay, we will mark this

18       as exhibit 2.

19         A.   Want to put the label?  I am getting the gist of

20       it.  It is already labeled as 6.  Do you want to remove

21       it?

22   THE COURT REPORTER:  No.  It is already labeled from the

23       previous deposition.  Do you want another label on it?

24   MR. VAN TOL:  This is Pieter.  I don't understand why you

25       are remarking the exhibits have already been marked,

```
 1        MR. JOHNSON:  Objection to form.

 2         A.  As I say, we did not issue, it was difficult enough

 3        to decide, we did not need two and certainly they were

 4        senior people, the whole firm was involved in making the

 5        decisions, because as I said before, there was lots of

 6        egg on our face and a huge amount for Europe especially.

 7        It was one of the few big losses in Europe and therefore

 8        there was a lot of attention and decisions were taken in

 9        a collegiate way but without needing an explanation.

10         Q.  Okay.  And after Lehman had acquired these shares

11        as a result of Kirch's default, a team, a work out team,

12        was put together to handle this investment, correct?

13         A.  Yes.

14         Q.  And --

15         A.  For many years, because it must have been 2002/3

16        that we exercised the pledge, jointly with JP, BLB.

17         Q.  Okay.

18         A.  And then for a number of years we discovered that

19        the governance was very opaque.  But the key people, you

20        saw them listed before were people working in my

21        department called Patrick Schmitz-Morkramer and Patrick

22        Bierbaum and on the legal side Peter Sherratt.

23         Q.  Okay.  And I would like to mark this next document

24        as Pignatti 3, the Bates range on the document is Lehman

25        222 through Lehman 224.
```

1          Q.   Okay.

2          A.   So he was kept informed.  But just like Magnoni had

3      been taken out of the day by day decision making, so the

4      fixed income for the originated loan likewise.

5          Q.   Okay.

6          A.   Steve Hannan, I don't remember what his role was.

7      Patrick Schmitz-Morkramer was the boss of Bierbaum.  He

8      reported to me.  To, he had a dual task, to ideally help

9       the firm recover both on the equity investment, so this

10     was not the only assignment they had, but at least on

11     the equity investment we were on our own, we didn't have

12     a JP Morgan and BLB.  Instead on this one we had Klaus

13     Diederichs of JP Morgan and, even worse, the BLB

14     executives, who did not necessarily see eye to eye with

15     us.  So every decision had to reach first the quorum

16     among the banks and then be discussed.  So that is what

17     took up most of Patrick Bierbaum's time.

18         Q.   Okay, and Peter Sherratt is identified here as

19     well.  He was legal counsel?

20         A.   Absolutely.

21    MR. JOHNSON:  Objection.  Leading.

22         A.   Hmm?

23    MR. JOHNSON:  I just made an objection.

24         Q.   You can answer the question.  Peter Sherratt was

25         legal counsel, correct?

1    MR. JOHNSON:  Objection.  Leading.

2         A.  Correct, to the firm in Europe and particularly to

3    the thorny transactions like this one that involved

4    everything, including reputation.  As I said, this was

5    not an investment, this was a work out.

6         Q.  Okay.  And Tom Bernard was the lead of the work out

7    team?

8    MR. JOHNSON:  Objection.  Leading.

9         A.  Tom Bernard was one of the most senior people on

10   the principal investment in New York, and sort of

11   trusted by the top of the firm to supervise any

12   complicated recovery.  He was also supervising the Prop

13   Principal Investments.  So actually, functionally, his

14   interests should have been more on the equity investment

15   that had turned sour than the fixed income, but given

16   that in the end they resulted in one big mess, we kind

17   of pooled the working team.

18        Q.  Okay.

19        A.  But he was instrumental in getting sort of New

20   York's buy in into any decision that Europe made.

21        Q.  Okay, at the time this email was

22   prepared, October 22, 2002, around that time, Lehman and

23   JP Morgan were considering jointly retaining

24   Dr. Marsoner?

25   MR. JOHNSON:  Objection.  Leading.

```
 1        MR. JOHNSON:  Objection.  Leading.

 2          A.  My task was a different task.  Okay, at that time

 3        the stake was unsaleable.

 4          Q.  Okay.  Thank you.

 5          A.  We owned 75 percent interest in a holding company

 6        that an agreement with another holding company in

 7        Guernsey and so on, and Peter Sherratt, give him credit,

 8        and us, the banking team in three years would change

 9        that situation.  Not smoothly, you know, through even

10        court cases and so on.  We at one point to eliminate the

11        BLB representative, who in theory was working on our

12        behalf, and finally some changes took place.

13          Q.  Okay.

14          A.  Which then led Bernie Ecclestone to become much

15        more amenable to a sale.  Rather than having three banks

16        being difficult and so on, they saw that we were quite

17        effective in making his life not so easy.

18          Q.  Okay.

19          A.  Had it been only BLB, I think he would still now

20        age 84 control the company with 25 percent and make all

21        of the decisions single-handedly.

22          Q.  Okay.  So at this point you considered retaining

23        Dr. Marsoner.  The decision was made not to retain him

24        in 2002, correct?

25        MR. JOHNSON:  Objection.  Leading.
```

1        A.  That is correct.  I think JP came back saying,

2        well, you know, for us, you know, JP, Lehman and we take

3        a Lehman guy, you know, it sounds like we are giving you

4        the keys and so on.  You know, if you want to, we would

5        be delighted if you add him to the team at your expense.

6        Q.  Okay.

7    MR. JOHNSON:  Just to point out the objection to leading is

8        based on the fact that he is not a hostile witness, he

9        is an ex employee of Lehman Brothers.

10   MS. ALVAREZ:  You can take that position.  We are taking the

11       position that he is a friendly witness to Dr. Marsoner

12       so he would be a hostile witness to Lehman Brothers.  He

13       is no longer employed with Lehman Brothers.

14   MR. JOHNSON:  He is an ex employee, though.

15   MS. ALVAREZ:  That is fine.

16   MR. VAN TOL:  This is Pieter.  And unless you establish

17       a foundation, none of your questions are admissible.

18   MS. ALVAREZ:  Well, that is really for the court to decide.

19       So we will move on.

20   BY MS. ALVAREZ:

21       Q.  I want to jump head, that is 2002.  I want to jump

22       ahead three years, let us jump ahead to 2005.  In 2005

23       you learned that CVC Capital was considering making

24       an offer to Lehman to purchase the Formula 1 shares,

25       correct?

1          Now, I want to look at what has been marked as

2      Pignatti exhibit 2, which is the letter you submitted to

3      the court, Mr. Pignatti, could we look at it again.  And

4      on the second page, the very last paragraph, you state:

5          "It was my understanding that Dr. Marsoner would

6      have been paid by Lehman Brothers for his services

7      concerning the F1 investment or I would not have asked

8      him to help."

9          What was the basis for your understanding?

10     A.  My understanding is that, as I think I mentioned

11     before, we had a long consolidated relationship with our

12     senior advisers which was regulated by contracts but

13     they were completely one sided.  You might have read

14     them.

15     Q.  Mm-hm.

16     A.  It says if the firm decides that you had a major

17     involvement in a transaction.  So completely left to our

18     discretion, the firm's discretion.  And therefore we

19     were instructed to use this power, not

20     opportunistically, but bearing in mind that we had

21     a name, a future and we had to keep our senior advisers,

22     you know, happy.

23     Q.  Mm-hm.

24     A.  But within, you know, the boundaries of the

25     economic interests of Lehman.  And therefore, as you can

1       see from previous emails and so on, any time we utilized

2       the senior adviser, not just myself, but also other

3       people on the team, and it was a large organization,

4       I wanted it to be flagged, because if we agreed to use

5       we would then remunerate.  I cannot tell you how much,

6       it depended on our good will, on a discussion with

7       a person and so on, but we wouldn't utilize someone

8       outside of the contract to tell them thank you very

9       much, it was free help, and so on.  Otherwise we would

10      not have been as successful as we were in retaining very

11      high caliber people for relatively low fixed amounts of

12      money.

13        Q.  Okay.  So when you got to that point, you realized

14      that someone needed to be remunerated, you would have

15      a conversation with that person about how much?

16    MR. JOHNSON:  Objection.  Leading.

17        A.  Absolutely.  I would have discussed the specifics

18      of something that was not in the contract and would have

19      had an internal discussion and then I would have gone

20      back with a response.  It was a negotiation to a certain

21      point.

22        Q.  Okay.  And then ultimately you would need to get

23      approval from someone more senior?

24    MR. JOHNSON:  Objection.  Leading.

25        A.  Depending on if it was the acquisition of a M&A

1        advisory and so on.  I had my guidelines and I could

2        move on.  I would specify, because in an advisory

3        mandate you are getting a success fee and a retainer

4        fee.  So it is all, you are sharing profits with a third

5        party and I would have documented that and the contract

6        would have been seen and approved by Peter Sherratt and

7        others, and we actually had a person under Peter in our

8        division, in legal.  So everything would be documented.

9        But it wasn't a payment that came from the balance sheet

10       of the firm, it was a forgone revenue, because they were

11       all success based.  And the fixed amount would be

12       budgeted in my division, so at the beginning of the year

13       I get so many millions in external expenditures; so much

14       for travel, so much for advisers and so on.  The

15       variable part would be a deduction of revenues, so quote

16       unquote, since my guys were all on a percentage bonus

17       pool calculated, so obviously it was an investment made

18       by my division and I had the authority within those

19       boundaries to use my best judgment.

20        Q.  Okay.

21        A.  Okay.  If, on the other hand, it was the sale of

22       an asset owned by the firm -- there weren't that many --

23       and that would have been always remunerated but dealt

24       with in a different conceal.

25        Q.  Okay.

1        A.   So someone who brought an advisory mandate, you

2    know, we would pay 10 to 20 percent.  There were no

3    specific incremental costs associated to it and we would

4    consider the standard or 10 percent range.  If it was

5    a percentage of a gain, then you would be talk about 1

6    or 2 percent, so it was a completely different scale.

7        Q.   Okay.

8        A.   Because there was a risk associated if it was a new

9    principal investment or in the case of something on

10   balance sheet it normally came from a loss, so imagine

11   it was an additional investment in.  So that would have

12   been approved ad hoc.

13       Q.   Okay.  I want to make sure I understand the

14   difference.  So where there is an advisory mandate,

15   an example of that would be the BAWAG transaction in

16   2006?

17       A.   BAWAG.

18   MR. JOHNSON:   Objection.  Leading.

19       A.   BAWAG had, a dual, I think, we can look it through,

20   had two components, because in BAWAG it was a major

21   advisory mandate that we would not have gotten unless we

22   had, for example, Thomas Marsoner in, a person on site

23   in Vienna dealing with the politics, the bankruptcy and

24   so, so it was better to pay him 10 percent of the

25   revenues than not to get the mandate.

1        Q.   Okay.

2        A.   The second component of BAWAG was that the

3    mezzanine fund of the firm intended to invest, and if

4    they invested they were willing to pay a fee, sort of

5    a finders fee, for having been brought into this

6    investment opportunity, but that would have been 1

7    percent, or -- I can't remember what the amount was.  So

8    those were the orders of magnitude.

9        Q.   Okay.  So it sounds like Dr. Marsoner was

10    instrumental in that BAWAG transaction?

11        A.   He was.  First, in securing a mandate for which we

12    were probably not the best qualified without him.  And

13    then the mandate lasted for a long time.  He managed to

14    bring to the Lehman mezzanine fund a position in the

15    financing.  That was a typical thing that happened with

16    advisory mandates, many times, led to additional firm

17    revenues which were not in advisory.

18        Q.   Okay.

19        A.   Okay.  Those were remunerated because the egg came

20    before the chicken and therefore, you know, the same

21    scale did not apply.  So that would have been outside of

22    my powers, to add a fee for another division, risking

23    capital, because it was really up to them to say whether

24    they could afford, and how much.  But I certainly made

25    sure that if they utilized the referral from an adviser

1        at the investment bank they would have to pay.  I would

2        participate in the negotiation but I couldn't force them

3        to pay out of their budget more or less.

4             Q.   Okay.  So when the BAWAG transaction was completed,

5        Lehman and Dr. Marsoner came to an agreement regarding

6        how much he would be paid for his help?

7   MR. JOHNSON:   Objection.   Leading.

8             A.   Yes.

9             Q.   Now, you mentioned when you were explaining the

10       differences to me --

11            A.   Mm-hm.

12            Q.   -- that the sale of an asset situation is

13       different?

14            A.   Yes.

15            Q.   Formula 1, would that fall into that category of

16       transaction, sale of an asset?

17   MR. JOHNSON:   Objection.   Leading.

18            A.   It was the sale of an asset and therefore there

19       wasn't a mandate originating fees for -- you know, we

20       were not getting paid, you know, inside of the

21       investment banking division there wasn't an advisory fee

22       of 3 million that Formula 1 was paying to Lehman.

23       Because we owned the company, or co-owned, we couldn't

24       charge any fees, so it would have come out of pocket

25       from the firm.  Therefore it happened, you know, several

1        times.

2            Q.   Mm-hm.

3            A.   So it would have been calculated and it wouldn't

4        have been zero, you know, otherwise the firm would never

5        -- if I had received an email from a discontinued

6        adviser telling me "I want to do this", you know, "let

7        me give you advice", I would stop him straight away and

8        say I am sorry, but we spoke three weeks ago.  I have

9        now socialized with the operating committee, I think we

10       have moved on.  So I wouldn't use people for free,

11       especially if they had been with the firm for 10,

12       15 years --

13           Q.   Mm-hm.

14           A.   -- to lead them on.  I would be quite firm and say

15       thank you very much, you know, bring it to Goldman

16       Sachs, these are great ideas, thanks.  We wouldn't use

17       free help --

18           Q.   Right.

19           A.   -- from people with whom we had a relationship that

20       we still treasured in any shape or form.  On the

21       advisory side we wanted to be promoted as the right bank

22       in an area or geography where we were not strong, we

23       wouldn't short change them or use them on something we

24       had no intention to use them, and that is my statement.

25           Q.   Right, I understand that.  So with Formula 1, who

1          would decide whether Dr. Marsoner would get paid for

2          Formula 1?

3             A.   Specifically on Formula 1, it would have been

4          Bernard, Isaacs, Meissner.

5             Q.   What about Peter Sherratt?

6             A.   Peter Sherratt on the legal side, obviously he

7          would have been one of the most listened to people in

8          Europe and so on, but he didn't -- of course, being

9          a member of the operating committee, the one who oversaw

10         anything signed by a Lehman executive, you know, myself,

11         copy would go to, you will find it in the internal memos

12         of Lehman where everything went and to which companies,

13         to who and everything else.  If something jumped to the

14         eye, Peter would call the person saying, you know, what

15         is going on here.  Normally we pay 10 percent but here

16         you have paid 35 percent, you know, let us get to the

17         root of that.  He wouldn't be leading, you know, he

18         would be objecting that something was either unethical,

19         or, you know, he would check whether anybody we paid as

20         a senior adviser was in conflict of interest because

21         maybe he was working for the company that was being

22         advised, or things like that.

23            Q.   Okay.  Thank you, that is very helpful.

24               I want to look at another document that I believe

25         has been marked.  Lehman 204.  I am just trying to get

1        a record of the exhibit number.  I believe it was marked

2        during Peter Sherratt's deposition and you used it

3        earlier.  You don't need to mark it, he has one copied.

4        Exhibit 5 should be in front of you somewhere.  Okay.

5        This is an email string.  We have three emails there.

6        The top email is dated November 26, 2005 from Tom

7        Bernard.  I would like to focus on the email at the

8        bottom of the string which would have been the first

9        email that we sent.  It is from Thomas Marsoner

10       dated November 25, 2005.  It is to you, Mr. Pignatti --

11       A.  26th?

12       Q.  Oh, the 25th, the email on the bottom of the page.

13       A.  Okay, sorry.

14       Q.  Do you see it is from Marsoner to you?

15       A.  Mm-hm.

16       Q.  Okay.  The very first line says:

17           "If this is the deal I suspect it is, my senior

18       advice is (strongly) against selling out now."

19           Do you see that?

20       A.  Mm-hm, yes.

21       Q.  And then Dr. Marsoner identifies the reasons why he

22       would not sell out?

23       A.  Mm-hm.

24       Q.  Okay.  And then at the very second to last

25       paragraph, the paragraph that begins "needless to

1    say" it says:

2         "Needless to say, if a "fresh face" were helpful to

3    facilitate things here, mine continues to be available

4    for a very modest percentage participation in LB's gain

5    upon eventual sale."

6         Do you see that?

7    A.  Yes.

8    Q.  Okay, I want to make sure I understand.

9    A.  Yes.

10   Q.  Dr. Marsoner here was offering to be what he called

11   a fresh face in coordinating a response --

12   MR. JOHNSON:  Objection.  Form.

13   Q.  -- for all of the banks?

14   MR. JOHNSON:  Objection.  Form.

15   A.  He was offering to say if -- I see, 25 November,

16   yes.  What he is saying is if you have reached the stage

17   where you want to do a sale, then do a total sale and if

18   you agree I will be more than happy and, because he was

19   not covered by advisory, specifies that it would be

20   a small percentage and so on, because even if we had,

21   you know, at the time, I can't remember if it was still

22   the old agreement or whatever, it wasn't going to fall

23   into an investment banking advisory agreement.  That

24   much he knew.

25   MR. JOHNSON:  Just for the record, Pieter has left the video

1          conference.  He is going to be dialing in soon.

2      MS. ALVAREZ:  Okay.

3      BY MS. ALVAREZ:

4          Q.  So Dr. Marsoner was offering to coordinate

5      a response to CVC?

6      MR. JOHNSON:  Objection.  Leading.

7          A.  I think it was more offered internally to see

8      whether the deal could be, you know, improved, limiting

9      the size of the stake that was being sold.

10         Q.  Okay.  And he was suggesting that he would do this

11     for what he called a modest fee?

12     MR. JOHNSON:  Objection.  Leading.

13         A.  Yes.

14         Q.  So he is offering to facilitate things in exchange

15     for a percentage upon LB's eventual sale?

16     MR. JOHNSON:  Objection.  Form.

17         Q.  You never took him up on this offer, correct?

18     MR. JOHNSON:  Objection.  Leading.

19         A.  I never took him up.  I think I passed on the

20     information to the people --

21         Q.  To whom?

22         A.  To Bernard, and, you know, and the others.  Maybe

23     verbally on a call, and I said guys, this is a view.

24     And that was a time when this was, you know, a debated

25     issue at Lehman as to what to do.

1          Q.  And to your knowledge, Tom Bernard never took him
2      up on the offer, correct?
3   MR. JOHNSON:  Objection.  Leading.
4          A.  I don't know.  There certainly was an exchange of
5      emails with Tom Bernard.
6          Q.  Do you know if Tom Bernard retained Dr. Marsoner to
7      coordinate a response to CVC?
8          A.  I don't know.
9   MR. JOHNSON:  Objection.  Form.
10         Q.  Peter Sherratt didn't take him up on the offer,
11     correct?
12  MR. JOHNSON:  Objection.  Leading.
13         A.  I don't think it would have been Peter Sherratt's
14     task to sign up a non-legal adviser.
15         Q.  Well Jeremy Isaacs didn't take him up on the offer?
16  MR. JOHNSON:  Objection.  Leading.
17         A.  Okay, that would have been the sort of person.
18     I don't see Christian Meissner.  Maybe it was before he
19     stepped in.
20         Q.  Did Jeremy Isaacs take him up on the offer?
21         A.  Not that I know.
22  MR. JOHNSON:  Objection.
23         A.  He is the only one who could have retained
24     an adviser for corporate Europe, for example.  That
25     would be him.

1        were people from finance, legal, so on and not the line

2        managers.

3          Q.   Okay, that's fair.  So regardless of Lehman

4        entity --

5          A.   Mm-hm.

6          Q.   -- you have no writings indicating that Lehman

7        agreed to pay Dr. Marsoner for Formula 1, correct?

8     MR. JOHNSON:   Objection.  Leading.

9          A.   That is correct.  I used in this sentence my

10       experience and the fact that I received information from

11       Mr. Marsoner.  I distributed it and it created

12       a dialogue with a follow up.  So he didn't get an email

13       saying thank you very much, as I would have done in the

14       same situations in my division.  If there was an adviser

15       that I thought was no longer going to be utilized

16       I would not have exploited that person, I would have cut

17       the mail flow by saying thank you very much,

18       I appreciate it.  It sounds like a great idea.  Feel

19       free to take it where ever.  In this case, obviously,

20       that didn't apply because who could this idea -- it

21       could only be sold to Lehman or JP Morgan.

22          Q.   And normally you would have eventually documented

23       an agreement to pay?

24          A.   Yes, absolutely.

25          Q.   In writing?

```
 1      MR. JOHNSON:  Objection.  Leading.

 2           A.  Even post facto in the sense, as I told you,

 3      because we operated with a completely one sided

 4      methodology, and therefore I didn't need to document

 5      things immediately.  I did because it is my practice to

 6      do these things, but it was not necessary because if we

 7      wanted we would do it.  But the policy of the firm was

 8      if we used someone considerably, we would then price the

 9      services.  If it was someone that was a trusted adviser

10      with other contracts and so on, we would not have them

11      work unless we intended to remunerate them.  That

12      doesn't define the amount.

13           Q.  And then eventually you would negotiate a price

14      with the adviser?

15      MR. JOHNSON:  Objection.  Leading.

16           A.  Basically we would tell the adviser what the price

17      was going to be.

18           Q.  And document it in writing?

19           A.  Yes.

20      MR. JOHNSON:  Objection.  Leading.

21           A.  We would not pay not inconsiderable amounts without

22      a valid reason and all documentation.

23           Q.  And getting approval from the senior people at

24      Lehman?

25      MR. JOHNSON:  Objection.  Leading.
```

1          A.   In this particular case it was only the senior

2          people in Lehman dealing with the person, so it was

3          a matter of putting it down on paper and we would be

4          told which company it would be and then, you know, we

5          could make the payment.   We could not make a payment

6          without any form of contract or anything, but in many

7          cases it would just be if there was an existing contract

8          pertaining to a general adviser and so on, then we would

9          write an addendum to that contract, dating it and so on,

10         and saying as per point six we consider the BAWAG

11         transaction a success and therefore associated with this

12         the fee of 1 percent in the scale provided in, you know,

13         and then we would pay.

14         Q.   Okay.   I want to make the declaration of

15         Dr. Marsoner as the next exhibit.   We are getting close

16         to a break.   What number is this?

17              (Exhibit Pignatti 4 marked for identification.)

18    THE COURT REPORTER:   4.

19         Q.   Okay.   That is the document exhibited by

20         Dr. Marsoner, it is actually exhibited to his motion.

21         Have you seen this before, Mr. Pignatti?

22         A.   No.

23         Q.   No.   I want to focus on a particular paragraph.   If

24         you go to paragraph E on the bottom of page 2.

25              "In 2005 I advised Lehman in my role as senior

1          adviser, both in emails and in telephone conversations,

2          to continue Lehman's investment in F1, which service

3          I explicitly provided in exchange for 10 percent of

4          Lehman's revenues related to the transaction, as was

5          customary under the agreements.  Lehman agreed, both

6          orally and by email, to this fee in exchange for my F1

7          advice."

8                Do you see that?

9          A.  Mm-hm.

10         Q.  Do you know who agreed orally to pay Dr. Marsoner

11         10 percent of Lehman's revenues?

12    MR. JOHNSON:  Objection.

13         A.  No I don't.

14         Q.  Do you have any emails where Lehman agreed to pay

15         Dr. Marsoner 10 percent of Lehman's revenues on F1?

16    MR. JOHNSON:  Objection.

17         A.  No I don't.

18         Q.  Did Dr. Marsoner ask you to search for any such

19         emails?

20    MR. JOHNSON:  Objection.

21         A.  No.

22         Q.  Did he ask you to search for any documents

23         indicating that he would be paid 10 percent of Lehman's

24         revenues for F1?

25    MR. JOHNSON:  Objection.

1           A.  No.

2       MS. ALVAREZ:  Okay, I think we are ready for a break.

3       THE VIDEOGRAPHER:  We are going off the record.  The time is

4           5:52 p.m.

5       (5:52 p.m.)

6                       (Break taken.)

7       (6:07 p.m.)

8       THE VIDEOGRAPHER:  We are back on the record.  The time is

9           6:07 p.m.

10      BY MS. ALVAREZ:

11          Q.  Mr. Pignatti, you testified earlier that you were

12          involved in the negotiations of Dr. Marsoner's 2002 and

13          2004 executive advisory agreements, is that right?

14          A.  Yes.

15          Q.  Okay.  Did you negotiate many of these agreements

16          for Lehman Brothers?

17          A.  Mm-hm.

18          Q.  Okay.  The purpose of this agreement is to set

19          forth the terms of the agreement, is that correct?

20      MR. JOHNSON:  Objection.  Leading.

21          A.  Yes.

22          Q.  The term determine or and duration of the

23          retention?

24      MR. JOHNSON:  Objection.  Leading.

25          A.  Yes.

1          Q.  The responsibility of the consultants?

2          A.  Yes.

3     MR. JOHNSON:  Objection.  Leading.

4          Q.  Also the responsibilities of Lehman Brothers would

5     be laid out in a consultant agreement correct?

6     MR. JOHNSON:  Objection.  Leading.

7          A.  You have the agreements.  They are standard

8     agreements that specify the restrictions on the side of

9     the adviser and not many on the side of the firm.

10    Q.  Okay.

11         A.  But they do specify the framework and then they

12    have a sentence, all of them, that says anything else

13    that comes out will have to be interpreted by the firm

14    within the guidelines of the contract.

15         Q.  Okay.  And agreed to in writing, correct?

16    MR. JOHNSON:  Objection.  Leading.

17         A.  Yes.  But we have the contracts, we can go through

18    them.

19         Q.  We are going to look at them in a moment.

20         A.  Mm-hm.

21         Q.  I just want to get an understanding of how these

22    agreements generally work.  Let us talk about the 2004

23    advisory agreement.  The 2002, I am sorry.  I don't

24    believe it has been marked yet so we will go ahead and

25    mark it.  What number are we on?

1      THE COURT REPORTER:  5.

2      MS. ALVAREZ:  Okay.

3           (Exhibit Pignatti 5 marked for identification)

4      BY MS. ALVAREZ:

5           Q.  Now I represent to you that this exhibit was

6      attached as exhibit C to Dr. Marsoner's motion.

7           A.  Mm-hm.

8           Q.  This is the 2002 agreement between Lehman Brothers

9      Europe Limited and Thomas Marsoner, correct?

10          A.  Yes.

11          Q.  The date of the agreement is July 24, 2002?

12          A.  Yes.

13          Q.  One thing I was curious about, if you look at the

14     bottom of the first page it says "page 71".  Do you know

15     why this agreement starts at page 71?

16          A.  I have no idea.

17          Q.  Okay.

18          Now, this agreement was signed by you on behalf of

19     Lehman Brothers Europe Limited, correct?

20          A.  Mm-hm.

21          Q.  Correct?

22          A.  Yes.

23          Q.  Dr. Marsoner signed on his own behalf?

24     MR. JOHNSON:  Objection.  Form.

25          Q.  Let's look at it.  It says page 79 on the bottom.

1        A.   Yes.

2             Q.   Okay.   And the period of this agreement, the

3        commencement date, was March 1, 2002.   And you can turn

4        to, it is the second page of the agreement.

5             A.   Mm-hm.   Yes.

6             Q.   And the agreement terminated on March 1, 2003.   And

7        you can see that on page 77.   Do you see that?

8        Section 10.1 says:

9             "This agreement shall expire automatically on the

10       first anniversary of the commencement date."

11            A.   Yes.

12   MR. JOHNSON:   Objection.   Form.

13            Q.   Okay.   Now, the information --

14            A.   If you notice, also, 10.3.

15            Q.   "Notwithstanding clause 10.1 of this agreement,

16       either party may terminate this agreement by giving 4

17       weeks' notice writing."

18            I see that.

19            A.   Mm-hm.

20            Q.   Did anybody terminate this agreement prior to the

21       termination date?

22            A.   No.   This is to point out the nature of these

23       agreements and the flexibility, when I said it was

24       totally one sided and therefore we did not need, you

25       know, to really pre-agree everything when in the

1       nebulous world of investment banking -- because all of

2       the ammunitions, I mean you can see that everything

3       could be terminated four weeks.  This is not

4       a standard -- it is a standard for this industry.

5           Q.  So it is a standard agreement that Dr. Marsoner --

6       standard consultancy agreements contain provisions like

7       this?

8           A.  Yes.

9       MR. JOHNSON:  Objection.

10          A.  The value in the agreement is in the relationship

11      with the firm because, being totally one sided, he was

12      certainly used to the fact the parameters overall were

13      spelt out.  But his entitlement was totally

14      discretionary on the firm's side.

15          Q.  Okay.  Well, let's take a look at section 3 of this

16      agreement.  Section 3 describes the payments that would

17      be made by Lehman Brothers Europe to Dr. Marsoner,

18      correct?

19          A.  Payments, mm-hm, yes.

20          Q.  Is that a yes?

21          A.  Yes.

22          Q.  Okay.  If you look at 3.1.1, provides that Lehman

23      Brothers Europe would pay Dr. Marsoner a retainer fee of

24      USD 200,000.

25          A.  Yes.

1    how many I signed over the decade that I was

2    responsible.

3        Q.  Okay.

4        A.  This is the catch all that I was describing before.

5        Q.  Mm-hm.

6        A.  As the agreement, you will agree with me, is

7    totally one sided.  We would have annual agreements.

8    You know how long it takes for these major transactions

9    to move ahead or not move ahead.

10       Q.  Mm-hm.

11       A.  So it would be too tedious to do a continuous

12   negotiation on everything that comes up.  What you do is

13   you list the major things that were covered because they

14   are probably -- I think Telekom Austria was probably

15   already a year old, from the previous agreement if there

16   was one.  It was the privatization of a major telecom

17   company, and BAWAG took a year to get done.

18        During this period there would be many things where

19   the adviser would say "can I work on this?"  I would ask

20   team members, and this is on the advisory side --

21       Q.  Mm-hm.

22       A.  -- does this really make sense?  Are you really

23   going to use him?  What is the contribution and

24   monitoring?  And so on.  And then I would ratify what

25   I thought, in my judgment or, if more people were

1       involved, in our judgment, was the contribution and in

2       the following contract, or even in this one, I would say

3       as per 3.2.1 we now agree to pay you, you know,

4       a million dollars for securing the Formula 1 advisory

5       mandate, okay, something like that.

6          Q.   Okay.

7          A.   Not necessarily when it happened, the day, or don't

8       lift your pen until I have sent you a confirmation and

9       so on, okay.

10         Q.   Okay.

11         A.   But this refers to advisory contracts which were,

12      as I said, within my powers because my division was

13      paying it out of revenues, okay.   So here the

14      USD 200,000 would have come out of my annual budget,

15      because it was a guarantee.   And then anything else, you

16      will see, is really a success fee and therefore, which

17      is actually paid the moment the client sends the money

18      to settle the invoice.   You know, so unless Telekom

19      Austria paid us the, I don't know, 7 million Euro

20      advisory fee, of which 700,000 would go to Mr. Marsoner

21      a month later, okay.   But first the cash came in.

22         Q.   Okay.

23         A.   Okay.   So --

24         Q.   Let me ask you, you said the agreement is

25      dated July 24, 2002?

1       A.   Yes.

2       Q.   At this point had Lehman acquired the shares, the

3       Formula 1 shares?

4       A.   Yes.

5       Q.   Okay.

6       A.   I think so.   I go without -- because I can't use my

7       notes.

8       Q.   Okay.

9       A.   It is public information.

10      Q.   Okay, I will look it up.   I want you to base it on

11      what you remember.

12      A.   Yes.   On what I remember, yes.

13      Q.   Okay so --

14      A.   But we were doing fixed income, legal troublemaking

15      work.

16      Q.   Okay.

17      A.   So it didn't need a senior adviser to say on this

18      article of association in Guernsey we actually have the

19      right to do this and therefore, you know, and start.

20      That was really Sherratt and the two Patricks who would

21      say we have a right to verify the accounts, we have

22      a right and we would exercise any right we had until we

23      were able to modify.

24      Q.   Okay.   So Formula 1 wasn't added to this agreement?

25      A.   No, because at that point it was not really part of

1        the core business of my division, was advisory.  Seeking

2        new paid assignments to provide intelligence, solutions

3        and so on.

4            Q.  Okay.

5            A.  And you see the nature of these engagements, one is

6        a telecom deal, the other is a financial institution,

7        both in Austria.  And we didn't have any senior Austrian

8        after Mr. Marsoner retired from full service and

9        therefore I retained his services.

10           Q.  Okay did. Dr. Marsoner ask for Formula 1 to be

11       added to this agreement?

12   MR. JOHNSON:  Objection.  Form.

13           A.  He probably did in that sense.  But he was probably

14       told there was nothing tangible and unless JP Morgan and

15       us had a budget at the corporate level, because there

16       wouldn't be investment banking pay out of goodwill for

17       the mistake of another division, so we were servicing

18       this but I didn't have a budget to -- in fact I would go

19       to Peter Sherratt and say legal, we need this, because

20       the expenses would be billed upstairs, he sat on the

21       floor above me.

22           Q.  Okay.

23           A.  So my division was not even paying for the travel

24       to go and see Formula 1 and so on, because we didn't

25       have a matching revenue.

1           Q.   Okay.   So if Dr. Marsoner had asked would you be
2      the person that he would have asked?
3    MR. JOHNSON:   Objection.   Leading.
4           A.   For the advisory side, yes.
5           Q.   Okay.   Do you recall whether he asked you to add
6      Formula 1 here?   Even though I understand that it
7      wouldn't be appropriate did, he ever ask you?
8    MR. JOHNSON:   Objection.   Form.
9           A.   I think he did --
10         Q.   Okay.
11         A.   -- say "can I work on Formula 1?" and I said it
12     isn't a profit center for me, so what we have do is
13     reach an understanding, it is a consortium.   We have
14     a few pooled expenses because for example legal we were
15     sharing with the three banks.   So any expense, we only
16     had 25 percent of the loan.   So with that we didn't pay
17     for anything 100 percent, because it would have been
18     disproportionate.
19         Q.   Mm-hm.
20         A.   So I said don't even bother with the Germans,
21     because they didn't agree to anything.   But at least
22     with JP if I get them in, I will speak about it
23     internally and see if we can add it.   Maybe it wouldn't
24     have been part of this, because this was one of our
25     companies in advisory, but we would have done something.

1          As it happens, it was kind of blocked.

2          Q.   Okay.

3          A.   I think I still retained some advice on Formula 1

4     specifically, not because I wanted to short change

5     Thomas in any way, but because I was still paying him

6     a retainer of 200,000, which covered, as you can see in

7     the agreement, whatever he agreed to provide, you know.

8     Even without, you know, in the normal course of

9     business.  But not high intensity thing.  But he did

10    provide intelligence on this Concordia agreement which

11    was the break out of the teams create their own

12    Formula 1.

13         Q.   And the Concorde agreement, just to clarify, that

14    was later on, that was in 2008?

15    MR. JOHNSON:  Objection.  Leading.

16         A.   It started already.  The moment the banks

17    repossessed, and so on, as you can imagine, the teams

18    revisited their contribution in because they were losing

19    money in Formula 1, and Formula 1 it became apparent was

20    making money, so they started to wonder whether, you

21    know, something could be renegotiated.  First they went

22    to Bernie and then they sent Goldman Sachs our way, as

23    if we could have done, not that we were interested in

24    paying them more, but even if we did agree to pay them

25    more we did not have the tools to change the agreements

1          because we realized that we had some negative powers but

2          not positive powers to tell Bernie what to do.

3             Q.  Okay.

4             A.  So that is why we didn't go for immediate sale, we

5          didn't do anything, because we had little to sell.  We

6          had an economic interest in Formula 1.  Without even the

7          ability to distribute dividends.

8             Q.  Okay.

9             A.  To force the distribution of dividends.

10            Q.  Okay.  Let us look --

11            A.  So he did some advisory things, covered by this,

12         and, you know, to be officialized in a different way.

13            Q.  And you paid Dr. Marsoner, Dr. Marsoner was paid

14         a retainer for this 2002 agreement?

15            A.  He was paid for the agreement and the agreement

16         reflects the services.

17            Q.  Do you know if there was ever an allotment made in

18         Lehman's revenues for payment to Dr. Marsoner for

19         Formula 1?

20         MR. JOHNSON:   Objection.   Leading.

21            A.  I have no idea.

22            Q.  Okay.  Let us look --

23            A.  Because the accounting was completely separate from

24         the banking division.

25            Q.  Okay.  So let us let's take a look at the 2004

1       agreement.  Would that be exhibit 6?

2          THE COURT REPORTER:  Yes.

3               (Exhibit Pignatti 6 marked for identification)

4          Q.  This agreement was also exhibit C to Dr. Marsoner's

5       motion.  We will mark it exhibit 6.  Just for the record

6       this agreement also begins in the middle, it is page 64,

7       just so we are clear.  It is dated February 13, 2004 and

8       the agreement is between Thomas Marsoner and Lehman

9       Brothers Europe Limited, do you see that?

10         A.  Mm-hm, yes.

11         Q.  Okay.  You, as you testified earlier, also

12      negotiated agreement, correct?

13         A.  Yes.

14         Q.  Who else was involved in the negotiations?

15         A.  On this one I think it was just myself and then

16      I was liaising with or reporting to the executive

17      committee for investment banking who was made aware of

18      all, I mean I wouldn't have a session just on the

19      Marsoner agreement, but we would go through, you know,

20      the budgeting and February sounds like a classic date in

21      investment banking as bonuses are paid as of 31 January.

22      So in February you finalize the budget for the year and

23      you put in everything and I probably had, you know, the

24      approval for this and all of the other mandates because

25      they were annual so we got them all rolled over and then

1        agreed.

2        Q.   Mm-hm.

3        A.   And not exceeded.   So it was the COO of investment

4        banking.

5        Q.   Okay.   What about William McKeown?

6        A.   McKeown?

7        Q.   McKeown.

8        A.   He is the equivalent of Marco Roggero in New York.

9        Q.   Okay.

10       A.   So the way New York used Marco Roggero as chief

11       operating of investment banking so that they would then

12       do the budget for the two, because we were completely

13       separate from the US.   So they just added everything up

14       and made sure, for example, that if we paid this kind of

15       money to the European advisers, the Americans got

16       something similar.

17       Q.   And Graham Wilson?

18       A.   Graham Wilson was on the finance side.   So there

19       was, you know, it is 350 people in investment banking

20       Europe.   And they did everything, and I was also a line

21       manager.   I used to get mandates, execute them and so

22       on, and do this, supported by a lot of people.

23       Q.   Okay.   Do you know if Tom Marsoner ever asked you

24       -- before we get there, let us look at section 3 of this

25       agreement.   So we are looking at section 3 of exhibit 6.

1          A.   Yes.

2          Q.   It is titled "compensation payable to the

3     consultant", correct?

4          A.   Yes.

5          Q.   Section 3 lays out how much Dr. Marsoner would be

6     paid under the terms of this agreement, correct?

7          A.   Absolutely.   And you will find that, in terms of

8     set up, identical to the previous one with a fixed

9     amount which has now been reduced.

10         Q.   Mm-hm.

11         A.   And I don't recall whether we didn't do well the

12    year before so they cut my budget overall or Austria was

13    less interesting, you know, these things depended on

14    many things.

15         Q.   Mm-hm.

16         A.   Then you have the identified transactions.

17         Q.   And Formula 1 is not identified in any of these

18    paragraphs, correct?

19         A.   No.

20    MR. JOHNSON:   Objection.

21         Q.   Do you recollect whether Dr. Marsoner requested to

22    be added to this agreement?

23    MR. JOHNSON:   Objection.

24         A.   I do not, I do not remember.

25         Q.   Your role in this agreement, as in the 2002, was to

1          talk, to go back and forthwith Marsoner with the
2          agreement, correct?
3     MR. JOHNSON:  Objection.  Leading.
4          A.  Back and forth in the sense that pretty much
5     I would be on, you know, I have long conversation was
6     the team on each of the projects, okay, some of which
7     I was directly involved, others I was not.  I would form
8     an important opinion and then I would do one session
9     with him, maybe for an hour, and tell him what was on
10    offer.  It is not that I was in a position where the
11    world would end, you know, without Dr. Marsoner.
12         Q.  But he would review a draft and provide you
13    comments, right?
14         A.  Absolutely.
15    MR. JOHNSON:  Objection.  Leading.
16         Q.  And did he ever request that Formula 1 be added to
17    the agreement?
18    MR. JOHNSON:  Objection.
19         A.  I do not remember.  In many cases we do the meeting
20    with Marco Roggero and Graham Wilson and so on, and then
21    I say okay, done, next and then they would make sure, do
22    the back and forth, not even with me, you know, up to
23    or, and/or, these things I did not deal with.
24         Q.  Right.  But would they communicate with
25    Dr. Marsoner about the agreement?

1          A.  Yes, they would, directly.  Johari as well.

2          Q.  Okay.  If Dr. Marsoner had requested that Formula 1

3     be added to the agreement would they bring that request

4     over to you?

5     MR. JOHNSON:  Objection.  Leading.

6          A.  He wouldn't ask them.  They wouldn't even know what

7     Formula 1 was.

8          Q.  So he would ask you?

9          A.  It would have to be me.  I would speak to the

10    various teams and so on.  The COO of finance and so on

11    just worked, taking for granted that these were the

12    transactions and that was the economics, and then making

13    sure the contract was correct, the dates were right and

14    so on, but he wouldn't negotiate on, you know,

15    situations.  Everything was covered by high

16    confidentiality in some cases.  Only I and Marco Roggero

17    had the names of the companies for which we were

18    engaged.

19         Q.  Okay.  But you don't recall him asking you that, to

20    add Formula 1?

21    MR. JOHNSON:  Objection.

22         A.  I don't recall, that doesn't mean he didn't do it.

23         Q.  That is okay.  Okay, so Dr. Marsoner also executed

24    similar agreements in 2006 and 2007 with Lehman Brothers

25    Europe, correct?

1        wouldn't send me back a signed copy.

2        Q.   Okay.  We would, to the extent that Dr. Marsoner

3        has a copy, this agreement if you flip through the pages

4        is cut off on the bottom on almost every page.

5        A.   Mm-hm.

6        Q.   We would request a copy that is not cut off.  Thank

7        you, Mr. Pignatti.

8        So I want to move away from these agreements

9        a little and talk about BAWAG.

10       A.   Mm-hm.

11       Q.   You testified earlier that this was an investment

12       banking transaction that took place in 2006, correct?

13       A.   Correct.

14       Q.   And Dr. Marsoner advised Lehman Brothers Europe on

15       Cerberus' acquisition of BAWAG?

16       A.   Absolutely.

17       Q.   Is that right?

18       A.   Yes.

19       Q.   And Lehman Brothers Europe agreed to pay Marsoner

20       for his assistance with BAWAG?

21       A.   Yes.

22       Q.   Correct.

23       A.   A percentage of the advisory fee.  So just to

24       clarify his role, he was an adviser to Lehman Brothers

25       in the sense that we were paying him and we had signed

1          a contract with Cerberus to provide advisory service to

2          Cerberus.   In reality, he was interacting directly with

3          Cerberus.

4              Q.   Okay, okay.   And it was typical to pay an adviser

5          a percentage of those advisory --

6      MR. JOHNSON:   Objection.   Leading.

7              A.   In investment banking, yes.

8              Q.   Okay.   Let us look at another exhibit.   It is

9          Lehman LEH 203, is the Bates number.   This may have been

10         marked during Sherratt's deposition, I don't recall.

11         But we will mark this as exhibit 8.

12             (Exhibit Pignatti 8 marked for identification)

13             Q.   Mr Pignatti, this is an email from you to David

14         Stonberg.   Michael Odrich and Anthony Tutrone are CC'd

15         on the email?

16             A.   Mm-hm.

17             Q.   It is dated May 24, 2007 and the subject line is

18         "BAWAG IBD fee", do you see that?

19             A.   Yes.

20             Q.   What is IBD?

21             A.   Investment banking division.

22             Q.   So these are the investment banking fees you were

23         referring to?

24             A.   Er, there is --

25     MR. JOHNSON:   Objection.   Leading.

1      A.  It is so small I am trying to decipher the text,

2      and I will answer in a second.

3      Q.  Okay.

4      A.  Yes, I do remember the whole thing.  It explains

5      a bit how we work.  So this was me --

6      Q.  Mm-hm.

7      A.  -- writing to people on the principal side, okay,

8      those responsible for the Lehman Brothers funds.  By

9      then I had joined them, so this was like a flashback,

10     saying to them I had entered on behalf of the investment

11     banking division into an advisory contract, which you

12     have seen, which basically spells out exclusively the

13     sharing of this adviser on the advisory fees.  In

14     addition, this person was instrumental to getting other

15     pieces of the bank, including yours, involved in

16     a transaction that closed.  So here you find Stonberg is

17     the head of co-investments, because the co-investment

18     fund put money with Cerberus in the BAWAG deal.

19     Mike Odrich was the American head of all of the funds

20     and Anthony Tutrone was his deputy.  So what I am asking

21     them is to accept, you know, to pay a fee to

22     Mr. Marsoner to for bringing in other parts of the bank.

23     So it was not included.  I wouldn't have paid it out of

24     my investment banking budget, because I didn't

25     receive -- you know, plus at that point they had made

1    an investment, it wasn't even clear.  It didn't turn out

2    to be a good investment, either, no.  But it was common

3    not to utilize, because Marsoner couldn't say "you know

4    what, there are many funds around the world.  I am

5    interested in keeping the relationship with Cerberus,

6    frankly, why should I bother alerting the Lehman funds

7    of the opportunity, inviting them to Austria, doing the

8    management presentation and so on", which he did.

9        Q.  Mm-hm.

10       A.  And they, I think, decided to pay something less

11   than this, but they did pay him something.  That is what

12   I was referring to before.  So I would do this before

13   the transaction closed to make sure that I wasn't

14   misrepresenting and the adviser felt cheated because he

15   had done extra work and so on.  This I did with every

16   other division, including head office upstairs, you

17   know.  So if there was something and I was using

18   an adviser who was paid by investment banking, I would

19   make sure that they wanted to chip in or I would say

20   candidly to the adviser, you know what, they don't

21   really think you are adding value so you won't get paid.

22   Do what you want but don't come back to me.

23       Q.  Okay.  You didn't send a similar email seeking

24   approval of Dr. Marsoner's payment for Formula 1?

25   MR. JOHNSON:  Objection.  Leading.

1          A.   No I did not.   Although I did convey the

2     information and things, but then it was no longer my

3     responsibility to even sign these agreements with him.

4     I was no longer the nominated person with whom he had to

5     get everything approved.   So apart from the fact that we

6     had known each other for a long time and so on, I wasn't

7     going to step in and create a mess by having someone who

8     was running another division, who was making agreements

9     on services, it was too big an organization for that.

10         Q.   Okay, so you weren't the guy who could approve

11    payment to Marsoner on Formula 1?

12    MR. JOHNSON:   Objection.   Leading.

13         A.   Not after, you know, the advisory services were

14    rendered, but for advice on whether to sell a principal

15    position on inherited from a bad loan.   In selling it

16    who was in investment banking or the funds not exposed

17    to the asset, say here is a million.   What I would have

18    done is I would have conveyed the information to Tom

19    Bernard, you know, and the people who had to make

20    a decision, and to the best of my knowledge, they did

21    take up --

22         Q.   Okay.

23         A.   -- the information.   They didn't say sorry, we

24    don't know who this guy is, we don't care what he says

25    and so on.   I kind of left it to them and said this is

1      a credible adviser that we have had for a long, long

2      time and this is his opinion.  And to the best of my

3      knowledge that opinion was not thrown away and everybody

4      said you know, we know exactly what is happening and we

5      have decided to sell and so on.

6        Q.  But to your knowledge was payment to him, payment

7      of ten percent of Lehman's revenues on Formula 1,

8      approved?

9    MR. JOHNSON:  Objection.  Form.

10       A.  I have absolutely no idea.  My own impression is

11     that 10 percent is more of an advisory type of agreement

12     when you are sharing revenues.  In this particular case

13     I wouldn't call the sale of Formula 1 a revenue, you

14     know, in the sense that we had not been repaid

15     300 million loan for 2002 to 2006, 8 years of interest

16     accrued and so on.

17       Q.  Mm-hm.

18       A.  So it wasn't -- you know, it sounds to me like,

19     well, first of all it would be very difficult to define

20     on Formula 1 the gain.

21       Q.  Okay.

22       A.  What you can do is a first derivative of the gain

23     and say had we sold we would have made less than had we

24     not sold, and therefore this is the implied gain.  But

25     in absolute accounting terms it would have been a much

1        more complicated exercise.  So I doubt that -- a fixed

2        amount of what?

3        Q.  Right, okay.  So let us talk about Formula 1 in

4        2006.  We are going to jump one year head, okay?

5        A.  6.

6        Q.  Formula 1 had refinanced its debt in 2006, that's

7        correct?

8    MR. JOHNSON:  Objection.  Leading.

9        A.  Yes.

10       Q.  There was a bond offering in 2001 by Formula 1?

11   MR. JOHNSON:  Objection.  Leading.

12       A.  I believe so.  This was by then completely out of

13       my domain.  I mean I never did fixed income, so the bond

14       issue would be the fixed income.

15       Q.  But it was pretty public, the bond offering?

16       A.  Sure.

17   MR. JOHNSON:  Objection.  Leading.

18       Q.  And that bond offering resulted in dividends being

19       paid out to shareholders of Formula 1?

20   MR. JOHNSON:  Objection.  Leading.

21       A.  Sure it was a --

22       Q.  We established earlier that Lehman Commercial Paper

23       was a shareholder at that point?

24   MR. JOHNSON:  Objection.  Leading.

25       Q.  Yes or no?

1          and then we arrive to this.

2              Q.   Okay.  So did you have any conversations with

3          anyone other than Dr. Marsoner about his request prior

4          to finalizing the letter?

5      MR. JOHNSON:   Asked and answered.

6              A.   Magnoni.

7              Q.   What did you discuss with Magnoni?

8              A.   No, he asked me what I recalled, whether we

9          recalled the same thing and so on, because he was also

10         lost in the decades; what happened?  When did we

11         repossess?  Because he was following it from the outside

12         he couldn't remember anything, the names of the people

13         involved, who was who.  And he said, you know, this is

14         going to be, you know, potentially complicated.  He

15         doesn't have anything because he exited Lehman.

16         I bought a business from Lehman, including the servers.

17         He did not, so he was not privy of any of the

18         information.

19             Q.   Okay.  I think we can move on.

20             You also submitted a letter on Dr. Marsoner's behalf

21         to the joint administrators of Lehman Brothers Europe,

22         correct?

23             A.   Dated?

24             Q.   I will get it for you.

25             A.   Thanks.

1         Q.   This document is stamped with LEH 1036.   He needs

2     to mark it first and then you will get it right back.

3             (Exhibit Pignatti 10 marked for identification)

4         Q.   This letter is dated January 13, 2014, correct?

5     A.   Yes.

6         Q.   Okay.   Is that your signature on the bottom?

7     A.   Yes.

8         Q.   Okay.   This letter was submitted to Daniel

9     Schwarzman, the joint administrator of Lehman Brothers

10    Europe Limited in administration at

11    PricewaterhouseCoopers, correct?

12    A.   Yes.

13        Q.   Okay.   What I would like to do is focus on the last

14    paragraph.

15    A.   Mm-hm.

16        Q.   You know what, let us start from the beginning.

17    You say:

18        "I, Vittorio Pignatti, Chairman of Trilantic Capital

19    Partners, former head of European M&A and Vice Chairman

20    of Lehman Brothers hereby confirm that ..."

21        And then you lay out three paragraphs.

22        The first paragraph states:

23        "Dr. Marsoner provided at Lehman Brothers' request

24    advice with regard to its investment in F1 and its

25    beneficial realization.

1          "2.  The advice was delivered not only in emails but

2     also in oral discussions with Lehman staff, including

3     myself.

4          "3.  The advice was intended to be rewarded by

5     Lehman Brothers on the basis of the beneficial outcome

6     of steps taken or omitted to be taken on the basis of

7     the advice."

8          Do you see that?

9     A.  Yes.

10     Q.  You submitted -- when you said in the third

11     paragraph:

12          "The advice was intended to be rewarded by Lehman

13     Brothers."

14          You were referring to Lehman Brothers Europe

15     Limited?

16     MR. JOHNSON:  Objection.  Leading.

17     Q.  Correct?

18     A.  I was referring in my capacity.

19     Q.  To Lehman Brothers Europe Limited?

20     MR. JOHNSON:  Objection.  Leading.

21     A.  As I said before, corporate structures at Lehman

22     Brothers were not my decision as to which company would

23     be rewarding whom.

24     Q.  Okay.

25     A.  It was not within my domain to say that this

1        adviser will be booked on this P&L and so on, because

2        these were things that were done by other departments.

3            Q.   Okay.   You submitted this letter to the joint

4        administrators of Lehman Brothers Europe Limited,

5        correct?

6            A.   Mm-hm, yes.

7            Q.   To support Dr. Marsoner's claim against Lehman

8        Brothers Europe?

9            A.   I would assume so, yes.

10           Q.   Okay.   So Lehman Brothers Europe would compensate

11       Dr. Marsoner for Formula 1, correct?

12   MR. JOHNSON:   Objection.   Asked and answered.

13           A.   Well, Formula 1 was on the books of Europe, which

14       company I was not aware of, but certainly assumed that

15       it was under the umbrella of Lehman Brothers Europe.

16           Q.   Well, you were submitting that so that Lehman

17       Brothers Europe --

18           A.   Yes.

19           Q.   -- would compensate Dr. Marsoner for Formula 1?

20   MR. JOHNSON:   Objection.   Asked and answered.

21           A.   Because the asset was the European asset.

22           Q.   I missed it over the objection.   Was the answer

23       yes?

24   MR. JOHNSON:   Asked and answered.

25           A.   Yes.

```
1          questions.
2     BY MR. JOHNSON:
3          Q.  I have a couple of additional questions for you,
4     Mr. Pignatti.
5          Would it be normal to agree on a consultant's
6     success fee before any profits were realized?
7     MS. ALVAREZ:  Objection to form.
8          A.  If the advice was accepted by the firm, or
9     stipulated, yes.  Or, rephrasing the question, did
10    Lehman pay advisers on a percentage of profits in my
11    20 years at Lehman Brothers?  The answer is yes, many
12    times.
13         Q.  But would they pay before they had received any
14    profits?
15         A.  Would they be paid?  No.
16         Q.  I believe you testified earlier that you know
17    Peter Sherratt?
18         A.  Yes.
19         Q.  Was Mr. Sherratt aware that success fees were paid?
20    MS. ALVAREZ:  Objection to form.
21         A.  Absolutely.
22         Q.  Even where there was no agreement covering the
23    transaction?
24    MS. ALVAREZ:  Objection to form.
25         A.  No.  I think I said earlier that no payment was
```

1          ever done unless there was a documented agreement.  So

2          especially substantial amounts, which were not just

3          reimbursements of expenses or reimbursements of expenses

4          but anything formulaic, based on a success would be

5          either regulated by a framework agreement to which

6          an addendum would be done, specifying and for this

7          transaction we have decided to pay the following amount,

8          but it would be a documented amount.

9             Q.   And on Dr. Marsoner's F1 advice, isn't it true that

10         such an addendum wouldn't have been made until profits

11         were realized?

12    MS. ALVAREZ:  Objection to form.

13            A.   It could have been done before or after.  As you

14         see, an email that was previously shown from me to our

15         colleagues on the fund side, you know, the transaction

16         had already been done.  Which is subsequent to the BAWAG

17         advisory.  A transaction was also originated for another

18         department in the absence of any sort of documentation

19         and so on, because the marginal cost to the adviser who

20         was working on a bigger transaction to channel a piece

21         of business to our funds would not have probably merited

22         a pre-approval by that division.  So the adviser took

23         the risk of sort of notifying his will or his request at

24         a later stage and it was approved.  So you have

25         an example of that.

1        Q.  And on BAWAG -- let me restate.  Is BAWAG included

2        in any of Dr. Marsoner's agreements?

3        A.  Yes.  But the advisory piece was included in

4        an existing agreement.  The amount of my email, the

5        300,000 to 400,000 and so on, would not have been

6        specifically covered in that agreement and therefore

7        I asked the proper department to include it in to a --

8        you know, otherwise I couldn't have paid the amount.

9        Q.  Can you point to where Cerberus' acquisition of

10       BAWAG is included in Dr. Marsoner's agreements?

11       A.  It is either in the 2004, it should be.  I believe

12       it is this BWBG.

13  MS. ALVAREZ:  What exhibit are you referring to, so that it

14       is clear?

15       A.  I am not looking at an exhibit, but it is the

16       Lehman Brothers advisory contract that I signed, dated

17       13 February 2004.

18  MS. ALVAREZ:  Mm-hm.  Thank you.

19  BY MR. JOHNSON:

20       Q.  Where are you looking at on that?

21       A.  I am looking at page 66.3 VII.  But I may be wrong

22       and that is not the one and that was done by --

23       Q.  That doesn't say Cerberus anywhere, does it?

24       A.  No, but I read Cerberus somewhere.

25       Q.  Could it be that it wasn't included?

1       A.  Well, if we don't find it then it wasn't included.

2       But I remember that he was paid --

3       Q.  Right.

4       A.  -- and it was officially documented.

5       Q.  Okay.

6       A.  But I can't remember if it was in one of the

7       contracts, or under the catch all was then included --

8       Q.  Okay.

9       A.  -- to one of the contracts.

10      Q.  So it may have been in a catch all provision?

11      A.  Yes, because as I explained, the way that we used

12      to work was to list, you know, normally they would be

13      renewed in February, whatever it was live in February,

14      and I don't remember when BAWAG came out, you know.  So

15      it would have been included in the following or sort of

16      an email circulated among the decision makers, saying as

17      per this adviser's retainer, should the BAWAG deal

18      happen X percent will be paid.

19      Q.  Okay.  Could you refer back to the declaration, of

20      Dr. Thomas Marsoner?

21  MS. ALVAREZ:  Which is exhibit 4.

22  BY MR. JOHNSON:

23      Q.  Turn to paragraph 8, which I believe we discussed

24      before.

25      A.  In 2005 I advised Lehman?

1              IN THE UNITED STATES BANKRUPTCY COURT

2                  SOUTHERN DISTRICT OF NEW YORK

3

4          - - - - - - - - - - - - - - - - - - -

5    IN THE MATTER OF

6          IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL.,

7                          Debtors.

8

9          - - - - - - - - - - - - - - - - - - -

10                  DEPOSITION OF RUGGERO MAGNONI

11                          VOLUME I

12                  Tuesday, November 17th, 2015

13                       AT:  2:30 p.m.

14                       Taken at:

15                       Hogan Lovells

16                    50 Holborn Viaduct

17                         London

18                        EC1A 2FG

19                         London

20                      United Kingdom

21

22                      CONFIDENTIAL

23    Court Reporter:

24    Chris Lang

25       Accredited Real-time Reporter

26

27

28

29

30

31

1                        RUGGERO MAGNONI

2      having been SWORN testified as follows:

3      BY MR. JOHNSON:

4         Q.  Mr. Magnoni, thank you for appearing here today.

5         I just wanted to give you a brief overview of what we

6         are going to be doing today.  I am going to be asking

7         you some questions and then the attorneys for Lehman

8         Brothers will have the opportunity to ask you some

9         questions.  If at some point you don't understand one of

10        the questions, please say so and we will repeat the

11        question, or possibly rephrase it.  If you hear either

12        side make an objection to form, you can still answer the

13        question that you have been asked.  Do you understand

14        these instructions?

15        A.  I do.

16        Q.  Okay, excellent.

17        A.  Let's see how it works.

18        Q.  So I wanted to start with your work history.  When

19        did you begin working at Lehman Brothers?

20        A.  February 1977 and I continued there until the last

21        day, which I think was September 15, 2008.  So 35 years.

22        My only job.  And then I continued with Nomura from 2008

23        to 2013, becoming senior adviser afterwards, but I was

24        chairman of investment banking division, EMEA, which is

25        European, Middle East and Africa, for Nomura during

1          those years.  I started from the bottom as an associate
2          out of business school in Columbia in 1977, Columbia
3          Business School, and made, you know, up to managing
4          director about ten years later, and then I was appointed
5          as vice chairman of Inc. and vice chairman of
6          International Europe, which were our two operating
7          units, the broker dealers of the group, about around
8          2000 and where about, immediately after.  So it is my
9          pride to tell the truth about Lehman Brothers, which is
10    my passion in life, has been my career, my everything.
11         Q.  And you said you became vice chairman in 2000?
12         A.  I can't remember exactly.  I think it was the end
13    of, yes, I think it was around 2000.  1999/2000.
14         Q.  And you continued in that role until --
15         A.  To the last day.  I was vice chairman of both, of
16    Inc. and Europe.
17         Q.  Can are we please look at Exhibit 1, the Lehman
18    Brothers 2007 report.  Do you see in the bottom
19    right-hand corner it says Marsoner and then there is
20    a number?
21         A.  Yes.
22         Q.  Please turn to 606.
23         A.  606 is where, I am there, my picture and everything
24    is what you want?  Okay, what did you say, 6?
25         Q.  606.

1        A.  Right, yes, that is me.  There is no picture here.

2    That is me, Ruggero Magnoni.

3        Q.  Do you see your name listed under the column that

4    says "other officers"?

5        A.  Yes.

6        Q.  And is that because you were an officer of Lehman

7    Brothers Holdings Inc.?

8        A.  And Europe.

9        Q.  And Europe?

10       A.  I would say.

11       Q.  Okay.

12       A.  International, IE.  So I was the only one with

13   both, with both titles --

14       Q.  Okay.

15       A.  -- in the firm.  I also had been member of the

16   chairman's strategic committee for a number of years,

17   for Dick, Dick Fuld, and I have a very strong personal

18   relationship, and I was the only European asked to serve

19   in his strategic committee for a number of years.  So

20   I had to fly every month to New York for his meetings,

21   where we would consider what to do with the group,

22   until, I would say, it then stopped, I think 2006 it

23   stopped.  But it went on for a number of years.  So much

24   so I was thinking about buying a flat in New York

25   because I was there every month.

1       Q.  Okay.  And could I actually ask you to turn back to

2       that page.

3       A.  Yes, please.

4       Q.  Could you identify the people on this list that you

5       regularly worked with?

6       A.  Well, regularly meaning, well, Dick Fuld was my

7       close friend.  But all of them, Jasjit Bhattal was the

8       head of Asia.  Erin M Callan, not much, but

9       Scott Freidheim is one of my close friends.  Dave

10      Goldfarb I worked for, Dave was my boss because I became

11      head of principal investments, the firm's principal

12      investment in Europe, and I was chairman of Italy and

13      I was the most senior banker in the roster.  But they

14      asked me to do all sorts of things and I, as long as

15      I didn't have to manage anybody I was free to do what

16      I wanted.  I did comply, because I loved it.

17          In Europe I basically reported, at the end,

18      I reported directly to the chairman and COO of Europe.

19      Jeremy Isaacs was my closest friend, he still is.  Who

20      else do you want to know.  I knew everyone here, Herb

21      McDade, Skip McGee was my partner, head of banking.

22      Andrew Morton I knew very well.  Tom Russo I knew very

23      well, that was your senior lawyer and a colleague of

24      yours, one of the most accomplished corporate lawyers in

25      Wall Street.  George Walker I didn't know too well, he

```
 1          joined us late.  Howard Clark, we went back, those many

 2          years.  Les Fabuss was one brotherly friend.

 3          Stu Francis, as well, Fred Frank, all of those guys,

 4          this was my, we grew up together.

 5          Q.  Okay.

 6          A.  I spent 35 years there.  Felix Robatyn he came

 7          from, these were -- Peter Sherratt, we had offices

 8          close, one to the other, up on the top floor of Lehmans.

 9          No, this was my firm.

10          Q.  Sure, okay.  We have talked about this a little,

11          but what were your day-to-day responsibilities at Lehman

12          Brothers?

13          A.  It moved, right, over the years.  Obviously it

14          depends on the years you were focusing on.  In

15          1999/2000, for example, I organized the largest, still

16          today, take over deal in Europe.  It was the Telecom

17          Italia old style by Olivette.  With Vittorio Pignatti

18          I was the senior, and Vittorio was my invaluable

19          partner, and we built the most incredible deal that was

20          ever made.  And still today, it is the largest old style

21          cash deal ever done in Europe.  And we were really the

22          driving, driver's seat.  We had other banks following

23          us, but we did the deal.

24              So what happened in 1999, we did the deal in early

25          1999 and it took me -- I was based in London, because
```

1     a view and I know that a lot of people at the firm

2     wanted to just sell and get rid of it.  It was also the

3     years where we were making truck loads of money so

4     losing 300, having already put them in the books, kind

5     of, in a firm that was making billions, was not very

6     important.  So I know this as being a very pointed

7     discussion.  Tom Bernard was the person I wanted to tell

8     you before.

9        Q.  Okay.

10       A.  Tom was really the arbiter in the end of what to

11    do, because he was a very senior guy.  He had been the

12    head of credit at the firm.  He was retiring, I think in

13    the Rocky Mountains, if I remember, to stay with a kid

14    that wasn't well or something.  There was some family

15    reason why.  And the firm basically, like with Thomas,

16    said please stay on, even if you are in Aspen, or

17    whatever, Sand Valley, I don't know where it was.

18    Please, stay on, follow some of the difficult deals that

19    we have inherited for the bank, because you know the

20    history, you are the top, senior guy in the firm, stay

21    with us, don't disappear.  And from there, I think,

22    I remember calls to the Rockies, and he was formulating a

23    vision of whether to hold or sell.  And thank God he

24    decided not to sell, I understand by leaning a lot

25    Thomas' vision, which was the only completely in favor

1    vision within the firm because I wasn't sure what was

2    good to do.  I don't know if you asked Patrick

3    Schmitz-Morkramer, he was involved.  I don't think any

4    of us were sure what was better for the firm.  There was

5    this maniac called Thomas Marsoner who called everyone

6    saying "no, we can't sell, this is going to be the best

7    thing in the world.  We can't sell it."  I know that

8    there was a threat at that point that the famous

9    Concorde agreement, which was the pact between Ferrari

10   and the other major squads, the teams, and Bernie, who

11   was a very peculiar character, I must say, I know him

12   very well.

13      Q.  You are talking about Bernie Ecclestone?

14      A.  Yes.

15      Q.  Okay.

16      A.  Very peculiar, very strange bird.  And, you know,

17   you can't trust him, 100 percent, or 50 percent.  You

18   really have to have your own opinion.  The basic reason,

19   I am really telling you guys because I am strong on it,

20   the thing could have been worth zero or a lot and it

21   depended at that moment on whether the Goldman led

22   group, which was called GPW, Grand Prix World or

23   whatever, was an association of the smaller teams, which

24   excluded Ferrari, which by the way, Ferrari is like 50

25   percent of Formula 1, Luca di Montezemolo, an old friend

```
 1          agreements, Thomas' advisory agreements.  You said you
 2          were aware of them.
 3           A.  I was aware that Thomas had been retained by my
 4          friend Vittorio, who was a very important person in our
 5          firm from 2003.  So let me tell you again, because you
 6          have to understand.  Telecom Italia, we helped to buy
 7          Telecom Italia in 1999.  In 2001, our man, our guy,
 8          Colannino, was booted out by Pirelli and Benetton.  We
 9          stopped being the bankers to Telecom Italia.  And that
10          freed me and Vittorio from a very profitable day to day
11          job, because it was one of the most active M&A clients
12          in the firm.  So Vittorio moved back to London, I moved
13          back to London to do, me principal, he M&A.  Okay.
14          Germany being our weak point, I knew, and we discussed
15          it with Vittorio, that he wanted to maintain Thomas on
16          board as an adviser.  I haven't seen the papers,
17          because, you know, that was his responsibility, but
18          I knew that Thomas continued as our adviser across the
19          board.
20           Q.  Do you know how he was paid under those agreements?
21           A.  We had a standard deal with our advisers.
22           Q.  Okay.
23           A.  Which would, may, vary in the proportion, in the
24          share.  But it was always if you are a success, we will
25          give you part of what we make.  And usually, because
```

1      I knew afterwards, that was about 10 percent of banking

2      or 20 percent of banking or 10 percent of the firm's,

3      was what normally was given to advisers.  It was given

4      to me, too, afterwards.

5      Q.  Okay.

6      A.  So that is a kind of a standard --

7      Q.  Okay.

8      A.  -- piece of paper.  But no, I have not seen his

9      actual engagement.

10     Q.  Okay.  Now, are you receiving anything from

11     Dr. Marsoner in exchange for this deposition here today?

12     A.  You are offending me.  You are kidding, right?  No,

13     the answer is no, and I would never have done anything

14     of that type.

15     Q.  Why are you providing testimony today?

16     A.  Because he asked me to say the truth.  He wrote me

17     about two years ago.  He asked me about two years ago to

18     say what I knew.  And Vittorio also, you know, Vittorio

19     and I are very close friends, really very close.  And he

20     told me to say if I knew that what he was saying was

21     true, which I did at that time, in 2004, I think.  And

22     then 2015, I was asked to say more clearly, and I did.

23     Q.  Okay.  Could we hand Mr. Magnoni exhibit 6, please.

24     MS. ALVAREZ:  From which deposition?

25     MR. JOHNSON:  The first one.

1        MS. ALVAREZ:  Sure.

2        THE VIDEOGRAPHER:  We are going off the record.  The time is

3            3:26 p.m.

4        (3:26 p.m.)

5                              (Break taken.)

6        (3:43 p.m.)

7        THE VIDEOGRAPHER:  We are back on the record.  The time is

8            3:43 p.m.

9        MR. JOHNSON:  I have no further questions, thank you

10           Mr. Magnoni.

11       BY MS. ALVAREZ:

12           Q.  We do have some questions for you, Mr. Magnoni.

13           A.  Please.

14           Q.  Thank you again for making yourself available.

15           A.  A pleasure.

16           Q.  Before I get into the questions, I just want to

17       remind you if you don't understand a question or you

18       don't hear me clearly, just ask.  I will repeat it.  If

19       you answer a question I will assume that you understood

20       it, alright?

21           A.  Yes.

22           Q.  Alright.  So we are going to mark our first exhibit

23       which is the notice of deposition.

24               (Exhibit Magnoni 1 marked for identification)

25           A.  Should I read this?

1        Q.  Sure, if you you can take a brief look at it.  Have

2        you seen this before?

3        A.  I can't remember, I don't remember.

4        Q.  Okay.  This is the notice of deposition.

5        A.  Should I have received this.  I can't remember.

6        Q.  You probably did receive it, we are hoping you

7        received it, but you are here so it is okay.

8        A.  Mm-hm.

9        Q.  It is Lehman's notice of deposition to inform you

10       that we have some questions.

11       A.  I understand.

12       Q.  The last line states that we expect to question you

13       for about 3 hours.  We are hoping it should be less?

14       A.  I am here for you.

15       Q.  Okay.  In the beginning of the deposition you told

16       us about your long history at Lehman Brothers.  One

17       point I wanted to clarify with you.  If you could take

18       a look at what was exhibit 1 to Sherratt deposition that

19       was shown to you.  If you could turn back to the page

20       you were looking at.

21       A.  606.

22       Q.  Yes, good memory.  606.  You can look back where

23       you are listed as "other officer"?

24       A.  Yes.

25       Q.  You see it says:

1             "Vice chairman of Lehman Brothers Inc..."

2             Correct?

3       A.   Yes.

4       Q.   And then it says:

5             "... and Lehman Brothers International Europe."

6       A.   Yes.

7       Q.   Okay.  So when you said that you were vice chairman

8    of Inc. earlier, were you referring to Lehman Brothers

9    Inc.?

10      A.   Yes.

11      Q.   Okay.  Thank you.

12      A.   That was the colloquial way we differentiated

13   between New York, and international was London.

14      Q.   Did you hold a board position at Lehman Brothers?

15      A.   No.  Of the holding company, you are saying?

16      Q.   We will break it up, then.  You did not hold

17   a board position at Lehman Brothers Holdings Inc.?

18      A.   No.

19      Q.   Did you hold a board position anywhere else?

20      A.   I think in Europe.

21      Q.   Okay.

22      A.   And I am not sure, the vice chairman of Inc.,

23   I cannot remember if it also meant -- I don't remember

24   signing papers through Inc., so I doubt it.

25      Q.   Okay.

1      A.   In Europe, there were two entities and I can't

2      remember now which one I was board member of.

3      Q.   Okay.

4      A.   Peter Sherratt will know, but I can't remember.

5      Q.   Okay.

6      A.   We had International Europe, and Europe LBIE and

7      LBE, I can't remember which one I was also a board

8      member of.

9      Q.   Okay, that is okay.  Thank you.  What did you do to

10     prepare for this deposition today?

11     A.   Not much.

12     Q.   Did you meet with anybody?

13     A.   No.  I was told look at your history at Lehman

14     Brothers and I did already that when we, when I sent you

15     that note on what happened on the phone.  I went back to

16     see what exactly was my position.  That was January this

17     year, right.  I haven't done much.

18     Q.   Okay.  You haven't sent me a note.

19     A.   No, sorry, sent, what is it, the deposition, the

20     affidavit.

21   MR. JOHNSON:  You are referring to the letter?

22     A.   Letter, right.  What is -- that is what, that was

23     the time when I went back and tried to remember what and

24     if and how.  I haven't done much.

25     Q.   Okay.  Who sent you that, who asked you to go back

1          Q.  Have you spoken --

2          A.  When you say Formula 1, you are saying Formula 1

3      events of those years?

4          Q.  Yes.

5          A.  I don't think I even spoke to him about the recent.

6      Again, he doesn't care about Formula 1, for some reason.

7      He is not a petrol head, as we are.

8          Q.  Okay.

9          A.  He doesn't really care.

10         Q.  Okay.  Have you discussed with Dr. Marsoner

11     anything about the negotiations of his advisory services

12     agreement?

13         A.  Never.

14         Q.  Have you discussed with Dr. Marsoner whether he

15     ever requested payment from Lehman for Formula 1?

16         A.  No.

17         Q.  Have you discussed with Dr. Marsoner whether Lehman

18     ever agreed to pay him for Formula 1?

19         A.  No.  Because I wouldn't know.  I was a bit out of

20     that loop.

21         Q.  Okay.

22         A.  I actually don't know if they agreed or didn't

23     agree.  It would be natural if they agreed to, because

24     that was the way we managed the relationship with our

25     advisers.  Everyone was on a small retainer and

1        a success fee.

2            Q.   But at that point you were not in the, I think you

3        called it the asset recovery group?

4            A.   No I was not.

5            Q.   So you didn't know?

6            A.   No.

7    MR. JOHNSON:  Objection.  Leading.  I am going to make the

8        same objection you made to Mr. Pignatti's; you haven't

9        provided a foundation that Mr. Magnoni is a hostile

10       witness, and earlier on he testified he was

11       disinterested and in fact loved Lehman Brothers --

12   MS. ALVAREZ:  That's right --

13   MR. JOHNSON:  -- I believe were his words.

14       A.   Sorry, can you say again, please Shane?

15   MS. ALVAREZ:  The court reporter can read it back, actually,

16       so he can read you exactly what Shane said.

17       A.   What is this, Shane, are you saying what Vittorio

18       said?

19   MR. JOHNSON:  He will read you back exactly what I said.

20       A.   Okay.

21   THE COURT REPORTER:  "Objection.  Leading.  I am going to

22       make the same objection you made to Mr. Pignatti's; you

23       haven't provided a foundation that Mr. Magnoni is a

24       hostile witness, and earlier on he testified he loved

25       Lehman Brothers."

1          Q.   Okay, that is fine.  Have you searched any

2          document, for any documents related to Formula 1?

3          A.   I don't have any document with me, no, I have

4          tombstones of the deals that we did with Kirch and that

5          is all.

6          Q.   Mm-hm.

7          A.   No, I haven't searched for anything.

8          Q.   Has Doctor Marsoner asked you to search for

9          anything relating to Formula 1?

10         A.   No.

11         Q.   Okay.  I would like to mark the following document

12         the letter he submitted to the court.  We will mark this

13         as exhibit 2.  Sorry, wrong letter.

14         A.   That is Tom Bernard's.

15              (Exhibit Magnoni 2 marked for identification)

16         A.   Is that mine?

17    MR. JOHNSON:  I can't see it, you can take look at it.

18    BY MS. ALVAREZ:

19         Q.   So we will mark this as exhibit 2 to the

20         deposition.  We spoke a little earlier about this

21         letter.

22         A.   Please.

23         Q.   Did you draft it letter?

24         A.   What do you mean?

25         Q.   Did you prepare the letter yourself?

1          A.   Yes.

2          Q.   Okay.   So Dr. Marsoner didn't send you a draft of

3     the letter?

4     MR. JOHNSON:   Objection.   Leading.

5          A.   Not that I know of.   They asked me to say what it

6     was.   And I did.

7          Q.   Okay.   And then did you type this up?

8          A.   My secretary, yes.

9          Q.   Okay.   And you dictated it to her?

10         A.   I might have written it on a pad, as I usually do,

11    and given it to her to type.

12         Q.   Okay.   Let us mark the next exhibit, which is

13    labeled Marsoner 71 to 72.   This will be Magnoni 3.

14    Okay.   That is an email of Thomas Marsoner to Ruggero

15    Magnoni dated January 14, 2015 and Vittorio Pignatti is

16    CC'd on the letter.

17             (Exhibit Magnoni 3 marked for identification)

18         A.   Right.

19         Q.   And I will just read the text of the email for the

20    record:

21             "Having discovered along the way that I ought to

22    have a claim in the US for the services I provided,

23    I have decided to pursue a claim in respect of the LB/F1

24    matters.   Though it will be a late filing, I believe

25    that I will be able to sustain a claim in the US,

1          primarily since no bar date notice has ever validly been

2          served upon me."

3              Do you see that?

4          A.  Yes.

5          Q.  Okay.  So then the next paragraph states, or the

6          first sentence of the next paragraph:

7              "With reference to our discussions around this

8          I would be very grateful if you could please look at the

9          draft letter attached, check to confirm it reflects

10         reality accurately, mark it up where ever you think it

11         might not, and send a scanned signed version back to

12         me."

13             Did I read that correctly?

14         A.  Yes, you did.

15         Q.  Okay.  And then attached to this email looks like

16         a draft letter.  Do you recall receiving this draft from

17         Dr. Marsoner now?

18         A.  I recall the first page, the second doesn't really,

19         but it was part of it, so -- January of this year,

20         right?

21         Q.  Yes.

22         A.  Yes.

23         Q.  So --

24         A.  So this is what I signed, right.

25         Q.  Okay.  Well, I was going to ask you.  Is this what

1            So, like you said, let's get into the substance.  If

2       we look at exhibit 2, which is your letter that you

3       submitted to the court, the beginning of the third

4       paragraph states:

5            "I was involved in Lehman's Formula 1 investment

6       from the outset."

7            Do you see that?

8       A.  Yes.

9       Q.  Okay.  By that, you were referring to your

10      involvement in the Kirch deal?

11  MR. JOHNSON:  Objection.  Leading.

12      A.  That is the investment that led us to obtain a 15

13      percent in the Formula 1 company, yes.

14      Q.  Okay.  Because the Formula 1 shares were pledged as

15      collateral?

16  MR. JOHNSON:  Objection.  Leading.

17      Q.  So when Kirch -- you didn't answer, sorry, you

18      nodded.

19      A.  Yes, I did, I said yes, indeed.

20      Q.  Okay.

21      A.  You are right.

22      Q.  Okay.  So when Kirch defaulted, Lehman Brothers

23      acquired the shares in Formula 1?

24  MR. JOHNSON:  Objection.  Leading.

25      A.  All lenders had been given by the Bankruptcy Court

1      of Munich part of the assets that were secured against

2      the loans.  So the loan was one.  And it was syndicated

3      or split among parts.

4          Q.  Okay.

5          A.  So we had part of the pot.

6          Q.  Okay.  So after the default a loan recovery group

7      was assembled?

8      MR. JOHNSON:  Objection.  Leading.

9          A.  Not immediately, but it was informal, I think.  It

10     was pretty informal.  There was, everyone was interested

11     in helping out, was brought in, like Peter Sherratt, who

12     was the senior level counsel in London.  I think after

13     a while, I can't remember, it was so many years ago, but

14     after a while it became an official group.  In the

15     beginning it was very spontaneous.

16         Q.  Okay.

17         A.  We were trying to get our money back.

18         Q.  Okay.  And Tom Bernard, was he part of that group?

19         A.  Not at the beginning.

20         Q.  Okay.  When --

21         A.  I can't remember.  I don't have a recollection of

22     when Tom was involved, but it was a very, very senior

23     guy in the firm.  So all of us were involved.

24         Q.  Right.

25         A.  It is not like in a commercial bank.  That was

```
 1              particular year, so it was so big that quite a big
 2              number of people were involved, but I can't remember.
 3                 Q.   Okay.   Now, at this point you were not involved in
 4              the day to day with regards to Formula 1?
 5     MR. JOHNSON:   Objection.   Leading.
 6                 A.   At that point I was, in that point I was.   As
 7              I said, slowly new people were added and only after, as
 8              I said, I think, it is taped, I believe one year later
 9              I was asked by the firm, by Jeremy and Dick, to loosen
10              up a bit, leave it to the guys in the recovery to try to
11              get the money back, because it was not a good use of my
12              valuable origination time.
13                 Q.   Okay.   Let's take a look at the last sentence in
14              the letter you submitted to the court.   It says:
15                 "It was well understood by the Lehman decision
16              makers that Dr. Marsoner's fees normally amounted to 10
17              percent of firm's revenues."
18                 Do you see that?
19                 A.   Yes.
20                 Q.   Who did you mean by Lehman decision makers?
21                 A.   The ones that I have told you before, anybody --
22              when we do, when we decided to have advisers we knew
23              that there was a share.   The normal share of the firm
24              was 10 percent.   Now, 10 percent gross, 20 net, I don't
25              know.   But there was an understanding that to have
```

1        advisers and finders there was a standard agreement, to

2        tell you the truth, around investment banking in Wall

3        Street and the City.  Particularly at Lehman, we had

4        a 10 percent approach.  So it was well known by everyone

5        from Jeremy and Roger Nagioff and I am sure, I can say

6        myself, that that was the norm and therefore was pretty

7        well understood by everyone.

8          Q.  Did you negotiate any consultancy agreements for

9        any advisers?

10         A.  Including mine, yes.

11         Q.  Did you negotiate, were you involved in the

12       negotiations of Dr. Marsoner's?

13         A.  No.

14         Q.  So you don't know if he was ever retained for

15       Formula 1?

16         A.  I don't know.

17     MR. JOHNSON:  Objection.  Leading.

18         A.  I assumed, like everybody else, that if he was

19       working willingly with us, and Vittorio was the entry

20       point of that negotiation, that normally would have had

21       -- I didn't know.

22         Q.  Did you ask anyone whether Lehman would pay

23       Dr. Marsoner?

24         A.  Not at all.

25     MR. JOHNSON:  Objection.  Leading.

1        Q.  Do you know if anyone told Dr. Marsoner that he

2        would be paid 10 percent?

3        A.  No.

4    MR. JOHNSON:  Objection.

5        A.  I don't know of anyone.

6        Q.  Okay.  I would like to mark the next exhibit,

7        please.  Actually, it was marked at the last deposition.

8        We can use the previous numbers, the Marsoner

9        declaration.  It was previously marked as Pignatti 4.

10   You can look at it, I have a copy.  Thank you, this is

11   a declaration of Dr. Thomas Marsoner submitted in

12   support of his motion.  It was previously marked it

13   Mr. Pignatti's deposition as exhibit 4.  Have you seen

14   this document before?

15       A.  I am not sure.  I am not sure I have read this.

16       Q.  Okay.  I am going to point you to a particular

17   paragraph.  If you can look at paragraph 8 which is on

18   page 2.

19       A.  Yes.

20       Q.  I am just going to read it for the record.  It

21   states:

22       "In 2005, I advised Lehman in my role as Senior

23   Adviser both in emails and in telephone conversations to

24   continue Lehman's investment in F1, which service

25   I explicitly provided in exchange for 10 % of Lehman's

1      (4:20 p.m.)

2                          (Break taken.)

3      (4:26 p.m.)

4      THE VIDEOGRAPHER:  We are back on the record.  The time is

5          4:26 p.m.

6      BY MS. ALVAREZ:

7          Q.   Okay, I would like to mark another document as

8          an exhibit.  I have lost track of the numbering.

9      THE COURT REPORTER:   4.

10         Q.   4.   This is a letter dated January 13, 2014.

11              (Exhibit Magnoni 4 marked for identification)

12         A.   Right, that is what I was referring to before.

13         Q.   From Mr. Magnoni to Daniel Schwarzman Esq joint

14      administrator of Lehman Brothers Europe Limited, the

15      Bates range is LEH 1037 to 1038.  So Mr. Magnoni, is

16      this the letter you were referring to earlier?

17         A.   Yes, indeed.

18         Q.   This is the letter that you submitted to the joint

19      administrators of Lehman Brothers Europe?

20         A.   Right.

21         Q.   I just want to confirm, is that your signature on

22      the bottom?

23         A.   Indeed.

24         Q.   Okay.  I am just going to read the body of the

25      letter for the record:

```
 1                    "I Ruggero Magnoni, senior global adviser to Nomura,
 2          former vice chairman of Lehman Brothers Inc., hereby
 3          confirm that Mr. Pignatti's letter of today's date,
 4          a copy of which is appended to this letter, describes
 5          the advisory relationship between Dr. Marsoner and
 6          Lehman Brothers on F1 in a way that coincides exactly
 7          with my own views of that advisory relationship at that
 8          time."
 9            A.   Right.
10            Q.   Okay.  And then attached to the letter looks like
11          Mr. Pignatti's letter to the joint administrator of
12          Europe?
13            A.   It is.
14            Q.   Okay.  Just so I understand, your statement was
15          that you agree with the contents of Mr. Pignatti's
16          letter?
17            A.   Indeed.
18            Q.   Okay.  I want to focus on paragraph 3 of
19          Mr. Pignatti's letter.  He stated:
20               "The advice was intended to be rewarded by Lehman
21          Brothers on the basis of the beneficial outcome of steps
22          taken or omitted to be taken on the basis of the
23          advice."
24               The advice we are referring to is Dr. Marsoner's
25          advice on Formula 1?
```

1      A.  Yes.  I think Vittorio Pignatti refers to that and

2      I interpreted it as such, right.

3      Q.  Okay.

4      A.  Because what I am saying is that I agree, and

5      I agree to that as being Marsoner's advice on Formula 1,

6      not anything else.

7      Q.  Okay.

8      A.  It is not clear, but that is what I think it was

9      referring to, at least this was what I thought he was

10     referring to for me to say that he, that my recollection

11     coincides with what he said.

12     Q.  Okay.  And this letter, you submitted it to the

13     administration for Lehman Brothers Europe, correct?

14     A.  That's --er, yes.

15     Q.  Okay.  And this was to support Dr. Marsoner's claim

16     against Lehman Brothers Europe?

17   MR. JOHNSON:  Objection.  Form.

18     A.  Er, I guess.  So the claim of Dr. Marsoner in the

19     administration, right, so --

20     Q.  Right.  So you submitted this so that Lehman

21     Brothers Europe would compensate Dr. Marsoner for

22     Formula 11?

23   MR. JOHNSON:  Objection.  Leading.

24     A.  No, I am just saying that I concur with

25     Mr. Pignatti's view, that is all.

1          Q.   Why did you send this to the administrators of

2     Lehman Brothers Europe?

3          A.   Because I was asked to do it.   I was sent this and

4     asked whether I agreed or not with it, which I did, and

5     I do, and I will continue doing it.

6          Q.   Who asked you to do it?

7          A.   I think Mr. Marsoner.

8          Q.   What is M&M Capital?

9          A.   It is a FCA registered advisory boutique founded by

10    Mr. Marsoner and participated by me as its chairman.

11         Q.   You say you are the chairman of M&M Capital?

12         A.   Correct.

13         Q.   And Dr. Marsoner is the founder of M&M Capital?

14         A.   He is the founder and managing director.

15         Q.   What does the M&M stand for?

16         A.   Well, the theory was Marsoner and Magnoni.

17         Q.   So you worked with Dr. Marsoner on a regular basis.

18         A.   No, not much, because it was really done to have

19    the basis for a potential future activity which we never

20    really acted upon.   Each of us does personal advice to

21    clients and then, you know, we book through M&M and it

22    keeps the books of the company.   So this really was, it

23    was really meant to be a center of potential growth to

24    attract other, which he haven't done yet.   But yes, we

25    worked together but the accounts are separate.

```
 1        Q.   Okay.   You have a joint interest in the success of
 2    M&M Capital?
 3        A.   To tell you the truth, it is not exactly that,
 4    because we keep the accounts completely separate.   I am
 5    glad if he is successful, but it doesn't affect me.
 6    Because it is like having two companies with one same
 7    name.   I don't think you can do that in the States, but
 8    certainly you can do it in the UK, I was told, so my
 9    clients pay M&M, but the they pay account B, which
10    declares a completely separate set of accounts to the
11    Inland Revenue, and to the FCA, so they are added
12    together but they are not one single entity from
13    an economic point of view.   In theory, one of the two
14    can do nothing and the other do very well and one is not
15    affecting the other.
16        Q.   When did you start M&M Capital?
17        A.   A couples of years ago.   Between -- two years ago.
18    MS. ALVAREZ:  Can we just go off the record for a moment?
19    MR. JOHNSON:  Are you almost done?
20    MS. ALVAREZ:  Yes.
21    MR. JOHNSON:  Okay.
22    THE VIDEOGRAPHER:  We are going off the record.  The time is
23        4:33 p.m.
24    (4:33 p.m.)
25                        (Break taken.)
```