William J.F. Roll, III
Solomon J. Noh
Randall Martin
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (646) 848-7174

*Attorneys for the Maverick Entities*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------ x
                                          :
                                          :
In re:                                    :     Chapter 11
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :     Case No. 08 – 13555 (SCC)
                                          :
                 Debtors.                 :     (Jointly Administered)
                                          :
                                          :
------------------------------------------------------------ x
```

## OPPOSITION OF THE MAVERICK ENTITIES TO THE PLAN ADMINISTRATOR'S FIVE HUNDRED NINETEENTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .......................................................................................................3

ARGUMENT ...........................................................................................................8

    A.    The Maverick Claims Are Straightforward and Can Be Allowed on the Basis of Conventional Principles ..............................................................................8

    B.    The Maverick Entities Have Adequately Alleged the Existence of Unsatisfied Guarantee Claims .......................................................................................11

    C.    Maverick's Settlement Payment to LBIE Does Not Show That the Maverick Entities Were Made Whole With Respect to the Prime Brokerage Agreements ..................................................................................................12

    D.    LBHI Cannot Avail Itself of Any "Netting" or Other Setoff Rights to Escape Liability ......................................................................................................15

        i.    No Setoff Occurred on or Before the LBHI Petition Date or the LBIE Settlement Date ...............................................................................16

        ii.    LBHI Had No Right of Setoff as of the LBHI Petition Date .....................17

        iii.    The Occurrence of an Implicit Setoff in Connection With the LBIE Settlement Was in the Nature of a Partial Payment and Does Not Alter the Calculation of the Claim Against LBHI .....................................17

    E.    Section 562(a) Does Not Affect the Amounts Owed by LBHI to the Maverick Entities .......................................................................................................18

        i.    The LBHI Guarantee Was Never Terminated, Liquidated, or Accelerated .....................................................................................18

        ii.    The Prime Brokerage Agreements Were Never Terminated With Respect to LBHI ...............................................................................19

        iii.    Maverick's Claims Are Based on Severable Custodial Obligations That Do Not Qualify as "Securities Contracts," Making Section 562 Inapplicable ...................................................................................20

        iv.    The Application of Section 562 Would Not Affect the Amount Ultimately Payable to the Maverick Entities .............................................21

    F.    The Exculpation and Force Majeure Provisions of the Prime Brokerage Agreement Do Not Apply to LBHI's Guarantee Obligations or Other Liabilities ...................................................................................................23

i.      Maverick's Guarantee Claims Are Not Barred by Law of the Case, and LBHI Should Be Precluded From Arguing that the Limiting Clauses Apply to Guarantee Claims .........................................................23

ii.     The Limiting Clauses Are Not Incorporated into the Guarantees and so Cannot Be Relied On................................................................................24

iii.    LBHI's Proposed Application of the Limiting Clauses Is Inconsistent With the Nature of a Guarantee of Payment.............................................25

iv.     Maverick's Guarantee Claims Are Distinguishable From the "Diminution Damages" Claims Asserted by Stonehill and by the Newport and Providence Claimants............................................................26

v.      The Language of the Limiting Clauses Demonstrates That Such Clauses Do Not Apply to the Maverick Claims........................................26

        a.      The Force Majeure Clause Does Not Apply..................................26

                1)      The Force Majeure Clause Only Applies to "Losses Caused" by a Force Majeure Event.....................................26

                2)      Insolvency Proceedings Do Not Qualify as Force Majeure Events ...............................................................27

                3)      The Force Majeure Clause Was Not Intended to Prohibit the Assertion of Claims in a Chapter 11 Proceeding........................................................................29

        b.      The Trading Error Exculpation Clause Does Not Apply..............30

vi.     Contractual Ambiguities Should Not Be Resolved in Connection With a Sufficiency Hearing.................................................................................32

G.      LBHI's Interpretation of the NYUCC Is Incorrect ................................................32

H.      Maverick's Claims Are Not Untimely ...................................................................34

I.      Maverick's Other Guarantee Claims and Direct Claims Are Also Valid .............35

        i.      Maverick's Claims Under the Other Guarantees Are Valid .....................35

        ii.     Maverick's Direct Liability Claims Are Valid .........................................35

CONCLUSION .........................................................................................................................37

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Alexander v. Wheeler*, 407 N.Y.S.2d 319 (App. Div. 1978) .........................................36

*In re Alexander's Inc.*, 176 B.R. 715 (Bankr. S.D.N.Y. 1995)......................................35

*Baker v. National City Bank of Cleveland*, 511 F.2d 1016 (6th Cir. 1975)...................16

*Bank of N. Am. v. Shapiro*, 298 N.Y.S.2d 399 (App. Div. 1969) ...................................8

*Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376 (2d Cir. 2006) ...............................9

*Calyon v. American Home Mortg. Corp.*, 379 B.R. 503 (Bankr. D. Del. 2008) ...........20

*In re Chateaugay Corp.*, No. 94 CIV. 1257 (LMM), 1996 WL 346010 (S.D.N.Y.
    June 24, 1996).....................................................................................................9

*Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995). .......................................16

*Clarkson Co. Ltd. v. Shaheen*, 533 F. Supp. 905 (S.D.N.Y. 1982)................................16

*Credit Suisse First Boston Mortg. Capital LLC v. Cohn*, 03 Civ. 6146 (DC), 2004
    WL 1871525 (S.D.N.Y. Aug. 19, 2004).............................................................22

*In re Feinberg*, 442 B.R. 215 (Bankr. S.D.N.Y. 2010)..................................................35

*In re HSH Nordbank AG N.Y. Branch v. Brian*, 421 F. App'x 70 (2d Cir. 2011) .......12

*Instituto Per Lo Sviluppo Economico Dell' Italia Meridionale v. Sperti Prods.*,
    323 F. Supp. 630 (S.D.N.Y. 1971)......................................................................14

*Ivanhoe Building & Loan Ass'n of Newark, N.J. v. Orr*,
    295 U.S. 243 (1935). .............................................................3, 10, 11, 15, 21

*Johnson v. Beck*, 117 B.R. 461 (Bankr. D. Minn. 1990) ...............................................22

*Kaminsky v. Herrick, Feinstein LLP*, 870 N.Y.S.2d 1 (App. Div. 2008) .......................9

*In re Lehman Bros. Holdings, Inc.*, No. 08-13555-scc (Bankr. S.D.N.Y. Feb. 11,
    2015), ECF No. 48807 .....................................................................................24, 26

*In re LightSquared Inc.*, Case No. 12-12080 (SCC), 2014 WL 5488413 (Bankr.
    S.D.N.Y. Oct. 30, 2014).....................................................................................10

*Marcus Dairy, Inc. v. Jacene Realty Corp.*, 638 N.Y.S.2d 779 (App. Div. 1996) ...................9, 24

*McMurray v. Noyes*, 72 N.Y. 523 (1878) .......................................................................8

*In re MF Global Inc.*, Case No. 11-2790 (MG), 2014 WL 4361552 (Bankr.
S.D.N.Y. Sept. 4, 2014) ...........................................................................................27

*N.Y. News Publ'g Co. v. Nat'l S.S. Co.*, 148 N.Y. 39 (1895) ...........................................9

*Nuveen Mun. Trust v. Withumsmith Brown, P.C.*, 692 F.3d 283 (3d Cir. 2012) .........10

*In re O.P.M. Leasing Servs., Inc.*, 79 B.R. 161 (S.D.N.Y. 1987) ...................................9

*Schneider v. Bytner*, 481 N.Y.S.2d 777 (App. Div. 1984) ..............................................36

*Simon v. Electrospace Corp.*, 28 N.Y.2d 136 (1971) ......................................................9

*In re Solutia Inc.*, 379 B.R. 473 (Bankr. S.D.N.Y. 2007) ...............................................9

*In re Tatro*, 12-21266-PRW (Bankr. W.D.N.Y. May 14, 2015) .....................................35

*U.S. Bank N.A. v. Perlmutter (In re South Side House, LLC)*, 470 B.R. 659
(Bankr. E.D.N.Y. 2012) .....................................................................................8, 10

*U.S. Printing & Lithograph Co. v. Powers*, 233 N.Y. 143 (1922) ................................36

*Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.*, 802 N.Y.S.2d 411 (App.
Div. 2005) ...........................................................................................................36

## Statutes

11 U.S.C. § 365(a) ...........................................................................................................18

11 U.S.C. § 502(b) .........................................................................................................1, 9

11 U.S.C. § 502(b)(9) ........................................................................................................5

11 U.S.C. § 562........................................................................................1, 2, 18, 19, 20, 21, 22

11 U.S.C. § 741................................................................................................................18

11 U.S.C. § 741(7) ...........................................................................................................20

15 U.S.C. § 78a *et seq.*, § 12(k) ....................................................................................28

UK Insolvency Act 1986 (1986 ch. 45) ...........................................................................5

## Rules

17 C.F.R. § 240.12d2-1......................................................................................................28

Bankruptcy Rule 3003(c)(3) ............................................................................................1

Fed. R. Bankr. P. 7012 ...................................................................12

Fed. R. Civ. P. 12(b)(6) ............................................................11, 12

**Codes**

NY CLS UCC § 8-503 & Official Comment 1 ...........................32, 33

NY CLS UCC §§ 8-503, 8-506, 8-508 (2015)...........................8, 33

NY CLS UCC § 8-504 .....................................................................33

NY CLS UCC § 8-509 .....................................................................33

NY CLS UCC § 8-509(a) ...........................................................33, 34

**Other**

9 COLLIER ON BANKRUPTCY (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) ..........................................................................................34

BLACK'S LAW DICTIONARY (10th ed. 2014) ..................................28

NYSE, *Listed Company Manual,* § 801.00 Policy (2016)..............28

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Maverick Long Enhanced Fund, Ltd., Maverick Neutral Levered Fund, Ltd.,

Maverick Neutral Fund, Ltd., Maverick Fund USA, Ltd., Maverick Fund II, Ltd. and Maverick

Fund, L.D.C. (collectively, the "**Maverick Entities**" or "**Maverick**") hereby submit this

response to the Plan Administrator's Five Hundred Nineteenth Omnibus Objection to Claims

(No Liability Claims) [Docket No. 53107] (the "**Maverick Claim Objection**"), submitted by

Lehman Brothers Holdings Inc. ("**LBHI**") on June 22, 2016. In support thereof, the Maverick

Entities incorporate by reference and refer the Court to their August 21, 2015 Objection to the

Motion Pursuant to Sections 8.4, 9.3, and 14.1 of the Modified Third Amended Joint Chapter 11

Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors to Estimate Claims for Reserve

and Distribution Purposes and all exhibits and appendices thereto (the "**Estimation Objection**")

[Docket No. 50761], annexed hereto for the Court's convenience as **Exhibit A**, and respectfully

represent as follows:

## PRELIMINARY STATEMENT

1.      Maverick's claims against LBHI are based on a small handful of

uncontroverted legal propositions and factual assertions. Specifically, Maverick asserts that

LBHI is liable both directly and as a guarantor under prime brokerage agreements that

committed LBHI and Lehman Brothers International (Europe) ("**LBIE**") to return Maverick's

cash and property upon request. Those obligations were breached when the Lehman entities

sought bankruptcy protection. Under Bankruptcy Code section 502(b), and applicable state law,

Maverick's resulting claims must be calculated as of LBHI's September 15, 2008 petition date,

and are valued at approximately $118.1 million as of such date. LBHI tries to avoid application

of this basic principle by invoking section 562 of the Bankruptcy Code. But several elements of

section 562 do not apply here. For example, the underlying transactional documents were never liquidated, terminated, or accelerated with respect to LBHI. Indeed, the guarantees issued by LBHI have never been liquidated, terminated, or accelerated at all, a fact that (among others) is fatal to LBHI's attempted reliance on section 562.

      2.     LBHI also argues that the amounts owed to Maverick should be subject to a setoff of amounts that were owed by Maverick to LBIE under two separate sets of contracts, but fails to mention that there is no record of it ever having exercised such setoff rights. LBHI also ignores the long-standing and well-established rule that an absolute and unconditional guarantor cannot invoke rights of setoff that arise under separate contracts.

      3.     LBHI takes issue with Maverick's contention that it has not received payment in full, pointing to a 2012 settlement agreement under which Maverick agreed to pay LBIE $30 million. LBHI effectively claims that it is impossible that Maverick could have entered into a settlement agreement under which it made a payment to LBIE without first receiving a full credit or setoff of all amounts owed to Maverick. But Maverick was unable to secure a setoff of the full amounts it was owed under New York law because LBIE took the position that English insolvency law permitted it to escape such liabilities without satisfying them in full. There is nothing remotely "implausible" about this assertion: in fact, LBHI is in possession of numerous documents, produced in discovery, that show it to be true. Moreover, although *LBIE* was able to use English insolvency principles to avoid honoring its full contractual obligations under New York law, *LBHI* cannot now piggyback on this partial payment and pretend that Maverick has already been satisfied in full. Supreme Court authority makes it clear that Maverick, having achieved only a partial recovery, is entitled to assert the full amount of its properly calculated claim, without setoff for any partial recovery made in 2012,

unless and until it has been satisfied in full (which will require additional distributions of approximately $16.2 million). *Ivanhoe Building & Loan Ass'n of Newark, N.J. v. Orr*, 295 U.S. 243, 246-47 (1935).

4.       Finally, LBHI argues that Maverick's claims are invalidated by a pair of exculpatory clauses in the prime brokerage agreements that were supposedly triggered by LBIE's insolvency proceedings.  In LBHI's view, these clauses act to bar any recovery of amounts that were connected to LBIE's bankruptcy or that would allow for recoveries in addition to what was obtained in LBIE's administration proceedings.  This interpretation of the guarantees is implausible on its face, however, not least because an LBIE bankruptcy was among the events that the guarantees were intended to protect against, not a trigger for reducing liability under the guarantees.  Indeed, LBHI's counsel has already represented to this Court that the clauses in question cannot be relied on as a defense to claims based on guarantees of prime brokerage agreements, and LBHI should not be allowed to change course now.  The language of the applicable contracts plainly shows that the exculpatory clauses were never intended to limit liability under the guarantees in the manner that LBHI now suggests, as described in greater detail below.

## BACKGROUND

5.       Prior to the commencement of these chapter 11 cases, each of the Maverick Entities entered into a separate prime brokerage agreement (the "**Prime Brokerage Agreements**") with Lehman Brothers Inc. ("**LBI**"), which signed not just on behalf of itself but also on behalf of all of its affiliates, including LBIE and LBHI.[1]  Copies of the Prime Brokerage Agreements are annexed as Exhibit B to the Estimation Objection.  Pursuant to the Prime

---

[1] LBHI acknowledged in the LBHI Guarantee (defined below) that it was a direct party to the Prime Brokerage Agreements.

Brokerage Agreements, the Lehman entities agreed to maintain custody of certain cash and securities of the Maverick Entities.

6.    The Lehman entities' obligations under the Prime Brokerage Agreements were unconditionally and irrevocably guaranteed by LBHI pursuant to each of the following: (i) that certain Guarantee of Lehman Brothers Holdings Inc., dated April 20, 2006, issued in favor of the Maverick Entities (the "**LBHI Guarantee**"); (ii) the Unanimous Written Consent of the Executive Committee of the Board of Directors of LBHI dated June 9, 2005 (the "**Board Guarantee**"); and (iii) that certain Guarantee of Lehman Brothers Holdings Inc., dated January 4, 2008 and addressed to Standard & Poor's Rating Services (the "**S&P Guarantee**", and collectively with the LBHI Guarantee and the Board Guarantee, the "**Guarantees**").    A copy of the LBHI Guarantee is annexed as Exhibit C to the Estimation Objection and a copy of the S&P Guarantee is annexed as Exhibit C to the Maverick Claim Objection.

7.    The LBHI Guarantee is governed by New York law and expressly provides, *inter alia*, that:

> i.    "The Guarantee is absolute and unconditional without limitation as to monetary amount or duration";
>
> ii.    "This Guarantee is a guarantee of payment, and not of collection, and Maverick may exercise its rights hereunder against the Guarantor without first having to take any action against [LBIE], or any other guarantor"; and
>
> iii.    "The Guarantor [*i.e.*, LBHI] hereby waives diligence, presentment, protest, demand of any kind in connection with the delivery, acceptance, performance, default or enforcement of this Guarantee."

8.    The Maverick Entities were also party to several separate contracts with LBIE relating to the facilitation of "short" trades and margin loans.    Specifically, each of the Maverick Entities was party to: (i) a Global Master Securities Lending Agreement; and (ii) a Margin Lending Agreement.    The Global Master Securities Lending Agreements were entered

into with LBIE only, and provided for the facilitation of certain "short" trades whereby Maverick would effectively borrow and promptly sell securities, with an obligation to re-acquire and return equivalent securities at a future date. The Margin Lending Agreements were entered into with LBIE (and LBI, as agent) and addressed the terms under which LBIE might make margin loans to the Maverick Entities from time to time.

9.      On September 15, 2008 (the "**LBHI Petition Date**"), LBHI commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). On the same date, LBIE entered English administration proceedings pursuant to the English Insolvency Act 1986 (the "**Administration Proceedings**").

10.      At the time of the insolvency filings, the Maverick Entities' cash and securities had been custodied with LBIE. As set forth in Exhibit D to the Estimation Objection, as of the LBHI Petition Date, LBIE had custody of approximately $118.1 million worth of property of the Maverick Entities, consisting of $59.4 million of cash and approximately $58.7 million of securities.

11.      In accordance with the Court's Order Pursuant to section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form, dated July 2, 2009 [Docket No. 4271], on September 22, 2009, the Maverick Entities timely filed Claim Nos. 27701, 27702, 27703, 27704, 27695, and 27696 (the "**Maverick Claims**") against LBHI for amounts owing under the Prime Brokerage Agreements.

12.      On December 6, 2011, the Court entered an order [Docket No. 23023] confirming the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "**Plan**"). The Maverick Claims fall under Class 9A of the

Plan, a class that has thus far received distributions reflecting approximately 23% of their allowed claims.  *See* Notice Regarding Tenth Distribution Pursuant to the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors [Docket No. 52991], dated June 9, 2016.

13.    On March 30, 2012 (the "**LBIE Settlement Date**"), the Maverick Entities and LBIE entered into that certain Deed of Settlement by and among LBIE and certain of the Maverick Entities (the "**LBIE Settlement Agreement**").  A copy of the LBIE Settlement Agreement is annexed as Exhibit E to the Estimation Objection.

14.    In addition to partially addressing LBIE's obligations with respect to the cash and securities custodied in connection with the Prime Brokerage Agreements, the LBIE Settlement Agreement also resolved all amounts that were owed to LBIE under the Margin Lending and the Global Master Securities Lending Agreements.  LBIE Settlement Agreement ¶ 2.3 and Schedule 2.  Specifically, the Maverick Entities made an aggregate cash payment to LBIE of $30 million and also effectively waived their right under the English insolvency laws to require LBIE to return the assets that had been custodied with LBIE.[2]  LBIE Settlement Agreement ¶¶ 2.1(i) and 2.1(b).  On the date that the Maverick Entities effectively agreed to waive any right to receive an in-kind distribution of their custodied securities and other assets, those assets were worth approximately $101.9 million (in contrast with the total $118.1 million

---

[2] The total amount paid to LBIE exceeded the amount that would have been owed by the Maverick Entities as of the LBHI Petition Date. The increase in the amount owed was a function not only of the depreciated value of the Maverick Entities' custodied property, but also of adverse price movements with respect to their short positions during LBIE's administration, a period during which the Maverick Entities lacked the legal ability, under English law, to unwind the short positions with LBIE. Indeed, as of the LBHI Petition Date, all of the Maverick Entities other than Maverick Fund II, Ltd. were owed money by LBIE on a net basis after accounting for all margin loan and short position obligations.

that LBIE owed the Maverick Entities under the Prime Brokerage Agreements).[3]  Because the settlement with LBIE was predicated on this value, the Maverick Entities have made the concession that an imputed setoff took place on such date for an equivalent amount.

15.    By the time this deemed setoff was effectuated, the value of the cash and securities custodied with LBIE had declined by approximately $16.2 million versus the value of such assets as of the LBHI Petition Date.  Under the LBIE Settlement Agreement, the Maverick Entities expressly preserved their right to continue pursuing LBHI.  LBIE Settlement Agreement ¶ 2.4 ("this Deed is without prejudice to any right or claim of the Maverick Entities against any Lehman Brothers Entity other than LBIE").

16.    On December 4, 2012, LBHI served subpoenas on the Maverick Entities seeking information in connection with their claims.

17.    On June 10, 2015, the Plan Administrator filed the Estimation Motion, seeking to estimate the Maverick Claims at $0 (including for purposes of allowance of such claims).

18.    On August 21, 2015, the Maverick Entities filed their Estimation Objection, setting forth certain reasons why their claim could not be estimated at $0.

19.    On December 14, 2015, LBHI served an additional subpoena on each of the Maverick Entities (the "**December 14 Subpoenas**").  On January 13, 2016, the Maverick Entities responded to the December 14 Subpoenas, and made a document production thereafter, on March 7, 2016.  The production included detailed trading records supporting the Maverick

---

[3] As described in the Declaration of Keith Hennington (the "**Hennington Decl.**"), annexed to the Estimation Objection as Exhibit A, the calculation of the $101.9 million figure is predicated on the values of securities and other assets as of February 13, 2012, rather than the precise LBIE Settlement Date itself, because such amounts were calculated around such time for the purpose of informing the LBIE settlement discussions and were the basis for an agreement in principle of the economic terms related thereto.

Claims as well as communications between LBIE and the Maverick Entities in connection with the LBIE Settlement Agreement negotiations.

20.     On February 16, 2016, the Estimation Motion was adjourned *sine die* by the Plan Administrator.

21.     On June 22, 2016, LBHI filed the Maverick Claim Objection.

## ARGUMENT

### A. The Maverick Claims Are Straightforward and Can Be Allowed on the Basis of Conventional Principles.

22.     The Maverick Claims are straightforward.  Under the Prime Brokerage Agreements and the New York Uniform Commercial Code ("**NYUCC**"), LBIE was obligated to return all custodied cash and securities to the Maverick Entities upon request.[4] LBIE, however, was not in a position to do so after having commenced its Administration Proceedings.  To protect themselves against precisely such an occurrence, each of the Maverick Entities had demanded and received from LBHI an absolute and unconditional guarantee of payment with respect to all such custodied property.  A guarantee of payment can be enforced at any point in time by the beneficiary (regardless of whether collection efforts have been made against the primary obligor),[5] and LBHI expressly waived its right to assert a wide array of defenses or other excuses with respect to such payments.[6]  As a consequence, upon demand, LBHI was obligated to provide an immediate cash payment to the Maverick Entities reflecting the full value of all

---

[4] *See* Prime Brokerage Agreements ¶ 3; NY CLS UCC sections 8-503, 8-506, 8-508 (2015).

[5] *McMurray v. Noyes*, 72 N.Y. 523, 525 (1878).

[6] *See, e.g.*, *U.S. Bank N.A. v. Perlmutter (In re South Side House, LLC)*, 470 B.R. 659, 675 (Bankr. E.D.N.Y. 2012) (collecting cases and holding that "unconditional guaranties have been held to foreclose, as a matter of law, guarantors from asserting any defenses or counterclaims") (citation omitted); *Bank of N. Am. v. Shapiro*, 298 N.Y.S.2d 399, 401 (App. Div. 1969) (under New York law, guarantor is liable "even where the principal may escape liability").

cash and securities custodied with LBIE. The Maverick Entities could have (and surely would have) made such a demand immediately upon the commencement of LBIE's Administration Proceedings, but LBHI's own chapter 11 filing frustrated their ability to do so, giving rise to claims under the Bankruptcy Code for all payments owed under the LBHI Guarantee.[7]

23.    The proper calculation and treatment of the Maverick Entities' guarantee claims are predicated on a handful of well-established legal propositions. Specifically, Maverick maintains that:

a.    The date for calculating the allowed amount of a claim against a chapter 11 debtor is the petition date;[8]

b.    The date for calculating a claim against a party that has breached a New York law-governed contract is the date of breach;[9]

c.    An absolute and unconditional guarantor cannot assert a right of setoff with respect to amounts owed under contracts to which it is not a party;[10] and

---

[7] The Maverick Entities are also pursuing a direct claim against LBHI on account of the fact that LBHI was a co-liable party under the Prime Brokerage Agreements.

[8] 11 U.S.C. § 502(b); *In re Solutia Inc.*, 379 B.R. 473, 483 (Bankr. S.D.N.Y. 2007) ("§ 502(b) requires that a claim be determined as of the filing date" and claims allowance "is not a forward looking process" that can take into account future outcomes in an insolvency proceeding); *In re Chateaugay Corp.*, No. 94 CIV. 1257 (LMM), 1996 WL 346010, at *1 (S.D.N.Y. June 24, 1996) ("[T]he bankruptcy court . . . 'shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition.'"); *In re O.P.M. Leasing Servs., Inc.*, 79 B.R. 161, 165 (S.D.N.Y. 1987) (The court acknowledges the "clear language of § 502(b) requiring the bankruptcy court to 'determine the amount of such claim . . . as of the date of the filing of the petition.'").

[9] *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971) (contract claimant is entitled to "the loss sustained or gain prevented at the time and place of breach" in context of failure to tender shares); *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 384 (2d Cir. 2006) ("It is settled Second Circuit law that in a breach of contract case, damages are calculated at the time of the breach."); *Kaminsky v. Herrick, Feinstein LLP*, 870 N.Y.S.2d 1, 11-12 (App. Div. 2008) (adopting the *Simon* court's reasoning and applying it to the calculation of damages for breach of contract for failure to deliver shares in an IPO at the initial offering price); *N.Y. News Publ'g Co. v. Nat'l S.S. Co.*, 148 N.Y. 39, 41 (1895) ("The rule in this state seems to be that where a party . . . fails to deliver the property, his obligation is thereby converted into one for the payment of money.").

[10] *Marcus Dairy, Inc. v. Jacene Realty Corp.*, 638 N.Y.S.2d 779, 780 (App. Div. 1996) ("[Under] . . . New York law, a guarantee agreement is separate and distinct from the contract" with the primary

    d.  In a chapter 11 proceeding, a creditor can assert the full value of an allowed claim against a guarantor unless and until it has received a satisfaction in full of all amounts owed to it. [11]

The Maverick Entities invoked each of these legal principles in their Estimation Objection and LBHI has identified no legal authority to call any of them into question.

    24.    The factual underpinnings of the Maverick Claims are similarly straightforward. Specifically, the Maverick Entities have asserted that:

    a.  They were owed approximately $118.1 million on account of custodied cash and securities (valued as of the LBHI Petition Date);

    b.  In connection with the 2012 LBIE Settlement Agreement, the Maverick Entities received only a partial recovery of the amounts owed to them (*i.e.*, a credit or offset in an amount not greater than approximately $101.9 million); and

    c.  Prior to the date of the LBIE Settlement Agreement, no setoff of the amounts owed by or to the Maverick Entities had ever been effectuated.

Once again, LBHI completely fails to rebut any of these factual premises or to establish that such assertions are "implausible," as it claims. Indeed, it is difficult to see how LBHI *could* contravene these basic factual assertions in connection with a mere sufficiency hearing. [12]

---

obligor, and "thus a party who enters into an unconditional guarantee of payment may not assert setoffs or defenses which arise independently from the guarantee."). *See also In re South Side House, LLC*, 470 B.R. at 675 (collecting cases and holding that "unconditional guaranties have been held to foreclose, as a matter of law, guarantors from asserting any defenses or counterclaims") (citation omitted).

[11] *See Ivanhoe*, 295 U.S. at 246-47 (holding that recoveries received from a non-debtor do not reduce the amount of the claim a creditor may assert against the debtor); *see also Nuveen Mun. Trust v. Withumsmith Brown, P.C.*, 692 F.3d 283, 295 (3d Cir. 2012) ("*Ivanhoe* thus provides that a creditor may file a proof of claim for the total amount it is owed by a debtor even if it has recovered or may recover all or a portion of that amount from a non-debtor."); *In re LightSquared Inc.*, Case No. 12-12080 (SCC), 2014 WL 5488413, at *5 (Bankr. S.D.N.Y. Oct. 30, 2014) ("In *Ivanhoe*, the United States Supreme Court held that a creditor was permitted to assert the full value of its claim against a debtor co-obligor, unreduced by the stipulated value of the collateral, subject only to the 'single-satisfaction rule' that the creditor could not retain value beyond payment in full.").

[12] Maverick expects that it can and will establish these facts in a full evidentiary hearing with respect to its claims. The amounts referenced above have been outlined in a sworn declaration by Maverick's Chief Financial Officer and are supported by trading records that have been produced to

25.     These basic and uncontroverted legal principles, when applied to Maverick's factual assertions, can lead to only one conclusion: the Maverick Entities have allowable claims in the amount of approximately $118.1 million and should be permitted to assert such claims against LBHI, in their full amount, until such time as the Maverick Entities have achieved a single satisfaction of the full $118.1 million to which they are entitled.  *See Ivanhoe*, 295 U.S. at 246-47. Here, that result will be achieved when the Maverick Entities have received distributions of approximately $16.2 million – because such amount, when coupled with the recovery of approximately $101.9 million that was received in connection with the LBIE Settlement, will constitute a "single satisfaction" of all amounts owed to the Maverick Entities under the Prime Brokerage Agreements and the Guarantees.[13]

**B. The Maverick Entities Have Adequately Alleged the Existence of Unsatisfied Guarantee Claims**.

26.     LBHI is wrong that the Maverick Entities have failed to set out a *prima facie* claim for amounts owed under the LBHI Guarantee.[14]  Maverick has produced an executed

---

LBHI in discovery.  *See* Hennington Decl. The trading positions on which the figures are based were also thoroughly vetted and largely or entirely agreed to by LBIE in connection with a lengthy reconciliation process that was undertaken in advance of the LBIE settlement negotiations.

[13] As noted in footnote 3 of the Estimation Objection, Maverick's Claims also asserted and reserved rights with respect to various other entitlements, such as interest, legal fees, and other damages, including damages for lost investment opportunities and other items.  Any reference herein to the approximate amount required to achieve a "single-satisfaction" of the amounts owed to the Maverick Entities refers only to a single-satisfaction with respect to Maverick's claims for custodied property. LBHI does not address Maverick's other claims in its objection, and Maverick reserves its rights with respect to all such claims.  Without limiting the foregoing, Maverick is entitled to reimbursement of attorneys' fees and expenses in connection with enforcement of the S&P Guarantee.

[14] The Maverick Claim Objection invokes several authorities that speak to the proper legal standard for a well pleaded complaint and the standard for dismissal under Federal Rule of Civil Procedure 12(b)(6).  The Maverick Entities object to any interpretation or application of this Court's April 19, 2010 order (the "**Claims Management Order**") (ECF No. 8474) that would purport to require them to have submitted proofs of claim or other documentation that satisfied the standards for a well pleaded complaint.  The Claims Management Order was entered after the deadline for filing of proofs of claim in these cases, and creditors therefore had no way of knowing that a future order

copy of an absolute and unconditional guarantee, has submitted a sworn declaration affirming the amounts that were guaranteed, and has asserted that it never received payment in full of all amounts guaranteed. New York law requires nothing further to establish a valid guarantee claim. *HSH Nordbank AG N.Y. Branch v. Brian*, 421 F. App'x 70, 72 (2d Cir. 2011) ("creditor need prove no more than an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guarantee").

27.     Moreover, because LBHI has chosen to pursue only a sufficiency hearing with respect to the Maverick Claims, at this juncture the Court need only conclude that the Maverick Entities have plausibly *asserted* the existence of a guarantee and the failure to receive payment in full for all guaranteed amounts. It is beyond dispute that the Maverick Entities have made such plausible assertions, and the Court should deny the Maverick Claim Objection on this basis.

## C. Maverick's Settlement Payment to LBIE Does Not Show That the Maverick Entities Were Made Whole With Respect to the Prime Brokerage Agreements.

28.     LBHI argues that because the Maverick Entities made a payment to LBIE in connection with the LBIE Settlement Agreement, it is impossible that anything further could

---

might potentially seek to apply the standards of Federal Rule of Bankruptcy Procedure 7012 to the contents of a proof of claim (or to any other document other than a complaint filed to commence an adversary proceeding). Any such interpretation or application of the Claims Management Order would thus constitute a clear violation of the Maverick Entities' due process rights. Moreover, the Claims Management Order is itself unclear as to what documents or statements should be subject to Rule 12(b)(6) scrutiny in connection with any "sufficiency hearing." The Maverick Entities understand that this Court has generally been taking a practical approach to the use of sufficiency hearings and are supportive of such an approach. The Maverick Entities further believe that the Maverick Claims, coupled with the contents and attachments to this response and the Estimation Objection, set forth detailed allegations concerning the non-payment of amounts owed to the Maverick Entities. Should the Court conclude that additional allegations need to be "pleaded" with respect to the Maverick Claims, the Maverick Entities respectfully request that they be afforded an opportunity to provide any such additional "pleadings" in advance of any final ruling with respect to the Maverick Claim Objection.

be owed under the LBHI Guarantee.  LBHI is wrong.  LBHI incorrectly presumes that there are no conceivable circumstances under which the Maverick Entities could have made a payment to LBIE without having first received full payment or setoff of all amounts owed them under the Prime Brokerage Agreements.  Yet this is precisely what the Maverick Entities were compelled to do as a result of LBIE's Administration Proceedings.

29.     The reason the Maverick Entities did not receive payment of the full $118.1 million owed to them under New York law is that LBIE, in English law administration, was not legally obligated to honor the full amount owed under the New York law-governed Prime Brokerage Agreements.  Instead, English insolvency laws, at best, required only that LBIE return all custodied assets to the Maverick Entities.  At the time the terms of the LBIE Settlement Agreement were agreed in principle, such property was worth only $101.9 million.  Hennington Decl. at ¶¶ 5, 14. It would be unreasonable to presume that LBIE would ever have agreed to credit Maverick for anything more than the then-current value of these custodied assets (*i.e.*, $101.9 million).  Indeed, it would have been irrational and irresponsible for LBIE to have agreed to such terms.  If Maverick had demanded a larger setoff (as it in fact attempted to do), LBIE could simply have returned the custodied property.[15]  LBHI has made absolutely no effort to address this central factual and legal contention (other than to baldly deny it).

30.     Thus, while LBHI claims that Maverick's assertions concerning its failure to be paid in full are "implausible," LBHI has it backwards.  It is LBHI's unsupported speculation that LBIE paid *more* than was required under English law that is implausible.  Furthermore, if LBHI wishes to challenge the Maverick Entities' assertion of the value that they

---

[15] LBHI's unsupported speculation that Maverick received a credit for the full value of its securities as of the LBHI Petition Date also begs the question why Maverick negotiated to expressly preserve the right to pursue any remaining claims against LBHI if Maverick had in fact already been paid in full.  LBIE Settlement Agreement ¶ 2.4.

received when they waived their rights to receive an in-kind distribution, LBHI must do so by initiating an evidentiary hearing on the allowance of the Maverick Claims. Although the parties never memorialized the final value attributed to the setoff implicit in the LBIE Settlement Agreement, concrete evidence exists to show that LBIE never agreed to credit Maverick's positions at their 2008 values (which is what Maverick is entitled to under U.S. law and under the Guarantees). For example, in a February 2012 e-mail exchange that preceded the parties' settlement negotiations, LBIE's representatives flatly rejected Maverick's attempt to condition settlement negotiations on LBIE's acceptance that Maverick should receive full credit for the value of its positions in September of 2008. Instead, LBIE claimed that the appropriate valuation date was in dispute, and LBIE never backed down from this position. Maverick will establish as much if an evidentiary hearing is required on its claims. At this preliminary stage, however, no basis exists to credit LBHI's unsupported contention that Maverick was paid in full, or to doubt the Maverick Entities' assertion that only partial value was ever received. Moreover, because the Maverick Entities are the claimants in connection with this sufficiency hearing, their assertions should be treated as true (as indeed they are) and are entitled to the benefit of any reasonable inferences.

> 31.     Finally, LBHI cannot credibly argue that the mere fact that the Maverick Entities elected to settle with LBIE for a negotiated sum reflecting what they were likely to recover under English law is the same thing as having been "paid in full" under their New York law-governed contracts. *See Instituto Per Lo Sviluppo Economico Dell' Italia Meridionale v. Sperti Prods.*, 323 F. Supp. 630, 637 (S.D.N.Y. 1971) (obligations of a guarantor are not discharged merely because foreign bankruptcy proceeding allowed discharge of obligations of primary obligor, noting that "[i]f a creditor, by accepting a final partial distribution of the

debtor's assets from the [Italian] Bankruptcy Court . . . forfeited his rights to collect the balance from the guarantor, the guarantee would become a meaningless instrument"). LBHI's claim that Maverick has been paid in full is both factually and legally unconvincing.

### D. LBHI Cannot Avail Itself of Any "Netting" or Other Setoff Rights to Escape Liability.

32. LBHI asserts, with no explanation, that there is something inappropriate about the Maverick Entities asserting a claim for the full amount owed to them under the Prime Brokerage Agreements and the Guarantees without "netting" the amounts that were separately owed under the Global Master Securities Lending Agreements and Margin Lending Agreements. LBHI also makes inconsistent assertions concerning the date on which such a setoff supposedly occurred (or should be deemed to have occurred).[16] Each of LBHI's various "netting" or setoff arguments ignores basic and well-established rules governing the law of setoff, surety, and bankruptcy. At bottom, LBHI's "netting" arguments boil down to attacks on the validity of the Supreme Court's *Ivanhoe* decision, a repackaging of its incorrect assertion that Maverick has already been paid in full, or both.[17]

---

[16] For example, in footnote 4 of its Objection, LBHI appears to take the position that it is entitled to "netting" even if the Maverick Entities' claims are valued as of the Petition Date. Elsewhere, LBHI seems to be arguing that it should be entitled to the benefit of any netting that occurred in connection with the LBIE Settlement Agreement. *See, e.g.*, Maverick Claim Objection at ¶¶ 29-30. Both positions are unsupportable.

[17] LBHI also suggests that Maverick somehow admitted that netting was appropriate when it filed the Maverick Claims. This is untrue. LBHI first points out that the Maverick Entities indicated that the amounts they would be owed would be "less any amounts owed in connection with the Prime Brokerage Agreements." This is beside the point, because no amounts are or were owed to LBHI as of the LBHI Petition Date under the Prime Brokerage Agreements. Elsewhere, LBHI also points out that Maverick stated that its effort to quantify the sums owed to it reflected a "gross claim" that "does not take into account any amounts or obligations Maverick may owe the Lehman Entities" under various other contracts. But this was a mere factual statement (and an innocuous one), not a legal concession that LBHI could avail itself of setoff rights even if it did not possess any such rights. Indeed, this would have been an absurd concession for Maverick to have included in a proof of claim. The much more natural reading of the statement is the reading that is consistent with

### i. *No Setoff Occurred on or Before the LBHI Petition Date or the LBIE Settlement Date*.

33.     LBHI does not and cannot allege in good faith that any setoff ever occurred prior to the date of the LBIE Settlement.   In fact, and as Maverick's representatives from the 2012 settlement discussions can confirm, LBIE's representatives expressly adopted the position that all of Maverick's long and short positions remained "open" as of the date of the 2012 settlement discussions (*i.e.*, they took the position that no netting or setoff had previously occurred).[18]  The Lehman entities cannot have it both ways, with LBHI now seemingly claiming there was (or should be deemed to have been) a setoff as of its own 2008 petition date, when LBIE has already (correctly) adopted and exploited the position that no setoff had occurred on such date.

34.     LBHI's claim that the amounts owed under the Prime Brokerage Agreements must be calculated "net" of separate amounts owed under separate contracts thus ignores the distinction between a right of setoff and the actual occurrence of a setoff.[19]   The Maverick Claims must be calculated by reference to the amounts owed under the Prime Brokerage Agreements as of the LBHI Petition Date, and LBHI offers no credible argument for its contrary position.

---

Maverick's current position:  Maverick noted that the reported figures had not been netted precisely because no such right of setoff was available.

[18] This position was unfavorable to the Maverick Entities, because in the years that their positions had remained "open," the value of both their long and short positions had declined, a fact that LBIE leveraged to its advantage in extracting a $30 million settlement payment from Maverick.

[19] *Clarkson Co. Ltd. v. Shaheen*, 533 F. Supp. 905, 925 (S.D.N.Y. 1982) ("[T]he act of setoff is . . . complete . . . (when) three steps have been taken: (1) the decision to exercise the right, (2) some action which accomplishes the setoff and (3) some record which evidences that the right of setoff has been exercised." (citing *Baker v. National City Bank of Cleveland*, 511 F.2d 1016, 1018 (6th Cir. 1975))); *see also Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 20 (1995).

### ii.    LBHI Had No Right of Setoff as of the LBHI Petition Date.

35.    LBHI is in any event wrong that it could have invoked any right of setoff in the first place.  This is so for two reasons.

1) *First*, New York law prohibits an absolute and unconditional guarantor from attempting to invoke setoff rights with respect to separate contracts to which it is not a party.  *See* footnote 10 *supra*.

2) *Second*, LBHI incorrectly claims paragraph 4 of the Prime Brokerage Agreements provided contractual rights of setoff by creating "master netting" rights.  The language of paragraph 4 (which LBHI selectively quoted) makes it clear that such cross-agreement netting rights ripen only upon a default by the applicable Maverick Entity.[20]  But no Maverick Entity ever defaulted under the Prime Brokerage Agreements.[21]

### iii.    The Occurrence of an Implicit Setoff in Connection With the LBIE Settlement Was in the Nature of a Partial Payment and Does Not Alter the Calculation of the Claim Against LBHI.

36.    As discussed in paragraphs 29 and 30 above, the Maverick Entities received, at most, a credit of approximately $101.9 million on account of the implicit setoff effectuated in connection with the LBIE Settlement Agreement (out of the $118.1 million owed to them under the Prime Brokerage Agreements).  On the other hand, Maverick paid, in full, all

---

[20] All of paragraph 4 is prefaced with the phrase "If you shall:" and continues to identify seven enumerated events of default.  Thus, the entire section is predicated on the occurrence of such an event of default.  Making this even more clear, the remedies available to Lehman, including the master netting rights that LBHI invokes, arise only "[i]n the event of such default."  LBHI presumably declined to flag this language to the Court because it cannot identify any default by the Maverick Entities that would have triggered such netting rights.

[21] LBHI also appears to contend that any rights of setoff can be applied across distinct legal entities such as the Maverick Entities.  LBHI provides no contractual or legal support for this position, and there is none.  For the avoidance of doubt, each of the Maverick Entities is a separate legal entity with separate claims and liabilities.  Aggregate figures are presented herein for the sake of convenience only.

amounts owed to LBIE under the Global Master Securities Lending Agreements and Margin

Lending Agreements (as was required under English law). Thus, all amounts available for setoff

have already been fully applied by LBIE, but Maverick has not yet been paid in full and is

entitled to continue to assert its claims. If LBHI intends to argue that the partial recovery already

achieved by Maverick in connection with the 2012 LBIE Settlement means that Maverick can no

longer assert the full amount of its allowed claim against LBHI, LBHI must explain why *Ivanhoe*

is no longer good law.

### E.  Section 562(a) Does Not Affect the Amounts Owed by LBHI to the Maverick Entities.

37.     LBHI argues that section 562 applies to the Maverick Claims and that they

must therefore be calculated as of the LBIE Settlement Date. Section 562 alters the timing for

calculating damages only if:

> the trustee rejects a . . . securities contract (as defined in section 741) . . . or a master
> netting agreement pursuant to section 365(a), or if a forward contract merchant,
> stockbroker, financial institution, securities clearing agency, repo participant, financial
> participant, master netting agreement participant, or swap participant liquidates,
> terminates, or accelerates ***such contract or agreement*** . . . . (emphasis added)

As a threshold matter, several of these elements are not satisfied here, and so section 562 does

not apply.

#### i.     *The LBHI Guarantee Was Never Terminated, Liquidated, or Accelerated*.

38.     In the first place, LBHI does not indicate when it believes the LBHI

Guarantee was terminated, liquidated, or accelerated, nor can it.[22]  No such event has ever

occurred. Indeed, the LBHI Guarantee contains no provision allowing for liquidation or

acceleration (and it is unclear what "liquidation" or "acceleration" would even mean in respect of

---

[22] LBHI glosses over this glaring omission by pointing out that certain other agreements were
terminated on the LBIE Settlement Date, but this is beside the point, at least with respect to the
Maverick Entities' guarantee claims.

a guarantee). Although the LBHI Guarantee allows for the possibility of termination, no termination right was ever exercised by LBHI. Nor were the other Guarantees ever terminated. That being so, section 562 does not apply to the Maverick Claims that are based on the Guarantees. The plain language of section 562 states that the date for calculating damages is the date on which a specified party "terminates . . . such contract or agreement." Because the LBHI Guarantee has never been terminated, section 562 does not alter the correct date for calculating damages owed for "such contract" (*i.e.*, the LBHI Guarantee). The Court can and should dispose of LBHI's section 562 argument on this basis alone.

   *ii.*  *The Prime Brokerage Agreements Were Never Terminated With Respect to LBHI.*

   39. Nor is it open to LBHI to argue that a termination of the Prime Brokerage Agreements (or the other so-called "Prime Brokerage Documents") triggered the application of section 562. In addition to being unsupported by the plain language of section 562, any such argument ignores the fact that no such termination ever occurred *with respect to LBHI*. LBHI misstates the contents of the LBIE Settlement Agreement when it claims that the agreement "terminated" the Prime Brokerage Agreements. Maverick Claim Objection at ¶ 25. What the LBIE Settlement actually provided was that such contracts were to be considered terminated "as between LBIE and each Maverick Entity." LBIE Settlement Agreement at Section 2.1(a). In other words, the parties expressly agreed that the Prime Brokerage Agreements were *not* being terminated as between the Maverick Entities and other Lehman entities such as LBHI, against whom all other rights had been expressly reserved.

   40. Section 562 applies only to circumstances in which a qualified contract is rejected by a trustee or is unilaterally terminated by a qualified entity (such as a financial

participant) that is a counterparty to a chapter 11 debtor.[23]  Neither situation applies here and

section 562 therefore cannot apply, because there has not been a termination, liquidation, or

acceleration of any pertinent transaction document vis-à-vis a chapter 11 debtor (*i.e.*, there has

been no termination vis-à-vis LBHI).  The fact that LBIE and the Maverick Entities expressly

excluded all Lehman entities other than LBIE from such termination makes it clear that section

562 should not apply in these circumstances.

> ### iii.  Maverick's Claims Are Based on Severable Custodial Obligations That Do Not Qualify as "Securities Contracts," Making Section 562 Inapplicable.

41.     In addition, even if some portions of the Prime Brokerage Agreements

could properly be construed to be securities contracts within the meaning of section 741(7), the

contracts are plainly severable.  *Calyon v. American Home Mortg. Corp.*, 379 B.R. 503, 520-23

(Bankr. D. Del. 2008) (explaining that where a contract is severable into two or more distinct

sets of obligations, each such portion must be separately analyzed to determine whether it

qualifies as a "securities contract under the Bankruptcy Code").  The Maverick Claims are based

on breaches of LBIE's *custodial* obligations, not breaches of any obligations concerning the

"purchase, sale, or loan" of securities, or on any other type of obligation that might partially

qualify the Prime Brokerage Agreements as "securities agreements."  Because LBIE's custodial

functions and obligations are clearly severable and distinct from its obligations with respect to

the sale of securities on behalf of the Maverick Entities, the Maverick Claims are not subject to

section 562.  *Id.*  If Maverick had made claims with respect to failed trades, or similar

obligations, those claims might potentially have been subject to section 562.  But the claims

---

[23] To read section 562 otherwise would be to suggest that section 562 would apply even in circumstances where, for example, two derivatives counterparties exercised termination, liquidation, or acceleration rights, but where neither was a chapter 11 debtor.  This plainly is not the intent of section 562, which applies only to terminations, liquidations, and accelerations where a chapter 11 debtor is a party to such action.

asserted here are based on LBIE's failure to honor its obligation to return cash and securities

upon request, and those custodial obligations are severable, and have nothing to do with the

obligations that might otherwise have triggered a potential application of section 562.[24]

### iv. The Application of Section 562 Would Not Affect the Amount Ultimately Payable to the Maverick Entities.

42.    Even assuming, *arguendo*, that section 562 could be applied to the

Maverick Claims, dismissal of such claims would not be appropriate. To the contrary, as LBHI

itself points out, Maverick would still be entitled to pursue an allowed claim calculated as of the

LBIE Settlement Date (*i.e.*, a claim of approximately $101.9 million).[25] Maverick Claim

Objection at ¶ 25. LBHI jumps from this premise to the unsupported conclusion that Maverick

will not be entitled to any further distributions, reasoning that Maverick has already received

approximately $101.9 million from LBIE. But LBHI is once again ignoring *Ivanhoe*, which

provides that Maverick can assert its full claim (*i.e.*, $101.9 million if section 562 applies) until it

has achieved a single recovery of all amounts to which it is entitled under state law (*i.e.*,

approximately $118.1 million). The flaw in LBHI's reasoning is assuming that section 562 not

only governs the calculation of an allowed claim against a debtor (which Maverick concedes) but

that it also modifies the maximum amount that Maverick can recover under applicable state law

from all co-liable debtors and guarantors. Nothing in the plain wording of section 562 supports

this interpretation.

---

[24] If the Court is of the view that the severability of Lehman's custodial obligations is not clear from the face of the contracts, the Maverick Entities should be permitted an opportunity to present evidence in connection with this issue, including evidence of the parties' intent or of industry custom. Maverick contends that it is premature to dismiss such a contention in connection with a sufficiency hearing.

[25] Based on current distributions of approximately 23 percent having been distributed to similarly classified claims, Maverick would be entitled to a distribution well in excess of the approximately $16.2 million required to ensure that Maverick has been paid in full (meaning its distribution will in fact be capped at approximately such amount).

43.    To the contrary, section 562 is clearly a modification of a creditor's otherwise applicable state law rights.  Like other such applicable Bankruptcy Code limitations (*e.g.*, limitations on claims for unmatured interest or leases of a certain duration), it should be treated only as a limitation on the maximum that can be recovered from a Chapter 11 debtor, not as a modification of the maximum amount that can be recovered from all available sources. *See, e.g.*, *Johnson v. Beck*, 117 B.R. 461, 470 (Bankr. D. Minn. 1990) (holding a claim against a guarantor "enforceable in its full amount . . . notwithstanding any limitation on its allowability" arising in an insolvency proceeding); *Credit Suisse First Boston Mortg. Capital LLC v. Cohn*, 03 Civ. 6146 (DC), 2004 WL 1871525, at *8 (S.D.N.Y. Aug. 19, 2004) ("A discharge of liability pursuant to the bankruptcy laws generally does not affect a guarantor's liability and leaves a creditor free to pursue collection from a guarantor.").

44.    While cases such as those just cited involved claims asserted against guarantors that were not chapter 11 debtors, the underlying logic of these and other similar authorities is clear:  Bankruptcy Code limitations on the size of claims that can be asserted against chapter 11 debtors do *not* modify the maximum amount that a creditor is permitted to recover from all co-liable entities and guarantors under state law.  When that principle is applied here, LBHI's argument is shown to be without merit, because Maverick must be permitted to pursue all permissible claims against all liable entities until it has recovered the full amount owed to it under state law.  Thus even if section 562 applies, Maverick can still assert a claim of $101.9 million against LBHI, unless and until it has achieved a full satisfaction of the $116.2 million owed to it (which, here, will require an additional distribution of approximately $16.2 million).

**F.  The Exculpation and Force Majeure Provisions of the Prime Brokerage Agreement Do Not Apply to LBHI's Guarantee Obligations or Other Liabilities**.

45.     LBHI also argues that it can avoid liability under the Guarantees by invoking Sections 28 and 29 of the Prime Brokerage Agreements (respectively, the "**Force Majeure Clause**" and "**Trading Error Exculpation Clause**", and together, the "**Limiting Clauses**"). As this Court has already suggested, however, and as LBHI's counsel has already admitted in open court, neither of these provisions has any application with respect to guarantee claims such as those at issue here. Indeed, if it were otherwise, the LBHI Guarantee would be essentially worthless, because it would not cover the primary instance it was intended to cover: a bankruptcy of the entity holding Maverick's cash and securities. Whatever else the Limiting Clauses might mean, they certainly were not intended to excuse LBHI from honoring its absolute and unconditional promise to ensure that the Maverick Entities receive the full value of all property that had been custodied under the Prime Brokerage Agreements. Yet that is precisely the interpretation that LBHI now urges on the Court.

*i.*     *Maverick's Guarantee Claims Are Not Barred by Law of the Case, and LBHI Should Be Precluded From Arguing that the Limiting Clauses Apply to Guarantee Claims*.

46.     LBHI argues that the application of the Limiting Clauses to guarantee claims such as those asserted by the Maverick Entities has already been adjudicated by this Court in connection with direct claims asserted by Stonehill and by the Newport and Providence Claimants (each as defined in the Maverick Claim Objection). LBHI even goes as far as to assert that the "holdings in the Stonehill, Newport, and Providence matters are law of the case and they compel disallowance of Maverick's claims . . . even assuming such claims were otherwise valid." Maverick Claim Objection at ¶ 39. This assertion is nothing short of incredible, not least because LBHI's counsel repeatedly confirmed, directly to this Court, that the Limiting Clauses

did not apply with respect to prime brokerage claims based on guarantees. Transcript of Oral Argument at 112-20, 149-50, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555-scc (Bankr. S.D.N.Y. Feb. 11, 2015), ECF No. 48807.

47.    Asked whether guaranteed prime brokerage claims would be affected by the Limiting Clauses, LBHI's counsel flatly stated: "I don't think I can rely on the exculpation." *Id.* at 117. Counsel further admitted that "the guarantee would stand on its own" and described a guarantee of a prime brokerage agreement as "a blanket guarantee of whatever loss you suffer." *Id.* Counsel then concurred with the Court's suggestion that the guarantee was "not hooked into the prime brokerage agreement" (an admission that accords with the holding of cases such as *Marcus Dairy*) and stated that the beneficiary of a guarantee could "come see Uncle LBHI and he'll take care of it" (an admission that, albeit colloquial, nonetheless accords with the basic legal principles governing waiver of defenses and the nature of an absolute and unconditional guarantee of payment). *Id.* In light of these binding admissions, it is difficult to apprehend how LBHI can argue that the guarantee claims of the Maverick Entities are barred by the "law of the case." Indeed, if there is any preclusive effect that should be given to LBHI's previous adjudication of the Limiting Clauses, it is that LBHI should be precluded from reversing course and arguing that the Limiting Clauses can be relied on in connection with a guarantee claim.

**ii.    *The Limiting Clauses Are Not Incorporated into the Guarantees and so Cannot Be Relied On*.**

48.    But even if LBHI is permitted to alter its prior position on this matter, the Limiting Clauses simply do not apply to guarantee-based claims such as those asserted by the Maverick Entities. As this Court has already suggested, and LBHI has agreed, the fact that the Limiting Clauses are not expressly referred to in the Guarantees is fatal to LBHI's ability to rely on them. *Marcus Dairy*, 638 N.Y.S.2d at 780 (collecting cases and holding that under New York

law "a guarantee agreement is separate and distinct" from the guaranteed contract and that as a result "a party who enters into an unconditional guarantee of payment may not assert setoffs or defenses which arise independently from the guarantee"). LBHI's reliance on the Limiting Clauses can be disposed of on this basis alone.

### iii. LBHI's Proposed Application of the Limiting Clauses Is Inconsistent With the Nature of a Guarantee of Payment.

49.    LBHI seems to argue that the Limiting Clauses bar prime brokerage customers from seeking any compensation above and beyond what can be recovered in an insolvency proceeding even when the recovery of such amounts was expressly guaranteed. But this argument completely ignores the fact that the LBHI Guarantee (and the S&P Guarantee) were both guarantees of payment, rather than guarantees of collection. The fundamental distinction between the two types of guarantees is that a guarantee of payment can be enforced immediately and irrespective of whether remedies have been exercised with respect to a primary obligor (as the LBHI Guarantee plainly states). Thus, it is incoherent for LBIE to argue that the Limiting Clauses bar Maverick's ability to seek payments under the Guaranty that exceed what can be recovered in an LBIE insolvency proceeding. By entering into a guarantee of payment rather than collection, LBHI unconditionally agreed that Maverick could enforce its rights under the guarantee before waiting to first receive distributions in an LBIE insolvency. Indeed, but for LBHI's chapter 11 filing, the LBHI Guarantee could have been immediately enforced, before the amounts recoverable in an LBIE proceeding were even known. In other words, the fact that the LBHI and S&P Guarantees were guarantees of payments proves either: (i) that LBHI's interpretation of the scope of the Limiting Clauses is wrong; (ii) that the Limiting Clauses were never intended to be applied with respect to the Guarantees; or (iii) both "i" and "ii".

### iv. Maverick's Guarantee Claims Are Distinguishable From the "Diminution Damages" Claims Asserted by Stonehill and by the Newport and Providence Claimants.

50.        LBHI is also incorrect in arguing that the Maverick Entities are seeking "Diminution Damages" akin to the claims asserted by Stonehill and by the Newport and Providence Claimants. The claims brought by those creditors were not claims under guarantees, but rather direct claims brought under prime brokerage agreements.[26]  In contrast to direct prime brokerage claims, Maverick's guarantee claims are brought under different documents and under different laws. These distinctions are critical. Under the LBHI Guarantee, for example, LBHI promised to make good any obligations that LBIE could not satisfy and to do so immediately and without protest. These clear and unambiguous promises amount to a waiver of defenses and clearly override any ability of LBHI to appeal to the Limiting Clauses. *See* footnote 6, *supra*.

### v. The Language of the Limiting Clauses Demonstrates That Such Clauses Do Not Apply to the Maverick Claims.

51.        The language of the Limiting Clauses also shows that neither such clause applies with respect to the claims asserted by the Maverick Entities.

### a. The Force Majeure Clause Does Not Apply.

### 1) The Force Majeure Clause Only Applies to "Losses Caused" by a Force Majeure Event.

52.        In the first place, by its plain language, the Force Majeure Clause only purports to exculpate the Lehman entities from "any loss caused" by any one of a series of listed events. But the Maverick Entities are not pursuing a claim for any "losses caused" by any

---

[26] The Newport and Providence Claimants also asserted guarantee claims, but LBHI's objection to those claims was withdrawn, with LBHI's counsel stating that the reason for such withdrawal was that the objection in question involved factual contentions that could not be addressed in connection with a mere sufficiency hearing. Transcript of Oral Argument at 112-20, 112-15, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555-scc (Bankr. S.D.N.Y. Feb. 11, 2015), ECF No. 48807.

specific event. Instead, they are pursuing a straightforward guarantee claim, based on LBHI's promise to ensure full compliance with all terms of the Prime Brokerage Agreements. This claim is based on the right to have their property returned to them, not a claim for damages or losses, and the Force Majeure Clause has no application to such claims.

### 2) Insolvency Proceedings Do Not Qualify as Force Majeure Events.

53.    Furthermore, the Maverick Entities respectfully disagree with LBHI (and with the *MF Global* court)[27] that the Force Majeure Clause was triggered by an LBIE or LBHI insolvency proceeding. If the parties had intended for the Force Majeure Clause to be triggered by an insolvency proceeding by a Lehman entity, such a provision could easily have been added to the list of extraordinary events. But it was not. Elsewhere in the Prime Brokerage Agreements, detailed provisions of the Bankruptcy Code are explicitly discussed, but in section 28 no reference to such laws is made. This omission is both telling and dispositive.

54.    LBHI's argument to the contrary focuses on the specific references to "government restrictions" and "suspension of trading," and to the more generalized "catch-all" phrase "other conditions beyond Lehman Brothers' control." None of these phrases were intended to describe a Lehman insolvency proceeding.

55.    Each of the specific force majeure events listed is an event that is entirely "beyond the control" of the Lehman entities, because the event was either an act of nature or an act of a third party. The same cannot be said with respect to a *voluntarily* commenced Lehman bankruptcy, because Lehman had meaningful input into the various factors leading up to such an event (*e.g.*, investment and other decisions), not to mention the filing itself. To read an

---

[27] The exculpatory language addressed by the *MF Global* court was highly distinguishable in any event, most obviously because the exculpatory clause there, unlike here, included exculpation with respect to "any Applicable Law." *See In re MF Global Inc.*, Case No. 11-2790 (MG), 2014 WL 4361552 (Bankr. S.D.N.Y. Sept. 4, 2014). Nor did the case address a guarantee claim.

insolvency proceeding into the list of enumerated force majeure events would be to add an event with a crucial characteristic utterly absent from all of the other force majeure events. Thus, if anything, the concluding "catch all" only makes it more clear that an LBIE insolvency proceeding was not a qualifying "extraordinary event."

56.    The references to "government restrictions" and "suspension of trading" are also inapplicable. A "suspension of trading" is a well-defined term of art in the financial industry; it does not refer to an insolvency proceeding by a specific company. Instead, a suspension of trading typically refers to actions taken by regulators or securities exchanges to temporarily prevent trading in the securities of a specific company or securities index.[28] Any effort to expand this phrase to encompass an insolvency proceeding would unduly stretch the natural meaning of a widely understood financial term. An insolvent debtor under the protection of English (or U.S.) insolvency laws is not "suspended" from "trading." Nor do any claims against LBIE or LBHI constitute "losses caused by" the fact that such entities were supposedly

---

[28] *See* BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "suspension of trading" as "the temporary cessation of all trading of a particular stock on a stock exchange because of some abnormal market condition"); Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, § 12(k) (authorizing the Securities and Exchange Commission, if "in its opinion the public interest and protection of investors so require" to summarily a) "*suspend trading* in any security . . . for a period not exceeding 10 business days," and to b) "*suspend all trading* on any national securities exchange or otherwise . . . for a period not exceeding 90 calendar days") (emphasis added); 17 C.F.R. § 240.12d2-1 (regulation permitting a national securities exchange to "*suspend from trading* a security listed and registered thereon in accordance with its rules") (emphasis added); NYSE, *Listed Company Manual,* § 801.00 Policy (2016) (stipulating that "securities admitted to the list may be *suspended* from dealings or removed from the list at any time that a company falls below certain quantitative and qualitative continued listing criteria") (emphasis added); Patrick McGee, *China's market frozen after 7% fall*, FINANCIAL TIMES, (Jan. 4, 2016), https://next.ft.com/content/0e93d8d7-0c00-34f0-bf53-98e29cb6aba5. ("Trading on China's stock market finished early on Monday after heavy losses triggered a new 'circuit breaker' mechanism," resulting in a "5-minute *trading suspension* for all shares and index futures in Shanghai and Shenzhen if the CSI 300 index falls by at least 5 per cent.") (emphasis added); Thomas Hale, *Shares briefly suspended on biggest FTSE fallers*, FINANCIAL TIMES (Jun. 27, 2016), https://next.ft.com/content/1030d7bd-7c82-3778-bee2-709781ad2288. ("RBS and Barclays have seen *their shares briefly suspended* this morning as another nervy day of trading grips investors in the aftermath of the country's Brexit vote.") (emphasis added).

"suspended" from the right to "trade." No "trade" by Lehman or by Maverick would have prevented such "losses," and the claims were therefore not "caused" by any "suspension of trading."

57.    LBHI's invocation of the "government restrictions" clause is problematic for many of the same reasons. In the first place, if the word "laws" had in fact been intended, it surely would have been used (as it is elsewhere in the agreement). Furthermore, the clause precedes the phrases "exchange or market rulings" and "suspension of trading," indicating that, like these surrounding phrases, the types of restrictions the parties had in mind were those that might be implemented by a third party (*e.g.*, a government regulator) in the future (as opposed to already existing laws). Indeed, read in context, it is clear that the type of government restrictions that the parties had in mind were restrictions that would impede Lehman's ability to execute customer trades or otherwise interfere with its operational obligations to prime brokerage customers. The provision was intended to protect the Lehman entities from liability with respect to specific orders or actions, not to excuse them, in toto, from honoring their statutory and contractual obligations to return assets to their customers.

### 3) The Force Majeure Clause Was Not Intended to Prohibit the Assertion of Claims in a Chapter 11 Proceeding.

58.    Indeed, to classify an insolvency proceeding as a "suspension of trading," a "government restriction," or an event "beyond the control" of the Lehman entities, and to then claim that the very occurrence of such a proceeding was intended to exculpate LBHI from all obligations to honor allowed claims under the Guarantees, is absurd. LBHI is effectively arguing that it could never be liable under the Guarantees for amounts in excess of what can be recovered by creditors in the bankruptcy of a primary obligor, raising the question of why the guarantees ever existed at all.

59.     If the parties had intended that a bankruptcy by a primary obligor would act as a total prohibition on asserting claims under the Guarantees, they surely would have said so much more directly.  LBHI's proposed application of the Force Majeure Clause would turn the Guarantees on their head, converting a bankruptcy filing by the entity that held the assets of Lehman's customers into an excuse for not honoring the Guarantees, when the possibility of such a bankruptcy was surely the primary reason the Guarantees were demanded in the first place.

60.     Putting the question beyond any doubt, the LBHI Guarantee expressly states that it will continue "in full force and effect" in the event that a primary obligor such as LBIE becomes subject to a chapter 11 or foreign insolvency proceeding, making it unmistakably clear that the parties agreed that an LBIE insolvency would be one of the circumstances in which the LBHI Guarantee would be triggered.  Indeed, the LBHI Guarantee expressly states that LBHI would be liable, as guarantor, for any payments that were clawed back as preferences or fraudulent transfers in connection with an LBIE insolvency proceeding.  Any payment that was received by Maverick and then clawed-back as a preference or fraudulent conveyance would certainly have been a "loss" arising as a result of an insolvency proceeding.  Thus, by making it expressly clear that such avoided payments would need to be satisfied by LBHI as guarantor, the LBHI Guarantee is clear on its face that either the Limiting Clauses do not contemplate an insolvency proceeding as the type of event that falls within their scope, that LBHI cannot invoke such Limiting Clauses to escape its guarantee obligations, or both.

**b.     The Trading Error Exculpation Clause Does Not Apply**

61.     LBHI's arguments concerning the applicability of the Trading Error Exculpation Clause are similarly flawed.  Read in context, this clause was clearly intended to limit Maverick's ability to pursue claims based on specific types of operational errors or for

specific types of damages. It simply is not reasonable to read the provision as a wholesale restriction on the ability of prime brokerage customers to make a claim for the return of their custodied assets. An analysis of the language of the clause, which has three parts, further supports this conclusion.

62.     The first sentence of Section 29 disclaims liability for "the execution, handling, purchasing or selling of securities, commodities, or other property, or other action, except for gross negligence or willful misconduct on Lehman Brothers' part." This sentence plainly has no application here, because the Maverick Entities are not making a claim based on the manner in which LBIE dealt with trading orders or other operational matters, which is clearly what this provision addresses.[29]

63.     The second and third sentences of Section 29 disclaim liability arising as a result of the fact that "certain securities may be held outside the United States by unaffiliated, foreign agent banks and depositories." The Maverick Entities do not assert that any special damages or liabilities arose as a result of any such arrangements.

64.     Finally, the last sentence of Section 29 disclaims liability for "special, indirect, incidental or consequential damages arising out of this Agreement." The Maverick Entities are not seeking any such damages, and LBHI does not appear to contend otherwise (nor could it). The Maverick Entities are seeking to enforce a straightforward claim for the return of

---

[29] Nor can LBHI avoid this reading by attempting to construe the words "or other action" out of context and in a wildly overbroad manner, because to do so would be to make superfluous all of the preceding words, which would be rendered redundant if "other action" included all actions of any sort whatsoever, regardless of whether they related to the handling of securities. Furthermore, even on such a hyper-literal reading, LBHI could not escape liability, because the Maverick Entities are asserting a claim based on inaction (*i.e.*, the failure to return custodied assets upon request), rather than upon any affirmative action that resulted in or caused a loss.

their property and a related guarantee of that obligation. This request does not constitute a demand for special damages of any kind.

65.    In short, none of the provisions of Section 29 apply to any of the claims asserted by the Maverick Entities, and this is particularly clear with respect to the guarantee claims. Furthermore, for all of the reasons discussed in paragraph 60 above, the LBHI Guarantee is clear on its face that LBHI, as guarantor, is liable to make good any losses incurred in connection with an insolvency proceeding by a primary obligor (including losses attributable to avoidance actions). This clearly undermines LBHI's interpretation of Section 29, particularly with respect to the Guarantees.

### vi.    *Contractual Ambiguities Should Not Be Resolved in Connection With a Sufficiency Hearing.*

66.    Finally, if this Court were to conclude that there is any ambiguity with respect to the meaning of the Limiting Clauses, such ambiguity should not be resolved, and such provisions should not be adjudicated, in the context of a sufficiency hearing. Instead, the Court should afford the parties an opportunity to offer evidence of the parties' intent that might assist in the appropriate construction of the disputed contractual language.

### G.    LBHI's Interpretation of the NYUCC Is Incorrect.

67.    LBHI appears to take the position that the NYUCC somehow excuses it, both as a primary obligor and as a guarantor, from its obligations related to the return of cash and securities upon demand in light of LBIE's Administration Proceedings. The NYUCC does no such thing. LBHI cites to section 8-503, which sets forth state law (applicable non-bankruptcy law) rights that "entitlement holders" (*i.e.*, customers of broker-dealers) have in respect of assets that are custodied with "securities intermediaries" (*i.e.*, broker-dealers). Official Comment 1, to which LBHI also refers, contains the unremarkable observation that upon a failure of the broker-

dealer, the state law principles set out in section 8-503 would be superseded by the relevant

insolvency principles (*e.g.*, with respect to a registered broker-dealer in the United States, the

Securities Investor Protection Act of 1970). To state the obvious, section 8-503 only addresses

customers' claims and entitlements vis-à-vis a failed broker-dealer. It simply does not address

any claim such customer might have against a guarantor under a stand-alone guarantee.

68.    LBHI also cites to section 8-509(a), suggesting that because the estates of

LBHI and LBIE have been administered in accordance with the Bankruptcy Code and the United

Kingdom Insolvency Act 1986, respectively, the Maverick Entities' claims against the guarantor,

LBHI, based on sections 8-503, 8-506 and 8-508 "fail as a matter of law." If that were indeed

true, there would be no way for anyone to provide a meaningful guarantee to ensure the

performance of duties of broker-dealers, because they would be rendered worthless upon the

broker-dealer's insolvency. It would also be difficult to discern the policy intent behind such a

bizarre exculpatory provision. Fortunately, the Official Comment makes clear what section 8-

509 is intended to achieve, stating:

> This Article is not a comprehensive statement of the law governing the relationship
> between broker-dealers or other securities intermediaries and their customers. . . . This
> Article deals only with the most basic commercial/property law principles governing the
> relationship. Although [s]ections 8-504 through 8-508 specify certain duties of securities
> intermediaries to entitlement holders, the point of these sections is to identify what it
> means to have a securities entitlement, not to specify the details of performance of these
> duties.

In other words, section 8-509(a) recognizes that the standards set forth in sections 8-504 through

8-508 are general and high-level, and accordingly, contemplates that other more specific statutes,

regulations or rules would fill in any gaps. The statute thus contemplates an additive layer of

rules and regulations that would supplement and spell out in more granular detail a prime

broker's obligations concerning the proper handling of customer property (*e.g.*, the general

obligation to return cash and securities on demand), rather than a complete displacement of such

obligations.[30]    Furthermore, there is absolutely no suggestion in section 8-509(a), the
accompanying commentary, or elsewhere, that *guarantee* obligations relating to the broker-
dealer's basic obligation to return securities upon request would somehow be discharged simply
because a broker-dealer commenced and completed an insolvency proceeding.

### H. Maverick's Claims Are Not Untimely.

69.    The Maverick Claims were timely filed in advance of the bar date and the
Court should reject LBHI's various arguments that Maverick has untimely raised new theories.
The Maverick Claims provided considerably more detail than is required under Bankruptcy Rule
3001 and clearly placed LBHI on notice of the general size and nature of the claims asserted and
of Maverick's intent to hold LBHI liable for such claims.   9 COLLIER ON BANKRUPTCY ¶¶
3001.01, 3001-4-5 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.).   Maverick provided
LBHI with notice of its intention to hold it liable for amounts owed under the Prime Brokerage
Agreements, including to the extent that such amounts had been guaranteed by LBHI, and that is
precisely the claim that Maverick is now seeking to prosecute.

70.    By focusing on an additional guarantee (*i.e.*, the LBHI Guarantee) that
was not expressly named in or annexed to the proofs of claim,[31] the Maverick Entities, at worst,

---

[30] The unpersuasive nature of LBHI's argument is made all the more clear by LBHI's contention that
foreign laws can displace the most basic obligations under the NYUCC.  The notion that the New
York legislature, or the drafters of the UCC, intended that a *foreign* government could pass a law that
would eliminate the obligation of a U.S. law broker-dealer to return cash and securities upon a
customer request is absurd on its face. Yet this is what LBHI asks the Court to accept.

[31] LBHI also unpersuasively argues that Maverick's reliance on applicable provisions of the NYUCC
is untimely.  This, however, is not a "new" theory being raised by Maverick.  LBHI's statutory
obligations to execute trades or to return cash and securities on demand were always part-and-parcel
of its contractual obligations under the Prime Brokerage Agreements.  They are among the
obligations that LBHI accepted by agreeing to be Maverick's prime broker.  By putting LBHI on
notice that they intended to enforce all amounts guaranteed in connection with the Prime Brokerage
Agreements, the Maverick Entities were clearly asserting a claim for both contractual and statutory
obligations, which are in any event interconnected.

are providing additional detail or simply expanding on the theory of liability that was so clearly laid out in the original proofs of claim. Under these circumstances, there should be no need for amendment.[32] Decision and Order Denying Debtor's Omnibus Objection to Claims, *In re Tatro*, 12-21266-PRW (Bankr. W.D.N.Y. May 14, 2015) (creditor's failure to provide supporting documentation does not create an independent basis for debtor to object to proof of claim in light of existing disclosure).[33]

## I. Maverick's Other Guarantee Claims and Direct Claims Are Also Valid.

### i. *Maverick's Claims Under the Other Guarantees Are Valid*.

71.      Maverick's claims under all of the Guarantees are valid. Although this opposition has focused on the terms of the LBHI Guarantee, most or all of the same arguments apply with respect to the Board Guarantee and the S&P Guarantee. LBHI has not offered any reason why this would not be the case, and it has not otherwise objected to the validity of these Guarantees; Maverick's claims based on these guarantees should also survive a sufficiency hearing.

### ii. *Maverick's Direct Liability Claims Are Valid*.

72.      Maverick's claims based on LBHI's direct liability under the Prime Brokerage Agreements should also survive a sufficiency hearing. LBHI implies that it was not

---

[32] To the extent that LBHI is raising the mere technicality that the LBHI Guarantee was not originally annexed to the proofs of claim filed by the Maverick Entities, existing authority in this district clearly provides that amendment to allow attachment of a document should be freely granted where the nature of the claim has been adequately disclosed. *See In re Feinberg*, 442 B.R. 215 (Bankr. S.D.N.Y. 2010).

[33] If the Court has any doubt as to the adequacy of the original proofs of claim, Maverick should be afforded an opportunity to seek leave to amend. Maverick expressly reserved the right to amend the Maverick Claims. *See* Maverick Claims at ¶ 7. The only circumstance in which bankruptcy courts in this district commonly deny leave to amend is one where a creditor seeks to introduce a "wholly new claim or theory of liability based on different facts." *In re Alexander's Inc.*, 176 B.R. 715, 723 (Bankr. S.D.N.Y. 1995). That is not the case here.

liable under the Prime Brokerage Agreements even though it was a party to such agreements, but such an argument is inconsistent with well-settled New York law bearing on this issue.[34]

73.    As claims filed against a chapter 11 debtor, Maverick's direct claims are subject to calculation in the same manner as the guarantee claims, and will generate the same result. Because LBHI was a co-liable party to the Prime Brokerage Agreements, the Maverick Entities can pursue the full amount of their allowed claims against such entities until they have received a single-satisfaction of the full amount owed to them. *See ¶¶ 23-25, supra*. LBHI cannot appeal to any rights of setoff, because no such rights were ripe, and in any event they were never exercised. *See ¶¶ 32-36, supra*. Section 562 would not alter the total amount that the Maverick Entities could receive by way of a distribution, and in any event, does not apply to the direct claims, because the Prime Brokerage Agreements are severable and were in any event never terminated with respect to LBHI. *See ¶¶ 37-44, supra*. For the reasons discussed above, the Limiting Clauses also would have no application to the direct claims, including because they were not triggered by a Lehman insolvency proceeding, and in any event were clearly not intended to prohibit a claim based on the right to demand that custodied property be returned to prime brokerage customers. [35]

---

[34] *Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.*, 802 N.Y.S.2d 411, 414 (App. Div. 2005) ("Settled rules governing the interpretation of contracts provide that when two or more entities take on an obligation . . . they do so jointly, and that words of severance are necessary to overcome this primary presumption."); *Schneider v. Bytner*, 481 N.Y.S.2d 777, 779 (App. Div. 1984) ("A contractual obligation entered into by more than one person is always presumed to be joint unless the contrary is stated."); *see also U.S. Printing & Lithograph Co. v. Powers*, 233 N.Y. 143, 152 (1922) ("It is a general rule so well established as not to require extended discussion that promises by two or more persons create a joint duty unless the contrary is stated. It is a general presumption of law that when two or more persons undertake an obligation they undertake jointly, words of severance being necessary to overcome this primary presumption."); *Alexander v. Wheeler*, 407 N.Y.S.2d 319, 320-21 (App. Div. 1978) (adopting the *U.S. Printing* rule).

[35] LBHI makes a peculiar argument that the very existence of the Guarantees demonstrates that the parties never intended LBHI to be directly liable under the Prime Brokerage Agreements. LBHI

## CONCLUSION

WHEREFORE, the Maverick Entities respectfully request that the Court reject the Maverick Claim Objection, and either allow the Maverick Claims against LBHI or schedule an evidentiary hearing with respect to such claims at some appropriate point thereafter consistent with the Court's calendar.

Dated:  New York, New York
        August 3, 2016

      SHEARMAN & STERLING LLP

      By: */s/* William J.F. Roll, III

      William J.F. Roll, III
      Randall Martin
      599 Lexington Avenue
      New York, New York 10022
      Telephone: (212) 848-4000
      Facsimile: (646) 848-7174

      Solomon J. Noh
      9 Appold Street
      London, EC2A 2AP
      United Kingdom
      Telephone: +44 20 7655 5000
      Facsimile: +44 20 7655 5500

      *Attorneys for the Maverick Entities*

---

reasons that this is so because it is impossible to guarantee one's own obligations. This makes no sense. LBHI guaranteed the obligations of all primary obligors other than itself. Moreover, it is neither prohibited nor unusual for an entity to act as both a guarantor and a primary obligor in a transaction or series of contracts, and that is what happened here.