Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 08-13555

5

6  - - - - - - - - - - - - - - - - - - - - - -x

7  In the Matter of:

8

9  LEHMAN BROTHERS HOLDINGS INC.,

10

11           Debtor.

12

13  - - - - - - - - - - - - - - - - - - - - - -x

14

15           United States Bankruptcy Court

16           One Bowling Green

17           New York, New York

18

19           July 25, 2016

20           10:03 AM

21

22

23  B E F O R E:

24  HON. SHELLEY C. CHAPMAN

25  U.S. BANKRUPTCY JUDGE

Page 2

1    08-13555-scc Lehman Brothers Holdings Inc.

2    Ch 11

3

4    EVIDENTIARY HEARING re Motion of Dr. Thomas Marsoner to Deem

5    Proofs of Claim to be Timely Filed [ECF #47589]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Beck, Sherri Breach and Jamie Gallagher

**Page 3**

1    A P P E A R A N C E S :

2    WEIL GOTSHAL & MANGES LLP

3        Attorneys for LBHI, as Plan Administrator

4        767 Fifth Avenue

5        New York, NY 10153

6

7    BY:  DAVID LENDER, ESQ.

8        JACQUELINE MARCUS, ESQ.

9        DENISE ALVAREZ, ESQ.

10       MAURICE HORWITZ, ESQ.

11

12   HOGANS LOVELLS US LLP

13       Attorneys for Movant, Dr. Thomas Marsoner

14       875 Third Avenue

15       New York, NY 10022

16

17   BY:  PIETER VAN TOL, ESQ.

18       M. SHANE JOHNSON, ESQ.

19

20

21

22

23

24

25

Page 4

```
 1                    P R O C E E D I N G S

 2              THE COURT:  How's everyone today?  All right.  I'm

 3      ready when you are.

 4              MR. VAN TOL:  Thank you, Your Honor.  Pieter Van Tol

 5      representing Dr. Thomas Marsoner.  If I could, I'd like to

 6      introduce my team for the Court.

 7              THE COURT:  Sure.

 8              MR. VAN TOL:  I'm joined by Shane Johnson, associate.

 9              THE COURT:  Hello.

10              MR. VAN TOL:  Christine Sipperman (ph), a summer

11      associate.

12              THE COURT:  Very nice.

13              MR. VAN TOL:  And our client, Dr. Thomas Marsoner.

14              THE COURT:  Hello, sir.  How are you?

15              MR. LENDER:  Good morning, Your Honor.  David Lender

16      from the law firm of Weil Gotshal & Manges for the Lehman

17      entities.  And I have with me my colleagues, Denise Alvarez --

18              MS. ALVAREZ:  Good morning, Your Honor.

19              MR. LENDER:  -- Maurice Horwitz --

20              MR. HORWITZ:  Good morning.

21              MR. LENDER:  -- and Jackie Marcus.

22              THE COURT:  Hello, Ms. Marcus.

23              Okay.  Opening statements or right to the testimony?

24      I've read your submissions and I'm absolutely prepared to

25      proceed how ever you'd like.
```

Page 5

1          MR. LENDER:  Your Honor, we would suggest going

2     straight to testimony.  Perhaps a summation would be more

3     helpful.

4          THE COURT:  All right.  So just to level set, we have

5     had a previous hearing on this claim.  And I determined that it

6     was necessary to make a threshold determination as a factual

7     matter of whether Dr. Marsoner was a known creditor of Lehman

8     Brothers.  That being said, as reflected in the pleadings,

9     there are many other issues that have also been raised

10    including the adequacy of the service that was affected by

11    Lehman on Dr. Marsoner at various addresses.  And also, there

12    is elements of this that seem to speak to the merits of the

13    claim.  And I just want to be clear that we are here simply to

14    determine the factual issue whether or not Dr. Marsoner was a

15    known creditor of Lehman.  But inevitably, I think, as

16    reflected in the papers, there's going to be some overlap with

17    the merits of the claim.  So I just wanted the record to be

18    clear that even though it will from time to time sound as if

19    you folks are talking about the merits of the claim, there is

20    no determination that will be made on that today.

21          All right.

22          MR. VAN TOL:  Thank you, Your Honor.  Dr. Marsoner

23    calls Ruggero Magnoni to the stand.

24          THE COURT:  Okay.  Very well.

25          Good morning, sir.  Would you raise your right hand,

Page 6

1    please?

2        (Witness sworn)

3             THE WITNESS:  Correct.

4             THE COURT:  Please have a seat.  Make yourself

5    comfortable.  If you'd like a break at any time, let us know.

6    If you'd like some water, tell Dr. Marsoner's counsel.

7             THE WITNESS:  Thanks, Your Honor.

8             THE COURT:  All right.

9             We're going to turn this air off so that I can hear

10   you better.  But if you become too warm, just let me know.

11            THE WITNESS:  Right.

12            THE COURT:  All right?

13            THE WITNESS:  Thank you.

14            THE COURT:  Okay.

15            MR. VAN TOL:  Thank you, Your Honor.

16   DIRECT EXAMINATION

17   BY MR. VAN TOL:

18   Q    Good morning, Mr. Magnoni, and welcome back to New York.

19   A    Morning.

20   Q    I'd like to start with some preliminaries.  And I'd

21   appreciate it if you could be succinct.  These will be broad

22   questions but if you could be brief, I would appreciate it.

23        When did you begin working at Lehman Brothers?

24   A    1977, February (indiscernible).

25   Q    And what positions did you hold at Lehman Brothers?

Page 7

```
1    A    Well, from the most humble to vice chairman of Lehman

2    Brothers in New York and in London.

3    Q    And you were vice chairman of which entity?

4    A    LBHI and LBIE.

5    Q    Did you have any other titles while you were at Lehman

6    Brothers?

7    A    Before -- yeah.  Managing director, chairman of

8    (indiscernible), head of several different roles that I had at

9    that -- over the years.

10   Q    And I'd like to hand you a binder of exhibits, if I could.

11        (Pause)

12   Q    Could you please turn to Exhibit 52 which would be the

13   first in your binder?

14            MR. VAN TOL:  And, Your Honor, that's the same as

15   Exhibit 52 in the trial binder.

16            THE COURT:  All right.

17            THE WITNESS:  All right.

18   BY MR. VAN TOL:

19   Q    And I'd like to draw your attention to the next to last

20   page.  It has a number at the bottom, Marsoner606.

21   A    601, 2, 3, 4, 5, 6.  Yeah.

22   Q    And if you're on the right page, it should say at the top,

23   "Senior Leadership".  Do you see that?

24   A    Yeah.

25   Q    Were you among those --
```

1          THE COURT:  I'm sorry.  I'm not with you.  Behind tab

2    52?

3          MR. VAN TOL:  Yes, Your Honor.  And it's the next to

4    last page on tab 52.  And the Bates number is Marsoner606.

5          THE COURT:  Oh, I see.  Thank you very much.

6          MR. VAN TOL:  You're welcome.

7    BY MR. VAN TOL:

8    Q    Were you part of the senior leadership, Mr. Magnoni?

9    A    Yep.  Yes, I was.

10   Q    And was Jeremy Isaacs (ph) part of the senior leadership?

11   A    Yes.  Let me find him but yes, indeed.

12   Q    And what about Vittorio Pignatti.  Was he part of the

13   senior leadership?

14   A    He was.

15   Q    And --

16         THE COURT:  I'm sorry, sir.  You -- in response to

17   counsel's initial question, you said you were a vice chair of

18   LBHI.

19         THE WITNESS:  Well, that's --

20         THE COURT:  Is that correct or LBI?

21         THE WITNESS:  No.  LBI, I think.  Yeah.

22         THE COURT:  That's a big difference.

23         THE WITNESS:  Yes.  We have too many of those that --

24   it's kind of -- I'm not sure if this is LBI -- right, is not

25   the holdings.

Page 9

```
 1              MR. VAN TOL:  And I can clarify, Your Honor.

 2   BY MR. VAN TOL:

 3   Q    Mr. Magnoni, were you an officer of LBHI?

 4   A    I think I was.  I'm not 100 percent sure.  Now I'm

 5   confused by looking at this.

 6   Q    But at least you were --

 7   A    Because we had so many of those -- do you actually know

 8   that --

 9   Q    I'm sorry, sir.  I asked you --

10   A    Have you researched that --

11              THE COURT:  Mr. Magnoni?

12              THE WITNESS:  I wouldn't know.

13              MR. VAN TOL:  It has to be your testimony.

14              THE COURT:  For better or worse, when a witness is

15   testifying, only counsel or I get to ask questions.  You do

16   not.

17              THE WITNESS:  I'm sorry.

18              THE COURT:  All right.

19              THE WITNESS:  I am not 100 percent sure.

20              THE COURT:  Very well.

21              THE WITNESS:  -- as to what -- if there was a BHI.

22              THE COURT:  Okay.

23              THE WITNESS:  LBI --

24              THE COURT:  This is not --

25              THE WITNESS:  -- and LBIE, yes.
```

1          THE COURT:  Okay.  This is not a memory test.  If you

2     know, you know; if you don't know, you don't know.  All right?

3          THE WITNESS:  Thanks, Your Honor.

4          THE COURT:  Okay.

5     BY MR. VAN TOL:

6     Q    So, Mr. Magnoni, Lehman Brothers Inc., what we call LBI,

7     that was a U.S. entity, correct?

8     A    Yeah.

9     Q    And was it common for members of the Lehman Brothers

10    senior membership to serve in multiple roles with different

11    Lehman entities?

12    A    Yes, it was.

13    Q    Are you currently employed?

14    A    By --

15    Q    By anyone.  Do you work currently?

16    A    No.  I'm not employed by anyone.

17    Q    Do you have any employment currently?

18    A    No.  I serve in many boards.  And I am chairman of an

19    advisory boutique in London but not properly an employee.

20    Q    And what's the name of that group?

21    A    M&M.

22    Q    And what -- could you tell the Court what M&M Capital is?

23    A    It stands for Magnoni and Marsoner.  It's a boutique

24    advisory firm registered with the FCA in the UK which allows us

25    to provide advice to companies as long as Brexit is not

Page 11

1   enforced all across Europe.

2   Q    And just so the record is clear, the Marsoner to whom you

3   refer is Thomas Marsoner.

4   A    Thomas Marsoner.

5   Q    And please also make sure that I've completed my question

6   before you answer even if it appears obvious.

7        What arrangement, if any, do you have with Dr. Marsoner

8   with regard to any profits or losses in connection with M&M

9   Capital?

10  A    We share a few costs like I think we have a secretary and

11  an office.  But the revenues and all the other (indiscernible)

12  costs are kept separate.  Under the UK law, that is possible.

13  Actually, we pay taxes on different amounts of profits as if we

14  were completely independent.

15  Q    If Dr. Marsoner were to recover in this case, would you

16  receive any benefit from such recovery?

17  A    No.

18  Q    How did you come to know Dr. Marsoner?

19  A    Dr. Marsoner was hired by Lehman's in '95 when I was one

20  of the senior managers of the banking business in London for

21  our European business.  And he came over from Salomon Brothers

22  with a group of his partners and associates to run the

23  Financial Institution's Group, which we call FIG, because we

24  were pretty weak on that role.  And so he stayed with us for

25  six years, if I will remember, and then he decided to go back

Page 12

1    to Austria to follow his family's business and his own personal

2    business.

3    Q    About what time was that?

4    A    I think it was 2001.

5    Q    And to your understanding, did Dr. Marsoner have any

6    relationship with Lehman after 2001?

7    A    Yes, he did.  We tried to maintain a close business, a

8    relationship with him as a firm because we were particularly

9    weak in the German-speaking world in Europe.  We've never been

10   very strong unlike Italy or other parts of Europe.  And Thomas

11   was important for us.  So we -- I actually personally, as I was

12   the head of the merchant banking area of the firm in Europe, I

13   tried to do a deal with them.  A (indiscernible) families did

14   business which was one of the largest deals in Austria.  And

15   the idea was to work together with Lehman's and Thomas' family

16   and buy out the average (indiscernible).  We ended up not being

17   successful but we worked quite a bit together at that part.

18        But I will try to (indiscernible) my firm.  We worked with

19   him and particularly, Vittorio Pignatti did engage Thomas

20   Marsoner's services for MMA deals.

21   Q    Are you aware of an advisory services agreement between

22   any Lehman entity and Dr. Marsoner?

23   A    I learned that as we went, I didn't see any -- all those

24   documents myself.  But I knew that he was working with us and I

25   guess he had a formal relationship with us.

Page 13

1  Q    If you could in your binder, could you turn to Trial

2  Exhibit 48?  It should be the next tab.

3  A    Yes.  I'm there.

4  Q    Hang on.  I'm -- make sure everyone can get there.  It's

5  tab 48.

6       Tab 48 is a 2004 advisory services agreement.  If you look

7  under paragraph 1 on the very first page, it refers to services

8  to be rendered by the consultant.  And if you look in the third

9  line down, it says "to assist Lehman Brothers in the Lehman

10  Group".  Do you see that?

11  A    Yes, I do.

12  Q    Now did you ever use the phrase "Lehman Group" when you

13  were with Lehman?

14  A    Well, (indiscernible).  I mean, legally, they don't have

15  any meaning but he was considered as the group of companies

16  under the same name.

17  Q    And did it include companies like LBHI?

18  A    Yeah.  I mean, one of the group of companies, yes.

19  Q    And did it include companies like LBI?

20  A    I don't know.  I think so but I can't really comment on

21  it.  It's the first time I see this agreement.

22  Q    In an earlier answer, you referred to Dr. Marsoner's

23  experience in the Austrian market.  Are you aware of any

24  expertise that he had in certain industries?

25  A    As I told you, he was very involved in our (indiscernible)

1   and financial institutions advisory and (indiscernible) to our

2   insurance, banks and all financial intermediaries.  But in the

3   German speaking world, we were kind of weak, so anything that

4   may -- might (indiscernible) there and he could have been

5   (indiscernible), we would have been grateful because there were

6   not senior people like him around on the ground there.

7   Q    Did that include or did the expertise include F1?

8   A    Well, F1, I think, was his (indiscernible) in terms of

9   (indiscernible) in life he was a metro head as we call them.

10  So he knew everything about Formula One.  We went to Monte

11  Carlo together in '98 and he knew everything about every car.

12  And so I thought he was very interested in it.  Then I learned

13  afterwards that his family also was very interested in Formula

14  One and so, you know, he kept a strong interest on it.

15  Q    Did you become aware at some point that Lehman held an

16  investment in F1?

17  A    Of course, I did.  I was responsible for it,

18  unfortunately, for a long time.

19  Q    And why do you say unfortunately?

20  A    Because we lent money to this German magnate called Kirch,

21  Leo Kirch, to his holding company who then had a number of very

22  large stakes in TV, in Germany and Austria.  ATV was what

23  became afterwards SKY or actually (indiscernible).  And

24  (indiscernible) the publisher and they just bought when we were

25  one of their bankers, they bought a large stake in Formula One,

1    I think 75 percent of it with most of the money coming --

2    almost all the money coming from a loan package provided by

3    Bayerische Landesbank, JPMorgan and us.  So I was the senior

4    man of that account.  So I was responsible for that loan which,

5    after a year and a half, went bust.  The guys couldn't serve us

6    the interest.  So we ended in the bankruptcy proceedings there.

7    Q    And about what time period was that, Mr. Magnoni?

8    A    I believe it was 2002.

9    Q    Now when, to your understanding, did Dr. Marsoner become

10   involved in the F1 investment.

11   A    He was called in by Vittorio Pignatti.  When the loan went

12   bust and Kirch went bust and we had to face the consequences of

13   a bad loan, and became from lender to Kirch became

14   (indiscernible) of the underlying security.

15   Q    And again, this is in the 2001-2002 time period?

16   A    Right.

17   Q    Okay.  And why did -- why, to your knowledge, did Mr.

18   Pignatti call on Dr. Marsoner?

19   A    Because nobody knew much about Formula One at the firm,

20   particularly in the States where Formula One was not well known

21   as an ongoing sport circuit while in Europe we were more aware

22   of it.  And I was asked to step out of the day-to-day team and

23   -- because I was spending too much time in Germany trying to

24   recover the loan and spend time basically -- I was asked to

25   spend more time in getting new business into the firm and

1    manage the firm's principal part.  So there was a new team

2    being formed slowly to try to get our money back.

3    Q    And what was -- to your knowledge, what was Dr. Marsoner's

4    role in that new team?

5    A    I think it was -- as he was residing and I think he was in

6    Austria at that time.  And Kirch was in Munich and most of the

7    events were Germany-centered at that point.  And he knew a lot

8    about Formula One.  I did Vittorio -- but I wasn't there when

9    he was hired back -- went to the only person in our senior team

10   who knew something about Formula One.

11   Q    I'd like to go back to something you said earlier which

12   was referred to the new team that was brought in.  Other than

13   Mr. Pignatti and Dr. Marsoner, who else was on that team?

14   A    I only figured that out afterwards in full.  But Peter

15   Sherratt certainly, who was on the senior legal counsel in

16   London.  I learned afterwards that Tom Bernard, the senior

17   fixed income office of the firm in New York was brought in.

18   Q    Could I stop you there again?  Was Mr. Bernard employed by

19   a U.S. Lehman entity to your knowledge?

20   A    I wouldn't know but I guess so because almost everyone in

21   Europe were employed by Europe.  And most of the U.S. guys were

22   employed by the broker dealer in New York or the other

23   subsidiaries.

24   Q    Are you aware of any advice that Dr. Marsoner gave to

25   Lehman in connection with the F1 investment?

Page 17

1    A    I think it was involved on a longer basis.  But I do not

2    know.

3              MR. LENDER:  Your Honor, objection.

4              THE COURT:  Just a moment, please.

5              MR. LENDER:  I just heard him say that he was not

6    involved anymore in 2002, so I'm not sure how he could be

7    testifying about what happened after he was no longer involved.

8    It would be hearsay or speculation or I don't know what it

9    would be.  But I don't think it's appropriate to ask him about

10   that.

11             THE COURT:  I agree.

12             MR. VAN TOL:  Well, Your Honor, to the extent that

13   Mr. Magnoni has developed personal knowledge after the fact, it

14   would be relevant.  And it doesn't necessarily have to be

15   hearsay.  He could have talked to Dr. Marsoner about things

16   that he -- that they both were aware of.

17             But I will move on.

18             THE COURT:  Very good.

19   BY MR. VAN TOL:

20   Q    Mr. Magnoni, what occurred with the F1 investment at

21   Lehman?  In other words, how did it develop over time?  I think

22   when we stopped our story, you had told us that Lehman had an

23   interest after the loan went bust, as you said.  What happened

24   next?

25   A    What happened is that from 2002 to 2005 --

Page 18

1          MR. LENDER:  Your Honor, at least we should lay

2     foundation for how he knows that.  Again, he's test -- he said

3     he was out of the loan completely in 2002.

4          THE COURT:  Yes.

5          MR. LENDER:  Now he's being asked to testify to what

6     happened to the loan after that.

7          THE COURT:  Exactly.  I think simply avoiding

8     formulating questions in terms of hearsay doesn't take care of

9     the problem of testimony about matters that occurred after the

10     witness was no longer involved.

11     BY MR. VAN TOL:

12     Q    Did you ever gain an understanding, Mr. Magnoni, about

13     what happened to the F1 investment?

14     A    Not the first-hand because we became --

15          MR. LENDER:  Objection, Your Honor.

16          THE COURT:  All right.  So the witness has now

17     confirmed that he doesn't have any first-hand knowledge of what

18     happened with the Formula One investment after he ceased being

19     involved.  So I don't think that this line of questions is

20     really appropriate.

21     BY MR. VAN TOL:

22     Q    Did you have any involvement with the F1 investment after

23     2005?

24     A    Not directly.  I was part of the management team of the

25     firm from the top floor.  And discussions took place, which I

1    was part of, of what to do, but I was not a direct decision

2    maker on that.

3    Q    But nonetheless, you participated in discussions where the

4    team was trying to decide what to do with the F1 investment.

5    A    I was a spectator when that decision was made because I

6    was still considered an integral part of the whole investment.

7    And I participated in those conversations, particularly Germany

8    (indiscernible) eyes of (indiscernible) Peter Sherratt.  But I

9    wasn't a decision maker.

10   Q    As an integral member of the team, did you come to an

11   understanding of what happened to the F1 investment?

12   A    Yes, in the sense that it was very public.  As you know,

13   CVC made an offer and bought the interest of the other banks

14   and even did not send or participate in the leverage buyout of

15   the company.

16   Q    Do you know why Lehman did not sell its interest?

17   A    I -- because they thought the price was too low.

18   Q    Any other reason?

19   A    We wanted to recover as much as possible and we thought

20   that that property had more value.

21   Q    And do you have an understanding of why Lehman thought the

22   property had more value?

23        MR. LENDER:  Again, Judge, I know he said he wasn't a

24   decision maker.  So it's -- I'm not sure he can testify to the

25   decisions.

1          THE COURT:  All right.  Well, the question is whether

2     he has an understanding.

3          MR. LENDER:  That's fine.

4          THE COURT:  So we'll hear what the answer is and go

5     from there.

6          THE WITNESS:  Your Honor?

7          THE COURT:  Yes, sir?

8          THE WITNESS:  One thing is not to be a decision

9     maker.  The other one is not to know what happened.

10         THE COURT:  Certainly.

11         THE WITNESS:  So if you ask me if I know what

12    happened, I'd answer honestly.

13         THE COURT:  Okay.

14         THE WITNESS:  So what happened is that I had

15    discussions on what to do with the different assets the firm

16    had inherited from not just this loan but the other loans

17    because we had over 500 million out to Mr. Kirch's group.  And

18    in the other properties which we could have come or would have

19    obtained as security to our loan, we let go and disposed of in

20    the bankruptcy proceedings.  And the firm elected not to

21    subscribe to the different solutions the Court in Munich had

22    proposed.  So we lost all our interest in those assets.

23         In Formula One, instead, it was decided to stay on

24    and not sell after a long conversation to which I happened to

25    have heard of and participated.  And I think the final decision

1   was refer to the U.S. as well.  And I think Mr. Fuld must have

2   been part of that because we discussed that in couple of

3   occasions.

4   Q    So one of the options that would be considered in 2005 was

5   to sell the F1 stake.

6   A    I did.

7   Q    And you mentioned earlier, Mr. Magnoni, that it was

8   determined that the F1 investment had value.  Do you know why

9   it was determined that the F1 investment had value?

10  A    What I know is that Thomas Marsoner sits as an advisor to

11  the firm.  (Indiscernible) value and that would be beneficial

12  to Lehman to keep it -- that stake.  He said it several times

13  to several people who were involved in that discussion

14  (indiscernible).  But I cannot tell you if that particular

15  advice was or not material in the decision of the firm not to

16  sell the stake to CVC.

17  Q    And that's because you weren't one of the decision makers,

18  correct?

19  A    That is right.

20  Q    But you were aware of the advice of Dr. Marsoner to

21  give --

22  A    I was.

23  Q    I'd like to shift gears a bit, Mr. Magnoni, and talk about

24  your experience with advisors like Dr. Marsoner.

25       To your understanding, was there a general rule of thumb

Page 22

1   as to how much advisors would be paid for their work?

2          MR. LENDER:  I mean --

3          THE COURT:  Yes.  I'm willing to let this move along.

4   But I find it difficult to see what the relevance is going to

5   be of anything that Mr. Magnoni has to say about agreements

6   that may have been in place with other advisors.

7          MR. SCHMIDT:  Your Honor, one of the things that has

8   been alleged by Lehman in this case is that not just that there

9   was no agreement but that there was no agreement to pay Dr.

10  Marsoner a ten percent fee.  Now to the extent they're alleging

11  that they've put that at issue and if there is a custom and

12  practice or there was a custom and practice at Lehman in 2005

13  to pay advisors ten percent

14         THE COURT:  Well, let me say --

15         MR. VAN TOL:  -- that's relevant.

16         THE COURT:  Let me say one thing which bears

17  repeating.  And the podium is in an unfortunate place.

18         MR. VAN TOL:  I'm sorry, Your Honor.

19         THE COURT:  I can't see --

20         MR. VAN TOL:  Let me move to the side.

21         THE COURT:  I can't see Mr. Lender.

22         MR. VAN TOL:  My apologies.

23         THE COURT:  It's very important -- and forgive me,

24  Mr. Magnoni.  I meant to point this out at the top.

25         This came out in reading your pre-hearing brief.

Page 23

1    Give me one moment.

2        (Pause)

3            THE COURT:  It's very important to not talk just

4    about Lehman.  In your pre-hearing brief, for example, you have

5    a defined term.  You say you're going to talk about Lehman

6    Brothers.  I'm trying to find it.  It might be in a footnote.

7    Yes.  Footnote 1 on page 2.  "Lehman Brothers" is used to refer

8    to Lehman Brothers generally as opposed to a specific Lehman

9    Brothers entity."

10            So it's very important when you're asking questions

11   that you're not asking questions simply about Lehman because,

12   as a legal matter, my view is that it matters what we're

13   talking about.  So if you could be a little more surgical in

14   your questions, I would appreciate it.

15            MR. VAN TOL:  Understood, Your Honor.  And that was

16   the purpose of finding out from Mr. Magnoni at the beginning

17   whether he was an officer at LBHI, whether he had any capacity

18   at LBHI.  So I will certainly narrow my questions to what he

19   knows about which entity --

20            THE COURT:  All right.  Well, I'll let you go a

21   little bit on this line but I do have a serious question about

22   the relevance.  But we can continue.

23            MR. VAN TOL:  And I will focus it, Your Honor, to

24   LBEL because the advisory agreements we've seen have been with

25   LBEL.

1        THE COURT:  Okay.

2    BY MR. VAN TOL:

3    Q    So, Mr. Magnoni, my question is were you aware of any

4    standard rate for advisors around 2005 who were working with --

5    or had contracts with LBEL?

6    A    Yes.  The idea was, as you know, to keep very senior

7    people involved without -- despite not being employed anymore

8    and the standard agreement was 10 percent of the firm's

9    revenues, including capital appreciation, or 20 percent of the

10   banking business with some negotiation possible if the

11   (indiscernible) was particularly small, so just of an

12   introductory nature.  And it was -- I can tell you about this

13   because we kept doing that also afterwards when I took our

14   people, Your Honor, to the (indiscernible) when we saved our

15   people and went to (indiscernible).  We kept the same

16   practices.  And I --

17   Q    And we should -- I'm sorry to cut you off, but in the

18   interest of time, let's focus on LBEL.

19        You mentioned in your answer, Mr. Magnoni, revenues.  What

20   did you mean by the term revenue?

21   A    Investment banking revenues is what the firm -- you got

22   assigned to the investment banking division as their assigned

23   portion of the total revenues of the firm.  And depending on

24   the product and the type of relationship varied, but, in

25   general, it used to be a JV approach between the different

Page 25

1   divisions of the firm to avoid any particular competition.  So

2   even if I introduce a client or my client did a fixed income

3   deal with the fixed income division banking, my division, would

4   still be a recognized, depending on the nature of the

5   transaction, a large chunk of the revenue so that I could pay

6   my people, have bonus pool and enlarged by that portion of the

7   fee.

8   Q    And did the 10 percent fee come out of revenues once the

9   transaction was consummated?

10  A    The 10 percent of banking would be after the -- a portion

11  of the (indiscernible) divisions.  So if there was a capital

12  gain, first would be divided between the divisions and then

13  would be part of banking.  Again, dependent on -- it depended

14  very much on the type of transaction.

15        To answer your question, 10 percent was standard as far as

16  I can tell --

17  Q    Okay.

18  A    -- and remember.

19  Q    And I'm not asking you about Dr. Marsoner in particular

20  because you weren't involved --

21  A    I wouldn't know.

22  Q    Now I'd like to shift gears and ask you about Dr.

23  Marsoner's residence, if you know it.  Do you know where Dr.

24  Marsoner lives?

25  A    At that time or now or what --

1    Q    At that time.

2    A    At that time, as I told you, we tried to do a deal,

3    Lehman's and Marsoner, on the (indiscernible) business in those

4    years subsequent to 2001.  And Dr. Marsoner was living in

5    Austria.

6    Q    And are you aware of any other addresses for Dr. Marsoner?

7    A    I guess he had a flat in London.

8    Q    And that was in 2005, 2006?

9    A    For the duration of our relationship, yes.

10   Q    And is that to this day to your knowledge?

11   A    No.  That I know now I think is more in the UK where, I

12   think, his kids go to school.  And Austria is still his place

13   of origin and I think he's there a lot.

14   Q    In your binder, could you turn to page -- or to Trial

15   Exhibit 50, 5-0?

16   A    Yes.

17   Q    Exhibit 50 is Dr. Marsoner's 2007 advisory agreement.  And

18   there's an address at the top in Innsbruck, Austria.  Do you

19   recognize that address?

20   A    Not really.  (Indiscernible).

21   Q    Do you have any reason to doubt that that's Dr. Marsoner's

22   address?

23   A    No.  Innsbruck, I think, is his family's origin.  And

24   so -- but I never used that address myself.

25   Q    At some point, Mr. Magnoni, did you become aware that Dr.

Page 27

1    Marsoner was seeking compensation for the advice he provided

2    regarding F1?

3    A    Yes.

4    Q    And did you become aware that Dr. Marsoner submitted a

5    claim in the proceedings involving LBEL in England?

6    A    Yes.

7    Q    And I'd like to turn in your binder to Trial Exhibit 27,

8    please, which is the next document.  Can you tell the Court

9    what this is, please?

10   A    It is my letter to the administrators confirming that what

11   Mr. Pignatti stated on the same day.  It was in accordance to

12   my collection.

13   Q    Why did you submit the letter?

14   A    I was -- well, I was asked by Dr. Marsoner but I thought

15   that it was a correct statement.  It was the truth.  So I had

16   no problem doing that.

17   Q    Are the statements in your letter true and accurate?

18   A    Yes, it is, indeed.

19          MR. VAN TOL:  Your Honor, we'll move for the

20   admission of Trial Exhibit 27 into evidence.

21          THE COURT:  All right.  What we customarily do is

22   hold everything until the end and then counsel confers and then

23   you'll give me all the exhibits you want entered into the

24   record at the same time.  All right?

25          MR. VAN TOL:  Will do so, Your Honor.  And we can

1   represent to the Court now that we have no objections to the

2   exhibits being offered by --

3            THE COURT:  Very good.

4            MR. VAN TOL:  -- Lehman in this case.

5            THE COURT:  Thank you.

6   BY MR. VAN TOL:

7   Q    Now, Mr. Magnoni, did you become aware that Dr. Marsoner

8   was submitting a claim in this proceeding in the U.S.?

9   A    Yes.

10  Q    How did you become aware of that?

11  A    He told me.

12  Q    About what time frame was that, do you recall?

13  A    Not exactly.  I don't remember.

14  Q    Let's look at a document and see if that helps.  If you'll

15  turn to the next document, which is Trial Exhibit 42 --

16  A    Yep.

17  Q    -- you'll see that this is a supplemental declaration of

18  Dr. Marsoner.  And your letter is the second one appended to

19  it.

20  A    Yep.

21  Q    And is that your signature on the letter, Mr. Magnoni?

22  A    Yes, indeed.

23  Q    Why did you provide the letter, this January 14th letter,

24  that's in Exhibit 42?

25  A    Because I thought it was a very proper thing to do and I

Page 29

```
 1    was asked to conform with that, believed in what I wrote, and I

 2    did.  So I wrote that letter.

 3    Q    And is everything in this letter true and accurate?

 4    A    Yes.

 5    Q    Is everything in this letter based on your personal

 6    knowledge?

 7    A    Yes, it is.

 8    Q    Did you receive a draft of the letter before you signed

 9    it?

10    A    I did.

11    Q    Could you turn to the next exhibit which is the last

12    exhibit in the binder, Trial Exhibit 64?  Does this contain the

13    draft that you received?

14    A    Yes, it does.

15    Q    It appears that you did not make any changes to the draft

16    letter.  Could you tell us why that is the case?

17    A    Well, because it's exactly what I felt.  It is exactly

18    what I think had happened.

19    Q    Did you -- do you recall sitting for a deposition in this

20    case, Mr. Magnoni, when you were asked questions by the Weil

21    Gotshal firm and by our firm?

22    A    I was, in London.

23    Q    So you've provided a deposition -- excuse me -- you

24    provided a letter in this case on behalf of Dr. Marsoner.  You

25    sat for a deposition.  And now you've traveled to New York to
```

Page 30

1    testify in this case.  Why have you gone to all that trouble?

2    A    I'm very attached to the truth.  Formula One was my

3    investment and it turned out to be a very -- a (indiscernible)

4    winner after many years of agony that I had to go through

5    because it looked like a bad deal.  Thomas helped getting these

6    results and I think it's only fair that be recognized.  And had

7    Lehman been still alive, I would have asked to be part of that

8    reward system.  But being an employee, I had no further claims

9    on it.

10   Q    Are you receiving any compensation for testifying today?

11   A    Not at all.

12   Q    Do you bear any hostility towards Lehman?

13   A    I love Lehman.  Forty-one years of my life.  It has been

14   the most excruciating pain seeing it go under.  So I don't.

15   Q    I'd like to conclude, Mr. Magnoni, by asking you what you

16   about what you did to prepare for today's testimony.  Could you

17   tell the Court briefly what you did to make yourself prepared

18   for today?

19   A    I did review some of our very small memories that we have

20   -- that I have at home from those days.  And I reviewed my

21   declarations, my deposition and Thomas -- you guys' motion and

22   nothing else.

23   Q    Have you met me before today?

24   A    Not in person.

25   Q    Did you speak with me over the phone to prepare for

Page 31

1    today's testimony?

2    A    No, sir.

3    Q    Did you speak with anyone on my team to prepare?

4    A    No.

5         MR. VAN TOL:  Thank you, Your Honor.  Subject to any

6    redirect, that's all we have.

7         THE COURT:  All right.  Very good.

8         MR. LENDER:  Your Honor, Ms. Alvarez is going to

9    handle our cross-examination.

10        THE COURT:  Very good.

11   CROSS-EXAMINATION

12   BY MS. ALVAREZ:

13   Q    Good morning, Mr. Magnoni.  I just have a few questions

14   for you this morning.

15        It is your opinion that Dr. Marsoner should be paid for

16   his services on Formula One, correct?

17   A    Yes, it is.

18   Q    Because he provided some advice to Lehman.

19   A    Yes, it is.

20   Q    And, as you testified, advisors were typically paid a

21   success fee.

22   A    Yes.

23   Q    Now in this case, you know that Dr. Marsoner filed a claim

24   for payment for Formula One against Lehman Brothers Europe,

25   correct?

Page 32

1    A    Yes.

2    Q    Lehman Brothers Europe was the counterparty to Dr.

3    Marsoner's advisory agreement?

4    A    I guess so but I don't know if it was the only one.  But

5    if you say so, yes.

6    Q    Well, you submitted a letter -- I believe you testified

7    you submitted a letter in support of the claim in the UK

8    insolvency proceedings?

9    A    I did.

10   Q    Because you believe Marsoner should be compensated for

11   Formula One.

12   A    Yes.

13   Q    And Marsoner asked you to submit the letter.

14   A    Yep.

15   Q    You know that Dr. Marsoner settled his claim and was paid

16   by Lehman Brothers Europe, correct?

17   A    I learned that not a long time ago.

18   Q    I'm sorry?

19   A    I only learned that three months ago.

20   Q    Okay.  But you know he was paid by Lehman Brothers Europe.

21   A    Yes, I know.

22   Q    Advisors typically executed consulting agreements with

23   Lehman covering the work that would be done for Lehman

24   Brothers?

25   A    Hard to say.  On some occasions but I would have to

Page 33

1    research where, you know, contracts expired and the

2    (indiscernible) grew as low in putting it back into shape.  It

3    happened to me afterwards at (indiscernible), for example.  And

4    also, some people who had oral agreements, handshakes, which

5    we, at Lehman Brothers, respected if obviously success was.

6    So, yes, in principle, you're absolutely right.  But there are

7    some opportunities, occasions, where things didn't work that

8    way.

9    Q    Okay.  And when you negotiate these agreements -- and

10   these agreements -- when Lehman entered into these agreements,

11   these agreements typically identified how much the consultants

12   would be paid.

13             MR. VAN TOL:  Objection, Your Honor.  Now --

14   A    Sorry.  I didn't --

15             THE COURT:  Hold on.  Yes?

16             THE WITNESS:  I didn't -- sorry --

17             THE COURT:  Hold on, Mr. Magnoni.  I need to hear

18   what the objection is.

19             THE WITNESS:  Sorry --

20             THE COURT:  -- before you continue.

21             THE WITNESS:  Your Honor.

22             MR. VAN TOL:  Once again, the question was Lehman.

23   So it was not targeted to any entity.  So I don't mean to be

24   invoking the goose versus gander rule but I think --

25             THE COURT:  You are.

Page 34

1          MR. VAN TOL:  -- I am, actually.

2          THE COURT:  Very much invoking.  I was about to

3  invoke the goose for the gander rule.  So I think you can try

4  to be more specific, Ms. Alvarez, or to the extent that the

5  witness has knowledge generally, we can hear that as well.

6          MR. VAN TOL:  Thank you.

7          THE COURT:  All right?  Thank you.

8  BY MS. ALVAREZ:

9  Q    When Lehman Brothers Europe entered into the advisory

10 agreements, those agreements identified how much the

11 consultants would be paid?

12 A    Yes.

13 Q    You didn't negotiate any of Dr. Marsoner's agreements with

14 Lehman Brothers Europe, correct?

15 A    No, I did not.

16 Q    You don't know whether Lehman Brothers Europe retained Dr.

17 Marsoner for Formula One in any of those agreements?

18 A    I haven't (indiscernible) at the time of any of those

19 agreements but I knew because I used to speak to Thomas and

20 Pignatti and heard from Sherratt and Isaacs during those dense

21 days that Thomas was maintained as a consultant.

22      But it was also during the same time that we did a large

23 transaction with him called BAWAG.  And so, you know, Thomas

24 was an advisor to Lehman, a former Lehman employee who decided

25 to go back to Austria but it was in our interest to keep

Page 35

1    involved as much as we could to our business.

2    Q    Okay.  So then you don't know whether any of those

3    agreements between Marsoner and Lehman Brothers Europe covered

4    Formula One.

5    A    No, I do not know.

6    Q    In fact, you never discussed with Dr. Marsoner whether

7    Lehman ever agreed to pay him for Formula One.

8    A    Absolutely.

9    Q    You never asked anyone at Lehman whether Marsoner would

10   pay him for Formula One?

11   A    Not explicitly as you can imagine.  We all assumed that it

12   -- at that time, also very important to know that we were under

13   water.  We were losing money.  And the last thing we had in

14   mind is to pay or to discuss revenue sharing when we were

15   losing $500 million.  So we were panicking a bit and we were

16   trying to find what was the best way to get back in the black.

17        So -- but no, I never discussed if Thomas had officially

18   agreed to a sharing of any fees.

19   Q    Because at that time, I believe you testified, a new team

20   was created.

21   A    Say that again.

22   Q    A new team was created at that point to recover --

23   A    You know, it evolved from the front line bankers that was

24   me and Schmitz-Morkramer, Makram Azar, was a team of people

25   involved with me in the generation of the Kirch, the

Page 36

1    transaction.  When it unraveled slowly, the lawyers started

2    coming in to see what was the proceeding in Munich.  And then

3    the decision making what I'm going to do here, are we going to

4    let go, are we going to put more money, that became more and

5    more a decision to be taken away from the banking team.

6        So slowly, a new team emerged and I ceased to take full

7    responsibility for that account.

8        I cannot tell you whether it was just a decision -- I

9    don't think it was.  It was over a period of time, of months.

10   Q    Okay.  And then at that point, you testified that you were

11   no longer -- you were not a decision maker at that point in

12   time.

13   A    That is right.

14   Q    And because you were not a decision maker, you didn't know

15   what Lehman would agree to at that time.

16   A    I was not a decision maker of Formula One, day-to-day, but

17   I was part of the top management team of Lehman Brothers in

18   Europe.  Actually, my office was in between Jeremy Isaacs and

19   Peter Sherratt.  So it was -- you know, I was part in the day-

20   to-day conversation, what we're going to do here or there.  But

21   it wasn't my decision.

22   Q    Okay.  And just to be clear, you never discussed with Dr.

23   Marsoner whether Lehman ever agreed to pay him for Formula One

24   because you were out of that loop.

25   A    I never discussed with him because we don't discuss these

Page 37

1    things.  It's really an administrative issue and you don't talk

2    about those things.  But if you see somebody working day -- day

3    in, day out on something of that type, of that dimension, of

4    half a billion dollars being exposed to Kirch and be part of

5    the team, you assume that, like in all the other deals that

6    were done in Austria or witness to Marsoner, he was going to be

7    paid.  So --

8    Q    Okay.  I just want to be clear --

9    A    So it was an assumption.

10   Q    Okay.

11   A    I never discussed with him.

12   Q    Okay.  Because you were a bit out of that loop.

13   A    Perhaps.  Not necessarily just because of that.  Just

14   because we don't discuss necessarily these things.  Vittorio

15   Pignatti had hired him and I assumed that he had a valid

16   agreement.  Otherwise, why would he work, right?

17   Q    You --

18   A    You don't answer but that -- you wouldn't work if you

19   don't have an agreement, oral or written, that you're going to

20   get paid for your efforts.  So I was not the right person to

21   discuss because I was not the head of a department whose PNL

22   was going to be hit if there was a sharing with an outside

23   advisor.  Pignatti and M&A were the valid counterparty.  And I

24   never had to question any of his decisions.

25   Q    Okay.  Thank you, Mr. Magnoni.  I just have a few more

Page 38

```
 1    questions.

 2    A     Please.

 3    Q     You testified earlier that you submitted a letter to this

 4    Court in support of Marsoner's claim.

 5    A     Yes.

 6    Q     Dr. Marsoner sent you a draft of the letter?

 7    A     Yes, he did.

 8    Q     You reviewed the letter?

 9    A     Yes, I did.

10    Q     You signed it?

11    A     Yes.

12    Q     You didn't write the letter yourself, correct?

13    A     My secretary in Milan typed it.

14    Q     After reviewing Dr. Marsoner's draft.

15    A     Yes, indeed.

16    Q     And she made no changes.

17    A     No, I don't think so, no.

18    Q     You're currently in business with Dr. Marsoner, correct?

19    A     Well, in a way, yes.

20    Q     I believe you said the boutique was called M&M Capital?

21    A     Yeah.  But differently from what happens here, it is

22    called M&M Capital and should bear our names.  But we keep

23    totally separate accounts which is something very peculiar of

24    UK and I'm not sure it's done here.

25    Q     And M&M Capital was founded by Marsoner?
```

Page 39

```
 1   A    Yeah.

 2   Q    You're the vice chairman?

 3   A    I'm the chairman.

 4   Q    And M&M stands for Marsoner and Magnoni, correct?

 5   A    They're (indiscernible), yes, but it could be also

 6   anything else.  It's not specifically Magnoni and Marsoner

 7   (M&M).  It's M&M Capital.  And for us was Magnoni and Marsoner.

 8   Q    Okay.

 9   A    So our intention was.

10   Q    Okay.  Thank you.

11           MS. ALVAREZ:  Let me just check -- okay.  No further

12   questions.

13           THE COURT:  Thank you, Ms. Alvarez.

14           MR. VAN TOL:  No redirect, Your Honor.

15           THE COURT:  Very well.

16           MR. VAN TOL:  And we'd ask that the witness be

17   excused.

18           THE COURT:  All right.  Mr. Magnoni, thank you very

19   much.

20           THE WITNESS:  Thank you very much, Your Honor.

21           THE COURT:  Go out and enjoy this very hot day in New

22   York.

23           THE WITNESS:  Thank you.  Is this --

24           THE COURT:  You may be --

25       (Witness excused)
```

Page 40

1          MR. VAN TOL:  And, Your Honor, at this time, we call

2     Dr. Thomas Marsoner to the stand.

3          THE COURT:  All right.

4          Good morning, sir.  Would you raise your right hand,

5     please?

6       (Witness sworn)

7          THE COURT:  Very well.  Have a seat.  Make yourself

8     comfortable.  If at any time you would like a break, even if

9     the lawyers don't stop, simply let us know.  If you need some

10    water, I see some bottles sitting right over there.  All right?

11         THE WITNESS:  Thank you.

12         THE COURT:  Thank you.

13         MR. VAN TOL:  Thank you, Your Honor.

14    DIRECT EXAMINATION

15    BY MR. VAN TOL:

16    Q    Good morning, Dr. Marsoner.  You're currently employed at

17    M&M Capital, as we've heard, is that correct?

18    A    That is correct.  I am paid a salary there.

19    Q    And what arrangement, if any, do you have with Mr. Magnoni

20    with respect to profits and losses that come in to M&M Capital?

21    A    We share costs, regulatory costs, accounting costs and all

22    those on a 50/50 basis.  London office costs on a 70/30 basis.

23    Other than that, all costs are borne by the person who incurs

24    it.  And all revenues are earned by the person who earns them.

25    We have not have, at least not yet, a revenue item that would

Page 41

1   have been shared by us.  We keep those accounts completely

2   separately and every quarter, our accountants tell each of us

3   down to the penny what our equity in the business is.

4   Q    And to be clear, if you were to recover any sums in this

5   case, would any portion of it go to Mr. Magnoni?

6   A    No.  Not only not to Mr. Magnoni but also not even to M&M

7   Capital.  I'm here in my personal capacity.

8   Q    Let's talk about your employment at Lehman Brothers.  And

9   could you briefly tell the Court when you started working for

10  any Lehman Brothers entity and what your responsibilities were.

11  A    I started in July of 1995.  And I originally co-headed,

12  later headed, the Financial Institutions Group.  Later, was in

13  charge of all the industry groups in investment banking in

14  Europe.  In 2001, I resigned from my full-time position and

15  became a part-time senior advisor to the firm, to the Lehman

16  Group.

17  Q    Now in the 1995 to 2001 time period, which entity employed

18  you?

19  A    Forgive my hesitation.  Lehman -- and forgive me, Your

20  Honor.  Lehman acted so much as a one-firm entity where being

21  employed by any particular accounting entity was actually

22  fairly beside the point.  It is only now that I'm even able

23  from my later role on the LBEL committee, I think I was

24  probably employed by LBL, Lehman Brothers Limited.  I believe

25  that that was the employment services company under LBIE, the

Page 42

1    big European partnership.

2    Q    And while you were --

3              THE COURT:  Just to be clear for the clarity of the

4    record, when you say LBL, are you referring to the entity that

5    we call LBEL, Lehman Brothers Europe Limited?

6              THE WITNESS:  No, I do not.  I was definitely not

7    employed in my full-time employment by LBEL.

8              THE COURT:  Okay.  So say it again who your employer

9    was?

10             THE WITNESS:  I believe -- well, it was certainly a

11   subsidiary of LBIE --

12             THE COURT:  Yes.

13             THE WITNESS:  -- known as Libby in all --

14             THE COURT:  Libby, yes.

15             THE WITNESS:  -- these proceedings.  And I assume --

16   I do not know that for sure -- that the employment company was

17   probably LBL, Lehman Brothers Limited, not Lehman Brothers

18   Europe Limited.

19             THE COURT:  Okay.  Thank you.

20             THE WITNESS:  Definitely not the latter.

21             THE COURT:  Thank you.

22   BY MR. VAN TOL:

23   Q    And, Dr. Marsoner, when you were employed by LBL in the

24   period 1995 to 2001, what interactions, if any, did you have

25   with your counterparts in the U.S. entities at Lehman?

Page 43

1    A    I had daily interaction with them.  Lehman was run as a

2    fully integrated global firm.  In my case, that transcended all

3    the industry groups I was responsible for in Europe.  So I had

4    daily interactions with my U.S. colleagues.

5    Q    You brought us up before to the time period of February

6    2001.  And I believe you said after that, you became a senior

7    advisor.  How long did that role last?

8    A    The senior advisory role lasted for about seven and a half

9    years until Lehman left me in 2008.

10   Q    Who hired you in 2001?

11   A    In 2001, the signatory on the advisory contract, I

12   believe, was Dr. Rydevik who was the then co-head of European

13   investment banking.

14   Q    And in April 2001, did you have an understanding of what

15   your role was as a senior advisor?

16   A    Yes, a very clear understanding.  I had that discussion

17   with Bertil.  And the role was a transaction specific role

18   where I was going to be paid a small retainer fee as earnest

19   money.  And where in transactions I contributed to, I was going

20   to be paid 20 percent of investment banking fees which equate

21   in non-M&A transactions to 10 percent of firm revenues in all

22   transactions where I had significant involvement.  I still

23   remember the sentence Bertil ended that description with.  He

24   said, "And if you only read about a deal in your local gazette,

25   tell us about it and we make money out of it, then we will pay

Page 44

1    you five percent."

2    Q    You referred in an earlier answer to the contract that you

3    entered into.  I'd like you to turn -- let me give you the

4    binder.

5    A    Yeah.  I have -- oh --

6    Q    This is the subset we filed.

7         If you turn in your binder, Dr. Marsoner, to Trial Exhibit

8    16.

9         MS. ALVAREZ:  And for the record, Trial Exhibit 16 is

10   a compendium of the five --

11        THE WITNESS:  Yeah.

12        MS. ALVAREZ:  -- agreements.

13   BY MR. VAN TOL:

14   Q    Does Trial Exhibit 16 contain all the written agreements

15   that you have with Lehman -- any Lehman Brothers entity from

16   2001 to 2008?

17   A    I'm not sure it does.  I'm not sure it has them all.  I

18   see the '07 one.

19   Q    If it helps, they're --

20   A    Oh, yeah.  Now I see the '06.  Sorry.  It's two-sided.

21   Q    They're in reverse chronological order.

22   A    I see the '04, yeah.  Yeah.  Yes, I can confirm that.

23   Q    And what I'd like to do is draw your attention to the last

24   agreement in this group which is actually the 2001 agreement

25   which is on page Marsoner727.

Page 45

1        And is this the agreement that you entered into as your

2   first advisory agreement?

3   A     That is correct.

4   Q     I want to draw your attention to the first page under the

5   recitals.  And it says, "Lehman Brothers wishes to be able to

6   use the services of the advisor and to provide those services

7   to other group companies for the purposes of their businesses."

8        Do you see that?

9   A     Yes.

10  Q     At the time you executed this agreement, did you have an

11  understanding of what was meant by "other group companies"?

12  A     Absolutely.  It was The Lehman Group which was The Lehman

13  Group worldwide.  Wherever I could help them make money, they

14  were delighted to take it.

15  Q     At the time, were you ever told that you were restricted

16  to working only for Lehman Brothers Europe Limited?

17  A     Not at all.  I spent a lot of time working on the

18  situation for a Canadian company, for example, over the years.

19  So absolutely not restricted to only LBEL clients.  LBEL were

20  presented -- the worldwide Lehman Group and this contractual

21  relationship with me.

22  Q     You testified earlier about your compensation.  And if I

23  understood you, you received quarterly fees and then you were

24  also able to get success fees, is that correct?

25  A     Correct.

Page 46

1   Q    Do you have an understanding of which Lehman Brothers

2   entity paid your compensation?

3   A    It was Lehman Brothers Holdings Inc.

4   Q    Did you ever question why LBHI paid your compensation when

5   your advisory agreements were with LBEL?

6   A    I did not.  It seemed complete and natural for me that the

7   top company since I was working for the Lehman Group worldwide,

8   would also pay me.

9   Q    Over the course of the period 2001 to 2008, were there

10  ever instances in which you worked on transactions that were

11  not particularly set forth in an advisory agreement?

12  A    Oh, yes.  There were many of them.

13  Q    Could you give us an instance or two when that happened?

14  A    Well, for example, the Magna situation where I --

15  Q    I'm sorry.  Did you say Magna?

16  A    Magna.  A Canadian company where I spent a lot of time

17  working on a whole number of possible assignments for Magna

18  were either the vast majority of them did not make into the

19  agreements or even all of them.  I do not know the precise

20  distinction but there were a lot of things in this business

21  that one works on for a long time.  And only when revenues

22  actually crystalize, when revenues actually become visible, is

23  it worth everybody's while to document them in a formal

24  advisory agreement.

25  Q    Let me ask you about the Magna transaction.  Were you

Page 47

1   compensated for your work in connection with that transaction?

2   A    No, I wasn't because, at the end of the day, nothing ever

3   came to pass that Lehman made money on.  That's a separate

4   story.

5   Q    What was the time period of that transaction?

6   A    I would assume it was probably in the '05 time period,

7   give or take.

8   Q    Is there any other example of a transaction that you

9   worked on that was not covered specifically under an advisory

10   agreement?

11   A    Well, absolutely.  The largest Austrian transaction that I

12   worked on in my advisory years, which was the acquisition of

13   the Austrian bank, BAWAG, by the U.S. private equity firm

14   Cerberus, was never documented formally in any agreement.  And

15   it was a transaction which Lehman made close to $100 million

16   and I got paid certainly something like $7 million.

17            THE COURT:  So --

18   A    And that was never documented.

19            THE COURT:  -- the BAWAG transaction was never

20   documented as --

21            THE WITNESS:  The main BAWAG transaction was never

22   documented.  The ancillary -- there were about three

23   divestitures out of BAWAG.  That then -- those then were

24   documented.  But the acquisition of BAWAG by Cerberus on which

25   Lehman made a $14 million M&A fee and 50 million in financing

Page 48

1    and so on, that was never documented.  The only documentation

2    that exists is literally an e-mail by Graham Wilson (ph), the

3    administrator, setting out what my claim was and how I was

4    going to get paid under the established framework.

5    BY MR. VAN TOL:

6    Q    And what time period was the BAWAG transaction?

7    A    It was signed at the end of 2006 and it closed in May

8    2007.  I was paid in June 2007.

9    Q    And how was your compensation fixed?  You referred to

10   it -- I think you said you were paid $7 million.  How to your

11   understanding was your pay determined?

12   A    Well, that's for the whole group of transactions.  I think

13   the Lee acquisition transaction itself -- somewhere in the

14   exhibits we have that term sheet, that spreadsheet from Graham

15   Wilson. I was paid the usual 20 percent of the M&A fee.  And I

16   was paid 10 percent of the firm revenues around financing.  And

17   I was also paid 10 percent while the firm revenues around two

18   principal gains.

19   Q    With whom did you work on your BAWAG transaction?

20   A    On the BAWAG transaction, I worked with Christian Meissner

21   the then head of European investment banking, Michael Bonacker,

22   the head of German investment banking, and Biergen Krieger, a

23   senior M&A guy.  The reality was that that's a transaction I

24   lived for about a year of my life and so I spent most of my

25   time working directly with the Cerberus team.

Page 49

1   Q    Over the course of the time period 2001 to 2008 when you

2   were an advisor, did you have any opportunity to interact with

3   anyone from a Lehman U.S. entity?

4   A    As an advisor of Lehman U.S. entity, yes, of course.  I

5   had lots of interactions with people from Lehman U.S. entities.

6   The one that, of course, immediately comes to mind is with

7   Jonathan Rouner who then held the industrial automotive brief

8   at Lehman on Magna International, the Canadian auto parts

9   company.

10  Q    Let me start you there.  When you say Lehman, was he at

11  LBI?

12  A    He was absolutely employed at LBI, yes.

13  Q    Okay.  Please continue.

14  A    Sorry.

15  Q    Nope.  Anyone else other than Mr. Rouner from a U.S.

16  entity that you worked with from 2001 to 2008?

17  A    Well, there was U.S. involvement to a degree in

18  absolutely, I think -- I think in absolutely everything I ever

19  worked on.  Specifically in Formula One, I've worked

20  particularly with Tom Bernard who was head of Lehman's credit

21  business who was put in charge of the Formula One workout.  And

22  with Tom, I originally had the discussions about the idea for

23  JPMorgan and Lehman to hire me jointly.  And I then had the

24  e-mail exchange that is part of the record on several

25  conversations, the critical time period in November 2005.

Page 50

1   Q    We'll come on to that, Dr. Marsoner.  Before that, I want

2   to ask you about any gaps among the agreements.  There are five

3   agreements from 2001 to 2008.  Was there ever a time period

4   when a written agreement had expired?

5   A    Yeah.  Simple mathematics suggests that five one-year

6   agreements cannot possibly cover a seven and a half year time

7   span.  So the period in which no technical agreement was in

8   force was nearly as prevalent as the time period when such an

9   agreement was in force.

10  Q    In those gap periods, did you provide any services to any

11  Lehman entity?

12  A    My services to Lehman and my relationship with Lehman in

13  those seven and a half years was completely seamless.  There

14  was no change whatsoever.  And the activity level and the

15  mutual work intensity based on whether the formal agreement

16  happened to be in place or not.

17  Q    How, if at all, were you compensated for those services

18  that you provided?

19  A    I beg your pardon?

20  Q    How, if at all, were you compensated for those services

21  that you provided?

22  A    Under the framework that was established from the outset

23  and that did not change in any of those five agreements, as

24  you've seen in BAWAG-Cerberus, I was just paid under the

25  established framework without it being in any of the individual

Page 51

1    formal agreements.

2    Q    And when you refer to the established framework, what do

3    you mean?

4    A    I mean the -- it boils down to 10 percent of revenues.

5    Q    I'd like you to turn to the next exhibit in your binder,

6    Dr. Marsoner, which is Exhibit 1, Trial Exhibit 1.  And you'll

7    see this is an e-mail from Mr. Pignatti to Jonathan Rouner.  I

8    think we established already that Mr. Rouner was an LBI

9    employee.  Do you have an understanding of what LBI was as of

10   2005?

11   A    What LBI was --

12   Q    Yes.

13   A    -- as of 2005?

14   Q    Yes.

15   A    It was the heart of Lehman Brothers.  It was the U.S.

16   broker dealer.

17   Q    Do you know why Mr. Pignatti is writing to the employee of

18   a U.S. entity regarding your compensation?

19   A    Absolutely.  I was working with Jonathan on actually a

20   number of Magna transactions.

21   Q    And do you see in the first line, Mr. Pignatti refers to

22   your contract expiring.  And he goes on to discuss fees for

23   projects that will take place after the expiration of the

24   agreement.  Is this sort of discussion consistent with your

25   experience at the time when there was no agreement in place?

Page 52

1   A     It was completely normal.

2   Q     Please turn to -- or go back to Exhibit 16.  Or actually,

3   I'm sorry, Dr. Marsoner, we covered it.

4         I'd like to move on to the F1 investment.  Briefly, could

5   you tell the Court how Lehman's interaction and involvement

6   with F1 began to your knowledge.

7   A     Yes.

8         I apologize but this is very important for me.  So, if I

9   may, I need to go back in time very quickly.  Jochen Rindt,

10  Austria's first Formula One champion who died in 1970, was one

11  of my uncle's closest friends.  Nikki Lauda, Austria's three-

12  times Formula One champion, was -- still is a reasonable --

13  reasonably good friend of my uncle.  Already in the 70s, when

14  my uncle sold Nikki his first racecar, when my father bought

15  Nikki's first company car, I was involved.

16        This was a -- so this essentially created a -- maybe it's

17  like you're ridiculous, but, to me, important.  Maybe you call

18  it petrol head, probably not correct term but it is something

19  I've been involved with all my life.  I think I know a lot

20  about.  And I think I, therefore, moving forward into the

21  relevant time period, suggested to Ruggero Magnoni that,

22  together with his close friend, Johann Ruppert, who then owned

23  the company called Rothmans which, in turn, was the main

24  sponsor of the Formula One team.  Williams would be a good idea

25  to go to the Monte Carlo Grand Prix and kick tires a bit.  We

Page 53

1    did that.  That is when Ruggero also met Bernie Ecclestone.

2    And that is also the time period when the fantastic deal Bernie

3    Ecclestone had done for himself on the back of Fia (ph) and the

4    other teams had become public.  It was clear it wasn't going to

5    be sustainable that way.  So it was clear that business

6    opportunities would follow from that.

7    Q    And Ruggero is Mr. Magnoni, correct?

8    A    Yes.

9    Q    Okay.  We've heard Mr. Magnoni talk about what happened

10   with the F1 loans.  I'd like to move forward to the time when

11   Lehman Brothers was a stakeholder in F1.  What, if any, role

12   did you play with respect to F1 in the 2001, 2002 time period?

13   A    Well, Vittorio Pignatti called me into his office, said

14   they'd like to intensify their advisory relationship with me.

15   And trusting that they wanted to see was whether it was

16   possible to retain me jointly with JPMorgan because the

17   American banks probably had fairly similar objectives while the

18   German bank, that I knew relatively well by Rische Landesbank

19   as well as Ecclestone and Formula One potentially had very

20   different objectives.

21        So the Lehman idea was to propose me to work for both the

22   American banks on the 17 percent stakes that they each held at

23   the time.

24   Q    Did that occur?

25   A    It did not.  JPMorgan decided that they did not require my

Page 54

1    services.

2    Q    Was that the end of your involvement?

3    A    Not at all.  In the meeting when Vittorio told me that

4    JPMorgan had passed, he asked me to stay on the case, keep him

5    involved, keep him informed and take it from there.

6    Q    Why did you not include the F1 transaction or advice in

7    your original agreement with LBEL?

8    A    As I said before, the time to include transactions in a

9    formal agreement was when revenues first crystallized, when

10   revenues were first become visible.  In Formula One, revenues

11   first became visible in 2012.  Until 2011, the head of CVC

12   testified under oath in court that he thought that the stake

13   might be worthless.  So it's only in 2012 that revenues first

14   became visible.  And at the time when such a transaction would

15   normally make it into an advisory agreement outcome.

16   Q    Did you ever indicate to Mr. Pignatti in any way that you

17   were offering your assistance on F1 for free?

18   A    Absolutely not.  Quite on the contrary.  And the whole

19   number of the 30 e-mails that I wrote over the three years that

20   I worked for him on this from 2002 to 2005 and very

21   specifically used words like my senior advice is and my senior

22   advice continues to be available.  So in many ways I confirmed

23   in a polite way that this was a completely normal fully paid

24   senior advisory relationship.

25   Q    Did anyone associated with any Lehman entity tell you that

Page 55

1   you should cease working on F1 because you weren't getting paid

2   for it?

3   A    Not at all.  Not at all.  And if this had been a pitch of

4   mine, I would have been told to leave them alone.  The reverse

5   happened.

6   Q    Let me ask you about that.  Were there ever occasions

7   where you offered services to Lehman and they said no thank

8   you?

9   A    Oh, yes, of course, there were.  Oh, yes, of course, there

10  were.

11  Q    All right.  Dr. Marsoner, let's turn to Trial Exhibit 18

12  in your binder.  It may be a few tabs over.  Trial Exhibit 18.

13  If you're on the right document, the top e-mail should be a

14  November 26, 2005 e-mail from Mr. Bernard to several people.

15  A    Yes, I can see it.

16  Q    Now the bottom e-mail is from you to Mr. Pignatti.

17  A    That is correct.

18  Q    Why did you send that e-mail?

19  A    I had been monitoring F1 developments and threats to the

20  value of the F1 stake for Pignatti for three years.  When

21  something as material as a new owner came up, it was my core

22  duty to immediately report to him what I thought the

23  implications of this would be.

24  Q    And which new owner are you referring to?

25  A    I'm sorry?

Page 56

1   Q     Which new owner are you referring to?

2   A     CVC.

3   Q     All right.  Just above the reference to CVC in that

4   e-mail, you say, "If this is the deal I suspect it is, my

5   senior advice is (strongly) against sowing up now."  Why did

6   you write that?

7   A     Because already the first -- already the first

8   announcement suggested to me that this deal was coordinated

9   quite widely within the F1 community so that it would take the

10  main risk out of the valuation of Formula One.  The main risk

11  for all those years have been that the series would split.  And

12  I (indiscernible) there that this was -- that this was probably

13  going to be a sale at the very low price.

14        An important component to that view of mine, as you see in

15  point 2 here, is that I had a very low opinion of the

16  Bayerische Landesbank management.  I had seen them do really

17  value destructive transactions in the past, so that first I

18  heard about this -- I immediately thought that this was

19  probably a very good deal for the buyer, a very bad deal for

20  the sellers.

21  Q     And that's the reference to (indiscernible)?

22  A     (Indiscernible).  Bayerische Landesbank, yes.

23  Q     Now in that first line that I read, you used the words

24  "senior advice".  Why did you use those particular words?

25  A     To just reconfirm that this is the continuing four fees

Page 57

1  advisory relationship that I've been working on for three years

2  and that was continuing with an important point here.  So I

3  just wanted to, in a polite way, make it clear that this was

4  continuing and as a professional as opposed to a social

5  conversation.

6  Q    In the paragraph that's next to last beginning with the

7  words "Needless to say", you say, "If a fresh base were

8  available to facilitate things here, mine continues to be

9  available for a very modest precision in LB's gain upon

10  eventual sale."  Do you see that?

11           THE COURT:  Just to be -- just for the sake of the

12  record, you misspoke.  So let's try it again.  "Needless to say

13  if a fresh base were helpful."

14           MR. VAN TOL:  I'm sorry.  I misspoke.  I apologize --

15           THE COURT:  You did.

16           MR. VAN TOL:  -- Your Honor.

17           THE COURT:  It's okay.  I just want the record to

18  accurately reflect what's written on the page.

19           MR. VAN TOL:  Thank you, Your Honor.

20           THE COURT:  Go ahead.

21  BY MR. VAN TOL:

22  Q    Dr. Marsoner, why did you refer to a fresh base there?

23  A    In this very high profile and interesting situation,

24  showing one's face also has attractions.  My role had been and

25  continued to be a pure behind the scenes advisory.  So what I

1   was offering here was to take it one step up and also involve

2   me in negotiations.  A little later, I even offered another

3   step up which is I was prepared to essentially front the

4   investment for Lehman that Lehman thought that they didn't want

5   it anymore.  Escalation II and Escalation III were never

6   accepted by Lehman.  But the basic advisory relationship that

7   have started when Pignatti first asked me to perform in '02

8   lasted all through certainty the end of 2005.

9   Q    And in that paragraph that I read, why did you say -- use

10  the words "continues to be available"?

11  A    Because it had been available for three years and it

12  continues to be available.

13  Q    Were you trying to alter the terms of your deal with --

14  A    Not at all.

15  Q    -- Lehman when you wrote this?

16  A    Not at all.

17  Q    If you see the e-mail above that is forwarded to several

18  people including Mr. Bernard.  Why did you do that?

19  A    Well, that's the e-mail two above.

20  Q    I'm sorry.  Two above.  Why, to your knowledge, was that

21  forwarded to Mr. Bernard?

22  A    Well, just to be very precise, the original e-mail when I

23  just sniffed something, I only wrote to Vittorio.  When I then

24  found out -- at least thought I found out through a

25  conversation with my uncle -- that Rondenes (ph) was also in

Page 59

```
1    favor of this transaction, that I personally also thought huge

2    because McLaren was the other main team in (indiscernible) for

3    the 20 years up to '05.  And McLaren was the leader of the

4    large group of teams that were threatening to split away.  So

5    when McLaren is in favor of the CVC deal, the longevity of the

6    Formula One business that used to be about one year at the time

7    or, at most, up to the end of the Concord agreement seven years

8    now had just become a normal corporate multi-year longevity.

9    That multiplied the value of the business.  So I felt that that

10   insight was so significant that I wrote not only to Vittorio

11   but also to Peter Sherratt and Tom Bernard who, to my

12   knowledge, were the three key guys on this.  And it was then --

13   it was then Tom Bernard who agreed with my assessment, wasn't

14   very firm on the spelling of McLaren, but he agreed that it's

15   huge.  And then and there, he takes my advice and says, I'm

16   only certain we're staying in.

17   Q    In the e-mail that begins with the words "QED", the second

18   paragraph says, "Hence, don't also panic."  What did you mean

19   there?

20   A    It had been absolutely public that Bayerische Landesbank

21   had sold and had sold cheaply by everything one had heard at

22   the time.  So I told him definitely stay in and even if

23   JPMorgan, who apart from with, all due modesty, my advice had

24   exactly the same information that Lehman had that even if

25   JPMorgan sells, Lehman should definitely not sell because of
```

Page 60

1   the very, very bad idea.

2   Q    Did you have an understanding as of November 26, 2005 that

3   Lehman was contemplating selling except one stake?

4   A    I actually did.  All the stakes that Mr. Magnoni mentioned

5   in his earlier testimony that were recovered out of the other

6   200 million that were lent to Mr. Kirch were let go in

7   bankruptcy cheaply.  Of the whole 500 million exposure to Mr.

8   Kirch, the only part that Lehman held onto was the F1 stake.

9   So I would like to just state for the record that JPMorgan and

10  Lehman had the same information on F1 except me.  Lehman itself

11  had the same information on the Kirch stakes except me.  And it

12  was only where those two intersected in F1 that Lehman actually

13  stayed in.

14  Q    Was the information that you provided publicly available

15  to your knowledge?

16  A    It became publicly available very soon thereafter.  I saw

17  a public statement by Rondenes confirming what I had heard from

18  my uncle before.  I don't know how soon but very soon

19  thereafter.

20  Q    What was your reaction when Mr. Bernard said in his e-mail

21  this is huge?

22  A    Let me see.  This is the e-mail that only --

23          THE COURT:  Let's be clear what the e-mail actually

24  says.  It doesn't say this is huge.

25          THE WITNESS:  Yeah.  He sent me a different one in

Page 61

1   which I believe he also said if true, it's huge.  This is an

2   internal one that I didn't actually see at the time.

3   BY VAN TOL:

4   Q   Okay.  Understood.  Let's move on to that then.  If you

5   turn to Exhibit 2 --

6        THE COURT:  Could you go back.  Could we stay on

7   Exhibit 18 for a moment?

8        MR. VAN TOL:  Certainly, Your Honor.

9        THE WITNESS:  Sure.

10        THE COURT:  Dr. Marsoner, where were you when you

11   sent the e-mail to Mr. Pignatti, Mr. Sherratt and Mr. Bernard?

12   Physically, where were you?

13        THE WITNESS:  I believe I was physically at my desk

14   in London at the time.

15        THE COURT:  In London.  Okay.  So could you look on

16   Exhibit 18, the second e-mail from the top.  So the e-mail from

17   you to Pignatti, Sherratt and Bernard has a timestamp,

18   Saturday, November 26th, 06.

19        THE WITNESS:  Yep.

20        THE COURT:  Is that -- Saturday, November 26,

21   06:57:35.

22        THE WITNESS:  Yep.

23        THE COURT:  So that would have been what time?

24        THE WITNESS:  That would have been --

25        THE COURT:  That would have been London time, 6:30

Page 62

```
 1    a.m.

 2              THE WITNESS:  It looks to me like --

 3              THE COURT:  Do you know if that's --

 4              THE WITNESS:  -- three minutes before 7 in the

 5    morning London time.

 6         (Pause)

 7              THE COURT:  All right.  Thank you.

 8    BY MR. VAN TOL:

 9    Q    If you go on, Dr. Marsoner, to Trial Exhibit 2 which is

10    next in your binder.

11              MR. VAN TOL:  Trial Exhibit 2, for the record, is an

12    e-mail exchange beginning on November 25th and ending on

13    December 1.

14    BY MR. VAN TOL

15    Q    If you look at the top e-mail, this is from you to Mr.

16    Bernard.  Do you see that?

17    A    Yes.

18    Q    And you're providing your phone number, correct?

19    A    Yes.  Yes.

20    Q    And you're responding to Mr. Bernard's request for your

21    phone number --

22    A    Correct.

23    Q    -- is that right?  Is that right?

24    A    Yes, that is correct.

25    Q    And did you and Mr. Bernard have a discussion about the
```

Page 63

1    advice that you had rendered in your earlier e-mails?

2    A    I beg your pardon.  I didn't --

3    Q    Sorry.

4    A    -- fully get that.

5    Q    My head was down.  I apologize.

6         Did you and Mr. Bernard have conversations about the

7    advice that you had provided in the earlier e-mails?

8    A    Yes, of course.

9    Q    Now what, if anything, did Mr. Bernard indicate to you?

10   A    He'd essentially, as I recall it, restated pretty much

11   what he had been writing in these e-mails.  And, of course,

12   probed me on a number of things on how certain I was, how -- by

13   then, for sure, I think, the McLaren statement was public

14   information.  So he -- you know, he asked me how durable I

15   thought that was.  I told him I thought very durable.  Those

16   kinds of things.

17   Q    Did anyone other than Mr. Bernard at any Lehman entity

18   indicate to you they did not find your advice to be valuable?

19   A    No.  On the contrary.  Everybody who was a recipient of

20   that advice has actually been kind enough to say that it was

21   very, very useful.  Even Mr. Sherratt.

22   Q    Now to your knowledge, was your advice relied upon when

23   the Lehman Brothers entity decided to reinvest in F1?

24            MR. LENDER:  Objection, Your Honor.

25            THE COURT:  Yes?

Page 64

1           MR. LENDER:  Foundation.  I don't know how he can

2   testify what --

3           THE COURT:  Yeah.  There was no foundation for that

4   question.  So you're welcome to try to lay a foundation.

5   BY MR. VAN TOL:

6   Q    Dr. Marsoner, did you ever come to learn whether your

7   advice was relied upon?

8   A    If one reads the two e-mails by Tom Bernard, who was the

9   key guy on this and particularly if one looks carefully about

10  he tells me that that's huge, that sort of stirs.  "We are

11  inclined to take your advice and stay in but we are still in

12  recovery mode.  Vis-à-vis me, he hedges the impact of the huge

13  nature of my advice.  And "huge" in this case is a

14  multiplication of the valuation.  And if you then look at how

15  he says that to his colleagues internally was no hedge, just

16  says I'm almost certain we're staying in, I'd submit to you

17  that this is the key guy on this deal --

18          THE COURT:  Where -- excuse me.  Where is the line

19  that says I'm inclined to take your advice.

20          THE WITNESS:  It's -- sorry.  It does -- in Exhibit

21  20.  The e-mail on 26 November 2005, at 16:22, which is sort of

22  on page 2 of that exhibit.

23          THE COURT:  Exhibit 20?

24          THE WITNESS:  Sorry.  It's called Exhibit -- well,

25  Exhibit 02.

Page 65

1          MR. VAN TOL:  02.  Exhibit 2.

2          THE COURT:  Okay.  And where is it?  I'm sorry.

3          THE WITNESS:  If you turn over and then I think the

4    Bates stamp is the page LEH0000215.

5          THE COURT:  I see it.  Thank you very much.

6          THE WITNESS:  There he says --

7          THE COURT:  I see it.

8          THE WITNESS:  Yep.

9    BY MR. VAN TOL:

10   Q    So let me ask you a question I asked --

11   A    Sorry.  If I could just -- because how certain are you

12   about the McLaren information, it shows you how McLaren really

13   meant nothing much to him then.  But he understands because he

14   misspells it completely.  Then he says that huge.  Then he says

15   Ecclestone and he get along well.  And then he says we're

16   inclined to stay your advice but we're still in this covering

17   mode.

18        In his internal e-mail, he's already spelling McLaren a

19   little bit better.  Still not perfectly.  And there's not

20   hedging how his -- he now says almost certain we're staying in.

21   So I think that alone shows how -- you know, various --

22   probably the central Lehman decision maker obviously racked to

23   my advice.

24   Q    Let's stick with what you knew in 2005, Dr. Marsoner.

25   A    Yep.

Page 66

1    Q    So on that page, LEH215, and the e-mail we were just

2    looking at, Mr. Bernard sent that to you on the same day that

3    your -- of your e-mail that was at almost 7 in the morning,

4    correct?

5    A    Let's see.  My e-mail's London time 7 in the morning.  And

6    I'm not sure what time zone the 16:22 is.  But he certainly

7    replied on the same day.

8    Q    And let me ask a question I asked you earlier.  What was

9    your reaction when Mr. Bernard wrote to you, "That's huge."

10   A    I was very pleased to get that.  My experience with many

11   colleagues at Lehman was that they were hedging and that they

12   were delighted to hold the credit.  Somebody who actually

13   replies in an e-mail this openly, you know, was pretty rare.

14   So I immediately thought that, number one, Tom Bernard is a

15   great guy; and number two, this is potentially a very valuable

16   e-mail which I will keep very carefully for very many years if

17   I have to.

18   Q    Did you have an understanding of what Mr. Bernard meant

19   when he wrote "We are inclined to take your advice"?  And what

20   I mean is, did you not have an understanding of what he meant

21   when he used the word "We"?

22          MR. LENDER:  Objection, Your Honor.

23          THE COURT:  Yes.  I'm giving you substantial latitude

24   but we are well beyond anything that is reasonable for this

25   witness to testify to.

Page 67

1          MR. VAN TOL:  I'll move on, Your Honor.

2          THE COURT:  Well beyond.

3          MR. VAN TOL:  Thank you.

4    BY MR. VAN TOL:

5    Q    Dr. Marsoner, did Lehman stay in?

6    A    Lehman stayed in.

7    Q    Did you ever learn which entity at Lehman reinvested in

8    F1?

9    A    Only many, many years later.

10   Q    When was that?

11   A    I believe in the course of the UK proceedings.

12   Q    And do you know a time, a year?  Was it 2012?  2011?

13   A    In 2012, I did not know who the precise Lehman entity was

14   that held the F1 stake.  It was in 2014 or 2015 in the course

15   of the UK proceedings but I became a bit more aware and I

16   believe it was only in the course of these proceedings that I,

17   for the first time ever, heard about the relationship between

18   LCPI, LBH, LBI around the holding and the management of the F1

19   stake.

20   Q    And to your knowledge, was the F1 investment also going to

21   be profitable?

22   A    To my documented knowledge, Lehman generally did net

23   revenues of more than $1.5 billion, more than half of which

24   already in cash today.

25   Q    When did you learn that?

Page 68

1   A      That I learned in the preparation for the UK proceedings

2   where I first -- well, first, I heard in 2012, in May of 2012,

3   about the Waddell & Reed, Blackrock, and Norwegian Fund

4   investment that put a value on F1.  Then recapitalizations also

5   became public knowledge.  My valued view evolved over time.

6   Originally, I thought they have made a billion.  Later on, I

7   realized it was a billion and a half.  And the moment I have

8   seen these revenues crystallize, I made my claim.

9            MR. VAN TOL:  Your Honor, I'm about to move on to a

10  new area.  May I request just a brief five-minute --

11           THE COURT:  Sure.

12           MR. VAN TOL:  -- bathroom break?

13           THE COURT:  Let's just talk a little bit about what

14  the rest of the day is going to look like.  How much longer --

15  how much more do you think you have?

16           MR. VAN TOL:  Half hour, Your Honor, at least.

17           THE COURT:  Half an hour.  Okay.  And let me -- Ms.

18  Alvarez, will you be doing the cross-examination?

19           MR. LENDER:  Your Honor, I'll be handling the

20  cross-examination.

21           THE COURT:  Okay.  And would you like to take a lunch

22  break in between the direct and the cross?

23           MR. LENDER:  Happy to, Your Honor.

24           THE COURT:  Okay.  So why don't we take a brief break

25  and then we'll go until you're finished with your direct and

Page 69

1    then we'll take lunch break.  And then you have no additional

2    witnesses, correct?

3             MR. VAN TOL:  That's correct, Your Honor.

4             THE COURT:  All right.  And then we're going to hear

5    two folks --

6             MR. LENDER:  Yes, Your Honor.  Both of our directs

7    are short.

8             THE COURT:  Okay.  All right.  Very good.  We'll come

9    back -- I can't see the clock very well.  We'll come back at

10   five minutes to the hour.  Okay?  Dr. Marsoner, you remain

11   under oath during a break and indeed during a lunch break.

12   You're not to discuss your testimony with anyone or be in

13   anyone's presence while they're discussing your testimony or

14   any aspect of this case.

15             All right?  Thank you.

16             MR. VAN TOL:  Thank you, Your Honor.

17             MR. LENDER:  Thank you, Your Honor.

18        (Recess from 11:47 a.m. until 12:00 p.m.)

19             THE COURT:  All right?

20             MR. VAN TOL:  Thank you, Your Honor.

21   DIRECT EXAMINATION (RESUMED)

22   BY MR. VAN TOL:

23   Q    Dr. Marsoner, could you turn to Exhibit 6 in your binder,

24   please?  It should be the next document after Exhibit 2.  I'd

25   like to draw your attention to the top e-mail dated July 4,

Page 70

1    2007 which is entitled "Thanks for the coffee".  Could you tell

2    the Court what this is?

3              THE COURT:  Where is this?

4              MR. VAN TOL:  Exhibit 6, Your Honor.

5              THE WITNESS:  This is an e-mail --

6              THE COURT:  6.  Thank you.

7              THE WITNESS:  This is an e-mail by me to Jeremy

8    Isaacs who, at the time, was the chief executive of the Lehman

9    Brothers businesses in Europe.  So I believe that that boils

10   down to LBIE as the top company that he was the chief executive

11   for.

12   BY MR. VAN TOL:

13   Q    And why are you writing to Mr. Isaacs?

14   A    He had kindly invited me for coffee after he had heard

15   that I have actually been the person who was central to the

16   BAWAG-Cerberus transaction.  And he actually also kindly asked

17   me whether I wanted to rejoin the firm on a full-time basis.  I

18   told him that I thought that was already doing plenty of stuff

19   for the firm so that there was no particular need for me to

20   rejoin on a full-time basis.  And then thought that I would

21   sort of summarize the key things I have been doing for him

22   which it looks like he had not been particularly clearly aware

23   of.  And obviously, number 3 was Formula One.

24   Q    When you say "Set out below is the best advice I gave LB

25   in all those years" to what are you referring?

1   A     That's what I meant.  The best advice I gave Lehman in all

2   those years.  And the human Piranha is Tom Bernard.  He

3   acquired the name in Michael Lewis' book, Liar's Poker.

4   Q     And what was the purpose of you telling Mr. Isaacs about

5   the best advice you had given LB?

6   A     I wanted to make sure that the people at Lehman who

7   ultimately would be the decision makers in terms of who would

8   get paid what out of it knew first-hand about my critical

9   involvement.

10  Q     And your July e-mail refers to BAWAG.  We talked about

11  that before.  Can you tell the Court how you became involved in

12  the BAWAG transaction?

13  A     I had watched the BAWAG situation for many, many years.

14  And when then BAWAG nearly went bankruptcy and the Austrian

15  trade unions sell, it was actually Lehman, specifically, I

16  believe, Michael Bonacker, who introduced me to Cerberus.  And

17  as a team, we thought about which horse we wanted to back.

18  Decided we were going to go with Cerberus and then spent pretty

19  much a full year working on that.

20  Q     And could you turn to the next exhibit which is Trial

21  Exhibit 20?

22  A     Yep.

23  Q     And in Exhibit 20, I'd like to draw your attention to the

24  very bottom e-mail --

25  A     Yep.

Page 72

1  Q    -- which is March 5th, 2007 at 2:40 p.m.  What was the

2  purpose of sending this email to Mr. Pignatti?

3  A    This was a small detail around the BAWAG acquisition.  I

4  got paid -- I knew I would be paid under the normal framework

5  for the M&A, the financing and the principal gains that were

6  made automatically.  There was one small ancillary matter which

7  was that the Lehman Brothers private equity fund also invested

8  150 million I think euros into BAWAG alongside Cerberus.  And,

9  you know, I thought that in that ancillary matter, I had also

10 been helpful.  And so, I was trying to get compensated for

11 that.  This failed and the person who decided that was Peter

12 Sherratt.

13 Q    Now to be clear, did you receive any compensation for

14 BAWAG?

15 A    I received, as you see on the Graham Wilson spreadsheet

16 that's here in the documents, some five million euros for the

17 M&A, the financing and the principal gains.  And I received

18 zero for the co-investment.

19 Q    Let's turn to the next exhibit which is 5, please.  I

20 think you just referred to it as the Graham Wilson --

21 A    Yeah.

22 Q    -- spreadsheet.  Now could you turn to that spreadsheet

23 which is on the second page of Exhibit 5?  And could you

24 explain to us what this shows?

25 A    Yes.  It -- there's one unrelated transaction but the four

Page 73

1    items called Cerberus-BAWAG show exactly what I just said.

2    Leverage financing fee.  So that was the fee for the loan that

3    Lehman gave was 22 million euros 50 percent of which would be

4    investment banking revenues of 11 million of which 20 percent

5    amounts to an amount due to me of 2.2 million in euros and the

6    rest is Forex.  Then on the M&A fee, the 14 million of which I

7    was entitled to 20 percent, gives me 2.8.  And then

8    importantly, for purposes of what we're discussing here today,

9    FEX hedging and (indiscernible) interest rate swap, these

10   relatively small numbers are the principal gains.  So all those

11   principal gains, first, they get split in half and then I get

12   20 percent of them which amounts to a small amount of money but

13   without any discussion.  A principal gain is part of it.  So if

14   you add all of that up, it's $6.9 million -- yeah, it's

15   actually $6.9 million for the acquisition of BAWAG by Cerberus.

16   Q    So when were you paid for your services in connection with

17   BAWAG?

18   A    Sorry?  Where was I paid?

19   Q    When.

20   A    In about June of 2007.

21   Q    And were you paid before or after the Lehman entity

22   received profits on the transaction?

23   A    I was entered after the transaction closed and after

24   Lehman actually had the cash in hand.

25   Q    And was BAWAG referred to in your 2007 advisory agreement?

1    A    No, it was not.

2    Q    Was it referred to in your 2006 advisory agreement?

3    A    No, it was not.

4    Q    And again, do you know why you were paid for that work if

5    it was not in your advisory agreements?

6    A    Because I was asked to perform the work.  I performed the

7    work.  It was successful.  It created significant money for

8    Lehman.  And with the framework agreement in place, there was

9    not a shadow of a doubt, not a question ever, that I wouldn't

10   be paid.

11   Q    Now who's Mr. Wilson?

12   A    He's -- or was the sort of main administrator of the

13   European investment banking department of, in that case, I

14   guess, LBIE.

15   Q    And in his e-mail, Mr. Wilson says "I am now authorized to

16   agree this with you".  Did you have an understanding that Mr.

17   Wilson needed authorization from someone else?

18   A    Well, any corporation before it pays out money has a whole

19   number of internal authorizations to obtain.  And so I assume

20   that he obtained whatever authorizations they internal Lehman

21   sort of, in my experience, Kafkaesque system made him obtain.

22   Q    And how, if at all, did the compensation you received for

23   Cerberus fit in with the framework that you've been describing

24   today?

25   A    Perfectly.  This is exactly the framework agreement which

Page 75

1   boils down to 10 percent of firm revenues except when it's M&A

2   when it's 20 percent.

3   Q    All right.  Dr. Marsoner, I'd like to talk now about your

4   addresses --

5   A    Sure.

6   Q    -- which have become an issue in this case.  Where do you

7   currently live?

8   A    At 20 Earls Terrace, London W8 during the school year.

9   Q    And where is your domicile if it's different from England?

10  A    My domicile is and has always been in Austria.  And the

11  Innsbruck address that I left with the UK tax authorities is

12  also the address that my first advisor agreement with LBEL had

13  and my last two advisory agreements.

14  Q    Have you ever had another domicile?

15  A    I've never had a domicile other than Austria.

16  Q    Did you receive notice of the U.S. claims bar date at

17  either your London address or at your Austrian address?

18  A    No.  I absolutely did not.

19  Q    Did you ever inform anyone at Lehman that you live in

20  London?

21  A    Did I ever inform anybody at Lehman that I live in London?

22  Q    Yes.

23  A    Certainly during my full-time years.  My London address

24  which was the flat before I bought the house was on all my pay

25  slips.  So that London address was certainly known to everybody

Page 76

1    at Lehman.

2            THE COURT:  Everybody at Lehman.  That's a very large

3    number of people.

4            THE WITNESS:  Sorry.  Everybody at Lehman who --

5    forgive me -- who would care to look at the records.

6    BY MR. VAN TOL:

7    Q    All right.  Did you ever inform anyone that you worked

8    with -- I want to limit it to the people you worked with.  Did

9    you ever inform anyone that you worked with that you live in

10   Austria?

11   A    My advisory agreements addressed to me in Austria

12   specifically cite my expertise in markets including Austria.

13   So from that alone, I believe it is very clear that my

14   counterparts knew that I'm an Austrian citizen.  Most

15   transaction I worked on have at least an Austrian aspect to

16   them.  So, yes -- yes.  Yes, of course.  It is to the best of

17   my knowledge very widespread knowledge at Lehman at the time

18   that I -- I am Austrian and spent some of my time in Austria,

19   some of m time in London, some of my time elsewhere.

20   Q    Could you turn to Trial Exhibit 31, please?  Just two

21   exhibits in.  Trial Exhibit 31 is an e-mail exchange.  The top

22   e-mail is August 9, 2010 and then there's some 2008 e-mails

23   below that.

24        Could you tell the Court what this is?

25   A    My LBI, to be very precise -- my LBI brokerage team, Jim

1    Puccirrelli (ph), Marion Maskowski (ph) and Fran Auer (ph),

2    during Lehman's lifetime, had arranged a $5 million U.S. Forex

3    collar for me.  And I had posted, since (indiscernible) on a

4    way a bit, I have to post collateral in a margin account.  So

5    the -- you see that the first e-mail is dated the 2nd of

6    October.  This is already two weeks after the bankruptcy.

7    Until then, what turns out to have been my contractual

8    counterpart, LBCC, was actually -- had actually not filed for

9    bankruptcy.  So I did get a little bit of my margin account

10   back in those two weeks.  And then LBCC presumably also filed

11   so I got nothing back anymore.  And then I sat on -- I was out

12   the margin and I wanted to make sure that if then for the

13   balance of the life of this collar it would move against me,

14   nobody could go after me since I was not able to re-hedge.  And

15   therefore, whether -- the bottom here, Jim, is a termination by

16   me of a collar for cause.

17   Q    Now let me ask you about the middle e-mail which is dated

18   October 27th from you to Allyson Carine at Barclays Capital.

19   First of all, why were you writing to Ms. Carine at Barclays

20   Capital?

21   A    Barclays Capital had bought LBI.  And for all intents and

22   purposes, were essentially -- yeah -- were the agents for LBCC

23   that technically LBI had been before.

24   Q    In the paragraph that's got a number 2 next to it, you

25   say, "When can I" -- or you say "When I can expect the sum U.S.

Page 78

1    $60,000 margin funds in this account back?"  Were you expecting

2    to get money back from LBCC?

3    A    In my -- in my naiveté U.S. bankruptcy matters, I did hope

4    that at some point and at some percentage, some of those 60,000

5    would come back, yes.

6    Q    And then you sign it.  And then beneath your signature is

7    an Innsbruck, Austria address.  Why did you include that

8    address?

9    A    This -- this is the most permanent address in my life.

10   It's the house where my grandfather lived, where my father and

11   my brother have offices.  It's basically the one building in my

12   life that has never changed which is why I designated it as my

13   domicile.  And since I felt that this would be a very long-term

14   thing, I made sure that the domiciliary address, the one where

15   things always can validly be served upon me, would be in the

16   records of my counterparty.

17   Q    Did you ever provide any addresses to any Lehman entity

18   that were other than the London Earls Court address and the

19   Austrian address?

20   A    Well, yes, of course.  In my invoicing policy, I used

21   addresses of where I happened to be for reasons of pure tax

22   cosmetics, not reasons of anything in any way dodgy under tax

23   law, as some seem to allege.

24   Q    Have you ever been accused by any authorities in the UK of

25   breaking UK tax law?

Page 79

1   A    I've not only not been accused, my tax matters in the UK

2   have been audited in microscopic detail for the years 2003 to

3   2009 and I had to submit documented calendars for six years.

4   It was a stack about this high.  It was boarding cards, hotel

5   bills and whatever else that documented that I was indeed

6   outside the UK for more than 180 days.  And as a result of that

7   audit that is complete, not only are all my UK tax matters

8   perfectly in order, I didn't have to pay anything in addition.

9   On the contrary, I actually got a withholding tax claim that I

10  have been claiming for a while back.  So the allegation that I

11  should have been in any way anything other than precise and

12  forthright on my tax matters is frankly offensive.

13  Q    So I've seen references in the documents to addresses in

14  Malta, Mexico and Italy.  Are you able to receive mail at those

15  addresses?

16  A    Absolutely not.  I happened to be there at the time when

17  the first invoices that I wrote were sent int.  And my

18  objective in using addresses of places where I happened to be

19  was to just make -- have the file precisely reflect the reality

20  that these were legitimate offshore transactions for me,

21  perfectly legitimate under UK tax law.

22  Q    From 2001 to 2008, did you ever receive any correspondence

23  from any Lehman entity at the addresses in Malta, Mexico or

24  Italy?

25  A    I do not believe so, no.

Page 80

1   Q    And after 2008, did you ever receive any correspondence

2   from any Lehman entity at those addresses?

3   A    Absolutely not, no.

4   Q    The last thing I want to ask you, Dr. Marsoner, is about

5   the claims that you submitted both here and in England.

6        Let's start with England.  Why did you submit a claim for

7   the F1 work in the English proceedings?

8   A    Because LBEL was my direct contractual counterparty.  LBEL

9   was working on behalf of the Lehman group worldwide and LB --

10           THE COURT:  When you say LBEL was your direct

11  contractual counterparty, which contract are you referring to?

12           THE WITNESS:  All the five.

13           THE COURT:  All the five that are --

14           THE WITNESS:  All the five one-year contracts --

15           THE COURT:  Okay.

16           THE WITNESS:  -- that cover the full seven and a half

17  year period.

18           THE COURT:  Okay.  Thank you.

19           THE WITNESS:  And LBEL was actually able to -- to pay

20  me on a Frankfurt fee that became due later.  So it was very

21  obvious that LBEL would be my first port of call.

22  BY MR. VAN TOL:

23  Q    And when did you settle your claim against LBEL?

24  A    I believe it was in June of 2014.

25  Q    Now at some point, you decided to turn to the U.S. and

Page 81

1    seek compensation here, is that correct?

2    A    That is correct.

3    Q    Why did you do so?

4    A    Because the main issue that I encountered in my UK claim

5    was that the profits were all in the U.S. so that the risk that

6    was made very clear to me was that I might well win the UK

7    proceedings but that then the UK companies would say, yeah,

8    great, but we don't have the money.  The money is in the U.S.

9    That became clear to me in June of 2014.  And I then saw -- it

10   hadn't been drafted by me.  It had been drafted by Linklaters

11   that the settlement agreement was very UK specific.  So when I

12   became aware of the settlement agreement being very UK

13   specific, I started talking to U.S. counsel.  I did not

14   actually go to Hogan Lovells first.  I tried the cheaper firm

15   first.  When the cheaper firm did not seem to be up to the

16   standards I had experienced from Hogan Lovells in London, I

17   then went to Hogan Lovells in New York.  And it was -- and it

18   was at that time that I first learned what bar date and bar

19   date notices means.

20   Q    You asked Mr. Pignatti, Mr. Magnoni and Mr. Bernard to

21   submit letters in these proceedings.

22   A    Yes, I did.

23   Q    Why did you do that?

24   A    Well, in the UK proceedings -- or in the U.S. proceedings?

25   Which is your question?

Page 82

1    Q    In the U.S. proceedings.

2    A    Okay.  In the U.S. proceedings, I asked Magnoni and

3    Pignatti because they had kindly done son in the UK

4    proceedings.  I asked Tom Bernard for a letter because there

5    was an e-mail by Peter Sherratt that contained a flat lie in

6    two respects.  He said in that e-mail, which is part of the

7    record here, that Christian Meissner and Tom Bernard agreed

8    that I have no claim.  So I had actually -- when I got that e-

9    mail -- Christian Meissner I know very well.  I called him

10   immediately and he told me that he had never said any such

11   thing.  On the contrary, he had said that -- this was before

12   his aegis.  He could say nothing about him.  And then I managed

13   through a mutual acquaintance to get to Tom Bernard and had a

14   discussion with Tom Bernard about whether he really thought

15   that that deserved nothing.  And on the contrary, he actually,

16   more weakly than Pignatti and Magnoni, thought that I actually

17   did deserve something and kindly enough wrote a letter in

18   support.

19   Q    Did you provide draft letters to any of those gentlemen?

20   A    Yes, of course.

21   Q    Why?

22   A    Well, it's quite an imposition to ask somebody for

23   anything and to make it as easy for them as possible is quite

24   natural.  And then I obviously asked my attorneys, i.e., your

25   colleagues, to provide drafts that made sense under U.S. law

Page 83

1   that made sense to me.  Those were then passed on to them with

2   the very specific statement to please mark them up how ever

3   they wanted because I wanted them to only write something they

4   truly believed in.

5          THE COURT:  I'm sorry.  Can I understand this?  The

6   draft letter --

7          THE WITNESS:  Yes.

8          THE COURT:  -- that was sent to Mr. Magnoni --

9          THE WITNESS:  Yeah.

10          THE COURT:  -- that was written by Hogan Lovells?

11          THE WITNESS:  Absolutely.  All three -- the first

12   drafts came from Hogan Lovells at my request.

13          THE COURT:  Thank you.

14   BY MR. VAN TOL:

15   Q    And, Dr. Marsoner, when changes were made to any of the

16   letters, did you object?

17   A    I accepted them.

18   Q    And are you aware of anything in the three letters to Mr.

19   Pignatti, Mr. Magnoni and Mr. Bernard that is in any way

20   untrue?

21   A    I'm absolutely not aware of anything that is in any way

22   untrue.  Already the drafts I submitted looked perfectly fine

23   to me.  Otherwise I wouldn't have submitted them.  But then, of

24   course, perceptions between human beings change.  And the

25   perceptions of the three people who kindly submitted those

Page 84

1   letters have to be the ones prevailing.

2   Q    Thank you, Dr. --

3   A    And I think, short of being -- I think with Bernard, I did

4   have one discussion about the order of his letter where I did.

5   So in one I may have misspoken slightly earlier.  I believe in

6   the Bernard exchange, he sent me a draft -- it's all in the

7   records anyway.  But saying something like does this work.  And

8   I said something like it doesn't really flow.  Can we please

9   change it around?  And we came to change it around.

10  Q    Did you try to persuade anyone to change any of the facts

11  that are in their letters?

12  A    Of course not.

13          MR. VAN TOL:  Thank you, Your Honor.  Subject to any

14  redirect, that's all we have.

15          THE COURT:  Thank you.

16          Give me one moment.

17      (Pause)

18          THE COURT:  Okay.  So I think this would probably be

19  a good time to take the break.  I had originally said an hour

20  but perhaps I could talk you into something shorter than an

21  hour because this is taking a longer time than I anticipated.

22  How do you feel about that, folks?

23          MR. VAN TOL:  We're happy coming back at 1 o'clock,

24  Your Honor.

25          THE COURT:  All right.  Well, I'm looking more at the

Page 85

1    Lehman side since they're up next.  Can we do 45 minutes?

2    Would that --

3              MR. LENDER:  That would be fine, yeah.

4              THE COURT:  Would that give you enough time?

5              MR. LENDER:  Yeah.  I'm more interested in just

6    getting something quick to eat.  So 45 minutes would be great.

7              THE COURT:  Okay.  Did we -- I don't know if you

8    asked my chambers staff for breakout rooms.  Do you have rooms?

9              MR. VAN TOL:  We don't, Your Honor.

10             THE COURT:  Well, had we known ahead of time, we

11   could have given you rooms.  But if you -- and not to be --

12   well, I have one conference room.  If you folks would like a

13   conference room as well, we could try to find something for

14   you.  But --

15             MR. VAN TOL:  I think we're fine, Your Honor.  We

16   appreciate the offer.

17             THE COURT:  -- I'm more concerned with allowing the

18   folks who are up next to find a place to eat.  So if you want

19   to come back and use a conference room, just knock on the door

20   and someone will let you in.

21             So, Dr. Marsoner, I'm afraid it's going to be a

22   boring lunch hour for you.  All right?  So you either -- I

23   would ask you to have lunch on your own.  Or if you have lunch

24   with your counsel, talk about nothing but the heat and, I don't

25   know, how about politics in the United States.  That's a boring

Page 86

```
 1    topic.

 2              All right?

 3              MR. LENDER:  We'll need more than 45 minutes, Your

 4    Honor.

 5              THE COURT:  Yeah.  But in any event, the rules hold.

 6    No discussion whatsoever about the case or your testimony.  All

 7    right, sir?

 8              THE WITNESS:  I'll stick to Austrian politics --

 9              THE COURT:  Okay.  About which I know nothing.  Thank

10    you very much.

11              MR. LENDER:  Thank you, Your Honor.

12              THE COURT:  We'll see your in 45 minutes.  So that'll

13    be 1:15.

14         (Recess from 12:29 p.m. until 1:20 p.m.)

15              THE COURT:  All right.  Welcome back.  Oh.  You've

16    rearranged my courtroom.

17              MR. LENDER:  Is that all right?

18              THE COURT:  I suppose so.

19              MR. LENDER:  I'll put it back.  I promise.

20              THE COURT:  All right.  If you break anything, you

21    will have to answer to folks above my pay grade.

22              MR. LENDER:  I will do my best.

23              THE COURT:  All right.

24              MR. LENDER:  May I proceed?

25              THE COURT:  Yes.
```

Page 87

1    CROSS-EXAMINATION

2    BY MR. LENDER:

3    Q     Good afternoon, Dr. Marsoner.

4    A     Good afternoon.

5    Q     I put before you a -- just a full set of the exhibits so

6    that if we want to go over some exhibits, we can today.

7          Now, Dr. Marsoner, you understand that Lehman acquired its

8    interest in Formula One in 2002, correct?

9    A     Yes, that is correct.

10   Q     Lehman had underwritten $300 million of a $1.6 billion

11   loan made by various lenders to Leo Kirch?

12   A     Correct.

13   Q     And you had no involvement whatsoever in the loan itself,

14   correct?

15   A     I had only very peripheral, very little involvement.  But

16   I certainly did not work on the loan transaction as such.  It

17   would not be an entirely correct statement to say that since

18   the 1998 initiation of the Formula One thing I was not at all

19   involved.  I was certainly aware that it was happening.

20   Q     But you had no involvement whatsoever in the loan itself,

21   correct?

22   A     I was luckily not on the team that decided to make that

23   loan.

24   Q     And then in 2002 when Mr. Kirch defaulted on the loan,

25   Lehman and the other lenders foreclosed on the collateral.  And

Page 88

1    Lehman acquired a 17 percent interest in Formula One, correct?

2    A    That is correct.

3    Q    And one of those other lenders was JPMorgan.

4    A    That is correct.

5    Q    And at the time, in 2002, Lehman and JPMorgan considered

6    hiring you to provide services in connection with Formula One,

7    right?

8    A    Correct.

9    Q    And you met with people at JPMorgan about possibly

10   retaining your services, right?

11   A    Three of them, that's right.

12   Q    And at the time, that decision was made by JPMorgan not to

13   retain your services for Formula One, right?

14   A    Which cost them a billion dollars.  That is correct.

15   Q    So the answer to my question is yes?

16   A    The answer is yes.

17   Q    Okay.  Now from 2002 forward, you did provide certain

18   advisory services pursuant to advisory services agreements that

19   you had signed with Lehman Brothers Europe Limited, correct?

20   A    Correct.

21   Q    And your main contact at Lehman was Vittorio Pignatti?

22   A    Vittorio Pignatti, that is correct.

23   Q    And at least through 2006, your contractual counterparty

24   was Mr. Pignatti.

25   A    Correct.

Page 89

1   Q     And Mr. Pignatti was head of European M&A.

2   A     Correct.  Towards the end of the period you mentioned, we

3   had moved over and had become head of European merchant banking

4   which was the private equity function.

5   Q     Great.  And Mr. Pignatti certainly would know the rules of

6   how and when a Lehman consultant like yourself would be

7   entitled to get paid, right?

8           MR. VAN TOL:  Objection, Your Honor.

9           THE COURT:  Yes.

10          MR. VAN TOL:  It's calling for speculation about what

11   Mr. Pignatti would know.

12          THE COURT:  Can you try to ask it a different way?

13          MR. LENDER:  Yes.

14   BY MR. LENDER:

15   Q     Based on your best understanding in having dealt with Mr.

16   Pignatti as your main contact, you believe he would know the

17   rules as to how and when a Lehman consultant like yourself

18   would get paid?

19   A     Referring to my knowledge on this matter, I can only refer

20   on an e-mail that he wrote to Jonathan Rouner somewhere in here

21   which explained to Jonathan Rouner how these things happened,

22   yes.

23   Q     So, yes.  So he would know the rules then, to your

24   understanding, as to how and when a Lehman consultant would get

25   paid.

Page 90

1    A    My understanding?  My knowledge is restricted to the

2    e-mail by Pignatti to Rouner.

3    Q    Right.  And you also had some --

4    A    We may want to look at -- maybe this --

5    Q    We might.  We may do that.

6         You had some contact with Peter Sherratt as well?

7    A    Yes, of course, I had contact with Peter Sherratt.

8    Q    And Peter Sherratt was in-house counsel to Lehman in

9    Europe, correct?

10   A    Correct.

11   Q    And you also --

12   A    The senior.  The senior.  He was the head European

13   counsel.

14   Q    Great.  And you also had some contact with Ruggero Magnoni

15   but to a lesser degree?

16   A    That is correct.

17   Q    And Mr. Magnoni also based in Europe?

18   A    He is based in Europe.

19   Q    Now in this case, you are claiming that you are a creditor

20   of both LBHI and LCPI, correct?

21   A    Correct.

22   Q    And you filed a motion at the end of 2014 seeking to be

23   allowed to file a claim against LBHI and LCPI more than five

24   years after the bar date, right?

25   A    That is correct.

Page 91

1   Q    And the claim you would like to file is based on advice

2   you gave back in November of 2005 where you recommended that

3   Lehman retain its stake in Formula One.

4   A    That is not entirely correct.  It was based on advice I

5   gave throughout the time period of 2002 through the end of 2005

6   which culminated in the November 5 -- or the November "huge"

7   advice.

8   Q    Great.  And we're going to look at that, I promise you, in

9   a moment.  But for years, you didn't believe you were a

10  creditor of LBHI or LCPI, correct?

11  A    That is incorrect.

12  Q    Well, you actually thought you were a creditor of Lehman

13  Brothers Europe Limited or LBEL, correct?

14  A    That is incorrect.  I had no positive knowledge which

15  Lehman entity I was a creditor of.  I knew I was a creditor of

16  somebody in the Lehman group that had been represented in my

17  contracts vis-à-vis me by LBEL.

18  Q    So you thought perhaps back in 2005, 2006, you might have

19  been a creditor of LBHI?

20  A    Possibly.  Possibly.  But I would have thought that

21  unlikely.  I would have thought that this -- I would have

22  thought that this loan would have been made and they're

23  (indiscernible) then booked in some special purpose subsidiary

24  somewhere in the Lehman group.  No knowledge where.

25  Q    Right.  And you thought it's possible, even back in 2005,

Page 92

1   2006, you could have been a creditor of LCPI, correct?

2   A    It's -- I could have been a creditor of anybody in the

3   Lehman group.

4   Q    Now there's no question that you did file a claim against

5   Lehman Brothers Europe Limited or I guess we refer to them as

6   either -- they used the word LBEL on more of the formal SIEs.

7            THE COURT:  LBEL.

8            MR. LENDER:  I'm going to L-B-E-L so I don't mess it

9   up.

10  BY MR. LENDER:

11  Q    But you did file a claim in the L-B-E-L bankruptcy,

12  correct?

13  A    I absolutely filed a claim in what we call the LBEL

14  bankruptcy.

15  Q    And you were on the creditors' committee of Lehman

16  Brothers Europe or L-B-E-L?

17  A    I am on the creditors' committee.

18  Q    And you filed your claim in the UK proceedings in November

19  of 2013?

20  A    That is correct.

21  Q    And you ultimately settled your claim with Lehman Brothers

22  Europe, right?

23  A    I did.

24  Q    For two and a half million pounds?

25  A    Correct.

Page 93

1    Q    And L-B-E-L has paid you that full amount, correct?

2    A    They have.

3    Q    Let me ask you to look at Exhibit 10 in your binder, if I

4    could.  Let me know when you're there.

5    A    Yep.

6    Q    And you'll see this is the consent order that was entered

7    in the L-B-E-L bankruptcy.  And attached to that is a copy of

8    the settlement agreement that you signed with Lehman Brothers

9    Europe Limited concerning Formula One, correct?

10   A    That is correct.

11   Q    And it wasn't until June of 2014 during the course of the

12   UK proceedings that you first thought you might have a claim

13   against LBHI or LCPI, correct?

14   A    That is correct.

15   Q    Which we know is well after the bar date of September 22,

16   2009 here, correct?

17   A    Which I now know is way after the bar date.

18   Q    And you knew that the Lehman U.S. entities had filed for

19   bankruptcy back in 2008?

20   A    I certainly knew that the Lehman U.S. entities had filed

21   for bankruptcy in 2008.

22   Q    And at least prior to filing your motion here, you never

23   filed a claim against LBHI or LCPI, correct?

24   A    I -- that is correct.

25   Q    You did, however, file a claim, a timely claim, against

Page 94

1  Lehman Brothers Inc. relating to a currency collar, correct?

2  A    That is correct.

3  Q    You filed that claim against LBI very soon after the

4  bankruptcy in September of 2008, right?

5  A    I'd be surprised that it had been in September 2008.  Can

6  I have a look at what you're looking at because we had the

7  discussion about the FEX collar.  And the very first thing I

8  did is I terminated the collar.  We've been through that

9  earlier today.  And I then remember getting --

10             MR. LENDER:  Your Honor, may I approach the witness?

11             THE WITNESS:  Sure.  Please.

12             THE COURT:  Yes.

13             MR. LENDER:  Here's a copy of his deposition.

14             THE COURT:  Yep.

15             MR. LENDER:  He may (indiscernible) --

16             THE COURT:  Okay.

17  BY MR. LENDER:

18  Q    And, Dr. Marsoner, if you would just turn to page 200 of

19  your deposition, line 17 to line 24.  Let me know when you're

20  there.  Are you there?

21  A    Page 200 of my deposition --

22  Q    Yes.

23  A    -- yes?

24  Q    And you see where you were asked the following question:

25             "Q    We discussed earlier your claim relating to LBI, LBCC

Page 95

1    and the collar, do you recall that?"

2    A    Yeah.

3         "A   I recall it, yes.

4         "Q   Do you recall when that claim was submitted?

5         "A    That must have been very soon after the Lehman

6    bankruptcy in September of '08."

7    A    Yeah.  The September --

8    Q    Is that correct?

9    A    -- 2008 refers to the Lehman bankruptcy.

10   Q    Okay.

11   A    And very soon after, I think a couple of months after, I

12   must have filed it.

13   Q    Okay.  Thank you.

14        Now, Dr. Marsoner, when you provided your advice regarding

15   Formula One back in November of 2005 that we looked at, you

16   never discussed with anyone the possibility of being

17   compensated for it, right?

18   A    That is wrong.

19   Q    Mr. Marsoner, I want to ask if you could turn to page 57

20   of your deposition.  Line 24.  Let me know when you're there.

21   A    57, 24.

22   Q    Line 24.  Were you asked this question that you gave this

23   answer:

24        "Q   At the point that you were providing this advice, did

25   you discuss with anyone the possibility of being compensated

1    for it?

2        "A   I didn't have to. I was a paid advisor. Terms were

3    very clear."

4        That was your testimony?

5    A    That was my testimony.  That was perfectly consistent with

6    what I just said.  The question here is a much narrower

7    question than the one you asked me, with respect.  Here it

8    says, "at the point you were providing this advice".

9    Q    Okay.  And your view was you had an advisory agreement

10   already in place even though it had expired, right?

11   A    My view is that I had a seven and a half year advisory

12   relationship.  The seven and a half year advisory relationship

13   was documented, at times, in five one-year advisory agreements.

14   The reality was that it was one seamless continuous five and a

15   half year -- or sorry -- seven and a half year relationship.

16   Q    Okay.  But the agreement that you are relying on in this

17   case to support your claim against LBHI and LCPI is your

18   February 13, 2004 advisory agreement with Lehman Brothers

19   Europe Limited, correct?

20   A    Technically, that is not entirely correct because that

21   agreement had not only expired but it was also, you know, --

22   don't know the technical term but doubly invalidated having

23   already expired by the '06 agreement.  What I rely on are the

24   rules of the '04 agreement.  The rules of the '04 agreement

25   and, as a matter of fact, any other technically expired

1    agreement that was then expired again, those rules governed the

2    interim phases.  So it is not the agreement that I rely on;

3    it's the rules of the agreement that I rely on --

4    Q    It --

5    A    -- which is at least, under English law, a very important

6    distinction.

7    Q    It's the content of the 2004 agreement that you're relying

8    upon as the basis for your claim against LBHI and LCPI.

9    A    That is correct.

10   Q    And there's no dispute, right, that in November of 2005

11   when you provided this advice that we looked at, there was no

12   agreement in force, correct?

13   A    Again, not entirely correct.  There was no formal

14   agreement in place.  There was the overall agreement which is

15   the seven and a half year framework agreement that was very

16   much fully in force.

17   Q    Right.  And that's because the 2004 agreement that you had

18   signed had expired by the end of that year in December of 2004,

19   correct?

20   A    The year agreement itself had expired.  Its rules had

21   survived.

22   Q    Okay.  Let's take a look at Exhibit --

23   A    And survived to this day.

24   Q    Okay.  Well, we'll see.  We're going to go through that.

25   Let's look at Exhibit 48 which is a copy of the February 2004

Page 98

1   agreement.

2          THE COURT:  What exhibit number is that?

3          MR. LENDER:  Exhibit 28, Your Honor.

4          THE COURT:  4-8?

5          MR. LENDER:  4-8, yep.

6          THE COURT:  Thank you.

7   BY MR. LENDER:

8   Q    And, Mr. Marsoner -- Dr. Marsoner, the contents of this

9   agreement, Exhibit 48, is the agreement that you are relying

10  upon as the basis for your claims against LBHI and LCPI,

11  correct?

12  A    Again, not entirely technically correct.  It's one of two

13  things I relied upon.  On the one hand, I'm making a quanta

14  meruit claim.  And on the other hand, I am making a contractual

15  claim.

16  Q    Great.  And if you turn to the second page, you'll see

17  that the term of the agreement says that the agreement shall

18  terminate on the earlier of, unless renewed, December 2nd,

19  2004, right?

20  A    Sir, where are you --

21  Q    Top of page 2?

22  A    Yes.  Yes.  That's exactly what it says.

23  Q    So your 2004 agreement had expired more than 11 months by

24  the time you were giving this advice in November of 2005,

25  correct?

Page 99

1    A    That is correct.

2    Q    Now if we turn to the last page of Exhibit 48, we'll see

3    the signature block.

4    A    Yep.

5    Q    And the signatories to this 2004 agreement are you, Dr.

6    Marsoner, and Lehman Brothers Europe Limited, correct?

7    A    Correct.

8    Q    And that's your signature?

9    A    That is my signature.

10   Q    Okay.  And that's Mr. Pignatti who signed on behalf of

11   LBEL?

12   A    Correct.

13   Q    And if you go to the first page of the agreement, the

14   address that you listed for yourself in this agreement was an

15   address in Malta, correct?

16   A    Correct.

17   Q    Now I want to talk a little bit about the compensation

18   section of this agreement, which is paragraph 3.  You with me?

19   A    Yes.  I'm at paragraph 3.

20   Q    And paragraph 3 sets forth how much Lehman Brothers Europe

21   is agreeing to pay you under this agreement, correct?

22   A    Correct.

23   Q    And Section 3.1 states that you will be paid a fee of

24   150,000 pounds within seven days of the execution of this

25   agreement?

Page 100

1    A    Euros, actually.

2    Q    Oh.  Beautiful.  Thank you.  150,000 euros would be paid

3    to you.

4    A    Yes.

5    Q    And that was paid to you, correct?

6    A    I beg your pardon?

7    Q    You were paid that amount, correct?

8    A    I was paid that amount, yes.

9    Q    And then Section 3.2 talks about quarterly fees that would

10   be paid to you under this agreement, right?

11   A    Uh-huh.

12   Q    You have to verbalize, sir.

13   A    Right.  Yes.

14   Q    And those were paid to you as well, right?

15   A    Those were paid to me as well.

16   Q    And then if you look through Sections 3 through 8, those

17   provisions identify various transactions that you were working

18   on with Lehman, correct?

19   A    Correct.

20   Q    And it states how much you --

21   A    Sorry.  Sorry.  Sorry.  Not at Lehman.  For Lehman.

22   Q    For Lehman.

23   A    With Lehman.

24   Q    Yes.  For Lehman.

25   A    Not at Lehman.

1   Q    Yes.  Thank you.  And it states how much you're going to

2   be paid for each of these transactions?

3   A    Correct.

4   Q    So, for example, just to use a couple of examples, if you

5   look at subsection (iv), it lists a Telecom Austria transaction

6   involving a change of control of Telecom Austria or its

7   subsidiary, Wireless Mobile.com, or the merger of the latter?

8   A    Correct.

9   Q    And then it sets forth the agreed fees that you would be

10  paid for this transaction, right?

11  A    Of 20 percent as ever.

12  Q    Your answer to my question is yes?

13  A    Yes.

14  Q    Okay.  And then in Section 5, we see another transaction

15  involving Telecom Austria by the company itself or by OIAG.  Do

16  you see that?

17  A    I see that.

18  Q    And then it sets forth the agreed fees you would be paid

19  for this transaction, right?

20  A    Right.

21  Q    And there are other specific transactions covered by the

22  2004 advisory agreement with LBEL listed as (indiscernible),

23  right?

24  A    Correct.

25  Q    And nowhere -- nowhere is Formula One listed, correct?

Page 102

1    A    Correct.

2    Q    In fact, in none of your advisory services agreement will

3    we see any reference to Formula One as a transaction for which

4    you would be paid, correct?

5    A    Correct.

6    Q    Now you also have no consulting agreement covering Formula

7    One with LBHI or LCPI as a signatory, correct?

8    A    Correct.

9    Q    In fact, you have no consulting agreement with LBHI or

10   LCPI as a signatory at all, correct?

11   A    Technically, I, again, cannot fully agree because LBEL, as

12   a member of the Lehman group, I believe, was in a position to

13   buy in LBHI and LCPI.

14           THE COURT:  Dr. Marsoner, I'll make the legal

15   determinations.  I would appreciate if you would answer

16   counsel's questions.

17           So could you ask the question again, please?

18           MR. LENDER:  Absolutely.

19   BY MR. LENDER:

20   Q    In fact, you have no consulting agreement with LBHI or

21   LCPI as a signatory at all, correct?

22   A    I have no formal written agreement with LBHI or LCPI, that

23   is correct.

24   Q    Now you claimed on direct that there was a framework to

25   pay you 10 percent, is that right?

Page 103

1  A    Ten percent of firm revenues is the simple version of the

2  framework, correct.

3  Q    But there is not a single e-mail or document anywhere in

4  the file where anyone at Lehman agreed to pay you 10 percent

5  for your services for Formula One, correct?

6  A    Correct.

7  Q    No one specifically said you'll get paid 10 percent for

8  Formula One, right?

9  A    With the framework agreement in place, nobody had to say

10  that specifically.

11  Q    No one specifically said that you'll be paid 10 percent

12  for Formula One, correct?

13  A    With the framework agreement in place, that was not

14  necessary.

15  Q    Okay.  And there's certainly no document whereby LBHI or

16  LCPI agreed to pay you for Formula One, right?

17  A    With the framework agreement in place, again, that was not

18  necessary.

19  Q    Okay.  Now I want to ask you to take a look at Exhibit 36

20  which is the declaration you filed with this court on December

21  29, 2014.  Let me know when you're there.

22  A    Yeah.

23  Q    And just to confirm, Dr. Marsoner, this is a declaration

24  and that's your signature on the last page?

25  A    That is confirmed.

Page 104

1    Q    And in paragraph 8 -- if you can turn there, page 2.

2    A    Uh-huh.

3    Q    And you see where you talk about this 10 percent rate that

4    we were just talking about in paragraph 8.

5    A    Yes.

6    Q    And then what you wrote and swore in this affidavit was

7    that " Lehman agreed both orally and by e-mail to this fee in

8    exchange for my Formula One advice."  Do you see that?

9    A    I see that.

10   Q    That's not true, correct?

11   A    That is incorrect.  This is perfectly true.

12   Q    Well, we just discussed that no one ever specifically said

13   to you that you'll be paid 10 percent on Formula One, right?

14   A    Mr. Pignatti formally asked me to work on F1.  My e-mail

15   exchange, that's the oral part that I meant here.  Mr. Bernard

16   and I, in the e-mail correspondence that is well known,

17   confirmed in writing that they were taking my senior advice.

18   Those two things happened against the background of the

19   framework agreement that had been in place for seven and a half

20   years.  So for you to stand here and accuse me of having made a

21   false statement in a sworn affidavit to a court is as offensive

22   as the other stuff you have mentioned about the tax position --

23            THE COURT:  All right.  That's quite enough.

24            THE WITNESS:  -- sir, with respect.

25            THE COURT:  Dr. Marsoner --

Page 105

1           THE WITNESS:  Sorry.  I apologize.

2           THE COURT:  I'm sorry.

3           THE WITNESS:  I apologize.

4           THE COURT:  We're not going to get into an

5      adversarial exchange in response to a straightforward

6      question.  So --

7           MR. LENDER:  I'll rephrase my question, Your Honor.

8      BY MR. LENDER:

9      Q    You said in the affidavit that Lehman agreed, both orally

10     and by e-mail, to this 10 percent fee.  But there's no question

11     that no one from Lehman ever said to you that you'll be paid 10

12     percent on Formula One, right?

13     A    Nobody had to.  The 10 percent were fixed in the framework

14     agreement that lasted for seven and a half years.

15     Q    And for the e-mail you're referring to here, the e-mail

16     you're referring to is your e-mail exchange with Tom Bernard in

17     November of 2005?

18     A    That is correct.

19     Q    Okay.  And where -- let's take a look at it, which is

20     Exhibit 2.  Let me know when you're there.  Dr. Marsoner,

21     Exhibit 2 is the e-mail you are relying upon where you claim

22     that Lehman agreed to pay you 10 percent for your advice with

23     regard to Formula One that we just looked at in your affidavit?

24     A    I'm -- yeah.  I'm just --

25           THE COURT:  Why don't you give Dr. Marsoner a moment

Page 106

1     to read the whole exhibit?

2             THE WITNESS:  Yeah.  Let me just --

3             THE COURT:  All right?

4             THE WITNESS:  Let me just make sure that it contains

5     everything I'm referring to.

6         (Pause)

7             THE WITNESS:  That is indeed the e-mail exchange that

8     I am relying on for the contractual aspect of my claim.

9     BY MR. LENDER:

10    Q    Okay.  But nowhere in this e-mail does Lehman agree to pay

11    you anything for Formula One, right?

12    A    I disagree.  At the very beginning and saying that I'm

13    continuing to be available for a very modest percentage

14    participation of LB's gain upon eventual sale, "very modest"

15    being interpretable only as to 10 percent of the framework

16    agreement.  And further on in the exchange, Tom Bernard says

17    "Thanks, Thomas.  That's huge.  We are inclined to take your

18    advice and stay in."  That is the agreement by e-mail that I

19    have been referring to in this proceeding and in the previous

20    English proceeding.

21    Q    What you just testified is your testimony as to Lehman's

22    agreement to pay you 10 percent for Formula One?

23    A    The 10 percent, as I'm happy to repeat for the rest of the

24    day if you want me to, was stipulated in the framework

25    agreement and was clear to all --

Page 107

```
 1              THE COURT:  When you say, Dr. Marsoner --

 2    A     -- parties at all times --

 3              THE COURT:  I need to --

 4              THE WITNESS:  I apologize.

 5              THE COURT:  I'm sorry.  When you say the framework

 6    agreement --

 7              THE WITNESS:  Yeah.

 8              THE COURT:  -- what exactly do you mean?

 9              THE WITNESS:  I refer to the first discussion about

10    my advisory relationship with Dr. Rydevik, the then head of

11    European investment banking who set out to me the 20 percent of

12    M&A fees, the 10 percent of firm revenues and the 5 percent, if

13    I read something in the gazette, which is how this --

14              THE COURT:  So the -- so there's the written

15    agreements and then there's what you view as some overarching

16    agreement that wasn't written down anywhere?

17              THE WITNESS:  Well, it was written down in five of

18    the seven and a half years.

19              THE COURT:  Okay.  All right.  Go ahead.

20              MR. LENDER:  Okay.

21    BY MR. LENDER:

22    Q     So --

23    A     It was implemented, if I can try to be more precise --

24              THE COURT:  Okay.  I just simply wanted to understand

25    when you were referring to the framework agreement what exactly
```

Page 108

1    you meant.  Thank you.

2    BY MR. LENDER:

3    Q    Now what you just referred to is on page Bates number 216

4    where you say "Needless to say, if a fresh face were helpful to

5    facilitate things here, mine continues to be available for a

6    very modest percentage participation in LB's gain upon eventual

7    sale"?

8    A    The "fresh face" I did not quote earlier because that was

9    the offer to do even more for what was in place already.

10   Q    You were saying that you were available as a fresh face to

11   help for a modest participation fee.

12   A    I was making the factual statement that I continued --

13   emphasis on the word "continued" -- to be available as I have

14   been available for the last three years.

15   Q    And there is no written acknowledgment anywhere whereby

16   Mr. Pignatti agreed to pay you a very modest percentage for

17   Formula One, right?

18   A    There is very specific answer to my senior advice which

19   you find on the e-mail to Pignatti on the 25th where then

20   Bernard says "We're inclined to take your senior advice".  The

21   senior advice implies explicitly, in my view, that this is a

22   professional conversation as a paid senior advisor and nothing

23   else.

24   Q    I'm going to try my question again.  Dr. Marsoner, there

25   is no written acknowledgment anywhere whereby Mr. Pignatti

Page 109

1    agreed to pay you a very modest percentage for Formula One,

2    right?

3    A    I again have to technically disagree because there is a

4    letter that Pignatti was happy to sign in which he said that my

5    services for Formula One were similar to the services for BAWAG

6    PSK for which I was paid 10 percent.  So if you need a Pignatti

7    signature next to a 10 percent for Marsoner, you'd find it in

8    that letter.

9    Q    Can I ask you to turn to your deposition, page 93, line

10   14?  Let me know when you're there.

11   A    Sorry.  Exhibit --

12   Q    Your deposition.

13   A    Oh, sorry.  My deposition.

14   Q    Keep that handy.  Page 93, line 14, please.  Dr. Marsoner,

15   you there?

16   A    I'm there now, yeah.

17   Q    Were you asked this question and did you give these

18   answers in response to questions from Ms. Alvarez:

19        "Q   Is there written acknowledgment from Pignatti

20   agreeing to pay you a very modest percentage participation in

21   Lehman Brother's gain upon eventual sale?

22        "A   There didn't have to be. The terms were clear from

23   the outset.

24        "Q   So nothing in writing?"

25        Objection by Mr. Van Tol.

Page 110

1      "A   The course of dealings between Pignatti and me,

2  between Lehman and me was very clearly established. It did not

3  require any further repetition."

4      That was your testimony?

5  A    That is indeed correct.  This referred to that time again

6  that is in no way inconsistent with the letter Pignatti wrote

7  about the 10 percent years later.

8  Q    Okay.  Now, Dr. Marsoner, you testified that the inside

9  information you provided about McLaren soon became public.  You

10 remember that?

11 A    Yes.

12 Q    And, in fact, if we turn to the first page of Exhibit 2,

13 we'll see a reference, I don't know, maybe halfway down in an

14 e-mail from you that says, "P.S. Rondenes verbatim in case

15 you've missed it."  And then there's a reference to a Bloomberg

16 article.  Do you see that?

17 A    Yep.

18 Q    Is that the reference to how it became public soon

19 thereafter?

20 A    That is one of the things I found after the fact.

21 Q    And, in fact, the date of the Bloomberg, the Bloomberg

22 article is November 25th, the exact same day that you said you

23 gave this inside information to Lehman, right?

24 A    That's what it looks like, indeed, yes.

25 Q    Okay.  Now --

Page 111

1   A     But neither I nor anybody else had it at the time.

2   Otherwise, I wouldn't have had the responses that I got.

3   Q     Well, okay.  That's fine.  Anyway, in the next e-mail up

4   going back we talked about the fresh face e-mail.

5   A     Sorry.  Which one?

6   Q     The same Exhibit 2.  You talked about --

7   A     Yeah.

8   Q     -- the fresh face e-mail that you were offering.

9   A     Yeah.

10  Q     And then the next e-mail up, the one that you forwarded to

11  Mr. Bernard, you actually made another offer to Lehman,

12  correct?

13  A     That is correct.

14  Q     And in this offer if we look in the third paragraph down

15  on page 215 you said:

16        "If conversely you want to get Lehman Brothers out of the

17  Formula One headlines or feel your relationship with Bernie has

18  become too bad, a Marsoner family company previously involved

19  in consumer products would happily consider taking it on if it

20  comes with a to be agreed financing package fairly sharing

21  risks and rewards."

22  A     Yes.  That is correct.

23  Q     So in addition to providing a fresh face, you separately

24  actually offered to buy Lehman out, right?

25  A     Exactly.  There were two offers in addition to the extent

Page 112

1   advisory relationship that I made, neither of which were

2   accepted.  One was the fresh face which would have been

3   involvement of myself in the negotiations as opposed to just

4   background advice, and the second one was that (indiscernible)

5   management and a family company that was a client of Lehman's

6   would be prepared to take the stake.

7   Q    And this offer to buy out Lehman obviously never happened,

8   right?

9   A    That did not happen.  No.

10  Q    Now, Dr. Marsoner, you understand that it's very important

11  for a consultant and Lehman, the companies you're working with

12  within Lehman to agree upfront on whether and how much of a fee

13  you'll be paid by Lehman, right?

14  A    Once revenues crystallize.

15  Q    Actually, even before revenues are crystallized you

16  understood it's important to get that agreement upfront so that

17  the consultant could have a claim later for payment against

18  Lehman, right?

19  A    The way it worked is that we went after so many things and

20  so many things were so time pressured, like this F1 thing at

21  the time that quite often it was just not possible to even

22  think about documenting anything.  So, therefore, the

23  documentation standard which you will see Mr. Pignatti

24  explaining to Mr. Rouner is one where things get documented

25  once revenues crystallize and in F1 that was in 2012.

Page 113

1    Q    Let's take a look at an example.  Maybe this will help

2    speed this a little along.  I want -- I would ask you to take a

3    look at Exhibit 58, 5-8 in your book.  Let me know when you're

4    there.

5    A    I am on 58.

6    Q    Yeah.  And you can see at the top this is an e-mail

7    exchange between you, Thomas Marsoner, and Jonathan Rouner and

8    Vittorio Pignatti dated October 17th, 2005.

9    A    Correct.

10   Q    So this is basically a little more than a month before the

11   Bernard e-mail that we've spent some time talking about today,

12   correct?

13   A    Yes.

14   Q    And do you see at the bottom of Trial Exhibit 58 at the

15   second to last line there's a discussion about a transaction

16   called Magna.  Do you see that?

17   A    Yes.

18   Q    And in the top e-mail you respond to Mr. Rouner and you

19   say in the second paragraph, "This may be the opportune time to

20   bring up the small matter of my advisory fees."  Do you see

21   that?

22   A    Yeah.

23   Q    And the -- and then you say in the last sentence, "The

24   advisor, on the other hand, is well advised to have the

25   agreement in place before Lehman Brothers gets signed up."  Do

Page 114

```
 1   you see that?

 2   A    I see that.

 3   Q    And the reference to advisor here is a reference to you,

 4   correct?

 5   A    Correct.

 6   Q    And the agreement in place you're referring to is an

 7   agreement on the amount of your advisory fees, right?

 8   A    Correct.

 9   Q    Okay.  Now I would ask if we can turn to Exhibit 49 which

10   is the next advisory agreement that you signed with Lehman

11   Brothers Europe.

12             THE COURT:  Exhibit number was?

13             MR. LENDER:  49, Your Honor.

14             THE COURT:  49.  Thank you.

15   BY MR. LENDER:

16   Q    Dr. Marsoner, is Exhibit 49 a copy of the next agreement

17   that you signed with LBEL after the 2004 agreement we just

18   looked at expired?

19   A    Yes.

20   Q    And, again, if we look at the signature block which is the

21   last page we'll see that that's your signature, Thomas

22   Marsoner?

23   A    Yes.

24   Q    And it's signed by Lehman Brothers Europe Limited?

25   A    That is correct.
```

Page 115

1  Q    And, Dr. Marsoner, you stand by the terms of this

2  agreement, right?

3  A    Yes.  Of course.

4  Q    Thank you.

5           Now in the second paragraph of the 2006 agreement on

6  the very first page do you see in the second sentence, second

7  paragraph where it says:

8       "By executing this agreement the consultant acknowledges

9  that he will not be entitled to any payments or other rights

10 under the executive advisory services agreement between the

11 consultant and Lehman Brothers dated 13 February 2004, the

12 prior agreement."

13 A    I see that.

14 Q    And that's a reference to the agreement whose contents you

15 say you're relying upon as the basis for your claim against

16 LBHI and LCPI, correct?

17 A    I replied to that before.  I'm very happy to do that

18 again.  The --

19 Q    Can you first answer my question and then you can explain?

20 A    Sorry.  The 2004 agreement had expired.  It didn't even

21 have to be killed again here.  In the interim period its

22 provisions survived.  That was the way it worked throughout the

23 seven and a half years.

24 Q    I'm going to try it again, my question.  The 2004

25 agreement that you acknowledged in this paragraph is the same

Page 116

1  agreement that you are relying upon its contents for as the

2  basis for your claim against LBHI and LCPI for Formula One,

3  right?

4  A    That is absolutely correct.

5  Q    Thank you.

6       Now if you look at paragraph 3 of the agreement you'll see

7  a section that lists compensation payable to the consultant?

8  A    Yeah.

9  Q    And you see again it lists a number of transactions?

10 A    Yeah.

11 Q    And if you look at paragraph 6 you'll see that the Magna

12 transaction we just discussed is identified in this agreement,

13 correct?

14 A    That is actually incorrect.  That is a different Magna

15 transaction from the one here.

16 Q    Okay.  We see it, but it -- so this is a different Magna

17 transaction than the one we were just looking at?

18 A    There were a whole number of Magna transactions.

19 Q    Okay.

20 A    And I certainly remember -- that I do not remember in

21 detail, but I certainly remember that not all the Magna

22 transactions were documented.

23 Q    Do you know if this Magna transaction here is the same one

24 we were just looking at?

25 A    I do not remember which one the Magna transactions we had

Page 117

1    called project (indiscernible).  There were a number of

2    (indiscernible) transactions.

3    Q    And when you testified on direct that you worked on a

4    Magna transaction and it wasn't covered by an agreement, you

5    may have been referring to this Magna transaction or it may

6    have been a different Magna transaction?

7    A    What I said in direct, at least what I remember saying in

8    direct, is that there were a number of Magna transactions and

9    I do not believe that they were all documented.

10   Q    Actually, what you said on direct was that you worked on

11   Magna and it wasn't covered by an agreement.  That was your

12   testimony, right?

13   A    I believe if you look at the record you will find that I

14   said what I just said, which is that I do not remember -- I

15   remember working on a number of Magna transactions and I said

16   that I did not think that they were all documented.  I said

17   already this morning, if you look at the record, that one may

18   have been documented.  Whether this one is the same as that one

19   I do not know.  What I remember is that there were several.

20   Q    So, Dr. Marsoner, were you paid on this Magna transaction

21   that we're seeing here in the 2006 agreement?

22   A    I was paid on no Magna transaction because no Magna

23   transaction ever was successfully completed by Lehman Brothers,

24   hence the imprecision of my memory.  If --

25   Q    Well, Dr. Marsoner --

Page 118

1   A    -- we have documents I might remember it better.

2   Q    So your -- Dr. Marsoner, your testimony in your direct

3   that transactions were only included in advisory agreements

4   when revenues became a visible, that's not correct, right?

5   A    That is completely correct.  I think here you see

6   somewhere that there was an estimate of this one of something

7   like a ten million visible potential fee which is how it then

8   got documented.

9   Q    Well, Dr. Marsoner, Magna was included as a covered

10  transaction in the 2006 agreement even though revenues had not

11  yet been visible, right?

12  A    Well, there's a ten million number somewhere.  In this

13  documentation it was visible that Lehman was going to make ten

14  million or more on it.  That is how it got into the '06

15  agreement.

16  Q    Okay.  Let me ask you this --

17            THE COURT:  But, Dr. Marsoner, I need to -- I'm

18  sorry.  I just -- one of the things that you said much earlier

19  today was that you didn't think of making a claim in the Lehman

20  LBHI or LCPI case because there hadn't been any revenue, right?

21  You said that this morning?

22            THE WITNESS:  I made --

23            THE COURT:  You explained --

24            THE WITNESS:  I --

25            THE COURT:  -- that one of the reasons you didn't

Page 119

1    think of making a claim until the time that you did, five years

2    after the bar date, was because you didn't know how valuable

3    this was to Lehman, right?

4          THE WITNESS:  F1 could have been zero net revenue

5    until 2011.

6          THE COURT:  But --

7          THE WITNESS:  That is correct.

8          THE COURT:  But the point that counsel's exploring

9    here, which I would like to follow up on, is that this

10   agreement reflects a hypothetical sliding scale.  It posits a

11   possible return and it sets forth a ladder of compensation in

12   the event that an event -- that a transaction becomes

13   profitable.

14         So my question is why is that not absolutely

15   applicable to Formula One as well?  The -- obviously I think

16   one thing is crystal clear.  Lehman was not in the business of

17   being a charity.  It was in transactions to make money.

18         THE WITNESS:  Yes.

19         THE COURT:  Right?

20         THE WITNESS:  Yes.

21         THE COURT:  So that's what they were all about.  So,

22   therefore, the fact that it hadn't yet made money has nothing

23   to do with whether or not they could have agreed to a ladder of

24   compensation to compensate you for your advisory services,

25   correct?

Page 120

1        THE WITNESS:  Absolutely.  The only difference is

2   that a 10 million revenue number was visible in the Magna

3   thing as is shown in one of the e-mails here from Pignatti to

4   (indiscernible).  The moment an order of magnitude of revenues

5   becomes visible, it makes sense to document it formally.

6        THE COURT:  I see.  But --

7        THE WITNESS:  That's the difference --

8        THE COURT:  But one more.  One more.

9        THE WITNESS:  -- Your Honor.

10        THE COURT:  But notwithstanding that, in this exhibit

11   that counsel is taking you through, each of these or many of

12   these named transactions have a cap.

13        THE WITNESS:  That was introduced later.  That was

14   introduced only for transactions going forward in the 2006

15   agreement.  All the old transactions did not get that cap.

16        THE COURT:  I see.

17        THE WITNESS:  So the cap is only going forward for

18   new transactions from 2006.

19        THE COURT:  Okay.  Go ahead.

20        MR. LENDER:  Okay.

21        THE COURT:  I'm sorry.

22   BY MR. LENDER:

23   Q    Now in Section 3 if you look at paragraph 3 and 4, we also

24   see the two Telecom Austria transactions that we talked about

25   in connection with the 2004 agreement, right?

Page 121

1    A      Three and four, yes.

2    Q      So transactions that you were working on in 2004, if you

3    hadn't been paid yet, got carried over into the 2006 agreement.

4    That's two examples of it, right?

5    A      When revenues were visible that was the case.  That -- it

6    -- the consideration was always are there visible revenues.

7    Then they made it in here.  When the revenue picture was

8    completely uncertain they were not documented.

9    Q      Well, Dr. Marsoner, the Telecom Austria, both transactions

10   even though revenues weren't yet visible were included in the

11   2004 agreement and the reason why it was carried over again

12   into the 2006 agreement was because you hadn't yet been paid,

13   right?

14   A      May I just look at whether that's really exactly the same

15   than --

16   Q      Absolutely.

17   A      -- the Austrian agreements?

18   Q      That's the reason why I went over them with you --

19   A      I mean, what --

20   Q      -- but, you know, let's do it again.

21   A      Because things obviously evolved.  Sorry.  Where's the

22   2004 agreement?

23   Q      That's okay.  I'm going to find it for you.  Are you

24   looking at the prior Exhibit 48?

25   A      48.  Right.  Yeah.

Page 122

1   Q    And paragraph 4 was Telecom Austria with Mobile.com.

2   Paragraph 5 was Telecom with OIAG, and those two were carried

3   over into the 2060 agreement.

4   A    Well, in the shortness of time I only noticed that the

5   paragraph 4 in the '04 agreement is about twice as long as the

6   paragraph 4 in the '06 agreement, and that -- I mean, this is

7   not the same text.  It's just -- in these two paragraphs it's

8   not the same text.  Things have evolved and what was visible in

9   one year was visibly differently in another year.  But you're

10  absolutely right.  When there were visible revenues around that

11  we put them into the formal agreements.

12  Q    Okay.  We can all compare the agreements later.  But the

13  one thing that we -- you and I can both agree on is nowhere in

14  paragraph 3 of the 2006 agreement will I see a reference to

15  Formula One, right?

16  A    That is absolutely correct.  We are in full agreement.

17  Q    Now during your direct exam you mentioned BAWAG as an

18  example where Lehman paid you even though BAWAG was not listed

19  on an advisory agreement and allegedly not documented, right?

20  A    The acquisition of BAWAG by Cerberus was in no advisory

21  agreement and I was paid for it.

22  Q    And for BAWAG, as counsel showed you, you were sent an e-

23  mail whereby Lehman agreed to pay you, right?

24  A     I was sent an e-mail that only served to mutually agree

25  the numbers.

Page 123

1    Q    Let's take a look at Exhibit 5 one more time.

2    A    The Graham Wilson e-mail?

3    Q    Yeah.  Thank you.  Let me know when you're there.  I know

4    I -- I apologize if I keep jumping you through the book.

5    A    I'm alright.   Yes.

6    Q    Trial Exhibit 5 is an e-mail from Graham Wilson to you,

7    Thomas Marsoner, dated June 13th, 2007?

8    A    Yes.

9    Q    And Graham Wilson was the chief administrative officer of

10   Lehman in Europe?

11   A    He was a senior administrator in the investment banking

12   department of Lehman in Europe.

13   Q    In Europe.  Okay.  Thank you.

14        And what Mr. Wilson wrote was, apologies for the delay.

15   Am now authorized to agree this with you and move forward with

16   processing the payment, right?

17   A    That is correct.

18   Q    And, Dr. Marsoner, there is no e-mail whereby LBHI or LCPI

19   agreed to pay you for Formula One, right?

20   A    LBHI paid me for this.

21   Q    Did you hear my question?

22   A    Sorry.  I probably missed it.

23   Q    My question was there's no e-mail whereby LBHI or LCPI

24   agreed to pay you for Formula One, right?

25   A    Technically I do not entirely agree because I do believe

Page 124

1    that my e-mail exchange with Tom Bernard constitutes such an

2    agreement by e-mail.

3    Q    Okay.  Now you've also read Mr. Pignatti's deposition?

4    A    Yes, I believe I have.  Yes.

5    Q    And we know that Mr. Pignatti was someone that you

6    approached about filing a letter on your behalf in this case,

7    right?

8    A    Correct.

9    Q    And so since you read Mr. Pignatti's deposition you know

10   that he testified that you were only paid on BAWAG because

11   Lehman and you came to an agreement regarding how much you

12   would be paid for your help there, right?

13   A    Absolutely incorrect.  Mr. Pignatti was not involved in

14   BAWAG.

15              MR. LENDER:  Your Honor, may I just approach for --

16              THE COURT:  Yes.  Is this Mr. Pignatti's deposition?

17              MR. LENDER:  Yes, it is.  Thank you.  This is the

18   designated testimony.

19              THE COURT:  Okay.

20   BY MR. LENDER:

21   Q    And I would ask you if you wouldn't mind, Dr. Marsoner, to

22   turn to page 67, line 4 to 67, line 8 of Mr. Pignatti's

23   deposition.

24   A    I can see line 4 here.  Yes.

25   Q    And Mr. Pignatti was asked the following question and gave

Page 125

1   the following answer:

2       "Q    So when the BAWAG transaction was  completed Lehman

3   and Dr. Marsoner came to an agreement   regarding how much he

4   would be paid for his help?

5       "A    Yes."

6   A   Well, this is something that Ms. Alvarez said.

7   Q   I'm sorry.

8   A   The agreement between Lehman and Dr. Marsoner, as you just

9   read, was something that Ms. Alvarez said.

10  Q   Okay.

11  A   Okay.

12  Q   We can move on.  Exhibit 6 --

13  A   Mr. -- sorry.  Mr. Pignatti was not involved in that

14  aspect of the BAWAG transaction so he couldn't have known what

15  that question meant precisely.

16  Q   Your testimony is that Mr. Pignatti was incorrect when he

17  answered yes to that question in his deposition?

18  A   My testimony is that the correct interpretation of the yes

19  that Pignatti gave is what you find in the Graham Wilson e-

20  mail, I am now authorized to agree this with you.  He couldn't

21  know more about it because he was not involved in the

22  acquisition of BAWAG by Cerberus.

23  Q   Okay.  Exhibit 6, you mentioned this e-mail with Jeremy

24  Isaacs during your direct.

25  A   Yes, I did.

Page 126

1   Q    Let me know when you're there.

2   A    Yes, I did.

3   Q    And Jeremy Isaacs was the chief executive officer of

4   Lehman Brothers in Europe?

5   A    He was.

6   Q    And to be clear what you were -- I think what you said you

7   were doing was you were sort of laying the groundwork for an

8   eventual fee claim here?

9   A    Correct.

10  Q    But you never told Jeremy Isaacs that you were expecting

11  to get paid for Formula One, right?

12  A    I think I implied that very clearly in what I said.  Yeah.

13  Q    But you didn't ever tell Jeremy Isaacs that -- explicitly

14  that you were expecting to get paid for Formula One, right?

15  A    I believe I told him in very politely and implicitly.

16  Q    Okay.  Exhibit 31, another e-mail you were shown.  And now

17  this is an e-mail that you sent to Allyson Carine at Barclays

18  Capital in October of 2008?

19  A    Correct.

20  Q    And this is an e-mail where you were telling Ms. Carine at

21  Barclays that you were walking away from your obligations to LB

22  Commercial Corp or LBCC concerning and FX column?

23  A    For cause.  They had walked away from their obligations to

24  me.

25  Q    Okay.

1    A    So I, on the reciprocal basis, terminated.

2    Q    And is it your testimony that -- I'm sorry.  Is it your

3    claim that an e-mail that you sent to Barclays Capital about

4    LBCC should have put LBHI and LCPI on notice of your address in

5    Austria?

6    A    Yes, it is my claim.  Yes, it is my claim that this is an

7    e-mail that went to people I had known as LBHI people,

8    specifically employees of its subsidiary LBI for many years.

9    So this was, as far as I was concerned, an e-mail to Lehman

10   Brothers in New York where LBI was the broker/dealer and LBHI

11   was the holding company which holding company had just sold LBI

12   to Bar Cap.  So I do believe that by sending this e-mail I told

13   the New York Lehman system yet again what my address was.

14   Q    Do you have any evidence that this e-mail was ever

15   forwarded to anyone at LBHI or LCPI and included in the 350

16   billion pages of data that Lehman had?

17   A    I have no such evidence.

18   Q    Do you have any evidence that anyone at LBHI or LCPI was

19   aware of this e-mail at the time it was coming up with its list

20   of potential creditors?

21   A    I have absolutely no evidence for that.  No.

22   Q    Okay.  Now, Dr. Marsoner, in connection with filing your

23   motion to seek to file a late claim here you asked a number of

24   former Lehman employees to write letters on your behalf?

25   A    Correct.

Page 128

1    Q    And one person you asked to write a letter on your behalf

2    was Mr. Pignatti, your main contact at Lehman Brothers Europe

3    Limited, right?

4    A    That is right.

5    Q    And Mr. Pignatti, we know from your testimony, had

6    submitted a letter on your behalf for Formula One in connection

7    with the Lehman Brothers EL bankruptcy, right?

8    A    Right.

9    Q    Now in -- on your direct you said that Hogan Lovells

10   prepared the first draft of that letter, right?

11   A    That's right.

12   Q    But that's not true, correct?

13   A    To the best of my knowledge that is true.

14   Q    The truth is that you prepared the first draft of that

15   letter, right?

16   A    No.  I got that from Hogan Lovells.

17   Q    Can I ask you to take a look at page 166 of your

18   deposition, please?

19   A    166 of my deposition?

20   Q    Line 17.  Let me know when you're there.

21   A    166 of my deposition.  Yes.

22   Q    Were you asked this question and were you given this

23   answer.  You were talking about Mr. Pignatti's letter and then

24   you were asked:

25         "Q   Did you prepare this letter?

Page 129

1         "A    I, as in the two other cases, prepared a convenience

2    draft for him inviting him to mark it up in whatever way he

3    felt like it."

4    A    Yeah.  By instructing my lawyers to draft it I prepared

5    those convenience drafts.  Of course the actions of my lawyers

6    in this case are my actions, obviously.

7              THE COURT:  Okay.  We're going to get this straight.

8              MR. LENDER:  Yeah.

9              THE COURT:  Okay.  We're going to get this straight.

10   I want to know who drafted the letter.  Did you --

11             THE WITNESS:  Hogan Lovells.

12             THE COURT:  -- draft the letter or did someone else

13   draft the letter?

14             THE WITNESS:  I asked Hogan Lovells to --

15             THE COURT:  No.  Mr. -- Dr. Marsoner, you need to

16   answer my question.

17             THE WITNESS:  I'm sorry.

18             THE COURT:  Who drafted the letter?  Who literally

19   sat down with a pen and a piece of paper or a computer or a

20   typewriter and put the words on the page?  Who --

21             THE WITNESS:  Hogan Lovells.

22             THE COURT:  -- did that?

23             THE WITNESS:  Hogan Lovells, Your Honor.

24             THE COURT:  Thank you.

25   BY MR. LENDER:

Page 130

1   Q   And, Dr. Marsoner, when you provided that first draft to

2   Mr. Pignatti his reaction was that he couldn't sign what you

3   had sent to him because he was worried about committing

4   perjury, correct?

5   A   I had told him in my cover letter to mark it up however he

6   want -- he saw fit.  He did write something back which said

7   what you just said, which can only have been based on a

8   misunderstanding.

9   Q   Let's take a look at that e-mail exchange if we could.

10         MR. LENDER:  This is Exhibit 51, Your Honor.

11   BY MR. LENDER:

12   Q   Dr. Marsoner, Exhibit 51 is a series of e-mails that you

13   produced in this case, correct?

14   A   Correct.

15   Q   And I want to first start at the bottom of page Marsoner

16   19.

17   A   At the bottom of page --

18   Q   Okay.  You're at the bottom --

19   A   -- Marsoner 19.  Yes.

20   Q   Okay.  You see it?  The bottom of 19 to the top of

21   Marsoner 20 you send a draft of the letter to be submitted to

22   this Court to Vittorio Pignatti dated January 14th, 2015.  Do

23   you see that?

24   A   Yeah.

25   Q   And then if you go up in the e-mail on January 28th, 2015

Page 131

1    you resent it to Mr. Pignatti?

2    A    Correct.

3    Q    And what we see is -- the next e-mail is Mr. Pignatti's

4    response on January 31st, 2015, right?

5    A    I see that.

6    Q    And what he says is:

7         "Dear Thomas, I can't risk -- I can't sign risking perjury

8    sign a statement that presents facts that I was not involved

9    with like the matters relating to the sale to CVC of LB stake

10   in Formula One.  People who are involved have a different

11   recollection and if asked by  the Court will air it.  Not sure

12   there is much upside for you, but I do see some downside.

13   Sorry.  V."

14            Right?

15   A    I can see that.

16   Q    And now, Dr. Marsoner, what I would like to do --

17            MR. LENDER:  And, Your Honor, just to make this a

18   little easier so we're not flipping back, I want to show Dr.

19   Marsoner a copy of the draft and the final letter so we can see

20   what changes were made.

21            THE COURT:  Sure.

22            THE WITNESS:  Sorry.  May I just finish answering

23   your question?

24            MR. LENDER:  I think you did, but if you want -- if

25   there's something else you want to share, by all means.

Page 132

1              THE WITNESS:  Thank you very much.

2              I said earlier there must have been a

3    misunderstanding on this and the misunderstanding is right here

4    because I wrote explicitly, check to confirm it reflects

5    reality accurately.  Mark it up wherever you think it might

6    not.  So I invited him to do whatever he thought made this

7    draft more accurate in my cover letter to him.

8              MR. LENDER:  Okay.  Thank you.

9    BY MR. LENDER:

10   Q    Dr. Marsoner, just to make this easier so we don't have to

11   flip through the books, what I'm going to hand you is Trial

12   Exhibit 42 which were the letters that were submitted to the

13   Court that counsel already showed you, and then a copies of the

14   draft that we understand were provided by you to the letter.

15             Okay.  So, Dr. Marsoner, what you should have before

16   you, which I hope you do, is again the draft -- we're going to

17   start off with Mr. Pignatti's since that's what we're talking

18   about now.  So Trial Exhibit 63 is the draft and then attached

19   to Trial Exhibit 42 is the actual copy as Mr. Pignatti

20   submitted it.  Okay.  So let me know when you have those before

21   you.

22   A    I have those before me.

23   Q    Okay.  Now I want you to look at the paragraph -- let's

24   make sure we're all on the same page.  The paragraph one, two,

25   three, four, five down, the paragraph that starts with, with

Page 133

1   regards to the investment in Formula One.

2   A    I can see that.

3   Q    And in the draft that you provided, Trial Exhibit 63, the

4   last line that you included was that Lehman accepted Dr.

5   Marsoner's requested remuneration by e-mail and orally.  Do you

6   see that?

7   A    I see that.

8   Q    You may recall that that was a sentence that was very

9   similar to the affidavit that you submitted with the Court that

10  we looked at earlier.  Do you remember that?

11  A    I remember that.

12  Q    And if you look at the actual letter that was submitted to

13  Judge Chapman that sentence was taken out, correct?

14  A    I can see that.  Yeah.  I can see -- we can all see that

15  it's out.

16  Q    Okay.

17  A    Yes.

18  Q    And then if we turn to the very last paragraph you'll see

19  that the draft has a sentence that says, it was always my

20  understanding that Lehman would pay Dr. Marsoner ten percent of

21  Lehman's gross revenues from the F1 investment.  Do you see

22  that?

23  A    I see that.

24  Q    And, again, that sentence was eliminated in the letter

25  that was submitted to the Court, correct?

Page 134

1    A     That is correct.  However, the ten percent comparison of

2    the line above he let stand.

3    Q     Okay.  And nowhere in your draft that you supplied to Mr.

4    Pignatti or in the final does the letter say that LBHI or LCPI

5    ever agreed to pay you in connection with Formula One, right?

6    A     That's correct.

7    Q     Now you also approached Peter Sherratt, who you said was

8    the senior lawyer to Lehman in Europe to see if he would help

9    you in connection with the LBEL filing, right?

10   A     He was the senior lawyer of Lehman in Europe.  That is

11   correct.

12   Q     And he declined to help you, correct?

13   A     He declined to help me.  Correct.

14   Q     And if you turn to Marsoner 25 which is in Exhibit 51,

15   that e-mail chain.

16   A     Exhibit --

17   Q     Exhibit 51?

18   A     -- 51.  Yes.  Sorry.  Exhibit 51 in the big book?

19   Q     Yeah.  Yes, please.

20   A     All right.  Which specific page, please?

21   Q     Page 20 -- Marsoner 25, the bottom --

22   A     Oh.

23   Q     -- of page 51.

24   A     All right.

25   Q     Are you there?

1   A    Yes.  I see it.

2   Q    Okay.  And this is a time when you were trying to get

3   Peter Sherratt to help you in connection with your claim that

4   you were filing in the LBEL bankruptcy, right?

5   A    That is correct.

6   Q    And what we see in the middle of the page on page Marsoner

7   25 is Mr. Sherratt's response where he says to you:

8        "My view is that the claim on LBEL isn't justified.  We

9   both know there was no agreement to pay you relating to Formula

10  One.  You are a highly intelligent and meticulous person and

11  have -- and would have put in a claim years ago if you believed

12  in it.  I do feel a lot of loyalty to old colleagues especially

13  those I've known   for a very long time like you.  But helping

14  on the claim would not only be wrong, but involve giving false

15  evidence which is, of course, a criminal offense in England."

16       Do you see that?

17  A    I see that it continues with:

18       "The lie Linklaters have spoken to Tom and Christian who

19  share the view the claim is unjustified.  There's documentation

20  in this file that shows that that part of this paragraph is a

21  flat lie."

22  Q    Okay.  But the concern about trying to get you to say

23  something untruthful, that's the same concern that we just saw

24  from Mr. Pignatti, right?

25  A    It seems to be a similar concern.  That is correct.

Page 136

1  Q    Now you also approached Ruggero Magnoni to write a letter

2  on your behalf?

3           THE COURT:  Could you -- before you move on --

4           MR. LENDER:  Yes.

5           THE COURT:  -- Dr. Marsoner, if you could look down

6  at the very bottom of page 26 of this e-mail where it looks

7  like this thread began on Tuesday, March 4th.

8           THE WITNESS:  Yes.

9           THE COURT:  From you to Mr. Sherratt, F1 past and

10  future.

11           THE WITNESS:  Yes.

12           THE COURT:  Hi, Peter.  You see where I am?

13           THE WITNESS:  Yes.  I see that.

14           THE COURT:  Would you have time for me to come see

15  you for half an hour next week to chat about F1 matters of

16  potentially mutual interest.  Do you see that?

17           THE WITNESS:  Yes.  I see that.

18           THE COURT:  What did you mean by that?  What's

19  the --

20           THE WITNESS:  He was --

21           THE COURT:  -- mutual interest?

22           THE WITNESS:  He was still on the board the --

23           THE COURT:  Of --

24           THE WITNESS:  Of the F1 companies.  So the mutuality

25  I meant was that I could, as ever, tell him lots of things

Page 137

1    about F1 that he didn't know and what I was looking for him to

2    give me is obvious.

3              THE COURT:  So in 2014 --

4              THE WITNESS:  Yeah.

5              THE COURT:  -- you were -- this was an offer that you

6    were trying to gain an -- a visit with him --

7              THE WITNESS:  Yes.

8              THE COURT:  -- so you could give him additional

9    inside information about F1?

10             THE WITNESS:  To give him additional information that

11   he had in the past described as very, very useful.  Yes.  That

12   was -- I had no expectation, Your Honor, that he would just see

13   me by when I told him I need something from you not having

14   talked to him for a while.  So I thought the way to best phrase

15   that is let's have a chat about an area that we both have an

16   interest in.  I can tell you a lot about what's going on in

17   racing circles and can you please help me.  That was what

18   mutual interest here was intended to say.

19        (Pause)

20             THE COURT:  Can you explain to me -- I'm sorry.

21             MR. LENDER:  Please.  Absolutely.

22             THE COURT:  Can you explain to me, if you follow the

23   chain up in time --

24             THE WITNESS:  Uh-huh.

25             THE COURT:  -- he then says, kind of you to offer to

1    travel, but this is so cryptic.  Could you be more specific.

2             THE WITNESS:  Uh-huh.

3             THE COURT:  And then you say, not cryptic at all, but

4    obvious.  Past, I greatly appreciate fully understanding your

5    perception of my role, future scenarios going forward.

6             THE WITNESS:  That's exactly what I was trying to

7    explain, the mutual interest was before.

8             THE COURT:  I see.  So on the claim he says -- Mr.

9    Sherratt responds to you and says, the claim on LBEL isn't

10   justified and, two, I don't really want to meet to talk about

11   the investment and see it crop up again in litigation so I'll

12   pass.  Okay.

13            THE WITNESS:  That --

14            THE COURT:  Thank you.

15            THE WITNESS:  -- this is --

16            THE COURT:  All right.  I understand now.  Thank you.

17   BY MR. LENDER:

18   Q    So you also mentioned you approached Ruggero Magnoni to

19   write a letter on your behalf?

20   A    That is correct.

21   Q    And you provided Mr. Magnoni a draft?

22   A    I certainly provided Mr. Magnoni a draft which had been

23   prepared for me by Hogan Lovells for purposes of this

24   proceeding.

25   Q    And he signed -- I think we covered this before, but he

Page 139

1   signed exactly what you sent him.  He didn't --

2   A    He signed exactly what I sent him.

3   Q    And you're currently in business with Mr. Magnoni, this

4   company we've heard, M&M Capital?

5   A    We share expenses.  That is correct.

6   Q    And you've been in business with him since 2013?

7   A    That is correct.

8   Q    Now you also mentioned a conversation you stated you had

9   with Tom Bernard where, tell me if I got this wrong, but I

10  think what you said is he told you that you should get paid on

11  Formula One?  Is that what you stated --

12  A    Well, I think --

13  Q    -- Tom Bernard told you?

14  A    I -- this is, sorry, by your standards a highly un-

15  technical way of putting it.  What Tom Bernard said is what he

16  ultimately wrote.  So there's nothing more, nothing less than

17  the letter he wrote for purposes of the preparation of this

18  trial.  The other major Tom Bernard interaction was the one we

19  just had a long conversation about.

20  Q    So just so there's no confusion.  Maybe I misheard your

21  testimony.  Your testimony, just so we're clear, is that the

22  full extent of what Tom Bernard had to say about Formula One

23  was set forth in the letter that he submitted in terms of what

24  he knew about it?

25  A    For purposes of disproving what Peter Sherratt claimed and

Page 140

1    to support me in this proceeding as much as he saw fit, that's

2    what he wanted to write, felt like writing, is prepared to talk

3    about in deposition if necessary.  Independent thereof, I take

4    nothing back of what I said about the original e-mail exchange

5    with him --

6    Q    Fair enough.

7    A    -- in 2005.

8    Q    But Tom Bernard wasn't really involved in the details of

9    your Lehman relationship, right?

10   A    That is precisely why the letter he wrote is much less

11   specific than the ones written by Magnoni and Pignatti.

12            MR. LENDER:  Your Honor, I just have one short topic

13   left.  Should I --

14            THE COURT:  Okay.

15            MR. LENDER:  -- just finish up?

16            THE COURT:  Oh, yeah.  I think so.

17   BY MR. LENDER:

18   Q    I want to talk to you briefly about the bar date notices.

19   A    Yes.

20   Q    You understand that copies of the bar date notices were

21   sent to you at a number of different addresses that you had

22   provided to Lehman over the years, right?

23   A    That's correct.

24   Q    For example, we saw earlier that you included a --

25   A    Oh, sorry.  Sorry.  Sorry.  Forgive me.  There were four.

Page 141

1    In one case that's clearly not correct because it's Lehman's

2    own address which obviously I have never provided to Lehman.

3    Q    That's the Schedule G.

4    A    That's the Broad Gate address.  That -- I did not -- I

5    never provided that to Lehman.

6    Q    I'm talking about the three that you did provide to

7    Lehman.

8    A    Yes.

9    Q    So we saw earlier that you included a Malta address in

10   your 2004 consulting agreement with Lehman Brothers Europe?

11   A    That's right.

12   Q    And this was an address of a friend of yours in Malta?

13   A    Correct.

14   Q    And the reason why you included a Malta address, I think

15   what you said was for cosmetic tax purposes?

16   A    Yes.

17   Q    You were including a Malta address because you were trying

18   to support your argument as to why you shouldn't have to pay

19   taxes in Austria and the U.K. in connection with that work,

20   right?

21   A    That's technically incorrect.  I wanted the invoice to

22   reflect the reality that has since been audited and found to

23   have been correct that these were offshore revenues that are

24   perfectly legal under U.K. tax law not to be taxable.

25   Q    But when you say cosmetic tax purposes, what you mean is

Page 142

1    you didn't want a consulting agreement or an invoice, you

2    wanted those to say that you lived in Malta because you didn't

3    want there to be a document out there stating that you lived

4    in Austria or the U.K. right?

5    A    That is manifestly incorrect with respect of my five

6    consulting agreements with Lehman, three have my Austrian

7    address.

8    Q    But --

9    A    In '04 I felt like for prudency purposes I should vary

10   that to reflect the, I think peripatetic is the English word

11   nature of my life; that I was sometimes here, sometimes there.

12   But that these for U.K. tax purposes were also looked like what

13   they were which is offshore transactions and offshore revenues

14   for me --

15   Q    But --

16   A    -- perfectly legal and not --

17   Q    But the point --

18   A    -- taxable.

19   Q    But the point is so that you're not taxed in the U.K. on

20   those revenues, right?  Isn't that the whole point?

21   A    The -- I would have not been taxed in the U.K. on those

22   revenues whatever address I had put on this because the

23   substance of where I was and where I worked and how many days I

24   spent here and there has been audited in great detail.  I just

25   wanted to make it cosmetically, you know, more closely

Page 143

1    reflective of reality.

2            THE COURT:  Well, what's the --

3            THE WITNESS:  I was actually --

4            THE COURT:  What's the reality again that it was

5    reflective of?

6            THE WITNESS:  The reality is that these were offshore

7    revenues for me and that, the Austrian address, Your Honor,

8    would actually have been perfectly good enough for

9    it --

10           THE COURT:  Okay.  But I want to hear about the Malta

11   address.

12           THE WITNESS:  Yeah.

13           THE COURT:  What -- was that a home you owned?

14           THE WITNESS:  No.  That's an Austrian friend of mine

15   who had a home in Malta that he used for legal optimization of

16   Austrian --

17           THE COURT:  Okay.

18           THE WITNESS:  -- and U.K. --

19           THE COURT:  And you stayed at that home at a certain

20   point in time?

21           THE WITNESS:  I went to Malta at one point at that

22   time and he kindly said that, after he had told me that he used

23   this address to make everything look as clean as it was, that

24   if I saw a reason I was more than welcome to use this address.

25   And so I did.

Page 144

```
 1              THE COURT:  But this friend of yours, he lives in

 2     that house?

 3              THE WITNESS:  No.  He visits it occasionally.

 4              THE COURT:  He owns the house?

 5              THE WITNESS:  He also -- he's also Austrian who also

 6     lives in London and who occasionally goes to this summer house

 7     of his in Malta.

 8              THE COURT:  Okay.  Go ahead.  I'm sorry.

 9     BY MR. LENDER:

10     Q    And you also used that Malta address for cosmetic tax

11     purposes on invoices that you had submitted to LBEL, right?

12     A    Yeah.  My secretary did that.

13     Q    And you also used an address in Mexico for certain

14     invoices that you submitted to Lehman, right?

15     A    In Mexico, I rented a house once in Careyes for several

16     weeks which coincided with, you know, I think my first use of

17     that address.  And, yes, I used it.  Yes.

18     Q    You used -- so in addition to Malta, you sometimes used

19     the Mexican address on invoices for tax cosmetic purposes as

20     well?

21     A    I -- my secretary did the invoicing.  I would assume that

22     she did.  Yes.

23     Q    And you also used an address in Northern Italy, Casa --

24     A    Carpione.

25     Q    Yeah.  You have a better accent than me.  But in San
```

Page 145

1   Giacomo, right?

2   A     San Giacomo.  Yes.

3   Q     I was close.  Okay.  But you -- that's another address

4   that you used on invoices that you submitted to LBEL for

5   cosmetic purposes, right?

6   A     Yeah, because I was there very occasionally.

7   Q     Okay.  And that home in Northern Italy was your father's

8   vacation home?

9   A     Correct.

10  Q     Which you now own?

11  A     No.  This is a house with six flats.  I need to be very

12  precise here.

13  Q     Yeah, please.

14  A     This is a house with six flats, two of which my father

15  owned, one of which he gave to my brother and the other one he

16  gave to me.

17  Q     So you own some portion of this home now?

18  A     I now own one of those flats.  That is correct.

19  Q     And the Northern Italy address is another address that you

20  put on invoices submitted to Lehman Brothers Europe Limited,

21  right?

22  A     Yes.

23  Q     And, again, for tax cosmetic purposes?

24  A     For purely cosmetic purposes that had nothing to do with

25  changing or trying to change the substance of what was really

Page 146

1   going on, which is that these were U.K. offshore activities

2   that I, you know, carried out outside the U.K.

3   Q    Were you providing any advice to Lehman Brothers Europe

4   Limited from Malta?

5   A    Yes.  I actually do remember I very specifically on one

6   occasion sent in something to them with a Maltese stamp for --

7   you know, for purposes of making the file confirm with the

8   reality.

9   Q    I got you.  Thank you.

10        MR. LENDER:  No further questions.  Thank you, Dr.

11   Marsoner.

12        THE COURT:  All right.

13        THE WITNESS:  Thank you.

14        THE COURT:  Any redirect?

15        MR. VAN TOL:  I do, Your Honor.  I --

16        THE COURT:  All right.  I think --

17        MR. VAN TOL:  -- can do it before or after --

18        THE COURT:  Let's take a brief break.  I'm trying to

19   get some more cold air pumped into the room.  It's getting a

20   little warm.  If any of you is uncomfortable, you're very

21   welcome to take your jackets off.  I know no one ever takes me

22   up on that, but I really do mean it.  If I get one person to do

23   it, then others will follow.  So --

24        MR. VAN TOL:  I may start the trend.

25        THE COURT:  Excellent.  I would be grateful if you

Page 147

1    did.

2            Let's come back at ten minutes to the hour.  All

3    right.

4            MR. VAN TOL:  Thank you, Your Honor.  And I promise I

5    will.

6            MR. LENDER:  Thank you, Your Honor.

7        (Recess from 2:42 p.m. until 2:59 p.m.)

8            MR. VAN TOL:  I was showing solidarity.  So --

9            THE COURT:  Dr. Marsoner, please.

10           THE WITNESS:  Thank you very much.  I have the

11   privilege of the cold air.

12           THE COURT:  You put that on?  All right.  Then I'll

13   need you to keep your voice up.  The only reason to keep that

14   off is because it makes it harder for us all to hear, but I

15   will -- if you raise your voice --

16           THE WITNESS:  That's very easy.  I just have to take

17   one hearing aid out and I'll be much louder.

18           THE COURT:  Very good.  All right.  Go ahead.

19           MR. VAN TOL:  Thank you, Your Honor.

20   REDIRECT EXAMINATION

21   BY MR. VAN TOL:

22   Q    Dr. Marsoner, I want to go back to the testimony you gave

23   about your claim in the LBI SIPA proceedings.  At the time were

24   you related -- were you represented by U.S. counsel?

25   A    No.  No, I was not.

Page 148

1  Q    And how is it that you knew how to submit a claim in the

2  SIPA proceeding?

3  A    I got a letter.  I got a letter.  I must have been -- I

4  got a letter in London.  I must have been on some database.  I

5  got a letter in London that informed me that if I had a claim

6  against LBI I should make it.  And since I -- yeah, I did not

7  take advice.  I just thought the margin amount that I stood to

8  lose I might as well, you know, try always to recover it.  And

9  so I filled in this form that happened to have reached me in

10  London incidentally.

11  Q    And whom did you get that letter from?

12  A    I'm sorry.

13  Q    Who did you get the letter from?

14  A    I believe the -- I received a whole number of such letters

15  in London and they were all from Epiq Bankruptcy Solutions to

16  the best of my recollection.

17  Q    All right.  I would like to talk about the BAWAG

18  transaction.

19  A    Yeah.

20  Q    We've seen that you were paid for that in June of 2007; is

21  that right?

22  A    I'm sorry.  The BAWAG transaction, when I was paid?

23  Q    Yes.

24  A    Yes.  That was in June of 2007.

25  Q    Yeah.  That was after the effective date of the 2007

Page 149

1    consulting agreement, wasn't it?

2    A    Yeah.  Yeah.  I believe so.  Yeah.  Sure.  Yeah.

3    Q    Did anyone at Lehman take the position that you should not

4    be paid for the BAWAG transaction because you hadn't released

5    any claims under a prior agreement?

6    A    No.  Of course not.  Nobody in any way doubted that this

7    was money I had earned fairly.

8    Q    Even though a new agreement had taken over?

9    A    Absolutely.

10   Q    All right.  Now in your binder could you please turn to

11   Exhibit 51?  Exhibit 51 is a series of e-mails and within those

12   I would like you to turn to Marsoner 25 which is an e-mail

13   exchange you were asked about on cross.

14   A    Yes.  I'm on Marsoner 25.

15   Q    And you were asked about the middle e-mail from Mr.

16   Sherratt.  I would like to ask you about the top e-mail in

17   which you state in the third paragraph:

18        "Objectively these perceptions are compatible since they

19   occurred subsequently to each other.  Christian Meissner

20   certainly agrees that my involvement in F1 predates his egis."

21        What did you mean by that?

22   A    That means that until November when I had my exchange with

23   Bernard I had also worked at Pignatti's request for Pignatti,

24   but after -- I forget what it was, but relatively soon after my

25   exchange with Bernard my understanding is that essentially

Page 150

1    Jeremy Isaacs and Peter Sherratt had taken over from the old

2    team on the justification that CVC was such an important M&A

3    and firm relationship that any negotiation that could

4    potentially become adversarial was better handled by the firm

5    represented by Isaacs and Sherratt, Sherratt rather than the

6    business as represented by Pignatti.

7         So essentially, essentially what I was trying to tell

8    Peter was that his perception that he was the big guy on F1

9    after I had been critical is -- are two compatible perceptions.

10   Q    Did Mr. Sherratt play any role in setting your

11   compensation for any of the time that you worked for any Lehman

12   entity?

13   A    None whatsoever.

14   Q    Last question relates to Mr. Meissner.  You asked Mr.

15   Meissner to sign a letter on your behalf; is that correct?

16   A    That is correct.  Yes.

17   Q    And do you know why he did not do so?

18   A    Yes.  He wrote me an e-mail in German, which is part of

19   the record here, in which he says that I should please

20   understand that although what I am putting forward to him is

21   non-problematic, he would rather not get involved because with

22   his new job at Bank of America, Merrill Lynch, head of global

23   corporate investment banking and all that he was far too busy

24   and the last thing he needed in his career was a reminder of

25   his Lehman past.

Page 151

1           MR. VAN TOL:  Thank you.  Nothing further, Your

2    Honor.

3           THE COURT:  All right.  Thank you.  Anything more?

4           MR. LENDER:  No, Your Honor.  Thank you.

5           THE COURT:  All right.  Dr. Marsoner, thank you very

6    much.  You can step down.

7        (Witness excused)

8           MR. VAN TOL:  Your Honor, we have no further

9    witnesses.  At --

10           THE COURT:  All right.

11           MR. VAN TOL:  -- at this time we will rest subject to

12    moving in exhibits which I understand we'll do at the end.

13           THE COURT:  Very good.  Thank you.

14           MR. VAN TOL:  Thank you, Your Honor.

15           MR. LENDER:  So, Your Honor, Mr. Horwitz will be

16    calling our first witness.

17           THE COURT:  Very good.

18           MR. LENDER:  Thank you.

19           MR. HORWITZ:  Good afternoon.

20           THE COURT:  How are you?

21           MR. HORWITZ:  Good.

22           THE COURT:  Would you please raise your right hand,

23    sir?

24        (Witness sworn)

25           THE COURT:  All right.  Please make yourself at home.

Page 152

1    Let us know if you would like a break at any time.

2    DIRECT EXAMINATION

3    BY MR. HORWITZ:

4    Q    Could you please state your name for the record?

5    A    Steve Kotarba.

6    Q    And where are you currently employed?

7    A    Alvarez & Marsal.

8    Q    What is your current position at Alvarez & Marsal?

9    A    Managing director.

10   Q    And how long have you held that position?

11   A    Approximately eight years.

12   Q    What are your responsibilities as the managing director at

13   Alvarez & Marsal?

14   A    Sure.  As it relates to this case I'm part of the claims

15   management group.  So what we typically do in a Chapter 11 case

16   is we're involved in the early days of identifying creditors

17   that would be put onto the master mailing list.  We'll then

18   take that and prepare the statements and schedules.  We'll work

19   on matters on the claims reconciliation, preference analysis.

20   Primarily we work on the creditor side of the case.

21   Q    When did you start working on the Lehman Brothers' Chapter

22   11 cases?

23   A    Almost from the beginning, a day or two after it filed.

24   Q    Okay.  And who were you engaged by?

25   A    Sure.  We were engaged by Lehman Brothers Holdings Inc.

Page 153

1  and then there were certain enumerated debtors in that caption.

2  Q    Were you engaged by anyone other than the debtors --

3  A    We were not.

4  Q    -- in these cases?

5  A    We were not.

6  Q    Do you still work on Lehman Chapter 11 cases?

7  A    I personally do not.

8  Q    When did you stop working on those cases?

9  A    I would say on or about 2011, 2012.

10  Q    What were your responsibilities during your work on the

11  Chapter 11 cases?

12  A    Sure.  Initially it was to handle the triage of the early

13  days of the case as it -- again, as it relates to these

14  matters.  We quickly began preparing what's been referred to as

15  the master mailing list which is a list of -- I wouldn't say a

16  list of creditors, but it's a list of all entities that we want

17  to receive notice of the commencement of the bankruptcy cases.

18  We then moved into preparation of the debtors' statements and

19  schedules, and then started to work on claims reconciliation

20  after the bar date was set and claims began to come in after

21  the filing of those statements and schedules.

22  Q    Could you describe generally how you prepared the master

23  mailing list?

24  A    Sure.  What we would have done there is what we do in

25  every case.  So as we come into a case what we'll do is we'll

Page 154

1    have a predesigned checklist that will say from cases that

2    we've been on previously from previous preparation these are

3    the types of categories that we would expect to see in any

4    case.  And we'll have a critical group of individuals that

5    we'll invite to that meeting and we'll expand the individuals

6    out as we have that meeting and subsequent meetings.

7         So, for example, on that list we would have employees and

8    we would have someone there from HR as we would like to get a

9    list of employees.  We would have vendors because we would

10   expect to have AP.  We would have someone there, a general

11   counsel or someone to speak to litigation because we would

12   expect to have open litigation.  We would expect to see

13   contract databases so we would have someone that was familiar

14   with those databases, someone from IT to the extent that we

15   needed to do system pulls.

16        But, again, what we would do is we would start with our

17   checklist.  We would be looking for subject matter experts that

18   could help us identify and pull out the information for that

19   checklist and then also help us to identify additional

20   categories that would be case specific that we should add to

21   the checklist and again start that same process, identify a

22   subject matter expert, and work with them to prepare the list

23   of creditors.

24   Q    Is this what you did for the Lehman Chapter 11 cases?

25   A    It is.

Page 155

1  Q    Now could you describe how your subject matter experts

2  that you referred to would help you prepare your --

3  A    Sure.  So for example, let's take vendors.  If we had

4  vendors we would understand -- we would fully expect that a

5  company would have what's called the vendor master.  So in

6  order for someone to -- for a company to receive invoices to

7  make payments what's typical and what we see in almost every

8  case is they'll have a computer system that's set up to take in

9  those vendors, to code those vendors, grab general information

10 pertinent here, mailing address, tax ID, things of that nature.

11      When we have a subject matter expert we would want to

12 understand, you know, are there -- where are your vendors, how

13 do we find your vendors, what systems feed into your vendors,

14 who do we call.  And then as we get system files, nothing's

15 perfect and we would take -- and we would work through those

16 files that subject matter expert would help us work through

17 those files, answer questions, and certainly let us know if we

18 were complete.

19 Q    Now you mentioned vendor master.  Were there other systems

20 that you looked at?

21 A    Sure.  There -- there's always a number system.  So there

22 were one or several derivative systems.  There were contract

23 systems.  There were systems that we used to pull employee

24 files, just to name a few.

25 Q    Now what would you do with the information that you

Page 156

1    ultimately collected from these systems?

2    A    Sure.  So what we would do is we would collect that

3    information and for that initial purpose we were trying to do

4    two things, where, one, we're contemplating that we're

5    ultimately going to file the debtors' statements and schedules

6    so we're loading them in for that purpose, to identify if they

7    would later be identified as creditors.  But at this point what

8    we're trying to do is really just take a list of potential

9    parties so that we can get them a notice.

10        So what we would do there is we're grabbing names and

11   addresses to compile in a format that would be acceptable and

12   usable by, as it was mentioned earlier, Epiq Bankruptcy

13   Solutions was the court-appointed claims and noticing agent

14   here.  So we would be grabbing information that we would

15   provide to them that would be used to be -- to make that

16   mailing of the notice of commencement.

17   Q    Why would you look in a vendor master system?

18   A    Essentially for that early purpose the reason is because

19   it's a good starting point.  We're going to assume that for

20   your vendors, while all of them may not ultimately become

21   creditors, you would fully expect that there's going to be a

22   lot of open payables, and when you're talking about a notice of

23   commencement, where's a likely target, that's a good place to

24   start.

25   Q    What did you do with contracts?

Page 157

1   A     Well, in this case what we did is we took system poles.

2   So we identified their contract systems and then received data

3   from those systems that would identify the existence of

4   contracts, contract parties and then ultimately the notice

5   addresses for those parties.

6   Q     What did you do with -- now what do you do with contracts

7   with non-debtors?

8   A     Well, we wouldn't do anything with contracts or with any

9   party with non-debtors.  Again, as I mentioned earlier, we've

10  got to, in effect, sort of put our blinders on, there's

11  probably a better word for it, but we have to -- we're

12  responsible to our client.  We're retained by certain entities.

13  So we mentioned here LBHI.  When we're collecting information

14  we're collecting information because, again, we're tasked with

15  reporting of the liabilities of a specific entity on a stand-

16  alone legal basis.  So we're capturing information of our

17  clients, the debtors.

18  Q     So when you say you would pull contract information, you

19  were pulling contract information of the debtors?

20  A     From an enumerated list, yeah.  That's exactly right.

21  Q     Okay.  And what did you do with the e-mails that are in

22  the Lehman systems?

23  A     We wouldn't do anything per se with the e-mails.

24  Q     Why not?

25  A     We don't view those as being a reliable business record of

Page 158

1    the company.  If there was some reason why, someone identified

2    an e-mail or something of that nature, we would certainly take

3    a look at it.  But we're not canvassing for e-mails.  That's

4    not a part of what we would view as a record that we would

5    review to pull information.

6    Q    So beyond these company systems what else did you look at

7    in preparing the credit matrix?

8    A    Again, we would look at the systems themselves.  We would

9    look at information and files that would be provided by

10   individuals and subject matter experts.  So, for example, there

11   may or may not be in a given case a litigation database.

12   Someone may have a stand-alone file of litigation and they

13   would provide that.  There may be certain parties that aren't

14   captured in one of these systems.  So we would -- that's what

15   we would canvas with the subject matter expert to understand

16   and pull that information that wouldn't be captured by the

17   other systems that we pulled.

18   Q    How did you make a determination as to whether or not to

19   include an address or a name on the master mailing list?

20   A    You know, that's sort of easy for us in that there's no

21   decision at that point.  So, for example, if we get two

22   addresses that are conflicting, a conflicting address, we would

23   simply mail it to both addresses again because it's there.

24   It's to cast the net as far and wide as we can to get out

25   notice.  There's no reason for us to make a distinction at that

Page 159

1    point which is why I think we mentioned we served to multiple

2    addresses here which is not atypical.

3    Q    Well, how did -- if you had multiple addresses how did you

4    decide which ones to include or not include?

5    A    Again, we wouldn't.  If we had multiple addresses we would

6    mail multiple times.

7    Q    What would you do with invoices that you came across?

8    A    Again, that wasn't part of what we were reviewing either

9    for the master mailing list or for purposes of preparing the

10   schedules.

11   Q    If you found an invoice that was addressed to a non-debtor

12   would you -- what would you do with that?

13   A    Again, I find it highly unlikely at that point that we

14   would have reviewed an invoice to put two and two together to

15   identify that it was addressed to a non-debtor.  That's just

16   not -- that wasn't -- one, we weren't reviewing invoices and if

17   we had invoices that's not what we were reviewing them for.  We

18   were relying on the company's books and records for them to set

19   them up in vendor master, capture it through their normal

20   processes and pull the address information that way.

21   Q    So if you're saying you didn't review invoices what -- is

22   there any way that you would have reviewed the -- any

23   attachments or receipts to those invoices?

24   A    Not that I can think of.  No.

25   Q    How much time did you spend preparing the master mailing

Page 160

1   list for these cases?

2   A    I guess the answer is much, much more than we did in a

3   typical case.  And the way that a master mailing list is

4   prepared, it's sort of an organic document.  So you start with

5   a list and that grows as the case grows.  So here what we were

6   trying to do is get out as much notice as we could as soon as

7   possible, understanding that you would have a master mailing

8   list.  You would mail a, what's called a notice of commencement

9   that related to that mailing list.  But then right on the heels

10  of that we had statements and schedules that were due so we're

11  trying to pull that information together.  Certainly as we

12  filed the statements and schedules all of those parties become

13  part of the master mailing list.  Parties can request on their

14  own merit to be added to that list.

15       Again, so that -- I would say, you know, in a nutshell it

16  grew as the case grew, but certainly, you know, for our

17  purposes greater than six months preparing that list.

18  Q    In a typical case that you work on how long does it take

19  to prepare the master mailing list?

20  A    It's hard to say what a typical case is, but, I mean, I

21  can tell you cases where we've pulled together a master mailing

22  list in a week or two.

23  Q    Okay.  Why did it take so much longer to prepare this

24  master mailing list?

25  A    Well, there was a lot -- I mean, one, obviously people

Page 161

1   have read all about the complexity of these cases, the time

2   demands on everyone in those early days in the cases.  In

3   addition, I think someone mentioned there were upwards of 250

4   billion records in this case.  So the sheer magnitude of this

5   case made it different than any other, and I think everyone's

6   read about that.

7   Q    Did -- how many addresses ended up going into the master

8   mailing list?

9   A    I don't have a final number.  I mean, I think it was well

10  over 300,000.

11  Q    Okay.  So if you had wanted to would it have been feasible

12  to review every e-mail and every contract in these cases?

13  A    No.

14          MR. HORWITZ:  I don't have anything further.

15          THE COURT:  All right.  Thank you.

16          Cross-examination.

17          MR. VAN TOL:  Your Honor, my colleague, Mr. Johnson,

18  will do the cross-examination.

19          THE COURT:  Okay.

20  CROSS-EXAMINATION

21  BY MR. JOHNSON:

22  Q    Good afternoon, Mr. Kotarba.

23  A    Good afternoon.  I guess before you get started if we're

24  going to reference exhibits I don't have a binder.  I think

25  I --

Page 162

1   Q    Yeah.  We will, but actually it will be easier -- we have

2   a special one for you that's going to be referenced back and

3   forth.  It would be easier to use ours.

4   A    If that's fine with counsel, that's fine with me.

5   Q    Okay.  So first I want to start with, isn't it correct

6   that Dr. Marsoner was identified as someone who should receive

7   notice of the claims bar date?

8   A    I would disagree with that.  No.

9   Q    Well, otherwise he wouldn't have been sent notice at any

10  address or attempted to deliver notice to any address, isn't

11  that right?

12  A    There's been talk about that.  There's various reasons

13  why.  Again, entitled to notice versus entitled to a notice of

14  commencement, I think it's -- there's a distinction that is

15  probably important here.  So he received mailings by virtue of

16  being on the master mailing list.  If what you're getting at is

17  did he receive notice as a known creditor I would disagree with

18  that.

19  Q    That's not what I asked.  I said isn't it correct that Dr.

20  Marsoner was identified as someone who should receive notice of

21  the claims bar date?

22  A    I'm only pausing because I'm trying to think of why he

23  would have been -- again, as I mentioned earlier, we're going

24  to be overbroad and making sure that we get out notice of the

25  claims bar date.  I can't think of an instance here where  when

Page 163

1   we talk about would he be entitled to notice.  He would be

2   entitled to notice if he was a known creditor.  We don't view

3   him to be a known creditor.  We certainly did send him a notice

4   of the bar date to various addresses.

5   Q    So you're testifying that you would send notice to people

6   who didn't deserve it or were entitled to --

7   A    I wouldn't --

8            THE COURT:  All right. We're not going to have --

9            THE WITNESS:  -- phrase --

10           THE COURT:  -- we're not going to have questions that

11  sound like that.  Okay.  So if you have a actual precise

12  question to ask I'm happy to have you ask it.  But we're not

13  going to use words like deserve notice.

14           MR. JOHNSON:  Sure.  I'll move on.

15  BY MR. JOHNSON:

16  Q    Mr. Kotarba, could you please look at Exhibit 12 in your

17  book, please?

18  A    Okay.

19  Q    This is a declaration of Herb Baer with respect to Dr.

20  Marsoner's motion to deem proofs of claim as timely filed.  Do

21  you see that?

22  A    I do.

23  Q    And do you know who Herb Baer is?

24  A    I do.

25  Q    Is it correct that he worked at Epiq?

Page 164

1    A     That's correct.  Yes.

2    Q     And Epiq was the company actually in charge of mailing the

3    notices; is that correct?

4    A     That's correct.  They were the court-appointed claims and

5    notice agent.

6    Q     And Alvarez provided names and addresses for the master

7    mailing list that Epiq used to send bar date notices; is that

8    correct?

9    A     We did.

10   Q     And Alvarez looked at the debtors' books and records to

11   compile these names and addresses?

12   A     We did.

13   Q     And wouldn't you agree that the debtors' books and records

14   includes e-mails?

15   A     I -- again, it gets to the point we're getting to.  I

16   wouldn't.  I would say that's debtors' information.  And I'm

17   not trying to parse words or get into semantics.  But for us

18   when we're talking about books and records it's reliable

19   business records and we wouldn't view a review of the debtors'

20   e-mails as being part of their reliable business records for

21   the purposes that we were using them for.

22            MR. JOHNSON:  Your Honor, could I pass up Mr.

23   Kotarba's deposition transcript?

24            THE COURT:  Sure.

25        (Pause)

Page 165

1          THE COURT:  Thank you.

2    BY MR. JOHNSON:

3    Q    Mr. Kotarba, could you look at page 8 starting at line 11?

4    A    Okay.  I'm there.

5    Q    And this is -- just to be clear this is the -- your

6    deposition of December 22nd, 2015 that I took; is that correct?

7    A    That's correct.

8    Q    So starting at page 8, line 11, I asked, "With regard

9    those names and addresses Alvarez looked at Lehman Brothers'

10   books and records; is that correct?"  You answered, "We looked

11   at among other things we looked at the books and records of the

12   filing debtors."  My question, "That included e-mails from

13   Lehman Brothers?"  Your answer, "It could have."

14        Is that a correct statement?

15   A    It is.

16   Q    And the debtors kept records of their e-mails; is that

17   correct?

18   A    That's correct.  Of course they did.  Yeah.

19   Q    And I believe you testified a little bit earlier that once

20   someone has been identified as going on the master mailing list

21   Alvarez includes every address it finds for them; is that

22   correct?

23   A    I would -- I think that's right.  Yes.

24   Q    And in compiling the mailing list is it Alvarez's goal to

25   identify someone's last known address; is that right?

Page 166

1    A    It is.

2    Q    Could you turn to Exhibit 30?  This is an affidavit of

3    service of Herb Baer with respect to the notice of deadlines

4    for filing proofs of claim.  Do you see that?

5    A    I do.

6    Q    If you turn to the, I guess it's the second page do you

7    see that he signed that on July 10th, 2009?

8    A    I do.

9    Q    If you could turn to the next exhibit, Exhibit 7.

10   A    Okay.  I'm there.

11   Q    It's a corrected affidavit of service by Herb Baer.

12   A    I see that.

13   Q    Do you see that's signed on June 2nd, 2010 on page 3?

14   A    I do.

15   Q     Do you know why it took almost a year to correct the

16   original affidavit of service?

17   A    I don't.

18   Q    Alvarez didn't inform Epiq of the mistakes that had been

19   made?

20   A    Not to my knowledge, no.

21   Q    So to your knowledge Alvarez wasn't aware that there had

22   been any mistakes?

23   A    I'm just not familiar with this document or why it would

24   have been filed a year later.

25   Q    Well, if you looked back at Exhibit 12, Herb Baer's

Page 167

1    declaration, you see paragraph 5, how the original affidavit of

2    service incorrectly listed the address of certain parties that

3    were served.  Were you not aware that happened?

4    A    I was not.  I don't recall having a discussion on that.

5    Q    Okay.  If we could go back to Exhibit 7.  Do you see this

6    corrected affidavit of service lists five total addresses for

7    Dr. Marsoner?  On the first page you see there's two Malta

8    addresses, a Mexico address and an Italy address?

9    A    I do.

10   Q    If you flip the page you see that on the very last entry

11   there's a 1 Broad Gate, 5th Floor, London address for Dr.

12   Marsoner?

13   A    I do.

14   Q    And isn't it correct those addresses were included because

15   Dr. Marsoner had interactions with the debtors?

16   A    With looking at this document I can't tell from what

17   system we pulled or why we included those addresses on this

18   document.

19   Q    So you don't know, for example, whether the Malta, Mexico

20   and Italy addresses were from invoices; is that correct?

21   A    I would have very strong reason to believe they're not

22   from invoices because, again, it's not our process to review

23   invoices or pull from invoices.  So they -- I would -- it would

24   be very hard for me to believe that they are from invoices.

25   Q    Okay.  But let's take a look at the next exhibit, Number

Page 168

1    25, please.  Do you see this is an invoice from Dr. Thomas

2    Marsoner and it says sort of in the middle, expenses incurred

3    by consultant on behalf of Lehman Brothers Europe Limited?

4    A    I see that.

5    Q    Do you see the address on the invoice is an address in

6    Malta; is that correct?

7    A    I do.  I do see a Malta address at the top of the invoice.

8    Q    And that Malta address matches an address where Dr.

9    Marsoner was sent notice of the claims bar date; is that

10   correct?

11   A    I mean, I can go back to the previous exhibit --

12   Q    Sure.

13   A    -- and prepare that or compare that.  I have no reason to

14   believe it doesn't.

15        (Pause)

16   A    Yeah.  That appears to match.  Yeah.

17   Q    So -- but you testified that you don't think Dr.

18   Marsoner's Malta address was included on the mailing list

19   because of an invoice?

20   A    That's correct.  That wouldn't have been a typical record

21   that we would review to pull addresses for the master mailing

22   list.

23   Q    So then do you believe it came from a contract?

24   A    I -- again, without looking at the -- this document

25   doesn't tell me where the address information would have come

Page 169

1    from.   Likely it would have come from some Lehman system,

2    whether it was a contract system or some other system.  I can't

3    tell you looking at this file.

4    Q    You have a -- I believe you described a payable systems

5    records that you used for the mailing list; is that correct?

6    A    That would have been one of the records we would use.

7    Yes.

8    Q    And were that payable systems, did they pull invoices that

9    were in the debtors' records?

10   A    I think that would be someone's interpretation of the

11   information that would be required from an invoice to create

12   payables.  So I -- it's hard for me to tell you.

13   Q    Well, I'll ask you another way then.  Are you aware of any

14   other document in the debtors' possession that includes the

15   Malta address?

16   A    I think there was a contract mentioned earlier that had

17   the Malta address.

18   Q    A 2004 contract?

19   A    I believe that's right.

20   Q    That was in the debtors' possession?

21   A    Again, I don't know.

22   Q    Okay.  So your answer to my question is you don't know if

23   there's another document --

24   A    Could you restate your question?

25   Q    Yes.  So I asked are you aware of any other document in

1   the debtors' possession that includes the Malta address?

2   A    Yeah.  There was the document I mentioned earlier which

3   was the contract that had the Malta address.  When we were

4   pulling information we would pull reference to that document

5   from a system.  Whether the debtors had that particular -- the

6   physical document in their possession, I don't know the answer

7   to that.  But I fully expect that it existed, had that address.

8   It would have been in their computer -- it would have been in

9   their contract system and we would have pulled it that way.

10  Q    So your testimony is you believed the Malta address came

11  from the 2004 agreement?

12  A    I -- my testimony is I don't know where it came from.  It

13  would be likely that it would come from there, but I would  be

14  speculating.  I don't -- with this document, I don't know where

15  that address came from.

16  Q    The only way they could use the address on the 2004

17  agreement is if they had it in their possession; is that

18  correct, the debtors had it in their possession?

19  A    Well, that would be true, but I don't know that that's why

20  that address is in this document.  But you're correct.  The

21  only way they could use an address from a contract is if they

22  had the existence of the contract.  I agree with that.

23  Q    So just to be clear I'm talking about why the Malta

24  address was in the mailing list.

25  A    Okay.

Page 171

1  Q    So I asked do you believe that address on the 2004

2  agreement was on -- was included on the mailing list -- let me

3  rephrase.

4        Do you believe that the Malta address was included on

5  the master mailing list because it was on the 2004 agreement;

6  is that correct?

7  A    Yeah.  And I said I don't know -- I can't tell you looking

8  at this document why that Malta address appeared on the master

9  mailing list.

10  Q    But you believe it's because it was on the 2004 agreement?

11  A    Again, I said I don't know.  It would be very --

12  Q    Okay.

13  A    Okay.

14  Q    Now would you agree that past payments to someone are an

15  indication that they might be entitled to additional payments

16  in the future?

17  A    Not necessarily, no.

18  Q    Okay.  Now when Alvarez provides the addresses does it

19  check to determine if they are vacation addresses?

20  A    We do not.

21  Q    Do you check to see if they're working addresses?

22  A    There -- from my understanding there's some work that's

23  done at Epiq that they will go through and there's a process.

24  I can't remember the word that they have for it.  But they can

25  tell if it's a mailable address.  I don't know what you mean by

Page 172

1    working, but, you know, if there's a right zip and that

2    combination they will do some work to make sure that that

3    occurs.

4    Q    That's not something that Alvarez does, though?

5    A    That's not.

6    Q    Okay.  Now with respect to the One Broadgate, 5th Floor,

7    London address that we looked at in Exhibit 7 --

8    A    Right.

9    Q    -- that was LBEL's former address; is that correct?

10   A    I believe that's correct.

11   Q    And that was no longer LBEL's address in 2009 when the bar

12   date notice was sent; is that right?

13   A    I believe that's also correct.

14   Q    Let's just look at Exhibit 32 really quickly.  This is a

15   Lehman Brothers Europe Limited progress report.  It's dated

16   April 21st, 2009.

17   A    I'm there.

18   Q    Okay.  Could you go to page 5?  Do you see the full name

19   of the entity listed as Lehman Brothers Europe Limited?

20   A    Yes.

21   Q    And it's registered address is 25 Bank Street, London,

22   England?

23   A    I see that.

24   Q    So Alvarez doesn't do an independent check on an address

25   even if it's LBEL's former address?

Page 173

1    A    I'm not sure I understand the question.

2    Q    Well, I think you just testified that, and we just looked

3    at the progress report that LBEL's address in 2009 when the bar

4    date was sent was not at the Broad Gate, One Broadgate address?

5    A    Right.

6    Q    Is that correct?

7    A    That's correct.

8    Q    But on Exhibit 7, the corrected affidavit of service it

9    lists the One Broadgate address for Dr. Marsoner; is that

10   correct?

11   A    I believe that's correct.

12   Q    So my question is Alvarez, that doesn't raise any red

13   flags with Alvarez when they input that address into the master

14   mailing list?

15   A    It didn't.  That's the address we mailed to.

16   Q    I'm sorry.

17   A    It didn't.  That's the address we mailed it to.

18   Q    Okay.  Could you take a look at Exhibit 28, for instance?

19        (Pause)

20   A    Okay.  I am there.

21   Q    You're at Exhibit 28?

22   A    28.  I'm here.  Yeah.

23   Q    Okay.  So you see this is an e-mail from Aaron Johari

24   dated September 19th, 2008.  And do you see that there's an LEH

25   Bates stamp in the bottom right-hand corner?

Page 174

1   A     I do.

2   Q     And that's because it came from the debtors' files; is

3   that correct?

4   A     I believe so.  I wasn't part of the production, but I have

5   no reason to disbelieve that.

6   Q     Can you turn to LEH 389?

7              THE COURT:  Okay.  Are you going to lay any

8   foundation on -- for showing the witness this document?

9              MR. JOHNSON:  Your Honor, he's spoken about how

10  Alvarez came up with the master mailing list --

11             THE COURT:  Yes.

12             MR. JOHNSON:  -- and came up with Dr. Marsoner's

13  addresses.

14             THE COURT:  Yes.

15             MR. JOHNSON:  So now I would like to ask him why

16  another address in the records wasn't included.

17             THE COURT:  Okay.  And my question remains, are you

18  going to lay any foundation for using this document to question

19  this witness?

20             MR. VAN TOL:  Your Honor, if I may --

21             THE COURT:  This is not -- this is not a joint

22  participation.

23             MR. VAN TOL:  Well, I was just simply going to remind

24  the Court there's a representation from Weil on behalf of

25  Lehman that they were not objecting to the authenticity of the

Page 175

1    document --

2            THE COURT:  My question isn't --

3            MR. VAN TOL:  -- as a business record.

4            THE COURT:  I'm not making an authenticity -- I'm not

5    raising an authenticity concern.

6            MR. VAN TOL:  I -- that's fine.  I was confused.

7            THE COURT:  Okay.  I have a witness on the witness

8    stand who is giving testimony that there were literally

9    hundreds of millions if not billions of documents.  And the

10   witness is being shown a document from a Mr. Johari to a number

11   of other folks dated September 19th, 2008.  And I would simply

12   like to know what the foundation is for asking the witness

13   questions about this document.  I have no doubt that it came

14   from Lehman's files.

15           MR. JOHNSON:  Can I confer for a second, Your Honor?

16           THE COURT:  Sure.

17       (Pause)

18           MR. JOHNSON:  Can I ask one question of Mr. Kotarba,

19   if he's seen this document before in this -- as part of this

20   proceeding?

21           THE WITNESS:  I have not.

22           MR. JOHNSON:  Okay.

23   BY MR. JOHNSON:

24   Q    You didn't see this document as part of your deposition?

25   A    Oh, I thought you meant as part of this matter.  I mean, I

Page 176

1    believe this may be a document you asked about -- asked me

2    about at my deposition.

3    Q    What was the last part?  I'm sorry.

4    A    Did you ask me about this document?  I didn't see this

5    document independent of these, you know, this matter.

6    Q    Well, that's what I'm asking.  Did you see this document

7    as part of this proceeding including at your deposition?

8    A    I can't recall whether or not I saw this as part of my

9    deposition.  If I did not see it as part of my deposition,

10   then, no.

11            MR. JOHNSON:  Can I have a second, Your Honor?

12            THE COURT:  Uh-huh.

13       (Pause)

14            THE WITNESS:  Yeah.  Looking at this, I mean, if you

15   can find it --

16            THE COURT:  Hold on.  There's no --

17            THE WITNESS:  Oh, sure.

18            THE COURT:  There's no question pending.

19            THE WITNESS:  Okay.

20       (Pause)

21   BY MR. JOHNSON:

22   Q    If you look at page 35 of your deposition, line 18, it

23   references an Exhibit 10 Bates stamp LEH384 to 395 and then my

24   question, "Do you see this is an e-mail from Aaron Johari dated

25   September" --

Page 177

1    A    Wait.  Where are you again?

2    Q    Page 35 --

3              MR. HORWITZ:  Your Honor, we -- I would like to

4    object.  Showing Mr. Kotarba a document from his deposition

5    does not lay a foundation.

6              THE COURT:  Well, are you setting up some impeachment

7    here?  I don't really understand what you're doing.

8              MR. JOHNSON:  Well, yes, Your Honor.  He's -- he just

9    testified he has not seen the document.

10             THE COURT:  Well, he testified that he wasn't sure he

11   had seen the document other than in connection with this

12   proceeding and --

13             MR. JOHNSON:  Right.

14             THE COURT:  -- the context of that answer was that

15   this proceeding meant the proceedings relating to Dr.

16   Marsoner's proof of claim, not the Lehman proceeding globally,

17   right?  Did I --

18             THE WITNESS:  That's --

19             THE COURT:  -- get that?

20             THE WITNESS:  No.  That's correct.

21             THE COURT:  Okay.

22             MR. JOHNSON:  Okay.  Then that's -- that wasn't my

23   understanding of his answer, but that's okay.

24             THE COURT:  I'm sorry.

25             MR. JOHNSON:  I think -- that wasn't my understanding

Page 178

1    of his answer, but -- so that's what I was showing him.  But he

2    confirmed it now, so.

3           THE WITNESS:  That's confirmed.  Yeah.

4    BY MR. JOHNSON:

5    Q    So I would like to go back to the same e-mail that we

6    spoke about at your deposition.

7           MR. HORWITZ:  Your Honor, objection.  There's still

8    no foundation for this e-mail that we're referring to.

9           THE COURT:  I'm sorry.  What was the question again?

10          MR. JOHNSON:  Well, there was -- the only question

11   was that I would like to go back to the e-mail that we had

12   looked at at your deposition.

13          THE COURT:  Okay.  I'm sorry.  I'm lost at this

14   point.  So if you want to -- if you could help me catch up to

15   where you are.  What are we -- what are you asking about?

16          MR. JOHNSON:  I'm asking about the same e-mail, Your

17   Honor, the Exhibit 28.

18          THE COURT:  Okay.  All right.  Go ahead.  And what's

19   the question?

20          MR. JOHNSON:  Well, there hadn't been a question yet.

21   But my question was going to be to identify the 2007 agreement

22   as being an agreement between Dr. Thomas Marsoner and Lehman

23   Brothers Europe Limited.

24          THE WITNESS:  I -- just to be clear, so you're

25   talking about the agreement that's attached starting at Lehman

Page 179

1    389?

2              MR. JOHNSON:  That's correct.

3              THE WITNESS:  And what's your question on that?

4    BY MR. JOHNSON:

5    Q    Do you see that Dr. Thomas Marsoner's name is at the top?

6    A    I do.

7    Q    And that this is an agreement between Dr. Thomas Marsoner

8    and Lehman Brothers Europe Limited, if you look at LEH 395?

9    A    Yeah.  That's what it purports to be.  Yeah.

10   Q    Okay.  And do you see there's -- he lists his Austrian or

11   an Austria address?

12   A    I do see that.

13   Q    But he was not -- that address was not included on the

14   master mailing list; is that correct?

15   A    That's correct and I wouldn't expect it to be based on

16   this.  Again, I'm not saying that I saw this, but you're

17   talking about an agreement between Dr. Marsoner and a non-

18   debtor entity.

19   Q    I believe you testified earlier that once you identify

20   someone to include in the master mailing list you include every

21   address that you have for them?

22   A    That we would have access to and that we would search for.

23   We would not have had access to nor would we have searched the

24   address information for non-debtor entities.

25   Q    But you had -- but if it was in the debtors' records you

Page 180

1    would have access to it, wouldn't you?

2    A    Yeah, but it gets into the discussion of what constitutes

3    the debtors' records.  I'm not sure I understand your question.

4    Q    Well, it was produced by your counsel in this proceeding.

5    Doesn't that mean that you had access to it?

6         MR. HORWITZ:  Your Honor, Mr. Kotarba was not

7    involved in this part of the document production or even any

8    part of the document production.

9         THE COURT:  Objection sustained.

10        MR. JOHNSON:  All right.  If I could have one second.

11       (Pause)

12   BY MR. JOHNSON:

13   Q    Okay.  Can we look at Exhibit 21, please?  If you would

14   turn to the proof of claim of Dr. Klaus Kinkel.

15   A    I'm there.

16   Q    Do you see that he attached to a September 10th, 2001

17   agreement between himself and Lehman Brothers Bank House AG?

18   A    I do.

19   Q    And do you see the address listed on the agreement?  It's

20   Sun and Rain 46 in St. Augustine?

21   A    I do.

22   Q    Do you see this -- if you flip to Exhibit 24 --

23   A    I'm there.

24   Q    -- do you see this address was included for Dr. Kinkel

25   in --

Page 181

1          THE COURT:  Okay.  Can I just -- I'm -- other than

2     reading from documents in a binder I really don't know what's

3     going on here.

4          MR. JOHNSON:  Your Honor, the next question is going

5     to be --

6          THE COURT:  You haven't laid any foundation.  You

7     haven't asked the witness if he's ever seen these documents.

8     So I think I understand what you're trying to do, but -- you

9     know, and there is no objection.  But it's a quarter to four

10    and we really have to meaningfully move this along.

11         So you haven't asked this witness if he has ever seen

12    these documents.  So right now all this is is a reading

13    exercise and any question, therefore, that you ask him would be

14    completely hypothetical.  If you would like to lay a

15    foundation, I'm happy to listen to it.

16         MR. JOHNSON:  Okay, Your Honor.  Just if I could have

17    one second to confer.

18       (Pause)

19    BY MR. JOHNSON:

20    Q    So Alvarez prepared the master mailing list that Epiq

21    relied on to send out the corrected notice of service?

22    A    We prepared information that was given to Epiq that was

23    put into the master mailing list.

24    Q    Such as addresses and names?

25    A    That's correct.

Page 182

1    Q    So Alvarez would have provided Dr. Kinkel's address and

2    name; is that correct?

3    A    Again, I -- looking at this document I don't know how or

4    why he got onto the mailing list.

5    Q    Did anyone else provide names and addresses to Epiq

6    besides Alvarez's?

7    A    Yes.  It could have been addresses that came from the

8    schedules.  It could have been addresses that -- people could

9    have been asked independently to be added to the mailing list.

10   There were any number of parties and reasons why people could

11   have been added to the mailing list that would not have been an

12   Alvarez addition.

13   Q    So you don't know why that address that we just looked at

14   on the agreement was included on the master mailing list?

15   A    Looking at these documents, no.

16        (Pause)

17            MR. JOHNSON:  I may be done, Your Honor.  Just one

18   second.

19            THE COURT:  All right.

20        (Pause)

21            MR. JOHNSON:  Your Honor, I have no further questions

22   for Mr. Kotarba.

23            THE COURT:  All right.  Thank you very much.

24            MR. HORWITZ:  Your Honor, I just have one brief

25   question on redirect.

Page 183

 1                  THE COURT:  Okay.

 2   REDIRECT EXAMINATION

 3   BY MR. HORWITZ:

 4   Q    Mr. Kotarba, could I ask you to take a look at your

 5   deposition transcript which we read from just a moment ago,

 6   page 8 where you were asked the question:

 7        "We looked other thing -- among other things you looked at

 8   records of the filing debtors.  That included e-mails from

 9   Lehman Brothers?"

10        "A   It could have.

11        "Q    -- I'm just going to read on.

12   A    Sure.

13   Q    Okay.

14        "Q   So you checked at least some e-mails?

15        "A   I don't recall whether we reviewed e-mails or not.

16        "Q   E-mails aren't the Lehman Brothers' records?

17        "A   I'm trying to figure out the best way to answer that

18   question.  If we were provided e-mails to review, we would have

19   reviewed them.  We wouldn't have independently gone into the e-

20   mail records and reviewed those records."

21        Now is that an accurate description of what Alvarez &

22   Marsal did with e-mails?

23   A    That is.  Yes.

24                  MR. HORWITZ:  No other questions for this witness.

25                  THE COURT:  All right.  Thank you.

Page 184

1          Anything further?

2          MR. JOHNSON:  No, Your Honor.

3          THE COURT:  All right.  Thank you.  You may step

4   down.

5          THE WITNESS:  Thank you, Your Honor.

6      (Witness excused)

7          MR. LENDER:  Your Honor, for our next and final

8   witness we call Tom Behnke.  Ms. Alvarez will be handling the

9   direct.

10          THE COURT:  Okay.  Very well.

11          THE COURT:  Good afternoon, Mr. Behnke.  Would you

12   raise your right hand, please?

13      (Witness sworn)

14          THE COURT:  Please have a seat.  Make yourself

15   comfortable.  Let us know if you need a break at any point.

16          MS. ALVAREZ:  Your Honor, if I could just hand this

17   to the witness?

18          THE COURT:  A different binder?

19          MS. ALVAREZ:  It's a binder that --

20          THE COURT:  Okay.

21      (Pause)

22   DIRECT EXAMINATION

23   BY MS. ALVAREZ:

24   Q   Good afternoon.  Would you please state your name for the

25   record?

Page 185

1    A    Thomas Allen Behnke.

2    Q    Where are you currently employed?

3    A    Alvarez & Marsal.

4    Q    What is your position?

5    A    I'm a managing director.

6    Q    What other titles do you hold?

7    A    I am a certified accountant licensed in the State of

8    Texas.

9    Q    How long have you been a managing director at Alvarez &

10   Marsal?

11   A    I was promoted in January 2015, for a year and a half.

12   Q    What position did you hold before that time?

13   A    I was a senior director.

14   Q    How long were you senior director?

15   A    From the date of my employ in May 2009 until January 2015

16   at my promotion, so five and a half years.

17   Q    What are your responsibilities at Alvarez & Marsal?

18   A    I work in a special lead group called the claims -- CMF,

19   claim services group and my responsibilities are assisting

20   debtors prepare for bankruptcy.  During bankruptcy I assist

21   debtors.  I do claims objections.  I do claims reporting.  I'm

22   responsible for distributions, all kinds of claims analysis.

23   That's really it.

24   Q    And when did you start working on the Lehman Brothers'

25   Chapter 11 cases?

1    A    I started on the Lehman Brothers case at the end of August

2    2011.

3    Q    What has your involvement been with Dr. Marsoner's motion?

4    A    In my role at Lehman I do all kinds of things in relation

5    to claims, reporting as I said, distributions, things of that

6    matter.  So when Dr. Marsoner filed his motion I read it and I

7    became the point person to understand and analyze where certain

8    data came from, where mailings came from and things of that

9    nature.  So I've been in the internal point person working with

10   counsel in-house counsel and outside counsel.

11   Q    Okay.  And in connection with the motion have you reviewed

12   the corrected affidavit of service of the bar date that was

13   filed by Herb Baer?

14   A    Yes, I have.

15   Q    If you could just turn to Trial Exhibit 7 in that large

16   binder.

17   A    Okay.

18   Q    Is this the corrected affidavit of service that you just

19   referred to?

20   A    Yes, it is.

21   Q    Are you familiar with this document?

22   A    Yes, I am.

23   Q    Okay.  I would like to just represent that what's enclosed

24   here at Tab 7 are actually excerpts of that affidavit.  The

25   actual affidavit is almost 6,000 pages when you include all the

Page 187

1   attachments.

2        Mr. Behnke, if you would just take a look at Exhibit E and

3   F to Trial Exhibit 7.

4   A    Yes.

5   Q    What do these show you?

6   A    On Exhibit E approximately halfway down it shows that Dr.

7   Marsoner was served at three different addresses, one in Malta,

8   one in Mexico and one in Italy, and it's Exhibit E.  In Exhibit

9   E he was sent based on the affidavit a personalized notice that

10  would have had his name and address on it.

11  Q    Now are all the individuals on these list creditors of the

12  estate?

13  A    No, they're not all necessary creditors of the estate.

14  Had they been creditors of the estate they would have been on a

15  different exhibit.  They would have been on Exhibit F which

16  would have included a personalized notice which would have

17  included a debtor listed, one of the LBHI debtors in our cases.

18  It would have included an amount, a nature, a classification.

19  I am reading from Mr. Baer's declaration here or his affidavit

20  here.

21       So people on Exhibit E were not necessarily creditors.

22  Q    Okay.  And look -- looking at Exhibit E, you pointed out

23  it indicates that Marsoner was served with the bar date notice?

24  A    That's right.

25  Q    You mentioned there was a Malta address, a Mexico address

Page 188

1   and an Italy address?

2   A     That's correct.

3   Q     Where did those addresses come from?

4   A     So when -- after Dr. Marsoner filed his motion we started

5   doing research to find out where the addresses came from.

6   These three addresses came from the company's people soft

7   vendor system, which is essentially their accounts payable

8   system.

9   Q     And what is your basis for this understanding?

10  A     My basis is talking to company people who are involved in

11  the accounts payable system and, you know, as part of my role I

12  instructed people to do various searches of the company's,

13  Lehman's, LBHI's books and records to determine, you know,

14  where exactly the addresses came from.

15  Q     Okay.  If you can just turn to Exhibit 15 in the binder.

16  A     Okay.

17  Q     Do you recognize this?

18  A     Yes, I do.

19  Q     What is it?

20  A     This is an extract from the people soft vendor system.  It

21  looks like an Excel file.  It's got different columns and

22  headings.  But essentially it's an extract of the people soft

23  system which shows the -- Dr. Marsoner, if you look at Column

24  F, for example, it says name.  Dr. Marsoner is in there.  As

25  you flip through this document, think of a database as a long

Page 189

1   document with a bunch of column, you continue to go through

2   this.  If you, for example, go to page -- it's marked as LEH

3   926, there's a country.  One of the country's ITA, which stands

4   for Italy.  One or two of them are MLT which stand for Malta,

5   and one of them is MEX which stands for Mexico.  Column BD has

6   various address fields in it, and if you continue to the next

7   page, 927, there are address line 2 additional addresses.

8   Column BH is city.  Colum BQ is the postal address.

9       So this was an abstract from the people soft system that I

10  requested from company people who pulled from their records.

11  Q    And was this accounts payable system maintained by LBHI in

12  the regular course of business?

13  A    Yes.  This was a system that was maintained.  It was a

14  global system for vendors and LBHI had a copy of this when the

15  bankruptcy occurred.  So this was a global system that they had

16  a copy of.

17  Q    And did you compare the addresses in this extract to the

18  Marsoner addresses that are identified in Exhibit 7 which was

19  the corrected affidavit of service?

20  A    Yes, I did.

21  Q    And what did you find?

22  A    And they agreed.

23  Q    Why -- do you know why these addresses would have been

24  LBHI's account payable system?

25  A    Well, LBHI, in their accounts payable system, they would

Page 190

1    have had various addresses for various people.  On a global

2    basis they would have had access to them.  These particular

3    ones were based on transactions where Dr. Marsoner submitted

4    invoices for LBEL or LBEL as we've talked about it, and the

5    BLHI UK branch as paymaster, essentially the bank, paid those

6    invoices to Dr. Marsoner either through wire or some form of

7    electronic transfer.

8    Q    And after LBHI would have paid those invoices how was that

9    dealt with in Lehman's books and records?

10   A    So it would have been recorded as an intercompany

11   transaction.  So it would have been presumably an expense.  He

12   was providing a service that would have been expensed, and then

13   there would have been an intercompany transaction that would

14   have said LBHI would have had a receivable from LBEL in

15   relation to the expenses that they paid for them.

16   Q    So in connection with Marsoner whose debts do you

17   understand LBHI paid?

18   A    The research that we did, he would -- they were paying

19   debts of LBEL.  The invoices were addressed to LBEL and they

20   were paying debts of LBEL.

21   Q    Okay.  If we can go back to Exhibit 7, the corrected

22   affidavit of service, if you could take a look at Exhibit F to

23   that affidavit.

24   A    Yes.

25   Q    You'll see -- I'll point you to the bottom of the page.

Page 191

1   There's an address there listed for Thomas Marsoner.  Do you

2   see that?

3   A    Yes, I do.

4   Q    Do you know where that address came from?

5   A    It came from the company's entity master records, a

6   database that stores derivative contracts, trades, things of

7   that nature.

8   Q    And what is the basis for -- of your understanding?

9   A    The basis is having people at the company at Lehman at the

10  estate that I work for do research and show me that that's

11  where it came from.

12  Q    And why would Mar -- Dr. Marsoner be served at an address

13  associated with the derivatives contract?

14  A    So on -- he had a derivatives contract with LBCC that was

15  scheduled on Schedule G of the public schedules that were filed

16  with the Court that Mr. Kotarba helped put together.  And he

17  was served there, and so he was on this exhibit because he was

18  sent a customized notice that would have personalized various

19  information regarding his schedules.

20  Q    Okay.  If you could just flip to Trial Exhibit 62 and take

21  a look at it, please.  What is Exhibit 62?

22  A    Yes, I'm there.

23       (Pause)

24  Q    So what is Exhibit 62?

25  A    Yes.  So Exhibit 62, I'm sorry, is the schedules of --

Page 192

1   amended schedules of assets and liabilities filed in relation

2   to Lehman Brothers Commercial Corporation which also includes

3   Schedule G which is a listing of executory contracts and

4   unexpired leases.

5   Q    And can you turn to, it's called page LBCC Schedules 47.

6   A    Yes.

7   Q    Can you just show us where Dr. Marsoner appears on

8   Schedule G?

9   A    He is the sixth item from the top, Marsoner, Thomas S.

10  And the address is One Broadgate, 5th Floor.

11  Q    Do you know why Dr. Marsoner is included in Schedule G?

12  A    Because he had a contract in the company's books and

13  records and entity master that said that he had a contract with

14  LBCC, a derivative trade contract.

15  Q    Is that be -- does that mean that he was a creditor of

16  LBCC?

17  A    Not necessarily being on the list of executory contracts.

18  He might have been a creditor depending on what happened with

19  the contract.  This is really a listing of contracts and that's

20  all it is, unexpired contracts and he was listed as having an

21  LBCC contract.

22  Q    Do you know where the information on the Schedule G came

23  from?

24  A    It came from entity master, the company's books and

25  records.

Page 193

1   Q    Do you know when Marsoner would have been served the bar

2   date notice on the -- at an address identified on Schedule G?

3   A    Why he would have been served?

4   Q    Yes.

5   A    All parties that are listed either in the mailing matrix

6   or on the schedules of liabilities and executive contracts are

7   provided a bar date notice.

8   Q    Now it turned out that this One Broadgate, 5th Floor was a

9   former Lehman address, correct?

10  A    That's my understanding.

11  Q    Do you know if Dr. Marsoner ever identified another

12  address or requested an address change after Schedule G was

13  filed?

14  A    He did not.  We could not find, and we searched for any

15  correspondence that he had requested specifically, please

16  change my address to the following.

17  Q    Okay.  I would like to just briefly change topics now and

18  talk about the employment history of Vittorio Pignatti and

19  Ruggero Magnoni.

20  A    Okay.

21  Q    Can you please describe for us the research you did into

22  their employment history?

23  A    Similar to the other things that I did in relation to this

24  case I worked with people at Lehman, the appropriate people, in

25  this case HR, human resources, and asked them to provide

Page 194

1    information regarding certain people that we were requested in

2    discovery by opposing counsel to look for, certain names they

3    gave us, about 30 names.  And they asked to provide information

4    as to their titles, their positions, their entities that they

5    worked for, things of that nature.

6    Q    And did opposing counsel to your knowledge ask that we

7    look into the employment history of Pignatti and Magnoni?

8    A    No.  I believe that those two they did not for some

9    reason, but we felt that it was relevant and provided them that

10   information in the discovery.

11   Q    Okay.  If you could just turn to Trial Exhibit 14, please.

12            THE COURT:  If I could ask you for -- just trying to

13   manage time, how much more time do you think you have?

14            MS. ALVAREZ:  Less than five minutes.

15            THE COURT:  Okay.  And will there be

16   cross-examination?

17            MR. VAN TOL:  About 15 minutes, Your Honor.

18            THE COURT:  Okay.  Very good.

19   BY MS. ALVAREZ:

20   Q    If you can look at Exhibit 15, Mr. Behnke.

21   A    Yes.

22   Q    I'm sorry, 14.

23   A    14.  Yes.

24   Q    What is Trial Exhibit 14?

25   A    So Trial Exhibit 14 is a letter from Weil Gotshal to

Page 195

1    opposing counsel on a discovery request, and the one item that

2    is included in here is the response of the job titles and

3    officer positions that Lehman was able to research from their

4    books and records.

5    Q    Okay.  And where did the information in this document come

6    from?

7    A    So Lehman has a system, another system called people soft,

8    but it's the people soft HR system.  They refer to it

9    as -- it's human resources.  That was a global system that

10   stores a lot of information about former employees, current

11   employees, their addresses, their titles.  It has a lot of

12   information in it about -- if somebody was employed in Asia it

13   would include that.  It was a global entity system.

14   Q    And what is -- what does this document show you with

15   regard to Pignatti and Magnoni?

16   A    So on page 4 of 7 here it's marked, I don't see a Lehman

17   number, at the top it's number 30.  It's Pignatti.  So there's

18   a few things that this had that includes dates, either when the

19   person was hired or 3/21/2001, I think that that was part of

20   the requests.  It went to 2001.  The various job titles at

21   various times, the officer title and what legal entity Mr.

22   Pignatti worked for.

23        So you could see here, the last column, the department

24   legal entity in the company's books and records indicated that

25   for various years he worked for LB Europe Limited and then at

Page 196

1    other times he worked for LB Limited.

2    Q    And with regard to Mr. Magnoni?

3    A    So the item below that Item Number 31, shows at various

4    times he worked for LBI, the Milan branch, and LB Limited.

5    Q    And what about later on in the document, if you flip to 7

6    of 7?

7    A    So on page 7 of 7, actually 5, 6, and 7 are listing of

8    officer titles and directorships.  So on page 7 of 7 it shows

9    that Mr. Pignatti had various officer or directorship titles

10   for various entities including Lehman Brothers Inc., but never

11   one of LBHI or the debtors in our estate.  He never had a title

12   in our estate.

13   Q    And what about Mr. Magnoni?

14   A    The same thing.  It shows that he has had various titles

15   including, you know, managing director and vice chairman of

16   Lehman Brothers Inc.  It shows LBI here and several others, but

17   none of these entities are estate, the debtors that we work on,

18   LBHI or any of our debtors.

19   Q    Mr. Behnke, how do you know these lists are accurate?

20   A    They came from the companies' books and records.  I

21   believe they're accurate.

22   Q    So based on the research you've done did Pignatti and

23   Magnoni ever work for LBHI or LCPI?

24   A    They never directly worked for LBHI or LCPI or had titles

25   or directorships at our entities.

Page 197

1          MS. ALVAREZ:  Okay.  No further questions.

2          THE COURT:  All right.  Thank you.

3          All right.  We're going to take a seven minute break.

4    We'll come back at 4:15 and finish up.  All right.

5          Mr. Behnke, you know the rules.  You --

6          THE WITNESS:  Yes, I do.

7          THE COURT:  -- remain under oath.  Please don't

8    discuss your testimony or the case with anyone during the

9    break.

10        (Recess from 4:09 p.m. until 4:22 p.m.)

11         THE COURT:  All right.  Please have a seat.

12         We're losing the battle of the air.  I really

13   apologize.  I can only say that it would be worse if the

14   courtroom were full.  Trust me, I know.  So I'm ready when you

15   are.

16         MR. VAN TOL:  Thank you, Your Honor.

17   CROSS-EXAMINATION

18   BY MR. VAN TOL:

19   Q    Mr. Behnke, I would like to pick up with the last thing

20   you testified about, which was the interrogatory responses.  I

21   believe that is Exhibit 13 and you should have it in front of

22   you.  My apologies.  Exhibit 14.

23   A    14, yes.

24   Q    And you -- we were on page 7 of this exhibit or of the

25   attachment and you were talking about the titles of Mr.

Page 198

1   Pignatti and Mr. Magnoni.  Do you see there at the top there

2   are also titles listed for Mr. Sherratt?

3   A    Yes, I do.

4   Q    And why did you provide information about the titles for

5   Mr. Sherratt?

6   A    Because opposing counsel, your firm, asked us to provide

7   information on him.

8   Q    And there's nothing indicate -- in this, in those titles

9   that indicates that Mr. Sherratt was an officer of LBI,

10  correct?

11  A    I do not see listed here that he was -- it goes on to page

12  6 of LBI.  No.  That's correct.

13  Q    Okay.  Now I would like you in the trial binder to turn to

14  Exhibit 52, please.  And in Exhibit 52 I would like you to turn

15  to the next to the last page which is Marsoner 606.

16  A    Yes.

17  Q    And do you see Mr. Sherratt is listed in the right-hand

18  column under other officers?

19  A    Yes, I do.

20  Q    And do you see that he's listed as vice chairman of Lehman

21  Brothers Inc.?

22  A    I do see that.

23  Q    And this is the annual report for Lehman Brothers,

24  correct?

25  A    That's correct.

Page 199

1    Q    And is it fair to assume that the annual report for Lehman

2    Brothers is accurate?

3    A    Yes.  I presume it is.

4    Q    So then at least with respect to Mr. Sherratt we see that

5    the chart appended to the interrogatories on Exhibit 14 is

6    inaccurate, correct?

7    A    As it relates to this, yes, I guess.

8    Q    All right.  You also testified that Mr. Pignatti is not

9    listed as an officer of LBHI on Exhibit 14.

10           THE COURT:  Well, can I ask a question?  Mr. Behnke,

11   the Trial Exhibit 14, the entry for Mr. Sherratt does not

12   include a listing for him as a officer or director of LBI,

13   correct?  Right?

14           THE WITNESS:  Yes.  That is correct.

15           THE COURT:  All right.  And then counsel just pointed

16   you to the annual report 2007.

17           THE WITNESS:  That's correct.

18           THE COURT:  Do you as you sit here know -- they're

19   inconsistent.

20           THE WITNESS:  They are.

21           THE COURT:  Okay.  As you're sitting here today do

22   you know which one is accurate and which one is not accurate if

23   one or both or neither?

24           THE WITNESS:  I would not know.

25           THE COURT:  Okay.  Thank you.

Page 200

BY MR. VAN TOL:

1

2    Q    Now I think you testified earlier that in Exhibit 14 it

3    says that Mr. Pignatti is not an officer of LBHI, correct?

4    A    That's correct.

5    Q    All right.  I would like you to turn to Exhibit 42.  It's

6    in the trial exhibits.  And in Exhibit 42 I would like you to

7    turn to the second page which is a January 7, 2015 letter from

8    Mr. Pignatti.  Do you see that?

9    A    Yes, I do.

10   Q    And do you see in the first line that he states, "I

11   declare under penalty of perjury under the laws of the United

12   States of America that the foregoing is true and correct."  Do

13   you see that?

14   A    Yes, I do.

15   Q    And if you look in the next paragraph after identifying

16   self Mr. Pignatti says he was a vice chairman of Lehman

17   Brothers Holdings Inc. from 1999 to 2006.  Do you see that?

18   A    Yes.

19   Q    That's LBHI, isn't it?

20   A    According to this he's saying that.

21   Q    Would you agree with me that Mr. Pignatti has a better

22   understanding of what his title is than you?

23   A    Absolutely not.  I don't agree with that statement.

24   Q    So you think Mr. Pignatti worked for seven years as the

25   vice chairman of Lehman Brothers Holdings Inc. under some sort

Page 201

1    of misapprehension?

2    A    I'm been dealing with the claims process at Lehman since

3    2011 and in my dealings a lot of employees filed claims

4    thinking that they worked for LBHI and they did not and we

5    objected to those claims as no liability and we won those

6    objections.  People were confused of where they worked.

7    Q    And -- but to be clear the basis of your earlier testimony

8    that Mr. Pignatti did not work at LBHI was the chart that we

9    saw attached to Exhibit 14, correct?

10   A    That's correct.

11   Q    And we have seen that the chart is either inaccurate or

12   inconsistent, correct?

13   A    In that one example you're pointing out an inconsistency.

14   That's correct.

15   Q    And you would agree with me that it's possible that it's

16   also incorrect with Mr. Pignatti, right?

17   A    It's possible, that question.  Yes.

18   Q    And you have not ever interviewed Mr. Pignatti to ask him

19   what his titles were, correct?

20   A    I have not.

21   Q    So any knowledge you have gleaned has been solely from the

22   books and records from Lehman Brothers Holdings Inc.; is that

23   right?

24           THE COURT:  Yes.

25           MR. LENDER:  Your Honor, normally I wouldn't object,

Page 202

 1    but I find this testimony so problematic that I would like to

 2    make an objection for the record.

 3              To show this witness this letter that he hasn't seen

 4    before, but not to show him what he's -- what Mr. Pignatti said

 5    in his deposition which is the opposite of what Mr. Van Tol is

 6    now saying I think is really inappropriate because what he said

 7    in his sworn testimony at deposition was that he was not an

 8    officer of LBHI.

 9              So I just think this is --

10              THE COURT:  Were you going to get to that?

11              MR. VAN TOL:  Your Honor, I -- that's redirect.

12    I'm -- Mr. Pignatti --

13              MR. LENDER:  No.  I'm sorry.  That's misrepresenting

14    to a witness.  When you say to a witness, would Mr. Pignatti

15    know better than you when you know the sworn testimony is

16    opposite, that's really inappropriate.

17              THE COURT:  I know the -- I know how it works.  I

18    know all about the scope of cross and what's appropriate for

19    redirect.

20              MR. LENDER:  Sorry, Your Honor.

21              THE COURT:  But we have not only that, but we also

22    have an original draft which was apparently the original draft

23    of the letter in which it appears to say that Mr. Pignatti was

24    vice chairman of LBEL.  So --

25              MR. VAN TOL:  And he changed it, Your Honor, to

Page 203

```
 1    reflect LBHI.

 2              THE COURT:  All right.  Well --

 3              MR. VAN TOL:  Mr. Pignatti changed it, I mean.

 4              THE COURT:  Let me ask this, Mr. Behnke.  Do you have

 5    any direct knowledge one way or the other of what Mr.

 6    Pignatti's titles were --

 7              THE WITNESS:  I don't.

 8              THE COURT:  -- responsibilities were?

 9              THE WITNESS:  I don't.

10              THE COURT:  All right.  Thank you.

11              MR. VAN TOL:  I'm sorry, Your Honor.

12    BY MR. VAN TOL:

13    Q    Mr. Behnke, let's please turn to Trial Exhibit 29 which is

14    your declaration.

15    A    Okay.

16    Q    And first just a preliminary question.  I think I

17    understand it, but I want to be sure that I know that you had

18    no participation in the compilation of the master mailing list;

19    is that right?

20    A    That's correct.  I did not have.

21    Q    And everything that you have put into your declaration is

22    based on information that you gleaned after the fact, correct?

23    A    That's correct, working with the company people, asking

24    questions, talking to them, doing research.  That is correct.

25    Q    And would it be fair to say that when you're doing that
```

Page 204

1    you're trying to cast your -- a wide net and get as much

2    information as possible?

3    A    Sure.  That's correct.

4    Q    And would you agree with me that that's also good practice

5    when one is originally compiling the master mailing list, to

6    cast a wide net and get as much information as possible?

7    A    He has to look in the company's books and records and

8    determine whether or not there's a possibility somebody should

9    be sent notice.  Correct.

10   Q    And you would agree with me that those books and records

11   that you just talked about include e-mails, isn't that right?

12   A    I did not agree that they include e-mails.

13   Q    So you distinguished e-mails from the debtors' books and

14   records?

15   A    From the definition, yes, of debtors' books and records I

16   would not include e-mails.  It was over three billion e-mails

17   that are in the debtors' possession.

18   Q    All right.  Did Alvarez & Marsal have access to the

19   debtors' e-mails to your knowledge?

20   A    At the time of the mailing matrix or now?  At what point

21   in time?

22   Q    Well, let's start with you weren't around for the mailing

23   matrix list.  So let's start with now.  Does Alvarez & Marsal

24   now have access to the e-mails at Lehman Brothers Holdings

25   Inc.?

Page 205

1   A     They have access to certain e-mails at Lehman Brothers

2   Inc. --

3   Q     And the same is true --

4   A     -- Holdings Inc.

5   Q     Sorry.  I didn't mean to cut you off.  The same is true

6   when the mailing notice was prepared, correct?

7   A     I believe so.  Yes.

8   Q     And what's the basis of your belief that e-mails are not

9   part of the books and records of a company?

10  A     Well, e-mail is really electronic conversation, in my

11  opinion.  A lot of things are said in e-mails that the next e-

12  mail contradicts.  That it wouldn't be something that you would

13  necessarily record in your books and records as a liability,

14  chatter amongst people.  Accounts book things in their books

15  and records based on certain established information, but they

16  don't review every e-mail that compile, for example, the SCC

17  annual report on their schedules of liabilities or on their

18  balance sheet.

19  Q     So to be clear, you wouldn't exclude a document simply

20  because it's in an e-mail, right?

21  A     I wouldn't.  If it was brought to our attention, if

22  somebody said, look at this, we would look at an e-mail.

23  Correct.

24  Q     All right.  And if I understand the process in compiling a

25  mailing list you would look at invoices.  You would look at

Page 206

1    contracts.  You would interview people.  Have I left anything

2    out of the process?

3    A    To compile a mailing matrix?

4    Q    Yes.

5    A    You wouldn't look at invoices to compile a mailing matrix.

6    You would look at invoices to prepare liability schedules,

7    whether they go on Schedule D, E or F of the schedules and

8    liabilities.  You would look at invoices to determine whether

9    there was an outstanding liability that would make somebody a

10   creditor --

11   Q    Okay.

12   A    -- but not on a mailing matrix.

13   Q    Understood.  Thank you for that.

14        But in doing the mailing list then, if I understand

15   it, you would look for contracts; is that right?

16   A    You know, it depends on what part of the process you're

17   in.  Collecting contracts takes a long time.  I mean, it takes

18   six or seven months on this case to pull them together.  So you

19   would eventually get to the point that you would have a

20   complete mailing matrix.  It might not be on the first week or

21   the second week or the second month.  But eventually your

22   mailing matrix would have a list of contracts that the debtors

23   are a party to that are contracts, not non-debtors.

24   Q    Okay.  And those contracts would help you identify people

25   to whom notice should be given; is that correct?

Page 207

1   A     That's correct.

2   Q     And even if that contract is in an e-mail you would still

3   include that as part of the mailing list, right?

4   A     If you had access to a specific e-mail that had a contract

5   in it, I presume you wanted to ignore it.

6   Q     Okay.  To be clear, Alvarez & Marsal had access to Lehman

7   Brothers e-mails at the time the mailing list was compiled,

8   correct?

9   A     Alvarez has access to, my understanding, over three

10  billion e-mails.

11  Q     Okay.  I'd like you to turn, please, to Exhibit 25 in the

12  binder.  So Exhibit 25 is a May 21, 2007 invoice and this is an

13  invoice that relates to consulting Services, right?

14  A     That's what it says, yes.

15  Q     All right.  And is it your testimony that -- strike that.

16  The address on the invoice is a Malta address, correct?

17  A     That's what it says.

18  Q     And is it your testimony that a document like this, since

19  it's an invoice, is something that would not be considered in

20  compiling the mailing list?

21  A     When you're compiling a mailing matrix, you're looking at

22  databases.  So Lehman, I don't know how many invoices Lehman

23  has, but this invoice may have been the basis of putting a

24  record into a database, which then would be used to notice

25  somebody of a bankruptcy.

Page 208

1   Q     But you don't know that for sure, do you?

2   A     I don't know what for sure?

3   Q     You don't know for sure that this invoice was used to put

4   in to a data or an accounts payable system, right?

5   A     Not this particular invoice.  I don't know.  I don't have

6   any knowledge that this one was typed in.  But at some point,

7   it got into the accounts payable system through this invoice or

8   some other invoice.

9   Q     And it could have gotten in through a contract as well,

10  correct?

11  A     Possibly through a contract that would have been with a

12  particular debtor that we represented, yes, that's correct.

13  Q     Or it could have been -- it could have gotten into the

14  system through an e-mail that had the contract attached,

15  correct?

16  A     Do you want me to speculate?

17          THE COURT:  No, I do not want you to speculate.

18          THE WITNESS:  I have no knowledge of whether somebody

19  had an e-mail that they would have input into a payable system.

20  I have no knowledge.

21  BY MR. VON TOL:

22  Q     You've told me what you consider to be the books and

23  records of the debtors.  Do you consider invoices to be the

24  books and records of the debtors?

25  A     I think invoices are the basis of certain things in the

Page 209

1    company's books and records, yes.

2    Q    Mr. Behnke, please turn to your declaration and in

3    paragraph 7 -- sorry, declaration is Exhibit 29 --

4    A    29, thank you.

5    Q    Are you there?

6    A    Yes, I am.

7    Q    In paragraph 7, you state, "The Chapter 11 estates do not

8    have access to Marsoner's agreements with LBEL."  Do you see

9    that?

10   A    That's correct.

11   Q    That statement is not right, is it?

12   A    Through discovery, we did find a very specific, targeted

13   request when we were asked to look for various people's names

14   and we found an e-mail that had a contract connected to it.

15   Q    And that was the 2007 advisory agreement?

16   A    Yes, I believe it was a 2007 agreement.

17   Q    Okay.  Well, let's turn to it then.  Could you please turn

18   to Trial Exhibit 28?

19   A    28 is not his agreement.

20   Q    I'm sorry.  You need the bigger book.

21   A    I have a big book.  28 is an e-mail.

22   Q    You've got it.

23   A    Okay.

24   Q    Sorry, sorry.

25   A    Sorry.

Page 210

1   Q    Speed things up.  This came from the debtor's files, isn't

2   that correct?

3   A    Yes, the debtor in discovery did find this when we were

4   asked to look for something very specific names like the Jahar

5   (ph).

6   Q    And if you turn to Lehman 389, that's the 2007 advisory

7   agreement with Dr. Marsoner, correct?

8   A    That is correct.

9   Q    And that lists an address at Austria, right?

10  A    That is correct.

11  Q    And Mr. -- Dr. Marsoner did not receive notice at that

12  Austrian address, isn't that also right?

13  A    He did not.

14  Q    And are you aware -- excuse me, let me strike that.  You

15  are aware, aren't you, that there were other consulting

16  agreement attached to Exhibit 28 other than Dr. Marsoner?

17  A    I've been made aware of that, yes.

18  Q    And you're aware that several of those people received

19  notice of the bar date, correct?

20  A    I am aware of that, yes.

21  Q    And four of those people submitted claims in this

22  proceeding, correct?

23  A    I am aware of that.

24  Q    And the addresses that they used in those proceedings are

25  the same as their consulting agreements, isn't that also right?

Page 211

1    A    The addresses that they were served were addresses that

2    they had provided us.  In two instances, they came from the

3    account.  The PeopleSoft accounting system, because they had

4    RSU's or CFA's, and I believe the Court is familiar with RSU's

5    and CFA's.  And two of them came from invoices where those

6    consultants had provided proper addresses, not addresses in

7    different countries where they were visiting on vacation.  So

8    they gave an address.  We sent them a piece of mail at that

9    address.  They submitted a claim.

10   Q    Now, if a contract is found in the system and it lists an

11   address, I take it you send -- you would send a notice to that

12   address even if it's different for -- from an invoice, right?

13            THE COURT:  Your question is very unspecific.

14            MR. VAN TOL:  I'm sorry, Your Honor.

15            THE COURT:  I don't know what a notice.

16            MR. VAN TOL:  I'll withdraw it.

17            THE COURT:  Okay, thank you.

18            MR. VAN TOL:  It was terrible.  I'm tired and I

19   apologize to the Court.

20   BY MR. VAN TOL:

21   Q    Let me try again, Mr. Behnke.  You talked about invoices

22   submitted by people who got -- who then made claims in the

23   estate.  And what I'm trying to find out is when the bar date

24   notice is sent to those people, do -- did you only look at the

25   address on the invoice, or did you look for other addresses for

Page 212

1    those people?

2    A    I think I testified that I was not here when the bar date

3    notices and the mailing matrix was compiled.  Would you like me

4    to speculate on --

5    Q    No.

6    A    -- things that happened?

7    Q    Not at all.  I'd like to ask you your experience in coming

8    up with mailing lists.

9    A    Okay.

10   Q    So in your experience in compiling a mailing list, you

11   will look for as many addresses as you can reasonably find,

12   would you agree with that?

13          MS. ALVAREZ:  Objection, Your Honor.

14          THE COURT:  Yes.

15          MS. ALVAREZ:  He's already testified that he was not

16   involved in compiling the mailing list in this matter.  I'm not

17   sure of the relevance.

18          MR. VAN TOL:  He's testified at length, Your Honor,

19   about how the mailing list was compiled after the fact.  His

20   knowledge is after the fact.  I'm asking him a similar question

21   after the fact based on his after the fact knowledge.  If he

22   doesn't know, he can say so.

23          THE COURT:  I'm pretty sure that he's given that

24   testimony in response to your questions.  So we are far afield.

25   That doesn't mean we should go farther afield so --

1                    MR. VAN TOL:  I agree, Your Honor.

2                    THE COURT:  I really only am interested in actual

3        knowledge, not speculation.

4                    MR. VAN TOL:  Okay.

5        BY MR. VAN TOL:

6        Q    I want to be clear I understand you testimony,

7        Mr. Behnke.  The fact that someone has listed an address on an

8        invoice related to a contract, that would not mean that you

9        would ignore the -- a different address on the contract, isn't

10       that correct?

11       A    I think you're asking me for a hypothetical here and I

12       could talk hypothetical, but I don't think people ignore

13       addresses when they put mailing matrices together, if that's

14       your question.

15       Q    You answered my question.  Thank you.  Last question.  Mr.

16       Behnke, you were talking about in your testimony about the way

17       the payment system worked, that LBHI was the pay master and

18       then there'd be these offsetting entries, accounting entries,

19       correct?

20       A    Correct.

21       Q    Now, did you undertake to look for yourself to see these

22       offsetting accounting entries, or how did you come to that

23       knowledge?

24       A    I did not.  I spoke to people at Lehman.  I read the

25       declaration of (indiscernible).  I spoke to (indiscernible).  I

Page 214

1    spoke to other people at the company on how their intercompany

2    transactions work and I'm familiar, being a CPA, on how the pay

3    masters work at companies and how intercompanies are recorded.

4    Q    So if I understand you right, it was a general inquiry.

5    You weren't asking about any specific person, consultant, or

6    transaction, correct?

7    A    I did not say was there an intercompany recorded for Dr.

8    Marsoner.  I know in general at how they do it.  That's

9    correct.

10              MR. VAN TOL:  Thank you.  I have nothing further.

11   Thank you, Your Honor.

12              THE COURT:  All right, thank you.

13              MS. ALVAREZ:  Very briefly, Your Honor.

14   REDIRECT EXAMINATION

15   BY MS. ALVAREZ:

16   Q    Mr. Behnke, you were asked if Mr. Pignatti was an officer

17   of LBHI, correct?

18   A    That's correct.

19              MS. ALVAREZ:  May I approach, Your Honor?  I'd like

20   to show him --

21              THE COURT:  Yes.

22              MS. ALVAREZ:  -- (indiscernible).

23              THE WITNESS:  Okay.

24   BY MS. ALVAREZ:

25   Q    If you take a look at the cover, Mr. Pignatti was deposed

Page 215

1    on November 16th, 2015?

2    A    That's correct.

3    Q    This is after he submitted the letter to the Court in

4    January of 2015?

5    A    Okay.

6    Q    All right, if you would turn to page 36 of his transcript,

7    the bottom of 36 to the top of page 37.  If you take a look, he

8    was asked whether he was on --

9           MR. VAN TOL:  Excuse me.  Sorry, Ms. Alvarez.

10          MS. ALVAREZ:  Yes.

11          MR. VAN TOL:  I apologize, Your Honor, but I have to

12   object.  I don't understand what this is.  On redirect, is this

13   impeachment of counsel's own witness with someone else's

14   testimony?  There's been no -- there's no foundation for this.

15   He doesn't say he doesn't recall.

16          THE COURT:  Okay, let's go back.  Okay?  You showed

17   Mr. Behnke the -- I think it was a PeopleSoft spreadsheet or

18   some spreadsheet that was produced in response to your

19   discovery request.  That did not reflect that Mr. Pignatti was

20   an officer of LBI.  You then showed the witness the last page

21   of the 2007 annual report in which he's listed as an officer of

22   LBI, right?

23          MR. VAN TOL:  That was about Mr. Sherratt, Your

24   Honor, but I see where Your Honor is going, if I may cut to the

25   case.  My purpose was impeachment.  Mr. Behnke can't testify --

Page 216

1    or to the extent he's trying to testify about what Mr.

2    Pignatti's title was, I wanted to establish he's using faulty

3    evidence.  Now, if opposing counsel would like to say no, let's

4    go with what Mr. Pignatti says, they can do that, but not

5    through this witness.  That's improper impeachment.

6             THE COURT:  Well, we don't have to do it through this

7    witness because as I understand it, you're going to designate

8    portions of the deposition.

9             MR. VAN TOL:  That was my point, Your Honor.

10   Exactly.  There's no reason to do this.

11            THE COURT:  Well, the reason to do it is because it

12   creates a misimpression on the record.  But since it's almost 5

13   o'clock and it's very warm in here, we can move on and we can

14   just take it in the form of deposition designations and

15   counter-designations.

16            MR. VAN TOL:  Thank you, Your Honor.

17            MS. ALVAREZ:  And that's it.  I have nothing further,

18   Your Honor.

19            THE COURT:  All right.  Thank you.  You may step

20   down, Mr. Behnke.  All right, it's been a long -- yes.

21            MR. LENDER:  The only thing we need to do before we

22   conclude is to -- we submitted the depo excerpts from

23   Mr. Sherratt and Mr. Pignatti.  Obviously Mr. Magnoni and

24   Marsoner were here live.  So we would move in our deposition

25   designations from Mr. Sherratt and Mr. Pignatti to complete our

Page 217

 1    side of the case.

 2              THE COURT:  Okay.

 3              MR. VAN TOL:  To the extent we have objections to

 4    those, Your Honor, we waive those and have no objection to

 5    their admission.

 6              THE COURT:  Okay.  All right, very well.  And then

 7    you'll need to come up with a list of the exhibits out of all

 8    that were shown the witnesses today, which exhibits you'd like

 9    to move into the record.  So --

10              MR. LENDER:  What I would propose, Your Honor, is we

11    kept a list, I suspect they did to.

12              THE COURT:  I hope so.

13              MR. LENDER:  We can confer.  I assume we'll be able

14    to come up with an agreed lesson and we'll submit that to Your

15    Honor.

16              THE COURT:  That would be great.

17              MR. LENDER:  Thank you.

18              THE COURT:  All right.  If the parties are not too

19    tired, I really would like to have an opportunity to speak with

20    you.  So if you can join me, we're going to open up the

21    conference room back there.  I think it's a little cooler back

22    there.  And let's just start with attorneys.  And if the

23    principals and clients could remain in the Courtroom or even

24    out in the hallway where it might be cooler, I would be

25    grateful.

Page 218

1          MR. LENDER:   Thank you, Your Honor.

2      (Whereupon, these proceedings were concluded at 4:48 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          I N D E X

3

4                      T E S T I M O N Y

5    WITNESS              EXAM BY              PAGE      LINE

6    Ruggero Magnoni      Mr. Van Tol            6        16

7    Ruggero Magnoni      Ms. Alvarez           31        11

8    Thomas Marsoner      Mr. Van Tol           40        14

9    Thomas Marsoner      Mr. Lender            87         1

10   Thomas Marsoner      Mr. Van Tol          147        21

11   Steve Kotarba        Mr. Horwitz          152         3

12   Steve Kotarba        Mr. Johnson          161        21

13   Steve Kotarba        Mr. Horwitz          183         3

14   Allen Behnke         Ms. Alvarez          184        23

15   Allen Behnke         Mr. Van Tol          197        18

16   Allen Behnke         Ms. Alvarez          214        15

17

18

19

20

21

22

23

24

25

Page 220

```
 1                    C E R T I F I C A T I O N

 2

 3   I, Lisa Beck, Sherri Breach and Jami Gallagher certify that the

 4   foregoing transcript is a true and accurate record of the

 5   proceedings.

 6   Lisa Beck           Digitally signed by Lisa Beck
                         DN: cn=Lisa Beck, o=Veritext, ou,
                         email=digital@veritext.com, c=US
 7   _____ Date: 2016.07.27 10:17:03 -04'00'

 8   Lisa Beck (CET**D 486)

 9   AAERT Certified Electronic Transcriber

10   Sherri Breach       Digitally signed by Sherri Breach
                         DN: cn=Sherri Breach, o=Veritext, ou,
                         email=digital@veritext.com, c=US
11   _____ Date: 2016.07.27 10:23:14 -04'00'

12   Sherri Breach (CERT**D 397)

13   AAERT Certified Electronic Reporter & Transcriber

14   Jamie Gallagher     Digitally signed by Jamie Gallagher
                         DN: cn=Jamie Gallagher, o=Veritext,
                         ou, email=digital@veritext.com, c=US
15   _____ Date: 2016.07.27 10:23:47 -04'00'

16   Jamie Gallagher

17

18

19   Veritext Legal Solutions

20   330 Old Country Road

21   Suite 300

22   Mineola, NY 11501

23

24

25   Date:  July 27, 2016
```