HEARING DATE AND TIME: July 28, 2016 at 10:00 a.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard L. Levine
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| -------------------------------------------------------------------x | | |
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| -------------------------------------------------------------------x | | |

**REPLY IN SUPPORT OF**
**PLAN ADMINISTRATOR'S OBJECTION TO CLAIM NUMBER 29606**

# Table of Contents

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT .................................................................................................................................5

I.      Sir John Chadwick's Declarations Present Relevant Discussion And
        Analysis That May And Should Be Considered By This Court .........................................5

II.     Each Of The Claims Must Be Dismissed Because SRM
        Disclaimed Reliance On Prior Statements In The PBA.....................................................6

III.    The Segregated Assets Claim Must Be Dismissed
        Because SRM Has Failed To Allege Cognizable Damages .............................................10

        A.      The Segregated Assets Claim Should Be Valued On The PBA
                Termination Date Pursuant To Section 562 Of The Bankruptcy Code ................11

        B.      Even If Section 562 Does Not Apply, The Segregated Assets
                Claim Must Be Valued On Or About The Petition Date
                Pursuant To Section 502 Of The Bankruptcy Code.............................................13

        C.      The PBA Itself Requires Measurement Of SRM's Segregated
                Assets Claim As Of the Termination Date, At The Very Latest ..........................15

IV.     Each Of The Claims Is Without Merit Under The Express Terms Of The PBA...............18

        A.      Clause 14.4 Of The PBA Precludes Any Recovery..............................................18

        B.      SRM's CMNA-Based Claims Are Subject to Clause 14.4 Of The PBA..............25

        C.      Clause 14.3 Of The PBA Also Precludes A Recovery On The Claims.................27

V.      The Lost Opportunities Claim Must Be Dismissed
        Because The Damages Sought Are Speculative And Remote............................................29

VI.     Whether SRM May Amend Its Claim Is Not Before The Court .......................................33

CONCLUSION.............................................................................................................................33

WEIL:\95797449\9\58399.0011

# Table of Authorities

**Page(s)**

**Cases**

*ACCD Glob. Agric. Inc. v. Perry*,
    2013 WL 840706 (S.D.N.Y. Mar. 1, 2013) .......................................................................31

*Ashcroft v. Iqbal*,
    556 U.S. 662 ........................................................................................................................20

*Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*,
    2015 WL 4940126 (S.D.N.Y. Aug. 10, 2015) ......................................................................24

*Bankers' Trust Co. v. Irving Trust Co. (In re United Cigar Stores Co.)*,
    73 F.2d 296 (2d Cir. 1934) ...................................................................................................15

*Base Metal Trading SA v. Russian Aluminum*,
    253 F. Supp. 2d 681 (S.D.N.Y. 2003), *aff'd sub nom. Base Metal Trading Ltd. v.*
    *Russian Aluminum*, 98 F. App'x 47 (2d Cir. 2004) ..............................................................6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................................20

*BWA Corp. v. Alltrans Express U.S.A., Inc.*,
    112 A.D.2d 850 (1st Dep't 1985) .........................................................................................8

*Carrols Equities Corp. v. Villnave*,
    57 A.D.2d 1044 (N.Y. App. Div 4th Dep't 1977) ...............................................................15

*Curley v. AMR Corp.*,
    153 F.3d 5 (2d Cir. 1998) .....................................................................................................5

*Danann Realty Corp. v. Harris*,
    5 N.Y.2d 317 (1959) .........................................................................................................7, 8

*Deutsche Lufthansa AG v. Boeing Co.*,
    2007 WL 403301 (S.D.N.Y. Feb. 2, 2007)..........................................................................21

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003)................................................................................................32

*EPLG, LLC v. Citibank (In re Qimonda Richmond, LLC)*,
    467 B.R. 318 (Bankr. D. Del. 2012) ...................................................................................13

1

*ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*,
2015 WL 247404 (N.Y. Sup. Ct., New York Cty. Jan. 14, 2015), *aff'd*, 133 A.D.3d
444 (1st Dep't 2015)........................................................................................31

*Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Research,
Defendant.*,
2016 WL 205445 (S.D.N.Y. Jan. 15, 2016) .........................................................24

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*,
748 F.2d 729 (2d Cir. 1984)............................................................................8

*Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*,
655 F.3d 136 (2d Cir. 2011)............................................................................24

*Ivanhoe Building & Loan Ass'n of Newark, New Jersey v. Orr*,
295 U.S. 243 (1935)................................................................................14, 15

*Kantor v. 75 Worth St., LLC*,
95 A.D.3d 718 (1st Dep't 2012) .......................................................................31

*Kenford Co. v. County of Erie*,
67 N.Y.2d 257 (1986) ...........................................................................29, 30, 31

*Kramer v. Lockwood Pension Servs., Inc.*,
653 F. Supp. 2d 354 (S.D.N.Y. 2009)................................................................32

*In re Lehman Bros. Holdings Inc.*,
2014 WL 2766164 (Bankr. S.D.N.Y. June 18, 2014)..............................................20

*In re Lehman Bros. Holdings Inc.*,
515 B.R. 171 (Bankr. S.D.N.Y. 2014).................................................................20

*Lehman Bros. Holdings Inc. v. JP Morgan Chase Bank, N.A.* (*In re Lehman Bros.
Holdings Inc.*),
469 B.R. 415 (Bankr. S.D.N.Y. 2012).................................................................12

*Re Lehman Brothers International Europe*,
[2009].......................................................................................16, 25

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015).........................................................30

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
27 F. Supp. 3d 447, 458 (S.D.N.Y. 2014)............................................................20

*In re LightSquared Inc.*,
2014 WL 5488413 (Bankr. S.D.N.Y. 2014) ....................................................13, 14

WEIL:\95797449\9\58399.0011

*LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*,
    725 F.3d 184 (2d Cir. 2013)....................................................................20

*Midland Cogeneration Venture v. Enron Corp.* (*In re Enron Corp.*),
    419 F.3d 115 (2d Cir. 2005)...................................................................33

*Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*,
    930 F. Supp. 2d 532 (S.D.N.Y. 2013)......................................................24

*Oei Hong Leong v. Goldman Sachs Grp., Inc.*,
    2014 WL 2893310 (S.D.N.Y. June 25, 2014) .........................................5

*Radakovich v. Energy Recovery, Inc.*,
    2012 WL 4513636 (E.D. Mich. Sept. 30, 2012)....................................24

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    476 B.R. 715 (S.D.N.Y. 2012), *aff'd, In re Bernard L. Madoff Inv. Sec. LLC*, 773
    F.3d 411 (2d Cir. 2014)..........................................................................12

*In re Sneijder*,
    407 B.R. 46 (Bankr. S.D.N.Y. 2009)......................................................33

*Tevdorachvili v. Chase Manhattan Bank*,
    103 F. Supp. 2d 632 (E.D.N.Y. 2000) ...................................................32

*Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*,
    629 F. Supp. 2d 259 (S.D.N.Y. 2007), *aff'd,* 351 F. App'x 472 (2d Cir. 2009)......................32

*Vivaro Corp. v. Raza Commc'n, Inc.* (*In re Vivaro Corp.*),
    2014 WL 486288 (Bankr. S.D.N.Y. Feb. 6, 2014) ...............................21

*Winn v. Schafer*,
    499 F. Supp. 2d 390 (S.D.N.Y. 2007).....................................................5

**Statutes**

11 U.S.C. § 741(7)(A)(xi).........................................................................12

11 U.S.C. § 502.......................................................................3, 10, 13, 15

Companies Act 1985...............................................................................9, 10

Companies Act 2006....................................................................................10

Federal Rule of Civil Procedure 44.1 ..........................................................5

WEIL:\95797449\9\58399.0011

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors for the entities in the above-referenced chapter 11 cases, files this reply to the response [ECF No. 53250] (the "Response") of SRM Global Master Fund Limited Partnership ("SRM") to the Plan Administrator's Objection to Claim Number 29606 [ECF No. 53215] (the "Objection")[1] and respectfully represents as follows:

### PRELIMINARY STATEMENT

1. ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ Nevertheless, SRM continues to pursue claims initially filed in the amount of approximately $256 million, which SRM now has asserted -- without amending its claims -- may be as high as $413 million.[2] Regardless of the amount, such claims are unrecoverable as a matter of law because, among other reasons, they seek: (i) appreciation in the value of securities *after* the Petition Date and *after* the PBA Termination Date (the "Segregated Assets Claim") contrary to the terms of the Bankruptcy Code; (ii) alleged losses on investments sold by SRM by its own choice to cover margin calls at other brokerage houses (the "Forced Sales Claim"), which are at best consequential damages that SRM cannot pursue under the terms of the PBA; and (iii) completely speculative profits from hypothetical investments that might

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

[2] In fact, in response to Rule 2004 discovery, SRM suggested that its claims may be for hundreds of millions of dollars more than $413 million. The amount of $256 million excludes the ISDA Claim, which was filed in the amount of approximately $49 million.

WEIL:\95797449\9\58399.0011

have been made by SRM (the "Lost Opportunities Claim)," which SRM is likewise precluded from pursuing under the terms of the PBA and English and U.S. law.

2.    In any event, notwithstanding the "valiant" efforts of SRM to suggest the existence of issues of fact and disputes over English law (following the standard playbook of a party desperately trying to beat back (what is effectively) a motion to dismiss), accepting as true *all* of SRM's factual allegations and consistent with the opinions as to English Law set forth in the declaration of Lord Collins of Mapesbury (the "Collins Declaration") proffered by SRM, SRM has failed to state a valid guaranty claim against LBHI.  Accordingly, for the reasons set forth in the Objection and herein, each of the Segregated Assets Claim, the Forced Sales Claim, and the Lost Opportunities Claim (collectively, the "Claims") should be disallowed and expunged by this Court.

3.    Indeed, the Court need not even consider English law to conclude that the Claims should be disallowed and expunged.  The Court must find only that either (i) SRM's representation that it had "not relied on any representation, warranty or other statement of another party in entering into [the PBA]" (PBA ¶ 16.3(a)) or (ii) SRM's agreement that only documents expressly referenced in the PBA will prevail (PBA ¶ 2.2) negates the alleged "parties' discussion," "LBIE's communications," and emails "of the LBIE representatives negotiating the PBA" about the existence of a purported guaranty by LBHI that preceded entry of the PBA. (Resp. ¶ 44.)  The Court should do so based on the plain and unambiguous language of the PBA. Put another way, the question before the Court is not whether SRM knew of or relied on the Corporate Resolution, but whether SRM waived its right to rely.  If the Court finds, as the Plan Administrator urges, that SRM waived its right to rely on the Corporate Resolution, each of the

2

Claims must be disallowed and expunged, because there is no other guarantee of LBIE's obligations at issue.

4.    The largest of the Claims, the Segregated Assets Claim, also must be dismissed on an alternative ground that likewise does not require consideration of English law: SRM's failure to allege legally-cognizable damages.  The Segregated Assets Claim seeks *the appreciation in value of securities after* both the Petition Date (September 15, 2008) and the date on which SRM terminated the PBA (November 6, 2008) (the "<u>PBA Termination Date</u>").  SRM's argument that it is entitled to damages based on the value of the securities on ██████████

████████████████████████████████████████████████████████

██████████ has no basis in law.  Under the Bankruptcy Code, the Segregated Assets Claim must be valued as of the Petition Date under section 502, or as of the PBA Termination Date under section 562. ████████████████████████████████████████

████████████████████████████████████████████████████████

████ SRM has not suffered – and has not and cannot allege – any cognizable damages relating to the Segregated Assets Claim.

5.    Moreover, each of the three Claims fails under the plain language of the PBA, which is governed by English law, when applying undisputed English law principles.  The allegations made by SRM give rise, at most, to a simple breach of contract claim.  Such claim is expressly precluded by Clause 14.4 of the PBA, which limits LBIE's liability to events of gross negligence, fraud, or willful default or breach.  SRM's argument that LBIE committed a willful default necessarily ignores the fact that LBIE's actions allegedly constituting such a breach of the PBA – the alleged failure to return SRM's securities – were after its entry into Administration and thus explicitly permitted by Clause 7.2 of the PBA.  SRM's alternative

WEIL:\95797449\9\58399.0011

argument that LBIE's alleged pre-Administration actions were grossly negligent fails because such actions constitute, at most, a claim for breach of an *un*enforceable oral side agreement not to rehypothecate the Segregated Assets. But even assuming, *arguendo*, that LBIE had committed gross negligence or a willful default under the PBA, Clause 14.4 limits the amount of SRM's damages to the market value of the securities as of the discovery of a loss. Further, the Claims should be dismissed because Clause 14.3 of the PBA precludes any recovery by SRM for damages arising from the "general risks of investing" or "market conditions . . . affecting the value of assets." (PBA ¶ 14.3.) These, however, are precisely the damages that SRM seeks in each of the Segregated Assets Claim, the Forced Sales Claim, and the Lost Opportunities Claim.

6.       As established in detail below, the Plan Administrator's construction of the provisions of the PBA at issue is supported by common sense and the plain words of the PBA, along with the analysis and conclusions contained in the Chadwick Declaration. As made clear by Sir John's supplemental declaration filed contemporaneously herewith (the "Supplemental Chadwick Declaration"), there is nothing in the English law declaration submitted by SRM that is inconsistent with the conclusions in the Chadwick Declaration. Indeed, Sir John concludes in his new declaration that

> I do not take the view that the principles of contractual interpretation under English law which are set out in [the Collins Declaration] in any way conflict with the analysis and conclusions in my first declaration.

(Supp. Chadwick Decl. ¶ 5.A.) Sir John further states therein that

> There is nothing in [the Collins Declaration that] leads me to change any of the analysis or conclusions in my declaration: I take the view that my analysis is wholly consistent with Lord Collins' statement of [English law] principles.

*(Id.* ¶ 5.B.)

WEIL:\95797449\9\58399.0011

7.       Given the analyses set forth in the Objection, the Chadwick Declaration, the Supplemental Chadwick Declaration, and herein, the Claims should be disallowed in their entirety and ordered expunged at a Sufficiency Hearing.

## ARGUMENT

**I.      Sir John Chadwick's Declarations Present Relevant Discussion And Analysis That May And Should Be Considered By This Court**

8.       SRM argues (Response ¶¶ 32-37) that the Chadwick Declaration goes beyond the scope of what is permitted by Federal Rule of Civil Procedure 44.1 because it offers Sir John's views as to the application of English law to the facts of the case.

9.       This argument is contrary both to the language of Rule 44.1 and the bulk of case law from this Circuit construing that rule.  Under Rule 44.1, "[i]n determining foreign law, [t]he court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  FED. R. CIV. P. 44.1.  Recognizing the broad discretion provided by Rule 44.1, the Second Circuit has "urge[d] district courts to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations." *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998).  Indeed, courts in this Circuit routinely reject requests to strike or disregard expert declarations on foreign law, including where one party argues that it is inappropriate for a foreign law expert to opine on the application of foreign law to the facts of the case.  *See, e.g., Winn v. Schafer*, 499 F. Supp. 2d 390, 396 n. 28 (S.D.N.Y. 2007) (rejecting argument that a foreign law expert may not opine as to the "ultimate application of the (foreign) law to the facts of the case" and stating that the court may "consider a foreign law expert's opinion even on ultimate legal conclusions") (citation omitted); *Oei Hong Leong v. Goldman Sachs Grp., Inc.*, 2014 WL 2893310, at *4 (S.D.N.Y. June 25, 2014) (refusing to strike foreign law declaration where plaintiff argued that it

5

"contain[ed] improper conclusory legal statements and it incorporate[d] incorrect factual allegations") (citation omitted); *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 700 (S.D.N.Y. 2003), *aff'd sub nom. Base Metal Trading Ltd. v. Russian Aluminum*, 98 F. App'x 47 (2d Cir. 2004) ("The Court must decide what weight, if any, to give [foreign expert] declarations and to all of the evidence the Court uses in determining Russian law, but the Court will make such a determination rather than to merely strike informative testimony"). Indeed, SRM fails to cite a single case from this Circuit in support of its argument that the Court should disregard Sir John's declaration because it applies law to facts.

10.     This Court thus has broad discretion to determine what information to take into account to resolve questions of foreign law and may consider the Chadwick Declaration and the Supplemental Chadwick Declaration as it deems appropriate.  This is particularly true given that the facts on which Sir John relies consist solely of undisputed contractual language and SRM's own allegations, and given that the Collins Declaration provides a broad overview on contract interpretation under English Law, which the Plan Administrator does not dispute.  The Plan Administrator therefore submits that the Chadwick Declaration and the Supplemental Chadwick Declaration are highly useful for the Court in examining the English law issues arising in this contested matter.

## II.    Each Of The Claims Must Be Dismissed Because SRM Disclaimed Reliance On Prior Statements In The PBA

11.     Whether SRM had knowledge of, and relied on, the Corporate Resolution may be a factual question but it is a question the Court need <u>not</u> consider.

12.     It is the Plan Administrator's position that, even accepting as true all of SRM's factual assertions of SRM's knowledge of and reliance on the Corporate Resolution prior to SRM's signing the PBA, SRM is precluded from asserting such reliance as a matter of law.

6

This is because SRM specifically represented in Clause 16.3 of the PBA that it was not relying on any representations made outside of the four corners of that document. (*See* Objection ¶ 26; PBA §16.3 ("Each party acknowledges and agrees that (a) they have not relied on any representation, warranty or other statement of another party in entering into this Agreement other than those expressly set out in this Clause 16; and (b) . . . the Counterparty further represents and warrants to the Prime Broker that (i) it has not relied on any oral or written representation made by the Prime Broker. . . .").)  Each of the Claims, given they are based on the Corporate Resolution, should consequently be disallowed.

13.    Such a result is not inequitable.  SRM did not have to agree to that provision, and it even obtained a specific, written, executed guarantee from LBHI of *other* obligations of LBIE (those arising under the ISDA Agreement between LBIE and SRM), but elected to waive reliance on pre-contract representations in the PBA.[3]

14.    While the PBA is governed by English law, there is no dispute that, under English law, the plain meaning of contractual language generally controls.  (Supp. Chadwick Decl. ¶¶ 7-8.)  Further, the Plan Administrator's position is consistent with well-established New York law.  In the seminal case of *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 323 (1959), the New York Court of Appeals held that even fraud claims based on a defendant's alleged misrepresentations were prohibited where the plaintiff expressly disclaimed any reliance on representations not included in the contract.  Relying, in part, on principles of estoppel that are equally applicable here, New York's highest court stated:

> [T]he plaintiff made a representation in the contract that it was not relying on specific representations not embodied in the contract, while, it now asserts, it was

---

[3]  Indeed, efforts by SRM to walk away from its disclaimer of reliance in the PBA is asking this court of equity to condone something akin to fraud in the inducement, as the New York Court of Appeals expressly warned against in the case discussed immediately below.

in fact relying on such oral representations. Plaintiff admits then that it is guilty of deliberately misrepresenting to the seller its true intention. To condone this fraud would place the [plaintiff] in a favored position.

*Id.*; *see also Grumman Allied Indus., Inc. v. Rohr Indus., Inc*., 748 F.2d 729, 735 (2d Cir. 1984) ("*Danann* therefore stands for the principle that where the parties to an agreement have expressly allocated risks, the judiciary shall not intrude into their contractual relationship."). *A fortiori*, here, where the allegation is that SRM relied on statements (not misstatements) and that such reliance gave rise to a contract claim (not a fraud claim), the Court should not permit SRM to avoid its contractual disavowal of reliance.[4]

15.    SRM's response is to assert a number of highly-technical arguments under English law that purport to limit LBHI's right to enforce the non-reliance provisions in Clauses 16.3(a) and 16.3(b)(i), including that (i) 16.3(a) applies only to the parties to the agreement – LBIE and SRM, and (ii) LBHI is not a third-party beneficiary of the PBA. (*See* Response ¶¶ 50-52.)  These arguments are red-herrings.  SRM's allegations concerning its reliance on the Corporate Resolution amount to an admission that its representations in the PBA were deliberate misrepresentations; irrespective of SRM's English-law arguments, this Court, as a court of equity, should not permit SRM to disavow its disclaimer of reliance as doing so would "place . . . [it] in a favored position." *Danann*, 5 N.Y.2d at 323.

16.    SRM's technical English law arguments also fail.  Even if Clause 16.3(a) applies only to the parties to the agreement, as alleged by SRM without support, then such Clause still applies to the alleged statements made by LBIE representatives concerning an LBHI

---

[4] SRM is also equitably estopped from asserting reliance that it previously disclaimed.  *See generally BWA Corp. v. Alltrans Express U.S.A., Inc.*, 112 A.D.2d 850, 853 (1st Dep't 1985) (Describing the elements of equitable estoppel as: "'(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than and inconsistent with, those which the party subsequently seeks to assert; (2) intention, or at least expectation, that such conduct will be acted upon by the other party; (3) and, in some situations, knowledge, actual or constructive, of the real facts.'") (citation omitted).

Pg 14 of 39

guaranty.  (*See* Response ¶ 44.)  Further, the undefined phrase, "another party", in Clause 16.3(a) should be given its natural meaning and not be limited to the parties to the agreement as SRM would ask this Court to write into the PBA.  Indeed, if the drafters of the PBA had meant to so limit Clause 16.3(a), they would have used defined terms, as they did previously in the immediately succeeding Clause 16.3(b) – where the "Counterparty" disclaimed reliance on statements made by the "Prime Broker" and "any person on behalf of the Prime Broker."  (*See* PBA ¶ 16.3(b)(i).)

17.     SRM's argument that LBHI is not a third-party beneficiary of the PBA also is wrong.  As a matter of English law, the Contract (Rights of Third Parties) Act 1999 permits a third party to rely on a contractual right in two situations.  As provided in section 1(1) of that Act:

> Subject to the provisions of this Act a person who is not a party to a contract (a "third party") may in his own right enforce a term of the contract if-
> (a) the contract expressly provides that he may, or
> (b) subject to subsection (2), the term purports to confer a benefit on him

18.     Subsection 2, which is not relevant for present purposes, provides that "Subsection (1)(b) does not apply if on a proper construction of the contract it appears that the parties did not intend the term to be enforceable by the third party."

19.     In this case, clause 31.1 of the PBA expressly provides that "[*o*]*ther than the Affiliates of the Prime Broker* . . . a person who is not a party to this Agreement shall have no right under the Contract (Rights of Third Parties) Act 1999 to enforce any of its terms" (emphasis added), thus expressly providing that "Affiliates" of the Prime Broker may enforce the terms of the PBA in accordance with section 1(a) of the Act.  The definition of "Affiliates" in the PBA includes "a holding company" as defined in section 736 of the Companies Act 1985 (or any statutory modification or re-enactment thereof).  Section 736 of the Companies Act 1985 has

been re-enacted as section 1159 Companies Act 2006 (Companies Act 2006, schedule 16).  Both

the 1985 and 2006 definitions include indirect holding companies within the meaning of

"holding company."  Specifically, the most recent enactment (section 1159 companies Act 2006)

provides that:

> (1) A company is a "subsidiary" of another company, its "holding company", if that other company—
> (a) holds a majority of the voting rights in it, or
> (b) is a member of it and has the right to appoint or remove a majority of its board of directors, or
> (c) is a member of it and controls alone, pursuant to an agreement with other members, a majority of the voting rights in it, *or if it is a subsidiary of a company that is itself a subsidiary of that other company*.

(emphasis added).

20.    Therefore, as LBIE's ultimate parent, LBHI is LBIE's "holding

company" within the meaning of the Companies Act.  It follows that LBHI is an "Affiliate" of

LBIE under the PBA.  As an "Affiliate," LBHI was expressly granted the right to rely on the

PBA "and enforce any of its terms", pursuant to section 1(a) of the Contract (Rights of Third

Parties) Act 1999."

## III.    The Segregated Assets Claim Must Be Dismissed <br> Because SRM Has Failed To Allege Cognizable Damages

21.    ███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████    Therefore, if the Court agrees that either of these dates is

the proper date on which to value the Segregated Assets, then the Segregated Assets Claim must

fail as a matter of law and without consideration of English law.

WEIL:\95797449\9\58399.0011

22.     In its Response, SRM argues its Segregated Assets Claim should survive because the amount of its damages is a factual question that cannot be decided at a Sufficiency Hearing. (Response ¶ 73.)  This argument misses the mark.  The Objection is based on a purely legal issue:  when are SRM's damages to be measured under the Bankruptcy Code?  SRM's only theory for why LBHI has guaranty liability with respect to the Segregated Assets Claim is that,

███████████████████████████████████████████████████████

█████████████████████████.  (Response ¶ 72; Estimation Obj. ¶ 17.)  For the reasons set forth in the Objection and below, █████████████████████████  as the valuation date for the Segregated Assets Claim is improper as a matter of law.  Therefore, SRM has failed to allege a plausible theory of guaranty liability and the Segregated Assets Claim must be disallowed.

### A.     The Segregated Assets Claim Should Be Valued On The PBA Termination Date Pursuant To Section 562 Of The Bankruptcy Code

23.     SRM asserts that section 562 does not apply because the Segregated Assets Claim is based on the Corporate Resolution, which is not itself a "securities contract" under the Bankruptcy Code in that it does not reference or specifically concern any securities transaction. (Response ¶ 75.)

24.     This contention ignores the plain text of the Bankruptcy Code.  Pursuant to section 741(7)(A)(xi), a guaranty of a "securities contract" is itself a "security contract." Specifically, that section defines the term "security contract" as:

> any security agreement or arrangement or other credit enhancement *related to* any agreement or transaction referred to in this subparagraph, *including any guarantee* or reimbursement obligation by or to a stockbroker, securities clearing agency, financial institution, or financial participant *in connection with any agreement or transaction referred to in this subparagraph*, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562.

11

11 U.S.C. 741(7)(A)(xi) (emphasis added).

25.    Assuming, *arguendo*, that the Corporate Resolution is an enforceable guaranty (no other guaranty is alleged), then such guaranty is a "securities contract" under section 741 of the Bankruptcy Code because it is "related to" a "securities contract" or is a guaranty "in connection with" a "securities contract" because it cannot seriously be disputed—and SRM does not dispute—that the PBA (a Prime Brokerage Agreement) is a "securities contract." *See* 11 U.S.C. § 741(7)(A)(i), (x) (defining "securities contract" to include "a contract for the purchase, sale or loan of a security" and "a master agreement that provides for [such] an agreement or transaction"); PBA ¶ 2.1 ("This Agreement applies to all acquisitions and disposals of securities, and the provision of any advances of cash and securities in respect thereof . . . ."); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 720 (S.D.N.Y. 2012), *aff'd*, *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014) (account agreements between Madoff Securities and its customers were "securities contracts" under the Bankruptcy Code).

26.    There is no requirement, as SRM asks this Court to find, that a guarantee specifically reference the underlying agreement or transaction to be a "securities contract." *See Lehman Bros. Holdings Inc. v. JP Morgan Chase Bank, N.A.* (*In re Lehman Bros. Holdings Inc.*), 469 B.R. 415, 439 (Bankr. S.D.N.Y. 2012) ("[T]here is no required language to connect agreements so that they will be deemed related" under section 741(7)(A)(xi)); *see also Picard v. Ida Fishman Revocable Trust* (*In re Bernard L. Madoff Inv. Sec. LLC*), 773 F.3d 411, 418 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2858 (2015) (applying expansive definitions to the terms, "securities contract" and "in connection with").

WEIL:\95797449\9\58399.0011

27.    If the Corporate Resolution does not "relate to" to the PBA or is not a guaranty "in connection with" the PBA, then LBHI necessarily has no guaranty liability whatsoever for obligations arising under the PBA.  If the Corporate Resolution "relates to" the PBA or is a guaranty "in connection with" the PBA, then it is "securities contract," section 562 applies, and the PBA Termination Date is the proper date to value the Segregated Assets Claim.[5]

**B.    Even If Section 562 Does Not Apply, The Segregated Assets Claim Must Be Valued On Or About The Petition Date Pursuant To Section 502 Of The Bankruptcy Code**

28.    In the Objection, the Plan Administrator established that, even if section 562 of the Bankruptcy Code does not apply, the Segregated Assets must be valued on or about the Petition Date under the plain language of section 502 of the Bankruptcy Code.  (Objection ¶ 44.)  In its Response, SRM argues that the Petition Date value of its Segregated Assets is irrelevant because the Segregated Assets Claim is a contingent guaranty claim that must be valued on the date it became fixed ███████████████████████.  (Response ¶¶ 76-78.)

29.    SRM's position is not only wrong as a matter of law, it is inconsistent with a prior decision of this Court and a previous position assertion by SRM.  Specifically, the Segregated Assets Claim became fixed on the date of LBIE's alleged breach, not on ████████ ████████████████.  As this Court has previously ruled,

> [u]pon default of the principal on the underlying debt, liability on a guaranty becomes fixed and is no longer contingent because all predicates to enforcement have occurred.

*In re LightSquared Inc.*, 2014 WL 5488413, at *3 (Bankr. S.D.N.Y. 2014) (citing *In re Rhead*, 179 B.R. 169, 172 (Bankr. D. Ariz. 1995)).

---

[5] We note that the only case cited by SRM in its Response on this point, *EPLG, LLC v. Citibank* (*In re Qimonda Richmond, LLC*), 467 B.R. 318, 323 (Bankr. D. Del. 2012), is inapposite.  In *Qimonda*, the primary obligations arose under bond indentures, which are not "securities contracts," unlike the PBA.

30.    Notably, SRM cited the Court's decision in *LightSquared* in its Estimation

Objection to support an argument that the Segregated Asset Claim was no longer contingent.

(Estimation Obj. ¶ 26.)  Moreover, SRM admitted in the Estimation Objection that,

> [i]f a default by the primary obligor has occurred, then the predicate to
> enforcement has occurred and a guarantee claim becomes absolute and not
> contingent.

*Id.* (citing *LightSquared* and *In re F.B.F. Indus., Inc.*, 165 B.R. 544, 548-49 (Bankr. E.D. Pa.

1994)).

31.    SRM's claims became fixed on or about the Petition Date, and no other

conclusion is possible given SRM's pleadings.    SRM has alleged that LBIE breached its

obligations under the PBA by (i) failing to segregate the Segregated Assets before and shortly

after the Petition Date, (ii) refusing to return the Segregated Assets in response to SRM's request

on September 26, 2008, and (iii) failing to recognize the setoff of ISDA and prime brokerage

obligations on September 26, 2008.  (Claim ¶ 14; Estimation Obj. ¶¶ 10, 27.)  These alleged

breaches occurred before or within a few weeks of the Petition Date, ███████████████

█████████████████.  Indeed, SRM filed its proof of claim on September 22, 2009.██

██████████████████████.  Tellingly, the proof of claim did not describe the

Claims as being contingent.  (*See* Claim ¶¶ 8-18.)

32.    SRM's response that "all predicates to enforcement" of its claim did not

occur until ████████████████████████████ (Response ¶ 78)

is not only contrary to its position in the Estimation Objection and this Court's ruling in

*Lightsquared*, but it also is inconsistent with long-standing bankruptcy precedent concerning

guaranty claims.  Under principles first announced by the Supreme Court in *Ivanhoe Building &*

*Loan Ass'n of Newark, New Jersey v. Orr*, 295 U.S. 243 (1935), the allowed amount of a

guaranty claim is not measured by reference to the amount recovered from the primary obligor. Rather, a guaranty claimant may assert the full value of its underlying claim until it is paid in full. *See Bankers' Trust Co. v. Irving Trust Co.* (*In re United Cigar Stores Co.*), 73 F.2d 296 (2d Cir. 1934) ("Although the claim against the bankrupt is secondary, it should be allowed in full, and dividends should be paid, regardless of the security furnished by the principal obligor, until full satisfaction is had").[6]  If a debtor-guarantor is found liable under a guaranty before the primary obligor, it must pay the full amount owed; if the primary obligor makes a subsequent payment to the claimant, then the guarantor has rights of subrogation. *See, e.g., Carrols Equities Corp. v. Villnave*, 57 A.D.2d 1044, 1044, (N.Y. App. Div 4th Dep't 1977) (Surety entitled to right of subrogation by operation of law).  It is not the case, as SRM implies, that the claimant must wait to see what, if any, deficiency there is before having the ability to liquidate its claim against the debtor-guarantor.

33.    For the foregoing reasons, if section 502 applies, as opposed to section 562, the Segregated Assets Claim must be valued on or about the Petition Date; in either case, SRM has not pleaded guaranty liability.

### C.    The PBA Itself Requires Measurement Of SRM's Segregated Assets Claim As Of the Termination Date, At The Very Latest

34.    In the Objection, the Plan Administrator demonstrated that the Bankruptcy Code, and not the terms of the PBA, governs the valuation date for the Segregated Assets Claim. (Objection ¶¶ 47-51.)  SRM does not dispute this.  Accordingly, if the Court finds that either of

---

[6] The Plan's treatment of Guarantee Claims is consistent with *Ivanhoe* and *United Cigar*.  Guarantee Claims may be Allowed and Distributions may be made simultaneously on a Guarantee Claim and a Primary Claim.  Holders of Guarantee Claims are not required, in the first instance, to wait to have their claims Allowed until after Primary Claims are first Allowed and satisfied by Primary Obligors to the full extent of the Primary Obligors' ability.  (*See generally* Plan §§ 8.13, 8.14.)

WEIL:\95797449\9\58399.0011

sections 502 and 562 determine the date on which to value the Segregated Assets Claim, the Court need not consider the appropriate valuation date under the PBA.

35.    However, even if the Court were to turn to the PBA to determine the proper date to value the Segregated Assets, SRM's Segregated Assets Claim would fail. Contrary to SRM's argument (Response ¶ 80), SRM did not have a trust (or customer) claim to the Segregated Assets that granted it a proprietary right to a return of those assets once the PBA no longer was in force.  As a matter of English law, any trust relationship between LBIE and SRM was extinguished by SRM's *own* termination of the PBA on November 6, 2008. (Chadwick Decl. ¶¶ 13 (Issue A), 62-63; Supp. Chadwick Decl. ¶¶ 41-44.)

36.    And contrary to SRM's assertions, *Re Lehman Brothers International Europe* [2009] EWHC 2454 (Ch), supports this conclusion.  Indeed, as set forth more fully in the Supplemental Chadwick Declaration, both the court and the parties in that case assumed that once a LBIE prime brokerage agreement had been terminated, the customer would lose its proprietary interest.  (Supp. Chadwick Decl. ¶¶ 41-44.)  Indeed, the court in that case noted that the risk that a termination would have exactly such an effect is precisely why so few LBIE customers served termination notices on LBIE.  *See Re Lehman Brothers International Europe* [2009] EWHC 2454 (Ch) at ¶ 42 ("[T]he obvious risk that clause 13.2 [would convert a proprietary claim to a breach of contract claim] has to date been enough to deter MCF and most other Counterparties (wishing to advance proprietary claims in relation to securities) from serving termination notices or, for that matter, Default Notices on LBIE").

37.    Further, and contrary to SRM's assertion, the English-law doctrine that a party cannot take advantage of its own wrong is irrelevant.  As noted in the Supplemental Chadwick Declaration: "measurement of damages on the Termination Date is required by the

16

'close-out' provisions in clause 13 of the PBA. Those provisions became applicable because, on

6 November 2008, SRM chose to serve a Default Notice under clause 12.1(d) of the PBA and a

notice to terminate under clause 13.1 of the PBA: they did not become applicable because LBIE

was in breach of an obligation."   (Suppl. Chadwick Decl. ¶ 50.)  The cases cited by SRM

therefore are distinguishable.  (*Id*. ¶¶ 44-50.)

38.    In sum, to the extent SRM had a proprietary interest in the Segregated

Assets, such interest was extinguished on the Termination Date, at which point SRM was entitled

to receive only the net amount due to it (if any) as of the Termination Date.  (*See* Objection

¶¶ 53-55; Supp. Chadwick Decl. ¶ 50.)

39.    SRM's alternative argument that ███████████████████  ████

constitutes "the date of the discovery of loss" for purposes of Clause 14.4 of the PBA (Response

¶ 84) is likewise unavailing.  Clause 14.4 states in relevant part,

> "The parties agree that, as a genuine pre-estimation of loss, [LBIE's] liability to
> [SRM] shall be determined based only upon the Market Value of the relevant cash
> or securities as at the date of the discovery of loss and without reference to any
> special circumstances, indirect or consequential losses, or subsequent variations to
> the Market Values of the relevant cash or securities."

Such language not only limits any damages to "the Market Value of the relevant . . . securities,"

it also establishes the valuation date as the date of breach.  (*See* Chadwick Decl. ¶ 68; Supp.

Chadwick Decl. ¶ 53.)  SRM nevertheless tries to construe the phrase "the date of the discovery

of loss" to mean the date on which *the amount* of the loss is determinable.  (*See* Response ¶ 83

("[O]n the date of breach a party's loss may be undiscoverable (*e.g.*, contingent or otherwise

incapable of being determined")).)  This is an unreasonable construction of the phrase "the date

of the discovery of loss" under English law.  A party can know that it has experienced a "loss"

without knowing the precise amount of that "loss."  As stated in the Supplemental Chadwick

Declaration:

17

> [T]he relevant words in the second sentence of clause 14.4 of the PBA are "the discovery of loss" and not, as is suggested in paragraph 84 of SRM's Response, "the discovery of *the* loss". The distinction is of importance. The use of the phrase "the discovery of loss" – rather than the phrase "the discovery of the loss" – indicates that it was the parties' intention to measure damages as at the date when it is discovered that loss has been suffered; not at the date when, as suggested by SRM, the loss can be quantified. And it is important to keep in mind, also, that the second sentence of clause 14.4 is introduced by the words "The parties agree that, as a genuine pre-estimate of loss, . . .". Those words point to an intention that the amount of LBIE's liability for the breach of duty complained of shall be determined at an early stage and without the need to wait until the exact amount of damages can be calculated after detailed computation.  The underlying purpose of an agreement to quantify damages in the contract (and so in advance of any breach of the contract) in an amount described as "a genuine pre-estimate of loss", as a matter of English law is to avoid dispute, following a breach, as to the amount of the damages for which the party in breach should be liable. To give the words "discovery of loss" the meaning for which LBHI contends – that losses are measured on a conventional basis as of the date when SRM appreciates that it has suffered loss as a result of the breach – is, as it seems to me, is to give the words their natural meaning. To give the words the meaning for which SRM contends in paragraph 84 of its Response is to give the words used an unnatural meaning which – in circumstances in which there is no reason to do so - infringes the basic principles of contractual interpretation and defeats the underlying purpose of the provision; and so must be regarded as an unreasonable construction.

(Suppl. Chadwick Decl. ¶ 54.)  Applying a reasonable interpretation of the phrase, "the date of discovery of loss," an English court would find that SRM discovered its loss – *i.e.*, that LBIE was not about to deliver SRM securities – on or about September 19, 2008 or, in any event, not later than October 3, 2008. (Chadwick Decl. ¶ 69; Suppl. Chadwick Decl. ¶ 55.)  It was on those dates when SRM sent written demands from its attorneys for the return of its securities, but did not receive them, and that is as of when damages – the "Market Value" of the Segregated Assets – must be measured under the PBA.

## IV.    Each Of The Claims Is Without Merit Under The Express Terms Of The PBA

### A.    Clause 14.4 Of The PBA Precludes Any Recovery

40.    In the Objection, the Plan Administrator demonstrated that any claim by SRM for damages other than in the amount of the value of the Segregated Assets was precluded

by Clause 14.4 of the PBA, a broad exculpatory provision that limits damages exposure to "the Market Value of the relevant cash or securities" as discussed above, and liability to claims for gross negligence, fraud, or willful default or breach. (*See* Objection ¶ 34; PBA ¶ 14.4 ("Where the Prime Broker has been found to be liable, the Prime Broker shall only be liable to the Counterparty to the extent that the Prime Broker has been grossly negligent, fraudulent, or is in willful default or breach of its duties as set out in this Agreement . . . .").) The Objection demonstrated that SRM's Claims are barred because SRM has not plausibly alleged that LBIE (or LBHI) was grossly negligent, fraudulent, or in willful default or breach of its duties to SRM. (*See* Objection ¶¶ 35-36.)

41.     The Objection also demonstrated that, even if SRM could establish that LBIE (or LBHI) had acted fraudulently, grossly negligently, or in willful default of its obligations (which it cannot), Clause 14.4 of the PBA would still limit the amount of SRM's damages to the value of the securities at issue as of the time of discovery of loss, and that, among other things, consequential damages would not be recoverable. Specifically, Clause 14.4 provides that SRM's damages must be "determined based only upon the Market Value of the relevant….securities as at the date of the discovery of loss and without reference to any special circumstances, indirect or consequential losses, or subsequent variations to the Market Values of the relevant…securities." (PBA ¶ 14.4.) In the Objection, the Plan Administrator demonstrated that, under this clear exculpatory language, the Forced Sales Claim and the Lost Opportunities Claim must be dismissed because, at most, they seek indirect or consequential losses, ███████

███████████████████████████████████████████

42.     In its Response, SRM first argues that it need not allege that LBIE's purported breaches of the PBA constitute gross negligence, fraud or willful default because that

"is a question of fact that cannot be resolved at the pleading stage." (*See* Response ¶ 55.)  Such argument is just plain wrong:  the question of whether SRM plausibly has pled gross negligence, fraud or willful default is a matter of law that this Court can, and courts regularly do, decide at the pleading stage.  *See, e.g., LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 191 (2d Cir. 2013) ("A district court's dismissal of claims by reason of the insufficiency of the pleading presents a pure question of law").[7]  It is not enough for a claimant to conclusorily assert that the alleged behavior rises to the level of gross negligence, fraud, or willful default; rather, though a court must accept the well-pleaded factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007)). "Once a court accepts all of the plaintiff's factual allegations as true, those allegations must demonstrate 'more than a sheer possibility that a defendant has acted unlawfully' in order to pass muster under Rule 12(b)(6).  If a plaintiff has 'not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed.'" *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 458 (S.D.N.Y. 2014) (quoting *Iqbal,* 556 U.S. at 678 and *Twombly,* 550 U.S. at 570).  Courts, of course, regularly dismiss claims that are not supported by the factual allegations of the complaint.

     43.    The cases cited by SRM to support its argument—one from 2007 and one from 1989 which, SRM fails to note, were each rendered prior to *Iqbal* and *Twombly*—are entirely inapposite because they involved complaints that included substantive allegations of bad faith conduct.  In *Cimini v. Jaspan Schlesinger Hoffman LLP* (discussed in Response ¶ 55), the

---

[7] The standard of review for a Sufficiency Hearing is "equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim." *In re Lehman Bros. Holdings Inc.*, 515 B.R. 171, 174 (Bankr. S.D.N.Y. 2014) (citation omitted); *see also In re Lehman Bros. Holdings Inc.*, 2014 WL 2766164, at *2 (Bankr. S.D.N.Y. June 18, 2014).

court declined to dismiss a fraud claim where the complaint alleged with particularity that the defendant "participated in a fraudulent scheme by intentionally and fraudulently inducing [plaintiff] to enter into an irrevocable trust agreement with an unnecessarily broad exoneration provision and then, at a later time, willfully dissipated the asset in that trust in bad faith by terminating the Policy without [plaintiff's] knowledge or consent, while falsely representing that it was being terminated pursuant to an arrangement between [plaintiff] and the Firm." 2007 WL 173893, at *7 (E.D.N.Y. Jan. 19, 2007). Likewise, in *Ally Gargano/MCA Advertising, Ltd. v. Cooke Properties, Inc.*, (discussed in Response ¶ 55), the court declined to grant summary judgment for defendant where plaintiff alleged a laundry list of specific and plausible facts showing that defendant had repeatedly acted in bad faith. 1989 WL 126066, at *10 & n.7 (S.D.N.Y. Oct. 13, 1989). These cases do not support SRM's assertion that the conclusory allegations of willful misconduct, gross negligence, or fraud contained in the Response allow the claim to survive a motion to dismiss, given the absence of factual allegations in the proof of claim to support a claim for anything other than breach of contract.[8]

44.    SRM likewise has failed to plead – and cannot plead – facts to support the argument that LBIE was grossly negligent in failing to comply with purported obligations not to rehypothecate SRM's assets. (*See* Response ¶ 57.) SRM points to its allegations in the Proof of Claim that unnamed "individual members" of LBIE's prime brokerage team told SRM that "LBIE would not rehypothecate any of SRM's assets without first getting SRM's permission or at a minimum giving SRM sufficient notice for SRM to exercise its contractual right under the

---

[8] Claims alleging willful misconduct or gross negligence in an attempt to evade exculpation clauses are routinely dismissed at the pleading stage. *See, e.g.*, *Vivaro Corp. v. Raza Commc'n, Inc.* (*In re Vivaro Corp.*), 2014 WL 486288, at *5 (Bankr. S.D.N.Y. Feb. 6, 2014) ("Raza's sparse allegations do not meet this burden; the limitation of liability provision cannot be set aside"); *Deutsche Lufthansa AG v. Boeing Co.*, 2007 WL 403301, at *4 (S.D.N.Y. Feb. 2, 2007) ("Boeing acted rationally in its endeavor. The conduct alleged by Lufthansa falls well below the levels required by the New York courts to invalidate a mutually agreed upon limitation of liability").

21

PBA to prohibit rehypothecation." (Response ¶ 54, citing Claim ¶ 13.) These allegations on their face at most support a claim for simple breach of contract, not gross negligence.

45.     Indeed, the parties agree that, under English law, the term "gross negligence" means "a serious disregard of or indifference to an obvious risk." (*Compare* Response ¶ 56 *with* Supp. Chadwick Decl. ¶ 19.1.) Given the failure by SRM to allege any facts suggesting a culpable state of mind consistent with "disregard" or "indifference," SRM's allegations in the Proof of Claim do not plausibly allege gross negligence. Further, a failure to provide notice to SRM of a proposed rehypothecation (*see* Response ¶ 57) is, at most, an alleged breach of an oral or collateral agreement between SRM and LBIE—not a willful breach of LBIE's duties under the PBA as asserted by SRM at Paragraph 56 of the Response. As explained in the Supplemental Chadwick Declaration:

> The "contractual right under the PBA to prohibit rehypothecation" to which SRM refers in paragraph 56 of its Response is the right to "request in writing" that certain positions be excluded from Collateral Use. . . . If, in circumstances in which there had been no request in writing by SRM pursuant to clause 11.6 (and no agreement by LBIE that it would act in accordance with that written request), failing to treat assets deposited by pursuant to the PBA as Ineligible Positions was not (as a matter of English law) a breach of its duties under the PBA.

(Supp. Chadwick Decl. ¶ 22.)

46.     Moreover, as demonstrated in the Objection, LBIE's purported failure to return the Segregated Assets cannot constitute willful default of its duties under Clause 7.2(a) of the PBA as LBIE expressly was permitted to decide not to return the Segregated Assets, or securities "equivalent" to the Segregated Assets, notwithstanding a client request, following an "Event of Default" or a "Potential Event of Default." (*See* Objection ¶ 36; PBA ¶ 7.2 ("The Prime Broker acting in good faith and in its commercially reasonable discretion shall not be required to make a payment or delivery under Clause 7.1 if - (a) an Event of Default or Potential Event of Default has occurred and is continuing[]").) The Plan Administrator showed in the

22

Objection that LBIE's seeking of an order for administration on September 15, 2008, represented an Act of Insolvency under Schedule 3(d) the PBA, and that such an Act of Insolvency was a Potential Event of Default under Clause 12.1(d) of the PBA.  (*See* Objection ¶¶ 36, 53)  Thus, any decision by the Joint Administrators not to return the Segregated Assets shortly following their appointment was permitted under Clause 7.2 of the PBA because the only plausible construction is that any such decision would have been made in good faith and with commercially reasonable discretion as the Joint Administrators commenced their task of marshalling assets and evaluating claims.  (*See* Objection ¶ 37.)

47.     In its response, SRM argues first that the question of whether any decision by the Plan Administrator not to return the Segregated Assets was exercised in good faith is a factual question that cannot be resolved at the pleading stage.  (*See* Response ¶ 60.)  Second, SRM argues that the question of whether LBIE's entrance into administration constituted an Event of Default or a Potential Event of Default also is a factual question that cannot be resolved at the pleading stage.  (*See id*. ¶ 61 & n. 36.)  Third, SRM contends that Clause 7.2 of the PBA cannot act to suspend LBIE's obligation to return the Segregated Assets because, under English Law, LBIE cannot use its own insolvency to justify such a decision.  (*See id*.)  SRM is wrong on all three points.

48.     First, SRM is again mistaken in its assertion that the Court cannot decide the sufficiency of SRM's allegations at the pleading stage.  Frankly, this Court is better situated than most to determine as a matter of law that the Joint Administration's failure to return assets on demand in the fall of 2008 was commercially reasonable and in good faith given these court-appointed responsibilities.  Not surprisingly, the only case SRM relies on to support its argument that the sufficiency of the pleading of the absence of good faith and reasonable discretion cannot

23

be decided at the pleading stage is from a federal court in Michigan applying Delaware law. *Radakovich v. Energy Recovery, Inc.*, 2012 WL 4513636, at \*3 (E.D. Mich. Sept. 30, 2012). Courts, however, routinely resolve questions of pleading of good faith and reasonable discretion at the pleading stage. *See, e.g.*, *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 137 (2d Cir. 2011); *Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 539 (S.D.N.Y. 2013).

49.     Second, SRM is once again mistaken in its assertion that the question of whether or not LBIE's entrance into administration constituted an Event of Default or Potential Event of Default is a "question of fact" that cannot be resolved at the pleading stage. As shown in the Objection, the clear and unambiguous language of the PBA, as discussed above, provides that an Event of Default or Potential Event of Default occurred upon LBIE's entrance into administration. The interpretation of an unambiguous contract is a question of law that a court can and should decide at the pleading stage. *See, e.g., Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Research, Defendant.*, 2016 WL 205445, at \*3 (S.D.N.Y. Jan. 15, 2016) ("Since the interpretation of a contract generally is a question of law to be determined by the court, the court may dismiss a complaint based on a contract if the contract unambiguously shows that the plaintiff is not entitled to the requested relief") (citation omitted); *Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, 2015 WL 4940126, at \*12 (S.D.N.Y. Aug. 10, 2015) (dismissing complaint where "[defendant's interpretation is the only 'reasonable' reading of the relevant terms of the Agreements, and that the Agreements are therefore unambiguous as a matter of law").

50.     Third, SRM's argument that Clause 7.2 of the PBA cannot allow LBIE to suspend its obligation to return the Segregated Assets based on its own insolvency as a matter of

English law (Response ¶ 61) is baseless, given that its reliance on *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch) at [66], is wholly misplaced.  In that case, the parties and the court actually all assumed that such a provision would suspend LBIE's delivery obligations under Clause 7.1.  As explained in the Supplemental Chadwick Declaration, in that case:

> Mr Justice Briggs rejected the contention that "LBIE's delivery obligations under Clause 7.1 of the PBA were suspended based on LBIE's own insolvency" was doubtful as a matter of [English] law; and that his observations do not support SRM's argument (advanced at paragraph 61 of the Response) that, as a matter of English law, the effect of LBIE's insolvency is that Clause 7.2(a) of the PBA is inapplicable to SRM's claims in these proceedings. Rather, Mr Justice Briggs accepted that LBIE's delivery obligations under clause 7.1 were (or were capable of being) suspended, by reason of clause 7.2(a), following the occurrence of a Potential Event of Default; and that, notwithstanding the existence of the trust relationship, there was nothing incongruous in that result.

(Supp. Chadwick Decl. ¶ 31.)

51.    For all the foregoing reasons, the terms of the PBA preclude a recovery on each of the Segregated Assets Claim, the Forced Sales Claim, and the Lost Opportunities Claim.

## B.    SRM's CMNA-Based Claims Are Subject to Clause 14.4 Of The PBA

52.    In the Objection, the Plan Administrator also demonstrated that any breach of the CMNA caused by the Joint Administrators' alleged failure to deliver a compliant margin notice is precluded by the exculpatory language of Clause 14.4 of the PBA.  (*See* Objection ¶ 21; PBA ¶ 7.2.) Specifically, under Clause 2.2 of the PBA, the CMNA is an "ancillary arrangement contemplated by the PBA and a document "identified as being related to a Transaction contemplated by" the PBA and is thus subject to the provisions of the PBA. (*See* Chadwick Declaration ¶¶ 17, 30; PBA ¶ 2.2.)  Further, to the extent that SRM's purported damages under its Lost Opportunities claim were caused by issues resulting from the failure to segregate assets under the PBA (as opposed to the CMNA), as pleaded by SRM in the Proof of Claim, such

25

liability is also necessarily precluded by the exculpatory language of Clause 14.4.  (*See* Objection ¶ 61.)

53.    In response, SRM argues that its claims under the CMNA are not subject to the PBA's exculpatory clause because "a plain reading of Clause 2.2 makes clear that the parties did not intend to read specific provisions of the PBA such as 14.4 into the CMNA." (Response ¶ 64.)  SRM also argues that, under English law, any intention to exclude or limit liability must be clearly set forth in the relevant agreement(s), and that such standard is not satisfied because the CMNA is not explicitly referenced in the PBA.  (*Id*. ¶ 65.)

54.    Such responses fail because the relevant language in the CMNA and PBA makes clear that the Parties intended the PBA and CMNA to be read as a single agreement and, therefore, for the clauses limiting liability in the PBA to apply to claims arising under the CMNA.

55.    First, Clause 2.2 of the PBA states in relevant part:

> 2.2    **All Transactions and *ancillary arrangements* contemplated by this Agreement are entered into by the parties to this Agreement** . . . in reliance on the fact that this Agreement and all settlement requests, acknowledgments, Instructions, term sheets, confirmations **and *all other documents* identified as being related to a Transaction contemplated by this Agreement form a single agreement between the parties**. . . .

(all emphasis added).  SRM does not dispute that the CMNA is an ancillary arrangement to the PBA and is a document identified as "related to" a "Transaction contemplated by this Agreement," and the ordinary meaning of these undefined terms support the interpretation that the CMNA and the PBA "form a single agreement between the parties."

56.    Second, Schedule 1 to the CMNA explicitly defines the PBA as a "base contract" and the recitals of the CMNA make clear that the CMNA is an ancillary agreement to the PBA.  *See* CMNA Recital A ("LBIE and the Counterparty have entered into two or more

*Base Contracts* pursuant to which LBIE and the Counterparty may from time to time have exposures, contingent liabilities or debts to each other. ***LBIE will require the Counterparty to provide Margin in relation to such exposures, contingent liabilities or debts pursuant to the terms of the relevant Base Contract***") (emphasis added); CMNA Recital B ("The Counterparty has requested LBIE to enter into this Agreement in order to reduce its operational expense in respect of the Base Contracts by ***calculating the Margin Requirement on a net basis across all the Base Contracts***") (emphasis added).   Thus, the CMNA ties itself to the PBA as a "Base Contract" and as ancillary to the PBA under the plain meaning of that word.

57.     Third, both the Chadwick and Collins Declarations agree that contemporaneous contracts generally should be read as a single agreement.  (*See* Collins Decl. ¶ 50; Supp. Chadwick Decl. ¶ 9.15.)

58.     It thus follows that the parties intended the exculpatory clause of the PBA to apply to the parties' obligations under the CMNA.  As Sir John summarizes it, "as a matter of English law, it is clear beyond reasonable argument that (i) the CMNA is 'a document identified as being related to a Transaction contemplated by this Agreement", (ii) accordingly, clause 2.2 provides that the CMNA and the PBA "form a single agreement between the parties" and (iii) because the CMNA and the PBA form a single agreement, the exculpatory provisions of clause 14.4 of the PBA apply in cases in which LBIE has been found liable for a breach of clause 2.4 of the CMNA."  (Supp. Chadwick Decl. ¶ 40.)

59.     Because CMNA-based claims (like its PBA-based claims) are subject to Clause 14.4 of the PBA, the Lost Opportunities Claim must be dismissed.

## C.     Clause 14.3 Of The PBA Also Precludes A Recovery On The Claims

60.     Even assuming, *arguendo*, that SRM adequately has alleged fraud, gross negligence, or willful default, SRM cannot recover the damages that it seeks under the plain

WEIL:\95797449\9\58399.0011

terms of Clause 14.3 of the PBA.  Clause 14.3 states in relevant part, that LBIE "accepts no liability for and shall not be liable to [SRM] . . . for any Losses whatsoever . . . as a result directly or indirectly from . . . (a) *the general risks of investing*, or (b) investing or holding assets in a particular country (including but not limited to, Losses arising from . . . *market conditions affecting the orderly execution of securities transactions or affecting the value of assets*) . . . ." (emphasis added).

61.    First, SRM's argument that LBIE's alleged misconduct does not constitute a "general risk[] of investing" (Response ¶ 68) is a red-herring because it misstates the Plan Administration's argument.  As demonstrated in the Objection, Clause 14.3(a) speaks in terms of a waiver of particular types of "Losses" (*e.g.*, those tied "directly or indirectly" to the "general risks of investing"), not to the nature of the alleged underlying claim or behavior.  Here, the "Losses" sought by SRM – losses caused by market movements – are precisely what Clause 14.3(a) covers (*i.e.*, post-breach fluctuations in the value of particular securities).[9]

62.    Second, SRM's argument that Clause 14.3(b) of the PBA does not apply because LBIE's failure to segregate and return SRM's assets were not caused by "holding assets in a particular country" (Response ¶ 69) is similarly flawed.  Clause 14.3(b) exculpates LBIE from "Losses" that were caused "directly or indirectly" from "investing or holding assets in a particular country," including, specifically, "market conditions affecting the value of assets."  It cannot be disputed that SRM's claimed "Losses," which are based on postpetition fluctuations in the value of certain securities, were the result of "market conditions affecting the value of

---

[9] The Losses sought by SRM in each of the Claims include: (i) the appreciation in value of the Segregated Assets (in the case of the Segregated Assets Claim); (ii) the appreciation in value of certain securities SRM was allegedly "forced" to sell at disadvantageous prices in the fall of 2008 (in the case of the Forced Sales Claim); and (iii) the lost profits SRM would have earned through hypothetical investments it would have made had LBIE's purported breaches not diverted SRM's management's time (in the case of the Lost Opportunities Claim).  (See Claim ¶¶ 8-18.)

assets."   Further, SRM's inability to immediately access its Segregated Assets was, at a minimum, an "indirect" result of LBIE entering Administration in England under English law.

**V.     The Lost Opportunities Claim Must Be Dismissed**
**Because The Damages Sought Are Speculative And Remote**

63.     In the Objection, the Plan Administrator also demonstrated that SRM's (obviously plucked-from-thin-air) $100 million Lost Opportunities Claim is barred (i) under Clause 14.4 of the PBA because it seeks consequential damages (the damages claimed by SRM are for hypothetical profits it did not earn due to its "loss of investment opportunities" that allegedly resulted from the "substantial diversion of vast amounts of management time and energy" – which are inherently remote and consequential); and (ii) because such damages are entirely speculative and are not adequately pled because no facts have been alleged either directly tracing the claimed damages to the purported breach or providing any support that damages in any amount actually were incurred.  (*See* Objection ¶¶ 60-63; PBA ¶ 14.4.)  Indeed, under New York law, where there is a claim for a loss of future profits, "the alleged loss must be capable of proof with reasonable certainty.  In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes."  *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261 (1986).

64.     In its Response, SRM argues that, under English law, simply alleging a breach of contract is sufficient for the Lost Opportunities claim to survive a motion to dismiss because it is unnecessary to establish at this point that SRM is entitled to recover damages.  SRM further argues that, under English law, the Court should infer that, had SRM's management's time not been diverted, such time would have been applied to activities which would have generated profits for SRM.  (*See* Response ¶¶ 85-86.)

29

65.     Each of SRM's arguments fail.  As an initial matter, as Lord Collins concedes, pleading requirements are governed by New York law.  (*See* Collins Decl. ¶ 74 ("The extent to which details of the losses must be pleaded is, in accordance with elementary principles, a matter of procedure governed by the law of the forum, i.e. New York law").)  SRM's arguments regarding English law pleading standards thus are irrelevant according to their own proffered expert.

66.     In addition, as noted, PBA Clause 14.4 precludes claims for consequential damages:  "The parties agree that, as a genuine pre-estimate of loss, [LBIE's] liability to [SRM] shall be determined based only upon the Market Value of the relevant cash or securities as at the date of the discovery of loss and without reference to any special circumstances, indirect or consequential losses, or subsequent variations to the Market Values of the relevant cash or securities."

67.     Claims that are three steps away – the damages sought from the alleged breach are not direct, but rather the purported breach (i) allegedly caused a diversion of time and attention; (ii) which resulted in SRM not making unspecified investments; and (iii) which caused SRM not to have earned the resulting profits – are necessarily indirect, remote, and consequential.

68.     Moreover, SRM's fails to rebut the fact that the damages sought for the Lost Opportunities Claim are entirely speculative.  As the Court of Appeals held in *Kenford*, a claim for lost profits must be "capable of proof with reasonable certainty."  *Kenford*, 67 N.Y.2d at 261.  Thus, the Lost Opportunities Claim should be dismissed because SRM's hypothetical lost profits on hypothetical investments will never be capable of proof with reasonable certainty.  *See, e.g., In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6696407, at *11

(S.D.N.Y. Nov. 3, 2015) ("In cases involving bonds or loans, it is often proper to compare the cash flows received with those that would have been received if the plaintiff had invested in a hypothetical interest-bearing deposit. . . . However, Berkshire Bank has not pleaded information about any specific investment, so we cannot assess whether Berkshire Bank suffered any net loss on any mortgage or other loan. Accordingly, we dismiss Berkshire Bank for failure to plead damages"); *ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 2015 WL 247404, at *5, 9 n.2 (N.Y. Sup. Ct., New York Cty. Jan. 14, 2015), *aff'd*, 133 A.D.3d 444 (1st Dep't 2015) (dismissing lost profits claim and observing that "New York courts have consistently applied the standards set by the *Kenford* cases and imposed liability for consequential damages only where the parties contemplated the imposition of such damages at the time of contracting, and the damages were capable of proof with reasonable certainty"); *ACCD Glob. Agric. Inc. v. Perry*, 2013 WL 840706, at *2 (S.D.N.Y. Mar. 1, 2013) ("plaintiffs' complaint here simply asserts that plaintiffs 'would [have made] over $1 million per year in profits'—and makes no other proffer whatsoever concerning that allegation. This is insufficient to support a claim for lost profits, even at the motion to dismiss stage."); *Kantor v. 75 Worth St., LLC*, 95 A.D.3d 718, 718–19 (1st Dep't 2012) (affirming dismissal where "plaintiff's claim for lost profits is too speculative to sustain a cause of action").

69.     Finally, SRM's Response, like its pleading, fails to assert any plausible connection between its purported lost profits due to a diversion of SRM's management's time and LBIE's purported failure to deliver compliant margin notices.[10]  The one case SRM cites to

---

[10] SRM now points to the belated Declaration of J. Wood (the "Wood Decl.") in an attempt to show a causal relationship between the purported failure to deliver compliant margin notices and the diversion of SRM's management's time. However, the paragraphs of the Wood Declaration that SRM cites for this point primarily argue that SRM would have terminated the PBA earlier had it received timely margin notices. (*See* Response ¶ 88; Wood Decl. ¶¶ 25-29.)  While Mr. Wood does state that "[i]n the months immediately following LBIE's administration, we were forced to devote all of our time to dealing with the dispute with LBIE and the fallout," he

in support of its argument that no plausible causation needs to be pled is an inapposite securities class action where the court found that plaintiffs had plausibly pled that defendants' false and misleading statements had led to the defendant company's stock rising, and that the stock price fell once the truth of those statements was revealed. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (cited in Response ¶ 87 & n.44). In fact, courts regularly dismiss claims where plaintiffs fail to plead a connection between the purported breach and the alleged harm. *See, e.g., Kramer v. Lockwood Pension Servs., Inc.*, 653 F. Supp. 2d 354, 383 (S.D.N.Y. 2009) (dismissing claim where "[a]lthough [plaintiffs] state . . . they will suffer damages in an amount not less that the face value of the Lincoln Policy, i.e. $10,000,000.00, there is no plausible connection between that loss" and the alleged breach); *Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*, 629 F. Supp. 2d 259, 264 (S.D.N.Y. 2007), *aff'd,* 351 F. App'x 472 (2d Cir. 2009) ("Even if plaintiff's factual assertions were sufficient to support an allegation that Paul Weiss breached its fiduciary duty, he has not adequately alleged that this breach caused his damages-*i.e.,* 'that "but for" [Paul Weiss's] conduct [plaintiff] ... would not have sustained any ascertainable damages'") (citation omitted); *Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 641 (E.D.N.Y. 2000) (dismissing claim for lost business opportunities where "plaintiff has pleaded no facts suggesting that [defendant] was aware of any of the business ventures he had to forgo as a result of losing access to the funds at issue, which is to say that there is no sufficient pleading that the damages alleged were within the contemplation of the parties at the time their contract was formed. Thus, even if he had sufficiently and specifically pleaded facts showing how the loss of funds proximately

---

fails to tie that alleged diversion of time to the purported breach of the CMNA relating to the margin notices, nor does he show what investments would otherwise have been made. (Wood Decl. ¶ 30.)

WEIL:\95797449\9\58399.0011

caused his business ventures to suffer (which, as it happens, he has not done), he would still have failed to maintain a cause of action").

## VI.    Whether SRM May Amend Its Claim Is Not Before The Court

70.    In the Response, SRM asserts that if it has not adequately stated its claims, it should be permitted to supplement or amend its claims "to the extent the Court concludes additional detail is necessary or would be useful." (Response ¶ 89.) The Plan Administrator, of course, is highly skeptical that there are any additional facts SRM could plead which would salvage its claims.

71.    In any event, whether SRM may amend its claims is not properly before the Court: SRM has not sought affirmative relief to amend its Claims as required by the Confirmation Order, and it cannot circumvent the requirements thereof by requesting leave to amend in response to a claim objection. (*See* Confirmation Order ¶ 86.)

72.    The issue before the Court is whether the Claims can survive a Sufficiency Hearing. As set forth above, even accepting as true all of the factual allegations made by SRM to date, including those set forth in the Estimation Motion Objection and the SRM Response, the Claims must be dismissed for failure to state a claim upon which relief can be granted.[11]

## CONCLUSION

73.    SRM already has had multiple bites at the apple to sufficiently plead its claims – in its proof of claim, in its Estimation Objection, and in its Response. Each attempt by

---

[11] To the extent SRM is asserting that it may plead "breach" in its proof of claim and then later amend to add tort claims, like gross negligence and fraud (Response ¶ 55), such assertion is contrary to the case law. *Midland Cogeneration Venture v. Enron Corp.* (*In re Enron Corp.*), 419 F.3d 115, 133 (2d Cir. 2005) (courts "must subject post bar date amendments to careful scrutiny to assure that there was no attempt to file a new claim under the guise of amendment"); *In re Sneijder*, 407 B.R. 46, 54 (Bankr. S.D.N.Y. 2009) ("Post-bar date amendments should be scrutinized to ensure that the amendment is not making a new claim against the estate"). SRM has not – and should not be permitted to – amend its claims now to assert any new claims. In addition, to the extent SRM refused to provide information in response to LBHI's Rule 2004 discovery requests, it should not be allowed to use such information in an amended claim.

SRM to set forth a plausible claim has failed.  What SRM's pleadings reveal, however, are the lengths to which this fund will go to obtain a recovery to which it is not entitled at the expense of LBHI's unsecured creditors.  ███████████████████████████████████████████ ██████████████████████████████████████████.  It seeks █ ██████████████ from LBHI, representing the post-Petition Date and post-PBA Termination Date increase in the value of securities held by LBIE for SRM (in the case of the Segregated Assets Claim), alleged losses on investments sold by SRM by its own choice to cover margin calls at other brokerage houses -- instead of, for example, borrowing the required funds or selling other assets (in the case of the Forced Sales Claim), or of speculative profits from unknown investments that might have been made by SRM (in the case of the Lost Opportunities Claim). These amounts are unrecoverable as a matter of law.  Indeed, given the analyses set forth in the Objection, the Chadwick Declaration, the Supplemental Chadwick Declaration, and herein, the Claims should be disallowed in their entirety and ordered expunged at a Sufficiency Hearing with prejudice.

Dated: July 26, 2016
       New York, New York

                                        /s/ Richard L. Levine
                                        Richard L. Levine
                                        Garrett A. Fail

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        *Attorneys for Lehman Brothers Holdings Inc.*
                                        *and Certain of Its Affiliates*

WEIL:\95797449\9\58399.0011