**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | : | **08-13555 (SCC)** |
| Debtors | : | **(Jointly Administered)** |

-------------------------------------------------------------- x

_____

**SUPPLEMENTAL DECLARATION OF SIR JOHN CHADWICK**
**IN RESPECT OF ENGLISH LAW ISSUES**
**ARISING IN RELATION TO THE RECOVERY OF DAMAGES**
**CLAIMED BY SRM GLOBAL MASTER FUND LIMITED PARTNERSHIP**
_____

**I, Sir John Chadwick, of One Essex Court, Temple, London EC4Y 9AR, make this declaration under 28 U.S.C. § 1746:**

**Supplemental Instructions**

1. I have been asked on behalf of Lehman Brothers Holdings Inc. ("LBHI") to supplement the declaration which I made in May 2016 ("my first declaration") in connection with the Plan Administrator's Objection to Claim Number 29606 in these proceedings in order to state my opinion in respect of certain arguments advanced by SRM Global Master Fund Limited Partnership ("SRM") in its Response to that Objection and to comment on the Expert Opinion of Lord Collins of Mapesbury filed by SRM in support of that Response.

2. In addition to the copy documents described in paragraph 3 of my first declaration and numbered i to vi, I have been provided with copies of the following (amongst other) documents which have come into existence since my first declaration was made:

   vii   the Expert Opinion of Lord Collins of Mapesbury, affirmed on 4 July 2016, and

   viii   SRM's Response to the Plan Administrator's Objection to Claim Number 29606, dated 5 July 2016;

   together with copies of the documents which are exhibits to Lord Collins' Expert Opinion and SRM's Response.

3.  The questions which I have been asked address in this supplemental declaration may be summarised as follows:

A.  Are the principles of contractual interpretation under English law as set out Lord Collins' Opinion inconsistent with the analysis and conclusions in my first declaration?

B.  Does anything in Lord Collins' Opinion cause me to change any of the analysis or conclusions in my first declaration?

C.  Has SRM plausibly alleged that LBIE was grossly negligent, fraudulent, or in willful default in respect of its "obligations not to rehypothecate SRM's assets, or that LBIE intentionally disregarded the terms of its agreement with SRM, its obligations under the FSA Rules, and the significant impact that LBIE's conduct would and did have on SRM" ?  Has SRM alleged facts giving rise to a breach of trust claim under English Law such that the exculpatory language in clause 14.4 of the PBA is inapplicable?

D.  Does the holding in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch) - cited by SRM, but not addressed by Lord Collins in his Expert Opinion - support SRM's argument that clause 7.2(a) of the PBA is inapplicable to SRM's claim because of LBIE's insolvency?

E.  Do I remain of the view that, under English law, the provisions of clause 14.4 of the PBA apply in relation to alleged breaches by LBIE of its obligations to deliver Margin Notices under the CMNA?

F.  Does the holding in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch) support SRM's argument that SRM's proprietary beneficial interest in the Virgin Media Shares was not extinguished by SRM's termination of the PBA?

G.  Would the English law principles cited by SRM in paragraph 81 of the Response preclude measurement of SRM's damages for the Segregated Assets Claim on the Termination Date?

H.  Is SRM's contention that "SRM's loss in respect of its Segregated Assets was only discovered ███████████████████████████████████ ███████████████████████████████████████████" based on a reasonable construction under English law of the phrase, "at the date of the discovery of loss," in clause 14.4 of the PBA?  Is SRM's construction of such phrase consistent with the purpose under English law of contractual provisions providing for a "genuine pre-estimate of loss"?

4. This supplemental declaration should be read with my first declaration. Expressions or terms which are given defined meanings in that first declaration have the same meanings in this supplemental declaration.

**Summary of conclusions**

5. In summary, my answers to the questions put to me in the supplemental instructions are:

A. I do not take the view that the principles of contractual interpretation under English law which are set out in Lord Collins' Expert Opinion in any way conflict with the analysis and conclusions in my first declaration.

B. There is nothing in that Expert Opinion leads me to change any of the analysis or conclusions in my first declaration: I take the view that my analysis is wholly consistent with Lord Collins' statement of principles.

C. SRM has not plausibly alleged that LBIE was grossly negligent, fraudulent, or in willful default in respect of its obligations under the PBA not to rehypothecate SRM's assets, or that LBIE intentionally disregarded the terms of its agreement with SRM as contained in the PBA, its obligations under the FSA Rules or the significant impact that LBIE's conduct would and did have on SRM. SRM has not alleged facts giving rise to a breach of trust claim under English Law such that the exculpatory language in Clause 14.4 of the PBA is inapplicable.

D. The holding in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch) does not support SRM's argument that clause 7.2(a) of the PBA is inapplicable to SRM's claim because of LBIE's insolvency.

E. I remain of the view that, under English law, the provisions of clause 14.4 of the PBA apply in relation to alleged breaches by LBIE of its obligations to deliver Margin Notices under the CMNA.

F. The holding in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch) does not support SRM's argument that SRM's proprietary beneficial interest in the Virgin Media Shares was not extinguished by SRM's termination of the PBA.

G. The English law principles cited by SRM in paragraph 81 of the Response do not preclude measurement of SRM's damages for the Segregated Assets Claim on the Termination Date

H. The contention that "SRM's loss in respect of its Segregated Assets was only discovered at the time at which ███████████████████████████████████████████████████████," is not based on a reasonable construction under English law of the phrase, "at the date of the discovery of loss," in clause 14.4 of the PBA.  SRM's construction of that phrase is not consistent with the purpose under English law of contractual provisions providing for a "genuine pre-estimate of loss"

6.  That summary of conclusions should be read with the reasoning which is set out in the following paragraphs of this supplemental declaration.

**Questions A and B**

7.  I am asked (A) whether I take the view that the principles of contractual interpretation under English law which are set out in Lord Collins' Expert Opinion in any way conflict with the analysis and conclusions in my first declaration; and (B) whether anything in that Expert Opinion leads me to change any of the analysis or conclusions in that first declaration.  It is convenient to address those questions together.

8.  Lord Collins has set out his conclusions as to the principles of contractual interpretation applicable under English law – and the authorities from which those conclusions are derived – at section IVA of his Expert Opinion. There is nothing in that section (paragraphs 22 to 71) with which I disagree. In particular, I agree and would emphasise that:

(1) The over-riding object of contractual interpretation is to give effect to the intention of the parties objectively established (as Lord Collins has stated at paragraph 24 of his Opinion).

(2) The principles of contractual interpretation have recently been restated by Lord Neuberger of Abbotsbury, President of the Supreme Court, in *Arnold v Britton* [2015] UKSC 36, [2015] AC 1619, at paragraphs [15] to [22], in the terms which Lord Collins has set out paragraph 25 of his Opinion.

(3) The starting point – and in the vast majority of cases the ending point - is the natural meaning of the language used by the parties (paragraphs 27 and 28 of Lord Collins' Opinion).

(4) That does not necessarily mean that a literal interpretation divorced from context or from the surrounding circumstances will be adopted (paragraph 29 of the Opinion).

4

Nevertheless, reliance on commercial commonsense and surrounding circumstances should not be invoked to undervalue the importance of the language of the provision which is to be construed: it is relevant only to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date that the contract was made (paragraphs 35 and 41 of the Opinion).

(5) Contemporaneous documents should not be considered in isolation: where the court comes to the conclusion that a series of documents represents a single transaction between the same parties they should be construed as "one overall package" even though they each contain an "entire agreement" clause (paragraphs 42 to 46 of the Opinion).

(6) Any doubt or ambiguity in the construction of an exemption clause will be resolved against the party seeking to rely upon that clause: if a term is to be construed as having an exempting or exculpatory effect (and thereby to prevent from arising the ordinary consequences which would otherwise follow as a matter of law) clear words are necessary (paragraphs 47 and 49 of the Opinion).

(7) There are three areas which are excluded from the scope of the exercise of contractual interpretation: (i) the subjective intention of the parties, (ii) evidence of conduct subsequent to the contract and (iii) evidence of the pre-contractual negotiations (paragraph 63 of the Opinion).

9.    At paragraph 50 of his Expert Opinion, Lord Collins has expressed the view that:

> "Although multiple agreements should be interpreted to achieve consistency, in my opinion, against the background of the *contra proferentem* approach to the interpretation of exemption or exculpatory clauses, a 'single agreement' clause would not, without a clearly expressed intention, have the effect that an exculpatory provision in relation to obligations under one of the agreements would be incorporated in another contract dealing with different contractual obligations."

I understand Lord Collins to be addressing the question whether, in a case where the principle to which he had referred at paragraphs 42 to 46 of his Opinion – that is the say, the "single agreement" or "one overall package" approach to the construction of multiple agreements which, together, constitute a single transaction – would otherwise be applicable, an exculpatory clause in relation to obligations under one of the multiple agreements would be treated as applicable to obligations under another of those agreements. I agree that it is necessary to find, in a single agreement clause, a

clear intention that it should have that effect; but I would emphasise that, in addressing that issue, the correct approach under English law in such a case is to construe the agreements as "one overall package". The question of contractual interpretation, under English law, is whether it was the clear intention of the parties that an exculpatory clause in one agreement should apply to obligations arising under the other. That question is to be answered by applying the principles to which I have referred in the previous paragraph of this supplemental declaration; including, in particular, each of the principles referred to in sub-paragraphs (5) and (6). I do not understand, from paragraph 50 of his Expert Opinion, that Lord Collins takes a different view.

10. At paragraph 59 of his Opinion, Lord Collins has expressed the view that, where the context and background drives an English court to conclude that something has gone wrong with the language of a contract, English law does not require the court to attribute to the parties an intention which a reasonable person would not have understood them to have had. In a case where it is clear both that there has been a mistake on the face of the document and what correction ought to be made in order to cure it - in that it was clear what a reasonable person having all the background knowledge which would have been available to the parties would have understood the parties by using the language in the contract to have meant - the court is entitled to correct the mistake as a matter of construction. I agree with that view.  I also agree with Lord Collins' view (expressed at paragraph 62 of his Opinion) that this principle cannot be taken too far: under English law the court should not embark on an exercise of searching for, or constructing, drafting infelicities in order to facilitate a departure from the natural meaning of the language used, and the mere fact that a contractual arrangement, if interpreted according to its language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural meaning of that language. I should add that I take the view that neither the principle, nor the qualification, is applicable in the context of SRM's claims in the present case.

11. In my view none of the principles of contractual interpretation applicable under English law which Lord Collins has set out at section IVA of his Expert Opinion – with which, as I have said, I do not disagree – conflict with the analysis and conclusions in my first declaration.. In order to explain why I take that view it is

convenient, first, to identify the questions of contractual interpretation which I addressed in reaching the conclusions which I did. Those may be summarised as follows:

(1) In reaching the conclusion, stated in paragraph 62 of my first declaration, that

> "SRM's ownership of securities comprised within the description 'Segregated Assets' (in so far as it had not already determined under clause 11.2(a) of the PBA) would have determined, at the latest, on 6 November 2008, the Termination Date for the purposes of Clause 13.1 of the PBA."

I addressed, as a question of contractual interpretation, the effect of clause 13.2 of the PBA in the circumstances that a Non-Defaulting Party had terminated that agreement by written notice given under clause 13.1.

(2) In reaching the conclusion, stated in paragraph 63 of my first declaration, that

> "if while Charged Assets, (i) those securities had been lent or disposed of, SRM's interest as owner would have been extinguished (Clause 11.2(a) of the PBA) and (ii) those securities had been charged or hypothecated by LBIE for its own use, SRM's interest would have become subject to the charge or other security interest created by such charge or hypothecation (Clause 11.2(b))."

I addressed, as a question of contractual interpretation, the effect of clause 11.2 of the PBA in the circumstances that securities which had become Charged Assets within the meaning of that agreement had been (i) lent or disposed of or (ii) charged or hypothecated by LBIE (as the Prime Broker) under clause 11.1.

(3) In reaching the conclusions, stated in paragraph 64 of my first declaration, that

> "the contractual right [to the delivery of Equivalent Securities upon reasonable request] conferred by Clause 7.1 was subject to the qualification (in Clause 7.2(a)) that LBIE acting in good faith and in its commercially reasonable discretion was not required to deliver Equivalent Securities to SRM because a Potential Event of Default had occurred on 15 September 2008."

and that

> "the contractual right [to the delivery of Equivalent Securities upon reasonable request] conferred by Clause 11.3 was qualified by Clause 11.4; which entitled LBIE to credit the Cash Accounts in an amount equal to the Market Value Equivalent of the Equivalent Securities in circumstances where, for any reason, LBIE was unable to deliver Equivalent Securities to SRM on the due date for delivery".

and that, in any event,

> "the contractual rights to the delivery of Equivalent Securities were exercisable from and after 6 November 2008 only in accordance with the close-out provisions of Clause 13.1(d) and Clause 13.2: that is to say, by setting off what one party owed to the other as of the date of termination and making payment of the balance."

I addressed, as questions of contractual interpretation, (i) whether an Act of Insolvency (within the meaning of clause 12.1(d) of the PBA) had occurred when LBIE sought an administration order in the High Court in London on 15 September 2008, (ii) whether, given the occurrence of an Act of Insolvency on 15 September 2008, a Potential Event of Default (within the meaning given to that expression in Schedule 3 to the PBA) had occurred, (iii) whether, given that a Potential Event of Default had occurred on 15 September 2008, the effect of clause 7(2)(a) of the PBA was that LBIE, acting in good faith and in its commercially reasonable discretion, was not required, thereafter, to deliver Equivalent Securities to SRM, (iv) whether, in circumstances where LBIE was unable to deliver Equivalent Securities to SRM on the due date for delivery, the effect of clause 11.4 of the PBA was that the contractual right to delivery conferred by clause 11.3 was suspended and (v) whether, in any event, the effect of clause 13.1(d) of the PBA, read with clause 13.2, was that, from 6 November 2008 (the date on which SRM gave notice to terminate the PBA), the contractual right to the delivery of Equivalent Securities was exercisable only by setting off what one party owed to the other as of the Termination Date and making payment of the balance.

(4)  In reaching the conclusion, stated in paragraph 65 of my earlier declaration, that

> "the effect of the close-out provisions in Clause 13 of the PBA was that there could be no claim by SRM to any subsequent appreciation in the value of [the Segregated Assets] after that date"

I gave effect to the conclusion as to the effect of clause 13.2 of the PBA, as a question of contractual interpretation, that I had stated in paragraph 62.

(5)  In reaching the conclusions, stated in paragraph 66 of my first declaration, that

> "[SRM's contractual rights, under Clause 7.1 and Clause 11.3, to the delivery of Equivalent Securities] . . . were subject to the provisions in Clause 14, which, . . . were intended to limit or exclude the liability of the Prime Broker (LBIE) for losses suffered by the Counterparty (SRM)."

and that

> "Clause 14.3 provided that "Save . . . where any Losses or liability was caused as a direct result of gross negligence, willful default, fraud on the part of the Prime Broker . . . the Prime Broker accepts no liability and shall not be liable to the counterparty . . . for any losses whatsoever which [it] may incur . . . as a result directly or indirectly from . . . (g)  the Prime Broker's inability to deliver securities on the same day  that  such securities are received  for the Counterparty's  Securities   Accounts"; but that provision did not exclude

> liability for a more general failure to deliver Equivalent Securities pursuant to
> the Prime Broker's breach of its contractual obligations"

and that

> "Clause 14.4 applied in circumstances where, notwithstanding Clause 14.3,
> the Prime Broker had been found to be liable for breach of its contractual
> obligations. In such a case Clause 14.4 provided that the Prime Broker should
> only be liable to the Counterparty "to the extent that the Prime Broker has
> been grossly negligent, fraudulent or is in wilful default or breach of its duties
> as set out in this Agreement".

I addressed, as questions of contractual interpretation, (i) whether the provisions
in clause 14 of the PBA were intended to limit or exclude the liability of the
Prime Broker (LBIE) for losses suffered by the Counterparty (SRM) and, if so,
(ii) whether the effect of Clause 14.3 (so far as material) was limited to the
exclusion of liability caused as a direct result of gross negligence, willful default
or fraud on the part of the Prime Broker for any losses arising directly or
indirectly from its inability to deliver securities on the same day that  such
securities were received  for the Counterparty's  Securities Accounts and did
extend to liability for a more general failure to deliver Equivalent Securities
pursuant to the Prime Broker's breach of its contractual obligations and (iii)
whether the effect of the first sentence of clause 14.4 was to limit LBIE's liability
- in circumstances where, notwithstanding Clause 14.3, the Prime Broker had
been found to be liable for breach of its contractual obligations – to cases where
(or to the extent that) the Prime Broker had been grossly negligent, fraudulent or
in wilful default or breach of its duties as set out in the agreement.

(6) In reaching the conclusion, stated in paragraph 67 of my first declaration, that

> "No allegation of gross negligence, fraud or willful default in the context of
> failure to deliver Equivalent Securities following the events of 15 September
> 2008, has been made in the Attachment to Proof of Claim"

I addressed, as a question of contractual interpretation, what meaning should be
given to the words "grossly negligent, fraudulent or in wilful default or breach of
its duties" used in clause 14.4 of the PBA.

(7) In reaching the conclusions, stated in paragraph 68 of my first declaration, that

> "Clause 14.4 does preclude recovery from LBIE in respect of loss, suffered by
> reason of a failure to deliver Equivalent Securities in breach of Clause 7.1 or
> Clause 11.3, which is referable to any appreciation in the value of the
> Segregated Assets after 'the date of the discovery of loss'"

I addressed, as a question of contractual interpretation, whether the effect of the second sentence of clause 14.4 of the PBA (in cases where liability for loss is not excluded or restricted by the first sentence of that clause) was that the determination of LBIE's liability should be based only upon the market value of the relevant securities as at the date of the discovery of loss and without reference to ". . . subsequent variations to the Market Value of the relevant . . . securities".

(8) In reaching the conclusion, stated in paragraph 69 of my first declaration, that

> "Clause 14.4 of the PBA precluded SRM from recovering from LBIE any loss attributable to the appreciation in the value of the Segregated Assets after [the date, not later than 3 October 2008, on which SRM appreciated that LBIE was not about to deliver Equivalent Securities]"

I addressed, as a question of contractual interpretation, what meaning should be given to the words "the date of the discovery of loss" used in clause 14.4 of the PBA.

(9) In reaching the conclusions, stated in paragraph 70 of my first declaration, that SRM's Forced Sales Claim is excluded by the provision in clause 14.3 of the PBA that "the Prime Broker [LBIE] accepts no liability and shall not be liable to the Counterparty [SRM] . . . for any Losses whatsoever which [it] may incur (in connection with this Agreement and any Transaction) as a result directly or indirectly from . . . (b) market conditions . . . affecting the value of assets. . ." I addressed, as a question of contractual interpretation, whether losses arising from the alleged need to effect disadvantageous sales of assets (on a firesale basis) in order to meet margin calls (which, themselves, were made by other prime brokers in consequence of the fall in the value of existing collateral), fell within the words "any Losses whatsoever" which SRM might incur "directly or indirectly from market conditions affecting the value of assets" used by the parties in clause 14.3; and, in particular, whether the words required that assets of which the value was affected by market conditions should, themselves, be assets held by the Prime Broker.

(10) In reaching the conclusion, stated in paragraph 71 of my first declaration, that

> "the exclusion of reference to 'special circumstances, indirect or consequential losses' in the determination of loss resulting from failure to deliver Equivalent Securities on the due date simply emphasizes the requirement that determination of the loss is to be based 'only upon the market value of the relevant securities as at the date of the discovery of the loss'"

10

I addressed, as a question of contractual interpretation, whether the inclusion of the words "and without reference to any special circumstances, indirect or consequential losses, or subsequent variations to the Market Values of the relevant cash or securities" in the second sentence of clause 14.4 of the PBA added anything of significance to the requirement (already contained in that sentence) that "the Prime Broker's liability to the Counterparty shall be determined based solely upon the Market Value of the relevant cash or securities as at the date of the discovery of loss".

(11)   In reaching the conclusion, stated in paragraph 73 of my first declaration, that

> "Insofar as the Lost Opportunities Claim is based upon breaches by LBIE of its obligations under the PBA to deliver Equivalent Securities as a factor leading to lost opportunities or wasteful diversion of management time, the provisions of Clause 14.4 of the PBA would apply in the same manner as those provisions apply to the Forced Sales Claim, as already explained"

I gave effect to the conclusion as to the effect of clause 14.4 of the PBA, as a question of contractual interpretation, that I had stated in paragraph 71.

(12)   In reaching the conclusions, stated in paragraph 74 of my first declaration, that

> "in so far as the Lost Opportunities Claim is based upon breaches of the obligations under the CMNA as a factor leading to lost opportunities or wasteful diversion of management time, the provisions of Clause 14.4 of the PBA would, for reasons which I have explained, apply to the losses said to result from breaches by LBIE of its obligations to serve Margin Notices under the CMNA. Such losses would be . . . 'indirect or consequential losses'; and so would be excluded under those provisions.

I gave effect to (i) the conclusion that the effect of clause 2.2 of the PBA, as a question of contractual interpretation, was (as I had stated at paragraph 30 of my first declaration) that

> "the provisions of Clause 14.4 of the PBA apply in relation to alleged breaches by LBIE of its obligations to deliver Margin Notices under the CMNA, as they do in relation to alleged breaches by LBIE of its obligations to deliver securities or Equivalent Securities under the PBA."

and (ii) the conclusion as to the effect of clause 14.4 of the PBA, as a question of contractual interpretation, that I had reached in arriving at the conclusion stated in paragraph 71.

12.   The terms of the several clauses of the PBA to which I have referred in the previous paragraph - which I addressed, in reaching the conclusions as to the effect of those

11

clauses, as questions of contractual interpretation under English law – have been set out in my first declaration. But, for convenience, I set them again:

Clause 2

"2.1  This Agreement applies to all acquisitions and disposals of securities . . . (each a 'Transaction'. . .)

2.2  All Transactions and ancillary arrangements contemplated by this Agreement are entered into by the parties to this Agreement . . . in reliance on the fact that this Agreement and all settlement requests, acknowledgments, Instructions, term sheets, confirmations and all other documents identified as being related to a Transaction contemplated by this Agreement form a single agreement between the parties. . . ."

Clause 7

"7.1  Subject to Clause 7.2
    (a) . . .
    (b) upon reasonable request, the Prime Broker shall deliver to the Counterparty securities equivalent to any securities standing for the time being to the debit of a Securities Account.

7.2  The Prime Broker acting in good faith and in its commercially reasonable discretion shall not be required to make a payment or delivery under Clause 7.1 if –
    (a) an Event of Default or Potential Event of Default has occurred and is continuing; . . ."

Clause 11

"11.1  Subject to clause [11.6], the  Counterparty  hereby authorises the Prime Broker at any time or times to borrow, lend, charge, hypothecate, dispose of or otherwise use for its own purposes any securities which are included in the Charged Assets by transferring such securities to itself or to another person without giving notice of such transfer to the Counterparty. . . .

11.2  Upon –
    (a) a borrowing, lending, disposal or other use, such securities will become the absolute property of the Prime Broker  (or that of the transferee) free from the Security and from any equity, right, title or interest of the Counterparty;
    (b) a charge or hypothecation of any of the Counterparty's securities, all of those securities, including the Counterparty's interest in those securities, will be subject to the charge or other security interest created by such charge or rehypothecation.
 . . .

11.4  If on the due date for delivery thereof the Prime Broker shall for any reason be unable to deliver any Equivalent Securities to the Counterparty, the Prime Broker may, pending such delivery, credit the Cash Accounts in an amount equal to the Market Value Equivalent of those Equivalent Securities. . . ."

Clause 12

"12.1 Each of the following events is an "Event of Default" in relation to the relevant party ('the Defaulting Party', the other party being the 'Non-Defaulting Party'):

. . .

　　(d) An Act of Insolvency occurs in relation to the Prime Broker and the Counterparty serves a Default Notice on the Prime Broker".

Clause 13

"13.1 Upon the occurrence of an Event of Default, the Non-Defaulting Party may, by written notice to the Defaulting Party terminate this Agreement with effect from the time of the Event of Default (the date of such occurrence being the 'Termination Date'). On the Termination Date, the following shall immediately occur –

　　. . .

　　(c) all . . . outstanding obligations of each party to deliver securities  or Equivalent Securities . . . to the other under this Agreement shall become due for performance immediately (and shall be effected only in accordance with the following provisions of this Clause 13);

　　(d) the Prime Broker, or in the event that an Event of Default has occurred under Clause 12.1(d), the Counterparty (the 'Default Calculation Agent') shall establish, as at the date of the Event of Default, the Default Market Values of all cash and securities to be delivered or paid by each party under paragraph (c) above . . ."

"13.2 On the basis of the sums so established, an account shall be taken (as at the Termination Date) of what is due from each party to the other under this Agreement (on the basis that each party's claim against the other in respect of the transfer to it of securities or Equivalent Securities equals the Default Market Value therefor) and the sums due from one party shall be set off against the sums due from the other and only the balance of the account shall be payable (by the party having the claims valued at the lower amount) and such balance shall be due and payable on the next following Business Day. . . ."

Clause 14

"14.3 Save in the case of sub-clause 14.3(g) where any Losses or liability is caused as a direct result of gross negligence, wilful default, fraud on the part of the Prime Broker, its Affiliates or nominees with whom securities are held which are directly controlled by the Prime Broker or its Affiliates, the Prime Broker accepts no liability and shall not be liable to the Counterparty . . . for any Losses whatsoever which [it] may incur (in connection with this Agreement and any Transaction) as a result directly or indirectly from –

(a) the general risks of investing; or

(b) investing or holding assets in a particular country (including, but not limited to, Losses arising from nationalisation, expropriation or other governmental actions; regulations of the banking or securities industries; currency restrictions, devaluations or fluctuations; and market conditions affecting the orderly execution of securities transactions or affecting the value of assets); or

. . .

    (g) the Prime Broker's inability to deliver securities on the same day that such securities are received for the Counterparty's Securities Accounts;

and such exclusion of liability shall extend, without limitation, to obligations in tort, any indirect, punitive Special or Consequential loss or damage, even if the Prime Broker was previously informed of the possibility of such loss or damage, provided that this does not apply to any loss or damage caused by fraud on the part of the Prime Broker or to death or personal injury arising from any failure on the part of the Prime Broker to take reasonable care or exercise reasonable skill.

14.4 Where the Prime Broker has been found to be liable, the Prime Broker shall only be liable to the Counterparty to the extent that the Prime Broker has been grossly negligent, fraudulent or is in wilful default or breach of its duties as set out in this Agreement, save that nothing in this Agreement shall restrict any liability owed by the Prime Broker to the Counterparty under the Financial Services and Markets Act 2000 or the Rules or disclaim any liability to an extent not permitted by such Act or the Rules. The parties agree that, as a genuine pre-estimate of loss, the Prime Broker's liability to the Counterparty shall be determined based only upon the Market Value of the relevant cash or securities as at the date of the discovery of loss and without reference to any special circumstances, indirect or consequential losses, or subsequent variations to the Market Values of the relevant cash or securities."

Schedule 3: Definitions

"'Act of Insolvency' occurs in respect of a party upon

. . .

    (c) the presentation or filing in any jurisdiction of a petition in respect of it in any Court . . . seeking . . . administration . . .

. . .

  'Default Market Value' means

  . . .

    (b) with respect to any securities on any date –

    (i) . . .

    (ii) in the case of securities to be delivered by the Defaulting Party, the amount it would cost to buy such securities at the Default Valuation Time at the best available offer price therefore on the most appropriate market . . ."

13. In addressing the terms of the several clauses of the PBA which were germane to the conclusions reached in my first declaration – and which I have set out in the previous paragraph of this supplemental declaration - I sought to apply the principles of contractual interpretation applicable under English law which I have identified in paragraph 8 of this supplemental declaration – and which Lord Collins has identified in his Expert Opinion - so far as they were of relevance to the interpretation of the

14

documents which were before me. In particular, I had regard to the principles that the over-riding object of contractual interpretation is to give effect to the intention of the parties objectively established; and that the starting point is the natural meaning of the language used by the parties. I had regard to commercial commonsense and surrounding circumstances (so far as those appeared from the documents which were before me); but I did not rely on such surrounding circumstances to undervalue the importance of the language used and I did not conclude that commercial commonsense was affronted by giving effect to the natural meaning of the language which had been used by the parties. I did not take account of any matters within the three areas which are excluded from the scope of the exercise of contractual interpretation: the subjective intention of the parties, evidence of conduct subsequent to the contract and evidence of the pre-contractual negotiations (in so far as any of those matters were within my knowledge).

14. I had regard, also, to the principle –to which Lord Collins refers - that any doubt or ambiguity in the construction of an exemption clause will be resolved against the party seeking to rely upon that clause; and that, if a term is to be construed as having the effect of excluding or limiting a liability which would otherwise have arisen under the general law, clear words are necessary. That principle is of particular application in relation to the contractual interpretation of clause 14.4 of the PBA. Nevertheless, in my view the words

> ". . . shall  only  be liable to the Counterparty to the extent  that  the  Prime Broker  has been grossly negligent, fraudulent or is in wilful default or breach of its duties as set out in  this  Agreement. . ."

which appear in the first sentence of that clause and the words

> ". . . the Prime Broker's liability to the Counterparty shall be determined based only upon the Market Value of the relevant cash or securities as at the date of the discovery of loss and without reference to any special circumstances, indirect or consequential losses, or subsequent variations to the Market Values of the relevant cash or securities."

which appear in the second sentence of that clause are clear and unambiguous; and there is no reason not to give effect to their natural meaning.

15. I had regard to the principle - to which Lord Collins also refers - that contemporaneous documents should not be considered in isolation; and that, where the court comes to the conclusion that a series of documents represents a single transaction between the same parties they should be construed as "one overall package" even though they each

contain an "entire agreement" clause (as both the PBA and the CMNA do, at, respectively, clauses 2.2 and 6.1). In the present case, express contractual effect is given to that principle by the words in the first sentence of clause 2.2 of the PBA that

> "all . . . documents identified as being related to a Transaction contemplated by this Agreement form a single agreement between the parties. . ."

And I had regard, also, to the principle – to which, again, Lord Collins refers - that, in a case where the "single agreement" or "one overall package" approach to the construction of multiple agreements would otherwise be applicable, the correct approach under English law is, nevertheless, to ask whether it can be said that (construing the agreements as "one overall package") the clear intention of the parties was that an exculpatory clause in one should apply to obligations arising under the other. That principle is of particular application to the question whether or not, as a matter of contractual interpretation, the words limiting liability which appear in the second sentence of clause 14.4 of the PBA apply to a failure to provide margin notices in breach of the obligation imposed by clause 2.4 of the CMNA. I address that question further in the later paragraphs of this declaration (in response to "Question E").

16. My answer, therefore, to Question A is that I do not take the view that the principles of contractual interpretation under English law which are set out in Lord Collins' Expert Opinion in any way conflict with the analysis and conclusions in my first declaration. My answer to Question B is that there is nothing in that Expert Opinion that leads me to change any of the analysis or conclusions in that declaration.

**Questions C and D**

17. I am asked to report whether, in my opinion, (C) the allegations (at paragraph 57 of the Response) would be regarded by an English Court as having any substance as a matter of English law and (D) whether, in my opinion, the observations of Mr Justice Briggs in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch) support SRM's argument (advanced at paragraph 61 of the Response) that, as a matter of English law, the effect of LBIE's insolvency is that clause 7.2(a) of the PBA is inapplicable to SRM's claims in these proceedings. I am asked, also, whether, in my opinion, SRM has alleged facts giving rise to a breach of trust claim under English law, with the

consequence (it is said) that the exculpatory language in clause 14.4 of the PBA is inapplicable.

18. Clauses 7.2 and 14.4 of the PBA have been set out earlier in this supplemental declaration; but, for convenience, I set them out again (so far as material in the present context):

> "7.2    The Prime Broker acting in good faith and in its commercially reasonable discretion shall not be required to make a payment or delivery under Clause 7.1 if -
>   (a) an Event of Default or Potential Event of Default has occurred and is continuing; . . ."

> "14.4 Where the Prime Broker has been found to be liable, the Prime Broker shall only be liable to the Counterparty to the extent that the Prime Broker has been grossly negligent, fraudulent or is in wilful default or breach of its duties as set out in this Agreement, save that nothing in this Agreement shall restrict any liability owed by the Prime Broker to the Counterparty under the Financial Services and Markets Act 2000 or the Rules or disclaim any liability to an extent not permitted by such Act or the Rules. . . ."

Clause 7.2 must be read with clause 7.1 which provides (again, so far as material in the present context):

> "7.1   Subject to Clause 7.2
>    (a) . . .
>    (b) upon reasonable request, the Prime Broker shall deliver to the Counterparty securities equivalent to any securities standing for the time being to the debit of a Securities Account."

19. In addressing the questions put to me under (C) and (D) I have restricted my consideration to those of the arguments advanced in SRM's Response which contain assertions as to the effect of English law. They may, I think, fairly be summarised as follows:

  (1) The assertion, at paragraph 56 of the Response, that the facts surrounding LBIE's conduct (in, as alleged in the Proof of Claim, failing to comply with an oral agreement that it would not hypothecate any of SRM's assets without first getting SRM's permission) support a finding that LBIE was grossly negligent, fraudulent or in willful default or breach of its duties under the PBA; in that, under English law, "wilful default" generally entails intentional or reckless breach of duty and "gross negligence" arises from a serious disregard of or indifference to an obvious risk.

(2) The assertions, at paragraph 57 of the Response, that duties to segregate and not to rehypothecate or otherwise dispose of significant assets posted by SRM under the PBA "arose pursuant to LBIE's regulatory obligations as a firm (then) regulated by the Financial Services Act"; that "LBIE's failure to segregate and return SRM assets also misappropriated the value of the specific securities posted by SRM and breached the FSA's Rules."; and that:

> "In these circumstances, there is at least a plausible basis, particularly if one draws all reasonable inferences in SRM's favor as the Court must do at this stage, that LBIE was grossly negligent in complying with its obligations not to rehypothecate SRM's assets, or that LBIE intentionally disregarded the terms of its agreement with SRM, its obligations under the FSA Rules, and the significant impact that LBIE's conduct would and did have on SRM."

(3) The assertions, at paragraph 58 of the Response, that "Under clause 17.1 of the PBA, securities posted by SRM were held by LBIE as custodian on trust for SRM"; and that "the Counterparties retained and continued to retain after the commencement of LBIE's administration, a beneficial interest in those securities, subject of course to LBIE's charge".

(4) The assertion, at paragraph 59 of the Response, that, as a matter of English law, an exemption clause such as Clause 14.4 cannot excuse a trustee such as LBIE who knows that its act or omission is contrary to the interests of the beneficiary (here, SRM) or is recklessly indifferent to the beneficiary's interests.

(5) The assertion, at paragraph 61 of the Response, that LBIE did not have a license to disregard its commitments to SRM by rehypothecating or disposing of the substantial collateral posted by SRM which LBIE held on trust for SRM; and that LBHI's contention that LBIE's delivery obligations under Clause 7.1 of the PBA were suspended by reason of based on LBIE's own insolvency "is doubtful as a matter of [English] law".

I address those assertions in the following paragraphs.

20. The "facts surrounding LBIE's conduct" on which SRM relies in making the assertion, in paragraph 56 of its Response, that those facts "support a finding that LBIE was grossly negligent, fraudulent or in willful default or breach of its duties under the PBA" are pleaded at paragraph 13 of the Attachment to Proof of Claim in these terms:

> "LBIE, through individual members of the prime brokerage team covering SRM in summer 2008 and again in September 2008 prior to administration, repeatedly agreed with SRM that LBIE would not rehypothecate any of SRM's

18

> assets without first getting SRM's permission or at a minimum giving SRM
> sufficient notice for SRM to exercise its contractual right under the PBA to
> prohibit rehypothecation. In consideration for such commitments and
> assurances SRM deposited substantial collateral with LBIE and refrained from
> designating all stock as being automatically non-rehypothecable, as was
> SRM's right under the PBA".

Further facts on which SRM seeks to rely in this context are alleged at paragraphs 14
to 16 of SRM's Response.

21. As I have said, earlier in this supplemental declaration, in reaching the conclusion,
stated in paragraph 67 of my first declaration, that

> "No allegation of gross negligence, fraud or willful default in the context of
> failure to deliver Equivalent Securities following the events of 15 September
> 2008, has been made in the Attachment to Proof of Claim."

I addressed, as a question of contractual interpretation, what meaning should be given
to the words "grossly negligent, fraudulent or in wilful default or breach of its duties"
used in clause 14.4 of the PBA. In reaching that conclusion I gave the expressions
"wilful default" and "gross negligence" the meanings for which (in reliance on
paragraphs 52 and 54 of Lord Collins' Expert Report) SRM contend in paragraph 56
of its Response: that is to say, I took the view that "wilful default" generally entails
intentional or reckless breach of duty and that "gross negligence" arises from a serious
disregard of or indifference to an obvious risk.

22. I remain of the view that, as a matter of English law, the facts on which SRM relies do
not support an allegation that LBIE was grossly negligent, fraudulent or in willful
default or breach of its duties under the PBA. As I explained in my first declaration,
clause 11.1 of the PBA authorised the Prime Broker (LBIE):

> "11.1 . . . at any time or times to borrow, lend, charge, hypothecate, dispose of
> or otherwise use for its own purposes any securities which are included in the
> Charged Assets by transferring such securities to itself or to another person
> without giving notice of such transfer to the Counterparty. . . . ('Collateral
> Use')"

Clause 11.6 provided that:

> "11.6 In connection with any Collateral Use pursuant to clause 11.1 the
> Counterparty may at any time request in writing the Prime Broker to exclude
> certain positions from such Collateral Use (each such position, an 'Ineligible
> Position'). . . ."

The "contractual right under the PBA to prohibit rehypothecation" to which SRM
refers in paragraph 56 of its Response is the right to "request in writing" that certain

positions be excluded from Collateral Use (and so excluded from re-hypothecation). As I pointed out in paragraph 44 of my first declaration, unless and until, following a request in writing made by SRM pursuant to clause 11.6 of the PBA, LBIE had agreed that assets which had become Charged Assets for the purposes of clause 11.1 should be excluded from Collateral Use and be treated as Ineligible Positions, those assets remained available for hypothecation and re-hypothecation by way of Collateral Use. If, in circumstances in which there had been no request in writing by SRM pursuant to clause 11.6 (and no agreement by LBIE that it would act in accordance with that written request), failing to treat assets deposited by SRM pursuant to the PBA as Ineligible Positions was not (as a matter of English law) a breach of its duties under the PBA.

23.  Properly understood, as a matter of English law, the allegations pleaded at paragraph 13 of the Attachment to Proof of Claim are allegations that LBIE acted in breach of a collateral agreement (or agreements) made orally: they are not allegations that LBIE acted in breach of the PBA. Those allegations do not support the assertion made in paragraph 56 of the Response that "facts surrounding LBIE's conduct" support a finding that LBIE was grossly negligent, fraudulent or in willful default or breach of its duties under the PBA.

24.  It is asserted, at paragraph 57 of SRM's Response, that duties to segregate and not to rehypothecate or otherwise dispose of significant assets posted by SRM under the PBA "arose pursuant to LBIE's regulatory obligations as a firm (then) regulated by the Financial Services Act"; that "LBIE's failure to segregate and return SRM assets also misappropriated the value of the specific securities posted by SRM and breached the FSA's Rules.". In support of that assertion reference is made (in general terms) to the *FSA Handbook of Rules and Guidance, Client Assets Sourcebook,* at Chapter 6.2 ("CASS 6.2"). SRM does not identify the particular rule (or rules) in CASS 6.2 on which reliance is placed; but the relevant rule, in my view, is that set out as CASS 6.2.1 ("Requirement to protect clients' financial instruments"). The Rule is in these terms (so far as material in the present context):

> "CASS 6.2.1. A firm must, when holding financial instruments belonging to clients, make adequate arrangements so as to safeguard clients' ownership rights . . . and to prevent the use of financial instruments belonging to a client on the firm's own account except with the client's express consent."

As I have said, clause 11.1 of the PBA confers on LBIE express authority (subject to the right of SRM to exclude from Collateral Use under clause 11.6) to hypothecate and use for its own purposes securities which are included in the Charged Assets. In my view, as a matter of English law, hypothecation or re-hypothecation of Charged Assets in accordance with the provisions in clauses 11.1 and 11.6, would not infringe CASS 6.2.1: it would not do so because, although Collateral Use in accordance with those provisions is (or may be) "the use of financial instruments belonging to a client on the firm's own account", it is use "with the client's express consent".

25. For the reasons that I have set out in the preceding paragraphs of this supplemental declaration, I take the view that, as matter of English law, there is no basis to support a finding that LBIE was grossly negligent in complying with obligations under the PBA not to rehypothecate SRM's assets or that LBIE intentionally disregarded its obligations under the FSA Rules.

26. I agree with the assertion (made at paragraph 58 of the Response), that, as a matter of English law, "Under clause 17.1 of the PBA, securities posted by SRM were held by LBIE as custodian on trust for SRM". I also agree that, until SRM gave notice on 6 November 2008, to terminate the PBA, it "retained and continued to retain after the commencement of LBIE's administration, a beneficial interest in those securities, subject of course to LBIE's charge". In my view – so long as the securities had not been lent or disposed of by LBIE by way of Collateral Use under clause 11.1 of the PBA (in which event they would become the absolute property of LBIE or of the transferee pursuant to clause 11.2(a) of the PBA) – those propositions follow from the reasoning of Mr Justice Briggs in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch).

27. I do not agree that it can be said that, as a matter of English law, a trustee can never rely on an exemption clause in circumstances where the trustee knew that its act or omission was contrary to the interests of the beneficiary or where, in acting or omitting to act, the trustee was recklessly indifferent to the beneficiary's interests. The proposition, in the terms stated at paragraph 59 of the Response, is not supported by the observations of Lord Justice Millett in *Armitage v Nurse and others* [1997] EWCA Civ 1279; [1998] Ch 241 (with which the other members of the court agreed). The question before the Court of Appeal in that case – as appears from Lord Justice

Millett's comment at [1998] Ch 241, 253E – was whether a trustee exemption clause can validly exclude liability for gross negligence. The Court of Appeal concluded, at [1998] Ch 241, 256B, that it was not contrary to public policy to exclude liability for gross negligence by an appropriate clause clearly worded to have that effect.

28. At paragraph 61 of the Response, it is asserted, first, that LBIE did not have a license to disregard its commitments to SRM by rehypothecating or disposing of the substantial collateral posted by SRM which LBIE held on trust for SRM. I am of opinion that a proposition in those terms cannot be supported under English law. As Mr Justice Briggs observed in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch), at [52], it was amply demonstrated by the submissions that had been made to him in that case that, "if any trust is created by the Charge IPBA [the terms of which were in all material respects the same as those of the PBA in the present case], it is a most unusual type of trust". Those submissions had included, as the judge observed at [51] of his judgment, the rhetorical question: "Under what sort of trust known to English law . . . could the trustee be free to use the trust property for its own purposes, free to ignore the beneficiary's instructions to sell or deliver them, and be freed from any proprietary obligations in relation to them upon termination of the contract?".  And, referring to "The Prime Broker's Right of Use under clause 11 of the Agreement", the judge recognized, at [60] of his judgment, that "It is, *prima facie* at least, inconsistent with the recognition of the obligations of a trustee that it should be at liberty to take and use trust property for its own benefit without even giving the beneficiary notice of its intentions to do so".  Nevertheless, he concluded, at [64] of his judgment that:

> "[64] . . . In my judgment the Right of Use in clause 11 fails to displace the otherwise clear indications of an intention to create the relationship of trustee and beneficiary between Prime Broker and Counterparty in relation to securities that are to be gathered from the Agreement, viewed as a whole. . . . However broadly interpreted, clause 11 does not displace a trust in relation to securities which are, at any moment in time, not the subject of the exercise of any Right of Use. . . ."

Mr Justice Briggs held that the agreement which he had to construe – which, as I have said, was indistinguishable from the PBA in this context – did create the relationship of trustee and beneficiary in relation to securities which had been deposited by the Counterparty. But, in reaching that conclusion, he found that full effect could be given to clause 11 of the PBA within the trust relationship. In the present case,

notwithstanding the trust relationship, LBIE had and retained the right to hypothecate under clause 11.1 of the PBA unless and until, following a request in writing made by SRM pursuant to clause 11.6, it agreed that assets which had become Charged assets should be excluded from Collateral Use and be treated as Ineligible Positions.

29. It is asserted, also at paragraph 61 of SRM's Response, that the contention "that LBIE's delivery obligations under clause 7.1 of the PBA were suspended based on LBIE's own insolvency" – said to be advanced by the Plan Administrator at paragraph 36 of its Objection – "is doubtful as a matter of [English] law".   In support of that assertion, reliance is placed on observations of Mr Justice Briggs in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch) at [66]. It is convenient to address that issue in conjunction with the question put to me under (D): whether, in my opinion, the observations of Mr Justice Briggs in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch) support SRM's argument (advanced at paragraph 61 of the Response) that, as a matter of English law, the effect of LBIE's insolvency is that clause 7.2(a) of the PBA is inapplicable to SRM's claims in these proceedings.

30. The contention advanced at paragraph 36 of the Plan Administrator's Objection to which SRM refers in its Response (so far as material in this context) was that, after an "Event of Default" (which included an "Act of Insolvency"), LBIE was permitted to decide not return the Segregated Assets or securities "equivalent" to the Segregated Assets, notwithstanding a client request. In support of that contention the Plan Administrator relied on the provisions in clause 7.2(a) of the PBA and on the analysis in paragraph 50 of my first declaration. As explained in the analysis in my first declaration, LBIE was permitted to decide not return the Segregated Assets or securities "equivalent" to the Segregated Assets, notwithstanding a client request, if there were a "Potential Event of Default"; and an Act of Insolvency constituted a Potential Event of Default.

31. At [66] of his judgment in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch) Mr Justice Briggs said this (so far as material in the present context):

> "[66]. Again, it is *prima facie* surprising in the context of an alleged trust relationship . . . that the insolvency of the trustee should suspend the beneficiary's right to call for the return of the trust property . . ."

He went on, at [68], to address the argument that a provision which did have that effect was inconsistent with the existence of a trust relationship between LBIE (as Prime Broker) and the Counterparty. He said this:

> "[68] What therefore is the effect of the suspension of the right to demand the return of securities brought about by clause 7.2(a)? In my judgment, a mere suspension of a beneficiary's right to demand the return of trust property from an insolvent trustee does not of itself count against the continuing existence of a trust. The natural expectation in relation to a Prime Broker such as LBIE subject to English insolvency processes is that trust property will in due course, once identified, be returned by the competent office-holder to qualifying beneficiaries or, in the event of a shortfall, shared out among them. I can think of no reason why the suspension of the contractual right to demand return in the meantime should, any more than the statutory moratorium on bringing proceedings for a return of securities, prevent that outcome. On the contrary, it is likely to ensure that such an outcome is properly and fairly managed, so that all those claiming a beneficial interest in property under the control of the insolvent Prime Broker receive their just entitlements."

When [66] and [68] of his judgment in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch) are read together (as they must be), it is plain that Mr Justice Briggs rejected the contention that "LBIE's delivery obligations under Clause 7.1 of the PBA were suspended based on LBIE's own insolvency" was doubtful as a matter of [English] law; and that his observations do not support SRM's argument (advanced at paragraph 61 of the Response) that, as a matter of English law, the effect of LBIE's insolvency is that clause 7.2(a) of the PBA is inapplicable to SRM's claims in these proceedings. Rather, Mr Justice Briggs accepted that LBIE's delivery obligations under clause 7.1 were (or were capable of being) suspended, by reason of clause 7.2(a), following the occurrence of a Potential Event of Default; and that, notwithstanding the existence of the trust relationship, there was nothing incongruous in that result.

**Question E**

32. I am asked to report whether I continue to take the view (expressed at paragraph 30 of my first declaration) that, under English law, the provisions of clause 14.4 of the PBA apply in relation to alleged breaches by LBIE of its obligations to deliver Margin Notices under the CMNA; and, if so, why? In particular, I am asked to report whether, in my opinion, the meaning of the words in clause 2.2 of the PBA "all other documents identified as being related to a Transaction contemplated by this Agreement form a single agreement between the parties" is sufficiently clear: so that it can properly be

said that, as a matter of English law, no conclusion (other than that the parties intended that the PBA and the CMNA form a single agreement between them) is reasonable.

33. Clause 2.2 of the PBA has been set out earlier in this supplemental declaration; but, for convenience, I set it out again (so far as material in the present context):

> "2.2    All Transactions and ancillary arrangements contemplated by this Agreement are entered into by the parties to this Agreement . . . in reliance on the fact that this Agreement and all settlement requests, acknowledgments, Instructions, term sheets, confirmations and all other documents identified as being related to a Transaction contemplated by this Agreement form a single agreement between the parties. . . ."

In that context "Transaction" means "all acquisitions and disposals of securities . . .": clause 2.1. The phase "ancillary arrangements" is not a defined term; and so must be given its natural meaning. Given the context, the phrase must, in my view, be taken to include arrangements which are recorded in "settlement requests, acknowledgments, Instructions, term sheets, confirmations, and . . . documents identified as being related to a Transaction contemplated by this Agreement".

34. At paragraph 30 of my first declaration, I referred to the direction (in clause 2.2 of the PBA) that ". . . all other documents identified as being related to a Transaction contemplated by this Agreement form a single agreement between the parties. . . ."; and I went on to say this:

> "30 . . . In my view, it is plain that, as a matter of English Law, the CMNA and the PBA must be construed together; and that, when Clause 2.2 of the PBA is construed with the provisions of the CMNA in mind, the CMNA is properly to be regarded as a document "identified as being related to a Transaction contemplated by this Agreement [the PBA]". It follows that the PBA and the CMNA must be read as forming a single agreement between the parties; and that the provisions of Clause 14.4 of the PBA apply in relation to alleged breaches by LBIE of its obligations to deliver Margin Notices under the CMNA, as they do in relation to alleged breaches by LBIE of its obligations to deliver securities or Equivalent Securities under the PBA."

It follows from what I have said in the previous paragraph of this supplemental declaration that I am of opinion that "documents identified as being related to a Transaction contemplated by this Agreement" include documents which record ancillary arrangements.

35. In reaching the view that, as a matter of English law, the CMNA and the PBA must be construed together I had regard to the principle (identified by Lord Collins in his Expert Opinion) that contemporaneous documents should not be considered in

isolation: where a court comes to the conclusion that a series of documents represents a single transaction between the same parties they should be construed as "one overall package" even though they each contain an "entire agreement" clause. I had regard, also, to the principle that, if a term is to be construed as having the effect of excluding or limiting a liability which would otherwise have arisen under the general law, clear words are necessary. And I took the view – which I continue to hold - that, in a case where the "one overall package" approach to the construction of contemporaneous agreements would otherwise be applicable and one of those agreements contained an exculpatory clause,  the correct approach under English law is to ask whether it can be said that (construing the agreements as "one overall package") the clear intention of the parties was that the exculpatory clause in one agreement should apply to obligations arising under the other. As I have said, that principle is of particular application to the question whether or not, as a matter of contractual interpretation, the words limiting liability which appear in the second sentence of clause 14.4 of the PBA apply to a failure to provide margin notices in breach of the obligation imposed by clause 2.4 of the CMNA to serve margin notices.

36. In addressing the questions put to me under (E), I am asked to consider the arguments advanced in paragraphs 62 to 66 of SRM's Response. It is asserted, at paragraph 64 of SRM's response that a proper reading of clause 2.2 of the PBA starts with the natural and ordinary meaning of the language used by the parties in the agreement. As I have earlier in this supplemental declaration, I agree with, and emphasise, that proposition. It is said that a plain reading of clause 2.2 makes clear that the parties did not intend to read specific provisions of the PBA such as 14.4 into the CMNA. The reasons advanced by SRM in support of its proposition are these:

(1) Clause 2.2 in relevant part refers to the PBA "and all settlement requests, acknowledgements, Instructions, term sheets, confirmations and all other documents identified as being related to a Transaction contemplated by" the PBA forming "a single agreement between the parties."

(2) The term "Transaction" is defined in clause 2.1 to include "all acquisitions and disposals of securities, and the provision of any advances of cash and securities in respect thereof" or a "Third Party Transaction" (which is a Transaction between SRM and any third party).

(3) There is no reference whatsoever in clause 2.2 to the CMNA or any margin notices. Indeed, the CMNA is not referred to anywhere in the PBA.

(4) The documents contemplated by clause 2.2 are documents generated in connection with Transactions carried out under the PBA. They have nothing to do with a separate contractual arrangement such as the CMNA which governs an independent and separate aspect of the overall commercial relationship between LBIE and SRM."

At paragraph 65 of the Response it is said that, if the parties had intended LBIE's liabilities under the CMNA to be limited by the provisions in clause 14.4 of the PBA, they were required to say so expressly; and that, because they did not do so, clause 14.4 of the PBA cannot be read into the CMNA.

37. I do not agree that SRM's analysis is consistent with the applicable principles under English law. As a matter of contractual interpretation under English law, the first question (which the paragraphs in SRM's Response to which I have just referred do not address) is whether the CMNA is properly to be regarded for the purposes of clause 2.2 of the PBA as a document "identified as being related to a Transaction contemplated by this Agreement" (an expression which, as I have said, includes documents which record ancillary arrangements). In addressing that question it is appropriate, a matter of English law, to adopt the "one overall package" approach to the construction of contemporaneous documents: it is appropriate to construe the words "identified as being related to a Transaction contemplated by this Agreement" with the provisions of the CMNA in mind; and, in particular, it is appropriate to have in mind the Recitals to the CMNA, which are in these terms:

> "(A)  LBIE and the Counterparty have entered into two or more Base Contracts pursuant to which LBIE and the Counterparty may from time to time have exposures contingent liabilities or debts to each other. LBIE will require the Counterparty to provide Margin in relation to such exposures, contingent liabilities or debts pursuant to the terms of the relevant Base Contracts.
>
> (B)    The Counterparty has requested LBIE to enter into this Agreement in order to reduce its operational expense in respect of the Base Contracts by calculating the Margin Requirement on a net basis across all the Base Contracts."

In that context, "Base Contract" has the meaning given by clause 1.4 of the CMNA: "any agreement or transaction between the Counterparty and LBIE and identified in Schedule 1 . . .". The PBA is identified in schedule 1 to the CMNA as a "Base

Contract". "Transaction" is defined in the CMNA (at clause 1.4) to mean "an individual transaction made subject to the terms of a Base Contract". Further, clause 6.2 of the PBA provides that:

> "6.2    The Prime Broker may from time to time specify general principles, criteria and margin rates which it intends to adopt in connection with its calculation of the Margin Requirement applicable to any Transactions and positions. Such specified information may be notified by the Prime Broker to the Counterparty in such manner as the Prime Broker considers appropriate including without limitation, by means of any Terms."

"Terms" has a defined meaning for the purposes of the PBA: it means "any terms notified by the Prime Broker to the Counterparty setting out the fees, interest rates and Margin requirement which the Prime Broker in its absolute discretion intends to apply to the Transactions . . .". It is with those provisions of the PBA and the CMNA in mind that I have taken the view (expressed in paragraph 30 of my first declaration and reinforced by, but not dependent, upon my view, that the expression includes documents which record ancillary arrangements) that the CMNA is properly to be regarded as a document "identified as being related to a Transaction contemplated by this Agreement [the PBA]".  There is nothing in the arguments advanced in those paragraphs of SRM's Response which I have been asked to consider which leads me to alter that view.

38.    Given that the CMNA is properly to be regarded as a document "identified as being related to a Transaction contemplated by this Agreement [the PBA]" for the purposes of clause 2.2, that clause provides, in terms, that the CMNA and the PBA "form a single agreement between the parties". It is with that provision in mind that I have taken the view (expressed in paragraph 30 of my first declaration) that "it follows that the PBA and the CMNA must be read as forming a single agreement between the parties". Again, there is nothing in the arguments advanced in those paragraphs of SRM's Response which I have been asked to consider which leads me to alter that view.  In particular, I reject the argument that "a plain reading of clause 2.2 makes clear that the parties did not intend to read specific provisions of the PBA such as 14.4 into the CMNA". In my view, a plain reading of clause 2.2 of the PBA makes it clear that the PBA and the CMNA are to be read as single agreement. Properly understood, the requirement is that each of the provisions contained in those two documents are to be read and construed as if they were all contained in a single document.

39. If clause 14.4 of the PBA is read with that requirement in mind – that is to say, on the basis that it is to be read and construed as if the "single agreement" in which it is contained also contains clause 2.4 of the CMNA – then it seems to me impossible to avoid the conclusion that the exculpatory provisions of clause 14.4 of the PBA will apply where LBIE has been found to be liable for a breach of clause 2.4 of the CMNA. Put shortly, the expression "this Agreement" means the "single agreement" which contains all the provisions which are contained in the PBA and the CMNA.

40. I am asked whether the language in clause 2.2 of the PBA – that "all other documents identified as being related to a Transaction contemplated by this Agreement form a single agreement between the parties" – is sufficiently clear that, as a matter of English law, no other conclusion is reasonable. In my view, as a matter of English law, it is clear beyond reasonable argument (i) that the CMNA is "a document identified as being related to a Transaction contemplated by this Agreement", (ii) that, accordingly, clause 2.2 provides that the CMNA and the PBA "form a single agreement between the parties" and (iii) that, because the CMNA and the PBA form a single agreement, the exculpatory provisions of clause 14.4 of the PBA apply in cases in which LBIE has been found liable for a breach of clause 2.4 of the CMNA.

**Question F**

41. I am asked whether, in my opinion, the observations of Mr Justice Briggs in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch) support SRM's argument (advanced at paragraph 80 of the Response) that, as a matter of English law, SRM's proprietary beneficial interest in the Virgin Media Shares was not extinguished by SRM's termination of the PBA.

42. It is said at paragraph 80 of SRM's Response that, contrary to LBIE's assertions, SRM's proprietary beneficial interest in respect of the Segregated Assets (and, in particular, in the 5.094,060 shares of Virgin Media Inc common stock) was not extinguished by SRM's termination of the PBA (on 6 November 2008). In support of that contention, it is asserted by SRM that:

> "80     As a matter of English law, it is unlikely that the termination of the PBA for any reason, let alone because of the trustee's default, could have the effect of extinguishing a beneficial interest in the trust assets. See Re Lehman Brothers International Europe [2009] EWHC 2545 (Ch) at [66] (considering the effect of termination of a prime brokerage agreement, noting the

> incongruity of the insolvency of a trustee being used as a basis to suspend a beneficiary's right for the return of property held on trust)."

I have already set out (in part) the observations of Mr Justice Briggs at [66] of his judgment in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch) earlier in this supplemental declaration in a different context. In addressing the point raised by SRM at paragraph 80 of its Response, it is necessary to set out his observations at [66] and [67] in full.

> "66 Again, it is *prima facie* surprising in the context of an alleged trust relationship both that the insolvency of the trustee should suspend the beneficiary's right to call for the return of the trust property and that the termination of the agreement pursuant to which it was entrusted to the trustee should lead to the automatic extinction of any continuing beneficial interest in it. If the Agreement had provided for the automatic extinction of the Counterparty's beneficial interest in its securities upon the Prime Broker's insolvency, then that would on the face of it be the end of the matter, at least in cases such as the present where an insolvency event has occurred. That would, for reasons already mentioned, be fatal to any claim to a proprietary interest in post-administration cash derived from such securities."

At [67] of his judgment Mr Justice Briggs went on to say this:

> "[67] I consider that the Agreement falls critically short of providing for that consequence [that is to say, for an automatic extinction of the Counterparty's beneficial interest in its securities upon the Prime Broker's insolvency]. It falls short primarily because, as most Counterparties have recognised, the potentially disastrous consequences of clause 13.2 of the Agreement are only triggered if, both, the Counterparty notifies an Event of Default and then serves notice under clause 13.1 terminating the Agreement. Counterparties are not obliged to serve either notice, and most of them have not done so. Plainly, the Prime Broker cannot do so either under clause 12.1(e) or clause 13.1, because it is not the Non-Defaulting Party."

In the present case, as I explained in my first declaration, SRM did trigger what Mr Justice Briggs described as "the potentially disastrous consequences of clause 13.2 of the Agreement" by serving, on 6 November 2008, both a notice of Event of Default and a notice under clause 13.1 terminating the PBA.

43.  Mr Justice Briggs did not need to decide (and did not decide) whether or not termination of the PBA by the Counterparty under clause 13.1 – following the service by the Counterparty of a Default Notice under clause 12.1 notifying an Event of Default consequent upon an Act of Insolvency in respect of LBIE – had the effect that the Counterparty's proprietary beneficial interest in deposit assets was extinguished. That question did not arise on the facts before him. The application for directions with which he was concerned was argued by counsel on the basis of a common assumption

that termination of the PBA in those circumstances would, indeed, have had that effect. This can be seen from [42] of his judgment, where Mr Justice Briggs said this:

> "[42] I was told that there is, again, a dispute about the precise meaning and effect of clause 13, in particular as to the question whether clause 13.2 automatically converts any proprietary interest in securities belonging to a Counterparty at the Termination Date into personal rights to payment of money, as unsecured creditors of LBIE. It is sufficient for present purposes to note that the obvious risk that clause 13.2 has precisely that effect has to date been enough to deter MCF and most other Counterparties (wishing to advance proprietary claims in relation to securities) from serving termination notices or, for that matter, Default Notices on LBIE. Mr Peacock's submissions were based on an assumption that clause 13.2 does indeed have that effect. Mr Sher did not dissent from that assumption. It is sufficient, as will appear, for me to proceed upon the basis of that assumption, without having to decide that it is correct."

At [50] he referred to counsel's submission that:

> "[50] . . . the fact (or the obvious risk) that, on termination of the Agreement, the Counterparty's rights consisted of unsecured receivables pursuant to clause 13.2 of the Agreement, rather than to the return of securities *in specie*, or even to the delivery of equivalents."

And, at [65] he referred to the "arguable extinction of all proprietary rights to securities on termination, pursuant to clause 13.2" and went on to say this:

> [65] For this purpose, and so as to finesse any issues as to the effect of clause 13.2, I shall assume but without deciding that it has the draconian consequence, contended for by Mr Peacock, of converting all proprietary interests in securities into unsecured receivables of an equivalent face value."

44. In my view it is impossible to contend that observations of Mr Justice Briggs in *Re Lehman Brothers International Europe* [2009] EWHC 2545 (Ch) support the proposition that, as a matter of English law, SRM's proprietary beneficial interest in the Virgin Media Shares was not extinguished by SRM's termination of the PBA. As I have said, the application was argued before him on the basis that the contrary view was correct; and he did not decide the point. He referred to the "obvious risk" that termination of the PBA would have the assumed effect. His observation at [66] of his judgment that "it is *prima facie* surprising in the context of an alleged trust relationship . . . that the insolvency of the trustee should suspend the beneficiary's right to call for the return of the trust property" (on which SRM places reliance) must be read in the light of what he went on to say at [68] of his judgment (to which I have referred earlier in this supplemental declaration); and his observation that it was *prima facie* surprising "that the termination of the agreement pursuant to which it was entrusted to the trustee

should lead to the automatic extinction of any continuing beneficial interest in it" must be read in the light of his subsequent explanation that – in a case where the agreement was terminated following the insolvency of the Prime Broker – that was the consequence of a positive decision of the Counterparty; there was no automatic extinction of any continuing beneficial interest on insolvency.

**Question G**

45. I am asked whether, in my opinion, the principles of English law on which SRM seeks to rely in paragraph 81 of the Response preclude measurement of SRM's damages in respect of the Segregated Assets Claim on the Termination Date.

46. At paragraph 81 of the Response it has asserted that it "terminated the PBA as a result of LBIE's (admitted) wrongful refusal to recognize SRM's setoff". In addressing the question put to me, I am asked to assume as true "the allegation that LBIE refused to recognize SRM's purported setoff and that such refusal caused SRM to terminate the PBA". The only right of set-off claimed by SRM of which I am aware is that asserted in the letter dated 19 September 2008 - and in the second of the two letters dated 26 September 2008 - from SRM to which I referred in paragraphs 39 and 40 of my first declaration. That right of set-off was said to arise under Section 6(f)(i) of the ISDA Master - added by Part 5(e) of the Schedule to that agreement – to which reference had been made at paragraph 14 of the Attachment to Proof of Claim. I do not understand it to be admitted by the Plan Administrator that LBIE's refusal to recognize that SRM was entitled to assert that right of set-off was wrongful.

47. The proposition asserted at paragraph 81 of SRM's Response is that "English law does not permit a party to benefit from its own wrong". In support of that proposition reliance is placed on observations in *Cheall v Association of Professional Executive Clerical and Computer Staff* [1983] 2 AC 180 at page 189B and in *Alghussein Establishment v Eton College* [1988] 1 WLR 587, at page 594C.

48. In the first of those cases, *Cheall v A.P.E.X.,* the claimant was a member of the defendant trade union. When accepting his application to become a member, A.P.E.X had failed to enquire whether the union of which the claimant had formerly been a member (the A.C.T.S.S.) objected to the transfer. Subsequently A.P.E.X was directed by an inter-union disputes committee to terminate the claimant's membership.

A.P.E.X. did so, in reliance on its own membership rules (which permitted the expulsion of an individual member in order to comply with such a direction). The claimant sought a declaration that termination of his membership was invalid, on the grounds that, in accepting him as a member, A.P.E.X had acted in breach of obligations to which it was subject as a member of the T.U.C, and that it could not rely on its own wrong in purporting to dismiss him under its Rules. The matter came before the House of Lords on appeal. In allowing the appeal and dismissing the claim, Lord Diplock (with whom the other members of the House agreed), after referring to the decision in *New Zealand Shipping Co Ltd v Société des Ateliers et Chantiers de France* [1919] AC 1, said this (at [1983] 2AC 180, 188H to 189B).

> "In the course of the speeches [in the *New Zealand Shipping* case], which are not entirely consistent with one another, reference was made by all their Lordships to the well known rule of construction that, except in the unlikely case that the contract contains clear express provisions to the contrary, it is to be presumed that it was not the intention of the parties that either party should be entitled to rely upon his own breaches of his primary obligations as bringing the contract to an end, i.e. as terminating any further primary obligations on his part then remaining unperformed. This rule of construction, which is paralleled by the rule of law that a contracting party cannot rely upon an event brought about by his own breach of contract as having terminated a contract by frustration, is often expressed in broad language as: 'A man cannot be permitted to take advantage of his own wrong.' But this may be misleading if it is adopted without defining the breach of duty to which the pejorative word 'wrong' is intended to refer and the person to whom the duty is owed."

And he went (at 189G) to say this:

> "To attract the principle, whether it be one of construction or one of law, that a party to a contract is not permitted to take advantage of his own breach of duty, the duty must be one that is owed to the other party under that contract; breach of a duty whether contractual or non-contractual owed to a stranger to the contract does not suffice."

49.  In the second of those cases, *Alghussein Establishment v Eton College,* the defendant, Eton College, had agreed to grant a lease to predecessors in title of the plaintiff for the purposes of development. The agreement provided, at clause 4, that the lease should be granted on the issue of a certificate of practical completion of the development; but that clause was subject to the proviso that, if for any reason due to the willful default of the tenant the development should remain uncompleted by a specified date, the lease should be granted forthwith. The development was not completed (or even commenced) by the specified date. The College purported to treat the agreement for lease as repudiated because of the failure to commence and complete the development.

The developer sought specific performance of the obligation to grant the lease, relying on the proviso to clause 4 of the agreement. In dismissing the developer's appeal, Lord Jauncey of Tullichettle (with whom the other members of the House of Lords agreed), after referring to the *New Zealand Shipping* case and to *Cheall v A.P.E.X*, said this (at [1988] 1 WLR 587, 594C-D:

> "Although the authorities to which I have already referred involve cases of avoidance the clear theme running through them all was that no man can take advantage of his own wrong. There was nothing in any of them to suggest that the foregoing proposition was limited to cases where the parties in breach were seeking to avoid the contract and I can see no reason for so limiting it. A party who seeks to obtain a benefit under a continuing contract on account of his breach is just as much taking advantage of his own wrong as is a party who relies on his breach to avoid a contract and thereby escape his obligations."

50. In my view the observations in *Cheall v A.P.E.X* and in *Alghussein Establishment v Eton College* to which I have referred – and on which SRM seeks to rely in paragraph 81 of its Response – do not support SRM's contention that measurement of SRM's damages in respect of the Segregated Assets Claim on the Termination Date would be contrary to English law. As I have explained in my first declaration, measurement of damages on the Termination Date is expressly required by the "close-out" provisions in clause 13 of the PBA. Those provisions became applicable because, on 6 November 2008, SRM chose to serve a Default Notice under clause 12.1(d) of the PBA and a notice to terminate under clause 13.1 of the PBA: the close-out provisions did not become applicable because LBIE was in breach of an obligation under the ISDA Master. The refusal of LBIE to recognize SRM's purported right of set-off under the ISDA Master – whether or not a breach of the ISDA Master – did not, of itself, terminate the PBA or bring the close-out provisions in clause 13 of the PBA into effect; notwithstanding that it may have led SRM to decide to serve the notices which it did on 6 November 2008. In relying on those provisions, LBHI is not seeking to benefit from "its own wrong" within the principles explained in *Cheall* and *Alghussein.* Nor is LBHI relying on the wrong (if any) of LBIE under the ISDA Master. LBHI is relying on the close-out provisions in clause 13 of the PBA; and on SRM's own decision to serve notices which triggered those close-out provisions.

**Question H**

51. I am asked to report whether, in my opinion as a matter of English law, SRM's
contention, advanced in paragraph 84 of the Response, that "SRM's loss in respect of
its Segregated Assets was only discovered at the time at which ███████████
██████████████████████████████████████████████████████████
███████████████████" is based on a reasonable construction under English law of the
phrase, "at the date of the discovery of loss," in clause 14.4 of the PBA.

52. At paragraph 84 of SRM's Response it is asserted that LBIE's contention (advanced at
paragraph 41 of the Plan Administrator's Objection) that the "date of the discovery of
loss" for the purposes of clause 14.4 of the PBA was on or about 19 September 2008,
when SRM appreciated that LBIE was not about to deliver Equivalent Securities "is
incorrect". It is said that "SRM's loss in respect of its Segregated Assets was only
discovered at the time at which ███████████████████████████████████
███████████████████████████████████████████ i.e the point at
which it knew that it would not receive its Segregated Assets.

53. In addressing the question put to me under (H), I think it important to recognize that
there are two distinct issues in relation to the provision, in the second sentence of
clause 14.4 of the PBA, that "the Prime Broker's liability to the Counterparty shall be
determined based only upon the Market Value of the of the cash and securities as at
the date of the discovery of loss". The first issue – which is an issue of contractual
interpretation to be determined by English law – is the meaning to be given to the
expression "discovery of loss". The second issue – which is to be determined on the
facts – is on what date did "discovery of loss" take place.

54.  In addressing the first of those issues it is important to keep in mind, first, that the
relevant words in the second sentence of clause 14.4 of the PBA are "the discovery of
loss" and not, as is suggested in paragraph 84 of SRM's Response, "the discovery of
*the* loss". The distinction is of importance. The use of the phrase "the discovery of
loss" – rather than the phrase "the discovery of the loss" – indicates that it was the
parties' intention to measure damages as at the date when it is discovered that loss has
been suffered; not at the date when, as suggested by SRM, the loss can be quantified.
And it is important to keep in mind, also, that the second sentence of clause 14.4 is
introduced by the words "The parties agree that, as a genuine pre-estimate of loss, . .
.". Those words point to an intention that the amount of LBIE's liability for the breach

of duty complained of shall be determined at an early stage and without the need to wait until the exact amount of damages can be calculated after for detailed computation. The underlying purpose of an agreement to quantify damages in the contract (and so in advance of any breach of the contract) in an amount described as "a genuine pre-estimate of loss", as a matter of English law is to avoid dispute, following a breach, as to the amount of the damages for which the party in breach should be liable. To give the words "discovery of loss" the meaning for which LBHI contends – that losses are measured on a conventional basis as of the date when SRM appreciates that it has suffered loss as a result of the breach – is, as it seems to me, is to give the words their natural meaning. To give the words the meaning for which SRM contends in paragraph 84 of its Response is to give the words used an unnatural meaning which – in circumstances in which there is no reason to do so - infringes the basic principles of contractual interpretation and defeats the underlying purpose of the provision; and so must be regarded as an unreasonable construction.

55. The breach complained of the Attachment to Proof of Claim is the failure to deliver the Segregated Assets, or Equivalent Securities, at – or shortly after – the time that demand for such delivery was made. As I have explained in my first declaration, it is that breach which gives rise to the Segregated Assets Claim, the Forced Sales Claim and in part at least) the Lost Opportunities Claim. As I said, at paragraph 69 of my first declaration, the facts alleged in the Attachment to Proof of Claim and the letters to which I had referred in that declaration would be sufficient, as a matter of English law, to satisfy an English Court (if seized of the issue) that SRM appreciated that LBIE was not about to deliver Equivalent Securities on or about 19 September 2008; and, in any event, not later than 3 October 2008. It is on that basis that I expressed the view that those are possible dates for the measurement of damages as a matter of English law.

**I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.**

Sir John Chadwick
25 July 2016