1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc   Adv. Case No. 08-01420

4   - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6   LEHMAN BROTHERS HOLDINGS INC.,

7            Debtor.

8   - - - - - - - - - - - - - - - - - - - - - -x

9   In the Matter of:

10  LEHMAN BROTHERS INC.

11           Debtor.

12  - - - - - - - - - - - - - - - - - - - - - -x

13              United States Bankruptcy Court

14              One Bowling Green

15              New York, New York

16

17              August 16, 2016

18              10:05 AM

19

20  B E F O R E:

21  HON. SHELLEY C. CHAPMAN

22  U.S. BANKRUPTCY JUDGE

23

24

25  ECRO:  F. FERGUSON

1     HEARING RE Status Conference -- State of the LBHI Estate

2

3      HEARING RE:  Adversary proceeding:  08-01420-scc Lehman

4      Brothers Inc. Status Conference -- State of the LBHI Estate

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      Transcribed by:  Nicole Yawn

Page 3

```
 1    A P P E A R A N C E S :

 2    WEIL, GOTSHAL & MANGES, LLP

 3         Attorneys for Lehman Brothers Holdings Inc.

 4         767 Fifth Avenue

 5         New York, NY 10153-0119

 6

 7    BY:  JACQUELINE MARCUS, ESQ.

 8         GARRETT A. FOIL, ESQ.

 9

10    HUGHES HUBBARD & REED LLP

11         Attorneys for SIPA Trustee

12         One Battery Park Plaza

13         New York, NY  10004-1482

14

15    BY:  JEFFREY S. MARGOLIN, ESQ.

16         JAMES W. GIDDENS, ESQ.

17         JAMES B. KOBAK, ESQ.

18

19    SECURITIES INVESTOR PROTECTION CORPORATION

20         Attorney for SIPC

21         1667 K Street, N.W.

22         Suite 1000

23         Washington DC 20006-1620

24

25    BY:  KENNETH J. CAPUTO, ESQ.
```

Page 4

```
1    LEHMAN BROTHERS

2          Attorney for Lehman Brothers Holdings Inc.

3          1271 Avenue of the Americas

4          New York, NY 10020

5

6    BY:  MATTHEW A. CANTOR, ESQ.

7

8    ALSO APPEARING:

9    JAMES A. PECK, U.S. BANKRUPTCY JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1                    P R O C E E D I N G S

2              THE COURT:  How is everyone today?

3          Good morning, Ms. Marcus.

4              MS. MARCUS:  Good morning, Your Honor.  Jacqueline

5      Marcus, on behalf of Weil, Gotshal & Manges, on behalf of

6      Lehman Brothers Holdings Inc. and its affiliated debtors.

7              Your Honor, as you well know, we're here for the

8      100th omnibus hearing today.  There is not very much on the

9      calendar.  We have just the two state of the estate

10     presentations.

11             THE COURT:  Okay.

12             MS. MARCUS:  But since this is a somewhat

13     momentous occasion and we're nearing the eighth anniversary

14     of the cases, I thought I'd take the opportunity to just say

15     a few words.

16             Because of where we are with the litigation, we

17     sometimes forget that these cases have not only been about

18     derivatives and big banks, flip clauses, and safe harbors.

19     Of course, we had the usual issues in any Chapter 11 case,

20     the automatic stay, treatment of claims, executory

21     contracts, plan issues, distributions to creditors, all

22     rendered much more complicated because of the number of

23     cases -- the number of -- sorry -- the size of the cases and

24     the number of creditors.  We also have had many other

25     issues, though, that we sometimes lose sight of, given the

Page 6

1    passage of time.

2         We've had fascinating cross-border issues.  We've

3    unwound the complex relationship between LBHI and LBI, the

4    broker/dealer.  We've had many major transactions approved

5    by the Court, Lehman's Archstone investment, mistreatment of

6    Aurora Bank, the sale of Neuberger Berman, in addition to

7    the main transaction, which has gotten so much attention

8    early on.

9         We have also had competing Chapter 11 cases.

10   We've had the SunCal litigation and the Moonlight Basin Ski

11   Resort that was in Chapter 11 in, I think it was, Montana.

12   We've even had Canyon Ranch, which may be rearing its head

13   again, --

14        THE COURT:  It has so reared, yes.

15        MS. MARCUS:  -- from what I understand.

16        THE COURT:  What these cases have demonstrated,

17   however, is that Chapter 11 and the statutory scheme

18   established by Congress really does work, even if it takes

19   time and extraordinary effort on behalf of everybody

20   involved.

21        On a personal note, a lot has changed since the

22   cases were filed eight years ago.  Garrett Fail, my partner,

23   became a partner at Weil.  The baby lawyers who started with

24   us at the beginning of the case are now our senior

25   associates.  Several of my partners at Weil, including Lori

Page 7

1   Fife and Richard Krasnow and Shai Waisman -- even though

2   Shi's not retired -- have retired.  And, of course, we lost

3   our beloved Harvey Miller.

4           In closing, Your Honor, I'd just like to thank you

5   and Judge Peck for your time, attention, and devotion to

6   these cases.  And we hope we'll get them wrapped up soon.

7           THE COURT:  Thank you, Ms. Marcus.

8           You mentioned Judge Peck.  There's someone who

9   looks remarkably like him sitting in the back of the

10  courtroom.

11          Judge Peck, would you like to be heard?

12          JUDGE PECK:  Okay.

13      (Laughter)

14          THE COURT:  Well, as you said, Ms. Marcus, this

15  is, in fact, a very special day.  The mention of Harvey

16  Miller makes me a little choked up.  His name still appears

17  on our listing, our docket listings when I look at what's on

18  the calendar.  And this case very much was and is a tribute

19  to him, folks at your firm, folks in many of the other firms

20  that have handled it over the years.  And it is and stands

21  as tribute to my friend, Judge Peck, who, notwithstanding

22  the fact that he represented to me that the case was pretty

23  much over when he left two-and-a-half years ago, --

24          JUDGE PECK:  Right.

25          THE COURT:  -- I'm delighted to have him here in

Page 8

1    the courtroom today.  As time has gone by, from this side of

2    the bench, I have come to appreciate even more than I did

3    previously what a monumental truly, literally unprecedented

4    situation he faced.  I have come to appreciate his wisdom,

5    his judgment, his patience, his chops, I guess, is the word

6    in handling a case like this and getting to the bottom of

7    the issues.  And I couldn't be more excited and honored to

8    have him in the courtroom today.

9              Judge Peck?

10             JUDGE PECK:  I have no prepared remarks.

11             THE COURT:  Now it's truly a -- now it's a truly

12   momentous occasion.

13        (Laughter)

14             JUDGE PECK:  But I -- first I want to thank you,

15   Judge Chapman, for the invitation to be here today.  And I'd

16   like to thank the professionals who were involved in this

17   case from the beginning through to the present.  I rise as

18   an omnibus amicus.  And I recognize that the process of

19   bankruptcy is not just about the headlines in Bankruptcy Law

20   360 or the Wall Street Journal or other publications that

21   professionals read.  It's about hard work that goes on

22   behind the scenes, not just the hearings that get the

23   headlines, but the work of partners, associates, paralegals,

24   and staff at each of the major firms involved in these

25   cases.

Page 9

1          I have a particular appreciation for this now.  As

2     I think many know, I was in private practice in a large firm

3     before I became a judge.  I'm in practice now with a large

4     firm as a retired judge.  And I think that being on the

5     bench tends to, after a while, insulate the judiciary from

6     the hard work that gets done every day just in producing

7     binders that show up in chambers.  That the work that has to

8     be done to achieve a compromise is beyond the mere concept

9     of the compromise, but goes to the details that often

10    require enormous time and effort.

11          In hearing Jackie Marcus recite some of the

12    headlines of the case, I appreciate having a personal

13    association with many of them.  But what I wanted to observe

14    publicly is that it's not just the headlines.  It's the back

15    pages.

16          And to be here at the hundredth omnibus

17    demonstrates that the U.S. insolvency system, particularly

18    Chapter 11, and even in the most unbelievably difficult case

19    ever, works, works well.  And that's because of the

20    symbiosis that exists between the skilled bench and the

21    skilled bar.  It's a pleasure to be here today.

22          THE COURT:  Thank you, Judge Peck.  I'm going to

23    now turn to the state of the estate presentations.  And I

24    may have some more things to say after that.  Thank you.

25          JUDGE PECK:  Thank you.

1            MR. CANTOR:  Are there enough copies?

2            THE COURT:  I don't think we have a copy,

3    Mr. Cantor.  You even achieved the compromise over which

4    case goes first, I see.

5            MR. CANTOR:  Yeah, they just said I go first.  So

6    I just stood up.

7            It is a monumental occasion the hundredth omnibus

8    objection.

9            THE COURT:  It's the one hundredth omnibus

10   hearing.

11           MR. CANTOR:  Hearing.

12           THE COURT:  We're up to the -- almost the six

13   hundredth omnibus objection, right, Ms. Marcus?

14           MS. MARCUS:  Six thousandth.

15           THE COURT:  Six thousandth?

16           MR. CANTOR:  Right.  Your Honor, you know, we at

17   the estate now all sort of showed up after the case was

18   completed to carry out the plan's mandate, which is what

19   we're doing.  But I would -- I can say, having practiced for

20   a long time before this, looking back on what everybody

21   achieved during the case, it was truly, truly monumental to

22   develop the plan that was developed now that I can see what

23   was there as we get unwound, there's no doubt that the

24   quality of the effort was extraordinary by everybody and

25   couldn't be done without the -- without Judge Peck and

Page 11

1    without the attorneys involved in the case at the time.  So

2    that was a great job.

3             You know, Mr. Giddens at LBI -- they filed their

4    state of the estate sort of listing all the achievements

5    throughout the case.  And I think that clearly exemplifies

6    what a wonderful effort that Mr. Giddens and his team

7    expended, too.  So that was a laudable record I found in

8    that presentation.  It certainly shows how much he's

9    accomplished.

10            What we've tried to do with the state of the

11   estates is stay focused on what we've done since the last

12   presentation and what remains to be done.  And I had

13   mentioned before in this court, it remains a mega-case from

14   our perspective going forward.  Not to say everything that

15   needed to get done until now had been done, but there's

16   still a lot to do, you know.

17            I mean, if you think about what's been done since

18   2009 when the -- at the bar date, there was over a

19   1,200,000,000,000 of claims in the estate.  And then it went

20   down to about 54,000,000,000, which is a big number, not

21   when you compare it to 1,200,000,000,000 remaining.  There

22   were more than 64,000 claims filed.  Went down to 857,

23   which, you know, in hindsight sounds not so -- not so big.

24   But, you know, looking forward, there's still a lot of work

25   to do.

1           Since the company's emerged from bankruptcy, the

2    plan administrator had distributed over $109 billion.  And

3    again, this could not have been possible, even since 2012,

4    without a tremendous effort and an awful lot of time spent

5    here working through things.  So let me -- I'll turn to the

6    presentations and get through that.

7           THE COURT:  Please.

8           MR. CANTER:  So, you know, we started this, as you

9    have observed, and, you know, we have taken the perspective

10   there is no Lehman any more.  It's just the plan

11   administrator looking to carry out the mandate of the plan.

12   You know, we're focused on monetizing assets, maximizing

13   distributions to creditors, and fairly resolving disputed

14   claims.

15          And we do our best to analyze each of their many

16   claims, come to do what we think the fair outcome is.  We're

17   in an adversarial system, so we're left with counterparties

18   who may not always agree with what we think fair is.  And

19   everybody's working real hard to get to a solution.

20          Since our last plan update, which was June of last

21   year, we have distributed $10.2 billion, which I mentioned

22   before was a total cumulative distribution of $109.8

23   billion.  We have resolved 14 --

24          THE COURT:  Do you know what percentage recovery

25   that represents at this point, Mr. Cantor?

Page 13

1          MR. CANTOR:  Well, I think -- at the holding

2    company?

3          THE COURT:  At the holding company.

4          MR. CANTOR:  It's about 36 cents we've gotten out

5    the door.

6          Is that right?

7          About 36 cents.  And, you know, there's some

8    amount to come, which the market is investing in.

9          So since the last update, we resolved $14.1

10   billion of claims.  And that brings the total claims

11   resolved since the plan administrator started at $139

12   billion of claims resolved.  But nevertheless, the case

13   remains a mega-bankruptcy case.

14         There's about 10 billion of assets left that we

15   need to monetize.  Most of that is in the disputed claims

16   reserve.  So the lion's share of the focus of our effort is

17   in resolving the remaining claims, although there are some

18   assets left to monetize.

19         The assets are in the real estate interests,

20   interests in private companies, and also recoveries from our

21   non-controlled foreign affiliates.  And that $10 billion

22   excludes potential litigation recoveries, which we generally

23   don't estimate what the value is.  It'll be what it'll be.

24         There is a real focus on trying to influence, to

25   the extent we can, the foreign non-controlled affiliate

Page 14

1    receiverships, because there's an awful lot of value in

2    trying to bring back here.  We need to accelerate that, to

3    the extent possible.

4              As I mentioned, there's about 850 claims

5    remaining, seeking over $54 billion.  And at this point,

6    those are the claims that are likely going to require a fair

7    bit of judicial resources and time.  And we appreciate you

8    and your chambers' efforts to accommodate all the time that

9    we're going to need.  And we'll get to the schedule later.

10             The biggest matters we still have disputes on are

11   the derivatives claims with Citibank and SCS (ph).  And with

12   JPMorgan, there's one matter remaining, which is resolving

13   what we call the deficiency claim.  Of the $54 billion, 37

14   billion of that reserve relates to the private label RBS

15   claims.  Those are the -- what have been the 405 trusts.

16             THE COURT:  Yeah.

17             MR. CANTOR:  Now, we're down to about two-thirds

18   of that.  I think where we have a protocol in place, the

19   trustees have submitted 94,080 claims.  And we're going to

20   need to find a way to get through that.  We'll talk more

21   about that as we get to the presentation.

22             THE COURT:  Okay.

23             MR. CANTOR:  So needless to say, this is going to

24   require a fair bit more time and judicial resources to

25   resolve these remaining claims.  If you flip to page 3, it's

Page 15

1     just a chart that sort of lays out --

2              THE COURT:  There's no more low-hanging fruit is

3     what you're trying to say.

4              MR. CANTOR:  Does not appear to be a lot of easy

5     ones.  But you never know.

6              So at page 3, we just put out in a chart format --

7     you can see we have -- we have the D-8 (ph), which is the

8     distribution last October, where we got 5,700,000,000 out.

9     And D-9, which was the April distribution.  We distributed

10    1,500,000,000.  And I know you'll recall there was a large

11    sum of money that we were bringing in from a settlement that

12    JPM's derivative claims --

13             THE COURT:  Yes.

14             MR. CANTOR:  -- and the collateral case.  And that

15    got held up by some appeals, which we were able to resolve.

16    And we were able to do an interim distribution, which is

17    atypical.  It's something we obviously want to try to avoid.

18    But you could see, with 2,800,000,000 out, it was worth

19    getting out as best we could.  And we appreciate the Court's

20    time and assistance in helping us achieve that interim

21    distribution.  So you can see the plan administrator, the

22    new -- has gotten out 109,761,000,000.

23             And on the claims side, there's just a -- you

24    know, a chart representing whatever I said is -- $14.1

25    billion in filed amount of claims have been resolved since

Page 16

1    the last presentation since the D-7.  And you could see back

2    on the right, we left with 54 billion.  And like I said, 37

3    billion of that is the RBS private label trustees.  A bunch

4    of billions is in the C.S. and Citi claims.

5              THE COURT:  Right.

6              MR. CANTOR:  And we'll get to the Syncora claim,

7    which was 1,300,000,000 of resolved -- we have resolved

8    that.

9              THE COURT:  Okay.

10             MR. CANTOR:  So that number of 54 does not take

11   that into account, but we'll -- and we'll get to that.  And

12   there's two other resolutions coming up that we've got done

13   since the time we finalized this.

14             So on page 5, you know, as the -- as the litigated

15   move forward -- moving forward, you know, when

16   counterparties go through discovery and the process goes

17   forward, it becomes apparent to some of our counterparties

18   it's time to settle rather than keep going.  And that's why

19   it's important to keep the process moving forward quickly.

20             And as you can see, some of the more significant

21   resolutions, you know, in the last year -- earlier in the

22   year, we settled the JPM derivatives case and the collateral

23   case, which had been before Judge Sullivan that enabled us

24   to bring in a 1,496,000,000 into the estate.  And that, as I

25   had mentioned, we got a little hung up with appeals, but we

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 17

1    got that done when the Second Circuit dismissed the pro se's

2    appeal.

3           In the Citi litigation, which is a matter that

4    seems to be very stuck in the mud in terms of any potential

5    settlement, we were able to resolve the dispute as it

6    related to a third party claimant in that, which was Brice

7    Bridge (ph).  And we were able to work that out.  But as a

8    general matter, the Citi litigation moves forward.

9           Previous litigation that --

10          THE COURT:  Citi litigation is --

11          MR. CANTOR:  Citi's derivatives claim.

12          THE COURT:  We're currently -- we have that

13   scheduled to commence on April 10th, 2017.  And we have set

14   aside, at the parties' request, 40 days --

15          MR. CANTOR:  Forty-five --

16          THE COURT:  Forty to forty-five days of trial.

17          MR. CANTOR:  Forty?  It's not 45?  Yeah.

18          Well, as you know, those derivatives cases are

19   highly complex involving thousands and thousands of trades.

20   You know, and I would say we were able to settle with JPM

21   and virtually every other big bank, other than C.S. and

22   Citi.  The range of those settlements were fairly narrow

23   among all those big banks on those highly complex

24   derivatives matters.  In the ordinary push, you would think

25   we would be able to get that Citi case settled there also.

Page 18

1    But we have been unable to do that.

2         So as a stance, we're moving forward.  We're in

3    the middle of expert -- you know, expert reports,

4    preparation.  And then we'll get into expert depositions.

5    And then we'll head towards dispositive motions.

6         On the L. Corp. (ph) matter, which was a smaller

7    matter, we were able to get that resolved.

8         THE COURT:  Yes.

9         MR. CANTOR:  That was a good example of one of

10   those cases that was just -- that should have been resolved

11   earlier, but without, you know, the Court's assistance and

12   everybody laying out their positions publicly, we were able

13   to get that matter resolved.  Your Honor, similar with the

14   (indiscernible) matter we just had, sometimes it just takes

15   people to go to court and the outcome becomes apparent.

16        Mizuho -- we had another very complex matters

17   that we needed to resolve with them.  And we were able to

18   get that done through business B&B discussions.  And we

19   saved a tremendous amount of our time and the Court's time

20   with that.  We --

21        THE COURT:  Moore Macro also settled as --

22        MR. CANTOR:  Moore Macro settled.

23        THE COURT:  -- as it approached the trial date,

24   which was to have been last June.

25        MR. CANTOR:  Right.  So again, the theme

Page 19

```
1     continues.  You know, and the courthouse steps sometimes is

2     the best place to make these things go away.

3              And the Stonehill matters -- we have 40 claims

4     with Stonehill for $3.3 billion from 2 different Stonehill

5     funds.  And we were able to get those resolved before

6     needing the Court's time and trial on that.

7              And as I had mentioned, we were able to settle the

8     Syncora matter.  And that was -- as you know, that was a

9     very complicated matter requiring litigation, this Court and

10    New York State Supreme.  And in that case, (indiscernible)

11    U.S. Bank as the RMBS trustee for that particular trust.

12              THE COURT:  Yes.

13              MR. CANTOR:  So we've signed up with Syncora, the

14    trustee for the RMBS Trust is -- there are a couple more

15    groups that jumped through before we can get that done with

16    them.  And hopefully, that will be resolved.  But it's good

17    to get that one off the books.

18              And then we resolved eight additional litigations

19    relating to our derivatives book.  And --

20              THE COURT:  We still have it on the books, so to

21    speak, Mr. Cantor, for October 18th.  So --

22              MR. CANTOR:  Syncora?

23              THE COURT:  Yes.  We --

24              MR. CANTOR:  Well, you can cross that off.

25              THE COURT:  I can?
```

Page 20

1                MR. CANTOR:  Okay.  Yes.

2                THE COURT:  We can cross that off.

3                MR. CANTOR:  You just -- but I'm sure Ms. Marcus

4      and Mr. Fail will give me something else to fill right in

5      there.

6                THE COURT:  It's okay.

7                MR. CANTOR:  Don't plan anything.

8                Yes, we resolved that.

9                You know, there was a tremendous amount of success

10     during this case with ADR processes.  And we continued to

11     use that after emergence from bankruptcy.  We've laid out

12     some data here, right?

13               So since the inception of the Court-ordered ADR

14     process relating to derivatives-type matters, there were 564

15     settlements achieved, resulting in $3.1 billion of

16     recoveries.  And that's since the inception of that

17     protocol.

18               Since our last update through the ADR process, we

19     were able to achieve 37 settlements, which resulted in

20     recoveries of about $200 million.  You know, as of -- you

21     know, just as a measure, as of this July, 98 percent of the

22     Tier 1 ADRs -- and Tier 1 are with a million dollars or

23     more, which is basically really -- was it 1 million or 5

24     million?

25               UNIDENTIFIED SPEAKER:  Five million.

Page 21

1              MR. CANTOR:  Five million.  Right here

2     (indiscernible).

3              There $5 million more of the Tier 1s.  We were

4     able to achieve 98 percent of the settlements of the matters

5     that went to the ADR process.  We established two new ADR

6     protocols, one with the private label trustees, which is not

7     all that successful yet.  But we're, you know, continuing to

8     run that through the protocol.

9              And then we also had an ADR process relating to

10    the downstream mortgage claims that came out of our

11    liabilities to Fannie Mae and Freddie Mac.

12             THE COURT:  Fannie Mae and Freddie Mac, right.

13             MR. CANTOR:  And we've had some success.  There's

14    been a fair bit of resistance from the mortgage originators

15    to resolving things through the ADR process without some

16    further judicial determinations from this Court.  And I --

17    or it may be from the District Court on some of the

18    preliminary matters regarding statue of limitations and the

19    validity of the assignments.

20             There are a fair number of counterparties who have

21    not been willing to participate in the Court-ordered ADR

22    process.  And I anticipate we will be asking the Court for

23    some relief to help enforce the order to at least encourage

24    folks to come to New York, participate in at least one ADR

25    so we can see if we can find some common ground to move this

Page 22

1    forward.  But there definitely is some reluctance to settle

2    in the -- in that ADR process.

3              So with the remaining matters and the claims that

4    we have, like I said, there's this 850 -- I think there were

5    exactly 157 claims seeking $54 billion.  This is very

6    consistent with the last update that we made, which was

7    these are very fact-intensive disputes involving billions of

8    dollars.  That usually can support some legal costs.  So the

9    nuisance value becomes less relevant with matters of this

10   size.

11             And most of these disputes have already been

12   through an ADR.  And so, we're going to probably need to

13   keep watching forward towards a trial before something's

14   going to get done.  Again, it's going to require a

15   significant amount of Court time and resources, because all

16   these disputes are very fact-intensive.

17             THE COURT:  You know, I just will ask you to pause

18   before we get to your slide on page 9, which is of

19   particular interest to me.  You keep mentioning Court

20   resources.  I think it's worth my noting that that -- some

21   might think what's the big deal.  That's my job.  And it

22   absolutely is.

23             The way that allocation of resources within the

24   judiciary functions, though, is not an exact science.  And

25   it's not exactly fitted to appreciate, in the sense of

Page 23

1    understand, what a case like this continues to entail.  So

2    the most common reaction at the mention of Lehman Brothers

3    is oh, that case was over a long time ago, wasn't it?

4            And I say no, the plan was confirmed several years

5    ago, but there remains X billion dollars of litigation

6    remaining, hundreds of claims, et cetera.  And then I talk

7    about the trial calendar that I'm facing, which you're about

8    to tell me about.  And it's significant to the Court here,

9    because it enables us to get resources that we need.  And it

10   also informs the government's understanding of complex

11   cases.

12           They aren't done after five years.  We're not

13   making it up.  Judge Bernstein still has almost 1,000

14   matters pending in Madoff cases.  The General Motors case is

15   still very active in this building.  The Lyondell cases are

16   very active.  So what I tell people is if I did nothing else

17   but Lehman, that, in and of itself, would be a full-time

18   job.

19           So for those who may not appreciate the

20   significance of your comment on resources, I just wanted to

21   add that and to thank you for putting this in a format that

22   helps me have folks be able to understand what it is that

23   we're looking at, despite the fact that, as I tell people

24   from time to time, I'm actually not a slacker.

25       (Laughter)

1           MR. CANTOR:  Yes, --

2           THE COURT:  Nor was Judge Peck before me.

3           MR. CANTOR:  So -- and, yeah, the chart on page 9

4    -- if we could flip to that now --

5           THE COURT:  Sure.

6           MR. CANTOR:  -- makes it clear.  Mind you, this

7    doesn't even do justice to what you just described, because

8    these are only the matters that we have formal orders --

9           THE COURT:  That's right.

10          MR. CANTOR:  -- and to schedule these things.

11          THE COURT:  Right.

12          MR. CANTOR:  And I think the number was -- there's

13   about eight other or so major litigations beyond this that

14   we haven't scheduled that would probably have schedules that

15   look somewhat like this.  So this is really just the -- what

16   we have currently calendared.  I'd note that on that JPM

17   deficiency case, there's a -- we're going to be having a new

18   scheduling order that's going to be changing that somewhat.

19   But it's for the purposes of what we're trying to express

20   here, there's --

21          THE COURT:  Right.

22          MR. CANTOR:  -- there's an awful lot that needs to

23   get done.

24          THE COURT:  Well, if you were to amend this to

25   reflect how I keep track of things, we are now into Q2 of

Page 25

1    2018.   Trials are booked into Q2 of 2018.

2              MR. CANTOR:  Yes, and again, most of these things

3    are things that have resisted settlement through

4    negotiations, --

5              THE COURT:  Right.

6              MR. CANTOR:  -- business-to-business, and the

7    formal ADR process.  And either it'll get --

8              THE COURT:  We'll remain optimistic.

9              MR. CANTOR:  -- done after dispositive motions.

10   But we remain optimistic.  And as you know, we do our best

11   to settle whatever we can.

12             THE COURT:  Yes.

13             MR. CANTOR:  So flipping to page 10, you know, the

14   big bank litigation or any big bank -- these are -- and

15   again, as it relates to C.S. and Citi, those are derivatives

16   matters.  And again, there were, you know, 11 of the 13 big

17   banks have all -- and that includes J.K. (ph) -- have all

18   settled.  Because, you know, there's sort of a reasonable

19   place to get those things done.  Citi and C.S. haven't

20   gotten there yet.  So that's going to head towards trial.

21             But as I mentioned before, we were able to resolve

22   the JPM derivatives case.  And that also included the

23   resolution of the collateral case, which Judge Sullivan had

24   already really ruled on.

25             One of the significant matters is the JPM

Page 26

1    deficiency case.  You know, that was the -- that's the case

2    where JPM was alleging tens of -- the tens of billions of

3    dollars that the LBI Trustee -- that LBI held its collateral

4    was insufficient to satisfy the JPM's extension of credit

5    for preclearing.  And they required the provisional

6    application of about $6 billion of LBHI cash.

7            We're challenging the adequacy of the credit given

8    to LBI by JPM for approximately 4,000 securities that JPM

9    held as collateral.  There's a massive, massive discovery

10   record underway in which I know you're familiar with,

11   because we have conferences with you virtually monthly.

12   Because the estate is in a little bit of a wild hunt because

13   we're left with trying to figure out where -- the estate was

14   given credit for 4,000 closeouts.  And we're really trying

15   to figure out exactly what the estate should have gotten

16   credit for.  And we're being, you know, put through the

17   paces to rebuild all these values in an effort to figure out

18   what the right credit was.

19           So -- and that, as we've seen in many, many, many,

20   many of these kind of suits.  And I would tell you beyond

21   the people that came down here today to sort of listen to

22   the hea4ring and pay credit to this being the hundredth

23   omnibus objection is an awful lot of really talented people

24   still at Lehman spend their days doing forensics on trying

25   to figure out what the credit we should have got for this

1    massive (indiscernible).  So --

2           THE COURT:  Well, you know it's significant when

3    folks come in for a discovery dispute and the courtroom is

4    almost as full as it is right now.

5           MR. CANTOR:  Yes.

6           THE COURT:  It's highly unusual.

7           MR. CANTOR:  Well, personally when I was in this

8    -- I was, you know, in the asking (ph) business for a little

9    while.  And I was going to practice law for a long time.

10   I've never really ever seen anything this massive.  It's,

11   you know, going through trying to recreate the closeout of

12   one of the -- you know, the biggest collateral packages ever

13   years afterwards and having to, you know, use the court

14   process to get that information and being -- it's very

15   adversarial, because there's a lot of money at stake.  But

16   we're going to get there.

17          And if we can't resolve that, that will be, if it

18   needs to be, tried and an extremely time-consuming, fact-

19   intensive case.  And that's -- you know, that's currently,

20   we're thinking first quarter 2018.

21          Again, I mentioned the Citi and the C.S.

22   derivatives matters still remain unresolved.  Again, we hope

23   we can get them resolved, but it doesn't appear that way

24   now.  Citi, as we mentioned, is scheduled for April 2017.

25          THE COURT:  Right.

Page 28

1              MR. CANTOR:  And, you know, will get many, many,

2      many trial dates.  C.S. is behind Citi in terms of time.

3      And that's moving forward, though.

4              THE COURT:  Right.

5              MR. CANTOR:  Also with the typical arm wrestling

6      over discovery and sharing documents and trying to make it a

7      little more difficult for us to right-size that claim.

8      That's a trial, as you've mentioned, is something that won't

9      happen before the end of the first quarter of 2018.

10             THE COURT:  Right.

11             MR. CANTOR:  So second quarter is probably not

12     (indiscernible).  And again, highly complex matters

13     involving, you know, very fact-intensive disputes and

14     relating to the very complicated relationships between

15     Lehman and its -- and its -- and its bank counterparties.

16     And as you know, we have a post-petition issue with Citi.

17             THE COURT:  Yes.

18             MR. CANTOR:  And issues (indiscernible).  Again,

19     likely to take an awful lot of time and Court resources.

20             In page 11, we've laid out the details.  You know,

21     in this Citi case, Citi received about $2 billion from

22     Lehman prior to the bankruptcy case.  And they filed claims

23     against the estate related to the closeout of derivatives

24     trades exceeding over $2.2 billion.

25             And they seek to impose -- to apply a set-off

Page 29

1   against those claims and retain that cash.  And we're

2   obviously looking to get the cash back.  As I mentioned,

3   we're in the expert stage of the Citi case now.  And based

4   upon the scheduling order, the trial's set for April 2017.

5           In the C.S. case, C.S. filed claims of about

6   1,200,000,000 relating to nearly 30,000 derivatives trades.

7   And they also filed guarantee claims.  That's up against

8   LBHI.  The derivative claims against LBSF.

9           We dispute the way they calculate their closeout

10  amounts.  As of the early termination date, we think they

11  filed and pled (ph) claims.  We are looking to significantly

12  reduce their claim.  We actually think -- you know, we're

13  seeking to recover about 150 million from C.S. as a

14  receivable to the estate in connection with that case.  And

15  again, that's in the early stages of discovery.

16          The next massive matter are private label

17  trustees.  So the protocol has proceeded as planned, and the

18  trustees were able to go through the requisite loan (ph)

19  files.  And they presented to us 94,080 (indiscernible)

20  since the last update.

21          So step one of the protocol is complete, and that

22  was the trustee loan review process and the claim

23  submission.  So they reviewed -- the trustees reviewed it

24  and (indiscernible) 210,928 files.  And they submitted from

25  that 94,080, which they --

1              THE COURT:  So the universe of files was

2     dramatically shrunk --

3              MR. CANTOR:  Correct.

4              THE COURT:  -- by the protocol?

5              MR. CANTOR:  From this -- from the -- from the

6     total universe of files possible.

7              THE COURT:  Right.

8              MR. CANTOR:  They identified files that they claim

9     supported a breach and their recovery that they're entitled

10    to, 94,000 files they presented to us.  So in step two of

11    the protocol, which is our review, the plan administrator's

12    review, and our acceptance and rebuttal -- it's currently

13    ongoing.  We're on schedule.  That was the schedule required

14    of the protocol.

15             We've reviewed 63,004 of the loan files.  We've

16    begun step three of the protocol process, which is a

17    business-to-business level negotiation between -- you might

18    have met Mr. Trump and his team, our business folks on the

19    mortgage team.  And they have been meeting with the folks

20    from Duff & Phelps who are the trustee's expert in

21    connection with the protocol.  And that's ongoing.

22             Now, we put aside about 30,000 of the loans.  So

23    that's -- so do you see the delta between 63 and 90?  And

24    those are files that we identified were deficient in terms

25    of the protocol had a list of documents that needed to be

Page 31

1    attached to that.

2              THE COURT:  Yes.

3              MR. CANTOR:  About 30,000 of those files we were

4    unable to complete our review, because it didn't comply with

5    the protocol order.  Because we think -- you know, things

6    like in every loan file when there's a breach and a default,

7    there's a corporate expense report that actually lays out

8    and keeps track of what expenses were incurred.  Because

9    that -- if there were a legitimate breach, at least we can

10   sort of figure out how much we owe them.

11             THE COURT:  Track it back, right.

12             MR. CANTOR:  So that was one type of file that was

13   missing, another piece of information was missing from the

14   files.  Another piece of information was payment history.

15   Some portion of those 30 files were submitted, and the

16   trustees did not include a payment history.  So we were

17   unable to determine whether or not the file defaulted

18   quickly after it was written or five years after it was

19   written.  And that was one of the things, if you remember,

20   was fairly heavily negotiated and argued over.  And that was

21   all before the protocol.

22             Some of the files didn't contain loss

23   certificates.  Meaning a certificate that laid out exactly

24   how much was owed.  So we put that aside so that -- that's

25   30,000 of those files.  But as for the files that we did

Page 32

1    review, so we've accrued -- meaning we have agreed with the

2    trustees that there was a breach that we could -- we think

3    would be provable that's supported the loss.

4             About 1,053 that we agree with supporting a claim

5    of $217 million.  We rejected 61,951.  And those support a

6    claim of about $12.4 billion that we rejected.  And you will

7    see in step three of the protocol there's a dispute over

8    those.

9             You know, we had a -- we recently had a motion and

10   order entered by the Court disallowing claims relating to --

11            THE COURT:  Transfer or trusts.

12            MR. CANTOR:  -- trusts.  Disallowing claims that

13   related to no files, where the trustees did not present a

14   file.

15            THE COURT:  Yes.

16            MR. CANTOR:  We're looking at other strategies,

17   which we anticipate moving forward very shortly, to continue

18   to begin, you know, winnowing down the quantum of the

19   claims, to the extent possible, to keep trying to narrow

20   this down.  And, you know, we -- I talked about 30,000 files

21   we were unable to even quantify the claim of.

22            THE COURT:  Well, I'll look forward to lending any

23   assistance I can in helping to continue to move that

24   forward.

25            MR. CANTOR:  Thank you.  I appreciate it.

Page 33

1                THE COURT:  Because the numbers in that one in

2       particular are quite daunting.

3                MR. CANTOR:  Yeah, again, 54 billion remaining, 37

4       is this matter (ph).

5                THE COURT:  Yes.

6                MR. CANTOR:  Now, look.  At the end of the day,

7       even with whatever work we can do to winnow down the

8       universe of claims, there are going to be disputes over loan

9       files.  And the nature of these types of claims, as you saw

10      from the downstream process, are loan-by-loan.

11               You know, whatever the laws are that relate to

12      breaches or the relationship between the breaches, the

13      losses are necessarily tied to the facts.  So it's a knotty

14      (ph) one, but I think we have a couple of strategies.  We'll

15      be able to winnow this down.

16               THE COURT:  Okay.

17               MR. CANTOR:  One the downstream, which is the

18      second part of the mortgage related -- and I -- you can sort

19      of see as we talk about the downstreams from the Fannie Mae

20      and Freddie plans --

21               THE COURT:  Right.

22               MR. CANTOR:  -- where the rock was rolling on the

23      downstreams that come through the private labels.  But we're

24      not going to think about that yet.

25               So again, with Your Honor's assistance, we have an

Page 34

1    ADR process we put in place.  The ADR process has not been

2    as successful as we might have liked, but we keep working

3    hard at it.  So I anticipate there's going to be some court

4    time that's going to be required to keep those moving

5    forward.

6              We filed an omnibus complaint relating to 140

7    among settlers.

8              THE COURT:  Yes.

9              MR. CANTOR:  And if you remember, that was a

10   function of counterparties looking to other Courts.

11             THE COURT:  Yes.

12             MR. CANTOR:  Just as a matter of update -- and I

13   don't know whether you had been updated.  Remember there was

14   one counterparty who had sought relief in the State Court of

15   Delaware.

16             THE COURT:  Yes.

17             MR. CANTOR:  That counterparty has asked to

18   adjourn the hearing in Delaware.  And the next step was to

19   go to Delaware and see whether or not that judge wanted to

20   hear the case.

21             THE COURT:  Okay.

22             MR. CANTOR:  The counterparty has asked to move

23   that hearing that we were supposed to have over the summer

24   and something came up.  And he wanted to move it out, I

25   think, some time in the fall now we'll get it done.  I don't

Page 35

1    even know whether they're going to want to go forward in

2    Delaware.  But just as a matter --

3              THE COURT:  Okay.

4              MR. CANTOR:  Nothing's happened.

5              THE COURT:  All right.  My understanding is that a

6    judge in Milwaukee sent one back.

7              MR. CANTOR:  Yes, there was one judge in Milwaukee

8    who was asked by a guarantee bank.  There was a local bank

9    out there that asked that judge to hear the case.  And that

10   judge -- you might have read the decision -- was of the view

11   that this Court was probably the best Court to resolve the

12   matter, given the Court's experience with these types of

13   things and its relationship to the broader case.  So that's

14   the mortgage stuff.

15             And on page 14, again, we have the derivative

16   disputes.  And we've laid them out on the next page.  The

17   number is getting small, and we're working them down.  But

18   again, we are dealing with counterparties who have come up

19   with a variety of method to, at least in our opinion,

20   inflate their claims and profit from the Lehman bankruptcy.

21             THE COURT:  And speaking for them, they would

22   wholeheartedly disagree with your characterization.

23             MR. CANTOR:  Yes, absolutely.  And the way that

24   we've seen this is counterparties have submitted loss

25   calculations that generate claims in excess of their actual

Page 36

1    loss, which we think is the most appropriate way to

2    determine what the recovery should be.  They calculate that

3    closeout supplying dates and times to maximize their loss,

4    regardless of the actual date they chose to terminate these

5    things or haven't actually managed their portfolios.  And

6    again, highly fact-intensive, only through, you know, hand-

7    to-hand combat in discovery are we able to collect the

8    information and the emails and the communications that have

9    occurred beforehand so we can get a sense of --

10              THE COURT:  Well, and in some instances, --

11              MR. CANTOR:  -- what the strategy was.

12              THE COURT:  In some instances, not only have we

13   gone up to the trial date, in some instances, at least one I

14   can think of, we've actually conducted the entire trial and

15   then a settlement was achieved, only after that entire

16   exercise took place.

17              MR. CANTOR:  Yes, and then again, we're down to

18   the highest hanging fruit.  We have counterparties making

19   hypothetical loss calculations and submitting those to

20   support their claims, even though the trades were replaced.

21   And we've seen them try to --

22              THE COURT:  Which again, they would argue was

23   entirely acceptable.

24              MR. CANTOR:  We've seen counterparties trying to

25   pull proceeds -- entirely acceptable.

1            THE COURT:  Just to be fair, since nobody's

2    specifically here today for the purpose of answering any of

3    your substantive arguments.

4            MR. CANTOR:  Correct.  And then the other area of

5    major -- area of dispute where counterparties would disagree

6    is in situations where, you know, in the ordinary course of

7    business, you know, there's offsetting or netting in

8    derivatives books.

9            THE COURT:  Yes.

10           MR. CANTOR:  And yet, in the context of submitting

11   a claim, that suddenly becomes meaningless.

12           So we have 18 remaining adversary proceedings

13   involving derivatives counterparties, and there will be 5

14   more that we anticipate if we can't get it settled.  And we

15   haven't been able to settle it yet, so it will bring that to

16   23.  Again, very large dollar amounts at stake, generally

17   supporting a fair bit of legal spend, which would result in

18   this Court's needing to spend time and resources helping us

19   adjudicate these things.

20           THE COURT:  I don't keep track, but my guess is

21   that there are probably at least -- I'm going to guess

22   completely wrong -- there are at least a dozen appeals

23   pending.  Probably folks in the room know.  I can name

24   almost a dozen right off the top of my head.  But we can't

25   lose sight of the fact that a number of orders are up on

1    appeal.  So based on what happens either at the district

2    court or at the circuit, we could be seeing some things come

3    back here obviously; I hope that's not the case, but it is

4    what it is, it is what it will be.

5              MR. CANTOR:  And then another area of the

6    litigation you have is this DSPV matters, which Your Honor

7    is familiar with from our hearings more recently.  Many of

8    those matters still remain subject to an ADR process.

9              Just as a matter of update, we had resolved with a

10   hundred of 200 of the defendants in this SPV protocol.

11   Again, as you know, highly complex, some novel law, and

12   something we continue to work on.

13             So on page 15 we laid out again just sort of a

14   list of the derivative disputes with the adversary number

15   and what stage the litigation is in.  And just for the

16   purposes of the record, where we see things in discovery, as

17   you know, a tremendous amount of time is spent down here

18   with you managing discovery disputes, which we all try to

19   avoid, but we appreciate the amount of time that you and

20   your chambers have spent and have been so responsive to our

21   needs to move those cases forward.

22             THE COURT:  We have -- just looking at my running

23   scorecard, we have FHLB Cincinnati coming in for trial, a

24   week trial beginning on November 30th; QVT is slotted in for

25   two weeks of trial at the end of January, 2017; we have a

Page 39

1    date set aside for Winchester Medical Center, February 1st,

2    2017.  Right before the commencement of the Citibank trial,

3    we have FHLB New York --

4            MR. CANTOR:  New York.

5            THE COURT:  -- set for a day, and we also have

6    DILA set for a week's trial in October, which would be

7    particularly -- which will be particularly interesting since

8    my understanding is that it will be partially in Japanese,

9    which I have done before.  I've actually conducted a three-

10   week trial with interpreters in Japanese.

11           MR. CANTOR:  Okay.

12           THE COURT:  In addition, we're in Olympic season,

13   so it's an additional degree of difficulty.

14           MR. CANTOR:  Yes.  So there's a lot coming and we

15   will do our best to resolve those matters.  I wouldn't be

16   surprised if a couple of those you mentioned ultimately

17   don't happen, but until it's done --

18           THE COURT:  If they do happen, we'll be ready.

19           MR. CANTOR:  Thank you, Your Honor.

20           So if you remember, we had the LBIE guaranty

21   issue, which had been since the last plan update that we

22   were able to make that progress.  If you remember in July of

23   2000 -- of last year, we asked the Court to estimate at zero

24   LBHI's guaranty claims to the primary obligations of LBIE,

25   Lehman Brothers International Europe.  The basis of the

1    motion is that the LBIE case was going to make distributions

2    be more than enough to satisfy LBHI's guaranties.

3            On the heels of that motion and some of the early

4    motion practice before hearing that matter, a number of

5    creditors agreed to release LBHI's guaranty claims.  We were

6    able to disallow over 900 claims and with claim reserves of

7    $3 billion, which resulted in a release of over $200 million

8    of cash from the estate to creditors, which I thought was

9    really a great outcome for that type of matter.  That was

10   one of those really large, complicated ones that was going

11   to slow us down if we couldn't get some relief.

12           There was a smaller group of creditors who

13   generally agreed with our position, but were unwilling to

14   agree to the disallowance of their claims until we -- until

15   LBIE distributed at least an additional 15 percent on their

16   claims.  So those matters are sort of put to the side and

17   hopefully once that LBIE case goes a little further we'll

18   make those go away.  But as usually there are always --

19   there were a few creditors that were unwilling to do

20   anything.

21           These are creditors whose claims had been set in

22   the LBIE case either by agreement with the LBIE receiver or

23   by court order, but who nevertheless think they're entitled

24   to a larger claim against this estate on account of the

25   guaranty of that underlying claim.  And you've seen some

Page 41

1   motion practice already and the way things are going I

2   anticipate we would at least have to head towards some sort

3   of trial date with those folks.  Luckily, it was a very

4   small number of creditors compared to the hundreds that we

5   had.

6          You know, we spent an awful lot of time and

7   resources at the estate, you know, with the largest creditor

8   and most of those foreign receiverships.  And a tremendous

9   amount of time and effort is spent not only monitoring those

10  cases, but working with those foreign receivers and other

11  creditors in those cases to help those cases resolve as

12  quickly as possible, enable cash to flow out of those

13  foreign receiverships back to LBHI, so we can get out to our

14  creditors.

15         The Australian receivership case, disputes we had

16  with that receiver were particularly knotty to get resolved,

17  but we were able to resolve all our issues with the

18  Australian receiver since the last update.  It enabled the

19  flow of hundreds of millions of dollars on distributions to

20  local and foreign creditors for those Australian entities,

21  and it avoided an awful lot of litigation which was going to

22  be coming down in Australia and potentially some tension

23  over jurisdiction.  But those foreign matters are going to

24  take an awful lot of time, less of this Court's time.

25         So in conclusion, we've made significant progress

Page 42

1    in asset recoveries and claim resolution, and we've made

2    substantial distributions to date and we continue to work

3    hard to make more distributions.

4           The remaining portfolio of disputed claims is for

5    the most part held by our most contentious creditor

6    constituency and some of the discussions are constant.  As

7    you know, we're constantly trying to resolve things and I'm

8    always available to be here to help get things resolved.

9    These are --

10          THE COURT:  Well, it's a point that you are here

11   very frequently, as are numerous members of the team, who

12   reflect a real desire to move things along and also reflect

13   an extraordinary level of knowledge about the nitty-gritty

14   details, which is often I think one of the most important

15   pieces in the puzzle of being able to move something along.

16   So I appreciate their work.  I do appreciate your presence,

17   because it puts a face on Lehman and I do think that, at

18   least based on what happens sometimes after matters are

19   heard, it does seem to make a difference.

20          I will also say that often when I raise the

21   possibility of settlement or mediation parties will ask, I

22   think seriously, if Judge Peck is available to mediate, I

23   think they seriously ask if Judge Peck is available to

24   mediate matters.  Judge Peck is apparently evidencing a

25   willingness to do that, but I think that that probably would

Page 43

1    not be proper.

2        (Laughter)

3            MR. CANTOR:  You know, and with -- just to digress

4    for a minute -- and again, we like to stay very focused on

5    what's ahead and it's been -- our approach to resolving this

6    has been very low key, but I would say --

7            THE COURT:  I don't think low key would be the

8    word that I would pick, but --

9            MR. CANTOR:  -- low key in terms of -- low key in

10   terms of I would say the people remaining at the estate.

11   And it always amazes me the quality of the work being done,

12   the intensity that the team brings to the work.  I've never

13   been around a group like this in 30 years of practice, after

14   a case is done getting claims resolved and assets sold.  The

15   level of talent and commitment is extraordinary at this

16   estate.

17           So the next we -- again, we're maintaining a

18   robust and experienced litigation platform and we're

19   prepared to strike the necessary balance considering the

20   value of fair compromise, the cost of litigation, the

21   benefit received by the estate's creditors from timely

22   resolution, and the goal of ensuring that all creditors are

23   treated fairly.  And I stopped and read that bullet

24   carefully, because we spent a lot of time thinking about

25   what our mission is and how we want to describe it, and we

Page 44

1    used great care drafting it that way because those are the

2    things we are focused on in trying to resolve the case.

3                    And again we anticipate a fair amount of the

4    Court's time and resources are going to be required to fully

5    and finally resolve this massive estate, and we appreciate

6    all the time and efforts you will give.

7                    THE COURT:  Mr. Cantor, thank you very much.

8                    MR. CANTOR:  Sure.

9                    MR. FAIL:  Your Honor, Garrett --

10                   THE COURT:  Yes, Mr. Fail.

11                   MR. FAIL:  -- Garrett Fail, Weil Gotshal, for the

12   debtors.  I just wanted to follow onto your comments, Mr.

13   Cantor's and Judge Peck's about all the work that's done

14   behind the scenes by introducing some of the folks behind

15   the bar that are behind the scenes, including one of the

16   board members of LBHI, David Pauker, who's here.  Chris

17   O'Meara, the --

18                   THE COURT:  Hello, Mr. Pauker.  How are you?

19                   MR. PAUKER:  Fine.  Thank you, Your Honor.

20                   MR. FAIL:  Chris O'Meara, the CEO, and members of

21   LBHI's legal and derivatives team --

22                   THE COURT:  Hello, Mr. O'Meara.

23                   MR. FAIL:  -- Tom Hommel, Larry Brandman,

24   and Shefali Raina, who are here in the front row

25   today.

Page 45

1          THE COURT:  Yeah, they're frequent flyers here.

2      (Laughter)

3          MR. FAIL:  Thank you, Your Honor.

4          THE COURT:  Thank you, Mr. Fail.

5          Good morning.

6          MR. KOBAK:  Good morning, Your Honor.

7  It brings back a lot of memories to see Judge Peck in the

8  courtroom today and I'd like to say --

9          THE COURT:  Good ones, I hope -- well, good in

10  some sense.

11          MR. KOBAK:  No, very good, Your Honor.

12  I remember many times he would ask me at the end of a

13  hearing to report on where we stood on many of the issues

14  that the trustee is going to describe today.  His questions

15  usually ended with the word "when," which I studiously tried

16  to avoid at the time, but today, finally, we know the answer

17  to most of those questions.

18          THE COURT:  Well, before you get started and not

19  to steal your thunder -- and Judge Peck can speak to this I

20  think probably more forcefully or at least as forcefully as

21  anybody in the room -- I think that when the case was filed,

22  certainly I remember what it felt like and how nobody knew

23  what was going to happen.  And it certainly was not within

24  anybody's contemplation that here today you would be

25  standing here and telling me about the level of recovery to

Page 46

1    unsecured creditors, which to put a fine point on it means

2    that all of the customer claims have been paid in full.  And

3    I think Judge Peck can probably reflect on this as well that

4    that was certainly not the way everybody thought it was

5    going to turn out back in September of 2008 when this case

6    commenced.

7              So that in and of itself is an extraordinary thing

8    and I look forward to your describing where you've been and

9    where you're going, because you are getting very close to

10   the finish line, as far as I can tell -- not that it's a

11   race between the two estates.

12             MR. KOBAK:  Yes, Your Honor.  I'd just

13   like to say, as Ms. Marcus said, we think too that the

14   insolvency statutes really prove that they work in our case,

15   the SIPA statute rather than Chapter 11, and I think from

16   the point of view of our term -- of our team, we think the

17   quality and dedication of the judges, both you and Judge

18   Peck and generally the judges in this district, is a

19   tremendous asset in these cases.  And Judge Peck referred to

20   all the work and research and putting the binders together,

21   but all that work goes to good use, it reaches good results,

22   it's very satisfying for the lawyers involved and it's very

23   important for the public.

24             THE COURT:  It's also -- just to again -- and I

25   will let you speak, but oftentimes there are reports in the

Page 47

1    press, the legal press and the general press, about the

2    level of fees, and I think it bears emphasis that this is an

3    incredibly labor-intensive process and it is not relevant or

4    probative of anything to talk about an amount of fees that

5    have been incurred or expended without comparing it to the

6    results that have been achieved.  So to the extent that we

7    want to remark that there have been a large number of fees,

8    amount of fees, which there have, there's a reason for it

9    and frankly it's reflected in the results that have been

10   achieved, which are a heavy lift in many, many instances.

11   So I wanted to make that point as well, which I think I

12   probably made at the last state-of-the-estate presentation

13   as well.

14           MR. KOBAK:  Yes.  Thank you, Your

15   Honor.

16           Your Honor, I actually don't propose to speak

17   today.  When the case began, the trustee asked to address

18   the Court and the trustee would like to do so again today.

19   I think Mr. Caputo will also have some remarks --

20           THE COURT:  Okay.

21           MR. KOBAK:  -- from the point of view

22   of SIPC.  And to the extent Your Honor has any questions,

23   Mr. Kiplok, Ms. Cragg (ph), Mr. Margolin, Mr. Smith, who's

24   in the back of the courtroom, and myself will try to answer.

25   Thank you.

Page 48

```
 1              THE COURT:  Again, all frequent flyers and --

 2              MR. KOBAK:  Thank you.

 3              THE COURT:  -- always good to see.

 4         Good morning.

 5              MR. GIDDENS:  Good morning, Your Honor.  Thank you

 6    for providing this opportunity for me to update the Court on

 7    the state of the Lehman Brothers Inc. nearly eight years

 8    after the liquidation proceeding began under the Securities

 9    Investor Protection Act.

10              As trustee, it's very satisfying for me to report

11    that we continue to move towards substantial completion.  In

12    the dark days of Lehman's failure as the largest bankruptcy

13    in history threatened global markets and economic stability,

14    very few observers thought we would be able to accomplish

15    the recoveries and distributions we have in fact

16    accomplished in this proceeding.

17              Customer claims have been fully satisfied, with

18    most customer claims fulfilled within weeks of the

19    liquidations between in 2008.  Secured creditors, priority

20    creditors and administrative creditors have also received

21    100-percent distributions.

22              General creditors recently received their fourth

23    distribution, bringing the cumulative payout on allowed

24    unsecured general creditor claims to 38 percent, far

25    exceeding initial expectations.
```

Page 49

1          We are now focused on working hard to resolve

2     outstanding issues where I can seek the Court's approval for

3     a final distribution that will complete the full wind-down

4     of the estate and end the liquidation proceeding.

5          On distributions, before going into unresolved

6     issues, I'd like to provide a brief recap.  The LBI

7     liquidation presented a case of unprecedented magnitude and

8     complexity.  Certain asserted customer claims, including the

9     LBIE claim and the LBHI claim were by themselves larger than

10    any previous SIPA proceedings in history.

11          In total, Lehman's broker/dealer customers and

12    creditors have now received $115 billion in distributions.

13    This represents the single largest distribution across

14    worldwide Lehman insolvency proceedings.  Importantly, more

15    than 110,000 retail customers received 100 percent of their

16    property within days of the bankruptcy due to the unique

17    account transfer process permitted under SIPA.  Following

18    those customer account transfers, over 14,000 customer

19    claims with an asserted value of approximately 50 billion

20    were resolved.

21          The swift return of customer property was

22    critically important to the restoration of stability to

23    trading platforms in the midst of very real fears or

24    potential for global financial collapse.  The return of

25    customer property could not have happened without the SIPA

Page 50

1    account transfer provisions and the ability of the transfers

2    to be backstopped by the SIPC funds.  It took thousands of

3    professionals working hand-in-hand with regulators to

4    accomplish this extraordinary task, and it took nearly two

5    years to completely reconcile the transferred accounts.

6            For example, there might have been one hedge fund

7    account which had more than a million transactions even

8    though it was treated as one account.

9            In addition, the liquidation required the wind-

10   down of thousands of open transactions with virtually every

11   financial and governmental entity throughout the world, and

12   a determination of claims based on highly sophisticated and

13   complex financial transactions.

14           Given these complexities back in 2008, the

15   prevailing expectation was that the general unsecured

16   creditors would not receive very much, if anything.  Despite

17   these concerns, the estate has distributed over 8.8 billion

18   to general unsecured creditors.  These distributions were

19   made possible by the settlement of LBHI's and LBIE's

20   customer claims, which Judge Peck referred to, and I quote,

21   as "one of the most complex matters to ever be resolved in

22   history, at least in a commercial sense."

23           These settlements served as the key that opened

24   the door for distributions to general creditors.  I also

25   would like to note that additional distributions to general

Page 51

1   creditors remain possible and most likely.

2          I am pleased to report that approximately 140,000

3   claims were asserted at the beginning of the liquidation,

4   those have now been reduced to 430 which are unresolved.

5   All of those remaining claims are now before a court for

6   resolution or are pending settlement.

7          The Barclays transaction: it's very important for

8   me to acknowledge that conditions that existed that limited

9   the full realization of assets that were previously

10  available for LBI customers and creditors.  These are assets

11  which were on the LBI balance sheet at the time of the

12  liquidation.

13         Over the course of this liquidation, we have

14  pursued every reasonable legal avenue to recover assets that

15  we believed belonged to the estate.  However, unsecured

16  losses resulted from (indiscernible) specific to the

17  historic failure of the Lehman enterprise and the Barclays

18  acquisition of some, but not all of the LBI business and

19  select customer accounts.

20         The amount and sources of these losses are

21  detailed in the preliminary realization report, which takes

22  the corrected balance sheet and indicates what we have

23  recovered of those assets.  That report was filed with the

24  Court on February 23, 2015.

25         The Barclays transaction did provide a number of

Page 52

1    benefits, including enabling a significant portion of LBI

2    customers to transition to a new, solvent broker/dealer.

3    The transaction also provided for continued employment of

4    several thousand former Lehman personnel.  However, the

5    emergency transaction with Barclays negotiated in the days

6    and hours before the liquidation was also the largest cause

7    of losses.  Specifically, Barclays acquired over, under our

8    estimate, 11 billion in assets from LBI, plus LBI's former

9    employees, intellectual property, high-worth customer

10   accounts, and an entry into the U.S. market in exchange for

11   approximately 2.4 billion of payments to third parties to

12   settle LBI obligations.  This resulted in a multi-billion-

13   dollar loss to LBI.

14          Disputes arose between the office of the trustee

15   and Barclays over whether Barclays had purchased certain

16   assets and assumed certain obligations and over accessed the

17   necessary information.  As a result we engaged in over six

18   years of litigation.  The litigation was resolved through a

19   settlement last year.  The assets paid to Barclays

20   significantly diminished amounts available for LBI's

21   unsecured general creditors.

22          Outstanding issues and next steps:  Today we are

23   at a stage where the LBI liquidation has entered a phase of

24   substantial completion, but it's important to note that the

25   proceeding still remains a mega-case and significant work

Page 53

1    remains before the liquidation proceeding can come to an

2    end.  While the administration of the general estate is

3    almost complete, there are still over 400 general creditor

4    claims awaiting a final resolution, including ten objections

5    before the Bankruptcy Court, 35 claims awaiting the outcome

6    of appeals before the District Court, and 384 claims

7    awaiting the outcome of appeals before the Second Circuit.

8            The claims pending before this Court primarily

9    relate to transfers through the Automated Customer Account

10   Transfer Service or ACATS, as well as one-off claims

11   relating to failed foreign exchange transactions and

12   employee bonuses.

13           All of the claims on appeal to the District Court

14   are asserted by the equity award and RSU claimants.  The

15   claims pending on appeal in the Second Circuit include all

16   of the Executive and Select Employee Deferred Compensation

17   plan or ESEDC claims, as well as three Barclays bonus

18   claims.

19           I am the appellee in all of these appellate

20   proceedings.  The closure of the estate is dependent on the

21   final resolution of these appeals by the relevant appellate

22   courts and we are hopeful that the claims appeals will be

23   resolved swiftly and efficiently.

24           We continue to have over $839 million in asset to

25   administer.  The assets are subject to reserves pending the

Page 54

1   outcomes of the matters I've noted.  In addition, remaining

2   sales of residual assets which are pending before the Court

3   include the sale of LBI's claims against various bankruptcy

4   estates and other future payment streams will need to be

5   completed to allow the closure of the estate.

6           Once the remaining claims are finally resolved and

7   the asset sale is completed, we'll commence the final steps

8   to close the estate.  At that time we'll seek the Court's

9   approval for the preservation of the required data and

10  abandonment of unnecessary systems and information for a

11  final distribution to creditors.  We are committed, as is

12  the LBHI and estate, to the prompt closure of the estate,

13  and dependent on the issues I've mentioned, we hope to make

14  additional distributions as promptly as possible.

15          As this overview has demonstrated, at a

16  fundamental level the current liquidation regime was

17  successful.  In our investigation report and throughout the

18  proceeding we have promoted specific reform proposals and

19  identified additional areas where reform would be

20  appropriate.  In addition, in 2012 I was appointed to a task

21  force that recommended recommendations for modernizing SIPA

22  and I incorporated various learnings from the LBI

23  liquidation in my contributions to that task force.

24          We continue to update regulators in the United

25  States, the United Kingdom and elsewhere on a regular basis

Page 55

1   on these issues, as well as more generally on the lessons

2   learned from Lehman and possible areas for reform.  We

3   regularly provide updates and recommendation to

4   congressional committees, legislators and other interested

5   parties on similar topics.

6           I urge regulators, policymakers and others to bear

7   in mind the lessons we've learned from the Lehman bankruptcy

8   in considering the future reform of our financial system.

9   One of the most important lessons of this administration in

10  connection with the LBHI bankruptcy proceeding is that the

11  bankruptcy process and the SIPA regime has been tried and

12  tested and shown not only to work, but to work well.

13          In conclusion, I would like to thank SIPC,

14  including Ken Caputo, who will address the Court this

15  morning, the SEC, the CFTC, FINRA, and other regulators who

16  played an active role in the LBI administration and provided

17  substantial support and guidance.

18          The progress we've seen would not have been

19  possible without the oversight of this Court, including

20  Judge Peck, who is here today, and of course Your Honor.

21          Our goal is to close the estate as soon as

22  possible.  We recognize that court calendars do not always

23  move at a party's desired pace and in light of the claims on

24  pending appeals that timeline for closure may be optimistic.

25  However, our goal is that a final distribution be made and

Page 56

1    the estate be closed by the end of 2017.  We look forward to

2    continuing to work with the Court as we resolve outstanding

3    issues and pursue the closure of the estate.

4              Thank you, Your Honor.

5              THE COURT:  Thank you very much.

6              Good morning.

7              MR. CAPUTO:  Good morning, Your Honor, Kenneth

8    Caputo on behalf of the Securities Investor Protection

9    Corporation.

10             As you've just heard, the SIPA liquidation

11   proceeding of Lehman Brothers Inc. has progressed quite

12   well.  From the outset, we worked with the trustee to effect

13   the largest bulk transfer proceedings in the history of

14   SIPA.  To the many varied and unique challenges faced by the

15   estate throughout the proceeding, we've worked closely not

16   just with the trustee, but with the Securities and Exchange

17   Commission, the Federal Reserve Board, the Federal Reserve

18   Bank of New York, and many others to effect the expeditious

19   return of property to customers and to enhance recoveries

20   for general creditors to the maximum extent possible.

21             As the slide dec that was submitted touches on,

22   many of the challenges we faced were far from certain and

23   many involved novel questions of law.  From matters

24   involving things like TBA contracts, repurchase agreements,

25   and without a doubt the gargantuan inter-company claims that

Page 57

1    led to the historical settlements with LBHI and LBIE, and

2    frankly so many others.

3            We are pleased to report to the Court today that

4    from SIPC's perspective this has been an extremely

5    successful liquidation proceeding and one that serves to

6    highlight the benefits of investor protection afforded under

7    the Securities Investor Protection Act.  And as you have

8    heard, the liquidation proceeding is winding down in an

9    orderly fashion.

10           SIPC's role throughout the proceeding has been to

11   oversee the liquidation, to advise the trustee and counsel

12   on matters affecting the statute, to appear in court as

13   necessary to set forth our position, and to report to and

14   inform various departments and agencies of government about

15   the issues and our progress.

16           In that regard, one of the unique aspects of a

17   SIPA liquidation proceeding of this size and importance is

18   that it involves interaction with all three branches of the

19   federal government.  The judicial branch of course plays the

20   primary role:  where the case is commenced, where it

21   proceeds and to whom we report on an ongoing basis.

22           Throughout the oversight role played by the

23   Securities and Exchange Commission the executive branch is

24   involved.  As SIPA mandates, SIPC reports regularly to the

25   Commission, and SIPC's and the trustee's work have been the

Page 58

1    subject of examination by the Commission.  Further, the

2    Commission sends out a report to the President, who also

3    remains informed as to our work through the appointment

4    process on SIPC's board of directors.

5            The legislative branch receives not only regular

6    and periodic briefings, both in the Senate through the work

7    of the Senate Committee on Banking, Housing and Urban

8    Affairs, and in the House through the work of the House

9    Financial Services Committee, but also holds periodic

10   hearings where they receive the testimony of individuals

11   like SIPC's CEO, the trustee, and others who are involved in

12   the process.

13           The SIPC liquidation proceeding has also been the

14   subject of inquiry and attention at numerous other levels of

15   exchange with the government, with the legal profession and

16   with the securities industry around the globe and it remains

17   so to this day.

18           For example, just a few weeks ago through our work

19   on the Financial and Banking Information Infrastructure

20   Committee, which committee is hosted by Treasury, we met

21   with the Deputy Secretary of the Treasury and with SEC Chair

22   White.  Just last month I once again served as an instructor

23   in Toronto's Centers of Securities and Leadership seminar

24   where Lehman and its challenges were center stage.

25           Mr. Kiplok and I were asked not long ago to

Page 59

1   provide a briefing and a report to the Financial Stability

2   Board on issues surrounding hypothecation and repurchase

3   agreements in Lehman.  And I also delivered a presentation

4   on Lehman recently to the International Compensation

5   Scheme's section of the IOSCO meetings in London.

6          Finally, Your Honor, we continue to use the

7   lessons learned from Lehman to inform our work with the FDIC

8   and the SEC as we work collectively to finalize the rule

9   involving the covered broker/dealer provisions under Title 2

10  of the Dodd-Frank Wall Street Reform and Consumer Protection

11  Act.  The proposed rule was published in the Federal

12  Register on March 2nd, 2016, and the common period has now

13  expired.  It is expected to be released prior to the year

14  end.

15         As you know, Your Honor, this has been a case like

16  no other.  I'd like to thank the trustee for his exemplary

17  leadership and his terrific counsel for all their hard work,

18  and all the parties that have worked with SIPC to get us

19  this far along.

20         But I'd also like to thank the Court, including

21  Judge Peck --

22         THE COURT:  Well, you should turn around and

23  address Judge Peck.

24         MR. CAPUTO:  And Your Honor for all of the

25  courtesies extended to SIPC and to me personally on matters

Page 60

1    of administration and scheduling and the like as we travel

2    from Washington to be here on a regular basis.  It has been

3    a pleasure.

4           Thank you.

5           THE COURT:  It's been a pleasure for us as well.

6           Well, you've not surprisingly all taken -- made

7    great emphasis on the work of your teams and folks who don't

8    appear here, but who work very hard behind the scenes.

9    That's true here as well, that's true here as well.  There

10   have been a series of law clerks starting with Judge Peck's

11   law clerks, who I would say didn't know what hit them that

12   day, but had a wonderful ride once the case started.  I was

13   lucky enough to have one of Judge Peck's clerks, Ms. Lutkis

14   (ph), stay with me to help me with the transition, and she

15   since moved on to other things.  She was followed by Mr.

16   O'Neil, who also has moved on to other things, who was then

17   followed by Mr. Beller, who is moving on to other things.

18   Ms. Smith, who's going to stay with me.  Ms. Eisen (ph) all

19   of you know, she's been with me forever, and there's

20   actually a secret order entered that she has to stay with me

21   forever.  But rest assured that we will effect the

22   transition and we will continue to give you time as and when

23   you need it, which I hope is your experience of interaction

24   with chambers.

25           It does seem like a lot of work sometimes, it is a

Page 61

1    lot of work, but we pride ourselves on making hard

2    decisions, giving you the calendar time that you need, and

3    doing whatever we can to assist.

4            There's another group of folks that I think it's

5    important to mention and it picks up on something that Mr.

6    Cantor mentioned, that there is no Lehman.  It's a line that

7    I say in particular when we're dealing when we're dealing

8    with parties who don't understand everything that is second

9    nature to you folks, in particular individuals.  It bears

10   mentioning that there were thousands and thousands of Lehman

11   employees and other regular folks who lost a lot.  They

12   don't understand why we could be sitting here today talking

13   about what a great success these cases have been and yet

14   they lost everything.

15           It's been one of my missions presiding over the

16   cases, as it was for Judge Peck, to explain to each and

17   every person who asks what this is about, what the process

18   entails and why they cannot get a recovery, if in fact

19   that's the case, as it has been for the employees in

20   particular who have retirement accounts that held stock and

21   stock options.  We have had folks participate in these

22   proceedings by telephone, I have even received letters from

23   people saying thank you, even though you did not accept my

24   claim, I felt heard and now I understand.

25           So I think it's very important as the cases

1    continue to be covered and there continues to be very active

2    dialogue and concern over how to avoid another Lehman that

3    those folks be mentioned and that you all understand that we

4    try very hard to have the process be transparent and

5    understandable to regular people.

6            Picking up on a few things that the trustee and

7    Mr. Caputo mentioned, I will tell you that Judge Peck

8    travels the world talking about Lehman and is involved in

9    many ongoing efforts in the area of understanding GSIFI,

10   Globally Systemic Important Financial Institutions, and

11   having folks understand what led to Lehman, how to avoid

12   another Lehman, and his work in that regular is invaluable.

13           Just a few weeks ago I was asked by the chairman

14   of the FDIC, Chairman Gruenberg, to become a member of the

15   Advisory -- Systemic Resolution Advisory Committee of the

16   FDIC, which appointment I of course accepted and I'm very

17   excited to participate in that.  That committee is charged,

18   as a lot of you know, with the implementation of Dodd-Frank,

19   and I expect that my particular focus will be on single

20   point of entry and the role that the bankruptcy system has

21   to play.  I appear to be the first and only judge to serve

22   on that committee, so excited and a little nervous about

23   that.

24           And I just also want to say that I think above all

25   the case and the past number of years really speaks to the

Page 63

1    fact that the system does work.  Our legal system, the rule

2    of law, the concept of due process survives even in times of

3    crisis, and it's a great testament to everyone here and to

4    many, many folks who are not here.

5            On that note, I would like to give Judge Peck the

6    last word.  It's not often that you get to put Judge Peck on

7    the spot, but I relish the opportunity.

8        (Laughter)

9            JUDGE PECK:  Well, it's --

10           THE COURT:  Thank you for entrusting me with this

11   life's work.

12           JUDGE PECK:  It's in good hands.  And this has

13   been a remarkable morning for me.  I've been in an

14   unaccustomed position in this courtroom and it's due to

15   Judge Chapman's invitation.  I wasn't so sure I was going to

16   make it; I'm really glad that I'm here.

17           And your reference toward the end of the rule of

18   law is an incredibly important umbrella that surrounds not

19   only this courtroom, but everybody who is participating in

20   the circles that surround this courtroom.

21           I travel a lot and one of the things that Lehman

22   did for me is that it showed me that insolvency isn't just

23   what we practice here in accordance with the United States

24   Bankruptcy Code, but an interconnected system that doesn't

25   always synchronize.  And one of the great lessons of Lehman

Page 64

1   is not what we can do internally in the United States, but

2   how we can better harmonize what goes on here throughout the

3   world, because the problems of global SIFIs represent global

4   problems and at the moment we don't have a global solution,

5   despite best efforts.

6           So I guess my last word is we've done a great job,

7   but we have a lot more to do.  And thank you so much for

8   inviting me --

9           THE COURT:  Thank you, Judge Peck.

10          JUDGE PECK:  -- to be here today.

11          THE COURT:  Thank you all.

12      (Whereupon, these proceedings concluded at 11:33 AM)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 65

1                          C E R T I F I C A T I O N

2

3    We, Nicole Yawn and Tracey Williams, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6

7    Nicole          Digitally signed by Nicole Yawn
                      DN: cn=Nicole Yawn, o=Veritext,
                      ou, email=digital@veritext.com,
     Yawn            c=US
8    _____Date: 2016.08.18 15:27:45 -04'00'

9    Nicole Yawn

10   Tracey          Digitally signed by Tracey Williams
                      DN: cn=Tracey Williams,
                      o=Veritext, ou,
11                    email=digital@veritext.com, c=US
     Williams        Date: 2016.08.18 15:28:13 -04'00'

12   _____

13   Tracey Williams

14

15

16   Date:  August 17, 2016

17

18

19   Veritext Legal Solutions

20   330 Old Country Road

21   Suite 300

22   Mineola, NY 11501

23

24

25