**Hearing Date: October 20, 2016 at 10:00 a.m. (Eastern Time)**
**Objection Deadline: September 29, 2016 at 4:00 p.m. (Eastern Time)**

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
Paul V. Shalhoub
Todd G. Cosenza
Benjamin P. McCallen

ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Telephone: (303) 945-7415
Facsimile: (303) 945-7468
Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)

*Attorneys for Debtors Lehman Brothers Holdings Inc.*
*and Certain of its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                                            )
In re                                                       )     Chapter 11 Case No.
                                                            )
Lehman Brothers Holdings Inc., *et al.*,                    )     08-13555 (SCC)
                                                            )
            Debtors.                                        )     Jointly Administered
                                                            )
-----------------------------------------------------------x

**NOTICE OF HEARING ON LEHMAN BROTHERS HOLDINGS INC.'S SECOND**
**OBJECTION TO CERTAIN RMBS TRUST CLAIMS AND MOTION TO DISALLOW**
**AND EXPUNGE CERTAIN RMBS TRUST CLAIMS FOR INSUFFICIENT**
**DOCUMENTATION**

**PLEASE TAKE NOTICE** that, on August 30, 2016, Lehman Brothers Holdings Inc.

("LBHI" or the "Plan Administrator"), filed a Second Objection To Certain RMBS Trust Claims

And Motion To Disallow And Expunge Certain RMBS Trust Claims For Insufficient

Documentation (the "Objection").

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held on the Objection before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 623, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court") on **October 20, 2016 at 10:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Objection must be made in writing, state with particularity the grounds therefor, conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, be filed electronically in text searchable portable document format (PDF) with the Court in accordance with General Order M-399 (General Order M-399 can be found at www.nysb.uscourts.gov, the official website for the Court), by registered users of the Court's case filing system and by all other parties in interest (with a hard-copy delivered directly to the Judge's Chambers), and be served in accordance with General Order M-399, and upon the following:  (a) the chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 23; (b) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: William K. Harrington, Esq., Susan D. Golden, Esq., and Andrea B. Schwartz,, Esq.); (c) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005 (Attn: Dennis F. Dunne, Esq., Wilbur F. Foster, Jr., Esq., Dennis C. O'Donnell, Esq., and Evan R. Fleck, Esq.), attorneys for the official committee of unsecured creditors; (d) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 (Attn: Paul V. Shalhoub, Esq., Todd G. Cosenza, Esq., and Benjamin P. McCallen, Esq.), attorneys for LBHI and certain of its affiliates; and (e) Rollin Braswell Fisher LLC, 8350

East Crescent Parkway, Suite 100, Greenwood Village, Colorado 80111 (Attn: Michael A. Rollin, Esq. and Maritza Dominguez Braswell, Esq.), attorneys for LBHI and certain of its affiliates, so as to be actually filed and received no later than **September 29, 2016 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that if no objections are timely filed and served with respect to the Objection, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court a proposed order disallowing and expunging the RMBS Trust Claims (as defined in the Objection) to the extent that they are based on the loans listed in Exhibits A and B to the Declaration of Jonathan D. Waisnor, submitted in support of this Objection, which order may be entered with no further notice or opportunity to be heard offered to any party.

*[Remainder of Page Intentionally Left Blank]*

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
Paul V. Shalhoub
Todd G. Cosenza
Benjamin P. McCallen

ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Telephone: (303) 945-7415
Facsimile: (303) 945-7468
Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)

*Attorneys for Debtors Lehman Brothers Holdings Inc.*
*and Certain of its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ----------------------------------------------------------x | | |
| | ) | |
| In re | ) | Case No. 08-13555 (SCC) |
| | ) | |
| Lehman Brothers Holdings Inc., *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| ----------------------------------------------------------x | | |

**LEHMAN BROTHERS HOLDINGS INC.'S SECOND OBJECTION TO CERTAIN**
**RMBS TRUST CLAIMS AND MOTION TO DISALLOW AND EXPUNGE CERTAIN**
**RMBS TRUST CLAIMS FOR INSUFFICIENT DOCUMENTATION**

## TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ............................................................................................1

**FACTUAL AND PROCEDURAL BACKGROUND** .................................................................6

**ARGUMENT**..........................................................................................................................16

**I.     THE RMBS CLAIMS SUBMITTED WITH INSUFFICIENT DOCUMENTATION
        SHOULD BE DISALLOWED AND EXPUNGED.**......................................................16

**CONCLUSION** .......................................................................................................................**20**

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), respectfully

submits this Second Objection To Certain RMBS Trust Claims And Motion To Disallow And

Expunge Certain RMBS Trust Claims For Insufficient Documentation (the "Objection").  LBHI

respectfully states as follows:

## PRELIMINARY STATEMENT

1.    More than six years after the RMBS Trustees ("Trustees") filed their proofs of

claim (the "RMBS Proofs of Claim"), and approximately 20 months after the Court entered the

Protocol Order and set a March 31, 2016 cut-off date for the submission of claims relating to

approximately 400 RMBS Trusts under the Protocol ("RMBS Claims"), the Trustees continue to

assert RMBS Claims on 36,351 loans for which they have offered insufficient proof of damages.

These deficient claims consist of: (i) 20,890 loans for which the Trustees have failed to assert a

claim amount that reflects the amounts they would be due under the Protocol; and (ii) 15,461

loans for which the Trustees have failed to provide two documents that are necessary under the

Protocol for the Plan Administrator to review the alleged damages.[1]  The Trustees' delay is

contrary to the Protocol and the Court's instructions, and continues to impede the effective

administration of the estate.  All of these claims should be disallowed and expunged.

2.    In 2009, the Trustees filed the RMBS Proofs of Claim, claiming to be entitled to

approximately $37 billion.  LBHI, and later the Plan Administrator on its behalf, attempted on

numerous occasions as early as 2010 to require the Trustees to substantiate those claims and

---

[1]    Schedules of each loan in these two categories that was submitted to the Protocol are attached as Exhibits A and B to the Declaration of Jonathan D. Waisnor, filed with and in support of this Objection ("Waisnor Declaration" or "Waisnor Decl.").  Exhibit A to the Waisnor Declaration lists the 20,890 active loans, identified by their unique loan file number.  Exhibit B to the Waisnor Declaration lists all of the 15,461 loans for which the Trustees have failed to provide documents necessary to evaluate their damages. Through this Objection, the Plan Administrator seeks to disallow and expunge the RMBS Claims, and, as a result, the RMBS Proofs of Claim, to the extent they are based on the loans identified in Exhibits A and B.

enable their resolution.  LBHI first moved *in March 2011* to disallow the Trustees' claims for

insufficient documentation of, among other things, an amount of damages attributable to LBHI's

alleged breaches of representations and warranties.  Although the Court reserved decision on that

motion, it confirmed that the Trustees would be required to submit loan-level proof before the

RMBS Proofs of Claim would be allowed.

3.       For the next three years, while an unknown number of loans that the Trustees had

made claims on defaulted and entered liquidation, the Trustees elected not to provide loan-level

proof.  Instead, the Trustees waited until August of 2014 to move to estimate their claims at an

amount of $12.143 billion, based upon a flawed sampling methodology and an overstated breach

rate.  Following a hearing on December 10, 2014, the Court denied that motion.  Consistent with

its 2011 ruling, it granted LBHI's cross-motion to establish a Protocol to cause the collection,

review and presentation of loan files from which the parties – or the Court, if necessary – could

establish an allowable amount for the Trustees' claims.  The Court set a cut-off date of March

31, 2016 by which the Trustees were required to place RMBS Claims into the Protocol, along

with all supporting documentation that would allow the Plan Administrator to review those

claims ("RMBS Claim Cut-Off Date").

4.       The parties agreed on a Protocol that balanced the interests of the Trustees in

being able to present their valid claims with the interests of the estate in ensuring that only

claims for which LBHI was both liable and for which the Trusts had suffered calculable damages

would be allowed.  This Protocol requires the Trustees to put forward evidence of damages by

providing a calculation of the Purchase Price "as defined in the governing agreement[s]" along

with "all supporting documentation" for that calculation.  This is a critical requirement: before

the Plan Administrator can approve an RMBS Claim for allowance purposes, it must be assured

that the Trusts actually have a claim for which they have sustained damages.  In addition, the

supporting evidence required by the Protocol permits the Plan Administrator to determine

whether it has valid downstream indemnification claims against originators and other third-

parties.  These claims represent sizable potential assets of the estate that will benefit all creditors,

including the Trustees.

5.      Of the roughly 94,000 RMBS Claims the Trustees have submitted into the

Protocol, 36,351 loan files fail to contain a statement of damages that comports with the

governing agreements for the trusts ("Governing Agreements") or supporting documentation for

the alleged damages.  These loans fall into two categories.  The first are 20,890 "active loans,"

*i.e.*, loans that are still performing or for which the foreclosure or liquidation process is not

complete.  For these RMBS Claims, the Trustees have failed to state a valid claim because they

have not proven their damages as contemplated by the Governing Agreements.

6.      The Governing Agreements contemplate that the Trustees would receive the

Purchase Price – unpaid principal balance plus unpaid interest and fees – and LBHI would

repurchase the underlying loan.  However, in the Protocol, the Trustees put forth only the

"unpaid principal balance" ("UPB") of the loans – without reference to the current value of the

underlying asset or any documentation showing expected future payments by the borrower.

7.      This omission is significant because many of the active loans have been

performing for more than a decade since origination.  It is possible that the value of the asset

exceeds the current UPB.  If that is the case, the Trusts have likely suffered no damages at all, or

minimal or nominal damages.  To approve a damages claim at the amount put forth by the

Trustees would result in a significant windfall to the Trusts at the expense of other creditors.

However, the Plan Administrator cannot wait until all of the loans underlying the RMBS Claims have either been paid in full or have defaulted and been liquidated, as this could take decades.

8.     The second category of loans at issue consists of 15,461 RMBS Claims for which the Trustees have not provided two vital documents to support the Purchase Price calculation – the loss certification and corporate expense log.  As a result of the Trustees' failure to provide the loss certification and the corporate expense log, the Plan Administrator cannot evaluate whether the alleged Purchase Price calculation is accurate or fair, as is required under the Protocol.  As a result, the Plan Administrator does not know whether the claim it approves is one with actual damages, and at what amount.

9.     At the Protocol hearing and in subsequent conferences, this Court was clear that it expected the Trustees to make a good faith effort to obtain loan files from the relevant servicers and review them.  The Protocol reflects this requirement.  It requires the Trustees to submit claims to the Protocol "promptly" after review of a loan file, and also to request that the Court use its subpoena powers to compel the production of loan files and documents if the servicers refuse to provide them in a timely manner.  Thus, the Protocol was crafted to allow the Trustees sufficient time to produce information necessary to allow the Plan Administrator to evaluate the claims, determine the estate's liability and ascribe a value to the claims for allowance purposes, while requiring the loan-level proof that LBHI first formally requested in 2010.

10.     The Trustees have had numerous opportunities during the Protocol process to make progress on resolving deficiencies with the RMBS Claims that are the subject of this Objection.  In April 2015, barely four months after the beginning of the Protocol, the Plan Administrator placed the Trustees on notice that it cannot review loan files ("RMBS Claim Files") that do not contain the loss certification or corporate expense log.  The Plan

Administrator even offered to support any application by the Trustees to the Court to require the
servicers to produce these documents.  However, the Trustees failed to exercise their rights under
the Governing Agreements to review or obtain the documents, or to take advantage of the
Protocol's mechanism for the Trustees to obtain a court order for all necessary documents.

11.    The parties held a number of meet and confers and attended several Court
conferences during which they updated the Court on the status of the Protocol.  The Trustees
admitted to the Court during a conference in September 2015 that the 20,890 active loan file
claims are overvalued, but subsequently did nothing to provide the Plan Administrator with a
value that reflects the actual damages sustained by the Trusts.  The Trustees never even raised
the issue of the missing loss certifications and corporate expense logs at any of these
appearances.

12.    In early 2016, the Trustees requested a 60-day extension of the RMBS Claim Cut-
Off Date for new claims so they could submit approximately 3,900 loan files for which they had
yet to receive the documentation they had requested from third-parties, or which had allegedly
been mischaracterized as transferor loans. The Trustees did not seek to extend the deadline as to
any of the 36,351 RMBS Claims that are the subject of this Objection.  The Plan Administrator
agreed not to oppose their request on the approximately 3,900 loan files if the Trustees agreed
that any other RMBS Claims not submitted by the extension date would be waived, disallowed,
and expunged.  The Trustees agreed.  The Protocol has been closed to new claims since May 31,
2016, and on June 27, 2016 the Court disallowed and expunged all RMBS Claims that were not
submitted under the Protocol.

13.    The Trustees have been given ample notice and opportunity to fulfill their
obligations under the Protocol.  Their delay with respect to the 36,351 RMBS Claims that are the

subject of this Objection leaves the Plan Administrator in an impossible position. It cannot approve the claims for allowance purposes because the Trustees have put forth no evidence of any calculable damages. It cannot revise the Purchase Price, as it is required to do in the Protocol, because it has not been provided with supporting documentation that would allow the Plan Administrator to confirm the Trustees' Purchase Price calculation. These calculations and supporting documents are also critical to the Plan Administrator's efforts to recover through downstream indemnification claims.

14.    At this point, the delay by the Trustees is inexcusable. The estate, creditors, and the Court cannot wait to resolve the RMBS Claims. For the reasons set forth above and below, the RMBS Claims (and the RMBS Proofs of Claim, to the extent they include claims on account of the RMBS Claims) should be disallowed and expunged.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 105, 157 and 1334, Article XIV of the Debtors' confirmed plan (the "Plan"), and paragraph 77 of the order confirming the Plan, and the Bankruptcy Court's power to enforce its own orders. This Objection is a "core proceeding" pursuant to 28 U.S.C. § 157(b). Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL AND PROCEDURAL BACKGROUND

16.    In 2009, the Trustees representing over 400 RMBS trusts filed the RMBS Proofs of Claim, alleging entitlement to more than $37 billion against LBHI and its affiliates (collectively, the "Debtors"). At the time, the proofs of claim contained generalized descriptions of the Governing Agreements, but asserted claims on only approximately 4,700 mortgage loans

6

that allegedly contained breaches, for an aggregate claim value of $209 million (less than 1% of the total asserted claim value).

17.     In 2010, LBHI made its first of many efforts to resolve these claims by contacting each of the Trustees and requesting that they provide evidence on a loan-level basis supporting the claims.  (Ex. C of Waisnor Decl. ¶ 21 ([Docket No. 15008]).)  The Trustees largely refused this offer, admitting that they had not identified many specific breaches and were not making further efforts to do so.

18.     Because this was in direct violation of the Court's Bar Date Order, on March 14, 2011, the Plan Administrator filed the *One Hundred Ninth Omnibus Objection to Claims (Insufficient Documentation)* (the "First Insufficient Documentation Objection").  (Ex. C of Waisnor Decl.)  The First Insufficient Documentation Objection sought to disallow and expunge the RMBS Proofs of Claim on the basis that the Trustees violated the Bar Date Order by, among other things, not providing sufficient supporting documentation to allow the Plan Administrator to assess LBHI's liability on their claims or to identify and quantify "the harm that resulted from the alleged defect . . . ."  (*Id.* ¶ 19.)

19.     On June 30, 2011, the Court dismissed claims asserted by some of the Trustees.  (*See* Ex. D of Waisnor Decl. at 26:9-22, 27:1-3 (June 30, 2011 Hr'g Tr. [Docket No. 18251]).)  The Court reserved decision as to the rest of the Trustees' claims, and stated that "if there are claims, *the trustees would be put to their proof*, and whether they can actually succeed in carrying a burden of proof establishing residential and mortgage loan breaches . . . would be extraordinarily difficult."  (*Id.* at 71:8-19 (emphasis added).)

20.     The Trustees did nothing for three years after the June 30 hearing to provide the loan-level evidence contemplated by the Court.  In August 2014, the Trustees moved to increase

the previously-established $5 billion reserve to $12.143 billion, and requested that the Court allow them to use statistical sampling to estimate and allow their claims without conducting a loan-by-loan review. (*See* Ex. E of Waisnor Decl. ([Docket No. 46078]).) The Plan Administrator objected and filed a cross motion to institute a loan-by-loan review procedure (the "Protocol").

21.     A full-day hearing took place before this Court on December 10, 2014. The Court made clear that the Protocol was both necessary and appropriate to narrow the underlying pool of disputed loan files in order to pave the way for a resolution of the ultimate allowable claim. (*See* Ex. F of Waisnor Decl. at 62-63 (Dec. 10, 2014 Hr'g Tr. [Docket No. 49007]).)

22.     The Plan Administrator proposed that the Trustees should have to provide "enough documentation . . . [to] prove up their claim" under "the language of the contract," along with evidence sufficient to "support their claim that the breach actually caused . . . the loss at issue." (*Id.* at 339:2-11.) The Plan Administrator and counsel for the Unsecured Creditor's Committee also pointed out that the Plan Administrator's ability to pursue downstream indemnification claims was a significant asset of the estate that would be jeopardized if the Court did not enter the Protocol. (*Id.* at 101:1-3, 347:19-23.)

23.     The parties also discussed the logistical issues with obtaining necessary documents. LBHI said that it was willing to support the Trustees in making applications to third-parties to obtain these documents. (*Id.* at 339:15-17.) The Court stated that these logistical difficulties would not be allowed to "shortcut a claims process that . . . the governing documents require." (*Id.* at 351:14-15.) The Court pointed out that the Protocol might proceed faster than anticipated because it would be able to assist with getting the loan files in a timely manner. (*Id.* at 340:7-9, 357:21-23.)

24.     The Trustees argued that it would be unfair for claims to be disallowed arbitrarily in the event certain immaterial supporting documents were unavailable or if servicers failed to comply with information requests.  (*Id.* at 362:1-3.)  The Plan Administrator argued that a firm deadline was necessary in order for the Protocol to move forward at an acceptable pace.  (*Id.* at 364:2-4.)  The Court replied that the Trustees could revisit the deadlines in the Protocol if it was not working, but that there would be deadlines for non-compliance with the process.  (*Id.* at 367:12-20.)

25.     On December 29, 2014, this Court granted the Plan Administrator's cross-motion and entered the *Order Establishing A Protocol To Resolve Claims Filed By Trustees On Behalf Of Certain Issuers Of Residential Mortgage-Backed Securities* ("Protocol Order"), which established the Protocol.  (Ex. G of Waisnor Decl. ([Docket No. 47569]).)[2]

26.     The intent of the Protocol is to "reconcile and determine the RMBS Claims."  (*Id.* at 2.)  The Protocol provides that RMBS Claims "shall be submitted on a loan-by-loan basis in accordance with the Trust Agreement or other governing agreement providing a remedy for such alleged RMBS Claim."  (*See id.* at Ex. A § III(e)(ii) (Protocol).)  The Trustees must identify particular loan files for which they believe they have valid claims for breaches of representations and warranties and for which they have suffered damages.  These claims "shall be submitted on a rolling basis promptly upon the applicable RMBS Trustee's good faith determination that the relevant claim file contains a Material Breach."  (*Id.* at Ex. A § III(e)(iii).)  Any claims "not submitted by the applicable RMBS Claim Cut-Off Date shall be deemed waived and disallowed and expunged . . . ."  (*Id.* at Ex. A § III(e)(iv).)

27.     Each RMBS Claim is accompanied by an RMBS Claim File.  This includes documents and information that permit the Plan Administrator to review the validity of the claim

---

[2]     The Protocol is attached as Exhibit A to the Protocol Order.

and the accuracy of the damages sustained by the Trustees.  Among these required documents

are: "A calculation of the <u>Purchase Price</u> (as defined in the governing agreement), together with

all supporting documentation . . . ." (*See id.* at Ex. A § III(e)(v)-(vi)(4).)  This requirement

relates to whether the Trustees have alleged a calculable damages amount and have supported

this amount with evidence sufficient for the Plan Administrator to allow the claim.

28.    The Governing Agreements set forth various representations and warranties made

to the trusts and the remedies in the case of compensable breaches of those representations and

warranties.  Stated generally, upon receipt of notice that material breaches of the representations

and warranties have occurred as to a particular loan, LBHI must either cure the deficiencies,

substitute another loan, or "repurchase such Mortgage Loan or any property acquired in respect

thereof from the Trustee at the Purchase Price."[3]  Although the precise definition of the term

Purchase Price varies among the Trusts, it is typically the sum of three figures: (1) the UPB of

the mortgage loan at issue, (2) any accrued interest outstanding at the time of repurchase at the

rate provided for in the loan documents, and (3) outstanding servicing fees incurred in servicing

the loan or pursuing remedies for default, such as liquidation or foreclosure.[4]  Under the

---

[3]    An example of the repurchase provision is as follows:

> Upon discovery by either the Depositor, the Master Servicer or the Trustee of a breach of any of such representations and warranties that adversely and materially affects the value of the related Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties.  Within 90 days of the discovery of a breach of any representation or warranty given to the Trustee by the Depositor, any Transferor, or Lehman Brothers Holdings and assigned to the Trustee, the Depositor, such Transferor, or Lehman Brothers Holdings, as applicable, shall either (a) cure such breach in all material respects, (b) repurchase such Mortgage Loan or any property acquired in respect thereof from the Trustee at the Purchase Price or (c) within the two year period following the Closing Date, substitute a Qualifying Substitute Mortgage Loan for the affected Mortgage Loan.

*See* Ex. H of Waisnor Decl. § 2.04 (Trust Agreement for SASCO 2005-RF2).

[4]    An example definition is as follows:

Governing Agreements, after payment of the Purchase Price, the underlying collateral is to be returned to LBHI for further disposition.  In light of LBHI's bankruptcy, however, the Trustees will retain the collateral and thus must reduce the value of the active loan claims by the remaining value of the collateral and estimated future payments by the mortgagor.

29.    Many of the documents that are necessary for the Plan Administrator to make a determination about the validity and amount of any particular RMBS Claim are within the possession of third-party servicers but are available to the Trustees pursuant to the Governing Agreements and/or by subpoena pursuant to the Protocol.  Under the Protocol Order, the Trustees are responsible for obtaining sufficient documentation for each RMBS Claim File from these servicers.  (*See* Ex. G of Waisnor Decl. at Ex. A § I(a)-(e); *see also* Ex. G at 5 (Trustees "shall promptly request and seek applicable documents and records from the master servicers with respect to the Covered Loans . . . .").)  In the event a servicer refuses to provide such documents, the Trustees must "promptly request that the Bankruptcy Court order the production of the files."  (*See id.* at Ex. A § I(e).)

---

Purchase Price:  With respect to the repurchase of a Mortgage Loan pursuant to this Agreement, an amount equal to the sum of (a) *100% of the unpaid principal balance of such Mortgage Loan*, (b) *accrued interest thereon at the Mortgage Rate, from the date as to which interest was last paid* to (but not including) the Due Date immediately preceding the related Distribution Date, (c) *any unreimbursed Servicing Advances with respect to such Mortgage Loan* and (d) any costs and damages incurred by the Trust Fund in connection with any violation by such Mortgage Loan of any predatory- or abusive-lending law.  The Master Servicer or the applicable Servicer (or the Trustee, if applicable) shall be reimbursed from the Purchase Price for any Mortgage Loan or related REO Property for any Advances made with respect to such Mortgage Loan that are reimbursable to the Master Servicer or such Servicer under this Agreement or the applicable Servicing Agreement, as well as any unreimbursed Servicing Advances and accrued and unpaid Master Servicing Fees or Servicing Fees, as applicable.

*Id.* at 25 (emphasis added).

30.    A critical element to any breach of contract claim is the damages element.  Under

the Protocol, the Trustees can only satisfy the damages element by and through submission of a

valid Purchase Price.  Once the Plan Administrator receives an RMBS Claim File for a particular

RMBS Claim, it will analyze whether a valid claim has been made.  If LBHI determines it is

liable, the Plan Administrator must then "either (i) approve the Purchase Price proposed by the

RMBS Trustee or (ii) revise the Purchase Price calculation in accordance with the formula in the

governing agreement."  (*See id.* at Ex. A § IV(c)(i)(1).)  The Plan Administrator may also "seek

the disallowance and expungement of any RMBS Claims for the RMBS Trustees' failure to

comply with the procedures and deadlines set forth in the RMBS Protocol with respect to any

such RMBS Claims."  (*See id.* at 4.)

31.    During the Protocol, the Trustees submitted 20,890 RMBS Claims for which the

borrower is continuing to make payments of principal and interest on the underlying loan or for

which the loan is currently in default but the foreclosure and liquidation procedures have yet to

be completed.  It is possible that some of these loans will never default during the term of the

loan, which could be decades from the date of origination.  For these claims, the Trustees have

submitted an admittedly invalid Purchase Price that is the UPB of the loan, plus interest and

applicable fees.  (Ex. O of Waisnor Decl. at 20:19-25 (Sept. 17, 2015 Hr'g Tr. [Docket No.

51186]).)  The Trustees' purported Purchase Price fails to account for future payments from the

borrower or the value of the underlying asset that would be recovered in liquidation or

foreclosure.

32.    The Plan Administrator placed review of a number of RMBS Claims on hold due

to the Trustees' failure to provide certain documents, stating that it would not review those

RMBS Claims until the Trustees cured the document deficiencies.  (*See, e.g.,* Ex. I of Waisnor

Decl. at 1-2 (Letter from Todd G. Cosenza to Trustees' Counsel, Apr. 16, 2015).)  For 15,461 of

these RMBS Claims, the Trustees have failed to provide the loss certification and the corporate

expense log for each RMBS Claim File.  These are supporting documentation for the Purchase

Price, which generally demonstrate the following:

- Loss Certification:  Sets forth the servicer's final loss on the loan, including the UPB of the loan at the time of foreclosure or liquidation, any accrued interest that remains unpaid, and fees for service providers, taxes, and home insurance.  (*See* Ex. J of Waisnor Decl. (sample Loss Certification).)

- Corporate Expense Log:  Reflects amounts that the servicer or their agents, like attorneys or appraisers, have incurred in servicing the loan, processing the loan for foreclosure or liquidation, maintaining the property, or providing property insurance and paying taxes, until such time as the property is foreclosed upon or liquidated.  (*See* Ex. K of Waisnor Decl. (sample Corporate Expense Log).)

33.      On March 17, 2015, counsel for the Plan Administrator wrote to counsel for the

Trustees, stating that "the RMBS Trustees' and the servicers' collective diligence with respect to

the collection of the necessary loan files is critical for the parties to achieve their shared goal of

efficiently resolving the RMBS Claims on a timely schedule."  (Ex. L of Waisnor Decl. at 1

(Letter from Todd G. Cosenza to Trustees' Counsel, Mar. 17, 2015).)  The Plan Administrator

also "urge[d] the RMBS Trustees to avail themselves of the Court's assistance with respect to

ensuring timely compliance with loan file requests . . . .  Lehman considers such request of the

Court to be both necessary and proper at this juncture."  (*Id*. at 1-2.)  The Plan Administrator

offered to "support" an application by the Trustees for any missing documents.  (*Id*. at 2.)

34.      The Trustees replied on March 25, 2015 that they "have not had the need to seek

the Court's assistance to compel compliance," but that they would "not hesitate to pursue Court

relief if any servicer balks or fails to meet its stated delivery schedule."  (Ex. M of Waisnor Decl.

at 4 (Letter from Trustees' Counsel to Todd G. Cosenza, Mar. 25, 2015).)

35.     However, despite being notified many times throughout the Protocol process that the Plan Administrator would not commence review of RMBS Claim Files without the loss certifications and corporate expense logs, the Trustees have yet to make such a request.  (*See, e.g.*, Exs. I, N, V of Waisnor Decl.)   The Court also held conferences to administer the Protocol on July 22, 2015, September 17, 2015, March 29, 2016, and June 9, 2016.  (*See* Exs. O – Q of Waisnor Decl.)  The Trustees had the opportunity to ask for the Court's assistance at these sessions, but chose not to do so.

36.     The Trustees did raise the issue of active loans at a status conference on September 17, 2015.  During this conference, the Court and the parties discussed several methods to streamline the Protocol process.  The Court expressed that to the extent RMBS Claims with no or little damages did not justify the time and expense of the Protocol "there ought to be a mechanism to prevent those [loans] from going into the [review queue] in the first instance."  (Ex. O of Waisnor Decl. at 20:2-4.)  The Trustees mentioned that the projected losses on a particular RMBS Claim were already being taken into account when selecting loans to submit to the Protocol, and to the extent some of the RMBS Claims they had previously submitted were for active loans they would "sit down and talk to the debtors about how we're going to really value active loans . . . we just asserted them for the full purchase price, but obviously we realize we're going to have to discuss those." (*Id.* at 20:19-25.)

37.     After the conference in September 2015, the Trustees continued to place active loans into the Protocol without any supporting documents or information that would allow the Plan Administrator to either (i) approve the Purchase Price proposed by the Trustees at a value that reflects the intent of the Governing Agreements, or (ii) revise the Purchase Price calculation

14

to reflect the Trustees' actual damages, as it is required to do under the Protocol to properly

value the claim for purposes of allowance.  (Ex. G of Waisnor Decl. at Ex. A § IV(c)(i)(1).)

38.    In March 2016, the Trustees obtained an extension of the RMBS Claim Cut-Off

Date with respect to a limited universe of loans after agreeing with the Plan Administrator that

the RMBS Claims not submitted by March 31, 2016 (for those not subject to the extension

request) or by the extended date of May 31, 2016 (for those subject to the extension), would be

disallowed and expunged.  Consistent with this understanding, the Court ordered that aside from

the loans that were the subject of the extension request, "the RMBS Trustees shall not be entitled

to assert any RMBS Claims . . . under the Protocol Order not already submitted pursuant to the

Protocol Order." (Ex. R of Waisnor Decl. at 2 ([Docket No. 52367]).)  The Court also ordered

that any such RMBS Claims not submitted to the Protocol by March 31, 2016 "shall be deemed

waived and released by the RMBS Trustees and disallowed and expunged upon entry of this

Order." (*Id.* at 2.)

39.    On June 27, 2016 this Court disallowed and expunged all RMBS Proofs of Claim

that did not contain any RMBS Claims that were submitted to the Protocol.  (*See* Ex. S of

Waisnor Decl. at 1-2 ([Docket No. 53163]).)  For the reasons discussed below, through this

Objection the Plan Administrator seeks the same relief (that is, disallowance and expungement of

the RMBS Proofs of Claim to the extent they are based on the 20,890 RMBS Claims on active

loans and the 15,461 RMBS Claims that lack supporting documentation of the Purchase Price),

because the Trustees have failed to put forth sufficient documentation of damages under the

Protocol.

15

## ARGUMENT

I.    **THE CLAIMS SUBMITTED WITH INSUFFICIENT DOCUMENTATION SHOULD BE DISALLOWED AND EXPUNGED.**

40.    For the purposes of assessing damages, the Protocol requires the Trustees to submit RMBS Claims "in accordance with the Trust Agreement or other governing agreement providing a remedy for such alleged RMBS Claim," along with "a calculation of the <u>Purchase Price</u> (as defined in the governing agreement), together with all supporting documentation . . . ." (Ex. G of Waisnor Decl. at Ex. A § III(e)(ii), (e)(v)-(vi)(4).)

41.    The reasons for these requirements are obvious.  First, damages are an essential element in any breach of contract claim.  The Plan Administrator cannot approve an RMBS Claim for allowance purposes without proof that the Trusts were actually damaged and that these damages are both reasonable and not the fault of other parties, like the servicers.  Second, the damages calculation and supporting evidence are critical to the Plan Administrator's determination of whether to pursue downstream indemnification claims for the benefit of creditors.  (*See* Ex. D of Waisnor Decl. at 64:18-23; Ex. F of Waisnor Decl. at 101:1-3, 347:19-23.)

42.    The 20,890 active loan claims submitted by the Trustees fail to accurately reflect the Trusts' damages as contemplated by the Governing Agreements.  The Governing Agreements contemplate that if a loan was still performing under the applicable mortgage loan documents, or was in default but had yet to be foreclosed upon and liquidated, LBHI would receive the underlying loan and asset in return for the Purchase Price.  (*See* Ex. H of Waisnor Decl. § 2.04.)  The Trustees, however, have submitted a Purchase Price amount that is equal to the current UPB of the loans, plus interest and fees.  For active loans, use of the UPB without discounting for payments made by the borrower in the future or the proceeds from any

16

foreclosure or liquidation does not reflect the Purchase Price "as defined in the governing agreement[s]," because the Trustees will retain the underlying collateral and its value. Accordingly, it is contrary to the Governing Agreements and the Protocol. (Ex. G of Waisnor Decl. at Ex. A § III(e)(v)-(vi)(4).)

43.    The Trustees' failure to provide this information is clearly in contrast to the purpose of the Protocol, which was intended to provide a mechanism by which the Plan Administrator could efficiently resolve and value the RMBS Claims. Because this information was not provided, the Plan Administrator cannot value the claims without waiting for all of the active loans to be either be paid in full, or to default and be liquidated. Given that the Protocol set an initial deadline of March 31, 2016 for the Trustees to submit their claims along with all supporting documentation of the Purchase Price (which was later extended by an additional 60 days for a limited universe of loans), the failure to discount for future payments or the value of the collateral is not faithful to the objectives or intent of the Protocol.

44.    This omission has a significant impact on the value of the RMBS Claims. The Trustees have alleged that the total UPB on active loans is roughly *$6.5 billion*. Given that many of the active loans are still performing a decade or more after origination, it is possible that any increases in the value of the underlying collateral have now exceeded the UPB. Thus, even assuming the loan went into default and was liquidated, the value of the collateral in foreclosure or liquidation would come close, equal, or even exceed the Purchase Price. When this is extrapolated over all the active loans, the actual claim value over the 20,890 active loans that are at issue in this Objection could be much closer to zero than $6.5 billion. The fact that 20 months after the Protocol was entered, the Plan Administrator still cannot determine the actual damages that the Trustees claim were incurred on such a significant percentage of RMBS Claims is in

17

violation of the letter and spirit of the Protocol, impedes the efficient administration of the estate, and prejudices all creditors.

45.     Furthermore, the Trustees have submitted 15,461 RMBS Claims that state an alleged Purchase Price, but have failed to provide the "supporting documentation" required by the Protocol to permit the Plan Administrator to calculate the Purchase Price.  (Ex. G of Waisnor Decl. at Ex. A § III(e)(vi)(4).)[5]  Without the loss certification and corporate expense log, the Plan Administrator cannot evaluate the Purchase Price calculation because it cannot calculate the UPB, interest, and fees that make up this calculation, nor can it confirm that any such figures submitted by the Trustees are correct or justified.  By failing to provide these documents before the RMBS Claim Cut-Off Date of May 31, the Trustees have failed "to comply with the procedures and deadlines set forth in the RMBS Protocol . . . ."  (*See id*. at 4.)

46.     The Court should not provide the Trustees with additional time to cure these deficiencies.  The extraordinary delay by the Trustees, stretching back to 2010, is reason alone to disallow the RMBS Claims.  But even more astoundingly, the Trustees have had clear direction since December 2014 that they needed to take steps to submit a damages calculation and supporting documentation under the Protocol and obtain missing documentation from servicers.

47.     When it entered the Protocol on December 29, 2014, the Court set a firm deadline of March 31, 2016 for the assertion of RMBS Claims and the production of supporting documentation.  On March 17, 2015, LBHI placed the Trustees on notice that it would not review files that were not submitted with sufficient documentation.  In response, the Trustees claimed that the servicers were in the process of providing such documentation and that if they

---

[5]     The Plan Administrator has placed review of a number of other RMBS Claims on hold on the basis that the Trustees have failed to submit supporting documentation that goes to issues other than the Purchase Price. However, this Objection focuses only on the insufficient documentation claims that are relevant to the Purchase Price calculation and thus to damages.

did not provide it, "the RMBS Trustees will not hesitate to pursue Court relief if any servicer balks or fails to meet its stated delivery schedule." (Ex. M of Waisnor Decl. at 4.)

48.     Shortly thereafter, the Plan Administrator placed the review of RMBS Claims that did not contain the loss certification and the corporate expense log on hold until those document deficiencies were cured. (Ex. I of Waisnor Decl. at 1-2.) The Plan Administrator repeated this procedure each time it received RMBS Claim Files from the Trustees without these documents. (*See, e.g.*, Ex. L of Waisnor Decl. at 1-2; Ex. N of Waisnor Decl. at 2; Ex. T of Waisnor Decl. at 2 (Letter from Todd G. Cosenza to Trustees' Counsel, May 26, 2016).)[6]  The Trustees failed to cure a substantial portion of these document deficiencies, and at no point during the four court appearances where the Protocol was discussed did they mention their inability to obtain these documents or request the Court's assistance in obtaining them – despite the fact the Court required the Trustees to "promptly" request such documents from the servicers and obtain court assistance if necessary. (Ex. G of Waisnor Decl. at 5, Ex. A § I(e).)[7]

49.     Similarly, the Trustees acknowledged to the Court that the active loan claims were overvalued, yet subsequently did nothing to remedy this fact. Instead, the Trustees continued to submit active loans along with a Purchase Price that was solely based on the UPB, without accounting for future payments by the borrower or the proceeds of foreclosure or liquidation, potentially overvaluing the total damages on the active loans by billions of dollars. (*Supra*, at ¶¶ 28, 31.)

---

[6]     The Plan Administrator sent dozens of these "Completeness Assessments" to the Trustees over the course of the Protocol. If the missing documents were provided after a Completeness Assessment was sent, the Plan Administrator would review these RMBS Claim Files. (Ex. I of Waisnor Decl. at 2.)

[7]     The Trustees have represented that they were able to obtain the loss certifications and corporate expense logs from at least one servicer, Nationstar, which originally resisted providing these documents. However, they have not taken the necessary steps to secure these documents from other servicers.

50.     Even when the Trustees approached the Plan Administrator regarding a 60-day extension of the RMBS Claim Cut-Off Date with respect to roughly 3,900 loans, the Trustees did nothing to address the RMBS Claims at issue in this Objection.  The Plan Administrator agreed to extend the Protocol deadline, subject to the condition that "the RMBS Trustees will not submit any additional RMBS Claims (for Covered Loans or otherwise) under the Protocol" and that any remaining claims would be disallowed and expunged.  (Ex. U of Waisnor Decl. at 7.)  The Court so ordered this agreement.  (Ex. R of Waisnor Decl. at 2.)

51.     In sum, the Trustees have had ample opportunity under the Protocol to submit claims with valid damages amounts and supporting documentation for their damages.  Giving the Trustees additional time after the RMBS Claims Cut-Off Date has passed would reward them for their delay at the expense of the estate and other creditors.  Accordingly, this Court should disallow and expunge the 20,890 RMBS Claims involving active loans, and the 15,461 RMBS Claims submitted without supporting documentation for their damages (and the RMBS Proofs of Claim to the extent they are based upon such RMBS Claims).

*[Remainder of Page Intentionally Left Blank]*

20

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of an order disallowing and

expunging the RMBS Proofs of Claim to the extent they are based on the loans listed on Exhibits

A and B of the Waisnor Declaration, and such other and further relief as the Court may deem just

and proper.

Dated: New York, New York
       August 30, 2016

By: /s/ Todd G. Cosenza
    Paul V. Shalhoub
    Todd G. Cosenza
    Benjamin P. McCallen
    WILLKIE FARR & GALLAGHER LLP
    787 Seventh Avenue
    New York, New York 10019
    Telephone:  (212) 728-8000
    Facsimile:  (212) 728-8111

    Michael A. Rollin
    Maritza Dominguez Braswell (*pro hac vice*)
    ROLLIN BRASWELL FISHER LLC
    8350 East Crescent Parkway, Suite 100
    Greenwood Village, Colorado 80111
    Telephone: (303) 945-7415
    Facsimile: (303) 974-7468

    *Attorneys for Debtors Lehman Brothers Holdings*
    *Inc. and certain of its affiliates*

21