Page 1

 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 4   In re:

 5

 6   LEHMAN BROTHERS HOLDINGS INC.,

 7   et al.,                          Case No. 08-13555(SCC)

 8            Debtors.

 9   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   In re:

11

12   LEHMAN BROTHERS INC.,           Case No. 08-01420(SCC)

13                                   (SIPA)

14            Debtor.

15   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

16

17                    U.S. Bankruptcy Court

18                    One Bowling Green

19                    New York, New York

20

21                    December 10, 2014

22                    10:04 AM

23

24

25

```
 1    B E F O R E :

 2    HON SHELLEY C. CHAPMAN

 3    U.S. BANKRUPTCY JUDGE

 4

 5

 6

 7    Hearing re:  Adv. 08-01420 - Doc #9013 Trustee's Two Hundred

 8    Thirty-Seventh Omnibus Objection to General Creditor Claims

 9    (Employee Claims)

10

11    Hearing re:  Adv. 08-01420 - Doc #9478 Trustee's Two Hundred

12    Fifty-First Omnibus Objection to General Creditor Claims

13    (Employee Claims)

14

15    Hearing re:  Adv. 08-01420 - Doc #10097 Trustee's Two

16    Hundred Sixty-Seventh Omnibus Objection to General Creditor

17    Claims (Employee Claims)

18

19    Hearing re:  Adv. 08-01420 - Doc #10194 Trustee's Objection

20    to the General Creditor Proof of Claim of Robert J. Chambers

21    (Claim No. 6107)

22

23    Hearing re:  Doc #19399 One Hundred Seventy-Third Omnibus

24    Objection to Claims (No Liability Employee Claims)

25
```

Page 3

1    Hearing re:  Doc #46078 The RMBS Trustee's Motion to (I)

2    Increase the Reserve to $12.143 Billion and (II) Estimate

3    and Allow Their Claims for Covered Loans at $12.143 Billion

4    Pursuant to Section 502(c) of the Bankruptcy Code

5

6    Hearing re:  Doc #47294 Lehman Brothers Holdings Inc.'s

7    Motion in Limine to Exclude Expert Reports and Testimony of

8    Dr. Charles Parekh

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Dawn South, Sheila Orms, Sherri L. Breach,

25    Debra McCostlin, and Jamie Gallagher

```
 1    A P P E A R A N C E S :

 2    WILKIE FARR & GALLAGHER LLP

 3         Attorneys for the Debtors

 4         787 Seventh Avenue

 5         New York, NY 10019-6099

 6

 7    BY:  TODD G. COSENZA, ESQ.

 8         BRIAN E. O'CONNOR, ESQ.

 9         ROGER NETZER, ESQ.

10         PAUL V. SHALHOUB, ESQ.

11         JOSEPH T. BAIO, ESQ.

12

13    WEIL, GOTSHAL & MANAGES LLP

14         Attorney for LBHI

15         1300 Eye Street NY

16         Suite 900

17         Washington, DC 20005-3314

18

19    BY:  RALPH I. MILLER, ESQ.

20

21

22

23

24

25
```

Page 5

1    FOX ROTHSCHILD LLP

2         Attorney for Todd O'Malley

3         100 Park Avenue

4         Suite 1500

5         New York NY 10017

6

7    BY:  ELIZABETH A. CHEW, ESQ.

8

9    WARNER & SCHEUERMAN

10        Attorneys for MacMillian

11        6 West 18th Street

12        10th Floor

13        New York, NY 10011

14

15   BY:  KARL E. SCHEUERMAN, ESQ.

16

17   STAMELL & SCHAGER, LLP

18        Attorney for Claimant

19        555 Fifth Avenue

20        14th Floor

21        New York, NY 10017

22

23   BY:  RICHARD J. SCHAGER, JR., ESQ.

24

25

```
 1   MILBANK, TWEED, HADLEY & MCCLOY LLP

 2        Attorney for the Subcommittee

 3        One Chase Manhattan Plaza

 4        New York, NY 10005-1413

 5

 6   BY:  DENNIS C. O'DONNELL, ESQ.

 7

 8   WHITE & CASE LLP

 9        Attorney for 1EE, LLC

10        1155 Avenue of the Americas

11        New York, NY 10036-2787

12

13   BY:  DOUGLAS P. BAUMSTEIN, ESQ.

14

15   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

16        Attorneys for Lehman, Inc.

17        1633 Broadway

18        New York, NY 10019-6799

19

20   BY:  DAVID J. MARK, ESQ.

21        HAJ LUKIEWICZ, ESQ.

22

23

24

25
```

Page 7

1    CHAPMAN AND CUTLER LLP

2         Attorney for U.S. Bank National Association, as

3         Trustee

4         111 West Monroe Street

5         Chicago, IL 60603-4080

6

7    BY:  FRANKLIN H. TOP III, ESQ.

8

9    NIXON PEABODY LLP

10        Attorney for Deutsche Bank as Trustee

11        100 Summer Street

12        Boston, MA 02110-2131

13

14   BY:  RICHARD C. PEDONE, ESQ.

15

16   SEWARD & KISSEL LLP

17        Attorneys for Law Debenture Trust Company of New

18        York as Separate Trustee

19        One Battery Park Plaza

20        New York, NY 10004

21

22   BY:  M. WILLIAM MUNNO, ESQ.

23        DANIEL GUZMAN, ESQ.

24        JUSTIN L. SHEARER, ESQ.

25        ALEXANDER LESIN, ESQ.

```
1   ALSTON & BIRD LLP

2        Attorney for Wilmington Trust

3        One Atlantic Center

4        1201 West Peachtree Street

5        Atlanta, GA 30309-3424

6

7   BY:  GRANT T. STEIN, ESQ.

8

9   HUGHES HUBBARD & REED LLP

10       Attorneys for James Giddens, SIPA Trustee

11       One Battery Park Plaza

12       New York, NY 10004-1482

13

14  BY:  SAVVAS A. FOUKAS, ESQ.

15       JEFFREY S. MARGOLIN, ESQ.

16       GREGORY FARRELL, ESQ.

17

18

19  JONES & KELLER

20       1999 Broadway

21       Suite 3150

22       Denver, CO 80202

23

24  BY:  MICHAEL A. ROLLIN, SQ.

25       MARTIZA D. BRASWELL, ESQ.
```

1  ALSO PRESENT TELEPHONICALLY:

2  MARK MOEDRITZER

3  VITO SANTORO

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S

 2        **(DISCLAIMER:  Channel 4 of the audio is not working;

 3    thus when objections are made, and can't be heard, they are

 4    noted as "indiscernible")

 5              THE COURT:  How's everyone today, good?  How are

 6    you?

 7              MR. FOUKAS:  Good morning.

 8              THE COURT:  Have a seat everyone, please.

 9              MR. FOUKAS:  Good morning, Your Honor.

10              THE COURT:  Good morning.

11              MR. FOUKAS:  Savvas Foukas from Hughes Hubbard &

12    Reed on behalf of James Giddens, the SIPA Trustee.  And I'm

13    joined here by my colleagues, Jeff Margolin, Greg Farrell,

14    and Lauren LaPari (ph).

15              THE COURT:  Okay.  Very good.

16              MR. FOUKAS:  So I think we've only good one item

17    on our agenda today --

18              THE COURT:  Right.

19              MR. FOUKAS:  -- Your Honor, which is the status

20    conference, and I know you've got a lot of other things on

21    your agenda.

22              So you have received a few letters related to the

23    status conference --

24              THE COURT:  Right.

25              MR. FOUKAS:  -- and, you know, I'm happy to answer
```

1    questions about them, I just wanted to make a couple of

2    points.

3                    THE COURT:  Are those folks here?

4                    MR. FOUKAS:  I believe Mr. Baumstein is here.

5                    THE COURT:  Okay.

6                    MR. FOUKAS:  And I presume --

7                    THE COURT:  And I think there was also a letter

8    from the Kasowitz firm.

9                    MR. FOUKAS:  He is here as well.

10                   THE COURT:  Okay.

11                   MR. FOUKAS:  Yeah, Mr. Mark is here.

12                   THE COURT:  Mr. Mark.  Okay.

13                   MR. FOUKAS:  I guess just I want to make a couple

14   of points, Your Honor.

15                   There are, as you know, there were 23 claimants in

16   this little grouping we've put together, and I will say that

17   overwhelmingly the claimants are not expressing any

18   displeasure apart from what you've heard so far with the

19   schedule and with our progress thus far.  We've been making

20   good progress, we've been in discussions, and I can tell you

21   that far from militating for a January omnibus hearing date

22   of some kind the claimants, other than the ones you'll hear

23   from, want no part of that, Your Honor.  So --

24                   THE COURT:  So are the -- the proposal will be to

25   bucket, if you will, all the claimants in this little pool

1    in a binding way.  Everybody has -- the other claimants --

2    and I realize you're speaking for them -- they're agreeing

3    to the test case approach in this sense that that will be a

4    binding ruling in each of those buckets?

5              MR. FOUKAS:  I guess I wouldn't say that they've

6    agreed to necessarily be bound, I mean they'd be certainly

7    free to argue if they have specific facts that are

8    different.  They're not militating to go forward themselves

9    right now, and we've, based on our review of all the facts

10   applicable to all the claims, believe these four claims

11   would be broadly applicable.  And, you know, obviously

12   reserving the other claimants' rights to say that somehow

13   they're different down the road.

14             THE COURT:  Well, I guess there's two -- there's

15   two levels, right?  There's one that with respect to a

16   particular bucket the trustee's position is wrong as a

17   matter of law.  And then two, even if the trustee's position

18   is correct their claim is different, right?

19             MR. FOUKAS:  I think that's right.

20             THE COURT:  Those are the two ways that you get to

21   not be in a particular disposition -- bucket disposition,

22   right?

23             MR. FOUKAS:  I think that's right, Your Honor.

24             THE COURT:  Okay.

25             MR. FOUKAS:  Yeah.

```
 1            THE COURT:  Because I wouldn't want to have a
 2    situation where after we go through a trial or whatever
 3    we're going to do for a particular bucket then we then have
 4    a series of do-overs.  I just want to make sure we have a
 5    common understanding.
 6            MR. FOUKAS:  That's certainly our understanding,
 7    Your Honor.
 8            THE COURT:  Okay.
 9            MR. FOUKAS:  And I don't think anyone has
10    expressed anything different to us.
11            THE COURT:  All right.
12            MR. FOUKAS:  And just in terms of the four cases
13    that we've selected as test cases, you've heard already from
14    Mr. Baumstein, I'm sure you'll hear again from him.  I will
15    say that counsel for claimant Judkins does not oppose our
16    schedule.  Counsel for claimant Chambers, although I'm not
17    sure if she's here or not, but has in fact expressed the
18    view that our schedule is a little too aggressive and has
19    asked in fact that we -- and I understand her position that
20    an amended -- the response to the amended objection would be
21    due January 7th right after the holidays, and I am
22    sympathetic to the burden that that may impose, and you
23    know, obviously I'd be happy to adjust that slightly, but we
24    think the schedule overall is a good one, one that will get
25    us --
```

```
 1           THE COURT:  Well, I'm never -- I'm never a fan of
 2    having the holidays fall as a particular burden on one party
 3    or not.
 4           What I have to say about the timeline though is
 5    that I'm not sure that given how much time has already gone
 6    by and given the relatively narrow scope, I'm not sure that
 7    we need, we're sitting here today in the middle of December,
 8    January, February, March, I'm not sure we need 'til March
 9    16th for discovery.  That strikes me as -- unless there are
10    things I don't know -- too long a period of time, but I'm
11    happy to hear you on that.  And I understand the parties
12    have different views about the level of cooperation on
13    certain of the discovery requests.
14           And secondly, I'd like to talk a little bit about
15    pre-motions -- motions for summary judgment in this case.
16           I'm just not sure that that's an efficient step to
17    put in this timeline without absolutely cutting off parties'
18    rights.  Because what inevitably I think is going to happen
19    is that I'm going have competing views, I'm going to have
20    competing statements of materially undisputed facts.
21           It seems to me we should just go to merits
22    hearings, and those will either be evidentiary hearings
23    entirely or they will be trials based on a stipulated
24    record, and that that then doesn't interpose the extra step
25    of a summary judgment motion that frankly just seems to me
```

1   not likely to be dispositive if the parties have less than a

2   full agreement on the facts.

3            I mean just based on these letters I can tell

4   there's not a meeting of the minds on a whole lot of stuff.

5            MR. FOUKAS:  I think that is fair, Your Honor.

6            I guess just in terms of the -- the time of

7   discovery I hear Your Honor's point.  From our perspective

8   there's not much that needs to happen, but it does need to

9   happen with respect to third parties --

10           THE COURT:  Sure.

11           MR. FOUKAS:  -- Barclays, and so, I think that

12  does build some, you know, potential issues in there.  And,

13  you know, I know having spoken to some of the other

14  claimants they envision discovery as well, Mr. Baumstein has

15  talked about taking depositions of some other people that

16  his client says he spoke to.

17           So, I mean there's some amount to be done,

18  obviously anything can be done if there's a deadline, but

19  you know, it seemed to us that given where we are and

20  particularly given the holidays that we're not talking about

21  a real long time with the cut off there.

22           And I did take Your Honor's point about the

23  summary judgment motions, I do think that based on the facts

24  that we expect to be, you know, at the end of the day pretty

25  evident, it should be subject to motion, but obviously we're

1    in a -- Your Honor is the one making the decisions here and

2    certainly capable of hearing or not hearing --

3         THE COURT:  Well we can adopt a wait and see

4    approach.  What I don't want to happen is that consideration

5    of a slew of summary judgment motions delays matters even

6    further where we can just cut to the chase and have trials,

7    I can give -- I can give you trial dates -- not at the

8    moment, but you can talk to my chambers.  I just would

9    rather you not then have to wait for trial dates until some

10   time, you know, much later in the spring when I might be

11   able to just give you March dates now.

12        MR. FOUKAS:  Yeah.  No --

13        THE COURT:  So we can work that through.

14        MR. FOUKAS:  Yeah.  No, and I think that's --

15        THE COURT:  But I do have to hear from the other

16   folks who want to say that I should do none of the above.

17        MR. FOUKAS:  Thank you.

18        THE COURT:  All right?  Thank you.

19        MR. BAUMSTEIN:  Thank you, Your Honor.  Doug

20   Baumstein from White & Case LLP on behalf of 1EE, LLC.

21        Your Honor, the omnibus objection at issue here

22   has been fully briefed and ready to be heard since the end

23   of August.  But for the trustee's delays it would have been

24   heard and likely resolved by now.

25        THE COURT:  But, you know, I just have to stop

1    you.  There are -- based on the correspondence, which was in

2    fact curious that you attach, because it is denominated

3    subject to FRE 408, but be that as it may, it seems that

4    there at least as of a couple of weeks ago there still was a

5    lack of clarity or complete information with respect to a

6    number of the questions the trustee had asked relating to

7    the compensation paid to Mr. Hoffman by Barclays.

8              MR. BAUMSTEIN:  And let me be clear about that,

9    because I think there's two very important issues.

10             First of all, there is no dispute that Mr. Hoffman

11   had a separate contract with Barclays, it spells out how he

12   is to be compensated by Barclays for the work he does at

13   Barclays.  He was compensated pursuant to that letter.  We

14   don't dispute that, there's -- you know, the -- I'm not even

15   sure what they're factual issues are.  But there's no doubt

16   that they've had the ability to get those factual issues

17   over the last five years.  They litigated the Barclays, no

18   doubt they have schedules already in their possession on

19   this.  If they had an issue it was to be raised in the

20   objection.

21             Instead what we have is they're moving the goal

22   line on us, Your Honor.  We had a -- we -- they raised an

23   objection, it's ready to be heard, and instead of having a

24   single hearing, which we'll object the legal issues, and

25   these are all legal issues, and let me be very clear on

 1   that, to raise these legal issues we're now going to have in

 2   their view 4 but maybe 20 separate hearings to address that.

 3          THE COURT:  We're not having 20 separate hearings,

 4   the process that they've outlined is for 4, okay?  So that's

 5   a complete red herring, that's off the table.

 6          Secondly, the trustee has identified a whole host

 7   of issues that have my attention.  So the fact that you want

 8   to characterize this as, you know, simple and

 9   straightforward, the -- what I have before me now doesn't

10   support that view.

11          MR. BAUMSTEIN:  Your Honor, the fact is there are

12   four documents here that -- and the only -- that truly

13   matter and the legal interplay between them.  We have

14   Mr. Hoffman's contact with LBI, we have the APA, we have

15   Mr. Hoffman's contract with Barclays, and we have the

16   Court's decision with respect to the Barclays' litigation.

17          Beyond -- the only thing in that -- that's raised

18   in their objection --

19          THE COURT:  You're saying the Court's decision in

20   the Barclays' litigation is not binding, doesn't have any --

21          MR. BAUMSTEIN:  Right, exactly.

22          THE COURT:  Okay.

23          MR. BAUMSTEIN:  But --

24          THE COURT:  But the underlying --

25          MR. BAUMSTEIN:  -- they're arguing res judicata.

1          THE COURT:  But the underlying facts do.  So the

2     fact that there was a decision in which certain parties

3     participated in an adjudication of an issue, which you now

4     say is not binding on you because you weren't a party, that

5     doesn't preclude the trustee from adducing the same facts

6     and applying them to the issues we have here.

7          MR. BAUMSTEIN:  And, Your Honor, and maybe that

8     goes to I think maybe a misunderstanding of the objection

9     they've raised.  Their objection is that the legal decision

10    issued in the Barclays' decision is res judicata not because

11    -- or is instructive on what the APA means, but the APA

12    means whatever it means.  It's not an issue to be resolved

13    with respect to what is in the separate contracts.

14          Mr. Hoffman was -- had a contract with Lehman, he

15    entered a separate contract.  It could have been with

16    Barclays, it could have been with anyone.

17          THE COURT:  I understand that, but based on what I

18    have before me we need to have a hearing on this.

19          MR. BAUMSTEIN:  Okay.  Then can I address one

20    other issue, and this is --

21          THE COURT:  I mean let's just put a fine point on

22    it.  This is an 80 odd million dollar claim?

23          MR. BAUMSTEIN:  correct, Your Honor.

24          THE COURT:  Okay.  For very high ranking former

25    manager at Lehman, right?

08-13555-scc-mg Doc 53621 Filed 08/30/16 Entered 08/30/16 20:48:16 Main Document
Pg 20 of 374
08-13555-scc Doc 49007-1 Filed 03/07/15 Entered 03/20/15 13:48:16 Exhibit F

Page 20

 1          MR. BAUMSTEIN:  He was actually not considered a

 2     -- the way it worked he was not technically an executive,

 3     but he was a very highly compensated employee.

 4          THE COURT:  He was very highly compensated.  And

 5     you -- and you're seeking a -- and he was paid a lot of

 6     money by Barclays, right?

 7          MR. BAUMSTEIN:  He was paid a lot of money by

 8     Barclays.

 9          THE COURT:  Which you say was -- has no

10     relationship to what he was owed by LBI.

11          MR. BAUMSTEIN:  Correct, Your Honor.

12          THE COURT:  Okay.  So, I have no idea whether

13     that's true or not.  I mean that's the point of --

14          MR. BAUMSTEIN:  And, Your Honor, that's why we

15     submitted his contract with Barclays, because that actually

16     explains what he got paid for.

17          THE COURT:  And the trustee takes the position

18     that there are other issues that need to be explored to

19     determine whether or not that in fact is the end of the

20     story, vis-à-vis, what he should get further from LBI.

21          MR. BAUMSTEIN:  But, Your Honor, what they

22     actually point to is the very testimony by Barclays saying

23     he had a separate contract with us and we paid him pursuant

24     to that contract.  So that testimony by the way isn't going

25     to override what's in the contract with Barclays in any

08-13555-scc-mg   Doc 53621   Filed 08/30/16   Entered 08/30/16 20:49:16   Main Document
08-13555-scc-mg   Doc 49007   Filed 03/02/15   Entered 03/02/15 13:48:16   Exhibit F
Pg 21 of 374

Page 21

```
 1   event.

 2           So it looks like what they're trying to do is

 3   create a red herring.  But I -- and I --

 4           THE COURT:  What they're trying to do is bring

 5   before the Court contested issues that have to do with

 6   whether or not Mr. Hoffman should get a claim, and I assume

 7   you want a claim for actual cash, right?

 8           MR. BAUMSTEIN:  Yes, Your Honor.

 9           THE COURT:  Well, I spent three days presiding

10   over a trial involving $350 million of former employees'

11   claims, and you know how much they got?  Zero?  Okay?

12           So on a summary basis I'm not prepared to

13   determine the claim of a former Lehman high ranking

14   employee, individual, however you want to characterize it

15   without having the trustee have an opportunity put in what

16   they want to put in.  All right?

17           So let's just talk about a schedule.

18           MR. BAUMSTEIN:  Okay.  Can I address one other

19   thing, and I think this goes to the scheduling aspect, which

20   is at the point I don't -- you know, given the amount of

21   delays, given the opportunities and the six years that the

22   trustee has had I don't think that they should be permitted

23   to now suddenly come up with a new objection, and I don't

24   think they should be permitted to amend their objection to

25   raise wholly new issues.
```

08-13555-scc   Doc 53621   Filed 08/30/16   Entered 08/30/16 20:49:16   Main Document
08-13555-scc   Doc 49907-1   Filed 05/02/15   Entered 05/30/15 13:48:16   Exhibit F
Pg 22 of 374

Page 22

 1           They -- we've now, as you pointed out, identified

 2      the question what did he get paid at Barclays for?

 3           THE COURT:  Well but all the time it happens that

 4      somebody that the parties take positions and then discovery

 5      develops, the facts and circumstances, and that allows

 6      parties to amend their affirmative claims, assert additional

 7      defenses.  On what basis would I cut that off?

 8           MR. BAUMSTEIN:  Well, Your Honor, I think the

 9      basis for this is that in fact this was already ready to be

10      heard, we could have had a hearing in October on the very

11      objection at issue.  And in particular here -- and I

12      understand obviously there's some dispute about what he

13      received payment for -- in particular I think now they're

14      looking to raise a wholly new argument here and that they

15      hinted at this in their letter that some of his compensation

16      should now be calculated -- should now not count because it

17      could have been paid in consideration other than cash.  This

18      was not a -- this was an argument available back to them

19      back when they raised their objection, it's been available

20      for the last five and a half years.  They've not raised it.

21           You know, I think raising it at this point they're

22      bringing in an entirely new issue with this, and it's not

23      something that is appropriate.

24           THE COURT:  Does the trustee want to respond to

25      that?

1          MR. FOUKAS:  Sure, Your Honor.

2          Well, I guess first our objection seeks

3     disallowance of the claim in its entirety.

4          And specifically with respect to Mr. Hoffman's

5     claim he did assert a claim for restricted stock awards and

6     we certainly have objected.  That's in our objection.  I'm

7     not sure what the issue is.  His contract is very clear that

8     it calls for a significant portion of his compensation,

9     overwhelming majority to be paid in restricted stock awards.

10          So the idea that this is something that is new,

11    you know, I don't -- I don't think flies, Your Honor.

12          MR. BAUMSTEIN:  Your Honor, the trustee's

13    objection to restricted stock rewards, Mr. Hoffman had a

14    claim for damages for failure to deliver them.  I understand

15    that that issue has been raised and it's been briefed.  I

16    don't have an issue with that.

17          I think what they're saying is a new issue with

18    respect to his 2008 bonus not that -- that was not -- which

19    would be struck in 2009.

20          THE COURT:  Okay.  I'll tell you what, based on

21    what you're saying now I'm certainly not going to issue a

22    ruling that precludes them from proceeding to seek to deny

23    allowance of the claim on any basis whatsoever.  When we get

24    to trial and you can assert that they ought not to be able

25    to put in evidence or raise that issue and then I'll make a

1    ruling and you'll have the point preserved for appeal.  But

2    right now just based on lawyer arguing with each other I'm

3    not going -- I'm not -- cut that off.

4           All I want to talk about is a date.  That's all I

5    want to talk about at this point.  All right?

6           MR. BAUMSTEIN:  Okay, Your Honor.  The only issue

7    I would have is the same issue, I don't understand why they

8    would have -- if they're going to submit some sort of

9    amended objection on December 17th I wouldn't want to

10   respond by January 7th.

11          THE COURT:  Fair enough.  Well you tell me, when

12   would you like to respond by?

13          MR. BAUMSTEIN:  I'd like to put it at let's say

14   January 21.  My only reason -- and the only thing that I

15   would have as a caveat is if they're going to raise new

16   objections that we've never seen that have -- that require

17   additional response I may need additional time.  I don't

18   want to be --

19          THE COURT:  Okay.  Well why don't we presumptively

20   say you can have January 21st, and then to the extent that

21   there's something so new that you feel you need additional

22   time you can seek their consent, and if you can't come to an

23   agreement you can reach out to the Court.

24          MR. BAUMSTEIN:  Right.  And then the other --

25          THE COURT:  All right?  And then I'm going to have

08-13555-scc Doc 49507-1 Filed 05/02/15 Entered 05/02/15 13:48:16 Exhibit F
Pg 29 of 374

Page 25

1    to give -- I need the trustee to confirm what I was talking

2    about in terms of the buckets and who's participating and

3    everybody having a common understanding of the binding

4    nature of a determination, and then chambers is going have

5    to give you folks a series of dates that work for a trial.

6                MR. BAUMSTEIN:  Okay.

7                THE COURT:  This is not long.  I mean I think with

8    respect to the Hoffman claim it could well be a day, but I

9    don't -- but I don't know.

10               MR. BAUMSTEIN:  I think that's probably correct,

11   Your Honor.

12               THE COURT:  Right.

13               MR. BAUMSTEIN:  That it's probably a one-day

14   hearing.

15               THE COURT:  Right.

16               MR. BAUMSTEIN:  You know, and we'll need some

17   discovery.  Again, there's -- it's mostly third parties,

18   that's the biggest issue is getting --

19               THE COURT:  Right.

20               MR. BAUMSTEIN:  -- people served and --

21               THE COURT:  Okay.  And I think --

22               MR. BAUMSTEIN:  -- testimony preserved.

23               THE COURT:  I think that it can be completed by

24   March 16th, but I think the third-party point is a good one,

25   so for that purpose -- and I don't know that these dates are

```
1    going to actually -- well you do have an order establishing

2    a litigation schedule, so I'll leave that be then.

3              All right?  Thank you.

4              Mr. Mark, did you want to be heard?

5              MR. MARK:  Nothing -- nothing to add.

6              THE COURT:  Okay.  All right.  So then why don't

7    you revise the order to reflect what we've talked about

8    today, and I would ask you to reach out to the other members

9    of the various buckets to make sure that everybody has the

10   same understanding.  And then if they don't for some reason

11   let us know and we can revisit.

12             MR. FOUKAS:  Okay.  Thank you, Your Honor.

13             THE COURT:  All right?  Thank you very much.

14             Okay.  So we're now going to the one item on the

15   LBHI agenda?  We're going address the one hundred and

16   seventy-third.

17             Mr. Miller, how are you?

18             MR. MILLER:  I'm fine, thank you.  Good morning,

19   Your Honor.  May it please the Court.  I'm Ralph Miller here

20   for LBHI from Weil, Gotshal & Manges, and I have a very

21   short presentation --

22             THE COURT:  Yes.

23             MR. MILLER:  -- on this, Your Honor, and also one

24   status matter that I want to raise.

25             THE COURT:  All right.  Let me ask, we're hearing
```

1    the claim of Mr. Stipo correct?

2              MR. MILLER:  Yes, Your Honor, Michael Stipo.

3              THE COURT:  All right.  Let me ask if anybody is

4    in the courtroom representing Mr. Stipo?  Let me ask is

5    anybody is on the telephone either Mr. Stipo or anyone

6    representing him?

7              Okay.  Let the record reflect it's 10:21 and

8    there's no response.

9              MR. MILLER:  Thank you, Your Honor.

10             As the Court knows this specific objection has

11   been adjourned six times at Mr. Stipo's request, and the

12   Court I understand advised Mr. Stipo in July that he could

13   appear by telephone --

14             THE COURT:  Yes.

15             MR. MILLER:  -- and we understand that he was

16   advised that this objection would proceed on a contested

17   basis if he could not appear.

18             On December 5th the Court received a short letter

19   from Mr. Stipo stating that he would not be appearing today

20   because his wife's medical condition has worsen.

21             Given this history we would like to proceed, Your

22   Honor, if that's all right.

23             THE COURT:  Right.  And in that letter he did not

24   request any further adjournments, and we, to our knowledge,

25   have not been contact again by him other than by the letter.

1          MR. MILLER:  Yes.  And, Your Honor, so far as I

2     know no one at the Weil firm has been contacted --

3          THE COURT:  Okay.

4          MR. MILLER:  -- by Mr. Stipo asking for an

5     adjournment either.

6          Very briefly, Your Honor, Mr. Stipo was admittedly

7     an employee of Lehman Brothers Inc. who asserts that a loss

8     in his LBI employee's retirement plan should be the

9     responsibility of the parent corporation, LBHI, because he

10    contends that LBHI quote "depleted" close quote, the assets

11    of LBI through quote "fraud and mismanagement."

12         As the Court knows the Second Circuit has held

13    that individuals do not have standing for these alter ego

14    claims by a debtor, subsidiary against its parent.  And in

15    fact this very type of alter ego claim was specifically

16    asserted by LBHI and has been expressly released in an

17    approved settlement.

18         The response filed by Mr. Stipo on September 14th

19    really summarizes the key facts and his position in one

20    sentence.

21         Referring to the claims objection he says, quote,

22    "the reason for my opposition - my original agreement was

23    made with Shearson Lehman Brothers and eventually became the

24    obligation of Lehman Brothers Inc., which Lehman Brothers

25    Holdings Inc. depleted of its assets through fraud and

1    mismanagement and therefore destroyed the value of my plan."

2    Close quote.

3             The primary supporting document for the claim form

4    is a statement of account from the Lehman Brothers Inc.

5    executive and select employees plan.

6             The law is clear as reflected in prior ruling in

7    this proceeding that this type of claim by LBI, employee

8    against LBHI, must be denied.

9             As cited in paragraph 18 of objection this Court

10   has entered a series of orders in virtually identical claims

11   and it has generally had this entry quote:

12            "Ordered that as alleged creditors of LBI

13   respondents lack standing to assert against LBHI any alter

14   ego claim, veil piercing claim, or similar claim to

15   disregard the corporate form of LBHI or LBI as such claims

16   were the property of the LBI estate and have been

17   irrevocably released, discharged, and acquitted by the LBI

18   trustee pursuant to the LBI settlement."  Close quote.

19            And the plan administrator believes that is the

20   correct disposition for this matter before you now and asks

21   that the one hundred and seventy-third omnibus objection be

22   sustained and that the claim number 15580 of Mr. Stipo be

23   denied and expunged.

24            THE COURT:  All right.

25            MR. MILLER:  I'm happy to answer questions.

1          THE COURT:  Thank you, Mr. Miller.

2          I agree entirely with your recitation of the facts

3     and the law, and the claim of Mr. Stipo, claim number 15580,

4     should be disallowed and expunged.  And I would ask --

5          MR. MILLER:  Thank you, Your Honor.

6          THE COURT:  -- that the order be submitted.

7          I would also ask the following, given that

8     Mr. Stipo has been unable to -- or elected not to appear

9     either in person or telephonically I would ask that you

10    obtain a copy of this portion of the hearing and send it to

11    him and that will illuminate the basis of the disposition

12    which is for the reasons that you outlined.

13         MR. MILLER:  Thank you, Your Honor.

14         Your Honor, I do have an order, but it seems to

15    have a copy error in it, it doesn't have the attached

16    exhibit.  So if we may, we'll submit a complete --

17         THE COURT:  Sure, that's fine.

18         MR. MILLER:  -- a complete copy.

19         Mr. Candor (ph) asked me, Your Honor, if I could

20    make one status report --

21         THE COURT:  Okay.

22         MR. MILLER:  -- which is not on the agenda but may

23    assist the Court in administration.

24         And that is, as the Court knows there are a number

25    of post-petition interest disputes that have to do with the

1    solvent LBHI subsidiaries and various debtors in the LBHI

2    proceeding.  And Mr. Candor tells me that the plan

3    administrator is planning to submit a procedure that will

4    organize these and allow them to be presented to the Court

5    in a way that should avoid, or at least hopefully greatly

6    reduce, any one of resolution.

7              So we wanted to -- Mr. Candor wanted me to make

8    sure that the Court knew that that would be coming for you.

9              THE COURT:  Okay.  Thank you.

10             MR. MILLER:  Surely, Your Honor.

11             May I be excused?

12             THE COURT:  Yes.  Thank you, Mr. Miller.

13             MR. MILLER:  Thank you, Your Honor.

14             THE COURT:  Okay.  Do the parties for the

15   estimation motion and related matters want to get themselves

16   set up?

17        (Pause)

18             THE COURT:  All right.  How is everyone today?

19             UNIDENTIFIED SPEAKER:  Good morning.

20             UNIDENTIFIED SPEAKER:  Good morning.

21             THE COURT:  Good morning.

22             UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

23             THE COURT:  Hello.  All right.  So who am I going

24   to be hearing from each side or are you going to be sharing

25   the responsibilities?

```
 1              MR. COSENZA:  Your Honor, Todd Cosenza here from
 2   Wilkie Farr & Gallagher.  You'll also be hearing at points
 3   today from my colleagues, Brian O'Connor, Roger Netzer, and
 4   Joe Baio.  I'm also here with Matthew Cantor, general
 5   counsel for Lehman Brothers and Paul Shalhoub, also with
 6   Wilkie Farr.
 7              THE COURT:  Okay.  Good morning.
 8              MR. MUNNO:  Good morning, Your Honor.  My name is
 9   William Munno with the law firm of Seward & Kissel, we
10   represent the Law Debenture Trust Company of New York in its
11   capacity as separate trustee.
12              THE COURT:  Okay.
13              MR. MUNNO:  And you will be hearing from me, as
14   well as counsel from the other trustee representatives.
15              MR. TOP:  Your Honor, my name is Frank Top from
16   the law firm of Chapman and Cutler, I'm here representing
17   U.S. Bank National Association in this matter.
18              THE COURT:  Okay.  Good morning.
19              MR. PEDONE:  Your Honor, Richard Pedone with Nixon
20   Peabody represent Deutsche Bank as trustee.
21              THE COURT:  Okay.
22              MR. STEIN:  Your Honor --
23              THE COURT:  I just want to -- oh, I'm sorry, go
24   ahead.
25              MR. STEIN:  Oh, I'm sorry, I'm not sitting -- I
```

1    guess I can move up here.

2             THE COURT:  Okay.

3             MR. STEIN:  Grant Stein, Alston & Bird on behalf

4    of Wilmington Trust.

5             THE COURT:  Okay.

6             MR. STEIN:  Thank you, Your Honor.

7             THE COURT:  I would ask though that although

8    you're representing different parties that I not hear the

9    same point twice from two or more people, including if I

10   don't agree with you asking someone else to stand up and

11   take another shot at it.  Okay?

12            So to the extent that there are material

13   differences, and material is going to be a word that we talk

14   about a lot today in your positions, I'm happy to hear that,

15   I just don't want to have any do-overs.  All right?  Does

16   that work?  Mr. Cosenza?

17            MR. COSENZA:  Yes.  Just one logistical issue.

18            LBHI believes that it makes sense given the

19   efficiency here of trying to move forward to protocol that

20   we argue the protocol first and then, you know, obviously

21   we'll have opening arguments from both sides and then that

22   we put on our witnesses on the protocol first.  And I'm just

23   looking for the Court's guidance as to what your expectation

24   is in terms of the order of the proceedings.

25            THE COURT:  Sure.  Okay.  Mr. Munno?

1          MR. MUNNO:  Yes.  The RMBS trustees moved in

2     August for estimation, and we received opposition to that in

3     the form of a cross-motion, and to suggest a protocol on the

4     grounds that estimation is not permitted for the RMBS

5     claims.

6          So having moved first and I think we should be

7     going first on this point.

8          THE COURT:  Well this gets us right into the thick

9     of it, because I think as I indicated on the call that we

10    had, it's important to clarify what the hearing is about and

11    what it's not about.

12         So you're quite right, the first thing that

13    happened was a motion to estimate under 502(c), right?

14         MR. MUNNO:  Yes.

15         THE COURT:  Okay.  That's a legal question.

16         MR. MUNNO:  It is.

17         THE COURT:  That's a purely legal question.

18         MR. MUNNO:  We agree.

19         THE COURT:  In support of that though you

20    submitted, I'll call it, the sampling methodology, right?

21         MR. MUNNO:  We submitted the sampling methodology

22    as one of the ways in which estimation of these 209,000 plus

23    loans could be estimated.

24         THE COURT:  Okay.  But the existence or not or the

25    validity or not of the sampling methodology has nothing to

Page 35

```
 1    do with the legal question of whether or not the claims

 2    ought to be estimated under 502(c), right?

 3              MR. MUNNO:  We agree with that.

 4              THE COURT:  Okay.  So then given that, why don't

 5    we have argument first on that very narrow legal issue,

 6    because that will then inform what we do for the rest of the

 7    day?

 8              MR. MUNNO:  I'm fine with that, but --

 9              THE COURT:  Right?

10              MR. MUNNO:  -- I certainly would like to inform

11    the Court of the overview as we begin, but not going into

12    the details of, you know, the sampling, because we don't

13    think that is the issue for today.

14              THE COURT:  Okay.  So then why don't we do the

15    overview where you have your openings on all points, and

16    then I think we ought to proceed to the nitty-gritty on the

17    502(c), because I think that then that will inform what we

18    do for the rest of the day.

19              MR. COSENZA:  We're agreeable to that, Your Honor.

20              THE COURT:  Okay.  All right.

21              MR. MUNNO:  May I begin?

22              THE COURT:  Sure.

23              MR. MUNNO:  What is the best way to determine the

24    amount of the RMBS claims?

25              THE COURT:  No, that's not the issue.  That's not
```

```
 1    -- we just discussed that the first issue is not what's the

 2    best way to determine the claims.  The first issue is

 3    whether or not the claims are subject to estimation under

 4    502(c).

 5              MR. MUNNO:  I agree.

 6              THE COURT:  There's a very clear legal test for

 7    that.

 8              MR. MUNNO:  That's my next statement.

 9              THE COURT:  Okay.

10              MR. MUNNO:  The RMBS trustees maintain that as a

11    matter of law the RMBS claims must be estimated under 502(c)

12    of the Bankruptcy Code.

13              The RMBS trustees further maintain that because

14    there are over 209,000 loans at issue statistical sampling

15    is the timely and cost effective method of estimating the

16    RMBS claims in these circumstances.

17              THE COURT:  But the circumstances are created in

18    -- at least in part by the fact that the four trustees have

19    chosen to act together, right?

20              MR. MUNNO:  I would say no to that, Your Honor.

21    What the four trustees have done in respect of these claims

22    is to try to have an efficient effective way to reduce costs

23    overall to the trusts and thus to the certificate holders

24    who are the beneficiaries of the distribution that will

25    ultimately be received from this Lehman estate.
```

```
 1              So by gathering together we thought it would be

 2      efficient and less costly for us to do this.

 3              And we learned from talking with experts that the

 4      best way to do that was through a statistical sample, and

 5      that's why we're here on that point for estimation and

 6      suggesting if Your Honor agrees that as a matter of law

 7      we're entitled to estimation under 502(c) then we would --

 8      we would propose that we do that estimation through the

 9      statistical sample that already has been performed, took two

10      years, 5,000 loan sample, took us over 18 months to get the

11      loans in question, and we didn't get all of them, and then

12      they were re-underwritten by Digital Risk and reviewed by

13      Duff & Phelps as to its conclusions and as to what the

14      liability was based on that statistical sample that was

15      drawn.

16              And based on the RMBS trustees' experience, not

17      just in this case but in many cases -- there are many put-

18      back cases in which the RMBS trustees are involved -- the

19      RMBS trustees know that hand-to-hand combat on a loan-by-

20      loan review basis is very time consuming, and with 209,000

21      plus loans at issue it will take many years to do.

22              THE COURT:  Right.  But the 209,000 loans, which

23      is net of the 5,000, which is the 214- net of the 5,000,

24      that's a number that is just the aggregate number of the

25      loans in the pools in the trusts that you folks represent.
```

1      It's in that sense an artificial number, right?

2              MR. MUNNO:  Well, I hear what you're saying.  It

3      is the number collectively of all of the loans that are at

4      issue.

5              THE COURT:  Right.  That's just a fact.

6              MR. MUNNO:  That is a fact.

7              THE COURT:  That's a fact.  It's just collectively

8      the number of loans that are at issue before anybody has

9      taken any sort of a first cut at them, so to speak, right?

10     That's just the aggregate number of loans, right?

11             MR. MUNNO:  That is the aggregate number of

12     loans --

13             THE COURT:  Okay.

14             MR. MUNNO:  -- and we would say -- and it's not

15     for today's discussion -- that there has been a first cut at

16     all because there was a statistical sample drawn with 12

17     cohorts to make sure that we had all the vintages and all of

18     the identical -- the types of products, brought in those

19     loans, had then re-underwritten, and came up with a 57

20     percent breach rate, which is very similar to the 50 percent

21     breach rate that Aurora found when it did its analysis of a

22     sample of loans for which Lehman has responsibility.  And

23     Aurora is the master servicer here on 252 of the 255 covered

24     trusts.  And as master servicer it was responsible to tell

25     Lehman about problems.  And we know from one of the business

1    records we attached to our motion that Lehman was well aware

2    of it and they had a duty to self-report but didn't.

3            But let me focus on estimation.  We say the law is

4    clear under 502(c) that these claims are unliquidated and

5    that they're not readily calculable, and that some claims

6    will arise in the future adding to the fact that they're not

7    readily calculable.  We estimate that there's about

8    $6 billion of claims that will occur in the future because

9    there were breaches of reps and warranties at the date of

10   origination of the loan that went do the trust.  There have

11   already been over $15 billion of losses on these covered

12   loans.  That's not a disputed fact, there's over 15 billion.

13           Now under Section 502 estimation is mandatory.  I

14   know Your Honor knows this, we cited the cases that speak to

15   it.

16           And Lehman represented in its reserve motion that

17   it filed with the plan that estimation of these claims is

18   appropriate because litigation quote, "would be

19   extraordinarily lengthy and complex," close quote, and would

20   quote, "take years to complete."

21           In his August declaration --

22           THE COURT:  But they're going stand by those

23   statements today.  Those statements remain true and they

24   were made in the context of a reserve motion.

25           MR. MUNNO:  They were made in the context of a

```
 1    reserve motion --

 2              THE COURT:  Right.

 3              MR. MUNNO:  -- but the fact of what they were

 4    saying was it would take years.

 5              THE COURT:  Right.

 6              MR. MUNNO:  Whether it's in a context of a reserve

 7    motion or a liquidated --

 8              THE COURT:  Okay.

 9              MR. MUNNO:  -- claim it's still going take years.

10    Not a year.

11              THE COURT:  Okay.

12              MR. MUNNO:  But years.

13              THE COURT:  Okay.  Would you be standing here

14    making this argument if we had one trust at issue?

15              MR. MUNNO:  Yes.

16              THE COURT:  If we had one trust.

17              MR. MUNNO:  Well if we had one -- let me back up.

18              THE COURT:  If we had one trust.

19              MR. MUNNO:  If we had one trust at issue --

20              THE COURT:  Uh-huh.

21              MR. MUNNO:  -- and we had -- depending on the

22    number of loans --

23              THE COURT:  Right.

24              MR. MUNNO:  -- you know, our experience, because

25    I've been involved in many of the put-back cases.  We have
```

1    many of the loans, we think the efficient and cost effective

2    way to do it is to draw a statistical sample, have that

3    statistical sample re-underwritten, determine the breach

4    rate, agree with your adversary, you usually can't, there's

5    usually going to be some narrowing, and then present it for

6    an estimation of the claim.  That is where the -- I won't

7    call it the industry -- but that's the state of play in the

8    RMBS world where the put-back cases are occurring.

9    Statistical sampling is what's been used.  Because it is the

10   most efficient and cost effective way to resolve a dispute

11   as to whether there was a material breach that affected the

12   value of the loan at the time --

13             THE COURT:  Are the governing documents --

14             MR. MUNNO:  -- of the origination.

15             THE COURT:  -- in all of those other put-back

16   litigations that you refer to, is -- is the specific

17   language in the governing documents identical to what is at

18   issue here?

19             MR. MUNNO:  Virtually identical if not identical.

20   This -- this --

21             THE COURT:  Because some of the ones that I've

22   looked at in the other cases are not at all identical.

23             MR. MUNNO:  Okay.  Well certainly the ones that

24   are involved with the JPM proposed settlement that you may

25   have heard about, this provision that we're focusing on

1    today is pretty much the same across the board.

2              THE COURT:  Is that -- but you're talking about

3    the settlement with JPM?  I'm talking about --

4              MR. MUNNO:  No, I'm not talking about the

5    settlement with JPM, I'm talking about the underlying so

6    called PSAs or other governing agreements have essentially

7    the same terms and conditions as we have with the underlying

8    trust documents for these 255 covered trusts.

9              THE COURT:  Okay.

10             MR. MUNNO:  I am talking about that.

11             In his August declaration Dr. Parekh estimated the

12   delay and costs to the estate and to the parties, you know,

13   if we don't have estimation.

14             THE COURT:  That's the 27 years?

15             MR. MUNNO:  No, actually he doesn't say 27 in his

16   August declaration, he says if you, as the Court, were to

17   hear disputes as to whatever is left of the 209,000 loans

18   sitting in a court back and forth that would take more years

19   than that.

20             THE COURT:  Forty-one years.

21             MR. MUNNO:  Forty-one years.  The 27 years is what

22   you get if you follow the Lehman proposed protocol, that's

23   what you would get.  It takes years.

24             A few days ago Mr. Pino on behalf of Lehman

25   estimated it would cost 110 million to do Lehman's proposed

1    loan-by-loan review.  That is more than ten times the amount

2    it would take to do a statistical sampling even if we

3    started from scratch.

4             THE COURT:  But Lehman is a fiduciary.  You folks

5    are asking for $12 billion.  They're fiduciaries for an

6    estate in which other creditors have been required to prove

7    up their claims.  So they're a fiduciary, it's a big number.

8    Everything in Lehman is a big number, an outsized number.

9    But in comparison to the incremental claim that's being

10   sought above the reserve it's a tiny fraction.  I mean

11   that's just math.  Everybody is telling me about math.

12   That's just math.

13            MR. MUNNO:  Well the point though, Your Honor, is

14   that these covered loans had breaches that were material

15   that affected the value such that the trust would not have

16   purchased them --

17            THE COURT:  Did Mr. -- did Dr. Parekh -- did

18   Mr. Parekh do that analysis, that the breaches affected the

19   value?

20            MR. MUNNO:  That's the -- that's the -- Dr. Parekh

21   -- that's not for today, but that would be for another day.

22            THE COURT:  And -- but is that --

23            MR. MUNNO:  But what that --

24            THE COURT:  -- is that the way you're -- is that

25   you're telling me, his analysis is that he identified and

1    using a sampling methodology material breaches that affected

2    the value of the loans?

3                  MR. MUNNO:  I'm saying that what was done there

4    was that Digital Risk, which is, you know, perhaps the best

5    known firm that undertakes forensic underwriting of loans

6    has done that analysis and has detailed -- we've provided it

7    to you and to the other side --

8                  THE COURT:  Uh-huh.

9                  MR. MUNNO:  -- all the information about what

10   those material breaches were, we provided it to Lehman --

11                 THE COURT:  And I'm asking you a specific

12   question.

13                 MR. MUNNO:  Yeah, and Mr. Parekh and others at

14   Duff & Phelps reviewed those findings to be satisfied that

15   those were material breaches --

16                 THE COURT:  That affected the value of the loan?

17                 MR. MUNNO:  -- that affected the value of the

18   loans.  So let's be clear --

19                 THE COURT:  So every single breach materially

20   adversely affected the value of the loans?

21                 MR. MUNNO:  No.  In fact Digital Risk found many

22   other breaches that we did not put forward as material

23   breaches.

24                 THE COURT:  That's not the question I just asked

25   you.

1          MR. MUNNO:  I misunderstood the question.

2          THE COURT:  And this is completely beside the

3     point, but you've raised it so I'm following you there.  You

4     have said that -- is it Mr. or Dr. Parekh?

5          MR. MUNNO:  Well I call him Mr. Parekh, he has a

6     Ph.D.

7          THE COURT:  He has a Ph.D.

8          MR. MUNNO:  Let's call him Mr. Parekh because he

9     likes to be called Charlie.

10         THE COURT:  Well, I'm not going call him Charlie.

11     (Laughter)

12         THE COURT:  But I don't want to not afford him

13     sufficient respect if he's -- if he is used to being called

14     doctor.  I just can't remember what it says on the pleading.

15     Mr. Parekh, okay?

16         My recollection is that his work in conjunction

17     with Digital Risk came up with a 57 percent material breach

18     rate and that was the driver of the $12 billion number,

19     correct?

20         MR. MUNNO:  Correct.

21         THE COURT:  Okay.  My question to you is that

22     therefore implicit in that math is that every material

23     breach that was identified by Mr. Parekh, in conjunction

24     with Digital Risk or however he formulated the opinion, was

25     a material breach that materially adversely affected the

Page 46

1    value of the mortgage loan.  That's the math, right?

2            MR. MUNNO:  Correct.

3            THE COURT:  Okay.

4            MR. MUNNO:  That is correct.  And just on that

5    point, Your Honor.

6            Lehman's own counsel this matter has advocated

7    statistical sampling to resolve RMBS cases.  Lehman's

8    counsel has stated that quote, "forensic re-underwriting"

9    close quote, quote, "short circuits" close quote, a loan by

10   loan fight.  And we agree with that.  And Lehman also has

11   noted the enterable cost and delay that would be imposed by

12   a loan-by-loan review.  It did that when it asked this Court

13   to approve a settlement with Fannie Mae that involved only

14   7,600 loans.  This matter is 27 times larger.

15           Now Lehman contents that estimation would not be

16   proper under 502(c) even though it represented the opposite

17   in its reserve motion.  But bankruptcy courts have

18   determined that rep and warranty claims can be estimated for

19   purposes of allowance.  We've cited you the cases and I'm

20   sure Your Honor is aware of them.  New century, American

21   Home Mortgage, NLC Financial, and others.

22           We maintain that the RMBS claim can, and under

23   Section 502(c), must be estimated.  We're not saying it has

24   to be estimated by statistical sampling --

25           THE COURT:  Well even if I --

1          MR. MUNNO:  -- but we are saying that's the best

2     way.

3          THE COURT:  Even if I agree with you on the first

4     part of the test, which is that the claim has to be

5     contingent or unliquidated, right, you're saying it's

6     unliquidated, right?

7          MR. MUNNO:  We are saying it's unliquidated and

8     we're saying that it would unduly delay the administration

9     of the estate.

10          THE COURT:  Okay.

11          MR. MUNNO:  We're saying those two things.

12          THE COURT:  But you haven't said the second thing

13     yet.

14          MR. MUNNO:  Well, I'm saying it now.  And you said

15     it because you noted that Mr. Parekh had estimated that if

16     you were to hear each loan that would take many years, 41,

17     and if we follow the Lehman proposed protocol it could take

18     over 20 years in one instance or maybe 27 years in another.

19     And of course those aren't etched in stone, those are

20     estimates.  Yes, could they be fewer years?  Sure.  Sure

21     they could.  Could they be more years?  Sure.  Sure they

22     could.  It just depends.

23          But what we do know is this, it will take many,

24     many years to liquidate this under the proposed Lehman

25     protocol.  Because what basically Lehman is saying we're

08-13555-scc mg Doc 53621 Filed 08/30/16 Entered 08/30/16 30:89:16 Exhibit F
08-13555-scc mg Doc 49007 Filed 05/02/15 Entered 05/20/15 19:19:48 Main Document
Pg 48 of 374

Page 48

1    going to have a hand-to-hand combat on each loan.  Maybe

2    outside --

3              THE COURT:  But that's actually -- that's actually

4    not what they're saying.  That's actually not what they're

5    saying.  It's an overstatement of what they're saying.

6              MR. MUNNO:  Well it may be an overstatement, but

7    we'll go through that protocol in the testimony, you'll hear

8    it.

9              You know, having been involved, the trustees

10   having been involved in just these kinds of I'll call meet

11   and confers where we sat in a conference room for months and

12   years literally, it takes a long time.

13             THE COURT:  You know, here's the thing, I'm not --

14   you keep telling me about all of your experience and all the

15   trustees' experience.  That's not testimony.

16             MR. MUNNO:  Well, I understand that.

17             THE COURT:  And I'm not going to take it as

18   evidence.

19             MR. MUNNO:  I'm not offering it as evidence.

20             THE COURT:  You're not -- but you're seeking to

21   persuade me that you all have been there, done this many

22   times before and this the way it's done, and I'm not going

23   to afford that any weight.

24             MR. MUNNO:  Okay.

25             THE COURT:  Okay?  I've got governing agreements

Page 49

1    that I'm required to interpret.  They mean what they -- they

2    say what they mean, they mean what they say.

3              MR. MUNNO:  A hundred percent.

4              THE COURT:  How we approach the litigation going

5    forward is a completely separate issue.

6              MR. MUNNO:  Well the RMBS trustees oppose the

7    protocol assuming this Court were to determine that the RMBS

8    claims are not eligible for estimation under 502(c).

9              We oppose it because it will take too long, cost

10   too much.  It will take years, and you will hear evidence on

11   this.

12             THE COURT:  But again, if you -- if I had one

13   trust or one trustee you wouldn't be able to make this

14   argument.  The reason that you're able to make this argument

15   is because each of the trustees undertook to be the trustee

16   for the number of trusts that they did, a voluntary

17   decision, the four of you have elected to proceed together,

18   a voluntary decision.  And I'm very much struggling with why

19   that should be the driver of a process -- of an allowance

20   process in this proceeding in which a fiduciary has caused

21   as it's obligation to have all other claimants carry their

22   burden of proof on their claims one by one by two by three

23   by however and you -- and the RMBS trustees say here we all

24   are, there's 209,000 loans, this is really big, this is

25   really complicated don't -- don't do it that way.

1    MR. MUNNO:  Well you would be faced with the same

2    circumstance if we were dividing four.  In fact it would

3    take even more time for this Court to have those claims

4    ultimately resolved if we were -- we're not banned together.

5    It's more efficient for this Court.  It's certainly more

6    efficient for us.  And the fact of the matter is through

7    statistical sampling, even though we're not here to argue

8    about it, it's scientific, it will give you effectively the

9    same result as if you reviewed each and every one of 209,000

10   loans.

11       Now that would be true whether you divide us into

12   4 and took 50,000, 50,000, 50,000, and 50,000, because there

13   are characteristics that are identified because of the

14   vintage, because of the product type, and this has been, you

15   know, a method that the cases that we have cited to you have

16   embraced.  And it is an efficient way to do it.  And they

17   have a fiduciary duty to make sure that no creditor gets too

18   much, but they also have a duty to make sure that they we

19   don't get -- our certificate holders in these trusts don't

20   get too little.  And we have an obligation under these PSAs

21   to advance --

22       THE COURT:  Well what the certificate holders get

23   is not necessarily completely a function of the amount of

24   the claim that is allowed on -- in respect of the trustees'

25   claim, right?

1            MR. MUNNO:  Well, no, no.  The trustees have no

2 financial interest in the outcome of these claims.  These

3 claims are for the benefit of the trust and the certificate

4 holders only.

5            THE COURT:  Oh, I understand that, but the

6 certificate holders -- we're getting far afield here -- but

7 the certificate holders, to the extent that they have any

8 rights against the trustees, those are what they are, right?

9            MR. MUNNO:  Certificate holders' rights against

10 the trustees may be whatever they are --

11            THE COURT:  Right.

12            MR. MUNNO:  -- but there have been no claims by

13 any certificate holders against these trustees with respect

14 to these trusts or these covered loans.

15            THE COURT:  Okay.  So that -- that's neither here

16 nor there.

17            MR. MUNNO:  Right, it's neither here nor there.

18            But what is here is that we have contractual

19 obligations under the PSAs to present the claims.  We filed

20 our proofs of claim as required under the Lehman protocol --

21            THE COURT:  So let me ask you a question.  So you

22 undertook the sampling analysis beginning in July of 2012,

23 right?

24            MR. MUNNO:  Yes.

25            THE COURT:  And even though pursuant to you some

1   preliminary discussions we had we're not going to be looking

2   at the declaration of Mr. Top, right?

3           MR. MUNNO:  Yes, that's correct.

4           THE COURT:  Okay.  But be that as it may there are

5   certain facts --

6           MR. MUNNO:  Yes.

7           THE COURT:  -- that have been alleged in the

8   papers.  One of them is that you began this sampling

9   exercise in July of 2012.

10          MR. MUNNO:  Correct.

11          THE COURT:  Okay.  Did you confer with Judge Peck

12  at that time?

13          MR. MUNNO:  With Judge Peck at that time?

14          THE COURT:  He was the judge who did this job

15  before I did.

16          MR. MUNNO:  Yes.  No, I understand that he was the

17  judge at that -- at that time.  No, we had -- we had been

18  advised by Judge Peck to engage in a mediation --

19          THE COURT:  Right.

20          MR. MUNNO:  -- which we did engage in and it

21  was --

22          THE COURT:  It didn't work.

23          MR. MUNNO:  -- it proved unsuccessful.  And then

24  we tried to, at the request of Lehman, to come up with a

25  proposal that was other than statistical sampling.  We came

1    up with a proposal and we had deafening silence for two

2    years, we could not get ahold of them.  Now they may contest

3    that, I don't know, but that's what happened.

4           So we --

5           THE COURT:  Okay.  But I'm asking you.

6           MR. MUNNO:  Yes.

7           THE COURT:  So that -- that is what you say.  You

8    made a proposal, deafening silence.  Okay.  But Judge Peck

9    was here day in and day out, you didn't do anything.  You

10   did not seek to have a conference.  You did not write a

11   letter to Judge Peck saying we're frustrated, we're stymied,

12   help us get them in line.  Instead --

13          MR. MUNNO:  Well neither did Lehman.

14          THE COURT:  Okay.  We're not -- this is not a

15   dispute between six year olds --

16          MR. MUNNO:  Right.

17          THE COURT:  -- okay?

18          MR. MUNNO:  But, you know, it doesn't occur to us

19   to go to Judge Peck on that point.

20          THE COURT:  But what you were -- but what you --

21   okay.  But what you are saying -- part of your motion now is

22   beginning in July of 2012 we started this sampling process.

23   Look at all this work that we've done, right?  And there's

24   an aspect of your argument I think that says because we've

25   already done all this you should use it.  And I just don't

1    -- I don't agree that simply because you undertook a process

2    in the face of let's assume Lehman's silence, but while

3    Judge Peck was sitting here and available to give his

4    guidance on whether or not that's the way he thought it

5    should proceed, is just something of interest to me.

6              MR. MUNNO:  Well, I'd like to address that just --

7              THE COURT:  Sure.

8              MR. MUNNO:  -- very briefly, Your Honor, because

9    you know, we undertook the statistical sampling because we

10   had advice from the experts that the trustees had retained

11   them because of other experience that the trustees have had

12   that statistical sampling was the way to go, but we were

13   very concerned quite frankly that Lehman might bring on a

14   motion to disallow our claim.  And so we thought we needed

15   to be prepared if that were to occur, so we under the

16   statistical sampling process.

17             THE COURT:  But in lots of other --

18             MR. MUNNO:  And we're not standing here saying --

19             THE COURT:  In lots of other -- in lots of other

20   cases, in lots of the Monolying (ph) cases, I think in some

21   of the pending ResCap cases, the statistical sampling issue

22   gets raised very early.  Very, very early.  Folks go to the

23   judge and say, you know, one party says I want to use

24   statistical sampling and the other party responds, and as

25   far as I can tell, and it's not -- you can't tell everything

1    from the report decisions -- sometimes folks agree on some

2    aspects of the use of statistical sampling and sometimes

3    they don't.

4            MR. MUNNO:  That's true.

5            THE COURT:  But you really have to -- you really

6    have to drill down in the cases on how it came about in each

7    of the cases that statistical sampling is used and to what

8    extent for what purpose.  Whether it's just simply breach

9    rate or something else, and you have to tie it back to the

10   legal theory underlying those cases.  And none of that --

11   there was a missed opportunity here to have that

12   conversation with Judge Peck, and I think that's

13   unfortunate.

14           MR. MUNNO:  Well, we may have missed an

15   opportunity, you know, in that regard, I know that we raised

16   statistical sampling with Lehman, it's on an agenda sheet

17   that we attached as part of the information for the Court to

18   consider, and even if you were to assume that, okay, you

19   guys went ahead and did this, you didn't talk about it,

20   let's draw a new statistical sample, fine.  Because we're

21   saying that it would cost ten times as much if we start from

22   scratch.

23           THE COURT:  To draw a new statistical sample?

24           MR. MUNNO:  No, that it would cost 10 times as

25   much to do the protocol, because we're told it's going to

1  cost 110 million, and I think we could have a new

2  statistical sample starting from scratch all done for

3  $10 million.

4         But let me tell you why we don't agree with the

5  protocol.  Again, we think statistical sampling, as I just

6  said, would be less costly and less time consuming.

7         Also we don't agree with the protocol because it

8  proposed to expunge the RMBS claims unless each loan file,

9  as Lehman defines it -- it's not defined this way in the

10  governing agreements -- is presented with breaches that are

11  material within 60 days, and now they've expanded that to

12  180 days.  But six months.  We know, even Mr. Pino's

13  declaration says you can't do that in six months.

14         Now --

15         THE COURT:  You might be able to do some of it.

16         MR. MUNNO:  Of course you can.  But they're saying

17  six months is the deadline, you're cut off.

18         THE COURT:  Well have I agreed to that yet?

19         MR. MUNNO:  No, of course not, I understand, but

20  I'm saying that's what the protocol says, that's one of the

21  reasons why because it would foreclose claims on a time

22  basis when we don't think it's feasible to get the loans

23  from the -- from the servicers, from the custodians, re-

24  underwrite those loans, and then present material breaches

25  back.

```
 1              THE COURT:  You know, there's a dramatically

 2     different view of the amount of time that it will take to

 3     get the loan files.

 4              MR. MUNNO:  There is.

 5              THE COURT:  Dramatically different.  There's a

 6     footnote in -- I think in the reply papers that talks about

 7     how quickly the loan files might be made available.  I think

 8     Aurora has 50,000 digitally as we speak.

 9              MR. MUNNO:  Well, it's not clear to me -- there is

10     that footnote -- it's not clear to me that that 50,000

11     digitally as we speak are 50,000 of these covered loans or

12     not.

13              THE COURT:  Well that's the -- I'll ask Lehman

14     when it's their turn, but that was certainly the implication

15     of that -- of that statement.  I can't find it right now.

16              MR. MUNNO:  No, but we agree with the through

17     process that's been proposed in the protocol, and at least

18     as Mr. Park reviews it, yes, you would have a continual

19     review, but there are bottlenecks and we'll wait for the

20     testimony on that so Your Honor can hear it.

21              But Lehman argues one of the reasons for its

22     protocol is it has third-party claims, but Lehman hasn't

23     provided any evidence of which covered loans allegedly are

24     covered by third-party indemnities.  And Lehman has not

25     offered any witness on this issue or any admissible evidence
```

1  that it has any such claims as to these covered loans.

2         Lehman also argues that we didn't comply with the

3  governing agreements.  We don't agree with their reading.

4         But more importantly and dispositively --

5         THE COURT:  You're talking about on the notice

6  issue?  What --

7         MR. MUNNO:  Well, I'm getting to the notice --

8  notice issue -- yes, notice issue is certainly one of the

9  issues that they raise that we have to give notice, that the

10  trustees have to give notice.

11         But the dispositive point is that these governing

12  documents are executory contracts.  They were not assumed,

13  they were rejected.  Lehman has no rights under them.

14  Lehman is not making full payment.  Lehman's interpretation,

15  which we don't agree with, is not relevant.  Lehman rejected

16  the contracts and they have no right to any benefit under

17  the contracts, assuming their interpretation were correct.

18         And there are two other problems.

19         THE COURT:  You've completely lost me now.

20         MR. MUNNO:  Okay.

21         THE COURT:  So a rejected executory contract

22  becomes irrelevant for the purposes of determining the

23  parties' damage claims back and forth under that rejected

24  contract?

25         MR. MUNNO:  I'm not saying that.  I'm saying it's

Page 59

1    irrelevant to the extent that Lehman is asserting that the

2    trustees failed to do something.  Because they're not going

3    to be making payment under that agreement in accordance with

4    the terms of that agreement.  They're not paying 100 percent

5    of what was lost on a particular loan.

6          We have two other problems with Lehman's argument.

7          First, the automatic stay did not permit the

8    trustees to come forward and say here are loans, repurchase

9    them.

10         And second, we complied with Lehman's protocol --

11   I will call it the protocol for that purpose only -- we

12   filed with the notice that we were supposed to file our

13   proofs of claims.  We did that.

14         Now Lehman as the seller and Sasco (ph) as the

15   depositor under these agreements were required to give

16   notice and cure breaches when they learned of them, and they

17   learned of those breaches from Aurora, the master servicer

18   on 252 of 255 of these loans, but Lehman --

19         THE COURT:  Of the trusts.  You said loans, you

20   mean trusts.

21         MR. MUNNO:  I did, I misspoke.

22         THE COURT:  Okay.

23         MR. MUNNO:  I meant to say trust.  Thank you.

24         THE COURT:  Okay.

25         MR. MUNNO:  Now, I just want to touch briefly on

Page 60

1    the proposed protocol.

2              Now in support of estimation Mr. Parks admitted

3    his August declaration.  In Part 7 of that declaration

4    estimates the years a loan-by-loan review would take if this

5    Court were to each other loan, and nobody is suggesting that

6    that would make any sense.

7              When Lehman proposed their protocol in October

8    they said nothing about the time or the cost that it would

9    take to do the protocol other than to say, without support,

10   it'll be economical, it'll be efficient, it's be

11   expeditious.

12             Accordingly the RMBS trustees reviewed that

13   opposition to the estimation and in support of the cross-

14   motion that was being made and put in an opposition to it

15   with Mr. Parks saying, I've looked at the protocol, let's

16   just follow what's supposed to happen under the protocol.

17   And based on his experience, which you'll hear about, he's

18   been involved for the past two and a half years virtually

19   exclusively on half a dozen put-back cases where he's

20   retrieved loan files, reviewed loan files, overseen others

21   reviewing loan files, assisted in the negotiation of put-

22   back claims to be resolved between the parties, he fully

23   understands, you know, the length of time these tasks take.

24             THE COURT:  But a lot of it is just math.

25             MR. MUNNO:  A lot of it is just math, but we're

08-13555-scc-mg  Doc 53621-6  Filed 09/30/16  Entered 09/30/16 20:19:16  Exhibit F
08-13555-scc-mg  Doc 49007  Filed 03/02/15  Entered 03/20/15 13:48:14  Main Document
Pg 61 of 374
Pg 60 of 374

1    not arguing about that.

2           THE COURT:  A lot of it is just math, and a lot of

3    is driven by whether or not you have 40 people looking at

4    loan files, or whether you have 140 people looking at loan

5    files, right?

6           MR. MUNNO:  Nothing -- none of that is driven by

7    the number of bodies you throw at it, because what it

8    ultimately comes down to, Judge, and you'll hear testimony

9    that --

10          THE COURT:  None of that is driven by the number

11   of bodies you have thrown at it?

12          MR. MUNNO:  That's correct.

13          THE COURT:  How could that be?

14          MR. MUNNO:  I'll explain.  Because if you're going

15   from one light to the next, if you go at one mile an hour or

16   a hundred miles an hour, you're going to get that light

17   faster if you go a hundred miles an hour.  But the choke

18   points in the protocol are how many loans get resolved, and

19   how many are left.

20          THE COURT:  Okay.

21          MR. MUNNO:  And so that's what takes the time.

22   What the issue is the number of loans that are unresolved.

23   Now, what Mr. Pino says is that 99.96 percent of over

24   209,000 loans would be resolved before anything has to come

25   to this Court.

```
 1              THE COURT:  Okay.  Pretty high number, right?

 2              MR. MUNNO:  A very high --

 3              THE COURT:  Right.

 4              MR. MUNNO:  Well, but we have a number from Mr.

 5    Park, too.  He says 96 percent he assumes or estimates will

 6    be resolved.  But 96 percent --

 7              THE COURT:  Okay.

 8              MR. MUNNO:  -- depending on whether we, you know,

 9    do the 150,000 or the 209,000 loans, will leave this Court

10    with anywhere between 6 and 9,000 loans to resolve, and that

11    will take years.

12              So the choke points in the protocol --

13              THE COURT:  Well, at that point, there might be

14    other options.  I mean, once you get to the end game, right,

15    there might be other options.  At that point, it may be that

16    the pool has been narrowed in a way that the parties can

17    more readily agree to a sampling methodology at that point.

18    In some of the sampling, they've sampled in pools that are

19    much, much smaller.  The way that you -- both sides have

20    gone at this is very, very binary, that it's either one or

21    the other.  It's either we do nothing in terms of an

22    individual loan-by-loan review, and simply do a statistical

23    sampling at the outset, period, full stop versus we're going

24    to look at every one of these loans and don't worry because

25    it's going to come down to a number that the Court can
```

Page 63

1    manage at the end of the day.

2          And again, you know, I understand a little bit

3    about science.  I understand, because I've spent a lot of

4    time looking at these cases, in what ways the courts have

5    employed statistical sampling, I get that.  Okay.  You don't

6    have to convince me of that, I see certain distinctions,

7    though, between the facts that we have, the agreements, that

8    we have and the others.

9          But that being said, I think that what neither

10   side has done, I'll talk to Mr. Cosenza I guess and others

11   about this is that, you know, we set the goal posts really,

12   really far apart from the beginning of this discussion, and

13   that's kind of unfortunate.  That's kind of unfortunate.

14         Now, you know, I was just talking to Judge

15   Bernstein the other day, he's got a couple of thousand

16   Madoff claims.  Okay.  And, you know, you do what you have

17   to do, they'll get done when they get done.

18         MR. MUNNO:  Well, we're interested in getting this

19   done expeditiously --

20         THE COURT:  Sure.

21         MR. MUNNO:  -- and not unduly delaying the

22   administration of the estate.  And we're interested on

23   behalf of the certificate holders in the trust to receive a

24   distribution.  And we're also interested in making sure that

25   ultimately when the RMBS claims, as I'm calling them, get

1   resolved, that there will be something left in the Lehman

2   estate so that they will be able to get a --

3          THE COURT:  Sure.

4          MR. MUNNO:  -- distribution, for whatever the

5   amount of the claim is ultimately allowed to be.  And we do

6   say that estimation is appropriate under the law, and we do

7   think statistical sampling in this circumstance, when we

8   have this number of loans, even though you could break them

9   up, and I would say it would be the same even if you had

10  50,000, 50,000, 50,000 and 50,000 across four trustees, and

11  you don't by the way, as disproportionality of the number of

12  trusts each trustee has, but the point is, we thought this

13  was an efficient and effective way to present it, to resolve

14  it, both from the point of view of the Court, and the point

15  of the view of the Lehman estate, in terms of the cost, $110

16  million.  That's a lot under their projection of the cost.

17  And from the point of view of the trust.

18         THE COURT:  Thank you.  Oh, I didn't realize I was

19  hearing from one of you.

20         MR. PEDONE:  Very briefly, Your Honor, a couple of

21  points, we're not repeating each other, but we do each have

22  a couple of points to make.

23         THE COURT:  Okay.

24         MR. PEDONE:  Your Honor, Richard Pedone for

25  Deutche Bank, it's indentured trustee.

1          Early in the presentation, you made a statement

2     that you believe that you were required to follow the

3     governing documents.  I want to reiterate that those

4     documents were rejected in the plan.  And that goes to

5     directly why an estimation process is appropriate here.

6          So you're appearing quizzically.

7          THE COURT:  I just -- this is such a unique point,

8     I just don't understand what I'm missing.

9          MR. PEDONE:  So it goes to why we estimate claims

10    in bankruptcy.  We're here today where the trustees have

11    filed claims, filed claims relatively early according to a

12    process Lehman established to resolve claims.

13          Lehman said in a multi-page protocol, if you will,

14    for how they wanted claims filed, what documents they wanted

15    submitted, the largest set of instructions in the history of

16    the world for filing claims in bankruptcy that these

17    trustees complied with --

18          THE COURT:  Okay.

19          MR. PEDONE:  -- here's how to file a claim.  The

20    trustees submitted the claim.  For those years, those claims

21    are deemed allowed.  Lehman then objects to those claims,

22    because Lehman realized going into the plan process that

23    they had to be estimated or dealt with in some way, or maybe

24    they had other reasons to reject, I don't know all of them

25    to object, but they objected, and then in connection with

08-13555-scc-mg Doc 53621 Filed 08/30/16 Entered 08/30/16 20:49:16 Main Document
08-13555-scc Doc 49907 Filed 08/02/15 Entered 08/20/15 13:48:16 Exhibit F
Pg 66 of 374

Page 66

1    the plan Lehman rejects every executory contract that is not

2    specifically assumed.  These PSAs were not assumed in the

3    other governing documents.

4           Lehman now today, after objecting, after not

5    seeking a scheduling to prosecute the objections after not

6    taking extensive discovery on the objections, Lehman comes

7    today with new litigation counsel saying, we can and we must

8    have a protocol.

9           If you look at their expert's opinion number one

10   of Mr. Alread, "In order to comply with the governing

11   documents, we must use a protocol as opposed to estimation."

12          Well, Lehman is not entitled to the benefit of the

13   governing documents, because Lehman tore them up when they

14   rejected them.  So we come to this court today on a claims

15   determination process, not a contract dispute between

16   solvent parties who have obligations to continue to comply.

17          THE COURT:  I just -- I'm sorry, I just don't

18   understand this argument.  The -- everything is still

19   subject to the governing documents.  That -- you're

20   asserting a repurchase obligation.  You're saying that

21   Lehman doesn't get to say anything about the governing

22   documents because it, in fact, hasn't repurchased the loans.

23          We're actually asserting a claim, we're not asking

24   Lehman to perform by repurchase, because Lehman chose to

25   reject the --

```
1              THE COURT:  I understand that.

2              MR. PEDONE:  -- repurchase opportunity.

3              THE COURT:  But the way you determine whether or

4    not there's a claim --

5              MR. PEDONE:  Uh-huh.

6              THE COURT:  -- is based on the documents, right?

7    Whether or not there was a material breach among other

8    things, right?

9              MR. PEDONE:  Yes, that's how you figure out what

10   the trustee's claim should be.  You can turn to the

11   governing documents.

12             THE COURT:  Okay.  So that's --

13             MR. PEDONE:  Absolutely.

14             THE COURT:  -- the field on which issue is joined.

15             MR. PEDONE:  But that is not a requirement that we

16   follow the terms of the government (sic) documents, it's not

17   a reason to reduce the trustee's claims for failure after

18   rejection to follow the governing documents, and it's -- to

19   have an expert testify as Mr. Alread did --

20             THE COURT:  I'm sorry, I just -- I'm just going to

21   be very honest, I have no idea what you're talking about.

22             MR. PEDONE:  Your Honor --

23             THE COURT:  I don't understand.  You're asserting

24   claims, and the claims are for -- arise in the first

25   instance from alleged material breaches, right?
```

```
1                MR. PEDONE:  Yes.

2                THE COURT:  Okay.  That language comes from the

3    governing documents, which have been rejected, right?

4                MR. PEDONE:  Yes.

5                THE COURT:  So Lehman's saying that they disagree

6    with you on that.  That's all this is.

7                MR. PEDONE:  No, today we're on a choice between

8    estimation or a protocol.

9                THE COURT:  Okay.

10               MR. PEDONE:  That's the issue before the Court

11   today.  Lehman's basis for arguing for a protocol is that

12   the governing documents require the trustees to take certain

13   actions, so that Lehman can repurchase, and Lehman will have

14   the right to cure, and Lehman will have the right to

15   repurchase.  That will be the testimony you'll hear, that's

16   the testimony given in the depositions, that's some of the

17   testimony in the declarations before you.  Those are two

18   alternative foreclosed to Lehman by objection.

19               Lehman can no longer cure, they gave up the

20   benefit of the documents, and Lehman can no longer

21   repurchase.

22               THE COURT:  I don't really -- Lehman can address

23   this when they argue, but it's not my understanding that

24   they're seeking to repurchase or cure.  We're trying to

25   liquidate the amount -- we're trying to establish an amount
```

1    for the allowed amount of these claims, for the purposes of

2    distribution under the plan.  That's what we're doing.

3              MR. PEDONE:  Okay.  And then I --

4              THE COURT:  Isn't that what we're doing?

5              MR. PEDONE:  That is.  And that's why I'm

6    mystified by the testimony that was given during the

7    depositions --

8              THE COURT:  Okay.  Well --

9              MR. PEDONE:  -- and the declarations concerning

10   the need for Lehman to go through a protocol on a loan-by-

11   loan basis, so that they could push the loans downstream or

12   exercise other rights under documents.  They don't have the

13   rights under the documents.  And so as long as there's no

14   testimony concerning rights under the documents, meaning we

15   have to go to protocol, I'm in complete agreement with you,

16   Your Honor.

17             THE COURT:  Okay.

18             MR. PEDONE:  Thank you.

19             THE COURT:  Thank you.

20             MR. TOP:  I just --

21             THE COURT:  We're never going to finish if this is

22   going to happen at every round.

23             MR. TOP:  Your Honor, I'm going to very brief.

24   This is Frank Top.

25             THE COURT:  All right.  So when we get to the

```
1    witnesses, let me be clear, I'm not hearing from three or

2    four of you.

3              MR. TOP:  No, I understand that.

4              THE COURT:  All right?

5              MR. TOP:  The one thing I wanted to make clear is

6    that under the terms of these governing documents, as you

7    recognize, there has to be a material and adverse effect on

8    a loan.  And I only raise this because they're going to

9    make, and I believe you're making distinctions between some

10   of the cases, particularly Mimeline (ph) cases that have

11   different documents.

12             But a (indiscernible) servicing agreement would

13   allow me in the ordinary course of business to take a

14   performing loan that has breaches in it, and return it to

15   the originator and say, look, this mortgage file has

16   problems with the loan, you're required to repurchase this

17   loan irrespective of whether there's defaults underneath the

18   terms of that loan.

19             And the reason that is the case, is because there

20   is an increased risk with respect to that loan that at some

21   point in the future --

22             THE COURT:  And that's exactly what the Monoline

23   (ph) cases are about, and that's exactly, exactly what Judge

24   Rakoff held in Flagstar (ph), exactly.  But an increased

25   risk --
```

1           MR. TOP:  That's right.

2           THE COURT:  -- is different from, is different

3    from how you calculate the amount of a repurchase

4    obligation.  And increased risk is, I'll say it again,

5    because it's a really important point, an increased risk or

6    a similar type of analysis in the securities fraud area is

7    different from what you have in the Monolines.  It's

8    entirely different.  It's entirely different.

9           Now, whether or not, in fact, when you drill down

10   on the repurchase cases, and there are very few of them that

11   have actually gone to trial.  If you drill down the

12   repurchase cases, that argument stands up in support of the

13   use of statistical sampling, that's a different issue, and

14   we are way far afield from what we should be talking about

15   right now.

16           MR. TOP:  Okay.  Well, in any event, that's -- the

17   only reason why I stand is just to make sure that we were

18   clear that we view at least the theory behind, you know, why

19   someone should pay a Monoline to be very less the same as

20   why we're able to -- you know, it's in the increase and the

21   risk in the loan file, and that's what I --

22           THE COURT:  Okay.  We'll get to that in due

23   course.  Thank you.

24           MR. TOP:  Thank you, Your Honor.

25           THE COURT:  So in what sense are we doing 15

1   minutes a side for opening?  Your estimates are clearly

2   suspect.

3          MR. STEIN:  I'll be about ten seconds, Your Honor.

4          I heard you, we heard you in your comment about

5   the goal post being very far apart.  I would like to talk

6   about that at an appropriate time, and I will wait, thank

7   you.

8          THE COURT:  Okay.  I'll let that cryptic comment

9   stand for the moment.

10          MR. STEIN:  Well, I can be much more specific with

11   the Court's permission.  I'd be happy --

12          THE COURT:  I don't know where you're going, so

13   why don't we complete the thought, and then let's give Mr.

14   Cosenza finally the opportunity to make his remarks.

15          MR. STEIN:  Sure.  I was trying not to be cryptic,

16   Your Honor.

17          THE COURT:  Okay.

18          MR. STEIN:  Grant Stein, Austin & Bird on behalf

19   of Wilmington Trust.

20          The situation that is presented where you've got

21   polar positions, and there's a line being attempted to be

22   drawn in the sand, either here or here --

23          THE COURT:  Right.

24          MR. STEIN:  -- we've got 5,000 loans that are

25   ready to go.  And those 5,000 loans can be the subject of

08-13555-scc-mg   Doc 53621-6   Filed 08/30/16   Entered 08/30/16 20:48:16   Main Exhibit F-
08-13555-scc-mg   Doc 49907    Filed 05/02/16   Entered 05/02/16 20:48:16   Main Document
Pg 73 of 374

1    the process, whether it be an estimation process, a protocol

2    process, the process of getting those ready to move forward,

3    where the parties can meet, discuss, address, and resolve

4    those --

5              THE COURT:  On a one-by-one basis?

6              MR. STEIN:  And then be before you, so that if

7    there are those that are not resolvable within 120 days,

8    submit a pretrial and get those things scheduled to be

9    tried.

10             THE COURT:  But this is out of left field.  This

11   is --

12             MR. STEIN:  Actually it's not, and I'm happy to

13   address it further.  Go ahead.

14             THE COURT:  I don't want you to address it

15   further.

16             MR. STEIN:  Okay.  Thank you.

17             THE COURT:  I want to hear from Mr. Cosenza.

18             MR. STEIN:  All right.

19             MR. COSENZA:  May it please the Court, Your Honor,

20   I'm happy to finally be here.  The plan administrator has

21   thought long and hard about this claim, bearing in mind its

22   duties to the estate as a whole, including the interest of

23   Lehman's other creditors, to whom Lehman has been diligently

24   working to make orderly and periodic distributions.

25             Your Honor, the plan administrator is not looking

08-13555-scc-mg Doc 53621 Filed 09/30/16 Entered 09/30/16 13:48:16 Main Document
08-13555-scc-mg Doc 49907-1 Filed 05/02/19 Entered 05/29/19 13:48:16 Exhibit F
Pg 74 of 374

Page 74

1    for hand-to-hand combat, we're looking for an efficient

2    mechanism to try to resolve this massive claim.

3            After much thought and consideration, Lehman has

4    concluded that the loan-by-loan claim resolution protocol

5    proposed in our cross-motion is the most appropriate course

6    here.

7            Your Honor, in this situation, we're able to

8    develop a plan or protocol under which these creditors will

9    be able to prove their claims, but prove their claims and

10   amounts related to the actual losses suffered, and the

11   actual reimbursement rights for these loans, as provided in

12   the underlying agreements.

13           As originally filed, we asked the Court to require

14   the trustees to collect the loan files, and present their

15   claims within 60 days.  We then understood from the

16   trustees' response, that they had not done anything beyond

17   collecting the 5,000 loan files that were part of their

18   sampling approach.  We took that into consideration.

19           THE COURT:  What do you think accounts for the

20   difference, the trustees say it took them I believe 18

21   months to collect the almost 5,000 loan files, and Lehman

22   estimates that the loan files can be readily collected in

23   now it's the six months.  What are you -- how do you account

24   for that different?

25           MR. COSENZA:  Your Honor, I really think there

Page 75

1    just needs to be in a position of a deadline.  We went out

2    to Aurora over the last few weeks, and were able to gather

3    60,000 loan files in a very short period of time.

4         THE COURT:  And all -- do all of those comply with

5    the 43 item checklist that you have in the protocol?

6         MR. COSENZA:  They should comply with that, Your

7    Honor.  So that's 60,000 loans sitting ready to start.  The

8    protocol could begin, in essence, tomorrow.  We understand

9    another 50,000 loan files at Nation Star, another major

10   servicer, the trustees know how to gain access to Nation

11   Star, that process should begin immediately.  It'll be a

12   process where they have to work diligently, work hard, this

13   is not going to be easy to get the loan files, but the

14   process has to start.

15        And I think if you give someone six months, they

16   will, you know, it'll take the six months to get done.  If

17   they give the trustees a year, it'll take them a year.

18        THE COURT:  But there's no way that these loan

19   files just based on what we can reasonably assume, there's

20   no way these loan files are going to have every single

21   document in them, right?  Well, so to the extent that the

22   protocol can be read to require the 43 documents to be in

23   there, to constitute a loan file, sufficient to preclude the

24   expungement of a claim, that's just not going to work.

25        MR. COSENZA:  I understand.

 1          THE COURT:  I mean, if we had great loan files, we

 2   wouldn't be in this position.  So they're going to be more

 3   of a mess than that.

 4          MR. COSENZA:  I understand that, Your Honor, and I

 5   think in terms of the 43 items, that is sort of the list of

 6   what Lehman requests.  If there's enough information in the

 7   loan file for there to be a determination made, based on the

 8   information there as to whether or not there's been a

 9   breach, whether or not that breach materially adversely

10   affected the performance of the value of the loan, that

11   would be enough for us --

12          THE COURT:  Right.  I mean that's --

13          MR. COSENZA:  -- to sort of make that assessment.

14          THE COURT:  -- an example of where the goal posts

15   are unfortunately way to Y.  Because one thing that you

16   certainly could talk about is talking about the -- trying to

17   agree on the outer limits of the types of breaches.

18          For example, one of the items I'm remembering from

19   the list, is whether or not there's evidence of a deposit or

20   a HUD compliance certificate, things that at least to me,

21   without being more fully educated by all of you, who cares.

22          MR. COSENZA:  Your Honor, if Lehman is in the

23   position --

24          THE COURT:  Unless someone is going to show me

25   statistically or otherwise, that the lack of an evidence of

1   a deposit in a folder correlates to a certain percentage

2   with there being other problems in the loan.  I mean, there

3   are lots of things that just aren't going to rise to the

4   level of mattering.

5          MR. COSENZA:  Well, Your Honor --

6          THE COURT:  They're not going to be material,

7   right?

8          MR. COSENZA:  Yeah, I think that's an important

9   point, but I think what's also an important point is, the

10  parties have to start working to getting through the loan

11  files, starting this process going immediately.  There's no

12  reason why we shouldn't be starting, you know, tomorrow,

13  getting the loan files over from Aurora.

14         The trustees already have -- you know, we already

15  have 4,700 files from the trustees, there's no reason why

16  the trustees shouldn't be able to go to Nation Star and

17  start that process going and getting another 50 to 60,000

18  loan files.  The process needs to get moving, and there

19  needs to be a point where the process should resolve itself.

20         We have -- we're going to hear expert testimony

21  from two mortgage industry experts, you know, with combined

22  50 years of experience, who have gone through with

23  painstaking detail efforts to try to get this protocol

24  completed within one year.

25         And, Your Honor, I think you raised a good point

08-13555-scc-mg Doc 53621-5 Filed 08/30/16 Entered 08/30/16 20:49:16 Exhibit F
08-13555-scc Doc 49007-1 Filed 03/02/15 Entered 03/02/15 13:48:16 Main Document
Pg 78 of 374

Page 78

1    in terms of where things stand.  Even under their view of

2    our protocol, 96 percent of the claims will never get to

3    Your Honor.  Our view is that it's a slightly higher

4    percentage.  If we start moving forward with the protocol, a

5    vast number of these claims under these loans will be

6    resolved by the parties, and they'll be resolved

7    consensually, they may be resolved with the claims

8    facilitator, which we put forward in our protocol.

9         But the most important point is the parties have

10   to start moving on this, and we need to go through this on a

11   loan-by-loan basis.

12        THE COURT:  Well, but people in glass houses,

13   right?  I mean, one of the things that they're saying is

14   that Lehman did nothing for years and years and years, no

15   one was home, nobody would talk to them.

16        MR. COSENZA:  Well, Your Honor, we're looking for

17   -- it's their obligation to produce the loan files over to

18   us to show the breach, so that we can start this process

19   going.  You'll hear from our experts later, traditionally

20   custom and practice in the industry is for a person who

21   believes they're at breach, to sort of go through and then

22   provide notice to Lehman.

23        I understand we need to start working

24   cooperatively, but typically how this works is, they have to

25   provide notice to us, and provide us some information as to

1   why there's a material breach.  So they have to start going

2   through their files.

3          THE COURT:  Well, there's a difference between --

4   I think there's -- and a number of the cases have addressed

5   this.  I don't -- maybe I'm wrong, but I'm not sure I hear

6   Lehman to be saying that a failure to provide notice in a

7   conditioned precedent sense cuts off Lehman's liability.  I

8   don't think you're arguing that, are you?

9          MR. COSENZA:  No, I'm not arguing that, Your

10   Honor.

11          THE COURT:  Okay.

12          MR. COSENZA:  I'm just saying in terms of the

13   process how this typically works in the industry --

14          THE COURT:  Right.

15          MR. COSENZA:  -- the custom is, they have to

16   provide the loan files to us, and then we sort of look at

17   that loan file, see if it's a valid claim.  There are

18   opportunities for us, for example, to cure, if there's some

19   reason that, you know, there's a de minimus document missing

20   from, you know, like the HUD file is for example missing.

21          THE COURT:  Right.

22          MR. COSENZA:  We can cure that.  There's an

23   appraisal missing, we can sometimes reach out to appraisers

24   who have the copies of files.

25          THE COURT:  But now what you're saying is that if

1    there's -- to take the missing HUD form, right --

2          MR. COSENZA:  Yeah.

3          THE COURT:  -- now what you're saying is that not

4    that you would, in fact, cure, but that you would

5    demonstrate that, it could have been cured and therefore,

6    there shouldn't be a claim arising from it.

7          MR. COSENZA:  Or we can do both, Your Honor, if

8    it's easy enough to cure it through someone else has a copy

9    of the file or the appraisal, we can try to do it both ways,

10   it would depend on the circumstance.  But that would be, you

11   know, our effort.

12         Your Honor, we've now gone through and we think

13   it's more reasonable, and we're trying to be fair to

14   everyone to start the process moving, and we now want the

15   files to be turned over to us in six months.  I think that's

16   a reasonably -- a very reasonable deadline.  You're going to

17   hear again, testimony from our two experts who are going to

18   talk about this and the process for turning over --

19         THE COURT:  Well, it's to be turned over to you,

20   but then for them, the trustees to then on a loan-by-loan

21   basis tell you what the breaches are?

22         MR. COSENZA:  Yes.  So, Your Honor, how the

23   protocol works is there's an ongoing -- you know, there are

24   five steps to the protocol.

25         THE COURT:  Right.

1        MR. COSENZA:  But many of them overlap with one

2    another, so their step zero which is collecting loan files.

3    That process should take less than six months in our view.

4    And I explained the reasons before as to how that could be

5    done.

6            Step one is the trustees on a rolling basis, and

7    this is starting immediately, start looking at the loan

8    files, start identifying for us the breaches, start turning

9    over those files to us, so that we can start step two,

10    theoretically in three days, once they start looking at the

11    Aurora files.  And we can start going through that process

12    to see, is this one that should be allowed, that goes in

13    basically in the payment pile.  No, this one is not a valid

14    claim, and you know, we have to talk to the trustees about

15    this one.

16            But that process can start within a week, so it

17    really is an effort -- that's how the protocol is out there,

18    you know, not defined time periods, it's just an effort to

19    get things moving as quickly as possible.

20            The point is, if the trustees are reasonably

21    diligent, and we have testimony from one of their experts,

22    Dr. Parekh, who talked about -- I'm sorry, Mr. Aronoff who

23    mentioned that when he started making calls to try to get

24    the on-line loan files, he was often very successful.

25            So the effort -- there has to be a deadline here,

1  they have to be put to their -- to some burden, so that we

2  can be put to our burden.  You know, we tried to sort of

3  figure this out, and try to work out in a sort of -- in both

4  a comprehensive and reasonable manner.

5          Your Honor, you did mention --

6          THE COURT:  You're not -- but you're not

7  suggesting that we actually re-underwrite 290,000 loans, are

8  you?

9          MR. COSENZA:  No.  That's not what we're asking

10  for, Your Honor, we're just looking for a process so we can

11  understand what the claims are and go through this effort.

12  I think even their expert has testified again that most of

13  these claims would be resolved once the parties start

14  meeting with one another and going through this process.

15          Your Honor, I do want to come back and talk more

16  in detail about the benefits of the protocol.  But you

17  mentioned earlier you wanted to get into the nitty gritty of

18  502(c) and what that means.

19          My colleague, Mr. O'Connor is going to address

20  that from a legal perspective --

21          THE COURT:  Okay.

22          MR. COSENZA:  -- so maybe he can just talk to you

23  for a few minutes on that --

24          THE COURT:  Sure.

25          MR. COSENZA:  -- and then I'll come back and talk

Page 83

1      about the benefits of the protocol.

2              THE COURT:  Okay.  How are you, Mr. O'Connor?

3              MR. O'CONNOR:  I'm very well, Judge Chapman, Brian

4      O'Connor from Willkie Farr & Gallagher on behalf of Lehman.

5              Your Honor, there's no doubt that this is a very

6      substantial claim that's been asserted, and that's going to

7      be a complex task to resolve it.  But I think the issue

8      before you today, as you have accurately described as a

9      legal issue, and I think it's one which is relatively

10     straight forward.

11             We submit that these claims are not estimable

12     under 502(c).  And as Your Honor is very familiar,

13     estimation of claims can be done for a variety of purposes.

14     Courts regularly estimate claims for plan feasibility, for

15     voting, for reserve purposes, and Section 502(c) as you know

16     provides on its face for estimation claims only for

17     allowance purposes, and it provides that a claim shall be

18     estimated for allowance purposes if it's contingent or

19     unliquidated, and the fixing or liquidating of the claim

20     would unduly delay the administration of the estate.

21             Now, we submit, Your Honor, that the RMBS claims

22     fail to meet the requirements of 502(c) for a variety of

23     reasons.  First, I think you've heard even today these

24     claims are not contingent within the meaning of 502(c).

25             THE COURT:  But they say they're unliquidated

08-13555-scc-mg Doc 53621 Filed 09/30/16 Entered 09/30/16 20:49:16 Main Document
Pg 84 of 374
08-13555-scc-mg Doc 49907-1 Filed 09/02/15 Entered 09/02/15 20:48:14 Exhibit F
Pg 84 of 374

1    because some of the breaches have yet to come home to roost.

2          MR. O'CONNOR:  And I think that's incorrect.  Our

3    position on that is one, with respect to the contingency

4    since they say all the reps and warranties, they would've

5    been breached or not breached at the date of the closing,

6    and you heard counsel say that their statistical sampling is

7    contending that those breaches and warranties that were

8    made, they demonstrated were material and adverse in their

9    effect on the value of the loan.  So that piece --

10          THE COURT:  So that's static.

11          MR. O'CONNOR:  That's static.  Now, when we come

12    to the remedy under the documents, there's an exclusive

13    remedy in the documents in terms of what happens if there is

14    a breach like that.  And it's the repurchase obligation, and

15    it's a set formula.  You look at the unpaid principal, you

16    looked at the accrued interest.  You look at any costs

17    because of any violation of predatory lending laws, and any

18    unreimbursed servicing costs.  That's a mathematical

19    calculation.

20          And I think you've heard counsel say again, that

21    would apply both to performing and to non-performing loans.

22    So there's no reason if the breaches occurred, if they did,

23    as of the closing date if they were material and adverse,

24    which they contend, then you can apply that formula to both

25    non-performing and performing loans.

1          And under your holding in Lightsquare, I think

2    it's clear that this is not a contingent claim.  There's

3    nothing further that needs to occur for this liability to be

4    triggered.

5          THE COURT:  Go back to the performing versus non-

6    performing loans.  They've applied their breach rate I think

7    only to the non-performing loans.

8          MR. O'CONNOR:  They -- I think --

9          THE COURT:  That's part of one of the interesting

10   issues that --

11         MR. O'CONNOR:  Right.

12         THE COURT:  -- the two sides have with respect to

13   the validity, the scientific validity of the sample.

14         MR. O'CONNOR:  Right.

15         THE COURT:  Because they're just looking at --

16   their starting part is the defaulted loans, right?

17         MR. O'CONNOR:  That's right.  As I understand it,

18   the sample they took were all non-performing loans, and

19   there's an argument about whether that's appropriate,

20   whether you should have a mix.

21         THE COURT:  Right.

22         MR. O'CONNOR:  But in any event, the point for the

23   502(c) I think is simply under Lightsquare it's not

24   contingent, there's nothing further that remains to occur.

25   If there was a breach, you can calculate the damages, and

Page 86

     1    under Lightsquare again, that would be easily ascertainable

     2    from the documents and it's therefore not unliquidated.

     3           We would submit, Your Honor, that the other

     4    requirement of the 502(c) that the fixing of the contingent

     5    claim or the liquidation of an unliquidated claim would

     6    unduly delay the administration of the estate that that's

     7    not satisfied either.  Here --

     8           THE COURT:  Well, what do we do about the specter

     9    of there being nothing left to pay them when we get to the

    10    end of the process?

    11           MR. O'CONNOR:  Well, Your Honor --

    12           THE COURT:  Isn't that something that I should be

    13    worried about?

    14           MR. O'CONNOR:  Well, first of all, we do have the

    15    background here that there was a motion to estimate for

    16    reserve purposes.  There -- that was a disputed motion.  The

    17    parties reached an agreement on the amount of the reserve,

    18    and there's really no new facts or anything since that time

    19    that ought to change that.  So I think our first position

    20    would be that that's the reserve.

    21           Now, I suppose if during the course of the

    22    protocol, something came to the parties' attention, they

    23    could always go back to the Court, and ask the Court to

    24    increase the reserve.  But at this point, I don't think

    25    there's any basis for increasing the reserve.

08-13555-scc-mg Doc 53621 Filed 08/30/16 Entered 08/30/16 20:89:16 Main Exhibit F
08-13555-scc-mg Doc 49007 Filed 08/02/19 Entered 08/20/19 20:48:16 Main Document
Pg 87 of 374

Page 87

      1              THE COURT:  Would it be possible, and in the

      2    spirit of, you know, being creative as we go along here

      3    today, would it be possible at least in theory, that if we

      4    start tomorrow as Mr. Cosenza suggests, and six months out,

      5    lo and behold, we have a half a billion dollars of claims

      6    that Lehman agrees fit the criteria, would it be possible to

      7    have some interim distribution short of a resolution of the

      8    entire pool of 209,000 claims?

      9              MR. O'CONNOR:  Well, Your Honor, assuming the

     10    facts of what you asked me if Lehman agreed that that seemed

     11    to be --

     12              THE COURT:  Right.

     13              MR. O'CONNOR:  -- appropriate certainly is

     14    something that --

     15              MR. CANTOR:  (indiscernible) certainly, Your

     16    Honor, I think it's possible --

     17              THE COURT:  Mr. Cantor.

     18              MR. CANTOR:  I apologize, Your Honor.

     19              THE COURT:  This is highly unusual.

     20              MR. CANTOR:  The plan doesn't (indiscernible)

     21    distributions absent some (indiscernible).

     22              THE COURT:  Okay.  Thank you.  Have a seat.

     23              MR. O'CONNOR:  Thank you.

     24              THE COURT:  I -- that wasn't even my question,

     25    which is yet another reason why I didn't need to hear from

1    Mr. Cantor.  Okay.  So I understand the distributions go,

2    how they go under the plan.  I'm simply trying to address in

3    a surgical and creative way possible concern that because of

4    the back ended nature of the way this process might unfold,

5    there might be ways to be creative about putting money into

6    people's hands earlier.  We don't have to run that to

7    ground.

8              MR. O'CONNOR:  No.  And I think Your Honor

9    obviously if the facts were that, I think that everyone

10   would have to be reasonable and try to do something which

11   would satisfy the Court that everybody's rights were being

12   preserved.

13             THE COURT:  Okay.

14             MR. O'CONNOR:  But to continue on the unreasonable

15   delay, and the lack thereof, of course, as Your Honor knows,

16   the plan was confirmed back in January 2012, a reserve of $5

17   billion was set by agreement of the parties for these

18   claims.  In excess of 57 billion has been distributed to

19   creditors holding allowed claims, and clearly, this case is

20   not -- its administration is not being delayed, and the

21   claim by loan-by-loan reconciliation process that we

22   advocate in the protocol is not going to unduly delay the

23   administration.

24             As you know, most of the Courts have looked at

25   undue delay as unjustifiable delay as opposed to simply

1    undue delay.  And I think one of Your Honor's comments in

2    the Lightsquare case is appropriate.  There you said that

3    delay, whether it's undue or otherwise, is not a

4    justification for ignoring applicable law, or undermining

5    the settled expectations of parties who transact every day

6    in reliance on the belief, for example, that credit

7    documents, such as guarantees mean what they say.

8              And it's, you know, our submission here that

9    notwithstanding the fact that we have a very large claim

10   amount, and a lot of individual claims that the governing

11   documents do govern here.  I will note that --

12             THE COURT:  So you disagree with Mr. Munno's

13   argument?

14             MR. O'CONNOR:  On rejection?

15             THE COURT:  Yes.

16             MR. O'CONNOR:  Yeah, I frankly don't understand

17   the argument.  It seems to me that given the allegations

18   that these breaches occurred, if they occurred at all at the

19   closing, these are all pre-rejection breaches of the

20   contract, and all we're talking about is figuring out what

21   the damages are.

22             THE COURT:  Right.

23             MR. O'CONNOR:  And the contracts govern that.  So

24   I don't follow the argument either.

25             One thing also I would comment on is --

Page 90

1        THE COURT:  I don't think -- I'm not recalling the

2   argument was made in the papers.

3        MR. O'CONNOR:  I don't believe it was, Your Honor.

4        MR. COSENZA:  (indiscernible)

5        THE COURT:  Okay.  One other point, Your Honor, on

6   this is I would just commend to Your Honor, I know you're

7   familiar with the decision, I don't think it was cited in

8   our brief -- may I approach the bench?

9        MR. O'CONNOR:  Sure.

10       THE COURT:  It's Judge Gerber's decision in ABIZ,

11  a case you'll remember.  There ABIZ was attempting to

12  confirm a plan, and ABIZ' parent, Adelphia had a $71 million

13  administrative expense claim.  And ABIZ had moved to have

14  that claim estimated both for feasibility purposes, and for

15  allowance.  And Judge Gerber is instructive I think for two

16  reasons.

17       Number one, Judge Gerber ruled that even for

18  feasibility purposes, he could not estimate the debtor in

19  possession claim.  Adelphia, the parent, had provided debtor

20  in possession financing to ABIZ and there was a liquidated

21  amount that was due.

22       ABIZ contended that Adelphia had breached its

23  obligations under the DIP and they had defenses and

24  counterclaims, and therefore, contended that that made the

25  claim unliquidated, you didn't know what the actual amount

08-13555-scc-mg   Doc 53621   Filed 08/30/16   Entered 08/30/16 23:48:16   Main Document
08-13555-scc-mg   Doc 49907   Filed 09/02/15   Entered 09/02/15 13:48:16   Main Document
Pg 91 of 374

1     would be.  Judge Gerber rejected that, and said that it was

2     a liquidating claim.

3            And therefore, said that if it came time to

4     actually doing this for allowance purposes, that would do it

5     the old fashioned way by litigation by contested matter.

6     And the most important point I think in the case is that he

7     refused to estimate these claims for anything other than

8     feasibility.  He would not estimate it for allowance

9     purposes.

10           And one quote from him I think in particular is

11    important.  He says, estimation is effective as I noted for

12    enabling bankruptcy cases and Chapter 11 cases, in

13    particular, to move forward and get recoveries into the

14    pockets of creditors without delaying the whole process, as

15    a consequence of a very limited number of complex claims.

16           But especially since the case law makes it clear

17    that the bankruptcy courts have a great deal of flexibility

18    in estimation procedures, it raises risks of the denial of

19    due process and bankruptcy courts need to be sensitive to

20    this concern.  And he concluded that trying to adjudicate

21    the claim in this short framework would've caused due

22    process concerns, and therefore, he would not do it.

23           And, Your Honor, I think we submit here that there

24    are the same kinds of due process concerns in trying to

25    litigate or estimate these claims for allowance purposes.

08-13555-scc-mg Doc 53621 Filed 09/30/16 Entered 09/30/16 20:89:16 Exhibit F
08-13555-scc-mg Doc 49007 Filed 03/02/18 Entered 03/20/18 20:48:16 Main Document
Pg 92 of 374

Page 92

1        THE COURT:  Well, are you the right -- are you or

2    Mr. Consenza the right person to talk about the other cases,

3    the other RMBS cases in which sampling has been used?

4        MR. O'CONNOR:  I can address that.

5        THE COURT:  Okay.  So why shouldn't I just follow

6    the pack?

7        MR. O'CONNOR:  Well --

8        THE COURT:  Because the pack seems to be to use

9    sampling, except notably I think the Embrace Court in

10   Minnesota, and I think that it's yet to be determined, for

11   example, in the Rescap litigation that's currently pending

12   before Judge Glenn.

13       Putting to one side what's been cited in

14   connection with settlements in the Big West Cap case --

15       MR. O'CONNOR:  Right.

16       THE COURT:  -- which is by the way neither here

17   nor there, I mean what that -- that's not a dispositive --

18       MR. O'CONNOR:  Right.

19       THE COURT:  -- statement about the use of

20   sampling, that was in the 9019 context.

21       MR. O'CONNOR:  Right.

22       THE COURT:  So I'm not interested in that.

23       MR. O'CONNOR:  Right.

24       THE COURT:  So what's your view about or in answer

25   to the statement that this is just like the Monolines or the

08-13555-scc-mg Doc 53621 Filed 08/30/16 Entered 08/30/16 08:49:16 Main Document
08-13555-scc-mg Doc 49907-1 Filed 05/20/15 Entered 05/20/15 13:48:16 Exhibit F
Pg 93 of 374

Page 93

 1    use of sampling in the repurchase context, the narrowly

 2    purchased context?

 3              MR. O'CONNOR:  Well, I think just like sometimes

 4    the cases and counsel are overly broad in their statements

 5    about estimation, not making the fine distinctions between

 6    estimation for allowance versus feasibility versus reserves,

 7    the statement that the trustees make that -- the statistical

 8    sampling has been widely accepted in these cases is far too

 9    broad.

10              And I think as Your Honor said, you really have to

11    drill down in the -- to the cases.  And as you said, you can

12    eliminate the 9019 settlement cases.  That's not relevant

13    here.  You can eliminate, as you said, the securities cases,

14    where you're talking about misrepresentation of a rep or

15    warranty in the offering memorandum.

16              THE COURT:  Right.

17              MR. O'CONNOR:  That's not here.  You can eliminate

18    the insurer cases, because again, under the indemnity

19    agreements that the insurers have --

20              THE COURT:  It's an increased risk.

21              MR. O'CONNOR:  -- and the insurance state laws,

22    that all they have to demonstrate is an increased risk of

23    loss, which is very different than demonstrating that a

24    particular rep or warranty materially affected the value of

25    the loan.

1        And so when you come down to it, you really only

2    have a couple of cases that they've cited in which courts

3    have said you can use statistical sampling.  And I think the

4    problem with those cases are, number one, they really don't

5    analyze, at least in the cases, whether or not reliance on

6    some of the other cases like the insurance cases is

7    appropriate, given the difference in the governing

8    documents.

9        And number two, even if you put that aside, the

10   most that could be said for those cases, is that the Courts

11   have essentially said, they're going to allow that, the

12   admissible evidence.  You know, they're not ruling that this

13   is going to be conclusive, that it's the only evidence

14   they're going to need.

15        THE COURT:  I mean, that -- I think and -- we can

16   get into this now or we can get into it later, but I think

17   that that's actually accurate.  I think that what courts

18   have said is that at least in one of the cases, the

19   plaintiff has elected to carry its burden by the use of

20   statistical sampling.

21        Whether or not at the end of the day they win is

22   an entirely different issue.

23        MR. O'CONNOR:  That's exactly right.

24        THE COURT:  But that the blessing of the

25   statistical sampling up front --

08-13555-scc-mg   Doc 53621   Filed 08/30/16   Entered 08/30/16 13:48:16   Main Document
08-13555-scc   Doc 49907   Filed 03/02/15   Entered 03/20/15 12:13:48   Main Document
Pg 95 of 374

Page 95

 1              MR. O'CONNOR:  Right.

 2              THE COURT:  -- I simply don't find -- I don't find

 3      that.  So that's one of the things that we're going to have

 4      to get into later.

 5              MR. O'CONNOR:  I agree with that.  I mean, the

 6      plaintiff, you know, it's their choice what kind of case

 7      they ultimately want to put on.

 8              THE COURT:  So for this purpose, the claimants are

 9      the plaintiff, right?

10              MR. O'CONNOR:  Yes.

11              THE COURT:  They're the ones with the burden of

12      proof.

13              MR. O'CONNOR:  Right.  And you're right.  I don't

14      think you can at this point make a decision that that's --

15      they can use statistical sampling, and that's all they need

16      to carry their burden.

17              THE COURT:  But on the other hand, to take you

18      back the other way --

19              MR. O'CONNOR:  Yeah.

20              THE COURT:  -- how can you really challenge the

21      narrow statistical point that you can take a population of

22      loan documents, analyze and let's assume for this

23      hypothetical that we agree on a sample, right, we agree on a

24      sample.  And that you can then analyze them for material

25      breaches.  And again, we can agree on these five things are

08-13555-scc Doc 53621 Filed 08/30/16 Entered 08/30/16 20:48:16 Main Document
08-13555-scc Doc 49907 Filed 05/22/15 Entered 05/22/15 13:48:16 Exhibit F
Pg 96 of 374

Page 96

      1    going to be material breaches.  And then you extrapolate

      2    that to a population solely, solely for the purpose of

      3    coming up with a breach rate.

      4         Do you quarrel with that?  Putting aside the

      5    additional language in the operative documents that the

      6    breach has to have a material adverse effect on the value of

      7    the mortgage loan, putting that aside, just for the purposes

      8    of establishing a breach rate.  Is it your position that

      9    statistical sampling doesn't work?

     10         MR. O'CONNOR:  Well, Your Honor, I guess the devil

     11    is in the details.  As you say a moment ago, you'd have to

     12    be -- number one, you'd have to start with the proper --

     13         THE COURT:  Sample.

     14         MR. O'CONNOR:  -- sample to begin with.

     15         THE COURT:  Right.

     16         MR. O'CONNOR:  Which they clearly haven't by

     17    looking only at the non-performing loans.  Secondly, I guess

     18    I'd have to know more about exactly you would come to the

     19    conclusion as to what at the time of the rep or warranty was

     20    made --

     21         THE COURT:  What was material.

     22         MR. O'CONNOR:  -- was it a material adverse effect

     23    on the loan.

     24         THE COURT:  Well, I'm controlling -- I'm putting

     25    that out --

1          MR. O'CONNOR:  You're assuming.

2          THE COURT:  -- I'm just talking simply, simply,

3    simply about a breach rate, plain and simple, a breach rate,

4    at least in theory.

5          MR. O'CONNOR:  Right.

6          THE COURT:  I think without getting into the --

7          MR. O'CONNOR:  Yeah.

8          THE COURT:  -- damages aspect of it.

9          MR. O'CONNOR:  I'm not a statistician, but I

10   suspect that you're probably right.

11         THE COURT:  You play one on TV.

12         MR. O'CONNOR:  You're probably right on that.

13         THE COURT:  Okay.

14         MR. O'CONNOR:  Your Honor, the only other thing I

15   would say and this may be falling more into Mr. Consenza's

16   realm, but you know, it seems to me the question before you

17   is how am I going to handle this.  And it seems to me the

18   right way to approach this is that if you do have a

19   protocol, assuming whatever the goal posts are on the

20   protocol, that that could very easily have the benefit of

21   reducing actually what the conflict is.

22         Number two, even if we get to the end, and you do

23   have still disputes, it seems to me that you could do a

24   number of things.  You could, to use Judge Gerber's

25   approach, sometimes let's have a few test cases.  There may

1    be a number of types of breaches that fall into certain

2    categories, you could litigate a few cases, and then ask the

3    parties to extrapolate that holding to the remaining claims,

4    and see if they could be resolved.

5              Or even you could try, as you suggests, perhaps

6    the statistical sampling when you got down to the smaller,

7    but it seems to me that the protocol makes sense to try to

8    get you down to as small a number as you can, and reserve

9    decision as to what to do with the smaller set once you get

10   there.

11             THE COURT:  Or you might be able to get some of

12   the low hanging fruit early in the process with respect to,

13   I'm going to make this up, don't attach any significance to

14   it, a particular tranche, in a particular trust.

15             MR. O'CONNOR:  Right.

16             THE COURT:  Just to kind of, you know, when you

17   look at all the different ways to invoke Judge Gerber, you

18   can slice and dice this, right.

19             MR. O'CONNOR:  Yeah.

20             THE COURT:  There may, in fact, be ways to look at

21   a particular cut, slice, tranche, however you want to say

22   it, and make a determination on that, and --

23             MR. O'CONNOR:  And the parties --

24             THE COURT:  -- you know, like in those Candy Crush

25   games, they have it just gets swept out, and that's the end

Page 99

1    of it, right.

2            MR. O'CONNOR:  And the parties ought to be able to

3    hopefully take a look at that decision and see if they can

4    then agree on its application to the other cases that

5    haven't been resolved.

6            THE COURT:  Okay.

7            MR. O'CONNOR:  So in summary, Your Honor, we don't

8    think 502(c) is applicable.  And even if it were, we don't

9    think the statistical sampling method of estimation would be

10   appropriate.

11           THE COURT:  Thank you.

12           MR. O'CONNOR:  Thank you.

13           THE COURT:  All right.  Let's try to wrap it up,

14   Mr. Consenza.

15           MR. COSENZA:  Your Honor, if I could have just a

16   couple of minutes on a couple of key points.

17           THE COURT:  Sure.

18           MR. COSENZA:  Just to make it clear here, for many

19   of the loans at issue, Lehman merely acted as the middleman,

20   passing along reps and warranties of loan originators and

21   loan purchasers, respected those loans issued by third party

22   originators, Lehman should bear little or no liability.

23           Accordingly, Lehman bargained for the right to

24   prosecute downstream indemnification claims against mortgage

25   loan originators.  The only way Lehman can do that is by

Page 100

1   going through protocol and --

2           THE COURT:  Why is that -- why should that be

3   their problem?

4           MR. COSENZA:  But it is an issue for the estate,

5   and why we're trying to proceed with the protocol, Your

6   Honor.  This is an effort to be fair to everyone, and try to

7   be fair to all the creditors of the estate.

8           THE COURT:  But they shouldn't be disadvantaged

9   because their counterparty is now a fiduciary in bankruptcy,

10  right?  I mean, it shouldn't make a difference.

11          MR. COSENZA:  Well, Your Honor, it does make a

12  difference in this sense, we're the plan administrator,

13  we're trying to do what's in the best interests of all the

14  creditors, so we're trying to strike a balance here between,

15  you know, making sure the claims are allowed at a certain

16  level, but also making sure we're protecting the estate and

17  trying to bring as much money as we can, and protect those

18  claims when we go downstream.

19          THE COURT:  Sure.  But they --

20          MR. COSENZA:  That's one of the reasons.

21          THE COURT:  But you have that responsibility, but

22  by the same token, the claimants shouldn't be -- they

23  shouldn't be disadvantaged by the fact that you have that

24  obligation.

25          MR. COSENZA:  But if sampling is adopted, Lehman's

1    ability to pursue the downstream claims could be eviscerated

2    and that could -- would be to the detriment of Lehman and

3    its other creditors.

4              In addition, I just also want to make one other

5    point.  The protocol you're going to hear testimony later

6    today comports with standard practices in the mortgage

7    industry, where mortgage loans routinely handled at the loan

8    level, you're going to hear testimony from even the

9    trustee's expert, that when it comes back to putting back

10   mortgages and making claims on mortgage loans, standard

11   industry practice is for the mortgage claims to be handled

12   at the loan level.  And that's not going to be in dispute,

13   and we'll go through the testimony later on that.

14             Your Honor, you also made a very important point

15   earlier about why we're here today in terms of the trusts,

16   and we have four trustees for, you know, 250 some odd

17   trusts.  If each of these trust had a different trustee, I

18   think we'd be in a fundamentally different position, in

19   terms of sampling.

20             I think given the number of loans at issue here,

21   you're talking probably in each trust a thousand, maybe they

22   vary in size, and could be at the high end, 2,000, but

23   there's no doubt in my mind that they would be able to go

24   through, and go through the loan-by-loan level exercise,

25   instead of trying to do a sampling, given the small number

Page 102

1    of loans in each trust.

2            So I think that's something we're really dealing

3    with, because they've elected to take on the fees of being a

4    trustee for so many trusts.

5            One other issue on that point, Your Honor, is the

6    expense, you know, our experts have talked about how

7    expensive the protocol will be, it'll be $110 million, and

8    we understand Your Honor's comment that, you know,

9    everything has to be taken into context.  But in terms of

10   the fees per trust, we're talking about 70 million

11   attributable to the trustees, we're talking roughly $400,000

12   per trust, given the context here, the claims that's

13   relatively de minimus, to try to get to the right result and

14   try to get to a precise number, I think that sort of makes

15   sense.

16           So, Your Honor, last, we've offered the protocol,

17   we're seeking fairness to the estate as a whole, and to

18   Lehman's creditors, it could be significantly harmed if the

19   trustees were given the shortcut they request.  Lehman is

20   prepared to honor its new purchase obligations to the

21   trustees for their claim, and to allow claims in amounts

22   equal to any properly prudent claims, but the claim

23   resolution process should comport with the agreements that

24   the parties signed on it, and it should protect Lehman's

25   ability to prosecute downstream recoveries.

Page 103

1          So thank you, Your Honor, and you'll hear

2    testimony in a few minutes.

3          THE COURT:  Okay.  Why don't we, let's talk about

4    what we ought to do next, and let's talk about the trustees

5    filed a motion to strike the declaration of Mr. Alread, is

6    it?

7          MR. COSENZA:  Yes, Alread.

8          THE COURT:  Alread.  And yesterday there was a

9    motion in limine filed with respect to Dr. Parekh's report

10   and testimony.  So should we talk about those?

11         MR. COSENZA:  Sure, Your Honor.

12         THE COURT:  Unless you want to argue further, I

13   can just tell you my view on those two motions.

14         I think that with respect to the motion to strike

15   the declaration of Mr. Alread and the portions of the reply

16   brief, I don't think it'll be in anybody's interest for me

17   to go through and do a line-by-line.  I am not interested in

18   Mr. Alread's views or anybody's views for that matter, on

19   how to interpret the governing agreements.

20         To the extent that the experts wants to testify

21   about what industry practice is, that comes in, I'm happy to

22   hear that.  To the extent that in the declaration or the

23   brief or the testimony it's about what the loan documents

24   require, that I'm not interested in.  That's for me to

25   determine.  All right?

```
 1              MR. COSENZA:  We agree with that, Your Honor.

 2              THE COURT:  Okay.

 3              MR. COSENZA:  They'll be classified on the custom

 4    and practices --

 5              THE COURT:  Okay.

 6              MR. COSENZA:  -- in the industry, regarding how

 7    these contracts usually --

 8              THE COURT:  All right.  Mr. Munno, that satisfies

 9    your points in that regard?

10              MR. MUNNO:  It does.

11              THE COURT:  Okay.  Very good.  All right.

12              So then let's talk about the motion in limine with

13    respect to Dr. Parekh, which is just a different -- which is

14    different.  Did you -- given the timing on the filing, you

15    haven't had an opportunity to address it at all, and since

16    it's seeking to exclude his testimony in the entirety, do

17    you want to talk about that a little bit?

18              MR. MUNNO:  Yes, I do, and you're correct --

19              THE COURT:  Okay.

20              MR. MUNNO:  -- we haven't had an opportunity to

21    address it at all.  But I would say this, and we would

22    demonstrate Dr. Parekh's credentials to speak to the issues

23    about which we would call him.

24              THE COURT:  Including getting past the issue of

25    what the -- what Lehman says is in the inappropriate
```

```
1    reliance on the hearsay evidence of digital risk?  In other
2    words, getting past the mere regurgitation of hearsay
3    problem?
4              MR. MUNNO:  Yes.
5              THE COURT:  Okay.
6              MR. MUNNO:  Including all that.  But let's just
7    first start with his qualifications.  So you'll hear
8    evidence from Dr. Parekh that during the past two and a half
9    years he has spent virtually all of his time on large RMBS
10   put back cases.  And in connection with that, and we are
11   offering for his expertise and industry knowledge, custom
12   and practice, about the time it takes to retrieve large
13   numbers of loan files, the time it takes to forensically re-
14   underwrite loan files for material and adverse problems with
15   those loan files, the time it takes when negotiations occur
16   with respect to put back claims, and for his expertise in
17   put back cases, where sampling has been employed, being more
18   economical than doing each loan-by-loan.
19             So we're going to be making that point with
20   respect to his credentials, which qualify him to testify
21   about that.  And an expert under 703 can rely on, you know,
22   the observations that he has --
23             THE COURT:  Inadmissible evidence.
24             MR. MUNNO:  Yes.
25             THE COURT:  Right?
```

1      MR. MUNNO:  He can.  So, I mean, so I don't think

2   there's going to be --

3      THE COURT:  But it has to be -- he has to use that

4   in synthesizing his own views.  He can't simply just repeat

5   what the other person told him.

6      MR. MUNNO:  That's right.

7      THE COURT:  Right?

8      MR. MUNNO:  He's not a puppet, and he has his own

9   views, and you will hear from him and be satisfied.

10     THE COURT:  And you're telling me that I will hear

11  that?

12     MR. MUNNO:  You will.

13     THE COURT:  Okay.

14     MR. MUNNO:  I am.

15     THE COURT:  All right.  I'm going to deny the

16  motion in limine, we're going to hear from Dr. Parekh.

17     So the question now is, do you want to get started

18  with the evidence, do you want to take your lunch break now,

19  what would you folks like to do?  I'm happy to do either

20  one.

21     MR. COSENZA:  Your Honor, whatever you prefer.  I

22  -- you know, I know we're a little bit behind schedule, so

23  from our perspective, maybe we should get started with

24  Dr. --

25     THE COURT:  All right.  We're going to be here I

1     think for most of the afternoon, so since it's minutes

2     before 12, why don't we take a lunch break now. You can get

3     yourselves assembled. Why don't we restart at 12:45.

4             MR. COSENZA: That's great, Your Honor.

5             THE COURT: All right. If you'd like to bring in

6     coffee in the afternoon that's fine, I simply ask you that

7     you clean up after yourselves. All right? Thank you.

8             MR. MUNNO: Thank you, Your Honor.

9             THE COURT: I should add also that I think I'll

10    give you a ruling on the estimation issue when we come back

11    at 12:45. All right? And to the extent that we need to

12    clarify what we're going to do next as a result of that, we

13    can do that. Okay?

14       (Recessed at 11:59 a.m.; reconvened at 12:51 p.m.)

15            THE COURT: All right. So let me start with the

16    motion pursuant to Section 502(c) of the Bankruptcy Code to

17    estimate the claims and let you know that I'm going to deny

18    the motion to estimate.

19           Consistent with what I think is pretty clear case

20    law on this point, and that's a test that was set forward in

21    a number of cases, including the Mazzio case.

22           In my view, this is a claim that's capable of

23    ready determination and precision and computation by

24    reference to an agreement or otherwise by perhaps not simple

25    computation, but by computation.

1          This is certainly not what the courts have

2     traditionally characterized as an unliquidated claim for the

3     purposes of 502(c).  Moreover, even if one did characterize

4     this as an unliquidated claim, it does not fall within the

5     contemplated parameters of 502(c) and that I don't believe

6     that its determination will unduly delay the administration

7     of the case.

8          Getting to an allowed amount of these claims, is

9     going to take some time, there's no question about that.  A

10    reserve has been set.  We can talk about another day, and I

11    believe the parties have agreed that we would talk about

12    another day.  Whether or not there's an ability to revisit

13    the reserve amount pending a determination of this motion,

14    I'm not giving a view one way or the other on that today.

15    We will all agree we're not going to talk about that today,

16    and we're not going to talk about it today.

17          I do not believe that the time that it takes to

18    allow the RMBS claims that are at issue here will unduly

19    delay the administration of this case.

20          To the extent that it seems appropriate later for

21    me to issue a more formal opinion with respect to the 502(c)

22    issue, I'm happy to do that.  But in the interest of moving

23    us forward and clarifying what we're going to do next, I

24    wanted to give you that ruling now.

25          So -- yes, Mr. Pedone?

08-13555-scc mg Doc 53621 Filed 09/30/16 Entered 09/30/16 20:48:16 Main Document
08-13555-scc Doc 49907 Filed 09/02/15 Entered 09/28/15 13:48:16 Exhibit F
Pg 109 of 374
Pg 109 of 374

Page 109

```
 1              MR. PEDONE:  Your Honor, may I ask a point of
 2    clarity?
 3              THE COURT:  Yes.
 4              MR. PEDONE:  I understand that ruling is under
 5    502(c).
 6              THE COURT:  That's correct.
 7              MR. PEDONE:  But the (indiscernible) bankruptcy
 8    law, the question of whether --
 9              THE COURT:  That's right.
10              MR. PEDONE:  -- samples is appropriate going
11    forward under some other --
12              THE COURT:  For the purpose of allowance, that's
13    correct.
14              MR. PEDONE:  That remains open.
15              THE COURT:  That's exactly right.
16              MR. PEDONE:  Thank you.
17              THE COURT:  Right?  So just to be clear, right, as
18    a matter of law, I'm not going to estimate these claims
19    pursuant to 502(c), we're going to move to the allowance of
20    the claims.  So the question then becomes down the road,
21    whether or not the claimants are going to be able to, I
22    don't know how to say it, be permitted to, I don't know if
23    that's the right rubric are going to use sampling.  That's
24    the next step.
25              So when we get to the end of today, and we see
```

```
 1   more clearly what the path forward is, we should circle back

 2   and talk about that issue, because presumably, in the

 3   context of the allowance of the claims, as opposed to the

 4   estimation of the claims, you folks are going to want to

 5   still use sampling.  Right?

 6            MR. PEDONE:  Correct, yes, Your Honor.

 7            MR. COSENZA:  And we oppose that, Your Honor.

 8            THE COURT:  Understood.  And you're going to

 9   oppose it.  So we -- so step one, no estimation; step two,

10   we're going to come up with a path towards allowance, and

11   then we're going to have to circle back and revisit the

12   sampling issue.

13            But for that purpose, we're not going to bring in,

14   for example, Dr. Parekh's August declaration.  We're not

15   doing that today.

16            MR. MUNNO:  Correct.

17            THE COURT:  Right?

18            MR. COSENZA:  Your Honor, in terms of the next

19   steps, I think what's really at issue right now is Lehman's

20   protocol.

21            THE COURT:  That's right.

22            MR. COSENZA:  So I think in terms of logic, I

23   think it makes sense for Lehman to propose and put forward

24   its two experts --

25            THE COURT:  Yes.
```

Page 111

1          MR. COSENZA:  -- and put them on and --

2          THE COURT:  I agree.

3          MR. COSENZA:  -- move forward.

4          THE COURT:  Mr. Munno, do you agree?

5          MR. MUNNO:  We agree.

6          THE COURT:  Excellent.  See how many points of

7    agreement you can find, if you just try.

8          MR. COSENZA:  Your Honor, in terms of

9    administration, I'm going to call Mr. Alread.  Should I hand

10   around the exhibits and demonstratives I intend to use at

11   one point in time?

12         THE COURT:  Yes, please, that'll be great.

13      (Pause)

14         MR. COSENZA:  May I approach?

15         THE COURT:  Yes, thank you.

16      (Pause)

17         MR. COSENZA:  With that, Your Honor, I'm going to

18   call William Alread to the stand.

19         THE COURT:  You're over here, Mr. Alread.  Would

20   you raise your right hand, please?

21              WILLIAM ALREAD, WITNESS, SWORN

22         THE COURT:  All right.  Please have a seat, make

23   yourself comfortable.  If at any time you need to take a

24   break or you need anything, please let us know.

25         THE WITNESS:  Thank you.

```
 1          THE COURT:  Irrespective of whether counsel asks

 2    you.  Okay?

 3          THE WITNESS:  Thank you, Your Honor.

 4          THE COURT:  All right.

 5    DIRECT EXAMINATION

 6    BY MR. CONSENZA:

 7    Q    Okay.  Can you state your name for the record?

 8    A    William Carl Alread.

 9    Q    And what do you currently do for a living?

10    A    I work for Steel Mountain in Denver, Colorado.

11    Q    And what is the nature of Steel Mountain's business?

12    A    We buy and sell loans from account, we broker loans to

13    buyers and sellers, and we provide litigation support both

14    in whole loans and RMBS transactions.

15    Q    And what is your current title at Steel Mountain?

16    A    Chief operating officer.

17    Q    And can you describe generally what your

18    responsibilities are?

19    A    In charge of the accounting department, preparing our

20    financials, due diligence for all the loans that we

21    reviewed, negotiations of the contracts where we buy loans,

22    closing of those transactions and monitoring our service

23    import portfolio going forward.

24    Q    Do you have any interaction with RMBS transactions?

25    A    I have.
```

08-13555-scc-mg  Doc 53621  Filed 09/30/16  Entered 09/30/16 20:09:16  Exhibit F
08-13555-scc-mg  Doc 49907  Filed 09/02/15  Entered 09/29/15 13:48:16  Main Document
Pg 119 of 374

Page 113

1    Q    Can you describe what they are at Steel Mountain?

2    A    Steel Mountain doesn't currently do RMBS.  I have at my

3    time at Security National and at First Tennessee, we worked

4    on RMBS transactions, but right now, Steel Mountain doesn't

5    hold any residential bonds.

6    Q    Okay.  And how long have you been at Steel Mountain?

7    A    Nine years.

8    Q    And before Steel Mountain, where did you work?

9    A    Security National.

10   Q    And what did you do at Security National?

11   A    I was in charge of the performing loans that we

12   purchased, the due diligence on those loans, reviewed the

13   collateral, reviewed the servicing, preparation of

14   agreements and closing the transactions.

15   Q    And what was your title at Security National?

16   A    Senior vice president.

17   Q    And can you describe generally what your job

18   responsibilities were?

19   A    I was in charge of the performing loans, performing due

20   diligence on those loans, the purchase and sale agreements,

21   the closing of those transactions.

22   Q    Okay.  And before Security National, where were you

23   employed?

24   A    Matrix Capital Bank.

25   Q    And how long were you there?

08-13555-scc-mg   Doc 53621   Filed 08/30/16   Entered 08/30/16 20:48:16   Exhibit F
08-13555-scc-mg   Doc 49007   Filed 03/02/15   Entered 03/20/15 13:48:16   Main Document
Pg 114 of 374

Page 114

1    A    Two years.

2    Q    And if you can describe what you did at Matrix?

3    A    Matrix didn't originate loans, we purchased loans to

4    grow the balance sheet.  I was in charge of the policies and

5    procedures for the bank, the review of the loans,

6    determining if they met the bank's policies and procedures.

7    Assuming they did, I was in charge of preparing the

8    agreements, closing the transactions, and reporting to the

9    board of directors on the portfolio.

10   Q    Okay.  And before you were at Matrix, where were you

11   employed?

12   A    First Tennessee Capital Assets.

13   Q    And how long were you at First Tennessee?

14   A    Six and a half, seven years.

15   Q    Describe generally what your responsibilities were at

16   First Tennessee.

17   A    We would go to the smaller banks and savings and loans

18   that were not Fannie/Freddie approved, we would go in,

19   review their portfolio of loans, determine if they met the

20   agency requirements.  Of those loans that did, we would

21   purchase those loans, structure them into RMBS Fannie and

22   Freddie securities, and then sell those bonds.

23   Q    Okay.  And before you were at First Tennessee, where

24   were you employed?

25   A    First Mortgage Strategies Group.  We were -- this is

1   during the mid, late '80s in the savings and loan crisis.

2   We were one of the largest vendors for the Resolution Trust

3   Corporation or the RTC.  We would go into failed Thrifts

4   that the RTC had taken over.  We would review their

5   portfolios, obtain information on the loans, market that

6   information to potential purchasers, and ultimately sell the

7   loans.

8   Q    So how long in total have you been in the mortgage

9   industry?

10  A    Thirty years.

11  Q    Are you a member of any mortgage industry groups?

12  A    Yes.

13  Q    Which ones?

14  A    My company is a member of the Mortgage Bankers

15  Association.

16  Q    And during your time, this 30 year period, you've been

17  involved in some capacity in conducting loan level reviews?

18  A    I have, the whole time.

19  Q    Can you give a rough estimate regarding your real

20  number of loan reviews that you've conducted or overseen

21  during your 30 year career in the industry?

22  A    I haven't gone back and counted them over a 30-year

23  period.  Very conservatively, you could say one different

24  transaction per week, so over 30 years, that would be about

25  1,500 loan reviews.  Some of those would be small and some

1    would be in the tens of thousands of loans.

2    Q    And how long have you been involved in litigation

3    support matters?

4    A    Just four years.

5    Q    And that's all been at Steel Mountain?

6    A    That's correct.

7    Q    And just during those four years, have you worked --

8    ever conducted loan level reviews as part of your litigation

9    support activities?

10   A    I've been involved in a couple of different loan level

11   reviews.

12   Q    And for any particular matters?

13   A    One on my bio it was the Nomora Plumber's Union case.

14   Nomora had structured and sold residential backed

15   securities, the Plumber's Union was suing them over the

16   quality of those loans.  Sorry, lost my train of thought.

17   Q    That's fine.

18   A    My first trial.  We reviewed the loan files in my

19   office, determined if the breaches were accurate or not, and

20   I issued a report on the quality of the loans.

21   Q    How many loan files did you review in connection with

22   the Nomora matter?

23   A    Approximately 150.

24   Q    Okay.  Any other matters you've worked on recently?

25   A    Recently I was hired by Williams and Connolly, they

1   were representing Merrill Lynch, B of A in the FHFA matter.

2   Williams and Connolly had two different due diligence firms

3   they were dealing with, accounting firms, and different law

4   firms, and they hired our group to help them manage that

5   process.

6   Q    And how many loans did you and your team review in that

7   case in the FHFA matter?

8   A    As it relates just to Bank of America and Merrill

9   Lynch, there were approximately 11,000 loans, but they were

10  16, 17 defendants in that case.  So it's my understanding if

11  you added all the defendants in the FHFA together, it was

12  approximately 100,000 loans.

13          MR. COSENZA:  Your Honor, I seek to qualify Mr.

14  Alread as an expert on custom and practice in the mortgage

15  loan industry in large and small mortgage loan reviews.

16          THE COURT:  All right.

17          MR. COSENZA:  Okay.

18          MR. TOP:  Your Honor, we object on the grounds

19  that he hasn't established that Mr. Alread has any

20  experience in doing put back loans.  All they've attested to

21  is that they've done loan level reviews.  It's my

22  understanding that Mr. Alread primarily conducts rebuttal

23  reviews of loans.  Meaning that he doesn't go in and review

24  a loan file for purposes of determining whether or not there

25  are breaches of representations or warranties in those

Page 118

1    loans, he takes that loan file that it's given by someone

2    who is using -- who has done that work, and then verify

3    whether or not he believes that that entity is correct.

4           THE COURT:  Mr. Cosenza, do you want to respond to

5    that?

6           MR. COSENZA:  Is he looking to voir dire the

7    witness, or is he -- does he want me to just ask a question

8    whether he has expertise in breaches of --

9           THE COURT:  It's unclear to me.

10          MR. COSENZA:  Yeah.

11          THE COURT:  It's unclear to me that that's a

12   distinction with a difference --

13          MR. COSENZA:  Yes.

14          THE COURT:  -- or difference with a distinction.

15          MR. COSENZA:  Yeah, I don't really understand,

16   Your Honor, he's involved in massive loan level reviews for

17   -- in the FHFA case, that was a case where they were seeking

18   rescission, it's different in some context.

19          THE COURT:  So are there additional questions you

20   want to ask the witness?

21   VOIR DIRE EXAMINATION

22   BY MR. TOP:

23   Q   Mr. Alread, how many loans have you reviewed personally

24   for purposes of determining whether or not breaches of

25   representations and warranties exist with those particular

08-13555-scc mg Doc-53621-6 Filed 08/30/16 Entered 08/30/16 30:89:16 Main Exhibit F
08-13555-scc mg Doc 49007-1 Filed 09/02/15 Entered 09/20/15 13:48: Main Document
Pg 119 of 374

1  mortgage loans for purposes of putting them back to a

2  (indiscernible)?

3  A    Well, two questions there.  With the exception of my

4  first job at First Mortgage Strategies Group, I've always

5  been in charge of put backs and demand letters for the

6  companies that I've worked for.  Demand letters would be

7  issued to me, I would issue demand letters to others.

8       As it relates to litigation support, as put backs in

9  litigation support, I've only doing that for four years.

10 I've not counted the number of loans I personally reviewed,

11 but I've looked at hundreds, if not thousands in the cases

12 that I've worked on.

13 Q    Is that -- Mr. Alread, is that in the context of

14 reviewing the loans to determine whether breaches of

15 representation and warranties exist, or is that in the

16 context of determining whether someone else's determination

17 of whether breaches of representation and warranties exist?

18 A    For the most part, I've worked for the defense, so we

19 would -- I would've been a rebuttal expert.  I would've

20 received the plaintiff's expert report.  That typically

21 comes along with a list of alleged breaches, and our process

22 has been to rebut those alleged breaches, if we feel like

23 they're incorrect.

24 Q    Do you have any idea how many loans you have reviewed

25 for purposes of determining breaches of representations and

1  warranties on those mortgage loans to put them back to third

2  parties?

3  A    I think my answer would be the same.  I'm not sure I

4  understand your question.

5  Q    I'm just asking you, do you know approximately how many

6  loans you've reviewed for purposes of determining breaches

7  of representations and warranties of mortgage loans for

8  purposes of putting them back to the seller?

9  A    Well, in all the cases that we've done loan level

10  reviews, we are reviewing the alleged breach, to determine

11  if we agree it's an alleged breach or not.  If we agree with

12  the alleged breach, we don't do anything.  If we don't

13  agree, then we create a rebuttal.  But the first step in

14  that process is determining whether you agree that there's a

15  breach of the representations and warranties or not.

16  Q    But is it true -- it's true, is it not, that that's on

17  the rebuttal side of the process --

18        THE COURT:  Okay.  We're going to --

19  Q    -- rather than on --

20        THE COURT:  -- conclude this now.  Okay.  The

21  objection is overruled.

22        MR. TOP:  Thank you, Your Honor.

23        THE COURT:  Thank you.

24        MR. COSENZA:  Your Honor, if I can approach the

25  witness --

Page 121

```
 1              THE COURT:  Yes.

 2              MR. COSENZA:  -- and hand him the exhibits and his

 3      expert report.  Shall we mark these into evidence?

 4              THE COURT:  Yes.

 5              MR. COSENZA:  I don't know if we have the

 6      stickers.

 7              THE COURT:  You don't need stickers, you can just

 8      mark them.

 9              MR. COSENZA:  Okay.  That's fine.  I'll hand it

10      to --

11              THE COURT:  And mark it as Lehman 1 or Trial 1,

12      whatever you prefer.  That's the --

13              MR. COSENZA:  That's the -- his report will be 1,

14      and the two demonstratives I guess would be 2.

15              THE COURT:  Okay.

16      DIRECT EXAMINATION, CONTD.

17      BY MR. COSENZA:

18      Q    Now, Mr. Alread, you drafted this declaration?

19      A    Yes, I did.

20      Q    And you -- it was submitted to the Court on December

21      3rd, 2014 to the best of your knowledge?

22      A    That's correct.

23      Q    And would you look at it quickly, is this your report?

24      A    It sure appears to be.

25              MR. COSENZA:  So introduce Alread 1 into the
```

1    record.

2    Q    Can you please describe for the Court and summarize

3    maybe, the two opinions you've offered in your report?

4    A    Yes.  My first opinion is that I feel like the protocol

5    is an efficient effective manner of determining if there

6    were, you know, actual breaches on these loans.  I think it

7    follows that spirit of the industry standard.  And I think

8    it's a good way to get this litigation resolved.

9              THE COURT:  Would you pull the microphone a bit

10   closer to you?  We're recording everything, and we need to

11   be able to hear you.

12             THE WITNESS:  Sorry.

13             THE COURT:  That's fine.

14   BY MR. COSENZA:

15   Q    Mr. Alread, do you have an opinion with regard to the

16   timeline that will be necessary to effectuate the protocol?

17   A    I do.

18   Q    And what is that opinion?

19   A    I feel like that if the parties work together, we can

20   get this done in a year.

21   Q    And what do you base that on, that opinion?

22   A    My 30 years of reviewing loan files.

23   Q    If you look at the protocol, step 0 of the protocol is

24   the trustees being able to gather the underlying loan files.

25   A    That's correct.

08-13555-scc-mg  Doc 53621-6  Filed 08/30/16  Entered 08/30/16 20:48:16  Exhibit F
08-13555-scc  Doc 49907-1  Filed 05/02/15  Entered 05/26/15 13:48:16  Main Document
Pg 123 of 374

1   Q    Okay.  What's your view on the abilities of the

2   trustees to get the underlying loan files within 180 days?

3   A    As I said in my deposition, I feel like we've got

4   50,000 ready to go, if you add in the loans with Nation

5   Star, the others in the motion footnote, we're almost

6   halfway there.

7        So assuming everybody works together, I think we can

8   get this done.  There will be some challenges, but I feel

9   like we can get it done in 180 days.

10  Q    So you think this process in terms of the collection of

11  loan files can be completed within six months?

12  A    Let me back up a little bit.  The majority of the loan

13  models are almost all the loan files.  We're going to have

14  some missing files, that's just inevitable.  I think Mr.

15  Pino's report takes that into account.  So I didn't want to

16  suggest that we would be finding every single loan file.

17  There will be hopefully just a very few that are missing.

18  Q    And do you think there's capacity in the industry to

19  undertake the review of the loans, as contemplated by the

20  protocol?

21  A    Yes, I do.  I'm talking to re-underwriters in the

22  business all the time, hired some to work on a project in

23  our office last week.  I talked to some of the larger due

24  diligence firms.

25       If you really take into account how big the FHFA case

Page 124

```
 1    was, I think that's the best example of how this capacity

 2    has come about recently.  The majority of those cases

 3    settled earlier in the year, and there were hundreds, if not

 4    thousands of re-underwriters working on that project, and I

 5    do believe there's capacity in the industry to do this.

 6    Q    Have you reviewed the two reports prepared by Dr.

 7    Parekh in connection with the protocol?

 8    A    Yes, I have.

 9    Q    Do you have an opinion regarding Dr. Parekh's

10    conclusion regarding the timeline to complete the protocol?

11    A    I do.

12    Q    And what is your opinion?

13    A    I'm sure Dr. Parekh is a good man and a good

14    mathematician, but to suggest that this would take 27 years

15    or 41 years or whatever his ultimate decision is, I just

16    don't agree with.  I think our industry and other areas has

17    done big reviews, and I just don't believe it'll take that

18    long.  I think we can do it in a year.

19    Q    Do you have any opinion on the overall cost of

20    implementing and completing the protocol within a year?

21    A    I do.  I've read Mr. Pino's report, I've discussed it

22    with him.  I feel like that's reasonable, and I think we can

23    do it for $110 million.

24    Q    And is that based on your experience in the industry as

25    well?
```

1    A    Based on my 30 years of experience in due diligence

2    reviews.

3    Q    Can you also look at your declaration, and look at your

4    second opinion?

5    A    Okay.

6    Q    Can you summarize your second opinion for the Court or

7    second and summary opinion?

8    A    In my business, in my 30 years in this business, I feel

9    like this has got to be done on the loan level.  I don't see

10   how you could -- to do this on a sample.  You've got to

11   identify the specific loan, you've got to identify the

12   specific breach, we've got to determine if there is a

13   breach, and I feel like this just has to be done on the loan

14   level.  I just don't see how you would do it based on a

15   sample.

16   Q    So is it your opinion that the only way to go through

17   this process in order for Lehman to preserve its downstream

18   rights, is to do this on a loan-by-loan basis?

19           UNIDENTIFIED:  Objection, leading.

20           THE COURT:  Sustained.

21   Q    Is there any other way to do this, Mr. Alread?

22   A    No, as I'd said, you have to identify the loan, you've

23   got to determine if there's alleged breach.  Hopefully there

24   would be a remedy, some discussion about whether there is

25   alleged breach or not.  You'd have to have the ability to

1    cure that alleged breach, and then potentially as it relates

2    to the transferred agreements, Lehman would need the ability

3    to go and put the loan back to the originator.

4    Q    And these views are based on your 30 years of

5    experience as to how it's done?

6    A    That's correct.  That's how we do it in our business,

7    and that's how it's always been done in the industry.

8              MR. COSENZA:  Your Honor, I'm done with my direct.

9              THE COURT:  Thank you.

10             MR. COSENZA:  I'm sorry, Your Honor, Mr.

11   (indiscernible) corrected me.  I don't believe I've moved

12   the report into evidence, Exhibit 1.

13             THE COURT:  Okay.  Any objection?

14             MR. COSENZA:  And also the declaration, the

15   summary and demonstratives as Exhibit 2.

16             THE COURT:  Any objections from the trustees

17   either on the admission into evidence of one or both of

18   these exhibits?

19             MR. TOP:  Well, my only objection on the second

20   one, Your Honor, is with respect to opinion 2 that talks all

21   sorts about governing documents and things like that.

22             THE COURT:  So the admission into evidence of

23   these documents is limited by my earlier ruling --

24             MR. TOP:  Ruling, yes.

25             THE COURT:  -- with respect to not taking the

1    expert's opinion on matters that I believe are a matter of

2    legal interpretation of the governing documents.

3            MR. TOP:  That's --

4            THE COURT:  So subject to that, they're going to

5    come in.

6    (Debtor's Exhibit Nos. 1 and 2 received)

7            MR. TOP:  That would be fine, Your Honor.

8            THE COURT:  Okay.

9    CROSS-EXAMINATION

10   BY MR. TOP:

11   Q    Good afternoon, Mr. Alread.

12   A    Good afternoon.

13   Q    You -- have you ever, yourself, requested 200,000

14   mortgage files from a servicer?

15   A    No, I have not.

16   Q    Do you know how many servicers are involved with

17   respect to the mortgage loans that were in the portfolio

18   that we're talking about today?

19   A    As I told you in my deposition yesterday, no, I do not.

20   Q    Have you reached out to any of the servicers that are

21   servicing the mortgage loans in this portfolio to determine

22   how quickly they might be able to assemble these mortgage

23   loans?

24   A    Well, if I don't know who the servicers, I wouldn't

25   have been able to reach out to them.

Page 128

1    Q    Have you seen the 50,000 loans that have been

2    apparently produced by Aurora?

3    A    No, I have not.

4    Q    Do you even know yourself whether or not those loans

5    have been produced?

6    A    I don't, but I don't think that people at Willkie would

7    lie to me about that.

8    Q    Now, getting to your report, it's true, is it not, that

9    you have worked in a couple of matters where sampling was

10   involved?

11   A    Yes, it is.  There were two matters, one was a Monoline

12   case, and again, I'm not legal counsel, I'm not an attorney,

13   but I understand it was different because it was associated

14   with New York insurance laws, and as I understand it, both

15   parties agreed to it.  Nobody asked me whether I thought

16   they should sample or not.  If they had, I'd told them they

17   probably shouldn't.

18        And then in the FHFA case that I mentioned as well, it

19   was a rescission case, not a repurchase case.  And again, as

20   I understand it, both parties agreed to the sampling.

21   Q    Now, you mentioned I believe that you reviewed Dr.

22   Pino's or Dr. Pino's -- Mr. Pino's declaration in connection

23   with the preparation of your declaration?

24   A    Yes, I did.

25   Q    And you -- I believe you testified that you found it

Page 129

1    reasonable.

2    A    I did, yes.

3    Q    What due diligence did you do in connection with any of

4    the numbers that Mr. Pino came up with in his declaration?

5    A    I reviewed the numbers, I checked the math, thought

6    about where I could, whether each number was really

7    reasonable or not.  I liked the way that he put in some

8    contingencies as to okay, we're not going to have all these

9    people working on the project at one time.  He cut that back

10   to 90 percent of the people.  I liked that.

11       He took into account the contingency that realistically

12   we're going to have, you know, some portion of missing

13   files.  I reviewed his report.  I felt like it was

14   reasonable.

15   Q    And -- but it's true, though, that your belief that

16   this -- his report is reasonable is based on your own

17   industry experience, you did not consult a database or books

18   of any kind or statistical analyses with respect to this

19   industry in coming up with your conclusion that these are

20   reasonable numbers?

21   A    I guess my answer there would be, I viewed it in

22   connection with my 30 years in the business.  I don't know

23   of any books or databases that are specifically set up to

24   review 150,000 loans.  I reviewed his numbers, and I felt

25   like they were reasonable based on my experience.

08-13555-scc-mg Doc 53621-6 Filed 08/30/16 Entered 08/30/16 30:89:16 Exhibit F
08-13555-scc-mg Doc 49907-1 Filed 09/02/15 Entered 09/02/15 13:48:16 Main Document
Pg 130 of 374
Pg 130 of 374

Page 130

1    Q    And in connection with the number of underwriters that

2    might be available to complete the project that is outlined

3    in the protocol, have you contacted any review firms in

4    connection with this particular project, to determine

5    whether or not they, in fact, had availability?

6    A    I've not spoken to anybody about this particular

7    project.  I am in contact with review forums, review firms

8    in my normal course of business.

9                MR. TOP:  No further questions, Your Honor.

10               THE COURT:  All right.  Any redirect?

11               MR. COSENZA:  I'm going to move with my next

12   witness.

13               THE COURT:  Okay.

14               MR. COSENZA:  You can be excused, Mr. Alread.

15               THE COURT:  Thank you, Mr. Alread.

16               THE WITNESS:  Thank you.

17               MR. COSENZA:  Your Honor, I'm going to call next

18   Craig Pino to the stand.

19               THE COURT:  All right.

20               MR. COSENZA:  Your Honor, may I?

21               THE COURT:  Yes.  Mr. Pino, would you stand up,

22   please?

23               MR. PINO:  Oh, yes.

24               THE COURT:  Would you raise your right hand?

25                    CRAIG PINO, WITNESS, SWORN

```
 1              THE COURT:  Thank you.  Please have a seat, make

 2     yourself comfortable, let us know if you need a break at any

 3     time.

 4              THE WITNESS:  Thank you.

 5     DIRECT EXAMINATION

 6     BY MR. COSENZA:

 7     Q    Can you please state your name for the record?

 8     A    Craig Pino.

 9     Q    And can you please tell the Court where you're

10     currently employed?

11     A    I'm employed at RECOVCO Mortgage Management.

12     Q    And what is your title at RECOVCO?

13     A    I'm the President of RECOVCO.

14     Q    And how long have you worked at RECOVCO?

15     A    I've worked there since September of 2010, just over

16     four years.

17     Q    And how many employees does RECOVCO have?

18     A    Roughly a hundred employees.

19     Q    And can you describe generally what the business is of

20     RECOVCO?

21     A    Sure, RECOVCO is a leading forensic due diligence firm.

22     We provide forensic re-underwriting services, and other

23     services to large financial institutions, other large

24     mortgage market participants, related to disputes relative

25     to representations and warranties or allegations of
```

Page 132

```
 1    underwriting defects within loan files.

 2    Q    And where does RECOVCO have offices?

 3    A    We have operation centers in Long Island in New York.

 4    We have an operation center in Irving, Texas, and in

 5    Maitland, Florida.  Occasionally, we have underwriting teams

 6    at other places around the country.

 7    Q    Has RECOVCO done any work on any RMBS related matters?

 8    A    Yes.  Much of the work that RECOVCO does is related to

 9    RMBS matters.

10    Q    And does RECOVCO undertake any large scale mortgage

11    loan reviews?

12    A    Certainly.  I would characterize many of the

13    engagements that we've had as being large scale RMBS related

14    matters.

15    Q    And, Mr. Pino, how long have you been in the mortgage

16    industry?

17    A    I've been in the mortgage industry a little over 23

18    years.

19    Q    Okay.

20         MR. COSENZA:  I'm going to mark as Lehman 3 the

21    declaration of Craig Pino.  I'll hand it to you.

22    Q    Mr. Pino, is this your -- the declaration you submitted

23    to the Court on December 3rd, 2014?

24    A    I believe it is.

25         MR. COSENZA:  Your Honor, I'd also move this into
```

1    evidence.

2            THE COURT:  All right.  Any objection?

3        (No response)

4            THE COURT:  All right.  The declaration will come

5    in as Exhibit 3.

6    (Debtor's Exhibit No. 3 received)

7    BY MR. COSENZA:

8    Q    I'm going to direct you to Exhibit A of your

9    declaration.  Now, Mr. Pino, is this your CV?

10   A    Yes, it is.

11   Q    And does this accurately describe your work history?

12   A    I believe it does, yes.

13   Q    And do you want to just describe generally what your

14   work experience has been prior to joining RECOVCO?

15   A    Sure.  Prior to my time at RECOVCO, as I mentioned,

16   I've been in the industry for 23 years.  Eighteen of those

17   have been in really senior executive positions with large

18   mortgage companies.

19        Previous to RECOVCO, I spent roughly seven years with

20   American Home Mortgage.  I was both pre -- the pre-

21   bankruptcy American Home, as well as post-bankruptcy as

22   Executive Vice-President and Treasurer.  Prior to that, I

23   spent roughly eight years at Countrywide Financial

24   Corporation, as Executive Vice-President and Assistant

25   Treasurer.

08-13555-scc-mg Doc 53621 Filed 08/30/16 Entered 08/30/16 20:48:16 Main Document
Pg 134 of 374
08-13555-scc-mg Doc 49900-1 Filed 03/02/16 Entered 03/02/16 13:48:16 Exhibit F
Pg 134 of 374

Page 134

```
 1        Prior to my time at Countrywide, I worked at North

 2   American Mortgage, Arbor National Mortgage, Margaret &

 3   Company, I started in the mortgage industry in 1991 at

 4   Margaret & Company.

 5   Q    So all of your jobs over the last 23 years, have been

 6   related to the mortgage industry?

 7   A    They've all been in the mortgage industry, yes, that's

 8   correct.

 9   Q    Have you ever served as an expert witness before?

10   A    This is my first time.

11   Q    Okay.  A little bit nervous?

12   A    A little bit.

13   Q    Now, during your 23 years in the mortgage industry,

14   have you overseen projects involving the large scale review

15   of mortgage loans?

16   A    Absolutely.  As I said at during my time at RECOVCO,

17   many of the engagements that we have are what I would

18   consider large scale mortgage re-underwriting engagements,

19   specifically we've engaged one very large case in the

20   Southern District of New York related to disputes of many

21   thousand mortgage loans, where we worked together with other

22   large mortgage re-underwriting firms and reviewing loan

23   files.  I've had a number of engagements with large banks,

24   money center banks, and other financial institutions dealing

25   with thousands of loan files related to put backs of or put
```

1  backs for alleged breaches of representations and

2  warranties.

3  Q    For that large scale project you mentioned that you're

4  working on, the mortgage file review for litigation, who

5  retained you in that matter?

6  A    A law firm representing the plaintiffs.

7  Q    And who were the plaintiffs in that case?

8  A    I think for confidentiality purpose, I'd rather not

9  say.

10  Q    Okay.  During your 23 years in the mortgage industry,

11  how many of these large scale loan level reviews have you

12  conducted?

13  A    During my four years plus at RECOVCO, you know, I would

14  say roughly 25 or 30 of our engagements have involved in

15  large scale loan file reviews.

16  Q    So is it fair to say you've worked on reviews that have

17  encompassed thousands of mortgage loans?

18  A    Absolutely, yeah.

19  Q    Based on your experience, what does the management of a

20  large scale loan review usually entail?

21  A    You know, a number of components, but it involves the

22  staffing and the allocation of resources necessary for

23  performing the review, including hiring and training re-

24  underwriters, underwriters, making sure that the systems and

25  facilities are in place, coordinating, coordinating with

1   clients, often with other forensic review firms on

2   methodologies and standardization of reporting, things like

3   that.

4   Q    And you've done some reviews where the loans have been

5   reviewed by RECOVCO?

6   A    Yes.

7   Q    And you've also conducted other reviews where it's been

8   RECOVCO working with other loan review firms?

9   A    That's correct, yes.

10  Q    And how many of those have you worked on?

11  A    Working on engagements with other loan review firms?

12  Q    Yes.

13  A    A number of large ones.  Often I mention, for instance,

14  a lot of the work that we do with the money center banks,

15  where we are reviewing files related to the back claims,

16  there are multiple vendors involved in the transaction as

17  well as the bank's own personnel.

18       The case that I mentioned in the Southern District was

19  one where we worked together with a number of review firms.

20  I don't know if I have an exact number, but a number of

21  them.

22  Q    In your -- based on your experience and your work in

23  the industry, how many large mortgage loan review firms out

24  there are there in the marketplace?

25  A    You know, I would estimate that there's roughly a dozen

```
 1    or so firms that are large, kind of national scaled firms,

 2    like RECOVCO, some larger than RECOVCO, some about our same

 3    size.  There's probably many more that are smaller or more

 4    regional firms that are participants in the industry as

 5    well.

 6    Q    And you've worked with those firms, you testified

 7    before on various projects?

 8    A    Many of those firms, yes.

 9              MR. COSENZA:  Your Honor, I now move to admit Mr.

10    Pino as an expert on large scale mortgage loan review

11    projects.

12              THE COURT:  Okay.  Any objection?

13              MR. TOP:  My only objection is I have no idea what

14    he means by large.

15              MR. COSENZA:  Your Honor, these are massive --

16    sorry.

17              THE COURT:  Large --

18              MR. TOP:  What does a large scale mean.  Are we

19    talking a thousand loans, are we talking 20,000 loans, are

20    we talking 100,000 loans?

21              THE COURT:  Mr. Pino, can you give some more

22    detail into what you mean when you say large scale loan

23    reviews?

24              THE WITNESS:  When I say large scale, I mean,

25    thousands of loans, so not 1,000, a few thousand, some of
```

1    these engagements are 10, 20,000 loan files.  So kind of in

2    that range.

3                  THE COURT:  All right.

4                  MR. TOP:  With that understanding, we're okay.

5                  THE COURT:  Okay.

6    BY MR. COSENZA:

7    Q    Mr. Pino, what is your belief about whether there's

8    capacity in the underwriting industry to undertake the

9    protocol, that's described in your report?

10   A    I believe there's --

11                 MR. MUNNO:  Objection, foundation.

12                 MR. COSENZA:  Excuse me?

13                 THE COURT:  It's overruled, go ahead.  Let me -- I

14   want to ask a question before you get started.  Could you

15   explain to me when we're talking about capacity to do this,

16   what are the qualifications and experience of a person who

17   when you're thinking of a mortgage re-underwriter, you're

18   thinking, who is that person?  Give me a profile.

19                 THE WITNESS:  Sure.  And it's a bit of a range.

20   There are many --

21                 THE COURT:  There are attorneys right out of law

22   school, and there are attorneys as old as these guys over

23   here, right?

24                 THE WITNESS:  There are a large number of

25   underwriters in the industry that over the last, you know,

1    three, four, five years, the focus of their experience has

2    been what we would consider forensic re-underwriting doing

3    these loan file reviews.  There are many more underwriters -

4    -

5             THE COURT:  Are they -- do they have bachelor's

6    degrees, do they have MBAs?

7             THE WITNESS:  No, typically they're mortgage

8    underwriters, so they would be not necessarily degrees

9    professionals, but they would people that had experience

10   underwriting mortgage loans in the origination of mortgage

11   loans.  So they might have, you know, started out as a

12   mortgage processor, and then increased their experience and

13   gotten jobs with banks or mortgage companies underwriting

14   loans, reviewing loans to the underwriting guidelines.

15            There are, sort of as you go up the levels of

16   experience of underwriters, there are designations that

17   underwriters that might get.  You know, typically in the

18   industry most of the mortgage originators have -- they sort

19   of rank their underwriters, they may call them underwrite

20   level 1, level 2, level 3, and it would -- the delegated

21   authority that that underwriter has to approve a mortgage

22   loan really based on the size of that mortgage loan, would

23   go up as their designations increased.

24            It's generally not -- it's generally on the job

25   training, industry training that the underwriters get.

1    Sometimes there's training specific to government loans,

2    sometimes there's training specific to individual financial

3    institutions, mortgage loans, but it's kind of based on

4    industry training and experience.

5              THE COURT:  Okay.  Thank you.

6    BY MR. COSENZA:

7    Q    I'm not sure if you answered this, but in your view, is

8    there capacity in the underwriting industry to undertake the

9    project that's outlined in the protocol?

10   A    I believe there is capacity in the industry, yes.

11   Q    And what's your basis for that opinion?

12   A    It's based on my experience in the industry, my

13   experience is at RECOVCO in hiring and building teams for

14   larger re-underwriting projects and talking to my peers in

15   the industry, and working -- you know, working closely with

16   other large re-underwriting firms, to understand what their

17   infrastructure and capabilities are.

18        It's going to things like, you know, trade events, the

19   Mortgage Bankers conferences, Asset Back conferences, and

20   talking to people in the industry about the state of the

21   industry.

22   Q    How many trained forensic underwriters are there

23   generally in the industry?

24   A    I would estimate -- I don't know the upward limits of

25   how many there are, but I estimate that there's thousands of

1    trained forensic re-underwriters, forensic underwriters in

2    the industry.

3    Q    Referring back --

4          MR. PEDONE:  Objection, there's no foundation for

5    that.

6          MR. COSENZA:  Your Honor, he --

7          THE COURT:  He said that's his -- that that's what

8    he knows.  That's what he believes.

9          MR. PEDONE:  (indiscernible) definition of

10   experience based on going to conferences, there's no

11   knowledge of this (indiscernible) --

12         THE COURT:  But when you --

13         MR. PEDONE:  -- or action.

14         THE COURT:  You can cross-examine him, okay?

15         MR. PEDONE:  Thank you.

16   BY MR. COSENZA:

17   Q    Referring back to the protocol, Mr. Pino.

18   A    Sure.

19   Q    Did you perform an analysis to estimate the amount of

20   time the protocol would take to complete?

21   A    Yes, I did, yes.

22   Q    And what was that estimate?

23   A    The amount of time that it would take, I estimated

24   there are five steps in the protocol for step 0 through 4

25   that it would take roughly one year to complete.

1   Q    Did you also put together an estimate of the cost of

2   implementing step 0 to 4 of the protocol?

3   A    I did so.

4   Q    And what was your estimate?

5   A    Again, through step 0 to 4, I estimated that the cost

6   would be roughly 110 million.

7   Q    Can you -- I want to refer you to Exhibit A of your

8   report.  Do you have that, Mr. Pino?

9   A    Yes, I do.

10  Q    I apologize for the small font.

11           THE COURT:  That's okay.  Yes?

12           THE WITNESS:  Excuse me, would I be able to grab

13  my water from my --

14           MR. COSENZA:  Sure, we'll get it.

15           THE COURT:  Of course you would.

16           THE WITNESS:  Oh, thank you.  Thanks.  Sorry.

17           THE COURT:  You're willing to accept their water?

18           THE WITNESS:  It was still sealed.

19      (Laughter)

20  BY MR. COSENZA:

21  Q    Can you describe what Exhibit A outlines, the exhibit

22  to your report?

23  A    This was a schedule that I prepared to demonstrate my

24  opinion on the amount of time and the amount of cost it

25  would take to underwrite 157 loan file population.

Page 143

1    Q    And going back, there are five steps to the protocol?

2    A    Yes, there are.

3    Q    Do you want to describe step 0 of the protocol?

4    A    Step 0 of the protocol would be when the trustees

5    access the loan files from the servicers.

6    Q    Mr. Pino, I just want to also refer you to for

7    everyone's convenience, one of the documents I handed out

8    was a blown-up version of Exhibit A, and that's what I'll

9    refer to.

10   A    Oh.

11           MR. COSENZA:  And I'll mark that as Lehman 4.

12           THE WITNESS:  Thank you.

13           MR. COSENZA:  I'd like to introduce it into

14   evidence.  I apologize, I just wanted to (indiscernible) the

15   report.

16   BY MR. COSENZA:

17   Q    So do you want to take a step back, go over step 0 of

18   the protocol?

19   A    Yes.  Step 0 was the process of the trustees requesting

20   and receiving the loan files from the servicers.

21   Q    And based on your experience, how long do you think

22   that was going to take?

23   A    Well, based on my experience, I assume that to get the

24   vast majority of the 157 loan files would take roughly six

25   months, maybe five months overall.

1   Q    And again, what did you base that on?

2   A    A few -- I based it on a few assumptions, in addition

3   to just my experience in getting loan files.  I based it on

4   the assumption that Aurora was one large servicer, and that

5   they had roughly 50,000 loan files that would be available

6   to be delivered to the trustees in very short order.  I

7   based it on the assumption that another large or a servicer

8   of another large component of these loans was Nation Star,

9   and that it took roughly 30 days for Aurora to pull together

10  the loan files, and so that -- and based on my experience as

11  well, that Nation Star should be able to pull together the

12  loan files in roughly 60 days, and that during that time,

13  this would all be happening concurrently, the trustees would

14  be actively pursuing gaining loan files from the remaining

15  servicers and, you know, I based on my assumption that in

16  those instances, it might take 60 to 90, possibly 120 days

17  to get the loan files.

18  Q    Based on your experience, how do you expect these loan

19  files to be maintained at the servicers?

20  A    I would expect that the large majority of the loan

21  files would be in image, I would say PDF files, document

22  imaged files that they would be obtained by receiving maybe

23  hard drives or other digital media format, such as a

24  transmission through an FTP site.

25  Q    Moving on, do you want to describe on your chart what

1    step one of the protocol is?

2    A    Step one is the part where the -- as the trustees are

3    receiving loan files from the servicers, that they are

4    undertaking the forensic review process that allows them to

5    determine whether or not there are alleged claims of

6    breaches of reps and warranties.

7    Q    So step one will be ongoing with step 0 --

8    A    That's correct.

9    Q    -- as files come in and --

10   A    Yes, as soon as files come in, the trustees could begin

11   reviewing those files.

12   Q    And how long do you expect step one to be completed?

13   A    Based on my estimation, and again concurrently with the

14   files coming in from the servicers, that that could be

15   completed within six months.

16   Q    Do you want to describe moving on to step two of the

17   protocol?

18   A    Step two of the protocol is the -- is after the

19   trustees have reviewed the files, and they've identified

20   loans that they believe have breaches of representations and

21   warranties, they would send those claims of breaches to the

22   plan administrator, and the plan administrator would review

23   the files, determine if it concurred that there was, in

24   fact, a breach, or if it was able to provide evidence that

25   there wasn't a breach.

1  Q    And that's what typically the plan administrator does

2  in terms of looking at when a breach is provided over from

3  the trustee?

4  A    That's correct.

5  Q    How many files do you expect to get to stage -- to step

6  two of the protocol?

7  A    Well, based on my estimation of 157,000 files being

8  reviewed by the trustees, I assumed 92,000 roughly would

9  come to the plan administrator.

10 Q    So how did you get to those two numbers?

11 A    The 157,000 that was based on my assumption of loans

12 that were either impaired or had incurred losses relative to

13 the related trust that were at issue.

14      The 57 -- the 92,000 was based on 57 percent assumed

15 breach rate of claims reviewed by the -- or loans reviewed

16 by the trustee actually having breaches.

17 Q    And where did that 57 percent number come from?

18 A    The 57 percent number was an assumption that I take

19 from Dr. Parekh's report.

20 Q    And of these 92,000 files that would make their way to

21 the administrator step two, based on your experience, what

22 percentage would be valid breaches accepted by the plan

23 administrator?

24 A    So I made the assumption that roughly 50 percent of the

25 breaches presented to the trust administrator would be

1    accepted at by the trust administrator as valid breaches.

2    Q    So that -- just using numbers again, some math, so

3    that'd be 46,000 loan files that would be accepted by the

4    plan administrator as having a valid claim?

5    A    That's correct.

6    Q    Okay.  So now we're down to 46,000 loan files?

7    A    Correct, yes.

8    Q    And of the 46,000 loan files, based on your

9    descriptions in step two of the protocol, what do you think

10   would happen with those files?

11   A    Well, I believe that half of those files would be

12   successfully, what I would term as rebutted by the plan

13   administrator, and so that could be either that the plan

14   administrator was able -- that there was a claim based on

15   perhaps a missing documentation, and the plan administrator

16   was able to find that documentation, provide it back to the

17   trustee, or alternative documentation that satisfied the

18   requirement that was the reason for the breach.

19        That some level of the claims presented could -- would

20   be erroneous breaches, they were, in fact, based on research

21   and documentation from the plan administrator they weren't

22   correct.

23   Q    So out of these 46,000 files that are left, 23,000 you

24   believe would be excluded because they would be contested by

25   the plan administrator for uncontested reasons?

Page 148

```
 1    A    That's correct.

 2    Q    And that's based on your experience in the industry?

 3    A    That's correct.

 4    Q    So now we're down to 23,000 files?

 5    A    Yes.

 6    Q    Do you want to describe step three of the protocol and

 7    how it addresses those 23,000 files?

 8    A    Yes, step three of the protocol would be at a point

 9    where the trustees have delivery of loan files and again,

10    this is all sort of happening concurrently, the trustee had

11    delivered the loan files, the plan administrator had

12    reviewed, it had accepted some claims, it had uncontestably

13    rebutted some claims and there is now a difference of claims

14    that haven't been resolved.  And they would be the plan

15    administrator and the trustees would together negotiate in

16    attempt to satisfy or resolve the remaining differences.

17    Q    So this is an effort for both sides to work together,

18    and try to resolve these consensually?

19    A    That's correct, yeah.

20    Q    And based on your experience in the industry, how many

21    of those when they sit down, when the plan administrator and

22    trustee sit down, what percentage of those claims would go

23    away and be resolved consensually?

24    A    Sure.  In my analysis here, I used an estimation of 25

25    percent.  That was a number from Dr. Pareckh.  I used from
```

Page 149

1    Dr. Pareckh's report when I reviewed it, but it seemed

2    reasonable to me based on my experience.

3    Q    So roughly 25 percent, that's another 6,000 files would

4    be put to side, either there will be a claim or the trustees

5    would walk away from that.

6    A    That's correct.

7    Q    So we're now down to 17,000 files.

8    A    Yes.

9    Q    I just want to make clear, I think you've said it

10   several times.  Step three would be going on concurrently

11   with step zero, step one and step two --

12   A    Exactly.

13   Q    -- in the protocol?

14   A    Exactly.

15   Q    As soon as files move through, they'll be able to, you

16   know --

17   A    They can move to the next step.

18   Q    -- step three can continue on as soon as quickly, as

19   you know, step zero, one and two are completed.

20   A    Correct.

21             THE COURT:  Can I -- before you get to the next

22   step, I just want to ask another question.  When you are re-

23   underwriting a loan, and you look at, for example, whatever

24   documentation there is of the borrower's income, well, let

25   me ask the question, let me object to my own question on

1    foundation.

2         Is one of the things in the file something about

3    the borrower's income?  When you go to get a mortgage loan,

4    right, doesn't the bank want to know how much money you

5    make?

6         THE WITNESS:  You know, especially in the vintages

7    of loans that we're looking at --

8         THE COURT:  Yes.

9         THE WITNESS:  -- had to be the older loans,

10   there's some loans they called them either stated income

11   loans or no income/no asset loans where there might not be

12   documentation in the file that supports the borrower's

13   income.

14        THE COURT:  Okay.  But will the -- is it your

15   testimony then that that would be on its face a breach or a

16   -- something missing, or that the loan didn't require it in

17   the first instance?

18        THE WITNESS:  That the loan didn't require it in

19   the first instance.

20        THE COURT:  Okay.  In an instance in which a loan

21   required there to be something in the file or the

22   application pertaining to the borrower's income level, what

23   would that -- what might that be?

24        THE WITNESS:  That --

25        THE COURT:  That would reflect the income of the

Page 151

1    borrower?

2                THE WITNESS:  Sure.  That could be W-2 forms --

3                THE COURT:  Okay.

4                THE WITNESS:  -- it could be tax returns, it could

5    be paystubs, it might be bank statements that some banks had

6    programs where you could support your income using bank

7    statements.  It could be a verification of income that's

8    signed by the borrower's employer that states the amount of

9    income that they had.

10               THE COURT:  But in any case, would it be simply a

11   statement on a loan application about what your income is?

12               THE WITNESS:  That's the stated income loans that

13   I described.  So they -- the borrower would state on their

14   loan application, but there wouldn't be other documentation

15   in the file to support that.

16               THE COURT:  Okay.  Thank you.

17               THE WITNESS:  Sure.

18   BY MR. COSENZA:

19   Q    Mr. Pino, I think we're up to step four of the protocol

20   where we're down to roughly 17,000 loans.  Can you describe

21   step four of the protocol?

22   A    Step four of the protocol would be that after the

23   trustees and the plan administrator have gotten together and

24   attempted to negotiate the remaining unresolved loans, that

25   those loans would then move to a claims facilitator that

1    would be an independent third party approved by both sides,

2    tasked with reviewing the claims and making determinations

3    as to whether or not the claims were valid or not.

4    Q    And again, step four would be going on concurrently

5    with step zero, one, two, and three --

6    A    Exactly.

7    Q    -- till it's ready for the claims facilitator, the

8    claims facilitator would be ready to hear the dispute?

9    A    That's correct, yes.

10    Q    Okay.  And based on your experience in the industry,

11    what percentage of these 17,000 claims would be resolved in

12    step four?

13    A    Well, I based my assumption on virtually all of the

14    claims being resolved through the claims facilitator

15    process.

16    Q    And how'd you come to that conclusion?

17    A    I did it a number of ways.  One as I said in the

18    assumption that the claims administrator is an independent

19    third party agreed to by both sides specifically for the

20    purpose of trying to determine the resolution for these.

21        And I guess one concept or one step that really sort of

22    applies to the earlier steps as well, but really I think is

23    important here is what I describe as a standard handling

24    process where --

25    Q    Can you describe that briefly?

1   A    Sure. As, you know, what's standard in loan file

2   reviews is that typically the asserted breaches in the loan

3   files fall into certain categories, such as a missing

4   document category, and within that missing document

5   category, there's other categories such as missing HUD form,

6   or a missing truth in lending disclosure, right of

7   rescission, appraisal, but there's, you know, a pretty

8   standard list of the typical missing documents that might be

9   in a loan file.

10      And within each of those categories, you might have, if

11   you reviewed 57,000 -- 157,000 loan files, and had 92,000

12   breaches, you might have 10,000 loans, or I don't want to

13   make an assumption on what that number is, but it's, you

14   know, 10,000, 20,000 loans where a claim is that the TIL is

15   missing.

16      And so it was my view that it really even earlier in

17   the process, but throughout the process, so the claims

18   facilitator might not have to -- might make one decision on

19   whether or not they believed the missing truth in lending

20   statement was a valid claim, and that one decision would

21   apply across many of the loans with exactly similar or

22   exactly the same or very similar circumstances.

23      And so I called that in my declaration a special

24   handling procedure, but it really meant to mean that there

25   are going to be large groupings of very similar categories

Page 154

1    of loans.

2    Q    And this has to be done on a loan-by-loan basis?

3    A    Loan-by-loan basis, you'd have to review the file to

4    know that the truth in lending, alleged truth in lending

5    breach existed.  You might have to review the file to

6    confirm -- that the plan administrator would have to review

7    the file to confirm that they agree, it's not in the file.

8    So you would need to know that on a loan-by-loan basis.

9         But the facilitator might be able to look at a lot of

10   loans, and see that they all have that -- those very similar

11   characteristics and make one determination on those loans

12   with the similar characteristics.

13   Q    Mr. Pino, I'm going to mark and hand you a

14   demonstrative I handed up before, it's entitled proposed

15   protocol timeline.

16              MR. COSENZA:  And this is -- I'll mark this as

17   Lehman 5 and move it into evidence.

18   Q    And is this an accurate summary of the timing of step

19   zero through step four of the protocol that we just walked

20   through?

21   A    Yes, it is.  It shows that each step walking -- working

22   concurrently with the other steps that are happening, step

23   zero being the collection files being done with 180 days,

24   the trustees beginning to review as soon as they get the

25   loan files, delivering claims within 180 days.  The files

08-13555-scc-mg Doc 49007 Filed 09/02/15 Entered 09/02/15 13:48:16 Main Document
Pg 155 of 374

Page 155

1    being reviewed by the plan administrator, to determine

2    whether or not they agree with the alleged claims, and then

3    moving onto the negotiation and the claims facilitation

4    process.

5    Q    So, I mean, in theory step zero to four on your chart,

6    there could be something by for the claims facilitator

7    within, you know, optimistically within a month or two?

8    A    Within a month or two, yes.

9    Q    Assuming that everyone works cooperatively.

10   A    That's correct.

11   Q    You also mention in your report a step five in the

12   protocol.  Do you want to describe that briefly?

13   A    So step five was after both sides have gone through all

14   of the process of reviewing the loan files, trying to

15   negotiate, putting those unresolved claims in front of the

16   facilitator, the number of occurrences that loans need to go

17   before the Court on an individual loan basis or maybe it's

18   an example of a loan that needs to go before the Court to

19   decide an aspect that applies to a large number of loans.

20   Q    And did you provide an estimate as to how long that

21   would take?

22   A    I did not.

23   Q    Step five of the protocol?

24   A    No.

25   Q    And based on your report, what percentage of loan files

1   would be resolved through step zero through four of the

2   protocol?

3   A    The percentage was roughly 99 and a half percent,

4   virtually all of the loans being resolved through steps one

5   through four.

6   Q    Did you provide -- again, I think we talked about it

7   earlier about your estimate, do you just want to go through

8   it?  How expensive do you think the protocol step zero

9   through four will be for the parties?

10  A    I estimated that it would be roughly $110 million.

11  Q    Did you allocate that cost between the plan

12  administrator and the trustees?

13  A    Yes, I did.

14  Q    And how did you -- what conclusion did you reach?

15  A    I estimated that the trustees, the expense to the

16  trustees would be roughly $70 million, and the cost to the

17  plan administrator would be roughly $40 million.

18  Q    And why does the trustee have to spend more money

19  during this process?

20  A    It's really directly related to the number of loan

21  files reviewed, so the trustees, in my estimation, would

22  review 157,000 loan files.  They would allege breaches on 57

23  percent of those loan files, therefore, the plan

24  administrator would have to review and rebut roughly 92,000

25  loan files, and the difference is really just the cost of

```
 1   the --

 2   Q    There's really a difference in step one, in terms of

 3   level -- number of loan reviews?

 4   A    That's correct, yeah.

 5         MR. COSENZA:  Your Honor, I've concluded my

 6   examination.

 7         THE COURT:  Okay.  Thank you.

 8   CROSS-EXAMINATION

 9   BY MR. TOP:

10   Q    Good afternoon, Mr. Pino.

11   A    Good afternoon.

12   Q    How are you today?

13   A    Doing well, thanks.

14   Q    Mr. Pino, how many pages are in a typical loan file?

15   A    It varies by the loan file.

16   Q    Is there -- well, do you know -- can you give us an

17   average of what an average loan file might contain in terms

18   of pages?

19   A    An estimate might be 450, 500 pages possibly.

20   Q    And so if you were to multiply those number of pages by

21   200,000 loans, that would be a very large number, wouldn't

22   it?

23   A    Large is relative, but, yeah.

24   Q    You mentioned forensic reviewers.  Is it true that a

25   forensic review is more than just looking at a loan file?
```

1   A    So far RECOVCO forensic review depending on what the

2   client's needs are, the forensic review can encompass a

3   number of aspects.  It can be reviewing the underlying

4   documentation to identify what the breach -- what the

5   representations and warranties were made in a

6   securitization.  It can be looking at mapping those

7   representations and warranties to underwriting defects,

8   things like that.

9   Q    To the extent that, for example, a forensic reviewer

10  wanted to determine whether or not the borrower was lying

11  about its income, how might it have to go about doing that?

12  A    It could be a number of ways, it could be reviewing the

13  loan file and looking in the loan file for documentation

14  that supports the contradiction of what the borrower stated

15  on the application.

16  Q    And it's true that a forensic reviewer might want to go

17  outside the loan file, so to speak, and make a determination

18  as to how much other indebtedness that borrower might have;

19  is that correct?

20  A    In some instances, yes.

21  Q    It's also true that a forensic reviewer might also want

22  to take a look at where the borrower was currently living,

23  to make sure the particular mortgage loan related to the

24  house that that person was supposed to be living in; is that

25  correct?

08-13555-scc Doc 49007-1 Filed 03/02/15 Entered 03/20/15 21:30:48 Exhibit E
Pg 159 of 374

Page 159

```
 1    A    Well, they might want to look at -- yeah, I think you

 2    asked where they're currently living.  I guess it really

 3    depends on when the loan was originated and what they're

 4    trying to determine.  So, for instance a loan that was

 5    originated ten years ago, they might not look at where

 6    they're currently living today.

 7    Q    And it's true that a forensic reviewer, they typically

 8    look outside the four corners of the mortgage loan file to

 9    make -- to try and make determinations as to whether or not

10    the borrower had made misrepresentations with respect to its

11    capability to handle this mortgage loan; is that correct?

12    A    That's true.  Forensic reviewers do research outside of

13    just the documentation and the loan file.

14    Q    So then in addition to reviewing 500 pages per loan,

15    more or less --

16    A    Yes.

17    Q    -- the forensic reviewer would have to do a number of

18    other tasks to try to verify the -- a particular loan file

19    either meets or does not meet whatever list of

20    representations and warranties that loan file is supposed to

21    meet; is that correct?

22    A    That's true.  Yeah.

23    Q    And there -- is it also true that there -- there may be

24    different representations and warranties that relate to

25    different types of loans?
```

1    A    Absolutely.  Yes.

2    Q    So a forensic reviewer is going to have to know for

3    each particular loan what reps and warranties relate to that

4    particular loan?

5    A    I mean, not always.  It depends on the firm and it

6    depends on what -- how the review is set up.  A forensic

7    reviewer, the -- and I think by that it -- if -- I don't

8    want to presume, but if you mean the actual underwriter

9    doing the review, is that what you mean by forensic

10   reviewer?

11   Q    Correct.

12   A    Yeah.  So, for instance, in many of the engagements

13   that Recovco does, the underwriter -- the forensic reviewer

14   really just underwrites the file to -- or reviews the file

15   to things like the guidelines that were in place at the time

16   of origination.  It looks at, as you said, what we call

17   third party research or -- or other tools that might

18   identify that there were misrepresentations or defects

19   related to the loan at time or origination.

20          But often our forensic reviewers, for instance,

21   don't individually go back to the representations and

22   warranties.  They identify the defects within the loan

23   files.  Maybe a law firm that we're working with maps those

24   defects within the loan file to specific representations and

25   warranties.  Sometimes others at Recovco do that on a more

Page 161

1   global basis.  But the individual underwriters don't really,

2   as they're looking through loan files always try to identify

3   what breach of a representation and warranty.  They really

4   produce a report that shows what the defects are and those

5   defects are mapped to breaches of reps and warranties.

6   Q    And is it your understanding that in this particular

7   transaction we're talking about 255 different trusts?

8   A    I don't know the exact number, but I believe it's

9   roughly 255 different trusts.

10  Q    And as you sit here today do you know whether or not

11  the representations and warranties in each of those trusts

12  are identical?

13  A    I don't know.  No.

14  Q    And would it be fair to say that any forensic review

15  team would have to -- any forensic review team or their

16  counsel would have to go up in each of those 255 documents

17  to make a determination as to what breach -- what

18  representations and warranties they ought to be looking for

19  in reviewing the loan file to determine whether or not

20  there's a breach of those representations and warranties?

21  A    Yeah.  If it hadn't been done already, somebody would

22  need to go through and review the documents to understand

23  what the rep and warranties were.

24  Q    So that's part -- another part of the process of a

25  forensic review?

Page 162

1    A     That is part of the process of a forensic review.

2    Yes.

3    Q     Mr. Pino, have you ever requested over 200,000 loans

4    from any servicer?

5    A     No, I have not.

6    Q     And do you know which servicers are involved in

7    servicing the loans that are part of this mortgage

8    portfolio?

9    A     I mentioned -- my understanding that Nations Star is

10   servicing roughly 50,000 files and that I believe a number

11   of the loans that are, I guess what I would call liquidated

12   loans, that there's not technically -- they're not

13   technically still being serviced, but that Aurora had a

14   large portion of loans, maybe another 50,000.  Beyond that I

15   don't know -- or 50 or 60,000, I think.  I don't know beyond

16   that 110,000 who the other servicers are.

17   Q     And where did you obtain that understanding of who --

18   of those particular servicers?

19   A     I believe in the conversations with individuals at

20   Wilke.

21   Q     So you did not do any due diligence yourself as to who

22   the servicers are in this portfolio of loans?

23   A     No, I didn't.

24   Q     And have you had any conversations with anyone at

25   Nation Star about their ability to produce mortgage loan

1    files in this matter?

2    A    No, I haven't.

3    Q    And have you had -- have you review -- seen the loan

4    files that have been produced apparently by Aurora in

5    connection with this?

6    A    The 50,000 that I referred to?

7    Q    Yes.

8    A    No, I have not.

9    Q    And as you sit here today do you know -- do you, in

10   fact, know whether or not they have one put together?

11   A    Only the -- only the information I just mentioned.

12   Q    Is it true that you have not reviewed any loan files in

13   connection with your engagement in this matter; that

14   mortgage files in this particular ruling pool?

15   A    For the purposes of my declaration, no.

16   Q    Does it concern you at all that when the trustees

17   sought to obtain 5,000 loans from the servicers they were

18   only able to obtain 45 -- a little bit more than 4,500

19   loans?

20   A    Not necessarily.  I don't know what the trustees did to

21   try to obtain them.  I didn't know why they weren't able to

22   obtain the additional files.  I don't know how actively they

23   were engaged in trying to get those loan files.

24   Q    You mentioned in your testimony that there were

25   thousands of forensic reviewers.

1   A    Yes.

2   Q    Where did you obtain that information?

3   A    As I mentioned, I've been the president of Recovco for

4   a number of years.  I've been in this industry for over four

5   years.  I've worked on large forensic engagements working

6   side by side with firms that had many of hundreds of

7   forensic reviewers.  I've worked for -- and along with a

8   number of large money-centered banks that individually had

9   hundreds of loan file reviewers.  I believe there's over,

10   you know, 12 firms in the industry that are roughly -- some

11   of them are much larger than Recovco, but roughly the size

12   of Recovco.  If I add those numbers together, I come up with

13   many thousands.

14   Q    Is there any data base or statistical analysis of any

15   kind that one could determine how many forensic reviewers,

16   for example, there are in --

17   A    I mean, it wouldn't -- it wouldn't encompass all of the

18   forensic underwriters or people that have done forensic

19   underwriting.  LinkedIn might be a -- you know, if you were

20   type in forensic underwriting in LinkedIn you might get a

21   thousand forensic underwriters.

22   Q    As you sit here today have you contacted any of the

23   firms that have -- that provide forensic underwriting

24   services to determine whether or not they would be available

25   for this engagement?

Page 165

1    A    I have not.  No.

2    Q    And for purposes of your declaration you assume a

3    little less than 500 forensic underwriters would be

4    necessary in order to accomplish the protocol?  The trustees

5    would have to hire --

6    A    For the trustees we would have to hire roughly 400 plus

7    underwriters, yes.

8    Q    And so would you agree that's a significant percentage

9    of people in the industry?

10   A    I -- I don't know if I would say that's a significant

11   percentage of people in the industry.  As I said I'm not

12   sure what the upward limit of number of underwriters in the

13   industry is.  Just from doing -- from saying, okay, I know I

14   worked in my position at Recovco with four banks that each

15   had, you know, at least hundreds of underwriters while I

16   worked side by side with other firms that had hundreds of

17   underwriters that there's probably at least 2,000 or more

18   forensic underwriters.

19         But the mortgage industry is very, very elastic.

20   We see it all the time as we see large shifts in interest

21   rates and we see underwriter companies staff up

22   underwriting.

23         And so as I think I was saying before about, you

24   know, what are the qualifications of a forensic underwriter,

25   they could be somebody who worked in the industry that --

Page 166

```
 1    for many years that did forensic underwriting.  And I

 2    believe there's a lot of them out there, or it could be

 3    other underwriters that have worked in the industry for many

 4    years that could be quickly trained up to be forensic

 5    underwriters.  There are components that are different, such

 6    as the -- what you mentioned, that third party research.

 7    But it's -- it's aspects in parts of underwriting that there

 8    -- that many participants in the industry are very familiar

 9    with.

10            So, you know, I don't know if you could say it's a

11    static -- significant percentage of the qualified -- 400

12    people would be a significant percentage of qualified people

13    in the industry.

14    Q    In your chart in your declaration, I believe it's at

15    page 9, you detail seven different teams that would be

16    formed for purposes of providing the protocol.  Do you have

17    that recollection?

18    A    I -- you're referring to?

19    Q    I believe it's marked in the actual body of your

20    declaration.  I may be wrong on that.  It -- it's part of --

21    have you reviewed, by the way, Mr. Alread's declaration?

22    A    I -- yeah.  I've seen it.  Yes.

23    Q    Do you recall him having a chart in his declaration

24    with respect to the various teams that would be established

25    for purposes of finishing the protocol?
```

Page 167

1   A    I don't recall.

2   Q    Let me --

3        (Pause)

4   Q    I'm going to show you Mr. Alread's declaration on page

5   8 and ask if you've ever seen that chart before.

6   A    Okay.  This looks like -- similar to the -- to the

7   exhibit, Exhibit B in my declaration.

8   Q    And in that particular chart you -- it's true, isn't

9   it, that you listed -- you proposed seven teams for this

10  work?

11  A    When I put this chart together it was really to

12  demonstrate the -- that the number of loan files done --

13  able to be completed per month was based on the number of

14  underwriters that you assigned to perform those file

15  reviews.  And so it wasn't meant to cap out you could only

16  assign seven teams of underwriters.  It was just merely to

17  show that as you put more underwriters on the project, the

18  number of months required for the project to be completed

19  would go down.

20  Q    I note that only in one team that you note that it's a

21  currently existing Lehman team; is that correct?

22  A    Team One.

23  Q    Team One.

24  A    Yes.

25  Q    And the rest of the teams would have to be, I believe,

08-13555-scc  Doc 49907  Filed 08/30/16  Entered 08/30/16 20:48:16  Exhibit F
Pg 169 of 374

Page 168

1   either reassigned, developed or you would have to use other

2   firms to make up other teams; is that correct?

3   A     Again, it -- the purpose of the chart was to show the

4   number of loan files that could be done in time would be the

5   number of times -- the amount of time it would take would

6   decrease by the number of underwriters that you put on it.

7   What you describe is what's in the chart.

8   Q     And -- but you used that chart, did you not, in coming

9   up with your time line for the purposes of determining the

10  reasonableness of this protocol?

11  A     No, not really.  I used -- for my assumptions was

12  really based on -- I -- based on my Exhibit A which assumed

13  400 -- I believe 490 underwriters, 430 or some odd of them

14  working --

15  Q     So --

16  A     -- continuously on the project on the trustee side.

17  Q     So whether or not the 490 some underwriters are in

18  seven teams or not in seven teams --

19  A     Right.

20  Q     -- it's true, is it not, that if you can't obtain 498

21  underwriters in a particular month you're not going to be

22  able to produce the same volume of work that you would --

23  that you're assuming you would produce under this protocol?

24  A     When you say you you mean --

25  Q     I'm meaning --

1   A    -- the company --

2   Q    -- you -- your -- in your declaration.

3   A    You, Recovco?

4   Q    You --

5   A    Or if somebody couldn't produce 490 underwriters they

6   wouldn't be able to do 25,000 files?

7   Q    That's right.  You've made assumptions that you need a

8   certain number of underwriters in order to obtain the -- to

9   review the number of forensic -- to review the mortgage

10  loans on a forensic basis for purposes of meeting your six-

11  month deadline for reviewing them?

12  A    Yes.

13  Q    That's correct?

14  A    That's correct.

15  Q    And so if for some reason those numbers of underwriters

16  are not available in any particular month, if so, that

17  number is going to have to be reduced?

18  A    That's correct.

19  Q    And that would extend your timeline by some degree

20  depending upon how long and how many underwriters you're not

21  able to obtain?

22  A    Well, that -- my scheduled based -- I mean, you could

23  view that as an average, 400 and however many underwriters.

24  So if on day one you only had 200, but on -- I hate to do

25  the math in my head, but if at the end of the project you

1   had more underwriters you might still come out to the same

2   number of underwriters over that same amount -- or the same

3   number of loans reviewed over that same amount of time.

4   Q    Sure.  But if there's an aggregate shortfall, that's

5   going to have an impact on your timing?

6   A    That's correct.  Yes.

7   Q    And you also assume as part of your declaration that

8   there's going to be a certain number of underwriters that

9   Lehman is going to likewise have to retain?

10  A    That's correct.  Yes.

11  Q    And how many was that again?

12  A    Let me just refer to my chart quickly.  It was 200 -- I

13  believe it was -- I'll tell you in one second, but 230.  I

14  -- you know, I made the assumption that the plan

15  administrator would need roughly 245 underwriters.

16  Q    And so when you combine the two numbers we're really

17  talking, in order to complete the protocol within the time

18  frame that you envision the group of us, you know, both the

19  trustees and Lehman are going to have to hire well over 700

20  underwriters?

21  A    Over 700 I would say.

22  Q    Correct.

23  A    Yes.

24  Q    Now turning to step 2 of your process you state, I

25  believe -- well, first of all -- well, you -- strike that.

1          On -- in step 2 you make an assumption as to how

2    many claims that Lehman is going to agree to once the

3    trustees produce their reports to Lehman.  Is that not

4    correct?

5    A    In Step 2 I make an assumption.  That is correct.  I

6    use an assumption of, I believe it's 50 percent.

7    Q    And where did you get that number?

8    A    I believe that I looked at the number that Dr. Parekh

9    had used in an attempt to do an apples to apples comparison

10   of the timing.  I viewed that as a reasonable assumption.

11   Q    Did you -- and you -- and are you basing the 50 percent

12   solely on your industry experience or did you consult any

13   other materials in coming up with the 50 percent besides Dr.

14   Parekh's declaration?

15   A    When you say consult others, other than my experience

16   in the industry?

17   Q    That's right.  Did you consult books, for example, to

18   determine the 50 percent?

19   A    No.  No.

20   Q    Is there any database that's available for repurchase

21   claims generally?

22   A    I mean, I -- I assume there's like individual review

23   firms that might have databases about claims, law firms that

24   have reviewed might have databases.

25   Q    Does Recovco have a database of percentage of claims

1     that are resolved consensually for example?

2     A     No.  Recovco doesn't, no.

3     Q     And then you assume that 20 -- that -- well, getting

4     back to the 50 percent, so if, for example, Lehman disagrees

5     with more loans than 50 percent on the initial review, say

6     for example they only agree to 25 percent, that's going to

7     also increase the length of time it's going to take to

8     review the loans and this protocol; is that correct?

9     A     I mean, one of the things I mentioned as I was going

10    through my chart was that it -- what really applies

11    throughout the waterfall is the idea that it might be the

12    case that Lehman rejects a larger number of claims because,

13    again, they believe, using my earlier example, that a

14    missing TIL (sic) doesn't rise to a material breach and so

15    that they see a large number of missing TIL claims.  That's

16    not necessarily going to materially change the downstream

17    waterfall because that's going to be one thing.  If the

18    negotiations decide that the TIL is a valid breach, then

19    that resolves in that one decision a large number of claims.

20    If the claims facilitator decides that the TIL's breach is a

21    valid breach, then that resolves that large number, or if

22    the Court decides that the TIL is a breach, that one

23    decision resolves a large number.

24          So it's not necessary that just by changing these

25    percentages you could automatically extrapolate out this is

1    going to take exponentially longer.

2    Q    But it's true it pushes the resolution further

3    downstream and, in fact, may, may lengthen the time it takes

4    to complete the protocol?

5    A    It may or may not.  Yes.

6    Q    And same with your assumption that 25 percent of these

7    loans are going to be resolved on an incontestable bases; is

8    that correct?

9    A    Very similar analysis; that if the we -- if -- if the

10   plan administrator believes that they've rebutted a claim

11   based on an incontestable basis, for instance it's in --

12   but, again, using the -- you know, we found a document that

13   was alleged to be missing.  The trustee doesn't believe that

14   that document sufficiently supports the claim.  It moves it

15   downstream.

16   Q    And in connection with step 3, you assume, then, that

17   the parties go through a negotiations stage?

18   A    That's correct.  Yes.

19   Q    How long did you anticipate that each -- the

20   negotiation of each one would last?

21   A    The way my math works it becomes a broad estimate.

22   Obviously, some loans would take much longer to negotiate,

23   other loans would take much less time.  But I assume that if

24   you had a negotiator, negotiators on either side could get

25   through roughly 25 loans a day.

1   Q    And that -- does that not equate to less than 20

2   minutes per loan?

3   A    Roughly that.  Yes.

4   Q    So the -- in step 3 for each particular loan you

5   average that the trustee's on one side and Lehman on the

6   other side with the negotiator would take under 20 minutes

7   to resolve that loan?

8   A    Yeah.  Again, based on that assumption that after

9   having, you know, been presented with 10,000 claims for a

10  missing TIL violations that the parties would agree were

11  either -- we're going to agree that this is a good claim;

12  we're going to agree this is a not -- a bad claim or we're

13  going to move on, but we're not going to spend an hour for

14  every of the 10,000 missing TILs necessarily trying to

15  negotiate that point.

16  Q    And, again, if for some reason the average length of

17  time to negotiate a claim increases from the 19.2 minutes I

18  believe is what you've assumed in this chart, that's going

19  to -- that may have -- may length the time frame for this

20  protocol; is that correct?

21  A    Yes.  If the average time for negotiation absent

22  additional negotiators lengthened, it would lengthen the

23  time.  If you added negotiators and the average time

24  lengthened, it would keep the time the same.

25  Q    Okay.  And then we get to the claims facilitation stage

Page 175

1    and you've assumed that a claims facilitator would review

2    three loans per day; is that correct?

3    A    I included the consent of claims facilitator and

4    assistant claims facilitator.  I think I said claims

5    facilitator would review roughly four loans per day.

6    Q    Okay.  Four loans per day.  Fair enough.  And how many

7    loans per day would the assistant claims facilitator review?

8    A    Fifteen loans per day.

9    Q    And do you have an idea as to how much time per loan

10   you've allocated for an assistant claims facilitator?

11   A    Maybe roughly 30 minutes.

12   Q    And, again, in each case if for some reason the claim

13   facilitator only reviews three loans per day and an

14   assistant claims facilitator takes longer on each particular

15   loan that may have an effect of lengthening the process?

16   A    If it took longer than my estimated time and there

17   wasn't a change to the number of facilitators or system

18   facilitators that would increase the time of the project.

19   Q    And it's true that step 5, which is ultimate resolution

20   of any remaining loans before the Court does -- is not

21   included in your year-long protocol; is that correct?

22   A    That's correct.  Yes.

23   Q    And so if more than 50 or I -- 70 loans unfortunately

24   get before this Court, that might take some time to resolve,

25   well beyond the year?

08-13555-scc  Doc 49007  Filed 03/02/15  Entered 03/20/15 13:48:16  Exhibit F
Pg 176 of 374

1    A    You know, again, applying the idea that many, many

2    instances of very similar characteristics of breaches will

3    be presented in every aspect of the waterfall.  I -- you --

4    the 50 to 70 loans that I assumed would be still remaining

5    at the end.  They might be larger, but my estimation is that

6    they are characteristic of breaches where the Court might be

7    able to make a determination that affects a much larger

8    number of loans.

9    Q    But people may not agree and this Court might have to

10   entertain more loans than 70 or more issues than 70?

11   A    There's a possibility, yes.

12            MR. TOP:  Your Honor, I have no other questions.

13            THE COURT:  All right.  Thank you.

14            MR. STEIN:  Your Honor, I've got three to five

15   minutes worth of questions if I may.  I know (indiscernible)

16            THE COURT:  You do, too?

17            MR. MUNNO:  (Indiscernible).  I have a few.  I

18   won't be long.

19            THE COURT:  I don't -- I don't understand this.

20   At the beginning I said we're not going to have multiple

21   questioners.  So I -- I just -- I'm dumbfounded.  I don't

22   understand this.

23            MR. MUNNO:  It's hard to coordinate since we only

24   just got the declaration on Thursday for all practical

25   purposes.  I have three or four questions and then I'll be

1    done.

2            THE COURT:  Last Thursday?  You couldn't

3    coordinate between last Thursday and now?

4            MR. MUNNO:  Well, we had a fair amount of work to

5    do just understanding the opposition papers, the reply

6    papers that came in, the two declarations, preparing for

7    Parekh's deposition, preparing for Alread and Pino's

8    deposition and preparing for Aronoff's declaration.  But if

9    Your Honor doesn't want to hear my questions, then I won't

10   ask them.

11           THE COURT:  Are they on an entirely different

12   subject?

13           MR. STEIN:  They are on issues that haven't been

14   raised, questions that haven't been raised.  My client who

15   is here in the courtroom who I'm willing to trust would like

16   me to address (indiscernible).  I would be three to five

17   minutes and if I go over I'm done at five.

18           THE COURT:  I'll give you both a little leeway,

19   but I have to say --

20           MR. MUNNO:  Thank you, Your Honor.

21           THE COURT:  -- this is not my first choice of how

22   to proceed.

23           MR. MUNNO:  Thank you, Your Honor.  I'll be very

24   brief.

25   CROSS-EXAMINATION

1    BY MR. MUNNO:

2    Q    Mr. Pino, good afternoon.  I'm Bill Munno.

3    A    Afternoon.

4    Q    In the past two years you have not participated in a

5    non-binding claims facilitation process where two parties

6    were disputing whether there were material breaches of reps

7    and warranties; is that correct?

8    A    Can you ask that one more time, please?

9    Q    You haven't participated in a claims process with a

10   facilitation as in this proposed protocol in the past two

11   years?

12   A    That's correct.

13   Q    And based on your experience you do not know how long

14   such a facilitation process actually would take; is that

15   fair?

16   A    I don't know with certainty, no.

17   Q    And based on your experience you do not know how many

18   loans would be left unresolved as a result of such a claims

19   facilitation process; is that right?

20   A    As I said earlier, I made the -- my assumption based on

21   it could be more loans, but similar characteristics.  I

22   think I do have a good sense of the number of

23   characteristics.

24   Q    And you have never participated in the protocol Lehman

25   proposes; is that so?

Page 179

1   A    I've participated in --

2   Q    No.  I'm only asking about the Lehman proposed

3   protocol.  You haven't --

4          THE COURT:  How could he have participated in

5   something that hasn't begun yet?

6          MR. MUNNO:  Well, they could have been -- because

7   he's in the industry and protocols -- we're told that it may

8   be commonplace.

9   BY MR. MUNNO:

10  Q    But you haven't participated in this type of a protocol

11  as outlined by Lehman, isn't that so?

12  A    I mean, if I broke down the different steps in -- I --

13  Q    I'm not asking you about broken --

14  A    -- got loan files --

15  Q    I'm asking you if you --

16  A    -- I've done step --

17  Q    -- participated in a --

18  A    -- one, step two --

19  Q    -- in a protocol.

20  A    -- step three.  I haven't done step four.

21  Q    Now you mentioned teams in your report.  When --

22  A    Right.

23  Q    -- you mention teams are you saying that multiple re-

24  underwriting firms who are competitors with one another are

25  going to join together their systems, join together their

08-13555-scc-mg  Doc 53621-6  Filed 08/30/16  Entered 08/30/16 20:19:16  Exhibit F
08-13555-scc-mg  Doc 49007-1  Filed 03/02/15  Entered 03/20/15 13:19:18  Main Document
Pg 180 of 374

Page 180

1    QC, quality control, and join together their personnel to

2    tackle the problem; is that what you're saying?

3    A    Absolutely.

4    Q    You are saying that?

5    A    Yes.

6    Q    Now in the past two years have you seen multiple re-

7    underwriting firms join together their systems, their

8    quality control and their personnel into one system to do a

9    re-underwriting project?

10   A    Yes.

11   Q    Which project?

12   A    For confidentiality I feel uncomfortable naming names,

13   but I have personally as recently as last Friday, actually

14   maybe as recently as this Wednesday have teams of my

15   underwriters working in one of my peer's systems, another

16   large forensic review firm, doing loan file reviews.  I've

17   worked in --

18   Q    Right.  But you're saying those re-underwriters from

19   your firm were working within one system.  I'm asking --

20   A    I mentioned --

21        MR. COSENZA:  Your Honor, can he finish?  He's

22   interpreting the witness.

23        THE COURT:  Yeah.  Let's let him --

24        MR. MUNNO:  I'm sorry.

25        THE COURT:  Let's let him try to answer your

                                                        Page 181

1   question, okay?

2           MR. MUNNO:  Yeah.  But I don't think I was getting

3   an answer.  But, please, go ahead.

4           THE COURT:  Well --

5           THE WITNESS:  Oh, I -- well, then maybe -- could I

6   ask him to ask it one more time, please?

7           MR. MUNNO:  Yes.  I'll ask it again.  I'm sorry.

8   I was probably unclear.

9   BY MR. MUNNO:

10  Q    What I'm trying to understand is this.  I can

11  understand that there can be forensic re-underwriters at

12  other firms who contract with a single firm to undertake a

13  project.

14  A    Sure.

15  Q    But what I'm not familiar with, which is what I was

16  trying to get clarity on in your report --

17  A    Right.

18  Q    -- is whether separate firms --

19  A    Yeah.

20  Q    -- have a contract with a party --

21  A    Yeah.

22  Q    -- where -- and they join together up all of their

23  systems and join together four separate or more -- several

24  separate quality control teams to undertake a forensic re-

25  underwriting project.  And I'm asking is that what you're

Page 182

1    proposing in your report?

2    A    Join together the system.  So I have worked -- I -- I

3    think, yes is my answer.  I've worked together on large

4    forensic review projects with multiple of my peers in the

5    industry that are other nationally recognized firms that you

6    would recognize together on projects reviewing pools of

7    mortgage loans using similar methodologies for the purpose

8    of pooling all of those results together for one client to

9    perform reviews.  I have not joined my systems with them,

10   but I have developed reporting methodology that allows me to

11   feed data, along with my other peers in the industry,

12   together.

13           I think I testified earlier that on all of the

14   instances that I've worked with the large financial

15   institutions in defending put back claims almost always we

16   have worked side by side with other vendors in the industry

17   as well as with those financial institutions on file

18   reviews.

19   Q    Now in any of your experience in the last two years

20   have you had a 99.96 percent resolution rate on disputed

21   loans of over 200,000?

22   A    No, I have not.

23   Q    Have you had a 99.96 resolution rate with disputed

24   loans of over 100,000?

25   A    No, I have not.

1      MR. MUNNO:  Nothing further.

2           Thank you, Your Honor.

3   CROSS-EXAMINATION

4   BY MR. STEIN:

5   Q    Mr. Pino, under the protocol from the time that Lehman

6   gets a put back, if you will, of a loan how long do they

7   have to respond and say, we accept this or don't accept

8   this?

9   A    I'm not -- I don't recall the exact number from the --

10  I don't recall the number from the protocol.

11  Q    Did you not assist in preparing the protocol?

12  A    I didn't assist in preparing --

13  Q    Okay.  So if the --

14  A    -- the protocol.

15  Q    -- protocol actually has no --

16           MR. COSENZA:  Your Honor, can you let -- the

17  witness is being cutoff.

18           MR. STEIN:  Oh, I didn't mean to do that, Your

19  Honor.

20           THE COURT:  Okay.  Lower -- lower the tone of your

21  voice a little bit, please.

22           MR. STEIN:  Certainly.  I did not mean to cut you

23  off.  You're not -- you were saying something.

24           THE WITNESS:  I was -- I did not participate in

25  preparing the protocol.

Page 184

```
 1              MR. STEIN:  Okay.

 2   BY MR. STEIN:

 3   Q    So if there is a time deadline or if there isn't a time

 4   deadline, it will be on the face of the protocol?

 5   A    I -- yeah.  I was not involved in preparing the

 6   protocol.

 7   Q    Who was?

 8   A    I --

 9   Q    If you know?

10   A    I can't tell you that.  No.

11   Q    How long does it ordinarily take to respond to a put

12   back claim?

13   A    It varies.  I've worked in situations where, you know,

14   it takes an underwriter -- an underwriter reviews three

15   loans a day; that they could be ready on day two.

16   Q    Okay.  With respect to the total number of loans

17   involved -- there's 200,000 loans, approximately 209,000.

18   I'm going to make it 200,000 that need to be reviewed that

19   are the subject of the RMVS claims.  Is that your

20   understanding?

21   A    I based my assumption on 157,000 --

22   Q    And where --

23   A    -- loans.

24   Q    -- did you get that number?

25   A    I based my assumption on the -- either the defaulted
```

```
 1    loans or loans that were impaired in the existing trusts.

 2    Q    Okay.  So with respect to 157,000, if we're dealing

 3    with ten percent of those that would be, what, 15,700?

 4    A    That's right.

 5    Q    okay.  And with respect to that and the $110,000 cost,

 6    if you looked at 15,700, then that 110,000 across the board

 7    costs would be cut to ten percent to $11 million.  Is that a

 8    reasonable assumption?

 9    A    You mean, 110 million cut to --

10    Q    Yes.

11    A    -- cut to 11 million?  The -- I mean, the cost per loan

12    to review the loans would decrease proportionally with the

13    number of loans reviewed, maybe not exactly lunary (sic),

14    but close.

15    Q    And the same thing would happen if the initial review

16    as not of 15,700, but of 1,570 which would be one percent of

17    your 157,000; is that correct?

18    A    I think that's how the math would work.

19    Q    Okay.  And of those as I understand it at this 96.4

20    percent you expect everything to come out and only have .4

21    percent in dispute; is that correct?

22    A    99.6 percent having been resolved through the claims --

23    up through the claims facilitating process and that .4

24    percent being presented to the Court.  Yes.

25    Q    And so that would apply to the 1,570?
```

1   A    I guess it depends on how you got to the 1,570.

2   Q    You expect to be -- the loans to come in on a rolling

3   basis, not at all -- all 157,000 --

4            THE COURT:  I'm going to start pointing out that

5   this has been already covered at least once.

6            MR. STEIN:  The -- I am done with this question.

7            THE COURT:  That's great.

8            MR. STEIN:  And, in fact, I will not proceed with

9   it.  I think I took my three minutes.  Thank you, Your

10  Honor.

11           THE COURT:  Yes.  Thank you.

12           Any redirect?

13           MR. COSENZA:  Do you mind if we take a break and

14  then --

15           THE COURT:  Sure.

16           MR. COSENZA:  -- come back and see if there's any

17  --

18           THE COURT:  Okay.  Mr. Pino, you're going to

19  remain under oath for the break.  Please do not talk to

20  anybody about your testimony or be in anyone's presence

21  while they're discussing the case or any aspect of your

22  testimony.

23           THE WITNESS:  Sure.  Yeah.

24           THE COURT:  All right.  We'll come back at --

25  let's come back at 2:45.

1        (Recess taken at 2:35 p.m.; resume at 2:50 p.m.)

2              THE COURT:  Please have a seat.

3              All right.  Do we have more for Mr. Pino?

4              MR. COSENZA:  No, Your Honor.  We're finished with

5     our questioning --

6              THE COURT:  Okay.  All right.

7              MR. COSENZA:  -- of Mr. Pino.

8              THE COURT:  Very good, Mr. Pino.  You're excused.

9     Thank you very much.

10             THE WITNESS:  Yeah.  Thank you.

11             MR. COSENZA:  So, Your Honor, we're done with our

12    experts.

13             THE COURT:  Okay.

14             MR. COSENZA:  So --

15             THE COURT:  Very good.

16             Yes.  Mr. Munno.

17             MR. MUNNO:  We will call Mr. Aronoff, James --

18             THE COURT:  Very good.

19             MR. MUNNO:  -- Aronoff.

20             THE COURT:  Okay.

21             MR. BAIO:  Your Honor --

22             THE COURT:  Yes.  Mr. Baio, how are you?

23             MR. BAIO:  Good.  How are you?

24             Mr. Aronoff is a rebuttal --

25             THE COURT:  He is.

1           MR. BAIO:  -- expert who gave us his report

2   yesterday at --

3           THE COURT:  Right.

4           MR. BAIO:  -- whatever time in the morning we got

5   it.  So I just wanted to reinsert he is not their opening

6   expert.  They had another expert that they used to --

7           THE COURT:  Dr. --

8           MR. BAIO:  -- advance their criticism --

9           THE COURT:  Dr. Parekh.

10          MR. BAIO:  Yes.

11          THE COURT:  Right.

12          MR. BAIO:  So this witness should be at most

13  limited to rebuttal testimony, not bolstering, not his own

14  views of what the protocol is or should be.  It's a rebuttal

15  witness so he should be rebutting the expert testimony that

16  was provided by our witnesses.

17          I will note that the report itself goes well

18  beyond that and I will be objecting to the report on a

19  variety of grounds based largely on the fact that he is a

20  rebuttal witness, not the affirmative witness.

21          THE COURT:  Okay.  Mr. Munno.

22          MR. MUNNO:  Well, I think you'll find his

23  testimony and his report all in point and it will be in

24  rebuttal to what Mr. Pino and Mr. Alread had said, and we

25  will file him with Mr. Park who will take us through the

Page 189

```
1    protocol and why it will take much more than a year to

2    complete.

3               MR. BAIO:  Can I give you an example, Your Honor,

4    just to --

5               MR. MUNNO:  How about if we have the testimony?

6               THE COURT:  How about if we let Mr. Baio finish

7    his sentence, okay?

8               MR. BAIO:  Thank you.

9               THE COURT:  Go ahead.

10              MR. BAIO:  Paragraph in his findings and

11   declaration is the assumptions regarding cost and timing

12   contained within the Parekh report are reasonable and not

13   inconsistent with my industry experience.  That has no basis

14   whatsoever as a rebuttal expert.  He is simply bolstering

15   the expert testimony that was provided by his colleague.

16   That is not allowed.  That is not a rebuttal.

17              There --

18              THE COURT:  Okay.

19              MR. BAIO:  -- are other examples --

20              THE COURT:  Hold on.  Let's --

21              MR. BAIO:  -- of that.

22              THE COURT:  -- stop with that one.

23              MR. MUNNO:  Okay.

24              THE COURT:  Mr. Munno.

25              MR. MUNNO:  We'll have -- we'll have Mr. Park talk
```

1    about that.  I don't plan on having Mr. Aronoff talk about

2    that point.  I haven't --

3            THE COURT:  Well, I -- then -- it's a little

4    disorganized because then we have something that's been

5    given as a declaration with (II) Findings and declaration,

6    but now what you're saying is that you're not really going

7    to do that.

8            So --

9            MR. MUNNO:  What I'm really saying is --

10           THE COURT:  -- does everyone have -- we're going

11   to have to go through this bit by bit because the way that

12   -- and we talked about this, I think, when we had the little

13   telephonic call the other day, and I don't think you

14   disagreed in principal with the notion that a rebuttal

15   witness should be a rebuttal witness, right?  I mean, I

16   don't think we have a disagreement on that.

17           MR. MUNNO:  I don't think we have a disagreement

18   about what a rebuttal witness is.  But we do have this

19   disagreement, which is that Lehman only proffered Pino and

20   Alread in their --

21           THE COURT:  Right.

22           MR. MUNNO:  -- in their reply, so we had no

23   opportunity in the first --

24           THE COURT:  And I --

25           MR. MUNNO:  instance to put --

```
 1                THE COURT:  And I --

 2                MR. MUNNO:  -- that forward.

 3                THE COURT:  -- I heard you on that point and I

 4     didn't --

 5                MR. MUNNO:  So this --

 6                THE COURT:  -- disagree.

 7                MR. MUNNO:  -- Aronoff declaration would have been

 8     put in in November had they put in Pino and Alread in

 9     October, but they waited till the last minute and we were

10     effectively mouse trapped on that.

11                THE COURT:  Okay.  I know you've taken that

12     position, and to the extent that you -- I don't like the

13     word "mouse trapped."

14                MR. MUNNO:  Well --

15                THE COURT:  To the extent that you were not given

16     a fair --

17                MR. MUNNO:  I don't either.  And --

18                THE COURT:  -- opportunity --

19                MR. MUNNO:  -- I withdraw it.

20                THE COURT:  To the extent that you were given --

21     not given or afforded a fair opportunity because of the

22     timing of the submissions you can have rebuttal.  Mr. Baio's

23     point is that rebuttal is rebuttal and bolstering Dr. Parekh

24     is not rebuttal.

25                MR. MUNNO:  We will not be seeking through Mr.
```

1    Aronoff to bolster Mr. Parekh.

2              MR. PEDONE:  Your Honor, I --

3              MR. BAIO:  Paragraphs 11 and 12 do the identical

4    thing.

5              MR. PEDONE:  Your Honor, may I address the point,

6    please?

7              THE COURT:  Are you going to tell me something

8    different from what Mr. Munno is telling me.  I -- I cannot

9    continue --

10             MR. PEDONE:  I am, Your Honor.

11             THE COURT:  -- to do this.

12             MR. PEDONE:  I am, Your Honor.

13             THE COURT:  Why should I not be listening to only

14   one of you.  The premise of your entire motion and cross-

15   motion is that you want to act collectively, and yet in this

16   simple proceeding to just decide the threshold issue of how

17   we're going to do this, you can't act collectively.  I'm

18   beginning to lose my patience.  I don't understand why four

19   capable attorneys are not able to coordinate with respect to

20   the presentation of a witness.  I don't understand it.

21             MR. PEDONE:  Your Honor, I'm responding to the

22   motion that was just made that --

23             THE COURT:  But Mr. Munno --

24             MR. PEDONE:  -- we did not realize --

25             THE COURT:  -- is standing at the podium.  I --

1          MR. PEDONE:  And I would like to be heard on the

2     request to disqualify my witness at the appropriate time.

3          THE COURT:  He --

4          MR. PEDONE:  It was --

5          THE COURT:  But they haven't made a request to

6     disqualify the witness.

7          MR. PEDONE:  They're seeking to limit his

8     testimony.

9          THE COURT:  Yes.  They're seeking --

10          MR. PEDONE:  And I would like to --

11          THE COURT:  -- to limit --

12          MR. PEDONE:  -- be heard before the testimony is

13     limited.  Mr. Munno will do the direct, but --

14          THE COURT:  Well, we can --

15          MR. PEDONE:  -- I would like to be heard on the

16     limitations.

17          THE COURT:  We can -- then, perhaps, what we ought

18     to do, perhaps what we ought to do is ask the witness to

19     step outside and we can have Mr. Baio and all of you go

20     through the declaration and see if you can come to an

21     agreement on what stays and what goes.  To the extent that

22     you don't agree, Mr. Baio can make his objection, I can rule

23     on it, and then we can hear from the witness.

24          Instead, we're -- we have something that is very

25     disjointed, which I don't like.

1          Mr. Baio, how would you like to do that?

2          MR. BAIO:  That's fine, Your Honor.

3          THE COURT:  All right.  Why don't we -- why don't

4    we have -- well, let's try to do this in a way that makes

5    sense.  Do you we want to take a brief recess and have the

6    two of you go back in a conference room or the five of you

7    go back in the conference room and have the conversation and

8    then we can come back on?

9          MR. BAIO:  I can identify the ones that I disagree

10   with.  If they need time, they can --

11         THE COURT:  All right.

12         MR. BAIO:  -- caucus as they wish, that way we

13   keep things --

14         THE COURT:  All right.  I --

15         MR. BAIO:  -- moving.

16         THE COURT:  -- don't want to do it on a one-off

17   basis.  So this is your entire sweep of points --

18         MR. BAIO:  Scope of testimony.

19         THE COURT:  Scope of testimony.  Okay.  Go ahead.

20         MR. BAIO:  Yes.

21         Paragraph 11 is simply a statement as to the

22   protocol.  It has nothing to do with the testimony that was

23   provided.

24         The attack on the protocol could have been made in

25   the first instance.  It did not need anything to respond to.

1   There's nothing in that sentence or in sentence 12 that has

2   anything to do with the testimony that was provided by the

3   experts.  Those should be out.

4           MR. MUNNO:  Well --

5           MR. BAIO:  They are purely directed to the

6   protocol which could have been done in the opening expert

7   report.

8           Next, paragraph 17 is simply giving an opinion

9   that Mr. Parekh is better than everybody else.  That is,

10  again, bolstering the testimony of his own expert and that

11  is not the appropriate thing for an expert to be doing,

12  particularly a rebuttal expert.

13          The rest I will cross-examine on, but those are

14  the ones.  So it's 7 --

15          THE COURT:  Well, we've already discussed --

16          MR. BAIO:  I'm sorry.

17          THE COURT:  Eight.

18          MR. BAIO:  Eight.

19          THE COURT:  Okay.

20          MR. BAIO:  Eight, 11, 12 and 17.

21          THE COURT:  Okay.  Mr. Munno.

22          MR. MUNNO:  I don't understand the objection to

23  Number 7.

24          MR. BAIO:  No.  No.  Not 7, sorry.

25          THE COURT:  Eight.

```
 1              MR. BAIO:  I didn't --

 2              THE COURT:  He misspoke.

 3              MR. MUNNO:  Oh, okay.  Thank you.

 4              MR. PEDONE:  Your Honor, may we --

 5              THE COURT:  Sure.

 6              MR. PEDONE:  -- confer for one minute.

 7              THE COURT:  Take a moment.

 8              MR. PEDONE:  And I don't believe --

 9              THE COURT:  Go ahead.

10              MR. PEDONE:  -- a recess will be necessary.

11         (Pause)

12              MR. MUNNO:  We're fine with 8, 11, 12 and 17 not

13    be considering as part of the --

14              THE COURT:  Okay.  So those are going to be --

15              MR. MUNNO:  -- rebuttal reports.

16              THE COURT:  -- stricken from the declaration.

17              MR. MUNNO:  Stricken from the declaration.

18              THE COURT:  Okay.

19              MR. BAIO:  Thank you, Your Honor.

20              THE COURT:  Very good.

21              All right.  So now shall we hear from Mr. Aronoff?

22         (Pause)

23              THE COURT:  Mr. Aronoff, would you raise your

24    right hand, please?

25         (Witness sworn)
```

08-13555-scc-mg Doc 53621 Filed 08/30/16 Entered 08/30/16 20:48:16 Main Document
08-13555-scc-mg Doc 49007 Filed 03/02/15 Entered 03/20/15 19:48:16 Main Document
Pg 197 of 374

1          THE COURT:  Please have a seat.  Make yourself

2    comfortable.  Let us know if you would like a break at any

3    time.  And if you would, that's it, pull that microphone

4    down towards you.

5    DIRECT EXAMINATION

6    BY MR. MUNNO:

7    Q    Good afternoon.  Do you have any experience in the RMBS

8    industry?

9    A    Yes.

10   Q    Please tell us what it is.

11   A    I've spent the better part of 30 years working in the

12   RMBS industry.

13   Q    And tell us in what capacities you have spent the

14   better part of 30 years working in the RMBS industry?

15   A    As a structured finance attorney, as a trader and

16   investment banker, as a senior executive bond insurer, as

17   the owner and founder of a mortgage company, and for the

18   last number of years as a consultant to the industry.

19   Q    Could you please briefly tell us your educational

20   background?

21   A    Yeah.  I got my undergraduate degree from Yale with a

22   bachelors of arts in economics and political science, and I

23   have a JD with a specialization in international law from

24   Cornell Law School.

25   Q    Okay.  And you mentioned that you worked as a lawyer

1    and -- as a structured finance lawyer.  Could you tell us

2    what you did in that capacity that's relevant to asset-

3    backed securities?

4    A    Yes.  We represented primarily investment banks with

5    respect to the acquisition, financing and securitization of

6    residential holdings.  And in that regard we were

7    responsible for drafting the documents and negotiating the

8    documents on behalf of our clients as well as back in those

9    times, the early 80s, the young associates went on the road

10   and reviewed loan files prior to the advent of third party

11   due diligence firms.

12          So my first entry to review of loan files as a

13   young associate as Vagger (ph), Profitt (ph) and Ward.

14   Q    Okay.  And what have you done since leaving the

15   practice of law?

16   A    I've -- as I noted, I worked at investment banks,

17   Kidder Peabody and Nomura Securities where I ended up

18   running the fixed income structured finance group where we

19   were responsible, again, for acquiring and financing and

20   securitizing, among other things, residential whole loans

21   and, of course, prior to the acquisition and securitization

22   of loans we engaged in extensive due diligence.

23          In addition, at boat stops (sic), to the extent we

24   chose to exercise our rights in connection with put backs we

25   did that as well, so -- and reviewed loans in connection

1    with exercising our rights to put back loans that didn't

2    comport with the reps and warranties to the appropriate

3    party.

4              During -- in between Kidder and Numora I was

5    managing director at Financial Security Assurance, a bond

6    insurer, and little different focus whereas the bond insurer

7    views themselves as an investor in the securities they

8    insure, again, prior to an agreement to insure any

9    particular transaction we did extensive loan file due

10   diligence to make sure that the loans comported to what our

11   understanding of the loans were.

12   Q    Are you currently employed?

13   A    Yeah.  I -- I'm currently managing director at Duff &

14   Phelps.

15   Q    Okay.  And in that capacity what have you been doing in

16   the last several years --

17   A    I actually --

18   Q    -- relating to RMBS.

19   A    I actually came to Duff in November of 2012 as part of

20   the disputes group and we provide litigation support,

21   analytics, expert witness testimony in connection with

22   litigation matters.  My particular focus is with respect to

23   capital markets and asset-backed securities including RMBS.

24   Q    So let's focus on RMBS claims.  Do you have any

25   experience in RMBS claims resolution?

1   A    Yes.  As I noted at -- during my time in Numora we had

2   occasion, as a general part of the business, to review loans

3   in our portfolio as well as having been a securitizer from

4   time to time we had claims of loans put back to us.  So as a

5   general part of the business we had to either execute or

6   respond to put back claims.

7            Similarly, when I had my own mortgage company, we

8   vigorously enforced our rights to put back loans that we

9   acquired that we felt did not comport with the reps and

10  warranties and, from time to time, not too frequently, but

11  from time to time we had loans put back to us that we had to

12  either rebut or accept.

13           Subsequent to my sale of the mortgage company in

14  2000 I've been consulting to the industry, and in that

15  capacity I've had, I dare say, not quite 100, but nearly 100

16  various engagements where the evaluation of mortgage loans,

17  not always in a forensic context, but many, many, many cases

18  in a forensic context, many opportunities on behalf of

19  clients to analyze and review residential mortgage loans.

20  Q    And some of those are so-called put back claims where

21  the parties are in dispute as to whether there is a material

22  breach of a rep and warranty?

23  A    That's correct.  During my time at a company called

24  Portfolio Reconnaissance Services we provided consulting

25  services to investors in asset-backed securities, primarily

1    RMBS, and in that capacity we were retained many times to

2    actually do the analysis, manage the forensic reviews, and

3    for lack of a better term prosecute the put back claims with

4    whoever the sponsor or the repurchasing party was.

5         Similarly in my role at MTGX, a consulting firm, I

6    had the opportunity to work with banks and actually defend

7    and rebut put back claims.

8    Q    Have you been involved in the mortgage industry in any

9    other capacities, served on any boards?

10   A    In the late 90s I was on the board of NHEMA, National

11   Home Equity Mortgage Association, and during that time

12   period when there -- when there was a more significant

13   private label residential mortgage market I frequently spoke

14   at conferences and on panels.

15   Q    Now I -- during the past four years, if we can just

16   focus on this more recent period, have you been involved in

17   RMBS put back claims?

18   A    Yes.  Since about 2009 I've been almost exclusively

19   working as an expert witness or consultant in connection

20   with RMBS litigation.  And so that's been my primary work

21   over the last four years.

22   Q    And have you participated in parties efforts to resolve

23   disputed put back claims?

24   A    Yes, I have.

25   Q    And based on your experience with put back claims, have

08-13555-scc mg Doc 53621 Filed 09/30/16 Entered 09/30/16 08:49:16 Main Exhibit F
08-13555-scc Doc 49907 Filed 05/02/15 Entered 05/20/15 13:48:16 Main Document
Pg 202 of 374

Page 202

1    you observed how long it takes on these -- some of these

2    disputes?

3    A    I've participated so, yes, I've been involved from

4    beginning to end in most cases.  Yes.

5    Q    Did you read Mr. Pino and Mr. Alread's declarations?

6    A    I did.

7    Q    Now based on your experience do you agree with Mr.

8    Pino's assumption that most of the Lehman proposed protocol

9    could be completed in a year?

10    A    No, I don't.

11    Q    Based on your experience do you believe it is real --

12    reasonable that over 700 forensic re-underwriters could be

13    assembled to undertake a loan by loan review of over 209,000

14    loans as Mr. Pino assumes?

15    A    I know this is direct, Bill, but could you ask that

16    again.

17    Q    Oh, yeah.  Sorry.

18         Based on your experience, do you believe that it

19    is reasonable that over 700 forensic re-underwriters could

20    be assembled to undertake a loan by loan review of over

21    209,000 as Mr. Pino assumes?

22    A    You know, I -- I honestly don't know.  I think it would

23    be extremely difficult to cobble together that many forensic

24    review personnel in a cooperative effort for -- even

25    assuming for purposes of discussion we're going 12 straight

1  months without a significant diminution in the quality of

2  the reviews.  And that's something that no one has talked

3  about today, which would -- is -- would be very important to

4  me.  I have no doubt you could find bodies to sit in front

5  of terminals and enter data.  But because each of these

6  forensic reviews is, in essence, an opinion, the quality and

7  skill of the reviewer is very important to getting a result

8  that doesn't waste time once you're presenting a claim and

9  trying to discuss whether it's a valid claim.

10         And so I -- I think it -- based on my experience

11  it -- I can't answer the question as to whether you could

12  find 700 bodies, but I think once you get above a certain

13  point -- and, you know, I -- I don't know, because I know

14  someone is going to ask me, if it's 150, 200, 500 or 700,

15  but at some point you get a significant diminution of

16  quality.

17  Q    Well, on the put back matters that you've been working

18  on during the past four years what number of re-underwriters

19  have there been involved?

20  A    You know, the number of re-underwriters involved has

21  really been a function in the cases I've worked on and the

22  time we had to get the job done.  And so it's -- we've never

23  -- I've never faced a situation where we've had to get

24  209,000 done within a year.  That presents a de novo

25  situation of first impression for me.

```
 1    Q    Okay.  Do you believe it is realistic that 99.96

 2    percent of over 209,000 loans would be resolved before the

 3    Court has to become involved to settle disputed loan claims?

 4    A    Again, I don't know what number would fall out of this

 5    process because it really matters on how readily -- how

 6    ready the parties are to reach agreement on loans.  In

 7    looking at Mr. Pino's report, it seemed unrealistic to me

 8    that just by taking a loan that no one could agree on in

 9    step 2, resubmitting it in step 3 and resubmitting it in

10    step 4 that you would reach agreement on all but 50 loans

11    out of 209,000.  That does not comport with my experience.

12    Q    Based on your experience do you believe that the

13    trustees could retrieve over 209,000, re-underwrite them,

14    and present them back to Lehman with what they believe are

15    material breaches of reps and warranties in 180 days as Mr.

16    Pino says?

17    A    No.

18    Q    Now let's back up and drill down on some of your views.

19         You testified a moment ago that you do not agree

20    with Mr. Pino's assumption that this proposed protocol could

21    be completed within a year plus whatever time the Court has

22    to be involved to adjudicate the unresolved claims.  Tell us

23    why you have that view.

24    A    Could you give me the first part of the question again?

25    I'm sorry.
```

1  Q    Yeah.  Why -- you know, why do you assume it couldn't

2  be done in a year plus whatever time it takes the Court?

3  A    I was assuming that Mr. Pino's timeline was the time

4  things would take pursuant to the protocol, and I have a

5  fundamental difficulty in understanding that how all those

6  loans could be delivered in a form ready to be reviewed

7  within five months.

8         So at the first instance, I found it, again,

9  difficult to buy into the assumption that 209,000 loans on a

10  rolling basis could be delivered for five months and,

11  therefore, be the starting point to complete the review in

12  the time frame that he established.

13         Unless, of course, implicit in his analysis is an

14  assumption that along the way a significant number of the

15  loans that were submitted were rejected for technical

16  reasons or that many of the loans never got submitted

17  because they didn't satisfy the protocol submission

18  procedures.

19         THE COURT:  Can I ask a question?

20         MR. MUNNO:  Please.

21         THE COURT:  So Dr. Parekh said -- based some of

22  his work -- and it's become an issue here today -- that it

23  took 18 months to assemble just short of 5,000 files.  Do

24  you adopt that as the time frame that I should consider to

25  be the one that will actually occur, 18 months to collect

08-13555-scc-mg Doc 53621 Filed 08/30/16 Entered 08/30/16 20:48:16 Exhibit F
08-13555-scc Doc 49907 Filed 05/02/15 Entered 05/02/15 13:48:14 Main Document
Pg 206 of 374

Page 206

```
 1    5,000 files?

 2              THE WITNESS:  I think that was -- no, Your Honor,

 3    I do not.

 4              THE COURT:  You disagree with Dr. Parekh -- you

 5    disagree with the notion that that's what I should use as my

 6    starting point to extrapolate the amount of time that it

 7    would take to produce the 209,000 files?

 8              THE WITNESS:  If you're asking for guidance, I

 9    think that --

10              THE COURT:  Yes, I am.

11              THE WITNESS:  -- I think that we can use the

12    initial requests and why it took that long because that was

13    an extraordinarily long period of time --

14              THE COURT:  Yes.

15              THE WITNESS:  -- why it took that long to complete

16    -- well, they still weren't completed, but complete them to

17    the point --

18              THE COURT:  Right.

19              THE WITNESS:  -- they are --

20              THE COURT:  Yes.

21              THE WITNESS:  -- and use that as guidance.  All

22    I'm saying is that it will take longer, based on my

23    experience, given the multiple servicers, the number of

24    servicing transfers that have occurred.  It will take longer

25    than five months.  I don't know if 18 months is the right
```

1   number, but I think we can use that to guide us as to was

2   everyone doing what they were supposed to be doing to get it

3   done in the most efficient fashion.

4           THE COURT:  All right.  Thank you.

5   BY MR. MUNNO:

6   Q    Now in your experience in the industry is Mr. Pino's

7   estimate of the time to retrieve loan files consistent with

8   the proposed protocols requirement to retrieve, review and

9   present breaches within six months or forfeit any claim?

10  A    As I said I -- he comfortably, in his statement, said

11  that will all be done with six month -- within six months,

12  but that's because any claim that wasn't made under the

13  protocol within six months goes away and the RMBS trustees

14  lose the right to ever make that claim.

15  Q    Well, does his exhibit to his report estimate the time

16  that it will take to get files to your recollection?

17  A    His report, I think in a footnote, says it would take

18  five months in his estimates to get the files.

19  Q    Now in Mr. Pino's report he refers to uncontestable

20  reasons.  Do you agree with Mr. Pino about the number of

21  loans that would be resolved for uncontestable reasons?

22  A    I -- quite frankly, it's not a term of art and I've

23  never heard -- I know what those two words mean next to each

24  other.  But I've just viewed it as a device to take a 50

25  percent agree rate at that level, which he said he took from

1   Dr. Parekh's report and add another 25 percent to it.  So,

2   in essence, if you look at step 2, the agreement rate is

3   they reject 75 and accept 25 percent.

4   Q    Now do you agree that there would be the elimination of

5   that many disputed loans in step 2 based on your experience

6   with disputed loan files?

7   A    Given the posture of the parties that I've observed

8   today I think it would be -- I can -- I could posit 75

9   percent being rejected.  I don't think -- I don't know if we

10  reach resolution on 75 loans and have them go away.

11  Q    Now Mr. Pino and Mr. Alread say that, based on their

12  experience, they think the proposed protocol could be

13  accomplished within a year except for the part that would be

14  left for the Court to adjudicate.

15       Now do you agree that -- with that or do you think

16  that there are hurdles in the protocol that would forestall

17  such a rapid resolution?

18  A    Yeah.  And I -- I actually agree with something Mr.

19  Alread said this morning, which is if everyone agrees we

20  might be able  to do this in a year.  But that's precisely

21  the point is that unless you reach agreement, which I don't

22  see the -- there are various points in the process in Mr.

23  Pino's analysis where in my view loans vaporized for reasons

24  that I don't quite understand.  One was, as he pointed out

25  in step 2, these incontestable decisions or reasons, and

08-13555-scc-mg Doc 53621 Filed 08/30/16 Entered 08/30/16 20:48:16 Main Document
08-13555-scc-mg Doc 49907 Filed 05/02/15 Entered 05/30/15 20:48:16 Main Document
Pg 209 of 374

Page 209

```
 1    then in the -- at the next step there are these -- at step

 2    4, I believe, there were the special handling matters that

 3    reduced any loans coming to the Court's attention to a

 4    handful.

 5              And, you know, what struck me as I read it is

 6    there was a discussion within the context of the report that

 7    you would -- and it was in Mr. Alread's as well -- I think

 8    he picked up on the theme -- was that you would find common

 9    themes and you would develop them and you would use that to

10    pick up speed and accelerate the process by which you would

11    administer these claims as you move forward.

12              I saw two problems with that.  One is that -- and,

13    again, as a businessman, not as an attorney, I read the last

14    section of the protocol, the last paragraph of the protocol

15    as preventing that, whereas the -- you could not use

16    decisions made with respect to a loan to administer or

17    decide what you would do with other loans.

18              And so I think -- I think if you could do that

19    that would be helpful.  But then the other thing I didn't

20    understand is why would you wait till step 3 or 4 to start

21    taking these easy, readily agreed upon -- use these readily

22    agreed upon devices to start lopping off large portions of

23    the loans to be administered.  Couldn't you do that in the

24    first step?  A claim is presented and it's resolved because

25    it's an easy fix.
```

Page 210

1       I give you a note or, you know, I -- I just didn't

2    see -- I envisioned those kinds of easy fixes easy to

3    understand or incontestable decisions to have happened

4    before it went through the negotiation and the facilitation

5    and the monitoring stage.

6    Q    Now in your experience Mr. -- do you agree with Mr.

7    Pino that they might have a missing TIL that a missing TIL

8    would be the only problem with the loan file?

9    A    I understood his example, but since many of these loans

10   have multiple breaches I think the loan would have to be

11   discussed in total.

12       Similarly, a missing document may in and of itself

13   -- I don't think in this case a missing TIL is -- but a

14   missing document may in and of itself rise to the level of

15   material adverse breach.  And so to the extent it can be

16   cured because the file that was sent was incomplete doesn't

17   minimize it.  It's a valid breach that needs to be presented

18   and adjudicated.  It's just fixed and it's no longer a

19   breach.

20       Alternatively, you have to draw a distinction

21   between missing documentation that's evidence of the breach

22   that's being presented to support a breach plan versus a

23   missing document that in and of itself might mean there is a

24   breach.

25       So it's -- again, like everything else involved in

1  the forensic review and administration of these loans it --

2  it's very technical and it -- it's very specific, and the

3  administration of these loans could take 20 minutes, but as

4  I mentioned in my deposition I've been involved in

5  situations where we thought it was reasonable to present

6  three loans a day to the court and we ended up spending

7  three days on the first loan.

8  Q    Do you agree with Mr. Alread's opinion that the

9  proposed protocol is efficient and workable?

10 A    I do not.

11 Q    Can you explain without repeating points that you've

12 made again --

13 A    Yes.

14 Q    -- why that's so?

15 A    Yeah.  I didn't understand the need for steps 3 and 4,

16 especially since in my view they were filled with certain

17 procedural traps that if you didn't resubmit a claim within

18 a certain time period you -- you lost the right to put that

19 claim forward.

20        And that's similar to the initial requirements

21 that you have to submit the claims from the order date as

22 opposed to from the date you receive a full file.

23        Another example along those lines is that it

24 seemed to turn the industry custom and practice around in

25 terms of the timing whereas under the governing documents,

1   which reflect what industry practice is in my view,

2   typically the party that's receiving the put back request

3   has 60 to 90 days to respond to that request.  This turned

4   it around and said that the party making the request has to

5   do it within a time period or they lose their claim.

6          So I think there are different answers to why was

7   it inconsistent with industry practice and why was it

8   unwieldy and inefficient because I kind of mixed those

9   together in the same statement in my declaration.  But I

10  think they're all tied together.

11         And then there are detail things, like the

12  requirement that they provide a detailed, you know, claims

13  data sheet which, in my examination of it, contained a large

14  number of fields that have no bearing -- may have no bearing

15  on the specific put back request that -- that's being made.

16  But my understanding would be that is if he didn't comply

17  with the strict requirements of the claims submission

18  procedures, then you've lost the opportunity to argue that

19  law.

20  Q    Now do you agree with Mr. Alread that put back claims

21  are done only through loan -- on a loan by loan basis?

22  A    There was a time when that -- I would agree with that,

23  although as I stated in my declaration I think the market is

24  evolving and it's evolving to a point where, for reasons in

25  each case are articulated, sometimes clearer than others,

1    the courts or participants in administering claims have

2    decided or been forced to use sampling.  And, you know,

3    perhaps part of that is a difference of opinion or a belief

4    now that the put back protocol in most RMBS agreements was

5    never intended or designed by the parties, from a commercial

6    standpoint, to handle these large scale types of situations.

7    That as Judge Rakoff said, they were -- it was meant to

8    handle onesies and twosies.

9    Q    Now have you ever participated in a protocol similar to

10   the one that Lehman is proposing to resolve hundreds of

11   thousands of loans?

12   A    No.

13   Q    A thousand loans?

14   A    I've never participated in a protocol like this.

15   Q    Have you ever seen a protocol like this being used in

16   the industry to resolve a large number of disputed loans?

17   A    We've reached agreement with parties to enter into a

18   little p protocol to -- you know, the documents essentially

19   say, discover breach, provide the breach, accept or rebut

20   the breach.  And in each of those cases where we have more

21   than a couple of loans, we've reached agreement or tried to

22   reach agreement with the other side to say, how are we going

23   to go about administering these loans.

24            So to the extent little p protocol, yeah, we come

25   up with the rules of what we think the most efficient way to

1   administer loans in -- is.  And I didn't think the big p

2   protocol that I was asked to look at in this case made that

3   process easier.  I thought it made it significantly harder

4   and I thought it was, as I said, filled with traps that if

5   -- that could impair the trustee's ability to put forth

6   claims that otherwise they would be entitled to bring.

7   Q    Now with respect to the matters that you've been

8   working on, put back matters in the last couple of years

9   that have involved a large number of loans, have you had a

10  little p protocol of the type that you've just described?

11  A    We have -- to date the put back cases I've worked on

12  have all been brought to the point they're at through the

13  use of statistical sampling.  Any kind of loan

14  administration on a loan by loan basis that I've been

15  involved with preceded my work in some of these larger RMBS

16  disputes.  The disputes that -- cases that I've worked on

17  have all involved sampling.

18  Q    Now did you prepare a declaration December 9 -- or

19  filed December 9, dated December 8 --

20  A    Yes.

21  Q    -- 2014?  Is this your declaration?

22  A    I can't see that far.

23       (Laughter)

24  A    I'm sorry.  I used to be able to.

25            MR. MUNNO:  May I show the witness this

Page 215

 1   declaration?

 2            THE COURT:  Yes.

 3            THE WITNESS:  Yes.  It appears to be my

 4   declaration.

 5            MR. MUNNO:  May we have that declaration received

 6   as Trustee's 1.

 7            THE COURT:  Okay.  Except --

 8            MR. MUNNO:  Except for those --

 9            THE COURT:  -- as previously agreed --

10            MR. MUNNO:  -- paragraphs stricken.

11            THE COURT:  -- paragraphs 8, 11, 12, and 17.  Any

12   other objections, Mr. Baio?

13            MR. BAIO:  No objection.

14            THE COURT:  All right.  It's in in that truncated

15   form.

16       (Trustee's Exhibit Number 1 was admitted)

17            MR. MUNNO:  No further questions.

18            THE COURT:  Well, before you sit down, could you

19   look at paragraph 15 of your declaration in which you say

20   that "the single most influential driver of how long it will

21   take to resolve the put back claims is step 5," which --

22            THE WITNESS:  Yes.

23            THE COURT:  -- I think is me.

24            THE WITNESS:  Yes, Your Honor.

25            THE COURT:  So is that because you disagree with

Page 216

1   the number of claims that will end up before the Court or is

2   that because of some other reason?  In other words, subject

3   to the caveats that you outlined about what you described as

4   -- I don't know if you used the word "traps," but certain

5   things that -- in step 3 and 4 that troubled you, this still

6   emerges, the what might have to go to court step is the most

7   influential driver of how long this whole capital p protocol

8   process will take.

9          THE WITNESS:  Yes, Your Honor.  Assuming none of

10   those other difficulties arose --

11          THE COURT:  Right.

12          THE WITNESS:  -- the single most aspect -- the

13   single most timely aspect of the protocol would be --

14          THE COURT:  Time consuming?

15          THE WITNESS:  Yeah.

16          THE COURT:  Yes.

17          THE WITNESS:  Time consuming, most expensive, I

18   think the assumptions in Dr. Parekh's report is we can only

19   spend -- his assumption was we could only spend one week a

20   month, five days a week --

21          THE COURT:  Trying claims.

22          THE WITNESS:  -- trying these claims, which that

23   may even be a stretch.  But it was one week a month, and I

24   think it was -- I don't -- I won't guess the number.  I

25   think it was seven a day.

 1          THE COURT:  Okay.  But --

 2          THE WITNESS:  And --

 3          THE COURT:  -- that didn't take -- that doesn't

 4  take --

 5          THE WITNESS:  No.  But --

 6          THE COURT:  -- into account --

 7          THE WITNESS:  But --

 8          THE COURT:  -- alternate dispute resolution at

 9  that point, for example?  That --

10          THE WITNESS:  Correct.

11          THE COURT:  -- assumes that --

12          THE WITNESS:  Correct.

13          THE COURT:  -- I would have to try every single

14  case.

15          THE WITNESS:  Absolutely.  And just --

16          THE COURT:  Right?

17          THE WITNESS:  -- assuming his numbers, the 35 a

18  month divided by 11,000 which was what fell through --

19          THE COURT:  Right.

20          THE WITNESS:  -- got out at 20 something years.

21          THE COURT:  Okay.  But --

22          THE WITNESS:  All right.

23          THE COURT:  But before you get to that point,

24  also, even if you don't agree with the 99. --

25          MR. MUNNO:  96.

```
 1              THE COURT:  -- 96, whatever the percentage is, as
 2     you said quite astutely, there are offerings that can occur
 3     earlier in the process.  The parties, if they were to work
 4     together, for example, could agree to bring to me a question
 5     about whether or not a missing TIL should continue to move
 6     through the queue.  In other words, they could -- they could
 7     seek resolution on discreet issues and then that would
 8     determine whether or not whole buckets of claims stay in the
 9     queue or go into one -- into the win or loss column.
10              THE WITNESS:  That's correct, Your Honor.  And I
11     think the protocol recognizes that.
12              THE COURT:  Okay.  All right.  Thank you very
13     much.
14              MR. MUNNO:  Can I do one last thing because --
15              THE COURT:  Sure.
16              MR. MUNNO:  -- I want to be clear that we have
17     qualified Mr. Aronoff as an expert.
18              THE COURT:  I don't think anybody's objected to
19     his qualifications.
20              MR. MUNNO:  I --
21              MR. BAIO:  I have not to the questions that were
22     asked.
23              THE COURT:  All right.
24              MR. PEDONE:  Do I go?
25              THE COURT:  I think --
```

```
1              MR. BAIO:  Oh, I saw someone else stand up.

2              THE COURT:  I did see someone else stand up, but

3     --

4              MR. BAIO:  Oh, good.

5         (Laughter)

6              THE COURT:  He sat -- he sat down.

7              UNIDENTIFIED SPEAKER:  I needed to get a note.

8         (Laughter)

9              MR. BAIO:  So it wasn't a look from the Court?

10             THE COURT:  It's only taken till 3:30 to get

11    everybody under control.  So --

12             MR. BAIO:  See if I can -- can I turn this --

13             THE COURT:  You --

14             MR. BAIO:  -- just a little bit, just a wee bit?

15             THE COURT:  You know what, there's -- there's

16    wiring.

17             MR. BAIO:  All right.  I'm not going --

18             THE COURT:  So if you --

19             MR. BAIO:  -- to get anymore, Your Honor.

20             THE COURT:  Don't get me in trouble.  You can move

21    it.  People don't like the way it is.  I didn't build the

22    court.

23             MR. BAIO:  Yeah.  I'm -- I'm okay.  Thank you.

24             THE COURT:  Okay.

25    CROSS-EXAMINATION
```

08-13555-scc mg Doc 53621-6 Filed 08/30/16 Entered 08/30/16 30:89:16 Exhibit F
08-13555-scc mg Doc 49907-1 Filed 05/02/15 Entered 05/20/15 29:13:48: Main Document
Pg 220 of 374

Page 220

```
 1    BY MR. BAIO:

 2    Q    Good afternoon --

 3    A    Good afternoon.

 4    Q    -- Mr. Aronoff.  You, yourself, worked on some of the

 5    requests for claims files starting the fall of last year; is

 6    that right?

 7    A    Yeah.  I wasn't entirely sure what the exact date was,

 8    but I believe at some point in time towards the latter part

 9    of last year when there were discussions about how can we

10    get more files --

11    Q    Yeah.

12    A    -- to look at I -- I got involved as did others of my

13    colleagues at Duff & Phelps.  That's correct.

14    Q    And you made some calls and some files appeared so far

15    as you know; is that right?

16    A    That's right.  But as I pointed out yesterday I don't

17    know if there was a cause and effect.  I would like to think

18    there was.

19    Q    Okay.  But it happened?

20    A    We got --

21    Q    You called and files came in?

22    A    I think -- I think there were ongoing requests, quite

23    frankly, but we did assist in that effort and ultimately we

24    did get subsequent deliveries of files.  That's correct.

25    Q    Okay.  Now in 2008, let's say the end of 2008 and 2009
```

1    the trustees made no requests for these files; is that

2    right?

3    A    I have no knowledge of that.

4    Q    Well, you haven't seen any evidence that in 2008 and

5    2009 they requested claims files; is that right?

6    A    I haven't seen any evidence one way or the other, sir.

7    Q    Okay.  And you haven't asked, gee, did you guys, you

8    know, make these requests back in 2008 and 2009.  Did you

9    ask anybody?

10   A    I did not.

11   Q    How about 2010, did the trustees make any requests for

12   files, claims files back then so far as you know?

13   A    I don't know, and that was slightly outside the scope

14   of my rebuttal.

15   Q    Oh, well, I think I'm allowed to question your

16   credibility.

17              How about in --

18              MR. MUNNO:  It's beyond credibility.

19   Q    -- 2011?  How about --

20              THE COURT:  Okay.

21              MR. BAIO:  What's happening?

22              THE COURT:  I have no idea.

23        (Laughter)

24              MR. MUNNO:  I made an objection.  It's beyond the

25   scope of this witness's testimony and --

1          THE COURT:  Okay.

2          MR. MUNNO:  -- it's not a credibility issue.

3          THE COURT:  Keep going, Mr. Baio.

4          MR. BAIO:  Thank you, Your Honor.

5     BY MR. BAIO:

6     Q    2011 -- 2010 and 2011 did the trustees make any

7     requests for any of these difficult to get files so far as

8     you know?

9     A    I have no knowledge if they did or didn't.

10    Q    And how about in 2012, same answer?

11    A    No, not the same answer.

12    Q    Okay.  You know that they made requests in 2012?

13    A    I was told at the time we were retained that there were

14    requests for files.  There were files being reviewed.  And I

15    have to assume that the servicers weren't sending files to

16    Digital Risk on their own.

17    Q    All based on assumptions.

18          MR. BAIO:  I move to strike.

19          THE COURT:  Mr. Munno, does the witness know or

20    not?

21          MR. MUNNO:  Does he know whether the loan files

22    were requested?

23          MR. BAIO:  In 2012.

24          THE COURT:  Yes.

25          MR. MUNNO:  I believe he does.

Page 223

1          THE COURT:  Okay.  Let's try it again.  Do you

2    know, based on your personal knowledge, whether loan files

3    were requested in 2012 --

4          THE WITNESS:  Yeah.

5          THE COURT:  -- by the trustees?

6          THE WITNESS:  Yes, I do.  They were.

7    BY MR. BAIO:

8    Q    And what is that knowledge?  How do you know from

9    personal knowledge that requests were made for claims files

10   in 2012?

11   A    Based on our weekly status calls with Digital Risk.

12   Q    Okay.  So requests were made by Digital Risk in 2012?

13   A    That's my understanding.

14   Q    How about from the trustees' themselves, do you know if

15   there were any such requests?

16   A    I don't know one way or the other.

17   Q    Now when there was difficulty getting files, if there

18   was, do you know if anybody went to Judge Chapman and said,

19   we're having trouble getting files?  Do you know --

20          THE COURT:  It would --

21          MR. BAIO:  -- one way or the other?

22          THE COURT:  They wouldn't have had really success.

23       (Laughter)

24          MR. BAIO:  Because you weren't there.

25          THE COURT:  Because I wasn't here.  It would have

1    been --

2    BY MR. BAIO:

3    Q    How about --

4              THE COURT:  -- Judge Peck.

5    Q    How about Judge Peck?  Do you know if they went to

6    Judge Peck and said, Judge, these people have to give us the

7    files and they won't, please help us.  Do you know if that

8    happened?

9    A    I don't know if that happened.

10   Q    Okay.  Did any of these files that were reviewed in

11   2012 or 2013, did the trustees present them as claims, I

12   mean, actually present the files and say, get started Lehman

13   and let's move this ball along, do you know?

14   A    I don't know.

15   Q    Well, did you ever tell the trustees in your capacity

16   as an experienced person in this area, get moving, just

17   present the files that at least we have?

18             MR. MUNNO:  Objection.

19   Q    Did you suggest that?

20             MR. MUNNO:  Objection.

21             THE COURT:  Mr. Munno.

22             MR. MUNNO:  This is beyond rebuttal.  The witness

23   was talking about Mr. Alread and Mr. Pino and now we're

24   being examined about what it was that happened in 2012, what

25   may or may not have happened by the trustees.  It's beyond

Page 225

1    the scope.

2              THE COURT:  Why isn't he right, Mr. Baio?

3              MR. BAIO:  Because this man testified that you

4    should consider the 12 to 18 months that it took to get the

5    file, and I think it's relevant to know what people were

6    doing because they're suggesting that you multiply that

7    period times some gigantic number and, therefore, it's

8    impossible.

9              THE COURT:  Okay.  Well --

10             MR. BAIO:  But the fact is they didn't do

11   anything.

12             THE COURT:  Okay.

13             MR. BAIO:  That's all.  And I want --

14             THE COURT:  All right.

15             MR. BAIO:  -- to know whether -- if he knows of

16   anything.

17             THE COURT:  Okay.  I think -- I think you've

18   exhausted this line of questioning.

19             MR. BAIO:  Okay.  I'll move on.

20             Thank you.

21   BY MR. BAIO:

22   Q    Now --

23             THE WITNESS:  Your Honor, if I -- I think he

24   mischaracterized my testimony --

25             THE COURT:  Okay.  You --

```
 1              MR. BAIO:  I'm sorry.

 2              THE COURT:  He -- I appreciate that you have a

 3      J.V. --

 4          (Laughter)

 5              THE COURT:  -- but you're here as an expert

 6      witness.

 7              THE WITNESS:  Understood, Your Honor.

 8              THE COURT:  All right.  So I would appreciate it

 9      if you would refrain from pointing out objections to Mr.

10      Baio's questions.  Okay.

11              Thank you.

12      BY MR. BAIO:

13      Q    Now I know you -- strike that.

14              Assume with me that there are 50,000 or so

15      electronic files available right now from Nation Star to be

16      reviewed, and that there are 60,000 from Aurora ready right

17      now.  And you know that you have almost 5,000 from the work

18      that was done for whatever period it was done to get the

19      almost 5,000 files.  That's 115,000 files ready to be looked

20      at right now.

21              Do you think there's any impediment in place that

22      precludes the trustees from beginning that phase one process

23      of looking at them and evaluating them and deciding whether

24      they're going to be putting in a claim?  Is there any

25      impediment?
```

Page 227

1    A    I can't speak for whether the trustees have an

2    impediment or not.

3    Q    And 115,000 out of 157,000, the number that our experts

4    use, would leave only 42,000 more to be found, isn't that

5    correct?

6          MR. MUNNO:  Your Honor, I do --

7          THE COURT:  Yes.

8          MR. MUNNO:  -- have an objection --

9          THE COURT:  Yes, Mr. Munno.

10          MR. MUNNO:  -- because we pointed out in the cross

11    of Mr. Pino and Mr. Alread that neither has any real

12    knowledge and there's no evidence here that 60,000 and

13    50,000 are waiting to be delivered --

14          THE COURT:  But that's --

15          MR. MUNNO:  -- for review.

16          THE COURT:  -- that's not the point of the

17    question.  Mr. Baio asked the witness to assume --

18          MR. BAIO:  Yes.

19          MR. MUNNO:  Well --

20          THE COURT:  -- to assume.  So he's assuming away

21    your issue.  You're quite right.  There's no -- I've --

22    there's been no direct testimony one way or the other on

23    what those files are, if they're really good to go, if

24    they're complete, et cetera, et cetera.  He's making -- he's

25    asking the witness to assume.

Page 228

1          MR. BAIO:  Yes.

2          THE COURT:  Right?

3          MR. BAIO:  Yes.

4          THE COURT:  Okay.

5          MR. BAIO:  And I got the answer.

6          THE COURT:  Okay.

7     BY MR. BAIO:

8     Q    Now, sir, you testified -- actually, let me refer you

9     to your paragraph 19.

10         (Pause)

11    Q    And in the final sentence of that provision you state

12    -- you refer to well-established industry custom and

13    practice with respect to the administration of put back

14    claims.  Do you see that?

15    A    I see that.

16    Q    And you remember I asked you questions about that

17    yesterday during your deposition?

18    A    I do.

19    Q    Okay.  And do you remember answering me as to what the

20    well-established industry custom and practice was that you

21    were referring to there?

22    A    I remember the exchange.  I don't remember the exact

23    words.

24    Q    All right.  Well, it's true, isn't it, that when you

25    were at Numora, you ran billions of dollars of positions and

1    whole loans that Numora financed and that Numora aggregated

2    to securitize; is that correct?

3    A    Yes.

4    Q    And you used that as an example of the well-established

5    industry custom and practice with respect to the

6    administration of put back claims, isn't that right?

7    A    No.  That wasn't the example of the practice.

8    Q    That was the basis on which you concluded what the

9    practice was; is that right?

10   A    That was one example that we discussed where I had

11   engaged in a large number of put backs.  That's correct.

12   Q    And you were using that as an example of the well-

13   established industry custom and practice, correct?

14   A    Yes.

15   Q    Okay.  And in describing that industry practice you

16   stated that "the first step is to secure the loan files,"

17   isn't that right?

18   A    I don't recall my testimony verbatim.

19   Q    All right.  Well, we're going to give you the

20   transcript, then, and we'll go over it.  Maybe it will

21   refresh your recollection.

22        MR. BAIO:  We need copies of the transcript.

23        (Pause)

24        MR. BAIO:  And you can hand one out to everyone I

25   think, if you could, Christina.

08-13555-scc-mg Doc 53621-6 Filed 09/30/16 Entered 09/30/16 20:49:16 Exhibit F
08-13555-scc-mg Doc 49007-1 Filed 03/02/15 Entered 03/02/15 19:13:48 Main Document
Pg 230 of 374

 1          Thank you.

 2          I have one.  The witness has to get one, too.

 3          THE WITNESS:  Thank you.

 4    BY MR. BAIO:

 5    Q    Even before we get there, is that the first step in the

 6    custom -- the industry-wide custom and practice that the

 7    claimant get the files that will be the basis of the claim?

 8    A    I think that's a good starting point to commence the

 9    put back process, yes, receipt of a file sufficient to do

10    the review.  Yes.

11    Q    Okay.  And then it is industry custom and practice, as

12    you described it here in paragraph 9, for there to be a

13    forensic review of those files by the claimant to evaluate

14    whether it will submit a claim or not, isn't that correct?

15    A    I'm not with you.  Paragraph 9 where?

16    Q    I'm sorry.  Paragraph 19, the well-establish -- all I'm

17    talking about now is the well-established industry custom

18    and practice with respect to the administration of put back

19    claims.  Is the next phase under the industry custom and

20    practice, after securing the files, that the claimant does a

21    forensic review of those files to evaluate whether there is

22    a basis for a claim?

23          MR. MUNNO:  Your Honor, I'm confused by this

24    question and the citation.  What paragraph are you referring

25    to?

Page 231

1          MR. BAIO:  19 he refers to well-established

2     industry custom and practice.

3          MR. MUNNO:  Okay.  I don't see that paragraph.

4          THE COURT:  It's in paragraph 19 of his

5     declaration.

6          MR. MUNNO:  In his --

7          THE COURT:  "Further, the protocol ignores the

8     well-established industry custom and practice with respect

9     to the administration of" --

10          MR. MUNNO:  Thank you.

11          THE COURT:  -- "put back claims."

12          THE WITNESS:  Yes.

13     BY MR. BAIO:

14     Q    That's the next phase in industry custom and practice?

15     A    Generally, yes.

16     Q    And in connection with that phase the review is done

17     solely for the purpose of determining whether there was a

18     breach of a rep and warranty in industry custom and

19     practice, correct?

20     A    That's what a forensic review would be.

21     Q    Okay.  Then after that review it is industry custom and

22     practice that the claimant decides whether or not it's a

23     good claim and should be submitted; is that right?

24     A    That comports with my understanding.  Yes.

25     Q    And the claim or -- and the decision as to whether to

08-13555-scc  Doc 49907  Filed 09/02/15  Entered 09/29/15 13:48:16  Exhibit F
Pg 232 of 374

1    present the claim is based on the individual files that are

2    -- that involve each loan, isn't that right?

3    A    If you were engaged in a loan by loan put back

4    arrangement, yes.

5    Q    Well, that would -- that's industry custom and

6    practice, isn't it?

7    A    Not anymore.

8    Q    Well, when you testified yesterday and did I ask you

9    what the well-established industry custom and practice was?

10   A    At --

11   Q    Do you --

12   A    At Numora that's what it was in 1996.

13   Q    Oh, so when you -- please read the question on page 71

14   -- actually, the question starts at the bottom of page 70:

15          "Question:  In what cases and what are you

16   referring to as to how the industry and practice was

17   reflected in those cases.  You identify hundreds of put back

18   claims.  Give me examples of those claims that demonstrate

19   that the protocol ignores well-established industry custom

20   and practice?"

21          Do you see that question?

22   A    No.  I don't know where you are.

23   Q    The bottom of page 70, it starts on line 24.  Do you

24   have that?

25   A    Prior to the submission of a put back claim?

08-13555-scc-mg  Doc 53621-6  Filed 08/30/16  Entered 08/30/16 20:48:16  Exhibit F
08-13555-scc-mg  Doc 49907-1  Filed 05/02/15  Entered 05/20/15 20:48:16  Main Document
Pg 239 of 374

Page 233

```
1    Q    I'm not sure you're on page 70.

2              MR. BAIO:  May I approach, Your Honor, to look at

3     the witness's -- I just --

4              THE COURT:  Sure.

5              MR. BAIO:  -- want to point out where we are.

6         (Pause)

7              THE WITNESS:  We're both in the right place --

8              MR. BAIO:  This is the --

9              THE WITNESS:  -- but it's wrong.

10             MR. MUNNO:  I think the witness has the rough.

11             MR. BAIO:  This is the rough.

12             MR. MUNNO:  Yeah.

13             THE COURT:  I have --

14             MR. BAIO:  We have to give --

15             THE COURT:  I have the rough as well.

16             MR. BAIO:  Yeah.  I think we would be better off

17    if we --

18             THE COURT:  Okay.

19             MR. BAIO:  -- all worked off the same --

20             THE COURT:  That's a great idea.

21             MR. BAIO:  -- thing.

22        (Pause)

23             THE WITNESS:  I thought it was me.

24             THE COURT:  Me, too.

25        (Laughter)
```

Page 234

```
 1              MR. BAIO:  My bad.

 2              THE COURT:  Well, while we're getting ourselves

 3    organized could I ask what are we doing next after this

 4    witness?

 5              MR. BAIO:  I think there's one more witness.

 6              MR. MUNNO:  Mr. Parekh.

 7              THE COURT:  I wasn't sure whether you still

 8    intended to call him.

 9              MR. MUNNO:  I do.

10              THE COURT:  All right.

11              MR. BAIO:  That's okay.  That's all right.

12              THE COURT:  Yes.  Okay.  No problem.

13              Okay.  So while we're -- while we're continuing to

14    get ourselves organized --

15              THE WITNESS:  Thank you, again.

16              THE COURT:  -- I'm just -- I'm trying to organize

17    support staff --

18              MR. BAIO:  Yes.

19              THE COURT:  -- because I only have one person who

20    can stay after six.  So I've arranged for someone to stay

21    after five.  What's your expectation, notwithstanding the

22    fact that it's snowing?

23              MR. BAIO:  I don't know how long the next witness

24    will be.

25              THE COURT:  I thought you were going to say --
```

1           MR. BAIO:  I will be --

2           THE COURT:  -- I don't know how long it's going to

3     snow.

4           MR. BAIO:  I could be --

5        (Laughter)

6           MR. BAIO:  I could be 40 minutes or less.

7           THE COURT:  You could be 40 --

8           MR. BAIO:  I could.

9           THE COURT:  -- minutes or less with this witness.

10          MR. BAIO:  Correct.

11          THE COURT:  So that optimistically would get us to

12    4:30 --

13          MR. BAIO:  Yes.

14          THE COURT:  -- and then we have Dr. Parekh.

15       (Pause)

16          THE COURT:  All right.  We'll try to line up

17    someone to stay after six, but I can't promise you.

18          MR. BAIO:  Okay.

19          THE COURT:  All right.

20          MR. BAIO:  Yes, Your Honor.  Thank you.

21          THE COURT:  All right.  So now we have --

22          MR. BAIO:  We have the correct transcript --

23          THE COURT:  -- the correct transcript.

24          MR. BAIO:  -- I hope, everyone, and --

25          THE COURT:  Okay.

1          MR. BAIO:  -- I'm reading from the bottom of page

2     70.

3          MR. MUNNO:  Line, please.

4     BY MR. BAIO:

5     Q    Line 24:  "In what cases and what are you referring to

6     as to how the industry and practice was reflected in those

7     cases.  You identify hundreds of put back claims.  Give me

8     examples of those claims that demonstrate that the protocol

9     ignores well-established industry custom and practice."

10          And you refer to Numora Securities in response to

11     that; is that correct?

12     A    Yes.

13     Q    And did you testify in response to the question, "what

14     demonstrates the protocol ignoring well-established industry

15     custom and practice," you said the following:

16          "We ran billions of dollars of positions and whole

17     loans that we financed and that we aggregated to securitize

18     and from time to time when we discovered that loans were not

19     conformity with the reps and warranties, we exercised our

20     rights under the controlling agreements and put loans back

21     to the providers of those loans, the seller of those loans,

22     and there was an established mechanism among the parties

23     that, that upon discovery we gave notice of the breach, they

24     would analyze the breach, and they would either buy it back,

25     convince us we were wrong, or we would go to court."

Page 237

1          Do you see that?

2     A    Yes, I do.

3     Q    And was that the testimony that you gave yesterday in

4     response to the question of how the protocol ignores the

5     well-established industry custom and practice?

6     A    Yes.

7     Q    Okay.  And is it also true that in responding to my

8     questions about industry custom and practice that you said

9     that there would be a forensic review solely for the purpose

10    of defy -- determining whether there was a breach of a rep

11    and warranty.

12          MR. MUNNO:  Where are you reading from?

13          MR. BAIO:  First, I'm just asking you -- and I'll

14    refer to it.  Do you --

15          THE WITNESS:  Yeah.  I don't recall --

16          MR. BAIO:  Is it your testimony --

17          THE WITNESS:  -- specifically.

18          MR. BAIO:  Okay.

19    BY MR. BAIO:

20    Q    Please look at the question on page 74, line 5:

21          "Question:  Now in the examples that you gave,

22    particularly Numora, the starting point is Numora reviews,

23    gathers and reviews its loan files, correct?"

24          "Answer:  Prior to the submission of a put back

25    claim, regardless of any other review we had done in the

Page 238

1   purchase decision, we would conduct a forensic review solely

2   for the purpose of determining whether there was a breach of

3   a rep or warranty."

4          Do you see that?

5   A    I see rep and warranty, but otherwise it's correct.

6   Q    Is that -- and that was your testimony yesterday,

7   correct?

8   A    Yes.

9   Q    And that after that in industry custom and practice you

10  -- it -- the claim would be submitted to the other side to

11  evaluate whether it's a good claim or not, correct?

12  A    To the extent we felt that the review showed a material

13  adverse breach, yes.

14  Q    Okay.  And that was custom and practice and is custom

15  and practice?

16  A    This is simply a -- an explanation of timeline.  This

17  is not the totality of custom and practice.  And my

18  objections to the protocol, which includes in general terms

19  all of these things, didn't go to these points.

20  Q    I'm asking about industry practice and what's custom-

21  wide and this is the response that you gave, correct?  I

22  understand you may have other objections to the protocol,

23  but that's not what I'm asking.  I'm asking about the

24  process that you identified as an industry-wide custom and

25  practice as to what happens in connection with the

1    submission of claims relating to these instruments.  That's

2    it.

3                THE COURT:  Mr. Munno.

4                MR. MUNNO:  I have an objection because I thought

5    the witness's earlier testimony was that that was the

6    practice back in the day when he was at Numora, not that

7    it's currently the practice today.

8                MR. BAIO:  That's not in the testimony.

9                THE COURT:  Okay.  That -- that's not in the -- I

10   mean, I think the whole point of this entire little

11   interlude is that that's not in the testimony.  So if now or

12   on redirect the witness is going to clarify that point or

13   make the point that he's making now, so be it.  I mean --

14   but that -- Mr. Baio's point I think simply is that the

15   words on the page of the testimony that's -- that doesn't

16   appear to be what it says.  That's all.

17   BY MR. BAIO:

18   Q    Now the experience that you had at Numora was that

19   almost 100 percent of the claims that were submitted were

20   accepted; is that right?

21   A    I think I said that.  I don't recall specifically.

22   Q    Well, look -- let's look at page 79, line 11, my

23   question was:

24                "And in your experience they didn't accept 100

25   percent of the claims that were submitted, correct?"

Page 240

1          "Answer:  I mean, Numora was pretty close to 100

2     percent.  Yes."

3          "Question:  Okay.  And that was because you were

4     very careful in the claims process; is that correct?"

5          "Answer:  I would like to think so.  Yes.

6          Do you see that?

7     A    Yes.

8     Q    And that was testimony that you gave yesterday,

9     correct?

10    A    Yes.

11    Q    Now do you think that the trustees are going to be

12    careful in the claims process or are they just going to

13    throw stuff in?

14    A    I think the trustees will be careful in the claims

15    process.

16    Q    Okay.  And you think they'll act in good faith in

17    submitting whatever claims they actually believe they have

18    based on the documents, correct?

19    A    Yes.

20    Q    Now you've suggested, I think, that you think Lehman

21    Brothers in this process is going to somehow act

22    inappropriately.  Is that a conclusion that you've reached?

23    A    Not at all.

24    Q    So you don't know whether when a real claim is

25    submitted and this process continues just as you've

Page 241

1   described here, a review by the trustees, an evaluation of

2   whether there's a real claim, a submission and, as in the

3   Numora case, almost 100 percent of properly submitted claims

4   being recognized, you have no reason to believe that won't

5   happen here; is that right?

6   A    No.  That's not right.

7   Q    Okay.  So you think that it won't be a substantial

8   number of the claims that will be accepted; is that right?

9   A    I don't know what the number is.

10  Q    Okay.  You don't know whether it's going to be 50

11  percent or 75 percent or 10 percent or anything, isn't that

12  right?

13  A    That's correct.

14  Q    And one of the things that will happen if this protocol

15  plays out is we'll see, won't we, we'll learn?

16  A    Yes.

17  Q    And so far as you know the judge is here if people are

18  taking unusual positions or unjustified positions, isn't

19  that right?

20  A    I don't know that for a fact.  I would hope so.

21  Q    Now it's also true in the typical custom industry

22  practice that some claims are not accepted.  They are

23  rejected by the party that it is -- they are put to, isn't

24  that right?

25  A    Yes.

1   Q    And those have to be adjudicated on an individual

2   basis, isn't that correct?

3   A    I'm not sure what you mean by that.

4   Q    Can you look at your transcript?  I asked the question

5   and I'll -- I'll start a little bit further back.  It's line

6   20 on page 79:

7           "Question:  Okay.  And then there were some claims

8   that were rejected because of reasons that are articulated

9   by the defendant, if you will, correct?"

10          "Answer:  I'm not sure why, but not every claim

11  was accepted."

12          "Question:  And some of those claims had to be

13  adjudicated on an individual basis, isn't that correct?"

14          "Answer:  Post-presentation and lack of

15  acceptance, yes."

16          "Question:  And that's industry practice on a

17  broad scale?"

18          "Yes."

19          Do you see that?

20  A    I do.

21  Q    Now you didn't think I was using the past tense when I

22  said, "And that's industry practice," right?  You knew I was

23  -- I mean, you put in a declaration that talks about

24  industry practice.  Did you think you were giving me a

25  history lesson here?

1    A    I thought we were talking about the example.

2    Q    Okay.  So you didn't think -- when you said, "On a

3    broad scale that's industry practice," you didn't mean that

4    that's industry practice now; is that what your testimony

5    is?

6    A    I didn't say that either.

7    Q    Okay.  So said it was industry practice now on a broad

8    scale; is that accurate?

9    A    For that example, yes.

10   Q    For an example of industry practice?  That's what I was

11   asking.

12   A    I'll stand with my -- what my testimony says.  I can't

13   elaborate on it right now.

14   Q    Okay.  Now can you look at your declaration on page 4.

15   It's paragraphs 15 and 16.  Judge Chapman asked you some

16   questions about this.

17        And you do say here, "Based upon my analysis of

18   the protocol, the single most influential driver of how long

19   it will take to resolve the RMBS trustees' put back claims

20   is what has been referred to as step five," correct?

21   A    That's what I said there.  Yes.

22   Q    And once claims are submitted and once they are

23   rejected, if they are, and there is a mediation process with

24   a -- with an independent party selected, after that whenever

25   it occurs, people can go to Judge Chapman and begin the

Page 244

1    resolution process, correct?

2    A    I'm sorry.  You lost me in that question.

3    Q    Okay.  Following the protocol they review files.  They

4    submit a claim.  The claim is accepted in which case there's

5    no further problem, no further issue, or the claim is

6    rejected for articulated reasons.  There then is a possible

7    resolution made with an independent person, and if that does

8    not succeed it goes to the judge, correct?

9    A    Ultimately it goes to the judge.  You might have left

10   out a step.

11   Q    Okay.  But, ultimately, whatever it -- I think I've got

12   all the steps, but maybe I missed one.  But eventually they

13   get to the judge and they can get to the judge relatively

14   quickly, correct, they can?

15   A    I don't know how quickly they could get to the judge.

16   Q    Okay.  You don't know one way or the other?

17   A    That's correct.

18   Q    And you're not testifying about things like res

19   judicata and collateral estoppel.  I know you're a lawyer,

20   but I think yesterday you said you're not suggesting that an

21   adverse ruling in one case might not have an implication for

22   all -- a whole bunch of other cases that may be coming down

23   the pike, correct?

24   A    My intent was not to make any legal conclusions or

25   observations whatsoever.

Page 245

1   Q    Okay.  So step five is the most influential driver, is

2   that correct, of how long this will take?

3   A    When I looked at the analysis of Dr. Parekh and Mr.

4   Pino, yes.

5   Q    Now you also read the Parekh report, correct?

6   A    Yes.

7   Q    And if you look at paragraph 16 you note that in Mr.

8   Parekh's view only four percent of potential claims -- of

9   the claims -- of the total claim pool will be left after

10  steps zero to four; is that right?

11  A    That's what his analysis said.  Yes.

12  Q    So for every billion dollars of claims before you even

13  get to the judge, $960 million worth will be resolved?

14  A    That's not necessarily right.

15  Q    Well, is it in the neighborhood?

16  A    The percentage is by loan count, not by dollar amount.

17  Q    Okay.  And do you think that -- well, neither you nor

18  he were suggesting which loans would be left as the 11,000

19  in your calculation, correct?

20  A    That's precisely why I don't know what the dollar

21  amount is.

22  Q    Okay.  You don't know what it is, but 96 percent of the

23  files drop out before we even get to the judge.

24  A    They are otherwise resolved.  That's correct.

25  Q    And you agree with that.  You actually think that's

Page 246

```
 1    reasonable.

 2    A    I thought it was more reasonable than zero.

 3    Q    Well, I'm just asking whether you thought it was

 4    reasonable.  I mean, did you tell Mr. -- Dr. Parekh, you're

 5    out of your mind with 96.  That's not possible.  You didn't

 6    tell him that?

 7    A    I didn't confer with Dr. Parekh when he prepared his

 8    report.

 9    Q    Well, as you sit here now do you think he's flat out

10    wrong, it's a ridiculous number, he should never have

11    presented it to the Court?

12    A    That would run contrary to what I said.  I said I

13    thought four percent was reasonable.

14    Q    Okay.

15            MR. MUNNO:  Your Honor, I -- I do think we're

16    beyond the rebuttal aspect of Mr. Aronoff's testimony with

17    these questions.

18            THE COURT:  This is -- this is directly in the

19    wheelhouse because one of the -- this witness is saying that

20    the most influential driver is step five which is the court,

21    and he then goes on to say that 96 is good, 99.96 not so

22    much.  And that's what he's being questioned on.

23            So I -- it's in the declaration.

24            MR. BAIO:  May I continue?

25            THE COURT:  Yes.
```

Page 247

1    BY MR. BAIO:

2    Q    Now if you look at paragraph 18 you say:

3         "Further, based on my review and consideration of

4    the Pino and Alread declarations, it is my conclusion that

5    the administration of 209,395 loans at issue in this matter

6    cannot be completed within a year."

7         Do you see that?

8    A    Yes.

9    Q    And when you're referring to the administration of

10   those loans, you are including or not including the

11   adjudication by Judge Chapman?

12   A    I am including -- I am including the adjudicate -- the

13   final step five.

14   Q    Okay.

15   A    I am including the entire administration based on the

16   protocol --

17   Q    Okay.

18   A    -- which is what I thought the inquiry was based on the

19   reports.  That's what Parekh talked about.  Pino chose not

20   to deal with step five.  I assumed it was because of the de

21   minimis number of loans that fell out.  But he didn't give a

22   time frame for five.  Based on --

23   Q    But --

24   A    -- Parekh's numbers it would have been about two weeks

25   additional.

08-13555-scc-mg Doc 53621 Filed 08/30/16 Entered 08/30/16 20:49:16 Main Document
08-13555-scc Doc 49507 Filed 05/02/15 Entered 05/20/15 20:49:16 Exhibit F
Pg 249 of 374

Page 248

1   Q   But you are including in the statement that it's

2   impossible or that the matter cannot be completed within a

3   year.  You were including adjudication by the judge of

4   whatever lingering claims are left, correct?

5   A   I included the entire protocol as it was presented to

6   me.  Yes.

7   Q   Okay.  And you said that the judge is -- the phase five

8   period is the one that's going to really take the long time.

9   That's the significant extender, correct?

10   A   I think there are other important factors.  I said that

11   was the single most important driver.  Yes.

12   Q   Okay.  And did you do any analysis as to whether the

13   loans at issue could be administered short of the judge's

14   decision-making or submission to the judge?  Did you make

15   any evaluation as to whether those loans could go through

16   zero to four in a year?

17   A   Yes.

18   Q   You didn't put it in your report, though, did you?

19   A   It's included in 18.  Eighteen is my analysis based on

20   zero through five, all zero through five.  There are points

21   in the Pino declaration based on the assumptions or

22   assertions he made at a various step that I don't agree with

23   that I think would expand the timeline as well.

24   Q   Yeah.  But I'm not asking that.  I'm saying did you do

25   a separate analysis of how long zero to four would take?

1    Did you do any such thing because it's not in this report.

2    A    I didn't do a separate analysis of five either.  I did

3    the protocol.  Eighteen refers to --

4    Q    Okay.

5    A    - the entire protocol.

6    Q    The answer is you didn't do it just from zero to four?

7    A    I guess you're right.  That's correct.

8    Q    Well, let's just take zero, the getting the files, is

9    it your testimony that that can't be completed within a

10   year?

11   A    I don't know how long it will take.  I think five

12   months was an unreasonable assumption.

13   Q    But you don't have any -- five months to actually just

14   get the files, even though if -- if you assume that 115,000

15   are available now, do you think that that could happen in

16   five months, the remaining files?

17   A    Assuming that, it could.  I don't believe that 115

18   (sic) files are ready to go and be reviewed right now.

19   Q    Okay.  But if you assume they are, maybe it could be

20   done then in five months, yes?

21   A    Maybe it could be done.

22   Q    Okay.  Now I asked you this in your testimony

23   yesterday, how many loans did you think could be completed

24   within a year?

25   A    I didn't play the numbers game.  I didn't -- I wasn't

08-13555-scc mg Doc 53621-6 Filed 09/30/16 Entered 09/30/16 20:48:16 Exhibit F
08-13555-scc Doc 49007-1 Filed 03/02/15 Entered 03/02/15 13:48:16 Main Document
Pg 250 of 374

Page 250

1    asked to evaluate how many.  I was just asked to look at Dr.

2    Parekh's and Mr. Pino's and make observations.

3    Q    Well, could -- in your opinion could 10,000 loans in

4    this matter be completed within a year?

5    A    I have no view one way or another.  It depends on the

6    posture of the parties, the complexity of the put back

7    requests, the quality of the evidence.  It depends on a

8    whole range of things that I have no better crystal ball

9    than anyone else.

10   Q    And how about ten loans, can ten loans be done in a

11   year?  Same answer?

12   A    As I said yesterday when you asked me about one, I

13   would like to think so, but I don't know.

14        (Pause)

15   Q    Can you look at paragraph 14?

16        (Pause)

17   Q    Actually, strike that.  Let me ask you this.  You know

18   about the 57 percent number that Dr. Parekh put forth?

19   A    I understand 57 percent to be the breach rate.  Yes.

20   Q    Okay.  And that is of the whatever number of files

21   there are, his estimate is that 57 percent will constitute

22   breaches, correct, that will have breaches in them?

23   A    I don't have the report in front of me, but I think,

24   yes.  Of the 209,000, he assumes that 57 percent of that

25   number will be presented in step two.

Page 251

1    Q    Okay.  So that means 43 percent get knocked out after

2    the review.

3    A    That's right.

4    Q    And you don't -- you can't say as you sit here today

5    which ones get knocked out for dollar value and which ones

6    get kept in, correct?  You have no idea.

7    A    I don't understand the question.

8    Q    Well, you described before that there are 96 percent of

9    the loans does not tell you what the value was.  Is it also

10   true that 43 percent of the loans that -- I'm sorry -- 57

11   percent that are submitted, you have no idea what the dollar

12   amount of those loans are, correct?  It's not 57 percent of

13   the total.

14   A    That's correct.

15   Q    Okay.  And the only way you know which ones get through

16   and which ones don't is by looking at them individually,

17   correct?

18   A    If you choose to not extrapolate, yes.  If you choose

19   to ignore statistical sampling and you're doing it loan by

20   loan, yes.

21   Q    Okay.

22           MR. BAIO:  Can I take one minute?  I'll just ask

23   my colleagues.  Maybe five --

24           THE COURT:  Maybe five minutes?

25           MR. BAIO:  Yes.  Thank you, Your Honor.

Page 252

```
 1                THE COURT:  Do you want to do this -- shall we go
 2      to shelter in place or do you want to actually take a break?
 3                MR. BAIO:  Maybe we could take a little break.
 4                THE COURT:  All right.
 5                MR. BAIO:  Five minutes, is that okay?
 6                THE COURT:  Are you going to have --
 7                MR. MUNNO:  I will.
 8                THE COURT:  You will?
 9                MR. MUNNO:  Oh, yes.
10                THE COURT:  Okay.  So then why don't we take a
11      break until 4:20 and then we'll conclude, Mr. Baio, with
12      you, and then Mr. Munno, we'll go right into  you.  All
13      right.
14                MR. BAIO:  Thank you.
15                THE COURT:  Okay.
16                MR. COSENZA:  Your Honor, I had a scheduling
17      issue.  Is there any chance that we can continue tomorrow?
18      I just need to cancel some things if it's possible.
19                THE COURT:  Okay.  I --
20                MR. COSENZA:  I have no idea.
21                THE COURT:  My strong preference, although I don't
22      want to run people into the dust, is to finish this tonight.
23      That's my very strong preference.
24                MR. PEDONE:  Your Honor, that's our preference --
25                THE COURT:  I'm --
```

```
 1              MR. PEDONE:  -- as well.

 2              THE COURT:  -- trying to line up the support

 3     staff.  I think it's very important to finish this tonight.

 4     I have a calendar in the morning, among other things, but

 5     just for the continuity of what we're doing here today, I

 6     would like to finish.

 7              So I don't want to imperil anyone's health, safety

 8     and welfare, but if you could make other arrangements that

 9     -- that would be great.

10              MR. COSENZA:  No.  I'm fine.  I just needed to

11     know if I needed to cancel things tomorrow.  And I'm not

12     going to do that.

13              THE COURT:  Okay.  I want to keep going today.

14              All right.  Let's come back at 4:20.

15              THE WITNESS:  Excuse me, Your Honor.  You want me

16     to stay here?

17         (Laughter)

18              THE COURT:  We quite forgot about you.  You're

19     free to walk around.

20              THE WITNESS:  Thank you.

21              THE COURT:  You're just -- you're under oath.

22     Don't talk about anything.

23         (Recess taken at 4:16 p.m.; resume at 4:31 p.m.)

24     CROSS-EXAMINATION (Resumed)

25     BY MR. BAIO:
```

1   Q    You've referred to statistic sampling in your report

2   and in your direct testimony.  And it's not your testimony

3   that that's now the custom and practice in the industry that

4   there be sampling in lieu of loan by loan analyses; is that

5   correct?

6   A    That's correct.

7   Q    But you're talking about the -- a movement toward

8   employing statistical sampling; is that right?

9   A    In my declaration in rebuttal to statements made by Mr.

10  Alread I said that there is an alternative to loan by loan

11  that exists in the market place right now.

12  Q    Okay.

13  A    And loan by loan is not the sole method by which put

14  back claims can be administered.

15  Q    And you referred to some cases, correct?

16  A    Yes.

17  Q    And I would like to know all the cases that you are

18  relying on to conclude that there is this movement.  You

19  mentioned Judge Rakoff, correct, in the Flagstar (ph) case?

20  A    Today or yesterday?

21  Q    Both, actually.

22  A    I mentioned Flagstar yesterday.  That's correct.

23  Q    Okay.  And you mentioned Judge Rakoff today.

24  A    Yeah.  I don't know if the onesie, twosie comment was

25  actually in Flagstar or not.

Page 255

1    Q    Okay.  But you understand that was a monoline (sic)

2    case, correct?

3    A    I understand what the case was.  Yes.

4    Q    Okay.  And did you think that distinction was -- the

5    fact that it was a monoline case is meaningful?

6    A    No, I don't.

7    Q    Okay.  You also mentioned MBIA Countrywide.  Is that

8    another case that you are relying on to support the notion

9    that there's some movement towards sampling?

10   A    I mentioned it yesterday and, yes, I do.

11   Q    Okay.  And you understood that that was no endorsement

12   of sampling.  In fact, you wanted to make it clear in your

13   deposition that you didn't want to push it too far; that it

14   was just a summary judgment opinion as to whether summary

15   judgment would be granted or denied; is that right?

16   A    I don't think that accurately portrays my testimony.

17   Q    Okay.  Let -- then let's look at page 82 of your

18   transcript, line 15:

19          "Question:  What put back cases support that

20   conclusion, if you can identify them?  Are you using

21   Countrywide as an example?"

22          "Answer:  Again, I don't want to push.  I don't

23   want anyone to misunderstand this as a legal opinion based

24   on cases.  My understanding of those cases in their

25   commercial context is that, for example, I know in MBIA

08-13555-scc-mg Doc 53621 Filed 08/30/16 Entered 08/30/16 20:49:16 Main Document
08-13555-scc Doc 49907 Filed 05/02/15 Entered 05/20/15 19:13:48 Main Exhibit F
Pg 256 of 374

Page 256

1  Countrywide, because I was close to it, Countrywide moved

2  for a summary judgment on the specific issue of whether or

3  not sampling was appropriate and Judge Branstin (ph) denied

4  it and allowed MBIA to proceed utilizing sampling to bring

5  their case.  The case settled.  We don't know what

6  ultimately would have happened."

7           Do you see that?

8  A    I see that testimony.

9  Q    And is -- was that accurate when you gave it?

10 A    Yes.

11          MR. BAIO:  I pass the --

12          MR. MUNNO:  Judge --

13          MR. BAIO:  -- witness, Your Honor.  Oh, maybe I

14 don't.

15 BY MR. BAIO:

16 Q    And that was also a monoline case, correct?

17 A    MBIA is a monoline.  That's correct.

18          MR. BAIO:  Now I pass the witness.

19          THE COURT:  Okay.  Thank you.

20 REDIRECT EXAMINATION

21 BY MR. MUNNO:

22 Q    A moment ago you answered that you didn't think that

23 the distinction was meaningful if there was statistical

24 sampling employed in a monoline case.  Tell us why.

25 A    Because I think the material adverse standard in an RBS

1   case is the same regardless of whether it's being utilized

2   by a financial guarantor or by a trustee on behalf of

3   investors.

4   Q    And is that --

5        THE COURT:  Can I just remind everybody that I'm

6   here to determine the legal issues and I'm really not

7   interested in the opinions of any witness on that point.

8   BY MR. MUNNO:

9   Q    Is it your view that in large put back cases there has

10  been a movement towards using statistical sampling as

11  opposed to a loan by loan review process?

12  A    I'll phrase it like I did in the declaration, which is

13  that I think there's -- the market's evolving to recognize

14  and accept statistical sampling where appropriate in some

15  put back cases.

16  Q    And in some put back cases is size a -- one of the

17  elements to be considered?

18  A    In the cases I've worked on there has been a -- an

19  attempt to use statistical sampling when loan by loan is,

20  for one reason or another, viewed as burdensome on the

21  parties.

22  Q    Now you were asked to assume that 115,000 files could

23  flow into Digital Risk to be immediately re-underwritten.

24  Now based on your experience when you receive a few thousand

25  loan files, would you expect to see problems with those

1    files?

2    A    I don't have any expectation.  They are what they are.

3    Q    Okay.  And they are what they are.  In your experience

4    did -- do they have problems?

5    A    Maybe --

6            THE COURT:  Could you be -- I don't understand

7    what the word "problems" means.  Could you be a little more

8    specific --

9            MR. MUNNO:  Yes.

10           THE COURT:  -- in your question.

11   BY MR. MUNNO:

12   Q    That the loan files are complete; that the loan files

13   are missing; that the loans files have been stitched

14   together; that the loan files have to be -- you have to go

15   back to the servicer to get additional documents for the

16   loan files.  Is that something that you typically see when

17   you request loan files?

18   A    I have experienced that where the files were wholly

19   incomplete and unusable.

20   Q    And in those instances where you have that occur, does

21   that add to the time that it takes to re-underwrite the loan

22   file?

23   A    Yeah, because you can't commence until you have a file

24   sufficient to commence your review.

25   Q    Now you mentioned that the most important factor in

1    terms of the time that the proposed protocol would take is

2    step five, that is the amount of the loans -- the number of

3    loans that are left for adjudication by the Court.  But you

4    said that there were other factors -- that there are other

5    places where there might be roadblocks.  What are those?

6    A    One step in the protocol where I thought that Mr. Pino

7    tightened the time frame up in a fashion that I didn't

8    necessarily agree with was step two where he put forth a 50

9    percent agree rate, for lack of a better term, but then

10   dismissed half of that again and said, well, 25 percent will

11   be resolved for incontestable reasons.  And that struck me

12   as contrary to my experience; that there's either agreement

13   or disagreement and some segment of the loans that are in

14   one of those two camps don't just disappear.

15            I would expect in the 50 percent assumption those

16   issues had already been handled.  So his -- the loans that

17   were ultimately administered at that point was really 75

18   percent rejected as opposed to 50/50.  And, of course, what

19   that meant is that more loans would go down through the

20   waterfall and that, in my view, could extend the timeline.

21            Similarly, at step four, he talks about this

22   special handling and that, too, gets rid of some large

23   percentage of the loans that had made it down to that level

24   to get us comfortably within the one-year time frame.

25            So at each step if you don't introduce special

08-13555-scc Doc 53621 Filed 08/30/16 Entered 08/30/16 20:09:16 Main Document
08-13555-scc Doc 49007 Filed 03/02/15 Entered 03/20/15 13:48:19 Exhibit E
Pg 260 of 374

Page 260

```
 1    handling and you don't introduce incontestable reasons, then

 2    of course more loans will flow through the waterfall and

 3    extend the timeline.  It's just math.

 4              MR. MUNNO:  No further questions.

 5              THE COURT:  All right.  Mr. Baio, anything --

 6              MR. BAIO:  Nothing further, Your Honor.

 7              THE COURT:  -- more?  All right.  Very good.

 8              Thank you.  You're excused.

 9              THE WITNESS:  I'm sorry.  Leave these up here?

10              THE COURT:  Yes.  You can leave them there.

11              Thank you.

12              Okay.  Mr. Munno.

13              MR. MUNNO:  Yes.  We'll call Mr. -- Dr. Parekh.

14         (Pause)

15              THE COURT:  Would you raise your right hand,

16    please?

17         (Witness sworn)

18              THE COURT:  Please have a seat.

19              THE WITNESS:  Thank you.

20              THE COURT:  Make yourself comfortable.  If you

21    would like to take a break, Dr. Parekh, let us know.

22              THE WITNESS:  Of course.  Thank you.

23              THE COURT:  Just pull that microphone down.

24              THE WITNESS:  Is this -- all right.

25    DIRECT EXAMINATION
```

BY MR. MUNNO:

1

2     Q    Have you been involved in RMBS put back cases?

3     A    Yes.

4     Q    During what period of time have you been involved in

5     RMBS put back cases?

6     A    I've been extensively involved over the last two-and-a-

7     half years.  Virtually all of my time has been spent on RMBS

8     put back cases for the last two-and-a-half years.

9     Q    And in connection with the RMBS put back cases that

10    you've been involved with, what has your involvement been?

11    A    I have trained on reviewing loans.  I've reviewed loans

12    personally.  I've supervised loan reviews.  I've drawn

13    samples of loans to be reviewed and designed the sampling

14    process.  I've extrapolated claims from those review

15    results.  I've reviewed review results from forensic

16    reviewers.  Those are the things that I can think of right

17    now.

18    Q    Have you reviewed costs of review?

19    A    Yes.  I've reviewed the costs as well.

20    Q    And have you participated in any negotiations of put

21    back claims between adverse parties?

22    A    Yes.  I haven't been the one to personally negotiate

23    the claim, but I have provided support and I have witnessed

24    negotiations of put back claims on individual loans and

25    assisted as a consultant the lawyers who were engaging in

1   those negotiations, and I've witnessed those firsthand.

2   Q    Can you tell us something, without any revelation of

3   confidential information, what put back matters you've been

4   working on during the past two-and-a-half years?

5   A    So for the last two-and-a-half years publicly I've been

6   involved obviously in the Lehman matter, this one.  I also

7   have been heavily involved, and it's still ongoing, in the

8   Rescap bankruptcy.  And then there have been, to my

9   recollection, five other matters that are RMBS put back

10  claim matters, four of which have involved loan reviews in

11  addition to Lehman and Rescap.

12  Q    Okay.  Now in the Rescap matter was there a loan

13  review?

14  A    Yes.

15  Q    Do you recall how long it took to get the loans that

16  were reviewed?

17           MR. NETZER:  Your Honor, pardon me --

18           THE COURT:  Mr. Netzer.

19           MR. NETZER:  Yes.  I believe that at the

20  deposition you said there was a mediation privilege in the

21  Rescap matter that he did not know the full scope of and,

22  therefore, could not testify about it.

23           So I will object to this part of his background

24  being entered into --

25           THE COURT:  Okay.

08-13555-scc mg Doc 53621 6 Filed 08/30/16 Entered 08/30/16 30:19:16 Main Exhibit F
08-13555-scc mg Doc 49907 Filed 09/02/15 Entered 09/20/15 21:13:48 Main Document
Pg 263 of 374

Page 263

1          MR. NETZER:  -- now.

2          THE COURT:  Mr. Munno.

3          MR. MUNNO:  Well, after the deposition I explored

4     with the witness to what extent he could talk about the

5     confines.  The fact that there was a loan file review isn't

6     going to breach the --

7          THE COURT:  But that's --

8          MR. MUNNO:  -- privilege.

9          THE COURT:  -- entirely unfair.  During the

10    deposition if he was precluded from answering the questions

11    why can it be that after the fact he re-examines his ability

12    to talk and now --

13         MR. MUNNO:  I'll move on.

14         THE COURT:  Okay.

15    BY MR. MUNNO:

16    Q    In the other matters that you've been working on have

17    you been involved in loan file reviews?

18    A    Yes.

19    Q    And do you have any experience with the length of time

20    it takes to get loan files?

21    A    Yes.  In the other matters that I've been involved in

22    it -- it's taken many months and certainly in some instances

23    over a year to request, obtain and then get the loan files

24    into a form that can be ready to review.

25    Q    And what --

```
 1    A     Then if -- I'm just very sorry.  And in no matter that

 2    I can recall have all the loan files been received.  There

 3    have always been missing files.

 4    Q     And in the matters that you've been involved with when

 5    loan files come in, are there any missing files or

 6    incomplete files?

 7    A     Yes.  In my experience --

 8               MR. NETZER:  Your Honor, pardon me --

 9               THE COURT:  Yes --

10               MR. NETZER:  -- for interrupting.

11               THE COURT:  -- Mr. Netzer.

12               MR. NETZER:  We're excluding the Rescap as part of

13    the database he's talking about, correct?

14               MR. MUNNO:  Yes.

15               MR. NETZER:  I just wanted to make sure the

16    witness --

17               THE COURT:  Okay.

18               MR. NETZER:  -- understands that because the

19    questions don't make that clear.

20               THE COURT:  Keep going.

21               THE WITNESS:  May I ask you a question about that

22    or just keep going?

23               THE COURT:  Generally speaking --

24               MR. MUNNO:  Just answer the question.

25               THE COURT:  -- the person at the podium --
```

Page 265

```
 1                THE WITNESS:  Okay.  That's fine.

 2                THE COURT:  -- gets to ask the questions.

 3                THE WITNESS:  That's why I asked.  I apologize.

 4                THE COURT:  Okay.  If there's something -- let me

 5    put it this way.  If there's something that you don't

 6    understand about the question, you should indicate that you

 7    don't understand it --

 8                THE WITNESS:  Okay.

 9                THE COURT:  -- and we'll have the question be

10    asked in a more precise way.

11                THE WITNESS:  That's fine.  I'm --

12                THE COURT:   Okay.

13                THE WITNESS:  -- not a lawyer and I'm relatively

14    new to this, so --

15                THE COURT:  Okay.

16                THE WITNESS:  -- I thought I would ask.

17                THE COURT:  No problem.

18                THE WITNESS:  Please go ahead.

19    BY MR. MUNNO:

20    Q    In your experience in reviewing loan files, have you

21    experienced that there were missing ones?

22    A    Yes.

23    Q    Have you experienced that there were incomplete files?

24    A    Yes.

25    Q    Have you experienced that you received the wrong file?
```

Page 266

1    A    Yes.

2    Q    Have you -- have you experienced other issues about a

3    file --

4    A    Yes.

5    Q    -- in your own file retrieval process?

6    A    Yes.  Among other things that I can think of sometimes

7    loan files are -- multiple loan files are stitched together

8    into one computer file and that can be hard to detect.  You

9    have to open up the computer files, split them up.

10   Sometimes they're split in the middle and you have to go

11   find the end of the file and some other computer file, or

12   the opposite of that.  You get, you know, a computer file

13   that has just part of a loan file and you have to -- you

14   have to go get the other pieces and put them all together.

15   Q    Have you received paper files?

16   A    There have been -- well, not outside of Rescap do I

17   recall receiving paper files, so.

18   Q    Can you tell us your educational background?

19   A    Yes.  I have a bachelors of arts in economics from

20   Colgate University.  I have a masters of public policy

21   analysis from the University of Chicago, and I have a

22   doctorate of philosophy in public finance from New York

23   University.

24   Q    Okay.  And by whom are you currently employed?

25   A    Duff & Phelps.

08-13555-scc-mg  Doc 53621  Filed 08/30/16  Entered 08/30/16 20:48:16  Main Document
08-13555-scc  Doc 49007  Filed 09/02/15  Entered 09/28/15 19:13:48  Main  Exhibit F
Pg 267 of 374

Page 267

 1   Q    How long have you been with Duff & Phelps?

 2   A    About three-and-a-half years at this point.

 3   Q    And what do you do at Duff & Phelps?

 4   A    I'm a director in the dispute and litigation -- sorry

 5   -- dispute and legal management consulting practice, and the

 6   bulk of my work is in calculating damages and performing

 7   estimations for litigation.  And for most of my time at Duff

 8   & Phelps, two-and-a-half -- for the last three-and-a-half

 9   years that's all been in -- not all, but largely been in the

10   context of mortgage -- residential mortgage back securities,

11   put back litigation.

12   Q    Did you estimate the time and expense of Lehman's

13   proposed protocol?

14   A    I did.  Yes.

15   Q    What were your general conclusions?

16   A    My general conclusions, as I had put in my declaration

17   are that it would take many, many years to do this and cost

18   over $100 million.

19   Q    On what did you base your conclusions?

20   A    I based it on --

21            MR. NETZER:  Your Honor, pardon me.

22            THE COURT:  Yes.

23            MR. NETZER:  Is the witness being offered as an

24   expert?

25            MR. MUNNO:  Yes.

1          MR. NETZER:  He should be offered before he starts

2    offering his expert opinion.

3          MR. MUNNO:  I offer Mr. --

4          THE COURT:  That's a reasonable point.

5          MR. MUNNO:  I offer Dr. Parekh as an expert.

6          THE COURT:  Okay.  Mr. Netzer.

7          MR. NETZER:  For -- Your Honor -- I just want to

8    state for the record Your Honor has already denied our

9    motion, so I --

10          THE COURT:  Correct.

11          MR. NETZER:  -- I -- just for the record I will

12    state the same --

13          THE COURT:  Okay.

14          MR. NETZER:  -- grounds and assuming the same

15    ruling.

16          THE COURT:  You are correct.  Okay.  Let's keep

17    going.

18    BY MR. MUNNO:

19    Q    On what did you base your conclusions, sir?

20    A    So I based it on my personal experiences and what I've

21    seen in reviewing loans and conducting loan reviews and

22    supervising loan reviews, and sitting in the mediations that

23    I've sat in on.

24          In addition, I had discussions with others at my

25    firm that are also experienced in this type of work and I

08-13555-scc-mg  Doc 53621  Filed 08/30/16  Entered 08/30/16 20:49:16  Exhibit F
08-13555-scc-mg  Doc 49907  Filed 07/02/15  Entered 07/02/15 13:48:16  Main Document
Pg 269 of 374

Page 269

1    also spoke with the forensic -- you know, the forensic

2    review firm, Digital Risk, and people there and visited

3    Digital Risk and reviewed their process.

4    Q    Did you spend more than a couple of hours there?

5    A    I spent the -- my recollection the better part of two

6    full work days there.

7              MR. MUNNO:  May I show the witness his declaration

8    of November 14th, 2014?

9              THE COURT:  Yes.

10             THE WITNESS:  Thank you.

11   BY MR. MUNNO:

12   Q    Could you summarize for us the proposed Lehman

13   protocol?

14   A    So as I -- I think everyone's heard at least more than

15   once today there are five steps that I read in the protocol,

16   steps one through five.  There's also what I say is step

17   zero, which I don't think is explicitly in the protocol.

18             But the protocol says that, you know, very

19   generally that in step one the trustees would submit claims

20   to the plan administrator.  In step two, the plan

21   administrator would review those claims and render a

22   decision.  In step three --

23             THE COURT:  Okay.  I'm sorry.  I missed it.  Did

24   you mention step zero?

25             THE WITNESS:  I said there is a step zero, but I

Page 270

1    don't believe it's explicitly stated in the protocol.  It's

2    --

3              THE COURT:  Okay.  I'm sorry.

4              THE WITNESS:  -- implicitly part pf the trustees

5    making its claims.  I would have to look at the protocol

6    again to refresh my exact --

7              THE COURT:  Okay.

8              THE WITNESS:  -- memory, but I'm not trying to be

9    coy here.  I just --

10             THE COURT:  Okay.  I assume not.  Go ahead.  I'm

11   -- I was just trying to follow your testimony.

12             THE WITNESS:  Oh, absolutely.  Thank you.

13             So in step three the parties would get together

14   and negotiate the unresolved claims.  Then in step four it

15   would go on to a non-binding claims facilitation process and

16   the parties again would try and, you know, reach some

17   resolution.  And then in step five the Court would give its

18   final adjudication -- or give its adjudication.  I don't

19   mean to say final.  I don't presume that there's anything

20   before that, but would give it its adjudication

21   BY MR. MUNNO:

22   Q    Did you estimate the time and expense of implementing

23   the steps?

24   A    I did.  Yes.

25   Q    And did you do that under different scenarios?

Page 271

1   A    I did.  I did two different scenarios.  Scenario one is

2   a scenario that presumes about 209,000 loans and scenario

3   two presumes about 160,000 loans, and I could look at my

4   report and give you the exact number, but those are close.

5   And then the -- after that the two scenarios don't differ in

6   their inputs and assumptions.  They do differ with the

7   number of loans that go through it.

8   Q    Now why are there different number of loans?  Maybe you

9   could walk us through that in the two scenarios?

10  A    So I think it's easiest to start with scenario one, the

11  -- that has 213,000, almost 214,000 loans and then you don't

12  have to re-review the ones that have already been reviewed.

13        What that is is it's the 416,091 covered loans and

14  covered trusts less any loan that's already paid off in

15  full.  And the reason you exclude the paid off in full loans

16  is that no claim would arise from those and so it would be

17  disingenuous -- nobody would need to look at those loans as

18  part of this protocol because there's no claim from those.

19  So the 416,000 approximate loans less the paid in full

20  loans, that's the 213,000 that go through scenario one.

21        Now scenario two, what I -- what I did was I

22  acknowledged that this protocol is going to take some time

23  and if people were rational about this, they would start

24  with the paid in full loans because those are largely fact.

25  And then over time as they're reviewing the paid in full

1    loan -- I'm sorry -- not the paid in fulls, the loans with

2    -- I misspoke, loans liquidated with a loss, that that's

3    approximately 110,000 or so that have liquidated with a

4    loss.  You would start by reviewing those.  And over time as

5    you go through that review process some number of those

6    213,000 will pay in full.  And so they're -- therefore, they

7    would move into that status of loans without a claim.

8            And so what scenario two tries to do is give the

9    protocol the benefit of the doubt and say, let's

10   approximate, let's forecast how many loans will eventually

11   pay in full.  And scenario two only looks at -- only

12   considers the loans that have liquidated with a loss or are

13   expected to liquidate with a loss, projected to liquidate

14   with a loss.  So it's a lower number of loans because that's

15   practically -- well, it is -- it's -- it is practical and

16   reasonable to assume that the full 213,974 will not actually

17   need to go through the protocol.

18   Q    Okay.  Now so -- let's just focus then on scenario two

19   which is the fewer number of loans that's -- you say is more

20   likely to flow through the proposed protocol.

21   A    Okay.

22   Q    Did you estimate in your report how much time you think

23   it would take, how much it would cost?

24   A    I did.  Yes.

25   Q    Can you tell us what that is and we'll ask you to walk

Page 273

1    through how you arrived at what you say in scenario two.

2    A    Right.  So in scenario two my conclusions on the cost

3    are that it would cost approximately 128 million to $165

4    million, and depending on whether the Court waits for

5    scenarios one through four to complete its work or whether

6    the court works alongside the protocol, it would take 21 to

7    27 years for that protocol to be completed.

8    Q    And is that shown in Table 2 at page 5 of your report?

9    A    That is shown in Table 2.

10   Q    Now in preparing this report did you know what the

11   actual losses have been to -- nearly to date on these

12   covered loans?

13   A    I do.  It's approximately $15 billion of realized

14   losses to date.

15   Q    And do you know what is estimated to be the additional

16   losses that may arise?

17   A    The project -- my projection is that approximately

18   another $6 billion of losses will occur.

19   Q    Now in your report you refer to inputs and assumptions.

20   A    That's correct.

21   Q    Why are there assumptions?

22   A    There are simply parts of this protocol that are

23   unknown.  They're things that may happen in the future.

24   That's part of it.  Another part of it is there are parts of

25   the protocol that are potentially unclear to me or maybe

1    interpreted differently by somebody else.  And so I had to

2    make an assumption doing my analysis -- or assumptions in

3    doing my analysis as to what the protocol meant and what

4    would happen as loans flow through the protocol.

5    Q    Now let's start with what is denominated in your report

6    at page 6 as step zero --

7    A    Okay.

8    Q    -- when the loans are received from the various

9    servicers.  Do you estimate the amount of time it's -- it

10   may take for the loans to be received?

11   A    I do.  I estimate that it would take, you know, up to a

12   period of three years to get all of the loan files if, in

13   fact, they can all be located.  So up to a period of three

14   years.

15   Q    What -- based on your experience in your put back

16   matters over the past two-and-a-half years what informs your

17   estimate of three years to get all the loan files or as many

18   as can be found?

19   A    Well, there were -- there were more than one thing that

20   informed that estimate.  First of all, I think one of the

21   best -- you know, best things to inform that estimate is the

22   fact that, you know, what it took Digital Risk and the

23   trustees to get the initial 5,000 requests.  I mean, 5,000

24   loans were requested and 4,579 came back.  That process took

25   18 to 20 months.  Ad when we're talking about 160,000 loans

1    you're talking about a process -- a number of loans that's

2    30 times greater.

3            Now I don't assume that it would take 30 times as

4    long.  There are obviously gains from scale that you're

5    going to get here, but it's -- there -- there are more

6    opportunities for things to go wrong.  So that's' step one

7    is what -- you know, that's one place is how long it took

8    compared, you know, to get the 5,000 loan files or 4,579

9    from the 5,000 requests.

10           Two, I've been involved in other RMBS put back

11   matters other than Rescap in which I have been part of loan

12   file requests and those requests have taken many months, in

13   some cases over -- you know, over a year to get not that

14   different a number of loans.

15           And then thirdly I asked questions of Digital Risk

16   as to what some of their experiences were in obtaining the

17   loan files and they described situations in getting -- in

18   the 4,579 loans that were consistent with my experience in

19   other matters.

20   Q    And you mentioned not that different a number of loans.

21   When you made that reference what number of loans were you

22   referring to in that latter?

23   A    Well, so 5,000 -- a 5,000 loan request and in other

24   matters I have been involved with requests that were in the

25   thousands, but fewer than 10,000 loans.

1    Q    Now does the proposed protocol specify what has to be

2    in each loan file?

3    A    The proposed protocol for my reading specifies what

4    needs to be in each claim file.  So in order to make a claim

5    there have to be 43 separate document categories and, you

6    know, by logical assumption, I assume that if those never

7    come in the file from the servicers or the custodians in the

8    first place, they can't be in the claim file.

9          So my reading -- and, again, I'm not a lawyer --

10   is that there have to be at a minimum those 43 document

11   categories all in the loan file for review.

12          THE COURT:  But let me -- let me interject.

13          But if I were to order something differently,

14   files are what they are.

15          THE WITNESS:  Yeah.

16          THE COURT:  Would that materially affect your

17   analysis of the timeline?

18          THE WITNESS:  No.

19          THE COURT:  It wouldn't?

20          THE WITNESS:  No.  No.  It would not -- it would

21   not change the timeline, but not because -- well, let me

22   just say what I said in my report if you don't mind.  Can I

23   just --

24          THE COURT:  Sure.

25          THE WITNESS:  -- read it?  So --

 1          THE COURT:  You can just point me to your report.

 2          MR. MUNNO:  What paragraph?

 3          THE WITNESS:  It's actually in footnote 7.

 4     So my time --

 5          MR. MUNNO:  Page 6.

 6          THE WITNESS:  Page 6, footnote 7.  I apologize.

 7          So my time frame takes only into account that the

 8     loan files are a complete and ready -- are ready to review.

 9     But even beyond that, my analysis assumes that the loan

10     review starts within a month.  So it does take about a month

11     to just get things going.  But after that nothing slows

12     down.

13          So the -- my analysis assumes that the trustees

14     are able to get the loan files fast enough that even if

15     there are problems getting the loan files it doesn't slow

16     down anything.  So they start reviewing at a rate of three

17     loans per day per reviewer, which I think you know, is a

18     reasonable rate and it's the same rate that Mr. Pino uses, I

19     believe.  And nothing slows down at that point.  So --

20          THE COURT:  So the 43 items is neither here nor

21     there?

22          THE WITNESS:  It only speaks to the difficulty of

23     actually getting the protocol done.  It's not a time issue.

24     It's a -- you -- the 43 items set a very large burden in

25     terms of the missing files.  I do note that when 5,000 were

Page 278

```
 1    requested, only 4,579 complete loan files came back.  That's
 2    based on not even trying to get all 43 of these items.
 3              So I would assume that if you set the burden
 4    higher 43 items that -- you know, groups of loans that have
 5    to be gotten, it may be difficult to even get this
 6    percentage, 4579 out of 5,000.
 7              That -- but, no.  The time --
 8              THE COURT:  Okay.  Okay.
 9              THE WITNESS:  Yeah.
10              THE COURT:  Go ahead.
11              THE WITNESS:  I apologize.  Sorry.
12              THE COURT:  No problem.
13    BY MR. MUNNO:
14    Q    Now still on step zero, the loan files come in, what
15    happens when the loan files come in in connection with a
16    forensic re-underwriting put back manner?
17    A    So from my experience the first thing that has to
18    happen is the electronic files need to be opened up and they
19    need to be made sure that the files are complete and you
20    need to make sure that the files requested were the files
21    actually received and things weren't mislabeled.  You need
22    to make sure that the electronic file isn't blank.  I've
23    seen cases where you get a file and it's either blank or
24    corrupt, and then in which case you would have to go back
25    and try and get that again.
```

1          And then after all of that is done, you have to

2     map -- you have to take the applicable guidelines and map

3     the reps and warranties.  And all of that process has to be

4     done up front before the -- or at least the mapping process

5     has to be done up front before a loan can be reviewed, so.

6     Q    Now is that mapping process done on -- on each

7     governing document for each trust?

8     A    Yes, it has to be done for any of the necessary

9     governing documents for a trust.

10    Q    Why is that?

11    A    Because in order to produce an output in terms of a

12    loan file review that can be used in connection with a

13    repurchase request you have to state which reps and

14    warranties of that -- of that -- you know, of the applicable

15    reps and warrantees that that loan is breaching.

16    Q    Now did you project how many reviewers would be

17    involved reviewing three loans a day?

18    A    I did, yes.  I -- my analysis projects that 40

19    reviewers will be used.

20    Q    Why 40?

21    A    Well it was based on first my experience.  In the loan

22    reviews that I've -- that' I've been involved in typically

23    -- fewer than 40 reviewers I would say on average about 20

24    reviewers have been used, and so I also thought that the

25    best evidence of what -- how many reviewers Digital Risk

Page 280

1  could provide would be to talk to Digital Risk.  So I asked

2  Digital Risk, they told me 20 reviewers is the number they

3  could provide, and I said, could you get more reviewers, and

4  they told me that 40 -- they could get 40 reviewers.  And so

5  that's the number that I put in there.

6          So it's based on conversations with Digital Risk

7  as well as my own experience and the numbers of reviewers in

8  loan reviews that I -- in which I've been involved in.

9  Q    Now on the put-back cases in which you've been involved

10 have there been more than 40 re-underwriters involved?

11 A    No.  No matters that I've been involved in personally

12 have had greater than 40 reviewers reviewing at any one

13 time.

14 Q    Now once you have a complete loan file it's re-

15 underwritten; is that correct?

16 A    Once you have a complete loan file that's ready for

17 review then it would go through the re-underwriting process.

18 Q    Okay.  And you estimate 3 loans per day by 40

19 reviewers; is that correct?

20 A    Yes, I estimate that each reviewer would be able --

21 each forensic underwriter would be able to do 3 loans per

22 day, 40 reviewers, 120 loans per day.

23 Q    And how long would that take under scenario two where

24 we have fewer loans to deal with?

25 A    I have to --

Page 281

```
 1    Q    Is that in your attachment?

 2    A    It's in my attachment.

 3    Q    Which attachment?

 4    A    Three.  And let me just be -- so scenario two.  At that

 5    pace it would take 5.2 years of reviewing, but let me be

 6    very clear, this is all happening in sequence.  So after one

 7    month Lehman would start to receive loans for its review.

 8    And so while it takes 5.2 years, what that really is, it's a

 9    measure of intensity, not a measure of calendar time.  I

10    mean effectively in my analysis after one month the loans

11    are progressing to step two, and they continue to progress

12    to step two at a rate that doesn't slow down the process.

13              MR. MUNNO:  Your Honor, since we're going to go

14    through this attachment we did have a larger size of

15    attachments.  If I hand it to Lehman's counsel --

16              THE COURT:  Okay.

17              MR. MUNNO:  -- it might be helpful to your eyes.

18              THE COURT:  Sure.

19              MR. MUNNO:  I know it's helpful to mine.

20              THE COURT:  Thank you.  Do you have another one

21    that I could give to Ms. Litcus (ph)?  Do you have one more?

22              MR. MUNNO:  Oh, yes, I do.

23              THE COURT:  Although her eyes are better than mine

24    I think.  Thank you very much.

25    BY MR. MUNNO:
```

08-13555-scc Doc 53621 Filed 08/30/16 Entered 08/30/16 20:19:16 Main Document
08-13555-scc Doc 49907 Filed 05/02/15 Entered 05/26/15 21:30:18 Exhibit F
Pg 282 of 374

Page 282

1   Q    Now it's true, isn't it, that if you had more reviewers

2   the process would go faster isn't it?

3   A    If you had more reviewers that 5.2 year number would

4   drop, but my overall analysis of the protocol would -- would

5   not change in terms of calendar time.  In fact I -- you

6   know, after I saw Mr. Pino's declaration I put his number of

7   reviewers in, into my analysis, and you end up with the

8   exact same answer, because it's a -- you know, it's a serial

9   process and it'll go as fast as it goes until it hits a

10  choke point, until it hits a red light or a traffic jam.

11  Q    Now in connection with the re-underwriting process,

12  which is step one in your declaration attachment number 3,

13  you estimate cost.  Where did the cost numbers come from?

14  A    So the cost came from what Digital Risk actually has

15  charged in terms of the first 5,000 loan review, which was

16  $250 a loan, and then now what their current rates are of

17  $400 a loan.  So it gives a range.  The low end is number of

18  loans times 250 and the high end is the number of loans

19  times 400.

20  Q    And what number is that in your chart?

21  A    That's -- so for scenario two that is 39.3 million to

22  $62.9 million.

23  Q    And is that cost range consistent with the other put-

24  back cases where you have re-underwriting terms involved?

25  A    Yes, it's consistent with my experience in other -- in

1    other loan reviews.

2    Q    Now how many loans after step one do you assume get put

3    back to Lehman for review and consideration?

4    A    So, I assume that 92,000 in scenario two go on to

5    Lehman as put backs.

6    Q    And how did you arrive at that 92,000 range?

7    A    So that is based on the 57 percent material breach rate

8    that Digital Risk found in its sample of the first 5,000

9    loan, so that's -- you know, of the loans that are reviewed

10   57 percent.

11   Q    Now did you review any of the findings that Digital

12   Risk found with respect to material breaches of reps and

13   warranties?

14   A    I have reviewed them, yes.

15   Q    Now what happens at the next step, please.

16   A    So at the next step, step three, I -- I make the

17   assumption that 50 percent of the loans are agreed upon, you

18   know, the trustee has put them back and 50 percent of those

19   92,000 Lehman agrees that those are -- those are legitimate

20   claims and agrees to pay them, and then I believe -- and

21   that's about -- that's about 46,000 loans, and then I make

22   the assumption that the other 46,000, the other 50 percent

23   are not agreed upon, and they proceed on to step three,

24   which is a negotiation process.

25   Q    Now in your analysis or estimation of the proposed

1    protocol you have 20 reviewers on behalf of Lehman.

2    A    Uh-huh.

3    Q    Why do they have fewer in your analysis?

4    A    Because this protocol only proceeds step by step, you

5    know, in -- you know, in serial, and so if you put in 40

6    reviewers they -- those reviewers go -- if you -- any Lehman

7    reviewer can only go as fast as the loans are coming from

8    the trustee, and so because the breach rate is approximately

9    50 percent, you know, it was found to be 57 percent, it

10    would be disingenuous to put in 40 reviewers for Lehman

11    because it would just drive up the cost without changing the

12    rate.

13    So because they need -- you know, only half the

14    loans are coming to them in order to keep pace with the

15    trustees they only need half as many reviewers.  That number

16    could be 21 or 22 to reflect 57 percent instead of 50

17    percent, but that was the idea.

18    Q    Okay.  Now does your analysis of how the protocol would

19    work at that phase when Lehman has the loans the same as

20    when the analysis that Mr. Pino has?

21    A    No.  I make the assumption that 50 percent are agreed

22    to be repurchased, and that is I believe the same as

23    Mr. Pino, but then I make the -- the assumption that 50

24    percent proceed on to step three.

25    I believe that what Mr. Pino does is he says 50

1    percent agree, 25 percent move on, and 25 percent aren't

2    negotiated or anything else, they just drop out.

3    Q    Now based on your experience on put-back matters that

4    you've been involved with, has that been your experience

5    that 25 percent of the 50 percent will just drop out, will

6    not proceed in some manner to be resolved by the parties?

7    A    No, that's -- that's not been my experience.  You know,

8    my experience is that these are at least in the eyes of the

9    trustees good claim being put forward, and if Lehman has

10   seen fit to deny them they feel that they're not good

11   claims, and so because there is another step -- actually

12   more steps after this -- it's not in my experience that

13   anybody would be rational to simply give up on 25 percent of

14   the claims.

15        There are additional steps, and if people believe

16   that these are good claims or bad claims, depending on which

17   side of the aisle you're sitting on, it would make sense

18   that if there's no agreement you would move on into the next

19   step.

20   Q    And what do you estimate would happen at the next step,

21   step three, when the trustees and the plan administrator,

22   Lehman, negotiate?

23   A    So in the next step I assume that -- or I estimate that

24   of those loans that are disagreed on the negotiations

25   resolve an additional 25 percent, and this is based on my

1     experience witnessing negotiations of put-back claims in the

2     context of mediations.

3     Q     And did you estimate the cost of the negotiation step,

4     step three?

5     A     I did.  I estimate it to be approximately $11 million

6     to the trustees -- or to the trusts and an additional

7     $11 million to the estate, and that's based on an hourly

8     rate of $600 per hour, which is roughly the rate that, you

9     know, a good lawyer who's participating in these

10    negotiations would charge, and that's based on, you know,

11    sort of my experience of hourly rates of quality

12    professionals.

13    Q     Could it be less?

14    A     It could be less.

15    Q     Could it be more?

16    A     It could be more.  But I don't think $600 an hour is an

17    unreasonable amount of money.  Maybe someone who has to pay

18    that might think it is, but I think that's at least

19    reflective of what I've seen.

20    Q     What happens at the next step, step four, with the

21    claim facilitator?

22    A     So then in step four the claim facilitator process I --

23    I believe that this is going to be an effective step, and so

24    I make the assumption that the remaining loans, 75 percent

25    of those are taken care of by the claims facilitation

1  process, and you know, it's a high number because I do think

2  people are going to try to work hard to do this and get it

3  done, but -- and reach agreement, but on the other hand

4  these have already been through a negotiation in step three.

5           And so it's a difficult process, but I make the

6  assumption that, you know, based on my -- on my experience

7  that of people trying to work hard and reasonably do this

8  that that 75 percent will get taken care of by the claims

9  facilitation process.

10  Q    Let's take a step back --

11  A    Okay.

12  Q    -- to step two.  How much time did you estimate it

13  would take the plan administrator to review the alleged

14  breaches of reps and warrantees that were being presented to

15  it by the trustees?

16  A    Well, I make the assumption that it takes six years for

17  them to complete that process, but -- but remember this is

18  all going in series.

19           So, you know, it'll take them -- in my analysis it

20  takes them a month to get the first loans out the door, just

21  it might take them some time to get the process started.  It

22  could be faster if they're immediately ready to go, but --

23  so it takes six years of time to complete the process, but

24  they are sending loans to step three for negotiation within

25  the month.

Page 288

1    Q    And when we say six years to complete that process at

2    that step we're talking about how many loans that we expect

3    are going to be presented at that step?

4    A    Ninety-two thousand in scenario two.  And like I said,

5    if you change the assumption slightly from 20 reviewers to

6    reflect that it's not 50 percent but 57 percent breach rate,

7    if you gave them enough reviewers they'd be able to match

8    the trustees' pace of 5.2 years.  So 5.2 years, 6 years is

9    what I've written in my declaration, but --

10   Q    And how about at step three when the trustee and the

11   plan administrator, Lehman, are negotiating about the loans

12   that have yet to be agreed upon?

13   A    So it takes 4.6 years in my estimation to complete the

14   process, but again, like I've said, it's happening in

15   series, and so after a month loans are proceeding from step

16   two to step three and then from step three to step four.

17   Q    And just on your attachment 3 what are the assumptions

18   that are going into how hard people are working?

19   A    In most of my steps, at least steps one through four, I

20   make the explicit assumption that -- that these are 251 days

21   of -- working days a year, which I believe is the number of

22   working days in a year.  So -- and then where hours are

23   appropriate these are eight hours a day.

24          So this is a continuous constant process where

25   people are working solely on this for all of the -- all of

1    the working days in a year.

2    Q    Now in connection with step four where we have the

3    claim facilitator, have you personally been involved in a

4    process that's gone through these steps to a claims

5    facilitator?

6    A    I've not been involved with a claims facilitator.  What

7    I've been involved in are negotiations and mediations that

8    -- that might approximate the level of effort to which -- to

9    which people might be fighting these claims, but --

10   Q    Have you seen a protocol during your past two and a

11   half years where put-back claims are going through a process

12   which has these first zero through four steps?

13   A    No, I've not.

14   Q    Has anybody told you of any such protocol that goes

15   through zero through four steps as in this proposed

16   protocol?

17   A    Not -- no.  Other than this particular protocol, no.

18   Q    Now based on your review of Mr. Pino's declaration do

19   you agree with him as to the number of loans that would get

20   resolved at the facilitator level?

21   A    No, I don't.

22   Q    Why not?

23   A    Well, I see these as very contentious, and I also

24   believe that the loans that -- that could get resolved

25   likely would have gotten resolved in step three.  So by the

1   time, you know, you get to the claim facilitator process --

2   and I don't mean to say that it's going to be ineffective, I

3   in fact assume that 75 percent of the loans get taken care

4   of -- but these are incredibly contentious.

5          But that even aside there is a step five, and so

6   any party that doesn't get the finding that it wants from

7   the claim facilitator, because it's not binding would in

8   many cases -- in many, many cases I believe go on and try

9   and get these adjudicated through -- through the courts in

10  step five.

11         And so it doesn't seen rational or likely to me

12  that 99.6 percent of these loans would get taken care of by

13  the claims facilitator.  That being said, I do make the

14  assumption that 75 percent of them are taken care of by the

15  claims facilitation process.  So I do want to believe that

16  it's effective.  I mean, everyone I've seen here is working

17  hard at this but is -- you know, but these are also

18  contentious things.  And they've already gone through a

19  negotiation process.  So --

20  Q    And in connection with, you have put that matter

21  (indiscernible) resolved within a year?

22  A    None of the put back matters that I have been involved

23  with have been resolved within a year.

24  Q    Did any of them involve over 200,000 loans?

25  A    Nothing has come close to that number.

1    Q    Now, at the step four with the facilitator, what do you

2    estimate the time that would be taken at the facilitator

3    level?

4    A    So I make the assumption for step four that in scenario

5    two this will be completed in 2.8 years, just under 3 years,

6    but as I've said, and I'll just repeat it so that it's very

7    clear, the loans will progress -- start progressing through

8    this process and out of the process within a month.  So

9    there's not meant to be a hold up of 2.8 years.  It's just

10   that's a measure of the intensity of time that it would take

11   to get that done.

12   Q    To work through all the loans.

13   A    To work through all the loans.

14   Q    From beginning to end.

15   A    From beginning to end.

16   Q    And what do you estimate the cost at that step?

17   A    About -- so it's just under $14 million in total, split

18   evenly between the trusts and the estate.

19   Q    Now, with respect to this scenario two where we're

20   dealing with about 157,000 loans at the outset, what do you

21   estimate would be left to be adjudicated by the Court after

22   we go through steps zero through four?

23   A    So my analysis estimates that 8600 loans are left to be

24   adjudicated by the Court.  That's based on, you know, the

25   loans that are taken care of in steps one through four,

1    which remove loans from the process in each of those steps.

2    So the remaining number -- well, they don't remove them from

3    the process --they come to a resolution on those loans and

4    by the time you get to step five, there are 8600,

5    approximately, loans that are left that have not yet come to

6    a resolution.

7    Q    And did you make any estimates or assumptions as to how

8    long it might take the Court to get through and resolve that

9    number of loans that are in dispute?

10    A    Yes.  So I made the assumption that the Court would

11    work full time on adjudicating these for one week a month.

12    So one week every month they would spend each day, Monday

13    through Friday, on these loans and getting through seven

14    loans a day.  So in an eight hour day that's a little bit

15    over an hour per loan for each side to present the loan,

16    present evidence on the loan, for the other side to rebut

17    that evidence, breaks, if people need to go to the bathroom

18    or eat or what not, but seven loans a day and that would

19    take over 20 years if you dedicated one week per month.

20    Now, obviously, if you dedicated four weeks per month, that

21    number would go down to five years.

22    Q    And did you estimate the cost of that?

23          THE COURT:  We can stipulate that that's not

24    happening.  Just to be clear.

25    BY MR. MUNNO:

1  Q    Did you estimate the cost of that process?

2  A    I did.  That cost is approximately $30 million split

3  evenly between the trust and the estate and that's based on

4  each side bringing a lawyer and bringing an expert to

5  present or rebut the evidence in court.  It doesn't assume

6  any other outside court preparations.  It's just the hourly

7  cost for the courtroom work.

8  Q    And under this scenario two, where were dealing with

9  only the 157,000 loans, how long do you estimate the time

10  would take if the Court were to consider the unresolved

11  loans on a seriatim basis.

12  A    So that -- if they consider the loans and take the 20

13  years that I've written in my analysis here to resolve the

14  loans in a seriatim basis, the total amount of time -- so

15  it's 20.6 years for the Court and the total amount of time

16  is 21 years and that's reflective of the fact that the Court

17  can start its review within five months.  The first loans

18  are going to reach the Court within five months.

19  Q    And what's the total cost that you estimate the range

20  of costs?

21  A    So for scenario two, which is the fewer number of

22  loans, I estimate the cost to be between 128 million and 165

23  million, approximately.

24  Q    Now going back, how would the trustees know which loans

25  might be paid in full in the future if they we have to get

08-13555-scc-mg   Doc 49007   Filed 03/02/15   Entered 03/02/15 13:48:16   Exhibit F
Pg 294 of 374

Page 294

1    the loans today?

2    A    So, like I said, if you were to start the protocol

3    today, you'd have to request all of the 209,000 loans and

4    you wouldn't know which ones, specifically, pay off in the

5    future, but it is reasonable to think that you would start

6    with the ones that you know have a loss.  And you'd start

7    reviewing those and those would take some time and the

8    faster you go, the fewer of those active loans would pay off

9    and drop out of the protocol and the slower you go, the more

10   of those would pay off.  So it's an estimate, but that

11   estimate -- if the step one were to go more quickly and step

12   two -- one and two were to go more quickly, we'd be closer

13   to 209,000.

14   Q    So on day one the trustees would have to try to get all

15   209,000 loans?

16   A    They would have to make a request for all 209,000

17   loans, but certainly not all 416,000 covered loans.

18   Q    Now it -- a question has been raised or at least it

19   seemed not logical that if we put more people on the job to

20   re-underwrite the loans and to negotiate the loans and to

21   put more facilitators to interact with the parties about the

22   loans that we would get done faster.  In your view of the

23   protocol, are there points where there are going to be slow

24   downs?

25   A    Well, so, yes.  I think it's indisputable that if you

```
 1    were to put more bodies into this the steps zero through
 2    four could get done faster, but there are potentially
 3    quality issues that might occur if you put a lot of bodies
 4    onto this.  And that may slow down the process to some
 5    degree because if there are mistakes that are made from
 6    rushing through the process and things have to go back
 7    through the process, that would be one thing.
 8         But to maybe give you the most simple answer, even
 9    if you were to put in the number of bodies that Mr. Pino
10    contemplated and you'd have to do it in every step, right,
11    because if you put in more bodies in step one but not in
12    step two, then they would just back up at step two and if
13    you put in more bodies in steps one and two but not in step
14    three, they would just back up in step three and so on and
15    so forth.
16         But eventually things are going to come to the
17    Court and if you're talking about thousands of loans going
18    to the Court, no matter how quickly you get to the Court,
19    and in my analysis they're getting there -- they're starting
20    to get there within five months and there's always loans for
21    the Court to review.  So no matter, you know, no matter how
22    many bodies you throw into this, there are loans for the
23    Court to review, it's going to slow down at that juncture.
24    There's, you know, there's only one -- in my analysis
25    there's only one Judge Chapman doing this.  So --
```

1  Q    Now, the time --

2        THE COURT:  Thank heavens for that.  Mr. Munno, can

3  you give us some idea of how much longer you have?

4        MR. MUNNO:  Five minutes.

5        THE COURT:  Okay.

6  BY MR MUNNO:

7  Q    The time to complete the proposed Lehman protocol

8  theoretically could take less time than you have estimated;

9  isn't that so?

10  A    It could, absolutely.

11  Q    Okay.

12  A    These are estimates.  These are estimates based on my

13  experience and discussions with my colleagues, but it could

14  take less.  So I don't -- it would be disingenuous for me to

15  say it couldn't take less.  But it's still going to take

16  years and it's still going to cost millions and millions and

17  millions of dollars.

18  Q    What I think Mr. Pino says, he estimates it at 110

19  million.  Is that correct that he estimates it at 110?

20  A    He estimates it at 110 million and that's -- we

21  actually agree on many of the cost estimates.  I think it's

22  largely based on the fact that he just has fewer loans

23  reaching, you know, the latter processes and that's where we

24  disagree and so his cost goes down, but it's not so far from

25  my estimate of 128 million to 165 million.

1  Q    So it is clear that you do not agree with Mr. Pino and

2  Mr. Paul Allred that this protocol could be finished, steps

3  zero through four, within a year?

4  A    No, steps zero through four -- assuming -- getting the

5  loan files, I think that's the one that really is a loud

6  card.  Where I disagree with Mr. Pino and Mr. Allred, if you

7  were to throw enough bodies at it and you weren't as worried

8  about the quality drop that you might perceive in this then

9  perhaps you could get to step -- the end of step four within

10  a year, but I do think it would be very, very difficult to

11  do.

12       But let me just reiterate, that doesn't change my

13  answer.  Five months, loans are getting to the -- you know,

14  through -- beginning to get through step four and then it

15  never slows down the process beyond that, in my analysis.

16  Q    Now, in your experience in put back cases, have you

17  seen multiple competitors band together to take on a project

18  and share their infrastructure?

19  A    I have never experienced that, no.

20  Q    Are there reasons -- you mentioned quality control.

21  What's the potential issue with quality control, based on

22  your experience?

23  A    So there are two sets of issues that I would talk about

24  and one is the problem with different IT systems.  Different

25  firms are going to use different IT systems.  They're going

Page 298

1    to use different procedures and protocols.  They're going to

2    have different training.  They're going to have different

3    cost structures on how they review loans.  So that's one

4    issue.    The other issue is that, in my experience, people

5    get better at reviewing loans over time and so what I've

6    experienced is that when you first start, loan reviewers

7    make more mistakes.  Their quality checkers find more

8    mistakes but also could potentially make more mistakes and

9    as you go through the process over months or years of

10   reviewing loans with a particular set of loans, you get

11   better at it and the quality control second level reviewers

12   get better at their job and more familiar with the

13   tendencies of the reviewers that they're overseeing.  So by

14   adding multiple firms, what you're doing is you're spreading

15   that learning out that takes time to do over many, many,

16   many reviewers and so, yes, you could get through the review

17   with what, I think, Mr. Pino says is 400 something

18   reviewers, but you would lose that learning, that

19   experiential learning by an individual reviewer over time

20   because per reviewer there weren't be as many loans to learn

21   from.

22   Q    Now, Mr. Pino says that the industry has capacity for

23   forensic re-underwriters to undertake a job of this size of

24   over 200,000 loans.  Are you aware that 700 plus re-

25   underwriters could be summoned to this task based on what

Page 299

```
 1    you know about the industry?

 2    A    I'm aware he said it.  I've never, in my own

 3    experience, seen that number of reviewers, anywhere close to

 4    it.

 5    Q    Do you think it's reasonable to make that assumption?

 6    A    Not based on my experience.

 7    Q    Now, have you ever seen multiple competitors in the

 8    field engage with one client to undertake the task of

 9    underwriting loans of this type?

10    A    I've never experienced multiple competitors working

11    together in that nature.  I have experienced multiple firms

12    working together but only in the capacity that one firm

13    might provide a quality control secondary review or an

14    independent review.  Or multiple firms might have very

15    specific roles such as only an appraisal review because that

16    was deemed to be more efficient under the circumstances.  I

17    have seen both of those, but not in the case that we're --

18    not in the manner that we're contemplating here where you've

19    got firms that are all doing the forensic underwriting

20    together and then -- let me stop there.

21         MR. MUNNO:  No further questions.

22         THE COURT:  All right.  Just give me a moment.  I

23    need to clarify the overtime coverage.

24    (Pause)

25         THE COURT:  All right.  If you would give me five
```

```
 1   minutes to make the switch in reporters who's going to carry

 2   us through to the end of the day, that would be great.

 3            Dr. Parekh, do you want a break from being on the

 4   witness stand?  If you'd like one, that's fine.

 5            THE WITNESS:  I might just --

 6            THE COURT:  Okay.

 7            THE WITNESS:  Just if you're doing five minutes I

 8   might run to the bathroom and run back.

 9            THE COURT:  Okay.  That sounds good.  Five minutes

10   it is.  You remain under oath.  Please don't talk to anyone

11   about your testimony or be in anyone's presence while

12   they're talking about your testimony or the case.  We'll

13   start up again in five minutes.

14            THE WITNESS:  Understood.  Thank you.

15        (Recess.)

16            MR. MUNNO:  Mr. Netzer will be back in one minute.

17   He just used the restroom.

18            THE COURT:  Can we just start without him?  Now?

19   All right.  I'm just going to ask everybody and I will ask

20   Mr. Netzer when he gets back, we have a new reporter so the

21   first time you get up to speak, if you would identify

22   yourself for his benefit, that would be great.

23        (Pause)

24            MR. NETZER:  Sorry, your Honor.

25            THE COURT:  Yes.  And for the reporter's benefit,
```

08-13555-scc-mg  Doc 53621-6  Filed 08/30/16  Entered 08/30/16 20:49:16  Exhibit F
08-13555-scc-mg  Doc 49007  Filed 03/02/15  Entered 03/02/15 13:48:16  Main Document
Pg 301 of 374

Page 301

```
 1   you are?

 2           MR. NETZER:  Roger Netzer, may it please the Court,

 3   on behalf of the debtors.  May I proceed, Your Honor?

 4           THE COURT:  Yes.

 5   CROSS-EXAMINATION

 6   BY MR. NETZER:

 7   Q    Dr. Parekh, before we took a break you expressed a

 8   concern for the Court about even increasing the number of

 9   bodies you throw at this, I think was the phrase you used,

10   and you acknowledged that you could, in fact, I believe,

11   increase the rate of the various steps, maybe even to get it

12   all done in one year.  But you expressed a concern that

13   doing that would cause a diminution in quality.  Do you

14   remember what you said about diminution in quality?

15   A    I believe I said it was a concern.  I don't know if I

16   said it would or could.  I'd have to refresh.

17   Q    Well, you expressed a concern.

18   A    Right.

19   Q    I assume you meant that the judge should be concerned

20   that that could cause a diminution in quality, correct?

21   A    Yes.

22   Q    All right.

23   A    I did mean that.

24   Q    And you said that that was based on your experience,

25   correct?
```

1   A    That's correct.

2   Q    All right.  And I believe you also testified that apart

3   from the Rescap matter and the Lehman matter, you've worked

4   on four loan reviews?

5   A    I believe it was four other matters, three of which

6   involve loan reviews.

7   Q    So you've worked on three loan reviews.

8   A    Three other loan reviews than the Rescap and Lehman

9   matter.

10  Q    Okay.  And when you --

11  A    But --

12  Q    And when you expressed the concern --

13       MR. MUNNO:  I think the witness was wanting to say

14  something.

15       THE COURT:  Okay.

16       THE WITNESS:  Yeah --

17       THE COURT:  Did you have something you want to say?

18       THE WITNESS:  -- but I just -- okay.  Go ahead.

19  Just -- I'm sorry.  I had a thought but it's left my head.

20  I apologize.

21       THE COURT:  Okay.  Okay.  Let's keep going.

22  BY MR. NETZER:

23  Q    Am I wrong about the number?

24  A    No.

25  Q    Okay.  And now you weren't including the Rescap matter

Page 303

1  in your testimony as your lawyer instructed you, correct?

2  A    Today, yes, I was not including the Rescap matter.

3  Q    So the experience you were talking about wasn't in the

4  Rescap matter and it isn't in the Lehman matter either, is

5  it?

6  A    That's -- no, I have seen that in the Lehman matter and

7  by what I mean there in these loan reviews is that you

8  can -- based on the experience in these matters as well as

9  in the discussions, there's a concern -- well, there's an

10 understanding that reviewers get better over time when

11 they're working on a particular matter.

12 Q    My question is, you have some experience in a loss of

13 quality when the number of loan reviewers is increased.

14 A    No, that's not what I'm saying.

15 Q    So --

16 A    I have experienced --

17        MR. NETZER:  My I, Your Honor, continue?

18        THE COURT:  Well, he hasn't finished his answer?

19        THE WITNESS:  I --

20        MR. NETZER:  He said no.

21        THE COURT:  Okay.  Let's just clarify the general

22 rules of the road.  This is cross-examination so the witness

23 is being asked, generally speaking, yes or no questions.

24 Those are the general rules of the road.

25        To the extent that you feel that you can't answer a

1   question with a yes or no answer, you can elaborate but in

2   general, you have to try to answer to the best of your

3   ability with yes or no and Mr. Munno will have the

4   opportunity to clarify any ambiguous areas, if he so

5   chooses, on redirect.

6           THE WITNESS:  Okay.

7           THE COURT:  But let's try to get as full testimony

8   as we can from the witness, Mr. Netzer.

9           MR. NETZER:  Thank you.

10          THE WITNESS:  My apologies.

11          THE COURT:  Okay.  No problem.

12  BY MR. NETZER:

13  Q    So, Dr. Parekh, my point is, you testified, did you

14  not, that you have direct experience of the increase in the

15  number of loan reviewers causing a diminution in quality of

16  the loan reviews.  If I have it wrong, tell me I have it

17  wrong.  You didn't say that?

18  A    That's not what I believe I said.

19  Q    So tell me now, then, do you or do you not have direct

20  experience of the increase in the number of loan reviewers

21  causing a diminution in quality, and I don't mean just

22  discussing it a concern, do you have direct experience?

23  A    I do not.  I do not.

24  Q    So when you said based on my experience, there's a risk

25  of diminution in quality based on increasing the number of

Page 305

1   loan reviewers, you were not intending to suggest to the

2   Court that you had ever witnessed such a thing, were you?

3   A    No, I was not.

4   Q    And she would have been mistaken to infer from your

5   testimony that you had some direct experience of that,

6   wouldn't she?

7   A    I don't know --

8   Q    But --

9   A    No.  I mean, yes, I mean, she would have been mistaken.

10  Q    You didn't mean --

11  A    I don't --

12  Q    -- to create that impression.

13  A    I don't want to be caught -- yes.  That's --

14  Q    And you didn't mean --

15  A    That is not --

16  Q    -- to create that impression.

17  A    -- what I -- obviously I did not mean to mislead the

18  Court.

19  Q    And, in fact, the only direct experience of loan

20  reviews you have, apart from Lehman and Rescap which is

21  outside your testimony, are just the three you mentioned,

22  correct?  So your statistical sample, anyway, would only be

23  three, correct?

24  A    It's three loan reviews.  I don't know if it's a

25  statistical sample.  It's -- it is the totality of my -- of

1    the loan reviews with which I have direct experience.

2    Q    Okay.  And those -- which of -- could you show us on

3    your resume which are the ones that you're talking about?

4    It's in your report.  I see Lehman.  The first one is RMBS

5    Financial Advisory.

6    A    Right.

7    Q    What's that one?

8    A    And that's one of the three and the other two --

9    because my resume isn't updated to the full amount, there

10   are two others that are more recent -- that are recent

11   ongoing matters that aren't here.  So they're --

12   Q    What's the third one, Residential Capital, RMBS

13   bankruptcy?

14   A    That's the Rescap.

15   Q    Why didn't you put in that it's Rescap?

16   A    Isn't Rescap Residential Capital?

17   Q    Oh, I'm sorry.

18   A    Yeah.

19   Q    And the RMBS Financial Advisory, which one is that?

20   That's the name of the company?

21   A    Oh, no, no.  That's a generic name because for

22   confidentiality I can't -- my retention is not disclosed

23   yet.

24   Q    So there again, that's one that we were not able to

25   question you about; isn't that correct, sir?

Page 307

1   A    I don't --

2              MR. MUNNO:  Objection.

3              THE WITNESS:  I don't know if you were able to

4    question me about it.

5              THE COURT:  I'm sorry.  Let me hear the --

6              THE WITNESS:  I believe you questioned me about it.

7              THE COURT:  Hold on.  Hold on.  What's the basis of

8    the objection?

9              MR. MUNNO:  Your Honor, there's a premise that they

10   weren't able to question him and going back to the previous

11   exclusion, if we actually go back and look at the deposition

12   transcript, the examiner chose to move on.  He didn't ask

13   the question.  The word Rescap came up thirty other times

14   during the examination.  So the foundation that he couldn't

15   ask him is inappropriate.

16             MR. NETZER:  I'll ask him now, if you don't mind,

17   Your Honor.

18             THE COURT:  Hold on.  I'm entirely confused.  So

19   we're not talking about Rescap because there was a mediation

20   privilege there.  We're not talking about Rescap.  But now

21   the questions are about this generic RMBS Financial Advisory

22   and now -- right?

23             MR. NETZER:  Thank you, Your Honor.  So I can ask

24   about that.

25             THE COURT:  But now Dr. Parekh is saying that he

 1   can't identify the actual firm because of the terms of his

 2   retention, right?

 3         MR. MUNNO:  He actually said when I asked you

 4   something at your deposition yesterday and he was going back

 5   he was going back on the same argument --

 6         MR. NETZER:  I'll ask a different question then,

 7   Your Honor.

 8         THE COURT:  Okay.  I'm confused.

 9         MR. NETZER:  I'll withdraw it.  Sure.

10         THE COURT:  Okay.

11   BY MR. NETZER:

12   Q    What was the experience in that case -- first of all,

13   yes, what is that company?

14   A    I don't think I'm allowed to talk about specifically

15   what that company is.

16   Q    But that is one of the engagements you're basing your

17   opinion on; is it not?

18   A    That's correct, yes.

19   Q    And so I'll ask again, what happened in that case that

20   led you to conclude -- we're talking about only three cases

21   now.

22   A    Uh-huh.

23   Q    So that's your statistical sample, isn't it?

24   A    If you want to call it a statistical sample, but --

25   Q    Well, would you call it a statistical sample?

1    A    No, I would --

2    Q    It's too small, isn't it?

3    A    I would call -- no, I would call it a population

4    because it's the total sum.

5    Q    Okay.  So your total population is three.  Tell us what

6    your experience was in that case that led you to tell the

7    Court that there is a loss of quality based on an increase

8    in the number of loan reviewers.

9    A    So --

10             MR. MUNNO:  Objection.

11             THE COURT:  Hold on, Dr. Parekh.

12             Yes, Mr. Munno?

13             MR. MUNNO:  That hasn't been the witness'

14    testimony.

15             MR. NETZER:  I'm asking now.

16             THE WITNESS:  So what --

17             THE COURT:  Okay.  Hold --

18             MR. MUNNO:  It's been asked and answered.

19             THE COURT:  Hold on.  The witness has now -- in

20    answer to your questions, Mr. Netzer, he's testified that he

21    has no experience.  No experience with the loss of quality

22    as correlating with the increase in the number of reviewers.

23    He said he doesn't have that experience, right?

24             MR. NETZER:  Okay.  I'm ready to move on, Your

25    Honor.

```
 1              THE COURT:  Okay.

 2              MR. NETZER:  Just from that one observation --

 3              THE COURT:  Okay.

 4              MR. NETZER:  -- I've been persuaded to move on.

 5      BY MR. NETZER:

 6      Q    Now, let's talk about what you -- your concerns you've

 7      expressed about the issues that get to the Court for

 8      resolution.  Okay.  And you've opined about how -- the time

 9      that that would take, correct?

10      A    Yes.

11      Q    Okay.  And you're not a lawyer, correct?

12      A    I am not a lawyer.

13      Q    So you were not opining about legal matters, were you?

14      A    Certainly not, no.

15      Q    And so would it be fair to say that doctrines of

16      judicial economy and efficiency were not part of your

17      analysis?

18      A    No.

19      Q    It wouldn't be fair to say?

20      A    They were not part of my analysis.  Let me just --

21      Q    Oh, they were not.  So, for example, you didn't factor

22      in res judicata, collateral estoppel, issue preclusion,

23      claim preclusion, none of that.

24      A    No.

25      Q    Do you know what those things are?
```

```
 1    A    I don't.

 2    Q    And let's go back to something you said in answer to a

 3    question from the Court.  I understood you to be saying, and

 4    maybe I got it wrong, but the Court asked you if you

 5    increased the number of loans available for review -- in

 6    other words, if there weren't the 43 requirements and you

 7    could accelerate the readiness of the loans for review, I

 8    believe you said that that would not have an impact on the

 9    rate at which the loans could be reviewed or did I get that

10    wrong?

11    A    I think you got it wrong.  So --

12    Q    So, okay.  That's all right.  So, in fact, that isn't

13    your testimony.

14    A    That is not my testimony.

15    Q    All right.  And, in fact, isn't it the case that if 400

16    loan reviewers could begin immediately reviewing, say,

17    50,000 loans, that it would accelerate the process.

18    A    Yes, it would accelerate the process.

19    Q    All right.  Now, I have a question about the number of

20    people who could be turned loose on this because you said in

21    your report that the number was 40, correct?  That's the

22    number you used.

23    A    Yes, that's the number in my report.

24    Q    Let me just get my notes about that.  And, in fact,

25    that number of 40 is -- generates the -- let's see the
```

1  number.  I think it was -- years, I think you said five or

2  seven depending on which scenario.  Is that fair?

3  A    That number of reviewers --

4  Q    Oh, I found it.  I'm sorry.  Based on this rate it

5  would require seven years or five years, correct?  That's

6  what it says page 8, paragraph 23, correct?  I'm reading

7  correctly?

8  A    Let me just review that.  So -- oh, it's on page 8, I'm

9  sorry.

10  Q    Page 8.  I'm sorry.

11  A    I was looking at the wrong page.  I apologize.

12  Q    The end of -- the carryover of paragraph 23.  I'm

13  sorry.

14  A    Yes.  What I wrote was based on this rate it would

15  require seven years or five years to complete the loan

16  review.

17  Q    And that's using the 40 number, correct?

18  A    That is using the 40 number.

19  Q    Okay.  And then you explained to the Court where you

20  got the 40 number.  In paragraph 43 you said, based on a

21  conversation with Digital Risk, I used the assumptions that

22  the loan review process would involve 40 reviewers, correct?

23  I'm reading correctly again?  And it goes on.  I'm just

24  saying the 40 part.  I'm just asking --

25  A    Yes.  No, that's -- I was making sure -- yes, that's

08-13555-scc-mg   Doc 53621   Filed 08/30/16   Entered 08/30/16 20:48:16   Exhibit F
08-13555-scc   Doc 49907   Filed 05/02/15   Entered 05/26/15 13:48:16   Main Document
Pg 313 of 374

Page 313

          1    what I wrote.

          2    Q    And that conversation with Digital Risk was the basis

          3    of your telling the Court that it would be 40 and that it

          4    would take five to seven years, correct?  Are you with me so

          5    far?

          6    A    I'm with you so far in that was part of my basis.

          7    Q    Well, you said based on a conversation with Digital

          8    Risk.  Did you mean to say based on a series of

          9    conversations with Digital Risk?

         10    A    I had one conversation with Digital Risk on this topic,

         11    but I also have what I experienced in, you know, in my

         12    experience with RMBS.  But, yes, I did write there, based on

         13    a conversation with Digital Risk, the process would involve

         14    40 reviewers and I didn't have any reason to think that was

         15    wrong.

         16    Q    Sure.  And when you -- but the reason you said that

         17    here is that it was the truth, correct?

         18    A    Of course it's the --

         19    Q    Yeah.  It was based --

         20    A    -- it was the truth.

         21    Q    -- on your conversation with Digital Risk.

         22    A    Oh, absolutely.

         23    Q    And I'd like to just focus on that conversation again

         24    since it was an important one.  And I believe on your direct

         25    you described the conversation as follows:  I asked Digital

1  Risk could they put more than 40 -- excuse me -- more than

2  20 on this task and the response was we could put 40,

3  correct?

4  A    That's the general substance, yes.

5  Q    And you didn't ask them if they could put 100, did you?

6  A    No, I did not.

7  Q    And, in fact, you didn't ask them whether they would

8  use outside contractors for said project --

9  A    No, I did --

10  Q    -- did you?

11  A    I did not.  I did not.

12  Q    And then you said, you told the Court earlier that you

13  have no experience of loan review companies working side by

14  side on the same -- for the same client on the same project.

15  A    I have never experienced that.  That's correct.

16  Q    But you didn't ask Mr. Miller at Digital Risk if he had

17  that experience in this conversation, did you?

18  A    I --

19            THE COURT:  Do you mean Mr. Phillips?

20            THE WITNESS:  Yeah.

21            MR. NETZER:  Did I -- what -- I --

22            THE COURT:  You said Miller.

23            MR. NETZER:  That's what I mean.  That's what I

24  mean, Phillips.

25            THE COURT:  Okay.

1          THE WITNESS:  I didn't ask Mr. Miller or Mr.

2     Phillips that question.

3     BY MR. NETZER:

4     Q    And, in fact, you didn't ask him why they couldn't do

5     60, 80, 100, did you?

6     A    No, I did not.

7     Q    You really stopped after that first question, didn't

8     you?

9     A    For the purpose of this analysis, yes, I asked him a

10    question and I got an answer and that's what I went with.

11    Q    Exactly.  For the purpose of telling this Court how

12    many people could work on this matter, that's all you did,

13    sir.  Did the witness answer?  I'm sorry.

14    A    I didn't know that was a question.  I'm sorry.

15    Q    Well, let me -- let me continue.  I'll ask a different

16    question, then.  Now, you told the Court earlier that while

17    you were at Duff and Phelps one of the responsibilities or

18    one of the things you did in relation to loan reviews was

19    trained in loan reviews.  Do you remember telling the Court

20    that?

21    A    Yes, I do.

22    Q    Okay.  Tell the -- would you tell the Court how it was

23    that you were trained in loan review at Duff and Phelps?

24    A    Yes.  So I sat down with a firm by the name of

25    CrossCheck Compliance who we used in -- and they have --

1    they're a forensic review firm and with them I went over

2    parts of -- parts or all of about 75 loans in which I

3    reviewed under their instruction because I wanted to learn

4    about the process of loan review that we were going to

5    engage in.

6    Q    So when you said earlier, when you said I trained in

7    loan review, you were talking about getting trained,

8    correct?

9    A    Yes.  Yes.  I apologize if somebody misunderstood that.

10   Q    Because prior to going to Duff and Phelps you had no

11   experience with loan review, correct?

12   A    That's correct.

13   Q    And, in fact, it was necessary to get that experience

14   in loan review from an outside contractor because Duff and

15   Phelps didn't have the ability to teach you; isn't that

16   correct?

17   A    At that time, that is correct.

18   Q    Okay.  And I believe you also told the Court that you

19   have no experience of loan review companies working side by

20   side.  Were you saying that Duff and Phelps and CrossCheck

21   didn't work side by side doing the loan review?

22   A    No, they didn't work side by side.  What -- the way

23   that that loan review worked was Duff and Phelps did the

24   forensic underwriting and CrossCheck did the secondary

25   quality control review.  They made the calls on what was

08-13555-scc-mg  Doc 53621  Filed 08/30/16  Entered 08/30/16 20:09:16  Exhibit F
08-13555-scc-mg  Doc 49007  Filed 09/02/15  Entered 09/02/15 21:30:48  Main Document
Pg 317 of 374
Pg 317 of 374

Page 317

1   material and adverse.  So that I wouldn't characterize as

2   side by side forensic re-underwriting.

3   Q    Didn't you state at your deposition that, in fact, Duff

4   and Phelps employees were doing loan reviews after they were

5   taught to do so by Digital, by CrossCheck, excuse me?

6   A    Yes.  So Duff and Phelps did the loan reviews and

7   CrossCheck provided the calls on what was material and

8   adverse and provided the secondary review, the quality

9   control review but not the forensic re-underwriting.

10  Q    How did the Duff and Phelps personnel learn how to do

11  the loan reviews?

12  A    They were trained prior to the start of the loan review

13  by CrossCheck.

14  Q    Oh, CrossCheck trained them.

15  A    CrossCheck trained them.

16  Q    I see.  So they were people who, prior to doing this

17  big loan review, hadn't done them before.

18  A    Who -- who was --

19  Q    The 20 Duff and Phelps people you just testified were

20  conducting the loan reviews.

21  A    Yes, they had not done the loan review before.

22  Q    And but this -- your experience with that, with these

23  people getting trained and doing the job at Duff and Phelps

24  was so terrible that you don't believe it could be done

25  here, correct?

1    A    I'm sorry.  Can you --

2    Q    Well, what went wrong in the Duff and Phelps loan

3    review that leads you to think that people can't be trained

4    to do it here?

5    A    So the Duff and Phelps loan review was in the context

6    of negotiating a settlement and the standard of the loan

7    review for that settlement I would say is different than the

8    standard that Digital Risk has done in this manner.  So,

9    yes, Duff and Phelps did it.  They did the job that was

10   efficient for the client.  Nothing went so wrong and -- but

11   it -- but the training that they received would not be the

12   same training that loan reviewers might receive to do a loan

13   review, for example, on Lehman.

14   Q    So there would have to be more training?

15   A    I believe there would have to be more training.

16   Q    And would it be fair to say that prior to 2012 you had

17   no experience whatsoever with mortgage loan review

18   companies?

19   A    That's correct.

20   Q    Okay.  In fact, would it be fair to say prior to 2012

21   that you had not worked in the mortgage loan industry at

22   all?

23   A    Other than providing litigation support work for asset

24   backed securities, I -- that would be fair to say.

25   Q    Well, there were no -- there was no loan review

1    involved in that.

2    A     There was no loan review, absolutely not.

3    Q     And, in fact, you came over to Duff and Phelps and have

4    worked in their, I believe you said their litigation support

5    group, correct?

6    A     Yes.

7    Q     So have you ever actually done a loan -- as a

8    principal, engaged in a mortgage loan repurchase

9    transaction, as a principal?

10   A     No, I have not.

11   Q     Just pursuant to the litigation group, your activities

12   there, correct?

13   A     Pursuant to the litigation -- my work has always been

14   in pursuant to litigation of RMBS repurchase matters.

15   Q     And you have no experience whatsoever with loan

16   repurchase demands, correct?

17   A     That's not true.

18   Q     Apart from what you've done in the litigation group.

19   A     Apart from the litigation work, no.

20   Q     Okay.  Well, sorry.  Let me get to your transcript.

21          THE COURT:  Can I -- while you're looking at your

22   document, Mr. Netzer, could I ask the witness a question.

23   Would you mind?

24          MR. NETZER:  Of course not, Your Honor.

25          THE COURT:  So in your November 14th declaration,

Page 320

```
 1    paragraph 27.

 2              THE WITNESS:  Okay.

 3              THE COURT:  You indicate that Duff and Phelps has

 4    reviewed the breaches -- has reviewed the breaches that

 5    determined the 57 percent material breach rate and has

 6    concluded that these breaches represent proper repurchase

 7    requests.

 8              THE WITNESSTHE WITNESS:  Well, that's correct.

 9    Yes.

10              THE COURT:  So I thought I heard you say a few

11    minutes ago that CrossCheck provided some other review in

12    connection with the breaches.  Did I misunderstand it?

13              THE WITNESS:  Not in this matter.

14              THE COURT:  Not in this matter.

15              THE WITNESS:  Not in this matter.

16              THE COURT:  Thank you.

17    BY MR. NETZER:

18    Q    Okay.  Did you remember -- I took your deposition last

19    Friday, remember?

20    A    Of course, I remember you.

21    Q    Okay.  And I asked you what is your experience with

22    respect to repurchase demands from companies that brought

23    loans from your client, that is a Duff and Phelps client,

24    didn't I?

25    A    Yes, you did.
```

Page 321

1    Q    And I believe you answered, my only experience is that

2    I know people at the firm do this type of work and I know

3    people at the firm do give this kind of advice to clients

4    who have repurchase demands made against them.  I have not

5    been specifically involved, that I can call, at least right

6    now, in any of those matters.  That is correct -- that was

7    correct testimony, correct?

8            MR. MUNNO:  What page and line number?

9            MR. NETZER:  Oh, I'm sorry.

10   BY MR. NETZER:

11   Q    You -- well, first of all, is that correct?  And then

12   we'll get to the transcript.

13   A    Could I hear that again?  I mean, if you're reading it

14   I'm going to assume that's what I said.  I may have been

15   answering what I think is a different question, but I'm

16   assuming that's what I said.

17           MR. MUNNO:  May I have the page and line, please?

18           MR. NETZER:  Sure.  185, line 12 to line 21.

19   BY MR. NETZER:

20   Q    Now, you also testified about the difficulties of

21   obtaining complete loan files just now and I take it that

22   the experience -- and I believe you said it was based on

23   your experience and you were not including Rescap in that,

24   were you?

25   A    I am not including Rescap.  I could, but I'm not.  I

08-13555-scc-mg Doc 53621 Filed 08/30/16 Entered 08/30/16 20:48:16 Exhibit F
08-13555-scc-mg Doc 49007 Filed 03/02/16 Entered 03/02/16 13:48:16 Main Document
Pg 322 of 374

Page 322

1    mean, I would, but I am not.  So --

2             MR. NETZER:  I'll move to strike that.

3    BY MR. NETZER:

4    Q    But the -- so but you are including the three other

5    engagements involving mortgage loan review?

6    A    Yes, I am.

7    Q    Okay.  And when did those engagements start?

8    A    Those started at various points over the last two

9    years.

10   Q    Yes.  When?

11   A    One started about two years ago, one started about a

12   year ago and then one started about six to seven months ago.

13   Q    And the one that started six to seven months ago, is

14   that on -- what's that one?  Who's the client there?

15   A    I can't disclose that.  I can only disclose my

16   involvement in Lehman and in Rescap so I wouldn't be able to

17   disclose my involvement in the other three.

18   Q    Well, tell the -- how -- could you explain to the Court

19   -- so when you were explaining to the Court your basis for

20   the difficulty in obtaining loan files, you were relying on

21   these three matters that I'm not permitted to know the name

22   of?

23   A    I was, yes.

24   Q    Okay.  And how many loans have you been unable to

25   obtain within the one that started two years ago?  What's

1    the percentage?

2    A    From the best of my recollection, it is approximately

3    ten percent of -- ten percent of the loans.

4         THE COURT:  Can we -- in order for this to be at

5    all meaningful -- and I appreciate confidentiality and I'm

6    not asking you to reveal or breach your obligations, but

7    without a context this is meaningless.

8         MR. NETZER:  Exactly.  That's really the point I'm

9    making, Your Honor.

10        THE COURT:  So my point is that unless the witness

11   can give me some idea of the dimension --

12        THE WITNESS:  I can --

13        THE COURT:  Hold on, please.

14        THE WITNESS:  Oh, sorry.  I apologize.

15        THE COURT:  The number of loans, the number of

16   trusts, the underlying nature of the dispute, I have no

17   context in which to place this testimony.  I don't know if

18   it's ten percent of ten loans, ten percent of a million

19   loans.  There's quite a bit of difference.  Moreover, the

20   fact that these engagements would appear to have been taking

21   place simultaneously in the last two years.  I'm just -- I'm

22   going to need context.

23        So, Mr. Netzer, I'm not going to cut off your

24   examination.  I'm just, in the spirit of moving this along,

25   making that observation.

Page 324

1          So, Mr. Munno?

2          MR. MUNNO:  The parameters that you outlined, I

3    believe this witness can testify to.  He can tell you the

4    number of loans and that kind of thing.

5          THE COURT:  Okay.  Well, I'm going to --

6          MR. NETZER:  And will my --

7          THE COURT:  I'm going to --

8        MR. NETZER:  And will my cross examination be similarly

9    unfettered?

10          THE COURT:  Okay.  Well, I'm going to leave it to

11    Mr. Netzer.  I just wanted to point out --

12          MR. NETZER:  All right.

13          THE COURT:  -- that I -- you know.

14          MR. NETZER:  Thank you, Your Honor.  So, actually,

15    I think I'll just leave it there.

16    BY MR. NETZER:

17    Q    But I do want to ask you something else.  Have you

18    rendered an opinion for the Court about why -- you've heard

19    some testimony and commentary, anyway, about 50- or 60,000

20    loan files being obtained from Aurora, correct?

21    A    That's correct.  I've heard that testimony.

22    Q    Okay.  So --

23          MR. MUNNO:  We didn't get testimony about 50,000

24    being -- we heard an assumption that 50,000 already --

25          MR. NETZER:  Fair enough.

Page 325

1           THE COURT:  Yes.

2           MR. MUNNO:  The witnesses just testified --

3           THE COURT:  Okay.

4           MR. MUNNO:  -- they didn't know anything about it.

5           THE COURT:  Okay.  Fair enough.

6           MR. NETZER:  And let me -- I'll go back.  Fair

7     enough.

8     BY MR. NETZER:

9     Q    You've heard about that assumption, correct?

10    A    That's correct.

11    Q    Okay.  And do you know whether or not 50,000 loan files

12    have been obtained from Aurora?

13    A    I don't know one way or the other.

14    Q    Okay.  And when you talked about how long it would take

15    to obtain the loan files and you took that -- I believe the

16    -- you added some time to the 18 to 20 months it involved in

17    survey, correct?  That's how you generated the three years

18    to get the loan files?

19    A    That's correct.

20    Q    Okay.  And I take it that as part of that analysis, it

21    certainly wasn't part of your analysis that as we sit here

22    today Lehman had 50,000 loan files already, was it?

23    A    It certainly wasn't part of my analysis that Lehman had

24    50,000 loan files ready to review today.

25    Q    So it was part of your analysis that it had 50,000 loan

08-13555-scc mg Doc 53621-6 Filed 08/30/16 Entered 08/30/16 20:89:16 Exhibit F
08-13555-scc mg Doc 49900-1 Filed 05/02/19 Entered 03/20/19 12:43:16 Main Document
Pg 326 of 374

1   files.  Is that what you're saying?

2           MR. MUNNO:  The witness said just the opposite just

3   now.

4           THE WITNESS:  I don't know how to answer your

5   question.  I'm sorry.

6   BY MR. NETZER:

7   Q   Well, let me put it this way.  Do you have -- have you

8   done an analysis and rendered an opinion?  Has the client

9   asked you to do an analysis why the client -- why your --

10  why the trustees don't have those 50- -- don't have 50,000

11  loans already obtained from Aurora?

12  A   No.

13  Q   Okay.  So you're not offering this Court any expert

14  opinion about that.

15  A   No, I am not.

16  Q   In fact, what did your clients tell you about why they

17  didn't obtain the 50,000 loans from Aurora.

18          MR. MUNNO:  We're using an assumption in a

19  question.  I object to it.  We don't know anything about

20  these so-called 50,000 loans so how --

21          THE COURT:  But Mr. Munno, your clients don't --

22  the trustees don't have 50,000 loan files from Aurora,

23  right?

24          MR. MUNNO:  We don't have 50,000 loan files from

25  Aurora.

Page 327

1          THE COURT:  Okay.

2          MR. MUNNO:  And we don't know that Aurora has

3    50,000 loan files to give --

4          THE COURT:  Okay.  Well --

5          MR. MUNNO:  -- to our clients.

6          THE COURT:  -- I might point out to you that it's

7    been represented to me, in a pleading filed in this Court

8    pursuant to Rule 11, not to mention applicable bankruptcy

9    statutes including the bankruptcy crime statues, that, in

10   fact, Aurora has 50,000 loans ready to go.  Okay.

11         MR. MUNNO:  And why hasn't that been provided to

12   us?  If they have them, why didn't they say here?

13         THE COURT:  Well, isn't that an interesting

14   question.  Why don't you let Mr. Netzer answer -- ask the

15   witness that question?

16         MR. MUNNO:  No, my question is why hasn't Lehman

17   said here are 50,000, come get them?

18         THE COURT:  Mr. Munno, have a seat.

19   BY MR. NETZER:

20   Q    You have identified for the Court various impediments

21   to getting complete loan files, haven't you?

22   A    Yes, I have.

23   Q    I take it that one of the -- I didn't even mention this

24   one, but one impediment to getting loan files is if you

25   don't ask for them.  That must be an impediment, isn't it?

Page 328

```
 1    A    I would assume yes.

 2    Q    So what is your analysis of the impact of your client's

 3    failure since 2008 to ask Aurora for loan files on the

 4    timing concerns you've expressed in your report.

 5    A    I haven't done that analysis one way or another.

 6              MR. NETZER:  No further questions.

 7              THE COURT:  Okay.

 8    REDIRECT EXAMINATION

 9    BY MR. MUNNO:

10    Q    At the beginning of Mr. Netzer's cross examination --

11              THE COURT:  For the record, Mr. Munno --

12              MR. MUNNO:  Oh, I beg your pardon.  I'm sorry.

13              THE COURT:  -- for the benefit of the reporter

14    unless he hasn't heard me yet.

15              MR. MUNNO:  William Munno of Seward and Kissel for

16    Law Debenture Trust Company of New York as separate trustee.

17              THE COURT:  Thank you.

18    BY MR. MUNNO:

19    Q    At the beginning of Mr. Netzer's cross examination, he

20    asked you that could all of steps zero through four be done

21    within a year.  Do you remember him asking you that

22    question?

23    A    THE WITNESS:  Yes.

24    Q    Okay.

25              MR. NETZER:  No, Your Honor, I didn't.  Objection.
```

```
 1              THE WITNESS:  Or something like that.  I remember

 2      --

 3              THE COURT:  I have to say, given the lateness of

 4      the hour, I don't recall, but --

 5              MR. NETZER:  I will represent to the Court that I

 6      asked no such question.

 7              THE COURT:  Okay.

 8              THE WITNESS:  Okay.

 9      BY MR. MUNNO:

10      Q    Is it your testimony that, and your report, that you

11      believe it would take more than one year to get all of the

12      loan files?

13      A    Yes.

14      Q    Is it your testimony and your belief that all of the

15      loan files probably would not be obtainable?

16      A    That is my testimony, yes.

17      Q    Now, the Judge was asking for context a moment ago

18      about these three matters.  Could you give us each matter --

19      the parameters of the number of loans that are at issue on

20      the put back?

21      A    Yeah.  So in the --

22              THE COURT:  Can I -- before you do that, can I ask

23      in each case, have you been retained by a trustee or a

24      similar party acting in a similar role to the trustee under

25      a RMBS security?
```

1        THE WITNESS:  Yes.

2        THE COURT:  Okay.

3        THE WITNESS:  In all three.

4        THE COURT:  Okay.  Go ahead.

5        THE WITNESS:  So the number of loan files and the

6    one that began about two years ago involved a 4,000 loan

7    request and that was a sample of 4,000 loans that I

8    constructed and participated in the request of.  The one

9    that began about a year ago involves a 400 loan request and

10   then the one that began about six months ago involves about

11   1200 loans.

12   BY MR. MUNNO

13   Q    Now, with respect to the loans that you are getting

14   from the 4,000 loan sample, can you estimate for us how long

15   it took to get those loans?

16   A    It took years to get those loans, multiple years but I

17   will be very forthright on this that part of the reason it

18   took years is that people weren't trying for all of that

19   time to push it through.  But, that being said, there were

20   still significant issues in doing that expeditiously.

21   Q    Okay.  And the project that you started on about a year

22   ago with the 400 loans, have all of those loan files been

23   obtained.

24   A    No, not all of the loan files were obtained.

25   Q    And has there been activity to try to get those 400

1  loan files?

2  A    There was but there are just some number that are not

3  going to be obtained.

4  Q    And the project that started six months ago, the 1200

5  loan files, have they all been obtained?

6  A    They were not all obtained.

7  Q    Do you have any reason to understand that in connection

8  with these projects that the people weren't trying hard,

9  except for the point that you told us about on the first

10 one, to get these loan files.

11         THE COURT:  Mr. Netzer?

12         MR. NETZER:  Objection.  Leading.

13         THE COURT:  Ask a direct question to that.

14         MR. MUNNO:  I'll ask.  Okay.

15 BY MR. MUNNO:

16 Q    With respect to the project that started about a year

17 ago with the 400 loans, were people trying to get the loan

18 files?

19 A    People were working hard to get the loan files.

20 Q    And the project that started six months ago, were

21 people trying to get the loan files?

22 A    People were trying to get the loan files and working

23 diligently.

24         MR. MUNNO:  No further questions.

25         THE COURT:  Your colleagues are handing you a piece

1    of paper.

2           MR. MUNNO:  Oh, wait a second.  I have a question.

3    BY MR. MUNNO:

4    Q    Okay.  Without violating the confidentially in Rescap,

5    can you give us the parameters of the number of loans that

6    were involved there?

7    A    Well, that wouldn't be violating the confidentiality is

8    probably -- it's in the record.

9    Q    What number is it?

10   A    It was a review of about 6500 loan files.

11          MR. NETZER:  This is Rescap?

12          THE COURT:  This is Rescap.

13          MR. NETZER:  That's what I wasn't allowed to

14   examine him about in his deposition.

15          THE COURT:  That's correct.  So --

16          MR. PEDONE:  Yes and No, Your Honor.  May I address

17   this point, page 35 of the deposition?

18          THE COURT:  Can I just tell you something that as a

19   legal matter, Rescap is irrelevant.

20          MR. MUNNO:  Well, we're only asking about Rescap

21   and bringing it to your attention, Your Honor --

22          THE COURT:  Then he should have been able to

23   question about Rescap in the deposition.

24          MR. MUNNO:  I think he --

25          MR. PEDONE:  Yes, Your Honor, he could have but if

1   you read page 35 of the question, it came up in the context

2   of the witness asserted a mediation privilege.  I can't talk

3   about what happened in the mediation.

4           THE COURT:  Okay.

5           MR. PEDONE:  Rescap has been discussed on 35 or so

6   separate occasions in the deposition.  The examiner -- the

7   witness asked for a moment to get guidance with regard to

8   what he could discuss in the mediation and the examiner said

9   I will move on and he moved on.  He never went back to the

10  question of mediation (indiscernible).

11          THE COURT:  Okay.  Mr. Netzer, this is not worth

12  fighting over.  Let's just have an answer to the question,

13  all right?

14  BY MR. MUNNO:

15  Q    So how many loans were there?

16  A    It was about -- a loan review of about 6500 loans.

17  Q    And how long did that take?

18  A    Over a year.

19          MR. MUNNO:  No further questions.

20          THE COURT:  Okay.  Anything more?

21          MR. NETZER:  There's one thing and I admit I made a

22  mistake.  I could offer that there is one piece of testimony

23  from his deposition that I could offer just as deposition

24  testimony, but I wanted to ask the witness that one question

25  and in the shuffling of my papers, I didn't get to it.

Page 334

```
 1          THE COURT:  Okay.

 2   RECROSS-EXAMINATION

 3   BY MR. NETZER:

 4   Q    Dr. Parekh, it's your view, is it not, and in fact you

 5   testified that extrapolating from one Lehman loan, one of

 6   the loans in this case to draw a conclusion about any

 7   others, that you would be worried -- you know, by

 8   generalizing from one loan to the next, you would be

 9   potentially ignoring the totality of what might create a

10   breach and so two loans that have the same breach might not

11   both result in the same claim.  You expressed that concern

12   in your deposition, didn't you?

13   A    I did.

14   Q    And you were telling the truth when you expressed it.

15   A    Yes.

16   Q    Thank you.

17          THE COURT:  Okay.  Dr. Parekh, thank you very much.

18   You're excused.

19          THE WITNESS:  Thank you.

20          THE COURT:  Okay.  Mr. Cosenza?

21          MR. COSENZA:  Permission to move to closing, Your

22   Honor.

23          THE COURT:  Sure.  Am I going to -- how many of you

24   folks am I going to hear from?

25          MR. MUNNO:  Well, I didn't think we were going to
```

1   have closing given the lateness of the hour, but --

2           THE COURT:  Well, what --

3           MR. MUNNO:  -- I don't (indiscernible).

4           THE COURT:  What would be your proposal about what

5   we do next?  I'd rather like to wrap this up.

6           MR. MUNNO:  I think we ought to, you know, close

7   the record.  You have our papers.  You've heard our

8   arguments.

9           THE COURT:  No.  That's not the way it's going to

10  happen.

11          MR. MUNNO:  Okay.  That's fine.  Then we'll do --

12          THE COURT:  All right.  I mean, I'd like to hear

13  from each of you what you think I should do now that you've

14  had the benefit of being here all day and listening to what

15  all of the witnesses have to say.

16          MR. PEDONE:  Your Honor, in that connection with --

17          THE COURT:  Yes.  Could you identify yourself for

18  the reporter, please?

19          MR. PEDONE:  Richard Pedone with Nixon Peabody for

20  Deutsche Bank --

21          THE COURT:  Thank you.

22          MR. PEDONE:  -- as indentured trustee.

23          THE COURT:  Thank you.  Yes, Mr. Pedone?

24          MR. PEDONE:  The trustees have actually been having

25  some discussion among ourselves on exactly that question

 1   but --

 2              THE COURT:  Yes.

 3              MR. PEDONE:  -- we haven't had a chance to get all

 4   of us in one place to caucus.  So if we could have five

 5   minutes to discuss before we make a proposal.

 6              THE COURT:  Okay.  I -- you know, this is -- I am

 7   not about to enter into a negotiation that -- your making a

 8   proposal sounds as if you're going to make a proposal to me.

 9              MR. PEDONE:  Thank you.

10              THE COURT:  So if what you're saying is you'd like

11   to have an opportunity to confer with counsel for Lehman and

12   Mr. Cantor, who I see is still here, I'm happy to do that,

13   but I'm not going to engage in a negotiation.

14              MR. PEDONE:  Your Honor, I was actually addressing

15   your question you'd like to hear from each of us what we

16   think we could do.  Before I can speak for the entire

17   group --

18              THE COURT:  Okay.  I guess maybe --

19         MR. PEDONE:  So only one of us speaks I need a --

20              THE COURT:  Let me say it this way.  What you --

21   what your position is now that we've come to the end of the

22   day.

23              MR. PEDONE:  Yes.

24              THE COURT:  Okay.

25              MR. PEDONE:  I need to confer with all trustees

 1   so --

 2            THE COURT:  That's fair.

 3            MR. PEDONE:  -- I can speak with one voice.

 4            THE COURT:  That's fair.  So why don't we take --

 5   why don't we take five minutes and then we're going to move

 6   forward, is that okay?

 7            MR. PEDONE:  Yes, thank you.

 8            THE COURT:  All right.  Anyone who wants to be

 9   excused at this late hour is welcome to do so.  I will not

10   take offense.  You're welcome to stay also.  All right.

11        (Recess taken at 6:37 p.m.; resume at 6:46 p.m.)

12            THE COURT:  All right.

13            MR. COSENZA:  Your Honor, can I start --

14            THE COURT:  Sure.

15            MR. COSENZA:  -- with the proposal?  Thank you for

16   spending so much time with us --

17            THE COURT:  Sure.

18            MR. COSENZA:  -- today, Your Honor.  It's greatly

19   appreciated.  This is a matter that's --

20            THE COURT:  It's a head start on the 20 years I'm

21   going to spend, right?

22        (Laughter)

23            MR. COSENZA:  This matter is of great importance

24   to the estate and to the creditors, so this is really

25   critical that we try to get a resolution today and that we

08-13555-scc mg Doc 53621 Filed 08/30/16 Entered 08/30/16 20:48:16 Main Exhibit F
08-13555-scc mg Doc 49907 Filed 05/02/15 Entered 05/20/15 19:30:18 Main Document
Pg 3389 of 3747

Page 338

1  get the ball moving.  And I think we heard from all the

2  experts today that there's really an effort and that there

3  really could be a lot of activity taking in the near term.

4  We have made the representation to you that 50,000 loan

5  files are available electronically.  We'll make the

6  representation today that we should start the protocol

7  moving forward, have those files delivered to the trustees,

8  and it get to them by Friday to start the process moving.

9        THE COURT:  Well let me try to understand,

10  assuming that, as I think under any scenario, what's going

11  to happen is that loan files are going to start to move.

12  But let me understand what you think is going to happen at

13  the next juncture.  So the loan files will become available

14  and then it's your position that the trustees will then have

15  to do a review?

16        MR. COSENZA:  Correct.

17        THE COURT:  And they will have to, on a loan by

18  loan basis, make a claim?

19        MR. COSENZA:  Correct, Your Honor.  One other

20  thing I want to clarify for the protocol because you did

21  raise your concern that -- because we were trying our best

22  here to get to the best result in terms of what the real

23  numbers should be.  You mentioned that -- and protocol

24  mentions that the 43 items need to be submitted to Lehman

25  with the claim.  Sitting here, I'm doing this on the fly.  I

Page 339

1   think that's something that could be modified.  I think

2   instead of having all 43 items, if we can just get enough

3   documentation from the trustees when they prove up their

4   claim that sufficient -- that is sufficient to prove and

5   just following the language of the contract, that there was

6   a breach and that it was material and adverse to the value

7   of the loan.

8           So, basically, we're not looking for all 43 items,

9   but we're looking for enough information to sort of support

10  their claim that the breach actually caused, you know, the

11  loss at issue.  So it'll be more of, you know, a gut check

12  for us instead of putting a rigid requirement that they have

13  to provide all 43 items.  So that's another view.

14          And our real -- overarching approach, Your Honor,

15  is we'll get the 50,000 loan files on Friday.  We will

16  support the trustees in every application they will make to

17  try to get the documentation here.  I think if we find out

18  in a month or so that there are some services that are not

19  moving quickly when the trustees start making their requests

20  for files on, hopefully, the next day or two, we will

21  support them in trying to do that.  We will join in

22  applications to the Court.

23          I want to hand up a document to you, and I'll hand

24  this to the trustees.  The trustees have a clear contractual

25  right to get the documents here.

1        THE COURT:  Right, I mean, I think that's one

2     thing we didn't talk about today was none of the testimony,

3     you know, took in the account the ability of the Court to

4     assist in obtaining the documents.  I think it's one thing

5     for, you know, parties in the run up to a litigation make

6     some phone calls and people respond with more or less

7     urgency.  I think it's another thing when the Court gets

8     involved and they might pay a little more attention to the

9     request.  So that's something that we were not really able

10    to adjust for in any of the witnesses' testimony.

11        MR. COSENZA:  I agree, Your Honor.  And a key

12    driver here for the impediments that we heard for the

13    trustees was actually getting the loan files.  I think we

14    even heard Dr. Parekh say that assuming they got the loan

15    files in a short period of time, we could get this protocol

16    in the time contemplated by Lehman.

17        THE COURT:  Let me take you back the other way,

18    though, because we really haven't had extensive argument on

19    the issue of the use of sampling.  So at the outset today,

20    or noon maybe it was, I said we're not going to do

21    estimation, but that that wasn't necessarily going to

22    preclude the use by the trustees of sampling at some point

23    down the road.  So I expect that the trustees are now going

24    to tell me, first of all, don't do the protocol or don't do

25    pieces of the protocol.  But they're also going to again

1   urge, either now or later, that I will be a complete outlier

2   if I don't employ sampling.  So what do we do?

3          MR. COSENZA:  Your Honor, just one point on

4   sampling just on the factual issue regarding sampling.  We

5   heard testimony from Dr. Parekh (indiscernible) a little bit

6   troubling about sampling.  He made a comment that -- he said

7   in terms of training loan reviewers, in his testimony, that

8   they required less training when they were doing proposed

9   estimation or sampling than when you actually do a loan by

10  loan level review.  And it's important here, we're trying to

11  get to the right number for the estate.  And it tells you in

12  the industry when you're doing an estimation or sampling,

13  there's not the same level of diligence performed by the

14  reviewers in terms of trying to get through the files and

15  actually finding the loss number and providing claims.

16  That's just one example he just commented on.

17          I also want to note there were several concessions

18  and Mr. Netzer went through some of those with -- or at

19  least one of those with Dr. Parekh.  And Mr. Aronoff also

20  testified in the same way.  You really -- the only way to

21  get to the right number is to do a loan by loan level

22  review.  I understand there's some difficulties with going

23  through the loan files.  But in order to try to get to the

24  best number, we have to start the review process right now,

25  see where that goes, try to get some real deadlines.  And I

 1    think Mr. Aronoff said, you know, it's hard to gauge how

 2    long something will take unless you have a deadline.  So

 3    it's really important that we have a deadline here, and we

 4    move forward.  And we're trying our best here to move --

 5             THE COURT:  But the trustees argue, I think

 6    persuasively, that, you know, we don't know what we're going

 7    to find once those files start rolling out.  And that the

 8    way at least it's been styled now, they stand to lose the

 9    ability to assert claims when they hit a certain time

10    deadline.  And that, frankly, seems unfair, that there's not

11    the ability to have a second look, depending on the facts

12    and circumstances --

13             MR. COSENZA:  Your Honor --

14             THE COURT:  -- because we don't know.  I'm highly

15    confident, highly confident it's not going to take three

16    years to get the loan files.  It's just not.  It's just not.

17             MR. COSENZA:  We agree with that, Your Honor.  I

18    would also note, I think there's a process here and, you

19    know, we spent all day going through the background and now

20    you're very familiar with the issues.  If there is some

21    snafu with the protocol in a month or two, and really

22    everyone's trying to move forward with best efforts, and

23    there's a real deadline that we're moving toward, and -- I

24    think people are going to be reluctant to come back to you

25    if they're not operating in the best and good faith.  So,

1    you know, in some ways putting a deadline in place will get

2    people moving and get us all going forward.  And if there

3    really is some unforeseen snafu or some issue that comes up,

4    the parties always have the right to come back to you.

5            THE COURT:  Do you think that, and maybe Mr. Munno

6    is the right person to ask -- do you think that one of the

7    impediments to moving forward with the protocol is that the

8    cost of the review -- if I'm remembering the way it works

9    correctly -- the cost to the estate of the step one is zero.

10   The entire cost of that step is on the trustees, which you

11   would say, well, that's what they have to do in order to

12   make a claim --

13           MR. COSENZA:  Correct.

14           THE COURT:  -- right?

15           MR. COSENZA:  Correct, Your Honor.

16           THE COURT:  I mean, if this were a smaller amount,

17   they would have to review the loan files and determine the

18   breaches and determine whether there are claims associated

19   with the breaches.  So I assume that that's the estate's

20   position is that that's not your fault.  That's just the way

21   the burden of proof crumbles, so to speak.

22           MR. COSENZA:  That's correct, Your Honor.  That is

23   our view.  I'll ask Mr. Munno if he has a different view.

24           MR. MUNNO:  Well, I do have a different view

25   because I don't think you can just take it step by step as

1    to who has what cost at what step.  What we're most

2    concerned with is that there is a lot of cost, and in the

3    first step, we have to re-underwrite those loans.  That's a

4    very expensive process.

5                THE COURT:  Okay, well, what -- were you done,

6    Mr. Cosenza?

7                MR. COSENZA:  Yes, do you want me -- I just want

8    to --

9                THE COURT:  Okay.  Yeah --

10               MR. MUNNO:  Okay, so --

11               MR. MUNNO:  -- so -- let me see if I can't --

12               MR. O'DONNELL:  Your Honor?

13               THE COURT:  Hold on one second.

14               MR. MUNNO:  Sorry.

15               MR. O'DONNELL:  Your Honor, Dennis O'Donnell,

16   Milbank Tweed on --

17               THE COURT:  Yes.

18               MR. O'DONNELL:  -- behalf of the Lehman litigation

19   subcommittee.  If I could briefly speak?

20               THE COURT:  Briefly, yes.

21               MR. O'DONNELL:  We filed a statement in opposition

22   to the trustee's motion in support of the cross-motion.  Out

23   of concerns on behalf of the Lehman unsecured creditors, we

24   continue to exist for certain purposes and this is one of

25   these purposes.

Page 345

```
 1           This is -- you know, these are concerns -- these

 2     are not new concerns.  The committee was very much involved

 3     in the whole history here in terms of the original objection

 4     to the trustees' claims in the reserve motion and reached

 5     the same conclusions then that it's reaching now, which is

 6     that the protocol that the debtors are proposing is the only

 7     way to fully protect the rights of the unsecured creditors

 8     here for at least two reasons.  One of which is that to do

 9     otherwise would be to acknowledge that the trustees claims

10     are somehow different than all other unsecured claims, that

11     they are somehow -- if we were to adopt their sampling

12     methodology here, we'd be allowing them to avoid the burden

13     of proof that thousands of other Lehman creditors have had

14     to satisfy throughout this case and continue to have to

15     satisfy on a, you know, weekly or biweekly --

16           THE COURT:  But they -- and I don't know if you've

17     drilled down in a lot of detail in the RMBS cases that are

18     out there, but --

19           MR. O'DONNELL:  Right.

20           THE COURT:  -- the cases talk in terms of the

21     election by the plaintiffs, the election by the plaintiffs

22     to carry their burden of proof by using sampling.

23           MR. O'DONNELL:  Right.

24           THE COURT:  Okay?  Without prejudice to the right

25     of the defendants to defend, right --
```

```
 1              MR. O'DONNELL:  Right.

 2              THE COURT:  -- under the rules of evidence, under

 3      Daubert, under whatever they have to say that methodology,

 4      that's not right.  Putting aside the issue of whether or not

 5      proof by sampling works in a pure repurchase case, which

 6      this is.  It's not a monoline case.

 7              MR. O'DONNELL:  Right.

 8              THE COURT:  It's not a fraud case, right?

 9              MR. O'DONNELL:  Right.

10              THE COURT:  It's a pure repurchase case.

11              MR. O'DONNELL:  Right.

12              THE COURT:  Okay, putting aside that issue.  So

13      that's kind of like the elephant in the room, I feel,

14      whether or not --

15              MR. O'DONNELL:  Agreed.

16              THE COURT:  -- ultimately there's an ability, or

17      there should be an ability to let them take their shot by

18      sampling and they may win or they may lose.

19              MR. O'DONNELL:  Your Honor, and that's between

20      plaintiff and defendant.  But from the perspective of the

21      creditors who are standing by or the potential beneficiaries

22      here, there seems to be --

23              THE COURT:  But it's the same difference, though,

24      because the estate speaks for all of the --

25              MR. O'DONNELL:  Agreed.
```

1          THE COURT:  -- unsecured creditors.

2          MR. O'DONNELL:  Agreed and --

3          THE COURT:  Right?  And the trustees, I think,

4    it's a new trough.  I mean, it's something that we're aware

5    of, but I don't think that they should be in a worse

6    position because their counterparty is a fiduciary for the

7    creditors of this estate.  I think that it doesn't have a

8    bearing on an ultimate determination of whether or not they

9    carry their burden of proof --

10         MR. O'DONNELL:  Agreed.

11         THE COURT:  -- whether they carry their burden of

12   proof.

13         MR. O'DONNELL:  Right.  But just in terms of

14   fundamental fairness, they would -- you would be

15   acknowledging that they are different and we wanted to make

16   that point.

17         Now the second issue was just in terms of assets

18   of the estate here.  The estate's ability to pursue

19   downstream claims against the original -- the downstream

20   originators.  This is a significant asset of the estate

21   which any other solution other than the protocol, which

22   would do it on a loan by loan basis, would result in the

23   estate potentially losing.  And that's an issue of concern

24   to the creditors as well.

25         THE COURT:  Okay.

Page 348

```
 1           MR. O'DONNELL:  I think you've already
 2   acknowledged that Lehman has a fiduciary obligation, a
 3   fiduciary motive here and we're here to say the same thing,
 4   that the interest of the creditors, not just the plaintiffs
 5   and defendants here need to be taken into account.
 6           THE COURT:  Okay, thank you.
 7           MR. O'DONNELL:  Thank you, Your Honor.
 8           MR. MUNNO:  I, too, would like to thank the Court
 9   on behalf of the RMBS trustees and their counsel for all the
10   time they've spent on this today with us.  We do think that
11   this proposed protocol is unworkable, too costly, too time
12   consuming, and utterly untested.
13           THE COURT:  Mr. Munno, it's not going to take 27
14   years.
15           MR. MUNNO:  Let's say it doesn't --
16           THE COURT:  It's not going to take 27 years.
17           MR. MUNNO:  Let's say it takes five years, is --
18           THE COURT:  Let's say it takes five years.
19           MR. MUNNO:  Isn't five years too long?
20           THE COURT:  Well, if you had started two years
21   ago, then it would only be taking three years.  If when you
22   hired Dr. Parekh and you undertook the process of going by
23   the sampling route, you had come to this building and sought
24   Judge Peck's advice, he would have given it to you.  He
25   would have given you a determination as to whether or not he
```

1   thought sampling was a good idea or not.  He would have

2   given you his determination, for example, like Judge Cote

3   did in the FHFA case that the plaintiffs may elect to use

4   sampling, but the trustees are going to produce a million

5   loan files so that the other side has the ability, among

6   other things, to test the sample.  That's what Judge Coat

7   did in that case, and I predict in my rearview mirror, that

8   that's what Judge Peck might have done in this case.  But

9   you elected not to do that.  You elected to go and engage in

10   this process to construct the sample, which is not on the

11   table today what I think of the sample.

12          I've given you some indications that I believe

13   taking the breach rate that's been identifying and

14   translating that 100 percent into claims, I have some

15   problems with that.  I also have some problems with the way

16   the sample was constructed, but that's not before me today.

17          My point is simply that you want me to say to

18   Lehman, shame on you for not having produced the loan files.

19   And I said eight hours ago that I didn't want to get into,

20   you know, a trivial argument about who could've done what.

21   But it's clear to me that had the trustees, who now have

22   come to Court and said do sampling, that's what everybody

23   else does, you could've had the benefit of Judge Peck's

24   knowledge on that.  Moreover, for the past two years and

25   however many months it is, you could've had the benefit of,

1   perhaps, some preliminary rulings from the Court on what

2   constitutes a breach that translates into a claim or not.  I

3   can think of, off the top of my head, six different ways you

4   might do that.

5          All of these are different trusts.  They were

6   issued by -- some were originated by Aurora.  Some were

7   purchased.  There's so many different ways to sort these,

8   and I know you're going to tell me that that's exactly what

9   the sample was designed to replicate.  But you might be able

10  to lop off, so to speak, huge categories of claims based on

11  sorting them out.  And you might've been able to do that on

12  a rolling basis.

13         And while I'm talking about this particular aspect

14  of it, the witnesses that spoke on behalf of the trustees

15  were all ready to talk about things that might slow down the

16  process, but it really didn't give a lot of voice to things

17  that might speed up the process, like the ability to come to

18  Court when you've identified something that you're at

19  (indiscernible) with the estate about, and I'll give you a

20  determination.  It won't be an advisory opinion at that

21  point because somehow we could have issue joined with

22  respect to a certain subset.

23         But the answer -- even in the cases where sampling

24  is approved on a preliminary basis or at least not

25  discarded, the files have to move.  They're entitled to

1   discovery.  The files have to move.  And what I said at the

2   very beginning today, and I stand by it, is that I think

3   there is something fundamentally not appropriate about the

4   four trustees coming into Court together and pointing to the

5   209,000 loans and saying, look, that's a really big number.

6   It's impractical.  If there were 200 trustees, we wouldn't

7   be having this conversation.  If this process had started

8   two or three years ago, we wouldn't be having this

9   conversation.  We would be two years down the road.

10         So I'm not -- to say we're going to have 20

11   reviewers, or 40 reviewers, that's too small a number, nor

12   are we going to have 400 reviewers.  We're not going to do

13   that.  We're just not going to do that.  But we're not going

14   to cut off and shortcut a claims process that, at least in

15   my view at this point, the governing documents require and

16   is not precluded by anything, with all due respect, to those

17   Courts that sit much higher level than I do in the pecking

18   order of the federal judiciary have said they're going to

19   use sampling.  I've read the cases.  I've read them more

20   times than I care to think about, and I'm not convinced.

21         MR. MUNNO:  Well, I'd like to convince you that

22   this protocol is not workable.  And I think you've heard

23   some of the reasons why it's not workable.  It's untested

24   and it's cumbersome in that we have all of these --

25         THE COURT:  What does it mean to say a protocol is

1      untested?  If you look at each step --

2              MR. MUNNO:  It means nobody has done it before

3      successfully.

4              THE COURT:  But saying that no one has done it

5      before, this is not -- it's not a phase three drug trial.

6      It's a series of steps that trained people will take to get

7      to claim numbers.  There will be underwriters.  There will

8      be lawyers.  Dr. Parekh, himself, testified that before he

9      began his work at Duff & Phelps, he hadn't done this before.

10     So that is an admission that you can train smart people to

11     do this.

12             MR. MUNNO:  We don't deny that you can't train

13     smart people to do it.  We don't deny that --

14             THE COURT:  So let's find a bunch of smart people

15     to do this.

16             MR. MUNNO:  That's easier said than done.  But let

17     me just point out a few things about this protocol that give

18     us a lot more than heartburn.  And first of all, the

19     protocol proposes that a claim has to be presented within a

20     period of time or be cut off.  There should be no cutoff in

21     any kind of a protocol.

22             THE COURT:  Okay, I've said that already today

23     that I'm not going to, I'll say arbitrarily, say that at a

24     certain point in time a claim gets automatically cut off.

25             MR. MUNNO:  And another area that is a big concern

 1    is that under the protocol, the way it's supposed to work,

 2    we have to get files back but there's no indication as to

 3    when we will hear back from Lehman as to whether they think

 4    our breach is correct or not correct.  There's no timeline

 5    for them to respond.  And I'm not sure why we need a

 6    facilitator because I just think that will enlarge the

 7    expense.  And I get very concerned when I see $110 million

 8    price tag.  That's $50 million to the estate.  That seems

 9    pretty pricey to me.

10                THE COURT:  Well, how would you think that it

11    would go?

12                MR. MUNNO:  Well, you know, the way it normally

13    goes, as has been testified to is when -- you present the

14    claim, the other side reviews it.  They say yes or they say

15    no.  And then if they say no --

16                THE COURT:  But you haven't done that.

17                MR. MUNNO:  Well, but let's be clear, we do have,

18    and Lehman has in hand and has for two months all of the

19    details and all of the backup on 2,612 loans that were re-

20    underwritten, which we believe have a material breach.  You

21    know, if you wanted to test -- not this protocol --

22                THE COURT:  You're talking about in the -- from

23    the sample?

24                MR. MUNNO:  Yes, they're from the sample, but

25    they're just loans.  Forget about that they're from the

```
 1    sample.

 2              THE COURT:  I understand.  But we're in the

 3    middle --

 4              MR. MUNNO:  But you could take those --

 5              THE COURT:  Okay, but we're in the middle of

 6    litigating right now --

 7              MR. MUNNO:  Well, I understand that.

 8              THE COURT:  -- at least that we're trying to get

 9    out of the starting gate.  So --

10              MR. MUNNO:  But the starting gate here, we say,

11    should be sampling in one form or another, whether it's some

12    other sample, a proper sample, they could agree on a sample.

13    If we could agree on a sample, do a sample.  That will be

14    much more efficient, much more cost-effective --

15              THE COURT:  I'm giving you a heads up.

16              MR. MUNNO:  Okay.

17              THE COURT:  I'm giving you a heads up that I have

18    serious concerns --

19              MR. MUNNO:  Okay.

20              THE COURT:  -- with the validity of the sampling

21    methodology that's been put before me.  This is not a

22    monoline case.  I think there's a difference.  I think

23    there's a difference.  If you read Judge Rakoff's decision,

24    what he has to say about causation makes it not on all fours

25    with this situation.
```

08-13555-scc-mg Doc 53621 Filed 08/30/16 Entered 08/30/16 20:48:16 Main Document
08-13555-scc-mg Doc 49907 Filed 06/02/15 Entered 06/02/15 13:48:16 Main Exhibit F
Pg 359 of 374
Pg 355 of 374

1          Now I know people have very broad brush said there

2     are other cases out there involving both monolines and

3     repurchase obligations.  My reading of the cases, I'm

4     looking at securities' fraud.  I'm looking at mostly

5     monolines.  And I am not looking at anybody who has had the

6     exact language we have in the governing agreements here,

7     which I know this morning you told me they can't avail

8     themselves of.  I told you this morning I didn't really

9     understand that argument.  There are provisions in the loan

10    agreements that define a breach that has a material adverse

11    effect on the value of the mortgage loan, point one.  Point

12    two is you then have a recalculation of the repurchase

13    amount.  And I've heard nothing that addresses why it is

14    that you can go from the identification of a breach and roll

15    100 percent into a breach that has a material adverse effect

16    on the value of the mortgage loan.  There's been nothing

17    about that, nothing.

18          MR. MUNNO:  Well, that wasn't for today I didn't

19    think but we certainly could provide that.  But we do have

20    fundamental issues with this proposed protocol.  We don't

21    think you should adopt the proposed protocol, certainly not

22    in the fashion that is currently prepared.  I know that you

23    are disinclined towards sampling based on what you said.  I

24    think -- as the months go on, we'll see more and more

25    cases --

```
 1               THE COURT:  But isn't that a good point?  As the

 2     months go on, right, and certainly Dr. Parekh testified that

 3     the biggest log jam is step five.

 4               MR. MUNNO:  That is the biggest.

 5               THE COURT:  Right?

 6               MR. MUNNO:  But not the only.

 7               THE COURT:  Okay, but at various points, and if

 8     you factor in the ability to lop off large amounts of

 9     claims --

10               MR. MUNNO:  Because they're accepted.

11               THE COURT:  Either way, Mr. Munno.

12               MR. MUNNO:  Okay, good.  All right.

13               THE COURT:  Okay?

14               MR. MUNNO:  Either way, I agree.

15               THE COURT:  Either way.

16               MR. MUNNO:  Right, either way.

17               THE COURT:  Right?  Then we're narrowing the

18     field.  We're narrowing the field, and we might actually get

19     to a point where the parties might agree on a sampling

20     protocol.  I have no idea.  But we're not even out of the

21     starting gate yet.  So for me to say don't produce the loan

22     files, let's just go with the sample, that would be error.

23               MR. MUNNO:  Well, receiving loan files is one

24     thing.  Adopting this protocol is quite another.  And so

25     what we're saying is since you're not inclined towards
```

Page 357

1   sampling at this point, maybe at any point, this protocol

2   doesn't fit the bill for the reasons that you've heard

3   testimony on from Mr. Parekh and from Mr. Aronoff.

4           THE COURT:  Well -- so let's go through each of

5   the steps, okay?  I mean, from the outset, and putting aside

6   what the starting point is because I think that for better

7   or worse it's a little bit around the error in the case

8   whether we're starting at the 161 or some others, right?

9   We're -- we have the initial conclusion that it's going to

10  take three years to receive the loans from the servicers.  I

11  reject that.

12          MR. MUNNO:  Okay.

13          THE COURT:  Okay?  I reject that.  There's no

14  basis for me to make a finding that it's going to take three

15  years to get the loans from the servicers, okay?  So that's

16  incorrect.

17          MR. MUNNO:  Three years, how about two years, or

18  18 months, which is what it took Digital Risk and the

19  trustees to get the 5,000 loans and didn't get them all.

20          THE COURT:  Maybe, maybe not, but we don't know

21  until we get started, right?  And we don't know until we get

22  started in -- and backed up by the ability of the Court to

23  order parties to reduce documents.  So that's point number

24  one.

25          Point number two is we have 40 reviewers.  That's

08-13555-scc-mg Doc 53621 Filed 08/30/16 Entered 08/30/16 20:48:16 Main Document
08-13555-scc-mg Doc 49007 Filed 03/02/15 Entered 03/20/15 13:48:16 Main Exhibit F
Pg 358 of 374

Page 358

```
 1    a completely arbitrary number based on a conversation that

 2    Dr. Parekh had with Digital Risk.  That is a -- that is the

 3    quintessence of an arbitrary number.

 4           MR. MUNNO:  But this -- in fairness, Judge, he

 5    also testified in the other matters that he's been working

 6    on, they haven't had more than 40 reviewers --

 7           THE COURT:  But it's common sense.  It's common

 8    sense that there are -- that you could have more than 40

 9    people working on this.  If you add up the three years and

10    the 5.2 years, that's longer than it took to put a man on

11    the moon.  President Kennedy said in 1961 by the end of the

12    decade, we'll put a man on the moon.  We did.  This is not,

13    to continue the bad analogy, rocket science.  It's reviewing

14    loan files.  You can take smart college graduates and train

15    them to do it.  And you can have quality control that works

16    across more than 40 people.

17           MR. MUNNO:  We don't dispute that.

18           THE COURT:  But you put in an expert report and we

19    spent a whole day and weeks based on that, based on the

20    predicate assumption that we're going to use 40 reviewers.

21    It doesn't make sense.

22           MR. MUNNO:  Well, it makes sense in this context.

23    It makes sense based on the experience of Duff & Phelps, and

24    Jim Aronoff, and Charlie Parekh as to what they've seen done

25    and based on what Digital Risk has done.  Now could you
```

Page 359

1   throw more bodies at it?  Perhaps.  But that hasn't been our

2   experience.

3        THE COURT:  I don't care for the expression throw

4   more bodies at it, because --

5        MR. MUNNO:  Well, okay, let me --

6        THE COURT:  -- you know, you all are very

7   sophisticated.  You have come from the top flight law firms,

8   and you know that you can assemble teams of people that can

9   work together in a very coordinated, high quality fashion.

10  It frankly undercuts the credibility of the attack on the

11  protocol that my jumping off point is 40 reviewers.  I don't

12  want to belabor the point.

13       MR. PEDONE:  Your Honor, we had divided up that I

14  would present the actual trustee proposal for the mechanics.

15  I'm not sure if that thing makes sense but

16  (indiscernible) --

17       THE COURT:  Sure.

18       MR. PEDONE:  -- and that will either -- it will

19  give us your indication of whether that might work or not.

20       THE COURT:  Well, you know, I don't really want to

21  have a negotiation at 7:15 at night, but -- so what I might

22  suggest is this, we're not going to have 400 reviewers.

23  It's just not going to make -- that's as unreasonable,

24  frankly, as having 40.  We're going to have production of

25  the loan files, okay?

08-13555-scc-mg   Doc 53621-6   Filed 08/30/16   Entered 08/30/16 20:48:16   Exhibit F
08-13555-scc   Doc 49007   Filed 03/02/15   Entered 03/20/15 19:13:48:16   Main Document
Pg 360 of 374

Page 360

1           MR. PEDONE:  By that, Your Honor, do you mean

2     every single last loan file or is it possible to begin the

3     process and get through 20,000 or 30,000 and then evaluate

4     whether sampling is appropriate.  Do we really need that

5     whole expense?

6           THE COURT:  Have you read Judge Cote's decision in

7     the FHFA case?

8           MR. PEDONE:  I hear you, Your Honor.

9           THE COURT:  A million files.

10          MR. PEDONE:  Okay.

11          THE COURT:  Okay?  A million files in that case.

12    So we have -- the good news is we have a lot fewer in this

13    case.  But here's the bottom line.  I think you folks ought

14    to talk to each other and come up with something that's

15    reasonable and workable.  You can talk to each other just

16    the two sides.  If you want to include me and you don't

17    believe that that would impair my ability to adjudicate

18    anything in the case, I'm happy to try to help you.  If

19    you're uncomfortable with that and I want to do nothing to

20    impair my ability to adjudicate any and all aspects of this

21    for the next 20 years.

22        (Laughter)

23          THE COURT:  I can -- you know, we can -- I can

24    appoint a protocol mediator.  I can appoint somebody to help

25    you come to a meeting of the minds on a protocol.  That

 1   could include reserving for another day the question of how

 2   and when sampling may be used.

 3              MR. PEDONE:  Your Honor, that was -- something

 4   like that was where I was going to end.  There is one other

 5   area perhaps, too, that guidance would help.  We strongly

 6   believe, and I believe this is what actually caused far more

 7   litigation today than should have been necessary, is that a

 8   protocol should not be automatic penalty laden.  The Court

 9   is the only one that can decide if a claim finally has to be

10   disallowed.  You should manage us rigorously as you would in

11   discovery, but you can't have a protocol that tosses us

12   automatically --

13              THE COURT:  That has a drop dead date.  I agree

14   with that.

15              MR. PEDONE:  Okay, so that would be --

16              THE COURT:  At some point, that might be --

17              MR. PEDONE:  Come back?  They should tell us we

18   have to drop dead and we can explain why we haven't been

19   able to get there.

20              THE COURT:  Right.

21              MR. PEDONE:  But it can't be automatic under a set

22   of guidelines --

23              THE COURT:  I agree with that.

24              MR. PEDONE:  -- the estate imposes.  And then we

25   believe that at some point there should be a testing of the

1    process.  So six months from now after everybody does what

2    we decide upon, we should be able to come back in an orderly

3    way and say it's time to consider, again, sampling for the

4    following reasons based upon the results we've gotten to

5    because at some point, we strongly believe, and you could

6    reserve decision on this, the line between the estate

7    resources and the ability to pay the claims that we believe

8    are going to be proven or going across, and that's going to

9    bring us back here on an estimation process for what the

10   reserve has to go up on --

11            THE COURT:  Well, that gets us into a whole

12   different area with respect to the ability to seek to redo

13   the reserve amount.

14            MR. PEDONE:  That's right, and we don't need to go

15   there today, but we just need to reserve our right to go

16   there if the process gets --

17            THE COURT:  Well, you have whatever rights you

18   have.

19            MR. PEDONE:  Yeah, I understand.  And so those are

20   the two big issues that -- hear your thoughts on and we

21   believe we should go and have a period of time to speak and

22   then collectively come back to this (indiscernible) protocol

23   mediator or something like that makes sense.

24            THE COURT:  All right, Mr. Cosenza?

25            MR. PEDONE:  Thank you.

1           MR. COSENZA:  Your Honor, I actually disagree with

2     that.  We --

3           THE COURT:  Disagree with what?

4           MR. COSENZA:  With the idea of just letting us go

5     into the abyss, and talking, and spending time.  And we've

6     spent months based on the motion and application they made.

7     We spent time going through their whole sampling exercise

8     and trying to potentially hold the estate hostage for

9     distribution by trying to increase the reserve at the last

10    minute in August.  We've gone to an exercise now preparing

11    for a hearing.  We've gone through four expert witnesses

12    talking about a protocol.  And frankly, their experts didn't

13    carry their water here today and now at the last minute

14    they're like, well, okay, now we agree.  I think a protocol

15    could make some sense, maybe sampling later.  Let's just go

16    off and see if we can try to work it out.

17          THE COURT:  That's not what I -- that's not the

18    take away from this --

19          MR. COSENZA:  But that's -- I think that's what

20    they were pitching.

21          THE COURT:  No, that's not the take away.  The

22    take away is that, you know, to move the goalpost together.

23    We're not going to have -- we're not going to embark on a

24    procedure that's going to involve 419 reviewers.  That, to

25    me, is -- does not make sense.

```
 1              MR. COSENZA:  Your Honor, but I think the one

 2     point that is critical here is we do need a deadline, and we

 3     do need the process to start because even what we heard from

 4     their expert, unless there are deadlines, nothing happens,

 5     things do not move.

 6              THE COURT:  I'll give -- but I'll give you

 7     deadlines.  I mean, it's Wednesday.  You could have until --

 8     if you want, you know, you could have until Friday to try to

 9     come up to some agreement on a modified protocol to start

10     with.  The one thing that I'm clear on is that the loan

11     files are going to be produced.  They're going to be

12     produced, so the question then becomes how you're going to

13     wade into the review process with how much resources, right?

14     And then to take up the points that a number of the

15     witnesses testified to, we can begin to have facilitators,

16     negotiators, folks to help begin, but we're not going to do

17     -- we shouldn't create bottlenecks ahead of time.  So you

18     could try to agree on a modified proposal.  You can take two

19     days, or three days, or five days to do it.  If you can't

20     agree, I'll appoint somebody to help you agree.  If that

21     fails, I'll do it.

22              MR. COSENZA:  Your Honor, I think it's really

23     important at this point that we have the loan files ready to

24     go.  We started a process to try to move something -- at

25     least start something --
```

1    THE COURT:  Okay, they're not going to not accept

2    -- they're not going to block their e-mail accounts to not

3    receive the loan files.  So you can start doing that, but

4    I'm not prepared to approve the protocol as it's been

5    written and presented.  I'm not prepared to do that.  I

6    think it needs to be modified.  I think there need -- you

7    need to build in what Judge Gerber would call stop, look,

8    and listen points to figure out how you're doing, what's

9    working, what's not working.

10   So I'll ask you one more time, do you want to have

11   a period of time to sit down with them and negotiate an

12   amended protocol, or do you want me to be involved?  Do you

13   want me to appoint somebody?

14   MR. COSENZA:  Your Honor, I think given the

15   resources and today -- what happened today, I would prefer

16   if you were to -- you know, given your familiarity of the

17   issues, if you were to stay involved in trying to devise a

18   protocol here with some (indiscernible) and some deadlines

19   where the loan files can start being reviewed, and real

20   deadlines where people can start exchanging information.

21   I'm concerned that this can sort of drift off for quite some

22   time.

23   THE COURT:  I don't want it to drift off.  They

24   don't want it to drift off.

25   MR. COSENZA:  So I would like for things to start

1   moving.  I would like to caucus with my client for one

2   minute.

3           THE COURT:  Yeah, Mr. Cantor looks like he wants

4   to tell me something.

5           MR. CANTOR:  I do.

6           THE COURT:  Come on up.  Come up to the podium.

7           MR. CANTOR:  Matthew Cantor.  I said I wasn't

8   going to do this again.  Why don't we take until Friday and

9   if we can't get (indiscernible), we make a proposal to you

10  and you pick one that makes the most sense.

11          THE COURT:  Well, why don't you try to at least

12  narrow the bid and the ask, right, and to talk about these

13  potential off-ramps along the way, where -- either by coming

14  to Court or going to a third party.  You can narrow the

15  field of play.

16          MR. CANTOR:  Your Honor, I suspect the biggest

17  divide is going to be, and I've heard you, but I've been

18  living this for the last couple of years too, without a

19  deadline, which means claims go away if they haven't been

20  submitted in a timely fashion --

21          THE COURT:  Sure.

22          MR. CANTOR:  -- will result in an unending

23  process --

24          THE COURT:  Sure, I --

25          MR. CANTOR:  -- and that's one of the things --

```
 1              THE COURT:  -- I hear you.

 2              MR. CANTOR:  -- we've been willing to move on

 3    virtually everything in this process, but we need to have a

 4    deadline --

 5              THE COURT:  Okay, well why don't --

 6              MR. CANTOR:  -- that has some teeth in it.

 7              THE COURT:  You can talk to them.  Mr. Munno, you

 8    can talk to Mr. Cantor about how a -- I think he's right.

 9    You need some sort of a deadline, but it should not be

10    unfair to you.

11              MR. MUNNO:  We agree with that.

12              THE COURT:  Okay?  So that if in fact I'm wrong

13    and the loan files take much longer to be turned over then I

14    think they are going to be, you shouldn't lose your claim as

15    a result of that, as a result of something that's not your

16    fault, putting aside the he said/she said issue of what

17    could've been done two and a half years ago.  Like, it's a

18    new day.  We're starting fresh, right?  We're going to move

19    forward.  But I agree with Mr. Cantor.  We need deadlines.

20    People respond to deadlines.  And I think that that's why

21    loan files are going to move more quickly and I think that,

22    unfortunately, I think the trustees had concluded that you

23    were going to be able to go the sampling route, and you went

24    down that route for the last two years and now I've put a

25    little bit of a monkey wrench in that.
```

1          MR. COSENZA:  So in terms of going forward, I

2     mean, we do have the 2,612 loans that we say have material

3     breaches.  They have them and so we would appreciate it if

4     they could, you know, get back to us in 30 days if they

5     agree or disagree.

6          THE COURT:  At 7:25 --

7          MR. COSENZA:  No, no.  I understand, but I'm just

8     saying they have (indiscernible).

9       (Simultaneous speaking)

10          THE COURT:  -- I'm not going to have --

11          UNIDENTIFIED SPEAKER:  That's a --

12          THE COURT:  -- a little negotiation on little

13     points.  Mr. Cantor, what was the last thing that you said

14     that you wanted until Friday?

15          MR. CANTOR: We wanted until Friday to sort of try

16     to --

17          UNIDENTIFIED SPEAKER:  Why don't we see if we can

18     work it out?  We can't work it out until Friday because I

19     have a feeling -- I'm going to try my best to get it done.

20          THE COURT:  Okay.

21          UNIDENTIFIED SPEAKER:  If we don't, I think we

22     would submit something too that we think is fair.

23          THE COURT:  Okay.

24          UNIDENTIFIED SPEAKER:  And I think Mr. Munno would

25     suggest they would submit (indiscernible) you think is fair.

```
 1              THE COURT:  Okay.

 2              UNIDENTIFIED SPEAKER:  And then, why don't we

 3    leave it to you to choose which is fair.

 4              THE COURT:  And then if part of choosing involves

 5    having you come back and talk to me then I'll let you know.

 6              UNIDENTIFIED SPEAKER:  Thank you, Judge.

 7              THE COURT:  All right, now just in terms of

 8    timing, we are -- you know, we're heading into the holidays

 9    and so when would you propose that I would hear back from

10    you?  The end -- close of business on Friday?

11              MR. PEDONE:  Your Honor, that would be by close of

12    business Friday, we'll appear whether we work something out

13    and --

14              THE COURT:  Yes.

15              MR. PEDONE:  -- have until Monday to -- or Tuesday

16    to actually submit versions?

17              UNIDENTIFIED SPEAKER:  Sure.

18              THE COURT:  Sure?

19              MR. PEDONE:  I'll concentrate on resolve the

20    issues between --

21              THE COURT:  Okay, but then are you folks going

22    away for the rest of December, do -- or would you expect to

23    have a further hearing or -- other than, believe it or not,

24    having to go to jury duty on Monday --

25              (Laughter)
```

Page 370

```
 1          THE COURT:  I'd make a great juror, don't you

 2     think, as opposed to jurist?  I'm around.  So I could keep

 3     going, but I don't want to ruin anybody's holiday.

 4          (Simultaneous speaking)

 5          UNIDENTIFIED SPEAKER:  We're here next week, Your

 6     Honor.

 7          THE COURT:  All right, so why don't we say by the

 8     end -- you're going to sit down with each other and have a

 9     good faith negotiation around the modified protocol with the

10     goal of getting that done by the close of business on

11     Friday.  If you can't do that by the close of business on

12     Tuesday, December 16th, you're going to submit to me your

13     bid and ask.

14          UNIDENTIFIED SPEAKER:  That's correct, Your Honor.

15          THE COURT:  And then we'll take it from there as

16     to, you know, whether I just decided or whether I seek to

17     confer with you further.

18          (Chorus of thank you)

19          THE COURT:  All right?  All right, thank you all

20     very much for your patience and efforts today.

21          (Whereupon these proceedings were concluded at 7:28 PM)

22

23

24

25
```

```
 1                    I N D E X

 2                T E S T I M O N Y

 3

 4     DEBTOR'S

 5     WITNESSES           EXAM BY            PAGE      LINE

 6     William Alread      Mr. Cosenza        112       5

 7                         VOIR DIRE EXAM     118       21

 8                         Mr. Top            127       9

 9

10     Craig Pino          Mr. Cosenza        131       5

11                         Mr. Top            157       8

12                         Mr. Munno          177       25

13                         Mr. Stein          183       3

14

15     TRUSTEES'

16     WITNESSES           EXAM BY            PAGE      LINE

17     James Aronoff       Mr. Munno          197       5

18                         Mr. Baio           219       25

19                         Mr. Munno          256       20

20

21     Dr. Charles Parekh  Mr. Munno          260       25

22                         Mr. Netzer         301       5

23                         Mr. Munno          328       8

24                         Mr. Netzer         334       2

25
```

08-13555-scc-mg   Doc 53621-6   Filed 08/30/16   Entered 08/30/16 20:89:16   Exhibit F
08-13555-scc-mg   Doc 49007   Filed 09/02/15   Entered 09/20/15 20:13:48   Main Document
Pg 372 of 374

Page 372

```
 1                    I N D E X

 2                  E X H I B I T S

 3        DEBTOR    DESCRIPTION              ID.    EVID.

 4          1         Document               --     127

 5          2         Document               --     127

 6          3         Document               --     133

 7

 8        TRUSTEE   DESCRIPTION              ID.    EVID.

 9          1         Declaration            --     215

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 373

```
 1                        I N D E X

 2

 3                         RULINGS

 4                                                      PAGE

 5    Doc #19399 One Hundred Seventy-Third Omnibus

 6    Objection to Claims (No Liability Employee Claims)    30

 7

 8    Doc #47230 The RMBS Trustee's Motion to Strike the

 9    Expert Declaration of William Alread and Portions of

10    the Lehman Reply Brief on that Declaration          103

11

12    Doc #47294 Lehman Brothers Holdings Inc's Motion

13    in Limine to Exclude Expert Reports and Testimony

14    of Dr. Charles Parekh                                106

15

16    Doc #46078 The RMBS Trustee's Motion to (I) Increase

17    the Reserve to $12.143 Billion and (II) Estimate and

18    Allow Their Claims for Covered Loans at $12.143

19    Billion Pursuant to Section 502(c) of the Bankruptcy

20    Code                                                 107

21

22

23

24

25
```

Page 374

1    I, Dawn South, Sheila Orms, Sherri Breach, Debra McCostin

2    and Jamie Gallagher certify that the foregoing transcript is

3    a true and accurate record of the proceedings.

4    **Dawn South**    Digitally signed by Dawn South
                        DN: cn=Dawn South, o=Veritext, ou,
5    _____  email=digital@veritext.com, c=US
                        Date: 2014.12.12 15:51:58 -05'00'

6    Dawn South

7    AAERT Certified Electronic Transcriber CET**D-408

8    **Shelia G. Orms**   Digitally signed by Shelia G. Orms
                           DN: cn=Shelia G. Orms, o=Veritext, ou,
     _____     email=digital@veritext.com, c=US
                           Date: 2014.12.12 15:52:37 -05'00'

9    Sheila Orms

10
     **Sherri Breach**   Digitally signed by Sherri Breach
11                        DN: cn=Sherri Breach, o=Veritext, ou,
     _____    email=digital@veritext.com, c=US
                          Date: 2014.12.12 15:53:38 -05'00'

12
     Sherri L. Breach

13
     AAERT Certified Electronic Reporter & Transcriber CERT*D-397

14                        Digitally signed by Debra McCostlin
     **Debra McCostlin**  DN: cn=Debra McCostlin, o=Veritext,
15                        ou, email=digital1@veritext.com, c=US
     _____    Date: 2014.12.12 15:56:03 -05'00'

16
     Debra McCostlin

17                        Digitally signed by Jamie Gallagher
     **Jamie Gallagher**  DN: cn=Jamie Gallagher, o=Veritext, ou,
18                        email=digital@veritext.com, c=US
     _____    Date: 2014.12.12 15:56:47 -05'00'

19
     Jamie Gallagher

20
     Veritext

21
     330 Old Country Road

22
     Suite 300

23
     Mineola, New York 11501

24
     Date:  December 12, 2014

25