Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS INC.

8

9              Debtors.

10

11  - - - - - - - - - - - - - - - - - - - - -x

12

13                         United States Bankruptcy Court

14                         One Bowling Green

15                         New York, New York  10004-1408

16

17                         September 17, 2015

18                         10:04 A.M.

19

20  B E F O R E:

21  HON. SHELLEY C. CHAPMAN

22  U.S. BANKRUPTCY JUDGE

23

24

25  ECRO:  MATTHEW

08-13555-scc  Doc 52621-15  Filed 08/30/16  Entered 08/30/16 20:39:16  Exhibit O
Pg 2 of 30

1    HEARING re #47569:    Status Conference regarding the RMBS

2    Protocol

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Theresa Pullan

```
 1    A P P E A R A N C E S :

 2

 3    CHAPMAN AND CUTLER LLP

 4          Attorneys for US National Bank, As Trustee

 5          111 West Monroe Street

 6          Chicago, Illinois  60603-4080

 7          Houston, TX 77002-2755

 8    BY:   FRANKLIN H. TOP, III, ESQ.

 9

10    WILLKIE FARR & GALLAGHER LLP

11          Attorneys for Debtor

12          787 Seventh Avenue

13          New York, NY  10019

14    BY:   TODD G. COSENZA, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 P R O C E E D I N G S

 2            THE CLERK:  How is everyone today.  Please have a

 3    seat.  All right.  Mr. Cosenza?

 4            MR. COSENZA:  May I approach?

 5            THE COURT:  Yes.  It seems like we were just

 6    together.

 7            MR. COSENZA:  Yes.  Just another update, Your Honor.

 8            THE COURT:  Okay.

 9            MR. COSENZA:  May it please the Court, Todd Cosenza

10    from Willkie Farr and Gallagher for Lehman Brothers Holdings

11    Inc.

12            Your Honor, I'm going to be brief, but I just want to

13    give you just a brief overview of where we are, give you sort

14    of Lehman Brother's general observations on where we are next,

15    next steps, give you an overview from the trustees, their

16    process, give you an overview of what Lehman Brothers is doing

17    in terms of reviewing files and rebuttal.

18            THE COURT:  Okay.

19            MR. COSENZA:  Some of the issues that we're seeing

20    and some of the problems we're seeing with some of the claims

21    that are being presented to us and then where we're going next

22    basically --

23            THE COURT:  That sounds good, and then of course

24    folks will have a chance to give their perspective.

25            MR. COSENZA:  So, Your Honor, the plan administrator
```

1    has completed its initial review of the RMBS trustee's claims

2    on the first 50,000 loan files.  I think I have four general

3    observations and then we'll get into more detail.

4              As we discussed at the hearing in December, it's

5    clear to us from looking at the files that each claim file

6    presented is unique, it has unique challenges, unique factual

7    issues.  Each file has to be reviewed in context based on the

8    underwriter, the lender and the borrower.  Basically each,

9    every loan has an individualized story and that has made our

10   review process somewhat time consuming by the protocols working

11   in that regard, and that is something that we expected remember

12   when we had the hearing back in December.

13             Two, the second general observation, the RMBS

14   trustees have taken a very broad view of what documentation is

15   sufficient to establish a claim.  In many instances this broad

16   view encompasses --

17             THE COURT:  Broad view meaning fewer documents.

18             MR. COSENZA:  Yeah, anything that could facially seem

19   to be a claim, just throw it over to us for us to sort of rebut

20   and have to, you know, make an assessment and rebut the claim.

21   This is --

22             THE COURT:  Could you describe that in a little more

23   detail?

24             MR. COSENZA:  Sure.

25             THE COURT:  When you say a broad view, I'm reading

 1    that to mean skinny documentation.

 2          MR. COSENZA:  Yes.

 3          THE COURT:  But then the next thing that you said

 4    didn't seem consistent with that.  So give me an example.

 5          MR. COSENZA:  Yeah, it's almost, I can give you

 6    several examples.  I mean one example is there certain claims

 7    that have been put forward to us as obvious breaches of reps

 8    and warranties by borrower.  When we provide over to the

 9    trustees the underwriting guidelines that the loan was written

10    under, the loan actually comports with the underwriting

11    guidelines, so we have to go through this process of them

12    sending it over to us, us looking at it, saying well it

13    actually comports with the underwriting guidelines, and then

14    sort of putting that to the side.  So step three is actually

15    going to have more files than we had initially anticipated.

16          THE COURT:  Does the protocol contemplate that in

17    response to your hitting it back, so to speak, that they are

18    then obligated to say you're right or does that go off into

19    another bucket?

20          MR. COSENZA:  So we now move on to step three, and

21    this is, we're going to have sort of a rubber is going to meet

22    the road in some sense.  We're going to have a meet and confer

23    business to business discussion.  They have what their claim

24    was, we have our basis for our rebuttal.  And I think a number

25    of these claims that they put forward are going to fall to the

Page 7

1   side during that process.  We hope, that's sort of our

2   expectation based on what we've seen and sort of what we're

3   putting back to them.

4           If that does not work, there's then step four of the

5   protocol which is the claims facilitation process where both

6   sides will have, you know, in essence a mediation process

7   before a claims facilitator where it decides if it's really a

8   viable claim, but there are some issues with that, there's

9   going to be a discussion as to whether or not that moves on to

10  step five and to Your Honor.

11          THE COURT:  Right.

12          MR. COSENZA:  But in terms of the documentation, just

13  some other issues that we've seen, just so I can highlight some

14  of them for you.

15          Another example is, there have been claims put

16  forward based on misrepresentations of income.

17          THE COURT:  Right.

18          MR. COSENZA:  And then to support that claim, the

19  trustees will put forward a W-2 or tax return for a year or two

20  after the loan was originated and that doesn't, that's an

21  example of something where they haven't put forward you know

22  sufficient evidence for us to show the breach occurred at the

23  time of origination.

24          There are a number of other examples where there are

25  typographical errors in the appraisal reports, they have put

Page 8

1    those forward to us, they're really not material errors in the

2    appraisal's report.  And we expect and we have a meeting,

3    process with them, some of those claims are going to fall by

4    the side.

5             Another example is a number of claims were, they have

6    claims of misrepresentation from the borrower, that this is a

7    primary residence when in fact it was a second home.  And it's

8    clear when you actually look at the entire underwriting file

9    for some of those that it was disclosed to the originator that

10   these were in fact second homes so there's really no breach of

11   misrepresentation by the borrower.

12            But I guess the overall point, Your Honor is there is

13   a lot of stuff being thrown to us on this first step that we

14   thought we could whittle down by the trustees, we had to go

15   through a more painstaking process and go through a lot more,

16   you know, some more files than we expected.  But --

17            THE COURT:  Can you characterize, I'd be surprised if

18   you can but I'll ask anyway, can you characterize a percentage

19   of you know what you've described?  You know, like this

20   reflects what we see with respect to 50 percent, 10 percent?

21   Do you have a ballpark sense of how many?

22            MR. COSENZA:  I'll confer with my co-counsel but I

23   would say here --

24            THE COURT:  It's more than anecdotal.

25            MR. COSENZA:  Yeah.

08-13555-scc   Doc 51266-1   Filed 09/08/15   Entered 09/15/15 13:24:18   Main Document
Pg 9 of 30

Page 9

1        THE COURT:  But it's not pervasive.

2        MR. COSENZA:  It may be somewhat pervasive, it could

3   be over 30 percent of the claims being put to us, if not

4   higher.  So it's an issue, and we're hoping in step three that

5   there's obviously going to be a much more reasonable approach

6   put forward by the trustees when they hear our rebuttals and

7   understand the claims that really are, really don't have any

8   merits and we don't have to waste time on step four or step

9   five.  That's why I mentioned before step three is really an

10  important part of this process.

11       But there is a downside to this and that it is

12  there's a lot more expense that we're incurring on step two to

13  go through.

14       THE COURT:  You know, I need to hear from the

15  trustees first, but my observation would be that taking what

16  you say as accurate then it ought to be the case that on a go

17  forward basis the process is adjusted so that those same things

18  do not continue to happen either because the protocol that's

19  been set up internally, I'm looking at the trustee's counsel,

20  either because the protocol that's been set up internally for

21  the review before the claims come over to you needs to be

22  tweaked or because individual reviewers or groups of reviewers

23  are not correctly implementing the protocols that are in place.

24  I'd rather believe that the instructions are correct and this

25  is kind of human error than systematically folks are being

08-13555-scc   Doc 52621-15   Filed 08/30/16   Entered 09/30/16 09:39:16   Main Document
Pg 10 of 30

1    told, you know, just shovel the stuff across.  So --

2          MR. COSENZA:  Well we hope, sorry, we hope when we do

3    --

4          THE COURT:  I mean I presume, I always presume good

5    faith and I'd like to believe that's the case.

6          MR. COSENZA:  And I hope that after we go through the

7    initial round in step three from some of these files that there

8    will be sort of a re-jiggering of the system in terms of the

9    files that are being put forward to us because there are, I

10   think we are, we do see some systemic issue with some of the

11   claims being put forward.

12         THE COURT:  So when is the, when is that step three

13   meeting, or series of meetings supposed to occur?

14         MR. COSENZA:  I think they're supposed to come, I

15   mean, within the next 60 days.

16         UNIDENTIFIED:  I think it's discretionary.

17         THE COURT:  Right.  But so that's my point.  So you

18   know there's a run rate I'm imagining in terms of the number of

19   files that get reviewed a day.  So if you don't have that

20   meeting that among other things will speak to systemic issues

21   for 60 days, that's a whole heck of a lot of files that then

22   are run through the mill under hypothetically, you know,

23   inaccurate guidelines.  So it would seem to me that you ought

24   to do that sooner rather than later or that we ought to kind of

25   insert into a lineup some kind of a meet and confer that would

1   help obviate more of the same happening.  And again, these

2   folks might stand up and tell me that you're completely wrong,

3   or marginally wrong.

4           MR. COSENZA:  One other part of this.  There are

5   weekly meet and confers between not the lawyers but basically

6   between Duff & Phelps and the Lehman team sort of go through

7   sort of big picture issues, so there are efforts that I think

8   are going to be much more detailed over the next month or two

9   to try to whittle these down.

10          THE COURT:  So that's good.  Okay.

11          MR. COSENZA:  Third point, Your Honor, general point

12  and observation, the trustees are presenting claims on

13  virtually all nonperforming loans with a value of at least

14  $1,000, so we have a very low monetary threshold for the claims

15  that are being put forward to us.  Again, this is not

16  surprising, but we were hoping to sort of get to the more

17  substantive claims, you know, getting a lot more volume that's

18  causing the trust to go through, or the estate to go through a

19  lot more in terms of expenses.

20          And fourth, Your Honor, I think is the point, you

21  know, the biggest point, due to the types of claims that are

22  being put forward to us, we believe we have received a

23  voluminous number of unwarranted claims.  And the plan

24  administrator can't justifiably accept those claims, and those

25  claims are going to have to go through step three, step four

1   and step five of this process.  And we have years of experience

2   pursuing downstream claims and the types of evidence that we

3   need to substantiate those claims.  So we have guidance from

4   the Court on how those claims are supposed to be pursued and

5   what evidence is needed to establish a downstream claim.  So

6   we're keeping that in mind in terms of as we're going through

7   this process and that's important to us.

8           So we have a very high rebuttal rate, Your Honor,

9   about 97 percent of the claims being put forward to us.  Again,

10  it's not totally surprising, but it's a little bit dismaying in

11  terms of the volume of claims that are being put forward to us.

12          So in terms of next steps, I think I've highlighted

13  this for you in terms of step three, I detailed this before.

14  We're going to have this business to business meet and confer

15  process on some of these claims.  Again, if there's not a

16  resolution to a bunch of those claims in step three, we then

17  move the claims facilitation process, just in essence, to

18  mediation.  So there's still quite some time before we appear

19  before you for claims, and we're very hopeful and optimistic

20  that once people meet face to face on an individual claim

21  there's more realistic assessment of what the claim is worth

22  and the issues, and evidentiary issues in terms of some of the

23  claims that have been forwarded to us.

24          THE COURT:  Okay.  And remind me -- two questions

25  that you may not be prepared for but I'll ask them anyway --

1   remind me what the situation is with respect to the reserves

2   for these claims.

3         MR. COSENZA:  The reserves for these claims remain at

4   --

5         THE COURT:  How much are, is still being reserved for

6   these claims?

7         MR. COSENZA:  $5 billion.

8         THE COURT:  Five billion.  Okay.  And the other

9   question, are you aware of any developments in the CNBS, RNBS

10   litigation landscape generally that affect your view of the go

11   forward, this go forward litigation, anything that you believe

12   that I ought to be aware of if you, again, I'm not, I don't

13   want to put you on the spot, but I see a lot of headlines

14   regarding RNBS, CNBS and most of them appear to be completely

15   unrelated to what we're doing here, but I'd certainly like to,

16   would like to be able to keep up with what's going on.

17         MR. COSENZA:  We will, we do intend on doing that.

18   There have been a couple of decisions recently in the Southern

19   District that are difficult to understand fully even when you

20   read the opinion, not because you know Judge Coe (phonetic) is

21   a great Judge, there's a lot of information that's been

22   provided to the Court in terms of expert reports, underlying

23   documents that are hard to parse through.

24         THE COURT:  Very lengthy opinion.

25         MR. COSENZA:  Yeah, that are very --

```
 1            THE COURT:  Even longer than mine.

 2            MR. COSENZA:  Yes.  That are hard to parse through

 3    without fully seeing what the countered positions were and how

 4    the underlying documents worked.  So we're in the process of

 5    trying to figure some of those issues out.  But we do intend to

 6    bring, if there's something we think is a meaningful shift in

 7    the landscape or something you should be aware of, we will

 8    debrief you on that, but that's, there's one decision in

 9    August, late August from Judge Coe that we are looking at right

10    now.  But again, we're not in a position to get it to you

11    because we're trying to fully assess it.

12            THE COURT:  Fair enough.  Okay.

13            MR. COSENZA:  Your Honor, a few other things as I

14    mentioned earlier.  The trustees have put forward their, how

15    they're going to do their review process and I wanted to give

16    you some color very briefly as to what Lehman is doing in terms

17    of going through the loans on rebuttal.

18            We've taken a two prong approach to review claims

19    brought by the trustees.  This approach is meant to ensure a

20    comprehensive and accurate view of the claims as well as

21    documentation and evidence that the claims have been

22    [indiscernible].  First, the loans that are presented by the

23    trustees are [indiscernible] by Recufco (phonetic) which as you

24    will recall in December is Mr. Keon's (phonetic) firm, so

25    they're doing comprehensive due diligence, re-underwriting the
```

1   files.  And this analysis provides an initial recommendation as

2   to how we should view the file in terms of how it was

3   underwritten.

4          Second, the plans administrator counsel, Mr. Rollin

5   (phonetic) who is sitting at the table, his team performs a

6   legal review of the claims, looking at Recufco's

7   recommendations of how the claims should be treated.  This

8   review focuses on the evidence presented by the trustees to

9   support their claims.  The purpose of that review is to verify

10  whether there is sufficient documentary basis to justify the

11  claims on a loan by loan basis and to make sure obviously as

12  the plan administrator wants to make sure that the claims that

13  we do agree with they're justifiable claims before the money is

14  basically earmarked to go out the door.  So our process is look

15  at each loan and related claim very carefully to determine in

16  each individualized case whether there is a loss that is

17  justifiably compensable.

18          Your Honor, I provided some examples of some of the

19  types of loans we've seen.  I just want to highlight a couple

20  of them for you in addition to the one I mentioned earlier.  I

21  mentioned to you the W-2 issue, number of files where the

22  income that is misrepresented, what they've provided to us as

23  income from a subsequent time period not from when the loan was

24  issued.  Clearly that's you know pretty significant from our

25  perspective because [indiscernible] misrepresentation has to

1    take place at the time of loan.  Again, that number of

2    typographical errors that they have thrown up to us in the

3    appraisal documents doesn't impact the substance of the

4    appraisal, some technical issues with the appraisal, they put

5    those forward and we don't think those are bad appraisals

6    because the substantive data in the underlying appraisal is

7    accurate.

8            Again, the issue I raised before about whether or not

9    there's a misrepresentation as to whether or not this is a

10   primary residence or a secondary residence.  We have a number

11   of files that we've seen where we actually do a comprehensive

12   review of what the underwriters looked at and it's clear that

13   this was for a second home, not for a primary residence.

14   Again, we expect, we are hoping and we expect in step three all

15   those files will just fall right to the side.

16           THE COURT:  And you also mentioned files that are

17   only in the thousand dollar range.

18           MR. COSENZA:  Yes.

19           THE COURT:  Can you characterize how many?

20           MR. COSENZA:  I can ask Mr. Roe if you can just give

21   me one minute.  Yeah, we don't know the number, Your Honor.  So

22   I can speed things along, Your Honor, I don't have that number,

23   I can get it to you.

24           THE COURT:  That's fine.  I'm just trying to, you

25   know, gauge and --

1           MR. COSENZA:  But each of these number of claims,

2    each sort of you know a few hundred here, a couple hundred

3    here, a thousand here, 4,000 here, the number of claims, this

4    could help speed things along in step three and step four.

5           So I guess in summary, Your Honor, the important

6    points I wanted to raise to you; one, the protocol is working

7    to some degree.  We have gotten more claims than we expected

8    and some of the quality of the claims are lower than we had

9    expected and hoped, so we're incurring some additional

10   expenses.

11          THE COURT:  So that's the one thing that I didn't ask

12   you in terms of how many claims you've gotten versus how many

13   files they've reviewed.  I think when we were last together I

14   recall a 50 percent number.

15          MR. COSENZA:  Yes.

16          THE COURT:  So is that still --

17          MR. COSENZA:  I think that remains generally

18   consistent and yeah, it's about right, I don't have --

19          THE COURT:  So 50 percent are coming over, and you're

20   saying basically 97 percent of those 50 percent are going back

21   across in rebuttal.

22          MR. COSENZA:  That's sort of correct, but there's one

23   carve out on that.  There are a number of files where they sent

24   to us out of the 50 percent that are missing documentation that

25   even we, you know, they agree and we agree that we can't really

1    begin the review process, so there's some chunk of those files

2    that haven't even gone into the reject or the accept bin

3    because they've just been sitting and they're making efforts to

4    try to get the documentation.

5              So I think the protocol is where it is.  We're hoping

6    that these move more quickly in step three and step four.  We

7    do think it may take more time than we anticipated in step

8    three because of the number of files that we're getting

9    through.  But again, we're moving diligently and trying to move

10   forward with the protocols as fast as we can.  Thank you, Your

11   Honor.

12             THE COURT:  Good morning, how are you?

13             MR. TOP:  Good morning, Your Honor, Frank Top from

14   Chapman and Cutler.

15             THE COURT:  How are you, Mr. Top?

16             MR. TOP:  On behalf of U.S. Bank National

17   Association.  I'm doing well.

18             THE COURT:  Am I going to hear from --

19             MR. TOP:  I'm also here with Bill Monroe (phonetic).

20             THE COURT:  Sure.  Am I going to hear from all of you

21   or are you speaking for the group?

22             MR. TOP:  I'm speaking for the group.

23             THE COURT:  Okay.  I mean I'd be happy to hear from

24   each of you.

25             MR. TOP:  So anyway --

```
 1              THE COURT:  The glass is half empty, half full it

 2      sounds like.

 3              MR. TOP:  You know, obviously we have a hard big task

 4      in front of us.  You know, we've already reviewed 86,000 loans

 5      as of the end of August, we're continuing to review 17,000 per

 6      month, and we've met every milestone we're expected to meet in

 7      terms of the protocol so far.

 8              THE COURT:  Okay.

 9              MR. TOP:  We have not submitted claims of the 86,000,

10      we have not submitted claims with respect to over 46,000 so

11      we're a little bit over the 50 percent.

12              THE COURT:  Okay.

13              MR. TOP:  And as it relates to how we're going about

14      reviewing the loans, we are in fact prioritizing the loans for

15      purposes of review.  Obviously, I would be surprised if there

16      is a lot of thousand dollar loans in there because frankly if

17      we're getting 40 cents on the dollar, it's not worth our while

18      to review those loans.  Right?

19              THE COURT:  Exactly, it's totally not.  Right.

20              MR. TOP:  We have as a group of trustees have come up

21      with a method of prioritizing loans based upon damage amounts,

22      so you know to the extent that there are a couple of loans in

23      there that might be of a $1000 value, I would be surprised, but

24      you know if that's the case, that's the case.

25              THE COURT:  Sure.  But based on, and I'm not going to
```

08-13555-scc   Doc 52661-15   Filed 05/18/15   Entered 05/15/15 23:24:18   Main Document
Pg 20 of 30

Page 20

1  give you a suggestion as to where the line would be drawn,

2  certainly $1,000 seems like it's not worth pursuing, but there

3  ought to be a mechanism to prevent those from going into the

4  cue in the first instance.

5          MR. TOP:  And we're doing that.  It had cost us $600

6  to review it.  Right?  So we're not going to review a loan for

7  600 bucks when we're going to [indiscernible].

8          THE COURT:  Right.  Okay.  So I mean I think the

9  takeaway from that is that you'll double-check that would allow

10  claims that small amount to even get into the cue.  So I don't

11  think we have to pause on that for long.

12          MR. TOP:  Yes.  So that's absolutely right.  We have

13  submitted 39,000 claims now for in the amount of $9 billion.

14          THE COURT:  How much?

15          MR. TOP:  9 billion.

16          THE COURT:  9 billion?

17          MR. TOP:  Yeah.

18          THE COURT:  9 million or billion?

19          MR. TOP:  Billion.  39,000 claims, $9 billion, some

20  of those are active loans and, you know, we have to sit down

21  and talk to the debtors about how we're going to really value

22  active loans, so there's a part of that 9 billion that

23  constitutes active loans and we just asserted them for the full

24  purchase price, but obviously we realize we're going to have to

25  discuss those.

08-13555-scc Doc 52166-1 Filed 05/19/15 Entered 05/19/15 13:24:18 Main Document
Pg 22 of 30

1        THE COURT:  Let me take you back up.  86,000 out of

2    how many total?

3        MR. TOP:  Well so the total number of loans that are

4    in the covered loan steer are 213,000.

5        THE COURT:  Right.

6        MR. TOP:  That would include loans --

7        THE COURT:  But my recollection was that that was the

8    number that we were working off when we had our first series of

9    hearings, but then that number came down.

10        MR. TOP:  That's right.  So we're, as part of our

11    prioritization, we may not review all 213,000 loans, I suspect

12    we will not.  I mean there's a part of those, some of those

13    loans are being paid off, no reason to review those, and some

14    are going to be below a certain threshold that we're just going

15    to decide probably it's not worth our while.  So the number

16    ultimately will be less than 213,000 --

17        THE COURT:  Okay.

18        MR. TOP:  -- in terms of total loans.  In terms of

19    gathering loans and documents and things like that, we're about

20    92 percent of the entire steer of loan files out there.

21        THE COURT:  Of obtaining the files.

22        MR. TOP:  We have a couple of really one big servicer

23    that's outstanding that we've been working with closely in

24    order to get those loans.  Some of the loans were tied up in

25    the Rescap bankruptcy, but we've been able to, we've actually

1    received a significant number of those loans, we're in the

2    process of reviewing them for completeness.  And they have

3    pledged to us to try to get us the remaining loans sometime

4    this month and they've so far been true to their word.  We

5    ended up getting the colonial loans after serving a subpoena.

6    We have a couple of straggling loans from a couple other

7    servicers but by and large, you know, if you asked me in

8    December whether I think we'd get 92 percent of the loan files

9    as of this date, I would have told you absolutely not.

10          THE COURT:  Oh, you did tell me absolutely not.

11       (Laughter)

12          MR. TOP:  Yes, I'm sure I did.  So you know I think

13   we're all very, very pleased that we've been able to obtain

14   those loans and keep up with the milestones that are set forth

15   in the protocol.

16          As it relates to, you know, some of the instances

17   that Mr. Cosenza raised, I mean obviously, you know, we've

18   submitted 26,000 loans, I don't have those loan files here to

19   respond to them one way or the other.  We received their

20   responses to our initial claims on the 50,000 on August 31st,

21   you know, we worked with them on the protocol when our

22   responses would be due on those and they're not due until 670

23   days after they've given our response, so we're still in the

24   process of reviewing all of those loans and I suspect that as

25   he said there probably are some that when you look a little bit

1    closer we may decide not to end up pursuing that claim.

2        THE COURT:  Would it be possible though because of

3    the volume that you're pushing through and 60 days times that

4    volume per day is a lot, would it be possible to at some high

5    level look at a few specimens which may be outliers or may

6    represent systemic problems?  For example, submitting, and

7    maybe your legal position is different, but Mr. Cosenza made

8    the point that a W-2 dated two years after origination isn't

9    probative of whether or not there was a misrepresentation at

10   origination.  So seemingly straightforward things like that or

11   you know a typo in I don't know what it would be, the zip code

12   of a property or something like that, that would be also not

13   material that you could agree and agree to communicate to the

14   team that you know these don't make it over the wall.

15        I'm just trying to, you know, this is extremely

16   expensive, it's extremely time consuming and I'm very gratified

17   that you're moving along as quickly as you are because you

18   didn't think you'd be able to, but you have.  But nonetheless,

19   to the extent that we can tweak it, and make it even better, it

20   seems to me in everybody's economic interest to make it better.

21   So is there a way to maybe address for example some of the

22   issues you know on an across the board basis so that the teams

23   cannot continue to make those errors?

24        MR. TOP:  So let me address it by saying this, that

25   we did not go out to our review teams and say come up with any

1    claim that you can find.  Right.  We were very measured in

2    coming up with a list of those types of breaches a) that we

3    thought were material that they ought to be looking for.

4              THE COURT:  Right.

5              MR. TOP:  And, b) we have not told them be as

6    aggressive as you can, for example, in looking for income

7    things, to say oh yeah, you know, because you didn't make a

8    certain amount four years down the line --

9              THE COURT:  But I'm coming at it from the other

10   direction.  If you were to, and again your legal position might

11   be different, if it is, then it is what it is.  But if you were

12   to categorically say that a W-2 dated two years after

13   origination isn't sufficient so that, you know, just clear

14   direction like that, you know, would help, or the -- I'm just

15   using the ones that Mr. Cosenza indicated.

16             MR. TOP:  But to be clear, they've also rejected

17   loans that we've given them a tax return from that same year.

18   So, look, we're going to have some conversations about the

19   evidence that we've presented and the evidence that they view

20   as sufficient or not sufficient to support a claim.  We're

21   going to have that additional -- so we're going to --

22             THE COURT:  Right.  So that might be, I mean, that

23   might be that the borrower represented that they had $80,000 in

24   income and it shows that they had $76,000 in income and --

25             MR. TOP:  Well it's usually not that.  We would,

```
1   probably not assert that one.

2           THE COURT:  Okay. Well --

3           MR. TOP:  But let me assure you this.  Again, I don't

4   have all these loan files in front of me so I don't know

5   whether those have been asserted or not.  It's not that these

6   loans come from the review firms and go immediately to the

7   debtor, we also have a quality control program as well.  And so

8   someone else actually looks at the entire file and from the

9   review decided that that was something that was a material

10  breach before we even pass it on to the debtor.  So it does

11  have a quality control check and sometimes those quality

12  control checks knock out loans that the review firms otherwise

13  would have presented.  So we are likewise doing that as well.

14  And so at this point in time, you know, we've submitted 26,000

15  claims I believe as of August 31st that they have reviewed,

16  they have accepted 705.  Of the 705, we're going to send them a

17  letter saying basically we agree with them on the purchase

18  price on 701, but about $155,000,0000 worth of loans.  Right

19  now, under the protocol, we have a disagreement with the

20  debtors as to when that should be paid.  We'll have to sit down

21  and talk to them a little bit about that under the protocol.

22  We also have a difference of opinion on -- so under the terms

23  of the protocol as we read it, they're supposed to be filing

24  these acceptances or rejections with the Court.  We have a

25  difference of opinion on that particular issue, we're going to
```

Page 26

1   sit down and talk to the debtors about those type of things.

2   And obviously as we go through their responses to our claims,

3   we're reviewing each and every one of them.  We're going to

4   have to rebut them or agree with them.  And after that point in

5   time, we're going to sit down with them and obviously try to

6   negotiate amount.  And I think one of our thoughts is you know

7   maybe we'll send some earlier ones so we can start talking

8   about exactly what you're talking about.  Let's float a couple

9   of trial balloons out there and see where we can agree and

10  where we don't agree on things, and we may have a disagreement

11  on the law, we may have a disagreement now that facts are

12  sufficient to prove something, but we're going to have to have

13  those conversations with them.  So that's kind of where we are

14  in terms of protocol.

15         THE COURT:  I mean I can't recall in detail but it

16  seems to me that it would be useful to be in a position to make

17  some categorical determinations that would inform the rest of

18  the process, shorten the time and save everybody you know money

19  and expense.

20         MR. TOP:  Absolutely, and that's what we're

21  anticipating doing.

22         THE COURT:  So let me go back to the reserve.

23         MR. TOP:  Okay.

24         THE COURT:  And again, I can't recall exactly what

25  the trustee's projected hit rate was, if you will, but given

1   that I think you know the number of total files is somewhere

2   perhaps out to 200,000, you're approaching the 50 percent mark,

3   you're not putting over 50 percent. I guess what I'm beating

4   around the bush the point is that at some point if it seems

5   appropriate to revisit the amount of the reserve that would be

6   something that would be good to do because it's a big number

7   and I know you say that you've already put back 9 billion in

8   claims. So in your mind that $5 billion number still sound

9   good. But as the process continues and there's an occasion to

10   re-look at that number, folks are waiting to get paid. I'll

11   just leave it at that.

12           MR. TOP: And I appreciate that, Your Honor, and

13   obviously that's a discussion we intend to have with the

14   debtors as well. Maybe going in the other direction, to be

15   honest with you, but look, we've been pretty good about trying

16   to work out our differences on this and things like that.

17           THE COURT: The ship pretty much sailed on the other

18   direction.

19           MR. TOP: We are, that's a discussion we'll have with

20   them along with many other discussion including details on each

21   particular claim and you know that's the way you know we're in

22   this together, we're going to have to work things out.

23           THE COURT: All right. Well, it sounds like for the

24   most part that is indeed working.

25           MR. TOP: So far so good. Thank you, Your Honor.

1        THE COURT:  All right.  Thank you.  Anyone else want

2   to add anything on behalf of the trustees?  Mr. Cosenza,

3   anything more from you?

4        MR. COSENZA:  One last point, Your Honor.

5        THE COURT:  Did you check with Mr. Cantor first?  No?

6        MR. COSENZA:  Just one last point, Your Honor.  We're

7   very mindful of the reserve and there may be a point over the

8   next couple of months before the next distribution where based

9   on the date [indiscernible] step three and step four and as the

10  other files come in where there may be a time to make an

11  application to the preserve.

12       THE COURT:  All right.  Don't misunderstand.  I'm not

13  looking for disputes, I'm looking for resolutions.

14       MR. COSENZA:  Yes.  I think people, as you know

15  people have been waiting for their money for quite some time,

16  this is an opportunity we believe in good faith after going

17  through that that number should be lower we'll come to you.

18  Thank you, Your Honor.

19       THE COURT:  All right.  So I think we're scheduled to

20  next be together some time in December.

21       MR. COSENZA:  Yes.

22       THE COURT:  Okay.  Obviously if there's any need for

23  the Court's assistance before then, we'd be happy to help out.

24  All right.  Good to see you, thank you for coming in today.

25       (Proceedings concluded at 10:37 AM)

1                        I N D E X

2

3                          RULINGS

4    DESCRIPTION                                          PAGE

5    HEARING re #47569:   Status Conference regarding the RMBS

6    Protocol

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08-13555-scc  Doc 52261-1  Filed 09/18/15  Entered 09/18/15 13:24:18  Main Document
Pg 30 of 30

1                          CERTIFICATION

2              I, Theresa Pullan, certify that the foregoing is a

3      correct transcript from the official electronic sound recording

4      of the proceedings in the above-entitled matter.

       Sonya Ledanski        Digitally signed by Sonya Ledanski Hyde
                              DN: cn=Sonya Ledanski Hyde, o=Veritext,
5      Hyde                   ou, email=digital@veritext.com, c=US
                              Date: 2015.09.18 14:10:23 -04'00'

6      AAERT Certified Electronic Transcriber CET**00650

7      Theresa Pullan

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22     Veritext

23     330 Old Country Road

24     Suite 300

25     Mineola, NY  11501