Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In re

6    LEHMAN BROTHERS HOLDINGS, INC.,et al.,

7            Debtors.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9    Case No. 08-01420 (SCC)(SIPA)

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   In re

12   LEHMAN BROTHERS INC.,

13           Debtor.

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15

16               U.S. Bankruptcy Court

17               One Bowling Green

18               New York, NY  10004

19               February 23, 2016

20               10:14 AM - 11:49 AM

21

22   B E F O R E :

23   HON SHELLEY C. CHAPMAN

24   U.S. BANKRUPTCY JUDGE

25

Page 2

1    HEARING re:  1. Plan Administrator's Objection to Claim of

2    Morgan Stanley Bank International limited (Claim No. 21866)

3    [ECF No. 51875]

4

5    HEARING re:  2. Motion of Fondo De Proteccion Social De Los

6    Depositos Bancarios for Substitution of Counsel and to

7    Designate Homer Bonner Jacobs as Agent for Receipt of all

8    Distributions [ECF No. 51969]

9

10   HEARING re:  3. Nineteenth Application of Hughes Hubbard &

11   Reed LLP for Allowance of Interim Compensation for Services

12   Rendered and Reimbursement of Actual and Necessary Expenses

13   Incurred from May 1, 2015 through August 31, 2015 [LBI ECF

14   No. 13104]

15

16   HEARING re:  4. Motion of Fondo De Proteccion Social De Los

17   Depositos Bancarios for Substitution of Counsel and to

18   Designate Homer Bonner Jacobs as Agent for Receipt of all

19   Distributions [LBI ECF No. 13309]

20

21   HEARING re:  5. Trustee's Motion for an Order Regarding

22   Certain Repurchase Agreement Claims [LBI ECF No. 12194]

23

24

25

Page 3

1    HEARING re:  6. Objection to Transfer of Claim #787 to

2    Claims Recovery Group LLC, filed by Frank H. Carraway [LBI

3    ECF No. 13229]

4

5    HEARING re:  7. Lehman Brothers Special Financing Inc. v.

6    Federal Home Loan Bank of Cincinnati [Adversary Proceeding

7    No. 13-01330]

8

9    HEARING re:  8. Allied World Assurance Company v. LB Rose

10   Ranch LLC [Adversary Proceeding No. 15-01128]

11

12   HEARING re:  9. Lehman Brothers Special Financing Inc. et al

13   v. Sequa Corporation [Adversary Proceeding No. 15-01404]

14

15   HEARING re: Lehman Brothers Special Financing Inc. v.

16   Federal Home Loan Bank of Cincinnati

17   Discovery Conference

18

19   HEARING re: Allied World Assurance Company (U.S.) Inc. v.

20   LB Rose Ranch LLC et al

21   Doc #19 Motion To Dismiss For Lack Of Jurisdiction Or In The

22   Alternative, Motion To Abstain

23

24   HEARING re: Allied World Assurance Company (U.S.) Inc. v.

25   LB Rose Ranch LLC et al Pretrial Conference

1    HEARING re: Lehman Brothers Special Financing Inc. et al v.

2    Sequa Corporation Pre-trial Conference

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

Page 5

1    A P P E A R A N C E S :

2

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Lehman Brothers Holdings Inc.

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  CANDACE ARTHUR

9         JACQUELINE MARCUS

10

11   JONES DAY

12        Attorneys for Lehman Brothers Holdings, Inc.

13

14   BY:  JAYANT W. TAMBE

15        LAURI W. SAWYER

16        EDWARD M. JOYCE

17

18   HUGHES AND HUBBARD

19        Attorneys for the SIPC Trustee

20

21   BY:  JAMES B. KOBAK, JR.

22        MICHAEL E. SALZMAN

23        JEFFREY S. MARGOLIN

24

25

Page 6

1   SIPC

2        1667 K Street, NW., Suite 1000

3        Washington, DC 20006

4

5   BY:  KENNETH J. CAPUTO

6

7   OTTERBOURG

8        Attorneys for Fogade

9

10  BY:  ERIK B. WEINICK

11

12  PERKINS COIE

13        Attorneys for Colorado Homeowners

14

15  BY:  JOHN D. PENN

16

17  BERENBAUM WEINSHIENK PC

18        Attorneys for Colorado Homeowners

19

20  BY:  DAVID M. MILLER

21

22  BURG SIMPSON

23        Attorneys for Colorado Homeowners

24

25  BY:  JOE SMITH

Page 7

```
 1   PROSKAUER ROSE, LLP

 2        Attorneys for Federal Home Loan Bank

 3

 4   BY:  STEPHEN L. RATNER

 5        DAVID A. PICON

 6        MASSIEL PEDREIRA

 7

 8   DIAZ, REUS & TARG LLP

 9        Attorneys for Fogade

10        100 SE 2nd Street, #3400

11        Miami, FL 33131

12

13   BY:  MARTA COLCHAR-GARCIA

14

15   DAVID J. HOFFMAN

16        Attorney for Hipotecas de America, S.A.

17        One Whitehall Street

18        Suite 1825

19        New York, NY 10004

20

21   KELLEY DRYE

22        Attorneys for Claims Recovery Group, LLC

23

24   BY:  DANA KANE

25
```

```
                                                    Page 8

  1    WOLLMUTH, MAHER & DEUTSCH LLP

  2          Attorneys for Lehman Brothers

  3

  4    BY:  FLETCHER W. STRONG

  5

  6    ZEICHNER, ELLMAN & KRAUSE, LLP

  7          Attorneys for American Home Insurance Company

  8          National Fire Inc.

  9

 10    BY:  MICHAEL S. DAVIS

 11

 12    TAFT STETTINIUS & HOLLISTER

 13          Attorneys for Federal Home Loan Bank of Cincinnati

 14

 15    BY:  W. STUART DORNETTE

 16

 17    TRAUB LIEBERMAN

 18          Attorney for Allied World Assurance

 19          7 Skyline Drive

 20          Hawthorne, NY 10514

 21

 22    BY:  BRIAN MARGOLIS

 23

 24

 25
```

```
 1   BAILEY & GLASSER LLP

 2        Attorneys for Seque Corp.

 3        1054 31st Street, NW

 4        Suite 230

 5        Washington, DC 20007

 6

 7   BY:  THANOS BASDEKIS

 8        NICHOLAS S. JOHNSON

 9

10   ALSO PRESENT TELEPHONICALLY:

11   ADAM L. SCHWARTZ

12   MICHAEL G. LINN

13   PATRICK MOHAN

14   RICHARD HODYL

15

16

17

18

19

20

21

22

23

24

25
```

Page 10

1                    P R O C E E D I N G S

2            THE COURT:  Sorry for the interruption.  Hopefully

3    it woke everybody up.  How are you today?

4            MS. ARTHUR:  Very good.  Good morning, Your Honor.

5            THE COURT:  Good morning.

6            MS. ARTHUR:  For the record, Candace Arthur, Weil,

7    Gotshal & Manges on behalf of Lehman Brothers Holdings Inc.

8    and certain of its affiliates.  Your Honor, in regards to

9    Chapter 11 cases, we have a brief agenda, two items which

10   were listed as uncontested.

11           In connection with the first item, the plan

12   administrator's objection to the claim filed by Morgan

13   Stanley Bank International, that matter has been adjourned.

14   And in connection with the second matter, the motion

15   pertaining to the request for a substitution of counsel, as

16   well as the defamation of aiding to receive all

17   distributions, a certificate of no objection has been filed

18   in connection with that matter.

19           THE COURT:  All right.

20           MS. ARTHUR:  Your Honor, I will conclude the

21   matters under Lehman Brothers Holdings Inc. Chapter 11

22   cases.

23           THE COURT:  All right.

24           MS. ARTHUR:  And with your permission, I will turn

25   the lectern over for the LBI proceedings to begin.

1           THE COURT:  Okay, thank you.  Good morning.

2           MR. KOBAK JR.:  Good morning, Your Honor.

3           THE COURT:  How are you?

4           MR. KOBAK JR.:  James Kobak, Hughes Hubbard & Reed

5     for the trustee.  Your Honor, I'd --

6           THE COURT:  Could I ask -- excuse me -- could I

7     ask the folks on the phone to put your phone on mute,

8     please?  Thank you.  Go ahead.

9           MR. KOBAK JR.:  Your Honor, if it's all right with

10    Your Honor, I think we'll begin with our fee application.

11          THE COURT:  Okay.

12          MR. KOBAK JR.:  This is our 19th interim fee

13    application.  It covers the four month period, May through

14    August of 2015.  No objections have been filed to this

15    application.  SPIC has filed a statement in support, and Mr.

16    Caputo of SIPC is in Court today.  During this period, we

17    expended over 13,000 hours of which 220, approximately, were

18    spent by the trustee.

19          In addition to our fees, we request a total amount

20    of expenses of $73,661.64.  As I said, SIPC supports the

21    allowance of the fees and expenses, subject to deductions.

22    And their recommendation, of course, is entitled to

23    considerable reliance.  As you know, our firm provides a 10

24    percent public interest discount, which is reflected in the

25    application.

1          In addition to that, we voluntarily adjusted our

2     fees by over $250,000, and a few thousand dollars more after

3     review by SIPC, and also, reduced expenses by approximately

4     $50,000.

5          During this period, the main accomplishments were

6     submitting our application for distribution to the general

7     estate of 10 percent, which brought people to 35 percent and

8     that brought the amount -- or the amount distributed, and

9     that distribution has been $1.89 billion.

10          We also, as Your Honor will recall, settled

11     remaining disputes with Barclay's, which resulted in $563

12     million being released from reserve to be put into the

13     general estate.

14          We had very active claim litigation, both before

15     Your Honor, before several district court judges and in a

16     couple of cases before the Second Circuit.  So Your Honor,

17     we'd ask that you approve the application.

18          THE COURT:  All right.  Does anyone wish to be

19     heard with respect to the 19th application for the allowance

20     of compensation to the Hughes Hubbard firm?

21          All right, thank you very much.  I -- as I always

22     do, appreciate all of the hard work that goes into moving

23     through these cases.  Can you, while you're here, give us a

24     sense of how close you feel that you are, dare I say, to the

25     finish line?

1             MR. KOBAK JR.:  Yeah, I was afraid to be asked

2    that question, Your Honor.  We have -- really what we have

3    remaining to do is to work through the remaining claims.

4    There are approximately I think 465 of those.  That's a

5    little misleading because three quarters of them, 330, I

6    think, are represented by the ESEP claims, which are

7    basically a group.

8             So it's really a function of how long it will take

9    to complete those litigations.  Still some that are before

10   Your Honor, many of them now are in the district court --

11            THE COURT:  Up on appeal, right.

12            MR. KOBAK JR.:  And a few were on appeal to the

13   Second Circuit, and even in one or two cases, on cert to the

14   Supreme Court.  So I'm afraid I can't give you a better

15   answer than that.

16            THE COURT:  Fair enough, all right.

17            MR. KOBAK JR.:  Thank you, Your Honor.

18            THE COURT:  Thank you very much.  All right.  Now

19   we also had the FOGADE matter.  I think there was no

20   objection to that.

21            MR. SCHWARTZ:  Adam Schwartz on behalf of Homer

22   Bonner Jacobs on behalf of FOGADE, Your Honor.  Yes, there's

23   no filed objection to the motion.

24            THE COURT:  Yes.

25            MR. WEINICK:  Erik Weinick of Otterbourg, co-

Page 14

1    counsel of Mr. Schwartz on behalf of the FOGADE. I believe

2    there's a moral objection to this, that's being attempted to

3    be made.

4              THE COURT:  Okay.  Thank you.

5              MS. COLOMAR-GARCIA:  Yes, good morning, Your

6    Honor.

7              THE COURT:  Good morning.

8              MS. COLOMAR-GARCIA:  This is Marta Colomar from

9    Diaz, Reus.  We did not file any written objection because

10   we were waiting for instructions from our clients.

11             THE COURT:  I'm sorry.  I'm going to ask you to

12   start over again.  Could you?

13             MS. COLOMAR-GARCIA:  Yes.

14             THE COURT:  Speak up a little bit?

15             MS. COLOMAR-GARCIA:  My name is Marta Colomar.

16             THE COURT:  Yes.

17             MS. COLOMAR-GARCIA:  From Diaz, Reus, which is the

18   law firm that -- this new law firm is starting to

19   substitute.

20             THE COURT:  Yes.

21             MS. COLOMAR-GARCIA:  We represent the FOGADE for a

22   number of years.  We were waiting for instructions from our

23   clients on whether to file objections or not file written

24   objections to the motion for substitution of counsel.  We

25   have not gotten any of those instructions yet.

Page 15

1          THE COURT:  But it's FOGADE, is that the way you

2     say it, FOGADE?

3          MS. COLOMAR-GARCIA:  FOGADE, yes.

4          THE COURT:  It -- but it's FOGADE's motion to

5     replace the Diaz firm.

6          MS. COLOMAR-GARCIA:  I understand, Your Honor.  We

7     have not received any instructions as one way or the other.

8     That's why we did not consent to the motion for substitution

9     of counsel.  If the Court is inclined to grant it, we

10    suggest that we stay as co-counsel until we receive specific

11    instructions from the client.  We have not been terminated.

12    We have not -- and this has happened in the past, Your

13    Honor.  We have had another law firm that tried to act on

14    behalf of FOGADE, and (indiscernible) --

15         THE COURT:  Well, the motion says that FOGADE

16    informed the Diaz firm of its termination by letter by

17    January 29th letter.

18         MS. COLOMAR-GARCIA:  We have no communication from

19    our client, from FOGADE telling us that we were terminated.

20    We do not.

21         THE COURT:  Mr. Jacobs?  Mr. Schwartz?

22         MR. SCHWARTZ:  Your Honor, Adam Schwartz on behalf

23    of FOGADE.  To clarify, one, the Diaz firm did receive a

24    letter from the International Head of Litigation for FOGADE,

25    advising them that their services were no longer required or

Page 16

1   wanted on this matter.

2           Secondly, Your Honor, this Saturday, I believe,

3   Mr. Diaz, who is the President of the firm, actually sat

4   down and met with the President of FOGADE, Dr. Socorro,

5   whose affidavit is appended to our motion.  And she advised

6   him in no uncertain terms that their services would no

7   longer be needed in this matter.

8           THE COURT:  All right, thank you for that

9   clarification.

10          Well, to the extent that putting aside the fact

11  that the objection deadline has passed, I will simply view

12  your appearing here today as seeking absolute clarification

13  that you were not acting in any way in an unauthorized

14  fashion in representation of your client, but the motion

15  will be granted, all right?

16          MS. COLOMAR-GARCIA:  Thank you.

17          THE COURT:  All right?  Okay, thank you.

18          MS. COLOMAR-GARCIA:  Thank you, Your Honor.

19          MR. WEINICK:  May I be excused?

20          MR. SCHWARTZ:  Thank you, Your Honor.

21          THE COURT:  Yes.

22          MR. WEINICK:  Thank you.

23          THE COURT:  Thank you.  All right, I think that

24  brings us to the motion regarding the repurchase claims.

25  Perhaps we should -- all right.  We can proceed with this

Page 17

1    one.  Is anyone else here?

2            MR. HOFFMAN:  Should I state my appearance right

3    now?

4            THE COURT:  Sure.

5            MR. HOFFMAN:  David Hoffman, One Whitehall Street,

6    New York, New York for Hipotecas de America, S.A.

7            THE COURT:  All right, thank you.

8            MR. HOFFMAN:  Good morning, Your Honor.

9            THE COURT:  That's the fire truck that didn't have

10   to come here.

11           MR. SALZMAN:  20 minutes late.  I'm Michael

12   Salzman from Hughes Hubbard and Reed on behalf of the SIPA

13   trustee.  There was a pending motion to reclassify repo

14   claims as general creditor claims, rather than customer

15   claims.  The Second Circuit has ruled in a test case that

16   indeed, repo claims are a general creditor and not customer

17   in connection with that.  Test case litigation, we then

18   brought a motion to reclassify a number of claims.

19           All the other claimants have stipulated in one

20   fashion or another that whatever happens with that test case

21   involving carve-out would be binding on them.  One claimant

22   has declined any such stipulation, and that's Hipotecas.

23   Hipotecas opposed the motion, filed a substantive

24   opposition, 31 pages in length with three declarations, and

25   also sought discovery.

Page 18

1          We entered into a stipulation with Hipotecas,

2     which was so ordered by Your Honor, providing for 90 days of

3     discovery.  And after that 90 days had passed, that we would

4     appear before Your Honor at a status conference to seek a

5     schedule for the completion of supplemental briefing invited

6     at discovery.

7          The stipulation provided that both sides would

8     have the opportunity to brief anything learned in that

9     discovery period, plus opposition to the papers that had

10    previously been filed.  We are here today pursuant to that

11    stipulation to seek a briefing schedule for the completion

12    of the briefing.  Before today, we sought to have an

13    agreement with Hipotecas as to what the briefing schedule

14    might be.

15         And it was at that time approximately two weeks

16    ago that we were informed that Hipotecas, as of then, was

17    seeking depositions now at a time.  We wrote a letter to the

18    Court.  We have not heard from closing counsel since then,

19    or to my understanding has the Court been advised as to the

20    position of Hipotecas.  But I'm assuming that they persist

21    in the view that they want to be taking depositions.

22         We would oppose that.  They're out of time.

23    There's no reason to take depositions, as we can assert the

24    decision on this point is categorical, it says.  Repos

25    simply are not general creditor claims.  If you -- if your -

Page 19

1    - are not customer claims.  They're general creditor claims.

2    The Hipotecas has conceded that indeed, the transactions it

3    entered into are repos, and did that in its opposition

4    papers.

5            And so, taking that all together, we would ask

6    Your Honor to please enter an order with this briefing

7    schedule we had proposed in our letter March 8th for any

8    paper Hipotecas wants to put in at this point, and then 30

9    days for us to file a -- an opposition.

10           THE COURT:  All right.

11           MR. SALZMAN:  Thank you, Your Honor.

12           THE COURT:  Thank you.  Good morning.

13           MR. HOFFMAN:  Good morning, Your Honor.  Just a

14   little -- Mr. -- if you read Mr. Salzman's letter, he says,

15   "Well, discovery was closed on December 7th."  And I did

16   make a document request to the Trustee, and on December

17   16th, I wrote to Ms. Walker, his associate, and I asked when

18   the Trustee was going to produce its documents.  And she

19   said, "Well, we already produced those to you on the 4th of

20   December."

21           And I said, "Well, I haven't received them.

22   Perhaps they've been mislaid or misdirected in my office."

23   And I'd asked for a second copy of those papers.  And she

24   came back to me on the 22nd of December at 5:00 o'clock and

25   said she was not in the office, but she would arrange to

Page 20

1   have a second, a copy made for me.  And I myself was was

2   leaving come the next day and be out the next week, so I

3   said, "I'll pick up a copy after the new year," which --

4           THE COURT:  Okay.  What does this have to do with

5   anything?

6           MR. HOFFMAN:  Well, he's saying that I -- well,

7   the discovery order says, "Except for good cause shown."  So

8   he put -- he gave me his documents, even as I didn't receive

9   them, on the day before the end of the discovery period.

10          Now how am I supposed to review those documents

11   and then do the depositions, if it's given to me on a

12   Friday, December 4th, when he's saying the discovery period

13   is done on Monday December 7th.

14          THE COURT:  Well, what was -- were depositions

15   part of contemplating the discovery order?

16          MR. HOFFMAN:  They were certainly contemplated in

17   the discovery order in Paragraph Six.

18          THE COURT:  Could you hand me a copy, please?

19          MR. HOFFMAN:  Thank you.

20          THE COURT:  So when did you say you finally

21   received the documents?

22          MR. HOFFMAN:  I received them on January 7th.

23          THE COURT:  Okay.

24          MR. HOFFMAN:  I had an email exchange with Ms.

25   Walker on -- two weeks later, and I said I would like --

Page 21

1    they said, "We'd like to put it on the calendar."  And I

2    said, "Well, let's have a conference first," in which I

3    intended to bring up the issue of the depositions.  They

4    suggested the date of I think February 9th, is when we did

5    have a telephone conference then.

6             And at that time, I -- Mr. Salzman said, "Oh my

7    god, the first I've ever heard of depositions.  Oh my god.

8    We can't have that."  I do have another problem with the

9    briefing schedule, Your Honor, but I'll leave that to a

10   moment later.  But you could see that --

11            THE COURT:  What is it about the repos at issue

12   here that you believe takes it outside the contours of

13   carve-out?

14            MR. HOFFMAN:  What is it?

15            THE COURT:  Yes.

16            MR. HOFFMAN:  Well, first of all, our statements

17   all said that the securities were held at Lehman Brothers.

18   That language is identical to other brokerage statements

19   that have all received customer status.  In other words, our

20   statements don't look like the statements that were in

21   carve-out, where it was blank.

22            And if you read, especially Judge Peck's opinion

23   that was affirmed, he says, "Your statement says you don't

24   have any holdings."  There was a holding section.  Our says,

25   "Holdings," it says, "Your securities are held at Lehman

Page 22

1    Brothers."  Okay?

2              There's also a difference in that, first of all,

3    it -- the other difference is that my client -- it was

4    really more like a margin account, their retail customers.

5    It was only like, approximately $3 million worth of bonds

6    that they put $2 million up for, and then they -- the way it

7    works out, and I -- is that they were able to buy $3 million

8    worth of bonds with $2 million in cash.

9              In other words, it was a really a margin account.

10   I know everyone says, "Repo's (indiscernible) loans.  You

11   get these, it's all this institutional clients and it's U.S.

12   Treasuries and it's this tiny haircuts and all that stuff."

13   None of that is true in our case, none of that is true.

14             We have like, a 66 percent haircut.  We have

15   retail customers.  We have Latin American corporate bonds,

16   which are not part -- none of these things that are true for

17   all those other entities that went through the test

18   (indiscernible), I have been a starch -- in starch

19   opposition to referring to these as test cases, because

20   there was no procedure at all to the term of whether or not

21   those were typical of anybody else's claims.  That was him

22   picked by the trustee.  Be that as it may, I was here on the

23   25th of January, 2012 to tell Judge Peck that I wanted my

24   own case.

25             THE COURT:  Well, you had your own case.

Page 23

1          MR. HOFFMAN:  And I had my own case.  And he said,

2    "You'll have the full chance to litigate that."  My

3    discovery was originally served -- I originally served

4    discovery demands in 2011, never got a response to those.

5    Their motion was made without, you know, consultation with

6    me, without a chance to take discovery before they made

7    their motion.  I made a very limited amount of requests.

8          THE COURT:  Well, let me ask you this.  What the -

9    -

10         MR. HOFFMAN:  But the difference is -- I'm sorry -

11   -

12         THE COURT:  Now that you have the documents, what

13   depositions would you like to take?

14         MR. HOFFMAN:  I'd like to take Mr. (indiscernible)

15   deposition.

16         THE COURT:  And who is he?

17         MR. HOFFMAN:  He's a gentleman that worked at

18   Lehman Brothers that they'd used several times in the case.

19   He's -- I believe he may be on retainer with the Trustee or

20   -- he's done a lot of work.

21         THE COURT:  Is that the only deposition?

22         MR. HOFFMAN:  That's what I would like to have.

23   And it -- Your Honor, the problem is, this was very -- a lot

24   of this is very technical stuff with these internal

25   documents, and it's very difficult to make them out, what's

Page 24

1    going on in them without the expertise that the -- only the

2    Trustee has access to all the old Lehman Brothers people,

3    not me.  Okay?  And I need --

4              THE COURT:  Have you identified this individual as

5    someone that you believe can provide useful information to

6    you?

7              MR. HOFFMAN:  Yes, he was one of the people that

8    provided affidavits in the so-called test cases.

9              THE COURT:  Are you taking the position that the

10   documents are not clear on its face, and therefore, I am

11   going to have to look at evidence other than the documents

12   themselves?  Because those are the general rules, right?

13   When the documents are clear on their face, there's no

14   resort to parallel evidence.

15             MR. HOFFMAN:  Well --

16             THE COURT:  So is part of your case going to be

17   that there's a --

18             MR. HOFFMAN:  There's a slight difference.  My

19   understanding is -- and what I understand from the

20   production of the Trustee, and in their sort of rebuttal to

21   my point that mine says that the securities were held at

22   Lehman Brothers.  And those guys didn't have that, okay?

23   Their rebuttal to that is that we were on some other

24   reporting systems.

25             THE COURT:  Okay, but that you should understand

Page 25

1    that both in the repo context and in many other contexts --

2              MR. HOFFMAN:  Yes.

3              THE COURT:  -- there are documents that say that

4    securities are quote unquote "held at Lehman Brothers."  And

5    those are not magic words that necessarily give rise to a

6    customer claim.  There are --

7              MR. HOFFMAN:  True.

8              THE COURT:  -- decisions in the repo context and

9    outside of the repo context in which those magic words are

10   not as magic as they seem.  So --

11             MR. HOFFMAN:  Yeah.

12             THE COURT:  I don't want to cut off your rights,

13   but you seem to be going back to those words, and that

14   doesn't necessarily -- isn't necessarily going to be

15   dispositive.

16             MR. HOFFMAN:  Well, I appreciate that.  I -- you

17   know, I have other arguments.  I mean, as Mr. Salzman

18   mentioned, my brief was 31 pages long.  I think I have more

19   ammunition than that.

20             THE COURT:  All right, so you want one deposition,

21   and then we're going to go have a briefing schedule, yes?

22             MR. HOFFMAN:  Yes.  And I do have a problem with

23   the briefing schedule, (indiscernible).

24             THE COURT:  Well, let me go back to Mr. Salzman.

25   Mr. Salzman, can we do the one deposition?

Page 26

1              MR. SALZMAN:  If that's agreeable to Mr.

2    (indiscernible).  You know who he is and he -- we could make

3    him available.

4              THE COURT:  Quickly, yes?

5              MR. SALZMAN:  I believe so.

6              THE COURT:  Okay.  So what's the problem with the

7    briefing schedule?

8              MR. HOFFMAN:  Well, my understanding is that I

9    have the burden of proof as to customer status.

10             THE COURT:  Yes.

11             MR. HOFFMAN:  And you know, my understanding is

12   that I should get the last word.  In other words, they

13   shouldn't have the chance to make an initial brief and a

14   reply if they're not the ones with the burden of proof.  Now

15   that might be okay in a summary judgment context because the

16   law makes the presumption that the facts are going the other

17   way.  In this context, I have the burden of proof.  I expect

18   it's going to be decided on papers.  I should have the last

19   word.

20             THE COURT:  So you want to go first?

21             MR. HOFFMAN:  Well, we've already gone once each.

22             THE COURT:  Who went first?

23             MR. HOFFMAN:  They went first.

24             THE COURT:  Okay.

25             MR. SALZMAN:  We made a omnibus motion --

Page 27

```
 1              THE COURT:  And made --

 2              MR. SALZMAN:  -- (indiscernible) numerous people.

 3              THE COURT:  Okay, to reclassify, as a general

 4    claim.

 5              MR. SALZMAN:  Exactly.

 6              THE COURT:  Right?  And you opposed?

 7              MR. HOFFMAN:  And I opposed it, yes.

 8              THE COURT:  Okay.  And now we've had to look on

 9    (indiscernible) complete this discovery.

10              MR. HOFFMAN:  Now they want me to go again.  What

11    their proposed schedule is, I go again, and then they get to

12    knock me out of the park by having, you know, clean me out.

13    Okay, so I go twice in the middle, which I don't want that,

14    and I think that's not correct from a due process

15    standpoint.  If I have the burden of proof, I go first, I go

16    last.  And maybe I don't -- didn't get -- maybe I didn't get

17    to go first, but I go last.

18              THE COURT:  Well, let me ask you this question.

19    Let me ask you this question.  There's going to be

20    discovery.

21              MR. HOFFMAN:  Yes.

22              THE COURT:  All right, more discovery, right?

23              MR. HOFFMAN:  Yes.

24              THE COURT:  And now, what should happen next?

25    Should you have to say why what you found in discovery means
```

1    you win?

2            MR. HOFFMAN:  Yes, I should, but I would like to

3    see --

4            THE COURT:  Okay.

5            MR. HOFFMAN:  -- their -- I mean I don't know if

6    there's --

7            THE COURT:  Okay, let's make this simple, okay?

8    Let's make this simple.  Okay?  You're going to do the

9    discovery, okay?

10           MR. HOFFMAN:  Yes.

11           THE COURT:  Then I think it's incumbent upon you

12   to say why what you discovered means you win.  And they're

13   going to reply to that.  And then you can sur-reply.

14           MR. HOFFMAN:  Okay.

15           THE COURT:  All right?  But we're going to put

16   page limits on it.

17           MR. HOFFMAN:  Page limits?

18           THE COURT:  Page limits, I'm not interested in

19   reading, with all due respect, two more 30 page briefs.

20           MR. HOFFMAN:  Okay.

21           THE COURT:  That you submit, okay?

22           MR. HOFFMAN:  Okay.  I mean, just to be clear,

23   Your Honor, I'm not saying that my -- my main argument's

24   already in

25           THE COURT:  Sure.

Page 29

1          MR. HOFFMAN:  There's things in the discovery that

2    I'm hope -- that in the documents I have, and hopefully from

3    Mr. (indiscernible) that bolsters it.

4          THE COURT:  Okay.  But then the next round --

5          MR. HOFFMAN:  Okay.

6          THE COURT:  -- should be limited strictly to that,

7    right, not duplicate what's already been said.

8          MR. HOFFMAN:  Exactly.  Fine.

9          THE COURT:  Okay?  All right.  So can you agree on

10   a schedule or do you want to --

11         MR. HOFFMAN:  It depends on how quickly Mr.

12   (indiscernible) can be made available.

13         MR. CAPUTO:  Your Honor, if I may, can I make one

14   additional point.

15         THE COURT:  Sure.  I mean, I just want to

16   emphasize again, that it's not going to be a -- it's not

17   going to come down on whether or not the securities were

18   quote unquote, "Held," at LBI.  I want to emphasize that.

19   So I'm not going to cut off your rights, but I'm very

20   protective, if you will, of the resources of the estate.

21   And that's always a balance.  So we are where we are, let's

22   try to get to the finish line.  Yes?

23         MR. CAPUTO:  A brief point.  Kenneth Caputo on

24   behalf of the Securities Investor Protection Corporation,

25   Your Honor.  Because the briefing that will take place post

1    discovery will move this dispute into the realm of whether

2    or not the state customer claim or not, SIPC, which is a

3    party by right to every proceeding pursuant to statute --

4              THE COURT:  Yes.

5              MR. CAPUTO:  -- has not had the opportunity to

6    file a brief.  We don't want to necessarily add to Your

7    Honor's work load, and we certainly don't aim to repeat

8    arguments.

9              THE COURT:  Sure.

10             MR. CAPUTO:  We will make arguments, if we can, on

11   SIPC's behalf and focused on SIPC's view.

12             THE COURT:  Sure.  So that dovetails perfectly

13   into the schedule, because then you will have an opportunity

14   to reply, sur-reply to both sets of points that are made in

15   response to your next brief.

16             MR. CAPUTO:  Perfect.  Thank you, Your Honor.

17             MR. HOFFMAN:  Okay, but as long as we're clear,

18   SIPC was not in the initial briefings, so but their -- their

19   points should be limited to the discovery, just like

20   everybody else.  They're not going to come out of left field

21   with new stuff.

22             MR. CAPUTO:  Our points will be focused on the

23   law.

24             THE COURT:  I think their points will be pretty

25   focused on the law.

1              MR. CAPUTO:  Right.

2              THE COURT:  And will be consistent with the

3     position that they've taken in all these cases.  Remember,

4     there's very little dispute about the law.  There's no

5     dispute about the law, unless the Supreme Court says

6     something else, right?  What you're saying is, "I'm

7     different."

8              MR. CAPUTO:  Right.

9              THE COURT:  And all I'm doing is giving you a

10    chance to demonstrate that you're different.  The law is --

11             MR. CAPUTO:  That's all I'm asking for.  Thank

12    you, Your Honor.

13             THE COURT:  All right?  So now, do you need me in

14    terms of an actual calendar schedule, or can you work that

15    out among yourselves?  I'd like to keep it moving.

16             MR. HOFFMAN:  I would be prepared, if Your Honor

17    maybe the -- would the beginning of April be okay for me to

18    file my first brief, if we could get the --

19             THE COURT:  The beginning of April?  It's the end

20    of February.

21             MR. HOFFMAN:  Yeah.  When the --

22             THE COURT:  Well, when are you going to take the

23    deposition?

24             MR. SALZMAN:  We think that -- well, obviously I

25    haven't confirmed with them, probably Mr. (indiscernible)

Page 32

1    could be made available at a -- you know, in two weeks,

2    something like that, from now.

3              THE COURT:  Okay.  So why don't we say that you'll

4    file your brief two weeks after the deposition?

5              MR. HOFFMAN:  Okay.

6              THE COURT:  All right?  And then, you can work out

7    the additional briefing, dovetailing off of that.

8              MR. SALZMAN:  Yeah, thank you, Your Honor.

9              THE COURT:  Okay?

10             MR. HOFFMAN:  Okay, thank you very much, Your

11   Honor.

12             THE COURT:  Okay, thank you.  All right, what's

13   next?

14             MR. MARGOLIN:  Good morning, Your Honor.

15             THE COURT:  Good morning.

16             MR. MARGOLIN:  Jeffrey Margolin, Hughes Hubbard &

17   Reed for the Trustee.  But one last LBI matter, which is

18   listed under the contested matters, Item Six --

19             THE COURT:  Right.

20             MR. MARGOLIN:  -- is the objection to transfer

21   Claim 787 --

22             THE COURT:  Claim 787.

23             MR. MARGOLIN:  -- Claims Recovery Group, LLC by

24   Mr. Caraway.  I don't know if Mr. Caraway -- I believe the

25   Claims Recovery Group, LLC's counsel is in the courtroom.

Page 33

1            THE COURT:  Okay.  Is Mr. Carraway here, or anyone

2    on behalf of Mr. Caraway?

3            MS. KANE:  I don't believe so, Your Honor.  Dana

4    Kane from Kelly Drye & Warren --

5            THE COURT:  Yes, Ms. Kane.

6            MS. KANE:  -- for the Claims Recovery Group.  We

7    did -- I -- my office received a call from Mr. Caraway on

8    Friday evening after I was gone for the day.  He's in

9    California, three hours behind.

10            THE COURT:  Okay, this past Friday evening?

11            MS. KANE:  And -- this past Friday evening, the

12    19th.

13            THE COURT:  Okay.

14            MS. KANE:  Yes, Your Honor.  And Mr. Caraway

15    indicated during that phone call that he -- I believe he

16    might have been confused by the proceedings.  He indicated

17    that he was calling regarding the claim he had against the

18    Claims Recovery Group, and that he already signed the check

19    and everything is okay.  And as far as he knows, there was

20    nothing else to be done.  So I can represent to the court

21    room --

22            THE COURT:  Okay.

23            MS. KANE:  -- that is what was said.  I called him

24    back yesterday evening.

25            THE COURT:  All right.

Page 34

1          MS. KANE:  But I did not (indiscernible) --

2          THE COURT:  Okay.  And he was made aware of this

3   hearing today?

4          MS. KANE:  Yes, Your Honor.  We filed a notice of

5   hearing.  We did duly serve it on him about a week and a

6   half ago.

7          THE COURT:  All right.  And it also appears that

8   initially, he had indicated he hadn't received payment yet.

9   But we now also have evidence in the form of a canceled

10  check, indicating that he cashed the check.

11         MS. KANE:  Yes, Your Honor.  The timeline is that

12  the claim was transferred on December 11th --

13         THE COURT:  Right.

14         MS. KANE:  -- with both sides having signed the

15  agreement and the claimant recovery having sent the check.

16  To give Mr. Caraway the benefit of the doubt, because he is

17  an individual, I assumed that he meant when he said in his

18  papers to the Court that he had not received payment, that

19  he had not cashed the check.

20         THE COURT:  I see.

21         MS. KANE:  And he had, at that time, been issued

22  the check and would have received it by then.  But since

23  that time, he has cashed the check, Your Honor.

24         THE COURT:  Okay, all right.  Well, it does seem

25  that it was a misunderstanding, and particularly since Mr.

Page 35

1   Caraway is not appearing here today.  We will assume that he

2   has thought better of pursuing the objection to the transfer

3   of the claim.  Could you submit an order to us that disposes

4   of the matter?

5           MS. KANE:  Yes, Your Honor.  And I have one in

6   paper form and I can submit it electronically as well.

7           THE COURT:  If you can submit it electronically,

8   and do you have contact information from Mr. Caraway?

9           MS. KANE:  I have the phone number he left for me

10  and I also have his street address, so I can mail it to him

11  and files to (indiscernible) the Court.

12          THE COURT:  If you could, that would be lovely.

13          MS. KANE:  We will, Your Honor.

14          THE COURT:  All right.  Thank you very much.

15          MS. KANE:  Thank you very much.

16          THE COURT:  All right.  So that concludes the LBI

17  calendar?

18          MR. KOBAK JR.:  Yes, Your Honor.

19          THE COURT:  Okay.

20          MR. KOBAK JR.:  May I be excused?

21          THE COURT:  Of course.

22          MR. KOBAK JR.:  Thank you, Your Honor.

23          THE COURT:  Thank you very much.  Good morning,

24  Ms. Marcus.

25          MR. MARGOLIN:  Good morning, Your Honor.

Page 36

1    Jacqueline Marcus, Weil, Gotshal & Manges, for Lehman

2    Brothers Holdings Inc. and its affiliates.  That brings us

3    to the adversary proceeding calendar and --

4              THE COURT:  Okay.

5              MR. MARGOLIN:  -- the first matter on the calendar

6    is Lehman Brothers Special Financing Inc. versus Federal

7    Home Loan Bank of Cincinnati.

8              THE COURT:  Okay.

9              MR. TAMBE:  Good morning, Your Honor.

10             THE COURT:  Good morning, Mr. Tambe.

11             MR. TAMBE:  Jay Tambe from Jones Day with my

12   partner Lauri Sawyer.

13             THE COURT:  Usually I start by saying it's good to

14   see you all.  I'm not going to start that way today.  All

15   right?  This needs to come to a conclusion.  I am a very

16   patient person, but I am out of patience for six page single

17   spaced letters at cross purposes to other five page single

18   spaced letters over two very simple issues.  This is not

19   that complicated.

20             It's become complicated because I think that

21   there's a lack of will to resolve the underlying discovery

22   issues and get to a trial.  So we are today going to finally

23   resolve the issues, and we are going to set a definitive

24   trial schedule.  That's it.  We're not going to keep doing

25   this.

1            MR. TAMBE:  That's exactly what we --

2            THE COURT:  Seem fair?

3            MR. TAMBE:  That's exactly what we've asked for on

4    January 20th.  I can start with the first issue because we

5    think it's a simple issue.

6            THE COURT:  Go ahead.

7            MR. TAMBE:  Are they going to invoke advice of

8    counsel in any shape or form as part of their defense of the

9    case?

10           THE COURT:  And?  I make a prediction.  They're

11   going to say, "That depends on whether or not you are going

12   to put their good faith into question."

13           MR. TAMBE:  All right, so we --

14           THE COURT:  Okay?

15           MR. TAMBE:  -- dial it back and --

16           THE COURT:  Am I right?  Yes, I'm right.

17           MR. TAMBE:  So we can dial it all the way back to

18   the complaint, right?  We think the case is actually a very

19   simple case, and we've gone --

20           THE COURT:  I do, too.

21           MR. TAMBE:  -- we've gone through all sorts of

22   details, right?  (indiscernible) termination.

23           THE COURT:  Yeah.

24           MR. TAMBE:  We know what date this contract

25   terminated.

1              THE COURT:  Yes.

2              MR. TAMBE:  September 15th, 2008.  One, I don't

3      think there should be any disagreement about that, but

4      that's our second issue is, they don't seem to agree even on

5      that.

6              THE COURT:  Okay, but hold on that one.  They say,

7      "That's our position.  You don't like it, let's litigate

8      it."

9              MR. TAMBE:  Right.

10             THE COURT:  So I don't think there's anything more

11     to be said on that issue, on the date, time, 12th versus

12     15th issue.  That's their position.  You disagree.  I don't

13     think there's anything more we can say about that.

14             MR. TAMBE:  So we get to the -- we get to the next

15     one, okay.

16             THE COURT:  Right.

17             MR. TAMBE:  That's the early termination date, our

18     view.

19             THE COURT:  Right.

20             MR. TAMBE:  We think the contract is clear, you

21     value the terminated contract on or reasonably practically

22     after the early termination date.

23             THE COURT:  That's just --

24             MR. TAMBE:  (indiscernible) language.

25             THE COURT:  Right.

1              MR. TAMBE:  There's no scope in that language,

2      good faith or otherwise, to say, "I want to value it as of a

3      date that precedes the early termination date."

4              THE COURT:  Okay.  That's your position.

5              MR. TAMBE:  I'm done.

6              THE COURT:  Okay.

7              MR. TAMBE:  And when I sit down, I can

8      (indiscernible) and say, "No," there's another

9      (indiscernible) that allows us to say we reasonably could've

10     picked a time, but that was before the early termination

11     date.  They're raising that issue, now it's an issue.  We

12     need to talk about that issue.

13             THE COURT:  Right.

14             MR. TAMBE:  So it starts on the contract inception

15     point, but then it gets into, okay, you say you acted

16     reasonably.  What evidence are you going to rely on,

17     privileged matter or non-privileged issues?  Up until last

18     fall, they steadfastly said, "Privileged service

19     (indiscernible), we want to get discovery on AT, all these

20     other things."

21             THE COURT:  All right.

22             MR. TAMBE:  We did that discovery.  In

23     depositions, we find out, well, they're a little wishy washy

24     about whether they're going to invoke advice of counsel on

25     that point to support the reasonableness of their selection,

1    assuming that's valid as a contractual matter at all.  So

2    with all due respect to them, they're the ones who are going

3    to invoke the reasonableness of their actions, and I think

4    they intend to rely on advice of counsel as one of the legs

5    of that stool at the 11th hour.

6          But after having taken the position consistently

7    through discovery that there was this whole body of

8    privileged information, late in the day, these are the folks

9    who say, "Well, here are documents from September 15th to

10   September 25th."  Their choice, they selected it.  We know

11   from the privileged law they talk about these issues

12   throughout October.  And then they're saying, "We'll give

13   you these documents, but you have to agree never to argue

14   for broader waiver or any waiver."  How can they do that?

15         THE COURT:  Okay, but let's go back.  Let's go

16   back to the issue of good faith.

17         MR. TAMBE:  Yeah.

18         THE COURT:  Okay?  I've indicated from the outset

19   that who has the burden in this kind of case, is something

20   that you're going to have to brief, okay?  I'm not giving

21   you a ruling on it.  I don't know what the answer is.  FHLB

22   has expressed a view that there's nothing especially

23   specific in the ISDA, and therefore re-default to New York

24   law, et cetera.

25         I don't think it's that simple, but be that as it

1    may.  Okay?  So they say, "Ah ha, look at some other cases

2    involving these ISDA's, right?"  Look at Intel.  At Intel,

3    Lehman specifically knows how to say, "Good faith is not an

4    issue," okay?

5              MR. TAMBE:  Right.

6              THE COURT:  You say, "Well, this is different."

7              MR. TAMBE:  Yeah.

8              THE COURT:  All right?

9              MR. TAMBE:  Yes, it is different.

10             THE COURT:  Okay.  So --

11             MR. TAMBE:  I can go through the reason point,

12   yeah.

13             THE COURT:  Okay.  So this is different.  So in

14   your view, it's your view that in their view, good faith is

15   at issue, right?  They said as much.  You quote to me a

16   statement that --

17             MR. TAMBE:  Yeah.

18             THE COURT:  -- they made, I believe back in

19   October that says that the reasonableness and good faith,

20   the Federal Home Loan Bank, in choosing their time, which we

21   think is mandated by the agreement.  But in choosing that

22   time, reasonableness and good faith is the key issue

23   (indiscernible).

24             MR. TAMBE:  Yes, that's what they said.

25             THE COURT:  That's what they said.  Okay.

Page 42

1          MR. TAMBE:  So surprise is not an issue here.

2     They've known, they've viewed the cases including that

3     issue, now all that's left is what evidence are they going

4     to rely on to support their good faith?  And if they're

5     going to rely on privileged information, we should get the

6     privileged information.

7          THE COURT:  Okay.

8          MR. TAMBE:  That's it.

9          THE COURT:  All right.  So now I think we set the

10    table and now I think I should hear from FHLB.

11         THE COURT:  Good to see you, Mr. Ratner.

12         MR. RATNER:  It's always good to see you, Your

13    Honor.  Even with the introduction, (indiscernible), it's

14    good to see you.  Your Honor, we share the Court's

15    frustration.  We just think it's directed at the wrong

16    table.  And let me explain it briefly why.

17         THE COURT:  I was directing it at both tables,

18    okay?  But --

19         MR. RATNER:  My sensitivity --

20         THE COURT:  Forget about my frustration, okay?  Is

21    good faith an issue in the case or not?

22         MR. RATNER:  Well, it depends when you ask Mr.

23    Tambe that question.  And if you give me 30 seconds, I'll

24    explain what I mean.  I -- we wrote the letter to you

25    yesterday that laid out the chronology here.  And when I

1    stood in this courtroom on October 1st and I talked about

2    good faith being an issue, things had been happening in

3    discovery and I was under the impression, I was, that good

4    faith was being raised by them.  I thought that was an

5    issue, okay?

6            This is a contract case.  And they have to prove

7    all of the elements of their case.  We've cited the law to

8    you on burden of proof, where good faith is alleged.  So

9    when I stood here on October 1st, we thought that.  And

10   then, we looked back after we were here.  We lost on the

11   discovery issues, Your Honor.  We lost on those.

12           We went back and we looked at the complaint.  And

13   looked at other complaints.  This complaint doesn't mention

14   the words good faith.  It doesn't say.  It says that Federal

15   Home Loan Bank did it (indiscernible).  It doesn't say they

16   did it in bad faith as a whole list of other cases do.  And

17   then we looked at Your Honor's decision in Intel, which had

18   come out very shortly before I stood at the podium that

19   time.

20           And in there, Your Honor pointed out that Lehman

21   wasn't challenging good faith in that case.  So we say,

22   "Wait a minute.  Maybe I'm wrong.  Maybe they're not

23   challenging it here."  So we served a contention in

24   derogatory.  And they gave it -- an answer with a little bit

25   of a good faith challenge.  They (indiscernible) some things

Page 44

1      that they said that were challenging about good faith.

2              And then, they write a letter on January 20th to

3      Your Honor and they say, I think it's on page three, that on

4      faith is not an element of their claim.  Okay.  And that's

5      why in our letter of January 22nd, we said, "It appears that

6      it's not in the case."  But what Your Honor --

7              THE COURT:  The point is that if you're going to

8      defend on the basis that you acted reasonably and in good

9      faith, then good faith is an issue in the case.

10             MR. RATNER:  To defend against what?  Your Honor,

11     is the --

12             THE COURT:  Against the allegation that you

13     breached the ISDA in the manner in which you applied the

14     early termination.

15             MR. RATNER:  That puts the burden of proof on us.

16     Your Honor --

17             THE COURT:  I am not deciding burden of proof.  I

18     am deciding the existence.  I am trying to ascertain the

19     existence of the issue of reasonableness and good faith in

20     this case.  Is it or is it not an issue in this case?

21             MR. RATNER:  If they raise it, it's an issue.

22             THE COURT:  No --

23             MR. RATNER:  Your Honor, if it's an element of

24     their -- the cases we cited in a letter we sent to you

25     yesterday.  It makes it -- make clear we believe that the

Page 45

1   party asserting a breach of contract, asserting their -- in

2   fact, bad faith that the defendant did not act in good

3   faith, that's the burden.  It has to go -- has to plead it

4   and has to prove it.

5           THE COURT:  You keep going back to the burden and

6   I am not going to go there.  I am not going to decide ahead

7   of time who has the burden.  If this problem gets solved by

8   their amending their complaint to allege an information

9   belief that the termination was not performed reasonably and

10  in good faith without prejudice to who's got the burden, but

11  we can do it that way.

12          MR. RATNER:  Your Honor, let me be clear on where

13  I was going with the last step in the (indiscernible).  The

14  letter that we received last Friday from Jones Day for the

15  first time said that the -- that good faith was in the

16  complaint that he served three years (indiscernible), not

17  withstanding the fact that they said on January 20th it

18  wasn't an element in their claim.

19          Your Honor, I understand what Your Honor is saying

20  about burden of proof.  I'm not going to belabor the point.

21  We've laid out our arguments on that in the correspondence.

22  But we're now being put in a position where we have to

23  decide whether we're going to be defending (indiscernible) -

24  -

25          THE COURT:  But the ISDA requires that the day and

Page 46

1    time to solicit marketing quotations has to be selected in

2    good faith.  This --

3               MR. RATNER:  They say -- I'm sorry, Your Honor.

4               THE COURT:  I just don't understand.

5               MR. RATNER:  They say -- if they say, "We didn't

6    do that," they have to prove we didn't do that.  That's our

7    position, Your Honor, and I understand that Your Honor's not

8    ruling on that point now.  We've laid that out, you know, in

9    our papers, and that's why we are where we are.  But Your

10   Honor, more importantly, we took what your -- what you said

11   when we were here, you know, very seriously about not

12   wanting to see us anymore.

13              And we tried very hard to come to an accommodation

14   with Lehman on this point.  When you were here in November,

15   Ms. Sawyer said all she's asking for, all right, are

16   materials on September 15th, the date -- when the date and

17   time was selected by Federal Home Loan Bank.  That's when

18   they made their decision as to the date and time.  They --

19   she said, "We're not asking for weeks.  We're only asking

20   for a very narrow thing."

21              We thought, "Okay, fine.  We'll come to an

22   accommodation.  We won't have to darken your doorstep

23   again."  And we tried to do that.  In fact, we proposed the

24   15th and the 16th, (indiscernible) confirmed on the 16th.

25   As soon as we proposed that, they wouldn't take yes for an

Page 47

1   answer, they want more and then they want more.  And those

2   were the negotiations that are summarized.

3          THE COURT:  Well, but let's go back to the whole

4   concept that if we quote unquote "agree" that good faith is

5   an issue in the case without deciding who has the burden to

6   prove good faith or lack thereof, right, then Lehman's

7   position is that therefore, there's a waiver.

8          To the extent that you will be relying on the

9   advice of counsel, then there's a waiver.  So that makes --

10  that explains, I believe, and Ms. Sawyer can certainly speak

11  for herself -- the notion that the timeframe shouldn't be

12  limited, because why should the timeframe be limited, if

13  there's advice and conversations surrounding the issue that

14  shed light on the issue of good faith in making the

15  selection?  So it's -- you're either in or you're out.

16         MR. RATNER:  Your Honor, the reason for that is

17  that the decision was made on the 15th of September, 2008.

18  So the question would be, what was -- was there good faith

19  in making that decision on that day?  That's -- and that

20  should be the temporal scope of anything we are talking

21  about.  And with that, we are prepared to do that, Your

22  Honor.

23         What we're not prepared to do, and which keep

24  pushing it back and then leave it open for Lehman Brothers

25  to claim a broader waiver on other subjects.  Your Honor,

Page 48

1    the only provision in the market quotation section, good

2    faith relates to (indiscernible).  It relates to the

3    selection of referenced market managers.

4              THE COURT:  That's right.

5              MR. RATNER:  And it refers to the selection of the

6    date and time as of which the quotations speak.

7              THE COURT:  That's right.

8              MR. RATNER:  Mr. Tambe dated his view of the date

9    and time and saying it has to be on (indiscernible).

10             THE COURT:  That's right.

11             MR. RATNER:  We have a very different view and we

12   think that you will hear evidence on that.  But it's good --

13   to the extent good faith is in, it's in as to that.  Those

14   are the two points.  That happened on the 15th of September.

15   And Your Honor, any waiver, we will be prepared to waive

16   with respect to that issue.

17             The only thing they've been challenging so far,

18   according to their contention response, is the date and time

19   we would be prepared to produce the materials on that, on

20   the 15th, and the (indiscernible) of the 16th, because

21   there's one piece that refers back to that.  But in doing

22   so, Your Honor, we don't want to put a -- we don't want to

23   put ourselves in the position where we're going to be back

24   here with Lehman saying, "Oh, now they've waived on

25   everything under the sun."  Your Honor, we want to get this

Page 49

1    thing to trial.  We want to get this thing resolved.  And --

2            THE COURT:  Let me hear from Mr. Tambe and/or Ms.

3    Sawyer.

4            MR. TAMBE:  I don't want to give a quote with any

5    misimpressions.  If you have a copy of the ISDA master

6    agreement, you can go specifically with the language.  Now I

7    think some of the confusion here comes from both of us,

8    paraphrasing the language.  So --

9            THE COURT:  We're looking at the ISDA now?

10           MR. TAMBE:  At the ISDA.  If you have a copy

11   there, and I don't know if it's --

12           THE COURT:  I don't actually carry one around with

13   me.

14           MR. TAMBE:  Nor do I, Your Honor --

15           THE COURT:  Unless they make one of those little

16   pocket sized, like the Constitution.  Thank you.

17           MR. TAMBE:  Your Honor, I have a Constitution in

18   my left pocket, the ISDA in my right pocket.  It hasn't

19   helped very much, recently.  So if we go to the definition

20   of market rotation, which I think is on Page 15 --

21           THE COURT:  Yeah.

22           MR. TAMBE:  And it's a long definition, but here's

23   the part on Page 16, to carry over.  And it's the sentence

24   that begins, "The party making the determination will

25   request."

1          THE COURT:  Yeah.

2          MR. TAMBE:  Right.  You can read that whole

3    sentence, and there's no mention of good faith in there, in

4    that sentence.  It's in the next sentence.  So the first

5    sentence says, "Ask market makers to provide its quotation

6    to the extent reasonably practicable, as of the same day and

7    time," parenthetical, "or assuming as reasonably practical

8    after the early termination date."  That as of date and time

9    that you pick, in the next sentence, it says, "You have to

10   pick that reasonably and in good faith."

11         THE COURT:  Mm hmm.

12         MR. TAMBE:  When you have picked a time that's

13   before the early termination date, no matter how much good

14   faith you have, how much reasonableness you have, as a legal

15   matter, they'd say you don't even get that question.  But

16   they're going to try and defend their breach of this

17   agreement by saying, "No, we acted reasonably."  Stop right

18   there.  If they don't ever rely on advice of counsel to make

19   that argument, we have no issue.  But I think they wanted

20   (indiscernible) advice of counsel, and said (indiscernible)

21   advice.  And our lawyers said, "X."

22         THE COURT:  Right.

23         MR. TAMBE:  And we (indiscernible) them that.  As

24   soon as they do that on that issue --

25         THE COURT:  That's right.

1          MR. TAMBE:  -- no big restriction did -- that

2    lawyer says, "This is my view of the ISDA and this is how

3    I'm going to instruct the traders."

4          THE COURT:  Okay.

5          MR. TAMBE:  She sent that on the 15th.  She says

6    that on the 16th.  She may have said that on the 18th, the

7    20th --

8          THE COURT:  Okay, but let me stop you there,

9    because what Mr. Ratner is telling me, as he's reluctantly

10   conceding, I think, that good faith is an issue, putting

11   aside the burden, okay?  But what Mr. Ratner's saying, I

12   think that deserves a response is that once the decision is

13   made, subsequently, if there's chatter between the client

14   and the lawyer, hand wringing, second thoughts, alternative

15   theories, it's got nothing to do with anything.  Right?

16         MR. RATNER:  Your Honor, I think that's correct.

17   (indiscernible) --

18         THE COURT:  That (indiscernible) -- you -- that as

19   of the moment the decision was made, after that, except to

20   the extent that in one instance Mr. Ratner's saying

21   something refers back, not quite sure what you mean, but be

22   that as it may.

23         MR. RATNER:  (indiscernible), Your Honor?

24         THE COURT:  Well, I'm just trying to draw a

25   distinction between your -- after an act occurs and then

Page 52

1    there's more discussion about it, right, there are some

2    circumstances in which the subsequent discussion, which shed

3    light on the very act let me explain, right?

4             For example, you could say, "We agreed at such and

5    such time to do X."  Okay?  To -- (indiscernible) counsel,

6    yes.  But then, if there's subsequent correspondence that

7    says, "Oh gee, maybe the agreement's not enforceable because

8    we didn't write it down, let's write it down now," then that

9    might be probative of the illegal effect of the so-called

10   agreement.

11            So there are scenarios in which otherwise

12   privileged communications, after a legally significant

13   moment of alleged decision making, there are hypothetical

14   communications that could occur after that, that I believe

15   would be discoverable and would be probative.  But you're

16   right.  It shouldn't be forever.

17            MR. RATNER:  Your Honor, that's pretty much our

18   point.  And the reason I refer to the 16th is because there

19   is an email, a communication on the 16th that confirms a

20   discussion on the date.  So in candor, we said, "Your Honor,

21   that -- we would include that in our proposal."  But here,

22   we're not talking about, you know, the legal effect of

23   something.

24            We're talking about state of mind, in the language

25   of, will neither be, you know, of the federal rules.  We're

Page 53

1    talking about it's a state of mind concept.  That's what

2    existed on the day the choice was made.  And was it in good

3    faith or was it not good faith when that decision was made?

4    They made a decision, acted on that basis, and was it done -

5    -

6              THE COURT:  Okay.  So now, are we down to -- are

7    now -- next.  So our good faith, we've reluctantly agreed is

8    in the case.  Advice of counsel is going to be relied on, so

9    we have an at issue waiver.  Right?

10             MR. RATNER:  Your Honor, we've received it on the

11   basis that Your Honor said, "Put aside burden of proof."

12             THE COURT:  Put aside burden of proof.

13             MR. RATNER:  As it (indiscernible) a confirmation

14   (indiscernible), but put aside the burden of proof.  Good

15   faith, whether they do it or we do it --

16             THE COURT:  Right.

17             MR. RATNER:  -- Your Honor has said it's

18   (indiscernible) in the case.

19             THE COURT:  Yeah.

20             MR. RATNER:  That's our starting point.

21             THE COURT:  Right.

22             MR. RATNER:  Okay?

23             THE COURT:  Because it's in the ISDA, not because

24   I feel like it.

25             MR. RATNER:  No, no, I'm sorry.  I didn't --

Page 54

1              THE COURT:  Okay.

2              MR. RATNER:  But I did want to at some point

3    address Mr. Tambe's (indiscernible) views.

4              THE COURT:  Okay, but --

5              MR. RATNER:  But Your Honor, I believe that we

6    (indiscernible) advice of counsel, with respect to the

7    selection of the day and time on the 15th of September,

8    2008.

9              THE COURT:  And with respect to soliciting

10   quotations from referenced market makers?

11             MR. RATNER:  There's no challenge to that, Your

12   Honor.

13             THE COURT:  There's no challenge to that.

14             MR. TAMBE:  The identities are who -- what banks

15   they lent to were not challenged.

16             THE COURT:  You're not challenging.

17             MR. RATNER:  It's really only that one.

18             THE COURT:  Okay, are we clear on this?

19             MS. KANE:  Yes.

20             THE COURT:  Yes?

21             MR. RATNER:  Yes, we are.

22             THE COURT:  Okay, very good.  So therefore, we

23   have good faith, we have reliance on advice of counsel,

24   therefore, we have an at issue waiver, right?

25             MR. RATNER:  On that one --

```
 1                THE COURT:  On that one, on that issue, okay?

 2                MR. RATNER:  (indiscernible) --

 3                THE COURT:  And therefore, go ahead.  I'm sorry.

 4                MR. RATNER:  I -- we've left out so far the

 5      temporal limitation.

 6                THE COURT:  And now we're going to the temporal

 7      limitation.  Okay?  So let's resolve the temporal

 8      limitation.

 9                MR. TAMBE:  (indiscernible).  Bridget Hoffman's

10      the lawyer, I believe, that --

11                THE COURT:  Yeah.

12                MR. TAMBE:  -- (indiscernible) communications are

13      going to be the key ones.

14                THE COURT:  Right.

15                MR. TAMBE:  And we know she's communicating with

16      (indiscernible) in Cincinnati early on Monday morning.

17                THE COURT:  Right.

18                MR. TAMBE:  Presumably, that's when the advice is

19      given.  There are other significant dates.  The very next

20      day, the 16th, the (indiscernible) goes out and actually

21      replaces every single transaction at a different price than

22      the price that they had just obtained as of Friday evening.

23      So they -- there's a delta there.  On September 25, they

24      have to submit their calculations statement while

25      recognizing this $40 million discrepancy between where they
```

1    hedged --

2              THE COURT:  Right.

3              MR. TAMBE:  -- and the Friday prices.  To the

4    extent conversations, did Bridget know, for example, did Ms.

5    (indiscernible) know, for example on Monday morning that the

6    markets were moving in such a direction that the advice she

7    was giving, if she had no idea where markets were, she might

8    say, "I reasonably think about (indiscernible) this

9    contract.  I'm a transactional lawyer, yeah, you can do

10   this."

11             But then someone gives us some more information

12   and says, "Ms. Hoffman, is that still your place?  Was that

13   reasonable for us to have done that?"  I don't know if this

14   conversation took place or not, but you can see if such

15   conversations took place, if there was a re-visitation of

16   whether or not it was reasonable for them to continue to

17   rely on a Friday close, given what they had actually done

18   and what they knew, and whether they had shared that with

19   the lawyer whose advice they're relying on.

20             I think all of that -- so I can't put a strict

21   temporal line, but I can tell you on the 16th, there are

22   probative events.  Up to the 25th of September, there are

23   probative events.  And the last time I would say that there

24   are probative events is probably getting into October of

25   2008, when Lehman contacts (indiscernible) in the first time

1     it (indiscernible).

2              THE COURT:  November, Lehman contacts?

3              MR. TAMBE:  November of 2008.  Lehman contacts

4     (indiscernible) to say, "This -- there seems to be a

5     discrepancy here between what you have submitted to us on

6     the 25th and what your public filings say, which is you

7     recognize this $40 million gain."

8              THE COURT:  Okay.  Thank you.  So Mr. Ratner?  So

9     now I have this nice little binder that I've had for a

10    while.  This binder of in camera documents.

11             MR. RATNER:  In camera.

12             THE COURT:  Okay?  So now that we have clarified

13    what we've clarified, what's your position with respect to

14    producing all of the documents in this binder?

15             MR. RATNER:  Those are (indiscernible).  I don't

16    remember what every line item of each of those documents

17    says to the extent they will (indiscernible) to the

18    selection of the date and time, that would be part -- of

19    course, there -- I think they're the 15th.  They're --

20    (indiscernible) on the 15th, we would produce those

21    documents to the extent they were (indiscernible) to the

22    selection of the (indiscernible).

23             THE COURT:  What -- okay.  Articulate for me again

24    the manner in which you're not challenging the selection of

25    the referenced market makers in quotations?  You're

Page 58

1    challenging the amount of their claim?

2            MR. TAMBE:  Oh yeah, we're challenging the amount

3    of the claim.  We're challenging the date as of which, yeah.

4            THE COURT:  You're -- but are you challenging the

5    amount of the claim only because of the date as of which, or

6    are you challenging the calculation of the claim as a result

7    of the quotations that they got?

8            MR. TAMBE:  I'm sorry.

9            THE COURT:  Mm hmm.

10           MR. TAMBE:  I think it's both, because good -- I

11   think like we discussed, good faith comes in two ways.

12   You're supposed to take your reference market makers in good

13   faith.  To who you're going to ask.

14           THE COURT:  Who you're going to ask and how you

15   ask them.

16           MR. TAMBE:  And how you ask them.  So the --

17           THE COURT:  You're not allowed to gain the --

18           MR. TAMBE:  That's right.

19           THE COURT: -- (indiscernible) market quotation

20   process.

21           MR. TAMBE:  That's right.  And if that's part of

22   what they did, and what we know from the documents we have

23   so far and the testimony we have is we know they

24   (indiscernible) quotes as of Friday.  That's on the face of

25   their document.  We know clearly that was part of

Page 59

1    communication.  If they skewed it in any other way, if they

2    made any other comments to the referenced market makers to

3    skew the outcome, yeah, that would be part of how we would

4    challenge the reasonableness.  You can't just sort of

5    isolate it and pick out one part of it.  If someone's giving

6    you advice and saying, "This is a reasonable way to conduct

7    and close our process, here are all the things you should be

8    doing."

9            We know one of them is clearly impermissible in

10   our view under the contract, but if other advice was given,

11   which was not reasonable, this would be able to put that

12   behind the shield, and only show us what they want to show

13   us.  And then, it all starts with them wanting to rely on

14   advice of counsel to make their defense.

15           MR. RATNER:  Your Honor, and the (indiscernible)

16   advice of counsel as to what?  What Mr. Tambe is doing now

17   is he is doing a (indiscernible) of what happened when we

18   were trying to dissolve this and saying yes, and they

19   (indiscernible).  When you look at their answers are

20   intentionally derogatory to the extent they haven't

21   challenged (indiscernible) --

22           THE COURT:  Look --

23           MR. RATNER:  It says nothing about this, Your

24   Honor.  It's only about taking time.  This is a new story,

25   we're hearing.  And when Mr. Tambe, to the extent that the

Page 60

1    communications we've referenced market markers, they have

2    that.  That's a -- we're not relying on advice of counsel

3    with respect to the communication with (indiscernible).  We

4    would be relying on advice of counsel with respect to the

5    selection of the date and time on September 15th, 2008.

6    There's been -- not a word was said to the (indiscernible) -

7    -

8           THE COURT:  Okay.  So my view, based on where

9    we've gotten to today, is that everything in this binder

10   gets produced.  Do you recall, as you're sitting there,

11   what's in here?

12          MR. RATNER:  Your Honor, I do not (indiscernible)

13   specifically.  I hear what you're saying, (indiscernible) --

14          THE COURT:  The document -- the documents in this

15   binder, and I won't reveal -- the dates on them are Monday

16   September 15th, Wolf to Hendrickson.  Okay?

17          MR. RATNER:  And Monday --

18          MR. TAMBE:  I think they're all (indiscernible) --

19          THE COURT:  Well, no, let me --

20          MR. TAMBE:  One is on the 16th.

21          THE COURT:  One is on the 16th, okay?  Then we

22   have some transcripts.  There apparently was a power outage,

23   a lot of discussion with the power outage.  Ms. Wolf and

24   Carol (indiscernible).  So that's the 15th.  Then there's

25   Ms. Wolf and Don Abel.  That's the 15th, also a transcript

Page 61

1    that gets produced.  Then there's the 15th at 9:24, Ms. Wolf

2    and Ms. Hoffman.  That gets produced.

3                MR. RATNER:  May I --

4                THE COURT:  Yes?

5                MR. RATNER:  May I address that?

6                THE COURT:  Yeah.

7                MR. RATNER:  The answer, Your Honor is, I don't

8    know without looking at it.  We submitted those materials to

9    Your Honor plus the assertion that was made by Lehman with

10   respect to those documents, that they are not privileged

11   because they took place before lawyers were consulted.  That

12   was based on mis-remembrance of the (indiscernible).

13               THE COURT:  Right, but --

14               MR. RATNER:  So the starting point, I'm sorry --

15               THE COURT:  Mm hmm.

16               MR. RATNER:  The starting point that we had is

17   that these are privileged documents.  The question is

18   whether they're going to be waivered with respect to

19   privileged documents, but they are privileged documents.  To

20   the extent those documents deal with the selection of the

21   date and time, then we would agree with Your Honor that if

22   there is going to be a waiver (indiscernible) advice of

23   counsel on that subject, they would be produced.  To the

24   extent they deal with other subjects, Your Honor, I want to

25   (indiscernible).

Page 62

1          THE COURT:  Well --

2          MR. TAMBE:  Was (indiscernible) --

3          THE COURT:  My view is they all deal with exactly

4    what we've been talking about today.

5          MR. RATNER:  And if that's the case, Your Honor,

6    we won't have an issue with it, but I can't say until I look

7    at it, I don't know whether they're dealing with other

8    subjects.  And --

9          THE COURT:  Well, my view is, and I'm continuing

10   to page through them, you've got a September 15th 9:38 Wolf

11   and Don Abel.  You've got September 15th, a couple of other

12   people.  And then, you've got a September 16th, Wolf and Don

13   Abel.  And that gets produced as well.

14         MR. RATNER:  Your Honor, (indiscernible) --

15         THE COURT:  So I will -- because I don't want to

16   ambush you because I'm not sure if you knew that I was going

17   to do this today, my view is now that in light of where we

18   have arrived with respect to good faith/at issue waiver,

19   that these should all be produced.  So I will give you an

20   opportunity to take another look at them, and I would say,

21   let's see.  Today is Tuesday the 23rd.  I'd like you to let

22   me know by the end of the close of business on Friday the

23   26th in a letter with a copy of Mr. Tambe and Ms. Sawyer,

24   whether you disagree with the conclusion that my tentative

25   conclusion that they should all be produced --

1          MR. RATNER:  Yeah, Your Honor --

2          THE COURT:  So simply by tab number and in general

3   terms, why you disagree.  All right?

4          MR. RATNER:  Of course, Your Honor.  The starting

5   point here is that they are (indiscernible) questions of

6   whether they're (indiscernible) in scope or --

7   (indiscernible) the advice of counsel.

8          THE COURT:  That's right.  My view is that they

9   are.  Yes, I can see why you say they're privileged, but I

10  believe that they're now within the scope of what ought to

11  be produced.  All right?

12         MR. RATNER:  Thank you, Your Honor.

13         THE COURT:  So now, that hasn't resolved the

14  temporal issue.  Okay.

15         MR. RATNER:  So (indiscernible), Your Honor.

16         THE COURT:  So are we fighting about something or

17  are we fighting about nothing because I don't want to fight

18  about nothing?

19         MR. TAMBE:  Nor I.  The concept is pretty clear.

20  If it relates to the selection of time and date, whether it

21  was in the 15th, the 16th or some later date, if it relates

22  to that topic, it's within the scope of the at issue waiver.

23         MR. RATNER:  And Your Honor, that could not

24  possibly affect the good faith of the Federal Home Loan Bank

25  on the 15th, (indiscernible) the selection.  And a later

Page 64

1    discussion would not be advice of counsel, that is the --

2    that (indiscernible) the selection of the (indiscernible).

3              MR. TAMBE:  That's the one we (indiscernible),

4    right?  If you tell Ms. Hoffman only a few facts on Monday,

5    and she gives you some advice and you say, "I like that

6    advice, I'm going to rely on that," Ms. Hoffman learns from

7    you, in a privileged conversation a week later the rest of

8    the story, as they say, and Ms. Hoffman says, "I'm shocked.

9    Why didn't you tell me this on Monday?  I'm not going to get

10   to see that?"  So I get to cross examine Ms. Hoffman and

11   say, "Only they shared with you all the facts with Hoffman,

12   would you have given that advice?  Was that reasonable

13   advice, knowing everything you know today?  Was that

14   reasonable advice that you gave on Monday?"

15             Those were all facts known to your client.  That's

16   just one -- that -- I don't' know if that happened or not,

17   but that's giving you rationale as to why things have

18   happened after the 16th may well be probative, when Ms.

19   Hoffman takes the stand and is cross examined on this issue,

20   on whether she gave reasonable advice.

21             MR. RATNER:  Your Honor, the issue is not the

22   advice given by the lawyer.  The issue is the good faith of

23   the Federal Home Loan Bank in relying on advice of counsel

24   as part of its determination on good faith.

25             THE COURT:  Well, what if the -- what if they

Page 65

1    relied on the advice with respect to the 15th, and then a

2    week later, the lawyers call and they say, "You know, this

3    is a more complex question than we originally thought.  And

4    we think you should do something else."  And Federal Home

5    Loan Bank says, "This ship has sailed, too bad."

6               MR. RATNER:  The decision on the date had already

7    been (indiscernible).

8               THE COURT:  But --

9               MR. TAMBE:  But, and (indiscernible) and then they

10   submit the (indiscernible) statement and (indiscernible) --

11              THE COURT:  Correct, that's right.  That's the --

12              MR. TAMBE:  Which could possibly have been a good

13   faith submission.

14              THE COURT:  That's the hypothetical fact pattern,

15   is that they make a decision, the advice then gets changed,

16   they say, "I'm sorry, we're sticking with our member.  We're

17   putting in the valuation statement."

18              MR. RATNER:  Your Honor --

19              THE COURT:  This is privileged, right, Mr. Ratner?

20   Yes, it's privileged, right?

21              MR. RATNER:  It is privileged.  Your Honor, in the

22   interest of -- and we're not casting too big a

23   (indiscernible), (indiscernible) subject matter to the

24   selection of the date --

25              THE COURT:  Yes.

Page 66

1          MR. RATNER:  -- and time.

2          THE COURT:  Yes.

3          MR. RATNER:  We would be prepared to go up just

4     that subject, we would be prepared to go up to the 25th,

5     which is what we came to (indiscernible) discussions with a

6     -- with Jones Day, but we don't want to be put in a position

7     where there -- they're hoping (indiscernible) thing --

8          THE COURT:  Well, but the concern again, I have a

9     very strong feeling that we're fighting about nothing.  The

10    concern is that picking of an arbitrary date --

11         MR. RATNER:  That's the date we submitted the

12    statement, and what Mr. Tambe just talked about.

13         MR. TAMBE:  (indiscernible) --

14         MR. RATNER:  (indiscernible) idea.

15         MR. TAMBE:  The generous offer came with, you

16    know, a lit bomb, right?  I mean, it was basically saying,

17    "Yeah, you could have the documents, but you have to now

18    agree that you've never argued for (indiscernible)."

19         THE COURT:  Okay.  Here's what we're going to do,

20    because I've got all these other people waiting and I've got

21    people coming in for a trial at one o'clock, all right?

22    Consistent with our discussion today, which has been

23    recorded so that everybody can remember it and not disagree

24    about what was actually said, you're going to produce the

25    documents that we've described through the 25th.

Page 67

1          I'm not going to say for certain, no more.  If

2     there's any indication in the documents that there's some --

3     something more that ought to be produced, we'll talk about

4     it.  I believe that taking you through the 25th ought to do

5     it, okay?

6          But I'm not going to definitively say that I won't

7     entertain a request for something more, if it appears from

8     the documents that there is still an ongoing, evolving

9     situation that somehow relates to the issue of good faith

10    and selecting the early termination fee.  All right?  So

11    that's what we're going to do.  So how about taking it --

12    yeah?  I'm sorry?

13          MR. RATNER:  And Your Honor, again, the materials

14    to be produced will be limited to that issue.

15          THE COURT:  That's right, that --

16          MR. RATNER:  And (indiscernible) redacting things

17    (indiscernible) --

18          THE COURT:  That's right.  And we've got a record.

19    I'll so order the record.  I'm not going to ask you to

20    reduce this to an order because it will be too hard, but

21    we'll so order the record so that preserves all of your

22    rights with respect to appellate issues in the event that it

23    becomes something that needs to be pursued on your part.

24          MR. RATNER:  Thank you, Your Honor.

25          THE COURT:  All right?

Page 68

1          MR. RATNER:  Yes, Your Honor.  Thank you.

2          THE COURT:  Mr. Tambe?

3          MR. TAMBE:  I'm going to the next step, which is

4    the potential schedule.

5          THE COURT:  Yes.

6          MR. TAMBE:  So we have a proposed schedule.  We

7    have not discussed it with them, pending this, but we have

8    something like that that's just September 19th to the trial

9    date, that I think that there may be some time

10   (indiscernible).  We were happy to talk to them about our

11   schedule.  We can step outside --

12         MR. RATNER:  Your Honor, may I suggest that we

13   have conversations and then come back to Your Honor.

14         THE COURT:  Okay, you --

15         MR. RATNER:  Which Mr. Tambe and I can do.

16         THE COURT:  But someone -- someone's going to tell

17   me that they want to file for summary judgment?

18         MR. RATNER:  I believe that that is a realistic

19   possibility, Your Honor.

20         THE COURT:  Okay.

21         MR. RATNER:  And I think after, I want to do that

22   after expert discovery.  We still have to deal with expert

23   reports.  We have to deal with expert depositions that still

24   has to be done.  We wanted to talk scheduling --

25         THE COURT:  But the likelihood that this is going

Page 69

1    to be able to be disposed of on summary judgment is not

2    great.

3              MR. RATNER:  Your Honor, I've heard you.  On that,

4    Your Honor, I understand what you're saying.  We think that

5    --

6              THE COURT:  You have your rights under the federal

7    rules.  I'm not going to take them away.  I'm just giving

8    you my impression, that this is not going to be capable of

9    summary disposition.  So --

10             MR. RATNER:  (indiscernible), Your Honor,

11   (indiscernible) --

12             THE COURT:  September 19th sounds as if it would

13   be right around the Jewish holidays.  I don't know if

14   they're early or late this year.

15             MS. KANE:  (indiscernible) --

16             THE COURT:  They're always one or the other.

17             CLERK:  They're late.

18             THE COURT:  It's (indiscernible) the Jewish

19   holidays.  Look, why don't you talk and we're heading into

20   in the fall and into the winter of next year, a lot of

21   trials.  So I want to get folks who are ready on the

22   calendar sooner rather than later.  And this doesn't sound

23   like a whole heck of a lot of trial time, maybe even less

24   trial time than we've spent in having discovery conferences.

25   All right?

Page 70

1          Will you talk to each other and contact -- this is

2    my new law clerk, Mr. (indiscernible).  If you will contact

3    Mr. (indiscernible) or Ms. (indiscernible) and they control

4    the calendar and they'll give you some dates.  Come prepared

5    with an estimate of how much time you will need subject to -

6    -

7          MR. TAMBE:  Thank you, Your Honor.

8          THE COURT:  -- subject to rights to convince me

9    that you could do it on summary judgment.  Okay?

10          MR. RATNER:  We will do that.

11          THE COURT:  All right.  Thank you very much.

12          MR. TAMBE:  Thank you, Your Honor.  Thank you.

13          MR. RATNER:  Thank you, Your Honor.

14          MR. TAMBE:  May I be excused?

15          THE COURT:  Yes, you may.  Thank you very much for

16    coming in.  So Ms. Marcus, should we do SEQUA next or did

17    you want to do Rose Ranch next?  Whatever you'd like.

18          MR. MARGOLIN:  I have no idea how long SEQUA will

19    take, so I'll (indiscernible) --

20          THE COURT:  Are the Rose Ranch people coming up?

21          MR. MARGOLIN:  They were.

22          THE COURT:  Come on up.

23          MR. MARGOLIN:  Your Honor, Jacqueline Marcus

24    again.  Your Honor, on the agenda, we've separated out the

25    pre-trial (indiscernible) and the motion to dismiss.  And I

Page 71

1    think it makes sense to reverse the order and start with the

2    motion to desist.

3                 THE COURT:  I agree.

4                 MR. PENN:  So much for the paperless society.

5                 THE COURT:  How are you, Mr. Penn?  Yeah.

6                 MR. PENN:  Doing well, Your Honor.  Good to be

7    here.  I'm assuming you want to take appearances first?

8                 THE COURT:  Sure.

9                 MR. PENN:  John Penn, Perkins Coie on behalf of

10   the Colorado Homeowners.  And I will introduce also Mr.

11   David Miller from Denver.

12                THE COURT:  Hello.  How are you?

13                MR. PENN:  He's been admitted pro hoc.

14                MR. MILLER:  Good morning, Your Honor.

15                THE COURT:  Okay, good morning.

16                MR. MILLER:  David Miller from Berenbaum

17   Weinshienk PC from Denver.  Thank you for having me in the

18   courtroom.

19                THE COURT:  Very good.  Welcome.

20                MR. PENN:  And Mr. Joseph Smith, who hasn't been

21   admitted pro hoc in this adversary --

22                THE COURT:  Okay.

23                MR. PENN:  -- but is trial (indiscernible).

24                THE COURT:  Okay, very good.  Okay.

25                MR. SMITH:  Good morning, Your Honor.  How are

Page 72

1    you?

2              THE COURT:  Welcome.  All right.  So I've read all

3    the papers.  And in particular, I have read and found very

4    helpful the supplemental response that was filed by Ms.

5    Marcus at Docket 36 on February 19th.  So I'd like to start

6    there, and kind of work backwards, because it does seem to

7    me that there is an issue about rightness, because this

8    could all come to nothing vis-à-vis the insurance policies

9    and therefore, visa this case, if the judgment and the

10   arbitral award come together in a certain way.

11             So notwithstanding only interesting briefing and

12   the fact that we could have a long conversation about, you

13   know, the conceivable effect test, let me put a different

14   concept to you.  I think not inappropriately, Ms. Marcus

15   suggests dismissal without prejudice.  But could we simply

16   not put this on hold until there's a determination and save

17   you all additional filing fees?

18             And then, once it -- once the Colorado court

19   completes its work, you can talk to one another.  Hopefully

20   you would agree as to whether or not there remains an issue

21   for me to decide or for people to tell me that I shouldn't

22   decide.  And if you can't agree about that, we'll have to

23   have a hearing.  But I just never like to, notwithstanding

24   that it generates fees for the Court, have you dismiss

25   something and have you re-file it.  I don't know if there

Page 73

1   are any hidden, you know, statute or limitations issues or

2   other things like that.

3           So I don't have a formal suspense docket, but I

4   could simply say, "Nice to see you," and I'm going to not do

5   anything until we get word as to how the Colorado court has

6   decided to deal with the judgment.  How does that sound?

7           MR. MILLER:  May I, Your Honor, (indiscernible)?

8           THE COURT:  Yes.

9           MR. MILLER:  I may have Mr. Smith coming to assist

10  as well --

11          THE COURT:  Okay.

12          MR. MILLER:  -- because he's familiar with the

13  insurance aspects of this.

14          THE COURT:  Sure, sure.

15          MR. MILLER:  But this action was actually filed in

16  the middle of a trial, which is why the rightness matter was

17  raised in the first place.  We have a jury verdict now, but

18  --

19          THE COURT:  Right.

20          MR. MILLER:  -- no actual judgment

21  (indiscernible).

22          THE COURT:  Judgment, right.

23          MR. MILLER:  And so, the issue of the rightness

24  comes to bear because of the fact that they filed this

25  secretly and didn't serve it on anybody in the midst of

Page 74

1    trial.  And then, only after the jury verdict was entered,

2    did they serve the complaint at a later date.  And to have

3    this matter relate back to the date of the filing, July

4    17th, 2015, before we -- to hold it in suspense, would in

5    essence --

6            THE COURT:  Yeah.

7            MR. MILLER:  -- give them that complaint date, has

8    some importance vis-à-vis Colorado interpretation of

9    insurance law and where these matters get decided.  And I

10   think while Ms. Marcus' supplement and suggestion that the

11   matter be --

12           THE COURT:  Why -- I can't possibly know anything

13   about that.  Why would that be?  Why would the date of an

14   action filed in this court relating to coverage turn on the

15   date of the filing of the complaint and something under

16   Colorado law?  I just can't even imagine that.

17           MR. SMITH:  I think what it comes down to, Your

18   Honor, is that it was a race to the courthouse.  We're in

19   the middle of trial, and (indiscernible) steps up and files

20   this declaratory judgment action here in New York.

21           THE COURT:  Right.

22           MR. SMITH:  Clearly, an effort to get out ahead of

23   the (indiscernible), try to insist that New York law is

24   going to govern any insurance coverage actions that might be

25   necessary filed in the verdict that we did get.

Page 75

```
 1              THE COURT:  Well, what -- hold on.  Why would New
 2    York law govern?  Whatever law governs, governs.
 3              MR. SMITH:  Well, we certainly object to New York
 4    law governing, but that's a primary point under declaratory
 5    judgment action.
 6              THE COURT:  Well -- but that -- does New York law
 7    govern the coverage dispute?
 8              MR. SMITH:  We don't believe it will.
 9              THE COURT:  Doesn't -- what policy -- what does
10    the policy say?
11              MR. MILLER:  There are, I think a number of
12    policies that are implicated by these actions.  And I don't
13    --
14              THE COURT:  Okay, but bankruptcy --
15              MR. MILLER:  -- (indiscernible) parties have been
16    joined as well.
17              THE COURT:  Okay, but we're getting -- we're --
18    see, we're getting way ahead of ourselves, okay, because
19    bankruptcy courts apply applicable state law.  So just
20    because I'm sitting in New York doesn't mean that I'm
21    necessarily going to apply New York law.  I'm going to apply
22    whatever applicable state law is.  I assume that you would
23    rather not have a New York judge decide that issue, if you
24    want the answer to be something other than New York law.
25              We do that all the time.  So that's not a problem.
```

Page 76

```
 1    The -- there's a bankruptcy issue that's been raised, and

 2    the bankruptcy issue is the potential diminution of the

 3    proceeds of the policy and the effect that that has on the

 4    estate.

 5              MR. MILLER:  Right.  And this is a very untimely

 6    raising of that issue is, I don't -- I'm not going to repeat

 7    what we put in the (indiscernible) --

 8              THE COURT:  Yeah.

 9              MR. MILLER:  But what's clear is that the Debtor

10    didn't -- was aware of that issue from the inception in

11    2011, when (indiscernible) responsible on motion for relief

12    from stay, and indicated therein that they are the

13    gatekeepers of the insurance policies --

14              THE COURT:  Yes.

15              MR. MILLER:  -- and they allow creditors or

16    parties that have non-privileged claims to give relief from

17    (indiscernible) insurance.

18              THE COURT:  That's right.

19              MR. MILLER:  And but not to file claims.  And so,

20    we agreed and --

21              THE COURT:  Right, but that's a -- but I don't

22    know if you're a bankruptcy lawyer.

23              MR. MILLER:  Yes, I am, Your Honor.

24              THE COURT:  Okay.  But you know -- then you know

25    the drill, right?  The drill is that if you want to pursue
```

Page 77

1    your claim somewhere else, you say you'll limit your

2    recovery to insurance proceeds.  Everybody reserves their

3    rights as to coverage issues.  And off you go to liquidate

4    your claim, which is what you did.  It's not a waiver of the

5    Debtor's right to say later or any party's right to say here

6    are the insurers that they don't have to cover.

7              MR. MILLER:  Right, but there's two points there,

8    Judge.  First, we didn't get just relief from the state to

9    liquidate the claim.  We also got relief from state to

10   execute on and collect on the judgment.  And there was

11   language in both stipulations that said that the terms of

12   the (indiscernible) --

13             THE COURT:  To the policy, on the policy?

14             MR. MILLER:  Yes, on the proceeds insurance

15   policies -- that's right, proceeds, policies and proceeds.

16   And the -- there's also a provision in the stipulations that

17   say that there's no terms of the confirmed plan that will in

18   any way inhibit those collection efforts whatsoever.  And

19   what I was saying in the -- at the outset was that in the

20   response to the motion for relief from stay, the Debtor set

21   forth that the -- its insurance assets are substantial, but

22   not unlimited, and they'll give relief from stay to those --

23             THE COURT:  Okay, so let's -- so this is all very

24   fascinating, but let's go back to the issue of, you've got a

25   jury verdict.  You don't have a judgment yet.  We don't know

Page 78

1   if there's any live issue.  Why is it that my saying, "It

2   was great to see you, go have a nice day in New York,"let

3   me know when the numbers are final and we'll see if there's

4   an issue or not.  It -- and I -- we can make that without

5   prejudice to any argument you might have, although I can't

6   imagine what it is, that somehow the date of filing of the -

7   - of this action in any way should affect the outcome, which

8   I can't imagine that it would.

9           MR. MILLER:  Well, we've received two relief from

10  stay orders that said basically, "Do not come here," and

11  deal with everything in Colorado and now we're being hauled

12  back the third time, after we've had a -- our experiences in

13  court, our jury trial, millions of dollars and hundreds of

14  spent in attorney's fees and extra witness fees and the

15  like.

16          And in the middle of the trial, we have a

17  secondary insurer who's not actually part of the defense of

18  Lehman in the case, okay?  So they were not actually

19  involved in the lawsuit --

20          THE COURT:  Okay.

21          MR. MILLER:  -- (indiscernible) moderate.  In the

22  middle of trial, comes and files a declaratory judgment

23  action, asking you, as a bankruptcy judge in the Lehman

24  matters, to issue a declaratory judgment relating to the --

25  what's an occurrence under the policy and (indiscernible),

1    Your Honor.

2            THE COURT:  But I am not going to do that now,

3    okay?

4            MR. MILLER:  I understand.

5            THE COURT:  So we keep coming back to that.  So

6    what's -- what is wrong with leaving this filed on the

7    docket, my not doing a single thing until I hear from you as

8    to the ultimate outcome of -- with respect to the judgment,

9    and as to whether we have a dispute of a dollar or a million

10   dollars, with respect to the policy?  Because that will

11   inform what we should do next.

12           MR. SMITH:  If I can, Your Honor, because once the

13   judgment does enter --

14           THE COURT:  Yes.

15           MR. SMITH:  -- and we have a 14 day automatic stay

16   in Colorado.

17           THE COURT:  Okay.

18           MR. SMITH:  After which we can immediately issue

19   (indiscernible) to all the carriers that may potentially

20   provide coverage.

21           THE COURT:  Okay.

22           MR. SMITH:  And start our collection efforts.

23           THE COURT:  Okay.

24           MR. SMITH:  Our concern is that everything is teed

25   up now, can we get it resolved?  Because we don't want to

Page 80

1    wait until the judgment is entered.

2          THE COURT:  I'm not going to give you a -- give an

3    advisory opinion or give an opinion on an issue that's not

4    right.  The moment you get your judgment, I'll put you on

5    the calendar.

6          MR. MILLER:  The other thing, Judge, to consider

7    is that in essence, if you allow the matter to simply be

8    held in suspense --

9          THE COURT:  The insurance carriers aren't going

10   anywhere.  It's not like, you know, a defendant who's going

11   to abscond with the money.  So as soon as you get your final

12   word, I will get you on the calendar as soon as you can make

13   travel arrangements.  As you said, it's fully briefed.  And

14   at that point, there will be a fact that I could -- if we're

15   still at that point, if it's -- if it indeed becomes right,

16   there will be a fact that I could apply to inform the

17   conceivable effect analysis.  And I will hear all your

18   arguments about basically, you know, "We got relief.  We

19   weren't supposed to have to come back here.  We shouldn't

20   have to come back here."

21          MR. MILLER:  The other point, Judge, is that by

22   holding it in suspense, and I understand the practical

23   wisdom in that, is that in some respects, it blesses the

24   premature filing and the actions are premature.

25          THE COURT:  I'm not blessing anything.  I am not

Page 81

1    blessing anything.  I am simply suggesting an efficient

2    measure that will maintain the status quo, that will not

3    enhance anybody's rights, that will not diminish anybody's

4    rights.  All it will do is avoid the need for something to

5    be re-filed.  That's all.  And you have an open docket on

6    which you can then file a letter that tells the Court what

7    happened and what should happen next.

8              MR. SMITH:  One thing that you may want to know,

9    Your Honor, is just last week I did get an email from

10   (indiscernible) trial (indiscernible) letters, a copy of it,

11   asking to state refitting in the underlying case on our

12   recently filed motion to (indiscernible).  My response, and

13   (indiscernible) the trial counsel was, "I believe Judge

14   (indiscernible) Garfield County was waiting for that issue

15   to be (indiscernible), after which he'll rule on the

16   collateral source issue --

17             THE COURT:  Sure.

18             MR. SMITH:  -- motion for fees and costs and

19   (indiscernible) --

20             THE COURT:  Okay.

21             MR. SMITH:  -- judgment in our favor.  So my

22   concern is now we have LB Rose Ranch (indiscernible) --

23             THE COURT:  I'm not -- okay, we're not going to

24   whipsaw you, so let me talk to Ms. Marcus.  So Ms. Marcus,

25   they ought not be whipsawed, right?

Page 82

1          MR. MARGOLIN:  Right, Your Honor, I'm just having

2    a little difficulty hearing, but I'm not --

3          THE COURT:  I'm sorry --

4          MR. MARGOLIN:  -- aware of the letter that you're

5    referring to.

6          MR. SMITH:  So Mr. (indiscernible) emailed me,

7    asking if I would read the (indiscernible) on the fees and

8    costs.  And I believe that --

9          THE COURT:  Based on this?  Based on the

10   occurrence of this?

11         MR. SMITH:  No, just overall, (indiscernible)

12   relation to.  I guess he's thinking Judge (indiscernible)

13   will enter judgment and then we can talk about fees and

14   costs.

15         THE COURT:  Okay.  Well, I don't want to wade into

16   that, but --

17         MR. MARGOLIN:  That doesn't sound like we're

18   whipsawing them, Your Honor.

19         THE COURT:  Yeah, no, I don't -- I'm not going to

20   offer an opinion about something I don't -- I don't know

21   what's typical under Colorado practice, so I don't want to

22   react to that.

23         MR. SMITH:  I'm just raising the issue because I

24   think that what we have going on in the state court action,

25   which Your Honor has said we're waiting to see what happens

Page 83

1   is --

2           THE COURT:  Sure.

3           MR. SMITH:  (indiscernible) there is trying to

4   delay getting an entry to judgment.  I think that by, first

5   of all, they'll file a motion to stay any further briefing,

6   which will cause its own briefing schedule, which Judge

7   (indiscernible) would have to move on.  I just think it's

8   pushing now our entry of judgment (indiscernible) farther

9   and farther down the road, which means we don't get back on

10  your docket until much, much farther down the road.

11          THE COURT:  Well, but I -- there (indiscernible)

12  markets --

13          MR. MARGOLIN:  Your Honor, may I just respond?

14  Because you were looking at me --

15          THE COURT:  Yeah.

16          MR. MARGOLIN:  And because this was a matter that

17  Rose Ranch's insurance counsel is handling --

18          THE COURT:  Right.

19          MR. MARGOLIN:  -- we weren't aware of that letter.

20  I don't know if there's anybody here representing AIG who

21  can respond and discuss that, but I really --

22          THE COURT:  Sure.

23          MR. MARGOLIN:  -- I'm at a loss on that one.

24          THE COURT:  Yeah, no, I can understand that.  But

25  I guess my point is that in a world in which this action had

Page 84

1    not been filed, you would have to deal with that in your

2    underlying litigation, right?  The --

3            MR. SMITH:  Right.

4            THE COURT:  Right?  So to be, and I want to be

5    consistent here.  So what I'm saying is, your litigation,

6    your state court litigation, consistent with the rights that

7    you got for relief from the stay, your state court

8    litigation needs to run its course.

9            And once it runs its course, however quickly or

10   slowly, the moment it's done running its course, I'll put

11   you back on the calendar, if there's still an issue ripe for

12   determination as to coverage.  But I think Ms. Marcus is

13   right, I reacted instinctively because I don't like to --

14   any sense that parties are being whipsawed, but it just

15   sounds as if you're still having the litigation and I have

16   nothing to say about that.  I shouldn't have anything to say

17   about that.  So again, the suspense here, holding this in

18   suspense is just an efficient way of dismissing it with

19   prejudice -- without prejudice, rather.

20           MR. MILLER:  Your Honor, (indiscernible) of

21   course, if you choose that (indiscernible) --

22           THE COURT:  Yeah.

23           MR. MILLER:  That's fine.  But it seems that it

24   might make some sense, because the insurers have raised this

25   issue of potential dissipation at this point, without

1   actually getting into any specifics, that perhaps you

2   require them to provide some sort of analysis or disclosure

3   regarding what insurance is actually threatened with being

4   depleted here, that there's not going to be enough.

5           THE COURT:  We're talking about insurance that

6   covers LBHI and other Debtors and affiliates.  That's a --

7   that's -- this is not like a family car policy.

8           MR. MILLER:  Oh we understand that.  We --

9           THE COURT:  Okay.

10          MR. MILLER:  -- our estimation is that they have

11  $950 million, roughly, of insurance.  And so, we were

12  wondering --

13          THE COURT:  But that --

14          MR. MILLER:  -- how much has been exhausted so

15  that they're raising this issue?

16          THE COURT:  Well, but now you're going down the

17  non-practical route.  First of all, you're talking about

18  Lehman Brothers, so you're talking about claims that were in

19  the trillions of dollars, who knows, okay?

20          Secondly, we don't know if that's necessary.  If

21  in -- if the judgment comes back and it's $1,000, I suspect

22  I won't be interested in adjudicating it.  The -- if the

23  number comes back at $6 million, I still may not be under

24  the conceivable effect test, and everybody might decide to

25  go away.  We don't have to keep talking about it, though.

Page 86

1    We're not going to -- I'm not going to put the estate to

2    potentially unnecessary expense until we know.

3              I will say it loud and clear for the whatever

4    number time.  You should take the message back and you could

5    have the record of this transcript as evidence.  Nothing

6    that I've said today or nothing that I'm doing today should

7    be interpreted or construed as having any effect, my

8    offering any stamp of approval or disapproval of anything

9    that's happened or is going to happen in the Colorado case

10   or any position that's been taken by any of the parties with

11   respect to the coverage dispute.

12             It's going to be as if it didn't happen, and that

13   we're just going to be as if it didn't happen and that we're

14   just going to wait to hear from you as to when you get to

15   the end of your litigation (indiscernible) and where exactly

16   that finds you.  All right?

17             MR. MILLER:  Very good, Your Honor.

18             THE COURT:  Okay.  So I'm going to -- I will so

19   order the record in this regard so that you don't have to

20   tussle over drafting an order that reflects what happens

21   today.  Does anyone else wish to be heard?

22             MR. MARGOLIN:  Your Honor, just one more thing.

23   Thank you, Your Honor, for that.

24             THE COURT:  Sure.

25             MR. MARGOLIN:  There were a couple of things said

1    on the record that we disagree with, but it's been a long

2    calendar this morning.  I know you have a trial.  I don't

3    want to belabor it, I just wanted to know that if those were

4    ever issues, we would want to respond.

5                THE COURT:  Okay.

6                MR. MARGOLIN:  Thank you.

7                THE COURT:  All right, anyone else make

8    (indiscernible) --

9                MR. HODYL:  Your Honor, Rich Hoody, I'm the

10   coverage counsel for AIG.  I just wanted to express my

11   gratitude for accommodating me and letting me bow in today.

12               THE COURT:  Okay.  Very good.  Sir, did you have

13   something else?

14               MR. DAVIS:  I was just going to join in the last

15   reservation.  I'm Michael Davis for the AIG Company.

16               THE COURT:  Sure.

17               MR. MARGOLIS:  Your Honor, Brian Margolis, counsel

18   for (indiscernible).  We would just say for the record that

19   we think that the -- we'd like to revisit some of the

20   rightness issues.  We think there's certain issues,

21   certainly some of the exclusions that could be addressed

22   now, even in the absence of another monetary judgment.

23   That's all (indiscernible) -- that's for the record.

24               THE COURT:  All right.  Thank you.  I've made my

25   ruling.

1           MR. MARGOLIS:  Thank you.

2           THE COURT:  Okay.  All right.  So now, is there

3    anything more we need to do on this today, Ms. Marcus?

4           MR. MARGOLIN:  No, Your Honor.  I think that

5    concludes the --

6           THE COURT:  Okay.

7           MR. MARGOLIN:  -- that adversary.

8           THE COURT:  Okay.

9           MR. MARGOLIN:  Oh I'm sorry, pre-trial conference,

10   it seems premature like, where we are.

11          THE COURT:  That's what I mean, right, right.

12   Okay, so we will wait to hear from you one way or the other.

13          MR. MARGOLIN:  Thank you, Your Honor.

14          MR. SMITH:  Thank you, Your Honor.

15          MR. MILLER:  Thank you, Your Honor.

16          THE COURT:  All right --

17          MR. HODYL:  Thank you.

18          THE COURT:  -- now Ms. Marcus, we have another

19   matter on the calendar?

20          MR. MARGOLIN:  We do.

21          THE COURT:  SEQUA?

22          MR. MARGOLIN:  And (indiscernible) for a moment?

23          THE COURT:  There they are.

24          MR. MARGOLIN:  Okay, there they are.  May we be

25   excused, Your Honor?  Thank you.  Yeah, hello.

1              MR. STRONG:  Hi, good morning, Your Honor.

2              MR. MARGOLIN:  Good morning.

3              MR. STRONG:  Fletcher Strong, Wollmuth Maher &

4    Deutsch, counsel for Lehman Brothers Special Financing Inc.

5    and Lehman Brothers Holdings Inc. in the underlying

6    adversary proceeding against (indiscernible) SEQUA

7    Corporation.  We are here on a pre-trial conference for the

8    adversary proceeding, just to give the Court some quick

9    background on the case.

10             THE COURT:  Sure.

11             MR. STRONG:  This case concerned the determination

12   of three transactions between the parties, the interest rate

13   swap and two interest rate (indiscernible) that were

14   terminated --

15             THE COURT:  Right.

16             MR. STRONG:  -- on the bankruptcy filings of LBHI

17   and LBSF.  Specifically, the parties' dispute arises from

18   the calculation of the termination payments, as -- well,

19   under the parties' agreement, which LBSF alleges was

20   undertaken in a commercially unreasonable manner.  The

21   parties' dispute was originally subject to mediation, which

22   took place in 2012, unfortunately, which did not result in a

23   resolution of the case.

24             THE COURT:  Okay.

25             MR. STRONG:  Accordingly, Lehman went forward and

1    filed the underlying complaint in this action.  Recently,

2    SEQUA filed an answer and counter claim seeking attorneys

3    fees and costs, which Lehman will respond to the --

4            THE COURT:  Sure.

5            MR. STRONG:  -- combined answer in due course.

6    Nevertheless, we are here.  We had a scheduling order

7    entered in the case--

8            THE COURT:  Okay.

9            MR. STRONG:  -- providing a discovery schedule and

10   dispositive motion schedule.  And while we're hopeful that

11   settlement negotiations can continue and this matter may be

12   settled, we are prepared to go forward with discovery at

13   this time, unless there are any questions.

14           THE COURT:  All right, so dispositive motions, as

15   always, as subject to the local rule that you have to seek -

16   - you have to write a letter for 7056-1?

17           MR. STRONG:  Yes, Your Honor.

18           THE COURT:  Okay.

19           MR. STRONG:  And that's actually subject -- that's

20   in the scheduling (indiscernible).

21           THE COURT:  Sure, okay.  We've -- we always make

22   sure that it is.  Would you -- so you attempted mediation

23   with one of the panel, with Lehman mediators, if you will?

24           MR. STRONG:  Yes, Your Honor.  My law firm was not

25   a party to that mediation, was not --

1              THE COURT:  Okay.

2              MR. STRONG:  -- representing Lehman for that

3     mediation.

4              THE COURT:  Okay.

5              MR. STRONG:  But yes.  There was a mediator.

6     There were ADR notices and responses --

7              THE COURT:  Right.

8              MR. STRONG:  -- that were issued.

9              THE COURT:  Right.

10             MR. STRONG:  And then, mediation took place in

11    2012, and then it did not, you know, result in any sort of a

12    resolution.

13             THE COURT:  Do you think -- and I don't know

14    enough to have a view, I'm just asking the question, do you

15    think it would be useful to have another round of mediation,

16    for example, with someone who comes to work in this

17    building?

18             MR. STRONG:  We would be open to another

19    mediation.  We'd have to discuss the client, but you know,

20    we're hopeful, as I said, (indiscernible) --

21             THE COURT:  I mean, it kind of depends on exactly

22    what the issues are, because the -- sometimes, the issues in

23    these types of cases can be pretty highly technical.

24             MR. STRONG:  The issues are highly technical in

25    the sense that it's the question of whether the actions that

Page 92

```
 1   were performed to calculate the termination pending was done
 2   in a commercially reasonable manner.
 3               THE COURT:  Sure.
 4               MR. STRONG:  However it's a pretty discreet issue
 5   that would, you know, we don't suspect would get out of
 6   control with, you know, discovery and (indiscernible) --
 7               THE COURT:  Right.  Well, I guess the -- I don't
 8   know if (indiscernible) mediation would be a good fit unless
 9   the parties were inclined to be talking about what I would
10   characterize as an economic settlement, as opposed to, you
11   know, a discussion of the merits.  So --
12               MR. STRONG:  We would welcome the Court's
13   consideration of that and we would certainly be open to
14   mediation on (indiscernible) --
15               THE COURT:  All right.  Well, why don't you
16   proceed ahead and you know, keep it in mind?  And if at any
17   point you think it would be useful to have a sitting judge,
18   which is my way of saying for free, spend a couple of hours
19   with you, I'd be happy to ask --
20               MR. STRONG:  Okay.
21               THE COURT:  -- someone to do that.
22               MR. STRONG:  Very good, thank you, Your Honor.
23               THE COURT:  All right?  You folks want to add
24   anything?
25               MR. BASDEKIS:  Just very briefly, I'm Thanos
```

Page 93

1    Basdekis on behalf of SEQUA, along with my law partner Nick

2    Johnson.  Judge, we have a pro hoc (indiscernible) motion

3    for Mr. Johnson, which --

4            THE COURT:  Okay.

5            MR. BASDEKIS:  -- I think is on the docket.

6            THE COURT:  Okay.

7            MR. BASDEKIS:  It hasn't been ruled on yet,

8    whenever you get a chance, that'd be great.

9            THE COURT:  Sure.  Okay.

10           MR. BASDEKIS:  That's it.

11           THE COURT:  All right.  So we will hear from you

12   when we hear from you.

13           MR. STRONG:  Great.  Thank you, Your Honor.

14           THE COURT:  All right, thank you very much.  Have

15   a pleasant day.

16           MAN:  Thank you, Your Honor.

17           (Whereupon these proceedings were concluded at

18   11:54 AM)

19

20

21

22

23

24

25

Page 94

1                        I N D E X

2

3                          RULINGS

4                                          Page        Line

5    19th application for allowance of       3           16

6    compensation to Hughes Hubbard

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 95

1                C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya Ledanski    Digitally signed by Sonya Ledanski Hyde
                       DN: cn=Sonya Ledanski Hyde, o=Veritext,
6    Hyde              ou, email=digital@veritext.com, c=US
                       Date: 2016.08.31 10:02:27 -04'00'
7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 24, 2016