WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
| | | |
|---|---|---|
| **In re** | **:** | **Chapter 11 Case No.** |
| | **:** | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | **:** | **08-13555 (SCC)** |
| | **:** | |
| **Debtors.** | **:** | **(Jointly Administered)** |

------------------------------------------------------------------x

**REPLY IN SUPPORT OF THE PLAN ADMINISTRATOR'S OBJECTION TO**
**DEMANDS FOR POSTPETITION INTEREST RELATED TO CLAIM NO. 28308**

## TABLE OF CONTENTS

REPLY ...................................................................................................................1

    I.    The Holders Cannot Demonstrate Entitlement to a Contractual Rate ....................2

        A.    The Settlement Supersedes Any Prepetition Contract................................2

        B.    The Lehman Re Claim Is Based on the Settlement....................................5

    II.    The Statutory Rate Is the Federal Judgment Rate...................................................8

    III.    The "Contract Rate" Is a Floating Rate..............................................................13

    IV.    The "Contract Rate" Is United States Dollar Denominated .................................18

CONCLUSION.....................................................................................................19

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Barber-Green Co. v. M.F. Dollard, Jr., Inc.*,
   269 N.Y.S. 211 (3d Dep't 1934) ........................................................................... 7

*Cappiello v. ICD Publications, Inc.*,
   720 F.3d 109 (2d Cir. 2013) ................................................................................ 9

*F.D.I.C. v. Bear Stearns Asset Backed Secs. I LLC*,
   92 F. Supp. 3d 206 ............................................................................................... 9

*Faggionato v. Lerner*,
   500 F. Supp. 2d 237 (S.D.N.Y. 2007) ................................................................ 10

*Greenfield v. Philles Records, Inc.*,
   780 N.E.2d 166 (N.Y. 2002) ................................................................................ 3

*In re Alleghany Int'l, Inc.*,
   954 F.2d 167 (3rd Cir. 1992) ............................................................................... 4

*In re Arndt*,
   201 B.R. 853 (M.D. Fla. 1996) ............................................................................. 4

*In re Azabu Buildings Co.*,
   383 B.R. 738 (D. Haw. 2008) ............................................................................. 10

*In re CBI Holding Co., Inc.*,
   529 F.3d 432 (2d Cir. 2008) .............................................................................. 13

*In re Chiapetta*,
   159 B.R. 152 (Bankr. E.D. Pa. 1993) ................................................................ 18

*In re Dow Corning Corp.*,
   244 B.R. 678 (Bankr. E.D. Mich. 1999) ....................................................... 17, 18

*In re Dow Corning Corp.*,
   456 F.3d 668 (6th Cir. 2006) ("*Dow Corning IV*") ....................................... 16, 18

*In re Dow Corning Corp.*,
   No. 01-cv-71843-DT, 2004 WL 764654 (E.D. Mich. Mar. 31, 2004) ("*Dow Corning II*") ... 14

*In re Dow Corning Corporation*,
   237 B.R. 380 (Bankr. E.D. Mich. 1999) ("*Dow Corning I*") ........................ 10, 14, 15, 16

iii

*In re Dow Corning Corporation*,
   No. 2:01-cv-71843-DPH, slip op. (E.D. Mich. May 18, 2004) ("*Dow Corning III*") ...............
   .......................................................................................................................... 13, 14, 15, 16

*In re Dvorkin Holdings, LLC*,
   547 B.R. 880 (N.D. Ill. 2016) ...........................................................................................18

*In re FRG*,
   121 B.R. 451 (Bankr. E.D. Pa. 1990)..........................................................................5, 7, 8

*In re John Osborn's Sons & Co.*,
   177 F. 184 (2d Cir. 1910) ...................................................................................................9

*In re Lipper Holdings, LLC*,
   766 N.Y.S.2d 561 (1st Dep't 2003) ..................................................................................11

*In re Saint Vincent's Catholic Medical Centers of New York*,
   440 B.R. 587 (Bankr. S.D.N.Y. 2010) .........................................................................16, 17

*In re Stone Hedge Props.*,
   191 B.R. 59 (Bankr. M.D. Pa. 1995)...................................................................................4

*In re Taylor*,
   280 B.R. ...............................................................................................................................5

*In re Wash. Mut., Inc.*,
   461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part on other grounds by* No. 08-12229
   (MFW), 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012)...............................................11

*Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*,
   655 F.3d 136 (2d Cir. 2011) ................................................................................................4

*Levy v. Ina Life Ins. Co. of N.Y.*,
   No. 05 Civ. 10310 (GEL), 2006 WL 3316849 (S.D.N.Y. Nov. 14, 2006) (Lynch, J.).....13, 15

*N.Y. City v. N.Y. Jets Football Club, Inc.*,
   394 N.Y.S.2d 799 (N.Y. Cnty. Sup. Ct. 1977) ....................................................................4

*Pludeman v. N. Leasing Sys., Inc.*,
   890 N.Y.S.2d 370, 2009 WL 1812532 (N.Y. Cnty. Sup. Ct. Apr. 24, 2009)..........................4

*Ruskin v. Griffiths*,
   269 F.2d 827 (2d Cir. 1959) ..............................................................................................13

*S.S.I. Investors Ltd. v. Korea Tungsten Mining Co., Ltd.*,
   438 N.Y.S.2d 96 (1st Dep't 1981) .......................................................................................7

*Torres v. D'Alesso*,
   910 N.Y.S.2d 1 (1st Dep't 2010) ..........................................................................................4

*United States v. Marxen (In re Monterey Brewing Co.)*,
   307 U.S. 200 (1939) ................................................................................................... 16, 17

*Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*,
   394 B.R. 325 (S.D.N.Y. 2008) .............................................................................................13

*Wilson v. Broadband Wireless Int'l Corp. (In re Broadband Wireless Int'l Corp.)*,
   295 B.R. 140 (10th Cir. 2003) ............................................................................................4

**Statutes**

11 U.S.C. § 502(b) ................................................................................................... 17, 18

11 U.S.C. § 726(a)(2) ...............................................................................................17

11 U.S.C. § 1129(b)(1)..............................................................................................16

28 U.S.C. § 1961(a) ..................................................................................................17

Section 726(a)(5) of the Bankruptcy Code.............................................. 9, 10, 15, 17

Judgments Act of 1838................................................................................................9

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc., as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (the "Plan"), files this reply to the response (ECF No. 53349) (the "Response") of Centerbridge Special Credit Partners II, L.P., CCP Credit Acquisition Holdings, L.L.C., Recovery Partners Holdings I, LLC, and Chase Lincoln First Commercial Corp. (together with Lehman Re Ltd., the "Holders") to the *Plan Administrator's Objection to Demands for Postpetition Interest Related to Claim No. 28308* (ECF No. 52994) (the "Objection")[1] and respectfully represents as follows:

## REPLY

1.      The Court should sustain the Objection and reduce the Demands.  As set forth below, the Holders failed to overcome any of the arguments in the Objection, namely that: (a) the releases in the Settlement are operative even if there was a prepetition contract upon which the Lehman Re Claim was based; (b) there was no prepetition contract upon which the Lehman Re Claim was based, and the Lehman Re Claim is not based on a contract other than the Settlement; (c) the federal judgment rate, not an English law rate, applies in the absence of a contract rate; and (d) assuming, arguendo, that the "contract" alleged by the Holders to be applicable applies, the contract rate is (i) floating, not fixed and (ii) United States dollar denominated.

2.      The Holders can only be entitled to the interest they are demanding if it arises "at the rate applicable in the contract . . . on which [the Allowed Lehman Re Claim] is based."  (Plan § 8.13(c).)   In search of a contract with a convenient rate, they point to the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan or the Objection, as applicable.

Draft. While the Plan Administrator's position is that neither the Draft nor the GCCM can be the contract on which their claim "is based"—nor, for that matter, is either a contract at all—the point is moot. Even if there were a contract (whether the Draft, the GCCM, or otherwise), the plain language of the Settlement ("All other contracts . . . shall be . . . of no force and effect as of the date [of the Settlement's effectiveness].") eliminates the Holders' entitlement to assert any rate thereunder (or other rights arising therefrom). If there is <u>not</u> such a contract, then there can be no "rate applicable in the contract" for purposes of section 8.13(c) of the Plan. In either case, the Holders are entitled to interest only at the statutory rate.

3.     The statutory rate is the federal judgment rate of 1.59%. Alternatively, accepting the "contract" alleged by the Holders, the Holders are entitled to interest at a lower, contract rate of 0.26%.

## I.    <u>The Holders Cannot Demonstrate Entitlement to a Contractual Rate</u>

### A.    <u>The Settlement Supersedes Any Prepetition Contract</u>

4.     Lehman Re released any and all rights it may have had against LBCC based on any contract other than the Settlement when it agreed:

> except as to (i) the agreements, promises, settlements, representations and warranties set forth in this Agreement, (ii) the performance of the obligations set forth herein, (iii) the . . . Allowed LBCC Claim, . . . and (iv) Lehman Re's distribution entitlements under the Plan, . . . and in consideration of the foregoing and the Debtors' execution of this Agreement, Lehman Re and Congress Life, on behalf of themselves, their estates, and their successors and assigns, expressly release, discharge and waive, unconditionally and irrevocably, *any claims* (whether direct or derivative), counterclaims, defenses, rights of setoff, *debt*, liens, *losses, demands, damages* (whether general, special or punitive), *liabilities, obligations*, judgments, executions, *debts*, costs and causes of action of whatever nature, *whether asserted or unasserted*, fixed or contingent, *known or unknown*, *suspected or unsuspected*, foreseen or unforeseen at the present time *and whether based on contract*, tort, statute or other legal or equitable theory of recovery, *unsecured*, secured, priority, administrative *or otherwise* . . . , that Lehman Re or Congress Life may have against any of the Lehman U.S. Parties or any of their respective officers, directors, shareholders, partners, members, employees, agents, servants, counsel, representatives, participants, or any successors or assigns

2

thereof, *including, without limitation, any such Claims arising under, in connection with or relating in any manner to . . . any of the Lehman Re Claims* [including those against LBCC] *or any of the documents, instruments agreements or transactions described in or contemplated thereby*[.]

(Settlement § 15.1 (emphases added); *see* Obj. ¶¶ 10, 19.)

5.    Lehman Re agreed that any contract predating the Settlement (other than specified contracts not relevant here) is "of no force and effect."  (Settlement art. VII; *see* Obj. ¶¶ 10, 18.)

6.    Lehman Re agreed that the Settlement "embod[ies] the entire agreement and understanding of the Parties with respect to the transactions contemplated hereby and supersedes all prior written or oral commitments, arrangements or understandings with respect thereto."  (Settlement § 18.8; *see* Obj. ¶¶ 10, 19.)

7.    Lehman Re agreed that the Settlement "constitutes a valid and binding obligation of Lehman Re, enforceable against Lehman Re *in accordance with its terms*[.]" (Settlement § 13.2 (emphasis added).)

8.    Based on the foregoing, the only rights the Holders have are those set forth in the Settlement, and the Settlement does not provide a contractual rate of interest.

9.    The Holders' *only* response to the Objection's clear and unambiguous, plain-text argument is to collectively label the separate provisions as "standard boilerplate" and to suggest that the Court disregard them all.  (Resp. ¶¶ 36–38.)  The Holders cite no case law whatsoever for this proposition, and there is no argument or basis in fact or law to overrule the Objection.

10.    Contrary to the Holders' assertions, it is black-letter law that "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (citation omitted); *see, e.g.*,

3

*Pludeman v. N. Leasing Sys., Inc.*, 890 N.Y.S.2d 370 (Table), 2009 WL 1812532, at *7 (N.Y. Cnty. Sup. Ct. Apr. 24, 2009) ("Generally, a contract must be interpreted and enforced according to the plain meaning of its unambiguous terms *including its boilerplate provisions*.") (emphasis added); *N.Y. City v. N.Y. Jets Football Club, Inc.*, 394 N.Y.S.2d 799, 803 (N.Y. Cnty. Sup. Ct. 1977) (enforcing "mere 'boilerplate'" provision in lease). In addition, as the First Department has emphasized, "*[m]erger clauses are not mere boilerplate. They provide further protection for the interests of certainty and finality.*" *Torres v. D'Alesso*, 910 N.Y.S.2d 1, 6 (1st Dep't 2010) (emphasis in original). And, "[u]nder New York law . . . 'a valid release constitutes a complete bar to an action on a claim which is the subject of the release.'" *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) (affirming dismissal of complaint under Rule 12(b)(6) based on valid release; quoting *Centro Empresarial S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (N.Y. 2011)). Moreover, the Settlement was not a standard form. The Plan Administrator and five other parties, in the unique circumstances of these cases, all agreed that they "engaged in good faith negotiations for the purpose of reaching a mutually satisfactory agreement for the compromise and settlement of their disputes." (*See* Settlement 4.)

11.    "[A]n objection raising only legal issues is sufficient," without more, to rebut a claim's *prima facie* validity. *See Wilson v. Broadband Wireless Int'l Corp. (In re Broadband Wireless Int'l Corp.)*, 295 B.R. 140, 145 (10th Cir. 2003) (citing *In re Lenz*, 110 B.R. 523, 525 (D. Colo. 1990)). Once the objecting party has satisfied this threshold, the burden shifts back to the claimant to ultimately prove the validity and amount of the claim. *Wilson*, 295 B.R. at 145; *see also In re Alleghany Int'l, Inc.*, 954 F.2d 167, 173-174 (3rd Cir. 1992); *In re Arndt*, 201 B.R. 853, 857 (M.D. Fla. 1996); *In re Stone Hedge Props.*, 191 B.R. 59, 64–65

4

(Bankr. M.D. Pa. 1995); *In re FRG*, 121 B.R. 451, 456 (Bankr. E.D. Pa. 1990); *In re Taylor*, 280 B.R. at 713.

12.     The Holders have not met their burden of demonstrating that the Settlement is unenforceable.    Therefore, the Settlement must be enforced.    Even assuming, arguendo, as the Holders have, that the Lehman Re Claim was based on a prepetition contract, postpetition Demands based on a rate in such contract must be denied.

**B.      The Lehman Re Claim Is Based on the Settlement**

13.     As set forth above, the Holders' Demands based on a rate in any prepetition contract must be denied based on the subsequently-executed Settlement.    But, independently, as set forth in the Objection, only one contract gave rise to the Allowed Lehman Re Claim: the Settlement.  (Settlement § 2.3 ("On the Effective Date, the LBCC Claim shall be allowed as an unsecured, non-priority affiliate claim against LBCC in the fixed, liquidated amount of $87,621,000.00."); Obj. ¶ 18.)   The Settlement is "the contract . . . on which such Allowed Claim is based[.]"   (Plan § 8.13(c).)  Pursuant to the Plan, the Settlement is the only contract relevant for purposes of calculating postpetition interest demands.

14.     As set forth in the Objection, Lehman Re's proof of claim identified no prepetition contract between Lehman Re and LBCC; the Settlement identified no prepetition contract between Lehman Re and LBCC; and the motion filed seeking approval of the Settlement by this Court identified no contract between Lehman Re and LBCC described only "undocumented" transactions between the parties.  (Obj. ¶ 9.)  Additionally, as set forth in the Objection, the Demands did not identify any *contract on which* the Lehman Re Claim *is based*, as is required to be entitled to a contract rate of interest pursuant to the Plan.  (*Id.* ¶ 13.)

15.     In their Response, the Holders make two arguments on this point.  Each is rebutted, in turn, below.

5

16.     First, the Holders wrongly assert that, prior to filing the Objection, the "Plan Administrator *agreed* that the GCCM system provides the applicable contractual rate" governing the allowable amount of postpetition interest. (Resp. ¶ 28.)  The Plan Administrator did not make any such statement previously and does not now.  In support of their allegation, the Holders selectively cited two paragraphs of a previous objection that was withdrawn before the Holders filed any response thereto.  (*See id.* ¶ 21 (citing ECF No. 52453 ¶¶ 13–14).)  The Plan Administrator did not agree that the GCCM provides the applicable contract rate in either of those paragraphs.  In the first paragraph, the Plan Administrator simply stated a rate "*based upon the Claimants' argument that* the GCCM establishes a contractual rate".  (*See* ECF No. 52453 ¶ 13.)  In the second paragraph, the Plan Administrator specifically stated only that "the Plan Administrator *does not presently contest* the applicability of the GCCM for purposes of establishing the rate of postpetition interest applicable to the Lehman Re Claims," responding to Holders' alternative claim that an 8% statutory rate should be used based on the GCCM "contract."  (*Id.* ¶ 14.)  The Plan Administrator's statements in these two paragraphs are entirely consistent with its language in the objection that made clear the Plan Administrator was not conceding the applicability of a GCCM rate.  (*See id.* ¶ 3 ("Assuming, arguendo, that for purposes of the Lehman Re Claim, Claimants can rely on the GCCM as governing their right to postpetition interest, . . . .").)  The statements are also consistent with the Plan Administrator's broad reservation of rights, which included the right "to object on any other basis to the Claimants' demands for postpetition interest." (*Id.* ¶ 16.)  There simply was no admission.

17.     Second, and incredibly, the Holders suggest that the Plan Administrator does not "dispute the material facts" now (*id.* ¶ 31) and therefore that the Plan Administrator "concedes" the applicability of the GCCM and the accuracy of its description in the Manual (*id.*

6

¶ 30). There is no question that the Plan Administrator did *not* concede the applicability of the

GCCM or the accuracy of its description in the Manual. (*See* Obj. ¶ 14 n.3.)[2] And the claimant

bears the burden of proving the elements of its claim by a preponderance of the evidence. *See*

*FRG*, 121 B.R. at 456.

18.    The Holders assert that the GCCM is "every bit as much a contract as a

piece of paper stamped 'contract' on the top," although they describe it as a "system" and "a web

deployed tool." (*Id.* ¶¶ 30, 32–33.) They allege, without evidence, that "obviously there was an

understanding" between LBCC and Lehman Re and the "GCCM is an inextricable part of that—

and any other—understanding with respect to amounts owed between Lehman entities because it

governs the rate at which those obligations accrue interest." (*Id.* ¶ 34.) They ask the Court to

conclude that the "GCCM system provides the applicable contractual rate for determining

postpetition interest owed by LBCC to Lehman re in respect of the Allowed Claim." (*Id.* ¶ 27.)

As is clear from the case law cited above, the Holders have the burden to establish the existence[3],

applicability[4], and terms of a legally-binding contract with admissible evidence. They ask to be

permitted to take costly discovery of the Debtors, if relevant, after the Sufficiency Hearing to do

---

[2] The Objection states: "[T]he Draft appears to be an early-planning-stage manual relating to one of the several prepetition cash-management systems previously described to the Court as the "GCCM". The Draft plainly is not (and does not purport to be) the GCCM, nor does it describe the entirety of the GCCM or the complete prepetition cash-management systems."

[3] A contract requires an offer and acceptance such that the parties' "minds have . . . met." *Barber-Green Co. v. M.F. Dollard, Jr., Inc.*, 269 N.Y.S. 211, 215 (3d Dep't 1934). "Before an offer can be accepted, its terms must be definite and certain." *S.S.I. Investors Ltd. v. Korea Tungsten Mining Co., Ltd.*, 438 N.Y.S.2d 96, 101 (1st Dep't 1981) (quotation marks omitted). Thus far, the Holders assert that the Allowed Lehman Re Claim is based on "the Funds" (Resp. ¶ 31) and "monies owed between Lehman affiliates" (*id.* ¶ 27). Neither of these is a contract. Nor is LBCC's bankruptcy schedule of liabilities. The Holders' multiple requests for discovery confirm the Holders inability to identify "the contract," other than the Settlement, "on which [the] Allowed [Lehman Re] Claim is based[.]" (Plan § 8.13(c).)

[4] For example, the Debtors previously identified the GCCM as one of *fifteen* different cash-management systems that were employed prepetition. *See Declaration of John K. Suckow in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (ECF No. 22759) (the "Suckow Declaration"), Ex. 14 at 15.

7

so.  (*Id.* ¶¶ 31, 33 (regarding whether the GCCM is a contract), 50 (regarding the rate of interest it provides)).)

19.     The Plan Administrator continues to reserve all right with respect to the foregoing, but the Court need not rule on all of these issues now.  The Objection permits the Court to rule at a Sufficiency Hearing and the parties to avoid unnecessary, costly, time-consuming litigation.  Pursuant to this Court's bar date order, LBCC cannot be held liable for postpetition interest in amounts or on grounds not asserted in the Demands.  (*See* ECF No. 48966 at 3.)  Therefore, the Court can conclude—assuming arguendo that the GCCM is a contract between LBCC and Lehman Re and that it governed the rate of prepetition interest on amounts owed by LBCC to Lehman Re—that the GCCM is not the contract on which the more than $87 million Lehman Re Claim "is based."  Likewise, the Court can conclude that Lehman Re released any and all rights it may have had against LBCC based on any contract other than the Settlement.  Moreover, as set forth below, the Court can conclude— again assuming arguendo that the GCCM is the "contract" as alleged by the Holders—that the "contract" rate is floating, not fixed and United States dollar denominated.  There would be no economically rational reason to pursue discovery after such ruling.

## II.     The Statutory Rate Is the Federal Judgment Rate

20.     If the Court finds that either (a) the releases in the Settlement are operative even if there was a prepetition contract upon which the Lehman Re Claim was based, or (b) there was no prepetition contract upon which the Lehman Re Claim was based, and the Lehman Re Claim is not based on a contract other than the Settlement, then the Court must find that the Holders are entitled to interest accrued at the federal judgment rate.

21.     The United States Court of Appeals for the Second Circuit has held that allowed claims in liquidating bankruptcy cases are "entitled to be treated as judgments" entered

in federal court. *In re John Osborn's Sons & Co.*, 177 F. 184 (2d Cir. 1910). The federal judgment rate applies to such judgments. *See Cappiello v. ICD Publications, Inc.*, 720 F.3d 109, 112–13 (2d Cir. 2013). There is no basis to disregard such precedent. As the United States District Court for the Southern District of New York has stated, "[l]ower courts are bound by Second Circuit precedent unless it is expressly or implicitly overruled by the Supreme Court or an en banc panel of the Second Circuit." *F.D.I.C. v. Bear Stearns Asset Backed Secs. I LLC*, 92 F. Supp. 3d 206, 214 (S.D.N.Y. 2015) (quotation marks omitted). Nonetheless, the Holders assert, without citation, that the Court should disregard existing Second Circuit precedent and apply a rate pursuant to the Judgments Act of 1838 under English law. (Resp. ¶ 51.)

22.     The Holders assert five arguments in response to the Objection on this point at the end of their Response. None is sufficient to overcome the Objection.

23.     First, the Holders acknowledge that the Objection is supported by "decisions interpreting the term 'legal rate' under Section 726(a)(5) of the Bankruptcy Code." (Resp. ¶ 53.) They argue, without any support, only that that section "is not at issue here." (*Id.*) But that simply is not the case. Courts that have considered whether unsecured claims accrue postpetition interest at the federal judgment rate or a state statutory rate have done so in the context of interpreting the phrase "the legal rate" in section 726(a)(5) of the Bankruptcy Code—the only statutory basis for awarding postpetition interest on unsecured claims—as made applicable in chapter 11 cases by the "best interests test" under section 1129(a)(7). As set forth in the Objection, the vast majority of those courts have concluded that unsecured claims accrue PPI at the federal judgment rate. (*See* Obj. ¶ 25.) The Holders do not address *any* of these cases or their reasoning for consistently applying the federal judgment rate.

WEIL:\95794362\7\58399.0011

24.     Second, the Holders cite *In re Dow Corning Corporation*, 237 B.R. 380 (Bankr. E.D. Mich. 1999) ("*Dow Corning I*"), for the proposition that "the legal rate" under section 726(a)(5) means "'at the contract rate, or, if a contract rate does not exist, at the otherwise applicable state statutory rate.'"  (Resp. ¶ 54 (quoting *Dow Corning I*, 237 B.R. at 394).)  But *Dow Corning I* considered and *rejected* this view!  The court in *Dow Corning I* clearly stated: "the cases adopting the state law approach are exceptionally insubstantial."  *Id.* The court held that, "within the context of § 726(a)(5), 'interest at the legal rate' means the federal judgment rate."  *Id.* at 412.  *Dow Corning I* supports the Objection, not the Holders' Demands.  Indeed, there is no longer a credible debate among courts between the federal judgment and a state rate.  (*See* Obj. ¶ 25.)

25.     Third, the Holders cite *In re Azabu Buildings Co.*, 383 B.R. 738 (D. Haw. 2008), and *Faggionato v. Lerner*, 500 F. Supp. 2d 237 (S.D.N.Y. 2007), in support of the application of an English law rate.  Neither of these cases provides a basis for the Court to ignore binding Second Circuit precedent.   Neither of these cases involved a federal judgment, postpetition interest, contract interpretation, or a chapter 11 plan.  *Azabu Buildings* determined a creditor's entitlement to *prepetition* interest—part of the creditor's claim and governed by Hawaii state law.  383 B.R. at 743.  *Faggionato* involved a contract dispute governed by French law and held that the plaintiff lacked standing to bring the action.  500 F. Supp. 2d at 244–45, 251.

26.     Fourth, the Holders wrongly conclude, without analysis, that, because the Plan authorizes "varying rates where different contracts apply," it "is naturally read also to authorize varying postpetition interest where different statutes apply."  (Resp. ¶ 53.)  They argue that the Plan provides "even more flexibility than the state law approach because it does not

10

qualify the phrase 'statutory rate' with the term 'state,' thereby not limiting the candidate jurisdictions to this country." (*Id.* ¶ 54.)  The Holders' reading is not the plain, natural, or logical reading of the Plan.  As set forth above, there is—and at the time the Plan was drafted and confirmed, there was—no longer a serious debate among courts that the statutory rate is the federal judgment rate.  As highlighted in the *Washington Mutual* case referenced by the Holders, the only live debate was whether creditors were entitled to interest at a contract rate or the federal statutory rate.  *See, e.g.*, *In re Wash. Mut., Inc.*, 461 B.R. 200, 241–44 (Bankr. D. Del. 2011), *vacated in part on other grounds by* No. 08-12229 (MFW), 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012).  The Debtors' creditors are entitled to either a contract rate where a prepetition contract gave rise to the claim or the statutory rate where no right to interest was provided for in the contract that gave rise to the claim.  Given the extensive case law history and overwhelming weight of precedent, the Court cannot conclude that the absence of the adjective "state" qualifying "statutory rate" requires the Court to read-into the Plan the broader adjective "state or other foreign jurisdiction" rather than read the Plan "as is" under the current state of the law.  The Plan "should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562 (1st Dep't 2003) (citations omitted).  As Plan proponent, LBHI consented to contract rates of interest on contract-based Allowed Claims; but the Plan language makes clear that LBHI did not consent to various rates of interest for "*the* statutory rate." (Plan § 8.13(c) (emphasis added).)  As set forth in the Objection, the Plan must be fair and equitable to LBCC's Equity Interests (Confirmation Order ¶ JJ), and "the statutory rate" can only be the federal judgment rate.

11

27.     Finally, the Holders suggest that four purported facts should create enough of a "strong nexus" for the English Rate to apply to postpetition interest on amounts owed by LBCC to Lehman Re.  (Resp. ¶ 52.)  The Holders allege the amounts owed (i) were denominated in British pounds prepetition; (ii) "belonged to" Lehman Re, which is "formed under the laws of Bermuda, which is a British territory,"[5] (iii) were "transferred to LBCC by LBIE, an English entity," and (iv) were transferred by LBIE in breach of an agreement that was governed by the laws of England.  (Id.)[6]  Assuming, arguendo, both that a factual analysis is appropriate, which it is not, and that the facts alleged are true, none of these facts, alone or together, would entitle the Holders to postpetition interest at the English Rate:

- Claims against LBCC were converted into and owed in U.S. dollars effective as of the petition date in accordance with the Bankruptcy Code and orders of this Court.  Prepetition foreign currencies are irrelevant to the choice of law for postpetition interest on a U.S. dollar claim.

- There is no evidence that "Funds" "belonged to" Lehman Re (suggesting a custody relationship) as opposed to amounts being owed to Lehman Re, because there was no prepetition contract governing the Lehman Re Claim.  Even if there was an ownership interest, the fact that the owner is Bermudan and that Bermuda is a British territory would be no more determinative than the fact that the obligor or custodian is a corporation formed in Delaware and headquartered in New York, two of the United States governed by U.S. federal law.

- Similarly, if LBCC had the "Funds" because LBIE, an English company, transferred the "Funds" to LBCC, it would be no more determinative than the fact that LBCC was in possession of the "Funds" as a corporation formed in Delaware and headquartered in New York, two of the United States governed by U.S. federal law.

---

[5] Among other things, the fact that Bermuda is a British Overseas Territory does not imply that Bermuda is governed by the same laws as England and Wales.  "Britain" is constituted by England and Wales, Scotland, and Northern Ireland.  Each of these three jurisdictions has different laws, including with respect to legal rates of interest.

[6] The Holders abandon their primary theory that the GCCM controls postpetition interest for purposes of this argument.  In doing so, they fail to note that the GCCM, upon which the Holders otherwise relied, and the TWS "managed movement of cash in and out of the enterprise and enabled all cash flows to be monitored centrally, i.e., from Lehman headquarters in New York and Jersey City."  (Suckow Decl. ¶ 29.)

12

- LBCC was not a party to an agreement between LBIE and Lehman Re. The allegation that LBIE transferred "Funds" to LBCC in breach of any such contract only further demonstrates that such contract does not govern and is irrelevant to any obligation of LBCC to LBIE.

## III.    The "Contract Rate" Is a Floating Rate

28.    Assuming, arguendo, that the "contract" alleged by the Holders to be applicable applies, the "contract" rate floating, not fixed. Awarding the Holders an artificially fixed rate would translate to almost $23 million more interest than Lehman Re bargained for.

29.    The reason courts award contract rates of postpetition interest in bankruptcy cases is to give those creditors the benefits of their bargains. *See, e.g.*, *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) ("[W]here there is no showing that the creditor entitled to the increased interest caused any unjust delay in the proceedings, it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act"); *Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325, 340 (S.D.N.Y. 2008) (explaining that *Ruskin* applies postpetition interest).

30.    The "contract rate" asserted by the Holders is the rate specified in the Draft: "1-week LIBOR flat; reset daily." (Draft § 5.3.2.3.) The Holders' assertions that they are entitled to a contract rate that is fixed on LBCC's petition date rests on unsound precedent and are otherwise unsupported.

31.    The Holders' primary argument on this point is that *In re Dow Corning Corporation*, No. 2:01-cv-71843-DPH, slip op. (E.D. Mich. May 18, 2004) (ECF No. 36) ("*Dow Corning III*"), requires that the Court artificially fix a contract rate as of LBCC's petition date. As the Court is aware, nonbinding precedent should be followed only to the extent its reasoning is persuasive. *In re CBI Holding Co., Inc.,* 529 F.3d 432, 456 (2d Cir. 2008) (declining to follow unpersuasive, nonbinding precedent); *Levy v. Ina Life Ins. Co. of N.Y.*, No. 05 Civ. 10310 (GEL),

13

2006 WL 3316849, at *3 (S.D.N.Y. Nov. 14, 2006) (Lynch, J.) (explaining that decisions "have no persuasive influence where their supporting reasoning is unknown"). Here, *Dow Corning III*'s reasoning is unsound and inapplicable. The relevant procedural history makes this clear:

- On April 29, 2001, the *Dow Corning* bankruptcy court issued an oral ruling interpreting a "verbal amendment" to Dow Corning's chapter 11 plan. The amendment had provided that unsecured creditors with prepetition contracts in a dissenting class would receive postpetition interest at their contract rates, but it had not specified whether floating rates should be fixed on the petition date. *See In re Dow Corning Corp.*, No. 01-cv-71843-DT, 2004 WL 764654, at *4 (E.D. Mich. Mar. 31, 2004) ("*Dow Corning II*"). Interpreting that amendment, the bankruptcy court concluded, among other things, that the rate "would presumably be the rate in effect on May 15, 1995, the date Dow Corning's bankruptcy case commenced." *Id.* The parties appealed this ruling to the district court.

- On March 31, 2004, the district court issued *Dow Corning II*, affirming the bankruptcy court's decision, *see id.* at *9, but including almost no discussion of whether contractual rates of postpetition interest should be fixed at the rates in effect on Dow Corning's petition date. The parties requested that the district court clarify its ruling on this issue. *See Dow Corning III* at 2 & n.2.

- On May 18, 2004, the district court issued *Dow Corning III*, clarifying, among other things, that the rate of interest on the dissenting class's floating-rate contracts would be fixed at the rates in effect on Dow Corning's petition date. The Court made three statements regarding its reasoning:

  - First: "The Debtor makes a good argument to support its position that the floating rate should continue to vary during the bankruptcy, but that is just not what the bankruptcy court determined nor what this Court affirmed." *Id.* at 3.

  - Second: "The case law supports the application of a *set* rate, more often than not, an interest rate set by statute, such as the federal judgment rate. *See* [*Dow Corning I*], 237 B.R. at 402 (citing various cases holding that the statutory interest rate where there is no contract rate or where the debtor is insolvent) [*sic*]." *Id.*

  - Third: "[T]he intent behind allowing the pendency interest rate at the contract rate was to provide the [dissenting class'] Claimants with some of the benefit of their bargains by application of the fair and equitable provision of the bankruptcy code." *Id.* (citing *In re Dow Corning Corp.*, 244 B.R. 678, 696 (Bankr. E.D. Mich. 1999)).

14

Based on the foregoing and as explained below, there is no reason for this Court to follow *Dow Corning III* in these chapter 11 cases with respect to the Plan.

32.     First, the district court acknowledged that the debtor made a "good argument to support its position that the floating rate should continue to vary during the bankruptcy." The district court then provided no rationale or explanation as to why it fixed the rates of interest. In this context, the district court decision "ha[s] no persuasive influence [because its] supporting reasoning is unknown." *Levy*, 2006 WL 3316849 at *3.

33.     Second, the district court relied on case law that the bankruptcy court had cited for a completely unrelated proposition. For example, the district court cited the following statement by the bankruptcy court, focusing on the word "fixed": "For over 100 years courts have consistently used the term [*i.e.*, "the legal rate"] to mean a rate of interest fixed by statute." *Dow Corning I*, 237 B.R. at 402. But the bankruptcy court's discussion shows that the bankruptcy court's use of the word "fixed" in that context was not in contrast to "floating." Moreover, the quoted statement referenced the debate over the meaning of the phrase "the legal rate" under section 726(a)(5) of the Bankruptcy Code (i.e., contract versus statutory rate) and is irrelevant to whether a particular contract rate should be artificially fixed or remain floating. The bankruptcy court cited 27 cases interpreting "the legal rate," but all 27 involved statutory rates. Not one of them involved contract-rate postpetition interest. *None of the cases considered whether a rate should be floating or fixed.* Only eight even involved bankruptcy. *See Dow Corning I*, 237 B.R. at 402. This rationale does not support artificially fixing a contract rate of interest.

34.     Third, the "fair and equitable" argument referenced by the district court is inapplicable to the Holders. First, as a matter of law, the Holders cannot assert a fair and

WEIL:\95794362\7\58399.0011

equitable argument because every impaired Class of Claims voted overwhelmingly to accept the Plan, including the Lehman Re Claim's Class (LBCC Class 5C), which voted 100% in favor of the Plan. (*See* ECF No. 22743, Ex. B at 2.) Unlike the treatment of dissenting classes under the plan in *Dow Corning*, the Plan in these chapter 11 cases need not be "fair and equitable" to the Lehman Re Claim or any Class of Allowed Claims. *See* 11 U.S.C. § 1129(b)(1).[7] Second, as a matter of fact, the district court's reasoning simply is inapplicable to the Holders. A *fixed* contract-rate of interest in this case would not "provide . . . Claimants with *some* of the benefit of their bargains. . . ." *Dow Corning III*, at *3. It would provide the Holders with over 23 times as much interest as they were entitled under the asserted floating-rate contract.

35.     Moreover, the *subsequent appellate* history provides additional reason why the Court should not rely on *Dow Corning III* to fix an otherwise floating contract rate of interest in these chapter 11 cases. On appeal from the district court, the United States Court of Appeals for the Sixth Circuit held that the phrase "'the applicable contract rate' could mean several things" and was ambiguous as a matter of law. *In re Dow Corning Corp.*, 456 F.3d 668, 677 (6th Cir. 2006) ("*Dow Corning IV*"). The circuit court *did not* hold that contract rates must be artificially fixed; it merely affirmed the bankruptcy court's interpretation that the phrase could reasonably mean "the base applicable contract rate on the date of the petition," under an abuse-of-discretion standard. *See id.*

36.     The Holders cite no other authority that would require the fixing of a floating contract rate. The Holders' citations to *United States v. Marxen (In re Monterey Brewing Co.)*, 307 U.S. 200 (1939), and *In re Saint Vincent's Catholic Medical Centers of New York*, 440 B.R. 587 (Bankr. S.D.N.Y. 2010), are misplaced. *Marxen* held that a postpetition

---

[7] By contrast, the Plan must be fair and equitable to LBCC's Equity Interests, thereby limiting "the statutory rate" to the federal judgment rate. (*See* Confirmation Order ¶ JJ.)

transfer of a claim does not change the claim's priority.  *See Marxen*, 307 U.S. at 207–08.  The *Saint Vincent's* court's statement that "[a] claim is measured as of the petition date" is irrelevant because postpetition interest is not part of an unsecured claim.  *See Dow Corning*, 244 B.R. at 685 ("[P]endency interest—whether based on § 726(a)(5) or § 1129(b)'s requirement that the plan be fair and equitable—does not constitute an allowed claim[.]"); *compare* 11 U.S.C. § 726(a)(2) (providing for "payment of any allowed unsecured claim") *with* § 726(a)(5) (providing for "payment of interest at the legal rate . . . on any claim under [§ 726(a)(2)]").

37.     To the contrary, case law does support awarding postpetition interest at a floating rate based on a creditor's prepetition contract.  *See Han v. GE Capital Small Business Finance Corp. (In re Han)*, Ch. 13 Case No. 00-42086, Adv. Proc. No. 05-03012, slip op. at 3 (Bankr. N.D. Fla. Sept. 26, 2005) (showing that "[t]he correct interest rate to be charged on Han's loan after the bankruptcy filing, but before confirmation of his chapter 13 plan" varied between 12.25% and 9.50% in each of 10 months).[8]

38.     The Holders make two final arguments in support of a fixed contract rate. Neither survives scrutiny.  First, the Holders suggest the Court should draw an "analogy" to the federal judgment rate, which is fixed as of the petition date.  (Resp. ¶¶ 42–43.)  This suggestion ignores the reasoning of Courts that permit postpetition interest at prepetition contract rates: to give the creditors the benefit of their prepetition bargain.  *See supra* ¶ 28.  Courts that do not adopt that reasoning apply the statutory federal judgment rate; they do not fix a floating prepetition contract rate.  There is no analogy to be drawn and no reason to apply the fixed-nature of the federal judgment rate to the floating nature of contract entitlement.[9]  Finally, the

---

[8] A copy of *Han* is attached as <u>Exhibit A</u> hereto.

[9] The federal judgment rate is prescribed by a federal statute that requires that it be calculated "from the date of the entry of the judgment."  28 U.S.C. § 1961(a).  Claims are allowed as of the petition date.  *See* 11 U.S.C. § 502(b).

17

Holders observe that claims in foreign currencies are converted into U.S dollars as of the petition date even though foreign exchange rates fluctuate. (Resp. ¶ 44.) The Bankruptcy Code expressly requires this. *See* 11 U.S.C. § 502(b). There is no similar statutory requirement to fix contract rates of postpetition interest. There is no analogy that supports fixing a floating contract rate of interest in this context.

## IV.    The "Contract Rate" Is United States Dollar Denominated

39.    Assuming, arguendo, that the "contract" alleged by the Holders to be applicable applies, the "contract" rate is United States dollar denominated.

40.    Upon the filing of LBCC's petition, the Lehman Re Claim was converted to U.S. dollars. LBCC owed Lehman Re U.S. dollars. In accordance with the Plan, the Allowed Lehman Re Claim was paid—in full—in U.S. dollars. The Holders are entitled to demand postpetition interest on *the Allowed Lehman Re Claim*, not on an amount of pounds sterling owed to Lehman Re prior to the existence of the Allowed Lehman Re Claim. Postpetition interest is a distribution on an allowed claim. *See Dow Corning*, 244 B.R. at 685. Because the applicable currency postpetition was always U.S. dollars, LIBOR "by currency" is USD LIBOR. The Holders' argument that LIBOR "by currency" requires GBP Libor has no basis. The Holders' citations to *In re Dvorkin Holdings, LLC*, 547 B.R. 880 (N.D. Ill. 2016), and *Dow Corning IV* lend no support. Neither addresses foreign-currency interest rates.

41.    The Holders fail to establish that interest on the U.S. dollar-denominated Lehman Re Claim should accrue at a rate tied to British pounds sterling.

---

"From and after the petition date, then, creditors hold the equivalent of a federal judgment against estate assets, enforceable only in federal court." *Melenyzer*, 143 B.R. at 833; *accord In re Chiapetta*, 159 B.R. 152, 161 (Bankr. E.D. Pa. 1993) ("Following the holding in *Melenyzer*, we further conclude that, since a claim is like a judgment entered at the time of the bankruptcy filing, the applicable rate should be the federal judgment rate in effect at the time of the bankruptcy filing."). Neither the Plan nor a federal statute imposes any similar requirement on contract-based rates.

WEIL:\95794362\7\58399.0011

## CONCLUSION

42.     Lehman Re received the Lehman Re Claim during the pendency of its own foreign insolvency and U.S. chapter 15 proceedings.  In the course of these chapter 11 cases, LBCC satisfied the Lehman Re Claim in full, and Lehman Re was able to satisfy all of its creditors in full.

43.     The Holders have not sufficiently overcome the Objection to establish that they are entitled to postpetition interest on the Lehman Re Claim at a rate higher than the federal judgment rate.  Their Demands should be reduced accordingly.

44.     The Court should find at the sufficiency hearing that the "contract" rate alleged, assuming, arguendo, that it applies, is floating, not fixed, and United States Dollar denominated.  Such rulings would avoid the need for discovery because, if accepted as true, such a "contract" rate is 0.26%, lower than the federal judgment rate.

45.     The difference between the sum of any postpetition interest demands asserted against LBCC and the allowed amount of such demands will inure to the benefit of LBHI's creditors, which have not yet been satisfied in full.

Dated:    September 26, 2016
          New York, New York

                        /s/ Garrett A. Fail
                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York 10153
                        Telephone: (212) 310-8000
                        Facsimile: (212) 310-8007
                        Garrett A. Fail

                        *Attorneys for Lehman Brothers Holdings Inc.*
                        *and Certain of Its Affiliates*

19

## Exhibit A

*Han v. GE Capital Small Business Finance Corp. (In re Han)*,
Ch. 13 Case No. 00-42086, Adv. Proc. No. 05-03012, slip op. (Bankr. N.D. Fla. Sept. 26, 2005)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA

In Re

JUNG BEA HAN                                                    Case No. 00-42086

      Debtor


JUNG BEA HAN

      Plaintiff

vs.                                                            Adv. No. 05-03012


GE CAPITAL SMALL BUSINESS
FINANCE CORPORATION

      Defendant


**ORDER AND JUDGMENT GRANTING IN PART AND DENYING IN PART
DEFENDANT'S SUPPLEMENTAL MOTION FOR SUMMARY
JUDGEMENT AND AWARDING PLAINTIFF $400 IN
ACTUAL DAMAGES AND $2,000 IN PUNITIVE DAMAGES**

Jung Bea Han, Plaintiff, pro se, Milton, Florida
Daniel S. Mandel, Attorney for Defendant, Mandel, Weisman, Heimberg & Brodie, P.A.,
    Boca Raton, Florida

This case is before the Court on the Supplemental Motion for Summary Judgment of GE

Capital Small Business Finance Corporation as to Count III of the complaint.  This Court has

jurisdiction to hear this matter pursuant to 28 U.S.C. § § 157 and 1334 and the Order of

Reference of the District Court.  This motion is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2) and the Court has the authority to enter a final order.  For the reasons indicated

1

below, the Court is granting in part and denying in part defendant's supplemental motion for

summary judgment and awarding a judgment to plaintiff in the amount of $400 in actual

damages and $2,000 in punitive damages pursuant to 11 U.S.C. § 362(h).

FACTS

The Court will not recite again the facts stated in its earlier order granting partial

summary judgment to GE Capital which order was entered on July 12, 2005. The facts stated in

that order are incorporated by reference. In that order the court found that the only issue[1] as to

which summary judgment could not be awarded to GE was, as alleged in Count III of the

complaint, the claim that GE violated the automatic stay by charging postpetition interest at a

higher rate than the rate allowed under the note in the postpetition but preconfirmation time

frame.[2]

The Court stated:

Han also claims that GE violated the automatic stay by charging a postpetition
interest rate that was higher than the rate allowed under the note. GE locked in
Han's interest rate at 12.25% after he defaulted on his loan in June of 2000.
However, the note only allowed GE to lock in the rate if Han was in default when
the SBA purchased the guaranteed portion of the loan. Although Han was in
default in June of 2000, there is no evidence before the Court that the SBA
purchased the guaranteed portion of the loan. Furthermore, there is no evidence

---

[1] The U.S. District Court only referred a specific, limited issue to this Court for
consideration. That issue is whether the plaintiff is entitled to any damages for "alleged
violations of the automatic stay provisions of 11 U.S.C. § 362(h)." Order of October 28, 2004, ¶
3, *Jung Bea Han v. GE Capital Small Business Finance Corporation*, Case
3:04cv127/MCR/EMT.

[2] Mr. Han had alleged that the higher interest rate was also a violation of the stay
postconfirmation, but the Court concluded in the July 12, 2005 order that GE's postconfirmation
actions did not violate the stay. All issues dealing with whether the prepetition preconfirmation
actions or the postconfirmation actions of GE were actionable on any other grounds were dealt
with by the U.S. District Court in its order of October 28, 2004.

2

before the Court of what the Wall Street Journal's published prime rates were on the applicable dates.

Because, as stated above, the preconfirmation direct payments were property of the estate, if GE charged a higher interest rate on the preconfirmation payments than the note authorized, there could have been a violation of the stay, as any amount GE charged over the note authorized amount could be considered an act to obtain possession of property of the estate. *See* 11 U.S.C. § 362(a)(3); *LTV Corp. v. Gulf States Steel, Inc. of Alabama*, 969 F.2d 1050 (D.C. Cir. 1992).

GE has now provided evidence that the SBA did not buy the guaranteed portion of the loan at Han's default, or at any time thereafter. Therefore, the interest rate did not lock in at any fixed rate.[3] The interest rate continued to float after Han's default as it did before Han's default. The correct interest rate to be charged on Han's loan after the bankruptcy filing, but before confirmation of his chapter 13 plan, and the incorrect rate, were as follows:

| Dates | Interest Rate Charged as Fixed | Interest Rate as Adjusted | Prime Rate | Rate Charged after Corrected History |
|---|---|---|---|---|
| Oct. 00 | 12.25 | 12.25 | 9.50 | 12.25 |
| Nov. 00 | 12.25 | 12.25 | 9.50 | 12.25 |
| Dec. 00 | 12.25 | 12.25 | 9.50 | 12.25 |
| Jan. 01 | 12.25 | 12.25 | 9.50 | 12.25 |
| Feb. 01 | 12.25 | 11.25 | 8.50 | 11.25 |
| Mar. 01 | 12.25 | 11.25 | 8.50 | 11.25 |
| Apr. 01 | 12.25 | 10.75 | 8.00 | 10.75 |
| May 01 | 12.25 | 10.25 | 7.50 | 10.25 |
| June 01 | 12.25 | 9.75 | 7.00 | 9.75 |
| July 01 | 12.25 | 9.50 | 6.750 | 9.50 |

---

[3] See footnote 4.

3

GE charged a higher interest rate than allowed under its own note with Han in 6 of the 10 months after Han filed bankruptcy but before his chapter 13 plan was confirmed. This higher rate meant GE told Han he had to pay $1,465 per month on the note for the direct payments required under his plan. GE sent Han an accounting that showed his payments posted per the incorrect interest rate schedule.[4] GE corrected the interest rate problem 6 months after entry of the confirmation order and sent Han an amended payment history that posted the amounts paid according to the correct interest rate schedule.[5] Han paid direct payments to GE as follows:

| | |
|---|---|
| Nov. 00 | $1,290.00 |
| Dec. 00 | $1,290.00 |
| Jan. 01 | $1,290.00 |
| Feb. 01 | $1,290.00 |
| Mar. 01 | $1,290.00 |
| Apr. 01 | $1,290.00 |
| May 01 | $1,465.00 |
| June 01 | $1,465.00 |
| July 01 | $1,465.00 |

---

[4] The Court could not find the incorrect accounting in the exhibits of the plaintiff, but it is clear such an accounting was provided to Han. Han's Exhibit 20 is a letter of John Walter, Liquidation Specialist at GE, dated April 8, 2002, to Han's then attorney which stated:

> You are correct in stating that the payment history provided to Mr. Han on October 29, 2001 and the payment history provided to him on December 31, 2001 differed significantly. The reason is very simple. Per the terms of the Note, the interest rate was fixed at 12.25% on the date of default of the loan which was June 6, 2000. Mr. Han requested that GE return the interest rate to a floating rate. Because GE Capital has the authority under current U.S. Small Business Administration guidelines to reduce the interest rate to current levels, we did so.

(The statement about the generosity of GE is disingenuous. The Note did not allow GE to lock in the higher rate.)

[5] Han's Exhibit 17, letter of GE Capital Small Business Finance Corporation liquidation specialist, John Walter, dated December 31, 2001.

4

During the period from October 2000 to July 2001, Han, under his plan, was also paying

$7798.70 in prepetition arrearages owed to GE through the chapter 13 trustee based upon the

proof of claim filed by GE that stated that that amount was its prepetition claim.  GE stated it was

the "accrued interest and various fees (late fees, NSF fees, term fee, access fees)" owed by Han.[6]

Han continued to insist that he should get a schedule that showed that his postpetition loan

payments to GE were applied to reduce principal as well as pay the interest accruing each month

after the filing of the case, as if he were current as of the date he filed bankruptcy.  GE did not

apply the payments in its own accountings as Han requested.  GE applied the payments to interest

accrued in prepetition periods.  For instance, in GE's schedule, Han's payment on November 7,

2000 was applied to interest accrued through July 4, 2000.  Han's December 5, 2000 payment

was applied to interest accrued through August 2, 2000.  The January and February 2001

payments were also applied to prepetition interest.  As stated by John Walter of GE in a letter of

January 9, 2002:

> Our payment history sent to you by facsimile on December 31, 2001 is <u>correct.</u>
> The column marked "Act Date" represents the "Actual Date" we received your
> payment.  The column marked "Due Date" represents the "Due Date that the
> payment was applied against.  The column marked "Int Thru" represents the date
> through which interest was paid with the payment received.[7]

Han sent, either himself or through attorneys, at least 6-7 letters or faxes to GE asking

that his account be corrected to reflect the current interest rate.  It took approximately one year

for GE to determine that it had incorrectly locked in the interest rate on Han's loan.  The Court is

---

[6]  Han's Exhibit 22, letter of GE Capital Small Business Finance Corporation general
counsel, Katherine D. Knocke, dated April 17, 2003.

[7]  Han's Exhibit 18, letter of John Walter, Liquidation Specialist, GE Capital Small
Business Finance Corporation, dated January 9, 2002, to Jung B. Han.

convinced that the interest rate would not have been corrected but for Han's persistence. When it was corrected, until GE disclosed the fact that the SBA had never purchased part of the loan, GE never indicated that it had made a mistake. The only evidence shows that GE stated it made the adjustment "[b]ecause GE Capital has the authority under the current U.S. Small Business Administration guidelines to reduce the interest rate to current levels."[8] In fact the converse is true--GE never had the authority to raise the rate in the first place.

## LAW

The Court, in partially granting GE's first motion for summary judgment on July 12, 2005, held, pursuant to *Telfair V. First Union Mortgage Corp. (In re Telfair)*, 216 F.3d 1333 (11th Cir. 2000), that the only period in which a violation of the stay could have occurred was the period from October 11, 2000, the date of Han's bankruptcy filing until July 12, 2001 when the Hans amended chapter 13 plan was confirmed. No stay was in effect postconfirmation except as to the money necessary for payments to the chapter 13 trustee ($600 per month for 36 months and $845 per month for 24 months thereafter). In reviewing the evidence submitted by GE and Han, it appeared to the Court that the only possible violation could be if GE's charging of the incorrect interest rate could be construed as an "act to obtain possession of property of the estate." 11 U.S.C. § 362(a)(3). By telling Han he must pay $1,465 per month to stay current with the nontrustee direct payments, the argument would be that GE was attempting to collect money (property of the estate) otherwise available to pay other debts. In further reviewing the evidence for this supplemental summary judgment motion, the Court also concludes that Han is possibly alleging that GE's posting of payments and accounting were incorrect and a violation of

---

[8] See footnote 4.

6

the stay.  The accounting did not start interest accruals anew at the bankruptcy filing and treat the

arrearage claim separately.  Han is possibly alleging that the application of postpetition payments

to the prepetition arrearage by GE in its accounting was a violation of the stay.  The automatic

stay precludes "any act to collect . . .or recover a claim against the debtor that arose before the

commencement of the [bankruptcy] case."  11 U.S.C. § 362(a)(6).

A motion for summary judgment is controlled by Rule 56 of the Federal Rules of Civil

Procedure, which is applicable to bankruptcy proceedings pursuant to Fed. R. Bankr. P. 7056.  A

court shall grant summary judgment to a party when the movant shows that "there is no genuine

issue as to any material facts and . . . the moving party is entitled to judgment as a matter of law."

Fed.R. Bankr. P. 7056(c).  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2502, 91

L.Ed. 2d 2020 (1986), the Supreme Court found that a judge's function is not to determine the

truth of the matter asserted or weight of the evidence presented, but to determine whether or not

the factual disputes raise genuine issues for trial.  *Anderson,* 106 S.Ct. at 2510-11.  In making

this determination, the facts are to be looked upon in the light most favorable to the nonmoving

party.  *Id.*; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## A.

The Court will discuss the issue raised by the Court in its July 12, 2005 order first as that

issue has been addressed by both parties in this supplemental summary judgment motion and

response.  Did GE violate the automatic stay by calculating the payments due from Han at

12.25% for October 11, 2000 through July 2001 and requiring him to pay $1,465.00 per month to

be current on his note when his payments, if the correct interest rate had been charged, would

have been a lesser amount?[9]   There are three issues to be considered.  (1) Did the higher

payments required result in Han utilizing property of the estate to make the payments?; (2) Was

the miscalculation "willful?"; (3) Did the action of GE result in any damages shown by Han?

1.

Han was required to pay $1,465 each month according to GE to pay a complete direct

payment during the preconfirmation period.  The sum of $1,465 was the correct sum for the

months of October 2000 through January 2001.  Therefore, requiring this sum for those months

cannot be a stay violation.  Han was only being asked to live up to what he offered to do in his

chapter 13 plan.  For the months of February and March 2001, from earlier payment records, it

appears that the payment should have been about $1,368 per month for an 11.25% interest rate.

For April 2001 the payment should have been about $1,317 or so; for May 2001, $1,150 or so;

for June 2001, $1,100 or so; for July 2001, $1,050 or so.[10]  If Han had paid the $1,465 per month

as requested, he would have paid $13,185.  However, Han paid less than the amount GE was

insisting upon in all but three of the nine postpetition preconfirmation months.  Han actually paid

$12,135.  The payments, if the correct interest rates were used would have been about $11,748.

Since Han only paid $12,135, he paid approximately $387 more than he had to pay to be current

with the proper interest rates.  Was this sum paid from property of the estate?

Section 1306(a)(2) states that "earnings from services performed by the debtor after the

---

[9]  The incorrect payment amount was quoted to Han only for the months of February 2001
through July 2001.  For October 2000 through January 2001, the floating interest rate was
actually 12.25% The interest rate only floated lower in February 2001.

[10]  The Court derived these amounts from payments Han made in the prepetition period
when the same or similar interest rate was in effect.  *See,* e.g., Han's Exhibit 17.

8

commencement of the case" are property of the estate.  *See U.S. Postal Service v. Hudson*, 230

B.R. 542 (W.D. Tenn. 1999) (gross wages of debtor were property of the estate).  Also, the

*Telfair* case held that postpetition earnings of a chapter 13 debtor were not property of the estate

postconfirmation because all property including earnings revested in the debtor except funds

necessary to make plan payments to the chapter 13 trustee.  *Telfair,* 216 F.3d at p. 1340-41.

Therefore, conversely, all preconfirmation earnings would be property of the estate.

Therefore, writing to Han and his attorney and telling them that payments of $1,465 per

month were due in expectation of receiving that sum were actions taken "to obtain possession of

property of the estate or of property from the estate."  11 U.S.C. § 362(a)(3).

2.

The receipt of the additional $387 was "willful" on the part of GE.  Pursuant to § 362(h),

a "willful" violation of the stay is one in which the creditor knows there is a stay and acts

anyway.  A "willful violation [of the stay] occurs when the creditor knew that the automatic stay

had been invoked and intended the action that violated the stay.  *See In re Jove Engineering, Inc.*,

92 F.3d 1539, 1555 (11th Cir. 1996)."  *Rutherford v. Auto Cash, Inc. (In re Rutherford)*, 2005

WL 2237694, *10 (Bankr. N.D. Ga. 2005); *U.S. Fernandez (In re Fernandez)*, 132 B.R. 775

(M.D. Fla. 1991). Here, GE knew there was an automatic stay.  There has been no allegation that

it did not know of the bankruptcy case.  GE, acting negligently, recklessly, or intentionally,

required payments from Han's assets that were higher than the postpetition debt required.  These

payments from property of the estate were a result of GE's insistence on the fact that $1,465 was

9

the correct payment.[11]  These were actions to "obtain possession of property of the estate" and the court concludes they were violations of the automatic stay.

3.

Section 362(h) provides that the debtor "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages" when a creditor has violated the stay.  11 U.S.C. § 362(h).  Han has the burden of proving that he was harmed by a preponderance of the evidence.  *Smith v. GTE North Inc. (In re Smith)*, 170 B.R. 111, 115 (Bankr. N.D. Ohio 1994).  Han alleges that he has suffered actual damages, including emotional distress, and that he should be awarded punitive damages.

Actual damages are "compensatory damages."  They are "real, substantial and just damages, or the amount awarded to a complainant in compensation for his actual and real loss or injury, as opposed to 'nominal' damages and 'punitive' damages."  *McMillian v. F.D.I.C*, 81 F.3d 1041, 1054 (11th Cir. 1996) (quoting BLACK'S LAW DICTIONARY (6th Ed. 1991); *Cox v. Billy Pound Motors, Inc. (In re Cox),* 214 B.R. 635, 642 (Bankr. N.D. Ala. 1997).  Han suffered approximately $387 of actual, out-of-pocket damages that were proved.  Han also asserts that he has emotional distress actual damages.

---

[11]  For example, Han's Exhibit 7 is a letter from John Walter, GE Capital Small Business Finance Corporation, dated March 27, 2001, stated "As I have discussed with you previously, the regular monthly payments due outside the bankruptcy plan since you filed chapter 13 bankruptcy on October 11, 2000 are $1,465.00 per month.  Post-petition payments were due on November 6, 2000, December 6, 2000, January 6, 2001, February 6, 2001 and March 6, 2001."

Also, Han's Exhibit 9 is the GE Objection to Confirmation which states that "[t]he regular monthly payments outside of the Plan are $1,465.00 per month."  The objection was dated March 27, 2001, after the date when the floating rate should have lowered the monthly payment amount.

10

> A debtor's emotional distress must be more than fleeting, inconsequential, and
> medically insignificant to support an award of actual damages pursuant to
> § 362(h).  *Aiello v. Providian Fin. Corp.*, 257 B.R. 245, 250 (N.D. Ill. 2000),
> *aff'd*, 239 F.3d 876 (7th Cir. 2001).  In the absence of conduct of such an
> egregious or extreme nature that emotional distress would be expected to occur, a
> debtor must present some medical or other corroborating evidence showing that
> she suffered more than fleeting and inconsequential distress.
> *In re Hedetneimi*, 297 B.R. 837, 842 (Bankr. M.D. Fla. 2003).

"The potential for abuse if damages for a purely emotional injury can be awarded in suits to redress violations of the stay is considerable."  *Aiello*, 239 F.3d at 881.  Han has provided no evidence of damages other than his statement that he suffered emotional distress and the showing that he had to pay approximately $387 above his actual required payments. The excess payment required of Han was not very large.  There is no evidence that $387 required Han to forego making other necessary payments.  Han was clearly upset because he could not get a properly amortized payment history and GE kept insisting that $1,465 per month was due, but the monetary concern was minimal.  If Han had made all of the payments he was required to make under his plan and paid the direct payments as recalculated in December 2001, he would have paid off his loan according to the loan agreement, regardless of how GE accounted for the payments during the chapter 13.  Han alleges no public embarrassment from the letters of GE. The annoyance was private in his letters to them and from them.  Since Han is representing himself, there are no attorney's fees.

It should also be noted that GE corrected its error in December 2001.  Although a correction does not change the fact that the stay was violated, the correction clearly mitigated much of the actual damage that Han might claim.

Therefore, the Court concludes that Han suffered actual damages of about $387.  The

11

court will round the number to $400 and award that sum.  Han proved that he overpaid this sum

by a preponderance of the evidence.  He proved no emotional distress damages beyond

aggravation.

Punitive damages are permitted for a willful violation of the stay "in appropriate

circumstances."  11 U.S.C. § 362(h).   Many courts have adopted the standard set forth in the

*Wagner v. Ivory (In re Wagner)* case, 74 B.R. 898 (Bankr. E.D. Pa. 1987) to determine when

appropriate circumstances exist.

> Punitve damages are awarded in response to particularly egregious conduct for
> both punitive and deterrent purposes.  Such awards are reserved for cases in which
> the defendant's conduct amounts to something more than a bare violation
> justifying compensatory damages or injunctive relief.  To recover punitive
> damages, the defendant must have acted with actual knowledge that he was
> violating the federally protected right or with reckless disregard of whether he was
> doing so.
> *Wagner*, 74 B.R. at 903 (quoting in part *Cochetti v. Desmond*, 572 F.2d 102, 106 (3rd Cir.
> 1978)

The Second Circuit Court of Appeals stated that a punitive damage award required an "additional

finding of maliciousness or bad faith on the part of the offending creditor."  *In re Chateaugay*

*Corp.*, 920 F. 2d 183, 186, n. 1 (2nd Cir. 1990).  Other cases have required "an arrogant defiance

of the federal law demonstrated."  *Matter of Mullarkey*, 81 B.R. 280, 284 (Bankr. D.N.J. 1987).

Bankruptcy cases in this circuit have followed these or similar cases and have not awarded

punitive damages without weighty circumstances.  *Bishop v. U.S. Bank/Firstar Bank, N.A. (In re*

*Bishop)*, 296 B.R. 890 (Bankr. S.D. Ga. 2003); *Flynn v. Int. Rev. Service (In re Flynn)*, 169 B.R.

1002 (Bankr. S.D. Ga. 1994).

GE's conduct was inappropriate and reckless.  It should not have taken 6-7 letters and one

year for GE to read the note and determine that the interest rate was to float.  The conduct,

12

although not as egregious as that in some cases, lasted too long and required too much

persistence on Han's part to correct to not warrant some punitive damage award.  The Court

found no other case where a clear violation of the stay took as long as it did in this case to

correct.  GE needs to understand that it must take the questions of each client very seriously.  The

Court concludes that an award of $2,000 is appropriate.

B.

The second issue which Han's response possibly alleges was the issue of whether the

incorrect accounting furnished to Han constitutes a violation of the stay.  Did GE's crediting of

the postpetition payments against the prepetition interest in its payment schedule violate the stay?

> [O]ther than possibly in a setoff context, mere internal bookkeeping entries by a
> creditor, in and of themselves, do not generally produce any effect on a debtor,
> much less a change or an attempted change in possession of property of the estate.
> [The creditor] . . .could produce all kinds of paperwork which if communicated to
> the debtor or a third party would violate the stay, but absent that communication,
> some overt act, or resulting effect on the debtor, no violation has occurred.
> *Sims v. Capital One Financial Corp.*, 278 B.R. 457, 471 (Bankr. E.D. Tenn. 2002)
> (citations omitted)

In this case, GE did send Han a copy of its payment and amortization records for Han's loan.

Although GE credited payments as if no bankruptcy had occurred on the history, GE abided by

the confirmed plan of the debtor.   While Han was in chapter 13, it charged him no postpetition

late fees or other charges.  GE added no accruing interest to his note that raised his payments

during the case.  GE did show his balance owing at any point in time as the amount that would be

owed if no bankruptcy had occurred, crediting payments made first to outstanding fees and

charges and accrued interest, and then to principal.  If Han had made all of his chapter 13

payments over the 5 year life of his plan and had paid his direct payments, the loan would have

13

been current at the conclusion of the plan.  Therefore, the accounting itself, in this instance, even though communicated to Han, was not a violation of the stay.  The accounting was not an attempt to improperly collect a prepetition debt postpetition.  11 U.S.C. § 362(a)(1).  The creditor was abiding by the chapter 13 plan.  If all payments were made, GE's internal accounting would have been correct at the conclusion of the chapter 13 case.  The provision of the accounting to Han was not an attempt "to obtain possession of property of the estate."  The accounting was used to show Han where his account stood, but GE took no actions to obtain funds except as allowed by the plan.  Also, when GE realized that the accounting included the incorrect interest rate, it corrected it.

## CONCLUSION

The Court concludes that GE Capital Small Business Finance Corporation's motion for summary judgment as to Count III of the complaint is due to be granted in part and denied in part.  The Court concludes that GE Capital Small Business Finance Corporation did not violate the stay in Jung Bea Han's bankruptcy case, except for the postpetition preconfirmation incorrect interest charges from February 2001 through July 2001.  Due to that stay violation, Jung Bea Han is entitled to $400 in actual damages and $2,000 in punitive damages pursuant to 11 U.S.C. § 362(h).

IT IS ORDERED that:

1.    The supplemental motion for summary judgment as to Count III of GE Capital Small Business Finance Corporation is GRANTED in part and DENIED in part due to the Court concluding that the defendant, GE Capital Small Business Finance Corporation violated the stay by charging Jung Bea Han interest at the incorrect rate for the months of February 2001 through July 2001 and concluding that Jung Bea Han suffered $400 in actual damages and $2,000 in punitive damages pursuant to 11 U.S.C.

14

§ 362(h).

2.      Jung Bea Han is awarded judgment against the defendant, GE Capital Small
Business Finance Corporation in the amount of $2,400.


Dated:    September 26, 2005



_____
MARGARET A. MAHONEY
U.S.  BANKRUPTCY JUDGE

15