| | |
|---|---|
| Franklin H. Top III (admitted *pro hac vice*)<br>CHAPMAN AND CUTLER LLP<br>111 West Monroe Street<br>Chicago, Illinois 60603<br>Telephone: (312) 845-3000<br>*Counsel for U.S. Bank National Association, solely in its capacity as Indenture Trustee for Certain Mortgage-Backed Securities Trusts* | M. William Munno<br>Daniel E. Guzmán<br>SEWARD & KISSEL LLP<br>One Battery Park Plaza<br>New York, New York 10004<br>Telephone: (212) 574-1587<br>*Counsel for Law Debenture Trust Company of New York, solely in its capacity as Separate Trustee for Certain Mortgage-Backed Securities Trusts* |
| John C. Weitnauer (admitted *pro hac vice*)<br>ALSTON & BIRD LLP<br>1201 West Peachtree Street<br>Atlanta, Georgia 30309<br>Telephone: (404) 881-7000<br>*Counsel for Wilmington Trust Company and Wilmington Trust, National Association, each solely in its capacity as Trustee for Certain Mortgage-Backed Securities Trusts* | Dennis J. Drebsky<br>NIXON PEABODY LLP<br>437 Madison Avenue<br>New York, New York 10022<br>Telephone: (212) 940-3085<br>*Counsel for Deutsche Bank National Trust Company, solely in its capacity as Trustee for Certain Mortgage-Backed Securities Trusts* |

**In the United States Bankruptcy Court**
**for the Southern District of New York**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Case No. 08-13555 (SCC) |

**RESPONSE OF THE RMBS TRUSTEES TO**
***LEHMAN BROTHERS HOLDINGS INC.'S SECOND OBJECTION***
***TO CERTAIN RMBS TRUST CLAIMS AND MOTION TO DISALLOW AND EXPUNGE***
***CERTAIN RMBS TRUST CLAIMS FOR INSUFFICIENT DOCUMENTATION***

The RMBS Trustees[1] respectfully submit this response to *Lehman Brothers Holdings Inc.'s Second Objection to Certain RMBS Trust Claims and Motion to Disallow and Expunge*

---

[1] The RMBS Trustees are U.S. Bank National Association, Law Debenture Trust Company of New York, Wilmington Trust Company, Wilmington Trust, National Association, and Deutsche Bank National Trust Company, not individually but solely in their respective capacities as trustees or separate trustees for certain RMBS trusts (each a "**Trustee**" and collectively the "**RMBS Trustees**" or the "**Trustees**").

*Certain RMBS Trust Claims for Insufficient Documentation* (ECF 53620) (the "**Motion**") filed by Lehman Brothers Holdings, Inc. ("**Lehman**" or the "**Plan Administrator**").

1. The Motion asserts that 36,351 RMBS Claims (as that term is used in the Protocol[2]) should be "disallowed and expunged" because, Lehman says, the RMBS Trustees:

> have offered *insufficient proof of damages*. These deficient claims consist of: (i) 20,890 loans for which the Trustees have failed to assert a claim amount that reflects the amounts they would be due under the Protocol; and (ii) 15,461 loans for which the Trustees have failed to provide two documents that are necessary under the Protocol for the Plan Administrator to review the alleged damages.

Motion at ¶ 1 (emphasis added, footnote omitted).[3]

2. In substance, the Plan Administrator is asking this Court to grant a motion to dismiss *en masse 36,351* RMBS Claims (despite detailed evidence provided on a loan-by-loan basis in accordance with the Protocol) *only* arguing that (a) for 20,890 loans, the RMBS Trustees have not included a particular "damage calculation" or asserted "the amount due" – which is *not*

---

[2] See *Order Establishing A Protocol To Resolve Claims Filed By Trustees On Behalf Of Certain Issuers Of Residential Mortgage-Backed Securities* (ECF 47569) (as amended, the "**Protocol Order**"). The Protocol Order, and Exhibit A to that order (as amended, the "**Protocol**"), were amended on March 30, 2016 by that certain *Order Granting Motion of RMBS Trustees To Extend The Overall Claim File Cut-Off Date For Certain Loans Under The Protocol Order And Related Relief* (ECF 52367). All terms that are not defined herein shall have the definition set forth in the Protocol.

The Plan Administrator asserts that "the parties agreed on a Protocol that balanced the interests of the Trustees in being able to present their valid claims with the interests of the estate in ensuring that only claims for which LBHI was both liable and for which the Trusts had suffered calculable damages would be allowed." Motion at¶ 4. The RMBS Trustees did not agree to the Protocol; it was entered over their objections. *See The RMBS Trustees' (1) Reply In Support Of Their Motion To Estimate The RMBS Claims Using Statistical Sampling, And (2) Opposition To Lehman's Cross-Motion For A Full Loan-By-Loan Review* (ECF 46960). Notwithstanding their standing objection to the Protocol, the RMBS Trustees have complied with its terms.

[3] After first claiming "insufficient" proof, the Plan Administrator then goes further and says that:

> [The Plan Administrator] cannot approve the claims for allowance purposes *because the Trustees have put forth no evidence of any calculable damages*. It cannot revise the Purchase Price, as it is required to do in the Protocol, *because it has not been provided with supporting documentation* that would allow the Plan Administrator to confirm the Trustees' Purchase Price calculation.

Motion at ¶ 13 (emphasis added). As explained below, the RMBS Trustees have put forth evidence of the Purchase Price for each RMBS Claim, which is found in each RMBS Claim File submitted to Lehman as required by the Protocol.

2

required by the Protocol or the governing documents, and (b) for 15,461 loans, the RMBS Trustees have not provided what Lehman now asserts is the *only* acceptable evidence to prove the Purchase Price – a "loan loss certification" and a "corporate expense" log.

3. As the RMBS Trustees explain below, however, (a) for the 20,890 loans, the RMBS Trustees provided the calculation and supporting documentation for the Purchase Price in accordance with the Protocol and the governing documents; and (b) for the 15,461 loans, (i) the Protocol does not require that the Trustees provide either a loss certification or a corporate expense log, and (ii) further, the RMBS Trustees provided evidence that establishes the Purchase Price in accordance with the Protocol.

4. In addition – although not necessary to deny Lehman's Motion – (a) for the 20,890 loans, the RMBS Trustees offered to provide evidence on the value of the loans to be repurchased, an offer the Plan Administrator declined; and (b) for the 15,461 loans, the detailed evidence that the RMBS Trustees have provided to the Plan Administrator is more reliable than the information contained in the loss certifications (in those cases where loss certifications were in the servicing files).

5. The RMBS Trustees have complied with the Protocol regarding the Purchase Price for each of the 36,351 RMBS Claims. Accordingly, Lehman's Motion should be denied.

**I.    The 20,890 Non-Liquidated Loans**

*A.    The Protocol does not require the RMBS Trustees to Include Information about the Value of these Loans as part of an RMBS Claim File.*

6. The first category of RMBS Claims that Lehman seeks to summarily expunge are claims made on loans that Lehman refers to as "active loans" – including those that are performing to some extent under the applicable mortgage loan documents, or loans that are in default but have yet to be foreclosed upon and liquidated. *See* Motion at ¶ 42. In fact, the vast

3

majority of the 20,890 loans listed on Exhibit A to the Declaration of Jonathan D. Waisnor in Support of the Motion (ECF No. 53621) (the "**Waisnor Declaration**") are loans that are delinquent in payments, have a history of delinquency, or have already suffered losses through a loan modification or forgiveness program. Affidavit of Allen Pfeiffer dated September 29, 2016 (the "**Pfeiffer Affidavit**") at n. 4. The RMBS Trustees refer to these loans as "**Non-Liquidated Loans**."

7. Lehman complains that, for these Non-Liquidated Loans, the RMBS Trustees "have submitted a Purchase Price amount that is equal to the current UPB of the loans, plus interest and fees." Motion at ¶ 42.[4] But this is exactly what the Protocol requires – it states that each RMBS Claim File "shall include: ... [a] calculation of the Purchase Price (as defined in the governing agreement), together with all supporting documentation ...." Protocol at III.e.vi.4. (pp. 4 – 5) (emphasis in original). Lehman notes (and the RMBS Trustees generally agree, *see* Pfeiffer Affidavit at ¶ 8) that under the governing agreements for the RMBS Trusts the Purchase Price is generally defined as the total of the unpaid principal balance of the loan, interest and fees. *See* Motion at ¶ 45.[5]

8. Accordingly, for each of the 20,890 Non-Liquidated Loans, the RMBS Trustees submitted the Purchase Price for the Non-Liquidated Loans in accordance with the Protocol and as defined in the governing agreements. Pfeiffer Affidavit at ¶ 9. The aggregate Purchase Price of these loans is $6,494,458,705. Pfeiffer Affidavit at ¶ 18.

9. Lehman's argument that the RMBS Trustees are required to provide an estimate of future payments or future foreclosure/liquidation proceeds for Non-Liquidated Loans finds no

---

[4] "UPB" refers to "unpaid principal balance."

[5] There are a few other components to the Purchase Price which are not relevant to Non-Liquidated Loans.

4

support in the Protocol and is contrary to the arguments Lehman made in seeking implementation of the Protocol. When it asked this Court to put the Protocol in place, Lehman argued that the repurchase claims should *not* be estimated under 11 U.S.C. § 502(c) because the amount of any claim "would be easily ascertainable from the documents and it's therefore not unliquidated." *See December 10, 2014 Hearing Tr.* at 86:1-2 (ECF 49007), at Exhibit F to the Waisnor Declaration, ECF 53621. Lehman argued that the Purchase Price formula is "a mathematical calculation . . . [and] you can apply that formula to both non-performing <u>and performing loans</u>." *Id*. at 84:11-25 (emphasis added).

10.     Now, Lehman claims for the first time that the elements of the Purchase Price stated in the governing agreements are inadequate to calculate the amount of the Purchase Price on Non-Liquidated Loans, and that the Trustees are somehow required by the Protocol to provide estimates of future payments or future foreclosure/liquidation proceeds. Lehman apparently recognizes that the Protocol does not require this new information, arguing only that the "failure to provide this information is clearly in contrast *to the purpose of the Protocol*, which was intended to provide a mechanism by which the Plan Administrator could efficiently resolve and value the RMBS Claims." Motion at ¶ 43 (emphasis added).

11.     The Protocol says nothing about such estimates and does not require that any different or additional calculations or supporting documentation be provided in the case of Non-Liquidated Loans. The same calculation and information is required by the Protocol for all loans, whether liquidated or not. Absolutely nothing in the Protocol requires the RMBS Trustees to "provide this information" and therefore, the Motion should be denied.

5

        B.      *The RMBS Trustee offered to provide the Plan Administrator with evidence of the value of the Non-Liquidated Loans, but the Plan Administrator declined to consider it.*

12.     In its Motion Lehman explains for the first time why it believes, in the case of the Non-Liquidated Loans, it needs something more than what the Protocol requires. These loans, or the collateral for these loans, have some value. If Lehman repurchased them it "would receive the underlying loan and asset in return for the Purchase Price," Motion at ¶ 42, but now, Lehman says, "the Trustees will retain the underlying collateral and its value." *Id*. ¶ 42 at p. 17.[6]

13.     Lehman asserts that "the failure to discount for future payments or the value of the collateral is not faithful to *the objectives or intent* of the Protocol," Motion at ¶ 43 (emphasis added), but Lehman fails to inform the Court that – even though the Protocol does not require it – the RMBS Trustees' advisor, Duff & Phelps LLP ("**Duff & Phelps**") tried to discuss this issue and offered Lehman a valuation model with supporting evidence. Pfeiffer Affidavit at ¶¶ 13 – 17.

14.     During Step 2 of the Protocol, Duff & Phelps recognized that a mechanism to efficiently resolve and value a claim made on any Non-Liquidated Loan might require the parties to discuss how to value, and take into account the value of, each such loan, and approached the Plan Administrator about ways to do just that. Pfeiffer Affidavit at ¶ 17. On multiple occasions, Duff & Phelps offered to share with the Plan Administrator valuation evidence that Duff & Phelps had obtained regarding the values of the Non-Liquidated Loans. *Id*. Lehman's advisors declined to discuss or consider this valuation evidence. *Id*. Lehman's refusal to engage in discussions over this issue is the antithesis of "the objectives" or "intent" of the Protocol.

---

[6]    It is not impossible for the Plan Administrator to repurchase the loans. The Court has already provided authority for the Plan Administrator to purchase other securities in the open market in part to help facilitate resolutions. For example, in the Exum Ridge series of transactions, many of the disputes related to those CDOs were resolved through purchases of the securities by the Plan Administrator.

6

15. Finally, Lehman's statement that "it is possible that any increases in the value of the underlying collateral have now exceeded the UPB," Motion at ¶ 44, is completely unsupported speculation. In fact, the valuation evidence that the RMBS Trustees offered the Plan Administrator shows that, in the aggregate, the Purchase Price for the Non-Liquidated Loans reduced by the value of such loans (as Lehman now requests) would be $2,586,958,725. This amount is calculated by deducting the value of these loans ($3,907,499,980) from the Purchase Price of these loans ($6,494,458,705). *See* Pfeiffer Affidavit at ¶ 18.

**II.    The 15,461 RMBS Claims that allegedly lack "supporting documentation."**

16. The second category of RMBS Claims that Lehman seeks to summarily expunge are 15,461 RMBS Claims filed for loans that have been liquidated ("**Liquidated Loans**") with an aggregate Purchase Price of $1,509,212,504.04. Pfeiffer Aff. at ¶ 19. For these loans, Lehman claims that the Trustees "have failed to provide the 'supporting documentation' required by the Protocol to permit the Plan Administrator to calculate the Purchase Price." Motion at ¶ 45. Lehman asserts that two items are missing: a "loss certification" and a "corporate expense log." *Id.*

17. Lehman would have the Court believe that these two documents are the only possible evidence of the Purchase Price, stating:

> *Without the loss certification and corporate expense log, the Plan Administrator cannot evaluate the Purchase Price calculation because it cannot calculate the UPB, interest, and fees that make up this calculation, nor can it confirm that any such figures submitted by the Trustees are correct or justified. By failing to provide these documents* before the RMBS Claim Cut-Off Date of May 31, the Trustees have failed "to comply with the procedures and deadlines set forth in the RMBS Protocol . . . ."

Motion at ¶ 45 (emphasis added). This is not true, as explained below. The RMBS Trustees have provided voluminous and detailed evidence of the Purchase Price for each of these 15,641 RMBS Claims. Pfeiffer Affidavit at ¶ 22.

7

> A. *The RMBS Trustees have Provided Supporting Documentation for the Purchase Price of the Liquidated Loans.*

18. The only obligation imposed by the Protocol regarding Purchase Price is in Section III(e)(vi)(4): "A RMBS Claim File shall include . . . [a] calculation of the Purchase Price (as defined in the governing agreement), together with all supporting documentation." The term "supporting documentation" is not defined in the Protocol, and no minimum requirement is set for the contents of the supporting documentation.

19. For each of the 15,461 Liquidated Loans, the RMBS Trustees provided a calculation of the Purchase Price, and provided the documents supporting that calculation. Lehman tries to create the impression that the RMBS Trustees have submitted nothing but "figures" unsupported by any evidence as the basis for the Purchase Price, stating that, without these two documents, the Plan Administrator cannot "confirm that *any such figures submitted* by the RMBS Trustees are correct or justified." Motion at ¶ 45 (emphasis added). In fact, each RMBS Claim File contains business records that substantiate the Purchase Price for each loan – exactly as required by the Protocol. That evidence is described in detail at paragraphs 10 -12 and paragraphs 22 – 26 of the Pfeiffer Affidavit.

> B. *The Protocol does not require that a loss certification or a corporate expense log be contained in an RMBS Claim File.*

20. The Protocol never imposes a requirement that any RMBS Claim File include a loss certification or a corporate expense log. Instead, the Protocol provides (in pertinent part) that:

> A RMBS Claim File shall include:
>
> 1. The <u>Mortgage Loan File</u>, including, at a minimum, *all of the loan documents the RMBS Trustees received from the applicable master servicer, primary servicer and/or any other party*, or otherwise relied upon in making their claim, which **may** include the documentation identified in Exhibit B, **to the extent such**

8

>    ***documentation is available*** and applicable to a particular loan file. In the case of a document defect claim, the RMBS Trustees shall submit a copy of the applicable document exception report, to the extent available and applicable to the document defect claimed, together with evidence of its transmittal pursuant to the Trust Agreement or other applicable governing agreement.
>
>    ...
>
>    4. A calculation of the <u>Purchase Price</u> (as defined in the governing agreement), together with all supporting documentation ....

Protocol at III.e.vi (italic and bold emphasis added). Exhibit B to the Protocol (entitled Mortgage Loan File Documentation) is a two page long list of documents that *may* be found in a "Credit File," "Servicing File" or "Mortgage Loan File." The list includes "Corporate Expense Log," but *makes no mention* of the – now supposedly essential – loss certification.

21.  The direction letter the Protocol required the Trustees to send to the Master Servicers included, at the request of the Plan Administrator, a definition of the "Servicing File" that was being sought. That definition was a long list of documents, but that definition did not include either a "corporate expense log" or "loss certification." Affidavit of Edmond Esses ¶ 6, Ex. 2.

22.  The Protocol's language that an RMBS Claim File *"may* include the documentation identified in Exhibit B, *to the extent such documentation is available*" is not what Lehman wanted the Protocol to say - the version that Lehman originally proposed provided, in pertinent part, that a "complete RMBS Claim File *shall* include: 1. The Mortgage Loan File, including, *at a minimum*, the documentation identified in Exhibit C-1...." Exhibit C to he Protocol Motion, page 2 of 3, at I.a.v.1 (ECF 46526-3) (emphasis added). *See also December 10, 2014 Hearing Tr.*, pp. 75:18-25 (ECF 49007), attached as Exhibit F to the Waisnor Declaration (ECF 53621). But even in Lehman's original proposal there was no mention of a

9

loss certification in the documentation listed at Exhibit C-1 to the Protocol Motion (ECF 46526-3).

    C.    *The Governing Documents do not require either a loss certification or a corporate expense log to be provided as a condition to a repurchase obligation.*

23.    Lehman never contends – because it cannot – that the governing documents require the submission of a loss certification or corporate expense log in order to trigger a repurchase obligation. The governing agreements do *not* refer to either a loss certification or a corporate expense log. In fact, they do not identify any specific documents that must be provided in connection with a Purchase Price calculation.

24.    Even the Aurora loan files – which serve as the "template" for a "Complete File," Protocol at II.a., do not always include a loss certification or a corporate expense log. Pfeiffer Affidavit at ¶ 28 ("We reviewed 500 randomly-selected Aurora loan files for loss certifications or corporate expense logs. We found that 305 (or 61.0%) of them did not have loss certifications. We further found that 328 of the 500 (or 65.8%) of them did not have a corporate expense log.").

    D.    *The Protocol Cannot Negate the Federal Rules of Evidence.*

25.    The RMBS Trustees are entitled to establish their claims using any admissible evidence. In each of the RMBS Claims, submitted on a loan-by-loan basis, the business records already provided are sufficient to prove the Purchase Price as defined in the governing agreement for each RMBS Trust – even if those business records are not the particular pieces of paper Lehman would prefer.

26.    The Protocol cannot and does not purport to rewrite the Federal Rules of Evidence, which are applicable to these contested matters. "Evidence is relevant if (a) it has any tendency to make a fact more or less probable that it would be without the evidence; and (b) the fact is of consequence in determining the action." F.R. Evid. 401.

10

*E.    The Business Records Submitted in Support of the Purchase Price are More Up to Date and therefore More Accurate than Loss Certifications provided as of a Particular Date.*

27.    Even in those cases where there is a loss certification in the loan file, other business records submitted in the RMBS Claim File demonstrate that the loss certification is not always the most accurate evidence of the Purchase Price.  Pfeiffer Affidavit at ¶¶ 29 – 34.  Specifically, a servicer may prepare a form that summarizes the loss suffered by a Trust when a loan becomes a Liquidated Loan, but after that time, subsequent recoveries are sometimes received (reducing the Purchase Price) or subsequent expenses are sometimes recognized (increasing the Purchase Price).  Pfeiffer Affidavit at ¶ 31.  Business records that evidence the amount of such recoveries or expenses must be taken into account to correctly state the Purchase Price, which the RMBS Trustees have done by providing current and accurate business records that prove the Purchase Price.  *Id*.

*F.    The RMBS Trustees Fully Complied with the Protocol's Requirement that they gather complete loan files.*

28.    Lehman makes the false argument that the RMBS Trustees should be penalized for the absence of a loan certification or a corporate expense log in some of RMBS Claim Files because:

> at no point during the four court appearances where the Protocol was discussed did they mention *their inability to obtain these documents* or request the Court's assistance in *obtaining them* – despite the fact the Court required the Trustees to "promptly" request *such documents* from the servicers and obtain court assistance if necessary."

Motion at ¶ 48 (emphasis added).  The Protocol never imposed an obligation on the RMBS Trustees to obtain "these documents" from the servicers – rather, they were to direct servicers to "gather complete origination and servicing files."  Protocol at I.b.  The files contain what the files contain, Protocol at III.e.vi.1.

11

29. If the servicers "are not promptly providing the requested files, the RMBS Trustees shall promptly request that the Bankruptcy Court order the production of the files." As the Esses Affidavit demonstrates, servicers did promptly provide the loan files. The RMBS Trustees did exactly what the Protocol required. Direction letters were sent to each master servicer directing them to seek the complete files from the applicable servicers. Esses Aff. at ¶¶ 6-7. The RMBS Trustees did not rely on the efforts of the master servicers alone, however, and directly contacted each servicer, too. Esses Aff. at ¶ 9. Each servicer was provided a copy of the Protocol Order and Protocol, Esses Aff. at ¶¶ 21, 24, 27, 30, 33, 36, 39, 44, 47, and the RMBS Trustees followed up – continuously – by email or by telephone, to obtain the entire origination and servicing files for each loan. Esses Aff. at ¶¶ 14-58.

30. The servicers promptly cooperated, and several servicers even hired additional staff to locate, retrieve, and, in some instances, image loan files that were not in electronic form. Esses Aff. at ¶ 11. In the one and only case where the servicer was not prompt in providing loan files, the RMBS Trustees served a subpoena, and in response that servicer provided the files requested. Esses Aff. at ¶ 41; *see also* ¶ 56.

31. For each of the 92,581 RMBS Claims, the RMBS Claim Files submitted to Lehman contained:

> all of the loan documents the RMBS Trustees *received* from the applicable master servicer, primary servicer and/or any other party, or otherwise relied upon in making their claim, which may include the documentation identified in Exhibit B, *to the extent such documentation is available* and applicable to a particular loan file.

Protocol at III.e.iv.1 (emphasis added). Nothing more is or can be required. More specifically, the Protocol never specifies that an RMBS Claim will be expunged if these two specific documents are not in the loan files.

12

*G.     Conclusion*

32. Lehman cannot create an obligation on the RMBS Trustees to obtain documents not required by the Protocol, the governing documents, or the Federal Rules of Evidence. For all of the foregoing reasons, the Motion is fatally flawed, and must be denied.

33. If Lehman insists it will never review any RMBS Claim Files without a loss certification and corporate expense log or consider the business records presented by the RMBS Trustees, then there is no reason for these 15,461 RMBS Claims to continue in limbo while other loans are processed through Steps 3 and 4 of the Protocol. Instead, the Court should hold a status conference to schedule a trial, or series of trials, on an issue by issue basis to resolve these 15,461 RMBS Claims.

### III.    While Irrelevant, the Plan Administrator's Rendition of the History of the RMBS Claims Warrants Correction

34. Lehman recites the same purported history that it advanced in 2014[7] to suggest that the RMBS Trustees have not been diligent in presenting RMBS Claims with supporting evidence. The tens-of-thousands of RMBS Claim Files provided to Lehman rebut Lehman's suggestion.

35. While the RMBS Trustees believe this purported "history" is irrelevant to the Motion (because the Trustees have provided sufficient documentation to the Plan Administrator for each of the 36,351 RMBS Claims), the record should be corrected.

---

[7] *See* the *Motion to (I) Increase the Reserve to $12.143 Billion and (II) Estimate and Allow their Claims for Covered Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code* (ECF 46078) (the "**Trustees' Motion**") and *Lehman Brother's Holdings Inc.'s (A) Objection to RMBS Trustees' Motion to (I) Increase the Reserve to $12.143 Billion and (II) Estimate and Allow their Claims for Covered Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code, And (B) Cross-Motion To Establish A Protocol to Resolve Claims Filed by RMBS Trustees* (ECF 46526) that established the Protocol (the "**Protocol Motion**").

13

36. On July 2, 2009, the Court entered an order establishing a bar date of September 22, 2009[8] for filing proofs of claims in the Chapter 11 Cases (ECF 4251). Each of the RMBS Trustees filed their proofs of claim for unliquidated claims with respect to breaches of representations and warranties on or prior to September 22, 2009.

37. In September 2010, Lehman contacted the RMBS Trustees with respect to the RMBS Claims and expressed their view that breaches should be presented on a loan-by-loan basis. At the time, this loan by loan approach was not typical of the resolution of RMBS claims in other bankruptcy proceedings. *See In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (Bankr. D. Del.); *In re Amer. Home Mortg. Holdings, Inc.*, Case No. 07-11047 (Bankr. D. Del.); *In re HomeBanc Mortg. Corp.*, Case No. 07-11079 (Bankr. D. Del).

38. In the Spring of 2011, Lehman filed objections to the RMBS Claims on the grounds of insufficient documentation. On June 30, 2011, the Court heard the objections, reserved decision, and indicated that the parties should continue efforts to come up with a commercially practicable approach to resolving the RMBS Claims. *See June 30, 2011 Hearing Tr.*, at 70:19-20, 71:8-11, (ECF 18251), at Exhibit D to the Waisnor Declaration (ECF 53621). Judge Peck stated that "the presentations by all parties highlight the complexity of the process of proving the existence and the amount of any claim for these representation and warranty breaches in residential loans." *See id.* at 70:21-24. The Court also stated that a loan-by-loan review "doesn't seem like a reasonable exercise" *(id.* at 34:24-25) and that "there seems to be little dispute that the exercise of going through a loan-by-loan review is both burdensome and

---

[8] The bar date was approximately one year from the date of the filing of the largest and most complex bankruptcy proceeding in the history of the world. Due to its many connections with Lehman related entities the Trustees were required to file Proofs of Claim for many transactions other than RMBS claims. U.S. Bank in its capacity as Trustee alone filed over 1000 claims against the Lehman entities.

14

commercially impracticable." *Id.* at 66:4-7. Thereafter the parties met and exchanged ideas as to how to resolve the claims asserted by the RMBS Trustees.

39. Having confirmed a Plan of Reorganization in December 2011, Lehman moved to establish a reserve for the RMBS Claims.[9] Lehman stated that the parties were "continuing to negotiate the terms of a settlement protocol that would facilitate the final resolution and allowance of the Claims." Reserve Motion, at ¶ 11 (ECF 24254). Several of the RMBS Trustees objected to the Reserve Motion.

40. On January 26, 2012, the Court reserved decision on the Reserve Motion and urged the parties to reach agreement on the amount of the reserve for the RMBS Claims. *See January 26, 2012 Hearing Tr.* at 84:20-23 (ECF 24756).

41. On February 22, 2012, the parties informed the Court that they had agreed to a $5 billion reserve and to mediate the allowed amounts of the RMBS Claims in an attempt to resolve the matter. *See February 22, 2012 Hearing Tr.* at 27:23-25, 28:1 (ECF 25803). The Court entered a conforming order (ECF 25643). As the Order made clear, the amount for a reserve was without prejudice to either the rights of the RMBS Trustees to assert that a greater claim amount was due and owing on account of breaches of representations and warranties, or the rights of Lehman to assert that any such claim should be less.

42. The RMBS Trustees and the Plan Administrator met periodically through the Spring of 2012 in an effort to reach agreement on a method to resolve the claims, and scheduled a mediation as directed by the Court.

---

[9] *See Motion Pursuant To Section 8.4 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors and Sections 105(A), 502(C) And 1142(B) of the Bankruptcy Code to Estimate the Amounts of Claims Filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage-Backed Securities for Purposes of Establishing Reserves* (the "Reserve Motion") (ECF 24254).

43. On July 31, 2012, the parties participated in mediation before the Honorable Gary McGowan, but were unable to reach agreement. Thereafter, the parties continued to meet to develop a framework for the resolution of the claims. As part of this discussion, the Plan Administrator requested that the RMBS Trustees propose a framework for resolving the RMBS Claims. On October 9, 2012, the RMBS Trustees delivered a proposal for a method for resolving the claims and were advised by the Plan Administrator that the framework would be discussed with its Board. The Plan Administrator never responded.

44. Faced with uncertainty as to whether a response would be forthcoming, the RMBS Trustees undertook the task of proving the claims using random statistical sampling. The RMBS Trustees directed one of their advisors, Cowen & Company, to create a random sample of 5,000 of the Covered Loans (the "**Sample**") that would be "re-underwritten" to produce a statistically significant estimate of the overall breach rates for all Covered Loans in the Covered Trusts that (a) either suffered an actual loss, or (b) were projected to suffer a loss.

45. In September 2012, the RMBS Trustees retained Digital Risk to re-underwrite the Sample constructed by Cowen. The RMBS Trustees and Digital Risk ultimately obtained, and Digital Risk reviewed, the mortgage origination files for 4,579 of the 5,000 Covered Loans in the Sample to determine if there was a material breach. The loan retrieval and review process took 18 months, from September 2012 through March 2014.

46. During the period, the RMBS Trustees continually asked the Plan Administrator for feedback on the framework for resolving the RMBS Claims that they proposed on October 9, 2012. On one occasion, one or more of the RMBS Trustees were told that the Board deferred it to another meeting. On another, the RMBS Trustees were advised that the Plan Administrator retained new General Counsel and that the new General Counsel would have to "get up to speed"

16

on the issues. It was not until April 2014 that the RMBS Trustees received a response – that the Plan Administrator was busy with other matters and because the RMBS Trustees demands were so "high," the Plan Administrator was unwilling to even meet.

47. In May 2013, the RMBS Trustees retained Duff & Phelps to (a) review the sampling and selection work performed by Cowen, (b) review and analyze the procedures followed and findings made by Digital Risk, and (c) opine on the amount of the RMBS Trusts' claims, based on its review and analysis. In August 2014, Duff & Phelps completed its analysis of the data from Digital Risk.

48. After receiving Duff & Phelps' analysis, on August 22, 2014, the RMBS Trustees filed the Trustees' Motion (ECF 46078), and Lehman filed the Protocol Motion (ECF 46526). The Court granted the Protocol Motion over the objection of the Trustees.

**IV.    Conclusion**

49. For all of the foregoing reasons, Lehman's Motion to summarily disallow and expunge these 36,351 RMBS Claims should be denied.

08-13555-mg    Doc 53730    Filed 09/29/16    Entered 09/29/16 14:10:21    Main Document
                                    Pg 18 of 18


DATED: September 29, 2016

Respectfully Submitted,

**U.S. BANK NATIONAL ASSOCIATION, SOLELY IN ITS CAPACITY AS INDENTURE TRUSTEE FOR CERTAIN MORTGAGE-BACKED SECURITIES TRUSTS**

**By:** /s/ Franklin H. Top III

    ONE OF ITS ATTORNEYS

**LAW DEBENTURE TRUST COMPANY OF NEW YORK, SOLELY IN ITS CAPACITY AS SEPARATE TRUSTEE FOR CERTAIN MORTGAGE-BACKED SECURITIES TRUSTS**

**By:** /s/ M. William Munno

    ONE OF ITS ATTORNEYS

**WILMINGTON TRUST COMPANY AND WILMINGTON TRUST, NATIONAL ASSOCIATION, EACH SOLELY IN ITS CAPACITY AS TRUSTEE FOR CERTAIN MORTGAGE-BACKED SECURITIES TRUSTS**

**By:** /s/ John C. Weitnauer

    ONE OF ITS ATTORNEYS

**DEUTSCHE BANK NATIONAL TRUST COMPANY, SOLELY IN ITS CAPACITY AS TRUSTEE FOR CERTAIN MORTGAGE-BACKED SECURITIES TRUSTS**

**By:** /s/ Dennis J. Drebsky

    ONE OF ITS ATTORNEYS

SK 16271 0159 7267674