UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al*, | |
| Debtors | Case No. 08-13555 (SCC)<br>(Jointly Administered) |

**AFFIDAVIT OF ALLEN PFEIFFER IN CONNECTION WITH THE RMBS TRUSTEES' OPPOSITION TO LEHMAN BROTHERS HOLDINGS INC.'S SECOND OBJECTION TO CERTAIN RMBS TRUST CLAIMS FOR ALLEGED INSUFFICIENT DOCUMENTATION PROVIDED UNDER THE PROTOCOL**

STATE OF NEW YORK      )
                                        : ss.:
COUNTY OF NEW YORK   )

ALLEN PFEIFFER, being duly sworn, deposes and says:

1.      I have been asked by counsel for the RMBS Trustees[1] to submit this affidavit in connection with certain allegations contained in *Lehman Brothers Holdings Inc.'s Second Objection to Certain RMBS Trust Claims and Motion to Disallow and Expunge Certain RMBS Trust Claims for Insufficient Documentation* (ECF 53260) (the "**Motion**").  The Motion seeks to expunge 36,351 RMBS Claims (as that term is used in the Protocol[2]).  The facts and figures

---

[1]      The RMBS Trustees (and their counsel) are Wilmington Trust, National Association and Wilmington Trust Company (Alston & Bird LLP), Law Debenture Trust Company of New York (Seward & Kissel LLP), U.S. Bank National Association (Chapman and Cutler LLP), and Deutsche Bank National Trust Company (Nixon Peabody LLP) ("**RMBS Trustees**" or "**Trustees**").

[2]      See *Order Establishing A Protocol To Resolve Claims Filed By Trustees On Behalf Of Certain Issuers Of Residential Mortgage-Backed Securities* (ECF 47569) (as amended, the "**Protocol Order**"). The Protocol Order, and Exhibit A to that order (as amended, the "**Protocol**"), were amended on March

presented in this affidavit result from work that I performed with my colleagues at Duff & Phelps, LLC ("**Duff & Phelps**" or "**we**").[3]

2.      I am a Managing Director and the Global Service Leader of Dispute Consulting – Complex Valuation and Bankruptcy Litigation of Duff & Phelps, which is a global financial services firm with expertise in complex valuation, corporate finance, disputes and investigations and compliance and regulatory consulting.  I lead the team at Duff & Phelps as financial advisor to the RMBS Trustees.

## I.      Summary

3.      *First*, Lehman Brothers Holdings Inc. ("**Lehman**" or the "**Plan Administrator**") contends that 20,890 of the RMBS Claim Files we submitted should be expunged because, it says, the RMBS Trustees have not provided a particular "damage calculation" or have not asserted "the amount due."  The 20,890 RMBS Claim Files referred to in the Motion are loans that are current, delinquent, in foreclosure, in bankruptcy, or the mortgaged property is currently held as Real Estate Owned property (the "**Non-Liquidated Loans**").[4]  As I discuss in detail below, the RMBS Claims filed for each of the Non-Liquidated Loans included the "Purchase Price" as required by the Protocol; furthermore, although not required by the Protocol, we

---

30, 2016 by that certain *Order Granting Motion of RMBS Trustees To Extend The Overall Claim File Cut-Off Date For Certain Loans Under The Protocol Order And Related Relief* (ECF 52367).  All terms that are not defined herein shall have the definition set forth in the Protocol.

[3]      In those instances where tasks were performed by my colleagues, I reviewed their work and determined that it was appropriate to rely upon that work.

[4]      The vast majority of the 20,890 loans listed on Exhibit A to the Declaration of Jonathan D. Waisnor in Support of the Motion (ECF No. 53621) (the "**Waisnor Declaration**") are loans that are delinquent in payments, have a history of delinquency, or have already suffered losses through a loan modification or forgiveness program.  We refer to such loans as "Non-Liquidated Loans."

offered to provide the Plan Administrator with the very information the Motion now claims is essential, but the Plan Administrator declined to review such information.

4.     *Second*, Lehman contends that 15,461 of the RMBS Claim Files we submitted should be expunged, alleging that we have not provided two specific documents – a "loan loss certification" and a "corporate expense log" which are allegedly "necessary under the Protocol for the Plan Administrator to review the alleged damages."   The 15,461 loans referred to in the Motion are loans that have been liquidated (the "**Liquidated Loans**") – that is, the property securing the loan has been sold (at foreclosure or after foreclosure) or otherwise disposed of (for instance, in a short sale).   As I discuss in detail below: (a) the RMBS Claim Files for each of these Liquidated Loans included the business records we rely on to prove the "Purchase Price" of each loan (which is all that is required by the Protocol); (b) the Protocol does not mention loss certifications or require corporate expense logs (and a review of 500 Aurora loan files – identified as the "template for what the Plan Administrator considers a complete file," Protocol, Section II.a. – shows that over 60% of those reviewed do not include these documents); (c) we have found that, in many cases, the Data Tape (defined below) is more accurate than "loan loss certifications" (in those loan files where such a document was created in connection with the liquidation of a loan); and (d) a re-review of a sample of the loan files identified by the Plan Administrator shows that many of the loan files that are subject to the Motion do indeed contain a loss certification and corporate expense log data.

## II.    The 20,890 Loans Non-Liquidated Loans.

### A.    The Purchase Price was Provided for the 20,890 Non-Liquidated Loans

5.    The Plan Administrator seeks to disallow and expunge 20,890[5] Non-Liquidated Loans asserting that the RMBS Trustees "have failed to state a valid claim because they have not proven their damages as contemplated by the Governing Agreements" (Motion ¶ 5).  The Plan Administrator's statement is incorrect.  The RMBS Trustees have followed the Protocol and the governing agreements.

6.    The Protocol specifies that a RMBS Claim File shall include: "A calculation of the Purchase Price (as defined in the governing agreement), together with all supporting documentation."  (Protocol Section III.e.vi.4).

7.    Starting in December 2014, Duff & Phelps, together with the RMBS Trustees, reviewed and cataloged the definition of the Purchase Price from the governing agreements for the Covered Trusts on a trust-by-trust basis.

8.    The governing documents generally define "Purchase Price," as the sum of:

-    100% of the Unpaid Principal Balance ("**UPB**");

-    Unpaid interest; and

-    Unreimbursed servicing advances.

9.    The Protocol does not require any information or documentation to be provided regarding the value of a Non-Liquidated Loan (including the value of the collateral for such

---

[5]    Prior to the filing of the Motion and as of the date of this Affidavit, (a) 173 of the Non-Liquidated loans listed on Exhibit A to the Waisnor Declaration liquidated with a loss, and (b) 292 of them were rescinded by the RMBS Trustees during Step 2 of the Protocol.  Thus, as of the filing of this Affidavit, there are 20,425 Non-Liquidated Loans subject to the Motion.  However, to avoid any confusion over these changes, this Affidavit will continue to refer to the number of the Non-Liquidated Loans subject to the Motion as 20,890.

loan) as part of an RMBS Claim File with respect to the Purchase Price or otherwise. Under the governing documents, upon the repurchase of a Non-Liquidated loan at the Purchase Price, Lehman would get the benefit of the value of that loan, including its collateral, when the loan was transferred from the applicable trust to Lehman. We submitted the Purchase Price on a loan-by-loan basis for each of the Non-Liquidated Loans in accordance with the Protocol and as defined in the governing agreements.

10.    The Protocol requires the RMBS Trustees to provide a "Claim Tracking Spreadsheet, substantially in the form attached as Exhibit C" (Protocol Section III.e.vii). We provided a Claim Tracking spreadsheet for each RMBS Claim File.

11.    The Protocol and the Claim Tracking Spreadsheet only include one line for the Purchase Price. Nevertheless, in the Claim Tracking Spreadsheet we provided to the Plan Administrator, we included a breakdown of the various components of the Purchase Price, including the UPB, Corporate Advance Balance, Escrow Advance Balance, Principal Advance, Interest Advance, Accrued Interest, and the resulting Purchase Price. An example of a Claim Tracking Spreadsheet is attached as Exhibit 1.

12.    In addition to the Claim Tracking Spreadsheet, we update the Purchase Price information on a monthly basis in Excel format for the Plan Administrator's convenience. We continue to provide the Plan Administrator with monthly updates and provide the supporting materials monthly via FTP or on a hard drive, which, generally, are several hundred megabytes. See Exhibit 2, which is a section of the August 31, 2016 updated Purchase Price calculations for the RMBS Claim Files.

13.    I have been in constant contact with the Plan Administrator's representatives since the Protocol was put in place. The Plan Administrator's statement (Motion ¶ 28) that it

will not "repurchase" a Non-Liquidated Loan at the Purchase Price as defined in the governing agreements – that is, pay cash equal to the Purchase Price in exchange for the underlying loan and the collateral for the loan – is the first time it has stated this position on the matter.

14.     Even though the Plan Administrator had not stated this position on the repurchase of Non-Liquidated loans, we considered the possibility that, for Non-Liquidated loans that must be repurchased as a result of a breach of a representation and warranty, the Plan Administrator would want to reach an agreement regarding the value of such loans, deduct such value from the Purchase Price, and use the net amount as the claim to be allowed – the position the Plan Administrator now takes.

15.     We determined that a loan level pricing model, the LoanKinetics Pricing model from Andrew Davidson & Co. (the "**LoanKinetics Model**"), provided a valid and reliable method to determine a value for each Non-Liquidated Loan.  The LoanKinetics Model "uses a proprietary scenario-based procedure to generate projected credit performance of each individual loan."[6]  The LoanKinetics Model incorporates a mortgage prepayment model, an interest rate forecast, a housing price forecast, and a credit option adjusted spread model.  The LoanKinetics Model takes into account the borrower's characteristics at origination (FICO score, documentation type, purpose, property type, occupancy status, etc.), as well as updated data, such as the loan performance (*e.g.*, whether the loan was previously modified or if the borrower has a history of delinquencies), and the updated loan-to-value.  The LoanKinetics model is used by financial institutions and investors for both loan valuations for financial reporting and

---

[6]     Andrew Davidson & Co LoanKinetics Brochure, 2015.

investing purposes.[7]   An example set of the valuations for Non-Liquidated Loans is attached as Exhibit 3.

16.     Using the loan-by-loan values provided by the LoanKinetics Model would have achieved what the Plan Administrator now insists must take place: "the [RMBS] Trustees will retain the collateral and thus must reduce the value of the active loan claims by the remaining value of the collateral and estimated future payments by the mortgagor" (Motion ¶ 28).

17.     On multiple occasions I have offered to provide the Plan Administrator with the loan-by-loan valuation of the Non-Liquidated loans generated by the LoanKinetics Model, and the supporting documentation for those valuations.   The representatives of the Plan Administrator have so far declined our offer to consider this valuation method and supporting documentation.

### B.     The Value of the Non-Liquidated Loans Does Not Exceed the Purchase Price[8]

18.     We most recently obtained the value of each of the remaining Non-Liquidated Loans as of April 30, 2016 using the LoanKinetics Model.   The results have been available to the Plan Administrator.   This loan-by-loan valuation, in the aggregate, shows that the Purchase Price for the Non-Liquidated Loans, reduced by the value of such loans (as Lehman now requests),

---

[7]     The LoanKinetics Model user base includes, among others, a very large bank, a very active opportunistic aggregator of whole loans, and a smaller bank (originator) that is wholly owned by a very large financial institution. In addition, Andrew Davidson & Co. performs loan level valuation for clients on an ad hoc basis.  Also, Andrew Davidson & Co.'s Non-Agency LoanDynamics model, one of the most critical components of the LoanKinetics Model application, is licensed by thirty six of the largest banks, broker-dealers, hedge funds, and insurance companies.

[8]     While the Plan Administrator conflates the UPB and the Purchase Price, the correct measurement would be whether the value of a Non-Liquidated Loan exceeds the Purchase Price.  The UPB is only one component of the Purchase Price.

would be $2,586,958,725. This amount is calculated by deducting the value of these loans

($3,907,499,980) from the Purchase Price of these loans ($6,494,458,705).[9]

### III.    The 15,461 Liquidated Loans Do Not Lack "Supporting Documentation"

19.    The Plan Administrator also seeks to disallow and expunge 15,461 Liquidated

Loans[10] – with an aggregate Purchase Price of $1,509,212,504.04 – asserting that the RMBS

Trustees "have not provided two vital documents to support the Purchase Price calculation – the

loss certification and corporate expense log." (Motion ¶ 8).  According to the Plan Administrator,

it "cannot evaluate whether the alleged Purchase Price calculation is accurate or fair" and that

they "do not know whether the claim it approves is one with actual damages, and at what

amount." (Motion ¶ 8).  This statement is not correct.

### A.    We provided documents supporting the Purchase Price as required by the Protocol

20.    The Protocol states that the RMBS Claim File shall include:

The Mortgage Loan File, including, at a minimum, all of the loan documents the
RMBS Trustees received from the applicable master servicer, primary servicer
and/or any other party, or otherwise relied upon in making their claim, ***which may
include the documentation identified in Exhibit B, to the extent such
documentation is available*** and applicable to a particular loan file. (Protocol
Section III.e.vi.1) (emphasis added).

---

[9]    The RMBS Trustees did not submit loans with an estimated value in excess of the Purchase Price.
In fact, 23,889 were not submitted as an RMBS Claim under the Protocol for this very reason.  If, based
on updated valuations, there are any of the 20,890 Non-Liquidated Loans that are shown to have an
estimated value that exceeds the Purchase Price, the RMBS Trustees will review the claim.

[10]    Prior to the filing of the Motion and as of the date of this Affidavit, 50 of the Liquidated Loans
listed on Exhibit B to the Waisnor Declaration were rescinded by the RMBS Trustees during Step 2 of the
Protocol.  Thus, as of the filing of this Affidavit, there are 15,411 Liquidated Loans subject to the Motion.
However, to avoid any confusion over these changes, this Affidavit will continue to refer to the number of
the Liquidated Loans subject to the Motion as 15,461.

21.     For each of the Liquidated Loans we requested everything the servicers had, we provided everything received from the servicers, and we followed up with the servicers in response to the Plan Administrator's requests. We specifically followed up with the servicers to obtain loss certifications and corporate expense logs. To the extent that these documents had been prepared and were provided to us, they were provided in the RMBS Claim Files.

22.     We further submitted a Claim Tracking Spreadsheet for the Liquidated Loans, as described in paragraph 10 above, in accordance with the Protocol. Once a loan is liquidated, the Purchase Price components are factored into the realized loss shown in the Data Tapes. In addition, we submitted documentation supporting the Purchase Price for each of the 15,461 Liquidated Loans, as described below.

23.     Nationstar Mortgage LLC ("**Nationstar**") is the master servicer on all but three of the Covered Trusts. Nationstar provides Duff & Phelps with a customized data report for all of the loans at issue under the Protocol. We additionally obtain loan level remittance data reporting for the Covered Trusts from the Nationstar Investor Portal[11] on a monthly basis for each loan, and for the other three Covered Trusts we obtained loan-by-loan loss data from Intex Solutions, Inc. ("**Intex**")[12] (collectively, "**Data Tapes**"). The Data Tapes report losses on a loan-by-loan basis.

---

[11]     The Nationstar Investor Portal can be accessed at the following link: https://masterservicing.nationstarmtg.com/Home/InvestorPortal. Aurora Loan Services, LLC ("Aurora") was the predecessor master servicer.

[12]     Intex is a global provider of structured fixed income, including RMBS, deal data and models and maintains the standard cash flow engine used by investors, investment banks, and broker dealers.

24.    The Data Tapes are the business records used for cash flow and accounting purposes by the master servicer and are relied on by investors.  We used the Data Tapes in determining the Purchase Price.

25.    An example of a Data Tape for one of the Liquidated Loans is attached as Exhibit 4.

26.    Moreover, 13,343 of the 15,461 Liquidated Loans were liquidated prior to June 2012, when Aurora's mortgage servicing assets were acquired by Nationstar.[13]  Thus, for 13,343 of the 15,461 Liquidated Loans, Aurora was responsible for reporting the loan level losses. Accordingly, the Plan Administrator now asserts a need to audit the Purchase Price of 13,343 RMBS Claim Files that its own company reported.

### B.    The Protocol Does Not Mention Loss Certifications or Require Corporate Expense Logs

27.    A loss certification is not mentioned anywhere in the Protocol.  It is not required by the Protocol.  The Plan Administrator has not referenced that a loss certification is required under any governing document.  Nor are we aware of a requirement that a servicer is to provide a master servicer with a worksheet that would be referred to as a "loss certification."

28.    The 51,109 Aurora-serviced loan files, all of which are liquidated loans, are defined by the Protocol as a template for a "Complete File" (Protocol, Section II.a.).  We reviewed 500 randomly-selected Aurora loan files for loss certifications or corporate expense logs.  We found that 305 (or 61.0%) of them did not have loss certifications.  We further found

---

[13]    Amended and Restated Residential Servicing Asset Purchase Agreement By and Among Aurora Bank FSB, Aurora Loan Services LLC, and Nationstar Mortgage LLC Dated as of June 12, 2012 available                                                                                                                                at https://www.sec.gov/Archives/edgar/data/1507951/000119312512271103/d365929dex101.htm

that 328 of the 500 (or 65.8%) of them did not have a corporate expense log.  A list of these Aurora loan files is attached as Exhibit 5.[14]

### C. Loss Certifications and Corporate Expense Logs Are Not As Reliable As The Data Tape Information

29.    We have previously demonstrated to representatives of the Plan Administrator that the loss certifications and corporate expense logs, to the extent available, were not as accurate as the Data Tapes.[15]  Around April 2015 representatives of the Plan Administrator requested that we assist them in reconciling loss certifications and the corporate expense logs with the Purchase Price for three loans, of which two were Aurora loans.  We determined, and so advised the Plan Administrator's representatives, that the corporate expense logs coupled with the loss certifications did not take into account trailing recoveries and expenses.  The differences were as follows:

| Trust | Loan Number | Liquidation Date | Loss per Loss Certification | Submitted Purchase Price | Difference |
|-------|-------------|------------------|------------------------------|---------------------------|------------|
| SASC 2003-32 | 16123523 | 6/12/2006 | $39,385.70 | $41,733.19 | $2,347.49 |
| LMT 2007-4 | 33791039 | 6/17/2011 | $341,596.59 | $209,992.68 | $ (131,603.91) |
| LXS 2007-15N | 40560856 | 10/17/2011 | $407,184.04 | $430,909.96 | $23,725.92 |

30.    For each of these examples, we examined the trust remittance reports for the relevant reporting periods.  For each of these three loans all three sets of data reconciled to the Purchase Price that we provided in the Claim Tracking Spreadsheet and monthly updates.

---

[14]    When examining these loans, I considered that the loss certification was present if it was provided in either a preliminary or final form.

[15]    As we did not have Data Tapes for periods prior to the entry of the Protocol, we utilized the trust remittance reports for this review.  The trust remittance reports are a byproduct of the information contained in the Data Tapes and a business record relied on by investors nonetheless. In all cases, the cumulative loss reported in the trust remittance report matched the Data Tapes.

31.     Based on a review of the trust remittance reports, we were able to see that liquidated loans either (i) had recoveries that were reported after the date the liquidation was reported in a loss certification ("**Trailing Recoveries**"), or (ii) had expenses that were reported after the date the liquidation was first reported ("**Trailing Losses**").  This trend was highlighted for one of the loan examples that was sent to us by the Plan Administrator, loan #16123523, where the loss certification reported a loss of $39,385.70.[16]  As the table below shows, preliminary losses were first reported to investors in June 2006, while Trailing Losses were reported in August 2006 and January 2007 which were not, and could not be, captured on the earlier loss certification.  After taking into account the Trailing Losses, the final loss number – and the correct Purchase Price - is $41,733.19.

| Loan 16123523 | | |
|---|---|---|
| Report Date | Reported Loss | Cumulative Realized Loss |
| 6/26/2006 | $39,385.70 | $39,385.70 |
| 8/25/2006 | $1,097.49 | $40,483.19 |
| **1/25/2007** | $1,250.00 | **$41,733.19** |

32.     Similarly, the loss certification for loan #33791039 did not capture Trailing Recoveries.  The loss certification for this loan, created by Aurora on August 23, 2011, stated that the loss on the loan was $341,596.59.[17]  While we were unable to tie to this exact amount, the trust remittance report listed a cumulative loss through September 2011 of $344,462.37 that likely included additional Trailing Expenses not accounted for on the loss certification.  The

---

[16]     See Exhibit 6 which provides the loss certifications for this loan, along with the trust remittance reports detailing the initial loss and subsequent adjustments.

[17]     See Exhibit 7 which provides the loss certifications for this loan, along with the trust remittance reports detailing the initial loss and subsequent adjustments.

correct Purchase Price is, in fact, $209,992.68 after taking into account the Trailing Recoveries

as reported in the Data Tapes and trust remittance reports after the date of the loss certification,

as follows:

| Loan 33791039 | | |
|---|---|---|
| Report Date | Reported Loss / (Recovery) | Cumulative Realized Loss |
| 6/24/2011 | $342,311.81 | $342,311.81 |
| 9/23/2011 | $2,150.56 | $344,462.37 |
| 12/27/2011 | $ (94,904.80) | $249,557.57 |
| 4/25/2013 | $ (9,201.14) | $240,356.43 |
| 4/25/2014 | $ (22,082.73) | $218,273.70 |
| 5/25/2016 | $ (5,520.68) | $212,753.02 |
| 7/25/2016[18] | $ (2,760.34) | $209,992.68 |

33.    Finally, for loan #40560856, the Plan Administrator provided *two* loss

certifications,[19] one with a loss value of $407,184.04 dated January 26, 2012 and another with a

loss of $11,470.81 dated April 4, 2012, for a total of $418,654.85.  Again, while we were unable

to tie to this exact amount, the trust remittance report listed a cumulative loss through May 2012

of $424,026.17 that likely included additional Trailing Expenses not accounted for on the loss

certification.  Neither certification accounted for an additional adjustment reported in July 2012

to arrive at the final loss number of $430,909.96 as follows:

---

[18]    As the May and July 2016 adjustments were subsequent to our April 2015 demonstration to the
Plan Administrator, they were not discussed at the time. We communicated the adjustments as part of our
monthly updates to the Purchase Price.

[19]    See Exhibit 8 which provides the loss certifications for this loan along with the trust remittance
reports detailing the initial loss and subsequent adjustments.

| Loan 40560856 | | |
|---|---|---|
| **Report Date** | **Reported Loss** | **Cumulative Realized Loss** |
| 10/25/2011 | $396,675.36 | $396,675.36 |
| 2/27/2012 | $15,880.00 | $412,555.36 |
| 5/25/2012 | $11,470.81 | $424,026.17 |
| **7/25/2012** | $6,883.79 | **$430,909.96** |

34.     In all of the cases presented to us by the Plan Administrator, our Purchase Price number was consistent in all three forms of business records that were created in the normal course of business by the master servicer, and the loss certification was not as accurate a measurement of the loss incurred.

35.     This is further evident in that the Plan Administrator has not revised the Purchase Price for any of the 1,053 Approved RMBS Claims based on any discrepancy between the loss certification and the Purchase Price submitted by the RMBS Trustees.

**D.      Review of Non-Aurora Files**

36.      From the list of the 15,461 Liquidated Loans, we reviewed 160 randomly-selected

loan files from multiple servicers to determine whether the Plan Administrator had overlooked

any loss certifications or corporate expense logs that were submitted as part of the RMBS Claim

Files.  More than half of them contained corporate expense logs, loss certifications, or the data in

other formats.  A list of the results is attached as Exhibit 9.[20]

_____

Allen Pfeiffer

Sworn to before me September 2?, 2016

_____

Notary Public

*MY COMMISSION EXPIRES*
*ON  FEBRUARY 13, 2018*

_____

[20]      When examining these loans, I considered that the loss certification was present if it was provided
in either a preliminary or final form.