Donald and Elizabeth Arney
2958 Burnett Terrace
The Villages, Fl 32163

September 27, 2016

SHEILA BURGOYBE
LEHMAN BROTHERS HOLDINGS, INC.
7807 PARKVIEW AVENUE
CENTENNIAL, CO 80111

ATTENTION:

Mr. John Baker
Lehman Brothers Holdings, Inc.
720-945-4546

> **RECEIVED**
>
> SEP 3 0 2016
>
> **U.S. BANKRUPTCY COURT, SDNY**

Dear Mr. Baker

After reviewing your Demand Letter and other documents the Arney's (Donald and Elizabeth) emphatically deny all demands made.

In a statement of position all of our reasons for denial are clearly stated with emphasis to the last section entitled **"Finally and Foremost"**

Be advised that the Arney's have spent a great deal of time and effort researching and collecting evidence to defend itself only to find there is no avenue for such defense.  That Mr. Baker is in violation of the Constitution of the United States of America.  Amendments and requirements posted.

We are now demanding to be made whole without penalty to you or Lehman Brothers Holdings, Inc. Within a time limit of 10 days from the date of receipt of this response. A simple admission that "this was mailed to you in error no demand intended" would be fine.

Should you fail to make us whole it will be considered evidence that you (personally) had intention to violate the Constitution of the United States of

America, we will forward all documents and writings to the proper authorities for prosecution.

Please be guided accordingly.

Sincerely,

Donald Arney
Elizabeth Arney

Please respond with your bar number and the state in which you are licensed. Should you not respond within ten days of receipt with a letter of apology we fully intend to file a complaint with the Attorney General of Florida, copy to Loretta Lynch Attorney General of the United States of America.

Govern yourself accordingly.

## Statement of Position

## Response of

## Las Olas Mortgage Center, Inc.  (dissolved 9/14.2007)

## VIA UPS DELIVERY

**Reply of :**

**Donald Arney**

**and**

**Elizabeth Arney** (response approval enclosed)

September 29, 2016

**Reference to:**
**Chapter 11  Case Number 08-13555 (scc) Bankruptcy Court**
**Southern District of New York** as alluded to by John Baker of Lehman Brothers
Holdings, Inc.

It is the position of Las Olas Mortgage Center, Inc. (LOMCI) (dissolved 9/14/2007)
**DEMANDS ARE DENIED**. This entire Demand is designed to subvert the laws of
the State of Florida (where all business was completed) and its statute of
limitations.

## REASONS FOR DENIAL ARE AS FOLOWS:

The manner in which this Demand is styled prevents the use of defenses provided
to Florida Corporations by the Statutes of The State of Florida.

Las Olas Mortgage Center, Inc. (LOMCI) was a Florida Corporation, located at 945
E. Las Olas Blvd., Ft. Lauderdale, Florida 33301. It was the only location for LOMCI.

This business address was in use at the time Aurora Bank (LBHI) representative contacted LOMCI soliciting LOMCI's business. The agreement signed by LOMCI and LBHI, was signed at the office of LOMCI, however no manual was ever issued as the representative stated they were being printed as LBHI was doing such a business they had run out of manuals. The representative never did bring a manual. When asked about the manual the representative stated *"Rely on underwriting, as they are the Bible for this business"*. *"If underwriting approves then you are good to go"*.

All applications for mortgages were completed in the State of Florida at the Las Olas location as were the collection of **package for submission** documents. Interviews with clients were conducted in Florida and the mortgages in question were issued on Florida Properties. LOMCI was a Florida Corporation, legally licensed and established and never conducted any business outside of Florida. Therefore all transactions and business was conducted in Florida and therefore operated legally under Florida Law with the protection of the laws of the State.

**THEREFORE:**

***Based on the Statute of Limitations of the State of Florida (attached). Lehman Brothers Holdings, Inc. (LBHI) had a two year, (maximum five year) window to file such action.***

The loans were written in 2006 and LOMCI dissolved 9/14/2007) Two years from that date would be 9/14/2009. LBHI failed to file such action in a timely manner, **therefore claim is denied in full.** Additionally the Third District Court of Appeal in Florida issued a clarification ruling stating that

LOMCI also denies the accusation that it falsely reported facts about the loan. LBHI Bank was a big lender in the stated income, no doc loan

Definition:

For a traditional mortgage loan, borrowers must prove their gross monthly income by sending their lenders copies of their last two paycheck stubs, two months of bank account statements and last two years of income tax returns.

*In a no-doc loan, though, borrowers, in the simplest of cases, do not have to send their lenders any documents to verify their incomes. Lenders simply approve a no-doc loan based on borrowers' credit scores and stated income. To qualify for such a loan, though, borrowers will need high credit scores. Today, most lenders consider credit scores of 740 or higher to be in the "good" to "excellent" range, so borrowers seeking no-doc loans should have a score at least that high.*

Subsequently they failed (**attachment #1**). LOMCI has never table funded or written a loan, all of its product were a submission to a lender and that submission went through the lenders underwriting. These loans were funded in 2006 after going through a rigorous underwriting by Aurora Bank. LOMCI followed and answered all of the underwriters concerns at the time of the loan submission and then the loan was funded. Proof(?) **the loan was funded** by LBHI. In the three loans mentioned in the Demand Letter LBHI has had the loan package for 10 years never indicating or alleging any wrongdoing. That is a length of time that out lives all statute of limitations including contracts.

In the period of time from 2006 until yesterday 9/13/16 nothing was said about the loan or its application that was submitted to LBHI, the funder. That is a period of 10 years. The loans have been closed, sold and resold and reviewed.(Attachment #2) New occupants have moved into the properties short sales have occurred. Each time the original loan was reviewed. The lender had ample opportunity to bring this matter forward in this a timely manner.

The bankruptcy filing of LBHI provided to LOMCI does not mention LOMCI. Not until 9/8/16 did LBHI state accusations of some wrongdoing on the part of LOMCI.

This hardly seems timely or relevant Following 10 years of review and scrutiny to the collapse of LBHI.

The scurrilous nature of LBHI and its manner of doing business can be found throughout social media and is summed up quite well by this description of how LBHI did business. This is a quote from an article appearing in the Denver Post complete article describing Aurora's way of doing business attached.

*"If something was denied, within a day, usually within a half-hour, we'd get a call from an account executive," said a former Aurora processing manager who worked closely with underwriting. "If we still denied it, it would escalate up to upper management, and before you knew it, the loan was approved."*

*(describing the way Aurora overrode the underwriting department).*


2. The Demand Letter somehow relates the demand to a Bankruptcy filing of LBHI in 2014, without mention of LOMCI.  It is viewed that LBHI is using this vehicle to subvert the statutes of The State of Florida and its **Statute of Limitations**.  The veiled accusation is that of fraud, the altering of documents or improper recording of information in the loan package.  This filing allows LOMCI no **Due Process** in defending itself in such claims and prevents LOMCI from dismissal due to **Statute of Limitations** provided by Florida Statute.   The original filing of the bankruptcy order was 07/18/14.  At that time LOMCI was not mentioned and no accusation was made concerning LOMCI.  Then on 9/08/16 (some 10 years after the loan was funded) LBHI decided to sweep LOMCI into the fray disregarding all Due Process provided to LOMCI by Florida Statutes.  To wit:   **Statute of Limitations** previously cited.  LBHI attempted to place LOMCI in the mediation/settlement stage of an action that had long been dismissed by Florida Statutes.

3.   The reason the mentioned loans failed had nothing to do with LOMCI.  Preparing and submitting the package but the failure of the Housing Market in 2006 and 2007 brought forward by out of control lending policies of Banks such as Aurora, Bank a subsidiary of Lehman Brothers.  The Stated Income No Doc loan offered by Aurora was the beginning of the downfall of the Mortgage Market.  This product was put into play for LOMCI.

4.   LOMCI was dissolved in 9/14/2007 under the Statue of Limitations at its outside is 5 years or 2012 to bring action.  The demand is denied on the basis of exceeding the Statute of Limitations. (Attachment #3)

5. LOMCI has never written or table funded a loan with Aurora without that loan package being approved by the Underwriting department of Aurora. If the underwriting department did not approve the loan, the loan was placed elsewhere or returned to applicant.

6. The loans mentioned in the Letter of Demand were all Stated Income/No Doc loans. It was impossible to submit altered documentation when no documentation was required. Should the loan be other than a Stated Income/No Doc Loan all documentation proof would be available to the underwriting department of Aurora Bank (credit reports, income verification, etc.)Therefore when approved all conditions of the loan would have been verified by Aurora Bank underwriting department or the loan would not have been funded.

7. All loans mentioned were submitted to and approved by the underwriting department of Aurora Bank in every instance. If the underwriting department disapproved the loan or was not satisfied the loan was turned down.

8. There were no broker's breeches of the contract with Aurora Bank or Lehman Holdings.

9. To claim that the mentioned loans failed because of some error on the part of LOMCI (the allegation is brought some 10 years after these loans were written and approved by Aurora underwriting, the loans closing and being sold two additional times) is completely unbelievable and a long reach for recovery. The reason these loan failed is because the property values of properly appraised homes mentioned fell in price making it impossible to sell or refinance the property. **In all cases Aurora wrote a collateral loan and did in fact receive the property in return for resale.** Aurora and its products were the leader in the No Doc loans and that in part caused the collapse of the housing market. Ample written proof is available to prove this point.

10. LOMCI has no intention in remunerating Lehman Holdings in any amount as the allegations have no basis for the failing of these loans. Lehman only needs to look to itself for the failure of this loan product.

11. **Of the three loans in question, they were all collateral loans in which Aurora or LBHI retained the property for resale.** There was no loss of property only the

loss of their poorly invested money in a failing Real Estate market of which statistics show they were driven by greed.

12. While the false claims of LBHI are that in some way LOMCI caused these loans to fail, LOMCI did not write the loans or fund them. The most LOMCI could be held responsible for is the fee they received from LBHI. And that again has far outreached the statute of limitations in the State of Florida.

13. This is a failed proceeding by LBHI in an attempt to avoid the real facts in this case. LOMCI is being dragged into this case without due process or availability of proper legal defenses.

**LOMCI also objects to Mediation Sites.** The loans were originated in Florida, by LOMCI of Florida on Florida Property. Request the Mediation in the unlikely manner it should be necessary be held in Fort Lauderdale Florida.

In this Demand LBHI has retained the original files for the past 10 years, LOMCI has not had control of or been allowed to review them, in fact the files have been maintained and reviewed multiple times by multiple companies. Now LBHI is asking LOMCI to believe they have not themselves altered the files. In reading about LBHI the social media is full of mistrust, accusations of fraud, lying, and cheating customers. And yet LOMCI is asked to trust their failed handling of the files. This is ludicrous.

## FINALLY AND FOREMOST

LOMCI has been stripped of its due process procedure detailed below by filing such action in a court that allows the "fundamental fairness" portion of due process to be violated.

LOMCI and Donald and Elizabeth have two choices in this filing, pay the amount demanded or go to mediation, if no mediation then a judgement. No where is the offended given a fair and impartial opportunity to present and defend their case. The offending authority LBHI and the filing attorney have violated the Due Process clause of the United States Constitution and are therefore liable to suffer penalties. Accusations have been made, without proof, that LOMCI violated

certain procedures and practices of doing business. No where is this allegation against LOMCI stated or proven, instead they are directed to the penalty phase allowing LOMCI and the Arney's no ability to defend or refute the allegations. This filing is inherently unfair to The Arney's, and LOMCI. To this point The Arney's demand dismissal of this action, withdrawing of the Demand and to be put back into full health prior to this Demand for Monies. If done by letter all will be well, if not The Arney's and LOMCI will prosecute LBHI and John Baker for their willful written attempt to violate the procedural rights (Due Process) of the Arney's and LOMCI.

Penalties provided.


This must be completed within 10 days in writing or the violation of and the attempted violation of The Constitution of the United States of America to wit: section quoted below will be deemed intional.

### United States Constitution

### Civil procedural due process

Procedural **due process** is essentially based on the concept of "fundamental fairness." For example, in 1934, the United States Supreme Court held that **due process** is violated "if a practice or rule offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."[17] As construed by the courts, it includes an individual's right to be adequately notified of charges or proceedings, the opportunity to be heard at these proceedings, and that the person or panel making the final decision over the proceedings be impartial in regards to the matter before them.[18]

To put it more simply, where an individual is facing a deprivation of life, liberty, or property, procedural due process mandates that he or she is entitled to adequate notice, a hearing, and a neutral judge.

The Supreme Court has formulated a balancing test to determine the rigor with which the requirements of procedural due process should be applied to a particular deprivation, for the obvious reason that mandating such requirements in the most expansive way for even the most minor deprivations would bring the machinery of government to a halt. The Court set out the test as follows: "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second,

the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[19]

Procedural **due process** has also been an important factor in the development of the law of personal jurisdiction, in the sense that it is inherently unfair for the judicial machinery of a state to take away the property of a person who has no connection to it whatsoever. A significant portion of U.S. constitutional law is therefore directed to what kinds of connections to a state are enough for that state's assertion of jurisdiction over a nonresident to comport with procedural due process.

The requirement of a neutral judge has introduced a constitutional dimension into the question of whether a judge should recuse himself or herself from a case. Specifically, the Supreme Court has ruled that in certain circumstances, the due process clause of the Fourteenth Amendment requires a judge to recuse himself on account of a potential or actual conflict of interest. For example, on June 8, 2009, in *Caperton v. A. T. Massey Coal Co.* (2009), the Court ruled that a justice of the Supreme Court of Appeals of West Virginia could not participate in a case involving a major donor to his election to that court.[20]

The Fifth and Fourteenth Amendments to the United States Constitution each contain a **due process clause**. **Due process** deals with the administration of justice and thus the **due process** clause acts as a safeguard from arbitrary denial of life, liberty, or property by the Government outside the sanction of law.[1] The Supreme Court of the United States interprets the clauses more broadly because these clauses provide four protections: procedural **due process** (in civil and criminal proceedings), **substantive due process**, a prohibition against vague laws, and as the vehicle for the incorporation of the Bill of Rights. Due process ensures the rights and equality of all citizens.

This could not be made more clearly.

**The demand is denied based on the foregoing,  LOMCI demands all claims be dismissed in this alleged action. Letter of Demand be withdrawn and Written statement of same to be provided to in the time limets specified:**

Donald Arney
2958 Burnett Terrace
The Villages, Fl 32163

Elizabeth Arney
1460 S Ocean Blvd. #603
Lauderdale by the Sea, FL 34062

Sincerely,

Donald Arney

For Elizabeth Arney

dparney@aol.com all responses or discussions are to be made on this email address including any for Elizabeth Arney. Failure to respond will be cause to foreword these charges to the appropriate entity of the Federal Government.

September 26, 2016

I Elizabeth (Beth) Arney grant Donald Arney permission to respond to
Lehman Brothers holdings on my behalf regarding the DEMAND FOR
PAYMENT, letter dated September 9th 2016 sent via UPS 2nd day Air
and received on September 13, 2016.

Should you have any questions I may be reached at 954-868-3876.

Sincerely,

Beth Arney

HOME PAGE | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS

*The New York Times*

# Business

SUBSCRIBE NOW | Log In | Register Now

Search All NYTimes.com

WORLD  U.S.  N.Y./REGION  BUSINESS  TECHNOLOGY  SCIENCE  HEALTH  SPORTS  OPINION  ARTS  STYLE  TRAVEL  JOBS  REAL ESTATE  AUTOS

**Search Business**

**Financial Tools**
Select a Financial Tool

**More in Business »**
Global Business | Markets | Economy | DealBook | Media & Advertising | Small Business | Your Money | Energy & Environment

## Report Details How Lehman Hid Its Woes

By MICHAEL J. de la MERCED and ANDREW ROSS SORKIN
Published: March 11, 2010

It is the Wall Street equivalent of a coroner's report — a 2,200-page document that lays out, in new and startling detail, how Lehman Brothers used accounting sleight of hand to conceal the bad investments that led to its undoing.

TWITTER
LINKEDIN
COMMENTS (307)
PRINT
REPRINTS
SHARE

Enlarge This Image

LEHMAN BROTHERS

David Goldman for The New York Times
A report said that Lehman Brothers used accounting tricks.

**Related**

Lehman Brothers Holdings Inc. Chapter 11 Proceedings Examiner's Report (Jenner & Bloc)

DealBook: Ex-Lehman C.F.O. Criticizes Repo 105 (March 12, 2010)

DealBook: Lehman Examiner Unveils Report (March 11, 2010)

*The New York Times*                              More Video »

PLAY VIDEO  4:59

AUTOMOBILES
**Driven | 2016 Ford Explorer**
Ford's new three-row, midsize S.U.V. offers a dizzying number of ways to make it your own, with five distinct models and three engine choices.

The report, compiled by an examiner for the bank, now bankrupt, hit Wall Street with a thud late Thursday. The 158-year-old company, it concluded, died from multiple causes. Among them were bad mortgage holdings and, less directly, demands by rivals like JPMorgan Chase and Citigroup, that the foundering bank post collateral against loans it desperately needed.

But the examiner, Anton R. Valukas, also for the first time, laid out what the report characterized as "materially misleading" accounting gimmicks that Lehman used to mask the perilous state of its finances. The bank's bankruptcy, the largest in American history, shook the financial world. Fears that other banks might topple in a cascade of failures eventually led Washington to arrange a sweeping rescue for the nation's financial system.

According to the report, Lehman used what amounted to financial engineering to temporarily shuffle $50 billion of assets off its books in the months before its collapse in September 2008 to conceal its dependence on leverage, or borrowed money. Senior Lehman executives, as well as the bank's accountants at Ernst & Young, were aware of the moves, according to Mr. Valukas, the chairman of the law firm Jenner & Block and a former federal prosecutor, who filed the report in connection with Lehman's bankruptcy case.

Richard S. Fuld Jr., Lehman's former chief executive, certified the misleading accounts, the report said.



Meet Optimizely X
Experiment Everywhere

LEARN MORE

*Optimizely*

**Most Popular - Business**

EMAILED | VIEWED

1. Millions in U.S. Climb Out of Poverty, at Long Last
2. In Australia, China's Appetite Shifts From Rocks to Real Estate
3. Your Money: How to Pay for College With Less Stress
4. Inside Wealth: Your Local 1-Percenters May Not Be as Rich as You Think
5. Mediator: A Moment of Truth for Presidential Debate Moderators
6. Jane Pauley to Become Anchor of CBS Show 'Sunday Morning'
7. Clinton-Trump Debate Expected to Be Rare Draw in a Polarized Age
8. 'Aviation's Paris Moment' as Nations Near Emissions Deal
9. What if 'One Click' Buying Were Internetwide?
10. 'Brexit' Prompts Many British C.E.O.s to Consider Relocating, Survey Finds

Go to Complete List »

RELATED ADS          What are Related Ads?

» Bank Business Banking
» Business and Accounting
» Bankrupt Business
» Loans Small Business
» NYTIMES.com

**Readers' Comments**

Readers shared their thoughts on this article.

Read All Comments (307) »

"Unbeknownst to the investing public, rating agencies, government regulators, and Lehman's board of directors, Lehman reverse engineered the firm's net leverage ratio for public consumption," Mr. Valukas wrote.

Mr. Fuld was "at least grossly negligent," the report states, adding that Henry M. Paulson Jr., who was then the Treasury secretary, warned Mr. Fuld that Lehman might fail unless it stabilized its finances or found a buyer.

Lehman executives engaged in what the report characterized as "actionable balance sheet manipulation," and "nonculpable errors of business judgment."

The report draws no conclusions as to whether Lehman executives violated securities laws. But it does suggest that enough evidence exists for potential civil claims. Lehman executives are already defendants in civil suits, but have not been charged with any criminal wrongdoing.

A large portion of the nine-volume report centers on the accounting maneuvers, known inside Lehman as "Repo 105."

First used in 2001, long before the crisis struck, Repo 105 involved transactions that secretly moved billions of dollars off Lehman's books at a time when the bank was under heavy scrutiny.

According to Mr. Valukas, Mr. Fuld ordered Lehman executives to reduce the bank's debt levels, and senior officials sought repeatedly to apply Repo 105 to dress up the firm's results. Other executives named in the examiner's report in connection with the use of the accounting tool include three former Lehman chief financial officers: Christopher O'Meara, Erin Callan and Ian Lowitt.

Patricia Hynes, a lawyer for Mr. Fuld, said in an e-mailed statement that Mr. Fuld "did not know what those transactions were — he didn't structure or negotiate them, nor was he aware of their accounting treatment."

Charles Perkins, a spokesman for Ernst & Young, said in an e-mailed statement: "Our last audit of the company was for the fiscal year ending Nov. 30, 2007. Our opinion indicated that Lehman's financial statements for that year were fairly presented in accordance with Generally Accepted Accounting Principles (GAAP), and we remain of that view."

Bryan Marsal, Lehman's current chief executive, who is unwinding the firm, said in a statement that he was evaluating the report to assess how it might help in efforts to advance creditor interests.

Repos, short for repurchase agreements, are a standard practice on Wall Street, representing short-term loans that provide sometimes crucial financing. In them, firms essentially lend assets to other firms in exchange for money for short periods of time, sometimes overnight.

But Lehman used aggressive accounting in its Repo 105 transactions: it appears to have structured transactions such that they sold securities at the end of the quarter, but planned to buy them back again days later.

The effect of the accounting was to artificially and temporarily lower the firm's debt levels to hit certain targets, making the firm look healthier than it really was.

In a series of e-mail messages cited by the examiner, one Lehman executive writes of Repo 105: "It's basically window-dressing." Another responds: "I see ... so it's legally do-able but doesn't look good when we actually do it? Does the rest of the street do it? Also is that why we have so much BS [balance sheet] to Rates Europe?" The first executive replies: "Yes, No and yes. :)"

Mr. Valukas was appointed by the United States Trustee in the case in January 2009 to investigate the causes of the Lehman bankruptcy, as well as to find out if any fraud or misconduct took place.

Mr. Valukas writes in the report that "colorable claims" could be made against some former Lehman executives and Ernst & Young, meaning that enough evidence existed that could lead to the awarding of damages in a trial. He added that Lehman's directors were not aware of the accounting engineering.

By his reckoning, Lehman managed to "shed" about $39 billion from its balance sheet at the end of the fourth quarter of 2007, $49 billion in the first quarter of 2008 and $50 billion in the second quarter. At that time, Lehman sought to reassure the public that its finances were fine — despite pressure from short-sellers like the hedge fund manager David Einhorn.

Executives, including Herbert McDade, who was known internally as the firm's "balance sheet czar," seemed aware that repeatedly using Repo 105 was disguising the true health of the investment bank. "I am very aware ... it is another drug we r on," he wrote in an April 2008 e-mail cited by the examiner's report. At other times, he is described as calling for a limit to the number of Repo 105 transactions.

By May and June of 2008, a Lehman senior vice president, Matthew Lee, wrote to senior management and the firm's auditors at Ernst & Young flagging "accounting improprieties." Neither Lehman executives nor Ernst & Young alerted the firm's board about Mr. Lee's allegations, according to the report.

Mr. Fuld is described in the examiner's report as denying having knowledge of the Repo 105 transactions, and there is no evidence that he directed subordinates to make use of that aggressive accounting. (He did recall issuing several directives to reduce the firm's debt levels.) But Mr. McDade is reported as telling Mr. Fuld about using Repo 105 to achieve that goal.

*This article has been revised to reflect the following correction:*

### Correction: March 13, 2010

*An article on Friday about an examiner's report detailing accounting maneuvers used by Lehman Brothers to conceal its perilous finances described incorrectly in some editions the assets that were temporarily shuffled off its books. They were mostly high-quality securities that could be easily accepted by other banks, according to the examiner's report; they were not "troubled" and "mostly illiquid real estate holdings." The article also misstated in some editions the status of some Lehman executives in the aftermath of the bank's collapse. They are defendants in civil suits, not plaintiffs.*

A version of this article appeared in print on March 12, 2010, on page A1 of the New York edition.

COMMENTS
(307)

PRINT

REPRINTS




LORI PARRISH
BROWARD COUNTY
PROPERTY APPRAISER

| Site Address | 2881 NE 32 STREET 111, FORT LAUDERDALE | | ID # | 4943 19 EA 0310 |
|---|---|---|---|---|
| Property Owner | PARROT 33306 LLC | | Millage | 0312 |
| Mailing Address | 1314 E LAS OLAS BLVD #1205 FORT LAUDERDALE FL 33301 | | Use | 04 |

| Abbreviated Legal Description | WATERSIDE ON THE INTRACOASTAL UNIT 111 BLDG 2881 |
|---|---|

**The just values displayed below were set in compliance with Sec. 193.011, Fla. Stat., and include a reduction for costs of sale and other adjustments required by Sec. 193.011(8).**

### Property Assessment Values

Click here to see 2015 Exemptions and Taxable Values as reflected on the Nov. 1, 2015 tax bill.

| Year | Land | Building | Just / Market Value | Assessed / SOH Value | Tax |
|---|---|---|---|---|---|
| 2016 | $26,630 | $239,700 | $266,330 | $266,330 | |
| 2015 | $26,300 | $236,670 | $262,970 | $262,970 | $5,381.85 |
| 2014 | $21,240 | $191,170 | $212,410 | $208,210 | $4,415.63 |

### 2016 Exemptions and Taxable Values by Taxing Authority

| | County | School Board | Municipal | Independent |
|---|---|---|---|---|
| Just Value | $266,330 | $266,330 | $266,330 | $266,330 |
| Portability | 0 | 0 | 0 | 0 |
| Assessed/SOH | $266,330 | $266,330 | $266,330 | $266,330 |
| Homestead | 0 | 0 | 0 | 0 |
| Add. Homestead | 0 | 0 | 0 | 0 |
| Wid/Vet/Dis | 0 | 0 | 0 | 0 |
| Senior | 0 | 0 | 0 | 0 |
| Exempt Type | 0 | 0 | 0 | 0 |
| Taxable | $266,330 | $266,330 | $266,330 | $266,330 |

### Sales History

| Date | Type | Price | Book/Page or CIN |
|---|---|---|---|
| 11/14/2014 | SWD-Q-DS | $325,000 | 112644861 |
| 5/3/2012 | CET-D | $141,300 | 48764 / 441 |
| 6/8/2006 | SWD | $419,900 | 42272 / 144 |

### Land Calculations

| Price | Factor | Type |
|---|---|---|
| | | |

| Adj. Bldg. S.F. | 1120 |
|---|---|
| Units/Beds/Baths | 1/2/2 |

*Perlman*
*? -*
*Gryc*

### Special Assessments

| Fire | Garb | Light | Drain | Impr | Safe | Storm | Clean | Misc |
|---|---|---|---|---|---|---|---|---|
| 03 | | | | | | | | |
| R | | | | | | | | |
| 1 | | | | | | | | |

CFN # 110767792, OR BK 48764   Page 441   Page 1 of 1

278

### In the Circuit Court of the Seventeenth Judicial Circuit
### In and for Broward County, Florida

AURORA LOAN SVCS LLC
Plaintiff

VS.

GRYC, MIROSLAW ; LEZON, EDYTA ; WATERSIDE ON THE
INTRACOASTAL ; MORTGAGE ELECTRONIC
Defendant

CACE-08-027199
Division:   13

## Certificate of Title

The undersigned, Howard C. Forman, Clerk of the Court, certifies that he executed and filed a certificate of sale in this action on May 03, 2012, for the property described herein and that no objections to the sale have been filed within the time allowed for filing objections.

The following property in Broward County, Florida:

UNIT NO. 111 IN WATERSIDE ON THE INTRACOASTAL, A CONDOMINIUM, ACCORDING TO THE DECLARATION OF CONDOMINIUM THEREOF, RECORDED MARCH 20, 2006, IN OFFICIAL RECORDS BOOK 41657, AT PAGE 446, PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA.

also known as: 2881 NE 32nd St # 111, Fort Lauderdale, FL 33306

Was sold to: 2006 VENTURE CORP, AS TRUSTEE
10417 SW 22 Place Davie, FL, 33324

Witness my hand and the seal of this court on   May 15, 2012 .

Howard C. Forman, Clerk of Circuit Courts
Broward County, Florida

Total consideration: $141,300.00
Doc Stamps: $989.10

CIRCUIT CIVIL 2012 MAY 15 AM 10:36 FILED FOR RECORD CLERK OF CIRCUIT COURT BROWARD COUNTY, FLA.

3 of 7

 

**LORI PARRISH**
**BROWARD COUNTY**
**PROPERTY APPRAISER**

| Site Address | 2881 NE 32 STREET 119, FORT LAUDERDALE | | ID # | 4943 19 EA 0380 |
|---|---|---|---|---|
| Property Owner | SOBOTNIK, SIMON | | Millage | 0312 |
| Mailing Address | 5 TYRE AVE #6 *TORONTO ON CA M9A 1C6 | | Use | 04 |

| Abbreviated Legal Description | WATERSIDE ON THE INTRACOASTAL UNIT 119 BLDG 2881 |
|---|---|

**The just values displayed below were set in compliance with Sec. 193.011, Fla. Stat., and include a reduction for costs of sale and other adjustments required by Sec. 193.011(8).**

**Property Assessment Values**
Click here to see 2015 Exemptions and Taxable Values as reflected on the Nov. 1, 2015 tax bill.

| Year | Land | Building | Just / Market Value | Assessed / SOH Value | Tax |
|---|---|---|---|---|---|
| 2016 | $17,760 | $159,870 | $177,630 | $168,300 | |
| 2015 | $15,300 | $137,700 | $153,000 | $153,000 | $3,225.32 |
| 2014 | $14,170 | $127,500 | $141,670 | $138,860 | $3,019.89 |

**2016 Exemptions and Taxable Values by Taxing Authority**

| | County | School Board | Municipal | Independent |
|---|---|---|---|---|
| Just Value | $177,630 | $177,630 | $177,630 | $177,630 |
| Portability | 0 | 0 | 0 | 0 |
| Assessed/SOH | $168,300 | $177,630 | $168,300 | $168,300 |
| Homestead | 0 | 0 | 0 | 0 |
| Add. Homestead | 0 | 0 | 0 | 0 |
| Wid/Vet/Dis | 0 | 0 | 0 | 0 |
| Senior | 0 | 0 | 0 | 0 |
| Exempt Type | 0 | 0 | 0 | 0 |
| Taxable | $168,300 | $177,630 | $168,300 | $168,300 |

Sobotnik –
Algveira –
Jorressen –

**Sales History**

| Date | Type | Price | Book/Page or CIN |
|---|---|---|---|
| 10/16/2014 | WD-Q | $170,000 | 112624114 |
| 2/18/2011 | SWD-Q-DS | $130,000 | 47753 / 1359 |
| 3/2/2010 | CET-T | | 46950 / 780 |
| 6/8/2006 | SWD | $275,800 | 42239 / 1921 |

**Land Calculations**

| Price | Factor | Type |
|---|---|---|
| | | |

| Adj. Bldg. S.F. | 747 |
|---|---|
| Units/Beds/Baths | 1/1/1 |

**Special Assessments**

| Fire | Garb | Light | Drain | Impr | Safe | Storm | Clean | Misc |
|---|---|---|---|---|---|---|---|---|
| 03 | | | | | | | | |
| R | | | | | | | | |
| 1 | | | | | | | | |

4 of 7

This Instrument Prepared by and Return to:
STEPHEN J. STRALEY
ACTION TITLE COMPANY
2699 STIRLING ROAD, SUITE C-204
FT. LAUDERDALE, FL 33312

Property Appraisers Parcel Identification (Folio) Numbers: 494319-EA-0380
Documentary Stamps are based on a sales price of $130,000.00

_____ SPACE ABOVE THIS LINE FOR RECORDING DATA _____

**THIS SPECIAL WARRANTY DEED**, made and executed the 18th day of February, 2011 by THE FEDERAL HOME LOAN MORTGAGE CORPORATION having its principal place of business at 5000 PLANO PARKWAY, CARROLLTON, TX 75010 herein called the grantor, to DANIELA ECHEGARAY and JOSE SALGUERO FERNANDEZ, WIFE AND HUSBAND, whose post office address is: 200 NE 30th St., #5-F, Ft Lauderdale, FL 33306

(Wherever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations) , hereinafter called the Grantee:

**W I T N E S S E T H**: That the grantor, for and in consideration of the sum of TEN AND 00/100'S ($10.00) Dollars and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the grantee all that certain land situate in BROWARD County, State of Florida, viz:

UNIT NO. 119, BLOCK 2881, OF WATERSIDE ON THE INTRACOASTAL CONDOMINIUMS, A CONDOMINIUM, ACCORDING TO THE DECLARATION OF CONDOMINIUM, AS RECORDED IN OFFICIAL RECORDS BOOK 41657, PAGE 446, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA.

Subject to easements, restrictions and reservations of record and to taxes for the year 2011 and thereafter.

**TOGETHER**, with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**TO HAVE AND TO HOLD**, the same in fee simple forever.

**AND**, the grantor hereby covenants with said grantee that except as above noted, at the time of delivery of this Special Warranty Deed the premises were free of all encumbrances made by them, and they will warrant and defend the same against the lawful claims of all persons claiming by, through or under grantor.

**IN WITNESS WHEREOF**, the said grantor has signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in the presence of:

THE FEDERAL HOME LOAN MORTGAGE CORPORATION

_____
Witness Signature

_____
Printed Witness Signature

_____
Witness Signature

Marlon Brown
_____
Printed Witness Signature

By: _____
Title: **Sandra Taylor**

Authorized Signer of
National Default REO Services,
a Delaware Limited Liability
Company dba First American
Asset Closing Services ("FAACS"),
as Attorney in fact and/or agent

STATE OF FLORIDA Texas
COUNTY OF BROWARD Dallas

The foregoing instrument was acknowledged before me this 18th day of February, 2011, by **Sandra Taylor** as
_____ of THE FEDERAL HOME LOAN MORTGAGE CORPORATION on behalf of the corporation. He/she is personally known to me or has produced Drivers License as _____ identification.

S E A L

MARLON BROWN
Notary Public, State of Texas
My Commission Expires
September 16, 2014

_____
Notary Signature

_____
Printed Notary Name

_____
My Commission Expires:

Our File No.: 1022615

5 of 7




| Site Address | 2881 NE 32 STREET 317, FORT LAUDERDALE |
|---|---|
| Property Owner | LESHMAN,TIFFANY H/E ROSENTHAL,ALAN |
| Mailing Address | 2881 NE 32 ST #317 FORT LAUDERDALE FL 33306 |

| ID # | 4943 19 EA 0560 |
|---|---|
| Millage | 0312 |
| Use | 04 |

| Abbreviated Legal Description | WATERSIDE ON THE INTRACOASTAL UNIT 317 BLDG 2881 |
|---|---|

**The just values displayed below were set in compliance with Sec. 193.011, Fla. Stat., and include a reduction for costs of sale and other adjustments required by Sec. 193.011(8).**

### Property Assessment Values
Click here to see 2015 Exemptions and Taxable Values as reflected on the Nov. 1, 2015 tax bill.

| Year | Land | Building | Just / Market Value | Assessed / SOH Value | Tax |
|---|---|---|---|---|---|
| 2016 | $15,080 | $135,690 | $150,770 | $107,610 | |
| 2015 | $14,890 | $133,970 | $148,860 | $106,870 | $1,522.05 |
| 2014 | $12,020 | $108,210 | $120,230 | $106,030 | $1,530.26 |

### 2016 Exemptions and Taxable Values by Taxing Authority

| | County | School Board | Municipal | Independent |
|---|---|---|---|---|
| Just Value | $150,770 | $150,770 | $150,770 | $150,770 |
| Portability | 0 | 0 | 0 | 0 |
| Assessed/SOH 09 | $107,610 | $107,610 | $107,610 | $107,610 |
| Homestead 100% | $25,000 | $25,000 | $25,000 | $25,000 |
| Add. Homestead | $25,000 | 0 | $25,000 | $25,000 |
| Wid/Vet/Dis | 0 | 0 | 0 | 0 |
| Senior | 0 | 0 | 0 | 0 |
| Exempt Type | 0 | 0 | 0 | 0 |
| Taxable | $57,610 | $82,610 | $57,610 | $57,610 |

### Sales History

| Date | Type | Price | Book/Page or CIN |
|---|---|---|---|
| 4/18/2016 | QCD-T | $100 | 113659123 |
| 5/14/2008 | WD-Q | $200,000 | 45370 / 1255 |
| 6/9/2006 | SWD | $271,400 | 42218 / 469 |
| | | | |

Tiffany Leshman

Sharon Stenbridge

### Land Calculations

| Price | Factor | Type |
|---|---|---|
| | | |
| | | |
| | | |
| Adj. Bldg. S.F. | | 634 |
| Units/Beds/Baths | | 1/1/1 |

### Special Assessments

| Fire | Garb | Light | Drain | Impr | Safe | Storm | Clean | Misc |
|---|---|---|---|---|---|---|---|---|
| 03 | | | | | | | | |
| R | | | | | | | | |
| 1 | | | | | | | | |

CFN # 107894536, OR BK 45370 Page 1255, Page 1 of 2, Recorded 05/15/2008 at
08:41 AM, Broward County Commission, Deputy Clerk 2160

08-13555-mg   Doc 53740   Filed 09/30/16   Entered 09/30/16 15:04:31   Main Document
Pg 21 of 25

6 of 7

THIS INSTRUMENT PREPARED BY AND RETURN TO:
Tim V. Milianta
Surf Title Inc.
4301 NE 1st Terrace, Suite 2
Oakland Park, FL 33334
Property Appraisers Parcel Identification (Folio) Numbers: 4943-19-EA-0560

_____ Space Above This Line For Recording Data _____

**THIS WARRANTY DEED**, made the 14th day of May, 2008 by Sharon Shewbridge, a single woman, whose post office address is 2260 Salerno Drive, Weston, FL 33327, and Mathew Schaefer, a married man, whose post office address is 841 Amherst Avenue, Davie, FL 33325 herein called the grantors, to Tiffany Leshman, a single woman, whose post office address is 2881 NE 32 Street, #317, Fort Lauderdale, FL 33306, hereinafter called the Grantee:
*(Wherever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)*

**W I T N E S S E T H :** That the grantors, for and in consideration of the sum of TEN AND 00/100'S ($10.00) Dollars and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the grantee all that certain land situate in BROWARD County, State of Florida, viz.:

Unit 317, WATERSIDE ON THE INTRACOASTAL CONDOMINIUMS, according to the Declaration of Condominium thereof, recorded in Official Records Book 41657, Page 446, of the Public Records of Broward County, Florida, together with an undivided interest or share in the common elements appurtenant thereto and any amendments thereto.

Subject to easements, restrictions and reservations of record and taxes for the year 2008 and thereafter.

***This property is not now nor never has been the Homestead property of the Grantors nor is it contiguous with the Homestead property of the Grantors.

### ***ALONG WITH EXHIBIT 'A' CONDO APPROVAL***

**TOGETHER**, with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**TO HAVE AND TO HOLD**, the same in fee simple forever.

**AND**, the grantors hereby covenant with said grantee that the grantors are lawfully seized of said land in fee simple; that the grantors have good right and lawful authority to sell and convey said land, and hereby warrant the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to December 31, 2007.

**IN WITNESS WHEREOF**, the said grantors have signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in the presence of:

Witness #1 Signature

**TIM V. MILIANTA**
Witness #1 Printed Name

_____
Sharon Shewbridge

Witness #2 Signature

**ADRIANA CALDERON**
Witness #2 Printed Name

_____
Mathew Schaefer

**STATE OF FLORIDA**
**COUNTY OF BROWARD**

The foregoing instrument was acknowledged before me this 14th day of May, 2008 by Sharon Shewbridge and Mathew Schaefer who are personally known to me or have produced _____ R D _____ as identification.

SEAL

Tim V. Milianta
Commission # DD513162
Expires April 11, 2010
Bonded Troy Fain - Insurance Inc 800-385-7019

Notary Public

**TIM V. MILIANTA**
Printed Notary Name

My Commission Expires:

File No: 08-030

②

Exhibit 'A'

# CERTIFICATE OF APPROVAL

THIS IS TO CERTIFY THAT **Tiffany Leehman** have been approved by Waterside on the Intracoastal, a Florida Corporation, Not for Profit, as the new owner/residents of the following described real property in Broward County, Florida:

## Waterside on the Intracoastal Condominiums Association, Inc
### 2881 NE 32nd Avenue # 317
### Fort Lauderdale, FL 33308

SUCH APPROVAL has been given pursuant to the provisions of the Declaration of Documents and all Exhibits attached to the Declaration of Documents and any Amendments thereto, if any.

DATED this **14th** day of April **2008**

BY: _____
As Agent for the Board of Directors
Waterside on the Intracoastal Condominiums Association, Inc

# The Statute of Limitations for a Breach of Contract Claim Does Not Apply to All Contracts Equally

February 12, 2014 by Hans C. Wahl, Esq.

### By: Hans C. Wahl, Esq.

The statute of limitations refers to the period of time in which a potential plaintiff is allowed to bring a legal claim against a potential defendant. Chapter 95, Florida Statutes, provides the statute of limitations period for all possible causes of action under Florida law. For a breach of contract claim, Section 95.11(2)(b), Florida Statutes, makes clear that the statute of limitations is five years for most contracts (contracts for the improvement of real property have a 4 year statute of limitations). This means that if suit is filed five years and one day after the breached occurred, the defendant could raise a statute of limitations defense and have the suit dismissed. However, not all contracts are the same and, therefore, the statute of limitations does not apply to all contracts equally. This blog post discusses how the statute of limitations for claims involving a breach of contract applies to what is known as installment contracts.

*Attachment #3*
*2 of 3*

scan.pdf          Open with CloudConvert

### Statutes of Limitation in Florida

| | |
|---|---|
| Injury to Person | 4 yrs. §95.11(3)(o) |
| Libel/Slander | 2 yrs. §95.11(4)(g) |
| Fraud | 4 yrs. §95.11(3)(j) |
| Injury to Personal Property | 4 yrs. §95.11(3)(h) |
| Professional Malpractice | 2 yrs.; Medical: 2-4 yrs. §95.11(4)(a) and |
| Trespass | 4 yrs. §95.11(3)(g) |
| Collection of Rents | - |
| Contracts | Written: 5 yrs. §95.11(2)(b), 1 yr. specific performance§95.11(5)(a)Oral: 4 yrs. §95. |
| Collection of Debt on Account | - |
| Judgments | 20 yrs. domestic §95.11(1); 5 yrs. foreign |

Page    1    /    5

*Attachment 3*
*3 of 3*

# Statute of Limitations for Civil Actions

Each cause of action has its own statute of limitations. These are some of the <u>common time limits in Florida</u>:

- Personal injury (negligence)—four years from injury
- Destruction of personal property—four years
- <u>Wrongful death</u>—two years from death
- Fraud—four years
- Professional malpractice—two years
- Contracts—five years in the case of written contracts; four years for oral ones

In some cases, the discovery rule can extend these times. For example, for medical malpractice, you generally have two years from your injury to file. But if your injury was not immediately obvious, you have up to two years from discovery, with a maximum of four years from the act that caused your injury.