WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------------ x

## NOTICE OF HEARING ON PLAN ADMINISTRATOR'S
## OBJECTION TO PROOF OF CLAIM NUMBER 28520

**PLEASE TAKE NOTICE** that a hearing on the annexed objection (the "Objection") of Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors to proof of claim number 28520 filed by the Ad Hoc Committee of LBREP III Limited Partners, on behalf of certain Participating Partners (the "Fried Claim") will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Courtroom 623, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **November 22, 2016 at 10:00 a.m. (Eastern Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Objection shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of

the objecting party, the basis for the response, and the specific grounds thereof, shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with General Order M-399 upon: (i) the chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Garrett A. Fail, Esq., attorneys for LBHI and certain of its affiliates; and (iii) the Office of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: William K. Harrington, Esq., Susan Golden, Esq., and Andrea B. Schwartz, Esq., so as to be so filed and received no later than **November 14, 2016 at 4:00 p.m. (Eastern Time)** (the "Response Deadline").

**PLEASE TAKE FURTHER NOTICE** that if a response to the Objection is not received by the Response Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

WEIL:\95857138\8\58399.0011

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted or denied upon

default.

Dated:   October 18, 2016
         New York, New York

/s/ Garrett A. Fail
Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

WEIL:\95857138\8\58399.0011

Hearing Date and Time: November 22, 2016 at 10:00 a.m.
Response Deadline: November 14, 2016 at 4:00 p.m.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- x
In re                                              :        **Chapter 11 Case No.**
                                                   :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,       :        **08-13555 (SCC)**
                                                   :
                     **Debtors.**                  :        **(Jointly Administered)**
                                                   :
-------------------------------------------------------------------- x

**PLAN ADMINISTRATOR'S OBJECTION TO PROOF OF CLAIM NUMBER 28520**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the

Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

Affiliated Debtors (the "Plan") for the entities in the above-referenced chapter 11 cases, files this

objection and respectfully represents:

**Preliminary Statement**

1.      The Plan Administrator files this objection seeking to disallow and

expunge a $56.5 million proof of claim (assigned proof of claim number 28520, the "Fried

Claim") filed by a purported "Ad Hoc Committee of LBREP III Limited Partners" (the "Ad Hoc

Committee") for numerous persons.

2.      The Fried Claim should be disallowed and expunged in its entirety

because (a) the Ad Hoc Committee failed to comply with the requirements of Rule 2019 of the

Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and there is no proof that the Ad Hoc Committee is authorized to represent any persons, and (b) the filing of a class claim was not authorized even if the Ad Hoc Committee could represent one or more persons. Each basis is sufficient independently to disallow and expunge the Fried Claim at a sufficiency hearing.

3.      Further, the Fried Claim relates to investments in certain non-debtor commercial real estate partnerships. The Ad Hoc Committee's allegations against LBHI are unclear but "are taken in part from a draft complaint by Claimants against affiliates of the Debtor not in bankruptcy proceedings." Fried Claim, Annex C at 2. LBHI is alleged to have "conspired with, and aided and abetted" those affiliated parties. *Id.* at 19. Since the filing of the Fried Claim in 2009, actions brought on behalf of the same purported creditors against the affiliated parties in both federal and state courts have been dismissed. Indeed, the United States District Court for the Southern District of New York, the United States Court of Appeals for the Second Circuit, and the Supreme Court of the State of New York considered the allegations and found them to be insufficient as a matter of law. Having failed to establish the existence of a valid claim in those litigations, the Ad Hoc Committee and individual creditors are barred by res judicata and collateral estoppel from further pursuit of their claims against LBHI. The Fried Claim should be disallowed and expunged or estimated at zero for all purposes based on litigation to date.

4.      A proposed form of order disallowing and expunging the Fried Claim is annexed hereto as **<u>Exhibit A</u>**.

WEIL:\95857138\8\58399.0011

## Jurisdiction

5.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

*Chapter 11 Cases*

6.      Commencing on September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases (together, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

7.      On July 2, 2009, this Court entered an order setting forth the procedures and deadlines for filing proofs of claim in these chapter 11 cases (the "Bar Date Order") [ECF No. 4271], which requires, among other things, that each Proof of Claim "must be signed by the claimant or by an authorized agent of the claimant." (*Id.* at 6).  Further, the Bar Date Order provides that "any holder of a claim against the Debtors who is required, but fails to file a proof of such claim in accordance with the Bar Date Order on or before the Bar Date . . . specifying the applicable Debtor and other requirements set forth herein, shall forever be barred, estopped, and enjoined from asserting such claim against the Debtors (or filing a Proof of Claim with respect thereto)." (*Id.* at 9-10).

8.      On December 6, 2011, the Court approved and entered an order confirming the Plan [ECF No. 23023] (the "Confirmation Order").  The Plan became effective

on March 6, 2012.  The Confirmation Order provides that no Proof of Claim may be filed or

amended after the Effective Date without the authority of the Court.  (Confirmation Order ¶ 86).

*The Fried Claim*

9.      The Ad Hoc Committee filed the Fried Claim on the Bar Date.  It asserts

$56,500,000 in damages from LBHI's having allegedly acted in concert with and directed certain

non-debtor affiliates.  Fried Claim §8.  The Fried Claim collectively alleges against LBHI and

other non-debtors violations of Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. §

78j(b), Rule 10b-5 thereunder, and Delaware securities anti-fraud provision 6 Del. § 7303;

breaches of the implied duty of good faith and fair dealing under limited partnership agreements;

common law fraud; and breaches of fiduciary duty.  *See* Statement of Basis of Claim ¶ 29.

*Litigation of the Same Claims in Federal and State Courts*

10.      On or about October 9, 2009, a number of the parties who are listed on the

Fried Claim as purported members of the Ad Hoc Committee[1] filed a complaint ("Fried I") in the

United States District Court for the Southern District of New York against a number of non-

debtor affiliated parties.  Case No. 10-civ-4299 (BSJ).  The plaintiffs asserted violations of

Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5

promulgated thereunder, 17 C.F.R. § 240.10b-5(b), and common law claims for fraud and breach

of fiduciary duty.

11.      The District Court dismissed the complaint with prejudice on or about

March 29, 2011.  *Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*, 2011 WL 1345097

---

[1] Barbara J. and B. Mark Fried, Altitude Partners, LLC, Christian Zugel, Richard D. Maltzman as trustee for the
Richard D. & Charlene Maltzman Family Trust U/A/D, 3/23/88, Jefforeed Partners, L.P., Zelfman, LLC and other
limited partners.  The Fried I Plaintiffs filed their complaint on behalf of themselves and other limited partners.  The
Fried Claim lists additional parties who later were not named plaintiffs in the *Fried I* action.  The *Fried I* plaintiffs
sought damages of not less than $53,750,000 plus disgorgement and payment of certain additional fees.  *See Fried I*
Complaint [ECF No. 1].

(S.D.N.Y. Mar. 29, 2011).[2]  Certain of the plaintiffs filed an appeal from the District Court's

order to the United States Court of Appeals for the Second Circuit, but the Second Circuit

affirmed the dismissal on or about December 20, 2012. *Fried v. Lehman Bros. Real Estate*

*Assocs. III, L.P.*, 506 F. App'x 5 (2d Cir. 2012).[3]  Copies of the District Court and Second

Circuit decisions are attached hereto as **Exhibits B and C**, respectively.

12.    After the District Court's dismissal, on or about May 27, 2011, a number

of the parties who are listed on the Fried Claim as purported members of the Ad Hoc

Committee[4] filed a complaint against a substantially similar group of defendants in the Supreme

Court of the State of New York ("Fried II").    The complaint alleged state law claims of

intentional misrepresentation, negligent misrepresentation, bad faith breaches of fiduciary duty,

breach of fiduciary duty, breach of contract, and conspiracy.  On or about February 3, 2015, the

state court plaintiffs filed an amended complaint.  On or about August 8, 2016, the New York

state court dismissed the Fried II amended complaint in its entirety and with prejudice.  A copy

of the state court's decision is attached hereto as **Exhibit D**.[5]  A judgment dismissing the *Fried II*

---

[2] The District Court granted the motion to dismiss the *Fried I* Complaint because plaintiffs failed to plead scienter because they did not adequately allege that defendants knew or should have known that the transfer of the properties to partnerships' portfolios would have caused the partnerships to sustain losses.  *Fried I*, 2011 WL 1345097, at *8.

[3] The Second Circuit affirmed, finding that documents attached to the plaintiffs' own complaint showed that "defendants *did not* believe that the property interests being held for transfer to the partnership . . . had depreciated in value" and "actually undermine[d] [Plaintiffs'] claim." *Fried I*, 506 F. App'x at 9 ("contemporaneous documents attached to the complaint address[ed] the particular property interests bound for the Partnerships" and "support[ed] the inference that the defendants did not think that the property interests depreciated in value.").

[4] Barbara J. Fried, Altitude Partners LLC, Richard D. Maltzman as trustee, Jefforeed Partners, L.P., and Zelfam, LLC, on behalf of themselves and for other limited partners similarly situated.

[5] In granting the defendants' motions to dismiss, the state court repeatedly cited the opinions of both federal courts, holding that the amended complaint "sets forth no facts to demonstrate that defendants knew that the specific properties at issue . . . had decreased in value" and finding that the internal documents cited by the courts "indicated that, as of December 31, 2007, the partnership-bound investment properties had, in aggregate, appreciated $300,000 in value since their acquisition."  Exhibit D (citing *Fried I*, 506 F. App'x at 8). The Court also rejected plaintiffs' theory that a generalized downturn in the real estate market was sufficient to establish an inference of scienter on the part of LBHI.  *Id.* at 13 ("Even assuming that Lehman's overall portfolio had decreased in value due to a downturn

5

amended complaint was entered in the office of the Clerk of New York County on August 25,

2016.  The plaintiffs have appealed the state court's ruling and the judgment entered by the Clerk

of New York County.

### Basis for Requested Relief

13.    Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a

claim may not be allowed to the extent that "such claim is unenforceable against the debtor and

property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).

*The Ad Hoc Committee Failed to Comply with Bankruptcy Rule 2019*

14.    Neither the Ad Hoc Committee nor any attorney for the Ad Hoc

Committee has complied with the stringent requirements of Bankruptcy Rule 2019, which

provides, in pertinent part, that:

> Every entity . . . representing more than one creditor . . . shall file a verified
> statement with the clerk setting forth
>
> (1) the name and address of the creditor . . . ;
>
> (2) the nature and amount of the claim or interest and the time of acquisition
> thereof unless it is alleged to have been acquired more than one year prior to the
> filing of the petition; [and]
>
> (3) a recital of the pertinent facts and circumstances in connection with the
> employment of the entity . . .;
>
> The statement shall include a copy of the instrument, if any, whereby the entity
> . . . is empowered to act on behalf of creditors . . .

FED. R. BANKR. P. 2019(a).

15.    An agent may only prosecute a claim on behalf of another when he has

express authorization to do so.  *See In re Manville Forest Prods. Corp.*, 89 B.R. 358, 376 (Bankr.

S.D.N.Y. 1988) *aff'd* 99 B.R. 543 (Bankr. S.D.N.Y. 1989).  A fiduciary relationship

---

in the market, plaintiffs put forth no case law to demonstrate that a general downturn in the market supports an
inference of fraudulent scienter.") (citing *Fried I*, 2011 WL 1345097 at *8).

WEIL:\95857138\8\58399.0011

> Results from the manifestation of consent by one person to another that the other
> shall act on his behalf and subject to [the] control, and consent [of the person] to
> act.    [It is critical that the] 'agency relation exists only if there has been a
> manifestation by the principal to the agent that the agent may act on his account.'

*In re Baldwin-United Corp.*, 52 B.R. 146, 148 (Bankr. S.D. Ohio 1985) (quoting Restatement of

Agency § 15 (1958)).  Absent such consent, an agent may not legitimately represent the interests

of individuals.  To this end, Bankruptcy Rule 2019 requires that an entity file an instrument

which empowers the entity to act on behalf of the creditors.

16.    To be an authorized agent for other parties, Bankruptcy Rule 2019(a)

further requires that the party purporting to represent more than one creditor "file a verified

statement setting forth the names and addresses of the creditors, the nature and amount of the

claims and the relevant facts and circumstances surrounding the employment of the 'agent.'"  *In

re Electronic Theater*, 57 B.R. 147, 148-49 (Bankr. N.D. Ohio 1986); *see also In re Baldwin-

United Corp.*, 52 B.R. at 148; *In re Cont'l Airlines*, 64 B.R. 874, 880 (Bankr. S.D. Tex. 1986).

"[T]he initial burden is on the party claiming to be an agent for several claimants."  *In re Great

Western Cities, Inc.*, 88 B.R. 109, 112 (Bankr. N.D. Tex. 1988).  "The Rule is long-standing, and

there is no basis for failure to apply it as written."  *In re Northwest Airlines Corp.*, No. 05-17930,

2007 Bankr. LEXIS 557 at * 10 (Bankr. S.D.N.Y. Feb. 27, 2007).

17.    Neither the purported Ad Hoc Committee nor its attorneys filed a verified

statement pursuant to Bankruptcy Rule 2019.  There is no evidence the Fried Claim was filed

with the authorization of any person.  Further, as discussed in further detail below, none of the

Ad Hoc Committee, the Fried I plaintiffs or the Fried II plaintiffs have been recognized by any

court to be a class or their claims to constitute class claims.

18.    Pursuant to Bankruptcy Rule 2019(b), if a party fails to comply with the

requirements of Bankruptcy Rule 2019(a), this Court may "refuse to permit that entity to be

7

heard or further intervene in this case" and may "hold invalid any authority . . . given, procured or received by" such party. FED. R. BANKR. P. 2019(b)(3). The Ad Hoc Committee failed to comply with the requirements and seeks a $56.5 million on behalf of a number of parties who could have filed a claim of their own. The Fried Claim should be disallowed and expunged in its entirety.

*The Ad Hoc Committee Cannot Bring a Class Claim*

19.    The Ad Hoc Committee purports to have filed the Fried Claim as a class claim or in a representative capacity. The Fried Claim should be disallowed and expunged because it is improper to file class action claims in a chapter 11 case, and further, the Ad Hoc Committee has not satisfied the requisite procedural requirements to bring such a class claim. *See In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1 (S.D.N.Y. 2005).

20.    Part VII of the Bankruptcy Rules, which includes Bankruptcy Rule 7023 (governing class actions in bankruptcy proceedings), only applies to adversary proceedings. *See* FED. R. BANKR. P. 7001. Bankruptcy Rule 9014 adopts certain of the rules from Part VII for contested matters. However, Bankruptcy Rule 7023 is not one of those rules adopted for contested matter. *See* FED. R. BANKR. P. 9014. Plaintiffs seeking application of Bankruptcy Rule 7023 to a class proof of claim are required to move pursuant to Bankruptcy Rule 9014 for the court to apply "at any stage in a particular matter . . . one or more of the other rules in Part VII." Fed. R. Bankr. P. 9014; accord *In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 7 (affirming that the need for a Rule 9014 motion clearly follows from an attempt to apply Rule 23 to a proof of claim); *In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. 365, 369 (Bankr. S.D.N.Y. 1997) (stating that "[f]or a class action claim to proceed . . . the bankruptcy court must direct Rule 23 to apply"). "Rule 23 may be invoked against the debtor only if the bankruptcy court first makes a

discretionary ruling under Rule 9014 to apply Rule 23 to the proof of claim." *In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 4.

21.     In *In re Ephedra Prods. Liab. Litig.*, the Southern District of New York sustained objections filed by the debtors and its creditors' committee to six consumer class claims, expunging all consumer class claims against the debtors.  329 B.R. 1.  The court found that, "counsel for the class claimants bear primary responsibility for . . . moving under Rule 9014(c) for class certification."  *Id.* at 5.  The court rejected arguments by the claimants that it is a debtor's responsibility to bring the issue to the court's attention sooner.  *Id.* at 6-7 ("From the moment the Chapter 11 petition was filed, . . . the . . . class claimants had the right to move for certification by virtue of 11 U.S.C. § 1109(b) . . . . They could have requested class certification even before they filed their proof of claim.").  The court specifically rejected the class claimants' "construction of Rule 9014 which would mean that a debtor or others with interests adverse to a class claim could prevent the claimant from asking the bankruptcy court to apply Rule 23 simply by withholding their objections until the eve of confirmation and then move to expunge the class claim on the grounds that applying Rule 23 would unduly delay distribution."  *Id.* at 5.

22.     In the eight years the Chapter 11 Cases have been pending, the Ad Hoc Committee has never requested that this Court apply Rule 23 to the Fried Claim, nor has this Court issued any ruling allowing the Ad Hoc Committee to file a proof of claim on behalf of other potential claimants.  No other court has certified a class in any related proceeding.

23.     Further, even if the Ad Hoc Committee had complied with the provisions of Rule 9014, a class claim should not be allowed in these Chapter 11 Cases.  "[N]othing in the Bankruptcy Code or Rules expressly permits a creditor to file a proof of claim not only for himself but also on behalf of all other creditors similarly situated."  *In re Ephedra*, 329 B.R. at 4.

9

The Southern District of New York has adopted a line of cases emanating from the Seventh Circuit's decision in *In re American Reserve Corp.*, 840 F.2d 487 (7th Cir. 1988), which held that class proofs of claim are not barred by section 501 of the Bankruptcy Code but may be allowed in the discretion of the bankruptcy court.  *In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 5 (collecting cases).

24.    As this Court has previously recognized, however, bankruptcy courts should only sparingly allow class claims in the context of a chapter 11 case.  *See* Tr. at 77:12-22, Adv. Pro. No. 09-01482 (Bankr. S.D.N.Y. Jan. 21, 2010) (ECF No. 13) ("Ordinarily, Rule 23 provisions [allowing class claims] are applied sparingly in Chapter 11 cases.  The reason for that is that the bankruptcy process itself allows for a multitude of claimants to have their claims heard and determined by a single court . . . .  Under these circumstances, without prejudice to the rights of plaintiffs, a class action is, in the Court's view, an entirely unnecessary and inappropriate procedure.").  Other courts in this district have reached the same conclusion.  *In re Northwest Airlines Corp.*, No. 05-17930 (ALG), 2007 WL 2815917, at *3 (Bankr. S.D.N.Y. Sept. 26, 2007) ("Class action status is sparingly used in a bankruptcy case."); *In re Thomson McKinnon Sec., Inc.*, 133 B.R. 39, 40 (Bankr. S.D.N.Y. 1991) ("Manifestly, the bankruptcy court's control of the debtor's affairs might make class certification unnecessary.").

*25.*    The Chapter 11 Cases have been pending for more than eight years.  At no time has this Court been asked to certify a class claim.  Nor has any class claim been certified by either the federal or the state courts.  Further, a class claim would be inappropriate in this case.  Parties in interest all had the opportunity to file a proof of claim in these Chapter 11 Cases prior to the Bar Date.  The Bar Date has passed and the Ad Hoc Committee's filing of a class claim on the Bar Date must not be permitted to allow creditors to avoid the consequences of a bar date.

*The Ad Hoc Committee is Bound by Res Judicata and Collateral Estoppel*

26.     Beyond the fatal deficiencies discussed above, the Fried Claim should be disallowed and expunged because the Ad Hoc Committee is bound by the doctrine of *res judicata*.  "Under the doctrine of *res judicata*, or claim preclusion, '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'"  *St. Pierre v. Dyer*, 208 F.3d 394, 399 (2d Cir. 2000) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)).  "Once a final judgment has been entered on the merits of a case, that judgment will bar any subsequent litigation by the same parties or those in privity with them concerning the transaction, or series of connected transactions, out of which the [first] action arose."  *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) (internal citations omitted).

27.     Here, the Fried Claim alleges that LBHI acted in consort with other defendants.  The Fried Claim alleged claims that were alleged and dismissed in the Fried I action and in the Fried II action.  The Ad Hoc Committee must show how any claim against LBHI is not bound by the determinations of those courts.

28.     "The fundamental notion of the doctrine of collateral estoppel, or issue preclusion, is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the parties or their privies."  *Constantine v. Teachers College*, 488 Fed. Appx. 92, 93 (2d Cir. 2011) (internal quotations omitted).  The Second Circuit has held that collateral estoppel applies where "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party has a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on

11

the merits." *Overview Books, LLC v. U.S.,* 438 Fed. Appx. 31, 33 (2d Cir. 2011) (citing *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F. 3d 86, 91 (2d Cir. 1997). Further, it is well settled in this Circuit that "bankruptcy proceedings may not be used to relitigate issues already resolved in a court of competent jurisdiction." *Kelleran v. Andrijevic*, 825 F.2d 692, 695 (2d Cir. 1987); *see also, Glatzer v. Enron Corp.*, 2008 WL 4449439 (S.D.N.Y.).

29.    In this case each prong of the Second Circuit's test is satisfied. The issues raised in the Fried Claim are the same issues previously raised in the District Court and state court litigations. While the Second Circuit's decision is no longer subject to appeal, the plaintiffs have continued to litigate and are pursuing an appeal in the state court system. LBHI should not be required to continue to reserve Plan Distributions on account of a claim without merit and, accordingly, if the Fried Claim is not disallowed and expunged in its entirety, it should be estimated at zero for all purposes.

30.    The Plan permits the estimation of disputed claims. Plan § 9.3 ("[T]he Plan Administrator may at any time request on behalf of any Debtor that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules . . . ."). Specifically, the Plan permits the estimation of disputed claims for both reserve and distribution purposes. *Id.* ("[T]he amount so estimated may constitute . . . a maximum limitation on such Claim, . . . [or] the amount to be reserved in respect of the Claim . . . ."); *see also id.* § 8.4 (permitting the Plan Administrator to reserve for disputed claims in the "amount determined . . . by the Bankruptcy Court . . . ."). In addition, the Court has broad authority to issue any order necessary to implement the provisions of the Plan or the Bankruptcy Code. *See* 11 U.S.C. §§ 105(a), 1142(b); FED. R. BANKR. P. 3020(d).

WEIL:\95857138\8\58399.0011

31.     "Neither the [Bankruptcy] Code nor the [Bankruptcy] Rules prescribe any method for estimating a claim, and it is therefore committed to the reasonable discretion of the court, which should employ whatever method is best suited to the circumstances of the case." *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996) (internal citations omitted); *accord Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982). Estimation of a claim requires only "sufficient evidence on which to base a reasonable estimate of the claim." *Bittner*, 691 F.2d at 135.

32.     The Fried Claim is a "Disputed Claim" as such term is used or defined in the Plan. *See* Plan §§ 1.46, 8.3, 84. Accordingly, pursuant to the Plan and consistent with the procedures of section 502(c) of the Bankruptcy Code, the Court may estimate such claims for reserve and distribution purposes.

33.     Based on the foregoing, estimation of the Fried Claim would clearly prevent "undue delay" in the administration of LBHI's case and be consistent with estimation under section 502(c) of the Bankruptcy Code. *See* 11 U.S.C. § 502(c) (requiring estimation of "any contingent or unliquidated claim, the fixing or liquidation of which . . . would unduly delay the administration of the case."); *Enron*, 2006 WL 544463, at *23 ("[B]ecause a deferral of a distribution affects the efficient administration of a case, the possibility of such deferral provides a justification for estimation of a claim."); *In re Lionel LLC*, 2007 Bankr. Lexis 2652 (Bankr. S.D.N.Y. Aug. 3, 2007) ("[A] main goal of the Bankruptcy Code is to equitably distribute the debtor's assets among its creditors. Lengthy bankruptcy proceedings cause delayed distributions, which in turn, greatly devalue the claims of all creditors as they cannot use the assets until they receive them."); *O'Neill v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 981 F.2d 1450 (5th Cir. 1993) (stating that section 502(c) of the Bankruptcy Code serves

two purposes, one of which is "to promote a fair distribution to creditors through a realistic assessment of uncertain claims.").   The Ad Hoc Committee, Fried I plaintiffs and Fried II plaintiffs have unsuccessfully pursued their spurious claims for close to a decade.   The Fried I and Fried II suits have been dismissed by three separate courts, and the time has come to allow the Plan Administrator to move forward and release the reserves that it is continuing to hold on account of the Fried Claim.

## **Reservation of Rights**

34.     LBHI denies all liability for the Fried Claim and disputes the allegations made therein.   The Plan Administrator reserves all rights to object to, estimate, or subordinate the Fried Claim on any and all bases.

## **Notice**

35.     No trustee has been appointed in the Chapter 11 Cases.   The Plan Administrator, in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [ECF No. 9635], as served notice of this Objection on (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; (v) the Ad Hoc Committee and counsel to the Ad Hoc Committee; and (vi) all parties who have requested notice in the Chapter 11 Cases.   The Plan Administrator submits that no other or further notice need be provided.

14

36.     No previous request for the relief sought herein has been made by LBHI

or the Plan Administrator to this or any other court.

WHEREFORE the Plan Administrator respectfully requests that the Court grant

the relief requested herein and such other and further relief as it deems just and proper.

Dated:    October 18, 2016
          New York, New York

                                      /s/ Garrett A. Fail
                                      Garrett A. Fail
                                      WEIL, GOTSHAL & MANGES LLP
                                      767 Fifth Avenue
                                      New York, New York 10153
                                      Telephone: (212) 310-8000
                                      Facsimile: (212) 310-8007

                                      Attorneys for Lehman Brothers Holdings Inc.
                                      and Certain of Its Affiliates

WEIL:\95857138\8\58399.0011

**Exhibit A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

In re                                          :      **Chapter 11 Case No.**
                                               :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :      **08-13555 (SCC)**
                                               :
                      **Debtors.**             :      **(Jointly Administered)**
                                               :

---------------------------------------------------------------- x

## ORDER GRANTING PLAN ADMINISTRATOR'S
## OBJECTION TO PROOF OF CLAIM NUMBER 28520

Upon the objection (the "Objection"),[1] dated October 18, 2016 to proof of claim

number 28520 (the "Fried Claim") filed by Lehman Brothers Holdings Inc. ("LBHI"), as Plan

Administrator and Its Affiliated Debtors (the "Plan"), seeking to disallow and expunge the Fried

Claim pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code"),

all as more fully described in the Objection; and the Court having jurisdiction to consider the

Objection and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the

Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and

consideration of the Objection and the relief requested therein being a core proceeding pursuant

to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Objection having been provided to (i) the United

States Trustee for Region 2; (ii) the Securities and Exchange Commission; (iii) the Internal

Review Service; (iv) the United States Attorney for the Southern District of New York; (v) the

Ad Hoc Committee of LBREP III Limited Partners; and (vi) all other parties entitled to notice in

accordance with the procedures set forth in the second amended order entered on June 17, 2010

governing case management and administrative procedures for these cases [ECF No. 9635]; and

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

it appearing that no other or further notice need be provided; and a hearing having been held to

consider the relief requested in the Objection; and the Court having found and determined that

the relief sought in the Objection is in the best interests of the Chapter 11 Estates, their creditors,

and all parties in interest and that the legal and factual bases set forth in the Objection establish

just cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is

ORDERED that the relief requested in the Objection is granted; and it is further

ORDERED that pursuant to section 502(b) of the Bankruptcy Code, claim

number 28520 is disallowed and expunged in its entirety with prejudice; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: New York, New York
_____, 2016

_____
Honorable Shelley C. Chapman
United States Bankruptcy Judge

WEIL:\95857138\8\58399.0011

**Exhibit B**

Fried v. Lehman Brothers Real Estate Associates III, L.P., Not Reported in F.Supp.2d...
2011 WL 1345097

2011 WL 1345097
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Barbara J. FRIED et. al., Plaintiffs,
v.
LEHMAN BROTHERS REAL ESTATE
ASSOCIATES III, L.P. et. al., Defendants.

No. 09 Civ. 9100(BSJ).
|
March 29, 2011.

*Memorandum & Order*

BARBARA S. JONES, District Judge.

**\*1** Plaintiffs Barbara J. Fried et. al. ("Plaintiffs") filed the above-captioned action on October 30, 2009 against Defendants Lehman Brothers Real Estate Associates III, L.P. et. al. ("Defendants"). Plaintiffs name five Lehman entities as defendants: Lehman Brothers Real Estate Associates III L.P.; Lehman Brothers Private Equity Advisers LLC, Real Estate Private Equity, Inc.; LegacyCo Advisor; and ManageCo. Plaintiffs also name ten individual defendants: Mark A. Walsh, Brett Bossung, Mark H. Newman, Michael J. Odrich, Christopher M. O'Meara, Richard S. Fuld, Jr., Joseph M. Gregory, Erin Callan, Ian Lowitt, and Thomas Russo.

On July 14, 2010, Plaintiffs filed their Second Amended Complaint alleging eleven causes of action against Defendants, including: securities fraud under section 10(b) of the 1934 Securities Exchange Act; rescission under the 1934 Securities Exchange Act; violation of Section 20 of the 1934 Securities Exchange by the ten individual defendants; breaches of fiduciary duty under New York and Delaware law; violation of the Delaware Securities Anti–Fraud Statute; fraudulent misrepresentation under New York law; concealment under New York law; willful breach of the covenant of good faith and fair dealing; aiding and abetting fraud violations against all the individual defendants; fraud and breach of contract under New York law against individual defendants Walsh, Bossung, Newman, as well as the General Partner, Investment Advisor, REPE

LegacyCo Advisor, and ManageCo; and declaratory relief concerning management fees against General Partner, Investment Manager, REPE, Walsh, Bossung, Newman, LegacyCo Advisor, and Manage Co.

Defendants now move to dismiss all claims on the grounds that Plaintiffs have failed to state a claim upon which relief may be granted. *See* Fed.R.Civ.P. 12(b)(6). For the reasons stated below, Defendants' Motion to Dismiss is GRANTED.

*BACKGROUND* [1]

**Overview of the Formation of the LBREP III Partnerships**

The 67 Plaintiffs in this action are each limited partners in one of four Delaware partnerships, Lehman Brothers Real Estate Partners III, L.P., Lehman brothers Real Estate Fund III, L.P., Lehman Brothers Offshore Real Estate Fund III, and Lehman Brothers Real Estate Capital Partners III. These four partnerships (referred to collectively as the "LBREP III Partnerships" or the "Partnerships") were formed on June 25, 2007. (Comp.¶ 42.) Defendant Lehman Brothers Real Estate Associates III ("LBREA III") is the General Partner of each of the Partnerships. (Compl.¶ 15.) The Complaint also names ten Lehman executives as individual defendants.

The Partnerships were formed for the purpose of creating an investment vehicle for commercial real estate assets. (Compl.¶ 43.) Using a "disciplined investment process" and benefiting from their access to Lehman's "deal flow," the LBREP III Partnerships sought to invest in "meaningful pockets of opportunity ... in local real estate markets." (Second Polkes Decl. Ex. 1 at 1–8.) LBREP III was the third such partnership created by Lehman Brothers. LBREP I and LBREP II, founded in 2000 and 2004 respectively, had a "proven record of success" seeking out "strategic investments in real estate markets in the U.S., Europe, and Asia." (*Id.*)

**\*2** Lehman began considering investment opportunities for LBREP III even before the Partnerships were officially formed on June 25, 2007. (Compl.¶ 42, 44.) Commercial real estate properties were examined and purchased by Lehman for LBREP III throughout 2007, "many [for prices] near the top of the market not long

before the commercial real estate market began a steep decline." (Compl.¶ 44.)

As part of the marketing of LBREP III, in October 2007 the Partnerships issued a Private Placement Memoranda ("PPM") to provide information for prospective investors. The PPM outlined the Partnerships' intended investment strategy, the process for selecting investments, and Partnership management structure. (Compl. ¶ 46; Second Polkes Decl. Ex. 1.)

In November 2007, the Partnerships issued the first supplement to the PPM ("Supplement One"). This document listed 29 possible partnership investments (all commercial real estate properties) under consideration or already purchased by Lehman, as described above. Basic details were provided for each property, including the expected total investment, amount invested by Lehman to date, details regarding the nature of the property, whether other entities would serve as partners in the venture, and other relevant information. (Parker Decl., Ex. Q.) These properties will be referred to as the "warehoused properties."

Supplement One specifically disclosed that any listed property eventually transferred to the Partnerships from Lehman would be for the "acquisition cost plus Lehman Brothers' cost of carry, not to exceed 9% per annum." (Compl.¶ 5.) The document also disclosed additional information regarding "Risk Factors and Potential Conflicts of Interest." The new section explained that recent events in the sub-prime mortgage market and other areas of the economy caused "significant dislocations, illiquidity, and volatility" in global markets. The document mentioned that this market change could cause a weakening of economies in the United States and abroad, and could have negative effects on LBREP Ill's investment strategy, including the loss of "invested capital and anticipated profits." (Parker Decl., Ex. Q.) Thus, information regarding the "warehoused properties" targeted for transfer to LBREP III, as well information regarding changes in market conditions, was available to investors prior to making any investment decision.

Most of the Plaintiffs signed Subscription Agreements in October and November 2007, collectively committing to invest more than $53 million into the Partnerships.[2] (Compl.¶ 45.) These Plaintiffs were officially admitted as limited partners on November 30, 2007. (Compl.¶

7.) Some Plaintiffs signed Subscription Agreements in January and February 2008 and were admitted as limited partners shortly thereafter. (Compl.¶ 7.) The capital commitments of the Plaintiffs were "expressly made irrevocable by the Subscription Agreements." (Compl.¶ 7.)

**\*3** By May 8, 2008, all Plaintiffs had signed Subscription Agreements, been admitted as Limited Partners, and paid the "capital calls" (cash contributions) to LBREP III. (Compl. ¶ 63 .) On that date, the General Partner issued the fifth PPM Supplement ("Supplement Five"), informing the limited partners that it planned to transfer 26 of the warehoused real estate investments to the Partnerships, "almost all [of which] had been previously listed in supplements [to the PPM] ... as mere possibilities." (Compl.¶ 63.) The transactions were approved pursuant to Section 6.13 of the Limited Partnership Agreement, which specified that "consent [for a transaction] would be deemed to have been given if the transaction were disclosed before the investor is admitted as a limited partner." (Compl.¶ 78.)

"From mid–2007 through 2008," the commercial real estate market and global economy declined substantially. (Compl.¶ 2.) As has been well documented by the media, this decline, as well as other factors, caused Lehman Brothers Holdings Inc. to announce major losses in June 2008 and ultimately declare bankruptcy on September 15, 2008. (Compl.¶ 2.)

On December 5, 2008, the LBREP III Partnerships issued unaudited financial statements for the Third Quarter of 2008. These statements reflected a markdown of approximately 27% of the value of the LBREP III holdings. Further losses were reported in the 2008 Annual Report and the First Quarter 2009 report. (Pl. Br. at 15.)

### Plaintiffs' Allegations [3]

The core of Plaintiff's case is the allegation that Lehman omitted material information regarding the LBREP III Partnerships from the PPM, supplements to the PPM, and the LPA. They allege that Defendants knew and failed to disclose that upon transfer of the warehoused properties, the limited partners would immediately sustain major losses to the value of their holdings because the

properties had lost significant value since their acquisition by Lehman. (Pl. Br. at 2.)

According to Plaintiffs, Defendants engaged in these material omissions and misrepresentations to "conceal [Lehman's] virtual insolvency long before its bankruptcy on September 15, 2008." (Compl.¶ 2.) Plaintiffs theorize that this virtual insolvency stemmed from Lehman's decision in mid to late 2007 to "double down" and increase its exposure in commercial real estate, and then to change course in November 2007 and decide to dramatically reduce its risk exposure in commercial real estate. (Compl.¶ 6.) Lehman began marking down its own commercial real estate holdings as early as November 2007, while leaving the LBREP III properties without any adjustment to their valuation until after the transfer had been completed. (Pl.'s Br. at 4.) On May 31, 2008, Lehman's quarterly report filed with the SEC disclosed that it had sustained a quarterly loss of $2.8 billion, including $600 million in real estate markdowns since November 2007. (Pl. Br. at 13–14.) No adjustments were made to the valuation of the LBREP III properties until September 2008. (Compl.¶ 66.)

**\*4** Plaintiffs' Second Amended Complaint contains four main allegations to sustain their claims for securities fraud. First, the Second Amended Complaint identifies 39 statements in the PPMs regarding the investment process, strategy, and approval process for prospective investments that were allegedly misleading. According to Plaintiffs, these statements failed "to state that the Lehman properties to be transferred to LBREP III had already been purchased, at substantially higher prices ... result[ing] in substantial losses" for the limited partners. (Pl. Br. at 8.) In this regard, Plaintiffs contend that Lehman's decision to "mark to market" its own commercial real estate holdings during the same time period demonstrates that Defendants knew or should have known that write-downs to the warehoused properties were also warranted. (Pl. Br. at 13.)

Second, Plaintiffs allege that Defendants knew they would not form an Investor Advisory Committee to represent the interests of the limited partners, as promised in the PPM and LPA. (Compl.¶ 50.)

Third, Defendants allegedly knew and failed to disclose that the acquired properties carried substantial debt,

obligating the Partnerships to take on $1.131 billion of the debt, due by 2013. (Compl.¶ 53(h).)

Fourth, Plaintiffs allege that Defendants knew and failed to disclose $157 million in additional acquisition costs incurred by Lehman while acquiring the properties and passed these costs on to the Partnerships. (Compl.¶ 53(e).)

Essentially, Plaintiffs allege that taken together, Defendants' omissions and misrepresentations were designed to "conceal the risk that Defendants would use the Partnerships as a vehicle to dispose of overvalued assets to minimize overall losses to Lehman, [and] failed to state the risk that Defendants would indeed place Lehman's interests above those of the Partnerships." (Compl.¶ 54.)

### Allegations against Individual Defendants

Plaintiffs' suit names ten individual Defendants. Five of these Defendants (Michael Odrich, Mark Walsh, Brett Bossung, Mark Newman, and Christopher O'Meara) were members of the Lehman Investment Committee that reviewed and approved Lehman investments. Plaintiffs allege that these five individuals "knew or had access to the omitted facts that were later published in 2008 and 2009 financials" and knew or had access to facts demonstrating that Lehman's public statements were not accurate. (Pl. Br. at 17.)

Plaintiffs also name Richard Fuld, Lehman's Chief Executive Officer, alleging that he knew of the need to write down the LBREP III properties or warn prospective investors of the losses they were likely to incur. (Pl. Br. at 18.)

Additionally, Defendant Joseph Gregory, Lehman's President and Chief Operating Officer, allegedly "knew the 2007–08 real estate market was deflating" and therefore knew that LBREP III investors "ran a real risk of suffering a substantial loss" upon transfer of the properties. (Pl. Br. at 19.)

**\*5** Further, Plaintiffs name Lehman's three Chief Financial Officers during the time period in question, Christopher O'Meara (already mentioned as a member of the Lehman Investment Committee), Erin Callan, and Ian Lowitt. O'Meara, CFO until December 1, 2007, received

underwriting documents for the LBREP III properties and possessed "certain knowledge of the growing risks in real estate markets ... making him 'reckless' to fail to recognize that the PPMs omitted material information of coming losses." (Pl. Br. at 19 .) Erin Callan, CFO from December 1, 2007 to June 12, 2008, reportedly knew that Lehman "began to curtail its risk profile in commercial real estate in November 2007." Callan "had access to information suggesting that the PPMs were misleading without the omitted information." Finally, Lowitt, who became CFO on June 12, 2008, oversaw the LBREP III financial statements for the second quarter of 2008, which allegedly omitted material information regarding losses to the Partnerships. Plaintiffs asserts that this is "in itself circumstantial evidence of guilty knowledge." Like his predecessors, Lowitt also had access to financial information regarding the eventual losses to the Partnerships. (Pl. Br. at 19–20.)

Finally, Plaintiffs allege that Thomas Russo, Lehman's Chief Legal Officer, "had chief legal responsibility to assure that securities prospectuses be published without misstatements or omissions ... including the obligation to disclose all material facts to investors." (Pl. Br. at 20–21.)

### LEGAL STANDARD

Rule 12(b) (6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief may be granted. A plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1940 (2009).

Additionally, Plaintiffs must satisfy the heightened pleading standard under both rule 9(b) of the Federal Rules of Civil Procedure and under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Under rule 9(b), the complaint must state the circumstances constituting fraud "with particularity." Fed.R.Civ.P. 9(b). Under the PSLRA, a securities fraud complaint must: (1) specify the misleading statements, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87,

99 (2d Cir.2007). Additionally, the PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

### LEGAL ANALYSIS

#### 1. 10(b) and Rule 10b–5 Claims against all Defendants

#### Legal Standard

**\*6** To state a claim under Section 10(b) of the 1934 Securities and Exchange Act and under Rule 10b–5, Plaintiffs must allege that Defendants: (1) made a material misstatement or omission; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) which Plaintiffs reasonably relied upon; and (5) that this reliance was the proximate cause of Plaintiff's economic loss. *Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 153 (2d Cir.2007).

#### Analysis

##### a. Relevant Date for 10(b) Analysis
As a preliminary matter, the parties dispute the relevant date of the investor's commitment for the purpose of analyzing Plaintiffs' securities fraud claims. The relevant time period for analyzing liability for securities fraud is the time of the sale of the security. Securities are considered sold when the parties "are obligated to execute the transaction." *Westinghouse Electric Corp. v. '21' International Holdings, Inc.,* 821 F.Supp. 212, 215 (S.D.N.Y.1993) (citing *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 891 (2d Cir.1972)). This is significant because the Second Circuit has stated that "for the purposes of § 10(b) and rule 10b–5, the 'materiality of the information misstated or withheld is determined in light of what the defendants knew at the time the plaintiff committed himself [to the transaction]." *Castellano v. Young and Rubicam, Inc.,* 257 F.3d 171, 181 (2d Cir.2001).

Plaintiffs argued at oral argument that Defendants' duty to disclose did not cease with the November 30, 2007 closing, but continued until the last supplement to the PPM was issued on May 10, 2008. (Oral Argument Tr., 20–21.) Defendants counter that most plaintiffs were irrevocably committed when they signed the Subscription

Agreement and were admitted as limited partners on November 30, 2007. Therefore, Defendants argue that the relevant date for the analysis under § 10(b) is November 30, 2007.

In this case, Plaintiffs were irrevocably committed to investment in LBREP III Partnerships upon their signing of the Subscription Agreement. The Complaint states that in November 2007:

> [M]ost of the Plaintiffs received the PPMs and signed Subscription Agreements, thereby committing to invest their full Capital Commitment in the Partnerships. On November 30, 2007, they were admitted as limited partners. Some of the Plaintiffs signed Subscription Agreements in January and February of 2008 and were admitted shortly thereafter.... Plaintiffs' Capital Commitments were expressly made *irrevocable* by the Subscription Agreements, so investors were indeed wholly dependent on Defendants to abide by the PPM's promise to seek "risk-adjusted returns."

(Compl. ¶¶ 6–7, emphasis in original.) Accordingly, the analysis under § 10(b) and rule 10b–5 focuses on what Defendants knew as of the date of signing of the Subscription Agreements. For most plaintiffs, the relevant date is November 30, 2007. Plaintiffs fail to specify how many Plaintiffs committed after that date. For the purposes of this motion, the Court will assume based on the allegations in the Complaint quoted above that all Plaintiffs had signed Subscription Agreements and been admitted as limited partners on or before March 1, 2008.

**b. Knowing or Reckless Misrepresentations and Omissions Regarding the Value of the Warehoused Properties**

**\*7** As described above, Plaintiffs allege that Defendants made 39 misleading statements in the PPM and LPA, see Pl. Br. at 2 n.1, describing the investment process, oversight, and management of the LBREP III Partnerships while omitting that the investors would suffer substantial losses upon transfer of the properties bought by Lehman. (Pl. Br. at 6.) They further allege that

Defendants made such omissions with a reckless state of mind, fulfilling the scienter requirement for a 10(b) and 10b–5 claim.

To satisfy the scienter requirement, Plaintiffs must allege facts that "constituted strong circumstantial evidence of conscious misbehavior or recklessness on the part of defendants." *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000). In this context, recklessness is defined as "conduct which is highly unreasonable and reflects an extreme departure from the ordinary standard of care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.,* internal citations and quotations omitted.

Specifically, Plaintiffs allege the following facts to support their assertion that Defendants were reckless in issuing the PPMs and LPA. First, Plaintiffs assert that Lehman greatly expanded its real estate holdings in 2007, "from $9.4 billion as of November 2006 to over $21.9 billion at November 2007." (Pl. Br. at 12.) Then, beginning in November 2007, Lehman began to reduce its risk exposure in commercial real estate and take write downs on its commercial real estate holdings. In support of this statement, Plaintiffs cite the report of the Bankruptcy Court Examiner. The Report detailed that in a November 2007 presentation to Lehman CEO Richard Fuld, the commercial real estate group recommended reducing its balance sheet by $15 billion. During the "December 2007 Holiday Season," Fuld decided to "pursue an aggressive reduction of Lehman's risk profile." (Parker Decl., Ex K, Report of Anton R. Valukas, Examiner In re Lehman Brothers Holdings Inc., at 158.) However, Lehman did not actually begin pursuing reductions until March 2008. (Parker Decl., Ex. K at 158–59.) Overall, Lehman ultimately took more than $3 billion in write-downs in commercial real estate over the course of 2008, with $488,000,000 of those write-downs in occurring in the first and second quarters of 2008. (Parker Decl., Ex. K at 228.)

Plaintiffs argue that these facts show that Lehman knew or should have known when they issued the first PPM, the five PPM supplements, and the LPA that the LBREP III-designated properties had lost significant value prior to the May 28, 2008 transfer. As Lehman was considering taking significant write-downs on its own commercial real estate holdings, it was reckless in failing to disclose the risk

that substantial write-downs might also be warranted for the LBREP III properties.

Defendants counter that Plaintiffs have not identified any fact or document demonstrating that Defendants knew or had reason to know that the LBREP III properties would sustain losses. Nor, according to Defendants, can Plaintiffs show that any losses had actually been sustained by the properties as of the first closing date, November 30, 2007. Rather, Defendants argue that the documents and statements relied on by Plaintiffs demonstrate that at some point in 2008 Lehman determined that write-downs to its own commercial real estate portfolio were appropriate. However, Defendants argue that these documents do not demonstrate that they knew or should have foreseen the losses to the warehoused LBREP III properties as of November 30, 2007. Defendants also maintain that they disclosed all material information to investors in the LPA, PPM, and PPM Supplements.

**\*8** The Court finds that, even using March 1, 2008 as the relevant date for the 10(b) analysis, Plaintiffs have failed to allege facts with sufficient particularity to support the allegation that Defendants knew or should have known by this date that the transfer of the LBREP III properties would cause the LBREP III Partnerships to sustain a major loss.

First, Plaintiffs fail to plead facts supporting an inference of scienter with the specificity required under the PSLRA. Plaintiffs rely heavily on the fact that Lehman marked-to-market a portion of its commercial real estate holdings in the First and Second Quarters of 2008. However, they cannot allege specific facts to support their allegation that these markdowns demonstrate scienter as to the LBREP III properties. General knowledge about market conditions or trends "does not equate to harboring a mental state to deceive, manipulate, or defraud." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce,* 694 F.Supp.2d 287, 300 (S.D.N.Y.2010) (citing *In re PXRE Group, Ltd., Sec. Litig.,* 600 F.Supp.2d 510, 540 (S.D.N.Y.2009)). Although Plaintiffs allege that Lehman had special expertise that gave them superior knowledge about the future of the commercial real estate market (*see* Compl. ¶¶ 46, 53(a)-(t), 65), they have failed to plead facts with particularity to support this assertion. Plaintiffs have alleged no facts indicating that Defendants knew or should have known of any losses to the LBREP III properties as of March

2008. Mere observations about trends in the commercial real estate market generally, such as those highlighted in the Maltzman declaration, do not support Plaintiffs' allegation that Defendants should have known that the LBREP III warehoused properties had decreased in value as of March 1, 2008. [4]

Further, Defendants made substantial disclosures to prospective investors regarding the targeted properties. As described above, Supplement One to the PPM, issued before any Plaintiff committed to invest in LBREP III, gave substantial details regarding every property under consideration at that time. For each investment opportunity, the document described the expected total investment, money invested to date, and plans for future development, as well as important details regarding the property's intended use, location, and business plan. Additionally, that document also described changes happening in the market during the fall of 2007 that could affect LBREP III investments. (*See,* supra, pp. 4–5.) Thus, Plaintiffs had information regarding most of the LBREP properties prior to investing and could have engaged in their own investigation to determine whether the properties were likely to gain or lose value relative to the Lehman purchase price. Plaintiffs also had information about market risks specific to the fall of 2007, the time period when Plaintiffs were deciding whether to invest in LBREP III. Where the allegedly omitted facts are disclosed to the market, there can be no omission for the purposes of a securities fraud claim. *In re Progress Energy, Inc.,* 371 F.Supp.2d 548, 552 (S .D.N.Y.2005). A prospective investor in early 2008 would have had access to substantial information regarding the warehoused properties and the state of the market generally, undermining Plaintiffs' claims that they were misled regarding the true values of the properties.

**\*9** Lastly, Plaintiffs attempt to demonstrate scienter by showing that Defendants intentionally concealed and misstated the fair market values of the warehoused properties during the spring of 2008. Plaintiffs contend that these manipulations prove that Defendants knew they were concealing material information regarding the decreasing values of the warehoused properties. Plaintiffs point first to Defendants' failure to issue financial statements for the second quarter of 2008 as evidence of scienter. However, this allegation cannot support a claim of securities fraud because this occurred after the March 1, 2008 commitment date relevant to this analysis.

Plaintiffs then point to internal Lehman documents prepared in 2008 that show that the value of LBREP Ill's portfolio increased 2.4 percent as of June 30, 2008. (Pl. Br. at 14.) While Plaintiffs do not entirely explain how this document bolsters their claims, they seem to allege that these gains were knowingly inflated by Defendants through a manipulation of the discount rate used to estimate the current value of a property. However, Plaintiffs calculations do not demonstrate that the discount rates were actually adjusted to increase the values of the properties, let alone that Defendants did so knowingly for the purpose of hiding LBREP III losses. [5] In fact, Plaintiffs' reference to this internal (and at the time confidential) Lehman document actually undermines their claim, as it provides evidence that Lehman believed the properties had gained value through the second quarter of 2008. As Plaintiff cannot plausibly allege facts that contradict these valuations, Plaintiffs' attempt to establish scienter by this means fails.

Consequently, Plaintiffs have not met the pleading standards of the PSLRA, as they have not alleged facts with particularity to demonstrate that Defendants knew or should have known that the LBREP III properties had sustained losses as of March 1, 2008.

### c. Failure to Establish the Investment Advisory Committee

Plaintiffs also argue that Defendants failed to create an Investment Advisory Committee as promised in the PPM and LPA. This group was supposed to "advise the General Partner with respect to potential conflicts of interest" and to consult with the General Partner regarding "valuations for the purposes of determining write-downs of investments, if any." (Compl.¶ 81.) The materials provided to investors did not specify a date by which the IAC would be formed. (Second Polkes Decl. Ex. 1 at 27; Ex. 3 at 53–55.)

Plaintiffs contend that because Defendants never intended to create an IAC, this failure constitutes a misrepresentation under § 10(b) and rule 10b–5. In support of this claim, Plaintiffs rely on the fact that no IAC had been created as of the dates of transfers of the warehoused properties to the LBREP III Partnerships and also mention unspecified facts acquired by "access to confidential information." (Compl.¶¶ 81–82.)

**\*10**  This claim lacks the factual allegations required to withstand a motion to dismiss. As the Plaintiffs did not identify or describe the facts obtained by their "access to confidential information," the only factual allegation underlying this assertion is that no IAC was formed. Allegations based merely on "fraud by hindsight" are insufficient as a matter of law under § 10(b) and rule 10b–5. *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978). The mere fact that no IAC was ever formed cannot sustain a claim that this failure constituted a knowing misrepresentation to induce Plaintiffs to invest. Plaintiffs cannot point to any actual facts underlying their belief that Defendants knew or should have known upon issuing the LPA that it would not form the IAC. [6]

Therefore, as Plaintiffs has not alleged any fact demonstrating that Defendants knowingly failed to create the IAC, this allegation does not support a claim for securities fraud under § 10(b) or Rule 10b–5.

### d. Failure to Disclose Debt/Leverage

Additionally, Plaintiffs allege that Defendants failed to disclose "$2.702 billion of short-term indebtedness associated with the properties that LBREP III had acquired" until late 2009. (Compl.¶ 73.) Of this amount, the Partnerships were responsible for $1.242 billion, payable by 2013. (Compl.¶ 53(e).) Defendants counter that the use of leverage (or debt) was disclosed in the PPMs issued prior to the first closing on November 30, 2007.

The Court agrees with Defendants that the use of debt at all stages in the investment process was repeatedly disclosed to prospective investors. A review of the PPMs and LPA demonstrate that Defendants described in detail the role leverage would play in the LBREP III investment strategy. The October 2007 PPM stated that the Partnerships "will employ leverage in the acquisition, operation, and ownership of its investments ... Debt may take the form of mortgage, corporate or seller financing." (Second Polkes Decl., Ex. 1 at 19.) The August 2007 PPM even disclosed that "the General Partner expects the Fund leverage to be up to 65% of the market value of its investments." (Second Polkes Decl., Ex. 2 at 19; *see also* Ex. 3 at 41.) The LPA, issued prior to the first admission of limited partners in November 2007, described the use of leverage in more detail, including the Partnerships' ability to use leverage to finance transactions, the 65 percent leverage threshold,

and the circumstances under which the leverage threshold could be exceeded. (Second Polkes Decl., Ex. 3 at 41.) Where, as here, the allegedly omitted statements were actually disclosed, the § 10(b) claim fails. *Debora v. WPP Group PLC,* 1994 WL 177291 at *5 (S.D.N.Y., 19 94); *see also* In re Progress Energy, Inc., 371 F.Supp.2d 548, 552 (S.D.N.Y.2005).

#### e. Failure to Disclose Additional Acquisition Costs

Plaintiffs also allege that Defendants omitted material information in failing to disclose additional costs of acquisition passed on to LBREP III investors, above the "acquisition cost" paid by Lehman and charged to the Partnerships upon transfer of the warehoused properties. While the complaint alleges one type of additional acquisition cost, the opposition brief advances an entirely different theory.

### $157 Million in Undisclosed Costs

 *11  In the Second Amended Complaint, Plaintiffs contend that Defendant Lehman Brothers Holdings and its investment committee agreed to $157 million in additional, undisclosed costs related to the investment properties. These costs exceeded the "acquisition cost," or amount paid by Lehman to acquire the property.

Plaintiffs allege that these undisclosed costs were paid by Lehman and then passed on to the Partnerships. Such facts were material because with these additional costs, "the total investment exceeded even that 9% carrying cost by more than $110 million," resulting in a higher payment to Lehman than agreed upon in the LPA. (Compl.¶ 84.) Plaintiffs offer specific allegations in the Second Amended Complaint of each overpayment, noting the difference between the "acquisition price" and the price of transfer to LBREP III on a specified transfer date. (Compl.¶¶ 86–87.) The chart in paragraph 87 of the Second Amended Complaint purports to document these additional costs, alleging $157.1 million total "excess over disclose price." (Compl.¶ 87.)

Defendants point out that the figures used by Plaintiffs to argue that Plaintiffs incurred the $157 million "overcharge" are misleading. Defendants assert that Plaintiffs essentially "conflate[d] the acquisition cost of the properties paid to Lehman [by the Partnerships] with

the incremental investments that were used to finance the ongoing development and maintenance of the properties" after the transfer to the Partnerships. (Def. Reply Br. at 12.)

The Court agrees. Plaintiffs calculated this $157 million discrepancy using incorrect data regarding the costs paid by LBREP III for the warehoused properties. Rather than use the "Investments at Cost" data provided in the LBREP III September 30, 2008 statements, Plaintiffs used the Transaction Summaries also published on that date. These summaries do not document the acquisition costs of the properties, but the total LBREP III commitment, including acquisition cost and unfunded commitments.

Plaintiffs as much as acknowledge this error, as they fail to argue the overpayment theory in their opposition papers. Instead, they argue that "the SAC does not contend that the approximately $157 million was anything other than a *commitment* that Lehman made prior to acquisition." (Pl. Br. at 26, emphasis in original.) Plaintiffs thus drop the theory of undisclosed costs pled in the Second Amended Complaint and adopt the theory that Defendants knowingly failed to disclose "unfunded commitments" to make future investments in the warehoused properties.

### $156 Million in Unfunded Commitments

Thus, Plaintiffs allege in their opposition brief that Defendants actually agreed to $156 million of "unfunded commitments" to invest further in some of the warehoused properties. "Unfunded commitments" are "forward commitments made to finance the ongoing development and maintenance of the properties." (Def. Reply Br. at 13.) For instance, in addition to the $40 million acquisition cost paid for a property at West 44th St, the Partnerships were also obligated to make additional investments, or as yet "unfunded commitments," to develop the vacant lot into a hotel, as described in Supplement One to the PPM. (Def. Reply Br. at 13.)

 *12  Plaintiffs argue that it was these binding commitments that were not disclosed to investors in Supplement One. Plaintiffs also explain that upon transfer of the properties in May 2008, the Partnerships assumed these future payment obligations. Plaintiffs contend that Defendants knew of these additional commitments and

Fried v. Lehman Brothers Real Estate Associates III, L.P., Not Reported in F.Supp.2d...

2011 WL 1345097

failed to disclose them to investors until almost a year after the date of the first closing. (Pl. Br. at 15.)

Defendants contend first that this theory should be dismissed as it was not plead in the Second Amended Complaint, but was raised for the first time in Plaintiffs' opposition brief. Secondly, they argue that the PPMs and LPA repeatedly disclosed that additional investments in LBREP III properties could and would be made after the initial acquisition costs were paid.

Defendants are correct that the Plaintiffs may not amend their complaint in their legal briefs. The Court will nonetheless analyze these factual allegations to consider whether granting Plaintiff leave to amend would be futile.

The Court finds that Plaintiffs have not alleged facts to support the claim that Defendants made material omissions regarding these unfunded commitments, and thus any amendment of the pleadings would be futile. Prospective investors were advised that the General Partner had considerable discretion regarding investment decisions. For instance, in Section 2.4 of the LPA, under the "Purpose and Powers" section, the General Partner is empowered to:

> subsequent to the Partnerships' initial investment in any Portfolio Investment, make additional investments in such Portfolio Investments (including additional investments made to finance acquisitions by any Portfolio Company or any capital improvements, tenant improvements, or other improvements or alterations to any property constituting a Portfolio Investment or otherwise to protect the Partnership's investment in any Portfolio Investment or to provide working capital for any Portfolio Investment.

(Second Polkes Decl., Ex. 3 at 17.) Moreover, the detailed descriptions of prospective investment properties listed in Supplement One frequently discussed in detail ongoing and future plans for development and construction, often in partnership with other commercial real estate companies. These plans should have further alerted

a prospective investor of the likelihood of additional investments in the warehoused properties. (See Reply Br. at 13 n. 11.) The unfunded commitments were obligations by LBREP III to make ongoing investments in the properties, as specifically disclosed and authorized in the LPA. As such, these investment decisions were well within the discretion of the General Partner to approve and do not constitute a knowing, material omission under Section 10(b) or Rule 10b–5. [7]

In addition, Plaintiffs' charts again make repeated, careless mistakes in characterizing the allegedly omitted unfunded commitments, often overstating the allegedly undisclosed amount. While in some instances LBREP III did agree to make further investments in properties above the price disclosed in Supplement One, in other cases Defendants merely paid their originally disclosed commitment over time. [8] These errors further support the finding that Plaintiffs have not alleged facts to support their claims that Defendants made material omissions regarding undisclosed costs or commitments for future payments incurred by Lehman and passed on to the Partnerships.

**\*13** In sum, the Court finds that Plaintiffs have failed to sufficiently plead any claim for securities fraud under section 10(b) of the 1934 Act and Rule 10b–5. As there is no adequately pled underlying violation of the Act, Plaintiffs claim for rescission under Section 29(b) also fails.

### 2. Section 20 Claims against Individual Defendants

Count three of the SAC alleges that the ten individual defendants are separately liable as control persons under Section 20(a) of the 1934 Securities Exchange Act. One of the requirements to establish a violation of § 20(a) is a primary violation of the Act. *ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.,* 553 F.3d 187, 207 (2d Cir.2009). As this Court has found that Plaintiffs have failed to state a claim under Section 10(b), Plaintiffs claims against individual defendants under Section 20(a) also fail.

### 3. State Law Claims & Supplemental Jurisdiction

As all of Plaintiffs' federal claims have been dismissed and there is no complete diversity between the parties, this Court declines to exercise supplemental jurisdiction

over the remaining state law causes of action. 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED with regard to the claims under Section 10(b), Section 29(b) and Section 20(a) of the 1934 Securities Exchange Act. The Court declines to exercise supplemental jurisdiction over the remaining state claims. The Clerk of the Court is directed to terminate the pending motion to dismiss (ECF Docket Number 57) and close both pending cases.

**SO ORDERED:**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1345097

Footnotes

1    All facts are drawn from the allegations in the Second Amended Complaint. These facts are assumed to be true only for the purposes of the instant Motion to Dismiss. The Court has also considered a number of documents that were either attached to, referenced in, or integral to Plaintiffs' allegations. This includes two documents that were central to the LBREP III Transactions: first, the Private Placement Memorandum ("PPM"), which explained the LBREP III investment strategy, management structure, and potential risks, (Second Polkes Decl., Ex. 1); and second, the Limited Partnership Agreement ("LPA") which essentially served as the contract binding the Partnerships and investors, setting out all material terms for the investors and management. (Second Polkes Decl. Ex. 3.)

2    The Subscription Agreement, signed by the investor and a representative of the Partnerships, formally bound both parties to the transaction and admitted an investor as a Limited Partner to LBREP III. (*See* Parker Decl., Ex. I.)

3    As discussed at oral argument, Plaintiffs' opposition brief presents a significantly narrowed set of issues as compared to the Second Amended Complaint. This Court has considered all of Plaintiffs' arguments, but has focused on the arguments and theories emphasized in the opposition brief.

4    The Maltzman Declaration, relied on in the Second Amended Complaint and Plaintiffs' opposition brief, attempts to provide quantitative analysis in support of their claims. It is worth mentioning that Richard Maltzman, author of the document, is also a Plaintiff in this action.

5    Plaintiffs include a chart entitled "Discount Rate Analysis" on page 14 of their opposition brief, listing the discount rates applied in the last quarter of 2007 and the first three quarters of 2008 for eight different properties. But, Plaintiffs' chart does not provide persuasive evidence that Defendants consciously manipulated the discount rate to defraud investors. During the relevant time period for this analysis (Fourth Quarter 2007 to First Quarter 2008), the discount rate increased for two of the properties, decreased for two of the properties, stayed the same for two properties. This does not support Plaintiffs' theory that Defendants knowingly decreased discount rates to show a profit rather than a loss.

6    The PPM and LPA also specifically disclose that the intended role of the IAC was limited to "advising the General Partner" on various issues. (Second Polkes Decl., Ex. 1 at 27.) The LPA further explains that the General Partner "in its sole discretion may present to the IAC for its review such matters as the General Partner determines ...." (Second Polkes Decl., Ex. 3 at 53–55.) The Investment Committee, comprised of Lehman executives, had "final approval of a proposed investment for inclusion in LBREP III ." (Second Polkes Decl., Ex. 1 at 26.)

7    The Court also rejects the Plaintiffs' attempt to conflate the two arguments in the opposition papers by relying on the similarity of the two figures, referring to the $156 million of unfunded commitments as a "near-$157 million discrepancy." They go so far as to describe the table on page 16 of their opposition brief documenting unfunded commitments as a "summary" of the table included at paragraph 87 of the complaint. These tables document entirely different calculations, and contain virtually none of the same information.

8    These properties include the Aldi Senior Housing investment, the Atemi France investment, the West 44th Street investment, and the Bangkok Serviced Apartment Portfolio.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    10

**Exhibit C**

506 Fed.Appx. 5
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Barbara J. FRIED, Mark Fried Altitude Partners, LLC, Richard D. Maltzman, as Trustee for the Richard D. & Charlene Maltzman Family Trust U/A/D 3/23/88, Jefforeed Partners, L.P., Zelfam LLC, on behalf of limited partners listed on Annex A., B. Mark Fried, Altitude Partners, LLC, Jefferee Management Company Inc., Alex Khowaylo, Barry Aronoff, Bill Newlin, Bill Schnuhl, Bukfenc LLC, Catlin Family Trust, Charco Ventures, L.P., Daniel R. Pfau, Elisabeth S. Pfau, Drew Perkins Trust U/A/D 12/21/99, Eli Barkat Holding Ltd., Erik Sculte, Frank Keener, Frank Rutan, George Evans, GSB Holding, Inc., Iracini L.P., James J. Van Stone, Susan E. Van Stone, James R. Douglas, Margaret W. Douglas, Jeff Moster, John Argue, Jeffrey Hecktman Trust, John Draghi, John Rosekranz, Karen A. Ubelhart, Louise E. Cohen, Martin Burger, Michael & Diane Branon Revocable Trust, Michael Sher, Billie Gelb, NIR Barkat Holding Ltd., Paul Dektor, Peachblow Partners, L.P., Provident Holdings, Inc., PSERD Trust, RFLP Group, LLC, Richard Landgarten, Robert T. Fraley Trust, Ross C. Hartley, Russell and Judith Fradin, Tic, Sanford H. Robbins, Shlomo Shmelzer, Atalya Shmelzer, Simon Family Investment Partnership, Stephanie Borynack, Stephen Guerino, Kathleen Guerino, Steven Holder, Tad Lowrey, The Gold/Sherman–Gold Family Trust, Thomas G. Macey, Three Horse Investments, Vahid Manian, Waite Family Trust, William C. Scott, Julien de Slaberry, Glickenhaus and Co., Real Estate Private Equity, Inc., Plaintiffs, and
Alan Gerber Lewis Marital Irr. Trust, Richard Shuster, Rickel Shuster, Plaintiffs–Appellants,
v.
LEHMAN BROTHERS REAL ESTATE ASSOCIATES III, L.P., Lehman Brothers Private Equity Advisers, LLC, Mark A. Walsh, Mark H. Newman, Brett Bossung, Michael J. Odrich,

Christopher M. O'Meara, Richard S. Fuld, Jr., Joseph M. Gregory, Erin Callan, Ian Lowitt, Thomas Russo, Does 1 through 50, Real Estate Private Equity, Inc., Silverpeak Real Estate Partners L.P., Repe CP ManageCo LLC, Defendants–Appellees.

No. 11–1774–cv.
|
Dec. 20, 2012.

Synopsis
**Background:** Limited partners in real estate investment partnerships filed action against investment partnerships, alleging fraud in violation of federal securities laws. The United States District Court for the Southern District of New York, Jones, J., 2011 WL 1345097, dismissed action. Investors appealed.

**Holding:** The Court of Appeals held that publicly-filed table showing gross and net loss with regard to values of real property in general was not sufficient to give rise to strong inference of scienter under Private Securities Litigation Reform Act (PSLRA) that property bound for partnerships had depreciated in value.

Affirmed.

**\*6** Appeal from the United States District Court for the Southern District of New York (Jones, J.).
**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court be and hereby is **AFFIRMED.**

**Attorneys and Law Firms**

Robert Ted Parker, Parker Law Firm, Orinda, CA (Arthur Russell, New York, NY, on the brief), for Plaintiffs–Appellants.

Jonathan D. Polkes, Weil, Gotshal & Manges LLP, New York, N.Y. (William A. Burck, Robert V. Spake, Jr., and Adam B. Banks, Weil, Gotshal & Manges LLP, New York, NY, for Defendants–Appellees Lehman Brothers Real Estate Associates III, L.P., Lehman Brothers Private Equity Advisers, LLC, and Real Estate Private Equity, Inc.; Richard A. Rosen, Paul, Weiss, Rifkind, Wharton

& Garrison LLP, New York, NY, for Defendants–Appellees Mark A. Walsh, Mark H. Newman, Brett Bossung, Silverpeak Real Estate Partners, L.P., and REPE CP ManageCo, LLC; Patricia M. Hynes and Todd. S. Fishman, Allen & Overy, LLP, New York, NY, for Defendant–Appellee Richard S. Fuld, Jr.; Michael J. Chepiga and Mary Elizabeth McGarry, Simpson Thacher & Bartlett LLP, New York, NY, for Defendants–Appellees Michael J. Odrich, Christopher M. O'Meara, and Thomas Russo; Martin J. Auerbach, New York, NY, for Defendant–Appellee Ian Lowitt; Robert J. Cleary, Dietrich L. Snell, Mark E. Davidson, and Seth D. Fier, Proskauer Rose LLP, New York, NY, for Defendant–Appellee Erin Callan; Israel David and Audrey Strauss, Fried Frank Harris Shriver & Jacobson LLP, New York, NY, for Defendant–Appellee Joseph M. Gregory, on the brief) for Defendants–Appellees Lehman Brothers Real Estate Associates III, L.P., Lehman Brothers Private Equity Advisers, LLC, and Real Estate Private Equity, Inc.

Present: ROBERT A. KATZMANN, B.D. PARKER, RICHARD C. WESLEY, Circuit Judges.

### SUMMARY ORDER

**1** Plaintiffs–Appellants Alan Gerber Lewis Marital Irrevocable Trust and Richard and Rickel Shuster (collectively, "plaintiffs") appeal from a March 29, 2011, memorandum and order of the United States District Court for the Southern District of New York (Jones, *J.*) dismissing their case in its entirety for failure to state a claim upon which relief may be granted. The plaintiffs are limited partners in one or more of four real estate investment partnerships: Lehman Brothers Real Estate Partners III, L.P.; Lehman Brothers Real **7** Estate Fund III, L.P.; Lehman Brothers Offshore Real Estate Fund III; and Lehman Brothers Real Estate Capital Partners III (collectively, the "Partnerships"). The defendants, affiliates of Lehman Brothers Holdings Inc. (collectively, "Lehman"), formed the Partnerships on June 25, 2007, for the purpose of investing in commercial real estate both domestically and abroad. The plaintiffs allege that the defendants knowingly or recklessly omitted material information in connection with the sale of the limited partnerships to the plaintiffs, causing the plaintiffs to rely on the omission and consequently to suffer economic loss. We assume the parties' familiarity with the underlying facts and procedural history of the case.

The plaintiffs principally contend that they have alleged sufficient facts to support a claim of securities fraud pursuant to Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5(b). More specifically, the plaintiffs contend that the complaint alleges sufficient facts to support a claim that the defendants knew or should have known (1) that certain property interests being held by Lehman for sale to the Partnerships had depreciated in value since their acquisition by Lehman and (2) that the Partnerships' purchase of those property interests at the prices paid by Lehman plus carrying costs would consequently cause the Partnerships to incur immediate losses.

The district court held that the plaintiffs did not allege sufficient facts to support an allegation of scienter. With respect to the element of scienter, the Private Securities Litigation Reform Act provides:

> [I]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2)(A). "To meet the 'strong inference' standard, it is not sufficient to set out 'facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent,' for that gauge 'does not capture the stricter demand Congress sought to convey....' " *S. Cherry St., LLC v. Hennessee Grp. LLC,* 573 F.3d 98, 110–11 (2d Cir.2009) (emphasis in original) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). Instead, "[t]o qualify as 'strong' within the intendment of § 21D(b)(2) ... an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499.

**\*\*2** It is undisputed that the presence or absence of scienter on the part of the defendants is determined with respect to the date that the plaintiffs committed to invest in the Partnerships. *See Vacold LLC v. Cerami,* 545 F.3d 114, 122 (2d Cir.2008). The plaintiffs argue that they committed to invest in May 2008; the defendants argue that the plaintiffs committed to invest on November 30, 2007. Neither party points to record support indicating when the Alan Gerber Lewis Marital Irrevocable Trust or Richard and Rickel Shuster committed to invest in the Partnerships. However, the complaint states that some of the plaintiffs made that commitment as late as February of 2008. We consequently consider whether the complaint alleges facts sufficient to give rise to a strong inference of scienter **\*8** on the part of the defendants on or before February 29, 2008.

We must determine whether the entire collection of facts alleged gives rise to a strong inference of scienter as of that date. *Tellabs,* 551 U.S. at 322–23, 127 S.Ct. 2499. The complaint alleges that (1) during a November 2007, presentation to Lehman Chairman and CEO Richard Fuld, Lehman's commercial real estate group recommended reducing its global balance sheet by \$15 billion; (2) a preliminary and unaudited table attached to Lehman's Securities and Exchange Commission Form 8–K indicated that Lehman's portfolio of "[r]eal estate held for sale" had incurred \$300 million in both gross and net losses in the three months ending on February 29, 2008; (3) the defendants did not form an Investor Advisory Committee for any of the Partnerships until after May 28, 2008, when the Partnerships acquired the property interests at issue; and (4) the defendants failed to issue a required financial report to the limited partners for the second quarter of 2008. The district court correctly held that, in light of the entire complaint and the incorporated documents, these allegations are insufficient to support a strong inference of scienter.

The plaintiffs principally rely on the table titled "Lehman Brothers Holdings Inc. Mark to Market Adjustments Gain/(Loss) (Preliminary and Unaudited)" included in a press release attached to Lehman's S.E.C. Form 8–K quarterly report. Specifically, they rely on the fact that the line item in the table for "[r]eal estate held for sale" shows a gross loss and a net loss of \$300 million for the three months ending on February 29, 2008, and again for the three months ending on May 31, 2008. However, even if we assume, as the plaintiffs do, that the property

interests being held for sale to the Partnerships were included within the category of Lehman's "[r]eal estate held for sale," the table does not give rise to a strong inference that the defendants knew that those *particular* property interests had depreciated in value. The table does not address specific properties or groups of property, and it does not indicate whether the losses were evenly distributed across the category of "[r]eal estate held for sale."

**\*\*3** By contrast, other contemporaneous documents attached to the complaint address the particular property interests bound for the Partnerships, and those documents support the inference that the defendants did not think that the property interests had depreciated in value. An internal Lehman document lists the appreciation or depreciation of each of the Partnership-bound investments and indicates that as of December 31, 2007, the investments, in aggregate, had appreciated \$300,000 in value since their acquisition. A second internal Lehman document comprises line items indicating the increase, decrease, or lack of change in value of each of the Partnership investments as of June 30, 2008. The June 2008 document indicates that the investments, in aggregate, had increased in net value by 2.4% relative to their acquisition prices.

The plaintiffs argue that the figures in the June 2008 document reflect only changes in discount rates and not an attempt to calculate the "fair value" of the property interests. However, the "Comments" in the document, which explain the valuation of each property interest, refer to factors other than discount rate adjustments; moreover, the document refers multiple times to the calculation of "fair value." The plaintiffs also argue that the June 2008 figures are implausible because the appreciation in value that they document is inconsistent with real estate indicators worldwide from the same time period. However, those real estate indicators **\*9** do not address the particular property interests at issue in this case. The plaintiffs do not successfully undermine the strong inference arising from the December 2007 and June 2008 internal documents that as of February 29, 2008, the defendants did not believe that the property interests being held for transfer to the Partnerships (as opposed to the general category of "[r]eal estate held for sale") had depreciated in value.

Fried v. Lehman Bros. Real Estate Associates III, L.P., 506 Fed.Appx. 5 (2012)

Fed. Sec. L. Rep. P 97,236

The remainder of the allegations asserted by the plaintiffs do not substantially increase the strength of the inference of scienter on the part of the defendants. First, with respect to the November 2007 presentation to Fuld, the plaintiffs do not allege facts specifying whether the recommendation to reduce the commercial real estate group's global balance sheet was a suggestion to mark down the value of properties on the balance sheet or to reduce the balance sheet by other means, such as by disposing of some of the investments. Even if we assume that the recommendation was to mark down the value of the properties on the balance sheet, the plaintiffs do not allege facts indicating that the recommendation referred to the particular property interests bound for the Partnerships.

Second, with respect to the defendants' failure to appoint an Investor Advisory Committee for any of the Partnerships until after May 28, 2008, the date that the property interests at issue were transferred to the Partnerships, this allegation does not carry much weight. The partnership agreements contained no deadline for the appointment of the Investor Advisory Committees. Moreover, the partnership agreements did not require the defendants to consult with the Investor Advisory Committees regarding purchases of property interests from Lehman. Consequently, even if the Committees had already been appointed, the defendants could have entirely avoided the Committees' participation in the May 28, 2008, transaction.

**\*\*4** Finally, with respect to the defendants' failure to prepare and mail a financial report for the second financial quarter of 2008, the plaintiffs do not make clear how the failure to issue financial statements required by August 29, 2008, demonstrates that as of February 29, 2008, the defendants knew that the properties had depreciated in value. All of the plaintiffs had already committed to the funds by the end of February 2008; the failure to issue the report months later was not a ploy to induce investment. Moreover, the failure to issue the report only delayed the inevitable disclosure of the information in a later report. The plaintiffs do not explain how the defendants would benefit from such a delay.

Considering the complaint in its entirety, we hold that the plaintiffs have not alleged facts sufficient to support a strong inference of scienter on the part of the defendants. Because the claims against the institutional defendants fail here, the claims against the individual defendants fail as well. *See SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996) ("In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person....").

We have considered the appellants' remaining arguments and find them to be without merit. For the reasons stated herein, the judgment of the district court is **AFFIRMED.**

### All Citations

506 Fed.Appx. 5, 2012 WL 6621300, Fed. Sec. L. Rep. P 97,236

---

End of Document © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**Exhibit D**

# SUPREME COURT OF THE STATE OF NEW YORK - NEW YORK COUNTY

| | | |
|---|---|---|
| **PRESENT:** | SCARPULLA, SALIANN | **PART** 39 |
| | *Justice* | |

FRIED, BARBARA J

**INDEX NO.**  651461/2011

**MOTION DATE**  10/22/2015

- v -

LEHMAN BROTHERS REAL ESTATE

**MOTION SEQ. NO.**  003

The following papers, numbered 1 to _____, were read on this application to/for  _____

| | |
|---|---|
| Notice of Motion/ Petition/ OSC - Affidavits - Exhibits | No(s) _____ |
| Answering Affidavits - Exhibits | No(s) _____ |
| Replying | No(s) _____ |

**Upon the foregoing papers, it is**

Motions no. 003, 004, and 005 are resolved in accordance with the accompanying memorandum decision.

DATE :  **8/5/2016**

SCARPULLA, SALIANN , JSC

| | | |
|---|---|---|
| 1. CHECK ONE | : [X] CASE DISPOSED | [ ] NON-FINAL DISPOSITION |
| 2. APPLICATION | : [X] GRANTED  [ ] DENIED | [ ] GRANTED IN PART  [ ] OTHER |
| 3. CHECK IF APPROPRIATE : | [ ] SETTLE ORDER | [ ] SUBMIT ORDER |
| | [ ] DO NOT POST | [ ] FIDUCIARY APPOINTMENT  [ ] REFERENCE |

651461/2011  FRIED, BARBARA J VS. LEHMAN BROTHERS REAL ESTATE    Motion No. 004

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 39
------------------------------------------------------------------------x
BARBARA J. FRIED; ALTITUDE
PARTNERS, LLC; RICHARD D.
MALTZMAN, AS TRUSTEE FOR THE
RICHARD D. & CHARLENE MALTZMAN
FAMILY TRUST; JEFFOREED PARTNERS,
L.P.; ZELFAM, LLC; on behalf of themselves
and other limited partners joining them,

                    Plaintiffs,

                                                                              Index No. 651461/11

         -against-

LEHMAN BROTHERS REAL ESTATE
ASSOCIATES III, L.P.; LEHMAN
BROTHERS PRIVATE EQUITY ADVISERS,
LLC; REAL ESTATE PRIVATE EQUITY,
INC.; SILVERPEAK REAL ESTATE
PARTNERS, LP; REPE CP MANAGECO,
LLC; MARK A. WALSH; MARK H.
NEWMAN; BRETT BOSSUNG; RODOLPHO
AMBOSS; KEVIN DINNIE; MICHAEL J.
ODRICH; CHRISTOPHER M. O'MEARA;
RICHARD S. FULD, JR.; JOSEPH M.
GREGORY; ERIN CALLAN; IAN LOWITT;
THOMAS RUSSO; & JOHN DOE 1 through
50,

                    Defendants.

------------------------------------------------------------------------x
**Saliann Scarpulla, J.:**

1

Motions bearing sequence numbers 003, 004 and 005 are consolidated for disposition.

This is an action for fraud, breach of fiduciary duty, breach of contract and a declaratory judgment arising from several real estate investment partnerships formed in 2007. The gravamen of the amended complaint ("complaint") is that defendants induced plaintiffs to invest in the partnerships in order to rid themselves of devalued properties at plaintiffs' expense.

In motion sequence 003, defendants Lehman Brothers Real Estate Associates III L.P., Lehman Brothers Private Equity Advisers, LLC, Real Estate Private Equity, Inc., Michael J. Odrich, Christopher M. O'Meara, Richard S. Fuld, Jr., Joseph M. Gregory, Erin Callan, Ian Lowitt and Thomas Russo move, pursuant to CPLR 3211 (a) (1) and (7), for an order dismissing the complaint. In motion sequence 004, defendants Mark A. Walsh, Mark H. Newman, Brett Bossung, Rodolpho Amboss, Kevin Dinnie, Silverpeak Real Estate Partners, LP, and REPE CP ManageCo, LLC move, pursuant to CPLR 3211 (a) (1) and (7), for an order dismissing the complaint.

In motion sequence 005, defendants Lehman Brothers Real Estate Associates III, L.P., Lehman Brothers Private Equity Advisers, LLC, and Real Estate Private Equity, Inc. move for permission to supplement the record.

2

The facts set forth below are drawn from plaintiffs' amended complaint, filed February 3, 2015, unless otherwise indicated.

**Parties**

According to the complaint, plaintiffs are each limited partners in one of eleven partnerships formed for the purpose of investing in commercial real estate. The partnerships operated collectively under the name Lehman Brothers Real Estate Partners III ("LBREP III" or "partnerships") and were formed primarily in June 2007 by non party Lehman Brothers Holdings, Inc. ("Lehman").

Defendant Lehman Brothers Real Estate Associates III, L.P. ("LBREA III" or "General Partner") was the general partner of the various partnerships, and defendant Lehman Brothers Private Equity Advisers, LLC ("LBPEA") was the original investment advisor to the partnerships. LBPEA was replaced in that role by defendant Silverpeak Real Estate Partners, LP ("Silverpeak") in 2010. Silverpeak was controlled by defendants Mark A. Walsh, Brett Bossung, Mark H. Newman, Rodolpho Amboss and Kevin Dinnie, each of whom was also originally involved in operating LBREA III.

The other individual defendants, Michael J. Odrich, Christopher M. O'Meara, Richard S. Fuld, Jr., Joseph M. Gregory, Erin Callan, Ian Lowitt and Thomas Russo are referred to in the complaint as Lehman officials with access to, and knowledge of, its confidential records.

3

Defendant Real Estate Private Equity, Inc. ("REPE") was formed in 2005 by Lehman and it originally held the various real estate assets that were transferred to each of the partnerships after the plaintiffs became limited partners. REPE CP ManageCo, LLC was an entity formed in Delaware by Walsh, Bossung, Newman, Amboss and Dinnie to carry on the business of LBREP III.

## Background

In the fall of 2007, the partnerships distributed private placement memoranda ("PPMs") and supplements to the PPMs ("Supplements"), to prospective investors. The PPMs stated that certain properties would be purchased by Lehman and warehoused until investors were admitted as partners. The properties would then be transferred to the partnerships at their acquisition costs, plus Lehman's cost of carry, which was not to exceed 9% per annum.

The PPMs also stated, among other things, that the General Partner would create an unaffiliated Investor Advisory Committee ("IAC") to review transactions in which the General Partner had conflicts of interest, and to consult on write-downs of property valuations. It is undisputed that the first Supplement, issued in November 2007, disclosed the identities of properties that were being considered for transfer to the partnerships, including most of the properties that eventually were transferred.

4

The majority of the plaintiffs signed Subscription Agreements by November 2007, and all of them were admitted as limited partners by March of 2008. Their limited partnership interests were governed by limited partnership agreements ("LPAs") which provided, among other things, that the limited partners would forfeit 50% of their capital accounts if they failed to pay capital contributions upon notice. The first capital call was made on March 28, 2008.

The amended complaint states that, on May 28, 2008, Lehman sold 26 properties to LBREP III, at prices above their current market value. Three days later, on May 31, 2008, the U.S. Office of Thrift Supervision concluded an examination of Lehman, finding that Lehman failed to employ sound risk management practices in its commercial real estate business. Plaintiffs state that, on June 9, 2008, Lehman filed a Form 8-K, reporting its first quarterly loss, due to related mark-downs in commercial real estate values. On September 10, 2008, Lehman pre-announced a $3.9 billion net loss for the 3d Quarter of 2008 and on September 15, 2008, Lehman filed for Chapter 11 bankruptcy.

According to the amended complaint, defendants delayed in revealing the May 28th sales of Lehman properties to LBREP III, as well as the losses that investors incurred, until December 5, 2008. Defendants also allegedly failed to issue any 2nd Quarter 2008 financial statements, as the LPAs required, because such statements would have required a GAAP-based "Fair Value" estimate of property values, which would have

5

revealed the losses that investors had incurred.  Instead, in June 2008, defendants created

a non-GAAP Valuation Summary ("Valuation Summary") which stated that LBREP III's

portfolio had increased in value by 2.4%.  The parties sharply dispute whether the

Valuation Summary was sent to the limited partners, including plaintiffs.

Plaintiffs allege that no LBREP III quarterly financial statements appeared until

December 5, 2008, after Lehman's bankruptcy filing.  These statements listed LBREP

III's commercial real estate properties at Fair Value, and allegedly revealed a 30% drop in

value compared to the original purchase price by Lehman.  The complaint states that, in

February 2010, the management team of the General Partner, *i.e.*, defendants Amboss,

Bossung, Dinnie, Newman and Walsh, began a campaign to acquire the management

business of the General Partner.  To that end, they needed to obtain the consent of LBREP

III limited partners to amend the LPAs to create a Ninth LPA, and to approve a new

agreement with the manager's new company, which eventually became Silverpeak.

Plaintiffs state that the Ninth LPA proposed a dramatic increase in the fees that would be

paid to the management team at Silverpeak.

In October of 2009, plaintiffs in this action commenced an action in federal court

in New York against these defendants, alleging various causes of action under the federal

securities laws.  In March 2011, the district court dismissed the complaint.  *See Fried v*

6

*Lehman Brothers Real Estate Associates III, L.P.*, 2011 WL 1345097, 2011 US Dist

Lexis 40431 (SD NY 2011), *affd* 506 Fed Appx 5 (2nd Cir 2012).

First, the court stated that:

> The core of Plaintiff's case is the allegation that Lehman
> omitted material information regarding the LBREP III
> Partnerships from the PPM, supplements to the PPM, and the
> LPA. They allege that Defendants knew and failed to disclose
> that upon transfer of the warehoused properties, the limited
> partners would immediately sustain major losses to the value
> of their holdings because the properties had lost significant
> value since their acquisition by Lehman.

*Id.* at *3, *11.

The court then found, among other things, that plaintiffs failed to plead the

element of scienter.  Specifically, the court stated that:

> Plaintiffs have alleged no facts indicating that Defendants
> knew or should have known of any losses to the LBREP III
> properties as of March 2008.  Mere observations about trends
> in the commercial real estate market generally. . . . do not
> support Plaintiffs' allegation that Defendants should have
> known that the LBREP III warehoused properties had
> decreased in value as of March 1, 2008.

*Id.* at *8, *24.

Relevant here, the court also noted that

> Supplement One to the PPM, issued before any Plaintiff
> committed to invest in LBREP III, gave substantial details
> regarding every property under consideration at that time.  For
> each investment opportunity, the document described the
> expected total investment, money invested to date, and plans

7

> for future development, as well as important details regarding
> the property's intended use, location, and business plan.
> Additionally, that document also described changes
> happening in the market during the fall of 2007 that could
> affect LBREP III investments . . . Thus, Plaintiffs had
> information regarding most of the LBREP properties prior to
> investing and could have engaged in their own investigation
> to determine whether the properties were likely to gain or lose
> value relative to the Lehman purchase price.

*Id.* at *8, *25.

The district court's decision was affirmed by the Second Circuit in 2012. *Fried v*

*Lehman Bros. Real Estate Associates III, L.P.,* 506 Fed Appx 5 (2d Cir 2012), Among

other things, the Second Circuit noted that internal Lehman documents indicated that, as

of December 31, 2007, the partnership-bound investment properties had, in aggregate,

appreciated $300,000 in value since their acquisition. *Id.* at 8.

Plaintiffs filed this action on May 27, 2011, and defendants removed it to federal

court on June 17, 2011. The District Court stayed the removed action pending the

conclusion of the Second Circuit appeal. Plaintiffs filed an amended complaint (the

"Federal Complaint") on February 28, 2013 and on May 30, 2013, the case was remanded

back to this court.

In a decision dated January 7, 2015, this court denied, as moot, defendants' motion

to dismiss the Federal Complaint and gave plaintiffs permission to file an amended

complaint in this court. Plaintiffs filed an amended complaint on February 3, 2015.

8

**Motion Sequence 005**

In motion sequence 005, defendants move to supplement the record with respect to motion sequence 003 and motion sequence 004. Specifically, defendants request permission to introduce a brief submitted by plaintiffs to the Second Circuit (Second Circuit Brief).

At issue here is the parties' dispute over the Valuation Summary described above, which was created in June 2008 and which stated that LBREP III's portfolio had increased in value by 2.4% at that time. The parties sharply disputed, at oral argument of motions 003 and 004, whether the Valuation Summary was sent to plaintiffs at any point. At oral argument on motions 003 and 004, plaintiff's counsel stated that plaintiffs told him that they had received the Valuation Summary. Defendants contend that the Valuation Summary was not sent to investors, including plaintiffs.

Defendants now seek to introduce the Second Circuit Brief to contradict plaintiffs' assertion. Specifically, they contend that the brief contains a statement by plaintiffs which indicates that the Valuation Summary was an internal document of defendants and was never sent to investors, including plaintiffs. Defendants further contend that, in any event, plaintiffs could not have relied on the Valuation Summary because it was created after plaintiffs made their investments.

9

Plaintiffs contend that the Second Circuit Brief states only that the Valuation

Summary was an "internal" document in the sense that it was not GAAP-compliant, *i.e.*,

that it was not created under public accounting rules. They contend that describing the

Valuation Summary as "internal" does not also mean that plaintiffs never received it.

Plaintiffs further contend that, in any event, they are not relying on the Valuation

Summary to support a claim for fraudulent inducement. Instead, they argue that it is

relevant because it was not prepared under GAAP standards and constituted an attempt by

defendants to conceal the true value of the properties.

As described above, the parties dispute whether the Valuation Summary was sent

to investors. They further dispute the meaning of plaintiffs' description of the Valuation

Summary as an internal document. However, plaintiffs have not demonstrated any

prejudice or surprise from introduction of the Second Circuit Brief and plaintiffs have had

an opportunity to be heard in opposition to defendants' request to supplement the record.

Therefore, I permit defendants to supplement the record and I will consider the Second

Circuit Brief for whatever probative value it has, if any, in consideration of motion

sequences 003 and 004.

**Motion Sequences 004 and 005**

Defendants move to dismiss the complaint for failure to state a cause of action.

"On a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal

10

construction." *Amaro v Gani Realty Corp.*, 60 AD3d 491, 492 (1st Dept 2009), citing

*Leon v Martinez*, 84 NY2d 83, 87-88 (1994). "The court must accept the facts alleged in

the complaint as true and accord the plaintiffs the benefit of every possible favorable

inference." *Id.*, citing *Leon v Martinez*, 84 NY2d at 87.

## Fraud

Plaintiffs assert causes of action for intentional misrepresentation (first) and gross

negligence in misrepresentation (second). Both causes of action arise from plaintiffs'

central allegation in this action, that defendants fraudulently induced plaintiffs to invest in

the partnerships in order to rid themselves of devalued properties at plaintiffs' expense.

Specifically, plaintiffs allege that defendants stated that their strategy for acquiring

investment properties would be to "monitor changing economic conditions, anticipate the

impact on real estate markets and act quickly and decisively on compelling investment

opportunities." Plaintiffs allege that defendants failed to inform them that the investment

properties had already been purchased at prices much higher than current market value,

due to a precipitous decline in the real estate market. As such, plaintiffs allege that

defendants' real goal was to pass their investment losses on to plaintiffs by selling the

properties to LBREP III at the original acquisition cost plus 9%.

"To make a prima facie claim of fraud, a complaint must allege misrepresentation

or concealment of a material fact, falsity, scienter on the part of the wrongdoer, justifiable

11

reliance and resulting injury." *Basis Yield Alpha Fund (Master) v Goldman Sachs Group, Inc.*, 115 AD3d 128, 135 (1st Dept 2014). CPLR 3016 (b) requires that, where a cause of action or defense is based upon fraud, the circumstances constituting the fraud must be stated in detail. In certain cases, the requirements of 3016 (b) "may be met when the facts are sufficient to permit a reasonable inference of the alleged conduct." *Pludeman v Northern Leasing Sys., Inc.*, 10 NY3d 486, 492 (2008) (citations omitted). Further, "corporate officers and directors may be held individually liable if they participated in or had knowledge of the fraud, even if they did not stand to gain personally." *Id.* (citation omitted).

As a threshold matter, I find that the complaint fails to allege any specific misrepresentations or omissions by any of the individual defendants in their individual capacities sufficient to sustain a cause of action for fraud. Therefore, the first and second causes of action are dismissed against the individual defendants on that basis.

Defendants also move to dismiss the fraud causes of action on the ground that the amended complaint fails to adequately allege the element of scienter in the factual detail required by CPLR 3016 (b). Plaintiffs rely on several items of circumstantial evidence to support their fraud causes of action.

First, they contend that a rational basis exists for inferring fraudulent scienter on the part of defendants because the LBREP III interests were being marketed to Lehman

12

clients at the same time that Lehman was writing off the value of its commercial real

estate property portfolio across the board.  Essentially, they argue that because Lehman

was writing down the value of its overall real estate portfolio in October 2007, the value

of the  LBREP III properties must have been falling as well and defendants must have

been aware of that fact.

Plaintiffs' argument is unpersuasive.  The amended complaint sets forth no facts to

demonstrate that defendants knew that the specific properties at issue here had decreased

in value.  *See Fried v Lehman Bros. Real Estate Associates III, L.P.*, 506 Fed Appx  at 8.

Even assuming that Lehman's overall portfolio had decreased in value due to a downturn

in the market, plaintiffs put forth no case law to demonstrate that a general downturn in

the market supports an inference of fraudulent scienter.  *See Fried v Lehman Brothers*

*Real Estate Associates III, L.P.* 2011 WL 1345097 at *8, 2011 US Dist Lexis 40431 at

*24, (internal quotation marks and citations omitted) ("General knowledge about market

conditions or trends does not equate to harboring a mental state to deceive, manipulate, or

defraud").

Further, as set forth above, it is undisputed that the first supplement to the PPMs,

which was distributed in November 2007, disclosed the identities of the investment

properties that were being considered for transfer to the partnerships, including most of

the properties that eventually were transferred.  This supplement provided, among other

13

things, descriptions of the properties, the amount invested in each property and the dates

on which Lehman received approval to invest in each property. Plaintiffs cannot now

allege that they were not informed that certain properties had been purchased, or were

being considered for purchase, or that they were not informed of the details of such

transactions.

Plaintiffs assert that scienter may be inferred from several other facts.

Specifically, they allege that defendants: 1) gave no notice of the May 28th property sales

to LBREP III and resulting losses to investors until December 5, 2008; (2) failed to issue

any 2nd Quarter 2008 financial statements under GAAP, which would have revealed the

investors' losses; (3) gave investors a non-GAAP "Valuation Summary," claiming that

LBREP III's portfolio had increased in value by 2.4%; and (4) waited until December 5th,

2008 to issue GAAP-based financial statements for LBREP III which revealed a 30%

drop in value compared to the LBREP III purchase price.

The parties dispute whether the Valuation Summary relied on by plaintiffs was

sent to investors or whether it was a purely internal Lehman document. However, in

either event, this document does not support an inference of fraudulent scienter on

defendants' part. As found in the federal court decisions related to this action, this

document actually undermines an inference of fraudulent scienter because it indicates that

14

defendants did not believe that the value of the LBREP III portfolio had declined in value.

I find that, even assuming the truth of plaintiffs' other allegations with respect to the financial statements, the facts listed above do not support an inference of fraudulent scienter in inducing plaintiffs to invest in LBREP III.  As noted in the federal action, each of these allegations involve actions that took place after all of the plaintiffs had already invested in LBREP III.  Thus, they were not part of a "ploy to induce investment." *Fried v Lehman Bros. Real Estate Associates III, L.P.*, 506 Fed Appx at 9.

Plaintiffs also argue that an inference of scienter may be drawn from defendants' failure to appoint an Independent Advisory Committee (IAC), as promised in the PPMs, to review conflicts of interest or to consult on write downs, until after the transfer of properties on May 28, 2008.  However, as noted in the federal court action, and as conceded by plaintiffs here, the PPMs did not set forth a deadline for the creation of an IAC and did not state that such a committee would be formed before the properties were transferred.  Even assuming that such a committee was not formed before May 28, 2008, that fact does not support an inference of fraudulent conduct on the part of defendants in inducing plaintiffs to invest in LBREP III because there was no promise by defendants to do so.  In fact, as noted in the Second Circuit decision,

15

the partnership agreements did not require the defendants to consult with the Investor Advisory Committees regarding purchases of property interests from Lehman. Consequently, even if the Committees had already been appointed, the defendants could have entirely avoided the Committees' participation in the May 28, 2008, transaction.

*Fried v Lehman Bros. Real Estate Associates III, L.P.*, 506 Fed Appx at 9.

Based on the foregoing, I find that plaintiffs have failed to allege sufficient facts upon which an inference of fraudulent scienter can be drawn on the part of any of the defendants. Therefore, the first and second causes of action are dismissed.

## Breach of Fiduciary Duty

Plaintiffs' third, fourth, fifth and sixth causes of action allege claims for breach of fiduciary duty.

In the third cause of action, plaintiffs allege that defendants breached their fiduciary duties by failing to disclose that investors would lose value by inheriting Lehman's properties because the fair value of the properties to be acquired by LBREP III was substantially less than the purchase prices.

Even assuming, for the purposes of this motion, that defendants owed a fiduciary duty to plaintiffs, the complaint fails to state a cause of action with respect to plaintiffs' allegation that defendants misled them as to the value of the properties being sold to LBREP III. As set forth above, the PPMs and the Supplements thereto provided plaintiffs

16

with notice as to the properties that were being considered for transfer to LBREP III and the prices at which they had been purchased.

The third cause of action also alleges that defendants failed to obtain the informed consent of LBREP III investors prior to transferring properties to the limited partnerships in transactions. However, plaintiffs fail to allege that such consent was required under the LPA. Moreover, even if adequately alleged, such a cause of action would be for breach of contract, *i.e.*, breach of the LPAs, and a cause of action for breach of fiduciary duty would be duplicative. *See Celle v Barclays Bank P.L.C.*, 48 AD3d 301, 302 (1st Dept 2008).

The complaint further alleges that defendants failed to form an IAC as required by the PPMs and LPAs prior to the May 28, 2008 property transactions, to be able to consult on issues of conflicts of interest between Lehman and LBREP III and on appropriate valuations of properties to be transferred. As noted above, and in the federal court action, and as conceded by plaintiffs here, the PPMs did not set forth a deadline for the creation of an IAC and did not state that such a committee would be formed before the properties were transferred. In any event, here again that allegation would only support a cause of action for breach of contract and a cause of action for breach of fiduciary duty would be duplicative. *See id.* at 302.

17

Finally, in the third cause of action plaintiffs allege that defendants failed to disclose the contents of any "side letters" entered into with other limited partners. The LPAs permitted side letters and plaintiffs have not pointed to any section in the LPAs which required disclosure of the content of such side letters. Further, as above, such a cause of action would be for breach of contract and a cause of action for breach of fiduciary duty would be duplicative. *See id.* Accordingly, the third cause of action is dismissed in its entirety.

Plaintiffs allege in the fourth cause of action that defendants breached the LPAs by failing to obtain consent from either investors or from a duly formed IAC before purchasing the Lehman properties. First, this cause of action is one for breach of contract, not for breach of fiduciary duty. Moreover, the complaint fails to demonstrate that the defendants were required to obtain consent from the investors before completing the May 28, 2008 purchase of the Lehman properties.

With respect to the failure to form an IAC and obtain its consent, the Second Circuit decision noted that "the partnership agreements did not require the defendants to consult with the Investor Advisory Committees regarding purchases of property interests from Lehman. Consequently, even if the Committees had already been appointed, the defendants could have entirely avoided the Committees' participation in the May 28,

2008, transaction." *Fried v Lehman Bros. Real Estate Associates III, L.P.*, 506 Fed Appx at *9.

In the fifth cause of action, plaintiffs allege that, in February 2010, the individual defendants began a campaign to acquire Lehman's interest in the management business of the General Partner from the bankruptcy estate. They allege that defendants sought to obtain the consent of the LBREP III partners to amend the LPAs to create a Ninth Limited Partnership Agreement and to approve a new Investment Advisory Agreement with defendants' new company, LegacyCo Advisors, which was later renamed Silverpeak. The Ninth LPA was allegedly designed to increase defendants' management fees and, as such, the LBREP III partners were asked to vote on a proposal for these additional management fees.

Plaintiffs allege that the voting process was tainted in numerous ways with the result that it was difficult to vote against the proposal. Among other things, they allege that the proposal was sent by email rather than by regular mail, even though many of the partners' email addresses were no longer valid. They also allege that defendants refused to count ballots to which a "No" or "No consent" box had been added by voting partners. Defendants also allegedly refused to count ballots returned by email, despite the fact that the election materials had been sent by email. Plaintiffs further allege that the consent form was hidden at page 13 of a 100+ page document and they allege that "Defaulting

19

Partners" were not allowed to vote, despite the fact that the Ninth LPA would reduce the distributable proceeds payable to them, making their consent mandatory under the existing LPAs.

As above, this cause of action is properly one for breach of contract, not for breach of fiduciary duty. Even if was pled as a breach of contract claim, these allegations are deficient. First, the parties dispute whether the LPAs permitted the proposal to be sent by email rather than by regular mail. In either event, assuming that the proposals were sent by email, the amended complaint fails to allege that any of the plaintiffs here (as opposed to other, unnamed limited partners) did not receive the proposal or were injured by it being sent by email. The amended complaint also fails to allege any actual facts supporting the conclusory allegation that the defendants did not count votes against the proposal or those returned by email. Plaintiffs fail to adequately allege how the consent voting was hidden, particularly because defendants have shown that the consent and the expedited time frame of the election were prominently mentioned on the front page of the proposal. It is also undisputed that the LPAs permitted the General Partner to exclude defaulting partners from participating in the elections.

Finally, although plaintiffs object to the increase in the fees sought in the proposed Ninth LPA, the complaint fails to allege that plaintiffs and other limited partners were not

20

informed of such proposed fees before the vote which approved such fees. Therefore, the fifth cause of action for breach of contract is dismissed.

Plaintiffs' sixth cause of action alleges breaches of the LPAs in connection with management fees. LPA section 7.3 required each limited partner to pay a prescribed management fee to the General Partner for the period between the "Initial Closing" and the date of the "Final Distribution."

Plaintiffs allege that defendants breached the LPAs by calculating the amount of the management fees based on an Initial Closing date of October 1, 2007. They allege that the actual initial closing took place two months later, on November 30, 2007, when investors had signed subscriptions and were accepted as limited partners.

Plaintiffs' argument is unpersuasive. Once again, this cause of action is properly one for breach of contract, not for breach of fiduciary duty. In any event, the LPAs specifically provide that the Initial Closing date was October 1, 2007. Therefore, this portion of the complaint is dismissed.

Plaintiffs also allege that, in September 2009, defendants breached their fiduciary duty by wrongfully seeking to collect management fees for the period from January 1, 2009 to June 30, 2009. Plaintiffs allege that in February, 2009, defendants voluntarily reduced the amount of management fees applicable to the period in question. Defendants do not dispute that they temporarily reduced the amount of fees applicable to that period

21

of time. However, they argue that this was not a waiver of their right to later collect

additional fees for that period.

"A waiver, by definition, is the intentional relinquishment of a known right — it

must be clear, unequivocal and deliberate." *Silverman v Silverman*, 304 AD2d 41, 46 (1st

Dept 2003) (internal quotation marks and citations omitted). Plaintiffs acknowledge that

the original Capital Demand and Management Fee Notice, which was sent to the limited

partners on February 6, 2009, stated that *"[a]t this time*, the General Partner is not calling

Management Fees associated with Unfunded Capital Commitments pending finalization

of the sale process." (Emphasis added) Thus, the original notice plainly stated that the

fees at issue here were not being required "at this time," but said nothing about waiving

the fees.

Plaintiffs' allegation of waiver arises from a February 23, 2009 follow-up

Memorandum sent by the General Partner with information regarding a capital call made

on February 6, 2009. In that Memorandum, defendants stated that management fees for

the relevant period had been calculated "based only on total committed capital in respect

of current Portfolio Investments rather than on . . . . full Capital Commitment." It further

stated that "[a]s a result, the General Partner has significantly reduced, on a voluntary

basis, the Management Fees that would otherwise be payable." As the documents plainly

show, defendants took a voluntary reduction in management fees *at the time,* but

22

plaintiffs have not allege facts demonstrating a clear and unequivocal waiver of the right

to collect additional fees at a later time.

Finally, the amended complaint alleges that defendant LBREA III breached its

fiduciary duty by breaching its obligation under section 3.1 of the LPAs. This section

stated, in relevant part, that if the General Partner determined that a change in business

conditions had occurred, making a termination of the Commitment Period[1] necessary or

advisable, the General Partner was required to cancel outstanding capital commitments to

the extent that there were existing unfunded capital commitments. Upon that occurrence,

the Commitment Period would terminate. Such a termination would affect the amount of

management fees to be paid by the limited partners.

Plaintiffs allege that the Lehman bankruptcy in September 2008 and the decline of

the commercial real estate market constituted a change in business conditions which

required termination of the commitment period nine months earlier than its actual

termination. Defendants seek dismissal of this claim on the ground that such a

determination was within its discretion and, therefore, not subject to challenge by

plaintiffs.

---

[1] The Commitment Period was defined as commencing as of the Initial Closing and ending on the fourth anniversary of the Initial Closing, or on an earlier expiration date as defined in the LPAs.

23

Plaintiffs concede that determining whether a change in business conditions had occurred, requiring an earlier termination of the Commitment Period, was within the discretion of defendants. Plaintiffs contend that defendants' failure to make such a determination was done in bad faith. However, the complaint fails to set forth any facts to support such an allegation, thus I dismiss this cause of action.

**Declaratory Relief**

Plaintiffs' seventh, eighth, ninth, tenth and eleventh causes of action seek declaratory relief in connection with various provisions of the LPAs.

The seventh cause of action seeks a declaration from the court with respect to the issue of whether defendants waived the right to collect additional management fees, as discussed above. Based on the dismissal of that claim, the seventh cause of action is dismissed.

Plaintiffs' eighth, ninth and tenth causes of action allege that certain provisions of the LPAs constituted unconscionable forfeitures and penalties. Specifically, plaintiffs allege that section 9.7 of the LPAs provided certain of the defendants with an improper, discretionary right to deem each LBREP III investor a "Defaulting Partner" and declare a forfeiture of 50% of his or her capital account if the partner failed or refused to timely pay a capital contribution demanded by said defendants, failed to timely pay a management

24

fee upon demand or failed to timely pay a management fee after termination of the

Commitment Period.

Plaintiffs allege that these provisions are unconscionable and violate public policy.

Defendants argue that Delaware law applies and that under Delaware law the provision

at issue would not be considered unconscionable. Plaintiffs disagree that Delaware law

applies, and argue that a New York court would not enforce the provisions at issue under

New York public policy.

The parties have not fully briefed the issue of whether New York or Delaware law

applies. However, I find that under either state's laws this cause of action must be

dismissed. In Delaware, "it is generally held that the unconscionability test involves the

question of whether the provision amounts to the taking of an unfair advantage by one

party over the other." *Reserves Management, LLC v American Acquisition Property I,*

*LLC*, 86 A3d 1119, *9 (Del 2014) (internal quotation marks and citation omitted).

Moreover, "mere disparity between the bargaining powers of parties to a contract will not

support a finding of unconscionability." *Id.* "For a contract clause to be unconscionable,

its terms must be so one-sided as to be oppressive." *Id.* (internal quotation marks and

citation omitted).

In New York, "[a]n unconscionable contract has been defined as one which is so

grossly unreasonable or unconscionable in the light of the mores and business practices of

25

the time and place as to be unenforcible according to its literal terms." *Gillman v Chase Manhattan Bank,* 73 NY2d 1, 10 (1988) (internal quotation marks and citation omitted). "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made — i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Id.* (internal quotations marks and citations omitted).

Here, I find that plaintiffs have not adequately alleged that the provisions at issue were unconscionable under either New York or Delaware law. First, plaintiffs have failed to allege or demonstrate that, at the time plaintiffs decided to enter into subscription agreements, the plaintiffs lacked bargaining power or that they had no meaningful choices. In fact, it is undisputed that the PPMs disclosed that a party who failed to make required fundings under the LPAs could be declared in default and required to forfeit 50% of their capital account. In light of such disclosure, plaintiffs could have simply declined to invest in the first instance.

Moreover, the events at issue, involving defaults arising from failing to make a capital contribution or pay management fees, were important elements of the contract which were known to both parties from the outset. The complaint sets forth no facts to demonstrate that these provisions are so grossly unreasonable or oppressive as to be

unconscionable and unenforceable.  Therefore, I dismiss the eighth, ninth and tenth causes of action.

Plaintiffs' eleventh cause of action alleges that, for the period following the termination of the Commitment Period on July 9, 2009, *i.e.*, the Expiration Date, defendants, after deeming a limited partner to be in default, continued to demand a management fee based on 1% or 1.75% of unreturned Capital Contributions, unreduced by the 50% forfeiture of the partner's Capital Account which resulted from such default, as described above.

Plaintiffs contend that, as defendants purported to have reduced the Capital Accounts of Defaulting Partners by a 50% forfeiture, the amount of their unreturned Capital Contributions was also reduced by 50%, and thus, the Management Fees payable by them must also be reduced by 50%.  They assert that this is true because, by taking the 50% forfeitures, defendants asserted a right to return to defaulting partners on Final Distribution only half of the Capital Accounts such partners would otherwise have been entitled to except for the declaration of their default.

The LPAs defined Capital Contributions as "[w]ith respect to any Partner, at any time, the amount of capital actually contributed to the Partnership by such Partner."  It is also undisputed that section 7.3 of the LPAs provided that, for "the period commencing upon the Expiration Date through the date of the Final Distribution, the Management Fee

27

payable by each Limited Partner shall equal 1.75% of such Limited Partner's unreturned

Capital Contributions in all Portfolio Investments."

Thus, the LPAs clearly provide that the management fees at issue here were to be

calculated based on the amount of a given partner's unreturned Capital Contributions.

Plaintiffs point to no provision in the LPAs which required the amount of such unreturned

contributions to be reduced by, or take into account, any amount that the partner forfeited

on due to its own default.

## Breach of Contract/Good Faith and Fair Dealing

Plaintiffs' twelfth cause of action is for breach of contract.  The complaint alleges

simply that defendants breached the LPAs by the various acts of fraud and

misrepresentation, omission, gross negligence and breaches of fiduciary duty alleged in

the other causes of action in the complaint.  However, the complaint alleges no additional

breaches other than those set forth in the various causes of action which have been

disposed of above.  Therefore, this cause of action is dismissed.

The thirteenth cause of action in the amended complaint is for breach of the

implied covenant of good faith and fair dealing.  A claim for breach of the implied

covenant of good faith and fair dealing is properly dismissed as duplicative of a breach of

contract claim when both claims arise from the same facts.  *Feld v Apple Bank for Sav.*,

116 AD3d 549 (1st Dept 2014); *Logan Advisors, LLC v Patriarch Partners, LLC*, 63

28

AD3d 440, 443 (1st Dept 2009). Here, the factual allegations underlying this cause of action are duplicative of the allegations underlying plaintiffs' breach of contract cause of action in that plaintiffs once again assert that defendants breached various provisions of the LPAs, as described above, which I have already addressed. Therefore, the thirteenth cause of action is dismissed.

**Aiding and Abetting Fraud and Breach of Fiduciary Duty**

Plaintiffs' fourteenth cause of action is for aiding and abetting fraud and breaches of fiduciary duty against Walsh, Bossung, Newman, Amboss, Dinnie, Fuld, Gregory, O'Meara, Odrich, Callan, Russo, and Littow. The complaint alleges, in a conclusory manner, that each of the individual defendants had knowledge of the fraudulent misrepresentations and omissions set forth above, with respect to the sale of the partnership interests to plaintiffs, and with respect to the true value of the properties.

The complaint does not adequately set forth specific factual allegations against the individual defendants or otherwise distinguish among them with respect to specific conduct, such as would support a cause of action against a given individual. The only specific conduct in the complaint is the allegation that Odrich sent a letter to plaintiffs on March 18, 2008, which warned investors that the real estate market was under unprecedented stress, but assured them that Lehman remained confident about its ability

29

to provide good investment returns. Plaintiffs have not put forth any facts or otherwise demonstrated that the statements in the letter are actionable.

In any event, the causes of action underlying the aiding and abetting claim have been dismissed, as set forth above. Therefore, the fourteenth cause of action is also dismissed.

## Civil Conspiracy

Plaintiffs' fifteenth cause of action is for civil conspiracy. However, civil conspiracy is not recognized as an independent tort in New York. *Mamoon v Dot Net Inc.*, 135 AD3d 656, 658 (1st Dept 2016), citing *Shared Communications Servs. of ESR, Inc. v Goldman Sachs & Co.*, 23 AD3d 162, 163 (1st Dept 2005). Therefore, the fifteenth cause of action is dismissed.

## Derivative Claim

The sixteenth cause of action in the amended complaint asserts a derivative claim on behalf of LBREP III, in the event that the remainder of the amended complaint is dismissed. However, the amended complaint sets forth facts to support claims of alleged injuries to the individual plaintiffs as investors. It sets forth no facts to demonstrate a cause of action on behalf of the partnerships themselves. Therefore, this cause of action is dismissed.

30

Accordingly, it is

ORDERED that the motion to supplement the record by defendants Lehman

Brothers Real Estate Associates III L.P., Lehman Brothers Private Equity Advisers, LLC,

and Real Estate Private Equity. Inc. is granted and it is further

ORDERED that the motion by defendants Lehman Brothers Real Estate

Associates III L.P., Lehman Brothers Private Equity Advisers, LLC, Real Estate Private

Equity, Inc., Michael J. Odrich, Christopher M. O'Meara, Richard J. Fuld, Jr., Joseph M.

Gregory, Erin Callan, Ian Lowitt and Thomas Russo, to dismiss the amended complaint

(sequence 003), is granted and the amended complaint is dismissed as against them; and it

is further

ORDERED that the motion by defendants Mark A. Walsh, Mark H. Newman,

Brett Bossung, Rodolpho Amboss, Kevin Dinnie, Silverpeak Real Estate Partners, LP,

and REPE CP ManageCo, LLC, to dismiss the amended complaint (sequence 004), is

granted and the amended complaint is dismissed as against them; and it is further

ORDERED that the Clerk of the Court is directed to enter judgment accordingly.

This constitutes the decision and order of the Court.

DATED: 8|5|16                                    ENTER:

                                                 _____

                                                 J.S.C.


31