# Exhibit A

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator, on behalf of LB I Group Inc. and Lehman Brothers CDO Associates 2004 L.P., | Arbitration No.: _____ |
| Claimant, | |
| - against - | |
| Cynthia Zamora Daniel, Christopher Montalvo, T.K. Narayan, Goran Puljic, and Scott Snell, | |
| Respondents. | |

## STATEMENT OF CLAIM

PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

October 27, 2016

Claimant Lehman Brothers Holdings Inc. ("Claimant" or "LBHI"), in its capacity as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, on behalf of LB I Group Inc. ("LB I Group") and Lehman Brothers CDO Associates 2004, L.P. (the "Delaware GP," and together with LB I Group and LBHI, "Lehman Brothers"), submits this Statement of Claim to the American Arbitration Association, in support of its claims against five individuals:  Cynthia Zamora Daniel, Christopher Montalvo, T.K. Narayan, Goran Puljic and Scott Snell (collectively, "Respondents").

## PRELIMINARY STATEMENT

1.      The Respondents are former investment bankers in the private equity group at Lehman Brothers.  Respondents managed investment funds established by Lehman Brothers and marketed to outside third party investors ("Fund Investors"), including the investment funds implicated in this proceeding (the "Funds").

2.      As part of their compensation package, the Respondents received a portion of the 20% performance fee paid by the Fund Investors to the Delaware GP.  The fee was calculated based on the lifetime performance of the Funds.  In particular, the Delaware GP would receive 20% of the net investment returns that exceeded the performance benchmark established in the Fund documentation and marketed to the Fund Investors.  This performance fee is referred to as "carried interest" in the industry.  The Delaware GP would then distribute the carried interest to its limited partners, including the Respondents.

3.      The better the Funds performed the more carried interest the Respondents could earn.  Conversely, if the Funds underperformed, the Respondents would receive less or potentially no carried interest.  Carried interest was intended to align the interests of the Funds'

managers, including the Delaware GP and its limited partners such as the Respondents, and the Fund Investors.

4.      Respondents received another benefit from the manner in which the Funds paid carried interest. Although carried interest was based on the ultimate net performance of the Funds, Respondents did not have to wait until the Funds' end date to receive carried interest. Instead, carried interest was paid on a periodic basis over the life of the Funds. When the Funds' performance exceeded the benchmark, the Funds paid 20% of that return to the Delaware GP and the Delaware GP, in turn, paid its Limited Partners, including Respondents, their allocated share.

5.      The benefits and obligations of this arrangement for the Respondents are obvious. Respondents would receive, and have the use of, cash payments over the course of the Funds' life. However, at the end of the Funds' life and depending on the net performance of its investments, Respondents could become obligated to pay back to the Fund Investors some of the carried interest they received. Even in this instance, however, the Respondents benefit, because they have effectively received an interest free loan from the Fund Investors for any amount they become obliged to return.

6.      The present dispute illustrates how the Respondents accepted all the substantial benefits of the carried interest compensation package, but have refused to comply with their commensurate obligations.

7.      From the Funds' inception to around the time of the financial crisis, the Funds performed well and the Respondents profited handsomely. Respondents received and had the use of approximately $12.2 million in carried interest payments.

8.      But after the financial crisis the performance of the Funds deteriorated. By the time the Funds dissolved in 2015, they had failed to meet the performance benchmarks

2

established in the Fund documents and marketed to the Fund Investors. As such, the

Respondents were required to return to the Fund Investors a portion of the carried interest the

Respondents received. Specifically, $3.3 million, or roughly 25% of the carried interest

Respondents received.

9.      This amount that must be returned to Fund Investors is referred to as the

"clawback amount." The clawback amount is owed to the Delaware GP which in turn remits the

clawback amount to the Funds for the benefit of the Fund Investors.

10.     The Respondents have been steadfast in their refusal to remit the clawback

amount. Consequently, LBHI brings this arbitration to compel Respondents to fulfill their

contractual duties under the limited partnership agreement, and remit the clawback amount so

that it may be returned to the Fund Investors. LBHI also seeks interest, costs and attorney's fees.

## THE PARTIES AND OTHER RELEVANT ENTITIES

11.     Claimant LBHI is a Delaware corporation with its principal place of business at

1271 Avenue of Americas, New York, New York 10020.

12.     LB I Group is a Delaware corporation with its principal place of business at 1271

Avenue of Americas, New York, New York 10020. LB I Group is an indirect wholly owned

subsidiary of LBHI.

13.     Lehman Brothers CDO Associates 2004, L.P. (the "Delaware GP") is a Delaware

limited partnership with its principal place of business at 1271 Avenue of Americas, New York,

New York 10020. LB I Group is the general partner of the Delaware GP. The limited partners

of the Delaware GP are (i) LB I Group and (ii) various individuals who were former employees

of Lehman Brothers (the "CDO Fund Employees"). The CDO Fund Employees included,

among others, the five individual Respondents in this proceeding.

3

14.     Lehman Brothers CDO Associates (Cayman) Ltd. ("Cayman GP") is a foreign company incorporated under the law of the Cayman Islands and has its principal place of business at PO Box 309 Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.  The Delaware GP is the sole member and owner of Cayman GP.

15.     Respondent Goran Puljic is an individual who, on information and belief, resides at 8 Searles Road, Darien, CT 06820.  He is a limited partner in the Delaware GP.  He was paid over $5.6 million in carried interest over the years and now owes approximately $1.5 million plus interest.

16.     Respondent T.K. Narayan is an individual who, on information and belief, resides at 219 West 81st Street, Apt. 8A, New York, NY 10024.  He is a limited partner in the Delaware GP.  He was paid over $3.2 million in carried interest over the years and now owes approximately $870,000 plus interest.

17.     Respondent Cynthia Zamora Daniel is an individual who, on information and belief, resides at 2373 Broadway, Unit P8, New York, NY 10024.  She is a limited partner in the Delaware GP.  She was paid over $2.8 million in carried interest over the years and now owes approximately $773,000 plus interest.

18.     Respondent Scott Snell is an individual who, on information and belief, resides at 51 Hewlett Street, Rye, NY 10580.  He is a limited partner in the Delaware GP.  He was paid over $355,000 in carried interest over the years and now owes approximately $96,000 plus interest.

19.     Respondent Christopher Montalvo is an individual who, on information and belief, resides at 621 Lovett Road, Colts Neck, NJ 07722.  He is a limited partner in the

Delaware GP. He was paid over $142,000 in carried interest over the years and now owes approximately $39,000.

## THE ARBITRATION PROVISION

20.    Respondents are each parties to the Lehman Brothers CDO Associates 2004 L.P. Limited Partnership Agreement (the "Limited Partnership Agreement") (attached as Exhibit 1).

21.    The Limited Partnership Agreement contains an arbitration provision, which states:

> Any dispute, controversy or claim arising out of or in connection with or relating to this Agreement or any breach or alleged breach thereof shall (to the extent not prohibited by governing law) be determined and settled by arbitration in The City of New York pursuant to the rules then in effect of the American Arbitration Association. Any such arbitration shall be before a single arbitrator, who shall have the power, but shall not be required, to award attorney's fees and costs. Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in the highest court of the forum, state or federal, having jurisdiction.

22.    Under Section 13.6 of the Limited Partnership Agreement, Delaware law applies.

## FACTUAL BACKGROUND

A.    **The Zephyr Funds**

23.    In 2004, Lehman Brothers formed and raised capital for three Funds called the "Zephyr Funds", which, through intermediate funds, invested in collateralized debt obligations, or "CDOs".

24.    Also in 2004, the Delaware GP was created as an investment vehicle for certain Lehman employees—including the Respondents—to invest personal capital in and earn carried interest from the Zephyr Funds.

25.    The three Zephyr Funds consisted of three limited partnerships: (i) Zephyr Recovery 2004-1 LP ("Zephyr 2004-1"); (ii) Zephyr Recovery 2004-2 LP ("Zephyr 2004-2"); and (iii) Zephyr Recovery 2004-3 LP ("Zephyr 2004-3").[1]

26.    From inception until 2009, Cayman GP served as the general partner for each of the Zephyr Funds.

27.    The Delaware GP is the sole member and owner of Cayman GP.

28.    LB I Group serves as the general partner and as a limited partner of the Delaware GP.

29.    The other limited partners of the Delaware GP were the CDO Fund Employees, which included Respondents.

30.    Below is an organizational chart detailing the relationships among these entities, from inception of the Funds until 2009:

---

[1] Originally, these three funds were called Lehman Brothers CDO Opportunity Partners 2004-1 L.P., Lehman Brothers CDO Opportunity Partners 2004-2 L.P. and Lehman Brothers CDO Opportunity Partners 2004-3 L.P.; they were renamed the Zephyr Funds in connection with a transaction involving an entity known as Zais, which is further detailed below.



31.    In February 2009, Cayman GP sold its investment advisor and general partner responsibilities in the Zephyr Funds to Zais Group LLC ("Zais").

32.    As a result of the sale, a Zais entity became the general partner of the Zephyr Funds, and Cayman GP became a special limited partner in each of the Zephyr Funds.[2]

## B.    The Partnership Agreement

33.    The Delaware GP is governed by the Limited Partnership Agreement.

34.    The Limited Partnership Agreement was not formally executed. However, it is a legally binding partnership agreement.

35.    Indeed, the Delaware GP operated according to the provisions of the Limited Partnership Agreement. For example, the Delaware GP distributed K-1s annually to its partners,

---

[2] Cayman GP retained its clawback obligations to the Zephyr Funds pursuant to the limited partnership agreements governing the Zephyr Funds.

including Respondents, which, among other things, detailed their respective distributions from the Delaware GP.

36.     The limited partners of the Delaware GP, including Respondents, received distributions in 2005 and 2006, and honored capital calls without objection.

37.     These capital calls were memorialized in annual Interest Schedules, which various limited partners received and signed as parties to these documents, thereby acknowledging the validity of the Limited Partnership Agreement.

38.     The Interest Schedules state that the defined terms used therein "have the meanings set forth in the [Limited Partnership Agreement]." The Interest Schedules also include the limited partners' sharing percentages and required capital contributions, which explicitly reference and implement the Limited Partnership Agreement.

39.     The Interest Schedules contain a section acknowledging that all limited partners of the Delaware GP, including Respondents, agreed to be bound by and are deemed to have executed the Limited Partnership Agreement.

40.     The Interest Schedule also contained a signature block on a page that stated the following:

> This page shall serve as a counterpart signature page to the [Limited Partnership] Agreement. By executing below, the undersigned is deemed to have executed the [Limited Partnership] Agreement and is hereby admitted as a Limited Partner of the Partnership. In consideration for being admitted as a Limited Partner pursuant to Section 4.1 of the [Limited Partnership] Agreement, the undersigned hereby agrees to be bound by the terms of the [Limited Partnership] Agreement, a copy of which has been provided, and acknowledges its admission as a Limited Partner of the Partnership and its award hereunder.[3]

---

[3] The first page of the Interest Schedule makes clear that the phrase "Agreement" as used in the Interest Schedule means the Limited Partnership Agreement. The first page also clarifies that "Partnership" refers to the Delaware GP.

8

41.    CDO Fund Employees, including certain of Respondents, signed this page of the Interest Schedule.  For example, Respondents Daniel and Montalvo signed it on January 31, 2007, and Respondent Puljic signed it on January 29, 2007.

42.    Additionally, under Delaware law, the Limited Partnership Agreement is an enforceable and legally binding partnership agreement, notwithstanding that it was not formally executed by Respondents.  Partnership agreements are enforceable under the Delaware Revised Uniform Limited Partnership Act ("DRULPA") even if they have not been executed, and they are "not subject to any statute of frauds."  Del. Code Ann. tit. 6, § 17-101(12) (West).

43.    Specifically, "[a] partner of a limited partnership or an assignee of a partnership interest is bound by the partnership agreement whether or not the partner or assignee executes the partnership agreement."  Id.; see also ESG Capital Partners II, LP v. Passport Special Opportunities Master Fund, LP, 2015 WL 9060982, at *3 (Del. Ch. Dec. 16, 2015).

44.    DRULPA further provides that unexecuted partnership agreements are enforceable if the limited partners "complie[d] with the conditions for becoming a limited partner or assignee as set forth in the partnership agreement or any other writing" and such agreements "shall not be unenforceable" merely because they were not "signed by a person being admitted as a limited partner . . . ."  Del. Code Ann. tit. 6, § 17-101(12)(a-b).

45.    Section 2.1 of the Limited Partnership Agreement specifies that the Delaware GP was, in fact, "form[ed] ... pursuant to and in accordance with [DRULPA]."

46.    The enforceability of the Limited Partnership Agreement is also in accord with the stated policy goals of DRULPA, including giving "maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements."  Del. Code Ann. tit. 6, § 17-1101 (West).

9

47.    The enforceability of the Limited Partnership Agreement is also in accord with applicable common law, since the parties thereto operated for years in a manner consistent with it being enforceable and, indeed, Respondents each received significant payments pursuant to its terms. In fact, the benefits the Respondents received pursuant to the Limited Partnership Agreement exceed by nearly three-fold the liabilities that they owe under the clawback provision.

## C.    The Clawback Obligation

48.    Each of the Zephyr Funds is governed by a limited partnership agreement (collectively, the "Zephyr Agreements") (attached as Exhibits 2, 3 and 4).

49.    Pursuant to each of the Zephyr Agreements, in the event of "dissolution, winding up and termination" of all or substantially all of the Zephyr Funds' assets, and if third party investors have not received a certain return on investment (referred to as the "IRR Threshold" in the Agreements), Cayman GP becomes obligated to make certain clawback payments.[4]

50.    As mentioned above, the clawback obligations concern only a small portion of the carried interest payments Respondents received over the years. Even after Respondents fulfill their obligations and return the full amount owed, Respondents still will have benefited from the arrangement as they had use of these sums for approximately a decade before the clawback obligation was triggered. Essentially, this portion of their carried interest payments will have operated as an interest-free loan. And Respondents remain entitled to keep approximately 75 percent of all carried interest previously paid.

---

[4] Cayman GP retained its clawback obligations, pursuant to Section 8.1(c) of the Zephyr Agreements, even after Cayman GP sold its general partner responsibilities in the Zephyr Funds to Zais in February 2009. *See* Exhibits 2, 3 and 4. This arrangement was disclosed to all investors in the Zephyr Funds by letter in or around March 2009. After this transfer, Respondents Daniel and Montalvo joined Zais.

51.     Section 9.4 of each of the Zephyr Agreements details when the clawback

obligation is triggered.  It states in relevant part:

> "If (i) following the dissolution, winding up and termination of the
> Partnership and the distribution of all or substantially all of the
> Partnership's assets, including all Portfolio Investments (the date
> of such event being the "Clawback Determination Date"), a
> Limited Partner has not received distributions from the Partnership
> at least equal to the IRR Threshold with respect to such Limited
> Partner, and (ii) the General Partner has earned Performance
> Allocations with respect to such Limited Partner (other than
> Performance Allocations earned by the General Partner in
> connection with withdrawals by such Limited Partner), the General
> Partner shall be obligated to return promptly to such Limited
> Partner an amount (the "Clawback Amount") equal to the lesser of
> (i) the amount of the deficiency, and (ii) the aggregate of such
> Performance Allocations, subject to a cap equal to the After-Tax
> Amount of such Performance Allocations actually received by the
> General Partner, calculated at the Assumed Income Tax Rate.  The
> General Partner shall distribute any Clawback Amount to the
> applicable Limited Partner…[5]

52.     In the event Cayman GP becomes liable for the clawback amount, the Delaware

GP becomes responsible for making the payment pursuant to the Limited Partnership

Agreement.

53.     The Delaware GP is obligated to pay Cayman GP with funds from the Delaware

GP's reserves.  In particular, Section 9.4(a) of the Limited Partnership Agreement states in

relevant part:

> "[I]f at any time the Cayman Company is obligated to contribute a
> Clawback Amount pursuant to any Partnership Agreement, then
> the Partnership shall … pay to the Cayman Company such
> amounts out of the Reserve Amount …"[6]

---

[5] In the Zephyr Agreements, "Partnership" refers to the relevant Zephyr Fund.  As stated above, the Zephyr Funds
are limited partnerships.  "General Partner" refers to Cayman GP.

[6] Article 1 of the Limited Partnership Agreement clarifies that "Cayman Company" refers to Lehman Brothers CDO
Associates (Cayman) Ltd. (Cayman GP) and "Partnership" refers to Lehman Brothers CDO Associates 2004 LP
(Delaware GP).

54.    In the event that the Delaware GP's reserves are not sufficient to pay the

clawback amount to Cayman GP, the Delaware GP's limited partners become responsible for

any remaining portion of the clawback amount that the Delaware GP is not able to pay.[7] Section

9.4(a) of the Limited Partnership Agreement states in relevant part:

> "[T]he Partnership... shall require the Partners to pay to the
> Partnership for payment to the Cayman Company such additional
> amounts as are necessary to satisfy such obligation. If so required
> (x) each Limited Partner shall contribute to the Partnership in
> satisfaction of the Partnership obligation, in cash, when and as
> called by the Partnership an amount (the "Refund Amount") equal
> to the product of (i) such Partner's Give Back Percentage and (ii)
> the amount of such Clawback Amount not satisfied by the Reserve
> Amount, and the Partnership shall [contribute the Clawback
> Amount to the Funds] [or] [invest the Clawback Amount to
> Cayman Company, which will in turn, contribute the Clawback
> Amount to the Funds]..."[8]

55.    If a clawback is triggered, the limited partners become liable for their apportioned

Give Back Percentage as follows: LB I Group is responsible for 42% and the CDO Fund

Employees, including Respondents, are responsible for the remaining 58%. The portion of the

clawback amount to be paid by LB I Group, which is insolvent, will be paid in accordance with

its legal obligations to all of its creditors. This payout amount is expected to exceed 80%.

56.    The limited partners are each responsible for no more than the after-tax amount of

the distributions they received, as calculated under the Zephyr Agreements.

57.    LB I Group, the general partner of the Delaware GP, is liable for any remaining

clawback obligation to Cayman GP not covered by the Delaware GP's limited partners. In

particular, Section 9.4 states in relevant part:

---

[7] Under Section 9.4(d) of the Limited Partnership Agreement, limited partners' payment obligations under Section
9.4 survive dissolution and winding up of the Delaware GP as well as the limited partners' withdrawal from the
Delaware GP.

[8] The above brackets are in the most recent draft of the Limited Partnership Agreement. These brackets only relate
to how the CDO Fund Employees' payments will be transferred to Cayman GP or Zephyr Funds and are irrelevant
to the CDO Fund Employees' obligation to satisfy the Delaware GP's clawback liability.

"[S]uch Partner shall not be obligated to pay an amount … that is greater than the "after-tax amount" (as calculated by the General Partner in a manner consistent with the calculation of the "After-Tax Amount" under the Partnership Agreements) of all distributions of Covered Proceeds made to such Partner over the life of the Partnership and … the General Partner shall pay any remaining amounts owed…"

58.    Section 9.4(b)(ii) of the Limited Partnership Agreement gives the general partner of the Delaware GP, Claimant LB I Group, full recourse to demand clawback payments owed by the limited partners.

59.    Respondents were aware of and acknowledged the clawback obligations at issue in this proceeding in several ways.

60.    By way of example, in a letter sent by Respondent Daniel to the investors of the Zephyr Funds on March 18, 2009, Daniel represented that Cayman GP would "continue to be obligated to make payments to [Zephyr Funds] pursuant to the 'clawback' provisions of the [Zephyr Agreements]."

61.    By way of further example, CDO Fund Employees, including certain Respondents, were involved in preparing audited financial statements for the Zephyr Funds that reflect Cayman GP's "clawback" liability.  In particular, on June 30, 2009, Respondent Daniel, as a Director of Cayman GP, signed an audit representation letter in connection with Ernst & Young LLP's audit of Zephyr 2004-2, which states that as of December 31, 2008, Cayman GP's "capital account reflects a clawback obligation based on a hypothetical liquidation of the [Zephyr 2004-2 fund] at December 31, 2008," noting that as per Section 9.4 of Zephyr 2004-2's partnership agreement, Cayman GP "has no obligation to pay any clawback amount to [Zephyr 2004-2] until the actual dissolution" of Zephyr 2004-2.  This same letter states that "a hypothetical clawback obligation of $6,881,537 has been recorded, of which $2,555,294 has

13

been reserved due to the uncertainty of the collectability from [Cayman GP] at the time of dissolution of [Zephyr 2004-2]."

62.     By way of further example, Cayman GP corporate resolutions from 2005 state that the Delaware GP would provide financial support to Cayman GP for the Zephyr 2004-2 and Zephyr 2004-3 funds, if necessary.

63.     In addition, letters signed by Respondents Puljic and Daniel, on behalf of the Delaware GP, confirmed its support of Cayman GP.

### D.    Clawback Liability Is Triggered

64.     By May 2015, all of the Zephyr Funds' assets were disposed of and subsequently the final audits were completed. At that time, the IRR Threshold had not been met for any of the three Zephyr Funds. As a result, under Section 9.4 of the Zephyr Agreements, Cayman GP became liable for the clawback amount.

65.     On December 18, 2015, Cayman GP was placed into liquidation. Cayman GP currently has no assets.

66.     In total, the Zephyr Funds paid Cayman GP—and therefore, the Delaware GP and its limited partners, including Respondents—approximately $22.8 million in carried interest over the years. (All payments were made in 2005 and 2006.) Respondents, in particular, collectively received approximately $12.2 million.

67.     Cayman GP's total clawback liability is approximately 25 percent of the total carried interest, *i.e.*, approximately $6.19 million.

68.     The Delaware GP's obligation to satisfy Cayman GP's clawback obligation must be satisfied according to the terms of the Limited Partnership Agreement, as detailed above.

69.     The Delaware GP currently has no reserves to satisfy this obligation as all the carried interest earned was previously paid out to the limited partners. Therefore, the limited partners, *i.e.,* LB I Group and the CDO Fund Employees, are responsible for the full clawback amount.

70.     As stated above, LB I Group is responsible for 42% of the total clawback liability. LB I Group has committed to satisfy its portion of the clawback liability consistent with its legal obligations.[9]

71.     As stated above, the CDO Fund Employees are responsible for 58% of the total clawback liability. This amounts to approximately $3.6 million. Respondents, collectively, are liable for the vast bulk of that amount: approximately $3.3 million. Respondents have not paid what they owe, nor have they committed to do so.

72.     On April 13, 2016, Lehman issued Respondent Puljic a letter demanding he pay $1,546,616 to the Delaware GP. On May 4, 2016, Lehman issued a letter to Respondent Puljic stating that he is deemed a Defaulting Party under the Limited Partnership Agreement. To date, Respondent Puljic has failed to pay said amount.

73.     On April 13, 2016, Lehman issued Respondent Narayan a letter demanding he pay $869,983 to the Delaware GP. On May 4, 2016, Lehman issued a letter to Respondent Narayan stating that he is deemed a Defaulting Party under the Limited Partnership Agreement. To date, Respondent Narayan has failed to pay said amount.

74.     On April 13, 2016, Lehman issued Respondent Daniel a letter demanding she pay $773,339 to the Delaware GP. On May 4, 2016, LBHI issued a letter to Respondent Daniel stating that she is deemed a Defaulting Party under the Limited Partnership Agreement. To date, Respondent Daniel has failed to pay said amount.

---

[9] As stated above, LBI Group is insolvent and the payout to all of its creditors is expected to exceed 80%.

75.    On April 13, 2016, Lehman issued Respondent Snell a letter demanding he pay $96,644 to the Delaware GP.  On May 4, 2016, Lehman issued a letter to Respondent Snell stating that he is deemed a Defaulting Party under the Limited Partnership Agreement.  To date, Respondent Snell has failed to pay said amount.

76.    On April 13, 2016, LBHI issued Respondent Montalvo a letter demanding he pay $38,670 to the Delaware GP.  On May 4, 2016, LBHI issued a letter to Respondent Montalvo stating that he is deemed a Defaulting Party under the Limited Partnership Agreement.  To date, Respondent Montalvo has failed to pay said amount.

77.    Respondents are also responsible for the costs and expenses of this arbitration, including attorney's fees, under the terms of the Limited Partnership Agreement.  Section 9.4(c) specifies that "each Defaulting Party shall in any event be obligated to reimburse the [Delaware GP] for all reasonable attorney's fees and expenses and all other costs and expenses ("Enforcement Costs") incurred by [Delaware GP] in enforcing against such Defaulting Party the obligation to pay [the clawback amount] and such other amounts."

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (BREACH OF CONTRACT)

78.    LBHI repeats and realleges the allegations set forth above.

79.    The Limited Partnership Agreement is a valid and binding contract, notwithstanding that it was not formally executed.

80.    Section 9.4(a) of the Limited Partnership Agreement requires the Delaware GP to pay Cayman GP the amount of any clawback liability Cayman GP is obligated to pay to Zephyr Funds.  The Delaware GP's clawback obligations shall be paid first out of the Delaware GP's reserves and the Delaware GP "shall require the Partners to pay to the [Delaware GP] for

16

payment to the [Cayman GP] such additional amounts as are necessary to satisfy such obligation."

81.     "Partners" is defined in the Limited Partnership Agreement as "[c]ollectively, the General Partner and the Limited Partners"—LB I Group and the CDO Fund Employees.  Each of the limited partners is responsible for their "Give Back Percentage", which amounts to 42% for LB I Group and 58% for the CDO Fund Employees, which includes Respondents.

82.     The Delaware GP has no reserve funds and is therefore unable to satisfy its clawback liability obligations.

83.     Accordingly, Respondents are required to contribute to the clawback obligations of the Delaware GP.

84.     Their failure to do so constitute breaches of the Limited Partnership Agreement.

85.     LB I Group has been damaged by Respondents' breaches in an amount to be determined in this proceeding.

## SECOND CLAIM FOR RELIEF
### (UNJUST ENRICHMENT)

86.     LBHI repeats and realleges each and every allegation above.

87.     Respondents received significant financial benefit under the Limited Partnership Agreement.

88.     As limited partners of Delaware GP, Respondents' failure to contribute to Delaware GP's clawback obligations is unreasonable and unfair to LB I Group and provides improper benefits to Respondents.

89.     Respondents are the direct and primary beneficiary of their failure to contribute to Delaware GP's clawback obligations.

17

90.     It would be unconscionable for Respondents to be permitted to retain these benefits that were derived by improper and unlawful means.

91.     Respondents have therefore been unjustly enriched as a result and LB I Group is entitled to restitution.

### THIRD CLAIM FOR RELIEF
### (DECLARATORY JUDGMENT)

92.     LBHI repeats and realleges each and every allegation above.

93.     The Respondents are obligated to contribute to the clawback obligations of the Delaware GP pursuant to the terms of the Limited Partnership Agreement, which is valid and binding, and an order from this Tribunal should be issued declaring this.

### DEMAND FOR RELIEF

WHEREFORE, after arbitration on the merits, LBHI respectfully demands the following relief:

A.     For judgment against Respondents in an amount proven at the arbitration, together with interest as allowable by law;

B.     For judgment awarding LBHI its costs, expenses, and attorney's fees in accordance with Section 9.4(c) of the Limited Partnership Agreement;

C.     For declaratory judgment, declaring Respondents obligated to contribute to the Delaware GP's clawback obligations; and

D.     For such other and further relief, whether at law or in equity, to which it is justly entitled.

18

Dated:  New York, New York
        October 27, 2016

                              PAUL HASTINGS LLP

                              /s/ Joshua Bennett
                              Kurt W. Hansson
                              Joshua M. Bennett
                              J. Jeanette Kang
                              200 Park Avenue
                              New York, New York 10166
                              (212) 318-6000

                              *Attorneys for Claimant*