# Exhibit C

CWT DRAFT 11/23/04

**LEHMAN BROTHERS CDO ASSOCIATES 2004 L.P.**

**Limited Partnership Agreement**

**Dated as of November 24, 2004**

# TABLE OF CONTENTS

**Page**

## ARTICLE 1

### CERTAIN DEFINED TERMS

## ARTICLE 2

### FORMATION, NAME AND PLACE OF BUSINESS; PURPOSE AND LIMITATION ON OPERATIONS; TERM

| | | |
|---|---|---|
| Section 2.1 | Formation | 9 |
| Section 2.2 | Name | 10 |
| Section 2.3 | Place of Business | 10 |
| Section 2.4 | Purpose; Investment Objective | 10 |
| Section 2.5 | Term | 11 |

## ARTICLE 3

### GENERAL PARTNER; EXPENSES; RELATIONSHIP WITH LEHMAN BROTHERS

| | | |
|---|---|---|
| Section 3.1 | General Partner; Management of General Partner | 11 |
| Section 3.2 | General Partner Expenses; Extraordinary Expenses | 11 |
| Section 3.3 | Certain Fees | 12 |

## ARTICLE 4

### LIMITED PARTNERS

| | | |
|---|---|---|
| Section 4.1 | Limited Partners | 12 |
| Section 4.2 | List of Limited Partners | 13 |
| Section 4.3 | No Management by Limited Partners | 13 |

## ARTICLE 5

### LIABILITY OF PARTNERS

| | | |
|---|---|---|
| Section 5.1 | General Partner | 13 |
| Section 5.2 | Limited Partners | 13 |

## ARTICLE 6

### POWERS OF GENERAL PARTNER; DUTIES OF GENERAL PARTNER; INDEMNIFICATION AND CONTRIBUTION

| | | |
|---|---|---|
| Section 6.1 | Powers | 13 |
| Section 6.2 | Duties | 15 |
| Section 6.3 | Exculpation, Indemnification and Contribution | 15 |

## ARTICLE 7

### SHARING PERCENTAGES; CAPITAL CONTRIBUTIONS AND ACCOUNTS; DEFAULTS; REPURCHASE OF INTERESTS; ACCOUNTING AND TAXABLE YEARS

| | | |
|---|---|---|
| Section 7.1 | Sharing Percentages | 16 |
| Section 7.2 | Capital Contributions and Accounts | 17 |
| Section 7.3 | Default with Respect to Capital Contributions | 18 |
| Section 7.4 | Repurchase of Interests | 19 |
| Section 7.5 | Interest | 23 |

## ARTICLE 8

### ALLOCATIONS

| | | |
|---|---|---|
| [Section 8.1 | Allocation of Profits and Losses; Other Allocations | 23 |
| Section 8.2 | Special Allocation Provisions | 23 |
| Section 8.3 | Tax Allocations | 24 |
| Section 8.4 | Transfers | 25 |
| Section 8.5 | Tax Elections | 25 |
| Section 8.6 | Other Allocation Provisions | 25 |

## ARTICLE 9

### DISTRIBUTIONS; WITHDRAWAL

| | | |
|---|---|---|
| Section 9.1 | Distributions | 25 |
| Section 9.2 | Non-Cash Distributions | 27 |
| Section 9.3 | Withholding | 27 |
| Section 9.4 | Clawback and Forfeiture | 28 |
| Section 9.5 | Withdrawal | 31 |
| Section 9.6 | Tax Distributions | 31 |

## ARTICLE 10

### TRANSFERABILITY OF INTERESTS

Section 10.1    Restrictions and Conditions on Transfers of Interests ...................................31
Section 10.2    Assignees ...................................................................................................32
Section 10.3    Substituted Limited Partners.......................................................................33
Section 10.4    Disposition of General Partner's Interest.....................................................34
Section 10.5    Division of Property....................................................................................34

## ARTICLE 11

### DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP

Section 11.1    Events Causing Dissolution .........................................................................34
Section 11.2    Liquidation..................................................................................................35

## ARTICLE 12

### BOOKS AND RECORDS; ACCOUNTING;
### APPRAISAL; TAX MATTERS AND ELECTIONS

Section 12.1    Books and Records ......................................................................................36
Section 12.2    Accounting Basis, Fiscal Year.....................................................................36
Section 12.3    Bank Accounts; Temporary Investments.....................................................36
Section 12.4    Valuation.....................................................................................................36
Section 12.5    Reports ........................................................................................................36
Section 12.6    Tax Matters and Elections ...........................................................................37

## ARTICLE 13

### MISCELLANEOUS PROVISIONS

Section 13.1    Appointment of the General Partner as Attorney-in-Fact...................................37
Section 13.2    Amendments of this Agreement ...................................................................38
Section 13.3    Arbitration...................................................................................................39
Section 13.4    Notices ........................................................................................................39
Section 13.5    Binding Provisions......................................................................................40
Section 13.6    Applicable Law...........................................................................................40
Section 13.7    Counterparts.................................................................................................40
Section 13.8    Separability of Provisions............................................................................40
Section 13.9    No Right of Employment or Payment ..........................................................40
Section 13.10   Section Titles ..............................................................................................40
Section 13.11   Waiver of Accounting and Partition ............................................................40
Section 13.12   Certain Matters Pertaining to Family Investment Partners...............................41
Section 13.13   Full Satisfaction ..........................................................................................41

Section 13.14    Certain Representations and Warranties ...........................................................41
Section 13.15    Adjustments to Voting Percentage; Voting Generally.......................................43

Annex A
Exhibit A

## LIMITED PARTNERSHIP AGREEMENT

## LEHMAN BROTHERS CDO ASSOCIATES 2004 L.P.

LIMITED PARTNERSHIP AGREEMENT (this "Agreement") of Lehman Brothers CDO Associates 2004 L.P., a Delaware limited partnership, is made as of this 24th day of November, 2004, by and among LB I Group Inc., a Delaware corporation, as general partner (the "General Partner"), and the parties listed as limited partners of the Partnership on Annex A hereto (the "Limited Partners").

### WITNESSETH:

WHEREAS, the parties hereto desire to form a limited partnership pursuant to and in accordance with the Act.

NOW, THEREFORE, in consideration of the mutual promises and agreements made herein and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE 1

## CERTAIN DEFINED TERMS

As used in this Agreement, the following terms shall have the following meanings:

"1940 Act":  The United States Investment Company Act of 1940, as amended.

"Act":  Delaware Revised Uniform Limited Partnership Act, 6 Del. C. §§ 17-101 et seq., as amended from time to time and any successor to said act.

"Affiliate":  Any person or entity that controls, is controlled by, or is under common control with, any other person or entity.

"Agreement":  This Limited Partnership Agreement, as the same may be amended, modified or supplemented from time to time.

"Assumed Income Tax Rate":  As defined in the Partnership Agreements.

"Beneficial Ownership":  As defined in Rule 13d-3 promulgated under the Exchange Act.

"Business Day":  Any day which is not a Saturday, Sunday or a day on which commercial banks in New York, New York are authorized or required by law to close.

"Capital Account":  As defined in Section 7.2(c).

"Capital Contributions":  Amounts contributed by the Partners to the Partnership.

"[Carrying Value":  With respect to any Partnership asset, the asset's adjusted basis for federal income tax purposes, except that the Carrying Values of all Partnership assets shall be adjusted to equal their respective fair values (as reasonably determined by the General Partner), in accordance with the rules set forth in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), except as otherwise provided herein, immediately prior to:  (a) the date of the acquisition of any additional Partnership Interest by any new or existing Partner in exchange for more than a de minimis Capital Contribution or (b) the date of the distribution of more than a *de minimis* amount of Partnership property (other than a pro rata distribution) to a Partner; provided that adjustments pursuant to clauses (a) and (b) above shall be made only if the General Partner determines in its sole discretion that such adjustments are necessary or appropriate to reflect the relative economic interests (including, without limitation, the right to receive distributions in accordance with the terms of this Agreement) of the Partners. The Carrying Value of any Partnership asset distributed to any Partner shall be adjusted immediately prior to such distribution to equal its fair value.  In the case of any asset that has a Carrying Value that differs from its adjusted tax basis, Carrying Value shall be adjusted by the amount of depreciation calculated for purposes of the definition of "Profits and Losses" rather than the amount of depreciation determined for U.S. federal income tax purposes.]

"Cayman Company":  As defined in Section 2.4.

"Cayman Company Investment":  An investment of the funds of the Partnership in the Cayman Company, so that the Cayman Company can meet its Fund Capital Commitment.

"Change in Control":  As defined in Section 7.4(c).

"Clawback Amount":  The amount of any "Clawback Amount" (as defined in the Partnership Agreements) which must be contributed to the Funds pursuant to Section 9.4 of the Partnership Agreements (or equivalent provisions thereof), including, for the avoidance of any doubt, any contributions required by Section 9.4(b); provided that "Clawback Amount" shall include with respect to each Limited Partner any amounts that the General Partner, LBHI or its Affiliates has contributed in respect of the Partnership's obligations to the Funds on behalf of such Limited Partner who was otherwise obligated to make such payment but failed to do so.

"Code":  Internal Revenue Code of 1986, as amended.

"Competitive Activity":  Involvement, whether as an employee, proprietor, consultant or otherwise, with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with the Funds, as determined in the sole discretion of the General Partner.

"[Cost of Carry":  An amount, with respect to each Capital Contribution required to be made by a Limited Partner, not to exceed the amount of such Capital Contribution multiplied by the product of (i) an annual rate of interest (expressed as a percentage) equal to Lehman Brothers' cost of funds, as determined in the reasonable judgment of the General Partner, or, if higher, an amount determined by the General Partner with reference to the applicable United States federal rate for interest on loans then utilized by the Internal Revenue

Service in connection with below-market loans to employees with a maturity date from one to five years and (ii) a fraction the numerator of which is the number of days elapsed from the date on which the Partnership invested in the Cayman Company, so that the Cayman Company could fund the portions of its Fund Capital Commitment corresponding to such required Capital Contribution (as reasonably determined by the General Partner) and the denominator of which is 365. The payment of any Cost of Carry to the Partnership shall not be considered a Capital Contribution for purposes of the calculation of a Limited Partner's voting percentage or share of required expenses or other funding obligations under this Agreement.]

"Covered Proceeds": All amounts distributed (including, for the avoidance of doubt, all liquidating distributions, distributions in-kind, Tax Distributions, Transaction Fees, and distributions in respect of Portfolio Investments) to the Partnership from the Cayman Company, other than Temporary Investment Income and those amounts representing a return of the Partnership's capital contributions to fund the Fund Capital Commitment.

"Default Interest Rate": The lower of (i) the sum of (a) the rate of interest per annum published in the Wall Street Journal as the prime rate and (b) 5%, and (ii) the highest rate of interest permitted under applicable law.

"Defaulting Party": As defined in Section 9.4(c).

"Detrimental Activity": (a) Using information that was received by or disclosed to such Limited Partner relating to the business affairs of the Funds or any of its Portfolio Investments, in breach of his or her responsibilities or obligations to keep such information confidential, (b) directly or indirectly by any means persuading or attempting to persuade any employee of Lehman Brothers who is involved in the affairs of the Funds to terminate his or her employment or (c) any activity deemed to be detrimental to the Funds, in each case as determined in the sole discretion of the General Partner.

"Disability": A disability that meets, or that with the passage of time is reasonably expected to or does meet, the criteria under both the Lehman Brothers Long-Term Disability Insurance Plan and the United States Social Security Disability Act.

"Distribution": For each Portfolio Investment (with, for the avoidance of any doubt, any Follow-on Investments considered to be separate Portfolio Investments), the date on which distributions are made by the Cayman Company to the Partnership in respect of Portfolio Investments. For each Transaction Fee, the date on which such fee is distributed to the Partnership by the Cayman Company and for each Prospective Transaction Fee (including for purposes of Section 7.4(a)), the date on which a Limited Partner is granted a Sharing Percentage therein.

"Election Contest": As used within the context of Rule 14a-11 promulgated under the Exchange Act.

"Enforcement Costs": As defined in Section 9.4(c).

"Exchange Act": The U.S. Securities Exchange Act of 1934, as amended.

"Exercise Schedule":  As defined in Section 7.4(a).

"Extraordinary Expenses":  As defined in Section 3.2(b).

"Fair Value":  The fair value of any asset or property determined in accordance with Section 12.4 hereof.

"Family Investment Partner":  With respect to any individual Limited Partner who is or has been, at any time, an employee of Lehman Brothers, any Person who is a member of such individual Limited Partner's Immediate Family or any Limited Partner which is a trust, partnership or other entity investing in the Partnership for the primary benefit of one or more members of such individual's Immediate Family or such other Persons as are approved by the General Partner.

"Follow-on Investment":  With respect to any Portfolio Investment, means any additional investment in or relating to such original Portfolio Investment.  Each Follow-on Investment in a Portfolio Company shall be deemed a new and separate Portfolio Investment for all purposes hereof and all Investment Proceeds received from the Funds in respect of such Portfolio Company shall be allocated among the original Portfolio Investment and such Follow-on Investment by the General Partner based upon the capital invested in each, or on such other basis as the General Partner determines in good faith is more equitable.

"Friendly Change in Control":  Any Change in Control that is not a Hostile Change in Control.

"Fund Capital Commitment":  The Cayman Company's capital commitment to the Funds as set forth in the Interest Schedules.

"Funds":  Lehman Brothers CDO Opportunity Partners 2004-2, L.P., an exempted limited partnership formed under the laws of the Cayman Islands, and all other Parallel Funds.

"General Partner":  LB I Group Inc., a Delaware corporation and a subsidiary of LBHI, as general partner of the Partnership, and/or any other Person which becomes a successor or an additional General Partner of the Partnership as provided herein, in such Person's capacity as General Partner only.

"General Partner Expenses":  As defined in Section 3.2(a).

"Give Back Percentage":  The percentage determined, for any Partner, by dividing (a) the total amount of distributions of Covered Proceeds received by such Partner from the Partnership by (b) the aggregate amount of distributions of Covered Proceeds received by all Partners from the Partnership.

"Hostile Change in Control":  The occurrence of a Change in Control, without the prior approval of a majority of the independent members of the Incumbent Board.

"Immediate Family":  With respect to any Limited Partner, such Limited Partner's parents, spouse, siblings, lineal descendants and such siblings' and descendants' spouses.

"Incumbent Board": The members of the board of directors of LBHI as of the date hereof, provided, however, that if the election, or nomination for election by LBHI's common stockholders, of any new director was approved by a vote of at least two-thirds of the Incumbent Board, such new director shall, for purposes of this Agreement, be considered as a member of the Incumbent Board; provided, further, however, that no individual shall be considered a member of the Incumbent Board if such individual initially assumed office as a result of either an actual or threatened Election Contest or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the board of directors of LBHI, including by reason of any agreement intended to avoid or settle any Election Contest or such other proxy contest.

"Indemnified Party": As defined in Section 6.3.

"Interest": The entire limited partnership interest owned by a Limited Partner in the Partnership at any particular time, including the right of such Limited Partner to any and all benefits to which a Limited Partner may be entitled as provided in this Agreement, together with the obligations of such Limited Partner to comply with all the terms and provisions of this Agreement, provided that, for purposes of Section 7.4, "Interest" shall mean only that portion of a Limited Partner's interest in the Partnership as it relates to the relevant Portfolio Investment Distribution (and, if applicable, to the relevant Transaction Fees and Prospective Transaction Fees).

"Interest Schedule": With respect to any Partner, a schedule (substantially in the form attached hereto as Exhibit A) delivered to such Partner pursuant to Section 7.1 from time to time by the General Partner setting forth such Partner's (and each of its associated Family Investment Partners') Sharing Percentage applicable to each Portfolio Investment Distribution and each Transaction Fee or Prospective Transaction Fee set forth therein, the Capital Contributions required to be made by such Partner (and any of its associated Family Investment Partners) to the Partnership pursuant to this Agreement and such other matters as may be relevant to such Partner's interest in each Portfolio Investment Distribution and any Transaction Fee or Prospective Transaction Fee, as the same may be adjusted from time to time in accordance with this Agreement. A separate Interest Schedule may be issued with respect to each Family Investment Partner. Each Limited Partner shall maintain the confidentiality of any Interest Schedule and shall not disclose such Interest Schedule, except as required by law or legal process or to his/her Immediate Family or financial, accounting and legal advisors, in each case who are obligated to keep such information confidential.

"Investment Committee": The Private Equity Investment Committee of Lehman Brothers.

"Investment Proceeds": Any distributions to the Partnership from the Cayman Company, in each case with respect to distributions the Cayman Company received from the Funds with respect to Portfolio Investments, including any Transaction Fee, associated Tax Distributions and distributions of Temporary Investment Income allocated in good faith by the General Partner to such Portfolio Investments, but excluding, for the avoidance of doubt, any other fees paid to the Partnership. The General Partner may withhold any Reserve Amounts from distributions of Investment Proceeds.

"Issuance Items": As defined in Section 8.2(h).

"LBHI": Lehman Brothers Holdings Inc., a Delaware corporation.

"Lehman Brothers": LBHI and its subsidiaries.

"Limited Partner": Any party listed as a limited partner in Annex A and any person/entity admitted to the Partnership as a substituted or additional Limited Partner in accordance with this Agreement.

"Non-Control Acquisition": With respect to LBHI, an acquisition by (i) an employee benefit plan (or a trust forming a part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by (A) LBHI or (B) any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned, directly or indirectly, by LBHI (for purposes of this definition, a "Subsidiary"), (ii) LBHI or its Subsidiaries, or (iii) any Person who files in connection with such acquisition a Schedule 13D which expressly disclaims any intention to seek control of LBHI and does not expressly reserve the right to seek such control; provided, however, that any amendment to such statement of intent which either indicates an intention or reserves the right to seek control shall be deemed an "acquisition" of the securities of LBHI reported in such filing as beneficially owned by such acquiring Person for purposes of this definition.

"Nonrecourse Deductions": As defined in U.S. Treasury Regulations Section 1.704-2(b). The amount of Partnership Nonrecourse Deductions for a fiscal year equals the net increase, if any, in the amount of Partnership minimum gain during that fiscal year, determined according to the provisions of U.S. Treasury Regulations Section 1.704-2(c).

"Organizational Expenses": As defined in the Partnership Agreements; provided that the Partnership shall bear only that portion of Organizational Expenses that the Cayman Company is obligated to bear and pay pursuant to such Partnership Agreements.

"Parallel Fund": As defined in the Partnership Agreements.

"Partner Nonrecourse Debt Minimum Gain": [An amount with respect to each partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)) equal to the Partnership Minimum Gain that would result if such partner nonrecourse debt were treated as a nonrecourse liability (as defined in Treasury Regulations Section 1.752-1(a)(2)) determined in accordance with Treasury Regulations Section 1.704-2(i)(3).]

"Partner Nonrecourse Deductions": [As defined in U.S. Treasury Regulations Section 1.704-2(i)(2).]

"Partners": Collectively, the General Partner and the Limited Partners.

"Partnership": Lehman Brothers CDO Associates 2004 L.P., the limited partnership formed under the Act in accordance with this Agreement.

"Partnership Agreements": The Limited Partnership Agreements (or similar governing documents) of the Funds, as amended, modified or otherwise supplemented in accordance therewith.

"Partnership Expenses": As defined in the Partnership Agreements.

"Partnership Minimum Gain": As defined in Treasury Regulations Section 1.704-2(b)(2) and 1.704-2(d).

"Person": As used within the context of Sections 13(d) and 14(d) of the Exchange Act.

"Portfolio Companies": Companies whose securities or ownership interests are the Funds' Portfolio Investments.

"Portfolio Investment": Any "Portfolio Investment" as defined in the Partnership Agreements. To avoid doubt, each Follow-on Investment shall constitute a separate Portfolio Investment for purposes hereof.

"Portfolio Investment Distribution": Each distribution from the Cayman Company to the Partnership with respect to a Portfolio Investment.

"Profits and Losses": [For each fiscal year or other period, the taxable income or loss of the Partnership, or particular items thereof, determined in accordance with the accounting method used by the Partnership for federal income tax purposes with the following adjustments: (a) all items of income, gain, loss or deduction allocated pursuant to Section 8.2 shall not be taken into account in computing such taxable income or loss; (b) any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses shall be added to such taxable income or loss; (c) if the Carrying Value of any asset differs from its adjusted tax basis for federal income tax purposes, any gain or loss resulting from a disposition of such asset shall be determined with reference to such Carrying Value; (d) upon an adjustment to the Carrying Value of any asset, pursuant to the definition of Carrying Value (other than an adjustment in respect of depreciation), the amount of the adjustment shall be included as gain or loss in computing such taxable income or loss; (e) if the Carrying Value of any asset differs from its adjusted tax basis for U.S. federal income tax purposes the amount of depreciation, amortization or cost recovery deductions with respect to such asset shall for purposes of determining Profits and Losses be an amount which bears the same ratio to such Carrying Value as the federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (provided that if the federal income tax depreciation, amortization or other cost recovery deduction is zero, the General Partner may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Profits and Losses); and (f) except for items in (a) above, any expenditures of the Partnership not deductible in computing taxable income or loss, not properly capitalizable and not otherwise taken into account in computing Profits and Losses pursuant to this definition shall be treated as deductible items.]

"Prospective Transaction Fee": As defined in Section 7.1(a).

"Refund Amount":  As defined in Section 9.4(a).

"Refund Amount Reduction Date":  As defined in Section 9.4(a).

"Representative":   Any executor, administrator, trustee, committee, guardian, conservator or representative appointed by a court of competent jurisdiction or otherwise duly appointed to act on behalf of a Limited Partner or the estate of a Limited Partner, or any other legal, tax or financial advisor duly engaged to act on behalf of such Limited Partner.

"Repurchase Percentage":  As defined in Section 7.4(a).

"Repurchase Termination Date":   As defined in the Exercise Schedule in Section 7.4(a).

"Repurchased Distributions":  Distributions received by a Limited Partner from the Partnership in excess of those distributions to which such Limited Partner would have otherwise been entitled if as of the date of any such distribution the General Partner had exercised its repurchase rights pursuant to clause (ii)(A) of the second proviso to Section 7.4(a) and paid the amount due thereunder.

"Reserve Amount":  As defined in Section 9.1(a).

"Securities Act":  The Securities Act of 1933, as amended.

"Security Interest":  As defined in Section 9.4(c).

"Sharing Percentage":  As defined in Section 7.1(a).

"Surviving Corporation":  As defined in Section 7.4(c)(4)(A)(i).

"Tax Advances":  As defined in Section 9.3.

"Tax Distributions":  As defined in the Partnership Agreements.

"Temporary Investment":  Short term investments in money market funds, bank accounts and other money market investments reasonably determined by the General Partner to be of high quality.

"Temporary Investment Income":  As defined in the Partnership Agreements.

"Transaction Fee":  Break-up fees and any other fees or payments received by the Funds for the use of their credit or capital, including any litigation recoveries (net of costs incurred in connection therewith) associated with a Portfolio Investment or with potential Fund investments (whether or not actually consummated), in each case that are paid to the Funds and distributed to the Cayman Company (net of any withholdings by the Funds to satisfy Fund expenses, liabilities and obligations), and then ultimately distributed to the Partnership (net of any withholdings by the Partnership to satisfy Partnership expenses, liabilities and obligations). Prospective Transaction Fees shall be deemed Transaction Fees for purposes hereof upon

payment of such fees to the Funds and distribution thereof to the Cayman Company and ultimately to the Partnership; provided that the Sharing Percentage granted in respect of such Prospective Transaction Fee shall not be affected.

"Transaction Fee Distribution": Each distribution from the Cayman Company to the Partnership with respect to a Transaction Fee.

"Transfer": As defined in Section 10.1(a).

"Transfer Application": As defined in Section 10.2(a).

"Transferring Limited Partner": As defined in Section 10.1(c).

"Triggering Event": Shall mean (i) Limited Partners holding an aggregate of at least a majority of the Interests (based on aggregate Capital Contributions actually made by all Limited Partners, excluding from such calculation any Interest held and Capital Contributions made by the General Partner or any entity that is an Affiliate of the General Partner) voluntarily or involuntarily ceasing to be actively engaged in the business and affairs of the Partnership following any Hostile Change in Control or (ii) Limited Partners holding an aggregate of at least a majority of the Interests (based on aggregate Capital Contributions actually made by all Limited Partners, excluding from such calculation any Interest held and Capital Contributions made by the General Partner or any entity that is an Affiliate of the General Partner) involuntarily ceasing to be actively engaged in the business and affairs of the Partnership following any (A) sale or other disposition of a controlling interest in the General Partner, the Partnership, the Funds or the Private Equity Division of Lehman Brothers to any Person other than an Affiliate of Lehman Brothers or (B) Friendly Change in Control.

"Unallocated Percentage": As defined in Section 7.1(b).

"Voting Securities": With respect to any Person, the outstanding shares of capital stock or other securities having ordinary voting power in the election of directors.

## ARTICLE 2

## FORMATION, NAME AND PLACE OF BUSINESS; PURPOSE AND LIMITATION ON OPERATIONS; TERM

Section 2.1    Formation.  The Partners hereby agree to form the Partnership pursuant to and in accordance with the Act.  In the event that it shall be necessary for the Partnership to exist in or qualify to do business under the laws of any state or states other than, or in addition to, the State of Delaware, the parties hereby agree that the Partnership shall take such action as may be necessary to exist or qualify to do business in any state in which such existence or qualification shall be required, provided that in any such event the Partnership shall at all times continue to be a limited partnership formed under and governed by the provisions of the Act.

Section 2.2    Name.    The name of the Partnership shall be "Lehman Brothers CDO Associates 2004 L.P." The business of the Partnership may be conducted under any other name deemed necessary or desirable by the General Partner.

Section 2.3    Place of Business.    The principal place of business of the Partnership shall be at such place within or outside the State of New York as the General Partner hereafter may determine.

Section 2.4    Purpose; Investment Objective.    (a) The purpose and character of the business of the Partnership is to (i) invest the funds of the Partnership in Lehman Brothers CDO Associates (Cayman), Ltd., an exempted company with limited liability formed under the laws of the Cayman Islands, (the "Cayman Company"), which will, in turn, invest in the Funds and serve as general partner of the Funds or in a similar capacity for other investment partnerships formed pursuant to the Partnership Agreements, and (ii) [to provide investment management services to other investment vehicles formed pursuant to and as contemplated by the Partnership Agreements.] The Partnership may engage in such other activities as are permitted hereby or are in furtherance of or incidental or ancillary to the foregoing as the General Partner shall deem necessary or appropriate.

(b)    In furtherance of its purposes, the Partnership shall have all powers necessary, suitable or convenient for the accomplishment of its purposes, alone or with others, including the following:

(i)    to render investment and asset management services to the Funds and other persons;

(ii)    to hold, receive, mortgage, pledge, transfer, exchange, otherwise dispose of, grant options with respect to and otherwise deal in and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to all securities and other property;

(iii)    to invest and reinvest cash assets of the Partnership in the Cayman Company;

(iv)    to have and maintain one or more offices within or without the State of Delaware and, in connection therewith, to rent or acquire office space, engage personnel and do such other acts and things as may be advisable or necessary in connection with the maintenance of such office or offices;

(v)    to open, maintain and close bank accounts and draw checks and other orders for the payment of moneys and to open, maintain and close accounts with brokers, custodians and others;

(vi)    to engage employees (with such titles and delegated responsibilities as may be specified herein or determined by the Investment Committee), accountants, auditors, custodians, consultants, attorneys and any and all other agents and assistants, both professional and nonprofessional, and to compensate them as may be necessary or advisable;

(vii)    to form or cause to be formed and to own the stock of one or more corporations, whether foreign or domestic, and to form or cause to be formed and to participate in partnerships and joint ventures, whether foreign or domestic;

(viii)    to enter into, make and perform all contracts, agreements and other undertakings as may be deemed necessary or advisable or incident to carrying out its purposes;

(ix)    to sue, prosecute, settle or compromise all claims against third parties, to compromise, settle or accept judgment of claims against the Partnership, and to execute all documents and make all representations, admissions and waivers in connection therewith;

(x)    to borrow money from any person or to guarantee loans or other extensions of credit for any purpose (subject to Section 6.1(a)(iv) hereof);

(xi)    to distribute, at any time and from time to time to the Limited Partner(s) cash, securities, investments or other property of the Partnership, or any combination thereof; and

(xii)    to take such other actions necessary or incidental thereto as may be permitted under applicable law.

Section 2.5    Term.    (a) The term of the Partnership commenced upon the filing of the Certificate of Limited Partnership with the Secretary of State of Delaware in accordance with the provisions of Section 17-201 of the Act.  The Partnership shall continue until the later of December 31, 2014 or the termination of the last remaining Fund, unless the Partnership is dissolved prior to such date or dates as provided herein or otherwise by operation of law.

(b)    No Limited Partner's withdrawal from the Partnership, death, incapacity or bankruptcy, resignation or retirement from Lehman Brothers or other termination of employment with Lehman Brothers shall result in the dissolution or termination of the Partnership as among the remaining Partners.

## ARTICLE 3

## GENERAL PARTNER; EXPENSES; RELATIONSHIP WITH LEHMAN BROTHERS

Section 3.1    General Partner; Management of General Partner.    Except as limited by the express terms of this Agreement, the General Partner shall have complete control of the Partnership's business.  Such control shall be exercised by the General Partner, in its capacity as general partner of the Partnership, by the appropriate officers of the General Partner or their designees.

Section 3.2    General Partner Expenses; Extraordinary Expenses.    (a) The General Partner shall bear the following costs and expenses ("General Partner Expenses"):  (i) all expenses relating to the organization of the Partnership; (ii) the ongoing administrative and

ordinary operating expenses of the Partnership, including without limitation the fees and expenses of attorneys, accountants and experts, payroll and other costs of salaried personnel, and rent and general office overhead, but excluding Extraordinary Expenses [; and (iii) certain expenses of the Cayman Company as set forth in Section [●] of the Cayman Company's Memorandum and Articles of Association].

(b)    [The Partnership shall bear all expenses incurred outside of the ordinary course of its business of [investing all of the assets of the Partnership in the Cayman Company], as reasonably determined by the General Partner in good faith (the "Extraordinary Expenses"), including indemnification and litigation expenses.]

Section 3.3    Certain Fees.  In connection with the investment activities of the Partnership (indirectly through the Cayman Company's investment in the Funds), Lehman Brothers and its Affiliates shall be entitled to receive certain fees, brokerage commissions or other benefits from purchasers, sellers and Portfolio Companies in connection with services rendered to these companies.  Except for Transaction Fees and Prospective Transaction Fees, as provided for in this Agreement, Limited Partners, as such, shall not be entitled to share in these fees, commissions and other benefits.

# ARTICLE 4

# LIMITED PARTNERS

Section 4.1    Limited Partners.  (a) The Limited Partners shall make cash Capital Contributions from time to time when called by the General Partner pursuant to Article 7, (i) with respect to a Portfolio Investment, in accordance with such Limited Partner's Sharing Percentage applicable to such Portfolio Investment, to fund the Partnership's obligations to the Cayman Company, so that the Cayman Company can meet its obligations with respect to each Portfolio Investment and any Partnership Expenses related thereto; (ii) as allocated by the General Partner pro rata based upon such Limited Partners' respective aggregate Capital Contributions actually made (calculated assuming contribution of all amounts called pursuant to payment notices issued under Section 7.2 but not yet received by the Partnership) to invest in the Cayman Company so that the Cayman Company can meet its other funding obligations to the Funds, including for Partnership Expenses unrelated to a particular Portfolio Investment, and the Cayman Company's share of Organizational Expenses of the Funds; and (iii) otherwise in accordance with Section 9.1(c) with respect to Extraordinary Expenses.

(b)    The terms and conditions under which subscriptions for Interests will be accepted, and the manner of and conditions to the sale of Interests will be as provided in this Agreement and any other agreements between the Partnership and each Limited Partner, and subject to any provisions of any of them.  The General Partner may, in its sole discretion, admit additional Limited Partners at any time during the term of the Partnership.  A Limited Partner shall be admitted on his or her execution of an undertaking to be bound by the provisions of this Agreement in the form set out as Exhibit A or such other form acceptable to the General Partner and on the day his or her admission is reflected on the books and records of the Partnership or on such other day as the General Partner and such Limited Partner agree in writing.

(c)      The Partners acknowledge that the Partnership was formed to invest the funds of the Partnership in the Cayman Company, which in turn, will serve as the general partner of the Funds and only those persons whom the General Partner determines have the requisite level of experience and expertise in managing and operating a private investment fund having objectives the same as those of the Funds, and in whom the General Partner has trust and confidence, may be admitted as Limited Partners unless otherwise determined by the General Partner in its sole discretion.

Section 4.2    List of Limited Partners.  The name and address of each Limited Partner is set forth on Annex A hereto, as amended from time to time.  All Limited Partner Interests not held by individual Limited Partners or their Family Investment Partners shall be held by an Affiliate of Lehman Brothers.

Section 4.3    No Management by Limited Partners.  No Limited Partner in its capacity as such shall take part in the management of the Partnership's business, transact any business in the Partnership's name or have the power to sign documents for or otherwise bind the Partnership.

## ARTICLE 5

## LIABILITY OF PARTNERS

Section 5.1    General Partner.  The General Partner shall make cash Capital Contributions from time to time with respect to Portfolio Investments and other expenses to the extent required to invest in the Cayman Company, so that the Cayman Company can satisfy the Fund Capital Commitment and not contributed by the Limited Partners, provided that such Capital Contribution by the General Partner shall be in an amount equal to not less than 1% of all of the Capital Contributions to be made on such date by all Partners.  The General Partner shall not otherwise be required to contribute to the capital of, or lend, the Partnership any funds.  Neither the General Partner nor any of its Affiliates shall have any personal liability for the return or repayment of the aggregate Capital Contributions of any Limited Partner.

Section 5.2    Limited Partners.  Except as otherwise required under Delaware law, no Limited Partner shall be liable for the debts, liabilities, contracts or any other obligations of the Partnership (except to the extent of such Limited Partner's Capital Contributions and his or her share of the undistributed profits of the Partnership) or for the debts or liabilities of any other Partner (subject to Sections 10.2 and 13.13).  No Limited Partner shall be required to lend the Partnership any funds.

## ARTICLE 6

## POWERS OF GENERAL PARTNER; DUTIES OF GENERAL PARTNER; INDEMNIFICATION AND CONTRIBUTION

Section 6.1    Powers.  (a) In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the General Partner shall have and may exercise on behalf of the Partnership all powers and rights necessary, proper,

convenient or advisable to effectuate and carry out the purpose and business of the Partnership. These powers shall include, without limitation, the following powers:

      (i)     to invest in the Cayman Company;

      (ii)    to repurchase (as provided herein) any Limited Partner's Interest in the Partnership;

      (iii)   to make loans or provide other extensions of credit to any person, including Lehman Brothers;

      (iv)   to borrow money, and pay principal and interest thereon, in the name of the Partnership or the Funds from any person, including Lehman Brothers, or guarantee loans or other extensions of credit for purposes of covering Partnership expenses, making tax distributions pursuant to Section 9.6 hereof or for providing interim financing to cover the Partnership's obligations to the Funds prior to the receipt of Capital Contributions hereunder;

      (v)    prior to investing in the Cayman Company or pending cash distributions to the Partners, to make investments of Partnership capital in all types of debt and equity securities of issuers of all types, including, without limitation, United States government and agency securities, certificates of deposit, interest-bearing deposits in United States banks, securities issued by or on behalf of states, municipalities and their instrumentalities, the interest from which is exempt from federal income tax, commercial paper, repurchase agreements with respect to any of the foregoing, securities issued by other investment companies (including unit investment trusts and taxable and tax-exempt money market funds sponsored and/or advised by Affiliates of the General Partner);

      (vi)   to enter into contracts (including, without limitation, swap agreements, insurance policies and other contracts, of any type and coverage) and make commitments on behalf of the Partnership (including all Cayman Company Investments) and, in general, to do and perform everything which may be necessary, advisable, suitable or proper for the conduct of the Partnership's, the Cayman Company's and the Funds' business and for the carrying out of the purposes and objects herein before enumerated, including the delegation to any person or persons of such functions and authority as the General Partner may determine; and

      (vii)  to employ attorneys and accountants to represent and audit the books of the Partnership, which attorneys and accountants may also serve as counsel and auditors to the General Partner and any of its Affiliates.

      (b)    Notwithstanding the foregoing, the Partnership shall not incur any indebtedness or guarantee loans or other extensions of credit in excess of $15 million in the aggregate outstanding at any time or mortgage or subject to any other security device all or any portion of the assets of the Partnership without the consent of a majority of the Interests held by the Limited Partners (based on aggregate Capital Contributions actually made by all Limited Partners to the Partnership, excluding from such calculation any Interest held and any Capital

Contributions made by the General Partner or any entity that is an Affiliate of the General Partner).

(c)    The General Partner is hereby granted an irrevocable power of attorney to exercise instruments that it deems necessary or advisable on behalf of a Limited Partner in connection with the repurchase therefrom in accordance with Section 7.4. Such power of attorney is coupled with an interest and shall survive the death, Disability or other incapacity of such Limited Partner.

(d)    Any person not a party to this Agreement dealing with the Partnership shall be entitled to rely conclusively upon the power and authority of any officer or director of the General Partner to bind the Partnership in all respects, and to execute agreements, instruments and other writings on behalf of and in the name of the Partnership.

Section 6.2    Duties.    (a) Except as otherwise expressly provided herein, the General Partner shall take all action that may be necessary or appropriate for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Delaware.

(b)    The General Partner shall prepare or cause to be prepared and shall file on or before the due date (or any extension thereof) any United States federal, state or local tax returns required to be filed by the Partnership. The General Partner shall cause the Partnership to pay, from Partnership funds, any taxes payable by the Partnership.

(c)    The General Partner shall be under a fiduciary duty and obligation to conduct the affairs of the Partnership in the best interest (or not opposed to the best interest) of the Partnership, including the safekeeping and use of all Partnership funds and assets (whether or not in the immediate possession or control of the General Partner) for the benefit of the Partnership; provided that the provisions of this Agreement, to the extent that they expand or restrict the duties and liabilities of the General Partner otherwise existing at law or in equity, are agreed by the Partners to modify to that extent such other duties and liabilities of the General Partner.

(d)    The General Partner may delegate or assign any action that may be or is required to be taken by the General Partner to any third party, including without limitation, an Affiliate of the General Partner.

Section 6.3    Exculpation, Indemnification and Contribution.    Neither the General Partner, its Affiliates, nor any of their respective partners, members, shareholders, officers, directors, agents, employees or representatives (including any members of the Investment Committee), nor any person who controls the General Partner (a "control person") within the meaning of Section 15 of the Securities Act, nor any partners, officers, directors, agents, employees or representatives of the Partnership (any of such foregoing Persons an "Indemnified Party") shall be liable to the Partnership or the Limited Partners for any act or failure to act relating in any way to the Partnership, its assets, business or affairs so long as such act or failure to act does not constitute such person's willful misconduct, bad faith or gross negligence or reckless disregard of the duties involved in the conduct of the Partnership or such Indemnified Party's office. Each Indemnified Party shall be indemnified by the Partnership to

the fullest extent permitted by law for any and all losses, claims, damages and expenses arising out of or incurred in connection with any claim, action or demand against the General Partner, the Partnership or any such Indemnified Party relating to the Partnership, its assets, business or affairs (including, without limitation, attorneys' fees and expenses and any amounts paid in settlement or compromise of any such claim, action or demand); provided, however, that the foregoing indemnification shall not apply if a court or arbitrator of competent jurisdiction makes a final decision that such claim, action or demand resulted directly from such Indemnified Party's willful misconduct, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of the Partnership or such person's office. The foregoing shall not be construed to reduce or vitiate the benefit of any exculpation or indemnification otherwise provided to an Indemnified Party by Lehman Brothers.

## ARTICLE 7

## SHARING PERCENTAGES; CAPITAL CONTRIBUTIONS AND ACCOUNTS; DEFAULTS; REPURCHASE OF INTERESTS; ACCOUNTING AND TAXABLE YEARS

Section 7.1    Sharing Percentages. (a) The General Partner may, from time to time and in its sole discretion, grant some or all Partners a percentage interest ("Sharing Percentage") in Investment Proceeds that are to be distributed by the Partnership to the Partners with respect to any Portfolio Investment, and in any Transaction Fee received by the Partnership, in each case for which there has been a Distribution. In addition, the General Partner may, from time to time and in its sole discretion, grant some or all Partners a Sharing Percentage with respect to a specific Transaction Fee that may be received in the future and for which there has not been a Distribution (a "Prospective Transaction Fee"). The General Partner intends to make such grants with respect to Portfolio Investments or Transaction Fees within one year after the applicable Distribution relating thereto. The Sharing Percentage, if any, of a Partner applicable to any Portfolio Investment, Transaction Fee and Prospective Transaction Fee shall be set forth in such Partner's Interest Schedules, as issued or amended from time to time in accordance with this Agreement. After the first issuance of an Interest Schedule to a Limited Partner, such Limited Partner's Sharing Percentage in respect of Portfolio Investments set forth in such initial Interest Schedule may not be increased in respect of any Portfolio Investment set forth in a subsequent Interest Schedule without his or her written consent; provided that Sharing Percentages may be decreased in accordance with the terms of this Agreement without such written consent.

(b)    Determination of Sharing Percentages.

(i)    Except as expressly agreed upon in writing by the General Partner and the applicable Partner, no Limited Partner will have any Sharing Percentage (or any right to be granted one) in any distribution or potential distribution to the Partnership in respect of any potential Fund investment, Portfolio Investment, Transaction Fee or Prospective Transaction Fee, unless (and then only to the extent that) such Limited Partner has been granted such Sharing Percentage in accordance with the terms of this Agreement.

(ii)    The General Partner may elect to allocate to the Partners less than 100% of the Sharing Percentages for any distributions from the Cayman Company with respect

to any Portfolio Investment, Transaction Fee or Prospective Transaction Fee (any remainder of such Sharing Percentages being called an "Unallocated Percentage"). Any Unallocated Percentage with respect to any Portfolio Investment, Transaction Fee or Prospective Transaction Fee may be allocated by the General Partner at such later times and to such Partners as the General Partner shall determine; provided, however, that any Unallocated Percentage that is not allocated by the General Partner shall be deemed to be allocated to LB I Group Inc., as Limited Partner.

(c)     The General Partner shall cause the books and records of the Partnership and each Partner's Interest Schedule to reflect the Sharing Percentage of each Partner with respect to each distribution from the Cayman Company with respect to each Portfolio Investment, Transaction Fee and Prospective Transaction Fee.

Section 7.2    Capital Contributions and Accounts.    (a) Each Limited Partner will be required to make Capital Contributions or other payments to the Partnership as provided in this Section 7.2 and in Sections 2.6, 4.1, 7.3, 9.1, 9.4, 10.2 and 13.13 and as otherwise required by this Agreement or applicable law.  Subject to Section 7.2(d) below, the General Partner will provide a payment notice (which may be included in an Interest Schedule) to such Limited Partner requiring such contribution within a reasonable period of time after the delivery of such notice.  [Without limiting the generality of the foregoing, with respect to Portfolio Investments the General Partner will make Capital Contributions required to satisfy the Cayman Company Investment in respect thereof until such time as Sharing Percentages in such Portfolio Investments are granted pursuant to Section 7.1 hereof and Capital Contributions become due.] The amount of any required Capital Contribution (whether for the Cayman Company Investment in respect of Portfolio Investments, expenses or otherwise) may, in the General Partner's discretion, include the Cost of Carry thereof.  Except as provided in Section 9.4, no Limited Partner will be required to contribute an amount greater than its pro rata share of the Cayman Company Investment (based on the ratio of the aggregate Capital Contributions such Limited Partner has actually made to the aggregate Capital Contributions that all Partners have made, calculated assuming contribution of all amounts called pursuant to payment notices issued under Section 7.2, but not yet received by the Partnership) as of such date plus any Cost of Carry charged in accordance with the immediately preceding sentence.

(b)     The General Partner shall fund its share of each Capital Contribution required by Section 7.2(a) above in accordance with Section 5.1. The General Partner shall also be a Limited Partner to the extent that it purchases or becomes a transferee of all or any part of the Interest of the Limited Partner, and to such extent shall be treated as a Limited Partner in all respects.

(c)     A separate capital account (the "Capital Account") shall be established and maintained for each Partner.  The Capital Account of each Partner shall be credited with such Partner's aggregate Capital Contributions, all Profits allocated to such Partner pursuant to Section 8.1 and any items of income or gain which are specially allocated to such Partner pursuant to Section 8.2; and shall be debited with all Losses allocated to such Partner pursuant to Section 8.1, any items of loss or deduction of the Partnership specially allocated to such Partner pursuant to Section 8.2, and all cash and the Carrying Value of any property (net of liabilities assumed by such Partner and the liabilities to which such property is subject) distributed by the

Partnership to such Partner. To the extent not provided for in the preceding sentence, the Capital Accounts of the Partners shall be adjusted and maintained in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), as the same may be amended or revised; provided that such adjustment and maintenance does not have a material adverse effect on the economic interests (including, without limitation, the right to receive distributions in accordance with the terms of this Agreement) of the Partners. Any references in any section of this Agreement to the Capital Account of a Partner shall be deemed to refer to such Capital Account as the same may be credited or debited from time to time as set forth above. In the event of any Transfer of any Interest in the Partnership in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

(d)     The General Partner may require Limited Partners to make Capital Contributions from time to time in advance of Capital Contributions to be made pursuant to Section 7.2(a), provided that any such Capital Contributions shall reduce the amount of Capital Contributions which Limited Partners would otherwise be required to make pursuant to Section 7.2(a).

Section 7.3     Default with Respect to Capital Contributions.

(a)     Consequences of Default in Capital Contributions. For each occurrence of a Partner's default with respect to such Partner's obligation to make Capital Contributions or other payments pursuant to Section 7.2 or otherwise under this Agreement or applicable law, the General Partner may reduce such Partner's (and any associated Family Investment Partners') Sharing Percentage applicable to any distribution from the Cayman Company with respect to any Portfolio Investment, Transaction Fee or Prospective Transaction Fee, regardless of when made (including, for the avoidance of doubt, each existing funded Portfolio Investment and any Transaction Fee or Prospective Transaction Fee regardless of whether received by the Cayman Company from the Funds), by up to 25% with respect to such defaulting Limited Partner and each of its associated Family Investment Partners; provided that a default shall not be deemed to have occurred until a 10 Business Day period following delivery of notice from the General Partner to the Partner of the initial failure by such Partner to make such Capital Contribution or other payments and the continuing failure of the Partner through the expiration of such period to make such Capital Contribution or other payments. As a result of the application of the foregoing, a Limited Partner (and such Limited Partner's associated Family Investment Partners) may forfeit all or a portion of distributions of Investment Proceeds (including liquidating distributions of the Partnership and the Funds) and a corresponding portion of its share of distributions of income from Temporary Investments. The General Partner may determine, in its discretion, that a defaulting Limited Partner (and such Limited Partner's associated Family Investment Partners) shall also forfeit its right to vote on any matters on which Limited Partners are entitled to vote under this Agreement, except as otherwise required by the Act. Any voting percentage forfeited by a defaulting Limited Partner (and such Limited Partner's associated Family Investment Partners) shall be deemed to have been voted and/or abstained in the same proportion as the votes cast by all Limited Partners and accordingly shall not affect the outcome of any such vote. In the event the Limited Partner (and such Limited Partner's associated Family Investment Partners) defaults on its Capital Contribution or other payment, the General Partner, one of its Affiliates or any other Person selected by the General Partner may assume such

Limited Partner's (and any associated Family Investment Partners') remaining obligation to make Capital Contributions to the Partnership and, to the extent so assumed, shall make such Capital Contribution as a Limited Partner.

(b)     To the extent that the General Partner has elected to reduce a defaulting Limited Partner's Sharing Percentage pursuant to Section 7.3(a) above, the provisions and remedies in Section 7.3(a) shall be exclusive. To the extent that the General Partner has not elected to reduce a defaulting Limited Partner's Sharing Percentage pursuant to Section 7.3(a) above, the provisions and remedies in Section 7.3(a) will not be exclusive, and each such provision or remedy shall be cumulative and in addition to every other right, power or remedy whether conferred elsewhere in this Agreement or now or hereafter available at law or in equity or by statute or otherwise. Each Partner acknowledges by his or her execution hereof that it has been admitted to the Partnership in reliance upon such Partner's agreements under this Agreement, that the Partnership may have no adequate remedy at law for a breach hereof and that damages resulting from a breach hereof may be impossible to ascertain at the time hereof or of such breach.

(c)     For purposes of this Section 7.3, a Limited Partner shall be deemed a Family Investment Partner of each of such Limited Partner's associated Family Investment Partners.

Section 7.4     Repurchase of Interests.

(a) Exercise Schedule.    Subject to and in accordance with the terms of this Section 7.4 and except as set forth in a Partner's Interest Schedule, expressly agreed upon in writing following the date hereof by the General Partner and the applicable Partner, or as otherwise set forth herein, the General Partner shall have the right in its sole discretion with respect to each and every Portfolio Investment Distribution to repurchase a percentage (the "Repurchase Percentage"), determined pursuant to the Exercise Schedule set forth below, of the Interest of a Limited Partner (and all of such Limited Partner's associated Family Investment Partners) in each such Portfolio Investment Distribution for an amount equal to the Fair Value of the percentage of such Interest to be repurchased. The foregoing repurchase right must be exercised, if at all, with respect to the Repurchase Percentage of all Portfolio Investment Distribution in which such Limited Partner and his associated Family Investment Partners have an Interest. The schedule according to which the General Partner's right to repurchase a Limited Partner's Interest with respect to each Portfolio Investment Distribution will expire (the "Exercise Schedule") is set forth below. For the avoidance of doubt, with respect to each Limited Partner, the repurchase arrangements set forth below shall apply only to those Portfolio Investment Distributions for which such Limited Partner has been granted a Sharing Percentage. However, upon the granting of a Sharing Percentage, the Repurchase Percentage shall be determined based upon the date of the relevant Distribution as if the Sharing Percentage had been granted on such date. A Limited Partner's interest in Transaction Fees and Prospective Transaction Fees shall be subject to the repurchase provisions of this Section 7.4 (and shall be included in the calculation of Repurchased Distributions) on the same basis as Portfolio Investment Distributions, in each case as reasonably determined in good faith by the General Partner.

| On or After | But Prior To | Repurchase Percentage | Percentage of Interest Not Subject to Repurchase |
|---|---|---|---|
| The Closing | The last day of the calendar quarter in which such Closing occurred | 100% | 0% |
| The last day of the calendar quarter in which such Closing occurred | The last day of the next calendar quarter thereafter | $91^{2/3}$% | $8^{1/3}$% |
| The last day of each consecutive calendar quarter thereafter (i.e., the 3rd through 12th quarterly periods) | The last day of the 12th quarterly period thereafter | $91^{2/3}$% minus $8^{1/3}$% for each such quarterly period elapsed | $8^{1/3}$% for each such quarterly period elapsed |
| The last day of the 12th such quarterly period (the "Repurchase Termination Date") | - | 0% | 100% |

The General Partner, in its sole discretion, shall have authority to increase at any time the percentage of any Limited Partner's Interest not subject to repurchase. Notwithstanding any of the provisions of this Section 7.4, (i) in the event of a Limited Partner's death or Disability, the General Partner's right to repurchase a Limited Partner's Interest (including those of such Limited Partner's Family Investment Partners) pursuant to this Section 7.4(a) with respect to any Portfolio Investment, Transaction Fee or Prospective Transaction Fee shall automatically terminate and shall be of no further force and effect; and (ii) if a Limited Partner has engaged in any Competitive Activity or Detrimental Activity on a date prior to the Repurchase Termination Date, (A) the Repurchase Percentage of such Limited Partner (and such Limited Partner's associated Family Investment Partners) for purposes of the Exercise Schedule above shall be deemed to be the Repurchase Percentage in effect as of the date that is one year prior to the date on which the General Partner exercised its repurchase rights pursuant to this clause (A) and paid the amount due hereunder and (B) any repurchase under clause (ii)(A) above as it relates to the Repurchase Percentage shall be for a price equal to the lower of the Fair Value of the Repurchase Percentage of the Interests to be repurchased or such Limited Partner's Capital Contributions used to fund the Repurchase Percentage of the Interests to be repurchased (in either case less any Repurchased Distributions); provided that the provisions of clause (ii) of the foregoing sentence shall not apply to the extent that a Limited Partner has engaged only in Competitive Activity following such Limited Partner involuntarily ceasing (other than in connection with the engaging by such Limited Partner in Detrimental Activity prior thereto) to be actively engaged in the

business and affairs of the Partnership. The foregoing proviso shall be subject to the good faith interpretation of the General Partner.

    (b)    <u>Change in Control</u>. Notwithstanding Section 7.4(a) above,

    (i)    Immediately following a Hostile Change in Control or the occurrence of the events described in clause (ii) of the definition of "<u>Triggering Event</u>", the General Partner's right to repurchase a Limited Partner's Interest pursuant to Section 7.4(a) with respect to any distribution from the Cayman Company with respect to any Portfolio Investment, Transaction Fee or Prospective Transaction Fee shall automatically terminate and shall be of no further force and effect.

    (ii)    Immediately following a Friendly Change in Control that does not involve a Triggering Event, the General Partner's right to repurchase a Limited Partner's Interest with respect to any distribution from the Cayman Company with respect to any Portfolio Investment, Transaction Fee or Prospective Transaction Fee pursuant to Section 7.4(a) shall terminate upon the earlier to occur of (A) the date, as determined in accordance with Section 7.4(a), upon which the percentage of a Limited Partner's Interest subject to repurchase is equal to zero and (B) the date that is two (2) years following the date of the completion of such Friendly Change in Control.

    (c)    <u>Definition of "Change in Control"</u>. For purposes of this Agreement, "Change in Control" shall mean the occurrence during the term of this Agreement of (i) LBHI and its affiliates no longer being legally permitted to engage in collateralized debt obligations transactions in substantially the same manner as of the date hereof or (ii) the completion of any of the following:

    (1)    The consummation (within the meaning of Rule 14d-2 under the Exchange Act) of a tender offer for more than 20% of LBHI's Voting Securities;

    (2)    An acquisition (other than directly from LBHI) of any voting securities of LBHI by any Person immediately after which such Person has Beneficial Ownership of 20% or more of the combined voting power of LBHI's then outstanding Voting Securities; <u>provided</u>, <u>however</u>, in determining whether a Change in Control has occurred, Voting Securities which are acquired in a Non-Control Acquisition shall not constitute an acquisition which would cause a Change in Control;

    (3)    The Incumbent Board ceasing for any reason to constitute at least a majority of the members of the board of directors of LBHI; or

    (4)    Approval by stockholders of LBHI of:

    (A)    A merger, consolidation or reorganization involving LBHI, unless such merger, consolidation or reorganization meets each of the requirements described in (i), (ii) and (iii) below (a "<u>Non-Control Transaction</u>"):

(i)    The stockholders of LBHI, immediately before such merger, consolidation or reorganization, own, directly or indirectly, immediately following such merger, consolidation or reorganization, at least fifty percent (50%) of the combined voting power of the outstanding voting securities of the corporation resulting from such merger or consolidation or reorganization (the "Surviving Corporation") in substantially the same proportion as their ownership of the Voting Securities immediately before such merger, consolidation or reorganization;

(ii)    the individuals who were members of the Incumbent Board immediately prior to the execution of the agreement providing for such merger, consolidation or reorganization constitute at least a majority of the members of the board of directors of the Surviving Corporation immediately following the consummation of such merger, consolidation or reorganization; and

(iii)    no Person other than LBHI, any Subsidiary, any employee benefit plan (or any trust forming a part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by LBHI, the Surviving Corporation, or any Subsidiary, or any Person who, immediately prior to such merger, consolidation or reorganization, had Beneficial Ownership of 20% or more of the then outstanding Voting Securities has Beneficial Ownership of 20% or more of the combined voting power of the Surviving Corporation's then outstanding voting securities immediately following the consummation of such merger, consolidation or reorganization;

(B)    A complete liquidation or dissolution of LBHI; or

(C)    An agreement for the sale or other disposition of all or substantially all of the assets of LBHI to any Person (other than a transfer to a Subsidiary).

Notwithstanding the foregoing, a Change in Control shall not be deemed to occur solely because any Person (the "Subject Person") acquired Beneficial Ownership of more than the permitted amount of the outstanding Voting Securities as a result of the acquisition of Voting Securities by LBHI which, by reducing the number of Voting Securities outstanding, increases the proportional number of shares Beneficially Owned by the Subject Persons, provided that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of Voting Securities by LBHI, and thereafter such Beneficial Owner acquires any additional Voting Securities which increases the percentage of the then outstanding Voting Securities Beneficially Owned by the Subject Person, then a Change in Control shall occur.

(d)     _Dissolution of the General Partner_.  Subject to Section 10.4, immediately following (i) the dissolution, winding up and termination of the General Partner or (ii) the insolvency, dissolution or liquidation of LBHI, the General Partner's right to repurchase a Limited Partner's Interest with respect to any distribution from the Cayman Company with respect to any Portfolio Investment, Transaction Fee or Prospective Transaction Fee pursuant to Section 7.4(a) shall automatically terminate and shall be of no further force and effect.  This Section 7.4(d) shall not apply to the dissolution, winding up and termination of any entity that served as the general partner of the Partnership prior to a disposition permitted by Section 10.4.

(e)     _Notice/Closing_.  The General Partner may exercise its rights to repurchase all or a portion of an Interest in any distribution from the Cayman Company with respect to any or all Portfolio Investments, Transaction Fees or Prospective Transaction Fees pursuant to Section 7.4(a) at any time, subject to the Exercise Schedule.  The General Partner shall notify a Limited Partner in writing with respect to the exercise of its right to repurchase the Limited Partner's Interest as provided above.  The closing of any such repurchase shall occur as soon as possible after the determination of Fair Value in accordance with Section 12.4.

Section 7.5     _Interest_.  No Limited Partner shall receive interest on amounts credited to such Limited Partner's Capital Account.

# ARTICLE 8

## ALLOCATIONS

[Section 8.1     _Allocation of Profits and Losses; Other Allocations_.  Except as otherwise provided in this Agreement, Profit or Loss and, to the extent necessary, individual items of income, gain, loss or deduction of the Partnership shall be allocated among the Partners in a manner that gives economic effect to the provisions of Articles 9 and 11 (and other relevant provisions of this Agreement) as determined in the discretion of the General Partner.]

Section 8.2     [_Special Allocation Provisions_.  Notwithstanding any other provisions of this Article 8:

(a)     _Minimum Gain Chargeback_.  If there is a net decrease in Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain (determined in accordance with the principles of U.S. Treasury Regulations Sections 1.704-2(d) and 1.704-2(i)) during any Partnership taxable year, the Partners shall be specially allocated items of Partnership income and gain for such year (and, if necessary, subsequent years) in an amount equal to their respective shares of such net decrease during such year, determined pursuant to U.S. Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5).  The items to be so allocated shall be determined in accordance with U.S. Treasury Regulations Section 1.704-2(f).  This Section 8.2(a) is intended to comply with the minimum gain chargeback requirements in such U.S. Treasury Regulations Sections and shall be interpreted consistently therewith; including that no chargeback shall be required to the extent of the exceptions provided in U.S. Treasury Regulations Sections 1.704-2(f) and 1.704-2(i)(4).

(b)    Qualified Income Offset.  If any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Partnership income and gain shall be specially allocated to such Limited Partner in an amount and manner sufficient to eliminate the deficit balance in its Capital Account created by such adjustments, allocations or distributions as promptly as possible.

(c)    Gross Income Allocation.  If any Limited Partner has a deficit Capital Account at the end of any fiscal year which is in excess of the amount such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5), each such Limited Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 8.2(c) shall be made only if and to the extent that a Limited Partner would have a deficit Capital Account in excess of such amount after all other allocations provided for in this Article 8 have been tentatively made as if Section 8.2(b) and this Section 8.2(c) were not in this Agreement.

(d)    Nonrecourse Deductions.  Nonrecourse Deductions shall be allocated among the Partners in accordance with their respective Capital Account balances.

(e)    Partner Nonrecourse Deductions.  Partner Nonrecourse Deductions for any taxable period shall be allocated to the Partner who bears the economic risk of loss with respect to the liability to which such Partner Nonrecourse Deductions are attributable in accordance with U.S. Treasury Regulations Section 1.704-2(j).

(f)    Payee Allocation.  If any payment made by the Partnership that is treated by the Partnership as the payment of an expense or obligation is recharacterized by a taxing authority as a Partnership distribution to the payee as a partner, such payee shall be specially allocated an amount of Partnership income and gain as quickly as possible equal to the amount of such distributions.

(g)    General Partner Expenses.  To the extent, if any, that General Partner Expenses and any items of loss, expense or deduction resulting therefrom are deemed to constitute items of Partnership loss or deduction rather than items of loss or deduction of the General Partner, such General Partner Expenses and other items of loss, expense or deduction shall be allocated 100% to the General Partner and the General Partner's Capital Account shall be credited with a deemed Capital Contribution in the same amount.

(h)    Allocations Relating to Taxable Issuance of Membership Interests.  Any income, gain, loss or deduction realized as a direct or indirect result of the issuance (or deemed issuance) of an Interest to a Partner (the "Issuance Items") shall be allocated among the Partners so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Partner, shall be equal to the net amount that would have been allocated to each such Partner if the Issuance Items had not been realized.]

Section 8.3    [Tax Allocations.  For income tax purposes only, each item of income, gain, loss and deduction of the Partnership shall be allocated among the Partners in the

same manner as the corresponding items of Profits and Losses and specially allocated items are allocated for Capital Account purposes; provided that in the case of any Partnership asset the Carrying Value of which differs from its adjusted tax basis for United States federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Sections 704(b) and (c) of the Code (in any manner determined by the General Partner) so as to take account of the difference between Carrying Value and adjusted basis of such asset.]

Section 8.4    [Transfers.  In the event of a permitted Transfer of any Interest or the termination or reduction of a Partner's interest in his or her Capital Account in the Partnership during a taxable year of the Partnership, allocations of income, gain, loss, deductions and credits of the Partnership will be based on an interim closing of the Partnership's books or such other method as is determined by the General Partner.]

Section 8.5    [Tax Elections.  The General Partner is hereby authorized and empowered to make on behalf and in the name of the Partnership any election, and to prepare or have prepared, to execute or have executed and to file, on behalf and in the name of the Partnership, any returns, applications and other instruments and documents, under the Code and the regulations thereunder, as in effect from time to time, which the General Partner determines in its sole discretion are desirable or advisable in connection with determining such allocations.]

Section 8.6    [Other Allocation Provisions.  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with U.S. Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such regulations.  Sections 8.1 to 8.5 may be amended at any time by the General Partner, if deemed necessary in the reasonable discretion of the General Partner, to comply with such regulations.]

# ARTICLE 9

# DISTRIBUTIONS; WITHDRAWAL

Section 9.1    Distributions.  (a) Subject to Section 9.4, distributions should be made to the Limited Partners at the same time (or as close as reasonably practicable) and in the same manner as distributions are made to the Partnership by the Cayman Company.  The General Partner will determine the aggregate amount of and payment dates for any cash and non-cash distributions to Partners after establishing such reasonable reserves as the General Partner deems appropriate for Extraordinary Expenses and other contingencies, liabilities or obligations, including, without limitation, a reserve of Investment Proceeds to prospectively cover the requirements of Section 9.4.  The General Partner may also withhold from any distribution to a Limited Partner whose Interest has been subject to repurchase pursuant to clause (ii)(A) of the second proviso to Section 7.4(a) an amount equal to such Limited Partner's Repurchased Distributions.  (Amounts reserved and withheld pursuant to the preceding two sentences being referred to as "Reserve Amounts" for purposes of this Agreement.)  However, for purposes only of the General Partner's repurchase rights pursuant to Section 7.4, any such reserves shall be deemed to have been distributed to the Limited Partners.

(b)    Distributions in respect of Investment Proceeds with respect to a Portfolio Investment or any Transaction Fee will be made to the Partners (minus such Partner's share of any Reserve Amounts established by the General Partner pursuant to this Section 9.1(a)) *pro rata* based upon their respective Sharing Percentages relating to each Portfolio Investment Distribution and Transaction Fee.  Other than Transaction Fees, Limited Partners will have no right to share in any other fees paid to the Partnership by the Company.  Notwithstanding anything else to the contrary contained in this Agreement, any such fees (other than Transaction Fees) shall be allocated for tax and other purposes, distributed and otherwise used in the sole discretion of the General Partner.

(c)    In the event that the Partnership incurs an Extraordinary Expense that is related to a Portfolio Investment, Transaction Fee or Prospective Transaction Fee, such Extraordinary Expense will be allocated to the Partners who have made or are required to make Capital Contributions to satisfy the Cayman Company Investment in respect of such Portfolio Investment (on a pro rata basis amongst them based upon their respective Capital Contributions actually made to satisfy the Cayman Company Investment in respect of such Portfolio Investment, calculated assuming contribution of all amounts called pursuant to payment notices issued under Section 7.2, but not yet received by the Partnership) or had Sharing Percentages in respect of such Transaction Fee or Prospective Transaction Fee (on a pro rata basis based upon such Sharing Percentages) and not to any other Partners; provided that following the occurrence of a Triggering Event, Extraordinary Expenses pursuant to this Section 9.1(c) will not be allocated to a Limited Partner unless (i) such Limited Partner has, prior to the earlier of the Triggering Event or the Repurchase Termination Date related to such Portfolio Investment Distribution or the receipt by the Partnership of such Transaction Fee or Prospective Transaction Fee, engaged in any Competitive Activity or Detrimental Activity or (ii) such Limited Partner was involved in the affairs of the Partnership at the time at which the conduct giving rise to such Extraordinary Expense occurred.  Any such Extraordinary Expense will be funded from the following sources and in the following order of priority:

(i)    first, out of any available reserves for such Extraordinary Expense;

(ii)    second, out of proceeds from the disposition of such Portfolio Investment or the payment of such Transaction Fee or Prospective Transaction Fee, any other investment or income; and

(iii)    third, if the General Partner in its discretion elects to obtain a loan to the Partnership to fund such Extraordinary Expense, out of the proceeds from such loan, provided that such loan shall be treated as though made in connection with the Portfolio Investment relating to such Extraordinary Expense.

(d)    In the event that the Partnership incurs an Extraordinary Expense that is unrelated to a particular Portfolio Investment, Transaction Fee or Prospective Transaction Fee, each Partner's share of such Extraordinary Expense will be determined on a pro rata basis (based on the ratio of the aggregate Capital Contributions such Limited Partner has made to the aggregate Capital Contributions that all Partners have made, calculated assuming contribution of all amounts called pursuant to payment notices issued under Section 7.2, but not yet received by the Partnership); provided that following the occurrence of a Triggering Event, Extraordinary

Expenses pursuant to this Section 9.1(d) will not be allocated to a Limited Partner unless (i) such Limited Partner has, prior to the Triggering Event, engaged in any Competitive Activity or Detrimental Activity or (ii) such Limited Partner was involved in the affairs of the Partnership at the time at which the conduct giving rise to such Extraordinary Expense occurred. Any such Extraordinary Expense will be funded from such sources and in such order of priority as the General Partner determines.

(e)      Income from Temporary Investments (minus such Partner's share of any reserves established by the General Partner pursuant to this Section 9.1) shall, unless otherwise applied to satisfy obligations of the Partnership, be distributed at such times and intervals as the General Partner shall determine, but no less frequently than annually. Each distribution of income from Temporary Investments shall be divided among all Partners (including the General Partner) pro rata in proportion to their respective proportionate interests in the Partnership property or funds that produced such income, as reasonably determined by the General Partner (taking into account, among other things, adjustments to Limited Partners' Interests pursuant to Sections 7.3, 7.4, 9.4, 9.5 and Article 10 or otherwise in accordance with this Agreement). The General Partner may withhold any Reserve Amounts from distributions of income from Temporary Investments.

(f)      Any distributions under this Section 9.1 shall be subject to Section 17-607 of the Act, and other applicable laws.

Section 9.2      Non-Cash Distributions. The General Partner in its sole discretion will have the right to distribute to the Limited Partners any securities that the General Partner determines in good faith are marketable in lieu of cash. In addition, the Partnership may distribute any other securities or property in kind upon liquidation. The value of any non-cash assets that are distributed shall be determined by the General Partner in accordance with Section 12.4 hereof.

Section 9.3      Withholding. To the extent the Partnership is required by law to withhold or to make tax payments on behalf of or with respect to any Partner or the Partnership is subjected to tax itself by reason of the status of any Partner ("Tax Advances"), the General Partner may withhold such amounts and make such tax payments as so required. All Tax Advances made on behalf of a Partner shall, at the option of the General Partner, (i) be promptly paid to the Partnership by the Partner on whose behalf such Tax Advances were made or (ii) be repaid by reducing the amount of the current or next succeeding distribution or distributions which would otherwise have been made to such Partner, if such distributions are not sufficient for that purpose, by so reducing the proceeds of liquidation otherwise payable to such Partner. Whenever the General Partner selects option (ii) pursuant to the preceding sentence for repayment of a Tax Advance by a Partner, for all other purposes of this Agreement such Partner shall be treated as having received all distributions (whether before or upon liquidation) unreduced by the amount of such Tax Advance. The Partnership shall also have the right to set-off as appropriate and apply against such Partner's obligation to repay Tax Advances any amounts otherwise payable to such Partner by any Affiliate of the Partnership (including amounts such as returns of capital, profit thereon, dividends and employee compensation). Each Partner hereby agrees to indemnify and hold harmless the Partnership and the other Partners from and against any liability (including, without limitation, any liability for taxes, penalties,

additions to tax or interest) with respect to income attributable to or distributions or other payments to such Partner.

Section 9.4    Clawback and Forfeiture.

(a) Payment of Clawback Amount to the Funds.  Notwithstanding any other provisions of this Article 9, if at any time the Cayman Company is obligated to contribute a Clawback Amount pursuant to any Partnership Agreement, then the Partnership shall (x) pay to the Cayman Company such amounts out of the Reserve Amount and (y) shall require the Partners to pay to the Partnership for payment to the Cayman Company such additional amounts as are necessary to satisfy such obligation.  If so required, (x) each Limited Partner shall contribute to the Partnership in satisfaction of the Partnership's obligations, in cash, when and as called by the Partnership, an amount (the "Refund Amount") equal to the product of (i) such Partner's Give Back Percentage and (ii) the amount of such Clawback Amount not satisfied by the Reserve Amount, and the Partnership shall [contribute the Clawback Amount to the Funds] [or] [invest the Clawback Amount to the Cayman Company, which will in turn, contribute the Clawback Amount to the Funds]; provided that such Partner shall not be obligated to pay an amount pursuant to this Section 9.4(a) that is greater than the "after-tax amount" (as calculated by the General Partner in a manner consistent with the calculation of the "After-Tax Amount" under the Partnership Agreements) of all distributions of Covered Proceeds made to such Partner over the life of the Partnership and (y) the General Partner shall pay any remaining amounts owed pursuant to the foregoing sentence. [Each Partner shall promptly pay directly to the Funds such Partner's Refund Amount as and when called for by the General Partner.]  Notwithstanding the foregoing, if a Triggering Event occurs with respect to any Limited Partner who (x) ceased to be involved in the affairs of the Partnership as of any date (the "Refund Amount Reduction Date") before or after such Triggering Event, and (y) has not otherwise engaged in any Competitive Activity or Detrimental Activity prior to such Refund Amount Reduction Date, (A) the General Partner shall in good faith determine (1) for all Portfolio Investments for which Closings were held prior to the Refund Amount Reduction Date the amount by which the performance of such Portfolio Investments, taken in the aggregate, increased the Partnership's obligation to contribute a Clawback Amount to the [Cayman Company] [Funds] and (2) for all Portfolio Investments for which Closings were held after the Refund Amount Reduction Date the amount by which the performance of such Portfolio Investments, taken in the aggregate, increased the Partnership's obligation to contribute a Clawback Amount to the [Cayman Company] [Funds] and (B) the Refund Amount owed by each such Limited Partner shall equal the product of the Refund Amount, calculated as set forth above in this Section 9.4(a), multiplied by a fraction the numerator of which is the amount determined under clause (A)(1) above and the denominator of which is the sum of the amounts determined pursuant to clauses (A)(1) and (A)(2) above. **[Should the partners "invest" Clawback Amount in the Cayman Company or directly pay it to the Funds?]**

(b)    (i) The General Partner in its sole discretion may require a Limited Partner to return to the Partnership the amount of any Repurchased Distributions as calculated, in accordance with the terms of this Agreement, with respect to such Limited Partner.

(ii)    The General Partner, in its sole discretion, may require each Limited Partner (including any former Limited Partner) to repay to the Partnership, at any time or

from time to time, whether before or after final liquidation of the Partnership or before or after such Limited Partner's withdrawal from the Partnership, all or any portion of the amount of distributions previously made by the Partnership to such Limited Partner to the extent of such Limited Partner's share (as provided below) of any amounts the Partnership is required to return to the [Cayman Company] [Funds] pursuant to any provisions of the Partnership Agreements (other than Section 9.4 thereof) or applicable law. The provisions of this Section 9.4(b)(ii) shall be in addition to and shall not affect the obligations of the Limited Partners under the Act or any other provision of applicable law. The General Partner shall be required to return (at the same time as Limited Partners) its pro rata portion (as provided below) of any amounts required to be returned by Limited Partners under this Section 9.4(b)(ii). A Partner's share of the giveback obligation under this Section 9.4(b)(ii) will be based on the ratio of the aggregate Capital Contributions such Partner has made in respect of the Portfolio Investment giving rise to the Partnership's giveback, indemnification or other obligation to the aggregate Capital Contributions all Partners have made in respect of such Portfolio Investment (calculated assuming contribution of all amounts called pursuant to payment notices issued under Section 7.2, but not yet received by the Partnership); provided that if such giveback, indemnification or other obligations (i) are not related to a particular Portfolio Investment or (ii) exceed the amount of distributions received by such Partner arising out of a Portfolio Investment, then a Partner's share of such giveback obligation shall be based on the ratio of the aggregate Capital Contributions such Partner has made to the aggregate Capital Contributions all Partners have made (calculated assuming contribution of all amounts called pursuant to payment notices issued under Section 7.2, but not yet received by the Partnership).

(iii)    If at any time the General Partner in its sole and absolute discretion determines that the Partnership cannot meet its obligations for Extraordinary Expenses, the General Partner may require each Partner to return distributions made to such Partner for the purpose of meeting such Partner's pro rata share based upon such Limited Partner's respective aggregate Capital Contributions actually made (calculated assuming contribution of all amounts called pursuant to payment notices issued under Section 7.2, but not yet received by the Partnership) of such obligations in an amount up to, but in no event in excess of, the "after-tax amount" (as calculated by the General Partner in a manner consistent with the calculation of the Clawback Amount under the Partnership Agreements) of all distributions of Covered Proceeds made to such Partner over the life of the Partnership; provided that following the occurrence of a Triggering Event, Extraordinary Expenses pursuant to this Section 9.4(b)(iii) will not be allocated to a Limited Partner unless (i) such Limited Partner has, prior to the Triggering Event, engaged in any Competitive Activity or Detrimental Activity or (ii) such Limited Partner was involved in the affairs of the Partnership at the time at which the conduct giving rise to such Extraordinary Expense occurred. The General Partner shall give each Limited Partner at least 10 Business Days prior notice of the amount to be contributed by such Partner pursuant to this Section 9.4(b)(iii). The General Partner may require returns of distributions pursuant to this Section 9.4(b)(iii) without regard to whether a call for capital contributions could be made pursuant to Section 7.2.

(c)    Amounts due under this Section 9.4 shall be paid within ten (10) Business Days after notice requiring such payment is delivered. In the event that any Limited Partner (a "Defaulting Party") fails to repay on a timely basis all or any portion of such Defaulting Party's Refund Amount or any amounts required to be returned to the Partnership pursuant to Section 9.4(b) above, for any reason, the General Partner shall determine in its good faith judgment and in consideration of its obligations under the Partnership Agreements whether the Partnership should pursue any and all remedies (at law or equity) available to the Partnership against the Defaulting Party, the cost of which shall be a General Partner Expense to the extent not ultimately paid or reimbursed by the Defaulting Party or the Funds; provided that each Defaulting Party shall in any event be obligated to reimburse the Partnership for all reasonable attorney's fees and expenses and all other costs and expenses ("Enforcement Costs") incurred by the Partnership (and not otherwise reimbursed) in enforcing against such Defaulting Party the obligation to pay Refund Amounts or such other amounts. It is agreed that the Partnership shall have the right, to the maximum extent permitted by law (effective upon such Defaulting Party becoming a Defaulting Party) to set off as appropriate and apply against such Defaulting Party's Refund Amount or such other amounts (and any Enforcement Costs owed by such Defaulting Party pursuant to the proviso in the preceding sentence) any interest owing by such Defaulting Party thereon as provided for and any amounts otherwise payable to the Defaulting Party by the Partnership or any other Affiliate thereof (including, without limitation, amounts such as returns of capital, profit thereon, employee compensation and any similar amounts owed to such defaulting party by LBHI or any of its Affiliates). To the maximum extent permitted by law, each Limited Partner (including for the avoidance of doubt any new Limited Partner) hereby charges and assigns and agrees to charge and assign his or her Interest in favor of the other Partners of the Partnership as may subsist from time to time in accordance with the Interest each Partner holds in the Partnership (the "Security Interest"), effective upon such Limited Partner becoming a Defaulting Party, in all accounts receivable and other rights to receive payment from any Affiliate of the Partnership (including, without limitation, amounts such as returns of capital, profit thereon, employee compensation and any similar amounts owed to such Defaulting Party by LBHI or any of its Affiliates) and agrees that, upon the Security Interest becoming effective the General Partner on behalf of itself and the other Partners, may sell, collect or otherwise realize the Security Interest. In furtherance of the foregoing, each Limited Partner appoints the General Partner as its true and lawful attorney-in-fact with full irrevocable power and authority, in the name of such Limited Partner in its own name, to take any actions which may be necessary to accomplish the intent of the immediately preceding sentence. Such power of attorney shall not be affected by the subsequent withdrawal, Disability or other incapacity of the Limited Partner granting such power of attorney. The Partnership shall be entitled to collect interest on the Refund Amount and such other amounts (together with any Enforcement Costs that have not yet been reimbursed to the Partnership) of a Defaulting Party from the date such Refund Amount and other amounts (and Enforcement Costs, if any) were required to be paid on behalf of the Partnership at a rate equal to the Default Interest Rate.

(d)    The obligations of the Partners under this Section 9.4 shall be several and no Partner shall be responsible to pay more than the amounts calculated under Sections 9.4(a), (b) and (c) above. A Limited Partner's obligation to make payments under this Section 9.4 shall survive the dissolution and winding up of the Partnership and such Limited Partner's withdrawal from the Partnership.

Section 9.5    <u>Withdrawal</u>.  No Partner shall have the right to withdraw in whole or in part from the Partnership or to receive a return of such Partner's Capital Contributions or any part thereof except (i) upon termination and dissolution of the Partnership, (ii) as may be permitted by the General Partner in its sole discretion or (iii) as otherwise expressly provided herein or required by law.  Upon the death or incompetence of any Partner, or the occurrence of any mandatory withdrawal event under the Act with respect to any Partner, such Partner shall thereupon cease to be a Partner, except as expressly provided herein.  The withdrawal from the Partnership of any Partner shall not, in and of itself, affect the obligations of the other Partners to continue the Partnership during the remainder of its term.

Section 9.6    <u>Tax Distributions</u>.    Notwithstanding any of the foregoing provisions of this Article 9, the General Partner shall cause the Partnership to make a cash advance against distributions to the Partners to the extent that the Partnership receives tax distributions pursuant to Section 10.6(b) (or similar provisions) of the Partnership Agreements. The General Partner may, in its discretion and at such other times as it deems appropriate, make tax distributions to the Partners.  Such amounts may be distributed among the Partners in proportion to the taxable income and gain allocable to the Partners pursuant to this Agreement as reasonably determined by the General Partner.  Amounts otherwise distributable to a Partner under Section 9.1 or 9.2 (including, for the avoidance of doubt, liquidating distributions) shall be reduced by the amount of any prior advances made to such Partner pursuant to this Section 9.6 until all such advances are restored to the Partnership in full.

## ARTICLE 10

## TRANSFERABILITY OF INTERESTS

Section 10.1    <u>Restrictions and Conditions on Transfers of Interests</u>.  (a) Except for Transfers permitted under Section 10.2, no direct or indirect sale, exchange, transfer, assignment, pledge, creation of a security interest in, or encumbrance on, or other disposition by a Limited Partner of all or any portion of such Limited Partner's Interest or any economic interests (including, without limitation, the right to receive distributions in accordance with the terms of this Agreement) therein (including without limitation by means of any participation or swap transaction) (each, a "<u>Transfer</u>") shall be made without the prior written consent of the General Partner (which consent may be withheld in the sole discretion of the General Partner); <u>provided</u> that subject to clause (b) below, (i) such consent may not be unreasonably withheld in the case of voluntary Transfers of a portion of a Limited Partner's Interests, in trust or otherwise, to one or more of such Limited Partner's Family Investment Partners and (ii) such consent shall not be necessary in the case of a Transfer upon a Limited Partner's death to his or her Family Investment Partners.  Except with respect to transfers occurring upon the death of a Limited Partner or in accordance with Section 10.2, a Limited Partner may not transfer or otherwise assign all of its Interest to its Family Investment Partners.

(b)    Any Transfer otherwise permitted under this Article 10 may only be made if:

(i)    such Transfer would not violate any United States securities laws, or any state securities or "blue sky" laws (including any investor suitability standards) or the

laws of any jurisdiction outside the United States applicable to the Partnership, the Fund or the Interest to be Transferred;

(ii)     such Transfer would not cause the Partnership or the Fund to become subject to the 1940 Act; and

(iii)    such Transfer would not in the judgment of the General Partner, pose a risk that the Partnership would be treated as a publicly traded partnership as defined in Section 7704 of the Code.

(c)     The General Partner, its Affiliates, each Limited Partner, the Partnership and their respective officers, directors, agents, employees and control persons shall be indemnified by a Limited Partner (the "Transferring Limited Partner") to the fullest extent permitted by law for any and all losses, claims, damages and expenses arising out of or reasonably incurred in connection with any claim, action or demand against the General Partner, the Partnership or any such other indemnified person relating to the Partnership, its properties, business or affairs (including, without limitation, attorneys' fees and expenses and any amounts paid in settlement or compromise of any such claim, action or demand) for which the Partnership, the General Partner or such other indemnified person has not otherwise been reimbursed actually and reasonably incurred by them in connection with such action, suit or proceeding and arising out of, relating to, or in connection with, any Transfer of all or any portion of such Transferring Limited Partner's Interest, or in connection with the admission of a substituted Limited Partner to the Partnership for such Transferring Limited Partner; provided, however, that the foregoing indemnification shall not apply if a court or arbitrator of competent jurisdiction makes a final decision that such claim, action or demand resulted primarily from such indemnified person's willful misconduct, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of the Partnership or such person's office.

Section 10.2   Assignees.    (a) The Partnership shall not recognize for any purpose any purported Transfer of all or any portion of the Interest of a Limited Partner unless the provisions of Section 10.1 shall have been complied with and there shall have been filed with the Partnership an application (a "Transfer Application"), in form satisfactory to the General Partner, executed and acknowledged by both the seller, transferor or assignor and the purchaser, transferee or assignee and such Transfer Application (i) contains the acceptance by the purchaser, transferee or assignee of all of the terms and provisions of this Agreement, (ii) contains an assumption by the purchaser, transferee or assignee of the obligations of the Transferring Limited Partner to make any unfunded Capital Contributions with respect to such Interest, (iii) contains a representation of the seller, transferor or assignor that such Transfer was made in accordance with all applicable laws and regulations, and (iv) contains the purchaser's, transferee's or assignee's powers of attorney identical to those provided in Section 13.1 and elsewhere in this Agreement, and, in addition, appoints the General Partner his or her attorney-in-fact to execute this Agreement on behalf of such purchaser, transferee or assignee. Notwithstanding anything else contained in this Agreement, in the case of any Transfer by a Limited Partner of all or any portion of its Interest to any of its Family Investment Partners, such Family Investment Partners (a) shall be required to assume the obligations of such Limited Partner hereunder in respect of all or such portion of such Interest, including the obligation to make Capital Contributions pursuant to Article 7 and any Clawback Amount in accordance with

Section 9.4 and any other amounts owing in accordance with Section 9.4(b) in respect of all or such portion of such Interest, provided that, unless expressly released by the General Partner, the Transferring Limited Partner shall remain liable for (i) its obligations hereunder with respect to such transferred Interest and (ii) its Refund Amount and other amounts required to be returned under Sections 9.4(a) and 9.4(b) above and (b) if such transfer is upon the death of a Limited Partner, shall be entitled only to allocations and distributions with respect to that Interest and shall not be entitled to vote as a Limited Partner or otherwise be employed by the General Partner or any of its Affiliates, provided that such distributions shall be subject to the provisions of Section 9.4.  Any Transfer approved in accordance with this Agreement shall be recognized by the Partnership as effective as of the date on which such Transfer Application is filed with the Partnership.

(b)    Any Limited Partner who shall assign all of his or her Interest shall not cease to be a Limited Partner unless and until a substituted Limited Partner is admitted in his or her stead.

(c)    A person who is the assignee of all or any portion of the Interest of a Limited Partner, but does not become a substituted Limited Partner and desires to make a further assignment of such Interest, shall be subject to all the provisions of this Article 10 to the same extent and in the same manner as any Limited Partner desiring to effect a Transfer of its Interest.

Section 10.3    Substituted Limited Partners.  (a) No Limited Partner shall have the right to substitute a purchaser, assignee, transferee, donee, heir, legatee, distributee or other recipient of all or any portion of such Limited Partner's Interest as a Limited Partner (including any Family Investment Partners) in its place. Notwithstanding anything else contained in this Agreement, any such purchaser, assignee, transferee, donee, heir, legatee, distributee or other recipient of Interests shall be admitted to the Partnership as a substituted Limited Partner only (i) with the consent of the General Partner, which consent shall be granted or withheld in the sole and absolute discretion of the General Partner and may be withheld with or without cause, and (ii) by an amendment to Annex A to this Agreement executed by the General Partner and recorded, as and to the extent required by law, in the proper records of each jurisdiction in which such recordation is necessary to qualify the Partnership to conduct business or to preserve the limited liability of the Limited Partners. The Limited Partners hereby consent to the admission of a substituted Limited Partner whose admission has been consented to by the General Partner. Any such consent by the General Partner and the Limited Partner may be evidenced by the execution by the General Partner of an amendment to this Agreement on its behalf and on behalf of all Limited Partners evidencing the admission of such person as a Limited Partner and the making of any filing required by law.

(b)    To the extent required by law, the General Partner shall file an amended certificate of limited partnership with the appropriate authorities of each state in which the Partnership transacts business for the purpose of adding as substituted Limited Partners all assignees of Interests previously approved by the General Partner for admission as substituted Limited Partners and deleting any person/entity that is no longer a Limited Partner or reflecting accurately Capital Contributions of the Limited Partners.

(c)    No person shall become a substituted Limited Partner until such person shall have delivered a Transfer Application as provided in Section 10.2(a) and become a party to this Agreement; provided, however, that for the purpose of allocating profits, losses and distributable cash, a person shall be treated as having become, and as appearing in the records of the Partnership as, a Limited Partner on such date as the Transfer to such person was recognized by the Partnership pursuant to Section 10.2(a).

Section 10.4    Disposition of General Partner's Interest.    The General Partner shall not dispose of its interest in the Partnership as a general partner except to an entity controlled by, or an Affiliate of, Lehman Brothers. No disposition of the General Partner's interest shall be effective, and the General Partner shall not cease to be a general partner of the Partnership, unless and until the transferee thereof is admitted as a general partner of the Partnership and agrees in writing to continue the business of the Partnership with itself as general partner and to be bound by the provisions of this Agreement. Dispositions permitted by this Section 10.4 shall not affect the General Partner's repurchase rights under Section 7.4.

Section 10.5    Division of Property.    In the event of a property settlement or separation agreement between a Limited Partner and his or her spouse, such Limited Partner agrees that he or she shall use his or her reasonable efforts to retain all of his or her Interest in the Partnership and shall pay his or her spouse for any Interest he or she may have in the Partnership out of funds, assets or proceeds separate and distinct from his or her Interest in the Partnership. To the extent that such Limited Partner is unable, despite his or her exercise of reasonable efforts, to retain all of his or her Interest in the Partnership, such Limited Partner shall use reasonable efforts to assign to his or her spouse only the right to share in profits and losses, to receive distributions, and to receive allocation of income, gain, loss, deduction or credit or similar item to which the assigning Limited Partner was entitled, to the extent assigned, with the assigning Limited Partner remaining entitled to exercise all rights and powers of a Limited Partner hereunder. Notwithstanding the foregoing, if a spouse or former spouse of a Limited Partner acquires an Interest in the Partnership as a Limited Partner as a result of any such proposed settlement or separation agreement, (i) such spouse or former spouse hereby grants an irrevocable power of attorney to the assigning Limited Partner, to the same extent as is provided in Section 13.12 below with respect to a Family Investment Partner and (ii) such acquisition shall be deemed a Transfer to which the proviso of Section 10.1(a) does not apply.

# ARTICLE 11

# DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP

Section 11.1    Events Causing Dissolution.    The Partnership shall be dissolved upon the earliest to occur of:  (i) the expiration of its term as set forth in Section 2.5 hereof, (ii) a determination by the General Partner to dissolve the Partnership or (iii) other than as permitted by Section 10.4, upon the resignation, withdrawal, dissolution or bankruptcy of the General Partner or the occurrence of any other event that causes the General Partner to cease to be a general partner of the Partnership under the Act; provided that the Partnership shall not be dissolved or required to be wound up upon the happening of such event if within 90 days after such event, a majority of the Interests held by the remaining Partners (based on aggregate Capital Contributions actually made by such Partners to the Partnership, excluding from such calculation

any Interest held and Capital Contributions made by the General Partner or any entity that is an Affiliate of the General Partner) agrees in writing to continue the business of the Partnership and to the appointment, effective as of the date of such event, of one or more additional general partners. Dissolution of the Partnership shall be effective on the date on which the event occurs giving rise to the dissolution, but the Partnership shall not terminate until the Partnership's certificate of limited partnership has been canceled and the assets of the Partnership have been distributed as provided in Section 11.2.

Section 11.2    Liquidation.  (a) Upon dissolution of the Partnership, its liabilities shall be paid in the order provided herein. The General Partner shall cause Partnership assets to be sold in such manner as the General Partner, in its sole discretion, shall determine. The General Partner or its Affiliates may, to the extent permitted by applicable law, purchase from the Partnership or the Funds any assets upon which there are significant restrictions or for which another purchaser willing to pay Fair Value is not readily obtainable. Payment of the Fair Value of any such investment at the time of the transfer determined by the General Partner in accordance with this Section 11.2 shall be deemed fair and reasonable and not a violation of the General Partner's fiduciary duty to the Partnership. Pending sale of Partnership assets, the General Partner shall have the right to continue to operate and otherwise to deal with Partnership assets. In the event that (other than as permitted by Section 10.4) the General Partner has resigned, withdrawn, dissolved or is bankrupt, or has otherwise ceased to be a general partner of the Partnership, Limited Partners holding a majority of the Interests (based on aggregate Capital Contributions actually made by such Partners to the Partnership, excluding from such calculation any Interest held and Capital Contributions made by the General Partner or any entity that is an Affiliate of the General Partner) shall elect a person (the "liquidating trustee") who is hereby authorized to perform the functions of the General Partner in liquidating the assets of the Partnership and in winding up its affairs.

(b)    Proceeds received upon the liquidation of Partnership assets shall be applied to the payment of the debts and liabilities of the Partnership (whether by payment or establishment of reasonable reserves), including those to Partners who are creditors, to the extent required by law, in the order of priority as provided by law, and to the payment of the expenses of liquidation. The remaining proceeds, if any, plus any remaining assets of the Partnership, shall be applied and distributed to the Partners in accordance with the positive balances of the Partners' Capital Accounts, as determined after taking into account all adjustments to Capital Accounts for the Partnership taxable year during which the liquidation occurs, by the end of such taxable year or, if later, within 90 days after the date of such liquidation; provided, that liquidating distributions shall be made in the same manner as distributions under Article 9 if distributions under Article 9 would result in the Partners receiving a different amount than would have been received pursuant to a liquidating distribution based on Capital Account balances. For purposes of this Section 11.2(b) and for determining Capital Accounts on liquidation, all unrealized gains, losses and accrued income and deductions of the Partnership shall be treated as realized and recognized immediately before the date of distribution.

(c)    In the sole discretion of the General Partner, payments in liquidation may be made either in cash or in non-cash assets designated by the General Partner, or partly in cash and partly in non-cash assets. If payment is made in non-cash assets, the value of such assets shall be determined in accordance with Section 12.4 hereof. In the event of any distribution of

non-cash assets to the Limited Partner, such Limited Partner agrees, if requested by the General Partner at the time of such distribution, to deliver to the Partnership a letter in form and substance satisfactory to the General Partner, or which may be deemed necessary or desirable by the General Partner, to comply with any legal requirements or governmental regulations, including restrictions on the resale of securities.

## ARTICLE 12

## BOOKS AND RECORDS; ACCOUNTING; APPRAISAL; TAX MATTERS AND ELECTIONS

Section 12.1    Books and Records.  The General Partner shall keep or cause to be kept complete and appropriate records and books of account. The books and records of the Partnership shall be maintained by the General Partner at the office of the Partnership and shall be available for examination and copying there by any Limited Partner and/or its duly authorized Representatives at any and all reasonable times for any purpose reasonably related to the Limited Partner's interest as a limited partner of the Partnership.

Section 12.2    Accounting Basis, Fiscal Year.  The books and records and the financial statements and reports of the Partnership shall be kept on such basis as the General Partner shall determine. The fiscal year of the Partnership shall be the calendar year.  An accounting period and taxable year shall mean the calendar year, except that the last accounting period and taxable year shall mean the period ending with the termination of the Partnership.

Section 12.3    Bank Accounts; Temporary Investments.  The General Partner shall maintain the Partnership bank account, and withdrawals shall be made only in the regular course of the Partnership business on such signature or signatures as the General Partner may determine. The General Partner shall invest Capital Contributions and other cash in Temporary Investments pending their contributions by the Partnership to the Funds.  The making of Temporary Investments is deemed to be an activity in the ordinary course of Partnership business.

Section 12.4    Valuation.  If at any time the value of any indirect interest in a Portfolio Investment Distribution is required to be determined under this Agreement, the Investment Committee or a sub-committee thereof shall value such interest in good faith in a manner consistent with Lehman Brothers' valuation procedures applicable to Portfolio Investments held by the Funds.

Section 12.5    Reports.  Within 90 days after the end of each fiscal year, or as soon as practicable thereafter, the General Partner shall send to each person who was a Limited Partner at any time during the fiscal year then ended (i) such tax information as shall be necessary for the preparation by such Limited Partner of its United States federal and state tax returns; and (ii) financial statements of the Partnership.  With reasonable promptness, the General Partner will deliver such other information available to the General Partner as any Limited Partner may from time to time reasonably request in order to complete and file any 83(b) election form with the Internal Revenue Service.

Section 12.6  <u>Tax Matters and Elections</u>.  (a) Each Limited Partner hereby appoints and designates the General Partner as tax matters partner of the Partnership, as such term is defined under the Code, and hereby agrees that any action taken by the General Partner in connection with audits of the Partnership under the Code will be binding upon the Limited Partners. Each Limited Partner further agrees that it will not treat any Partnership item on its tax return in a manner inconsistent with the treatment of the item on the Partnership's tax return and that he will not act independently with respect to tax audits or tax litigation affecting the Partnership, unless, in either case, previously authorized to do so in writing by the General Partner, which authorization may be withheld in the sole discretion of the General Partner.

(b)    As such tax matters partner, the General Partner may cause the Partnership to make all elections required or permitted to be made by the Partnership under the Code (including an election under Section 754 thereof permitting the adjustment in basis of Partnership assets upon the occurrence of certain events, such as a sale of Interests or the death of a Limited Partner) and not otherwise expressly provided for in this Agreement.

## ARTICLE 13

## MISCELLANEOUS PROVISIONS

Section 13.1  <u>Appointment of the General Partner as Attorney-in-Fact</u>.  (a) Each Limited Partner, by his or her execution of this Agreement (which execution may be by his or her attorney-in-fact pursuant to a power of attorney contained in a subscription agreement or Transfer Application), hereby makes, constitutes and appoints the General Partner, acting by any of its officers or their designees, his or her true and lawful agent and attorney-in-fact, with full power of substitution and full power and authority in its name, place and stead to make, execute, sign, acknowledge, swear to, record and file, on its behalf and on behalf of the Partnership such documents, instruments and conveyances that may be necessary or appropriate to carry out the provisions or purposes of this Agreement, including, without limitation:

(i)    the original certificate of limited partnership of the Partnership and all amendments thereto required or permitted by law or the provisions of this Agreement including, without limitation, the admission to the Partnership of additional Limited Partners and substituted Limited Partners, and any certificate of cancellation with respect thereto and modifications of Annex A hereto and all other instruments that the General Partner deems appropriate to reflect a change or modification or amendment of this Agreement, in accordance with this Agreement;

(ii)    all certificates and other instruments deemed advisable by the General Partner to carry out the provisions of this Agreement or to permit the Partnership to become or to continue in the jurisdictions where the Partnership may be doing business as a limited partnership or partnership wherein the Limited Partners have limited liability;

(iii)    all conveyances and other instruments or papers deemed advisable by the General Partner to effect the dissolution and termination of the Partnership;

    (iv)    all fictitious or assumed name certificates required or permitted to be filed on behalf of the Partnership;

    (v)    all other instruments, documents, undertakings, certificates, agreements or papers which may be required or permitted by law to be filed on behalf of the Partnership.

    (b)    The foregoing power of attorney:

    (i)    is coupled with an interest, shall be irrevocable, shall not be affected by and shall survive the subsequent death, Disability, incapacity or incompetence of each Limited Partner;

    (ii)    may be exercised by the General Partner either by signing separately as attorney-in-fact for each Limited Partner or by a single signature of the General Partner acting as attorney-in-fact for all of them or by any other legally acceptable means; and

    (iii)    shall survive the delivery of an assignment by a Limited Partner of the whole or any portion of its Interest; except that, where the assignee of the whole of such Limited Partner's Interest has been approved by the General Partner for admission to the Partnership as a substituted Limited Partner, the power of attorney of the assignor shall survive the delivery of such assignment for the sole purpose of enabling the General Partner to execute, swear to, acknowledge and file any instrument necessary or appropriate to effect such substitution.

    (c)    Each Limited Partner shall execute and deliver to the General Partner within five days after receipt of the General Partner's request therefor such further designations, powers-of-attorney and other instruments as the General Partner deems necessary or appropriate to carry out the terms of this Agreement.

    Section 13.2  <u>Amendments of this Agreement</u>.  (a) An amendment to this Agreement may be proposed by the General Partner by submitting to all Limited Partners (i) the text of such amendment and (ii) a statement of the purpose of such amendment.  Subject to paragraphs (b) and (c) below, the proposed amendments shall be deemed adopted (A) 10 Business Days after the General Partner submits such notice, unless Limited Partners holding a majority of the Interests (based on aggregate Capital Contributions actually made by such Limited Partners to the Partnership, excluding from such calculation any Interest held by the General Partner or any entity that is an Affiliate of the General Partner) have, by the end of such notice period, delivered their written disapproval thereof to the General Partner or (B) if earlier, upon the delivery by Limited Partners holding a majority of the Interests (based on aggregate Capital Contributions actually made by all Limited Partners to the Partnership, excluding from such calculation any Interest held and Capital Contributions made by the General Partner or any entity that is an Affiliate of the General Partner) of their written approval thereof to the General Partner; <u>provided</u> that, except as otherwise provided for in this Agreement, no such amendment shall reduce its share of the Partnership's distributions, income and gains, increase its share of the Partnership's losses or materially and adversely affect the rights granted to or the obligations imposed on such Limited Partner (including those set forth in any Interest Schedule) hereunder

taken as a whole without the written consent of each Limited Partner so affected. Notwithstanding the foregoing, the General Partner may unilaterally amend this Agreement in any manner consistent with, or otherwise determined by it to be desirable to effect the provisions of, the Partnership Agreements and any amendments thereto. No amendment to this Agreement or any Interest Schedule shall be effective without the written consent of the General Partner.

(b)    Notwithstanding the foregoing, this Agreement may be amended by the General Partner without the consent of the Limited Partners (i) to cure any ambiguity or correct or supplement any provision hereof which is incomplete or inconsistent with any other provision hereof or correct any printing, stenographic or clerical error or omissions, (ii) to amend Sections 8.1 to 8.5 pursuant to Section 8.6 and (iii) to amend Annex A hereto and any Interest Schedule to reflect the admission to the Partnership of additional and substituted Limited Partners or other matters provided for in this Agreement.

(c)    Upon the adoption of any amendment to this Agreement, the amended Agreement shall be executed by the General Partner for itself and on behalf of the Limited Partners pursuant to the power of attorney granted in Section 13.1, and, if such amendment affects the certificate of limited partnership of the Partnership under the Act, or any other filing made in any other state, the General Partner, pursuant to the power of attorney granted in Section 13.1, shall execute and file proper amendments and filings in the State of Delaware and in each jurisdiction in which such action is necessary for the Partnership to conduct business or to preserve the limited liability of the Limited Partners.

(d)    The parties hereto acknowledge and agree that after the date hereof, the General Partner may enter into side letters or other agreements or writings with one or more individual Partners that have the effect of establishing rights under, or altering or supplementing, the terms of, this Agreement. The parties hereto agree that any rights established, or any terms of this Agreement altered or supplemented, in a side letter or other agreement or writing with a Partner shall govern with respect to such Partner notwithstanding any other provision of this Agreement.

Section 13.3    Arbitration.  Any dispute, controversy or claim arising out of or in connection with or relating to this Agreement or any breach or alleged breach hereof shall (to the extent not prohibited by governing law) be determined and settled by arbitration in The City of New York pursuant to the rules then in effect of the American Arbitration Association. Any such arbitration shall be before a single arbitrator, who shall have the power, but shall not be required, to award attorney's fees and costs. Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in the highest court of the forum, state or federal, having jurisdiction.

Section 13.4    Notices.  Except as otherwise specifically provided herein, all notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if (i) mailed, certified or registered mail, first-class postage paid or sent via overnight courier or (ii) transmitted via facsimile, if to any Limited Partner, at such Limited Partner's business address, or to such Limited Partner's facsimile number, set forth in the Partnership's records, and if to the Partnership, to the General Partner at the General Partner's address, or to the General Partner's facsimile number, set forth on Annex A, Attention:

Fred Steinberg, or to such other person or address as any Partner shall have last designated by notice to the Partnership, and in the case of a change in address by the General Partner, by notice to the Limited Partners. A copy of any notice sent to the General Partner should also be sent to [Ruth Horowitz]; provided, however, that the failure to do so shall not affect the validity of any notice otherwise given to or sent by the General Partner in compliance with this Section 13.4. Any notice shall be deemed to have been duly given if personally delivered or sent by the mails or by facsimile and will be deemed received (i) if sent by certified or registered mail, return receipt requested, or via overnight courier, on the second Business Day after mailing, (ii) if sent by overnight mail or courier, on the Business Day it is actually received, (iii) if sent by facsimile transmission, on the date sent (or if such date is not a Business Day, on the next succeeding Business Day) provided that confirmatory notice is sent by first-class mail, postage prepaid, and (iv) if delivered by hand, on the date of receipt (or if such date is not a Business Day, on the next succeeding Business Day).

Section 13.5  Binding Provisions.  The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the respective parties hereto, but such agreements and covenants shall not be for the benefit of any third parties (including creditors of the Partnership or the Funds), except to the extent expressly provided in Section 6.3.

Section 13.6  Applicable Law.  This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware.

Section 13.7  Counterparts.  This Agreement may be executed in several counterparts, all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that not all the parties have signed the same counterpart.  The General Partner may execute any document by facsimile signature of a duly authorized officer.

Section 13.8  Separability of Provisions.  If for any reason any provision or provisions hereof that are not material to the purposes or business of the Partnership or the Limited Partners' Interests are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement that are valid.

Section 13.9  No Right of Employment or Payment.  This Agreement does not create any right of employment on the part of any Limited Partner and no Limited Partner shall have any right (implied or otherwise) to be paid any amount hereunder except as expressly provided for herein.  This Agreement shall not be construed as affecting the right of Lehman Brothers to terminate a Limited Partner's employment with or without cause.

Section 13.10  Section Titles.  Article, section and paragraph titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

Section 13.11  Waiver of Accounting and Partition.  Each Partner hereby irrevocably waives any and all rights that it may have to maintain an action for an accounting or

for partition or similar action of the Partnership's property. The foregoing shall not constitute a waiver of a Partner's right to bring an action for breach of this Agreement.

Section 13.12 <u>Certain Matters Pertaining to Family Investment Partners</u>. With respect to any matter herein or under Delaware law requiring a vote or approval of any Family Investment Partner, each Family Investment Partner by executing and delivering this Agreement (or any other document binding such Family Investment Partner the terms of this Agreement) hereby grants an irrevocable power of attorney (which shall be deemed coupled with an interest) to the associated Limited Partner to vote or to give or withhold such approval as such associated Limited Partner shall himself vote or approve with respect to such matter and without the necessity of the taking of any action by any such Family Investment Partner. As a result of the foregoing, a vote by a Limited Partner shall be deemed a vote by all of such Limited Partner's associated Family Investment Partners. Such power of attorney shall not be affected by the subsequent disability or incapacity of the Family Investment Partner granting such power of attorney. Notwithstanding anything else herein, or otherwise to the contrary, upon a Limited Partner's death or Disability, such Limited Partner's Family Investment Partners shall be entitled only to allocations and distributions with respect to their Interests and shall not be entitled to vote as Limited Partners or otherwise be employed by the General Partner or any of its Affiliates, <u>provided</u> that such distributions shall be subject to the provisions of Section 9.4. In the event of any alteration to a Limited Partner's Interest, status as a Limited Partner or its rights and obligations under this Agreement (including, without limitation, adjustments to such Limited Partner's Sharing Percentage or Repurchase Percentage), the General Partner shall have the power to make a corresponding alteration to the Interest, status as a Limited Partner or its rights and obligations under this Agreement of such Limited Partner's associated Family Investment Partners.

Section 13.13 <u>Full Satisfaction</u>. Each Limited Partner agrees that the General Partner and the Partnership shall, upon demand, be entitled to receive from any Limited Partner the full amount then owed under this Agreement by such Limited Partner's associated Family Investment Partners and such Limited Partner hereby unconditionally agrees to pay such amounts when due. Each Family Investment Partner further agrees that the General Partner and the Partnership shall, upon demand, be entitled to receive from any Family Investment Partner the full amount then owed under this Agreement by such Family Investment Partner's associated Limited Partner who is or has been, at any time, an employee of Lehman Brothers, and such Family Investment Partner hereby unconditionally agrees to pay such amounts when due. Any default under this Agreement by a Limited Partner or a Family Investment Partner shall be deemed a default of the respective Family Investment Partner or Limited Partner associated therewith with the consequences of any such default as provided for in this Agreement.

Section 13.14 <u>Certain Representations and Warranties</u>. (a) The General Partner hereby represents that the issuance of Interests to each Limited Partner pursuant to the terms of this Agreement has been duly authorized by all necessary action of the General Partner and appropriate officers of Lehman Brothers.

(b)    Each Limited Partner which is not a natural person represents, warrants and covenants to the other Partners that such Limited Partner is duly formed and validly existing under the laws of the jurisdiction of its organization with full power and authority to perform its

obligations hereunder and that the execution, delivery and performance of this Agreement has been duly authorized by such Limited Partner.

(c)    Each Limited Partner who is a natural person represents, warrants and covenants to the other Partners that such Limited Partner has the legal capacity to enter into this Agreement and perform such Limited Partner's obligations hereunder.

(d)    Each Limited Partner represents, warrants and covenants to the other Partners that:

(i)    this Agreement has been duly executed and delivered by such Limited Partner and constitutes the valid and legally binding agreement of such Limited Partner enforceable in accordance with its terms against such Limited Partner subject to the effect of bankruptcy, insolvency, moratorium and other similar laws relating to creditors' rights generally, by general equitable principles and by an implied covenant of good faith and fair dealing;

(ii)    such Limited Partner is acquiring its Interest in the Partnership for such Limited Partner's own account for investment purposes only and not with a view to resale or distribution;

(iii)    such Limited Partner understands that Interests in the Partnership have not been registered under the Securities Act, the securities laws of any state thereof or the securities laws of any other jurisdiction, nor is such registration contemplated;

(iv)    such Limited Partner understands and agrees further that, subject to the limited rights set forth in this Agreement, its Interest in the Partnership must be held indefinitely unless such Interest is subsequently registered under the Securities Act, the securities laws of any state and the securities laws of any other jurisdiction or an exemption from registration under the Securities Act and these laws covering the sale of such Interests is available; that even if such an exemption is available, the assignability and transferability of its Interests in the Partnership will be governed by this Agreement, which imposes substantial restrictions on transfer; that legends stating that its Interests in the Partnership have not been registered under the Securities Act and these laws and setting out or referring to the restrictions on the transferability and resale of the Interests will be placed on all documents evidencing such Interests;

(v)    such Limited Partner has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in Interests in the Partnership, is able to bear the risk of loss of an investment in such Interests and understands the risks of, and other considerations relating to, a purchase of Interests in the Partnership;

(vi)    such Limited Partner and each of his or her associated Family Investment Partners is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act;

(vii)    such Limited Partner has no need for immediate liquidity in such Limited Partner's investment in its Interests in the Partnership;

(viii)    such Limited Partner has carefully read this Agreement and, to the full satisfaction of such Limited Partner, such Limited Partner has been furnished any materials such Limited Partner has requested relating to the Partnership and the Funds and the offering of Interests in the Partnership, has consulted to the extent deemed appropriate by such Limited Partner with such Limited Partner's own advisors as to the financial, tax, legal and related matters concerning an investment in the Partnership and such Limited Partner has been afforded the opportunity to ask questions of representatives of the Partnership concerning the terms and conditions of the offering and to obtain any additional information necessary to verify the accuracy of any representations or information provided to such Limited Partner and to make an informed investment decision with respect to an investment in the Partnership and

(ix)    All of the representations, warranties and covenants made under this Section 13.14 shall be deemed to be made on a continuing basis during the existence of the Partnership and shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby. Each Partner agrees to notify the other Partners promptly upon becoming aware of a breach in any of such Partner's representations, warranties and covenants under this Section 13.14.

Section 13.15    <u>Adjustments to Voting Percentage; Voting Generally</u>.    Whenever this Agreement provides for a vote of Partners holding a specified percentage in Interest or otherwise, Limited Partners shall vote as a single class and a Limited Partner's voting percentage shall be decreased in proportion to any reductions in such Limited Partner's Interest under Sections 7.3, 7.4, 9.4, 9.5 and Article 10 (or otherwise in accordance with this Agreement) as determined, for purposes of Sections 9.4 and 9.5, in good faith by the General Partner. Except as otherwise set forth in this Agreement, Limited Partners, as such, shall have no voting rights with respect to the affairs of the Partnership.

IN WITNESS WHEREOF, the parties hereto have executed this Limited Partnership Agreement of Lehman Brothers CDO Associates 2004 L.P. as of the date first above written and agree to be bound by its terms.

GENERAL PARTNER

LB I GROUP INC.

By:_____
    Name:
    Title:

LIMITED PARTNERS:

[LB I GROUP INC.

By:_____
    Name:
    Title:  ]

## Annex A

**GENERAL PARTNER:**

Name:                    LB I Group Inc. (1%)

Registered Office:       c/o Corporation Service Company
                         2711 Centerville Road, Suite 400
                         Wilmington, Delaware 19808

Business Address:        399 Park Avenue
                         New York, New York 10022
                         Attention: Fred Steinberg
                         Phone: 212-526-0372
                         Fax: 646-758-2826

**LIMITED PARTNERS:**

[LB I Group Inc.

Business Address:        399 Park Avenue
                         New York, New York 10022
                         Attention: Fred Steinberg
                         Phone: 212-526-0372
                         Fax: 646-758-2826]

Exhibit A

**[Form of Interest Schedule and New Limited Partner Consent]**

**Lehman Brothers CDO Associates 2004 L.P.**

**Interest Schedule for [NAME]**

**Dated as of [_____]**

Defined terms used herein have the meanings set forth in the Amended and Restated Limited Partnership Agreement, as amended from time to time (the "Agreement") of Lehman Brothers CDO Associates 2004 L.P. (the "Partnership"). Pursuant to the Agreement, the General Partner shall update this Interest Schedule as required from time to time to reflect changes to your Interest in the Partnership. Pursuant to the Agreement, future grants of Sharing Percentages in Portfolio Investments, Transaction Fees and Prospective Transaction Fees shall and future payment notices requiring capital contributions may be set forth in a new Interest Schedule

1. Total capital commitments to the partnerships ("CDO Partnerships") for which the Cayman Company acts as general partner (the "Cayman General Partner")  $[____]

2. Cayman General Partner's capital commitments to the CDO Partnership (the "Fund Capital Commitment")  $[____]

3. Partnership's investment in the Cayman Company ("Cayman Company Investment")  $[____]

4. Capital contributions by CDO Partnerships to fund Portfolio Investments listed on Schedule A plus expenses  $[____]

5. Capital contributed by the Cayman Company as Cayman General Partner of the CDO Partnerships  $[____]

6. Your Sharing Percentage in Portfolio Investments, Transaction Fees and Prospective Transaction Fees listed in Schedule A attached hereto  $[____]

7. **Your required Capital Contributions to the Partnership pursuant to this notice (line 5 multiplied by line 6)**  $[____]

8. Your aggregate Cost of Carry in respect of your required Capital Contributions pursuant to line 7  $[____]

9. **Your required aggregate payment (sum of lines 7 and 8)**  $[____]

10. The date on which the aggregate payment pursuant to this notice is due  [___], 200[_]

Prepared by:

_____

[Fred Steinberg]
Private Equity Controller

For New and Current Limited Partners

You hereby consent to and accept the grant of a Sharing Percentage set forth in line 5 above for all purposes of the Agreement, including, without limitation, the calculation of any required Capital Contributions and consent to such grant to the extent required by the last sentence of Section 7.1(a) of the Agreement.

_____

[NAME]

**For New Limited Partners only**

This page shall serve as a counterpart signature page to the Agreement. By executing below, the undersigned is deemed to have executed the Agreement and is hereby admitted as a Limited Partner of the Partnership. In consideration for being admitted as a Limited Partner pursuant to Section 4.1 of the Agreement, the undersigned hereby agrees to be bound by the terms of the Agreement, a copy of which has been provided, and acknowledges its admission as a Limited Partner of the Partnership and its award hereunder.

Terms set out herein have the same meaning as provided in the Agreement unless otherwise defined. Without derogation of the foregoing the undersigned hereby expressly confirms and agrees to the following in the Agreement:

   (a)    that the Interest being acquired is subject to a Security Interest;

   (b)    the several powers of attorney given to the General Partner; and

   (c)    the representations and warranties set out in Section 13.14(b), (c) and (d).

_____

[NAME]