WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
William A. Maher
Paul R. DeFilippo
James N. Lawlor
Adam M. Bialek
John D. Giampolo
Mara R. Lieber

ROLLIN BRASWELL FISHER LLC
8350 E. Crescent Pkwy., Suite 100
Greenwood Village, Colorado 80111
Telephone: (303) 945-7415
Facsimile: (303) 974-7468
Michael A. Rollin
Maritza Dominguez Braswell (admission pending)
Caleb Durling
Corey Longhurst (application to be filed)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | **Chapter 11** |
| Debtors. | **Case No. 08-13555 (SCC)** |
| LEHMAN BROTHERS HOLDINGS INC., | |
| Plaintiff, | **Adv. Pro. No. _____** |
| -against- | |
| PMAC LENDING SERVICES, INC., individually and as successor by merger to PMC Bancorp, f/k/a Professional Mortgage Corp., and as successor by merger to Reliant Mortgage Company, LLC, and PMC BANCORP, f/k/a Professional Mortgage Corp., individually, and RELIANT MORTGAGE COMPANY, LLC, individually, | |
| Defendants. | |

## SECOND AMENDED ADVERSARY COMPLAINT

Plaintiff Lehman Brothers Holdings Inc. ("LBHI"), the Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), for its Complaint Defendants PMC Bancorp, f/k/a Professional Mortgage Corp. ("PMC Bancorp"), individually, Reliant Mortgage Company, LLC ("Reliant"), individually, and PMAC Lending Services, Inc. ("PMAC Lending"), individually and as successor to PMC Bancorp and Reliant (PMC Bancorp, Reliant, and PMAC Lending, and Reliant are collectively referred to herein as the "Defendants"), alleges upon knowledge as to itself and its own conduct, and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.      In this action, LBHI seeks to enforce its right to contractual indemnification against Defendants, and their successors, for liabilities, losses, damages, claims, judgments and any other costs, fees and expenses LBHI incurred as a result of Defendants' sale and/or submission of defective mortgage loans in breach of representations, warranties, obligations, and/or covenants, and for which LBHI incurred liability due to Defendants' acts, failures to act, and/or omissions (the "Defective Loans").

2.      LBHI sold the Defective Loans to the Federal National Mortgage Association ("Fannie Mae") and/or the Federal Home Loan Mortgage Corporation ("Freddie Mac") under agreements that included representations and warranties about the Defective Loans that were coextensive with those that Defendants made to LBHI.  LBHI retained the right to seek indemnification from Defendants in the event it became liable for certain indemnification events. After Fannie Mae and Freddie Mac discovered that the Defective Loans breached certain of those representations and warranties, Fannie Mae and Freddie Mac made claims upon LBHI for

losses suffered on the Defective Loans.  In January and February 2014, respectively, the United

States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court")

approved settlements between (i) LBHI and Fannie Mae (ECF No. 42153), and (ii) LBHI and

Freddie Mac (ECF No. 42754), triggering LBHI's indemnification claims under the Agreements,

as defined below, with Defendants.

3.      By this action, LBHI seeks to recover money damages from Defendants, as well

as the Defendants' successors, for the indemnification claims.

4.      In addition to each Defendant's separate liability for the Defective Loans it sold,

LBHI also seeks to recover damages from PMAC Lending for LBHI's claims against PMC

Bancorp and Reliant because PMAC Lending is liable, as successor, for PMC Bancorp's and

Reliant's obligations, debts, and liabilities.  Specifically, PMAC Lending expressly or impliedly

agreed to assume PMC Bancorp's debts, obligations, and liabilities; engaged in a de-facto

consolidation or merger with PMC Bancorp; and/or is a mere continuation of PMC Bancorp.

PMAC Lending and PMC Bancorp also engaged in a fraudulent transfer of PMC Bancorp's

assets with actual intent to hinder, delay, or defraud PMC Bancorp's creditors, thereby giving

rise to PMAC Lending's liability as successor for PMC Bancorp's obligations, debts, and

liabilities.  PMAC Lending also expressly or impliedly agreed to assume Reliant's debts,

obligations, and liabilities.  As a result, PMAC is jointly and severally liable for PMC Bancorp

and Reliant's indemnification obligations to LBHI.

## PARTIES

5.      On September 15, 2008, Plaintiff LBHI commenced with this Court a voluntary

case under chapter 11 of the Bankruptcy Code.  LBHI is a Delaware corporation with its

principal place of business in New York, New York.

6.      Upon information and belief, Defendants are or were, at all relevant times, organized in and does business within the United States.

7.      PMAC Lending is a successor to PMAC Bancorp and Reliant.  As a result, all debts, liabilities and obligations of PMAC Bancorp. and Reliant vested in PMAC Lending. PMAC Lending is named in this action both in its own capacity and as successor.

## JURISDICTION AND VENUE

8.      This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

9.      This Court has subject-matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334 and as the matter has a close nexus with the Plan, which was confirmed by Order of the Bankruptcy Court, dated December 6, 2011 (the "Confirmation Order"), and became effective on March 6, 2012.  The Court has retained post-confirmation jurisdiction over this matter pursuant to section 14.1 of the Plan and paragraph 77 of the Confirmation Order.

10.     Venue is proper under 28 U.S.C. §§ 157(a), 1408, and 1409.

11.     This Court has personal jurisdiction over Defendants pursuant to Rule 7004(f) of the Bankruptcy Rules.  In addition, this Court has personal jurisdiction over Defendants because Defendants are or were, at all relevant times, organized in and doing business within the United States, and because the transactions giving rise to this controversy occurred in the United States.

## FACTUAL BACKGROUND

12.     At all relevant times, LBHI engaged in the purchase and sale of mortgage loans directly or through affiliates, including Lehman Brothers Bank, FSB ("LBB"), then sold the loans to third parties, including Fannie Mae and Freddie Mac.

4

13.    At all relevant times, Defendant engaged in mortgage origination, as well as the sale of mortgage loans on the secondary market to entities such as LBB and LBHI.

A.    **The Governing Agreements**

14.    This dispute arises out of Defendants' sale of residential mortgage loans to LBHI's assignor, LBB, under one or more Loan Purchase Agreements with LBB (each a "LPA").[1]

15.    The dates of the relevant LPAs are listed in Exhibit A hereto.

16.    The LPAs specifically incorporate the terms and conditions of the Seller's Guide of loan administrator, Aurora Loan Services LLC (the "Seller's Guide", together with the LPAs, "Agreements") which sets forth additional duties and obligations of Defendants.[2]  The Seller's Guide in its entirety is valid and binding on Defendants.

17.    The Agreements set forth the duties and obligations of the parties with respect to the purchase and sale of mortgage loans, including but not limited to purchase price, delivery, and conveyance of the mortgage loans and mortgage loan documents.

18.    The Agreements also set forth Defendants' duties and obligations regarding underwriting; representations and warranties concerning the parties and individual mortgage loans purchased, sold or submitted; and Defendants' indemnification obligations.

19.    Pursuant to the Agreements, Defendants sold mortgage loans—the Defective Loans—to LBB that resulted in LBHI being exposed to and incurring liability, as described

---

[1] Although PMC Bancorp, PMAC Lending, and Reliant entered into separate Loan Purchase Agreements, the relevant provisions are substantially similar in all material respects as between the Loan Purchase Agreements at issue in this action.

[2] The operative Seller's Guide for each of the Defective Loans is the version in effect at the time the Defendants sold the relevant loan to LBB.  Although the language of certain sections referenced throughout this Complaint may vary slightly from Seller's Guide to Seller's Guide, it is generally consistent in all material respects.

further below.

20.    The parties agreed that Defendants' obligations would extend to any subsequent purchasers and/or assignees, such as, in this case, LBHI.  The Seller's Guide defines the "Purchaser" as LBB and, among others, its "successors and/or assigns."  *See* Seller's Guide § 8.

21.    In conjunction with the sale by LBB to LBHI of the Defective Loans, LBB assigned to LBHI all of its rights and remedies under the Agreements pertaining to the Defective Loans.

22.    Further, the Seller's Guide provides that LBHI, as a subsequent holder of any Mortgage Loan, "shall be a third party beneficiary" of the LPAs.  *See* Seller's Guide § 711.

**B.    Defendants' Representations Under the LPAs**

23.    Accordingly, LBHI as the "assignee" and third-party beneficiary of the LPAs, and as "subsequent holder" of the Defective Loans, is entitled to all the benefits of the Agreements, including the right to contractual indemnification.

24.    With respect to each of the loans sold to LBHI (as, among other things, LBB's assignee) under their respective LPAs, Defendants made a number of representations, warranties, and covenants concerning the quality, characteristics, and underwriting of the mortgage loans; the property securing the mortgage loans; and the borrowers.

25.    Specific examples of Defendants' representations, warranties and covenants include, but are not limited to, the following:

> No document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan (including, without limitation, the Mortgagor's application for the Mortgage Loan executed by the Mortgagor), was falsified or contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading.  Seller's Guide § 703(1).

6

Seller . . . has duly and faithfully complied with and will continue to comply with: (i) all applicable laws, rules, regulations, decrees, pronouncements, directives, orders and contractual requirements with respect to the origination, closing, underwriting, processing and servicing of each Mortgage Loan . . . . Seller's Guide § 703(8).

The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. No fraud was committed in connection with the origination of the Mortgage Loan. The Seller has reviewed all of the documents constituting the Mortgage Loan File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein. Seller's Guide § 703(12).

There is no default, breach, violation or event of acceleration existing under the Mortgage or the Note and, no event has occurred or condition exists that, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration and neither Seller nor its predecessors has waived any default, breach, violation or event of acceleration. Seller's Guide § 703(18).

The Mortgage Loan has been originated and processed by Seller or Seller's correspondent in accordance with, and conforms with, the terms of this Seller's Guide and the Loan Purchase Agreement, and the Mortgage Loan has been underwritten in accordance with Underwriting Guidelines in effect as of the date of the Delivery Commitment applicable to the Mortgage Loan. The Mortgage Loan complies with all the requirements of the related Program Profile applicable to such Mortgage Loan . . . . Seller's Guide § 703(21).

The Mortgaged Property is lawfully occupied under applicable law, unless properly disclosed to Purchaser. All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property, or with respect to the use and occupancy of the same (including, without limitation, certificates of occupancy and fire underwriting certificates), have been made or obtained by Seller or Seller's correspondent from the appropriate authorities. The Mortgagor represented at the time of origination of the Mortgage Loan that the Mortgagor would occupy the Mortgaged Property as the Mortgagor's primary residence, if applicable. Seller's Guide § 703(24).

Notwithstanding anything contained elsewhere in this Seller's Guide or the Loan Purchase Agreement, Seller hereby represents

and warrants that all appraisals and other forms of real estate valuation conducted in connection with each Mortgage Loan comply with applicable federal and state law, including without limitation, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 as applicable, and the requirements of Fannie Mae or Freddie Mac and the Seller's Guide and were conducted and delivered prior to approval of the Mortgage Loan application by either (i) in the case of an appraisal, by a qualified appraiser, duly appointed by the Seller, or (ii) a valuation method meeting the requirements of the Seller's Guide. The fair market value of the Mortgaged Property as indicated by the property appraisal or valuation is materially accurate. Any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property has no interest, direct or indirect, in the Mortgaged Property or in any security thereof. The compensation of any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property was not affected by the approval or disapproval of the Mortgage Loan. Seller's Guide § 703(36).

26.    To the extent Defendants were also the underwriter of certain loans as permitted under the Seller's Guide or other applicable agreements, Defendants additionally represented, warranted and covenanted in Section 717(1) of the Seller's Guide that with respect to such loans:

All underwriting performed by Seller hereunder shall be in strict compliance with the underwriting guidelines and product descriptions contained in the Seller's Guide and such other guidelines and requirements as may be provided to Seller in writing from time to time.

27.    Defendants represented and/or warranted that they had the ability to perform their obligations under, and satisfy all requirements of, the LPAs. *See* Seller's Guide § 702(5).

28.    LBHI (as, among other things, LBB's assignee) relied upon the representations and warranties contained in the Agreements in purchasing the Defective Loans. Specifically, Section 701 of the Seller's Guide provides that:

Seller acknowledges that Mortgage Loans are purchased in reliance upon: (i) the truth and accuracy of Seller's representations and warranties set forth in the Loan Purchase Agreement and this Seller's Guide, each of which representations and warranties relates to a matter material to such purchase; and (ii) Seller's compliance

8

with each of the agreements, requirements, terms, covenants and conditions set forth in the Loan Purchase Agreement and this Seller's Guide.

**C.    Defendants' Indemnification Obligation Under the LPAs**

29.    Defendants agreed to indemnify LBHI (as, among other things, LBB's assignee)

from liabilities, claims, judgments, losses and expenses it might sustain as a result of the

Defective Loans, including attorneys' fees.  Section 711 of the Seller's Guide, entitled

"Indemnification and Third Party Claims," provides, in pertinent part, as follows:

> In addition to any repurchase and cure obligations of Seller, . . .
> Seller shall indemnify Purchaser and Purchaser's designee
> (including, without limitation, any subsequent holder of any Note)
> from and hold them harmless against all claims, losses, damages,
> penalties, fines, claims, forfeitures, lawsuits, court costs, reasonable
> attorney's fees, judgments and any other costs, fees and expenses
> that the Purchaser may sustain in any way related to or resulting
> from any act or failure to act or any breach of any warranty,
> obligation, representation or covenant contained in or made
> pursuant to this Seller's Guide or the Loan Purchase Agreement by
> any agent, employee, representative or officer of Seller or Seller's
> correspondent.  In addition to any and all other obligations of Seller
> hereunder, Seller agrees that it shall pay the reasonable attorney's
> fees of Purchaser incurred in enforcing Seller's obligations
> hereunder . . . .

**D.    LBHI's Settlements with Fannie Mae and Freddie Mac**

30.    When LBB acquired loans from the Defendants and others, it typically did not

hold those loans on its books.  The loans it acquired from the Defendants and other entities,

including the Defective Loans, were sold to LBHI, and then sold to other industry participants,

including Fannie Mae and Freddie Mac.

31.    When LBHI sold the Defective Loans to Fannie Mae and/or Freddie Mac, it relied

on information provided to LBB by Defendants, and it made representations and warranties to

Fannie Mae and/or Freddie Mac based, in part, on the representations Defendants made to LBB.

32.    Eventually, Fannie Mae and/or Freddie Mac discovered breaches of

representations, warranties and/or covenants in the Defective Loans.

33.    Fannie Mae and Freddie Mac filed proofs of claim in LBHI's bankruptcy proceeding to recover for losses on the Defective Loans and other loans sold to LBB.

34.    Many of the loans at issue in the Fannie Mae and Freddie Mac proofs of claims, and all of the Defective Loans, contained defects which caused LBHI to incur losses, judgments, costs, expenses, attorneys' fees, and liability to Fannie Mae and Freddie Mac.

35.    LBHI was forced to defend against and eventually settle with Fannie Mae and Freddie Mac.

36.    The Bankruptcy Court approved LBHI's settlements with Fannie Mae and Freddie Mac, including loan-level damages amounts for each Defective Loan (as shown in Exhibit A of each settlement agreement), finding the settlements to be "reasonable and appropriate."

37.    The types of defects which caused LBHI to incur expenses, costs, losses, judgments, attorneys' fees, and liability to Fannie Mae and Freddie Mac, include but are not limited to defects concerning the quality and characteristics of the loans, the creditworthiness of the borrowers, and the value and characteristics of the collateral, such as with respect to the income, employment, assets, and debt obligations of the borrowers, the intended and actual occupancy status of the properties, the appraised value of the properties and compliance with appraisal standards, among other things; defects concerning underwriting and the collection and review of the loan application and supporting documentation; and defects concerning origination practices generally, including compliance with applicable laws, rules, regulations, decrees, pronouncements, directives, orders and guidelines.

38.    As it concerns Defendants specifically, Exhibit B attached hereto identify each

Defective Loan, and provide a non-exclusive list of the defects causing LBHI to incur liability, expenses, losses, judgments, attorneys' fees, and other costs for each Defective Loan.  A general description of the defects identified in Exhibits B is included in Exhibit C.

39.     The liability incurred by LBHI to Fannie Mae and/or Freddie Mac was the result of Defendants' acts, failures, omissions, and breaches of their representations, warranties, obligations, and/or covenants, which representations, warranties, obligations, and/or covenants are co-extensive with the representations and warranties LBHI made to Fannie Mae and Freddie Mac.

**E.      Defendants' Obligation to Indemnify LBHI**

40.     Defendants agreed to indemnify LBHI (as, among other things, LBB's assignee) from liabilities, claims, judgments, losses, attorneys' fees, and expenses it might sustain as a result of the Defective Loans.  *See* Seller's Guide § 711.

41.     LBHI has demanded that Defendants indemnify LBHI, which demands have been refused.

42.     Defendants' failure and refusal to indemnify LBHI for LBHI's liability to Fannie Mae and/or Freddie Mac constitute breaches of Defendants' contractual indemnification obligations.

43.     Pursuant to the Agreements, the laws of the State of New York govern this action.

44.     All conditions precedent to bringing this action have been met, occurred or have been waived.

**F.      PMAC Lending's Liability for PMC Bancorp's Obligations and Liabilities**

45.     Under their respective Agreements, PMC Bancorp and PMAC Lending must indemnify LBHI for all liabilities, claims, losses, damages, judgments, and expenses that LBHI might sustain because of the Defective Loans.

11

46.     PMAC Lending, however, is not only liable for the Defective Loans it sold to LBHI or LBHI's assignor, but is also liable, as successor, for PMC Bancorp's obligations.

47.     As detailed below, in 2010 PMC Bancorp and its principals deliberately schemed to shift PMC Bancorp's assets, employees, and interests to PMAC Lending to hinder, delay, or defraud PMC Bancorp's various creditors, including LBHI.

48.     PMC Bancorp's scheme resulted in (i) a *de facto* merger with PMAC Lending and/or (ii) otherwise rendering PMAC Lending a mere continuation of PMC Bancorp.

49.     Since that time, PMAC Lending has also impliedly agreed to assume, and has assumed, PMC Bancorp's liabilities.

*(i)     PMC Bancorp Seeks to Escape Massive Contractual Exposure*

50.     PMC Bancorp is and/or was, at all relevant times, wholly owned by William Park and his wife, Soo Mi Kim.

51.     PMC Bancorp is and/or was, at all relevant times, operated by William Park and Soo Mi Kim, with Soo Mi Kim's family, including her brothers Ryan Kim and James Kim who worked for PMC Bancorp respectively as Executive Vice President and Manager of Sales.

52.     William Park incorporated PMC Bancorp in 1998 and operated PMC Bancorp as a wholesale mortgage lender, in which capacity PMC Bancorp procured thousands of loans from mortgage brokers, underwrote and funded those loans, and then sold those loans into the secondary mortgage market to purchasers such as LBHI (or LBHI's assignor LBB), Bank of America, JP Morgan Chase, and Citibank, among others.

53.     As the financial crisis of 2008 intensified, buyers of PMC Bancorp's mortgage loans increasingly asserted repurchase and indemnity demands to PMC Bancorp related to PMC Bancorp's sale of defective loans into the secondary market.

12

54.    According to PMC Bancorp's former in-house counsel Daniel Kim, these demands exceeded $150 million.

55.    Facing significant and increasing repurchase/indemnity exposure, PMC Bancorp and its principals searched for a mortgage loan originator that PMC Bancorp and/or its principals could purchase so the principals could then transfer PMC Bancorp's assets, employees, and operations to that mortgage loan originator, leaving PMC Bancorp and its massive debts behind.

56.    In or about May 2010, Daniel Binowitz—who worked in PMC Bancorp's secondary markets division—contacted Jon Magill, the founder and owner of PMAC Lending.

57.    Binowitz contacted Magill on behalf of PMC Bancorp's owner William Park to inquire whether Magill was interested in selling PMAC Lending.

58.    William Park then requested information from Magill regarding whether PMAC Lending faced any repurchase/indemnity exposure related to the sale of defective loans and, if so, how much.

59.    After learning that PMAC Lending's repurchase/indemnity was minimal, William Park communicated to Magill his intention to purchase PMAC Lending through his intermediary company known as Alamo Heights Financials, Inc. ("Alamo"), a company that otherwise had no legitimate business purpose.

60.    At the direction of William Park, Alamo was incorporated by PMC Bancorp's Manager of Sales and William Park's brother-in-law, James Kim.  From inception, Alamo was primarily owned by William Park, who also owned PMC Bancorp.

61.    As a result of Alamo's unity of ownership with PMC Bancorp, the lines between Alamo and PMC Bancorp were often blurred.  For example, Alamo shared PMC Bancorp's address, shared many of PMC Bancorp's banking relationships, and relied on PMC Bancorp to

pay certain of Alamo's expenses.

62.    On September 10, 2010, William Park and PMC Bancorp, through Alamo,

purchased all of PMAC Lending's outstanding shares.

63.    PMC Bancorp provided Alamo with at least part of the funds to purchase PMAC

Lending.

***(ii)    PMC Bancorp-PMAC Lending Agreements Rendering PMAC Lending a Mere Continuation of PMC Bancorp and/or Giving Rise to a De Facto Merger Between the Two Entities***

64.    Following Alamo's purchase of PMAC Lending, William Park immediately

controlled and operated PMAC Lending.

65.    While simultaneously operating (and winding down) PMC Bancorp, William Park

also appointed himself and his brother-in-law, Ryan Kim, to PMAC Lending's board of

directors.

66.    In October 2010, one month after Alamo's purchase, PMC Bancorp and PMAC

Lending entered an agreement whereby PMC Bancorp would broker mortgage loans for PMAC

Lending.

67.    Under the October 2010 agreement, PMC Bancorp accessed PMAC Lending's

credit and warehouse lines to fund loans procured by PMC Bancorp, alleviating PMC Bancorp's

need to access its own warehouse lines of credit, which had been increasingly limited as a result

of PMC Bancorp's massive repurchase exposure.

68.    The October 2010 agreement also allowed PMC Bancorp to retain loans already

in PMC Bancorp's pipeline and divert the funding of those loans to PMAC Lending, after which

PMC Bancorp could sell its loans into the secondary market through PMAC Lending, disguising

that PMC Bancorp procured and originated these loans.

69.    It was necessary for PMC Bancorp to funnel its loans into the secondary market via PMAC Lending because, by that time, many primary market participants had suspended PMC Bancorp from selling into the secondary market  because of the increasing and unsatisfied repurchase demands.

70.    The October 2010 agreement was also designed to insulate PMC Bancorp's ongoing loan origination business and the resulting assets (the loans and the servicing rights) from PMC Bancorp's growing list of creditors.

71.    In December 2010, PMC Bancorp contracted with PMAC Lending whereby PMC Bancorp transferred thousands of PMC Bancorp servicing rights to PMAC Lending, although by December 2010 PMAC Lending lacked the infrastructure or ability to service mortgage loans.

72.    PMC Bancorp did not receive reasonably equivalent value for transferring these servicing rights.

73.    The December 2010 servicing rights agreement was not intended to obtain fair value for PMC Bancorp's assets but, instead, sought to transfer one of PMC Bancorp's most valuable assets—mortgage servicing rights—beyond the reach of PMC Bancorp's creditors.

74.    Because PMAC Lending lacked the ability to service mortgage loans, PMC Bancorp and PMAC Lending—after the December 2010 agreement—immediately entered a second agreement whereby PMC Bancorp, as a subcontractor or "sub-servicer," serviced the loans for which PMAC Lending now held the servicing rights.

*(iii)*    ***The Re-making of PMAC Lending in PMC Bancorp's Image***

75.    When it shifted assets to PMAC Lending, PMC Bancorp also transferred over 40 key employees and executives to PMAC Lending *en masse* into the same or substantially similar positions that each such employee/executive had held at PMC Bancorp, including but not limited

15

to these individuals:

    a.    William Park, PMC Bancorp's owner, CEO, and controlling principal became, through his intermediary Alamo, PMAC Lending's owner and controlling principal by his position on PMAC Lending's board and, later, as its CEO;

    b.    Daniel Kim, PMC Bancorp's in-house counsel, became in-house counsel for PMAC Lending;

    c.    Soo Mi Kim's brother Ryan Kim, EVP at PMC Bancorp, became EVP at PMAC Lending;

    d.    Sharon Kim, Director of Operations at PMC Bancorp, became Director of Operations at PMAC Lending;

    e.    Brian Witham, Senior Vice President of Servicing at PMC Bancorp, became CEO of PMAC Lending after William Park abandoned that position;

    f.    Carol Sim, Controller at PMC Bancorp, became Controller at PMAC Lending;

    g.    Robert Ramirez, Manager of Loss Mitigation at PMC Bancorp, became Manager of Loss Mitigation at PMAC Lending;

    h.    Constantine "Gus" Cafcalas, SVP of Capital Markets at PMC Bancorp, became a consultant, among various other ongoing ties, to PMAC Lending while simultaneously remaining behind at PMC Bancorp to serve as PMC Bancorp's litigation representative for Rule 30(b)(6) depositions, tasked with pleading that PMC Bancorp could not satisfy claims to resolve the outstanding repurchase/indemnity claims. While performing these duties, Mr. Cafcalas also engaged in an aggressive scheme to fraudulently convey PMC Bancorp's remaining real property assets to Alamo insiders for no consideration.

76.    In conjunction with the transfer of employees and executives, William Park remade PMAC Lending in PMC Bancorp's image, including converting PMAC Lending from a retail mortgage lender to PMC Bancorp's model as a wholesale mortgage lender, and migrating PMC Bancorp's software and loan-origination computer systems to PMAC Lending. Park also caused PMAC Lending to use PMC Bancorp's broker networks, replaced PMAC Lending's pricing engine with PMC Bancorp's pricing engine, and caused PMAC Lending to adopt PMC Bancorp's underwriting philosophy.

77.    William Park also moved PMAC Lending's loan processing center from

California to PMC Bancorp's loan processing company in the Philippines.

78.    From October 2014 through March 2016, via monthly wires of thousands of dollars, PMAC Lending continued to fund PMC Bancorp's remaining operations, which by that point comprised little else than litigation.

79.    After Alamo's purchase, PMAC Lending's financial relationships were abandoned for PMC Bancorp's relationships, including a move to one of PMC Bancorp's primary banks, known then as Center Bank (n/k/a BBCN Bank).

*(iv)*    ***The Center Bank Loan***

80.    In August 2011, PMAC Lending applied for and received a $10 million line of credit from Center Bank.

81.    Although the loan was for PMAC Lending's benefit, the loan was securitized by PMC Bancorp's assets and collateral.

82.    PMC Bancorp also guaranteed the loan via a guaranty signed by William Park as PMC Bancorp's President and Ryan Kim as PMC Bancorp's Secretary.

83.    William Park pledged various personal assets as collateral for PMAC Lending's Center Bank loan, including his stock in various banks, and Soo Mi Kim pledged various personal assets as collateral for PMAC Lending's Center Bank loan, including her real property.

84.    On December 31, 2015, during proceedings to enforce a judgment that LBHI obtained in March 2013 against PMC Bancorp (related to loans different than those at issue here), federal Magistrate Judge Patrick Walsh (C.D. Cal.) reviewed the Center Bank transaction and found that "Lehman Brothers has produced more than enough evidence to suggest that PMC and PMAC have at times operated as one, including with regard to this loan."  Magistrate Judge Walsh also found "it appears that PMC and PMAC are intertwined and have been for a number

of years." *Lehman Brothers Holdings Inc. v. PMC Bancorp*, 2:10-cv-07207-JAK-PJW, Doc. #

338 (C.D. Cal. Dec. 21, 2015).

**(v)     *Unity of Ownership and Interests between PMC Bancorp and PMAC Lending Has Continued into the Present***

85.     In 2013, despite having moved to PMAC Lending and serving as an executive at

PMAC Lending and on its board of directors, Ryan Kim continued to control PMC Bancorp's

affairs, including signing of two grant deeds on behalf of PMC Bancorp as part of Gus Cafcalas'

scheme to transfer PMC Bancorp's real properties to Alamo insiders, including James Kim's

wife, Helen Choi.

86.     During the proceeding to enforce the March 2013 judgment referenced above,

LBHI pursued PMAC Lending as successor.  During those proceedings, PMC Bancorp and

PMAC Lending often spoke with one voice, culminating in PMAC Lending's agreement on

August 19, 2016, through counsel, to pay more than $3 million owed to LBHI by PMC Bancorp.

**(vi)    *Status of PMC Bancorp and PMAC Lending***

87.     PMC Bancorp is no longer solvent and claims to have one remaining shareholder,

a Mexican company named Sal Si Puedes De Esta, SA de CV, which translates to "get out if you

can."

88.     In March 2015, William Park sold many of PMAC Lending's assets to Finance of

America except for PMAC Lending's servicing rights which, upon information and belief, had

been obtained from PMC Bancorp.

89.     In July 2016, William Park purportedly sold all of PMAC Lending's shares to

new shareholders, after which PMAC Lending was renamed AmWest Funding Corp.

**G.     <u>PMAC Lending's Liability for Reliant's Obligations and Liabilities</u>**

90.     PMAC Lending is also liable as successor for Reliant's obligations and debts.

91.     Upon information and belief, on August 16, 2013, PMAC Lending agreed to merge with Reliant and expressly and/or impliedly assumed Reliant's obligations, debts, and liabilities, including Reliant's contractual obligations under the Agreement between Reliant and LBHI or LBHI's assignor.

## FIRST CLAIM FOR RELIEF
### (Contractual Indemnification)

92.     LBHI hereby incorporates by reference the allegations set forth above as though fully set forth herein.

93.     The Agreements are valid and enforceable contracts that are binding upon Defendants.

94.     LBHI and/or LBB substantially performed all of its obligations under the Agreements.

95.     Pursuant to their respective Agreements, Defendants owe LBHI indemnity for its liabilities, losses, claims, attorneys' fees, judgments and any other costs, fees and expenses as to the Defective Loans.

96.     Defendants failed to indemnify LBHI for its liabilities, losses, claims, attorneys' fees, judgments and any other costs, fees and expenses as to the Defective Loans.

97.     Defendants' breaches of the Agreements and other acts and/or omissions as to the Defective Loans resulted in LBHI incurring liability and/or losses in an amount to be determined at trial, comprised of the settlement amount for each Defective Loan as identified in the court-approved Fannie Mae and/or Freddie Mac settlement agreement, plus prejudgment interest pursuant to New York law, attorneys' fees, litigation costs, and all other fees and costs provided by the Agreements.

98.     PMAC is jointly and severally liable for LBHI's contractual indemnification

19

claim, as alleged herein, because it is PMC Bancorp's and Reliant's successor.

## PRAYER FOR RELIEF

WHEREFORE, LBHI respectfully requests relief in this matter, including as follows:

a)　　A judgment against PMC Bancorp for all damages arising from or relating to its contractual obligations, in an amount to be determined at trial;

b)　　A judgment against PMAC Lending for all damages against arising from or relating to its contractual obligations, in an amount to be determined at trial;

c)　　A judgment against Reliant for all damages against arising from or relating to its contractual obligations, in an amount to be determined at trial;

d)　　A judgment against PMAC Lending for all damages against arising from or relating to PMC Bancorp's contractual obligations, in an amount to be determined at trial;

e)　　A judgment against PMAC Lending for all damages against arising from or relating to Reliant's contractual obligations, in an amount to be determined at trial;

f)　　An award of all recoverable interest from all Defendants;

g)　　An award of all costs and expenses incurred by LBHI in enforcing the Defendants' obligations under the Agreement, including attorneys' fees and costs and any expert witness fees incurred in litigation; and

h)　　Any other relief as the Court deems just and proper.

Dated: New York, New York
       December 29, 2016

*/s/ William A. Maher*

William A. Maher
Paul R. DeFilippo
James N. Lawlor
Adam M. Bialek
John D. Giampolo
Mara R. Lieber

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone:  (212) 382-3300
Facsimile:   (212) 382-0050

Michael A. Rollin
Maritza Dominguez Braswell (admission pending)
Caleb Durling
Corey Longhurst (application to be filed)

ROLLIN BRASWELL FISHER LLC
8350 E. Crescent Pkwy., Suite 100
Greenwood Village, Colorado 80111
Telephone:(303) 945-7415
Facsimile: (303) 974-7468

*Counsel for Lehman Brothers Holdings Inc.*