*FILE ON DEMAND*

*Case #* 08-13555

No. __-____

IN THE Supreme Court of the United States

———————

KEITH OLIN HEDMAN &

ADRIALYN VARILLA HEDMAN,

INDIVIDUALS,

Petitioners,

v.

NATIONSTAR MORTGAGE, INC/LLC,

FIRST AMERICAN TITLE INSURANCE COMPANY, THE BANK OF NEW YORK MELLON,

ET AL., & DOES 1-100

Respondents.

———————

On Petition for a Writ of Certiorari to the Court of Appeal, Third Appellate  District-

———————

PETITION FOR A WRIT OF CERTIORARI

KEITH OLIN HEDMAN &

ADRIALYN VARILLA HEDMAN

785 Shelli Street   Mountain House,

California 95391

(209) 836-1334


RECEIVED
JAN - 3 2...
U.S ...
SO DIST OF...

## QUESTION PRESENTED

HEDMANS have already filed multiple letters of rescission and Qualified Written Requests to each party in what appears to be a fraudulent securitization scheme that has been perpetrated on them since 2003, and has involved many non-disclosed parties, Including LEHMAN BROTHERS BANK, FSB , LEHMAN BROTHERS HOLDINGS, INC., AURORA BANK, FSB, AURORA LOAN SERVICES, LLC, J.P. MORGAN CHASE, , WELLS FARGO, NA ,RICHARD FULD, EARNST & YOUNG, LLP. NDEX WEST, LLC. CMG MORTGAGE, INC.,LENNAR HOMES, UMAC MORTGAGE;(BARRETT, FRAPPIER, TREDER, & WEISS), ET AL, SASCO(STRUCTURED ASSET SECURITIES CORPORATION) , AND THE BANK OF NEW YORK MELLON, U.S. BANK, N.A., FIRST AMERICAN TITLE COMPANY, NORTH AMERICAN TITLE COMPANY,MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, CMG MTG, INC., AND NATIONSTAR MTG,LLC, NATIONSTAR MTG,INC. ,NATIONWIDE TITLE CLEARING, INC..,& DOES 1-20,  AS WELL AS SEVERAL OTHER MINOR PLAYERS, ALLEGED LOAN SERVICERS, AND LAW FIRMS whom the judge let consistently violate Transey v. Pagliaro, whom allowed the attorney's to also be the witness giving their own testimony, and sign affidavits, declarations, etc., all while HEDMANS objected. Even though HEDMANS invoked COMMON LAW jurisdiction, and brought up the consistent violation of Federal Rule 601. This case has been decided mostly on HEARSAY, without considering the many Prima Fascia exhibits that HEDMANS have submitted into evidence, even with Motion In Liminie. The main offenders being and with including the most aggressive law firms WRIGHT, FINLAY & ZAK, LLP, ; BUCHALTER NEMER ; BARRETT, FRAPPIER, TREDER, & WEISS, law firms and a few others, whom we believe are acting in concert and unethically, and the Judge whom is conflicted since he has a pension of the counties design that half of the pension is based on Fraudulent Mortgage Backed Securities . Each of these companies are engaging in control and RICO fraud.

HEDMANS  hired a retired Wall Street banker, Neil F. Garfield,MBA, JD, a Hand Writing Expert Nannette Barto, and Thompson Reuters Investment Research Firm to look through their paperwork to see if any improprieties had taken place since most of HEDMANS request letters had been stonewalled not wanting to provide HEDMANS any due process or discovery. Also, no payments with interest amounting to be over $1,200,000.00 has ever been refunded back to HEDMANS as per TILA statutes as well as the over $13, 264.650 that was taken out of HEDMANS accounts as loans from HEDMANS by LEHMAN. This amount needs to returned back to HEDMANS with the payments they were fraudulently induced to pay, plus penalties, fines and interest, and Clouded Title properly restored to HEDMANS (Chase v. Nguyen, 11th District Court, Westminster,CA)   , US Supreme Court Decision JESINOSKI V. COUNTRYWIDE HOME LOANS, INC., ET AL.. As in California Case 11th District Court Decision CHASE v. NGUYEN; for payments back, title to the property, and damages; and now year has gone by since the rescission, so these adverse parties are barred from pursing a claim against HEDMANS.  However, what HEDMANS have been experiencing in the Superior Court  could only be described as ethics violations of both the Judiciary, and the Lawyer Participants. HEDMANS had rescinded their signatures in a (TILA )Rescission , however the questing still remains is that HEDMANS never received a loan an check of any monies during the process of the alleged loan closing, to consummate a loan?.Even though they were told they would be getting a loan through the builder Lennar, and received loan counseling through what was represented as their premier loan provider, UMAC , and their representative. Mrs. Kathy Ulhorn

represented to HEDMANS many loans and even had them sign prequalifying paperwork, and had them sign a rate lock paperwork from Aug of 2003 to May of 2004, she specifically represented several loans to HEDMANS and told them the pros and cons of each as a consultant. The final paperwork being signed at closing represented by CMG Mortgage, Inc. representative Peter Bueke, and Loan officer from North American Title Company Mary Williams. Thus, HEDMANS would want to preserve their rights under UCC 1-308, in that the alleged loans were intentionally misrepresented fraudulently in violation of civ code § 1710(1), HEDMANS believed Mr. Peter Bueke, CMG Mortgage, Inc. representative, that they were getting a loan from them, which would be used to buy a home. Eventually, no loan was ever given & HEDMANS were prequalified by UMAC, Kathy Ulhorn with other loan paperwork that said loan lock rate on them. Thus, HEDMANS were misrepresented a loan, that in actuality was a security. At no time during the closing on May 18, 2004 where HEDMANS shown anyones credentials from MERS as a letter of appointment, or anyones security license. To this date HEDMANS still have not received any loan monies of the alleged $333,700.00 amount. From the dates of 7/1/2003 till after closing of the alleged loan both Kathy Ulhorn & Peter Bueke and other people from North American Title Company, Mary Williams, explained that we were filling out loan paperwork and documents to allegedly borrow monies that were never provided or produced to HEDMANS.HEDMANS state a cause of action for conspiracy, since the alleged loan company whom never provided HEDMANS with a loan work working with Kathy Ulhorn from UMAC, Karen Wurmoth and Don from the Builder LENNAR & GREYSTONE HOMES, & PETER BUEKE from CMG MORTGAGE, INC. & MARY WILLIAMS, ETC., whom worked for NORTH AMERICAN TITLE COMPANY. Each were working together to commit fraud in a common plan or design to perpetrate fraud. (Applied Equipment Corp. v. Litton Saudi Arabia Ltd.(1994)7 Cal 4th, 503,510-511.) The formation of the operation of the conspiracy involved participants in the selling of single family residences, built by LENNAR HOMES & GREYSTONE HOMES, these parties used other parties to induce HEDMANS to file other paperwork involving a security or securities that in Appendix A, shows that it was deposed immediately by a stamp of LEHMAN BROTHERS BANK, FSB which monetized the note, paying off HEDMANS property at 785 Shelli Street, Mountain House, CA 95391. The NOTE Paperwork was stamped two additional times by LEHMAN BROTHERS HOLDINGS, INC. to take loans out of HEDMANS Federal Reserve Accounts making HEDMANS 3rd party non-disclosed creditors on loans taken out by LBHI, using HEDMANS monies.

The result in damages to HEDMANS which has led them to file Bankruptcy Chapter 13 and then convert to a Chapter 7, finalized Aug. 2014 done out of reliance. HEDMANS have suffered damages due to stress, emotional distress, slander, and resulting medical conditions of each party, and resulting medical bills. HEDMANS have been induced to file legal suits to protect their property rights, and to amass expenses and damages not being over several millions of dollars.(Orloff v. Metropolitan Trust Co.(1941)17 Cal. 2ed 484, 488).First American was involved with this process because they own North American Title Company Insurance & have paid to have several documents recorded in the San Joaquin

County Recorder's office harassing HEDMANS and pursuing foreclosure of their property that is paid off, damaging their good name and reputation while working with NDEX WEST, and NATIONSTAR MORTGAGE, INC/LLC., AURORA LOAN SERVICES, AND AURORA BANK, FSB and other LEHMAN BROTHER HOLDINGS, INC. companies whom working together engaged in unfair business practices under Business & Professionals Code Section 17200. The parties aforementioned working with Law Offices produced

false documents, manufactured by robosignors to foreclose on HEDMANS. This was done very sloppy since the loan documents were supposed to be in a static IRC 860G trust or REMIC. Then multiple fraudulent documents were produced moving documents outside of the trust, which would violate the terms of the trust. HEDMANS had hired a hand writing expert that proved fraud was taking place, so a notary bond was forfeited, the write up and declaration can be seen in Appendix E. HEDMANS also provided a copy of the endorsed note as Appendix A. HEDMANS hired an expert witness whom provided Expert Declaration and testimony(Notarized), in Appendix B. HEDMANS also included a Affidavit of Truth Notarized, Appendix C. HEDMANS also provided a form 15D that was turned into the SEC Jan. 24, 2005 canceling the trust, Appendix D. Currently in the Superior court the law firm of Wright, Finlay & Zak ,LLP are representing that they represent the Trustee of this canceled trust. Appendix F & G are the decisions of both appellate courts Appendix F; Hedman v. First American Title Ins. Co. CA3 Filed 04/20/16 number C078538, and Appendix G, Hedman v.Nationstar Mortgage CA3, Files 05/04/16 number C079416. In each case the prima fascia evidence was presented and not used of allowed to be judicially noticed. Hedmans find that the two decisions conflict with each other in their opinions. Hedmans filed with the California Supreme Court which did not hear these cases.

The Truth in Lending Act provides that a borrower "shall have the right to rescind the transaction until midnight of the third business day following . . . the delivery of the information and rescission forms required under this section . . . by notifying the creditor . . . of his intention to do so." 15 U.S.C. § 1635(a). The Act further creates a "[t]ime limit for [the] exercise of [this] right," providing that the borrower's "right of rescission shall expire three years after the date of consummation of the transaction" but since the fraud was so pervasive , and as per Neil F. Garfield, MBA, JD; "No monies were ever given or received, and the loan never delivered. Thus no consummation took place, and the alleged loan should have never left the closing table" if the "disclosures required . . . have not been delivered." Id. § 1635(f). The question presented is: Does a alleged borrower exercise his right to rescind a transaction in satisfaction of the requirements of Section 1635 by "notifying the creditor, and what if they changed the role what LEHMAN was doing in their documented REPO 105 or REPO 108 procedure putting HEDMANS in as a bailor / bailee relationship as a "non-disclosed third party creditor" in writing within three years of the consummation of the transaction, as the Third, Fourth, and Eleventh Circuits have held, or must a borrower file a lawsuit within three years of the consummation of the transaction, as the First, Sixth, Eighth, Ninth, and Tenth Circuits have held? This is a unique case that is very prevalent out there, in that no monies were ever delivered to HEDMANS or the alleged Borrower. While on the Securitization Trust side that is not fully disclosed, the Alleged Borrower is actually the Lender, since their signatures are being used to pull funds out of their own pre paid exemption accounts by a Commercial Investment Bank with them as a Bailor or "non-disclosed third party creditor", an unconscionable act, that was non-disclosed, and concealed not to be disclosed later when mistakes were made, and the deception identified. The damage no being alleged loan payments and interest that were now determined to be paid by fraudulent inducement. And what usually would be determined to be a large withdrawl and loan from the Bailor (HEDMANS) or "non-disclosed third party creditor", in this case HEDMANS as a large withdrawl from their social security trust account, also known as their exemption account which there are the custodians of after filing a UCC1 statement. From the prima fascia factual evidence, it was determined that a multiple of 21X the amount $333,700 or ($7,007,700)

was taken out on a table funded 1st mortgage, while Wells Fargo who participated in the transaction originated a loan for $128, 950 for a second that was used as the down payment and collateral so that the larger amount loan could take place. We believe Wells Fargo also engaged in this fraudulent practice or REPO 105 so the amount taken out as a loan from HEDMANS was $128,950 x 21 or ($2,707,950), this amount was soon increased to $169,000 with a second mortgage, where the process of the REPO 105 was repeated$169,000 x 21 or ($3,549,000), these amounts would also incur interest payable to HEDMANS at 7% over the next 13 years. Payments to each institution were also fraudulently induced by mail fraud. HEDMANS payment to the 1st alleged mortgage was roughly ($2081.95), while the second that was then called an alleged equity line of credit had a fraudulently induced payment of around ($1000) each and every month. HEDMANS had filed a letter of rescission after approximately 110 fraudulent payments were made to each. So, HEDMANS had been fraudulently induced to pay approximately($3,081.95) X 110= $339,014.50 the loss the HEDMANS, plus compound interest of roughly 7% over 13 years, as well as Federal Fines of Mail Fraud for about 400 pieces of mail at $8,000 per fraudulent mail piece or Federal Fines that now are around($3,200,000.00). HEDMANS are also on the Fedral " do not call lists", that have been violated over 200 times at $11,000 fine each time or  at a violation of ($2,200,000.00). HEDMANS were alerted to this condition when Aurora Loan Services started raising the payments to their alleged loan payment; to 2X and 3X the amount for a fixed rate alleged mortgage. In this process THE BANK OF NEW YORK MELLON sent HEDMANS a letter (Evidence 3 CIVIL C079416, PAGES 92-94)that they had an incident with a lost data tape with their financial data, and that HEDMANS should be aware that such a tape was lost and that the Bank was taking out a $25,000 insurance policy if any loss were to occur. However, THE BANK OF NEW YOUR MELLON, never identified themselves properly to HEDMANS. HEDMANS not remembering ever doing business with, THE BANK OF NEW YORK MELLON discounted the letter, but did keep it and filed it away. HEDMANS have come to realize from newly disclosed Securitization Trust paperwork that THE BANK OF NEW YORK MELLON was the TRUSTEE in relation to the Issuing Entities of the Trust "STRUCTURED ASSET SECURITIES CORP. TRUST 2004-S4", of the Depositor STRUCTURED ASSET SECURITIES CORP.  While it has been determined that La Salle Bank, NA & US Bank, NA were Custodians. This information only becomes relevant when the data tape information surfaced at Aurora Loan Services and NDEX WEST.LLC(showing only 1X endorsement by LEHMAN BROTHERS BANK, FSB" while at NDEX WEST, LLC, and the Law Firm of BARRETT, FRAPPIER, TREDER, & Weiss, whom work intimately with NATIONSTAR MORTGAGE, INC /LLC. From these last three fraudulent entities paper work copies (scanned)of the "NOTE" have been recovered that show HEDMANS note was monetized and endorsed 3X by Commercial Banks(LEHMAN), the hallmark of a REPO 105 transaction. Showing that the "NOTE" paperwork was turned into the FED by a Commercial Bank to receive ($7,007,700) from HEDMANS prepaid trust account . Thus with this evidence it was determined that the "Deed of Trust" was never valid that is the basis of HEDMANS now paying over $60,000 in legal fines and charges that were determined by Judge Carter P. Holly in San Joaquin Superior Court. HEDMANS have showed this and other factual prima fascia evidence that has been over looked by the court in what the HEDMANS surmise as gross violation of Judicial Misconduct. HEDMANS believe that this may be a symptom of having a Judge whom works for the County as an employee, having a conflict of interest, and  vested interest to collect on Mortgage Backed Securities that fund half of his Pension and that of other Public Servants.

## PARTIES TO THE PROCEEDINGS

Petitioners KEITH OLIN HEDMAN  and ADRIALYN VARILLA HEDMAN were the plaintiffs and the appellants in the proceedings below. Respondents Including LEHMAN BROTHERS BANK, FSB , LEHMAN BROTHERS HOLDINGS, INC., AURORA BANK, FSB, AURORA LOAN SERVICES, LLC, J.P. MORGAN CHASE, WELLS FARGO,RICHARD FULD, EARNST & YOUNG, LLP. NDEX WEST, LLC. CMG MORTGAGE, INC.,LENNAR HOMES, UMAC MORTGAGE;BARRETT, FRAPPIER, TREDER, & WEISS, ET AL, SASCO(STRUCTURED ASSET SECURITIES CORPORATION) , AND THE BANK OF NEW YORK MELLON, U.S. BANK,N.A., NATIONWIDE TITLE CLEARING, FIRST AMERICAN TITLE COMPANY, NORTH AMERICAN TITLE COMPANY,MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, CMG MTG, INC., AND NATIONSTAR MTG,LLC, NATIONSTAR MTG,INC. & DOES 1-20 AS WELL AS SEVER OTHER MINOR PLAYERS, ALLEGED LOAN SERVICERS, AND LAW FIRMS including the most aggressive law firms WRIGHT, FINLAY & ZAK, LLP, AND BUCHALTER NEMER; BARRETT, FRAPPIER, TREDER, & WEISS ,LLP that HEDMANS believe are acting fraudulently.

iii

## TABLE OF CONTENTS

                                                                                    Page

QUESTION PRESENTED ........................................... i

PARTIES TO THE PROCEEDINGS ......................... ii

TABLE OF AUTHORITIES ...................................... vi

INTRODUCTION ...................................................... 1

OPINIONS BELOW .................................................. 3

JURISDICTION ......................................................... 3

STATUTORY AND REGULATORY PROVISIONS INVOLVED ................................................... 3

STATEMENT ............................................................. 3 A.

Statutory and Regulatory Background ........... 3 B.

Factual Background ......................................... 6 C.

Proceedings Below ........................................... 7

REASONS FOR GRANTING THE PETITION ......... 9 I.

THE COURTS OF APPEALS ARE DEEPLY DIVIDED OVER WHETHER A BORROWER EXERCISES THE RIGHT TO RESCIND UNDER SECTION 1635 BY NOTIFYING A CREDITOR OR INSTEAD MUST FILE SUIT ........... 9 A.

The Third, Fourth, And Eleventh Circuits Hold That Notifying A Creditor In Writing Within Three Years Of The Consummation Of The Transaction Is Sufficient To Exercise The Right To Rescind

However in this case it is apparent criminal violations have taken place and the Consummation Of The Transaction is in Question, However there is Prima Fascia evidence money was given by HEDMANS to pay for their residence at 785 Shelli Street, Mountain House, CA 95391,and that LEHMAN BROHERS BANK, FSB, AND LEHMAN BROTHER HOLDINGS, INC. and WELLS FARGO BANK, NA took out $13,264,650 from HEDMANS Accounts without their consent and have fraudulent induced HEDMANS to pay additional payments using mail fraud, and have held monies for going on 13 years while paying no interest or fines /penalties.................................................................................10

iv.

B. The First, Sixth, Eighth, Ninth, And Tenth Circuits Hold That A Borrower Must File Suit Within Three Years Of The Consummation Of The Transaction To Exercise The Right To Rescind ................................................. 12 C.

The Split Among The Courts Of Appeals Is Widely Recognized And Entrenched, And It Can Be Resolved Only By This Court ................................... 18

II. THE EIGHTH CIRCUIT'S HOLDING THAT A BORROWER MUST FILE SUIT TO EXERCISE THE RIGHT TO RESCIND UNDER SECTION 1635 IS IN ERROR ...................................................... 19 A.

Section 1635's Plain Text Establishes That Notice To A Creditor Is Sufficient To Exercise The Right To Rescind ...................................................... 19 B.

The Structure And Purpose Of The Truth In Lending Act Confirm That Notice Alone Is Sufficient To Exercise The Right To Rescind ........................ 21 C.

Regulation Z Removes All Doubt That Written Notice Is Sufficient To Exercise The Right To Rescind ................ 23 D.

The Eighth Circuit's Reliance Upon Beach Is Misplaced ................................... 24

v.

III. THIS CASE IS A SUPERIOR VEHICLE FOR ADDRESSING A RECURRING QUESTION OF GREAT NATIONAL
IMPORTANCE THAT WARRANTS THIS COURT'S IMMEDIATE REVIEW ...... 26

CONCLUSION ......................................................... 28

APPENDIX: Opinion of the United States Court of Appeals for the Eighth Circuit, Jesinoski, et al. v.
Countrywide Home Loans, Inc., etc., et al., No. 12-2202 (Sept. 10, 2013) ........................................... 1a

Memorandum Opinion and Order of the United States District Court for the District of Minnesota,
Jesinoski, et al. v. Countrywide Home Loans, Inc., etc., et al., Civil No. 11-474 (DWF/FLN) (Apr. 19, 2012)
...................................... 4a

Order of the United States Court of Appeals for the Eighth Circuit Denying Rehearing, Jesinoski, et al. v.
Countrywide Home Loans, Inc., etc., et al., No. 12-2202 (Nov. 13, 2013) .......... 10a

Statutory and Regulatory Provisions Involved ..... 12a

Truth in Lending Act, 15 U.S.C. § 1601 et seq.: 15

U.S.C. § 1635 ........................................... 12a

12 C.F.R. § 226.23(a)-(b) (Regulation Z of the Federal Reserve Board) ........................ 17a

vi

## TABLE OF AUTHORITIES

Page

### CASES

Anderson Bros. Ford v. Valencia, 452 U.S. 205 (1981) ..................................................... 23

Auer v. Robbins, 519 U.S. 452 (1997) ........................ 24

Beach v. Ocwen Fed. Bank, 523 U.S. 410 (1998) .................................................. 2, 3, 9, 13, 14, 15, 19, 20, 24, 25

Belini v. Washington Mut. Bank, FA, 412 F.3d 17 (1st Cir. 2005) ................................................... 22

Carson v. Wells Fargo Bank, N.A., No. 8:10- CV-2362-T17-EAJ, 2011 WL 2470099 (M.D. Fla. June 20, 2011) ............................................. 12

Chase Bank USA, N.A. v. McCoy, 131 S. Ct. 871 (2011) ............................................................ 24

Gilbert v. Residential Funding LLC, 678 F.3d 271 (4th Cir. 2012) ..................................... 11, 18, 20

Johnson v. Mortgage Elec. Registration Sys., Inc., 252 F. App'x 293 (11th Cir. 2007) ............... 12

Keiran v. Home Capital, Inc.: Civil No. 10-4418 (DSD/JSM), 2011 WL 6003961 (D. Minn. Nov. 30, 2011), aff'd, 720 F.3d 721 (8th Cir. 2013) .......................... 27-28

720 F.3d 721 (8th Cir. 2013) ................... 7, 8, 9, 13, 15, 16, 18, 20, 22

Large v. Conseco Fin. Servicing Corp., 292 F.3d 49 (1st Cir. 2002) ...........................................17, 18

Lumpkin v. Deutsche Bank Nat'l Trust Co., No. 12-2317, 2013 WL 4007760 (6th Cir. Aug. 6, 2013) ...................................................16, 17

vii

McOmie-Gray v. Bank of Am. Home Loans, 667 F.3d 1325 (9th Cir. 2012) .......................13, 14

Rosenfield v. HSBC Bank, USA, 681 F.3d 1172 (10th Cir. 2012) ......................................... 14, 15, 18

Semar v. Platte Valley Fed. Sav. & Loan Ass'n, 791 F.2d 699 (9th Cir. 1986) .............................. 21

Sherzer v. Homestar Mortg. Servs., 707 F.3d 255 (3d Cir. 2013) ..........................................10, 11, 18, 20,
21, 25

Sobieniak v. BAC Home Loans Servicing, LP, 835 F. Supp. 2d 705 (D. Minn. 2011), aff'd sub nom.

Keiran v. Home Capital, Inc., 720 F.3d 721 (8th Cir. 2013) ....................................... 27

Williams v. Homesake Mortg. Co., 968 F.2d 1137 (11th Cir. 1992) .......................... 11, 12, 18, 21

Williams v. Saxon Mortg. Co., Civil Action No. 06-0799-WS-B, 2008 WL 45739 (S.D. Ala. Jan. 2, 2008)
........................................................ 12

STATUTES, REGULATIONS, AND RULES Act of Oct. 28, 1974, Pub. L. No. 93-495, § 405, 88 Stat. 1500,
1517 ................................................. 5

Consumer Financial Protection Act of 2010, Pub. L. No. 111-203, tit. X, 124 Stat. 1376, 1955: §
1061(b)(1), 124 Stat. 2036 (codified at 12 U.S.C. § 5581(b)(1)) .......................................... 5

§ 1061(d), 124 Stat. 2039 (codified at 12 U.S.C. § 5581(d)) ................................................. 5

Truth in Lending Act, Pub. L. No. 90-321, tit. I, 82 Stat. 146 (1968):

§ 103(b), 82 Stat. 147 ............................................... 5

§ 105, 82 Stat. 148 .................................................. 5

Truth in Lending Act, 15 U.S.C. § 1601 et seq. ... passim

15 U.S.C. § 1601(a) ...........................................3

15 U.S.C. § 1631 ..................................................... 3

15 U.S.C. § 1632 ..................................................... 3

15 U.S.C. § 1635 ................................ 2, 3, 9, 10, 19, 20, 22, 23, 24, 25, 28

15 U.S.C. § 1635(a) ................. 1, 3, 4, 19, 20, 21, 25

15 U.S.C. § 1635(b) ..................... 4, 6, 11, 21, 22, 23

15 U.S.C. § 1635(f) ............. 1, 5, 6, 7, 13, 20, 24, 25

15 U.S.C. § 1638 .................................................... 3

15 U.S.C. § 1640 .............................................. 7, 20

28 U.S.C. § 1254(1) .................................................. 3

12 C.F.R. pt. 226 (Regulation Z) ....................... 3, 5, 11, 15, 23, 24,
25 § 226.17(d) ................................................ 6 §

226.23(a)(2) .................................................. 5,

23 § 226.23(a)(3) ......................................... 5

§ 226.23(b) .............................................. 6

12 C.F.R. pt. 1026 (Regulation Z) ................................ 5

§ 1026.23 .................................................... 5

§ 1026.23(a)(2) ...................................... 8

Fed. R. Civ. P. 12(a) ................................... 22

ADMINISTRATIVE MATERIALS

Board of Governors of the Federal Reserve

System, Mortgage Debt Outstanding (up

dated Sept. 25, 2013), at http://www.

federalreserve.gov/econresdata/releases/ mortoutstand

/current.htm (last visited Dec. 4, 2013) ................................................................. 26

Final Rule, Mortgage Servicing Rules Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 10,902 (Feb. 14, 2013):

p. 10,905 ............................................................. 26

p. 10,906 ............................................................. 26

Interim Final Rule, Truth in Lending (Regulation Z), 76

Fed. Reg. 79,768 (Dec. 22, 2011):

pp. 79,803-04 ......................................................... 5

OTHER MATERIALS Saif Alaqili, Comment, Striking a Balance:

How Equitable Doctrine Restores the Purposes of TILA's Rescission Right,

2013 U. Chi. Legal F. 711 (2013) ....................................... 18

Brief of the Consumer Financial Protection Bureau as Amicus Curiae in Support of Plaintiff-Appellant and Reversal, Rosenfield v. HSBC Bank, USA, 681 F.3d 1172 (10th Cir. 2012) (No. 10-1442) (filed Mar. 26, 2012), 2012 WL 1074082 ................................23, 24

Lea Krivinskas Shepard, It's All About the Principal: Preserving Consumers' Right of Rescission Under the Truth in Lending Act, 89 N.C. L. Rev. 171 (2010) ............................. 26-27

x

Jeff Sovern, Preventing Future Economic Crises Through Consumer Protection Law or How the Truth in Lending Act Failed the Subprime Borrowers, 71 Ohio St. L.J. 761 (2010)
.................................................................... 26

David Liss, A Conspiracy Of Paper, First Ballantine Books Edition, Feb. (2001)
..............................................................................435-442

Petitioners KEITH OLIN HEDMAN  and ADRIALYN VARILLA HEDMAN

Respectfully petition for a writ of certiorari to review the judgment of the United States Court of
Appealsand for the Third Appellate District, and that of the California Supreme Court, in this case.
INTRODUCTION This case arises from a mortgage lender's violation of the Truth in Lending Act and the
homeowners' obstructed attempt to exercise their right under the Act to rescind the mortgage as a
remedy for that lender's statutory violations. In the years prior and preceding the housing crisis of 2008,
many mortgage lenders violated the Act's disclosure requirements in tens of thousands of loan
transactions. As a result, countless homeowners were lured into oppressive mortgages on the basis of
false, misleading, or incomplete disclosures of material information about loans secured by their homes
or credit(House Joint Resolution 192, June 5, 1933). The HEDMANS did not receive complete disclosures.
They first got a table funded loan through Wells Fargo Bank, NA that was backdated, and the alleged
lenders UMAC Mortgage, and CMG MTG, INC,, as preferred lenders of LENNAR HOMES, INC, after
LENNAR gathered confidential credit information from HEDMANS,  then HEDMANS loan was table
funded, the deal to receive an alleged first mortgage from CMG MTG, INC. It should be noted that during
this entire process HEDMANS did not receive any of the alleged loans($333,700.00, $128.950.00-
refinance ($169,000) via a check or electronic deposit, however HEDMANS signatures were requested
multiple times, they were told they were getting a home mortgage,but alleged money lenders failed to
furnish the HEDMANS all the information and disclosures required by the Act, or the monies from the
transactions that they believe to be embezzled. The Act creates a "right to rescind" the loan transaction
within "three business days" of the delivery of all the required disclosures and funds. A borrower
exercises that right simply "by notifying the creditor." 15 U.S.C. § 1635(a). The Act further provides that
the right "shall expire three years" after the closing of the transaction, even if all the required
disclosures have not been delivered. Id. § 1635(f). When the HEDMANS sought to exercise their
rescission right under the Act by sending their creditors a written notice, those creditors refused to
honor their right, saying they received a

money purchase, but alas HEDMANS never received the loan monies. When the HEDMANS brought
individual suit to enforce the rescission, the courts below refused to recognize that they had validly
rescinded 2 of their mortgages. Instead, the courts below held that the Act required the HEDMANS to
file a lawsuit to rescind. The San Joaquin Superior Court has joined four other circuits in holding that, to
exercise the right to rescind under Section 1635, a borrower must file a lawsuit within three years of the
closing of the transaction, but it appears the transaction is still open since HEDMANS never received the
Funds. However, other disclosed Prima Fascia evidence has 'shown other non-authorized investment
banking activity by LEHMAN BROTHERS BANK, FSB & LEHMAN BROTHERS HOLDINGS, INC. The courts of
appeals are starkly divided on the issue. But nonetheless HEDMANS hold this information from multiple
sources showing this fraud that has been consciously overlooked by the lower courts causing further
damages to HEDMANS. Three other circuits hold that, in accord with the plain text of Section 1635 and
with its implementing regulation, notifying the creditor in writing is all that is required to exercise that
right. The San Joaquin Superior Court,  holding to the contrary, shared by a minority of the circuits that
have ruled on unlike issues, derives from a misinterpretation of the statutory text and a misreading of

this Court's decision in Beach v. Ocwen Federal Bank, 523 U.S. 410 (1998). The resulting rule does violence to the statutory text, manufactures legal obstacles for homeowners seeking to vindicate their rights under a law that was enacted to protect them, and risks flooding the federal courts with thousands of needless lawsuits to accomplish rescissions that Congress intended to be completed privately and without litigation, but while still maintain a non-disclosure of the general public whom have been lied to , cheated, and ill effected. However in this case of HEDMANS the Lower Court Judge has ordered sanctions and fines on HEDMANS as if there was a Mortgage and Deed of Trust in Effect. Even after a higher Federal court in Bankruptcy properly discharged any alleged creditors claims. This was after HEDMANS were forced into Bankruptcy Court, and the Federal Judge discharged NATIONSTAR MORTGAGE, INC, AND CMG MORTGAGE, INC, WELLS FARGO, US BANK, NA, AND SEVERAL OTHERS, since HEDMANS listed them as non-secured creditors. The Federal Judge understood what the HEDMANS were doing and gave the Respondents/Defendants over 90 days to file a proper

claim, and they could not, so they were discharged in Chapter 7. The bankruptcy was only necessary to prove HEDMANS standing since the Superior Court appears to not be able to interperate the Law Appropriatelyrder denying rehearing en banc, Judge CANTIL-SAKAUYE & Collton explicitly recognized the circuit conflict (as have many others) and opined that only this Court can resolve it. App. 11a. Because of the deeply entrenched circuit split and the national and recurring importance of the issue, the petition should be granted and this is after the Jesinoski v. Countrywide Mortgage, Inc. decision.

4

## OPINIONS BELOW

The opinion of the court of appeals (App. 1a-3a) is reported at C079416 F.3d 1092.

The opinion of the Supreme Court Of California (App. 4a-9a) is not reported (but is available at 2016 S235169). They also did not take the newly submitted evidence of the "NOTE" with 3 stampings (Appendix A) on it and the notarized expert testimony  and declaration by Neil F. Garfield , MBA, JD (Appendix B) into making their decision, which is imperative to the proper adjudication of this case.

## JURISDICTION

The court of appeals entered its judgment on May 4, 2016, and denied a petition for rehearing (App. 10a-11a). This leading from the first case of the Superior Court in KEITH O. HEDMAN,et al., vs. AURORA LOAN SERVICES, LLC,(Superior Court Case No. CV 39-2011-00260395-CU-FR-STK, that ended up being Court of Appeal Case No. C069453), *originating back to 2009).*This case prompted the Consumer Financial Protection Bureau to put the AURORA LOAN SERVICES, AND LEHMAN COMPANIES, in a government conservatorship.  HEDMANS would like to enjoin each case here San Joaquin County Superior Court Case No: 39201400307185CUORSTK, that became Court of Appeal, Third Appellate District Case No.'s C078538/C079416, and California Supreme Court Case S234930 Filed July 13, 2016, and California Supreme Court Case S235169 Filed July 27, 2016. Also, a quiet title case filed as San Joaquin County Superior Court Case No: 39201400314934CUFRSTK .   *This* Court's jurisdiction is invoked under 28 U.S.C. § 1254(1). STATUTORY AND REGULATORY PROVISIONS INVOLVED Relevant provisions of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and of the Federal Reserve Board's Regulation Z are reproduced at App. 12a-19a. STATEMENT A. Statutory and Regulatory Background Congress enacted the Truth in Lending Act "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing . . . practices." 15 U.S.C. § 1601(a).

The Act therefore requires creditors to disclose to borrowers various terms of a credit transaction, including "finance charges, loans taken out, annual percentage rates of interest, and the borrower's rights." Beach v. Ocwen Fed. Bank, 523 U.S. 410, 412 (1998) (citing 15 U.S.C. §§ 1631, 1632, 1635, 1638). Section 1635(a) provides that a borrower who secures the loan with a principal dwelling "shall have the right to rescind the transaction until midnight of the third business day following the consummation ofthe transaction or the delivery of the information and rescission forms required under this section . . . whichever is later, by notifying the creditor . . . of his intention to do so." 15 U.S.C. § 1635(a). Section 1635(a) thereby creates an unconditional right to rescind for three days after the consummation of the transaction and, as a remedy for a creditor's violation of the Act's disclosure requirements, extends that right to rescind until three days following the ultimate delivery of the required disclosures. A borrower's exercise of the right to rescind under Section 1635(a) sets in motion a series of automatic steps to unwind the transaction, imposing obligations on both the creditor and the borrower. When a borrower "exercises his right to rescind under [Section 1635(a)], he is not liable for any finance or other charge,

5

and any security interest given by the [borrower] . . . becomes void upon such a rescission." Id. §
1635(b). Section 1635(b) next provides that, "[w]ithin 20 days after receipt of a notice of rescission, the
creditor shall return to the [borrower] any money or property given as . . . downpayment . . . and shall
take any action necessary or appropriate to reflect the termination of any security interest created
under the transaction." Id. Subsequently, "[u]pon the performance of the creditor's obligations under
this section, the [borrower] shall tender the property to the creditor," but, "[i]f the creditor does not
take possession of the property within 20 days after tender by the [borrower], ownership of the
property vests in the [borrower] without obligation on his part to pay for it." Id. These "procedures
prescribed" by Section 1635(b) "shall apply except when otherwise ordered by a court." Id. Although the
Act originally extended the three-day rescission right until the creditor delivered proper

disclosures and notices, whenever that might be, Congress later limited to three years the time within
which a borrower may exercise the right to rescind even if a creditor never delivers the disclosures
required by the Act. See Act of Oct. 28, 1974, Pub. L. No. 93-495, § 405, 88 Stat. 1500, 1517 (codified at
15 U.S.C. § 1635(f)). Section 1635(f) thus provides that a borrower's "right of rescission shall expire
three years after the date of consummation of the transaction . . . notwithstanding the fact that the
information . . . required under this section or any other disclosures required under [the Act] have not
been delivered to the [borrower]." 15 U.S.C. § 1635(f). Regulation Z, which implements the Act,*
confirms that, "[i]f the required notice or material disclosures are not delivered, the right to rescind shall
expire 3 years after consummation." 12 C.F.R. § 226.23(a)(3). That Regulation further explains that, "[t]o
exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram,
or other means of written communication." Id. § 226.23(a)(2). * The Act originally vested the Federal
Reserve Board with authority to promulgate regulations implementing the Act. See Pub. L. No. 90-321,
tit. I, §§ 103(b), 105, 82 Stat. 146, 147, 148 (1968). Under this authority, the Board promulgated
Regulation Z, after notice and comment. See 12 C.F.R. pt. 226. The Consumer Financial Protection Act of
2010 transferred implementing authority from the Federal Reserve Board to the Consumer Financial
Protection Bureau. See Pub. L. No. 111- 203, tit. X, § 1061(b)(1), (d), 124 Stat. 1376, 1955, 2036, 2039
(2010) (codified at 12 U.S.C. § 5581(b)(1), (d)). The Bureau repromulgated Regulation Z without
substantive changes. See Interim Final Rule, Truth in Lending (Regulation Z), 76 Fed. Reg. 79,768, 79,803-
04 (Dec. 22, 2011) (promulgated at 12 C.F.R. § 1026.23). In this example the HEDMANS have been put in
to position of "3rd Party Non-Disclosed Creditor", so it is very clear that there is complex RICO fraud
here, a network that has been built to do this in a repeatable process like organized crime is set up.

6

B. Factual Background On May 18, 2004, petitioners KEITH OLIN HEDMAN  and ADRIALYN VARILLA
HEDMANS purchased their primary residence in Mountain House, California, by executing two
promissory notes , but they were never lent any money, and never received the funds. The "NOTES"
were for $333,700 with CMG MORTGAGE, INC/UMAC MORTGAGE, INC./LLC, and a table funded loan for
$128,950 with Wells Fargo, NA.   Home Loans, Inc. App. 5a. At and After the alleged closing of the
transaction, HEDMANS never received any checks or transfers or loan proceeds.  The alleged creditor
also, provided none of the paperwork or disclosures required by the Act ,claiming that their copier was
broken, and they would be sent the paperwork within a week, but past the three day cut off, operating
in violation of the Act,and they failed to include two copies of a Notice of Right to Cancel for each of the
HEDMANS timely, and any documentation explaining to HEDMANS that additional monies were going to
be taken out other their accounts with them being a creditor in a REPO 105 transaction making
HEDMANS the Bailor or "non-disclosed 3[rd] party creditor", they also did not receive two copies of a
Truth in Lending Disclosure Statement. If HEDMANS knew that LEHMAN BROTHERS HOLDINGS, INC. was
associated with the paperwork they might have not signed it, and if they knew additional monies were
going to be lent from HEDMANS, HEDMANS would have changed and negotiated different terms and
conditions. Thus, the transaction was unconscionable, and thus void ab initio. HEDMANS since they did
not know about the loan gave none of the assumed mandatory paperwork to the loan
recipient(LEHMAN BROTHERS HOLDINGS, INC.), since it is a regulated industry. See Am. Compl. ¶¶ 19-20
(Dkt. No. 7); see also 12 C.F.R. § 226.23(b) ("[A] creditor shall deliver two copies of the notice of the right
to rescind to each consumer entitled to rescind") (emphases added); id. § 226.17(d) ("If the transaction
is rescindable . . . , the disclosures shall be made to each consumer who has the right to rescind.")
(emphasis added). The creditors never delivered the additional required disclosures or monies activating
the mortgage or deed of trust. App. 5a. On May 18, 2007, within the three-year limitation period set by
Section 1635(f), the HEDMANS were unaware they did not have a valid mortgage to be able to exercise
their right to rescind the transaction by sending written notice of rescission to respondents. Id. On June-
July, 2013, HEDMANS' gave notice of rescission to multiple parties. Many of the parties have been
refusing to acknowledge the rescission stating that the transaction was a Money Purchase Agreement,
which was never disclosed during the closing. Id. No other interested party responded to the HEDMANS'
notice of rescission. See Am. Compl. ¶ 33 (Dkt. No. 7). The alleged creditors/ alleged loan providers
subsequently failed to take, within 20 days of receipt of the notice of rescission, any of the steps
required by Section 1635(b) to reflect the termination of the security interest in the HEDMAN' home.
See id. ¶ 31.

7

C. Proceedings Below, In 2009-2010 time frame HEDMANS filed a Lawsuit against LOAN SERVICER, AURORA LOAN SERVICES, INC. when they still believed they may have had a loan, but there were gross loan servicing violations and further discovery had to take place and then AURORA was put into a government conservatorship. On February 4th, 2014, the HEDMANS filed a complaint in the United States District Court for the District of California seeking to enforce the rescission they had exercised by notifying their creditors in writing of their intention to rescind among other Statutes. App. 5a-6a. They petitioned to file an amended complaint giving them 20 -60 days leave to ammend but proceedurely with disallowed their God Given rights to DUE PROCESS and a JURY HEARING even though all JURT FEES were Collected by the Court. HEDMANS sought a declaration that the mortgage transaction had been rescinded by that written notice, damages under Section 1640 for respondents' violations of the Act, and damages under state-law causes of action arising from violations of federal mortgage regulatory law. App. 6a. Respondents answered and moved for judgment on the pleadings on the ground that the HEDMANS' suit was barred because the complaint was filed more than three years after the alleged consummation of the transaction,and the court proceedurely dis-allowed HEDMANS justice. App. 7a-9a. The Superior granted respondents' motion. App. 9a. Following other decisions in the district, it held that "a suit for rescission filed more than three years after consummation of an eligible transaction is barred by [the Act's] statute of repose" in Section 1635(f). Id. Because "there is no dispute that [the HEDMANS] failed to file suit within the three-year period," the court held that "their claims are time barred." Id. The HEDMANS appealed to the Third Appellate District, which affirmed the Superior court's judgment. Since it appears the new evidence/ Declaration was not observed by NEIL F. GARFIELD , MBA, JD.  The per curiam opinion noted that the Third District said  and cautioned HEDMANS for things that they filed properly in the court, yet the court was engaging in Judicial Misconduct making decisions allowing Attorneys to offer testimony in court as if they were the defendant as a witness, which is clear violation of Transey v. Pagliaro, and the HEARSAY RULE. "recently weighed in on the circuit split regarding this precise issue and held that a party seeking to rescind a loan transaction must file suit within three years of consummating the loan." App. 2a (citing Keiran v. Home Capital, Inc., 720 F.3d 721, 726-29 (8th Cir. 2013)). On that ground alone, the court of

8

appeals "affirm[ed] the Superior court's judgment on the pleadings in favor of the alleged lenders." Id. Two members of the panel each concurred separately to express their views that the Third Appellates precedent compelled the wrong result. HEDMANS "[have said they will offer a conditional acceptance upon proof of claim that they received loan proceeds, so any IRS form 8300, IRS form 1099-oid showing the true lender, or evidence that the monies had been cashed at any of HEDMANS accounts, showing they received the monies, via a paper trail"., to this date, this request and conditional acceptance has been left unchallenged, even in the Federal Bankruptcy Court, where each party toting a claim on HEDMANS property was discharged. " The other court though stands by their decision. . . that sending notice within three years of consummating a loan is sufficient to 'exercise' the right to rescind."(Which HEDMANS have done" App. 2a-3a (Melloy, J., concurring in the judgment in Jesinoski v. Countrywide Mortgage, LLC.) (citing 12 C.F.R. § 1026.23(a)(2)).Also, Judge Colloton wrote that he "believe[s] that Keiran . . . was wrongly decided . . . and I would reverse the judgment of the district court if the question presented were open in this circuit." App. 3a (Colloton, J., concurring). The HEDMANS petitioned for rehearing en banc, which the Third Appelate District denied, so HEDMANS asked the matter to be heard in California Supreme Court, where there paperwork was sent back, and not read with a "PETITON FOR REVIEW IS DENIED"... App. 10a.: No 'matter how this court decides this case, there will remain a well-developed conflict in the circuits on the question how a consumer may exercise his or her right to rescind under the Truth in Lending Act, 15 U.S.C. § 1635(f) WHEN THERE IS FRAUD, AND NO CONSUMMATION AND RECIEPT OF MONIES TO VALIDATE A "MORTGAGE" OR "DEED OF TRUST". Compare Sherzer v. Homestar Mortg. Servs., 707 F.3d 255 (3d Cir. 2013), and Gilbert v. Residential Funding LLC, 678 F.3d 271, 277-78 (4th Cir. 2012), with Rosenfield v. HSBC Bank, USA, 681 F.3d 1172, 1187-88 (10th Cir. 2012), and McOmieGray v. Bank Am. Home Loans, 667 F.3d 1325, 1328 (9th Cir. 2012). It appears that none of these cases was presented to the Supreme Court by way of petition for writ of certiorari, so it cannot be said that the Court has resolved to

9

leave the issue to individual circuits despite a conflict in authority. Therefore, I conclude that the resources of a rehearing en banc are not warranted at this time simply to move this court from one side to the other in what may prove to be a short-lived conflict in the circuits. App. 11a (Colloton, J., concurring in denial of rehearing en banc). REASONS FOR GRANTING THE PETITION I. THE COURTS OF APPEALS ARE DEEPLY DIVIDED OVER WHETHER A BORROWER EXERCISES THE RIGHT TO RESCIND UNDER SECTION 1635 BY NOTIFYING A CREDITOR OR INSTEAD MUST FILE SUIT, BUT THIS CASE CUTS TO THE VERY ROOT OF PROPERTY RIGHTS IN AMERICA. The Third Circuit's decision in this case deepens a significant conflict among eight circuits by holding that a borrower must file suit within three years of the consummation of a loan to exercise his right to rescind the transaction under Section 1635, it also does not address several of the other issues that HEDMANS provided Prima Fascia evidence to the court to validate. HEDMANS envoked Common Law jurisdication, and in many cases objected to HEARSAY evidence that was taken into court as truthful,and other ethics and judicial violations taking place, with HEDMANS appearing as the EXECUTOR or TRUSTEE for the BENEFICIARY. . The Third, Fourth, and Eleventh Circuits properly rejected such a requirement, holding that the plain text of the statute and its implementing regulation dictate that written notice to the creditor is sufficient, and that neither the statute nor the regulation makes any mention of a further requirement to sue within the three-year time limit. The Third Appelate holding, shared by the First, Sixth, Ninth, and Tenth Circuits, looks past the text of the statute and regulation, "[e]xtrapolating" from this Court's decision in Beach v. Ocwen Federal Bank, 523 U.S. 410, 412 (1998), to impose a requirement that under Section 1635(f) "the [borrower] must file a rescission action in court" within three years. Keiran v. Home Capital, Inc., 720 F.3d 721, 728 (8th Cir. 2013). This Court's review is required to resolve this stark division in authority

10

and to establish uniform national requirements for a borrower's exercise of the right to rescind under Section 1635. A. The Third, Fourth, And Eleventh Circuits Hold That Notifying A Creditor In Writing Within Three Years Of The Consummation Of The Transaction Is Sufficient To Exercise The Right To Rescind 1. Third Circuit. In Sherzer v. Homestar Mortgage Services, 707 F.3d 255 (3d Cir. 2013), the Third Circuit held on facts identical to those here that written notice to a creditor is sufficient to exercise the right to rescind under Section 1635, especially when it is determined there was fraud, misrepresentation of facts and monies were not actually lent this is covered in UCC 3-103, further issues are covered in UCC 3-603 where the definition of legal tender is to be determined, and as the debt is to be discharged, as per the actions of the Bankruptcy Judge, when HEDMANS were forced into Ch13 then Ch7. The alleged creditor could not provide proof of claim, so they were discharged. There, as here, the homeowners notified their creditors in writing of their intention to rescind the loan within three years of its consummation, but in this case that period is still in limbo since HEDMANS are still waiting to be given the loan monies, or for consummation. Id. at 256. The court held that written notice was sufficient because "the text of [Section] 1635 and its implementing regulation . . . supports the view that to timely rescind a loan agreement, [a borrower] need only send a valid notice of rescission." Id. at 258. The court explained that "[n]either [Section] 1635(a) nor Regulation Z states that the [allewged/borrower] must also file suit; both refer exclusively to written notification as the means by which [a borrower] exercises his right of rescission," id., and therefore rejected the creditor's invitation to "infer that the statute contains additional, unwritten requirements with which [borrowers] must comply," id. at 261. Accordingly, the court held that "[a borrower] exercises his right of rescission by sending the creditor valid notice of rescission, and need not also file suit within the three-year period." Id.

11

2. Fourth Circuit. In Gilbert v. Residential Funding LLC, 678 F.3d 271 (4th Cir. 2012), the Fourth Circuit
similarly relied upon "the plain meaning of the applicable statute and regulation" to hold that a
borrower exercises the right to rescind by notifying a creditor. Id. at 278. There, as in Sherzer and as
here, the homeowner sent written notice of rescission within three years of the consummation of the
loan but filed suit after three years. The Gilbert court explained that, "[s]imply stated, neither [Section]
1635(f) nor Regulation Z says anything about the filing of a lawsuit, and we refuse to graft such a
requirement upon them." Id. at 277. The court therefore held, in accord with the Third Circuit, that "a
borrower exercises her right of rescission by merely communicating in writing her intention to rescind."
Id. 3. Eleventh Circuit. The Eleventh Circuit reached the same conclusion in Williams v. Homesake
Mortgage Co., 968 F.2d 1137 (11th Cir. 1992). Although the homeowner in that case had both notified
the creditor in writing and filed suit before the expiration of the three-year time limit, the Eleventh
Circuit unmistakably held that written notice alone is sufficient to exercise the right to rescind.
"Congress provided the consumer with the right to rescind a credit transaction . . . solely by notifying the
creditor within set time limits of his right to rescind." Id. at 1139 (emphasis added). In modifying the
default procedures established by Section 1635(b) to unwind the transaction, the court explained that
"all that a consumer need do is notify the creditor of his intent to rescind [and] [t]he agreement is
automatically rescinded." Id. at 1140. The Williams court further explained that Regulation Z
"reaffirm[ed] . . . the Act's

12

12 intent to make rescission automatic upon notification." Id. at 1142. See also Johnson v. Mortgage Elec. Registration Sys., Inc., 252 F. App'x 293, 294 (11th Cir. 2007) (per curiam) (explaining that a "borrower can trigger rescission 'solely by notifying the creditor within set time limits of [her] intent to rescind'" but holding that the borrower in that case had failed to do so) (citing Williams v. Homesake Mortgage) (alteration in original). District courts in the Eleventh Circuit have followed Williams v. Homesake Mortgage in holding that written notice alone is sufficient to exercise the right to rescind. See, e.g., Carson v. Wells Fargo Bank, N.A., No. 8:10-CV-2362-T17-EAJ, 2011 WL 2470099, at *3 (M.D. Fla. June 20, 2011) ("Rescission is automatic once the creditor is notified. . . . [B]ecause notifying the creditor automatically triggers rescission, it is this notification, not the filing of the suit, that must be within the three-year period.") (citing Williams v. Homesake Mortgage); Williams v. Saxon Mortg. Co., Civil Action No. 06-0799-WS-B, 2008 WL 45739, at *3 (S.D. Ala. Jan. 2, 2008) ("[A]ll that the consumer need do is notify the creditor of his intent to rescind. The agreement is then automatically rescinded and the creditor must . . . tender first.") (quoting Williams v. Homesake Mortgage). B. The First, Sixth, Eighth, Ninth, And Tenth Circuits Hold That A Borrower Must File Suit Within Three Years Of The Consummation Of The Transaction To Exercise The Right To Rescind The First, Sixth, Eighth, Ninth, and Tenth Circuits depart from this straightforward interpretation of the statutory text and its implementing regulation, instead requiring that a borrower must file a lawsuit

13

13 within three years to exercise the right to rescind. Those courts of appeals "[e]xtrapolat[e]," Keiran, 720 F.3d at 728, such a rule from this Court's decision in Beach, which held that a homeowner who had neither notified a creditor nor brought suit within the three year time limit could not then assert rescission as an affirmative defense to a foreclosure action brought years later by the creditor. 1. Ninth Circuit. In McOmie-Gray v. Bank of America Home Loans, 667 F.3d 1325 (9th Cir. 2012), the Ninth Circuit held that "[Section] 1635(f) is a three-year statute of repose, requiring dismissal of a claim for rescission brought more than three years after the consummation of the loan . . . regardless of when the borrower sends notice of rescission." Id. at 1326. The court conceded that, "[w]ere [it] writing on a blank slate, [it] might consider whether notification within three years of the transaction could extend the time limit imposed by [Section] 1635(f)." Id. at 1328. Instead, though, the court suggested that it was bound "under the case law of [the Ninth Circuit] and the Supreme Court," which in its view indicated that "rescission suits must be brought within three years of the consummation of the loan, regardless whether notice of rescission is delivered within that three-year period." Id. The Ninth Circuit based its holding on this Court's statement in Beach that Section 1635(f) "talks not of a suit's commencement but of a right's duration," Beach, 523 U.S. at 417, and its conclusion that the Act "permits no federal right to rescind, defensively or otherwise, after the 3-year period of [Section] 1635(f) has run," id. at 419. The Ninth Circuit acknowledged that this Court in Beach held merely that "the [borrower] could not raise the right to rescind as a defense to the [creditor's] foreclosure

14

action after the three-year period had run" when the borrower had neither notified the creditor nor brought suit himself. McOmie-Gray, 667 F.3d at 1328. It nonetheless suggested that "[t]he language the Court used, however, broadly assumes that a three-year limitation governs cases where a borrower, as plaintiff, seeks rescission of the mortgage transaction." Id. at 1328-29. On the basis of this extension of Beach, the Ninth Circuit concluded that "Section 1635(f) is . . . not merely a statute of limitations – it completely extinguishes the underlying right itself," and therefore as "a statute of repose" it "represents an absolute three-year bar on rescission actions," even if the borrower had notified the creditor in writing within the three-year period. Id. at 1329. 2. Tenth Circuit. In Rosenfield v. HSBC Bank, USA, 681 F.3d 1172 (10th Cir. 2012), the Tenth Circuit joined the Ninth Circuit in holding that "the mere invocation of the right to rescission via a written letter, without more, is not enough to preserve a court's ability to effectuate (or recognize) a rescission claim after the three-year period has run." Id. at 1182. Like the Ninth Circuit in McOmie-Gray, the Tenth Circuit "believe[d] that Beach [was] dispositive of the instant question" and that "the Supreme Court has definitively foreclosed – through the implicit instruction of Beach – any argument that a consumer may exercise her right to rescind" by notifying the creditor of his intention to rescind. Id. In the Tenth Circuit's view, the homeowner's "position is not consistent with the effect of a strict repose period – which Beach held that [Section] 1635(f) establishes in this context – one that operates to completely extinguish the right claimed after it lapses." Id.

15

The Tenth Circuit disregarded the Consumer Financial Protection Bureau's ("Bureau") interpretation of the statute and of Regulation Z, advanced in an amicus brief, that a borrower need not file suit to exercise the right to rescind, again on the basis of the perceived implications of Beach. According to that court, "part and parcel of the Court's vision of repose was the manner in which a rescission must be asserted during the repose period — that is, by invoking the power of the courts through litigation." Id. at 1186 n.10 (citing Beach, 523 U.S. at 415-16). To hold otherwise, the court supposed, "could conflict with the Court's conception of repose under [the Act], in that it would effectively create commercial uncertainty." Id. On this policy basis, the court rejected the agency's authoritative interpretation of the Act and of Regulation Z. 3. Third Appellate District and California Supreme Court. In Keiran v. Home Capital, Inc., the Third Appellate District and California Supreme Court surveyed the split among its sister circuits before joining the Ninth and Tenth Circuits in "hold[ing] that a plaintiff seeking rescission must file suit, as opposed to merely giving the bank notice, within three years in order to preserve th[e] right [to rescind] under [Section] 1635(f)." 720 F.3d at 726-28. The court "[e]xtrapolat[ed] from Beach" to infer that, "to accomplish rescission within the meaning of [Section] 1635(f), the [borrower] must file a rescission action in court." Id. at 728. The court further disregarded the Bureau's interpretation of Regulation Z, suggesting that "while Regulation Z sets forth one of the things [a borrower] must do to rescind the loan — give written notice to the bank — it does not set forth the entirety of the things necessary to accomplish rescission." Id. As a result, the court felt free to impose the additional requirement that the borrower file suit within three years. Id.

16

Judge Murphy dissented, explaining that "[t]he majority decision is contrary to the plain language of [the Act], the congressional intent behind it, and the position of the agency responsible for enforcing it." Id. at 731 (Murphy, J., concurring in part and dissenting in part). She recognized that "[n]owhere in the [Act] is there any requirement that a consumer must file a lawsuit in order to exercise a right of rescission." Id.; see id. at 733 ("[The Act] contains no language even hinting that a lawsuit is required to exercise the right of rescission."). Judge Murphy further explained that "[t]he majority['s] suggest[ion] that Beach . . . compels a different interpretation of the statute . . . is puzzling," because "in Beach the homeowners had unquestionably not exercised their right of rescission within three years, either by providing the statutory notice or by filing a lawsuit as the majority advocates." Id. at 731. Accordingly, she understood that "Beach provides no answer to the question in this case." Id. at 732. For these reasons, she properly concluded that "[t]he plain language of [the Act], its implementing regulations, and its supporting policy rationale all support reading [Section] 1635 to mean what it says: that rescission is exercised when a consumer provides written notice to the lender." Id. at 736. 4. Sixth Circuit. In Lumpkin v. Deutsche Bank National Trust Co., No. 12-2317, 2013 WL 4007760 (6th Cir. Aug. 6, 2013), the Sixth Circuit shared the Eighth, Ninth, and Tenth Circuits' view in holding that a borrower must file suit to exercise his right to rescind. The court there held that the letter the homeowner had sent to his creditors within the three-year period did not qualify as a notice of rescission, id. at *2, and further held that "[t]he three years defined by [Section] 1365(f) were over by the

17

time this suit was filed, and so [the borrower's] right to bring a rescission suit had expired, regardless of when and whether he notified the lender of his rescission within those three years," id. at *3. The Sixth Circuit has thus unmistakably indicated that it would join the Eighth, Ninth, and Tenth Circuits in holding that written notice is insufficient to exercise the right to rescind. 5. First Circuit. The First Circuit has not yet considered this issue in the context of enforcing a rescission, but it has held that a notification within the three-year period did not effect a rescission without suit being filed within the three years. In Large v. Conseco Finance Servicing Corp., 292 F.3d 49 (1st Cir. 2002), the First Circuit reached the same conclusion in enforcing an arbitration provision in the loan agreement a homeowner had attempted to rescind via written notice to his creditor within three years. There, the court rejected the homeowner's argument that his letter notifying his creditors of his intention to rescind "in fact rescinded the transaction the moment it was mailed." Id. at 54. The First Circuit instead held that "neither [Section 1635] nor [Regulation Z] establishes that a borrower's mere assertion of the right of rescission has the automatic effect of voiding the contract." Id. Rather, the court suggested, "[t]he natural reading of this language is that the security interest becomes void when the [borrower] exercises a right to rescind that is available in the particular case, either because the creditor acknowledges that the right of rescission is available or because the appropriate decision maker has so determined." Id. at 54-55. The court further inferred that, if "a lender disputes a borrower's purported right to rescind," as was the case in Large and is the

18

case here, "the designated decision maker," there an arbitrator and here a court, "must decide whether the conditions for rescission have been met," and, "[u]ntil such a decision is made, the [borrower] ha[s] only advanced a claim seeking rescission." Id. at 55. The court limited the Eleventh Circuit's approach in Williams v. Homesake Mortgage to cases in which the creditor agreed that grounds for rescission existed, thus holding that written notice alone does not exercise the right to rescind unless "the grounds for rescission have been established, either by agreement or by an appropriate decision maker." Id. C. The Split Among The Courts Of Appeals Is Widely Recognized And Entrenched, And It Can Be Resolved Only By This Court This entrenched conflict in authority is widely recognized among the courts of appeals, as well as not observing PRIMA FASCIA EVIDENCE THAT IS NEW AND SHOW FRAUD. See App. 2a ("This Court recently weighed in on the circuit split regarding this precise issue."); Keiran, 720 F.3d at 726 ("Our sister circuits are split on this issue."); Sherzer, 707 F.3d at 258 (acknowledging circuit split); Rosenfield, 681 F.3d at 1187-88 (same); Gilbert, 678 F.3d at 276 (same); see also Saif Alaqili, Comment, Striking a Balance: How Equitable Doctrine Restores the Purposes of TILA's Rescission Right, 2013 U. Chi. Legal F. 711 (2013) (recognizing circuit split and advocating sufficiency of notice). As Judge Colloton recognized below in his opinion concurring in the denial of rehearing en banc, App. 11a, there is no realistic prospect that the courts of appeals will reconcile this "well-developed conflict" in authority without this Court's intervention. Accordingly, the Court should grant this petition to resolve the conflict rather then expect if to be resolved in a Superior Court where the Rule of Law is not being followed and cases are being decided outside of, "The Law" and Supreme Court Statutes.

19

II. THE EIGHTH CIRCUIT'S HOLDING THAT A BORROWER MUST FILE SUIT TO EXERCISE THE RIGHT TO RESCIND UNDER SECTION 1635 IS IN ERROR This Court's review is further warranted because the Eighth Circuit's holding is incorrect on the merits. The plain text of the statute, the structure and purpose of the Act, and the clear direction of the implementing regulation establish that "notifying the creditor" is sufficient to exercise the right to rescind under Section 1635 and that there is no further requirement to file suit within the three-year time limit. This Court should grant review to correct the Eighth Circuit's misinterpretation of the Act in Jesinoski v. Countrywide, its failure to afford proper regard to the Bureau's implementing regulation, and its misapplication of this Court's decision in Beach. A. Section 1635's Plain Text Establishes That Notice To A Creditor Is Sufficient To Exercise The Right To Rescind The text of Section 1635(a) both creates a right of rescission and specifies the method of its exercise. The statute indisputably provides that the borrower "shall have the right to rescind the transaction." 15 U.S.C. § 1635(a). The statute further details the manner in which that right may be exercised by specifying that the borrower shall have the right to rescind "until midnight of the third business day" after the closing or the delivery of proper disclosures "by notifying the creditor, in accordance with regulations of the Bureau, of his intention to do so." Id. The clear meaning of this statutory text is that a borrower exercises his "right to rescind" a transaction "by notifying the creditor." Id.

20

Section 1635(f)'s text confirms that interpretation. That section creates a "time limit for [the] exercise of [the] right," id. § 1635(f), but does not restrict the manner in which that right may be exercised within that time limit. As this Court recognized in Beach, Section 1635(f) "says nothing in terms of bringing an action but instead provides that the 'right of rescission [under the Act] shall expire' at the end of the time period." 523 U.S. at 417. By addressing the "right's duration," id., Section 1635(f) is simply silent regarding what a borrower must do within the time limit it establishes in order to exercise that right.

Beyond Section 1635(a)'s affirmative statement that a borrower exercises his right to rescind by "notifying the creditor" and Section 1635(f)'s notable silence on the issue, neither section gives any indication of a further requirement that the borrower must sue within the three-year time limit. Indeed, neither section even mentions a court or legal proceedings. See Sherzer, 707 F.3d at 260 ("[T]he absence of any reference to causes of action or the commencement of suits in [Section] 1635 also suggests that rescission may be accomplished without a formal court filing."); Gilbert, 678 F.3d at 277 ("Simply stated, neither [Section] 1635(f) nor Regulation Z says anything about the filing of a lawsuit, and we refuse to graft such a requirement upon them."); see also Keiran, 720 F.3d at 728 ("Regulation Z says nothing about filing suit."). This conspicuous absence is notable in a statute that elsewhere explicitly establishes legal causes of action. See 15 U.S.C. § 1640 (creating damages cause of action for violations of the Act and a statute of limitations thereto). Accordingly, Section 1635 does not impose a requirement that a borrower sue to exercise the right to rescind.

21

**B. The Structure And Purpose Of The Truth In Lending Act Confirm That Notice Alone Is Sufficient To Exercise The Right To Rescind** Congress designed the Act to effectuate rescission upon a borrower's notifying creditors without relying on the intervention of the courts. As an initial matter, there is no dispute that a borrower has an unconditional right to rescind under Section 1635(a) for three days after the closing of the transaction since the other fraudulent facts were not disclosed at that time. No court has suggested that a borrower must file a lawsuit within three days to exercise that unconditional right. And it makes no sense to interpret that unconditional right to rescind as requiring only notice while interpreting the extended right to rescind, which is created by the very same clause in the very same sentence of Section 1635(a), as requiring the filing of a lawsuit. See Sherzer, 707 F.3d at 264. Such an incongruous interpretation of Section 1635(a) is unsupportable. Moreover, Section 1635(b) establishes procedures to unwind the transaction "when [a borrower] exercises his right to rescind under [Section 1635(a)]," without mentioning or requiring the involvement of a court. 15 U.S.C. § 1635(b). Those procedures are triggered by the borrower "exercis[ing] his right" under Section 1635(a); that is, by "notifying the creditor." "When" the borrower "exercises his right," immediately and automatically he "is not liable for any finance or other charge." Id.; see Williams, 968 F.2d at 1140; Semar v. Platte Valley Fed. Sav. & Loan Ass'n, 791 F.2d 699, 705-06 (9th Cir. 1986). Moreover, "upon such a rescission" that a borrower exercises by notifying his creditor, "any security interest . . . becomes void." 15 U.S.C. § 1635(b).

22

Those first steps proceed automatically upon notice of rescission, and the statute does not require the involvement of a court. The next steps in Section 1635(b)'s default procedures are affirmatively inconsistent with a court proceeding. The statute specifies that, "[w]ithin 20 days after receipt of a notice of rescission, the creditor shall return" any "money or property given as earnest money, downpayment, or otherwise" and "shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction." Id. The provision specifies that those procedures of Section 1635(b) are triggered by "receipt of notice of rescission," not by a lawsuit. Moreover, the time limits established here and elsewhere in Section 1635(b) are tied to the actions of the borrower and creditor, see Keiran, 720 F.3d at 733 (Murphy, J., concurring in part and dissenting in part), and are therefore inconsistent with those established for a legal action by the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 12(a) (establishing times for responsive pleadings). The only reasonable interpretation of Section 1635, therefore, is that notice to a creditor triggers rescission, and the default unwinding procedures of Section 1635(b) follow in due course from that notice without requiring the initiation of a court proceeding. The structure of the statute, including the unwinding procedures in Section 1635(b), reflects the Act's purpose. "[S]ection 1635 is written with the goal of making the rescission process a private one, worked out between creditor and debtor without the intervention of the courts." Belini v. Washington Mut. Bank, FA, 412 F.3d 17, 25 (1st Cir. 2005). The Eighth Circuit would instead channel all rescissions

into the legal system, flooding the courts with thousands of unnecessary lawsuits. That rule not only flouts the structure of Section 1635 generally and the procedures of Section 1635(b) specifically, it eviscerates the efficiencies of the Act by manufacturing thousands of needless lawsuits from a regime that was designed to process rescissions privately in the first instance and without the intervention of the courts. C. Regulation Z Removes All Doubt That Written Notice Is Sufficient To Exercise The Right To Rescind Regulation Z resolves any remaining ambiguity regarding the interpretation of the Act in favor of the sufficiency of written notice. That regulation specifies that, "[t]o exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication." 12 C.F.R. § 226.23(a)(2). The Bureau's interpretation of the Act in Regulation Z, which makes clear that notifying a creditor is sufficient to exercise the right to rescind, is due deference. See Anderson Bros. Ford v. Valencia, 452 U.S. 205, 219 (1981) ("[A]bsent some obvious repugnance to the statute, the [Bureau's] regulation implementing [the Truth in Lending Act] should be accepted by the courts."). Because the text of Section 1635, which does not even mention a court proceeding, does not clearly preclude the Bureau's interpretation promulgated in Regulation Z, that interpretation of the statute is entitled to deference from this Court. The Bureau has reiterated in numerous amicus briefs before the courts of appeals its view that a borrower need only notify a creditor to exercise the right to rescind. See, e.g., Brief of the Consumer

24

Financial Protection Bureau as Amicus Curiae in Support of Plaintiff-Appellant and Reversal, Rosenfield, supra, No. 10-1442 (filed Mar. 26, 2012), 2012 WL 1074082. There, the Bureau confirmed that it interprets Section 1635 to require only notice to the creditor to exercise the right to rescind and that "[c]onsumers are not required also to sue their lender within the three-year period provided under [Section] 1635(f)." Id. at *14. The Bureau's interpretation in an amicus brief of its own regulations is itself entitled to deference. See Chase Bank USA, N.A. v. McCoy, 131 S. Ct. 871, 880 (2011) ("[W]e find Regulation Z ambiguous as to the question presented, and must therefore look to the [Bureau's] own interpretation of the regulation for guidance in deciding this case.") (citation omitted); Auer v. Robbins, 519 U.S. 452, 461 (1997) (holding an agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation") (internal quotation marks omitted). Accordingly, the Court should accept the Bureau's interpretation of Section 1635 and Regulation Z to hold that notice to a creditor is sufficient to exercise the right to rescind. D. The Eighth Circuit's Reliance Upon in,Beach Is Misplaced in Jesinoski v. Countrywide, This Court's decision in Beach, on which the Eighth Circuit and several other circuits relied in departing from the clear meaning of Section 1635 and Regulation Z, is not to the contrary. Beach held that Section 1635(f) "permits no federal right to rescind, defensively or otherwise, after the 3-year period of [Section] 1635(f) has run." 523 U.S. at 419. The Court explained that Section 1635(f) "govern[s] the life of the underlying right" and "talks not of a suit's commencement but of a right's duration."

25

Id. at 417. Accordingly, because the homeowner in Beach had not attempted to exercise his right to rescind – by suit, by notifying the creditor, or by any other means – within the three-year period of Section 1635(f), that right was extinguished when that limitations period expired. Id. That holding has no bearing on the question here. The Supreme Court of California failed to apprehend that the HEDMANS do not seek to exercise an expired rescission right by filing their suit, as the homeowner in Beach had attempted to do by asserting an expired rescission right as an affirmative defense in a foreclosure action. Rather, as the Third, Fourth, and Eleventh Circuits recognize, the HEDMANS already exercised their right within the three-year limitations period of Section 1635(f) by notifying their creditors, in accordance with the requirements of Section 1635(a). This Court's decision in Beach in no way questions the legitimacy of that manner of exercising the right to rescind. As the Third Circuit explained in Sherzer, "nowhere in Beach does the Court address how [a borrower] must exercise his right of rescission within that three-year period." 707 F.3d at 262. Rather, "[t]he most that can be gleaned from [this Court's] oft-quoted statement" in Beach that the Act "permits no federal right to rescind, defensively or otherwise, after the 3-year period of [Section] 1635(f) has run," 523 U.S. at 419, is the unremarkable conclusion that, "however the right of rescission is to be exercised, it must be done within three years." Sherzer, 707 F.3d at 263. The Eighth Circuit, along with the Sixth, Ninth, and Tenth Circuits, were therefore mistaken to rely upon Beach as warrant to ignore the plain meaning of Section 1635 and Regulation Z.

III. THIS CASE IS A SUPERIOR VEHICLE FOR ADDRESSING A RECURRING QUESTION OF GREAT NATIONAL
IMPORTANCE THAT WARRANTS THIS COURT'S IMMEDIATE REVIEW The issue presented in this petition
implicates a matter of surpassing national importance in the aftermath of a housing crisis that triggered
the worst economic downturn since the Great Depression, one may also believe it was the looting of the
UNITED STATES TREASURY, what happened in ROMAN time prior to its collapse. Let this be a
Trumpet/Siren to Each and Every Supreme Court Justice that reads this, because the Countrys fate is in
your hands. In this case HEDMANS were attacked by multiple stabs like Julius Caesar, but unlike him
HEDMANS are very much alive, as Natural Persons. But muddying the water with many parties should
not lessen the facts that HEDMANS have a Claim of Trespass. *It is vital to each economy that valid proof
of claim be produced upon request so that basic property rights can be upheld in America.* As the agency
responsible for administering the Act has recognized, "[t]he mortgage market is the single largest
market for consumer financial products and services in the United States." Final Rule, Mortgage
Servicing Rules Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 10,902, 10,905 (Feb. 14,
2013). In September 2013, more than $13 trillion in mortgage debt remained outstanding in the
domestic economy. See Board of Governors of the Federal Reserve System, Mortgage Debt Outstanding
(updated Sept. 25, 2013), at http://www.federalreserve.gov/
econresdata/releases/mortoutstand/current.htm (last visited Dec. 4, 2013). That massive market has
been beset by defaults and foreclosures. See 78 Fed. Reg. at 10,906 ("[m]ortgage loan delinquency rates
nearly doubled between 2007 and 2009," reaching nearly 10% in 2009); Jeff Sovern, Preventing Future
Economic Crises Through Consumer Protection Law or How the Truth in Lending Act Failed the Subprime
Borrowers, 71 Ohio St. L.J. 761, 764 (2010) (estimating 2.4 million foreclosures in 2009 and as many as
13 million by 2014). Rampant violations of the Act preceded the housing crisis, vastly increasing the
number of borrowers eligible for rescission under the Act. See Lea Krivinskas Shepard, It's All About the
Principal: Preserving Consumers' Right of Rescission

27

27 Under the Truth in Lending Act, 89 N.C. L. Rev. 171, 175 (2010) (stating that "TILA errors seemed surprisingly common, particularly during the early years of the mortgage bubble," and reporting that forensic auditing revealed "actionable mistakes in borrowers' disclosure documents . . . in as many as eighty percent of loans"). Clarification of the procedure that borrowers must follow to exercise their rights under the Act, especially when the majority of circuits would direct hundreds of thousands of rescission actions into federal court, warrants this Court's immediate attention. This case is the ideal vehicle to resolve the question presented. The legal issue is cleanly presented and dispositive of the case. In contrast to other cases raising the same issue that may come before the Court, the district court granted respondents' motion for judgment on the pleadings solely on the procedural ground that the HEDMANs' suit was timebarred and procedurally butchered, without reaching the merits of whether respondents had provided the information and disclosures required under the Act or burden of proof4433. Compare App. 7a n.3 ("[F]or the purposes of the present motion, the Court assumes without deciding that Plaintiffs have pled a plausible claim that they did not receive the required documents at the closing.") with Sobieniak v. BAC Home Loans Servicing, LP, 835 F. Supp. 2d 705, 709 (D. Minn. 2011) ("plaintiffs offer no evidence that their signatures on the cancellation notices and TILA disclosure do not mean what they say," and "a bald assertion . . . years later" to the contrary "is not sufficient to overcome the presumption" that they received the required disclosures), aff'd sub nom. Keiran v. Home Capital, Inc., 720 F.3d 721 (8th Cir. 2013), and Keiran v. Home Capital, Inc., Civil No. 10-4418

28

(DSD/JSM), 2011 WL 6003961, at *3 (D. Minn. Nov. 30, 2011) ("Bank of New York claims that no violations of the [Act] were evident on the face of the Keirans' loan documents. The court agrees."), aff'd, 720 F.3d 721 (8th Cir. 2013). For these reasons, the Court should resolve the deeply entrenched conflict over the meaning of Section 1635 and provide clarity to homeowners seeking to vindicate their statutory rights.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

KEITH OLIN HEDMAN &

ADRIALYN VARILLA HEDMAN

785 Shelli Street   Mountain House,

California 95391

(209) 836-1334

VERIFICATION

We are the PLAINTIFFS in the above entitled action. We have read the foregoing

complaint and Motion for Default and know the contents thereof to be true. The same is true of

my own knowledge, except as to those matters which are therein stated on information and

belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the

foregoing is true and correct.

Dated ~~October 7~~, Dec 28th, 2016

PLAINTIFFS, KEITH OLIN HEDMAN, ADRIALYN VARILLA

HEDMAN

**VERIFICATION**

*FILE ON DEMAND*

*Case # 08 -13555*

**TABLE OF CONTENTS**

OPINIONS BELOW.................................................................................. 1

JURISDICTION......................................................................................

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED ................................

STATEMENT OF THE CASE ..................................................................

REASONS FOR GRANTING THE WRIT .......................................................

CONCLUSION.......................................................................................

**INDEX TO APPENDICES**

APPENDIX A  *Copy of original note showing alterations & negotiated by LEHMAN*

APPENDIX B  *Expert Declaration Neal F. Garfield retired Wall street banker & Attorney/Notarized.*

APPENDIX C  *Affidavit of Truth of Keith Olin Hedman Notarized.*

APPENDIX D  *SEC -15D FORM FILED 1/24/2005 DISSOLVING THE TRUST.*

APPENDIX E  *Declaration of Nanette M. Berto That Forged Document in San Joaquin County Record.*

APPENDIX F  *Non Published Decision 3rd APPELLATE DISTRICT C073558 4/20/16*

APPENDIX G  *Non-Published Decision 3rd APPELLATE DISTRICT C079116  5/4/16 PG II Deny Documents*

**APPENDIX A**

# NOTE

HEDMAN
LOAN #: 20519535
MIN: 100072400205195350

| MAY 14, 2004 | PLEASANTON | CALIFORNIA |
|---|---|---|
| [Date] | [City] | [State] |

785 SHELLI STREET, MOUNTAIN HOUSE, CA 95391
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 333,700.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is CMG MORTGAGE, INC.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.375 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1ST day of each month beginning on JULY 1, 2004 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal If, on JUNE 1, 2034 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 3160 CROW CANYON RD., STE 240, SAN RAMON, CA 94583 or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S $ 2,081.85

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to these changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200 1/01
DOCUCFA1
DOCUCFA1.VTX  01/26/2004
(page 1 of 3 pages)

20519535

### 6. BORROWER'S FAILURE TO PAY AS REQUIRED
**(A) Late Charge for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000    % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means

**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees

### 7. GIVING OF NOTICES
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together  This means that any one of us may be required to pay all of the amounts owed under this Note.

### 9. WAIVERS
I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 10. UNIFORM SECURED NOTE
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

---

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200 1/01
DOCUCFA2
DOCUCFA2.VTX 1/06/2003
(page 2 of 3 pages)

20519535

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

- BORROWER - KEITH O HEDMAN - DATE -      5/18/04

- BORROWER - ADRIALYN V. HEDMAN - DATE -      5/18/04

[Sign Original Only]

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200 1/01
DOCUCFAJ                                                    (page 3 of 3 pages)
DOCUCFAJ.VTX 04/06/2004

PAY TO THE ORDER OF
LEHMAN BROTHERS HOLDINGS, INC.
WITHOUT RECOURSE
LEHMAN BROTHERS BANK, FSB

BY:_____
RICK W. SKOGG
VICE PRESIDENT

PAY TO THE ORDER OF
WITHOUT RECOURSE
LEHMAN BROTHERS HOLDINGS, INC.
BY:_____
RALPH A. IGNIZI III
AUTHORIZED SIGNATORY

LEHMAN BROTHERS BANK, FS_

SANDY SMITH
ASSISTANT SECRETARY

**APPENDIX B**

EXPERT DECLARATIOIN
FOR KEITH HEDMAN
BY NEIL F GARFIELD

2/11/16

County of Broward
                              SS
State of Florida

## Expert Witness Affidavit

Comes Now the Affiant, Neil F Garfield, MBA, JD, and says as follows:

1. Affiant was retained by Keith Hedman to perform a review and analysis of mortgage loan documents and related claims of securitization. Mr. Hedman is located at 785 Shelli Street, Mountain House, California 95391,

2. Affiant's Resume is attached hereto.

3. Affiant has been qualified in many courts to give testimony as an expert witness on the effects of claims of securitization on the original "loan" documents and transfers of interests as it relates to ownership and balance of an alleged "loan."

4. Mr. Hedman delivered many documents for my review including but not limited to a letter in which he identifies some of the parties, to wit: Lehman Brothers Holdings, Inc., CMG Mortgage, LLC, Wells Fargo (which he says funded the loan), Nation Star Mortgage, Aurora Loan Services and Aurora Bank FSB, NDEX West, Texas Law Firm

Barret, Frappier, Treder, and Weis, Mortgage Electronic Registration Systems, First American Title Company, Lehman Brothers Bank FSB, Mellon Bank, U.S. Bank, and Structured Assets Security Corporation. There is also an undated servicing agreement purportedly related to this case between EF Hutton Mortgage capital and an unarmed servicer. In my opinion the presence of these entities, based upon my experience and research into these entities means by definition that loan papers were sold into the secondary market subject to claims arising out of an alleged securitization process. However, in my opinion the paperwork (note and mortgage) do not reflect any transaction that actually occurred. In contract terms, this means that while there maybe been offer and acceptance, there was no actual transaction between the parties making the offer or accepting the offer. The absence of a completed loan contract leads to the inescapable conclusion that no contract, executory or otherwise, existed between the party named as payees on the note or mortgagee (beneficiary on deed of trust) on the mortgage instrument. My experience and training in matters of real estate closings leads me to conclude with certainty that neither the note nor the mortgage should have been released from the "closing" table.

5. A Notice of rescission was sent and delivered under 15 U.S.C. §1635. According to that statute the loan contract, if it ever existed, is canceled, and the note and mortgage or deed of trust are void, not voidable. The issue has been settled by a unanimous US Supreme Court decision in Jesinoski v Countrywide. Since more than one year has passed since there rescission was sent, the TILA does not allow for an action to enforce the duties under the TILA Rescission

procedures in 15 USC §1635. But this does not affect the status of the alleged loan contract or the status of the note and mortgage. As a matter of law, they are all void. The currents status therefore is that there are no documents that can be used for collection or enforcement of any money from Hedman. Any dispute over the rescission appears to have been completely settled by the US Supreme Court. In accounting terms this means that any entity carrying a claim on their accounting records as an asset (i.e., the purported Loan") is required under generally accepted accounting principles and auditing standards published by the Financial Accounting Standards Board make entires showing the obligation (Liability) to return all monies paid by Hedman, and decreasing the "asset" of the ownership of the note and mortgage to zero because they are void. However, a new asset arises on the balance sheet of some party --- for a claim by an actual party who would qualify as the actual lender or creditor. The claim would be for the principal amount of the "loan" only. The footnotes to such an entry would ordinarily explain that the claim is contingent upon the creditor's compliance with the three duties specified by the TILA Rescission statute — return of the canceled note, release of the encumbrance and payment of the disgorgement and payment of all money paid to third parties as compensation for the origination of the loan. The "asset" would also be a contingent asset, as the debt cannot be claimed until after all statutory duties under the TILA Rescission statute have been fully executed, and after one year the debt either expires or is rendered unenforceable if the debtor (Hedman) raises the statute of limitations.

6. In this case there are several issues present that further complicate the complex issues involved with claims of securitization. Those additional issues arise from the fact that Lehman Brothers Bank FSB is asserted by "successors" to have been a participant in the origination of a loan contract with Hedman and transfers of purported "loan" documents thereafter.

7. The first issue is that Lehman Brothers went into bankruptcy in 2008. Affiant has tried numerous times to get a response from the U.S. Trustee in that Bankruptcy relating to ownership, servicing, and balance of loans in documents that are claimed by "Successors" to have been transferred by Lehman during bankruptcy. In my opinion, there is no document that has been presented, and most likely no document in existence allowing transfers of loans out of the Lehman bankruptcy estate.

8. The next issue is that numerous Lehman related entities (including but not limited to Aurora Loan Servicing, Lehman Brothers Holdings, Inc.) appear to be involved without any clear documentation of their roles, nor documentation of the nature of any transaction in which these related entities acquired either ownership of the debt or the purported loan documents.

9. Wells Fargo was the party identified on certain documents as the originator of the loan, but for reasons stated below, it is my opinion that it was not the lender or creditor. For reasons already stated and as elaborated below, it is my opinion that no debtor-creditor relationship nor any loan contract ever existed between Hedman and Wells Fargo, CMG Mortgage LLC, nor any of the Lehman entities. Hence it is my opinion that while Hedman have executed certain documents they

were not actually "loan" documents because neither Wells Fargo nor Lehman nor any related entities suppled the actual money for a transaction, but instead acted as conduits, but not was agent, for multiple third parties who did in fact supply the funds and with whom Hedman could have executed loan documents completing a loan contract. Hence it is my opinion that while certain parties may claim to be "successors" of the loan documents that might have been executed by or on behalf of Hedman, those documents relate to a transition that never occurred. Having taught auditing during my tenure as a student pursuing an M.B.A. and having reviewed the pronouncements of the Financial Accounting Standards Board it is my opinion that the documents relied upon in the Hedman case are insufficient to establish consummation of any transaction, ownership of the debt, or the right to collect on any debt from Hedman.

10. It is my opinion, therefore, that (a) Lehman and related entities have failed to produce any actual evidence of a an actual monetary transaction that is documented by a note or mortgage and (b) the documentation relied upon by Hedman's adversaries refer to a transaction that never occurred. As a former investment banker with a degree in accounting, auditing and taxation, no monetary event ever occurred between Wells Fargo, CMG Mortgage or the Lehman entities and successors. The absence of a claim from anyone asserting the status of holder in due course further corroborates this view. The only rational reason for not asserting status as holder in due course is that there is no party who can do so. If such a party existed, then it is inevitable in the business world and the world of banking and investment banking in particular, that they would have asserted such

Hedman Declaration by Neil F. Garfield

status because this would enable them to enforce the note, even if it was void or subject to borrower's defenses of no consummation, the holder in due course would have the right to enforce without regard to borrower's defenses.

11. It is apparent from the documentation provided that Lehman Brothers was the underwriter in the offering of mortgage backed securities. This was an initial public offering with a restricted clientele. The issuer was one entity wholly owned and controlled by Lehman. Purchasers of the certificates issued by the issuer were given a prospectus in which they were led to believe that the money, with which they paid for the pass-through certificates would be under management of the issuing entity — a Trust that would qualify under the Internal revenue Code as a Real Estate Mortgage Investment Conduit. There is no evidence that this ever happened. Instead, it is my opinion that the underwriter did not turn over proceeds of sale of the certificates to the issuing entity and kept the proceeds of sale of the certificates under its own control in its own accounts, with the Trustee of the inactive trust having no power, authority or rights over the business or money generated by the money advanced by the investors who bought essentially worthless mortgage backed securities. As Underwriter, Lehman was intended to be the Master Servicer of the entity that was issuing the "securities."

12. Another issue that is an audit alert is the destruction of documents. In a letter dated January 7, 2014, CMG Financial admits that the loan documents were destroyed in May 2011. This is consistent with the above opinion that the loan documents were and are void as expressed

above. If the note had value, there is no rational business reason for its intentional destruction.

13. From the perspective of an auditor, the presence of prior complaints involving both Aurora and Nation Star in which they were fined because of reporting at least 2 false reports of default removes an basis for attesting to the credibility of claims against Hedman without revealing the actual chain of monetary transactions. In legal terms this would mean that the rebuttable presumptions that could be allowed in connection with claims against Hedman should be ignored. This is further corroborated by the analysis and report of another expert who reviewed the handwriting samples of certain documents relating to the purported assignment of the deed trust (mortgage). The report of the forensic document examiner, Nanette M. Barto, supports the statement that the documents were fabricated and forged. Hence no presumption, should, in my opinion, be allowed to what would otherwise be considered "facially valid" documents. Examining the documents themselves show that the documents are neither facially valid nor do they reference an actual transaction.

14. In my opinion Mr. Hedman is correct in demanding explanations associated with eh apparently self-serving declarations contained in the Notice of Substitution of Trustee executed by Bradley Gorz. The body of the document is inconsistent with the assertions by the "new Trustee." In my opinion the Trustee is, in actuality, the original trustee and has never been changed.

15. Despite the clear wording in the prospectus given to investors, there are many indications here that the plan sold to investors was never actually followed in reality. The first clue is that the alleged party

pursuing collection has produced unsupported self-serving statements as to who actually owns the debt, where the money went and how it was used. The next clue is that the payments that were required to be made by the alleged Trust were made directly to the certificate holders (beneficiaries) without regard to whether or not the alleged borrowers in the alleged loan pool were in fact paying on the note and mortgage. The next and largest clue is the fact that nobody is claiming that the trust was a holder in due course (HDC). It is custom and practice int eh industry to allege the status of holder in due course when that applies. The reason for this is that as per the applicable provisions of the Uniform Commercial Code (UCC) the risk of loss is expressly shifted by statute from the lender, creditor or owner of the debt to the borrower, the maker on the note and mortgage. Thus it is always prudent to allege HDC status because the "borrower's" defenses cannot be raised against the Trust if the Trust has HDC status. The borrower must pay the note and mortgage and then seek damages from those whom he alleges have misbehaved. Yet here there is no allegation of HDC status for anyone, although it certainly appears that they seek to be treated as such. Accordingly it is my opinion that (a) the trust does not and never has owned the Hedman loan and (b) the real party in interest (creditor) cannot be defined by the any of the parties asserting facts or claims against Hedman.

16. The elements of HDC status set forth in the UCC Article 3, allow a party to claim HDC status if they purchased the debt for value paid, in good faith and without knowledge of the borrower's defenses. Alternatively, Article 9 allows for enforcement of the security instrument (mortgage or deed of trust) if an innocent party can prove

payment of consideration. The Trusts are creatures of the Wall Street banks that created them. But on the face of the instruments used it would be difficult to state with any degree of certainty that the Trustee and the Trust were possessed with knowledge of the borrower's defenses nor that they were not operating in good faith. The failure of good faith seems to be with the underwriter who created the Trusts. Hence the only reason why one would not allege HDC status for the Trust would be that the Trust never paid for the subject loan. There could be several reasons for the trust not paying for the purchase of the debt. But one thing is clear — if the Trust did not pay for the debt, then the ownership of the debt lies elsewhere, which could account for why the allegation is made of "holder" status instead of HDC status. Based upon my knowledge of the industry it appears that while the trusts were created by the investment banks they were never actually utilized as a "pass-through" entity. The money from the sale of certificates was never delivered to the Trust or the Trustee and thus the Trust never had any assets, which at best under most Statutes means that the Trust was "inchoate" (inactive), or more likely nonexistent since there was no trust property in the form of cash or other assets. The reasons for this behavior are beyond the scope of my engagement but not beyond my knowledge. Upon further inquiry I can elaborate on the actual behavior of the banks and their reasons.

17. To be clear, it is my opinion beyond any reasonable doubt that none of the parties mentioned in paragraph 4 have or ever had any interest in the debt and that none of those parties has presented any documentation that would support a finding that the documents upon which they place "reliance" reflect any actual business or monetary

transaction. To put it simply, none of those parties have any supported claim of ownership, authority or rights in connection with any debt owed from Hedman.

Neil F Garfield, MBA. JD

SWORN AND SUBSCRIBED BEFORE ME THIS 18th DAY OF February, 2016.

NOTARY PUBLIC

MY COMMISSION EXPIRES



PATRICK ~ GIUNTA
Notary Public - State of Florida
My Comm. Expires Oct 22, 2016
Commission # EE 831323
Bonded Through National Notary Assn.

# RESUME

# NEIL F. GARFIELD, MBA, JD

954-494-6000 eFax 561-634-3488

**neilfgarfieldesq@gmail.com**

## SUMMARY:

Varied and integrated professional and business background in the following areas — *investment banking, community banking derivative security baskets, electronic funds transfer, management, information systems, accounting, auditing and law*. Editor and publisher of www.LivingLies.wordpress.com blog with 10 million visitors. Expert witness in state and federal actions, consultant on evidence and trial law and procedure. Started or funded more than 200 companies as an investment banker or investment banking consultant. Frequent guest commentator on radio and TV.

- ✓ Expert Witness and consultant on commercial and residential real property transactions, foreclosures and workouts in several states, class actions and consultant to law enforcement in several states and on the Federal level.

- ✓ Expert witness on rehypothecation and securitization

- ✓ Currently teaching lawyers, judges, legislators, and layman in the Garfield Continuum Seminars for Attorney CLE credit and general information, appearing on numerous radio and TV broadcasts, Garfield is the Editor in Chief of livinglies.wordpress.com, a blog site that has reached over 7 million visits and is widely regarded as the premier resource on the internet for foreclosure cases, opinion, links to law reviews, practice guides and current events the foreclosure of securitized mortgages. Garfield draws on his Wall Street experience and trial lawyer years combined with intensive analysis of derivatives, securitized financial products and personal relationships developed over the years that give him unique insights into the realities of Wall Street in the Mortgage Meltdown of 2001-present.

- ✓ Starting out on **Wall Street**, he became proficient in the language and conduct of highly complex financial transactions. At an early age, Mr. Garfield personally handled the negotiations leading to successful **mergers, acquisitions, multimillion dollar financing, IPO's, secondary offerings, and private financing** for dozens of companies.

- ✓ He then achieved his **MBA (summa cum lauda) and JD (magna cum lauda) degrees with distinction**, and began a 38 year law and business consulting career. He is the recipient of numerous academic awards.

- ✓ Following his law career he assumed control of two **public companies** for which he successfully structured financing and merger programs, **creating and implementing novel business and marketing plans for information systems** storage and retrieval including a mobile platform for backfile conversion for clients who were installing imaging systems. Initial clientele included **Fannie Mae, Chemical Bank, the Securities and Exchange Commission, the New Mexico Legislature**, and a host of Universities and Government agencies.

✓ Following that engagement, he bought out the **ATM/POB portfolios** of several different companies now consolidated under EFT Systems, Inc., d/b/a American Bank Card, which now electronically processes payments

✓ As an attorney he has represented banks, credit unions, more than 400 community associations, investor owned commercial and residential real property, homeowners in foreclosure defense and construction defect litigation, and continues to conduct CLE seminars for lawyers and accountants on trial techniques, expert witness testimony and securitization of mortgage debt.

## WALL STREET BACKGROUND:

With a family securities business in his background (Garfield and Co. Members NYSE, AMEX etc.) Mr. Garfield started off as a trainee securities analyst and quickly rose to be Director of Research and Director of Mergers and Acquisitions at well-respected brokerage houses on Wall Street. At the end of this portion of his career, Mr. Garfield concurrently studied for his **MBA *magna cum laude*.** He was licensed as a registered representative 1968-1972.

## LAW CAREER

Following his investment banking career, Mr. Garfield moved to Florida where he studied law and was awarded his **JD degree *cum laude*.** Concurrently with his studies, he was the business manager for a small law firm in Fort Lauderdale.

A member of the **Florida Bar** since 1977, he devoted most of his time to practicing law from 1977 through the present. He is also a member of the **Federal Trial Bar**, the Federal Bankruptcy Bar, and several national and local committees. Until his semi-retirement in December, 1992 he was also a member of The Florida Trial Lawyers Association, the American Bar Association and the West Broward Bar Association. He has served on committees for the Florida Bar and was a volunteer, early in his legal career for the Florida Bar Committee for mental disability law reform, where he represented individuals incarcerated for reasons associated with mental disabilities (pro bono).

He received his Undergraduate Degree from Dickinson College in 1968, his MBA from Iona College in 1974, Magna Cum Laude, and his Juris Doctor from Nova University Center for the Study of Law in 1977, Cum Laude.

The concentration of his law practice was in the areas of commercial transactions, commercial litigation, condominium law, administrative law and bankruptcy. He has been the recipient of **numerous academic awards** in business and law, including:

**LAW**
*American Jurisprudence Award in Torts
*American Jurisprudence Award in Commercial Transactions
*American Jurisprudence Award in Federal Jurisdiction
*Horn Book Award for outstanding scholastic achievement from Nova University Law Center (first out of 175 students)
**BUSINESS, ACCOUNTING AND TAXATION**
*Medal for Academic Excellence 1974, MBA, (first in a two-year program of 159 students)

*Who's Who Among Students in American Universities and Colleges - 1974 - Iona College

Concurrently with his law career, he was frequently retained as a **business consultant** to small and medium sized businesses.

PUBLICATIONS

Published numerous **articles on law and business, including practice manuals for Florida lawyers.** He has published several articles and tapes on specific legal and business subjects as well as personal development and has appeared on numerous television and radio programs, including the AZTV 7, Sandy Peyton Show, Eyewitness News, Palm Beach, Florida, PBS and Channel 33, WNWS Radio, WJNO Radio, and had his own radio talk show on WGBS in 1986. He is currently the HOSt of the Neil Garfield Show on www.blogtalkradio.com.

➢ Author and Editor of www.livinglies.wordpress.com , the number 1 resource on the internet for information, research, forms, articles and resources used by banks, lawyers, paralegals, pro se litigants and prospective buyers of property.
  o The Blog provides free resources and some paid services for research and analysis of debt that is claimed to be securitized, assigned or otherwise transferred. Garfield's experience in the 1908's in trading commercial properties and residential properties, together with his investment banking experience on Wall Street is the resource for the blog as to how and why the banks used securitization and his opinions on whether they actually succeeded.
  o While on Wall Street Garfield was the lead on nearly 200 investment banking transactions, in which securitization was utilized although not named as such. This knowledge was used when he created more of such securities in the 1980's when securitization and derivatives were words just starting in the Wall Street lexicon.
  o His detailed knowledge of electronic funds transactions is used  to support his findings and opinions regarding the tracing of the money trail in debt that is claimed to be securitized
➢ Author of Attorney Workbook, 2009 companion to CLE Courses for attorneys in several states, providing 9.5 CLE credits in Florida with 1.5 credits for ethics.
➢ Author of Expert Witness Manual for Attorneys, 2010
➢ Author of Discovery and Motion Practice Handbook, 2010
➢ Author of Harrison Publications Update to Florida Real Property Law, 1975

Editor of **SMARTBanking Fax Newsletter,.,** to 350 Florida independent community banks. Currently working on articles for banking publications and other publications and a book intended to be published in early 2016 entitled *Banking in the Next Millenium: Strategies for Survival and Prosperity.*

# EMPLOYMENT HISTORY:

**2007—present Founder and Editor** www.livinglies.wordpress.com

**2008-present presenter of Garfield Continuum Attorney CLE and Lay Seminars in Foreclosure and Securitized Mortgages**

**2003—present: Consultant to General Transfer Corporation, GTC Consulting**

1997—2009 General Counsel SMARTBanks1994-1999 Editor of SMARTBanks Fax Newsletter

**1994: Chief Operating Officer, American Bank Card, Inc.**

1992 - 1994: Chairman and CEO Technology International, LTD., Chairman and CEO, Data Imaging Services, Inc., Chairman, Garco Business Development Corp. .

1992 - 1993: Partner, Garfield & Levin, P.A., condominium law.

1978 - 1992: President, Garfield & Associates, P.A., general law practice.

1977 - 1978: Partner, Law Offices of Fields & Garfield, general practice.

1977 Partner, Law Offices of Hurth, Fields & Garfield, general practice.

1975 - 1977: Business Manager, Law Offices of Hurth & Saphirstein

1973 - 1975: Consultant, Garfield & Company - Members, NYSE, AMEX, etc.

1970 - 1973: President and Majority Shareholder, Leisure Research Company, Investment Bankers

1969 - 1970: Director, Mergers and Acquisitions, and Registered Representative, Granger & Company, Members NYSE, AMEX, etc.

1968 - 1969: Director Research Department, and Registered Representative, Spingarn, Heine Company, Members, NYSE, AMEX, etc.

1968 Trainee - Security Analyst and Registered Representative, A.L. Stamm & Company, Members, NYSE, AMEX, etc.

# TEACHING AND PUBLIC SPEAKING EXPERIENCE:

1. Iona College **Graduate School** of Business Administration: Taught individual classes in a variety of management, auditing and accounting courses as substitute for usual professor.

2. Broward Community **College**: Taught variety of subject dealing with law and business for adult education. Guest lecturer on business, law, and psychology of learning and performance.

3. **Seminars**: Conducted numerous seminars in law, business and personal development. Methods employed: lecture, Socratic and experiential. Garfield Continuum Seminars on Foreclosure Defense, Litigation and Securitized Mortgages is qualified for Continuing Legal Education Credits in 26 states varying from 6.5 to 9.5 credits.

4. **Trials**: Every trial is an educational seminar for the jury or judge. In the course of 38 years of practice, has appeared as lead counsel in over 2000 contested hearings, bench trials and jury trials and approximately 20 oral arguments on appeal.

5. **Radio:** In 1985-1986, host of several radio programs, including the Neil Garfield Condo Connection show on what was then WGBS. This program dealt with educating the public concerning the law and practice as it related to living in condominiums, cooperatives, and home owner associations.

6. **Television:** Periodically over the years has appeared as the spotlighted guest or on a panel on PBS and other stations relating to condominium law, administrative law, and general business subjects.

7. *Currently preparing curriculum for seminar and matriculated course offerings in electronic commerce and electronic banking.*

## PERSONAL:

Married December 6, 2003 to Joyce Molloy, deceased. Children: Marc Andrew Garfield DPM (43, **Podiatrist**) Virginia beach, Va., Chelsea Lauren Garfield (38, Director of Website for Citizens Property Insurance, Florida, Danielle Kinorah Garfield, age 25. Brother, Gary J. Garfield, M.D., is a practicing **Cardiologist** in Coral Springs, Florida. Father, Frederick M. Garfield, M.D., was a retired **Physician**. Cousin, Brian Garfield is an **Author** in Hollywood, California ("Death Wish,", "Hopscotch", "Kolchak's Gold," etc.). Hobbies include music (keyboard player), reading and travel. The Garfield family created the **first fully U.S. automated pharmaceutical plant** at the beginning of this century. It is now an exhibit at the Smithsonian Institute in Washington, D.C.. The family also created and patented the process by which lanolin is extracted from cholesterol, providing the base for all cosmetics and paints made in the world. (American Cholesterol Corporation purchased by CPC International.)

5. **Radio:** In 1985-1986, host of several radio programs, including the Neil Garfield Condo Connection show on what was then WGBS. This program dealt with educating the public concerning the law and practice as it related to living in condominiums, cooperatives, and home owner associations.

6. **Television:** Periodically over the years has appeared as the spotlighted guest or on a panel on PBS and other stations relating to condominium law, administrative law, and general business subjects.

7. *Currently preparing curriculum for seminar and matriculated course offerings in electronic commerce and electronic banking.*

# PERSONAL:

Married December 6, 2003 to Joyce Molloy, deceased. Children: Marc Andrew Garfield DPM (43, **Podiatrist**) Virginia beach, Va., Chelsea Lauren Garfield (38, Director of Website for Citizens Property Insurance, Florida, Danielle Kinorah Garfield, age 25. Brother, Gary J. Garfield, M.D., is a practicing **Cardiologist** in Coral Springs, Florida. Father, Frederick M. Garfield, M.D., was a retired **Physician**. Cousin, Brian Garfield is an **Author** in Hollywood, California ("Death Wish,", "Hopscotch", "Kolchak's Gold," etc.). Hobbies include music (keyboard player), reading and travel. The Garfield family created the **first fully U.S. automated pharmaceutical plant** at the beginning of this century. It is now an exhibit at the Smithsonian Institute in Washington, D.C.. The family also created and patented the process by which lanolin is extracted from cholesterol, providing the base for all cosmetics and paints made in the world. (American Cholesterol Corporation purchased by CPC International.)

**APPENDIX C**

# AFFIDAVIT OF TRUTH

**The State of California**

**San Joaquin County of USA**

I, Keith Olin Hedman of Mountain House (TRACY) , California, MAKE OATH AND SAY THAT.

1. I Keith Olin Hedman of Mounatin House (TRACY), California, purchased a property at 785 Shelli Street with my wife, May of 2004. We were told that we were being sold a mortgage, but no check was ever produced and provided to my wife Adrialyn and I, meaning we never received the funds to validate the "DEED OF TRUST" or Mortgage. What we found out from ex-Wall Street Banker, Neil F. Garfield, MBA, JD, and Thompson Reuters of whom we both hired, is that misrepresentation has taken place where a Loan originator CMG MORTGAGE, INC. misrepresented security paperwork as a mortgage.

HEDMANS were led to believe that they were provided with financing and a loan when this did not occur. Prima Fascia evidence that is FACTUAL that HEDMANS "NOTE" was monetized by LEHMAN BROTHERS BANK, FSB, immediately paying off the residence. Then using fractional reserve banking the "NOTE" was additionally monetized by LEHMAN BROTHERS HOLDINGS, INC, using fractional reserve banking, in what is known as a "REPO 105". These monies all came out of HEDMANS, social security trust account, without their knowledge or consent. The current amount owed back to HEDMANS if interest is calculated on the payments of the "REPO 105" ($32,499,533.30) as a loan from HEDMANS., and the payments they (HEDMANS)were induced to pay is ($1,263,745.53) that has been tabulated including interest for HEDMANS fraudulently induced payments. The additional monies calculated with interest that

1    constituted an illegal loan from HEDMANS accounts. The current total amount is

2

3    ($33,763,278.80) . HEDMANS have filed multiple letters of rescission to the

4    various parties  to get back their monies. HEDMANS never received any loan check and

5    have asked repeatedly for proof of claim, IRS8300 form, IRS 1099-oid form  , and canceled

6

7    check submitted to HEDMANS showing they deposited it in their(HEDMANS) account as proof

8    of claim. To date from multiple requests by HEDMANS, no proof of claim has been produced.

9        A "Notice Of Rescission" was sent and delivered under 15 U.S.C. § 1635. According to

10   the statute the loan contract, if it ever existed, is canceled, and the mortgage or deed of trust are

11   void, not voidable. The issue has been settled by a unanimous US Supreme Court decision in

12   Jesinoski v. Countrywide. Since  more than one year has passed since the rescission was sent, the

13

14   TILA does not allow for an action to enforce the duties under the TILA Rescission procedures in

15   15 USC § 1635. But this does not affect the status of the alleged loan contract or the status of the

16   note and mortgage. As a matter of law, they are all void. The current status therefore is that there

17   are no documents that can be used for collection and enforcement of any money from

18

19   HEDMAN. Any dispute over the rescission appears to be completely settled by the US Supreme

20   Court. In accounting terms this means that any entity carrying a claim on their accounting

21   records as an asset(i.e., "the purported Loan") is required under generally accepted accounting

22   principles and auditing standards published by the Financial Accounting Standards Board to

23

24   make entries showing the obligation (Liability), to return all monies paid by HEDMAN, and

25   decreasing the "asset" of the ownership of the note and mortgage to zero because they are void.

26   However, a new asset  arises on the balance sheet of some party – for a claim by an actual party

27   who would qualify as the actual lender or creditor. The claim would be for the principal amount

28

Affidavit Of Truth

of the "loan" only. The footnotes to such an entry would ordinarily explain that the claim is

contingent upon the alleged creditor's compliance with the three duties

specified by the TILA Rescission statute—return of the canceled note, release of the

encumbrance, and payment of the disgorgement and payment of all money paid of all money

paid to third parties as compensation for the origination of the alleged loan. The "asset" would

also be a contingent asset, as the debt cannot be claimed until after all statutory duties under the

TILA rescission statute have been fully executed, and after one year the debt either expires of is

rendered unenforceable since the alleged debtor (HEDMANS) have raised the statute of

limitations.

HEDMANS raised such an issue with NATIONSTAR MORTGAGE, LLC/INC. and they
rescinded the default that they filed a "RESCISSION OF DEFAULT" 09/07/2016, 2016-
106632, HEDMANS believe this was done because of the payments section in the NOTE says
that the NOTE can never be in default, and that all missed payments can be made up at the
MATURITY DATE. An additional failure comes up because HEDMANS have repeatedly
asked for PROOF OF CLAIM and no valid PROOF has been provided, thus proving
HEDMANS never received a loan or any monetary payment that would verify them as a debtor.
"CREDIT BID" also comes under scrutiny here since no records can be produced that monies
were lent, or no paperwork to date that shows any interest was transferred to a trust, via a chain
of title documentation which would include monetary transactions for validation. Also, since
MERS was the alleged Trustee on a non-perfected document with their wrong legal name on
it,and no appointment authorization stamp present, this invalidates any TRUSTEE assignment
and the MERS paperwork.

**I declare under penalty of perjury the laws of the State of California that the
foregoing is true and correct. This Affidavit was Executed on October, 4rd,
2016 at_Tracy_, California.**

10-4-2016

KEITH OLIN HEDMAN

CHRISTINE HUMMEL
COMM. # 2151818
NOTARY PUBLIC - CALIFORNIA
SAN JOAQUIN COUNTY
COMM. EXPIRES MAY 2, 2020

Affidavit Of Truth

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ San Joaquin _____ )

On October 4, 2016 before me, Christine Hummel, Notary Public
_____
(insert name and title of the officer)

personally appeared KEITH OLIN HEDMAN _____
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

CHRISTINE HUMMEL
COMM. # 2151818
NOTARY PUBLIC - CALIFORNIA
SAN JOAQUIN COUNTY
COMM. EXPIRES MAY 2, 2020

Signature Christine Hummel    (Seal)

**APPENDIX D**

Form 15-15D

10/14/2014

15-15D 1 form15d.htm SASCO 2004-S4 FORM 15D

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 15

### CERTIFICATION AND NOTICE OF TERMINATION OF REGISTRATION UNDER (12) G OF THE SECURITIES EXCHANGE ACT OF 1934 OR SUSPENSION OF DUTY TO FILE REPORTS UNDER SECTIONS 13 AND 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission File Number  333-115858-31

Structured Asset Securities Corporation
(Exact Name of Registrant as Specified in its Charter)

745 Seventh Avenue, 7th Floor, New York, New York 10019;  (212) 526-7000
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

Structured Asset Securities Corporation
Mortgage Pass-Through Certificates
Series 2004-s4

(Title of each class of securities covered by this form)

(Title of all other classes of securities for which a duty to file reports under section 13(a) or 15 (d) remains)

Please place an X in the box(es) to designate the appropriate rule provision(s) relied upon to terminate or suspend the duty to file reports:

| | | | | |
|---|---|---|---|---|
| Rule 12g-4 (a) (1) (i) | [ ] | | Rule 12h-3 (b) (1) (i) | [ X ] |
| Rule 12g-4 (a) (1) (ii) | [ ] | | Rule 12h-3 (b) (1) (ii) | [ ] |
| Rule 12g-4 (a) (2) (i) | [ ] | | Rule 12h-3 (b) (2) (i) | [ ] |
| Rule 12g-4 (a) (2) (ii) | [ ] | | Rule 12h-3 (b) (2) (ii) | [ ] |
| | | | Rule 15d-6 | [ X ] |

Approximate number of holders of record as of the certification or notice date:  19

Pursuant to the requirements of the Securities Exchange Act of 1934, Structured Asset Securities Corporation has caused this certification/notice to be signed on its behalf by the undersigned duly authorized person.

By:  U.S. Bank National Association, as  Trustee  for:

Structured Asset Securities Corporation
Mortgage Pass-Through Certificates
Series 2004-s4

By:          /s/ Diana Kenneally

10/14/2014

Form 15-49b

Name:        Diana Kenneally
Title:        Assistant Vice President

Date: 24-Jan-05

Instruction: This form is required by Rules 12g-4, 12h-3 and 15d-6 of the General Rules and Regulations under the Securities Exchange Act of 1934. The registrant shall file with the Commission three copies of Form 15, one of which shall be manually signed. It may be signed by an officer of the registrant, by counsel or by any other duly authorized person. The name and title of the person signing the form shall be typed or printed under the signature.



Nanette M. Barto, QDE

7631 Mariposa Avenue
Citrus Heights, California 95610
Office: (916) 225-3016
Fax: (916) 910-9657
Nanette@handwritingdocumentexamination.com

# Client Receipt

Document Examiner: Nanette Barto

Case Number: NB3357-11-24-Keith Hedman

Date Issued: November 26, 2014

| Client | Keith Hedman |
|---|---|
| Address | 785 Shell St. Mountain House, CA 95391 |
| Telephone | 209-836-1334 |
| E-mail | kohedman@gmail.com |

Product/Service Purchased: Examined Documents, Written Opinion Letter.

Published Fee: $890.00

Reimbursable Expenses: $

Total Product/Service Fee: $890.00

Amount received: $ _____ Check# _____ x__ Credit Card

____ Retainer Fee _____ Interim Payment _____ Final Payment

Wednesday, November 26, 2014

# Opinion Letter

Prepared for: Keith Hedman

NB357-11-24-Keith Hedman

**Eye for the Obvious**
**Nanette M. Barto**
**Forensic Document Examiner**
7631 Mariposa Avenue,
Citrus Heights, CA 95610
Phone: 916-225-3016
Fax: 916-910-9657
Nanette@handwritingdocumentexamination.com

This letter contains a statement of the request of the client, descriptions of the questioned and comparison documents, a synopsis of the examination conducted, and this document examiner's opinion.

## Q: Description of the Questioned Documents

I examined the following questioned documents:

Exhibit Q.1 A one page. Corporate Assignment of Deed of Trust page 1 of 1 date printed 6/29/2013.

Exhibit Q.2 A one page. Substitution of Trustee dated 7/11/13.

## K: Description of the Known Documents of – Daniel Thompson

I examined the following known/comparison documents:

Exhibit K.1 A two page. Page 1 of 2 Declaration of Daniel Thompson beginning with "I, Daniel Thompson". Not dated.

Exhibit K.2 A two page. Page 2 of 2 Declaration of Daniel Thompson Beginning with "Mortgage Electronic". Dated 25th day of June, 2014.

## CD: Description of the Comparison Documents – Chandra Morris & Breesha Smith

I examined the following known/comparison documents:

Exhibit CD.1 A one page. Notary Public Commission Application dated 3/02/2011, for Chandra J. Morris.

Exhibit CD.2 A one page. Application for Appointment as Texas Notary Public dated 4/8/13, for Breesha Smith.

Questioned Document of Daniel Thompson

1 of 8

Wednesday, November 26, 2014

## 1.0  Request

I was asked to compare the known handwriting of Daniel Thompson, Chandra J. Morris and Breesha Smith on the Questioned documents to the known exemplars provided of their handwriting to determine if the Questioned documents contained the known handwriting of the above named individuals.

## 2.0  Basis of Opinion

**2.1** The basis for handwriting identification is that writing habits are not instinctive or hereditary but are complex processes that are developed gradually through habit and that handwriting is unique to each individual. Further, the basic axiom is that no one person writes exactly the same way twice and no two people write exactly the same. Thus writing habits or individual characteristics distinguish one person's handwriting from another.

**2.2** A process of analysis, comparison and evaluation is conducted between the known standards and questioned document(s).

**2.3** Based on the conclusions of the expert, an opinion will be expressed. The opinions are derived from the ASTM Standard Terminology for Expressing Conclusions for Forensic Document Examiners.  (Attached as Appendix B)

## 3.0  Observations

As a result of the examination and analysis, my observations are as follows:

**3.1** The Q1 document, Daniel Thompson signature, has significantly dissimilar identifying traits and characteristics when compared to the known signature found on the K1-K2 declaration purportedly from Daniel Thompson. The dissimilarities are found in: form; construction; shape; size; ratio; slant; spacing; entrance/exit strokes; fine/subtle traits; and, relation to the baseline.

SIDENOTE: Declaration K1-K2 of Daniel Thompson appears to be a computerized signature of some sort. There are heavy pixel marks surrounding only the signature and signature line. These pixel markings are non-existent on the rest of the 2 page document. K1 – K2 is a purported 2 page declaration by Daniel Thompson; however, the footers indicate that the first page was Daniel Thompson's, but the second page has a footer that indicates it goes to a declaration for Erica Lance, yet it has Daniel Thompson's computerized signature on it.

**3.2** The Q1 document, Chandra J. Morris signature, shares significant similarities in identifying traits and characteristics when compared to the known handwriting of Chandra J. Morris on the CD1 document. These similarities are found in: form; construction; shape; size; ratio; slant; spacing; entrance/exit strokes; connection/disconnection strokes; fine/subtle traits; and, relation to the baseline.

**3.1** The Q2 document, Breesha Smith signature, shares significant similarities in identifying traits and characteristics when compared to the known handwriting of Breesha Smith on the CD2 document. These similarities are found in: form; construction; shape; size; ratio; slant; spacing; entrance/exit strokes; connection/disconnection strokes; fine/subtle traits; and, relation to the baseline.

Wednesday, November 26, 2014

## 4.0   Opinion

Based on a thorough analysis of the documents submitted to me, my professional expert opinion is as follows:

**4.1** The signature of Daniel Thompson on the Q1 document is a forgery that was not authored by the same hand as the K2 signature of Daniel Thompson; the signature of Chandra J. Smith on the Q1 document is an authentic signature; the signature of Breesha Smith on the Q2 document is an authentic signature; and, this is based on the evidence I have been provided.

## 5.0   Declarations and Signature

Attached is Appendix A, a current copy of my CV as evidence of my special knowledge, skill, experience, training and education.

Executed at Citrus Heights, California this Wednesday, November 26, 2014.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Nanette M. Barto, QDE

Wednesday, November 26, 2014

## CURRICULUM VITAE

**Eye for the Obvious**
**Nanette M. Barto**
**Forensic Document Examiner**
7631 Mariposa Avenue,
Citrus Heights, CA 95610
Phone: 916-225-3016
Fax: 916-910-9657
Nanette@handwritingdocumentexamination.com

I am, Nanette M. Barto, a court qualified Forensic Document Examiner. Beginning my career in 2007, I have examined over 290 document examination cases involving over 6500 documents. I trained with the International School of Forensic Document Examination and have apprenticed under a leading court-qualified Forensic Document Expert.

*Forensic Examination Provided For:*
Disputed documents or signatures including: wills, checks, contracts, deeds, account ledgers, medical records, and autograph authentication. Investigation and analysis including: questioned signatures, suspect documents, forgeries, identity theft, anonymous letters, alterations, obliterations, erasures, typewritten documents, altered medical records, graffiti, handwritten numbers, and computerized and handwritten documents.
*Education*

- American River College: Associate in Arts - Psychology, Graduation Date May 2012

- American River College: Associate in Arts – Legal Assisting, Graduation Date May 2011

- International School of Forensic Document Examination: Certified Forensic Document Examination, Graduation Date July 2009
  *Specific Areas of Training:*

  Handwriting Identification and Discrimination, Signature Comparison, Techniques for Distinguishing Forged Signatures, Disguised Handwriting, Altered Numbers, Anonymous Writing, Laboratory Procedures, Forensic Microscopy and Forensic Photography, Identifying Printing Methods, Papers and Watermarks, Factors that Affect Writing, Demonstrative Evidence Training, Demonstrative Evidence in the High-Tech World, Forgery Detection Techniques, Detection of Forged Checks, Document Image Enhancement, Graphic Basis for Handwriting Comparison, Ethics in Business and the Legal System, Mock Courtroom Trials

- 2 year on-the-job apprenticeship with Bart Baggett, a court qualified document examiner and the president of the International School of Forensic Document Examination, July 2007 – July 2009.
  *Apprenticeship Included:*

  Gathering documents, setting up case files, scanning and photographing documents, assisting with on-site examinations, interacting as client liaison with attorneys and clients, accounting and billing, peer reviews, preparing court exhibits, directed and

**Wednesday, November 26, 2014**

witnessed client hand written exemplars. I re-examined 60 cases consisting of 657 documents during this time period.

Furthermore, I began taking active individual cases that were mentored and/or peer reviewed by Bart Baggett.

### Further Qualifications:

I am a Notary Public closing home loans and witnessing signatures since 2004. This has provided me with a reference base for how a person signs in all conditions including but not limited to: Illness and Disease; Blindness; Signature by Mark; hospital room signings of Wills, Testaments, Advanced Healthcare Directives, and Power of Attorney documents; and, Death Bed signatures. I was licensed from 2005 – 2009 in Real Estate procuring mortgages giving me firsthand knowledge of deeds, contracts, and loan documents.

### Laboratory Equipment:

Ms. Barto's laboratory is equipped to handle forensic handwriting analysis. Her laboratory consists of equipment used for examination, such as: 4x – 10x digital microscope; HP high resolution flat bed scanner/copier/fax; light table; numerous magnifying devices; Nikon COOLPIX 35mm digital camera; protractor and metric measuring devices; black and infrared lights; supporting computer programs.

### Library:

Library consists of numerous forensic document examination titles, other handwriting reference materials, legal assisting publications, psychology publications that assist in assessing neurological diseases or illnesses, and behavior profiling.

*Court Testimony: 2009-2010*
Superior Court of California, County of Alameda
1221 Oak St., Dept. 24, 3rd Flr.
Oakland, CA
Judge Patrick Zika
*Dismuke vs. Dismuke*
Dkt# RG05228940
February 10, 2009

Superior Court of California, County of Sacramento
100 Bicentennial Drive
Sacramento, Ca. 95826
Judge John M. O'Donnell
*Youa vs. Youa/Xiong/Child Action*
Dkt#09SC05006
December 18, 2009

Superior Court of California, County of San Mateo
400 County Center, Dept. 28
Redwood City, Ca. 94063
Judge George A. Miram
*Dickson vs. Scagiiola*
Dkt#PRO120063
October 26, 2010

Superior Court of California, County of Sacramento
100 Bicentennial Drive
Sacramento, Ca. 95826
Judge Delbert W. Oros
*Sone vs. Fisher*
Dkt# 09SC00967
March 26, 2009

Superior Court of California, County of Alameda
24405 Amador St Dept 507, Flr. 2
Hayward, Ca. 94544
Judge Elizabeth Hendrickson
*Hong vs. Wang*
Dkt# FF07342127
September 24, 2010

Superior Court of California, County of Sacramento
3341 Power Inn Road
Sacramento, Ca. 95826
Judge Gerrit W. Wood
*Wenzell v. Wenzell*
Dkt#34-2009-00057473
January 13, 2011

APPENDIX A – Nanette M. Barto Curriculum Vitae

31

**Wednesday, November 26, 2014**

## Court Testimony Continued: 2011-2012

Superior Court of California, County of San Mateo
400 County Center, Dept.
Redwood City, Ca. 94063
Judge Stephanie Garratt
*Leigh v. Lampert*
TRO Hearing
March 30, 2011

Superior Court of California, County of Merced
2260 N Street
Merced, CA 95340
Judge Gerald W. Corman
*Chaudhry v. Hassain*
Dkt # FLM-47893
Family Law - February 8, 2012

Superior Court of California, County of Solano
3055 Cleveland Ave
Santa Rosa, CA 95401 Dept #19
Judge Arthur Wick
*Niffenegger v. Long*
Dkt # SCV-249528
Criminal Case
February 27, 2012

Superior Court of California, County of Sacramento
720 9th Street
*Sacramento, CA 95814*
*Albaz v. Saleh*
Unlawful Detainer
November 29, 2012

Superior Court of California, County of Plumas
520 Main Street
Quincy, CA 95971
Arbitrator Christopher Burdick
*County of Plumas, Employer, v. Ted Sieck, Employee*
C.S.M.C.S. Case #ARB-12-0173
May 15, 2013

Superior Court of California, County of Solano
600 Union Avenue
Fairfield, CA 94533
Judge Harry S. Kinnicutt
*Centro Property Owner II, LLC v. Chang*
Civil Law
February 19, 2014

Superior Court of California, County of San Bernadino
247 West 3rd Street Dept S48P
San Bernadino, CA 92415
Judge Tara Reilly
*The Southorn 1995 Revocable Trust*
Probate Law
October 15, 2014

Superior Court of California, County of San Joaquin
222 East Weber Street
Stockton, California 92114
Judge Carter P. Holly
*Bafaiz v. Morrison*
Contract Case
July 22, 2011

Superior Court of California, County of San Joaquin
222 East Weber Street
Stockton, California 92114
*People v. Serratos III*
Criminal Case
February 13, 2012

Superior Court of California, County of Santa Clara
191 N. First Street
San Jose, CA 95113
Judge William J. Monohan
*Reynolds v. Lydecker*
Dkt # 1-10-CV-171079
Civil Law
June 26, 2012

Superior Court of California, County of Contra Costa
725 Court Street
Martinez, CA 94553
Judge David B. Flinn
*Scarano v. Bellmore*
No. P12-00905
Probate Law
February 27 & 28, 2013

Superior Court of California, County of Nevada
220 Church Street
Nevada City, CA 95959
Commissioner
*Hassan v. Hassan*
Family Law
July 9, 2013

Superior Court of California, County of San Francisco
400 McAllister Street Dept. 201
Judge McBride
*Murray Jr. v. Anoushiravan Massoumi*
Civil Law
September 29, 2014

APPENDIX A — Nanette M. Barto Curriculum Vitae

Wednesday, November 26, 2014

Listed as an Expert Witness for: Sacramento County – Placer County – Fresno County, California, Public Defenders Office. Referred by: Public Defender, David Bonilla, Franz Criego, and Trisha Pal. Guest speaker for a three hour course on the science of handwriting for the forensic class of the Criminal Justice program at ITT Technical School 2011.

33

## LEVELS OF OPINION-BASED ON ASTM GUIDELINES FOR EXPRESSING CONCLUSIONS

Since the observations made by the examiner relate to the product of the human behavior there are a large number of variables that could contribute to limiting the examiner's ability to express an opinion confidently. These factors include the amount, degree of variability, complexity and contemporaneity of the questioned and/or specimen writings. To allow for these limitations a scale is used which has four levels on either side of an inconclusive result. These levels are:

- **Identification / Elimination**

May be expressed as 'The writer of the known documents wrote / did not write the questioned writing.' This opinion is used when the examiner denotes no doubt in their opinion; this is the highest degree of confidence expressed by a document examiner.

- **Strong Probability**

May be expressed as 'There is a strong probability the writer of the known documents wrote / did not write the questioned writing.' This opinion is used when the evidence is very persuasive, yet some critical feature or quality is missing; however, the examiner is virtually certain in their opinion.

- **Probable**

May be expressed as 'It is probable the writer of the known documents wrote / did not write the questioned writing.' This opinion is used when the evidence points strongly toward / against the known writer; however, the evidence falls short of the virtually certain degree of confidence.

- **Evidence to Suggest**

May be expressed as 'there is evidence to suggest the writer of the known documents wrote / did not write the questioned writing.' This opinion is used when there is an identifiable limitation on the comparison process. The evidence may have few features which are of significance for handwriting comparisons purposes, but those features are in agreement with another body of writing.

- **Inconclusive**

May be expressed as 'no conclusion could be reached as to whether the writer of the known documents wrote / did not write the questioned writing.' This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing and the examiner does not have even a leaning one way or another.

According to the rules of the forefathers of document examination, Albert Osborn, Ordway Hilton, Wilson Harrison, and James V.P. Conway, a single significant difference in the fundamental structure of a writing compared to another is enough to preclude common authorship. (*Handwriting Facts and Fundamentals*, Roy Huber and A.M. Headrick, CRC Press LLC, 1999, pp 50-51).

34

[FY. Use. TZ01]                        Comment:                              Station Id:Q67c

                                          Doc #:  2013-059665
                                          05/28/2013 07:41:34 AM
[RECORDING REQUESTED BY]                  Page 1 of 1    Fee $17.00
NATIONWIDE TITLE CLEARING                 Kenneth W. Blakemore
[AND WHEN RECORDED MAIL TO:]              San Joaquin County Recorder
Nationstar Mortgage LLC                   Paid By: NATIONSTAR MORTGAGE LLC
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683

## CORPORATE ASSIGNMENT OF DEED OF TRUST

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned,
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC, AS NOMINEE FOR CMG MORTGAGE, INC., ITS
SUCCESSORS AND ASSIGNS, WHOSE ADDRESS IS PO BOX 2026, FLINT, MI 48501, [ASSIGNOR], by these presents
does convey, grant, assign, transfer and set over the described Deed of Trust, without recourse, representation or warranty, together
with all rights, title and interest secured thereby, all liens, and any rights due or to become due thereon to NATIONSTAR
MORTGAGE LLC, WHOSE ADDRESS IS 350 HIGHLAND DR. VL LEWISVILLE TX 75067 /469 1549-2000.

Said Deed of Trust made by KEITH O. HEDMAN AND ADRALYN V. HEDMAN and recorded on 05/27/2004 as Instrument #
2004-115595, in Book , Page in the office of the SAN JOAQUIN County Recorder, CA.

IN WITNESS WHEREOF, this Assignment is executed this 24th day of May in the year 2013.
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR CMG MORTGAGE INC., ITS
SUCCESSORS AND ASSIGNS

_____
DANIEL THOMPSON
ASST. SECRETARY

## ACKNOWLEDGEMENT

STATE OF FLORIDA
COUNTY OF PINELLAS

The foregoing instrument was acknowledged before me on this 24th day of May in the year 2013, by Daniel Thompson as ASST
SECRETARY for MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR CMG MORTGAGE
INC., ITS SUCCESSORS AND ASSIGNS, who, as such ASST  SECRETARY being authorized to do so, executed the foregoing
instrument for the purposes therein contained. He/she/they is/are personally known to me.

_____
CHANDRA L MORRIS - NOTARY PUBLIC
COMM. EXPIRES: 03/18/2016

                                          [SEAL]
                                          CHANDRA L. MORRIS
                                          Notary Public - State of Florida
                                          My Comm. Expires Mar 18 2016
                                          Commission # EE 82806

Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152
NSDAV 20482916 HSDAV   MIN 100372400220519755   MERS PHONE 1-888-679-MERS   TZ41305-27/19 SFRMCA-

SAN JOAQUIN (SJ) CA
Document: DOT ASN 2013.69665

Page: 1 of 1

Printed on 6/29/2013 8:19:53 AM

35

Recording requested by:
FIRST AMERICAN TITLE CALIFORNIA

When Recorded Mail To:
NDEx West, L.L.C.
15000 Surveyor Boulevard, Suite 500
Addison, Texas 75001-9013

APN #: 254-100-18
Property Address:
785 SHELLI STREET
MOUNTAIN HOUSE, CALIFORNIA  95391

**\*SUB201301683**
**00300\***

Doc #: 2013-094833
07/22/2013 08:55:31 AM
Page: 1 of 1    Fee: $17.00
Kenneth W Blakemore
San Joaquin County Recorder
Paid By: DOCUMENT PROCESSING SOLUTIONS

Space above this line for Recorder's use only

Trustee Sale No. . 20130168000300 Title Order No.. 8337195

## SUBSTITUTION OF TRUSTEE

WHEREAS, KEITH G HEDMAN AND ADENALYN V HEDMAN was the original Trustor, NORTH AMERICAN TITLE COMPANY was the original Trustee, and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR CMG MORTGAGE INC. was the original Beneficiary Recorded on 06/27/2006 as Instrument No. 4804-118595 of official records in the Office of the Recorder of San Joaquin County, California, as more fully described on said Deed of Trust, and WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place and instead of said present Trustee.

NOW THEREFORE, the undersigned hereby substitutes NDEX WEST, LLC, WHOSE ADDRESS IS: 15000 Surveyor Boulevard, Suite 500, Addison, Texas 75001-9013 as Trustee under said Deed of Trust.

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

DATED: 7/11/13

State of ___TEXAS___
County of ___Dallas___

NATIONSTAR MORTGAGE LLC

By: _Bradley Gorz_

Name: __Bradley Gorz__

Title: __Assistant Secretary__

On 7-11-13 Bradley Gorz _____ Eeasha Smith _____, Notary Public, personally appeared ___Bradley Gorz___ who is known to me to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature: _____ 7-11-13    (Seal)

My commission expires: __4-8-2017__

EEASHA SMITH
Notary Public, State of Texas
My Commission Expires
April 08, 2017

PCUS_SubstituteOfTrustee_Mtgr - 05/17/2010 - Ver 13

Page 1 of 1

36

1  Mortgage Electronic Registration Systems, Inc." dated April 24, 2013 pursuant to which

2  certain identified employees of Nationwide, including myself, are authorized to sign

3  mortgage-related documents on behalf of MERS.  A true and correct copy of the Corporate

4  Resolution is marked as Exhibit "C" and is attached hereto and incorporated herein by

5  reference.

6       6.     I am a citizen and resident of the State of Florida.  I have never traveled to

7  California for any purpose, personal or business.  I have never transacted business in

8  California.  As far as I know, I have had no contacts with the State of California.

9       I declare under penalty of perjury and under the laws of the State of California that

10  the foregoing facts are true and correct and known to me of my personal knowledge, and I

11  could and would competently so testify if called upon to do so.

12       Executed this 25th day of June 2014 at Palm Harbor, Florida.

13

14                                             DANIEL THOMPSON

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

DECLARATION OF ERICA LANCE IN SUPPORT OF MOTION FOR SUMMARY JUDG...

K.2

37



**APPENDIX F**

Filed 4/20/16  Hedman v. First American Title Ins. Co. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| KEITH OLIN HEDMAN, | C078538 |
| Plaintiff and Appellant, | (Super. Ct. No. 3-92014-00307185-CU-OR-STK) |
| v. | |
| FIRST AMERICAN TITLE INSURANCE COMPANY et al., | |
| Defendants and Respondents. | |

1

Keith Olin Hedman, proceeding in propria persona, brought suit against First American Title California, First American Title Financial Corp., and First American Title Insurance Company (collectively First American) and many others after the recording of a notice of trustee's sale against his home.[1] The complaint purported to assert causes of action for intentional misrepresentation, conspiracy, unfair business practices (Bus. & Prof. Code, § 17200), and violations of Civil Code section 2924. First American demurred, claiming the complaint failed to state facts sufficient to state a cause of action and the complaint was uncertain and unintelligible. In particular, First American asserted there were no allegations that it had any role in the foreclosure and it was not a party to the loan, or the original or successor trustee. The trial court sustained the demurrer with leave to amend. After Hedman failed to file an amended complaint, the court entered a judgment of dismissal.

Hedman, again acting as his own attorney, appeals. His opening brief is rambling and disorganized, to the point where it is difficult to understand his arguments. He contends the complaint does state viable causes of action, but he fails to address the point that the complaint alleges *no involvement* in either the loan or the foreclosure process by First American. Because Hedman has failed to plead a proper cause of action against First American, we affirm the judgment of dismissal.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

In 2004, the Hedmans purchased a house in Mountain House, California (the property). They borrowed $333,700 from CMG Mortgage, Inc. (CMG), to finance the

---

[1] The complaint named both Keith Hedman and his wife Adrialyn Hedman as plaintiffs. Because Keith Hedman is not a licensed attorney, he cannot represent anyone other than himself. (*Russell v. Dopp* (1995) 36 Cal.App.4th 765, 775-776.)

[2] Hedman requested oral argument in this case and appeared in the courtroom. He refused to identify himself by name and properly state his appearance, despite our multiple requests that he do so. We deemed his case submitted on the briefs.

purchase. The promissory note was secured by a deed of trust on the property. Under the deed of trust, CMG was listed as the lender, North American Title Company as the trustee, and MERS as the nominee.

In 2013, MERS, as nominee of CMG, assigned the deed of trust to Nationstar Mortgage LLC. Nationstar substituted NDEx West, LLC as trustee. That July, NDEx West recorded a notice of default and election to sell the property. The notice stated a payment of $28,413.79 was due. In October, NDEx West recorded two different notices of sale, each indicating the sale was scheduled for November 21, 2013.

On February 4, 2014, Hedman filed suit. The complaint named over 20 defendants, including First American. The complaint alleged the Hedmans were unable to refinance the loan because they were told there was "something wrong" with the paperwork. The complaint alleged the Hedmans had rescinded their signatures and cancelled the mortgage due to constructive fraud. It alleged the assignment of the deed of trust and the substitution of trustee were invalid and defendants lacked standing to pursue the foreclosure. A nonjudicial foreclosure was scheduled for February 4, 2014. The complaint also contained rambling allegations of false and forged documents, robo-signing, improper securitization of the deed of trust, and other alleged acts of fraud. The complaint does not name First American individually in any of the factual allegations.

The complaint sets forth four causes of action, none of which mention First American by name. These causes of action are for intentional misrepresentation, conspiracy, unfair business practices under Business and Professions Code section 17200 and violations of Civil Code section 2924. The complaint sought an injunction of the scheduled sale as well as cancellation of: the notice of default; the two notices of trustee sale; the substitution of trustee; any assignments; and the trustee deed upon sale. It also sought a determination of who owned the property, damages, punitive damages, and attorney fees.

3

First American demurred on the basis that the complaint failed to set forth facts sufficient to state a cause of action. (Code Civ. Proc., § 430.10, subd. (e).) It also specially demurred on the basis that the complaint was uncertain and unintelligible. (*Id.,* subd. (f).) First American argued there were no allegations that it had any role in the foreclosure, made any misrepresentations, committed any wrongful acts, or violated any foreclosure statute. First American argued the complaint was uncertain and unintelligible because it contained no charging allegations against First American.

In a supplemental memorandum of points and authorities, First American advised that the Hedmans had filed a petition in bankruptcy. The bankruptcy had been converted to Chapter 7, which First American argued meant the bankruptcy trustee was now the proper plaintiff. First American requested judicial notice of supporting documents from the bankruptcy court.

In opposition to the demurrer, Hedman sought leave to amend if any cause of action had not been properly pleaded. He argued a pattern of behavior of wrongdoing was shown by First American's past fraudulent actions. He requested judicial notice of articles about a lawsuit in Florida against First American and fines imposed against First American in Minnesota. He argued he had properly pleaded causes of action for breach of contract, unjust enrichment, cancellation, constructive fraud, and negligence, although these were not the causes of action set forth in the complaint. He did not address the complaint's failure to make any specific allegation against First American.

The trial court took judicial notice of plaintiffs' bankruptcy, sustained the demurrer for lack of standing, and abated the matter. In September 2014, after the bankruptcy trustee was discharged, the court vacated the abatement.

4

On November 5, 2014, the court sustained the demurrer to all causes of action with leave to amend.[3] The court found Hedman failed to plead fraud with the required specificity, and the second and third causes of action relied upon the fraud count. In the fourth cause of action, Hedman was challenging the authority of various defendants to proceed with a nonjudicial foreclosure and the court found such a challenge was foreclosed by *Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149. (CT 1071)

On December 3, 2014, First American filed an ex parte application for dismissal with prejudice for failure to file timely an amended complaint. The court granted the application the next day.

On December 9, 2014, Hedman moved for 20 to 60 days leave to amend the complaint. The motion set forth that he had hired a handwriting expert to prove some signatures on the foreclosure papers were a fraud and "[m]uch new information has been discovered."

The court entered a judgment of dismissal.

Hedman moved to set aside the dismissal. He claimed he had been ill with a respiratory infection from the end of October until the first week of December. He provided a note from his doctor, stating that Hedman had been ill for three weeks prior to November 21, 2014.

The trial court denied both the motion to set aside the dismissal and the motion to amend the complaint.

---

[3] The order did not specify the time allowed for filing an amended complaint. In such cases, an amended complaint must be filed within 10 days. (Cal. Rules of Court, rule 3.1320(g).)

Hedman filed a notice of appeal from the judgment "rec'd 1/16/15 & 12/15/14."
We must liberally construe the notice of appeal.  (Cal. Rules of Court, rule 8.100(a)(2).)
The judgment of dismissal was filed December 15, 2014, and the register of actions
indicates notice of entry of judgment was filed January 16, 2015.  We construe the notice
of appeal as an appeal from that judgment.

## DISCUSSION

### I

*Hedman's Pro Per Status*

We recognize that Hedman is representing himself both in the trial court and on
appeal.  However, contrary to his assertion that he "must be held to a less stringent
standard then [*sic*] formal pleadings drafted by bar admitted attorneys," he is not entitled
to special treatment.  "Pro. per. litigants are held to the same standards as attorneys.
[Citations.]" (*Kobayashi v. Superior Court* (2009) 175 Cal.App.4th 536, 543.)  "A
doctrine generally requiring or permitting exceptional treatment of parties who represent
themselves would lead to a quagmire in the trial courts, and would be unfair to the other
parties to litigation." (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 985.)

Like First American, we find Hedman's brief difficult to read.  He fails to comply
with the standards for an appellate brief set forth in rule 8.204 of the California Rules of
Court.  Most significantly, he fails to provide a summary of the significant facts in the
record.  (Cal. Rules of Court, rule 8.204(a)(2)(C).)  Much of the brief rambles about
extraneous matters and fails to address the point at issue, whether Hedman has stated a
viable cause of action against First American.  For purposes of readability, the greater
problem is the failure to follow the form requirements of the Rules of Court (*id.*, (b))--or
even accepted practices of written English--such as inserting spaces between words and
separating different topics by creating paragraphs.  Much of the brief appears to be cut
and pasted from other documents, resulting in a large variety of fonts which are
distracting and confusing.

6

Despite the many flaws in the opening brief, and First American's reasonable request that we strike it, we have undertaken a thorough review of Hedman's claims. "On appeal from a dismissal after an order sustaining a demurrer, we review the order de novo, exercising our independent judgment about whether the complaint states a cause of action as a matter of law. [Citations.]" (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1501.)

II

*Hedman Failed to State a Cause of Action for Intentional Misrepresentation*

The first cause of action in the complaint is for intentional misrepresentation. Intentional misrepresentation is a type of fraud. (Civ. Code, § 1710(1) ["[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true"].) The elements of a cause of action for fraud by intentional misrepresentation are (1) a misrepresentation, (2) made with knowledge of its falsity, (3) intent to defraud or to induce reliance, (4) justifiable reliance, and (5) resulting damage. (*R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 377.)

"In California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.) "The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written. [Citations.]" (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 157.)

The complaint alleges that representations made by Nationstar, NDEx West, various Aurora entities, CMG, Lehman Brothers Bank FSB, and UAMC were false. There is no allegation of any misrepresentation by anyone from or on behalf of First American. Accordingly, Hedman failed to state a cause of action for misrepresentation against First American.

7

## III

*Hedman Failed to State a Cause of Action for Conspiracy*

The second cause of action in the complaint is for conspiracy. It is based on the alleged misrepresentations and alleges that all defendants "have formed and continue to operate a scheme to facilitate wrongful foreclosure for economic gain and profit."

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511.) "To support a conspiracy claim, a plaintiff must allege the following elements: '(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct.' [Citations.]" (*Arei II Cases* (2013) 216 Cal.App.4th 1004, 1022.) "To state a cause of action for conspiracy, facts must be alleged showing the formation and operation of a conspiracy and damage resulting from an act or acts done in furtherance of the plan." (*Orloff v. Metropolitan Trust Co.* (1941) 17 Cal.2d 484, 488.) A bare allegation that defendants conspired is insufficient (*Arei II Cases*, at p. 1022.)

The complaint contains no allegations that First American was involved in the formation of any conspiracy. There are no allegations that First American agreed or conspired with anyone or had any part in the alleged wrongful foreclosure or the alleged misrepresentations. Accordingly, Hedman failed to state a cause of action against First American for conspiracy.

## IV

*Hedman Failed to State a Cause of Action for Unfair Business Practices*

The third cause of action in the complaint alleged unfair business practices under Business and Professions Code section 17200. The complaint alleges defendants used

false documents, manufactured documents, used robo-signers, and used other unlawful practices "to facilitate quicker foreclosures."

A plaintiff alleging an unfair business practice "must state with reasonable particularity the facts supporting the statutory elements of the violation." (*Khoury v. Maly's of California, Inc.* (1993) 14 Cal.App.4th 612, 619.) A demurrer is properly sustained where the complaint "identifies no particular section of the statutory scheme which was violated and fails to describe with any reasonable particularity the facts supporting violation." (*Ibid.*)

The complaint fails to meet the requirement of sufficient particularity. It alleges no facts supporting a statutory violation by First American. Indeed, it alleges no acts by First American at all. Hedman failed to state a cause of action against First American for unfair business practices.

V

*Hedman Failed to State a Cause of Action for Wrongful Foreclosure*

The fourth cause of action in the complaint alleged violations of Civil Code section 2924. It alleged that prior to any transfer or assignment of the note or deed of trust, Lehman Brothers Holdings, Inc., filed bankruptcy and the note became property of the bankruptcy estate. It next alleges various entities, not including First American, were not authorized to conduct the foreclosure. It concludes, "Defendants have not complied with the basic requirements of Civil Code section 2924."

This cause of action challenges defendants' authority to initiate the foreclosure. Hedman, as a borrower, may pursue such a claim only if he alleges a specific factual basis for the claim. (*Gomes, supra,* 192 Cal.App.4th at p. 1154; *Siliga v. Mortgage Electronic Registration Systems, Inc.* (2013) 219 Cal.App.4th 75, 82-83, overruled on another point in *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 939.) As to First American, Hedman failed to allege the required specific factual basis.

9

As with the other causes of action, there are no factual allegations relating to First American. Neither the factual allegations nor the supporting documents indicate that First American was a party to the loan or the subsequent events leading to foreclosure. Indeed, its role—and its status as a defendant—remains a mystery. In exhibits to the complaint, First American's name appears only on attachments to a letter from NDEx to Hedman, purporting to verify the debt. Apparently, First American provided information about taxes on the property. The only other mention of First American in the record, other than as a named defendant, comes in two news articles. Hedman requested the court take judicial notice of these articles to show First American's "pattern of behavior of wrong doing." The first article states the FDIC is suing First American in Florida. The second indicates the Minnesota Department of Commerce fined First American for a sham business kickback scheme. Hedman has failed to show how these matters relate to his claim of wrongful foreclosure. Hedman failed to state a cause of action for wrongful foreclosure against First American.

## VI

### *Failure to Amend Complaint*

The trial court sustained First American's demurrer with leave to amend. Hedman failed to file an amended complaint. In his opening brief, Hedman does not assert a claim of error as to the filing of the amended complaint. At one point, he complains of not being allowed "to file a 20-60 days leave to ammend [*sic*]."

As noted *ante*, by court rule Hedman had 10 days to file an amended complaint after the trial court sustained his demurrer with leave to amend on November 5, 2014. (Cal. Rules of Court, rule 3.1320(g).) Hedman did not request leave to amend until December 9, 2014. His request was untimely. Further, even on appeal, Hedman has failed to indicate *how* he would amend the complaint so that it states a cause of action against First American. (See Cal. Rules of Court, rule 3.1324.)

10

## DISPOSITION

The judgment is affirmed.  First American shall recover costs on appeal.  (Cal.
Rules of Court, rule 8.278(a)(1) & (2).)


_____/s/_____
Duarte, J.


We concur:


_____/s/_____
Blease, Acting P. J.


_____/s/_____
Butz, J.


11

**APPENDIX G**

Filed 5/4/16  Hedman v. Nationstar Mortgage CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| KEITH OLIN HEDMAN et al., | C079416 |
| Plaintiffs and Appellants, | (Super. Ct. No. 39-2014-00307185-CU-OR-STK) |
| v. | |
| NATIONSTAR MORTGAGE, LLC et al., | |
| Defendants and Respondents. | |

Plaintiffs Keith and Adrialyn Hedman appeal from two awards of attorney fees after both defendants obtained judgments of dismissal following successful demurrers. One award was to defendant Nationstar Mortgage, LLC, Nationstar Mortgage, Jay Bray, and Mortgage Electronic Registration Systems, Inc. (MERS) (collectively Nationstar), and the other to defendant CMG Mortgage, Inc. (CMG). Although this appeal is from the awards of attorney fees, the Hedmans, in propria persona, challenge almost exclusively the propriety of the judgments of dismissal.

1

Because the Hedmans have failed to show an abuse of discretion in the awards of attorney fees, we affirm. We deny Nationstar's request for sanctions, but caution the Hedmans about their continuing practice of filing late, duplicative, and irrelevant motions.

## BACKGROUND

In 2004, the Hedmans took out a loan from CMG to purchase a house. The loan was secured by a deed of trust on the property. In 2013, MERS (as nominee of CMG) assigned the deed of trust to Nationstar. About the same time, the Hedmans defaulted on the loan. In July 2013, a notice of default and election to sell was filed, indicating the Hedmans owed $28,413.79. A trustee's sale was scheduled for November.

In February 2014, the Hedmans filed suit against Nationstar, CMG, and many others. The complaint alleged intentional misrepresentation, conspiracy, unfair business practices, and unlawful foreclosure.

Both Nationstar and CMG demurred and the trial court sustained both demurrers with leave to amend. After the Hedmans failed to amend the complaint within the time allowed, both Nationstar and CMG applied ex parte for a judgment of dismissal. On December 4, 2014, the trial court entered a judgment in favor of Nationstar and a judgment in favor of CMG.

On February 10, 2015, CMG moved for attorney fees pursuant to a provision in the deed of trust and noticed a hearing for March 10. It sought $21,385.50 in fees. Any opposition to this motion was due at least nine days before the hearing. (Code Civ. Proc., § 1005, subd. (b).) A week before the hearing, CMG filed a "notice of nonopposition" to the fee award. The day before the hearing, the Hedmans filed a "dispute and response," asserting the judgment of dismissal was void. The accompanying memorandum of points and authorities mostly argued the merits of the underlying lawsuit. It claimed the attorney fees were too high "Given their Lack of Knowledge of the subject matter."

2

On February 10, 2015, Nationstar moved for attorney fees, contending both the note and the deed of trust authorized attorney fees to the prevailing party. Nationstar sought $30,125 in fees and noticed a hearing for March 17. A week before the hearing, Nationstar requested the motion for fees be granted because the Hedmans had failed to file a timely opposition. Two days later, the Hedmans filed a "Dispute and Response" to Nationstar's motion for attorney fees. Most of this response alleged fraud relating to the loan and the foreclosure. It did claim the fees were not reasonable and opposing counsel was "non-responsive to the cla[i]ms, mostly because they don't understand the subject matter." Nationstar objected to this late opposition.

The trial court granted both motions for attorney fees, after hearing argument and considering written submissions. On March 25, 2015, the court entered an "*Amended, Nunc Pro Tunc,* Judgment of Dismissal with Prejudice" in favor of CMG. This judgment added the award of attorney fees and costs to the previous judgment. On April 7, 2015, the court entered an amended judgment in favor of Nationstar. This amended judgment added the award of attorney fees and costs to the previous judgment.

The Hedmans appealed from both of these judgments.[1]

Nationstar moved to dismiss the appeal on two grounds. First, it argued that the notice of appeal was too late to challenge the December 4, 2014 judgment, and the April 7, 2015 judgment only added the award of attorney fees and costs and did not restart the time for filing an appeal. Second, the Hedmans had failed to challenge the memorandum of costs and their opposition to attorney fees was late and failed to address any elements of the fee award, thus they were precluded from challenging either costs or attorney fees on appeal. This court granted the motion to dismiss "insofar as plaintiff purports to challenge the judgment entered on December 4, 2014."

---

[1] Only Keith Hedman signed the notice of appeal, but this court granted the petition to add Adrialyn Hedman as an appellant.

## DISCUSSION

### I

*The Attorney Fee Awards*

This appeal is limited to the attorney fee and costs awards and does not encompass the judgments of dismissal after the sustaining of the demurrers. The notice of appeal states the appeal is from the amended judgments only. An appellate court's review is limited in scope to the judgment specified in the notice of appeal. (*Soldate v. Fidelity National Financial, Inc.* (1998) 62 Cal.App.4th 1069, 1073; *Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 46-47.) "Despite the rule favoring liberal interpretation of notices of appeal, a notice of appeal will not be considered adequate if it completely omits any reference to the judgment being appealed." (*Shiver, McGrane & Martin v. Littell* (1990) 217 Cal.App.3d 1041, 1045.)

An appeal from the amended judgments does not include an appeal from the earlier judgments of dismissal. Only where an amended judgment amounts to a substantial modification of the judgment does the amended judgment supersede the original judgment for purposes of the time period for taking an appeal. (*Torres v. City of San Diego* (2007) 154 Cal.App.4th 214, 222.) "It is well settled, however, that '[w]here the judgment is modified merely to add costs, attorney fees and interest, the original judgment is not substantially changed and the time to appeal it is therefore not affected.' [Citations.] 'When a party wishes to challenge both a final judgment *and* a postjudgment costs/attorney fee order, the normal procedure is to file *two* separate appeals: one from the final judgment, and a second from the postjudgment order.' [Citation.]" (*Ibid.*)

In the argument portion of their opening brief, the Hedmans set forth five arguments; only one challenges the attorney fee awards and they do not challenge the awards of costs at all. Their challenge to the attorney fee awards is actually an attack on the original judgment because they contend the underlying loan documents are void due to fraud. They claim the attorney fee provision on which the awards were based was in

4

"a contract that never was consum[m]ated." They further argue they "were ordered to pay attorney fees out of a term and condition of a contract that was not in effect," that was "void, ab initio." They cite to authority for the first point, but provide only the case name and not the full citation, jurisdiction, or date.

"In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Civ. Code, § 1717, subd. (a).) The court found Nationstar was the prevailing party and implicitly found CMG was the prevailing party by awarding attorney fees. The Hedmans do not--and could not credibly--challenge the finding as to the prevailing parties. Under Civil Code section 1717, subdivision (b)(1), "the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract." Here, Nationstar and CMG recovered complete relief, a judgment in their favor. Nor do the Hedmans claim the contracts at issue, the note and deed of trust, do not contain an attorney fee provision, that the complaint was not "an action on the contract," or that attorney fees are otherwise unavailable. They do not challenge the amount of fees as excessive or otherwise unreasonable.

The Hedmans filed two response briefs, one responding to Nationstar and one responding to CMG. Each is a long, rambling brief, filled with assertions of a conspiracy and wide-ranging fraud, discussing the allegations of the complaint and contending the pleading of fraud was sufficient. To the extent the briefs raise the issue of the attorney fee award at all, it is only to claim the award was based on a void contract. As discussed, this claim challenges the original judgment and that judgment is not before us on this appeal.

5

"The trial court has broad discretion to determine the amount of a reasonable fee" authorized by contract. (*EnPalm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 774.) The Hedmans have failed to show the trial court abused its discretion in awarding attorney fees to Nationstar and CMG as prevailing parties in the action. Because we affirm the trial court's awards on this basis, we need not address Nationstar's argument that the Hedmans failed to properly oppose the motion for attorney fees in the trial court, or the arguments of CMG that the Hedmans failed to provide an adequate record for review or submit admissible evidence to support their assertion that the deed of trust was fraudulent.

## II

### *Requests for Judicial Notice*

There are three outstanding requests for judicial notice. We deny all of them as unnecessary or irrelevant.

Nationstar requests that we take judicial notice of (1) a judgment in federal court in *Keith O. Hedman, et al. v. Aurora Loan Services, et al.*; (2) our opinion in the state court case *Keith O. Hedman, et al. v. Aurora Loan Services, et al.;* and (3) the notice of appeal by Hedman in a related case pending before this court. These documents are "offered to establish certain facts set forth in the Statement of Facts/Statement of the Case in Respondents' Brief that are relevant to understanding the underlying history of this matter and the proper scope of this appeal." We deny this request as we find these documents are unnecessary to our understanding of the case or our resolution of this appeal. (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29.)

We have received two separate requests for judicial notice from the Hedmans. Both request that we take judicial notice of (1) a letter indicating the Hedmans will accept service only by mail; (2) paperwork showing how Nationstar's counsel served papers on the Hedmans (by overnight courier); (3) the original note with three stampings on it; (4) a

6

UCC-1 filed by the Hedmans "to claim their birth certificate bonds;" and (5) a letter to Nationstar from Keith Hedman purporting to rescind the deed of trust due to fraud. The Hedmans claim this information is offered to establish certain facts and "[t]hese facts shed light on to the legitimacy and authenticity of the documents put forth by Respondents . . . ." We deny these requests on the grounds that these documents are irrelevant. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1 [material to be judicially noticed must be relevant].)

III

*Motion for Sanctions*

Nationstar requests sanctions against the Hedmans of $13,375. Nationstar contends the appeal was frivolous and in bad faith.[2]

Code of Civil Procedure section 907 and rule 8.276(a)(1) of the California Rules of Court authorize a Court of Appeal to impose sanctions for a frivolous appeal. "[A]n appeal should be held to be frivolous only when it is prosecuted for an improper motive -- to harass the respondent or delay the effect of an adverse judgment -- or when it indisputably has no merit -- when any reasonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 (*Flaherty*).)

In *Flaherty*, our Supreme Court stressed the difficulty in distinguishing frivolous and nonfrivolous appeals and cautioned that any definition of "frivolousness" must be applied "so as to avoid a serious chilling effect on the assertion of litigants' rights on appeal. Counsel and their clients have a right to present issues that are arguably correct,

---

[2] After the time for requesting oral argument had lapsed, Nationstar moved to have the Hedmans declared vexatious litigants under Code of Civil Procedure section 391 and requested judicial notice of numerous documents. We deny the motion without prejudice to refiling it in the trial court and deny the request for judicial notice.

7

even if it is extremely unlikely that they will win on appeal. An appeal that is simply without merit is *not* by definition frivolous and should not incur sanctions. Counsel should not be deterred from filing such appeals out of a fear of reprisals." (*Flaherty, supra,* 31 Cal.3d at p. 650.) Sanctions for frivolous appeals "should be used most sparingly to deter only the most egregious conduct." (*Id.* at p. 651.)

Given the strict standard for imposing sanctions and the Hedmans' status as plaintiffs in propria persona and appellants, we decline to impose sanctions here. While courts have imposed sanctions on appellants who prosecuted appeals in propria persona, those appellants were either attorneys, had legal backgrounds, or prosecuted the appeal for an obvious improper purpose. (Cf. *Banks v. Dominican College* (1995) 35 Cal.App.4th 1545, 1558-1559; *Bach v. County of Butte* (1989) 215 Cal.App.3d 294, 310-313; *In re Marriage of Stich* (1985) 169 Cal.App.3d 64, 75-78.) There is no indication in the record that either Hedman has any legal background or that they do not in good faith believe the merits of their case. "We do not believe it is appropriate to hold a propria persona appellant to the standard of what a 'reasonable attorney' should know is frivolous unless and until that appellant becomes a persistent litigant." (*Kabbe v. Miller* (1990) 226 Cal.App.3d 93, 98.)

Although we decline to impose sanctions in this particular case, we caution the Hedmans that their continued filing of late and duplicative motions and requests that do not address matters actually at issue on appeal is completely inappropriate and unacceptable. At one point, the Hedmans submitted for filing eight such motions and requests on a single day; all were rejected or denied. Such conduct borders on abuse of the judicial process and wastes scarce judicial resources. The Hedmans' effort would have better been spent preparing and filing opposition to Nationstar's motion for sanctions, for which the Hedmans had requested and received an extension of time. The Hedmans should consider themselves on notice that we will seriously consider imposing sanctions should they continue on their present course of abusing the process.

## DISPOSITION

The judgments are affirmed.  Defendants Nationstar and CMG shall recover costs
on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


_____/s/_____
Duarte, J.


We concur:


_____/s/_____
Robie, Acting P. J.


_____/s/_____
Mauro, J.


9