UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                                                         :

In re                                                       :        Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :        Case No. 08-13555 (SCC)

Debtors.                     :        (Jointly Administered)
------------------------------------------------------------------x

### ORDER SUSTAINING PLAN ADMINISTRATOR'S OBJECTION TO DEMANDS FOR POSTPETITION INTEREST RELATED TO CLAIM NO. 28308

      Upon the June 9, 2016 objection (the "Objection") [ECF No. 52994] of Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), seeking an order fixing the amount of postpetition interest owed to the holders of Claim No. 28308 in the amount of $6,380,711; and the Plan Administrator having filed the Declaration of Angharad Bowdler ("Bowdler Declaration") [ECF No. 52995] in support of the Objection; and a response (the "Response") [ECF No. 53349] to the Objection having been filed by Centerbridge Special Credit Partners II, L.P. ("CSCP"), CCP Credit Acquisition Holdings, L.L.C. ("CCP"), Recovery Partners Holdings I, LLC ("Recovery Partners"), and Chase Lincoln First Commercial Corp. ("Chase Lincoln") (collectively, the "Holders"); and the Holders having filed the Declaration of Michael Kwon ("Kwon Declaration") [ECF No. 53350] in support of the Response; and a reply (the "Reply") [ECF No. 53701] to the Response having been filed by the Plan Administrator; and the Court having held a hearing on October 6, 2016 (the "Hearing");

      **NOW, THEREFORE,** after due deliberation thereon and good cause appearing therefor, it is hereby **DETERMINED, FOUND, ADJUDGED**, and **DECREED** that:

1. On September 15, 2008 and October 5, 2008, LBHI and Lehman Brothers Commercial Corporation ("LBCC"), respectively, commenced voluntary cases under chapter 11 of the Bankruptcy Code ("the Code"). The chapter 11 cases have been consolidated for procedural purposes and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

2. On September 22, 2009, Lehman Re Ltd. ("Lehman Re") filed a proof of claim in LBCC's chapter 11 case in the amount of $89,912,687.14 [Claim No. 28308] (the "Lehman Re POC"). *See* Kwon Declaration, Exhibit 2. According to the Lehman Re POC, "Lehman Re and LBCC entered into one or more intercompany transactions or arrangements" prior to LBCC's bankruptcy filing, pursuant to which certain Lehman Re funds were deposited with LBCC. *Id.* at ¶ 6. "Specifically, between July 2007 and August 2008, monies belonging to Lehman Re were deposited in an account with LBCC in Lehman Re's name. These funds deposited at LBCC were the proceeds from a Lehman Re account at Lehman Brothers International (Europe) ("LBIE") that had been pledged to one or more Lehman Re creditors." *Id.*

3. On December 6, 2011, this Court entered an order confirming the Plan, and the Plan became effective on March 6, 2012. The Plan contains a provision providing for the payment of postpetition interest to holders of allowed claims in the event that additional cash is available after a Debtor (as defined in the Plan) has satisfied all of its allowed claims in full. *See* Plan at § 8.13(c).

4. On February 16, 2012, Lehman Re, LBCC, and various other parties entered into a settlement agreement (the "Settlement Agreement") [ECF No. 25864, Exhibit A] which, among other things, provides that the Lehman Re POC is allowed in the amount of $87,621,000 (the "Allowed Claim"). *See* Settlement Agreement at § 2.3. The Settlement Agreement includes

2

several key provisions. Article VII of the Settlement Agreement specifies that, other than those contracts listed on Exhibit H of the Settlement Agreement, "[a]ll other contracts between the Lehman U.S. Parties on the one hand, and Lehman Re and/or Congress Life on the other, shall be rejected pursuant to Section 365 of the Bankruptcy Code . . . and/or terminated and of no force and effect[.]" *See* Settlement Agreement at Article VII. Furthermore, section 18.8 provides that the Settlement Agreement "embod[ies] the entire agreement and understanding of the Parties with respect to the transactions contemplated hereby and supersedes all prior written or oral commitments, arrangements or understandings with respect thereto." *See* Settlement Agreement at § 18.8. Lastly, section 15.1 states that Lehman Re releases "any claims . . . that Lehman Re . . . may have against any of the Lehman U.S. Parties . . . including, without limitation, any such Claims arising under, in connection with or relating in any manner to [the Lehman Re POC] or any of the documents, instruments[,] agreements or transactions described in or contemplated thereby[.]" *See* Settlement Agreement at § 15.1. The Settlement Agreement does not include a provision concerning the calculation of postpetition interest on the Allowed Claim. On March 22, 2012, this Court entered an order approving the Settlement Agreement (the "Settlement Order") [ECF No. 27085].

5. On November 18, 2013, Lehman Re assigned 36.11 percent of the Allowed Claim to CCP and 19.51 percent of the Allowed Claim to CSCP. *See* Response at ¶ 17. Chase Lincoln later acquired portions of the CCP and CSCP holdings, such that it currently owns 10.05 percent of the Allowed Claim. *Id.* Lehman Re retained the remaining 44.38 percent of the Allowed Claim and subsequently assigned its holding to Recovery Partners. *Id.*

6. On March 24, 2015, this Court entered an order setting a bar date for demands for postpetition interest against LBCC and establishing the procedure for demanding postpetition interest in respect of allowed claims against LBCC (the "PPI Bar Date Order") [ECF No. 48966]. The PPI Bar Date Order requires, among other things, that each "holder of a Claim against . . . LBCC asserting a Demand . . . provide the . . . source for any rate used in the calculation [and] upload any documentation in support of [its Demand.]" PPI Bar Date Order at 2-3.

7. On April 24, 2015, CCP, CSCP, and Lehman Re submitted substantively identical demands for postpetition interest on the Allowed Claim; Chase Lincoln joined Lehman Re's demand (collectively, the "Demands"). *See* Bowdler Declaration, Exhibits A-D. The Demands assert that postpetition interest on the Allowed Claim is governed by the contractual rate of interest in Lehman's Global Cash and Collateral Management System (the "GCCM"). *See* Response at ¶ 20. According to the Holders, (i) the GCCM was a "web deployed tool that Lehman used to centralize and internalize . . . all of the Firm's cash flows;" (ii) the GCCM "govern[ed] the obligations of the Lehman affiliates as to funds . . . owing by one Lehman affiliate to another, including a process to calculate and post intercompany interest on such funds;" and (iii) the rates at which intercompany interest was calculated are described in Lehman's *Business Requirements Document Module One: Disbursements and Receipts* (the "Manual") and, pursuant to the Manual, the interest rate under the GCCM was "1 week LIBOR flat." *Id.* at ¶ 2. Furthermore, the Holders assert that because the funds held by LBCC were denominated in British pounds sterling, the appropriate LIBOR index is the GBP 1 week LIBOR rate on October 3, 2008 (*i.e.*, 5.3785 percent). *See* Bowdler Declaration, Exhibits A, B, D at ¶ 12. Accordingly, the Holders claim an entitlement to postpetition

4

interest on the Allowed Claim in the amount of $23,872,769.75, utilizing the GBP 1 week LIBOR rate of 5.3785 percent to calculate such interest.

8. By the Objection, the Plan Administrator seeks an order fixing the amount of postpetition interest owed to the Holders on the Allowed Claim in the amount of $6,380,711. The Plan Administrator asserts that postpetition interest on the Allowed Claim should be calculated using the federal judgment rate that was in effect on the date that LBCC commenced its chapter 11 case (*i.e.*, 1.59 percent). *See* Objection at ¶ 21.

*Basis for Determining the Rate Applicable to Postpetition Interest on the Allowed Claim*

9. Section 8.13(c) of the Plan provides that:

[t]o the extent that any Debtor has Available Cash after all Allowed Claims against that Debtor have been satisfied in full . . . each holder of each such Allowed Claim shall receive its Pro Rata Share of further Distributions, if any, to the fullest extent permissible under the Bankruptcy Code in satisfaction of postpetition interest on the Allowed amount of such Claims **at the rate applicable in the contract or contracts on which such Allowed Claim is based (or, absent such contractual rate, at the statutory rate).**

Plan at § 8.13(c) (emphasis added). Accordingly, the Court must first examine whether there is a contract or contracts on which the Holders' Allowed Claim is based.

10. The Plan Administrator asserts that no prepetition contract existed between LBCC and Lehman Re, and the Court should instead look to the Settlement Agreement as the governing contract. The Plan Administrator challenges the Holders' contention that the GCCM should be considered a contract between the parties, particularly given that the GCCM was one of *fifteen* different cash-management systems employed by the Debtors prepetition; and the Manual is nothing more than an "early-planning-stage manual relating to one of the several prepetition cash-management systems" and does not specifically reference "a particular amount owed by LBCC to Lehman Re[.]" *See* Reply at ¶ 18 n. 4; Objection at ¶ 14 n. 3. In

5

addition, the Plan Administrator points out that neither the Lehman Re POC nor the Settlement Agreement identifies a prepetition contract between LBCC and Lehman Re, and the motion seeking approval of the Settlement Agreement also did not identify a prepetition contract between LBCC and Lehman Re, instead stating that "[p]rior to the commencement of LBCC's chapter 11 case, Lehman Re and LBCC entered into certain *undocumented* foreign exchange transactions."  *See* Objection at ¶ 9; Reply at ¶ 14 (citing Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 for Approval of a Settlement Agreement with Lehman Re Ltd. and Certain Other Parties (the "Settlement Motion") [ECF No. 25864] at ¶ 33 (emphasis added)).

11. Most importantly, the Plan Administrator asserts that, *even if* the Court were to assume that a prepetition contract did exist between LBCC and Lehman Re that provided a contractual rate of interest (whether it be the GCCM or another document), any such contract was (a) rejected by, (b) terminated by, (c) released by, and (d) superseded by the unambiguous terms of the Settlement Agreement, which agreement remains the sole contract between the parties with respect to the Allowed Claim.  As such, the Plan Administrator urges the Court to look only to the Settlement Agreement to determine the contractual rate of interest applicable to calculating postpetition interest on the Allowed Claim.

12. In contrast, the Holders contend that the GCCM provides the contractual rate of interest because, according to the Manual, the GCCM governed Lehman's intercompany obligations, including the calculation of interest accruing on funds held between Lehman affiliates.  *See* Response at ¶¶ 30-34.  The Holders assert that "obviously there was an understanding that LBCC was holding [$89,912,687.14] on Lehman Re's behalf" and that the GCCM is an "inextricable part" of such understanding with respect to amounts owed between Lehman

6

entities because the GCCM governed the rate at which those obligations accrued interest. *See* Response at ¶ 34.

13. The Plan Administrator's observations are persuasive. The GCCM was only one of many different cash-management systems employed by Lehman; the Manual, in describing the GCCM, does not specifically mention a transaction between LBCC and Lehman Re. In fact, in the section entitled *Intercompany Interest*, the Manual states that the section "outlines how GCCM D&R would take over the intercompany recover [*sic*] of the cost of funding payments and receipts on behalf of the business. The process outlined will need to be discussed with the Financial Controllers, ALM and Global Carry to ensure they agree change from TWS, etc." Manual at § 5.3.2.3. Based on this language, the Court observes that the Manual resembles more of an early-planning stage manual rather than a definitive document. While the Holders maintain that discovery is necessary to decide this issue, the Court need not do so at this time because, even assuming *arguendo* that the GCCM constituted a contract reflecting a rate of interest, the Court finds that, as a matter of law, the Settlement Agreement rejects, terminates, releases, and supersedes the GCCM.

14. The Settlement Agreement unambiguously reflects that, pursuant to its terms, Lehman Re relinquished any and all rights it may have had against LBCC based on any contract other than the Settlement Agreement. The broad language of the Settlement Agreement (i) rejects and/or terminates any prior contracts between LBCC and Lehman Re; (ii) provides that Lehman Re releases any rights and claims it may have had against LBCC based on any contract other than the Settlement Agreement; and (iii) provides that the Settlement Agreement supersedes all prior written or oral understandings between the parties.

15. Specifically, the language in the Settlement Agreement provides as follows: Article VII of the Settlement Agreement states that, other than those contracts listed on Exhibit H of the Settlement Agreement,[1] all other contracts between LBCC and Lehman Re are rejected pursuant to section 365 of the Code and/or terminated and "of no force and effect." *See* Settlement Agreement at Article VII.[2] Section 15.1 of the Settlement Agreement states that Lehman Re releases any rights it may have had against LBCC based on any contract other than the Settlement Agreement, including, without limitation, any claims arising under, in connection with, or relating to any of the Lehman Re Claims (including those against LBCC) or any of the documents, instruments, agreements or transactions described in or contemplated thereby. *See* Settlement Agreement at § 15.1. Finally, section 18.8 of the Settlement Agreement provides that the Settlement Agreement "embod[ies] the entire agreement and understanding of the Parties with respect to the transactions contemplated hereby and supersedes all prior written or oral commitments, arrangements or understandings with respect thereto." *See* Settlement Agreement at § 18.8.

16. While the Holders do not allege that the Settlement Agreement is invalid, they nonetheless assert that the foregoing provisions in the Settlement Agreement are merely "boilerplate" and do not serve to "retroactively nullify provisions in prepetition agreements concerning the accrual of interest." *See* Response at ¶¶ 36-38. The Court disagrees.

17. Courts have held that "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170

---

[1] The only contract listed on Exhibit H is "[t]he 2009 Settlement Agreement and all assignment and assumption agreements, allonges, and other transfer documentation executed thereunder." The "2009 Settlement Agreement" is defined as the settlement agreement, dated as of November 4, 2009, pursuant to which Lehman Re, LBHI, LCPI, and Lehman ALI have, among other things, resolved certain, but not all, disputes with respect to the MRA and the Mortgage Loans. *See* Settlement Agreement at p. 2.

[2] The Settlement Order contains identical language, stating that all contracts between LBCC and Lehman Re "shall be rejected in accordance with the Plan, and/or terminated and of no force and effect[.]" *See* Settlement Order at p. 3.

8

(N.Y. 2002) (citation omitted).  Upon reviewing the Settlement Agreement, the Court finds that the language contained in the Settlement Agreement is clear and unambiguous and that such agreement in fact rejects, terminates, and supersedes any prior agreements between the parties and releases any and all rights and claims of Lehman Re against LBCC.  "Under New York law . . . a valid release constitutes a complete bar to an action on a claim which is the subject of the release."  *Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) (internal citation and quotations omitted).  If the language of a release is clear and unambiguous, the signing of a release is a jural act binding on the parties.  *Morefun Co. Ltd. v. Mario Badescu Skin Care Inc.*, Case No. 13 CIV. 9036 (LGS), 2014 WL 2560608, at *4 (S.D.N.Y. June 6, 2014), *aff'd*, 588 F. App'x 54 (2d Cir. 2014) (internal citation omitted).  Such is the case here.  The Court declines to depart from well-established precedent and dismiss unambiguous substantive language in a valid settlement agreement as boilerplate.  The Court finds that, even if a prior contract between Lehman Re and LBCC had existed, the operative language in the Settlement Agreement wholly eliminates the Holders' entitlement to make a demand for postpetition interest based on a rate in such contract.  Thus, the Settlement Agreement is the only contract relevant for purposes of calculating postpetition interest due and owing on the Allowed Claim.

### *The Federal Judgment Rate is the Statutory Rate of Interest Applicable to Calculating Postpetition Interest on the Allowed Claim*

18. Section 8.13(c) of the Plan provides that:

[t]o the extent that any Debtor has Available Cash after all Allowed Claims against that Debtor have been satisfied in full . . . each holder of each such Allowed Claim shall receive its Pro Rata Share of further Distributions, if any, to the fullest extent permissible under the Bankruptcy Code in satisfaction of postpetition interest on the Allowed amount of such Claims **at the rate applicable in the contract or contracts on which such Allowed Claim is based (or, absent such contractual rate, at the statutory rate).**

9

Plan at § 8.13(c) (emphasis added). Because the Court has determined that the Settlement Agreement is the contract on which the Allowed Claim is based, the Settlement Agreement must be consulted to determine the rate of postpetition interest applicable to the Allowed Claim. However, the Settlement Agreement does not contain a provision addressing the calculation of postpetition interest on the Allowed Claim, a fact that neither the Plan Administrator nor the Holders dispute. Therefore, in accordance with the Plan, the Holders are entitled to receive postpetition interest on the Allowed Claim at "the statutory rate." The Plan, however, does not define the term "statutory rate."

19. The Plan Administrator urges the Court to interpret "statutory rate" to be the federal judgment rate (set forth in 28 U.S.C. § 1961(a)[3]) which was in effect on the day that LBCC commenced its chapter 11 case (*i.e.*, 1.59 percent). See Objection at ¶ 21. This argument is based on case law interpreting section 726(a)(5) of the Code (made applicable to chapter 11 cases by the "best interests test" of section 1129(a)(7)). Section 726(a) provides for distribution of property of the estate in a chapter 7 case, and subsection (a)(5) states that such property shall be distributed "fifth, in payment of interest at the *legal rate* from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection." 11 U.S.C. § 726(a)(5) (emphasis added). The Plan Administrator argues that section 726(a)(5) is "the only statutory basis for awarding postpetition interest on unsecured claims" in bankruptcy, and, when courts that have considered whether unsecured claims

---

[3] See 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.").

accrue postpetition interest at (i) the federal judgment rate or (ii) a state statutory rate, they "have done so in the context of interpreting the phrase 'the legal rate' in section 726(a)(5)." *See* Reply at ¶ 23.

20. The Holders dispute the application of section 726(a)(5) and contend that the statutory rate is 8 percent pursuant to the Judgments Act 1838 under English law (the "English Statutory Rate"). The Holders assert that the English Statutory Rate should apply because the funds that were transferred to LBCC "(i) were denominated in Great British Pounds, (ii) belonged to Lehman Re, an entity formed under the laws of Bermuda, which is a British territory, [and] (iii) . . . were transferred to LBCC by LBIE, an English entity, . . . in breach of the Custody Agreement,[4] which is 'governed by and construed in accordance with the laws of . . . England[.]'" *See* Response at ¶ 52. Based on this "strong nexus to British law," the Holders assert that, in determining the appropriate rate of postpetition interest on the Allowed Claim, the term "statutory rate" as used in the Plan should be interpreted to mean the English Statutory Rate of 8 percent rather than the federal judgment rate of 1.59 percent.

21. In response to the Holders' assertion that the English Statutory Rate applies, the Plan Administrator contends that (i) claims against LBCC were converted into and owed in U.S. Dollars effective as of LBCC's petition date in accordance with the Code and orders of this Court; (ii) there is no evidence that funds "belonged to" Lehman Re as opposed to amounts being owed to Lehman Re because there was no prepetition contract between LBCC and Lehman Re; and (iii) LBCC was not a party to any agreement between LBIE and Lehman Re. *See* Reply at ¶ 27.

---

[4] According to the Holders, the Custody Agreement was an agreement between LBIE and Lehman Re, dated March 19, 1999, pursuant to which LBIE held certain collateral as a custodian for Lehman Re. *See* Response at ¶ 12.

11

22. The Court finds that the Holders' arguments are not persuasive; there is simply no basis on which the Court should consider the existence of a purported "strong nexus to British law" that would support the application of the English Statutory Rate here. Section 502(b) of the Code requires a bankruptcy court to determine the amount of a claim "in lawful currency of the United States," thus rendering the denomination of funds transferred to LBCC irrelevant. *See* 11 U.S.C. § 502(b). Moreover, the Custody Agreement is an agreement solely between LBIE and Lehman Re and is irrelevant to the calculation of postpetition interest on the Allowed Claim. Reaching for a basis on which to assert an entitlement to a rate of interest higher than the federal judgment rate, the Holders argue that, because the Plan "authorizes varying rates where different contracts apply," it "is naturally read also to authorize varying postpetition interest where different statutes apply." *See* Response at ¶ 53. The Plan Administrator argues that this interpretation of the Plan language produces an absurd and commercially unreasonable result: while LBHI consented to the application of contractual rates of interest for Allowed Claims based on contracts, LBHI did *not* consent to various rates of interest for non-contract allowed claims receiving postpetition interest at "*the* statutory rate." Reply at ¶ 26 (citing to Plan at § 8.13(c) (emphasis added)). The Court agrees that such a twisted reading of the Plan cannot be correct; the absence of a specific qualifying term before "statutory rate" does not require the Court to read the Plan to permit application of varying statutory rates of interest, including a statutory rate from a foreign jurisdiction.

23. As the Plan Administrator correctly notes, a majority of courts considering the term "legal rate" used in section 726(a)(5) – the only Code section dealing with postpetition interest in bankruptcy cases – and whether the term refers to the federal judgment rate or a state

statutory rate have concluded that unsecured claims accrue postpetition interest at the federal judgment rate. *See Beguelin v. Volcano Vision, Inc. (In re Beguelin)*, 220 B.R. 94, 100 (9th Cir. B.A.P. 1998) ("We agree with the debtor that the federal judgment rate is the appropriate measure of interest under § 726(a)(5)[.]"); *Cadle Co. of Ohio, Inc. v. Kravitz et al. (In re Kravitz)*, Nos. MW 00-070, MW 00-071, 2001 WL 36381905, at *3 (1st Cir. B.A.P. Feb. 16, 2001) ("We are in accord with the line of cases holding that Section 726(a)(5) of the Code requires post-judgment interest to be paid at the federal judgment rate."); *In re Energy Future Holdings Corp.*, 540 B.R. 109, 113–14 (Bankr. D. Del. 2015) ("This Court adopts that portion of Judge Walrath's ruling in *In re Washington Mutual, Inc.* in which she held that the legal rate of interest under sections 726(a) and 1129(a)(7) is the Federal judgment rate.") (internal citation omitted); *In re Dow Corning Corp.*, 237 B.R. 380, 412 (Bankr. E.D. Mich. 1999) ("[T]he Court concludes that, within the context of § 726(a)(5), 'interest at the legal rate' means the federal judgment rate."). In addition to the case law analyzing section 726(a)(5) of the Code, decisions of the Second Circuit have held that allowed claims in liquidating bankruptcy cases are "entitled to be treated as judgments" entered in federal court, and the federal judgment rate applies to such judgments. *See In re John Osborn's Sons & Co.*, 177 F. 184 (2d Cir. 1910); *Cappiello v. ICD Publ'ns, Inc.*, 720 F.3d 109, 112-15 (2d Cir. 2013). The Court finds no basis to disregard such precedent and apply the English Statutory Rate here.

24. For all of the foregoing reasons, the Objection is sustained as provided herein.  The Court holds that the interest rate applicable to the Allowed Claim is the federal judgment rate set forth in 28 U.S.C. § 1961(a) that was in effect on the day that LBCC commenced its chapter 11 case – 1.59 percent.

25. The parties are directed to submit an order fixing the allowed amount of postpetition interest on the Allowed Claim consistent with this Order.

Dated: January 12, 2017
New York, New York

/S/ Shelley C. Chapman
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE