Dennis H. Tracey, III
Robin E. Keller
William M. Regan
Benjamin J.O. Lewis
John D. Beck
**HOGAN LOVELLS US LLP**
875 Third Avenue
New York, New York 10022
Tel.: (212) 918-3000
Fax: (212) 918-3100
*Attorneys for QVT Fund LP and*
*Quintessence Fund L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- X
In re:                                                                  :   Chapter 11
                                                                           :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :   Case No. 08-13555 (SCC)
                                                                           :
                                    Debtors.                        :   (Jointly Administered)
----------------------------------------------------------- X

**PRE-TRIAL BRIEF OF CLAIMANTS**
**QVT FUND LP AND QUINTESSENCE FUND L.P.**
**IN SUPPORT OF ALLOWANCE OF CLAIMS**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT ................................................................... 1

FACTUAL BACKGROUND ...................................................................... 7

    A.    QVT and the QVT ISDA Agreements .......................................... 7

    B.    The QVT Claims ...................................................................... 9

    C.    The ISDA Termination Process ............................................... 11

        i.    Notice of Early Termination Date ................................ 11

        ii.    Market Quotation Solicitation Process ........................ 12

        iii.    QVT's Calculation Statement ..................................... 15

    D.    Overview of QVT's Loss Determination Process ...................... 16

BURDEN OF PROOF ............................................................................. 17

ARGUMENT ......................................................................................... 19

    I.    The ISDA Agreements Provide QVT Great Discretion as the Non-defaulting Party. ................................................................... 19

    II.    QVT Acted In Good Faith in Seeking Market Quotations and Reverting to Loss. ........................................................................ 21

        A.    QVT's Choice of Timing for the Market Quotations Was in Good Faith. ....................................................................... 21

        B.    The Inadvertent Exclusion of Certain Positions Does Not Evidence Bad Faith. ................................................................ 24

        C.    QVT's Reversion to Loss Is Proper for the Missing Market Quotation Positions. ............................................................... 24

    III.    QVT Determined its Loss under the ISDA Agreements Reasonably and in Good Faith. ........................................................ 26

        A.    Case Law Recognizes the Great Deference Afforded Non-defaulting Parties and Establishes a High Bar to Show Lack of Good Faith. ....................................................................... 26

        B.    QVT's PCDS Determination was Reasonable and in Good Faith. ........... 32

            i.    The Economics of CDS and the PCDS Transactions ................... 33

            ii.    QVT's Proxy Method to Value the PCDS Was Reasonable and Reflected the Underlying Economics of the PCDS Transactions. ....................................................... 35

i

## TABLE OF CONTENTS
### (continued)

Page(s)

iii.     Lehman's After-the-Fact Attacks on QVT's PCDS Methodology are Not Based in Sound Economic Theory and Should be Dismissed. ................................................................. 38

C.     QVT's CARB Determination was Reasonable and in Good Faith. ........... 40

D.     QVT's Corporate and Sovereign CDS Calculation was Reasonable and in Good Faith. .................................................................... 43

i.     QVT Selected Dates for Markit Data Reasonably and in Good Faith, as There were No Reasonable Determinants of Value as of September 15, 2008 for Many of its Positions. .......... 44

ii.     QVT Made Reasonable Mid-Bid and Mid-Ask Adjustments for the Markit-based Loss Transactions. ....................................... 46

E.     QVT's Mortgage CDS Calculation was Reasonable and in Good Faith. ............................................................................. 47

F.     QVT's Interest Rate Swap Calculation was Reasonable and in Good Faith. ............................................................................ 48

IV.     Lehman's Pre-Default Marks Are Irrelevant to a Close-Out Valuation. .............. 49

V.     QVT's Collection Fees and Costs are Recoverable from LBSF .......................... 51

VI.     The Opinions of Lehman Experts Professor Engle and Mr. Weiser Should Be Excluded as They Are Neither Relevant Nor Reliable. ................................... 52

A.     Professor Engle's Analysis Is Irrelevant, Unreliable and Inadmissible. ........................................................................ 53

B.     Sam Weiser's Opinions are Irrelevant and Inadmissible. ......................... 55

VII.     Motions *In Limine* .................................................................. 56

A.     Lehman Should be Precluded from Offering any Evidence, Testimony, or Argument at Trial Involving any Claims of any of Lehman's Other PCDS and CARB Counterparties. ................................ 56

B.     Lehman Should be Precluded from Introducing Evidence of QVT's Post-filing Valuations of the QVT Claims against Lehman. .................... 58

CONCLUSION ............................................................................ 59

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Amtrak,*
  303 F.3d 256 (2d Cir. 2002) ................................................................52

*Anthracite Rated Investments (Jersey) Ltd. v. Lehman Brothers Finance S.A.,*
  [2011] EWHC 1822 (Ch) ................................................................28

*In re Arcapita Bank B.S.C.(c),*
  508 B.R. 814 (S.D.N.Y. 2014) ................................................................18

*Atkins v. Cty. of Orange,*
  372 F. Supp. 2d 377 (S.D.N.Y. 2005) ................................................................58

*Barbara v. MarineMax, Inc.,*
  No. 12-CV-0368 (ARR)(RER), 2013 WL 4507068 (E.D.N.Y. Aug. 22, 2013),
  aff'd, 577 F. App'x 49 (2d Cir. 2014) ................................................................18, 29

*Barclays Bank plc v. Unicredit Bank AG,*
  [2014] EWCA Civ 302, [2014] 1 CLC 342 ................................................................28

*Bickerstaff v. Vassar Coll.,*
  196 F.3d 435 (2d Cir. 1999) ................................................................52

*Canon Inc. v. Tesseron Ltd.,*
  146 F. Supp. 3d 568 (S.D.N.Y. 2015) ................................................................18

*CDO Plus Master Fund Ltd. v. Wachovia Bank,*
  No. 07-Civ-11078 (LTS) (AJP), 2011 WL 4526132 (S.D.N.Y. Sept. 29, 2011) ................26

*CDO Plus Master Fund v. Wachovia Bank,*
  No. 07-Civ-11078, 2010 WL 3239416 (S.D.N.Y. Aug. 16, 2010) ................................51

*Dalton v. Educational Testing Serv.,*
  87 N.Y.2d 384 (1995) ................................................................18, 29

*Daubert v. Merrell Dow Pharms., Inc.,*
  509 U.S. 579 (1993) ................................................................52, 54

*In re Fairfield Exec. Assoc.,*
  161 B.R. 595 (D.N.J. 1993) ................................................................59

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*First Niagara Bank  v. Mortg. Builder Software, Inc.*,
   No. 13-CV-592S, 2016 WL 2962817 (W.D.N.Y. May 23, 2016)..........................................18

*Fondazione Enasarco v. Lehman Brothers Finance S.A.*
   [2015] EWHC 1307 (Ch) ...............................................................................................44

*Gan Insurance Co Ltd. v. Tai Ping Insurance Co Ltd. (No. 2)*,
   [2001] EWCA Civ 1047, [2012] CLC 1103 ..........................................................................28

*Good Hill Master Fund L.P. v. Deutsche Bank AG*,
   2017 WL 329105 (1st Dep't Jan. 24, 2017)..........................................................................30

*Good Hill Master Fund L.P. v. Deutsche Bank AG*,
   No. 600858/2010, 2016 WL 3580032 (Sup. Ct. N.Y. Cnty. Feb. 3, 2016) ......................29, 30

*The High Risk Opportunities Hub Fund Ltd. v. Credit Lyonnais*,
   No. 600229/00, 2005 WL 6234513 (Sup. Ct. N.Y. Cnty. July 6, 2005) ..........................24, 25

*HLT Existing Franchise Holding LLC v. Worcester Hospitality Group, LLC*,
   994 F. Supp. 2d 520 (S.D.N.Y. 2014)..................................................................................18

*JP Morgan Chase Bank v. Controladora Comercial Mexicana S.A.B. de C.V.*,
   No. 603215/08, 2010 WL 4868142 (Sup. Ct. N.Y. Cnty. Mar. 16, 2010) .............................51

*Kirke La Shelle Co. v. Armstrong Co.*,
   263 N.Y. 79 (1933) ..........................................................................................................29

*Laumann v. National Hockey League*,
   117 F. Supp. 3d 299, 315-16 (S.D.N.Y. 2015) ...............................................................53, 54

*In re Lehman Bros Holdings Inc.*,
   No. 08-13555, 2015 WL 7194609 (Bankr. S.D.N.Y. Sept. 16, 2015)............................ *passim*

*Lehman Bros. Intern. (Europe) v. AG Financial Products, Inc.*,
   969 N.Y.S. 2d 804 (Sup. Ct. N.Y. Cnty. 2013) ....................................................................30

*Lehman Brothers Finance S.A. v. Oppenheim*,
   [2014] EWHC 2627 (Comm).............................................................................................25

*In re Lorraine Castle Apartments Bldg. Corp.*,
   149 F.2d 55 (7th Cir. 1945) .............................................................................................59

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Ludgate Ins. Co v. Citibank* ,
    [1998] EWHC 1144, [1998] Lloyd's Rep IR 221...................................................28

*Merrill Lynch Capital Servs., Inc. v. UISA Fin.*,
    No. 09-Civ-2324 (RJS), 2012 WL 1202034 (S.D.N.Y. Apr. 10, 2012) ....................26, 27, 31

*Mich. State Hous. Dev. Auth. v. Lehman Brothers Derivative Prods. Inc.*
    *(In re Lehman Bros. Holdings, Inc.)*, 502 B.R. 383 (Bankr. S.D.N.Y. 2013) ........................47

*In re Mirena IUD Prod. Liab. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016).....................................................................58

*In re Oneida, Ltd.*,
    400 B.R. 384 (Bankr. S.D.N.Y. 2009) ...................................................................18

*Paragon Finance plc v. Nash*,
    [2002] EWCA Civ 1466, [2002] 1 WLR 685 ...........................................................28

*S & K Sales Co. v. Nike Inc.*,
    816 F.2d 843 (2d Cir. 1987)..............................................................................27

*Socimer Bank Ltd. v. Standard Bank Ltd.*,
    [2008] EWCA Civ 116, [2008] Bus LR 1304 .........................................................28

*Titus v. Bank One*,
    No. C04-5102FDB, 2005 WL 1667767 (W.D. Wash. 2005) .................................51

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
    487 F.3d 89 (2d Cir. 2007)...........................................................................18, 26

*Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*,
    549 U.S. 443 (2007)........................................................................................52

*United States v. Mejia*,
    545 F.3d 179 (2d Cir. 2008)...........................................................................52

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)...........................................................................52

*URSA Minor v. AON Fin. Prods.*,
    No. 00 Civ. 2474 (AGS), 2000 WL 1010278 (S.D.N.Y. July 21, 2000)................51

*Wagner v. JP Morgan Chase Bank*,
    No. 06 Civ. 3126 (RJS), 2011 WL 856262 (S.D.N.Y. March 9, 2011) .................29

# TABLE OF AUTHORITIES
## (continued)

Page(s)

**Statutes**

Bankruptcy Code § 502 ...........................................................................................18

Bankruptcy Code § 562 ..................................................................................18, 37, 44

**Other Authorities**

Fed. R. Bankr. P. 3001(f) ........................................................................................18

Fed. R. Bankr. P. 7026 .............................................................................................58

Fed. R. Bankr. P. 7037 .............................................................................................57

Fed. R. Bankr. P. 9014 .............................................................................................18

Fed. R. Civ. P. 26(a) ...............................................................................................57

Fed. R. Civ. P. 37 ................................................................................................57, 58

Fed. R. Evid. 401 ...................................................................................................54

Fed. R. Evid. 702 ...............................................................................................52, 54

H. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 134-135 (2005) .............................................44

## PRELIMINARY STATEMENT

The failure of Lehman Brothers marked a dramatic turning point in the financial crisis. Up until that point, the crisis had been steadily gathering force, but earlier interventions by the Federal Reserve and the U.S. Treasury made it seem possible, perhaps even likely, that a financial panic could be averted. The risk that Lehman's failure would push Merrill Lynch, AIG, Goldman Sachs, Morgan Stanley, Citigroup and others into insolvency seemed so disastrous that QVT[1] did not believe that regulators would allow Lehman to fail through an uncontrolled bankruptcy proceeding without at least trying to support its market-facing and over-the-counter derivative functions.

The Court is of course quite familiar with the financial crisis and the fact that Lehman's bankruptcy petition set off the most chaotic, volatile and illiquid market environment since the Great Depression. Nonetheless, it is worth recalling key events that provide context for the task that fell to QVT as a result of Lehman's bankruptcy petition. Bear Stearns had failed in March 2008 and was forced by its regulators to "merge" with JPMorgan. On September 6, the U.S. Government placed Fannie Mae and Freddie Mac into receivership, bailing out their bondholders, forcing their preferred stocks to defer dividends, and essentially wiping out their public stockholders. Merrill Lynch was forced to "merge" with Bank of America on September 14. Lehman filed and began to liquidate on September 15. The $85 billion AIG bailout was announced September 16. The markets were speculating that Morgan Stanley and Goldman Sachs could themselves be driven into bankruptcy. European financial institutions were in similar positions, with some of the largest banks requiring government support ranging from deposit guarantees to direct public capital injections.

---

[1] QVT Fund LP ("QVT Fund") and Quintessence Fund L.P. ("Quintessence") are managed by QVT Financial LP ("QVT Financial"), an investment manager. Unless otherwise indicated, this Brief refers to QVT Fund, Quintessence and QVT Financial collectively as "QVT."

1

After Lehman's failure, liquidity, which already had been disappearing from markets since the beginning of 2008, contracted sharply, risky assets immediately fell dramatically, and market prices began to imply a significant probability that many of the nation's largest financial institutions were at risk of similar collapse. This negative feedback loop, the essence of a financial panic, was the worst such occurrence since at least the Great Depression, and the speed of its transmission was far faster due to modern market innovations. Without a doubt, it was the most frightening and difficult moment that the financial market participants active at that time had ever had to manage. QVT lost $1 billion in September 2008 alone and over $1.8 billion more by the end of 2008.

It was in this environment that QVT's Early Termination of its 1992 ISDA Master Agreements with Lehman (hereafter, the "ISDA Agreements") took place on September 15, 2008, and in which QVT determined the cost of replacing more than $3 billion notional amount of credit default swap ("CDS") protection—protection heavily weighted toward the financial institutions most directly affected by the crisis.

Prior to Lehman's bankruptcy, QVT had more than $12 billion in assets under management with the vast majority of that total contributed by outside investors.  To protect its portfolio against the risk of a potential financial crisis arising out of the toxic mixture of declining credit quality and high leverage that it saw developing in 2006 and 2007, QVT entered into a series of CDS transactions with major dealers including Lehman.  For the vast majority of the CDS transactions with Lehman, QVT "bought protection," meaning that Lehman was obligated to pay QVT an agreed notional value, if the designated "reference entity" covered by the protection experienced a credit event such as bankruptcy.

2

The CDS market in 2008 was an over-the-counter market. Unlike exchange-traded equities, where traders have continuous access to actionable bids and offers as well as real-time transaction data, CDS users (both customers and dealers) had no such transparency and were never guaranteed the ability to transact. There was no "tape" that broadcasted prices to the CDS market; to the contrary, only the counterparties in a bilateral CDS trade were aware of the prices at which CDS transacted. CDS pricing services, such as Markit Partners ("Markit"), were not reporting a "last" or "closing" price as in the equity markets, but rather the aggregation of dealers' opinions about where a CDS might transact at the end of the day, usually when they marked their respective books. At least in part due to this lack of transparency, CDS dealers provided liquidity at their own discretion, and in a way consistent with their risk appetite and product specializations. As a customary matter, CDS dealers always had the right to refuse to provide bids or offers (to "pass"). In a very volatile market, or for less liquid CDS, customers could find that there was simply no "on demand" dealer trading at any given point in time. Conversely, CDS dealers created their own "bespoke" products that only they traded; if a dealer were to trade another dealer's bespoke product, it would, even in a normal market, be expected to charge a hefty premium.

QVT's CDS portfolio included some large and unusual transactions invented by and sourced exclusively through Lehman. These CDS provided protection on some of the most vulnerable financial exposures impacted by the crisis, including subordinate tranches in securitizations of automobile loans (CARB) and the risks of dividend deferral or default on the preferred stocks of financial institutions (PCDS).  These CARB and PCDS transactions represent approximately 82% of the difference in valuation between QVT and Lehman at issue in this case. Lehman was the *only* or *by far dominant* dealer in these products, and these products combined

3

had seen only *a single trade* since July 2008. Getting a replacement trade for QVT's very large

positions in these bespoke products, which were uniquely exposed to the risk of financial

contagion, from a different dealer that had never traded the product, in the most challenging

market in memory, would have been virtually impossible.  In the unlikely event that a dealer

willing to trade such products could have been found, that dealer would have charged a

significant premium intended to compensate it fully for the risks and costs it would incur in a

climate of illiquidity and financial panic.  Dealers generally were scrambling to *reduce* their risk

after Lehman failed, not to take on large, new trades that amplified their existing risk, and

especially in products for which they had not previously made markets.

QVT acted in good faith in complying with the requirements of the ISDA Agreements

relating to Early Termination and with the requirements imposed by the bankruptcy process.  In

so doing, QVT undertook a reasoned valuation process to determine the "Settlement Amount" of

the QVT Transactions.  QVT performed its valuation largely over the two weekends following

Lehman's collapse, because during the work week it was managing and actively trading a

portfolio of tens of billions of dollars of securities, derivatives and other instruments that was

severely adversely impacted by Lehman's filing and the ensuing market declines.

QVT both solicited Market Quotations on its portfolio and executed replacement trades,

and generally used these to determine its claim amount when they were available. However, on

the majority of its portfolio, both by notional and market value, Market Quotations and

replacement trades were not available. Thus, QVT reverted to determining its Loss on the

majority of its portfolio, and QVT was faced with the question of estimating what dealers would

charge for not only replacing less liquid, or wholly illiquid, CDS positions, but also, what they

would charge for taking "wrong-way" risk, *i.e.*, for taking on more illiquid credit risk by offering

4

billions of dollars of CDS protection on reference entities that could substantially widen before the dealers could hedge themselves.

QVT had never performed an ISDA close-out process before and was not an expert at it. More than eight years after its own default, Lehman tries to inflate a few minor, inadvertent errors in QVT's Market Quotation process into a full-blown attack on QVT's good faith.  It also claims that there are other (and in Lehman's view, better) ways to calculate QVT's Loss. But those arguments miss the point.  The Loss provisions of the ISDA Agreements ensure that there can be—and particularly for large, illiquid, non-standard positions will be—many ways for the Non-defaulting Party to value *its* loss for a terminated position, and accordingly that there could be a range of possible values that are reasonable.   Where Market Quotations are unavailable, the ISDA Agreements give broad discretion to the Non-defaulting Party to determine its Loss, including the loss of its bargain, by any method determined reasonably and in good faith.

During the trial of this case, Lehman will present experts to say they disagree with QVT's valuation.  But that is not the standard.  It is only if QVT's method is determined to be unreasonable or in bad faith that Lehman can offer an alternative.  QVT believes that the Court will conclude at the end of the trial that there is *not a whit of evidence* of bad faith.  And Lehman's arguments that QVT's valuations are unreasonable will have been rebutted both by (i) a review of QVT's process as described by the individuals who performed it and as vetted by Professor Paul Pfleiderer, the C.O.G. Miller Distinguished Professor of Finance at the Graduate School of Business at Stanford University, as well as (ii) an independent, after the fact, bottoms-up re-evaluation of PCDS and CARB using additional data sources that resulted in a comparable outcome. The bottoms-up re-evaluations, using a different methodology, were conducted by the risk management consulting firm Capital Market Risk Advisors ("CMRA") over the course of

5

more than one year, underscoring the complexity of the valuation task faced by QVT.  Although

QVT had only a few weeks to perform its own analysis due to the requirements of prompt

submission of the Calculation Statements under the ISDA Agreements, its valuations of both

CARB and PCDS are highly consistent with the results of CMRA's much more extensive, after-

the-fact analysis.

Lehman's representatives have never grasped QVT's unique exposures to Lehman's

failure due to the size of QVT's illiquid positions in PCDS and CARB.  Instead, Lehman's

positions at the trial will be based on the same rigid, ill-founded arguments that Lehman raises in

almost every derivatives dispute:  (i) non-defaulting counterparties were obligated to base their

claims on actual replacement trades or on prices only from the Early Termination Date (even if

those prices were merely stale quotes that provided little or no information about the price at

which QVT could have actually entered into a replacement transaction); and (ii) at the mid-point

of the market without application of a reasonable bid-mid or mid-ask spread.  Additionally,

Lehman apparently will argue that QVT is bound in determining its Loss by pre-bankruptcy

margin marks generated by Lehman.  This argument is baseless for many reasons, including that:

(i) such marks are mid-market indications at best (and clearly not QVT's side of the market); (ii)

were supplied by Lehman itself; and (iii) pre-date Lehman's bankruptcy and therefore do not and

cannot reflect QVT's replacement costs in the vastly different world (and markets) that existed

after Lehman's filing.

Not one decision by this or any other Court that has considered the ISDA process affirms

any of Lehman's arguments.  Lehman's arguments are a reckless and unjustified assault on

accepted market practices, and the commercial context and express language of the close-out

provisions of the ISDA Agreements.  As explained by Professor Jeffrey Golden (ISDA's counsel

and an authority on the development and content of the 1992 ISDA forms): "It was never the intention that a Non-defaulting Party would be obligated to derive a provably correct figure for its Loss. Rather, the Non-defaulting Party's obligation is to make its determination reasonably and in good faith." Golden Opening Rpt. ¶ 22. The evidence will show that QVT performed a reasonable, good faith valuation, and that Lehman's objections are the very type of disagreements that the discretionary provisions of the ISDA Agreements were designed to avoid.

After hearing the evidence, this Court should overrule Lehman's baseless objections and allow QVT's claim in its entirety ($264,998,765) plus the cost of collection (over $13 million through December 31, 2016), and any other amounts to which it is entitled under the ISDA Agreements, as determined by this Court.

## FACTUAL BACKGROUND

### A.    QVT and the QVT ISDA Agreements

QVT Fund and Quintessence are investment funds managed by QVT Financial, a New York based hedge fund management company[2] that originated as a proprietary trading group inside an investment bank and became a stand-alone investment manager in 2003. At the time of Lehman's collapse, QVT had over $12 billion in assets under management, and a long and short portfolio of billions of dollars of securities, derivatives and other instruments across a wide variety of strategies.

By 2006, QVT had developed the view that the credit markets, while superficially healthy, were in fact at risk of significant distress. In particular, QVT was concerned that U.S. and European financial institutions were exposed to a potentially toxic combination of dangerous credit exposures (subprime lending and structured finance generally) and high leverage. QVT

---

[2] QVT Fund and Quintessence generally were managed so as to make parallel investments *pari passu* based on their respective capital. Generally, the Quintessence positions are about 10% of the size of the QVT Fund positions.

felt that these financial institutions faced increasing risk of significant deterioration in their credit

profiles—deterioration that could lead to great stresses on the global economy and markets

generally, deferral of dividends on their preferred stock and ultimately even default of those

institutions on their debt.  Despite this backdrop, credit markets were not only sanguine but

decidedly optimistic, with credit spreads (reflective of the market's view of risk) at historically

narrow levels.

QVT looked for opportunities to make investments that would perform well if such a

scenario materialized, and began entering into CDS contracts that would provide protection to

the QVT funds' portfolios in the event of such defaults, dividend deferrals or other credit events,

using credit derivatives as a way to short this risk cheaply and efficiently. Even if no credit event

occurred, contracts providing protection against such events would increase in value as the

economy deteriorated and the *risk* of credit events increased.  Lehman was an active market-

maker in such derivatives and became QVT's largest trading partner for credit derivatives.

Prior to the Lehman bankruptcy filings, QVT Fund and Quintessence each entered into

1992 ISDA Master Agreements dated February 25, 2005 and June 18, 2007, respectively,

including related Schedules, Confirmations and Credit Support Annexes with LBSF,[3] which

were supported by unconditional payment guarantees by LBHI.[4]  Under these ISDA Agreements

and related confirmations, QVT and Lehman were party to 836 transactions (the "QVT

---

[3] Both ISDA Agreements are substantially similar in all respects relevant to this case. *Compare* JX-0001 and JX-0002; *see also* Brumm 30(b)(6) Tr. 25:5-12.  Therefore, references and citations to "ISDA Agreements" include both agreements unless otherwise noted.

[4] QVT also had ISDA contracts and underlying transactions with Lehman Brothers Commodity Services Inc. ("LBCS"), Lehman Brothers OTC Derivatives Inc. ("LBOTC"), and had prime brokerage agreements with Lehman Brothers International (Europe) ("LBIE") and Lehman Brothers, Inc. ("LBI"). Claims asserted by QVT Fund and Quintessence against those Debtors have previously been settled and the claims allowed.

Transactions")[5] consisting of 834 CDS and 2 interest rate swaps.  Within the QVT Transactions,

QVT Fund and Quintessence held duplicate positions (except for size) in 417 of the QVT

Transactions.[6] CX-1020; *see* Brumm 30(b)(6) Tr. 24:25-25:12.

### B.    The QVT Claims

As the Credit Support Provider,[7] under Section 5(a)(vii) of the ISDA Agreements,

LBHI's Chapter 11 bankruptcy filing on September 15, 2008 constituted an Event of Default. In

accordance with Section 6 of the ISDA Agreements, upon an Event of Default, QVT, as the

Non-defaulting Party, had the right to designate an Early Termination Date for all outstanding

transactions and to calculate a Settlement Amount. JX-0067.  The QVT Claims[8] arise from the

termination of the QVT Transactions on September 15, 2008 (the "Early Termination Date").

*See* JX-0091; JX-0092; CX-1020.

QVT's portfolio with LBSF was large, with a long notional value of over $3 billion,[9] and

QVT was overwhelmingly a "protection buyer" from LBSF. Specifically, the QVT Transactions

with LBSF included:

> (i)    highly bespoke and illiquid CDS created by Lehman on preferred
> securities ("PCDS"), representing protection purchased by QVT against a
> default or dividend deferral of the preferred stocks of referenced financial
> institutions. QVT owned *68%* of the total notional amount of long PCDS
> protection outstanding in the market with respect to those reference
> entities;

[5] There were 828 original transactions between QVT and LBSF; however, because of partial implied writedowns, partial unsettled trade amounts and failed physical delivery combined with interest shortfalls, there are 836 valuation line items in the Calculation Statement.

[6] There were two single name corporate CDS transactions entered into by QVT Fund that were not entered into by Quintessence. The two QVT-only positions were CDS on Harrah's Entertainment (HET-111220_ds2.!) and First Data Corp. (FDC-110320_ds2.!).  *See* CX-1020.

[7] All capitalized terms not otherwise defined herein are given the meaning ascribed in the ISDA Agreements.

[8] At issue in this case are Claim No. 21217 (QVT Fund vs. LBSF in the amount of $237,941,254.57); Claim No. 21140 (QVT Fund vs. LBHI in the amount of $237,941,254.57); Claim No. 20421 (Quintessence vs. LBSF in the amount of $27,057,420.54); and Claim No. 21146 (Quintessence vs. LBHI in the amount of $27,057,420.54) (collectively, the "QVT Claims").

[9] "Notional" is the total size to which a transaction relates—for a CDS it is equal to the face value of underlying reference obligations covered by the CDS.  "Long" in this context refers to the position of the party who is the "protection buyer."

    (ii)      a highly bespoke and illiquid Auto CDS index created by Lehman called the "CDS on Auto Receivables Basket" (the "CARB Index" or "CARB"), representing protection purchased by QVT against the decline in value of subordinated tranches of automotive asset-backed securities with significant subprime borrower exposure. QVT owned *84%* of the total notional amount of long CARB protection outstanding in the market; and

    (iii)     more standard mortgage CDS, corporate and sovereign CDS, of varying degrees of liquidity, and two interest rate swaps.

QVT's valuation of the QVT Transactions totaled approximately $382 million before the offset of margin (collateral) that Lehman had posted with QVT and the return of initial margin posted by QVT with Lehman.[10] CX-1020.  After the offset of margin, which amount and offset is not in dispute between the parties, QVT's valuation of the principal amount of the QVT Claims is approximately $265 million ($264,998,675.00).[11] CX-1020.  The aggregate difference between the QVT Claims and Lehman's objection as filed in June 2011 [Dkt. No. 17468] (the "Objection"), seeking to reduce the principal amount of the QVT Claims to $52 million, is approximately $213 million.

However, Lehman's experts have now valued the QVT Claims between approximately $101 and $121 million (after offset of collateral), thus leaving a difference in valuation between the parties on the principal amount of the QVT Claims of approximately $144 to $163 million at present.[12]  As is illustrated below, QVT's highly illiquid PCDS and CARB positions together account for, at the midpoint of Lehman's valuation range, 82.1% of the difference between the parties' Loss calculations.

---

[10] CX-1010; CX-1011; CX-1012; CX-1013.

[11] CX-1010; CX-1011; CX-1012; CX-1013.

[12] Counsel for Lehman has advised QVT that "Lehman intends to rely only on the valuation reports provided by its expert witnesses at trial . . . [as] set forth in the expert reports." CX-2085 (Letter from Jones Day to Hogan Lovells, dated November 29, 2016).

| Derivative Type | QVT Claim Valuation ($MM) | Lehman Experts' Valuation ($MM) | Difference ($MM) | Average % of Dispute |
|---|---|---|---|---|
| Preferred CDS (PCDS) | 134.0 | 20.1-39.4 | 94.6-113.9 | 67.7% |
| Corp. and Sovereign CDS | 179.2 | 155.1 | 24.1 | 15.7% |
| Auto CDS (CARB) | 36.7 | 14.7 | 22.0 | 14.4% |
| Mortgage CDS | 26.3 | 23.8 | 2.5 | 1.6% |
| Interest Rate Swap | (4.7) | (5.5) | 0.8 | 0.5% |
| Unpaid Amounts[13] | 10.8 | 10.8 | – | – |
| Total Claim Before Collateral ($MM) | 382.3 | 219.0-238.3 | 144.0-163.3 | – |
| **Claim After Collateral Offset ($MM)** | **264.9** | **101.6-120.9** | **144.0-163.3** | **100%** |

## C.    The ISDA Termination Process

### i.  Notice of Early Termination Date

After LBHI filed for bankruptcy in the early morning on September 15, 2008, QVT's management met at its office to decide what actions to take to protect the funds against the risks stemming from Lehman's default.  QVT decided that in order to have certainty as to its positions in a volatile market it would terminate the ISDA Agreements and derivatives transactions with Lehman immediately. Gold Tr. 82:7-87:17; Chu Tr. 37:10-39:7, 39:20-41:12.  During the course of the morning, QVT engaged in a series of telephone and email communications with inside and outside counsel and compiled documentation and information related to their extensive relationship with various Lehman entities. Gold Tr. 123:3-125:7; Brumm 30(b)(6) Tr. 75:4-10. At 1:02 pm on September 15, 2008, QVT hand-delivered to Lehman a Notice of Event of Default (the "Termination Notice") establishing that day as the Early Termination Date. JX-0067.

---

[13] Lehman does not dispute QVT's determination of Unpaid Amounts.

11

### ii. Market Quotation Solicitation Process

Once QVT terminated the ISDA Agreements and established the Early Termination Date, it was required under Section 6 of the ISDA Agreements to calculate a Settlement Amount of the QVT Transactions "[o]n or as soon as reasonably practicable after" the Early Termination Date. In the ISDA Agreements, the parties had selected Market Quotation and the Second Method for payments on Early Termination.[14]  Under these provisions, QVT was obligated in the first instance to seek Market Quotations on terminated transactions to determine the Settlement Amount (and had bargained for this right in entering into the ISDA Agreements). *See JX-0004.*

Even prior to delivery of the Termination Notice, QVT began to prepare to conduct its Market Quotation process. *See JX-0051; JX-0053; JX-0054; JX-0056.*  QVT compiled a list of the open transactions with LBSF, including a description of each derivative, the referenced entity, notional amount and other information.  QVT also drafted a form template of Market Quotation to be sent to its selected Reference Market-Makers ("Market-makers") seeking quotes for replacement of its CDS positions with LBSF. Brumm 30(b)(6) Tr. 74:24-75:10.  The form Market Quotation included instructions that requested a quotation for each position listed in "an amount that [it] would pay to QVT (expressed as a negative number) or that [it] would require to be paid by QVT (expressed as a positive number) in consideration of an agreement between QVT . . .  and [the Market-maker] . . . ***as of  4:00 p.m.*** (New York time) on September 15th, 2008 in writing by return email to lehman@qvt.com." (emphasis added). JX-0057; JX-0058; JX-0059; JX-0060; JX-0061; JX-0068; JX-0104.

---

[14] Pursuant to Sections 6(e)(i)(3) and 14 of the ISDA Agreements, the "Settlement Amount" is determined by the "Non-defaulting Party" as the sum of the Market Quotations for the Terminated Transactions, or for those transactions where a Market Quotation cannot be determined, or would not (in the Non-defaulting Party's reasonable belief) produce a reasonable result, the Non-defaulting Party's "Loss" for each such transaction.

For purposes of soliciting Market-makers, QVT divided its positions into three categories of CDS based on the nature of the underlying reference obligation: (i) corporate and index CDS (together "Corporate CDS"); (ii) CDS on asset backed securities ("ABS"); and (iii) CDS on emerging markets ("EM").  For each category, QVT selected qualified Market-makers that QVT, based on its dealings with and understanding of the respective Market-makers, believed were best positioned to provide live, actionable quotes in response to the Market Quotations. Brumm Tr. 29:5-23.

With respect to Corporate CDS (which included PCDS), QVT sought Market Quotations from JPMorgan Chase, Morgan Stanley, Barclays and UBS. JX-0057; JX-0058; JX-00061; JX-0068. With respect to ABS, QVT sought Market Quotations from Morgan Stanley, JPMorgan Chase, RBS, Citibank, Barclays, Deutsche Bank and Bank of America. JX-0059.  With respect to EM, QVT sought Market Quotations from JPMorgan Chase, Morgan Stanley, Deutsche Bank, and UBS. JX-0060; JX-0104.

QVT sent all but one of its requests for Market Quotations to Market-makers between 2:57 pm and 3:30 pm—within 2 to 2 ½ hours after delivery of the Termination Notice (one Corporate CDS request was sent to Barclays at 3:44 pm.). JX-0057; JX-0058; JX-0059; JX-0060; JX-0061; JX-0068; JX-0104. Although QVT received responses from some of the solicited Market-makers before 4:00 pm, *see* CX-1277 and CX-1278, the majority of responses (11) arrived between 4:00 pm and 8:20 pm the night of September 15, with 5 responses received the next day, September 16. CX-1273; CX-1274; CX-1275; CX-1279; CX-1281; CX-1283; CX-1284; CX-1285; CX-1288; CX-1289; CX-1291; CX-1292; CX-1399; CX-

13

1400; CX-1402; CX-1403.  Every Market-maker that received a Market Quotation request responded on some (but not all) of QVT's positions.[15]

Although at least three Market-makers responded to each category of QVT's Market Quotation requests, QVT received one or two Market Quotations for only 173 of the QVT Transactions, and received the minimum of three market quotations required for a valid "Market Quotation" for only 12 of the QVT Transactions.  Accordingly, QVT used the Market Quotation responses to value those 12 transactions, and utilized the "Loss" provisions of the ISDA Agreements for the remaining QVT Transactions. In addition, QVT was able to determine its Loss for 82 of the QVT Transactions by utilizing prices from 62 replacement trades made from September 15 to September 18, 2008, with certain appropriate adjustments primarily for differences in available maturity dates (collectively, the "Replacement Trades").[16]

Although QVT intended to request Market Quotations on all of its open CDS positions with Lehman (and its personnel believed it had done so), in fact due to an error in compiling the list of positions, QVT failed to include 44 of the QVT Transactions (approximately 5% of the total number of requests for Market Quotations).[17]   Those 44 transactions related to the following categories of CDS: CARB (4 transactions); ABX (32 transactions); ITRAX9 Sub Fin (2 transactions); STSUP (2 transactions); MLMI (2 transactions); and the interest rate swaps

---

[15] Particular recipients at Barclays and JP Morgan did not respond to requests for Market Quotations for QVT's Corporate and ABS Market Quotations, respectively, but Barclays provided two ABS responses, CX-1283 and CX-1284, and JP Morgan provided a Corporate and EM response. CX-1288; CX-1285. A recipient at Morgan Stanley responded to an ABS solicitation on September 16, 2008 that "we are unable to provide levels at this time," making no mention of a perceived deadline. See CX-1408. Morgan Stanley nevertheless provided a Corporate and EM response. CX-1279; CX-1289.

[16] Lehman has not disputed QVT's entry into the Replacement Trades or Loss determinations based on those trades.

[17] QVT also did not seek Market Quotations for 38 fully written down trades, which it booked in QVT's system at $0, or for 36 unsettled trades (i.e., trades entered into but where Lehman's bankruptcy filing intervened during the 5-day settlement period of a CDS contract), which QVT unwound at the original transaction amount (a level favorable to Lehman).  Lehman has not asserted that such positions required Market Quotations. QVT's calculation of the Unsettled Trades was reasonable and in good faith, and indeed, as its method actually favored Lehman, contradicts Lehman's argument that QVT lacked good faith.

(2 transactions) (the "Missed Market Quotations").[18] As discussed below, believing the Market

Quotation process had failed for these transactions, as it had for the overwhelming majority of

the other QVT Transactions, QVT calculated the value of these positions based on the "Loss"

method under the ISDA Agreements.  QVT believes that it likely would not have received

quotations for the Missed Market Quotations in any event. This is not to say that QVT excluded

these positions from the Market Quotation process because it was likely to have to fall back to

Loss anyway:[19] the omission was simply an honest, inadvertent error.

For its remaining positions where Market Quotation was unsuccessful, QVT reasonably

determined its Loss in good faith based on methodologies adapted to the nature of the CDS and

the information at hand, in an effort to reasonably determine the loss of its bargain upon

Lehman's default under the ISDA Agreements.

### iii.  QVT's Calculation Statement

In order to calculate the replacement values of the QVT Transactions that were not based

on the Market Quotation process, the QVT traders met on the weekends of September 20, 2008

and September 27, 2008 to compile data and perform the Loss determinations necessary to

submit a calculation statement of QVT's "Settlement Amount" to Lehman. Chu Tr. 65:6-15.  As

discussed in greater detail below, individual QVT traders and portfolio managers were generally

tasked with valuing the positions that they were responsible for and regularly traded. Wollman

30(b)(6) Tr. 327:4-15.   QVT compiled these trader valuations into a master Excel spreadsheet

(CX-1020, the "QVT Workbook") containing all data and calculations underlying QVT's Loss

determination.  The QVT Workbook contains a list of QVT's positions that faced LBSF, as well

---

[18] QVT personnel did not realize that there was no evidence of requests for the Missed Market Quotations positions
until it was pulling together information in 2016 in connection with pre-trial document discovery in this matter.
Brumm Tr. 51:12-53:8; Wollman 30(b)(6) Tr. 372:15-374:12; Chu Tr. 48:7-16.
[19] Golden Rebuttal Rpt. ¶¶ 3(c), 40-41.

as relevant pricing data consisting of, among other things, Market Quotation responses, Markit composite pricing data, broker runs, and other data.[20] Wollman 30(b)(6) Tr. 220:18-233:16.

On October 15, 2008, QVT sent a letter and calculation statement (the "Calculation Statement") to Lehman detailing its calculation of Market Quotation and Loss for the QVT Transactions as derived from the QVT Workbook. JX-0091.  On October 16, 2008, QVT sent a revised calculation statement reflecting that it had offset approximately $117 million in margin (collateral), reducing its claim against Lehman to approximately $289,701,010. JX-0092.   On July 11, 2016, QVT filed amended versions of the QVT Claims, reducing the aggregate claim amount sought against Lehman to $264,998,675 due to calculation errors discovered after the delivery of the Calculation Statement in 2008 related to certain foreign exchange and accrued interest adjustments, as well as a double-counting of margin.[21] CX-1010; CX-1011; CX-1012; CX-1013.

### D.    Overview of QVT's Loss Determination Process

The specifics of QVT's Loss determination for particular categories of CDS transactions will be discussed in further detail throughout this Brief.  But, as QVT trader Joel Wollman leads the Court through the complexities of the QVT Workbook, it will become clear that QVT's valuation approach was straightforward and followed a clear information hierarchy, although deviations were permitted in the discretion of the individual traders based on their judgment of market conditions affecting their products.  The following criteria were applied to value the QVT Transactions:

---

[20] The "Response 2" tab of the QVT Workbook (CX-1020) contains valuations of all individual positions QVT Fund and Quintessence had with Lehman that make up the Calculation Statement and ultimately the QVT Claims, as well as descriptive information about the positions.

[21] These calculation errors had been disclosed to and discussed with Lehman since 2010, and at Lehman's request, the QVT Claims were formally amended in 2016.

1.  to the extent that QVT received the requisite number of Market Quotation responses, it utilized the Market Quotation methodology;

2.  if it did not receive Market Quotations but executed actual Replacement Trades, the Replacement Trade cost was used as the basis for its Loss (with certain appropriate adjustments primarily for differences in available maturity dates);

3.  for positions where it did not execute Replacement Trades, QVT traders utilized their judgment in selecting the most reliable market data as the basis for Loss from the following: (a) the one or two responses received through the Market Quotation process;[22] (b) data from third party pricing sources such as Markit; or (c) broker runs;

4.  for the highly illiquid products of PCDS and CARB, for which there were no direct market data, QVT Managing Member Arthur Chu (the one who had most actively traded these two products) used a proxy methodology based on available market data relating to the reference securities to determine the cost of replacing those positions as of September 15, 2008; and

5.  for a few remaining positions, including the interest rate swaps, QVT used standard market calculation models.

The evidence at trial will show that QVT's Loss determination was methodical, detailed, well-documented and based on commonly accepted principles of economics and finance.  QVT was entirely reasonable in its Loss determination, and there will be not a shred of proof that QVT acted in any way other than with the utmost good faith.

## **BURDEN OF PROOF**

As discussed in greater detail below, Section 6 of the ISDA Agreements afforded QVT, as the Non-defaulting Party, the discretion to determine its Loss so long as such determination was reasonable and in good faith.  Lehman's generic, boilerplate Objection is devoid of substantive analysis of the QVT Claims and Lehman has since moved a great distance from the valuation it put forward in its Objection.  Discovery has shown that there is no one at the Lehman estate today who performed, or has direct knowledge of, the valuations underlying the

---

[22] Some quotes were not used, the effect of which was to *lower* QVT's valuation of those particular positions.

Objection, and Lehman has repudiated the valuation in its own Objection, instead relying on the flawed and non-factual analyses of its experts. Although QVT, as claimant, accepts that it has the burden to establish its actions were reasonable (and in doing so believes the Court will see its good faith),[23] under New York law, Lehman bears the burden of proving that QVT did not act in good faith.[24] *See, e.g., Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) ("[S]ince there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith.").[25] However, regardless of how this Court determines the burden of proof issue, the evidence will overwhelmingly show QVT's good faith in determining its Loss.

---

[23] Pursuant to Section 502 of Title 11of the United States Code (the "Bankruptcy Code"), when a claimant properly files a proof of claim, it is presumptively deemed to have established "prima facie evidence of the validity and amount of the claim." *See* Bankruptcy Code § 502(a); Fed. R. Bankr. P. 3001(f). However, once a debtor or other party objects to the claim, the claim's validity and amount becomes a contested matter. Fed. R. Bankr. P. 9014. The objecting party "bears the initial burden of production and must provide evidence showing the claim is legally insufficient" under Section 502. *In re Arcapita Bank B.S.C.(c),* 508 B.R. 814, 817 (S.D.N.Y. 2014) (*citing In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009)). Once the objecting party has met this initial burden, the claimant must then prove "by a preponderance of the evidence that under applicable law the claim should be allowed." *Id.* (*citing In re Oneida*, 400 B.R. at 389); Bankruptcy Code § 502(b). Thus, Lehman as the objector has the initial burden of production, and QVT has the burden to prove by a preponderance of the evidence that the QVT Claims should be allowed.

[24] *See* discussion *infra* p.44 on the effect of Section 562 on burden of proof regarding availability of commercially reasonable determinants.

[25] In footnote 118 of this Court's decision in *Intel*, the Court stated that cases addressing breach of contract claims were not on point to determine the burden of proof with respect to the reasonableness of a Loss determination under an ISDA contract. *In re Lehman Bros Holdings Inc.*, No. 08-13555, 2015 WL 7194609, n.118 (Bankr. S.D.N.Y. Sept. 16, 2015) (hereinafter, "*Intel*"). However, QVT submits that breach of contract case law is controlling to determine the burden of proof on good faith under the ISDA Agreements, which was not at issue in *Intel*, because New York law provides that where a contract applies a standard of "good faith," but does not otherwise define the term, courts should look to cases interpreting the implied covenant of good faith and fair dealing. *E.g., Barbara v. MarineMax, Inc.*, No. 12-CV-0368 (ARR)(RER), 2013 WL 4507068, at *8 (E.D.N.Y. Aug. 22, 2013), aff'd, 577 F. App'x 49 (2d Cir. 2014). In the context of the implied covenant of good faith and fair dealing, courts routinely place the burden of proving a lack of good faith on the party asserting the absence of good faith. *See, e.g., id.; First Niagara Bank N.A. v. Mortg. Builder Software, Inc.*, No. 13-CV-592S, 2016 WL 2962817, at *6 (W.D.N.Y. May 23, 2016); *Canon Inc. v. Tesseron Ltd.*, 146 F. Supp. 3d 568, 581 (S.D.N.Y. 2015); *HLT Existing Franchise Holding LLC v. Worcester Hospitality Group, LLC*, 994 F. Supp. 2d 520, 537-38 (S.D.N.Y. 2014); *Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389 (1995).

# ARGUMENT

## I.    The ISDA Agreements Provide QVT Great Discretion as the Non-defaulting Party.

The ISDA Agreements provide great discretion to QVT, as the Non-defaulting Party, to (i) select the Early Termination Date, (ii) select the time, manner and form of Market Quotation requests in good faith, (iii) select the Market-makers who will receive those requests and (iv) determine its Loss, including the loss of its bargain or the loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, by any means chosen reasonably and in good faith.[26]

Section 14 of the ISDA Agreements defines both the "Market Quotation" process and "Loss."  The Market Quotation method requires the Non-defaulting Party to contact Market-makers[27] to request quotations on the "Terminated Transactions" that would "have the effect of preserving for such party the economic equivalent of any payment . . . that would, but for the occurrence of the . . . Early Termination Date have been required after that date." ISDA Agreements §14. The Non-defaulting Party is to request those Market Quotations "to the extent reasonably practicable as of the same day and time without regard to different time zones . . . on or as soon as reasonably practicable after the Early Termination Date." *Id*. The day and time must be selected in good faith, but the Market Quotation definition does not mandate that quotes be obtained *on* the Early Termination Date, nor does it dictate what time the quotes should be transmitted to or received from Market-makers. *See id*. If more than three quotations are provided, the Market Quotation shall be their arithmetic mean without regard to the highest or lowest values.  *Id*.  If exactly three quotations are provided, the Market Quotation shall be the

---

[26] As this Court has recognized, the words of the 1992 Form ISDA are not to be viewed in isolation, commercial practice and the situation of the determining party must be considered. *See Intel*, 2015 WL 7194609 at *11-12.

[27] "Reference Market-makers" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.  ISDA Agreements § 14.

quotation remaining after discarding the highest and lowest quotations. *Id.* However, "if fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined" and pursuant to Section 6(e)(i)(3) the Non-defaulting Party shall revert to Loss. *Id.* at §§ 14 and 6(e)(i)(3).

Once the Loss method is deemed to apply, the Non-defaulting Party has greater flexibility and discretion.[28] This flexibility was recognized by Lehman itself when it negotiated the settlement method with QVT in 2005 and advocated for Loss, stating:

> Lehman as a firm does not support the use of Market Quotation since for instance, it does not take into consideration loss of bargain, cost of funding, cost associated with re-establishing the hedge etc. . . . these costs can be significant especially in the case of credit default swaps and equity derivatives.

JX-0004 (Email from Renilde Zug of Lehman to Adam Metter, among others, of QVT).

Specifically, the ISDA Agreements define "Loss" in relevant part as:

> "Loss" means . . . an amount [the determining party] reasonably determines in good faith to be *its* total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement . . . , *including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position* (or any gain resulting from any of them) . . . *A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable.*

ISDA Agreements § 14 (emphasis added).

Thus, QVT was required to "reasonably determine in good faith" the amount of "its total losses and costs," "including any loss of bargain, cost of funding or . . . loss or cost incurred as a

---

[28] *See* Golden Opening Rpt. ¶ 77 ("There are thus certain mechanical aspects to the Market Quotation measure that must be followed, although even this measure carries with it significant flexibility and advantages for the Non-defaulting Party, as described in greater detail below. However, where parties opt instead for the Loss payment measure or, as here, it otherwise is deemed to apply, a Non-defaulting Party has substantially greater flexibility, discretion, and advantage than when Market Quotation applies.").

result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading

position . . . as of the Early Termination Date . . . or as of the earliest date thereafter as is

reasonably practicable." This is precisely what QVT has done.

## II.  QVT Acted In Good Faith in Seeking Market Quotations and Reverting to Loss.

QVT's Market Quotation process was performed with a diligent effort to follow the

requirements of the ISDA Agreements in selecting appropriate Market-makers to provide quotes

and in the manner and substance of the requests for Market Quotations.

### A.  QVT's Choice of Timing for the Market Quotations Was in Good Faith.

Lehman's assertion that the timing of QVT's Market Quotation process was in bad faith

is both completely unfounded and directly contradicted by evidence, industry practice, and

common sense.  Lehman claims that QVT gave Market-makers insufficient time to respond to

the Market Quotation requests, and suggests—without any basis—that QVT did so in order to

avoid or subvert the Market Quotation process.[29]  In fact, QVT acted diligently to seek Market

Quotations on the Early Termination Date, asked for quotations to replace trades "as of" that date,

and accepted all Market Quotation responses whenever received.  If QVT had set a time for

responses delayed by a day or more, Lehman would no doubt have complained that QVT did not

seek Market Quotations "as of the Early Termination Date."

As noted above, QVT carefully drafted its Market Quotation requests, compiled trade

information on nearly all of its more than 800 positions with Lehman, formatted the information

---

[29] Lehman has suggested, without any evidence whatsoever, that QVT chose September 15, 2008 as the Early
Termination Date because it knew it was a "very busy day," extrapolating from that obvious observation the
implication that QVT intentionally chose September 15 because it knew it would not get responses to Market
Quotation requests.  This argument is based on nothing more than rampant speculation without any evidentiary
support and is contradicted by what QVT did and why, and section 6(e) of the ISDA Agreements, which gives the
Non-defaulting Party absolute discretion to determine the Early Termination Date so long as that date is not earlier
than the day the termination notice is effective.  ISDA Agreements § 6(e).  As QVT witnesses will testify, it chose
September 15, 2008 because it valued certainty above all else and it was essential that QVT knew its risk exposure
after the Lehman collapse.  Gold Tr. 82:7-87:17; Chu Tr. 37:10-39:7, 39:20-41:12.

into multiple lists appropriate for the type of CDS, selected appropriate Market-makers, called many of those Market-makers in advance to inform them of the coming Market Quotation requests, and sent its Market Quotation requests by approximately 3:00 pm on the day of Lehman's filing—remarkably quickly on a very busy day, especially given that QVT had never before conducted a close-out process.

Consistent with the ISDA Agreements' requirement, QVT selected a single date and time (September 15 *as of 4:00 pm*) as of which Market-makers should provide quotations.  It is important to note that *QVT did not state in its Market Quotation solicitation* that quotes were required to be received by QVT *"by"* 4:00 pm—but rather, consistent with the requirement of the ISDA Agreements, that the quotes should be made *"as of"* 4:00 pm on the Early Termination Date.[30] 4:00 pm is typically the end of the formal trading day and the official closing time of the U.S. equity markets (although not a deadline for OTC market participants to communicate with each other; it was typical for CDS transactions in the New York markets to continue to take place until 6:00 pm and occasionally later).  This Court will hear that QVT's intent was not to try to undermine the Market Quotation process by limiting Market-makers' time to respond, and Lehman does not have a whit of evidence that this was the case.  Rather, QVT was making a good faith effort to comply with the mandate of the ISDA Agreements to receive Market Quotations on or as soon as reasonably practicable after the Early Termination Date. QVT accepted every Market Quotation response regardless of when it was provided, contradicting Lehman's assertion that QVT was conspiring to avoid using Market Quotations.

---

[30] Lehman attempts to confuse the "as of" time of the Market Quotation with a deadline for response.  To the contrary, the majority of Market Quotation recipients (10 of the 15) were not asked to provide quotations within any specific time frame. These recipients were simply asked to provide responses "as of 4:00 p.m." and clearly did not understand QVT to be asking for responses by that time, as many of them responded later that night and even the next day.  An email from one QVT trader to six recipients of the EM Market Quotation requests did state that "we would appreciate your responses by 4:00 pm today," but this email related only to the EM CDS, a small percentage of the overall QVT Transactions—only 44 of the total 836—and was not consistent with the timing set by the Market Quotation requests themselves.  JX-0104.

22

It is readily apparent that Market-makers did not believe QVT had placed any unilateral "deadline" on their responses. In addition to the two responses received before 4:00 pm, a majority of the responses (11 of 18) QVT received arrived between 4:00 pm and 8:20 pm the night of September 15, and QVT received five responses the next day on September 16 (in total providing quotations for 185 Transactions). Again, QVT accepted and used each and every response provided by Market-makers. Not a single Market-maker failed to provide some quotations. Lehman will no doubt point to one UBS trader responding to QVT's EM request and stating he was unable to provide a response by 4:00 pm, JX-0062; however, that very same trader provided a curve for Argentina bonds at 3:35 pm in response to that very same EM request.[31] CX-1277. Thus, QVT received a significant amount of responses given the market chaos and to suggest that QVT acted in bad faith or that it would have received more responses if it had selected a different "as of" time is nothing more than baseless conjecture.

As the Court will hear from QVT's market expert, Dr. Athanassios Diplas, an experienced trader, Senior Advisor to the Board of ISDA and one of the primary architects of ISDA's CDS settlement process (and who managed Deutsche Bank's credit close-out process with Lehman), the lack of responses was largely a product of the chaos and general aversion to risk present on September 15, 2008, not evidence of, as Lehman would have the Court believe, QVT's bad faith effort to set up the Market Quotation process for failure.[32] Diplas Rpt. ¶¶ 121-127. Market-makers simply were overwhelmed by the vast number of requests for quotations and their far more pressing need to obtain inter-dealer quotations for their own books, and thus,

---

[31] QVT's Market Quotation instructions requested that if a Market-maker was unable to provide a bid or offer to provide a curve of 1, 3, 5, 7 and 10-year points, which is exactly what the UBS recipient did. CX-1277.

[32] *See also* CX-1629 (Schuyler K. Henderson, Henderson on Derivatives 511-12 (Butterworths LexisNexis, 2d ed. 2010) ("The sheer size of Lehman's derivatives operations illustrated the limitations of the market quotation procedure under the 1992 ISDA master agreement. Given the volume of quotations and the crisis atmosphere, prices were volatile and quotes for even the most simple plain vanilla transactions varied widely. This threw into question, if not the validity of the quotes, their relation to reality. Some major dealers simply stopped giving quotes or limited the number of transactions for which they would provide quotes.")).

at most, prioritized requests from their largest and best counterparties. *Id.* at ¶ 122.  QVT's witnesses will testify that they had no way to know what the conditions would be in response to their Market Quotation requests, and that their goal was to follow the process set forth in the ISDA Agreements.

### B.    The Inadvertent Exclusion of Certain Positions Does Not Evidence Bad Faith.

QVT intended to seek Market Quotations for all of its positions with Lehman and in fact did so for the vast majority of its positions. But due to a good faith error, QVT did not do so for a small number (44 out of 836) of its positions.  As Lehman's ISDA expert admits, these omissions by themselves are not evidence of bad faith on the part of QVT. *See* Henderson Tr. 177:9-14 ("Q: Could a determining party making an innocent mistake in the Market Quotation process do so without being deemed to have acted in bad faith? A: Yes, because I would regard innocent -- equate innocent with acting in good faith.").  QVT determined Loss on these positions in good faith, thinking it had simply not received any Market Quotations.

### C.    QVT's Reversion to Loss Is Proper for the Missing Market Quotation Positions.

The ISDA Agreements do not expressly address the result of a failure to comply with the requirement for seeking Market Quotations and courts have addressed this question in two different ways.   In *The High Risk Opportunities Hub Fund Ltd. v. Credit Lyonnais*, No. 600229/00, 2005 WL 6234513 (Sup. Ct. N.Y. Cnty. July 6, 2005), the court held that when the Market Quotation process fails (including because of bad faith of the determining party), the ISDA contract provides that the parties should default to Loss.  *Id.* at *6-9.  Lehman has adopted this position in other cases.  For example, in its adversary proceeding against Federal Home Loan Bank of Cincinnati ("FHLB")—where Lehman was "in the money" and it was therefore advantageous to do so—Lehman argued that FHLB's purportedly improper market requests to

24

reference Market-makers "should have caused the Market Quotation process to fail and FHLB to

resort to a Loss calculation, as expressly contemplated by the Master Agreement." LBSF Pretrial

Brief at p.3 [Adv. Dkt. No. 54], *LBSF v. Federal Home Loan Bank of Cincinnati* (Adv. Proc. No.

13-01330 (SCC)).  Thus, under the *High Risk* case and Lehman's own interpretation, any failure

by QVT in the Market Quotation process would result in reversion to the Loss measure under the

ISDA Agreements.

A different approach was taken by the English court in *Lehman Brothers Finance S.A. v.

Oppenheim* [2014] EWHC 2627 (Comm), an automatic early termination case triggered by

LBHI's filing.  There, the court found there was no evidence the Non-defaulting Party had

actually sought Market Quotations from four reference market-makers, and the data presented

were a retrospective valuation, back to September 12, 2008, not the 15th or even the 16th.

Finding a pre-Automatic Early Termination Date quotation inapplicable, the court determined

that quotations were available as of the 16th, and that: "In the absence of the [Non-defaulting

Party] having performed those obligations, the court must plainly do its best to reconstruct what

the Market Quotation route would have arrived at." *Id.* at ¶ 35.

The evidence will show that the *Oppenheim* decision is not pertinent on its facts to

QVT's case, whereas application of the reversion to Loss ruling in *High Risk,* apart from the

apparent bad faith of the determining party there, which is not present here, is the more

appropriate remedy. But even applying the *Oppenheim* approach, with respect to QVT's CARB

position, due to the unique nature of the CARB product, its illiquidity, dealers' aversion to taking

on new risk, and the large position held by QVT, it is highly unlikely that QVT would have

received quotations from any Market-makers, and the result would have been to revert to Loss.

This conclusion is reinforced by the fact that QVT did not receive at least three Market

25

Quotations on a number of far more standard and liquid products. *See, e.g.*, CX-1020. Thus, QVT's Loss determinations for the Missing Market Quotation positions should, if found to be reasonable and in good faith, be accepted.

### III.    QVT Determined its Loss under the ISDA Agreements Reasonably and in Good Faith.

The Loss definition does not require the Non-defaulting Party to use any particular methodology in determining its Loss, but instead permits it to use *any* methodology it chooses, so long as such methodology is reasonable and in good faith. *See Intel*, 2015 WL 7194609 at *24. Evidence at trial will show that QVT performed its Loss determinations reasonably, thoughtfully and in good faith, and Lehman's assertions to the contrary are unsupported by any credible basis and motivated solely by Lehman's desire to reduce the allowable claim.

### A.    Case Law Recognizes the Great Deference Afforded Non-defaulting Parties and Establishes a High Bar to Show Lack of Good Faith.

There has been little U.S. case law interpreting the "reasonableness" requirement of the 1992 ISDA Master Agreement's Loss definition, despite the huge volume of ISDA derivatives traded. Professor Jeffrey Golden explains that the flexibility and discretion granted to the Non-defaulting Party were deliberately intended to minimize the risk of litigation and second-guessing of a calculation made reasonably and in good faith. Golden Opening Rpt. ¶¶ 71-74; Golden Rebuttal Rpt. ¶ 71. In *CDO Plus Master Fund Ltd. v. Wachovia Bank*, No. 07-Civ-11078 (LTS) (AJP), 2011 WL 4526132 (S.D.N.Y. Sept. 29, 2011), the District Court referenced established Second Circuit law providing that "[t]he law of New York is clear that once the fact of damage has been established, the non-breaching party need only provide a 'stable foundation for a reasonable estimate [of damages].'" *Id.* at *2 (citing *Tractebel*, 487 F.3d at 111).

Similarly, in *Merrill Lynch Capital Servs., Inc. v. UISA Fin.*, No. 09-Civ-2324 (RJS), 2012 WL 1202034 (S.D.N.Y. Apr. 10, 2012), the court reviewed and allowed Merrill's claim for

26

damages arising from the termination of derivatives transactions, including reasonable attorneys' fees, noting that "[b]eginning in September 2008, the world's financial markets entered a period of unprecedented volatility." *Id*. at *4. On damages, the court referenced New York's standard measure of damages for breach of contract, stating that Merrill must "establish with certainty that it suffered some loss, but 'it need not prove the amount of loss with certainty.' Rather, it need only provide 'a sound basis for approximating with reasonable certainty the [amount] lost.'" *Id*. at *22 (quoting *S & K Sales Co. v. Nike Inc.*, 816 F.2d 843, 852 (2d Cir. 1987)).

As QVT did in this case, Merrill attempted initially to calculate its damages under the Market Quotation method of the ISDA contract, turning to Loss when the necessary quotes were not available. The defendants argued that Merrill did not make a reasonable, good faith attempt to calculate its damages under the Market Quotation method. *Id.* at *23. The court found that there was "no evidence that Merrill did anything other than what it was required to do under the ISDA Master Agreement" as it sought "live quotes" from the required number of reference Market-makers. *Id*. The court noted and accepted Merrill's expert testimony that "[i]t is not at all surprising that [Merrill] did not obtain three quotes in response to its request. October 2008 was a particularly volatile and stressful period for financial markets." *Id.* The court then held that Merrill provided a "sound basis" for its Loss by using "objective market data" and the industry standard model for valuing options, noting that Merrill's independent expert also performed three alternative calculations, one of which was higher than Merrill's Loss determination. *Id.*

English courts have similarly held that determination of Loss under the ISDA contract is a discretionary decision and courts should not substitute their own view for that of the determining party; rather, courts should review a Non-defaulting Party's Loss determination only on a rationality basis and not interfere unless the decision-maker has made a decision which no

27

reasonable decision-maker would make.  *See Ludgate Insurance Co v. Citibank NA* [1998]

EWHC 1144 [¶¶ 35-36], [1998] Lloyd's Rep IR 221; *Gan Insurance Co Ltd v. Tai Ping*

*Insurance Co Ltd (No. 2)* [2001] EWCA Civ 1047 [¶¶ 64, 67 and 73], [2012] CLC 1103;

*Paragon Finance plc v. Nash* [2002] EWCA Civ 1466 [¶41], [2002] 1 WLR 685; *Socimer Bank*

*Ltd v. Standard Bank Ltd* [2008] EWCA Civ 116 [¶¶ 61-66], [2008] Bus LR 1304; *Barclays*

*Bank plc v. Unicredit Bank AG* [2014] EWCA Civ 302 [¶ 20], [2014] 1 CLC 342.

In *Anthracite Rated Investments (Jersey) Ltd. v. Lehman Brothers Finance S.A.* [2011]

EWHC 1822 (Ch), Lehman S.A. argued that calculating Loss on the basis chosen by the Non-

defaulting Party produced "a fictitious loss widely at variance with [that party's] real gain." *Id.*

at ¶ 19(6). The English court rejected that argument, holding that Loss permitted flexibility in

approach and Lehman S.A. had failed to show that the technique employed by the Non-

defaulting Party for determining its Loss was unreasonable.  *Id.* at ¶ 127.  It was not enough to

demonstrate that the gain to the counterparty was different from the Loss calculated by the Non-

defaulting Party: "[I]t is by no means axiomatic that, in relation to derivatives, one party's loss

approximates to the other party's gain." *Id.* Rather, "the overriding control tests of commerciality

and reasonableness provide a measure of flexibility with the [ISDA contract] sufficient to enable

it to be applied across a wide range of different types of transactions, in an infinitely variable

combination of different circumstances." *Id.* at ¶ 115.

Likewise, there have been no cases thus far in which a U.S. court examines the issue of

whether a party determined a Settlement Amount in "good faith" under the Loss method.

Nevertheless, there have been a handful of cases involving ISDA agreements that have examined

the meaning of good faith in the context of alleged breaches of the implied covenant of good

faith and fair dealing implicit in all contracts under New York law.  The courts in the Second

Circuit have held that in cases where "there is no contract provision defining 'good faith,' the term may be construed to have the same meaning it does in the implied covenant context." *Barbara*, 2013 WL 4507068 at *8.

The New York Court of Appeals has held that good faith under New York law "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Dalton,* 87 N.Y. 2d at 389 (quoting *Kirke La Shelle Co. v. Armstrong Co.,* 263 N.Y. 79, 87 (1933)). In situations "where the contract contemplates the exercise of discretion, this pledge includes a promise not to act *arbitrarily or irrationally* in exercising that discretion." *Id.* (emphasis added). The hurdles to proving a case of bad faith are considerable. Courts applying New York law "generally hold that a defendant violates the covenant of good faith and fair dealing only when he acts with some improper motive." *Wagner v. JP Morgan Chase Bank*, No. 06 Civ. 3126 (RJS), 2011 WL 856262, at *4 (S.D.N.Y. March 9, 2011). Importantly, a party does *not* violate the covenant of good faith and fair dealing simply "by acting in its own self-interest consistent with its rights under the contract." *Barbara*, 2013 WL 4507068 at *8.

In *Good Hill*, a New York court considered a claim for breach of the implied covenant of good faith under an ISDA contract. *Good Hill Master Fund L.P. v. Deutsche Bank AG*, No. 600858/2010, 2016 WL 3580032, at *1 (Sup. Ct. N.Y. Cnty. Feb. 3, 2016). After a write-down of the notes underlying an ISDA contract triggered an early termination, Good Hill sought return of the collateral it had posted with Deutsche Bank ("DB"). DB refused to return the collateral, and Good Hill sued to recover. DB counterclaimed, asserting, *inter alia*, that Good Hill acted in bad faith when it sold the notes underlying the agreement and allocated a percentage of the purchase price in a manner that reduced its obligations to pay DB. *Id.* at 14. The court found that

29

the questioned transaction was motivated by a desire to further Good Hill's self-interests, not by

a desire to impair DB's interests. *Id*. at 16-17.  The court went on to state that the duty of good

faith "does not extend so far as to undermine a party's general right to act in its own interests in a

way that may incidentally lessen the other party's anticipated fruits from the contract" and that

the mere fact that the allocation was advantageous to Good Hill and disadvantageous to DB was

"hardly sufficient to establish bad faith." *Id*.  On January 24, 2017, the Appellate Division

affirmed the lower court's decision in all respects.  *Good Hill Master Fund L.P. v. Deutsche

Bank AG*, 2017 WL 329105, at *3-4 (1st Dep't Jan. 24, 2017).

        In one case involving a claim by LBIE against Assured Guaranty (AG) for allegedly

acting in bad faith in terminating two sets of swap agreements under an ISDA contract, the New

York court held that bad faith is implicated where a party "exercise[s] a [contractual] right

*malevolently*, for its own gain *as part of a purposeful scheme to deprive plaintiffs of the benefits

of the contract*" and engages in "*targeted malevolence in the guise of business dealings*."

*Lehman Bros. Intern. (Europe) v. AG Financial Products, Inc.*, 969 N.Y.S. 2d 804, at *3 (Sup.

Ct. N.Y. Cnty. 2013) (emphasis added).  In dismissing LBIE's bad faith claim on the first set of

terminations, the court wrote that "LBIE's conclusory assertion that Assured Guaranty

terminated the transactions pursuant to the provision in order to avail itself of a favorable

payment methodology falls far short of alleging the kind of fraudulent or malevolent scheme to

deprive LBIE of the benefits of the contract necessary to make out a claim." *Id.* at *5.

        When taking the above standards into account, it is clear Lehman will be unable to offer

any evidence that QVT failed to determine its Loss in good faith. First, there is not a scintilla of

evidence that QVT exercised its rights under the ISDA malevolently, or as part of a purposeful

scheme to deprive Lehman of the fruits of the contract.  QVT lost the benefit of its bargain and

30

attempted to quantify no more and no less than what it believed, in good faith, to be its cost of replacing the transactions on which Lehman defaulted. Second, QVT did not act "arbitrarily or irrationally" in calculating its Loss. QVT based its Loss determinations on well-documented and clearly articulable methodologies that, as Professor Pfleiderer opines, comport with market standards and reflected the economics of the underlying transactions. Pfleiderer Opening Rpt. ¶¶ 32-33. Additionally, as in *Merrill Lynch Capital Servs.*, QVT's expert, Dr. Peter Niculescu of CMRA, has performed an independent, bottoms-up analysis of the PCDS and CARB transactions. Dr. Niculescu undertook a costly and extremely thorough analysis for over a year and will testify that his results are consistent with QVT's Loss determination.

Lehman's arguments that QVT's methodologies to value PCDS and CARB were "new" or different from the methods used to value the contracts for purposes of collateral calculations, or were otherwise "outside the normal course of conduct of the parties" are red herrings. The situation faced by QVT when Lehman filed for bankruptcy was as far from "business as usual" as possible. Further, PCDS and CARB were proprietary products of Lehman, and even if QVT had used Lehman's marks prior to bankruptcy, no such marks, or even indicative quotes, were available after the filing, whether from Lehman or from other dealers. No one, including Lehman, had ever before determined loss arising from a dealer's default on PCDS or CARB. There were no transactions to guide the valuation, and neither QVT nor Lehman had any model for valuing them. Accordingly, *any* valuation of replacement cost would be a "new" method, and particularly one arising from the extraordinary impact of Lehman's default on the financial markets, exacerbating the impact of the financial crisis on the PCDS and CARB products. As Professor Pfleiderer will testify, QVT's methodology was reasonable and based on sound principles of economics and finance.

31

### B.    QVT's PCDS Determination was Reasonable and in Good Faith.

PCDS was a bespoke product created by Lehman in 2005. Philbin Tr. 37:14-38:2;

Neumann Tr. 35:9-36:5. Despite Lehman's efforts to interest other dealers in the product, there

were no other known Market-makers for PCDS, and QVT had never traded PCDS with anyone

other than Lehman. CX-1168 ("pcds hardly exists!"); CX-1103 ("there is zero liquidity in

pcds"); JX-0010 ("there is VERY thin liquidity in street in pcds lately"); Neumann Tr. 47:22-

48:16; Philbin Tr. 38:17-39:6, 73:7-74:8.  In September 2008, QVT held 68% of the aggregate

long notional amount of the total PCDS outstanding in the underlying reference obligations.[33]

Further, there was virtually no trading in PCDS and therefore no observable market prices

available on or around September 15.[34]  Only a single trade had occurred in any of the PCDS

reference names QVT held since July 2008, and many had not traded since 2007. *See* CX-1788;

CX-1293.  Indeed, Lehman itself was unwilling to offer PCDS to QVT at any price in the

months preceding its collapse in September 2008. CX-1184; CX-1194; CX-1202; CX-1235; Chu

30(b)(6) Tr. 252:13-22, 337:8-16, 340:4-21, 345:17-20; Chu Tr. 89:19-90:14.  Because there was

no active market for PCDS prior to Lehman's filing, and the only market-maker (Lehman) had

gone bankrupt, QVT had no reliable CDS market data to value the PCDS. Thus, QVT was forced

to use other market data, namely, the prices of the preferred stocks underlying the PCDS, to

determine its replacement costs. While these preferred stock pricing data were imperfect in

revealing where one *actually* could have sold a $370 million portfolio of preferred stocks, they

---

[33] *See* CX-1788; CX-1293; Niculescu Opening Rpt. p.121, Exhibit 45. Of the $544 million of total PCDS sold by Lehman in QVT's reference obligations, QVT was $371 million.

[34] Although Markit published PCDS composite pricing data for certain of the PCDS names, QVT believed such data to be unreliable given that Lehman was the only market-maker and the primary contributor of PCDS pricing data to Markit, in addition to Markit's own metrics rating its PCDS marks as weak or "thin."  One of QVT's valuation experts, Dr. Niculescu, conducted an extensive analysis of the reliability of Markit's PCDS pricing data as of the Early Termination Date and has confirmed that it was indeed unreliable and incorrect. Tellingly, Lehman's own expert for valuing PCDS, Dr. O'Kane, does not rely on Markit's PCDS pricing data. O'Kane Tr. 96:25-98:3.

were the only available means of directly observing market pricing evidencing the underlying

risks of default and deferral inherent in preferreds.

### i.    The Economics of CDS and the PCDS Transactions

A CDS is akin to a form of insurance that protects its holder against certain "credit

events," including a payment default by the specified "reference entity" (*i.e.*, the issuer of the

bond to be "insured").  The CDS contract requires that the buyer of the CDS pay an ongoing

annual premium (called a "spread") to the CDS seller, analogous to ongoing home or auto

insurance premiums.  In return, the CDS seller agrees that if a "credit event" occurs—*e.g.*, if the

reference entity fails to make an interest or principal payment, restructures or files for

bankruptcy, then the CDS seller will purchase at 100 cents on the dollar ("par") from the CDS

buyer bonds issued by the reference entity of an agreed notional amount.  Importantly, the value

of a given CDS contract with a fixed premium will fluctuate with the market's perception of the

probability and severity of a credit event, and can be perceived as more valuable if market

conditions change and the premium for the original contract appears low.

QVT's PCDS contracts are a type of CDS referencing preferred stocks, rather than bonds,

of the issuer.  Unlike bonds, typically an issuer of preferred stock is permitted to defer coupons

by the terms of the applicable certificate of designation. The deferral of a preferred stock coupon

would not be a credit event under a standard CDS.  However, PCDS contracts have an expanded

definition of credit events (*i.e.*, an expanded set of insured credit risks) that includes deferral of

preferred stock coupons.[35]  Thus, if an issuer of a preferred stock referenced by a PCDS deferred

a coupon during the term of the contract, the buyer of the PCDS would be able to deliver the

---

[35] This deferral option is particularly well suited to the financial structures of financial institutions, whose regulators
generally require them to maintain a certain amount of deferrable fixed income instruments as a cushion for periods
of stress with an implicit or explicit understanding that the regulator may elect to require them to defer payments on
such instruments.

preferred stock in exchange for its par value. Regarding QVT's PCDS portfolio, which was
created at a time when spreads of financial issuers were extremely tight and the market perceived
deferral risk to be extremely low, a seller of PCDS protection would receive a quite small annual
premium (averaging 1.46% across QVT's PCDS) with extensive down-side risk, while a
purchaser of PCDS would have the potential for equity-like upside in a financial crisis.[36]  Chu
30(b)(6) Tr. 37:23-39:9.

Long positions in PCDS would have been particularly valuable in the aftermath of
Lehman's default. Banks and other financial institutions were acutely distressed in the fall of
2008, and every long PCDS contract in QVT's portfolio referenced the preferred securities of
financial institutions.[37] Further, regulators and senior creditors were pressuring financial
institutions to exercise their rights to defer preferred and common stock dividends in order to
preserve capital (and many ultimately were ordered, or elected, to do so in the course of the
crisis), which, in turn, put more downward pressure on the prices of these junior instruments.
Notably, in the week before Lehman's default, Fannie Mae and Freddie Mac's regulator required
that both U.S. Government sponsored entities stop paying preferred dividends, and their
preferred stocks fell suddenly and dramatically from approximately *55%* of par the Friday before
the deferral to approximately *12%* of par the Monday of deferral.  Finally, in the event that a
financial institution actually defaulted on its senior or subordinated debt—which would also be a
credit event under PCDS—its preferred stock would likely receive very minimal recoveries due

---

[36] In 2007, for example, QVT bought over $160 million of 5-year PCDS for an average spread of 0.33% per year.
On any contract, its maximum liability would be approximately 1.65% of the notional (0.33% x 5). However, on a
deferral event, preferreds could conceivably depreciate to 20 cents on the dollar or lower, representing a payout of
nearly 50 times the capital at risk.
[37] Although it thought it had entered standard CDS contracts, QVT entered into two PCDS transactions selling
protection to Lehman on non-financial retailer CVS Health Corp.  QVT valued these positions as Corporate CDS,
and Lehman's expert, Dr. O'Kane, has stated that the difference in this calculation is inconsequential to the overall
claim. O'Kane Rpt. n.19.

34

to their deeply subordinated position in the capital structure (generally estimated at 10% by market convention and Lehman itself). *See* CX-1293 at "Recovery" Tab.

QVT's PCDS portfolio offered significant protection against any of the above adverse developments. The portfolio had an average time to maturity of approximately 4.4 years at the time of Lehman's default.  Thus, if any of the reference entities in QVT's portfolio deferred or defaulted within 4.4 years (and several of the issuers did in fact defer), QVT would have had the right to deliver preferred stock of that issuer and receive par in exchange.  The multi-year term of the PCDS protection was clearly long enough to cover future deferral (or default-related) credit events over the time period relevant to the financial crisis at hand. To compensate for this risk and the low ongoing premium described above, a dealer would charge a large upfront premium to replace the trade. As discussed below, this upfront premium is the replacement value of QVT's PCDS portfolio under Loss.

### ii.   QVT's Proxy Method to Value the PCDS Was Reasonable and Reflected the Underlying Economics of the PCDS Transactions.

Because there was no PCDS market pricing without Lehman, and QVT had received no responses to its Market Quotation requests for PCDS, QVT determined its Loss for each PCDS transaction by putting itself in the shoes of a hypothetical replacement dealer, asking itself what price that dealer would charge a customer for a large volume of PCDS referencing financial preferreds given the backdrop of the recent deferral of Fannie Mae and Freddie Mac preferred dividends and the rising distress in the financial markets. QVT reasoned that a replacement dealer would want to hedge itself against the risk of unexpected, immediate deferrals—particularly given the huge size and 4.4 year maturity of QVT's PCDS positions.

In order to hedge this deferral risk, dealers would not be able to access a PCDS market—there was none—and therefore their only effective available hedge would have been actually to

sell short the cash preferred securities referenced in the PCDS. Further, the dealer would need to charge the CDS buyer an "upfront amount" in order to hedge the deferral risk. Thus, if a replacement dealer were to offer PCDS protection, then the amount that the dealer would need to charge in order to be hedged against an immediate deferral of a PCDS would be *exactly equal to the difference between the par value of the preferred and the price at which the dealer could sell short the preferred*. This is precisely how QVT calculated its loss: for each contract, QVT calculated the difference between the par value of the underlying preferred stock and the price it would have received in creating a short position in the preferred stock underlying QVT's PCDS, as determined by reference to available, relevant market data between September 15 and September 19, 2008 ("Lehman Week").

In order to determine the price at which a hypothetical replacement dealer could have created a short position in the underlying preferred stocks as of the Early Termination Date, QVT had to determine the price a dealer would have been able to obtain in a block sale of an extremely large volume of preferred stock ($370 million, some 68% of the total PCDS protection outstanding in those reference obligations). It was clear that a dealer could not sell short that volume of preferred stocks at the prices reported on September 15. Not only were the prices reported by pricing services for September 15 stale,[38] they certainly didn't represent prices that could be obtained for such a large volume of securities. Even in normal times, in highly liquid markets, the sale of a large "block" of securities will occur at a discount to the last price, as a buyer will require additional compensation for the market impact and/or additional time it will take to lay off the risk. Dealers' appetite to purchase preferred stock had already shrunk considerably prior to Lehman's filing (having seen the surprise deferral of Fannie Mae and

---

[38] Stale pricing is a problem for many of the quoted prices in preferreds which are traded over-the-counter. For instance, in some of the preferreds used in QVT's calculation, pricing services reported that prices were *higher* on September 15, 2008 than on August 29, 2008—an extremely unlikely event indicative of stale pricing.

36

Freddie Mac the prior week), and following Lehman's filing, the situation was considerably worse. Bidders for preferred stock were almost non-existent, and those willing to trade were prepared to buy only in quantities that represented a tiny fraction of QVT's portfolio. Selling even small amounts of preferred stock caused prices to move dramatically. A dealer offering $370 million of PCDS would not assume that it could trade at the quoted closing price on September 15, but rather that the price at which a sale could have been made, if at all, would be much lower than the reported prices on September 15. To account for these effects, QVT used as the price of the preferred the lowest closing price (the price at the end of the trading day)[39] during Lehman Week for each preferred stock as the reference price for its "par minus preferred" calculation.[40]

This is likely a conservative estimation of what it would have cost a replacement dealer to re-establish a short position with a guaranteed borrow in $370 million of financial preferred stocks immediately after Lehman's demise. The difference between using the lowest closing price of Lehman Week and the September 15 closing price was approximately 7% of the notional amount of the PCDS, and QVT judged the market impact could have been significantly larger.[41]

---

[39] The lowest closing price of Lehman Week was significantly higher than the lowest intraday price of Lehman Week. For example, RBS 7.25% Preferred Series T ($25 Par) had a low closing price of $8.05 on September 17, 2008 (32.2% on a par basis) for Lehman Week, but traded as low as $6.55 (26.2% on a par basis) that day.

[40] Both the ISDA Agreements and Section 562 of the Bankruptcy Code (discussed in greater depth below) specifically permit QVT to look to data arising post-September 15 to determine its Loss as of the Early Termination Date. Because the evidence will clearly demonstrate that there was no reliable market data or actual transactions to value the PCDS as of September 15, 2008, there were no commercially reasonable determinants of value as of the Early Termination Date.

[41] A further reason for using the lowest closing price of Lehman Week was to account for the cost of obtaining a stock loan borrow equivalent to that embedded in PCDS. It would have been extremely difficult and expensive, if not impossible, for a hypothetical replacement dealer of PCDS hedging itself through a short sale to borrow such a large portfolio of preferred stock, especially for an extended period of time. Any short sale would have been predicated on being able to (i) borrow sufficient stock at reasonable financing rates and (ii) arrange a guaranteed stock borrow (which a CDS functionally provides, but which is rarely available or affordable even in normal markets) or at the very least obtaining reasonable assurance that the existence and cost of such borrow would be stable for a substantial time period. It is highly unlikely that a borrow in the required size could even have been

37

The Loss determination for the PCDS thus equaled the difference between par (100

cents) and the lowest closing price of the preferred security from Lehman Week, multiplied by

the notional amount of the terminating swaps. QVT's PCDS calculation generates a Settlement

Amount of 36% of the notional amount of the PCDS. Economically, this 36% figure simply says

that if QVT had to re-establish its PCDS positions in the aftermath of Lehman's bankruptcy, it

would have had to pay a price which was 36% (of notional) upfront.[42]  In short, QVT's proxy

method was based on observable market data and well-understood and accepted economic

principles and accurately reflected the economics of the PCDS transactions QVT was seeking to

replace. The evidence will be clear that QVT sought a fair measure of its Loss and that QVT's

method for valuing the PCDS was not arbitrary or capricious, but was thoughtful and rational.

### iii. Lehman's After-the-Fact Attacks on QVT's PCDS Methodology are Not Based in Sound Economic Theory and Should be Dismissed.

One of Lehman's experts, Dr. Dominic O'Kane (a former Lehman research analyst),

opines that QVT unreasonably inflated its PCDS determination and offers various alternative

methodologies he asserts are "better" than QVT's methodology, derived from (i) adjustments of

Lehman's own marks and (ii) reliance on historical ratios of preferred stocks to more senior

securities without reference to the financial conditions of September 2008, which caused those

historical ratios, if they were ever valid, to diverge.  Putting aside for the moment whether Dr.

O'Kane's methods are "better" (which, the evidence and expert testimony will show clearly they

are not), "better" is not the standard under the ISDA Agreements.[43]  The standard is whether

---

[arranged and the cost could well have been extremely high, particularly if sought on a basis where it was guaranteed for an extended fixed term, as opposed to recallable overnight, as typical stock loans are.

[42] QVT did not pay any premiums upfront in order to enter its PCDS trades, but rather, only obligated itself to pay ongoing premiums.

[43] Professor Golden will testify that one of the key objectives of the 1992 ISDA Agreement is to promote certainty for market participants, including in the context of a termination. Golden Opening Rpt. ¶¶ 50, 53.  But not certainty as to a single determination of loss; rather, certainty that terminations can be completed promptly, and "mitigating

QVT's methodology was reasonable and in good faith.  And even assuming *arguendo* that Dr.

O'Kane's methodologies are reasonable (again, they are not) that does not make QVT's method

unreasonable—*even if they reach different results*.  The evidence at trial will show that Dr.

O'Kane's opinions suffer not only from a highly incomplete understanding of the PCDS market

and the conditions in the preferred stock market in September 2008, but also, from a troublingly

feeble effort to obtain the facts necessary to achieve such an understanding:

- When asked whether he had any understanding of the size of the PCDS market in the period 2005 to 2008, Dr. O'Kane stated that he did not (O'Kane Tr. 18:2-14);

- When asked whether he had any knowledge about whether Lehman made markets in the PCDS in which QVT had invested, Dr. O'Kane stated that he "ha[d]n't studied the actual trades that Lehman . . . had been trading over the summer of 2008" (O'Kane Tr. 21:11-22:2);

- When asked whether he knew "anything about the typical size of a PCDS trade in 2007 to 2008," Dr. O'Kane said "no" (O'Kane Tr. 148:20-23);

- When asked whether he knew anything about the typical size or frequency of trading in preferred stocks in 2007 to 2008, Dr. O'Kane stated that he "had not considered that" (O'Kane Tr. 148:24-149:6);

- When asked whether he knew how Lehman sourced its PCDS protection, he said "not specifically" (O'Kane Tr. 149:14-16);

- When asked how a replacement dealer would try to hedge the deferral risk inherent in PCDS, Dr. O'Kane wishfully noted that he believed a trader would "use [its] sales force—to try to seek out customers who would be willing to take the other side of that trade." (O'Kane Tr. 84:10-18)  Yet when asked whether he was aware of any dealers making a market in PCDS on September 15th, 2008, he "hadn't investigated it" (O'Kane Tr. 80:25-81:11);

- When asked whether he thought a sale of almost $400 million of preferred securities might have a market impact in September 2008, Dr. O'Kane stated, "I've done no analysis on that" (O'Kane Tr. 147:25-148:10); and

---

the risk of fact-specific disputes and the attendant risk of protracted litigation." *Id*. at ¶ 53.  To this end, the 1992 Form ISDA contains numerous provisions aimed at avoiding fact-specific disputes.  *Id*. at ¶ 71.

- When asked why the market's perception of preferred stock deferral risk increased on September 8, 2008, Dr. O'Kane appeared to have no inkling that on this seminal day in the markets, Fannie Mae and Freddie Mac were nationalized by the U.S. government, causing their preferred stocks to plummet to 12 cents on the dollar—replying only that, "I'm not exactly sure which market events occurred on which dates." (O'Kane Tr. 201:2-10) Indeed, when asked whether he was familiar with the conservatorship of Fannie Mae in September 2008, Dr. O'Kane—as with virtually every other topic related to the actual trading and markets in PCDS—stated simply, "I have…a superficial knowledge…but I haven't studied it." (O'Kane Tr. 155:8-12).

It is not surprising then that the evidence and expert testimony will show that Dr. O'Kane's opinions and criticisms are deeply flawed, fail to comport with basic principles of financial economics, and totally disregard the market realities present at the time of Lehman's collapse. This analysis cannot possibly support Lehman's attack on this component of the QVT Claims. In contrast, Professor Pfleiderer will demonstrate and explain why QVT's methodology was reasonable and soundly based in principles of finance, and Dr. Peter Niculescu will testify that the results of his bottoms-up PCDS valuation reaches a valuation similar to QVT's PCDS Loss determination.

### C.    QVT's CARB Determination was Reasonable and in Good Faith.

QVT bought $80 million notional of CDS referencing subordinate (junior in credit priority) tranches of eight auto loan securitizations with significant subprime borrower exposure that formed the Lehman CARB Index. QVT's $80 million position represented over 84% of the long notional amount of CARB protection outstanding. CX-1263. The underlying auto loans were originated by General Motors Acceptance Corporation ("GMAC")[44] and Ford Motor Credit, both of which became deeply distressed in late 2008, with GMAC eventually requiring a Federal rescue of over fifteen billion dollars, leaving it predominantly owned by the U.S. Treasury. The CARB provided protection on the most junior, or second most junior, tranches in

---

[44] GMAC was among the world's largest automobile lenders and a leading indicator of the market changes on consumer auto loans during that time period.

the securitizations, *i.e.*, the most likely to suffer the effect of the financial crisis on consumers' auto loan payments and take the first losses from the subprime borrower exposure in the loan pool.  As in the case of PCDS, Lehman was the only known dealer in this product and it was not possible on September 15 to replace these contracts with another  counterparty. *See* McDougal Tr. 42:21-43:2, 128:11-17, 273:18-274:5.  Furthermore, each of the classes referenced was small and the underlying reference securities were impossible to borrow, and thus impossible to sell short.  Like with PCDS, the loss of the ability to remain short these securities through CDS represented a significant loss of value to QVT.

As with PCDS, there were no trades of CARB in or around September 2008 that one could have used to determine a market price.  QVT was not aware of any other source for pricing on CARB or the underlying CDS on the individual reference securities. QVT's method for determining Loss on the CARB was simple.  Because there was no market data for the CARB at all, QVT began with Lehman's CARB mark as of September 12, 2008, which was 16% of the notional amount of the CARB[45] and applied two adjustments to ascertain the cost it might have incurred in replacing these positions with another dealer.

First, QVT took into account the fact that CDS spreads referencing unsecured debt of GMAC had widened, increasing the cost of protection by 15% of notional during the period from September 12 through September 19, 2008. QVT reasoned that a dealer in the position of having to make an offer on CARB would likely be unable to observe trading in either CARB itself or the tranches underlying CARB. Thus, a dealer would rely on a more liquid proxy—in this case, GMAC CDS—to get an idea of how much the market price of credit risk in auto loans had changed. CARB's correlation with GMAC spreads was not invented by QVT. GMAC was in the

---

[45] Discovery in this case, as well as analysis from Dr. Niculescu of CMRA, have since shown that Lehman's September 12 mark of 16% of notional was stale and highly unreliable itself, but QVT did not know that at the time and used it as the best market reference point.  DX-5358; Niculescu Opening Rpt. ¶ 182.

business of making auto loans and the CARB reference obligations were subordinated tranches

of securitizations of auto loans. QVT in fact held the CARB positions in an internal account

called "GMAC-HEDGE." Furthermore, Lehman specifically touted GM CDS as a reference

point in its pre-petition marketing materials related to CARB.  *See* DX-5039 (Lehman Brothers,

Introduction to the CDS on Auto Recievables [sic] Basket (CARB), November 2, 2007) at p.8.

Second, because QVT represented over 80% of the total outstanding long side held by all

counterparties in CARB, QVT recognized that attempting to replace the full quantity of these

positions would likely impact the market and further widen spreads.  Thus, QVT assumed that

the market impact of replacing protection on the relatively large notional amount of CARB

would widen spreads and further increase the cost of protection by approximately 15% of

notional. Chu 30(b)(6) Tr. 255:21-256:15.

Applying these two adjustments to Lehman's September 12 mark, QVT determined that

its Loss (*i.e.*, cost of replacement) would be approximately 46% of the notional amount of the

CARB transactions, for a total of $36.7 million.  QVT's value is reasonable considering there

were no market data available to QVT, and, as in the case of PCDS, Dr. Niculescu will testify a

similar figure can be derived using alternative methodologies.[46]

In contrast, Lehman's expert, Graham Bruce, opines that the cost for QVT to replace the

CARB would have been only 18.5% of notional.  This is plainly unrealistic as can be

demonstrated by a single fact:  Lehman's own CARB "run" of August 21, 2008 offered to sell

CARB protection at 23% of notional. JX-0039.  If Mr. Bruce's calculation of 18.5% is to be

---

[46] In the course of discovery, Lehman produced to QVT certain quotes received by another CARB counterparty ("CARB Party A") on the underlying CDS components of CARB (not CARB itself).  Despite certain differences between these quotes and QVT's CARB positions (*e.g.*, much smaller in size and not identical products), QVT's expert, Dr. Niculescu, was able to utilize these quotes (as the only available market data) to derive a range of values for QVT's CARB positions from $33.06 to $35.65 million.  Niculescu Opening Rpt. ¶¶ 148-168.

believed, the value of protection against a default on subordinated consumer auto loans declined

between August and September 2008, which of course it did not.

> **D.    QVT's Corporate and Sovereign CDS Calculation was Reasonable and in Good Faith.**

In calculating its Loss for its Corporate and Sovereign CDS, QVT generally used a clear

hierarchy based on the quality of information received: (i) Market Quotation if successful; then

(ii) actual replacement trades; and then (iii) trader judgment in choosing the most reliable of

(a) dealer quotations received through the Market Quotation process but which were insufficient

to give rise to an actual Market Quotation, (b) Markit composite pricing data, and (c) unsolicited

broker runs.  There were good reasons why QVT generally prioritized replacement transactions

and levels received in Market Quotation above data from Markit and unsolicited broker runs.

Markit provided *only* a single mid-market, end-of-day mark that averaged data received from

dealers. Markit provided no information as to the bid-mid (or offer-mid) spread that a Non-

defaulting Party, like QVT, would need to determine the cost of replacement CDS. Further,

Markit data do not represent a price where any trading actually occurred (*i.e.*, not like a "last"

price from an equity exchange); it is an average of dealer opinions about where a CDS trade

could have occurred without regard to size or direction.

There is considerable doubt as to whether, given the crisis environment and volatile

market on September 15, Markit's marks on that date were accurate representations of the mid-

point of an actionable dealer market, *see* Diplas Rpt. ¶¶ 18, 59-65, particularly for the less liquid,

off-the-run (*i.e.*, not the most recent issuances of five-year CDS) positions in the QVT Corporate

and Sovereign CDS, for which the higher quality information sources noted above were

unavailable.  QVT valued 370 Corporate and Sovereign CDS of the 836 QVT Transactions using

43

Markit composite pricing data (the "Markit-based Loss Transactions") derived from dates it believed represented the most valid pricing. *See* CX-1020.

### i. QVT Selected Dates for Markit Data Reasonably and in Good Faith, as There were No Reasonable Determinants of Value as of September 15, 2008 for Many of its Positions.

Section 562(a) of the Bankruptcy Code provides in relevant part that if a swap participant terminates a contract, damages shall be measured as of the date of such termination provided that if "there are not any commercially reasonable determinants of value as of [a termination date]…, damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value." Bankruptcy Code § 562. The Legislative History to Section 562 of the Bankruptcy Code presciently states that: "although it is expected that in most circumstances damages would be measured as of the date . . . of termination . . . , in certain unusual circumstances, *such as dysfunctional markets or liquidation of very large portfolios*, there may be no commercially reasonable determinants of value for liquidating any such agreements or contracts or for liquidating all such agreements and contracts in a large portfolio on a single day." H. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 134-135 (2005) (emphasis added). Just as the Legislative History predicted, the chaotic market and dealer fears of taking on new risk resulted in a lack of reasonable determinants of value as of September 15, 2008.[47]

QVT personnel will testify that QVT allocated responsibility for determining Loss on each specific position to the QVT trader most knowledgeable about the position and the market in which it traded. Wollman 30(b)(6) Tr. 221:9-223:16. When using a Markit-based Loss

---

[47] The English High Court has stated that what constitutes "reasonably practicable" is a factual determination and, noting the unusual circumstances which followed the collapse of Lehman and the ensuing financial crisis, held that May 2009 was the earliest practicable date at which the Non-defaulting Party could determine its Loss. *See Fondazione Enasarco v Lehman Brothers Finance S.A.* [2015] EWHC 1307 (Ch), [¶53].

assessment, each QVT trader then selected, based on their own judgment, from the single Markit end-of-day average price given for each reference entity/maturity date for each day during Lehman Week based on the price they felt best approximated the mid-market price at which one actually could have entered into a replacement transaction. They then applied to that Markit mid-price a mid-to-bid (or mid-to-offer) adjustment to determine the full cost of a hypothetical replacement CDS. Wollman 30(b)(6) Tr. 324:6-11. In so doing, each QVT trader took into account multiple factors, including liquidity, maturity, size of the underlying instruments, and his view of the contemporaneous market conditions based on actual trading experience. Chu 30(b)(6) Tr. 373:5-385:16. Because QVT's Market Quotation process was not completed until after the close of trading on September 15, 2008—and therefore actual replacement trades could not have been executed until the next day—many of the QVT traders selected September 16, 2008 as the default date for Markit pricing data and only selected a date before or after that date if prevailing market data or the nature of the position suggested it was appropriate. Wollman 30(b)(6) Tr. 365:8-25; Chu 30(b)(6) Tr. 373:5-8, 375:9-376:17, 382:11-22, 385:12-16.

QVT's Loss methodology resulted in QVT selecting Markit pricing dates distributed across the days of Lehman Week as follows:

|  | 9/15/08 | 9/16/08 | 9/17/08 | 9/18/08 | 9/19/08 |
|---|---|---|---|---|---|
| Number of Positions | 28 | 260 | 54 | 2 | 26 |

Lehman's expert, Mr. Garzia, opines that the above allocation resulted in QVT's claim on Corporate and Sovereign CDS positions being $13.6 million higher than if QVT had used only Markit pricing data from September 15, 2008, Garzia Rpt. ¶58, and resulted in a higher aggregate value than if QVT had selected any one day to value its positions. Garzia Rpt. ¶71.

45

However, as will be shown at trial, Professor Pfleiderer's analysis of QVT's data selection on a

position-by-position basis clearly shows that QVT only chose the day most favorable to itself

39% of the time, the date most favorable to Lehman 17% of the time, and a date that was neither

most favorable nor least favorable to QVT 45% of the time.  Given these statistics and the

testimony of the relevant QVT personnel, it is clear that QVT did not select the dates of Markit

data in bad faith but did so as part of a reasonable process for a reasonable purpose and in a good

faith manner.

### ii.  QVT Made Reasonable Mid-Bid and Mid-Ask Adjustments for the Markit-based Loss Transactions.

As Professor Pfleiderer will testify, "QVT's adjustment of Markit's pricing data to add a

mid-bid or mid-ask spread is based on established and common market practice. *Investors cannot*

*transact at the midpoint of the bid-ask spread.*" Pfleiderer Opening Rpt. ¶ 93; Pfleiderer Rebuttal

Rpt. ¶ 47.  Lehman's ISDA expert, Mr. Schuyler Henderson, agrees that QVT is entitled to value

its claim positions at *its* side of the market. Henderson Tr. 98:7-100:3.[48]  Further, Professor

Engle and Mr. Garzia do not dispute QVT's right to a mid-to-bid adjustment, they merely take

issue with the size of an appropriate mid-to-bid (or mid-to-offer) adjustment. It is entirely

appropriate that QVT would consider all the major factors relating to the mid-to-bid adjustment,

---

[48] *See* Henderson, *supra* note 32, at 968 ("There is a significant advantage to being the determining party, using either quotations from third parties or loss or close-out amount. First . . . two parties to a derivatives transaction obtaining quotations for its value from the same dealer will obtain different quotations, even with all other factors being equal.  The reason is the bid /offered spread . . . Thus the determining party would generally show a larger loss or smaller gain than the corresponding gain or loss . . . of the other party.  In the typical 'plain vanilla' transaction, this difference would be relatively small. As the liquidity of the relevant transaction is less, the bid/offered spread widens. As terms vary from the more basic transaction toward the more complex, the bid-offered spread will widen further and the difference will become more significant.  Under certain circumstances . . . such as quotations obtained in crisis situations, the difference could be massive . . . Following the Lehman insolvency, the markets were also extremely unsettled . . . For the moment it is sufficient to note that one would always exact a difference, and possibly a significant difference, which will favour the determining party.").

taking into consideration contemporaneous market conditions and its own position and costs in those markets.[49]

QVT added mid-to-bid (or mid-to-offer) adjustments ranging from approximately 3% to 15%, with the most common adjustment being 10%, and only 16 positions (4%) having an adjustment above 10%. *See* CX-1020. Lehman's expert, Professor Engle, claims that these mid-to-bid and mid-to-offer adjustments are too large, but he bases his claim on a statistical analysis that is fundamentally flawed.

As the Court will see, it is a repetitive feature of Lehman's presentation to the Court that QVT's unique portfolio and positions are overlooked. Professor Engle and Mr. Garzia completely ignore the specifics of QVT's portfolio, its positions, circumstances and opportunities, or lack thereof, or the actual marketplace environment of September 15, 2008. As explained more fully in the *Daubert* section below, Professor Engle's analysis, which Mr. Garzia incorporates into his own analysis thereby perpetuating the flaws, bears no relation to QVT's actual portfolio and focuses on the most liquid positions in the market (those that actually traded during Lehman Week). Professor Pfleiderer and Dr. Diplas will testify that the most relevant data that QVT had at the time, namely the responses to its Market Quotation process, implied a bid-mid spread of approximately 20%, even higher than the 3% to 15% QVT applied. QVT thus acted reasonably and in good faith in all respects in determining its bid-mid adjustments.

### E.    QVT's Mortgage CDS Calculation was Reasonable and in Good Faith.

QVT solicited Market Quotations for most of its mortgage-related CDS on September 15, 2008, and received the minimum required three quotes for 12 of its mortgage derivatives transactions, using the Market Quotation method for those transactions. In 40 instances, QVT

---

[49] Judge Peck denied Lehman's efforts to bind a counterparty to mid-market pricing when calculating its damages in the context of a swap liquidation under the safe harbor provisions. *See Mich. State Hous. Dev. Auth. v. Lehman Brothers Derivative Prods. Inc. (In re Lehman Bros. Holdings, Inc.)*, 502 B.R. 383, 393-94 (Bankr. S.D.N.Y. 2013).

received fewer than the 3 quotations required for a "Market Quotation" but used the single

responses (or an average of two responses) to determine its Loss.  Of the 144 mortgage CDS

transactions QVT valued under the Loss method, Lehman's expert, Graham Bruce, has only

expressed a difference of opinion with QVT as to the CMBX positions and the STSUP positions,

a difference of $2.54 million between the two valuations. Bruce Rpt. ¶ 1; Bruce Tr. 19:11-21:11.

Mr. Bruce opines that QVT inflated its STSUP-2006 position by $1 million. Bruce Rpt. ¶20.  But

in reaching this opinion, he acknowledges that Markit pricing for this STSUP position was too

high as of September 15, 2008 and instead values the position based on nothing more than his

memory of his mark when he was a trader over eight years ago without providing any underlying

basis for that mark. Bruce Tr. 95:5-24.  There is no basis under the ISDA Agreements, custom,

practice or case law that permits an "expert" to challenge the reasonableness of a Non-defaulting

Party's determination eight years after the fact based on nothing more than speculation and

unsupported recollections.

### F.    QVT's Interest Rate Swap Calculation was Reasonable and in Good Faith.

QVT used commonly accepted swap valuation analytics from Bloomberg to determine its

Loss as of September 15, 2008 on its two interest rate swap positions. *See* CX-1568.  Based on

this method, QVT determined that it owed Lehman $4,685,993 (prior to the aggregate offset of

margin).  Lehman's expert, Dr. O'Kane, in the face of manifest evidence to the contrary, claims

that QVT's valuation of its interest rate swaps "leads [him] to believe that the QVT valuation

was a Bloomberg valuation from September 12, 2008."[50]

---

[50] Dr. O'Kane bases this conclusion on an email dated October 7, 2008 from QVT Managing Member, Tracy Fu (the trader who marked the interest rate swap positions), stating that he used September 12 pricing to value the interest rate swaps.  *See* JX-0088.  Mr. Fu's email contains a misstatement of what actually occurred nearly a week prior, when Mr. Fu sent to QVT's Lehman repository a Bloomberg screenshot valuing the interest rate swap position with a valuation date of September 17, 2008, which implies a September 15 curve.  *See* CX-1568.

The evidence will show clearly that QVT valued the interest rate swaps using a September 15, 2008 spread curve. As the Bloomberg swap valuation analytics are widely accepted, and endorsed by Lehman as well as by Dr. O'Kane, there is no question QVT's calculation of the interest rate swaps was reasonable and in good faith. Dr. O'Kane mistakenly concluded that the valuation was done on the wrong date (it was not) and his refusal to correct his erroneous analysis reflects the approach Lehman has taken throughout this process of seeking to latch on to any error, real or imagined and however minor, improbable or inconsistent with other facts in the case, and trying to spin it into a showing of an absence of reasonableness or good faith.

## IV.    Lehman's Pre-Default Marks Are Irrelevant to a Close-Out Valuation.

Lehman argues that QVT's Loss must be determined by reference to Lehman's own pre-petition marks of the QVT Transactions. Lehman claims that, because QVT did not contest Lehman's collateral marks on PCDS and CARB during September 2008, QVT's valuation of these QVT Transactions following Lehman's default must remain "tethered" to Lehman's valuations. This argument is meritless and contradicted by the simple logic that whether or not these marks were accurate as of any past date (whether protested or not), they (1) manifestly did not reflect the fact of Lehman's own bankruptcy and (2) were intended only for valuation or collateral purposes at mid-market levels, and not as a level at which a transaction with Lehman or any other dealer could take place.[51] Indeed, both QVT's ISDA expert, Professor Golden, and Lehman's ISDA expert, Mr. Henderson, testified that the ISDA Loss definition was not intended to bind the Non-defaulting Party to pre-default margin marks under the agreement. Golden

---

[51] *See* JX-0105 (Statement of Financial Accounting Standards No. 157 ("FAS 157")) at p.8, ¶ 7 ("Therefore, the objective of a fair value measurement is to determine the price that would be received to sell the asset or paid to transfer the liability at the measurement date (an exit price).").

Rebuttal Rpt. ¶ 51; Henderson Tr. 151:11-152:7.[52] In *Intel*, Lehman itself argued that internal

accounting marks had no relevance to Intel's Loss determination:

> Intel next argues that "the value to Intel" of this transaction was exactly $1 billion,
> simply because that is how Intel chose to account for it as an internal matter. *Intel
> may not invoke its own internal, subjective valuation of this trade as support for its
> determination of Loss.* This internal accounting approach ignores that the undelivered
> shares here are, in accordance with the definition of Loss and the ISDA Master, to be
> valued as Unpaid Amounts *on the basis of their fair market value on the Early
> Termination Date.*

Brief of LBHI at 21, *LBHI v. Intel Corp.*, Adv. Pro. No. 1301340 [Dkt. No. 86] (Bankr. S.D.N.Y.

Feb. 23, 2015) (emphasis added) (internal citations omitted).

Indeed, Lehman's own "MTM Statements" supplied for collateral purposes expressly

disclaim the marks for any purpose other than collateral:

> The below estimated value[s] are as of the date indicated *and do not represent
> actual bids or offers by Lehman Brothers. There can be no assurance that actual
> trades could be completed at such value[s].* Unless otherwise specified, *the below
> valuations represent mid-market valuations* . . . . Discussions of trade values in
> general, and indicative or firm price quotations and actual trade prices in
> particular, *may vary significantly* from these written estimated values as a result
> of various factors, which may include (but are not limited to) *prevailing credit
> spreads, market liquidity, position size, transaction and financing costs, hedging
> costs and risks and use of capital and profit.*

CX-2083, at LEH-QVT_0001142 (emphasis added).

Further, QVT's internal valuation policy required using marks received from third parties

over internal valuations. JX-0103 ("In determining the fair value it is important that: all positions

be valued using external and independent price sources to the extent available—the valuation

should reflect the market value, not QVT Financial's perception of the value."); Sale Tr. 59:17-

60:14. As a result, because PCDS and CARB were traded only by Lehman, QVT used Lehman's

---

[52] "Q: Mr. Henderson, with regard to your opinion, is QVT bound by its pre-filing margin marks? THE WITNESS:
There's no basis on which to bind it. Q: Sir, would it be reasonable for QVT to recover amounts in excess of its pre-
filing margin mark? THE WITNESS: That would depend on valuations. Q: But if those valuations were reasonable,
could QVT recover amounts in excess of its pre-filing margin marks? THE WITNESS: If the valuations were
prepared reasonably and in good faith, and reflected the actual losses of QVT, *clearly they are not bound.*"
(emphasis added).

own marks and occasionally Markit marks to which Lehman was the main contributor, to mark

its PCDS positions.  As the Court will hear from QVT's primary salesperson at Lehman, Michael

Neumann, Lehman could not ascertain "correct" marks for the PCDS transactions because of the

lack of PCDS trading. As Mr. Neumann pithily notes, the PCDS marks as far back as 2007 were

at best "*wild-ass guesses.*" CX-1104 ("QVT is scraping for some levels on PCDS – Even WAGs

are fine"); Neumann Tr. 156:15-17 (Q: And what are WAGs? A: Wild Ass Guesses, is what I

think that means.").

Market practice, accounting principles and the ISDA Agreements are clear that collateral

and indicative valuation marks are entirely different from a determination of Loss. QVT's pre-

petition marks, supplied largely by Lehman, are not relevant to QVT's Loss determination.

## V.    QVT's Collection Fees and Costs are Recoverable from LBSF.

Section 11 of the ISDA Agreements states that the Defaulting Party is responsible for a

Non-defaulting Party's attorneys' fees. Section 11 has been found to be an enforceable fee

shifting provision under New York law. *See URSA Minor v. AON Fin. Prods.*, No. 00 Civ. 2474

(AGS), 2000 WL 1010278, at *12 (S.D.N.Y. July 21, 2000); *JP Morgan Chase Bank v.

Controladora Comercial Mexicana S.A.B. de C.V.*, No. 603215/08, 2010 WL 4868142, at *17

(Sup. Ct. N.Y. Cnty. Mar. 16, 2010); *Titus v. Bank One*, No. C04-5102FDB, 2005 WL 1667767,

at *1-2 (W.D. Wash. 2005) (applying New York law).  The term "legal fees" in Section 11 "is

construed under New York law to include attorney's fees." *CDO Plus Master Fund, v. Wachovia

Bank*, No. 07-Civ-11078, 2010 WL 3239416, at *5 (S.D.N.Y. Aug. 16, 2010).  Like the

provisions affording discretion to the Non-defaulting Party's calculation of Loss, Section 11 puts

the onus for paying fees and costs of litigation on the defaulting party and thereby creating an

incentive to avoid litigation. Golden Rebuttal Rpt. ¶ 71.  Further, the Bankruptcy Code permits

contract-based claims for attorneys' fees incurred litigating issues of bankruptcy law. *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 449 (2007).

QVT's estimate of these fees and costs as of December 31, 2016, which continue to accrue, is over $13 million. These costs are in addition to the principal amounts set forth in the QVT Claims, and any other costs to which QVT is determined to be entitled under the ISDA Agreements.

**VI.  The Opinions of Lehman Experts Professor Engle and Mr. Weiser Should Be Excluded as They Are Neither Relevant Nor Reliable.**

Lehman bears the burden to establish by a preponderance of the evidence that its experts' testimony satisfies *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) (*Daubert)* and Fed. R. Evid. ("FRE") 702. *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*, 509 U.S. at 592, n.10). *Daubert* and FRE 702 "mandate the exclusion of . . . unreliable opinion testimony." *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999). A "qualified" witness may offer an opinion if it "rests on a reliable foundation" and is "relevant to the task at hand." *Daubert*, 509 U.S. at 597. The reliability inquiry requires that (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) the expert "has reliably applied the principles and methods to the facts of the case." FRE 702. The aim of the "reliability" prong is to exclude expert testimony based on subjective belief or unsupported speculation. *See Daubert*, 509 U.S. at 589-90. *Daubert*'s relevance inquiry requires that the expert opinion "will help the trier of fact to understand the evidence or determine a fact in issue[.]" FRE 702; *United States v. Mejia*, 545 F.3d 179, 188 (2d Cir. 2008).

### A.      Professor Engle's Analysis Is Irrelevant, Unreliable and Inadmissible.

Lehman intends to introduce the expert opinion testimony of Professor Robert Engle.

Professor Engle will opine that the spreads QVT used to value its Corporate and Sovereign CDS

were not reflective of the actual spreads quoted to and paid by CDS market participants in 2008.

The basis for Professor Engle's conclusion, however, is not market experience.  Instead,

Professor Engle relies exclusively on a statistical regression analysis that he calculated using

three data sets—DTCC for executed trades, CMA for quotes, and Markit for end-of-day marks.

In his report, Professor Engle calculates two metrics that he calls the "Quoted Bid/Mid Spread"

and the "Effective Bid/Mid Spread."  The Quoted Bid/Mid Spread purports to be the amount that

"Dealers" (such as Lehman) initially quoted to "End Users" (such as QVT) for CDS transactions.

*See* Engle Report ¶¶ 26-35.  The Effective Bid/Mid Spread is the percentage of the Quoted

Bid/Mid Spread that End Users purportedly end up paying when executing CDS transactions.  *Id.*

at ¶¶ 44-60.   Professor Engle claims to determine these metrics on both a market-wide basis and

also for QVT's specific portfolio.  *Id.* at ¶¶ 70-72.

Before calculating these metrics, however, Professor Engle applied a series of "filters" to

remove large numbers of CDS quotes and trades from his data sets.  Professor Engle first filtered

out *more than 70%* of the CMA quotes.  *Id.* at ¶¶ 28-30, 118-125.  He then filtered out *nearly

87%* of the executed CDS trades from the DTCC data.  *Id.* at ¶¶ 127-246, 152.  As a result of

these filters, Professor Engle did *not* conduct an analysis on the 2008 CDS market, he analyzed

only a fraction of that market.  And that small fraction is not and was not designed to be

representative of the market as a whole.  Professor Engle conceded that he applied his filters

solely to create a "consistent" data set for his spread metrics. *See* Engle Tr. 216:6-24.   Due to the

massive quantity of data excluded by his filters, Professor Engle has no basis to opine reliably on

the 2008 CDS market as a whole.  *See Laumann v. National Hockey League*, 117 F. Supp. 3d

299, 315-16 (S.D.N.Y. 2015) ("[T]he actual data on which [the expert] relie[d] to extrapolate consumer demand . . . is simply too sparse to survive defendants' challenge under FRE 702.").

Similarly, Professor Engle included in his data set only CDS trades at the standard 5-year maturity, designed to eliminate the most illiquid products with the likely highest spreads.[53] Engle Rpt. ¶ 29.  But *only 6%* of QVT's Corporate and Sovereign CDS had a 5-year maturity. *See* CX-1020.  Professor Engle's spread analysis therefore has *nothing to do with 94%* of QVT's portfolio. Diplas Rpt. ¶ 23.  Similarly, Professor Engle opined that there was no material decline in liquidity during Lehman Week based on a calculation analyzing CDX IG Series 9, 10 and 11. Engle Rpt. ¶¶ 102-108. *None* of these investment grade indices were in QVT's portfolio.  Simply put, Professor Engle's analysis is not reliable and should be excluded because his data are not reflective of QVT's portfolio or the circumstances QVT faced in obtaining pricing in the market after Lehman's default.  *See Laumann*, 117 F.Supp.2d at 315-16 (excluding regression analysis as unreliable where the data were "largely untethered from the actual facts of this case").

Lehman did not obtain discovery from the market participants involved in those trades and, as such, Professor Engle has no way of knowing what any dealer actually quoted to any customer for any given 2008 CDS transaction.  Further, the DTCC data not publicly available at the time, and the ISDA reasonableness standard cannot be governed by spread metrics that QVT and other market participants had no way to calculate at the time of the termination.  The Court should exclude Professor Engle's analysis pursuant to FRE 401, FRE 702 and *Daubert* because,

---

[53] Likewise, Professor Engle also excludes all CDS transactions that involved "up front points," which are payments that a protection buyer pays at the outset of a CDS trade in addition to the regular premiums.  Engle Rpt. n.33.  CDS quoted with up front points are in general riskier than others in the market, and QVT's portfolio included many such examples. Diplas Rpt. ¶ 47.

as a result of a series of "filtering" procedures and flawed model assumptions, Professor Engle's

opinions are irrelevant and unreliable.[54]

### B.      Sam Weiser's Opinions are Irrelevant and Inadmissible.

Lehman proffers as an "expert" in this case Sam Weiser, a certified public accountant, to

challenge QVT's valuation of its positions despite the fact that he admits that he has no expertise

whatsoever in valuation under an ISDA contract and no knowledge of QVT's Loss determination.

Weiser Tr. 24:2-3, 25:7-27:20, 31:23-32:10.  Specifically, Mr. Weiser has been retained to testify

about QVT's internal valuations of its QVT positions for accounting purposes even though those

valuations were admittedly (1) not performed on the Early Termination Date; and (2) not

performed for the purpose of, or according to the methods appropriate for, an ISDA close-out.

Further, as Lehman itself acknowledged in *Intel*, determination of Loss is a legal question, not an

accounting question and therefore Mr. Weiser's opinion is irrelevant.  *See* Brief of LBHI at 20-

21, *LBHI v. Intel Corp.*, Adv. Pro. No. 1301340 [Dkt. No. 86] (Bankr. S.D.N.Y. Feb. 23, 2015)

("[Intel's accounting expert] also agreed that the amount of Intel's claim on the collateral is a

legal question, rather than an accounting question.").

In addition to opining improperly on QVT's valuation, Mr. Weiser also offers several

opinions on what a "rational" hedge fund manager would do in an apparent attempt to argue that

QVT should have acted consistently with Mr. Weiser's "rational" hedge fund manager.  He

states, for example: "Based on my decades of experience in the hedge fund industry, it is my

opinion that fund managers acting rationally would not provide portfolio valuations that [they]

believed were understated." Weiser Rpt. ¶ 37. These opinions are so removed from the reality of

---

[54] Professor Engle received the Nobel Prize in Economics for his research on the concept of autoregressive
conditional heteroskedasticity ("ARCH"). This case does not involve the ARCH concept in any way.  With respect
to relevant issues, Professor Engle has never taught a course or published articles on CDS trading or valuation, has
never traded or valued CDS, has never seen his spread metrics analyzed in a derivatives market, has never
participated in derivatives trading, is not familiar with ISDA, and did not review the QVT Claims or the Objection.
*See* Engle Tr. 12:3-13:4, 22:2-25:12, 36:4-38:25, 44:12-14, 69:24-70:13.

QVT's accounting requirements, and so irrelevant to the determination of Loss under the ISDA

Agreements, that they are not reliable or relevant evidence.   His testimony should be excluded.

VII.    **Motions _In Limine_**

A.    **Lehman Should be Precluded from Offering any Evidence, Testimony, or Argument at Trial Involving any Claims of any of Lehman's Other PCDS and CARB Counterparties.**

It appears Lehman intends to rely on claims asserted in its bankruptcy case by other

PCDS and CARB counterparties to attempt to establish that QVT's claim valuation is

unreasonable. _See_ O'Kane Rpt. ¶¶ 134-145 (charting all of the PCDS claims asserted against

Lehman).  If permitted to assert these arguments, Lehman will take this trial into a long and

pointless detour into the rationale of other counterparties (who are not parties to this case) in

valuing _their_ positions based on unknown (at least to QVT) and as yet undisclosed

methodologies.  This evidence is offered on an issue that is not only irrelevant (and which

Lehman previously claimed was irrelevant) but also an issue on which it refused to provide

discovery.

The only issue in this case is whether QVT valued the QVT Transactions reasonably and

in good faith.  The PCDS and CARB claims asserted by other counterparties are entirely

irrelevant to this inquiry.   Allowing Lehman to pursue this line of argument will only serve to

waste the Court's time and detract from the real issues at hand.  If it is required to do so, QVT

will show that the other PCDS claims have no bearing on QVT's reasonableness because the

counterparties held much smaller PCDS positions that represented a smaller fraction of their

overall claims against Lehman.  As such, these counterparties had no incentive actually to spend

time to value properly their PCDS transactions. Indeed, it is quite apparent from an analysis of

the claim amounts that these parties did nothing more than utilize Markit PCDS pricing, which as

discussed herein, was entirely unreliable and not even utilized by Lehman's PCDS expert.

O'Kane Tr. 96:25-98:3.  In contrast, PCDS is by far the largest driver of the present dispute

between QVT and Lehman. There is simply no comparison of QVT's large, outsized PCDS

position to the PCDS claims of other third parties.  Entertaining this red herring will do nothing

more than create a side show requiring an inquiry into the positions and methodologies of other

counterparties, and waste the Court's valuable time.

Further, it would be wholly inequitable to delve into these issues as Lehman has refused

to provide QVT with documents related to the valuation methodology of these counterparties,

claiming that "the terms on which Lehman and other parties have resolved their disputes are of

no relevance to QVT's Claims" and that they are "confidential and cannot be produced." (Letter

from L. Sawyer to D. Tracey re LEH Resp and Obj., p. 6, March 27, 2015).  Now, Lehman seeks

to use third party claims as a sword against QVT without providing any discovery on how the

claims were calculated and how the claims were resolved.  Still worse, Lehman apparently has

not even provided the third-party valuation methodologies to Dr. O'Kane, who testified that he

was unaware of how those parties calculated their claims and did not rely on their calculations.

O'Kane Tr. 208:11-14 ("Q: And I think you testified earlier that you don't have any information

on how the counter-parties valued the PCDS. A: That is correct.").[55]  He looked only at the

amount of other PCDS claims (supplied by Lehman) and determined QVT was not in that range.

Lehman should be precluded from introducing evidence or argument relating to claims

involving other PCDS and CARB counterparties at trial pursuant to Fed. R. Civ. P. ("FRCP")

37(c)(7) (made applicable to this proceeding by Fed. R. Bankr. P. 7037).[56]  Whatever probative

---

[55] Dr. O'Kane did look at the valuation of Goldman Sachs, but erroneously referenced it as a purchaser of PCDS in an attempt to compare its claim unfavorably to QVT; unfortunately for Dr. O'Kane, Goldman Sachs was actually a seller to Lehman of PCDS and thus an inapposite comparison, requiring Dr. O'Kane to revise and correct his initial report. O'Kane Tr. 223:19-232:5.

[56] Under FRCP Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Once the movant demonstrates that Rule

value evidence from other counterparty claims may have is substantially outweighed by the risk

of unfairly prejudicing QVT at this late stage by permitting Lehman to introduce evidence at trial

after years of refusing to produce discovery about such evidence.

### B.    Lehman Should be Precluded from Introducing Evidence of QVT's Post-filing Valuations of the QVT Claims against Lehman.

When Lehman filed bankruptcy, QVT's credit protection became illiquid claims against

the Lehman estate, with extremely uncertain value.  In order to separate its investors' interests in

the illiquid claims from their other investments with QVT, QVT established a "side pocket,"

labeled "S25."[57] S25 was comprised of the QVT Claims at issue in this case, and also QVT's

claims against other Lehman entities such as LBIE, LBOTC, LBCS, and LBI.  The purpose of

the S25 side pocket was to allow the QVT funds' investors at that time to preserve their indirect

interests in the claims arising from Lehman's bankruptcy, undisturbed by future subscriptions

into or redemptions out of the QVT funds, over what had the potential to be—and proved to be—

a protracted confirmation and claims resolution process.

In September 2008, QVT had no idea what value unsecured claims against Lehman might

have at the end of the day.  Accordingly, when it transferred its claims against Lehman into the

side pocket, it attributed to them no net asset value for accounting purposes.  Over time a regular

trading market for claims developed as Lehman made disclosures about its assets and liabilities,

put together a plan of liquidation, and began to make distributions. After some time QVT

determined it had a reasonable basis to begin to "mark to market" the recoveries that might be

---

26(a) (made applicable to this proceeding by Fed. R. Bankr. P. 7026) has been violated, Rule 37 is self-executing and the non-disclosing party has the burden to demonstrate that the failure to disclose was substantially justified or that the failure was harmless.  *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 470 (S.D.N.Y. 2016) (quoting *Atkins v. Cty. of Orange*, 372 F. Supp. 2d 377, 395-96 (S.D.N.Y. 2005).

[57] The S25 side pocket was one of a number of separate side pocket accounts established by QVT to hold illiquid assets both prior to and after Lehman's filing. Of these, only S25 held Lehman claims, and S25 held all of QVT's claims against all Lehman entities.

achievable on the QVT Claims against Lehman.  Importantly, the *amount* of the claim recorded in the S25 side pocket never changed—only QVT's determination of the *value* of those claims.

Lehman's apparent suggestion is that any difference between the QVT Claims and QVT's internal valuations of the market value of such claims is indicative of "bad faith" in QVT's submission of the QVT Claims. As this Court has recognized, this is nonsense. Secondary market values are not indicative of the correct claim amounts.  *See, e.g.*, *In re Fairfield Executive Assoc.*, 161 B.R. 595, 602 (D.N.J. 1993) ("[T]he price paid for a claim does not affect the amount of the creditor's claim."); *In re Lorraine Castle Apartments Bldg. Corp.*, 149 F.2d 55, 58 (7th Cir. 1945) (noting that bonds and other debt instruments are allowed in their face amount, even if the debt is trading well below face value).  Lehman should be prohibited from raising this entirely irrelevant issue at trial.

## CONCLUSION

The evidence at trial will show that QVT sought to act in full compliance with the ISDA Agreements, made substantial efforts to determine its losses reasonably and even conservatively, made a few honest mistakes that are without import to its total claims, and has been the victim of an ill-founded, unjustified, and costly attack on its good faith.  QVT's experts have independently verified the reasonableness of QVT's determinations with a full picture of the facts.  The QVT Claims should be allowed in full, plus all collection-related fees and costs and all other amounts recoverable under the ISDA Agreements.

59

Dated: January 25, 2017

HOGAN LOVELLS US LLP

By:  /s/ *John D. Beck*
      Dennis H. Tracey, III
      Robin E. Keller
      William M. Regan
      Benjamin J.O. Lewis
      John D. Beck

875 Third Avenue
New York, New York 10022
Tel: (212) 918-3000
Fax: (212) 918-3100
dennis.tracey@hoganlovells.com
robin.keller@hoganlovells.com
william.regan@hoganlovells.com
ben.lewis@hoganlovells.com
john.beck@hoganlovells.com

*Attorneys for QVT Fund LP and*
*Quintessence Fund L.P.*