JONES DAY
250 Vesey Street
New York, NY  10281.1047
Telephone:  +1.212.326.3939
Facsimile:   +1.212.755.7306
Jayant W. Tambe (2884450)
Laura Washington Sawyer (3050853)
Jennifer L. Del Medico (4422770)
Ryan J. Andreoli (4259115)

*Attorneys for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | (Jointly Administered) |

**<u>DEBTORS' PRE-HEARING MEMORANDUM</u>**

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ............................................................................. 1

FACTUAL BACKGROUND ................................................................................. 5

    A.    The Parties, Master Agreements and Transactions ................................. 5

    B.    QVT's Pre-Bankruptcy Valuation of the Transactions ........................... 6

    C.    QVT's Preparations for Lehman's Bankruptcy ..................................... 8

    D.    QVT's Termination of the Transactions on September 15, 2008 .............. 10

    E.    QVT's Purported Market Quotation Process ........................................ 11

    F.    QVT's Replacement of Certain Transactions ....................................... 14

    G.    QVT's September 16 Margin Call ...................................................... 15

    H.    QVT's Transfer Into a Side Pocket ..................................................... 17

    I.    QVT's Intent To Seek Recovery For Losses QVT Had Not Incurred ........ 18

    J.    QVT's Claim Inflation ..................................................................... 18

ARGUMENT ................................................................................................ 20

    A.    QVT Cannot Satisfy Its Burden of Proof ............................................. 20

    B.    QVT Failed to Conduct its Market Quotation Process in Good Faith .......... 23

    C.    QVT's Loss Calculation Is Not Reasonable Nor Done In Good Faith ........ 26

        1.    QVT's "Loss" is Magnitudes Higher than the Posted Collateral QVT Calculated and Required Lehman to Post ................................. 26

        2.    QVT Inflated Its Loss Calculation By Using Post-September 15 Data ...................................................................................... 28

            a.    QVT Was Required to Value the Transactions as of September 15, 2008 ............................................... 28

            b.    QVT Did Not Value Many of the Transactions as of September 15, Inflating Its Claim by Over $50 Million ........... 29

            c.    QVT Inflated The Value Of The MarkIt Transactions By Cherry-Picking Favorable Valuation Dates .................... 30

            d.    QVT Inflated The Value Of The PCDS and CARB Transactions By Using Post-September 15 Data ............... 32

        3.    QVT Inflated Its Valuations Of The MarkIt Transactions By Including Unreasonable Bid/Mid Charges ................................... 32

        4.    QVT's Claim Includes Charges For Transactions Wholly Unrelated To LBSF .................................................................. 34

5.      QVT Adopted Unreasonable and Untested Valuation
        Methodologies Designed to Inflate Its Claim ......................................... 34

        a.      The CARB Transactions ................................................. 34

        b.      The PCDS Transactions ................................................. 39

                i.      Background on PCDS ......................................... 40

                ii.     QVT Used An Untested And Fundamentally
                        Flawed Methodology To Value the PCDS
                        Transactions ..................................................... 40

                iii.    QVT's PCDS Valuations Far Exceed
                        Comparable Valuations Submitted By Other
                        PCDS Counterparties. ........................................ 42

D.      The Opinions of QVT's Experts Should Be Excluded As They Are Not
        Admissible, Relevant or Reliable ......................................................... 44

        1.      Expert Testimony Must Be Relevant and Reliable to be Admitted ......... 44

        2.      Professor Golden's Opinions Are Inadmissible ..................................... 45

        3.      Professor Pfleiderer's Opinions Are Inadmissible ................................. 49

        4.      Dr. Niculescu's Opinions Are Irrelevant ............................................... 53

        5.      Dr. Diplas' Rebuttal Opinions Are Inadmissible ................................... 54

E.      Motions In Limine ............................................................................. 55

        1.      QVT's Purported Reliance On Counsel .................................................. 55

        2.      QVTs Alleged *Post Hoc* Analyses and Backtesting .............................. 56

        3.      QVT's Failure to Preserve Relevant Data ............................................. 56

CONCLUSION ..................................................................................................... 60

## TABLE OF AUTHORITIES

**CASES**                                                                                    **Page**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)............................................................................44, 45

*Arista Records LLC v. Lime Grp. LLC*,
    No. 06 Civ. 5936, 2011 WL 1642434 (S.D.N.Y. April 20, 2011).........................55

*Best Payphones, Inc. v. City of N.Y.*,
    No. 1-CV-3924, 2016 WL 792396 (E.D.N.Y. Feb. 26, 2016) .........................57, 58

*Bourjaily v. United States*,
    483 U.S. 171 (1987)........................................................................................44

*C.H. Robinson Worldwide, Inc. v. Auster Acquisitions, LLC*,
    No. 11 C 105, 2011 WL 3159155 (N.D. Ill. July 26, 2011) ...................................22

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)............................................................................... passim

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)............................................................................... passim

*Glowczenski v. Taser Int'l, Inc.*,
    928 F. Supp. 2d 564 (E.D.N.Y. 2013) ...................................................................49

*The High Risk Opportunities Hub Fund Ltd. v. Lyonnais*,
    No. 600229/00, 2005 WL 6234513 (N.Y. Sup. Ct. July 6, 2005) .........................23

*Hussain v. Burton & Doyle of Great Neck, LLC*,
    No. 14-CV-5924, 2016 WL 6088309 (E.D.N.Y. Oct. 18, 2016) ..........................56

*In Matter of Deemer Steel Casting Co.*,
    117 B.R. 103 (Bankr. D. Del. 1990) .....................................................................22

*In re Am. Home Mortg. Holdings, Inc.*,
    411 B.R. 181 (Bankr. D. Del. 2009). ....................................................................29

*In re KIT Digital Inc.*,
    No. 13-11298, 2015 WL 1440906 (Bankr. S.D.N.Y. Feb. 26, 2015)....................20

*In re Landmark Distrib. Inc.*,
  189 B.R. 290 (Bankr. D.N.J. 1995) ....................................................................22

*In re Motors Liquidation Co.*,
  No. 09-50026, 2012 WL 1886755 (S.D.N.Y. May 21, 2012) ................................21

*In re Reading Broad., Inc.*,
  No. 05-26563, 2008 WL 2705547 (Bankr. E.D. Pa. July 8, 2008)........................22

*In re Residential Capital, LLC*,
  552 B.R. 50 (S.D.N.Y. 2015).............................................................................20

*In re Residential Capital, LLC*,
  491 B.R. 63 (Bankr. S.D.N.Y. 2013)..................................................................55

*In re Robintech, Inc.*,
  863 F.2d 393 (5th Cir. 1989) ...........................................................................23

*In re Roblin Indus., Inc.*,
  78 F.3d 30 (2d Cir. 1996) .................................................................................23

*In re Spiegel*,
  No. 03-11540, 2007 WL 2456626 (Bankr. S.D.N.Y. Aug. 22, 2007)............................21, 22

*JA Apparel Corp. v. Abboud*,
  568 F.3d 390 (2d Cir. 2009)..............................................................................46

*Kumho Tire Co, Ltd. v. Carmichael*,
  526 U.S. 137 (1999).............................................................................. passim

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
  595 F.3d 458 (2d Cir. 2010)..............................................................................46

*Lippe v. Bairnco Corp.*,
  288 B.R. 678 (Bankr. S.D.N.Y. 2003).................................................................48

*Marvel Characters, Inc. v. Kirby*,
  726 F.3d 119 (2d Cir. 2013).......................................................................48, 49

*Nimely v. City of N.Y.*,
  414 F.3d 381 (2d Cir. 2005)........................................................................45, 52

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
  691 F. Supp. 2d 448 (S.D.N.Y. 2010)..................................................................47

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991)...........................................................................46, 56

*United States v. Dukagjini*,
  326 F.3d 45 (2d Cir. 2003)....................................................................................48

*United States v. Duncan*,
  42 F.3d 97 (2d Cir. 1994) ......................................................................................45

## OTHER AUTHORITIES

Federal Rule of Civil Procedure  37(e) ...................................................................57

Federal Rule of Evidence 701...................................................................................48

Federal Rule of Evidence 702.............................................................................44, 50

Federal Rule of Evidence 703...................................................................................49

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special Financing Inc. ("LBSF," and together with LBHI, "Lehman") respectfully submit this pre-evidentiary hearing statement regarding Proofs of Claim Nos. 21217, 21140, 20421 and 21146 (the "Claim") filed by the hedge funds QVT Fund LP ("QVT Fund") and Quintessence Fund L.P. ("Quintessence," and together with QVT Fund, "QVT," and together with Lehman, the "Parties").

## PRELIMINARY STATEMENT

QVT acted unreasonably and not in good faith in constructing and submitting its grossly inflated Claim concerning the termination of 836 derivatives transactions with LBSF (the "Transactions"). To construct its Claim, QVT bloated the value of the terminated Transactions to over $380 million – a sum that is more than *three times* QVT's own internal valuations of those same positions as of the close of business on September 15, 2008, the Early Termination Date. QVT's inflated Claim is no accident. As QVT watched financial markets move *after* the Early Termination Date, QVT's CEO, Dan Gold, sought an opportunity to extract from Lehman hundreds of millions of dollars more than what QVT had actually lost as of the Early Termination Date. On September 23, 2008, Mr. Gold declared to investors that "even if one doesn't actually lose money," QVT would seek damages for "lost profit opportunities," resulting from market movements that occurred *after* the Early Termination Date.

QVT's traders followed through on Mr. Gold's directive. Although the contracts required QVT to obtain Market Quotations in good faith, QVT ran only a perfunctory, incomplete and unreasonable Market Quotation process. When that process unsurprisingly failed to produce more than a handful of Market Quotations, QVT spent the next two weekends manufacturing an inflated "Loss" calculation. In doing so, QVT first abandoned its own valuations, books and records. QVT then proceeded to (a) cherry-pick valuation dates after the Early Termination Date; (b) concoct novel, untested and unreliable valuation methodologies; and

(c) tack on tens of millions of dollars of unreasonable trading charges it never incurred.

The reality is that QVT's books and records nowhere reflect the massive "Loss" that is the basis for QVT's Claim.  The "Loss" and "Claim" are an effort by QVT to profit at the expense of Lehman's other unsecured creditors.  QVT cannot sustain its burden of proof that tripling the value of the Transactions was done either in good faith or reasonably, as is required by the governing contracts; nor can QVT satisfy its burden that the Claim is proper under the Bankruptcy Code.  While Lehman acknowledges that QVT is entitled to a claim, QVT's inflated Claim must be rejected.  What QVT is entitled to is a reasonable measure of market movements from September 12 to September 15 and a reasonable amount of charges actually incurred or that would have been incurred.  And the Court should allow a Claim only if, and only to the extent that, QVT meets its burden to prove that a Claim is reasonable under all the evidence submitted.

On the Early Termination Date, Lehman and QVT were parties to 836 derivatives transactions, entered under 1992 ISDA Master Agreements.  All but two of the Transactions were credit default swaps ("CDS").  The vast majority of the Transactions were standard CDS, with, on balance, QVT buying credit protection from Lehman.  Over the course of 2008, as credit risks increased, many of the Transactions became more valuable to QVT.  Pursuant to the contracts, Lehman and QVT agreed on valuations daily and Lehman posted tens of millions of dollars in cash collateral to QVT.  QVT monitored the valuations closely and there was never any material dispute between Lehman and QVT regarding the valuations.  QVT also relied on those valuations in the formal net asset value ("NAV") calculations it reported to its investors on a monthly basis and in its audited financial statements.  There is no evidence that QVT, a multi-billion dollar hedge fund with substantial fiduciary duties to its investors and obligations to regulators, ever believed its valuations of the Transactions were incorrect prior to the Early

Termination Date (and certainly no evidence that QVT ever conveyed such a belief to its investors, auditors or regulators either before or after the Early Termination Date).

On Sunday, September 14, 2008, QVT carefully assessed its exposure to Lehman and QVT's CFO reported to internal management that, as of the close of business on Friday, September 12, QVT's exposure to LBSF was fully collateralized by the $117 million that LBSF had posted. Even as QVT prepared for a potential Lehman filing, no one at QVT challenged or questioned that QVT was fully collateralized. On Monday, September 15, QVT's valuation systems calculated that, as a result of market movements between the close on September 12 and the close on September 15, the value of the Transactions had moved in favor of Lehman by about $5 million. Despite that calculation, duly prepared in the ordinary course of QVT's business, QVT made a collateral call on Lehman on Tuesday, September 16. As of September 16, there is no evidence that QVT ascribed any different value to the Transactions; nor is there any evidence that QVT believed that the values in its books and records were incorrect in any way.

When QVT exercised its right on September 15 to terminate the Transactions because of LBHI's bankruptcy filing, the governing contracts obligated QVT to undertake a series of further acts in good faith and reasonably, starting with the Market Quotation process. But, QVT ran that process as only a "check the box" exercise, by emailing requests for hundreds of transactions to dealers around 3 p.m. (or later) and requesting responses by 4 p.m. that same day. Predictably, QVT received Market Quotations for only 12 of the 836 Transactions. For 44 of the Transactions – including several that now feature prominently in its Claim – QVT skipped the process entirely. QVT simply did not seek *any* quotations for those transactions. QVT was more than content to allow the objective, price discovery process in the contracts, that QVT had insisted upon, to fail so that QVT would be free to maximize its Claim.

- 3 -

QVT would like the Court to believe that this is a complex case all about a portfolio of very complicated and illiquid Transactions. While there are some less liquid Transactions in the portfolio, there is no doubt that QVT knew how to value these Transactions in a reasonable manner and could have done so in September 2008, as many other counterparties facing Lehman did in the wake of Lehman's bankruptcy. Instead, the valuation exercise conducted by QVT in late September 2008 was a wholesale effort to inflate values to generate an outsized claim:

- <u>First</u>, rather than valuing the Transactions as of the Early Termination Date, QVT's traders (with the full benefit of hindsight) cherry picked values from days that were more favorable to QVT. They did this notwithstanding the fact that the very same price sources had reported prices on the very same products on September 15. More than 500 Transactions were valued ***after*** the Early Termination Date when credit spreads had moved further in QVT's favor. Just by valuing these Transactions after the Early Termination Date, instead of using available market data from September 15, QVT has inflated the Claim by more than $50 million. This is precisely the type of moral hazard the contracts are intended to prevent.

- <u>Second</u>, QVT's calculations included theoretical transactions costs (charges) that massively overstated any such costs QVT would have incurred if it had chosen to replace or re-hedge the Transactions. QVT only sought to (and did) replace less than 10% of the Transactions.

- <u>Third</u>, with respect to the less common CDS trades, QVT's traders simply discarded the time-honored standard valuation methodologies that QVT had used to value those products and instead invented new methodologies that were plainly flawed and internally inconsistent. These novel methodologies inflated the Claim by over $100 million.

- <u>Finally</u>, and typifying QVT's arbitrary and unprincipled approach to its Claim construction, is QVT's inclusion of $4.1 million for the costs of unwinding certain transactions that had ***nothing*** to do with LBSF and were entered into ***after*** the Early Termination Date! They simply are not part of any reasonable or good faith calculation of QVT's losses under the contracts with Lehman.

QVT cannot carry its burden to prove that its Claim is reasonable and was prepared in good faith. Nothing in the contract or the Bankruptcy Code permits QVT to seek to maximize its recovery at the expense of Lehman's creditors through an inflated Claim that is entirely divorced from the reality of QVT's "total losses and costs" resulting from the termination of the

- 4 -

Transactions.  Moreover, at the time, QVT did not undertake any reasonable analysis of the novel, untested and unreliable methodologies it had elected to adopt; there is scant contemporaneous evidence supporting anything that QVT did.  Instead, QVT will seek to parade before the Court after-the-fact explanations that seek to justify the inflated Claim.  But that *post hoc* rationalization bears no relation to what QVT actually did in September 2008.

## FACTUAL BACKGROUND

### A.    The Parties, Master Agreements and Transactions

When Dan Gold founded QVT in 2003, he envisioned QVT as a "best-in-class" quantitative hedge fund that would "compete with…best-in-class hedge funds."[1]  QVT invested in a wide variety of financial products, including equities, options, fixed income (debt) securities (both domestic and foreign), convertible bonds and derivatives.[2]  By 2008, QVT had a NAV of approximately $9.2 billion.[3]

As part of its investment strategy, in February 2005, QVT entered into a 1992 (Multicurrency-Cross Border) ISDA Master Agreement, and in June 2007, Quintessence entered into a 1992 (Multicurrency-Cross Border) ISDA Master Agreement with LBSF (collectively, the "Master Agreements").[4]  The Master Agreements, accompanying Schedules and Credit Support Annexes (the "CSAs"), are collectively referred to as the "Agreements."  Other than the different parties (QVT and Quintessence), the Agreements of QVT and Quintessence with LBSF are essentially identical.  LBHI acted as "Credit Support Provider" and guaranteed LBSF's obligations under the Master Agreements.  The Parties selected "Second Method" and "Market Quotation" to determine the "Payments on Early Termination" in the Event of Default.

---

[1]     Gold Tr. 13:13-16, Aug. 11, 2016.

[2]     *See* JX-29, QVTFUND04423432.

[3]     Ex. 5096 at QVTFUND02447529.

[4]     JX-1, QVTFUND00000142; JX-2, QVTFUND00000188.

At the time of LBHI's bankruptcy, there were 836 outstanding derivatives transactions between the Parties, and QVT held $117.3 million in cash collateral posted by LBSF.[5]  The vast majority of the Transactions were standard CDS trades.  The chart below breaks down the Transactions by category:[6]

| Trade Type | Number of Trades |
|---|---|
| CDS referencing debt issued by a single corporate issuer ("Single Name CDS") | 448 |
| CDS referencing an index or basket of corporate issuers ("Index CDS") | 128 |
| CDS referencing subordinated auto loan securities ("CARB") | 4 |
| CDS referencing asset-backed securities excluding CARB ("ABS CDS") | 110 |
| CDS referencing the sovereign debt of emerging market countries like Argentina and Venezuela ("Emerging Markets CDS") | 46 |
| CDS referencing the preferred securities of single corporate issuers ("PCDS") | 62 |
| Interest rate swaps | 2 |
| Unwound trades | 28 |
| Implied writedowns | 8 |
| **TOTAL** | **836** |

**B.    QVT's Pre-Bankruptcy Valuation of the Transactions**

After entering into derivatives transactions with LBSF, QVT promptly recorded the details of the transactions in its internal books and records so that the value of the transactions could be monitored on an ongoing basis.  QVT thereafter calculated daily marks (as well as daily profit and loss ("P/L") information) for each of its transactions with LBSF, and stored that information in its proprietary Tyche database.[7]  In the 2008 time period, the Tyche database also contained a "subsystem" called Mordor that QVT used to calculate the amount of margin that it

---

[5]    Ex. 5130, QVTFUND00000558.

[6]    Ex. 5339, QVTFUND04595888.

[7]    Sale 30(b)(6) Tr. 283:24-284:16; 330:25-332:8, Aug. 26, 2016.

was required to exchange with its prime brokers and derivatives counterparties on a daily basis.[8]

In addition to its daily marking process in Tyche, QVT also performed a thorough analysis of the value of each of its positions with LBSF at the end of every month in a proprietary system called Beardstown.[9] QVT placed "particular importance" on these month-end marks because they were used in QVT's formal NAV calculations and therefore influenced the Funds' capital activity (including redemptions from the Funds, new investments into the Funds and performance fees paid to QVT). As part of this monthly review process, QVT would evaluate the accuracy of its marks in order to confirm that they reflected the fair market value of the transactions and were not stale.[10] These month-end marks were determined according to valuation policies that QVT described for its investors (and potential investors) in the Funds' offering materials.[11] In addition to applicable accounting and regulatory requirements, QVT also had a fiduciary duty to reasonably determine the transaction values that it reported to its investors.[12] In connection with QVT's rigorous month-end valuation process, QVT's traders and support personnel were required to identify and memorialize in the Beardstown system all source materials they used to mark QVT's positions. For example, if QVT relied on a dealer quote to value a particular derivative in its month-end valuation for July 2008, the name of the dealer and the quote it provided would be entered into the Beardstown system for that transaction. The Beardstown system also allowed QVT personnel to record "Comments" regarding marks. The data that QVT has produced from the Beardstown system demonstrates that QVT relied heavily

---

[8]    Sale 30(b)(6) Tr. 258:12-22, Aug. 25, 2016.

[9]    Wollman 30(b)(6) Tr. 273:18-274:6.

[10]    While now QVT claims its marks were "stale" and should be disregarded, Chu 30(b)(6) Tr. 215:13-216:18, 219:22-220:11, Aug. 2, 2016, these are the same marks that QVT carefully reviewed and used to calculate its NAV reported to investors and that formed the basis for QVT's performance fees.

[11]    JX-29 at QVTFUND04424433-435.

[12]    Ex. 5420, Expert Report of Samuel S. Weiser ("Weiser Report") ¶ 33.

on pricing information provided by third-party pricing service MarkIt Partners, and that QVT

knew how to value the Transactions in the months prior to Lehman's bankruptcy filing.[13]

Indeed, it appears that QVT used pricing information from MarkIt Partners to value more than

half of the Transactions for purposes of its month-end marks for June, July and August 2008.[14]

As required by the Agreements, QVT posted "initial margin" with Lehman in the amount

of $18.6 million.  In addition, the parties exchanged variation margin on a daily basis, reflecting

the "mark to market" value of the outstanding transactions.  Each day, both QVT and Lehman

calculated the value of the portfolio and the change in that value from the previous day.[15]  To the

extent Lehman was required to post additional margin with QVT, QVT would make a margin

call on Lehman.[16]  To the extent that Lehman's margin calculations were more favorable to QVT

than those reflected on QVT's own records, QVT would defer to Lehman's calculation.[17]

Lehman and QVT would discuss these daily margin calculations and calls and were able to

quickly resolve any occasional disagreements.[18]  At no time did QVT voice any material

disagreement with the valuations; nor did QVT ever avail itself of the expedited valuation

dispute provisions set forth in the CSAs.

### C.    QVT's Preparations for Lehman's Bankruptcy

As 2008 progressed, QVT experienced unsatisfying returns.  Mr. Gold sent periodic

"Estimated Performance Reports" to investors that consistently reported on the "generally

---

[13]    *See* JX-110, QVTFUND04645246; JX-111, QVTFUND04645247; JX-99 QVTFUND04645248.

[14]    *See* JX-110, QVTFUND04645246; JX-111, QVTFUND04645247; JX-99 QVTFUND04645248.

[15]    *See, e.g.*, Ex. 5106, QVTFUND00000526; Ex. 5107, QVTFUND00000527; Ex. 5108, QVTFUND00000528.

[16]    *See, e.g.*, Ex. 5890, LEH-QVT_0000493; Ex. 5126, LEH-QVT_0000481; Ex. 5182, LEH-QVT_0000457.

[17]    *See, e.g.*, Ex. 5101, QVTFUND02447292; *see also* Ex. 5130, QVTFUND00000558 (showing that as of September 14, 2008, QVT was over collateralized for the Transactions).

[18]    *See, e.g.*, Ex. 5891, LEH-QVT_0008582; Ex. 5175, LEH-QVT_0000005; Ex. 5177, LEH-QVT_0000249; Ex. 5304, LEH-QVT_0000522; Ex. 5178, LEH-QVT_0000410; Ex. 5305, LEH-QVT_0001275.

negative" performance of the funds.[19]  Mr. Gold told investors he was "deeply unhappy"[20] about

QVT's performance in the months leading up to Lehman's bankruptcy.[21]  And QVT's dismal

performance continued even after Lehman's bankruptcy.  By the end of September 2008, QVT's

year-to-date losses were more than 21%.[22]

In early September 2008, QVT methodically prepared to protect itself and its clients'

investments in the event that Lehman failed.  QVT carefully assessed its risk and exposure to

Lehman.  QVT attempted to novate trades to other dealers, made efforts to move certain of its

positions held in the custody of Lehman's prime brokerage business (at LBI) to other prime

brokers and bought protection that would result in a payout to QVT should Lehman fail.[23]

In the days before Lehman's bankruptcy, Mr. Gold assured QVT's investors that QVT

was prepared for the potential of a Lehman bankruptcy and would likely even profit as a result:

> At present we believe that we retain enough Lehman CDS such
> that should Lehman default we would likely make more on the
> CDS than the loss of our initial margin, equity in repo, and equity
> in prime brokerage held with Lehman although I would caution
> that this analysis is dependent on the completion of the transfers
> currently under way and is based on our understanding of how
> certain of our accounts would be treated in the event of a
> bankruptcy of Lehman.[24]

QVT also continued to take steps to ensure that it was in the best possible position in the event of

a Lehman default.  For example, QVT traders identified the most important positions to be

replaced in anticipation of a potential Lehman bankruptcy.[25]  In addition, QVT devoted increased

---

[19]    Gold Tr. 54:23-55:2; 55:15-18; 57:10-13; 65:8-14, Aug. 11, 2016.

[20]    Ex. 5096, QVTFUND02447528.

[21]    Gold Tr. 54:23- 55:2; 55:15-18; 57:10-13, Aug. 11, 2016.

[22]    Ex. 5096 at QVTFUND02447529.

[23]    *See, e.g.*, Ex. 5466, QVTFUND04409226; Ex. 5096, QVTFUND02447528; Sale 30(b)(6) Tr. 304:14-23, Aug. 26, 2016; Chu Tr. 20:5-21:14, Aug. 4, 2016.

[24]    Ex. 5464 at QVTFUND02445189.

[25]    Chu 30(b)(6) Tr. 402:3-403:2, Aug. 2, 2016.

attention to its margin position with Lehman. QVT's focus on margin was not surprising, given

that margin is an important protection and QVT routinely calculated and tracked margin over the

course of its relationship with Lehman.[26] QVT even attempted to recover from Lehman the

initial margin of $18.6 million that it posted when it entered into the Transactions.[27] QVT had

no basis to seek the return of that initial margin, and Lehman did not return it. QVT also

prioritized any margin calls to be made from Lehman to ensure that QVT was holding sufficient

collateral in the event of a bankruptcy.[28] Throughout the week of September 8, LBSF and QVT

agreed on margin levels.[29] In assessing QVT's margin position on the weekend before Lehman's

bankruptcy, QVT concluded that it was overcollateralized with respect to the Transactions with

LBSF.[30]

### D.    QVT's Termination of the Transactions on September 15, 2008

On September 15, 2008, LBHI commenced a case under chapter 11 of the Bankruptcy

Code. There is no dispute that LBHI's filing was an Event of Default under the Agreements. In

a termination notice sent to Lehman at approximately 1:00 p.m. on September 15, QVT

terminated the Agreements and designated September 15 as the Early Termination Date.

As of the close of business on September 15, QVT's mid-market valuation of the

Transactions – as reflected in its internal marks database called Tyche – was $110.5 million.[31]

According to QVT's internal records, the mid-market valuation of the trades had moved

---

[26]    *See* Ex. 5059 at QVTFUND02445295-56; JX-34, QVTFUND00000321; Ex. 5101, QVTFUND02447292; Ex. 5887, QVTFUND00000550.

[27]    JX-45, QVTFUND02443123; Sale 30(b)(6) Tr. 102:4-9, Dec. 30, 2016.

[28]    Brumm Tr. 21:19 -23:9, July 29, 2016; Ex. 5895, QVTFUND00000530.

[29]    *See, e.g.,* Ex. 5182, LEH-QVT_0000457; Ex. 5126, LEH-QVT_0000481.

[30]    Ex. 5130, QVTFUND00000558.

[31]    JX-6, QVTFUND04645280.

- 10 -

$5 million in Lehman's favor from September 12 to September 15.[32]  On September 15, QVT

held approximately $117 million of collateral posted by LBSF.  In other words, QVT believed it

was still overcollateralized as of the close of business on September 15.

### E.    QVT's Purported Market Quotation Process

The Agreements provide that in the event of an Early Termination, "Market Quotation

and Second Method will apply . . ."[33]  This was not an accident.  Rather, during the negotiation

of the Parties' first ISDA Master Agreement in 2005, QVT specifically requested that Lehman

agree to the selection of the Market Quotation payment measure, stating:  "[w]e continue to feel

Market Quotation is the proper method for valuing our positions.  Most of our positions have a

ready market with easily obtainable quotations."[34]

Under the Market Quotation method, QVT was required to:

> request each Reference Market-maker to provide its quotation to
> the extent reasonably practicable as of the same day and time
> without regard to different time zones[] on or as soon as
> reasonably practicable after the relevant Early Termination Date.
> *The day and time as of which those quotations are to be obtained
> will be selected in good faith by the party obliged to make a
> determination under Section 6(e)*, and, if each party is so obliged,
> after consultation with the other.[35]

QVT was well aware that if it received fewer than three responses, the Market Quotation process

---

[32]     JX-6, QVTFUND04645280; QVT Response to Interrogatory No. 23; Sale 30(b)(6) Tr. 92: 18-23; 101:24-
102:3, Dec. 30, 2016.

[33]     JX-1 at QVTFUND00000161; JX-2 at QVTFUND00000207 (Schedule Part 1(f)).  While Part 1(f) of the
Schedule to the Parties' Agreements provides that the "Loss" payment measure will apply to "customized
correlation products" and transactions "deemed to be "Structured Transactions" in the Confirmations related thereto,
QVT has conceded that none of the Transactions fall into these exceptions.  *See* Ex. 5547, Nos. 1336-1337
(Supplemental Responses and Objections of QVT to LBSF's First Set of Requests for Admission).

[34]     JX-4 at LEH-QVT_0018737.  QVT assured Lehman that it believed it would be able to obtain Market
Quotations for any "customized products" in its portfolio and indicated that all of its ISDA agreements with other
counterparties used Market Quotation "as the agreed valuation method. . . ."  JX-4 at LEH-QVT_0018738.

[35]     JX-1 at QVTFUND00000156-157; JX-2 at QVTFUND00000202-203, § 14(d) (definition of "Market
Quotation") (emphasis added).  The phrase "Reference Market-makers" is defined in the Agreements as "four
leading dealers in the relevant market selected by the party determining a Market Quotation in good faith."  *See* JX-
1 at QVTFUND00000157; JX-2 at QVTFUND00000203, § 14(d) (definition of "Reference Market-makers").

would be deemed to have failed.  In that event, QVT would be permitted to resort to "Loss."

QVT began drafting its request for Market Quotations on Sunday September 14, the day

before Lehman filed for bankruptcy.[36]  QVT divided the Transactions into three groups by type

of CDS: one request included Single Name CDS and Index CDS, a second request included ABS

CDS, and the third request covered Emerging Markets CDS.

QVT decided to solicit Market Quotations in the form of a "BWIC/OWIC," [37] which

refers to "bids" and "offers" "wanted in competition." [38]  In general, QVT's BWIC/OWIC

requests to Reference Market-makers attached a spreadsheet which contained instructions in one

tab, and a list of the applicable transactions in another.[39]  In the instructions tab, QVT requested

the following:

> [A] quotation…for an amount that [the dealer] would pay to QVT
> ...or…would require to be paid by QVT…in consideration of an
> agreement between QVT…and [the dealer] to enter into a
> transaction that would have the effect of preserving the economic
> equivalent of any payment or delivery…by the parties under
> Section 2(a)(i) of the ISDA Master Agreement…[40]

In other words, QVT specifically requested ***actionable*** quotes, not mere indications of value.[41]

QVT's solicitations requested that actionable responses for hundreds of positions be

provided as of 4:00 p.m. on September 15, just one hour (or less) after the requests were sent,[42]

despite the fact that QVT knew that "dealers were very, very busy at the time, and that they were

---

[36]     JX-51, QVTFUND04418577; Chu 30(b)(6) Tr. 402:3-405:5, Aug. 2, 2016.

[37]     *See, e.g.,* JX-57, QVTFUND04415982 (cover email containing the "Subject" line "BWIC-OWIC 080915 3PM non-EM.xls").

[38]     Bruce Tr. 43:7-15, Dec. 15, 2016; Wollman 30(b)(6) Tr. 267:4-14, Aug. 9, 2016.

[39]     *See, e.g.,* JX-57 at QVTFUND04415983 (spreadsheet containing "Instructions" tab and three additional tabs with lists of transactions).  At least one of QVT's BWIC/OWIC requests included transactions that are not at issue in this dispute.  *See, e.g.,* JX-57 at QVTFUND04415983 ("Single Name" tab, Rows 70-71, 75).

[40]     *See* JX-57 at QVTFUND04415983 ("Instructions" tab).

[41]     Chu 30(b)(6) Tr. 365:3-9, Aug. 2, 2016; Brumm Tr. 29:5-23, July 29, 2016; Wollman 30(b)(6) Tr. 210:8-11, Aug. 9, 2016.

[42]     JX-57, QVTFUND04415982.

receiving a lot of requests that may have been similar to market quotation requests."[43]  While

QVT received some quotations from Reference Market-makers on certain of these Transactions,

QVT claims it only received three or more quotations for twelve transactions.[44]

Significantly, QVT has now admitted, after repeatedly claiming otherwise,[45] that it failed

to solicit Market Quotations for all of the terminated Transactions.[46] In particular, QVT did not

solicit Market Quotations for: (i) 32 ABX transactions; (ii) 4 Single Name CDS transactions on

the reference entities STSUP and MLMI; (iii) 4 CARB transactions; (iv) 2 ITRAX9 index CDS

transactions; and (v) 2 interest rate swaps.[47]  In total, QVT failed to seek Market Quotations for

44 of the Transactions and has provided no explanation for its failure to do so.  For this

population of Transactions, QVT's inflated Claim exceeds its September 15 valuation by over

$28 million.

Ultimately, QVT only received the three requisite quotations for 12 of the

836 Transactions at issue in this dispute.  For the remaining 824 Transactions, QVT decided that

the Market Quotation process had failed and that it was entitled to use the Loss method.

---

[43]    *See* Chu Tr.  46:20-47:2; 58:7-14, Aug. 4, 2016; JX-57, QVTFUND04415982-983; *see also* Ex. 5407, QVTFUND04424731; Ex. 5147 at QVTFUND04414560; Wollman 30(b)(6) Tr. 374:13-376:9, Aug. 9, 2016; Ex. 5147, QVTFUND04414559-50 ("Please see the attached sheet.  We would appreciate your responses *by* 4:00 pm today") (emphasis added).

[44]    *See* CX-1020, QVTFUND04595888.

[45]    Despite the fact that QVT's Market Quotation solicitations plainly did not include all of the Transactions, QVT and its counsel repeatedly attempted to assert that QVT had in fact sought quotes on all of the Transactions and simply could not find the correspondence.  *See, e.g.,* Ex. 5545, Nos. 1306-1309 (Responses and  Objections of QVT to LBSF's First Set of Requests for Admission) (stating that for CARB, STSUP, MLMI and ABX transactions, QVT "cannot locate written evidence that it sought Market Quotations").  QVT finally conceded that it had not sought Market Quotations on all of the Transactions in supplemental responses it provided to Lehman's Requests for Admission.  *See* Ex. 5547, Nos. 1306-1309 (Supplemental Responses and Objections of QVT to LBSF's First Set of Requests for Admission); *see also* Brumm Tr. 52:7-53:8, 64:18-65:7, Dec. 29, 2016.

[46]    Ex. 5544, No. 14 (Responses and Objections of QVT to LBSF's Second Set of Interrogatories).

[47]    *See* Chu Tr. 48:17-49:12, Aug. 4, 2016; Wollman 30(b)(6) Tr. 372:11-374:5, Aug, 9, 2016.

- 13 -

### F.    QVT's Replacement of Certain Transactions

While QVT terminated all 836 of its Transactions with LSBF on September 15, it only entered into replacement trades for 82 of these Transactions (or approximately 10% of the trade population).[48]  Of the 82 Transactions that QVT actually replaced, 36 were Emerging Markets CDS referencing debt issued by Argentina and Venezuela, and 46 were Single Name CDS referencing the debt of various corporate issuers.[49]  QVT began entering into these replacement trades early in the morning on the Early Termination Date, hours before it sent the notice of termination and long before it sent its requests for Market Quotations.[50]  The vast majority of QVT's replacement trades had 5-year tenors, although a few were slightly longer or shorter dated.[51]

There is no evidence that QVT's failure to enter into replacement trades for the remaining 752 Transactions was the result of illiquid market conditions or an inability to find dealers willing to trade with QVT.  Rather, QVT made a conscious decision not to replace the vast majority of the Transactions as part of its strategy to reduce its risk.[52]  In light of QVT's decision not to replace the vast majority of Transactions, which was driven by its own business interests (not chaotic market conditions), QVT only incurred transactions costs (i.e., bid-ask charges) on those transactions it actually replaced.[53]  QVT did not incur any charges associated with those

---

[48]    *See* CX-1020, QVTFUND04595888.

[49]    *See* CX-1020, QVTFUND04595888.

[50]    *See, e.g.,* CX-1319, QVTFUND04603455; CX-1320, QVTFUND04596527; CX-1328, QVTFUND04583275; CX-1330, QVTFUND04596519; CX-1332, QVTFUND04603434; CX-1333, QVTFUND04603435; CX-1340, QVTFUND04603445; CX-1347, QVTFUND04603458.  QVT entered into replacement trades for 34 of the Transactions on the Early Termination Date, 44 of the Transactions on September 16, 2 of the Transactions on September 17 and 2 of the Transactions on September 18.  *See* CX-1020, QVTFUND04595888.

[51]    *See* CX-1020, QVTFUND04595888.

[52]    Brumm 30(b)(6) Tr. 57:22-58:6, July 29, 2016; *see also* Brumm Tr. 63:5-15, July 29, 2016.

[53]    Lehman is not challenging the inclusion of these charges in its Claim associated with the Transactions that QVT replaced.

trades that it did not replace, and there is absolutely no basis for valuing any of these
Transactions on a date other than September 15, 2008.

### G.    QVT's September 16 Margin Call

Consistent with QVT's prior practices, on the morning of September 16, QVT compared
its valuations of the Transactions as of the close of business on Friday, September 12 to its
valuations on Monday, September 15, to evaluate whether the market had moved in such a way
that Lehman was required to post additional collateral with QVT.  Kelly Feng had been regularly
handling this process at QVT since April of 2008 and was authorized to determine and make
margin calls on behalf of QVT.[54]  In fact, the week before LBHI filed for bankruptcy QVT
senior management specifically directed Ms. Feng to prioritize all margin calls to Lehman.[55]

After consulting QVT's margin system, Ms. Feng sent an e-mail message to her margin
counterpart at Lehman making a $13.3 million margin call.[56]  Ms. Feng's e-mail stated that QVT
was making the call because of "a MTM movement from EOB 9/12 to 9/15 for +12mm in QVT
and 1.3mm in QUINTESSENCE."[57]  In other words, it appeared that Ms. Feng was
communicating to Lehman that there was a $13.3 million movement in QVT's favor from the
end of the day on September 12 to the end of the day on September 15.

But QVT's internal books and records do not show a $13.3 million movement in QVT's
favor from the close on September 12 to the close on September 15.  Instead, QVT's books and
records show a $5 million move in **Lehman's** favor between those two dates.[58]  When pressed to

---

[54]    Feng Tr. 15:4-17:2, 18:15-21; 24:3-25:5, 29:16-31:4, Jan 10, 2017; *see also* Sale 30(b)(6) Tr. 267:20-268:7,
Aug. 25, 2016; Sale 30(b)(6) Tr. 71:6-10, Dec. 30, 2016 (Feng "was the one responsible for doing the analysis" to
determine if QVT should make a margin call).

[55]    Ex. 5111, QVTFUND00000373.

[56]    Ex. 5169, QVTFUND02442869; Feng Tr. 29:16-30:8, Jan. 10, 2017.

[57]    Ex. 5169, QVTFUND02442869.

[58]    JX-6, QVTFUND04645280.

explain this discrepancy, QVT has explained that it was actually making another "attempt[] to recover the initial margin [of $18.6 million] it had posted to Lehman prior to Lehman's bankruptcy."[59]  In other words, QVT sought $13 million because it had deducted the $5 million move in Lehman's favor from the initial margin QVT posted.[60]  It appears that QVT was hoping to exploit any confusion in the aftermath of Lehman's bankruptcy and dupe Lehman into returning the initial margin QVT had been seeking the week before Lehman filed.

Lehman responded to QVT's September 16 margin call by stating that "there [would] be no valuation/movements."[61]  When Ms. Feng notified QVT managing member Tracy Fu that Lehman would not be posting any additional margin, Mr. Fu did not reprimand Ms. Feng for making the margin call.  Instead, he simply forwarded Lehman's response to the other managing members of QVT and observed that "LBSF is *still* not making payments."[62]

Regardless of how QVT calculated its September 16 margin call, QVT's books and records do not show that QVT had suffered any significant loss resulting from a market move from the close of business on September 12 to the close of business on September 15.  Even if QVT were to retreat to its prior position that the September 16, 2008 margin call actually reflected the move in the positions from September 12, 2008 to September 15, 2008, $13.3 million is a far cry from the $265 million sought in QVT's Amended Proofs of Claim.[63]  QVT

---

[59]     Responses and Objections of QVT to LBHI's Second Set of Interrogatories, No. 23 (Nov. 10, 2016).  *See also* Sale 30(b)(6) Tr. 92:8-93:3, Dec. 30, 2016. The misleading nature of QVT's September 16, 2008 margin call is inconsistent with QVT's obligation to perform all of its obligations under the CSAs "including, but not limited to, all calculations, valuations, and determinations made by either party…in good faith and a commercially reasonable manner."  JX-1 at QVTFUND00000173-174.

[60]     Neither Mr. Sale nor Ms. Feng could explain why Ms. Feng sought $13.3 million instead of $13.5, which is the approximate difference of the initial margin and the MTM move in Lehman's favor.  Sale 30(b)(6) Tr. 124:21-126:9, Dec. 30, 2016; Feng Tr. 89:6-17, 96:17-97:2, Jan. 10, 2017.

[61]     Ex. 5169, QVTFUND02442869.

[62]     Ex. 5169, QVTFUND02442869 (emphasis added).

[63]     Ex. 5342, Stipulation and Order Regarding Amendment and Reduction of Proofs of Claim Nos. 20421, 21140, 21146, and 21217 (Docket 53285).

simply cannot reconcile its outlandish Claim with this reality.

### H.    QVT's Transfer Into a Side Pocket

On or about September 30, 2008, approximately two weeks after terminating its Agreements with Lehman, QVT engaged in a two-step process designed to move the Transactions out of its trading books and into a separate account called a "side pocket."[64]  First, the Transactions were "booked out" of QVT's trading book at their "collateral value" (i.e., the amount of collateral or margin that QVT held to reflect the mark-to-market value of the Transactions on September 11).[65]  Because QVT booked the Transactions at their collateral value (rather than any higher value such as the three times value QVT ascribed to the Transactions in the Claim), highlights that QVT's books and records again do not reflect any material loss associated with the termination of the Transactions.[66]  Second, QVT created a new "side pocket" for its claims against Lehman and assigned that "side pocket" a value of zero at inception, allegedly due to the uncertainty associated with potential recoveries from the Lehman Estate.[67]

According to Mr. Gold, QVT moved the Transactions out of its trading book and into this side pocket (which QVT has alternately referred to as the "S25 Side Pocket" and the "Lehman Side Pocket") "to isolate these things for the benefit of the investors that – that you know, bore the loss of Lehman's default[]."[68]  Thus, each investor who owned an interest in the funds on the Early Termination Date was assigned a pro rata share of the Lehman Side Pocket, and is thereby entitled to share in the proceeds from QVT's Proofs of Claim based on its percentage

---

[64]    Ex. 5231 at QVTFUND04415384 ("Also among these is a side pocket containing all claims that have or may be made by the QVT funds due to losses suffered in connection with Lehman's bankruptcy."); Ex. 5221, QVTFUND04423892-04423893.  In general, a side pocket is a separate account designed to hold assets that a hedge fund or investment manager deems to be relatively illiquid.

[65]    Chu Tr. 117:14-121:11, Aug. 4, 2016; Brumm Tr. 100:4-25, July 29, 2016.

[66]    Sale 30(b)(6) Tr. 175:7-178:20, Aug. 25, 2016.

[67]    Brumm Tr. 111:19-113:25, July 29, 2016; Chu Tr. 117:14-121:11, Aug. 4, 2016.

[68]    Gold Tr. 101:2-102:5, Aug. 11, 2016.

ownership.[69]   However, a small group of QVT insiders (including Messrs. Gold, Chu, Brumm, Sale and Wollman, some of whom are likely to testify during the claim objection hearing) now stand to receive a substantial percentage of any Claim proceeds paid to QVT.[70]

### I.   QVT's Intent To Seek Recovery For Losses QVT Had Not Incurred

On September 23, 2008, shortly before the movement of the terminated Transactions into the side pocket and QVT's manufacturing of its purported "Loss," Mr. Gold sent his investors an "Estimated Performance" update.[71]   In this update, Mr. Gold reported to his investors that QVT had no net exposure resulting from the Lehman bankruptcy.  Mr. Gold continued that "it is possible to be damaged even if one doesn't actually lose money, if one would have made money but for the counterparty's default."[72]  Mr. Gold explained that QVT had "lost the opportunities to profit that they would have had if Lehman had not failed" and promised QVT would seek to recover for these "lost profit opportunities" even though they did not arise until after the Early Termination Date.[73]

### J.   QVT's Claim Inflation

To track the Claim amounts, QVT trader and portfolio manager Joel Wollman created a spreadsheet template.[74]   Consistent with Mr. Gold's directive, and now unbound by the constraints of Market Quotation, QVT traders Wollman, Brumm, Knox, Chu and Yi Cen met on the weekends of September 20-21 and September 27-28 to come up with their calculation of

---

[69]     Brumm Tr. 114:2-12, July 29, 2016.

[70]     See Ex. 5339, QVTFUND04459557 (demonstrating that the percentage ownership of the insider group in the Lehman Side Pocket grew from approximately 9.4% in 2008 to approximately 17.8% in 2015, and has likely increased since 2015); Ex. 5354, QVTFUND00416800 (spreadsheet listing transfers of interests in the Lehman Side Pocket between 2009 and 2014).  When considering the impact of performance fees, we estimate the beneficial interest of the insider group to be as high as 34.3% in 2015.

[71]     Ex. 5466, QVTFUND04409226-229.

[72]     Ex. 5466 at QVTFUND04409227.

[73]     Ex. 5466 at QVTFUND04409226-227.

[74]     See Wollman 30(b)(6) Tr. 221:9-223:16, Aug. 9, 2016.

"Loss" arising from the termination of the Agreements.[75]  By the second weekend, QVT's traders had the luxury to review the data and market developments *following* Lehman's bankruptcy on September 15.  For example, QVT's traders were able to observe, as a general matter, that credit spreads widened in the days following Lehman's bankruptcy on September 15,[76] which meant that Loss calculations done on dates other than September 15 would likely result in larger valuations from QVT's perspective.

Once each of the traders had completed the process of valuing the trades assigned to him, Mr. Wollman combined the spreadsheets into a single master spreadsheet.[77]  Neither Mr. Wollman nor anyone else at QVT, however, checked the other traders' work or attempted to verify that the traders had all valued the Transactions consistently.[78]  Mr. Wollman's master spreadsheet, which QVT's witnesses referred to as the "888 Spreadsheet" during their depositions (due to the last 3 digits of its Bates number), was then used as the basis for QVT's Calculation Statement and Proofs of Claim.  Indeed, this spreadsheet – which is riddled with errors and inconsistencies – is not replicated in QVT's actual books and records.

As summarized below, QVT employed a number of techniques to maximize its Claim, resulting in a Claim that is divorced from reality and from any values found in QVT's records.  These strategies included:

- Including losses associated with unwinding trades that were not with LBSF or terminated as a result of Lehman's bankruptcy.

- Valuing many transactions using cherry-picked data from dates other than the Early Termination Date,  despite the fact that equivalent market data was available for September 15.

---

[75]    JX-86, QVTFUND04414811; Chu Tr. 64:23-66:10, Aug. 4, 2016.

[76]    Ex. 5024 at QVTFUND04409086; Gold Tr. 113:7-17, Aug. 11, 2016; Sale 30(b)(6)Tr. 153:8-22, Aug. 25, 2016.

[77]    *See* Wollman 30(b)(6) Tr. 221:9-223:16, Aug. 9, 2016.

[78]    *See* Wollman 30(b)(6) Tr. 326:21-328:23, Aug. 9, 2016.

- Applying excessive and theoretical trading charges for trades that QVT did not replace nor even attempt to replace.

- Relying solely on "trader judgment" to justify its methods while turning a blind eye to available market data and QVT's own historical valuation methodologies.

- Inventing new methodologies for valuing certain transactions, without undertaking any analysis to verify the legitimacy, bias, or reliability of the methodologies.

Ultimately, QVT's efforts resulted in a massive inflation of QVT's claim valuation compared to QVT's own September 15 valuations, as set forth in the chart below:

| Trade Type | Number of Trades | Values in QVT's Books as of September 15, 2008 | QVT's Claim Valuation[79] |
|---|---|---|---|
| Single Name CDS | 448 | $83,124,557 | $137,265,443 |
| Index CDS | 128 | $(41,059,142) | $(21,924,004) |
| ABS CDS | 110 | $28,764,094 | $59,451,607 |
| Emerging Markets CDS | 46 | $19,500,910 | $33,052,582 |
| PCDS | 62 | $14,733,809 | $134,179,132 |
| CARB | 4 | $16,796,667 | $36,710,000 |
| Interest rate swaps | 2 | $(4,367,913) | $(4,685,993) |
| Unwound trades | 28 | $(7,012,500) | $3,796,716 |
| Implied writedowns | 8 | | $4,531,576 |
| **TOTAL** | **836** | **$110,480,481** | **$382,377,060** |

## ARGUMENT

### A.    QVT Cannot Satisfy Its Burden of Proof

QVT bears the burden of proof in connection with its Claim. *See In re KIT Digital Inc.*, No. 13-11298, 2015 WL 1440906 (Bankr. S.D.N.Y. Feb. 26, 2015) ("The claimant is required to prove the claim, and not merely sit back while the objector attempts to disprove it."); *In re Residential Capital LLC*, 552 B.R. 50, 68-69 (S.D.N.Y. 2015) ("[A] claim is not automatically allowed in the amount the claimant alleges simply because the Bankruptcy Court determines that the claimant has a valid claim for *some* amount.  Rather, the Bankruptcy Court has an

---

[79]    *See* CX-1020, QVTFUND04595888.

independent obligation to 'determine the amount of each claim."); *In re Spiegel*, No. 03-11540, 2007 WL 2456626, at *15 n.6 (Bankr. S.D.N.Y. Aug. 22, 2007) ("The claimant **always** bears the ultimate burden of persuasion.") (emphasis added); *In re Motors Liquidation Co.*, Nos. 09-50026, 2012 WL 1886755, at *3 (S.D.N.Y. May 21, 2012) ("the claimant ... must ... prove by a preponderance of the evidence that under applicable law the claim should be allowed").

To meet this burden, QVT must demonstrate that it determined its Claim in accordance with the Agreements and applicable law. QVT cannot do so because it acted unreasonably to inflate its Claim. QVT has told this Court that its $265 million Claim is based on its "books and records,"[80] but that is false. QVT cannot point to any $265 million valuation in its "books and records," other than its post-bankruptcy exercise in claim inflation. Tellingly, the valuations underlying QVT's Claim are more than **three times** QVT's valuations of those same positions, prepared in the ordinary course of business as of the close of business on September 15.[81] There is no reasonable explanation to justify QVT's decision to abandon its settled valuations of the Transactions and replace them with new calculations that do not reflect the reality of QVT's "total losses and costs."

Moreover, QVT's decision to abandon its own valuations and substitute them with a number that was three times as large apparently was accomplished without any of the type of supporting financial calculations, models and analyses that one would reasonably expect to find at a "first in class," sophisticated hedge fund like QVT. The utter absence of any such evidence cannot be countered by a parade of expensive expert witnesses, coming in to offer after-the-fact explanations to justify QVT's Claim inflation exercise. QVT invokes "trader judgment" in a

---

[80]    JX-93 at QVTFUND00000269; JX-94 at QVTFUND00000276; JX-95 at QVTFUND00000283; JX-96 at QVTFUND00000290.

[81]    *Compare* JX-93 at QVTFUND00000266; JX-94 at QVTFUND00000273; JX-95 at QVTFUND00000280; JX-96 at QVTFUND00000287 *with* JX-6, QVTFUND04645280 (QVT Valuations 9/12-9/19) ("Sheet 1" tab, sum Column B to $115,520,196).

feeble attempt to explain away the lack of evidence. However, to be accepted by this Court, QVT's valuation must be supported by more than its self-serving testimony. *See, e.g., C.H. Robinson Worldwide, Inc. v. Auster Acquisitions, LLC*, No. 11 C 105, 2011 WL 3159155, at *3 (N.D. Ill. July 26, 2011) (denying claim where claimant failed "to precisely show how it calculated a claim"); *In re Reading Broad., Inc.,* No. 05-26563, 2008 WL 2705547, at *8 (Bankr. E.D. Pa. July 8, 2008) (disallowing portion of claim where claimant based valuations on "assumptions for which there was no support offered"). Because QVT cannot meet its burden of proof, its Claim must be rejected. *See In re Spiegel*, 2007 WL 680763, at *15 n.6.

Finally, and contrary to QVT's apparent belief, neither the Agreements nor applicable law gave QVT the discretion or the license to "maximize" its Claim. The Agreements plainly require QVT to have acted reasonably and in good faith in calculating "its total losses and costs." At the hearing, the Court will be presented with a range of reasonable valuations for the Transactions including, notably, QVT's own valuations from the close of business on September 15, 2008 that are far lower than the valuations underlying the Claim. Where the Court is presented with a range of reasonable valuations, it is consistent with both the Agreements and applicable law for the Court to select the lowest reasonable valuation in the range. *See In re Landmark Distrib., Inc.*, 189 B.R. 290, 316 (Bankr. D.N.J. 1995) (while court was "satisfied with the testimony of [the creditor's] expert with respect to the valuation," the court nevertheless "accept[ed] [only] the lower figure of his ... valuation range"); *see also In Matter of Deemer Steel Casting Co.*, 117 B.R. 103 (Bankr. D. Del. 1990) (determining an entity's quasi-contract damages by "[a]pplying the low end" of an estimated range of values). This practice makes sense since "[a]llowing a creditor to receive more than he is entitled to take "would be unfair to all of the [other] creditors ... whose slice of the bankruptcy pie would be

- 22 -

smaller as a result." *In re Robintech, Inc.*, 863 F.2d 393, 398 (5th Cir. 1989); *see also In re*

*Roblin Indus., Inc.*, 78 F.3d 30, 40 (2d Cir. 1996) (noting that the Bankruptcy Code reflects "a

concern for the equitable treatment of all creditors").

###    B.    QVT Failed to Conduct its Market Quotation Process in Good Faith

QVT was required to determine the Early Termination Payment due under the

Agreements using the Market Quotation method.  The Agreements expressly provide that a Non-

Defaulting party, such as QVT, had to conduct the Market Quotation process in good faith.[82]  *See*

*also The High Risk Opportunities Hub Fund Ltd. v. Lyonnais*, No. 600229/00, 2005 WL

6234513 (N.Y. Sup. Ct. July 6, 2005) ("Section 14 of the Master Agreement required [the

Determining Party] to obtain market quotations in 'good faith.'").[83]

While QVT purported to conduct a Market Quotation process, QVT did not approach or

conduct that process in good faith.  QVT's Market Quotation process was nothing more than an

exercise in formality, and was structured in a way that made failure inevitable.  The Court should

not endorse QVT's efforts to sabotage the Market Quotation process, but instead should hold the

parties to the bargain that they struck – that the Early Termination Payment must be determined

by Market Quotation.  Since QVT did not conduct the Market Quotation process in good faith, it

should not be rewarded by being permitted to resort to Loss.

As an initial matter, QVT has now conceded that it did not even seek Market Quotations

for 44 of the terminated Transactions.  While QVT initially took the position that Market

Quotations were sought for ***all*** transactions but that it was unable to find corroborating

documentation,[84]  it recently reversed course and admitted that it failed to seek Market

---

[82]        *See* JX-1 at QVTFUND00000157 ("Market Quotation" and "Reference Market-maker" definitions).

[83]        *See also* Ex. 5402, Expert Report of Schuyler K. Henderson ("Henderson Report") ¶¶ 5-8; 77-78.

[84]        *See, e.g.*, Brumm 30(b)(6) Tr. 41:24-42:6, July 29, 2016.

Quotations for (i) 32 ABX transactions; (ii) 4 Single Name CDS transactions on the reference

entities STSUP and MLMI; (iii) 4 CARB transactions; (iv) 2 ITRAX9 index CDS transactions;

and (v) 2 interest rate swaps.[85]   Obtaining QVT's admission that it did not even attempt the

Market Quotation process for these Transactions was hard fought; QVT only recently admitted

that it never conducted a Market Quotation Process for these 44 Transactions.[86]   QVT's failure to

even attempt to obtain Market Quotations for these Transactions precludes any resort to Loss in

relation to them.[87]   For these 44 Transactions, a Claim should be allowed only in the amount

reflected in QVT's books and records as of the close of business on September 15.

Second, QVT did not give the dealers sufficient time to respond to the Market Quotation

solicitations that were sent on September 15.   QVT knew that "dealers were very, very busy" on

September 15,[88] but proceeded to seek Market Quotations giving the dealers just an hour (and in

some instances only 40 minutes) to respond to quotation requests for hundreds of transactions.

QVT clearly did not give dealers adequate time to respond to its requests, nor is there any

evidence that QVT meaningfully followed up with dealers to ensure that it obtained the requisite

---

[85]        *See* Ex. 5544, No. 14 (Responses and Objections of QVT to LBSF's Second Set of Interrogatories).

[86]        *See* Ex. 5544, No. 14 (Responses and Objections of QVT to LBSF's Second Set of Interrogatories).  In its initial RFA responses, QVT's responses conflicted with its response to Interrogatory No. 14, which were provided simultaneously.  Specifically, in its RFA responses, QVT stated that it could not "locate written evidence that it sought Market Quotations" for the CARB, STSUP, MLMI, and ABX transactions.  Ex. 5545, Nos. 1306-1309 (Responses and Objections of QVT to LBSF's First Set of Requests for Admission).  However, QVT's Response to Interrogatory No. 14 admitted that QVT had not in fact sought market quotations for these positions.  At Lehman's request to clarify which of its responses was accurate, QVT amended its RFA responses to reflect QVT's failure to seek Market Quotations for the CARB, STSUP, MLMI, and ABX transactions.  *See* Ex. 5547, Nos. 1306-1309 (Supplemental Responses and Objections of QVT to LBSF's First Set of Requests for Admission).

[87]        To the extent that QVT argues that any failure to seek Market Quotations is harmless because it was likely that it would not have received any quotations, such an argument must be rejected.  The ABX CDS and Single Name CDS were widely traded and there would be no reason to conclude that quotations could not have been obtained.  And, in relation to the CARB transactions, other counterparties that had CARB trades with Lehman were able to obtain Market Quotations for CDS on the bonds underlying the index on or around September 15, 2008, which is the standard way to value a custom index such as CARB.  *See* Ex. 5186 at LEH-QVT_0061671- 0061673 (quotes received by Standish on September 15, 2008 and September 16, 2008); JX-73 at LEH-QVT_0061806-0061808 (Fund A (an anonymized counterparty) received quotes on September 16, 2008).

[88]        Chu Tr. 46:20–47:22, Aug. 4, 2016.

- 24 -

three quotes for the Transactions.[89]  Having designated the Early Termination Date, QVT was

obligated under the Agreements to use good faith in setting the time as of when the quotations

were to be given.[90]  QVT did not satisfy this good faith requirement.  Predictably, QVT received

the requisite number of Market Quotations on only 12 of the 836 terminated Transactions.[91]  As

observed by Mr. Garzia and Mr. Bruce, Lehman's market experts, it is not surprising that QVT

received so few responses given the limited time QVT gave the dealers to respond.[92]

       QVT's lack of good faith in conducting the Market Quotation process precludes any

efforts by QVT to resort to Loss under the Agreements.[93]  That was clearly QVT's intention in

the way it structured and conducted the Market Quotation process.  Indeed, QVT's failure to

obtain quotations in its Market Quotation process stands in stark contrast to its efforts to enter

into actual replacement trades.  While QVT waited until just an hour before the market closed to

send out its requests for Market Quotations, it began replacing the trades that it cared about early

in the morning on the Early Termination Date, and ultimately entered into 34 replacement trades

on that day.  QVT's bad faith in sabotaging the Market Quotation process should not be

rewarded.  Here too, if the Court were to agree with Lehman, the appropriate remedy would be to

reduce the Claim for the relevant Transactions to the values reflected on QVT's books and

records as of the close of business on September 15.

---

[89]    *See, e.g.,* Wollman 30(b)(6) Tr. 210:17-20; 399:23 – 400:3, Aug. 9, 2016.

[90]    JX-1 at QVTFUND00000156-00000157 ("Market Quotation" and "Reference Market-maker" definitions).;
JX-2 at QVTFUND00000202- 00000203 (same).

[91]    This is particularly striking as thousands of dealer runs were available for single- name CDS on
September 15, 2008.  Indeed, the CMA database contains over 27,000 quotes on single-name CDS from September
15, 2008 for names in QVT's portfolio.  *See* JX-112.  Similarly, QVT's bquotes database showed that QVT received
2,500 quotes on September 15, 2008 on the names in QVT's portfolio.  *See* Ex. 5467, Expert Report of Justin Garzia
("Garzia Report")  p. 12 fn. 23.

[92]    Ex. 5467, Garzia Report ¶¶ 48-55; Ex. 5408, Expert Report of Graham Bruce ("Bruce Report") ¶ 52.

[93]    Ex. 5402, Henderson Report ¶¶ 77-89.

C.    QVT's Loss Calculation Is Not Reasonable Nor Done In Good Faith

1.    QVT's "Loss" is Magnitudes Higher than the Posted Collateral QVT
Calculated and Required Lehman to Post

QVT routinely calculated the amount of collateral it required Lehman to post pursuant to the Agreements to protect the investments of QVT's clients.[94]  Posted collateral reflected an amount that approximates the value of the transactions to the "in the money" party, as adjusted by any initial margin amount.[95]  Its purpose, pursuant to the CSA, is to reduce or eliminate credit risk between the parties.[96]  QVT took its collateral calculations seriously and designated one employee, Ms. Feng, to make these calculations and interface with Lehman on a daily basis.[97]  When margin issues arose, Ms. Feng was required to consult with the highest level of QVT's management.[98]

The importance QVT placed on daily margin calculations is not surprising as QVT took pains to protect the Funds and its clients' investments.[99]  QVT's CEO Dan Gold testified that as a fiduciary of its clients' investments, QVT was obligated to do everything it could, within the limits of the law and ethical constraints, to protect the rights of its investors.[100]  In addition, it was in QVT's own interest to make sure that its valuations were accurate (as it was paid management and performance fees on the basis of those values) and that the amount of posted collateral would adequately protect the fund.[101]

QVT's purported valuation is three times the amount of posted collateral it required

---

[94]    Feng Tr. 12:16-13:25, Jan. 10, 2017.

[95]    Ex. 5420, Weiser Report ¶ 26.

[96]    Ex. 5402, Henderson Report ¶ 105.

[97]    Feng Tr. 18:15-21, Jan. 10, 2017.

[98]    Feng Tr. 21:17-24:2; 30:23-32:14, Jan. 10, 2017; Sale 30(b)(6) Tr. 71:6-73:14, Dec. 30, 2016.

[99]    Ex. 5420, Weiser Report ¶ 26.

[100]   Gold Tr. 120:7-14; 25:2-10, Aug. 11, 2016.

[101]   Ex. 5420, Weiser ¶ 56.

Lehman to provide as of the Early Termination Date to protect QVT and its clients' investments in the event of a Lehman default.[102]  QVT has failed to articulate a credible reason for a difference of this magnitude.  While QVT's expert, Professor Pfleiderer, makes the sweeping generalization that "posting collateral was inadequate to reflect accurate values in such rapidly changing market conditions,"[103] he provides no data to support his claim.[104]  In addition, Professor Pfleiderer completely ignores QVT's margin call for $13.3 million on September 16.[105]

Professor Pfleiderer argues that the Court should ignore QVT's own collateral calculation because QVT relied on Lehman's marks "which reflected largely just [Lehman's] own view of the prices, and these marks were not necessarily consistent with true market value, especially following Lehman's bankruptcy."[106]  That *post hoc* rationalization strains credulity.  QVT can hardly expect this Court to accept that a sophisticated "best in class" hedge fund like QVT would blindly accept Lehman's marks and ignore its fiduciary obligations if QVT believed they were inaccurate and insufficient to protect QVT's clients' investments.[107]  Indeed, the evidence confirms that QVT was carefully reviewing and analyzing its marks – particularly at month-end – to ensure that they accurately reflected the value of the transactions.[108]  If QVT truly believed that its historical marks were inaccurate or unreliable, it should have recalculated its NAV and

---

[102]    Ex. 5402, Henderson ¶ 109; Ex. 5420, Weiser ¶52.

[103]    CX-1687, Expert Report of Paul Pfleiderer ("Pfleiderer Report") ¶ 71.

[104]    QVT's rebuttal expert, Dr. Diplas, attempts to argue that the posted collateral does not reflect the value of the Transactions because Lehman was the calculation agent under the Master Agreements.  CX-1747, Expert Report of Athanassios Diplas ("Diplas Report") ¶¶ 181-187.  However, Dr. Diplas also did not consider any documents or records related to the exchange of collateral between QVT and Lehman and acknowledged that he was only making general observations about the way collateral is calculated in the market.  Diplas Tr. 395:6-16; 401:18 – 402:7, Jan. 20, 2017.

[105]    Pfleiderer Tr. 269:22-270:20, Nov. 14, 2016.

[106]    CX-1687, Pfleiderer Report ¶ 71.

[107]    Ex. 5420, Weiser Report ¶ 48-49.

[108]    *See, e.g.*, JX-174; QVTFUND04645252 (April 30, 2008 Beardstown file stating "5y sr @ 60" in Row 514, Column K); JX-170; QVTFUND04645245 (May 30, 2008 Beardstown file stating "mark vs 10y sub" in Row 132, Column K); JX-111; QVTFUND04645247 (July 31, 2008 Beardstown file stating "Collateral report, works out to about 230/10 recov, reasonable since sub 10y is ~ 185" in Row 129, Column K).

made appropriate disclosures to its investors.[109]  QVT never took any such actions.

### 2.    QVT Inflated Its Loss Calculation By Using Post-September 15 Data.

### a.    QVT Was Required to Value the Transactions as of September 15, 2008

QVT selected September 15, 2008 as the Early Termination Date under the Agreements.[110]  QVT must accept the obligations and consequences of that selection.  Primary among these is that the terminated Transactions must be valued as of September 15, under both the express language of the Agreements and the Bankruptcy Code.

The Agreements require QVT to determine its "Loss *as of* the relevant Early Termination Date, or if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable."[111]  Where there are values available as of the Early Termination Date, those values must be used – even where it is only reasonably practicable for the valuation to be calculated on a date after the Early Termination Date.[112]  These restrictions prevent a Determining Party from abusing its position as Determining Party by cherry-picking valuation data available after September 15.[113]

The language of the Agreements requiring that valuations must be done as of September 15, the Early Termination Date, is also consistent with Section 562 of the Bankruptcy Code, which requires that terminated transactions must be valued using "commercially reasonable determinants of value" on the termination date, and if "commercially reasonable determinants of value" are not available on that date, then the valuation must be done "as of the

---

[109]     Ex. 5420, Weiser Report ¶ 25.

[110]     JX-67 at QVTFUND00001413; Sale 30(b)(6) Tr. 20:6-21:15, 26:15-27:2, Aug. 25, 2016.

[111]     JX-1 at QVTFUND00000156 ("Loss" definition) (emphasis added); JX-2 at QVTFUND00000202 (same); *see also* JX-1 at QVTFUND00000150 (Loss must be determined "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date. . . ."); JX-2 at QVTFUND00000196 (same).

[112]     Ex. 5402, Henderson Report ¶ 124.

[113]     Ex. 5402, Henderson Report ¶ 119.

earliest subsequent date or dates on which there are commercially reasonable determinants of value." 11 U.S.C. § 562.  The Delaware Bankruptcy Court in *In re Am. Home Mortg. Holdings, Inc.*, warned of the "moral hazard" that would be created if Section 562 were disregarded:

> If damages were measured at some future date, the [counterparty] could hold the asset at little or no risk.  If the price of the asset were to rise, the [counterparty] participant would capture that increase up to the full amount owed under the agreement.  If the price were to fall, however, the [counterparty's] losses would be covered because its deficiency claim would rise accordingly.  Even if such a claim were not to be paid at 100%, there would certainly be instances where the discounted claim is sufficiently large to motivate the [counterparty] to shift the risk to the debtor.  In effect, this would make the debtor an insurer of the [counterparty's] investment even though the debtor has no control over the management of the asset—thus, the moral hazard.

411 B.R. 181, 191 (Bankr. D. Del. 2009).

### b. QVT Did Not Value Many of the Transactions as of September 15, Inflating Its Claim by Over $50 Million

There is no dispute that sufficient market data (or "commercially reasonably determinants of value") for the 836 Transactions was available for September 15.  Indeed, QVT marked its books as of the close on September 15 just as it had done throughout the history of the Transactions.  Notwithstanding the availability of market data for September 15, when QVT went to ascribe values to these Transactions for purposes of its Claim – weeks after September 15 and with the benefit of hindsight – QVT disregarded market information from September 15 and instead used data from other dates for nearly 500 of the Transactions.[114]  If QVT had used available September 15 data for these trades it would have reduced QVT's Claim calculation by over $ 50 million.

---

[114]    CX-1020, QVTFUND04595888.

c.    **QVT Inflated The Value Of The MarkIt Transactions By
Cherry-Picking Favorable Valuation Dates**

QVT valued 370 using pricing information provided by MarkIt Partners,[115] a leading

provider of credit derivative pricing.  As set forth in the chart below, QVT did not use

September 15 pricing to value 342 out of these 370 Transactions,[116] despite the fact that such

pricing information was available.[117]

**Valuation Dates QVT Selected for the MarkIt Transactions**[118]

| 9/15/08 MarkIt Data | 9/16/08 MarkIt Data | 9/17/08 MarkIt Data | 9/18/08 MarkIt Data | 9/19/08 MarkIt Data | **Total** |
|---|---|---|---|---|---|
| 28 | 260 | 54 | 2 | 26 | 370 |

QVT's motivation to use information from dates other than September 15 is obvious as credit

spreads generally widened in the days following Lehman's bankruptcy filing, and QVT was

generally long protection facing LBSF.  QVT's decision to value over 90% of the MarkIt

Transactions on dates *after* the Early Termination Date significantly inflated its Claim.[119]

QVT did not simply select a single date after September 15 and value the entire group of

MarkIt Transactions as of that date.[120]  Instead, QVT used pricing information from different

dates throughout the week of Lehman's bankruptcy.  Mr. Garzia has demonstrated that by

picking different valuation dates QVT was able to further increase the value of the MarkIt

---

[115]       This collection of 370 Transactions is referred to as the "MarkIt Transactions."  Of the 370 MarkIt Transactions, 324 were single name corporate CDS transactions, and 46 were CDS transactions that referenced a basket or index of credit products.

[116]       *See* Ex. 5467, Garzia Report ¶¶ 60-61.

[117]       *See* Ex. 5467, Garzia Report ¶ 64; *see also* Wollman 30(b)(6) Tr. 363:11-364:4; 456:3-457:10; 461:24-462:5; 468:17-469:6, Aug. 9, 2016; Chu 30(b)(6) Tr. 376:18-22; 385:5-386:22; 396:18-397:23, Aug. 2, 2016.

[118]       *See* Ex. 5467, Garzia Report ¶ 67, Figure 2.

[119]       Ex. 5467, Garzia Report ¶ 64.

[120]       Ex. 5467, Garzia Report ¶ 66.  *See also* CX-1020, QVTFUND04595888.

Transactions beyond that which would have resulted from using any single valuation date.[121]  By simply cherry-picking valuation dates in this fashion, QVT inflated its valuation of the MarkIt Transactions (none of which were replaced) by $13.6 million.[122]

While QVT's traders have asserted that they had legitimate reasons for using pricing information from dates after the Early Termination Date to value the MarkIt Transactions, those assertions are inconsistent with the evidentiary record and should be rejected.  For example, while Mr. Wollman testified that he used MarkIt Partners' prices from September 17 to value the MarkIt Transactions that he considered "short-dated" and/or illiquid, that testimony cannot be reconciled with the information contained in QVT's summary spreadsheet.  That spreadsheet shows that QVT valued other short-dated and purportedly illiquid MarkIt Transactions on September 15 and September 16, when MarkIt Partners' prices were unquestionably available for each of the MarkIt Transactions.[123]  None of the purported justifications provided by QVT are consistent with what it actually did in September 2008; they are only *post hoc* attempts to rationalize QVT's inflated Claim.[124]

---

[121]    *See* Ex. 5467, Garzia Report ¶¶ 69-72.  In order to determine how QVT's selection of dates affected its valuation of the MarkIt Transactions, Mr. Garzia calculated the value of each group of transactions on the date selected by QVT and then compared those results to the values QVT would have calculated if it had valued each group on every other day during the week of September 15, 2008.  For example, for the group of 260 MarkIt Transactions that QVT valued using pricing information from September 16, 2008, Mr. Garzia compared the value of those transactions (as a group) on September 16 to the value of that same group on every other day during the week of September 15 (always using the prices provided by MarkIt Partners for the applicable date).

[122]    *See* Ex. 5467, Garzia Report ¶¶ 71, 72, Figure 3.

[123]    Messrs. Chu and Wollman also asserted that they valued many of the MarkIt Transactions using pricing information from September 16 because QVT's Market Quotation process did not conclude until after the market closed on September 15.  *See* Wollman 30(b)(6) Tr. at 365:10-18, 366:17-367:15; Chu 30(b)(6) Tr. at 385:5-16, 382:17-20.  As explained above, however, QVT deliberately structured its Market Quotation process so that it was unlikely to succeed, and it should not be permitted to use the failure of that process as an excuse to inflate its claims.

[124]    While QVT used pricing information from *after* the Early Termination Date to value the vast majority of the MarkIt Transactions, it appears to have used pricing information from *before* the Early Termination Date to value its two interest rate swaps with LBSF.  *See* JX-88, QVTFUND02445521.  By improperly using pricing information from before the Early Termination Date for these two trades, QVT has inflated the value of these two positions by approximately $780,000.

       **d.**       **QVT Inflated The Value Of The PCDS and CARB**
               **Transactions By Using Post-September 15 Data**

As discussed in greater detail below, QVT also used this same strategy – cherry-picking

data from dates after September 15 – to inflate the Claim calculation for the PCDS and CARB

transactions.  This was only the first step QVT took to inflate the valuations of these

Transactions.

       **3.**       **QVT Inflated Its Valuations Of The MarkIt Transactions By**
              **Including Unreasonable Bid/Mid Charges**

Looking again at the population of transactions that QVT valued with MarkIt

information, QVT also inflated its Claim with regard to these transactions by adding

approximately $16.2 million of bid/mid charges, which QVT asserts it would have had to pay

above the mid-market price if it had actually replaced these transactions.[125]  But, as discussed

above, QVT never had any intention to replace these transactions, or made any efforts to do so.

QVT should not be permitted to include any bid/mid charges for transactions that it intentionally

did not replace.[126]  QVT's inclusion of replacement costs for trades that it did not intend to

replace only serves to further inflate QVT's Claim.

Even if it were appropriate for QVT to have included bid/mid charges on these MarkIt

Transactions that it had no intention of replacing, the amount of the charges included by QVT to

value these transactions was unreasonable and inflated QVT's valuations of these transactions by

an additional $10.5 million.[127]  Specifically, QVT used 10% of par spread as the default bid/mid

charge for its valuations of the MarkIt Transactions, and only deviated from that default charge

(to include bid/mid charges ranging from 3% to 15% of par spread) when one of its traders felt

---

[125]      *See* Ex. 5467, Garzia Report ¶ 79.

[126]      *See* Brumm 30(b)(6) Tr. 57:8-59:12, July 29, 2016; *see also* Brumm Tr. 63:5-15, July 29, 2016.

[127]      *See* Ex. 5467, Garzia Report ¶¶ 74-91.

that the bid/mid for a particular position should be larger or smaller.[128]

The bid/mid spreads that QVT included in its valuation of the MarkIt Transactions, however, dramatically exceed the bid/mid charges that dealers actually charged (and end-users like QVT actually paid) during the week of the Early Termination Date.  In that regard, Professor Robert Engle (who was awarded the Nobel Prize in Economics in 2003) performed an extensive analysis of the bid/mid charges that were quoted and actually charged by dealers on Single Name CDS during the week of September 15, and his analysis reveals that the bid/mid charges included in QVT's Proofs of Claim are not representative of real world charges.[129]  In particular, Professor Engle's analysis demonstrates that: (i) the bid/mid spreads quoted by individual dealers on Single Name CDS averaged roughly 4% of the quoted mid during the week of September 15, 2008, rather than the 10% default assumption used by QVT;[130] and (ii) end-users like QVT only paid approximately 40% of the quoted bid/mid spread when entering into new Single Name CDS transactions during the week of September 15, meaning that they paid less than 2% of par spread in bid/mid charges during that time period.[131]

Dr. Engle's analysis is consistent with Mr. Garzia's extensive experience with credit derivatives and his real time experience in the markets during the week of September 15, when

---

[128]      *See* Chu 30(b)(6) Tr. 305:24-308:21, Aug. 2, 2016.  QVT's summary spreadsheet indicates that it included the default 10% bid/mid charge in its valuation of 288 of the 370 MarkIt Transactions.  *See* CX-1020, QVTFUND04595888. QVT included reduced bid/mid spreads of 3%, 5% and 6% of par spread to its valuation of 48 positions, 10 positions, and 8 positions, respectively.  *See* CX-1020, QVTFUND04595888. QVT included an increased bid/mid spread of 15% of par spread in its valuation of the remaining 16 MarkIt Transactions.  *See* CX-1020, QVTFUND04595888. Thus, QVT included a bid/mid spread of at or above 10% of par spread in its valuation of 304 of the 370 MarkIt Transactions.

[129]      *See* Ex. 5385, Expert Report of Robert F. Engle, III (the "Engle Report") ¶ 21.

[130]      *See* Ex. 5385, Engle Report ¶¶ 26-35.

[131]      *See* Ex. 5385, Engle Report ¶¶ 44-60.  Dr. Engle also conducted an analysis of the Single Name CDS in QVT's portfolio with Lehman that were encompassed by his final data set, and the results of that analysis were consistent with his analysis of the larger market.  In particular, Dr. Engle's analysis of the names in QVT's portfolio indicate that end users like QVT only paid roughly 53% of the quoted spread (or, in other words, significantly less than 2% of par spread) when entering into new Single Name CDS transactions in those names during the week of September 15, 2008.  *See* Ex. 5385, Engle Report ¶¶ 70-72.

he was at Morgan Stanley.  Based upon Dr. Engle's analysis, Mr. Garzia's actual trading

experience in 2008, and Mr. Garzia's analysis of the bid/mid spreads quoted by dealers to QVT

in September 2008, Mr. Garzia determined that QVT overstated the Claim by approximately

$10.5 million by the inclusion of excessive and unreasonable bid/mid charges.[132]

### 4.    QVT's Claim Includes Charges For Transactions Wholly Unrelated To LBSF

QVT entered into replacement trades for its Argentina CDS positions on September 16,

2009, and has sought to recover all of the costs associated with those replacement trades in its

Claim, including costs QVT incurred to unwind those replacement trades later in September

2008.  QVT purportedly entered into those replacement trades because it owned Argentina bonds

and did not want to leave those bond positions unhedged.[133]  Since QVT actually replaced the

Argentina CDS positions that it terminated with LBSF, Lehman is not disputing the costs that

QVT included in its Claim to replace these positions.  However, QVT is also attempting to

include in its Claim $4.1 million in hedging losses that it supposedly incurred to unwind these

trades in the weeks following Lehman's bankruptcy.  LBSF had nothing whatsoever to do with

QVT's decision to unwind those replacement trades, and the inclusion of this $4.1 million in

unwind costs in the Claim is entirely unjustified and unreasonable.[134]

### 5.    QVT Adopted Unreasonable and Untested Valuation Methodologies Designed to Inflate Its Claim

#### a.    The CARB Transactions

The CARB Index was a portfolio of eight equally-weighted single-name ABS CDS

---

[132]    *See* Ex. 5467, Garzia Report ¶¶ 89-91.

[133]    Wollman 30(b)(6) Tr. 439:4-19, Aug. 9, 2016.

[134]    In the days prior to LBHI's bankruptcy filing, QVT allegedly attempted to transfer its Argentina bonds from Lehman's prime brokerage unit (where the bonds were being held on deposit) to a different prime broker. After QVT learned that Lehman's prime brokerage unit had not transferred the Argentina bonds to a different prime broker, QVT apparently decided that it no longer wanted to hedge its position in the Argentina bonds, and unwound the replacement trades it entered into in Argentina CDS.

contracts referencing Auto ABS issued by GMAC or Ford Motor Credit Corporation ("FMCC").[135]  QVT was involved in the development of CARB,[136] which Lehman began marketing and trading in late 2007.[137]  Indeed, Arthur Chu of QVT was so involved in selecting the underlying auto ABS that were referenced in the CARB Index that Lehman referred to the underlying auto ABS as "Arthur's Basket."[138]  As of the Early Termination Date, QVT held four positions in CARB with LBSF with a total notional amount of approximately $80 million.[139]  QVT has asserted that these four CARB transactions are worth $36.7 million, inflating its own September 15 valuation by $20 million.

Prior to Lehman's bankruptcy, QVT relied on the prices provided in Lehman's runs on CARB to value its own CARB positions.[140]  There is no evidence that QVT had any material disagreements with Lehman over the CARB valuations prior to Lehman's bankruptcy, and QVT admitted that it had never challenged the CARB valuations prior to Lehman's bankruptcy.[141]  For purposes of QVT's Claim, QVT did not factor in its actual marks on these trades as of the Early Termination Date.

Instead, QVT created an entirely new and untested methodology to value the CARB

---

[135]    Ex. 5037, LEH-QVT_0008672; JX-18 at LEH-QVT_0057962; JX-15, at LEH-QVT_0057929.

[136]    McDougal Tr. 65:14-18; 77:15-20, July 28, 2016; JX-16, LEH-QVT_00100117; Ex. 5045, LEH-QVT_0024697; JX-11, LEH-QVT_0009088 (AUTO Basket Tab refers to the underlying auto ABS as "ARTHURs BASKET").

[137]    Lehman presented and published both the buy and sell price on CARB to its potential customers. McDougal Tr. 35:6-36:8, July 28, 2016.  In its trading of CARB, Lehman endeavored to maintain a neutral rather than take a long or short position.  McNiff Tr. 54:13-56:11, June 2, 2016; McDougal Tr. 84:25-86:2, July 28, 2016.

[138]    See JX-11, LEH-QVT_0009088 (AUTO Basket Tab refers to the underlying auto ABS as "ARTHURs BASKET").

[139]    CX-1020, QVTFUND04595888.  The parties entered into additional CARB trades that QVT unwound prior to Lehman's bankruptcy and are not at issue.  See Wollman 30(b)(6) Tr. 145:12-146:14, June 9, 2016.

[140]    Wollman 30(b)(6) Tr. 139:19-140:13; 141:11-14; 150:11-20; 151:22-2; 160:18-161:4, June 9, 2016. QVT's daily marks on CARB were entered by QVT into Tyche whereas monthly marks were calculated in Beardstown.  Wollman 30(b)(6) Tr. 150:4-10, June 9, 2016.

[141]    Ex. 5547, No. 1347 (Supplemental Responses of QVT to LBSF's First Set of Requests for Admission).

trades. QVT valued CARB by taking Lehman's mark for CARB as of September 12, 2008, which was 16 bond points, and adding 15 points to reflect the amount that the spread on GMAC CDS (a single 5-year CDS on an unsecured corporate entity) had widened from September 12 to September 19.[142] QVT then applied a further "liquidity adjustment" of an additional 15 points to account for the purported market impact of replacing its CARB position.[143] QVT did not consult anyone about its novel methodology at the time it calculated its Claim, nor did it conduct any testing to ensure that its methodology was appropriate.[144] Indeed, QVT has admitted that, at the time that QVT prepared its Claim, QVT had not performed *any* analysis to see if GMAC CDS spreads were a suitable proxy for CARB pricing.[145] QVT's CARB valuation methodology is unreasonable, inconsistent with market practice, untested, without commercial basis, was clearly designed to inflate QVT's Claim, and, therefore, unreasonable.

As will be explained by Graham Bruce, an experienced trader in credit derivatives on indices, it is simply unreasonable for QVT to assume that the spread for GMAC CDS had any relation to the CDS on eight mezzanine Auto ABS bonds with (i) different ratings (as of September 15, 2008); (ii) different loan portfolio characteristics; (iii) different loss rates; and (iv) different levels of subordination with weighted average lives of significantly less than 5 years.[146] QVT admitted that it did not take these differences into consideration prior to choosing GMAC as a proxy.[147] Additionally, QVT's decision to use GMAC as a proxy, while

---

[142]    Chu 30(b)(6) Tr. 255:8-256:15, Aug. 2, 2016; CX-1687, Pfleiderer Report ¶ 41; CX-1020, QVTFUND04595888.

[143]    Chu 30(b)(6) Tr. 351:6-352:11, Aug. 2, 2016; CX-1687, Pfleiderer Report ¶ 41; CX-1020, QVTFUND04595888.

[144]    Chu 30(b)(6) Tr. 262:6-18, Aug. 2, 2016.

[145]    Chu 30(b)(6) Tr. 261:6-16, Aug. 2, 2016. QVT only assessed whether there was correlation between CARB and GMAC subsequent to submitting its Calculation Statement. Chu 30(b)(6) Tr. 261:6-10, Aug. 2, 2016.

[146]    Ex. 5408, Bruce Report ¶ 73.

[147]    *See* Chu 30(b)(6) Tr. 398:13-21, Aug. 2, 2016.

disregarding FMCC (which originated half of the Auto ABS underlying CARB) was obviously no accident.[148]  GMAC was much more distressed than FMCC in September 2008 given its exposure to the subprime housing market (which also makes GMAC an inappropriate proxy for CARB).  Using FMCC instead of GMAC would have resulted in a lower valuation for QVT.[149]

QVT further inflated its CARB valuation by using the movement in GMAC from September 12 to September 19 (a 15 point move), despite the fact that data was available to QVT showing GMAC moved only 3 to 4 points from September 12 to 15.[150]  By looking at data after the Early Termination Date in this circumstance, QVT was able to inflate its Claim by at least $9.2 million.[151]

Additionally, at the time it prepared its valuation, QVT conducted no analysis to justify its additional 15 point "liquidity" charge.  QVT was well aware that CARB was relatively illiquid from its launch in 2007.[152]  Nonetheless, QVT never made any "liquidity" adjustments in its marks to account for the illiquidity of CARB.[153]  In an effort to fill this evidentiary hole, QVT has corralled numerous after-the-fact explanations and the ruminations of its experts.  None of those tortured explanations justify a liquidity charge.  More fundamentally, none of QVT's after-the-fact stories can explain how or why Lehman's creditors should have to pay QVT a liquidity charge that it never actually paid.[154]

---

[148]    Indeed, at his deposition, Chu erroneously testified that the underlying securities comprising CARB were issued by Chrysler and Ford, rather than GMAC and FMCC.  Chu 30(b)(6) Tr. 263:13-18, Aug. 2, 2016.

[149]    If FMCC were used as the proxy instead of GMAC, the result would be less favorable to QVT for the improper time period September 12 to 19, 2008, which QVT used.  The price move for FMCC was only 9.5 to 10 points compared to the 15 point GMAC move for that same time period.  Ex. 5408, Bruce Report ¶ 74.

[150]    Ex. 5408, Bruce Report ¶¶ 76-77; JX-69, QVTFUND04417727; JX-74, QVTFUND04418109.

[151]    Ex. 5408, Bruce Report ¶ 78.

[152]    *See* Chu 30(b)(6) Tr. 259:17-260:2; 261:17-23; 274:14-275:25, Aug. 2, 2016; *see also* Ex 5892, LEH-QVT_0009112; JX-19, LEH-QVT_0024558; JX-24, LEH-QVT_0014645; JX-28, LEH-QVT_0014687.

[153]    Wollman 30(b)(6) Tr. 151:22-25; 160:22-161:14, June 9, 2016.

[154]    The magnitude of this "liquidity" charge is further evidenced by Arthur Chu's statement that a four-point spread was "rather wide."  Chu 30(b)(6) 259:17-20, Aug. 2, 2016.

At bottom, QVT's methodology is fundamentally inconsistent with how custom indices – such as CARB – are valued in the market.  As explained cogently by Graham Bruce, CARB is simply a custom index and, like all custom indices, can be easily valued by decomposing the index; that is valuing the eight underlying Auto ABS transactions.[155]  It is simply not plausible to believe that QVT, which holds itself out as a "best in class" hedge fund and was involved in the creation of CARB,[156] would not know that a custom index like CARB should be decomposed to be valued.  Had QVT properly decomposed the CARB Index into the eight underlying transactions, QVT's position would be viewed as eight separate CDS positions with notional amounts of $10 million each – not one single CARB trade with a net notional of $80 million.[157]  Given that the standard market size of a trade was $5 to $10 million in the underlying, a one point adjustment would have been more than sufficient to account for any liquidity risk.[158]  This 14 point difference has the effect of inflating QVT's claim by an additional $11.2 million.[159]

Moreover, any claim by QVT that it could not value CARB following Lehman's bankruptcy because Lehman was the primary market-maker for CARB is belied by actual market data from September 2008.  QVT was not the only counterparty facing Lehman that had CARB trades.  Other CARB counterparties were able to value their CARB trades by looking at the underlying CDS on Auto ABS or the Auto ABS.  Indeed, two Lehman CARB counterparties,

---

[155]     Bruce Report ¶¶ 18(b), 80.  This is also in line with how Lehman priced CARB at the time it was trading the Index.  One of Lehman's primary CARB traders testified that CARB's value was "determined by performance of the underlying bonds."  McDougal Tr., 71:5-9, July 28, 2016.  Consistent with this, Lehman, in developing pricing for which to offer CARB, considered the pricing of the underlying securities.  McDougal Tr. 79:20-80:8, July 28, 2016.

[156]     Gold Tr. 21:10-22:15, Aug. 11, 2016;  *see also* McDougal Tr. 65:14-18; 77:15-20, July 28, 2016; JX-16, LEH-QVT_00100117; Ex. 5045 LEH-QVT_0024697; JX-11, LEH-QVT_0009088 (AUTO Basket Tab refers to the underlying auto ABS as "ARTHURs BASKET").

[157]     Ex. 5408, Bruce Report ¶ 80.

[158]     Ex. 5408, Bruce Report ¶ 81.

[159]     Ex. 5408, Bruce Report ¶ 80.

Fund A[160] and Standish, obtained Market Quotations from five different dealers on the
underlying components of CARB to value CARB in connection with their own claims against
Lehman.[161]  As discussed above, QVT did not even attempt to solicit any Market Quotations on
CARB or the underlying components and should not be permitted to use that failure to justify its
use of a novel and untested methodology that ignores the underlying securities.[162]  Recognizing
the importance of using actual market information, QVT's expert, Dr. Niculescu relies on the
quotes Fund A received on the underlying components to value the CARB trades, but even by
doing so and making unsubstantiated assumptions, Dr. Niculescu cannot come up with a
valuation as high as QVT's.[163]

### b.    The PCDS Transactions

As of the Early Termination Date, QVT held 62 positions in PCDS with LBSF, with a
total notional amount of approximately $379.8 million.[164]  For 60 of the Parties' PCDS
transactions, QVT bought protection on preferred securities issued by 19 domestic and foreign
financial institutions.  In its Claim, QVT has asserted that these 62 PCDS transactions should be
valued at approximately $134 million, a number that inflates QVT's own September 15 valuation
of these same Transactions by about $120 million.  As explained below and set forth in the
expert report of Dr. Dominic O'Kane, QVT's valuation is inflated by between $94.8 million and
$114.1 million.[165]

---

[160]    "Fund A" is a Lehman counterparty that submitted its Derivative Questionnaire in redacted form as so as to maintain its confidentiality.

[161]    JX-73 at LEH-QVT_00618056-08; Ex. 5186 at LEH-QVT_0061671-73.

[162]    Chu 30(b)(6) Tr. 270:4-14; 270:23-271:4, Aug. 2, 2014.

[163]    CX-1617, Expert Report of Dr. Peter Niculescu ("Niculescu Report")  ¶¶ 22-23; Niculescu Tr. 320:10-20, Nov. 8, 2016.

[164]    Ex. 5484, Expert Report of Dominic O'Kane ("O'Kane Report") ¶ 197, n.86.

[165]    *See* Ex. 5484, O'Kane Report ¶ 53, 64, 67.

### i.      Background on PCDS

PCDSs are a type of CDS, which are contracts between a buyer and a seller that reference the third-party credit risk of a reference entity or index.  The parties to a CDS contract agree that the buyer will purchase a pre-agreed notional amount of protection (similar to insurance) against the credit risk of the reference entity's obligations – often a loan or a bond issued by a reference entity.  The buyer of protection pays a periodic premium throughout the life of the contract, and the seller agrees to make a lump sum payment if a credit event occurs.  Typically, the credit risk for which the purchaser buys protection covers specified credit events such as a reference entity's bankruptcy or failure to pay on the reference obligation.

PCDS are CDS that reference preferred equity securities (which are typically perpetual in nature) rather than the debt of a corporate issuer.  The primary difference between PCDS and standard CDS is that PCDS contracts have an additional credit event that can trigger payment by the protection seller: a deferral of dividends by the reference entity.[166]  Lehman created and began marketing PCDS in 2005, and was a leading dealer in this product until LBHI filed for bankruptcy.[167]

### ii.      QVT Used An Untested And Fundamentally Flawed Methodology To Value the PCDS Transactions

There is no dispute that prior to LBHI's bankruptcy filing, QVT valued its PCDS positions with Lehman based primarily on quotes or margin valuations that it received from Lehman on a daily basis.  While QVT often relied on Lehman's marks, the evidence shows that

---

[166]      Due to the increased likelihood of a credit event, the purchaser of PCDS protection is generally required to pay a higher premium, or spread, when establishing a PCDS position rather than a standard CDS position.  *See* Ex. 5489 at LEH-QVT_0035529.

[167]      Ex. 5489, LEH-QVT_0035527.

QVT carefully reviewed and analyzed these marks at month-end.[168]  QVT never formally

complained to Lehman about the PCDS quotes or margin valuations it provided, instead

choosing to adopt Lehman's values as its own for purposes of calculating the monthly NAV it

reported to investors.  Once LBHI filed for bankruptcy, however, Mr. Chu discarded QVT's own

valuations and instead invented a new, untested and unreliable methodology for valuing these

particular trades.

Mr. Chu explained that he identified the cheapest preferred security available for each

PCDS reference entity, and then subtracted the lowest closing price of that preferred security

during the entire week of September 15 from the par value of that security.[169]  QVT then took the

result of that calculation for each PCDS transaction and multiplied it by the notional amount of

the transaction to determine its purported Loss.[170]  Thus, if the underlying preferred security had

a par value of $100 and the lowest price for that preferred security during the week of

September 15 was $80, Mr. Chu would have multiplied $20 by the notional amount of the

Transaction to determine the "Loss" purportedly suffered by QVT.  Mr. Chu could identify no

supporting analysis of any type he did before adopting this radical valuation methodology.  And,

Mr. Chu admitted that he did nothing to back-test or otherwise validate this approach.[171]

Mr. Chu's valuation methodology suffers from at least three significant flaws.[172] First, it

is flawed and inflated because he cherry-picked dates other than the Early Termination Date to

value 54 of the 62 PCDS transactions.  Just by cherry-picking dates, QVT inflated the value of

---

[168]        *See, e.g.*, JX-174, QVTFUND04645252 (April 30, 2008 Beardstown file stating "5y sr @ 60" in Row 514, Column K); JX-170, QVTFUND04645245 (May 30, 2008 Beardstown file stating "mark vs 10y sub, this is pcds" in Row 132, Column K); JX-111, QVTFUND04645247 (July 31, 2008 Beardstown file stating "Collateral report, works out to about 230/10 recov, reasonable since sub 10y is ~ 185" in Row 129, Column K).

[169]        *See* Chu 30(b)(6) Tr. 211:2-212:15, Aug. 2, 2016.

[170]        *See* Chu 30(b)(6) Tr. 211:2-212:15, Aug. 2, 2016.

[171]        *See* Chu 30(b)(6) Tr. 231:8-13, Aug. 2, 2016.

[172]        *See* Ex. 5484, O'Kane Report ¶¶ 36-71.

its Claim by $27.6 million.[173]  Second, by comparing the price of PCDS directly to the price of

the underlying preferred securities, Mr. Chu failed account for the difference in tenor between

the derivative (PCDS) and the cash security (the underlying preferred securities).  On the Early

Termination Date, QVT's PCDS transactions with LBSF provided approximately 4.5 years of

protection, whereas the underlying preferred securities were perpetual in nature.  By ignoring

this key difference, and treating the PCDS protection he had purchased (which was similar to

term insurance) as providing protection in perpetuity (similar to whole life insurance), Mr. Chu

dramatically overstated the value of QVT's PCDS transactions.  Finally, by assuming that QVT

was entitled to recover the full par value of each underlying preferred security on the Early

Termination Date, Mr. Chu improperly assumed that each of the 19 reference entities underlying

QVT's PCDS trades was on the brink of a credit event on the Early Termination Date.  That

assumption was simply false and not supported by any contemporaneous data.  These errors,

collectively, result in a gross inflation of QVT's valuations of the PCDS Transactions.[174]

### iii.    QVT's PCDS Valuations Far Exceed Comparable Valuations Submitted By Other PCDS Counterparties.

In his expert report, Professor O'Kane also examined the valuations that other

counterparties submitted to LBSF in connection with the termination of their PCDS transactions

following Lehman's bankruptcy filing.[175]  The analysis covers all 224 PCDS transactions on

LBSF's books and records on September 15 that were terminated as a result of Lehman's

bankruptcy.  Importantly, this analysis focused on the valuations initially submitted by other

PCDS counterparties, rather than values that Lehman and the other counterparties may have

ultimately agreed upon in connection with settlement or mediation efforts.

---

[173]    Ex. 5484, O'Kane Report ¶ 67.

[174]    *See* Ex. 5484, O'Kane Report ¶¶ 70-71.

[175]    *See* Ex. 5484, O'Kane Report ¶¶ 134-145.

The results of this analysis (which are reflected in the scatter plot below) show that the valuations QVT submitted for its PCDS transactions are clear outliers that are significantly higher than the valuations submitted by virtually all other similarly situated counterparties.[176]



Indeed, while other similarly situated counterparties only changed the valuation of their PCDS transactions with LBSF by approximately 7.2% of notional from September 12 to the applicable Early Termination Date, the valuations submitted by QVT reflect an increase in value of 28% of notional from September 12 to September 15.[177]

---

[176]    *See* Ex. 5484, O'Kane Report ¶142, Exhibit 15.  This scatter plot is limited to the PCDS transactions on LBSF's books and records on September 15, 2008  that are most similar to QVT's PCDS transactions (i.e., the counterparty was a buyer of protection and the remaining life of the PCDS was less than five years).

[177]    *See* Ex. 5484, O'Kane Report ¶ 144.

**D.     The Opinions of QVT's Experts Should Be Excluded As They Are Not Admissible, Relevant or Reliable**

QVT has advanced four purported expert witnesses (three in support of its case and one rebuttal), but none of the opinions rendered by these experts should be considered by the Court, as their opinions are inadmissible, unreliable, and/or irrelevant.  Professor Golden is being offered to testify regarding the intent of the drafters of the 1992 Master Agreement. Dr. Pfleiderer, a finance professor with no derivatives trading experience, purports to opine on the reasonableness of QVT's valuation methodology, but has failed to do any analysis to assess the validity and reasonableness of QVT's approach.  Dr. Niculescu, on the other hand, expressly admits he is offering no opinion on QVT's methodology; instead, he offers his own untested and unsubstantiated methodologies that result in values conveniently similar to those determined by QVT.  Finally, Dr. Diplas, QVT's rebuttal expert, makes broad statements regarding his observations of the market without considering whether those statements are consistent with the specific facts of this case or observable market data.[178]

**1.     Expert Testimony Must Be Relevant and Reliable to be Admitted**

QVT, as the proponent of its experts, has the burden of establishing that their opinions are properly admitted pursuant to Federal Rule of Evidence 702.  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  QVT must demonstrate that its experts are relevant, meaning that the "expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). Likewise, QVT must demonstrate the reliability of the proffered expert opinions, meaning that

---

[178]     Less than a month prior to the start of the claims hearing, QVT offered Dr. Diplas as a rebuttal witness to certain of Lehman's experts.  As discussed at the January 11, 2017 pretrial conference, Dr. Diplas will only be permitted to testify as part of QVT's rebuttal case to rebut those opinions offered by Lehman's experts at trial. Lehman therefore reserves its rights to move to exclude Mr. Diplas' opinions at a later time.

there must be a "sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions." *Nimely v. City of N.Y.*, 414 F.3d 381, 396 (2d Cir. 2005). Moreover, "[i]t is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. The Court should not be required to rely upon the "*ipse dixit* of the expert." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). In accordance with *Daubert* and its progeny, the Court must act as a gatekeeper to "ensure the reliability and relevancy of expert testimony." *Kumho*, 526 U.S. at 152.

### 2.    Professor Golden's Opinions Are Inadmissible

Professor Golden puts forward impermissible legal opinions regarding the interpretation of the 1992 ISDA Master Agreement ("Master Agreement"). In an attempt to sidestep the inadmissible nature of his opinion, Professor Golden claims he is just reporting on his recollections of the drafting process of the Master Agreement.[179] But Professor Golden's recollections are not admissible expert testimony. The reliability of those recollections cannot be trusted or verified because Professor Golden has not consulted or produced any of his records of the drafting process.[180] Additionally, QVT's inappropriate attempt to circumvent the Federal Rules of Evidence to present irrelevant and inadmissible hearsay under the guise of a purported "expert" report must be rejected.

As an initial matter, Professor Golden's interpretations of the Master Agreement are not appropriate as they invade the province of the Court. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("In evaluating the admissibility of expert testimony, this Court requires the

---

[179]    CX-1617, Expert Report of Professor Jeffrey Bruce Golden ("Golden Report") ¶¶ 5, 49-50; Golden Tr. 23:9-16, Nov. 4, 2016.

[180]    Golden Tr. 20:4-8; 180:15-23, Nov. 4, 2016.

exclusion of testimony which states a legal conclusion."); *United States v. Bilzerian*, 926 F.2d

1285, 1294 (2d Cir. 1991) ("As a general rule an expert's testimony on issues of law is

inadmissible").  Professor Golden's reports are filled with assertions that are nothing more than

Professor Golden's own interpretation of the Master Agreement, which are inadmissible legal

conclusions.[181]

Professor Golden's attempt to circumvent the inadmissible nature of his legal

interpretations by presenting purported factual evidence as to the "intent" of the drafters of the

Master Agreement must be rejected.[182]  Since the Master Agreement is plain and unambiguous,

there is no need for the Court to consider any evidence of "intent."  *JA Apparel Corp. v. Abboud*,

568 F.3d 390, 397 (2d Cir. 2009) ("If the contract is unambiguous, its meaning is likewise a

question of law for the court to decide . . . the court is not to consider any extrinsic evidence as to

the parties' intentions.").  This is exactly the type of testimony that the Court has previously

stated it is unlikely to consider.  *See Lehman Bros. Holdings Inc. v. Longwood at Oakmont, LLC*,

Adv. No. 15-10299, Oct. 20, 2016 Hrg. Tr. 11:4-6 ("I'm highly skeptical that I will take into

account somebody giving me their view on how to interpret an ISDA.  That's a conclusion of

law.  That's my job."); *LBSF v. Fed. Home Loan Bank of Cincinnati*, Adv. No. 13-01330,

Nov. 22, 2016 Hrg. Tr. 42:17-20 ("The point is this, though. I don't -- I am [sic] to going to hear

or use expert testimony in order to interpret the meaning of the language in the ISDA, period.

---

[181]    Professor Golden admits that his opinions are based upon "extra text" that he claims to be aware of, but is not found in the express language of the Master Agreement.  Golden Tr. 20:19-21:9, Jan. 12, 2017.  Professor Golden has not produced any records or documents reflecting this "extra text" on which he purports to rely.

[182]    Notably, Professor Golden appears to have abandoned the phrase "drafter's intent" in his rebuttal report and now opines on "market expectation."  *See, e.g.*, CX-1618, Golden Rebuttal Report ¶¶ 34, 43 fn. 27, 48, 52-53, 73.  When asked whether there was a difference between "drafter's intent" and "market expectation," included in the rebuttal, Professor Golden stated:  "There may be, but it's just my understanding that the [C]ourt is less interested in hearing from me about drafters' intent, but there may be."  Golden Tr. 71:17-23, Jan. 12, 2017.  Professor Golden's frequent references to "market practice" are undermined by his admission at his deposition that market practice is "surprisingly varied."  Golden Tr. 132:9-13, Nov. 4, 2016.  Under New York law, the Court can consider evidence of "market practice" to aid its determination of whether a contract is ambiguous only if those market practices are "fixed and invariable."  *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (quoting *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir. 2003)).

Just not – that's my job.  It's a contact [sic], I'm going to interpret it.").

Moreover, Professor Golden's statements as to the "intent" of the drafters also must be rejected as they are unreliable.[183]  Professor Golden purports to base his statements upon "approximately 200 boxes of materials" relating to the drafting of the Master Agreement.[184]  But Professor Golden has not gone back to review these files.[185]  Therefore, Professor Golden's opinions are based entirely on his recollections from 25 years ago and are unsupported by any documentary evidence.  Professor Golden's recollections and opinions cannot be tested against his own records and files of the drafting process, which have not been produced in connection with his reports.  Professor Golden's memory, standing alone, cannot supply a "reliable foundation" for expert testimony.  *See Daubert*, 509 U.S. at 597; *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 458 (S.D.N.Y. 2010) ("[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is *reliably applied* to the facts.") (quoting Fed. R. Evid. 702 advisory committee's note) (emphasis added).  It is impossible for Lehman or the Court to determine whether Professor Golden has reliably applied his selective memory of events.  Rather, QVT is asking the Court to rely on Professor Golden's assertions based solely on his say so.  The Court should decline the invitation to do so, particularly since Professor Golden did not review or produce the records he claims exist that would allow Lehman and the Court to

---

[183]    In addition, as noted by Lehman's expert Schuyler Henderson, who offers a rebuttal to Professor Golden, the Master Agreement was drafted by a diverse group of stakeholders with different interests such that the final document does not reflect the drafters' intent, but rather the consensus view. Ex. 5402, Henderson Report ¶¶ 28-29.

[184]    Golden Tr. 18:21-19:18, Nov. 4, 2016.

[185]    Golden Tr. 19:2-20:8, Nov. 14, 2016.

evaluate the accuracy and veracity of his assertions.[186]  *See Kumho Tire Co.*, 526 U.S. at 157;

*Joiner*, 522 U.S. at 146.

Professor Golden's attempt to smuggle in his legal opinions by connecting them to his

recollections of the drafting of the Master Agreement highlights the problematic nature of

Professor Golden's "opinions."  Professor Golden's opinions are pure hearsay that are not

dependent upon any "specialized knowledge" beyond having been in the drafting room and are,

therefore, inadmissible.  Fed. R. Evid. 701; *United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir.

2003) (excluding expert who was "repeating hearsay evidence without applying any expertise

whatsoever.").  Professor Golden is nothing more than a fact witness being disguised as an

expert in order to circumvent the rules of evidence.  Indeed, Professor Golden has already

admitted that "In my Original Report . . . [w]hat I aimed to do was to provide, again where I had

relevant and direct experience of it, the historical background to the 1992 ISDA Master

Agreement. . . .").[187]  Not only does Professor Golden claim to be able to know and speak for

ISDA, but all of the dozens of other parties involved in the drafting of the Master Agreement.[188]

The Second Circuit has made clear that "a party cannot call an expert simply as a conduit for

introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his

testimony."  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013).  In *Marvel*, the

---

[186]    Professor Golden does not appear to be an impartial expert witness, but instead is an advocate for QVT in this matter (and for numerous other parties adverse to Lehman in other matters).  Professor Golden has been an "expert consultant" for QVT since at least 2014.  Golden Tr. 6:12-21, Nov. 4, 2016.  Indeed, Professor Golden attended the mediation on behalf of QVT.  Professor Golden – who is an attorney – is so involved in the representation of QVT in this litigation (and in the representation of other Lehman counterparties in this bankruptcy) that he cannot possibly be considered a reliable expert witness.  *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 684 (Bankr. S.D.N.Y. 2003) (precluding purported attorney-expert who "carried out the traditional functions of a lawyer" by helping the plaintiff to "explore and develop legal theories").  Professor Golden cannot be permitted to testify as if he were an impartial expert witness, which he is not.

[187]    CX-1618, Golden Rebuttal Report ¶ 6.

[188]    *See, e.g.*, CX-1617, Golden Report ¶¶ 49-50 ("Lawyers in ISDA working groups . . . have contributed to the ISDA documentation process . . ." and "a dozen or two stakeholders . . ." "(. . . together with . . . Daniel Cunningham), I 'held the pen' . . . .").

Second Circuit excluded two historians whose reports were "by and large undergirded by hearsay statements . . . [d]rawing from these statements, [the experts] then speculate[d] as to the motivations and intentions of certain parties." *Marvel,* 726 F.3d at 136. It is improper for Professor Golden to rely upon – and present to the Court – such hearsay evidence. *See* Fed. R. Evid. 703 (an expert may only rely upon inadmissible evidence if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."). Moreover, while Rule 703 allows an expert to rely on hearsay, the expert "may not cite that hearsay to the [fact finder]." *Glowczenski v. Taser Int'l, Inc.*, 928 F. Supp. 2d 564, 576 (E.D.N.Y. 2013), *aff'd in part, dismissed in part*, 594 F. App'x 723 (2d Cir. 2014) (excluding hearsay relied upon by expert witness). It appears that Professor Golden intends to impermissibly present hearsay from a drafting process that took place 25 years ago, based solely on his recollection of those events, without bothering to check any of his records relating to the process. Not surprisingly, the Court has already expressed skepticism regarding the value of such testimony. *LBSF v. Fed. Home Loan Bank of Cincinnati*, Nov. 22, 2016 Hrg. Tr. 56:22-57:1 ("And all the rest of this parade of people telling me about what happened when they drafted an ISDA 25 years ago, and what people in the market did or did not do, or did or did not think, I just have some serious doubts as to how helpful it's going to be.").

### 3.    Professor Pfleiderer's Opinions Are Inadmissible

Professor Pfleiderer opines on "whether QVT used reasonable methodologies to value its claims, and whether the implementation of those methodologies was reasonable given the market conditions at the time of the Lehman bankruptcy."[189] But Professor Pfleiderer does not have the background or experience to give such an opinion. Nor has Professor Pfleiderer done any

---

[189]     CX-1687, Pfleiderer Report ¶ 4.

analysis to support his broad, conclusory opinions.

Professor Pfleiderer – a professor of finance at Stanford – acknowledges that he does not have any expertise in relation to credit derivatives,[190] and has no actual experience valuing or trading derivatives.[191] He has never conducted any empirical research into the valuation of OTC derivatives or published any articles on the valuation of OTC derivatives.[192] In the absence of any real-world or academic experience valuing derivatives, Professor Pfleiderer asserts that he is qualified to opine on the reasonableness of QVT's methodologies used to value a portfolio of OTC derivatives based solely upon his experience as a professor of finance.[193] However, the closest Professor Pfleiderer has come to derivatives in any of his classes is an "introductory level finance course, which among other things covers the valuation of debt instruments and the pricing of options and other derivatives."[194] It is doubtful that Professor Pfleiderer has the sufficient "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, related to the trading of OTC derivatives to assert expert opinions that are properly admissible.

Additionally, Professor Pfleiderer's opinions are not properly admitted under Rule 702 because he has not based his opinions on sufficient facts or data or applied reliable principles and methods to analyze those facts and data. Professor Pfleiderer has done **no** analysis to assess the reliability and accuracy of QVT's novel and untested valuation methodologies. In his initial expert report of over 80 pages, Professor Pfleiderer does not introduce any metrics or analysis that he uses to test the reasonableness or validity of QVT's valuations. Instead, Professor Pfleiderer assumes QVT's descriptions of the market and its valuations to be true and then

---

[190]    Pfleiderer Tr. 12:2-13, Jan. 16, 2017.

[191]    Pfleiderer Tr. 23:13-24:6; 25:12-24, Nov. 14, 2016; Pfleiderer Tr. 34:7-8, Jan. 16, 2017.

[192]    Pfleiderer Tr. 26:17-27:2, Nov. 14, 2016.

[193]    Pfleiderer Tr. 25:12-19, Nov. 14, 2016.

[194]    CX-1687, Pfleiderer Report ¶ 1.

simply concludes that those valuations were reasonable.  For example, Professor Pfleiderer states

that "[i]n determining its Loss, QVT developed a disciplined process to determine the best

available information regarding each type of transaction,"[195] and, "for positions that were unique

and illiquid, particularly the PCDS and Auto CDS for which no reliable pricing information was

available to QVT's knowledge, QVT relied on the experience-based, practical judgments of its

leading traders who were responsible for the relevant products, in determining the likely

replacement cost of the protection purchased from Lehman."[196]  No support is provided for these

statements.  Professor Pfleiderer did not conduct any independent analysis,[197] market survey, or

in-depth review of QVT's calculations to substantiate his rubber stamp on QVT's valuations.[198]

Professor Pfleiderer did not even consider any market data, QVT's own internal valuations or

other third party information to evaluate the reasonableness of QVT's valuations.[199]  Professor

Pfleiderer simply looked at the summary spreadsheet that QVT prepared of its valuations and

verified that a few of the calculations contained in that spreadsheet were accurate, but did not do

---

[195]    CX-1687, Pfleiderer Report ¶ 31.

[196]    CX-1687, Pfleiderer Report ¶ 32.

[197]    The only "analysis" Professor Pfleiderer appeared to do that relates to QVT's methodology arises from his review of an article by *Kamga* et al., which attempts to use financial modeling to "decompose bid and ask quotes of CDS . . . for a period ranging from 2004 to 2010." *Kamga* et al. at 1; CX-1687, Pfleiderer Report ¶ 95.  Professor Pfleiderer's "analysis" of this article was to zoom in to a single figure in the report and making approximations by holding a ruler to his computer screen.  Pfleiderer Tr. 94:13- 98:23, Nov. 14, 2016.  Such "analysis" certainly doesn't meet the standards that presumably would be expected of a finance professor, or meet the rigor required by *Daubert*.

[198]    *See, e.g.*, Pfleiderer Tr. 27:3-8, Nov. 14, 2016 (admitting that he did not conduct empirical analysis of valuation or prices in the OTC derivative markets for the time in question); Pfleiderer Tr. 35:13-15. Nov. 14, 2016 (admitting that he did not do any statistical analysis in forming his opinions); Pfleiderer Tr. 128:11-17, Nov. 14, 2016 (admitting he conducted no independent analysis as to whether GMAC was a reasonable proxy for valuing CARB); Pfleiderer Tr. 222:2-11, Nov. 14, 2016 (admitting he did not explicitly attempt to calculate any "second order considerations"); Pfleiderer Tr. 226:17-227:23, 228:17-230:6, Nov. 14, 2016 (admitting he did not conduct any empirical analysis to test his conclusory assertions about "the main concept behind QVT's calculations" related to PCDS); Pfleiderer Tr. 14:10-15:20, Jan. 16, 2017 (admitting he did not test QVT's valuation methodologies against academic studies).

[199]    *See, e.g.*, Pfleiderer Tr. 43:7-44:22, Nov. 14, 2016 (admitting that he did not speak with traders other than QVT to see how other traders valued PCDS or Auto ABS); Pfleiderer Tr. 46:12-49:13 (admitting that he did not look at market data related to the derivatives at issue); Pfleiderer Tr. 51:6-23, 52:7-11, Nov. 14, 2016 (admitting he did not look at the results of third party subpoenas in this case); Pfleiderer Tr. 269:22-270:21, Nov. 14, 2016 (admitting he did no analysis of the 9/16 collateral call).

any investigation or analysis as to whether the information summarized in the spreadsheet was based on reasonable assumptions or resulted from any reasonable methodologies.[200]

Aside from rendering his opinions inadmissible, Professor Pfleiderer's blanket endorsement of QVT's approach without doing any independent analysis has him rubber stamping clear mistakes in QVT's valuation. For example, Professor Pfleiderer did not consider QVT's improper inclusion of losses to unwind hedges on Argentina bonds that bore no relation to the portfolio of derivatives QVT had with LBSF that were terminated as a result of Lehman's bankruptcy.[201] Similarly, Professor Pfleiderer accepted wholesale the results of QVT's Market Quotation process including the quotes it solicited for certain CVS PCDS trades as if they were senior CDS, which QVT erroneously used to value two transactions. QVT has admitted that the calculation on these two transactions is incorrect,[202] yet Professor Pfleiderer still opines that QVT's valuation of these transactions is reasonable.[203]

For Professor Pfleiderer's opinions to be useful for the Court (and admissible), they must provide some yardstick by which to determine the reasonableness of QVT's valuations. But Professor Pfleiderer has not provided any such analysis. Instead, he urges the Court to accept his opinions based solely on his say so, which is the hallmark of inadmissible expert opinions. *See, e.g.*, *Kumho Tire Co.*, 526 U.S. at 157 (quoting *Joiner*, 522 U.S. 136, 146 (1997)) (rejecting the "*ipse dixit* of the expert."); *Nimely,* 414 F.3d at 396 (there must be a "sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions").

---

[200]    Pfleiderer Tr. 146:20-147:8, 159:9-16; 177:24-178:4, 179:4-9, Nov. 14, 2016.

[201]    Pfleiderer Tr. 166:14-167:23, Nov. 14, 2016.

[202]    Ex. 5545, Nos. 1304-1305 (Responses and Objections of QVT to LBSF's First Set of Requests for Admission).

[203]    *See* CX-1687, Pfleiderer Report ¶ 145.

### 4.    Dr. Niculescu's Opinions Are Irrelevant

The over 350 pages of opinions submitted by Dr. Niculescu stand in stark contrast to those offered by Dr. Pfleiderer.  Dr. Niculescu's reports are filled with detailed analysis, supported with dozens of spreadsheets and sophisticated analysis.  Dr. Niculescu has looked at market data and what other derivatives counterparties were doing to value similar trades to the ones in QVT's portfolio in order to tether his analysis to the market at the time.

Setting aside disputes regarding certain assumptions and methodologies employed by Dr. Niculescu (which will be debated at length in the claims hearing), the fatal flaw in Dr. Niculescu's opinions is that he offers no opinion at all regarding the reasonableness of QVT's assumptions and methodologies.  Dr. Niculescu purports to opine on the reasonableness of QVT's valuations, through an alleged "independent, 'bottoms up' analysis" of the valuation of the PCDS and CARB trades.[204]  Dr. Niculescu does not consider, analyze or backtest QVT's methodology for its inflated claim.[205]  Dr. Niculescu does not offer any opinion regarding the issue before the Court – whether QVT acted reasonably and in good faith in calculating its Claim – so his opinions are therefore not relevant.

Similar to Dr. Pfleiderer, Dr. Niculescu's opinions are not based on any previous relevant real world experience.   Dr. Niculescu has no experience trading or valuing CARB or PCDS or *any* CDS or CDS Indices.[206]  Yet, Dr. Niculescu proclaims – without any basis or support – that his methods are "standard and common place financial valuation methodologies…performed in order to value these exotic and illiquid instruments at the time in question.[207]  Rather, Dr. Niculescu merely wants the Court to take him at his word that his valuation methodology is

---

[204]    CX-1637, Niculescu Report ¶ 1.

[205]    Niculescu Tr. 317:10-320:9; 344:6-17, Nov. 8, 2016.

[206]    Niculescu Tr. 77:20-25, Nov. 7, 2016; Niculescu Tr. 287:25-288:7, Nov. 8, 2016.

[207]    Niculescu Tr. 34:17-35:3, Nov. 7, 2016.

standard and commonplace, but that is not the standard for the admission of expert opinions.

*See, e.g.*, *Kumho Tire Co.*, 526 U.S. at 157.

### 5.    Dr. Diplas' Rebuttal Opinions Are Inadmissible

Many of Dr. Diplas' rebuttal opinions are inadmissible as they are not based on any analysis of relevant facts or market data.  Dr. Diplas' generalized "observations" of how the market – without confirming that his observations are consistent with the facts of this matter or available market data[208] – are simply of no value to the Court.  Dr. Diplas repeatedly explained his lack of analysis by stating that he "did not need to do an analysis for something I know to be true."[209]  For example, Dr. Diplas purports to be opining that QVT's Market Quotation process was reasonable, but he did not consider whether the fact that QVT failed to solicit quotations for nearly 44 transactions rendered the process unreasonable.[210]  To minimize the fact that he did not consider relevant facts, Dr. Diplas suggested that he might limit his opinion that the parts of the Market Quotation process that he considered were reasonable.[211]  But such a bizarre opinion is of no value to the Court who is faced with evaluating whether QVT conducted the Market Quotation process – in its entirety – reasonably and in good faith.  Dr. Diplas' opinions regarding the relevance of QVT's margin calculations to the reasonableness of QVT's Claim suffer from similar limitations because Dr. Diplas did not look at any documents, records or testimony regarding the background of how QVT and Lehman exchanged margin information and resolved disputes.[212]  Dr. Diplas conceded that his "opinions" were nothing more than his general observations of how margin was handled between derivatives counterparties, which may or may

---

[208]    *See, e.g.*, Diplas Tr. 172:8-174:6; 189:14-195:5; 218:18-219:14; 263:3-19; 286:3-22; 269:23-270:6; 288:9-18; 356:23-357:20; 393:5-12, Jan. 20, 2017.

[209]    Diplas Tr. 179:25-180:2, Jan. 20, 2017.

[210]    Diplas Tr. 294:12-295:10, Jan. 20, 2017.

[211]    Diplas Tr. 296:16- 297:5, Jan. 20, 2017.

[212]    Diplas Tr. 395:17-397:9; 401:11-402:7, Jan. 20, 2017.

not be applicable in this dispute.[213]

### E.    Motions In Limine

#### 1.    QVT's Purported Reliance On Counsel

While counsel for QVT represented in the recent pre-trial conference with the Court that it will not be arguing that QVT acted in good faith because it consulted with counsel, that representation is at odds with the record that has developed.  In QVT's Responses and Objections to LBSF's Second Set of Interrogatories, QVT asserts that it acted in good faith based upon "consultation with external counsel."[214]  Mr. Golden has testified that "[QVT] contacted counsel and proceeded on advice of counsel in this matter" and that could be used "to establish a good faith defense."[215]  Similarly, Dr. Diplas testified that "To me as a practitioner it shows that -- good faith.  It shows that they're trying to do the right thing.  And that is the purpose of seeking legal advice."[216]  QVT should be precluded from arguing in the opening statements, otherwise referring to, eliciting testimony or submitting any evidence stating or suggesting that QVT acted in good faith because it sought advice of counsel.  *See In re Residential Capital, LLC*, 491 B.R. 63, 68 (Bankr. S.D.N.Y. 2013) (internal quotations omitted) (finding that when a party fails to make the necessary disclosures during discovery, courts have precluded them "from offering evidence or argument at trial regarding their purported belief in the lawfulness of their conduct."); *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936(KMV), 2011 WL 1642434, at *3 (S.D.N.Y. Apr. 20, 2011) (precluding party from arguing or offering any evidence of good faith).

---

[213]    Diplas Tr. 395:24-396:5, Jan. 20, 2017.

[214]    *See* Ex. 5544, No. 19, 21 (Responses and Objections of QVT to LBSF's Second Set of Interrogatories)

[215]    Golden Tr. 59:24-60:12, Nov. 4, 2016.

[216]    Diplas Tr. 316:21-24, Jan. 20, 2016.

### 2.    QVTs Alleged *Post Hoc* Analyses and Backtesting

During the depositions, QVT's witnesses generally described the actions and analyses

QVT actually conducted prior to the submission of its Calculation Statement to Lehman on or

about October 15, 2008.[217]  Some QVT witnesses have suggested that following the submission

of the Calculation Statement they may have conducted additional analyses and backtesting but

only in discussions with, or acting for, counsel for QVT.[218]  QVT's counsel instructed each

witness not to answer any questions concerning "any communications he had with counsel or

work he did in conjunction with counsel."[219]  Having consistently precluded Lehman from

inquiring about QVT's *post hoc* analyses and discussions concerning the valuation

methodologies used by QVT, QVT should be precluded from arguing in the opening statements,

otherwise referring to, eliciting testimony or submitting any evidence concerning QVT's those

analyses.  *See Bilzerian,* 926 F.2d at 1292 ("the attorney-client privilege cannot at once be used

as a shield and a sword. . . "); *Hussain v. Burton & Doyle of Great Neck, LLC*, No. 14-CV-5924,

2016 WL 6088309, at *4 (E.D.N.Y. Oct. 18, 2016) (same).

### 3.    QVT's Failure to Preserve Relevant Data

While QVT's counsel has repeatedly suggested that the volume of documents produced

by QVT demonstrates its transparency and good faith, nothing could be farther from the truth.

QVT and its counsel have obstructed Lehman's legitimate discovery requests at every turn,

including by:  (i) blatantly ignoring document production deadlines set by the Court;

(ii) producing more than 250,000 documents without reviewing them for relevance, while at the

same time falsely representing that such a review had been performed; (iii) erroneously claiming

---

[217]        *See, e.g.,* Chu 30(b)(6) Tr. 207:24-208:21,  Aug. 2, 2016.

[218]        *See e.g.,* Chu 30(b)(6) Tr. 231:19-232:18, 244:24-245:13; 252:4-22; 253:8-254:5; 261:6-11; 265:3-18 ,
Aug. 2, 2016; Chu Tr. 88:19-89:17, Aug. 4. 2016.

[219]        Chu 30(b)(6) Tr. 232:8-18, Aug. 2, 2016; *see also* Chu Tr. 89:3-8, Aug. 4, 2016.

that all documents related to QVT's Market Quotation process had been produced, when the repository that QVT created specifically for communications related to that process had not been properly searched; (iv) failing to reveal until May 18, 2016 (approximately 17 months after the discovery process began) that QVT had not implemented a litigation hold on documents related to its Proofs of Claim until June 13, 2011 (more than 20 months after it filed its Proofs of Claim); (v) ignoring its obligation to produce expert reliance materials as required by the parties' stipulation regarding expert discovery; and (vi) providing false and misleading responses to Lehman's interrogatories and requests for admission. QVT's abuse of the discovery process is inconsistent with its assertion that it acted (and continues to act) in good faith.

The absence of documentary evidence relating to QVT's Claim and the fact that a litigation hold was not issued until more than two and a half years after QVT valued the Transactions suggests that documents relevant to this case have been destroyed. Pursuant to Federal Rule of Civil Procedure 37(e), the Court may impose sanctions on a party where "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Under the most recent amendments to Rule 37(e), sanctions are appropriate when the Court finds that the failure to preserve ESI resulted in prejudice to another party or where "the party acted with the intent to deprive another party of the information's use." *Best Payphones, Inc. v. City of N.Y.*, No. 1-CV-3924, 2016 WL 792396, at *3 (E.D.N.Y. Feb. 26, 2016) (internal quotation marks omitted).

QVT has withheld documents based upon the assertion that they are protected work product – which requires the anticipation of litigation – dated as early as July 14, 2008.[220] Since

---

[220] *See* QVT's December 13, 2016 Revised Privilege Log, entry 81.000.

QVT apparently anticipated litigation at that time, it had an obligation to issue a litigation hold

and preserve evidence.  *See Best Payphones, Inc.*, 2016 WL 792396, at *3.  QVT's failure to

take reasonable steps to preserve documents has prejudiced Lehman with respect to three

categories of important documents:  (a)  the internal margin documents that Kelly Feng relied

upon to make QVT's margin call to Lehman on September 16; (b) email communications from

Mr. Gold relating to Lehman's bankruptcy and the preparation of the Claim; and (c) calculations

that Arthur Chu performed to value the CARB index prior to Lehman's bankruptcy filing.

Despite repeated requests, QVT has not produced any documentation that provides the

back-up for the $13.3 million margin call QVT made on Lehman on September 16.  While QVT

did provide an interrogatory response asserting that the call was based on QVT's attempts to

withdraw initial margin from Lehman, no documents have been produced that support the

margin call.[221]  The absence of such documents is inexplicable since QVT's 30(b)(6) witness has

confirmed that the margin call must have been based on valuations of the Transactions that were

generated by QVT's own systems.[222]  The failure to produce these documents is prejudicial to

Lehman because they would have confirmed that QVT personnel (with the blessing of senior

management) affirmatively calculated the mark-to-market value of the Transactions as of the

close of business on the Early Termination Date, and then relied on those values to make a

margin call (which QVT was required under the Agreements to calculate in good faith and in a

commercially reasonable manner).  In light of QVT's evident failure to preserve these

documents, Lehman seeks an order precluding QVT arguing in the opening statement, otherwise

referring to, eliciting testimony or submitting any evidence stating or suggesting that QVT's

internal marks for the Transactions on the Early Termination Date were not accurate or reliable.

---

[221]     Sale 30(b)(6) Tr. 139:8-22, Dec. 30, 2016.

[222]     Sale 30(b)(6) Tr. 24:9-18, Dec. 30. 2016.

Second, QVT has failed to produce documents from Mr. Gold over the most relevant time period in this case.  QVT has only produced a paltry six emails sent by Mr. Gold between September 15, 2008 and October 16, 2008.  While QVT's counsel has claimed that QVT personnel simply did not send many emails, third-party productions have revealed that Mr. Gold did send relevant emails that have not been produced by QVT.  For example, on September 15, 2008, Mr. Gold sent emails to JPM and Deutsche Bank attaching what appears to be a draft of QVT's Market Quotation request.[223]  In addition to demonstrating QVT's failure to meet its discovery obligations, these communications contradict Mr. Gold's testimony that he was not involved in the process of terminating the Transactions and submitting the Claim.[224]  It goes without saying that QVT's failure to produce email communications from QVT's CEO from the crucial time period in this case has prejudiced Lehman's and the Court's ability to evaluate the reasonableness of QVT's Claim.

Third, QVT has failed to provide documents that reflect QVT's pre-bankruptcy valuations related to CARB using Intex.  At his deposition, Mr. Chu admitted that he used Intex to value the bonds underlying the CARB index.[225]  Despite this affirmation, QVT has been unable to produce any documents reflecting these valuations done by Mr. Chu.  These are relevant to establishing QVT's pre-bankruptcy valuation methodology and valuation, and their destruction has prejudiced Lehman's ability to show that QVT's abandoned its pre-bankruptcy valuation methodologies and unreasonably calculated Loss.

---

[223]     Ex. 5009, JPM-LBSF 0001787; Ex 5907, DB-QVT-E001076.

[224]     Gold Tr. 87:18-89:14, Aug. 11, 2016.

[225]     Chu 30(b)(6) Tr. 94:10-21, July 14, 2016 ("[D]oes this refresh your recollection as to whether you used Intex to value bond underlying the CARB index?  A:  Yes.  It says I tried running some stuff on Intex.  Q:  Right. Does it refresh your recollection, sitting here today, that you did that?  A:  As I said, it says I tried running some stuff on Intex, so it looks like I did some runs on Intex.").

## **CONCLUSION**

At the conclusion of the evidentiary hearing, Debtors will request a ruling from the Court rejecting QVT's Claim as submitted and allowing only such portion of the Claim as QVT can prove was calculated reasonably, in good faith and in compliance with the contracts and applicable law.


Dated: January 24, 2017                                    Respectfully submitted,
      New York, New York

                                                      */s/* Jayant W. Tambe
                                                      Jayant W. Tambe (2884450)
                                                      Laura Washington Sawyer (3050853)
                                                      Jennifer L. Del Medico (4422770)
                                                      Ryan J. Andreoli (4259115)
                                                      JONES DAY
                                                      250 Vesey Street
                                                      New York, New York 10281
                                                      Telephone: (212) 326-3939
                                                      Facsimile: (212) 755-7306

                                                      *Attorneys for Debtors*