Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS INC.,

8

9        Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  U.S. Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  January 30, 2017

17                  10:05 AM

18

19

20

21  B E F O R E :

22  HON SHELLEY C. CHAPMAN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO: TB

1    Hearing re:  Trial on Lehman's Objection to Claims of QVT

2    (Doc # 17468 Debtors' One Hundred Fifty-Fifth Omnibus

3    Objection to Claims)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

1    A P P E A R A N C E S :

2

3    HOGAN LOVELLS US LLP

4         Attorneys for QVT FUND LP

5         875 Third Avenue

6         New York, NY 10022

7

8    BY:  JOHN D. BECK

9         BEN LEWIS

10        DENNIS H. TRACEY, III

11        WILLIAM B. REGAN

12        ROBIN E. KELLER

13

14   JONES DAY

15        Attorneys for the Debtor

16        LAURI W. SAWYER

17        JENNIFER DEL MEDICO

18        RYAN J. ANDREOLI

19        REBEKAH BLAKE

20        SARAH EFRONSON

21        JAYANT W. TAMBE

22

23   ALSO PRESENT TELEPHONICALLY:

24

25   JASON SANJANA

Page 4

1                P R O C E E D I N G S

2             THE COURT:  Please, have a seat.  How is everyone?

3             MAN 1: Very well, thank you.

4             THE COURT:  Okay.  Any -- anything I need to know

5     before we get going?  Anything in the nature of

6     housekeeping?  I trust your accommodations are satisfactory?

7     All good?  Okay.  So, I understand -- yes, Mr. Tracey?

8             MR. TRACEY:  Yes, they're palatial, compared to

9     what we're used to, so thank you.

10            THE COURT:  You're welcome.  You're welcome,

11    anytime.  The price is right.  It only cost a couple of ten

12    million dollars to litigate and you can have a free room at

13    the Bankruptcy Court for a while.

14        (LAUGHTER IN THE COURTROOM)

15            MR. TRACEY:  I think the only housekeeping issue

16    is something that we communicated to the Court --

17            THE COURT:  About the motions in limity?

18            MR. TRACEY:  Right, that's it.

19            THE COURT:  All right, I'm ready.  Let me just put

20    some of this on my cart back here, and we'll be ready to go.

21    The only party I have dialed in on the phone is Mr. Sanjana

22    from Reorg Research.  All right, so Mr. Tracey, you're up

23    first, yes?

24            MR. TRACEY:  Fine with me.

25            THE COURT:  You only have two, right?  Which is

Page 5

1    the other PCS and card counterparty trades and the valuation

2    of the side pocket, right?

3              MR. TRACEY:  That's correct, Your Honor.

4              THE COURT:  Okay, is there anything that you

5    wanted to say in addition to what's in the papers, which I

6    read?

7              MR. TRACEY:  I have a few comments --

8              THE COURT:  Sure.

9              MR. TRACEY:  -- if you don't mind, Your Honor?

10             THE COURT:  No problem.

11             MR. TRACEY:  Let me start with the counterparty

12   motion.  As Your Honor knows, we're moving to preclude

13   Lehman from introducing evidence of the claims that were

14   submitted by counterparties other than QVT.

15             THE COURT:  Right.

16             MR. TRACEY:  And there are really two grounds for

17   the motion.  The first is that to us, it's a complete

18   sideshow to go into the valuations that other counterparties

19   made of their positions under their circumstances, under an

20   ISDA the provides for a party to value its positions based

21   on its own situation and its circumstances.  And to do that,

22   to go down that road, we would have to litigate every one of

23   those valuations.  We would have to understand what the

24   basis for the valuation was, what they considered, whether

25   they made mistakes, and what affected the levels at which

Page 6

1    they made their claims.  We don't think that's a good use of

2    time.  We think that's a complete distraction, and we don't

3    think it'll advance the ball at all.

4            But probably more importantly, this is a subject

5    on which we have gotten no discovery and from the outset of

6    this case, Lehman has taken the position that other

7    counterparties' claims and resolutions are irrelevant to

8    this case.  So, from the -- in their -- I just -- let me

9    read to Your Honor from Lehman's responses at objections to

10   QVT's first request for production of documents.  Right out

11   of the box, Paragraph 5: "Lehman objects to each and all of

12   the requests as overbroad to the extent that they seek

13   documents or information relating to transactions or claims

14   between Lehman or any of its affiliates and counterparties

15   other than QVT."  Period.  And that theme, of course, was

16   continued throughout all of the responses that we got, and

17   so, we requested the information on -- as discovery to

18   determine whether it was relevant, and they completely shut

19   us down.

20           THE COURT:  Did it make its way to any of our

21   conferences?  I just can't recall.

22           MR. TRACEY:  Not really, Your Honor, because they

23   took the position it wasn't relevant and we said, okay, if

24   it's not relevant and you're not going to present evidence

25   at trial on it, that's fine.  We just didn't want to fight

Page 7

1    it --

2            THE COURT:  Okay.

3            MR. TRACEY:  -- and extend things, and then, at a

4    30(b)6 deposition, the night before, we got a list of other

5    counterparty claims in PCDS and CDS, and they said --

6            THE COURT:  30(b)6, a Lehman 30(b)6?

7            MR. TRACEY:  A Lehman 30(b)6.  So, long after they

8    took this position, the night before, they said here's a

9    document, and lo and behold, it includes very limited

10   information about claims made by other PCDS and card

11   parties, just really the amount -- the notional amount, the

12   claim, the product and maybe a couple of other pieces of

13   information, but absolutely no information about how those

14   numbers were arrived at, whether they were based on the same

15   methodology we used, a different methodology, whether they

16   were correct or incorrect, what percentage of the claims it

17   represented.  So, it may be that somebody would put in a

18   claim and not put much effort into it because it's a very

19   small part of their claim.  So, in order to make any

20   comparison between where QVT made their claim and where

21   another party made their claim, we would have to understand

22   a lot more, and we don't have it, and I think it's too late

23   to get it.  They've taken their position and we believe they

24   should (indiscernible).

25           THE COURT:  All right, thank you.  All right, why

Page 8

1    don't we do them one at a time?

2              MR. TRACEY:  Okay.  Thank you.

3              THE COURT:  Yes?

4              MS. DEL MEDICO:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MS. DEL MEDICO:  I'm Jennifer Del Medico.  I'm

7    from Jones Day.

8              THE COURT:  Yes.

9              MS. DEL MEDICO:  Just wanted to make a few

10   comments on what Mr. Tracey said.  First of all, what Mr.

11   Tracey was talking about was Lehman's position on whether or

12   not Lehman was going to produce documents on how Lehman

13   acted with respect to other counterparties.

14             THE COURT:  Hold on.  Say that again, please?

15             MS. DEL MEDICO:  Sure.  What Mr. Tracey was

16   talking about was, Lehman was not going to produce documents

17   showing how Lehman reacted with -- vis-à-vis to other

18   counterparties.  But what Lehman did produce, Your Honor, is

19   a spreadsheet that showed information about other PCDS and

20   CV -- and card counterparties.

21             THE COURT:  So, the information that you're

22   referencing is the information that Mr. Tracey identified as

23   having been produced in connection with the 30(b)6 witness?

24             MS. DEL MEDICO:  Correct.  And --

25             THE COURT:  Okay, but, Lehman did not produce --

Page 9

1    all you're talking about is claims that were filed by

2    Lehman-facing counterparties other than QVT, where the

3    underlying trades were either PCDS or card?

4             MS. DEL MEDICO:  Correct.

5             THE COURT:  Okay.  And -- but you did not -- but -

6    - okay, keep going.

7             MS. DEL MEDICO:  Okay, so, we produced a large

8    spreadsheet showing what kind of -- what claims were given

9    by other PCDS and card counterparties.  Not only that, we

10   produced the DQ information, so where available, they got

11   the ISDAs, they got the termination notices, they got the

12   claimant --

13            THE COURT:  You mean MQ?

14            MS. DEL MEDICO:  No, DQ.

15            THE COURT:  Oh, the derivatives questionnaire.

16            MS. DEL MEDICO:  I'm sorry, the DQ data.

17            THE COURT:  Okay.

18            MS. DEL MEDICO:  So, they have -- so, to say they

19   have no data about other card counterparties is just -- it's

20   not true.  They do have data about other counterparties, and

21   it was produced long --

22            THE COURT:  What's the purpose -- how are you

23   going to use this?

24            MS. DEL MEDICO:  Sure.  Well, okay, so QVT makes

25   some statements in its brief.  It says, we didn't -- we

Page 10

1    admit, we didn't get market quotations for certain products,

2    but you know what?  It was highly unlikely that we would

3    have gotten market quotations.

4              THE COURT:  Right.

5              MS. DEL MEDICO:  And so, we have evidence that, in

6    fact, other counterparties went out and got market

7    quotations (indiscernible).

8              THE COURT:  Okay, so this is exactly where I

9    wanted to go.  So, there's a difference between saying,

10   here's how another party valued its card exposure or its

11   PCDS exposure, and that sheds light on whether or not what

12   QVT did was reasonable or not, okay?  That you can't do

13   because I think Mr. Tracey has it exactly right.  The number

14   that another counterparty puts down on its claim is not

15   probative of whether or not what QVT did was reasonable and

16   consistent under the ISDA.  To the extent that, however,

17   you're talking about data that happens to have been uploaded

18   into these claims and you want to use that data as evidence

19   to test the position that there was or was not a market that

20   the securities were or were not illiquid, I think that's a

21   different thing.

22             So, now I can't tell if we have a dispute or not

23   because they -- QVT needs to have had the opportunity to

24   test that and understand it, and to the extent that -- and

25   there was a -- I have managed to read virtually all of the

Page 11

1    expert reports.  To the extent that any one or more of the

2    experts relied on data or the absence of data on the issues

3    of market quotation, liquidity, et cetera, then that's

4    relevant, and I would expect that that would have been

5    identified as reliance materials, et cetera.  So, on the

6    point of, look at what these counterparties valued their

7    positions at, that's not -- that cannot come in as being

8    probative of what the level at which QVT values its

9    positions.  In terms of the underlying data, I hope the

10   answer is that they've had access to that and have been able

11   to test that.  So, am --

12           MR. TRACEY:  May I just --

13           THE COURT:  And I'm going to tell you folks

14   generally, notwithstanding the fact that I've done a lot of

15   preparation, there's obviously a learning curve.  So, to the

16   extent that you hear me misstate something, please don't

17   hesitate to tell me and to -- and help me get a course

18   correction if you think that I'm getting it wrong.

19           MS. DEL MEDICO:  So, Your Honor, one of the other

20   assertions QVT makes is, well, we're unique.  There's no

21   other PCDS counterparty like us because we have such a large

22   position.  And one of our experts is saying, you know,

23   looking at the data, which they have and saying, you know,

24   that's not true.  They're not unique.  There's another

25   company that has more.

1          THE COURT:  But that's -- but that's okay.  That's

2    not, look at these claims and they were -- and look at where

3    their marks were and look at what day they valued them on.

4    I'm -- you know, all the different factors, and using that

5    kind of configuration as a means of comparing to QVT and

6    saying, and therefore, what QVT did was not reasonable.

7    You're again talking about underlying data.  For example --

8    well, I won't give an example, right?  So, let me go back to

9    Mr. Tracey.  Do we have a disagreement now?

10          MR. TRACEY:  I don't think we do, Your Honor.

11    There are several instances in which, during the course of

12    discovery, Lehman produced information from other

13    counterparties, which has now formed the basis of the

14    opinions of both sides' experts.  So, for example, there was

15    a market quotation -- a successful market quotation for the

16    card product by another counterparty.  That was produced to

17    us.  We had no objection to that.  So, both sides have now

18    looked at that and said, okay, what does that tell us about

19    the value of cards?

20          THE COURT:  Sure.

21          MR. TRACEY:  And so, we've incorporated that into

22    our expert reports and we're prepared to put on evidence of

23    it.  So, to the extent that underlying market information

24    was provided in discovery, we have no objection to using it

25    at the trial.

1          THE COURT:  Okay, well, those are the parameters,

2    and we'll just have to keep that -- keep them in mind and

3    see what happens.  All right?

4          MS. DEL MEDICO:  Just --

5          THE COURT:  Yes?

6          MS. DEL MEDICO:  -- just to be clear on one point,

7    though, I -- we have -- we do have an expert and I want to

8    make sure that Mr. Tracey is not talking about this type of

9    data, who bases an opinion on data that we gave to QVT and

10   he shows a scatterplot of, you know, where QVT's claim is

11   compared to similarly situated parties, and that type of

12   data, looking at what a similarly situated party does,

13   courts routinely look at that type of data to assess whether

14   a party is reasonable, and I want to make sure that that --

15   that that's not outside of what you're talking about.

16         MR. TRACEY:  That's precisely --

17         THE COURT:  That's precisely what's outside --

18         MR. TRACEY:  -- what's outside --

19         THE COURT:  -- of what I'm talking about.  What

20   other parties put on a proof of claim is not probative of,

21   frankly, anything because they will have done their own

22   internal analysis or not of where they think recoveries are,

23   they might have other collateral positions, there are a

24   whole host of things that would come into that analysis, and

25   it's -- and you'll forgive me, I sometimes can't remember

Page 14

1    one set of Lehman claims from another vis-à-vis

2    counterparties, but consistently, I have expressed my view

3    that the filed amount of other claims, indeed the settled

4    amount of other claims, is not probative as to where the

5    appropriate level is to allow a particular claim.  So, I'm

6    glad you brought that up again, because I don't believe that

7    that's fair game.  All right?  So, we're not going to

8    exclude a whole expert report on that, but when we get to

9    it, I think that's -- is that Dr. O'Kane?

10               MS. DEL MEDICO:  It is.

11               THE COURT:  Yeah, okay.

12               MS. DEL MEDICO:  And so, Your Honor, as a -- as a

13   baseline for what's reasonable, your view is that that

14   should not be used?

15               THE COURT:  The filed amount of claims of other

16   Lehman-facing counterparties is not relevant / admissible or

17   probative of whether or not QVT's claim amounts are

18   reasonable under the ISDA, okay?

19               MS. DEL MEDICO:  Understood.

20               THE COURT:  All right, so, that takes care of that

21   one.  So, Mr. Tracey, we go back to you for the -- QVT's

22   post-filing valuations of the claim -- of the side pocket

23   claims.

24               MR. TRACEY:  Thank you, Your Honor.  So, the issue

25   here relates to, as I think Your Honor knows, the value --

Page 15

1    the value --

2            THE COURT:  Excuse me one minute.

3        (Judge confers off the record with Clerk)

4            THE COURT:  We're just having a technical problem

5    up here, so you're going to see a little activity, we're

6    going to try to fix it, but we're not going to stop.  All

7    right?  Go ahead.

8            MR. TRACEY:  So, the issue is the relevance of the

9    value on which QVT placed its post-filing claim against

10   Lehman, and the -- as Your Honor knows from the briefs --

11           THE COURT:  Right.

12           MR. TRACEY:  -- at the time of the filing, and

13   this is consistent with commercial practice, they moved the

14   claimant to a separate side pocket, valued it at zero

15   because they had no idea where things would be trading, and

16   over the course of the next eight years, that number has

17   changed.  They look at what -- initially what claims --

18   allowed claims were -- what people in the market were buying

19   allowed claims for, and considered that and put originally a

20   5 percent value on it.  They later saw that allowed claims

21   were trading at a higher level, so they put a higher level

22   on it, and they ran all of that by PWC, their auditors, and

23   the key inquiry, from an accounting standpoint, on what

24   value you place on a claim, is what you think a third party

25   in the market would likely pay you to buy that claim.

Page 16

1   That's the level at which you have to carry it on your

2   books.

3          THE COURT:  But don't you have to -- understood.

4   Don't you -- it -- doesn't it have two components?  It has

5   an estimate of the projected distributions, and also a

6   risking of the likely notional amount.

7          MR. TRACEY:  Correct.

8          THE COURT:  Okay.  So, to the extent that the

9   valuation of the side pocket involved the latter as opposed

10  to the former, why wouldn't that be fair game?

11         MR. TRACEY:  The reason that wouldn't be fair

12  game, Your Honor, is because it doesn't -- it doesn't bear

13  on what the substance of the claim.  It is an inquiry into

14  what a third party in the market would come in and would

15  say, here's what I think the likelihood is that you're going

16  to win this claim and how much I think you're going to win.

17         THE COURT:  So, let me ask another hypothetical

18  question, and again, I'll reiterate that sometimes I'll give

19  an extreme hypothetical to illustrate the point.  So,

20  suppose there was correspondence between and among the

21  traders at QVT that said, now that we're past the claims

22  process, we really have to get a better understanding of

23  what our claim really is.  Looks like we should have used

24  numbers from September 16th instead of September 19th for

25  the purposes of putting a nav on this for our investors, we

Page 17

1    had better adjust it down, okay?  So, wouldn't that be

2    hypothetically probative of the good faith to show that you

3    know, the process was flawed / not in good faith and

4    therefore, that should be taken into account?

5              MR. TRACEY:  Yeah, absolutely.

6              THE COURT:  You can say, great, that didn't

7    happen.

8              MR. TRACEY:  Great, that didn't happen.

9          (LAUGHTER IN THE COURTROOM)

10             THE COURT:  Understood.  But so, how can I know --

11   I mean, to me, I'm 100 percent with you in the analysis of

12   following where Lehman claims distributions would come in.

13   100 percent.  But to the extent that there were adjustments

14   made in their analysis of the notional amount of a claim as

15   it impacts value, there's a possibility that that could

16   reflect back on what was done in real time.

17             MR. TRACEY:  So, I think -- I think we may have to

18   address this --

19             THE COURT:  Wait and see?

20             MR. TRACEY:  Yeah, because --

21             THE COURT:  I think so, too.

22             MR. TRACEY:  -- because -- and if I could just --

23             THE COURT:  Yeah.

24             MR. TRACEY:  -- just distinguish two things.  What

25   Your Honor is talking about, and I fully agree, that if a

Page 18

1    principal of QVT wrote an email -- I don't care if it's 20

2    years after they put in the claim, and said, we really don't

3    believe in this, or we think we did it wrong, that's a

4    relevant document.  What I'm really talking about here,

5    though, is a valuation that was placed on QVT's books based

6    on what a third party would pay for a claim.  So, assume

7    that there's no, we think our claim is wrong, but what they

8    do do is they say, okay, we've got a -- we have an

9    unliquidated claim.  We're not willing to guarantee any part

10   of that claim to a buyer, it's going to be completely non-

11   recourse --

12           THE COURT:  Right.

13           MR. TRACEY:  -- and we're clearly looking at years

14   before we ever get this resolved, unless there's a

15   settlement.  Realistically, if there's a settlement, it's

16   going to be way below what we're asking because nobody

17   settles anything unless there's a huge discount, even if

18   it's a perfectly good claim, and everybody knows that.  So

19   they say, okay, nobody's going to pay $265 million dollars

20   for this claim, period.

21           THE COURT:  Sure.

22           MR. TRACEY:  And so they're going to say, the

23   likelihood of $265 million is zero in a third party's mind.

24   What would a third party say?  Well, the third party might

25   say $200 is a possibility but that's 50 percent.  $150 is a

Page 19

1    possibility, that's 40 percent, and that's how it's valued.

2    That, Your Honor, I would submit, is completely irrelevant

3    to this case.

4              THE COURT:  Right, and I agree with that.  I think

5    -- and Lehman can speak for itself, but I think that the arc

6    of what has been said about a lot of the aspects of this

7    case is that the claim is inconsistent with QVT's internal

8    discussions / analysis.  So, to the extent that, I think

9    they're saying, that QVT had a fiduciary or other

10   responsibility to accurately report the position to its

11   investors, they want the opportunity to look at that and

12   say, you see, when it really counts, when they really had to

13   put numbers on this, they took a different position.

14             MR. TRACEY:  Well, but Your Honor, of course they

15   did because it was all about what a third party would pay.

16             THE COURT:  Sure.  Right, so if -- but --

17             MR. TRACEY:  So, who cares?

18             THE COURT:  Right, so, I -- I don't dispute that,

19   but I think that this is also -- we're going to have to --

20   we're going to have to see.

21             MR. TRACEY:  Right.

22             THE COURT:  Because then now -- then they can

23   explain, you know, huge inconsistency.  And Lehman also

24   highlighted in their brief, and I don't know what -- where

25   they intend to go with it, but the economic stake of the

Page 20

1   holders of the side pocket and how the percentage of the

2   side pocket owned by principals has migrated over the years.

3   And so, I don't know where they're going to go with that,

4   but that was also, merited at least a footnote in their

5   brief.

6           MR. TRACEY:  It did.  I have no idea why that's

7   relevant.  We can explain it, but again, and Your Honor's

8   going to disagree with me on this because we have three

9   weeks of trial, I don't think it's worth the time we're

10  going to spend on it, but if you want to hear it, we'll --

11  we'll tell you all about it.

12          THE COURT:  Okay.  I won't comment anymore.  We'll

13  just see -- we'll see how it goes.

14          MR. TRACEY:  Okay.

15          THE COURT:  So, I mean, I think on this one, it's

16  kind of a wait and see what they say, and that means that I

17  reserve my right to kind of cut the testimony short if I

18  think it's going into an area that I think is off limits.

19          MR. TRACEY:  Sure.

20          THE COURT:  All right?

21          MR. TRACEY:  Thank you.

22          THE COURT:  So, based on that, should I hear from

23  you folks?

24          MS. DEL MEDICO:  No, we'll wait --

25          THE COURT:  Okay.

Page 21

1           MS. DEL MEDICO:  -- we'll wait and see --

2           THE COURT:  Okay.

3           MS. DEL MEDICO:  -- (indiscernible) Your Honor

4    said.

5           THE COURT:  All right, great.  Okay, so, next is

6    Lehman's.  Okay.

7           MS. SAWYER:  I think the first one is the

8    privilege issue.

9           THE COURT:  Right.

10          MS. SAWYER:  The first privilege issue.

11          THE COURT:  Right, so I got --

12          MS. SAWYER:  Two privilege issues.

13          THE COURT:  -- I got cases from both of you --

14          MS. SAWYER:  Yes.

15          THE COURT:  -- and I don't believe that what QVT

16   has argued justifies a waiver of privilege.  It's a timeline

17   issue.  There were a couple of statements that were quoted

18   in your pre-trial brief at Page 55 that I just want to make

19   sure I'm understanding, because you say that QVT asserts

20   that it acted in good faith based upon consultation with

21   external counsel, and I understood Mr. Tracey to be telling

22   me that that's not the case, that it's not good faith based

23   upon, which is not in quotes in the brief.  There occurred

24   consultation with external counsel, but that there's not a

25   reliance on that.  So, -- and Mr. Gold -- you also highlight

Page 22

1    what Mr. Golden said.  What Mr. Golden says on this issue is

2    completely beside the point and is not -- I'm not going to

3    take that as admissible.  Similarly, Dr. Diplus testified

4    that: "It shows that they're trying to do the right thing

5    and that is the purpose of seeking legal advice."  So,

6    that's off the table as well.

7             So, I don't know that anything's left, other than

8    the fact, as part of the timeline, that, during the couple

9    of hours before the market quotation request went out, that

10   they were, as a factual matter, talking to counsel, that

11   fact will come in, but that's about it.

12            MS. SAWYER:  I just want to point out a couple

13   things that weren't pointed out in our brief --

14            THE COURT:  Okay.

15            MS. SAWYER:  -- because they came up in their

16   brief.  So, they have taken the position in QVT's brief that

17   they said: "The Court will conclude at the end of the trial

18   that there is not a whit of evidence of bad faith," and

19   that's on Page 5 of their brief.  That's exactly the type of

20   statement that the Court -- the Courts in the cases that we

21   provided to you, are concerned about, because there's no way

22   for the Court, for you the Court, to evaluate that

23   statement, "there's not a whit of evidence of bad faith,"

24   when we are precluded from hearing information about the

25   advice that they received. And so, that's our concern --

Page 23

1              THE COURT:  But that gets back to what we talked

2      about last time, which is that, therefore, everyone knows

3      that in these situations, in some fashion, there's going to

4      be consultation with counsel.  So, where you are is that any

5      time a party is -- any time good faith is at issue, the

6      advice of counsel is in play and I just don't think that

7      that's correct.

8              MS. SAWYER:  I would just also point out to the

9      Court, and I heard you, but there are two interrogatory

10     responses, contention and interrogatory responses --

11             THE COURT:  Okay.

12             MS. SAWYER:  -- which are inconsistent with the

13     representations that have been made to the Court, which is

14     also hard for us to square.  So, one of the interrogatories,

15     No. 19 is: "Is it your contention that you selected the day

16     and time for referenced market makers to provide market

17     quotations on the Lehman transactions in good faith?  If so,

18     state the basis for the contention."  Answer: "QVT's

19     selection of September 15th, 2008 is the early termination

20     date in its request for market quotations as of 4:00 PM

21     Eastern, was made in good faith, following consultation with

22     external counsel, as to the form and content of the market

23     quotation requests."  So, when asked for the basis, that was

24     QVT's response.  Additionally, interrogatory No. 21 --

25             THE COURT:  That's as to the selection of

Page 24

1    September 15th as the early termination date, but you -- are

2    you -- you haven't questioned the selection of September

3    15th.  That's not really information that --

4           MS. SAWYER:  The question -- the question that was

5    posed --

6           THE COURT:  -- go ahead.

7           MS. SAWYER:  -- was whether QVT selected the day

8    and time for the referenced market makers to provide market

9    quotations on the Lehman transactions in good faith.  So,

10   it's specifically the good faith issue of the selection of

11   date and time for the market --

12          THE COURT:  Time for the MQ, okay.

13          MS. SAWYER:  Right, and they say that they

14   selected it on September 15th at 4:00 PM, according to their

15   response, and they state the basis for that, the

16   consultation with external counsel, as to the form and

17   content of the market quotation responses.

18          Additionally, interrogatory No. 21: "Is it your

19   contention that you acted reasonably and in good faith in

20   your solicitation of the market quotations for the Lehman

21   transactions?  If so, state the basis for that contention

22   and identify all documents and data supporting that."

23   Response: "Yes. QVT acted reasonably in good faith, and

24   based on the advice of experienced external counsel in its

25   solicitation of market quotations for the Lehman

Page 25

1   transactions." So, it's concerning to me that their

2   representation --

3          THE COURT: Okay, so what's the -- so what's the

4   effect of all that? So, the -- I agree with you that those

5   are the -- if those are the positions, then that's -- that's

6   different. But that's different from anything else that

7   I've read, so --

8          MS. SAWYER: I mean, I think there's several

9   arguments we've been making on this point, whether there's

10  an implied waiver based upon the fact that good faith is an

11  issue in the case, or whether there's an actual reliance

12  upon their consultation with counsel in their defense. And

13  so, those are kind of two distinct ways that QVT could have

14  waived the privilege in this circumstance. I think that --

15  I mean, I think that the fact that good faith is an issue in

16  the case, there is an implied waiver, but I understand the

17  Court disagrees with that view. But I think that they also

18  have expressly relied upon their consultations in counsel to

19  demonstrate their good faith in this circumstance. And so,

20  I mean, we're not trying --

21         THE COURT: Well, you have to -- you have to

22  educate me on what's the effect of those interrogatory

23  responses at this moment? What's the effect of it? Are

24  those admissions? Is -- what -- what do I do with -- so

25  it's a fact that those are the interrogatory responses.

Page 26

1    What do I do with that?

2            MS. SAWYER:  I mean, I think they could be moved

3    into evidence as admissions against the party opponent, and

4    I think that they could be presented to the Court in that

5    way.  They haven't yet, since we haven't commenced, and I

6    think the person who verified those responses could be

7    examined about those responses as well.

8            THE COURT:  And that would lead to a waiver -- a

9    subject matter waiver.

10           MS. SAWYER:  I would believe it would, unless that

11   -- I mean, that seems clear to me that that's where we would

12   be at that point.

13           THE COURT:  Okay.

14           MS. SAWYER:  I also just want to note, for

15   purposes -- I mean, I feel like this is like an 11th hour

16   issue and you know, concerns about we're starting the trial

17   today.  We're actually in the trial today.  I mean, we're

18   not talking about a large volume of documents.  We got a

19   specific privilege log from QVT identifying 25 documents at

20   issue that would need to be produced.  Like, it's not like

21   we're talking about something that would require days or

22   delay or anything like that.  I mean, it's a small subset of

23   documents related to the market quotation issue that have

24   been identified by QVT recently in response to our request

25   for timestamps on the privilege log, and then it would be to

Page 27

1    examine witnesses on the topic.

2            THE COURT:  Okay, thank you.

3            MR. TRACEY:  So, Your Honor, as I've said many

4    times, we are not taking the position in this hearing --

5            THE COURT:  But you did in those -- but you did in

6    those documents.

7            MR. TRACEY:  -- in the interrogatories we did, but

8    until we put those into evidence --

9            THE COURT:  But how -- but now -- now I feel that,

10   then, that makes pre-trial a game of bait and switch

11   because, to the extent that you answered those

12   interrogatories that way, then Lehman would be entitled to

13   inquire and develop that.  So, now, I think what you're

14   saying is, they don't really -- it doesn't really count

15   until we, you know, put someone on the witness stand or we

16   argue it here.  So, I do have a little uneasiness about a

17   feeling of bait and switch on that.

18           MR. TRACEY:  Well, I -- it's certainly not

19   intended as a bait and switch.  I mean, we may have been

20   over-inclusive in the answer just to be sure, but until it

21   goes into evidence, there's no prejudice because we haven't

22   asserted reliance on counsel as part of our -- as part of

23   our claim.

24           THE COURT:  So, I ask you the same question I ask

25   Ms. Sawyer because it's beyond what I know.  So, the effect

1    of an interrogatory answer is what?

2              MR. TRACEY:  Well, it's a conten --

3              THE COURT:  Once you start trial, so educate me.

4              MR. TRACEY:  Right.

5              THE COURT:  It's a contention interrogatory.

6              MR. TRACEY:  Yeah, I'm free-wheeling a little bit

7    here, so, just so you know.

8              THE COURT:  You are too?

9              MR. TRACEY:  Yes.

10             THE COURT:  Okay.

11             MR. TRACEY:  But --

12             THE COURT:  This is where I call on the real

13   Lehman Brothers.

14        (LAUGHTER IN THE COURTROOM)

15             MR. TRACEY:  Maybe my team knows --

16             THE COURT:  Do you have any?

17             MR. TRACEY:  -- knows more than I do.  I know.

18   But, I think the way the Court would look at this is, unless

19   a party relies on the advice of counsel as part of its

20   evidence in a case, it hasn't been waived.  So, they could

21   say, tell me all the reasons that you think you acted --

22             THE COURT:  But let's do it in order.  You --

23   there was an interrogatory that was posed, and an answer was

24   given.  In sum and substance, the answer was, we relied on

25   the advice of counsel in selecting the as of date and time

Page 29

1    for the market quotation process.  Now, Lehman says, aha,

2    subject matter waiver, we get to get the documents, right?

3    So, now, QVT is saying, you know what?  Never mind.

4              MR. TRACEY:  Right.

5              THE COURT:  Right?  Never mind.

6              MR. TRACEY:  Right.

7              THE COURT:  And so there's a credibili -- there's

8    an issue because now there'll be a witness and the

9    questioning will be, well, how'd you do this process?  And

10   they're going to make a statement that will be contrary

11   either explicitly or impliedly, contrary to the

12   interrogatory response that was previously given under oath

13   or something equivalent to it.  So, there's an issue.

14             MR. TRACEY:  Well, the -- it's a tricky issue

15   because --

16             THE COURT:  It is.

17             MR. TRACEY:  -- they did rely on counsel.  I mean

18   --

19             THE COURT:  But you -- right.

20             MR. TRACEY:  -- there's no doubt -- there's no

21   doubt about that, right?  That's -- there is -- that is the

22   fact, okay?  The question is, and that happens in every

23   case.

24             THE COURT:  That's right.

25             MR. TRACEY:  The question is, are we going to

1    waive the privilege --

2              THE COURT:  But you -- the interrogatory answer

3    was, why did you rely -- what's the basis of your saying

4    that you acted in good faith?  And the interrogatory answer

5    was, well, because part of it was, we got advice from

6    counsel on the as of date and time for the market quotation

7    process.  So, look, here's the thing.  We're never going to

8    get through this if we spend the entire day on this issue.

9    I would like to see the interrogatory -- those two

10   interrogatories, I'd like you to look at them again.  For

11   the purposes of opening argument, you can just kind of

12   bookmark this issue.  You know, we're not going to re-argue

13   it in the opening argument, and I'm going to have to think

14   about it.

15             MR. TRACEY:  Sure.

16             THE COURT:  And I know it sounds a little bit like

17   I make a decision and then I undermine myself, but I keep

18   getting new -- I didn't know about the interrogatory

19   responses until this moment.  So, why don't you give those

20   to me and I'll figure it out, all right?

21             MR. TRACEY:  Okay.

22             THE COURT:  All right?

23             MS. SAWYER:  Thank you.

24             THE COURT:  So, that was the -- the first of the

25   issues.  The second one was post hoc analysis and the back

Page 31

1    testing.

2              MR. TAMBE:  Yes.  Good morning, Your Honor --

3              THE COURT:  Good morning.

4              MR. TAMBE:  Jay Tambe for the Debtors.  So,

5    there's a fair amount of discussion in QVT's pre-trial brief

6    about analyses, circumstances, market conditions, during

7    Lehman week.  That was obviously the topic of a lot of

8    discussion when we took that 30(b)6 depositions and went

9    through all of the different valuation methodologies they

10   used.  And there was a series of questions that we asked

11   about, what analysis did you do at the time, and we got

12   whatever answers we did.  But we also had a series of

13   questions about what analysis have you done since submitting

14   your statement of claim?  And I want to play two clips to

15   just tee up the issue because I think the testimony we got

16   on these two points illustrates the issue we're dealing

17   with, and what we want to try and manage as their fact

18   witnesses take the stand.  So, if you play Mr. Chu No. 1 if

19   you have it.

20        (RECORDING: MR. CHU NO. 1 IS PLAYED)

21             MR. CHU: (ON RECORDING) Well, we looked the

22   methodologies and (indiscernible) generally you know,

23   discussions with counsel.

24             MAN 1: (ON RECORDING) Other than discussions with

25   counsel, you haven't done (indiscernible) back testing

Page 32

1    (indiscernible).

2            MR. CHU:  (ON RECORDING) I'm not certain of the

3    degree to which I talked about the -- whatever we did with

4    the methodology because (indiscernible) discussions that

5    were (indiscernible) discussions with counsel.

6            MAN 1:  (indiscernible) expect you not to answer

7    any (indiscernible) you had with counsel or (indiscernible)

8    you had with counsel, yes.

9        (END OF RECORDING)

10           MR. TAMBE:  And if we could play No. 5?

11       (RECORDING: MR. CHU No. 5 IS PLAYED)

12           MAN 1:  So, Mr. Chu, if you could turn to Page 6

13   through 10 of the -- this document?

14           MR. CHU:  (indiscernible)

15           MAN 1:  (ON RECORDING) So, my question is, the

16   analysis that's reflected in this document, related to

17   market partners, the (indiscernible) analyses that

18   (indiscernible) the form after it's (indiscernible)

19   calculation statement to Lehman.

20           MAN 2: (ON RECORDING) I'm going to object and

21   instruct the witness not to answer unless they're going to

22   analysis that was done with the (indiscernible) and with the

23   input of counsel specifically for the purpose of settlement

24   negotiations.  If you'd like to ask the witness what

25   analysis he did of market (indiscernible) before September

Page 33

1    28th, 2008, you can ask that.

2            MAN 3: (ON RECORDING) All right (indiscernible)

3    witness (indiscernible) answer without dealing with the

4    (indiscernible).

5            MAN 1: (ON RECORDING) Okay, I -- I'll ask that

6    question with a reservation of rights.

7        (END OF RECORDING)

8            MR. TAMBE:  So, that illustrates the issue we're

9    dealing with in the --

10           THE COURT:  Okay, but what you say, Mr. Tambe, in

11   your brief is, having consistently precluded Lehman from

12   inquiring about QVT's post hoc analyses and discussions, QVT

13   should be precluded from arguing in the opening statements,

14   et cetera, concerning those analyses.  So, let's find out if

15   that's a real live issue.

16           MR. TAMBE:  I mean I can --

17           THE COURT:  Yeah.

18           MR. TAMBE:  -- tell you it's a real live issue by

19   reading their brief.

20           THE COURT:  Okay.

21           MR. TAMBE:  In their brief, for example, if you

22   look at Pages 36 to 37, there's unidentified back testing

23   references with respect to PCDS in that section.

24           THE COURT:  Where?

25           MR. TAMBE:  So, it --

Page 34

1          THE COURT:  In the --

2          MR. TAMBE:  So, in order to determine the price at

3    which a hypothetical replacement dealer --

4          THE COURT:  Right.

5          MR. TAMBE:  -- blocks sale of $370 million, some

6    68 percent.  I -- we have seen no evidence of any analytics

7    like that done at the time.  We are aware that they did

8    analytics like that after the fact, but we weren't allowed

9    to inquire into any post statement of calculation analyses

10   they did.  And now, we see in the brief, these discussions -

11   -

12         THE COURT:  Let me look at it.  (indiscernible)  I

13   was not under the impression that this was an argument of --

14   that QVT was arguing that, in order to come up with its PCDS

15   valuation, that it did the block trade -- that it did this

16   analysis.  I was under the impression that that was what its

17   experts were now saying.  I did not read this as reflecting

18   their argument that --

19         MR. TAMBE:  So, that's part of the issue, right,

20   is, it's in there and this is not the only example.  There's

21   other examples where there's numerical analyses offered in

22   the brief, without citation as to whether the experts are

23   going to talk about it or the fact witnesses.  We certainly

24   were precluded from asking the fact witnesses about post-

25   calculation statement analyses they did, so they shouldn't

Page 35

1    be allowed to venture into that area.

2            The experts have a similar problem, and I'll tell

3    you why the experts have a similar problem.  Take Professor

4    (indiscernible) for example.  He doesn't do any analysis.

5    He does no numerical analysis.  He effectively sprinkles

6    holy water over what QVT did and said, this looks reasonable

7    to me.  Everything he knows about what QVT did, what they

8    looked at, what analysis they may have done, is based on his

9    conversations with Mr. Chu and others.

10           THE COURT:  Sure.

11           MR. TAMBE:  And so, again, he may well be relying

12   on things, and we believe he was relying on analyses that

13   were done after the fact because we know there were no

14   analyses done before the fact.  So, to the extent he's

15   satisfied himself that there was some analytics behind what

16   QVT did in making itself comfortable with this -- yes.

17           THE COURT:  So, let me -- let me kind of -- I'm

18   just trying to square what you're saying --

19           MR. TAMBE:  Yes.

20           THE COURT:  -- with what the objection is in the

21   brief, because a lot of what the experts had to say was, we

22   weren't there at the time, but, here's everything I know

23   that leads me to believe that the numbers are or are not

24   reasonable, right?

25           MR. TAMBE:  Sure.  So, that's a little different

Page 36

1    but I don't have -- I wouldn't have --

2              THE COURT:  Okay.

3              MR. TAMBE:  -- a problem with that.  I may have

4    other problems with it.

5              THE COURT:  Okay.

6              MR. TAMBE:  The issue is when someone on their

7    side opines that what QVT did was reasonable.

8              THE COURT:  And you're saying that there's no --

9    that QVT has not identified anything that they did in the

10   sense of they -- during -- that they tried to -- say for

11   CARB, right, where they actually got pricing on the

12   underlying ABS, right?

13             MR. TAMBE:  Let's use that as an example.  They

14   didn't do that.

15             THE COURT:  Right, or with respect to PCDS, that

16   they didn't do an analysis, real time, of what it would cost

17   to actually acquire a short position in the referenced

18   securities.

19             MR. TAMBE:  Right.

20             THE COURT:  Is that what you're talking about?

21             MR. TAMBE:  That's what I'm talking about.  So,

22   the analysis -- those are two examples.  There's others that

23   -- things they didn't do at the time.  You can have an

24   expert come in after the fact and say, I spoke to QVT, they

25   told me before they put in their claim, they didn't do any

Page 37

1    analysis.  I've now gone into the market and looked at

2    market data and here are my opinions.  That's not what we're

3    talking about.  What we're talking about is an expert who

4    comes in and says, I've spoken to QVT about what they did,

5    and the reasonableness of what they did is supported by the

6    following analyses.  And now what they're talking about is

7    things that were done after that point in time.

8            THE COURT:  Okay.  All right, so --

9            MR. TAMBE:  So, both for the fact witnesses and

10   for the expert witnesses, to the extent they're relying on

11   analyses done by QVT after the fact --

12           THE COURT:  Right, okay, I get it.

13           MR. TAMBE:  -- that should be off limits.  Yeah.

14           THE COURT:  All right.

15           MR. TRACEY:  I'm not sure we have any real

16   disagreement here.  To the extent that -- I mean, the

17   critical issue, of course, as Your Honor knows is what QVT

18   did before it filed the calculation statement --

19           THE COURT:  So, again, let me do my advice of

20   giving an extreme example, right?  So, to the extent that

21   they threw a dart, somebody threw a dart on a number and

22   that's what they put on the valuation statement, right?  And

23   then after the fact, they said, let me see how good my dart-

24   throwing skills were and they did analytics around CARB or

25   PCDS or whatever it is and say, look, oh that works, right?

                                                        Page 38

1    And then they don't reveal what the analytics were, and an

2    expert for QVT relies on that analytics, they ought to have

3    had insight into that.

4              MR. TRACEY:  I agree.

5              THE COURT:  Okay, then what's the issue?

6              MR. TRACEY:  So -- so I don't think there's an

7    issue.  So just because the --

8              THE COURT:  Because there wasn't that kind of

9    post-calculation statement analytics or because there was

10   and they know what it was?

11             MR. TRACEY:  It's because, to the extent that QVT

12   personnel went back and looked at their calculation in

13   connection -- this was primarily in connection with counsel

14   to deal with the mediation, we're not relying on any of

15   that, and neither are the experts, and --

16             THE COURT:  Okay.

17             MR. TRACEY:  -- the experts are doing their own

18   analysis and we're relying on that, and we're relying on

19   what QVT did contemporaneously and there is lots of analysis

20   around what they did, including, on that very issue of

21   market impact, for selling a lot of preferred, Mr. Chu, when

22   he did his initial calculation, looked at that issue,

23   collected data on it, put it in the spreadsheet, and it's

24   going to be open to everyone and we're going to be relying

25   on it.  that's -- so --

1           THE COURT:  The way you describe it, it sounds

2    like there's not an issue.

3           MR. TRACEY:  I don't think there's an issue.  But

4    of course, if they think something comes up, they can

5    scream, but I don't think there's an issue.

6           MR. TAMBE:  The concern is the following: the

7    concern is based on the statements we saw in the brief where

8    you have statements made about analytics without a source as

9    to whether that's coming from experts or fact witnesses.

10   And we'll wait and see as it comes in, but the concern I

11   have is, it may be too late once Mr. Chu and Mr.

12   (indiscernible) takes the stand and starts talking about the

13   analytics.  This also provides the Court with some

14   background as to what our concern is going to be if they

15   start straying into areas where we were not permitted an

16   opportunity to examine them.

17          THE COURT:  Well, on this statement on Page 37 of

18   QVT's brief, this is -- and this is about the PCDS, this is

19   likely a conservative estimation of what it would have cost

20   a replacement dealer to re-establish a short position with a

21   guarantee borrow of $375 million of financial preferred

22   stocks immediately after demise.  So, what Mr. Tracey is

23   saying, that in real time, Mr. Chu did an analysis.

24          MR. TAMBE:  Well, that we can question -- that we

25   can question Mr. Chu about on the stand.

Page 40

1          THE COURT:  Right, yeah.

2          MR. TAMBE:  Sure.

3          THE COURT:  Okay, and --

4          MR. TAMBE:  But look at the very next sentence,

5    Your Honor.  That one about the percentages, follows right

6    on that first statement.  We know there was no such

7    numerical analysis done at the time.  And if there was,

8    we've never been given any information about it.

9          THE COURT:  Okay, well, I do -- I think we're

10   going to have to revisit this when the testimony starts.

11   All right, so, the final category is the overarching

12   category of, in Lehman's view, the unsettling lack of

13   documents that exist, and this is the first I've -- this is

14   the first that I think I've heard of the timing of the

15   litigation hold.  I don't think I've heard about that

16   before.  I have -- I do recall from the discovery

17   conferences that we had, that Lehman was concerned about the

18   lack of documents that QVT produced, and QVT's position

19   consistently has been, we're a small shop, it was a handful

20   of people working in close proximity on the weekends, and we

21   just didn't generate a lot of documents.

22          So, I don't know at this point what I can do about

23   this, other than to have the testimony come in.  You're

24   entitled to ask questions about everything that happened

25   while they were doing their calculations.  I suppose I can

Page 41

1    make findings.  I can -- of course I can make findings on

2    credibility, and to the extent that Lehman believes that

3    it's entitled to an inference in -- with respect to one or

4    more points about the absence of documents, I'll hear you

5    and we'll have to see.  I'm not -- I don't exactly know what

6    Lehman is asking for, frankly, on this.

7             MAN: As long as Your Honor is amenable to hearing

8    arguments about adverse inferences and the like, at the

9    appropriate time, that's -- we're fine with that.

10            MR. TRACEY:  Obviously, the Court can consider any

11   adverse inferences requested and honestly, dumbfounded that

12   they're making this statement without any evidence that

13   there's ever been a document destroyed.  So, I just want to

14   be on record very clearly with this.

15            THE COURT:  I hear you --

16            MR. TRACEY:  -- and sort of emotional.

17      (LAUGHTER IN THE COURTROOM)

18            THE COURT:  That's fine.  Again, I -- I was

19   surprised when I saw this too, because there was -- the

20   first I heard about this litigation hold, and it is a very -

21   - it's a big deal to suggest that a party destroyed

22   documents, so --

23            MR. TRACEY:  Yes it is, Your Honor.

24            THE COURT:  -- so, there's no evidence of that.  I

25   understand, you know, a litigator's reaction to, you know,

Page 42

1   that you have an expectation of what documents should exist.

2   I think QVT is entitled to explain it and I don't want it to

3   be a Sword of Damocles hanging over anybody's head and I

4   don't believe we should spend a whole lot of time on it.  I

5   think we'll leave it at that.

6           MAN:  Thank you, Your Honor.

7           MR. TRACEY:  Thank you, Your Honor.

8           THE COURT:  All right?  Okay, did we finally

9   decide how long you were going to take for opening

10  arguments?

11      (LAUGHTER IN THE COURTROOM)

12          MR. TRACEY:  I hope you're not going to take back

13  your generous offer.

14          THE COURT:  I'm not.  I'm just trying to decide

15  whether we should have a short break now for a couple of

16  minutes and then how -- are you going to go three hours at a

17  clip?

18          MR. TRACEY:  We're probably -- we're going to try

19  to keep it to two and a half hours --

20          THE COURT:  Okay.

21          MR. TRACEY:  -- and there are going to be three of

22  us presenting --

23          THE COURT:  Sure.

24          MR. TRACEY:  -- and so, there'll be opportunity

25  for --

Page 43

1          THE COURT:  For a break?

2          MR. TRACEY:  -- breaks but this time might be a

3     good time for a break, also.

4          THE COURT:  Okay.  So, let's just take -- let's

5     take a short break.  We'll try to come back at 5 minutes

6     after 11:00 and then to -- just to be efficient, you want to

7     call a lunch time now so that you could order your lunches

8     to come in?  Just so you know, I just want to put you on

9     notice.  So, I got a big new Chapter 11 filing this morning.

10    So, I -- it looks like I have to have a first day hearing

11    this afternoon, so we're going to have to deal with that,

12    and then there's an assortment of other things,

13    unfortunately, that I'm going to have to deal with.  So,

14    what it's going to look like is, I'm going to be doing

15    something else every day, probably at 9:00, I'll have them

16    cleared out by 10:00 and I'm going to be doing things at --

17    during your lunch hour.  So, it's going to be important for

18    me to be able to highly schedule everything.  So, for today

19    there's nothing at lunch hour.  Okay, so what time do you

20    want the lunch hour to be today?

21         MR. TRACEY:  1:00 to 2:00?  Is that -- does that

22    work?

23         THE COURT:  Sure, 1:00 to 2:00 is great.

24         MR. TRACEY:  Okay.

25         THE COURT:  Okay.  At the rate things are going,

Page 44

1   we're probably not going to finish openings today, all

2   right?  I apologize.  Can we do a 45-minute lunch?

3            MR. TRACEY:  Sure, 1:00 to 1:45?

4            THE COURT:  1:00 to 1:45, yeah.  Okay, all right,

5   so we'll come back in about five minutes.

6       (Recess)

7            THE COURT:  Okay.  Do you have a dep for me?

8            MR. TRACEY:  We do.

9            THE COURT:  Okay.

10           MR. TRACEY:  Your Honor, apologies.  The rest of

11   the copies are in the other room, so --

12           THE COURT:  That's okay.  We're good to go.

13           MR. TRACEY:  We don't even have one for Jones Day,

14   so we'll just wait a few seconds, if that's okay.

15           THE COURT:  Oh, okay.

16           MR. TRACEY:  I didn't realize I was going to be

17   handing it up, so.

18           THE COURT:  I'll tell you what.  Why don't you

19   give this to Mr. Tambe or Ms. Sawyer --

20           MR. TRACEY:  Okay.

21           THE COURT:  -- and I'm going to look at my screen.

22           MR. TRACEY:  Okay.  They're (indiscernible).

23           THE COURT:  All right?  Every minute is going to

24   be valued highly here, if that's not a pun.

25       (LAUGHTER IN THE COURTROOM)

Page 45

1          THE COURT:  Okay, go ahead.

2          MR. TRACEY:  Thank you, Your Honor.  And again,

3    thank you for taking so much time for us.

4          THE COURT:  Sure.  Before you start, one second.

5    As I was preparing over the last period of time, it became

6    very clear to me how distinct -- there were distinct buckets

7    of issues, which we've been talking about for a while, but

8    it really crystalized with me as I've been preparing over

9    the last couple of days.  And so, as we're going through

10   this, both -- I'm sure you'll do it in the opening and

11   throughout the trial.  It would be helpful just to help me

12   continue to be able to bucket what we're talking about at a

13   given time, and almost generate a score card, if you will,

14   that includes which witnesses are speaking to which sets of

15   issues.  So, who was active on PCDS, who was active on CARB,

16   and so that I can kind of schematically fill it out in my

17   brain, you know, kind of like a memory palace --

18         MR. TRACEY:  Yeah.

19         THE COURT:  -- kind of a thing, if you know what

20   that is, so --

21         MR. TRACEY:  Sure.

22         THE COURT:  -- so I'm sure that's what you're

23   going to do, but I just wanted to underscore how important

24   that is going to be to me as we do this exercise over the

25   next, what looks like two months plus.

1           MR. TRACEY:  Sure.

2           THE COURT:  All right?

3           MR. TRACEY:  Absolutely, we're -- we'll give you a

4    road map and we'll hopefully follow it.

5           THE COURT:  Great, okay, go ahead.

6           MR. TRACEY:  Well, just to start, you know, I'm

7    sure everyone thinks their cases are important, but this is

8    truly an important case.  There is a lot of money at stake

9    and you know, QVT Fund and Quintessence Fund are investment

10   funds that are overwhelmingly owned by outside investors and

11   they are not here in this Courtroom, but they have entrusted

12   their funds and their money to the managing partners of QVT

13   and Quintessence to safe -- safekeeping, and this case is a

14   very important part of the safekeeping of the funds for

15   those investors.  And, just to put it in perspective, how

16   important it is, and I think Your Honor got this from the

17   briefs, but 2008 was a tough year, and QVT in particular

18   lost a billion dollars, it was about a $12 billion-dollar

19   fund.  It lost about a billion dollars before September

20   15th, lost another billion dollars in September and lost two

21   more before the year was out.

22           And one of the hedges that they had against losses

23   from a financial crisis of the kind were the protections

24   that they had bought from Lehman.  And as things turned out,

25   they suffered the losses, but they do not have the benefit

Page 47

1    to date of the hedges that they hoped would soften the blow.

2    So, this case and its claim is very important to the

3    investors.  It's a small percentage of the overall

4    portfolio, but it's an important -- it was an important

5    cushion against that blow.

6           It's also, of course, important to QVT's

7    management.  QVT's management takes this very seriously.

8    They have their own funds in these funds, and so it's

9    important to them as well.

10          It's also important more broadly from a legal

11   standpoint.  I think there are some very significant

12   principals at issue here under ISDA.  This is going to be a

13   very stark test of the ISDA principle that as long as the

14   non-defaulting party acts reasonably and in good faith, they

15   should not have to worry about being second-guessed by the

16   defaulting party days later or years later.

17          In our view, that's what's happening here.  Lehman

18   hasn't called it that, but they've -- and they know that

19   second-guessing doesn't work, so they've called it -- QVT's

20   claim a grossly inflated claim, a market quotation process

21   that was rigged, a loss calculation that was concocted, and

22   ignored important factors.  And they've refused to agree

23   that any of QVT's expert witnesses have the expertise to

24   testify.  They've refused to agree to a single position that

25   was properly valued.

Page 48

1          They're going to present their own methodologies.

2    And we're not saying that their alternative methodologies

3    are all frivolous.  It's in the nature of the valuation

4    process that were going to be talking about for the next

5    couple of weeks that there will be alternative reasonable

6    rights and value of position.  But we think Lehman's

7    position here answers the wrong question.

8          The question they're answering is, is there a

9    better way or a different way to value these positions.  If

10   that's what the question is, yes, there are.  They think a

11   lot of Lehman's are going to be unreasonable, but that'll --

12   we don't think you need to get to that.  It's not the issue

13   before the Court.  It is whether QVT acted unreasonably or

14   in bad faith.  Again, unreasonably means no reasonable

15   person would use the methods that QVT used.  Or was QVT

16   acting malevolently or intentionally in bad faith to inflate

17   its claims?

18         I've said this before and I'm going to say it

19   again.  There will not be an iota of evidence of bad faith

20   in this case.  And with respect to reasonableness, we

21   believe that the Court will conclude, and we hope you'll

22   conclude, that they were eminently reasonable.  And we will

23   take you to that calculation.  We will bring it to life as

24   much as we can.  We will put on the witness stand the people

25   who did it from QVT.

1        Nothing -- no market quotation process and no loss

2    calculation is going to be perfect.  These were busy

3    professionals working on weekends when they were trying to

4    manage what was then a $9 billion portfolio in a very, very

5    tough period.  So, it's not going to be perfect.  They made

6    mistakes, but they're only mistakes.  And I think the Court

7    will see in the and that these are good people, they're

8    honest people, and they really did their best under the

9    circumstances to try to come up with the right answer here.

10   And in doing that, I think you'll see their assumptions,

11   their calculations, are all documented, and they'll based in

12   the way they saw the market, based on their experiences,

13   which we think is consistent with this.

14        So, I think the way to start -- oh, go ahead.

15        MAN:  (indiscernible)

16        THE COURT:  Thanks.  Thank you.

17        MR. TRACEY:  So, I'll start by just giving you

18   sort of the map that we talked about.  This is the way it's

19   going to go.  We'll start with the key background facts.

20   We'll talk about the relationship between Lehman and Q.

21   I'll give you a chronology of all the key facts going

22   through the loss calc- -- first the market quotation, then

23   the loss calculation.

24        Then we're going to frame it with the legal

25   standards and Ms. Keller will address that issue.  And then

Page 50

1    we're going to go back to each category of valuation.

2              THE COURT:  Great.  Okay.

3              MR. TRACEY:  And start with the PCDS, then the

4    CARB, then the corporate and sovereign, which Mr. Regan will

5    do.  And then we're going to touch on Lehman's objections.

6    So, that's the way it'll be organized.

7              THE COURT:  Just as a minor housekeeping matter,

8    to the extent that you can tell the reporters how to reflect

9    CARB and PCD -- just, sooner rather than later --

10             MR. TRACEY:  Sure.

11             THE COURT:  -- let them know so that we can have

12   as clean of transcripts as is possible.  And on that point,

13   talk about a detail.  But in order to be able to accurately

14   record Mark IT, you're going to have to call it Mark IT --

15             MR. TRACEY:  Fair enough.

16             THE COURT:  -- as opposed to Markit.

17             MR. TRACEY:  Right.

18             THE COURT:  All right.

19             MR. TRACEY:  Fair enough.  We will --

20             THE COURT:  Sorry.

21             MR. TRACEY:  We'll do that.

22             THE COURT:  That'd be hard to do, but let's try to

23   do that for the sake of the transcript.  Okay?

24             MR. TRACEY:  Sure.

25             THE COURT:  Okay.

Page 51

1              MR. TRACEY:  I'm not sure I know how to do this,

2      Your Honor.

3              THE COURT:  Give it to a young person.

4              MR. TRACEY:  Yeah.  Ah, here we go.  Okay, QVT.

5      QVT Fund and Quintessence Funds are both funds that are

6      managed by QVT Financial, which is the investment advisor.

7      QVT Fund was originally a proprietary trading desk at

8      Deutsche Bank.  That's where the folks that you're going to

9      see met each other and they started trading together at

10     Deutsche Bank.  They did very well.  They spun off in 2003

11     and were asked by Deutsche Bank to continue to manage their

12     money.  And then they brought in additional investors over

13     time.

14              Quintessence Fund was spun out of QVT in 2007

15     because one particular investor, a series of investors,

16     wanted to have a separately managed fund.  But the way it

17     was done was just to take their portion of assets, move into

18     a new fund, and all of the trading and all of the positions

19     going forward were proportional.  So, whenever a position

20     was entered into, they would divide it up into two

21     transactions, one for a QVT Fund and one for Quintessence.

22     And it was about 9 to 1, so that's why in this case we have

23     836 individual positions, but only 400-some transactions.

24              I want to give the Court a sense of what the

25     trading floor looks like and who the individuals are who the

Page 52

1    Court is going to be seeing.  The chart that's on the screen

2    shows the entire trading floor.  Each one of those rows is a

3    double row of -- they're sort of like desks with monitors on

4    them, and the white part is the little area where they can

5    walk in.

6         It's not the palace, and as you can see, I've

7    highlighted where the key individuals who were involved in

8    this case sit.  And so, they sit mainly in this central

9    location between B and E.  And so, the way it looks when you

10   actually -- we'll show you a picture of it, but this is the

11   way it looks.  There are seats at each little desk and they

12   sit with their backs to each other, but like very, very

13   close.

14        So, these are the individuals that were involved

15   and what we're going to talk about.  Maybe I'll start with

16   Dan Gold, since he's the CEO and Chief Investment Officer.

17   But Dan was not really directly involved in most of what's

18   relevant here.  He had some involvement in the drafting of

19   the market quotation solicitation, but was really not

20   involved in it beyond that and was not really involved at

21   all in the loss calculation.

22        Next to him is Arthur Chu.  Arthur is a Managing

23   Member of the firm and he is a portfolio manager.  And it is

24   Arthur who was principally responsible for both the PCDS and

25   the CARB transactions.  He was the one who entered into the

Page 53

1    trades in the first place and he's the one who valued them

2    as part of the loss calculation.  And you'll obviously hear

3    from Arthur.

4          Next to him is Joe Lowman.  Joe was a partner, is

5    no longer with QVT, but he will testify.  He still has a

6    consulting arrangement.  Joe was also a portfolio manager.

7    He focused a lot on EBS and was involved in the valuation of

8    those positions.  He also had a very important

9    administrative role, both in market quotation and in the

10   loss calculation.  He was sort of the document person, so it

11   was Joe who collected the positions to put into the market

12   quotation solicitation and manage -- essentially manage the

13   process.  And he also was the person who created the

14   original template for the loss calculation, which ultimately

15   became the sort of base documentation for the loss

16   calculation.

17         Tom Knotts is on the other side of Dan Gold.  He

18   was a portfolio manager.  He is no longer with QVT.  His

19   specialty was emerging markets.  He was in charge of the

20   Argentina and Venezuela bonds and he valued those positions.

21         On the other side of the aisle, starting with Nick

22   Brunn, Nick is a Managing Member of the firm and is also a

23   trader.  He was involved in the drafting of the market

24   quotation with Mr. Gold, but didn't have a lot of direct

25   involvement beyond that.  And he also was involved in the

Page 54

1    loss calculation, but he didn't have any positions that he

2    personally valued.

3              Tracy Fu, another Managing Member, was not

4    involved in the market quotation process at all.  He was

5    involved in valuing a couple of positions.  The one that's

6    at issue in the case is the interest rate swaps.

7              And then Lee Sen, also a portfolio manager, traded

8    a wide variety of things, is no longer with QVT.  He was not

9    involved particularly in the market quotation process, but

10   he was involved in the loss calculation, valuing his own

11   positions.

12             MR. TRACEY:  I wanted to give the Court a sense of

13   what this really looks like.  It's kind of messy, but that's

14   where the Managing Members sit.  And I've tried to label

15   where they sit so you can get a sense of it.

16             THE COURT:  It's labeled in the deck.

17             MR. TRACEY:  Yeah.

18             THE COURT:  In that hard copy.  Yeah.

19             MR. TRACEY:  (indiscernible)

20             THE COURT:  Oh, you broke it entirely.

21             MR. TRACEY:  (indiscernible) Let me just talk

22   about the relationship between Lehman and QVT.

23             THE COURT:  Mm hmm.

24             MR. TRACEY:  This relationship goes back a long

25   way.  They started when they were at Deutsche Bank.  The

Page 55

1    primary salesperson when they were at Deutsche Bank was

2    Michael Newman.  He continued as their primary salesperson

3    through the QVT period.  Michael Newman had direct

4    involvement in the sales process for PCDS and he will

5    testify at the trial.

6              In addition to the trading relationship with LBSF,

7    they had a number of other relationships, which will be

8    relevant as we move forward.  There is a prime broker

9    relationship with LBIE and LBI, and also trading

10   relationships with LBOTC and LBCS.  And with respect to LBSF

11   in particular, QVT, as the Court knows, entered into an ISDA

12   agreement in 1992, formed with QVT in 2005 and with

13   Quintessence in 2007.  And both of those are guaranteed.

14   Both of them are guaranteed by LDHI.

15             I just want to give an overview of the

16   transactions that are at issue.  I think it helps to, as we

17   say, put them into buckets.  There were four transactions in

18   Auto CDS; that's CARB.  There were 62 in PCDS.  There were

19   some -- almost 600 in corporate and sovereign, about 170 in

20   mortgage, and two interest rate swaps.  So, that's what

21   we're going to be talking about.

22             Just a little basic background information on the

23   claim.  The ISDA was terminated on September 15th.  The

24   early termination date was that day.  The calculation

25   statement initially was submitted on October 15th, 2008,

Page 56

1    before the collateral was used to offset the positions.  And

2    then on October 16th, 2008, a revised demand was sent after

3    liquidating the collateral, which was about $117 million,

4    with a net claim of $290 million.  And then that claim was -

5    - as a result of some -- noting some mathematical errors,

6    some double counting, some foreign currency adjustment

7    issues -- was reduced, actually back in 2010, to $265

8    million.  But we never filed an amended proof of claim and

9    Your Honor allowed us to do that in June of last year.

10            THE COURT:  So, I must have misunderstood.  I

11    thought that when you described QVT and Quintessence that

12    there were identical positions, but the numbers are not

13    identical.  So, why is that?

14            MR. TRACEY:  Oh, why is there a difference --

15            THE COURT:  Yeah.  So, the number of transactions,

16    except for the two -- or Quintessence has two fewer

17    corporate insolvency CDS, but then on the calculation

18    statement, the numbers are dramatically different as between

19    QVT and Quintessence.

20            MR. TRACEY:  Oh, I'm sorry.  Because although

21    they're proportional, for every dollar that is invested in a

22    position by Quintessence, about $9.00 is --

23            THE COURT:  So, different notional amounts?

24            MR. TRACEY:  Correct.

25            THE COURT:  Got it.  Okay.  Thank you.

Page 57

1           MR. TRACEY:  And then there's -- I wanted to give

2      the Court an overview of the key valuation differences.  As

3      you can see in your book, the area --

4           THE COURT:  Slide 12?

5           MR. TRACEY:  Right.

6           THE COURT:  Right.

7           MR. TRACEY:  So, that's -- those are the valuation

8      differences between the parties, based on QVT's claim and

9      Lehman's expert valuations.  Lehman's experts have a range,

10     but we've -- just to be -- to simplify it, the percentages

11     are based on the average.  So, as you can see, and we've

12     mentioned before, between PCDS and CARB, we're talking about

13     82 percent of the difference between the parties.  And all

14     of the remaining positions, the hundreds and hundreds of

15     positions, is less than 18 percent.

16          And just taking those valuation differences, I

17     just want to put it in perspective, in particular with

18     regard to the margin.  So, the total notional amount of the

19     positions that QVT and Quintessence held with Lehman was

20     about $2.5 billion.  That was the amount of protection they

21     had.

22          And so, this slide shows you the various

23     valuations.  And starting with the right, the margin amount

24     that was posted against those positions as of September

25     11th, about, --

Page 58

1           THE COURT:  Mm hmm.

2           MR. TRACEY:  -- that was the last margin mark.  It

3     was $117 million, or 5 percent of the total notional amount.

4     Lehman's experts -- although Lehman has said that the margin

5     is supposed to be the value, actually, they don't

6     (indiscernible) saying that.  The experts have acknowledged

7     that the actual value is somewhere around double that level.

8     So, the Lehman experts committed about $228.7 million, and

9     that's 9 percent of the notional.  And QVT's valuation --

10    this is including collateral -- is $382.3 million, about 15

11    percent of the total notional.

12          So, the key point that I want to make about this

13    one is Lehman has taken the position that the collateral

14    marks are some kind of a limit on what this value should be.

15    That is just wrong, and it's wrong in so many ways because

16    all you have to do is look at Lehman's own experts.  And

17    they don't believe that these positions should be valued at

18    $117 million.  They think it should be valued at twice that.

19    QVT believes it's posted three times that.  But whatever it

20    is, it is not the margin marks.  It's a different number.

21    It's on a different basis.

22          We will go through in detail why the margin marks

23    are not a fair representation of the value as of September

24    15th.  It includes the fact that margin marks are at a

25    midmarket.  They don't include a bid offer spread, which is

Page 59

1    part of the ISDA valuation process, because if the

2    replacement value.  Second, the margin marks were from

3    September 11th.  They did not include the catastrophic

4    effects of Lehman going under.  And there was a clear --

5              THE COURT:  But on that point, Lehman makes an

6    argument about the margin call that took place on September

7    15th into September 16th, and I think that the

8    implication...  Well, I'll let Lehman speak for itself.  But

9    I thought the implication of the argument was that there was

10   a thought process around the level of margin at the time and

11   that that shows that the much higher valuations that were

12   later put on the positions should be discarded because, in

13   fact, at the time they thought about it and this was a real

14   valuation.  I think that's kind of the argument.

15             MR. TRACEY:  That's the argument.  And that is

16   factually wrong and theoretically wrong.  So, from a factual

17   standpoint, what that doesn't recognize is the fact that --

18   and there'll be lots of testimony on this -- QVT did not

19   mark its books in full every day.  It looked at it on a

20   monthly basis.  And secondly, most of those marks came from

21   Lehman, the only dealer in these products.  There was no

22   other price in the market.

23             But most importantly with respect to that

24   September 15th margin call, the facts, we believe, will show

25   that from September 12th to September 15th, the mark on

Page 60

1    these positions decreased by $5 million.

2              THE COURT:  Right.  Moved in Lehman's favor by $5

3    million.

4              MR. TRACEY:  And moved in Lehman's favor.  And --

5              THE COURT:  But then they make the argument that

6    then given that that's the case, then the additional margin

7    call is a bad fact.

8              MR. TRACEY:  But the --

9              THE COURT:  Right.  The additional --

10             MR. TRACEY:  Just to be clear --

11             THE COURT:  -- margin call was, they say, was just

12    an attempt to get back original margins --

13             MR. TRACEY:  Yes.

14             THE COURT:  -- as opposed to --

15             MR. TRACEY:  Exactly.  That's exactly what it was.

16    Because these positions clearly increased in value between

17    September 11th and September 15th.  These were protection on

18    the most dangerous part of the financial economy that was

19    going into the toilet.  So, they clearly increased in value.

20             But what -- the reason that the marks went down

21    between September 11th and September 15th is because the QVT

22    system automatically marks things that are liquid, many of

23    which did go down, but didn't touch any of the illiquid

24    securities that went up dramatically in value.  And so, the

25    result is it's an incomplete mark, and so only the positions

Page 61

1    that went down were remarked, and the ones that went up were

2    not remarked.  So, it's not going to be a valuable --

3              THE COURT:  Financial --

4              MR. TRACEY:  data point --

5              THE COURT:  -- or --

6              MR. TRACEY:  -- for anybody.  So, that's a run

7    through the basics.  I think what we'd like to do now is

8    present some of the legal issues as a framework --

9              THE COURT:  Okay.

10             MR. TRACEY:  -- before we go into the valuation

11   (indiscernible).

12             THE COURT:  Sure.  Good morning.

13             MS. KELLER:  Good morning.  Robin Keller --

14             THE COURT:  Yes.

15             MR. TRACEY:  -- from Hogan Lovells, for QVT.

16             THE COURT:  So, Ms. Keller, not to steal your

17   thunder.  If you'd like, you can walk me through all of the

18   provisions that are in play here.  I will tell you that I'm

19   familiar with them.  So, to the extent that you want to

20   focus on, you know --

21             MS. KELLER:  The case --

22             THE COURT:  -- kind of the nitty-gritty of the

23   issues, how they come into play here, that would be great.

24             MS. KELLER:  Great.

25             THE COURT:  If you want to go through, chapter and

Page 62

1    verse, on all of the relevant instant provisions, I'll let

2    you do that.  But we might want to be more efficient.

3              MS. KELLER:  I think we can definitely skip over

4    those.  There's no dispute there was a default and that QVT

5    turned it into --

6              THE COURT:  A non-defaulting party.

7              MS. KELLER:  -- (indiscernible) 915 and it

8    submitted calculation statements, as it was obligated to do.

9    By the middle of October.  The parties had collected second

10   method and market quotation, and so QVT had to run a market

11   quotation process, and only if that failed could they revert

12   to loss --

13             THE COURT:  Right.

14             MS. KELLER:  -- on their positions.  And that is

15   what they did.  They complied with the obligations of the

16   market quotation process by soliciting the necessary -- or

17   the list attaining quotes from the necessary reference

18   market makers, appropriate reference market makers, and

19   requesting those quotes as of the same date and time, as

20   required in market quotation.  And they have the discretion

21   to determine the date and time, as long as they did so in

22   good faith.

23             THE COURT:  So, there is an issue, though, with

24   respect to, I think, its 44 positions, as to which there was

25   no market quotation process.  And I think QVT has said that

1    -- and I don't know that there's a dispute on this, but QVT

2    has said, honest mistake, they were just left out.  Right?

3              MS. KELLER:  That's exactly right, Your Honor.

4    They had a large number of positions.

5              THE COURT:  Sure.

6              MS. KELLER:  It was a very frenzied --

7              THE COURT:  Yes.

8              MS. KELLER:  -- environment that day.  They were

9    trying to pull the data together.  They thought they had

10   sent market quotations out for every appropriate Lehman

11   transaction.  And years later, in the course of discovery,

12   they were unable to locate evidence that those 44 positions

13   had been put on a list.

14             THE COURT:  So, your position, though, as a legal

15   matter, is that that group accounts, if you will, for a

16   failure of a market quotation process that would enable QVT

17   to go to loss.  That is a failure of the market quotation

18   process that legally is no different from.  We've sent out

19   requests for bids; we don't get back the requisite number;

20   that's a failure of market quotation; we go to loss.

21             MS. KELLER:  Your Honor, this is one of the novel

22   issues that Your Honor will be considering.  The ISDA itself

23   does not tell you what happens if somebody makes a mistake

24   in taking a market quotation.

25             THE COURT:  Right.

Page 64

1          MS. KELLER:  It doesn't say where you go then.

2     There are some cases that have found, for whatever reason, a

3     market quotation was inappropriate to use and for the most

4     part, have reverted to loss.

5          There's also in the background the fact that

6     market quotation itself says if market quotation fails or is

7     not likely to give rise to a reasonable --

8          THE COURT:  Okay.

9          MS. KELLER:  -- response, you can revert to loss.

10    QVT is not invoking that provision because they thought they

11    had requested market quotations for everything.  But

12    included within the missed market quotations, there were a

13    number of very illiquid positions, including the CARB, where

14    they very likely would not have gotten market quotations

15    back.  They got very few market quotations back on a large

16    portfolio that included more liquid positions.

17         And so, while we can't point to some language and

18    say, yes, we get to revert to loss under these

19    circumstances, we think, as a practical matter, that is the

20    right way to go.  And they did revert to loss because they

21    thought they hadn't gotten quotations, and they did

22    calculate loss, we argue, reasonably and in good faith on

23    those missed positions.

24         THE COURT:  Okay.

25         MS. KELLER:  And loss, of course, is an amount

Page 65

1    reasonably determines by the non-defaulting party in good

2    faith to be its total losses and costs in connection with

3    the total agreement -- sorry to repeat this, but it's

4    important to our case -- including any loss of bargain, cost

5    of funding, or loss or costs incurred as a result of

6    terminating, liquidating, obtaining or reestablishing any

7    hedge or related trading position.

8            One other section I'll just point out.  I'm sure

9    Your Honor is aware of it.  Loss does not include a party's

10   legal fees and out-of-pocket expenses, but Section 11 of the

11   ISDA instant does provide for an indemnity by the defaulting

12   party of the non-defaulting party for its legal fees and

13   collection costs and expenses.  And those have been very

14   substantial, Your Honor, and QVT is seeking the recovery of

15   those amounts.

16           Okay.  Slide 25, Your Honor, a summary of legal

17   issues, so a few fundamentals.  This is a contract dispute

18   under the close-out provisions of the 1992 ISDA Master

19   Agreement.  New York law applies.  Lehman owes QVT damages

20   for breach of contract, and only the amount is contested.

21           The Safe Harbor provisions of the Bankruptcy Code,

22   specifically Section 560, apply, which permitted QVT to

23   terminate or liquidate it swaps, seize collateral, and set

24   off amounts under the ISDA agreements, following ISDA custom

25   and practice.

1          Lehman objects to QVT's claims under a variety of

2     misunderstandings of the facts and misinterpretation of the

3     ISDA language, principles and applicable law.  And the

4     comments I make in the next few slides, Your Honor, are

5     derived from the language of the ISDA agreements between the

6     parties, case law cited in our brief, and anticipates the

7     expert assistance that both Professor Jeffrey Golden, QVT's

8     ISDA expert, and even Mr. Skylar Henderson, Lehman's ISDA

9     expert, will provide to the Court regarding commercial

10    custom and market practice relating to the interpretation of

11    relevant provisions and the need for deference to the

12    situation of the determining party, as this Court noted in

13    the Intel case.

14          So, some of the issues are the scope of discretion

15    for the non-defaulting party to determine its losses and

16    costs from its side of the market, including bid offer

17    spreads it would likely incur in replacing the swaps Lehman

18    defaulted on.  Another issue is whether innocent errors in

19    the market quotation process should impact QVT's loss

20    determinations.  Another is whether QVT acted reasonably and

21    in good faith in conducting its market quotation and loss

22    determinations, including the use of proxy methodologies,

23    where direct market quotations were unavailable.

24          Another issue is whether QVT could utilize market

25    data from the days immediately following 9/15 to help it

Page 67

1    determine its loss as of the early termination date.  And

2    lastly, as you've heard, whether QVT is bound by pre-default

3    margin collateral marks, which were issued by Lehman in

4    calculating its losses after Lehman defaulted.

5              THE COURT:  Could you go back, Ms. Keller, to --

6              MS. KELLER:  Mm hmm.

7              THE COURT:  -- one of those.

8              MS. KELLER:  Summary of legal issues?

9              THE COURT:  Yeah.  What's the answer to the fourth

10   point?  Your answer?

11             MS. KELLER:  Whether QVT could utilize --

12             THE COURT:  Yes.

13             MS. KELLER:  -- market data?  Well, both the

14   definition of loss and 562 of the Bankruptcy Code talk about

15   determinations being made on the early termination date, or

16   as soon as reasonably practicable thereafter.  And case law

17   --

18             THE COURT:  Well, this gets into this interesting

19   issue of whether or not it's on, whether or not that

20   language speaks to when you have to do the calculation, or

21   as of when --

22             MS. KELLER:  Right.

23             THE COURT:  -- you have to do the calculation.

24             MS. KELLER:  Your Honor, there's not an exact,

25   crystal-clear answer to this question.

Page 68

1            THE COURT:  Mm hmm.

2            MS. KELLER:  But there is guidance in case law and

3    legislative history and custom and practice.  And both the

4    legislative history to 562 and commentary from derivatives

5    experts indicate that there be times when it's just not

6    going to be possible to get all the data you need to

7    determine your loss, or a market quotation for that matter,

8    on nearly termination date.

9            THE COURT:  Right.  So, I guess my question is,

10   the -- September 15th was the early termination date.  No

11   doubt about that.  To the extent that market quotations were

12   solicited, they were solicited as of 4:00 p.m. on September

13   15th.

14           MS. KELLER:  Correct.

15           THE COURT:  We know that some of them came back,

16   but the vast majority of them did not come back.  So, then

17   the QVT folks had to sit down and figure out where they got

18   to revert to loss, and they did that.  So, then the question

19   becomes, under what circumstances can they base a loss

20   calculation on where positions were trading on 9/16, 17, 18

21   or 19?

22           MS. KELLER:  Right.

23           THE COURT:  Right?  And that gets into the

24   question of as soon as reasonably practicable -- practical

25   to the extent that there's market confusion or dysfunction

Page 69

```
 1    on the early termination date.  So, I think that that's why

 2    I asked the question of you, what's the answer?

 3              MS. KELLER:  Well, what's so interesting about it

 4    is QVT did determine its loss as of the early termination

 5    date.  But it looked at, as it was entitled to, what would

 6    be entailed in replacing the positions that Lehman had just

 7    defaulted on.  And because some of those positions were so

 8    large in size for their applicable market, and so illiquid,

 9    they concluded that they could not do it on day one.  And

10    therefore, the only reasonable way to evaluate that

11    replacement cost was to look at data over the next couple of

12    days.

13              And Your Honor, there are cases that have allowed

14    non-defaulting parties --

15              THE COURT:  Sure.

16              MS. KELLER:  -- to go eight, nine months down the

17    road.  You know, it depends --

18              THE COURT:  But for a plain-vanilla one-off

19    corporate CDS --

20              MS. KELLER:  Sure, if --

21              THE COURT:  -- that's a different thing, right?

22              MS. KELLER:  Yeah.  If they had, you know, where

23    they sent out market quotations, for example, and people

24    came back right away with responses, either, you know, that

25    day or the next morning, I mean, that's data on the --
```

Page 70

1              THE COURT:  Right.

2              MS. KELLER:  -- early termination --

3              THE COURT:  But you don't get to wait and play the

4    market.

5              MS. KELLER:  Sure.  That's correct.  And that is

6    not what QVT did.

7              THE COURT:  I wasn't suggesting -- I mean, just in

8    terms of ISDA, one of the purposes of the ISDA was to

9    address the moral hazard issue and create a mechanism --

10             MS. KELLER:  I want to --

11             THE COURT:  -- where folks could avoid --

12             MS. KELLER:  -- talk about that a little bit.

13             THE COURT:  Okay.  Go ahead.

14             MS. KELLER:  And, you know, I think it's --

15             THE COURT:  Let me not highjack your remarks.

16             MS. KELLER:  -- a bit of a misnomer to talk about

17   playing the market because, of course, you don't know if the

18   markets going to go up or down on any given day.  And, of

19   course, in the wake of Lehman's filing, the markets were as

20   unpredictable and volatile as they ever have been in our

21   lifetimes.

22             And so, the reason QVT terminated on 9/15 was it

23   wanted certainty of knowing where it stood.  And the fact

24   that it took a couple of days, or they looked at data from

25   the succeeding few days to help them figure out when and how

Page 71

1    and what it would've cost to replace, I think that is

2    perfectly consistent with the idea that you do it on the

3    early termination date or as soon as reasonably practicable

4    thereafter.  And you'll hear more from Lehman about how they

5    cherry picked, you know, the best prices over the next

6    couple of days.  That is bogus, Your Honor.  They did not do

7    that.

8              THE COURT:  Okay.

9              MS. KELLER:  And you'll hear a lot more about

10   that.

11             THE COURT:  All right.  Go ahead.

12             MS. KELLER:  Okay.  I don't need to tell Your

13   Honor the 1992 ISDA Master Agreement is the industry

14   standard in general use worldwide for formalizing

15   derivatives trading arrangements.  The closeout provisions

16   are filled with contractual privileges for the non-

17   defaulting party to make its own determinations regarding

18   closeout and calculation of damages.

19             As Mr. Hendersen has said in his textbook,

20   Henderson on Derivatives, you really do want to be the

21   determining party, which QVT was.  Closeout process is not

22   intended to dictate uniform outcomes.  As Your Honor noted

23   in Intel, quoting Mr. Golden, Professor Golden, setting

24   specific fixing times or prices was not the game.  Neither

25   was searching for the correct or perfect or even best

Page 72

1    answers.

2           Great discussion is afforded to the non-defaulting

3    party, as Professor Golden will explain.  This was a

4    deliberate trade-off between the regulators and the dealers

5    in 1992 to soften the blow when second method was adopted,

6    which requires a non-defaulting party to pay money to a

7    defaulting party who is in the money.  And that's not the

8    way it was before 1992, and that was not terribly palatable

9    to the dealers at the time.  And part of the trade-off and

10   inducement that ISDA gave them to agree to allow this

11   methodology into the system was to give great discretion to

12   the non-defaulting party throughout the closeout process.

13          Your Honor may hear a lot from Lehman about moral

14   hazard around and end-user like QVT inflating its claim

15   unreasonably, but that was not what ISDA's concern was.  It

16   was this issue of the unfairness of having to pay a

17   defaulting party and how to mitigate that.  Essentially,

18   what was assumed in the '92 agreement was that except for

19   really bad actors, who would act in bad faith and

20   unreasonably, commercial practicalities, not to mention the

21   requirements of the bankruptcy laws relating to submission

22   of proofs of claim under oath, would enforce good behavior.

23          Loss is a general indemnity that's basic, Your

24   Honor.  Lehman attempts to read into the loss definition

25   restrictions that are not there.  Loss doesn't say that

Page 73

1    proxy methodologies are not permitted, if adopted in good

2    faith and reasonably determined.  Loss doesn't say that pre-

3    default calculations such as margin marks or valuations must

4    be used or mid-market prices, or specific pricing from any

5    source at any particular time of day.

6            The non-defaulting party is not obligated to

7    derive a provably correct amount for its laws, or even to

8    enter into actual replacement trades.  Loss must be

9    determined in good faith, no lying, no attempt to deceive,

10   and determined reasonably, not arbitrarily, irrationally or

11   perversely.

12           THE COURT:  With respect to cost of replacement

13   hedges, though, to the extent that a party determines not to

14   replace a position, does it get to a sort of claim for what

15   costs it would have incurred had it replaced?

16           MS. KELLER:  That's correct, Your Honor.  If it

17   can replace, usually a party will try to replace.  But if it

18   can't or it doesn't want to, it doesn't have to.

19           THE COURT:  But it gets to assert a claim for the

20   costs it would have incurred --

21           MS. KELLER:  Correct.

22           THE COURT:  -- had it replaced it?

23           MS. KELLER:  That's exactly what the loss

24   definition says.

25           THE COURT:  Where does it say that?

Page 74

1           MS. KELLER:  Sorry, Your Honor.  I need to go back

2     to Slide 23.

3           THE COURT:  Mm hmm.

4           MS. KELLER:  So, loss means the termination

5     equivalent of an amount that party reasonably determines in

6     good faith to be its total losses and costs in connection

7     with this agreement, including any loss of bargain, cost of

8     funding, or loss or cost incurred in terminating or

9     replacing hedges.  A party will determine if loss as of the

10    (indiscernible) early termination date or at the earliest

11    date thereafter as is reasonably practicable.  A party may,

12    but need not, determine its loss by reference to quotations

13    of relevant rates or prices from one or more leading dealers

14    in the markets.

15           So, nothing here says that a party has to incur an

16    actual loss or actually replace its positions, or even look

17    at relevant quotations of rates or prices in the market.

18    You have a very, very broad discretion to determine the loss

19    of your bargain, what you imagine, if you do so reasonably

20    and in good faith, you would have obtained, had Lehman

21    performed.

22           THE COURT:  Okay.

23           MS. KELLER:  Back to Slide 33, Your Honor.  I just

24    quickly want to touch on damages for loss under New York

25    law.  The law of New York is clear that once the fact of

Page 75

1  damage has been established, the non-breaching party need

2  only provide a stable foundation for a reasonable estimate

3  of damages.

4        In the CDO case, it was noted that loss under ISDA

5  includes loss of bargain and loss incurred in connection

6  with the agreement.  The contractually agreed upon

7  definition does not require an evaluation of the non-

8  defaulting party's actual loss or an evaluation of the

9  success of any (indiscernible) hedge against actual loss.

10 The absence of an actual loss on a reference obligation

11 transaction, thus is not a barrier to (indiscernible)

12 recovery of the expected benefit of its credit default swap

13 transaction.

14        Likewise, in the Merrill Lynch case, the Court

15 noted that the amount necessary to put the aggrieved party

16 in as good a position as it would have been had the contract

17 been fully performed is a basis for measuring damages.  It

18 must establish if suffered some loss, but need not prove the

19 amount of the loss with certainty.

20        Your Honor, I should have mentioned that the ISDA

21 is called a check the box form, which means that you can

22 select New York law or English law under the same form.  It

23 was not intended that it would make a material difference

24 which one you picked.  That's not to say there aren't any

25 differences between New York law and English law.  But as a

Page 76

1    general matter, there's actually more caselaw coming out of

2    the English courts than there is in the U.S. courts, and

3    there's a surprisingly little amount of case law in any

4    jurisdiction, given the pervasiveness of use of the ISDA

5    contracts.  So, occasionally, I'll refer to English law, not

6    to tell you that it's binding on Your Honor, but simply to

7    see what those courts have said about very similar

8    contracts.

9          So, English courts have held determination of loss

10   under the ISDA is a discretionary decision and courts should

11   not substitute their own view for that of the determining

12   party, but review only on a rationality basis and not

13   interfere unless the decision maker has made a decision

14   which no reasonable decision-maker would make.

15         Your Honor, I think we already talked about early

16   termination and as soon as reasonably practicable

17   thereafter.  I'll not on Slide 37 that Lehman has a very

18   flawed view of how damages should be calculated and

19   virtually no case law to support those views.  They

20   repeatedly tried out the American Home Mortgage Holdings

21   case, where a party determined a year after the fact a very

22   large claim equal to the total amount of their

23   (indiscernible), underlying (indiscernible) agreement and

24   had collected cash flow on the underlying assets for a year.

25   And the court said, well, there were reasonable determinants

Page 77

1    of value that could have been made on the early termination

2    date, and so that was not a good way to go.  But that is

3    inapposite as a legal precedent for this case.

4              In its prehearing memorandum, Lehman says QVT

5    cannot satisfy its burden of proof, and they cite two cases

6    for the proposition that when the court is presented with a

7    range of reasonable valuations, it can look to the lowest

8    reasonable valuation in the range.  Those two cases, Your

9    Honor, are inapplicable and the citation is inappropriate.

10   Those are Bankruptcy Court cases out of the District of New

11   Jersey and the District of Delaware.  They do not relate to

12   New York law.  They do not relate to ISDA agreements.  They

13   do not relate to loss under and ISDA agreement.  They are

14   just simply inapposite.

15             Turning to Slide 39.  You know, as we discussed,

16   it's not crystal clear what happens if a market quotation

17   process is breached or fails to Oak or the way it should.

18   Lehman sites only to the High Risk Opportunities case.  I'm

19   sure Your Honor is familiar with that.  Where High Risk

20   proved that its adversary had improperly influenced the

21   supposedly independent reference market makers through

22   repeated efforts to cause them to lowball their quotations.

23   This effort was concerted, ongoing and improper, and the

24   court concluded that the parties must revert to loss.

25             Well, that's not our case, Your Honor.  It was an

Page 78

1    honest mistake.  But that's precedent for saying that a

2    court can look to loss if for some reason the market

3    quotation fails.  That was the position Lehman took in the

4    Federal Home Loan Bank of Cincinnati, where they didn't like

5    Cincinnati referring to pre-termination date marks.  And

6    they said loss should have been imposed when it favored them

7    to do so.

8            I just want to point out another comment of Mr.

9    Hendersen.  In his derivatives treatise, he says, "Market

10   quotation works best for liquid transactions, that is,

11   plain-vanilla transactions.  If a currency element, a

12   longer-term, other indices or stranger structures are

13   present, the quotations will bury enormously.  Dealers may

14   not wish to provide quotations where the terms of the

15   terminated transaction are complex or contain unattractive

16   structural elements.  Commercial reality must be considered.

17   If a reference market maker is contacted to give quotations

18   of 15 off-market transactions, all with the same effective

19   date, on the data quotation is requested, the trader may

20   have some idea that the exercise is academic.  One may query

21   whether that trader will put in the same kind of effort as

22   if it really expected the deals to be done."

23           THE COURT:  So Lehman seizes on that, this subject

24   area, and in its opening brief says, aha, it was QVT that

25   wanted market quotations, and at the time QVT said, "We

Page 79

1    continue to feel this is the proper method for valuing our

2    positions.  Most of our positions have a ready market with

3    easily obtainable quotations."

4              MS. KELLER:  In 2005 and 2007.

5              THE COURT:  So in 2005, there was a ready market

6    for PCDS?

7              MS. KELLER:  No, no, no.  They didn't have PCDS at

8    that time.

9              THE COURT:  Okay.

10             MS. KELLER:  Okay?  They were just starting --

11             THE COURT:  Okay.

12             MS. KELLER:  -- their relationship with Lehman.

13             THE COURT:  Okay.

14             MS. KELLER:  They were in the initial stages of

15   building their --

16             THE COURT:  Okay.

17             MS. KELLER:  -- derivatives portfolio.  And PCDS

18   and CARB came --

19             THE COURT:  Came after that.

20             MS. KELLER:  -- after.  2007, 2008 was really the

21   peak of those transactions.

22             THE COURT:  Okay, thank you.

23             MS. KELLER:  And QVT did seek market quotation.

24   It thought obtaining market quotations was the best way to

25   go.  Lehman resisted it.  They liked the flexibility

Page 80

1    inherent in loss, which now they object to.  And QVT

2    intended to seek market quotation for all its positions, and

3    would have been happy if it did.  But it didn't.

4            Slide 40, quickly, Your Honor.  What's good faith,

5    what's reasonableness.  The Good Hill Court said it's a duty

6    of good faith, does not extend so far as to undermine a

7    party's general right to act in its own interests in a way

8    that may inci --

9        (Recess)

10            THE COURT:  Please have a seat.  Good to go?

11    Sorry about that.

12            MS. KELLER:  No problem, Your Honor.  Just a quick

13    matter of housekeeping?

14            THE COURT:  Yes.

15            MS. KELLER:  It appeared that some of the page

16    numbers that I was referring were off from the deck.

17            THE COURT:  That's true.  I was aware of that.  No

18    problem.

19            MS. KELLER:  I apologize for that.  The deck is

20    right; I'm wrong.

21            THE COURT:  I think all you did was say Page 37

22    when you were on Page 31.  So, no big deal.

23            MS. KELLER:  Okay.  I was working on an earlier

24    version.  Just a few couple of last points, Your Honor.  On

25    what actually is Slide 37, just to make the point that the

Page 81

1    burden of proven (indiscernible) bad faith should lie with

2    Lehman.  That's the typical standard under New York law

3    relating to the implied covenant of good faith.  And

4    obviously burden is not addressed in the ISDA or in the case

5    law on that issue.

6             You know, just one other point on the introduction

7    of the second method and the issues between the parties,

8    it's worth pointing out that another issue, not just having

9    to pay the defaulting party its in-the-money amount, but the

10   fact that the Debtor can collect interest from the non-

11   defaulting party, but the non-defaulting party can't collect

12   interest from the Debtor.  And that's another significant

13   unfairness that people were concerned about in giving

14   discretion to the defaulting party.

15            Your Honor, my last few slides really are a run-

16   through of a number of cases where Lehman estate

17   representatives have gone into courts in the U.S.  and the

18   U.K.  attacking discretionary determinations by non-

19   defaulting parties, and they tend to get thrown out of

20   court, Your Honor.

21            In the Anthracite case, a U.K.  case, Lehman

22   argued that the non-defaulting party produced a fictitious

23   loss widely at variance with that party's real gain.  The

24   Court disagreed, found the loss was reasonable, and that it

25   is by no means axiomatic that in relation to derivatives,

Page 82

1   one party's loss approximates to the other party's gain.

2   That's the concept, I think, to keep in mind here.  In the -

3   -

4              THE COURT:  I'm familiar with Anthracite, and that

5   was very unique facts because of the distressed position of

6   the non-Lehman counterparty.  So I don't know that that case

7   really sheds much light on what we have.  But I don't

8   disagree with the general proposition.

9              MS. KELLER:  Right.  In the LBIE case against AG

10  Financial Products in New York, the Court set out the

11  standard for bad faith.  Bad faith is implicated when a

12  party exercises a contractual right malevolently for its own

13  gain as part of a purposeful scheme to deprive plaintiffs of

14  the benefits of the contract and engages in targeted

15  malevolence in the guise of business dealings.  Your Honor,

16  there is no targeted malevolence.

17             THE COURT:  I don't think that we're talking about

18  targeted malevolence.  You know, well...

19             MS. KELLER:  Or anything rising close to that --

20             THE COURT:  Well, it's not -- Mr. Tracey said at

21  the top that the folks at QVT are good people.  This is not

22  -- this is a trial about a commercial dispute fundamentally.

23             MS. KELLER:  Yes.

24             THE COURT:  I mean, whether or not people are good

25  people is not --

1              MS. KELLER:  That's well-put, Your Honor.

2              THE COURT:  -- is not before me.  So...

3              MS. KELLER:  Right.  And the fact that they might

4    want to maximize their recovery has been held by court after

5    court to be an appropriate motivation as long as you don't

6    lie, cheat, unfairly inflate, you act reasonably --

7              THE COURT:  Well, I don't want to open a can of

8    worms here.  I don't know that I would use the words

9    maximize recovery.  They were -- they owed certain duties to

10   their investors, they were trying to get it -- I think QVT's

11   positions is it was a chaotic time; we were just trying to

12   get it right.

13             MS. KELLER:  Yeah

14             THE COURT:  And even if at the end of this couple

15   of months we're going to spend together I were to find

16   against QVT in whole or in part, I don't think that what's

17   before me is a finding that these were bad people.  It may

18   be...  We're going to find out what happens.  But I just

19   don't want this to turn into a trial of people's character

20   because I don't believe that that's at issue.

21             MS. KELLER:  And, Your Honor, here not only did

22   they try to do their best but they tried to be fair in what

23   they were doing.  You know, in the Michigan State case,

24   Judge Peck found that Lehman was distorting and truncating

25   the meaning of Section 560 in its very constricted reading

Page 84

1    to prevent a counterparty from using market quotation rather

2    than an alternative midmarket liquidation methodology that

3    Lehman preferred, and noted the current litigation as an

4    example of the delay, expense, and uncertainty that results

5    when there's doubts surrounding the enforceability of

6    contractual terms.

7                And, Your Honor, moving to the last slide -- last

8    but not least, Your Honor's findings in Intel, where the

9    Court read the definition of loss broadly, finding it does

10   not mandate any particular calculation method as long as it

11   was reasonable and in good faith.  Lehman's view that a non-

12   defaulting party having too much discretion to select a

13   methodology is a recipe for wild uncertainty and

14   unpredictability is misplaced hyperbole.  I think we have a

15   little bit of that here.

16               And noting, again, Professor Golden's comment that

17   the drafters intended to build into the definition of loss a

18   contractual privilege for the non-defaulting party to make

19   its own determination.  And we assume that the situations

20   when a court would interfere with the exercise of that

21   contractual discretion would be extremely limited.  Thank

22   you, Your Honor.

23               THE COURT:  Thank you.

24               MS. KELLER:  I'll turn the podium back to Mr.

25   Tracey.

Page 85

1          MR. TRACEY:  Okay.

2          THE COURT:  Okay.

3          MR. TRACEY:  So, (indiscernible) and back to the

4    facts, I'm going to take the Court through the default and

5    the market quotation process first, and I'm going to take it

6    pretty painstakingly because there is an issue about timing

7    that I just want to go through.  If the Court says move

8    along, I will not be insulted.  But I think it is important

9    to talk about it.

10         So, just back to the days of the default, this is

11   something you had to hear a lot about.  It's nothing new but

12   there will be a number of events that led up to this

13   memorable day that are very important in this case and

14   you'll hear them come up because they affected the markets.

15   And some of them particularly affected the PCDS marketing

16   and the card market.  So, we're going to have to relive

17   these times.

18         But the Bear Stearns issue occurred in March of

19   2008, and then in September, very importantly for this case,

20   when Fannie Mae and Freddie Mac were put into

21   conservatorship.  And that was sort of a watershed time for

22   a lot of things but it was definitely watershed for the

23   preferred market.

24         Because what happened there -- you probably know

25   all this but I'll just repeat it.  The government came in

Page 86

1    and they supported the debt.  The debt was fine.  It was

2    trading at I don't know what -- close to 100 percent.  And

3    the equity and the preferred were wiped out -- essentially

4    wiped out.  And so it created a new potential normal for the

5    difference between subordinated and senior debt and

6    preferred.  And that's what had had happened just a week

7    before the Lehman bankruptcy.

8            Merrill Lynch was on the verge of bankruptcy,

9    ultimately acquired by Bank of America, AIG was near

10   collapse, and then on the early morning of the 15th, our

11   clients woke up and had a big job to do.  And so the first

12   thing that they did after they determined to terminate was

13   they engaged in a market quotation process.  And I will take

14   you through the chronology but just broad strokes.

15           You can see here that what they did was they

16   wanted to make sure that they got the requests out to the

17   market makers who were most likely to give responses.  And

18   so, since they had a wide variety of different kinds of

19   products, they couldn't just send out a blast.  Plus, that

20   would make more work for them.  So they divided it into

21   three categories which they felt would match what the market

22   makers were looking for.

23           The first one was CARB, which included PCDS, the

24   second was ADS, and the third was emerging markets.  And so

25   they picked the market makers that they thought would be

Page 87

1    most likely to respond.  For corporate emerging markets they

2    chose four.  These are market makers they dealt with on a

3    regular basis, had a good relationship with.  And on ADS

4    they actually chose, I think, seven, because they wanted to

5    make sure that they got responses.

6            So, this is a summary of what happened.  As the

7    Court knows, there were three or more only on 12 positions.

8    There were one or two market quotations received on 173

9    positions; and for the other 545 there were no market

10   quotation responses.  Excuse me.

11           I've touched on this before but I wanted to show

12   you which positions were missed as a result of the way they

13   collated the information, and Joe Loman will explain this to

14   you when he testifies.  They left out these 44 positions.

15   They are virtually all mortgage-related positions.  And

16   there were, as you can see--it includes the CARB as well as

17   small amounts of other positions.

18           I wanted to spend some time talking about the 4

19   p.m.  deadline issue that's been raised by Lehman.  So, just

20   to go back to the ISDA for one moment because it's

21   important.  What the ISDA provides is that the market

22   quotations are to be obtained as of the same day and time

23   without regard to time zones, and that day and time is to be

24   determined by the non-defaulting party in good faith.  It

25   doesn't talk about when the responses are to be received; it

1    talks about as of time.

2            So, this was the -- and we'll provide this whole

3    thing to you -- but this was the market quotation

4    solicitation that they ultimately sent out.  And what that

5    said -- it tracked the ISDA exactly.  It said, "Please

6    provide market quotations as of 4 p.m."

7            THE COURT:  So, is this true -- you say the 4 p.m.

8    deadline.  So I believe that I've been told -- I don't know

9    if it's in the papers or not -- that some of the quotes did

10   say that -- and I don't know if it's instead of this

11   language or as a cover to --

12           MR. TRACEY:  It was as a cover.

13           THE COURT:  As a cover, said, please supply your

14   responses by.

15           MR. TRACEY:  Correct.  That was Tom Knox, the

16   emerging markets ones.  And he did put a cover note on

17   saying, "Please provide your responses by 4 p.m." That was a

18   small minority of positions.  Most of them went out only

19   with this language.  And his actually had this language,

20   too.

21           THE COURT:  So, the question that I have is -- my

22   recollection from what we've talked about in pretrial was

23   that these went out at 2:50-something?

24           MR. TRACEY:  Between a little before 3 and about

25   3:20, except for one that went out at 3:44.  And I'm going

Page 89

1    to go through the chronology with you.

2              THE COURT:  Sure.  But at what point -- they

3    wouldn't have been sent out at 3:55, right?

4              MR. TRACEY:  Right.

5              THE COURT:  And then you get into the question of

6    when you're soliciting market quotations, what are you

7    asking for?  You're asking for actionable quotes, you're

8    asking for live quotes, you're asking for are historical

9    quotes okay?  All of that -- you know, all of those issues.

10   But the relatively narrow window of time that would be

11   included here, it raises all those questions.  Because at a

12   certain point I don't think you -- they wouldn't have sent

13   out these market quotations at that point.  And then I think

14   under the interpretation of the ISDA that you would argue

15   that one might take the position that it wasn't reasonably

16   practical to get it done on the day of September 15th,

17   because of widespread chaos, etc., etc., and that if you had

18   sent it out first thing on Tuesday morning, that would've

19   been perfectly okay.  The markets would've settled, inter-

20   dealer stuff would've tamped down a little bit, etc.

21             So, I'm just anticipating that that's some of the

22   things that they might say.  But just focusing on the narrow

23   timeframe, what's the argument?

24             MR. TRACEY:  So, the answer, Your Honor, is that

25   if we had to deal with a situation where we sent out a

Page 90

1    market quotation and said you have to get it back by four,

2    and then we didn't consider responses after four, that would

3    be one thing.  We don't have to consider that.  What we have

4    here is a request for an as-of quote.

5            Now, can you do an as-of quote as of 4 o'clock and

6    send it in at 5?  A lot of people did.

7            THE COURT:  By send it in, you mean go out to the

8    market with that request?  So, at 5 o'clock -- no?

9            MR. TRACEY:  I'm sorry, I was not clear.  The

10   request to everybody said give us your quotes as of 4 p.m.

11           THE COURT:  Right.

12           MR. TRACEY:  A few people got responses back in

13   the 4 p.m.  period; most of them, as you'll see, came in 5,

14   6, 7, 8 o'clock, and the next day.  So, the communication to

15   the market makers told the market makers that it was fine to

16   respond after 4 o'clock.  Whatever they were seeing in our

17   solicitation, which you'll read, whatever was going on in

18   the market, whatever they interpreted a market quotation

19   process to be, they felt comfortable responding over --

20   mostly over a 4-1/2 hour period after 4 o'clock, giving

21   quotes as of 4 o'clock.

22           So, maybe Lehman will say, "How can you give a

23   quote as of 4 o'clock when it's later?" But that's what

24   everybody did.  And this market quotation process, there's

25   no playback for it, right?  There's a playbook for auctions.

Page 91

1    They're used to that.  But this doesn't happen every day.

2    And so when a market maker got this language, they knew what

3    was going on.  They knew this was a market quotation

4    process.  That's what it says.

5            And so they felt comfortable giving prices as of 4

6    p.m.  for the following four hours.  That is a valid market

7    quotation process.  That's what this requires.  It says as-

8    of.  It does not say if a market quotation comes in an hour

9    later, you should deem it to be non-actionable or you should

10   deem it to be not a valid market quotation as of 4 o'clock.

11   It doesn't say anything like that.  And that's not the way

12   the market interpreted it.

13           So, I believe the answer is that this was

14   consistent with a view that the market makers believed they

15   could come in after 4 o'clock and give 4 o'clock prices.

16   And I don't think there's going to be anything inconsistent

17   with that.

18           So maybe we should go through the timeline of the

19   day?

20           THE COURT:  Sure.

21           MR. TRACEY:  Because that'll give you a sense of

22   actually what happened.  So, the market quotation process

23   lasted across two days.  I'll take you first through

24   September 15th.  And it started in the morning, deciding to

25   terminate between 7 and 9 a.m.  After that, between 9 and 11

Page 92

1    o'clock, QVT was preparing an initial draft of the market

2    quotation and began to compile its positions with Lehman.

3            Between 11 and 1:40 was the bulk of the drafting

4    process.  It went through a number of drafts with comments

5    coming back from various people.  And I'll take you through

6    minute by minute.  11:02, Joe Lowman prepared a list of

7    positions that were in his ABS area, which he was most

8    familiar with in a market quotation format that he would

9    later propose to others.

10           At 11:11, he sends an email to Dan Gold and says,

11   "Have you finalized the format for the CDS bid offer

12   requests?" He said he was thinking of conducting a 1 p.m.

13   auction.  And there are a number of these going on in the

14   market.  He gets a response four minutes later:  "Not yet;

15   stand by" from Mr. Gold.

16           At 11:17, he circulates another example of a

17   market quotation process that's in the market to the other

18   partners involved in this.  At 11:28, he circulates his own

19   market quotation list, the one I showed you earlier, to Mr.

20   Brunn, Mr. Gold, and Mr. Chu, and said, "Here's what I was

21   thinking of doing.  It's primarily an ABS-type request but

22   you could adopt it to corporate."

23           At 12:30, Nick Brunn sends an email to the others

24   saying, "Attaching proposed language," which is somewhat

25   different from Mr. Lowman.  At 12:34, Joe Lowman responds

Page 93

1    and he says, "The first paragraph looks good; the second

2    paragraph doesn't seem to apply to ABS, my area."

3         At 1:06, Joe Lowman proposes some, what he calls

4    minor changes to the language.  And then at 1:41, Nick Brunn

5    circulates language called revised language, and this is

6    essentially the final language.  There are some small

7    differences but that's essentially the final language.  So

8    they got it done by 1:41.

9         At 2:06, Joe Lowman with that final language

10   circulates an email saying, "Here's where you can find all

11   the positions." He had put files on a server with these

12   three separate lists of positions and he's saying at 2:06,

13   here's where you can find the positions to attach to this

14   language.  And so then the first one went out at 2:57.  So,

15   Joe sent his out within a minute of each other for the

16   corporate.  The ABS ones went out about 10 minutes later at

17   3:08, and the emerging markets ones went out about 12

18   minutes after that.  For some reason, Barclays didn't get

19   theirs or it wasn't sent, so that was the last one that was

20   sent out at 3:44.

21        And then what's most important is to see what

22   happened after that.  Beginning at 4:05... I'm sorry,

23   beginning at 4:05, you've got responses.  I guess you have a

24   couple of responses before that from UBS, which are in green

25   down at the bottom, but mainly the responses start coming in

Page 94

1    at about 4:05.  And as you can see, they come in throughout

2    the evening.  Everybody worked late that night.  They were

3    all working on these things, and they were coming in

4    throughout the evening until 8:20.  And then including the

5    following day when some additional ones came in early in the

6    morning and then midday.

7              So that's the chronology, and that's why I say

8    that this was a market quotation process that worked.

9    Because those market makers responded and they responded at

10   the time they thought that it was appropriate with quotes

11   that were as of 4 p.m.

12             So, they got the number of market quotations they

13   got and the next thing they had to do was address the loss

14   calculation.  And that was done -- the five people who were

15   most involved in this were, as you know, the five main

16   traders for the entire portfolio, and this was an incredibly

17   stressful, difficult time, so they decided to do this on two

18   weekends during September.  And they met in the trading area

19   that we described and performed their calculations.

20             You know, it's -- I think we touched on this

21   earlier but on the issue of why they weren't emailing each

22   other, you can see how close they're sitting to each other,

23   and while they -- you can imagine somebody emailing their

24   partners even though they're sitting nearby, if it's during

25   a trading day and people are busy and somebody's walking

Page 95

1    away.  But this was on weekends.  There's nobody else

2    around, there's nothing going on, nobody's getting up to

3    look at the market.  And so they're working together orally

4    to get this done.

5            How did they go about the loss calculation?  There

6    were certain priorities.  Obviously, if there was a market

7    quotation that succeeded, that was the first priority.  If

8    it didn't, there were certain positions that were replaced.

9    So, the calculation was essentially just to adopt the

10   replacement price.

11           And this is an important point that I just want to

12   pause on for a second, because I can't remember exactly how

13   many positions were replaced but not an insubstantial

14   number.  A small part of the portfolio -- about 80 or 90.  I

15   can't remember the number but I'll get it for you.  Those

16   were done -- some were done on September 15th, some were

17   done on September 16th because you couldn't get them all

18   replaced, the ones you wanted to, and maybe a few on

19   September 17th.

20           Our loss calculation says, okay, what did we lose

21   as a result of the loss of that position?  What was our

22   loss?  Our loss was how much did it cost to replace it?  And

23   if that replacement took place on September 15th, that was

24   the number.

25           If we were -- if it reasonably took us until

Page 96

1    September 16th to replace the position, that's the number

2    that was used because that's our loss.  We lost a position,

3    we had to go out and get it, we replaced it the following

4    day, so it was whatever price we paid on September 16th.

5           So, right there you're done with the argument that

6    you can't consider the next day.  You're done.  When you

7    replace a trade on September...

8           Now, if we had sat around not replacing things,

9    thinking that you could inflate your claim somehow by

10   waiting on the replacement, of course that would be wrong.

11          THE COURT:  That would be wrong.  Right.

12          MR. TRACEY:  Right.  But --

13          THE COURT:  And if you were able to do that

14   because you have a cushion of margin or because you're

15   willing to take a shot, that would be wrong.

16          MR. TRACEY:  That would be wrong.  But assuming

17   that that didn't take place, assuming that they were being

18   reasonable in their replacement process, and assuming that

19   it reasonably took them until September 16th to replace it

20   because September 15th was so busy, there weren't available

21   bids, whatever -- nobody's going to say you can't use that

22   September 16th price even though it's not September 15th;

23   it's September 16th.  That's fine as a replacement price.

24          And so when we get to the valuation of the

25   positions that are not actual replacements, it's basically

1    the same story.  If -- what we lost was what it would've

2    cost to replace the positions.  So if we couldn't have

3    replaced the positions until September 16th, that's the

4    number that was used.  If because of liquidity or whatever

5    reason it's likely that that would've been replaced on

6    September 16th, that's the loss number.  It's a rational

7    approach to how you come up with a price.  So, I just wanted

8    to go through that because it's important.

9            THE COURT:  But that doesn't necessarily speak to

10   using price data later in the week, right?

11           MR. TRACEY:  Well, if you think it would've...

12   Most of the -- other than PCDS, the vast majority of dates

13   that were used were September 16th because the theory was we

14   just did a market quotation process, we couldn't get rid of

15   it, so of course we would've replaced it on September 16th.

16   There are some positions where they looked at it and said,

17   there are no buyers out there.  We're going to have to work

18   this.  It's going to take them until the 17th.

19           So you'll see which positions they did that for

20   and they will explain why they did it, and if you accept

21   that they were applying a reasonable approach to that,

22   there's nothing wrong with it.  Just because it's not

23   September 15th.  But, of course, you have to be satisfied it

24   was reasonable.

25           Okay.  So, calculation of loss.  First is

Page 98

1   replacement trades, second is the traders were basically

2   given the discretion because they knew their positions to

3   consider a variety of different inputs.  And these are the

4   three primary ones.  First is market quotations where fewer

5   than three were received.  In most cases, if they received

6   one or two, they used the one or two market quotations they

7   received.  There was one trader who didn't do that but most

8   people did that.  And so the market quotations, the 173 that

9   you saw on that prior slide that came in where there were

10  not three market quotations, most of those were used as the

11  loss number.  So they weren't running away from the market

12  quotations; they were using them.  They just didn't have

13  that many.

14         The second one is the use of a pricing service,

15  and the one that was used primarily was Markit, Markit

16  Partners, and that price was a mid-price and so they needed

17  to add a mid-bid spread to that, and we'll show you how that

18  was done.  And the third approach was using broker quotes.

19  Those are the rungs that come out on a daily or even more

20  than a daily basis from brokers offering to buy and sell

21  things.  And so in some cases they felt that those were fair

22  representations of what the price should be.

23         I'm about to go into the valuation of PCDS.

24  Should we look forward to that for lunch?

25         THE COURT:  It sounds like a fine place to stop.

Page 99

1    Nothing gets your appetite up than PCDS valuation or CARB,

2    but that's another bad joke.

3            MR. TRACEY:  Hopefully, I won't ruin your dinner.

4            MAN 1:  That's up to me.

5            THE COURT:  Don't even go there.  All right, so

6    what time did we say we're coming back?

7            MR. TRACEY:  1:45.

8            THE COURT:  All right, so here's the thing.  At

9    4:30 I have to do a first day hearing because apparently

10   ships are about to be arrested in various places in the

11   world.  So, I have no idea how long it's going to take.  It

12   might only take until 5 o'clock, in which case I would love

13   you to not have left so we can continue.  So, I'm sorry.

14           MR. TRACEY:  No problem.

15           THE COURT:  It is what it is.  So, once we

16   approach that point, I won't ask you to decamp but just to

17   kind of tidy a little bit so that the shipping folks can get

18   in here.  But I would like to continue as long as we can

19   because it doesn't look like it's going to get done with

20   closing markets -- with opening markets.

21           MR. TRACEY:  Right.

22           THE COURT:  All right?  So, what time?  We'll come

23   back at 1:45?

24           MR. TRACEY:  Yes.

25           THE COURT:  Okay, great.

Page 100

1            MR. TRACEY:  Thank you, Your Honor.

2            THE COURT:  Thank you.

3            [BREAK]

4            THE COURT:  All right, ready when you are, Mr.

5     Tracey.

6            MR. TRACEY:  So, just to take us back, we're on

7     the --

8            THE COURT:  PCDS.

9            MR. TRACEY:  PCDS, the lost calculation for PCDS.

10    And I will start with a big overview of what the PCDS were.

11    There were 19 entities that were underlying reference

12    entities.  The total notional amount was $371 million of

13    protection on these banks.  And ultimately QVT's valuation,

14    which I'll take you through, was $134 million, 36 percent of

15    the notional.

16            THE COURT:  And what was Lehman's valuation?

17            MR. TRACEY:  About 22.5.

18            THE COURT:  22.5?

19            MR. TRACEY:  Their experts were between 20 and 40.

20    Bear with me just a few minutes.  I know the Court is

21    familiar with CDSes, but maybe before addressing PCSes I can

22    just take the Court through the basic mechanics.  It works

23    like any other CDS in some respects, and there are some

24    differences that I'll come to.

25            But QVT is a protection buyer.  It's, as the Court

Page 101

```
1    knows, essentially like insurance.  QVT wants protection on

2    the potential decrease in value of preferred securities and

3    financial institutions.  It goes to Lehman, which is willing

4    to be a protection seller, and in this example, it's Wells

5    Fargo preferred stock, $10 million notional.  And Lehman

6    agrees to provide protection on that amount.

7            Lehman charges -- there are a few ways to skew

8    conventions for pricing and I want to take you through

9    those.

10           THE COURT:  Sure.

11           MR. TRACEY:  This convention is using a running

12   spread which is essentially an annual premium based on the

13   percentage of the notional amount.  So, in this case, the

14   annual premium was 150 basis points.  That's 1-1/2 percent

15   of the notional of $10 million.  So QVT in this case would -

16   - if it were a five-year protection contract, AVT would pay

17   $150,000 per year for five years.

18           Lehman would agree in return to provide

19   protection.  And that is paying QVT the $10 million -- if

20   there were a credit event, and we'll come back to that is --

21   paying QVT $10 million in return for returning the preferred

22   stock or the value of that, depending on how the contract

23   worked.  And so the cost of this would be $750,000 over five

24   years.

25           This is the alternative convention that I wanted
```

Page 102

1    to go through.  If a CDS contract becomes expensive, if the

2    underlying reference obligation is distressed, the

3    convention was that the parties would not use just an annual

4    premium for the cost; they would insist on an upfront

5    payment and would deduct that from the total payments.

6            So, in this case let's say that Wells Fargo had

7    become more distressed, still $10 million of notional

8    amount, but the cost that Lehman wants to charge for the

9    five-year contract is $3 million, let's say.  Instead of

10   charging whatever that is, 600 basis points, what they do is

11   they just have a running spread of 150 basis points, which

12   is the standard, and they charge QVT upfront the number of,

13   quote, "points" from points that would be needed to make

14   that $150,000 a year cost work over the course of five

15   years.

16           THE COURT:  Is this the same thing as pay as you

17   go?

18           MR. TRACEY:  No, this is not pay as you go.

19           THE COURT:  No.  Okay.

20           MR. TRACEY:  We'll come to this.  This is a

21   situation where there's a single credit event and either

22   they pay the entire five-year contract and it's done or

23   there's a credit event in the middle and the full payment is

24   made.

25           THE COURT:  I'm not following this one.  So, tell

Page 103

1    me again.

2              MR. TRACEY:  Sure.

3              THE COURT:  So, this is 150 -- the first one was

4    the protection buyer pays $150,000 a year.

5              MR. TRACEY:  Right.

6              THE COURT:  In the second one --

7              MR. TRACEY:  In the second one the total cost of

8    the contract is $3 million Lehman thinks.  So over five

9    years that's $600,000 a year.  But they don't like to do it

10   that way.  So what Lehman would do is they would charge 22.5

11   upfront points.  22.5 points is 22.5 percent of the

12   notional.  So, in this case, that would be $2,250,000.  On

13   the day of the contract inception QVT pays Lehman $2,250,000

14   plus they pay $150,000 a year.

15             THE COURT:  Got it.  Okay.

16             MR. TRACEY:  That doesn't come up in the context

17   of QVT's purchases because they were purchased before it was

18   heavily discussed like this.  But this convention will come

19   up when we get to September 15th.

20             So, how are PCDS different from CDS?  There are a

21   couple of differences.  Obviously, one is that instead of

22   debt, the reference obligation is preferred stock.  The

23   second is that there's an additional trigger beyond the

24   triggers that normal CDS have.  It would include bankruptcy,

25   restructuring, the traditional credit events.  But it also

1    included deferral, which is an important concept here.

2            And what that is is that -- as Your Honor knows,

3    preferred stock have a coupon but it's not a legal

4    obligation to pay.  And so in the event that an institution

5    wants to conserve capital, becomes distressed, it can defer

6    or cancel its payments on its preferred stock -- something

7    that would happen as you get more distressed.

8            They don't default on anything; they just defer.

9    They say, we're not going to pay at least this coupon.  One

10   coupon deferred and that's a credit event under PCDS.  And

11   the protection seller has to pay the $10 million less the

12   then current price of the preferred stock.  So, it can be

13   powerful protection.

14           The third differences, the recovery may be

15   different and it depends on the circumstances of the

16   default.  If it's a full default, the recovery on a

17   preferred stock is likely to be lower than the recovery on

18   debt because it's lower in the capital structure.  If it's a

19   deferral situation, it's not --

20           THE COURT:  It's not clear.

21           MR. TRACEY:  It's not clear.

22           THE COURT:  Right.  In other words, in a deferral

23   situation, it's not immediately clear that the equity --

24   that the preferred position has become worthless?

25           MR. TRACEY:  Exactly.  So, recovery might be

Page 105

```
 1    higher.  But the protection seller is still required to pay

 2    the par amount and takes that full risk, and gets back the

 3    preferred at probably a higher level.

 4              So, the last and important difference is there was

 5    no liquid market for PCDS.  Unlike CDS, which can trade all

 6    the time, PCDS was invented by Lehman, they tried to make it

 7    work with other dealers; it didn't work.  They had the

 8    trademark on it.  It was their product.  It was a

 9    proprietary product in which for most of this period they

10    were the only dealer making a market.

11              So, just focusing on September 15th, which is the

12    key moment, if you look back and you said, okay, those 19

13    obligations -- when was the last trade?  In most of them it

14    was July of 2007.

15              THE COURT:  You mean the last trade on PCDS?

16              MR. TRACEY:  On PCS in those referenced entities.

17              THE COURT:  Okay.

18              MR. TRACEY:  In some of them there were trades in

19    July of 2008 but I think -- and there may have been one

20    unwind between July of 2008 and September.  But there just

21    weren't any trades to look at.

22              THE COURT:  So, because of that lack of trades

23    then, what QVT did -- this is a question -- is they said,

24    all right, so we have to figure out what it would have --

25    what it would have cost to obtain a short position?  They
```

Page 106

1       synthetically -- kind of reverse-synthetically --

2               MR. TRACEY:  Exactly.

3               THE COURT:  -- figured out what a short position

4       would've looked like and what it would've cost.

5               MR. TRACEY:  Exactly.

6               THE COURT:  So then my next question is what's the

7       significance of looking -- so, when last seen, markets

8       closed to the extent that markets close, these markets close

9       maybe -- ish -- at, say, close of business on Friday, the

10      12th, right?  And then we go into pre-Lehman weekend, etc.

11      So, am I looking at -- are you going to tell me that I'm

12      going to look -- I shouldn't look at market movement between

13      the end of the day on the 12th and when the positions were

14      valued, taking into account what happened on the 15th?

15              To say it a different way is -- so these

16      underlying securities, distress was already going on in a

17      big way among financial institutions, and I think that you

18      highlighted in your papers like, these were the eye of the

19      storm, right?

20              So, am I supposed to be looking at the decline in

21      the prices of the underlying securities that occurred

22      between the 12th and the 15th?

23              MR. TRACEY:  So, it could be interesting to look

24      at the decline in the value of preferred securities, because

25      obviously the PCDS which referenced them are going to be

Page 107

1   somewhat related to that.  However, that is not an available

2   valuation methodology for QVT on September 15th, and I will

3   tell you why.  There's two reasons.

4          The first is you don't have a price for PCDS on

5   September 12th.

6          THE COURT:  Right.  I'm not talking about PCDS.

7          MR. TRACEY:  Oh.  Okay.

8          THE COURT:  I'm talking about, to the extent that

9   the methodology that QVT is now saying should be used

10  because there were no bid and ask on PCDS, they're looking

11  at what it would've cost to short the actual stocks.  Right?

12  So, therefore, are you looking at the stock price -- the

13  decline of the individual financial institution securities?

14         MR. TRACEY:  That's exactly what we're looking at.

15  But the way they develop the prices, they said, okay, what

16  would a dealer on September 15th charge us for protection?

17  What upfront points -- we're in a distress situation here --

18  what upfront points would a dealer charge us?

19         THE COURT:  Right.  But the way they come up with

20  that is what would it have cost us to go out and acquire a

21  short position in the actual underlying securities as a

22  proxy for the protection?

23         MR. TRACEY:  Exactly.  And so what their analysis

24  was is that the dealer, a dealer that would sell them

25  protection would have to go out into the market and short

Page 108

1    the stock --

2              THE COURT:  Right.

3              MR. TRACEY:  -- and would receive in return for

4    shorting the stock some amount of money.

5              THE COURT:  That's right.  Okay.

6              MR. TRACEY:  Say it was trading at 60 percent;

7    they're going to get $6 million from that.  What that

8    dealer, according to QVT, would charge QVT for that

9    protection would be 40 percent of the notional.

10             THE COURT:  Okay.  I mean, that's what my

11   understanding was of what your analysis is.  Okay.

12             MR. TRACEY:  Right.  Exactly.  So the lower the

13   preferred prices on September 15th or whatever price was

14   used, the more the premium would cost to QVT --

15             THE COURT:  Yeah.

16             MR. TRACEY:  -- and the more valuable it is; and

17   the higher the preferred stock is, the lower the premium,

18   the lower the value of the PCS is.

19             THE COURT:  That's what you say.

20             MR. TRACEY:  That's exactly -- yeah.  That's what

21   I say.

22             THE COURT:  Okay.  No, I just want to clarify.

23   When I say okay, it doesn't mean I'm agreeing with you; it

24   means I hear you.

25             MR. TRACEY:  Yes.  No, no, right.  Okay.  And

Page 109

1    maybe I can take you through what hedging is all about

2    because that's the foundation of the valuation methodology.

3    So, here where QVT is buying protection from Lehman, Lehman

4    has this potential $10 million or almost $10 million

5    contingent liability hanging over its head.

6           So what does Lehman do?  Lehman goes out and buys

7    protection from another party.  AIG in this case was a

8    common counterparty to Lehman, selling Lehman protection,

9    and Lehman then sold the protection to QVT.  And AIG was

10   selling a lot of protection in the good old days but they

11   ran out of interest in that, as did everybody in the market.

12   And so, by September 15th, there were no AIGs out there,

13   there were no protection sellers.  And so I can just show

14   the Court a couple of the communications that you'll see

15   during the course of the trial.  These are Bloomberg

16   messages involving -- basically by Lehman.  Zero liquidity

17   in PCDS.  Then by July of 2008, Megan Philbin, who was the

18   main trader -- one of the traders for PCDS, says PCDS hardly

19   exists.

20          And during that same time period, you'll see on

21   the next slide that QVT was going out into the market --

22   going out to Lehman primarily and saying, we'd like to buy

23   some more PCDS.  And Lehman consistently from July to

24   September says, we can't sell it to you.  There is no AIG

25   out there to sell protection to us, so we don't have any

Page 110

1    protection to sell you.  And the witnesses will explain how

2    all that happened.

3            So, what that means is that on September 15th when

4    some dealer is being asked to sell protection on these sort

5    of toxic financial institutions at that time, there's no one

6    out there to back it up on the other side of the trade.  So

7    that dealer can't go out into the market and say, AIG,

8    please sell me protection so I can sell it to QVT.  That

9    didn't exist anymore.

10           So, that's why they had to go out...  Morgan

11   Stanley, for example, if they were going to replace the

12   protection, would have to go out and sell the underlying

13   preferred, get the let's say $6 million, and charge QVT $44

14   million for taking that risk on the difference.

15           Do you want me to...?  So, there's no protection

16   seller.  So they used the par minus the value of the

17   preferred.  And I'll just skip through this because I really

18   have taken you through this and I don't need to do it again.

19           The question, though, is if you're Morgan Stanley

20   and you're being asked to sell protection to QVT on Credit

21   Lyonnais Preferred, that dealer is going to say, okay, I

22   need to go out in the market and sell Credit Lyonnaise

23   Preferred.  What's the price I can get for that?

24           So, the problem with preferred stock is unlike

25   equities, there is no ticker, there is no -- a few of them

Page 111

1    trade on the exchange in retail --

2            THE COURT:  But most of them are OTC?

3            MR. TRACEY:  Most of them are OTC.  So, you really

4    don't know what the price is on September 15th.  It's

5    dropping like a rock.  And so Morgan Stanley has to say to

6    themselves, well, if I'm going to go out in the market and

7    sell --

8            THE COURT:  Wait.  Stop for a second.  So you

9    don't know but it's dropping like a rock?  Only one of those

10   is true.  Either you don't know or you do know.

11           MR. TRACEY:  Well, you know that --

12           THE COURT:  You know that the common is dropping

13   like a rock.  No?

14           MR. TRACEY:  Well, you know that the retail is

15   dropping like a rock.  Retail preferred, which trade on an

16   exchange.

17           THE COURT:  Okay.

18           MR. TRACEY:  So you have to assume that the OTC is

19   also tracking that same way.

20           THE COURT:  You mean for different --

21           MR. TRACEY:  For different entities.

22           THE COURT:  I'm sorry.  Okay, for different

23   entities.  So you're --

24           MR. TRACEY:  You're just looking at the market.

25           THE COURT:  So you're just as -- so --

Page 112

1           MR. TRACEY:  So you're saying, I don't have a firm

2      price but I know they're dropping.  Because the retail --

3           THE COURT:  Okay, but then you have to...  I mean,

4      I don't know what the testimony's going to be, but it may be

5      that there was a long list of reference entities -- it may

6      be that they all were.  That there wasn't a correlation.

7           MR. TRACEY:  There's not a perfect correlation.

8           THE COURT:  An exact correlation between, you

9      know, a U.S.  bank and a Deutsche Bank.

10          MR. TRACEY:  That is true.

11          THE COURT:  Or a Credit Suisse or something like

12     that.

13          MR. TRACEY:  That is true.  But putting yourself

14     in Morgan Stanley's position, you need to figure out if I

15     sell $370 million of protection, how much am I going to get?

16          THE COURT:  Right.

17          MR. TRACEY:  And one thing I know for sure is that

18     if I go into a small market like this and sell $370 million

19     worth of preferred stock, the price is going to be

20     depressed.  So, Arthur Chu had to figure out how much that

21     depression would be when he went through this exercise.  And

22     the way he did that -- what he basically said is, I could

23     come up with a percentage number but I don't know quite

24     would that would be.  So he looked at the prices over the

25     course of Lehman week and took the lowest closing price that

Page 113

1    he could find during the course of that week, on the theory

2    that if -- that the market would be lower than it was if

3    $371 million went out into the market.

4              THE COURT:  Okay.  And that assumption or theory

5    is challenged by Lehman.

6              MR. TRACEY:  Yes.

7              THE COURT:  That the transacting in that much

8    stuff would not have affected the market or that transaction

9    would have been -- there would've been a countervailing

10   action-reaction thing that would've offset --

11             MR. TRACEY:  They do show that.

12             THE COURT:  Yeah, okay.

13             MR. TRACEY:  So you'll have to make that decision.

14   I think -- well, I won't say anything.

15             THE COURT:  Okay.  No, you think that's wrong.

16             MR. TRACEY:  I think it's wrong, yeah.  I mean,

17   these are tiny markets.  The amount of preferred stock that

18   trades in a Rabobank during an entire week is less than QVT

19   had.  So they would've been selling into the market more

20   preferred stock than traded by everybody else in the market

21   in one week.  So, they're going to say it doesn't affect the

22   market but we'll have to decide.

23             THE COURT:  Okay.

24             MR. TRACEY:  Okay, so that's really PCDS.  I can

25   take you to CARB now.  I'll just flip through this.  I just

Page 114

1    want to -- you asked about Lehman's range.  QVT valued it at

2    134 million.  Peter Niculescu, who is the expert who went

3    into full bottoms-up evaluation, determined that the range

4    was between 101 and 144.

5           One of the things that -- I just want to highlight

6    this because it's going to be important going forward; we

7    don't have to go into great detail.  But one of the things

8    that he relied on was on October 1st and 2nd, Merrill Lynch

9    actually made an offer for PCDS.  They had PCDS and they

10   were willing to sell protection.

11          It was after QVT finished their evaluation and QVT

12   wasn't aware of it.  This was discovered later.  And so QVT

13   did not use that bur Mr. Niculescu did, and he based his

14   valuation of those PCDS that were offered by Merrill Lynch

15   on the Merrill Lynch price.  And there's a big dispute about

16   what the price was that Merrill Lynch was offering.  I won't

17   go into detail.  You'll hear a lot about it.  But that's how

18   Mr. Niculescu valued those six PCDS that Merrill Lynch

19   offered.  He couldn't use that for the other 13 and he

20   developed a method of estimating the hazard of deferral and

21   default that you'll hear a lot about.

22          Mr. O'Kane is the expert on the Lehman side and

23   you'll hear his analysis.  I think you'll see that Mr.

24   O'Kane did not analyze some very critical aspects of this.

25   He wasn't able to answer about the size of the market, the

Page 115

1    percentage of PCDS that QVT owned, the structure of the

2    market, who were the market makers.  That didn't figure into

3    his analysis at all, so Your Honor will have to assess the

4    significance of that.

5              Okay, so turning to PCDS -- or to CARB.  You've

6    read the brief so I'm not going to repeat it.  But the CARB

7    was protection on -- it was a package of eight CDSes on

8    separate subordinated tranches of auto-securitization.  It's

9    the most complicated thing I've ever seen.  Every time I try

10   to say it I trip over myself.

11             THE COURT:  You got it right.

12             MR. TRACEY:  But it's the very lowest tranches, so

13   it's the ones that either get the losses first or soon

14   after.  And this is what these people tried.

15             THE COURT:  You say non-pejoratively.

16             MR. TRACEY:  And so, this again was a situation

17   where if you look at what QVT was looking at on September

18   15th, there was not a single sale of protection back to July

19   at least.  So they had no prices on which to base their

20   decisions.

21             The one thing that they did know, and this is the

22   key market -- objective market indicator, on August 21st,

23   which was what -- less than a month before, Lehman had

24   offered protection in CARB for 23 percent of the notional

25   amount.  So that's an objective price indicator in the

Page 116

1    market by Lehman.  This is what they would've been willing

2    to sell it for.

3              So, the question is what change would there be

4    between August 21st and September 15th?  Just as a reference

5    point, during that entire period Lehman is marking it at 16

6    percent, which makes no sense.  I mean, on August 21st

7    they're going into the market and saying we're only willing

8    to sell you protection on CARB for 23 percent and they're

9    marking it in their books for 16 percent.  So they're just

10   not -- they're not relevant marks.

11             And so what we're looking at is a deterioration in

12   the market between that 23 percent and September 15th.

13   Unemployment, prepayment rates are plummeting, Ford Motor

14   credit and GMAC is deteriorating, you've got the crisis on

15   Wall Street.  So the question is -- it's obviously higher

16   than 23 percent, and the question is what is it?

17             So, what QVT -- QVT didn't have any clear

18   indicators of price, so what they did was they started with

19   the 16 percent notional amount that Lehman had and they

20   said, well, the reason we went into CARB in the first place

21   is because we had a position in GMAC that we wanted to

22   hedge.  So we bought the CARB because we believed that the

23   CARB would go up when GMAC went down.

24             So they looked at GMAC, and they took the change

25   in GMAC's CDS from September 12th to September 19th, which

Page 117

1    increased 15 percent; they added that to the 16 percent

2    mark, and then they said, okay, if this $80 million is a

3    very significant amount of CARB to protect what would be the

4    market impact of that.  And they added 15 percent of that.

5    Totally judgmental number.

6            THE COURT:  But the CARB is made up of eight

7    different --

8            MR. TRACEY:  CDSes?

9            THE COURT:  -- CDSes.  Right?  So, the one thing

10   that I wasn't clear on was did they do an analysis of

11   trading in each of those separate buckets of CDSes?

12           MR. TRACEY:  They did not.

13           THE COURT:  Because -- and you can tell me why I'm

14   not thinking about it the right way.  But with respect to

15   PCDS, right, the whole methodology hinged on essentially

16   finding substitutes in the valuation context where you had

17   no trading in PCDS.  So, okay, we can't get a quote on PCDS,

18   no buyers, no sellers, whatever; we're going to figure out

19   what it would take to actually acquire a short position.  So

20   you're peeling away the derivative and you're looking at the

21   underlying --

22           MR. TRACEY:  Obligation.

23           THE COURT:  -- obligation.  Thank you.  So, here

24   you say, okay, great.  So CARB isn't trading but, look,

25   we've got this handy-dandy list of these eight CDSes; let's

Page 118

1    go and figure out how those are trading and we'll build up

2    our valuation based on that.  So isn't there a disconnect

3    between we're going to do this kind of reverse synthetic

4    exercise on the one side but we're not -- with this one

5    product, but we're not going to do it on the other product

6    as a response to no liquidity, no market quotation, nothing?

7            MR. TRACEY:  Well, it's a fair question, but the

8    problem with doing that is that if you looked at those eight

9    underlying CDSes you wouldn't find any transactions in those

10   either.

11           THE COURT:  Okay.

12           MR. TRACEY:  You could go back months and not find

13   transactions.

14           THE COURT:  Okay.

15           MR. TRACEY:  So that's why they had to do it this

16   way.  Again, Dr. Niculescu looks at it and actually there

17   was a successful market quotation by another counterparty.

18   This is what we talked about this morning -- which Lehman

19   produced and we're all going to talk about it.  And the

20   reason that was a successful market quotation is they did

21   what you suggested.  It wasn't a valuation of each CDS.

22   They basically went out into the market and said give us a

23   price on these eight individually, but as a package.  Right?

24   You can't bid on just one or two or seven; you have to bid

25   on all of them.  And three market makers did come back and

Page 119

1     bid on that.

2              THE COURT:  Got it, okay.

3              MR. TRACEY:  So, we're using --

4              THE COURT:  Yeah, I got it.

5              MR. TRACEY:  Or Mr. Niculescu was using those

6     prices.  Mr. Bruce comes out at a very different number.

7     He's the expert for Lehman.  He comes out at 19 percent of

8     notional.  And that, in our view, just isn't consistent with

9     Lehman having charged or being willing to charge 23 percent,

10    and then after all the bad stuff happens, it's less value.

11    It just doesn't compute for us.

12             So, that's CARB.  I think we'd like to turn to the

13    corporate and sovereign.  And I'll turn it over to Mr.

14    Reagan.

15             MR. REGAN:  Good afternoon, Your Honor.  Bill

16    Regan with Hogan Lovells.  So, Mr. Tracey told you about

17    PCDS and CARB, which are two of the more complex and

18    illiquid CDS debt, existed in the market back in 2008.  This

19    next distinct bucket that Your Honor asked us to deal with

20    this morning are what you call the more plain vanilla

21    corporate and sovereign CDS.

22             So, in QVT's portfolio at the time of Lehman's

23    bankruptcy they had 596 CDS that fit into that bucket.  It's

24    a larger number of transactions but in terms of the dispute

25    between the parties, the parties are roughly 24 million

Page 120

1    apart on these 596 transactions.

2            Within the portfolio there were 462 corporate

3    reference entity CDS on things such as American Airlines, or

4    Goldman Sachs, or other single individual corporate

5    entities.  There were 44 sovereign CDS on bonds issued by

6    Argentina and Ecuador and the like.  And there were 90 index

7    CDS on either corporate investment grade CDS or in this case

8    you see here, the emerging market index that QVT had

9    corporate CDS on as well.

10           Within that universe of 596 CDS the parties have a

11   dispute about 370 of those transactions that we call the

12   Mark-I-T transactions.  Although these transactions in some

13   sense can be considered more plain vanilla than CARB and

14   PCDS, so can most things in that regard, but I think it's

15   important to take a step back and look at how pricing works

16   in the CDS market.  Because, as you'll see, Lehman's experts

17   in this area tend to treat these CDSes as something like

18   widgets or even just common equities, where you can

19   determine the value if all you know is the name of the

20   reference entity or the name of a ticker in the case of an

21   equity.

22           So, this chart here shows the different types of

23   CDS that you could have with respect to American Airlines

24   alone.  If you want to know how to value, or price, or trade

25   a CDS it's important to look at all six of the columns or

Page 121

1    all six of the factors that drive pricing that are listed in

2    this chart here.

3              So, the first one obviously is the reference

4    entity.  You need to know what the reference entity is and

5    pricing varies significantly.  If we're talking about

6    September 15, 2008, the CDS on Morgan Stanley, which was on

7    the verge of bankruptcy, it's going to be priced very

8    differently than a CDS on American Airlines.  So the

9    reference entity is obviously very important.

10             The maturity date is obviously critical.  If you

11   are offering CDS protection for a one-year term, you might

12   charge a very different price than you would if you were

13   going to be on the hook for ten years.  And CDS come in

14   every variety in between.  And it's important to note, and

15   this'll come up later, that back in 2008, there was a market

16   convention or a market standard that the typical CDS was the

17   five-year variety.  And that will come up over and over

18   again.  You'll sometimes hear that referred to either by the

19   witnesses or in the document as an on-the-run CDS, the five-

20   year variety.

21             The notional size is obviously key in terms of the

22   valuation, the pricing of CDS.  If you are going to insure

23   somebody for a million dollars in exposure, that's one

24   thing.  If you're going to provide $20 million in CDS

25   protection, that's obviously something very different from a

Page 122

1    pricing perspective.  So you need to know the reference

2    entity, the maturity date, and the size of a trade before

3    you can make any reasoned judgment as to how to quote a CDS

4    or how to purchase a CDS for that matter.

5            THE COURT:  Are you saying that -- or implying

6    that the expert, Lehman's expert did not take into account

7    any of these other than -- any of these columns other than

8    what the reference entity was?

9            MR. REGAN:  They looked at the reference entity

10   and then only the five-year single names.  So they excluded

11   indices, they excluded any CDS that was a one-year, a three-

12   year, a seven-year, or a nine-year, which were, as we'll see

13   shortly, a significant part of QVT's portfolio.

14           THE COURT:  Okay.

15           MR. REGAN:  In terms of the notional size, too,

16   it's also important to note that there were conventions in

17   that area as well.  A typical CDS back in 2008 for an

18   investment grade CDS was typically a $5 million transaction;

19   for a sovereign CDS the standard size was typically 10

20   million; and for an index, the standard was roughly 25

21   million.  And you can have any variation in between but

22   those were generally the conventions that market

23   participants thought about back at that point in time.

24           The other factors that you see listed here,

25   restructuring clause, currency, and seniority certainly

Page 123

1    affect pricing in the CDS market.  A restructuring can

2    trigger a CDS contract, and within the marketplace there are

3    four different clauses that parties use, some of which make

4    it easier for a restructuring to trigger a CDS contract and

5    some of which make it more difficult for a restructuring to

6    trigger the contract.

7           And so depending on how easy that is, that affects

8    the pricing as well.  Certainly the currency that you use

9    impacts pricing, and whether you're providing CDS coverage

10   on a subordinate bond, more at risk would affect the

11   pricing, as would whether you have coverage on a more senior

12   bond, which would make it safer.

13          The other thing to keep in mind is that all of

14   these transactions happened in an over the counter market.

15   This is not the New York Stock Exchange, so there is no

16   automated matching of buyers and sellers.  If QVT's out in

17   the market, they can't go to the exchange and get hooked up

18   with a corresponding counterparty; they have to do that

19   legwork on their own.

20          There is no ticker or tape.  So folks like QVT

21   can't look at their Wall Street Journal screen or their

22   Bloomberg screen and see that other participants have traded

23   these CDS at particular prices.  It's essentially a dark

24   market.

25          The volume is much smaller than the New York Stock

                                                              Page 124

1    Exchange.  You'll see evidence in this case that the -- in

2    the New York Stock Exchange there were as many as 15 million

3    trades in a given day, whereas in the CDS market in 2008

4    there were on average 3,000.  So in terms of the overall

5    transaction activity it's a much smaller market.

6            And, of course, there's no open or close as there

7    is in the exchange market.  Sometimes CDS transactions

8    happen at 4 o'clock, 5 o'clock, 6 o'clock -- it depends on

9    when the traders go home.  But there's no formal market

10   close.

11           So, in terms of QVT's process, Mr. Tracey earlier

12   discussed sort of a hierarchy of price sources that QVT

13   looked at.  With respect to these Mark-I-T transactions,

14   where are in that hierarchy is that these are transactions

15   all of which the market quotation process failed.  QVT did

16   not receive free quotations for any of these.  They did not

17   execute replacement trades for any of these, so they were

18   essentially doing a valuation exercise in late September on

19   the two weekends that Mr. Tracey mentioned.

20           So what they did was follow a two-step process.

21   First, they looked at the Mark-I-T closing bid for each

22   stage during Lehman week.  And knowing their positions and

23   the drivers of pricing that we talked about earlier, they

24   made a judgment as to which price best reflected their

25   replacement cost had they been able to execute the trade.

Page 125

1          THE COURT:  So, let's pause on that one, though.

2     So, market quotation failed.  And they're not calculating at

3     the end of the day on the 16th.  You have said undisputed

4     that it was on the weekends, right?

5          MR. REGAN:  Yes.

6          THE COURT:  So, you're already -- so you're out of

7     Lehman week, you're on to that first weekend.  But you've

8     terminated -- your ETD is September 15th.  You went out into

9     the market on September 15th, you did or did not get answers

10    on September 16th.  Definitely by September 17th, say,

11    anyone who was going to quote was -- will have quoted.

12          So, why would you be looking at Mark-I-T data or

13    any other Markit data for dates subsequent to just, say, the

14    latest, the 17th?  Why should you be looking at data on the

15    19th when that was at the end of Lehman week, a very long

16    week -- lots of stuff had happened in the markets every

17    which way?

18          MR. REGAN:  So, they almost -- for the vast

19    majority of these transactions they used September 16th; for

20    another significant chunk they used September 17th.

21          THE COURT:  Right.

22          MR. REGAN:  I think it's probably true -- and

23    we'll have a slide on that in a minute where they used

24    September 19th.  And I think both of those prices were more

25    favorable to Lehman than they were to QVT.  If they'd picked

Page 126

1    a different date that week, QVT would've done better.

2              THE COURT: Okay.

3              MR. REGAN:  But we'll show you date by date which

4    dates they used for these transactions.

5              THE COURT:  So that was out of the goodness of

6    their hearts?

7              MR. REGAN:  No, they were trying to be reasonable.

8    They were trying to figure out their replacement costs, and

9    that was really what they were doing.  Which date best

10   reflected our most likely replacement costs given the chaos

11   in the market and what we know about our positions.

12             So after they picked that date, they knew that

13   Mark-I-T was a mid-price and they were trying to figure out

14   the replacement cost.  So we needed to go from mid to offer.

15   So they added a spread to that, and we'll show you that in

16   just a minute.

17             So this slide shows the breakdown and the 370

18   transactions at issue, and which date during Lehman week QVT

19   used.  For 260 of the transactions they used September 16th,

20   which was the very next trading day.  For 28 transactions

21   they actually used September 15th itself because they

22   thought -- they looked at the prices and they thought we

23   probably could have traded on that day.  And then for a

24   smattering of other transactions they used the 17th, 18th,

25   and 19th for roughly 75 or so.  And that's the date

Page 127

1    distribution, but you'll see there that 260 transactions

2    were the very next trading day.

3              In terms of the spread that they added to get from

4    the Mark-I-T mid to the offer price, they used a range of

5    spreads going from 3 percent to 15 percent with the vast

6    majority of those being valued at 10 percent, which QVT used

7    as something of a default assumption.  And traders varied

8    that up or down depending on whether they thought the

9    position was more liquid or less liquid.  You see they

10   varied that -- the used 3 percent for 48 trades, 5 percent

11   for 10 trades, and 10 percent for the bulk of 288 trades,

12   which was 77 percent of the universe of transactions.

13             So, Lehman objects to both of those steps -- both

14   the use of the Mark-I-T dates and the spread as well.  In

15   terms of the valuation date issue, Lehman makes essentially

16   the playing the market or moral hazard argument that Your

17   Honor mentioned earlier.  They call it cherry-picking, and

18   they introduced testimony of -- they will introduce the

19   testimony of Justin Garzia on that point.

20             Mr. Garzia was a CDO trader at Morgan Stanley

21   during September 2008.  And he will opine based solely on

22   the date distribution that we looked at, that QVT was

23   engaging in a cherry-picking exercise to inflate its claim.

24   He doesn't really tie a number to that particular line of

25   argument.  He makes the allegation of cherry-picking and

Page 128

1    throws around that word because there are different dates

2    involved.  But he doesn't tie in economics to that argument.

3            The argument that he does use for that is that, in

4    his view, Mark-I-T pricing from September 15th was no less

5    reliable than Mark-I-T pricing from any other date during

6    Lehman week.  And so, therefore, essentially, QVT was

7    required to use 9-15 for all the transactions.  And any time

8    they deviated from 9-15 they were inflating the claim.  So

9    that's how he calculates his $13.6 million inflation number

10   for the cherry-picking part.

11           Professor Engle is an NYU professor that Lehman

12   will introduce to talk about the spread issue.  Professor

13   Engle is a finance professor at NYU and he won the Nobel

14   Prize in 2003 in economics for something called ARCH.

15           THE COURT:  Yes.

16           MR. REGAN:  A-R-C-H.  I will not try to --

17           THE COURT:  You can't try to say what it is.

18           MR. REGAN:  Autoregressive Conditional

19   Heteroskedasticity.  If I got that right -- I'm not sure.

20   Don't make me do it again.  Let's go with ARCH on the

21   transcript.

22           THE COURT:  Do you want to just briefly explain

23   what it is for everybody?

24           MR. REGAN:  Yes, once I get back from MBA school

25   I'll construct -- try to explain that.  But, thankfully,

Page 129

1    that has nothing whatsoever to do with this case.  What

2    Professor Engle does is much more common regression

3    analysis.  And through his regression analysis, he reaches

4    two conclusions:  One that QVT's spreads were not consistent

5    with what the CDS market as a whole was seeing in 2008.  And

6    then, second, that QVT spreads were not consistent with what

7    the market was paying for the reference entities that QVT

8    had in its portfolio in 2008.

9            THE COURT:  And what's wrong with that?  What's

10   wrong with his conclusions?

11           MR. REGAN:  Oh, can we get to that in one second?

12           THE COURT:  Sure.

13           MR. REGAN:  Let's check on Mr. Garzia first

14   because I know Your Honor was concerned about the moral

15   hazard issue and the playing the market issue.  And I think

16   there's some very strong data that can put that in the

17   proper context.

18           The reason that QVT used September 16th for the

19   vast majority of these positions was that the market

20   quotation process on September 15th failed.  So there's some

21   strong pricing indication from the market that the market

22   was not interested in QVT's positions on the 15th.  And then

23   from a timing perspective, that process failed at the end of

24   the trading day.  So the earliest point in time when QVT

25   could begin to replace most of these positions was after

Page 130

1    that process had failed.

2            And so those two things together led most of the

3    QV traders and for most of --

4            THE COURT:  But the process didn't fail at the end

5    of the trading day.  Because according to Mr. Tracey, QVT

6    still was willing to transact or that the market understood

7    that it could respond and by implication transact on the

8    following day.  So the end of the trading day really didn't

9    have any impact on that, right?

10           MR. REGAN:  Not so much the end of the trading

11   day.  The end of that calendar day, some of the pricing that

12   Mr. Tracey referenced earlier today came in very late that

13   day.

14           THE COURT:  Sure.

15           MR. REGAN:  Some more trickled in on the morning

16   of the 16th but I think it was only a handful of responses.

17   I think it was pretty evident to QVT that the process had

18   failed by some point late on the 16th.

19           THE COURT:  On the 16th.

20           MR. REGAN:  On the 15th, sorry.  And so the

21   assumption was that the very next trading day would be the

22   earliest point in time when QVT could go out in the market

23   and actually do these trades.  So, for the vast majority

24   they used September 16th.

25           They deviated from that only when individual

Page 131

1    traders thought that the Mark-I-T price on some other day

2    better reflected when QVT could've actually effectuated a

3    replacement transaction due to liquidity concerns or

4    whatever the case may be.

5         I think it's important to note that -- and Mr.

6    Tracey alluded to this earlier -- Lehman doesn't object to

7    actual replacement trades that QVT entered on September

8    16th; it's only the use of hypothetical trade in the Mark-I-

9    T price on 9-16 that they object to it, and there seems to

10   be some inconsistency in that position.

11        Dr. Diplas, who is QVT's expert and was a CDS

12   trader at Deutsche Bank for many years, including having

13   responsibility for preparing Deutsche Bank's claim against

14   Lehman during the bankruptcy process will testify that in

15   his view it would have been highly unlikely that QVT

16   could've replaced these trades, all of them on the 15th.

17        So, in terms of the playing the market idea, Mr.

18   Garzia, all he does is look at the dates.  And he said, I

19   see different dates; therefore there's cherry-picking.  But

20   he doesn't do any further analysis.  He stops right there.

21        The data on this slide shows -- is data taken from

22   Mr. Garzia's own backup spreadsheets.  And what it shows is

23   the value he calculated for five of the CDS within 370 Mark-

24   I-T transactions.  And if you go through those dates you'll

25   see that in some instances QVT picked a date where the price

Page 132

1    is most favorable to QVT; on other instances QVT picked a

2    price where the date is more favorable to Lehman, and on

3    many they picked the date in the middle.

4            So, for example, you'll see in CIT Group, QVT used

5    September 16th, and that's the lowest value during Mark-I-T,

6    and that's the date QVT used in its claim.

7            For the bottom CDS, HCA Holdings, QVT also picked

8    September 16th.  That turned out to be the most pro QVT

9    value available during Lehman week.  And for the three

10   transactions in the middle, Alcoa, Genworth, and General

11   Motors, QVT picked a middle price, neither most favorable to

12   Lehman nor most favorable to QVT.  So you can go through

13   this analysis for all 370 --

14           THE COURT:  Just to stop.  Can you go back?

15           MR. REGAN:  Yeah, sure.

16           THE COURT:  So, just out of curiosity, and bearing

17   in mind the appropriate interpretation of loss and it has to

18   be reasonable, not best or not perfect, is there a thesis or

19   an understanding of why it would be that just across this

20   set -- what caused whoever did this valuation to pick the

21   17th as opposed to the 16th in terms of thought process or

22   analysis that was done at the time?

23           MR. REGAN:  It was trader by trader.  So QVT broke

24   the positions out to each individual trader who had made

25   that transaction.  And that trader looked at the position.

Page 133

1   And based on what they knew on the market, they looked at a

2   price on the 16th and said, we know there are many other

3   trades that day -- or in our view, we had such a big

4   position that we could not have transacted at that price.

5   The 17th is more realistic from a volume perspective, where

6   we could've gotten a trade out.  It was sort of case by case

7   and position by position where they deviated from the 16th,

8   which was more or less a default assumption.

9            THE COURT:  Go ahead.

10           MR. REGAN:  So if you repeat that analysis all 370

11  positions in the Mark-I-T transactions you see that in 38

12  percent of the cases QVT selected the date that was most

13  favorable to QVT, which is one issue.  And then for 62

14  percent of the transactions, QVT selected either a date most

15  favorable to Lehman or a date in the middle between the two

16  extremes.

17           So, either QVT wasn't cherry-picking to inflate

18  its claim or it wasn't doing it very well is the point of

19  the day.

20           THE COURT:  But then the adjustment from mid is --

21           MR. REGAN:  That comes next.

22           THE COURT:  -- is a separate component?

23           MR. REGAN:  Totally separate component.

24           THE COURT:  Okay.  So it doesn't -- there's no

25  necessary correlation on what the adjustment to mid was

Page 134

1    based on whether or not it happened -- you're adjusting a

2    price most favorable to Lehman or most favorable to QVT,

3    right?

4            MR. REGAN:  No.  Totally separate.

5            THE COURT:  Okay.

6            MR. REGAN:  So, the second opinion that Mr. Garzia

7    makes is that essentially QVT was required to use 915 Mark-

8    I-T data for all of the transactions because in his view the

9    pricing for that data -- for that date was no less reliable

10   than the price available for Mark-I-T for any other date

11   during Lehman week.

12           And then any time QVT used the September 16th or

13   September 17th, he calculates the difference between the 9-

14   15 price and the 9-16 price and says that's an inflation.

15   So, but he does this just based on his sense of the market.

16   And his recollections from 2008 were that 9-15 Mark-I-T data

17   was just as reliable as Mark-I-T data from any other point

18   in that week.

19           He didn't test that proposition in any way, he

20   didn't support it with any data, he didn't break it down

21   position by position; he didn't look at whether Mark-I-T for

22   Morgan Stanley and Goldman Sachs, which were teetering that

23   day, were just as reliable as Mark-I-T for Burlington

24   Northern Railroad or American Airlines, or some of the

25   referenced entities that were obviously less affected by the

Page 135

1    financial crisis.  He didn't go to that level of detail.  It

2    was just his hunch and his recollection.

3           When Mark-I-T collects contributions from dealers

4    and then they publish a composite price both on the incoming

5    side and the outgoing side they do some data analytics to

6    identify the data as potentially unreliable.  For incoming

7    contributions from the dealers they might designate a mark

8    as an outlier because it's outside what other dealers are

9    doing, or it's stale -- it looks like it hasn't changed in

10   some time, or it's a carryover price from the day before.

11   And so that kind of data is available in the Mark-I-T data

12   that Mr. Garzia had available to him when he read his

13   report.  He didn't really look at that.

14          On the outgoing side Mark-I-T when they published

15   a composite number, Mark-I-T will identify the number of

16   contributors to that mark.  And so a mark that has 30

17   contributors might be considered more reliable than a mark

18   that has two contributors to it.  And Mr. Garzia didn't look

19   at that either.

20          In some ways his opinion is just contrary to

21   common sense.  9-15 was one of the craziest days in market -

22   - with an E -- market history.  Lehman had failed, Morgan

23   Stanley was on the brink, Goldman was on the brink, many

24   dealers were either worrying about their own solvency or

25   their own Lehman exposure and getting around to putting a

Page 136

1    nonactionable price over to market at the end of the day was

2    not high on the to-do list in many cases.

3              THE COURT:  Ah-ha.  But you see, Lehman will say

4    that that's precisely why QVT put out their market quotation

5    process when they did, because they knew that, in effect,

6    they were asking for nonactionable trades.

7              MR. REGAN:  I think if you look closely at the

8    market quotation that Mr. Tracey put on the screen earlier,

9    there are actually two pieces to it.  QVT at the top asked

10   for actionable prices.  Give us bids for these positions

11   that we can transact on.

12             THE COURT:  Right.  Which is what market quotation

13   requires under the ISDA, right?

14             MR. REGAN:  Right.  But they also knew -- and they

15   wanted the market quotation process to succeed.  They knew

16   that people were busy that day; they knew it was a crazy day

17   in the market.  So, at the bottom of that market quotation

18   request there's a proposal that says if you cannot provide

19   or won't provide actual actionable bids, please provide a

20   curb marked as follows.  So, to make the process work they

21   offered both options to the dealers.

22             So, now, moving over to the spread issue, the

23   traders in this space tend to use spread in 19 different

24   ways and it's tough to follow.  So, for this particular

25   spread, I just wanted to go through some of the terminology

Page 137

1    here.  The screen shows basic bid and offer scenario.  The

2    dealer offers 90, will buy its protection at 90 and the

3    dealer will sell protection at 110.  That makes a bid offer

4    spread of 20 and the midpoint 100.  The mid is what Mark-I-T

5    puts out at the end of the day, that midpoint.

6         The mid offer spread, the distance from the mid to

7    the offer is 10 and also it's 10 going the other way -- the

8    bid mid-spread is 10.  What we're talking about here is

9    since QVT was primarily a protection buyer -- we're talking

10   about the mid offer spread.

11        So, even though that's what we're talking about,

12   you'll see the expert talk about bid mid spread, but we're

13   talking about the distance from the mid to the offer.  And

14   that's typically presented as a percentage.

15        THE COURT:  So you're saying that when they say

16   bid mid, they mean mid offer?

17        MR. REGAN:  Mid offer, yeah.  Everyone means mid

18   offer but they use bid mid, mid bid, all different things.

19   But we're talking about the mid offer.  Expressed as a

20   percentage over the mid, so in this case it would be 10

21   percent.

22        As we noted, QVT added a range of spreads.  It

23   could've been 3 percent, 5 percent, 6 percent, 10 percent

24   for the significant majority of the positions, and 15

25   percent for a handful of more of the liquid positions.  QVT

Page 138

1    trader did that by looking at the same drivers of pricing

2    that we talked about.  What is the reference entity, what is

3    our notional size, what is our sense of the market's demand

4    for this product?

5              Professor Engle doesn't really challenge any of

6    that; he just does a fundamentally different approach.  He

7    offers his regression analysis, which I'm sure the Court is

8    familiar with.  It's a relatively common mathematical tool

9    used for lots of different purposes in litigation.  And it's

10   generally accepted by courts if done properly.  And we'll

11   explain why that wasn't the case here.

12             So, Professor Engle first purports to analyze the

13   entirety of the 2008 CDS market, and he looks at primarily

14   two things:  What dealers like Lehman were quoting to end

15   users like QVT for CVS transactions.  He calls that his

16   quoted bid mid spread.  And then he looks at what end users

17   were actually paying to dealers and he calls that his

18   effective mid bid spread.

19             THE COURT:  Right.

20             MR. REGAN:  And he largely proceeds from the

21   assumption that end users can negotiate the spread down.

22   The spread is -- the quoted bid mid spread is something like

23   a sticker price, and if you haggle hard enough you can pay a

24   lower price at the end of the day.

25             THE COURT:  Hold on one second.  I just want to

Page 139

1    get his report.  Okay.

2              MR. REGAN:  He actually does four metrics.  He

3    does another one called inside market bid mid spread and

4    realized bid mid spread.  But those are more subsidiary

5    analyses that don't play as prominently in Lehman's pretrial

6    brief.

7              On the two analyses that do -- the two that seem

8    to be the most important, he concludes that the quoted bid

9    mid spread for both the market-wide analysis and for QVT's

10   portfolio was less than 4 percent.  And in terms of the

11   effective bid mid spread where folks were actually paying at

12   the end of the day, that number is less than 2 percent in

13   Professor Engle's view.  And so from that, Lehman will argue

14   that QVT's range of spreads going from 3-15 percent was

15   excessive and too high in roughly the amount of 10 or $11

16   million.

17             As I mentioned before, courts have frequently

18   accepted regression analyses to support expert opinions, but

19   courts also recognize that regression can be an abused

20   mathematical tool if not done properly.

21             MR. REGAN:  ...have frequently accepted

22   progression  analyses to support expert opinions, but courts

23   also recognize that regression can be an abused mathematical

24   tool if not done properly.  And particularly when one of two

25   things happen; when the analyst in advance of running the

Page 140

1    regression rigs the outcome by selectively choosing the data

2    that goes into the model.  You can get a biases outcome

3    that's so biased that it has no evidentiary value to either

4    scooted  entirely or reported no weight.

5            And the second reason is when the analyst looks at

6    a problem and ignores known explanatory variables.  So, for

7    example, if you were talking about a discrimination case and

8    you wanted to know were all the employees of a corporation

9    who were -- had the education and the same ability were

10   being compensated similarly, but you left out their

11   experience.  That would be a major problem because

12   experience affects compensation, so you would exclude a

13   regression analysis that leaves out known explanatory

14   variables.  Professor Engle's  analysis, as we see, will

15   suffer from both of things.  He rigs the outcome before he

16   runs the analysis and he ignores known explanatory variables

17   when trying to figure out what end-users pay for CDS

18   transactions in 2008.

19           I struggled with this when I first read Professor

20   Engle's report.  Why is he doing a regression analysis in

21   the first place?  Why not just look at what the quote was

22   from the dealer to the end-user?

23           THE COURT:  That's my question and I --

24           MR. REGAN:  It's a good question.

25           THE COURT:  Well, you know, when I looked at the -

Page 141

1    - his -- the figures, it looks more like that then an

2    actually regression analysis, but --

3            MR. REGAN:  There are different ways to look at

4    it.

5            THE COURT:  Okay.

6            MR. REGAN:  The problem is that the DTCC data set

7    that Professor Engle starts with -- DTCC is the Depository

8    Trust and Clearing Corporation.

9            THE COURT:  Yeah.

10           MR. REGAN:  They have kept a record of what may be

11   all CDS transactions from 2008.  People reported their

12   trades to DTCC --

13           THE COURT:  Right.

14           MR. REGAN:  That data set is not public.  No one

15   can access that.  The only reason we have it in this case is

16   through the power of a subpoena that Lehman issued.  So QVT

17   could not have looked at that data in 2008 when calculating

18   their claim.  But Professor Engle looks at that data and he

19   wants to find out what was the quoted price for those trades

20   and what was the executed price and he wants to compare

21   them.  The problem is that DTCC data doesn't record the

22   quoted price.  All you have is the actual executed price.

23   So he needs to go to some other source to find a quote and

24   then try to find a way to tie it to the DTCC data.

25           The only way to really do the analysis that he

Page 142

1    purports to do is to take discovery from all 866,000 trades

2    that happened across the market and find out; did you get a

3    quote from Morgan Stanley?  What was that quote?  What was

4    your final end price?  Was there a difference?  But he can't

5    do that.  That's 866,000 trades, so he tries to substitute

6    in the regression analysis.

7              THE COURT:  I see.  Okay.

8              MR. REGAN:  And the way he does that is trying to

9    tie these three separate data sources together.  So he

10   starts out with DTCC, which is non-public actual executed

11   trades from 2008.  There are limitations and imperfections

12   with that data set.  Reporting to DTCC was not mandatory.

13   Nobody in the 2008 CDS market had to send their trades to

14   DTCC.  It was a widespread practice.  Many market

15   participants did, but no everyone.  So we don't know how

16   complete the DTCC data set is.  CMA is a completely separate

17   corporation.  They have a software product that market

18   participants use and used back in 2008 to search their

19   Bloomberg messages and their emails for broker runs .  And

20   those brokers runs don't specify typically notional  size

21   and maturity that what brokers send out and say, "We see

22   this reference entity at this -- in this offer call if you

23   want to do a trade."  but you can find some quote

24   information in CMA, but it's not tied in any way to the DTCC

25   data.  It's a completely separate business and a completely

Page 143

1    separate company.

2            And in the last piece of data that uses is the

3    closing mids  from Mark IT and this is where you get deep

4    into the regression analysis.  He needs to use that price to

5    come up with first day profit and loss.  Essentially replace

6    the fact that he doesn't know what the actual quote was, so

7    he needs to sort of estimate it through the regression

8    analysis.

9            But in terms of rigging the analysis, Professor

10   Engle did not look at the 866,000 trades that happened

11   through 2008.  He applied a series of filters that knocked

12   that data set down dramatically, and in a biased way.  The

13   first thing Professor Engle did was exclude all trades

14   except for corporate single names.  So he didn't look at

15   indices in any way, shape or form.  The next thing he did

16   and this is particularly material, he excluded all trades

17   that were not at the five-year maturity and the five-year

18   maturity is that standard that we talked about earlier that

19   is more frequently traded than any other maturity.  So by

20   definition, took out the less liquid transactions.  He also

21   excluded all trades that were not quoted in the run/spread

22   convention that Mr. Tracy talked about earlier and that

23   means the upfront point spreads and those were the riskier

24   entities where the reference entity was under some kind of

25   stress, which by definition will tend to have wider spreads.

Page 144

1          And then because he was focused primarily on a

2     consistency issue, rather than a representative of the

3     market issue, Professor Engle excluded from his data, any

4     trade where he could not find a corresponding quote on that

5     reference entity on CMA and then, also a Mark IT closing

6     mid.  So unless he had a three overlap in his data set, he

7     just pretended that, that trade didn't happen.  And then

8     lastly, when he was running his data through Lehman

9     Bloomberg's calculator, if that calculator needed more

10    information or didn't -- their information wasn't reported

11    to DTCC in a way that the calculator could pump out a value,

12    he excluded that data as well.

13          So as you see in the diagram here, what he doesn't

14    do is look at the 2008 CDS market, he looks at this very

15    narrow overlap where CDS, DTCC, CMA and Mark IT have a data

16    point in common.  And so the effect that, that really is, is

17    rigging out.  He did not in any way look at the 2008 CDS

18    market.  In fact, in those filters that we just described,

19    he took out 87 percent of the trades that happened in 2008.

20    He started with 866,000 trades and ended up with 114,000

21    trades.  Those trades that he excluded really happened.

22    They're real trades that market participants did in 2008

23    that had a quote that had final purchase prices.  They were

24    real, so you can't opine on the market and exclude 87

25    percent of the market.  It just doesn't make any sense.  In

Page 145

1    terms of the quotes, you see the same effect of the filters.

2    He had 49 million quotes in the CMA data which are the

3    filters he excluded 30 million of those quotes getting down

4    to 15 million.

5              We talked about the result that, that what's left

6    is heavily biased to show -- is the heavily traded five

7    years to show small spreads.  So, not only did he not look

8    at the market, he also rigged the outcome by not looking at

9    QVT's actual portfolio.  And his report gets very confusing

10   and it took me 15 or 20 reads to figure out what he did for

11   the QVT portfolio, but the first thing he does is the market

12   wide analysis and after he completed the market wide

13   analysis, Lehman gave him a list of the reference entities

14   that were in QVT's portfolio and he scanned his filter data

15   set for data points on just those reference entities that

16   were in QVT's portfolio and he scanned his filter data set

17   for data points on just those entities and then recalculated

18   his numbers.  It came up something similar, 4 percent for

19   quoted and 2 percent for effective, but what he didn't do is

20   look at the CDS drivers pricing that we started with.  He

21   didn't look at QVT's portfolio.  He didn't look at the

22   notional size of the positions.  He didn't look at the

23   maturity of the positions.  He didn't look at the

24   restructuring clauses of the positions.  He didn't do any

25   analysis of QVT's (indiscernible ).  He just looked at his

Page 146

1    data set for points that happened to be there.  So he just

2    can't say that he looked at QVT's portfolio and I think the

3    best way to illustrate that is to look at applying his

4    filters to QVT's portfolio.

5            So we started out with 596 corporate and sovereign

6    CDS in QVT's portfolio and the first thing Professor Engle

7    does is exclude indices.  Indices were gone.  There were 90

8    in QVT's portfolio and that gets you down to 85 percent.

9    Then you exclude any transactions where you can't find a

10   three-way overlap in the data sets.  QVT has 120 positions

11   where you couldn't find a corresponding quote in CMA.  That

12   gets you down to 386 positions or 65 percent of the

13   portfolio.  And QVT's portfolio was primarily non-five-year

14   and Professor Engle exclude non-five-year, so if you apply

15   all those filters to QVT's portfolio, you get down to 36

16   positions.  Professor Engle filtered out 94 percent of QVT's

17   portfolio.

18           So the threshold question that we started with,

19   why is he doing this regression analysis; why not just look

20   at what was quoted and what was paid is interesting.  I

21   think the answer is probably because the data isn't helpful.

22   If your assignment was measure what was quoted for its

23   positions in 2000 (during Lehman week)  and what QVT would

24   have paid to replace those positions during Lehman week, we

25   have some pretty good data on those points.  The first is

Page 147

1    the DTCC data set, which is -- are actual executed trades,

2    both all of September 2008 -- all 2008; all of September in

3    a particular Lehman.

4          So this chart shows sampling of positions that

5    were in QVT's portfolio.  The first three columns show the

6    reference of any that QVT had; the specific maturity bucket

7    for that position; and the notional size of QVT's position.

8    So these are positions that QVT was trying to value and

9    figure out how to determine the replacement costs.  The next

10   five columns show the total amount traded for those

11   positions throughout Lehman week, so, for example, if you

12   look at Radian Group, you'll see that QVT had a four-year

13   mature -- four-year CDS for Radian and they had $27 million

14   in notional value for Radian.  On September 15th, the day of

15   Lehman, the entire market traded only $11 million in that

16   position, so how could QVT find a replacement seller for $27

17   million?  The entire market, including every other hedge

18   fund or end-user that lost their Lehman exposure -- Lehman

19   position that day were out there trying to find positions.

20         Professor Engle didn't look at any of this data.

21   He didn't look at the positions, he didn't look at the

22   value, he didn't look at the relevant data.  Some of the

23   extreme examples and Your Honor is a fan of extreme

24   examples, the gin  works seven-year.  I think is a good one.

25   QVT has seven years -- a seven-year maturity from that CD.

Page 148

1    They had $9 million in total notional.  No one in the market

2    traded that security at any point in time during Lehman

3    week.  So, in some sense, by choosing a price from Lehman

4    week, QVT was being generous to Lehman because no one traded

5    at that point in time, so they could have come up with

6    another methodology, but they used the process that we've

7    talked about.

8           A few other interesting points in the data to see

9    the Goldman Sachs position -- the two-year Goldman Sachs

10   position.  They had $20 million that day.  September 15th,

11   nobody traded Goldman Sachs two-year, obviously, because

12   Goldman Sachs was on the brink that day.  People were

13   worried about Goldman going under, so providing CDS

14   protection on Goldman Sachs that day wasn't a particularly

15   appetizing investment.

16          The other data point that Professor Engle ignores

17   that's quite compelling are the actual quote that QVT

18   receives.  So although the market quotation process failed,

19   that does provide some contemporary evidence of what the

20   spreads were; what QVT was really being quoted for its

21   positions at the relevant point in time.  Professor Engle

22   did no analysis of those quotes.  I don't even think he was

23   aware they existed, so we had our experts look at those

24   quotes, essentially do what Professor Engle did, compare

25   them to the Mark IT mid and all of those quotes show that

Page 149

1    QVT was sharing spreads of 20 to 22 percent that day.

2                 THE COURT:  Just to be really annoying or to show

3    you that I'm actually paying attention --

4                 MR. REGAN:  No doubt.

5                 THE COURT:  The slide on the screen is numbered

6    123 and the slide that I'm looking at is number 120, so

7    there appears to be a discrepancy --

8                 MR. REGAN:  The hard copy slide is 120?

9                 THE COURT:  Yes.  So there appears to be a

10   discrepancy and we can figure it out --

11                MR. REGAN:  Does your screen look like that?

12                THE COURT:  Yes.  No.  No.  So that's 119.

13                CLERK:  Right.

14                THE COURT:  This is 119 in my book.  This little

15   number down here says 119 and the one on the screen says

16   123.

17                MR. REGAN:  Where did I lose you?  Did you have

18   that one?

19                THE COURT:  I -- you know, I'm not going to answer

20   that question.  You're doing great.

21                MR. REGAN:  Oh, that's brutal.

22                THE COURT:  All right.  You're doing great, but

23   just that somebody should reconcile just so the record is

24   clear which deck we want in the record.  Okay?

25                MR. REGAN:  Let's use the monitor then, if that's

Page 150

1    the one that's working.

2            THE COURT:  The monitor, okay.

3            MR. REGAN:  So this data here shows what the

4    spreads were based on the market quotation responses that

5    QVT got on September 15th and into the next day on the 16th.

6    If you compare those market quotation responses to the Mark

7    IT mid for those days, these are the spreads that you see.

8    So on Lehman day and the next day, QVT was seeing spread in

9    the market in excess of 20 percent, which strongly suggests

10   that their 3 to 15 percent range was reasonable.

11           The other reason that courts exclude or put no

12   weight on regression analysis is when the analysts ignores

13   obviously known explanatory variables that help inform the

14   problem.  So all Professor Engle looked at was the quoted

15   price and the ultimate paid price.  He didn't look at any

16   specifics among the referenced entities.  He didn't analyze

17   whether pricing might be different for Morgan Stanley versus

18   Burlington Northern.  He didn't look at whether pricing

19   might vary among different counterparties.  The C -- CDS

20   market for people like Black Rock or Fidelity, very

21   different from the CDS market for hedgers like IBM or Exxon,

22   and that in turn is very different from the CDS market for

23   hedge funds like QVT.  Professor Engle made no effort to

24   account for the different prices paid by different kinds of

25   market participants.  He didn't look at the notional size of

Page 151

1    the trades in any way and he didn't look at anything other

2    than the five-year standard contract.

3            Let's take -- Dennis is going to talk a little bit

4    more about some of Lehman's objections that didn't, unless

5    Your Honor has any other questions on the plain vanilla

6    stuff.

7            THE COURT:  Thank you very much.

8            MR. TRACEY:  I have good news.

9            THE COURT:  You settled?

10           (Laughter)

11           MR. TRACEY:  No, no, no, no, no.

12           THE COURT:  It was worth a try.

13           MR. TRACEY:  We've covered the objections in the

14   course of our conversation --

15           THE COURT:  Okay.

16           MR. TRACEY:  -- today.  Most of them.  There's

17   possible one that we haven't covered, but I think in the

18   interest of time, I'm going to pass the baton to Lisa

19   Combat.

20           THE COURT:  Okay, that seems like a good idea.

21           MR. TRACEY:  So, thank you.

22           THE COURT:  Okay, thank you very much.  All right,

23   why don't we take until 10 minutes after 3:00 and then we'll

24   go until 4:30.  The shipping will have been told to quietly

25   make their way in and we'll do a quick switch at 4:30 and I

Page 152

1    would ask you to stay.  We're going to have a switch of a

2    reporter at 4:30 as well and I'm willing to stay, you know,

3    until 5:30, 6:00 today in the hopes of getting openings

4    done.  All right?  Sound like a plan?

5                UNISON :  (Indiscernible)

6                THE COURT:  By the way, I neglected to say again,

7    I think I said it during pre-trial conferences that during

8    long trials like this, the no coffee and soft drinks rule is

9    waived.  You're allowed to bring in coffee and soft drinks.

10   I just ask that you clean up after yourselves at the end of

11   the day.  All right?

12               Yes, there's a question from the gallery.  Sir?

13               MAN:  I'm just making sure our gear is going to be

14   okay here in the courtroom.

15               THE COURT:  Yes, so just -- you don't have to move

16   anything.  I'm just going to ask the people at the counsel

17   table to tidy a little bit, but obviously, if there's

18   anything sensitive that you don't want somebody to

19   inadvertently see, just turn it over or whatnot, but we've

20   told the folks who are coming in at 4:30 to sit quietly in

21   the back.  All right.

22               MAN:  That's about it, Your Honor.

23               (Recess taken at 3:02 p.m.; resume at 3:17

24   p.m.)

25               CLERK:  Please have a seat.

Page 153

1          THE COURT:  Mr. Tambe, how are you?

2          MR. TAMBE:  I'm fine, thank you, Your Honor.  Got

3   a little bit of a frog in my throat, so (indiscernible ).

4          THE COURT:  You need a lozenge?

5          MR. TAMBE:  No, I have one.

6          THE COURT:  Oh, okay.  All right.

7          MR. TAMBE:  (Indiscernible ).

8          THE COURT:  Okay.

9          WOMAN:  Every trial, there's lozenges there.

10          MR. TAMBE:  Every trial, (indiscernible ).

11          THE COURT:  It's a trick they employ.  It's like a

12   sympathy thing, you know.

13          CLERK:  One for the court reporter and what we're

14   taking (indiscernible ).

15          THE COURT:  Thank you.  For the benefit of the QVT

16   people, I know I've said this before, but one of my coping

17   mechanisms is just to lighten up a little, but please this

18   is entirely serious, apropos what Mr. Tracey said.  So I

19   just don't want you to leave and say, you know, she's making

20   jokes about this.  I'm not.  It's just a coping mechanism,

21   otherwise, I would be able to cope with this trial.  Okay,

22   ready when you are.

23          MR. TAMBE:  So what's at issue in this case?  The

24   way QVT has described it, the only issue in the case is

25   ether QVT valued the QVT transactions reasonably and in good

Page 154

1   faith, which prompts us to ask many questions, right.  Was

2   it reasonable for QVT to ignore its own valuations from

3   9/15?  They had been valuing these transactions from an

4   extended period of time.  They valued them day-to-day for

5   collateral purposes and they valued them at month end with

6   their auditors for (indiscernible ).  So there was an

7   understanding of what the trades were.  There was an

8   understanding of the liquidity; a lack of liquidity of these

9   trades, including, I think you saw some slides that showed

10  you that in some of these transactions they were well aware

11  that there had been no significant liquidity in the market,

12  2007, 2008.

13          So the lack of liquidity was not a sudden new

14  occurrence, so was it reasonable given all of those facts

15  and what they knew about these trades to ignore their own

16  valuations for 9/15?  Was it reasonable to ignore available

17  market data from 9/15 and we'll get into this in more

18  detail, Your Honor, but there was an extended discussion

19  about the Mark IT transactions --

20          THE COURT:  Right.

21          MR. TAMBE:  -- and every one of the traders

22  justified, yes, Mark IT data was available on 9/15, but it

23  wasn't used.  They decided to use 9/16, 9/17 or some other

24  date, right.  Was that a reasonable departure?  Does the

25  contract permit such a departure and what's the effect of

1    such a departure?  Which really prompts the question,

2    hundreds of transactions were valued after the early

3    termination.  Was it reasonable for them not to solicit

4    quotations on all transactions?  What you heard today and I

5    think what you've seen in the brief, it was a mistake.

6    Perhaps, but it goes to a broader point.  It goes to the

7    level of care in analysis that was put into the market

8    quotation to begin with.  This is not an unsophisticated

9    counterparty.  As you'll see and I'll go through some slides

10   here.  This is a counterparty that had a very good handle on

11   what its positions were.  Even before Lehman filed for

12   bankruptcy they had a running internal analysis of, "Hey,

13   what's our exposure to Lehman?  If Lehman were to fall over,

14   are we exposed?"  They knew what their transactions were and

15   yet, for whatever reason -- there's no explanation given,

16   but 44 trades are just missed, including some very liquid

17   names and we'll talk about those 44 trades.

18          THE COURT:  So are you suggesting that it wasn't

19   just an accident, just an oversight?

20          MR. TAMBE:  I think I'm suggesting it is part of a

21   lack of due care in running the market quotation process.

22   The contract says you're supposed to run the process in good

23   faith and you would expect that a party that is obligated to

24   run a market quotation process and has that flexibility to

25   pick the as of time in good faith, would give some thought

Page 156

1    on analysis to, "Are we in a position to run this process?

2    Are we running this process adequately?  Do we have the

3    trades?"  It is part of that overall story.  All right, you

4    can't just look at the 44 and say, "Well, we just happened

5    to miss the 44."  And there's many other reasons why the

6    stories we're now hearing about the 44, that it was just a

7    mistake, don't seem to add up.

8               THE COURT:  So what's Lehman's position and this

9    is maybe small compared to the rest of the exposure, but

10   Lehman's view of those 44 is that, therefore, they -- QVT

11   should not get to revert to loss --

12              MR. TAMBE:  That's right.

13              THE COURT:  -- because there was no market

14   quotation failure, as that term is used in the ISDA , so,

15   therefore, the measure of damages with respect to those 44

16   non-existent market quotations is to reconstruct what the

17   market process would have yielded had they run it, or that

18   their claim is disallowed.

19              MR. TAMBE:  But there is a value that is in QVT's

20   books and records for those 44 transactions and that would

21   be a reasonable number for Your Honor to look at, as the

22   value at which they carried those positions.  I know there's

23   case law up there and we -- in the Oppenheim --

24              THE COURT:  Well, there's the Oppenheim case.

25              MR. TAMBE:  The Oppenheim case that says redo the

Page 157

1    market quotation.

2              THE COURT:  Right.

3              MR. TAMBE:  and it may be the case that once we're

4    done hearing from all the experts and all the witnesses,

5    when we're talking about the legal causes of action and the

6    legal remedies, we will be talking about what options the

7    Court might have to resolve that particular issue --

8              THE COURT:  Okay.

9              MR. TAMBE:  -- with respect to 44, or consider the

10   44 as part of their overall approach to the market quotation

11   process and reach some other conclusion as to whether not

12   they ran the process in good faith and reasonably.

13             THE COURT:  So one bad apple could spoil the whole

14   bunch?

15             MR. TAMBE:  Well, one bad apple with other indicia

16   of a lack of care and interest in good faith and

17   reasonableness in running the process.  Was it simply an

18   exercise in futility, which is send out a request for

19   quotations late in the day.  Give people an hour to respond,

20   40 minutes to respond and we'll get into the details of why

21   we believe and they believed at the time that, that was the

22   deadline.  They're arguing differently now.  It's all part

23   of is that a -- was that a reasonably run market quotation

24   process, right?  Was it reasonable to adopt untested

25   valuation methodologies?  This harkens back to the

Page 158

1    discussion we had at the beginning of the day, today, which

2    is, what was the analysis that was really done when QVT

3    decided, "Well, we're not going to use the metrics we've

4    used before.  Maybe those data sources are not available to

5    -- we're going to do something different."  What, if

6    anything, did they to do to satisfy themselves that, that

7    was a reasonable way as opposed to a maximizing way of doing

8    the calculation?  Was any such analysis done?  We submit no

9    such analysis was done.

10              That, what seemed to be the driver for that part

11   of the calculation and many other parts of the calculation

12   was to maximize, or to certainly inflict, if not to out

13   drive  maximize.  In the case of PCDS, it seems like it was

14   to maximize it.  It was to pick the lowest point of the week

15   looking back weeks later.  But that doing a backward

16   exercise and say, "We're going to pick the lowest point of

17   the week and we've seen what's happened to prices of

18   preferred securities.  They've gone down and they've come

19   back up.  We're going to pick the lowest point.  Was it

20   reasonable to tack on millions of inflated charges?  And

21   this is -- this is going to get to a fundamental question, I

22   think, under loss.  I believe you asked a question of

23   counsel for QVT.  The loss definition on its face doesn't

24   say you get to recover for losses you didn't incur.  The way

25   it reads is, and this is what really gets me to the bottom

Page 159

1    of the page is what's missing from their description of the

2    only issue in the case is reasonable and in good faith

3    calculate what its total losses and costs.  It's right there

4    in the definition of loss.  It's not just your running a

5    reasonable process and a good faith process, but to do what?

6    To calculate your total losses and costs.

7           The end result of that process was a valuation

8    that triples the value of the transactions from either the

9    9/12 collateral valuation or the 9/15 marks the used to call

10   collateral from us.  The tripling of the value, is that a

11   reasonable result here given, albeit, everything going on in

12   the market, what decisions they made; what points in time

13   they pick; what charges they added on; is that a reasonable

14   result?  And does the totality of the evidence demonstrate

15   good faith?  Now, we can have an extended discussion about

16   what is and isn't good faith.  We're not suggesting that

17   there's bad people on the other side.  I would suggest to

18   you that you were cited a series of U.K. cases on

19   reasonableness and good faith and I do believe on the

20   question of good faith and reasonableness, the articulation

21   of what that is under English law is quite different than

22   what it is under New York law.

23          That's going to be a legal question to decide as

24   to whether the standard of the evidence, the acts you hear

25   about, the analysis or lack thereof that you find in the

Page 160

1     record, whether that supports ultimately a conclusion that

2     there was an absence of good faith, but that's going to have

3     to be -- I think the good faith calculation -- determination

4     is on the basis of the totality of the evidence.  And how

5     much of what you're going to hear is really what QVT knew

6     and did at the time?  As we went through the specific

7     calculations, the specific buckets this morning and early

8     afternoon, PCDS, COG , detailed analyses of what was going

9     on, on market and what different ratios were and what spread

10    were, you're not going to find that in the contemporary

11    analysis that was done by QVT.  What's striking is the lack

12    of analysis.  I get the point.  They're all sitting around a

13    couple of desks, so they're not shooting emails to each

14    other, but these products are so complex and illiquid, where

15    are the models?  Where are the screenshots?  There was a

16    mailbox they setup, Lehman@QVT to collect backup.  Where is

17    the analysis that says, made an effort to be reasonable

18    about their approach as opposed to maximizing, their

19    approach to this calculation?

20            Ultimately, notwithstanding all of the post-talk

21    justifications for doing what they did, what we think has

22    happened here, you get to 9/15, they make the decision to

23    terminate on 9/15.  They didn't have to terminate on 9/15.

24    Okay, they had the option and we'll talk about that briefly

25    -- there's nothing in the ISDA Master Agreement that says,

Page 161

1    if you're outside of automatic early termination, as the

2    non-faulting party, you absolutely have to deliver your

3    terminations.  They have the right to.  We're not saying

4    they didn't have the right to deliver that notice.

5            But once they did that, that had an important

6    consequence.  Those Lehman positions, if they had stayed

7    alive, everything I've seen from their side, would have

8    become more valuable because they were long protection and

9    credit spreads widened on Tuesday, Wednesday, Thursday.

10   They realized once they had terminated those straights, as a

11   legal matter, they no longer had a right to enjoy those

12   gains.  But that was -- that result, the fact that they

13   don't get to enjoy those gains that happened after the

14   termination, that's because of the choice they made.  They

15   terminated that.

16           The contract would have fully protected them if

17   they had not terminated half the trades alive.  They

18   terminated on Friday.  And there's a trade-off there, right.

19   They wanted certainty on Monday.  They wanted the certainty

20   of saying, "We're done.  We have no more open Lehman

21   positions."  That's fine, but it comes at a price.  It comes

22   up to several prices, right.  The obligations get kicked in

23   as to what you have to now do.  Now, that you've delivered

24   the notice, things have to begin to happen.  The market

25   quotation process has to be run.  Markets are going to move

Page 162

1    from here on out.  You don't have the right to seek recovery

2    on the basis of those market moves and I think what the

3    record will show is that, that is exactly what they were

4    trying to recover.  That's what Dan Gold's email to

5    investors on September 23 was about.  Spreads had widened,

6    markets had moved.  There were profits they could have made

7    if they had their trades on with Lehman; they didn't make

8    those profits that we are going to try and recover those

9    profits as well.

10            That's why you have valuations on the 16th, the

11   17th -- that's why you have these new indented methodologies

12   for valuing PCDS and CARB .  You asked a couple of questions

13   about, well, these are derivatives -- they derive their

14   prices by definition from some underline.  Did you go look

15   at how the underlines moved?  It's not what they did.  They

16   had the underline for PCDS.  They had the underlined

17   preferred data, but they came up with a formula that they

18   didn't back test and had they back tested would have shown

19   that it's nonsensical and we'll get into it.

20            So what's driving QVT after 9/15 is really this

21   notion of what could have been.  We could have had these

22   returns if we hadn't terminated.  The world's going to hell

23   in a hand basket, bad things are happening.  We're going to

24   include all of these losses in our claim against Lehman, but

25   the contract doesn't permit them to do that.  It's got to be

Page 163

1    their total losses and costs.  Can't be what might have

2    happened, some imaginary number.  What did you lose?  What

3    did this really cost you and what did you cost you as of the

4    early termination date.

5              The definition of loss is very clear.  It's as of

6    the early termination date or as soon thereafter as

7    reasonably practical, right.  But this entire exercise was a

8    backward look into the business.  This wasn't a calculation

9    they had to do on the evening of the 15th or the morning of

10   the 16th.  They did it two weekends later.  We talk about

11   their books and records, there's no evidence of actual

12   losses or costs incurred by QVT of this magnitude.  It's

13   just not reflected on their books and records.  There's one

14   place it's reflected.  It's reflected in the calculation

15   statement.  It's reflected in the statement of claim.  If

16   you go through their accounting records, you don't see

17   evidence of that kind of a hit, a $260 million hit over and

18   above the collateral they have.

19             We think the approach here, which is to do this

20   backward looking exercise; to try and create these

21   hypothetical replacement trades, not on the early

22   termination date, but on dates after the early termination

23   date to seek to recover (indiscernible ) spreads for

24   transactions that you did not replace and chose not to

25   replace because they certainly replaced a good number.  All

Page 164

1    of that exposes Lehman and its creditors the moral hazard

2    because that's a one-way exercise.  They just get to say,

3    "Well, we might have replaced them.  Had we replaced some,

4    some dealer might have charged us an astronomical sum."

5    You're not going to hear evidence from their side as to what

6    dealer was going to charge that and what transaction would

7    actually happen on those charts.  And we'll talk about PCDS

8    in particular because the transactions that they have now

9    constructed -- the hypothetical transaction is one that

10   would never be done.

11           This is not the only instance where you have

12   encountered, Your Honor, illiquid transactions.  Lehman had

13   what, 6,500 counterparties.  They had a derivative on

14   everything under the sun.  There were things that were

15   liquid; there were things that were illiquid.  There were

16   products like, reserve funding agreements, 30-year long-term

17   contracts that just disappeared from the market.  That

18   doesn't mean that you can just tack on an astronomical

19   number to that and say, that's my loss.  There has to be

20   some determination made of what did you reasonable lose?

21   What is the loss of bargain that you're complaining about?

22   Loss does have that phrase, loss of bargain.  What was your

23   bargain?  We can't talk about that in terms of what the

24   contract provides and what loss of bargain means versus what

25   they would have you think.

Page 165

1          Burden of proof -- I don't think it's seriously

2    disputed that they have the burden of proof.  I know there

3    was a case cited -- our case is completely inapposite

4    because you're talking about a claim being brought for

5    breach of covenant of good faith and fair dealing upon

6    bringing a claim for breach of the covenant of good faith

7    and fair dealing in most instances, I'd probably have the

8    burden of proof on that.  Here, the contract requires them

9    to act in good faith and reasonably, they're making a claim

10   against the estate.  They have the burden of proof.  That's

11   precisely why they went first with their expert reports.

12   That's why they went first this morning.  That's why they're

13   going to have a rebuttal case.  They have the burden of

14   proof and they know it.

15          I do think they have to demonstrate with respect

16   to each transaction that they acted reasonably in good faith

17   because they did it on a transaction-by-transaction basis.

18   And they used different methodologies for different

19   transactions.  It wasn't just one size fits all.  And I

20   think they have to convince you that they've met their

21   burden of proof with respect to all the (indiscernible ).

22   Not just those that have been challenged by Lehman's

23   experts.  They have to make the showing.  They, in fact,

24   have a basis for a claim for every dollar they're seeking

25   from the estate.  And they have to tie that to their total

Page 166

1    losses and costs.  We don't think they can meet the burden

2    of proof.  They chose 9/15, they elected 9/15 and we're

3    bucketing the arguments and the arguments will cut across

4    different products.  Fundamentally, our points are four,

5    right.  They ignored the historical books and records; they

6    cherry picked post-9/15-08 market data and let's just pause

7    on cherry picked.  We'll come back to this.  The fact that

8    valued their transactions after 9/15 increased their claim.

9    Could they have increased their claim even more?  Maybe.

10   But I'll submit to you for every --

11            THE COURT:  The fact that they -- when you say

12   after --

13            MR. TAMBE:  Yep.

14            THE COURT:  -- you mean --

15            MR. TAMBE:  Using --

16            THE COURT:  -- as of a date after?

17            MR. TAMBE:  Yep.

18            THE COURT:  Because the whole exercise was after?

19            MR. TAMBE:  That's right, yep.  The use of new and

20   untested valuation methodologies, again, we think they can't

21   sustain their burden that those were reasonable.  And

22   instead what you have is a lot of post-talk arguments about

23   justifications for why they did what they did, which don't

24   particularly work and are often rendered by experts that

25   have no expertise in the markets or the products that we're

Page 167

1    talking about.

2            We heard at length about Professor Engle.  Well,

3    if the attacks coming from Professor Pfleiderer, who is a

4    great professor of finance and economics at Stanford, he has

5    really no basis or expertise to comment on the valuation of

6    credit during this process.  That's not part of his academic

7    work.  It's not part of his experience.  He doesn't do any

8    analysis.  I mentioned before, it's sort of equivalent to

9    sprinkling holy water on what QVT did and saying, "It looks

10   reasonable to me."

11           So, the things that are not challenging, they

12   should still prove up the facts, but we're not challenging

13   the 12 trades where market quotations were received, albeit,

14   the (indiscernible ) flawed process.  We're not challenging

15   QVT's total losses and costs in connection with

16   (indiscernible ).  They demonstrated that they actually

17   incurred those costs and entered into those trades and they

18   have entered into some of those trades after 9/15.  We're

19   not challenging that.  And there's a reason for that.  At

20   the bottom of all of this, why are we here after so many

21   years of litigation, right.  The professionals of the estate

22   are fiduciaries to the creditors.  They have to ensure that

23   all claims are resolved fairly and equitably and that's what

24   this trial's about.  And for the most part we've been able

25   to achieve all of that, without trials.  Sometimes we can,

Page 168

1   and we have trials over it.  I have a series of legal

2   provisions here, I'm not going to go through those.  I might

3   come back to them as we discuss other points.  So I'm going

4   to switch forward to slide 14.

5              THE COURT:  Okay.

6              MR. TAMBE:  Nothing earth-shattering here.  This

7   is the sequence of events.  But to suggest that this was not

8   a new trading relationship -- this trading relationship's

9   over a long period of time.  And what's significant is, even

10  after the (indiscernible ) were put on, you know, '06, '07,

11  '08, you don't have any material disputes between Lehman and

12  QBT about the evaluation even -- and you saw all these

13  slides from them -- starting in 2007 and into 2008, there's

14  a general recognition, a lack of liquidity (indiscernible )

15  and you don't see a dispute, a demand for additional

16  collateral, additional security from QBT.  And all the

17  while, by the way, the credit markets and credit spreads are

18  worsening, certainly as we get into 2008.  That process

19  accelerates and Lehman (indiscernible ).  And let's not

20  forget that as those credit markets changed, Lehman was

21  posting collateral, and those calculations were being looked

22  at both by QBT and by Lehman.  And they held on $17 million

23  of collateral as of 9/15.

24              You'll hear evidence in the case about the fact

25  that they were focused on the margin position.  This wasn't

Page 169

1  a calculation just running in the background where no one

2  paid any attention.  I think Mr. Tracey said -- Mr. Gold and

3  his -- and his colleagues are (indiscernible) for the

4  investors.  They have an obligation to get it right

5  (indiscernible) they thought they were getting it right.

6  And they tried to get it right.  And they then just accept

7  Lehman's marks, they examine Lehman's marks, and there were

8  times when they questioned Lehman's marks.  But what's

9  significant is, they never said, hey, you're getting it

10  really wrong.  You're not looking at the price of

11  (indiscernible) properly.  It's gone completely a liquid,

12  credit spreads are rising, your evaluation methodology

13  doesn't work.  Or, here's your card mark, we think it's way

14  out of line.  You should change it and post more collateral.

15  There's no such communication between the parties.

16  Significant because all of a sudden you have after 9/15 the

17  suggestion that the marks were off by $250 million.  Some of

18  that can be explained by the movement from the 12th to the

19  15th, but not that magnitude.

20         I'm going to go to one more slide, slide 12.  We

21  are not collateral is the measure of loss.  (Indiscernible)

22  right, that's not our position.  Is it relevant?  Yes, it is

23  relevant, and it's relevant because of what it purports to

24  be and is supposed to be.  It's supposed to be this

25  definition of exposure from the (indiscernible) the amount

Page 170

1     that would be payable, right, to a party that is a secured

2     party by the other party, pursuant to Section 6C-2a of this

3     agreement as if all transactions are swapped.  Transactions

4     were being terminated as of the relevant evaluation time,

5     and it goes on to say its market quotation is going to be

6     determined at mid-market.  So clearly what we're trying to

7     calculate here is not just some amount that'll make you feel

8     secure, but it's an amount that will be paid if all

9     transactions were being terminated.  There's a connection

10    made to the termination of the transaction.  And the next

11    part, all calculations done by either party are supposed to

12    be done in good faith (indiscernible ) which brings us to

13    the September 16th collateral.

14              THE COURT:  So go back for a second --

15              MR. TAMBE:  Yes, sure.

16              THE COURT:  -- Mr. Tambe.  So focusing on the

17    wording of the definition of exposure --

18              MR. TAMBE:  Yep.

19              THE COURT:  -- you had said before you got here

20    that you're not saying that the amount of collateral is

21    equal to evaluation.

22              MR. TAMBE:  Yes.

23              THE COURT:  Right?  But isn't that what the

24    definition of exposure says?  It says --

25              MR. TAMBE:  It does, but the calc -- but here's

Page 171

1    the thing; as of the relevant evaluation time.  Right, and

2    so if you look at a collateral call that was made, for

3    example, (indiscernible )

4              THE COURT:  Evaluation time refers to the time the

5    collateral --

6              MR. TAMBE:  Evaluation of the collateral call,

7    right.

8              THE COURT:  Right.

9              MR. TAMBE:  So we recognize that they could be a

10   slippage or a movement, and that's why the September 16

11   collateral call is important, because they call collateral

12   from us --

13             THE COURT:  So evaluation time and early

14   termination date are not the same thing?

15             MR. TAMBE:  They're not the same thing.

16             THE COURT:  Right.

17             MR. TAMBE:  But --

18             THE COURT:  Okay.

19             MR. TAMBE:  -- again, how far apart are they?

20             THE COURT:  Yep.

21             MR. TAMBE:  And how much should that drive the

22   difference?  I mean, that's a relevant inquiry, and they say

23   --

24             THE COURT:  Right.

25             MR. TAMBE:  -- it's entirely irrelevant.  We're

Page 172

 1   not saying it's determinative.  We think it's highly

 2   relevant, right, especially because of the processes that

 3   parties have followed for a very long time, and then all of

 4   a sudden you get to a point when you're no longer following

 5   those processes and doing something completely different.  I

 6   think The Court should consider, is that a reasonable

 7   departure from the way things were done?  And the bottom,

 8   right, they'll say, well, Lehman was the evaluation agent.

 9   But when QBT's asking for collateral, which they did on the

10   16th -- they set -- sent us $13 million.  That's a demand

11   made out of the CSA.  That's the way they appraised it.  Or

12   maybe they're hoping to get lucky if someone wasn't paying

13   attention at a company that was in chaos and would simply

14   wire $13.3 million over.  But they did a calculation

15   internally.  It's a calculation that ties out to the values

16   on their books on 9/15, not 9/12, not 9/11, on 9/15.  They

17   did the math, they went out to Lehman, Lehman said, we're

18   not going to honor any calls today.  And that email chain

19   was circulated high management at QBT.  (Indiscernible )

20   said, oh, what are we doing asking collateral?  Those

21   numbers don't make any sense.  No one said that.  What are

22   you doing asking for a collateral call, you're not

23   authorized to ask for a collateral call?  We've heard those

24   stories by the way.  No one said that.  This was intended.

25   They wanted to use their calculation to extract collateral

Page 173

1    back from Lehman and the contract said, "That was a good

2    faith and commercially reasonable calculation."  That's what

3    it was supposed to be.  That's what it had to be.

4              Let's go to 18.  That's the email that was sent.

5    Utterly routine to Lehman, I see there's an end-to-end

6    movement from end of business from 98/12 to 9/15, plus $12

7    million in QVT and $1.3 million in Quintessence, are you

8    able to meet this call?  And you'll hear testimony from

9    their witnesses about exactly how that amount was calculated

10   -- calculated by using their 9/15 facts.  So where is the

11   $260 million loss?  Not there.  Not in their books and

12   records.

13             So let's get to the valuation.  I'm sorry, I'm

14   going back and forth a little bit --

15             THE COURT:  Mm hmm.

16             MR. TAMBE:  -- I'm just adjusting to a couple of

17   things that were said.  This is one worth looking at.  So,

18   this is the Sunday before and this goes to a point that I

19   discussed in my first few minutes, that they were focused on

20   margin and exposure to Lehman.  This is a spreadsheet that

21   gets distributed again, within the folks in QVT from Julian

22   Sale  internal to QVT.  From what that's reporting is, the

23   value of the Lehman position, not as of 9/11, but as of 9/12

24   -- close of business 9/12 and the margin they hold, right.

25   And even as of Sunday evening, right, they are over-

Page 174

1    collateralized.  So you've heard a lot about all the chaos

2    and how the markets could only move in one direction, well

3    their unlocks were showing from Thursday to Friday, the

4    positions that actually moved in Lehman's favor.  They were

5    over-collateralized.  They were holding too much collateral.

6    And this goes to the other point, they knew what the LBS

7    acquisitions were ELBS were.  This isn't a mystery as to

8    what trades we have on.  We've got to value to the last

9    dollar.  And I would say unlike a lot of other

10   counterparties, we are thinking about the potential of the

11   Lehman default and preparing for a potential Lehman default

12   well before 9/15.  I know the timeline you saw about the

13   market quotation process began on 9/15 in the morning, but

14   the fact of the matter is folks within QVT were discussing

15   market quotation and the need for actionable quotes days

16   before.

17          Now, slide 20, Your Honor.  Do you have any

18   questions about that?

19          THE COURT:  Nope.  Good.

20          MR. TAMBE:  Go to 20.  So this gets to the point

21   and it was raised by Mr. Tracey, performing poorly.  True

22   Lehman bankruptcy performed poorly after Lehman bankruptcy.

23   Again, you would think that if these positions were more

24   valuable and they were more in the money, surprising to me

25   that they wouldn't say, these things are more valuable,

Page 175

1    we're actually doing a little bit better than you investors

2    think we are.  There are actually really valuable positions

3    we have on the (indiscernible ).  They don't say that while

4    Lehman's alive.  Once Lehman is dead, yeah, these are

5    incredibly valuable positions.  They're worth another $260

6    million, but they only say that in the statement of claims,

7    not on their books and records.

8              So they take -- they try to take steps, prior to

9    Lehman bankruptcy.  They tried to (indiscernible ) trades to

10   other dealers.  They tried to move positions that were held

11   at LBI or LBIE to other prime brokers.  None of this has

12   anything to do with LBSF, but again, it shows a level of

13   preparedness and focus on the Lehman situation.  They also

14   bought protection should Lehman failure.  So SDS on Lehman.

15   They're not part of the claim, but again, in terms of

16   telling the story, these are folks who are preparing, who

17   are valuing, who are considering their positions.  this

18   notion that 9/15 rolls along and they have no idea how to

19   value these claims, I think strains (indiscernible ) to some

20   extent.

21             THE COURT:  What do you mean they bought protect -

22   - they bought CDS on Lehman?

23             MR. TAMBE:  Yeah.  They thought Lehman would fail.

24   They thought many other financial institutions might fail --

25             THE COURT:  Right.

Page 176

1          MR. TAMBE:  -- and they want protection.

2          THE COURT:  When did they buy the protection on

3    Lehman?

4          MR. TAMBE:  I don't know the answer to that.  They

5    also -- there was an exercise over the weekend where they

6    identified positions to be replaced, right.  So again, this

7    is preparedness and I would submit, a very high level of

8    preparedness.  Again, it puts in context this notion or this

9    compressed timeline on the 15th and why we're trying to

10   figure what we should do.  This is a counterparty that's

11   been doing some thinking and doing some preparing.  And I'm

12   not going to minimize the impact of the filing and the fact

13   that a lot of people were scrambling as a result of that.

14   But they still continue and there's different levels of

15   sophistication and I would submit to Your Honor, they fall

16   at one end of that spectrum.  They're highly sophisticated,

17   they're highly prepared.

18          THE COURT:  So does that mean I should hold them

19   to a higher standard?

20          MR. TAMBE:  I think in judging the reasonableness

21   in good faith of their action, you should judge it against

22   their sophistication, not the sophistication, for example,

23   of some school district in Ohio.  So they identified

24   positions to be replaced, urgent, not urgent, et cetera.

25   They started replacing transactions I think as early as 5:00

Page 177

1    a.m. on 9/15.

2              THE COURT:  So Lehman filed at 1:10 a.m. --

3              MR. TAMBE:  Mm hmm.

4              THE COURT:  -- on 9/15?

5              MR. TAMBE:  Yep.  And I don't think the notice of

6    early termination went out until later in the morning, so

7    they were effectively replacing transactions starting Monday

8    morning.  Even before the market quotation script is

9    prepared, before the market quotation ones go out, they are

10   replacing the trades they wish to replace and they focused

11   on collateral.

12             THE COURT:  They replaced trades before they were

13   actually terminated?

14             MR. TAMBE:  I believe that's the sequence.  At

15   least some trades were replaced before, in anticipation off

16   the fact that there would be a termination.  They probably

17   thought -- they prioritized the collateral issue and that's

18   what leads to the 9/16 collateral call where they're trying

19   to get the money back from them.  So this is the 9/23 email

20   to investors from Mr. Gold.  So let's do a couple of things.

21   Actually, could you pull up the document?  It's EX-5466-

22   5466.  In the top part -- let's just see the top part

23   increased in size.  And let's just start with the -- just

24   the two-prong subject line in the first two paragraphs, down

25   to -- next -- yeah, right down there.  Perfect.  Couple

Page 178

1    points here, right, it goes out on the 23rd 9:00 in the

2    evening.  We only mark our books at the end of the month.

3    That's when we tell investors what their performance is.

4    This is the 23rd of September.  There were emails with

5    intra-month performance the weekend before Lehman failed.

6    So this notion that, well, we don't generally mark our books

7    during the month, we do it at the end of the month and then

8    we report to investors what the performance of the funds is,

9    not true, Judge.  They're keeping investors apprised of how

10   the funds are doing on an intra-month basis.  Tey're looking

11   at some data.  They're looking at some evaluation.

12   9/23/2008 they're providing return stats as of 9/23, all

13   right.  Let's go further down into the document, the section

14   that begins, "The Lehman Brothers," which I think is at the

15   end of -- shall I hold on, maybe under page 2.  Yep, that

16   paragraph, the whole Lehman Brothers paragraph.  And the

17   first paragraph there, though.  Now, they're talking about

18   the process, so termination on 9/15.  There are values on

19   their books at 9/15.  They're reporting performance to

20   investors on 9/23, but they're constructing the claim.  The

21   first weekend of claim construction is gone; that was the

22   first week in the 20th, 21st.  A lot of the claim

23   construction happens the following weekend, which is the

24   27th, 28th, right.  They say it's very time-consuming and we

25   had not yet finalized the claims, and it's the second line:

Page 179

1    lost profit opportunities.  We highlight that whole -- the

2    rest of it.  And that's the sentence, Judge.  Lost profit

3    opportunities may also count as damages.  That is, it is

4    possible to be damaged even if one doesn't actually lose

5    money if one would have made money, but for the

6    counterparty's default.  And what they're talking about

7    there is the money they would have made had they not

8    terminated Lehman at 9/15 because those positions would have

9    gone up in value.  That's what they're trying to recover.

10   They make another statement to that effect and they're going

11   to say, no, that's not what we're talking about.  It's just

12   replacement risk, replacement value.  Then annual reports

13   that went out at the end of that year, and that's Exhibit

14   5254 (indiscernible ) page 15 ones.  It's not in the deck

15   here.

16            THE COURT:  Okay.

17            MR. TAMBE:  And we'll go to the bottom.  It's

18   going to be the very -- yeah.  So if you can just expand

19   that paragraph, "Exposure to Lehman Brothers."  That

20   paragraph -- and if you could highlight at the beginning,

21   five from the bottom, would even in the right-hand side.

22   Yeah, all the way down from there.  They're talking about

23   two different concepts here, okay.  They see even though at

24   the time of Lehman's failure, the fund held collateral from

25   Lehman in amounts close to the positive mark to market value

```
 1     of derivative positions valued as of the business date

 2     preceding Lehman's filing for bankruptcy less required

 3     initial margin.  The fund did not have sufficient collateral

 4     to cover the replacement costs and mark to market gains in

 5     respect of such derivative positions resulting from their

 6     rapid increase in value following Lehman's failure.

 7     Replacement costs were not challenging.  We're saying, okay,

 8     if you incurred actual replacement costs, you get it.  It's

 9     this mark to market gains in respect of such derivative's

10     positions resulting from their rapid increase in value

11     following Lehman's failure.  And you'll see the prices they

12     use on 9/16, 9/17, 9/18, 9/19, this is in worsening credit

13     market.  Those are the gains that they're referring to here.

14     Those are the gains these positions would have been enjoyed,

15     but they don't get the benefit of those gains because they

16     chose to terminate on 9/15.  But that -- on 9/23, we

17     believe, the message was quite clear -- the markets have

18     moved substantially after Lehman's termination, Lehman's

19     default.  We terminated on the date of Lehman's default.

20     There are profits we could have earned on those positions;

21     we're going to recover them through the loss calculation.

22     And that's what the loss calculation shows on its face.

23     They choose dates after 9/15 because that's what they're

24     trying to recover, and that's not compensable measure of

25     loss under the loss definition.
```

Page 181

1                    THE COURT:  Can I ask a --

2                    MR. TAMBE:  Mm hmm.

3                    THE COURT:  -- question about -- and if it's not

4     something that's really going to be developed, just tell me.

5                    MR. TAMBE:  Mm hmm.

6                    THE COURT:  Back on your slide 21 --

7                    MR. TAMBE:  Mm hmm.

8                    THE COURT:  -- in the highlighted paragraph,

9     second paragraph, because of the -- of certain -- because

10    other certain of our portfolio level hedges including but

11    not limited to CDS on Lehman...

12                   MR. TAMBE:  Mm hmm.

13                   THE COURT:  Is it your contention that because

14    they separately hedged their Lehman exposure -- they

15    separately hedged to some extent Lehman's failure --

16                   MR. TAMBE:  Mm hmm.

17                   THE COURT:  -- that they ought not -- that, that's

18    an offset, if you will.  Or it's almost like a recovery on a

19    guarantee that would be available as a set off to what their

20    loss was?  Or is that just a separate thing; that was a

21    separate bet that they placed and that's got nothing to do

22    with the amount of their "loss" that they incurred.

23                   MR. TAMBE:  I'll say it was a separate bet.  And -

24    - right.  And I don't think it has anything to do with their

25    loss calculation.  I think, the way you stated it, it has

Page 182

1   nothing at all to do -- I don't think it does.  We're not

2   arguing that, because they may have gone to Deutsche Bank

3   and bought protection on Lehman --

4            THE COURT:  Right.  Right.

5            MR. TAMBE:  And that contract paid out --

6            THE COURT:  Separate bet.

7            MR. TAMBE:  Separate bet.

8            THE COURT:  Okay.

9            MR. TAMBE:  So, now we're going to go through, I

10  think, the different categories of where we --

11           THE COURT:  So, but --

12           MR. TAMBE:  Yeah?

13           THE COURT:  Just -- I'd just like to match up.

14  So, the narrative that QVT started with was that this whole

15  -- you rode -- QVT rode the market up, is false.  And there

16  was, at one point in the presentation, a pie chart that

17  shows, "Oh, look, we actually took positions, two -- almost

18  two-thirds of the positions valuations that we took were the

19  most favorable to Lehman."  And -- you know which one I'm

20  talking about?

21           MR. TAMBE:  No, I'm laughing.  I'm smiling.  I'll

22  tell you why I'm smiling.  Have you read Danny Kahneman's

23  book?

24           THE COURT:  Who?

25           MR. TAMBE:  "Thinking Quick"?  "By Thinking Fast,

Page 183

1       Thinking Slow," right?  So, Michael Lewis -- Michael Lewis?

2                   THE COURT:  Yes, I know who Michael Lewis is.

3                   MR. TAMBE:  Right.  He's got a new bestseller out.

4                   THE COURT:  Yes, he does.

5                   MR. TAMBE:  Okay.

6                   THE COURT:  I have --

7                   MR. TAMBE:  That bestseller is about Danny

8       Kahneman.

9                   THE COURT:  I haven't read it yet.

10                  MR. TAMBE:  Okay.

11                  THE COURT:  Okay.

12                  MR. TAMBE:  So, what Danny Kahneman is talking

13      about is what people get wrong with statistics.  And he's

14      got a whole -- he did a -- he won a Nobel Prize, eventually,

15      right?  And people get stuff wrong with statistics all the

16      time, and it depends on the question you're asked.

17                  THE COURT:  Sure.

18                  MR. TAMBE:  Your recollection of that chart isn't

19      what the chart really shows.  And what the chart shows isn't

20      really what they mean to say.  So, let's go to the chart.

21                  THE COURT:  Okay.

22                  MR. TAMBE:  So, if you go to 101 (indiscernible),

23      we have a problem with the deck.

24                  THE COURT:  We have that discrepancy, right.

25                  MR. TAMBE:  But I'm looking at the printed deck,

Page 184

1    and the data was in 101, and the pie chart --

2            THE COURT:  On the printed deck, it's -- the pie

3    chart is in 102.

4            MR. TAMBE:  Yeah, the pie chart is in 102, right?

5            THE COURT:  Right.

6            MR. TAMBE:  So, I think what's driving that -- I'm

7    not sure, but I think what's driving that chart is what we

8    see on the previous page in the data.  And they've changed

9    the question from "more favorable to QVT" to "most favorable

10   to QVT."  Right?  And they're saying:  was -- were these

11   prices most favorable to QVT?  Were they most favorable to

12   Lehman?  And that part is put together with, "it's not most

13   favorable to either Lehman or QVT."

14           THE COURT:  Uh huh.

15           MR. TAMBE:  The question asked makes a difference.

16   Were the prices more favorable to QVT?  Let's go back to

17   101.

18           THE COURT:  Okay.

19           MR. TAMBE:  Starting from the bottom, 268 as of

20   the 16th, more favorable than 250.  568, more favorable than

21   534.  550, more favorable than 320.  538, not more favorable

22   than 564.  Right?  And seven, I don't know if you've got

23   positives or negatives, but you have a seven that's picked

24   versus 35 (indiscernible).  So, you assume those two -- I

25   don't know which way their figures run, but now you've kind

Page 185

1    of flipped the answer.  Now it's 60 percent, three of the

2    five trades, are more favorable to QVT if I'm valuing them

3    after 9/15.

4            So, you go back to the chart, and go back to

5    Michael Lewis's book and Danny Kahneman's work.  Right?  The

6    answer you're going to get to these kinds of statistical

7    analyses is going to be very different depending on what

8    question is asked.  And the fact of the matter is most

9    people, you and I included, and a lot of experts included,

10   get that wrong.  It's astonishing how much people get that

11   wrong.

12           Right?  We have this extended discussion of

13   Professor Engle and what he got wrong.  Professor Engle will

14   tell you why what he -- what he did and why he did what he

15   did.  Right?  And you can do all these pie charts and reduce

16   stuff down.  But let's get back to the question that's

17   really being asked and what's the question that's being

18   answered.

19           At the end of the day, Professor Engle doesn't

20   value QVT's trades.  A trader with experience valuing trades

21   takes some of Professor Engle's output and says, "You know

22   what?  That's consistent with what I saw in the market when

23   I was trading.  It confirms my recollection being in the

24   markets at that time, and I'm going to do the calculation,

25   because I have that trader judgment and trader expertise,"

Page 186

1    and that's Mr. Garcia.

2            You didn't hear about Mr. Garcia very much when we

3    were going after Professor Engle for all the things that he

4    didn't do.  He's got a Nobel Prize; I think he could defend

5    himself and the validity of his work, and what conclusions

6    can and cannot be drawn from his work.  He'll be the first

7    to tell you what conclusions shouldn't be drawn from his

8    work.  Hmm?  All right.

9            But you got to read the Kahneman book, because --

10   I hate to say it, because we do a number of --

11           THE COURT:  In my spare time, Mr. Tambe.

12      (LAUGHTER IN THE COURTROOM)

13           MR. TAMBE:  I'll belabor this, but only a little.

14   We're going to see some more examples of this, because we

15   deal with numbers a lot, right?  And we deal with complexity

16   a lot.  And you hear about the complexity of these products,

17   the fog of Lehman.  Isn't it obvious that everything would

18   have gone down?  And you get this confirmation bias, yeah.

19   It was terrible.  Everything was falling apart.  It must

20   have been.

21           And then you look at the data.  And the data

22   doesn't always follow that.  Right?  And we'll come back to

23   that theme a little bit.

24           THE COURT:  Okay.  But, again?

25           MR. TAMBE:  Yeah?

Page 187

1                THE COURT:  It's what was reasonable --

2                MR. TAMBE:  Yes.

3                THE COURT:  At the time, not perfect, or best

4    even, in retrospect.

5                MR. TAMBE:  I'm not suggesting -- and was the

6    process reasonable?

7                THE COURT:  Right.

8                MR. TAMBE:  Or was it, in effect, an arbitrary

9    process, which was taken on without doing any testing to

10   say, "Hey, we've adopted a new process.  Does this make any

11   sense?"

12               THE COURT:  Right.

13               MR. TAMBE:  "Does it hold true?"

14               THE COURT:  Right.  Okay.  So, we're back to your

15   book.

16               MR. TAMBE:  We're back to our book.  Okay.  So, we

17   go -- we'll go into market quotation.  I won't dwell on that

18   a lot; I think we've said -- we've laid at least the

19   groundwork for what we will be trying to show on market

20   quotation.  Yeah?

21               THE COURT:  So, on market quotation, are you going

22   to be trying to show, essentially, that, well, QVT says, "We

23   put it out; it was late in the day, but everybody knew that

24   they could still continue to respond into the 16th; look, a

25   bunch of people did"?

Page 188

1              But you seem to be suggesting that it was to the

2       contrary, that they put it out late, they knew that people

3       wouldn't respond, they knew that, even though they might

4       have thought that they would get a more robust set of

5       quotations on the 16th, they purposely just, you know, did

6       it when they did it on the 15th, knowing -- essentially,

7       knowing that it was designed to fail.

8              MR. TAMBE:  So, there are two or three threads in

9       there.

10             THE COURT:  Sure.

11             MR. TAMBE:  Right?  Including this notion of

12      you're hearing an explanation, in the course of this

13      litigation, which is belied by what happened then and what

14      QVT believed then.  So, let me start there, and hopefully

15      I'll address the rest of your questions while I'm answering

16      this.  I might lose track of one.

17             THE COURT:  Do you need some water, Mr. Tambe?

18             MR. TAMBE:  I don't think that's going to help the

19      frog, but.  That's all right.  As long as you can understand

20      me --

21             THE COURT:  I can.

22             MR. TAMBE:  And I'm not talking too fast, we'll be

23      fine.  So, let's start with Slide 26.  Thank you.

24             THE COURT:  Okay.

25             MR. TAMBE:  Right.  So, this is the back-and-forth

Page 189

1    at the time the contract was negotiated.  Clearly, when they

2    believed that they were likely to be the defaulting party,

3    they wanted Lehman to have less discretion.  They wanted

4    market quotation.  And the reason they gave for market

5    quotation, they said, "Look, most of our positions have

6    already market with easily obtained quotations."  And that's

7    all fine.  We get it.

8         They do other -- ISDA master agreement in '07 for

9    a quintessence, when that split happens.

10        THE COURT:  Right.

11        MR. TAMBE:  And again they pick market quotation.

12   At least some of these products are trading then; they are

13   still comfortable sticking with market quotation.

14        And, during the process of calculating collateral

15   -- right, so we go back to the discussion we had about,

16   "What does exposure mean?" If, after '05 and after '07, QVT

17   had concluded, "Hey, we've got market quotation in our ISDA,

18   but we're not picking up these positions -- BCDS, CAR --

19   that seem to be fairly illiquid.  We should revisit this.

20   We should revisit this with Lehman and say, 'Guys, we don't

21   think market quotation is going to work for these.'"

22        That didn't happen, right?  It's the contrary.

23   They took the prices from Lehman; they looked at them; they

24   analyzed them; they reflected them in their books and

25   records; they showed them to their auditors.  They didn't

Page 190

1   just swallow those prices and say, "Well, if Lehman says it,

2   it must be good."

3          And they had the tools to do the valuation.  I

4   mean, this is not, again, an Ohio school district.  This is

5   9, 10, $11 billion fund, with fiduciary duties to its

6   investors, with data feeds from all the great data sources

7   and some of the smartest folks who came out of Boston.  So,

8   they certainly had the wherewithal and the incentive.  And,

9   if that wasn't enough, they had the obligation to get it

10  right.

11         All right.  So, they wanted market quotation,

12  Slide 27.  This is September 8th, September 11th, before the

13  bankruptcy.  And we'll talk about more of these email

14  chains.  But the point of this email chain is:  here they

15  are, talking about market quotation and how market quotation

16  is supposed to work.  And this is in anticipation of Lehman.

17  What if Lehman fails, one of our big swap counterparties?

18  Right?  What do we have to do?

19         Very early on, they knew that they had to seek

20  actionable quotations.  It's not something they're

21  scrambling to find out on the morning of the 15th.  Let's go

22  back to the timeline.  This timeline should really start

23  back on --

24         THE COURT:  What's this?  You got to help me with

25  this terminology.

Page 191

1           MR. TAMBE:  Yeah.

2           THE COURT:  So, Metter to Chu on the 8th.

3           MR. TAMBE:  Yeah.

4           THE COURT:  What does it mean, "lift the dealers"?

5           MR. TAMBE:  Actually do the deal.  So, you get a

6    quote back; do you have to hit it?  You have to say, "Done.

7    I want to do that deal."  Right?  And we're not suggesting

8    you have to respond to a market quotation and hit the deal.

9    But the quotation should be actionable; that we do agree

10   with.  We would say, as a -- and Lehman's taken this

11   position consistently -- the quotation should be actionable.

12   And that's how they understood the market quotation process

13   to work.

14           THE COURT:  Okay.

15           MR. TAMBE:  That it was seeking actionable quotes,

16   which calls into question this whole, more recent discussion

17   about, "Well, 'as off' could be -- you could get it later."

18   Well, if you could get it later, it wasn't going to be

19   actionable, because the time has passed.  If it's going to

20   be actionable, you do it then and there.  And there's more

21   to that, right?  So -- yeah?

22           THE COURT:  But you -- I mean, there is a chicken-

23   and-egg problem, because you can't ask as of a time that

24   hasn't occurred.  And then, the minute the as-of time

25   occurs, it's -- I mean, you could -- you then -- you're not

Page 192

1     going to have an auction for this security before they quote

2     the price, right?

3                    MR. TAMBE:  Sure.  Yeah.

4                    THE COURT:  They're going to quote the price.  And

5     then, if they wanted to transact, they would get on the

6     phone and --

7                    MR. TAMBE:  That's right.

8                    THE COURT:  Right?

9                    MR. TAMBE:  And that's the -- and that happens in

10    real time.  That doesn't happen over periods of hours.

11                   THE COURT:  That's right.

12                   MR. TAMBE:  When you're actually doing actionable

13    -- an actionable exercise, you're setting it up so that they

14    come back in competition. And one of the things you saw --

15    and maybe it wasn't pointed out to you -- in the -- the

16    quote emails that went out had all that language from ISDA.

17                   But the cover of those emails said, "BWIC, OWIC,"

18    right?  And -- "Bids wanted in competition, offers wanted in

19    competition."  That's not in the ISDA itself.  But that has

20    meaning.  To be in competition, you got to be in the

21    competition.  You can't come in four hours later and say,

22    "Hey, I want to be in."

23                   THE COURT:  So --

24                   MR. TAMBE:  There was another signal they were

25    sending that 4:00 was the deadline.  And that's how they

Page 193

1    understood it, and that's how dealers understood it.  So,

2    let's talk about both of those, and we'll come back to this.

3              I should answer your questions before moving on.

4              THE COURT:  No, I understand.

5              MR. TAMBE:  Okay.

6              THE COURT:  You have answered my question.

7              MR. TAMBE:  Okay.  So, 30, let's just talk about

8    30 for a second.  Right?  So, on the left-hand side, that's

9    -- why don't we pull that up, 5147?  It's...

10             And just increase the (indiscernible).  Okay.  So,

11   that's from Tom Knox of QVT, sending out the "BWIC, OWIC."

12   "We would appreciate your responses by 4 p.m. today."

13             THE COURT:  Okay.  So, this is an emerging market

14   CDS?

15             MR. TAMBE:  Yeah.

16             THE COURT:  Okay.

17             MR. TAMBE:  Yeah?  So, clearly, the text of that -

18   - the attachment, right, reads exactly like all the other

19   attachments.  But Mr. Knox believes, "Hey, got to have your

20   responses by 4 p.m. today."  That's how Tom Knox at QVT

21   understood that.

22             Let's look at 31, and that's Joint Exhibit 61.

23   Why don't we just pull that up, and then look at the actual

24   documents?  If that's 61, just increase the --

25             This is Joel Wollman at QVT to someone at BarCap.

Page 194

1    They're the guys who got it late, right?  "It was originally

2    for 4 p.m.  But, since you didn't get it, if you could get

3    back to us by 4:30-4:45, that would be good."  QVT knew what

4    they wanted.  They wanted the quotes back by 4 p.m.  That's

5    how they understood the request they'd sent out.  They

6    wanted bids in competition and offers in competition.

7              So, there's a lot of talk about what dealers may

8    have inferred.  I don't know what dealers they're talking

9    about; I'm not sure what evidence you're going to hear from

10   dealers saying, "Hey, we got this from QVT and we thought

11   they meant mañana."  Right?  In fact, the evidence that's in

12   the record -- let's go to 5149, the bottom.

13             Citi gets the request.  And Citi says, internally,

14   "Due at 4 p.m."

15             THE COURT:  I'm losing the two (indiscernible).

16             MR. TAMBE:  Okay.

17             THE COURT:  So --

18             MR. TAMBE:  So, we'll have to pull up the whole

19   document, and let's --

20             THE COURT:  So, Wollman to (indiscernible)?

21             MR. TAMBE:  No.  We're not going to go there.

22   Let's start with the email chain from the bottom and move

23   up.  Yeah.

24             THE COURT:  Right.  So, it's Wollman to... right.

25   So, what's the Lehman to QVT.com?  Isn't that their --

Page 195

1    that's internal?

2              MR. TAMBE:  So, that's the -- that's where he's

3    keeping it internally, right?

4              THE COURT:  Right, that's internal.  And then it

5    goes --

6              MR. TAMBE:  So, if you follow the email chain up?

7              THE COURT:  Right.

8              MR. TAMBE:  Here.  So, it's sent to

9    Lehman@QVT.com.  It's BCCed out to the dealers.

10             THE COURT:  To the traders.

11             MR. TAMBE:  Right.

12             THE COURT:  So, they don't know who's -- who

13   they're asking.

14             MR. TAMBE:  Right.  Right.

15             THE COURT:  Right.

16             MR. TAMBE:  And so, if you go to the bottom of

17   this page, you'll see who's saying, "Due at 4 p.m."  It's

18   this guy Syed Haider, right?  And it says there, "CMB FICC."

19             THE COURT:  Okay.  But who --

20             MR. TAMBE:  That's a trader at Citi.

21             THE COURT:  That's a trader at Citi.

22             MR. TAMBE:  Citi, yeah.

23             THE COURT:  Okay.

24             MR. TAMBE:  That's within Citi.  And you'll see

25   that email chain gets forwarded up.  You'll see, at the next

Page 196

1    signature block up -- there you go.

2              THE COURT:  I'm sorry, go back down.  Who writes,

3    "Due at 4 p.m."?

4              MR. TAMBE:  Internal, Citi to Citi.  This is

5    within Citi.

6              THE COURT:  Within Citi?

7              MR. TAMBE:  Yeah.

8              THE COURT:  Okay.

9              MR. TAMBE:  And the point I was making is you

10   heard a lot about how dealers would have viewed this request

11   from QVT.

12             THE COURT:  I see.

13             MR. TAMBE:  And you were told, "Well, dealers

14   getting this would realize it's as-off.  They're not going

15   to be confused by it."  No, they thought it was due at 4

16   p.m. just like Mr. Knox did, just like Mr. Wollman did.

17   They all believed 4 p.m. was the deadline, because they had

18   said, "BWIC, OWIC," because they were looking for actionable

19   quotes.

20             And if we go up on this email chain, and just

21   highlight the top two, please?  The top two -- yeah, that's

22   it, all the way down.  I want to pick up the signature

23   block.  That's it.

24             And this is at 3:30.  So, you're getting email

25   traffic at 3:30 from someone at Citi.  You see the Citi

Page 197

```
 1    address.

 2             THE COURT:  Right.

 3             MR. TAMBE:  Right?  To Joel Wollman -- to Haider,

 4    and Joel Wollman is CCed.  And then Joel responds and says,

 5    "I'm asking you to offer me a positive IO," I believe is

 6    what it says.

 7             THE COURT:  IO is an indicative offer, or no?

 8             MR. TAMBE:  It's what?

 9             THE COURT:  What's IO?

10             MR. TAMBE:  I don't know what IO is.  We'll find

11    out from Mr. Wollman, right?  The point of this email is Mr.

12    Wollman sees in this email chain, "They're saying due at 4

13    p.m."  We know from the --

14             THE COURT:  But, when he says, "Which way are you

15    going on your IOs," isn't he asking who's in the money,

16    who's -- I mean, what -- I don't know what I'm looking at.

17             MR. TRACEY:  It's interest-only.

18             MR. TAMBE:  Interest-only.

19             THE COURT:  Interest-only.

20             MR. TRACEY:  Interest-only.

21             THE COURT:  So, clean versus dirty price, got it.

22    Okay.

23             MR. TAMBE:  I'm not sure it's clean versus dirty.

24             MR. TRACEY:  No, it's not that.

25             THE COURT:  No?
```

Page 198

1          MR. TAMBE:  It's not that.

2          MR. TRACEY:  It's interest-only; it's different

3    from a bid and different from an offer.  It's an interest-

4    only.

5          THE COURT:  Okay.

6          MR. TAMBE:  I'm not -- okay, now he -- now Mr.

7    Tracey is up.

8          THE COURT:  Now he's (indiscernible)?

9          MR. TAMBE:  We'll get evidence from a witness who

10   will tell us what that meant.

11         THE COURT:  Sounds good.

12         MR. TAMBE:  The point of this email, however, is

13   not whether it's IO or not.  It's Citi believed this to be

14   due at 4 p.m.  That's the point of this email.

15         THE COURT:  Okay.

16         MR. TAMBE:  Right?  And Mr. Wollman didn't correct

17   them, and he wouldn't have corrected them, because he told -

18   - his belief was 4 p.m. was the deadline.

19         So, last piece of this is, right, even on the

20   timeline they put up, it looks like it's around 2:00, 2:10

21   that they've got the script.  They're ready to go.  And we

22   know it wasn't -- the 15th wasn't the first time they

23   thought about this.  They'd been thinking about this since

24   September 8th, thinking about it some more over the weekend.

25   And yet they go out at 3:20 and they ask for quotes at 4

1    p.m.

2            It's Lehman Monday.  They know because they've

3    been on the phone with dealers doing replacement trades.

4    They've been actually doing replacement trades on the 15th.

5    They know dealers are busy.  They send over these

6    spreadsheets.  As far as we can tell, there's no real

7    follow-up to say, "Hey, will you give us a price?"  There's

8    no genuine effort to obtain market quotes.

9            THE COURT:  So, there was no -- they didn't work

10   the phones on the 16th?

11           MR. TAMBE:  No.  Didn't -- and they -- it seems to

12   us they were perfectly content letting market quotation fail

13   so they could then do what they needed to do to value these

14   trades.  And what they did, in our opinion, is they inflated

15   the values, they added on charges that no dealer would add

16   on, and you have all these hypothetical prices coming up

17   that doesn't reflect their actual total losses and cost.

18   And, before you know it, you're at $265 million being

19   demanded from the estate.

20           The other thing you heard a fair amount about in

21   the brief and today was this notion of a clear market

22   quotation hierarchy.  Contemporaneous evidence that a

23   hierarchy was actually present and was discussed with the

24   traders, was followed, is lacking.

25           There's no -- and so, why create this fiction of a

Page 200

1    hierarchy?  Because it gives a sense of regularity and due

2    regard to following some methodology.  And we'll go through

3    this when we examine their witnesses, when they tell you how

4    they value --

5                THE COURT:  But you concede the first two levels

6    of the hierarchy. I mean, everybody agrees that, if market

7    quotation succeeded --

8                MR. TAMBE:  Yeah.

9                THE COURT:  That's what we use.

10               MR. TAMBE:  Yeah.

11               THE COURT:  I think you also conceded that -- and

12   you're not challenging trades they actually replaced.

13               MR. TAMBE:  Mm hmm.

14               THE COURT:  So, Points 1 and 2 of the hierarchy

15   are conceded, right?

16               MR. TAMBE:  Right.  Right.  And then you get to --

17               THE COURT:  And then you get into --

18               MR. TAMBE:  The most rely --

19               THE COURT:  Other stuff.

20               MR. TAMBE:  Right.  And, on the other stuff, we'll

21   wait for their witnesses to see what position they're going

22   to take.  But we've seen a few different positions being

23   taken as to whether there was some hierarchy or ranking.

24   Or, for example, would they always take quotes they got

25   back?  So, they may not have gotten the full three market

Page 201

1    quotations.  But, if they got back one or two, did they

2    always take them?  Did some traders take them and others

3    didn't?  Right?

4             There's a suggestion that there's a regularity to

5    this process and the way it was applied, and we submit to

6    you the evidence will show, when they walk through their

7    valuation and tell you what they did on each position, it's

8    not going to hold up.

9             THE COURT:  Okay.

10            MR. TAMBE:  There may be broad patterns, but the

11   notion that there was a hierarchy that was followed, there

12   was a system, there was a methodology, I don't think is

13   true.  So, it's --

14            THE COURT:  Does -- do each of the traders who

15   were tasked with valuing the types of positions that they

16   were in -- does it have to be the case that each of them

17   followed the same methodology, as long as each of them can

18   support the reasonableness of the methodology that they

19   applied on their portfolios?

20            MR. TAMBE:  Well, it depends on whether QVT wants

21   you to believe there was a hierarchy across dealers.  And

22   the suggestion is that there was some hierarchy.  If they're

23   saying each trader did what he or she -- what he believed

24   was right?

25            THE COURT:  He.

Page 202

1          MR. TAMBE:  What he believed was right?  Well,

2    that's fine.  Then there isn't that type of hierarchy, and

3    maybe some had a hierarchy and others didn't.

4          THE COURT:  Okay.

5          MR. TAMBE:  Right?  But this notion that there is

6    this overall system to this I don't think is true, and I

7    think it's belied by the evidence when you go through the

8    separate lines and see what happened and when some data was

9    taken and other data was disregarded.

10         One of the reasons we found the hierarchy

11   explanation interesting was, if you went through this

12   checklist, where you said, "Okay, I'm going to see if I have

13   a market quotation; if I got that, I'm going to use it; if

14   there's a replacement, I'm going to use it; then I'm going

15   to go through the third category," if anyone was actually

16   following that kind of a system of checks, it would not have

17   been 2016 before they realized they have not stopped

18   quotations for 44 trades.

19         Right?  You would have realized, if there was a

20   system and a checklist that said, "Market quotation, yes or

21   no."  You didn't even ask for market quotations.  They'd

22   have known that day one.  They wouldn't have figured that

23   out in 2016.  It makes us wonder whether this is an after-

24   the-fact justification for what was otherwise a fairly

25   hurly-burly process with a lot less rigor to it than they

Page 203

1    would like you to believe now.

2            Right?  And that goes into your mix of whether

3    this was a reasonable, good faith effort to calculate total

4    losses and cost, or was this something else?

5            THE COURT:  I think, if you're -- if we're done

6    with market quotation?

7            MR. TAMBE:  Yeah.

8            THE COURT:  It would be a good stopping point for

9    us to let the 4:30 folks get into position.  And then you

10   folks can take a break, come and sit in the back, and then,

11   as soon as the 4:30 folks are done, we'll get back to it.

12   You don't have to decamp entirely.  Just create a little

13   spot for the 4:30 folks.  Come on up.

14      (Recess)

15            THE COURT:  Thank you for giving me the time

16   to take care of that.

17            MR. TAMBE:  We are back into --

18            THE COURT:  Books and records.

19            MR. TAMBE:  -- books and records, but just before

20   we go to books and records, I was reminded that I passed a

21   slide I should have covered.

22            THE COURT:  Okay.

23            MR. TAMBE:  And it's Slide 28.  And that's the 44

24   transactions, Your Honor --

25            THE COURT:  Okay.

Page 204

1          MR. TAMBE:  -- and only worth noting that that

2     includes CARB, but it includes 32 of these ABX transactions

3     and the ABX is an asset-backed index, and it's really an

4     index of CDS on subprime mortgage securitizations.

5          THE COURT:  Okay.

6          MR. TAMBE:  Okay, but it's a widely-traded

7     product, a liquid product, as is the iTraxx 9, which is

8     another one of these CDX -- CDS indices that's widely

9     traded, an interest rate swaps were as plain vanilla as they

10    get.  All we're noting on this slide is that, if you look at

11    this collection of 44 trades, they ultimately get valued at

12    a number that's $28 million dollars higher than the $915

13    valuation on QVT's books and records.

14          Okay, going to books and records.  Slide 38,

15    please?  This recaps how the valuation that underlies the

16    claim, which is the second-to-the-last column from the

17    right, compares to the values we have from QVT of the

18    positions as of the close of business on September 15th,

19    2008, the values that go into the collateral call that is

20    made the next morning on September 16th.  And then at the

21    bottom, you have the difference between that $382 million-

22    dollar claim valuation after you give effect to other

23    collateral, it's the 265 number.

24          And on Slide 39, that just tells you sort of by

25    bucket where the real changes in value are coming from.  So,

Page 205

1    a significant, significant change in value is really how

2    they changed their valuation of the PCDS contracts, but

3    there's also a significant change in the single-name CDS.

4    In the single-name CDS.  And as we go through sort of, the

5    reasons that underlie the changes, what's driving those

6    changes is just simply a change in midmarket from 9/12 to

7    9/15, or 9/15 to whatever this new valuation methodology is,

8    or is it something else, right?  And that gets -- you get at

9    that when you look at each specific type of trade and what's

10   driving the inflation, and we'll talk about that.

11         We've talked about, generally, the fact that

12   they're a sophisticated hedge fund.  They claim to be --

13   they wanted to build a best in class hedge fund.  Mr. Gold

14   as told us, as a fiduciary of the clients' investments, they

15   were obligated to protect the rights of their investors.

16   They have not just the obligation to calculate collateral

17   correctly, they had the right to do that under contract.

18   They had rights under the credit support annex, not simply

19   to accept Lehman's mark.  There's a dispute resolution

20   mechanism built into the CSA that says, if you are a party

21   on the other side of our valuation agent, you don't like the

22   value, you can institute a formal dispute process, and it's

23   a streamlined process that doesn't get you into litigation,

24   but results in a clarification of what's going on with the

25   valuation of particular positions, transactions, or the

Page 206

1    relationship as a whole.  Never invoked in the history of

2    this relationship.

3            And if it mattered, if these were significant

4    liquidity concerns, if there were significant concerns that

5    Lehman was the only game in town that would make these

6    products difficult to value, they had the right and the

7    obligation to their investors to do something about it.

8    they didn't, until Lehman no longer existed, and now it's a

9    completely different game because now, there is no Lehman to

10   push back and say, we're not going to accept that value.

11   We're not going to accept that calculation.  The commercial

12   realities that govern overreaching in derivatives

13   transactions, in a sense, go away once you have a default

14   and you have a bankruptcy entity.  Then all that remains is

15   this process, where we get an opportunity to evaluate what

16   the claims are based on, are they reasonable, were they done

17   in good faith, but the commercial reality of not wanting to

18   cross a (indiscernible) and you'll hear about that, the

19   check that ordinarily exists in the market where people will

20   not behave unreasonably, and commercial constraints keep a

21   tack on that, that goes away as soon as Lehman

22   (indiscernible)

23           THE COURT:  Was there anything in the documents?

24   I mean, this goes back to where we started the day with the

25   absence of documents, so, was there anything that, bearing

Page 207

1    in mind, you know, the visual of where folks were working,

2    et cetera, was there any discussion of this in the documents

3    that -- in emails or, was there anything?

4              MR. TAMBE:  So, I'll give you -- I think I know

5    what the question is going to.  If you look at 42, I think

6    there's some -- I'm not sure -- so, tell me if this answers

7    your question.  So, what I'm putting up on 42 is some

8    internal analyses that were done, right?

9              THE COURT:  Yeah, that's what I mean.

10             MR. TAMBE:  So, let's build to that, then.  If we

11   can just go to 41 for a second, just so -- so, at the

12   inception of each trade, right, the trade gets booked into

13   QVT's systems.  And the trades at inception have a zero

14   value.  They're priced at market, so you're not in the money

15   or out of the money on day one.  At the end of day one, the

16   markets have moved, someone's in the money, someone's out of

17   the money, and that changes day by day, right?  And when you

18   calculate the collateral positions, what you're calculating

19   is, if I'm valuing today and today's the termination date,

20   that's what I'm trying to get a picture on, right?  Pretty

21   important calculation.  So, historically, they'd use marks

22   from Lehman and third party pricing services, right?  And it

23   goes into a system called Tyche, T-Y-C-H-E, right?  There

24   are -- there's a system called, I think, Mordor, which gen -

25   -

Page 208

1          THE COURT:  Yes, highly amusing, right.

2          MR. TAMBE:  -- which generates margin faults,

3     right?  And there's a system called Beardstown that does the

4     month end marks, so there's a system.  There are systems in

5     place, not simply to take Lehman's marks and say, that's it,

6     we're done, our obligations to our investors are satisfied,

7     we can go on.  So now, let's get to 42.  So, we look through

8     and you see, okay, what kind of comments are you seeing in

9     the comment field there?  So, April 30th, 2008.  This is

10    with respect to PCDS.  It's a Beardstown file, five-year

11    senior SR at 60, right?  May 30th, 2008.  Mark versus ten-

12    year sub, this is PCDS.  Collateral report works out to

13    about 23010 recovery, reasonable since sub-ten year is 185.

14          Few things that come out from this, right?

15    They're not simply accepting Lehman's marks and saying,

16    that's it, we don't know what's behind it.  They're

17    comparing it to something and making themselves comfortable

18    that they can go into their books and records, be part of

19    the nav, and look what they're looking at. Five-year senior.

20    Ten-year subs, right?  There is something they're looking

21    at, as a frame of reference.

22          They're looking at the senior securities, the

23    subordinated securities and CDS on those positions, which,

24    by the way, in the PCDS pamphlet or publication that they

25    got from Lehman at the outset, are some of the things that

Page 209

1    were said, hey, that's something you should look at the

2    relationship between PCDS and CDS on senior versus sub,

3    right?  And you see them tracking that kind of data.  We

4    don't see this type of analysis after the fact.  After the

5    fact, it's just one thing and one thing alone that they look

6    at, and they do the most simplistic calculation, 100 minus

7    whatever the bond is trading at, the preferred security is

8    trading at.

9             And not any preferred security, the cheapest to

10   deliver security, so the lowest priced security on the

11   lowest priced day.  So, not all the check or the cross-check

12   that they had back in the day to say, well, that's really

13   what we should be looking at, that's really what drives this

14   analysis.

15            So, when we look at the books and records, we say,

16   well, where is the loss, right?  We have the 9/15 -- where's

17   the beef?  Where's the loss? 9/15 is, they have a value.  As

18   of 9/30, the trades have been removed from the trading book

19   and the testimony, and I think the documents support this,

20   is there's a booking that's done where, effectively, the

21   value of the trades is offset against the collateral that's

22   being held.  Very close.  There may be a few million here

23   and there, but it's -- effectively, it's a zero.  There's no

24   trading loss as a result of that, or there's a minimal

25   trading loss because of the replacement cost.  Not $260

Page 210

1    million dollars of trading loss, right?  So, as far as the

2    trading book where these trades have resided, since

3    inception, 'til the time they left, there isn't any evidence

4    of a material loss in that book.  Trades leave that book,

5    they show up in the side pocket, at a value of zero.

6           And I don't believe we have seen any documentation

7    from QVT saying the value of those trades, telling their

8    investors, we believe the value of those trades, forget

9    about the discount on Lehman claims and all that other

10   stuff.  The question you asked, I believe, Your Honor.

11   What's your assessment of what's the value of the trade?

12   What's your loss?  No such disclosure made to investors in

13   the side pocket, no such disclosure made to investors in the

14   original funds.  They -- investors, these positions, leave

15   the funds effectively flat.  No loss.

16          And what you have now is a side pocket where,

17   assuming you start at zero, somebody, either by resolution

18   or by judgment, there's going to be a claim.  We recognized,

19   there will be a claim.  We're not arguing for a zero claim

20   here, we're not arguing for a receivable.  We know there is

21   a claim.  Got to be a positive value to that account that

22   holds these transactions.  And the folks who will benefit

23   from that include substantially, a number of people who will

24   testify before you, and their interests in those returns

25   have been increasing over time, and, depending on where the

Page 211

1    fund is, if that is a profit, the two and twenty system

2    kicks in where the gain also feeds fees of the management

3    team.

4            So, if they're above their high water mark, that's

5    a profit, that's a gain, the 20 percent of profit kicks in

6    and again, management gets a piece of that.  So, what's the

7    point of it?  Well, you're going to hear, in the absence of

8    a whole lot of documents, about what people believe they did

9    back then, and what analyses they did back then,

10   distinguished from analyses that have been done more

11   recently, and why they did what they did.  Let's not forget,

12   the folks who will be telling you that have an interest,

13   real dollars and cents interest, in making out these claims.

14           This is the valuation date issue, 45.  So, for 500

15   of the transaction, this is on 46, a little more than 500 of

16   the transaction, I believe, when QVT had their slides up,

17   they have had the number 509.  It's roughly 500

18   transactions.  They used data that was post 9/15 data to

19   value those trades, so that's roughly 500 trades, that

20   includes, in that count, PCDS, which is valued using post

21   9/15 data.  It includes CARB, which is valued using post

22   9/15 data because they used the move for the entire week,

23   9/15 through 9/19 on GMAC to value that, but it also

24   includes trades that were valued using Markit prices.

25           And our point is quite simple.  The contract

Page 212

1    requires the valuation to be as of the termination date.  If

2    you're valuing these positions using data after the early

3    termination date when similar data was available, it was

4    reasonably practicable to do this calculation using 9/15

5    data, you can't claim 9/1t6, 9/17, 9/18 prices and values as

6    your loss as of the early termination date.  Because what's

7    necessarily included in those prices are things that

8    happened after you terminated.  And there were lots of

9    things happening that week.  There were other financial

10   institutions getting in trouble, there were talks of

11   government bailout or no bailout, there was other distress

12   in the market, and that is all reflected in these prices.

13   If you have prices from 9/15, if it's reasonably practicable

14   to do the calculation as of 9/15, they need to do it as of

15   9/15.

16          For this population of trades, so this is not the

17   500, this is a smaller population, using dates other than

18   9/15 increases the claim by $13.6 million.  Just that part

19   of it, not the add-ons and anything.  And we'll talk about

20   the date issue specifically on CARB and PCDS because that's

21   a different flavor of date issue.  It's not the Markit

22   flavor.  Let's get to charges.  There clearly were trades

23   that -- transactions that QVT as ones they intended to

24   replace, which to replace, and did replace.  Do you need

25   another copy of that because (indiscernible).

Page 213

```
 1              THE COURT:  It's come undone, but that's okay.

 2    I'm -- unless it bothers you, I'm good.

 3              MR. TAMBE:  No (indiscernible).  They do have

 4    numbers at the bottom, so I'm --

 5              THE COURT:  Yeah.

 6              MR. TAMBE:  -- I'm good.

 7              THE COURT:  You're on 50.

 8              MR. TAMBE:  They identified what they wanted to

 9    replace and they went about replacing them, starting as

10    early as, I think 5:00 or 6:00 in the morning on the 15th,

11    well before they delivered the termination notice.  And we

12    think the evidence will show that the trades they didn't

13    replace, they chose not to replace, because the price of

14    protection had gone up.  You've terminated your trade with

15    Lehman.  The price of protection has gone up.  The

16    protection may look valuable at a lower price, but at the

17    higher price, you might say, I don't know if these companies

18    are actually going to default.  If I hold a CDS, I could

19    hold it for five years and pay coupons, a higher rate of

20    coupon, and there could be no default.  So, they made a

21    decision.  We don't see evidence, we don't see a documentary

22    trail where they are pursuing replacement transactions with

23    any type of figure, right?  I think you can safely conclude,

24    they replaced what they wished to replace, and they chose

25    not to replace what they didn't feel like replacing because
```

Page 214

1    the price of protection had gone up after the Lehman

2    default.  And after the termination, more importantly.

3              If you look just --

4              THE COURT:  But if they're entitled to replicate

5    the economics of the position that terminated, why does that

6    matter?  Why aren't they entitled -- right?  Why aren't they

7    entitled to say that, we're entitled to be in the position

8    we would have been in, but for Lehman's default, and

9    therefore, so what?

10             MR. TAMBE:  So, let's talk about that, right?

11             THE COURT:  Okay.

12             MR. TAMBE:  Because the definition of loss doesn't

13   say replacement value.

14             THE COURT:  Right.

15             MR. TAMBE:  It says loss of bargain.

16             THE COURT:  Right.

17             MR. TAMBE:  And this gets you into discussion of

18   what, exactly, is the bargain when you're holding a CDS or

19   an interest rate swap, or any other instrument?  On any

20   given day, it's the present value of that stream of

21   payments.  If there is no termination, and if you look at

22   market quotation and you look in other parts of the

23   contract, one of the things you're trying to say is, trying

24   to value is, what would happen to this contract if it had

25   not been terminated?  What payments would have been

Page 215

1    exchanged between the parties?  That's a mid-market number.

2    That's a mid-market number.  It's a present value of two

3    cash flows.  How much am I paying out for the remaining life

4    of this deal, and what am I expecting to receive on the

5    other side of the swap?  That's a mid-market number.  That's

6    the bargain.  That's all it is.

7           Now, if you actually go out and replace, under

8    loss, you can say, yeah, I have total losses and costs, and

9    I've incurred the cost.  After incurring that cost and

10   paying a dealer the bid-ask spread, I still get just the

11   present value of the cash flows.  I don't get the profit

12   that goes to the dealer.  That's the dealer's profit, not

13   mine.  That's not their loss or their cost.  And that's why,

14   when you look at the values that Lehman's experts have come

15   up with, what they said is, look, if you're doing a

16   replacement value, if you do it properly, this is the kind

17   of result you could obtain.  I want to be quite clear to say

18   as a legal matter, we're saying it's a decision for you to

19   make, and it may well be a decision of first impression, but

20   based on the plain language of the loss definition, that if

21   you didn't incur those costs and expenses, they're not your

22   losses and costs.  You do get the benefit of your bargain,

23   you get the mark-to-market and that moved in your favor, you

24   get the benefit of that through the termination date, but

25   not after the termination date.  They get to keep the

Page 216

1    collateral, $117 million dollars of collateral they're

2    holding, and they get more, but they don't get more than

3    what they actually incurred.

4         So, let's go to the bid-ask spread discussion.

5    There was an extended discussion about ten percent, it's

6    really a range of three to fifteen, and that there was this

7    finely-attenuated analysis that was done.  Is it an on-the-

8    run contract, is not an on-the-run contract.  I think there

9    was an American Airlines page that you saw with all sorts of

10   different (indiscernible).  Well, let's look at 52.  That's

11   an actual list of names from this transaction, set of

12   transactions.  VC, which I think is Visteon Corp, and it's a

13   same -- it's the same issuer, and then you have different

14   maturities, and I think Mr. Brunn or Mr. Chu is going to

15   tell you how to read those definitions, so if you read the

16   first line on Page 52, 09 03 20, I think that's a CDS that's

17   expiring on March 20th, 2009, okay?  And there's a DS1 and a

18   DS1Q, and I believe what that is, is the first trade is the

19   QVT trade and the second trade is the Quintessence trade,

20   okay?  So, you have pairs of transactions moving there.

21        You will see different quantities, different

22   maturities, exactly the same bid mid adjustment.  So, when

23   you actually examine what traders did with particular names

24   in this portfolio, you don't see this rational, methodical

25   process where distinctions are being made for maturity and

Page 217

1    size of trade.  Sometimes they are, sometimes they're not.

2    and with respect to the ten percent bid mid adjustment,

3    which is a 20 percent bid-ask spread, our view is, that's

4    entirely arbitrary and far too large, and we'll talk about

5    why we believe that to be the case with respect to the vast

6    majority of these charges that are added on, and in many

7    instances, these are added on not to the 9/15 values, but to

8    the 9/16 values.  So, the mid-market has already moved up,

9    and they're asking for a 10 percent cushion above that

10   change in the mid-market.

11          This is a graph from one of their reports, and

12   what they are showing you, Your Honor, is spread data.  And

13   I believe this is Figure 7 in Professor Pfleiderer rebuttal

14   report.  And you say, wow, the world really fell off a

15   cliff, didn't it?  And your eyes are naturally drawn to the

16   high point in that graph.  And you might be thinking, that

17   high point's got to be 9/15.  That's got to be 9/15.  That's

18   got to be when the world nearly ended.  That's when things

19   came to a halt and no one knew what to do.  They don't tell

20   you where 9/15 is on that graph, so let's start with that.

21   Let's turn to 54.  That's where 9/15 is on that graph.  It's

22   not the best of times, but it's not the worst of times.

23   Things got a lot worse after 9/15, and we've talked about

24   these folks who were doing the calculation and looking at

25   the move in the markets after 9/15.  That's what they were

Page 218

1    seeing.  They've terminated, they've elected to terminate on

2    9/15, and the markets have moved.  These are composites,

3    financials and others.

4             So, now we know where 9/15 is on this, and we can

5    drill down a little bit more and say, where exactly, in that

6    September time period -- this is all Professor Pfleiderer's

7    data, by the way.  Where, exactly, in that timeframe is

8    9/15?  Oh, there it is.  It's before that big spike.  It's

9    after a bump up, but it's before that big spike.  And right

10   after that big spike, the spreads come right back down.  But

11   they picked 9/16 to value the vast majority of their market

12   transactions.  They were sitting out in October, they

13   submitted the calculation statement on October 15th, they

14   see this pattern, they pick 9/16 for the vast majority of

15   the Markit transactions.

16            Let's look at the left-hand scale.  That's

17   important.  So, going back to things I learned from Danny

18   Connor, let's look at the left-hand scale on Slide 53.

19   Remember when we talked about a 10 percent bid mid

20   adjustment?  That's not telling you anything about that.

21   You think it is, but it's not.  It's only telling you the

22   absolute spread number.

23            THE COURT:  It's a bid-ask.

24            MR. TAMBE:  It's -- no, not even the bid-ask.

25   It's the absolute spread.  How did spreads widen?

Page 219

1          THE COURT:  So, you'll have to explain this.  So,

2     this says -- this says it's the bid-ask.

3          MR. TAMBE:  Yeah, but not in percentage terms.

4     It's in absolute terms, in points.

5          THE COURT:  Ah.

6          MR. TAMBE:  The adjustment they made was at 10

7     percent of par.  It was a percentage adjustment they were

8     making, not an absolute adjustment.

9          THE COURT:  Right.

10          MR. TAMBE:  You look at this and you see 100 and

11     125, 75, you see these big numbers out here.  They're

12     talking about absolute point spreads, not percentage point

13     spreads.

14          THE COURT:  Okay.  So, you're going to give me a

15     chart that shows it?

16          MR. TAMBE:  Yup.  Well, see Professor Pfleiderer

17     could have given you that chart because that's his data on

18     56.  He picked the column that has the absolute numbers, the

19     bid-ask 15.81, for example, in the first row?

20          THE COURT:  Yeah.  Yep.

21          MR. TAMBE:  He had the data that allowed him to

22     compare a percentage bid-ask to mid.  So, that's the bid-ask

23     spread in percentage terms, compared to the mid.  So again,

24     it's the full bid-ask spread, but in percentage terms.  It's

25     still not the bid mid.  The bid mid would be half of that,

Page 220

1    right?  So, he has data in his data set, and this is just

2    the September data set.  He had the data set going back, I

3    think to 2007 all the way through the end of 2008.  So, he

4    has that in his possession, but the chart he shows you is

5    falling off the cliff, right?  It's the chart you see from

6    Professor Pfleiderer is 53.  You don't see this data and

7    what this data drive is 57.

8               That's what's really happening to bid mid spread

9    as a percentage of CARB in that bid set.  They're going

10   down.  That might astound you.  But they're going down the

11   percentage of the overall spread because the overall spread

12   is increasing.  They're getting the benefit of that when

13   they get the mids.  The mids show them that they're getting

14   the benefit of that rising spread market, right?  But this

15   is what the data is showing about the spreads as a

16   percentage of par, and again, you could dive deeper into the

17   data, so you're looking at September and October of 2008,

18   and again, it's higher after the 15th, right, and then it

19   declines later on in the month.  But they're sitting out in

20   October 15th, and they look back, and they say, no, we're

21   just going to take a 10 percent bid mid adjustment, okay?

22   Double what's shown by this data from Professor Pfleiderer.

23              All right, so let's talk about some of the

24   specific valuations.

25              THE COURT:  Let's decide if we're going to keep

Page 221

1    going if we're going to call it a night.  I think it might

2    be a good idea before we get into CARB valuations, which

3    looks like it's got a fair number of slides, to call it a

4    night, so.

5                MR. TAMBE:  That would be (indiscernible).

6                THE COURT:  You still have a number of tabs to go.

7                MR. TAMBE:  Yep.

8                THE COURT:  What do you think in terms of how much

9    longer you have tomorrow, Mr. Tambe?  I've lost track of how

10   long you've been speaking, to be honest.

11               MR. TAMBE:  About 15 minutes, no -- I'll have, I

12   think, an hour to go.

13               THE COURT:  Okay.

14               MR. TAMBE:  I think.

15               THE COURT:  So, that's good.  So, excuse me, we'll

16   start at 10:00, you'll finish at 11:00, we'll take a brief

17   break, and then who are we going to hear from in terms of a

18   witness, Mr. Tracey?

19               MR. TRACEY:  The first witness will be Nick Brunn.

20               THE COURT:  Okay.

21               MR. TRACEY:  He'll be ready to go any time

22   tomorrow.

23               THE COURT:  Okay.

24               MR. TRACEY:  I think one thing we left open was

25   the one and done issue.  I don't know that we ever decided

Page 222

1    that.  I think --

2             THE COURT:  I think we agreed that it was going to

3    be one and done -- we were going to call one and done on

4    each witness before they started, so that's for you two to

5    discuss --

6             MR. TRACEY:  Okay, so we'll -- we'll need to talk

7    about that

8             THE COURT:  -- and then let me know so that I know

9    what we're doing in terms of the scope.  Is that too short-

10   hand?  Everybody knows --

11            MR. TRACEY:  No, that's fine.

12            THE COURT:  -- what're talking about?

13            MR. TRACEY:  Sure.

14            THE COURT:  Okay.

15            MR. TAMBE:  Can I have (indiscernible) request,

16   Your Honor?

17            THE COURT:  Yeah.  I'm just trying to think if I

18   have any other matters that I'm squeezing in tomorrow.  I

19   don't think so.  Okay, go ahead.

20            MR. TAMBE:  What we anticipate is, there's going

21   to be a series of fact witnesses who will talk about

22   specific parts of the valuation.

23            THE COURT:  Right.

24            MR. TAMBE:  It would be helpful to know, even if

25   we know the night before, if a witness is -- what specific

1    line items or product types the witness will talk about?

2              THE COURT:  Well, that's what -- when I talked to

3    Mr. Tracey about the buckets, the schematic, that's what I

4    wanted to know ahead of time so that I -- if there's going

5    to be -- if a particular witness is going to testify across

6    different products versus only talking about CARB versus --

7    but don't you know that from --

8              MR. TRACEY:  We've had so many depositions, they

9    know that.

10             THE COURT:  Okay.  All right.

11             MR. TRACEY:  Yeah.

12             THE COURT:  So, you don't know -- you don't

13   necessarily know?

14             MR. TAMBE:  We don't necessarily know, that's the

15   issue.

16             THE COURT:  Okay.

17             MR. TAMBE:  So, I expect -- I fully expect Mr. Chu

18   to address PCDS and CARB, okay?  I expect that.  But if

19   someone else is going to address PCDS and CARB, I'd like to

20   know that before that someone gets on the stands because

21   part of what we're going to be doing, no surprises, with the

22   fact witnesses is, we're going to be walking through some

23   spreadsheets, and that's laborious, and that requires us to

24   do some prep in terms of the examples we want to show you --

25             THE COURT:  Okay.

08-13555-mg   Doc 54790   Filed 02/01/17   Entered 02/16/17 15:26:05   Main Document
                              Pg 224 of 226

1              MR. TAMBE:  -- with the fact witness.  So that's -

2    - we just want a little heads up --

3              THE COURT:  Okay, I'm sure they'll give it to you.

4              MR. TRACEY:  Of course.

5              THE COURT:  So --

6              MR. TAMBE:  You don't expect Mr. Brunn to talk

7    about any specific line items?  That's our expectation based

8    on the role he played.  Is that a fair --

9              MR. TRACEY:  That is.  Mr. Brunn did not

10   personally value any positions, so, he's not going to be

11   presenting any testimony about valuations (indiscernible)

12   positions.

13             THE COURT:  Okay.

14             MR. TAMBE:  That's all.

15             THE COURT:  All right, in terms of expectations

16   for tomorrow, tomorrow we're only going to go to 5:00.  I

17   actually have to do a -- teach a class tomorrow night on

18   Brazilian and Mexican bankruptcy law.  Why not?  So --

19             MR. TRACEY:  And you have a lot of time to prepare

20   for that, Your Honor.

21             THE COURT:  Already done.  So it'll only be until

22   5:00 tomorrow night so that I can get to where I need to be,

23   all right?  Thank you very much.  You can obviously leave

24   your stuff where it is, just tidy up, and I will just ask

25   you to throw away any spare water bottles that you have.

Veritext Legal Solutions

212-267-6868                    www.veritext.com                    516-608-2400

Page 225

1      Thanks very much.

2                MR. TAMBE:  Thank you, Your Honor.

3                MR. TRACEY:  Thank you, Your Honor.

4                THE COURT:  Thanks, Matt.

5           (Whereupon these proceedings were concluded at 5:50 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 226

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya                    Digitally signed by Sonya Ledanski
                              Hyde
                              DN: cn=Sonya Ledanski Hyde, o, ou,
7    Ledanski Hyde            email=digital1@veritext.com, c=US
                              Date: 2017.02.01 16:40:31 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 1, 2017