Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  U.S. Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  February 1, 2017

17                  1:04 PM

18

19

20

21   B E F O R E :

22   HON SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: RACHEL

Page 2

1    Hearing re:   Trial on Lehman's Objection to Claims of QVT

2    (Doc # 17468 Debtors' One Hundred Fifty-Fifth Omnibus

3    Objection to Claims)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    HOGAN LOVELLS US LLP

 4          Attorneys for QVT FUND LP

 5          875 Third Avenue

 6          New York, NY 10022

 7

 8    BY:  JOHN D. BECK

 9          BEN LEWIS

10          DENNIS H. TRACEY, III

11          WILLIAM B. REGAN

12          ROBIN E. KELLER

13

14    JONES DAY

15          Attorneys for the Debtor

16          250 Vesey Street

17          New York, NY 10281

18

19    BY:  LAURI W. SAWYER

20          JENNIFER DEL MEDICO

21          RYAN J. ANDREOLI

22          REBEKAH BLAKE

23          SARAH EFRONSON

24          JAYANT W. TAMBE

25          ROBIN E. KELLER
```

1    NICK BRUMM - QVT - WITNESS

2

3    ALSO PRESENT TELEPHONICALLY:

4

5    CHARLES WITTMANN-TODD

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  All right, so we're going to get

3    started.  It's a little after 1:00.  I would like to thank

4    everybody for their patience.  My apologies for the delayed

5    start.  This happens from time to time, as things develop

6    during the course of the trial, and I do appreciate that

7    it's expensive to have lawyers sitting around for a couple

8    of hours, but it is what it is.  So, thank you, and thank

9    you for the non-lawyers who sat through this morning.

10            So, Mr. Brumm, I think we're ready for you again.

11   You folks who are in the sun, you're welcome to shut the

12   curtains if the sun is bothering you.  You remain under

13   oath, Mr. Brumm.

14            MR. BRUMM:  Thank you, Your Honor.  I recall that.

15            THE COURT:  Okay.

16            DIRECT EXAMINATION OF NICK BRUMM

17   BY MR. REGAN:

18   Q    Mr. Brumm, yesterday you testified that on September

19   15th, 2008, QVT decided to terminate its (indiscernible)

20   agreements with Lehman.  Do you recall that testimony?

21   A    I do recall that testimony.

22   Q    You also testified that, in connection with the market

23   solicitation process, you reached out to counsel at some

24   point in time.  Do you recall that, as well?

25   A    I do recall that.

Page 6

1   Q    Do you recall when the first point in time is that you

2   reached out to counsel in connection with the market

3   quotation solicitation?

4   A    I recall reaching out to counsel on the evening of

5   September 14th, 2008.

6   Q    And which counsel is that?

7   A    I reached out to Mr. Dan Cunningham of Allen and Overy.

8   Q    And which -- I'm sorry, what -- you answered that.

9   Never mind.  Do you know what time you reached out to Mr.

10  Cunningham?

11  A    I reached out to him by email at -- in the evening.

12  Q    We provided you with a packet of documents that have

13  been produced to Lehman, and hopefully the court has a copy

14  as well.

15          THE COURT: I do not.

16          MR. REGAN: We have another copy.  (indiscernible)

17  Your Honor, one second?

18          THE COURT:  Sure.

19          MS. SAWYER:  I just wanted to understand what's

20  been handed up.

21          THE COURT:  Yeah, let's -- for the record, let's

22  make sure that...

23          MR. REGAN:  We have handed -- we have provided to

24  Lehman and to the court a series of Exhibits marked 2112

25  through 2128.  These are documents that are within the scope

Page 7

1    of the court's recent privilege ruling.  They have been

2    redacted in part and provided to the witness, to Lehman's

3    counsel, and to the court.

4            THE COURT:  Okay, Miss Sawyer, did you want to go

5    through these, one-by-one, to make sure that we all have the

6    same set, or are you willing to accept the representation?

7            MS. SAWYER:  Yeah, I mean, I think I'm willing to

8    accept the representation that each of those exhibits was in

9    the set that was handed up to the court.  I think if we come

10   across an issue, we'll realize it, I think, quickly.

11           THE COURT:  Okay.  All right, thank you.

12   Q    Mr. Brumm, if you could, turn to Exhibit 2112 in the

13   packet that you have.

14   A    Yes, (indiscernible).

15   Q    Do you recognize Exhibit 2112?

16   A    I do.

17   Q    What is it?

18   A    It's an email that I sent to Dan Cunningham of Allen

19   and Overy on Sunday, September 14th, 2008, at 7:18:51 p.m.

20   Q    And did you speak with Mr. Cunningham on Sunday

21   evening, September 14th?

22   A    I did not speak with him.

23   Q    Do you know if Mr. Cunningham responded to your email?

24   A    He did respond to my email.  He gave me a number on

25   which to call him, but I was not able to reach him that

Page 8

1    evening.

2    Q    If I can direct your attention to the second document

3    in your packet, Exhibit 2112.  What is that email?

4              MS. SAWYER:  My second document is --

5              MR. REGAN:  I'm sorry.  The first document is 2112

6    -- 2113.  Sorry, I made a wrong --

7              THE COURT:  Hold on.  Hold on.  Yes, Ms. Sawyer?

8              MS. SAWYER:  I was going to say my document is

9    2113.

10             MR. REGAN:  I just read it wrong; 2113.

11             THE COURT:  Okay.

12             MS. SAWYER:  Okay.

13             MR. REGAN:  Sorry, I was saying the same thing.

14   Excuse me.

15             THE COURT:  Uh-huh.

16   Q    Mr. Brumm, do you recognize Exhibit 2113?

17   A    I do.

18   Q    What is it?

19   A    It's an email from Mr. Cunningham to me on Sunday,

20   September 14th, 2008, 7:25 p.m., responding to the email

21   that I had earlier sent him, saying -- giving me a number on

22   which I could call him that evening.

23   Q    And did you attempt to call him that evening?

24   A    I did attempt to call him that evening.

25   Q    If you can, turn to the next Exhibit in your packet,

Page 9

1    2114.

2    A    Yes.

3    Q    What is Exhibit 2114?

4    A    Exhibit 2114 is an email from me to Dan Cunningham

5    dated Monday, September 15th, 2008, at 8:05 a.m.

6    Q    And did you send an email -- did you send this email to

7    Mr. Cunningham on that day and at that time?

8    A    I did.

9    Q    And did you speak with Mr. Cunningham at that time?

10   A    No, I spoke with Mr. Cunningham later that morning.

11   Q    Do you know what time you spoke with Mr. Cunningham?

12   A    I don't know what time I spoke with him.  I just know

13   it was later that morning.

14   Q    Did you speak with Mr. Cunningham, or have email

15   communication with Mr. Cunningham?

16   A    I -- well, I -- both.  I spoke with him later that

17   morning.

18   Q    And did you send -- exchange emails with Mr. Cunningham

19   on September 15th?

20   A    I did.

21   Q    If you can, turn to Exhibit 2115 in your packet.  What

22   is Exhibit 2115?

23   A    Exhibit 2115 is an email from me to Mr. Cunningham from

24   Monday, September 15th, 2008, dated 10:54 a.m.

25   Q    And what is the attachment?

Page 10

1   A    The attachment to the email is a draft request for

2   market quotations to reference market makers.

3            MS. SAWYER: Your Honor?

4            THE COURT:  Yes, Ms. Sawyer?

5            MS. SAWYER:  Note my understanding of Exhibit 2115

6   is the attachment is actually an Excel spreadsheet that's

7   available I native form, as well, so I just wanted to make

8   the record clear that we're all looking at a printout of

9   something that's available natively.

10           MR. REGAN:  (indiscernible).

11           THE COURT:  Okay.

12  Q    Did Mr. Cunningham respond to your email, that is,

13  Exhibit 2115?

14  A    He responded later in the day, yes.

15  Q    Do you know what time Mr. Cunningham responded?

16  A    It was after 3:00.

17  Q    If you could, turn to Exhibit 2126 in your packet.

18  A    2116 or 21 --

19  Q    2126.  I jumped ahead a bit.

20  A    2126, I'm sorry.  Okay, I'm there.

21  Q    What is Exhibit 2126?

22  A    Exhibit 2126 is an email from Mr. Cunningham to me,

23  from Monday, September 15th, 2008, at 3:11 p.m.

24  Q    Is there one or more than one email in Exhibit 2126?

25  A    There is more than one email.  There are several emails

1    there.   There is the email that I sent at 10:54 a.m. that

2    was the prior exhibit, I believe, that we looked at.   And

3    then, there is another email in which I respond to Mr.

4    Cunningham at 3:31 p.m.

5    Q     What did Mr. Cunningham advise you in the 3:12 p.m.

6    email, or 3:11 p.m., on the first page?

7    A     The 3:11 p.m. email states looks okay, don't spend a

8    lot of time on this.

9    Q     What is that in reference to?

10   A     It's in reference to the draft market quotation request

11   that I sent to him at 10:54.

12   Q     Did you reach out to any other counsel in connection

13   with the market quotation (indiscernible) quotation on

14   September 15th, 2008?

15   A     I did.

16   Q     Who was that?

17   A     I reached out to Jeannette Boot at WilmerHale, also in

18   the New York office.

19   Q     What time did you reach out to Ms. Boot?

20   A     Well I actually asked Mr. Metter, I believe, to reach

21   out to Ms. Boot.

22   Q     Do you know what time that was?

23   A     It was in the morning, sometime after I sent Mr.

24   Cunningham the draft market quotation request.

25   Q     If you could, turn to Exhibit 2116 in your packet.

Page 12

1    A    Yes.

2    Q    What is Exhibit 2116?

3    A    Exhibit 2116 is a email from me to Adam Metter, dated

4    September 15th, 2008, 12:27 p.m.

5    Q    And what did you ask Mr. Metter to do in this email?

6    A    Well, the subject line is please send to Jeannette.

7    That was Jeannette Boot.  And then I gave down below some

8    language on -- from the market quotation request.

9    Q    Who is Mr. Metter?

10   A    Mr. Metter was a -- is a documentation specialist at --

11   employed by QVT.

12   Q    Do you know if Mr. Metter forwarded your request on to

13   Ms. Boot?

14   A    Yes, he did.

15   Q    Do you know what time?

16   A    It was shortly thereafter.

17   Q    If you could, turn to Exhibit 2117 in your packet.

18   What is that exhibit?

19   A    Exhibit 2117 is a email from Mr. Metter to Ms. Boot

20   from Monday, September 15th, 2008, at 12:28 p.m.

21   Q    And does Mr. Metter in fact forward your language on to

22   Ms. Boot?

23   A    He does.

24   Q    And do you know if Ms. Boot responded to Mr. Metter?

25   A    She did.

Page 13

1   Q    Do you know what time?

2   A    It was shortly thereafter; I think 20 minutes, a half

3   hour later.

4   Q    If you could, turn to exhibit 2118 in your packet.

5   A    Yep.

6   Q    What is Exhibit 2118?

7   A    Exhibit 2118 is an email from Ms. Boot to Mr. Metter,

8   dated September 15th, 2008, at 1:03 p.m.

9   Q    And what information does Ms. Boot provide to Mr.

10  Metter in Exhibit 2118?

11  A    Ms. Boot provides some suggested language to Mr.

12  Metter.

13  Q    What is that language?

14  A    The language states please provide market quotations as

15  of 4:00 p.m. New York time on September 15, 2008, based on

16  the actual (indiscernible) amounts and other relevant

17  information provided to you in the attachment in respect to

18  the transactions in writing by return email.  Please

19  maintain the confidentiality of this quotation request in

20  all respects.

21  Q    Did Mr. Metter pass Ms. Boot's language on to you?

22  A    He did.

23  Q    Do you know what time that was?

24  A    I believe immediately.

25  Q    If you could, turn to Exhibit 2119 in your packet.

Page 14

1    A    Yeah.

2    Q    What is Exhibit 2119?

3    A    Exhibit 2119 is an email from Adam Metter to me, dated

4    Monday, September 15th, 2008, at 1:04 p.m.

5    Q    And does Exhibit 2119 contain any other emails?

6    A    Yes, it contains the email from Jeannette Boot --

7    Q    I'm sorry --

8    A    I'm sorry --

9    Q    There appears to be a copying problem with 2119, so I'm

10   going to strike that whole line of testimony relating to

11   2119.  The same document appears at 2120 in a more complete

12   form.  If you wouldn't mind turning to Exhibit 2120.

13          MS. SAWYER: Hold on.

14          THE COURT:  Let's slow down.  Let's --

15          MS. SAWYER:  So --

16          THE COURT:  Go ahead.

17          MS. SAWYER:  I just want to make -- I wasn't clear

18   exactly what -- what we were doing.

19          MR. REGAN:  2119 and 2120 are duplicates, but 2119

20   appears to be cut off, so I would like to use 2120.

21          THE COURT:  All right, let's give -- you want a

22   moment to look at -- compare the two?

23          MS. SAWYER:  I think I've got it.  Okay, I'm

24   following.

25          THE COURT:  Okay, go ahead.

Page 15

1    Q    Sorry, Mr. Brumm.  What is Exhibit 2120?

2    A    Exhibit 2120 is an email from Adam Metter to me, dated

3    Monday, September 15th, 2008, at 1:04 p.m.

4    Q    And are there any other emails contained in Exhibit

5    2120?

6    A    Yes.  Mr. Metter was forwarding to me the response that

7    he had received from Ms. Boot, which is the email that we

8    had looked at in the Exhibit 2118, I guess it is.  And just

9    before the -- it has the full email trail from when I asked

10   him to send the draft language to Jeannette Boot.

11   Q    Did you reach out to Ms. Boot at any other point in

12   time on September 15th in connection with the market

13   quotation solicitation?

14   A    Yes.

15   Q    Do you know what time that was?

16   A    I don't know exactly what time it was, but around the

17   time of these emails, I recall that Mr. Metter and I had a

18   phone conversation with Ms. Boot.

19   Q    And did you have any further email conversations, email

20   communications with Ms. Boot?

21   A    Yes.

22   Q    Do you know what time those were?

23   A    It was shortly after this; I would say within a half

24   hour or so.

25   Q    If you could, turn to Exhibit 2122 in your packet.

Page 16

1   A    Okay.  Yes.

2   Q    What is Exhibit 2122?

3   A    Exhibit 2122 is an email from me to Ms. Boot, copying

4   Mr. Metter, dated Monday, September 15th, 2008, at 1:24 p.m.

5   Q    And is there one or more than one email in Exhibit

6   2122?

7   A    There are additional emails.  I believe these emails

8   are the ones we just looked at.  There's the 1:04 p.m. one

9   from Adam Metter to me, forwarding Jeannette's 1:04 p.m.

10  email.

11  Q    Is there an attachment to the top email in Exhibit

12  2122?

13  A    There is an attachment to it.

14  Q    Is the last page of Exhibit 2122 that attachment?

15  A    I believe it is.

16  Q    Did Ms. Boot respond to your email that is at the top

17  of Exhibit 2122?

18  A    She did respond to my email.

19  Q    Do you know what time Ms. Boot responded to your email?

20  A    Very shortly thereafter.

21  Q    If you could, turn to Exhibit 2123 in your packet.

22  A    Okay.

23  Q    What is Exhibit 2123?

24  A    Exhibit 2123 is an email from Ms. Boot to me, copying

25  Adam Metter, dated Monday, September 15th, 2008, at 1:35

Page 17

1    p.m.

2    Q    And is that top email on Exhibit 2123 a response to the

3    email below?

4    A    Yes, I believe it is.  It's a response to the

5    attachment that I had sent her; prior email that we looked

6    at, where I'd asked her to review that.

7    Q    What was Ms. Boot's response?

8    A    Ms. Boot's response was looks good.

9    Q    Internally at QVT, what other steps did you take in

10    preparing the market quotation solicitations?

11    A    Well, we drafted the language for the market quotation

12    solicitation.  And then in addition, there was a second work

13    stream that was really my partner, Joe Lowman, was the

14    compiling of the master list of positions that we would be

15    seeing market quotation on.  And then the division of that

16    master list into three separate lists, based on the type of

17    CDS that it was.  We divided it into a corporate index

18    request list, a EBS request list, and an emerging markets

19    request list, because those would be going to different

20    trading desks at the dealers.

21    Q    And how long did Mr. Lowman's work stream take?

22    A    I think it took him the better part of the morning from

23    whenever he started, and certainly into the afternoon.  It

24    was complete sometime, I believe, between 2:00 and 3:00.

25    Q    And how long did it take to complete your process of

Page 18

1    preparing the market quotation language?

2    A    Around the same time.  I believe that the language was

3    substantially final shortly after I received this looks-good

4    message from Ms. Boot.

5    Q    If you could, turn to Exhibit 54 in your binder.

6    A    Okay.  (indiscernible) 54?

7    Q    Yes.

8    A    Yes, I'm there.

9    Q    Do you recognize Exhibit 54?

10   A    I do.

11   Q    What is it?

12   A    It's an email from Joe Lowman to me, Dan Gold, and

13   Arthur Chu, dated Monday, September 15th, 2008, at 11:28

14   a.m.

15   Q    And what information is Mr. Lowman providing to you,

16   Mr. Gold, and Mr. Chu?

17   A    Mr. Lowman is indicating that this is a -- what's he

18   originally drafted and was thinking of circulating.  It has

19   some EBS-specific features, like fixed variable cap

20   distinctions, and I break it out by type.  But otherwise, I

21   would think that corporates would fit into the same

22   structure, probably broken out by IG, HY, LCDS index.

23   Q    And there appears to be multiple messages on Exhibit

24   54.  What is the bottom message?

25   A    The bottom message is a breakdown of positions between

Page 19

1    different categories, a BWIC, a bid wanted in comp, a OWIC,

2    an offer wanted in comp, and a IOWIC, interest-only, I

3    believe, wanted in comp.  And the positions have been broken

4    down into those categories.

5    Q    You explained what the BWIC and OWIC acronyms were, but

6    can you tell us what they mean?

7    A    Sure.  A BWIC or an OWIC or a BWIC/OWIC is a form of

8    solicitation of tradable levels.  It's frequently done for

9    both the purposes of trading, sometimes for purposes of

10   marking, and -- but it's particularly done in the context of

11   less-liquid securities because it's a way to try to indicate

12   that you have a serious intention of trading the less that

13   you put out, and thus, you're looking for people to put

14   their best foot forward and give you actual levels.  So it

15   deals with the problem that if you just ask for quotes on

16   liquid securities, you may get levels that are designed to

17   shade the market very much whichever way the dealer would

18   like to go, knowing that it's not really a trade situation.

19   Q    What, if anything, does a BWIC or OWIC have to do with

20   the market quotation solicitation?

21            MS. SAWYER:  Objection, calls for speculation.

22            MR. REGAN:  This is Mr. Lowman's September 15th,

23   2008 email.  He's using that language in a communication to

24   Mr. Brumm, as he's in the process of --

25            THE COURT:  The question is -- forget about the

Page 20

1    document.  The question is what is BWIC/OWIC have to do with

2    market quotation, so Mr. Brumm can answer that, to the

3    extent you have knowledge.

4    A    Okay.  So, market quotation, it was our understanding

5    at the time that it requires you to seek actual, actionable

6    levels.  A BWIC/OWIC is also an indication that we're

7    seeking actionable levels, so to that extent, they're

8    similar.  And the term BWIC/OWIC was much more familiar to

9    dealers than the term market quotation was.  Dealers do

10   BWIC/OWICs all the time, across a wide variety of

11   instruments.  It's not limited to CDS.  It's very prevalent

12   in all types of bond trading, and we knew that was a term

13   that dealers would understand.  We didn't necessarily think

14   that dealers don't very often get market quotation requests

15   (indiscernible), so that's why we were using that language.

16   Q    If you could, turn to Exhibit 2074 in your binder.

17   A    Okay.  I'm there.

18   Q    What is Exhibit 2074?

19   A    Exhibit 2074 is an email from Joe Lowman, dated Monday,

20   September 15th, 2008, at 11:17, to me, Dan Gold, and Arthur

21   Chu.

22   Q    And what information is conveyed in Exhibit 2074?

23   A    In Exhibit 2074, Mr. Lowman states for example -- this

24   is an example of a list that is out there, which I believe

25   is related to the request for tradable levels.

Page 21

1   Q    And what, if anything, does Exhibit 2074 have to do

2   with the market quotation solicitation?

3   A    So, Mr. Lowman was stating here that he believed that -

4   - this list that had been put out that states at the top

5   intraday, 2:30 p.m. ADS, CDS, BWIC, OWIC in the subject line

6   of the email.  Mr. Lowman was stating that he believes that

7   this list of positions -- I think these are probably CDS,

8   although I can't be certain looking at it, whether it

9   relates to CDS or bonds, but I'm pretty sure it's CDS from

10  the strike language -- that this is an example of a list

11  that someone has out there.  I think he must have meant it

12  was related to CDS, because he say this is a list that is

13  out there that someone is seeking essentially market

14  quotation on.

15          MS. SAWYER:  Your Honor, I move to strike that

16  response as recounting hearsay from Mr. Lowman, who is going

17  to be taking the stand.

18          MR. REGAN:  I don't know if the whole response

19  was.  He said Mr. Lowman must have meant...  Maybe from that

20  point on.

21          MS. SAWYER:  Well, then I think that would be

22  speculation.

23          THE COURT:  Well, then that would be speculation,

24  so I think either way, we're going to have to hear from Mr.

25  Lowman on this, and to that extent, we'll strike the

Page 22

1   testimony.

2   Q     Mr. Brumm, can you turn to Exhibit 2076?

3   A     Sure.

4   Q     What is Exhibit 2076?

5   A     It's an email from me to Dan Gold, Arthur Chu, and Joe

6   Lowman, dated Monday, September 15th, 2008, at 12:29.

7   Q     And is there an attachment to Exhibit 2076?

8   A     There is an attachment.

9   Q     What information is conveyed in the attachment?

10  A     This attachment is the draft market quotation language

11  that I had prepared.

12  Q     You drafted the attachment to Exhibit 2076?

13  A     I believe I did, yes.

14  Q     And in this draft, were you intending to request any

15  particular type of quotation?

16  A     Yes, I was proposing to request firm quotations.

17  That's what the BWIC/OWIC language in the first line, where

18  I said please provide levels for the following BWIC/OWIC,

19  and stated -- and I think also, the language that you would

20  pay us so we would pay you indicates that there's to be firm

21  levels.

22  Q     If you could, highlight the second Paragraph.  In this

23  draft, you appear to also offer some other alternative.

24  What is that alternative?

25  A     Yes, that's correct.  We offered the alternative of

Page 23

1    providing a curve instead of an actual bid or offer

2    expressed in dollars to the exact maturity date, and for the

3    exact size that we had.  So a curve, as I explained

4    yesterday, would have been a indication to the 1, 3, 5, 7,

5    and 10-year points of where they saw the market in a

6    particular credit.  We also asked as a -- for a recovery

7    level, which is an assumption that goes into a CDS

8    calculator, as to what the recovery value would be in a

9    default.  There are relatively market-standard recovery

10   levels based on long-term averages, but individual credits,

11   particularly in the emerging market context, may have

12   recovery levels of their own.  Flat or curve interpolation,

13   that was, again, a setting in the standard CDS calculator

14   that was available on Bloomberg that allowed you to turn a

15   spread into a number of dollars payable in unwind value,

16   payable either way.  So you needed to have that, too.

17          So, essentially, if you had -- if you were

18   provided the curve, the recovery level, and a statement as

19   to whether it was a flat or curve interpolation, you were

20   able, in the Bloomberg CDS calculator, to -- it would

21   provide you a spread, because it would interpolate, which

22   just means to calculate the spread between the three and the

23   five year point, for example, if that's where you were --

24   and it would spit out an unwind value, expressed in dollars,

25   which is what we were asking for in the first paragraph.

Page 24

1    So, it was a way of getting additional responses, if people

2    were unwilling to provide the firm bidder offer that was

3    requested in the first paragraph.

4    Q    Did you -- did QVT include the option of providing a

5    curve in the final market quotation solicitation that

6    actually went out?

7    A    We did.

8    Q    Why did you do that?

9    A    We did it because we wanted to maximize responses to

10   our -- it's something that was present in our first draft,

11   in fact, of it, or the first draft that is reflected in the

12   documents here.  And I think there, we actually stated that

13   we understood that people might not be able to provide, for

14   whatever reason, (indiscernible) bids and offers, and we

15   wanted to get back as much information as we could.

16   Q    If you could, turn to Exhibit 2075 in your binder.

17   A    Okay.

18   Q    What is Exhibit 2075?

19   A    Exhibit 2075 is a email from Joe Lowman to me, Dan

20   Gold, and Arthur Chu, dated Monday, September 15th, 2008, at

21   12:34 p.m.

22   Q    And is there another email contained in Exhibit 2075?

23   A    Yes, there's the email that I had sent that had the

24   attachment with the BWIC/OWIC language, or really, the

25   market quotation language.  Sorry, I'm reading the subject

Page 25

1    line.  It says BWIC/OWIC language.

2    Q    And what information does Mr. Lowman convey in this

3    email?

4    A    Mr. Lowman states that the first paragraph looks good.

5    The second paragraph makes sense for corporates, but doesn't

6    apply for the ADS position, since there's really no concept

7    of a curve there.

8    Q    Do you recall receiving this email?

9    A    I do.

10   Q    Did you have any understanding as to what Mr. Lowman

11   meant by that second sentence?

12   A    Yes, I --

13        MS. SAWYER:  Objection.  I withdraw my objection.

14   Q    Did you have any understanding as to what Mr. Lowman

15   meant by this second sentence?

16   A    Yes, I understood him to be saying that the concept of

17   a curve didn't really apply for ADS positions because there

18   wasn't typically -- there wasn't a curve to multiple --

19   there weren't multiple maturity points that traded on these

20   ADS.

21   Q    If you could, turn to Exhibit 56 in your binder,

22   please.

23   A    Okay, 56?

24   Q    I'm sorry, 55.

25   A    55, okay.  Okay.

Page 26

1    Q    Do you recognize Exhibit 55?

2    A    Sorry, I'll just take a minute to look at this.  Yes, I

3    recognize this.

4    Q    What information is Mr. Lowman conveying to you in this

5    email?

6    A    Mr. Lowman is conveying that he made two changes to the

7    language that I sent to him.  One is that he inserted an in

8    in offers wanted in comp, and two, that he had removed the

9    language about currency, since these are all USD, meaning

10   that they're all US-dollar denominated.  Then he states I

11   will send this out as-is.  Formatting looks better in,

12   Bloomberg is I believe what he means by BBG, unless there

13   are other concerns.

14   Q    Okay.  Did you respond to Mr. Lowman's email?

15   A    I believe I did.

16   Q    Do you know what time you responded to Mr. Lowman's

17   email?

18   A    Very shortly thereafter.

19   Q    If you could, turn to Exhibit 56 in your binder.

20   A    Okay.  This is an email from me to Dan Gold, Arthur

21   Chu, and Joe Lowman, dated Monday, September 15th, 2008, at

22   1:41 p.m.

23   Q    And is there an attachment to Exhibit 56?

24   A    There is an attachment to it.

25   Q    What information is contained in the attachment?

Page 27

1    A    This is the market quotation language.

2    Q    And, to your knowledge, is this the final version of

3    the market quotation solicitation language?

4    A    Yes, I believe it is.

5    Q    And is Exhibit 56 your response to Mr. Lowman's email

6    that we saw in Exhibit 55?

7    A    Yes, it is.

8    Q    What time did QVT start sending out market quotation

9    solicitations?

10   A    I believe QVT started sending out market requests --

11   market quotation requests around 2:45 p.m.

12   Q    And why did QVT start sending their requests at that

13   time?

14   A    That's when they were first prepared to be sent out,

15   when the language had been attached to the spreadsheets that

16   had been developed for the individual portions of the broken

17   -- the universe of Lehman positions (indiscernible).

18   Q    And did QVT in fact send out market quotation

19   solicitations to reference market makers?

20   A    We did.

21   Q    Which reference market makers did QVT send their

22   request to?

23   A    So they were sent to different groups of reference

24   market makers for the three different lists, based on the

25   trading relationships that we had with those, those market

Page 28

1   makers.

2   Q    Did QVT send different categories of CDS to different

3   reference market makers?

4   A    Yes, there was a lot of overlap among the reference

5   market makers selected, but it was to different desks, each

6   list, at the different reference market makers.  So it just

7   depended who we had strong trading relationships with, who

8   we thought would be best able to respond to these market

9   quotation solicitations.

10  Q    Do you recall who the reference market makers were?  I

11  know it's a long list.

12  A    It's a long list, but I think I do.  With respect to

13  the corporate and index list, we sent it to Barclays, JP

14  Morgan, Morgan Stanley, and UBS.  And with respect to the

15  emerging market list, we sent it to Deutsche, Morgan

16  Stanley, JP Morgan, and UBS.  So it was substantially the

17  same, it's just it was Deutsche instead of Barclays for

18  emerging market.  And then, the ADS list was sent to a

19  broader range.  I don't know if I can remember all of them,

20  but it did include Morgan Stanley, JP Morgan, Deutsche, I

21  believe, Citi, RBS -- there may have been one or two

22  additional.

23  Q    How did QVT go about choosing which reference market

24  makers to send CDS transactions to?

25  A    We chose the reference market makers with whom we had

Page 29

```
1    the most experience trading the products, and who we had the

2    strongest relationships with, and who we thought we were

3    most likely to get attention from and get responses from.

4    Q    Did anyone at QVT communicate with the reference market

5    makers before the market quotation requests were sent?

6    A    Yes, I believe they did.

7    Q    Did you personally have any such communications?

8    A    I had communications, but I can't recall whether my

9    communications were only with them after we'd sent them out,

10   in the after hours, when it started to become clear we

11   weren't going to necessarily get a ton of responses, because

12   I recall at least one conversation like that.  But I was

13   aware that conversations were being had.  I mean, it just --

14   you wouldn't just send out a list like this to an email

15   address and expect someone to respond in general, let alone

16   on a day like September 15th.  I recall people calling

17   ahead.

18   Q    Who at QVT would have made those calls?

19   A    I think it would have been Joe Lowman, principally, and

20   also Tom Knox, as they were the two who were sending out the

21   market quotation solicitation requests, but it might have

22   been other of the traders, too.

23   Q    After the requests were sent out, did QVT and the

24   reference market makers have any further correspondence, to

25   your knowledge?
```

Page 30

```
 1    A    Yes, there was further correspondence.

 2    Q    Were you personally involved in any of that further

 3    correspondence?

 4    A    I don't recall receiving any correspondence regarding

 5    it.  As I stated a moment ago, I recall at least one

 6    conversation at some period substantially after hours, where

 7    one of our regular sales people told us that she didn't know

 8    if we would -- if they would be sending anything back.  It

 9    was -- she said it's crazy here, you know, with a huge

10    volume of requests.  We're -- I don't know if we can send

11    anything back.

12    Q    Who else at QVT, to your knowledge, had conversations

13    with reference market makers after the requests were sent?

14    A    I don't recall which individuals had those, but I do

15    recall that the conversation that I remember was consistent

16    with other conversations that were being had.

17              MS. SAWYER:  Objection.  Move to strike.  Lack of

18    foundation as to how his conversation was consistent with

19    other conversations that others had, when he can't even

20    remember which individuals were making the phone calls.

21              THE COURT:  All right, that's sustained.

22    Q    Mr. Brumm, at the time the market quotation requests

23    were sent, were you aware of any facts that led you to

24    conclude that reference market makers might not fully

25    respond to your requests?
```

Page 31

1    A    No.

2    Q    Did QVT impose a deadline on responses to the market

3    quotation requests?

4    A    We did not impose any deadline.

5    Q    If you could, turn back to Exhibit 56.

6    A    Okay.

7    Q    Which I believe you said contained the final market

8    quotation language, is that correct?

9    A    Yes, I believe this was the final market quotation

10   language.

11   Q    If I could direct your attention to the third

12   paragraph --

13   A    Yes.

14   Q    -- the attachment?

15   A    Yes.

16   Q    Can you read that for the record, please?

17   A    Please provide market quotations as of 4:00 p.m. New

18   York time on September 15th, 2008, in writing by return

19   email, based on the actual notional amounts and other

20   relevant information set forth below in respect of each

21   transaction.

22   Q    Was that statement a deadline.

23   A    I do not believe that statement was a deadline.

24   Q    Why not?

25   A    Because it states that it's as of 4:00 p.m. New York

Page 32

1   time, and if you want to say by 4:00 p.m., you know, that's

2   how you say it.  It's very commonly said, particularly in a

3   BWIC/OWIC context, that if there's a deadline, you state it

4   so that people know.  So...

5   Q    Did QVT receive any responses to the market quotation

6   requests before 4:00 p.m.?

7   A    We received a couple of responses right around 4:00

8   p.m., I believe a couple right before and a couple right

9   after.

10            THE COURT:  Can I ask one clarifying question?

11   Probably about 10 minutes ago, you, in response to Mr.

12   Regan's question, you explained what BWIC/OWIC is.

13            MR. BRUMM:  Okay.

14            THE COURT:  And you said, in sum and substance,

15   it's shorthand for I really want to trade.

16            MR. BRUMM:  Right.

17            THE COURT:  Put your best--give me your best bid,

18   right?  So if that's what BWIC/OWIC is, then as a practical

19   matter, when you're putting this out, when you did, and a

20   dealer looks at it and says this is a request for BWIC/OWIC,

21   it's as of 4:00 p.m., when 4:00 p.m. comes and goes, it's

22   not a tradable quote anymore.  So I'm trying to reconcile

23   the testimony you just gave, that it's not a deadline --

24            MR. BRUMM:  Yeah.

25            THE COURT:  -- with your prior testimony that

1    here's -- everybody knew, all dealers, reference market

2    makers, knew what BWIC/OWIC meant.  Could you explain that?

3               MR. BRUMM:  I will try to.

4               THE COURT:  Okay.

5               MR. BRUMM:  The -- so I think there are a whole

6    range of BWIC/OWICs.  I mentioned in particular that

7    sometimes, they're just used to marking purposes.

8    Sometimes, people say reserves apply.  Sometimes, people say

9    there's a deadline.  And it's just, the reason we used that

10   language, BWIC/OWIC at the top of this was, as I was trying

11   to explain, that it's really much more intuitive to dealers

12   than the term market quotation, which doesn't necessarily --

13   in fact, the fact that you use the term quotation, which

14   happens to be the defined term that we used here, that

15   actually implies to a dealer a non-tradable level, if

16   anything.  So that's why we included the phrase BWIC/OWIC.

17              As of -- the fact that we stated as of 4:00 p.m.

18   was simply because the ISDA requires you to request a market

19   as of a certain time, and that's why we stated as of 4:00

20   p.m.  I think what we're -- we selected that because it's

21   kind of the closing time, closing market, if you will, even

22   though the OTC markets obviously don't have formal closing

23   hours and continue to trade afterwards.

24              So what we were saying to people was please

25   provide me your closing market on a firm basis, and indicate

Page 34

1    if you want to trade there still, whenever you get it back

2    to me.  Because that was common in the OTC markets, as

3    people might say okay, you know, this CDS closed at this

4    level, and my dealer is act, meaning he still wants to

5    trade.  He has an offer on the other side if he's giving you

6    an offer, or he has risk on his books that he wants to get

7    rid of by selling to you.  So what we were doing was saying

8    provide me a closing market, and we want it to be firm, and

9    we want it to be able to trade there.  But the trade doesn't

10   have to occur at 4:00 p.m.  It's not an auction situation,

11   the way many BWIC/OWICs are.

12            THE COURT:  Thank you very much.

13   Q    Mr. Brumm, who at QVT was responsible for actually

14   sending out the market quotation solicitations?

15   A    The market quotations were sent out primarily by Joe

16   Lowman, who sent them out, I believe, for the corporate and

17   index list, and also for the ADS list.  Tom Knox, who was

18   our primary emerging markets trader, sent out the emerging

19   markets market quotation requests.

20   Q    Was there anyone at QVT responsible for collecting the

21   responses?

22   A    Yes, that was Joe and Tom, as well.

23   Q    And did QVT create a unique email address to collect

24   those responses?

25   A    We did create a unique email address, lehman@qvt.com.

Page 35

1    It was -- you know, I think it was only used sporadically.

2    In fact, a lot of the responses came directly back to Tom

3    and Joe.

4    Q    Mr. Brumm, do you have any ownership interest in QVT

5    Fund?

6    A    I do have an ownership interest in the QVT funds,

7    including in QVT Fund LP.

8    Q    Do you have any ownership interest in the Lehman claim

9    at issue in this case?

10   A    I do have an ownership interest in it.  I think I

11   testified yesterday that at the time, the insiders at QVT,

12   the then-employees and partners, represented about 10

13   percent of the capital of QVT Fund.  And as a result, when

14   we side-pocketed the Lehman claims, we received our pro rata

15   share, so a similar type of level.

16   Q    Has your ownership percentage in this claim changed

17   over time?

18   A    It has changed over time.  It has increased, largely

19   because my or our ownership interest overall in the QVT

20   funds has increased.  So the QVT funds, over the years,

21   engaged in various transactions with their investors, and as

22   part of that, the repurchased whole interests in the fund,

23   of which these claims and the side pocket that those claims

24   were contained in were a very small amount.  So, as the -- I

25   referenced, too, yesterday that the funds have grown smaller

Page 36

1    over time.  It's largely due to post-2008 losses; it's

2    largely due to net investor redemptions, and the effect of

3    that has been that today, the principals of QVT constitute a

4    much greater percentage of the fund than they did in 2008.

5             So while the ownership was essentially frozen of

6    the side pocked that contained the Lehman claims, because

7    the funds that we manage have over time purchased --

8    repurchased at discounts to NAV various interests in the

9    fund, this side-pocket claim is held by the main fund, of

10   which we are a larger share.  That's the principle way in

11   which the insiders' holdings of this have increased.

12   Q    If QVT's claim against Lehman is allowed in whole or in

13   part, will you personally receive any of the proceeds?

14   A    Yes, I will.  I -- as I just said, I mean, I own some

15   of this.  I own it directly as someone who received it at

16   the time that it was side-pocketed, and I own it indirectly

17   through my ownership of a QVT main fund today.

18   Q    Mr. Brumm, in Lehman's pre-hearing memorandum, on Page

19   1 --

20   A    Yes.

21   Q    -- QVT -- Lehman wrote QVT's inflated claim is no

22   accident.  To your knowledge, did QVT take any steps to

23   inflate its claim against Lehman?

24   A    No, we did not take any steps to inflate our claim

25   against Lehman.  We simply (indiscernible) and the

Page 37

1    replacement value of the various transactions that we lost

2    when they were (indiscernible) on September 15th, 2008.

3    Q    Also on page one of its pre-hearing brief, Lehman wrote

4    QVT's traders followed through on Mr. Gold's directive.  Are

5    you aware of any directive that Mr. Gold issued in

6    connection with QVT's claim against Lehman?

7    A    No, Mr. Gold did not issue any directive in connection

8    with QVT's claim versus Lehman.  In fact, he was largely not

9    involved in the valuation process, both because he lives in

10   Westchester, whereas the rest of us were in the city who

11   were working on it; because he -- we made the decision that

12   he should focus on the portfolio 100 percent and not -- even

13   on the weekends, not be spending time on, you know, what was

14   a very line-by-line, detailed analysis, building up of a

15   claim; and also, focus on communications with our investors,

16   for which he'd always been kind of the lead managing member

17   in contact with the investors.

18   Q    What steps, if any, did QVT take to maximize its claim

19   against Lehman?

20   A    I don't think we took any steps to maximize our claim.

21   As I said a moment ago, we were just trying to determine the

22   replacement value of the transactions that we lost.  We were

23   just trying follow what the ISDA said, not having any

24   experience of having done this.  So we tried to run a market

25   quotation process.  When it largely failed, we tried to come

Page 38

1   up with loss calculations, using the best available market

2   data that we had in each case.  There was quite a range of

3   available information.

4           The less-liquid stuff, there was very little

5   information on.  In the middle, there was stuff where we had

6   to exercise a fair amount of judgment as to what data out

7   there, be it broker runs, responses to the market quotation

8   requests that fell short of the requisite three responses

9   for it to be an actual market quotation, and Markit data.

10  And when we got into Markit data, what of the Markit data

11  really -- which data that was presented for the 15th, the

12  16th primarily, even the 17th in the cases of some of the

13  illiquid positions,  represented the best midmarket value --

14  the real midmarket value that we could have transacted at on

15  September 15th.  And then we -- the further judgment as to

16  what spread was appropriate, since we were only provided

17  mid-data when we were looking at Markit markets.

18  Q    Thank you, Mr. Brumm.  I have no further questions, so

19  pass the witness.

20          THE COURT:  All right.  Thank you.

21          MS. SAWYER:  May I have just a few moments to

22  organize my thoughts?

23          THE COURT:  Sure.  Can you -- do you think we

24  should take a -- don't break my courtroom.

25          MR. REGAN:  No one (indiscernible), right?

1           THE COURT:  Should we take a five-minute break?

2           MS. SAWYER:  That'd be great.  Thanks, Your Honor.

3           THE COURT:  All right, so let's take a five-minute

4    break, and then we'll (indiscernible).

5           MR. REGAN:  Thank you, Your Honor.

6       (Recess)

7           THE COURT:  Okay.

8           MS. SAWYER:  Your Honor, we have witness binders.

9           THE COURT:  Okay.

10          MS. SAWYER:  Which we have (indiscernible).

11          THE COURT:  Will you be going back to the other

12   binder, as well?

13          MS. SAWYER:  I think a couple of times, but --

14          THE COURT:  Okay.

15          MS. SAWYER:  -- but hopefully, primarily my

16   binder.

17          THE COURT:  All right.  Okay.

18          CROSS-EXAMINATION OF NICK BRUMM

19   BY MS. SAWYER:

20   Q    Good afternoon, Mr. Brumm.

21   A    Good afternoon, Ms. Sawyer.

22   Q    In general, I wanted to just set some ground rules.

23   I'm probably going to refer to QVT and Quintessence

24   generally as QVT.  But if you want to break up between the

25   two in any of your answers, please feel free to do so.  And

Page 40

1    if you think my questions need to be adjusted for the same

2    reason, please let me know.  I also probably will refer

3    generally to Lehman, but if there are circumstances that we

4    need to be more specific and refer to LBSF, please do so in

5    your answers, and I'll try to do so in my questions, as

6    well.

7            So with that, I wanted to start with some of your

8    testimony yesterday about the QVT Fund's assets under

9    management, and I believe that you testified yesterday that

10   QVT had $13 billion assets under management at the beginning

11   of 2008?

12   A    I think my testimony was that we peaked out at $13

13   billion at some point in 2008.

14   Q    Okay.  And now, QVT has about $2.3 billion assets under

15   management?

16   A    That's correct.

17   Q    And does that $2.3 billion in assets under management

18   include this claim?

19   A    It does include this claim.

20   Q    Okay, so this claim is more than 10 percent of QVTs

21   assets under management currently?

22   A    No, that's not correct.

23   Q    Why is that not correct?

24   A    So, assets under management refers to -- it's not your

25   long and short positions, it's your net asset value.  So

Page 41

1    it's stated from the point of view of the investor, so

2    that's one reason why it's not correct.  It's also not

3    correct in that we don't value this claim on -- for NAV

4    purposes.  We apply a mark to the $265 million claim.

5    That's essentially a quantity, if you will, of the claim

6    that we have on our books, and we apply a mark to that,

7    where we value it at a number that reflects (indiscernible).

8    Q    And that marked level, that is included in your assets

9    under management?

10   A    Yes, it is included in -- it's included in -- it's an

11   asset that leads to the NAV of the funds.  I'm reluctant to

12   say that it's included in our assets under management.  It's

13   a position for the funds we manage, but it feeds into it,

14   but it's not itself a portion of the assets under

15   management.  The assets under management refers to the

16   investors' interest in the funds.

17   Q    I wanted to ask you some questions about the structure

18   of kind of the QVT funds, and I don't want to go into too

19   much detail about it.  But QVT Financial LP is the

20   investment manager for various QVT hedge funds, is that

21   correct?

22   A    That's correct, for various QVT funds.

23   Q    And QVT Financial LP is an investment manager for the

24   Quintessence Fund LP, correct?

25   A    That's correct.

1    Q    And QVT Financial LP earns monthly management fees for

2    serving as the investment manager for both the QVT Fund LP

3    and Quintessence Fund LP, correct?

4    A    That is correct in a colloquial sense.  So I discussed

5    yesterday in my testimony, I believe, that there are a

6    number of feeder funds.  So actually, typically, the fees

7    are taken at the feeder-fund level, because that's the level

8    that the investors are at.  So I discussed that the QVT

9    funds have, in general, a master feeder structure, meaning

10   that there are feeder funds that the investors invest in.

11   There are a variety of feeder funds.  Typically, there are

12   more feeder funds than a master fund -- not in every case.

13   In some cases, it's one to one.  But that -- the fees, both

14   the management fees and the incentive fees, are typically

15   taken at the feeder level, because that's where the

16   investors are.  So it's one of the things that the third-

17   party administrator does is to calculate those fees.

18   Q    Okay, thank you.  And those -- the management fees that

19   are taken at the feeder-fund level, they amount to roughly 2

20   percent of the NAV of the funds per year?

21   A    It's actually somewhat less than 2 percent.  Under the

22   terms applicable to our funds, there are discounts that are

23   given to larger investors, so it's somewhere between 1.5 and

24   2 percent, I believe, on a blended basis, currently.  And I

25   should add further that that's with respect to the fee-

Page 43

1    paying investors.  The QVT employees, certain ex-QVT

2    employees, they typically do not pay fees to the fund.

3    Q    And then you'd mentioned that incentive fee that's also

4    collected at the feeder-fund level, is that correct?

5    A    That is typically collected at the feeder-fund level,

6    yes.  It's an incentive fee, or an incentive allocation,

7    depending on the structure of the fund.

8    Q    And that incentive fee is approximately 20 percent of

9    any profits earned, once QVT is above its high water mark.

10   Is that correct?

11   A    Again, that's kind of colloquially correct.  Those are

12   typical hedge fund terms, but in our case, it's somewhat

13   more complex in an investor-friendly way, which is to say

14   that we have not just a high water mark, but also something

15   called a hurdle.  A hurdle is a minimum rate of return that

16   the investor needs to earn before we receive fees.  So on a

17   net basis, net of our management fees and all the other

18   expenses, the investor needs to make a certain amount of

19   money each year before we're entitled to an incentive fee.

20   And that level is actually a floating level, but it's based

21   on LIBOR plus a fixed spread.

22   Q    And what is that fixed spread for the incentive fees?

23   A    Oh, I was afraid you were going to ask me that.  It's

24   actually a two-step.  I believe there's a -- I haven't

25   looked at this recently, but it's several hundred basis

Page 44

1   points, several percent above LIBOR, and there are two

2   steps.  There's something called catch-up, which is a

3   private equity concept where, once you're above the hurdle,

4   you can catch all the way back up.  So it would be as if you

5   earned a 20 percent from the first dollar, as long as the

6   investors received a high enough return.

7   So that's why I said, you know, you could say we're still,

8   you know, receiving -- we can under certain circumstances

9   still 20 a percent incentive fee or allocation.

10  Q    And where would one go to look to understand what the

11  percentage, the spread above LIBOR, is for the incentive?

12  A    It's stated in our current offering memorandum.

13  Q    And has QVT Financial LP earned any incentive fees to

14  date on the performance of the Lehman side pocket?

15  A    That is a -- that is a somewhat complicated question

16  for the following reason.  So for its direct management of

17  the -- for its direct management of the fund, which is the

18  QVT Combined Special Investment Fund, that holds the side

19  pocket, I don't believe that it has.  It's not -- the

20  structure of that fund's incentive interest is not a typical

21  hedge fund incentive fee or allocation, meaning that those

22  funds are usually taken annually based on mark-to-market

23  performance.  The structure of that fund is more in the

24  nature of a private equity fund, where there needs to be

25  realizations effectively in order for an incentive fee to be

Page 45

1    payable.

2        It's possible that due to the -- so, as I referenced

3    just before we took the break in response to Mr. Regan's

4    questions, the QVT main funds, which are subject to an

5    annual mark-to-market calculation and recalculation, that

6    any changes in the value of the Combined Special Investment

7    Fund, which includes the Lehman side pocket and which

8    includes the claims at issues in this case, you know, all --

9    it's just -- it looks at its total P&L across all its

10   assets.  So in that sense, I guess, it's possible to the

11   extent that P&L has been realized on these things, the

12   claims at issue in this case, due to changes in the mark,

13   you know, that has fed into the overall calculation.  But

14   there's been no, you know, incentive fee paid directly based

15   on that.

16   Q    Just to make sure I understand your answer.  So the

17   extent that there was P&L recognized on the Lehman side

18   pocket, then an incentive fee would have been paid on that

19   realized P&L, correct?

20   A    I don't think that's what I said, and I apologize if I

21   wasn't clear.  I realize this is somewhat dense material.

22   But it's -- what I just said a moment ago is that the Lehman

23   side pocket, which is I think you're aware included things -

24   - it included other Lehman claims, the ones that were

25   settled over time with the other Lehman entities, some of

Page 46

1    which were settled in the form of returns of securities, so

2    that went into the side pocket, those securities, and they

3    generated P&L over time depending on where they liquidated.

4         So that -- there's been no direct incentive fee payment

5    based off of that, but that fund which holds it is itself an

6    asset of the main funds.  And whatever P&L has been realized

7    there feeds into an overall P&L calculation where, you know,

8    every line item in the QVT funds has suffered a loss at the

9    end of the year, maybe or may non, maybe it's zero.

10   Q    I think maybe I understand your distinction.  So we'd

11   look at the fund that holds the Lehman side pocket and see

12   if there a P - a profit being earned in that.  And then

13   profit would be compared to the profit and losses of all the

14   other funds to see if, overall, there's a profit and an

15   incentive fee would be paid.  Is that a fair assessment?

16   A    I think that correct, yeah.  And when you said

17   compared, it's really being netted against.  So, you know,

18   every line item either generates a profits or loss in each

19   year or a zero.  So this QVT special investment fund, which

20   is held in part by the QFT fund itself, has generated -- it

21   has a bunch of different assets in it.  There were a number

22   of side pockets.  They were all combined into this fund in

23   2012 as part of a restructuring approved by our investors,

24   and its NAV fluctuates.  And based on that NAV and how --

25   and also the market value of that fund because it can trade

Page 47

1    at a discount to its NAV too, that can generate P&L at the

2    main fund.

3    Q    Do you know -- I'm sorry.

4    A    But it's just one item among many; not a large item, a

5    small item, in fact.

6    Q    And do you know whether or not the fund that holds the

7    Lehman side pocket has realized profits at any point since

8    its creation?

9    A    The fund that holds the Lehman side pocket has overall

10   generated profits since its -- since it was created through

11   the amalgamation of all side pockets.  But I don't think any

12   material around could be incentive fees ever received yet

13   for that.

14   Q    Do you know that?

15   A    I don't know the details of that.

16   Q    You talked quite a bit about --

17          THE COURT:  Can I just aske one more follow-up

18   question?

19          MS. SAWYER:  Yes.

20          THE COURT:  But if it's -- if, on a stand -- if

21   the Lehman side pocket were the only asset, right, then on a

22   standalone basis, you would -- I think you just told Ms.

23   Sawyer that you believe there has been a profit up to this

24   point.

25          MR. BRUMM:  Absolutely.

1              THE COURT:  Okay.

2              MR. BRUMM:  Because the Lehman side pocket was

3      created a value of zero.  That means that no investor

4      capital was taken out effectively.

5              THE COURT:  I understand.

6              MR. BRUMM:  Okay.

7              THE COURT:  I understand.  But then Ms. Sawyer was

8      also asking you, to the extent that it contributes up into

9      the overall P&L of the larger fund.

10             MR. BRUMM:  Right.

11             THE COURT:  Right?  So the fact that it is a P

12     instead of an L, right, has in some way contributed in a

13     positive way.

14             MR. BRUMM:  That's the point I was trying to get

15     across.

16             THE COURT:  Got it.  Has contributed in a positive

17     way to the calculation of whatever incentives may or may not

18     have been paid in connection with the performance of the

19     master fund.

20             MR. BRUMM:  I believe so.  I'd have to really go

21     back and check the record.

22             THE COURT:  But just as a mater --

23             MR. BRUMM:  But I'm pretty sure yes, because it

24     depends, of course, when the master fund bought it, what the

25     mark was for the Lehman stuff there in general.

Page 49

1   Particularly I'm using Lehman even more broadly than you are

2   when I -- you know, I'm taking in LBIE, LBI, essentially

3   because positive value has been recognized through those

4   things over time.  Yes, I believe it has.

5          THE COURT:  Yes, okay.

6          MR. BRUMM:  Or I don't have any of the details --

7          THE COURT:  Thank you.

8          MR. BRUMM:  -- which would be torturous obviously.

9   Q    And when this matter gets resolved that's before the

10  Court, that's going to be a positive value for the Lehman

11  side pocket, correct?

12  A    Depending on where it's resolved, yes, I expect it

13  would.

14  Q    But the claims were initially placed into the Lehman

15  side pocket these claims at zero, correct?

16  A    That's correct.

17  Q    So anything more than zero would be positive value in

18  connection with these claims, correct?

19  A    That's correct.  Although, I'm sorry, I took your prior

20  question to mean positive from the current value because

21  it's not currently valued at zero.  It's valued higher than

22  that.

23  Q    So yesterday you spoke with Mr. Regan about the ISDA

24  Master Agreement between LBSF and QVT and LBSF and

25  Quintessence, and I'd like to look at some of those specific

Page 50

1    provisions with you.  So let's look at Joint Exhibit 1,

2    which I believe my colleague gave you a binder.

3    A    Yes, I have your binder.

4    Q    Okay.  I think do you also have Mr. Regan's binder?

5    A    I have Mr. Regan's binder on the floor.

6    Q    So let's -- Joint Exhibit 1 is in both.

7    A    Okay.

8    Q    But whichever --

9    A    I'll use your binder until you ask me to use the other

10   binder.

11   Q    Perfect.  So you testified, so Joint Exhibit 1's on.

12   You testified yesterday that the parties had selected market

13   quotation and second method in the schedule, right?  It's on

14   Page 20.

15   A    Yes, I'm looking at F, payments on early termination.

16   For purposes of Section 6 of this agreement, market

17   quotation and the second method will apply.

18   Q    And that's consistent with your understanding, that the

19   parties had selected market quotation and second method in

20   both their QVT ISDA and their Quintessence ISDA, correct?

21   A    Yes, it is.

22   Q    Okay.  And looking at Page 20 of that Section F that

23   you read, it continues to have a proviso.  It says,

24   provided, however, that with respect to credit-related

25   products, loss will apply to all customized correlation

Page 51

1    products (market quotation marked by CDX tranches), as well

2    as any other transaction deemed to be a structure

3    transaction in the confirmation related thereon -- do you

4    see -- or thereto.  Do you see that?

5    A    I do see that.

6    Q    Now QVT's not asserting in this case that it should be

7    permitted to use a loss to value any of the transactions at

8    issue based upon this proviso in Section 6F of the schedule,

9    is it?

10   A    That's correct, QVT is not asserting that.

11   Q    So now let's look at the definition of market

12   quotation, which is found on Page 15 of the ISDA.

13   A    Okay.

14   Q    And if you could just take a moment to read that

15   provision to yourself, then I'll have a question for you.

16   Have you finished reading the provision?

17   A    Yes, I have.  I was just looking at some sections that

18   are average.

19   Q    Does the -- now the market quotation definition does

20   not refer to the non-defaulting party in any place, does it.

21   A    I think it doesn't refer to the -- it doesn't use the

22   term, non-defaulting party, but it does have a sentence

23   where it talks about the fact that only one party may be

24   making the determination, which I would take to be the non-

25   defaulting party.

Page 52

1    Q    Right.  In the, on Page 16, the sixth line down.  It

2    says, the party making the determination or its agent.  Do

3    you see that?

4    A    I do see that.

5    Q    And it doesn't say the non-defaulting party there, does

6    it?

7    A    No.  But if you read the next sentence, I think it is,

8    it says, the day and time as of which those quotations are

9    to be obtained will be selected in good faith by the party

10   obliged to make a determination under Section 6E, and if

11   each party is so obliged after consultation with the other.

12   Q    Right.  It could be more than one party that would be

13   obliged to make the determination, correct?

14   A    It can be.  My understanding is that those were under

15   circumstances where each side is seeking market quotation.

16   Where it's not an event of default situation; it's, there

17   are other forms of termination.  I think it's the illegality

18   or the tax provisions.

19   Q    We're going to look at some other provisions in the

20   schedule with you.

21   A    Sure.

22   Q    You could turn to Page 25 of the document.  It's the

23   QVT Fund 166.

24   A    Sure.

25   Q    And there is a Section 5B that says additional

Page 53

1    representations of Party B.  Do you see that?

2    A    I do see that.

3    Q    And Party B refers to QVT; is that correct?

4    A    To QVT Fund LP in this document, yes.

5    Q    Right.  And there's a number of additional

6    representations that are made here.  The first one is

7    complex risks.  It understands that the transactions

8    contemplated hereunder are subject to complex risk which may

9    arise without warning, may at times be volatile, and that

10   losses may occur quickly and in unanticipated magnitude.  Do

11   you see that?

12   A    I do see that.

13   Q    And the next subsection is entitled, sophisticated

14   investor.  Do you see that?

15   A    I see that.

16   Q    And that continues and says, it is a sophisticated

17   investor able to evaluate the terms, conditions, and risks

18   of the transactions contemplated hereunder and accepts such

19   terms, conditions, and risks.  Did I read that correctly?

20   A    I believe you did.

21   Q    And the next additional representation of QVT is

22   assumptions of risks.  It is capable of assuming and assumes

23   all risks, financial and otherwise associated with the

24   transactions contemplated in their ISDA.  Do you see that?

25   A    I do see that.

Page 54

```
 1    Q    And you signed the schedule on behalf of QVT, didn't

 2    you?

 3    A    I did.

 4    Q    And you were authorized to make those representations

 5    on behalf of QVT?

 6    A    I was.

 7    Q    And you also testified yesterday about the dispute

 8    resolution mechanism found in the credit support annex.  Do

 9    you recall that?

10    A    I do recall that.

11    Q    And let's look at that provision, which I think is on

12    Page -- QVT Fund 174.  It's Paragraph 5, dispute resolution.

13    Now, QVT and Lehman specifically elected that this dispute

14    resolution would apply in their ISDA, didn't they?

15    A    They did.  It was standard.

16    Q    And you testified that QVT never found itself in the

17    position where it needed to invoke the dispute resolution

18    provision under the CSA; is that correct?

19              MR. REGAN:  Objection, mischaracterizes his

20    testimony.

21              THE COURT:  Could you repeat the question, Ms.

22    Sawyer?

23    Q    And you testified that QVT never found it a position

24    where it needed to invoke the dispute resolution provision

25    under the CSA, correct?
```

1              THE COURT:  You can answer the question.

2    A    I believe I testified that QVT never invoked the

3    dispute resolution, or certainly not the -- what I think

4    Lehman's characterized as the formal dispute resolution

5    being the process under which their evaluation agent gets

6    market quotations from multiple third-party dealers.

7    Q    And QVT never invoked the dispute resolution provision

8    because when it had disagreement with Lehman about margin,

9    it was able to resolve those disagreements after discussions

10   with Lehman, correct?

11   A    I think that's only partially correct.  We were

12   sometimes able to resolve them and sometimes not.

13   Q    So there were circumstances that you recall where

14   Lehman and QVT had margin disputes that went unresolved?

15   A    I think it depends on what you mean by resolved.  There

16   was, I testified, no circumstances where we utilized this

17   procedure or the latter part of it.  We effectively engaged

18   in the consultation that's required as the first part of it.

19   There were instances where -- I think there were instances

20   where we weren't always happy with the resolution or, you

21   know, not at specific points in time, but --

22   Q    I'm not sure you answered my question.

23   A    Sorry, let me try again.

24   Q    So do you recall circumstances where you had disputes

25   with Lehman about margin -- QVT had disputes with Lehman

Page 56

1      about margin that remained unresolved?

2      A    I recall instances where we were not happy with the

3      marks that were being used for margin, and we tried to

4      resolve that with the desk and it wasn't necessarily

5      resolved right away.  I don't know if, in every instance, it

6      was resolved in the way that we were happy with with our

7      marks.  So that's what I took resolved, but we did not

8      invoke this further procedure here.

9      Q    The week before Lehman filed for bankruptcy, there

10     weren't any disagreements between Lehman and QVT regarding

11     margins to be posted, correct?

12     A    I'm not aware of our contesting any marks that week.

13     Q    Okay.  And you testified on direct that any collateral

14     posted between QVT and LBSF was post pursuant to the credit

15     support annex, correct?

16     A    That's correct, yes.

17     Q    And if you could look at Paragraph 11D of the credit

18     support annex, which is on Page 7 of the annex or QVT Fund

19     178.

20     A    I see that.

21     Q    That provision provides good faith and in a

22     commercially reasonable manner.  It says, performance of all

23     obligations under this annex, including, but not limited to,

24     calculations, valuations, and determinations made by either

25     party will be made in good faith and in a commercially

Page 57

1    reasonable manner.  Do you see that?

2    A    I do see that.

3    Q    And you understood that QVT had a duty to calculate its

4    margin in good faith, correct?

5    A    I did.

6    Q    And you have no reason to believe that QVT breached

7    this obligation to act in good faith and in a commercially

8    reasonable manner in making its calculations under the

9    credit support annex, do you?

10   A    That's correct.

11   Q    And you have no reason to believe that QVT was in

12   breach of the credit support annex on September 15, 2008, do

13   you?

14   A    I don't -- I do not believe we were in breach.

15   Q    And when QVT demanded margin from LBSF, QVT did so in a

16   good faith and in using commercially reasonable

17   calculations, didn't it?

18   A    I believe that we did, yes.

19   Q    So I want to talk about the Summer of 2008.  By the

20   Summer of 2008, QVT was carefully monitoring its exposure to

21   Lehman, wasn't it?

22   A    At a certain point in the summer, yes, we started to

23   monitor our exposure to Lehman.

24   Q    You did what?

25   A    I'm sorry.  At a certain point in the Summer of 2008,

1    we started to monitor our exposure to Lehman.

2    Q    And you -- that included QVT's exposure to LBSF,

3    correct?

4    A    That included QVT's exposure to LBSF, correct.

5    Q    And in assessing QVT's exposure to Lehman in relation

6    to its derivatives transactions with Lehman as a

7    counterparty, QVT would look at the market value of those

8    derivatives, correct?

9    A    That's correct.  That was one of the daily margin

10   process.  We'd also look at the initial margin we had

11   posted.

12   Q    And you compare those two numbers.  You'd look at what

13   QVT has as its market value of its derivatives transactions

14   versus the margin that was posted, correct?

15   A    Yes.  I mean, I think more technically, as I tried to

16   explain yesterday, there was a daily process where Lehman

17   sent a file to our operations area that contained its mark-

18   to-market on all the open derivatives positions, and we

19   would compare that with the mark-to-market that we had from

20   our system.

21   Q    I think you might not have heard my question.

22   A    I'm sorry.

23   Q    I was asking of, in terms of when QVT goes to assess

24   its exposure in connection with its derivatives

25   transactions, it looks at its market value on its books for

Page 59

1   those derivatives transactions and compares it to the

2   collateral its holding in connection with those

3   transactions, right?

4   A    That was one of the aspects.  The other was initial

5   margin.

6   Q    Okay.  And no one in the Summer of 2008 was raising

7   concerns that QVT's market value of its derivatives were

8   wrong when they were assessing its exposure to Lehman, were

9   they?

10  A    I don't recall anyone raising concerns that the market

11  value of the derivatives was wrong in the Summer of 2008.

12  Q    And no one at QVT in the Summer of 2008 indicated that

13  they could not assess QVT's exposure to Lehman because QVT's

14  market value of its derivatives on its books were erroneous,

15  did they?

16  A    No one said that they couldn't assess it because the

17  market value was erroneous.

18  Q    And as a managing member of QVT, if one of the traders

19  had concerns about the accuracy of QVT's internal valuations

20  of its derivatives positions, you'd expect that trader to

21  speak up and let you know, wouldn't you?

22  A    If a trader had concerns about the accuracy of the

23  valuations that we have, I would expect them to speak up,

24  yes.

25  Q    So let's look at the -- let's talk about the week

Page 60

1    before Lehman's bankruptcy.  At QVT, the week before

2    Lehman's bankruptcy, there were discussions and concerns

3    about Lehman; is that fair?

4    A    Yes, that is fair.

5    Q    And QVT was concerned about the level of exposure that

6    it had to Lehman, wasn't it?

7    A    It was.

8    Q    And as a result of that concern, QVT was trying to

9    reduce its exposure to Lehman across its whole relationship

10   with Lehman in a variety of ways, right?

11   A    That's correct.  And if I may just clarify in response

12   to this question and also the last one.  When we say Lehman,

13   we're talking about more than LBSF.  We're talking about a

14   full range of Lehman relationships, particularly the prime

15   brokerage and repo.

16   Q    So let's -- fair clarification.  I appreciate that.  In

17   connection with the LBSF derivatives transactions,

18   specifically in relation to those, QVT took a couple of

19   steps to try to reduce its exposure in connection with those

20   transactions, right?

21   A    That's correct.

22   Q    And the main steps that QVT focused on that week were

23   related to margin; is that fair?

24   A    I think I, as I testified yesterday, one of the steps,

25   and I believe it was during that week that we took it, was

Page 61

1    to try to move derivatives positions away from Lehman in

2    what's called novation, and is to speak where you get

3    another party to step in.  We were not very successful at

4    doing that.  There were not a lot of dealers that wanted to

5    take on Lehman risk, so we couldn't transfer derivatives

6    positions. So we focused more on margin.

7    Q    And in focusing -- well, strike that.  QVT wanted to

8    ensure that it was holding sufficient margin in the case of

9    a Lehman default, didn't it?

10   A    Well, I think as I testified yesterday, we knew we

11   couldn't possibly be holding sufficient margin in the case

12   of a Lehman default because margin only partially protects

13   you, particularly when you have a default of a major broker-

14   dealer.  I mean, yesterday, I discussed a number of factors.

15   One is the fact that margin is done on a mid-mark basis;

16   whereas, you know, you'll be -- obviously, when you look at

17   replacement value, you're looking at it on your side of the

18   market.  That difference can be very substantial, obviously,

19   for illiquid positions.  It offers a spread that could be

20   many points.  And a further reason is you're only -- you're

21   only protected to the extent that the marks are really good

22   and representative of the way things are going.  If your

23   liquid things are not trading, are not absorbable, then you

24   can't get mark-to-market margin on them.  And lastly, and

25   most importantly, is the sort of jump-to-default risk, which

Page 62

```
 1   is when a dealer -- when a major dealer files the way Lehman
 2   did, it's going to have a huge impact on the markets and on
 3   your positions.  So I don't think that -- we wanted to have
 4   as much margin as we could, and as you pointed me to,
 5   calculated it in good faith and in a commercially reasonable
 6   manner.  But we didn't have the right to just say to Lehman,
 7   give me more margin because I'm worried you're going to
 8   fail.
 9   Q    But you did, I think you just said, you wanted to --
10   QVT wanted to hold as much margin as it possibly could in
11   connection with the derivatives transactions with LBSF,
12   correct?
13   A    That's correct.  We wanted to make sure that there was
14   no amount of margin that we could call for that we were not
15   calling for.
16   Q    And one way, I think, based upon what you just said,
17   that QVT could make sure it was holding enough margin was to
18   make sure that QVT's marks were really good, right?
19   A    Yes, but those marks had to be marks that Lehman agreed
20   to.  We couldn't just mark stuff on our own system and say,
21   you know, hey, you know, like, I need more margin based on
22   that.
23   Q    But QVT believed that its marks were really good the
24   week before Lehman's bankruptcy because it was trying to get
25   as much margin as possible, right?
```

Page 63

1   A    Well, I think it's not -- I don't know that we believed

2   our marks were really good or that I said that in my

3   testimony.  I mean, I think that it's not where you mark;

4   it's where the dealer marks.  The dealer is the valuation

5   agent.  The dealer provides the marks.  You may mark for

6   those same levels; you can mark to different levels.  If

7   you're marked at different levels, you can tell the dealer

8   that you want them to post more margin.  But we did not

9   request additional margin based on changes in our marks.

10  Q    You described the process of the margin between Lehman

11  and QVT.  That Lehman would send over their daily marks, QVT

12  had their own marks, and there would be a comparison between

13  those two marks to see whether margin could be called; is

14  that correct?

15  A    It's basically correct, but it's not quite correct in

16  that what was sent over were actual market values for the

17  positions.  So meaning a mark had been applied already to

18  the position, and our system would spit out the same thing.

19  And, of course, our marks for many positions, they came from

20  different sources.  But often for positions, particularly

21  some of the main positions at issue in this case, the PCDS

22  and the CARB, those marks just came from Lehman.

23  Q    And the --

24  A    So we could have taken -- of course, we could always

25  mark things differently in our system and generate a mark-

Page 64

1    to-market, you know, in our favor, and then have our report

2    spit out a mark-to-market that's much larger than the Lehman

3    one, and then say, aha, there's a difference.  Lehman, you

4    know, I need you to post additional collateral.  But nothing

5    happens unless Lehman agrees to accept that mark-to-market

6    value that we have created in our system by applying a

7    different mark.

8    Q    In the week before Lehman's bankruptcy, QVT didn't

9    adjust its market value of its transactions to try to get

10   any additional collateral out of Lehman based upon the

11   remarking of those positions, did it?

12   A    That's correct.  We did not adjust our market values

13   because doing so wouldn't have generated additional

14   collateral from Lehman.  It's only Lehman agreeing to that

15   mark that would have generated additional collateral.  It

16   has to be changed in their system, not our system, in order

17   for it to affect change.

18   Q    And QVT never even asked Lehman, did it?

19   A    I'm not aware of QVT asking Lehman to change marks that

20   week.

21   Q    But QVT was that week prior to bankruptcy promptly

22   calling for any margin it could from Lehman, correct?

23   A    That's correct.

24   Q    And just maybe to give us a little bit of background.

25   On September 11, 2008, QVT held approximately $117.3 million

Page 65

1    in margin from LBSF; is that correct?

2    A    I don't know the exact number, but I believe that's

3    approximately correct.

4    Q    And there was also an independent amount or initial

5    margin at QVT had posted to Lehman at the inception of the

6    transactions, right?

7    A    That's correct.

8    Q    And that amount is about 18 to 18-1/2 million?

9    A    For the QVT and Quintessence funds, I believe that's

10   correct, combined.  Yes.

11   Q    Talking about the comparison of Lehman marks and the

12   QVT marks.  A Miss Fang at QVT was responsible in September

13   of 2008 for doing the comparison between the Lehman market

14   values -- you've corrected me -- and the QVT market values;

15   is that correct?

16   A    That's correct.  She -- I think there may have been

17   other people involved, but Miss Fang seems to have been the

18   person in the operations area who was handling the Lehman

19   margins at that point.

20   Q    And Miss Fang took QVT's market values from its Tyche

21   system to compare it to the Lehman valuations, correct?

22   A    I think it came from a system called Mordor that -- but

23   I believe that those values were fed out of the main Tyche

24   system.

25   Q    Another aspect of margin that QVT was focused on in the

Page 66

1    week before bankruptcy was trying to get Lehman to waive

2    that initial margin requirement, wasn't it?

3    A     Yes, that's correct, we were.

4    Q     And that would have the effect of requiring Lehman to

5    post even more collateral to QVT if QVT had been successful

6    in getting Lehman to agree to waive that initial margin

7    requirement.

8    A     That's correct.  If they'd waived it, they would have

9    transferred back to us approximately $18 million of initial

10   margin that they held.

11   Q     And you don't dispute that QVT was required to post

12   that initial margin under the terms of the CSA; is that

13   correct?

14   A     I do not dispute that it was required.

15   Q     And so QVT was simply asking for an accommodation that

16   it no longer be required to post that initial margin from

17   Lehman, right?

18   A     That's correct, and that was based on the fact that,

19   you know, Lehman was troubled at the time.  The rationale

20   for initial margin is supposedly that a dealer is a rated

21   entity, it's a much more solvent entity than end user, et

22   cetera, et cetera.  So we were saying to them, we don't

23   really think that applies given where the markets trading

24   your credit currently.

25   Q     And prior to Lehman's bankruptcy, QVT didn't succeed in

Page 67

1    getting Lehman to waive the initial requirement -- initial

2    margin requirement, did it?

3    A    Yes, I have to say I'm a little unclear on that.  I

4    never -- I heard they had made positive noises.  I believed

5    it might be coming, but there was no waiver document.  I

6    didn't have those discussions directly with Lehman, at least

7    that I recall at all.

8    Q    So you're not aware that Lehman ever agreed to waive

9    the initial margin requirement prior to bankruptcy.

10   A    I think I was -- it was unclear in my mind whether they

11   had agreed to or whether they had said they might agree,

12   whether they were going to do it, whether they were not

13   going to do it.  There was no clear agreement certainly.

14   Q    I'd like you to look at Exhibit 5116 in your binder.

15   Sorry about all the tabs.

16   A    Okay, no problem.

17   Q    This is an email from Julian Sale to Miss Kelly Fang,

18   copying you, sent on September 11, 2008 at 8:53 AM with the

19   re. line, LEH margin.  Do you see that?

20   A    I do see that.

21   Q    And Mr. Sale is telling Miss Fang to prioritize any

22   Lehman margin calls.  Do you see that?

23   A    I see that.

24   Q    And she -- Mr. Sale also tells Miss Fang that if she

25   has even the slightest concern, she should speak to Nick

Page 68

1    straight away.  Do you see that?

2    A    I see that.

3    Q    And that reference to Nick is a reference to you?

4    A    Yes, I'm included on the cc and I'm also the only Nick

5    at QVT.

6    Q    So if Kelly had any questions or Miss Fang had any

7    questions, she should speak to you, or concerns, correct?

8    A    That's correct.

9    Q    And Mr. Sale concludes, can you send us a note when you

10   get the calls and when they are paid.  Do you see that?

11   A    I see that.

12   Q    And so Mr. Sale's asking Miss Fang to provide updates

13   when margin calls are paid by Lehman, correct?

14   A    Yes, I think that's correct.

15   Q    And this is an example of how QVT was focused on the

16   margin calls to be made to Lehman on the week prior to

17   bankruptcy, right?

18   A    I think that's correct, yes.

19   Q    Okay.  If you could look at Joint Exhibit 47.  Are you

20   there, Mr. Brumm?  Do you have that in front of you, Mr.

21   Brumm?

22   A    I'm sorry, yes, I do.  I am at Joint Exhibit 47.

23   Q    Okay.  I can't see what you're looking at, so I want to

24   make sure you're caught up with me.

25   A    Of course.

1    Q    All right.

2    A    Of course.

3    Q    This is an email chain from you to Kelly Fang, copying

4    Mr. Sale this time, dated September 11, 2008.

5    A    Sorry, when I said I was there, I meant I was at the

6    page.  I've not read it.  May I just review it?

7    Q    Yes, absolutely.

8    A    I'll tell you when I'm ready to answer your question.

9              MR. REGAN:  Objection.  Lauri, I think, said

10   September 11th.

11             THE COURT:  I'm sorry, what's happening?

12             MS. SAWYER:  I think I misspoke, which I'll

13   correct when I ask the question.

14             THE COURT:  Thank you.

15   A    Okay, I'm ready.

16   Q    This is an email from you to Miss Fang on September 12,

17   2008 at 10:50 in the morning, copying Julian Sale.  Do you

18   see that?

19   A    Yes, that's the top email you're referring to, I take

20   it.

21   Q    Yes.  And if you look at the bottom email, it's from

22   Mr. Sale to Miss Fang -- I'm sorry, from Miss Fang to Mr.

23   Sale, where Miss Fang indicates the day to show, we can call

24   LBSF today for plus 8.1 MMQVT and plus 870 take Quint.  Do

25   you see that?

Page 70

1    A    I see that.

2    Q    And that would have been information that she would

3    obtained -- have obtained from the Mordor system?

4    A    I believe it is, yes.  It's possible she'd already

5    received something from Lehman too.  I think it's -- the

6    data isn't precise phrase.

7    Q    But that's either -- it's either information coming out

8    of QVT systems or it's based upon a comparison between QVT

9    systems and Lehman systems, correct?

10   A    That's what I would imagine it is, yes.

11   Q    Okay.  And you ask in response, does that reflect any

12   decrease in initial margin.  Do you see that?

13   A    Correct.  Yes, I do see that.

14   Q    And so you're wondering if Miss Fang's calculations

15   reflect any agreement from Lehman to decrease the amount of

16   initial margin that QVT is required to post, right?

17   A    That's right, that's right.  And I think it -- well,

18   your question was is if it reflects agreement from Lehman, I

19   think, right?  But it's possible that if the data were

20   coming solely out of Mordor, it might just reflect our

21   having already credited ourselves for a return of the

22   initial margin in Mordor.

23   Q    And she responds, moving up, that there's no change in

24   IM.  Do you see that?

25   A    I see that.

Page 71

1    Q    Meaning that there's no change in the initial margin

2    that QVT had posted to Lehman, right?

3    A    Right, that's what I took it to mean, that the

4    calculation of the data don't reflect any change.

5    Q    And that was Friday, September 12th about 10:40 in the

6    morning, right?

7    A    10:42, yes.

8    Q    And so you responded, okay, please make the call right

9    away, right?

10   A    Correct.

11   Q    Because QVT wanted to make all margin calls on Lehman

12   as promptly as possible the week before Lehman's bankruptcy,

13   right?

14   A    That's correct.  And I think if you don't make the call

15   by a certain time in the day, you don't get paid that day.

16   Q    And you want to make sure you got paid that day.

17   A    I did.

18   Q    If you could go to Exhibit 5114.

19   A    Okay.

20   Q    I'll give you a moment to look at it, and you can let

21   me know when you're ready.

22   A    Okay.

23   Q    This is an email chain among Miss Fang, yourself, Mr.

24   Sale, and Adam Metter on Thursday, September 11, 2008,

25   correct?

1   A    Yes.

2   Q    And starting at the bottom of the email chain, Miss

3   Fang writes, LBSF has called QVT for 710k today, and she

4   continues and said, I heard Adam said you are trying to pull

5   back some margin from them.  Any update yet?

6   A    I see that.

7   Q    And is that a reference to the attempts to get back the

8   initial margin from Lehman?

9   A    I would say probably.  It doesn't say initial margin,

10  but that's probably what it was, unless there was some other

11  accommodation that was being sought.

12  Q    And Miss Fang follows up in the next email up the chain

13  at 2:45 and asks if there's any update on this, should I pay

14  the call or hold off.  Do you see that?

15  A    I see that.

16  Q    And you write back, we are still waiting to hear,

17  correct?

18  A    Yes, that's an email from me to Kelly, Julian, and Adam

19  Metter.

20  Q    So you're still waiting to hear whether or not there's

21  going to be some margin pullback from Lehman, right?

22  A    That's what I would take it to mean, yes.

23  Q    And Miss Fang at the top says, okay, I will hold the

24  call.  Do you see that?

25  A    I see that.

Page 73

1    Q    And that means she's not going to pay the call at that

2    time?

3    A    That's what I would take it to mean, yes.

4    Q    Okay.  I'd like you to look at Exhibit 5464.

5    A    I'm sorry, I didn't hear the number.

6    Q    5464.

7    A    Okay.

8    Q    This is an update to QVT's investors that QVT put out

9    on Thursday, September 11, 2008 at 4:08 PM, isn't it?

10   A    I believe it is, yes.

11   Q    And these updates to the investors are sent out, at

12   least in 2008, regularly to the investors, correct?

13   A    They were sent out periodically; typically, at month --

14   following the month end when we would establish an NAV.  And

15   I believe at the time, they might have been done in the

16   middle of the month, too, typically.

17   Q    And at this time in particular in September of 2008,

18   they were coming out more frequently; is that fair?

19   A    That is fair, at least in September for sure.  I don't

20   remember if there were -- and perhaps earlier in the year,

21   there had been some kind of special investor updates, given

22   how volatile the markets were.

23   Q    And often those more frequent investor updates, like

24   this one, were coming out in the middle of the month,

25   correct?

1   A     That's right.  I'm sorry, what I was trying to say a

2   moment ago in response to your question is that I believe we

3   actually did midmonth estimates regularly in 2008.  Indeed,

4   today, we put out midmonth estimates and end-of-month

5   estimates.  I'm pretty sure we had that practice.  But there

6   were special estimates on top of this, so some a little

7   earlier than midmonth.  September 11th is obviously a little

8   earlier than midmonth.

9   Q     Would this have been the midmonth update or is this a

10  special one that's being sent out?

11  A     I don't recall.

12  Q     Okay.  Now, looking at the top of this, it has

13  estimated returns of feeder funds.  Do you see that?

14  A     I do see that.

15  Q     And it says that its estimated returns for the period

16  September 1, 2008 to and including September 10, 2008.  Do

17  you see that?

18  A     I do see that.

19  Q     And these estimated returns, this would have been

20  information generated from QVT's internal systems, the Tyche

21  system, correct?

22  A     That's correct, yes.

23  Q     Okay.  And at least as of September 11, 2008, QVT felt

24  confident enough in their values in the Tyche system to

25  generate a report that it sent to its investors about its

Page 75

1    estimated returns, correct?

2    A    That's correct.

3    Q    And there's, after the estimated return section, then

4    there's a comment section that says, comment on performance

5    and market conditions.  It's about halfway down the page and

6    underlined.  Do you see that?

7    A    I see that.

8    Q    And, generally, these investor updates include some

9    commentary that would be provided to the investors; is that

10   fair?

11   A    Frequently, yes, I think that's right.  I don't know

12   about generally, particularly for midmonth estimates, but

13   this one certainly does.

14   Q    And typically, Mr. Gold would provide this commentary

15   that would go into these types of communications, wouldn't

16   he?

17   A    That's correct.

18   Q    And Mr. Gold's draft commentary would be circulated to

19   the other managing members for their input and comment, so

20   that there was agreement as to what was going out to the

21   investors, right?

22   A    That's correct.  It was circulated more broadly than

23   that even probably.

24   Q    And if you could look at the paragraph that starts at

25   the bottom of the first page of this investor update.  It

Page 76

1   says, as you know, Lehman Brothers stock has declined

2   precipitously in recent days and is presently trading

3   between approximately $4.00 and $5.00 a share.  Do you see

4   that?

5   A    I see that.

6   Q    Mr. Gold's updating QVT investors regarding a decline

7   in Lehman's stock price?

8   A    Yes, Mr. Gold is telling people where Lehman stock is

9   presently trading.

10  Q    And then he continues in that paragraph to talk about

11  some of the efforts QVT is taking in connection with

12  Lehman's decline, doesn't he?

13  A    If you'll give me a moment to read it, I can answer

14  your question.

15  Q    Absolutely.

16  A    I'm ready.

17  Q    So in that paragraph that I believe you just read, Mr.

18  Gold is talking about some of the efforts QVT's taking in

19  connection with the Lehman decline; is that fair?

20  A    Yes, in that paragraph in the (indiscernible).

21  Q    And specifically in the third sentence, he says, we

22  have moved some positions from Lehman to other

23  counterparties and expect to move more today and tomorrow.

24  Do you see that?

25  A    I do see that.

Page 77

1   Q    And that's what you're referring to that QVT was trying

2   to move certain of its positions away from Lehman, correct?

3   A    That's correct.

4   Q    And then continuing on, Mr. Gold indicates, at present,

5   we believe that we retain enough Lehman CDS, such that

6   should Lehman default, we would likely make more on the CDS

7   than the loss of our initial margin, equity in repo, and

8   equity in prime brokerage held with Lehman, although I would

9   caution that this analysis is dependent on the completion of

10  the transfers currently under way, and is based on our

11  understanding of how certain of our accounts will be treated

12  in the event of the bankruptcy of Lehman.  Do you see that?

13  A    I do see that.

14  Q    So Mr. Gold is communicating that QVT had purchased

15  enough CDS on Lehman to not only cover its risk, but

16  actually make more in the event of a Lehman default than its

17  exposure to Lehman, correct?

18  A    Specifically, our loss of initial margin equity in repo

19  and equity in prime brokerage.  That's -- if that's your

20  definition of exposure, yes.

21  Q    And that QVT had purchased the CDS on Lehman that would

22  cover that, correct?

23  A    Yes.

24  Q    Okay.  And if you could turn to the second page of

25  this, the second line.  Mr. Gold identifies what he says as

Page 78

1   a further potential risk of replacement risk.  Do you see

2   that?

3   A    I do see that.

4   Q    And that sentence is underlined, right?

5   A    Yes, it is.

6   Q    And Mr. Gold explains that this replacement risk would

7   arise if Lehman collapses in such a way that all of its

8   contracts under the ISDA, including CDS, terminate, right?

9   A    That's what it says, yup.

10  Q    And in that scenario, then the QVT funds and the rest

11  of the very large universe of Lehman ISDA counterparties

12  would suddenly be left with certain unhedged positions,

13  right?

14  A    That's what it states, yes.

15  Q    And so according to Mr. Gold, the replacement risk is

16  the risk that the spread for the new CDS contract to replace

17  the old one will be higher than the level prevailing when

18  the old CDS termination occurred, right?

19  A    That's what it says, yes.

20  Q    And that's what you understood the replacement risk

21  that QVT was facing prior to Lehman's bankruptcy was, right?

22  A    Well, I guess I would state it a little differently

23  than it's stated here.

24  Q    So that's not your understanding as to what the

25  replacement risk is that QVT was facing prior to Lehman's

1    bankruptcy?

2    A    Well, I guess I would say a couple things about how my

3    understanding might differ certainly from the language that

4    you've read.  One is that replacement risk doesn't just

5    arise with respect to CDS that are acting as hedges for when

6    you suddenly have unhedged positions.  I think replacement

7    risk, as I think of it, is the -- it's the risk that when

8    you go to replace whatever CDS are terminated, that the

9    market is at a significantly different level from where it

10   was when you last valued your CDS, and particularly when you

11   last valued your last CDS for margin purposes versus that

12   counterparty.  So if -- that's what I've been referring to

13   as jump-to-default risk, which is another common term for

14   it, or replacement risk as it's defined here.

15   Q    And that replacement risk arises from the movement

16   between the time of the termination of the contract and the

17   time of the replacement, correct?

18   A    No, that's not correct.

19   Q    But that's what Mr. Gold wrote in this investor update,

20   correct?

21   A    That's why I stated that I have a somewhat different

22   understanding.  I would define it as the move from the point

23   that the business day before the insolvency of the

24   counterparty occurs, herein before the insolvency of Lehman

25   occurs.

Page 80

1   Q    That's not what was communicated to the investors on

2   September 11th, though, was it?

3   A    I mean, I find this phrase, when the old CDS

4   termination occurred, vague, and I don't know exactly what

5   it's trying to communicate.  But I would say that

6   replacement risk, as I understood it and as I believe Mr.

7   Gold understood it at the time, is not the difference

8   between where the CDS is on the day you terminated and some

9   subsequent day.  It's the difference between where the CDS

10  was as of the close of business preceding the day that you

11  terminated.  That's what jump-to-default refers to

12  obviously.  That all of a sudden, because there's a default

13  that there's a jump in values that you are not

14  collateralized for.

15  Q    But that's not the language that's used in this

16  investor update.

17  A    That is not the language that's used in this here.

18  Q    And going to the next paragraph that starts, it is

19  currently very difficult to novate.  Do you see that?

20  A    I see that.

21  Q    That -- I'm sorry, I lost my train of thought.  That

22  sentence is referring to QVT's efforts to novate some of its

23  CDS from Lehman to other investment banks; is that correct?

24  A    That's correct.

25  Q    And you'd mentioned that earlier in your testimony that

Page 81

1    that was one of the steps that QVT was undertaking to try to

2    reduce its exposure to LBSF, correct?

3    A    That's one of the steps we tried to take, but as I

4    remember, were either completely unsuccessful or largely

5    unsuccessful.

6    Q    And as noted in this update to the investors, they were

7    -- you were finding it difficult to do; is that correct?

8    A    Yes, I think difficult is probably an understatement.

9    I think it was, as I recall, it was impossible.  I don't

10   recall maybe a couple of things got novated, but it was very

11   small.

12   Q    And as a result of the difficulty or impossibility to

13   novate things, QVT was, in the words of this investor

14   updated, forced to maintain our current level of replacement

15   risk.  Do you see that?

16   A    I do see that.

17   Q    And then Mr. Gold goes on to say, it's difficult to

18   estimate how much that level of replacement risk might be,

19   but it could amount to two to three percent of NAV.  Do you

20   see that?

21   A    I see that.

22           MR. REGAN:  Objection.

23           THE COURT:  What's the objection?

24           MR. REGAN:  Misreading the document or incomplete

25   reading of the document.

```
 1              THE COURT:  Could you repeat, Miss Sawyer?

 2              MS. SAWYER:  It said, and Mr. Gold goes on to say

 3     it's difficult to estimate how much that level of

 4     replacement risk might be, but it could amount to two to

 5     three percent of NAV.

 6              MR. REGAN:  And the parenthetical.

 7              THE COURT:  Okay, go ahead.

 8              MS. SAWYER:  Though this is frankly only a guess.

 9              THE COURT:  And what's the question?

10              MS. SAWYER:  My question is, is that what Mr. Gold

11     said in this investor update on September 11, 2008.

12              THE COURT:  You can answer, Mr. Brumm.

13     A    Yes, that is what Mr. Gold said, including the

14     parenthetical.  Thank you for that.

15     Q    And he was communicating that this replacement risk

16     could be -- could amount to two to three percent of NAV,

17     right?

18     A    He says it could amount to two to three percent of NAV,

19     though, frankly, that is -- this is only a guess.

20     Q    Let's turn now to the weekend before Lehman's

21     bankruptcy.  QVT continued to focus on its potential

22     exposure to Lehman even that weekend, right?

23     A    We did.

24     Q    And I believe you testified on direct that there were a

25     number of conference calls on that weekend to discuss QVT's
```

Page 83

1    exposure to Lehman, right?

2    A    There were.

3    Q    And, in fact, there was an analysis done on that

4    weekend before Lehman's bankruptcy to assess what QVT's

5    exposures were to Lehman, including Lehman's deriv -- QVT's

6    derivatives exposure to Lehman, right?

7    A    I believe I recall that certain analyses were done, but

8    I don't recall the details.

9    Q    If you could look at Exhibit 50 -- I'm sorry -- 5130.

10   A    Okay.

11   Q    I'm not sure what's in your binder, but there's two

12   sheets of this.  One is kind of cut off, the chart is cut

13   off on the side.

14   A    I see it.

15   Q    So if you look at the second sheet, it shows everything

16   and it's a portrait landscape.

17            MR. REGAN:  Which page are you referring to?

18            MS. SAWYER:  It says Page 1 again, it's the second

19   page.  It's the one that's oriented this direction, yes.

20   Q    This is an email from Mr. Sale -- I'm sorry, the bottom

21   email is an email from Mr. Sale to you, Mr. Gold, Mr. Chu,

22   and Mr. Perez on Sunday, September 14, 2008.  Do you see

23   that?

24   A    I do see that.

25   Q    And Mr. Sale in September of 2008 was QVT's Chief

Page 84

1    Financial Officer, wasn't he?

2    A    He was.

3    Q    And Mr. Perez was the Chief Risk Officer at QVT in

4    September of 2008, right?

5    A    He was.

6    Q    And Mr. Sale is giving this update to you, Mr. Chu, Mr.

7    Perez, and Mr. Gold about the positions with Lehman as of

8    the close of business Friday, September 12th, right?

9    A    If I may have a moment to review the document.

10    Q    Yes, absolutely.

11    A    I'll be able to answer your question then.  Okay, I'm

12    ready.

13    Q    Okay.  My question was to you, Mr. Sale is giving an

14    update to you, Mr. Chu, Mr. Perez, and Mr. Gold regarding

15    QVT's positions with Lehman as of the close of business

16    Friday, September 12, 2008, right?

17    A    Yes.  He states, this is the trade date position as of

18    close of business Friday.

19    Q    And that's referring to September 12, 2008, right?

20    A    It is.  The phrase trade date means that based on

21    trades that have been done, so if there are trades that are

22    unsettled potentially.

23    Q    And there's -- it's broken up by custodian, the chart

24    is, and there's a row that says LBSF.  It's the third row

25    down.  Do you see that?

Page 85

1   A     I see that.

2   Q     And if you go across on that row, you see the value of

3   the derivatives for LBSF as $116,898 -- I'm sorry,

4   $116,898,602.  Dou see that?

5   A     I do see that.

6   Q     And that's the value of QVT's -- the market value of

7   QVT's derivatives transactions with LBSF as of the close of

8   business on September 12, 2008, right?

9   A     That's correct.

10  Q     Based upon QVT's own systems, right?

11  A     I imagine so, yes.

12  Q     And then right below that, the next row says, LBSF

13  margin.  Do you see that?

14  A     I do see that.

15  Q     And going across, there's a number and some of td cash

16  balance column that's a minus 117 million approximately.  Do

17  you see that?

18  A     I see that.

19  Q     And that's the amount of collateral QVT held from LBSF

20  as of the close of business on Friday, September 12, 2008,

21  right?

22  A     I believe that's correct.

23  Q     So according to this analysis from Mr. Sale, QVT held

24  more collateral from LBSF than the market of the derivatives

25  trades with LBSF on QVT's books as of the close of business

Page 86

1    September 12th, right?

2    A    Yes, by approximately $306,000.

3    Q    And you don't remember anybody objecting on Sunday,

4    September 14, 2008 to Mr. Sale's analysis to point out that

5    the market value of the derivatives transactions were

6    incorrect, do you?

7    A    I don't recall anyone pointing out that the market

8    value of the derivatives transactions as of the close of

9    business on Friday was incorrect.

10   Q    And it would have been important for QVT to know the

11   weekend before Lehman's bankruptcy if QVT's market valuation

12   of its derivatives trades with LBSF were not accurate,

13   wouldn't it?

14   A    Yes, it would be important to know that.

15   Q    And I believe you testified on direct that QVT would

16   sometimes remark its books when a significant intermonth

17   event happened.  Do you recall that?

18   A    I do recall that.

19   Q    And I believe you also testified that the Fannie and

20   Freddie event earlier in September of 2008 was a significant

21   event for the markets; is that fair?

22   A    I do recall that, yes.

23   Q    And did QVT take steps after that significant event of

24   the Fannie/Freddie situation to remark its books?

25   A    We did remark at least certain positions.  I don't

1    recall whether we remarked the whole book at some point.

2    It's possible that we did in order to generate the kind of

3    investor updates that you pointed me to earlier this

4    afternoon.

5    Q    And now, Fannie and Freddie, those are both GSE's,

6    government-sponsored enterprises, right?

7    A    That's what they were commonly referred to as that.

8    Q    And Lehman was not a GSE, was it?

9    A    Lehman was not a GSE.

10   Q    And QVT only had, you know, one or maybe a few PCDS

11   trades that referenced Fannie or Freddie, didn't it?

12   A    I don't recall us having PCDS trades that referenced

13   Fannie and Freddie, at least in September of 2008.

14         MS. SAWYER:  I could use a quick minute.

15         THE COURT:  I think everybody probably could, so

16   let's shoot for 3:30 to resume.  All right?

17      [BREAK]

18         THE COURT:  Come back up, please.

19   Q    You were involved in the decision to elect to terminate

20   the transactions on September 15, 2008, weren't you?

21   A    That's correct, yes.  I was involved in the early

22   termination decision.

23   Q    And I believe you testified on direct that it was a

24   joint decision of the managing members to terminate the

25   transactions on September 15, 2008, right?

1    A    I did, yes.

2    Q    And QVT understood that it had the right, but not the

3    obligation, to terminate the ISDA Master Agreements

4    following LBHI's bankruptcy, correct?

5    A    We did understand that it was a right, not an

6    obligation.

7    Q    And I'd like to look at Joint Exhibit 67.

8    A    Okay.

9    Q    Which is the termination notice that Mr. Regan showed

10   you.  It should be towards the front.

11   A    Yeah, I'm sorry, I'm just getting there.  I see -- 67,

12   you said, right?

13   Q    Yeah, 67.

14   A    Okay, sorry.  Yes, I'm there.

15   Q    And that's the termination notice signed by you and Mr.

16   Brumm -- I'm sorry, you and Mr. Gold, correct?

17   A    That's correct, yes.

18   Q    And it specifically states the early termination date

19   shall be September 15, 2008.

20   A    Yes, it does state that.

21   Q    And QVT understood that QVT had the ability under the

22   ISDA Master Agreements to designate the early termination

23   date, correct?

24   A    Correct.

25   Q    And even though QVT terminated it on September 15,

Page 89

1    2008, it didn't need to designate September 15, 2008 as the

2    early termination date, correct?

3    A    That's correct.  I believe we have to designate a date

4    within 20 days of the date on which we delivered the notice.

5    Q    And it was a joint decision of the managing members to

6    designate the early termination date as September 15, 2008,

7    correct?

8    A    It was a joint decision, yes.

9    Q    And QVT understood that certain obligations arose in

10   connection with the designation of an early termination

11   date, right?

12   A    We did understand that certain obligations arose, yes.

13   Q    And QVT understood that it was required to value the

14   transactions as of the early termination date, or if that

15   was not reasonable practicable, as soon as reasonably

16   practicable thereafter, correct?

17   A    Yes, that's correct.

18   Q    And you don't recall any discussions at QVT on

19   September 15, 2008 about the practicability of valuing the

20   terminated transactions as of September 15, 2008, do you?

21   A    I do not recall any discussion of the practicability of

22   it.

23   Q    And you don't recall any discussions at QVT that if QVT

24   terminated the transactions as of September 15, 2008 and the

25   portfolio deteriorated on the 16th or the 17th or the 18th,

Page 90

1    that QVT might be unable to capture that deterioration, do

2    you?

3    A    No, I do not recall any such discussions.

4    Q    So QVT, going back to the ISDA, QVT requested that the

5    market quotation measure be included in the ISDA Master

6    Agreements, correct?

7    A    QVT did request that the market quotation measure be

8    included in the ISDA Master Agreement between us and Lehman,

9    yes.

10   Q    And QVT sought the market quotation method because it

11   believed it was the most even-handed fairest form of

12   closeout under the ISDA Master Agreements, right?

13   A    That's correct.  We thought it was the most even-handed

14   fairest method of closeout.  And as an end user, we were

15   particularly concerned that it be the most even-handed,

16   fairest measure because I think when ISDAs were negotiated,

17   really, you know, right up until the financial crisis,

18   people didn't imagine that dealers would actually default.

19   They imagined that they would be the ones being closed out.

20   But by people, I mean end users, excuse me.

21   Q    And if you could look at Joint Exhibit 4.

22   A    Okay.  Yes, I need my glasses.

23   Q    Yes, it's a very poor copy.  This is a 2005 email

24   exchange between QVT and Lehman related to the negotiation

25   of the ISDA Master Agreement, correct?

Page 91

1   A    Yes.  If I can just take a moment to review it.

2   Q    Yes.

3   A    Thank you, I'm ready.

4   Q    This is a 2005 email exchange between QVT and Lehman

5   related to the negotiation of the ISDA Master Agreement

6   between QVT and LBSF, correct?

7   A    That's correct.  It also copies some of our then

8   derivatives counsel.

9   Q    And you're copied on the emails, correct?

10   A    I'm copied on a number of emails publicly, it looks

11   like, or certainly a number, I guess.

12   Q    And it appears --

13   A    I'm copied just on the latter ones.  There are some

14   earlier ones where Adam Metter, I believe, is the QVT

15   person.

16   Q    So you're copied on some of the ones on the first page.

17   A    That's correct, yes.  I see my name there.

18   Q    And Mr. -- it appears that Mr. Metter appears to be

19   negotiating with Lehman on behalf of QVT in connection with

20   this; is that fair?

21   A    That's correct, that was Mr. Metter's role at the time.

22   Q    And I believe you testified he was an ISDA

23   documentation specialist that worked for QVT?

24   A    That's correct.

25   Q    And if you look at the email that starts at the bottom

Page 92

1    of the first page, which is from Mr. Metter to Renelda

2    (indiscernible).

3    A    Okay.

4    Q    At 9:36.  Do you see that?

5    A    February 28, 9:36.  Yes, I see that.

6    Q    And --

7    A    I'm sorry, February 8th.  I'm sorry, I thought I saw a

8    2 there.

9    Q    It's February '08, I think.

10   A    Right, I think you're correct.  Thank you.

11   Q    Mr. Metter writes at the bottom of this first page, we

12   had a discussion this morning re market quotation loss.  We

13   continue to feel market quotation is the proper method for

14   valuing our positions.  Do you see that?

15   A    I do see that.

16   Q    And when Mr. Metter refers to we, he's referring to

17   QVT, right?

18   A    Yes.

19   Q    And so was that true in 2005 when Mr. Metter was

20   negotiating with Lehman that QVT felt that market quotation

21   is the proper method for valuing its positions?

22   A    I believe it was.  I mean, it's certainly what he

23   stated.

24   Q    And he continues to say, most of our positions have a

25   ready market with easily obtained quotations.  Do you see

Page 93

1    that?

2    A    I do see that.

3    Q    And that was true in 2005 when Mr. Metter was

4    negotiating with Lehman, that most of QVT's positions have a

5    ready market with easily obtained quotations, right?

6    A    I don't know what our positions were in 2005 with

7    Lehman, but it is what's stated here.

8    Q    And you don't know whether or not that's true in 2005,

9    whether QVT's positions had a ready market with easily

10   obtained quotations?

11   A    It was after discussion with others, including Arthur

12   Chu and myself, so I assume we believed that was correct in

13   2005.  I'm just saying I don't know what those positions

14   were in 2005.

15   Q    Now, Mr. Metter goes on to discuss customized products,

16   and states, we feel these become more common every day and

17   liquid quotation mechanisms will develop.  Do you see that?

18   A    I do see that.

19   Q    And was that true in 2005 when Mr. Metter was

20   negotiating with Lehman, that QVT felt that these were

21   becoming more common every day and liquid quotations

22   mechanisms would develop?

23   A    He does state that and it was after discussions, so I

24   think we did believe that.  I think that it was a period of

25   time when there was tremendous development in the CDS

Page 94

1   markets, and things that were one day a new product were

2   shortly thereafter much more widely traded.

3   Q    And I believe you testified on direct that QVT believed

4   that the market quotations obtained needed to be actionable;

5   is that fair?

6   A    For market quotation, yes, we believe that they needed

7   to be actionable, that's correct.

8   Q    And prior to Lehman's bankruptcy, QVT discussed

9   internally the procedure for valuing QVT's portfolio of

10  trades in the event Lehman went bankrupt, didn't it?

11  A    There was some discussion.  I recall an email trail

12  about how market quotation would work and/or loss and what

13  the requirements for those were.

14  Q    And you, I think you might refer to Joint Exhibit 46

15  that Mr. Regan showed you yesterday.

16  A    I should -- I'll turn to that.

17  Q    Yes.

18  A    Yes, this was what I was referring to.  Thank you.

19  Q    And if you go to Page 3 of this document, it starts

20  with an email from Arthur Chu on Monday, September 8, 2008.

21  Do you see where I'm at?

22  A    I do see that.

23  Q    And he is posing the question to Mr. Metter and Mr.

24  Sale.  "Suppose that Lehman were to file, what is the

25  procedure for valuing a CDS?."  Do you see that?

Page 95

1   A    I do see that.

2   Q    Mr. Chu is raising this question in the context of a

3   potential Lehman filing, right?

4   A    That's correct, yes.

5   Q    And then Mr. Regan, I think, focused on the top email

6   on the email chain, so the one on Page 1.

7   A    Okay.

8   Q    And that's where Mr. Metter's telling you that he told

9   Mr. Chu that the quotations should be actionable in

10  accordance with the market quotation definition.  Do you see

11  that?

12  A    Yes, I do see that.

13  Q    And that's consistent with your understanding that the

14  quotations obtained for the market quotation process needed

15  to be the levels at which dealers would actually enter into

16  replacement trades, right?

17  A    Yes, that's correct.

18  Q    And you testified, I believe, on direct that QBT did

19  not start preparing for the market quotation process until

20  September 15, 2008, is that correct?

21  A    I did, yes.

22  Q    But that's not true, is it?

23  A    I beg your pardon?

24  Q    If you could look at Joint Exhibit 51, which might not

25  be in your binder because I think it's a native file.

1    But...

2    A    I don't think I have it.

3    Q    No, it's a native file.

4    A    (indiscernible)

5    Q    Have you seen this document before?  It's a

6    spreadsheet.

7    A    I don't know whether I have or not.

8    Q    Well, let's look at the tab that says, Quote Market

9    Request.

10    A    Okay.

11    Q    Do you see that?

12    A    I do.

13    Q    And have you seen this language before?  This Quote

14    Market Request?  Dear XXX, we require firm tradable offers.

15    Do you see that?

16    A    I do see this and I have seen this letter before.

17    Q    And that's an initial draft of the instructions to go

18    along with the market quotation process, right?

19    A    It is.

20    Q    And if you could go over to the tab called Exposures,

21    do you recognize what this is?

22    A    I don't recognize what it is.  I believe it's...

23    Q    It has a list of different things like Argentina, GMAC

24    Hedge, things like that.

25    A    Yeah.

Page 97

1   Q    It's Column C, it's got LBSF and DC.  Do you see that?

2   A    I do see that.

3   Q    And do you know that this is a list of the LBSF trades?

4   A    I don't know what it is.  I would think that's actually

5   an account list on the side.  The accounts are things that

6   we stick positions in.  The accounts are the...level or the

7   concept in which we place individual positions to keep them

8   grouped.  So, I can tell from looking at these and

9   recognizing some of these that these were account names in

10  our system.  In the accounts would have been one or more

11  positions, what we called a ty-fy, Tyche.  And I know that

12  they're written in a different way, so these are not full

13  positions themselves.  I think this is some sort of exposure

14  -- it's some sort of exposure analysis by account.

15  Q    Could you go down to Row 669?  Or 666?  So here we're

16  starting to get into what you were saying, the ty-fys.

17  A    That's correct.

18  Q    They're showing up at Column B.

19  A    Yes, that's correct.  In Column B, those are ty-fys.

20  Q    Right.  And so those -- like looking at Row 666, it

21  says GMAC Hedge in Column A...

22  A    That's the account that this position resided in.

23  Q    Okay.  And then Column B it says Auto-BBB-Bespoke_DS1.!

24  Do you see that?

25  A    Yes, I do.  That was the name for CARB in our system.

Page 98

1    Q    And so this sheet listed the accounts at the top and

2    then continued to go down and list certain individual

3    trades, correct?

4    A    Yes, exactly.  It listed positions, we would call them.

5    Q    Okay.  And going back to the tab marked Quote Market

6    Request...

7    A    Yeah?

8    Q    Do you know who drafted this language?

9    A    I believe this language was drafted by Mr. Gold and me

10   together on September 15th.

11   Q    I'd like to look at the metadata for this document.

12   A    Okay.

13   Q    That's not the same one.  Do we have hand documents...?

14   There we go.

15           THE COURT:  Is this in the binder, Ms. Sawyer?

16           MS. SAWYER:  It is not in the binder.  I

17   apologize.

18           THE COURT:  It is not.  Okay.

19   Q    So, this is a metadata summary and if you go to the top

20   section --

21   A    I'm sorry, I can't read this at all.

22   Q    I think he's going to blow it up for us.

23   A    It's very -- it's just -- it's a very unclear image on

24   my screen.  Okay, I can read it well enough.

25   Q    Sure.

Page 99

1    A    Some of it anyway.  Yeah.

2    Q    So now it says Metadata Information, and it says Author

3    Arthur, do you see that?

4    A    I do see that.

5    Q    Do you know who that's a reference to?

6    A    I believe that's a reference to Arthur Chu, because

7    he's the only Arthur at QBT.

8    Q    Okay.  And if you could go down to the next section of

9    the metadata about date-time information...

10   A    Okay.

11   Q    And here it says, Date Created.  Do you see that?

12   A    I see that.

13   Q    And it says 9-14-2008.  Do you see that?

14   A    I see that.

15   Q    And that's inconsistent with your memory as to when

16   this document was created.  Is that what your testimony is?

17   A    It is inconsistent.  I mean, I don't think the tab you

18   were looking at was created on the 15th.  I don't think that

19   was something that Arthur drafted but...

20   Q    But you don't dispute that Arthur created the

21   spreadsheet on September 14, 2008?

22   A    Arthur did create a spreadsheet on September 14, 2008.

23   Q    And the spreadsheet is related to the market quotation

24   process, correct?

25   A    I don't know that it is related to the market quotation

Page 100

```
 1    process.  I recall Mr. -- Arthur creating a spreadsheet over

 2    the weekend that was an analysis of our CDS positions,

 3    including certain positions that he wanted to prioritize for

 4    CD replacement trades mostly.

 5    Q    But the spreadsheet we looked at -- let's go back to

 6    the spreadsheet, Jax 51.  The very first tab says, Quote

 7    Market Request, right?

 8    A    That's right.  But, as I said, I don't believe that

 9    this is a tab that was created by Arthur.  I remember this

10    as language that Dan and I created and in particular I'll

11    just say it has a style that is very much the way Dan writes

12    and the way he indicates emphasis.  And I remember this as

13    something that we created on September 15th together.

14    Q    So, I'd like you to look at Claimant's Exhibit 2115,

15    which -- it's in the package that Mr. Regan handed to you.

16    And I apologize for having you look a number of different

17    places.

18    A    No, that's fine.

19    Q    Let me...  Do you have it in front of you?

20    A    I do.

21    Q    Okay.  And this is the email that Mr. Regan showed to

22    you where you were sending a draft request for market

23    quotations to Mr. Cunningham at 10:54 a.m. on September 15,

24    2008.  Do you see that?

25            THE COURT:  What document number?
```

Page 101

1          MS. SAWYER:  It's in the package from --

2          THE COURT:  Yeah, I have the package.

3          MS. SAWYER:  And it's Claimant's Exhibit 2115.

4          THE COURT:  Thank you.

5     A    Yes, that's right.  It was an attachment to the email

6     that I sent to Mr. Cunningham at 10:54.

7     Q    And that attachment --

8     A    September 15th.

9     Q    I'm sorry.  I didn't mean to --

10    A    I'm sorry, on September 15th.

11    Q    Let's just make sure our record's clear.  So, this is

12    the email that you sent to Mr. Cunningham on September 15th

13    at 10:54 a.m. with an attachment to it, correct?

14    A    That's correct.

15    Q    And let's look at that attachment, which looks just

16    like the attachment we just looked at from Joint Exhibit 51.

17    Correct?

18    A    That's correct.

19    Q    And it's got the language of the draft market quotation

20    in a tab on the spreadsheet, do you see that?

21    A    I do see that.

22    Q    But all the other tabs from that spreadsheet from Joint

23    Exhibit 51 aren't included.  Is that correct?

24    A    Yeah, that's correct.

25    Q    So, when you provided Mr. Cunningham with the draft

Page 102

1    language for the market quotation process, you did not

2    provide him with the list of exposures or the list of

3    positions for which market quotations were going to be

4    sought, did you?

5    A    No, I did not.

6    Q    And did you at any time on September 15, 2008 tell Mr.

7    Cunningham how many positions QVT was seeking market

8    quotations?

9            MR. REGAN:  Objection.  Calls for privileged

10   communication.  I think the Court has ruled that -- she said

11   there's a --

12           THE COURT:  Come on up.  All right, we're going to

13   take a few minutes to discuss the point that's being raised

14   by Mr. Regan.  Rather than having you all leave, we're going

15   to leave.  So, everybody can stay here.  And if I could ask

16   counsel to meet with me in the conference room -- we'll be

17   back as soon as we can.

18           (Break)

19           THE COURT:  Okay, thank you, everybody, for your

20   patience.  Ms. Sawyer, perhaps you could -- I don't know if

21   you want to ask the question that you left off with or if

22   you want to ask a different question.

23           MS. SAWYER:  I think I'm going to withdraw that

24   question and ask some different questions.

25           THE COURT:  Okay.

Page 103

1    Q    Mr. Regan on your direct examination talked to you

2    about some of the conversations that you'd had with counsel

3    on September 15th regarding the market quotation process.

4    Do you recall that?

5    A    I do recall that.

6    Q    And I believe you testified that you spoke to Mr.

7    Cunningham on September 15, 2008.  Correct?

8    A    Yes.  I recall speaking with Mr. Cunningham.

9    Q    And he was an attorney at Allen & Overy at the time,

10   right?

11   A    He was an attorney at Allen & Overy at the time, yes,

12   that's correct.

13   Q    And I'd like you to, if you can, without revealing the

14   substance of any advice he gave you, identify the general

15   topics that you discussed with Mr. Cunningham.

16   A    Okay.  I think we discussed generally the market

17   quotation process and the fact that we would be sending out

18   market quotations.

19   Q    Did you talk with Mr. Cunningham about the time in

20   which QVT should go out to the market with its market

21   quotation requests?

22   A    I don't recall whether I discussed that with Mr.

23   Cunningham or not.

24   Q    Did you discuss with Mr. Cunningham the time as of

25   which the quotations should be received under the market

Page 104

1    quotation process?

2    A    I don't recall whether I discussed that with Mr.

3    Cunningham or not.

4    Q    Did you discuss with Mr. Cunningham the length of time

5    that the dealers should have or would have under the market

6    quotation process?

7    A    I do not recall whether we discussed that or not.

8    Q    I'd like you to look at -- just give me one minute --

9    Claimant's Exhibit 2126, which is in that packet that Mr.

10   Regan had given to you.

11   A    Okay.

12   Q    And this is -- before we were looking at the bottom

13   email, which is your email to Mr. Cunningham at 10:54 a.m.

14   on September 15, 2008.  Do you see that?

15   A    I do see that.

16   Q    And then this is Mr. Cunningham's response at 3:11 p.m.

17   Do you see that?

18   A    I do see that.

19   Q    And had you spoken to Mr. Cunningham between 10:54 a.m.

20   and 3:11 on Monday September 15, 2008?

21   A    I don't recall but I don't believe so.

22   Q    Did you speak to Mr. Cunningham before 10:54 a.m. on

23   Monday September 15, 2008?

24   A    I don't recall whether it was before 10:54, but looking

25   at the correspondence it would appear to me that it was.  I

Page 105

1    do recall that it was in the morning.  That's my only

2    memory.

3    Q    Okay.  And Mr. Cunningham's response on Claimant's

4    Exhibit 2126 to your email is "Looks okay.  Don't spend a

5    lot of time on this." Do you see that?

6    A    I do see that.

7    Q    And he's referring to that you shouldn't spend a lot of

8    time on drafting a market quotation request.  Is that

9    correct?

10   A    I believe that's what he's referring to.  That was the

11   attachment to the email I sent to him.

12   Q    That QVT should get that request out, right?

13   A    I just know that it says don't spend a lot of time on

14   this.  It doesn't say to get it out; it says to not spend a

15   lot of time on the form of the market quotation.

16   Q    And that's what you understood him to be communicating

17   at that time?

18   A    I don't recall any particular understanding of this

19   email at the time.  I just know what it says now when I read

20   it.

21          MS. SAWYER:  Your Honor, may I have just a moment?

22          THE COURT:  Sure.

23   Q    Could we go back to Claimant's Exhibit 2115, which is

24   the 105409 email to Mr. Cunningham and the attachment that

25   we were looking at?

Page 106

```
 1    A    Okay.

 2    Q    Now, this attachment that was sent to Mr. Cunningham at

 3    10:54 a.m. on Plaintiff's Exhibit 2115, Mr. Gold was also

 4    sending this draft language to others in the marketplace,

 5    wasn't he?

 6    A    I don't recall whether Mr. Gold was sending this

 7    language to others in the marketplace or not.

 8    Q    You don't recall whether -- that Mr. Gold sent this

 9    language to colleagues at DB to get their advice?

10    A    I don't recall that.

11    Q    And you don't recall discussing that with Mr. Gold?

12    A    No, I remember sitting in Mr. Gold's office and

13    drafting this language together.  That's what I recall of

14    this.

15    Q    Not on the trading floor but in Mr. Gold's office?

16    A    That's correct, it was in Mr. Gold's office, not on the

17    trading floor.

18    Q    And I believe you testified yesterday there were

19    offices around the trading floor that people would use,

20    correct?

21    A    That's correct.  And Mr. Gold's office is one of those

22    offices that were on the trading floor.

23    Q    Right.  I'd like you to look at Claimant's -- sorry, I

24    apologize -- Claimant's Exhibit 2117, which is in Mr.

25    Regan's package.
```

Page 107

1    A    All right.

2    Q    Are you there?

3    A    Yes.

4    Q    I hope I have the right number.  And this is the email

5    from you to Mr. Metter, that then Mr. Metter forwards on to

6    Ms. Boot at WilmerHale at 12:28 p.m. on September 15, 2008,

7    correct?

8    A    Yes, that appears to be correct.

9    Q    And the draft language at the bottom that gets

10   forwarded along, that's the draft language that you put

11   together with Mr. Gold?

12   A    This language is different than the draft language that

13   I put together with Mr. Gold that was shown on the

14   spreadsheet that you previously showed me.

15   Q    It's revised language from the spreadsheet that we

16   looked at a few minutes ago, correct?

17   A    That's correct.  Some of the language is similar and

18   some is different.

19   Q    And the changes from the language we were looking at in

20   the spreadsheet that was sent to Mr. Cunningham, were those

21   changes made in consultation with Mr. Gold?

22   A    I don't recall whether they were made in consultation

23   with Mr. Gold.  I would say that -- I know from some of the

24   other emails we've looked at that this language was

25   circulated to Mr. Gold eventually.  So in that sense, yes,

Page 108

1    in consultation -- but this appears to be language that I

2    wrote from the spreadsheet that we have done together.

3    Q    And was there any input from counsel in the revisions

4    from the spreadsheet we looked at to this language?

5    A    I don't recall.

6    Q    And you're sending this language to Ms. Boot for her

7    comment, correct?

8    A    Correct.

9    Q    And was there a conversation with Ms. Boot before you

10   sent over this language?

11   A    I don't recall whether there was a conversation before.

12   I believe there was a conversation at some point.  I think

13   that conversation occurred after this initial language but I

14   don't actually recall.  I just remember the fact of a

15   conversation.

16   Q    And you remember there being one conversation?

17   A    It might've been multiple conversations.

18   Q    And approximately how long did you spend speaking with

19   Ms. Boot?

20   A    I -- it was not an hour; it was shorter than that.  It

21   was probably somewhere between 10 and 20 minutes.  And I

22   don't recall whether it was one conversation or more than

23   one conversation.

24   Q    And your conversation with Mr. Cunningham that you

25   recall happening in the morning of September 15, 2008,

Page 109

1    approximately how long was that conversation?

2    A    It was a similar length.  20 minutes probably would be

3    my guess.

4    Q    And when you spoke with Ms. Boot, what topics did you

5    discuss?  Again, generally, not revealing any substance of

6    the advice.

7    A    I only recall speaking about the form of the market

8    quotation -- the market quotation language.

9    Q    So you only remember speaking with her about the draft

10   language to be sent to the dealers?

11   A    That's correct.

12   Q    Do you recall whether you spoke with Ms. Boot about the

13   timing at which QVT should go out to the market to solicit

14   quotations?

15   A    I don't recall speaking with her...

16   Q    And do you recall talking with Ms. Boot about the time

17   as of which the quotations were to be received?

18   A    I don't recall speaking with her...

19   Q    And do you recall speaking with Ms. Boot about the --

20        THE COURT:  Can I ask for a clarification of what

21   your answer means?

22        MR. BRUMM:  Sure.

23        THE COURT:  Does it mean you don't recall one way

24   or the other?  Or you don't -- as you're sitting here today,

25   you don't believe that you did discuss it with her?

Page 110

1          MR. BRUMM:  Sure, no, I think I was a little

2     clearer when I was responding with regard to Mr. Cunningham.

3     It's the former.  I don't recall one way or another.

4          THE COURT:  One way or the other.  Thank you.

5          MR. BRUMM:  Whether we discussed it.  Thank you

6     for --

7          THE COURT:  Sure.

8          MR. BRUMM:  -- that clarification.

9     Q    Do you recall discussing with... Okay.  So, we just

10    want to make clear -- when you spoke with Mr. Cunningham,

11    you did not discuss the timing issues that I asked you

12    about?  The timing as of which to go out to the market and

13    the timing as of which the quotations should be received?

14    A    No.  I thought when I spoke about Mr. Cunningham I was

15    quite clear that I don't recall one way or another whether

16    that topic was discussed or not.

17    Q    And it's the same testimony for Ms. Boot.  You don't

18    recall one way or another whether those topics were

19    discussed?

20    A    That's correct.

21    Q    And so looking at Claim -- now I'd like you to look at

22    Claimant's Exhibit 2118, which, hopefully, is maybe the next

23    one in your pile.  And this is a -- it looks like it's a

24    response from Ms. Boot to your request to review at 103.  Do

25    you see that?

Page 111

1    A    I do see that.

2    Q    And if you look at the top email from Ms. Boot, it has

3    language that looks like she's providing to you for

4    inclusion in a market quotation request.  Do you see that?

5    A    Yes.  This is the email from Jeanette to Adam Metter,

6    and she is -- I believe you're correct -- including...

7    That's why I take this to be -- language to be included in

8    the market quotation request.

9    Q    And she writes, "Please provide market quotations as of

10   4 o'clock p.m. New York time." Do you see that?

11   A    I do see that.

12   Q    And if you look back at Claimant's Exhibit 2117, which

13   is the language that you sent Mr. Metter to Ms. Boot, that

14   language isn't included?

15   A    That's correct.

16   Q    So, where did the 4 o'clock time come from in Ms.

17   Boot's email?

18   A    It came from her.  I mean, she proposed the language.

19   Q    Okay.  And did you discuss that language with her?  Her

20   proposal that the market quotation should be as of 4

21   o'clock?

22   A    As I told you a few minutes ago, I don't recall whether

23   we discussed that or not.

24   Q    But you believe that she is the one who came up with

25   the time as of which the quotation should be, correct?

Page 112

1    A    I don't know that she came up with the time.  I think

2    she did provide the first language that indicated that there

3    would be a time.  But I don't agree that she chose the time.

4    I mean, we would not have had Ms. Boot choose a time for us.

5    Q    But that's the time that QVT did, in fact, use for

6    their market quotation, was 4 o'clock?

7    A    That's correct.

8    Q    And that was the time suggested by Ms. Boot, correct?

9    A    I don't know if it was suggested by her.  I think

10   you're correct that the first time that the language appears

11   that says as of 4 p.m. is in the draft language that she

12   sends back to us, but I don't know that -- certainly I don't

13   think that she suggested the time.  We would've picked the

14   time.

15   Q    QVT would've picked the time?

16   A    Correct.

17   Q    And when QVT picked the time as of which the quotations

18   were to be -- as of, that selection was made without

19   consultation with counsel, correct?

20   A    I don't know that that's the case.

21   Q    You just don't know one way or the other?

22   A    I don't know.  She proposed language that said as of 4

23   p.m. That may have been after a phone call.  There was a

24   phone call certainly.  So, I don't know whether to say it

25   was...  I think your question was whether it was made in

Page 113

1    consultation with counsel.  So, I don't...  We picked the

2    time.  Certainly, the language first appears in her email

3    back to us.

4            MS. SAWYER:  Your Honor, may I --

5    A    There may have consultation with her on that point;

6    there may not have been.  I just don't recall.

7            MS. SAWYER:  May I have just another moment?  I

8    apologize.

9            THE COURT:  Sure.

10   Q    And in your consultations with Ms. Boot regarding the

11   market quotation process, did you tell her the number of

12   trades in the portfolio?

13           MR. REGAN:  Objection, Your Honor.  I don't know

14   how that goes to any of the time issues that are within the

15   scope of the issue we've been talking about.

16           THE COURT:  I thought we had resolved this

17   question.

18           MS. SAWYER:  I thought we had, too.

19           MR. REGAN:  In what way?  I'm not sure...

20           THE COURT:  In the way that we resolved it.

21           (Laughter)

22           MR. REGAN:  I'm not sure what that resolution was

23   then.  Was it that that question's fair game?

24           THE COURT:  I certainly believe that that's the

25   way that we had resolved it.  And that that was within the

Page 114

1   parameters of the overall resolution of this issue.

2            MR. TRACEY:  May I be heard, Your Honor?

3            THE COURT:  Sure.  Why don't you two talk to each

4   other for a moment, okay?

5            (Pause)

6            THE COURT:  Aren't you glad you don't practice

7   law?  Thank you for your patience.  Okay, do we have a

8   resolution of the narrow issue?

9            MS. SAWYER:  I think I'm going to withdraw the

10  question.  I think I'm going to try asking some other

11  questions.

12           THE COURT:  Okay.

13           MS. SAWYER:  And see where we go from there.

14           THE COURT:  Very good.

15  Q    So, Mr. Brumm, QVT picked the time as of which the

16  market quotations were to be obtained, correct?

17  A    We did.

18  Q    And QVT picked 4 o'clock, correct?

19  A    QVT requested that market quotations be given as of 4

20  p.m.

21  Q    And QVT -- you also discussed that time, 4 o'clock,

22  with Ms. Boot, correct?

23  A    I don't recall whether we discussed that time or not

24  with Ms. Boot.  What I do see is that the language saying as

25  of 4 p.m. first appears in an email from her back to us.

Page 115

1   Q    And so she endorsed the 4 p.m. in her email back to you

2   by incorporating it into that email, correct?

3   A    I don't know whether she endorsed it or not.  I just

4   know that she sent back an email saying "as of 4:00 PM",

5   whereas prior to that, if you look at the drafts, there's no

6   "as of" date, even though I think that's required by the

7   terms of market quotation.

8   Q    And -- sorry.  You didn't send Ms. Boot any

9   spreadsheets of the positions that QVT had, did you?

10  A    I don't recall doing so.

11  Q    And you didn't send Ms. Boot any summary of the

12  liquidity concerns that QVT had regarding the positions it

13  held, did you?

14          MR. REGAN:  Objection, Your Honor.  The liquidity

15  concerns that QVT had about the portfolio seem to be outside

16  the scope at the time of the waiver.

17          THE COURT:  Okay, yeah, that's sustained.

18  Q    Did -- you didn't tell Ms. Boot that QVT was concerned

19  that there was certain trades in the portfolio for which

20  market quotations might be difficult to obtain, did you?

21          MR. REGAN:  Same objection.

22          THE COURT:  I'm going to allow you to answer that

23  question.

24  A    Okay, may I hear the question again, please?

25  Q    You didn't tell Ms. Boot that QVT was concerned that

Page 116

1    there were certain trades in the portfolio for which market

2    quotations might be difficult to obtain, did you?

3    A    I don't recall discussing that with Ms. Boot.

4    Q    You don't recall one way or the other, or you don't

5    recall discussing it, period?

6    A    I don't recall one way or another.

7    Q    And you didn't tell Ms. Boot that QVT was concerned,

8    because some of the transactions, Lehman was the only

9    market-maker in those trades?

10           MR. REGAN:  Objection, Your Honor.  Well outside

11   of the timing issue.

12           THE COURT:  That's sustained.

13   Q    If you could look at Claimant's Exhibit 2122, which is

14   in that packet from Mr. Regan.

15   A    Yep.

16   Q    This is the spreadsheet where you're -- or I mean,

17   sorry, this is the email where you're sending Ms. Boot the

18   draft language in the standalone document, do you see that?

19   A    Yes, I do see that.

20   Q    And your attachment, which is entitled BWIC/OWIC

21   Request for Market Quotations, that you drafted, correct?

22   A    I believe, yes, that's a document that I generated.

23   Q    And that document, the attachment to Claimant's Exhibit

24   2122 contains the language that we were just discussing,

25   "Please provide market quotations as of 4:00 PM New York

Page 117

1    time", correct?

2    A    Yes, I see where it says that on the --

3    Q    And so at this time, the 4:00 time was settled, is that

4    fair?

5    A    Yes, that is fair.

6    Q    And if you could look at Claimant's Exhibit 2123, do

7    you see that?

8    A    Okay.

9    Q    This is the response to the one we were just looking

10   at, Claimant's Exhibit 2122, where Ms. Boot responds, "Looks

11   good."  Do you see that?

12   A    I do see that.

13   Q    And so as of 1:35 on September 15th, 2008, Ms. Boot has

14   signed off on the language, would you agree with that?

15   A    Yes, I believe that's what it indicates.

16   Q    And did you have any discussions with Ms. Boot at this

17   time about it getting late in the day, and whether the 4:00

18   time still made sense?

19   A    I don't recall any such discussions.

20   Q    Do you recall ever discussing it out with Ms. Boot as

21   the time continued to pass on the afternoon of September

22   15th 2008, as to whether the 4:00 time still made sense.

23   A    I do not recall having such discussion with Ms. Boot.

24   Q    Why was QVT speaking with two different sets of lawyers

25   about the market quotation process?

Page 118

1   A    I don't recall precisely.  But I do recall that it was

2   difficult to get in touch with Mr. Cunningham on the morning

3   of September 15th, 2008.  He's a well-known derivatives

4   lawyer, and I know too from the Claimant's exhibits in this

5   packet we looked at that he only got back to me on the draft

6   I sent him at shortly before 11 after 3:00.  So I presume

7   that we decided we needed someone else to look at it who

8   could maybe look at it a little more quickly, so we could

9   get it out.

10  Q    Did QVT -- you testified that QVT made the decision to

11  seek the quotes as of 4:00 on its own, correct?

12  A    I think I testified that we made the decision as to the

13  time.  But I think it's clear looking at the document that

14  the first time that an "as of" time appears at all, and that

15  time is 4:00 PM in the draft, is in the communication back

16  from Ms. Boot.

17  Q    I believe you testified that the reason that is, is

18  because you told Ms. Boot that time, correct?

19  A    I think what I testified was that we selected the 4:00

20  PM time.

21  Q    And did QVT also select the 3:00 time to -- in which to

22  go out to the market to seek the market quotations?

23  A    I don't think we selected a 3:00 time.  We didn't say,

24  "We'll send it out at 3:00."  We tried to send it out as

25  accurately as we could, as we completed the two work

Page 119

1    streams.  One was the language, which was done shortly

2    before 2:00.  And the other was the compiling of the

3    position list to which the language was attached, which was

4    done later -- I'm sorry.

5    Q    And did you consult with counsel as 3:00 rolled around

6    to see whether that would be sufficient time under the

7    market quotation process to get the dealers to respond?

8    A    I don't recall doing so, I don't recall further

9    conversations with counsel.  I did receive from Mr.

10   Cunningham his view that it looked good to send out at 3:00

11   PM.

12   Q    But you don't recall having such discussions with

13   counsel, correct?

14   A    I don't recall having further discussions with counsel,

15   that's right.

16   Q    And you don't recall exactly who sent out the market

17   quotation requests, do you?

18   A    I believe they were sent out by Joel, and Tom Knox.

19   Q    And you didn't send any out, did you?

20   A    I don't believe I did.

21   Q    And when QVT sent out its market quotation requests on

22   September 15th, it was asking for actionable quotations,

23   right?

24   A    That's correct.  It was asking for actionable

25   quotations.

Page 120

1    Q    I'd like you to look at Joint Exhibit 60.  6-0.

2    A    6-0, yes.

3    Q    And this is an email from Mr. Knox to himself on

4    Monday, September 15th 2008 at 3:20, with the RE line EM CBS

5    OWIC, do you see that?

6    A    I do see that.

7    Q    And this was -- Mr. Knox was the emerging markets

8    trader at QVT in 2008, right?

9    A    That's correct.  He was the emerging markets trader at

10   QVT in 2008, or the main emerging markets trader, I guess I

11   would say.

12   Q    And we can look at the spreadsheet, which is attached.

13   A    Okay.

14   Q    We'll have to look at it on the screen.  The first tab

15   has instructions, do you see that?

16   A    I do see that.

17   Q    And that's the language that you drafted, correct?

18   A    Sure, can you scroll down a little further?  Yes, that

19   appears to be the language that I drafted.

20   Q    And Mr. Knox is sending to -- sending out QVT's market

21   quotation request in Joint Exhibit 60 to dealers, isn't he?

22   A    He's sending it specifically to a dealer, to Ian Alban,

23   I guess, is the top email.

24   Q    And if you look at his bottom email, Mr. Knox, he says,

25   "We would appreciate your responses by 4:00 PM today," do

Page 121

1    you see that?

2    A    I do see that.

3    Q    And in fact, Mr. Knox is requesting that the dealers

4    respond by 4:00 PM on Monday, September 15th, 2008, to the

5    market quotation request, correct?

6    A    I guess I'm a little confused by the form of this

7    email.  You're saying this thing that he sent himself was

8    then forwarded to -- I guess that's what happened?

9    Q    Well, we don't know.  Mr. Knox would know, but our

10   understanding is that Mr. Knox probably blind copied the

11   dealers, and then forwarded one to someone else.

12   A    I see, I see, understood.

13   Q    If you disagree, that's --

14   A    I have no basis to disagree with that characterization,

15   I was just trying to understand.

16   Q    But you see Mr. Knox's language in the cover email,

17   where he says, "We would appreciate your responses by 4:00

18   PM today."

19   A    I do see that language.

20   Q    And so Mr. Knox, in sending out his request for the

21   market quotation, he's giving the dealers 40 minutes to

22   respond, correct?

23   A    I think that's not correct.  He says he would

24   appreciate the responses by 4:00 PM today.  It doesn't say

25   that 4:00 PM is a deadline, and I think the instructions

Page 122

1     clearly indicated that it was not.

2     Q    And you don't recall any review or analysis being done

3     at QVT to determine whether 40 minutes would be sufficient

4     time for the dealers to review and respond to QVT's market

5     quotation request, do you?

6     A    No, I don't recall any review or analysis being done

7     around the issue of what was an appropriate amount of time.

8     Certainly not as to whether 40 minutes was an appropriate

9     about of time.  But we didn't believe that we were putting

10    people under that type of a deadline.

11    Q    You don't recall any analysis being done as to whether

12    an hour for these transactions would be sufficient time to

13    ask the dealer to respond, do you?

14    A    No, I do not.

15    Q    And all told, QVT only received the requisite three

16    quotations for 12 of the transactions, correct?

17    A    That's correct.

18    Q    And you're not aware of any follow-up that QVT did with

19    the dealers, trying to get additional market quotations, are

20    you?

21    A    Well, no, that's not correct.  We did follow up, in

22    terms of calling dealers.  I think I testified this morning

23    about how we made calls to the dealers before we sent these

24    things, but we also made calls to the dealers afterwards to

25    find out what was going on, whether we would be getting

Page 123

1    these back, and what they would look like, and that sort of

2    thing.

3    Q    And you didn't make any of these calls, though, did

4    you?

5    A    I did make at least one call, that I recall.

6    Q    And that call was to try to get market quotation

7    responses that you made?

8    A    Yes, that call was to one of our salespeople.  It was a

9    conversation with one of our sales people as to what was

10   going on, were we going to get back a response from them.

11   Q    And who was it?

12   A    That was a sales person at Deutsche Bank called Shondra

13   Metzler, M-E-T-Z-L-E-R.  She was an emerging market

14   salesperson.

15   Q    And other than that one call that you remembered to Ms.

16   Metzler, the emerging market salesperson, did you make any

17   additional calls to follow up on QVT's market quotation

18   requests?

19   A    I don't recall any others.

20   Q    And did you have any concern at QVT that since the

21   market quotation process only yielded the three requisite

22   quotes on 12 transactions, that the process could be

23   challenged as not being reasonable, or in good faith?

24   A    No, I didn't have any particular concerns about that.

25   I just felt that the process had failed.  I mean, what I

Page 124

1    heard consistently was that the dealers were just saying

2    that they were not going to be able to provide very much,

3    that they were overcome by the volume of requests that they

4    had received, that in any event, they had more pressing

5    matters to deal with, including marking their own positions,

6    and dealing with their own risk, so we shouldn't expect back

7    much, and they'd send us something when they could.  That

8    was the gist of what we heard, and specifically what I

9    remember from the conversation.

10   Q    But you only had one conversation, correct?

11   A    What I recall is there were multiple conversations

12   going on.  Like this, you saw the trading flow that we sit

13   on, a lot of information was relayed.  But yes, the only

14   conversation that I had personally, that I remember, was

15   with her.

16   Q    And following Lehman's bankruptcy, QVT tried to reduce

17   its risk, sit that correct?

18   A    Yes, that is correct.

19   Q    And to the extent QVT had been left unheeded by the

20   termination of the Lehman transactions, QVT sought to enter

21   into new hedges where appropriate, right?

22   A    We did enter into certain new CDS transactions, which

23   were hedges for CDS that had -- sorry, hedges -- well, I

24   don't even recall if they were all hedges, frankly.  They

25   were -- we entered into new CDS transactions to replace

Page 125

1    certain of the CDS transactions.  And yes, I believe certain

2    of them were, as hedges, for positions that we had specific

3    bond positions, typically.

4    Q    And QVT looked at its portfolio following Lehman's

5    bankruptcy, and decided that there were certain positions

6    that it wanted to replace, correct?

7    A    That's correct.

8    Q    I'd like you to look at Exhibit 5169, which is in the

9    binder.

10   A    Okay.

11   Q    And this is an email chain at the top, from Mr. Fu to

12   the managing members on Tuesday, September 16th, 2008 at

13   noon, do you see that?

14   A    I do see that.

15   Q    And he's forwarding along an email chain between Ms.

16   Feng and Ms. Blanco at Lehman, correct?

17   A    That's correct.

18   Q    And if you look at the email at the bottom, from Ms.

19   Feng to Ms. Blanco at 10:47 AM on Tuesday, September 16th,

20   Ms. Feng writes, "Hi Patricia, I see there's an MTM movement

21   from EOB 9/12 to 9/15 for plus 12 million in QVT, and 1.3

22   million in Quintessence.  Are you able to make this call?"

23   Do you see that?

24   A    I do see that.

25   Q    And MTM commonly refers to market-to-market, right?

Page 126

1   A    That's what I would take it to mean here, correct.

2   Q    Okay.  And Ms. Feng here was following our daily

3   process for determining map margin, correct?

4   A    Yes.

5            MR. REGAN:  Objection, Your Honor.  Mr. Brumm is

6   nowhere referenced in this document.

7            THE COURT:  Why don't you lay some foundation?

8   Q    Mr. Brumm, are you a recipient of emails that go to

9   managingmembers@QVT.com?

10  A    Yes, I am a managing member of QVT, and I am a member

11  of that mailbox.

12  q    And as is Mr. Gold, and Mr. Chu, correct?

13  A    That's correct, and Mr. Fu as well.

14  Q    And so you would have received this email that Mr. Fu

15  forwarded to the managingmembers@QVT.com on Tuesday,

16  September 16th at noon, correct?

17  A    Yes, I would have received that.

18  Q    And that would have been just about an hour after LBSF

19  responded and said that they were frozen and wouldn't be

20  making any evaluations.  Do you see that?

21  A    I do see that's about an hour difference between the

22  top email and the second email.

23  Q    And Ms. Feng, in determining the MTM movement from EOB

24  9/12 to 9/15, she was following her daily process in

25  connection with margin, wasn't she?

Page 127

1   A    Yes, I believe that she was.

2   Q    I'd like you to look at Exhibit 5544.

3   A    5544, okay.

4   Q    These are entitled responses and objections of QVT to

5   LBSF's second set of interrogatories.  Do you see that?

6   A    I do see that.

7   Q    And if you go to the last page of this exhibit, 5544,

8   you have verified these responses, do you see that?

9   A    I do see that.

10  Q    And you understood when you -- you understood that you

11  were verifying them under oath, correct?

12  A    I did understand that.

13  Q    And you understood that to verify these, you believe

14  that the information contained herein would be true, to the

15  best of your knowledge, information, and belief, right?

16  A    That's correct.  That's what's stated right above my

17  signature.

18  Q    So if you could turn to Interrogatory Number 23, which

19  is on Page 17?  This interrogator asks about Exhibit 5169,

20  and it says, "Is it your contention that your employee,

21  Kelly Feng, was not authorized to send the margin call she

22  sent to Lehman on September 16th, 2008, related to the

23  Lehman transactions, as reflected in QVT fund 02442869?  Do

24  you see where I'm at?

25  A    Yes, I see where you are.

Page 128

1   Q    And if you look down to the response in the section,

2   the paragraph that starts "Ms. Feng", do you see that?

3   A    I do see that.

4   Q    It says that Ms. Feng was a very junior clerical

5   employee of QVT with no authority to issue margin calls

6   without approval from more senior management of QVT, do you

7   see that?

8   A    I do see that.

9   Q    And then it continues, it says the email reflected at

10  QT fund 02442869 is not a margin call based solely on the

11  change in value of the Lehman transactions, as estimated on

12  September 15th, 2008, but relates to QVT's efforts to

13  recover from Lehman the initial margin that QVT had posted

14  with Lehman.  Do you see that?

15  A    I do see that.

16  Q    And you believe that to be a true statement?

17  A    I do.

18  Q    And even though -- if you look back at Exhibit 5169,

19  Ms. Feng makes no reference to initial margin, does she?

20  A    I'm sorry, I'll just look back.  No.

21  Q    And she says -- I'm sorry.

22  A    I'm sorry, just say, I wouldn't necessarily expect her

23  to.  As I stated, I think in my direct testimony, the margin

24  called under -- margin, we're trying to agree, a number that

25  will be called, one always speaks in terms of one single net

Page 129

1    number.  So if you -- let's say you were to unwind, let's

2    say it were just an ordinary course, and you unwind a

3    transaction, and you get the initial margin back.  There's

4    no separate payment of the initial margin.  It just gets

5    wrapped in to the calculation, "Oh, I'm holding their much

6    money, I, the dealer, I see this much market value, so I'm

7    releasing it back to them."

8    Q    But the only way this would be an accurate net number

9    is if Lehman returned all of the initial margin to QVT,

10   correct?

11   A    Yes, I think that's correct.

12   Q    And this doesn't explicitly lay that out for that

13   Lehman, does it?

14   A    It does not.

15   Q    And the reason it would be an accurate margin call,

16   netting out the intimal margin, is because there was

17   actually a $5 million market-to-market movement in the

18   portfolio in Lehman's favor from September 12th to September

19   15th, correct?

20   A    That's what I believe that the numbers that Kelly was

21   looking at showed, yes.

22   Q    You testified on direct examination about the working -

23   - the meetings that happened the weekends of September 21st,

24   20th, 21st, and September 27th and 28th.  Do you recall

25   that?

1   A      I do.

2   Q      And you testified that these sessions lasted for five

3   to six hours, do you recall that testimony?

4   A      Yes, I do.

5   Q      And was that one session that lasted that long, or were

6   there multiple sessions that each lasted that long?

7   A      There were multiple sessions that east lasted

8   approximately that long.  People would come in, different

9   times, and around the same time, and they -- most of them

10  were there for some portion of the entire period, depending

11  on how much work they had to do.

12  Q      But these weren't meetings where everyone was sitting,

13  working on the same project for five or six hours, were

14  they?

15  A      No, they were working on their individual tabs of the

16  spreadsheet.

17  Q      And isn't it true that you actually don't recall

18  whether there was any in-person meeting about creating the

19  claims' calculation values?

20  A      I recall that we all sat around that trading desk that

21  you saw in our usual positions, and that there was

22  discussion.  So in that sense, there was an in-person

23  meeting.  I don't recall -- we definitely didn't go into a

24  conference room and hold an in-person meeting.

25  Q      So you were all in the office, but not necessarily

Page 131

1   meeting or discussing the situation with each other.

2   A    I remember that there were a lot of discussions.  We

3   weren't all sitting quietly, working on our own stuff.

4   There were period where we worked on our own stuff, there

5   were periods where we asked questions of others as to how --

6   what they thought of some valuation situation we were

7   considering.  There were periods where we talked to how we

8   would compile all the stuff together.

9   Q    And these weren't things that started at a specific

10  time or ended at a specific time, were there?

11  A    No, it was more general, like, "I'll try to be in by

12  11," or, "I'll see you around midday."

13  Q    People had their own work they needed to do, and were

14  in the office, isn't that fair?

15  A    I think it's more than that.  I mean, yes, they had

16  responsibility for individual things, but we all wanted to

17  be there at the same time.  Like, no one was coming in at

18  say, 7:00 PM when everyone else left, just to do their own

19  thing.  We all wanted to work together, so we could discuss

20  issues as they arose.

21  Q    And isn't it true that the process of calculating the

22  claim values was really done over email, with people sending

23  in their final versions of the transactions that they were

24  valuing.

25  A    Well, I won't say that that's how the process was done.

Page 132

1   That was the end step, was for each person to send in their

2   claim values.

3   Q    And so that was the final step, for each person to

4   email in their final claim values that they had calculated,

5   correct?

6   A    Yeah, I mean, when we say emailed in, they emailed an

7   attachment, as a spreadsheet that they had been working on,

8   and then those were all complied.

9   Q    And each -- and I think you testified on direct that

10  the portfolio was divided up for different traders to

11  handle, correct?

12  A    That's correct.  It was divided up, basically based on

13  their what -- the positions that they had traded, they were

14  given to value.

15  Q    And QVT didn't give the traders any written

16  instructions or guidelines about how to approach the

17  valuation of their transactions, did they?

18  A    No, we didn't.

19  Q    The traders were told to use their best judgment to

20  come up with the valuations of the transaction, right?

21  A    They were told that, but I think there were more

22  specific directions that were given.  I laid out in my

23  direct --

24  Q    And --

25  A    Sorry, that I laid out in my direct.  Sorry, I'm trying

Page 133

1   to get closer to the mic.

2   Q    But it ultimately came down to the individual trader's

3   judgment as to how to value their transactions, correct?

4   A    Yes.  For certainly a broad array of the transactions.

5   There were obviously the market quotation ones, there were

6   the replacement trades.  There it didn't really come down to

7   individual trader judgment, but yes, certainly for the

8   others, where they had to look at the different sources

9   available, what came back from the market quotation process,

10  but that didn't rise to the level of actual market

11  quotation, the unsolicited broker runs, and the Markit data.

12  Q    And so the traders were -- setting aside the market

13  quotation response ones, those 12 trades, and the actual

14  replacement trades, on all the other traders, the traders

15  were using their judgment and also told to look at data

16  beyond September 15th if they believed that was appropriate,

17  correct?

18  A    Right, and they were told that they needed to determine

19  what the replacement value was on the early termination

20  date, September 15th, but that in doing so, they should look

21  at when we could have actually replaced these trades, and in

22  particular, make sure that they thought that they were using

23  data that accurately reflected our replacement costs.

24  Q    But there were no guidelines or discussions making that

25  clear that you were suppose-d-about what the traders were to

Page 134

1   do.  Again, it was just the traders' judgment as looking at

2   the data available to them over that week, what they

3   believed was most appropriate, correct?

4   A    It's not correct to say that there was no discussion.

5   There was discussion of exactly what I've laid out, that we

6   discussed the fact that we had to look for the best market

7   data, and that in doing so, we couldn't just take one

8   source, or just take Markit or something for September 15th,

9   because it might not really be a good representation of

10  where you could have traded, even on that date.

11          I think as I said in my direct, it's really a

12  collection of dealer opinions.  And I think there was plenty

13  of reason to believe on September 15th that it wasn't the

14  highest thing on -- highest priority on dealers' minds.  I

15  mean, we couldn't even get back market quotations.  So we

16  considered that issue, when we looked at the levels.  And a

17  lot of it is related to the liquidity of the position

18  itself.  I think things that are more liquid, it was easier

19  to find market data from, more likely that it would be an

20  accurate representation.

21  Q    So to understand how the trader approached valuing each

22  of their transactions, we'd have to actually ask the traders

23  how they evaluated the data available to them, correct?

24  A    Well, I think there were some rules, which I've laid

25  out for you.  But in order to understand the individual

Page 135

1    judgments that were made around individual positions, you

2    would have to ask the trader, yes.

3    Q    And again, you didn't have primary responsibility for

4    valuing any of the transactions, correct?

5    A    I did not have primary responsibility for valuing any

6    of the transactions at issue in this case.

7    Q    I'd like you to look at Exhibit 5202.

8    A    Okay.

9    Q    We had talked about earlier that there were -- when you

10   sent investor communication, there were often -- that Mr.

11   Gold would draft the commentary, and then the other managing

12   members would review and comment on it.  Is that fair?

13   A    Yes.  Sometimes there were other people that would

14   draft sections of it in advance of him, people from our

15   investor relations area.  But often he would write the core

16   commentary himself, the initial draft, and circulate it to

17   the managing members, and other senior professionals, and

18   QVT for their comment.

19   Q    If you look at the cover email, this Exhibit 5202, it's

20   an email from you to Mr. Gold, and others, on Tuesday,

21   September 23rd, 2008 at 4:44, and the subject is estimated

22   returns of feeder funds draft.  Do you see that?

23   A    I do see that.

24   Q    And these appear to be comments that you sent on a

25   draft investor update that says Draft September 23, do you

Page 136

1    see that?

2    A    I do see that.

3    Q    And these are examples of the types of comments that

4    you and other gave to Mr. Gold on the commentary he'd

5    prepared, correct?

6    A    Yes, I think that's correct.  I mean, you just said you

7    and others, and yes, I would point out that I think some of

8    these are certainly not my comments.  I can't tell form

9    looking at which are my comments.

10    Q    So you may have collected comments from others, put

11    them into one document, and sent it alone, is that fair?

12    A    I think it's more likely that there was a draft with

13    comments in it that I was sent, and that I then commented on

14    that.  I think that's probably what happened.

15    Q    And you can't tell looking at this which were your

16    comments, and which are the comments of others?

17    A    I cannot.

18    Q    And if you could turn to the page at the bottom marked

19    QVT Fund 014414369.

20    A    Okay.

21    Q    And there's deleted language about middle of the page,

22    over to the side, and it's very small.  I think if we blow

23    it up, it'll make it easier for you to see.  Do you see

24    that?

25    A    I'm sorry, I'm on 369?

Page 137

1    Q    Yes.

2    A    In the middle.

3    Q    Yes.

4    A    Sorry, as of the -- okay, sorry, yes, it's a bubble in

5    the middle of the paper.

6    Q    Yes, do you see that?

7    A    I think actually the paper one is easier to read.

8    Q    Okay, whichever is easier for you.  And it says -- and

9    this is a suggested deletion, is that correct?

10   A    Yes.

11   Q    Okay.  And it says as of the close of Monday, September

12   15th, the QVT fund's month to date performance was

13   approximately, I think it's -0.30 percent to -0.40 percent,

14   depending on the feeder, taking into account Lehman-related

15   losses and loss of positions as of that date, essentially

16   unchanged with the month to date performance as of the

17   preceding Friday.  Do you see that?

18   A    I do see that.

19   Q    And was that accurate in September 2008, that the month

20   to date performance was essentially unchanged from Friday,

21   September 12th to Monday, September 15th?

22   A    I don't know if that was accurate, without going back

23   and looking in our PNL systems.  I mean, it was deleted

24   here.  I don't know if it was deleted was because we didn't

25   have a level of -- or whoever the reviewer was, perhaps it

Page 138

1  was me, perhaps it was another one, didn't have a level of

2  confidence in that number, or whether it was deleted for

3  other reasons, so --

4  Q    You just don't know?

5  A    I don't know.  I mean, I don't know without looking at

6  the PNL system.

7  Q    And do you have any reelection as to the movement in

8  QVT's month to date performance over the Lehman weekend?

9  A    Month to date performance over the Lehman weekend.  I

10  mean, I think we looked earlier at a document that set out

11  performance as of September 11th, and then I don't remember

12  what performance was on September 12th.  And I think

13  performance on September 15th, I don't think was very good.

14  But I don't recall precisely what it was.

15  Q    You didn't look at any -- you don't know?

16  A    I don't know.

17  Q    I'd like you to look at Exhibit 5466.

18  A    Okay.

19  Q    And this is an update on QVT estimated performance on

20  Tuesday, September 23rd, 2008, at 9:13 PM.  DO you see that?

21  A    I do see that.

22  Q    And this is an investor update being sent by QVT to its

23  investors on September 23rd, 2008, correct?

24  A    Correct.

25  Q    And you were involved in the drafting of this update,

Page 139

1    correct?

2    A    I believe I was, yes.

3    Q    And this was drafted by Mr. Gold, right?

4    A    Certainly sections of it I believe were drafted by Mr.

5    Gold, yes.

6    Q    And starting --

7    A    The more commentary-type sections, if you will.

8    Q    And starting at the top, it has the estimated returns

9    of feeder funds, right?

10   A    Yes, it does have the estimated returns of feeder funds

11   at the top.

12   Q    And this again would have been mid-month numbers

13   generated from QVT's Tyche system, right?

14   A    Yes, these are -- I would call the intra-month numbers.

15   It's not really mid-month, because it's not the middle of

16   the month, it's through September 22nd.

17   Q    And toward the bottom of the first page is a section, a

18   heading, Update on Counterparty Exposures, do you see that?

19   A    I do see that.

20   Q    And Mr. Gold starts by saying, "In talking about

21   counterparty exposures, it's important to highlight an

22   important distinction."  Do you see that?

23   A    I see that.

24   Q    And in this paragraph, he's making a distinction

25   between exposure and replacement risk, do you see that?

Page 140

1    A    I do see that he's making that distinction.

2    Q    And Mr. Gold say, "By exposure I mean" the amount of

3    the fund's equity directly at risk to the failure of a

4    counterparty's credit", correct?

5    A    I see that.

6    Q    And then he describes what replacement risk is, which

7    is the amount of money which may be lost, or a lost

8    opportunity to profit, because a position, repo, CDS, et

9    cetera, is terminated as a result of the failure of the

10   counterparty's credit, and can only be replaced at a higher

11   cost.  Do you see that?

12   A    I do see that.

13   Q    And Mr. Gold goes on to put this distinction in context

14   by talking about the Lehman default.  Do you see that toward

15   the bottom of the page?

16   A    I see that.

17   Q    And he says, "At the time of the Lehman Brothers

18   failure, the QVT funds had no net exposure in the sense that

19   they owed CDS on Lehman, large enough to offset the initial

20   margin and derivatives contracts, equity and prime brokerage

21   in repo, and any other credit exposures to Lehman."  Do you

22   see that?

23   A    I do see that.

24   Q    And that's very similar to the language that we saw in

25   the September 11th, 2008 update to the investors, correct?

Page 141

1   A    It's similar, but I would say that he better defines

2   replacement risk here, really loan the lines that I defined

3   it for you when I showed you that document.

4            MR. REGAN:  Your Honor, I have to object.  I think

5   Lehman took the position in its opening statement that CDS

6   on Lehman were a separate bet from the CDS that QVT had with

7   Lehman as a counterparty.

8            MS. SAWYER:  I'm not sure what the objection is.

9            THE COURT:  What's the objection?

10           MR. REGAN:  Relevance.  If the CDS that had Lehman

11  had the reference entity are a completely separate bet that

12  has Lehman as the counterparty, why is anything about CDS

13  that Lehman had -- that QVT had with Lehman as the reference

14  entity --

15           THE COURT:  Ms. Sawyer is asking Mr. Brumm

16  questions about this document, so I'm going to let her

17  continue to do that.  Okay, go ahead.

18  Q    So I was specifically talking about the language at the

19  time of the Lehman Brothers failure, the QVT funds had no

20  net exposure, in the sense that they owned CBS on Lehman.

21  Do you see that sentence?

22  A    I do see that sentence.

23  Q    And that sentence about there being no net exposure, in

24  the sense that they owned CDS on Lehman large enough to

25  offset these other losses, that's very similar to the

Page 142

1    language that we saw on the September 11th, 2008 investor

2    update, correct?

3    A    I don't know if that language is similar.  I'd have to

4    go back and compare it.  I guess I was -- I thought you were

5    asking if the replacement risk (indiscernible) was similar.

6    I was trying to define for you how it's similar, but

7    different.

8    Q    Okay.  I want to go on in this document to the next

9    sentence.  It says, "However, the QVT funds nevertheless

10   lost money, and they lost the opportunities to profit that

11   they would have had, if Lehman had not failed, because CDS

12   and repo contractors facing Lehman had to be terminated, and

13   could only be replaced at a greater cost."  Do you see that?

14   A    I do see that.

15   Q    And so is it true that QVT funds only lost money in

16   connection with the replacements that they did?

17   A    I'm sorry, your question, is it true that we only lost

18   money in connection with the replacements that we did?

19   Q    Right.

20   A    The replacement CDS?

21   Q    Yes.

22   A    No, I would not say that's the only way we lost money

23   in September of 2008.

24   Q    It's QVT's position that QVT has lost money because

25   they lost the opportunities to profit on trades that they

Page 143

1    did not do, correct?

2    A    Sorry, can you repeat that question?

3            THE COURT:  I think you should ask a different

4    question, okay?

5    Q    It's QVT's position in this case that it should be

6    entitled to recover for losses for trades that they did not

7    enter into, correct?

8    A    It's QVT's position in this case that we're not limited

9    to claiming, with respect to terminated transactions, only

10   if we look, executed replacement transactions, yes.  I mean,

11   that's a category of terminated transactions.  But we did

12   not replace any transaction we terminated.

13   Q    And QVT's calculation statement primarily is seeking to

14   recover for these lost profit opportunities, isn't that

15   correct?

16   A    I don't know that it's primarily seeking to recover for

17   lost profit opportunities.  I mean, I think there are

18   terminated transactions that were not replaced, that one

19   could think of that way.  But I think that the PCDS and

20   CARB, which as you're aware, are the major classes of

21   transaction at issue in this case, by value, I think that

22   certainly they became much more valuable instantaneously on

23   September 15th, as a result of Lehman's default, because it

24   indicated a whole new world order, and set of rules for

25   financials.  So I guess those could be considered a lost

Page 144

1    opportunity to profit.

2    Q    And QVT made no effort to replace either the PCDS

3    transactions -- any of the PCDS transactions or CARB

4    transitions, did it?

5    A    No, that's not true.  As we, we tried to find whether

6    other people were trading PCDS, and I think depending on the

7    price, if they have been trading it, it would have had

8    interest in actually replacing it.

9    Q    QVT didn't respond to the Merrill Lynch solicitation

10   seeking to replace any of the PCDS it had, correct?

11   A    That's correct.  We were not aware of the Merrill Lynch

12   solicitation.  We received a blast Bloomberg, we all

13   received thousand -- sorry, by which I mean we received a

14   Bloomberg message indicating that Merrill had interest in

15   offering PCDS, I think it was in early October.  And we were

16   not aware that we had received that Bloomberg message.

17         The way Bloomberg messages work is that

18   salespeople at sell-side firms have lists of people at buy-

19   side firms.  They can obviously just send you a message

20   directly, but they typically blast out their messages to

21   their whole coverage list.  And so consequentially, it's

22   sort of like an inbox on steroids or something.  You receive

23   thousands of Bloomberg messages a day, if you're active in

24   the OTC market.

25         So you have to be looking for something to know

Page 145

1    that it's there, and that's why people typically also, for

2    buy-side firms that they think may have interest, they would

3    either pick up the telephone and call them, or send them a

4    chat, or something like that, so do something individualized

5    to get their attention.  Say, hey, you know, we're going to

6    do this.  That never happened, with respect to the Merrill

7    Lynch offers that you're talking about, as far as I'm aware.

8    Q    So QVT wasn't looking for PCDS offers, at the time that

9    came in?

10   A    QVT was -- I don't know if at the time, we were looking

11   for PCDS offers.  I just recall my partner Arthur Chu, who

12   had been the trader on PCDS, I recall him trying to contact

13   other dealers, and find out whether they would be willing to

14   offer a PDS.

15   Q    And you weren't the PCDS trader, correct?

16   A    I was not the PCDS trader.

17   Q    And when you talked about what the others, about what

18   we knew, about this Merrill Lynch offering, you're only

19   talking about what you knew, correct?

20   A    I don't think anyone knew about the Merrill Lynch

21   offering at QVT, based on my knowledge, correct.

22   Q    But you can only speak to what you know, correct?

23   A    I think that's fair.  I can only speak to what I know.

24   I didn't know about it, and I don't recall anyone else

25   mentioning it.

1    Q    So I want to look at -- back to Claimant's Exhibit

2    5466, at the top of the second page, Mr. Gold provides an

3    example to illustrate replacement risk, do you see that?

4    And he says --

5    A    Oh, sorry, the following example, you're looking at

6    that language?

7    Q    Yes.

8    A    Yes, okay.

9    Q    So following example illustrates replacement risk.  The

10   funds held certain short positions in Argentine debt,

11   reverse repoed from Lehman, as well as long CDS on Argentine

12   debt facing Lehman, both of which terminated as a result of

13   the Lehman bankruptcy, causing the funds to become

14   temporarily un-hedged, i.e., long.  Over the next two days,

15   credit spreads on Argentine debt widened by upwards of 500

16   basis points, inflicting a loss on the remaining under-

17   hedged position.  Do you see that?

18   A    I do see that.

19   Q    So Mr. Gold's example, the fact that the credit spreads

20   widened after Lehman's bankruptcy is where the loss comes

21   from, correct?

22   A    I think when he says "the next two days", he's probably

23   referring to the day of Lehman's bankruptcy and the

24   following day.

25   Q    But you have to look beyond the day of Lehman's

Page 147

1      bankruptcy in order to determine the loss in Mr. Gold's

2      example, correct?

3      A     In Mr. Gold's example, yes.  He references two dates.

4      Q     And then if you look at the next section, it's a

5      section entitled Lehman Brothers, do you see that?

6      A     Sure.  May I just clarify something on the last point?

7      Q     Yes.

8      A     So I just want to be clear, because I think it's not

9      clearly stated here that he refers to the remaining under-

10     hedged positions.  This is an example where you have

11     something on the other side of the CDS, your long, some

12     other Argentinian debt, or something.  So that's where

13     you're taking your losses, is what he's trying to say.

14     That's what the reference to under-hedged positions means.

15     Q     So if you look at the Lehman Brothers' section?

16     A     Okay.

17     Q     The section sentence in this section says, "Lost profit

18     opportunities may also count as damages.  That is, it is

19     possible to be damaged even if one doesn't actually lose

20     money, if one would have made money, but for the

21     counterparty's default.  Do you see that?

22     A     I do, I do see that.

23     Q     And that's exactly what QVT is claiming in this case,

24     that their lost profit opportunities, money that QVT would

25     have made but for the counterparty's default, correct?

Page 148

1    A    Yes, I think that is correct.  We're claiming that but

2    for Lehman's default, we would have been able to collect on

3    these valuable contracts, as of the date that they were

4    terminating, on September 15th, because they became more

5    valuable as of that date.

6    Q    In the calculation statement that QVT submitted, it's

7    seeking to recover these replacement risks that Mr. Gold's

8    taking about in the September 23rd update, correct?

9    A    Well, I mean, as you just said, his example of

10   replacement risk includes subsequently losses.  Until you --

11   if you have an under-hedged position, until you re-hedge the

12   position, you can continue to experience profit and loss

13   swings that you wouldn't have experienced before that.  So

14   that's what he's talking about in replacement risk.  It's to

15   a different point in time, the point where you re-hedge, or

16   you get rid of the position that you needed the hedge for.

17   I think what we're claiming is for the replacement value as

18   of the early termination date.

19        And yes, that may be a lost profit opportunity in

20   the sense that, imagine a position that you're adequately

21   collateralized on, and didn't move -- well, then you didn't

22   -- there was no lost profit opportunity.  But if it moved a

23   lot, in part as a result of the dealers filing, then that

24   was a lost profit opportunity.  It became more valuable on

25   the date that the dealer filed, and that you terminated.

Page 149

1   Q    I don't think that -- I'm not sure you answered my

2   question.  My question is, Mr. Gold's talking about

3   replacement risks in the September 23rd update.

4   A    Okay.

5   Q    Those are the claim -- that replacement risk is what

6   QVT is attempting to recover for in its claim in this case,

7   correct?

8   A    Well, no, I don't think so, and I do think I just

9   answered that, but I'll try again.  The replacement risk

10  that Mr. Gold is talking about is the need to replace a CDS

11  for a potion that is specifically hedged by that CDS.  And

12  his example includes multiple days.

13         And he's basically saying that until you re-hedge

14  that Argentinian long bond position that you're long, or

15  sell that Argentinian long bond position, that you face

16  replacement risk, that is, that you need to -- whatever

17  level you eventually replace the CDS at, or sell the long

18  Argentinian bond at instead, your -- if it continues to

19  widen, you're going to continue to take losses But I don't

20  think that he's -- I don't think when you say, "That's what

21  we're seeking to recover", we're not seeking to recover for

22  post-early termination date losses.  I know that we've used

23  some data, post-early termination date, and that's why I

24  imagine the confusion arises.

25  Q    If you could look at the next paragraph, under the

Page 150

1    Lehman Brothers Section, it says because -- he starts with

2    "Because our other certain of our portfolio level hedges,"

3    do you see that?

4    A    Okay, sure, let me just read that.  Okay.

5    Q    And if you look towards the end of this paragraph, it

6    talks about the replacement risk again, on suddenly un-

7    hedged positions.  Do you see that?

8    A    I do see that.

9    Q    And it says, "However, because credit spreads widened

10   much more significantly over the following two days, we

11   experienced losses as we replaced additional hedges in

12   unfavorable market conditions.  Do you see that?

13   A    I see that.

14   Q    And that's referring to the two days after Lehman's

15   bankruptcy, right?

16   A    I think that's actually referring to the -- yes, I

17   think that's referring to September 16 and 17, to be clear,

18   yes, those following two days.

19   Q    And so QVT experienced losses that actually replaced

20   the additional hedges in the unfavorable market conditions,

21   correct?

22   A    Yes, I believe we did experience some losses as we did

23   that.

24   Q    And then there's also the discussion of the replacement

25   risk associated with the increased market-to-market on those

Page 151

1    positions that did not get replaced following Lehman's

2    bankruptcy, correct?

3    A    I'm sorry, where are you looking at?

4    Q    I'm just asking you a question, not reading from the

5    document.

6    A    Sorry, can you repeat the question for me, then.

7    Q    Well, there's a discussion in the sentence before, it

8    says there's an initial market-to-market replacement risk on

9    suddenly unhedged positions, correct?  Do you ese where I'm

10   at?

11   A    I do see where you're at, yes.

12   Q    And that's referring to a risk associated with the

13   differences in the market-to-market values as the spreads

14   widened over the two days following Lehman's bankruptcy on

15   position that were not replaced, correct?

16   A    I think that's not correct.  I think that this first

17   sentence is talking about the day of Lehman's bankruptcy

18   filing, and it's saying that portfolio-level hedges

19   compensated us for you Lehman-related exposure -- exposure

20   as distinct from replacement risk, as it was discussed on

21   the previous page, and for initial market-to-market losses

22   on suddenly unhedged positions, that it compensated for

23   those two things, is what it's saying.

24   Q    The CDS compensated for those two things, right.

25   A    No, sorry, our portfolio-level hedges, which include

Page 152

1    but are not limited to CDS, and Lehman, other investment

2    banks.  There was a variety of -- there were a variety of

3    instruments in our portfolio-level hedge.  It was a very big

4    book of risk.

5    Q    Now, you drafted this paragraph of the commentary,

6    correct?

7    A    I know that I commented on it.  I don't know if I

8    drafted it.

9    Q    You worked with Mr. Gold on it, for sure, correct?

10   A    I think he produced an initial draft and I commented on

11   it, yes.

12   Q    And I just want to make clear, so the replacement risks

13   in this paragraph, are those replacement risks being sought

14   -- is recovery for these types of replacement risks being

15   sought in the calculation statements (indiscernible) by QVT?

16   A    So, I think certainly initial market-to-market

17   replacement risks on suddenly unhedged positions, yes,

18   that's being sought in this, because that is the jump to

19   default effect, and it's -- we are seeking the replacement

20   value, the fact that net -- because we had a mostly long

21   book of CDS, that it became more valuable on the day that

22   Lehman filed.  So yes, we're absolutely seeing that, and

23   we're seeking it regardless of whether we replaced those

24   transactions, or whether we didn't.

25   Q    And you're seeking it based on data not just from 9/15,

Page 153

1    but also looking at data from throughout the week of

2    Lehman's bankruptcy, correct?

3    A    For certain of the calculations, that is correct.  We

4    looked at data after 9/15, but what we were trying to do was

5    to establish what we thought was the actual value that we

6    could have replaced those positions at as of the early

7    termination date.

8    Q    And again, that would have been a judgment call made by

9    each individual trader valuing that transaction.

10   A    That's correct.

11            THE COURT:  So, Ms. Sawyer, Mr. Brumm has been up

12   there for a long time.  What do you think about how much

13   longer you have?

14            MS. SAWYER:  I think I am honestly, close to the

15   end.

16            THE COURT:  Okay.

17            MS. SAWYER:  Maybe if we took a quick break, I

18   could be quite efficient when we came back.  But I also see

19   what time it is, so --

20            THE COURT:  Right, so it's almost 5:30.  We could

21   take a five-minute break, and then --

22            MS. SAWYER:  I mean, we could -- I could also just

23   step out and confer.  I mean, I have questions, but if I

24   conferred with Mr. Tambe for a few moments, I think we could

25   be --

Page 154

1          THE COURT:  Sure.  You okay staying?

2          MR. BRUMM:  I'm happy to stay, yes.  I'm fine,

3     thank you for asking.

4          THE COURT:  I'm just going to stay, if anyone

5     wants to leave, that's fine.

6          (Recess)

7          THE COURT:  Okay, home stretch.

8          MS. SAWYER:  Yes, absolutely.  Mr. Brumm, if you

9     could look at Exhibit 5466, which is the September 23rd

10    investor update?

11    A    Okay.

12    Q    And if you could got to the second page, the Lehman

13    Brothers section that we're looking at?

14    A    Okay.

15    Q    And I'm looking at the last sentence of that section.

16    And it says, "I believe that a majority of our month to date

17    losses would have been sustained, even if the QVT funds had

18    had no direct relationship to Lehman, simply because of the

19    market conditions on which (indiscernible) was valued."  You

20    see that?

21    A    I'm sorry, I don't see it at the moment.  It's 5466,

22    and I'm in the Lehman Brothers section --

23    Q    The last sentence of that section.

24    A    Okay, I see it now.  (indiscernible), thank you.

25    Q    You see that sentence?

Page 155

1   A    Sure, just give me a moment.  I do see that, yes.

2   Q    And you believe that's an accurate statement, when it's

3   sent to QVT's investors in September of 2008, correct?

4            MR. REGAN:  Objection, speculation.  It's a

5   statement of belief.  I'm not sure what the question is

6   actually asking.

7            THE COURT:  The question was if he believed it to

8   be accurate.

9            MR. REGAN:  Did he believe the belief to be

10  accurate?

11  Q    This is a statement that's being sent out to

12  investors.  Do you believe that to be an accurate statement

13  that was -- you believe that to be an accurate statement

14  that was sent to your investors in September of 2008, don't

15  you?

16  A    At the time it was sent, in September of 2008, I

17  believed it was an accurate statement, yes.

18  Q    Mr. Regan asked you some questions about the side

19  pocket, and your interests in the Lehman side pocket, do you

20  remember that?

21  A    I do recall that.

22  Q    And you had explained to Mr. Regan that the insiders'

23  interests in the Lehman side pocked have been increasing.

24  A    I explained that they have increased, yes.

25  Q    And if you could look at Exhibit 5339?

Page 156

1    A    Okay.

2    Q    It's in the second, in this page --

3    A    5339, yep, okay.  Okay.

4    Q    Sorry, are you looking at -- there's a spreadsheet in

5    here that I think we printed out in your binder that says

6    custodian's 2008 direct -- no, it's up on the screen.

7    A    I see it on the screen, I do not see it in my binder.

8    Q    It's not in your binder?

9    A    In my binder it says produced in native format.

10   Q    Okay, and if you turn to the next page, there's still

11   nothing (indiscernible) --

12   A    Yes, it has the metadata for the file.

13   Q    All right, so we'll just look at what's on the screen,

14   then.

15   A    That's okay.

16   Q    So this was a sheet that was produced to us,

17   summarizing the interests of certain individuals in the

18   Lehman side pocket as of 2008 and 2015, do you see that?

19   A    I do see that.

20            THE COURT:  Can I interrupt you to ask a technical

21   question?  So if this isn't in the binder, where is it going

22   to live in the record?

23            MS. SAWYER:  We have USB -- well, it's not in the

24   binder, apparently.

25            MR. TAMBE:  (indiscernible) the blue sheet, it's

Page 157

```
 1    in the binder.

 2              MS. SAWYER:  Is it?

 3              MR. TAMBE:  (indiscernible) the blue sheet, it's

 4    in the binder.

 5              THE COURT:  Is it after the blue sheet?  Oh, it

 6    is.

 7              MR. BRUMM:  Oh, I'm sorry, there's a blue sheet.

 8    You're correct.

 9              THE COURT:  It's after the blue sheet.  Thank you.

10    Mr. Tambe, you've earned your keep.

11              MR. TAMBE:  Is that on the record?

12    Q    All right, great.  So this is a spreadsheet that was

13    produced by QVT indicating what certain custodians'

14    interests were in the side pocket in 2008 and 2015, do you

15    see that?

16    A    I do see that.

17    Q    And it indicates, in 2015, the direct interests of the

18    custodian identified is 5.93 percent, do you see that?

19    A    I do see that.

20    Q    And then at 6.43, if you include the indirect interests

21    of those custodians, do you see that?

22    A    I do see that.

23    Q    And you, Yi Cen, Arthur Chu, Daniel Collins, Tracy Fu,

24    Dan Gold, Fatemeh -- apologize, I'm --

25    A    Sadeghi-Nejad.
```

Page 158

1    Q    Okay, Julian Sale and Joel Wollman are identified as

2    the custodians, do you see that?

3    A    And family members, yes, I see that, at Line 11.

4    Q    And family members.  So what is the percentage of that

5    group of individuals now in the Lehman side pocket, what do

6    they own?

7    A    I don't know what it is now.

8    Q    But it's more than 6.43 percent?

9    A    It's likely more than 6.43 percent.

10   Q    And are there records somewhere that indicate what it

11   is?

12   A    Yes, there are records.  It's a complex calculation to

13   form, for the indirect positions in particular.  So, but

14   there is an ability to produce that.  It was produced in

15   2015.

16            THE COURT:  Can I clarify?  You asked Mr. Brumm

17   about the indirect only, not the--the 2015 indirect, not the

18   2015 direct?

19            MS. SAWYER:  Yes.

20            THE COURT:  Okay.

21   Q    But my understanding is, maybe you can explain to me,

22   that I believe that the direct is -- well, what are those

23   direct and indirect columns?

24   A    Sure.  Let me try to explain.  So the direct ownership

25   is stated here in Row 9 as the actual ownership in S25, an

Page 159

1    economic ownership through an allocation to deferred fee

2    arrangements.  So that -- it's essentially our pro rata

3    interest, as it was in 2010 of the -- sorry, in 2008 of the

4    whole fund, when the side pocket was created.  You'll see

5    that it's increased slightly over time.  That, as I

6    understand it, is due to certain tax and fee considerations,

7    but you'll see that it's increased fairly minimally, I mean,

8    it's similar level.

9            There was no indirect ownership in 2008.  The

10   indirect ownership reflects some of the complexities I was

11   trying to address at the start of the cross-examination, in

12   terms of our ownership of the main fund having increased,

13   there are certain other funds, too, that have also purchased

14   interest in what we call the combined special investment

15   fund, which is the fund that today houses S25, and a number

16   of really, all of our other old special investments that

17   have not been wound up already.

18   Q    What is your direct and indirect interest in the Lehman

19   side pocket today?

20   A    I would have to go back and look at the source data.

21   I'm not a majority, or 50 percent of those numbers, but I'm

22   some percentage of them.

23   Q    Can you give us an approximation as to what your

24   percentage is today?

25   A    I'm reluctant to do so, without looking at actual

Page 160

1    numbers.  But --

2    Q    What percentage of the 2.3 billion of the assets under

3    management at QVT today are owned by insiders?

4    A    Well, I don't know the number -- I can't give you a

5    percentage for the 2.3 billion, because I don't know that.

6    What we call our continuing funds, which are the funds that

7    continue to actively trade and put on new position, that's

8    roughly 1.6 billion of the UM, I believe.  And of that, the

9    insiders, defined as -- I think that would be the custodians

10   and others here on this list, because it includes our former

11   partners, are a little bit over 40 percent, current.

12            MS. SAWYER:  Okay.  Can I have just one moment,

13   Your Honor?

14            THE COURT:  Sure.

15            MS. SAWYER:  I have no further questions.

16            THE COURT:  Thank you.

17            MR. REGAN:  No redirect, Your Honor.

18            THE COURT:  Okay, very good.  Thank you very much,

19   Mr. Brumm, you can step down.

20            MR. BRUMM:  Thank you, Your Honor.

21            THE COURT:  So I think we wanted to take a couple

22   of minutes to reflect on the record everyone's

23   understandings of certain discussion that were had today,

24   with respect to privilege issues.  Ms. Sawyer, did you want

25   to do that?  Did you want to give a general statement of --

Page 161

1          MS. SAWYER:  I can give it a shot.

2          THE COURT:  What's that?

3          MS. SAWYER:  I'll give it a shot.

4          THE COURT:  And then Mr. Tracey can comment, and I

5    can -- to the extent that you don't agree, I can give you

6    what I think the proper characterization of it is.

7          MS. SAWYER:  So I believe that in connection with

8    discussion we've had about certain positions taken in this

9    litigation, that the Court determined that certain documents

10   needed to be produced in redacted form, to allow limited

11   inquiry into certain areas of potentially privileged

12   communication in those areas related to the timing

13   associated with the market quotation process.

14          And specifically it was the timing at which QVT

15   went into the market to request market quotations, and the

16   timing as of which the quotes were to be obtained, and the

17   drafting of the language referring to as of the date and

18   time the market quotations would be obtained.  And QVT

19   produced certain documents, that have been submitted as

20   Claimant's Exhibit 2122 through 2128.

21          MR. REGAN:  2112.

22          THE COURT:  2112.

23          MS. SAWYER:  2112 through 2128.

24          THE COURT:  Right.

25          MS. SAWYER:  QVT has submitted those exhibits, and

Page 162

1    questioning occurred in connection with those.

2            THE COURT:  Right, and additional redactions --

3    and redactions were made to some, but perhaps not all those

4    exhibits, to narrowly reflect the scope of the at-issue

5    waiver that you've described with respect to the timing

6    issues associated with the market quotation process.

7            MR. TRACEY:  Yes, and I agree with the description

8    of the scope of the limited waiver.  I would only point out

9    that the Court has ruled, I believe, that that is not a

10   general waiver.

11           THE COURT:  Correct.

12           MR. TRACEY:  And that there has been no waiver of

13   any advice requested or given that's outside the scope of

14   the timing issues as described by Ms. Sawyer, and

15   specifically not on the general issues surrounding the ISDA

16   or the market quotation process.

17           THE COURT:  Correct.  And we're going to, to the

18   extent that additional witnesses are questioned on these

19   same topics or similar topics, we're going to attempt to

20   keep to the same out of bounds line, if you will, that we

21   managed to get through today.

22           MR. TRACEY:  And I, if I could just add -- and I

23   think this is right, but everyone will correct me if I'm

24   wrong, I think we're limiting the questioning to the QVT

25   side of the communications.

Page 163

```
 1                THE COURT:  Yes.

 2                MR. TRACEY:  And we're not veering into taking

 3      testimony from lawyers.

 4                THE COURT:  Right.

 5                MS. SAWYER:  Agreed.

 6                THE COURT:  No additional discovery, no testimony

 7      of lawyers, or anything related to that, or -- I'll leave it

 8      at that.  Okay, so should we talk about tomorrow?

 9                MR. TRACEY:  So we plan to put -- sorry, were you

10      going to say something?

11                MS. SAWYER:  No, I'm just standing here.

12                MR. TRACEY:  We're going to call Mr. Wollman first

13      to authenticate the --

14                THE COURT:  Spreadsheet.

15                MR. TRACEY:  -- the spreadsheet.

16                THE COURT:  Okay.

17                MR. TRACEY:  And then we will put Mr. Chu on the

18      stand for his testimony.

19                THE COURT:  And do you expect that that will take

20      most of the day tomorrow?

21                MR. TRACEY:  I believe that between the two of

22      them, they will take the full day.

23                THE COURT:  Okay.

24                MR. TAMBE:  And not just for your direct, or are

25      you building in cross-examination?
```

Page 164

1          MR. TAMBE:  Well, my understanding is there's

2     going to be no cross-emanation of Mr. Wollman.

3          MR. TAMBE:  We'll just reserve our objections and

4     we'll deal with that when we examine Mr. Wollman.

5          THE COURT:  I'm looking at Ms. Sawyer for a sign

6     off on that concept.  Well, I'm -- in all seriousness, to

7     the extent that there are questions about the

8     authentication, then --

9          MR. TRACEY:  I have no problem with it.  I have no

10     problem with it.

11          MS. SAWYER:  We're reserving -- we're not doing a

12     full cross-examination.

13          THE COURT:  No, it's not a full cross-examination,

14     it's only in connection with if they believe that your

15     questions don't establish a complete basis, then instead of

16     just objecting, and you want to put some questions, that's

17     what we're going to do, correct, right?

18          MS. SAWYER:  Right.

19          MR. TRACEY:  That's fine, that's fine.

20          THE COURT:  Okay, so there's that.  So then we go

21     back to the other question of you were just talking about

22     the direct, and not getting to cross tomorrow?

23          MR. TRACEY:  I think we may get to cross, but not

24     a lot.

25          THE COURT:  Okay.  All right, so we're starting at

Page 165

1    10:00, and we'll just take it from there.  All right?

2               MR. TRACEY:  Okay.

3               THE COURT:  I do have the folks coming in at 9:00

4    tomorrow morning, so if you could tidy as much as you can, I

5    would appreciate it.  And I'll have --

6               MR. TRACEY:  Are we planning on --

7               THE COURT:  I'm sorry?

8               MR. TRACEY:  Are we planning on 10:00, Your Honor?

9    THE COURT:  10:00, yeah.  And I'm 99 percent sure I'll have

10   those folks out by 9:45.  But you can come in and set up,

11   and get ready.  All right, thank you very much.

12

13

14        (Whereupon these proceedings were concluded at 5:50 PM)

15

16

17

18

19

20

21

22

23

24

25

Page 166

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya                    Digitally signed by Sonya Ledanski Hyde
                              DN: cn=Sonya Ledanski Hyde,
6    Ledanski Hyde            o=Veritext, ou,
                              email=digital@veritext.com, c=US
7                             Date: 2017.02.03 16:19:27 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 3, 2017