Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.

8

9            Debtor.

10   - - - - - - - - - - - - - - - x

11

12                    U.S. Bankruptcy Court

13                    One Bowling Green

14                    New York, New York

15

16                    February 2, 2017

17                    10:00 AM

18

19   B E F O R E :

20   HON. SHELLEY C. CHAPMAN

21   U.S. BANKRUPTCY JUDGE

22

23

24

25   ECRO:  KAREN

1   HEARING Re Trial on Lehman's Objection to Claims of QVT (Doc

2   #17468 Debtors' One Hundred Fifty-Fifth Omnibus Objection to

3   Claims)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sheila Orms, Sherri Breach and Lisa Beck

```
 1    A P P E A R A N C E S :

 2    HOGAN LOVELLS US LLP

 3         Attorneys for QVT

 4         875 Third Avenue

 5         New York, NY  10022

 6

 7    BY:  NICOLE E. SCHIAVO, ESQ.

 8         WILLIAM M. REGAN, ESQ.

 9         BEN LEWIS, ESQ.

10         JOHN D. BECK, ESQ.

11         DENNIS H. TRACEY, III, ESQ.

12         ROBERT E. KELLER, ESQ.

13         DARYL L. KLEIMAN, ESQ.

14

15    JONES DAY

16         Attorneys for Debtors

17         250 Vesey Street

18         New York, NY  10281

19

20    BY:  LAURI W. SAWYER, ESQ.

21         JENNIFER DEL MEDICO, ESQ.

22         JAYANT W. TAMBE, ESQ.

23         RYAN J. ANDREOLI, ESQ.

24         REBEKAH BLAKE, ESQ.

25         SARAH EFRONSON, ESQ.
```

Page 4

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.

3              ALL:  Good morning.

4              THE COURT:  How is everyone today?  Okay.  Ready when

5    you are.

6              MR. TRACEY:  QVT calls Joel Wollman.

7              THE COURT:  Very good.  Mr. Wollman, please come on

8    up.  Good morning, sir.  Would you raise your right hand,

9    please?

10                    JOEL WOLLMAN, WITNESS, SWORN

11             THE COURT:  Very good.  Please have a seat, make

12   yourself comfortable, let us know at any time if you would like

13   a break.  Mr. Tracey.

14                        DIRECT EXAMINATION

15   BY MR. TRACEY:

16   Q    Mr. Wollman, we don't have a notebook because we only have

17   one document.

18             THE COURT:  We have only one document.

19             MR. TRACEY:  It's an important one.

20             THE COURT:  It's a big one.

21             MR. TRACEY:  May I?

22             THE COURT:  Sure.

23   Q    And it's in electronic form, so the document I just handed

24   you is just a slip sheet and the metadata.

25   A    Yes.

Page 5

```
 1    Q    Could you state your name for the record, please?

 2    A    My name is James Wollman.

 3    Q    All right.  I'd like to get some background if I can.

 4    Would you describe your educational background please?

 5    A    Yes.  I have a bachelors in computer science as well as a

 6    master's in computer science from Harvard.

 7    Q    And when did you obtain your undergraduate degree?

 8    A    In 1999.

 9    Q    And your graduate degree?

10    A    1999.

11    Q    Same year.

12    A    Yes.

13    Q    And could you describe what position of employment, if

14    any, you took after that?

15    A    Yes.  After graduation I joined Oliver Wyman & Company

16    which is a financial services consultancy.

17    Q    And what was your position there?

18    A    I was a consultant but I was initially tasked on what was

19    known at the time as the e-risk venture from Oliver Wyman.

20    Q    And what was that, just in summary form?

21    A    It was an attempt to create an on-line company that would

22    provide financial risk analytics to banks.

23    Q    And how long were you at Oliver Wyman?

24    A    So including the e-risk aspect because after a year or so

25    I officially left Oliver Wyman to join e-risk, the entire
```

Page 6

1   relationship was four years.

2   Q    Okay.  And what did you do after that?

3   A    After that I joined a hedge fund called Devonshire Warwick

4   Partners.

5   Q    And was that in approximately 2003?

6   A    That was -- yes, that would've been the fall of 2003.

7   Q    Okay.  And what did you do there?

8   A    I was a portfolio manager and also responsible for the

9   implementation of the risk systems for the hedge fund.

10  Q    When you say portfolio manager, does that mean that you

11  were a trader?

12  A    Yes.  I was responsible along with others for trading a

13  portfolio of equity and equity index options.

14  Q    Okay.  And how long did you stay at that job?

15  A    For about a year.

16  Q    So you left in about 2004?

17  A    Yes, fall 2004.

18  Q    Okay.  And what did you do after that?

19  A    I joined QVT.

20  Q    Okay.  And approximately what day?

21  A    I believe it would have been September 1st, 2004.

22  Q    Okay.  And what was your first position at QVT?

23  A    So I entered in an investment role.  I guess I was hired

24  as a generalist, so I didn't have a particular group that I was

25  assigned to.

Page 7

1   Q    And what were your responsibilities?

2   A    So when I first joined, I was tasked with working with

3   Arthur Chu primarily on some investment opportunities and I was

4   also doing some operational work as well for the file.

5   Q    And what do you mean by operational work?

6   A    So there were various efforts under way to improve systems

7   at QVT.  I recall my first project I think was working on the

8   broker reconciliation effort, as well as some other computer

9   related activities.

10  Q    And did you trading responsibilities focus on any type of

11  particular products?

12  A    Sorry over what time period?

13  Q    At the beginning.

14  A    So it varied, but I would say the first main area I

15  focused on was in credit derivatives, specifically in what was

16  known at the time as correlation products.

17  Q    Okay.  And did your responsibilities change over time?

18  A    Yes.  They evolved over time.

19  Q    And could you give the Court an understanding of how they

20  changed and approximately at what time period?

21  A    Sure.  I continued to be involved in the credit derivative

22  aspect of it, but approximately in 2005 timeframe, I started

23  spending much more of my time focusing on pay as you go CDS

24  particularly in the RMDS and ABS CDO markets.  And then over

25  time I've since triggered many other products, but certainly

Page 8

1   over the 2005 through 2009, 2010 timeframe, that was where my

2   core area of specialization.

3   Q    Okay.  And did your position change as time evolved?

4   A    I was portfolio manager throughout.  As time went on, I

5   had more -- I looked in more positions and the size of those

6   positions grew and I spent less and less time on the

7   operational aspects of the job and focused more and more on the

8   portfolio aspects of the job.

9   Q    Okay.  And what was your title during the course of that

10  time?

11  A    So functionally it would've been portfolio manager and

12  then over time I eventually became a managing director which I

13  guess is more of a business title.

14  Q    And when did you become a managing director?

15  A    I don't recall exactly when it was.  It would've been some

16  time in the 2008 or 9 timeframe.

17  Q    And were you a partner of QVT?

18  A    Essentially, although the -- I wasn't labeled as a partner

19  per se for various tax reasons.

20  Q    Okay.  And are you still with QVT today?

21  A    I am not.

22  Q    And when did you leave QVT?

23  A    April 15th, 2016.

24  Q    And do you have any ongoing relationship with QVT?

25  A    Yes, I do.

Page 9

1    Q    And what is that?

2    A    I'm employed as a consultant.

3    Q    And what's the scope of your consultancy?

4    A    It's related to this matter.

5    Q    Okay.  So consulting with regard to this litigation?

6    A    Yes.

7    Q    Okay.  Let me take you back to the fall of 2008 and we'll

8    get into this more when you continue to testify later, but just

9    to put the -- put this in context.  Were you involved, did you

10   have any role in the termination of the Lehman positions after

11   Lehman's bankruptcy?

12   A    Yes.

13   Q    And what was your role?

14   A    So I was part of the market quotation effort, both --

15   well, including the drafting, solicitation, selection of

16   dealers, and communication with dealers/market makers involved

17   in that process, as well as the calculation of claims related

18   to the process.

19   Q    Okay.  Let me -- I guess first tell me what -- if you

20   could summarize it, what was your role in relation to the

21   calculation of the claim?

22   A    So initially it started as I created the main template

23   that other portfolio managers would use to value their

24   positions that they were most familiar with in the calculation.

25   As the process evolved, I became effectively the custodian,

Page 10

1   sort of overseer of the process, and kind of aggregated the

2   materials provided by the individual portfolio managers and

3   consolidated it all.

4   Q    And did you also have positions in the portfolio that you

5   personally valued?

6   A    Yeah.  So one of the portfolio managers that was necessary

7   to that process was me.

8   Q    Okay.  All right.  I'd like to show you a document now

9   that we've marked as Claimant's Exhibit 2108, which is in

10  electronic form, so would you bring it up on your computer

11  there.

12       Can you see it?

13  A    Yeah, the resolution is a little -- it'll take a little

14  adjustment but I think I got it.

15  Q    Okay.  So take your time to review it, but my question is

16  going to be whether you can identify that document.

17       And just so you know, what everything you do is also

18  displayed on everyone's screen so they can see.  If you want to

19  point something out, you can manipulate it on your screen and

20  everyone will see it.

21            THE COURT:  Yes?

22            MR. ANDREOLI:  Excuse me, Your Honor, I just want to

23  let the record reflect that Mr. Wollman is driving the

24  spreadsheet, I think you may have mentioned that, but just so

25  it's clear.

Page 11

1          MR. TRACEY:  Okay.  Thank you.

2          THE WITNESS:  Yes, I recognize this document.

3     BY MR. TRACEY:

4     Q    Okay.  And what is it?

5     A    So this is a spreadsheet that reflects the latest version

6     of QVT's calculation of its claim with LBSF.

7     Q    Okay.

8     A    It's a spreadsheet that I initially created back in

9     September 2008 but has been updated and modified since then.

10    Q    Okay.  And did this document have a name at QVT?

11    A    Yes.  I think it's -- it would have been largely called

12    the Lehman claim workbook, then as time progressed it may have

13    been called the QVT workbook as it related to this matter.  But

14    I think internally at QVT it was largely called the Lehman

15    claim.

16    Q    Okay.  I would like to show you the metadata from

17    Claimant's Exhibit 2108.  I'm sorry, that's not from this

18    document.

19         Thank you.  Mr. Wollman, I've placed before you the

20    metadata from the document you just identified.  Does that

21    metadata indicate an author?

22    A    Yes.

23    Q    And who is that?

24    A    Me, Joe Wollman.

25    Q    And does this indicate a date that this document was first

Page 12

1    created?

2    A    Yes, September 16th, 2008.

3    Q    And is that consistent with your recollection of when you

4    initially created this document?

5    A    When I initially created it, at least some aspect of this

6    document, yes.

7    Q    And was this document maintained in the records of QVT, in

8    the systems of QVT?

9    A    Yes.

10   Q    And where was it maintained?

11   A    So QVT had a central file system which we sort of referred

12   to as the G Drive.  And on the G Drive there was a folder

13   related to Lehman and then within that directory there was a

14   Lehman claim directory and information was stored within that

15   Lehman claim directory.  There were subdirectories within that

16   main directory, but that was generally the area where this was

17   located.

18   Q    Okay.  And who was the custodian of this document?

19   A    This document, I would've been the custodian.

20   Q    Okay.  And I know you said it was changed over time and

21   we'll talk about that, but from -- did there come a time when

22   you provided an evolved version of this document to our law

23   firm in connection with this litigation?

24   A    Yes.

25   Q    And do you recall when that was?

Page 13

1    A    Yes, that would have been December 2014.

2    Q    Okay.  And from September 16th, 2008 to December 2014 were

3    you the custodian of this document?

4    A    Yes.

5    Q    Okay.  And what I'd like to do now is give the Court a

6    sense of the evolution of the document.

7    A    Sure.

8    Q    So what I'd like to do is start with September 16th, 2008

9    and ask you to describe how the document changed from that time

10   until the claim was submitted.

11   A    Sure.  At a high level and I can go deeper if you'd like,

12   but at a high level from September 16th, 2008 through October

13   15th, 2008 that was the creation of the claim as created for

14   the calculation statement that we submitted on that date.

15        And the document would have been the result of the

16   calculations that were provided by the various portfolio

17   managers that were then aggregated into one main claim sheet,

18   and then that claim sheet was the source of the support for the

19   ultimate total claim number, as well as provided the detail at

20   a line item basis.

21        And then subsequent -- would you like me to talk

22   subsequent to?

23   Q    Well, first let's make sure we have the chronology

24   straight.  Do you recall the date on which the first

25   calculation statement was submitted to Lehman?

Page 14

1    A    I believe it was October 15th, 2008.

2    Q    All right.  So take us from October 15th, 2008 when the

3    calculation statement was submitted, based on this document,

4    what changes were made after that time to this document?

5    A    Well, so there were a number of corrections of I guess I

6    would call them mathematical errors from that time through I

7    would say 2013 at the latest, but concentrated earlier in that

8    time period.

9        And then there was also some formatting and other changes

10   that would have evolved in this document over time and then

11   some other descriptive information that evolved over this time.

12   But ultimately by September 2014, this document in its current

13   form was finalized.

14   Q    Okay.  So let's just break that down a little bit.  I

15   think you talked about the correction of errors.

16   A    Yes.

17   Q    During what time period were those errors corrected?

18   A    So I gave a sort of somewhat large timeframe.  I know that

19   there was an initial set of corrections that related to an

20   exchange rate mistake on some unsettled trades that were

21   reflected in the September 2009 proofs of claim.

22       So those corrections would have happened over that time

23   period.  And then there were really two more sets of

24   corrections, adjustments that I'm not sure exactly when each

25   occurred, but in aggregate it happened some time from 2009

Page 15

1    through I'd say the latest middle of 2013, but possibly some

2    time before that.

3    Q    Okay.  And we're not going to do it now, but if we went

4    into the spreadsheet, could you show the Court what changes

5    were made and what the reasons were between October 15th, 2008

6    and June of 2013?

7    A    Yes, I can do that.

8    Q    And did any of those changes change the methodology that

9    was used between September 16, 2008 and October 15th, 2008 to

10   calculate the claims?

11   A    No.

12   Q    In addition to the changes relating to the errors, I think

13   you said that there were changes in formatting.  And when was

14   the document finally formatted and fixed?

15   A    So I believe September 2014 would've been the last date,

16   the timestamp of the last date, this underlying document has.

17   Q    Okay.

18   A    So that would be conservative.

19   Q    Okay.  And is that the exact same document that you

20   provided to my law firm later?

21   A    No.

22   Q    Okay.  So what changes were made between September of 2014

23   and the time that you provided it to my law firm?

24   A    Right.  So as we discussed before, I provided December

25   2014 and over that time, the main change, I believe the only

Page 16

1    change, was the hard coding of certain QVT calculation costs.

2         So in order to just explain that a little bit more, in

3    order to do these calculations, the spreadsheet relies on two

4    different types of calculations at least, one of which is the

5    ability to pull in third party pricing to get information from

6    Bloomberg or Market IT, Markit Partners information.

7         And so we have functions in Excel that at QVT we can use

8    to pull that information into a spreadsheet, but that wouldn't

9    work for anyone outside of QVT.  So in order to make the

10   spreadsheet usable for you guys, we hard coded those values, so

11   you can't see the underlying function call.

12        The second set of calculations involve converting a spread

13   to a price.  So a lot of times we will receive input

14   information from pricing purchases in a spread form, but

15   ultimately we need to compute a price to arrive at a dollar

16   figure for the claim.  And that calculation also would have

17   required QVT function calls that were not native to Excel that

18   again those calculations would've been hard coded.

19   Q    And just to be clear, function call, when you say function

20   call, do you mean that for the spreadsheet to work it has to

21   ask some other QVT system for an answer?

22             MR. ANDREOLI:  Objection, leading.

23   Q    Is that correct?

24             THE COURT:  Hold on.  What?

25             MR. ANDREOLI:  Objection, leading.

Page 17

1          THE COURT:  I think for the efficiency I'll allow it.

2    Go ahead.

3          THE WITNESS:  Sorry, can you repeat the question?

4    BY MR. TRACEY:

5    Q    Yeah.  I want to make sure that we understand what you

6    mean by did you say function calls?

7    A    Yes.

8    Q    Okay.

9    A    Or an add-in function call or an add-in.

10   Q    Function call and add-ins.  Do I understand you correctly

11   the function call or add-in is when the spreadsheet asks some

12   other QVT system for information?

13   A    So it would either be a QVT system or it would be a third

14   party provider like Bloomberg that we would ask information

15   for.  But, yes, effectively asking either QVT or some non-QVT

16   source outside of Excel for information.

17   Q    Okay.  And explain how the hard coding -- how you changed

18   that with hard coding.

19   A    Sure.  So in the spreadsheet as it lives on QVT file

20   server, if you were to open up that spreadsheet in one of the

21   cells it might say something like equals DVG parenthesis and

22   then, you know, a string of information that if you go out to

23   Bloomberg it would know how to get that information.

24        So instead of that cell reflecting that formula inside it,

25   when we presented that spreadsheet to your firm, we would just

Page 18

1    copy and paste the result of that call.

2        So whatever that call -- when you make that call it will

3    produce an answer, and whatever that answer is would just be

4    placed directly in that cell as opposed to the formula that

5    shows how that answer was arrived at.

6            THE COURT:  Can I ask one follow-up question though?

7    But you told Mr. Tracey that the last -- the end of the

8    changes, so to speak, was in September of 2014.

9            THE WITNESS:  Correct.

10           THE COURT:  And then now you're talking about the way

11   the spreadsheet looks when it went to the Hogan Lovells firm.

12           THE WITNESS:  Correct.

13           THE COURT:  But the call in each cell as it exists

14   now is the same as it was in September of 2014, the -- so for a

15   Bloomberg query it's now a hard coded representation of what

16   the answer to that call to Bloomberg would have been in

17   September of 2014.

18           THE WITNESS:  It would have been really in December

19   2014 because that's when it was done, but the answer should not

20   have changed to the extent that it was a historical call in the

21   first place.

22           THE COURT:  Okay.  So now I'm confused because I

23   thought that you testified that the changes were done in

24   September of 2014.  So how does December of 2014 --

25           THE WITNESS:  Sure, maybe I can --

Page 19

1          THE COURT:  If I'm the only one confused,

2    that's --

3          THE WITNESS:  No, I'm sorry, it's a bit of a process.

4    So -- and maybe the easiest way to think about it is, there is

5    a spreadsheet on QVT system, it's not this spreadsheet but it's

6    a spreadsheet that looks awfully similar in many respects.  And

7    that spreadsheet was last updated in September 2014.

8          THE COURT:  Okay.

9          THE WITNESS:  And so that's the September 2014

10   information that I'm talking about.  And if you look at it, now

11   you will see the formulas are in there and there will be some

12   values even today which should not be any different than what

13   you would have seen in September 2014.

14          In December 2014, Hogan Lovells asked for a hard

15   coded version of this spreadsheet.  So whether I would have

16   hard coded it at September 2014 or December 2014, I would have

17   gotten the same answer.  But they asked for it three months

18   after that sheet had been created and that's --

19          THE COURT:  That was exactly my question.  So the

20   pulling of information from the third party sources in December

21   2014 gave you the same value to which you then hard coded that

22   would have pertained had you done all of that in September of

23   2014.

24          THE WITNESS:  That's correct.

25          THE COURT:  Thank you.

Page 20

1    BY MR. TRACEY:

2    Q    Okay.  Now, I'd like to move forward from December of '14

3    when we have the hard coded version and our law firm has it.

4    After that, were there any changes to the document?

5    A    Yes, there were.

6    Q    What changes were those?

7    A    So I believe your firm provided a version in May 2016 that

8    would have taken what was the original document and been

9    presented over to -- it would have been submitted to, I believe

10   it was Jones Day for this matter.  And that would have taken

11   the original spreadsheet that was produced to you, and altered

12   for any privileged communications.

13   Q    Okay.  And that production was made, I think you said, May

14   6th -- May 13th -- was it May of 2016?

15   A    Yeah, I don't think I specified the date.

16   Q    Okay.  May of 2016, okay.  From that time forward to

17   today, to this Claimant's Exhibit 2108 were any changes made to

18   the spreadsheet?

19   A    Yes, there were.

20   Q    Okay.  And what were those changes?

21   A    Okay.  And I believe this is the last set of changes.

22       The -- there are a number of columns in two sheets in this

23   workbook that have been redacted as they reflected information

24   provided by Lehman that was obtained during the course of

25   discussions, mediation and possibly beforehand.

Page 21

1    Q    Okay.  We'll go through that.

2         What I'd like to do now if I can is open up the

3    spreadsheet and just look at the individual tabs or sheets in

4    it.

5         And do you know how many sheets there are in this?

6    A    I can count, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13,

7    14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29

8    if I didn't miscount.

9    Q    All right.

10             THE COURT:  Is a tab and a sheet the same thing?

11             MR. TRACEY:  In my words.

12   Q    Is a tab and a sheet the same thing?

13   A    Yes.  And for completeness it includes some sheets that

14   are really just dividing sheets, they don't have any real

15   content on them but there aren't many of those.

16   Q    And does the 29 include the dividing sheet?

17   A    Yeah.

18   Q    Okay.  So -- and what do you like to use sheet or tab?

19   A    Let's stick with sheet, that'd be good.

20   Q    Okay.  So would you identify for the Court what sheets

21   reflect the actual calculation of the claim?

22   A    So, right.  So really the calculation happened on the

23   sheets that are labeled Lehman positions dash.  So it's Lehman

24   positions dash master.  The main one, that is the aggregation

25   of the individual trader provided sheets that are Lehman

Page 22

1    positions Arthur, Lehman positions Sam, Lehman positions Joel,

2    Lehman positions Dec, Lehman positions Tom and Lehman positions

3    Tracy.

4    Q    Okay.  And so separate from those, are there sheets that

5    include documentation that supports that calculation?

6    A    Yes, there are.

7    Q    Okay.  And would you identify for the Court which ones

8    those are?

9    A    And so I guess -- I mean, so it depends exactly what you

10   mean by support.  Certainly the individual sheets, some of them

11   relied on other sheets that were used as input into those

12   sheets.  So, for example, the sheets EM, CDS curves used, MI

13   data, PCDS data, those would've been inputs to some of those

14   individual trader sheets.  And then there were some other --

15   there's also a replacement detail sheet that feeds into the

16   Lehman position's master sheet.

17   Q    Okay.

18   A    Those are the main sources of calculations for certain

19   subsets of positions.  And then there are also -- like there's

20   a look-up sheet which provides global information that's used

21   as part of the calculation.

22   Q    Okay.  And other than the two categories of sheets we just

23   talked about, the calculation sheets, and the documentation,

24   the supporting documentation sheets, what other sheets are

25   there in this workbook?

Page 23

1    A    So there's source data sheets.  So there's a section

2    called lists which references the four sheets that made up the

3    three market quotation solicitations, the corporate list and

4    index list which made up the -- a corporate and sovereign and

5    then the ABS list and the EM list.

6         So those sheets provide the responses received and are

7    used as part of the calculation.  So that's one set of sheets.

8    There's also some summary information, the response to tab

9    shows a more nicely formatted version of the positions in the

10   aggregate claim.  The mark responsibility sheet shows how to

11   decide between the various trader sheets.  And then there's a

12   bunch of other -- I would say more description information that

13   make up the final set of sheets.

14   Q    Okay.  So what I'd like to do now is focus on the changes

15   that you described that took place between the time that this

16   document was produced to Jones Day and today.

17   A    Okay.

18   Q    I think you said that there were changes made that

19   eliminated information that related to settlement discussions.

20   A    That's correct.

21   Q    Could you identify where that information was in the

22   spreadsheet?

23   A    Sure.  The information specifically with respect to Lehman

24   provided information.

25   Q    Well, I want you to describe all changes that were made to

Page 24

1    this spreadsheet between the time it was produced to Jones Day

2    to today.

3    A    Right.  So there's a set of sheets that are just not in

4    this workbook because they would've been removed for privileged

5    reasons, so I can't --

6    Q    Okay.  That was before it was produced to Jones Day,

7    correct?

8    A    Correct.

9    Q    Okay.  I just want --

10   A    Oh, sorry just between Jones and Day and today, I'm sorry.

11   So that's just the set of positions -- so that's just on two

12   sheets.  On the response to sheet, if you look at -- if you go

13   to column S you'll see that entire column is redacted.

14       Similarly if you go -- if you look at columns W through

15   AP, those columns have also been redacted.

16   Q    And was that because that -- what was the reason for those

17   redactions?

18   A    Because they were, as I understand it, information

19   provided by Lehman as part of discussions prior to this trial.

20   Q    Okay.

21           THE COURT:  Hold on a second, Mr. Tracey.  Yes?

22           MR. ANDREOLI:  I just wanted to interpose an

23   objection, Your Honor.  I think right now we're talking about

24   information that was provided by Lehman in connection with

25   settlement negotiations.  We also heard in one of the couple of

Page 25

1    prior answers about information that I think was removed as a

2    result of privileged communications between QVT and counsel.  I

3    think that's the first time we're hearing about that.  I don't

4    think it's been logged, so we have an objection.

5            THE COURT:  Okay.  Let's take a moment and try to

6    figure this out, okay.

7            MR. TRACEY:  Sure.

8            THE COURT:  Yes.

9            MR. TRACEY:  So as I understand it, there was a date

10   beyond which the privileged log did not extend, so we agreed on

11   a date after which any privileged information that was created

12   or responsive would not be logged.  And I think that -- I don't

13   remember -- do you remember what date it was?

14           THE COURT:  Let me try to understand it because

15   you're -- so I understand end point or a point in time and

16   beyond that point in time to the extent that they're privileged

17   communications they're clearly -- communications between QVT

18   and counsel, they clearly would be privileged or and/or work

19   product because we're in litigation.

20           But what I thought Mr. Wollman was talking about and

21   maybe this is the confusion was information designated as

22   privileged that was created before that point in time.  So

23   that's what we need to --

24           MR. TRACEY:  We need to figure that out.

25           THE COURT:  -- be clear on.  Yeah.

Page 26

1              MR. TRACEY:  So I should ask the witness when that

2    was created?

3              THE COURT:  So --

4              MR. ANDREOLI:  Yeah.

5              THE COURT:  -- did I describe that right?

6              MR. ANDREOLI:  I think that's right.  We don't know

7    when this privileged information was in the sheet and came out

8    of the sheet.

9              THE COURT:  So we need to know when it was originally

10   in the sheet and when it came out of the sheet and then that

11   will inform whether --

12             MR. TRACEY:  Fine.

13             THE COURT:  -- right it's beyond the scope of the

14   privileged log parameters or not, so.

15             MR. TRACEY:  Yeah.

16             THE WITNESS:  So -- sorry.

17   BY MR. TRACEY:

18   Q   Okay.  You know what the question is.  The question is,

19   when -- with respect to any privileged information that was

20   taken out of the workbook between December 17th, 2014 and May

21   of 2016, do you know when that information was created?

22             THE COURT:  First, was entered into the --

23             MR. TRACEY:  Okay.

24             THE COURT:  Okay?

25             MR. TRACEY:  Sure.

1        THE COURT:  First was entered into the spreadsheet.

2        THE WITNESS:  So I can't say with specificity on any

3   of these particular worksheets, but I can describe them as a

4   set of worksheets that were created for purposes of discussion

5   with Lehman in response -- in various responses and mediation

6   with them.

7        So it's that type of information that I believe is

8   not included.

9        MR. ANDREOLI:  Sorry, I just want to -- I thought we

10  were talking about attorney/client privileged communications

11  not work product, so I'm a little unclear where we're going.

12        THE COURT:  I'm unclear still as well.

13        MR. TRACEY:  Yeah, well, so am I.

14  BY MR. TRACEY:

15  Q    When you said --

16        THE COURT:  There are two big categories, right, big

17  redactions related to Lehman mediation.  But I think everybody

18  thought your first category was something else.

19        THE WITNESS:  Sorry.  So that's where my lack of a

20  legal background probably is confusing.

21        The -- privilege was likely the wrong word.  It was

22  intended to mean the discussions with Lehman and the

23  presentation of information for Lehman.  I didn't actually

24  participate in the removal of those.  I just created -- I sent

25  the spreadsheet as it existed on our system in its entirety.

Page 28

1    And my understanding is that those -- a number of those sheets

2    would've been subsequently removed for that reason.  But I

3    didn't change those or remove the sheets, so I can't speak to

4    exactly what sheets those were.

5              THE COURT:  Can I ask a little different way?

6              MR. TRACEY:  Sure.

7              THE COURT:  Okay.  So to the best of your

8    recollection, are you referring to any material that would

9    simply include discussions among the members, partners, and

10   employees of QVT that relates to or references upcoming

11   discussions with Lehman as opposed to we're about to go to

12   mediation, counsel has directed that we do the following tasks,

13   here's the result of those tasks.

14             So we're trying to isolate simply communications

15   among yourselves, I'll say, without the involvement of counsel,

16   as opposed to everything after that, that may have related to

17   getting ready for mediation with Lehman, mediation with Lehman,

18   or discussions with counsel relating to this litigation.

19             THE WITNESS:  So I think I can sort of answer in a

20   way that sort of -- that addresses those.  Those would have

21   been largely slides that were created to present to Lehman in

22   the course of discussions.  They were as the result of these

23   calculations different ways of visualizing certain things and

24   so that's the nature as I recall of that type of information.

25             So it would have been supporting presentation

Page 29

1    material derived from the calculations in the spreadsheet.

2            MR. TRACEY:  It was mediation materials.

3            THE COURT:  I'm going to leave it there and just

4    leave it to you if --

5            MR. TRACEY:  That's fine.

6            MR. TAMBE:  Can we just confer for a minute --

7            THE COURT:  Yes.

8            MR. TAMBE:  -- because there's still confusion on

9    this point.

10            THE COURT:  Yes.

11        (Pause)

12            MR. ANDREOLI:  Okay.  Your Honor, thank you for that

13    time.

14            THE COURT:  Hold on one second.

15            Okay.

16            MR. ANDREOLI:  So I think we're willing to deal with

17    the privileged and work product issues with counsel, but I

18    think we're still missing certain dates as to when this

19    information was entered into the sheet, because there's still

20    the date cut off issue.  I don't think that's been --

21            MR. TRACEY:  We'll provide that information.

22            THE COURT:  Okay.

23    BY MR. TRACEY:

24    Q    Okay.  I think we were going through the sheet to identify

25    what information was redacted from the spreadsheet that was

Page 30

1    provided to Jones Day, and I think you identified some

2    information in response to.  Was there any other information?

3    A    Yes, there was one other sheet, the trade detail sheet and

4    I believe the redaction starts in column AO and continues

5    through the rest of the sheet, but the end.

6    Q    Okay.  And when were those redactions made?

7    A    I believe that would have been January 31st, 2017.

8    Q    Okay.  And other than those, is there any other

9    information in the spreadsheet that relates to settlement

10   discussions with Jones Day with Lehman or any mediation?

11   A    I don't believe so.

12        MR. TRACEY:  Okay.  That concludes my foundation

13   questions of Mr. Wollman.

14        THE COURT:  All right.  Thank you.

15        (Pause)

16                    CROSS-EXAMINATION

17   BY MR. ANDREOLI:

18   Q    Good morning, Mr. Wollman.

19   A    Morning.

20   Q    So on your direct testimony you talked about a series of

21   changes that have been made to Exhibit 2108 over the last I

22   guess it's eight plus years now.

23        The most recent changes you mentioned were the redaction

24   of certain columns of information in two sheets related to the

25   information provided by Lehman in the context of settlement or

Page 31

1    mediation communications; is that right?

2    A    Yes.

3    Q    Okay.  Did you personally make those redactions?

4    A    I didn't personally redact that, no.

5    Q    Okay.  Do you know who did?

6    A    It would have been somebody at Hogan Lovells.

7    Q    Okay.  And I think you said that the document has now been

8    out of your possession since, correct me if I'm wrong, I think

9    you said the end of 2014; is that right?

10   A    This document, yes.

11   Q    Okay.  And so you haven't made -- you personally have not

12   made any changes to the document since then, right?

13   A    This document, no.

14   Q    Okay.  And QVT submitted its claims to or its calculation

15   statement to Lehman you said on October 15, 2008, right?

16   A    That's my recollection.

17   Q    Okay.  And between that date and December 2014 when you

18   provided the document to counsel, did anyone else make any

19   changes to Exhibit 2108?

20   A    Yes.

21   Q    And who would that have been?

22   A    That -- so sorry, so the date, so the initial date was?

23   Q    October 15th of 2008.

24   A    So since then I believe the only other person who would've

25   made changes would have been Julian Sell (ph).

Page 32

1    Q     And who's Mr. Sell?

2    A     Well, at the time he was QVT's chief financial officer.

3    Q     Can you describe all the changes that Mr. Sell made to

4    Exhibit 2108 between October 15th of 2008 and the date you

5    provided the document to counsel?

6    A     If I can have a spreadsheet I could walk you through it.

7    Q     Okay.

8    A     So he wouldn't have made any changes related to the

9    calculations, so that was entirely me.  However, we're having a

10   little bit of technical difficulty here.

11   Q     Sorry, just so we're clear, who's driving the spreadsheet

12   now?

13   A     Oh, sorry.  Oh, can I drive?

14         Sorry.  I'm a bad driver.

15         MR. ANDREOLI:  Just for expediency, Your Honor.

16         THE WITNESS:  So the -- so I should say this

17   disclaimer tab would've been inserted by somebody that was not

18   me.  Might have been, but I don't think it was me.

19         But the response to tab would have been -- who is the

20   earliest versions of it were created by Julian Sell, although I

21   modified it since he made some changes to it.

22         And then the other areas where he would've been

23   involved were this QVT data sheet, I believe he created,

24   although it doesn't affect the calculations.  And similarly

25   with the trade detail sheet.  And then the original claim and

Page 33

1   adjustment claim sheets, he would have inserted, but again I

2   don't believe it affected any of the calculations.

3   BY MR. ANDREOLI:

4   Q    Okay.  So since you have the mouse so to speak, can you go

5   all the way back to the left if you wouldn't mind?

6   A    Sure.

7   Q    Okay.  So I believe you testified that the response to tab

8   was not created by you; is that right?

9   A    I think the first version of it was not created by me.

10  I've since modified it.

11  Q    Okay.  Do you know when it was created?

12  A    When the response to tab was created?  I think it was

13  introduced the sheet somewhere around the middle of 2013.

14  Q    Okay.

15  A    But my best guess would be June 13th, 2013, but it might

16  have been introduced prior to that.  Or sorry my best guess

17  would be -- it was certainly September 2014 or earlier,

18  somewhere June 13, 2013 and September 2014.

19  Q    Okay.  And if you could scroll to your right, please, on

20  the sheets.

21  A    Yes.

22  Q    You said that Mr. Sell also created the QVT data tab,

23  right?

24  A    I believe so.

25  Q    What do you mean you believe so?  I thought you said it

Page 34

1    was only you and Mr. Sell that --

2    A    I'm just saying whether or not I did it or not, I'm not

3    sure if it was me.  I think it was him, but if it was not him,

4    it was me, but I'm pretty certain that it was him.

5    Q    How could you be sure?  Would there be an e-mail trail or

6    something like that?

7    A    It wouldn't be an e-mail trail.  How could I be sure?  I

8    guess I couldn't say definitively, I could ask Mr. Sell, but

9    short of that.

10   Q    Okay.  So the trade details tab I think you mentioned also

11   was not in the original sheet as it existed in -- October 2008;

12   is that right?

13   A    That's correct.

14   Q    Okay.  When was that sheet created?

15   A    It would have been -- again, it would have been subsequent

16   to -- it would have been some time prior to September 2014, but

17   I'm not sure exactly when.

18   Q    Can you give us a year?

19   A    It would have been within the years leading up to that.

20   Well, in the year and a half, within the year and a quarter

21   from June 2013 to September 2014, that same sort of window.

22   Q    Can you describe what information is contained in the

23   trade details sheet?

24   A    Sure.  Sorry if I can reduce this.  So it's one bars to

25   the -- okay, I'm just operating for now.

Page 35

1      There's Lehman ID number which is in column A, let me just

2  go to the top of this sheet.

3  Q    Mr. Wollman, would you mind decreasing the size?

4  A    Yes, I was just trying to do that, but yeah.  You're

5  right, that works.

6      So the first column is Lehman ID, which is a Lehman ID and

7  numeric ID, the second -- do you want me to just go through all

8  the columns?

9  Q    I was looking for more of a general global description of

10  what --

11  A    Sure, sure, this is description information that relates

12  to the individual claims.  You can see that there's some hard

13  coded information and then there are look-ups to this QVT data

14  sheet.  But again, this is descriptive information that is

15  looking up with this QVT data sheet, but doesn't enter into the

16  calculation itself.

17  Q    So I guess I'm not clear what the purpose of this sheet

18  is.

19  A    Sure.

20  Q    Can you describe why it was created?

21  A    Yes.  So -- and I think it makes sense in the context of

22  the redactions and columns AO through BN.  And so I believe

23  that this was an attempt to create a sheet that could be used

24  for discussions between QVT and Lehman to discuss the set of

25  positions and I guess make sure we were on the same page with

Page 36

1   respect to the positions.

2       And so this was descriptive information that QVT was

3   providing that would've then been the QVT aspect of the

4   descriptions related to Lehman, alongside Lehman information

5   that was provided.

6   Q    Sir, can you scroll back to the left, please?

7   A    Sure.

8   Q    What is the additional detail tab?

9   A    What is the additional detail?

10  Q    I'm sorry, column, not tab, Column E.

11  A    Right.  So it looks like it labels certain -- so it looks

12  like it has certain descriptive information primarily preferred

13  and LBSF combined.

14  Q    Sorry, it's not clear to me who calculated this sheet,

15  right, this is you or Mr. Sell.

16  A    I believe it was Mr. Sell.

17  Q    Okay.  So you mentioned in your last answer that you

18  believe it was Mr. Sell again.  You don't know for certain.

19  A    Well, I don't recall producing this sheet myself and given

20  the other information I described before, it's consistent with

21  the description I provided before, but I can't say for certain,

22  but I have no recollection.

23  Q    Okay.  QVT data tab, I don't think we've -- did we do that

24  yet?  We jumped from -- okay, so QVT data tab.

25  A    Yes.

Page 37

1   Q    You said this is also a sheet that was created by Mr.

2   Sell; is that right?

3   A    I believe so, yes.

4   Q    And when was this sheet created?

5   A    I think it was in that same sort of timeframe that we

6   talked about, the June 2013 through --

7   Q    And what was the purpose of this sheet?

8   A    I think it was related to the trade details sheet as the

9   trade detail sheet looks into the QVT data sheet, so I think it

10  was the source of some of this descriptive information.  So,

11  for example, if you go back to the trade details tab, you can

12  see something like QVT source references, if you look into the

13  QVT data sheet, and I believe there are some other columns that

14  are referenced as well.

15  Q    Okay.  So you said again that you think it was related to,

16  you don't know for sure?

17  A    Yeah, I can't be sure, absent my recollection of having

18  created these sheets.

19  Q    Okay.  There's another tab you mentioned.  Can you scroll

20  to the right, please?

21  A    Sure.  I'm sorry --

22  Q    That's fine, I can see a couple more now.  Origin claim,

23  is that a new sheet or sorry, that is a new sheet post October

24  of '08, right?

25  A    Yes.

Page 38

1   Q    And adjusted claim is a new sheet after October of 2008,

2   right?

3   A    Yes.

4   Q    So I think we've talked about what is it five or six

5   columns or I'm sorry tabs that were created after the

6   calculation statement was submitted to Lehman; is that right?

7   A    Yes.

8   Q    Okay.

9   A    I can count exactly, I sort of -- that's certainly in the

10  ballpark.

11  Q    Okay.

12  A    So do you want me to tell you?

13  Q    Sure.

14  A    Okay.  How many --

15  Q    While I'm collecting my thoughts, go ahead.

16  A    Sure, how many just to be clear.

17  Q    How many sheets in Exhibit 2108 were created after QVT

18  submitted its calculation statement to Lehman on October 15th,

19  2008?

20  A    All right.  So the disclaimer -- is it okay if I iterate

21  them --

22  Q    Sure.

23  A    -- iterate them and then count as I do that?

24       The disclaimer tab is one, response to is the second.  The

25  QVT data is the third, trade details is the fourth.  Placement

Page 39

1   detail is a fifth.  Origin claim is the sixth.  Adjusted claim

2   is the seventh.  So would be seven.

3   Q    Sorry, so replacement details was also on a sheet that did

4   not exist as of October 15th of 2008?

5   A    That is correct.

6   Q    And who created that sheet?

7   A    I did.

8   Q    What was the purpose of the creation of that sheet?

9   A    So it's related to some of the adjustments, calculation

10  adjustments, some error corrections that I had mentioned

11  before.

12  Q    Okay.  So we've now identified seven tabs that did not

13  exist as of October 15th of 2008.  So is there a version of

14  this spreadsheet that accurately reflects only the information

15  that QVT used to prepare its calculation statement?

16  A    On QVT's file system?

17  Q    Anywhere.

18  A    There should be, yes.

19       MR. ANDREOLI:  Sorry, Your Honor.  I thought -- I'm

20  confused, I thought there was a representation that that did

21  not exist?

22       THE COURT:  I'm sorry, I can't hear what you just

23  said.

24       MR. ANDREOLI:  Sorry, I was speaking to Dennis.  My

25  understanding based on what Mr. Tracey said on Tuesday was that

Page 40

1    there was no version of this spreadsheet that was a snapshot as

2    of the date it existed on October 15th of 2008.  I think that

3    Mr. --

4              THE COURT:  Yes, that's what --

5              MR. ANDREOLI:  -- Wollman testified that that did

6    exist.

7              MR. TRACEY:  I wasn't aware of it, Your Honor.

8              MR. ANDREOLI:  I think we have a problem.

9              THE COURT:  Okay.  So I think this would be a good

10   time for a short break.  All right.  Why don't you step down.

11             THE WITNESS:  Sure.

12             THE COURT:  Okay.  So --

13             MR. TRACEY:  We can discuss it.

14             THE COURT:  Do you want to talk?

15             MR. TRACEY:  Sure.

16             THE COURT:  So let's take a ten minute break and

17   counsel can talk to each other and we'll see what happens then,

18   all right?

19             Just to be clear, it seems as if Mr. Tracey is going

20   to need to speak to the QVT folks, right?

21             MR. TAMBE:  Understood.

22             THE COURT:  Okay.

23        (Recessed at 10:58 a.m.; reconvened at 11:13 a.m.)

24             THE COURT:  Please have a seat.

25             MR. TRACEY:  Okay.  I can try to clarify.

Page 41

1            THE COURT:  Sure.

2            MR. TRACEY:  And we've had some discussions about

3    this.

4            THE COURT:  Okay.

5            MR. TRACEY:  The calculation statement that was

6    submitted on October 15th is an electronic document on a drive

7    of QVT.  And that's, of course, been produced.

8            That document in electronic form doesn't have the

9    calculations.  It has look-ups to other documents within the --

10   what they call the J Drive that Mr. Wollman described.

11           THE COURT:  Okay.

12           MR. TRACEY:  Those look-ups don't work and they don't

13   work -- I'm sorry.  They don't work because whatever documents

14   they were pointing to, either are renamed or different or

15   evolved.

16           So there is no document that is a snapshot as of

17   October 15th.  The reason that we are suggesting, and there are

18   lots of iterations of this, though, many, many iterations of

19   this document over time, including --

20           THE COURT:  This document being the spreadsheet or

21   the --

22           MR. TRACEY:  The spreadsheet.

23           THE COURT:  -- calculations to the spreadsheet?

24           MR. TRACEY:  No, the spreadsheet, sorry.

25           So there are iterations from October 13th, for

1   example, on the file server.  There are many iterations later.

2   All of those have been produced to Jones Day.  The only

3   question is which one to use.

4            THE COURT:  Right.  So isn't the question basically

5   how to functionally recreate the --

6            MR. TRACEY:  Right.

7            THE COURT:  -- the version that would have exited on

8   the date of the calculation statement.

9            MR. TRACEY:  Right.  And our approach to this was --

10  would have been to use the current one, which has been revised

11  to reflect the revised claim so it ties to what we're actually

12  claiming in the case.

13           THE COURT:  Right, and back out the changes.

14           MR. TRACEY:  Yeah, and have the witnesses talk about

15  what the changes are and they can do that.

16           THE COURT:  Okay.  I think we were going along that

17  path until the statement --

18           MR. TRACEY:  Right.

19           THE COURT:  -- that there was a snapshot.

20           MR. TRACEY:  Right.  And there really isn't a

21  snapshot.  I mean, I think Mr. Andreoli can -- I mean, he can

22  ask the witness to clarify but I do not believe there is a

23  snapshot based on my discussions.

24           THE COURT:  Okay.  So, Mr. Tambe, you or Mr.

25  Andreoli?

Page 43

1                    MR. TAMBE:  If you don't mind, Your Honor, if I can -

2       -

3                    THE COURT:  It's okay.

4                    MR. TAMBE:  So on the backing out the changes what we

5       heard, and I think at least some of us, if not all of us, are

6       the new tabs that are in this document.  Right, the --

7                    THE COURT:  Meaning post-calculation statement?

8                    MR. TAMBE:  Post-calculation statement tabs, right.

9       And those contained not just data, there's descriptions in

10      there.  Those should be backed out too because that's all post

11      calculation --

12                   THE COURT:  I don't think Mr. Tracey would disagree.

13                   MR. TRACEY:  I don't disagree with that.  I mean,

14      they're there, we're not going to --

15                   MR. TAMBE:  I don't know if the sheet functions with

16      those seven tabs out, I just don't know the answer to that.

17                   THE COURT:  But I guess I'll say what difference does

18      it make.  As long as we know what they are and as long as the

19      go forward testimony, so to speak, is not going to draw on

20      those tabs nor are those tabs, I don't know exactly how you do

21      this, I don't know how you enter a -- this spreadsheet into

22      evidence and you just have to describe the parties that are

23      actually in evidence and the parts that are not, right?

24                   MR. TRACEY:  Well, to me, this is like a document

25      that where you add additional pages over time, and the document

Page 44

1   is then bound and put into evidence, and a witness testifies as

2   to what was put in the book at each day.

3           THE COURT:  Right, it just happens to be a

4   spreadsheet instead --

5           MR. TRACEY:  Yeah, it's the same thing.

6           THE COURT:  -- of a hard copy.

7           MR. TRACEY:  So that's why we're using this one, and

8   you can trace it through all the iterations and we provided all

9   the back -- all the documents that were created back in the

10  day.  So if they want to test any of that, of course, they can.

11          THE COURT:  Okay.

12          MR. TAMBE:  Two problems with that, right.  There's a

13  linearity suggested in Mr. Tracey's description.  We view the

14  slightly different example, right, you've got a journal that

15  lots of people wrote in --

16          THE COURT:  Uh-huh.

17          MR. TAMBE:  -- but once they wrote in the journal it

18  wasn't a permanent thing.  The journal was revised.  So the

19  journal you see today has input from a whole bunch of different

20  people made at different times.

21          What we've suggested is that there is a way to go

22  back to the unaltered journal that existed at 10/15/08, I don't

23  think -- I don't know if that's possible, and I think it's

24  going to be very unwieldy working with this document as you --

25  you have to navigate --

1               THE COURT:  Let me stop you there because I'm -- then

2     I'm misunderstanding.  I thought there was a way by backing out

3     the entries that were made by whomever post-calculation

4     statement day that would get us back to what the document

5     looked like as of the date of the calculation statement.

6               MR. TAMBE:  I don't know whether that's possible.  I

7     don't know one way or the other because there's so much cross-

8     referencing, if you remove seven tabs I don't know what happens

9     to the spreadsheet.

10              THE COURT:  Okay.

11              MR. TAMBE:  I just don't.  Look, I know there are

12    lines when you go to three different tabs to pick up data, a

13    formula, select X versus Y and then you come up with a number.

14    If you remove seven, I don't know what happens.

15              THE COURT:  I understand what you're saying.

16              MR. TRACEY:  And then we can ask the witness that, I

17    don't think any of those affect the compilation.

18              THE COURT:  See, that's what I was trying to ask

19    about the look-ups, it's not so much in the look-ups as the

20    other, because the look-ups it would strike me based on the

21    testimony would accurately reflect what the look-ups would have

22    been on the date of the calculation statement.

23              But if there's other stuff, right --

24              MR. TRACEY:  Right.

25              THE COURT:  -- you agree with me about the look-ups?

Page 46

1          MR. TAMBE:  Again, here's why I agree with you on the

2    look-ups.  I believe that the witness saying, when we ran the

3    look-up function on the day we ran it, say December 2014 it

4    produced one, two, three, four, five, we wrote one, two, three,

5    four, five.  Okay.  You have --

6          THE COURT:  The look-up that would've been the same

7    as if we had asked for the look-up on the date of the

8    calculation statement.

9          MR. TAMBE:  I follow that concept.

10         THE COURT:  Okay.

11         MR. TAMBE:  I'm still missing something with that

12   description.  Because if I see the look-up it tells me not only

13   that you went to Bloomberg, you start with BBG, it tells me

14   what parameters you gave BBG to come up with your number.

15         THE COURT:  Sure.

16         MR. TAMBE:  That information is not available.  It

17   can make a difference because --

18         THE COURT:  Okay.  So now we're -- so the question

19   is, if that the pat parameters -- if the question asked was the

20   same question in terms of the parameters that would have been

21   asked on the date of the calculations.

22         MR. TAMBE:  Correct.

23         MR. TRACEY:  Your Honor, we also produced a non-coded

24   version, so every look-up is in this register, originally as it

25   existed at the time.  So they can see --

Page 47

1                THE COURT:  Including the parameters?

2                MR. TRACEY:  Yeah.

3                UNIDENTIFIED:  Please, sorry, I don't understand

4      that.

5                MR. TRACEY:  In other words --

6                THE COURT:  Okay.  You know what, let's do this.

7      Let's stop the recording and let's have this conversation.

8                MR. TRACEY:  Sure.

9                THE COURT:  Okay.  So.

10          (Recessed at 11:31 a.m.; reconvened at 11:35 a.m.)

11               THE COURT:  No, you don't need to reswear him,

12     reaffirm.

13               MR. ANDREOLI:  Are we back on?

14               THE COURT:  Yes.

15               MR. ANDREOLI:  Could we bring that up, Exhibit 2108

16     please?

17     BY MR. ANDREOLI:

18     Q    Okay.  Mr. Wollman, before the break we were discussing

19     Exhibit 2108 and you had mentioned that there were now seven

20     tabs that were created after October 15th of 2008.  We

21     identified them.  Now, do any of those tabs contain information

22     that feeds into or otherwise populates the trader tabs?

23     A    Nothing, I believe, that influences any of the trader

24     tabs.  The master tab is influenced by one of these sheets.

25     Q    Okay.  So again you said believed.  Do you know or?

Page 48

1    A    Yes, sorry.

2    Q    Okay.  So --

3    A    I guess I should say I know for a fact that one of these

4    sheets, this replacement detailed sheets is used in the

5    replacement master -- replacement master sheet.  And it's my

6    understanding that none of the other trader sheets rely on any

7    of the other sheets.

8    Q    Okay.  So let me make sure I understand that.  Can we go

9    to the Lehman position's master sheet?

10   A    Sure.

11   Q    And if I understood your testimony you were saying that

12   the Lehman position's master sheet, there's something in here

13   in this sheet that is influenced by the replacement detail

14   sheet; is that right?

15   A    That is correct.

16   Q    Can you show that to us please?

17   A    Sure.  That would be column BJ.

18   Q    Okay.  And --

19   A    Sorry, column BJ.

20   Q    Can you just describe what column BJ is for the record?

21   A    Sure.  So it probably helps by looking at column AO first,

22   which is the current -- the column that's labeled market value

23   but it's the valuation of the corresponding position, the ti-fi

24   that it relates to and you can see if you look at the formula

25   for this sheet that this is essentially doing a look-up into

Page 49

1    one of the underlying trader sheets based upon the relevant

2    trader for that position.

3         However, there is in column BJ, you can see that the

4    formula largely falls back to -- it may be hard to see because

5    you don't see the bottom of this formula, that the

6    -- this value of this formula falls back to AO4 which was that

7    column AO we just talked about, except in instances where the

8    position is labeled the type replacement and the

9    -- was a replacement adjustment as needed in the replacement

10   details tab.

11        So as I talked about some of the adjustments that were

12   created that were made mathematical adjustments over the course

13   of time, this would capture a subset of those.

14   Q    Okay.  So column BJ then did not exist in a version of

15   this spreadsheet that QVT used to calculate its -- sorry, used

16   to calculate the calculation statement.

17   A    That's correct.

18   Q    I see that some of these columns and can you move over

19   about two columns to the left, please?

20   A    Yes.

21   Q    If you want.  Okay.  So starting in column BJ, the

22   highlighting changes in row 3 from green to blue.

23   A    Yes.

24   Q    What does the change in highlighting signify?

25   A    From green to blue.  I believe that this was done to show

Page 50

1    -- this is to show the changes -- this set of information from

2    BF through the end of BQ, was information that largely related

3    to the adjustments.  There are two sets of adjustments that I

4    described after that initial adjustment that happened in

5    September 2009 related to the exchange rate on some of these

6    unsettled trades, there were two sets of adjustments.  And

7    those sets of adjustments are referenced in columns BI, the

8    description for them are referenced in columns BI and columns

9    BN.  Sorry, yeah, columns -- yeah, BI and BL rather.

10   Q    Okay.  So just to be clear, if we can go over a couple of

11   more columns --

12   A    Sure.

13   Q    -- to the left I'm sorry.  So columns BF through anything

14   to the right, those columns were all populated after October

15   15th, 2008.

16   A    That's correct.

17           MR. ANDREOLI:  Sorry, Your Honor.

18           THE COURT:  That's okay.

19   Q    Going back to the privileged issue.  So you mentioned, I

20   believe, that there were sheets removed.  Were there also

21   columns removed from any of the existing sheets or was it just

22   new sheets that were removed for privilege issues?

23   A    I believe that it was just sheets, but I'm not certain.

24       (Pause)

25           MR. ANDREOLI:  Thank you, Your Honor.

Page 51

1           THE COURT:  Anything more?

2           MR. TRACEY:  Just a couple of questions.

3           THE COURT:  Okay.

4                       REDIRECT EXAMINATION

5    BY MR. TRACEY:

6    Q    So, Mr. Wollman, if you could go back to the column in

7    this master sheet that reflects the final claim numbers.

8    A    Sure.  In the master sheet or in the response to sheet?

9    Q    In the -- okay, the response to.

10   A    Yes.

11   Q    Would you show where the current claim amount is?

12   A    Sure.  It's column T details it for the individual

13   positions and you can see that that sums to the value in cell

14   T840 which is the aggregate claim and then below it shows the

15   application of collateral held to arrive at a final claim of

16   $264,998,675.11, which is in cell T874.

17   Q    Great.  And the changes from the original calculation

18   statement to that claim, did any of those involve changes to

19   the methodology that was applied to result in the claim?

20   A    No.

21           MR. TRACEY:  I have nothing further.

22           THE COURT:  Can I ask a question?

23           THE WITNESS:  Sure.

24           THE COURT:  This is for my purposes only.

25           So is it possible, I'm going to show how non-tech

Page 52

1    savvy I am, to do something like take a screenshot of this the

2    way you would on your phone so that I -- because from time to

3    time you focus in on something that someone's making a larger

4    point about or time to time that has summary depiction of

5    something that's frankly very useful to me in remembering all

6    of this.  So is that technologically a thing that can be done?

7              THE WITNESS:  Certainly, yeah, absolutely.  We can

8    print it out, it'll be very wide and sometimes very small.

9              THE COURT:  Right, so that's the thing.

10             THE WITNESS:  Sure, we can do that.

11             THE COURT:  I mean obviously you can't print out

12   -- but like this screenshot, would you -- yes.

13             THE WITNESS:  Yeah, we can do that.

14             MR. TAMBE:  We can even have a printer in the room,

15   in the courtroom and just if you see a sheet --

16             THE COURT:  Well, it would just --

17             MR. TAMBE:  -- you'd like, we can print it.

18             THE COURT:  -- be helpful if there's a lot of

19   testimony about a particular, what I'm calling a screenshot to

20   take that out and mark it, we just make a record.  I mean, I'm

21   trying to think about how this record would even work on --

22             MR. TRACEY:  A demonstrative, a blow-up.

23             THE COURT:  Yeah, something like that.

24             MR. TRACEY:  Yeah, we can do that.

25             THE COURT:  So maybe at the break today, I don't

Page 53

1    know, do you have printers in your room?

2            MR. TRACEY:  We do.  I don't think they're going to

3    be strong enough to do this job, but we'll get it done.

4            THE COURT:  We'll get someone working on it and see

5    what we can do to -- yeah, because I have a printer back in

6    there that I don't know it's for the Government, so we'll find

7    out and then maybe we can do it.  Okay.

8            Mr. Wollman, thank you very much, you can step down.

9            THE WITNESS:  Thank you.

10        (Pause)

11            MR. TRACEY:  Are we ready for the next witness, Your

12    Honor?

13            THE COURT:  Yes, yes.

14            MR. TRACEY:  We call Arthur Chu.

15            MR. TAMBE:  And I just told Mr. Tracey that we

16    reserve the right to recall him on our case in chief, but I

17    suspect he'll be fairly thorough in his direct examination.

18            THE COURT:  Are you talking about Mr. Wollman or Mr.

19    Chu?

20            MR. TAMBE:  No, Mr. Chu.

21            THE COURT:  Okay.  So what -- so with respect to the

22    scope, you're still going to call him but what's the scope of

23    your cross going to be?  Limited to the scope of --

24            MR. TAMBE:  It'll be limited to the scope of direct.

25            THE COURT:  Direct, okay.  Do we have a binder for

Page 54

1    him?

2                MR. TRACEY:  Yes, we do.

3                THE COURT:  We can do that while we're waiting.

4         (Pause)

5                THE COURT:  We can give you back two, we only need

6    two.

7                MR. TAMBE:  Thanks.

8                MR. TRACEY:  He'll be right here.

9                THE COURT:  Okay.

10        (Pause)

11               THE COURT:  It's Ground Hog's Day.  Please come up,

12   Mr. Chu.

13               MR. TRACEY:  May I, Your Honor?  Oh.  Sorry.

14               THE COURT:  See, you're hired a full service law

15   firm.

16               Would you please stand, Mr. Chu, and raise your right

17   hand?

18                    ARTHUR CHU, WITNESS, SWORN

19               THE COURT:  All right.  Please have a seat, make

20   yourself comfortable, let us know if at any time you would like

21   to take a break.

22               THE WITNESS:  Thank you.

23               THE COURT:  And that means even if the lawyers don't

24   ask for one, okay?

25               THE WITNESS:  Thank you, Your Honor.

1              THE COURT:  All right.  Go ahead, Mr. Tracey.

2              MR. TRACEY:  Thank you, Your Honor.

3                        DIRECT EXAMINATION

4      BY MR. TRACEY:

5      Q    Mr. Chu, would you please state your name for the record?

6      A    Arthur Chu.

7      Q    And would you describe your education for me, please?

8      A    I have a bachelor's and a master's degree in physics from

9      Harvard.

10     Q    And when did you get your bachelor's degree?

11     A    I received my bachelor's degree in 1994 and I received my

12     master's degree in 1996.

13     Q    And what did you study in those, when you got those

14     degrees?

15     A    I studied physics.

16     Q    Do you have any other graduate or advanced degrees?

17     A    No.

18     Q    Do you have -- have you ever had any professional

19     licenses?

20     A    A long time ago I think I was Series 7 registered but that

21     was some quite number of years ago.

22     Q    And you have no professional licenses today?

23     A    No.

24     Q    Would you describe what your first job was after you got

25     out of college?

Page 56

1    A    Well, after I got out of college I was in graduate school

2    for two years, and then after that in 1996, I went to work for

3    Lehman Brothers.

4    Q    And what was your position at Lehman Brothers when you

5    joined?

6    A    I was a research analyst in the mortgaged back securities

7    department.  Specifically I was part of a group called the

8    modeling group at that time.

9    Q    And did you focus on any particular types of securities

10   while you were there in that role?

11   A    Yeah.  When I was in the modeling group I focused on

12   building econometric models for the way borrowers would behave

13   with respect to their mortgage obligations, whether they're

14   prepaying them or defaulting on them and particularly for non-

15   prime mortgages now called subprime mortgages.

16   Q    And did there come a time when you were at Lehman Brothers

17   that your responsibilities changed?

18   A    Yes, after approximately one year I moved to a sister

19   group of the modeling group, so I continued to be a research

20   analyst, but I was no longer in the modeling group.  I moved to

21   a group called product management or strategy group.

22   Q    And what were your responsibilities there?

23   A    Right.  So the strategy group, as I said, was a research

24   group as well, but the modeling group kind of sat off the

25   trading floor and the strategy group actually sat on the

Page 57

1    trading floor.

2         And the purpose of the strategy group was to make

3    investment recommendations to our clients at Lehman, and we

4    actually focused on the actual securities themselves, as

5    opposed to building the models that would be used to value

6    those securities.

7    Q    And during the time you were with that group did you focus

8    on particular types of securities?

9    A    Yes.  I continued to focus principally on so-called

10   mortgage related asset backed securities.  So things like non-

11   prime mortgages for instance.

12   Q    And how long did you work at Lehman Brothers?

13   A    I worked there until 2003.

14   Q    And after you left Lehman Brothers, what did you do for

15   work?

16   A    I left Lehman Brothers in 2003 and I went to go work at

17   Deutsche Bank in the QVT group.

18   Q    And what was the QVT group in 2003?

19   A    The QVT group was a proprietary trading group at Deutsche

20   Bank.  We invested the bank's capital as well as outside

21   capital and I reported to Dan Gold at that time.

22   Q    And were there other individuals who are currently at QVT

23   who were part of that desk?

24   A    Yes.  So Tracy Foo (ph) who's presently a managing member

25   of QVT was part of that group.  Nick Brum (ph) who talked

Page 58

1    yesterday was also part of that group, and of course, Dan was

2    part of that group.

3    Q    And what were your responsibilities with the QVT group at

4    Deutsche Bank?

5    A    I was hired to start an effort in investing in asset

6    backed securities, and I think my title in the bank was

7    director and I think my functional title was trader/analyst.

8    Q    And to this point in your career I didn't hear you talking

9    about trading.  Had you traded before you got to QVT group?

10   A    No, that was the first time I traded.

11   Q    Okay.  And what -- would you describe your role as a

12   trader at the QVT group in Deutsche Bank?

13   A    Sure.  So as I said, I was hired to focus on asset backed

14   securities, but the mandate of the group was very broad.  We

15   could invest really in all sorts of things around the world.

16   And I was also focused at that time on kind of opportunities in

17   the equity market and the stock market that we felt could be

18   understood by using information in asset backed securities.

19   And I also invested in certain types of corporate debt that had

20   certain overlap with asset backed securities financial

21   engineering if you like.

22   Q    And how long did you work at Deutsche Bank?

23   A    I worked at Deutsche Bank until basically the beginning of

24   2004 which is when the QVT group sort of formally separated

25   from Deutsche Bank.

Page 59

1    Q      And did you join the separated group?

2    A      Yes.

3    Q      And what position did you have after QVT separated from

4    Deutsche Bank?

5    A      I was a part of QVT Financial when we split up.

6    Q      And what were your responsibilities as a partner at the

7    time that you started QVT?

8    A      I mean, functionally they were the same.  I was a trader,

9    portfolio manager, I was continuing to trade and invest in the

10   same positions.

11   Q      And did your responsibilities change at all between 2004

12   when you started with QVT independently and 2008?

13   A      Yes, they did.

14   Q      In what way?

15   A      In terms of title, in early 2008 I became a managing

16   member of QVT, and in terms of the products I traded I

17   continued to invest in the asset backed securities market, but

18   I also traded quite a lot of credit derivatives and credit

19   generally during that time.

20   Q      And who were the other managing members in 2008?

21   A      They were the same as they are presently except there was

22   one additional managing member, Lauris Bader (ph).  So Dan

23   Gold, Arthur Chu, Tracy Foo, Nick Brum and Lauris Bader.

24   Q      And would you describe for the Court what changes, if any,

25   occurred in the business of QVT between 2004 and 2008?

Page 60

1    A     Yes.  So -- it was a time of quite significant growth in

2    our business.  Our assets under management I think were around

3    4 billion at the end of 2005 and they'd grown to around 6

4    billion at the end of '06, and around 12 billion at the end of

5    2007.  And I think peaking in the $13 billion range in early

6    2008.

7         We had quite -- we had more people than we had before when

8    we spun out the number of people is around 20 maybe.  And we

9    had more likely 110 people approximately at around the time

10   that Lehman filed in 2008.  So it was generally a time of

11   expansion in our business and growth.

12   Q   I'd like to focus on the trading function at QVT if I can.

13   How many -- and let's focus on the 2008 period.  How many

14   actual traders were in there at QVT at that time?

15   A     Right.  So there were approximately what I call 12 traders

16   or portfolio managers that actually made investment decisions.

17   There were a handful, say five or less of what I would call

18   more junior execution traders where they wouldn't really make

19   the decisions as to, for instance, what stocks to buy and sell,

20   but when buying and selling needed to get done, you would ask

21   them to do it for you.

22   Q   And was QVT at that time organized around trading desks or

23   separate groups with traders?

24   A     So there was no -- it definitely was not like trading

25   desks in the sense you would see at, for instance, an

Page 61

1    investment bank where you would have very large numbers of

2    trading desks spread across different floors with a high degree

3    of specialization across products.  You'd have, you know, a

4    German financial equities trader, you'd have a Benelux, you

5    know, financial's trader, someone would do debt, someone would

6    do equity, someone would do senior, someone would do

7    subordinate, so there was kind of that very narrow siloing that

8    existed at investment banks, that's not at all what we were

9    like.

10        While we did have areas of specialization, for instance,

11   one of my areas of specialization was asset backed securities.

12   We were very clear that we felt we had a mandate to invest in

13   any part of the capital structure in any part of the world.

14        And physically as we I guess a slide was shown earlier

15   basically we all sat very close to one another.  We had one

16   portfolio manager in London, but basically in New York, we all

17   sat, you know, within a few feet of one another.

18   Q    Okay.  And was there a head of trading in 2008 at QVT?

19   A    I guess -- we don't use the term head of trading but Dan

20   Gold was and has always been the chief investment officer at

21   QVT.

22   Q    Okay.  And did you report to Dan Gold?

23   A    Yes.

24   Q    So again, focusing on the 2008 period, did QVT have a

25   strategy for it that guided its trading, an overall strategy

Page 62

1   for its portfolio?

2   A    Well, we -- at QVT, our investment philosophy is not that

3   of what you'd call like a micro fund.  We don't, for instance,

4   generally take facts like, we generally think stocks will go

5   up, we generally think stocks will go down, or we think

6   interest rates will rise, or interest rates will fall.

7        Our investments tend to be quite particular in nature.

8   You might have heard the phrase bottoms-up investing, that's

9   more our style of investing.  That being said, I think that in

10  2008 in particular, we were kind of concerned with certain, you

11  know, macro themes that would cut across our entire portfolio,

12  including stress in the financial system.

13       At the same time, we had a fair amount of illiquid assets

14  and so this posed kind of a challenging portfolio management

15  problem, where illiquid assets by definition you can't just

16  sell them whenever you feel like it, it takes time to get rid

17  of them.

18       And so we had a variety of positions on many of which I

19  was responsible for managing that were intended to hedge the

20  overall risk of the fund.  So in contrast to, for instance, a

21  convertible bond which is hedged directly by the equity of that

22  company where the hedge and the security kind of live together

23  in a tightly linked way, we had these quite large macro hedges,

24  in fact, macro hedge was the name of the account that I was

25  responsible for, that were intended to sort of protect the fund

Page 63

1    particularly because we were both concerned about stress in the

2    financial system and in addition to that, we had these sort of

3    illiquid positions that we were slowly trying to work down.

4    Q    Is a macro hedge the same as a portfolio hedge?

5    A    Yes.  So when we called them macro hedges, we called them

6    portfolio level hedges.  The two terms in our mind were the

7    same.

8    Q    Okay.  I'd like to talk a little bit about the trading

9    process.  As a portfolio manager at QVT, what was the process

10   for getting authorization to enter into a trade?

11   A    Sure.  By the way, is the position at the microphone okay

12   for everybody?

13            THE COURT:  Yes.

14            THE WITNESS:  I can't tell.  So the question is

15   what's the process for authorization of a trade?

16   BY MR. TRACEY:

17   Q    Yeah.

18   A    So there's no formal authorization process at the time.

19   There was I think an expectation that portfolio managers would

20   communicate with each other when we started new strategy, when

21   we took a significant new position, when we were taking down a

22   position a lot, basically when we felt that there was a

23   significant change in our own positions we would talk to each

24   other.

25   Q    And could you describe the process, maybe take us from the

Page 64

1    beginning of an idea for a trading approach or a trading

2    strategy, how you implemented that in 2008?

3    A    Okay.  So the way we think of trades in our accounting

4    system is whenever we have an idea, we create something called

5    an account.  So, for instance, in the spreadsheet that Joel had

6    up earlier, there was an account called MI.  MI is an account I

7    managed, it stood for mortgage insurers.  I was short a lot of

8    credit of mortgage insurers, which are companies that insure

9    high loan to value mortgages in the United States.

10        So we'd sort of start off with this idea that we wanted to

11   be short mortgage insurers and we would kind of step one of us

12   to create this account called MI in that case.  And following

13   that, you would just begin executing on the strategy, which in

14   this particular case would have involved buying credit default

15   swaps on mortgage insurers, and you would build up a position

16   and manage it from there.

17   Q    And would the -- would all the trades that attached or

18   were the result of that strategy be included in that same

19   account?

20   A    Yes, they -- yes.  There could be kind of child accounts,

21   they are sub-ideas, but yes, that's right.

22   Q    What -- did QVT fund in 2008 trade with dealers in the

23   market?

24   A    Yes.

25   Q    And who were the dealers that you primarily traded with?

1    A    I think we traded with most of the major investment banks

2    that were there, Lehman, Goldman, Deutsche Bank, Barclays and

3    so on.

4    Q    If you would, I'd like you to describe QVT's relationship,

5    trading relationship with Lehman in the 2005 to 2008 period.

6    A    Yeah.  So our -- because just the way investment banks are

7    divided up, you may have had several different points of

8    contact at Lehman corresponding to the types of products that

9    the different people covered.  And our point of contact would

10   typically be the so-called sales people there, although we

11   often had direct relationships with the traders as well.

12        So, for example, we had a convertible bond salesperson, we

13   had an equity salesperson.  But for me, my primary point of

14   contact was through Michael Newman, who was a credit sales

15   person.

16   Q    And when did you first come into contact with Michael

17   Newman?

18   A    I first met him when I joined QVT in 2003.  Well, I guess

19   technically I was joining the QVT group at Deutsche Bank, but

20   Michael Newman also was our salesperson at the QVT group at

21   Deutsche Bank.

22   Q    Okay.  And was he your primary salesperson through

23   September of 2008?

24   A    Yes.

25   Q    And does that go across all products, or is that focused

Page 66

1    on a particular product line?

2    A    So he was a credit salesperson, but for much of the time

3    that he worked at Lehman, and I think really almost right until

4    the filing, up until a few months before the filing, he also

5    was our salesperson for asset backed securities and securitized

6    products.

7    Q    And could you just describe in general what your working

8    relationship was with Mr. Newman over the course of those

9    years?

10   A    Sure.  So I talked to Mr. Newman quite frequently.  He was

11   a big counterparty for QVT.  I probably talked to him almost

12   every day and sometimes multiple times a day.  And we would do

13   all kinds of different transactions, we would share ideas in

14   the market, we would give opinions to each other about various

15   types of trades and so on.

16   Q    And who would, in general, maybe there's no good answer to

17   this, who would bring the idea to the other person for a

18   particular trade?  Is that you asking Mr. Newman that you'd

19   like to trade in something or Mr. Newman going to you?

20   A    It's really both.  Sometimes there would just be a trade

21   that I wanted to do, and I would just say to him, and you know,

22   possibly another dealer at the same time, but say it was just

23   to him, I want to buy 100 million of CDXIG protection or

24   something, he would just give me a price and I would do it or I

25   wouldn't.

Page 67

1      Other times he would have some idea that he would bring to

2   me, like oh, if you're looking at this credit, these mortgage

3   insurer credits, well you should also look at this other -- you

4   know, this other company that also has mortgage insurance

5   exposure that maybe not everybody knows about or something like

6   that.

7   Q    Let me show you a document.

8        MR. TRACEY:  Could you bring up Claimant's Exhibit

9   1161?

10  Q    Do you have a book in front of you, Mr. Chu?

11  A    It doesn't look like it.

12  Q    Okay.  So that's a book of the exhibits that we'll use

13  today and if you want to look at the hard copy for hard copy

14  documents it's in there and the claimant's exhibits are in the

15  front of the book.

16  A    All right.

17  Q    So could you look at 1161?

18  A    Sure.

19  Q    And would you -- can you identify that document?

20  A    Yes.

21  Q    What is it?

22  A    It's a Bloomberg message from Michael Newman to me.

23  Q    And would you describe what Mr. Newman is or what you

24  understood Mr. Newman to be communicating in this?

25  A    Yes.  So this is from June 30th, 2008 at 9:42 a.m.  So

Page 68

1    he's basically getting ready to do a trade with me or maybe a

2    slightly better way to say it, is he's gauging my interest on a

3    particular trade which he's sort of describing in this all caps

4    language here.

5    Q    Okay.  And would you describe your understanding of what

6    he's suggesting?

7    A    Okay.  So maybe I'll try to go through it sort of line-by-

8    line and we can decode what he's saying here.  So he knew that

9    I was a buyer of protection in PCDS.  I wanted to buy PCDS and

10   so it sounds like we were having some discussion about it.  And

11   in the second line it says WBPCDS.

12        So what he means here is, this is PCDS, CDS on preferreds

13   of WB, which is Wachovia Bank.  And he says -- what he's saying

14   in the next line is, we have a potential seller of 9/20/11 and

15   12/20/11.  And so what he means by that is we have somebody who

16   might be willing to sell protection maturing in 9/20/11 and

17   12/20/11.

18        So this would be what, three and a half year protection,

19   something like that, it's June 30th, 2008, up to December 20th,

20   2011.  So that's the first bit of what he's saying, is he's

21   saying that we have somebody who might want to be on the other

22   side of the trade from you.

23        And then the next bit he says, 20-40 MM in size, and he's

24   saying the notional of the trade is 20 to 40 million, and then

25   he kind of goes through some various, you know, reasons why he

Page 69

1    thinks the trade might be interesting to us.

2         You can see a few notes in the second line.  He says,

3    "This is junior sub-hold co risk and deferral of PFD."

4    Deferral of the preferred stock dividend "is a trigger,"

5    meaning triggering CDS, "as well as FTP and Bruptcy," what he

6    means by that is failure to pay and bankruptcy, which are

7    standard credit events under really all CDS, not just PCDS, but

8    he's pointing out that a deferral of the preferred is a

9    trigger.

10        And then what he does is he goes on to give some different

11   benchmarks that suggest where it might trade.  So the next bit

12   is 5 year double WB 210/220.  He's saying five year senior CDS

13   in Wachovia Bank is 210 basis points bid 220 basis points

14   offered.

15        So that's saying if you wanted to buy senior CDS, you

16   would pay 220 basis points for five year.  And he's saying in

17   the next line, 5 year WB sub plus 45.  So I think what he means

18   by that if you were to buy subordinated protection or

19   protection referencing subordinated debt at Wachovia Bank, it'd

20   be 45 basis points more expensive.

21        And then he kind of asks the question, well, where should

22   Wachovia junior sub trade for 3 year.  And he's saying he

23   thinks it could be around 325 basis points, think it could come

24   325 (indiscernible).  So he's kind of -- he's kind of sketching

25   out where this thing might trade.

Page 70

1        He's saying I might have a seller, this would be 9/20/11

2    or 12/20/11 maturity and we think it might trade around 325

3    basis points and we think the size is around 20 to $40 million.

4            THE COURT:  Hold on a second.

5            MR. TAMBE:  I have an objection.  I have no problem

6    the witness deciphering what -- how he understood it.

7            THE COURT:  Right.

8            MR. TAMBE:  My objection goes beyond deciphering the

9    words on the page to what else may have been meant behind the

10    words of the page.  It's just -- so it's an objection to lack

11    of foundation and personal knowledge.

12            MR. TRACEY:  I think we're trying to keep this to

13    what the witness understood.

14            THE COURT:  What the witness' understanding was of

15    what Mr. Newman was communicating to him about the potential

16    trade.  Okay.  So all right, so we're at -- we were at 325.

17            THE WITNESS:  Right.  Okay.  Then what he's doing is

18    he's just giving a little -- giving me a little bit more detail

19    about what the trade is.

20            In the next couple of lines he says, "The most liquid

21    deliverable is the 7.98 hybrid," which has this dollar price of

22    89 and 3/4s is a 9 and 5/8s percent yield.  So by the most

23    liquid deliverable, he means if there is a credit event, the

24    buyer of protection which would be me in this case, would have

25    the right to go out in the market and buy the 7.98 hybrid at

Page 71

1    whatever price it was at that point and give it to Lehman

2    Brothers, the seller of protection, and I'll receive a hundred

3    cents on the dollar.  That's how the contract works.

4          He points out that there's something called WB.C,

5    that must be an exchange -- I understand that to be an exchange

6    credit preferred.  And he says it's -- they rarely trade, he's

7    saying the dollar price is around 17 3/4s, I understand that to

8    be versus $25 par, because something .C means it's going to be

9    an exchange traded instrument.

10         So 17 3/4s times four is a price around 70 cents.

11   And then he gives one more kind of thing he thinks might be

12   helpful to me.  He says, "We think PCDS curve should be

13   inverted and that these are cheap options."

14         What I understood that to mean is that he believes

15   that the PCDS spread for a shorter date like a 3 year shorter

16   than the standard 5 year should be higher than the spread of a

17   5 year.  That's what inverted curve means, where short dated

18   spreads are bigger than long dated spreads, and I understand

19   that economically to mean that the risk of a deferral event is

20   sort of, you know, bunched up in the near dates and not in the

21   far future.

22         And then lastly he reminds me, "We don't have

23   anything firm," meaning you can't just say, okay, I want to

24   trade 20 million with you at 325, but he's basically as I said

25   gauging my interest, "if you think you can, we'd like to

Page 72

1    engage."

2    BY MR. TRACEY:

3    Q    Okay.  Let me ask you to take a look at Claimant's Exhibit

4    2089.  Can you identify that document?

5    A    Yes.

6    Q    What is it?

7    A    This is another Bloomberg sent to me by Mike Newman on the

8    same day, Monday, June 30th, 2008.

9    Q    And what did you understand this to be communicating?

10   A    This is basically consummating the trade or the trade

11   proposal that we were just talking about in the other

12   Bloomberg.  You can see the first line says "Arthur done, 30

13   mm, 12/11 at 340 basis points you buy."

14       So what that means is I, well, QVT was buying a notional

15   of $30 million of Wachovia PCDS at 340 basis points and then he

16   says thanks very much, and then there's a little bit of

17   exchange back and forth about deliverability of instruments and

18   so on.

19   Q    And what is -- did you have an understanding of what he

20   meant by the 7.98 are humongous and deliverable?

21   A    Yeah.  So sometimes when you have a CDS that -- this is

22   what I understood that basically he's saying the 7.98 percent

23   was a quite large preferred that Wachovia issued early in 2008,

24   I think it was actually February of 2008.  And he was just

25   saying it's a very big issue, it's maybe, you know, a 2 or $3

Page 73

1    billion issue.  And I understood the significance of that to be

2    sometimes if you have CDS and you have like, you know, a very

3    small amount of bonds to deliver, that can be problematic in

4    trying to find those bonds.  But I think he's just saying

5    there's plenty of these WB 7.98s in case you ever need to

6    deliver them.

7    Q    Okay.  So on the subject of credit default swaps, I'd like

8    to ask you a few questions about how they work.

9    A    Okay.

10   Q    So if you could explain the basic mechanics of a credit

11   default swap whether it's a particular one that you put on with

12   Lehman or just in general, we've got a demonstrative exhibit in

13   Claimant's Exhibit 2099 if that would be helpful, maybe we

14   could bring that up.  If it's not helpful to you, you can just

15   explain.

16        So the first real question is, explain what a credit

17   default swap is and how you put on a trade.

18   A    Okay.  I mean, so a credit default swap is basically a

19   bilateral transaction between two parties.  One party is called

20   the protection buyer and one party is called the protection

21   seller.

22        And in this diagram, the protection buyer is QVT and the

23   production seller is Lehman.  And the idea is basically that

24   there is a particular credit that's referenced, in this case

25   it's IBM.  And there's a particular notional that's traded

Page 74

1    which is $10 million in this case.

2         And so what do the protection buyer and protection seller

3    kind of get out of the transaction.  So the protection buyer as

4    the name implies is kind of buying insurance against what's

5    called a credit event on IBM.

6         So what the protection buyer is doing is they're paying a

7    certain premium in this case, it's assumed to be 400 basis

8    points on the notional of $10 million, so $400,000 per year.

9    And in the event that IBM has what's called a CE credit event,

10   as defined in the document, such as a bankruptcy or a failure

11   to pay, most typically, then the buyer of protection has the

12   right to take any bond which is para passu or actually higher

13   in the capital structure with the particular IBM bond that's

14   referenced and deliver it to the protection seller and get a

15   hundred cents on the dollar back.

16        So it's -- they're not technically insurance, but it's

17   kind of like insurance on your house or something where you pay

18   your homeowner's insurance every year, and to the extent, you

19   know, you have something terrible happens and your house burns

20   down, you get back the insured amount.

21        So in this case, you sort of hand in this defaulted IBM

22   bond in the event of a credit event and you get the full

23   notional of it.

24        And so the protection seller on the other hand is

25   receiving the 400 basis points, they're sort of taking the risk

Page 75

1    that IBM defaults and they're taking the risk that if IBM

2    defaults, they have to pay you $10 million and wind up with a

3    defaulted bond.

4    Q    And does the protection buyer normally also own the bond

5    that it's insuring?

6    A    Now, the protection buyer does not have to own the bond

7    that it's insuring.  I think maybe in the very early days of

8    the CDS market some of the motivations were for insuring bonds

9    that people had, but the protection buyer does not need to own

10   the bond in order to do this transaction.

11   Q    And how does the buying of protection, as you just

12   described it, relate to going short an obligation?

13   A    They're very similar concepts to one another.  If you have

14   say an IBM bond, okay, which is a 5 year instrument, okay, and

15   it's -- say IBM, I don't know, does a leveraged buyout or

16   something like that, and they pile a whole bunch of debt onto

17   their capital structure.

18       And the spread on the bond goes from 400 to 700 basis

19   points.  Then you would expect something similar to happen in

20   the CDS market, you would expect the CDS spread to go from

21   roughly 400 to roughly 700 basis points.

22       So in that sense fluctuations in the prices of CDS kind of

23   mirror fluctuations in prices of bonds to the extent that those

24   fluctuations are due to the credit spread.

25   Q    And why would an investor buy a CDS rather than just

Page 76

1    selling short the underlying obligation?

2    A    Well, there are a couple of reasons.  One is that a CDS is

3    kind of a customizable contract.  So say you're -- you decide

4    that you want -- you think IBM is not a good credit and you

5    want to basically be short -- short it over a period of ten

6    years, okay.

7         Maybe there's not 10.0 year IBM bond that you can short.

8    Maybe there's only a 8 year old or a 12 year bond, but you can

9    just enter into a bilateral CDS contract.  The dealer and a

10   dealer will say, okay, fine, I'll write you 10 year CDS at this

11   level.

12        I think there's a more important issue from the standpoint

13   of a protection buyer, at least in my experience, which is that

14   when you sell short a bond, it's to say there was a 10 year IBM

15   bond and I wanted to sell it short, you have to have what's

16   called the borrow in the bond.  Because by definition in a

17   short sale you're selling something you don't have and so you

18   need to borrow the bond in order to be able to sell it short.

19        The difficulty is that you can't always do what's called

20   maintaining the borrowing the bond, someone has to lend you the

21   bond for you to be able to borrow it, and sometimes people

22   decide they don't want to lend out the bond anymore for

23   whatever reason, and then you have to close out your short

24   position.

25        That can't happen to you in a CDS, at least as long as the

Page 77

1    counterparty is solvent.  You have the trade on for the

2    specified tenure, so it's be ten years in this case.

3    Q    And so that's why a protection buyer would buy a CDS.  Why

4    would a protection seller not just own the underlying bond?

5    A    Well, I would say that the customization point works in

6    both directions.  And also the sort of financing also works in

7    both directions, in the sense that if someone wanted to buy IBM

8    bonds and didn't want to pay for them with cash, but wanted to

9    maybe say repo them, where they borrow some money against it,

10   so they buy $10 million worth of IBM bonds, maybe they'd have

11   to put down, I don't know, $2 million and they could borrow the

12   other $8 million.

13        That transaction is also typically not a tenured

14   transaction.  You can't -- in my experience I've never be able

15   to get a repo anywhere close to ten years.  If you do a CDS,

16   you are going to post probably initial margin in my experience

17   to the broker dealer in order to sell that protection, but you

18   locked in that initial margin and it's not going to change over

19   time.  The repo counterparty can't tell you I can't close you

20   out and you've got that financing locked in for a ten year

21   period.  So it's similar reasons, but maybe in reverse.

22   Q    Okay.  I'd like to ask you a few questions about the

23   market for CDS back in 2008.

24        Were CDS' traded on any kind of an exchange?

25   A    No.

Page 78

1   Q    Were they -- was there any clearinghouse like there is in

2   the equity markets?

3   A    No.

4   Q    And without an exchange, how did the buyers and sellers

5   find each other?

6   A    Well, they found each other basically the way people

7   normally find each other in an OTC market.  You have dealers

8   that would communicate with people like QVT and they would

9   typically send out these Bloomberg messages of the type that

10  Michael Newman sent me, although more typically those messages

11  might contain like a generic run on a whole bunch of different

12  credits.  So maybe there'd be a bunch of insurance credits like

13  here's where I think Ace should trade, here's where I think

14  Excel should trade, here's where I think Berkshire-Hathaway

15  should trade and so on and so forth.

16       So there'd be these kind of messages that go back and

17  forth on Bloomberg, and that would be the most typical way that

18  I got information about the market.

19            THE REPORTER:  (indiscernible)

20            THE WITNESS:  That would be the most typical way that

21  I got information about the market.

22  BY MR. TRACEY:

23  Q    And what you just referred to is that sometimes called a

24  broker run?

25  A    Yes.

Page 79

1   Q    And if there's no exchange, how does -- well, how does the

2   price get published when a trade is entered into?

3   A    Well, the trade price is not published.  It's only known

4   to the two part, it only has to be known I guess I would say to

5   the two parties who are actually trading with each other.

6        Sometimes a dealer may wish to advertise that it did a

7   trade at a certain level in order to cause other trading

8   activity to occur and see if there are other people who want to

9   do the trade.  But there's no requirement, say the way there is

10  in the equity market where when a trade is done it sort of

11  appears and everyone can see.

12            THE REPORTER:  (indiscernible)

13            THE WITNESS:  I'm sorry, there's no requirement, as

14  there is in the equity market where when a trade is done, the

15  price and the volume are published and everybody can see it.

16  BY MR. TRACEY:

17  Q    So let me ask you to take a look at Claimant's Exhibit

18  2095.  You referred to a run or a broker run earlier.  Is this

19  a broker run?

20  A    Yes.

21  Q    And could you just describe what information it has and

22  what you would understand from this?

23  A    Okay, sure.  So this is a broker run, I guess, on these

24  auto parts companies -- for concreteness, why don't I just

25  focus on the one all the way on the right, GT, which I think is

Page 80

1    Goodyear Tire.

2        So what the dealer is specifying here are --

3    Q    Can I approach you for just one second?

4    A    Sure.

5    Q    Is GT supposed to be over the third column?

6    A    Yes, that's what I understand it to be.

7    Q    Okay.

8    A    Okay.  So what the dealer is saying is, okay, there's

9    different tenors of CDS that we can trade, 1Y, 3Y, and so on.

10   So one year, three year, five year, seven year, ten year going

11   down the left most column.

12       And let's just focus on one particular set of numbers

13   under GT, under 1Y, one year, it says 160/190 tenths cross ten,

14   10X10.

15       So what the dealer, in this case, Goldman is saying or

16   what I understand them to be saying is, or what I understand

17   them to be saying is I would buy protection from you at 160

18   basis points running for one year, or if you want to buy

19   protection from me I would do that at 190 basis points running

20   for one year.  And he's saying the market is ten by ten,

21   meaning we can do either side of the market, the buy or the

22   sell, for ten million each.

23       And similarly as you move down the spectrum you can see

24   that in the five-year for instance it says 435, 450 ten by ten.

25   Similarly, we can enter into a five-year CDS contract where

1  Goldman Sachs would buy protection at 435 basis points in a

2  size up to ten million and they would sell you protection at

3  450 basis points in a size up to ten million.

4       And I think five-year at the time would not be exactly 5.0

5  years from Monday, September 8th, 2008.  There are -- in the

6  CDS market the convention is that basically four times a year

7  you do what's called rolling the contracts.  So this would --

8  five year would refer to, my understanding would be September

9  20th, 2013.  It's always the 20th of either March, June,

10 September or December.  It doesn't have to be, but that's just

11 the way it trades.

12 Q    And is this one of the ways that you got price information

13 in 2008?

14 A    Yes.

15 Q    And the prices are in spreads and bid and offer.  Is that

16 -- is -- what is the difference between the 160 and the 190?

17 A    Well, that -- that's the sort of bid offer spread that the

18 dealer is proposing to charge.

19 Q    Were there other ways that you received pricing

20 information in 2008 about CDSs?

21 A    Yes.  We -- in -- we received pricing information from

22 Mark IT for instance.  Let me just distinguish something.  So

23 this is price information that is actually related to trading.

24 When you say pricing information am I understanding you

25 correctly that you also mean just where -- what the price is

Page 82

1    CDS is generally, whether or not I wanted to trade it?

2    Q    Broadly speaking prices.

3    A    Right.  So you can also get prices from the service Mark

4    IT which is each day averages dealer opinion of the mid-market

5    across a number of different credits.  And so, for instance, in

6    this case if Goldman Sachs -- well, this is not exactly a

7    closing run, but suppose that it were, Goldman Sachs might

8    submit mid-market of the average of 160 and 190 for one year

9    Goodyear Tire which would be 175 basis points.  Maybe another

10   dealer would submit 185 basis points and so on and so forth,

11   and you would average them all together and Mark IT would

12   publish that one averaged figure and we could see that.

13   Q    And does the Mark IT prices represent actual transactions?

14   A    No.  It's not like the last price on an equity exchange.

15   It's just an average of dealer opinion.

16   Q    Okay.  Just spend a few minutes on liquidity in the

17   market.  What is liquidity in the CDS market?

18   A    Well, I think liquidity means the ability to -- how

19   difficult it is to buy or sell something without moving the

20   price.  And how do you determine that?

21   A    Well, in a very liquid market like the U.S. Treasury

22   market you can trade very, very large market values of

23   securities.  There's lots of dealers who are willing to bid

24   them or offer them and you can do so with very low transaction

25   costs.

Page 83

1          In an illiquid market it's the opposite.  Think of a

2    private high yield bond or something that there may be only a

3    few holders of it.  Most dealers or most market participants

4    would not know what the price is, or maybe wouldn't even know

5    about that security.  So it's very hard to trade that kind of

6    security.  That's an illiquid security.

7    Q    And what about CDSs, are they -- what's the level of

8    liquidity of CDSs?

9    A    Well, it -- there's a very broad spectrum of liquidity in

10   the CDS market.  Some CDSs are very liquid and some CDSs are

11   quite illiquid.

12   Q    And what is the concept of an on the run CDS?

13   A    An on the run CDS means usually the five-year point.  So

14   if we had that previous graph up the five-year point where I

15   think Goodyear Tire was 435, 455 -- 450 would be the on the run

16   point.  That's the most frequently traded point by convention

17   in the CDS market.  The five-year point is what's quoted most

18   frequently and traded most frequently.

19   Q    So let's talk a little bit about prices.  When you -- your

20   experience between 2005 and 2008 when you entered into a CDS

21   trade how did you evaluate the price that you were willing to

22   trade it?

23   A    Right.  So the -- I guess there's almost like two

24   different questions in there when you think about the price.

25   The first is that you have a general idea of where something

Page 84

1    should transact, and the second question is how would you think

2    about getting the best execution on that.

3           The second one is sort of a little bit maybe easier

4    to answer.  So once you have an idea where a price is, maybe

5    you've seen five different broker runs in a particular credit

6    trades around a hundred basis points you can figure out how you

7    want to get the best execution.  You might ask three dealers at

8    once to offer it to you.  You might ask one dealer to go see if

9    he can find sellers of protection.  You sort of have to decide

10   that on a case by case basis.

11          I think the first question is a little bit more -- is

12   a little bit different which is, well, if you know the prices,

13   you know, in the area of one hundred basis points do you think

14   that that's a fair price or not.  And there you may be able to

15   do kind of a quantitative analysis that would help you to

16   understand the price of it, or it may be that in certain cases,

17   as was the case in much of 2007, credit spreads were just so

18   incredibly tight that you just didn't worry that much about

19   whether -- even if you have to just say -- if you bought

20   protection at 30 basis points on something for five years, the

21   most you could lose is five years times 30 basis points or

22   about one and a half percent.

23          And so that case, you know, if the market price was

24   30 basis points you want to make sure you execute around 30

25   basis points, but it's just such a low price that you might not

Page 85

1    need to do a lot of quantitative analysis to convince yourself

2    to enter into a buy protection trade.

3    Q    Okay.  I would like to now turn to the subject that I

4    think you've heard, the PCDS or preferred CDS.  Can you

5    describe how a preferred CDS differs from an ordinary CDS?

6    A    Yes.  Let me just focus first on the contractual terms and

7    how it's different contractually leaving aside whatever market

8    structure existed at the time.

9            So a preferred CDS is like a regular investment grade

10   CDS except that it has an additional credit event which is the

11   deferral of preferred stock coupon.

12   Q    Okay.  Any other differences in terms of the arrangement,

13   the agreement, the contract?

14   A    No.  I mean, the -- it's going to reference a particular

15   preferred stock, just there's going to be a reference

16   obligation which is a preferred stock, but it's going to have

17   the same credit events in terms of bankruptcy and failure to

18   pay, for instance, that a regular CDS would have.  It just has

19   this added credit event.  That deferral is a credit event.

20   Deferral of the preferred stock coupon is a credit event.

21   Q    And are there any particular provisions in a PCDS contract

22   relating to the security that you are entitled to turn over in

23   the event of a credit event?

24   A    Sure.  So a PCDS contract has in it as most CDS contracts

25   do a so-called cheapest to deliver option where you're entitled

Page 86

1    to deliver any security which is pari passu with the reference

2    obligation.

3              So to the extent that at the time a credit event

4    occurs those are trading at different prices, the buyer of

5    protection has the right to -- well, to buy anyone with -- any

6    one that he or she wishes.  And typically you would buy the one

7    that's the cheapest because you know that you're going to get a

8    hundred cents on the other side.  So that's a so-called

9    cheapest to deliver option.

10   Q    Okay.  And focusing now on the market structure, was there

11   any difference in the market structure with regards to PCDS

12   compared to other CDSs?

13   A    Yes.  There was a difference in the market structure in

14   PCDS as compared to other CDS.

15   Q    Yeah.  And what was that?

16   A    Well, it was really that Lehman Brothers was kind of the

17   inventor of PCDS and they were the, at least in our experience,

18   the only market maker in PCDS that we had ever traded with.  We

19   understood them to be the dominant dealer in it and we were

20   never able to trade PCDS with anybody but Lehman Brothers.

21   Q    When did you first learn about PCDS?

22   A    I think it was back in 2005.

23   Q    And how did it come to your attention?

24   A    Well, at that time I think Lehman Brothers and one other

25   dealer, I think it was Morgan Stanley, were introducing this

1  concept of PCDS, which as I -- we were just talking about is

2  CDS with those additional deferral credit events attached to

3  it.  And they were trying to get going an index of PCDS similar

4  to, there's something called the CDX indices which have, you

5  know, a whole bunch of -- 125 different credits in them that

6  trade in the investment grade arena.  So this was called a PDX.

7  I think -- I can't remember the number of credits.  It was much

8  less, maybe 20 or 25 credits.  So they were trying to get this

9  PDX index going to get the preferred CDS market going.

10  Q    And did you invest in PDX?

11  A    We traded PDX a little bit, but it kind of never really

12  took off and we unwound all our positions, I don't remember, by

13  2005 or 2006.  It just was very short lived.

14  Q    And did there ever come a time after that that you got

15  interested in PCDS again?

16  A    Yes.  I think we did one PCDS trade with Lehman Brothers

17  in 2006 and -- but then we didn't really start buying PCDS in

18  earnest until the middle of 2007.

19  Q    And what led you to begin buying PCDS again in 2007?

20  A    So in -- around the middle of 2007 we had started to

21  become quite kind of concerned with the exposure of banks to

22  what we saw happening in the U.S. subprime mortgage market.  We

23  had put on in 2005 and 2006 a quite large short position in

24  credit default swaps referencing subprime mortgage and related

25  assets.

Page 88

1           And we were starting to make money on that position

2    because the prices of those securities were going down quite

3    precipitously.  And I think what we started to worry about is,

4    well, maybe there are other institutions that have exposure to

5    subprime mortgages directly or indirectly and maybe the market

6    doesn't completely realize that this is the case.

7           So that was the sort of, I guess, premise behind us

8    becoming interested in financial institutions or one premise

9    behind it.

10   Q    And when you say financial institutions you mean taking a

11   bet against them?

12   A    Well, yeah.  Well, we were worried about banks in

13   particular.  I guess we also looked at some insurance

14   companies, but really it was banks.

15   Q    And so how did it come to be that you began trading in

16   PCDS at that time?

17   A    Right.  So we began to focus on a particular exposure of

18   certain types of banks in the world at that time.  And that

19   exposure was called asset backed commercial paper, also called

20   ABCP.  And what asset backed commercial paper was and continues

21   to be is it's basically a commercial paper facility, but rather

22   than being like an unsecured obligation of a  corporation it

23   would be backed by a group of assets.  And it could be kind of

24   a normal group of assets like credit card receivables, for

25   instance.

Page 89

1          But the relation -- what had happened in 2007 is that

2    these asset backed commercial paper conduits had started to

3    finance the very assets that we saw in the subprime mortgage

4    market were going down in price quite precipitously and the way

5    it related in our minds to financial institutions is that a

6    commercial paper facility has like a bank back stop in it where

7    basically the commercial paper does not what's called roll

8    where they can't find you buyers for the commercial paper.  The

9    bank will agree to buy the commercial paper so it pays off on

10   time.

11          And what we saw is that a lot of European banks had

12   written these liquidity back stops against asset back

13   commercial paper conduits.  So we became interested in ways

14   that we could bet against the credit of European banks in an

15   efficient way.

16   Q    And did you discuss that with Lehman?

17   A    Yes.  So I had lunch with Michael Newman and someone

18   called Charlie Spiro who was the head of the asset back desk at

19   the time.  It was an old colleague from my Lehman days.  And we

20   started to talk about this issue and the idea of using PCDS

21   referencing these European banks with this exposure basically

22   came up in that lunch and that's how we started to buy in

23   earnest.

24   Q    And when did you start to buy in earnest?

25   A    June 2007.

Page 90

1  Q    And do you recall approximately how much you bought at

2  that time?

3  A    I think our first trade was approximately $60 million, but

4  I think across all of 2007 we probably bought 150 or $175

5  million of protection.

6  Q    And moving forward to September of 2008 what was your

7  position at PCDS at that time?

8  A    So we had a position of 300 -- in financial institutions.

9  I'm going to leave aside the two PCDS in CDS that were

10 mentioned earlier this week.  In financial institutions we had

11 a portfolio of a PCDS totaling about $371 million in notional.

12 Q    And that's buying protection?

13 A    Yes.  All of the trades were buy protection trades.

14 Q    And did there ever come a time that you were unable to buy

15 PCDS in the market?

16 A    Yes.

17 Q    And when did that occur?

18 A    That occurred in August and September of 2008.

19 Q    And what happened at that time?

20 A    Well, our last PCDS trade, I believe, was July 30th, 2008.

21 I had additional appetite to buy PCDS at that time and I was

22 asking Lehman Brothers via Michael Newman to offer me

23 additional PCDS, but I was unable to buy any.

24 Q    Let me ask you to look at Claimant's Exhibit 1184.  Do you

25 have that in front of you?

Page 91

1   A    Yes.

2   Q    And can you identify that document?

3   A    Yes.  It's a Bloomberg messages back and forth between

4   Michael Newman and me on August 5th, 2008.

5   Q    Okay.  So you say back and forth.  And it says from

6   Michael Newman to you, right?

7   A    Yes.  Maybe it would be helpful if I explained who is who.

8   Q    All right.

9   A    So I'm the all lower case part that says, morning, two

10  things, and he's the all upper case part below.

11  Q    Okay.  And would you describe for the Court, please, what

12  you're discussing with Michael Newman there?

13  A    Okay.  The first part about these MBI IO monetization

14  trades doesn't have anything to do with the PCDS.  But number

15  two says, anything to offer in PCDS Aussie banks.  So what I'm

16  asking him is do you have any PCDS referring Australian banks.

17  Q    And what does he say to you?

18  A    Okay.  So his response is -- begins in the part that, on

19  the first line that says, on number two.  Okay.  So let me kind

20  of decode this the same way I did before.  He says:  "On number

21  two we potentially do, but maybe on switch VS and UR names."

22  And he explains what he means by that.  He's saying we can

23  offer ANZ and CBA.   ANZ and CBA are two Australian Banks.

24  ANZ, I think, is Australia and New Zealand bank.  "If you would

25  be willing to take profits on any of these: ACAFP, BACR, BNP

Page 92

1    and so on."

2            So those are the EUR names that he referenced before.

3    ACAFP is Credit (indiscernible).  BACR is Barclays -- I'm sorry

4    -- ACAFP is Credit (indiscernible).  BACR is Barclays.  BNP is

5    BNP (indiscernible) and so on.  So all of those six names are

6    European banks.

7            And so what he means by switch is he's saying I'll

8    sell you protection on these Australian banks, ANZ and CBA,

9    maybe, if you'll sell me protection back that I previously

10   bought from him on these names, ACAFP, BACR and so on.  So he's

11   -- that's what he means by switch.  We've got to switch

12   positions.

13           And then he just adds the comment may be -- at the

14   end, the last two lines he says, "may be able to offer the

15   Aussie's outright, but on switch would be most likely.  So what

16   he means by that is an outright would be where he just offers

17   me the PCDS and that's the only transaction.  And he's saying,

18   maybe I can do that, but most likely we'll have to swap.

19   Q    And what did you make of the fact that he was saying that

20   he wanted to sell you PCDS protection on switch?

21   A    Well, it was telling me that I wasn't able to source any

22   more PCDS so to speak on risk with Lehman Brothers.  Stepping

23   back to just kind of maybe an earlier message you might

24   remember that when he had offered me this WB PCDS, this

25   Wachovia Bank PCDS he started off saying we have a potential

Page 93

1   seller of WB PCDS and that's -- I understood it to be that

2   that's why he's able to offer this to me.  He's finally got

3   somebody on the other side and Lehman will stand in the middle.

4   They will make some profit, but he can offer -- that's why he

5   can offer this to me.

6           And so here it's kind of maybe a continuation of the

7   same trend, except maybe things are getting a little bit worse

8   in the sense that he's saying I -- I can't just take more PCDS

9   risk or I'm unwilling to.  I can't just let you be short more

10  PCDS outright.  I need to take some back from you if you want

11  to trade from me.  But we'll -- that's how I understood it.

12  Q   And after you received this Bloomberg on August 5th of

13  2008 were you able to buy PCDS on Aussie Banks from Lehman?

14  A   I was not.

15  Q   Let me show you what we've marked as Claimant's Exhibit

16  1194.  Can you identify that document?

17  A   I can.

18  Q   What is it?

19  A   It's another Bloomberg message between Michael Newman and

20  I from a few days later.  This one is from August 13th, 2008.

21  Once again I'm the all lower case and he's the all caps.

22  Q   Okay.  And would you describe what your conversation is in

23  this Bloomberg?

24  A   Yes.  So I ask him, "Is there any PCDS in the seller not

25  on swap, just offered."  And what I mean by that is do you have

Page 94

1   any PCDS kind of that you can dredge up and that you can offer

2   to me.  I don't want to do it on swap or what he called on

3   switch in the previous e-mail or Bloomberg.  What I'm saying is

4   I just want you to offer me PCDS.  I don't want to sell you

5   PCDS back to buy new PCDS.  I just want to buy PCDS.  That's

6   what I mean by not on swap, just offered.

7   Q    And what's your understanding of what Mr. Newman's

8   response was?

9   A    Well, he says, "At this point need to sell stuff on swap."

10  So he's telling me I can't make you an outright offer.  And

11  then he has some commentary about how he can prob, probably

12  rustle up some WFCS Wells Fargo PCDS and then he gives his

13  opinion about whether that's a good trade or not.  But I think

14  the -- what I -- the main thing I took away is that he said at

15  this point we need to sell stuff on swap.

16  Q    And did you at this time ever make any inquiries to any

17  other dealers as to whether they could sell you protection in

18  PCDS?

19  A    Yes.

20  Q    Who did you contact?

21  A    I contacted JPMorgan.

22  Q    Let me direct your attention to Claimant's Exhibit 2098.

23       (Pause)

24  Q    Do you have that document in front of you?

25  A    Yes, I do.

Page 95

1    Q    And can you identify that, please?

2    A    Yes.  This is a Bloomberg from me to our sales person at

3    JPMorgan whose name is Jamie Benjamin.  And it's from a --

4    well, I guess it's from the same date, August 13th, 2008, and

5    as the text says I'm asking her, "Do you guys ever trade PCDS

6    in Europe CDS referencing preferreds or deferrals a credit

7    event."  And I think the second phrase, thinking about the

8    shorting prefs argument, is in reference to some research maybe

9    they had put out about how they thought preferred stocks were

10   not good values or something at that time.  But with the -- I'm

11   just inquiring with her, do you guys trade the -- do you guys

12   trade this product or not.

13   Q    Okay.  Let me direction your attention to Claimant's

14   Exhibit 1196.

15        (Pause)

16   A    Okay.

17   Q    Can you identify that document, please?

18   A    Yes.  This is the replay from Jamie Benjamin to me.  It

19   looks like about an hour afterwards on Bloomberg.

20   Q    Okay.  And what is Ms. Benjamin saying to you?

21   A    She said, "Arthur, I asked Pierre.  We don't do anything

22   on PCDS."  Pierre was her European financials trader and, well,

23   she says we don't trade PCDS.  We don't do anything in PCDS.

24   Q    And did you continue trying to buy protection on PCDS

25   after that?

Page 96

1    A    Yes.  I continued to ask Michael Newman whether he could

2    offer me PCDS.

3    Q    Can you take a look at Claimant's Exhibit 1202?  Can you

4    identify that one?

5    A    Yes.  This is another e-mail exchange between Michael

6    Newman and I on Wednesday, August 20th, 2008.  Again, I'm the

7    all lower case and he's the all caps.

8    Q    Okay.  And what are you asking him and what's his reply?

9    A    Well, I think I had breakfast with him that morning and a

10   colleague of his, Jonathan Gliona (ph).  But transactionally

11   I'm asking him the same question, do you have any PCDS to

12   offer.

13   Q    And what's his reply?

14   A    Well, he says, "The PCDS cupboards are nearly bare," and

15   he kind of repeats the same thing he said before in the first

16   block.  He says, "Can still try and arrange some swaps into

17   Aussie PCDS short via unwinding your fav" -- I think I -- that

18   means favorite -- "Euro shorts."  So that's basically the same

19   thing he was telling me before; that if you want to buy Aussie

20   PCDS if you sell us back some Euro PCDS maybe there's something

21   to do there.

22           And then in the second block he talks about things

23   he's kind of working on.

24   Q    And what does that mean to you?

25   A    Okay.  So just taking the first line it says, "Other,

Page 97

1    working on holder of H Boss and Lloyds, but it's slow going."

2    So what I understood that to mean is he was trying -- he -- a

3    holder in this case means somebody else who's already long PCDS

4    -- that's how I understood it anyhow -- of these two referenced

5    entities, H Boss Halifax Bank of Scotland and Lloyds Bank.  But

6    he says it's slow going.  So he says he's kind of -- well, I

7    understood this to mean there's somebody who owns this PCDS.

8    Maybe someone at Lehman is talking to them about it.  But it's

9    slow.  It's taking time.

10          And, similarly, he says, "Still in touch with WFC BAC

11   and maybe ILFC."  I think the content of it is similar except

12   he doesn't say it's slow going.  He's saying, in touch with

13   means  -- well, I understood it to mean he kind of knows of

14   somebody or maybe multiple institutions who own PCDS on WFC

15   Wells Fargo, BAC Bank of America, and maybe IFLC which was the

16   lease financing arm of AIG.

17          And then he lastly he says, "Working on holder of MER

18   and MS" -- Merrill and Morgan Stanley -- "but it's slow going."

19   So he's just kind of -- overall I would say he's giving me some

20   idea of what the landscape might be like and these are some of

21   the various names.  But it -- there's not a lot of specificity

22   here.  He's just saying these things might happen.

23   Q    Okay.  Just one more document on this.  If you could turn

24   to Claimant's Exhibit 1235.

25          (Pause)

Page 98

1   Q    Can you identify that document?

2   A    Yes.

3   Q    What is it?

4   A    It's another Bloomberg message between Michael Newman and

5   I, this time from Tuesday, September 9th, 2008.

6   Q    And what are you saying to him and what is he saying to

7   you?

8   A    Okay.  So, again, I'm the all lower case and I'm asking

9   him, "What was decided on the PCDS front?"  I think perhaps

10  there was a phone conversation before this when I said, hey, I

11  still want to buy PCDS from you.  And it -- this looks kind of

12  like a follow up to me.  But it -- I remember that I was trying

13  to buy PCDS.

14          And he writes back to me, "Nothing decided.  Still

15  digging, but nothing good to show you yet."  So he's basically

16  saying I don't have anything to show you.  I don't have

17  anything to offer you.

18  Q    And between September 9th and September 15th were you able

19  to buy any PCDS?

20  A    No.

21  Q    And just if you could explain what to you the significance

22  was of not being able to buy PCDS protection and Lehman not

23  being able to sell it.

24  A    Sure.  So, I mean, the -- thinking back to the, you know,

25  first time I did the PCDS trades in significant size in mid-

Page 99

1    2007, I was able to trade kind of certain names at very low

2    spreads, spreads maybe at 30 basis points or something.  And

3    they were all five-year on the run CDS at that time.  And so it

4    kind of felt to me like a regular CDS trade, like when you went

5    to a dealer at that time in June of 2007 and you say, I want to

6    trade CDS with you.  They say, okay, I'll trade five-year

7    September 20th, 2012 with you and these are my prices.

8         As time went on the Bloomberg exchanges got to be

9    more like, around PCDS with Lehman got to be more of the flavor

10   of the Wachovia exchange that we talked about a little while

11   ago where it was more, well, we're finding this person who

12   already holds PCDS, this, you know, potential seller that Mike

13   Newman had talked about.  And it wasn't the on the run data at

14   the time.  It was an old date.  It was September 20th, '11 or

15   as it turns out the one we traded was December of 2012.

16        So it was sort of the market evolved from one where

17   you -- you could trade it a little bit more like a regular CDS

18   where you trade the five year point to sort of -- like there

19   was -- it felt more and more like there was kind of this

20   existing finite pool of PCDS that you could sort of trade

21   around, but that Lehman increasingly was unable even by

22   February to just make you out outright offers.

23        And as we headed into July and August I think they

24   were a little bit more explicit about that.  They basically

25   were saying we can't offer you anything.  And I think the

Page 100

1    significance of that to me was that they couldn't make an

2    offer, or I interpret that as because they can't find these

3    sellers.  They talk about rustling up sellers of PCDS, but they

4    kind of can't find people to extract this PCDS from so that

5    they can offer it to me.  That's kind of the picture of the

6    market that I had.

7    Q    Turning to something else now I --

8              THE COURT:  Yeah.  I think it would be a good time to

9    take a break.  So what -- let's come back at 2:00 sharp.

10             Mr. Chu, you remain under oath during the lunch hour.

11   You're not to discuss the case or your testimony with anyone or

12   be in anyone's presence while they're doing the same.  All

13   right.

14             THE WITNESS:  Thank you, Your Honor.

15             THE COURT:  Very good.

16             MR. TRACEY:  Thank you, Your Honor.

17        (Recess taken at 1:05 p.m.; reconvened at 2:05 p.m.)

18             THE COURT:  Ready?  Okay.  Please come back up, Mr.

19   Chu.

20             MR. TRACEY:  Your Honor, may I ask a housekeeping

21   type --

22             THE COURT:  Sure.

23             MR. TRACEY:  Well, it's not really a housekeeping.

24   It's a substantive question.

25             THE COURT:  Yes.

Page 101

1           MR. TRACEY:  What I -- what I'm unclear on is whether

2     Mr. Wolman is currently under oath and whether I can speak to

3     him.

4           THE COURT:  That's a good question.  What do you say,

5     Mr. Tambe?

6           MR. TAMBE:  He's not under oath.

7           THE COURT:  He's not under -- I mean, I didn't view

8     him as being under oath.  But as a separate question whether or

9     not you can speak to him, I think the answer is yes.

10          MR. TRACEY:  Okay.  Thank you.

11          THE COURT:  Thank you, though.

12          Okay.  You're still under oath, Mr. Chu.

13        (Laughter)

14          THE WITNESS:  Understood, Your Honor.

15    BY MR. TRACEY:

16    Q    Okay.  We spoke this morning about PCDSs and your trading

17    in PCDSs.  We're going to move to CARB, but before we do I

18    wanted to ask you about your decision to enter into PCDS trades

19    in the first place.  We talked about the rationale.  But what I

20    didn't ask you is when you were presented with a particular

21    PCDS sale of protection how did you determine whether the price

22    was one that you were willing to trade in?

23    A    Okay.  Well, in general the spreads that we paid for PCDS

24    overall in our portfolio were not particularly large.  I think

25    the average spread that we paid in the whole portfolio for PCDS

Page 102

1    across all the trades was approximately 145 basis points.

2           And so particularly at the beginning in 2007 when we

3    were starting to buy more forcefully we were just paying such

4    low spreads that it was clear to us that they were trades that

5    we wanted to do.  These were -- we were paying 22 basis points

6    for Rabo (ph) Bank, 35 basis points for BNP (indiscernible).

7    And I suppose we looked at it very simply and we said, well,

8    these are preferred securities.  If we pay 33 basis points over

9    five years on an undiscounted basis the most we can lose is

10   1.65 percent in that case.  And preferred stocks, they're

11   called preferred stocks for a reason.  And, you know, we

12   thought -- I mean, they can go down like stocks.  You can

13   really lose a lot of your investment.

14          So we just felt in that case like you're risking

15   maybe 1.65 percent and if there's a credit event or the market

16   begins to price in a credit event we didn't know where the

17   preferred would trade, but maybe it would trade at the 30, 40,

18   50, maybe it would trade at ten.  But just the amount we could

19   make was so large compared to that premium that we were just

20   eager to do those trades.

21          And as time went on the level of credit spreads

22   generally became wider, but I think we still felt that just

23   that the risk and reward in being short this particular part of

24   the capital structure for instance, you know, the Wachovia

25   trade we talked about earlier at 340 basis points for three

Page 103

1    years.  We were risking more.  We were risking more like ten

2    percent rather than one and a half or two percent.  Still given

3    the conditions at the time we just liked that risk reward

4    profile.

5    Q    And did you have any model that you used to assess or

6    predict prices for CDS?

7    A    No, we didn't.

8    Q    Okay.  Well, were you aware of any models that were

9    available on that?

10   A    No.  I mean, there were things that you could look at.

11   You could look at the preferreds themselves and see what kind

12   of maybe credit spread they implied.  You could look at other

13   parts of the capital structure like the senior part of the

14   capital structure or the subordinate part of the capital

15   structure.  But I wouldn't really call those models.  I would

16   say those are sort of reference points.

17   Q    Okay.  So let's turn to CARB.  Would you describe for the

18   Court what CARB is?

19   A    Yes.  CARB is an acronym for CDS on auto receivables

20   basket.

21   Q    And would you describe what that instrument provided

22   protection on?

23   A    Yes.  It was a set of eight credit default swaps packaged

24   together into one entity, the CARB basket, and each of the

25   individual credit default swaps was a -- referenced a

Page 104

1   particular subordinated tranche of an auto loan securitization.

2   I believe four were issued by Ford under the Fordo ticker and

3   four were issued by GMAC under the carrot ticker.

4   Q    Could you turn to Claimant's Exhibit 2102?

5   A    Okay.

6   Q    And you can use this if it's helpful, but if you could

7   describe for the Court what a -- what an auto loan

8   securitization is and how it works?

9             MR. TAMBE:  Your Honor, can --

10            THE COURT:  Yes --

11            MR. TAMBE:  -- we just note for --

12            THE COURT:  -- Mr. Tambe.

13            MR. TAMBE:  -- the record, I don't believe what we're

14   seeing on the screen is actually CX-2102.  It's a demonstrative

15   based on data from CX-2102.  I think the record should just be

16   clear.  I think that's what it is.

17        (Pause)

18            MR. TRACEY:  I'm not following that.

19            MR. TAMBE:  I think it's a picture drawn from data

20   that's been taken from CX-2102.  I don't think CX-2102 looks

21   like that.

22            MR. TRACEY:  No.  I --

23            MR. TAMBE:  -- I --

24            MR. BECK:  I think we produced --

25            MR. TRACEY:  No.

Page 105

1              MR. BECK:  -- the demonstrative.

2              MR. TRACEY:  Well, so -- pardon me.

3              MR. BECK:  I think we produced the demonstrative.

4              MR. TAMBE:  Okay.

5              MR. TRACEY:  Yeah.

6              MR. TAMBE:  It's been produced as a demonstrative?

7              MR. TRACEY:  Yes, a demonstrative.

8              MR. TAMBE:  Okay.

9              UNIDENTIFIED SPEAKER:  That's 2102.

10             MS. SAWYER:  So it's just the sources itself?

11             MR. TAMBE:  But then I'm confused because --

12             MS. SAWYER:  Right.

13             MR. TAMBE:  -- then what's the source for this?

14             MR. TRACEY:  So the source --

15             MR. TAMBE:  I'm sorry.

16             MR. TRACEY:  -- for this is Mr. Nicholeska's report.

17    So this is simply a demonstrative.

18             MS. SAWYER:  So 2102 where it says source --

19             MR. TRACEY:  And that's (indiscernible).

20             MR. TAMBE:  That's just referring to the -- okay.  So

21    it's source from something from --

22             MR. TRACEY:  From the -- one of the courts.

23             MR. TAMBE:  Okay.

24             MR. TRACEY:  And it's just being used as a

25    demonstrative.

Page 106

1         MS. SAWYER:  Okay.

2         MR. TRACEY:  Sorry.

3    BY MR. TRACEY:

4    Q    Do you remember the question?

5    A    Actually I confess.  I don't remember the question.

6    Q    Okay.

7         THE COURT:  The question was to explain how an auto-

8    securitization works.

9         THE WITNESS:  Okay.  So this diagram is sort of a

10   schematic of an auto-securitization.  The big green box on the

11   left represents the so-called collateral for the

12   securitization, the 99,653 auto loans along with this small

13   yellow strip called the reserve account.  It's another asset of

14   the trust.

15        So all -- this reserve account and all these auto

16   loans are dropped into this special purpose entity that owns

17   the auto loans and owns the cash flows from them, and then in

18   turn issues the debt which is pictured in the middle set of

19   green boxes.  And the debt is -- the -- this special purpose

20   entity has a capital structure much like a regular company

21   would.  The Class A-1 through A-4 notes are the senior part of

22   the capital structure and you can see there, you know, of order

23   95 percent of the capital structure.

24        And as you go down below the A notes you have these

25   sort of mezzanine and junior notes, the Class Bb, C and D

Page 107

1    notes.  And the particular -- I would note that on the side

2    there's this kind of arrow going from top to bottom basically

3    saying that principal payments are paid sequentially in order

4    of priority from the Class A-1 down and losses are allocated in

5    the reverse order in the same way the equity in a company kind

6    of takes losses first.

7            And the particular tranche that's -- that we're

8    talking about here that's one of the eight tranches in CARB is

9    this Class C note which is approximately 1.5 percent of the

10   capital structure at origination.

11   BY MR. TRACEY:

12   Q    Okay.  And so the notes that are issued by that

13   securitization in Class C are the -- are they the reference

14   obligations for the underlying CDS?

15   A    Yes.  That's correct.

16   Q    Okay.  And would you describe, please, how that CDS --

17   what that CDS protects, the underlying CDS on this tranche?

18   A    Just -- right.  So it -- in concept the credit default

19   swap if you buy protection on this kind of CDS is in concept

20   the same as a corporate credit default swap except that the

21   mechanics are a little bit different.  In particular in a

22   corporate credit default swap the credit event either happens

23   or it doesn't happen and it all happens at one point in time.

24   For instance, a corporation fails to pay or declares

25   bankruptcy.

Page 108

1          But it's a little bit different in the case of an

2    asset backed security where you don't have a single obligor

3    here.  You have 99,653 individual auto loans to begin with.

4    And so this Class C doesn't default all at once.  What happens

5    is that as losses are allocated up the capital structure this

6    particular tranche, this Class C, begins taking losses.  And as

7    a result of that the mechanism for payment between buyer and

8    seller in this kind of default swap is a little different.

9          It's a so-called pay as you go credit default swap

10   where if you imagine that it take -- the structure starts

11   taking losses and each month say half a percent of the capital

12   structure -- first the Class C takes a hit equal to half a

13   percent, then half a percent, then half a percent, some three

14   months that adds up to 1.5 percent and the whole thing is wiped

15   out.  What would happen is that the seller of protection would

16   basically pay the buyer of protection, you know, a third the

17   first month, a third the second month, and a third the third

18   month.  In that sense it's a pay as you go.

19         And the other, I guess, mechanic is that in the case

20   of a corporate default swap you have a concept of different

21   bonds being deliverable at the same level of the capital

22   structure.  Here, a pay as you go default swap really

23   references that particular tranche and it's -- it just refers

24   to that tranche.

25   Q    Okay.  And so the -- how are the eight CDSs packaged

Page 109

1    together into CARB?

2    A    It's really as if the eight CDSs are just an indivisible

3    portfolio of eight separate credit default swaps.  So any one

4    single credit default swap, if it starts to trigger, then the

5    pay as you go mechanism will be triggered on that default swap

6    independent of what's going on with every other default swap in

7    the portfolio.

8    Q    And were buyers of CARB able to choose fewer than the

9    eight CDSs?

10            MR. TAMBE:  Objection.  Speculation.  He can speak

11   about his own knowledge.

12   BY MR. TRACEY:

13   Q    From your -- in your experience and your knowledge?

14   A    No.  I understood CARB to be these eight credit default

15   swaps which are indivisibly attached to one another.

16   Q    And where did you get that impression and knowledge?

17   A    Well, I mean, I suppose to be a hundred percent sure you

18   would have to look at the trade confirmation which would kind

19   of spell out how it worked.  But I'm just not aware of any

20   index -- these type of index products like CDX and ABX and CMBX

21   and CARB, which is one of those products, that's kind of by

22   construction.  That's how they work.  They trade as a package.

23   Q    And what dealers that you're aware of made markets in

24   CARB?

25   A    Only Lehman.

Page 110

1 Q And going back to when you first learned about CARB did

2 you have any conversations with Lehman at the time that CARB

3 was being developed?

4 A Yes, I did.

5 Q Would you describe those conversations, please?

6 A Sure.  So at QVT in 2006 and 2007 we were very involved in

7 the asset backed CDS market.  I think as I said earlier we had

8 a large portfolio of long protection positions in subprime

9 mortgages and CDOs at that time.  There was not really a market

10 that we were aware of in asset backed security CDS on basically

11 auto securitizations.  But we were interested in also being

12 able to buy protection to synthetically sell short those

13 tranches.

14  And so we reflected our interest in doing that to

15 Lehman.  We spoke with them over time and ultimately they did

16 launch the CARB product.

17 Q And other than the desire to short securitization -- auto

18 securitizations was there any other reason that you were

19 interested in trading CARB?

20 A Well, yes.  I mean, I guess is the question why were we

21 interested in being short through CARB?  Is that --

22 Q Yes.

23 A -- the question?

24 Q Yes.

25 A Okay.  Well, first, just as a mechanical matter we really

Page 111

1    couldn't sell short the underlying securities.  I think these

2    little tranches, this Class C tranche, they're really small.  I

3    think they're -- if you look at the eight pieces of CARB from

4    memory I think they're 30, 40, 50, $60 million tranches.  So

5    when you add them up there's probably less than 500 million

6    bonds total and you just can't -- well, in our experience we

7    could never borrow something like that.  So you can't

8    physically short the securities, so you need the ABS and CDS

9    markets, too.

10          But as to why we were interested in shorting these

11   types of securitizations in particular, I think there were kind

12   of two reasons.  One is just as a general matter we had seen

13   the prices of subprime mortgage securitizations fall a lot,

14   like, you know, from a hundred cents on the dollar to 30 or 40

15   cents on the dollar.  And we could see that the prices of these

16   cash securities, at least the indicated prices of these cash

17   securities was still very close to one-hundred cents on the

18   dollar.

19          And while we understood that they're two completely

20   different markets, structurally speaking we put a seed at --

21   this is -- had very similar characteristics in terms of being

22   like a very narrow tranche and a very -- you know, very levered

23   capital structure.  And we had seen that those -- the prices of

24   those things can kind of change very, very quickly by their

25   nature.  They're very levered.

Page 112

1          And secondly we had a particular -- so that kind of

2     meant that we thought it might be a good idea anyway to be

3     short these things.

4          But secondly we had a very specific exposure that we

5     were trying to hedge.  We were owners of, partial owners of --

6     we were partial powers of the equity of General Motors

7     Acceptance Corporation or GMAC. GMAC is the financing arm of

8     General Motors and it had been sold to a private equity group

9     led by Cerberus, I think, in 2005 and that private equity had

10    been syndicated out to a whole bunch of different people

11    including us.

12         So we had a position, a long position in GMAC equity

13    that we wanted to hedge.  And so one way that we decided to

14    hedge this was by trying to go and purchase protection on

15    subordinated tranches of these securitizations basically

16    thinking that, well, GMAC is in the business of auto loans and

17    these are auto loans that GMAC is making.  And, in fact, we --

18    I think we booked all the trades into an account that was named

19    GMAC-hedge.

20    Q    And would you describe, please, your conversations with

21    Lehman as these -- as CARB was being developed, if you can

22    recall.

23    A    I don't have an extremely specific recollection of what we

24    talked about.  I think that I was shown a certain portfolio of

25    bonds or maybe there was some discussion of which bonds should

Page 113

```
 1    go into CARB.  I don't remember how Lehman made the final

 2    decision as to which particular eight securities or ten

 3    securities, however many securities wound up in CARB.  It was

 4    eight.  But I think there was some back and forth about that.

 5            We had indicated that we were buyers of protection.

 6    They knew that.  I don't remember whether we told them we had a

 7    particular appetite in terms of the notional that we wanted to

 8    trade.  But we did wind up trading a substantial amount of it

 9    when the product was launched.

10    Q    And when the product was launched did you purchase

11    protection in CARB?

12    A    Yes.

13    Q    And when did that start?

14    A    That was in October of 2007.  So we did two fairly

15    sizeable trades in, I think, one was October 2nd and one was

16    October 9th or something like that, but around the beginning of

17    October.  CARB was a product with a fixed coupon of 150 basis

18    points and I think we paid something like three and a half

19    points up front for the first trade and one and a half points

20    up front for the second trade.

21    Q    Maybe then you can describe for us exactly how CARB was

22    priced.

23    A    Sure.  Okay.  So there's a little bit of a difference

24    between the way CARB traded and the way regular corporate CDS

25    traded not just in the mechanics that I was talking about, but
```

Page 114

1    also in the trading convention.

2    Q    So going back to our example of --

3              MR. TAMBE:  I just have an objection.  The question

4    was unclear to me.  If he's explaining how it was quoted to

5    him, that's fine.  And the question said, can you describe for

6    us exactly how CARB was priced.

7              MR. TRACEY:  I'll amend it.

8              MR. TAMBE:  Yeah.

9              MR. TRACEY:  I'll amend it.

10             THE WITNESS:  Okay.  Should -- maybe --

11   BY MR. TRACEY:

12   Q    Can you describe --

13   A    -- I'll stop --

14   Q    -- how CARB was quoted.

15   A    Oh, sure.  Yeah.  So CARB had a fixed coupon.  That's

16   unlike a regular CDS where in a regular CDS usually what

17   happens is that the buyer and seller don't exchange any money

18   up front usually.  So thinking back to one of the demonstrative

19   -- or the exhibits from earlier I think there was a Goodyear

20   Tire market around 375 basis points.

21             So if one were to buy protection from Goldman Sachs

22   hypothetically at 375 basis points no money would be exchanged

23   up front.  And if the market for Goodyear protection moved

24   around, say it went to 300 basis points the next day, if

25   someone wanted to buy protection again the next day it would be

Page 115

1    a new CDS contract with a coupon of 300 basis points.

2            And so the coupon fluctuates such that the upfront

3    payment at least for CDS that are not extremely large spreads

4    is always zero.

5            And CARB and other indices like it are a little bit

6    different.  It -- what you do is you fix the coupon at 150

7    basis points and you basically change the price that you have

8    to pay upfront.  So if the credit is getting much worse than

9    the price, the upfront payment you have to make goes up.  If

10   the credit is getting better the upfront payment goes down, or

11   it could even become negative in principal where the credit

12   spread would be less than 150 basis points.

13           So to answer your question, the way CARB was quoted

14   was it was quoted essentially as if it were a bond.  So, for

15   instance, the market might be quoted say for a first trade

16   where we bought protection around three and a half points.

17   Maybe the market would be quoted ninety-six-and-a-half, ninety-

18   eight-and-a-half.

19           What that means it that Lehman Brothers would be

20   willing to sell you protection at three and a half points,

21   which is at 100 minus 96.5 or they would be willing to buy

22   protection from you at one and a half percent which is 100

23   minus 98.5.  So it's kind of quoted as if it's a bond, you

24   know.

25   Q    Let me ask you to take a look at Claimant's Exhibit 1173.

Page 116

1        (Pause)

2    Q    Can you identify that document?

3    A    Yes.

4    Q    What is it?

5    A    This is a Bloomberg run from the trader or one of the

6    traders, John McNiff (ph) at Lehman Brothers on CARB from July

7    17th, 2008.

8    Q    Okay.  And can you help decipher this for us and maybe

9    explain how the prices are quoted?

10   A    Okay.  So -- okay.  So there's different tranches of the

11   capital structure.  There's the Triple A, the Single A and the

12   Triple B.  So if you think back to the demonstrative that we

13   had a few minutes ago the Triple A is going to be those, one of

14   those A classes, maybe it's the A-4.  I can't remember.  The

15   Single A would be like the Class B, and the Triple B would be

16   the Class C.

17        And so what we were looking at is we were looking at

18   this bottom bid, 07-1 Triple B.  So let me start with the next

19   kind of group of columns that's labeled Bid/Offer and change.

20        So you can see it says Bid 81 Batch 00/84-00.  So

21   what he's saying here is he's quoting it like a bond and he's

22   saying I will sell you protection, i.e. buy bonds at a price

23   equal to one-hundred minus 81 or 19 points up front and you --

24   I will buy protection from you at a price, i.e. I'll sell you

25   bonds at a price of one-hundred minus 84 or 16 points up front.

Page 117

1           And he notes that on the second to right most column

2    that the coupon on the trade is 150 basis points.  And then he

3    just kind of calculates that assuming that the so-called spread

4    duration is three years that these prices correspond to a

5    spread, a credit spread of 783 basis points on the bid side,

6    i.e. 81 correspondence to a credit spread of 783 basis points

7    and the offer -- and 683 corresponds to the credit spread at

8    the offered price of 84.

9    Q    And the spreads that are -- that he converts these two,

10   those are in terms of if you were paying this on an annual

11   basis that's what you would be paying?

12   A    Yes.  You -- you'll see it says spreads assume no stress

13   to underlying cash flows.  So he's sort of -- it's an analogous

14   to saying a yield to maturity in a bond.  The difference in a

15   securitization is that you don't know ahead of time what the

16   cash flows are going to be.  They're not contractual because it

17   depends on what people actually do and whether they pay off

18   their car loans.  So that's why he's saying spreads assume no

19   stress to underlying cash flows.

20   Q    Okay.  And I think you told us you started trading this in

21   -- or buying protection in late 2007.  Did you continue to

22   trade in CARB between that time and September of 2008?

23   A    Yes, we did.

24   Q    And could you describe in general terms what your trading

25   was in CARB during that period?

Page 118

1    A    Yes.  So our biggest buys of protection were really the

2    two buys that I just mentioned to you, where we purchased an

3    aggregate of $150 million of protection in two trades from

4    Lehman in October of 2007.

5         We wound up doing maybe of order ten more trades

6    total between that time and when Lehman filed for bankruptcy.

7    In general we were decreasing the size of our position so we

8    bought a little bit more CDS, so our gross buys were 170

9    million, so a little bit more than the 150 million.  We did two

10   trades of ten million each on the buy side and then we did a

11   number of partial unwinds; that is to say we sold down some of

12   the protection that we owned.  So that our gross buys were 170

13   million and then we sold 90 million along the way so that on

14   net at the time of the filing we owned $80 million of

15   protection on CARB.

16   Q    And did you ever trade any CARB with any party in the

17   holding Lehman?

18   A    No.

19   Q    And did you ever see any quotes or Bloombergs from any

20   other dealer in CARB?

21   A    No.  It was a Lehman product.  Yeah.

22   Q    And just for background other than CARB were you -- did

23   you have trading experience in buying and selling protection on

24   auto loans?

25   A    No.

Page 119

1  Q    And what about buying and selling auto loan

2  securitizations, was that something you did?

3  A    No.  My -- I never traded the cash auto loan

4  securitizations and I -- also I had never traded any CDS on

5  auto loans.  Indeed, that was kind of one of the reasons that

6  we approached Lehman because we had never seen a market in

7  that.  We wanted to sort of create the market.

8  Q    Okay.  So I would now like to turn to 2008 and ask you if

9  you could take us back to that time and describe for us in

10  general terms what you were seeing in the market in 2008.

11  A    Do you mean across all products or I'm a little unclear on

12  what --

13  Q    Focus on --

14  A    -- you're asking.

15  Q    -- CDSs and the -- and financial institutions.

16          THE COURT:  Can we get a time frame?

17          MR. TRACEY:  Sure.

18     (Laughter)

19  BY MR. TRACEY:

20  Q    Well, let's start with the -- let's start with the first

21  half of 2008.

22  A    Sure.  So I guess when I think back to the first half of

23  2008 I think a real important event for us was the Bear Sterns

24  rescue.  I think I stated earlier that it was kind of a

25  difficult environment for managing our portfolio because on the

Page 120

1    one hand we were kind of worried about the stresses in the

2    financial system.  And on the other hand we had a lot of

3    illiquid assets.

4         So I was the main trader on this so-called macro

5    hedge portfolio.  And we had quite large CDS positions in this

6    macro hedge portfolio.  I think they were around the time that

7    Bear Sterns was rescued it was on the order of 11 billion or

8    $12 billion.  And most of -- that was a bunch of different

9    credit default swaps, but there was -- a lot of it was credit

10   default swaps on broker dealers themselves including Bear

11   Sterns, Lehman Brothers, Morgan Stanley, Merrill Lynch, Goldman

12   and so on.

13        And so going into Bear which was in mid-March 2008 I

14   remember that we were generally making money on those credit

15   hedges because credit spreads were widening as people were

16   getting very worried about Bear Sterns.  And, in fact, I think

17   that the macro hedge portfolio the Friday before Bear, I mean,

18   it -- the P&L is never totally precise on any given day.  But

19   it was on the order of 300 or 350 or $400 million gain on the

20   month which roughly offset the losses in the rest of the

21   portfolio.

22        But then when Bear Sterns was taken over two things

23   happened that kind of made a big impression on me.  One was

24   that of course credit spreads tightened back in as the kind of

25   panic was resolved and the market relaxed a little bit and we

Page 121

1    gave up all of our mid-month gains on those CDSs and then some.

2    So I think the macro hedge strategy wound up with a loss of in

3    the 40 or $50 million range for the month.

4           But -- so that was unpleasant, definitely, and not

5    good.  But the really difficult thing that happened that month

6    was that whereas credit spreads were tightening a lot, the rest

7    of our portfolio wasn't responding in a positive way.  In fact,

8    the rest of our portfolio continued to lose money and we lost a

9    tremendous amount of money that month.  I think we lost over a

10   billion dollars that month in all tolled.  And the fund was

11   down about seven-and-a-half percent that month which was by far

12   the largest loss that we had ever taken up to that date.

13          So that was kind of an important even for us because,

14   especially for me as the trader of the macro hedge account,

15   because it sort of illustrated how difficult it was to use

16   these credit instruments to really try to hedge the rest of

17   this portfolio. And the net effect of that was that I made the

18   macro hedge portfolio sort of smaller in order to go -- avoid

19   these really gigantic swings.  We sort of decided that it would

20   be better to try to get our exposure down in the rest of the

21   portfolio rather than just try to hedge it out with these

22   really big positions.

23   Q    Okay.  And take us forward to August and early September,

24   were there any events in the market that were significant for

25   your portfolio?

Page 122

1    A    Well, yes.  I mean, I think that generally market

2    conditions were not great during that time in terms of the

3    ability to sell some of these less liquid assets.  And we had

4    made the macro port -- hedge portfolio substantially smaller at

5    that point.  Certainly one important event from my perspective

6    was when Fanny Mae and Freddie Mac were put into

7    conservatorship, sort of a -- I guess it's not exactly

8    bankruptcy, but it's sort of the GSE form of a receivership

9    in -- over the weekend before, I guess, September 8th, 2008.

10   That was an important event I thought.

11   Q    And why was that an important event for you?

12   A    Well, I think it was an important event generally in the

13   market.  These were very big financial institutions.  But as it

14   relates to something that I was active in trading at the time I

15   thought it was very relevant to P -- the PCDS market in the

16   sense that what happened in Fanny and Freddie was that the form

17   of the conservatorship in my mind drew a very big distinction

18   between the equity parts of the capital structure and the debt

19   parts of the capital structure.

20         The debt parts of the capital structure both senior

21   and subordinated were, in effect became obligations of the U.S.

22   Government because the U.S. Government pledged to invest in the

23   senior preferred securities such that the GSEs always had at

24   least a zero net worth.

25         In contrast, the equity was very, very heavily

Page 123

1    diluted.  I believe the government took 80 percent ownership

2    with warrants struck at one-one-thousandth of a cent, and as it

3    relates to PCDS the dividends on not only the common equity,

4    but also the preferreds were forced to be turned off.  And as a

5    result of that I believe the preferreds went from trading

6    around 55 cents on the dollar on Friday to something like 12 or

7    13 cents on the dollar on Monday.

8    Q    And what was the significance of that to you with regard

9    to your PCDSs?

10   A    Well, we had owned CDS of all types, but we had a

11   particular desire to buy PCDS because we felt that it had these

12   characteristics where in a bad environment it could be the case

13   that the rest of the capital structure that the debt is bailed

14   out, but that preferreds are, you know, are treated like equity

15   because it is called preferred stock.  So it was, I guess, in a

16   way confirmatory of our appetite to buy PCDS.

17   Q    Did there come a time in 2008 where you became concerned

18   about the solvency of Lehman?

19   A    Yes.  I would say that we continued to own protection on

20   Lehman Brothers as well as those of the other broker dealers,

21   although in significantly smaller size by September 2008 as

22   compared to say the time of Bear Sterns in March 2008.  And I

23   think that in terms of when the concern became more sharp I

24   guess you would say it was really around that same week after

25   Fanny Mae had filed, around the 8th.

Page 124

1   Q    Do you recall any steps that you or your partners took to

2   address that concern?

3   A    Yes.  I think that -- I mean, first for my part I recall

4   asking my colleague, Adam Metter, just kind of -- I think I

5   asked him a question about what is actually -- what would

6   actually happen under the ISDA if Lehman were to file.  But we

7   also took some actions to actually reduce our -- reduce our

8   risk to Lehman in -- both on the upside and the downside which

9   I'll explain in a minute.

10       On the downside meaning in the event of a Lehman

11  filing I was -- we were trying to reduce our exposure to Lehman

12  Brothers in several ways.  We tried to pull a fair amount of

13  funds back from prime brokerage and repo and decrease the size,

14  get equity out of that basically.

15       We tried to ask them for initial margin back.  And

16  for my part as a trader I tried to take off trades that I had

17  on with Lehman Brothers and potentially start to replace them

18  with equivalent positions facing other dealers.

19       So for example -- I think during that week I think I

20  traded something like 20 or 22 CDS that faced Lehman and all

21  but one of them were unwinds or novations.  I was taking off

22  trades facing Lehman Brothers.  And for the very liquid

23  products like the ITRAX index which is an index in Europe of

24  European credits like (indiscernible) were kind of worked

25  together where I would, you know, be on one phone and I would

Page 125

1   be selling Lehman back protection and he would be immediately

2   buying the same protection back from another dealer so that we

3   could kind of maintain our hedges on the one hand, but not have

4   them facing Lehman on the other hand.

5   Q    Did you have any view in early September 2008 as to

6   whether the collateral marks on your PCDS reflected their true

7   value?

8   A    I'm sorry.  Are you asking whether the collateral marks  -

9   - sorry, on the PCDS --

10  Q    Whether --

11  A    -- at what date?

12  Q    -- on the PCDS, yes, in early 2008 -- in early September

13  2008 reflected their full market value?

14          THE COURT:  Go ahead.

15          MR. TAMBE:  Just an objection, Your Honor.

16          THE COURT:  Yes.

17          MR. TAMBE:  Just a clarification on the question.  Is

18  --

19          THE COURT:  Uh-huh.

20          MR. TAMBE:  -- the question the witness, did you in

21  September 2008 think that your marks reflected the true value

22  or are you asking now looking back and saying --

23          THE COURT:  I think it's the former.

24          MR. TAMBE:  Okay.

25          MR. TRACEY:  Yes.

Page 126

1              THE COURT:  It's the former?

2              MR. TRACEY:  The former.

3              THE WITNESS:  Well, first maybe it would just help to

4    say what the marks were.  So the marks that existed in PCDS at

5    mid-month September 2008 or September 8th or 9th or any day

6    like that would be basically the same as the month end mark.

7    And I had -- I didn't make any effort to sort of update that

8    mark intra-month at that time.

9              So the mark would be very, very similar to the mark

10   on August 29th, 2008.  And the mark that -- marks that I got on

11   August 29th, 2008 were largely based on marks that I got from

12   Lehman Brothers.

13             And what I can say there is that, you know, Lehman

14   Brothers would give us some kind of, you know, Bloomberg with a

15   bunch of spreads on it like ANZ Bank.  I can't remember the

16   number, say it's 200, 250 meaning they would say, I'll buy

17   protection from you at 200.  I'll sell you protection at 250.

18   But it's just a mark.  It's not a market.

19             And I think what I believed at the time was that it

20   was -- maybe I could sell them protection on that basis, but it

21   was very clear that I couldn't buy any protection from them;

22   that that 250 wasn't real or actionable on the offered side.

23             So in that sense I thought that I would -- I wanted

24   to continue to buy the PCDS protection if I could do it

25   anywhere near those marks that they were showing me.  So,

Page 127

1    therefore, I think that -- I didn't think that the marks were a

2    good representation of what the PCDS -- of what I -- we would

3    be willing to pay for the PCDS.  I would have been willing to

4    pay more certainly.

5    BY MR. TRACEY:

6    Q    And in the context of your concern about Lehman at that

7    time did you ask Lehman for additional collateral on those PCDS

8    positions?

9    A    No.  We didn't ask Lehman for additional collateral on

10   those PCDS positions.

11   Q    Why not?

12   A    Sure.  So -- well, I think there are a few reasons why.  I

13   think in essence what we were trying to do is we were trying to

14   take actions that with a high degree of certainty would reduce

15   our Lehman exposure.  So getting money out of prime brokerage

16   is one thing that, you know, assuming the trades actually

17   settle in time those -- that gets your Lehman exposure down.

18          Taking off CDS with Lehman with a high degree of

19   certainty gets your exposure to Lehman down, again, assuming

20   that the trades actually settle.

21          In the case of PCDS I think that the situation was a

22   little bit different.  First of all, it was my experience in

23   contesting marks that it was extremely arduous to do so.

24   During 2007, for instance, we had gone through this exercise

25   with not only Lehman, but also with other dealers on some of

Page 128

1    our asset back CDS and it -- it often took weeks in order to

2    get a mark changed.  And that's -- those were in cases in which

3    we didn't have any dispute with the dealer about what the

4    valuation was.

5           For instance, in early June 2007 we got a bunch of

6    month end marks as of September 30th back from dealers and it

7    was just the case that in the case of Lehman for instance the

8    margin mark just didn't align with the mark that the trading

9    desk was giving.  Like there was cases in which the trading

10   desk was saying that a CDS was worth 50 points up front and the

11   margin mark was 28 points up front.  So it's a huge valuation

12   difference.  And that took something like two weeks to resolve.

13          So in the case of PCDS I think that I felt that I

14   wanted to buy PCDS and the best way to get the margin changed

15   is not to kind of get into an extended valuation dispute with

16   them, but if I could actually buy PCDS, even if it were at a

17   level which was significantly higher than the level at which I

18   was marked, that would be the best way to kind of create market

19   data that would show that the margin mark was too low.

20   Q    And did you have that -- did you have any of that market

21   data?

22   A    Well, no, because I wasn't able to buy any PCDS.  Yeah.

23   Q    Let me direct your attention to Joint Exhibit 46.

24        (Pause)

25   Q    If you have that in front of you can you identify that

Page 129

1    document?

2              MS. SAWYER:  Are they -- where -- are they in the

3    front?

4              MR. TRACEY:  No.  They're in the back.  Sorry.

5              THE WITNESS:  Oh.

6              MS. SAWYER:  Oh.

7              THE WITNESS:  Yes.  Yes, I can.

8    BY MR. TRACEY:

9    Q    What is that document?

10   A    This is an e-mail chain -- well, reading from the bottom

11   up this is an e-mail chain between myself and Adam Metter,

12   principally with some CC's to Julian Sale.

13   Q    And I think you may have referred to a question you posed

14   to Mr. Metter earlier, but can you describe the context of this

15   e-mail chain?

16   A    Sure.  I mean, reading from the bottom up at 10:54 a.m. on

17   Monday I send -- I sent Adam and Julian an e-mail asking,

18   "Suppose that Lehman were to file what is the procedure for

19   valuing the CDS?"

20   Q    And what occurred after that?  Just take us through it.

21   A    Okay.  So I think Adam asks a clarifying question.  I

22   clarify it saying it's the second question, not the first

23   question which is, "what is the procedure for valuing our

24   portfolio of CDS trades we have on with Lehman as

25   counterparty."

Page 130

1   Q    Okay.  And then?

2   A    Well, I said, that's -- "Yes, that's the question I'm

3   interested in."  He sent me back it looks like an excerpt from

4   the ISDA that goes through the definition of Loss and Market

5   Quotation.

6   Q    Okay.  And did you have questions on that?

7   A    Right.  So I asked him the question, "Does the quotation

8   agent" -- I guess that's not a defined term, but I think I

9   meant the dealers that we go out to for market quotation --

10  "actually have to trade with us or not.  I am thinking in

11  particular about the PCDS we have on with them.  Preferred CDS,

12  it's not really traded away from them."

13        So I think I was just not really sure basically how

14  this type of process would work in the case when the -- I guess

15  now I know they're called reference market makers, didn't

16  actually make a market in PCDS.

17  Q    Okay.  And what was the answer to that?

18  A    I don't think he actually really answered my question.  He

19  just gave me the definition of reference market makers and

20  suggested that we should get quotes from dealers that we trade

21  with, not dealers that we don't trade with.

22  Q    Okay.  And what was the follow up on that?

23  A    Well, so I think I -- I just said, "Well, I'm not sure you

24  really answered the question I was asking.  I was asking

25  suppose we go and do this auction, do we get to lift the

Page 131

1    dealers."  And what I mean by lift the dealers is if someone

2    offers me protection in the auction do I get to trade with them

3    or not, do I get to lift their offer of protection or not.  And

4    I -- in contrast I say, "or are they just, you know, quotes,"

5    just numbers somebody's giving me that don't have any, you

6    know, action that one can take as a result of the quotes.

7    Q    Okay.  And you're not copied on the top e-mail on that

8    chain, right?

9    A    I'm not.

10   Q    Do you recall any discussions with Mr. Metter on that

11   subject?

12   A    I don't remember what we talked about.  No.

13   Q    At that time did you or any of your partners begin to

14   prepare a market quotation process?

15   A    Do you mean on September 8th?

16   Q    Yes.

17   A    No.

18   Q    Let me ask you to look at Joint Exhibit 51, please.

19   That's a native document.

20        (Pause)

21   Q    So this document is open to the exposures tab right now.

22            MR. TRACEY:  I don't know who has control over it.

23   But would you mind giving the witness control.

24   BY MR. TRACEY:

25   Q    So feel free to look at the document whatever way you

Page 132

1    want, but my question is going to be whether you can identify

2    it.

3    A    Yes, I can.

4    Q    And what is it?

5    A    I think this tab exposures is something that I created I

6    believe on Sunday, the 14th, 2008.

7    Q    Okay.  Why don't we look at the metadata as long as we're

8    on this?

9         (Pause)

10   Q    So if -- I don't know if you can read the meta data, but

11   if you can, can you tell me whether that indicates the date

12   that this spreadsheet was created?

13   A    Yes.  It looks like there is a field called date created

14   9/14/2008.

15   Q    Okay.  And does it show who created the document

16   initially?

17   A    I think there's a box up above where it does that.  Yeah.

18   So in the fourth line it says author, Arthur.

19   Q    Okay.  And is that consistent with your recollection?

20   A    Yes.

21   Q    So let's go back to the exposures tab and first, before we

22   do that, if you could look at the first tab called quote mark

23   requests.

24   A    Right.

25   Q    And can I ask you whether that tab was on the document on

Page 133

1      September 14th?

2      A      No, I don't think so.  No.

3      Q      Did you create that tab?

4      A      I did not.

5      Q      Okay.  So let's go back to the exposures tab.  By the way,

6      do you know who created it?

7      A      It definitely looks like Dan Gold.

8      Q      And why do you say that?

9      A      I guess because I've sat next to Dan Gold for a really

10     long time --

11            (Laughter)

12     A      -- and it -- saying, please, please, please in bold, all

13     caps, fill in this section just sounds to me like Dan Gold.

14     Q      Okay.  But just to be super clear do you have any actual

15     knowledge that Dan Gold created it other than it looks like it

16     is?

17     A      No.  I just recall somebody was working on this kind of

18     language and I think it's Dan.  I -- you know --

19     Q      And when do you recall somebody was working on that

20     language, that kind of language?

21     A      I think that was on the -- I think that would have been on

22     the 15th, actually.  Yeah.

23     Q      Okay.  Let's go back to the exposures tab.  And so did you

24     create this entire spreadsheet with all the information on it?

25     A      I think what I did is I created sort of bits for people to

Page 134

1    fill out basically, or maybe I filled them out by talking to

2    them on the telephone.  But I think I created the spreadsheet

3    and then I canvassed opinions from various traders under the

4    column, JHIB.  It says, who.  You can see some say Sen.  Some

5    say Arthur and so on.  Sorry.

6            So I think I created the spreadsheet and we wanted to

7    fill in certain information and there's a column J here that

8    has people's names in it.  For instance, the first several say

9    Sen.  The next several say Arthur and so on.

10           So I created the spreadsheet, but I don't remember

11   whether others filled in some of the columns to the right of

12   Column J or whether I filled them in based on talking to

13   people.  But I created this template if you like.

14   Q   And to the best of your recollection is what you see on

15   this sheet right now the same as what was on this sheet on

16   September 14th?

17   A   Maybe I can look through it for a second --

18   Q   Yeah.

19   A   -- to be sure.

20       (Pause)

21   A   Yes.  I think it looks right.  Uh-huh.

22   Q   So would you describe for the Court why -- you know, why

23   you created this sheet and what its purpose is?

24   A    Okay.  So I think this is a listing of the CDS that we had

25   on with Lehman Brothers or it's all the ones that I guess I

Page 135

1    could find in our system at that time.  You can see that Column

2    C says counterparty and it -- they either all say LBSF or

3    Lehman, so these are all default swaps facing Lehman.

4             Going from left to right there's the account that the

5    default swap belongs to.  There's the Tied Fi which is the name

6    of basically a unit of trade I guess you would say in our

7    system.  For instance, the first thing F-10O320DS6 is a default

8    swap on four, maturity in March 20th, 2010 and it appears to be

9    the sixth such default swap we've traded.

10            There's some descriptive information as to whether

11   we're long or whether we're short.  And it looks like in this

12   case we are short protection so long risk in the amount of

13   $3,590,000.  So that's a bunch of descriptive information on

14   all these different default swaps.

15            Moving to the right there is kind of this idea of,

16   well, each person should take a look at the various default

17   swaps that he's responsible for and put in a little bit of

18   information around what to do with that default swaps in the

19   event that we were to -- in order for there to be a Lehman

20   filing and the default swaps were to face an insolvent entity.

21            THE REPORTER:  I'm sorry.  I didn't hear.

22            THE WITNESS:  Sorry.  In the event that Lehman with

23   the file and the default swaps would be facing and insolvent

24   entity.

25   BY MR. TRACEY:

Page 136

1   Q     And what is the "Replace Unwind" in column M?

2   A     Yeah.  Well, maybe -- maybe I should just explain what all

3   these columns are --

4   Q     Sure.

5   A     -- if that's acceptable.

6         So there's a column that's called "Naked vs. Hedge".  And

7   what that means is a naked position is a position where we just

8   have a CDS and there's nothing else on the other side.

9         A hedged position is a position where, for instance, in

10  the case of Argentina, you can see that these are all marked

11  "Hedge".  That's because we owned Argentinian bonds against

12  them and therefore the CDS was hedging something.  And those

13  are two different types of risk level, I guess you'd say.  So

14  that's why we wanted to -- to highlight that.

15        There's a column called "Replacement Difficulty ACS".

16              THE COURT:  Can I ask one clarifying question --

17              THE WITNESS:  Certainly.

18              THE COURT:  -- that has to do with a hedge position

19  is a higher risk than a naked position?  Or do you have

20  exposure on the underlying bond as well as the hedge?

21              THE WITNESS:  Right.  In a sense -- yes.  I think

22  that's right in the sense that before you had a position that

23  you thought was hedged where you ordered Argentina bond --

24              THE COURT:  Right.

25              THE WITNESS:  -- and you had a solvent counterparty

Page 137

1    on the other side.  Now, all of a sudden, your sort of

2    insurance has been taken away and you're (indiscernible) --

3            THE COURT:  And --

4            THE WITNESS:  -- with this bond.  And probably, you

5    know, you would expect the market would go down.

6            THE COURT:  You're exposed to the risk on the bond as

7    well.

8            THE WITNESS:  Exactly.

9            THE COURT:  Okay.

10           THE WITNESS:  Yeah.  That's right.

11           THE COURT:  Thank you.

12           THE WITNESS:  Okay.  So then there's this kind of

13   qualitative idea of how hard is it to replace these positions.

14   So I suppose this was kind of -- I think this was like a letter

15   grade, like an A, a C or an F.  So, for instance, Tom Knox

16   (ph), at the time, must have thought Argentina was relatively

17   easy to replace, so he gave those an A in terms of his guess as

18   to how hard they would be to replace.

19           If you look a little bit further down, you can see,

20   for instance, in rows 331 on down, these are all PCDS because

21   they all say, for instance, in row 334, AAB 120920

22   (indiscernible) 30321.ds1.  And I gave those an F in terms of

23   the ability to replace them, meaning I thought it would be very

24   difficult to replace them.

25           And finally, there's a notation in column M that sort

Page 138

1    of gives an idea, well, do you think you want to replace this

2    CDS or do you want to let it unwind, just sort of let it go?

3    And you can see that in the case where there's a notation that

4    says "Hedge", you often see "Replace" for the reason that I was

5    just talking about that you've lost your hedge and you need to

6    do something.

7    Q    Okay.  And --

8              THE COURT:  Mr. Tracey, if I could ask you when you

9    get to the appropriate stopping point, if you could take a

10   short break, I would appreciate it.

11             MR. TRACEY:  You spoke up at exactly the right time.

12             THE COURT:  All right.  So if we could come back at

13   about 3:15, that would be great.

14             THE CLERK:  All rise.

15        (Recess from 3:04 p.m. until 3:23 p.m.)

16             THE COURT:  Thank you for that break.

17        (Pause)

18   DIRECT EXAMINATION (RESUMED)

19   BY MR. TRACEY:

20   Q    Okay.  Thanks for bearing with us.  So going back to the

21   week before Lehman's failure, did you have a view about whether

22   Lehman would actually be allowed to fail?

23             MR. TAMBE:  Objection, Your Honor.  It calls for

24   speculation.  And an opinion, totally.

25             THE COURT:  I've --

Page 139

1          MR. TRACEY:  I think this witness is -- well, I mean

2     --

3          THE COURT:  I mean --

4          MR. TRACEY:  -- it's just his state of mind.

5          THE COURT:  -- maybe the question is whether Lehman

6     would fail.

7          MR. TRACEY:  Fine.

8          THE COURT:  I mean, are you focusing on the word "be

9     allowed to", Mr. Tambe?

10          MR. TAMBE:  I guess I was focusing on the entire

11     question, but I think amended to say whether Lehman would fail,

12     that's fair.  Still, I think it's speculation but --

13          THE COURT:  It's just what did he think at the time.

14          MR. TAMBE:  Yeah.  That's fine.

15          THE WITNESS:  So we're moving away from the 14th and

16     are we --

17     BY MR. TRACEY:

18     Q    Yeah.  I'm going to --  I'll come back --

19     A    -- kind of rewinding?

20     Q    -- to the 14th.  I'm talking about, say, the week before.

21     A    Yeah.  Well, I think what we thought is that we didn't

22     think Lehman should be allowed to fail.  Maybe that's the best

23     way to say it, although we realized that there was a risk that

24     it could fail.  But we were concerned not only with the case of

25     a Lehman failure, but we were also concerned with the kind of

Page 140

1    short squeeze scenario a la Bear Stearns that I described

2    earlier.  So I actually unwound some credit protection where I

3    had insured a CDS on Lehman, not CDS with Lehman, CDS on

4    Lehman, on Friday, and unwound two different trades of five

5    million of protection facing Lehman.  So I think that we --

6    it's the kind of thing where you don't know with any certainty

7    what's going to happen.  It's kind of like there's a risk.

8    You're not sure what the probability is.  You know it could be

9    really bad.  You also know that the opposite thing could be

10   really bad.  And so, we were trying to get risks down both in

11   terms of our exposure we had to Lehman and also the exposure

12   that we would have in our credit hedges in the event that

13   Lehman was saved a la Bear.

14           So I think to say that we thought Lehman would fail

15   or definitely wouldn't fail, I'm not sure we thought of it in

16   such definitive terms.

17   Q    Okay.  Thank you.

18           So now moving back to September 14th, we talked earlier

19   about your spreadsheet which included references to potentially

20   replacing positions.  Did you talk to your partners either on

21   the 14th -- on the 14th, let's say, about replacing -- the

22   potential for replacing position?

23   A    Yes.  I think we had actually a conference call where I

24   talked to then perhaps individually -- perhaps on a conference

25   call about this sheet, yes.

Page 141

1    Q    And what was the essence of that conference call?

2    A    I think the essence of it was, we don't really know what

3    the prices are going to be like if Lehman files in the morning

4    as it seemed increasingly likely at that point.  But we've got

5    this portfolio with quite a lot of default swaps in it.

6    Everyone should be taking a look at their part of the portfolio

7    and kind of prioritizing in their mind what kinds of

8    replacement trades they need to do.  And as I was discussing

9    earlier in the spreadsheet, we kind of made a distinction

10   between positions that were hedging other positions which we

11   kind of felt was a higher priority to replace and positions

12   that were kind of outright short positions which it was kind of

13   up to the discretion of the trader.

14   Q    Okay.  And did you begin to prepare a market quotation

15   request on the 14th?

16   A    I don't know.  I don't think we did.

17   Q    Were you involved in any such effort?

18   A    I was not.

19   Q    And do you recall when you learned that Lehman had filed

20   for bankruptcy protection -- or Lehman -- LBHI?

21   A    I think it would have been the next morning.

22   Q    And would you please describe for the Court what you did

23   at that point?

24   A    Well, I got up really, really early that morning, I

25   remember.  I think I did my first trade at 4:30 in the morning.

Page 142

1   So that, I think, it was only -- that was only a few hours

2   after Lehman filed.  And so I -- I just started doing various

3   kinds of trades in the market, many of which were replacement

4   trades of protection that I felt it was very likely that I

5   would have lost because of what happened with LBHI.

6   Q    And did you have any conversations with your partners

7   about the possibility of terminating the ISDA agreement with

8   Lehman?

9   A    Sorry.  Do you mean -- on when?

10  Q    On the morning of September 15th.

11  A    Yes.  On the morning of September 15th, I recall us

12  talking, I believe, on the desk at that time, meaning at our

13  normal seats, about terminating the ISDA.

14  Q    And what decision was made, if any?

15  A    The decision was made to terminate.

16  Q    Do you recall approximately what time that was?

17  A    I don't.  I know it was in the morning but I don't really

18  have a lot of specific recollection as to the exact time.

19  Q    And were you aware at that time that the ISDA required QVT

20  to conduct a market quotation process?

21  A    Yes, I was.

22  Q    And did QVT do so?

23  A    Yes.

24  Q    And what was your involvement in that process?

25  A    I think I maybe talked to people somewhat but I wasn't --

Page 143

1   and I sit right next -- or I sat right next to Joel Wollman.

2   He sat to the right of me.  And so, I think it's very likely

3   that Joel would have turned to me from time to time, oh,

4   (indiscernible), what about this or how do you think we should

5   break -- you know, break up the portfolio perhaps or, you know,

6   what dealers do you think we should use.  So perhaps we had

7   those kind of conversations.  But I wasn't involved in really

8   any of the drafting of the language or nor was I involved in

9   kind of creating directly the spreadsheets that ultimately were

10  used for the market quotation itself.

11  Q    Let me just go back to the decision to terminate for a

12  moment.  Could you describe what -- from your standpoint what

13  QVT's reason was for deciding to terminate on September 15th?

14  A    Yeah.  I mean, I think it was basically that if we -- if

15  we terminated, we knew -- we would know that we had terminated.

16  And the alternative to that would be to have this portfolio of

17  many, many derivatives facing -- well, I guess LBSF, I believe,

18  had not filed at that time, but LBHI had filed.  So with high

19  probability, what was going to be an insolvent institution, a

20  non-performing institution.

21       And so, that was just a very unfamiliar set of

22  circumstances to us, what would it mean for us to have hundreds

23  of these credit default swaps but we were mostly loan

24  protection facing an insolvent institution.  That's not

25  something we had ever done before.  So we had made the decision

Page 144

1    to terminate the ISDA and which would cause us to no longer

2    have those positions and then to go on managing the portfolio

3    from there.

4    Q    Do you remember having any discussion about whether to

5    designate the early termination date on the same date as you

6    sent your notice of termination?

7    A    I don't recall whether that was discussed or not.

8    Q    Okay.  So moving forward, after the market quotation

9    process, were you involved in calculating the settlement amount

10   for -- with Lehman positions?

11   A    Yes.

12   Q    And what was your involvement in that process?

13   A    So I was one of the portfolio managers who was tasked with

14   valuating a significant number of positions in the portfolio.

15   And, you know, I participated in discussions with the other

16   portfolio managers involved in the process when the process

17   started.

18   Q    And who else was involved in the process?

19   A    You know, the main people were myself, Joel Wollman, Tom

20   Knox, Yu Sen (ph) and Nick Bromwell, although Nick didn't

21   really do a lot of marking.  And I believe Tracy Fu had a very

22   small role in which he had a couple of interest rate swaps he

23   had to value.

24   Q    Okay.  And would you describe the process that group used

25   to perform its work with regard to the loss calculation?

Page 145

1          MR. TAMBE:  Objection, Your Honor.  If we can -- he

2     described five different people.

3          THE COURT:  Yes.

4          MR. TAMBE:  If we can take it in steps --

5          MR. TRACEY:  I'll break it down.

6          MR. TAMBE:  -- so we have some control over --

7          MR. TRACEY:  Sure.

8          MR. TAMBE:  -- who's doing what and --

9          THE COURT:  Okay.

10         MR. TRACEY:  Sure.

11    BY MR. TRACEY:

12    Q    Was there any discussion about what approach would be

13    taken to valuing the positions among any of those five people?

14    A    Sorry.  What do you mean what approach was taken?

15    Q    What approach that the traders would take to valuing the

16    positions.  Was there any discussion of that?

17    A    Well, yes.  I mean, maybe it would help to say that, like

18    in terms of kind of placing some structure on the problem, I

19    think that Joel Wollman kind of collated all of the different

20    CDSs together and put them in a spreadsheet which had certain

21    common information in it, like this is the account that the

22    trade lives in, this is the particular ti-fi (ph).  These are

23    the CDS characteristics.  It's maturity, it's spread.  And

24    there was various other types of information in that

25    spreadsheet as well.

Page 146

1    And the idea was that we would kind of work from this

2    spreadsheet breaking up the portfolio into different parts

3    depending on whose positions they were.  And then we would --

4    we would -- that's how we would kind of build up the

5    calculation.  And we did meet together on the weekend to talk

6    about some general parameters as to how we would go about

7    marking those different positions.

8    Q    And would you describe the discussions around the

9    parameters for marking the positions?

10   A    Right.  So --

11        MR. TAMBE:  And, Your Honor, if I could just make a

12   request.  If the witness could distinguish between the first

13   weekend and the second weekend.  If he can't, he can't.  I just

14   want some precision about this process, please.

15        THE WITNESS:  Okay.

16   BY MR. TRACEY:

17   Q    So to the extent you can put a time on it would be

18   helpful.

19   A    Right.  So I believe it was the first weekend, but I can't

20   be completely sure, in which we -- okay.  So the people who met

21   in the office, I guess, would have been myself, Nick, Joel, Tom

22   Knox and Yu Sen were the people who did -- did most of the

23   work.  And Nick was quite familiar with the ISDA and so he was

24   kind of there even though he wasn't really marking a lot of

25   positions.  To the extent that we had to -- had questions about

Page 147

1    what we were trying to d, we felt it would be a good idea to

2    have him around.

3         So I think that, in terms of the general principles that

4    we talked about for marking the positions, I think there was a

5    concept that to the extent that you had done replacement

6    trades, that would be a good -- you could use those replacement

7    trades to value the prior trades.  And to the extent that we

8    got levels on -- back on the list -- if we had a market

9    quotation, of course, there's nothing to think about because it

10   was just done.  It was a market quotation.  But that was only a

11   handful of positions.

12        To the extent we got levels back on the list, I guess we

13   thought it made sense generally to use those levels if you had

14   them.  By the list, I mean the market quotation process where

15   we got some kind of price back but not three prices back.  We

16   would have some market information and traders were kind of --

17   we thought that was good data.

18        And then finally, there's the question of positions that

19   we could mark using a markit.  And in that case, there was a

20   understanding that because we were the non-defaulting party, we

21   would be calculating the replacement value -- well, this

22   doesn't have to do with markit specifically, but there's a

23   markit data issue I'll get in a second -- get to in a second.

24   We were calculating the replacement values (indiscernible) our

25   side of the market, meaning if we had to pay the bid offer

Page 148

1    spread in order to transact into a place that would form part

2    of the loss calculation.  And the reason that's relevant to

3    markit is because markit only gives you a mid-market.

4              THE REPORTER:  Slow down.

5              THE WITNESS:  Mark IT only gives you a mid-market

6    price and therefore we would have to make an assumption about

7    what the difference between the mid-price and the actual

8    replacement price would be on any given transaction.

9              So those were, I would guess, the sort of general

10   shape of the calculation and how we thought about it.

11   BY MR. TRACEY:

12   Q    Okay.  And I think you testified that you were the one who

13   calculated the loss on PCDS, is that correct?

14   A    That's correct.

15   Q    And with respect to PCDS, were there any replacement

16   transactions?

17   A    No.

18   Q    And were there broker runs that you could use to value the

19   PCDS?

20   A    No.

21   Q    Were there any transactions in PCDS that you were aware of

22   that you could use to value them?

23   A    No.

24   Q    And at this time, were you aware of any market makers that

25   were making a market in PCDS?

Page 149

1    A    No.

2    Q    And was there anything on Bloomberg or services of that

3    kind that would reflect prices for PCDS?

4    A    No.  There were no PCDS prices on Bloomberg.  No.

5    Q    And did you include the PCDS positions in your market

6    quotation process that occurred on the 15th?

7    A    Yes.

8    Q    And were there any quotations that were generated on the

9    PCDS positions from that process?

10   A    No, there were not.

11   Q    And you referred to market partners as a pricing source.

12   Was there market partners pricing on PCDS that you could use?

13   A    There were a few reference entities for which when we did

14   the market partners data call in our system, there were numbers

15   in them.  But we didn't think the numbers were a very high

16   quality.

17   Q    Why was that?

18   A    Well, because some of them you could just tell that they

19   didn't make sense because, for instance, one of them, the

20   markit spread, was actually lower than a subordinated debt

21   spread which really shouldn't be the case because the preferred

22   CDS is sort of strictly worse than the subordinated debt CDS.

23        And -- but more generally, I mean, the markit data we need

24   to be an amalgam of dealer opinion about PCDS.  And with Lehman

25   gone, we just didn't think that the quality of the data would

Page 150

1    be very meaningful.

2    Q    Did you consider using the prices of senior CDS to do your

3    valuation?

4    A    I considered but I didn't use it, no.

5    Q    Why not?

6    A    Okay.  Well, so in the market (with an e), the marketplace

7    for CDS, there was sort of a trading -- I guess I would call it

8    a rule of thumb where people would sort of look at where PCDS

9    was as compared to senior CDS.  So, for instance, in that

10   message that Mike Newman (ph) sent me earlier on Wachovia Bank

11   CDS -- PCDS, he mentioned that he thought he might be able to

12   source 3 or PCDS at 325 and he was comparing that to senior

13   CDS.  I think it was 215, 225 in that Bloomberg, but that's

14   whatever the level was.  He was making a comparison between the

15   two.

16        So when PCDS was traded, people would often look at the

17   so-called ratio between PCDS and CDS.  So they might say

18   something like the ratio is 2 which meant that the senior debt

19   was at -- the spread was 50 basis points; the PCDS spread was

20   100 basis points.  And that was kind of, as I said, a rule of

21   thumb as to the way things tended to trade in the market.

22        But I was very clear in my mind and had been clear in my

23   mind kind of since the inception of the PCDS trades.  And

24   indeed, this was one of the reasons why we put on the PCDS

25   trades.  That this was just sort of a market convention or rule

Page 151

1    of thumb and it wasn't a hard relationship that had to hold.

2    Like an example of a hard relationship that has to hold is like

3    the price of the S&P 500 features has got to be very, very

4    close to the sum of the prices of all the stocks that underlie

5    it because if that's not the case, people will do trades to

6    arbitrage the difference.

7        But saying that senior CDS and PCDS have a certain ratio

8    historically, it's just a historical observation.  It's sort of

9    like saying Lehman Brothers' debt spreads are typically 110

10   percent of Goldman Sachs' debt spreads.  That was true for

11   maybe a -- something like that would have been true for a long

12   period of time but it clearly wasn't true after September 15th.

13   I mean, Brookshire, Hathaway and AIG may be considered

14   comparable credits and maybe their spreads were close to each

15   other for a long period of time.  But that clearly wasn't true

16   in the post-September 15th world.

17       And so, to me, when I looked at what happened with Fannie

18   Mae and Freddie Mac the week before Lehman, it was -- I really

19   felt that that was a very clear message to the market that

20   whatever historical relationship existed between senior and

21   preferred spreads, it didn't have to hold and it didn't have to

22   hold in a very stark way in the case of Fannie and Freddie

23   because, basically, the preferred went from -- went to about 10

24   or 15 cents on the dollar and the senior debt because very

25   close to a riskless investment in the sense that it was

Page 152

1   basically guarantied by the U.S. government.

2        So whatever historical relationship that existed at the

3   time, what was completely changed now after whatever had

4   happened to Fannie and Freddie.  That was my view of why even

5   if in the past people had looked at senior CDS and PCDS as

6   being two closely related entities, in fact, you had a very

7   important market event which showed that that historical

8   relationship was merely an observation and not a hard market

9   rule.

10  Q    And did you see any price sources in the market that you

11  thought you could use in connection with pricing your PCDS?

12  A    Well, we -- yes.  We used the preferred stocks themselves.

13  Q    And would you describe what your approach was to valuing

14  the PCDS?

15  A    Okay.  So the kind of concept behind it was that there

16  were -- you know, before the price of the PCDS would sort of be

17  where you could find the seller of PCDS on the other side but

18  it didn't appear to us like there were any such sellers, nor

19  did it appear to us that there was any dealer that would -- you

20  know, that traded PCDS other than Lehman.  So we tried to kind

21  of put ourselves in the shoes of a dealer who is being asked to

22  offer PCDS portfolio protections equal to what QVT had.  And

23  that portfolio of protection, I guess in rough terms, was $307

24  million in notional.  It was about a four and a half year time

25  to maturity, so significant time to maturity.  And it had a

Page 153

1   pretty low coupon, about 145 basis points now.  So that was

2   kind of like the basket of risk that the dealer was asked to

3   take.

4        And we felt that given those parameters and given what was

5   going on in the preferred market that a dealer would want to

6   hedge the risk of the deferral event and that he would hedge

7   that risk by selling short the underlying preferred stock.  And

8   so that was the sort of basis for the valuation method that we

9   did.

10  Q    And based on that premise, how do you get that to a price

11  for your PCDS?

12  A    Right.  Okay.  So we're turning to the kind of concept of

13  putting ourselves in the shoes of a dealer who is being asked

14  to offer this.  Okay?  So by offering the PCDS, the dealer is

15  going to have the right as the protection seller to received

16  the coupon on the portfolio of approximately 145 basis points.

17  So that's some cash inflow he has.

18       And to hedge the deferral -- and if there's a deferral

19  event, of course, he has to pay out 100 cents on the dollar on

20  the preferred.  So to hedge himself, we imagine that the dealer

21  -- we at least said, okay, well, the dealer's going to -- in

22  order to hedge the deferral with the dealer, we'll sell short

23  the preferred securities.

24       And suppose that the dealer sold short the preferred

25  securities at a price of 65 cents on the dollar.  And let's

Page 154

1    start with a case in which the dealer says I'm not going to

2    charge you anything up front.  I'm just going to agree to do

3    this for 145 basis points running.

4        On the short side, the dealer's going to have to pay out

5    the coupon on preferred assuming that they continue to perform.

6    So say they had a five percent coupon, so you're receiving 145

7    and he'd be paying five.  He could partially offset that

8    perhaps by owning treasury securities.  But he would be losing

9    some carry along the way.

10       More importantly, if a dealer sold short preferred

11   securities and had sold PCDS to QVT, if there were a credit

12   event, what happens?  Well, the dealer basically has to cover

13   his short at 100 cents on the dollar in the sense that QVT

14   would deliver him the preferred securities and he would pay

15   100.  So that's like buy the preferreds at 100 cents on the

16   dollar, i.e., you're short something and then you buy it at

17   100.  So if you're short at 65 and there's a risk that you have

18   to buy it back at 100 and you want to be hedged against that

19   risk, you charge 35 points, the difference between 100 and 65

20   for that risk.  So in that case, we would say, if the

21   preferreds are at 65 then the dealer would have to charge over

22   the hedge that jumps a deferral risk 25 points up front in

23   order to enter into that trade.  So that was the concept behind

24   -- that was the concept behind how we thought about how a

25   dealer could go about hedging his deferral risk.

Page 155

1    Q    And based on that, how did you determine the price of the

2    PCDS?

3    A    Well, so for each PCDS reference entity, I think there

4    were 19 reference entities -- excuse me -- yeah, reference

5    entity, we had to find a particular preferred to use in order

6    to calculate that price.

7         So I generally started with the reference obligation.  The

8    confirmation for the PCDS contains a reference obligation.  I

9    didn't use the reference obligation in all cases but I

10   generally started with a reference obligation.  And then I

11   looked at the price of that reference obligation as the basis

12   for this 100 minus the price of the preferred, this

13   hypothetical 65 I was just talking about in order to do the

14   calculation.

15   Q    Slow down.

16   A    I'm sorry.  I used --

17              THE REPORTER:  Slow down.

18              THE WITNESS:  I looked at the price of that preferred

19   which was often the reference obligation in order to do this

20   calculation of the difference between 100 and the price of the

21   preferred.

22   Q    And when you obtained the prices for the preferred stock,

23   did you use the prices on September 15th?

24   A    I did not.

25   Q    And why not?

Page 156

1  A    Well, because I thought that being in a position of a

2  dealer who basically would have to execute a very sizeable, in

3  my opinion, trade in the preferred stock market, I felt that

4  dealer was very unlikely to just look at the published price on

5  September 15th and just assume that he could execute at that

6  price.

7  Q    And in your view, why would that be?

8  A    Well, I think there's a couple of reasons.  One is that

9  many of these securities are OTC securities.  And if you look

10 at a published price, you just can't be sure that you can

11 actually trade at that price.  It might just be a quoted price.

12 And, in fact, when I looked at the prices on Bloomberg of many

13 of these securities, some of them looked like a steal to me.

14      And secondly, even if you thought that that price was, so

15 to speak, a real price akin to the last closing price on an

16 equity exchange, it was my experience that if someone does a

17 big trade, they're going to assume that it gets done at a

18 discount to the last price and that the dealer would adjust

19 that prices in some way for that market impact that he would

20 have by selling short such a volume of preferred stock.

21 Q    So I think you mentioned the first part of that answer

22 related to your view that some of the prices on September 15th

23 were stale.  Did you collect any documentation of that --

24 supporting that conclusion?

25 A    Well --

Page 157

1            MR. TAMBE:  Objection, Your Honor.

2            THE COURT:  Yes.

3            MR. TAMBE:  Could we just have a time frame as to

4    when he collected and --

5            THE COURT:  Sure.

6    BY MR. TRACEY:

7    Q    Sure.  And I'm talking -- all of my questions, until I say

8    otherwise, are focused on the two weekends when you performed

9    the loss calculation.  I'd like you, to the best of your

10   ability, to limit your answers to that time period for -- until

11   we decide otherwise.  So this is at any time while you were

12   valuing the PCDS between September 15th and October 15th, 2008.

13   A    Okay.  Yeah.  So -- excuse me.

14        So those -- so what I did is I took screenshots, like

15   snips of pictures of Bloomberg prices on various preferred

16   securities as well as taking Bloomberg screenshots of various

17   broker runs that had preferred securities on them.  And I did

18   that over those two weekends.  I think it's also possible I did

19   a few on, like, a Monday or something like that.  But it was

20   definitely in that window between those two weekends.

21   Q    Okay.  And if I could ask you to turn to Claimants'

22   Exhibit 2096.

23        First, I'm going to ask you a general question about the

24   entire document.  Can you identify what this set of pages

25   represents?

Page 158

```
 1   A     Just one moment, please.

 2         (Pause)

 3   A     Yes.  This is a collection of, I think, some of the

 4   screenshots, maybe not all of the screenshots, that I took

 5   during that time on preferred prices and some broker runs.

 6   Q     Okay.  Why don't we --

 7              THE REPORTER:  (Indiscernible).

 8              THE WITNESS:  Preferred prices and some broker runs.

 9   BY MR. TRACEY:

10   Q     Why don't we focus on the first page which is stamped QVT

11   Fund 4787?  Can you just take us through this and orient us to

12   what it says?

13   A     Okay.

14   Q     Before we do that, let me just set the time frame.  Is

15   this a Bloomberg screenshot that you took from your Bloomberg

16   screen?

17   A     Yes, it is.

18   Q     And what date did you take this screenshot?

19   A     Looking at the metadata here, it appears to be from

20   9/28/2008.

21   Q     Okay.  And does this represent all of the information that

22   was on your screen at that time that was relevant to this

23   issue?

24   A     Yes.  It's all of the information that's relevant to this

25   issue.
```

Page 159

1   Q    Okay.  So now can you just take us through it and explain

2   to us what this is?

3   A    Okay.  So this is a price history for a particular

4   preferred security which has been issued by ANZ Australia and

5   New Zealand banks.  Earlier, we were talking about PCDS on AUZE

6   (ph) Banks.  ANZ is one such AUZE Bank.  And this particular

7   security, ANZ Capital Trust II 5.36 percent preferreds -- those

8   are the reference obligation for that PCDS on ANZ that I had

9   entered into with Lehman Brothers.

10  Q    And can you describe what you asked your Bloomberg

11  terminal, if that's the right way to say it?

12  A    Okay.  I asked the Bloomberg terminal to please give me

13  the price history that it had on this security.  And it gave it

14  to me.  You can see in the middle bit that says "Source BGN"

15  (ph) -- that's the Bloomberg pricing service -- carry this

16  daily.  And the market is the mid as opposed to the last.  So

17  that's whatever BGN thought the mid-market was at the time.

18  Q    And --

19  A    And --

20  Q    Sorry.

21  A    No.  Go ahead.

22  Q    And the time range that you asked for was November 29, '07

23  to 9/16/08?

24  A    Yes.  That's the one that came up.  I'm not actually

25  certain why it says 9/16/08 rather than some later date like

Page 160

1    9/22 or 9/28.  I'm not certain whether Bloomberg just didn't

2    have those later prices.  But that's what's on this particular

3    screenshot.

4    Q    And I note that this -- on the top right, it says page 1

5    of 5.  And there's no 2 through 5.  Do you know what was on

6    those pages?

7    A    Yeah.  So when you put "Price Pressa" (ph) -- it's called

8    HP, that's price history in Bloomberg -- this here -- it gives

9    you this range that I think it probably defaulted to.  And so,

10   you can see the range from 11/29/07 and then it's in reverse

11   chronological order.  So I just think the other pages are going

12   to be the earlier prices which I didn't bother to take a

13   screenshot of.

14   Q    Okay.  And what was significant to you about these prices

15   when you reviewed them on September 28th?

16   A    Well, so in terms of just what the data is, it's a price

17   associated with each date which, I guess, I would presume to be

18   a closing price.  And I think one thing that I noticed when

19   I've seen this before in securities that are not very liquid is

20   you just have a lot of missing prices in this case.  You can

21   see that there are large blocks of time in which there are just

22   no prices at all.  There isn't even a 9/15 price that's given

23   in this case.

24        And away from that, the other thing that's a little bit

25   strange about this price series is that if you look for

Page 161

1    instance from 7/24 to 8/7, the price moves very, very little

2    during that period.  That's not, in principle, impossible.  But

3    just having seen a lot of prices before of things that are both

4    really traded and stale, this is something that you might worry

5    about as an indicator of a stale price.  And indeed, the fact

6    that if you look on 9/16/2008, I noticed that the price was

7    88.737 -- excuse me -- 7387.  It just struck me as a little bit

8    odd that that price would be actually higher than the alleged

9    price in June 31st, 2008 given that the preferred stocks that I

10   could see were following allotted price.  So that was kind of a

11   warning that these prices might potentially be stale.

12   Q    And I think you touched on this but what is the

13   significance of the fact that there are no prices for a lot of

14   these dates?  What was the significance of that to you when you

15   reviewed it?

16   A    Well, it means that how ever Bloomberg gets its data, it

17   just didn't have any quotes on this particular security.  I

18   also looked through my old Bloombergs I remember for this

19   particular security to see if I could find any broker runs.  I

20   couldn't find anything.  So it's sort of consistent with the

21   idea that this might not be a lively traded security.

22   Q    Okay.

23              THE COURT:  Can I ask one question?

24              MR. TRACEY:  Sure.

25              THE COURT:  Quite a while ago, Mr. Tracey was asking

Page 162

1   you about the market impact of selling a large block of

2   securities.  So does this screen tell you how large the

3   outstanding amount of this reference security is?

4          THE WITNESS:  No.  It doesn't.  There is another

5   screen in Bloomberg that you have to go to to see that.

6          THE COURT:  Thank you.

7          MR. TRACEY:  And we will get to --

8          THE COURT:  Okay.

9   BY MR. TRACEY:

10  Q   Okay.  Could you turn to the next page, please, which is

11  marked QVT Fund 4790?  And I have the same question on that.

12  What did you ask your Bloomberg screen to do?

13  A   Okay.  Excuse me.  So this was another security that I was

14  using in order to do the valuation of the par minus preferred.

15  In this case, it was on BNP Paribas and the security is the BNP

16  4-7/8ths of 2049.  It's a perpetual.  It's just that Bloomberg

17  represents that as 2049.

18      And in this case, you can see that the price series is

19  more filled in than it was for Australia New Zealand Bank.

20  Q   And before we get to that, can you tell what date you took

21  the screenshot?

22  A   One moment, please.

23      (Pause)

24  A   Yes.  It's also 9/28/2008.

25  Q   And where do you see that?

Page 163

1    A    It says "Last log date, 9/28/2008".

2    Q    Okay.  And what was the significance to you of the prices

3    you were seeing on September 28th, 2008?

4    A    So I would say that although this was more filled in than

5    the previous screenshot, I think some of the same -- I thought

6    there were some of the same types of issues.  For instance, the

7    price on 9/15 is alleged to be 64.59.  And if you look at the

8    price -- well, it's basically equal to the price or very, very,

9    very close to the price over a real long period of time from

10   roughly 8/18 to 9/5.

11   Q    And what does that tell you was the --

12   A    And actually --

13   Q    Oh, I'm sorry.

14   A    -- even kind of continuing a little bit, the price appears

15   to increase across the Fannie Mae event from 64.70 that Friday

16   to 64.75.  Yeah.  So I think that sort of is an indicator that

17   you would be concerned the pricing could be stale.  And

18   similarly, the price kind of drops from 64.59 down to 60.95.

19   And then drops a little bit more (indiscernible) kind of stays

20   around that 60, 61 price for several days at a time.  Again,

21   having traded in some liquid things before, this is a pricing

22   pattern that I was familiar with where it looks like something

23   isn't changing and then there's kind of a big change and then

24   it just sort of stays there again for a long time.  So this is

25   sort of suggestive of both the fact that the price went up --

Page 164

1    alleged -- was alleged to go up during very difficult market

2    conditions and this sort of stair step pricings 40537, what

3    you'd often see in the liquids.

4    Q    And tell us about the stair step pattern.  What does that

5    -- what did that tell you as a trader when you saw that?  What

6    does that mean?

7              MR. TAMBE:  Objection, Your Honor.

8              THE COURT:  Yes.

9              MR. TAMBE:  I don't think this -- the objection is I

10   don't think there's any evidence that that analysis was ever

11   done at the time.  So again, I go back to he can read the

12   screen and do an analysis today, but let's go back to whether

13   this analysis was done at the time.

14             MR. TRACEY:  Those are -- all of my questions are

15   intended to be that.  If I'm not asking right, I'll fix it.  So

16   let me rephrase my question.

17   BY MR. TRACEY:

18   Q    When you reviewed this Bloomberg on 9/28, what was your

19   conclusion based on this stair step pattern, if any?

20   A    Well, it was --

21             THE COURT:  Conclusion as to what?

22   BY MR. TRACEY:

23   Q    Conclusion as to the validity of these prices.

24   A    I guess I would just conclude that I know this is an OTC

25   security and I know that quoted prices on OTC securities are

Page 165

1    not always last prices or something where a trade actually

2    occurred.  It could just be a quoted price that's been hanging

3    out there for a long time.  And I think I had this kind of

4    concern when I looked at this type of security.

5    Q    Okay.  Let's turn to the next page stamped QVT Fund 4798.

6    Same question for this is can you identify that document, that

7    screenshot.

8    A    Yes.  It is another screenshot I took from Bloomberg.  In

9    this case, another AUZI Bank, Commonwealth Bank of Australia,

10   CBA.  Again, I'm not 100 percent sure why the price terminates

11   at 9/15/2008.  And again, these prices appear not to move

12   around very much compared to what I would have expected the

13   preferred would do during that time.

14   Q    And do you -- can you tell the Court what date you took

15   that screenshot?

16   A    It's -- looks like it's 9/28/2008.

17   Q    Okay.  And turning to the next one, document number QVT

18   Fund 4817, can you identify that screenshot and when you took

19   it?

20   A    So this is a screenshot from, I think, the same date,

21   9/28/2008 of Arabo (ph) Bank preferred.  And so it has some of

22   the same characteristics as the other ones where there's just a

23   lull period of missing prices.  You don't even have a quoted

24   price until 9/17/2008 which is, you know, according to this,

25   slightly higher than the price that prevails during August,

Page 166

1    88.7303, for instance, on 9/18 versus 87.6284.

2    Q    And what conclusion, if any, did you reach based on your

3    review of these prices at that time with regard to the validity

4    of the preferred prices?

5    A    Well, just that I guess I would say I was slightly

6    skeptical as to whether or not these prices were actually

7    actionable.

8    Q    Okay.  Going back to your earlier testimony about why you

9    didn't use the September 15th prices, you also referred to a

10   potential for market impact of the sale of securities.  Do you

11   recall that?

12   A    Yes, I do.

13   Q    And did you review any documentation which provided

14   support for that conclusion?

15   A    Yes.  I mean, while I was doing the analysis of the

16   preferred securities, I was looking through my Bloomberg

17   messages and looking for prices, but I was also coming across

18   trader commentary that people made.  And I could see also

19   broker runs where I could actually see the bid offer spread or

20   at least the quoted bid offer spread assuming the market

21   actually worked that -- on those Bloomberg messages at the

22   time.  So I was using Bloomberg's own kind of internal pricing

23   service, but I also -- was also reading the Bloomberg messages

24   that were coming to me as I was looking for prices.

25              MR. TAMBE:  Can we just get more clarification?  I'm

Page 167

1    not sure which Bloomberg messages is he -- during 9 --

2              THE COURT:  Could you speak up, Mr. Tambe?

3              MR. TAMBE:  I'm not clear on the answer.  If we could

4    just get clarification on --

5              THE COURT:  Which Bloomberg messages.

6              MR. TAMBE:  Which Bloomberg -- during what time

7    period?  Between 9/15 and 10/15/08?

8              THE WITNESS:  No.  This was -- well, no, because I --

9    it was really up to 9 -- it would have been up to 9/28/08

10   because that's when the analysis was concluded.

11   BY MR. TRACEY:

12   Q    So let me just ask you to clarify that answer.  First

13   question is, during what period did you review the Bloombergs

14   that you just referred to?

15   A    It was -- it was at the same time, the same session, that

16   I was taking these -- and same set of sessions, I would say,

17   that I was taking these screenshots.  I was looking around for

18   information on the preferreds that were relevant to our PCDS

19   portfolio which included both -- you know, taking screenshots

20   of Bloomberg-provided prices as well as looking through

21   Bloomberg messages from dealers who traded preferreds at the

22   time.

23   Q    Okay.  And as we go through the Bloomberg messages,

24   (indiscernible) them so you could see what the dates are.

25             But before we get into that, I just want to -- for those

Page 168

1    of us who don't sit at one of these terminals, you referred to

2    Bloomberg messages.  Is that the same as the broker runs you

3    talked about before?

4    A    Well, as I had said, a Bloomberg broker run is one form of

5    Bloomberg message that you can get.  But a Bloomberg is just a

6    messaging service that you can -- you can put whatever on it.

7    It's just like messages back and forth similar to e-mail.

8                THE COURT:  So it's like a g-chat but to a lot of

9    people?  In other words, how does the sender of a Bloomberg

10   message define the universe of recipients?

11               THE WITNESS:  Oh, okay.  I could -- sorry.  I don't

12   know what a g-chat is but --

13               MR. TRACEY:  Oh, no.

14               MR. TAMBE:  That's you and me both.  I don't either.

15               THE COURT:  Serious credibility issue now.

16               MR. TRACEY:  That is.  Had to reveal.

17               THE COURT:  You don't have teenagers.

18               MR. TAMBE:  Glad he asked.

19               THE COURT:  So apart from what a g-chat is --

20               THE WITNESS:  Yeah.  So you --

21               THE COURT:  -- the question is how does the sender --

22               THE WITNESS:  Sure.

23               THE COURT:  -- of a Bloomberg message, which you're

24   obviously the recipient of --

25               THE WITNESS:  Yep.

Page 169

1              THE COURT:  -- how does he define the universe of

2     recipients?  And there's been testimony from others that when

3     you're sitting at a Bloomberg terminal, someone in your

4     position is literally bombarded with Bloomberg messages --

5              THE WITNESS:  Right.

6              THE COURT:  -- that it sounds like kind of accumulate

7     in your inbox.  A g-chat message kind of pops up on your

8     screen, forces you to look at it.

9              THE WITNESS:  Oh, okay.  Yeah.

10             THE COURT:  So we're just all trying to understand

11    kind of the whole mechanism of receiving Bloomberg messages.

12             THE WITNESS:  Oh, okay.  Sure.  Let me try to --

13             THE COURT:  Sure.

14             THE WITNESS:  -- answer it one at a time.

15             THE COURT:  Okay.

16             THE WITNESS:  So the way --

17             THE COURT:  Is that --

18             MR. TRACEY:  That's my question.

19             THE COURT:  That's your question.

20             MR. TRACEY:  Exactly.

21             THE COURT:  Okay.

22             THE WITNESS:  Sure.  Okay.  So in terms of how I

23    would define the list of people -- of when you send a

24    Bloomberg, who you send it to, so you can just do a Bloomberg

25    between you and a single person.  It's just like sending an e-

Page 170

1    mail, like I could send it to --

2              THE COURT:  That's a g-chat.

3              THE WITNESS:  -- to Mike Newman.

4              THE COURT:  Right.

5              THE WITNESS:  Okay.  Or you can define these

6    basically lists of people where you can send a blast Bloomberg

7    to all of those people at the same time.  And in my experience,

8    most -- the very, very significant majority of the messages you

9    receive in your Bloomberg on a given day are basically those

10   blast Bloombergs where, I don't know, the -- the trader at

11   JPMorgan is (indiscernible) trades insurance CDS has the list

12   of, I don't know, hundreds and hundreds, maybe thousands, of

13   people that he sends out these runs continuously or, you know,

14   from time to time during the day on -- and they pick them up or

15   they don't pick them up.

16             Okay.  Then I guess the question is, like, how does

17   Bloomberg kind of get your attention.  Is that one of the

18   questions?  Well, so when you -- there's a couple different

19   ways.  Like, there's like a little box that can flash saying,

20   like -- it's just a small box that, like, flashes which -- and

21   it might say, like, "Message for Mike Newman", "Message from

22   Jamie Benjamin", what have you, but it's not like a big pop-up

23   or something like that that forces you to stop what you're

24   doing.

25             And then in terms of the way the messages kind of

Page 171

1    accumulate, they're just continually going in all the time.

2    And if you want to see what your messages are at a given point

3    in time, you say -- you type "MSG" and then it shows you the

4    first, I don't know, 20 messages, just like the first line of

5    them basically.  And it doesn't keep like scrolling away from

6    you.  Kind of like as of that point, you see the 20 messages

7    and you can page down or search or whatever.  So that's kind of

8    like a picture of how these things work.

9              THE COURT:  Okay.

10             THE WITNESS:  Yeah.

11             THE COURT:  Thank you.

12   BY MR. TRACEY:

13   Q    And at this time, about how many of these Bloomberg

14   messages did you get a day?

15   A    I got several thousand.  I think it was between like 6 and

16   8 or 9,000 per day.

17   Q    Per day?

18   A    Yeah.

19   Q    And so, if you -- so you didn't read every one.

20   A    No.  Most certainly not.

21   Q    And did you even look at the Re line in every one?

22   A    Sorry.  What -- oh.

23   Q    The subject line.

24   A    Like the --

25   Q    Is there a subject line?

Page 172

1    A    I guess when -- when you type MSG, it just kind of shows

2    the first line of the Bloomberg.  I guess there's probably a

3    way to ask it to put in an RE line but, no.  I mean, I didn't.

4    I would spend my entire day looking at Bloomberg if that were

5    the case.

6    Q    And so, if you wanted to see what Bloombergs you got on a

7    particular subject, what would you do?

8    A    Okay.  So when you type "MSG" and you get a list of a

9    bunch of Bloomberg messages, there's a little search box.  And

10   so, if I wanted to search for the phrase "ANZ", I would just

11   type "ANZ" in that search box and Bloomberg would use whatever

12   searching (indiscernible) and he would pull up the relevant

13   messages.  If I was looking up "ACAP", I could do that and so

14   on and so forth.  Yeah.

15   Q    Okay.  And so is that the process you followed in

16   September of 2008?

17   A    Right.  So I would have certain, if you like search terms

18   where I would search through those Bloomberg messages to look

19   for certain information.

20   Q    All right.  So let's go back to the question of what

21   documentation you looked at that supported your conclusions on

22   market impact.  Could you turn to Claimants' Exhibit 1396?

23   A    Sorry.  1396?

24   Q    Yes.

25   A    Okay.

Page 173

1    Q    And can you identify that document?

2    A    Yes.

3    Q    What is it?

4    A    This is a Bloomberg message from someone called David

5    Ullrich (ph) at Bank of America --

6    Q    And --

7    A    -- on September 15th.

8    Q    Sorry?

9    A    This is a Bloomberg message from David Ullrich sent on

10   September 15th.

11   Q    Okay.  And did you review this document in connection with

12   your valuation of the PCDS?

13   A    Yes.  I recall seeing this document.

14   Q    And how do you remember seeing this?

15   A    Because I was trying to find prices on SunTrust and

16   Wachovia.  Those were two names that we had PCDS on.  And so I

17   was searching around for information on SunTrust and Wachovia.

18   Q    Okay.  And what, if anything, does this tell you about the

19   -- or did this tell you in September of 2008 about the

20   potential market impact of the sale of preferred securities?

21   A    Well, it was just giving me an idea of what this

22   particular dealer was trying to do and in what size.  He was

23   saying I would buy the SunTrust 6.10 percent preferreds.  I

24   guess it doesn't say preferreds; I just knew that they were

25   preferreds -- at a price of 60.  And that bid works for five

Page 174

1    million notional of the preferreds.  And similarly, the WB

2    7.98, those are the securities, I think, actually that Michael

3    Newman mentioned in one of his earlier Bloombergs as saying --

4    I think he said something like they're humungous meaning it was

5    a big issue.  He's saying that they traded at 45, i.e., 45

6    cents on the dollar.

7    Q    Okay.  And what conclusion did you reach or what did this

8    mean to you in terms of the valuation process you were going

9    through?

10   A    Well, I just remember thinking it's notable that these

11   Wachovia 798s that were issued, I think, in February of the

12   same year at 100 or very close to thereabouts were trading at

13   45 cents on the dollar.  I just think that was -- just thought

14   it was notable.

15   Q    Anything else?

16   A    No.  I think that's it.  Thanks.

17   Q    Okay.  And if you could turn to Claimants' Exhibit 1443.

18        (Pause)

19   Q    I'm sorry.  Let's go to 1580.  I apologize.

20            MR. TAMBE:  1580?

21            MR. TRACEY:  Yes.

22   BY MR. TRACEY:

23   Q    Do you have that document in front of you?

24   A    I do, yes.

25   Q    Can you identify that document?

Page 175

1   A    Yes.  This is a Bloomberg from Peter Camps at JP Morgan

2   from September 15, 2008 I guess at 3:55 in the morning.

3   Q    And is this a document that you reviewed in connection

4   with your valuation of the PCDS?

5   A    Yes.  I recall coming across this document.

6   Q    And what -- tell us the significance of this document to

7   your valuation.

8   A    Oh, right.  So this guy, Peter Camps -- he would send out

9   these -- you can see below -- this big list of all these

10  different securities.  So at the beginning of the process, I

11  originally had tried to sort of collate a bunch of these broker

12  runs together to get an idea of what was going on in the

13  market.  I just remember that Peter Camps had a lot of kind of

14  commentary on what was going on in the market which is what's

15  up here in this top section.  And I -- what was interesting

16  was -- okay.  So perhaps not surprisingly, he says bank credit

17  is a lot weaker.  Everything is two to five cash points lower

18  on the open.  And what I thought was notable is he says all

19  below work 500 by 500 used JPEX.  JPEX was an electronic

20  exchange that JPMorgan had but that wasn't the main thing that

21  caught my eye.  But when a mark -- when a dealer says a market

22  works, like, he says the market works three by three, it

23  means -- say, it's, I don't know, 82, 85 three by three, he

24  means you can sell me three million bonds at 82 or I'll --

25              THE REPORTER:  Slow down.

Page 176

1          THE WITNESS:  You can sell me three million bonds or,

2     in this case, preferreds at 82 or I'll sell you three million

3     bonds or preferreds at 85.  So 82, 85 three by three.

4          And when he's saying "All below worth 500 by 500, he

5     doesn't mean that they work 500 million by 500 million.  He

6     means 500,000 by 500,000 which is a very small size in my

7     opinion.

8     BY MR. TRACEY:

9     Q    What's the significance to your analysis in September of

10    2008 of the small size that he's offering?

11    A    Oh.  It's just telling me that liquidity in the market is

12    really -- is really poor.  I mean, I had traded preferreds in

13    the past including in July of 2008.  And 500,000 by 500,000 is

14    a -- is just a really, really small size for a market.

15    Q    And what is the significance of the small size for the

16    market on your analysis -- what was the significance of the

17    small size of the market on your analysis of market impact?

18    A    Well, I mean, to the extent that the markets work on small

19    size, if one -- I think it's -- I felt it was reasonable to

20    think that if JPMorgan knew it, you know, other people in the

21    market would know it, too.  That if you were trying to -- if

22    you were faced with the problem of having to sell short

23    hundreds of millions of dollars of preferred securities, you

24    would assume that you're going to have a meaningful market --

25    market impact, perhaps any market but particularly in this kind

Page 177

1    of market.

2    Q    Okay.  Let me ask you to turn to Claimants' Exhibit 1379.

3    Can you identify that document?

4    A    Yes.  This is also a Bloomberg from Peter Camps -- I think

5    it's actually a little bit earlier.  Hang on one second.  So

6    this is 1:33 a.m.  The other one was 3:55 a.m.  So it looks

7    like what happened here is that he basically --

8    Q    Before you say anything, can I just establish a foundation

9    for this?  Sorry.

10   A    Sure.

11   Q    Is this a document that you reviewed in connection with

12   your valuation of the PCDS in September of 2008?

13   A    Yes.

14   Q    Okay.  So go ahead.  Tell us what the significance is.

15   A    Right.  So he was just starting off saying due to market

16   conditions, JPEX will be shut today.  So that's sort of when he

17   was -- and so this was, I guess, 6:33 in the morning London

18   time.  He's based in London, I think.  He is basically saying

19   our electronic exchange is going to be shut today, which I

20   thought was -- was notable.

21   Q    And did that electronic exchange include their trading in

22   preferred securities?

23   A    Yes.  I think so because he says when he says "All below

24   500 work, 500 by 500.  Use JPEX."  I think he -- so what he --

25   he must have made the decision -- well, I infer that he made

Page 178

1    the decision --

2              MR. TAMBE:  Objection, Your Honor.  Foundation.

3              THE COURT:  Okay.

4    BY MR. TRACEY:

5    Q    Why don't you just say what your --

6    A    Well, he --

7    Q    -- what your impression was.

8    A    He started off saying JPEX was shot.  And then he says,

9    "All below work, 500 by 500; use JPEX" which, to me, means --

10             THE REPORTER:  Sorry.  (Indiscernible).

11             THE WITNESS:  Apologize.  He started off at 1:33 a.m.

12   saying due to market conditions, JPEX will be shut today.  But

13   then it looks like he -- a couple of hours later, he changes

14   his mind and says you can use JPEX.  Just on small size,

15   500,000 by 500,000, use JPEX.

16   BY MR. TRACEY:

17   Q    Please turn to Exhibit -- Claimants' Exhibit -- it's 1388.

18   And I'll have the same question for you.  Is that a document

19   that you reviewed in September of 2008 in connection with your

20   valuation of PCDS?

21   A    Yes.

22   Q    So you can please identify it?

23   A    Okay.  So this is a closing -- yes.  This is another

24   Bloomberg from Peter Camps of JPMorgan sent around 2:56 p.m.

25   New York time, so in the evening in London.  And it's another

Page 179

1    one of these runs that I was mentioning.  And there's a bit of

2    market commentary that's attached to it as well.

3    Q    And would you describe for the Court what was significant

4    to you in September 2008 about this with regard to your

5    valuation?

6    A    Yes.  So what, I guess, struck me about this is he's

7    talking about only in the second sentence about how much the

8    market moved in his view, cash prices dropped 3 to 13 cash

9    points.  But I felt that the commentary around the price moving

10   was significant because he says "due to one-way flow from Asia

11   and Europe into a risk adverse straight."  Maybe it should be

12   "risk adverse street".  But leaving that aside, the phrase

13   "one-way flow" is commonly used in -- the phrase "flow" is

14   commonly used in trading.  And when a trader says there's two-

15   way flow, it means there's buyers and sellers.  Sometimes

16   traders -- I've received Bloombergs from traders saying "seeing

17   good two-way flow in X, Y, Z".  It means I'm seeing buyers and

18   sellers at this level.  There's activity at this level.

19        A one-way flow means when there's all buyers or all

20   sellers.  And I think what he's saying here is that there's

21   one-way flow.  It so happens that the sellers are from Asia and

22   Europe but the point, to me, was that there's one-way flow into

23   -- he calls it a risk adverse street.  And he notes that the

24   broker market remains broker offered to only -- broken --

25   excuse me -- offered only with just a few backstop bids.  And

Page 180

1    what that's telling me is that the street doesn't really want

2    to buy bonds.  And I think my understanding of what the broker

3    market means is the sort of inter-dealer market where dealers

4    sometimes sell bonds to each other through the so-called broker

5    market.  And he's basically saying here that it's broken.  It's

6    offered only, that people want to offer bonds but they don't

7    want to buy bonds.  That's why he's saying there's only a few

8    backstop bids.

9        And I think that the last thing I thought was interesting

10   was he said in the last sentence, it's easy to see at least

11   another five point sell-off in the coming days.

12   Q    Okay.  If you'd turn to Claimants' Exhibit 1443.

13   A    Okay.  One second.  Okay.

14   Q    And just a point of clarification, when you refer to bonds

15   in your last answer, what were you referring to?

16   A    I'm sorry.  I should have -- I should have said

17   preferreds.  So -- that's what I meant is preferreds, yeah.

18   Q    Okay.  So turning to Claimants' Exhibit 1443, is that

19   Bloomberg message that you were given in connection with your

20   PCDS valuation in September of 2008?

21   A    Yes.  I remember seeing this Bloomberg.

22   Q    Okay.  And what was the significance of this to your

23   valuation?

24   A    Well, I suppose it's just -- it's kind of pretty strongly

25   worded market color about what this trader felt was going on in

Page 181

1    the preferred market.  At the time, he describes it as a "sell

2    fest".  He's saying that he's exchanged JPEX, in the second

3    line, "he's overloaded with sell orders".  So it's sort of -- I

4    don't know.  It's like a more forceful version of the market

5    commentary he put up the night before.  He notes "There are no

6    customer buyers of prefs.  So nowhere to recycle them; street

7    offered only."  And I understood that to mean that if you sell

8    me preferreds, I don't, so to speak, have anywhere to go with

9    them.  I don't have any customers buyers of them.  And that's

10   why the street is -- he only wants to sell preferreds right

11   now.  And, you know, then he says, please let me know if you

12   have -- "buying (indiscernible)".  If you want to buy

13   preferreds, let me know.  Or, well, I'm not actually sure what

14   he means by the word "target orders" here but the -- yeah.

15   Q    Okay.  And one more.  Claimant's Exhibit 1445.  Can you

16   look at that?  Is that a Bloomberg that you reviewed in

17   September of 2008 in connection with your PCDS valuation?

18   A    Yes.  I remember seeing this -- this Bloomberg.

19   Q    And what was the significance of this to you?

20   A    So this is from the same trader earlier, David Ullrich.

21   David Ullrich is the one who had had, I think, a -- was it 60

22   bid?  I can't remember.  Sixty bid for the SunTrust, 6.10

23   securities.  And I just -- he's not really making a market

24   here.  He's giving it market color.  And he's talking about

25   these particular so called trust or trust preferred securities.

Page 182

1          THE REPORTER:  (Indiscernible).

2          THE WITNESS:  Trust or trust preferred securities.

3   And these are retail securities so there at $25 R securities.

4   And so, he says "They're 6.50/8.50 in street", which means he's

5   seen some kind of -- I take it to mean he's seeing some kind of

6   market in the broker market saying they can -- they're bid at

7   650 and they're offered at 850.  And he converts it to bond

8   terms by multiplying everything by 4 since they're $25 par.

9   And he's saying so 4 times 6.50 is 26 and 4 times is 8.50 is

10  24.  So the market is 26/34 in bond terms.

11  BY MR. TRACEY:

12  Q    And what is the significance -- what was the significance

13  of that?

14  A    Well, it's that a 26/34 market in price terms, in my

15  opinion, was just a really very, very live market.  It means

16  the transaction costs are eight percent of par on something

17  that has a mid-market of 30.  That is an indication to me of

18  really -- really poor liquidity.

19  Q    Okay.  And how, if at all, in your calculation of the

20  value of the PCDS did you take these factors into account?

21  A    Well, I think this -- it's more that by searching these

22  Bloombergs and looking for these prices and reading over these

23  various market commentaries, that's kind of how I came to

24  conclude that there would need to be a significant adjustment

25  to the September 15th price because even if it wasn't a sale

Page 183

1    price, even if it was a perfectly actionable price, there just

2    didn't appear to be very much market depth in these cash

3    preferreds including cash preferreds on names like Wachovia WB,

4    that QVT held protection.

5    Q    And how did you implement that adjustment?

6    A    Right.  So what I did is coming back to what we were

7    trying to do, we were trying to say, okay, we felt that a

8    dealer would -- or it would be reasonable for a dealer to

9    charge par minus the preferred price.  But we wouldn't just

10   take the preferred price as of September 15th.  We would make

11   an adjustment to that September 15th price for the reasons

12   we've been talking about.

13        So there are different ways that you could make that

14   adjustment.  You could just say, okay, you know, I'm seeing

15   these kind of markets, like this particular market is eight

16   points wide.  I'm seeing other markets that are three points

17   wide.  I'm going to kind of just use a number.  I'm going to

18   say I think it's 10 points or I think it's 8 points, I think

19   it's 12 points.

20        That would be one way you could go about doing it.  I

21   decided to do it a little differently.  I decided to try to use

22   actual market data.  I just looked up the low closing price of

23   the week as a proxy for what that market impact might be.

24   Q    And when you say the low closing price of the week, you're

25   talking about the lowest of the five days of that week closing

Page 184

1   prices?

2   A    Right.  So like, for instance, it might be helpful -- is

3   it possible to bring up again this BNP Paribas bond which is in

4   -- excuse me -- preferred --

5   Q    Sure.

6   A    -- which is in CX 2096.  And I can just be specific about

7   it?

8   Q    Sure.  2096?  What page did you want?

9   A    That would be in the -- we can do the second page.  So

10  actually, maybe we can stay on this page for a second.

11       So in this particular case for this "ANX Capital Trust

12  to", I didn't have any data beyond 9/16.  So I just used this

13  price.  So there was no adjustment in that case.  I didn't have

14  anything.

15       If you go to the next one, this BNP -- so what I would

16  have done is, I would have used the price during this week.  So

17  64.5918 was the 9/15 price but that wasn't the price I used.

18  The price I used was the 9/18 price which is, I guess, 59.8726.

19  So that would be about four and a half bond points difference

20  in this case.

21  Q    Okay.  And what was your basis for using this approach to

22  the adjustment for market impact and stale prices?

23  A    Well, as I said, I wanted to base the adjustment on some

24  actual market data.  And I think I had mentioned earlier that

25  in the case of assets that are less liquid, I had observed that

Page 185

1   it's only through the act of trading that you know that the

2   price is actually lower.  And so, in the case of something like

3   this, for instance, you can see that the price sort of drops on

4   Tuesday and sort of stays right around that 60 to 61 price for

5   the rest of the week.

6       So I thought that the low closing price could be a way of

7   sort of capturing this effect in part where you might have a

8   bunch of prices that may not have really been updated but I

9   knew the preferred market overall was falling and that those

10  lower later prices were likely to be, at least in the case of

11  the OTC securities, in my opinion, more valid than the prices

12  earlier in the week.

13  Q    And what was the effect on your calculation on an

14  aggregate basis of -- if you know, of using the lowest price of

15  the week?

16  A    Right.  So I went through this on a preferred by preferred

17  basis.  And in certain cases, like the ANZ that we were just

18  looking at, there was no adjustment because I just had that one

19  price.  And in the case of this BNP Paribas, you can see it

20  with VA something like 4., I guess, 62 bond points, the

21  difference between 64.59 and 59.97

22           THE REPORTER:  (Indiscernible).

23           THE WITNESS:  The difference between 64.59 and 59.97.

24           And for some securities, it was larger than that.

25  The retail preferreds, it was larger than that.  But when you

Page 186

1   averaged it across the entire portfolio, the difference between

2   the sort of earliest price, the 9/15 price in those cases, and

3   the low closing price of the week was about -- about six

4   percent, about six bond points.

5   BY MR. TRACEY:

6   Q    And when you say the lowest closing price of the week, is

7   that the same as the lowest price of the week?

8   A    No.  There could be lower intra-day prices for which in

9   certain cases you can observe, in the case of the retail

10  preferreds that are created on an exchange you can preserve

11  that -- I think for institutional (indiscernible), I think it's

12  probably much, march harder to observe that.

13  Q    And based on your calculations, what was your

14  determination of (indiscernible) value of the PCDS as of

15  September 15th?

16  A    So the aggregate valuation was approximately thirty-six

17  percent of the notional amount of 379 dollars which I think

18  works out to around $134 million.

19  Q    And did you discuss this methodology for valuing PCDS with

20  any of your partners at QVT?

21  A    Yes.  I remember kind of running it by my partners on the

22  desk, yes.

23  Q    And what do you recall about those conversations?

24  A    I mean, I think they thought it was a reasonable approach.

25  I mean, we kind of talked about whether there were other ways

Page 187

1    to do it.  We really couldn't -- we couldn't think of anything

2    else.  We were all aware of the senior PCDS ratio that we

3    talked about and I think we agreed that that -- we didn't

4    believe that was a good way to do the valuation.

5        I think we talked about this low close of the week concept

6    and I think, in the end, we -- I think that sort of back and

7    forth about, well, why should it be a low close of the week.

8    Why shouldn't it be some other number?  And I think that where

9    I settled was that if you look just at the magnitude of the

10   effect, this six point discount, we felt that was a reasonable

11   representation, a fair representation of what someone might

12   estimate the market impact to be given the types of bid offers

13   that we were observing in preferred securities at the time and

14   the depth of the market that we could see at the time.  So we

15   felt that that rough six percent number was okay.

16   Q    And did you -- had you ever used this method before to

17   value PCDS?

18   A    No, I had not.

19   Q    And why not?

20   A    Well, by value PCDS, do you mean to put a mark on the PCDS

21   that we had?

22   Q    Did you ever -- my question is whether you ever used this

23   methodology before and if not, why not.

24   A    Well -- okay.  So I think as far as marking these -- our

25   PCDS book, that, I think, is basically we did based on broker

Page 188

1    quotes from Lehman Brothers that that's how I marked those.  So

2    there was no need to use this methodology for getting a mark at

3    month end.

4         I think that in terms of whether or not I used this to

5    value PCDS as I was doing a PCDS trade, no.  I didn't sort of

6    do this as a matter of course but, of course, I was aware that

7    the price of the preferreds is informative in deciding whether

8    or not I wanted to do a PCDS trade.  For instance, to the

9    extent that the PCDS was appearing to imply a very different

10   deferral probability then maybe what the securities themselves,

11   the cash securities, were implying that was telling me that

12   whoever was selling protection on the other side must believe

13   that the deferral risk is quite back-ended meaning far in the

14   future.  And I think I was of the view that, at least in the

15   case, for instance, of the Wachovia bond that we were talking

16   about earlier, I was of the same view as Mike Newman, so to

17   speak, the curve should be inverted, that the deferral risk is

18   actually quite front-ended in my opinion.

19        So knowing that the preferreds were trading at a price

20   different than par or lower than par, to me, sort of signaled

21   that the PCDS seller was selling protection at a price that was

22   too low.

23   Q    Did you back test this methodology?

24   A    Well --

25              MR. TAMBE:  Again, a time period, Your Honor?

Page 189

1    BY MR. TRACEY:

2    Q    At any time.

3    A    No.  No.  I didn't back test this methodology.

4    Q    And why not?  Well, focus on the period from September

5    15th to October 15th.  Did you back test the methodology?

6    A    Well, no.  I mean, there was practical reasons such as

7    just we were very, very busy and we had a lot going on in the

8    portfolio.  But leaving that aside, I'm not actually sure what

9    -- I'm not sure what back-testing would actually mean in this

10   case because -- well, I was trying to calculate what the

11   replacement value of PCDS, roughly four and a half year PCDS

12   would be in kind of this distressed financial crisis

13   environment.  And I didn't have any data on where distressed

14   PCDS traded in such an environment.  It was a new product from

15   2005.

16       I mean, if you had a lot of data, you know, in an

17   environment where even a strong recessionary environment

18   leaving aside an environment where a broker-dealer failed as to

19   where five-year PCDS would have traded versus the preferreds.

20   I think you -- I guess, in principle, you could have done that

21   back-testing but I didn't have any data like that.

22   Q    In deciding to use this methodology, did you consider the

23   fact that you were pricing protection on preferred stock for

24   about a four and a half year period based on a dealer's hedge

25   by selling a perpetual bond or preferred stock?

Page 190

1    A    Yes.  I mean, I understood that a four and half year CDS

2    has a different tenor than a preferred which, in principle, is

3    a perpetual instrument.  Yes, I definitely understood that.

4    Q    And does that affect your view about whether this is a

5    reliable methodology?

6    A    Well, no, not really in the sense that the way I thought

7    about it -- okay.  Maybe it's more helpful to think about the

8    case of a bond.  Okay?  So say we're not talking about PCDS,

9    we're just talking about a bond.  And we're talking about a 4.4

10   year CDS.  And suppose that that dealer can't find a seller of

11   protection of a 4.4 year CDS.  He can go out and he can short a

12   4.4 year bond and kind -- he can go out --

13             THE REPORTER:  (Indiscernible).

14             THE WITNESS:  I'm sorry.  I apologize.

15             He can go out and he can short a 4.4 year bond and

16   that matches the CDS.  He takes the normal risks that you would

17   take.  He might get bought in on his repo and so on but he

18   would match the maturities in this case.

19             I think the difference here, in my mind, was that

20   there's really no such thing as a 4.4 -- a preferred which is

21   guaranteed to be 4.4 years.  Preferreds, by their nature, are

22   perpetual instruments.  It's my understanding that that's one

23   reason why they count as equity capital because they can go on

24   forever.

25             And so, from this -- coming back to the original

Page 191

1    thing that we were trying to solve for, which is how would a

2    dealer hedge his risk, a dealer wouldn't have the ability to

3    sell short a 4.4 year preferred.  There isn't -- there isn't

4    any such thing in the world.  So in order to sell -- in order

5    to hedge his risk, he would use the only thing that he had

6    available to him which is the actual 30-year preferred.  And

7    that was my thinking.

8              And while it might be the case that there's a

9    maturity mismatch there, as a practical matter, that's what he

10   would have available to him at that time.

11             And I think the other thing that -- so that's sort of

12   the -- if you like, the practical reason.  And I think that

13   there's also kind of an empirical reason that I was aware of

14   based on my own trading in the market, which was that a lot of

15   the credits that I traded personally, like PMI -- that's

16   private mortgage insurer -- MTGM, a private mortgage insurer,

17   CIT, Washington Mutual, MBIA -- these are all credits that I

18   traded CBS on actively.

19             When I looked at what dealers were charging for

20   regular CDS, which traded on a so-called points up front basis,

21   so there's a fixed script on a 500 basis points and a fixed

22   number of points up front, there was very little difference in

23   the price between the five-year point and the 10-year point or,

24   for that matter, oftentimes the two-year point and the ten-year

25   point were completely the same, in the case of WaMu, for

Page 192

1   instance, the point from one-year out to 10 year, I remember

2   was virtually flat from July up until the time that WaMu

3   actually defaulted.  For the mortgage insurance that I traded

4   actively, I saw the same thing.

5         So that was a kind of -- excuse me.  I saw that

6   between five and ten years the curve was very, very flat in

7   terms of price, in terms of points up front.

8         So to me, that the market at that time understood in

9   those credits that the risk of the credit event was so that --

10  you know, bunched up in the first several years and it wasn't

11  going to change a lot beyond that.  So I felt that the idea

12  that like a 4.4 year CDS would actually have a similar price up

13  front as a longer dated CDS was actually consistent with the

14  way other distressed credits that I traded in the market were

15  trading.

16  Q   Did you value all of QVT's PCDSs using this methodology?

17  A   I valued all of the PCDSs that I valued using this method.

18  You Sen actually valued two PCDSs where we had sold protection.

19  I don't know how he valued them.  He valued them some other

20  way.

21  Q   Let me ask you to turn to Claimant's Exhibit 1581.

22        THE COURT:  Mr. Tracey, could I ask you --

23        MR. TRACEY:  Yeah.

24        THE COURT:  -- for a stop, look and listen on --

25        MR. TRACEY:  Sure.

Page 193

1          THE COURT:  -- how much more you have to do and let's

2     kind of plan for the end of the day here.

3          MR. TRACEY:  So I -- I'm making very good progress.

4          THE COURT:  That's the good news.

5          MR. TRACEY:  I still have to go -- we're finished

6     with PCDS.

7          THE COURT:  Okay.

8          MR. TRACEY:  We're going to go to CARB and then we're

9     going to go to all of his other positions.  I think they're

10    going to be much quicker than PCDS.

11         THE COURT:  Okay.

12         MR. TRACEY:  But they're not -- it's not a few

13    minutes.

14         THE COURT:  All right.  So you're about to go to

15    CARB?

16         MR. TRACEY:  I'm about to go to CARB, yeah.

17         THE COURT:  Okay.  So let's take 10 minutes.  And why

18    don't we say 5:45?  We'll go to 5:45 today and we'll stop it

19    there.

20         MR. TRACEY:  Okay.

21         THE COURT:  All right?

22         MR. TRACEY:  Great.  Thank you.

23         THE COURT:  Thank you.

24       (Recess from 4:54 p.m. until 5:21 p.m.)

25         THE COURT:  Sorry.  We can continue.  When someone --

Page 194

1    when a district court judge calls --

2            MR. TRACEY:  You got to answer.

3            THE COURT:  -- I kind of have to --

4            MR. TRACEY:  You got to answer.

5            THE COURT:  -- get involved in the call.  I'm sorry.

6    I apologize, Mr. Chu.

7            MR. TRACEY:  No problem.

8            THE WITNESS:  No problem.

9    DIRECT EXAMINATION (RESUMED)

10   BY MR. TRACEY:

11   Q    Would you turn to Claimant's Exhibit 1581, please?

12   A    All right.

13   Q    Do you recognize that document?

14   A    Yes.

15   Q    And what is it?

16   A    This is a Bloomberg from Robert Burke, Bob Burke, who is a

17   salesperson at Merrill Lynch on October 1st, 2008.

18   Q    And what does it represent?

19   A    Okay.  This is a offering of PCDS in a number of names out

20   to March 20th, 2016.

21   Q    And were you aware of this offer at the time that you were

22   valuing the PCDS between September 15th and October 15th, 2008?

23   A    I was not.

24   Q    Can you turn to Claimants' Exhibit 1582?  Do you recognize

25   that document?

Page 195

1    A    Yes.

2    Q    What is it?

3    A    It's another Bloomberg from Bob Burke on October 2nd, 2008

4    with a list of PCDS.  It looks like a little bit longer list.

5    Just a second.

6    Q    And were you aware of this document when you valued your

7    PCDS between September 15th and October 15th, 2008?

8    A    No, I was not.

9    Q    And do you know whether this document was in your

10   Bloombergs?

11   A    Well, I think it was in my Bloombergs, yes.

12   Q    But it didn't come to your attention?

13   A    No.

14   Q    Okay.  Let's turn to the CARB position.  Did you include

15   the CARB position in your market quotation process?

16   A    No.  We -- I thought we had but we did not.

17   Q    Do you know why not?

18   A    Since I wasn't really the one who compiled everything, I

19   don't -- I can't really say with any confidence why not.

20   Q    And were there any transactions in CARB that you were

21   aware of between September 15th and October 15th, 2008 that you

22   could use to help determine the price?

23   A    Not that I was aware of, no.

24   Q    And were there any transactions in the underlying eight

25   CDSs in CARB that you were aware of between September 15 and

Page 196

1    October 15, 2008 that you could use to help price the CARB?

2    A    No.

3    Q    And were you aware during that same time period of any

4    trading in the underlying reference obligations that you could

5    use to help price this?

6    A    I was not.

7    Q    Were you aware of any quotations or broker runs from

8    brokers that you could use during that time period to help

9    value the CARB product?

10            MR. TAMBE:  Objection, Your Honor.

11            THE COURT:  Mr. Tambe?

12            MR. TAMBE:  If he could lead a little bit less.  I

13   think it's leading and the last few questions have been

14   leading.

15            THE COURT:  You can lead a little bit less.

16            MR. TRACEY:  Okay.  Okay.

17   BY MR. TRACEY:

18   Q    Were -- what pricing services, if any, were you aware of

19   that you could use to help value your CARB?

20   A    I don't think we used any pricing services to help us

21   value CARB.

22   Q    And were you responsible for the valuation of the CARB as

23   part of the loss calculation process?

24   A    Yes, I was.

25   Q    And what methodology did you use to value the CARB

Page 197

1    transaction for the purpose of QVT's calculation state?

2    A    So what I did is, I started from a prior mark that I had

3    received from Lehman from origin as a 9 -- I guess supposedly

4    of 9/12/2008.  And since I -- it was -- I guess in a way it was

5    a harder problem than the PCDS that -- in my mind at that time

6    because in PCDS, I could observe the underlying -- not in CDS

7    form but at least I could observe the underlying preferreds to

8    give me guidance on the PCDS.  In this case, I didn't have any

9    -- I wasn't aware of any observations on the underlying.

10        So what I did is, I made two adjustments.  First, I --

11   well, I guess I would say I had two steps.  The first step is I

12   looked at the move in GMAC five-year CDS, General Motors

13   Acceptance Corporation CDS, from 9/12, that Friday, to the

14   following Friday, 9/19.  And I then thought we had a quite big

15   position in CARB and that CARB was something that our dealers

16   hadn't traded.  And so, I added a market impact of

17   approximately 15 points to that calculation.  So I think the

18   total was 16 was the starting mark.  Fifteen was the move in

19   GMAC from 9/12 to 9/19.  And then -- 15 points is the market

20   impact.  So the sum of those things is 46.

21   Q    Okay.  Let's focus on the first part, the use of GMAC to

22   adjust the price.

23        First of all, why did you use the prices of GMAC?

24   A    Well, basically, I wanted a market-based measure for where

25   our auto risk was trading.  GMAC was an auto finance company

Page 198

1    CDS was trading as distinct from the OEMs like GM.  So this is

2    GMAC.

3         I think as I mentioned earlier, this particular position

4    actually lived in the account of GMAC Hedge.  And so, we were

5    of the view that these ought to have a correlation with GMAC.

6    And so, we couldn't observe the underlying, as I said, or

7    didn't observe the unerlyings.  We couldn't look at the CDS so

8    we -- I used a proxy which was GMAC.

9    Q    And did you do anything to test whether the price of CARB

10   was correlated with GMAC during the period 9/15 to 10/15/2008?

11   A    I did not.

12   Q    Why did you use the price of GMAC through 9/19 as opposed

13   to 9/15?

14   A    Right.  Well, I just thought that -- my understanding of

15   the background of CARB was the following.  That it was -- we

16   had only certainly traded with Lehman.  And my understanding

17   further was that Lehman was trying to get CARB to become an

18   index that was more widely traded by the dealer community akin

19   to the ABX and CNDX indices but that ultimately it never took

20   off.  And other dealers decided they didn't want to trade it.

21        So I guess I was sort of thinking that, well, you know,

22   it's Lehman day.  And you can ask a dealer to go trade with you

23   a product that they've already said they don't want to trade.

24   If somehow you get them to get the risk approvals and -- et

25   cetera to actually trade the product, it's going to take time.

Page 199

1    I didn't know how long that would be.  But all of the

2    valuations that I did were -- only used data of the Lehman week

3    itself.  So I used the last day of that week.

4    Q    And did you consider --

5         MR. TRACEY:  Withdraw that.

6    BY MR. TRACEY:

7    Q    Going to the second adjustment that you mentioned, the

8    potential market impact, how did you determine that 15 points

9    was an appropriate adjustment for the potential market impact

10   of the CARB position?

11   A    Right.  So in the CARB market, as I traded it, it was not

12   a particularly liquid market.  Certainly for something that was

13   supposed to be an index.  The total size we had to trade would

14   have been about 80 million notional.  And in the last time I

15   traded CARB was in July of 2008.  And I tried to trade $20

16   million with Lehman and I could only trade $10 million of it.

17        I also knew that the market -- the last markets that

18   Lehman put out, I believe, were four points wide.  I believe

19   the market was 77, 81.  So I thought that, well, you would have

20   a situation in which a dealer would need to build in a

21   substantial basically cushion for creating that kind of size in

22   that market which given the way I traded it in the past, I

23   thought 15 points was a reasonable estimate of what that would

24   be.

25   Q    Did you review any documents between September 15th and

Page 200

 1    October 15th, 2008 which informed your views on the market

 2    impact of a CARB sale protection?

 3    A    Well, I looked at my Bloombergs to try to figure out how

 4    much GMAC had moved.  And then away from that, I had searched

 5    for -- well, for CARB for some of the older Lehman markets

 6    which, you know, there weren't many of.  I think the last one

 7    was back -- was back in Jul -- excuse me -- in August of 2008.

 8              THE COURT:  When you say how much GMAC had moved,

 9    GMAC what?

10              THE WITNESS:  A GMAC five-year credit default swap --

11              THE COURT:  Thank you.

12              THE WITNESS:  -- on the unsecured, yes.

13    BY MR. TRACEY:

14    Q    Okay.  Let me direct your attention to Claimant's Exhibit

15    1773.  Is that a document that you reviewed between September

16    15th and October 15th in connection with your valuation of

17    CARB?

18              THE COURT:  What was the number again, Mr. Tracey?

19              MR. TRACEY:  1173.

20              THE WITNESS:  Yes, I think so.  This is a -- this is

21    a -- one of the last few runs that Lehman had on a CARB, I

22    think.

23    BY MR. TRACEY:

24    Q    Okay.  And we looked at this before but can you tell me

25    what the significance was when you reviewed this in September

Page 201

1    or October of 2008 to your valuation of CARB?

2    A    Well, this was a market that I actually traded off of.

3    This is a market -- okay.  Let me back up for a second.  Sorry.

4         So this is, again, a market that was sent out by Lehman

5    Brothers.  We were buyers of protection.  We had a protection

6    position in the so-called 071BBB which is the bottom line here,

7    which is an 81, 84 market.  And this is the run from which I

8    tried to 20 million CARB and I was only able to trade 10

9    million CARB.  That was the last CARB trade I did.

10   Q    Okay.  Would you turn to Claimant's Exhibit 2109, please?

11        Is that --

12   A    Yes.

13   Q    Sorry.  Is that a document that you reviewed in connection

14   with your valuation of CARB between September 15th and October

15   15th, 2008?

16   A    Yes.

17   Q    And what is it?

18   A    This is a Bloomberg from me to our sales person in

19   securitized products at the time which was Jeff Miller.

20   Q    And what was the significance of this to your valuation of

21   CARB?

22   A    Oh.  This is just the Bloomberg that I sent to him -- him

23   meaning Jeff Miller -- trying to do a trade.  So let me just go

24   through it.  So -- and I said "On CARB, I think I want to buy

25   some".  And because of the strange trading convention here,

Page 202

1   "buy some" here does not mean buy protection.  It means buy

2   risk.  So against that 81, 84 market, I'm basically saying I

3   want to buy bonds from you at 84, which is equivalent to

4   selling protection to you at 16.  Okay.  So when I said I want

5   to buy some, that's what I meant, I want to sell protection.

6        And then I say, "I think the best thing is to buy some to

7   work some.  I would buy 10 million at your offer of 84 to work

8   another 10 million at 83."  So what I was telling him is, I'd

9   like to trade 10 million at your market.  And I'd like you to

10  try to do another 10 million for me at a little bit better

11  price of 83 instead of 84.  That's what it means "work another

12  10 million".

13  Q    Okay.  And can you explain to the Court what the

14  significance of that is to your thinking when you were valuing

15  CARB?

16  A    Oh.  Well, ultimately, I was only able to trade that 10

17  million.  I wasn't -- I didn't get any response at all on the

18  other 10 million.  And so it gave me an idea of what the -- if

19  you like, the market death was in CARB and how much I could

20  reasonably trade at -- at a shop.

21  Q    Okay.  Would you turn to Claimants' Exhibit 2110?  Is that

22  a document that you reviewed in connection with your valuation

23  of CARB?

24  A    I'm sorry.  Let me just make sure this is 2110, right?

25  Q    Yes.

Page 203

1   A     Okay.  Yes.

2   Q     And what is that document?

3   A     So this is a set of Bloombergs, again, between me and Jeff

4   Miller, Jeff Miller being our salesperson.  I said the top bit

5   which says, "Hi Jeff.  Anything else done on CARB by which I

6   mean you were working 10 million for me.  Did anything happen

7   on it?"  And he replies, "Unfortunately not.  No bites

8   whatsoever."  And he tells me he's been working on some other

9   kind of bond stream today.  And I just wrote back, "Okay".

10  Q     Okay.  All right.  Let me now ask you to take a look at

11  Joint Exhibit JX39.

12        (Pause)

13  A     Okay.

14  Q     Is this one of those blasts you were referring to?

15  A     All right.  So, yes.  So this is a Bloomberg.  And you can

16  see there's a whole lot of people on the list who received the

17  information.

18  Q     And what is the subject matter or what's the content of

19  this Bloomberg?

20  A     All right.  So this is the -- I guess the only content is

21  in really the subject line.  And it says, "CARB BBB" -- so

22  that's the tranche that we were just talking about -- "auto

23  update, 77/81."  So he's saying "I'll buy bonds.  I'll firm you

24  at 77" meaning you can sell protection to me at -- sorry.  So

25  the offer of protection is 23 and the bid for protection is 19

Page 204

1    because it's 81.

2         So this is, I think, the last CARB BBB update that I, I

3    think, ever saw.

4    Q    Okay.  And now I'd like to turn to your internal marks on

5    CARB.  Did you have an internal mark on CARB and your CARB

6    position as of August 29, 2008?

7    A    Yes, we did.

8    Q    And was that -- what was the level, do you recall?

9    A    So we used the mid-market level which is implied by this

10   run from August 21st, 2008.  So we marked it on the bid side at

11   19 and the offered side at 23.  So the mid-market would have

12   been 21 and that's the market that went in on August 29th.

13   Q    And did you remark your CARB position at any time from

14   August 29th to September 15?

15   A    I did not.

16   Q    And did you use the internal QVT mark as a basis for your

17   valuation of the CARB?

18   A    I did not.

19   Q    And why didn't you?

20   A    Well, I'm not sure why I would have necessarily had a

21   strong preference for one versus the other.  I mean, they were

22   both ultimately marks that I received from Lehman in some way.

23   But I wound up using -- I wound up using the market mark.

24   Q    Why didn't you just say that the value of the CARB

25   position is my internal mark?

Page 205

1    A     Oh.  Well, because that internal mark was based on market

2    conditions from -- even though it was marked as of 8/29, it was

3    really based on a run back from 8/21.  And I just thought

4    market conditions had changed very appreciably from 8/21 to

5    that time after Lehman filed.

6    Q     And was that mark a mid-mark or replacement value mark?

7    A     No.  That was a mid-mark.

8    Q     And I'm not sure if I have this in the record but you

9    could stop me if I've already asked you this.  But I want to

10   ask the same question about PCDS.  Did you have internal marks

11   in your books and records for PCDS as of August 29th?

12   A     Yes, we did.

13   Q     Okay.  And did you remark those positions at any time

14   between August 29th and September 15th.

15   A     No.  I didn't -- I didn't update the marks, no.

16   Q     And did you use those marks for your PCDS valuation?

17   A     I did not.

18   Q     And why not?

19   A     Well, because what we were trying to calculate was the

20   replacement value of the positions.  And when I looked at the

21   marks that Lehman gave me, the mark is based on the mid-mark.

22   And so, if nothing else, it was just for any regular mark.  You

23   would have to make an adjustment for the difference between the

24   mid and where the offered side is.

25        But in the case of the Lehman PCDS marks in particular,

Page 206

1    there was a bid side to the market.  They were willing to buy

2    protection or at least they were willing to buy protection on

3    swaps.  But they weren't willing to offer any protection

4    outright at all.  So, for instance, if a credit had been marked

5    at 200/250, hypothetically, the mid-mark would have been based

6    on a 225 spread.  But I had no confidence at all that the 250

7    basis point offered side level would actually work because I

8    kept asking Lehman to trade PCDS and they wouldn't make any

9    offers.  It's not like they were offering it or 500.  There

10   just -- there was no offer at all.

11       So I thought that that wasn't really a good place to start

12   because I was trying to figure out where I could actually do

13   our replacement trade.  And as far as I was concerned, there

14   was really no evidence that the offered side of any of those

15   marks worked.  And there was a lot of evidence that, in my

16   mind, that none of them worked.  So I just didn't think that

17   was a good place to start with to calculate replacement value.

18   Q    And last question on PCDS, are you aware of any offers to

19   sell protection in PCDS after the Merrill Lynch offer that we

20   looked at earlier, October 1, to.

21   A    No.  I'm not aware of any such offers.

22            MR. TRACEY:  Okay.  Your Honor, I'm finished with

23   CARB.  I'm going to turn to the other positions.

24            THE COURT:  Tomorrow.

25            MR. TRACEY:  Tomorrow.  Okay.  Thank you.

Page 207

1          THE COURT:  All right.  Mr. Chu, you get the prize

2     for endurance.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  Thank you very, very much.  Same rules

5     apply overnight with respect to not speaking to anybody about

6     the case.  And we'll see you at 10 o'clock tomorrow morning.

7          MR. TRACEY:  Okay.

8          THE COURT:  And tomorrow I have some folks coming in

9     at 1:30 which I targeted to be --

10          MR. TRACEY:  Lunch?

11          THE COURT:  -- in your lunch hour.  And I will have

12     them leave by 2 o'clock.  All right?

13          MR. TRACEY:  Thank you, Your Honor.

14          THE COURT:  Anything else?

15          MR. TAMBE:  Okay.

16          THE COURT:  Okay.  Have a good day.

17          MR. TAMBE:  Have a good day, Your Honor.

18          THE COURT:  Thank you, Rachel.

19     (Whereupon, these proceedings were concluded at 5:47 p.m)

20                         * * * * *

21

22

23

24

25

1                        I N D E X

2

3                   W I T N E S S E S

4    WITNESS                  BY              PAGE

5    JOEL WOLLMAN         MR. TRACEY          4

6                         MR. ANDREOLI        31

7                         MR. TRACEY          52

8    ARTHUR CHU           MR. TRACEY          56

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 209

1                         CERTIFICATIONS

2      We, Sheila G. Orms, Sherri Breach and Lisa Beck, certify

3      that the foregoing is a true and accurate transcript from

4      the official electronic sound recording.

5      Sheila Orms    Digitally signed by Sheila Orms
                       DN: cn=Sheila Orms, o, ou,
                       email=digital1@veritext.com, c=US
6      _____
                       Date: 2017.02.06 10:53:26 -05'00'

7      SHEILA ORMS, APPROVED TRANSCRIPTIONIST

8      Sherri L Breach    Digitally signed by Sherri Breach
                          DN: cn=Sherri L Breach, o, ou,
                          email=digital1@veritext.com, c=US
9      _____
                          Date: 2017.02.06 10:55:41 -05'00'

10     Sherri L. Breach

11     AAERT Certified Electronic Reporter & Transcriber CERT*D-397

12     Lisa Beck    Digitally signed by Lisa Beck
                    DN: cn=Lisa Beck, o, ou,
                    email=digital1@veritext.com, c=US
13     _____
                    Date: 2017.02.06 10:56:26 -05'00'

14     Lisa Beck (CET**D 486)

15     AAERT Certified Electronic Transcriber

16

17     DATED:   February 5, 2017

18

19

20

21

22

23

24

25