Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC.,

9

10           Debtor.

11

12   - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14                   U.S. Bankruptcy Court

15                   One Bowling Green

16                   New York, New York

17

18                   February 3, 2017

19                   10:10 AM

20

21

22

23   B E F O R E :

24   HON SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

1    Trial on Lehman's Objection to Claims of QVT (Doc #17468

2    Debtors' One Hundred Fifty-Fifth Omnibus Objection to Claims)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach

Page 3

1   A P P E A R A N C E S :

2   JONES DAY

3        Attorneys for Debtors

4        250 Vesey Street

5        New York, New York 10281

6

7   BY:  LAURI W. SAWYER, ESQ.

8        JENNIFER DEL MEDICO, ESQ.

9        JAYANT W. TAMBE, ESQ.

10       RYAN J. ANDREOLI, ESQ.

11       REBEKAH BLAKE, ESQ.

12       SARAH EFRONSON, ESQ.

13       DAVID P. SULLIVAN, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1   HOGAN LOVELLS US, LLP

2        Attorneys for QVT

3        875 Third Avenue

4        New York, New York 10022

5

6   BY:   NICOLE E. SCHIAVO, ESQ.

7         JOHN D. BECK, ESQ.

8         DENNIS H. TRACEY, III, ESQ.

9         BEN LEWIS, ESQ.

10        ROBIN E. KELLER, ESQ.

11        WILLIAM REGAN, ESQ.

12        DARYL L. KLEIMAN, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                        P R O C E E D I N G S

2                THE COURT:  How's everyone today?

3                MR. TAMBE:  Fine.  Thank you, Your Honor.

4                THE COURT:  It's Friday.  Welcome back.  It's been a

5        very long week for you folks.  We get e-mails at 1:00 in the

6        morning, 3:00 in the morning.

7                Ready --

8                MR. TRACEY:  We were sleeping, too, Your Honor.

9                THE COURT:  Pardon me?

10               MR. TRACEY:  Jay and I were sleeping, too.

11               MR. TAMBE:  I don't know how he knows what I was

12       doing, but I wasn't sleeping.

13               There's a lack of foundation, Your Honor.

14               THE COURT:  I do appreciate the good will between the

15       two sides.  It makes it a little -- it makes it easier.

16               Welcome back.

17               THE WITNESS:  Thank you, Your Honor.

18               THE COURT:  Whenever you're ready, Mr. Tracey.

19               MR. TRACEY:  I thought I might just pick up with two

20       issues that came up --

21               THE COURT:  Sure.

22               MR. TRACEY:  -- yesterday.  It won't take a lot of

23       time.

24               The first is relating to the issue that arose

25       yesterday relating to Exhibit 2108 which is the --

Page 6

1              THE COURT:  The spreadsheet.

2              MR. TRACEY:  -- the workbook.

3              THE COURT:  Okay.

4              MR. TRACEY:  And we did some homework overnight and I

5     think we have resolved the issue, and I've advised Mr. Tambe

6     what we found and they're going to look into it.

7              But basically to summarize it, the issue was that

8     Exhibit 2108 does not have certain sheets that it previously

9     had and that were in previous iterations of the spreadsheet.

10    Ad we wanted to go back and make sure that we hadn't failed to

11    log any of the ones that were pulled out on a privilege log.

12    That was really --

13             THE COURT:  Sure.

14             MR. TRACEY:  -- the issue.

15             THE COURT:  Okay.

16             MR. TRACEY:  So just to go back, we -- there were

17    many, many iterations of this spreadsheet on the G drive at

18    QVT.  We collected every single one of them as part of the

19    discovery process and we produced many, many versions of it to

20    Jones Day.

21             During the course --

22             THE COURT:  That's the part I don't understand is

23    that it's a live document, but collecting versions implies that

24    you can -- that there exists what I call snapshots of prior

25    versions.  So that's the part I don't understand.

Page 7

1          MR. TRACEY:  Correct.  So over the course of the last

2    eight years that document has been saved with a unique name in

3    the G drive over many, many times.  So you do have snapshots at

4    various times.  It's not the -- not always the perfect times,

5    but you do have a lot of snapshots.

6          THE COURT:  Okay.

7          MR. TRACEY:  So just to answer the first question

8    that's probably in your mind, why don't we have a snapshot as

9    of October 15th.  We don't.  We have one as of October 13th, I

10    believe, and we're providing the Bate stamp numbers to --

11          THE COURT:  Okay.

12          MR. TRACEY:  -- Jones Day for those -- for that

13    iteration.   And to the extent that anybody wants to, you know,

14    ask questions about it with witnesses that's of course fine.

15          So going back to the privilege question --

16          THE COURT:  Right.

17          MR. TRACEY:  -- the parties agreed during the course

18    -- well, let me go back.  So all of these snapshots were -- had

19    formulas in them originally that looked to other documents

20    within the G drive and in some cases to external sources or QVT

21    systems.

22          So during the course of discovery Lehman's counsel

23    asked for a hard coded version which we then produced.

24          THE COURT:  Right.

25          MR. TRACEY:  I believe they selected the one that was

Page 8

```
 1    to be hardcoded, but it doesn't matter.  We all agreed that a

 2    particular one would be hardcoded so it could be used in

 3    discovery.  That was produced and it was stamped Bate Stamp

 4    Number 888.  So that was the spreadsheet.  We came to call it

 5    the 888 spreadsheet and it was used through all the depositions

 6    to ask -- you know, ask all the witnesses what they did.

 7            That one, as we discussed yesterday, did not have

 8    every tab in it.  So what we did during the course of

 9    discovery, we agreed together that we wouldn't log any

10    documents that were created after June 7th, 2011, and we

11    selected that date because that was the date that Lehman

12    submitted its objection to our claim.  And we all agreed that

13    after that it's really in litigation so why --

14            THE COURT:  Right.

15            MR. TRACEY:  -- should we log everything.  So that

16    was the agreement.  And so what we did last night is we -- what

17    we had to do is determine whether they had everything as of

18    June 7th, 2011.  If they have it, we're done.  There's nothing

19    to log.  So we went back and, in fact, fortunately there is

20    actually a version that was snapshotted as of June 7th, 2011.

21    We produced that last November to Jones Day.  We -- I've given

22    them this morning this -- the Bate stamp number and if they

23    verify that I think we're done.

24            THE COURT:  Okay.  Anything on that, Mr. Tambe?

25            MR. TAMBE:  Just a few responses.  We are verifying
```

Page 9

1    it, so.

2              THE COURT:  Okay.

3              MR. TAMBE:  There was throughout discovery of an

4    inquiry from our side as to really what is the operative

5    spreadsheet and we took a 30(b)(6) deposition and one of the

6    topics of the 30(b)(6) deposition was what supports the claim,

7    what are the calculations and what are the underlying documents

8    that support the claim.

9              Notwithstanding I think all of that we frankly

10   learned some new information through the course of the trial

11   and so we're trying to marry those --

12             THE COURT:  Sure.

13             MR. TAMBE:  -- two things together.

14             In terms of prior iterations I think one of the

15   issues with the prior iterations was I think they all came with

16   formulas which are not functional once they are with us.

17             THE COURT:  Right.  But that's where the hard coding

18   comes in.

19             MR. TAMBE:  That's where the hard code comes in.

20             THE COURT:  Right.

21             MR. TAMBE:  So there's a -- there may still be a

22   practical issue at our end of saying, okay, we've got something

23   that purports to be a 9/28 version of this document, but no way

24   for us to compare it --

25             THE COURT:  Uh-huh.

1          MR. TAMBE:  -- because what we have is a hard coded

2     document which is a later document.

3          THE COURT:  Uh-huh.

4          MR. TAMBE:  So all I'm saying is we need to look into

5     it --

6          THE COURT:  Sure.

7          MR. TAMBE:  -- more to figure out if this answers the

8     question or not, but we appreciate the additional information.

9          THE COURT:  Okay.  Good.  All right.  Was there a

10    second thing?

11         MR. TRACEY:  The second thing was just Your Honor had

12    asked about snapshots or screenshots of things that might be

13    helpful in the course of the testimony to follow along with the

14    testimony.

15         THE COURT:  Right.

16         MR. TRACEY:  And so --

17         THE COURT:  Or to have it afterwards, after the

18    testimony.  When we're at the end of the day, right, when --

19         MR. TRACEY:  Well --

20         THE COURT:  Yeah.

21         MR. TRACEY:  -- we can do it that way.  What we were

22    thinking is we have prepared a summary by witness of the 2108

23    spreadsheet information that they are going to testify about.

24         So they'll testify from the original document.

25         THE COURT:  Right.

1            MR. TRACEY:  It will be in front of them.  But to

2    follow along it might be helpful for the Court and everyone to

3    have a --

4            THE COURT:  So it will be a demonstrative?

5            MR. TRACEY:  It will be a demonstrative exhibit,

6    exactly --

7            THE COURT:  That sounds good.

8            MR. TRACEY:  -- for each witness, and this way you

9    can follow along.  But it's only a demonstrative or a -- I

10   mean, it might be --

11           THE COURT:  Right.  But it would be --

12           MR. TRACEY:  -- a 1009 but --

13           THE COURT:  -- tied back to the original spreadsheet

14   --

15           MR. TRACEY:  Exactly.

16           THE COURT:  -- in a fashion that is accurate as

17   testified to by the witness.

18           MR. TRACEY:  Correct.

19           THE COURT:  So that -- that sounds -- that's helpful

20   to me if it's okay with you.

21           MR. TAMBE:  It could certainly be helpful.  Two

22   observations:  One, it's a demonstrative, not evidence.

23           THE COURT:  Right.

24           MR. TAMBE:  It ties back to a spreadsheet that may

25   not be evidence itself.

1                THE COURT:  Understood.

2                MR. TAMBE:  As long as we're clear on that, if it's

3     something that helps the witness testify and it --

4                THE COURT:  Right.

5                MR. TAMBE:  -- helps it -- makes it --

6                THE COURT:  Helps me --

7                MR. TAMBE:  -- easier for us to follow, that's fine.

8                THE COURT:  -- be able to recollect the details

9     afterwards.

10               MR. TAMBE:  And the last piece of it is I'm not sure

11    what these summaries really look like, so it may not be

12    possible for us in real time to see whether they're accurate or

13    not.  We may have to sort of come back to that after we've

14    examined them.  But for purposes --

15               THE COURT:  That's fine.

16               MR. TAMBE:  -- of testimony, that's fine.

17               THE COURT:  Okay.  Great.  All right.

18               MR. TRACEY:  And that's all fine.

19               THE COURT:  Okay.

20               MR. TRACEY:  I guess the only thing is at some point

21    during the trial, and I think there was testimony that some of

22    the sheets in 2108 were prepared by Julian Sale and the other

23    traders.  So before we -- I know we're not offering things into

24    evidence, but before we consider it fully authenticated we're

25    going to put on the witness --

1              THE COURT:  Sure.

2              MR. TRACEY:  -- the testimony of those witnesses. At

3     some point during the trial I would like to have a conversation

4     about whether we're done with authentication on that document

5     because I don't want to be uncertain about that.

6              THE COURT:  That's fair.

7              MR. TAMBE:  Yeah.  At some point we should have that

8     discussion because at least based on the current lineup of the

9     witnesses we see an issue coming up.  But -- because, you know

10    --

11             MR. TRACEY:  I don't know what the issue is, but

12    we'll --

13             THE COURT:  Okay.  Well --

14             MR. TRACEY:  -- we'll see.

15             THE COURT:  -- maybe you can discuss --

16             MR. TRACEY:  Yeah.

17             THE COURT:  -- what the issue is.  So -- all right.

18    So why don't we get started in the hope that Mr. Chu can be

19    finished by the end of the day today.  And I'm not even going

20    to begin to talk to you about how far off we are from our

21    original estimate on what we thought we were going to be doing.

22             MR. TRACEY:  We have a new schedule that we're going

23    to send around to everyone today as a suggestion.

24             THE COURT:  Okay.  All right.  Sounds good.

25        (Pause)

1               MR. TRACEY:  May I approach, Your Honor?

2               THE COURT:  Yes.   Good morning.

3               MR. BECK:  Good morning.  John Beck of Hogan Lovells

4       on behalf of QVT.

5               MS. SAWYER:  Can we -- is there copies for us

6               MR. BECK:  Yes.  They're right here.

7               So what we've done, Your Honor, is we have filtered

8       the Lehman positions master tab in the sort of big QVT workbook

9       --

10              THE COURT:  Right.

11              MR. BECK:  -- to be -- we're going to do this for

12      each witness to -- this one is only Arthur Chu's positions that

13      he valued, and then we've only -- we've also filtered it so

14      it's only the QVT positions.  If you remember Quintessence had

15      essentially duplicate positions.

16              THE COURT:  Sure.

17              MR. BECK:  So that is what this is for Arthur.  And

18      what the internal -- if you look on the first row where it

19      says, A, B, C and then L, so I guess second row technically,

20      those are the columns that correspond to the actual spreadsheet

21      and the -- and some of those columns have been removed, the

22      ones that are not necessary for testimony.

23              THE COURT:  Now I'm not following you.  So it -- I'm

24      at the very top going across alphabetically --

25              MR. BECK:  Uh-huh.

Page 15

1          THE COURT:  -- from left to right and there's L and

2     then there's a Y underneath.

3          MR. BECK:  So it goes L, M --

4     (Pause)

5          THE COURT:  I got it.  Okay.  So at the very --

6     you're going to be referring to this by the very top --

7          MR. BECK:  We're going to be --

8          THE COURT:  -- right?

9          MR. BECK:  -- referring to it, actually the witness -

10    - so the witness will say, for instance, looking at the actual

11    spreadsheet, you know, if you look at N-519.  So you can look

12    at N, but this is on the first page, N which is on the row --

13    or Column G on the first line and then 519, the row.

14          Would it help if I approach and --

15          THE COURT:  There is no 519.

16    (Pause)

17          THE COURT:  Is it -- do it this way.  At the very top

18    it's alphabetical, A through whatever.  Is the N on the second

19    --

20          MR. BECK:  The second line, correct.

21          THE COURT:  So in -- we're in Row 1, Row Numbered 1

22    --

23          MR. BECK:  Yes.  Correct.

24          THE COURT:  -- on the left.  Okay.  So I'm looking at

25    N, and then you want me to go down --

Page 16

1          MR. BECK:  Correct.  To 13.

2          THE COURT:  -- to 13.

3          MR. BECK:  Row 13.  And you'll see 519.

4          THE COURT:  Okay.  Got it.

5          MR. BECK:  So the N and the 519 will correspond to

6    the actual rows and the actual columns in the QVT workbook.

7          THE COURT:  Okay.  Okay.

8          MR. BECK:  And for future witnesses we're actually

9    going to remove the outer rows and columns so you will only

10   have the internal rows and columns.

11         THE COURT:  But if I -- I'm sorry.  If I only have

12   the internal then I'm not going to be able -- the way to find

13   519, the reason I didn't see it at first was because down at

14   the bottom I was looking numerically.  The only way to find the

15   519 is by reference to the number 13.

16         MR. BECK:  Correct.  So let me -- so we have also

17   split it up by the method of calculation.  So in the blue rows

18   you'll see list --

19         THE COURT:  Right.

20         MR. BECK:  -- replacement --

21         THE COURT:  Replacement and Markit.

22         MR. BECK:  Markit.

23         THE COURT:  Right.

24         MR. BECK:  And then on the next page there's

25   calculation, PCS and other.  So the witness will only be within

Page 17

1    one of those categories at a time.

2            THE COURT:  And they --

3            MR. BECK:  So --

4            THE COURT:  Those will be numerical.

5            MR. BECK:  Those are numerical.  Correct.

6            THE COURT:  I got it.  Thank you very much.

7            MR. BECK:  Thank you.

8            THE WITNESS:  Should I also have a copy?  Am I

9    permitted to have a copy of that or am I just going to work

10   with --

11           MR. TRACEY:  No.  You're going to look at the --

12           THE WITNESS:  All right.

13           MR. TRACEY:  -- at the exhibit.

14           THE WITNESS:  Okay.

15       (Pause)

16           MR. TRACEY:  Can I --

17           THE COURT:  Ready when you are.  Yes.  Thank you.

18           MR. TRACEY:  Thank you.

19                   DIRECT EXAMINATION (Resumes)

20   BY MR. TRACEY:

21   Q    Good morning.

22   A    Good morning.

23   Q    We talked about your valuation of PCDS and the CARB

24   positions yesterday.  Today I would like to focus on the other

25   positions.

Page 18

1              Did you -- what other positions besides PCDS and CARB

2    did you value during the September 15th through October 15th

3    period?

4    A    I valued a number of positions on the order of 150

5    positions, I believe, between QVT and Quintessence.  So 75

6    unique positions if you like.  And those were credit default

7    swaps on corporates for the most part.  There were a couple

8    non-corporates, but for the most part those were corporate

9    credit default swaps.

10   Q    Okay.  And can you describe at a high level for the Court

11   what approaches you took to valuation for those positions?

12   A    Yes.  In cases where I did a replacement trade I used the

13   replacement value.  In cases when I had a level, a quote from

14   the market quotation process I would use that level or I

15   suppose if there were two levels I may have used an average of

16   the two levels, but I used the information from the market

17   quotation if I had that.

18              And if there was no such information I would have to

19   use a different method.  For the most part I used Markit to

20   value the rest of the positions, and for the Markit I had to

21   apply an estimate of what the bid mid-spread would be in order

22   to replace the position.  And similarly in certain cases I had

23   to make a judgment about which date on Markit would be the best

24   representation of replacement value.

25              And, finally, there's a small group of other default

Page 19

1    swaps that I had to calculate another way.

2    Q    Okay.  So what I would like to do is ask you to take a

3    look at Claimant's Exhibit 2108 which you've identified as the

4    workbook.  And if you would please --

5         MR. TRACEY:  Can you have the witness drive it?

6    Fine.

7    BY MR. TRACEY:

8    Q    If -- I wonder if you could open up the Lehman positions

9    master tab and filter that just to reflect the positions that

10   you valued.

11   A    Okay.

12   Q    And the witness is going to Column --

13   A    I guess it -- there's this thing called responsible party.

14   That looks like it's correct.

15   Q    Okay.  The witness is going to Column AQ.

16        THE COURT:  So for this, Mr. Tracey --

17        MR. TRACEY:  I'm sorry.

18        THE COURT:  -- do you want me to be --

19        MR. TRACEY:  It's BC.

20        THE COURT:  -- looking at the screen or at this

21   demonstrative?

22        MR. TRACEY:  I -- either one.  The demonstrative --

23   we're going to go in the order of the demonstrative so I think

24   it probably has everything you need.  There were going to be

25   some things the witness will refer to that are not on the

Page 20

1    demonstrative and then --

2             THE COURT:  Okay.

3             MR. TRACEY:  -- you can look at the exhibit.  But

4    it's up to you.  I wanted you to have a -- something on hard

5    copy if you wanted to refer to it or write on it.

6             THE COURT:  Okay.  So --

7             MR. TRACEY:  But there will be things in the

8    spreadsheet that will be referred to that are not in there

9    probably.

10            THE COURT:  Yeah, because AQ right off the top is not

11   on here unless I --

12            MR. TRACEY:  Right.

13            THE COURT:  So --

14            MR. TRACEY:  Right.  That's just a filtering

15   mechanism.  I don't think we're going to refer to it after

16   that.

17            THE COURT:  Okay.  Mr. Tambe's on his feet.

18            MR. TRACEY:  Oh.

19            THE COURT:  So --

20            MR. TAMBE:  I'm fine with the witness driving the

21   spreadsheet as long as the witness is telling the record what

22   he's doing because we may have a disconnect.  He -- I'm sure

23   Mr. Chu knows exactly how to navigate the spreadsheet so he

24   should be saying, I'm now going here.

25            MR. TRACEY:  I was just trying to be --

Page 21

```
 1              THE COURT:  Sure.

 2              MR. TRACEY:  -- helpful.  We -- that's fine with the

 3    --

 4              THE COURT:  Sure.  I mean, this is my ongoing concern

 5    with this being part of our record.  So that as much clarity as

 6    we can I think will just make for a record that I can use

 7    afterwards and that you could use after you're done with me.

 8    So --

 9              MR. TRACEY:  Okay.

10              THE COURT:  All right.

11    BY MR. TRACEY:

12    Q    So, Mr. Chu, when you are navigating through the

13    spreadsheet please state what you're doing, and if you are

14    filtering on a certain column please state what column you're

15    filtering.

16    A    Understood.

17    Q    Okay.  And so could you go to the column labeled Marked

18    on.  That is I believe Column BC.

19    A    Yes.  I see it.

20    Q    Okay.  And then if you could identify the positions that

21    you marked and state for the record what you're doing.

22    A    Yes.  So I am in the Cell BC-3 which is the marked by

23    filter tab and I'm opening the filter and there are various

24    initials of the traders that did the marks.  AC is me and then

25    there's all the other people like JW, for instance, who is Joel
```

Page 22

1   Wohlman.

2          So now I'm going to just check myself.

3       (Pause)

4          Okay.  So that gives me the positions that were

5   marked by me.  The Column BC now should only read AC and

6   nothing else.

7   Q    Okay.  And --

8          THE COURT:  So just -- again, to tie the live

9   spreadsheet to the demonstrative, now the demonstrative has

10  only Mr. Chu's positions.

11         MR. TRACEY:  Correct.

12         THE COURT:  I mean, the demonstrative has only --

13  only has Mr. Chu's positions and the live document has been

14  filtered in a way that it matches the positions that I have on

15  the hard sheet.

16         MR. TRACEY:  Correct.

17         THE COURT:  Right?

18         MR. TRACEY:  With one exception.

19         THE COURT:  Okay.

20         MR. TRACEY:  And that is that -- go ahead.

21         MR. BECK:  What -- so what he has still has QVT and

22  Quintessence.  The sheet only has QVT.

23         THE COURT:  Got it.

24         MR. TRACEY:  We just did it that way because it's

25  shorter.

1          THE COURT:  I -- that much I get.

2      (Laughter)

3  BY MR. TRACEY:

4  Q   Okay.  Now what I would like you to do, Mr. Chu, is if you

5  could filter the spreadsheet one more time I would like to

6  focus on the positions that you valued using each of the

7  different methods that you describe one by one.

8          And so what I would like to focus on first is the

9  positions that you valued using replacement trades.

10 A   Okay.

11 Q   So if you could filter that spreadsheet to limit it only

12 to replacement trades and tell the Court what you're doing.

13 You might want to try BP.

14     (Laughter)

15 A   Okay.  So I'm in Cell BP-3 right now.  And there is four

16 different categories of the way things were calculated:

17 Calculation list, Markit and replacement.  So I'm going to

18 select only the replacement items.

19         Okay.  So the filter is done.

20 Q   Okay.  And would you describe now what is up on the

21 monitor?  What universe of positions is on the monitor?

22 A   So this is the universe of positions that I did

23 replacement trades on.  In the lower left-hand corner of the

24 screen you can see it says, 38 of 796 records found.  So that

25 means that the number of replacement trades here is 38 between

1    QVT and Quintessence or 19 if you just looked at QVT.

2    Q    Okay.  So what I would like you to do now is if you could

3    look at the first trade that you valued using the replacement

4    approach, identify it by row number.

5    A    Yes.  I'm in Row Number 508.

6    Q    Okay.  And it -- does that have a related QVT Fund

7    position?

8    A    Yes.  The QVT Fund position is in Cell B as in Boy 508.

9    It is the ty-fi MTG 120620_DS27.bang.  That is a default swap

10   maturing June 20th, 2012 on the credit NGIC.

11            THE COURT:  I hate to be annoying, but --

12            MR. TRACEY:  It's 509.

13            THE COURT:  It's 509.  It's not 508.  Okay.  So now

14   I'm really confused.

15            MR. TRACEY:  I am, too.  I don't know we've got --

16            MR. TAMBE:  I'm sorry.  One other slight issue.  I

17   think yesterday we discussed with Mr. Wohlman the blue columns

18   --

19            THE COURT:  The --

20            MR. TAMBE:  -- were added some time later.

21            THE COURT:  The -- okay.  On --

22            MR. TAMBE:  The columns that have the blue headings,

23   that's where we were.

24            THE COURT:  Right.  But the -- on my sheet I have

25   baby blue and I have --

Page 25

```
1              MR. TAMBE:  Oh, it's the --

2              THE COURT:  -- royal blue.

3              MR. TAMBE:  It's the darker blue --

4              THE COURT:  The darker blue.

5              MR. TAMBE:  -- at the top.

6              THE COURT:  Adjust reason, further adjust reason  --

7              MR. TAMBE:  Yes.

8              THE COURT:  Okay.

9              MR. TAMBE:  Yes.

10             THE COURT:  So what's the issue on that?

11             MR. TAMBE:  I'm not sure if those are -- I'm seeing

12    columns line up here which have the blue heading and I thought

13    the witness was in one of those.

14             MR. TRACEY:  You know --

15             MR. TAMBE:  And use that to do the filtering.

16             MR. TRACEY:  Let's try again next time.  Let's work

17    in the spreadsheet and we'll make it clearer.  Apologies.

18             THE COURT:  Okay.

19             MR. TAMBE:  That's fine.  But my blue objection -- my

20    blue objection still stands because that's not where the sheet

21    was as we understand it on October 15th, 2008.

22             MR. TRACEY:  But that's not the purpose of this

23    exercise.

24             THE COURT:  Okay.  I'm sorry.  Now that I'm not

25    focusing on the sheets anymore could you state the objection --
```

Page 26

1              MR. TAMBE:  The objection --

2              THE COURT:  -- the concern or the question again with

3     the blue?

4              MR. TAMBE:  So the question again with the blue is

5     basically --

6              THE COURT:  Okay.  Mr. Chu, could you drive the

7     spreadsheet across to where Mr. Tambe --

8              THE WITNESS:  Sure.

9              THE COURT:  -- seems to be talking about.

10             MR. TAMBE:  Yeah.  Columns heading that begin right

11    there --

12             THE COURT:  Okay.

13             MR. TAMBE:  -- which is B -- I think it begins with

14    BF.  I'm just looking at my screen to see where the blue

15    coloring begins.  Oh, no, it's not.

16             THE COURT:  Yeah.

17             MR. TAMBE:  So it's BF.

18             THE COURT:  BF.

19             MR. TAMBE:  Right.

20             THE COURT:  Right.

21             MR. TAMBE:  My understanding based on Mr. Wohlman's

22    testimony yesterday was that the blue columns were added to the

23    spreadsheet after -- some time after 10/15/08.  This is not

24    part of what went in to preparing the calculation statement.

25    September of 2009 is what I understand his testimony --

1           THE COURT:  Okay.

2           MR. TAMBE:  -- was yesterday.

3           THE COURT:  Mr. Tracey agrees with you.

4           MR. TRACEY:  Yes.  I --

5           MR. TAMBE:  Okay.

6           MR. TRACEY:  -- I totally agree with that.

7           THE COURT:  Okay.

8           MR. TRACEY:  This was never -- this was -- this is

9     the current claim.  So the witnesses are going to describe what

10    the current claim is and they're going to describe what they

11    did between October -- September 15th and October 15th from a

12    methodology standpoint to get to that claim, and then those

13    numbers were adjusted between October --

14          THE COURT:  Right.

15          MR. TRACEY:  -- 15th --

16          THE COURT:  So this isn't going to be offered in

17    support of the reasonableness of any of the calculations with

18    respect to the positions.  This is going to be evidence of what

19    the claim is now only.

20          MR. TRACEY:  No.

21          THE COURT:  No?

22          MR. TRACEY:  That's not true.

23          THE COURT:  Okay.

24          MR. TRACEY:  So --

25          MR. TAMBE:  Actually, can we do this, if it's

Page 28

1    possible, if I may, outside the presence --

2              THE COURT:  Yeah.

3              MR. TAMBE:  -- of the witness?

4              THE COURT:  Sure.  Okay.  Okay.

5              THE WITNESS:  So should I leave or what should I do?

6              THE COURT:  No.  No.  I think every -- why doesn't

7    everybody stay in place?  We'll just go have a conversation

8    since other testifying witnesses are here as well.

9         (Recess taken at 10:38 a.m.; reconvened at 11:08 a.m.)

10             THE COURT:  All right.  Mr. Chu, thank you very much

11   for your patience.  We're going to try to keep going and pick

12   up the pace if at all possible.

13                    DIRECT EXAMINATION (Resumes)

14   BY MR. TRACEY:

15   Q    Okay.  Could you turn back again, please, to Claimant's

16   Exhibit 2108?

17             MR. TAMBE:  Yes.  I was wondering if --

18             MR. TRACEY:  What -- I thought we were putting

19   stuff on the record?

20             THE COURT:  We are putting something on the record.

21             MR. TRACEY:  Oh, yes.

22             THE COURT:  Okay.

23             MR. TRACEY:  So, I'll start and --

24             THE COURT:  Sure.

25             MR. TRACEY:  And Mr. Tambe can correct --

Page 29

1          THE COURT:  So, the context is the continuing

2     discussion between counsel regarding the appropriate scope and

3     use and understanding of how this spreadsheet is being used.

4     Okay.

5          MR. TRACEY:  And I'll just try to summarize what we

6     discussed off the record.

7          The spreadsheet, as the testimony has shown, is a

8     spreadsheet that includes information, both from prior to

9     October 15th, 2008 and after October 15th, 2008 and the

10    witnesses will be asked to testify about what was before and

11    after October 15th, 2008 and the testimony will be what it will

12    be.

13         The spreadsheet is being -- is being offered as

14    documentation of what the witnesses did at the time that they

15    did this work.  It is not being offered for the truth of the

16    matter asserted.  But solely to document the work that was

17    done, both between September 15, 2008 -- October 15th, 2008 and

18    afterwards.

19         And, to that extent, we believe that it is powerful

20    evidence corroborating what they did.  But it is not being

21    offered for the truth of the statements in the spreadsheet.

22         THE COURT:  Okay.  Mr. Tambe.

23         MR. TAMBE:  That's almost all consistent with my

24    understanding of our discussion except the formation that it is

25    being offered for -- as a documentation of what the witnesses

Page 30

1    did at the time.  I assume the witnesses will --

2              THE COURT:  But only to the extent that it is --

3    reflects or refers to pre-October 15th matters.

4              MR. TAMBE:  I think that's right.  I mean, I think

5    more broadly speaking our view is --

6              THE COURT:  And --

7              MR. TAMBE:  -- it is hearsay and not being offered

8    for the truth of the matter asserted.

9              THE COURT:  Correct.  All right.

10             And I think that we're just going to let the record

11   be filled out and that you'll be able to argue for whatever

12   inferences or lack thereof you think the testimony supports.

13             MR. TAMBE:  That's right, Your Honor.

14             THE COURT:  All right.  Go ahead.

15             MR. TRACEY:  Thank you, Your Honor.

16                    DIRECT EXAMINATION (Resumes)

17   BY MR. TRACEY:

18   Q    Okay.  If we could go back to Exhibit 2108 just to

19   reorient ourselves again, am I correct that you have filtered

20   this spreadsheet to show only the positions that you valued

21   using the prices of replacement trades that were actually done?

22   A    That's correct.

23   Q    Okay.  And there are 38 such positions?

24   A    Correct.

25   Q    Okay.  So, what I'd like you to do then, please, is to

1    start with the first one and explain to the Court what position

2    existed that was terminated as a result of the termination of

3    the ISDA agreement and how you valued that position.

4    A    Okay.  So, I'm in the tab Lehman Positions Master and

5    we're starting with the first entry which is a replacements

6    trade.  And this is in Cell B-508, MTG, 120620_DS27.bang (ph).

7              The quantity, that is to say the notional of the

8    trade is $11,590,000 U.S. and this trade was -- well, let me

9    just say one other thing that the strike of the -- or the

10   coupon of the CDS as is shown in Column L -- Cell L-508 is 78

11   basis points.

12             So, anyhow, so, that is the instrument that was

13   terminated and this was replaced -- I'm now referring to Column

14   AD508 -- Cell AD-508.  Generically, this area of the sheet is

15   any time one didn't use the Markit data, we would -- we could

16   note a reason why you didn't use it.  And Column AD notes a

17   replacement value of 29.789 approximately, which I can show you

18   the source data on in a moment.

19             The way this translates then further into the claim

20   is if we go into Column AL and we examine Column AL-508.

21   You'll see that there is a Mark of 29.79, that's the

22   replacement value we were looking at a moment ago.

23             And the amount of the claim then is equal to this

24   market value column, which is Column A -- the valuation of it

25   is equal to Column AO which is equal to 29.79 times this 11.59

                                                            Page 32

1    million figure.

2    Q    Okay.  And you said that this was based on a replacement

3    trade.  Would you identify what replacement trade that was and

4    any documentation there is of that replacement trade in the

5    spreadsheet?

6    A    Yes.  So, I -- you'll notice that in Column A, all of

7    these replacement trades happen to be in the account called MI,

8    mortgage insurers, and I recorded all of the replacement trades

9    that I did in a tab over here on the right.  And the name of

10   the tab is MI Data and I'm going to go to that tab now.

11           Okay.  So, what I did is I -- the name of the ty-fi

12   that we were looking at before is this thing MTG 120627 -- oh,

13   it's at 120620_DS27 and, right now, I'm looking in Cell B-69 of

14   the tab MI Data and you can see it's the same ty-fi, the same

15   contract.

16           It has the same strike of 78 basis points as before.

17   It also has the same quantity which you can see in cell F-69 of

18   this tab, of $11,590,000.

19           So, what I was doing here is this is a -- this tab is

20   a compilation of all of the CDS's that we had facing Lehman

21   Brothers, LBSF DC in Cell C-69 that were terminated.  And, just

22   for convenience, I color coded the ones with this light green

23   color that -- that I replaced.

24           So, moving from left to right in the spreadsheet, you

25   can see there in Column P as in Patrick, if you go up to the

Page 33

1    very top of the spreadsheet, Cell P-1, there's a header that

2    says; replacement ty-fi.  That is the CDS that I used to

3    replace the CDS over on the left.  So, in this case, this

4    particular default swap, in Cell B-69, MTG 120620 DS27 was

5    replaced with a new credit default swap equal to what's shown

6    in Cell P=69, that is MTG 120620_DS71.bang.

7           So, that's the new -- the new instrument that we

8    traded.  You can see that it has a 6/20/2012 maturity, the same

9    as the old instrument.  What's different about it is you can

10   see in Column R, that's labelled Spread.  So, instead of having

11   a 0.78 percent coupon -- just let me just go back here.

12          So, the old contract of 0.78 coupon, or 78 basis

13   points, this has a 500-basis point coupon.

14          And the amount that I paid to enter into the trade is

15   in the Column Q called Points.  So, I paid 18.75 points; that

16   is to say, 18.75 percent of the notional value in order to

17   replace this trade.

18          So, there's one last step that one has to do in order

19   to calculate the replacement value in this case.  The two

20   contracts are the same except they have different coupons.  So,

21   what I do here is in Column P, I'm converting the value, 18.75

22   points plus 500 running into an equivalent spread of 1,207.9

23   basis points.  That's in Column T, Cell T-69.

24          And, in order to do that, you need to assume a

25   recovery value.  I assumed 30 percent which was the -- of the

Page 34

1    market and the Markit recovery value that's at that time.

2            So, what that gives me is I can use a standard CDS

3    calculator and I can basically value the difference between

4    that 78-basis point spread and that 500-basis point spread and

5    that value is 29.79.

6            So, anyhow, so, then, that's -- that's the value that

7    goes into the spreadsheet.  So, you see this number in Cell U-

8    69 29.7898309.  Let's just go back to the other sheet and make

9    sure that ties up.

10           Okay.  So, there's that number 29.7898309.

11   Q    And that's back in the Lehman Positions Master at --

12   A    Yes.  I'm back in Lehman's Position Master Sheet, Cell AE-

13   508, just confirming that the data is the same in both sheets.

14   Q    Okay.

15           THE COURT:  Can I ask one follow up question?

16           THE WITNESS:  Yes.

17           THE COURT:  Where on the sheet can you tell the date

18   of the replacement?  Is that -- can that be inferred from

19   anything?

20           THE WITNESS:  I'm not certain that it's in the sheet

21   itself.  Let me see.

22           THE COURT:  There was -- when you were back in the

23   other sheet --

24           THE WITNESS:  Yeah.  Let's -- let's take a quick

25   look.

Page 35

1              THE COURT:  Right.

2              THE WITNESS:  Yeah.

3              THE COURT:  And then all -- see, all the way in V and

4    U, V and W, you've got --

5              THE WITNESS:  Yeah.  This is some extra data.

6              THE COURT:  So, if there's -- if you go back to

7    V --

8              THE WITNESS:  Yes.

9              THE COURT:  -- damage of extra date and there's a

10   zero; is that a (inaudible) --

11             THE WITNESS:  Oh, no.  Yeah.  Sorry.  I didn't

12   explain that part of it.

13             So, what that -- the purpose of that cell is

14   basically that occasionally I could not trade the exact date

15   that I wanted to trade.

16             THE COURT:  You mean the tenor?

17             THE WITNESS:  The exact header of the CDS.  And, so,

18   the purpose of these columns is to make an adjustment for that.

19             THE COURT: (Inaudible).

20             THE WITNESS:  That's something different.

21             But, I mean, I can tell you from memory that -- and

22   then we can -- I'm sure it's in the record, that there are 16

23   default swaps in this MI, out of 16 out of 19 that I replaced

24   on the 15th, two were on the 16th and one was on the 18th.

25   BY MR. TRACEY:

Page 36

1   Q    Can you, as long as we're on that subject, identify the

2   replacements that were done on the three dates that you

3   described?  Are you able to do that?

4   A    I can't do the 16th ones from memory, no.  I think that --

5   I think this last one down here, from memory, was done on the

6   18th.  But I would really have to go back and look at the trade

7   records to be certain.

8   Q    Okay.  So, if we could go to -- well, my first question

9   is, there is a -- there is a position on the spreadsheet.

10  Could be look at the master spreadsheet, please?

11  A    Yes.  Okay.

12  Q    Okay.  And, so, you were just describing the process for

13  valuation of Row 508.

14  A    Uh-huh.

15  Q    Is that correct?

16  A    Correct.

17  Q    Okay.  And below that is Row 509 which has a ty-fi which

18  is identical to the first one but has a Q after it; is that

19  correct?

20  A    Yes.

21  Q    And could you describe what that position is?

22  A    That position is the quintessence default swap.  So, the

23  DS27.bang is QBT's portion and the -- generically, everything

24  with a little Q.bang in here is going to be quintessence,

25  including this particular ty-fi.

Page 37

1           And you can see the ratio is, you know, roughly one

2    to ten or one to nine or something like that.  In Cell C-508,

3    it's 11.59 million.  In Cell C-509, it's approximately 1.31

4    million, which is the expected ratio.

5    Q    Okay.  And did you follow any particular practice with

6    regard to whether you valued the QBT fund positions the same or

7    different from the quintessence positions?

8    A    They should all be exactly the same just the quantity is

9    different.

10   Q    Okay.  And does that apply to all of the replacement trade

11   positions?

12   A    Yes, it would -- it applies to all of the replacement

13   positions.

14   Q    And does it apply to all of the positions in value?

15   A    Yes.  It should apply to all of the positions that we

16   valued.

17   Q    Okay.  All right.  So, you've described the process for

18   determining a loss based on replacement trade for Column 508.

19   Are there other positions on this list, among the 38 that we've

20   isolated here, that were valued in the same way?  And by what

21   -- what I mean by that is if you went through the same process

22   that you've just described, and what that the same columns

23   would the same valuation method apply?

24   A    To make sure I understand your question, I understand this

25   to mean what we just did; so, we looked at this one single ty-

Page 38

1    fi, MTG 120620 DS27 and we went through and we went to this

2    other tab called MI Data, and we made sure that -- when we

3    looked at the replacement cost and we -- going to figure out

4    the source of this number, 29.7838.  And, if your question is;

5    are these that are labelled replaced, should I be able to find

6    them in the MI tab, and does data tab and does it work the same

7    way, the answer is; yes.

8    Q    And there was one adjustment that appeared not to apply to

9    Row 508 that applied to other positions in your MI Data

10   spreadsheet tab for different tenors.

11   A    That's correct.

12   Q    And, so, would you, please, identify a position on this

13   spreadsheet that involved replacement of the position with a

14   replacement trade of the same underlying but a different tenor

15   and take us through the calculations.

16   A    Okay.  Okay.  So, for example, here.  I'm -- okay.  So,

17   I'm back in the MI Data tab and I'm looking at Cell P-84 and

18   Cell B-84.

19         So, going to B-84, first, that's -- this default swap

20   called MTG 120920_DS37 and that is a $4.11 million notional

21   position.

22         Moving across to the right of the spreadsheet into

23   Column P and looking at Cell P-84, this was replaced by a

24   different default swap, MTG 130920 DS74.  And, in this case,

25   what's different about the two contracts is not just that they

Page 39

1    potentially had different strikes.   You can -- the old ty-fi

2    had a -- in Cell D-84, a 2.10 percent strike or coupon.   But,

3    also, the new replacement trade does not have the same tenor or

4    maturity.   The old replacement trade, as its name implies, had

5    a maturity of 9/20/2012.   This new contract had a maturity of

6    9/20/2013.

7            So, the exercise is largely the same except that what

8    I did, as I said, well, I didn't really need that extra year of

9    protection.   What extra did I pay for that?   And that's

10   summarized in this cell column, excuse me, Column W called

11   Damage of Extra Date.   And there are various screen shots that

12   I saved that kind of go through these calculations in detail in

13   terms of the Bloomberg calculator.

14           But, ultimately, the total damage just basically

15   includes this damage of the extra date and this works out to be

16   33.79.

17           And, just for completeness, I would note that if you

18   look down below that damage of the extra date could be positive

19   in certain cases in which I bought CDS that was longer than the

20   CDS I used to have.   But if you look down below, for instance,

21   now, I'm in Row 105, and I'm looking at Cell W-105.   That's a

22   case in which the damage is actually negative, meaning I

23   reduced the claim and the reason for that is because if you

24   look over here, the original ty-fi that I was replacing in Cell

25   B-105 was MTG 140320.   So, it's a 3/20/14 date.   But I replaced

Page 40

1    it with a shorter date, 9/20/13, September 20th, 2013.

2         So, that's just to say that the effect is -- it kind

3    of goes both directions.  It can either increase or decrease

4    the claim.  It's just an adjustment for what the date that was

5    created was versus the actual thing you were trying replace

6    because you couldn't always trade the perfect date.

7         So, anyhow, coming back to Cell X-84, we have this

8    number, 33.791379 which is the final number.  I apologize.  We

9    have the set number, 33.791379 which is the number that results

10   from all the calculations including the date adjustment.  And,

11   in fact, when we come back to the -- now, I'm back in the

12   Lehman Positions Master spreadsheet.  Again, you see that the

13   Cell AD-518 ties out with that number at 33.79.

14   Q    Thank you.

15        Now, we've talked about the adjustment you made for

16   certain positions for differences in the coupon amounts,

17   correct?

18   A    Yes.

19   Q    And we've talked about an adjustment you made to certain

20   positions because the replacement had a different tenor,

21   correct?

22   A    Yes.

23   Q    Among all the replacement trades, were there any other

24   unique adjustments, any other adjustments that were made other

25   than those two adjustments in order to arrive at your final

                                                        Page 41

1    price?

2    A    I don't believe so.  But let me just be sure by looking at

3    the MI Data tab, please.

4         No.  I think that covers it.

5    Q    Okay.

6    A    Okay.

7    Q    Now, let's talk about the dates on which the replacement

8    trades were entered.

9    A    Okay.

10   Q    I think you had testified earlier that 16 of the 19 were

11   entered on September 15th; two were entered into on the 16th

12   and one was entered into on the 18th of September, 2008; is

13   that correct?

14   A    I think that's correct, yes.

15   Q    Okay.  And would you describe for the Court why you

16   replaced these positions on the dates that you did?

17   A     Okay.  Well, I mean, as you can see, in terms of the

18   positions that I actually replaced, there was sort of a

19   somewhat concentrated effort to replace a very specific set of

20   positions in these two names, PMI and MTG.

21        I think in the case of PMI, that was something that I

22   prioritized.  It was a credit I didn't like.  I wanted to

23   continue to be short it and I started trading it very early in

24   the morning.  I started off, I think, at five thirty in the

25   morning, doing a replacement trade of $2 million with UBS

Page 42

1    which, ultimately, was upsized into a $5 million trade.

2            And, continuously, throughout the day, I was

3    continuing to replace that credit until I was basically done

4    doing all the replacements that I wanted to do.  I think

5    actually if you look at the replacements notionals, it kind of

6    -- I replaced everything I had.  I mean, netting out the longs

7    and shorts of (indiscernible).  I think I replaced everything

8    or materially everything.

9            In the case of MTG, it was a similar process.  It

10   just, you know, maybe rather than starting at five thirty in

11   the morning, it started a little bit later in the day and I

12   just started trading and trying to replace the positions

13   throughout the course of the day.

14           And I just did a number of replacement trades during

15   that day.  I did a couple more on the 16th until most of the

16   positions were placed.  I think later in the week, on the 18th,

17   the -- that the price of protection actually had dropped a bit.

18   And, so, I just replaced a little bit more on the 18th.

19           Yeah.  So, that was kind of the sequence, the

20   sequence of events.

21   Q    And, so, just taking the trade on the 18th, the fact that

22   you replaced it three days later resulted in a lower claim in

23   this case?

24   A    Yes.

25   Q    And just on the subject of your trading on September 15th,

Page 43

1   you talked about starting trading at four thirty in the

2   morning.  Can you give the Court a sense of what trading you

3   were doing that day and how it compared to other days?

4   A    Okay.  Sure.

5          So, it was a really busy day.  And I started off at

6   four thirty in the morning.  My first trade was I actually sold

7   protection on Merrill Lynch because I had a lot of Merrill

8   Lynch protection and they had just been taken over by Bank of

9   America.  So, having been through the very difficult short

10  squeeze after Bear Stearns, I wanted to off load some of that

11  protection.

12         I also bought some protection on a European Index

13  Call -- the main index.  And, then, I started entering into

14  these replacement trades and, I think, the number of trades

15  overall that I did in that day, I think I did 33 trades that

16  day.  And, just to be clear, in terms of what I call a trade, I

17  call a single trade one that actually winds up appearing as two

18  or three trades if there are separate accounts.

19         So, I wouldn't call quintessence and QBT separate

20  credits.  I would -- so, really, I guess, in the language of

21  this document, it would be 66 trades or something like that.

22         But I call each trade just -- I don't think of it by

23  client.  It's just a trade.

24         Anyhow, so, of those trades, I think 32 of the trades

25  were CDS trades.  So, almost everything I traded that day was

1   CDS.  And, I think, I mentioned I did these 16 replacement

2   trades in MTG and PMI.

3            But I also did certain other replacement trades in

4   CDS of -- that faced Lehman.  It just so happens that it wasn't

5   the QBT fund that what was the counter-party and the reason for

6   that is that we have certain of these cases in which we owned

7   both bonds as well as credit default swaps.

8            But the bonds were prime brokerage at, in this case,

9   at Deutsche Bank and in order to minimize the margin that we

10  would have to post, rather than Deutsche Bank, QBT owning the

11  default swap, Deutsche Bank held the default swaps.

12           So, Deutsche Bank was basically taking the risk on

13  both the bond and the CDS together as a package, they wanted

14  them sort of both in their hands so to speak.

15           And the -- a lot of the trading that I did that day

16  was trying to replace that CDS that had been lost because we

17  had these positions that we used up formerly were low risk

18  positions, a bond plus a CDS together typically is thought of

19  as a relatively low risk position.  But the CDS was gone.  So,

20  I had to go out and try to buy that CDS.  So, I also did six

21  replacement trades in this -- these bond CDS basis trades.  It

22  just so happens that those CDS's weren't facing the QBT fund

23  that day.

24           And, then, I mean, I would say, in general, it was a

25  market in which it was -- you just had to trade off in small

Page 45

1    size to discover where the market was and, for example, in one

2    of the PMI trades I did with Barclays. I bought two million at,

3    I think, at twenty-four and then I bought another three million

4    at twenty-eight.  So, you know, a few minutes later.  So -- but

5    the market was all over the place.  That's a huge move for a

6    CDS in a small period of time.

7             And we kind of wrapped it all into one trade.  So,

8    actually inside some of these $5 million trades, there are

9    actually little trades that I had to do to kind of bunch them

10   together to make, you know, one single trade.

11   Q    And, so, just to give us a sense of the context, you said

12   there were 33 trades which had sub-trades in them; how does

13   that amount of trading compare to other days, generally?

14   A    It was a lot of trading.  I mean, I think that -- like I

15   think maybe the whole week before, I did on the order of 50 or

16   60 trades during the whole week.  So, it was busy; very, very

17   busy.

18   Q    Okay.  I'd like to turn now to the --

19             THE COURT:  Can I ask a question.

20             MR. TRACEY:  Sure.

21             THE COURT:  So, were these -- I'm trying to visualize

22   the trade.

23             THE WITNESS:  Yeah.

24             THE COURT:  So, were these initiated by a Bloomberg

25   message, Bewick Owick (ph) followed by a phone call?  Can you

Page 46

1    just describe --

2                THE WITNESS:  Yes.

3                THE COURT:  -- for me, you're going to trade --

4                THE WITNESS:  Sure.

5                THE COURT:  -- seek to trade a position; what did you

6    do?

7                THE WITNESS:  Yeah.  So, it would often be by

8    Bloomberg where I would send somebody in Bloomberg that --

9    okay.  Let me just step back for a second.

10               So, this was not a Bewick Owick process.  So, I

11   didn't try to go out --

12               THE COURT:  It was not a Bewick Owick process?

13               THE WITNESS:  No.

14               THE COURT:  Okay.

15               THE WITNESS:  I mean, it was not where I said; okay.

16   I've got --

17               THE COURT:  Yep.

18               THE WITNESS:  -- in a B, 16 positions blast out to

19   full dealers.  Respond to me --

20               THE COURT:  Okay.

21               THE WITNESS:  -- by this time.  Not -- it wasn't like

22   that.

23               THE COURT:  Okay.

24               THE WITNESS:  It was like one by one.

25               THE COURT:  One by one to a dealer?

Page 47

1            THE WITNESS:  To a dealer.  It would be common in a

2    normal market to maybe, so to speak, do a mini Bewick Owick

3    where you've got the two people at one time and you say; okay.

4    I want to buy 92013 MTG, where are you?  Like, I want to buy

5    9/20/13 MTG at five million, offer it to me.  And they would

6    come back.

7            I didn't feel like that was a good way to do it.  The

8    market was so fast.  So, I just engaged each dealer at a time

9    and I think your question is how did you engage them.

10           THE COURT:  Right.

11           THE WITNESS:  So, it wasn't through a blast process.

12   I would send them a Bloomberg or I would call them on the

13   telephone; often just a one line Bloomberg, saying; where can

14   you offer PMI?  And maybe UBS, for instance, would say --

15           THE COURT:  Uh-huh.

16           THE WITNESS:  -- I can offer you two million at

17   24.25.  And I'd say; done.

18           THE COURT: (Inaudible) Bloomberg (inaudible) got

19   done.

20           THE WITNESS:  And that Bloomberg back, done on two

21   million.  And then maybe he would say; do you want to work

22   more?  I would say; yes.  I'll work three million at the same

23   level.  And, you know, ultimately, he would come back in, I

24   don't know, 30 minutes, however long it took --

25           THE COURT:  Okay.

Page 48

1          THE WITNESS:  -- and say; okay.  Done.  Five million

2    on the day at 24.25; something like that.

3          THE COURT:  Great.

4          THE WITNESS:  Okay.

5          THE COURT:  Thank you.

6    BY MR. TRACEY:

7    Q    Okay.  Back to 2108.  Would you unfilter what you filtered

8    on replacement trades and filter the spreadsheet to show those

9    trades that you valued according to market quotations and,

10   please, describe, for the Court, as you move through the

11   spreadsheet what you're doing?

12   A    Okay.  Okay.

13        So, I'm going to be back on this Column BP and I'm going

14   to change the filter from replacement to list.

15        Okay.  So --

16   Q    Okay.  And how many positions appear in the spreadsheet

17   according to list?

18   A    Yes.  In the lower left hand corner of the screen, it says

19   10 of 796 records found.  So, there are 10 such positions.

20   Q    And is that the number of positions that you valued using

21   the market quotation responses that you received?

22   A    Yes.  I failed to clarify that.  The phrase, list, here is

23   shorthand for what we got back on the market quotation.

24   Q    And, just to be clear, are these positions where you did

25   not receive three or more market quotation responses?

Page 49

1    A    Yes.   They're positions where we received a response back

2    but not three responses back.

3    Q    Okay.   And did you follow the approach that if you -- if

4    it failed the market quotation process and there was no

5    replacement trade that you used the list approach?

6    A    I did with one exception where I made a clerical error

7    that I just didn't see the list level which I'll point out when

8    we get to the list.

9    Q    Okay.   So, if you would not start with the -- so, there

10   are ten positions here you said?   Is that five for QBT fund and

11   five for quintessence?

12   A    That's correct.

13   Q    Okay.   And -- so, I -- I don't want to focus on both.   I

14   want to focus on just one.   You can choose it.   Let's do QBT

15   fund maybe?   And if you could start from the top and take us

16   through how you valued that position using the market

17   quotations you received, stating which column you're referring

18   to and what your approach was.

19   A    Okay.

20   Q    And, by the way, I just want to make clear that I only

21   want you to respond with respect to what you did; what you saw;

22   and what you thought between September 15th and October 15th,

23   2008.

24   A    Understood.   Thank you.

25        Okay.   So, just kind of going through the mechanics

Page 50

1    again where on the tab, Lehman Positions Master, we're in Row

2    70, and I'm looking at the Cell B-70, which identifies the

3    default swap, AMR, American Airlines, 091220DS21.  So, this is

4    a default swap on American Airlines.

5           In the quantity of Cell C-70, $900,000 and the strike

6    or coupon in Cell L-70 is five percent, 500 basis points.

7           So, I think what I should do -- let me do just one

8    more thing.  Let me look at what the replacement value would be

9    according to this.  So, I'm looking at Cell AD-70 and you can

10   see the value is 16.0277.  So, round it to 16.03.  And when we

11   move over to the result area, in Cell AL-70, it's 16.03.

12          So, now, let's just see where that comes from.  So,

13   there should be a sheet in here -- okay.

14          So, I'm going to go to a tab, pretty far on the right

15   of the spreadsheet.  It's called Corporate List.  And, okay,

16   what this tab is, is this is basically a compilation of results

17   of the market quotation that we received from dealers.  So --

18   Q    Can I just interrupt you for one second?

19   A    Please.

20   Q    Is that the market quotation that was sent out on

21   September 15th?

22   A    That's correct.

23   Q    Go ahead.

24   A    So, maybe it would -- for the sake of efficiency, it would

25   help to just spend a second on what the format is before we

Page 51

1    dive into finding this particular AMR trade.

2           So, what this is, is this is just a list of all these

3    different default swaps.  The entity, the maturity, the strike.

4    I'm in Row 2 now.  The notional -- we happen to list the sector

5    so it's easier to break up by trader.  Notes is if it's not a

6    regular kind of CDS.  For example, you can see in Cell F-17, it

7    says, LCDS.  That's a CDS referencing a loan rather than a

8    regular bond.

9           And, then, it -- on Cell IQ, it says B/O that tells

10   you whether it's a Bewick or an Owick meaning were we asking

11   for a bid on protection or were we asking for an offer on

12   protection.  That's just a shorthand for dealers.

13          Then, the results in Columns K through R are the

14   results that we got back from the individual dealers.  So, for

15   example, you can see in Cell K-1, it says UBS.  So, that's what

16   we got back from UBS.

17          And the heading K-2 says quote.  And the Column L is

18   a note.  That's not a note that we put in.  That's a note that

19   the dealers put in.  And, similarly, Columns M and N are Morgan

20   Stanley; O and P are Barclays and Q and R are JPM.

21          So, just to decipher what these numbers mean, as an

22   example, I'm looking at Cell K-4 right now.  The quote that we

23   got from UBS on this credit DRI is 185 basis points and they

24   happen to have a notation that says; axed; which, in dealer

25   talk, means I want a credit, meaning this is a trade I want to

Page 52

1    do.

2            So, anyway, let's trade to find this AMR trade now.

3    Okay.

4            So, what we were looking for is we were looking for

5    an American Airlines default swap maturing in 122009 with a

6    500-basis point strike in an amount of $1 million.

7    Q    What row are you on?

8    A    Excuse me.  I'm on Row 230 and the data I just read you

9    was from Columns A through D.  So, A-230 identifies it as AMR,

10   B-230 as December 20th, 2009, C-230 as a 500 strike and D-230

11   as a million dollars.

12           And it's a million dollars not -- which is the sum of

13   the QBT and quintessence pieces because they're traded pro

14   rata.

15           And you can see it says Owick, meaning we want an

16   offer.  And, in this case, I'm now going to sell M as in Mary

17   230 and there's the number 17.25 and there also happens to be

18   the notation, axed, in this case; meaning Morgan Stanley

19   actually wants to offer that protection to us or that's what I

20   understood it to mean.

21           So, one more thing.  It's understood here that 17.25

22   is not in basis points; 17.25 is in points up front.  So, in

23   dollars, that would be 17.25 percent of a million dollars or a

24   $172,500.

25           Okay.  So, now, let me go back to the main sheet and

Page 53

1     kind of tie this all out.

2     Q     So, you're going back to the Master Sheet?

3     A     I'm going back to the Master sheet now.   Okay.

4           So, let's come back to our default swap here.   So,

5     there's this AMR 091220 DS21 and from the previous sheet we saw

6     that the level that Morgan Stanley gave was 17.25.   However,

7     the particular mark in this case is 16.03, which is not the

8     same number and you might ask yourself; why isn't it the same

9     number?   And the reason is because it's basically Morgan

10    Stanley is giving us a so-called clean price and 16.03 is a

11    dirty price.

12          If you just do the math, it's, basically -- this is a

13    500-basis point contract, interest accrues four times a year

14    and the next coupon date would be September 20th, 2008.   So,

15    you're very close to having a quarter of a year. So, it should

16    be very close to 17.25 minus a quarter of 500; i.e., you should

17    be very close to 16, which it is, it's -- the exact number is

18    the 16.03.   But that's why the numbers don't tie up the same

19    way they did in the other sheet.

20          Okay.   That was my laborious explanation of this

21    default swap.

22    Q     Thank you.

23          So, the mark -- the ultimate mark that you derived

24    from the market quotation was 16.03?

25    A     Correct.

1    Q    And how does that translate into a loss calculation?

2    A    Oh, yes.  So, this is in the Column AO.  So, the 16.03

3    times the quantity of $900,000 equals the market value of

4    $144,250 in this case.

5    Q    Okay.  Thank you.

6    A    And that is in Cell AO-70.

7    Q    Thank you.

8         Okay.  If you could go to the second position on that

9    list, the second unique position, not the quintessence

10   position, and take us through that calculation.

11   A    Okay.  So, I'm looking at Cells A-72 and B-72 in Lehman

12   Positions Master.  This is the account AMR ETC and this is the

13   default swap AMR 09 -- excuse me, AMR-100920 DS19.  So, a $1.53

14   million default swap.  I'm sorry.  Where did my mouse go?  Oh,

15   here it is.  Okay.  Okay.

16        And, once again, it has a five percent strike.  So,

17   let's just quickly go to the other sheet and see if we can find

18   that trade.

19        Okay.  So, here it is underneath the other one.  Now,

20   I'm in the Corporate List sheet.  I'm in -- looking at Row 231

21   and the Cells A-231 through D-231 show that this is a 9202010

22   default swap with a 500 strike in the amount of $2 million.

23   The Cell I-231 identifies this as an offer wanted and the price

24   that is given in this case is 30 points, 30 percent.  And it

25   happens to have the notation, axed.

Page 55

1          So, returning to the main sheet, I'm now back on

2    Lehman Positions Master and I'm looking at Cell AL-72 and you

3    can see the mark is 28.78 which differs, again, from 30 by very

4    close to 1.25 percent, again, for the reason of accrued

5    interest.  And the way that that rolls up into the valuation is

6    in Cell AO-72, 440,000 is equal to the quantity 1.53 million

7    times the mark of 28.78 percent.

8    Q    Thank you.

9          Now, in both of those cases, I noted that there was a

10   single -- a single market quotation that was received by QBT in

11   response to the mark quotation process.  Were there any

12   positions where you received two market quotations?

13   A    Yes.

14   Q    Would you take us through the calculation of how that

15   worked?

16   A    Okay.  So, I'm returning back to the tab Corporate List.

17   I think in the particular ones that I did, I'm not sure that

18   there were, but I can show you some examples up here.

19          Okay.  So, I'm back in the tab Corporate List and

20   this is Row 4 going back to DRI.  So, there happen to be two

21   quotes here.  One is from UBS and one is from JPM.

22          And the UBS quote in Cell K-4 is a hundred and

23   eighty-five and the JPM quote is a hundred.  And, I guess, this

24   Column U is equal to 142.5 in this case, which is -- perhaps

25   was the average of the two multiple quotes that were received

Page 56

1    in this case.

2    Q    And, just to be clear, is that a position that you valued?

3    A    No.  I didn't mark -- I didn't mark that position.

4    Q    Okay.  So, did all of your -- all of the list  positions

5    that you valued involved only a single market quotation?

6    A    Let me just see for a second.  I'm sorry.  I have to go

7    back to the other sheet.  I just don't recall the names of

8    them.

9         Okay.  So, RYL 111220, 161220 in Fannie Mae.

10        Okay.  So, this case is a case in which I had two

11   dealers.

12   Q    Would you identify the position you're (inaudible)?

13   A    Yes.  I'm sorry.  So, I'm back on the Corporate List tab

14   and this is the Row 44 which refers to this thing, RYL, Ryland

15   Homes, 122011, December 20th, 2011, 135 strike, 135 strike, $10

16   million.  And I'm asking for a bid on protection.

17        And, so, there are two dealers that happen to provide

18   quotes in this case.  One is Morgan Stanley.  They have a quote

19   of 425 and there's another one, J.P. Morgan, that has a quote

20   of a 185.

21        So, I don't know why this particular Cell T-44 is

22   formatted as a date in this case.  But it's supposed to be the

23   average of all of those numbers.

24        So, let's just check what that is.  That's 305.

25   Okay.

Page 57

1           Right.  So, the average of the two quotes is 305 and

2     you can see that in Column -- I'm sorry.  I'm back into Lehman

3     Positions Master sheet and I'm looking at Cell AG-314.  And

4     there's a notation spread which is -- has the value of 305.

5     So, that's the average of those two numbers.

6           And, in this particular case, I used also the

7     recovery that Morgan Stanley specified.  In the previous sheet,

8     Morgan Stanley noted a 50 percent recovery in that.  I'll take

9     a sidebar and explain why you'd need to put that in a second.

10          But, anyway, I used it.  So, if it would be helpful,

11    I can give the sidebar as to why people sometimes specify that.

12          THE COURT:  Could you go back to why -- probably a

13    stupid question, but why is there such a disparity between

14    these two market quotation numbers in that you're at 305, which

15    was an average of 425 and 185?

16          THE WITNESS:  I couldn't tell you.  I don't know the

17    answer to that.  It's -- I agree.  It's surprising.  It's much

18    larger than what you would expect.

19          But -- I mean, I could speculate but I really don't

20    know why.  I didn't talk to either party about why.

21          THE COURT:  Okay.  Thank you.

22    BY MR. TRACEY:

23    Q    Okay.  So, can you tell us why you used the recovery rate

24    that --

25    A    Oh.

1    Q      -- that you specified?

2    A      Well, yeah.  It's just because what -- when you value a

3    credit default swap, in order to do the valuation, the market

4    has to assume a certain recovery rate.

5              For example, suppose that you have a credit default

6    swap that has 100 basis point running coupon.  That's -- the

7    market is sort of saying that on average you should expect to

8    lose a hundred basis points by -- of credit losses by owning

9    this thing.

10             But how do you lose the hundred basis points?

11   Imagine that you think the recovery on a default is 50 percent.

12   Then, that means that the probability per year of the thing

13   defaulting, at that assumption, is two percent per year because

14   50 percent of two percent is a hundred basis points.

15             But, on the other hand, if you thought the recovery

16   rate was going to be 80 percent, you would only lose 20 percent

17   in a default.  And, so, therefore, the implied default

18   probability per year is higher, it's five percent per year

19   because five percent times twenty percent, which is your loss

20   upon a default, gives you back the hundred-basis point number.

21             So, changing the recovery assumption is going to

22   change the valuation of CDS slightly depending on the strike

23   because the so-called hazard rate that the chance of a default

24   that's implied by the default swap actually changes.  So, just

25   sort of a technical thing but that's why people do specify it

1    sometimes because to do a full valuation, if you have a

2    recovery rate, which is different than the standard 40 percent

3    recovery rate, people want to know.  Yeah.

4    Q    Okay.  So, we're on Row 314; could we -- could you take us

5    from the average spread that you used to how you got to the

6    ultimate loss calculation?

7    A    Right.  So, in -- yeah.  In this case, it's basically you

8    have to invoke a CDS calculator of some kind to get you to this

9    number of 4.52.  But that CDS calculator is what was used to do

10   it and we can kind of see whether the number makes sense or

11   not.

12           So, let's just think about this for a second.  So,

13   the strike of this coupon is 1.35 percent.  And they're saying

14   that the spread is 305 basis points.  So, the difference

15   between a strike and where they think the market is, is 305

16   basis points minus a 135 basis points.  So, that's about 170 --

17   that's 170 basis points.

18           So, if you think of how long this contract is, it's

19   approximately a three-year contract.  So, 170 basis points

20   times three would be 5.1 percent.  It's a little bit less than

21   that because of time value of money and because of the

22   possibility that the things defaults.  So, it's 4.52 percent.

23   But, the valuation, of course, wasn't done in the manner I just

24   said.  It was done by invoking a CDS calculator.  But just as a

25   sanity check on the number, yeah.

Page 60

1    Q    And could you take us from the 4.52 mark to the loss

2    calculation?

3    A    Yes.  So, it's done in the same manner.  It's -- you take

4    the 4.52 percent mark times the quantity of C-314.  The

5    quantity, in this case, is negative because we've sold

6    protection to Lehman in this case and because we're out of the

7    money in the trade, the market value is negative and it's

8    negative -- this is Cell AO-314, negative 345,701.

9              UNIDENTIFIED SPEAKER: (Inaudible) number.

10             THE WITNESS:  Negative 345,701.

11   BY MR. TRACEY:

12   Q    Okay.  So, we've gone through three of the five unique

13   positions on -- that you valued using market quotations.  If we

14   -- did you have an approach in September and October of 2008 of

15   valuing all of the positions in the same manner that you just

16   described?

17   A    If you mean whether in the case when I had something from

18   the list; did I value them all in the same way; the answer is

19   yes except for that clerical error that I mentioned before

20   where there's one default swap where I actually had a level and

21   I failed to transcribe it which I can tell you which one when

22   we get to it.

23   Q    Yeah.  Can we look at that now?

24   A    Sure.  Let's see.  So, I'm going to need to filter here.

25             So, I'm -- I'd like to move back to this thing that

Page 61

1    says QVT source.  Okay.  So, I'm back in the Lehman Positions

2    Master sheet.  I'm in Column BP and I'm going to filter on

3    Markit instead of on list.  Okay.

4           So, there's a particular -- oh, that's nice.  It came

5    up in the right place.

6           So, there's a particular set of default swaps here.

7    I'd sold protection on Berkshire Hathaway and I'm in the area

8    Rows 330 to 335.  And, I believe, I used Markit Partners for

9    all of these.  However, there is a level -- there is one of

10   these in which I actually had a level on the list and I failed

11   to use it.

12          So, I have to look back to the list to see actually

13   which one it was.  I think it was UBS that gave the response.

14          Okay.  So, I'm going back over to the tab Corporate

15   List.  And I'm over in Row 9 of the Corporate List.  There is

16   this credit default swap on Berkshire Hathaway with the 32013

17   maturity and a 98-basis point strike in a notional amount of 25

18   million.

19          The quote from UBS was 115 and, I mean, I think the

20   reason why there was nothing transcribed here is because this

21   formula wasn't copied down, you can see it.  So, that the

22   average formula wasn't copied down.

23          So, anyway -- so, on that one -- so, I guess, that's

24   this default swap here, Rows -- I'm back in Lehman Positions

25   Master.  These are Rows 330 - 331.  The ty-fi name is BRK130320

Page 62

1    DS1.  And you can see in Cells L-330 and L-331 here, it is the

2    98 strike.

3          So, as I said, that one I made a clerical error and I

4    should have used the list level but I used a Markit level

5    instead.

6    Q    And what was the effect of that on the valuation?

7    A    The effect of that on the valuation is that the -- if I

8    had used the list level, because the list -- the list level was

9    115 basis points.  Let's just go back to that.  I'm back on

10   Corporate List.  So, you can see K-9 is 115 basis points.

11         And what I actually used is -- I used the 117-basis

12   point Markit level.  But the bid mid was ten percent.  So, you

13   would have to take 90 percent of that number.  So, it's going

14   to work out to be about 105 basis points.  And, in this case,

15   had I used the list level of 115 basis points, that would have

16   the effect of decreasing QBT's claim by approximately $100,000

17   on that order.  So, it would be slightly more favorable to the

18   estate had I -- had I used the list level.

19   Q    Now, if you could go back to the Lehman positions master.

20   If -- I'm sorry.  Could you --

21   A    Thank you

22   Q    -- endeavor again to go back to the list approach to

23   valuation?

24   A    Yes, I'm going back to the BP column.  I'm again

25   filtering it back to lists to get back to the other -- the

Page 63

1    previous list of ten positions.

2    Q    Okay.  And I'd now like to direct your attention to the

3    columns that are in blue.  So now we're leaving the discussion

4    of what you did during the period September 15th until October

5    15h, 2008.

6    A    All right.

7    Q    And I'd like you to look at the columns in blue.  Would

8    you tell the Court whether there were any adjustments to the

9    marks that you have been talking about as list marks after the

10   original claim was submitted or the original calculation

11   statement was submitted on October 15th, 2008?

12   A    Yes, I mean, just reading the columns, it looks like

13   there were some changes.  For example, looking at Row 70 to

14   begin with, you can see that it states the original claim was

15   in Cell BG-70, $155,250.  But then the adjusted claim is

16   $144,250.  And it notes a reason.  It looks like there was an

17   error in the accrued interest calculation or something.  Yeah.

18   Q    And who performed those adjustments after October 15,

19   2008?

20   A    I don't actually know the person.  I don't believe that I

21   was the one who did these.  In fact, I'm quite sure of it.

22   But I don't know who specifically did it.

23   Q    Okay, then.  Thank you.  All right.  Now I would like to

24   focus on the positions that you valued using Markit Partners,

25   so go back to the position master and filter it for those

Page 64

1    positions, please.

2    A    Okay.  So I'm going back to Column BP once again and I'm

3    going to change from lists to Markit.  Okay.  And that results

4    in the lower left hand corner in 92 records being found.

5    Q    Okay.  And so -- and you valued each of those 92

6    positions?

7    A    Yes, I did.

8    Q    Using Markit Partners' information?

9    A    Using Markit, correct.

10   Q    Okay.  So for this I'd like you to first explain to the

11   Court your overall approach to -- when you decided to use

12   Markit Partners as the pricing source to calculate your loss?

13   A    Sure.  So there were essentially two parameters that one

14   had to specify in order to get a replacement value out of the

15   Markit data.  The first is that we had to specify -- first is

16   the bid mid-spread because Markit by its nature is a midmarket

17   and we were calculating the replacement value.  So depending

18   on which side of the market you are on, you would have to look

19   at either the bid or the offer side of the Petch market.

20          And the second one was to the extent you felt that

21   09/15/08 was not the right date in order to accurately reflect

22   the replacement value, you would use a date other than

23   09/15/08.  That's -- those are the nature of the adjustments.

24   Yeah.

25   Q    And just to be clear, when I asked you that question, I

1    meant to focus you on -- only on what you knew and did during

2    September 15th through October 15th; is that how you

3    understood it?

4    A    Yes.  Those are -- yes.  Those are the adjustments that we

5    made during that period, correct.

6    Q    And so for this line of questioning all of my questions

7    are going to be limited to that period; is that okay?

8    A    I understand.  Yes.

9    Q    Okay.  So let's talk first about the first adjustment that

10   you described, the addition of a bid -- mid-bid or mid-offer

11   spread.  Would you describe for the Court, your approach to

12   that adjustment across these Markit Partners positions?

13   A    Yes.  So in order to estimate the bid midspread, the

14   different people who are working on this project together,

15   myself, Nick Brum (ph) Tom Knox, Joe Wolman (ph),

16   (indiscernible), and we were in the office together and we

17   wanted to try to first agree on what we felt was a default

18   level of the bid mid-spread in -- and we talked about it and we

19   settled on a percentage bid mid-spread of 10 percent.  Okay.

20   What that means is for a credit trading at 100 basis points,

21   the market would be 90 basis points to 110 basis points, and

22   similarly for a credit at 200 basis points it would be 20 basis

23   points on either side.  So 180, 220.

24        And the context in which we came to that was, we

25   actually often recorded a bid offer spread in these spread

Page 66

1    sheets that we use to calculate our P&L, even though the -- the

2    NAV of the fund is calculated on a midmarket basis.  But kind

3    of going back -- it was a little bit vestigial, I guess -- kind

4    of going back to our Deutsche Bank days, our profit and loss

5    was always calculated on the bid side.  And we continued to

6    record both a bid and an offer.  And when we uploaded data, at

7    least in this -- I can specifically remember in the case of a

8    sheet that Joe Wolman and I shared, we assumed a 5 percent bid

9    mid-spread.

10             So we were -- what we were doing basically is one

11   context we had was that that we were going from a 5 percent bid

12   mid-spread in our mind to a 10 percent bid.  We were saying the

13   bid mid-spread is going to be wider in this environment than

14   what we had in the past.  And ultimately that 10 percent bid

15   mid-spread was something that we discussed and we thought it

16   was, you know, based on the fact that we were in the market, we

17   thought that was a good default starting assumption.

18   Q    And when you say we, who are you referring to?

19   A    It means the five people I just mentioned based on just

20   discussion at the desk.

21   Q    Yes.  Okay.  And now focusing on the valuations that you

22   did using Markit Partners, did you use 10 percent in all

23   instances?

24   A    I did not use 10 percent in all instances.

25   Q    Can you describe in general terms, and we'll go through

Page 67

1    individual examples, why you would depart from that default 10

2    percent Markit Partners mid-bid spread?

3    A    Sure.  So there were -- I think there was a case in which

4    I used a 3 percent spread because it was an index and it was

5    just more widely traded.  It was more liquid.  And conversely,

6    there were cases in which I used a larger bid mid-spread when

7    either the credit was just not a liquid credit, it didn't trade

8    very much, or it might have been an illiquid point on the curve

9    far away from the five-year point on the curve, or it could

10   have been a case in which -- there was one case I used a 15

11   percent bid mid rather than a 10 percent bid mid in which I had

12   a lot of protection to buy.  It was a somewhat liquid credit,

13   but I was kind of going the way that was hard to do in the

14   market but I made a notation that this protection is very well

15   bid.  It's very hard to buy.  I just didn't think I could buy

16   the quantity I needed to buy on -- at the standardized bid mid.

17   I used a larger number.  Yeah.  I think that those are the main

18   cases.

19   Q    Okay.  And is it possible for you to show the Court the

20   bid mid-spreads that you used as a whole?

21   A    Okay.  Sure.  Okay.  So I'm in the Lehman Positions Master

22   Sheet and I'm in the column W.  And you can see there's

23   something that says Bid/Mid in Cell W3.  And then there's a

24   bunch of numbers here.  I think the only three values here are

25   15 percent for some at the top, 10 percent in the middle, and

Page 68

1    there's another 15 percent, there's a 3 percent here as I

2    mentioned, and then as we go down the rows, there's a bunch of

3    10 percents in this MI account, so.  Yeah.  So those are the

4    bid mid-spreads that I used.

5    Q    Okay.  And can you just tell the Court how many of the 92

6    positions, how many you used 15, how many you used 10, and how

7    many 3?

8    A    Okay.  I'm going to have to count them.  So three is two

9    positions.  Hold on.  I think 16 are 15 percent.  And so the

10   rest are going to be 10 percent, whatever that difference is.

11   Okay.

12   Q    All right.  We'll come back to the reasoning for that in

13   individual cases, but before that I'd like to talk about the

14   date of the Markit Partners information that you used.

15   A    Okay.

16   Q    And would you describe for the Court what approach you

17   used to -- what date Markit Partners you used in your

18   calculations?

19   A    Sure.  Okay.  So first, how do we kind of identify which

20   date that we used?  So I'm in Lehman's Positions Master and I'm

21   looking at Cell V1.  So you can see Cell V1 says 09/15/2008.

22   And just the way the mechanics of the spreadsheet work, in

23   Column Y, if you don't put anything, it will use 09/15/08,

24   okay.  But if you do put something, it'll use whatever date

25   that is in Column Y.  And by use whatever date, what I mean is

Page 69

1    it'll go and make a function call to the Markit Partners

2    database.  It'll find the CDS spread interpolated for that

3    credit on that date.

4            So Column Y actually identifies all of the various

5    dates that we used in order to do the valuation.  And the three

6    dates that I used were 09/15, 09/16, and 09/17.

7    Q    Okay.  And why didn't you use 09/15 for all of the

8    positions?

9    A    Yeah.  So this is another topic that was discussed common

10   -- among the various people.  And I think that our view was

11   that we did this market quotation process on 09/15 and we got

12   whatever we got as a result of it.  We also did whatever

13   replacement trades we did on 09/15 and when did whatever we

14   did.  And in those two cases, as we just talked about, we would

15   use the -- there'd be a -- certainly in the case of replacement

16   you were supposed to use those values.

17           But given that we did the market quotation on 09/15,

18   our view is that the first time that we could trade in the

19   market for everything that we didn't get a market quotation

20   would have been on 09/16.  And therefore, 09/16 was kind of a

21   like a default date that one would tend to use.  Yeah.

22   Q    Okay.  So let's now go through an example of a calculation

23   using Markit Partners' information.  And why don't we start

24   with the first position.

25   A    Okay.  Sure.  So this is a position, a default -- okay.

Page 70

1   I'm at Row 254 in Lehman's Positions Master and I'm looking at

2   cell B-254 and this is this credit called KRB-100620DS14.  KRB

3   is the name for this credit card company called MBNA.  That was

4   actually taken over by Bank of America in I think 2005.  And

5   the significance of that is that it used to be a quite liquid

6   credit in the market.  It used to trade a lot, but it doesn't

7   -- didn't really trade after that.

8           So coming to how this was actually valued, in Cell V-

9   254, the Markit spread for this date, 09/15/2008, is 1.56

10  percent.  And because this was an illiquid credit, I used a

11  higher bid mid-spread of 15 percent in this case.  So the value

12  of the spread that's fed into the CDS calculator is not 1.56.

13  1.56 is the mid-spread, the value that's fed into the CDS

14  calculator is 1.15 times 1.56 and then that results in this

15  mark in -- excuse me -- in Cell X-254 of 1.9.  I mean I will

16  just add that logically I'm actually not sure why I chose

17  09/15/2008 in this case.  I think probably logically on a lot

18  of these, they should have all just been 09/16/2008 for the

19  reason that I talked about earlier.  But as it turns out here,

20  I used 09/15/2008.  Yeah.

21  Q    Okay.  And can you take us through the rest of the

22  calculation and how do you get from the 1.56 times 1.15 to the

23  price?

24  A    Right.  So the CDS calculator produces the mark and that's

25  again shown in Column AL, so I'm looking at cell AL-254 now.

Page 71

1    And then over here the calculation is the same as for all the

2    other default swaps that we were looking at.  In Column AO,

3    that's the market value.  So in this case, Cell AO-254 is

4    $139,702 which should be -- I'm sorry -- $139,702 which should

5    be equal to 1.9 percent the mark times the notional which is in

6    Cell C-254 of $7,370,000.

7    Q    Okay.  And again just taking the -- all of the Markit

8    positions would it be did you follow the same method of

9    calculation using the Markit Partners mid-mark spread

10   multiplying it by or adding in the mid-bid spread that you

11   identify in the spreadsheet to get the ultimate mark?

12   A    Yes.  Everything you said is correct except just for

13   clarification, in the event that you're selling protection, not

14   buying protection rather than using, say, 115 percent of the

15   spread, you would have used 85 percent of the spread.  But

16   modular that comment, everything you said is correct.

17   Q    Okay.  I'd like you to please go to the next position on

18   which you used a 15 percent mid-bid spread.

19   A    Okay.  So that's in Row 256.  That's KRB-100620_DS15.  And

20   just to make sure I'm following the convention correctly, when

21   you say the next one, the quintessence one that's the sister

22   one doesn't count?

23   Q    Right.  Exactly.  We're going to skip over the

24   quintessence ones and just focus on QB (ph).

25   Q    Okay.  Thank you.  And why did you use the 15 percent bid-

Page 72

1   mid spread in that one?

2   A    Well, I mean it's essentially a repeat of the same default

3   swap, so I used the same logic.

4   Q    Okay.  Please go to the next one where you used the 15

5   percent spread.

6   A    Yes.  This is a mortgage insurer called -- well, it's

7   actually a multiline insurance company, but it's called

8   Genworth.  This is Row 298.

9   Q    And why did you use a 15 percent mid-bid spread on that

10  one?

11  A    Right.  So this particular credit generally is a case in

12  which we had a position that was not extremely large in dollar

13  terms, but it was large compared to the liquidity in the market

14  I felt that was available at this time.  So you can see that we

15  had several default spots adding up to -- and I'm looking at

16  Rows 298, 299, 300, 301, 302, 303, 304, and 305.  And I'm

17  adding this -- the quantities.  They add up to about $32.61

18  million.  And so we were strictly a buyer of protection in this

19  (indiscernible).  And I looked through all of my Bloombergs on

20  this when I was trying to look at it and I noticed that it was

21  very hard to buy protection on this.  It -- there were bids for

22  protection like for instance on Monday, Park Place was trying

23  to buy protection.  But there were no apparent material offers

24  of protection and I think the 16th was largely the same way.

25  So I made a notation to myself in Column AE.  This was very

1    hard to buy and was well bid.  And for that reason I used a

2    higher bid mid.  I felt if I used 10 percent as a default, I

3    needed to use something higher than 10 percent in order to

4    value this credit's replacement value.

5    Q    Okay.  Thank you.  Does that apply -- that applies to all

6    the Genworth positions?

7    A    Yes.  The Genworth positions were traded as a group.

8    Q    Okay.  Would you go please to the next position on which

9    you used the 15 percent mid bid or mid-offer price -- spreads?

10   A    Okay.  Yes.  So now I'm on Row 436.

11   Q    Okay.  Could you give us your rationale for using 15

12   percent on these.

13   A    Sure.  So these -- really the rows 436 to 439 all carry

14   the same rationale.  They are the default swaps on German

15   banks.  Let me just start with V-436.  That's a DB, Deutche

16   Bank, 100620subDS1.  So that means it's a default swap that

17   matures on June 20th, 2010.  It's a subordinated.  And it --

18   yeah.  That and it -- yeah.  That's basically it.

19          And similarly for -- in B-438, it's Dresdner Bank.

20   And the reason that I used 15 percent in this case is just that

21   my experience trading these default swaps of this short date

22   was that they were illiquid.  The on-the-run date at that time

23   would have been 09/20/2013.  So the two-year date would have

24   been 09/20/2010 so this is actually even shorter than a two-

25   year date.  And my experience trading these short-dated default

1   swaps during that period was I felt that they were illiquid.

2   Yeah.

3   Q    And you say they were illiquid, how does that relate to

4   the size of the mid-offer spread?

5   A    Well, kind of almost by definition something that's

6   illiquid, you'd expect to have a bigger bid mid-offer spread.

7   Q    Okay.  Are there any other positions that you used a 15

8   percent mid-bid spread?

9   A    No, I don't see any.

10   Q    Okay.  Let's talk about the positons that you valued using

11   a 3 percent mid-offer-spread.  Could you identify those?

12   A    There's only one such position that's in Rows 448 and 449.

13   Q    Okay.  Describe that for us, please?

14   A    That is the ty-fi name is ITRAX 9-EUR-Sub-Fin-130620_DS10.

15   That is a index of European financials that traded in, you

16   know, referenced the subordinate debt of those financials.  And

17   it was just much more liquid than any of these single names and

18   so I used a lower bid-mid-spread.

19   Q    Okay.  And now taking the 10 percent mid-bid-spreads as a

20   whole, is there any way for you to describe in aggregate terms

21   why you used the 10 percent?

22   A    Well, as I said, it was kind of a default assumption that

23   we used and I think what it was intended to capture is a couple

24   of things.  One is that we felt liquidity in the market

25   generally was worse.  And in addition to that our portfolio had

1   I think relatively few contracts that were on-the-run five year

2   and we just knew in general from experience that the on-the-run

3   five year had -- excuse me -- dates away from the on-the-run

4   had worse liquidity than other dates.  So I mean, as I said

5   ultimately it was judgment call.  It was a decision that we

6   made talking to each other that we felt a 10 percent bid-mid

7   was reasonable.

8   Q    And just so I'm clear on your testimony, did you look at

9   each of these positions and say the default is an appropriate

10  mid-bid spread for this position or did you just hit the

11  default button for anything that didn't stand out in another

12  way?

13  A    I think it was probably somewhere between the two things.

14  I think that, you know, we are -- we went through line by line

15  and then looked at each line item.  You know, many of these

16  credits I traded actively.  Some of them I did not.  And, you

17  know, we set this 10 percent default.  And unless we felt

18  strongly that it was particularly liquid or particularly

19  illiquid by its nature, the default is something that you would

20  keep.  And so that's what I did.

21  Q    Okay.  All right.  So let's turn to the dating of the

22  Markit Partners information that you used.

23          THE COURT:  Can I ask you to stop, Mr. Tracey

24          MR. TRACEY:  Yes.

25          THE COURT:  So we've been at it for quite a long

Page 76

1    time.

2           MR. TRACEY:  Yep.

3           THE COURT:  So it's maybe needed to take a short

4    break and then we'll go to the lunch break.

5           MR. TRACEY:  Okay.

6           THE COURT:  How about that?

7           MR. TRACEY:  Sure.

8           THE COURT:  All right.  So just very quick, like five

9    minutes.

10          MR. TRACEY:  Okay.

11          THE COURT:  All right?

12          MR. TRACEY:  That'd be okay.

13       (Recessed at 12:36 p.m.; reconvened at 12:47 p.m.)

14          THE COURT:  So just so you know, what we're going to

15   have to do is we'll go until 1:15.  And then I have those folks

16   coming in at 1:30.  And then -- that means we'll resume at

17   2:15.  Simple math.  No spreadsheets needed.

18          MR. TRACEY:  I'm going to really try and get done

19   before 1:15.

20          THE COURT:  Sure.

21          MR. TRACEY:  So feel free to push me.

22          THE COURT:  Get done with Mr. Chu's direct?

23          MR. TRACEY:  Yes, yes, I'm going to try.

24          THE COURT:  Perfect.  Great.

25       (Pause)

Page 77

1            DIRECT EXAMINATION (Resumes)

2    BY MR. TRACEY:

3    Q    Okay.  I think, Mr. Chu, when we left off, we were going

4    to start to talk about dates in your Markit Partners' position.

5    A little earlier, we touched on a position that you had -- for

6    which you had used Markit Partners' data from September 15th.

7    Do you recall that?

8    A    Yes.

9    Q    And you made a comment that -- something along the lines

10   of logically, those positions should have been valued using

11   9/16 data.  Is that -- am I getting that right?

12   A    Yeah, yes, I think that's accurate, yep.

13   Q    And when you said that, were you referring to all of the

14   positions on the spreadsheet for which you used 9/15 data?

15   A    Yes, except I just want to point out that that particular

16   Berkshire Hathaway CDS that we talked about earlier -- this is

17   the one in rows 330 and 331.  That's the one that actually got

18   a level in the list from UBS.  So had I made that -- I happened

19   to use 9/15.  Had I gotten that transcribed correctly, I

20   wouldn't -- we wouldn't have to worry about that one.  But,

21   yes, I would say for the positions that I used 9/15, I think

22   that logically probably 9/16 would have been a better date,

23   yeah.

24   Q    Okay.  So let's focus then on the first position for which

25   you used 9/16 data.

Page 78

1   A    Okay.

2   Q    Would you -- would you take us through the valuation, why

3   you selected 9/16, and how that resulted in the loss

4   calculation?

5   A    Okay.  Now, so I am on Row Y-312 of the Lehman Positions

6   Master Spreadsheet.  This is -- the default swap is shown in

7   Cell B-313 CTX-130920DS6.  It's a 7.46 million of notional.  So

8   this was valued using the 9/16/2008 date, which can be seen in

9   the Cell Y-312.

10          And the market spread that applied as of that date

11  was 4.99 percent, as can be seen in Cell V-312 and a bit mid-

12  spread of 10 percent was applied to that, which means that the

13  default swap calculator was fed a value of -- the default swap

14  calculator -- excuse me -- was fed a spread of 110 percent of

15  4.99 percent, which led to the column market mark in the Cell

16  X-312, the value of 16.8.  And then the way that that

17  translates over to the claim is the same as before.  So moving

18  over to Column AL, Cell AL-312.  You can see the mark of 16.8,

19  16.79 transcribes over.  And the dollar value of the claim is,

20  again, shown in Column AO.  And the value in Cell AO-312 is

21  equal to the product of 16.79 percent of $7.64 million or about

22  $1.28 million.

23  Q    Okay.  And in your view, again focusing only on the 9/15

24  to 10/15/2008 period, was that -- was that a valuation as of

25  9/15 or 9/16?

1   A    That was -- that was our estimate of the value of what it

2   would -- it was a valuation as of 9/15/2008, but it used data

3   as of 9/16/2008.

4   Q    And why did it use data as of 9/16?

5   A    Well, as I said, because we -- during the day, we replaced

6   certain positions.  And then at the end of the day, we ran this

7   market quotation process.  This would be an example of

8   something where, on the market quotation process, we didn't get

9   anything back.  Because had we gotten something back, I would

10  have used it, as I did in the case of another (indiscernible)

11  Ryl, R-Y-L, that we talked about earlier.  And because we

12  didn't get anything back, our view is that we would have

13  therefore had to trade as of 9/16/08.  And that's why we used

14  the 9/16/08 close.

15  Q    When you say trade, do you mean you would have had to

16  replace the position on that date?

17  A    Right.  So basically, we did this market quotation process

18  as of -- as of the close of business as of 9/15.  And we got

19  back whatever we got back.  And this was something where we

20  didn't get anything back.  And therefore, we thought that we

21  would have to replace it as of a later date.  And the next

22  available date would have been 9/16.  That was the logic.

23  Q    And did that logic apply -- again, focusing only on what

24  you were thinking September 15th to October 15th, 2008.  Did

25  that logic apply to each of the positions that were valued

Page 80

1   using 9/16 Markit data?

2   A    Yes, that's -- yes, correct.

3   Q    Okay.  So now, what I'd like to do -- and the calculation

4   that you just took us through for that position -- again, would

5   that -- would that calculation apply to every position that was

6   valued using Markit data as of 9/16?

7            MR. TAMBE:  By this witness, just to be clear.

8            MR. TRACEY:  I'm sorry?

9            THE COURT:  As to --

10           MR. TAMBE:  By this witness.  By this witness.

11           THE COURT:  As to --

12           MR. TRACEY:  By this witness, yes.  Sorry.

13   BY MR. TRACEY:

14   A    Sorry.  Is the question would the kind of mechanics of the

15   calculation be the same for all of the cases in which I valued

16   it as of 9/16?  I wasn't sure.

17   Q    Correct.

18   A    Yes, they were the mechanics I just walked you through,

19   correct.

20   Q    Okay.  All right.  Were there cases in which you used

21   Markit data, other than 9/15 and 9/16?

22   A    Yes, there was the case of one credit, Genworth.  This is

23   now coming back to Rows 298 to 305.  I used a date of

24   9/17/2008.

25   Q    Okay.  And why did you use that date?

Page 81

1    A    Well, so I was looking through my -- in this case, my

2    Bloomberg messages to try to get an idea of where this thing

3    really was.  I was trading a lot of other mortgage insurers,

4    and this was a credit I was interested in.  So you can see in

5    the Column AE, I made a notation to myself.  "This was very

6    hard to buy and was well-bid."

7            And what I meant by that was that during the period

8    9/15 and 9/16, there didn't appear to be material offers of

9    protection that were out there.  It seemed like dealers, based

10   on the Bloomberg messages I could see, wanted to buy

11   protection.  So I thought it would have to be an even later

12   date in this case.  To the extent that 9/16 was used for one

13   other -- for most other things, I used something that was one

14   day later, which was 9/17.  So that was the logic.

15   Q    Okay.  So what I'd like to do now is move to the fourth

16   approach that you described earlier, which is the calculation

17   of a price using another approach.  Did you collect those on

18   your spreadsheet?

19   A    Yes, I did.

20   Q    And is it possible for you to filter the spreadsheet to

21   show only those positions?

22   A    Okay.  So I'm going to return to the Cell BP.  And I'm

23   selecting the notation calculation in this case.

24   Q    All right.

25            THE COURT:  Can I ask a clarifying question?

Page 82

1              MR. TRACEY:  Sure.

2              THE COURT:  If you go back Column AM, some of them

3     say manual instead of Markit; is that different from what we're

4     doing now?

5              MR. TRACEY:  Manual is an override of Markit.  We can

6     ask the witness.

7              THE COURT:  Okay.

8     BY MR. TRACEY:

9     Q     Mr. Chu, if you would look at Column AM on the Lehman

10    Positions Master.

11    A     Yeah, I see it.

12    Q     Yeah.

13    A     Right.  So --

14    Q     What does that mean?

15    A     Right.  So these all say manual in the particular filter

16    we have.  And that should correspond to a case in which you

17    weren't using the Markit data.  So it could be for any reason

18    that you weren't using the Markit data.  So let me just go back

19    for a second.

20              So what I'm going to try to do here is -- this is --

21    what was the column?  Is it this manual column?  What was it?

22    A? AL?

23              THE COURT:  AL.

24              THE WITNESS:  Yeah, okay, sure.

25              THE COURT:  In the --

Page 83

1          THE WITNESS:  Yeah.  So -- okay.  So what I'm looking

2    for is -- let's see.  M.I., right.  So this -- there are

3    certain cases in which it says manual, certain cases in which

4    it says Markit.  I have to say I'm actually slightly unsure,

5    because I would have expected that -- let's see.  To the extent

6    that certain of these MPGN positions were done with

7    replacements, I would have expected to say manual in some way.

8    But the other ones where they use Markit here, you can see it

9    continues to say manual.  So I can't explain why it says manual

10   in that case.

11   BY MR. TRACEY:

12   Q    I think the --

13          THE COURT:  Let me ask a follow-up question.  But I

14   thought the universe that we were looking at was either going

15   to be replacement, meaning actually replaced; Markit; or --

16          MR. TRACEY:  List.

17          THE COURT:  -- List.

18          MR. TRACEY:  Or the fourth category is the -- is the

19   calculation, which is none of the above.

20          THE COURT:  Which is none of the above.  But that

21   doesn't correspond to manual.

22          MR. TRACEY:  It does not.  It does not.  And there --

23   Mr. Wolman (ph) will be able to explain that.

24          THE COURT:  Okay.  All right.  I'll wait.

25          THE WITNESS:  Okay.  Maybe I can unfilter this to get

Page 84

1    back to the original.

2        (Pause)

3            THE WITNESS:  Okay.  So we're going to the case

4    calculation?

5    BY MR. TRACEY:

6    Q    Yes, please.

7    A    Okay.  Okay.

8    Q    Okay.

9    A    So there's 76 records found in this case.

10   Q    Okay.  And we talked extensively yesterday about the PCDS

11   and CARB.  Are those positions in this bucket?

12   A    Yes, they are.

13   Q    Okay.  So why don't we start with those?  How many -- how

14   many of those 76 positions are PCDS?

15   A    It should be 60 are PCDS.  They are all the things -- and

16   I'm looking, again, on the Lehman's Positions Master.  I'm

17   looking at Column B, as in boy.  And you can see various ty-fis

18   that have the notation -pref.DS.  Those are all PCDS positions.

19   I mean, to be completely sure, I guess -- well, sorry.

20       (Pause)

21   A    Those are all these positions here.

22   Q    Okay.  So 60 of the 76 positions in this category are the

23   PCDS?

24   A    That's right.  Yeah, there's 60.  I just counted them.

25   There's 60.

Page 85

1    Q    Okay.

2    A    That's correct.

3    Q    All right.  And how many of the positions of that universe

4    of 76 are CARB?

5    A    There are four of them.  Those are in Rows 280 to 283.

6    The notation that we had for CARB was auto BBB Bespoke.

7    Q    Okay.  And so, if you take those out of this category, am

8    I right that there are 12 positions left?

9    A    Yes, there are 12 positions left.  These are -- these

10   positions in Rows 202, 203, 204, 5, 6, 7, 8, 9, 10, 11, 14, and

11   15.

12   Q    Okay.  And so, that's six unique positions?

13   A    Correct.

14   Q    Okay.  All right.  Before we get to those, can you take us

15   to a PCDS calculation?  Just choose any one.  I'd like you to -

16   -

17   A    Okay.

18   Q    We talked about the rationale yesterday.  I'd like to see

19   how that translates into the spreadsheet calculation.

20   A    Okay.  So --

21   Q    And again, for this entire line of questioning, we're

22   limiting ourselves to what you did and knew and considered

23   between September and 15th and October 15th, 2008.

24   A    Right.  Okay.  Sure.  So I'm on Row 154 here.  This is a

25   Sun Trust preferred CDS, STI-120620-pref_DS1 with an amount of

1    $8.26 million.

2              THE COURT REPORTER:  (Inaudible.)

3              And the -- I'm sorry.  Of $8.26 million.  The mark is

4    45.41, which is in Cell AL-154.  And then the market value is

5    calculated in the same way in Cell AO-154 as 45.41 percent of

6    $8.26 million is $3,751,141.  And as to where this 45.41 comes

7    from, --

8    Q    That's the 45.41 in Column AL?

9    A    In Column AL, yes.  There's a tab here analogous to the

10   Tab M.I. Data called PCDS Data.

11   Q    Can we pause on this --

12   A    Yes.

13   Q    -- spreadsheet for a moment and just, again, give the

14   Court an overall understanding of what the purpose of this was

15   and what it shows?

16   A    The purpose of this spreadsheet was, basically, to record

17   the calculations that I was doing for this par minus preferred

18   concept that we talked about at some length yesterday.  And

19   just to kind of give the result of the calculation, you know,

20   I'm looking at Row 59 of the spreadsheet.  And you can see in

21   the Cell A-59 it says STI120620-pref_DS1.

22              And in Column K, the price that's used for the

23   preferred is 54.  So the price -- in the Column L, the price

24   that's used for the CDS is 46, which is 100 minus 54.  And then

25   translating that back to the master sheet, it's not -- again,

Page 87

1   it's not exactly equal to 46, because there's some accrued

2   interest in the trade, which is in the 45.41 number.  And so,

3   similarly, all the STI's were valued at a clean price of 46,

4   and they have slightly different accrued interests.  Everything

5   else propagates through the same way.

6   Q    Okay.  If you could return to the PCS data time.

7   A    Sure.

8        (Pause)

9   Q    I'd like to focus on Rows E through I.

10  A    Columns E through I?  Okay.

11  Q    Right.  Would you describe for the Court what those

12  columns represent and where the data came from?

13  A    Sure.  Okay.  So let's just look at Row 5.  Okay.  And

14  I'll get to your columns in a second just to make the whole

15  thing make sense.  So looking at Cell A-5, this is a default

16  swap called AAB120920-pref_DS1.  That's ABN AMRO.

17        And then you can see there is a -- in Cell C-5, there

18  is this long string of characters starting with XS.  That's

19  just the CUSIP or the ISIN that identifies the particular bond

20  that I was looking at.  And you can see a notation in Column,

21  "Is ref. ob.?"  And I put yes, because that is the reference

22  obligation of ABN AMRO that's referenced in this particular

23  default swap.

24        And what Columns E through I are is those are the

25  prices from Bloomberg for 15, 16, 17, the 18th, and 19th of

Page 88

1    September.  And I know the source, which is Bloomberg in this

2    case.  Just going across then, I note the claim price that I

3    used in Column K, 60.4357.

4              So yesterday, we talked about -- I talked about how I

5    used the low closing price of the week.  It happened to be the

6    19th of September price here as compared to the 15th of

7    September price of 65.69.  So I used 60.4357.  And the clean

8    CDS price, as I mentioned yesterday, was 100 minus that or

9    39.56.

10             And then this notation file name over here is just a

11   screen shot that I took.  That's just the name of the

12   screenshot that I saved, some of which we looked at yesterday.

13   Q    So that on Column M is a reference to a screenshot?

14   A    That's right.

15   Q    And did you retain those screenshots?

16   A    I did.

17   Q    Okay.  So if we could just go back to Column C.

18   A    Uh-huh.

19   Q    Do I understand you correctly that Column C is the CUSIP,

20   or unique identifying number, of the specific preferred stock

21   issuance that you used to obtain those prices?

22   A    Right.  So the -- yes, that's right.  So the -- for

23   instance in Cell E-5, 65.6922 is the Bloomberg closing price

24   that was shown on the screenshot for the ISIN shown in Cell C-

25   5, yes.

Page 89

1   Q    Okay.  So I just want to focus for a moment on how you

2   chose that specific issuance.  I think you mentioned earlier

3   that there may be multiple preferred stock issuances for an

4   individual bank; is that true?

5   A    Yes.

6   Q    And that CUSIP refers -- if there's more than one, that

7   CUSIP refers to a single one of the multiple preferred

8   issuances?

9   A    Correct.

10  Q    And did you have an approach, again, in September 15 to

11  October 15th, 2008 as to if there was more than 1 preferred

12  stock issuance for a particular bank, how you chose the

13  particular 1 you chose?

14  A    Yes, there was.

15  Q    And what was that?

16  A    So I think I may have mentioned yesterday that I wanted to

17  start with the reference obligation that was specified in the

18  contract.  I felt that was a natural place to start.  You don't

19  have to use that, but it was a natural place to start.

20          So, for example, here in the case of ABN AMRO, I did

21  use the particular reference obligation.  And I was able to

22  find a pretty -- you know, at least complete time series on

23  this -- on Bloomberg.  I have data for all the different dates.

24  That wasn't the case in -- okay.  So let me just step back for

25  a second.

1         So I guess the first part of the answer to your

2    question is to the extent I could find a reference obligation

3    that had a reasonably complete time series, I used it, with two

4    exceptions, which I'll get to in a second.  And this has to do

5    with matching the economics of the CDS with the bond.  And so,

6    I'll explain that when I get to -- when I -- when I come to the

7    exception.

8         So, for example, going to the next line, I was trying

9    to piece together some various time series of some of these

10   other PCAFP bonds.  So right now, I'm in Rows 7 through 12.

11   They're kind of all colored gray in the spreadsheet.  And I

12   think in this case, I may have been piecing them together from

13   various broker runs from -- in this case, it may have been that

14   fellow, Peter Camps, whose Bloombergs we were looking at

15   yesterday.  But it was -- it was difficult to sort of string

16   them all together to get a complete time series.

17        Similarly, when I looked at the particular reference

18   obligation for ACAFP -- I'm looking now at Cell D-10.  You can

19   see it says is ref. ob.?  Yes.  In Cell D-10, it says is ref.

20   ob.?  Is it the reference obligation?  And it says yes.

21        And the ISIN is US225313A837.  And you can see in

22   Columns E through I they're all blank.  And then I made a

23   notation to myself in parentheses, "No Bloomberg price data."

24   So I didn't have Bloomberg price data.  So I had to choose a

25   different ISIN.

Page 91

1            And the particular ISIN I chose was the ACAFP 4.13

2     shown here, which has the prices shown here.  This might

3     actually be a reasonable time for me to explain this concept of

4     matching the bond with the CDS, if we have a couple more

5     minutes.  So to do this, I think we have to take a look back at

6     the master sheet, and we have to look at what this default swap

7     actually is.  In particular, I'm going to focus on what coupon

8     is.

9            Okay.  So this ACA -- I'm back in the Lehman

10    Positions Master.  I'm on Cell B-108, and I'm looking at this

11    credit agree default swap, ACAFP120920DS1.  And what I'm

12    looking for is I'm looking in Column L. descriptive strike.  So

13    that's the CDS coupon, which you can see in this case is 0.31

14    percent.  And the next one is 0.32 percent.  And the next one

15    is 0.43 percent.

16           And what does this have anything to do with the

17    analysis?  Well, the way in which it has to do with the

18    analysis is -- let's go back to the -- what we're trying to

19    calculate, which is to be in the position of a dealer and

20    you're going to be short some kind of preferred stock.  And

21    you're going to be receiving the CDS coupon.  So we already

22    figured out the points up front.

23           And the question is is there a match between those

24    two things.  And in this case, there really -- there isn't a

25    perfect match, because you're only receiving 31 basis points.

Page 92

1    You're only receiving 31 basis points, 0.31 percent.  And

2    you're paying out, in this case, 4.13 percent.

3         It's not -- that's not exactly the right calculation

4    in the sense that a dealer may take one extra step, in my

5    experience, where, if you're short, basically, something that's

6    a perpetual, it's like a 30-year bond.  You're taking both

7    credit risk and interest rate risk.  You may choose to hedge

8    the interest rate risk by owning some kind of riskless bond,

9    like a 30-year Treasury bond, for instance.  This is a European

10   instrument.  So maybe on 30-year bonds or something like that.

11        That helps to offset.  You receive yield.  You

12   receive income by owning those securities, which helps to

13   offset some of the coupon.  But it doesn't -- it doesn't fully

14   match it.  But just to -- in terms of the order of magnitude

15   we're talking about, these are bonds which are approximately 70

16   cents on the dollar.

17        I think Treasury 30-year yields were very, very close

18   to 4 percent around those dates.  So if you -- and I think

19   bonds were about 4-and-a-half percent.  So if you were to own

20   Treasury securities to hedge the interest rate risk in these

21   bonds that you're short, you would be getting something on the

22   order of 70 percent of 4 or 70 percent of 4-and-a-half.  So

23   it's going to be on the order of, let's say, call it 3 percent,

24   to make it simple.

25        So as to the -- as the person who's short the

Page 93

1    preferred, you're paying out 4.13.  You're receiving 31 basis

2    points from the CDS.  That's the CDS coupon.  And you're

3    receiving approximately 3 percent from the Treasuries that you

4    own.  So that's not a perfect match.

5           The dealer is actually still paying out some money to

6    do that trade.  But it sort of emphasizes the idea that, as you

7    choose the different coupons you're looking at, you want to be

8    careful to try to match those two things together.  So that was

9    -- that was one of the thought processes behind this.

10   Q    Okay.  And in choosing the particular CUSIP to use, did

11   you follow the methodology that you just described with respect

12   to each of the PCDS?

13   A    Yes, I mean, I think that's basically right.  If I could

14   find a reference obligation that didn't have a coupon that was

15   very far off and it had an okay-looking price series, I would

16   use it.  For example, here -- we talked about this ANZ 5.36.

17   It actually -- I think -- I believe it is actually the

18   reference obligation, even though it's not noted here.

19          The ACR -- I noted that this is a reference

20   obligation, and that's what I used.  And I think I mentioned

21   that there was an exception here.  So in the case -- I'm on Row

22   34 now.  In the case of Dresdner, this Dresdner defaults swap,

23   the reference obligation is an 8.151 percent coupon, which is

24   the reference obligation.  And it has a clean-looking price

25   series.  Clean looking meaning it has all the numbers populated

Page 94

1    in it.

2            And when I looked back at this particular default

3    swap, it just --

4    BY MR. TRACEY:

5    A    I'm sorry.  When I looked at this particular default swap,

6    I noticed that it had a very low coupon.  Let's just look at

7    it.  This is Dresdner.  I'm back in the master sheet.  I

8    noticed it had a 35 basis point coupon.  So there would --

9    there would be quite a big mismatch in terms of carry by using

10   such a high coupon instrument.

11           So as a result of that, I used this Dresdner 6.352

12   instead.  I just couldn't find a preferred that had exactly the

13   right coupon, but -- nor, generally, when I found the reference

14   obligation, like in the case of something like Citi Group,

15   there's lots of preferreds.  I guess I could have spent a lot

16   of time finding exactly the right coupon that would have offset

17   the carry.  But in this case, I found the reference obligation,

18   and it had a clean price series.  So I used it.

19   Q    Okay.

20           MR. TRACEY:  Thank you, Your Honor.  I'm very close

21   to finishing, but I know that you have a deadline.

22           THE COURT:  Yeah.  So could I just -- can I ask one

23   question?

24           THE WITNESS:  Sure.

25           THE COURT:  We're still on this sheet.  And your

1    prior testimony was that, with respect to these, you selected

2    the lowest close of the week?

3            THE WITNESS:  That's right, Your Honor.

4            THE COURT:  So whether or not it occurred on the

5    15th, 16th, 17th, 18th, or 19th, --

6            THE WITNESS:  Whatever date it was, Your Honor.

7            THE COURT:  Whatever date it was?  Okay.  So we

8    didn't exactly make it.

9            MR. TRACEY:  But close.

10           THE COURT:  But close.  So how much longer do you

11   think you have?

12           MR. TRACEY:  Twenty minutes, at the most.

13           THE COURT:  Why don't we just do it?  Okay?

14           MR. TRACEY:  You want to just do it?

15           THE COURT:  Let's just do it.

16           MR. TRACEY:  Okay.

17           THE COURT:  They'll find stuff to talk about, those

18   folks.

19           MR. TRACEY:  Okay.

20           THE COURT:  And then you'll go.  And then

21   Mr. Tambe will be able to start, or whoever it is from Lehman,

22   Ms. Sawyer, I think.  Now, Mr. Tambe?  Okay.  So just --

23           MR. TRACEY:  Okay.

24           THE COURT:  Are you okay continuing?

25           THE WITNESS:  Sure, I'm happy to continue, yeah.

Page 96

1   BY MR. TRACEY:

2   Q    Okay.  Just following up on that date point for a moment,

3   I want to go back to some testimony you gave a bit earlier

4   about the dating and just make sure we're absolutely clear.

5   A    Okay.

6   Q    I asked you about the dating in relation to the Markit

7   Partners' positions that you valued.  Do you recall that?

8   A    I do.

9   Q    Okay.  And I asked you whether the Markit Partners'

10  position is -- whether you calculated your loss as of September

11  15th.  Do you recall that?

12  A    I do.

13  Q    And what's your answer to that?

14  A    Yes, we calculated our loss as of September 15th, but I

15  think I said I used data after September 15th.

16  Q    Okay, fine.  And so, now turning to the -- to the PCDS, is

17  it accurate that you -- well, did you value the PCDS as of

18  September 15th?

19  A    Yes, we valued the PCDS as of September 15th.

20  Q    And in a similar way, are you saying that you used some

21  data from after September 15th to reach that valuation?

22  A    That is what I'm saying, yes.

23  Q    Okay.  Okay.  So can we go back to the calculation?

24  That's the last bucket we have to finish.

25  A    Sure.

Page 97

1  Q    We've talked about PCDS.  Could you just quickly show how

2  the calculation worked in the CARB and what rows they were?

3  A    Sure.  Okay.  We're back in Lehman Positions Master.  And

4  we're in Rows 280 to 283, which are the 4 CARB positions.  You

5  can note that in Cells C-280 to C-283, they do add up to the 80

6  million that I mentioned yesterday.  Okay.

7          So the value here -- I'm in Cell AD-280 -- is 45.887,

8  which, again, is a dirty price.  The clean price is 46 points.

9  And I guess I'm going to have to widen the row so I can see

10 what I wrote.  But this is a notation that I made to myself

11 where I said, "As I said yesterday, GMAC widen 15 points from

12 912 to 919."

13         So that's the first part of the calculation, the

14 change in the mark over that period and the second part is the

15 sort of size/market impact concept.  This would take at least

16 15 more points to get our size done.  That's why it's the 15

17 plus the 15.  That gets you to the 46.

18         And in terms of how that flows through into the

19 claim, it flows through in the same way -- I'm looking at

20 Column AL, Cells 280 -- AL-280 to AL-283.  Those are all 45.89.

21 And then I'm going over to Cells AO-280 to AO-283.  And those

22 claim amounts are equal to 45.89 percent of the respective

23 notionals shown in Column C.

24 Q    Okay.  Thank you.  Now, if we could focus on those

25 positions in this calculation bucket, other than the PCDS and

Page 98

1   the CARB  If you could identify -- you identified earlier the

2   rows.  If you could look at them now and explain to the Court

3   why you used the valuation approach you did for those.

4   A    Sure.  So I'm going to look at Row 214 right now.  This is

5   a ty-fi called STSUP-20066-1-E.  And the name of the account

6   that it's booked in is called CMBS Property Hedge Europe.  And

7   this is the -- what this is is it's a default swap on a

8   securitization of something called Starling Supermarkets in

9   Europe and in, I think, England.  And this is actually the only

10  credit default swap of this type I ever created.  It's the only

11  thing in this particular property hedge account.

12          The notional is actually, I think, in British points

13  in this case.  It's 4.495 million.  So this is not a market I

14  was extremely familiar with.  I wasn't, apparently, on dealer

15  runs for this -- I don't know how frequently this bond traded.

16  But when I recall, I tried to look for the price of this cash

17  bond on my Bloomberg, and I wasn't able to find it.

18          This is a subordinated tranche.  I believe it's -- I

19  believe it's originally BBB rated of this securitization.  So I

20  kind of found myself in a little bit of a similar position to

21  where I was in GMAC, and I valued it in much the same way.

22  Instead of looking at GMAC, what I did is I looked at the CMBX

23  Index.

24          So the notation I made to myself was in -- again, in

25  Column AE.  I -- okay.  So what I did here is I think I tried

Page 99

1    to start with the Lehman mark, which I figured out was a spread

2    of 580 basis points.  I looked at how much this index called

3    CMBXII, which was a U.S. CMBS Index widened.

4              And then, similar to GMAC, I felt there would be a

5    large bid offer spread because I thought this was a quite

6    obscure bond.  Again, I wasn't sure who was going to trade it.

7    So I assume there's a 10-point bid offer in this

8    -- a 10-point additional cost in this case.

9              There was -- yeah, so that it was kind of a proxy

10   methodology.  Except in this case, unfortunately, there was no

11   sort of closely related to CDS that I was aware of.  So I used

12   CMBXII, which was a U.S. property index.  I didn't know of any

13   such thing that existed, and I don't think there was any such

14   thing that existed for British CMBS credit.

15   Q    And just to be clear, why did you use this approach rather

16   than just looking for prices of this STSUP?

17   A    Well, as I said, I did look for cash prices of this STSUP.

18   I just didn't have any of them.  I wasn't -- I wasn't really a

19   big participant in this market.  As I said, this is the only

20   credit default swap on CMBS property in Europe that I ever

21   created.  It was kind of a little bit of a one-off trade, and I

22   just didn't have those prices.

23   Q    Okay.  Any other positions in that category?

24   A    Yes.  So the last group of positions is, I think,

25   relatively quick to explain.  So I'm looking at Rows 202 to

Page 100

1    211.  All of these are in an account called CLO-Equity-

2    Synthetic.  And you can see that each of the default swaps has

3    a notation -L in the middle of it.

4            So, for instance, in Cell B-204, you can see

5    something that says JBLU-L.  That's Jet Blue.  That's their

6    loan.  So it's -- instead of being regular, this is so-called

7    LCDS.  It references the loans instead of the bonds.

8            And you can see also that these default swaps are

9    very small.  Together the 10 line items only add up to $2.5

10   million.  So what I tried to do is -- well, first, you know, I

11   tried to look in Markit, but looking in Columns R through V,

12   there is no Markit CDS data in this case.

13           So then I tried to -- where I could, I tried to look

14   at the prices of the underlying loans.  And I used 100 minus

15   the price of the underlying loan on the concept that it would

16   be a basis package, basically.  So I was only able to find that

17   for one of them, and that is U.A., United Airlines, UALAQ.  And

18   you can see in Column AE it says ref. U.A. U.A. loan.  So what

19   I did is I priced the loan, and I did the CDS as 100 minus

20   that.

21           For all of the other cases, I actually think I just

22   used the Lehman mark, the exact Lehman mark as of whenever it

23   was.  Let me just double check that that's the case.  Okay.  So

24   --

25       (Pause)

Page 101

1          So I'm just making a change to this reggie (ph) here,

2     which I'll undo in a second.  So I'm looking for the column

3     Lehman mark.  So Column H is this thing called Lehman PX,

4     Lehman price.  That's really not the Lehman margin mark.  Just

5     a second.

6          (Pause)

7          Okay, yeah.  So the mark I used was exactly equal to

8     the Lehman mark.  In this case, I'm looking at Cell AL-202 is

9     3.26.  I've manually put in the formula Cell AN-202 equal to

10    100 times the Lehman mark, from the left part of the sheet.

11    And it's also 3.26.

12          I mean, I think in essence, these were such small

13    positions that although undoubtedly the value of the LCDS must

14    have appreciated somewhat.  Having already looked for the loans

15    and been able to not find them, I didn't bother to try to, you

16    know, get exactly right what the value would be on a default

17    swap with, you know, a 300 Dow.  I didn't bother to try to get

18    the value exactly right on a default swap of a few hundred

19    thousand dollars of notional.  I was willing to accept the old

20    Lehman mark in this case.

21    Q    Okay.  Thank you.  Just one more question on this bucket.

22    Going back to CARB for a moment.  I may have forgotten to ask

23    you yesterday.  Did you look for broker runs on CARB to see if

24    they would help you to value that position?

25    A    Well, I think what I did is I think I searched for CARB in

Page 102

1   my Bloomberg in order to find some of these old Bloomberg

2   messages that we talked about.  And I think it would have -- if

3   there had been any broker runs on CARB from any other dealer,

4   they would have come up as a result of that.  When I searched

5   for the word CARB, they didn't come up.

6   Q    Okay.  And really lastly, the notes that you talked about

7   in the notes column of this spreadsheet -- did you put those

8   there between September 15th and October 15th, 2008?

9   A    Yes, I did.

10  Q    Okay.  And did you make any changes to the methodology in

11  any of these after October 15th, 2008?

12  A    No.

13  Q    All right.  So just stepping back from the spreadsheet for

14  a moment, can you estimate the number of hours that you

15  personally spent on the calculation of these claims back,

16  again, between September 15th, 2008 and October 15th, 2008?

17  A    Well, the bulk of the work was done over those weekends.

18  So I think I probably spent on the order of perhaps, you know,

19  25 to 30 hours, something on that -- on that range, yeah.

20  Q    And did you -- did you use, to the best of your ability,

21  the information you had at that point to reach your valuation?

22          MR. TAMBE:  Objection.  Leading.

23  BY MR. TRACEY:

24  Q    Let me -- let me ask a different question.  Lehman's

25  counsel has said that QVT's CEO, Dan Gold, sought an

Page 103

1    opportunity to extract from Lehman hundreds of millions of

2    dollars more than what QVT had actually lost as of the early

3    termination date.  And QVT's traders followed through on

4    Mr. Gold's directive.  Did Mr. Gold give that directive?

5    A    No.

6    Q    And did you try to inflate the size of your claim during

7    those weekends in 2008?

8    A    No, I did not.

9    Q    All right.

10        MR. TRACEY:  Just one second, Your Honor.  I have

11   nothing else, Your Honor.

12        THE COURT:  Very good.

13        Okay.  So let's come back in an hour, as close as we

14   can, 25 minutes to 2:00 -- 25 minutes to 3:00, right?

15        MR. TRACEY:  Right.

16        THE COURT:  Okay.  All right.

17        Same rules apply.

18        THE WITNESS:  Okay.  Understood.  Thank you.

19        THE COURT:  Okay?

20        Mr. Tambe, would you finish today, you think, with

21   your cross-examination?  Probably not, right?

22        MR. TAMBE:  I think it's highly unlikely.

23        THE COURT:  Highly unlikely?  Okay.  All right.

24        Then after the lunch break, I'm going to give you a

25   stopping point.  Because if you're not going to finish, then

Page 104

1   I'm not going to keep everyone 'til extremely late this

2   afternoon.

3            MR. TAMBE:  Okay.  Thank you.

4            THE COURT:  All right.  Thank you.

5            Thank you, Karen.

6       (Recessed at 1:34 P.M.; reconvened at 2:49 P.M.)

7            THE COURT:  We are.

8            MR. TAMBE:  I think we've handed up to you --

9            THE COURT:  You have.

10            MR. TAMBE:  -- a binder for the debtors.  And the

11   witness should have one.  And we may go back and forth between

12   the two binders, so Mr. Chu, if you are at all confused at any

13   time, let me know.  I'll make sure you're in the right binder.

14   And if we get it all right, whatever document we're talking

15   about will also be on the screen.

16                        CROSS-EXAMINATION

17   BY MR. TAMBE:

18   Q    So in the binder that I handed you, if we could turn to

19   tab 103, which is Exhibit 5204.  Now, I'm starting, Mr. Chu,

20   where you ended your direct examination.  That's a document

21   you're familiar with, correct?

22   A    Yes, would you mind if I just took a minute to look at it?

23   Q    Sure.  Take your time.

24   A    Okay.  Thank you.  I've read it over.

25   Q    And my question was, that is a document you're familiar

Page 105

1   with, correct?

2   A    Yes.

3   Q    All right.  This was the first investor update that went

4   out to the investors after the Lehman bankruptcy, correct?

5   A    I think that's correct, yes.

6   Q    And it's signed by Mr. Gold, correct?

7   A    Yes, it is.

8   Q    And you're aware that the commentary that appears in here

9   is drafted by Mr. Gold, correct?

10  A    Yes, I believe most of it is drafted or perhaps all of it

11  is drafted by Mr. Gold, yes.

12  Q    And documents of this nature, these substantive investor

13  reports when Mr. Gold drafted the commentary, he would send

14  around to the partners for their review and comment, correct?

15  A    It would be common to do so.  I would expect he would have

16  done so here.

17  Q    And since you're familiar with this document, I take it

18  you don't have any objections to anything that's said in this

19  document, right?

20  A    No, I wouldn't say I have major objections to it.  I'm not

21  sure I would have worded everything the same way, but people

22  have different writing styles.

23  Q    Well, at the time when Mr. Gold sent this important

24  directive out to investors, you didn't tell him, hey, you're

25  describing things incorrectly, did you, sir?

Page 106

1    A    No, I didn't say that, no.

2    Q    Right.  And you did get a chance to review this before it

3    went out to investors, correct?

4    A    I think it's very likely I got it.  I actually don't

5    specifically remember whether I reviewed it or not, but it's

6    quite possible.

7    Q    It's a long time ago.

8    A    It's quite possible I would have, yeah.

9    Q    It was a long time ago, eight plus years ago, correct?

10   A    Yes, it was over eight years ago, right.

11   Q    You can't remember all the details from all that time, can

12   you?

13   A    No, I can't remember all the details from that long ago,

14   no.

15   Q    And that's hardly surprising, correct, that you couldn't

16   remember all the details from all those years ago?

17   A    No, I wouldn't say that's surprising.

18   Q    Let's go to the section here that talks about Lehman

19   Brothers.  It's on page 2.  And it's the paragraph that begins,

20   "The process for submitting damages claims."  Do you see that?

21   A    Yes.

22   Q    All right, in fact -- and that's a reference to the

23   process that you had started the weekend before this on the

24   20th, 21st, and that you continued through October 15th,

25   correct?

Page 107

```
1    A    That's right.

2    Q    All right.  And everything you did was consistent with

3    what Mr. Gold told investors you would be doing in the process

4    of submitting damages claims to Lehman, correct?

5    A    I'm not sure I completely understand the question.  Do you

6    mean would I describe the calculation as exactly following the

7    language in this paragraph under Lehman Brothers?

8    Q    No, that wasn't my question.  Everything you did was

9    consistent with what Mr. Gold told investors you would be doing

10   in the process of submitting damages claims to Lehman, correct?

11   A    Well, I guess the operative language would be, "The QVTs

12   will fund -- will claim both types of damages to the full

13   extent possible under the governing loss calculation method

14   specified in the relevant counterparty agreements with Lehman."

15   And what I would say is that I would agree that the QVT funds

16   have claimed, I think, to the extent I understand what -- to

17   the extent I understand what Mr. Gold was saying, both types of

18   damages.  As to whether we claim them to the full extent

19   possible, I don't know that we did that, but we definitely did

20   claim -- make claims under the governing loss calculations

21   specified in the relevant counterparty agreements with Lehman.

22   Q    So I'm going to ask my question one more time, right?

23   Everything you did was consistent with what Mr. Gold told

24   investors you would be doing in the process of submitting

25   claims -- damages claims to Lehman, correct?  That's a yes or a
```

Page 108

1    no question.

2    A    I would say not exactly for the reason I just said.

3    Q    So you think there were -- I just want to understand this.

4    Are you saying you have not submitted claims to the full extent

5    possible under the governing loss calculation?  Is that what

6    you're -- want your investors to know?

7    A    I think we submitted a claim -- well, to the extent that

8    the phrase means the full extent possible, it could mean

9    different things.  It could mean, have you submitted a claim on

10   everything that you're entitled to submit a claim on.  That

11   we've done.  Have we submitted the largest possible claim on

12   any given CDS that we possibly could have submitted?  I don't

13   think the answer to that is yes.  So that's what I mean.

14   Q    So how about the question that's raised right there using

15   the words that Mr. Gold has used, have the QVT funds claimed

16   both types of damages to the full extent possible under the

17   governing loss calculation methods specified in the relevant

18   counterparty agreements with Lehman?

19   A    And to that I would say I think the QVT claims have made -

20   - QVT funds have made all claims to which they're entitled but

21   they haven't submitted the maximum possible claim and

22   therefore, no, they haven't claimed both types of damages to

23   the full extent possible.

24   Q    So was there an amended notice that went out to investors

25   telling them that notwithstanding what Mr. Gold said on

Page 109

1    September 23rd, in fact, the QVT funds should not have done

2    here is not submit damages claimed to the full extent possible

3    under the governing loss calculation?

4    A    No, I don't think there was any follow up to that.

5    Q    Let's talk about some of the other provisions of -- of the

6    other parts of this investor letter.  Staying within that

7    section, the Lehman Brothers section, the paragraph that

8    begins, "Of course," that first sentence.  "Of course,

9    following Lehman's bankruptcy, markets became increasingly

10   unsettled as AIG required rescuing and equity -- and credit

11   markets turned rapidly against Morgan Stanley and Goldman

12   Saks."  Do you see that?

13   A    Yes, I see that.

14   Q    Right, and you believe that to be a true statement when

15   that was made by Mr. Gold in September of 2008, correct?

16   A    I agree with that statement.

17   Q    That's what happened in the days after Lehman's

18   bankruptcy, correct?

19   A    I think that's a fair description, yes.

20   Q    Okay.  Now, let's go to the next section which is Morgan

21   Stanley and Goldman Sachs.  And that one says beginning --

22   begins, "Beginning on Wednesday as markets turned increasingly

23   against Morgan Stanley and Goldman Sachs' equity and credit, we

24   took the opportunity to cover the remaining long CDS positions,

25   etcetera."  I want to focus on the first part of that sentence.

Page 110

1  The true statement, right, "As markets turned increasingly

2  against Morgan Stanley and Goldman Sachs' equity and credit."

3  A    Sorry, are you asking whether markets turned increasingly

4  against Morgan Stanley and Goldman Sachs' equity and credit --

5  Q    Beginning on Wednesday.

6  A    -- beginning on Wednesday?  I don't think that's exactly

7  the meaning of the sentence.  I think Morgan Stanley and

8  Goldman Sachs credit was wider on Tuesday than it was on Monday

9  and from memory, it was wider on Wednesday than it was on

10 Tuesday.  But I don't think he's saying that beginning on --

11 that markets began to turn against Morgan Stanley and Goldman

12 Sachs on Wednesday.  I think what he's saying is we began to

13 cover our remaining long CDS positions on Morgan Stanley and

14 Goldman Sachs beginning on Wednesday.  That's how I read it.

15 Q    Well, Mr. Chu, isn't he saying that the markets turned

16 increasingly against Morgan Stanley and Goldman Sachs, that the

17 spreads continued to widen?

18 A    Well, yeah, he's saying they turned increasingly, yes.

19 Q    Yeah.  And that's consistent with your recollection of

20 what was going on then.

21 A    That Wednesday was generally a bad day for Morgan Stanley

22 and Goldman Sachs' credit, yes, I agree.

23 Q    And it was a bad day for many other credits as well,

24 correct?

25 A    Yes, I think so, uh-huh.

Page 111

1    Q    Going on to the next page, page 3, you'll see the --

2    there's a section called bans on the short selling.

3    A    I see it.

4    Q    And by the way --

5    A    Sorry, is the microphone an acceptable distance from me?

6    Can everyone hear if I --

7            THE COURT:  Yeah, a little bit farther back.  We're

8    just getting a little bit of a reverb, thank you very much.

9            THE WITNESS:  Thanks, okay.

10   BY MR. TAMBE:

11   Q    That section bans on short selling, that begins with the

12   sentence, "The funds experienced poor performance on Thursday

13   and Friday of last week, the days on which many countries,

14   including the United States, initiated bans on short selling of

15   financial stocks" under the parenthetical, do you see that?

16   A    I do.

17   Q    And you understood that to be a true statement about what

18   had happened on Thursday and Friday of that week, correct?

19   A    Yes.

20   Q    Okay.  And in fact, your PCDS positions, for example -- or

21   PCDS positions on financial companies, including companies in

22   Europe and Australia, correct?

23   A    That's correct.

24   Q    So the state of the market on Thursday and Friday, because

25   of these bans was very different than the state of the market

Page 112

1    on Monday, Tuesday, or Wednesday, correct?

2    A    Yes, that's correct.

3    Q    Going back to the Lehman Brothers' section, it's right

4    above the Morgan Stanley and Goldman Sachs, the paragraph right

5    there.  And it's the last sentence of that paragraph.  Mr. Gold

6    says, "I believe that a majority of our month to date losses

7    would have been sustained even if the QVT funds had had no

8    direct relationship with Lehman, simply because of the market

9    conditions unleashed by Lehman's failure."  Do you see that?

10   A    I do.

11   Q    Okay.  And some of those market conditions that he claimed

12   were unleashed by Lehman's failure are the ones we've just been

13   discussing in this document, correct?

14   A    Yes, some of them.

15   Q    And that's what happened on days after the Lehman

16   bankruptcy, correct?

17   A    Yes, correct.

18   Q    Let's take a step back -- about your background and how

19   you got into derivatives trades, do you remember that?

20   A    Yes.

21   Q    And if I recall your testimony correctly, what you were

22   talking about was initially -- it sounds like you did

23   econometric modeling, is that right?

24   A    Yes.

25   Q    And it looks like the first through years you were exposed

Page 113

1    to structured products, securitized products, asset based

2    securities, is that right?

3    A    Asset backed securities, that's right.

4    Q    And not derivatives on asset backed securities, but

5    primarily asset backed securities, correct?

6    A    That's right.

7    Q    Because the market for CDS on ABS was still nascent,

8    correct?

9              THE CLERK:  Still what?

10             MR. TAMBE:  Nascent.

11             THE WITNESS:  I'm actually not even sure whether it

12   existed during my time at Lehman Brothers.

13   BY MR. TAMBE:

14   Q    So what -- I'm talking about Lehman Brothers and probably

15   your first few years at QVT at DB.

16   A    Maybe some specificity on my part would help.

17   Q    Yes.

18   A    The first time I traded asset backed, pay as you go CDS

19   was in 2005.

20   Q    And by that time, you were at QVT, now separate from DB,

21   correct?

22   A    That's correct.

23   Q    Okay.  So in all your time at DB, you weren't trading CDS

24   on ABS?

25   A    During -- so that would be 2003, no, there -- I didn't

Page 114

1   trade any CDS on ABS then, that's right.

2   Q    Just terminology, when I say CDS on ABS, you responded

3   with pay as you go, correct?

4   A    Yes.

5   Q    Okay.  And CARB is a type of pay as you go CDS, correct?

6   A    Yes, it is.

7   Q    Okay.  So generally when you think about CDS on ABS,

8   you're thinking about pay as you go documentation, correct?

9   A    That's right.

10   Q    But it doesn't have to be that way.

11   A    Are you asking whether I can think of any CDS on ABS that

12   are not under pay as you go documentation?

13   Q    Yeah.

14   A    Let me just think it through.  So there's CDS on RMBS,

15   which is under pay as you go documentation, which I trade.

16   There's CARB, which is under pay as you go documentation.

17   There's CDS on ABS CDOs, which is under pay as you go

18   documentation --

19            THE CLERK:  (Indiscernible).

20            THE WITNESS:  I'm sorry, it's -- there's CDS on ABS

21   CDOs, which is under pay as you go documentation.  There's CDS

22   on CMBS, which is under pay as you go documentation.  And

23   there's CDS on CLOs, which is also under pay as you go

24   documentation.  So I -- everything that I've ever traded has

25   been under pay as you go documentation.

Page 115

1   BY MR. TAMBE:

2   Q     And that was starting in 2005 forward, right?

3   A     That's right.

4   Q     Okay.  But before 2005, you knew about cash flow models

5   and modeling for asset backed securities, correct?

6   A     I did, yes.

7   Q     Let's talk a little bit about the CARB profit.  Now,

8   you've described generally to the Judge what methodology you

9   used back between September 15th and October 15th, 2008, to

10  value those four CARB trades in the portfolio, right?

11  A     Yes, I did.

12  Q     So let's go through some of the basics because you

13  mentioned in describing the product that the details will be

14  found in the confirmation, correct?

15  A     Yes, the confirmation is sort of the governing document of

16  the transaction.

17  Q     And you know from the confirmation that the way that

18  product works is the confirmation states you are entering into

19  a separate Transaction, capital T Transaction, for each of the

20  referenced obligations in the basket, correct?

21  A     Do you want me to look at a particular part of the

22  confirmation?

23  Q     We can locate the confirmation and we can go -- so tab 11

24  in your binder, JX-0015.  And you can confirm -- you can take a

25  moment to look through it, but you can confirm that's a

Page 116

1    confirmation for one of the CARB transactions, correct?

2    A    Yes, it looks like it, right.

3    Q    One of the ones that you entered into?

4    A    Yes, it is.

5    Q    I'll give you a moment to look through it because I have

6    some questions for you.

7    A    Okay.

8    Q    So I want to draw your attention to the back of the

9    document and it will be page 929, second to last page of this

10   document.  It says Exhibit A on it.  Do you see that?  Because

11   that may be a little bit clearer on the screen.

12   A    Exhibit A.  Yeah, the annex, okay.

13   Q    And that's the reference obligations, correct?

14   A    Yes, those are the reference obligations.

15   Q    Those are the eight names: four from GM, four from Ford,

16   correct?

17   A    Four from GMAC, four from Ford, that's right.

18   Q    That's right, absolutely right.  So then they're not from

19   the auto companies, they're associated with the auto finance

20   companies?

21   A    Yeah, the depositor is GMAC, LLC.

22   Q    And just to be clear, when you say who the depositor is,

23   the depositor is the one that initiated the obligation  -- the

24   consumer obligation and deposited it into that structure, CARAT

25   (ph) trust, correct?

Page 117

1    A    Yes.  I mean, I'm supposed to be technically correct, in

2    principle, GMAC could have bought auto loans from somebody

3    else, but they're the ones in this case, I think, that did

4    originate the loans and can, so to speak, deposited them into

5    the trust.

6    Q    Okay.  And the trust owns those loans, correct?

7    A    Yes, it does.

8    Q    And the trust receives cash flows from investors and pays

9    it out to -- from consumers and pays it out to investors,

10   right?

11   A    Correct.

12   Q    And even if GMAC were to go under, declare bankruptcy, the

13   trust would not declare bankruptcy, correct?

14   A    The trust would not declare bankruptcy.

15   Q    Okay.  And the trust would continue to receive payments

16   from consumers, there might be some defaults, but consumers

17   would pay and investors would get paid, correct?

18   A    Yes, the securitizations themselves, it would be extremely

19   unlikely that they would be, so to speak, consolidated into the

20   bankruptcy.

21   Q    The bankruptcy remote.

22   A    Yes, that's the phrase, bankruptcy remote, that's right.

23   Q    And you know that phrase from your time of asset backed

24   securities, correct?

25   A    Yes, I do.

Page 118

1   Q     That's the whole idea behind asset securitization, right?

2   A     That certainly is one idea behind it, yes.

3   Q     And so it's the same issue with the Ford credit auto owner

4   trust, FORDO (ph), I think is how we refer to it in some of the

5   documents, right?

6   A     Correct.

7   Q     Same structure?

8   A     Uh-huh.

9   Q     And if you turn to the next page, now that you have those

10  eight reference obligations, let's go to the first -- the

11  second paragraph, "The parties agree."

12  A     Uh-huh.

13  Q     And we can highlight the first sentence which goes on for

14  four or five lines.  Now, the first sentence -- is this the

15  first sentence.  That first sentence reads, "The parties agree

16  that by entering into a transaction governed by these ABX

17  standard terms, a master transaction, they have entered into a

18  separate credit derivative transaction, each a component

19  transaction in respect of each reference obligation listed in

20  their relevant annex as defined below."  Do you see that?

21  A     I do.

22  Q     And the Exhibit A we were looking to is the relevant

23  annex, correct?

24  A     I mean, I would think so.  I have -- I don't actually see

25  where it says relevant annex.  I assume -- yeah, it says

Page 119

1    relevant annex.  Okay, yes.

2    Q    You don't have any doubt that the eight securities --

3    A    No, I --

4    Q    -- we're looking at is CARB?

5    A    I agree with you.

6    Q    Yeah, okay.  And you understood this to be the case when

7    you entered into these transactions, correct, that they were

8    treated under the documentation as eight separate credit

9    derivative transactions in respect of each separate preference

10   obligation, correct?

11   A    I understand that, yes.

12   Q    Now, you also understood under the ABX terms that if you

13   are going to sell, or novate, or assign this confirmation, it

14   was an all or nothing deal, correct?

15   A    Yes.

16   Q    But that said nothing about how you value these

17   transactions.  It didn't say you have to value them just as a

18   whole and you couldn't value them singularly, correct?

19   A    I don't think it says anything about valuation on what.

20   Q    No restrictions on how you value these, correct?

21   A    No, as I said, I don't think it says anything about

22   valuation either way.

23   Q    All right.  A couple of other things.  Let's go back to

24   the front of this document.

25   A    Okay.

Page 120

1   Q     So we talked about the fact that these are pay as you go,

2   correct?

3   A     Yes.

4   Q     And a feature of these transactions is you do not have a

5   maturity mismatch between the CDS and the underlying reference

6   obligation, correct?

7   A     Correct.

8   Q     And there's a specific mechanism that makes sure that the

9   maturities line up, correct?

10  A     I mean, that's kind of the pay as you go mechanism, yes.

11  Q     That's right.  As the bond amortizes, the CDS amortizes?

12  A     Yeah, that's right.  The CDS factor follows the bond

13  factor.

14  Q     Exactly.  So as the notional of the outstanding bonds goes

15  down, the notional of the CDS goes down, correct?

16  A     That's correct.

17  Q     And that can happen for two reasons either --

18          THE CLERK:  (Indiscernible).

19          MR. TAMBE:  Sorry.  We're both going to have trouble

20  because we're both fast --

21          THE CLERK:  (Indiscernible).

22          MR. TAMBE:  I'll say it again.

23          THE CLERK:  (Indiscernible).

24  BY MR. TAMBE:

25  Q     So as the notional reference obligation goes down, the

Page 121

1    reference of the CDS goes down?

2    A    Yes.  I mean, the way it's quoted is if you entered into a

3    $10 million trade, you would always call it a $10 million

4    trade, but everyone would understand that if 60 percent of the

5    bond were gone for whatever reason, you'd be only trading $4

6    million so to speak.

7    Q    Yeah.  And the cash flows for the underlying reference

8    obligation are mimicked by the cash flows on the CDS generally,

9    correct?

10   A    Sorry, what do you mean by mimic?  On which side of the

11   CDS are you?

12   Q    Well, if you -- fair point, right?  So it -- this would be

13   like if you are a protection seller --

14   A    Okay.

15   Q    -- right, you are making cash flows and receiving cash

16   flows similar to being short -- long (indiscernible), correct?

17   A    I mean, kind of.  You're not -- if you own the bond, you

18   are receiving the cash coupon and you're also receiving the

19   principal payments.  If you're selling protection, you are --

20   let me just say one thing about -- other thing about if you own

21   the bond.  So you're supposed to be receiving the principal

22   payments if you own the bond, but if the bond has a write down,

23   you don't pay any money out, you just take a write down.  And

24   in the case of a protection seller, you receive a different

25   coupon, in this case it's 150 basis points.  When they're

Page 122

```
1    principal payments, nothing happens to you.  You just amortize

2    down your notional.  But if there's a write down, you actually

3    have to make a pay as you go payment, so I think that's how it

4    works.

5    Q    And so when there's a shortfall to the bondholders,

6    there's a loss incurred by the bondholders, they'll get payment

7    made to the protection buyer, for example, a QVT in this case.

8    A    That's correct.

9    Q    And it's possible to model the cash flows of these bonds,

10   correct?

11   A    Yes, it is.

12   Q    And you, in fact, model the cash flows of these bonds at

13   least at some point, when you have these transactions, correct?

14   A    If you -- by modeled, you mean I used a cash flow engine

15   like Intex, yes, I did that.

16   Q    And you knew exactly how to do that, correct?  You have

17   the information to do that?

18   A    Yes, I know how to use Intex.

19   Q    But you didn't use Intex for purposes of pricing of CARB

20   transaction, or valuing the CARB transaction between September

21   15th and October 15th, 2008, correct?

22   A    I did not, no.

23   Q    Now, you also got information from time to time, or could

24   access information from time to time about the performance of

25   the underlying bonds, correct?
```

Page 123

1   A     Yes.

2   Q     Okay.  And it would give you detailed reports about what

3   the health was of any one of these securitizations, correct?

4   A     Do you mean the remittance reports?

5   Q     Absolutely, yeah.

6   A     Yes.

7   Q     And that would tell you losses to date, it would tell you

8   the status of the reserve account, it would give you lots of

9   detail about what was going on inside the securitization,

10  correct?

11  A     Correct.

12  Q     Okay.  So let's take a look at one of those.  And you know

13  how those work, correct?

14  A     I'm generally familiar with remittance reports, yeah.

15  Q     Well, you're investing, what, hundreds of millions of

16  dollars in investor money in asset backed securities, and

17  derivatives on those, you have an idea how those work?

18  A     Yeah, as I said, I'm familiar with remittance reports.

19  Q     Let's go to tab -- I think it's tab 121.

20  A     Okay.

21  Q     And it is CX-1354.  Let's start by enlarging the top of

22  the document.  If you need a moment to flip through those

23  pages, Mr. Chu, and know what this is about, I'll ask you some

24  questions when you're done.

25  A     Okay, I've looked through it, yeah.

Page 124

1   Q    And that is a remittance report for one of the

2   securitizations that is referenced in your CARB transactions,

3   correct?

4   A    Yes.

5   Q    All right.  And in particular it's, I guess, FORDO 2006-C,

6   right?

7   A    Right.

8   Q    And in particular, the obligation that is referenced in

9   your CDS are the class C notes, right?

10  A    Yes, I think so.

11  Q    You had that pretty picture yesterday that you talked

12  about, about how the class C notes are all the way down at the

13  bottom, almost at the very bottom of the stack, correct?

14  A    Yes.

15  Q    The green boxes.

16  A    Yes, the green boxes.

17  Q    Okay, all right.  So let's just study this report.  And

18  this report has a collection period date of August 2008 at the

19  top right-hand corner?

20  A    Uh-huh.

21  Q    So that's all monies received by the end of August 2008,

22  correct?

23  A    I think so, yeah.

24  Q    And the report itself gets published a couple of weeks

25  later?

Page 125

1   A     Well, the payment date is 9/15.  I would assume that this

2   comes out either on that date or very close to that.

3   Q     Okay.  So let's turn to page 2 of this document.  And

4   let's start with distributions, which is Romanette 3.  We can

5   enlarge that.  All right, the three left columns we can

6   enlarge.  That's the waterfall, right?

7   A     Right, so this is the monies in.  Yeah, the available

8   funds.  Yes, so this is how the available funds are distributed

9   through the different notes, yeah.

10  Q     Right.  And as you go down the two columns, you'll see

11  calculated amount versus amount paid, that adds up, right,

12  exactly what's calculated is what's paid, right?

13  A     Uh-huh.

14  Q     Yes?

15  A     Yes, it looks like that, yeah.

16  Q     And there's money left over.  There's a residual $2

17  million left over after everyone's been paid.

18  A     Right.

19  Q     Right.

20  A     The phrase residual released to depositor.

21  Q     So that money goes back to the depositor.  That's excess

22  money in August of 2008?

23  A     Yes, there's residual cash flow, that's right.

24  Q     And there's some other excess flow.  So let's go over to

25  the next page, page 3.  There's a section 6,

Page 126

1    overcollateralization information.  And let's increase the size

2    of that.  So the specified reserve balance, do you see that?

3    A    I do.

4    Q    Do you see the targeted credit enhancement amount?

5    A    Uh-huh.

6    Q    And then all the way at the bottom of that, actual

7    overcollateralization amount, do you see that?

8    A    I do.

9    Q    Good.  And that's comparing two figures, right?  End of

10   period pool balance minus end of period note balance, do you

11   see that?

12   A    I do.

13   Q    So that's assets minus liabilities, right?

14   A    I actually don't know if the pool balance includes the

15   reserve balance or not, but I think that's the idea is that how

16   many loans are here versus how many bonds are outstanding.

17   Q    And that number is $148 million of overcollateralization.

18   A    Okay.

19   Q    And if you look below that, the next section is

20   reconciliation of reserve account.  And no money has been taken

21   out of the reserve account, do you see that?

22   A    I do.

23   Q    And that's at 16.5 million.

24   A    All right.

25   Q    So even though the C notes are down there second from the

Page 127

1   bottom, there's some cushion there, right?

2   A    Yes, they have subordination, yes.

3   Q    And all the things we just talked about are different

4   aspects of the credit enhancement and subordination that

5   supports those C notes and the structure as a whole, correct?

6   A    Uh-huh.

7   Q    Yes?  That's a yes?

8   A    Yes.

9   Q    But this is not a document you looked at when you were

10  deciding what value to put on the car trades between 9/15 and

11  10/15/2008?

12  A    No, I don't think I look at the remittance report.

13  Q    You don't look at a single one of the remittance reports,

14  but any of the securitizations in that period, correct?

15  A    I don't think I did, no.

16  Q    And another thing you didn't look at is you did not look

17  at the Bloomberg prices for the securitizations either,

18  correct?

19  A    No, I did not look at the Bloomberg prices for the

20  securitization.

21  Q    Those were available to you.  You could have looked at

22  those, right?

23  A    Yes, I think the Bloomberg prices would have been

24  available, yeah.

25  Q    You have the terminal, you have the CUSIPs, you could do

Page 128

1    it?

2    A     I think I said yes to your question, yeah.

3    Q     All right, now you did do that after the fact, correct?

4    A     Sorry, you mean what -- over what period?

5    Q     So after the calculation statement has been submitted, you

6    did pull down the Bloomberg daily and monthly prices for these

7    underlying securities, correct?

8    A     I mean, some number of years later I think I did, yes.

9    Q     Right.  And let's look at tab 109 in your binder, it may

10   be a native document.  It's Exhibit 5433.

11             THE COURT:  What was the tab number?

12             MR. TAMBE:  109.

13             THE COURT:  Thank you.

14             MR. TAMBE:  And it is a native document, so it will

15   come up 5433.

16   BY MR. TAMBE:

17   Q     Now, you recognize this document, correct, sir?

18   A     I'm not actually sure I do.  I mean, looking at the

19   metadata, it says author Michael D., which I would think is

20   probably Michael Deermount.  I guess it also says privileged

21   and confidential, but leaving that aside.

22   Q     I don't think your lawyers are complaining yet.

23   A     Okay, that's fine.  All right, so what is this thing?  One

24   second.

25   Q     Take a moment.  If you want to drive it, I'm not sure

Page 129

1   whether you have control.  If you don't, we can get control of

2   the spreadsheet to you.  Would that help?

3   A    Sure, yes.

4   Q    Well, let's do that.  Just transfer it over so he can

5   drive the thing.  All right, so you've got control now

6   (indiscernible) spreadsheet.

7   A    Okay, except it's a different spreadsheet.

8   Q    No, it's not the right spreadsheet.

9         THE COURT:  Hold on.  Hold on.

10        MR. TAMBE:  5433.  There's an explanation because his

11  control pad is attached to that computer, they have to pull up

12  the spreadsheet and then Mr. Chu can drive it.

13        THE COURT:  Like a student driver, you need two

14  separate --

15        MR. TAMBE:  I looked into that and I was told you

16  can't have two mice.

17        THE WITNESS:  So I still don't -- I'm not sure, are

18  you waiting for me or am I waiting for you?

19        THE COURT:  All right, let's just slow down and try

20  to figure this out.

21        THE WITNESS:  Okay.

22        THE COURT:  Okay?

23        MR. TAMBE:  I think we're waiting for it to be pulled

24  up on the --

25        THE COURT:  Okay.

Page 130

1    BY MR. TAMBE:

2    Q    Okay, so it's up if you want a moment to look through it,

3    I believe it has data that goes to the end of 2008 that you can

4    focus on, whatever part you like.  When you're done looking

5    through it, let me know when you're done.

6    A    Sure.

7    Q    I believe the record should show that you're now in

8    September of 2008 on the BBG daily spreadsheet, is that right?

9    A    Okay.

10   Q    (Indiscernible) so let's get back there if we can -- okay,

11   so you're on the next tab now, BBG and IVC monthly.

12   A    Yeah, I just wanted to finish responding to your question

13   as to --

14   Q    Sure.

15   A    -- whether I had seen this document before.  Okay, I'm not

16   actually recalling whether I saw this document before or not

17   but okay.

18   Q    But you understand all the information that's conveyed on

19   it, right?

20   A    Yeah, I think I know what it's saying.

21   Q    And you'd recognize the eight CUSIPs over in columns A, B,

22   and C, do you see that?

23   A    Yeah.  I recognize the security names, yeah, and I assume

24   those are the right CUSIPs as well.

25   Q    Okay.  So if you could just move the spreadsheet over so

Page 131

1    we have the 9/12 through 9/19 period up on the screen.  Okay,

2    one more column over.

3    A    Okay.  Sorry, 9/12 to 9/19, okay, sure.

4    Q    Okay.  So now you have on the screen up 9/12 through 9/19

5    and some other dates, correct?

6    A    I do.

7    Q    And you can see the individual items for each CUSIP and

8    then there's a number at the bottom, for example in cell XE-10,

9    do you see that?

10   A    I do.

11   Q    Now, you recognize that, so if there's an average of the

12   eight numbers above it?

13   A    Uh-huh.

14   Q    And, in fact, you can see the formula highlighted there.

15   It's an average of the eight numbers above, correct?

16   A    Right.

17   Q    And so had you gone to Bloomberg when you were calculating

18   the valuation, this is what you would have seen, correct?

19   A    I assume it's what I would have seen, yes.

20   Q    And it would show that there was a slight increase in the

21   Bloomberg prices from Friday 9/12 to Monday 9/15, do you see

22   that?

23   A    I do see that.

24   Q    But that's not something you did, correct?

25   A    No, I didn't look at these prices.  They look not very

Page 132

1    reliable to me, but okay.

2    Q    But you've never looked at them before, correct?

3    A    Do you mean did I look at them at 9/15 to 10/15 or have I

4    ever looked at them?

5    Q    Well, you looked at them since then, but 9/15 to 10/15,

6    did you look at them?

7    A    I did not look at them in 9/15 to 10/15.

8    Q    And, please, that week, you didn't look at these prices

9    and say they're unreliable, I'm not going to use them?

10   A    No.

11   Q    That didn't happen?

12   A    No, I did not look at those prices in that week, that's

13   correct.

14   Q    But you looked at lots of other Bloomberg prices, right?

15   A    I did.

16   Q    I mean, as you were dealing with the aftermath of Lehman,

17   you were looking at every screen you could look at at your desk

18   to see if you could value these complex CDS where Lehman seemed

19   to be the only game in town, right?

20   A    Yes, but in the case of asset backed securities and

21   corporates, I think the pricing reliability is quite different

22   in those cases and I felt that at the time.

23   Q    And so instead you thought the best thing to do was use a

24   GMAC CDS spread from 9/12 to 9/19 instead of looking at the

25   Bloomberg prices for the actual reference obligations, correct?

Page 133

1   A    Well, I did use the GMAC CDS from 9/12 to 9/19 and I

2   didn't look at the Bloomberg prices.

3   Q    Well, and you've said to the Judge that you thought that

4   was the reasonable way of doing this calculation, not to look

5   at the Bloomberg but to look at GMAC's spreads over a week.

6   A    Well, I said that what I did was I used the GMAC spreads

7   over that week and I do think that was reasonable.

8   Q    Well, not only did you use the GMAC spreads over that

9   week, you added another 15 points on top of the movement of

10  GMAC from 9/12 to 9/19, correct?

11  A    That's right.  We added that, yes.

12  Q    Now, when we discussed your valuation methodology the last

13  time we met, you told me that there were no screenshots that

14  you saved off whatever GMAC spreads you looked at, right?

15  A    No, I don't think I saved a screenshot of GMAC.

16  Q    But you could not even identify to your auditors what GMAC

17  security you were referencing when you talked about a 15 point

18  movement, correct?

19  A    Sorry, to my auditors?  I'm not sure I talked --

20  Q    Your fund administrator.

21  A    Sorry, I'm a -- I don't recall having a conversation with

22  my fund administrator about the GMAC loss calculation.

23  Q    Do you know if anyone at QVT did?

24  A    It's certainly possible.  I don't recall having that

25  conversation.

Page 134

1   Q    But in any event, there were no screenshots to provide so

2   you could provide none, correct?

3   A    I didn't, but GMAC five year is a very, very widely traded

4   and quoted credit, but you're right, I didn't take a screenshot

5   of it.

6   Q    So it is widely traded?

7   A    Yes.  It is --

8   Q    And it was --

9   A    -- GMAC CDS is widely traded.

10  Q    And it was widely traded that week?

11         THE CLERK:  (Indiscernible).

12  BY MR. TAMBE:

13  Q    And it was widely traded that week?

14  A    Yeah, I guess I don't have volume information, but I

15  think, yes, I think it was widely traded that week.

16  Q    And that week you made no effort to add GMAC CDS

17  protection to your portfolio, correct?

18  A    I did not trade GMAC personally during that week.  I'm not

19  certain whether many of my colleagues did or not.

20  Q    But you were getting regular Bloomberg runs telling you

21  what the GMAC spreads were day to day to day, correct?

22  A    Yes.  We had Bloomberg runs on GMAC.

23  Q    So let's look at some of those runs.

24  A    Okay.

25  Q    Let's look at 64 -- tab 64 in the binder I gave you, which

Page 135

1    is JX-69.  You recognize that as a Bloomberg run, correct?

2    A    Yes.

3    Q    And it has on there: GM, GMAC, Ford Motor, Ford Motor

4    Credit, and ResCap, correct?

5    A    Uh-huh.

6    Q    Yes?

7    A    Yes.

8    Q    It's got the autos as well as the auto finance companies

9    and ResCap?

10   A    It does.

11   Q    It tells you the previous flows.  It tells you the open.

12   It tells you the updated, correct?

13   A    Yes.

14   Q    And this is a document that we're looking at, which is JX-

15   69, that's dated Monday, September 15th, 11:30 a.m.  Do you see

16   that?

17   A    Uh-huh.

18   Q    Yes?

19   A    Yes.

20   Q    And it's got the GMAC previous flows and it gives you a

21   bid ask 29 30, do you see that?

22   A    I do.

23   Q    And we've got the update, which is the Monday update, at

24   32 34.  See that?

25   A    I see it.

Page 136

1    Q    It's about a three to four point move from Friday to

2    Monday at this point, correct?

3    A    Right.

4    Q    It also has the Ford Motor Credit information on it.  Do

5    you see that?

6    A    I do.

7    Q    And again, about a three point move for Ford Motor Credit,

8    21 22 on Friday, 24 25 and a half it looks like on Monday, do

9    you see that?

10   A    Uh-huh.

11   Q    And you've got updates and runs like this every day from

12   the same folks at JPMorgan, correct?

13   A    I mean, I assume I did, yeah.

14   Q    Right.  And yet when you sat down to do your valuation,

15   the only spreads you looked at were the GMAC spreads?

16   A    We use GMAC, that's right.

17   Q    Even though your securitization and your basket of

18   securitizations was half GMAC and half Ford, correct?

19   A    Yes, we use GMAC.

20   Q    And you knew at the time that GMAC had exposure not just

21   to auto financing, but GMAC was also a home mortgage lender,

22   correct?

23   A    I think that wasn't exactly our understanding of it.  I

24   don't think that's exactly right.

25   Q    Well, sure you looked into it, didn't you?

Page 137

1    A     Well, I think to be precise about it, the way I think it

2    worked is that -- so ResCap was the mortgage part -- so ResCap

3    and GMAC were sort of formerly one entity but then I think

4    around 2004 and 2005, that was a time when mortgages were

5    thought to be like the better thing to be.  So ResCap was so-

6    called ring fenced from GMAC.  And so I don't think it's so

7    much that GMAC had a lot of mortgages as such on its balance

8    sheet, but rather that GMAC had shown an inclination to support

9    ResCap and, you know, inject funds into ResCap in various ways.

10   But if your point is that GMAC was thought to have some

11   connection to ResCap, I think that is correct.

12   Q     Right.  And in doing your calculations and relying solely

13   on GMAC and the GMAC move from 9/12 to 9/19, you made no

14   adjustments of the fact that there was this other relationship

15   involving ResCap that you just described, correct?

16   A     We just used the GMAC spreads, that's correct.

17   Q     Let's go to tab 92 in your binder.  And that's JX-74.

18   Same thing, this is a run you got on Tuesday, first thing in

19   the morning, correct?

20   A     Uh-huh.  Yes.

21   Q     And let's go to tab 95, which is JX-76.

22   A     Yes.

23   Q     And that's a run you got again from JPMorgan on Wednesday

24   afternoon, right?

25   A     It is.

Page 138

```
 1    Q    And you never picked up the phone and called JPMorgan and

 2    said, hey, I want to trade GMAC or FMCC CDS that week, did you,

 3    sir?

 4    A    No, I think I said I didn't trade GMAC that week

 5    personally and I don't think I traded FMCC either.

 6    Q    Let's go to tab 99.  And that's JX-82.

 7    A    Okay.

 8    Q    And so there you'll see -- that's another one of these

 9    auto CDS runs you received from JPMorgan, correct?

10    A    Yes.

11    Q    Okay.  So if you can, keep your hand right there on tab 99

12    and let's go back to tab 64, which is JX-69.

13    A    Yeah.

14    Q    You've got those two?  And lots of numbers here, but let's

15    just focus on the update column.  For GMAC on Monday, the quote

16    was 32 34, do you see that?

17    A    Yes.

18    Q    And on Friday it's 44 45 and a half, do you see that?

19    A    I do.

20    Q    Right, so if you were using CARB as a GMAC hedge, as it's

21    reflected in your spreadsheet, you could have bought GMAC on

22    Monday and you would have made up there a lot of money by

23    Friday, correct?

24    A    Yes, we could have -- well, wait, sorry.  If you're --

25    what's your question exactly?  Is it did GMAC CDS widen between
```

Page 139

1   Monday and Friday?  Yes.

2   Q    By about 10 points, right?

3   A    Yes, I -- right.  GMAC widened between Monday and Friday,

4   yes.

5   Q    And had you actually purchased those GMAC CDS on Monday

6   when it was offered to you by JPMorgan, that would have been a

7   much more valuable position by Friday?

8   A    Yes, it would have gone up from a midmarket of roughly 33

9   to a midmarket of roughly -- I guess I can't, it's a little bit

10  blurry but we'll call it 44 and three-quarters or something.

11  Q    And you'd have had a contract -- a derivatives contract

12  with JPMorgan where they would have owed you money on that

13  move, right?

14  A    Yeah, the value of our position would have gone up, yes.

15  Q    And, in fact, if they were obligated to post collateral to

16  you, they'd be posting collateral to you on that change,

17  correct?

18  A    Yes, presumably.

19  Q    But you didn't do that trade, correct?

20  A    We didn't do that trade, no.

21  Q    Instead, what you've submitted in this Court is a

22  valuation statement which you call a replacement value

23  transaction for a trade you didn't do seeking to charge Lehman

24  for that move from 9/15 to 9/19, right?

25  A    Wait, let me just try to unpack the question.  So is the

Page 140

1    question whether or not we use the GMAC move as a basis for our

2    valuation for loss in the calculation we submitted, the answer

3    to that is yes.

4    Q    So a trade you could have done on Monday that would have

5    made you money by Friday, a trade you didn't do, is the basis

6    for a calculation against Lehman's creditors, is that right?

7    A    Just a second.  We didn't do a trade in GMAC and we did

8    use GMAC -- the change in GMAC CDS in order to do the valuation

9    for purposes of loss.

10   Q    So the answer to my question is yes.  A trade you could do

11   but chose not to do --

12   A    Well, it's not --

13   Q    -- is a basis of your claim against Lehman's creditors?

14   A    Well, it's not a trade either way.  And it's not between

15   Monday to Friday in any event.  It's from 9/12, I believe, to

16   9/19.  It's just a level -- the midmarket of GMAC move, that's

17   -- whether we traded it or not, that is the midmarket move that

18   we used in the calculation.

19   Q    You told us that the GMAC CDS market was liquid, correct?

20   A    It's a liquid market, yes.

21   Q    You could have traded tens of millions of dollars of GMAC

22   CDS on Monday, correct?

23   A    I would think so, yeah.

24   Q    But you didn't even try to?

25   A    We -- as I said, I didn't trade GMAC CDS that week.  By

Page 141

1    the way, is the microphone distance acceptable?

2              THE COURT:  It's real good.

3              THE WITNESS:  Okay.

4              THE COURT:  Thank you.

5    BY MR. TAMBE:

6    Q    That's all right.  Just a couple other things on CARB.  I

7    believe you said on direct that one of the other things you did

8    was you searched your Bloomberg messages for CARB, C-A-R-B, is

9    that right?

10   A    Yes, I think so, yes.

11   Q    I thought you also said that CARB was an index that was

12   proprietary to Lehman, is that right?

13   A    Yes.

14   Q    So once Lehman had failed, you didn't expect to see a lot

15   of Bloomberg messages from other dealers quoting you CARB, did

16   you, sir?

17   A    No, I didn't expect to see that.

18   Q    So searching for CARB through your Bloomberg messages, you

19   knew was an exercise in futility?

20   A    Well, no, I wouldn't say that.

21   Q    Well, you could have searched your Bloomberg messages for

22   the reference obligations underlying the CARB basket, correct?

23   A    Yes.

24   Q    You didn't do that?

25   A    No, I don't believe I searched for the reference.  I was -

Page 142

1    -

2    Q    And you're only going to find what you look for, right?

3    A    If you say so.

4    Q    Well, you get 69,000 Bloomberg messages a day, right?

5    A    Yes, I get a lot of Bloomberg messages a day.

6    Q    Way too many.  You've got to go looking for the ones you

7    want to rely on, right?

8    A    Yes, you're going to have to look for what you want to

9    find, I agree with that.

10   Q    And you've got to go looking for the ones that you want to

11   show the Court, correct?

12   A    Well, I was just trying to find prices at that time.  I'm

13   not sure I was thinking about what I was going to show the

14   Court.

15   Q    Well, you were looking for evidence that you were being

16   reasonable, weren't you, sir?

17   A    I was trying to do a reasonable calculation.

18   Q    So in trying to do a reasonable calculation on CARB, you

19   didn't look at the Bloomberg prices for the underlying bonds.

20   You didn't search your Bloomberg messages for any references to

21   the underlying obligations, correct?

22   A    I don't recall searching for the underlying obligations.

23   Q    And you don't recall calling JPMorgan and trying to do any

24   of those GMAC transactions, correct?

25            MR. TRACEY:  If I could just, Your Honor --

Page 143

```
 1              THE COURT:  Yes.

 2              MR. TRACEY:  -- ask that counsel allow the witness to

 3      finish the answer.  I'm watching the transcription and --

 4              THE COURT:  Okay.  Let's --

 5              MR. TRACEY:  -- all the answers are being --

 6              THE COURT:  Let's try to slow it down half a notch.

 7              MR. TAMBE:  I think I'm ready to switch topics.

 8              THE COURT:  Yeah, so if we could just take a break

 9      for a couple of minutes, that would be great, okay?  And how

10      long did you think we ought to go today?  I think it's -- well,

11      it's not hard to imagine that you're not going to be done with

12      your cross-examination this afternoon.  So do you have one more

13      segment?  One or two more segments do you think?

14              MR. TAMBE:  That's what I'm deciding.  If I can

15      switch up some segments and use the next 45 minutes --

16              THE COURT:  Okay.  So why don't we just take -- let's

17      take 10 minutes and we'll come back and then maybe you could

18      just give us a heads up.  I'm not going to want to go much

19      later than 5:00, 5:30 today.  Okay?

20              MR. TAMBE:  Thank you.

21              THE COURT:  Thank you.

22          (Recessed at 3:44 p.m.; reconvened at 4:00 p.m.)

23                      CROSS-EXAMINATION (Resumes)

24              BY MR. TAMBE:

25          Q    So, Mr. Chu, just one more point of the car
```

Page 144

1    evaluation.  On the 80 million no-show, each point that you add

2    to your calculation, how much is that in dollars?

3        A    So, I guess that would -- let's see.  So if it was

4    $100 million, each point would be $1 million.  So it's $80

5    million, so it's $800,000.

6        Q    So it's $800,000 per point.  So ten points is $8

7    million?

8        A    Yes.

9        Q    Thirty points?

10       A    $24 million.

11       Q    Thirty points is what you added to the Lehman mock

12   propriety rate?

13       A    Yes, it is.

14       Q    Okay.  Let's talk a little bit about PCDS and

15   Griffiths (ph).  You never built any model for value in PCDS

16   while you have their transactions on between you, correct?

17       A    No, we didn't have a model for PCDS.  Sorry.  No,

18   we didn't have a model for PCDS in the sense that it didn't

19   have -- yeah.  No, we didn't have a model for PCDS.

20       Q    You didn't construct something that had the prices of

21   the preferreds, the prices of junior debt, senior debt; nothing

22   like that?

23       A    Sorry.  Do you mean where -- okay.  But by analogy in

24   the bond market you could look at the prices of different

25   senior bonds and you could try to imply a senior CDS curve.

Page 145

1   No, we didn't have something like that in PCDS.  No.

2       Q    And that's not something you constructed after the

3   Lehman bankruptcy as you were thinking about how to value these

4   PCDS, correct?

5       A    When you say "something you constructed," I don't

6   totally understand what you mean.

7       Q    You did not construct a model after the Lehman

8   bankruptcy to value the PCDS, correct?

9       A    Is the question -- did you say "you didn't construct

10  a model to" -- well, we did an evaluation but we didn't

11  construct a model of the type that I just described with, you

12  know, with -- analogous to what you would do with a senior

13  credit curve.

14      Q    Your calculation was a formula on the spreadsheet

15  under minus the price of the preferred security, correct?

16      A    Well, mechanically that's how the calculation was

17  done.

18      Q    But -- and mechanically in that spreadsheet you were

19  looking at this morning, there were no other analyses about

20  shorting costs, premium, borrowing cost -- any of that stuff,

21  correct?

22      A    Well, there were no analyses of shorting costs, but

23  those likely would have increased the plane.  We didn't know

24  what they would be, so we didn't include them.  We essentially

25  assumed the prefers were borrowable.

Page 146

1           As for the premium, all of that information was

2      known.  That was all in the master spreadsheet.  I'm sorry,

3      sir.  What were the other variables you asked me about?  So we

4      talked about premium.  We talked about shorting cost?

5           Q    Any other analyses.  Other than the math, a hundred

6      minus a bond price -- the preferred stock price -- so we know

7      about mathematical calculations in your spreadsheet where you

8      came up for a value for the PCDS positions, correct?

9           A    The calculation was based on hedging the jump cost

10     with the appropriate preferred.

11          Q    Right.  But nothing in that spreadsheet said hedging;

12     did it, sir?

13          A    I don't think the word "hedging" appeared in the

14     spreadsheet.  I mean, we can look at it again but I think

15     that's probably right.

16          Q    And away from the -- sorry.  Are you done?

17          A    I'm done, yeah.  Thanks.

18          Q    Away from the spreadsheet there was no analysis --

19     written analysis done of how we either might hedge one of the

20     PCDS contracts that you were constructing -- this hypothetical

21     replacement transaction report, correct?

22          A    Well, I didn't need to write down that the price of

23     the basis package is 100 if you -- if there's a credit event.

24     That's something I knew from trading credit for a long time.

25          Q    I'm not sure I follow that answer.  If I heard  you

Page 147

1    right, you said "I didn't feel the need to write down if the

2    price of the basis package is 100, if there is a credit; is

3    that right?

4        A    That's what I said, yes.

5        Q    Okay.  None of the referenced obligations in your

6    PCDS portfolio had had a credit event on September 15, 2008,

7    correct?

8        A    That's right.  None of them had had a credit event.

9    Yep.

10       Q    And none of them had a credit event on the 16th, the

11   17th, the 18th, or the 19th, correct?

12       A    No.  There were no credit events during legal (ph)

13   week on those names.

14           THE REPORTER:  Trade what?

15           THE WITNESS: There were no credit events on those

16   names during legal week.

17           BY MR. TAMBE:

18       Q    But your pricing -- the 100 minus the preferred

19   price, prices it as if a credit event had occurred, correct?

20       A    No.

21       Q    That's what you said.  That's why you didn't write it

22   down.  There was no reason to write it down is what you just

23   said.

24       A    No.  The reason why -- what I said is the price on

25   the basis package is going to be 100 in the event of a credit

Page 148

1   event.  That's why the dealer needs to charge the points

2   upfront, such that he's not shorting the basis package at a

3   price less than 100.

4           Because if he shorts it at a price less than 100, say

5   that prefers at 65 and he shorts it -- he shorts the preferred

6   to hedge the PCDS trade.  Charging no points up front, he's

7   going to lose 35 points in that trade.  So to avoid losing that

8   35 points, that is to say to hedge that risk, you have to

9   charge the 35 points up front.

10      Q    But that explanation that you just gave the Court and

11  you provided earlier in your direct testimony, that's not

12  written down anywhere in that week of 9/15 to 10/15, correct?

13      A    No.  But that's what I meant when I said I didn't

14  need to write down that the price of a basis package would be

15  100 in the event of a credit amend (ph).  That's something I

16  knew from trading.

17      Q    Let's go back to the model, all right?  So there was

18  no model prior to the Lehman bankruptcy, correct?

19      A    No.

20      Q    Again, I'm talking about PCDS.

21      A    Okay.  Uh-huh.

22      Q    You were the trader responsible for marking the PCDS

23  positions in the portfolio, correct?

24      A    Yeah.  They were my positions.

25      Q    They are your positions and you're responsible for

Page 149

1    putting a mark on them, correct?

2        A    I didn't enter every single mark, but they -- I guess

3    would say the ultimate responsibility for the mark was mine.

4    They were my positions.

5        Q    And to put a mark on the positions you didn't create

6    a model, correct?

7        A    We did not.

8        Q    Okay.  You described in very vivid terms yesterday

9    how liquidity dried up in the PCDS market as you went from '07

10   through 2008, correct?

11       A    That liquidity became much worse.

12       Q    And when the liquidity got worse, you did not create

13   a model to track the effect of that a lack of liquidity on your

14   marks off the PCDS transactions, correct?

15       A    Excuse me.  Do you mean did I adjust the marks or

16   something?  I don't understand the question.

17       Q    Did you adjust the marks?

18       A    No.  We used the marks that were given to us.

19       Q    And as we move later on into 2008, you became

20   concerned specifically about Lehman, correct?

21       A    We did become concerned about Lehman.

22       Q    And I think you said you became particularly

23   concerned about Lehman after Fannie and Freddie were taken

24   over, correct?

25       A    That's right.

Page 150

1     Q     Now, at that point in time you didn't change your

2  marks to account for the lack of liquidity, correct?

3     A     Well, no, we didn't change the marks at that time.

4     Q     If you can turn in your -- find the line I gave you.

5  (Indiscernible).  It's Exhibit 5101.  Do you have the documents

6  here?

7     A     Okay.

8     Q     And you've had a chance to review it?

9     A     Yes.

10    Q     So, that's an email chain, it looks like, dated

11  September 9, 2008.  Do you see that?

12    A     Yes.

13    Q     So, Fannie and Freddie got taken over by the

14  government over that weekend; is that right?

15    A     Uh-huh.

16    Q     Yes?

17    A     Yes.

18    Q     Okay.  So that's what heightened your concern about

19  Lehman starting Monday, September 8th, correct?

20    A     I don't know that it was the only thing, but it

21  definitely added to our concern.

22    Q     Well, you've told us yesterday that that event stuck

23  in your mind because that really elevated your concerns about

24  Lehman, correct?

25    A     It did elevate it.  It wasn't -- I'm just saying I'm

Page 151

1    not sure that was the only thing that was worrying us.  But,

2    yes, it (indiscernible).

3        Q    So come the morning of Tuesday the 9th, you see this

4    as a collateral call discussion, correct?

5        A    Yes, I see it as a collateral call discussion.

6        Q    And your portfolio, facing Lehman, on September 8th

7    was similar to the portfolio you had a week later facing

8    Lehman, correct?

9        A    It was broadly similar, yes.

10       Q    Basically the same risks, right?

11       A    Well, we took off a fair amount of protection.  As I

12   -- I think as I said I -- I think I took off something like 21

13   trades that were Lehman facing during that week.  But overall

14   the shape of the portfolio in terms of being net long

15   protection was the same, yeah.

16       Q    That was my question.  You were net long on Monday

17   the 8th.  You were net long on Monday the 15th, correct?

18       A    Net -- well, in protection.

19       Q    Correct.

20       A    Facing Lehman.  Facing Lehman.

21       Q    Correct.  And when the events off the conservatorship

22   of Fannie and Freddie, that portfolio didn't move in your

23   favor; it moved in Lehman's favor on the 8th of September,

24   right?

25       A    Assuming that this margin mark is correct, that's

Page 152

1  what it seems to indicate.  Yep.

2      Q    Well, you got copied on this discussion at the top.

3  Do you see that?

4      A    I do.

5      Q    Okay.  So let's -- and you didn't write back and say

6  "This is completely wrong.  How could this possibly be the

7  case?"  You didn't do that, did you, sir?

8      A    I don't remember writing any such email, no.

9      Q    In fact, you rarely got involved in margin

10  discussions, correct?

11      A    It was infrequent.  It wasn't never, but it was

12  infrequent.

13      Q    This one was brought to your attention?

14      A    Okay.

15      Q    Well, this is September the 9th.  We saw yesterday

16  the email on September 8th, where you said what happens if

17  Lehman defaults?  Do you remember that email chain?

18      A    Yes.

19      Q    So, let's start at the bottom here of Exhibit 5101,

20  and you'll see the subject line "LBSF calls QBT for $12

21  million."  Do you see that?

22      A    Yes.

23      Q    And you recognize that as a call from Lehman to QBT

24  to return some of the collateral that's being held by QBT,

25  correct?

Page 153

1       A    Yes.

2       Q    And if you look at the bottom there -- and so that

3   email is from Kelly Fang (ph) to Julian Serro (ph).  Do you see

4   that?

5       A    I see it.

6       Q    So she has described the LBSF call to QBT, but the

7   bottom she writes "I think we should agree to the call because

8   QBT data shows similar drop in mark to market, and trade

9   activities are 9/8, and Mordor (ph) show we are liable for call

10  of $18 million."  Do you see that?

11      A    Yes.

12      Q    So, Mordor is a reference to your collateral

13  calculation system, correct?

14      A    Yes, I think so.

15      Q    And then gets its data from Pikey (ph), correct?

16      A    I think it gets some of its data from Pikey.  I'm not

17  sure it gets all of its data from Pikey.

18      Q    That's the system you have, right?

19      A    Yes.

20      Q    I mean, just to be clear.  And that's the system you

21  have for managing collateral calls and collateral movement for

22  what, a $15 billion portfolio?

23      A    Yes, that would -- I think Mordor wasn't a -- used

24  for collateral management.

25      Q    And you thought it was a pretty good system, didn't

Page 154

1    you?

2        A    Well, we used it.  As to whether it was -- we used

3    it.

4        Q    You didn't tell your investors you were just using

5    some system, right?  You were telling your investors you had

6    good systems to take care of the $13 billion they had invested

7    with you, right?

8        A    Yes.  I think we told investors we had good systems.

9    I just don't know if I ever talked to any investor about Mordor

10   or not.

11       Q    And, in fact, your system was saying you had even

12   more -- you should be returning even more collateral to the $18

13   million, not 12?

14       A    It says "Mordor shows we are liable for a call of $18

15   million."

16       Q    Okay.  Now, you said that, sir, a larger number than

17   $12 that LBSF was requesting.

18       A    Yes.  I agree that 18 is larger than 12.

19       Q    Did you send 18 million over or just the 12 that

20   Lehman was requesting?

21       A    I don't know what we sent over.  I don't know.  I

22   don't think it would be 12, but I don't know.

23       Q    As you digested the news about Fannie and Freddie

24   going -- getting taken over by the government, you didn't go

25   and reprogram the way you were marking your PCDS positions,

Page 155

1    correct?

2         A    Are you asking whether I submitted and used spreads

3    for PCDS for marking?

4         Q    Whether you submitted new spreads to PSCS for

5    marking; whether you set -- hey, this stuff is really your

6    liquid.  Let's put a big -- put a new mark on it.  Did you do

7    any of that?

8         A    I don't think I changed any of the mark inputs that

9    way, no.

10        Q    And the concern continued to rise through the week of

11   September 8th concerning Lehman, correct?

12        A    Yes.  Uh-huh.

13        Q    And there was a weekend exchange of exposures --

14   small lien (ph) exposures to Lehman that were shared among the

15   management team at QBT, correct?

16        A    Yeah.  I think there were emails about exposures over

17   the weekend, yeah.

18        Q    And you studied those emails?

19        A    I received them, yes.

20        Q    You didn't just receive them.  You were focused on

21   them because you were talking about exposure to Lehman if

22   Lehman should fail, right?

23        A    Is there a particular email you'd like me to look at?

24        Q    Just generally.  We can get to the -- were there

25   emails concerning Lehman's failure and your exposure to Lehman

Page 156

1    that you didn't care about?

2        A    No, I cared about them.

3        Q    Every one of those was important to you, right?

4        A    Well, if you want to -- I think I -- the question of

5    exposure to Lehman was definitely important to me.  I think I

6    read a lot of emails, or whatever emails I got I think I

7    probably read most of them.  Perhaps I read all of them.  I

8    think that's a fair description of it.

9        Q    Let's go to 44 -- tab 44, which is Exhibit 5120.

10       A    One hundred and --

11       Q    No, I'm sorry.  44 is the tab number.

12       A    Oh, okay.  44.

13       Q    And the exhibit is 5130.

14       A    Uh-huh.  Okay.

15       Q    And so there's two things on this document.  So just

16   to get you oriented, the numbers -- the spreadsheet I'm going

17   to ask you to look at is a later page in (indiscernible format.

18   But the email text I'm going to ask you about, it's probably

19   easier to read on the first page.  So whatever order you want

20   to take it in, let me know when you're done.  I'll ask you a

21   few questions.

22       A    Okay.  So the -- I guess there's like a landscape

23   format version of this.  That's the same email.

24       Q    Oh, okay.  Yes.  That's so that all of the columns

25   print out on a page.  Do you see that?

Page 157

1      A    Okay.  Yeah, I see it.

2      Q    Okay.  And this is an email you recall getting that

3   weekend before they (indiscernible) back to you, right?

4      A    Yes.

5      Q    But there's probably later that same day, Sunday,

6   September 14th, where you drew up your list of positions and

7   started discussing replacement and priorities, correct?

8      A    It was the 14th.  I don't remember if it was before

9   or after this email, but I think that we drew up the positions,

10  or I drew up the positions on Sunday.  That's right.

11     Q    And you'll see that the table that is forwarded --

12  that you're initially copied on and is the subject of email

13  above, that has various types of Lehman exposures.  Do you see

14  that?

15     A    Yes.

16     Q    And I want to draw your attention to the third

17  custodian down, which is LBSF.  Do you see that?

18     A    Yes.

19     Q    And if you follow that line across, you'll see the

20  sum of TD derivative value.  Do you see it?

21     A    Yes.

22     Q    That's about 116 million, almost 117 million.  Do you

23  see that?

24     A    Yes.

25     Q    And right below that you see another line that says

Page 158

1   LBSF margin.  Do you see that?

2        A    I do.

3        Q    And you follow that across and that has a number

4   slightly above 117 million negative.  Do you see that?

5        A    I do.

6        Q    And these are numbers pulled from your system, the

7   QBT, correct?

8        A    Yes, I think so.

9        Q    Right.  And they've been pulled for the purpose of

10  informing management as to how to prepare for a potential

11  Lehman bankruptcy?

12       A    Yep, that's fair.  Yep.

13       Q    And when you received these numbers, you didn't

14  respond and say "Wait a second, the PCBS trades alone are worth

15  100 million more."  You didn't say that, did you, sir?

16       A    No.  I don't think I said anything about PCBS in this

17  email.

18       Q    And the purpose here was to assess your exposure to

19  the various Lehman entities, right?

20       A    Well, I think what I asked for that -- let's just

21  look at the email for a second.  So, I think what the email

22  says is -- it's an email from me at 10:38 a.m. to Julian and

23  Chris -- Julian Sayle (ph) was the CFO, Chris Perez was the

24  chief first officer, and it just says "Can you please update

25  our LEH exposure in PB, et cetera?"

Page 159

1           So when you say "assess the exposure," I think that's

2     a pretty broad term.  I think what I'm asking them to do is to

3     update where we are on marks versus collateral, for instance,

4     which they do.

5           But as to the question of assessing the jump risk in

6     the portfolio, I don't think that's something that Julian and

7     Chris are being asked to evaluate it here.

8           Q    Well, that's an idea that comes up later on in your

9     discussions, correct?

10          A    Later?  What do you mean, in our discussions?

11          Q    Well, this whole concept of jump risk, that's a

12    concept that emerges later on.  It's not a missing voucher,

13    right?

14          A    Well, I think we were aware of the concept of a jump

15    risk or the idea that a long protection portfolio would

16    increase in value and you would sort of, well, not realize that

17    increase in value as a result of the default of the counter

18    party.  I think we were aware of that before this.  But there

19    isn't further discussion of a jump risk in this email, if

20    that's what you're asking.

21          Q    Just fast forwarding a couple of days to September

22    16th, you're aware that there was a collateral call made by QBT

23    to Lehman on the morning of the 16th, correct?

24          A    I am.

25          Q    And you didn't adjust any of your modeling or

Page 160

1   evaluation parameters before that collateral call was made,

2   correct?

3        A    No.  I don't recall doing anything like that.

4        Q    And you do understand that that collateral call was

5   made based on data from QBT systems, correct?

6        A    I don't know that -- I don't think I was involved in

7   that collateral call, so I don't actually know what date it was

8   based on.

9        Q    Let's go to tab 93 and find it, please.  It's Exhibit

10   5169.  Let me know when you're done reviewing that document and

11   I'll ask you a question.

12        A    All right.

13        Q    So -- well, you've seen that document before today,

14   right?

15        A    Yeah, I've seen it before today.

16        Q    And you know what it's generally about, right?

17        A    Yeah, I know what it's generally about.

18        Q    And you would have received a copy of this at the

19   time because you are one of the recipients and managing members

20   at QBT.com, correct?

21        A    Yes.

22        Q    And you don't recall responding to this email and

23   objecting to the calculations that are set forth in this email,

24   correct?

25        A    No, I didn't object to Kelly Fang's calculation.

Page 161

1      Q    Now let's go to some of the questions you were asked

2    yesterday about PCDS evaluation, and so we can probably work

3    out the (indiscernible).

4      A    Huh?  Is that okay?

5      Q    I'll give you a document number in a second.  It is

6    CX2096.

7      A    209 -- okay.

8      Q    Right.  It's the Bloomberg shots that we discussed

9    for some time yesterday.  Do you see it?

10     A    I do.

11     Q    Now, this is sort of a compilation of various

12   Bloomberg shots.  Do you see that?

13     A    I see it.

14     Q    Was it your decision to decide which Bloomberg shots

15   to include in this compilation for purposes of this trial?

16     A    No.  I don't think I made the decision about which

17   Bloombergs to include.

18     Q    So someone else made that decision, but you spoke

19   about these -- some of these Bloomberg shots, yes, correct?

20     A    Yes, I did.  Uh-huh.

21     Q    And you have lots of other Bloomberg screenshots that

22   are not included in this exhibit, correct?

23     A    Yes.  There are some other Bloomberg screens.  This

24   is not a comprehensive list of all the Bloomberg screenshots I

25   said, no.

Page 162

1   Q   And just to be clear, this is not a comprehensive

2   list of all of the Bloomberg screenshots concerning the PCDS

3   evaluation, correct?

4   A   Yeah, I think that's right.  Uh-huh.

5   Q   And it's not even all the information that you had

6   available to you from Bloomberg about the relevant referenced

7   obligations that are in this exhibit 2096, correct?

8   A   Sorry.  Are you asking whether Exhibit 2096 includes

9   all of the information on preferreds that I would have ever

10  received on my Bloomberg in that time?  I'm not sure I

11  understand the question.

12  Q   No.  There are specific issuers that are included in

13  this exhibit, correct?

14  A   Okay.  Uh-huh.

15  Q   Yes?

16  A   Yes.

17  Q   And as you understand this exhibit, you have 19

18  issuers in the PCDS that you value?

19  A   Right.

20  Q   Right.  All 19 are not discussed in here -- in this

21  collection?

22  A   Correct.  You don't have all 19 issuers in this

23  packet.  That's right.

24  Q   Okay.  And with respect to the ones that you do have

25  in here, you don't have a lot of information about those

Page 163

1   issuers that was available to you at the time, correct?

2        A    When you say I "don't have a lot of information about

3   these issuers that was available to me at the time," I mean,

4   sure.  There's lots of other information about ANZ, for

5   instance, that one could find at the time, sure.

6        Q    Right.  So it's not -- you don't, for example, have

7   the prices for all the relevant ANZ or ANZET (ph) preferred

8   securities for this time period, correct, not in this document?

9        A    No.  This -- well, I'm trying to remember because I

10  remember in the case of ANZ it was particularly hard to find

11  prices.  I don't think I actually have other prices in the case

12  of ANZ in particular, no.

13       Q    How about BNP Paribas (ph)?

14       A    I think there are some other BNP Paribas data, but I

15  would have to look to be sure, yeah.

16            THE COURT:  Could I -- I'm trying to understand what

17  these answers mean.  Are you distinguishing or are you trying

18  to ask Mr. Chu to distinguish between what happens to be in

19  this binder versus everything that he looked at?  Because I am

20  unclear what this binder -- what this is supposed to represent.

21            MR. TAMBE:  Sure.  It's partly a question for Mr. Chu

22  and --

23            THE COURT:  Okay.  But based on the Q and A that

24  you've just had, I don't know -- I don't know what the answer

25  is.

Page 164

```
 1              BY MR. TAMBE:

 2         Q    It's an easy question, I hope.

 3         A    Okay.

 4         Q    This isn't everything you looked at in connection

 5    with your evaluation of the PCDS, right?

 6         A    No, it is not everything I looked at in connection

 7    with the PCDS.

 8         Q    And even for the referenced entities that are named

 9    in here, it's not everything that you looked at, but those

10    references, correct?

11         A    Right.  So, for example, later on there's something

12    on -- there's some Bloomberg shots, for instance, that have

13    prices on Citigroup and Wachovia.  But there are other

14    screenshots that I have of Citigroup and Wachovia prices.  So

15    it does not have everything related to these referenced

16    entities, correct.

17         Q    Okay.  And for some of the reference -- well, it's a

18    state of -- but these referenced entities also not included in

19    this package is the size of their preferred equity outstanding

20    in September of 2008, correct?

21         A    Correct.  So you can't see the size of the issue from

22    these.

23         Q    Now, some of that information would have been

24    available to you on Bloomberg when you were doing your

25    evaluation, correct?
```

Page 165

1      A     Yes.  You could see the size of the issue, yes.  Uh-

2  huh.

3      Q     But that's not something you included in this

4  exhibit, correct?

5      A     It's not in this exhibit, nope.

6      Q     And it's not something you included in the

7  spreadsheet where you did your math -- the 100 minus

8  (indiscernible)?

9      A     No.  There is nothing that says the size of ISIN or

10 QCIP (ph) in question.

11     Q     Now, there's been a fair amount of discussion that as

12 a whole you have 371 million noshino (ph) off PCDS across the

13 60 transactions that you have, correct?

14     A     That's right.

15     Q     But that wasn't all one package, correct?  They were

16 separate trades?

17     A     There are 19 different references (ph) out of these

18 that make up the 371 million.

19     Q     Right.  And generally, less than 25 million noshino

20 for any single name, correct?

21     A     Yeah.  I mean, on average, it's going to be roughly

22 370 divided by 19.

23 Q     And for the referenced names you have included in this

24 Exhibit 2096, you do know that they had billions of dollars off

25 preferred equity outstanding in September, 2008, correct?

Page 166

1    A     Sorry, for these different entities?

2    Q     Yeah.

3    A     Yeah, I don't know whether, for instance, Commonwealth

4    Bank of Australia or ANZ did or not but, taken as a whole, I

5    would think -- expect they would have billions of dollars, yes.

6              UNIDENTIFIED SPEAKER:  Taken as a (indiscernible).

7              THE WITNESS:  Taken as a whole, I would think they

8    would have billions of dollars.

9    BY MR. TAMBE:

10   Q     BNP had about what, 10 billion in recorded equity

11   outstanding in 2008?

12   A     I don't know the amount of preferred equity that BNP

13   Paribas had outstanding in 2008.

14   Q     Significant amount though?

15   A     Yes, it was likely a significant amount.

16   Q     It's not a small bank.  I may we -- it may not be a big

17   bank in the U.S. but it's a big bank globally, right?

18   A     It's a big bank, yes.

19   Q     Okay.  And about a billion or more for each of the others

20   you talked about yesterday ANZ Commonwealth?

21   A     I actually don't know.  It wouldn't surprise me if they

22   had a billion or more but I don't know the exact number.

23   Q     Commonwealth Bank of Australia?

24   A     I don't know, it's all standards and preferreds.

25   Q     Robo Bank?

Page 167

1    A    Again, I don't know the exact numbers.

2    Q    And also not reported here but likely available to you is

3    information about retail trading in preferred equity for any of

4    the issuers, the 19 issuers in your portfolio, correct?

5    A    Some of them have retail preferred, some of them don't.

6    Q    And the ones that have retail preferred, that was

7    available to you sitting at your Bloomberg terminal or whatever

8    the terminal you have, correct?

9    A    Yes, if you knew the CUSIPs, you could find those things

10   on Bloomberg, sure.

11   Q    And that's not something you went looking for, correct?

12   A    I used some retail preferreds in the valuation but I

13   didn't find every retail preferred that I could have found in,

14   you know, referencing these obligations, these issues.

15   Q    By your (indiscernible) -- sorry.

16   A    Yeah.

17   Q    Yeah?

18   A    Sure.  Yeah.

19   Q    That it?  They want to make sure you're done.

20   A    Okay.  I thought I was answering your question.  If I

21   didn't answer it --

22   Q    No, you answered my question, I just --

23   A    Okay.

24   Q    -- thought I interrupted you interrupting.  We're trying.

25           THE COURT:  So you want to go out for a drink?

Page 168

```
 1              MR. TAMBE:  Yes, definitely.

 2     BY MR. TAMBE:

 3     Q    Slightly different question.  It's not that you didn't

 4     look at prices of some of the retail --

 5     A    Okay.

 6     Q    -- it's the volumes.  Did you look at the volumes of what

 7     was traded in those retail preferreds that you did look at that

 8     week?

 9     A    I can't remember whether the HP screen for these retail

10     preferreds would tell you the volume or not in the case of the

11     retail preferreds I looked at.

12     Q    Okay.  But the HP screen is just one of probably gazillion

13     screens on Bloomberg, right?

14     A    Mean -- do you mean did I separately analyze the volume of

15     the retail preferreds?  No, I don't think I did that.

16     Q    All right.  So let's look within Exhibit 2096.  You

17     talked, I think, on direct about some of the pages but not all

18     the pages so let's go to page that ends in Bates No. 92, 4792.

19     A    Uh-huh.

20     Q    Beginning page that size.  It looks a little different

21     than the other screens we were looking at.  This is more like a

22     message, right?

23     A    This is a Bloomberg message.

24     Q    From someone at City?

25     A    Yes, from Intasar Hayder (ph) at City.
```

Page 169

1    Q      That's someone you knew at City, correct?

2    A      Correct.

3    Q      Okay.  And he gives a bunch of prices but then he says at

4    the bottom there traded north of 300 million now in this sector

5    alone.  Do you see that?

6    A      I do see that.

7    Q      And the securities he's talking about above are all

8    preferreds, correct?

9    A      Yes.

10   Q      And you have preferreds -- or you have PCDS on City Group,

11   C?

12   A      Yes.

13   Q      And on WFC?

14   A      Uh-huh.  Well, WB.

15   Q      Wellborn (ph)?  And WB, right?

16   A      Uh-huh.

17   Q      Yes?

18   A      Yes, we do.

19   Q      And then if you go a few pages further down, it's the one

20   4796.

21   A      Okay.

22   Q      It should be 4796.  It's a -- yup, got it.  So the --

23   you'll see the bottom.  Again, it's from the same person at

24   City and he says traded north of 250 million of paper in this

25   space.  Do you see that?

1   A    I see it.

2   Q    All right.  So this -- one trader at City in that week has

3   traded about half a billion dollars' worth of preferred

4   securities, correct?

5   A    Well, he doesn't actually say over what time period he's

6   traded this amount of paper.

7   Q    Did you ask him?

8   A    I didn't ask him, no.

9   Q    But you were grappling with this problem, how do I -- how

10  do you PCDS, Lehman's gone away, there's no liquidity, the

11  world order has changed.  You call up this trader at City and

12  say hey, give me some intel on what's trading and how much and

13  where, right?

14  A    Sorry, what -- what's the question?

15  Q    The question is did you ask any of those questions of this

16  trader who's telling you he's doing some activity of some

17  significant size --

18  A    Uh-huh.

19  Q    -- in preferreds?

20  A    I didn't talk to this trader about it, no.

21  Q    And this is just one of lots of traders who traded

22  preferred securities that week, right?

23  A    Yes, there are other dealers other than City, definitely.

24  Q    And, again, you may have gotten a lot of other Bloomberg

25  messages from those dealers but they're not, obviously, in this

Page 171

1    exhibit, right?

2    A    No, they're not in this exhibit.

3    Q    Did you search your Bloomberg messages to say let's go

4    find all transactions that were ordered to meet in preferred

5    securities that week?

6    A    Sorry, when you mean all transactions that were reported

7    to me on message, I'm not exactly sure what you mean because, I

8    mean, it -- they're not reported to you the way they are like

9    if you look at the -- a stock, for instance.  A stock you can

10   see, on a very high frequency basis, this many shares traded at

11   this price but Bloomberg messages -- I mean, they are --

12   they're just not organized in that way.  I don't -- totally

13   understanding what your question is.

14   Q    You got me.  I used the wrong word.  I used the word

15   transaction.

16   A    Okay.

17   Q    Did you search your Bloomberg messages for quotes on

18   preferred securities, bid asks like you see on this page of

19   this exhibit?

20   A    Yes, I looked through a fair amount of Bloomberg messages

21   to try to get an idea of what was going on in the market.

22   Q    And off the six to 9,000 Bloomberg messages you get a day,

23   how many hundreds of pages like page 4796 and the rest of this

24   exhibit, Exhibit 2096, did you find?

25   A    I don't know how many messages I found.

Page 172

1    Q    Did you go looking for messages that reported volumes like

2    the City Group trader reports in his Bloomberg message to you?

3    A    No, I didn't specifically look for volumes, no.

4    Q    Let's go back to the front of this exhibit and the BNP

5    page which is page 4790 -- let me know when you're there.

6    A    479 -- okay.

7    Q    See it?

8    A    I do.

9    Q    You used -- I think you told us yesterday that you used

10   one of the prices from this page for your calculation, correct?

11   A    Yes, I think so.  Uh-huh.

12   Q    Which one is it?

13   A    I think it would have been the low -- I mean, assuming I

14   was -- transcribed these correctly into the spreadsheet, it

15   would have been the price on 9/18 which is the price 59.9726.

16   Q    Did you put the L there?

17   A    No, that's something that Bloomberg does.

18   Q    Because it's the lowest price in your period, correct?

19   A    I think that's how it works, yes, that's right.

20   Q    I mean, in fact, it's the lowest price in that entire

21   period that ranged from October, '07 until September, '08?

22   A    Yes.  Yes, it is.

23   Q    Right?

24   A    That's right.

25   Q    That's how Bloomberg works, right?

Page 173

1   A     Well, it -- that is the lowest number of all these numbers

2   here, yeah.

3   Q     Right.  And you'll see if you look at this Bloomberg data

4   that if you compare, for example, the end of July, 2008, bottom

5   right-hand corner, right --

6   A     Uh-huh.

7   Q     -- to September 8th, Fannie and Freddie day, the price of

8   this security's higher on Fannie and Freddie day?

9   A     Well, the quoted price is higher.

10  Q     Right.  That's all we can tell from this sheet, right?

11  A     Yeah.  Uh-huh.

12  Q     Okay.  And it remains in the 64 range through 9/15,

13  correct?

14  A     That's right.

15  Q     And you are picking up close.  That's what you specify at

16  the top of the page, correct?

17  A     Yeah, it should be closing prices, yeah.

18  Q     Okay.  Right.  And so that would be the close on 9/15,

19  Lehman Monday, correct?

20  A     Do you mean the 64.5918?

21  Q     Yeah.

22  A     Yeah, that would be the close on Lehman Monday, right.

23  Q     Now, these were -- I think you may have testified these

24  were mid-market prices, right?

25  A     Yeah, that's what it says.  It says on -- in the middle

Page 174

1    next to 9/26/08, it says market M, mid slash last.  It says

2    mid, yeah.

3    Q    Okay.  So for BNP, the price you used was 59.97 from

4    Bloomberg, a mid-market price, correct?

5    A    Right.

6    Q    And I think you've expressed this view previously that you

7    thought maybe this is stale, this is some -- there's something

8    wrong with this data, right?

9    A    Well, I think you would question whether you can

10   definitely trade at these prices or not or whether -- you just

11   don't know how many bonds traded at or around those prices on

12   any of these days.  You just can't see it from this data.

13   Q    So, again, let's do this thing where you hold your hand on

14   that page.

15   A    Okay.  Of -- sorry, so this BNP page?

16   Q    This BNP page.

17   A    Okay.  That's fine.

18   Q    And then we'll go to Exhibit CX-1447.

19   A    Uh-huh.

20   Q    That's a Bloomberg message from Peter Camps of JP Morgan?

21   A    Yeah.

22   Q    Right?  And he's got a whole series of preferred prices

23   there.  Do you see that?

24   A    I do.

25   Q    All right.  Bids and offers, right?

Page 175

1    A    Uh-huh.

2    Q    And he's saying these are retail, USD Euro retail pref

3    updated levels.  Do you see that?

4    A    Yes, but I don't think these are $25 preferreds that trade

5    on the exchange.

6    Q    So these are not necessarily just retail, there may be

7    some institutional ones in there?

8    A    Yeah, I -- for instance, I don't think the bonds, the

9    ACAFP7s that are at the top, I don't think those trade on any

10   -- well, I don't think they trade on the New York Stock

11   Exchange, for instance, the way say the City Group 8.125 still.

12   Q    And he's got BNP there, two different bonds of BNP, where

13   he's quoting 8284 --

14   A    Uh-huh.

15   Q    -- 2-1/2 points wide, another one, 8688.50, again, 2-1/2

16   points wide.  Do you see that?

17   A    Yes, I see that.

18   Q    And that's not a mid-market quote, right?

19   A    Yes.

20   Q    And that's considerably higher than what Bloomberg was

21   showing either at the close of 9/15 or the open of 9/16.  You

22   see that?

23   A    But it -- yes, but it's not the same bond.

24   Q    But it's a BNP bond under the word carnage, is a preferred

25   security issued by BNP that he's got at 8688 on Tuesday

Page 176

1   morning?

2   A    Well, I agree that that's what it says.  I'm just saying

3   that that's a 6-1/2 percent bond and the other bond is a 4-

4   7/8ths percent bond.

5   Q    As you go further down -- and just look at some of these

6   names.  You got Robo Bank down there?

7   A    Uh-huh.

8   Q    -- in his Exhibit CX-1447?

9   A    Uh-huh.

10  Q    And he's quoting one Robo bond at 8991 and the next one at

11  95-5 -- 97-5, again, about two points wide.  You see that?

12  A    Yes, I see that.

13  Q    And further down, you got Deutsche Bank which he's quoting

14  on Tuesday morning at 8950, 9150.  Do you see that?

15  A    I do see that, yes.

16  Q    And these are all issuers that were referenced in your

17  BCDS portfolio, correct?

18  A    Yes, and he also has the BNP 4.875, substantially lower

19  than where they're shown in the Bloomberg which is the line

20  above the DB's.

21  Q    Correct.  Did you call up Mr. Camps and say hey, I'm

22  looking at Bloomberg's, there wasn't a lot of prices here, can

23  I get some more flavor on what the volumes are?  Who's trading

24  this?

25  A    No, I don't believe I called Peter Camps on

Page 177

1    September 16th.

2    Q    Do you ever call Peter Camps on any of this data?

3    A    I don't think I talked to him about it, no.

4    Q    You told us yesterday that you went looking through your

5    Bloomberg messages for messages to help you make your

6    calculation; is that right, BCS calculation?

7    A    That -- that's right.

8    Q    And you find a couple of messages from Ms. Ullrich when

9    you went looking for Sun Trust and Wachovia; is that right?

10   A    Yes.

11   Q    And to find those, you typed in Sun Trust?

12   A    I probably tried a couple different things.  I could type

13   Sun Trust, I could type STI.  I mean, I guess there are

14   different ways to find it, yeah.

15   Q    But you don't remember how you located those particular

16   messages from Mr. Ullrich, right?

17   A    I don't remember what command I used, no.

18   Q    And neither Wachovia or nor STI appear on Mr. Camp's list,

19   correct?

20   A    I don't think so.  I mean, I can take a look.  Just a

21   second.  No, it doesn't look like it.

22   Q    So you used a different search term to find Mr. Camp's

23   messages, correct?

24   A    Right, I -- yes, I would think so, yup.  Uh-huh.

25   Q    Did you go looking for Mr. Camps?

Page 178

1   A    Well, I think what happened is I was looking at -- I don't

2   remember which of the names it was that caused me to find Mr.

3   Camps' run but once you know Peter Camps put out a run, you can

4   just look for Camps and just see all the thing that Peter Camps

5   gives you.

6   Q    And you found all the messages and commentary from Mr.

7   Camps, correct?

8   A    Well, I would assume so if I put in Peter Camps, yeah.

9   Q    And you included it in the exhibits you discussed with the

10  Court, yes?

11  A    Well, there is -- I don't think these are all the

12  Bloombergs that Peter Camps sent me but there are Bloomergs

13  from Peter Camps, that's right.

14  Q    Well, nor are they all the Bloombergs that other brokers

15  sent you also talking about preferreds perhaps with different

16  commentary, are they, sir?

17  A    No, they're not all the Bloombergs, no.

18  Q    You probably have hundreds of Bloombergs, maybe thousands

19  --

20  A    Okay.

21  Q    -- discussing prices, market color, various things --

22  A    Uh-huh.

23  Q    -- on preferred securities, correct?

24  A    Uh-huh.  Yeah, I would think I have a fair amount of

25  Bloombergs, yeah.

Page 179

1   Q     But the ones you chose to discuss were these ones from Mr.

2   Camps, correct?

3   A     Those are the ones we talked about yesterday, yeah.

4   Q     At any time between 9/15 and 10/15/08, did you search your

5   Bloomberg messages just for preferreds or pref?

6   A     Probably.  I mean, I don't remember typing in pref but I

7   -- definitely possible, yeah.

8   Q     Because you did miss the Merrill Lynch e-mails, correct?

9   A     Which Merrill Lynch e-mail you're talking about?

10  Q     October 1 and October 2 with an offer not of preferreds

11  but an offer on PCDS.

12  A     Oh, okay.  So this is the PCDS Merrill Lynch October 1 and

13  October 2 things.  No, I didn't see those Bloombergs, right.

14  Q     So whatever search you were running through your Bloomberg

15  messages, you just missed those?

16  A     Well, hang on a second.  I wasn't searching.  I had

17  finished my PCDS valuation by, I think, the 28th of September

18  so I wasn't searching I don't think -- I don't think I was

19  searching anything at that time related to preferreds.

20  Q     Weren't you looking to replace your PCDS risk?

21  A     We would have liked to replace our PCDS risk, I guess, if

22  that's what you mean.

23  Q     I mean, if you'd have liked to replace your PCDS risk,

24  you'd have been looking for offers for PCDS in this incredibly

25  illiquid, dysfunctional market that you described yesterday.

Page 180

1    A    Well, I don't think that's really right.  I mean, we -- I

2    wasn't looking around for PCDS offers on October 1st and 2nd.

3    I don't think I was looking around for PCDS offers during the

4    week of September -- you know, the week preceding that.  It was

5    -- I had spent a lot of time looking for PCDS offers from

6    Lehman.  I had asked JP Morgan.  I'd never traded with any

7    other dealer so I actually wasn't spending a lot of time

8    looking for PCDS and I definitely wasn't on October 1st and

9    2nd.

10   Q    All right.  Because by that time, you had a claim on your

11   PCDS numbers of $134 million, right?

12   A    No, it's because I -- it's like there -- Lehman traded

13   PCDS.  I'd asked JP Morgan.  They're -- they were a second

14   largest derivatives counter-party and we did market quotation

15   on PCDS.  We got nothing back on PCDS and so I just didn't hold

16   out a lot of hope that suddenly with Lehman's demise, a PCDS

17   market would sort of spring up out of nowhere.  It just didn't

18   seem like a very likely event to me.

19   Q    And yet there was the Merrill Lynch e-mail, right?

20   A    Well, there was a Merrill Lynch offering in PCDS, sure,

21   definitely.

22         MR. TAMBE:  This is a good time to stop, Your Honor,

23   if it's okay with you.

24         THE COURT:  Okay.  All right.  So, Mr. Chu, thank you

25   very much.  You can step down for the day.  All right?

Page 181

```
 1                THE WITNESS:  Thank you, Your Honor.

 2                THE COURT:  Same rules apply over the weekend in

 3    terms of your conversations with folks.  Okay?

 4                THE WITNESS:  Okay.

 5                THE COURT:  All right.  So let's talk about Monday

 6    which is the only day we're going to be together next week.

 7    And, Mr. Tracey, I think you had said -- I don't know if you

 8    want to talk about it today but you had done some thinking

 9    about, generally speaking, where we are in the grand scheme of

10    things.

11                MR. TRACEY:  Yes, and I --

12                THE COURT:  You can step down, sir.

13                THE WITNESS:  Oh, that's right.  Thank you.

14                THE COURT:  Okay.  You can leave those binders there.

15                THE WITNESS:  Okay.

16                THE COURT:  Thank you.

17                MR. TRACEY:  We tried during the break and went

18    through my current sort of lineup.

19                THE COURT:  Sure.  Hold on one second, let me see if

20    I can find my --

21                MR. TRACEY:  Oh, it's changed a lot.

22                THE COURT:  Yeah, so the one I have --

23                MR. TRACEY:  It's changed a lot.

24                THE COURT:  Yeah, it's changed a lot.

25                MR. TRACEY:  And we -- and, unfortunately, we've
```

Page 182

1   added a couple of more witnesses because we're get -- if we're

2   going to need to put all the traders on that's -- we were

3   talking about this morning, there are more traders we'd have to

4   put on.

5          I'd like to try to avoid that and one of the things

6   I'm going to talk to Mr. Tambe over the weekend about --

7          THE COURT:  Is --

8          MR. TRACEY:  -- is how we could possibly do that.

9          THE COURT:  Right.  Okay.  So subject to that then, I

10  mean, in the near term, all -- you know, we have you booked

11  through March.

12         MR. TRACEY:  Okay.

13         THE COURT:  So that's just going to stay the way it

14  is.

15         MR. TRACEY:  Okay.

16         THE COURT:  All right?  And, you know, the week of

17  President's Week is still blocked off because people have other

18  things they need to do.  I'm going to be here getting as much

19  of -- you know, everything else done but -- I mean, so

20  immediately, we're just talking about Monday.

21         MR. TRACEY:  Right.

22         THE COURT:  So is that going to be Mr. Chu you think

23  for the entire day?  I know.

24         MS. SAWYER:  We're afraid of that.

25         MR. TAMBE:  I could please not be a part of it and I

Page 183

1   was told probably just two months or a little past that.

2   That's my best guess (indiscernible).

3           THE COURT:  Okay.  Just bear in mind though in

4   planning that that then we're going to have a week hiatus.  So

5   just in terms of not leaving a witness hanging for that period

6   of time, right?

7           MR. TRACEY:  So -- yeah, so we've been giving some

8   thought to that and I don't think we can put Joe Loman on after

9   Mr. Chu because I think that he's at least a full-day witness.

10  So we have Tracy Fu lined up for Monday.  The slight issue with

11  him is that he's on jury duty and he's in New York State Court

12  and his jury -- his trial begins -- resumes at 2 o'clock on

13  Monday.  So if we're going to put him on, it would be good to

14  get him on before that.

15          THE COURT:  He's on a jury?

16          MR. TRACEY:  He's on a jury, correct?

17          MS. SAWYER:  Yeah, selected for the jury, yes.

18          MR. TRACEY:  Selected for a jury.

19          MR. TAMBE:  Your Honor, if it's okay with you, I'm

20  happy to have Mr. Fu go first thing Monday morning so you get

21  him on his way up.

22          MR. TAMBE:  He would be really short.

23          MS. SAWYER:  Yeah.

24          MR. TRACEY:  Yes, he'd be very short.

25          THE COURT:  If the --

Page 184

1                  MR. TRACEY:  That would be great.

2                  THE COURT:  Then if you're amenable to that, then

3      that's great.  So we're going to have Mr. Fu first followed by

4      Mr. Chu.

5                  MR. TRACEY:  Great.  And that's probably the bet.

6                  THE COURT:  All right.

7                  MR. TRACEY:  Oh, maybe not.  I don't know, is that

8      the med (ph)?

9                  MR. TAMBE:  It should be med.

10                 MR. TRACEY:  Oh.

11                 MR. TAMBE:  Yeah, because you can't start Joel after

12     that.

13                 MR. TRACEY:  Right.

14                 THE COURT:  Do you want to start on Monday at 9:30

15     just to be sure?

16                 MR. TRACEY:  Sure.

17                 THE COURT:  Yes?

18                 MR. TAMBE:  Yeah.

19                 THE COURT:  Okay.  So we're going to start at 9:30 on

20     Monday.  Oh, right, and I have a thing that I have to do at

21     1:30 on Monday.

22                 MR. TRACEY:  Okay.

23                 THE COURT:  Okay?  So we'll just work the break

24     around that.  All right.  Anything --

25                 MR. TRACEY:  That works.

Page 185

1            THE COURT:  Anything else we should talk about today?

2            MR. TRACEY:  I don't think so, Your Honor.

3            THE COURT:  Okay.  All right.  So just -- and because

4   I'm out next week, I mean, you don't have to move out, you

5   don't have to move out of your rooms, just tidy up and leave

6   everything.  All right.  Have an excellent weekend.  Thank you

7   very much.

8            COUNSEL:  Thank you, Your Honor.

9            THE COURT:  Thank you, Rachel.

10  (Whereupon, these proceedings were concluded at 4:54 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       **I N D E X**

2                   **W I T N E S S E S**

3

4    **WITNESS**              **BY**              **PAGE**

5    Arthur Chu            Mr. Tracey              17

6                          Mr. Tambe              104

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 187

1                    C E R T I F I C A T I O N

2

3        I, Sherri L. Breach, certify that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    **Sherri L**        Digitally signed by Sherri L Breach
                          DN: cn=Sherri L Breach, o, ou,
                          email=digital1@veritext.com,
7    **Breach**          c=US
                          Date: 2017.02.07 15:31:48 -05'00'
     _____

8    Sherri L. Breach

9    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

10

11

12   DATE:  February 7, 2017

13

14

15

16

17

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501