K&L GATES LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 536-3900
Facsimile: (212) 536-3901
John A. Bicks
Henry E. Shin
Priya Chadha

K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
Telephone: (202) 778-9000
Brian D. Koosed

*Attorneys for Shinhan Bank*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**LEHMAN BROTHERS HOLDINGS, INC.,**<br><br>Debtor. | Chapter 11<br>Case No. 08-13555 (SCC)<br><br>**(Jointly Administered)** |

**MEMORANDUM OF LAW IN OPPOSITION TO LEHMAN BROTHERS SPECIAL
FINANCING INC.'S MOTION TO (I) ENFORCE AN ALLEGEDLY BINDING
SETTLEMENT BETWEEN LBSF AND SHINHAN; AND (II) GRANT LBSF
ATTORNEYS' FEES AND CERTAIN OTHER FEES AND COSTS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF UNDISPUTED FACTS ................................................................3

    The Mediator's Proposal ........................................................................................3

    The Parties Negotiate and Exchange Drafts of the Agreement ...........................4

    LBSF Signs The Agreement And Sends it to Shinhan For Signature ................5

    LBSF Inquires About Shinhan's Execution of the Agreement...........................7

    Before Shinhan Signs the Agreement, This Court Dismisses LBSF's Claims...................8

ARGUMENT ..............................................................................................................10

I.     The Parties Did Not Have a Binding or Complete Agreement to Settle
      this Litigation as of April 20, 2016......................................................................10

II.    Controlling Second Circuit Precedent Makes Clear That the Agreement
      Is Not Enforceable As A Matter of Law..............................................................13

      A.    *Winston* Factor #1: The Agreement Has Multiple Provisions
             Reflecting That the Parties Expressly Reserved Their Right Not
             to Be Bound Until the Agreement Was Fully Executed .......................14

             1.     Sections Four and Five of the Agreement Are Dispositive
                     Under Controlling Second Circuit Authority.............................15

             2.     Multiple Other Provisions in the Agreement Also Demonstrate
                     That the Parties Reserved Their Right Not to Bound Without
                     a Signed Writing .......................................................................20

             3.     LBSF's Own Conduct Further Demonstrates That The Agreement
                     Was Not Binding Until It Was Executed....................................23

      B.    *Winston* Factor #2: There Has Not Been Any Performance ................26

      C.    *Winston* Factor #3: There Were Open Terms as of April 20, 2016,
             But No Open Terms as of June 28, 2016................................................28

D.      *Winston* Factor #4:  Settlement Agreements Are Typically Committed
to Writing ......................................................................................................29

III.    The Agreement Is Not Enforceable Under NY CPLR 2104 ............................30

IV.     There Is No Basis For Awarding LBSF Fees and/or Costs ..............................32

CONCLUSION ..............................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Robinson,*
  No. 10 Civ. 7118 (SAS), 2011 WL 5022819 (S.D.N.Y. Oct. 19, 2011) ................................10

*Alvarez v. City of New York,*
  146 F. Supp. 2d 327 (S.D.N.Y. 2001)....................................................................................32

*Apple Corps v. Sony Music Entm't,*
  91 Civ. 7465 (CSH), 1993 U.S. Dist. LEXIS 9512 (S.D.N.Y. July 8, 1993)........................31

*Arcadian Phosphates, Inc. v. Arcadian Corp.,*
  884 F.2d 69 (2d Cir. 1989)....................................................................................................13

*Baker v. Health Mgmt. Sys., Inc.,*
  264 F.3d 144 (2d Cir. 2001)..................................................................................................33

*Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.,*
  447 F. Supp. 2d 329 (S.D.N.Y. 2006)...................................................................................10

*CAC Group, Inc. v. Maxim Group, LLC,*
  523 F. App'x. 802 (2d Cir. 2013) .................................................................................. *passim*

*Ciaramella v. Reader's Digest Ass'n,*
  131 F.3d 320 (2d Cir. 1997)........................................................................................... *passim*

*Conway v. Brooklyn Union Gas Co.,*
  236 F. Supp. 2d 241 (E.D.N.Y. 2002) ..................................................................................17

*Cruz v. OneSource Facility Servs.,*
  No. 03 Civ. 8233 (LAP), 2005 WL 2923517 (S.D.N.Y. Nov. 4, 2005)................................10

*Delyanis v. Dyna-Empire, Inc.,*
  465 F. Supp. 2d 170 (E.D.N.Y. 2006) ..................................................................................17

*H&R Block Tax Servs., LLC v. Strauss,*
  No. 1:15-CV-0085 (LEK) (CFH), 2016 WL 5107114 (N.D.N.Y. Sept. 20,
  2016) ......................................................................................................................................29

*Hanwha Corp. v. Cedar Petrochemicals, Inc.,*
  760 F. Supp. 2d 426 (S.D.N.Y. 2011)..............................................................................10, 11

*Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC,*
  No. 04 Civ. 1621 (KMW) (AP), 2005 WL 1377853 (S.D.N.Y. June 9, 2005) ......................17

*Jarowey v. Camelot Ent'mt Group,*
　　No. 11 Civ. 2611 (LAP) (JCF), 2012 WL 7785096 (S.D.N.Y. Sept. 10, 2012).....................21

*Johnson v. Fordham Univ.,*
　　No. 11 Civ. 04670 (ALC), 2016 WL 450424 (S.D.N.Y. Feb. 4, 2016) ................................11

*Kaczmarcysk v. Dutton,*
　　414 F. App'x. 354 (2d Cir. 2011) .................................................................... *passim*

*Kargo, Inc. v. Pegaso PCS, S.A. de C.V.,*
　　2008 WL 4579758 (S.D.N.Y. Oct. 14, 2008) ................................................... *passim*

*Kerin v. U.S. Postal Serv.,*
　　218 F.3d 185 .......................................................................................................33

*Langreich v. Gruenbaum,*
　　775 F. Supp. 2d 630 (S.D.N.Y. 2011).....................................................................26

*Lindner v. Am. Exp. Corp.,*
　　No. 06 Civ. 3834 (JGK), 2007 WL 1623119 (S.D.N.Y. June 5, 2007)......................17, 20, 21

*Lockheed Martin Corp. v. Retail Holdings, N.V.,*
　　639 F.3d 63 (2d Cir. 2011).....................................................................................19

*Longo v. Shore & Reich, Ltd.,*
　　25 F.3d 94 (2d Cir. 1994) .....................................................................................29

*Lyman v. N.Y. & Presbyterian Hosp.,*
　　No. 11 Civ. 3889 (AJN) (JCF) 2012 WL 6135354 (S.D.N.Y. Dec. 11, 2012)............17, 21, 23

*N. Fork Country, LLC v. Baker Publ'ns, Inc.,*
　　436 F. Supp. 2d 441 (E.D.N.Y. 2006) ...................................................................17

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC,*
　　861 F. Supp. 2d 344 (S.D.N.Y. 2012)...............................................................16, 22

*Nieves v. Comm'y Choice Health Plan of Westchester, Inc.,*
　　No. 08-Civ.-0321 (VB) (PED), 2011 WL 5533328 (S.D.N.Y. Aug. 31, 2011) ............. *passim*

*Norton v. Corr. Med. Care, Inc.,*
　　No. 09 Civ. 587 (TJM), 2010 WL 4103016 (N.D.N.Y. Oct. 18, 2010) ................................11

*NSI Int'l, Inc. v. Mustafa,*
　　No. Civ. 125528 (JFB) (AKT), 2014 WL 12539347 (E.D.N.Y. Feb. 25, 2014)....................11

*O'Connor-Goun v. Weill Cornell Med. College,*
　　956 F. Supp. 2d 549 (S.D.N.Y. 2013).......................................................21, 22, 27

*Olin Corp. v. Am. Home Assur. Co.*,
    704 F.3d 89 (2d Cir. 2012).................................................................................18, 19

*Pasmas v. Hunt*,
    724 F. Supp. 260 (S.D.N.Y. 1989)...........................................................................25

*PDL Vitari Corp. v. Olympus Indus., Inc.*,
    718 F. Supp. 197 (S.D.N.Y. 1989)......................................................................21, 24

*R.G. Group, Inc. v. Horn & Hardart Co.*,
    751 F.2d 69 (2d Cir. 1984).............................................................................. *passim*

*RKG Holdings, Inc. v. Simon*,
    182 F.3d 901; 1999 WL 464979 (Table) (2d Cir.1999) ...........................................14

*Rosenberg v. Inner City Broad. Corp.*,
    No. 99 Civ. 9579, 2001 WL 995349 (S.D.N.Y. Aug. 30, 2001) .............................31

*Selvam v. Experian Info. Solutions, Inc.*,
    No. 12-CV-01828 (DLI) (JO), 2013 WL 4547454 (E.D.N.Y. Aug. 28, 2013) ...........14, 22, 23

*Smith v. Lefrak Org., Inc.*,
    531 N.Y.S.2d 305 (2d Dep't 1998) .........................................................................32

*Sprint Commc'ns Co. L.P. v. Jasco Trading, Inc.*,
    5 F. Supp. 3d 323, 334-35 (E.D.N.Y. 2014) ..........................................................16

*Tancredi v. Metro. Life Ins. Co.*,
    378 F.3d 220 (2d Cir. 2004).....................................................................................33

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
    No. 03 CIV. 6731 (HB), 2005 WL 146807 (S.D.N.Y. Jan. 21, 2005) .....................11

*Turk v. Chase Manhattan Bank USA*,
    No. 00 Civ. 1573, 2001 WL 736814 (S.D.N.Y. June 11, 2001)..............................31

*Walker v. City of New York*,
    No. 05 Civ. 0004 (JBW) (JMA), 2006 WL 1662702 (E.D.N.Y. June 15, 2006) ...................17

*Winston v. Mediafare Entm't. Corp.*,
    777 F.2d 78 (2d Cir. 1985)............................................................................. *passim*

*Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*,
    No. 14 Civ. 7343 (ER), 2015 WL 5671724 (S.D.N.Y. Sept. 22, 2015) ..................16

*Zucker v. Katz*,
    836 F. Supp. 137 (S.D.N.Y. 1993).....................................................17, 21, 22, 28

**Statutes**

N.Y. C.P.L.R. 2104.................................................................................................................30, 31

Shinhan Bank ("Shinhan") respectfully submits this opposition to the motion filed by Lehman Brothers Holdings, Inc., as Plan Administrator on behalf of Lehman Brothers Special Financing Inc. ("LBSF"), which seeks to:  (i) enforce an allegedly binding settlement between LBSF and Shinhan; and (ii) grant LBSF attorneys' fees and certain other fees and costs.  *See* Case No. 08-13555, ECF No. 54675 (the "Motion").

## PRELIMINARY STATEMENT

1.      This dispute is simple and straightforward.  The parties have stipulated to the material facts.  *See* Case No. 08-13555, ECF No. 54676 ("Stip.").[1]  And the law is clear:  under a long line of controlling Second Circuit authority, LBSF's Motion should be denied in its entirety.

2.      Specifically, and as set forth in more detail below, on April 20, 2016, LBSF and Shinhan each accepted the Mediator's proposal as to the Settlement Amount, and the Mediator accordingly asked LBSF to prepare draft settlement documentation so that the parties could negotiate, and memorialize, the remainder of their settlement agreement.  Thereafter, LBSF and Shinhan exchanged drafts of the Agreement, ultimately agreeing in mid-May 2016 on specific language and terms, including, *inter alia*, the scope of the parties' releases, the timing and manner of payment, confidentiality, and conditions to effectiveness of the Agreement.

3.      It is undisputed that the parties' negotiations resulted in an Agreement that contains the following clear and unambiguous provisions:

- Section 4.  Execution in Counterparts:  ". . . .  The date of execution of this Release Agreement shall be **the date that [Shinhan] signs this Release Agreement** . . . and **this Release Agreement shall become effective and valid upon such execution**."

- Section 5.  Effectiveness:  "**This Release Agreement shall become effective upon execution hereof by each of the Parties** . . . ."

---

[1]      Capitalized terms not defined herein shall have the meaning ascribed to them in the Stipulation.

- 1 -

Stip., Ex. D, §§ 4, 5 (emphasis added).

4.    This language is dispositive of this dispute under binding Second Circuit authority.   As LBSF acknowledges, the Second Circuit's four-factor test for determining the enforceability of an unexecuted agreement controls here.  *See* Motion, ¶ 25 (citing *Winston v. Mediafare Ent'mt Corp.*, 777 F.2d 78, 80 (2d Cir. 1985)).  The first and most important of those *Winston* factors is whether the parties have reserved their right not to be bound in the absence of a signed writing.  *See* Motion, ¶ 26.  Indeed, the Second Circuit has often treated this first *Winston* factor as dispositive, noting that where "there is a writing between the parties showing that [one party] did not intend to be bound . . . a court need look no further than the first [*Winston*] factor."  *Kaczmarcysk v. Dutton*, 414 F. App'x. 354, 355 (2d Cir. 2011).

5.    Here, Sections 4 and 5 of the Agreement expressly state – twice, in clear and unambiguous language – that the Agreement is not effective unless and until it has been executed by Shinhan.  *See* Stip., Ex. D, §§ 4-5.  For this reason alone, the Agreement is unenforceable under controlling Second Circuit precedent because Shinhan never executed it.  *See, e.g., Kaczmarcysk,* 414 F. App'x. at 355; *see also infra*, ¶¶ 45-59.  LBSF's Motion should therefore be denied.

6.    This conclusion is further mandated by the Agreement's numerous other provisions that similarly confirm that the parties did not intend to be bound in the absence of a signed writing.  *See infra*, ¶¶ 60-70 (collecting Second Circuit and other authority holding that merger clauses (Section 11 of the Agreement), clauses requiring amendments to be in a signed writing (Section 10 of the Agreement), and various other clauses of the Agreement are each strong evidence of parties having reserved their right not to be bound in the absence of a signed writing).

7.      LBSF cannot and does not dispute the plain language of the Agreement.  Instead, LBSF simply asks this Court to ignore that plain language – and controlling law – and enforce the parties' "settlement" based solely on the fact that the parties agreed to the Mediator's proposed Settlement Amount.  *See* Motion, ¶¶ 22-39.  But, as set forth below, the parties' acceptance of that single term left open a number of other essential terms – including the scope of the parties' releases, the timing and manner of payment, and the timing of and conditions to effectiveness – that made it impossible for the parties to have entered into a binding contract on April 20, 2016 as a matter of law.  Indeed, it is undisputed that the parties did not agree on those essential terms until mid-May 2016.  For this reason, too, LBSF's Motion falls short.

8.      At bottom, LBSF essentially complains that Shinhan had a "change of heart." Motion, ¶ 20.  But LBSF ignores the fact that the express terms of the Agreement – which LBSF largely drafted, fully agreed to, and subsequently signed – expressly permit Shinhan (and LBSF) to have such a change of heart, right up until the moment the Agreement is fully signed.  That right is supported by a long and consistent line of controlling Second Circuit authority, all of which makes clear that the Agreement is not enforceable against Shinhan as a matter of law. Accordingly, for these reasons and the other reasons detailed below, LBSF's Motion should be denied in its entirety.

## STATEMENT OF UNDISPUTED FACTS

9.      Shinhan incorporates by reference herein the parties' stipulation of undisputed facts relating to this dispute.  *See generally* Stip.  The key facts are as follows:

### The Mediator's Proposal

10.      On April 6, 2016, the parties attended a mediation session before the Honorable Ralph Mabey as Mediator.  *See* Stip., ¶ 1.  At the conclusion of that session, the Mediator

proposed that Shinhan pay LBSF the Settlement Amount to settle LBSF's claims against Shinhan. Stip., ¶ 2. The Mediator's settlement proposal did not specify any other terms, such as the timing and manner of payment, the scope of the parties' releases, governing law, or confidentiality. The parties were given two weeks to consider the Mediator's proposal as to the Settlement Amount.

11.    On April 20, 2016, the Mediator reported that the parties had accepted his proposal as to the Settlement Amount. Stip., ¶ 3; Stip., Ex. B. The Mediator's email confirmation of that acceptance did not specify any other terms, and instead instructed LBSF to prepare, and provide Shinhan with, "settlement documentation." *See* Stip., Ex. B.

**The Parties Negotiate and Exchange Drafts of the Agreement**

12.    On April 21, 2016, LBSF sent Shinhan's counsel a draft settlement agreement. *See* Stip., ¶ 4; Stip., Ex. C, p. 8. Prior to that date, the parties had never discussed any specific terms of a settlement other than the Settlement Amount that Shinhan would pay to settle LBSF's claims. *See generally* Stip.

13.    On May 11, 2016, Shinhan proposed changes to the draft Agreement. *See* Stip., ¶ 5. First, Shinhan proposed "increas[ing] the period of time [it] had to pay the Settlement Amount." *See* Stip., Ex. C, p. 7. Second, Shinhan proposed "revis[ing] Section 4 of the [] Agreement to require that the parties execute hard copies of the [] Agreement as opposed to electronic copies due to internal regulations." *Id.* In light of this second change, Shinhan also proposed revising Section 4 of the Agreement so that the Agreement would be dated as of the day that Shinhan executed it in hard copy form. *See* Stip., Ex. D., § 4.

14.    In that May 11, 2016 email detailing Shinhan's proposed changes to the draft Agreement, Shinhan's counsel also told LBSF that Shinhan required certain additional

documentation from LBSF to support the authority of the Lehman Brothers Holdings Inc. ("Lehman") signatory signing the Agreement on LBSF's behalf. *See* Stip., Ex. C, p. 7.

15.     On May 12, 2016, LBSF accepted Shinhan's proposed changes to the Agreement. At the same time, LBSF asked Shinhan to advise what additional documentation Shinhan required to prove the authority of Lehman's signatory.  LBSF also advised Shinhan that LBSF would "circulate[] an *execution copy*" of the Agreement.  *See* Stip., ¶ 6; Stip., Ex. C, p. 6 (emphasis added).

16.     On May 19, 2016, Shinhan identified the additional documents it required from LBSF as proof of Lehman's authority to sign the Agreement. *See* Stip., ¶ 7; Stip., Ex. C, pp. 4-5. LBSF agreed to provide the additional documentation requested by Shinhan.  Stip., Ex. C, p. 4.

**LBSF Signs The Agreement And Sends it to Shinhan For Signature**

17.     On May 26, 2016, LBSF executed the Agreement.  The next day, LBSF sent the executed Agreement to Shinhan for signature, along with the documents requested by Shinhan to prove the authority of Lehman's signatory. *See* Stip., ¶ 8; Stip., Ex. C, p. 4; Stip., Exs. D-G.

18.     It is undisputed that the Agreement that LBSF signed on May 26, 2016 includes the following provisions:

> **Section 4.  Execution in Counterparts.**  This Release Agreement may be executed in any number of counterparts . . . . Lehman shall sign two hard copies of this Release Agreement and deliver the copies to Counterparty [Shinhan] . . . and, upon receipt of the copies, Counterparty [Shinhan] shall sign . . . .
>
> **The date of execution of this Release Agreement shall be the date that [Shinhan] signs this Release Agreement as provided above, and this Release Agreement shall become effective and valid upon such execution**.
>
> **Section 5.  Effectiveness.  This Release Agreement shall become effective upon execution hereof by each of the Parties** and the payment . . . of the Settlement Amount to Lehman.

- 5 -

> **Section 10. <u>Amendment</u>.** This Release Agreement may only be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived **only by an instrument in writing signed by each of the Parties**.
>
> **Section 11. <u>Entire Agreement</u>.** This Release Agreement constitutes the **entire agreement and understanding of the Parties** relating to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter hereof.

Stip., Ex. D., §§ 4-5, 10-11 (bold emphasis added only).

19.    The Agreement that LBSF signed further provided that various material obligations thereunder were tied to the date of execution of the Agreement.  Consider:

> Section 1. <u>Payment and Release</u>.  [Shinhan] shall pay the Settlement Amount . . . to Lehman **within ten (10) Korean business days of the date hereof** [i.e., the execution date].  **In consideration of each other Party's execution of this [] Agreement** . . . each Party . . . hereby generally releases, discharges, and acquits each other Party . . . .
>
> Section 3. <u>Dismissal of Claims</u>.  **Within seven (7) business days after Lehman's receipt of the Settlement Amount**, Lehman shall promptly dismiss with prejudice any and all claims . . . .

Stip., Ex. D., §§ 1, 3 (bold emphasis added only).

20.    Finally, the Agreement that LBSF signed provided that:

> Section 2. <u>Representations</u>.  Each Party represents and warrants to each other Party that . . . (ii) this [] Agreement has been **duly executed and delivered** . . . , (iii) it is **not relying upon any statements, understandings, representations, expectations, or agreements other than those expressly set forth in this [] Agreement**, (iv) it has had the opportunity to be represented and advised by legal counsel in connection with this [] Agreement, which it enters voluntarily and of its own choice . . . .
>
> **NOW**, THEREFORE, in consideration of the recitals set forth above and promises made **herein**, the receipt and sufficiency of

which is **hereby** acknowledged, the Parties **hereto agree** as follows:

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this [] Agreement . . . . [followed by signature blocks]

Stip., Ex. D., § 2 & pp. 2, 7 (bold emphasis added only).

## LBSF Inquires About Shinhan's Execution of the Agreement

21.     On or about May 30, 2016, Shinhan received the Agreement signed by LBSF, along with the documentation supporting Lehman's authority to sign the Agreement. *See* Stip., ¶¶ 8-9.  Thereafter, Shinhan began its internal review and approval process, which it needed to complete before signing the Agreement.

22.     While that process was ongoing, LBSF twice asked Shinhan's counsel for updates about the status of the Agreement; Shinhan's counsel promptly responded both times. *See* Stip., ¶¶ 10-12 & Stip., Ex. C, pp. 2-3.  Notably, LBSF's inquiries centered on only one question: whether or not Shinhan had yet executed the Agreement. *See* Stip., ¶¶ 10-12 & Stip., Ex. C, pp. 2-3.

23.     For example, on June 14, 2016, LBSF emailed Shinhan's counsel to ask a single question:

"Have you heard anything from Shinhan **on their execution of the Agreement**?"

Stip., ¶ 10; Stip., Ex. C, p. 3 (emphasis added).

24.     Shinhan's counsel promptly responded that "Shinhan is **trying to get everything signed up** and payment remitted by the end of this week, particularly because some of the higher-ups there will be out next week." *See* Stip., ¶ 10; Stip., Ex. C, p. 3 (emphasis added).

25.     Shinhan was unable to execute the Agreement later that week, so Shinhan's counsel informed LBSF accordingly on June 17, 2016:  "Shinhan was not able to complete its internal approval process this week.  With some of the higher-ups out next week, it looks like the week of June 27 is **most likely for signature**/payment."  Stip., ¶ 11; Stip., Ex. C, p. 3 (emphasis added).

26.     At 10:31 a.m. on June 28, 2016, LBSF again inquired as to the status of Shinhan's execution of the Agreement, asking Shinhan's counsel "Any updates?"  Stip., ¶ 12, Stip., Ex. C, p. 2.

27.     Shinhan's counsel replied within minutes, stating that "Shinhan just confirmed that they have completed their internal approval process and the [] Agreement will be **signed** by Thursday, June 30 (Korea time) . . . ."  Stip., ¶ 13; Stip., Ex. C, p. 2 (emphasis added).

28.     At no point during these communications did LBSF indicate that Shinhan could dispense with signing the Agreement, or that Shinhan was already late in paying the Settlement Amount, or that the parties were otherwise already bound to a settlement agreement.  *See* Stip., ¶¶ 10-12 & Stip., Ex. C, pp. 2-3.  Instead, every communication between the parties for a month – from May 27, 2016 (the date LBSF signed the Agreement) until June 28, 2016 (the date of this Court's BofA Order discussed below) – revolved around when Shinhan would be signing the Agreement.  *See* Stip., Ex. C, pp. 2-3.

**Before Shinhan Signs the Agreement, This Court Dismisses LBSF's Claims**

29.     On June 28, 2016, approximately four hours after Shinhan's counsel last updated LBSF via email as to the status of Shinhan's internal approval process and anticipated signing of the Agreement, this Court issued its BofA Order dismissing LBSF's claims against Shinhan, with prejudice.  *See* Stip., ¶ 14; Adv. Proc. No. 10-3547, ECF No. 1360.

- 8 -

30.    It is undisputed that, as of the time that the BofA Order was issued, Shinhan had

not yet executed the Agreement.  Stip., ¶ 17; Stip., Ex. H, ¶ 3.  Nor has Shinhan executed the

Agreement since the BofA Order was issued on June 28, 2016.  Stip., ¶ 17; Stip., Ex. H, ¶ 3.[2]

31.    On June 30, 2016, Shinhan's counsel advised LBSF that it had not signed the

Agreement and was still evaluating the BofA Order.  Stip., ¶ 15; Stip., Ex. C, p. 1.  LBSF replied

that it did not believe the BofA Order affected the parties' agreement and that "the wire should

be made" by Shinhan transferring the Settlement Amount to LBSF.  Stip., ¶ 16; Stip., Ex. C, p. 1.

32.    After undertaking a diligent review of the Agreement's terms and conferring with

counsel, Shinhan subsequently advised LBSF in July 2016 that Shinhan did not believe the

Agreement was enforceable under controlling Second Circuit precedent because Shinhan had not

yet executed it.

33.    Thereafter, LBSF and Shinhan engaged in numerous discussions regarding their

dispute.  From the start of those discussions in July 2016, Shinhan urged LBSF to review the

applicable law, which controlled the parties' dispute and demonstrated that there was no binding

and enforceable agreement between them.  LBSF nonetheless held to its position that there was

already a binding agreement between the parties.  Therefore, Shinhan repeatedly urged LBSF,

beginning in the summer of 2016, to file a motion to formally resolve the parties' dispute by way

of a final judicial order.  LBSF instead chose to pursue various informal means of resolution over

the ensuing six months.  *See generally* Motion, ¶ 21.  Those efforts ultimately proved

unsuccessful.  LBSF finally filed its Motion on January 30, 2017.

---

[2]    Though LBSF was not able to agree to stipulate to the facts set forth in the Declaration of Joo
Han Park, attached as Exhibit H to the parties' Stipulation, LBSF admits that it "does not contest" those
facts.  *See* Stip., ¶ 17.  Thus LBSF does not, and indeed cannot, dispute the most essential factual element
underlying this dispute: Shinhan has never signed the Agreement.  *See* Stip., Ex. H, ¶ 3.

## ARGUMENT

### I.   The Parties Did Not Have a Binding or Complete Agreement to Settle this Litigation as of April 20, 2016.

34.   In its Motion, LBSF claims that the parties had a binding and enforceable settlement agreement as of April 20, 2016, when the parties accepted the Mediator's proposal as to the Settlement Amount.  *See* Motion, ¶ 19.  LBSF's argument fails on both the law and the facts.

35.   *First*, LBSF is wrong on the law because the Mediator's proposal did not "contain[] all material terms of the settlement between the Parties," as LBSF claims.  *Id.* at ¶ 10.  Indeed, the Mediator's proposal *only* addressed the Settlement Amount and nowhere addressed, or reflected a meeting of the minds between LBSF and Shinhan on, a variety of other essential terms that would need to be part of any final settlement agreement between the parties.

36.   For example, none of the following terms – any one of which precludes the finding of a binding and enforceable agreement as a matter of law – were addressed in the Mediator's proposal or were otherwise agreed to by LBSF and Shinhan as of April 20, 2016:

- The scope of LBSF's and Shinhan's releases.  *See generally* Stip.; *see, e.g., Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 338-40 (S.D.N.Y. 2006) (finding that parties had not entered into an enforceable agreement because there was ambiguity as to the scope of the release one party received); *Cruz v. OneSource Facility Servs.*, No. 03 Civ. 8233 (LAP), 2005 WL 2923517, at *3 (S.D.N.Y. Nov. 4, 2005) ("[S]ettlement agreement is not complete where the parties cannot finalize general release language.").

- The timing of Shinhan's payment to LBSF and the mechanism therefor.  *See generally* Stip.; *see, e.g., Allen v. Robinson*, No. 10 Civ. 7118 (SAS), 2011 WL 5022819, at *5 (S.D.N.Y. Oct. 19, 2011) ("Material terms of a contract that require definition include time, manner of performance and payment schedule.") (citation and quotations omitted).

- The parties' choice of governing law.  *See generally* Stip.; *see, e.g., Hanwha Corp. v. Cedar Petrochemicals, Inc.*, 760 F. Supp. 2d 426, 433

- 10 -

(S.D.N.Y. 2011) (finding that parties who could not agree on a choice of law provision had not entered into a binding contract).

- <u>The timing of and conditions for the Agreement's effectiveness</u>. *See generally* Stip.; *see, e.g., NSI Int'l, Inc. v. Mustafa*, No. 12 Civ. 125528 (JFB) (AKT), 2014 WL 12539347, at *7 (E.D.N.Y. Feb. 25, 2014) (finding that material terms of a contract include, *inter alia*, payment terms, duration, and timing), *report and recommendation adopted*, 2014 WL 1232941 (E.D.N.Y. Mar. 26, 2014), *aff'd*, 613 F. App'x. 84 (2d Cir. 2015); *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, No. 03 Civ. 6731 (HB), 2005 WL 146807, at *4 (S.D.N.Y. Jan. 21, 2005) (finding the presence of "both conditions precedent and subsequent and termination rights" to be an important factor in concluding that the parties had reached an enforceable agreement), *aff'd*, 487 F.3d 89 (2d Cir. 2007).

- <u>The confidentiality of the parties' Agreement</u>. *See generally* Stip.; *see, e.g., Johnson v. Fordham Univ.*, No. 11 Civ. 04670 (ALC), 2016 WL 450424, at *5 (S.D.N.Y. Feb. 4, 2016) (finding no agreement on material terms because the scope of "the non-disparagement and confidentiality provisions," and how those provisions would be enforced, was unresolved); *Norton v. Corr. Med. Care, Inc.*, No. 09 Civ. 587 (TJM), 2010 WL 4103016, at *3-4 (N.D.N.Y. Oct. 18, 2010) (declining to enforce a draft settlement agreement where mutual confidentiality clauses, *inter alia*, were left for further negotiation).

Indeed, none of these essential terms were addressed or otherwise negotiated by and between the parties until the parties finalized the draft of the Agreement in mid-May 2016. *See generally* Stip., ¶¶ 4-7; Stip., Ex. D. For this reason alone, as a matter of law, the parties did not have a binding and enforceable settlement agreement as of April 20, 2016.

37. *Second*, LBSF's argument is further wrong on the facts, because the draft Agreement's terms themselves refute the notion that the parties had a binding agreement as of April 20, 2016. As noted below, the Agreement contains, among other things: (a) two express statements that the Agreement is not "effective" until it is signed by Shinhan; (b) a merger clause confirming that the Agreement is the "entire agreement" between the parties; (c) a provision requiring any amendments to the Agreement be in writing signed by both parties; and (d) various

other provisions confirming that the parties anticipated executing the Agreement, were tying
their obligations to such execution, and would have no "other" agreement outside of the written
Agreement.  *See infra*, ¶¶ 45-70.  As the Second Circuit has held, "[t]hese provisions **run
directly counter to [LBSF's] claim that the parties agreed to an oral contract**." *R.G. Group,
Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 78 (2d Cir. 1984) (emphasis added); *see also Winston*,
777 F.2d at 80-81; *Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 322-23 (2d Cir. 1997).

38.    *Third,* LBSF's argument also fails on the facts because LBSF's own conduct was
entirely inconsistent with its current claim that the parties had a final, binding agreement as of
April 20, 2016.  Consider:

- LBSF prepared a draft Agreement, and the parties negotiated various revisions to that Agreement, before finalizing it in mid-May 2016.  *See supra*, ¶¶ 12-14.

- In mid-May 2016, Shinhan further advised LBSF of an additional requirement related to the Agreement – the need for documentation to prove the authority of Lehman's signatory – which LBSF then agreed to provide.  *See supra*, ¶¶ 15-16.

- After the parties agreed on those additional items and finalized the terms of the Agreement, LBSF signed it and proceeded to repeatedly inquire as to when Shinhan expected to sign it.  *See supra*, ¶¶ 17, 21-28.

39.    This conduct is strong evidence that LBSF had the same understanding all along
that Shinhan did:   namely, that the parties would not have a binding settlement until the
Agreement was fully executed.  *See, e.g.*, *Kargo, Inc. v. Pegaso PCS, S.A. de C.V.*, No. 05 Civ.
10528(CSH)(DFE), 2008 WL 4579758, at *7-8 (S.D.N.Y. Oct. 14, 2008) (finding that inquiring
multiple times about a counterparty's signature further confirmed that the parties' agreement was
not binding without a signature).[3]

---

[3]    The agreement at issue in *Kargo* was not a settlement agreement, but its reasoning still applies because, as LBSF has noted, "settlement agreements are contracts and must therefore be construed according to general principles of contract law." Motion, ¶ 25.

40.    Even now, LBSF asks this Court to order Shinhan to "deliver an executed copy of the [] Agreement to LBSF." Proposed Order, p. 2. But it is hard to see how LBSF would need such an Order if, as LBSF claims, the parties had a binding and enforceable agreement as of April 20, 2016. *See supra*, ¶¶ 34-41. Instead, by requesting this relief, LBSF tacitly admits that the Agreement includes additional and material terms that the parties did not agree to simply by accepting the Mediator's proposal as to the Settlement Amount on April 20, 2016.

41.    Virtually all of LBSF's conduct – from drafting and revising the Agreement between April 21, 2016 and mid-May 2016, to including various provisions in the Agreement reflecting that the parties' agreement would be in a signed writing, to requesting updates as to Shinhan's "execution of the Agreement" – would be wholly unnecessary if, as LBSF contends, the parties already had a final, binding settlement agreement as of April 20, 2016. Simply put, LBSF's argument cannot be squared with LBSF's "expressed intentions, the words and deeds which constitute objective signs" of its intent. *R.G. Group*, 751 F.2d at 74. Those "expressed intentions" further confirm that the parties had no enforceable agreement on April 20, 2016. *Id.*

## II.    Controlling Second Circuit Precedent Makes Clear That the Agreement Is Not Enforceable As A Matter of Law.

42.    The applicable and controlling Second Circuit law is crystal clear: While parties are free to enter into a binding agreement orally, "no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract" if the parties do not intend to be bound until there is a fully executed contract. *Winston*, 777 F.2d at 80; *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989) ("There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents."); *CAC Grp., Inc. v. Maxim Grp., LLC*, 523 F. App'x. 802, 804 (2d Cir. 2013) (same).

- 13 -

43.    As set forth above, the parties had no such binding agreement as of April 20, 2016.  *Supra*, ¶¶ 34-41.  Nor did they have such a binding agreement as of June 28, 2016, when this Court's BofA Order was issued, as set forth below.

44.    In particular, and as LBSF concedes, the Second Circuit has instructed that, in deciding whether an unexecuted agreement is binding and enforceable, New York federal courts must examine four factors:  "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing."  *Winston*, 777 F.2d at 80; *see also* Motion, ¶ 25.  Here, three of the four *Winston* factors – including one factor that may be treated as dispositive – weigh *against* enforcing the Agreement.

A.    <u>*Winston* Factor #1:  The Agreement Has Multiple Provisions Reflecting That the Parties Expressly Reserved Their Right Not to Be Bound Until the Agreement Was Fully Executed.</u>

45.    Although the Second Circuit has not expressly held that the first *Winston* factor is, standing alone, dispositive, the Second Circuit has often treated it as such.  *See, e.g., Kaczmarcysk*, 414 F. App'x at 355 (noting that where "there is a writing between the parties showing that [one party] did not intend to be bound . . .  a court need look no further than the first [*Winston*] factor") (internal citations omitted); *RKG Holdings, Inc. v. Simon,* 182 F.3d 901, 1999 WL 464979 (Table), at *1 (2d Cir. June 23, 1999) (same, involving a partnership agreement); *see also Nieves v. Comm'y Choice Health Plan of Westchester, Inc.*, No. 08 Civ. 0321 (VB) (PED), 2011 WL 5533328, at *4 (S.D.N.Y. Aug. 31, 2011) (same; *Selvam v. Experian Info. Solutions, Inc.*, No. 12 Civ. 01828 (DLI) (JO), 2013 WL 4547454, at *2 (E.D.N.Y. Aug. 28, 2013) (same).  As the Second Circuit has noted:

- 14 -

[I]t is not surprising that considerable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed. **Courts are reluctant to discount such a clear signal, and it does not matter whether the signal is given during the course of bargaining, or at the time of the alleged agreement.**

*R.G. Group*, 751 F.2d at 75 (emphasis added).

46.     Given this controlling authority, LBSF's contention – that "there was no express reservation of rights on April 20, 2016" – misses the mark.  Motion, ¶ 26.  As *R.G. Group* makes clear, this Court cannot and should not limit its inquiry solely to what the parties said in accepting the Mediator's proposed Settlement Amount, but must instead consider *all* of the parties' "expressed intentions" throughout the negotiations that followed the parties' acceptance of the Mediator's proposed Settlement Amount.  *R.G. Group*, 751 F.2d at 74.  Those "expressed intentions" plainly reflect an intent by both LBSF and Shinhan not to be bound in the absence of a signed writing.  *Id.*; *see infra*, ¶¶ 48-70; *supra*, ¶¶ 12-16.

47.     Indeed, this Court need look no further than the express terms of Sections 4 and 5 of the Agreement, which conclusively establish that LBSF and Shinhan expressly reserved their right not to be bound unless and until the Agreement had been fully executed.  Nor are Sections 4 and 5 of the Agreement an aberration; multiple other provisions and LBSF's own conduct similarly confirm that the parties did not intend to be bound without a fully signed writing.

        1.     *Sections Four and Five of the Agreement Are Dispositive Under Controlling Second Circuit Authority.*

48.     Section 4 of the Agreement expressly provides:  "The date of execution of this Release Agreement shall be the date that [Shinhan] signs this Release Agreement . . . and **this Release Agreement shall become effective and valid upon such execution**."  Stip., Ex. D, § 4 (emphasis added).

- 15 -

49.    Section 5 of the Agreement similarly states:  "**This Release Agreement shall become effective upon execution hereof by each of the Parties** and the payment . . . of the Settlement Amount to Lehman."  *Id.* at § 5 (emphasis added).

50.    These provisions plainly state – twice, in clear and unambiguous language – that the parties are not bound unless and until Shinhan signs the Agreement.  The Second Circuit has repeatedly found that similar language in draft settlement agreements constitutes an express reservation of the right not to be bound without a fully executed writing.  *See Ciaramella*, 131 F.3d at 324 (finding an unsigned settlement agreement stating that it "shall not become effective . . . until it is signed by [the parties]" was unenforceable); *Kaczmarcysk*, 414 F. App'x. at 355 (same, where unexecuted settlement agreement stated it was "effective when it has been fully executed by all parties").

51.    Lower courts in this Circuit have repeatedly come to the same conclusion.  *See, e.g., Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, No. 14 Civ. 7343 (ER), 2015 WL 5671724, at *12 (S.D.N.Y. Sept. 22, 2015) (finding parties reserved their right not to be bound without a signed writing where agreement stated it would become "effective only as of 'the date of its acceptance *and* execution'"); *Sprint Commc'ns Co. L.P. v. Jasco Trading, Inc.*, 5 F. Supp. 3d 323, 334-35 (E.D.N.Y. 2014) (same, where agreement stated it was "made and entered into as of the last date of execution"); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 357-58 (S.D.N.Y. 2012) (same, where agreement stated it was effective "upon the date fully executed").

52.    Indeed, according to Westlaw, 315 cases have cited *Winston* in the Second Circuit, or in the District Courts and/or Bankruptcy Courts of New York, since *Winston* was decided in 1985.  Shinhan is not aware of a single one of those 315 cases in which an oral

agreement (settlement or otherwise) was enforced where the parties' only draft agreement contained the kind of unequivocal language set forth in Sections 4 and 5 of the Agreement here.[4]

53.    In fact, courts in this Circuit have repeatedly declined to enforce settlement agreements with far less explicit reservations of the right not to be bound.  *See, e.g.*, *CAC Grp.*, 523 F. App'x. at 804 (citing use of a clause providing that "*NOW*, THEREFORE, . . . for other good and valuable consideration, the receipt and sufficiency of which are *hereby* recognized, Purchaser and Seller *agree* as follows" as evidence that the parties intended to be bound only by a fully signed writing) (emphasis in original); *see also Winston*, 777 F.2d at 81 (citing, among other things, correspondence between the parties and the presence of a merger clause in the draft agreement); *Nieves*, 2011 WL 5533328, at *4-6 (relying largely upon merger clause); *Lindner v. Am. Exp. Corp.*, No. 06 Civ. 3834 (JGK), 2007 WL 1623119, at *6 (S.D.N.Y. June 5, 2007) (same); *Zucker v. Katz*, 836 F. Supp. 137, 145 (S.D.N.Y. 1993) (finding that parties reserved their right not to be bound without a writing because drafts of their agreement were "replete with references to the fact that the rights and obligations of the parties are triggered '[u]pon execution of this Agreement'"); *Lyman v. N.Y. & Presbyterian Hosp.*, No. 11 Civ. 3889 (AJN) (JCF), 2012 WL 6135354, at *5-6 (S.D.N.Y. Dec. 11, 2012) (same).

54.    LBSF attempts to dodge this binding Second Circuit and other authority by boldly – and inexplicably – asserting that "the Release Agreement itself includes no such explicit reservation of rights."  *See* Motion, ¶ 27.   However, even the most cursory review of the Agreement guts this argument by LBSF.

---

[4]    LBSF tacitly admits as much in its Motion, as none of the cases on which it relies involved a draft agreement with anything like the express reservation of rights in Sections 4 and 5 of the Agreement.  *See generally* Motion (citing *Conway v. Brooklyn Union Gas Co.*, 236 F. Supp. 2d 241 (E.D.N.Y. 2002); *N. Fork Country, LLC v. Baker Publ'ns, Inc.*, 436 F. Supp. 2d 441, 446 (E.D.N.Y. 2006); *Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*, No. 04 Civ. 1621 (KMW) (AP), 2005 WL 1377853 (S.D.N.Y. June 9, 2005); *Delyanis v. Dyna-Empire, Inc.*, 465 F. Supp. 2d 170 (E.D.N.Y. 2006); and *Walker v. City of New York*, No. 05 Civ. 0004 (JBW) (JMA), 2006 WL 1662702 (E.D.N.Y. June 15, 2006)).

55.    *First*, LBSF simply ignores the plain language of Section 4 of the Agreement, which expressly states that "this Release Agreement shall become effective and valid upon [] execution" by the "Counterparty," Shinhan.  Stip., Ex. D, § 4.  It is beyond cavil that a contract must be interpreted "to give full meaning and effect to all of its provisions."  *See, e.g., Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (internal citations omitted).

56.    Here, Section 4 of the Agreement, which Shinhan and LBSF jointly drafted, could not be any clearer – the parties agreed that the Agreement would not be effective until Shinhan had signed it.  Stip., Ex. D, § 4.  There is no mention of paying the Settlement Amount as a condition for the Agreement's effectiveness; indeed, there is no mention of the Settlement Amount in Section 4 at all.  *See id.*  LBSF's interpretation – that "the Release Agreement [] includes no such explicit reservation of rights" – effectively writes Section 4 out of the Agreement.  That is simply not the law.  *See Olin*, 704 F.3d at 99.  And, as noted above, Section 4's explicit reservation of rights is alone sufficient to find that Shinhan reserved the right not to be bound here without a fully signed writing.  *See supra*, ¶¶ 48-53.

57.    *Second,* even if Section 4 were not sufficient to rebut LBSF's claim (and it is), LBSF's interpretation still fails because it ignores the plain language of Section 5 of the Agreement.   By its terms, Section 5, entitled "Effectiveness," states that the "Release Agreement" will "become effective upon execution hereof by each of the Parties and the payment . . . of the Settlement Amount to Lehman."  *See* Stip., Ex. D, § 5.  LBSF contends that Section 5 "simply means that LBSF's release automatically becomes effective upon execution and payment."  Motion, ¶ 27.  But Section 5 of the Agreement does not say that "the release provisions in Section 1 of the Agreement" become "effective upon execution," nor does Section 5 refer to any other provision of the Agreement.  Stip., Ex. D, § 5.  Rather, Section 5 simply

refers to the "Release Agreement," i.e., it refers to the Agreement *as a whole* by using the title

that LBSF gave to the document.  *See id.*  LBSF's interpretation thus cannot be squared with the

plain language of Section 5, and again runs afoul of basic principles of contract interpretation.

*See Olin*, 704 F.3d at 99; *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d

Cir. 2011) ("When an agreement is unambiguous on its face, it must be enforced according to the

plain meaning of its terms.").  Simply put, Section 5 means what it says – and confirms what

Section 4 also says – that the Agreement becomes "effective" only upon execution.  Stip., Ex. D,

§§ 4-5.

58.    Finally, LBSF errs in contending that, under Shinhan's interpretation of Section 5,

"both parties could execute the [] Agreement, but the Settlement would not be 'effective,' and

thus not binding on Shinhan, until payment was made" such that "Shinhan would then be able to

delay payment indefinitely, without any consequences."  Motion, ¶ 29.[5]  This, again, cannot be

squared with the plain language of the Agreement.  By its terms, Section 1 requires Shinhan to

pay the Settlement Amount within ten business days after signing the Agreement.  *See* Stip., Ex.

D, § 1.  If, as LBSF suggests, Shinhan had signed the Agreement and then delayed payment of

the Settlement Amount indefinitely, Shinhan would then be in breach of Section 1 and LBSF

could sue Shinhan in this Court pursuant to Section 6 of the Agreement.  *See id.* at § 6.

59.    In sum, neither LBSF nor this Court can wish away the plain language of Sections

4 and 5 of the Agreement.  Those provisions are dispositive under controlling Second Circuit

authority.  *See Kaczmarcysk*, 414 F. App'x. at 355; *Ciaramella*, 131 F.3d at 324.  Simply put, the

---

[5]    In the course of making this argument, LBSF also attempts to distinguish *Kaczmarcysk* by
claiming that "[u]nlike the [] Agreement at issue in this dispute, the agreement at issue in *Kaczmarcysk*
was the proposed settlement itself."  Motion, ¶ 29.  This argument makes no sense.  As in *Kaczmarcysk*,
the "proposed settlement" is precisely the agreement at issue here.

parties expressly reserved – twice, in clear and unambiguous language – their right not to be bound without a signed writing.  For this reason alone, LBSF's Motion should be denied.

> 2.  *Multiple Other Provisions in the Agreement Also Demonstrate That the Parties Reserved Their Right Not to Bound Without a Signed Writing.*

60.    Though the first *Winston* factor instructs courts to look for express reservations, courts "also analyze whether the particular facts and circumstances of the case . . . demonstrate an implied reservation of the right not to be bound until the execution of a written agreement." *Lindner*, 2007 WL 1623119, at *6; *see also Winston*, 777 F.2d at 81 (finding no intent to be bound without a writing even though "neither party expressly reserved the right not to be bound").  Here, the Agreement contains at least ***eight*** other discrete provisions, each of which further demonstrates – consistent with the parties' express reservations in Sections 4 and 5 of the Agreement – that the parties did not intend to be bound without a fully signed writing.

61.    *First*, the Agreement contains a merger clause in Section 11, which provides "This [] Agreement constitutes the **entire agreement** and understanding of the Parties relating to the subject matter hereof and **supersedes all prior agreements** and understandings relating to the subject matter hereof."  *See* Stip., Ex. D, § 11 (emphasis added); *see also id.* at § 2 (representing that each party is "not relying upon any statements, understandings, representations, expectations, or agreements **other than those expressly set forth in this [] Agreement**") (emphasis added).

62.    The Second Circuit has repeatedly held that such merger clauses are "persuasive evidence" of an intent not to be bound in the absence of a signed writing.  *See, e.g., CAC Group Inc.*, 523 F. App'x. at 805; *Ciaramella*, 131 F.3d at 324; *Kaczmarcysk*, 414 F. App'x. at 355.  Courts in this District have reached the same conclusion; indeed, some have even found that a merger clause, standing alone, is enough to satisfy the first *Winston* factor.  *See, e.g., Nieves*,

2011 WL 5533328, at *4; *Jarowey v. Camelot Ent'mt Group,* No. 11 Civ. 2611 (LAP) (JCF),

2012 WL 7785096, at *5 (S.D.N.Y. Sept. 10, 2012); *Lyman*, 2012 WL 6135354, at *6; *Lindner*,

2007 WL 1623119, at *7; *see also PDL Vitari Corp. v. Olympus Indus., Inc.*, 718 F. Supp. 197,

207 (S.D.N.Y. 1989) (relying solely on merger clause).

63.    *Second*, Section 10 states that any amendment to the Agreement may be made

"only by an instrument in writing signed by each of the Parties."  Stip., Ex. D, § 10.  Again,

Southern District courts have repeatedly cited this kind of provision as evidence of an intent not

to be bound without a fully executed writing.  *See Zucker*, 836 F. Supp. at 145; *Kargo, Inc.*, 2008

WL 4579758, at *8; *O'Connor-Goun v. Weill Cornell Med. College*, 956 F. Supp. 2d 549, 553

(S.D.N.Y. 2013) ("It would be passing strange for the parties to agree that any binding

modification must be reduced to writing and fully executed if they did not also understand that

the initial agreement itself had similarly to be fully executed in order to become enforceable.").

64.    *Third*, Section 1 of the Agreement expressly ties the date by which Shinhan must

pay the Settlement Amount to the date of Shinhan's execution of the Agreement.  *See* Stip., Ex.

D, § 1.  And Section 3 then ties the date by which LBSF must dismiss Shinhan from the

Adversary Proceeding (as defined in the Agreement) to the date of Shinhan's payment.  *Id.* at

§ 3.  "Such provisions attach great significance to the execution date and may be viewed as

impediment[s] to forming a binding agreement prior to some formal time of execution." *Zucker*,

836 F. Supp. at 145 (citation omitted); *see also Ciaramella*, 131 F.3d at 324 (noting clauses tied

to execution of the parties' agreement were further evidence of an intent not to be bound without

a signed writing); *Winston*, 777 F.2d at 81-82 (same); *Lyman*, 2012 WL 6135354, at *5 (same).

65.    *Fourth*, Section 2 similarly represents that the "Agreement has been duly

executed . . . and constitutes a valid and binding obligation of [each] Party. . . ."  Stip., Ex. D,

§ 2.  This is clear evidence that only execution can trigger the Agreement's binding obligations. *See Zucker*, 836 F. Supp. at 145 ("Where, as here, the draft agreement declares on its face that 'when duly executed' it would set forth the parties' rights and obligations . . . the evidence unequivocally supports the position that the parties intended a writing.") (quotations omitted).

66.    *Fifth*, the Agreement contains signature blocks above which is written "IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this [] Agreement . . . ."  *See* Stip., Ex. D, p. 7.  Such blank signature blocks constitute "yet further evidence" of an intent not to be bound without a fully executed document.  *See O'Connor*, 956 F. Supp. 2d at 553; *see also Nieves*, 2011 WL 5533328, at *5 (citing "blank signature lines" as evidence that "the parties contemplated the moment of signing as the point when the settlement would become binding") (internal quotations and citations omitted); *Nat'l Gear & Piston, Inc.*, 861 F. Supp. 2d at 357 (declining to enforce unexecuted agreement that included signature blocks with similar language); *Kargo, Inc.*, 2008 WL 4579758, at *8 (same).

67.    *Sixth*, immediately following its "WHEREAS" clauses, the Agreement states "**NOW**, THEREFORE, in consideration of the recitals set forth above and promises made **herein**, the receipt and sufficiency of which is **hereby** acknowledged, the Parties hereto **agree as follows**."  Stip., Ex. D, p. 2 (emphasis added).  The Second Circuit has held that this kind of language "indicates that the parties understood that the written agreement would effectuate a binding contract and not merely memorialize a contract that had already been entered into." *CAC Grp. Inc.*, 523 F. App'x. at 804-05; *see also Ciaramella*, 131 F.3d at 324; *Selvam*, 2013 WL 4547454, at *3.  This provision thus directly rebuts LBSF's claims here.

68.    *Seventh*, Section 1 of the Agreement provides that "**[i]n consideration of each other Party's execution of this [] Agreement** and payment of the Settlement Amount . . . to

- 22 -

Lehman, each Party . . . generally releases . . . each other Party . . . ." Stip., Ex. D., § 1 (emphasis added). By its terms, then, the Agreement makes clear that the "consideration" being provided by LBSF to Shinhan in exchange for Shinhan's release of LBSF is LBSF's "execution of this [] Agreement." *Id.* This, too, is substantial evidence of an intent not to be bound without a signed writing. *See Ciaramella*, 131 F.3d at 324 (noting that the contrary interpretation advanced by defendant "leaves [plaintiff] no consideration for his promise").

69.      *Eighth*, and finally, Section 2 of the Agreement contains a representation that each party "has had the opportunity to be represented and advised by legal counsel in connection with this [] Agreement, which it enters voluntarily and of its own choice . . . ." Stip., Ex. D, § 2. The Second Circuit in *Ciaramella* noted that a substantially similar provision signified the parties' "voluntary and informed consent to the terms and obligation of the agreement. By not signing, he demonstrated that he withheld such consent." *Ciaramella*, 131 F.3d at 325; *see also Lyman*, 2012 WL 6135354, at *6; *Selvam*, 2013 WL 4547454, at *3. So too here, Shinhan has withheld its consent by not signing the Agreement. Stip., Ex. D, § 2; *id.* at Ex. H, ¶ 3.

70.      In sum, each of these provisions repeats the same theme: the parties anticipated throughout – and expressly required in Sections 4 and 5 – that the Agreement needed to be fully executed in order to become binding upon each of them. The Court should not disregard the parties' clearly expressed intent – as reflected in each of Sections 1, 2, 4, 5, 10, and 11 of the Agreement, as well as in its opening and closing clauses – by enforcing an agreement that Shinhan has never signed. *See, e.g., Ciaramella*, 131 F.3d at 324.

       3.     *LBSF's Own Conduct Further Demonstrates That The Agreement Was Not Binding Until It Was Executed.*

71.      In addition to the extensive express provisions throughout the Agreement, LBSF's "words and deeds, which constitute objective signs" of its intent from April 20, 2016 through the

- 23 -

present, further confirm that the parties only intended to be bound by a signed writing. *See R.G. Group*, 751 F.2d at 74.

72.     *First*, as noted, on April 20, 2016, the Mediator advised that his proposal for a Settlement Amount had been accepted and asked LBSF "to provide the documentation to Shinhan for its review." Stip., Ex. B. This clearly demonstrates that: (a) the parties intended to execute a writing that fully set forth the terms of their agreement; and (b) Shinhan needed to review and comment on that writing and, if necessary, note any areas of disagreement.[6]

73.     *Second*, following the Mediator's email, the parties traded drafts of the Agreement between April 21, 2016 and May 12, 2016. *See* Stip., Ex. C, pp. 6-8. During that time, Shinhan proposed material changes to the Agreement, which LBSF accepted. *Id.* Such back-and-forth negotiation is strong evidence that the parties did not intend to be bound without a writing. *See, e.g., PDL Vitari Corp.*, 718 F. Supp. at 207; *Nieves*, 2011 WL 5533328, at *7.

74.     *Third*, at Shinhan's request, LBSF then agreed to provide Shinhan with documents to demonstrate the authority of Lehman's signatory to the Agreement. Stip., Ex. C, p. 6. Then, once the parties had reached agreement on all terms in mid-May 2016, LBSF stated it would "circulate[] an *execution copy.*" *Id.* (emphasis added). This statement makes clear, as LBSF itself acknowledges in its Motion, that the prior versions of the Agreement that the parties had exchanged were merely drafts and thus that the parties did consider them final or binding. *See* Motion, ¶ 11 ("LBSF sent a *draft* agreement") (emphasis added); *Winston*, 777 F.2d at 81 (citing the fact that the attorney of the party seeking enforcement circulated a "proposed agreement" as evidence that he "considered unexecuted versions of the agreement to be nothing

---

[6]     Again, contrary to LBSF's claim that "there was no express reservation of rights on April 20," courts do not require parties to expressly reserve the right not to be bound without a writing at any specific point in the negotiation process. *See supra*, ¶ 45 (citing *R.G. Group*, 751 F.2d at 75).

more than drafts or proposals and not . . . final binding agreements"); *Pasmas v. Hunt*, 724 F.
Supp. 260 (S.D.N.Y. 1989) (declining to enforce an agreement where a "letter refers to the
agreement as a draft").

75.      *Fourth*, after LBSF had circulated an "execution copy" with its signature, LBSF
repeatedly asked Shinhan when the Agreement would be signed, an action that would be entirely
unnecessary if – as LBSF now argues – the parties were already bound to an enforceable
agreement as of April 20, 2016, or if the Agreement was otherwise binding without Shinhan's
signature. Stip., Ex. C, pp. 2-3, 6. Such behavior is, again, significant evidence that both parties
understood that their agreement was not binding until it was fully executed. *See, e.g., Kargo,
Inc.*, 2008 WL 4579758, at *7-9 (noting that similar behavior "undermined" a party's claim that
a binding agreement was in place).

76.      Even now, LBSF's conduct in asking the Court to require Shinhan to execute the
Agreement – despite LBSF's claim that the parties are already bound by an April 20 agreement –
suggests that LBSF is well aware that:  (i) the Agreement is not enforceable unless and until it is
signed by Shinhan; and (ii) the Agreement contains numerous other material terms beyond the
Settlement Amount which are essential to effectuating any complete settlement between the
parties. *See* Proposed Order, p. 2. Indeed, no such relief would be necessary from this Court if
LBSF's position were correct as a matter of law.

77.      All of the objective evidence here – from the parties' correspondence, to the
negotiating history, to the multiple express provisions of the Agreement itself – reflects the
parties' intent not to be bound without a fully signed writing. Under controlling Second Circuit
case law, this first *Winston* factor thus weighs heavily against enforcing the Agreement; indeed,
the Court "need look no further." *Kaczmarcysk*, 414 F. App'x. at 355. For this reason alone,

LBSF's Motion should be denied.  To the extent the Court wishes to examine the remaining

*Winston* factors, however, two of those three factors still weigh against enforcing the Agreement.

        B.      <u>*Winston* Factor #2:  There Has Not Been Any Performance.</u>

      78.     The second *Winston* factor looks to whether either party has performed under the

agreement and whether that performance was accepted by the other party.  *Ciaramella*, 131 F.3d

at 325.  Partial performance "requires some actual performance of the contract, such that one

party must have conferred something of value upon the other which the other accepted." *Nieves*,

2011 WL 5533328, at *6 (internal citations omitted).  "The absence of partial performance

weighs against the party seeking enforcement of the settlement." *Id.*

      79.     Here, there has been no performance under the Agreement.  Shinhan has not paid

the Settlement Amount or released LBSF, and LBSF has not released Shinhan or dismissed

Shinhan from the Adversary Proceeding.  *Supra*, ¶¶ 30-33.  These are "basic elements of

consideration that would have been due . . . under the settlement agreement," and it is undisputed

that they have not been exchanged.  *Ciaramella*, 131 F.3d at 325.  Nor has either party relied to

its detriment on the other's actions.  *Supra*, ¶¶ 30-33; *see also Langreich v. Gruenbaum*, 775 F.

Supp. 2d 630, 636-37 (S.D.N.Y. 2011) (finding no partial performance where there was no

evidence that the party opposing enforcement "induced any reliance" by the other party).  Simply

put, neither party has performed under the Agreement at all.

      80.     Nevertheless, LBSF argues that it "performed every action required of it" by

signing the Agreement.  Motion, ¶ 31.[7]  But LBSF notably fails to cite any cases to support its

---

[7]      This statement is plainly false.  Motion, ¶ 31.  The Agreement required LBSF to grant Shinhan a
release and dismiss Shinhan from the Adversary Proceeding, among other things.  *See* Stip., Ex. D., §§ 1,
3.  LBSF has done neither.

      Moreover, LBSF goes so far as to say that it "would have been bound to its release as soon as
Shinhan signed the [] Agreement."  Motion, ¶ 31.  But this undercuts LBSF's argument that the parties

assertion that the mere act of signing the Agreement constitutes conduct that any court would conceivably recognize as "performance." *See id.* Indeed, the Second Circuit in *Winston* effectively rejected such an argument, finding that there was no partial performance despite one side's signing of the alleged agreements at issue. *See Winston*, 777 F.2d at 80, 82; *see also Kargo, Inc.*, 2008 WL 4579758, at *2-3, 9 (same); *O'Connor-Goun*, 956 F. Supp. 2d at 553 (same). The law is clear that "mere preparatory acts" of this kind are not enough to constitute partial performance. *Nieves*, 2011 WL 5533328, at *7.

81.     Moreover, even if signing the Agreement did somehow constitute LBSF's "performance" under the Agreement (and it did not), the Second Circuit has held that a party "cannot rely on its effort to perform as an indication that [the other party] intended to be bound"; rather, any performance must have been "*accepted by the party disclaiming the contract.*" *CAC Grp.*, 523 F. App'x. at 805 (emphasis in original). Here, Shinhan has not accepted LBSF's "performance" of signing the Agreement as binding upon Shinhan by, for example, accepting LBSF's release or paying the Settlement Amount. *Supra*, ¶¶ 30-33. Rather, Shinhan has given every indication to LBSF for months that Shinhan does not consider itself to be bound to the Agreement. *Id.* at ¶¶ 17-33. Thus, LBSF's mere action of signing the Agreement, without more, does not and cannot constitute partial performance. *See CAC Grp.*, 523 F. App'x. at 805.

82.     Because neither LBSF nor Shinhan has partially "performed" under the Agreement, the second *Winston* factor weighs against enforcing that Agreement. *See, e.g., Nieves*, 2011 WL 5533328, at *6.

---

had already reached a binding agreement on April 20, 2016. Indeed, if anything, it supports Shinhan's argument that execution of the Agreement was necessary to trigger the parties' respective obligations and rights.

C.    *Winston* Factor #3:  There Were Open Terms as of April 20, 2016, But No Open Terms as of June 28, 2016.

83.    As noted above, as of April 20, 2016, the parties had not agreed upon all terms of the Agreement.  *See supra*, ¶¶ 11-16.  Rather, only the Settlement Amount had been agreed to as of that date.  *See id.*  The parties had not even discussed any other terms as of that date and thus could not possibly have known then if there were any areas of disagreement.  *See id.*

84.    LBSF cannot merely dismiss these open terms as minor issues.  As the Second Circuit held in *Winston*, "[i]t is not for the court to determine retrospectively that at some point in the evolution of a formal document that the changes being discussed became so 'minor' or 'technical' that the contract was binding despite the parties' unwillingness to have it executed and delivered."  *Winston*, 777 F.2d at 83.  Rather, that these open terms "may in the long view be fairly characterized as minor or technical does not mean that a binding contract was formed prior to the time that they were finally worked out."  *Id.* at 82.  Therefore, to the extent that LBSF considers April 20, 2016 to be the operative date for purposes of this Court's analysis of the third *Winston* factor, that factor weighs against enforcement.

85.    That said, Shinhan acknowledges that there were no open terms left for the parties to negotiate as of June 28, 2016, when this Court issued its BofA Order dismissing LBSF's claims against, among others, Shinhan.  But, to Shinhan's knowledge, no court in this Circuit has *ever* treated this third *Winston* factor as dispositive, particularly where, as here, the parties' draft agreement contains an express reservation of the right not to be bound without a signed writing. In fact, courts have repeatedly held that, "even if the parties have orally agreed on all the terms" of a proposed contract, it is still unenforceable "if the parties did not intend to be bound until after the execution of a formal written agreement."  *Zucker*, 836 F. Supp. at 144 (citing, *inter alia*, *R.G. Group, Inc.*, 751 F.2d at 74) (emphasis omitted); *see also Winston*, 777 F.2d at 80;

- 28 -

*H&R Block Tax Servs., LLC v. Strauss*, No. 15 Civ. 0085 (LEK) (CFH), 2016 WL 5107114, at

*3–6 (N.D.N.Y. Sept. 20, 2016) (declining to enforce a contract despite the parties' agreement

on all terms because the alleged contract evinced an intent not to be bound without a fully

executed contract); *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 96-97 (2d Cir. 1994) (declining to

enforce employment agreement even though all terms were agreed upon and employee had

performed under the agreement for three months, solely because the employer had not signed the

agreement).

   D.  <u>*Winston* Factor #4: Settlement Agreements Are Typically Committed to Writing.</u>

   86.  LBSF concedes that settlement agreements like the Agreement are typically

committed to writing. *See* Motion, ¶ 34; *see also Ciaramella*, 131 F.3d at 326; *Winston*, 777

F.2d at 83.

   87.  Nonetheless, LBSF argues that the "Agreement was complete, and the only

missing element was a signature," which LBSF contends was a "minor technicality."[8]  Motion,

¶ 37.  But LBSF cannot simply dismiss the lack of Shinhan's signature here because a signature

is a necessary component of reducing an agreement to writing. *See, e.g., Winston*, 777 F.2d at 83

(rejecting assertion that the agreement had been committed to writing because "[t]hat document

[] was not a fully executed contract").  That is especially true where, as here, the Agreement

explicitly required Shinhan's signature in order to be effective. *See* Stip., Ex. D, §§ 4, 5.

---

[8]  LBSF alleges that the reason Shinhan had not signed the Agreement as of June 28, 2016 was due to its request for "original signatures rather than exchanging electronic signatures in counterparts." Motion, ¶ 34.  This is false.  Even if Shinhan had been willing to exchange electronic signatures in counterparts, it could not have executed the Agreement prior to June 28, 2016 because Shinhan did not complete its internal approval process until that day. *See* Stip., Ex. C, p. 2.  The method of executing the Agreement is thus irrelevant.  In any event, Shinhan also notes that LBSF expressly agreed to exchange original signatures. *See id.* at p. 6.

88.     LBSF's reliance on *Alvarez v. City of New York*, 146 F. Supp. 2d 327, 337 (S.D.N.Y. 2001) in this regard is therefore misplaced. *See Motion*, ¶ 34. As noted above (*supra*, n.4), the agreement at issue in *Alvarez* did not contain anything like the language in Sections 4 and 5 of the Agreement, which expressly state that the Agreement is not binding until it is executed by Shinhan. Indeed, Judge Chin, who decided the *Alvarez* case, subsequently confirmed in *Kaczmarcysk* that the Court "need look no further" than the first *Winston* factor when a draft agreement contains language like that in Sections 4 and 5 here. *Kaczmarcysk*, 414 F. App'x. at 355.

89.     Finally, to our knowledge, LBSF has not settled any other case in this action via either a written agreement signed by only one side or an oral or other agreement made only as to the Settlement Amount. If correct, this would be yet another reason for the Court to find that the fourth *Winston* factor weighs against enforcement in this case.

                    *          *          *          *          *          *

90.     In sum, three of the four *Winston* factors – including the most important one, the first factor – clearly weigh against enforcing the Agreement under controlling Second Circuit authority. This Court should follow that controlling authority and deny LBSF's Motion.

## III.    The Agreement Is Not Enforceable Under NY CPLR 2104.

91.     Notwithstanding its unenforceability under binding Second Circuit authority, the Agreement is also unenforceable under New York state law, which governs the Agreement. *See* Stip., Ex. D, § 6. Specifically, CPLR 2104 provides that "[a]n agreement between parties or their attorneys relating to any matter in an action . . . is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered." CPLR

2104.  The Agreement here has not been subscribed by Shinhan or entered as an order, so it does not meet CPLR 2104's requirements.  *See* Stip., Ex. D.

92.    Although the Second Circuit has declined to rule on whether CPLR 2104 applies in federal cases, some Southern District courts have applied it.  *Compare Ciaramella*, 131 F.3d at 322 n.1, *with Rosenberg v. Inner City Broad. Corp.*, No. 99 Civ. 9579 (AKH), 2001 WL 995349, at *2 (S.D.N.Y. Aug. 30, 2001) (applying CPLR 2104), and *Turk v. Chase Manhattan Bank USA,* No. 00 Civ. 1573 (CM) (GAY), 2001 WL 736814, at *1–2 (S.D.N.Y. June 11, 2001) (same).   If the Court applies CPLR 2104 here, that would also be sufficient to find the Agreement unenforceable.

93.    LBSF argues that the parties have already met the requirements of CPLR 2104 based on emails sent by Shinhan's counsel:  (a) accepting the Mediator's proposal as to the Settlement Amount; and (b) updating LBSF as to the status of the Agreement, contending these emails represent a "signed affirmation of the Settlement."  Motion, ¶ 36.  But the Agreement, which LBSF signed, expressly provides in Section 11 that it "supersedes all prior agreements . . . ."  Stip., Ex. D, § 11.  Moreover, the April 20, 2016 email on which LBSF relies only related to the Settlement Amount.  *See* Stip., Ex. A.  It does not and cannot suffice as assent to the terms of the Agreement, none of which – other than the Settlement Amount – had even been substantively discussed as of April 20, 2016.  *See supra*, ¶¶ 11-16.

94.    LBSF also argues that "Shinhan is estoped from" relying on CPLR 2104 because "there can be no dispute . . . that the Parties entered into an agreement and that the terms of the agreement were certain."  Motion, ¶ 37.  But, of course, the undisputed facts clearly show that the parties did not enter into a binding agreement, either as of April 20, 2016 or as of any later date.  *Supra*, ¶¶ 11-33.

95.    Further, neither of the cases LBSF cites in support of its argument is relevant here.  *See* Motion, ¶ 37.  In *Apple Corps v. Sony Music Entertainment*, there was no dispute as to whether the parties had entered into an agreement, and the "defendants had indicated a willingness to be bound *prior to* the formal execution of the [agreement]."  91 Civ. 7465 (CSH), 1993 U.S. Dist. LEXIS 9512, at *24, 26 (S.D.N.Y. July 8, 1993) (emphasis added).   Here, Shinhan has done precisely the opposite.  *See* Stip., Ex. D, §§ 4, 5; *supra*, ¶¶ 11-33.

96.    In *Smith v. Lefrak Organization, Inc.*, the plaintiff seeking enforcement of the alleged agreement had "purchased a limousine for his new occupation, in reliance upon receiving the settlement proceeds."  531 N.Y.S.2d 305, 306 (2d Dep't 1998).  The Second Department refused "to permit the use of [CPLR 2104] against a party who has been misled or deceived by the oral agreement to his detriment or who has relied upon it."  *Id.*  Here, by contrast, LBSF has suffered no such harm in reliance upon Shinhan's anticipated execution of the Agreement, nor does LBSF allege any such harm.  *See* Motion.  If the parties had not reached an agreement as to the Settlement Amount on April 20, 2016, LBSF at most would presumably have sought to litigate further.  But "a party's decision not to resume active litigation 'does not weigh for or against enforcing the contract.'"  *Nieves*, 2011 WL 5533328, at *7.

## IV.    There Is No Basis For Awarding LBSF Fees and/or Costs.

97.    Like the rest of its Motion, LBSF's request to sanction Shinhan and award LBSF fees and costs should be denied in its entirety.  *First*, as noted, the Agreement is unenforceable as a matter of law.  *Supra*, ¶¶ 42-90.  There is thus no basis for sanctioning Shinhan here.

98.    *Second*, even if this Court disagrees with Shinhan and concludes that there is a binding agreement between the parties, there is still no basis for awarding LBSF fees and costs. The Second Circuit has held that, in order to award attorneys' fees, a court "must find that the

losing party's claim was (1) meritless; and (2) brought for improper purposes such as harassment or delay. The test is conjunctive and neither meritlessness alone nor improper purpose alone will suffice." *Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 190 (2d Cir. 2000). Courts require "clear evidence" of this behavior and a "high degree of specificity." *Baker v. Health Mgmt. Sys., Inc.*, 264 F.3d 144, 149 (2d Cir. 2001).

99.    Here, LBSF cannot plausibly claim that Shinhan's actions were meritless or baseless. Far from it, Shinhan's actions throughout this dispute have been taken in reliance upon – and consistent with – the long line of controlling Second Circuit authority, discussed above. *Supra*, ¶¶ 42-90. At a minimum, then, Shinhan has a good faith basis for its position. *Supra*, ¶ 42-90. It should not be sanctioned for relying on clear controlling authority.[9]

100.    Even if this Court ultimately disagrees with Shinhan's conclusion as to the non-binding nature of the Agreement pursuant to *Winston* and its progeny, that cannot and should not be a basis for sanctions against Shinhan. *See, e.g., Tancredi v. Metro. Life Ins. Co.*, 378 F.3d 220, 230 (2d Cir. 2004) (urging courts to "resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a [litigant] did not ultimately prevail, his action must have been unreasonable or without foundation") (citation omitted).

101.    *Third*, and finally, even if the Court rules against Shinhan and is further inclined to sanction Shinhan, it should only do so for any fees and costs related specifically to LBSF's Motion. *See Kerin*, 218 F.3d at 192 (noting fee awards "are limited to those expenses necessary to counter the losing party's bad faith"). As noted, since July 2016, Shinhan has repeatedly

---

[9]    LBSF states that Shinhan "is leveraging its months-long delay in returning the executed [] Agreement and paying LBSF to take advantage of the happenstance that the Court issued a ruling in the intervening period." Motion, ¶ 42. As noted, Shinhan was in the process of complying with its strict internal approval process when the Court issued its decision dismissing LBSF's claims against Shinhan. *Supra*, ¶¶ 21-29. While Shinhan understands LBSF's unhappiness with this confluence of events, it firmly rejects the notion that it acted in bad faith in not signing the Agreement before June 28, 2016.

urged LBSF to file its Motion to resolve the parties' dispute, but LBSF consistently opted to pursue informal dispute resolution mechanisms instead. *Supra*, ¶ 33. Shinhan should not be held responsible for fees and costs stemming from LBSF's decision to pursue informal dispute resolution, rather than promptly litigating this dispute as Shinhan suggested from the start. Thus, at most LBSF is only entitled to fees and costs related specifically to its Motion.

## CONCLUSION

102.    For the foregoing reasons, Shinhan respectfully requests that the Court deny LBSF's motion in its entirety.


Dated:  February 17, 2017             /s/ John A. Bicks
       New York, NY              John A. Bicks
                                  Henry E. Shin
                                  Priya Chadha
                                  K&L GATES LLP
                                  599 Lexington Avenue
                                  New York, NY 10022
                                  Telephone: (212) 536-3900

                                  Brian D. Koosed
                                  K&L GATES LLP
                                  1601 K Street, NW
                                  Washington, DC 20006
                                  Telephone: (202) 778-9000

                                  *Attorneys for Shinhan Bank*