Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC.,

9

10           Debtor.

11

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14                   U.S. Bankruptcy Court

15                   One Bowling Green

16                   New York, New York

17

18                   February 6, 2017

19                   9:33 AM

20

21

22

23   B E F O R E :

24   HON SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

Page 2

1    Trial on Lehman's Objection to Claims of QVT (Doc #17468

2    Debtors' One Hundred Fifty-Fifth Omnibus Objection to

3    Claims)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach

Page 3

1    A P P E A R A N C E S :

2    JONES DAY

3         Attorneys for Debtors

4         250 Vesey Street

5         New York, New York 10281

6

7    BY:   LAURI W. SAWYER, ESQ.

8         JENNIFER DEL MEDICO, ESQ.

9         JAYANT W. TAMBE, ESQ.

10        RYAN J. ANDREOLI, ESQ.

11        REBEKAH BLAKE, ESQ.

12        SARAH EFRONSON, ESQ.

13        DAVID P. SULLIVAN, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    HOGAN LOVELLS US, LLP

 2          Attorneys for QVT

 3          875 Third Avenue

 4          New York, New York 10022

 5

 6    BY:   NICOLE E. SCHIAVO, ESQ.

 7          JOHN D. BECK, ESQ.

 8          DENNIS H. TRACEY, III, ESQ.

 9          BEN LEWIS, ESQ.

10          ROBIN E. KELLER, ESQ.

11          WILLIAM REGAN, ESQ.

12          DARYL L. KLEIMAN, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1                    P R O C E E D I N G S

2              THE COURT:  How is everyone?

3              UNIDENTIFIED SPEAKER:  Good.  Thank you.

4              THE COURT:  Good weekend?  Super Bowl, some

5    watched, some people didn't.  So we're starting with Mr. Fu

6    this morning, yes?

7              MR. BECK:  Yes, Your Honor.

8              MR. TRACEY:  Yes, Your Honor.

9              THE COURT:  All right.  I'm ready when you are.

10             MS. SAWYER:  Your Honor, we actually have some

11   exhibits we marked over the weekend I would like to --

12             THE COURT:  Sure.

13             MS. SAWYER:  -- hand up.  We have copies

14   electronically and hard copy.

15             THE COURT:  Sure.

16             So speaking of housekeeping matters, I'm not -- I

17   think we've been receiving PDFs of the rough -- of the real

18   time transcript.  I think that's right.

19             MS. SAWYER:  You've been receiving a PDF of one

20   rough, but since then we've only been sending the finals.

21             THE COURT:  Okay.  Do I have the -- I have the

22   finals?

23             MS. SAWYER:  We haven't received Friday's final --

24             THE COURT:  Okay.

25             MS. SAWYER:  -- but we've received all of them --

1                    THE COURT:  Just by PDF or by hard copy?

2                    MS. SAWYER:  Just by PDF.  But we did provide hard

3      copies.

4                    THE COURT:  Would you mind --

5                    MS. SAWYER:  That's fine.

6                    THE COURT:  -- two copies of the -- of -- I don't

7      need the rough, just the final.

8                    MS. SAWYER:  Okay.  Absolutely --

9                    THE COURT:  That will be great.

10                   MS. SAWYER:  -- Your Honor.

11                   THE COURT:  Okay.  And these are --

12                   MS. SAWYER:  These are additional debtors'

13     exhibits.  There's a list, hard copies and electronic

14     copies.

15                   THE COURT:  Okay.  And Hogan Lovells has these?

16                   MS. SAWYER:  Yes.  We sent them over last night.

17                   THE COURT:  Okay.  Great.

18                   MR. BECK:  Good morning, Your Honor.

19                   THE COURT:  Good morning.

20                   MR. BECK:  QVT calls Tracy Fu.

21                   THE COURT:  Very good.

22                   MR. BECK:  And we have exhibit binders.  You just

23     need one copy or --

24                   THE COURT:  Two. Ms. Eisman (ph) will be joining

25     me shortly.

Page 7

1          MR. BECK:  May I approach?

2          THE COURT:  Yes.

3      (Pause)

4          THE COURT:  Hello, Mr. Fu.  Would you stand up,

5  please?  Would you raise your right hand?

6                  TRACY FU, WITNESS, SWORN

7          THE COURT:  Very good.  Have a seat.  Make

8  yourself comfortable.  Let us know if you need a break at

9  any time.

10                  DIRECT EXAMINATION

11  BY MR. BECK:

12  Q    Good morning, Mr. Fu.  Could you please state your name

13  for the record?

14  A    Tracy Fu.

15  Q    And who is your current employer?

16  A    QVT Financial.

17  Q    And what is your job title at QVT Financial?

18  A    I'm a managing partner.

19  Q    And as a managing partner what are your -- what is your

20  role and responsibilities at QVT Financial?

21  A    As a managing partner I sit on the investment committee

22  and I also have a particular responsibility for a part of

23  the -- a portion of the portfolio.

24  Q    And what portion of the portfolio are you responsible

25  for?

Page 8

1    A    Convertible bonds.

2    Q    And when you say responsible are you actively trading

3    that portion of the portfolio?

4    A    Yes.

5    Q    And taking a step back could you just explain to the

6    Court your educational background beginning with college?

7    A    I have a bachelors degree in applied physics from

8    California Institute of Technology and I have a masters

9    degree in electrical engineering from the University of

10   California at Berkley.

11   Q    And what did you do after you graduated from Berkley?

12   A    I went to go work at Deutsche Bank.

13   Q    And about how long did you stay at Deutsche Bank?

14   A    Ten years.

15   Q    And where did you go after you left Deutsche Bank?

16   A    A group of us all left Deutsche Bank together to form

17   QVT Financial.

18   Q    And have you been at QVT continuously ever since then?

19   A    Yes.

20   Q    And so sort of turning to the dispute at hand where

21   were you on the day that LBHI filed bankruptcy September

22   15th, 2008?

23   A    I was in the office.

24   Q    And were you involved in the process of deciding to

25   terminate QVT's ISDAs facing LBSF?

Page 9

1    A    I was peripherally involved and I agreed with the

2    decision.

3    Q    And sitting here today are you aware that QVT did, in

4    fact, terminate those ISDA agreements facing LBSF on

5    September 15th, 2008?

6    A    Yes.

7    Q    And after those agreements were terminated what role,

8    if any, did you have in valuing the underlying transactions

9    for purposes of a loss determination under those ISDA

10   agreements?

11   A    I valued a handful of contracts, some credit default

12   swaps and two interest rate swaps.

13   Q    And since QVT filed its proof of claim against the

14   Lehman estate what has been your involvement in the

15   litigation over the ensuing seven years?

16   A    Other than preparing for this testimony today, none.

17   Q    And so turning to the specific positions that you

18   valued facing LBSF can you sort of generally describe what

19   those positions were?

20   A    It was a few credit default swaps and two interest rate

21   swaps.

22          MR. BECK:  So I'm going to ask that we put Exhibit

23   2108 up on the screen, which is a native Excel spreadsheet.

24   And can we give the witness control of the (indiscernible).

25   BY MR. BECK:

Page 10

1    Q    So, Mr. Fu, if you'll -- if I can direct you to the

2    Lehman positions master tab, and you have to scroll over.

3    We're in the redacted part.  If you'll go to Column BC and

4    filter that column for the positions that you marked,

5    please.

6         (Pause)

7    A    I'm heading over to Column BC and I am going to filter

8    on the ones that are marked by me.  Sorry.  Okay.

9    Q    And could you identify for the Court the row numbers of

10   the CDS positions there that you marked?

11   A    Sure.  It's Rows 218 and 19 and Rows 660 to 669.

12   Q    And how did you value the CDS position?

13             MS. DEL MEDICO:  Your Honor, I just --

14             THE COURT:  Hold on just a second.

15             MS. DEL MEDICO:  -- I just wanted to object to the

16   demonstrative to the extent it doesn't have all the

17   positions on it that he just said that he was valuing.

18             MR. BECK:  Yes, Your Honor.  The demonstrative

19   only shows the QVT positions, not the Quintessence, so the

20   odd numbers are the Quintessence positions.

21             MS. DEL MEDICO:  Okay.

22             THE COURT:  Okay.  All right.  Thank you.

23   BY MR. BECK:

24   Q    And how did you value the positions in Row 218, 219 and

25   660 through 669?

Page 11

1   A      We used Markit data.

2   Q      And what date or dates did you use for the Markit data?

3   A      I'm scrolling over to Column Y and the dates are put in

4   Column Y.  You can see that most of the contracts are valued

5   for 9/16 and there are two that are valued for 9/18.

6   Q      And can you identify by row number the single name CDS

7   positions that you valued using 9/16 Markit data?

8   A      Those are Rows 660 to 669.

9   Q      And for those positions where you use 9/16 Markit data

10  why did you use that date?

11  A      That was the default date that we had agreed to.

12  Q      And I think you said there were two positions where you

13  use 9/18 data.  Could you please identify that by row number

14  for the Court?

15  A      Those are rows 218 and 219.

16  Q      And for those positions do you recall why you used

17  9/18/2008 as the mark -- for the Markit data?

18  A      I don't recall.

19  Q      And did you make any bid-mid adjustment to the Markit

20  data for the positions that you used that data to evaluate?

21  A      I used the default bid-mid spread which is ten percent.

22  Q      And when you say default what do you mean by that?

23  A      That was the amount that we put all the contracts

24  under.  That was the spread that we used for all of our

25  contracts unless there was a reason why the spread would be

Page 12

1   different.

2   Q      And did you value any other positions facing LBSF other

3   than the CDS that we just went through?

4   A      Yes, two interest rate swaps.

5   Q      And could you go to the rows on the Excel that show the

6   interest rate swaps?

7   A      These are Rows 1392 to 1395.

8   Q      And how did you value the interest rate swaps?

9   A      With a Bloomberg interest rate swap calculator.

10  Q      And in your experience is the Bloomberg interest rate

11  swap calculator a common way to value interest rate swaps?

12  A      Yes.

13  Q      And have you valued interest rate swaps using the

14  Bloomberg interest rate swap calculator on other occasions?

15  A      Yes.

16  Q      And at any time in your experience have you used

17  anything other than the Bloomberg interest rate swap

18  calculator to value an interest rate swap?

19  A      No.

20  Q      And what date did you use to value the interest rate

21  swap as of?

22  A      It's 9/15/08.

23  Q      And if we can turn to Exhibit 1568 which I believe is

24  the second tab in your book.

25         (Pause)

Page 13

1    Q     Do you recognize this document?

2    A     Yes.

3    Q     And what is this document?

4    A     This is an e-mail from my Bloomberg terminal that I

5    sent to the Lehman central repository and it's -- I'm

6    sending a screenshot of the interest rate swap valuation I

7    did.

8    Q     And what is the date of this e-mail?

9    A     Sunday, September 28th, 2008.

10   Q     And if you will turn the page to the attachment to this

11   e-mail, do you recognize this document?

12   A     Yes.

13   Q     And what is this document?

14   A     This is the Bloomberg valuation that I was referring

15   to, so this is what the calculator looks like and -- so this

16   is a valuation we did.

17   Q     And can you sort of explain to the Court what

18   information is being conveyed in this screenshot?

19   A     Sure.  This is basically everything you need to value

20   the swap.  You see here there's the notional of 200 million.

21   And an interest rate swap has two legs, a fixed leg and a

22   floating leg.  In this example we are paying fixed and

23   receiving floating.  There's a maturity here, November 20th,

24   2009.  You can see it's the same on both legs, both the

25   fixed leg and the floating leg.  And there's -- you can see

Page 14

1    what the fixed coupon is, it's 421.  And down here the

2    valuation you can see the curve that we use.  It says

3    9/15/08.

4    Q    And as it relates to the date of the valuation, what

5    does the curve 9/15/2008 mean?

6    A    9/15/08, that curve -- that means we used interest

7    rates coming from that date, 9/15/08.

8    Q    And how do you know what curve was used?

9    A    It says here we basically -- I mean, we used a standard

10   default curve.

11   Q    And did you change Bloomberg's default curve?

12   A    No.  I didn't know how to do that at the time.

13   Q    Is there anything else on this screenshot that tells

14   you that it was valued as of 9/15/2008?

15   A    Well, the other thing that tells you that is the number

16   to the right.  It says valuation here, but this is really a

17   settlement date which comes two days after the curve date.

18   And that's 9/17/08 which is two plus two from 9/15.

19            Also you can go and calculate the accrued interest

20   for each of these legs.  You can see it's written out here

21   for the fixed leg 2,736,500 and for the floating leg 437,111

22   spot 11.  If you go and do the math there's 117 days of

23   accrued interest in the fixed leg accruing from May 20th to

24   9/17.  And you can multiple 117 divided by 360 times 200

25   million times 4.21 percent and you will get exactly this

1     number.

2             Also, you can go to the floating leg which is

3     accruing interest from August 20th, 2008 because it pays

4     quarterly.  So there's only 28 days of accrued in there, and

5     so you take 28 divided by 360 times the interest rate here.

6     You see it's the latest index is 281 times 280 million and

7     you will get this exact number, 437,111 spot 11.

8             So that leads me to believe that this was valued

9     on 9/15/08.

10    Q    And does the settlement date being 9/17/2008 have any

11    effect on the valuation being as of 9/15/2008?

12    A    It tells you that's what the accrued -- that's what --

13    because like the standard settlement is to do two days, to

14    settle two days after that you would value it.  So if it's

15    settling on 9/17 that also means you're valuing it on 9/15.

16    Q    And remind us again what the notional is on this

17    screenshot?

18    A    It's 200 million on both legs, the same.

19    Q    And is that the same notional as QVT and Quintessence

20    had combined against LBSF?

21    A    No.

22    Q    What combined notional did QVT and Quintessence have

23    facing LBSF?

24    A    It's 182 and a half million.

25    Q    And why do those two numbers not match?

Page 16

1    A    Because there was a third leg of the swap that was done

2    by someone else, not QVT or -- I mean, not QVT Fund or

3    Quintessence Fund.

4    Q    And if those three are combined together what number

5    would you get?

6    A    You would get 200 million.

7    Q    And if we could go back to Exhibit 2108.

8         (Pause)

9    Q    So I believe you said earlier that the interest rate

10   swaps were in Rows 1392 through 1395.  I'm just going to

11   take you through the rows one at a time so you can explain

12   --

13   A    Sure.

14   Q    -- what we're looking at.  Let's start with Row 1392.

15   Can you --

16   A    13 --

17   Q    -- explain to the Court what that row has in it?

18   A    Yes.  1392 has a total of 200 million.

19   Q    And that 200 million is derived from where?

20   A    That's the same number that we're using for the total

21   of all the legs and that's what we're using in the

22   screenshot.

23   Q    And what is the market value of that 200 million

24   notional interest rate swap?

25   A    I'm going over to Column AO.  You can see it's right

Page 17

1    here.  It's 5,135,334 and that is the same number that was

2    on the screenshot on the Bloomberg.

3    Q    So if we can go back to Exhibit 1568.  Can you show me

4    where that number is?

5    A    So -- yeah.  I can see here 5,135,334.  It's exactly

6    the same number.

7    Q    Thank you.  And can we go back to 2108.

8         So now looking at Row 1393, what is in that row?

9    A    1393 you can see here in Column B it's the -- the name

10   of the instrument and so it's the interest rate swap, but it

11   says here -- it's labeled QVT so that's the QVT Fund portion

12   of the 200 million.

13   Q    And so does that mean that the 1394 is the Quintessence

14   position?

15   A    That's correct.  And it's labeled as such.

16   Q    And is the 1395 the third position that you referenced

17   earlier?

18   A    Yes.  And that's -- and the DB there stands for

19   Deutsche Bank.

20   Q    And so going back to 1393 what is the valuation that is

21   ascribed to the QVT interest rate swap position?

22   A    It's 4,236,651.  You can look in the spreadsheets.  You

23   don't have to do the math in your head and you can see that

24   the formula is here.  It's taking the 5,135,334.  It's

25   multiplying it by C1393 which is 165 million and dividing by

Page 18

1    C1392 which is 200 million.

2    Q    So if I'm understanding you correctly the 4,236,651 is

3    the QVT position's pro rata share of the --

4    A    200 million.

5    Q    -- aggregate --

6    A    Yeah.

7    Q    -- the 200 million.

8    A    That's correct.

9    Q    Okay.  And now moving to Row 1394, what is this row?

10   A    This is the Quintessence row and so you can see also if

11   you look at the formula here we're taking, you know, the

12   5,135,334.  We're multiplying by seventeen and a half

13   million and dividing by 200 million and the answer is

14   449,342.

15   Q    Now if you'll turn to Exhibit 88 which is the first tab

16   in your binder.

17        (Pause)

18   Q    Do you recognize this document?

19   A    Yes.  It's an e-mail exchange between me and Joel

20   Wohlman.

21   Q    And what is the date of this e-mail exchange?

22   A    October 7th, 2008.

23   Q    And what is Mr. Wohlman asking you?

24   A    He's asking me, "Do you have calculation support for

25   the interest rate swap you calculated for the Lehman claim?"

Page 19

1    A    And what is your response?

2    A    That I used Bloomberg to value this on 9/12/08.

3    Q    Now I think we had just discussed in the context of 15

4    -- Exhibit 1568 that you used 9/15 to value the interest

5    rate swap.  How do you explain the reference to 9/12 in this

6    e-mail?

7    A    This is a mistake.

8    Q    And I think you -- going up the chain what does Mr.

9    Wohlman ask you to do?

10   A    He said, "Thanks.  Did you send a screenshot to Lehman

11   at QVT.com?"

12   Q    And what is your response?

13   A    I said, "No, I will."

14   Q    And I think we have discussed in the context of Exhibit

15   1568 that you sent a screenshot to the Lehman repository on

16   September 28th, 2008, so how do you explain your statement

17   that you will send one over a week later?

18   A    It's a mistake as well.

19   Q    And did you send any other Bloomberg screenshot to the

20   Lehman repository at any time during this period?

21   A    Not that I recall.

22   Q    Have you since gone back and tried to determine whether

23   or not you did, in fact, value the interest rate swap as of

24   9/15/2008?

25   A    Yes, I have.

Page 20

1    Q    And what did you do?

2              MS. DEL MEDICO:  Your Honor, excuse me.  We have

3    an objection to this.  This is post-hac analysis on what he

4    did after the fact to try to, you know, back test his

5    methodology and what he did.  He just testified what he did

6    at the time.  I think what he's doing afterwards to try to

7    prove what he did at the time is inappropriate.

8              MR. BECK:  Your Honor, so this is not back testing

9    a methodology.  This is a response to Lehman arguing that

10   this e-mail that says 9/12 somehow trumps the actual

11   Bloomberg screenshot that says 9/15.

12             THE COURT:  So --

13             MR. BECK:  The methodology is the same in both

14   cases.

15             THE COURT:  Okay.  So the issue is whether as a

16   fact the position was valued as of September 12th or

17   September 15th.  That's the issue, correct?

18             MS. DEL MEDICO:  Correct.

19             THE COURT:  So to the extent that these questions

20   are designed to test the witness's recollection about the as

21   of date when he valued it it's admissible.  It's not

22   admissible as some sort of corroborative back test of what,

23   in fact, was done.  All right.

24             MS. DEL MEDICO:  Okay.  Uh-huh.

25             THE COURT:  Okay.

Page 21

1          Do you remember the question, Mr. Fu?

2          THE WITNESS:  Yes.  I did try to reproduce this

3    calculation.

4    BY MR. BECK:

5    Q    And what were the results of that?

6    A    When I first did it I got a different answer trying --

7    when I tried to historically recreate the 9/15/08 valuation.

8    Q    And what is your understanding of why you got a

9    different answer?

10   A    I -- as I understand it that the default curves that

11   Bloomberg was using in 2008 --

12          MS. DEL MEDICO:  Objection.

13          THE COURT:  Hold on.  Yes.

14          MS. DEL MEDICO:  Yeah.  I mean, first of all he's

15   saying --

16          THE COURT:  One second.  One second.

17          MS. DEL MEDICO:  Sure.

18       (Pause)

19          THE COURT:  Okay.  I need you to be closer to the

20   mic, please.

21          MS. DEL MEDICO:  Me?

22          THE COURT:  Yes.

23          MS. DEL MEDICO:  Sure.  Sorry about that.

24          THE COURT:  Okay.

25          MS. DEL MEDICO:  Whoa.

Page 22

1          (Laughter)

2               THE COURT:  Not that close.

3               MS. DEL MEDICO:  The first part of the objection

4     is a foundational objection.  I'm not sure how he would know

5     how things changed on Bloomberg.

6               The second part of the objection is, you know,

7     he's trying -- I don't see how -- this is again goes to the

8     back testing point.  It's him trying to recreate what he did

9     and kind of this is an issue that the experts are talking

10    about in this case.

11              So I'm unclear as to how this is fact testimony.

12              THE COURT:  Okay.  So Mr. Fu is a fact witness.

13    Why don't we allow the testimony and then you can ask

14    questions on redirect that would establish the parameters if

15    you will of what he did to verify the work that he did in

16    the appropriate time frame as opposed to anything that was

17    done afterwards to justify it.

18              To the extent that you have a question about the

19    recreation of the Bloomberg screens that existed at the

20    relevant time and how he was able to tell, that's

21    appropriate for cross-examination.

22              So let -- let's let the questioning proceed.  All

23    right.

24              MS. DEL MEDICO:  Uh-huh.

25    BY MR. BECK:

Page 23

1    Q    I'll just repeat the question.  What is your

2    understanding of why you were unable to recreate the

3    screenshot from September of 2008?

4    A    My understanding is that the curves used in 2008, the

5    default curve that Bloomberg used was different than what

6    the default curve that they use today.

7    Q    And what is your understanding of the default curve in

8    Bloomberg in 2008?

9    A    I believe that they're using cash rates for the first

10   12 months and then swap rates afterwards.

11   Q    And what is your understanding of the Bloomberg default

12   curve today?

13   A    It's cash rates for the first three months, futures

14   from three to 12 months, and then swap rates afterwards.

15   Q    And once you have this understanding --

16            MR. BECK:  You have a question, Your Honor?

17            THE COURT:  Yes.  So now I'm confused, Mr. Fu.  So

18   can you go back to the exhibit that's marked as Joint

19   Exhibit 0088 which is an e-mail exchange between you and Mr.

20   Wohlman?  And he says, "Thanks.  Did you send a screenshot?"

21   And you said, "No, I will."  And you said that was a

22   mistake.

23            So is the mistake that you had -- in fact, had

24   sent the screenshot?

25            THE WITNESS:  Yes.

Page 24

1          THE COURT:  So then if you had sent the screenshot

2    then -- and is the screenshot the exhibit that's marked as

3    -- that's in your binder as 1568?

4          THE WITNESS:  Correct.

5          THE COURT:  So then I guess my confusion is then

6    you have that screenshot.  That screenshot foots with the

7    numbers on the spreadsheet.

8          THE WITNESS:  Correct.

9          THE COURT:  So then what happened?  If that

10   screenshot foots with what's on the spreadsheet why is there

11   any analysis of some other screenshot?

12         THE WITNESS:  There is no other screenshot.  I'm

13   just trying to reproduce this screenshot today.

14         MR. BECK:  The issue, Your Honor, is Lehman has

15   focused on this e-mail saying 9/12 and then when they try to

16   recreate Mr. Fu's screenshot from 2008 they can't because

17   the default curve has changed.  That's the issue.

18         THE COURT:  But there is -- but this is -- then

19   this is an authenticity issue.  If there's no question but

20   that the screenshot that is at Exhibit 1568 is, in fact, the

21   Bloomberg screenshot from that date --

22         MS. DEL MEDICO:  There are other issues with the

23   screenshot, Your Honor.  If I can approach to --

24         THE COURT:  Sure.  Come on up.

25      (Sidebar discussion held off the record)

1        (At 10:01 a.m.)

2            MR. BECK:  Thank you, Your Honor.

3    BY MR. BECK:

4    Q    So I believe we were talking about your understanding

5    of the difference of the Bloomberg default curve between

6    2008 and 2016.  Once you reached an understanding of that

7    change were you able to recreate your screenshot from

8    September 2008?

9    A    Yes.  I created it to the -- we created it to the

10   penny.

11   Q    And at any time did you try to recreate the screenshot

12   using a 9/12/2008 date?

13   A    I did and I was not able to get it to match.

14   Q    And were you able to get it to match under either or

15   not get it -- able to match under either the 2008 default

16   curve as your understanding or the 2016 default curve?

17   A    That's correct.  I used both curves to value it and

18   neither matched.

19            MR. BECK:  Pass the witness, Your Honor.

20            THE COURT:  Thank you.

21            MS. DEL MEDICO:  Your Honor, could I have two

22   minutes?

23            THE COURT:  Sure.

24            MS. DEL MEDICO:  Thank you.

25        (Pause)

Page 26

1          MR. BECK:  Your Honor, we have some --

2          THE COURT:  Yes.

3          MS. DEL MEDICO:  -- witness binders that we would

4   like to --

5          THE COURT:  Okay.

6          MS. DEL MEDICO:  -- pass up.

7          THE COURT:  Should I put this aside?

8          MS. DEL MEDICO:  Please.

9          THE COURT:  Okay.

10     (Pause)

11                    CROSS-EXAMINATION

12  BY MS. DEL MEDICO:

13  Q    Mr. Fu, could you please turn to Exhibit 5933 in your

14  book?  And Exhibit 5933 is a demonstrative.

15          MS. DEL MEDICO:  Randall, can you put it on the

16  screen.

17  BY MS. DEL MEDICO:

18  Q    What we did was we filtered, like you just showed us

19  before, Column BC for TF and TF is you, correct?

20  A    Correct.

21  Q    And what shows -- what's on the screen right now are

22  the positions that are -- or some of the positions that you

23  valued in connection with QVT's claim against Lehman, right?

24  A    Correct.

25  Q    And if you look at Lines 218 and 219 you valued the

Page 27

1    tie-fi's in the copper account using Markit data for

2    9/18/2008, right?

3    A    Correct.

4    Q    And Markit data for those positions were -- was

5    available on September 15th, 2008, right?

6    A    I don't know.

7    Q    And you told -- you said on direct that there was an

8    agreed upon default of ten percent for bid-mid and that's

9    shown in Column W, correct?

10   A    That's correct.

11   Q    Who agreed upon that?

12   A    I don't recall.

13   Q    That's not an agreement you had with Lehman, is it?

14   A    I wouldn't think so.

15   Q    Did you do any independent calculations or valuations

16   to figure out if ten percent was an appropriate bid-mid

17   spread?

18   A    I did not.

19   Q    And if you look at Column C, that shows the notional of

20   the positions that you valued, these 12 positions, correct?

21   A    That's correct.

22   Q    And the notionals range from 440,000 to about 1.5

23   million.  Do you see that?

24   A    Well, there's larger ones than that, too, right?

25   There's eleven and a half million.

Page 28

1   Q    I'm sorry.  I misspoke, eleven and a half million.  Do

2   you see that?

3   A    Yes.  I do see that.

4   Q    Okay.  And you used a bid-mid spread of ten percent

5   regardless of the notional, the positions; is that right?

6   A    That's correct.

7   Q    In Column M you can see the maturities of the

8   positions; is that right?

9   A    Yes.

10  Q    And they're not all the same, you agree?

11  A    I agree.

12  Q    And so you used a bid-mid spread of ten percent

13  regardless of the maturity date?

14  A    That's correct.

15  Q    Now you didn't try to replace any of these positions on

16  9/15/2008, did you?

17  A    I did not.

18  Q    But you could have, right?

19  A    I don't know.

20  Q    Mr. Fu, can you go to Exhibit CX-1568?

21       (Pause)

22  Q    And this is the e-mail from you to the Lehman -- to

23  Lehman which is that a Lehman@QVT inbox?

24  A    Yes.

25  Q    And it attaches the Bloomberg that we were just

Page 29

1    discussing before, correct?

2    A    That's correct.

3    Q    Now if you look at the bottom left tab or the bottom

4    left of this Bloomberg screen you see that there is a main

5    tab, correct?

6    A    That -- yes.  And it's highlighted.  That means you're

7    on the main tab.

8    Q    So this -- so what I'm seeing here is the main tab,

9    correct?

10   A    That's correct.

11   Q    And there are other tabs here, right, like curves and

12   cash flow?

13   A    That's correct.

14   Q    And you didn't attach any of the other tabs to your e-

15   mail, correct?

16   A    I did not.

17   Q    And so there's information under these other tabs that

18   we can't see here; is that right?

19   A    Yes.

20   Q    And looking at this screenshot on its face it doesn't

21   indicate the bench mark instruments on which the curve was

22   built; is that right?

23   A    Well, it says the discount curve is Number 23.

24   Q    On the face of this document does it tell us what

25   Number 23 means?

1    A    No.

2    Q    And on the face of this screenshot it doesn't indicate

3    the actual price levels of the bench mark instruments; is

4    that right?

5    A    That's correct.

6    Q    Mr. Fu, have you been using Bloomberg since the mid-90s

7    would you say?

8    A    Yes.

9    Q    And have you been valuing interest rate swaps that

10   long?

11   A    Not since the mid-90s.

12   Q    How long would you say you've been valuing interest

13   rate swaps?

14   A    Maybe since 2005 or 6 or something.

15   Q    Okay.  So there's no way to tell conclusively based on

16   the face of this screenshot how the curve was constructed to

17   come up with the valuation, right?

18   A    From this screenshot, no.

19   Q    Just this screenshot alone.

20   A    Just this screenshot alone, no.

21         MS. DEL MEDICO:  One minute, Your Honor.

22      (Pause)

23         MS. DEL MEDICO:  Your Honor, I have no further

24   questions, but Lehman reserves the right to call this

25   witness.  He's on our witness list.

1          THE COURT:  All right.

2          Yes.

3          MR. BECK:  I have no further questions, Your

4     Honor, but I don't think Mr. Fu is on their witness list,

5     but that's fine if --

6          UNIDENTIFIED SPEAKER:  He is.

7          MS. DEL MEDICO:  He is.

8          MR. BECK:  No further questions.

9          THE COURT:  Okay.  All right.  Mr. Fu --

10         THE WITNESS:  Thank you.

11         THE COURT:  -- you're excused.  I understand you

12    have jury duty.

13         THE WITNESS:  Yes.

14      (Laughter)

15         THE WITNESS:  Thank you.

16         THE COURT:  Well, you can report back to us on

17    which Court is more enjoyable.

18      (Laughter)

19         THE COURT:  Thank you for coming in.  We

20    appreciate it.

21         All right.  Are we ready to go back to Mr. Chu?

22         MR. TAMBE:  That's right, Your Honor.

23         THE COURT:  Okay.

24         MR. TAMBE:  Can I just have a couple minutes to --

25         THE COURT:  Sure.

Page 32

1          MR. TAMBE:  -- set stuff up and --

2          THE COURT:  Yes.  Of course.

3     (Pause)

4          THE COURT:  Okay.

5          MR. TRACEY:  And we would have assumed he would be

6  here by now.

7          THE COURT:  Okay.

8          MR. TRACEY:  But he doesn't appear to be.

9          THE COURT:  He doesn't appear to be.  Okay.  So

10  why don't we just take a break and you can try to figure out

11  where he is and we'll just start whenever he gets here.

12          MR. TRACEY:  Okay.  Apologies, Your Honor.

13          THE COURT:  No problem.

14     (Recessed at 10:16 a.m.; reconvened at 10:29 a.m.)

15          THE CLERK:  All rise.

16          THE COURT:  Have a seat.

17          Welcome back, Mr. Chu.

18          THE WITNESS:  Thank you, Your Honor.

19     (Pause)

20                    CROSS-EXAMINATION, CONT'D.

21  BY MR. TAMBE:

22  Q    Good morning, Mr. Chu.

23  A    Good morning, Mr. Tambe.

24  Q    I want to go back a little bit to CARB and just touch

25  on a couple of issues we talked about on Friday.

1    A    Okay.

2    Q    One of the thing we had talked about last Friday was

3    the remittance report for one of the (indiscernible).  Do

4    you recall that testimony?

5    A    I do.

6    Q    And I think we were talking about Tab 121 in the binder

7    that I have given you.

8    A    Yes.  I'm there.  Thank you.

9    Q    And that is Exhibit CX-1354.  And that was the

10   remittance report for the month of August 2008, correct?

11   A    Yes.

12   Q    And I think you told us on Friday that's not a document

13   you had consulted in connection with your CARB valuation?

14   A    That's correct.

15   Q    Okay.  There was also a report for September 2008 for

16   each of these (indiscernible), correct?

17   A    Yes.

18   Q    And that's a report that could have told you whether in

19   the month of September 2008 following Lehman's bankruptcy

20   there was a deterioration in the performance of the

21   underliers, correct?

22   A    Yes.  It would have told you what happened in

23   September.  Correct.

24            MR. TAMBE:  If I can approach, Your Honor?

25            THE COURT:  Yes.

Page 34

1          (Pause)

2     BY MR. TAMBE:

3     Q    Mr. Chu, I've handed you the document marked Exhibit

4     5574.  And it's not in the binder.  It's a document that was

5     previously marked as an exhibit.  And if you could take a

6     moment to look at this document.  Let me know when you're

7     done.  I have a few questions for you on this document.

8          (Pause)

9               MR. TRACEY:  Your Honor --

10               THE COURT:  Yes, Mr. Tracey.

11               MR. TRACEY:  -- I don't have an objection to this

12     document to the extent that it -- there's no foundation that

13     it was issued before the (indiscernible) of the calculation

14     statement.  If that foundation is laid I have no objection

15     to it.

16               THE COURT:  Okay.

17          (Pause)

18               THE COURT:  I'm sorry.  Did Mr. Chu say he's ever

19     seen this document before?

20               MR. TAMBE:  I mean, I've just asked him to look at

21     the document.  I haven't asked him a question about it yet.

22               THE COURT:  Okay.

23          (Pause)

24               THE WITNESS:  Okay.  I've looked through it.

25     BY MR. TAMBE:

Page 35

1   Q    And you generally recognize the form of this document,

2   correct?

3   A    Yes.

4   Q    Okay.  You see it carries a date of 10/15/2008.  Do you

5   see that?

6   A    I do.

7   Q    And it says right above that, collection period

8   September 2008.  Do you see that?

9   A    Yes.

10  Q    Is this a document you consulted in connection with

11  your prep -- the preparation of the calculation statement?

12          MR. TRACEY:  Objection, Your Honor.

13          THE COURT:  Yes.

14          MR. TAMBE:  The question --

15          THE COURT:  Objection is the foundation objection?

16          MR. TRACEY:  Correct.

17          THE COURT:  Okay.

18          MR. TAMBE:  The question simply is, Your Honor, is

19  this a document that he consulted in connection with the

20  calculation statement.

21          THE COURT:  Go ahead, Mr. Tracey.

22          MR. TRACEY:  I object on the ground of lack of

23  foundation.  If this document wasn't available at the time

24  that the calculation statement was made, the questioning

25  about whether he did or did not consult it couldn't possibly

Page 36

1    be relevant and there's no foundation that he could have

2    reviewed it.

3              So I do object on relevance and foundation

4    grounds, I mean.

5              THE COURT:  Okay.  Go ahead.

6              MR. TAMBE:  Two problems with that, Your Honor.

7              THE COURT:  Yes.

8              MR. TAMBE:  I think with respect to the last

9    document we talked about I think Mr. Chu had said that the

10   date of 9/15/2008 for the other document --

11             THE COURT:  Right.

12             MR. TAMBE:  -- would be the date on which it was

13   issued or shortly thereafter.

14             THE COURT:  Okay.

15             MR. TAMBE:  All right.

16             THE COURT:  So you can ask him about -- you can

17   ask him a question --

18             MR. TAMBE:  Yeah.  Sure.

19             THE COURT:  -- along those lines with respect to

20   this document.

21             MR. TAMBE:  Okay.

22   BY MR. TAMBE:

23   Q    You see the date of 10/15/2008 on it?

24   A    I do.

25   Q    And do you have any reason to believe it wasn't issued

1   on 10/15/2008?

2   A    I'm not sure it was issued on 10/15/08 or whether it

3   was slightly thereafter.  I don't know the exact date.

4   Q    But in any event as you sit here today you know this is

5   not a document you consulted on 10/15/2008 when you

6   submitted your calculation statement?

7              MR. TRACEY:  Same objection.

8              THE COURT:  All right.  But I'll -- but on the

9   narrow question of whether or not he consulted the document

10  you can answer subject to the question, the unanswered

11  question of whether or not it was in existence as of

12  10/15/2008.

13             THE WITNESS:  No.  I did not consult this

14  document.

15             MR. TAMBE:  Okay.

16  BY MR. TAMBE:

17  Q    Have you consulted this document since you submitted

18  your calculation statement?

19  A    No.  I don't think I would have directly consulted this

20  document since then.

21  Q    Okay.  Did you look at all after you submitted the

22  calculation statement to see how the underlying reference

23  obligations were performed?

24  A    Well, you know, in the course of the years that have

25  passed since then I have looked at these bonds.  This data

Page 38

1    is available probably on INTEX and so I suppose indirectly I

2    would have seen this data.  I don't know if I saw this

3    month, but, yes, I would have seen performance data

4    thereafter.

5    Q    Okay.  And to the extent it was available on INTEX,

6    that would be available to you as soon as was -- as soon as

7    it was posted on INTEXT, correct?

8         MR. TRACEY:  Your Honor, I'm going to object to

9    questioning on work or consultations or reviews that Mr. Chu

10   may have done after October 15th.  Lehman's counsel has

11   specifically said that those post hac analyses are

12   irrelevant and if -- if it's good for the goose, it's good

13   for the gander.  I am not sure --

14        THE COURT:  So if this -- this sounds like it's in

15   the category of back testing which I think Mr. Tracey is

16   correct that Lehman has objected to.

17        So is there -- is that, in fact, where you're

18   going with this?

19        MR. TAMBE:  No, it's not.  It's --

20        THE COURT:  Okay.

21        MR. TAMBE:  -- based on the last answer he gave

22   where he added that this data is available probably on

23   INTEX.  And so he doesn't have to wait for this to be

24   published and mailed through snail mail.  If this is

25   available on INTEX it was available to him on 10/15/2008.

Page 39

```
 1              THE COURT:  All right.  On -- based on that you

 2     can continue.  So it's -- the question is the availability

 3     of this data, data like this on INTEX as of the time the

 4     calculation was done.

 5     BY MR. TAMBE:

 6     Q   And you didn't check INTEX to see if this data was

 7     available --

 8              THE COURT:  Okay.

 9     BY MR. TAMBE:

10     Q   -- as of the time you did the calculation?

11              THE COURT:  Hold on, Mr. Tambe.

12              MR. TRACEY:  I'm sorry.

13              THE COURT:  Go ahead.

14              MR. TRACEY:  If Mr. Tambe is trying to lay a

15     foundation that this information was available to the

16     witness on October 15th or earlier I have no objection to

17     that.  But he hasn't even tried to establish that.

18              MR. TAMBE:  I don't have to lay that foundation,

19     Your Honor.  The question is did he even look in INTEX to

20     see if this data was available.  It's what he didn't do

21     that's relevant to the arguments we're making.  He picked a

22     methodology and went forward and ignored information that

23     was available to him.

24              MR. TRACEY:  It's already established in the

25     record that he didn't review INTEX, so I'm not sure where
```

Page 40

1    this is going with this particular document.

2              THE COURT:  Well, it can go --

3              MR. TRACEY:  If it --

4              THE COURT:  -- it can go one of two ways, right.

5    He -- the witness has said he didn't consult INTEX.  So then

6    the follow up question would be to probe -- he -- the one

7    answer could be he didn't consult INTEX because he knew this

8    data wasn't available there or he didn't consult INTEX

9    notwithstanding that he knew this data was there.

10             So I think Mr. Tambe is entitled to ask a few more

11   questions to figure out the scope of this witness's

12   familiarity with the data that was on INTEX during the

13   relevant time period.

14             MR. TAMBE:  Thank you, Your Honor.

15             THE COURT:  All right.

16   BY MR. TAMBE:

17   Q    So let me lay some foundational questions, Mr. Chu.

18   A    Okay.

19   Q    You knew generally with your familiarity with INTEX

20   that information about underlying bond performance reference

21   obligation performance would be available on INTEX, correct?

22   A    Yes, albeit possibly with a lag.  I think probably with

23   a lag.  Yes.

24   Q    Okay.  And when the information is made available by

25   whatever entity prepares the remittance report, that

Page 41

1    information is available immediately on INTEX, correct?

2    A    Well, as I said I'm not sure it's available

3    immediately.  I don't know what the lag between the time

4    this remittance report is issued and the time that INTEX

5    updates their own systems.  I don't know what that lag is.

6    Q    And in any event you did not consult INTEX at all in

7    connection with your valuation of CARB, correct?

8    A    We did not use INTEX for the valuation of CARB.

9    Q    And it was available to you.  You could have used it

10   had you chosen to use it.

11   A    Yes.  We had INTEX at the time.  Correct.

12   Q    And, in fact, earlier in 2008 you had run each of the

13   eight bonds through INTEX, correct?

14   A    Yes.  Earlier in 2008 I had run the bonds.

15   Q    And as a matter of valuing the CARB positions on your

16   books pre-bankruptcy you never revised your valuation

17   methodology based on information you had seen in INTEX,

18   correct?

19   A    I don't exactly understand the question.  When you say

20   revised our valuation methodology what do you mean?

21   Q    Did you change your marks in your books pre-bankruptcy

22   based on information you had seen in INTEX relating to these

23   bonds, the underlying obligations?

24   A    So -- sorry, change our marks in our books.

25   Q    Yeah.

Page 42

1    A    Well, that's something that we would generally do at

2    month end.

3    Q    Uh-huh.

4    A    I don't think that -- I mean, you observe a market

5    price or you get a mark or you see a run from Lehman at

6    month end and that gives you your mark whether or not you

7    run it in INTEX.  So I'm a little bit not understanding what

8    the question is about.

9    Q    The question simply is you have no recollection as you

10   sit here of ever having changed your marks in your books

11   based on information you saw in INTEX, correct?

12   A    No, because I think the marks -- INTEX doesn't tell you

13   what the price is.  The market tells you what the price is.

14   So INTEX tells you once you know the price if you run the

15   different cash flows what rate of return might you achieve

16   given that price.

17          So I think the answer -- I mean, I'm not totally

18   understanding your question, but I think the answer to your

19   question is, no, we didn't, I think, revise our marks as a

20   result of what an INTEX run.

21   Q    And you didn't challenge Lehman's marks based on any

22   information you had seen in INTEX, correct?

23   A    No.  I don't believe we did that.

24   Q    I believe the word you used when you were on direct was

25   it would have been an arduous task, correct?

Page 43

```
 1    A     I think I said the word arduous, yes.

 2    Q     And by that you mean it would have been hard to do

 3    that?

 4    A     And it would have -- I think it would have been time-

 5    consuming or at least my experience had been it was time

 6    consuming to do it in the past.

 7    Q     We talked a little bit yesterday about a set of e-mails

 8    you got during the week of 9/15 which provided you with bid

 9    asks on the car companies as well as the auto finance

10    companies.  Do you recall that?

11    A     Are these the Bloomberg run -- the Bloomberg messages

12    from JPMorgan that you're talking about?

13    Q     I believe that's right, and there are about four or

14    five lines in each one talking about GM, GMAC, FM, FMCC.  Do

15    you remember those?

16    A     Yeah.  I think I know what you're talking about, but

17    maybe if you want to point me to an actual exhibit I can

18    verify it.

19    Q     Okay.

20              THE WITNESS:  If I can ask again, is the

21    microphone placement acceptable?

22              THE COURT:  Yeah.

23              THE WITNESS:  Okay.

24              THE COURT:  All good.

25              THE WITNESS:  All right.
```

Page 44

1          (Pause)

2               MR. TAMBE:  We're still looking for an exhibit

3     number that we can use as a frame of reference and I have

4     some other questions --

5               THE COURT:  Okay.

6               MR. TAMBE:  -- for Mr. Chu.

7     BY MR. TAMBE:

8     Q    All right.  Let's take a look in Tab 97 of your big

9     binder.  And it's Exhibit JX-79.  All right.  That's one of

10    the documents we were looking at.  Do you recall that?

11    A    Yes.

12    Q    And we looked at a series of them for various days

13    throughout the week of 9/15 --

14    A    I --

15    Q    -- right?

16    A    -- recall that.  Yes.

17    Q    And you were getting similar e-mails from brokers prior

18    to the week of September 15th, 2000, correct?

19    A    Similar Bloombergs, yes.

20    Q    Okay.

21               MR. TAMBE:  We have marked some of those as new

22    exhibits, Your Honor.  I'll be approaching the witness with

23    respect to those --

24               THE COURT:  Okay.

25               MR. TAMBE:  -- and provide them to Your Honor as

Page 45

1    well and the Exhibit 5928.

2            THE COURT:  Thank you.

3        (Pause)

4    BY MR. TAMBE:

5    Q    The document that's up on the screen, Mr. Chu, and in

6    your hands that's marked Exhibit 5928, that's from Goldman

7    Sachs and it is dated September 9, 2008.  Do you see that?

8    A    Yes.

9    Q    Okay.  And you'll see that it has information on five-

10   year CDS on GM, Ford and the finance companies, correct?

11   A    Yes.

12   Q    Okay.  And you'll note that it states "autos: five-year

13   CDS trading tighter."  Do you see that?

14   A    I do.

15   Q    And you understand that is not a widening of the

16   spreads, but a narrowing of the spreads, correct?

17   A    Yeah.  It means the credit spread is going down.

18   Q    Yeah.  And this is Tuesday, September 9th, the morning

19   after Fannie and Freddy's news was reported, correct?

20   A    Yes.

21   Q    The next document I'm going to hand up to you, Mr. Chu,

22   is Exhibit 5929.

23        (Pause)

24   Q    And this document, Exhibit 5929, you'll see this is

25   another e-mail from Goldman again talking about the same

Page 46

1    four names that were in the prior exhibit.  Do you see that?

2    A    Yes, I see the same four names.

3    Q    Okay.  And the subject line says "auto: five-year CDS

4    outperforming the market stip."  Do you see that?

5    A    That's what it says.

6    Q    And, again, this is post-Fannie and Freddy, correct?

7    A    It is post-Fannie and Freddy, yes.

8    Q    Okay.  The next document I'm going to show you, Mr.

9    Chu, is going to come up on the screen and I'll give you a

10   copy.  It's Exhibit 5931.  And you'll see Exhibit 5931, Mr.

11   Chu, is an e-mail from Credit Suisse on the subject of auto

12   CDS.  Do you see that?

13   A    I do.

14   Q    And this one is from the morning of September 15th, 10

15   a.m.  Do you see that?

16   A    Yes.

17   Q    And the subject line states, "Auto CDS bid offer type."

18   Do you see that?

19   A    I do.

20   Q    And this is after, some hours after the announcement of

21   the Lehman filing, correct?

22   A    Yes.

23   Q    (Indiscernible) I'm going to hand you Exhibit 5932 and

24   it's going to come up on the screen.

25        (Pause)

Page 47

1   Q    And you'll see this is an e-mail, Exhibit 5932.  It's

2   from Merrill Lynch just before 4 p.m. on Wednesday,

3   September 17th.  Do you see that?

4   A    I see it.

5   Q    And this one says, "Auto CDS bench mark Spinco

6   massacre."  Do you see that?

7   A    I do.

8   Q    And the spread that you used in the GMAC five-year CDS

9   to value CARB took into account changes not just as of

10  September 15th, but all the way to September 19th, correct?

11  A    That's right.

12       (Pause)

13  Q    All right.  Let's change topics.  Let's talk a little

14  bit about the market quotation process.

15  A    Okay.

16  Q    When QVT went out to the market --

17       MR. TRACEY:  Excuse me.  I don't mean to

18  interrupt.  I just want to lodge an objection for the record

19  on that last document.  I don't think there was any

20  foundation laid that Mr. Chu received it or read it.  I

21  could have missed it.  Sorry.  That's my objection.

22       THE COURT:  I don't think the question was asked.

23  I think you just asked Mr. Chu what the document reflects.

24       MR. TAMBE:  Yeah.

25  BY MR. TAMBE:

Page 48

```
 1   Q    If you would turn to the third page of the document

 2   you'll see the metadata.

 3   A    Uh-huh.  Yes, I see it.

 4   Q    All right.  Do you see --

 5   A    I see the metadata.

 6   Q    -- that they are -- it's addressed to various people at

 7   QVT?

 8   A    I do.  Yes.

 9   Q    And I think I see your name.  I had to go looking for

10   it.  It's the third line down sort of in the middle, Arthur

11   Chu.

12   A    Yeah.  I see it as well.

13   Q    The fact of the matter is, sir, you routinely got e-

14   mails like Exhibit 5932, I should say Bloomberg messages

15   like 5932 from various dealers, correct?

16   A    Yes.  I think I said I got many thousands of such

17   messages each day.

18           THE COURT REPORTER:  I can't hear you.

19           THE WITNESS:  Yes.  I think I said I got many

20   thousands of messages each day.

21   BY MR. TAMBE:

22   Q    And you have no reason to believe that any of these

23   exhibits that we've looked at, the ones that talk about the

24   auto CDS were not received by you, correct?

25   A    I mean, I think you just showed me data saying I got
```

Page 49

1    this Bloomberg and I think I did.  As to whether I read it I

2    think I -- it's very likely I did not read it.  But --

3    Q    And, in fact, even as part of your CARB valuation one

4    of the things you did not do is go back and look at the

5    history of Bloomberg messages the week of September 15th or

6    the week prior to September 15th on what brokers were

7    telling you what was going on with auto CDS, correct?

8    A    Well, I looked at broker runs in order to establish the

9    change between those two dates.  I may have read some broker

10   runs in between, but I didn't comprehensively read all of

11   the runs with GMAC and GM and so on during that time.

12   Q    And as part of your calculation process as you did with

13   PCDS where you went back and found Mr. Camp's e-mails --

14   A    Uh-huh.

15   Q    -- there were no particular e-mails from any particular

16   brokers that you singled out as informing your CARB

17   valuation, correct?

18   A    No, because GMAC was a very widely traded credit.

19   Q    All right.  Now let's talk about market quotation.

20   A    Okay.

21   Q    Maybe.

22   A    Okay.

23   Q    When QVT went out into the market for market quotations

24   on September 15th you were not the person at QVT sending out

25   those (indiscernible) requests, correct?

Page 50

1    A    I was not the one who sent out the market quotation e-

2    mails, no.

3    Q    But you were aware they were going out?

4    A    Yes, I was.

5    Q    Okay.  And the topic of market quotations is something

6    that you had been focused on with respect to Lehman at least

7    for a week, correct?

8    A    I had asked questions about market quotation, yes, in

9    the prior week.  Correct.

10   Q    Okay.  So let's go in the big binder to Tab 38, which

11   is JX-42.  And if you want to take a moment and review that

12   e-mail chain starting from the back to the front.  Let me

13   know when you're done.  I'll ask you some questions about

14   it.

15        (Pause)

16   A    Sorry.

17   Q    It's JX-42.  It's Tab 38.

18   A    What -- oh, Tab 38.  Okay.  Okay.  I see it.

19   Q    Okay.  And you've had a chance to review it?

20   A    Give me one moment, please.

21        (Pause)

22   A    Okay.  I've looked at it.  Yes.

23   Q    Okay.  And so you -- starting with the back of the e-

24   mail chain which is the third page of the exhibit --

25   A    Uh-huh.

Page 51

1   Q    -- that's an e-mail you sent out on the morning of

2   September 8th, 2008, correct?

3   A    Yes.

4   Q    And I think you told us that you became concerned about

5   a potential Lehman default following the Fannie Freddy

6   conservatorship, correct?

7   A    I would say our -- my concern level sharpened or got

8   larger.  Yes.

9   Q    Right.  And not only did you talk to your colleagues as

10  you did at your desk, this time you sent an e-mail asking

11  very specific question about what happens when Lehman

12  defaults, correct?

13  A    I did send an e-mail.  Yes.

14  Q    Okay.  And the response which you got back was, I think

15  two e-mails up from Adam Medder, later the same morning of

16  September 8th starting on page 1 over to page 2, he provided

17  you with, at the bottom of page 1 onto page 2, with excerpts

18  from the agreements, correct?

19  A    Yes.  The loss -- definition of loss and market

20  quotation.  I see those.

21  Q    So at the very top there's a little discussion which is

22  not a quote from the agreements, but it begins, "Our

23  agreement provides."  Do you see that?

24  A    I do.

25  Q    All right.  And you'll see a reference there to

Page 52

1    something that's within quotes called "structured

2    transaction."  Do you see that?

3    A    Yes, I do.

4    Q    All right.  And you understand that none of the PCDS or

5    CARB trade that you valued were identified as structured

6    transaction in the relevant confirmations, correct?

7    A    If I may just clarify, do you mean did I check at the

8    time whether that was the case or what do I think right now?

9    Q    What do you think right now?  You know that right now.

10   A    I don't believe that either of those are capital S,

11   capital T structured transactions under the documents.

12   Q    All right.  So when you entered into the confirmations

13   for the CARB trades and the PCDS trades you did not identify

14   those transactions as capital S, capital T structured

15   transactions, correct?

16   A    I don't think so.  No.

17   Q    Okay.  And at the time you don't ask any questions

18   about this; is that right, about that phrase, structured

19   transactions?

20   A    I mean, I don't see any reference to the phrase,

21   structured transaction anywhere else in the e-mail.

22   Q    So the answer to my question is you didn't ask any

23   questions about that phrase at the time?

24   A    I mean, I don't recall having a conversation with Mr.

25   Medder about it and I don't see it in the e-mail, so I think

Page 53

1    -- I mean, to the best of my recollection I think we didn't

2    talk about it.

3    Q     Okay.  You'll see there's an extended quote from the

4    market quotation definition. I think it's the entire

5    definition set forth in Mr. Medder's e-mail.  Do you see

6    that below?

7    A     I see it.

8    Q     You did read that at the time, correct?

9    A     I actually don't know if I read it at the time.

10   Q     Did you read it at any time before the quotation

11   requests went out to the dealers on September 15th?

12   A     I don't recall whether I personally read the definition

13   of market quotation or not.  I received the definition of

14   market quotation, but I don't recall whether I personally

15   read the definition of market quotation or not.

16   Q     And you don't recall any specific discussions with any

17   of your colleagues at QVT about the phrase economic

18   equivalents that appears in the definition of market

19   quotation, do you, sir?

20   A     What line are we on?

21   Q     It will be six lines down.  It will be called, economic

22   equivalent.  It's about six lines down towards the right.

23   A     No.  I don't recall discussing the phrase, economic

24   equivalent.  No.

25   Q     Not something that factored into any of your market

Page 54

1    quotation analysis at QVT, correct?

2    A    Sorry.  Do you mean did anyone at QVT analyze the

3    phrase economic equivalent or did I analyze the phrase

4    economic equivalent?

5    Q    Did you analyze the phrase economic equivalent?

6    A    I don't recall discussing the phrase economic

7    equivalent, no.

8    Q    And you don't recall anyone else at QVT telling you

9    about the phrase economic equivalent in connection with the

10   market quotation process that was run on September 15th,

11   correct?

12   A    I don't recall the phrase economic equivalent coming

13   up.

14   Q    You respond to Mr. Medder's e-mail on page 1.  And the

15   question you have for him is, "Does the quotation agent

16   actually have to trade with us or not?"  Do you see that?

17   A    I do.

18   Q    And then you see below that, "I'm thinking in

19   particular about the PCDS we have on with them (within

20   preferred CDS it's not really traded away from them)."  Do

21   you see that?

22   A    I do.

23   Q    In addition to identifying PCDS in that e-mail to Mr.

24   Medder, did you tell Mr. Medder that PCDS was a particularly

25   illiquid transaction?

Page 55

1   A    I didn't use the phrase illiquid.  But I did say it's

2   not really traded away from them.

3   Q    Mr. -- but did Mr. Medder ask you is this a liquid

4   trade?

5   A    I don't recall whether he asked me if it's a liquid

6   trade or not.

7   Q    Now you did have some input, did you not, sir, in

8   telling folks at QVT who were running the market quotation

9   process as to which dealers to go out to to seek quotations

10  from?

11  A    Yeah.  I think there was discussion on the desk and I

12  would have been present for some of those discussions.

13  Q    And in none of those discussions did you tell any of

14  your colleagues, hey, on PCDS, if we ask for PCDS we're not

15  going to get any returns?

16  A    I don't think I said if we ask for -- no.  I don't

17  think I said that specifically.  No.

18  Q    And you didn't discuss with your colleagues at QVT when

19  you were preparing the market quotation request, hey,

20  instead of asking for PCDS why don't we get prices from the

21  market for preferred securities as opposed to PCDS?

22  A    No, we -- on the market quotation we didn't ask for the

23  prices of preferred securities.  That's correct.

24  Q    And you did not discuss with them any other

25  economically equivalent transactions like PCDS for which you

Page 56

1    might get quotes, correct?

2    A    Well, I think I just said we -- I don't recall

3    discussing the phrase economic equivalent, so I think the

4    answer would be, no.  I didn't talk about that.

5    Q    Okay.  You are aware that there's a certain population

6    of trades that you ultimately have responsibility for that

7    were never included in the market quotation requests,

8    correct?

9    A    Yes.

10   Q    Wasn't it your job, Mr. Chu, to make sure that the

11   trades that you were responsible for as a trader were sent

12   out as part of market quotation requests?

13   A    I mean, I suppose in the sense that they were

14   ultimately my responsibility, but I wasn't the one collating

15   all of the trades.

16   Q    The people collating the trades were sitting to the

17   right of you, to the left of you, right behind you, correct,

18   not --

19   A    Well --

20   Q    -- buildings away or offices away, correct?

21   A    I think Joel was doing most of it.  I sat next to Joel

22   at that time.

23   Q    And you had no confusion on the morning of September

24   15th as to what your portfolio of trades facing Lehman was,

25   correct?

Page 57

1    A    No.  I think we had the ability to get that

2    information.

3    Q    Not just the ability to get the information, you had

4    actually collected the information at least as early as the

5    night before, correct?

6    A    Yes.  I had looked for all the CDS that I thought faced

7    Lehman.  Yeah.

8    Q    Yeah.  And you did that for a very specific purpose,

9    didn't you, sir?

10   A    Yes.  There was a purpose behind it.  Sure.

11   Q    Yeah.  And the purpose was to identify the Sunday

12   before Lehman filed what your replacement transaction

13   strategy was going to be, correct?

14   A    It was to talk -- look at the general landscape of the

15   placements that we had considered doing.

16   Q    Well, and you went through and made notations on that

17   list of transactions as to whether the transactions were

18   hedges or not hedges, correct?

19   A    We made those notations, yes.

20   Q    And you made notations as to whether there was an

21   urgency to re-hedge or replace any of the particular

22   transactions, correct?

23   A    Yes.  There was an urgency column.  That's correct.

24   Q    So let's take a look at that analysis that you did the

25   night before the Lehman bankruptcy.  So it's Tab 46.  It's a

Page 58

1    native document. It's JX-51 so it will come up on the

2    screen.

3    A    Okay.  Should I put down the extremely heavy binder or

4    --

5    Q    You could.

6    A    Okay.

7    Q    But you may have to lift it up again.

8    A    Okay.

9    Q    But not for a few minutes, so we can spend some time on

10   the spreadsheet.  And I don't know if you have control of

11   the spreadsheet.  It's JX-51.

12       (Pause)

13   Q    Okay.  So let's first start by identifying what the

14   document is and then we'll see if we need to give you

15   control of the mouse so you can drive around the

16   spreadsheet.

17   A    Okay.  Okay.  So --

18   Q    Right now you don't have control of the spreadsheet --

19   A    Oh, okay.

20   Q    -- because it's being run from the debtor's computer.

21   A    Okay.

22   Q    I think your mouse and keypad is attached to --

23   A    Got it.

24   Q    -- your computer.

25   A    Thank you.

1   Q    So we have up on the screen JX-51.  You're familiar

2   with this document, correct?

3   A    Yes.

4   Q    All right.  And the night before the Lehman bankruptcy

5   you were working with this document, correct?

6   A    Yes.  I think so.  Yes.

7   Q    Okay.  So let's scroll all the way to the top of this

8   tab.  And let's just be clear.  What tab are we

9   highlighting?  Is it on exposure?  Okay.  So exposures is

10  highlighted and let's go up to the top of the first page.

11          And if you can just gradually scroll down this

12  page and, Mr. Chu, I would just ask you to look at it

13  because I'll ask you some questions after we're done

14  scrolling down this page.

15      (Pause)

16  Q    And let's just stop for a second.  So we're through the

17  first top of the sheet, the exposure sheet, and so far we

18  haven't seen individual transactions.  We haven't see tie-

19  fi's, correct?

20  A    No.  I think everything in Column A looks to me like an

21  account.

22  Q    Okay.  And then starting with Line 110 and going down,

23  again, you don't have specific tie-fi's there either,

24  correct?

25  A    No.

Page 60

1    Q    Okay.  Now you'll start to see in the right-hand

2    columns, Columns H and I you see indications about urgent

3    and replaced.  Do you see that?

4    A    Yes.

5    Q    All right.  And those were placed in this spreadsheet

6    on that weekend of September 14th, correct?

7    A    I think so.  Yes.

8    Q    So let's scroll down.  And we'll keep scrolling down to

9    different parts of this sheet.  Okay.  Now let's slow down

10   and let's start -- so there's a different section of the

11   same workbook or the same -- what do you prefer, workbook or

12   spreadsheet?

13   A    I think either one will be fine.

14            THE COURT:  We've been calling these sheets --

15            MR. TAMBE:  Sheets.  So we'll --

16            THE COURT:  -- right?

17            MR. TAMBE:  -- call these -- this is a sheet in a

18   workbook.

19            THE COURT:  Correct.

20   BY MR. TAMBE:

21   Q    So within the workbook that is Exhibit 51 we're on the

22   exposure sheet and now starting in Line 268 you'll see the

23   specific tie-fi's that are identified.  Do you see that?

24   A    I do.

25   Q    Okay.  And you recognize those as the unique

Page 61

1   transaction identifiers within QVT's systems, correct?

2   A    Right.

3   Q    Now let's -- if we can freeze the pains at 268-A so we

4   can keep the headings.  And let's move over to the right.

5   Within the -- okay.  Slow down.  All right.

6          So Column J says who, do you see that?

7   A    I do.

8   Q    All right.  And it has names of various traders at QVT,

9   correct?

10  A    I --

11  Q    And we can scroll down --

12  A    -- do.  Yeah.  Uh-huh.

13  Q    I didn't catch your answer.

14  A    Sorry.  What was the question again?

15  Q    The question was those are the names of various traders

16  at QVT, correct?

17  A    Yes.  That's correct.

18  Q    And the next Column K says naked hedge.  Do you see

19  that?

20  A    IT says naked/hedge.

21  Q    Naked/hedge.  Right.

22  A    Uh-huh.

23  Q    And there's a -- you can get a drop down menu to filter

24  that column to see what the different options are, correct?

25  A    You can.

Page 62

1    Q    Okay.  So we're just going to do that.

2    A    Okay.

3    Q    All right.  So now these are the different options for

4    filling out Column K.  Do you see that?

5    A    Those are the different responses that people put in.

6    Yeah.

7    Q    All right.  And so different traders put in different

8    responses for different positions, correct?

9    A    I think so.  Yeah.

10   Q    All right.  And you put in responses for the positions

11   that were your responsibility, correct?

12   A    I think so.  Yes.

13   Q    Okay.  Let's go back up and -- then the next Column L

14   is -- you've got a letter code for REPL difficulty.  Do you

15   see that?

16   A    Yes.

17   Q    And by that you meant replacement difficulty, correct?

18   A    I think that's what it means.  Yeah.

19   Q    And grade -- a grade of A is easy to replace?

20   A    I think it's relatively easier.  Yeah.  I think so.

21   Q    And a grade of -- sorry.

22   A    Yes.  I think that's what that -- I think that was the

23   concept.  Yes.

24   Q    And a grade of F is difficult to replace?

25   A    Yeah.  I think that's the spectrum.  Yeah.

Page 63

1    Q    Not impossible to replace, difficult to replace,

2    correct?

3    A    I don't think this RPEL difficulty was a defined term

4    in here where we said exactly what F means.  I think the

5    idea was to give a general picture of what's easier, what's

6    harder, and something that's F could be extremely difficult.

7    It could be impossible.  It's hard to -- I don't think it

8    was defined to that level of precision.

9    Q    And, again, each person who was responsible for

10   particular positions selected A, C or F for their positions,

11   correct?

12   A    As far as I can recall.  I don't remember whether I

13   asked somebody what would you put in this column or whether

14   they put it -- filled it in.  But I think it's fair to say

15   that there was some assessment likely by the person under

16   the who column as to whether to put A, C or F.

17   Q    That was part of the discussion on Sunday evening was

18   -- we saw an e-mail earlier about --

19   A    Uh-huh.

20   Q    -- exposure to Lehman, the 116 million versus $117

21   million number.  Do you remember that?

22   A    Yes.  I think I know the one that you're talking about.

23   Q    That's also a Sunday conversation amongst the

24   management at QVT, correct?

25   A    Do you want to just show me the exhibit number so we

Page 64

1    make sure --

2    Q    We can do that.

3    A    -- we're talking about the same thing.

4         (Pause)

5    A    And is this in your binder or is this in the book

6    binder?

7    Q    It should be in my binder.  Yeah.  It's Tab 44, Exhibit

8    5130.

9    A    Okay.  Yes.  Okay.  I -- yes.  I recall this.  Uh-huh.

10   Q    All right.  So this is, again, a doc -- this reflects

11   discussions and conversations that are going on at QVT on

12   Sunday, correct?

13   A    Yeah.  That's right.

14   Q    And we had looked at the landscape version, page 3, of

15   this document and that had on an aggregate basis the

16   exposure to LBSF as well as the margin against those

17   positions, correct?

18   A    Right.

19   Q    Okay.  All right.  So, again, we're talking about the

20   same day.  We're now talking about JX-51 where people are

21   going through and marking hedge, not a hedge, replacement

22   difficulty, et cetera.  Okay.

23         MR. TRACEY:  I'm sorry.  Did you say --

24         THE WITNESS:  Well, I didn't' --

25         MR. TRACEY:  -- we're not talking about it?

Page 65

1           MR. TAMBE:  We are talking --

2           THE WITNESS:  Which one.

3           MR. TAMBE:  -- about it.  We are now talking about

4    it.

5           THE WITNESS:  Oh, we are now talking about it.

6    Okay.

7           MR. TAMBE:  Thank you.

8           THE COURT:  What was the question again, Mr.

9    Tambe?

10          MR. TAMBE:  We're going back to the question.

11          THE COURT:  Okay.

12   BY MR. TAMBE:

13   Q    So when we were discussing JX-51 the question I asked

14   you was there was a Sunday conversation amongst management

15   of QVT that underlies JX-51.

16   A    There were conversations about JX-51.  Maybe that's --

17   that's how I would say it.

18   Q    I mean, JX-51 doesn't just spring to life on Sunday

19   night.  There's discussions going on at QVT amongst people

20   about identifying positions and providing some description

21   about whether it was naked or hedged, replacement

22   difficulty, et cetera, correct?

23   A    I think there were discussions about the spreadsheet.

24   Yes.

25   Q    And following those discussions people went in to the

Page 66

1    spreadsheet and made notations, right?

2    A    Well, that's the part I'm not totally clear on as to

3    whether or not we asked people to fill in the spreadsheet

4    and then we talked about the results once they were all

5    collated or there -- whether we talked generally and then

6    people went off and filled in the sheet.  I just don't -- I

7    don't remember the order of operations.

8    Q    Okay.  But putting aside the order of operations, two

9    things happened.  There was a discussion and the spreadsheet

10   was filled out.

11   A    Those two things both happened.  Yes.

12   Q    Okay.  So let's go over to the right a little bit more

13   and talk about Column M, and if you can just see the drop

14   down menu for Column M.  And you'll see for Column M again

15   there were different responses that could be filled in.  Do

16   you see that?

17   A    I see there are different responses.  Yes.

18   Q    And among the responses were hedge, no, replace,

19   replace with a question mark, unwind and yes.  Do you see

20   that?

21   A    Yes.  I see those different things.  Yeah.

22         MR. TRACEY:  I'm sorry for interrupting.

23         THE COURT:  Yeah.

24         MR. TRACEY:  But the transcript says you're

25   talking about N as in Nancy and I think you're talking about

1    M as in Mary.  So I --

2              THE COURT:  We are talking about M as --

3              MR. TRACEY:  -- just want to clarify that.

4              THE COURT:  -- in Mary.  Thank you.

5              MR. TRACEY:  Thank you.

6              THE COURT:  Yes.

7    BY MR. TAMBE:

8    Q    So in Column M as in Mary those are the different

9    responses that could be filled in by the traders, correct?

10   A    Well, those are the different responses that the

11   traders did fill in.

12   Q    All right.  So let's roll over to S as in Sam.  And

13   there's a drop down menu for S as in Sam.  And that column

14   has the title, urgency for replacement.  Do you see that?

15   A    I do.

16   Q    And the drop down menu has an option of either yes or

17   blank, correct?

18   A    I do see that.  Yes and blanks.

19   Q    All right.  Now you reviewed this spreadsheet at the

20   time and -- on Sunday, September 14th, 2008, correct?

21   A    We talked about the spreadsheet.  Yes.

22   Q    Okay.  And you made notations in the spreadsheet as did

23   other QVT traders, correct?

24   A    Yes.  There's input from both me and other QVT traders.

25   Right.

Page 68

1    Q    Okay.  So we can sort this list to see which trades

2    have your name associated with them in Column G, correct?

3    A    Okay.  Yes.

4    Q    So we've just selected Arthur in Column J as in Jake.

5    And if we can scroll all the way over to the left and if you

6    can scroll down generally you can take a look at the names.

7    And you'll see a series of preferreds.  Do you see that?

8    A    Yes.  I see those, the dash pref.

9    Q    Okay.  Scroll down.  You see some CDX trades?

10   A    Yes.  I see those CDX trades.  Yeah.

11   Q    Let's keep scrolling down.  Hold on.  Hold on.  You see

12   -- scroll -- you see STSUP which is a trade I believe you

13   talked about on direct.

14   A    Yes.  I see STSUP.  Uh-huh.

15   Q    KRB and other trades you talked about on direct.

16   A    I do see that.  Yes.

17   Q    So this is a population of your trades as of Sunday,

18   September 14th, 2008, correct?

19   A    I think many of them were my trades.  Maybe most or all

20   of them were my trades.  I mean, it just says Arthur.  I

21   don't know that this is the comprehensive list of all Lehman

22   CDS that I had.  But, yes, it definitely -- this is the

23   filter that we get and I -- it's definitely what you would

24   get when you filter by the name Arthur and I recognize many

25   of the trades as being trades that I did and ultimately

Page 69

1    valued.

2    Q    Okay.  So can we sort this list, so this is just the

3    trades that have Arthur associated with them in Column J

4    just for the preferreds?

5    A    Okay.

6    Q    We can do that, right?

7    A    Yes.  Sure.

8    Q    Okay.  And you do that by dropping down the menu in

9    Column B and picking contains PRES, right?

10   A    That should pick up the preferreds, yes.

11   Q    So let's do that.

12           THE COURT REPORTER:  (Indiscernible).

13           THE WITNESS:  That should pick up the preferreds.

14   Yes.

15   BY MR. TAMBE:

16   Q    So let's scroll to the top of this list.

17   A    Okay.

18   Q    And you recognize that as a listing of the preferred

19   CDS transactions that you had, right?

20   A    Yes.  It looks like it also includes not only

21   Quintessence but -- and QVT.  It looks like it also includes

22   the preferred CDS that would have been for a managed account

23   that we had for Deutsche Bank.  But, yes, that has the

24   preferred CDS.

25   Q    Okay.  And so (indiscernible) the preferreds that are

Page 70

1    at issue in this case would show up on this list?

2    A    Yeah.  I think they should all be there.

3    Q    So now let's scroll to the right.

4          THE COURT:  So let me understand this.  So when

5    there's three seemingly identical entries in your

6    terminology you have the 1.bang and then the 1b.bang and

7    then the 1q.bang, right, and those would be -- the b would

8    be the Deutsche Bank one?

9          THE WITNESS:  Right.

10          THE COURT:  Thank you.

11    BY MR. TAMBE:

12    Q    So let's scroll over to the right.  And you have in

13    Column M indicated replace for every one of those, right?

14    You can scroll down and see if --

15    A    Uh-huh.  Yes.  It says replace for all of them.

16    Q    And then let's scroll over to the right some more and

17    scroll up and down that column.  All right.  And you haven't

18    indicated urgency for replacement for any of these

19    transactions, correct?  That column is blank.

20    A    That column is blank.

21    Q    So now let's sort this same collection or your

22    collection of trades not for preferreds, but for the auto

23    bbb, the CARB trades.  We can do that, right?

24    A    We can.

25    Q    I don't think it will show up by CARB.  It will --

Page 71

1           THE COURT:  It won't show up by CARB.

2           MR. TAMBE:  -- show up as triple B.  You know this

3    spreadsheet, Judge.

4    BY MR. TAMBE:

5    Q    If you look for triple B you should find it.  If you

6    look at un-filter and then search for triple B.

7         (Pause)

8    Q    So doing that pulls up some other triple B trades, but

9    you'll see the four auto bbb trades being highlighted on the

10   page.  Do you see that?

11   A    I see it.  Yes.

12   Q    That's Line 666 through 669.

13   A    Uh-huh.

14   Q    All right.  So, again, let's scroll to the right and

15   you've got a replace/unwind indication of yes.  And then

16   let's scroll over.  But the urgency for replacement is

17   blank, correct?

18   A    The column urgency for replacement is blank.  Yes.

19   Q    Okay.  And we talked about this, I believe, on Friday.

20   Other than -- well, these ones didn't even go out for market

21   quotations, right?

22   A    They were not included in the market quotations.

23   Q    And you did not make any calls to any brokers to try

24   and actually replace these transactions after 9/15/2008,

25   correct?

Page 72

1  A    No.  We didn't try to do that.

2  Q    And the PCDS trades were part of the population on

3  which market quotations were sought.  You got no responses,

4  but you didn't make any other efforts to actually enter into

5  replacement trades for any of those PCDS trades after

6  9/15/2008, correct?

7  A    I think I may have talked to some brokers about whether

8  they had anything in PCDS, but I didn't attempt to solicit

9  firm offers or anything like that if that's what you mean.

10 Q    So even though you had received absolutely nothing back

11 in response to your market quotation query, you claim you

12 spoke to some brokers, but you didn't ask for firm offers?

13 A    Well, no.  As I said I don't believe we asked for firm

14 offers.

15 Q    All right.  So as of Sunday evening you have a list of

16 trades which includes PCDS and CARB.  You're having

17 discussions with the other traders at QVT about the Lehman

18 portfolio.  Do you have any explanation, sir, as to why the

19 CARB trades did not make it out for the market quotation

20 process?

21 A    As I said I'm not the one who did the collating of the

22 different trades.  I think that's something that really Joel

23 is the best equipped to answer.

24 Q    And all that's transpired since the market quotation

25 requests were made, your calculations were done, this

Page 73

1   litigation unfolded, you still have no idea as to how those

2   CARB trades did not make it to the market quotation

3   replacement?

4   A    I mean, I think it has to do with the particular order

5   of events in which Joel was putting together a ABS b-wick,

6   O-wick or, you know, that's what his -- that was his

7   original language for it around, I don't remember, 11 a.m.

8   or something.   And I think those are the ones that got

9   transcribed onto the ultimate list.

10           But, again, that's something that Joel I think is

11  the best one to speak to.

12  Q    And given the lack of liquidity in CARB didn't you ask

13  him right on Monday when the quotes and information started

14  coming back from brokers, hey, what did you get on CARB?

15  A    I don't remember if I asked him that or not.

16  Q    And you didn't ask him that in any of the ensuing days

17  until you put it in your calculation statement, correct?

18  A    No.  I don't believe I asked him that.

19  Q    Let's clear the filters on this.  And, again, we're in

20  JX-51.  We're going to clear the filters and we can search

21  the tie-fi's for PMI, P as in Peter MI.

22      (Pause)

23  Q    And you'll see there's a listing of many rows of PMI

24  transactions.  Do you see that?

25  A    Yes.  There are multiple PMI transactions.

Page 74

1    Q    And those are transactions that you had responsibility

2    for, correct?

3    A    Yes.  Those are my transactions.

4    Q    Okay.  So now we're done with JX-51.  Let's talk about

5    what you did about replacing the PMI transactions.  Okay.

6    Now I believe you've testified you began entering into

7    replacement trades very early in the morning on Monday,

8    September 15th, correct?

9    A    Correct.

10   Q    So if you could turn in your binder to Tab 48.  It's

11   CX-1332.  And you can take a moment to get familiar with the

12   document.  I'll ask a question or two.  Let me know when

13   you're done.

14   A    Uh-huh.  I see it.

15   Q    You know this document, correct?

16   A    Yes.  I think I recognize it.

17   Q    Okay.  And that's an e-mail that you sent to a trades

18   e-mail box at QVT; is that right?

19   A    I think it's a Bloomberg message technically, but, yes.

20   Q    And you are recapping a transaction that you have done

21   at -- as of 5:26 a.m., correct?

22   A    Correct.

23   Q    And just so we can get familiar with the terminology

24   here, if you can just explain to the Court what is it that

25   you're recapping in the recap comment?

Page 75

1    A    Okay.  Sure.  So just focusing on the highlighted line

2    in the body it says, "To recap, QVT buys 2 MM PMI 9/20/13 at

3    24.25 plus 500 from UBS new."  Okay.  So just going one bit

4    at a time, it means that the QVT Funds are buying a total of

5    2 million notional of protection on this credit PMI with a

6    tenure of five years, 9/20/13, and the price is 24.25

7    percent up front, so 24.25 percent of $2 million.  And the

8    plus 500 means the coupon is 500 running as was often the

9    case for more distressed credits.

10              It says from UBS, so from UBS, the broker dealer,

11   and the notation, new, means to distinguish it from an

12   unwind of an existing transaction or suppose I had sold

13   protection 9/20/13 I would be unwinding that transaction by

14   doing the opposite transaction, by buying.  It's to make it

15   clear here that this is a new credit default swap that's

16   being created in our system.

17              And just one more small technical detail.  When I

18   say QVT buys I mean all of the QVT managed entities.  So

19   that would be QVT Fund.  That would include Quintessence and

20   I think assuming that Deutsche Bank had the PMI protection

21   as well it would include Deutsche Bank.

22   Q    And PMI was a mortgage insurer; is that right?

23   A    Correct.

24   Q    And it was a distressed mortgage insurer?

25   A    Yes.  It was pretty distressed.  Yes.

Page 76

1    Q    And you were buying more protection of it?

2    A    I think I was replacing protection that I had facing

3    Lehman that I had lost.  Yeah.

4    Q    So this was a -- this was -- you viewed this as a

5    replacement trade for a trade you had on with Lehman?

6    A    Yes.  That's right.

7    Q    You said the replacement that you -- a protection that

8    you had lost.  As of 5:26 a.m. on September 15th you had not

9    terminated the transaction --

10   A    Yes.

11   Q    -- with Lehman, right?

12   A    I guess I was being a little colloquial.  At 5:26 a.m.

13   we had not terminated.  Right.  Yes.

14   Q    And you had not made any decision with your colleagues

15   at QVT as to whether or not you were going to terminate,

16   correct?

17   A    No.  I think at that time we had not made any decision

18   to terminate.

19   Q    You didn't make any decision to terminate until later

20   in the day, correct?

21   A    It was after 5:26.  It was in the morning.  I don't

22   know exactly what time it was.

23          THE COURT:  So I'm confused about the word, new.

24   So it was new in the sense that at that moment it wasn't per

25   se a replacement trade?

1          THE WITNESS:  Sorry.  It was just new in the sense

2     that it was a new credit default swap facing UBS.  And the

3     reason I needed to specify that to my colleagues in

4     operations was they need to be able to set up the

5     transaction and they need to know, okay, am I unwinding an

6     existing CDS or am I creating a new CDS.

7          So all I'm indicating to them is -- like they

8     don't -- for purposes of trades at QVT.com the purpose is to

9     get the trade booked into our system properly.  And the sort

10    of why doesn't really matter.  You know, it doesn't really

11    matter to the people that are setting up the trade, are you

12    replacing it, are you taking new risk.  It doesn't really

13    matter.  They just need to set up the trade properly.  They

14    just need to set up the trade properly.

15         And so what I'm trying to do is I'm telling them,

16    set up a new CDS facing UBS with these properties.

17         THE COURT:  Okay.  Thank you.

18         Yeah.  She can't hear.  Just wait two seconds.

19    The truck noise is making it difficult for the reporters to

20    hear.

21         (Pause)

22         THE COURT:  I'm just that good.

23         (Laughter)

24         MR. TAMBE:  Awesome.  Do you have a button?

25         THE COURT:  I do, but you don't want me to push

Page 78

1    it.

2        (Laughter)

3    BY MR. TAMBE:

4    Q    So even though the transactions have not been

5    terminated facing Lehman in your mind at 5:26 a.m. on

6    September 15th you were starting to do the replacement

7    trades, correct?

8    A    Yeah.  I was trying to -- I would just -- like I would

9    just say that like they weren't necessarily like capital R,

10   capital T replacement trades in the legal sense.  I was

11   trying to manage the risk by doing replacements for things I

12   thought in all likelihood were, you know, facing an entity

13   that wasn't going to perform.

14   Q    You were putting on this trade in connection with, with

15   a looser sense of the word, your exposure to Lehman,

16   correct?

17   A    Yes.  I think that's correct.

18   Q    Okay.  And you continue to do other PMI transactions

19   throughout the morning of the 15th, correct?

20   A    I did.  Yes.

21   Q    So we won't look at every single one, but we looked at

22   several examples.

23   A    Okay.

24   Q    So if you can turn to Tab 49 which is CX-1340.  And

25   that's -- you recognize that as another Bloomberg message

Page 79

1    that you sent to trades at QVT, correct?

2    A    Yes.

3    Q    And you're reporting an upsize of a transaction with

4    UBS, correct?

5    A    Right.

6    Q    So the prior document we've been looking at, CX-1332

7    was 2 million.  This one refers to 5 million PMI.  Do you

8    see it?

9    A    Yes.  It refers to 5 million PMI.

10   Q    And at the same pricing, 24.25 plus 500; is that right?

11   A    That's what it says.  Yes.

12   Q    And it is the same price as the $2 million trade?

13   A    Right.  I think what I'm saying here is that forget

14   about the $2 million trade.  I did a bigger trade.  I did a

15   $5 million trade with these terms.

16   Q    Okay.  And it's a five-year CDS?

17   A    It's a five-year CDS.  Right, hopefully.

18   Q    Let's go to 51, Tab 51 which is CX-1341.  Now it's a

19   little bit later the same morning.

20   A    I'm sorry.  Which --

21   Q    And that's another --

22   A    Which tab are we in?

23   Q    I'm sorry.  Tab 51.

24   A    51.  Okay.

25   Q    And CX-1341.  Do you see it?

Page 80

1    A    I see it.  Yes.

2    Q    And this is another trade recap from you to trades at

3    QVT, correct?

4    A    It is.

5    Q    And this is recapping a $2 million notional purchase of

6    PMI, but this time from Barclays, correct?

7    A    Yes.

8    Q    And, again, it's a five-year CDS?

9    A    It is a five-year CDS.

10   Q    And the upfront is a little bit lower than the upfront

11   with -- actually, yeah, it's a little bit lower than the

12   upfront with UBS, correct?

13   A    It is.

14   Q    And you continued to speak with the various brokers to

15   put on these replacement trades through the morning,

16   correct?

17   A    Yes.  I think I did replacement trades with more than

18   these brokers.  I did numerous replacement trades that day.

19   Q    And you were doing these electronically or voice?  What

20   was the methodology you used to reach these brokers and make

21   these trades?

22   A    I think it would have been both.  I could have sent a

23   Bloomberg and said I'm looking to buy PMI, say five-year,

24   where would you be on that.  I could have sent to Bloomberg

25   saying, where are you on PMI five-year.  It could have been

Page 81

1    some mix of the two things.

2    Q    Let's go to Tab 53 which is CX-1328.  And that's

3    another trade recap from you to trades at QVT.com, correct?

4    A    I'm sorry.  We're in Tab 53 right now?

5    Q    It's 53 --

6    A    Okay.

7    Q    -- which is CX-1328.

8    A    Yes.

9    Q    And this is a trade with JPM?

10   A    It is a trade with JPMorgan.  Yes.

11   Q    Five-million notional?

12   A    Yes.

13   Q    And a five-year CDS?

14   A    It is a five-year CDS and the price is higher.

15   Q    Okay.

16        (Pause)

17   Q    Let's go to Tab 61, which is JX-0199.  And that's a

18   recap and this time it's not a PMI trade.  It's another name

19   that you're recapping here, right?

20   A    Yes.  It's the name MTG which is another mortgage

21   insurer.

22   Q    And this is another trade recap that you sent to trades

23   at QVT.

24   A    Yes.

25   Q    And you're doing a trade, ten million notional,

Page 82

1    correct?

2    A     Ten million.  Yes.

3    Q     Five-year CDS?

4    A     Five-year CDS 9/20/13.

5    Q     And this is from CS, correct?

6    A     Yes.  Credit Suisse.

7    Q     And, again, this is a distressed entity so you have

8    some points up front.  Do you see that?

9    A     Yes.  There are points up front in the trade.

10   Q     And you did several trades in MTG through the day on

11   the 15th, correct?

12   A     I did.

13   Q     And you also traded CIT risk through the day on Monday,

14   September 15th, correct?

15   A     Yes.  I did some trades in CIT.

16   Q     And by way of example let's see some of those trade

17   recaps.  Let's go to Tab 78 and it's JX-0201.  And take a

18   moment -- this is a slightly different format so take a

19   moment to look at it and let me know when you're done.

20        (Pause)

21   A     Okay.

22   Q     And you recognize this as a trade recap for a trade you

23   did with Morgan Stanley, correct?

24   A     It certainly looks like a trade recap.  I'm not sure

25   whether I'm the one who did this CIT (indiscernible).

Page 83

1            MR. TAMBE:  (Indiscernible).  Let's take a small

2    break.

3            THE COURT:  Okay.  Let's take a break for about

4    six minutes --

5            MR. TAMBE:  Yeah.

6            THE COURT:  -- so that Mr. Tambe can reconstitute

7    his --

8            MR. TAMBE:  Not my water, but probably my glasses.

9            THE COURT:  -- his glasses and, Mr. Chu, you can

10   take a break now as well.

11           THE WITNESS:  Thank you, Your Honor.

12           THE COURT:  All right.

13           MR. TAMBE:  That's a new one.

14           THE COURT:  We'll take --

15       (Recessed at 11:35 a.m.; reconvened at 11:45 a.m.)

16           THE COURT:  Has Mr. Tambe been reconstituted?

17       (Laughter)

18           MS. DEL MEDICO:  He is, but I'm not sure where.

19   I'll go (indiscernible).

20           THE COURT:  All right.  Everyone just have a seat.

21   We'll just wait.

22       (Recessed at 11:45 a.m.; reconvened at 11:46 a.m.)

23           MR. TAMBE:  I'm well-hydrated.

24       (Laughter)

25   BY MR. TAMBE:

Page 84

1  Q    All right.  So before we let some water pass under the

2  bridge, we were talking about tab 78 and with JX-0201.  Do

3  you have that back up?

4  A    I see it, yes.

5  Q    And I believe you're saying it's a trade recap, if you

6  want to show it, it's one that you were involved with; is

7  that right?

8  A    Yes.  I believe several different people were trying to

9  buy CIT protection that day:  myself, Vee Sen (ph), I think

10  Nick Brahm (ph).  And so I just don't know for this trade

11  who did it.

12  Q    Okay.  So we could probably move off of this and go to

13  one that I believe you were involved in.  So let's go to tab

14  81, which is CX-1368.  And that's a Bloomberg from you to

15  trades at QVT recapping a CIT trade, correct?

16  A    Yes.

17  Q    And this is one that you do with Citigroup?

18  A    Yes.

19  Q    And it's five million notional?

20  A    Yes.

21  Q    And it's a five-year swap, correct?

22  A    Correct.

23  Q    Annual buying protection on CIT?

24  A    Correct.

25  Q    And that's not Citi, that's a different entity?

Page 85

1    A    Yes, that was a finance company, CIT.

2    Q    And at the time distressed?

3    A    Yeah, it was pretty distressed, yes.

4    Q    84, tab 84, which is Exhibit 5897.

5         (Pause)

6    Q    Just take a moment to look at this.  This is probably

7    another one that you haven't done, but let me know if you

8    recognize the document.

9    A    I didn't do this trade it looks like, so I actually

10   don't recognize this document.  I think I understand what

11   it's saying, but I don't recognize it.

12   Q    All right.  So in addition to you there were other

13   traders at QVT doing CIT trades through the day, correct?

14   A    That's right.

15   Q    And generally you were buying protection on CIT?

16   A    In the trades I did I was buying protection.  I think

17   overall the effort was to buy protection, I don't believe we

18   sold protection at all that day on CIT.

19   Q    And also with respect to PMI and MTG, you were buying

20   protection, not selling protection; is that right?

21   A    I think all the trades were buy-protection trades; I

22   think that's right, yeah.

23   Q    I want to take a look at I think tab 19, which is JX-

24   0209.

25        (Pause)

Page 86

```
1    Q    Again, the format is different.  Do you see it's an
2    email to you, do you see that?
3    A    Yes.
4    Q    And this is recapping a CIT transaction, correct?
5    A    Yes, it is.
6    Q    And it's a trade date of 9/15?
7    A    Correct.
8    Q    And it's a five-year CDS?
9    A    It is a five-year CDS.
10   Q    You are buying protection?
11   A    Right.  It says "CDS buyer QVT."
12   Q    And this too was a replacement transaction to replace
13   the risk of your Lehman trades?
14   A    Yes, I think so.  Yes.
15   Q    You'll see it's an email from someone at Citi to you,
16   do you see that, Sayed Hyder (ph)?
17   A    Yes.
18   Q    And that's someone that you dealt with not just in the
19   context of CIT, correct?
20   A    Correct.
21   Q    And in fact he is one of the brokers who had sent you
22   information on preferred securities during the week of
23   September 15, correct?
24   A    Yes.  He was our institutional salesperson in credit at
25   Citigroup, Sahar (ph) Hyder.
```

Page 87

1    Q    And it's Mr. Hyder at Citigroup who indicated the

2    volumes of trading he was doing in preferred securities,

3    correct?

4    A    Are you referring to the Bloombergs that we saw, was it

5    I guess Friday?

6    Q    On Friday, yes.

7    A    Well, I think probably it's a little bit more

8    technically correct to say he was forwarding a message --

9    it's a little bit more technically correct to say that he

10   was forwarding most likely a message that came from one of

11   his traders who was making the market that had that volume

12   notation on it.

13   Q    So he was your coverage at Citi telling you about

14   activity in preferred trading at Citi during the 9/15,

15   correct?

16   A    Well, he was the one that sent that Bloomberg related

17   to the preferreds, if that's what you mean.

18   Q    Yep, the one with the volumes.

19   A    Yes, I think we're talking about the same thing.

20   Q    Okay, all right.  So you have a population of

21   replacement transactions that you do on 9/15 and you do

22   replacement transactions on subsequent days as well, but

23   what I want to focus on are the ones you did on 9/15.  And I

24   want to go from these trading recaps to the calculation

25   statement and the spreadsheet that you were discussing with

Page 88

1    Mr. Tracey last week, okay?

2    A    Okay.

3    Q    And I believe that's -- it's a native document, it's

4    Exhibit 2108.  So we'll pull that up in native format.

5         And actually it might be helpful if we can pass

6    the controller with the other computer so Mr. Chu can direct

7    us, because I just want you to isolate certain trades.

8         (Pause)

9              THE COURT:  It's up.

10   BY MR. TAMBE:

11   Q    So up on the screen now is Exhibit 2108 and you spent

12   some time with this document with Mr. Tracey last week.  And

13   we're in the Lehman Positions Master tab; do you see that?

14   A    Yes, I can see that we're in the Lehman positions

15   master tab.

16   Q    Let's just do a couple of things:  one, if you could

17   sort this sheet, this tab for the replacement trades that

18   you did, and if you could describe for the Court what

19   sorting you're doing to get to that information?

20        (Pause)

21   A    Okay.  So let's see, I think there's two ways to get

22   the marking person.  So I'm going to use column BC here,

23   which says "Marked by," it's currently set to TF, which is

24   Tracy Fu, and I'm going to uncheck that, I'm going to put

25   AC.  Okay.  And then there's in column BP, I'm going to

Page 89

1    click on that and there are four choices:  calculation,

2    list, mark IT and replacement.  So I'm going to uncheck

3    everything except replacement.  And I think that leads us to

4    the universe of thing, these MTG and PMI trades that we were

5    just talking about.

6    Q    And if you now wanted to isolate the trades that you

7    replaced on 9/15, can you do that on this sheet?

8    A    I have to look, I'm not sure we can do this.

9    Q    If you could just go a little bit to the left --

10   A    Yeah.

11   Q    -- a little more, right there.  So in column Y on this

12   tab, Lehman Positions Master, it says 9/16/2008 all the way

13   down this column; do you see that?

14   A    I see that, yes.

15   Q    So and you can look around this sheet, but I don't

16   believe this sheet identifies the trades that were replaced

17   on 9/15; if it does, you can tell me where it is.

18   A    No, I think it does not say which trade was done on

19   which day, no.

20   Q    And so if you're looking at Lehman Positions Master and

21   you sort it for replacement trades associated with you, this

22   would tell you the date is 9/16/2008, but we've just seen a

23   lot of trades you did on 9/15/2008, correct?

24   A    Hang on a second.  So column Y has the Mark IT mark.  I

25   believe the way the sheet works is it says, if you use the

Page 90

1    Mark IT mark, if you put in a date in column Y, what date

2    should I go into Mark IT to look for the data in?  However,

3    I think we went through this particular example in some

4    detail in my direct, I'm on row 508 here, this particular

5    trade MPG-1206-20-DS-27 was valued using replacement.  So

6    even though the Mark IT mark that comes up it looks like

7    cell X508 is 32.7, that's not what was used; 29.78 was used,

8    which I can confirm over here in cell AL508, that's the same

9    number, and then the market value of the claim is equal to

10   the product of that divided by a hundred times the quantity,

11   which is shown in cell C508.

12            So what I'm saying is I don't believe this date

13   9/16/08 says the date of the trade, I believe that says if

14   you had used Mark IT that would have been the Mark IT date

15   that you would have used.

16   Q    Well, it doesn't say that either.  It directs you to a

17   formula and you're reading the formula to say that's what

18   that formula means, right?

19   A    Well, I didn't actually read the whole formula, just

20   from memory I think that's how the sheet works.  And it --

21   Q    I get your explanation of how the sheet works, I'm just

22   commenting on your statement that that's what it says.

23   That's not what it says, that's how you believe it works,

24   correct?

25   A    That's how I believe it works, yes --

1   Q     Okay.

2   A     -- that would be more precise.

3   Q     Now, when you were valuing the positions that you were

4   valuing and let's just focus on this collection of trades,

5   the MPG PMIs that were replaced, right, you were not

6   entering data into Lehman Positions Master, were you, sir?

7   A     Sorry, just -- I didn't understand the question.  Can

8   you repeat the question?

9   Q     Sure.  When you're building a calculation statement and

10  you're valuing the positions you're responsible for valuing,

11  you're entering data into some spreadsheet or workbook; it's

12  not this tab, is it, sir --

13  A     Oh, I see --

14  Q     -- Lehman Positions Master?

15  A     -- what you mean.  No, it's not.  It's another sheet in

16  this Excel.

17  Q     Right.  And this sheet, Lehman Positions Master, is

18  pulling information from that other sheet, correct?

19  A     Yeah, I think that's right.

20  Q     So let's find out what sheet it is that you were

21  actually entering your data into; which one is that?

22  A     I think it should come from Lehman Positions-Arthur.

23  So maybe for simplicity, maybe I should do the same

24  filtering on this sheet or --

25  Q     That will be helpful.  So again, if you can explain to

Page 92

1   the Court what you're doing, you have -- let's just take a

2   moment on this.  Lehman Positions-Arthur, it is your

3   understanding, that's the sheet in which you entered data,

4   you, Arthur Chu?

5   A    Yes, I think that's right.  So I think the way it works

6   is that every person who was working on this I think got a

7   copy of the same sheet that had all the positions in it and

8   then every person went and filled in his or her -- his

9   appropriate part of that sheet.  And then -- you know, I

10  wasn't the one who copied these in, but I think what

11  happened is that, you know, there was something called

12  Lehman Positions-Arthur, there's something called Lehman

13  Positions probably Joel, Sen and so on, and I think the

14  master sheet kind of looks up in the appropriate place and

15  sticks it into the master sheet.  So I think these are the

16  -- this is the one that I would have been populating.

17  Q    Why don't you go ahead and filter this to identify the

18  trades that you valued and the ones that you valued using

19  replacement transactions?

20  A    Okay.  So let's see, so --

21  Q    And just describe for the Court where you're going and

22  what you're doing.

23  A    Okay.  So right now I'm in the sheet that's named

24  Lehman Positions-Arthur and there's a column AQ, and I'm

25  going to filter that on my initials AC.  Okay.

Page 93

1           (Pause)

2      A    Just a second.

3           (Pause)

4      A    Okay.  So I think we should get the same universe of

5      trades here.  I'm going to call them AE and there's

6      something called reason, and I'm going to try to look for

7      all the cases in which it says "replaced."

8               Okay.  So what I have now is I have this universe

9      of trades from this account MI and let me do just one more

10     check.  So I'm going to hop back to Lehman Positions Master

11     for a second and I'm in row 508.  And I can see the first

12     ty-fi is MTG 1206_DS27, and I can see that in cell B508.

13     And if I move over to the mark in column AL, so cell AL508,

14     I see 29.79, and I also see the quantity in cell C508 of

15     $11.59 million.  So then I go to Lehman Positions-Arthur and

16     I see the same information here.

17     Q    All right.  So now let's scroll to the left on this

18     sheet, which is Lehman Positions-Arthur.

19     A    Okay.

20     Q    Now, there are columns and information on Lehman

21     Positions-Arthur that don't appear on Lehman Positions

22     Master, correct?

23     A    Sorry, there are -- is there information in Lehman

24     Positions-Arthur that doesn't appear on Lehman Positions

25     Master?

1    Q    That's right.

2    A    Which column are you referring to?

3    Q    So you've gone all the way to the left, now let's just

4    go column-by-column to the right.

5    A    Okay.

6    Q    To the right.

7    A    To the right, okay.

8         (Pause)

9    A    Okay.

10        (Pause)

11   A    Okay.

12   Q    So column BB.

13   A    Okay.

14   Q    That says Level on 9/21/2008?

15   A    Okay.

16   Q    That's not a column that appears on Lehman Positions

17   Master, correct?

18   A    I don't know; I'll have to look.

19        (Pause)

20   Q    You just went past BB.  Blank?

21   A    So in Lehman Positions Master, yes, I can confirm that

22   the column BB is -- well, at least under this filtering is

23   blank.

24   Q    So let's go back to Lehman Positions-Arthur.

25   A    Okay.

Page 95

```
1   Q    So for this collection of trades that you just filtered
2   for on Lehman Positions-Arthur, every one of those positions
3   has a value on 9/21/2008; do you see that?
4   A    Well, there's something that says Level on 9/21/08 and
5   those numbers are all filled in.
6   Q    And if you go two columns over to BD, you'll see BD is
7   doing a calculation.  It's comparing the number in BB, which
8   is this column called Level on 9/21/2008 --
9   A    Okay.
10  Q    -- and comparing it to column AN, as in Nancy; do you
11  see that?
12  A    I do.
13  Q    And if you go over to column AN -- you've got to go
14  over one more to the left --
15  A    Okay.
16  Q    -- it's got a title that says "Claim," do you see that?
17  A    Uh, I do.
18  Q    And Claim is a column that does appear in Lehman
19  Positions Master?  You can check for yourself.  I think it's
20  column AN.
21  A    Uh-huh.
22       (Pause)
23  Q    Right?
24  A    Okay.
25  Q    And that's what goes up to 242, do you see that?
```

Page 96

```
1    A    Uh --

2    Q    To the top-left column.

3    A    -- so AN2 is the sum of AN4 to AN799, yeah, I see that

4    that -- I see that formula.

5    Q    And if you go to the right in Lehman Positions Master,

6    not only is there no entry for column BB -- hold on, let's

7    go to BB -- so there is no entry for 9/21/08, the

8    differential.  The BB column that we saw in Lehman

9    Positions-Arthur that shows you the difference between the

10   claim amount and the BB amount, that's also missing, right?

11   A    Well, there -- it doesn't look like there is a

12   calculation like that in this sheet, if that's what you

13   mean.

14   Q    So let's go back to Lehman Positions-Arthur.

15   A    Okay.

16   Q    If you can confirm for me in row -- go to the right --

17   I'm focusing your attention on column BB and BD.  So BB and

18   BD --

19   A    Uh-huh.

20   Q    -- in the Lehman Positions-Arthur sheet.

21   A    Okay.

22   Q    And we're now -- you're now on in column BD, which is

23   the DISF column?

24   A    Yes.

25   Q    And we just discussed, what that's discussing is level
```

Page 97

1    on 9/21 minus the level of the claim, right?

2    A    It's -- right, so it's just subtracting two columns.

3    So BD510 is equal to BB510, minus AN510.

4    Q    The numbers that appear in column BB are numbers that

5    you put in on or about 9/21/2008, correct?

6    A    I don't know where the numbers in column BB come from.

7    Q    No idea?

8    A    I mean, it's just like -- it just says

9    829587.867111671, I don't know where that's from.

10   Q    Well, that's hard-coded, correct?

11   A    Yeah.  It's not a formula, it's just a number, yep.

12   Q    And you do know because I think you were in court when

13   Mr. Waldman was discussing how when you went from the live

14   spreadsheet to ones for production there were certain

15   formulas that were converted into hard-coded amounts,

16   correct?

17   A    Yes, I do recall that discussion.

18   Q    So at least when you were working in Lehman Positions

19   Master it had a column that said Level on 9/21/2008 and it

20   had a column that said DISF that compared 9/21 values,

21   whatever those values are on that column, to the claim

22   amount, correct?

23   A    Yes, there's something that subtracts AN -- was it AN

24   from BB or BB from -- AN from BB.

25   Q    And none of that information, those two columns BB or

Page 98

1    BD, appears on Lehman Positions Master?

2    A    I don't -- no, I don't think this makes it over to

3    Lehman Positions Master.

4    Q    So we come back to this in the BCDS and COB (ph)

5    context, but at least for now let's stay with PMI and MTG,

6    the replacement trades.

7    A    Okay.

8    Q    You didn't replace all of these trades, correct?

9    A    No, I didn't replace all of them.

10   Q    So you replaced a collection of PMI trades on 9/15 and

11   some collection of MTG trades on 9/15, correct?

12   A    That's right.

13   Q    The ones you didn't replace on 9/15, you did not use

14   your replacement prices on 9/15 to value those trades,

15   correct?

16   A    So are you asking if I had a ty-fi that I hadn't

17   actually replaced did I use a replacement price?

18   Q    Yeah.

19   A    I don't think so, no.  I think the replacement prices

20   correspond to the ty-fis that were replaced.

21   Q    And for the ty-fis that were not replaced you used

22   values from 9/16/2008, correct?

23   A    Yes, I think that's right.  I think for all these I

24   used 9/16/08, that's right.

25   Q    So you had transacted in some volume on Monday,

1    September 15th and received prices for actual transactions

2    in PMI and MTG, correct?

3    A    Well, I'm sorry, are you just asking did I do a number

4    of replacement trades on 9/15 with these names?

5    Q    Yes.

6    A    Yes, I did do a number of replacement trades in these

7    names, yes.

8    Q    And in doing those trades, you did them at specific

9    prices that were quoted to you and agreed by you to enter

10   into those trades, correct?

11   A    Well, yes, I had to agree to the trades to do them.

12   Q    But you didn't use that price discovery mechanism to

13   value the other trades as of 9/15/2008, correct?

14   A    Well, if you're asking did I use -- I used the prices

15   to replace the trades that they were replacing, I didn't use

16   the prices to value the trades that they weren't replacing.

17   Q    And instead you used, I believe, Markit Partners data

18   for those trades, but data from 9/16/2008, correct?

19   A    Correct, Mark IT from 9/16.

20          THE COURT:  I'm sorry?

21          THE WITNESS:  Correct, Mark IT from 9/16.

22   BY MR. TAMBE:

23   Q    There was Mark IT data available on 9/15 for those

24   names, correct?

25   A    There was Mark IT for 9/15.

Page 100

1   Q    If we can just go to the left in the spreadsheet?  A

2   little too fast, a little whiplash for me, slowly.  Keep

3   going over to the right.

4   A    Okay.

5   Q    So let me hold you there for a second on column Y.

6   A    Uh-huh.

7   Q    Now, column Y is a collection of all the trades, the

8   ones you replaced and the ones you didn't replace, correct?

9   A    Uh, I actually don't think that's right, because under

10  here it says "reason replaced."

11  Q    And again, so if you go back to Y.

12  A    Okay.

13  Q    So now every one of these is one that you've replaced,

14  but here too we see 9/16/2008; do you see that?

15  A    Yes, I see the date 9/16/2008.

16  Q    Did you anywhere collect Mark IT Partners data from

17  9/15/2008 for the trades that you had actually replaced on

18  9/15/2008?

19  A    I'm sorry, do you mean did I go back and compare the

20  prices at which I had done replacement trades to the Mark IT

21  data on that date?

22  Q    Uh-huh.

23  A    No, I don't think I did that.

24  Q    And is that information -- you didn't do that analysis

25  and you didn't capture that 9/15/08 data; is that right?

Page 101

1   A    I didn't -- I don't believe I did that analysis.  As to

2   whether the data was captured, I think the way it worked is

3   the Mark IT stuff was in our database and you could call up

4   that information.  So in that sense it was captured; it was

5   not captured by me, it was captured by whatever automated

6   process would capture it.

7   Q    You would just send your spreadsheet to go look up that

8   data; is that right?

9   A    Yeah, I think there's a spreadsheet function that can

10  find that data for you, yes.

11  Q    So now if we can go to the right on this spreadsheet,

12  Lehman Positions Offer.  And again a little bit slowly, so I

13  can --

14  A    Okay.

15  Q    -- stay with you.  A couple more right, one more -- a

16  couple more.  Keep going through right.

17       (Pause)

18  Q    Let's go all the way to the right to see what other

19  information appears.

20  A    Oh, okay.

21  Q    But just slowly so we can all keep track of what else

22  is here.  Keep going.

23  A    I mean, do you want me to read out the column headings

24  or something so they're on the record or --

25  Q    When we get to a part that I want you to discuss.  For

Page 102

1    now I just want you to show what else is on this

2    spreadsheet.

3    A    Okay.

4    Q    And if you get through column BD, that's the end of the

5    data that you -- you didn't do --

6    A    I mean, it looks like it, yes.

7         (Pause)

8    Q    Let's go back to the left.  And I want you to compare

9    AL and AD.  And if you can hide the columns in the middle,

10   that way we can compare side-by-side AL and AD.

11   A    Okay.

12   Q    And if you can now describe for the Court what you're

13   doing, so we can have those two columns side by side.

14   A    Okay.

15        (Pause)

16   A    Okay.  So what I've done is I've grouped the

17   intermediate columns in the sheet Lehman Positions-Arthur

18   between AD and AL, and so I've -- and collapsed the middle

19   columns so AD and AL appear next to one another.

20   Q    So in this case what it shows is for the ones that you

21   actually replaced and you listed on here you have overridden

22   whatever Mark IT information there was to make sure the

23   price you used was the price at which you transacted,

24   correct?

25   A    Sorry, what was your question?

Page 103

1    Q    By putting AL next to AD we can see that the price you

2    used is the same as your override price and your override is

3    because you actually transacted, you used your actual

4    transaction price to value these trades, correct?

5    A    Right.  So column AD and AL have the same values it

6    looks like going all the way down the sheet and it looks

7    like those values are different than what you would find in

8    column X, which is the result of the Mark IT calculation.

9    Q    I think we covered this, but I just want to be sure.

10   Did you ever compare your prices at which you actually

11   transacted on 9/15 to what your formula would have yielded?

12   That is take 9/15 Markit Partners values, add your ten

13   percent bid-mid, would that be a higher price or a lower

14   price than where you actually transacted on 9/15?

15   A    No, I don't think I did that calculation, although I

16   can see in many cases the -- no, I don't think I did that

17   calculation.

18   Q    So now let's -- so we just compare that, right?  So

19   let's look at the -- your override price, AD, let's compare

20   that to column X.  So again let's put those numbers --

21   A    Okay.

22   Q    -- side-by-side.

23           THE COURT:  Can I ask a clarifying question?  Is

24   the Mark IT data in column X from September 15th or

25   September 16th?

Page 104

1     THE WITNESS:  I think it's from September 16th,

2   Your Honor.

3     THE COURT:  16.

4     THE WITNESS:  I mean, the underlying formula isn't

5   exposed anymore, but I think that the -- from what I recall

6   about the way this sheet works in column Y, if you put in

7   something there it will call that date rather than 9/15/08.

8     THE COURT:  Thank you.

9   BY MR. TAMBE:

10  Q    And the information that appears in column X for this

11  collection of trades, that's the Mark IT mark you get when

12  you use 9/16 data and apply your ten percent bid-mid

13  adjustment, correct?

14  A    Yes, I think that's what it is, yeah.

15  Q    You can confirm for yourself if that's what it is; it's

16  your spreadsheet.

17  A    Well, as I said, I think that's what it's doing, I just

18  can't see the actual formula on Mark IT mark, but I think

19  that's the way it works.

20  Q    And you will see by comparing X to AD --

21  A    Uh-huh.

22  Q    -- right?  So AD is prices you actually obtained versus

23  the formula you used for all the other replacement trades.

24  A    Okay.

25  Q    The prices at which you transacted are far lower than

Page 105

1    the prices generated by your formula?

2            MR. TRACEY:  Objection.

3            THE COURT:  Yes.

4            MR. TRACEY:  Can I ask, did you mean to say all

5    the other replacement trades?  If you meant it, it's fine, I

6    just want to know.

7    BY MR. TAMBE:

8    Q    No, I meant it for all the other trades that were not

9    replaced where you just used the formula --

10           MR. TRACEY:  Okay.

11   BY MR. TAMBE:

12   Q    -- did you look to see how your formula fared compared

13   to actual prices you obtained?

14   A    I'm a little bit confused.  So what we're looking at

15   here is we're looking at the Mark IT mark, we think, as of

16   9/16/2008, and we're comparing that to the price at which we

17   actually did a trade generally on 9/15/08.

18   Q    Right, that's right.

19   A    Okay.  And so what's the question you're asking?  For

20   the ones where -- and I think we're still on the case in

21   which I actually did a replacement trade --

22   Q    Yeah.

23   A    -- right?

24   Q    Right.

25   A    So I think your question a second ago had to do with

Page 106

```
 1    cases in which I didn't do a replacement trade, is that what

 2    you're asking?

 3    Q    That's right.  And in the cases where you didn't do a

 4    replacement trade you would have used 9/16 values and a ten-

 5    percent bid-mid, correct?

 6    A    Okay, yes.

 7    Q    That's right, right?

 8    A    Yes.

 9    Q    Now, all I asked you is did you do a comparison to see

10    when you actually transacted on 9/15 how did that compare to

11    the prices you were getting from your bundle?

12    A    Are you saying did I compare my 9/15 prices to the 9/16

13    prices generated by Mark IT, is that what you're asking?

14    Q    Well, not just generated by Mark IT, but you don't just

15    take the Mark IT prices, you also add a ten-percent mid-bid

16    to that?

17              THE COURT:  I think the confusion is coming in

18    because you're referring to trades that Mr. Chu actually

19    replaced, but then you're segueing to a question involving a

20    comparison between Mark IT data from 9/16 plus a ten-percent

21    adjustment and if he compared that with the levels at which

22    he actually replaced --

23              MR. TAMBE:  That's right.

24              THE COURT:  -- right?

25              MR. TAMBE:  Yeah.
```

Page 107

1          THE COURT:  So it's a little bit apples and

2    oranges.

3          MR. TAMBE:  It might be, it might not be.  It's

4    two different concepts.

5          THE COURT:  Right.  I didn't want to make it more

6    complicated, but --

7          MR. TAMBE:  But I think you've captured what I'm

8    asking him to compare.

9          THE COURT:  Do it this way.  Why don't you -- so

10   we have on the one hand the Mark IT data from 9/16 and on

11   the other hand you have two groups:  replacement trades

12   actually executed and replacement trades not executed --

13          MR. TAMBE:  Right.

14          THE COURT:  -- right?  So I think, Mr. Tambe,

15   you're asking for what comparison was done --

16          MR. TAMBE:  That's right, if any.

17          THE COURT:  -- if any.

18          MR. TAMBE:  That's it.

19          THE WITNESS:  Okay.  So breaking it out in that

20   fashion -- by the way, if I can just clarify one point?

21   When I say Mark IT mark here, from my recollection of the

22   way this works it already incorporates the ten-percent bid-

23   mid spread in this, so there's no need -- in other words,

24   this 32.7 number would be including the effect of the ten-

25   percent bid-mid, it's not just using the Mark IT mark in a

Page 108

1    raw form.  So when I say Mark IT mark I mean adjusting for

2    the bid-mid already.

3            But coming back to the question, the question is

4    say you have a transaction that you did on 9/15/08, did I

5    compare the price of that transaction at which the

6    transaction was actually executed to the price that would

7    have been calculated from Mark IT data on 9/16/08 using a

8    ten-percent bid-mid, the answer to that question is no, I

9    don't think I did.  And then if you have an alternative --

10   so the alternative is cases where I didn't do a replacement

11   trade and is the question did I compare those to the 9/16

12   Mark IT price?  Because they would just be the same in that

13   case, right?

14           MR. TAMBE:  Correct.

15           THE WITNESS:  Yeah.  So did I answer your

16   question?

17   BY MR. TAMBE:

18   Q    Almost.  Where you didn't do a replacement trade, you

19   used your formula, correct?

20   A    When we didn't do a replacement trade we used the

21   formula, which means we took the 9/16 Mark IT price and we

22   used a ten-percent bid-mid on that, yeah.

23   Q    And I think you've answered the question, what you

24   didn't do is a comparison for where you did replace to

25   compare the result that would have been yielded had you used

Page 109

1   your formula as opposed to the replacement prices, correct?

2   A    So -- okay, so for example, in the case where I did do

3   replacement, are you saying, okay, did I say -- okay, so if

4   we look at these two -- first two ty-fis for instance.  So

5   I'm in row 510 right now, you're saying, okay, did you

6   notice that Mark IT, the formula would have yielded in cell

7   X510 32.7, but you actually replaced at 29.79 or whatever,

8   when you did whatever (indiscernible) you did and calculated

9   it, it would have rolled back to 29.79, and it would have

10  rolled back to 29.7 or in the alternative on the next one

11  down in row 520 MTG-120920-DS37, the Mark IT mark would have

12  been 29.8, but you actually replaced at 33.79, no, I didn't

13  do that comparison.

14  Q    And you could go all the way down and compare how you

15  did generally in actually replacing versus performing,

16  correct?

17  A    Sure.  I mean, you could compare those numbers if you

18  wanted to.

19  Q    Okay.  While we're in 2108, let's also look at another

20  data set that's used to drive Lehman Positions Master.  So

21  let's go back to Lehman Positions Master.

22  A    Okay.

23  Q    And let's clear this for -- let's clear all the filters

24  and then we can go to the trades we want to look at.

25  A    Okay.

Page 110

1          (Pause)

2     A    Okay.  So do you want me to first leave it for just me

3     or --

4     Q    I want to make sure I'm picking up all of your trades.

5     So whatever you need to do to clear the filters to make sure

6     that we're looking just at the population of the trades you

7     valued in the Lehman Positions Master.

8     A    Okay.  So I think if I go to column BP, which right now

9     is filtered only on replacement and I un-filter that, so I

10    check all of the possibilities there and I'm going to leave

11    in place the filter in column BC.  Let's just make sure

12    that's correct.  So that's the marked by, that's under AC,

13    so I'm going to leave that in place.  I don't think there

14    are any other filters that I added, but -- yeah, I think

15    that should take us to the right universe.

16    Q    Okay.  And now if you were going to looking for the

17    PCDS transactions you could filter this sheet for the PCDS

18    that you valued, correct?

19    A    Yes, we can do that.  Do you --

20    Q    Okay, so let's do that.

21    A    -- want me to do that?

22    Q    Yes.

23    A    Okay.  So the way I'm going to do that is in column B

24    under ty-fi I'm going to put a text filter in which says

25    "contains," and I'm going to put the letters p-r-e-f.

Page 111

1   Right, and that gives -- in the lower left it says 60 of 796

2   records found, so I think that's --

3   Q    That's the population?

4   A    -- the right population, yep.

5   Q    And the first two lines are WFC, do you see that?

6   A    Yes.

7   Q    Rows 104 and 105?

8   A    Right, rows 104 and 105 say WFC, yes, Wells Fargo.

9   Q    That's Wells Fargo, okay.  And so if you just scroll

10  over to the right to see what price you used to value those

11  two trades.

12       (Pause)

13  Q    Does Lehman Positions Master tell you that?

14  A    Yes.  In column AL there's a column called Mark and

15  cells AL104 and cells AL105 have the number 19.57 in them,

16  so that gives you the -- yeah, so that gives you the column

17  AO, which is equal to 19.57 percent of the notional.

18  Q    Again, you did not populate the mark, you did not enter

19  19.57 on this sheet, you entered it in the sheet that you

20  were working on Lehman Positions-Arthur, correct?

21  A    Yeah, I think that's right.

22  Q    So let's go to Lehman Positions-Arthur and again filter

23  it -- release these filters and filter it for the preferred

24  transactions that you gathered.

25  A    Okay.

Page 112

1          (Pause)

2     A    Oh, you know what, I need to un-hide certain -- that's

3     why I can't find the filter, I need to un-hide these things

4     I hid before.  Okay.

5          (Pause)

6     A    Okay.  So I'm going to go to the column AE and before I

7     had put -- I had filtered on the word "replaced" and I'm

8     going to un-filter that now.  And so you want me to find the

9     preferreds again, right?

10    Q    That's right.

11    A    Okay, sure.  So I'm going to do the same thing.  I'm in

12    Lehman Positions-Arthur, I'm in the column B, and I'm going

13    to go to the -- put a text filter on, the same text filter,

14    it says contains p-r-e-f, and it says 60 records again are

15    found.

16    Q    So that's the number your valued, right?

17    A    Right.

18    Q    So let's again scroll across to the right on this

19    sheet.  You have a hard-coded price that appears there in

20    column AD --

21    A    Uh-huh.

22    Q    -- of 19.57, correct?

23    A    Yes, I see that.

24    Q    And that's not a number that's calculated in this sheet

25    either, it's just a hard-coded number, right?

Page 113

1   A    Well, there's sort of another sheet, the PCDS sheet

2   where the calculation is done.  I don't know whether in the,

3   you know, original version of this there was some sort of

4   lookup into that sheet or not, but this 19.57 doesn't have a

5   formula attached to it.

6   Q    Right, that's not the only point, but that calculation,

7   the determination of what number goes there is done

8   somewhere else?

9   A    Yeah, I think that's right.

10  Q    So let's keep going down this line, line 104.

11  A    Okay.

12  Q    Across.

13  A    Oh, across, okay.

14       (Pause)

15  Q    Now, you'll see in column BB for some of the preferreds

16  you have values; do you see that?

17  A    Yes.

18  Q    And it's the column 9/21/2008; do you see that?

19  A    I do.

20  Q    And again there's a differential in BD, which is

21  comparing the values in column BB to the claim column,

22  correct?

23  A    So you're saying if you look under the column BD, say

24  cell BD104, cell BD104 is equal to BB104 minus AN104, yes,

25  that's what the formula says.

Page 114

1   Q    So now let's find out where this 19.57, the price you

2   used for this line 104 comes from, what tab does that come

3   from?

4   A    There's this tab called PCDS sheet, there ought to be

5   anyhow -- oh, excuse me, PCDS data.  So I'm scrolling to the

6   right and I'm finding a thing called PCDS data, which I

7   think we had looked at last week.

8   Q    Okay.

9   A    Okay.

10  Q    And so if you see you have WFC noted in rows 68, 69,

11  70, and 71, do you see that?

12  A    Yes.  Those cells A68 to A71 contain these WFC CDSs.

13  Q    And if you scroll across in columns E through I --

14  A    Yes.

15  Q    -- there are various values that appear, right?

16  A    There are.

17  Q    And those are values, starting from the left in column

18  E, from 915 through 919, correct?

19  A    Okay, so let's just confirm that.

20  Q    And if you want to freeze the panes, that might make it

21  easier.

22  A    Okay.

23       (Pause)

24  Q    So let's go down to WFC.

25  A    I'm sorry, I think I froze in a funny spot in here.

Page 115

```
 1        (Pause)

 2   A    Okay.

 3   Q    So let's go back down to WFC.

 4   A    Okay.  Yep.

 5   Q    And so now we have the column headings September 15,

 6   16, 17, 18, and 19; do you see that?

 7   A    Uh-huh.

 8   Q    And this is data that you collected and populated this

 9   spreadsheet, correct?

10   A    Yes.

11   Q    And you have a variety of prices for different WFC

12   lines; do you see that?

13   A    I do.

14   Q    And it looks like it ranges from as high as 99 to maybe

15   a low of 80.1; do you see that?

16   A    Yes.

17   Q    And so row 68, you say in column J you got a Citigroup

18   closing run on 9/17; do you see that?

19   A    Yes, I see the notation Citigroup closing run, 9/17.

20   Q    So for that particular Wells Fargo CUSIP you got a run

21   from Citigroup on every single day from 9/15 through 9/19,

22   correct?

23   A    Yes.  I think there is a Citigroup run, the 9/17 run it

24   looks like is a closing run, I'm not sure if the other runs

25   were intra-day runs or if they were closing runs.
```

Page 116

1    Q    But in any event what you're reflecting in row 68 is

2    that for that particular Wells Fargo CUSIP you had data that

3    runs from Citigroup every single day 9/15 through 9/19,

4    correct?

5    A    That's right.

6    Q    And then if you skip line 69 where you have a single

7    observation from Bloomberg on one date of 80.1, right?

8    A    Uh-huh.

9    Q    Right?

10   A    Yes, I see that.

11   Q    You have two more rows of Citigroup runs for WFC on

12   each day from September 15 through September 19, right?

13   A    Yes, I see those.

14   Q    Now, if you go to the right, let's see which of those

15   prices you ended up using.

16   A    Well, I used the reference obligation, as you can see

17   in cell D69, of 80.1.

18   Q    So even though the only data you had was the Bloomberg

19   data for one day and you had multiple data points from

20   Citigroup on a day-by-day basis you used 80.1?

21   A    I can confirm I used 80.1, yes.

22   Q    And in fact the very next row in the very next column,

23   CDS claim, comma, clean, it says 19.9; do you see that?

24   A    I see that, yes.

25   Q    So that was the basis for the calculation you did for

Page 117

1    the WFC PCDS, right?

2    A    It was.

3    Q    And the reason you used that line is because you said

4    that was reference obligation, that line?

5    A    Uh, that would be one reason.  I mean, the coupons of

6    these other bonds are really quite different than the coupon

7    of the reference obligation, they're substantially higher.

8    Q    So if I go to reference obligation in the back of the

9    tab that has a lower coupon, it gave you enough comfort that

10   you would use the Bloomberg single observation as opposed to

11   those multiple data points from Citigroup; is that right?

12   A    Well, I did use the Bloomberg one, yes.

13   Q    And you concluded that was a reasonable thing for you

14   to do given all the data you had on WFC?

15   A    That's what I did, yes.

16   Q    All right.  You didn't do that consistently, did you,

17   sir?

18   A    I'm sorry, what do you mean you didn't do that

19   consistently?

20   Q    Applied that set of rules that you just described to

21   the Court as to how you used 80.1 for WFC?

22   A    As I said, I think I tried to start with the reference

23   obligation.  If the reference obligation data looked

24   reasonable and the coupon on the reference obligation was

25   reasonable, I think I wound up using the reference

Page 118

1   obligation.

2   Q    Let's see if you did that for BNP.

3   A    Uh-huh.

4   Q    Let's go up to the top.

5   A    Right, yep.

6   Q    So now you've got line 17 to 22 for BNP?

7   A    Uh-huh.

8   Q    You have one line, line 20, where you say yes, it is a

9   reference obligation; do you see that?

10  A    I see that.

11  Q    You've got one observation from Bloomberg on the 19th

12  of September, right?

13  A    Okay.

14  Q    That's not the one you used, right?  You used the lower

15  price you could find for that collection of six different

16  lines, some with daily observations, some with other

17  observations, correct?

18  A    Sorry, so you're asking did I use the 86.2731?  No, I

19  did not.

20  Q    Even though that was the reference obligation, right?

21  A    Yes, but it's a little bit strange that this would be

22  trading at 86.27, you don't have the exact same date data,

23  but you have bonds with higher coupons earlier in the week

24  trading at, you know, substantially similar prices.  So that

25  was a little bit strange.  The Wells Fargo bond is much more

Page 119

1    consistent, I would say.

2    Q    You didn't do any of that --

3    A    It's a 7.7 coupon.

4         THE COURT:  I'm sorry?

5         THE WITNESS:  The Wells Fargo is a 7.7 coupon.

6    And the 9.75 has the highest, then 5.95, which is the lowest

7    coupon, has the lowest price, and the 7.7 has the middle

8    price in between.  So at least that is more consistent.

9    BY MR. TAMBE:

10   Q    That answer you just gave, Mr. Chu, you didn't do that

11   analysis back in the time, did you?  You're just making it

12   up as you look at this sheet today.

13   A    No.  I mean, I -- having traded fixed income for a long

14   time, I think I had an awareness that higher coupon bonds

15   are going to generally trade at higher prices than lower

16   coupon bonds at the same maturity.

17   Q    One other thing I don't see on this sheet of BCDS data

18   is any observations from Mr. Camps' various emails to you

19   during the week of September 15th, 2008.

20   A    I'm not sure if that's right or not.  I think possibly

21   some of these ACAFP prices do actually coincide with Mr.

22   Camps' runs.

23   Q    And you just didn't happen to put any source in the J

24   column for where you got that data from?

25   A    No, there's no notation that says Mr. Camps in those

```
 1   columns.

 2   Q    So just looking at this sheet we have no way of knowing

 3   whether you actually used any of Mr. Camps' data or not,

 4   right?

 5   A    Well, you would have to go back and compare to Mr.

 6   Camps' Bloomberg.

 7   Q    And you weren't trying to list on this sheet every

 8   single observation you saw for all relevant preferred equity

 9   for each of these issuers, were you, sir?

10   A    No, I wasn't trying to do a comprehensive -- how would

11   you say, survey -- survey of all the preferreds that were

12   out there, no.

13        (Pause)

14   Q    And you didn't make any notations at the time of the

15   selection process you had used, for example to distinguish

16   the BNP selection from the WFC selection, right?

17   A    No, there's no additional notes that I'm aware of other

18   than what's shown in these columns.

19   Q    Let's go back to the Camps emails from Friday.  So

20   we're switching topic --

21   A    Okay.

22   Q    -- we're leaving this spreadsheet.  I think most of

23   these are in your white binder, in the smaller binder.

24   A    Okay.

25   Q    If they're not, I'll hand up a copy to you.  Okay?  So
```

Page 121

1    I'll be handing up more exhibits to you than you'll find in

2    that binder; there will be a few of them in the binder, but

3    I'll be handing up more of them to you.

4    A    Okay.

5    Q    Okay?  So last Friday we talk about emails to you from

6    Mr. Camps, Bloomberg messages from Mr. Camps to you, which

7    were generally the week of September 15th, 2008; do you

8    remember that?

9    A    Yes.

10   Q    So I'm going to hand up to you now CX-1223.

11        (Pause)

12   Q    And you'll see this is a Bloomberg message from Peter

13   Camps, do you see that?

14   A    Yes, I do.

15   Q    And you got messages from Mr. Camps in your email box

16   with the Bloomberg address at QVT, correct?

17   A    Yes, I did.

18   Q    No reason to think this one is not in your email box,

19   correct?

20   A    I mean, I don't know that I specifically recognize this

21   one, but if it appeared in my Bloombergs when you searched

22   them it wouldn't surprise me.

23   Q    So this is Thursday, September 4th, 2008, do you see

24   that?

25   A    Yes.

Page 122

1   Q     So before Penny and Freddie and before Lehman, do you

2   see that?

3   A     I do see it, yes.

4   Q     And you see Mr. Camps begin with the line "Carnage in

5   financials today," do you see that?

6   A     I do.

7   Q     And there was -- carnage is a word he's used in some of

8   the Bloomberg messages we saw on Friday, correct?

9   A     Yes, I think he did say carnage, yes.

10  Q     And you'll see there's a whole series of preferreds

11  that he lists on this sheet, do you see that?

12  A     Yes, I see lots of preferreds here.

13  Q     This is not something you took into account when you

14  were putting together your calculation statements?  And by

15  this I mean comparing Mr. Camps' pre-September 15 missives

16  with his post-September 15th missives?

17  A     By the word missives, do you mean prices?

18  Q     Well, it's not just the prices, it's the commentary as

19  well.

20  A     Oh.  Well, no, I don't think I copied them all and, you

21  know, read them all in sequence, if that's what you mean;

22  no, I don't think I did that.

23  Q     But you told the Judge that one of the things you did

24  do was look for messages that would support your valuation

25  and your new methodology for valuing PCDS, correct?

Page 123

1    A    I don't think I said it in so many words.  If you want

2    to read back to me what I said, I'd be happy to listen to

3    it.

4    Q    I'll be happy to do that, but you did specifically

5    identify certain of Mr. Camps' messages for the Judge to

6    consider, correct?

7    A    I confirmed that I have seen certain of Mr. Camps'

8    messages, yes.

9    Q    And I believe you said the way you found them is you

10   went looking through your Bloomberg messages to look for

11   some color on PCDS?  This was back at the time, right?

12   A    Well, I think what I said is that I was looking through

13   various Bloomberg messages from various people, including

14   Peter Camps, and Peter Camps was someone who gave color

15   about the market.

16   Q    So coming back to the question, one of the things you

17   didn't do as part of your process as you were doing your

18   calculation statement is compare Mr. Camps' color from the

19   week of 9/15 to his color from previous periods, correct?

20   A    Well, I guess if what you mean is did I read possibly

21   some pre-9/15 Bloombergs, sure, it's possible I read pre-

22   9/15 Bloombergs.  Did I engage in a study of whether his

23   commentary was different before or after, no, I didn't

24   engage in a study as to whether or not his commentary was

25   very different before or after.

Page 124

1    Q    And you didn't engage in any kind of study to see when

2    Mr. Camps used words like carnage what his prices that he

3    was showing on the same sheets showed?

4    A    No, I did not use -- I did not do that, no.

5    Q    You didn't look to see whether the words he's using,

6    the descriptive words he's using match up with how the

7    prices are changing from day to day in his various Bloomberg

8    messages, correct?

9    A    No.  As I said, I don't think for instance I compared

10   this Bloomberg that has the word carnage with the other

11   Bloomberg that also has the word carnage and lined up the

12   prices one by one, no, I don't think I did that.

13   Q    The next document I want to show you is CX-1232.

14        (Pause)

15   Q    You'll see CX-1232 is another Bloomberg message from

16   Peter Camps; do you see that?

17   A    Yes.

18   Q    And this one is dated Monday, September 8th, 2008, do

19   you see that?

20   A    I see it.

21   Q    This is post-Fannie/Freddie news?

22   A    Yes.  So Fannie and Freddie would have been announced I

23   think that Sunday, yep.

24   Q    And again you have a series of preferred securities and

25   prices listed by Mr. Camps, do you see that?

Page 125

1   A     I do.

2   Q     You didn't do any analysis to see post-Fannie and

3   Freddie announcement how Mr. Camps' pricing on preferred

4   securities had changed, did you?

5   A     You mean did I compare his prices -- no, I didn't

6   compare a time series of his prices across the Fannie Mae

7   event, no.

8   Q     And you never did that?

9   A     As I said, I think some of the ACAFP prices in that

10  PCDS sheet I think actually are from Mr. Camps' run, but no,

11  I didn't do the exercise that you just described.

12  Q     And even when you picked up some of the ACAFP prices

13  from Mr. Camps' run, you didn't look to see how Mr. Camps

14  had been pricing those ACAFPs for the days before and after

15  the Lehman bankruptcy, correct?

16  A     I think I recorded them on two days in that case, but I

17  didn't create the whole time series of his broker runs, no.

18  Q     All right.

19  A     I saw -- I think I recorded them on two days, from

20  looking at that sheet, but I didn't create the whole time

21  series, no.

22  Q     And the two days you recorded was during the week of

23  September 15th, but you didn't compare that to what you had

24  for example on 9/12/2008, correct?

25  A     I don't recall doing that.  I mean, it's possible I

Page 126

1   looked at the 9/12 run, but I don't remember lining them up

2   one by one in that way.

3   Q    I've handed you what's been marked as CX-1239, 1239,

4   and you recognize that as another Bloomberg message from Mr.

5   Camps on the topic of preferred equity?

6   A    Yes, it's another Bloomberg from Peter Camps, that's

7   right.

8   Q    And this is dated September 9th, 2008, correct?

9   A    It is dated September 9th, 2008.

10       (Pause)

11   Q    The next document I want to ask you to look at is

12   CX-1252.

13       (Pause)

14          UNIDENTIFIED SPEAKER:  Jay, what exhibit?

15          MR. TAMBE:  CX-1252.

16   BY MR. TAMBE:

17   Q    And you recognize this as another Peter Camps Bloomberg

18   message, correct?

19   A    Yes, it's another Bloomberg message from Peter Camps.

20   Q    Okay.  And no reason to believe you didn't get this

21   one, right?

22   A    As I said, if you found this in my Bloomberg inbox, it

23   wouldn't surprise me.

24   Q    And again on the topic of preferred pricing, correct?

25   A    Uh-huh.

Page 127

1   Q    Yes?

2   A    Yes.

3        (Pause)

4   Q    The next document I've handed you is CX-1261.  And you

5   recognize this as another Bloomberg message from Mr. Camps

6   to you -- I'm sorry, let me withdraw it -- another message

7   from Mr. Peter Camps dated September 12th, 2008, correct?

8   A    Yes.

9   Q    And no reason to believe you didn't receive this one,

10  correct?

11  A    No, it wouldn't surprise me.  By the way, do you mind

12  if I just take a lozenge for a second?

13  Q    Sure.

14  A    My throat is getting a little bit dry.  Thanks.

15  Q    Do you have water up there?

16  A    I do.

17  Q    I shouldn't be the one offering water, but --

18            THE COURT:  Here's a lozenge.

19            THE WITNESS:  Thank you, Your Honor.

20            (Pause)

21            THE COURT:  So, Mr. Tambe, let's take stock of

22  where we are.

23            MR. TAMBE:  So I just want to finish this chain,

24  two more --

25            THE COURT:  Okay.

Page 128

```
 1            MR. TAMBE:  -- documents in this vein.  That may

 2  be a fine time to stop.

 3            THE COURT:  Okay.

 4            MR. TAMBE:  And then we'll come back and go at it

 5  again.

 6            THE COURT:  Okay.

 7            MR. TAMBE:  And when we come back I could probably

 8  give you an idea of how much longer.

 9            THE COURT:  Sounds good.

10            THE WITNESS:  Okay.

11  BY MR. TAMBE:

12  Q    The document that I handed you is Exhibit CX-1261,

13  correct?

14  A    Uh, yes.

15  Q    So I want to make sure we're talking about the same

16  document.

17  A    Okay.

18  Q    And you recognize that as another Bloomberg message

19  from Mr. Camps, this one dated September 12th, correct?

20  A    I do.

21  Q    And again on the topic of preferred equity, correct?

22  A    Yeah, preferred stocks, yeah.

23  Q    And no reason to believe you didn't receive this,

24  correct?

25  A    No, certainly I could have gotten this.
```

Page 129

1    Q     And you'll see this one is dated middle of the day

2    Friday, September 12th, 2008, right?

3    A     That is when it's dated.

4    Q     So you had some data from Mr. Camps for values for some

5    preferred securities as of Friday, September 12th and you

6    had information from Mr. Camps on September 15th on some or

7    all of the same names, correct?

8    A     Yeah, I think I had runs both days, if that's what you

9    mean.

10   Q     And that's not a comparison you did between his

11   September 12th values and September 15th values, correct?

12   A     No, I don't think I created that time series.

13   Q     I've handed you, sir, a document marked CX-1388, and do

14   you recognize that as a Bloomberg message from Mr. Camps

15   dated September 15th, 2008?

16   A     Yes, I do.

17   Q     And that is post-Lehman filing, correct?

18   A     That is post-Lehman filing.

19   Q     And no reason to believe you didn't receive this

20   document, correct?

21   A     No, I know I got this document, yes.

22   Q     And you know you got this document because this is one

23   of the documents you believe you looked at in connection

24   with your calculation statement, correct?

25   A     Yes.

Page 130

1          (Pause)

2    A     Thank you.

3    Q     I've handed you a document marked CX-1447 and you

4    recognize that as another email from Mr. Camps, this one

5    dated Tuesday, September 16th, 2008, correct?

6    A     Yes, from Peter Camps, dated September 16th, 2008.

7    Q     And no reason to believe you didn't get this one,

8    correct?

9    A     No, I think I got this as well.

10   Q     Okay.

11         (Pause)

12   Q     I've handed you a document marked CX-1484 and that's

13   another Bloomberg message from Mr. Camps; do you see that?

14   A     I do.

15   Q     And this one is dated September 17th, 2008?

16   A     It is dated September 17th, 2008.

17   Q     And no reason to believe you didn't get this document?

18   A     No, I think I got this document, yes.

19         (Pause)

20   Q     And I've handed you a document marked CX-1510 and you

21   recognize that as another Bloomberg message from Mr. Camps,

22   correct?

23   A     I do.

24   Q     Again on the topic of preferred equity, correct?

25   A     For some preferreds, yes, two ones.

Page 131

1    Q    And dated September 18th, 2008, correct?

2    A    Dated September 18th, 2008, correct.

3    Q    And no reason to believe you didn't get this document,

4    correct?

5    A    It wouldn't surprise me if I got this document, no.

6    Q    And so you could with the collection of documents we've

7    reviewed today, as well as the documents we reviewed last

8    week, put together a time series of the names that appear in

9    every one of Mr. Camps' Bloomberg messages, correct?

10   A    You could do that, yes.

11   Q    And that would show you the changes, if any, in his

12   pricing from day to day from as early as September 4th all

13   the way through September 18th, correct?

14   A    Okay.

15   Q    You could do that, right?

16   A    You could do that, yes.

17   Q    And that's not something you did?

18   A    No, I did not do that.

19   Q    And you could compare Mr. Camps' prices to prices you

20   were seeing on Bloomberg and from Citigroup and from other

21   sources, correct?

22   A    I'm sorry, are you asking did I compare Mr. Camps'

23   prices with what?

24   Q    With prices you were seeing on Bloomberg, Citigroup and

25   from other sources?

Page 132

1   A    I don't recall whether I did that or not, I don't -- I

2   think the Citigroup runs are referencing different sets of

3   securities, I think those are all U.S. securities.  So I

4   don't recall doing that, no.

5          MR. TAMBE:  Okay, we can -- that's fine.

6          THE COURT:  Okay.  All right, we'll come back at 2

7   o'clock.  Same rules apply, Mr. Chu.  Thank you.

8          THE WITNESS:  Thank you, Your Honor.

9      (Recessed at 1:00 p.m.; reconvened at 2:33 p.m.)

10  BY MR. TAMBE:

11  Q    Good afternoon.

12  A    Good afternoon, Mr. Tambe.

13  Q    Let's talk a little bit about the valuation methodology

14  you used for PCDS.  So before the lunch break, we had spent

15  some time in the calculation spreadsheet and, in particular,

16  in the PCDS data cap.  Do you recall that?

17  A    I do.

18  Q    And just to sort of orient us in terms of where we are

19  in terms of the methodology, once you had identified a

20  particular bond whose price you were going to use, to value

21  the PCDS, you took 100 minus that bond price; is that

22  correct?

23  A    Yeah, minus.  Not the first price.  Correct, yes.

24  Q    I'm sorry.  Minus that preferred price.  That

25  methodology that that is the way to value PCDS is a

1    methodology you adopted post-bankruptcy, correct?

2    A    It's something we adopted for purposes of calculating

3    the claim, yes.

4    Q    It's not a methodology that you had ever used at any

5    point prior to September 15th, 2008, correct?

6    A    No, we had not used that prior to September 15th, 2008.

7    Q    And it's a methodology that was devised by you

8    personally?

9    A    Yes, I think I'm -- yes, I'm the one who came up with

10   it, yes.

11   Q    And it's something you discussed with your partners at

12   QVT, correct?

13   A    I think I ran it by them, but I think I'm the one who

14   came up with it.

15   Q    And it's not a methodology that you consulted with

16   third parties on for purposes of calculating your claim

17   against Lehman, correct?

18   A    No, I did not consult with third parties in doing the

19   calculation.

20   Q    And there was no particular literature that you

21   referenced or consulted when you were preparing your

22   calculation statement, correct?

23   A    I don't recall referencing any particular pieces of

24   literature, no.

25   Q    And once you had adopted that methodology, that it

Page 134

1    would be par minus the preferred price, you did not go back

2    in time and back test that approach with any prior marks or

3    valuations you may have had on your PCDS positions, correct?

4    A    No, I didn't.  I didn't back test it in the way you

5    describe, no.

6    Q    Okay.  Now, it is possible to apply your formula, par

7    minus preferred price, at the inception of the trade.  You

8    can do the calculation, correct?

9    A    Sure, you can figure out what the preferred price was

10   at that time, and you can take 100 minus that, sure.

11   Q    Not a calculation you've ever done, correct?

12   A    It's not a calculation I did at the time.  I think I

13   may have done it in subsequent years.

14   Q    In the course of this litigation?

15   A    Yes.

16   Q    When you did put on the PCDS transactions back in 2007

17   and 2008, on day 1, you valued those transactions at or

18   close to 0, correct?

19   A    Right, there was no money that changed hands upfront,

20   and we would have marked them, you know, wherever -- at that

21   month end, we got marks from Lehman, which was probably

22   close to the original spread that we traded it.

23   Q    So close or equal to zero?

24   A    I mean, it could have been exactly equal to it.  I

25   mean, it could have

1          UNIDENTIFIED SPEAKER:  (Inaudible).

2    BY MR. TAMBE:

3    A    I'm sorry.  It could have been exactly equal, but it

4    would have -- I would expect it would be in the zone, yeah.

5    Q    Even though the bonds -- oh, sorry.  Even though the

6    preferred equity positions that were referenced in your

7    various PCDS transactions -- some of them were trading at

8    the time in the 90s, in the 80s, and even lower, correct?

9    A    Well, if your point is they were trading up prices

10   different than par, yes, that's correct.

11   Q    So notwithstanding the fact that those preferred equity

12   securities were trading below par at inception, you still

13   marked and valued your PCDS positions at or close to zero,

14   correct?

15   A    Well, as I said, we would have marked them at that

16   month end at whatever level we got from Lehman, which, you

17   know, probably the first month afterwards was not greatly

18   different from the initiation price, which was zero, yeah.

19   Q    Just the last piece.  The issuance price was zero,

20   correct?

21   A    Correct, there was no -- there was no cash.  Let me

22   just think for a second.  Yes, I think these were all par

23   swaps.  There was no cash that changed hands at the

24   beginning.

25   Q    Right, and there were no points upfront on any of the

Page 136

1   trades that you did for Lehman in PCDS, correct?

2   A    Yeah, that's what I mean.  There was no -- there was no

3   cash exchanged upfront.

4   Q    And then when you got --

5            THE COURT REPORTER:  (Indiscernible.)

6   BY MR. TAMBE:

7   Q    Okay, sorry.

8   A    There was no cash exchanged upfront.

9   Q    And then once the positions were on, the value of those

10  positions could and did change over time, correct?

11  A    The value did change over time.

12  Q    I think you mentioned in one of your prior answers you

13  would have received some updated values from Lehman and you

14  would have used those values to mark your books month end;

15  is that accurate?

16  A    Yes.

17  Q    And once you adopted your new valuation methodology,

18  you haven't gone back to any of those month end marks and

19  recalculated those, correct?

20  A    Sorry.  What do you mean, recalculated those?  Do you

21  mean amend those marks in some way or no?

22  Q    Yes.

23  A    No, we did not -- we did not amend the marks.

24  Q    So even, for example, the month of August 2008, 1 month

25  before Fannie and Freddie and Lehman, you had marks on your

Page 137

1    books for the PCDS positions, correct?

2    A    We did have marks on our books for the PCDS positions.

3    Q    And those marks at month end would have rolled up into

4    your net asset value calculations, correct?

5    A    Yes, they would have.

6    Q    Okay.  And even though you adopted a new valuation

7    methodology for purposes of this claim, you haven't applied

8    that valuation methodology to go back and revalue or restate

9    your August 2008 nav. (ph), correct?

10   A    No, we did not restate our August 2008 av. on that

11   basis.

12   Q    And for the month of September 2008, other than using

13   that methodology to calculate the claim against Lehman,

14   that's not a methodology you use to calculate your nav. for

15   the month of September 2008, is it, sir?

16   A    Well, I don't think there were any PCDS in our

17   portfolio, other than the ones facing Lehman.  So the answer

18   is no, we didn't use that methodology for the nav.

19   Q    Okay.  So during the opening on behalf of QVT, there

20   were some slides that were presented about QVT's rationale

21   for this methodology.  Do you recall that?

22   A    Yes, I think so.

23   Q    So just for your reference and to make sure we're all

24   on the same page, we have a QVT opening that may be Slides

25   77 through 80.

Page 138

1          (Pause)

2     Q    So what's on the screen is Slide 77.

3     A    Yes, I see it.

4     Q    And so, just to make clear, we're working off the

5     document that was handed out during the opening, and that's

6     why the slide numbers we have match up with the hard copy

7     document handed out at the opening.

8               MR. TAMBE:  Do you have a new document, Your

9     Honor?

10              THE CLERK:  I gave it to her.

11              THE COURT:  I think I have the misnumbered one.

12              THE CLERK:  78?

13              THE COURT:  Is that this?

14              THE CLERK:  That's 77.

15              THE COURT:  77.

16              THE CLERK:  (Indiscernible.)

17              THE COURT:  Yes, I'm with you.  Thank you.

18    BY MR. TAMBE:

19    Q    I believe 77 states, "QVT's valuation:  PCDS."  And in

20    red, it has the formula, correct?

21    A    It says par minus value of preferred, yes.

22    Q    And then the subsequent slides, Slide 78, 79, and 80

23    walk through an example, correct?

24    A    Yes, there's an example, uh-huh.

25    Q    And this is not an example that was put together by you

Page 139

1    at the time.  This is an example created in this litigation,

2    correct?

3    A    No, I didn't create this example at the time.  That's

4    right.

5    Q    Nor did you create any example like this at the time,

6    correct?

7    A    No, I mean, I don't remember drawing any diagram like

8    this, no.

9    Q    But you have reviewed this progression of slides,

10   correct?

11   A    Yes, I've seen it, yes.

12   Q    Well, you've done more than just see it, right?  You

13   are familiar with the concepts that are being to the Court

14   in these slides.

15   A    Yes, I'm familiar with it, yes.

16   Q    And it's your understanding that these slides

17   accurately describe your rationale, QVT's rationale, for

18   valuing the PCDS as it has done?

19   A    Yes, I think it communicates the essential idea.

20   That's right, yes.

21   Q    And you aren't aware of any errors in the way these

22   slides depict PCDS valuation per QVT, correct?

23   A    I mean, I think it looks basically correct to me, yeah.

24   Q    So on Slide 80, right, that's the slide that sets forth

25   the rationale for why there would be a $4 million upfront

Page 140

1    premium, correct?

2    A    Yes, I think that's that, yeah.

3    Q    Right?

4    A    Yes, I think that's what it --

5    Q    And your rationale in valuing the PCDS is that that $4

6    million is what a replacement dealer like Morgan Stanley

7    would have charged QVT on day 1, had QVT and Morgan Stanley

8    entered into a replacement PCDS transaction alone these

9    lines, correct?

10   A    Right.  So the idea is that the price at which a dealer

11   would offer one something is the price at which they can

12   hedge it.  Like if I said -- if you said to me I want to

13   sell you Microsoft stock at 60 when it's trading at 55, the

14   reason I won't pay you 60 is because I can only go sell it

15   at 55 on the market.

16        Similarly, when Morgan Stanley goes to -- when

17   they sell protection to QVT, say, they're getting long

18   deferral risk.  They're taking the risk of deferral.  And

19   so, to lay that off, they've got to -- because there's no

20   PCDS market after Lehman, at least as far as we could see,

21   they would have to sell short the preferreds in order to

22   hedge that risk, in our view.

23        (Pause)

24        MR. TAMBE:  My screen's not working.  I just want

25   to follow that last answer.

Page 141

1          THE COURT:  Okay.

2    BY MR. TAMBE:

3    Q    I just want to make it clear that I haven't answered my

4    question.  Your rationale in valuing the PCDS is that $4

5    million is what a replacement dealer like Morgan Stanley

6    would have charged QVT on day 1, had QVT and Morgan Stanley

7    entered into a replacement PCDS along these lines, correct?

8    A    I'm saying in order to hedge the upfront deferral risk,

9    I think that -- one thing that's not depicted here is it

10   doesn't tell you what the coupon of the CDS is.  If the

11   coupon is 2,000 basis points versus the coupon being 2 basis

12   points, there is going to be some kind of adjustment for

13   that.  But, yes, in order to hedge this, assuming that the

14   preferred stock coupon and the CDS payments kind of line up,

15   that this is the right price, yes.

16          THE COURT:  When you say in order to hedge the

17   upfront deferral risk, would it be more accurate to say in

18   order upfront to hedge the deferral risk?

19          THE WITNESS:  That would be more accurate, yes,

20   because you would -- yes.

21          THE COURT:  Your modifier's in the wrong place.

22          THE WITNESS:  Yes, I think it would be better to

23   say in order to be hedged --

24          THE COURT:  In other words, --

25          THE WITNESS:  In order to be hedged immediately

Page 142

1    after the transaction upfront, you would --

2              THE COURT:  Upfront?

3              THE WITNESS:  -- have to --

4              THE COURT:  As opposed to the deferral risk is

5    upfront?

6              THE WITNESS:  Correct.

7              THE COURT:  Okay.

8              THE WITNESS:  Yes.

9              THE COURT:  Thank you.

10   BY MR. TAMBE:

11   Q    So whatever that deferral risk is, the transaction you

12   are depicting on -- QVT is depicting on Slide 80 -- that

13   deferral risk is being fully paid for on day 1 with this

14   upfront payment from QVT to Morgan Stanley, correct?

15   A    Yes, that's the way this example is set up.

16   Q    The bottom -- if you look at the arrow going from

17   Morgan Stanley to QVT, --

18   A    Uh-huh.

19   Q    -- you are showing there the payment of the protection

20   amount from Morgan Stanley to QVT, correct?

21   A    Uh-huh.

22   Q    Yes?

23   A    Yes.

24   Q    And then on the right-hand side, you're showing Morgan

25   Stanley pulling out and buying stock for 4 million; is that

Page 143

1    correct?

2    A    Let's see.  So --

3              MR. TRACEY:  Is it possible to give the witness

4    the --

5              THE COURT:  Yes.

6              MR. TRACEY:  -- opening?

7              THE COURT:  Yes.

8              MR. TRACEY:  Because they bill, and I'm not sure

9    this is the right place to start.  And I don't think it's

10   easy to figure out where you are from this.

11             THE COURT:  Can we give the witness --

12             MR. TAMBE:  Sure, Your Honor.

13             THE COURT:  -- the stack?

14             MR. TAMBE:  I don't have a physical --

15             THE COURT:  We have some extras.  Hold on.

16             UNIDENTIFIED SPEAKER:  We only got two, so --

17             THE COURT:  Okay.  Hold on.

18        (Pause)

19             THE WITNESS:  Thank you very much.

20             THE CLERK:  This is the one with the corrected

21   pages.  So you just have to talk about (ph).  These are two

22   of the corrected pages.

23             MR. TAMBE:  Well, it's the corrected deck, so I

24   think Mr. Tracey's going to have to tell the witness which

25   pages he should be going to.

Page 144

1          THE COURT:  Remember, we were just off by a couple

2     of pages.

3          MR. TAMBE:  Three.  I think it's 80 through 83.

4          THE COURT:  Right.

5          MR. TAMBE:  It's 80 through 84.

6          MR. TRACEY:  May I approach?

7          THE WITNESS:  Okay.  Thanks.

8          THE COURT:  Thanks.

9      (Pause)

10          THE WITNESS:  Okay.

11     BY MR. TAMBE:

12     Q    The question that was pending was and then on the

13     right-hand side, you're showing Morgan Stanley going out and

14     buying stock (indiscernible); is that correct?

15     A    Well, that's what's in the slide, yeah.

16     Q    Right.  But if a credit event occurs, Morgan Stanley

17     doesn't have to go and get that stock in the market,

18     correct?

19     A    What do you mean?  Like --

20     Q    Well, QVT doesn't get paid anything, unless it delivers

21     to Morgan Stanley a preferred security.

22     A    Yeah.

23     Q    So it's really QVT that's going into the market and

24     getting a preferred security, correct?

25     A    Yes, but QVT has to deliver the security to Morgan

Page 145

1   Stanley.

2   Q    Right.  And, in fact, Morgan Stanley has no obligation

3   to make a payment, even if there's been a deferral, unless

4   QVT can source and provide Morgan Stanley with a preferred

5   security, correct?

6   A    Well, I think that you can also settle a CDS suits

7   through a so-called auction process, which is optional.

8   But, yes, there's a mechanic that most likely has to be gone

9   through where QVT has to deliver the stock to Morgan

10  Stanley, yeah.

11  Q    And in your confirmations on PCDS, you, in fact, had

12  specified physical settlement for settlement upon a credit

13  event, correct?

14  A    Yep, there is a physical settlement.

15  Q    Let me finish the question.

16  A    Sorry.

17  Q    For settlement upon a credit event, correct?

18  A    Yeah.

19  Q    Now, also built into this diagram are several

20  assumptions that you made at the time, correct?

21  A    I think it might be easier if you tell me what

22  assumption you think is made in the diagram and I can tell

23  you whether or not we made it.

24  Q    Let's take them in turn, all right?  One assumption you

25  make is that sellers of PCDS protection would necessarily

Page 146

1    hedge the transaction by selling short preferred equity,

2    right?

3    A    Well, we thought that was one way that you could do it.

4    We weren't aware of any other way you could do it, because

5    we didn't -- I mean, kind of before all of this happened,

6    when there was a PCDS market, the way we had seen Lehman do

7    it was when they could find a seller on the other side, they

8    could then offer us the protection.  They could kind of pass

9    it through.  So from everything we could see, those sellers

10   were nowhere to be found.  And so, we said the dealer can't

11   find those to hedge it.  As far as we could see, you'd have

12   to sell the preferred stock.

13   Q    Right.  So if I understand your last answer, you had

14   not seen Lehman use preferred equity as a way of hedging the

15   protection it was selling you on PCDS, correct?

16   A    Well, we didn't know what they were doing on the other

17   side to hedge their book.  All we knew is that the language

18   that they were using when they were describing to us how

19   they were giving us the protection suggested to us that they

20   were finding sellers of PCDS on the other side.

21   Q    Okay.  And the language didn't suggest to you that they

22   were going out and selling preferred equity short as a way

23   of hedging their protection, the protection to you?

24   A    No, it didn't.  I don't think that's what it said.

25   Q    So you're also assuming, for purposes of this example,

Page 147

1   that the initial price of the preferred equity when the

2   trade is put on was 60, right?  That's in one of the earlier

3   slides, right?

4   A   Uh-huh, yes, that's right.  That's on page 81.  Well,

5   my things are misnumbered, but it would be a few slides

6   before that, yeah.

7   Q   And you're also assuming that, upon a credit event

8   occurring, a deferral credit event occurring, that the

9   preferred would trade at 40, correct?

10  A   That's the assumption here.

11  Q   Now, you do know that at the date of bankruptcy,

12  9/15/08, and through that week, the prices you looked at --

13  there were some prices that were in the 50's and 60's, and

14  there were some that were far higher than 50 or 60, correct?

15  A   Sure, yeah.

16  Q   So some equity was trading at a substantial discount of

17  par, and some was trading at just a minor discount of par,

18  correct?

19  A   Yes, some prices were higher.  Some prices were lower.

20  Q   And your methodology treats all of them exactly the

21  same?

22  A   Yes, we treat -- we treat them all as par minus

23  preferred, yep.

24  Q   And since you developed this methodology internally at

25  QVT and didn't speak to third parties about it, there was no

Page 148

1   dealer between 9/15/2008 and 10/15/2008 who said to you this

2   is the way you should now value PCDS in the new world,

3   correct?

4   A     No, no dealer told us to do it this way.

5   Q     I believe you said, when you testified on direct, that

6   your view was whatever rule of thumb or market convention

7   existed prior to the Lehman bankruptcy your view was that no

8   longer was true, correct?

9   A     I think what I was referring to specifically is in the

10   past, people in the market, dealers, for instance, would

11   look at PCDS as, say, a multiple of the senior spread.  The

12   PCDS should be, say, two times the senior spread.  And they

13   may have actually even hedged it that way, where they sold

14   PCDS, perhaps they would have been willing to hedge it with

15   senior debt.  It was my view that following Fannie Mae, it

16   would be unlikely that a dealer would be wanting -- would

17   actually hedge their book in that way.

18   Q     Right.  So your view following Fannie and Freddie was

19   that whatever that relationship existed before Fannie and

20   Freddie no longer existed?

21   A     Well, my view was that dealers -- that that

22   relationship, in the case of Fannie Mae, if you'd had -- was

23   basically one where if you were a dealer and you thought

24   about doing that trade on other credits, you were running

25   risk on basically both -- you were running the risk of

Page 149

1   losing on both sides of the trade.  So say you took, I don't

2   know, Wells Fargo, okay.  And you offered QVT $10 million of

3   PCDS.  So you're -- so you're long the deferral risk.  And

4   you hedge it with 25 million of senior risk.  The problem is

5   that what Fannie Mae just showed was that it's possible that

6   the senior debt, basically, becomes riskless.  It's

7   guaranteed by the government.  And then the preferred debt

8   goes to about 10 cents on the dollar.  So you would not only

9   lose on the protection that you were short, the protection

10  you had sold.  You'd also lose on your hedge.  So in -- I

11  think that's what Fannie Mae showed to me, and that's why I

12  thought people would be very hesitant to actually hedge a

13  large PCDS sale in that -- in that case.  Because rather

14  than being risk decreasing, which is what a hedge is

15  supposed to do, it could actually be risk increased.

16  Q    Right, but Fannie and Freddie were GSE's, correct?

17  A    They were GSE's, yes.

18  Q    Wells Fargo was not a GSE, correct?

19  A    No, Wells Fargo was not a GSE.  That's correct.

20  Q    Right.  And your identification of deferral risk -- you

21  got all the information you wanted about deferral risk

22  simply by looking at the price of a particular preferred

23  equity, correct?

24  A    Yes, that's how we -- that's what we used, uh-huh.

25  Q    So banks, including the financial names that you were

Page 150

1    trading PCDS on, have preferred equity.  They have

2    subordinated debt.  They have senior debt, correct?

3    A    Yes.

4    Q    All three of those types of instruments, preferred

5    equity, subordinated debt, senior debt, carry with them the

6    risk of default, correct?

7    A    Yes.

8    Q    And so, now let's talk about the cash instruments.  All

9    three of those, if you're a holder of that cash instrument

10   and there's a bankruptcy, that's a default risk, correct?

11   A    Yes, bankruptcy is a default risk.

12   Q    And that default risk applies equally to all three of

13   those, correct?

14   A    I mean, in CDS terms, yes, it would be a credit event

15   under all three of them, yes.

16   Q    Preferred equity has its additional risk, correct?  It

17   has the deferral risk.

18   A    That's right.

19   Q    You could have simply compared the prices of preferred

20   equity to senior and sub to isolate what had happened to

21   deferral risk, correct?

22   A    I don't know if it would isolate it.  I guess it would

23   give you some idea as to the relative deferral risk of the

24   relative change due to the two things, yep.

25   Q    And that's an analysis you did not do?

Page 151

1    A    No, we did not -- we didn't analyze -- we did not

2    isolate, as you said, the deferral risk from preferreds as

3    compared to subordinate and senior bonds.

4    Q    And because your view within QVT was the relationship

5    is broken and we've got to come up with a new way of valuing

6    PCDS, correct?

7    A    Well, as I said, our view was that whatever spread

8    multiple existed at the time, we didn't think that a dealer

9    would actually want to offer it on that basis.  Because, as

10   I said before, you could be doubling your risk rather than

11   hedging your risk, which is the -- kind of defeats the

12   purpose of trying to hedge.

13   Q    And that was your view held internally at QVT.  Because

14   you just told us you came up with this methodology without

15   speaking to third parties about it, correct?

16   A    Well, no, we didn't -- that's right we didn't speak to

17   third parties about it.

18   Q    Now, we discussed and you have seen that on October 1

19   and October 2, Merrill Lynch went into the market to sell

20   PCDS protection, correct?

21   A    Yes, I think I know the Bloomberg you're talking about,

22   Bloombergs.

23   Q    And they did not do that on a points upfront basis,

24   correct?

25   A    No, they had a very high coupon that they were

Page 152

1   offering, but there were no points upfront.  That's right.

2   Q    And in the emails, the Bloombergs from Merrill Lynch --

3   in the Bloombergs from Merrill Lynch where they offered to

4   sell PCDS post-Fannie, post-Lehman, they offered, as points

5   of comparison, lower Tier II CDS for each of those

6   counterparties, correct?

7   A    I think that's right, but shall we actually take a look

8   at the Bloomberg?

9   Q    All right.  So let's go in the white binder.

10          MR. TRACEY:  I'm just going to object to this line

11   of questioning.  I'm not sure exactly where Mr. Tambe is

12   going.  But this is something that Mr. Chu wasn't aware of

13   and didn't consider in the course of his valuation.  And so,

14   it's not anything that QVT is relying on for his good faith

15   or reasonableness.  I'll point that out, and we can see

16   where the questioning goes.

17          MR. TAMBE:  May I respond to that?

18          THE COURT:  All right.

19          MR. TAMBE:  That's exactly the point.  The fact

20   that these are documents from October 1 and October 2 that

21   were not considered by QVT makes our point that their

22   calculation was not reasonable and was not in good faith.

23          THE COURT:  I think it's part of the general

24   inquiry into what was available, what was looked at, and why

25   or why not.  So I'll allow it.

Page 153

1          Go ahead, Mr. Tambe.  Did you have a number in the

2    binder?

3          MR. TAMBE:  I do.  So in the white binder, --

4          THE COURT:  It's in the white binder?

5          MR. TAMBE:  -- it's Exhibit 1581.

6          THE COURT:  All right.

7          THE WITNESS:  1581, okay, uh-huh.

8    BY MR. TAMBE:

9    Q    Right?  And that is one of the Bloombergs from Merrill

10   Lynch dated October 1, 2008 offering PCDS protection,

11   correct?

12   A    Yes, that's what it -- that's what the Bloomberg is

13   about, uh-huh.

14   Q    And what you have in the individual lines -- for

15   example, on line one, is 16.5 million notional for Arboss

16   (ph), right?

17   A    Yes, it says 16.5 million Arboss.

18   Q    And you've got a coupon.  You said it's a high coupon

19   of about 750 basis points.  Do you see that?

20   A    Uh-huh, yes.

21   Q    And then you see an LT2 CDS equals 500.  Do you see

22   that?

23   A    Yes.

24   Q    Right, and that's a reference to the CDS for lower Tier

25   II capital for that issue, correct?

Page 154

1    A     I would think so.

2    Q     Well, you know so.

3    A     That's what I -- I mean, as I said, I didn't see this

4    at the time.  I think that's what LT2 -- if you ask me

5    today, LT2 CDS probably does refer to subordinated, i.e.,

6    lower Tier II capital CDS.  I'm sorry.  At which point did

7    you --

8              THE COURT REPORTER:  (Inaudible.)

9              THE WITNESS:  Okay.  Sorry.

10   BY MR. TAMBE:

11   Q     And if you turn to the next tab in that same white

12   binder, it's CX-1582.  And that's another offer to sell

13   protection from Merrill Lynch on several preferred equity

14   issuers, correct?

15   A     Yeah, it's a group of PCDS offerings from Merrill,

16   yeah.

17   Q     And again, it's -- there's a coupon there, but no

18   points upfront, correct?

19   A     Correct.

20   Q     And for each line item, there's a point of comparison

21   to lower Tier II CDS spreads, correct?

22   A     Yes, LT2 CDS appears on each line.

23   Q     So regardless of what you within QVT may have thought

24   about the breaking down of the relationship, Exhibit 1581

25   and 1582 show that at least 1 dealer was offering PCDS

Page 155

1    protection and offering as a point of comparison lower Tier

2    II CDS?

3    A    Yes, there is a comparison.  I agree there's a

4    comparison.

5    Q    And not charging points upfront?

6    A    Yes, there is no points upfront in this offering.

7         (Pause)

8             MR. TAMBE:  So I think we're done with that

9    document, and I think we are done with the opening slides.

10        (Pause)

11            MR. TAMBE:  I'm going to change topics, Your

12   Honor.

13            THE COURT:  Okay.

14            MR. TAMBE:  If I can take a five-minute break,

15   we'll see where we will go next.

16            THE COURT:  Yeah.

17            MR. TAMBE:  Thank you.

18        (Recessed at 3:04 P.M.; reconvened at 3:17 P.M.)

19            THE CLERK:  All rise.

20            THE COURT:  You ready?

21            UNIDENTIFIED SPEAKER:  Your Honor, Mr. Tambe is

22   still in the hall.  I'll go get him.

23            THE COURT:  Okay.

24        (Pause)

25            MR. TAMBE:  Just a couple of last questions, Your

Page 156

1    Honor.

2                THE COURT:   Okay.

3    BY MR. TAMBE:

4    Q    Going back to a discussion we had this morning,

5    Mr. Chu, we talked about PMI and MTG and the replacement

6    trades you had done in those two names; do you remember?

7    A    Yes, I do.

8    Q    And you did a lot of those transactions -- you did a

9    lot of those replacement transactions on 9/15, correct?

10   A    Yes.  I did most of them on 9/15.

11   Q    Now, PMI and MTG were names that were included in the

12   market quotation requests that went out to the market,

13   correct?

14   A    Yes, they were.

15   Q    And you know that you did not receive back a single

16   quotation from any dealer for any of those positions.

17   A    I think that's right.  I think we did not receive

18   market quotation in those names.

19   Q    So, I'm going to be a little bit more precise than

20   that.  On names in which you had actually transacted

21   throughout the day on September 15th, you did not get back

22   even one quotation from those dealers in response to your

23   email requests, correct?

24   A    In MTG and PMI, I think that's right, that we did not

25   get market quotation back on those names.

Page 157

1   Q    With some trepidation, I'd like to go back to 2108 and

2   only for a short while.  So, Exhibit 2108 is the spreadsheet

3   we were talking about before lunch.

4   A    Okay.

5   Q    I'll probably asked your technician to pull it up so

6   that you can control it from --

7   A    Okay.  That's fine.

8   Q    -- the stand.  And let's start with Lehman Positions

9   Arthur as the tab.

10  A    Okay.  By the way, is the volume more reasonable now?

11          THE COURT:  It's good.

12          THE WITNESS:  Okay.

13          THE COURT:  It's good.

14          THE WITNESS:  Okay.

15  BY MR. TAMBE:

16  Q    So, I'd like you to make sure the filters are all clear

17  so we're seeing all the transactions that appear on this

18  sheet and, then, we'll start doing some filtering.

19      (Pause)

20  Q    Is it completely unfiltered?  Let me know when it is.

21      (Pause)

22  A    Yes.  I think it is unfiltered and we're in the

23  worksheet, Lehman Positions Arthur.

24  Q    Right.  And if you just go over to the right a little

25  bit.  A few more columns.  Okay.  So, stop.

Page 158

1      AQ -- I believe it is filtered for Arthur Chu, though,

2   correct?

3   A    Oh, yes, it is filtered under Responsible Party, Column

4   AQ, it says; AC, which is me.

5   Q    So, these are -- this is the population of transactions

6   that you inputted values for, correct?

7   A    Yes.  I think -- I think this should be everything.

8   Yep.

9   Q    Why don't you -- why don't you take a moment and make

10  sure you're comfortable with -- that that's what this is.

11       (Pause)

12  A    Yeah.  There's -- yes.  I mean, there's some set of

13  stuff down here from Rows 854 downwards.  I actually don't

14  -- I don't believe those are actually at issue in this case.

15  But I think the stuff above that should be the universe.

16  Q    Okay.  So, now, let's filter this just to isolate the

17  preferred transactions.

18  A    Okay.

19       (Pause)

20  A    Okay.  So, I've completed that filter in Column B,

21  searching for the phrase, contains "pref".

22  Q    And you'll see the record at the very bottom of the

23  page says 60 records found.  Do you see that?

24  A    I do see that, 60 of 1389 records found.

25  Q    But that's the right count number, correct?

Page 159

1    A    Yes.  I think that's the right count number.

2    Q    So, now, let's go over to the column that said 9/21/08;

3    BB looks like the column.

4    A    Okay.  So, I'm in Column BB now.

5    Q    So, let's just, on the drop down menu in Column BB,

6    filter it to remove the blanks.

7    A    Oh, boy.

8         (Pause)

9    A    Okay.

10   Q    So, now, that you've -- did you increase the size of

11   the text a little bit?

12   A    Yeah, sorry.  I got -- okay.

13   Q    If you filter -- so, the filters you've applied have

14   now isolated trades that you valued, that were preferred and

15   for which you entered some value in the Column marked BB,

16   correct?

17   A    Well, as I said, I don't recall whether I entered

18   anything in Column BB.  I can confirm that I filtered so

19   that I eliminated all the cases in which Column BB is blank.

20   Q    So, someone or something populated that Column BB in

21   the Lehman Master Arthur sheet that we're looking at; is

22   that right?

23   A    Well, yes.  The cells are populated --

24   Q    Right.

25   A    -- so something must have happened.

Page 160

1    Q    Okay.  And you have no idea what that something is that

2    happened that populated those cells in a Column that says

3    Level on 9/21/2008?

4    A    I don't know what that is.

5    Q    Okay.  The other thing that's happening in this sheet

6    is Column BD, right?  And that's simply subtracting AN from

7    BB, correct?  A-N as in Nancy.

8    A    Yes.  Like, for instance, BD, Boy David, 116 is equal

9    to BB, Boy Boy, 116 minus AN, Apple Nancy, 116.

10   Q    And that large negative number, right, shows that AN is

11   a lot larger than BB, correct?

12   A    Yes.  It's a negative number.  So, the second number is

13   bigger than the first number.

14        UNIDENTIFIED SPEAKER:  I'm not sure what you said

15   there.

16        (Laughter)

17        THE COURT:  Siri apparently is having a hard time

18   following us.

19        (Laughter)

20        MR. TAMBE:  I didn't know Siri was on the line.

21        THE COURT:  I didn't either.

22        MR. TAMBE:  Siri's always on.

23        (Laughter)

24   BY MR. TAMBE:

25   Q    All right.  And, so, but this collection of trades that

Page 161

1   have some value inputted for 9/21/2008; what is the total of

2   the differential column?  You can just highlight that,

3   correct and it'll tell you the --

4   A    Okay.  So, I'm going to highlight the filtered bit on

5   BD which has one, two, three, four, five, six, seven, eight

6   and does two, four, six -- sorry.  It's got ten -- it's got

7   ten line items.

8   Q    Right.

9   A    It's minus $20,728,204.

10  Q    So, what that tells you is that, as a collection for

11  these ten items, the value in Column AN, as in Nancy,

12  exceeds the value in Column BB by about $20 million,

13  correct?

14  A    Yes.  That's the sum of the numbers I just talked

15  about.

16  Q    And the values in the AN Column are the values that

17  underlie the claim that's being pursued in this litigation,

18  correct?

19  A    I think that's kind of correct.  I thought the way it

20  worked is actually that Column AO, which is the value of the

21  derivative is summed up across all of the 836 derivatives in

22  question.  And, then, one subtracts from that the collateral

23  that was held at the time.

24       So, I wouldn't really know whether or not that the

25  difference between AO and AN is equal to the collateral of

Page 162

1    each line item.

2    Q    We can ask Mr. Wohlman (ph) that.  He would know that,

3    right?

4    A    You're free to ask him.  I don't know whether he would

5    know the answer to that or not.

6    Q    You don't know that?

7    A    I don't know the answer to that, no.

8    Q    Let's go back to Lehman Positions Master.

9    A    Okay.

10        (Pause)

11   A    Okay.  So, I'm back on the worksheet, Lehman Positions

12   Master.

13   Q    And can we make sure that this one is not filtered for

14   anything?

15        (Pause)

16   A    It's (inaudible).

17   Q    Does this sheet have a Column BBB?

18   A    Just hang on a second.

19        (Pause)

20   A    Okay, yes.  So, I think this has the right number of

21   records on it.  Sorry.  What was your question?

22   Q    Does this sheet have a Column BBB?

23   A    BBD?

24        THE COURT:  You mean a Column BBB or --

25        MR. TAMBE:  A column that has a heading BBB.

Page 163

1              THE WITNESS:  I don't know.  I mean -- I don't

2      think so because if I hit control right, I go -- it takes me

3      all the way to the right, Column XFD, and, so, the way that

4      -- we can try it in the body but it just took -- takes me

5      all the way over to the right.

6              So, I don't see anything that says BBB.

7      BY MR. TRAMBE:

8      Q    Right.  So, nothing in 2108 that has -- that goes that

9      far out.

10          Have you reviewed any version of this document that

11     existed as of 9/21/2008?

12     A    Of Lehman Positions Master.  I don't recall looking at

13     a tab called Lehman Positions Master as of 9/21/08 in any of

14     the sheets.

15              UNIDENTIFIED SPEAKER:  1552.

16     BY MR. TAMBE:

17     Q    I going to show you a spreadsheet.  It might be

18     something you recognize.  So, it's tab 108.  It's a native

19     document.

20          (Pause)

21              UNIDENTIFIED SPEAKER:  Yeah.  That's 1552.

22     BY MR. TRAMBE:

23     Q    So, let's go to Exhibit 1552, which a native

24     spreadsheet and I'll just --

25     A    Okay.  So, I don't --

Page 164

1   Q    You can -- you're done with that.

2   A    Do I need --

3   Q    There's nothing in the binder for you to look at.

4   A    Okay.  Okay.

5   Q    So, we go to 1550, excuse me, two.  And it'll come up

6   and I think it's again being driven by your computer so you

7   should be able to navigate around it.

8        (Pause)

9            MR. TRACEY:  So, there's no hard copy of that?

10           MR. TRAMBE:  There's no hard copy.

11           MR. TRACEY:  Okay.

12           MR. TRAMBE:  It's on the (indiscernible).  Okay.

13   BY MR. TRAMBE:

14   Q    So, what's been pulled up on the screen is CX1552.xls,

15   that's an excel spreadsheet, and you'll see if has a Lehman

16   Positions tab.  Are you familiar with this document?

17   A    Is there some form a medi data that I can look at that

18   would help me?

19   Q    Sure.  I'll give you what I believe to be the medi data

20   for this document.

21   A    Uh-huh.

22       (Pause)

23           UNIDENTIFIED SPEAKER:  It's (inaudible) --

24           MR. TRAMBE:  We'll call it 1552 medi data.  We'll

25   put a sticker on it, Your Honor.

Page 165

1           THE COURT:  Okay.

2       (Pause)

3   BY MR. TRAMBE:

4   Q    So, I've given you -- I think I've handed you a

5   document that we're going to mark as CX1552M as in Mary, and

6   that is, we believe, the medi data for this particular

7   document.  And I'm sure the folks at QBT will tell us if

8   that's wrong.

9           MR. TRACEY:  I don't know.

10           MR. TRAMBE: You don't know.  That's okay.

11   BY MR. TRAMBE:

12   Q    So, you'll see the medi data has a reference of date

13   created, 9/16/2008 and date modified of 9/21/2008; do you

14   see that?

15   A    So -- right.  So, date created 9/16, date modified

16   9/21.  Yes.  I see that in the medi data.

17   Q    And you see the author as Joel Wohlman?

18   A    Yes.  I see it.

19   Q    Okay.  Are you -- did you work in a spreadsheet like

20   this as of 9/21/2008?

21   A    Maybe I can look at the spreadsheet --

22   Q    Sure.  Spend some time looking at it --

23   A    -- for a second so --

24   Q    -- to see if you're familiar with it.

25       (Pause)

Page 166

1    A    I'm not -- I can't find the mouse anywhere on my

2    screen.  Oh, here it is.  Okay.  Thank you.

3         (Pause)

4    A    Okay.  So, what was the question again?

5    Q    Is it a document you're familiar with?

6    A    Well, I don't -- no.  I don't remember this version of

7    it.  I mean, it certainly looks familiar because it looks

8    like a lot of the other spreadsheets.  But I can't

9    specifically remember this version of it.

10   Q    Okay.  And do you know whether this version of the

11   document pulls prices for preferred securities or PCDS from

12   Markit Partners?

13              MR. TRACEY:  No, no.  I was just lodge an

14   objection.  This witness hasn't been able to identify the

15   document.  If Mr. Tambe wants to ask him to read it, sitting

16   here today, if he thinks that's useful, I don't have any

17   particular objection to it.  But I do object to the

18   document.  I think this is the wrong witness.

19              THE COURT:  Mr. Tambe.

20              MR. TAMBE:  He's the witness who valued PCDS.  We

21   were looking at a sheet that he worked on that had a column

22   that said; 9/21/2008 which had values for --

23              THE COURT:  The other sheet.  Not this sheet.

24              MR. TAMBE:  The other sheet.  Not this sheet.

25              THE COURT:  Right.

Page 167

1          MR. TAMBE:  But the other sheet that had values

2     for 9/21/2008.  He doesn't know where those numbers came

3     from.  This is a QVT document.  It's part of the valuation

4     progression of spreadsheets.

5          He can look at this document and see if this

6     identifies where those values came from.

7          THE COURT:  Well, can we do it in the context of

8     -- well, Mr. Chu has already said he doesn't remember,

9     right.

10          MR. TAMBE:  Uh-huh.

11          THE COURT:  So, is --

12          MR. TAMBE:  I will -- well, this spreadsheet might

13     identify for him where the prices were drawn from.

14          THE COURT:  Well, isn't it a -- aren't you

15     attempting to refresh his recollection?

16          MR. TAMBE:  I sure am.  And we'll see if it's

17     refreshed.

18          THE COURT:  So, on that basis, Mr. Tracey can --

19     he --

20          MR. TRACEY:  On that basis, I have no objection.

21          THE COURT:  Okay.

22     BY MR. TAMBE:

23     Q    So, if you could start with Column B for preferreds.

24     A    Okay.  Okay.

25          So, I am sorting for the preferreds under Column B in

Page 168

1    the tab Lehman Positions.

2    Q    And you see at the bottom there is a count of 60; do

3    you see that?

4    A    Yes, 60 of 814 records found.

5    Q    Let's go to AN as in Nancy.  Now, let's filter out the

6    blanks.

7    A    In what column, AL?

8    Q    In Column AN as in Nancy.

9    A    Okay.  It's right --

10        (Pause)

11   A    Okay.  So, I'm just having to re-filter this.  Hang on

12   a second.

13        (Pause)

14   A    Okay.  So, which column am I supposed to filter for the

15   non-blanks?

16   Q    AN and in Nancy.

17   A    Okay.

18   Q    And if you can filter that through --

19   A    It's not going to give you anything.  It's --

20   Q    Okay.

21   A    The only thing that aren't blanks.

22   Q    What?

23   A    Okay.

24   Q    Let's go to Column BB in this document.

25   A    Uh-huh.

Page 169

1    Q    And let's filter that column, which, again, says Level

2    on 9/21/2008.  Let's filter out the blanks in that one.

3    A    Okay.  So, on Column BB, I'm filtering out the blanks.

4    Q    Here.

5    A    Uh-huh.  Okay.  And there are ten records that remain.

6    Q    Okay.  And if you can over to the left in this

7    document.

8    A    Which column are you looking for?

9    Q    V, W and X.

10   A    Okay.

11   Q    So, in V, W and X, it says at the top of V, 9/15/2008;

12   W says 15 percent and we get error messages for what shows

13   up in market spread and market -- Mark IT spread and Mark IT

14   Mark; do you see that?

15   A    Well, there's -- the Mark IT spread gives you #name and

16   the Mark IT Mark gives you #n/a.

17   Q    And, so, in the live version of the spreadsheet, those

18   formulas sent you somewhere, correct?

19   A    What do you mean; sent me somewhere?  There are

20   formulas here.

21   Q    Yeah.  And, so, for example, you are in line 116 B --

22   A    Yes.

23   Q    -- B-116, the formula says; get Mark IT spread; do you

24   see that?

25   A    Yes.  It says; CDS.get Mark IT spread and the two

Page 170

1    arguments are B 116, which is the ty-fi, this Barclay's

2    credit default swap and $V$1, meaning sell V1 as of

3    9/15/2008.

4    Q    Okay.  Does this refresh your recollection that at

5    least as of 9/21/2008, when you were valuing BCDS, your

6    spreadsheet, a QVT spreadsheet, was seeking data from Mark

7    IT?

8    A    Well, I think the -- if I'm not mistaken, I think the

9    spreadsheet tries to get Mark IT data for everything.  Let's

10   just --

11   Q    And there was Mark --

12   A    -- let's just take out this text filter and take a

13   look.

14       (Pause)

15   A    Right.  So, as I said, I think what -- the way this

16   spreadsheet works is whether or not it's a preferred CDS or

17   not, it -- I'm looking at the Cell V-4, which is the first

18   hi-fi, and it has the same formula.  It, just instead of

19   referencing -- hold on.  What I just do?

20       Instead of referencing that preferred security, it

21   references F-100320 DS6.  So, I think all this is saying is

22   that there was -- the system was trying to query the Mark IT

23   database for all of these names.

24   Q    And this is as of 9/21/2008, correct?

25   A    Well, yes, it -- well, it says it was modified as of

Page 171

1    9/21/2008.

2    Q    So, the last time it was modified, that's what was

3    doing on Column B looking to get Mark IT spread data,

4    correct?

5    A    Yes, that looks like what the function is trying to do.

6    Q    Right.  And that's approximately two days before

7    Mr. Gold writes his note to investors about what QVT plans

8    to do to recover losses, correct?

9    A    Well, yes, the 21st is two days before the 23rd; that's

10   right.

11              MR. TAMBE:  No further questions, Your Honor.

12              THE COURT:  Okay.

13        (Pause)

14              THE COURT:  Redirect?

15              MR. TRACEY:  Yes, Your Honor.

16              THE COURT:  Okay.

17                      REDIRECT EXAMINATION

18   BY MR. TRACEY:

19   Q    Okay.  We're going to keep you a little longer.

20        We'll start with the PCDS where Mr. Tambe left off.

21   Mr. Tambe said over and over again referred to your new

22   methodology for valuing PCDS; do you recall that?

23   A    Yes.  I think he used that phrase.

24   Q    Which sounds like you threw out some old methodology

25   and brought in a new one.  Did you do that?

Page 172

1    A     Well, only to the extent that our old methodology was

2    to use Lehman Brothers marks that they gave us and Lehman

3    didn't exist anymore.  So, we, I guess, couldn't use that

4    methodology anymore.  Only to that extent, yeah.

5    Q     And he also referred to the fact that you didn't use

6    the nav marks that you had on the books from August.  Why

7    didn't you just use those marks for the PCDS?

8    A     Oh, well, I think there are several reasons.  One of

9    them is that the nav mark, by its nature, is a mid-market.

10   And, so, even there had been no move in the market

11   whatsoever, and we were calculating replacement costs, we'd

12   have to make an adjustment for -- rather than being in the

13   mid side of the market, we'd have to be on the offered side

14   of the market.

15        But there, of course, was a big move in the market.

16   And, so, you -- there's no way that one could just simply

17   use the 829 mark.  And, finally, and very importantly, the

18   mid-mark is the average of the mark computed using the bid

19   spread and the offered spread that Lehman Brothers provided

20   to us on 8/29.

21        While it was plausible to me maybe even likely, that

22   the bid side of the market worked.  Say they were making a

23   two hundred -- a two hundred and fifty market, in spread

24   terms, and we were marking it at two twenty-five, it

25   wouldn't surprise me if the bid side would work if they want

Page 173

1    to unwind -- they'd want us to unwind protection, they'd pay

2    two hundred for it.

3        I think that it was clear that there was no offered

4    side to the market whatsoever.

5        So, for purposes of calculating where that replacement

6    cost would be, I don't think their mark is at all

7    enlightening as to where an offer of protection, i.e., a

8    replacement could have occurred even if the market hadn't

9    moved between 8/29 and 9/15 which, of course, it did.

10   Q    And in trying to come up with an appropriate loss

11   calculation for PCDS in September and October, 2008, were

12   you aware of any literature that would show you a

13   methodology for how to -- how to value PCDS?

14   A    No.  I don't think so.  I mean, I think if you looked

15   around, you could probably find some broker research or

16   something on PCDS.

17       But we were trying to figure out where PCDS would be

18   offered when this, basically, the market maker in it or the

19   inventor of it had gone away.  And, so, there wasn't any

20   literature, that I knew of, that would have told me where it

21   should be.

22       And, in any event, even if such literature existed, I'm

23   not sure if you showed up to Goldman, Sachs saying; hey,

24   look at the PDF file.  It says you should offer it to me

25   here.  I mean, they're going to offer it to you where they

Page 174

1    can lay off the risk, not where a literature, a piece of

2    literature tells them they can offer it.

3    Q    And I think you told Mr. Tambe that you, prior to

4    September 15th, 2008, did not have your own model for

5    valuing PCDS.  Do I remember that right?

6    A    That's right.

7    Q    Are you aware of whether Lehman Brothers, the inventor

8    of this product, had a model?

9    A    I don't know whether Lehman had a model or not; no.

10   Q    Did anyone at Lehman Brothers in all the years that you

11   were trading this ever mention a model that they had?

12   A    No.  From time to time, they would mention what I

13   called these rules of thumb, when we did a trade, okay, sub

14   is here, senior is here.  Let's trade here.

15        But, as I said, I don't think I would consider that a

16   model.  That's just a reference point.

17   Q    And Mr. Tambe asked you whether you back tested your

18   valuation of PCDS.  Are you aware of any test that could

19   have been used to back test the values for PCDS on September

20   15, 2008?

21   A    Well, no, because -- okay.

22        I think there are two separate questions.  One is; did

23   you look at whether the CDS price that you paid upfront was

24   equal to par minus preferred at the time you did the trade?

25        I think I told Mr. Tambe; no, we didn't do that test.

Page 175

```
 1        But I think -- when I think of the word back testing,

 2   it would mean we're trying to make a prediction as to where,

 3   in an environment similar to September 15th, 2008, you know,

 4   four and a half year PCDS with 145 basis point coupon, which

 5   roughly characterizes our portfolio, referencing banks would

 6   trade.

 7        And in order to back test that, you would need some

 8   kind of data on where PCDS had traded in a similar

 9   environment.

10        So, we didn't have any data like that because PCDS was

11   a product that was invented around 2005.  So, I'm not

12   exactly sure what the word back testing would even mean in

13   this context, you no.

14   Q    Is there any reason why your approach to valuing the

15   PCDS as of September 15, 2008 wouldn't equally apply at the

16   time that you entered these trades?

17             MR. TAMBE:  Objection.  Speculation, Your Honor.

18   Is there any reason why?

19             MR. TRACEY:  Well, Your Honor, it's the same

20   question Mr. Tambe asked.

21             THE COURT:  Well, maybe if the word why; is there

22   any --

23             MR. TRACEY:  I'll rephrase, Your Honor.

24             THE COURT:  I think it's just the word why.

25             MR. TRACEY:  I understand.
```

Page 176

1    BY MR. TRACEY:

2    Q    Are there any factors or changes that would explain why

3    the methodology that you used would work as of September 15,

4    2008 and wouldn't be applicable at other times?

5              MR. TAMBE:  And, again, here we're -- I would

6    reiterate my objection that if his answer's going to be

7    based on things he did after 10/15/2008, we shouldn't be

8    going there, Judge.  It's what he knew and did at the

9    time --

10             THE COURT:  He's attempting to ask about

11   applicability.

12             MR. TAMBE:  Uh-huh.

13             THE COURT:  So, it's not why in the philosophical

14   sense.  It's just as a matter of the applicability of the

15   one the one methodology to the other situation, right?

16             MR. TRACEY:  Right.

17             THE COURT:  So --

18             MR. TRACEY:  Which was a big subject of the cross-

19   examination.

20             THE COURT:  Right.  So, your objection is

21   overruled, Mr. Tambe.  You can answer the question, Mr. Chu.

22             THE WITNESS:  I'm sorry.  Could you just repeat

23   the question one more time?

24             MR. TRACEY:  Sure.

25             THE WITNESS:  I'm --

Page 177

1            MR. TRACEY:   Sure.

2    BY MR. TRACEY:

3    Q    Are there any factors or changes that would explain why

4    the methodology that you used would work as of September 15,

5    2008 and wouldn't be applicable at other times?

6    A    I mean, sure, from a mechanical point of view, if we

7    think back to the other trades that we did, and I'm thinking

8    of an exhibit that you showed me, I don't know, a few days

9    ago, now, which was a transaction in which we bought

10   protection from Lehman Brothers in Wachovia WB.

11        And the setup for that transaction was Lehman said; we

12   have a potential seller of Wachovia PCDS in and around 325

13   basis points in a certain size and we wound up trading at

14   340 basis points.  I think that maturity was December 20th,

15   2012.

16        So, at that time, we didn't exchange any money.  It was

17   par PCDS swap but the reason we were able to do it was

18   because Lehman had seller of protection who believed that

19   there was a significant difference in the probability of

20   deferral over the term of the CDS to 12/20/11 versus,

21   perhaps, what the preferreds themselves implied about the

22   probability of deferral over a longer period of time.

23        And we didn't believe that.  Apparently, Lehman

24   suggested that they didn't believe it when they said; we

25   think the curve should be inverted.

Page 178

1          But, in any event, the point is, they had a seller who

2     believe that.  And, for that reason, we were able to source

3     that PCDS at that level in, I don't remember, maybe it was

4     June, 2008.  I don't remember the exact date.

5          However, the market conditions were sharply different

6     in September of 2008.  We had been trying to find those

7     sellers of protection continuously since -- or several times

8     since our last trade in July 30th, 2008.

9          We couldn't find any such sellers.  We were asking

10    Lehman; offer us protection.  And Lehman was telling us they

11    can't find those sellers of protection.

12         So, there were no such sellers of protection that we

13    could observe at the time and, as a result of that, it

14    wasn't possible to do those kinds of trades again.

15         So, then, coming back to our methodology, the question

16    we asked ourselves is; if you are a dealer who is in this

17    position, who has asked to offer such a large volume of

18    protection to QBT on PCDS and you don't have that seller on

19    the other sides; what's your alternative?  And, therefore,

20    we said your alternative is to sell short the preferreds

21    themselves.

22    Q    I think Mr. Tambe asked you a question about your use

23    of the same approach for PCDS where the underlying preferred

24    were trading at a moderate discount and also a significant

25    discount.  Is there any -- do you believe that that's

Page 179

1   reasonable?

2   A    Sorry.  To use the same approach regardless of, you

3   know, of kind a -- across a range of dollar prices --

4   Q    Right.

5   A    -- yes, inasmuch as the concept is if the dealer wishes

6   to upfront hedge his deferral risk, the amount he has to

7   charge is always equal to a hundred minus the price of the

8   preferred because if there's a credit event, he's got to

9   effectively cover his short at a hundred.

10       So, if it's trading at 80, he's got to charge 20

11   upfront.  If he's trading at 60, he's got to charge 40

12   upfront and so on and so forth.  So, just as a matter of

13   math, it -- the amount you have to charge is the same.

14   Q    And I think Mr. Tambe pointed out -- well, you said

15   that -- I recall that one of the factors that changed the

16   market was the Fannie and Freddie conservatorship; is that

17   correct?

18   A    I believed it was, yes.

19   Q    And Mr. Tambe pointed out that they were GSE's; do you

20   recall that?

21   A    Yes.

22   Q    And why did you think that was a significant factor

23   given that Fannie and Freddie were GSE's as opposed to

24   banks?

25   A    I'm sorry.  Unless I recall incorrectly, I'm not sure I

Page 180

1    thought -- it wasn't so much the fact that they were GSE's

2    that I thought was significant.  It was that these were very

3    systemically important institutions.  They are big

4    institutions and when it came time for the authorities to

5    decide how do we deal with these institutions that are, you

6    know, globally, financially important, the way they decided

7    to do it is they said; debt is debt and it will be, you

8    know, worth a hundred cents on the dollar or payoff at a

9    hundred.  And equity and preferreds are equity and they will

10   be severely diluted and/or have their dividends turned off

11   for an indefinite period of time.

12        And that's the distinction I think that I was trying to

13   draw there.

14        I'm not sure people used the word siffy (ph) back then

15   but, you know, Wells Fargo was also a very big bank.

16   Goldman Sachs was also a very big bank.  You know, BNP was a

17   big bank and so on, you know.

18   Q    I'd like to return to the Merrill Lynch offer that you

19   were asked about which is Claimant's Exhibit 1581.

20   A    Okay.

21   Q    That's in the white book.

22   A    Uh-huh.

23   Q    I'll just take that one as an example.  There's another

24   one on October 2nd but let's look at this one.

25        Again, were you aware of this at the time that you

Page 181

1    performed your work on the PCDS valuation between September

2    15th and October 15th?

3    A    I was not.

4    Q    And what date did you complete your valuation work on

5    the PCDS?

6    A    I think I completed it on September 28th.

7    Q    And, obviously, you were aware of this on September

8    28th?

9    A    Well, no, because that would be knowledge of the

10   future.

11        (Laughter)

12   Q    That was supposed to be a foundation question, sorry.

13        (Laughter)

14   A    Sorry.  I was just answering the question.  Maybe Siri

15   knows.

16        (Laughter)

17   Q    And did you, before completing your work, review your

18   Bloombergs to determine whether you could find any

19   information on PCDS's that would help you in your valuation?

20   A    Well, yes.  I mean, I was looking at numerous broker

21   runs to look for preferred prices, bid offer, market color.

22   I think it was quite likely, although I don't remember

23   specifically searching for the phrase, PCDS, what I know for

24   certain is I didn't have any PCDS, you know, markets or

25   offers or broker runs or anything like that.

Page 182

1       So, yeah, that's what I got from Bloomberg.

2   Q   And did you do any similar search after you completed

3   your valuation work?

4   A   What do you mean?  Did I keep searching my Bloomberg

5   after September 28th?

6   Q   Correct.

7   A   No.

8   Q   Am I correct that the document that's been marked as

9   Claimant's Exhibit 1581 is an offer of protection in PCDS?

10  A   Yeah.  It certainly looks that way.

11  Q   And as of September 15th, 2008, did you have a belief

12  as to whether Merrill Lynch was making a market in PCDS?

13  A   Well, we had never traded with Merrill Lynch in PCDS

14  before.  We didn't know them to be a market maker, no.

15  Q   And had you made inquiries into the market about who

16  was trading in PCDS?

17  A   As I said, I think I may have asked around a little bit

18  about PCDS after September 15th but I don't remember whether

19  I specifically inquired about Merrill Lynch or not.

20  Q   And if Merrill Lynch were a market maker in PCDS as of

21  September 15, 2008, would you have expected to be aware of

22  it?

23          MR. TAMBE:  Objection.  Calls for speculation.

24          THE COURT:  Well, hold on a second.  The question

25  was; would you have expected to be aware if there was a

Page 183

1    market being made in PCDS.

2             MR. TRACEY:  Right.  This gentleman was trading in

3    PCDS --

4             THE COURT:  That's a fair question.

5             MR. TRACEY:  -- for years.

6             THE COURT:  You can answer.

7             THE WITNESS:  Well, as I said, to the extent I

8    probably searched for the word PCDS in my Bloomberg, if

9    there had been a Merrill Lynch run or offering, I think I

10   would have come across it.

11            I think that -- I mean, I traded with Merrill

12   Lynch.  I traded with many different dealers across the

13   street and I never traded PCDS with them before that.  So,

14   whether or not I would have known that Merrill Lynch was a

15   market maker in PCDS had they been a market maker in PCDS, I

16   mean, I suppose there's a reasonable chance I would have

17   found out about it.  But it's -- it's just a little hard to

18   say what I would and wouldn't have known.  What I know is

19   that as of September 15th, I didn't know them to be a market

20   maker in PCDS.

21   BY MR. TRACEY:

22   Q    And, looking at Claimant's Exhibit 1581, is this a

23   broker run in the sense of having a bid and offer or PCDS?

24   A    No.  This is an offering of PCDS.  There's no bid side

25   that's indicated.  It's not like -- for instance, the first

Page 184

1    one, RBOS, they're not making it, I don't know, 700, 750 or

2    something.  They're just saying; we can offer 16.5 million

3    RBOS at 750.

4    Q    And is there anything that stands out to you in this

5    offer regarding the tenors of the various things that are

6    being offered?

7    A    Well, they're all March 20th, 2016.  That's different

8    than most of the tenors that QBT had.

9    Q    And is that what's known as on the run tenors?

10   A    No.  Those would not be the on the run tenors.  At the

11   time, five-year would be on the run for CDS generically

12   which would have been September 20th, 2013.

13   Q    And do you know whether Merrill Lynch had sold

14   protection to Lehman that it lost prior to making this offer

15   of protection?

16            MR. TAMBE:  Can I get a time frame, Your Honor, as

17   to source of knowledge?

18            MR. TRACEY:  Sure.

19   BY MR. TRACEY:

20   Q    At any time before October 15th, were you aware of

21   that?

22   A    No.  As I said, I wasn't even aware of this offering,

23   no.

24   Q    And are you aware of that today?

25            MR. TAMBE:  Objection, Your Honor, again, we were

Page 185

1   broadly denied discovery into what analysis this witness may

2   have done.

3          THE COURT:  All right.  The last question I think

4   we'll drop.

5      (Pause)

6   BY MR. TRACEY:

7   Q    Mr. Tambe asked you a number of questions about a

8   column in the 2180 spreadsheet that was labelled as of 9/21;

9   do you recall that?

10  A    Yes.

11  Q    And did you utilize -- did you utilize the numbers in

12  that column in your calculation of the loss for PCDS in

13  connection with this claim?

14  A    No.

15  Q    And were you finished with your valuation of the PCDS

16  on September 21, 2008?

17  A    On September 21, no.  I was not.

18  Q    Did you ever consider using Mark IT Partners to value

19  your PCDS positions for purposes of this claim?

20  A    I think we maybe considered it very briefly or

21  considered it in passing.  But I think we did not consider

22  it to be a serious source for calculating replacement value.

23  Q    And why is that?  And, again, I want you to just give

24  me --

25  A    Yeah.

Page 186

1    Q      -- your rationale from back September 15 to October 15.

2    A      Okay.  Well, it might actually be helpful in this

3    respect to pull up one of -- whatever the sheet is that has

4    Lehman Positions Master in it.

5    Q      Sure.  Can we bring up 2108?  2108.

6    A      Okay.  Okay.

7           So, I'm in the sheet, Lehman Positions Master, again

8    and I'm going to filter by pref.  Okay.

9           And, yeah.  So, one reason for it is that what -- okay.

10   So, what I've done is I've filtered Column B for pref once

11   again.  There are 60 records once again and I'm looking at

12   the Columns R through V.

13          And you can see that in most cases there's simply no

14   Mark IT CDS data at all.  There are a few entries that have

15   numbers in them.  But, in general, they're just -- it just

16   says; no Mark IT CDS data at all.

17          And this kind of comports with our understanding of

18   what you would expect from Mark IT because it's an average

19   of dealer opinion and there were very few dealers in the

20   market.  We only ever traded with Lehman.  But there's more

21   no Lehman.  But you wouldn't expect to get Mark IT data.

22          So, I think you would have to be very careful with the

23   data quality here if you used it at all.

24   Q      And, to the extent that Mr. Tambe was trying to suggest

25   that you considered -- that you calculated out Mark IT

Page 187

1    prices for PCDS, and then threw them away; is that accurate?

2    A    Well, no.  I think the sheet is going to do a

3    calculation based on whatever Mark IT -- you know, whatever

4    Mark IT data it has, the sheet's going to try to do a

5    calculation.

6         But it's just a cell that the sheet calculates.  It

7    doesn't mean that that's what we wind up doing the valuation

8    at.

9    Q    I think Mr. Tambe also asked you about whether you had

10   a model for valuing PCDS that considered the cost of

11   shorting the preferred; do you recall that?

12   A    I'm not sure exactly which question you're referring

13   to.

14   Q    Well, let me just ask you; did you consider, in your

15   valuation of the PCDS, the cost that a dealer might incur in

16   shorting preferred as a hedge for a sale of protection?

17   A    I think in one way we did, which is we looked at the

18   coupon of the preferreds that was relevant.  I think I

19   mentioned before that many of the PCDS's that we had, had

20   very, very low initial spreads, 30, 35 basis points.  And,

21   so, we knew it wouldn't make sense for a dealer to short a

22   really high coupon preferred against that.  Or, if he did,

23   he would have to charge something in addition to the par

24   minus preferred price.

25        So, in that sense, we considered that cost.

Page 188

1          One cost we didn't consider is that, I think as we

2     talked about a couple, or I talked about a couple days ago,

3     one of the benefits of CDS, in terms of purchasing CDS, is

4     that it gives you guaranteed borrow over the term and by

5     writing PCDS or any CDS for that matter, a dealer is

6     basically providing that guaranteed borrow to the person

7     who's buying it.

8          To the extent that it would cost something to borrow

9     the preferreds and to the extent that the dealer is taking

10    the risk of the borrow which, you know, could be

11    significant, we didn't take that second step to price the

12    cost of the borrow or to price what it would cost to

13    guarantee the borrow for roughly four and half years.

14    Q    And if you had included those costs in your

15    calculation, would that have increased or decreased your

16    client?

17          MR. TAMBE:  Objection.  Again, Your Honor, it

18    calls for speculation of an analysis that wasn't done at the

19    time.  It simply wasn't done.

20          MR. TRACEY:  Well, I -- Mr. Tambe specifically

21    asked whether he considered this.  I think I'm entitled to

22    explore --

23          THE COURT:  He --

24          MR. TRACEY:  -- why and why not and what effect it

25    would have had.  That's the whole point.

Page 189

```
 1              THE COURT:  I think that's fair.  You did ask him
 2   a series of questions along those lines.
 3              MR. TAMBE:  Well, he can say he did consider it
 4   but then to say what effect it would have had; he didn't do
 5   the calculation.  How could he possibly know what effect it
 6   would have had?
 7              THE COURT:  Well, but he can --
 8              MR. TRACEY:  He can say he doesn't know if he
 9   doesn't --
10              THE COURT:  -- he can say directionally.
11              MR. TRACEY:  Right.
12              THE COURT:  If you know.
13              THE WITNESS:  Yeah.  I think it would cost -- to
14   guarantee a borrow costs money and I think that that would
15   be something the dealer would -- if they were able to secure
16   it at all, they would be charged in order to do that.  So,
17   that would increase the claim.
18   BY MR. TRACEY:
19   Q    Mr. Tambe asked you a series of questions about the
20   size of the preferred issuances or the underlying preferred
21   securities relating to the PCDS; do you recall that?
22   A    I remember he asked me some general questions about
23   that; yep.
24   Q    And the liquidity of the preferred is -- was that
25   something you considered?
```

Page 190

1    A    Sorry.  Are you saying did I look at the size of the

2    issue in thinking about the magnitude of the bid offer

3    spread?

4    Q    Yes.

5    A    No, not specifically, no.

6    Q    And what information, if any, did you consider in

7    connection with your assessment of the liquidity of the

8    preferred?

9    A    Oh, well, I wasn't concerned with the size of the

10   issue.  I was concerned with the size of the market that was

11   being made.  So, for instance, when Peter Camp said; all but

12   low were 500 by 500, that's 500,000 by 500,000; that's the

13   kind of information I would consider.  It doesn't, you know,

14   it says nothing about the size of the issue.  Well, maybe

15   his run has the size of the issue.

16       But what I'm concerned about is what's the size of the

17   market when David Orridge said; I'm a 60 bid for 5 million

18   Sun Trust, that's telling me about what the depth of the

19   market is.  I don't know how big that Sun Trust issue is.

20   It's probably hundreds or millions or maybe even a billion

21   dollars.

22       What I want to know is how much can you buy or sell in

23   the market not what the size of the issue is.

24   Q    And did you, in fact, try to determine from the

25   information available to you, what the size of the market

Page 191

1    was at that time?

2    A    Sorry.  The size of markets that were being made?

3    Q    Yes.

4    A    I would say we didn't undergo like a systematic

5    analysis of all the bids and offers that we could see.  But

6    we could see that the bids and offers were not big.  I mean,

7    we didn't see -- I didn't see markets like 50 million up or

8    something like that.  We can trade $50 million on a side in

9    a preferred.

10         I saw numbers I think Peter Camp's is definitely on the

11   very small side.  I didn't see a lot of five -- I don't

12   think I saw any other 500 by 500.

13         But, you know, the two, three, five, ten million is

14   what I recall seeing and I think that comports with my own

15   experience with what can be traded in the preferred market.

16   Q    Let me direct your attention to Claimant's Exhibits

17   2096.  That should also be in the white book.

18   A    Okay.

19             THE COURT:  Could I ask a couple of questions?

20             THE WITNESS:  Sure.  Yeah.

21             THE COURT:  Mr. Tracey was just asking you a

22   series of questions about the size of the market for a

23   particular issuance.

24             THE WITNESS:  Uh-huh.

25             THE COURT:  I was under the impression that it was

Page 192

1    part of QVT's position that trying to make certain trades or

2    making certain trades would have a market impact trading an

3    order of magnitude of certain securities would have the

4    effect -- would have a market impact, would depress the

5    prices of the securities because a large transaction as

6    against the size of the market could have that effect.

7              And you seemed to give Mr. Tracey a slightly

8    different answer now.  So, I'm confused.

9              THE WITNESS:  Okay.

10             THE COURT:  Maybe they were two different

11   questions that were asked.  But thematically it's the same

12   idea.

13             THE WITNESS:  Okay.

14             THE COURT:  Can you clarify that for me?

15             THE WITNESS:  But perhaps I didn't express myself

16   clearly.

17             I think the recap that you just gave is an

18   accurate representation of the idea or the position that QVT

19   was trying to express here.

20             THE COURT:  Vis-a-vis the entire 371 notional

21   amount of the preferred that was protected by the PCDS?

22             THE WITNESS:  Correct.  And, also, I think when

23   Mr. Tracey was talking about the issue size --

24             THE COURT:  Yes.

25             THE WITNESS:  -- what I was just trying to

Page 193

1    distinguish is -- let's just be specific, so, let's come

2    back to Wachovia, for instance.

3              THE COURT:  Sure.

4              THE WITNESS:  So, in the case of Wachovia, I think

5    there was a Bloomberg from Michael Newman who noted the

6    Wachovia 7.98's are a humongous issue or something like

7    that.

8              THE COURT:  Right.

9              THE WITNESS:  And -- I don't remember whether they

10   were two billion or three billion, some really big number

11   like that.

12             And what I was concerned about is it really didn't

13   matter to me whether they were 2 billion or 1.5 billion or

14   2.5 billion. What mattered to me is; can you trade one

15   million or two million at the time or can you trade fifty or

16   a hundred million at a time.  And I think my strong

17   impression from being in the market and reviewing

18   Bloomberg's, et cetera was that it's much closer to the one

19   to two million at a time.

20             So, the sense that in -- the sense in which I

21   didn't take into account the size of the issue was the fact

22   that the Wachovia 798's were a $2 billion issue had no kind

23   of direct bearing on the calculation.

24             What I was concerned about is of that two billion,

25   how much can you trade at a time without --

Page 194

1              THE COURT:  Sure.  But the market --

2              THE WITNESS:  -- impacting the price.

3              THE COURT:  -- impact idea is stated broadly.

4    Hypothetically, if you were seeing bids and offers for

5    PCDS --

6              THE WITNESS:  Yes.

7              THE COURT:  -- moving 371 million of it might have

8    had a market impact.

9              THE WITNESS:  Yes.

10             THE COURT:  But you're not saying that had you

11   traded in the underlying securities that there would have

12   been a market impact that would have offset the other

13   pricing?

14             THE WITNESS:  Oh, okay.  I see what you're saying.

15             THE COURT:  See what I'm saying?

16             THE WITNESS:  Well, okay.  So, it's -- I think

17   it's kind of like this; if you -- maybe I can rephrase your

18   question --

19             THE COURT:  Sure.

20             THE WITNESS:  -- to make sure I understand it.

21             It's sort of like; are you asking -- you're not

22   trading 371 million of say the Wachovia 790.

23             THE COURT:  Correct.

24             THE WITNESS:  You're trading 371 million across --

25             THE COURT:  Across 19 (inaudible) --

Page 195

1          THE WITNESS:  -- 19 different names.  You're --

2          THE COURT:  Right.

3          THE WITNESS:  You're trading 371 million across 19

4     different names.

5          THE COURT:  Right.

6          THE WITNESS:  And I agree that's -- those are two

7     different things.  Nonetheless, I think it's my experience

8     that the market -- and I agree that spreading $371 million

9     across 19 different names is better than trying to trade

10    $371 million with one name.  No argument about that.

11          I think our view on it though was that when you

12    see that, say you have 20 or 30 million of a whole bunch of

13    names that you have to trade, and when you know that the

14    market size in each of those names is two, three, five

15    million for a single trade, that's a lot of trades you have

16    to do in each name.

17          And I think, furthermore, that it was our

18    experience that you can't -- there isn't like -- it's kind

19    of like imagine you're the German financials trader, okay?

20    And, you know, someone comes in to sell you a bunch of

21    Dresner preferred.  So Dresner is a name that we own PCDS

22    on.

23          If you see that the price of Deutsche Bank

24    preferreds on the Exchange is plummeting, that's going to

25    affect the price in my experience at what you're willing to

Page 196

1    buy Dresner preferreds because they're not exactly the same.

2    But they're two things that are related to each other.

3            So, I think the idea is correct that it's better

4    to trade -- it's better, in some way, to trade 20 million of

5    19 names than it is to strike 370 million in one name.

6            But it's not correct to say that it's like

7    they're, you know, trading 20 million in one name has no

8    impact on a related name especially in this type of, you

9    know, financial crisis type environment.  I think you would

10   -- the market's going to enforce a lot of read across

11   between those different things, yeah.

12           THE COURT:  Thank you.

13   BY MR. TRACEY:

14   Q    And direct your attention to Claimant's Exhibit 2096.

15   A    Yes.  I see it.

16   Q    If I could ask you to look at the sixth page which is

17   stamped 792 and the page that's marked 796.  If you could

18   look at both of those.

19   A    Yes.  I see them; 792, uh-huh.  Okay.  And 796.

20   Q    And 796.

21   A    Okay.  Okay.  I see them.

22   Q    Oh, that's clever.  Thank you.  I wasn't even hoping

23   for that.  Okay.  Good.

24           So, I think Mr. Tambe suggested that these two

25   Bloombergs suggested there was trading of a half a billion

Page 197

1   dollars in a week in these securities.

2   A    Uh-huh.

3   Q    Is that how you interpreted these two Bloombergs at the

4   time?

5   A    I'm not sure I ever put these two next to each other

6   and added three hundred and two fifty.  But, in any event,

7   I'm not sure what I thought either way.  When a trader says;

8   I traded north of 300 million now in this sector alone.

9   Q    Did that change your view that the markets being made

10  in these preferreds were very small at the time?

11  A    Well, no.  I mean, in the sense that -- okay.  First of

12  all, just as a matter of convention, it's very frequently

13  the case, and I don't know, I haven't talked to this trader,

14  the case that when a trader in CDS or bonds buys ten million

15  bonds and sells ten million bonds, instead of saying; I

16  traded ten million bonds.  He or she will say; I traded

17  twenty million bonds, okay?

18       That's very often the case.  So, I don't know if really

19  he traded 300 or a hundred and fifty million.  But that's

20  sort of, from my perspective, was neither here nor there.

21       I think the idea, I guess, that he's trying to express

22  is that there's a lot of activity here.  There's a lot of

23  liquidity in the market.  But, to me, it doesn't foot with

24  what he's actually doing, at least in some of the names that

25  were relevant to us.

Page 198

1        For instance, if you say; look.  I'm like a big market

2    maker in the city, 8.4, C 8.4 which is the third preferred

3    here.  I can sort through tons of liquidity.  I know like

4    where the buyers are.  I know were the sellers are.  I would

5    say; that's great.  Make me a market.  And then if you said;

6    I'll make it 6570, to me, that just -- it doesn't -- what

7    everything you told me before doesn't really ring true

8    because why do you have to make the market five points wide

9    if there's so much liquidity and you know where everything

10   is.

11        Similarly, in the case of a Wachovia 7.98's, I mean, he

12   happens to make them 5964 at the end of the week and he --

13   but he makes them 4348 here.  Again, you can say, like;

14   look.  I'm the biggest trader of the Wachovia 798's.  I

15   traded lots of these things.  Come to me if you need

16   liquidity if you want to trade.  But if you make the market

17   five points wide on something that has a dollar price on the

18   mids of 45, it doesn't feel like that much liquidity to me

19   if the bid offer spread is ten percent of the value of the

20   thing that's being traded.

21        So, I think what was important to me was just seeing

22   the actual width of markets that people were willing to

23   make.  And it's true that in certain names, the bid offer

24   spread was tighter.  For instance, in Wells Fargo, the bid

25   offer spread at the end of the week was tighter at 9395.

Page 199

1        But Bank of America was a little tighter at 7982.  But

2    in the case of City and Wachovia, if you say; look, I'm

3    trading tons of City and Wachovia.  I'm a great market maker

4    in this -- it's a little bit at odds with the idea of making

5    such a wide market, in my mind.

6    Q    And, just for clarity, what is the relationship between

7    liquidity in a market and the size of the bid offer spread

8    that's being offered?

9    A    Well, I think, generically, my experience is that when

10   there's a lot of liquidity, the bid offer is really narrow

11   because you can buy something and sell it instantly or sell

12   something and buy it back instantly and you can do it in a

13   lot size and there isn't a lot of uncertainty about where

14   you can do that, yeah.

15   Q    Okay.  And I think Mr. Tambe also asked you about this

16   Exhibit whether this represented all of the screen shots of

17   the preferred prices that you collected at the time you did

18   your valuation.  Do you recall that?

19   A    I recall he asked me that.  Yes.

20   Q    And is this all -- is this all of the screen shots in

21   this Exhibit?

22   A    This Exhibit does not contain all of the screen shots

23   that I recorded at the time.

24        MR. TRACEY:  I'd like to mark a new Exhibit, Your

25   Honor, which is not in book.  It is Claimant's Exhibit 2129.

Page 200

```
 1              THE COURT:  Okay.

 2         (Pause)

 3              THE COURT:  Thank you.

 4         (Pause)

 5    BY MR. TRACEY:

 6    Q    I'll give you a moment to look at it but the question

 7    is going to be whether you can identify these screen shots.

 8         (Pause)

 9    A    Yes.  I can identify them.

10    Q    What are they?

11    A    I think these are the screen shots that I saved of the

12    various preferreds that I used to -- well, these are the

13    sources of the prices that I punched into the sheet called

14    PCDS Data that we were looking at earlier that I used to do

15    the valuation.  I didn't use every preferred in all cases

16    but this would be the source data.

17    Q    Does this cover all 19 referenced entities?

18    A    Sorry.  I have to count.  One second.

19         (Pause)

20    A    One, two (inaudible) --

21         I think it has everything, yes.

22    Q    Okay.  I'd like to change the subject and ask you some

23    questions about CARB.

24    A    Okay.

25    Q    Mr. Tambe asked you some questions about a remittance
```

Page 201

1    report dated, if I remember correctly, it's September 15,

2    2008; do you recall that?

3    A    Yes.

4    Q    And you didn't look at that remittance report when you

5    were doing your valuation of CARB, correct?

6    A    I did not.

7    Q    Why didn't you look at the remittance reports?

8    A    Well, generally, if I were to try to look for that

9    data, I would probably start with INTEX and I didn't use

10   INTEX in this case.

11   Q    And would you tell the Court why you didn't use INTEX

12   to value the CARB position you have?

13   A    Sure.  So, I think it's important to distinguish what

14   INTEX gives you and what INTEX doesn't give you.  INTEX is a

15   cash flow engine.  It tells you if you input certain

16   assumptions, like this many borrowers prepay, this many

17   borrowers default and so on, what will the cash flows -- how

18   will the cash flows run through the waterfall in the

19   securitization and what cash flows will your bond get.

20        And you need something like INTEX or a similar cash

21   flow engine for these type of securitizations with consumer

22   loans because you don't know what the underlying consumers

23   are going to do.  They're going to behave in some way which

24   is uncertain.

25        So, what -- that's what INTEX gives you.  If you give

Page 202

1    the assumptions about what borrowers will do, it will give

2    you an output which is what will the cash flows of your bond

3    be.

4        What INTEX does not give you is it doesn't give you the

5    price of those bonds.  So, by analogy, if you think of a

6    corporate bond, I could say there's a six percent bond

7    maturing in ten years from, you know, issuer "X", who --

8    whatever it is, IBM.  What's the price?

9        INTEX, it gives you the part that says it's IBM, it's

10   six percent and matures in ten years.

11       The market gives you the answer to what's the price.

12   So, I want to be clear that I think, yes, from time to time,

13   did I run INTEX in CARB?  Definitely.  Did I run INTEX in

14   mortgages?  Yes.  I ran it all the time.

15       And I'm not saying that running INTEX wouldn't have

16   shed some light on the problem.  Running INTEX definitely

17   would shed light on the problem.

18           THE COURT:  But did you -- did you -- do you tell

19   INTEX and assume this default rate on this tranche or does

20   INTEX pull that from somewhere else?

21           THE WITNESS:  No.

22           THE COURT:  Or neither?

23           THE WITNESS:  Maybe both kind of, I guess.  INTEX

24   tells you what the past is, okay?  So, assuming INTEX is up-

25   to-date, it will tell you -- it will summarize some of the

Page 203

1   information that was in the remittance report.

2           THE COURT:  Okay.

3           THE WITNESS:   There are this many loans

4   delinquent.   There are this many that defaulted.   This many

5   prepaid.   And, so, you can get a summary time series of

6   where all those different behaviors have been.

7           But you have to tell INTEX how to extrapolate that

8   out into the future, okay?   Default's worth three percent

9   last month; are they going to be three percent next month or

10  maybe, more typically, one would run a range of scenarios;

11  four, five, six, seven, whatever they are.   And, then, INTEX

12  in each of those scenarios, given each of those assumptions,

13  will give you the cash flows of the bonds.

14          THE COURT:  So you tell INTEX directionally

15  whether things are going to get better or worse?

16          THE WITNESS:  Correct.  You have to supply those

17  assumptions.

18          So, I think the answer to the question -- so --

19  and, so, just to finish the thought, the -- but by running

20  those kinds of different assumptions, you can get an idea as

21  to; gosh, is this bond very sensitive to defaults or is this

22  bond somewhat less sensitive to default.  And that's the

23  sense in which it does shed some light on the problem.

24          If you look at the different components of CARB,

25  it might tell you; okay, this bond is relatively more risky.

Page 204

1    This bond is relatively less risky.

2            But, as I said, what INTEX doesn't give you is it

3    doesn't give you the thing that you need to get back to

4    price, which is either what the price of the bond is, the

5    market tells you that; and it doesn't tell you -- or,

6    alternatively, it doesn't tell you the discount rate at

7    which you would discount those cash flows to arrive at a

8    price today in the same way that if I tell you -- and here's

9    -- there's an IBM bond that has a six percent coupon and

10   matures in ten years, it tells you what the parameters of

11   the bond are.  But you don't know if that should trade at 95

12   or it should trade at a hundred or it should trade at a

13   hundred and ten.  The market tells you that information.

14   BY MR. TRACEY:

15   Q    And why didn't you have that information?

16   A    Well, we didn't have that information because we didn't

17   have a price on either -- to the CARB itself because Lehman

18   was gone; nor, did we have prices on the underlying ABS

19   CDS's.

20   Q    Mr. Tambe also asked you some questions about why you

21   didn't look at Bloomberg prices for the underlying bonds.

22   Do you recall that?

23   A    Yes.

24   Q    And why didn't you look at those?

25   A    Oh, well, I think for cash securities like that, I'm

Page 205

1    not sure we ever really used Bloomberg to price those small

2    ABS tranches.  Those tranches were between 30 and 60 million

3    dollars in size and we just didn't think that that was going

4    to be a reliable -- Bloomberg was going to be a reliable

5    price source because those tranches, typically, don't trade

6    very frequently.

7    Q    And, just to be clear, again, does Bloomberg represent

8    prices of actual transactions?

9    A    I think Bloomberg prices, if they knew about it, I

10   guess, it could represent it.  But, in general, it's just a

11   quotation.  It's just a pricing source.  Yeah.

12   Q    And, just for context, when you entered into the CARB

13   trade in the first place, did you look at the Bloomberg

14   prices of the underlying bonds?

15   A    No.  I think I'd never looked -- in all the times I

16   traded CARB, I never looked at the Bloomberg prices of the

17   bonds.

18   Q    In -- when you trade ABS, generally, do you look at the

19   Bloomberg prices for the underlying bonds?

20   A    No.  At that time, we did not.  I think, now, the

21   reporting is a little bit better.  But, at that time, for

22   these -- for instance, when we were selling short, sub-prime

23   mortgage securitizations, there -- we did hundreds and

24   hundreds of these trades and we never looked at the prices

25   on Bloomberg because -- well, then I guess that was the

Page 206

1    whole point.  The ABS/CDS market was a way to trade these

2    things without having to rely on trading this little tiny

3    cash tranche that really never traded.  Yeah.

4           THE COURT:  And you never -- so, for RNBS or CNBS,

5    you never diligenced down to remittance reports to see

6    whether -- how the case was coming in on the underlying

7    assets?

8           THE WITNESS:  No.  Well, I --

9           THE COURT: (Inaudible) --

10          THE WITNESS:  No.  I think we -- definitely, we

11   did use remittance reports from time to time in RNBS when

12   you had to -- this was -- I would say that this was more

13   post-crisis.  Pre-crisis, we kind of used the data from

14   INTEX that summarized the remittance report data and we

15   would, you know, often graph that for ourselves and, you

16   know, we had a model, actually for RNBS that forecasted

17   those different variables.

18          So, I don't want to give the impression that we

19   didn't use the remittance data.  We did in RNBS.

20          What I'm saying is that in RNBS, we didn't try to

21   look at the price on Bloomberg of the underlying cash

22   security because we just didn't think it would mean anything

23   to us.  Yeah.

24   BY MR. TRACEY:

25   Q    Mr. Tambe showed you some Bloomberg prices that were

Page 207

1   gathered long after September 15th; do you recall that,

2   2008?

3   A    Is -- are you referring to the spreadsheet for whom the

4   author is Michael Dearmont (ph) from --

5   Q    Correct.

6   A    -- 2012?  Yes.  I remember that.

7   Q    Let's bring up that Exhibit.  It's Exhibit 5433.

8   A    Okay.

9   Q    Do you recall Mr. Tambe showing you this document?

10  A    Yes, I do.

11  Q    And do you -- can you -- can we look at the medi data

12  on this?

13       (Pause)

14  Q    It's cross -- it's tab 109 in the black book.

15  A    Okay.

16  Q    Do you have that there?

17  A    One second.

18       (Pause)

19  A    I see it.

20  Q    And what was the date that that document was created?

21  If you can read it.

22  A    It says; date created 7/21/2012.

23  Q    And do you recall what was going on with your claim

24  against Lehman in July of 2012?

25  A    No, not really, actually.

Page 208

1   Q    And did you -- do you recall, looking at these prices,

2   all those years later?

3   A    Yes.  I mean, I recall performing analysis of the bonds

4   at these given prices; yes.

5   Q    And, during that period, what -- was that during a

6   period when QBT was having discussions with Lehman about the

7   claims?

8   A    Yes, I think so.  But I don't have a lot of specific

9   recollection.  But, yes.

10            THE WITNESS: May I request to go to the restroom?

11            THE COURT:  Of course.

12        (Laughter)

13            THE WITNESS:  Thank you.

14            MR. TRACEY:  Lawyers don't do that.  You have to

15   ask.

16        (Laughter)

17            THE COURT: (Inaudible) conclude by five thirty or

18   so today; aren't we?

19            MR. TRACEY:  Yes.

20            THE COURT:  Okay.  And we need (inaudible) --

21        (Recessed at 4:38 p.m.; reconvened at 4:50 p.m.)

22            THE COURT:  Home stretch, Mr. Chu.

23            THE WITNESS:  I hope so, Your Honor.

24   BY MR. TRACEY:

25   Q    You were asked some questions on cross-examination

Page 209

1  about using GMAC as a proxy for changes in prices of CARB,

2  do you recall that?

3  A    I do.

4  Q    And I think you said that the underlying trusts that

5  issued the bonds were bankruptcy remote?

6  A    That's right.  It was structured to be that way, yes.

7  Q    And were you aware of that at the time you valued CARB

8  using GMAC?

9  A    Yes, I was.

10 Q    And did that affect your belief that GMAC was a

11 reasonable proxy per the change in price?

12 A    No, we knew from the beginning that the securitizations

13 were structured to be bankruptcy remote.

14 Q    And why, if the structures are bankruptcy remote, would

15 you think that the price of a CDS on GMAC would be

16 correlated with that?

17 A    Well, it --

18         MR. TAMBE:  Same objection in terms of analysis as

19 to what he knew at the time versus what he may have divined

20 since --

21         MR. TRACEY:  This is strictly limited -- I'm

22 sorry.

23 BY MR. TRACEY:

24 Q    This is strictly limited to what you knew at the time

25 and what your thinking was.

Page 210

1    A    Yes.  So -- I mean, going back to the inception of the

2    transactions, I think I had mentioned previously that we had

3    booked all of these transactions in an account called

4    GMAC/hedge.  So in our minds, these securitizations from

5    vintages 2006 and 2007 were kind of representative, I guess

6    you'd say, of some of the risks that GMAC was taking in the

7    auto finance business and we always felt from the beginning

8    that there could be a correlation between them.

9         In fact, we actually felt that there was a reasonable

10   chance that the securitizations could actually do much worse

11   than GMAC itself, because even though they're structured to

12   be bankruptcy remote, we had seen many cases of individual

13   securitizations from, say, the mortgage issuer Countrywide,

14   for instance, where the mortgage securitizations, the

15   subordinate triple BBB tranches, actually basically went to

16   zero, but Countrywide itself, as an important financial

17   institution, wound up being bought by Bank of America.  So

18   we actually thought that there was a chance that the

19   securitizations could do significantly worse than GMAC.

20        But I think that in general we felt the idea was simply

21   that they're both pools of auto loans.  They're

22   representative of the types of auto loans that GMAC was

23   making.  And we felt that there should be a correlation

24   between them.

25   Q    Do you recall that Mr. Tambe showed you one of the

Page 211

1   confirmations for a CARB transaction?

2   A    Yes, I do.

3   Q    And pointed out that the CARB is a package of eight

4   separate CDS's, do you recall that?

5   A    I recall that.

6   Q    And you agree with that, right?

7   A    I agree with that, yes.

8   Q    And -- but whenever -- when Lehman introduced CARB to

9   you, did they ever suggest that you could trade the

10  individual CDS's separately?

11  A    Do you mean in the course of trading CARB itself, or do

12  you mean just as a general matter that no one could trade

13  them separately from one --

14  Q    No, with respect to CARB?

15  A    No.  It was understood that CARB was this individual

16  package of these eight CDS's that were, you know, glued to

17  each other, basically.

18  Q    Did they ever -- you know, did you ever ask them if you

19  -- did they ever suggest to you that you could trade one of

20  them and you could not trade the other seven?

21  A    No.  Whenever I traded CARB it was understood we were

22  all trading at -- we were trading the whole package at once.

23  Q    Okay.  I'd like to turn to a slightly different subject

24  and that is your marking of your CDS positions on your own

25  books and records.  I'd like to start with CARB and ask you

Page 212

1    what the source was for the pricing for CARB when you marked

2    your books and records prior to September 15th, 2008.

3    A    We used Lehman's marks.

4    Q    And did you ever use the pricing service that provided

5    prices on the underlying bonds?

6    A    No, we did not.  We used Lehman's marks.

7    Q    Did you ever use Bloomberg pricing for the underlying

8    bonds to mark your positions in CARB?

9    A    No.

10   Q    Let me turn your attention to your marking of your PCDS

11   on your books and records.  Do you recall being asked some

12   questions about a collateral or a margin call on September

13   16th?

14   A    Yes.

15   Q    Let me show you that document, again it's Defendant's

16   Exhibit 5169.

17   A    One moment.

18            THE COURT:  Is that in the black book?

19            MR. TRACEY:  That is tab 93 in the black book.

20            THE COURT:  Thank you.

21   BY MR. TRACEY:

22   Q    Okay, and again just to orient our -- orienting

23   ourselves, this is an e-mail dated September 16th, 2008, at

24   the bottom.

25   A    Correct, yes.  September 16th, 2008.

1    Q    And that is an e-mail from Kelly Feng of QVT to

2    Patricia Blanco (ph) of Lehman?

3    A    Yes.

4    Q    And it's asking -- essentially, this is asking for a

5    margin payment from Lehman of $12 million for QVT and $1.3

6    million for Quintessence, is that correct?

7    A    That's what it says.

8    Q    Okay.  And Mr. Tambe asked you on cross-examination

9    whether you sent an e-mail to somebody objecting to this

10   margin call.  Do you recall that?

11   A    I recall the -- yes, the general topic, yeah.

12   Q    And why didn't you send an e-mail to somebody objecting

13   to this margin call?

14   A    Well, I'm not even sure on what -- I mean, assuming I

15   had seen the e-mail, I'm not sure on what basis I would

16   object to it.  I think I said I don't actually know where

17   Kelly's numbers are even coming from in this case.  And to

18   the extent that LBSF was able to make a payment to us, I

19   mean, that would be helpful to our investors.  So I'm not

20   sure why I would object to it in any event.  Yeah.

21   Q    And focusing on the mark to market change, do I read

22   this quote correctly that this relates to, at least in part,

23   to a mark to market movement from 9/12 to 9/15?

24   A    Well, it says there is -- I see there's an MTM, mark to

25   market movement, from EOB, I think that's end of business,

Page 214

1    9/12 to 9/15 for plus 12 million in QVT and 1.3 million in

2    Quintessence.  So, yes, I think it relates to the movement

3    between those two dates.

4    Q    And did you make any -- did you remark your PCDS

5    positions between September 12th and September 15th?

6    A    No, I did not.

7    Q    So would the marks on QVT's books reflect the changes

8    in the value of PCDS from September 12th to September 15th?

9    A    No, not in any material way, just maybe there was

10   something really small like, you know, a couple more days of

11   interest on the CDS accrued, but not in the remarking at

12   month end sense, no.

13   Q    And the same question for CARB, did you mark your CARB

14   position on September 15th?

15   A    No, we did not remark the CARB position on September

16   15th.

17   Q    So would your mark on your own books for CARB reflect

18   any change from September 12th to September 15th?

19   A    No, I don't think it would.

20   Q    Let me direct your attention to another document that

21   Mr. Tambe asked you about.  It's Exhibit 5130, which is tab

22   44 in your -- in the black book.

23   A    Okay.

24   Q    And I want to direct your attention as he did to the

25   attachment which is a landscaped --

Page 215

1    A    The third page?

2    Q    -- spreadsheet of some kind.

3    A    Do you mean the third page?  Okay, yes, I see it.

4    Q    Yes.  And I think he focused your attention on the fact

5    that the value on the books for LBSF positions was

6    essentially the same as the collateral against that, is that

7    -- do you recall that?

8    A    Well, yeah, I -- if I recall correctly, they -- he was

9    referring to the third and fourth lines called LBSF and LBSF

10   margin, which have on the right side 116.898 million and --

11   on the other entry, minus 117,285,000.

12   Q    And is it surprising to you that the value of the

13   positions on the books is approximately equal to the

14   collateral?

15   A    Is it surprising?  No, not particularly.

16   Q    Are those two things related in any way?

17   A    Well, I mean, to the extent that we're using Lehman's

18   marks for a significant part of the portfolio, it would

19   surprise me that our marks are similar to theirs.  And that

20   would just say that we've called them for all the margin

21   that we can call them on, the fact that the two numbers are

22   the same.  That's all it's telling me.

23   Q    And does that mean that upon termination of those

24   positions on September 15th, that you were fully covered for

25   any losses?

Page 216

1    A    No, it does not.

2    Q    Why doesn't it mean that?

3    A    Because first of all, even if there were no movement in

4    the market at all, one would have to calculate the

5    replacement value, which is different than a collateral

6    value.  But secondly, and more importantly, there was a big

7    move in the market over that time and indeed to the extent

8    that the marks that we were using were, you know, frequently

9    829 marks, there was actually a market movement over a

10   larger period of time.  So there's both a market movement

11   component and there was also a, you know, replacement value

12   versus midmarket collateral value component.

13   Q    And when you referred to direct exposure in your e-mail

14   on September 14th, were you including in that direct

15   exposure those potential losses you just described?

16   A    No, there's no contemplation in this e-mail of the jump

17   or the change in the market value.

18              MR. TRACEY:  May I have a moment, Your Honor?

19              THE COURT:  Sure.

20              MR. TRACEY:  I have nothing further, Your Honor.

21              THE COURT:  Thank you.  Mr. Tambe, anything?

22              MR. TAMBE:  Just a couple of points, Your Honor.

23                      RECROSS EXAMINATION

24   BY MR. TAMBE:

25   Q    Mr. Chu, the document you were just looking at, Exhibit

Page 217

1    5130, that showed that you were holding about $117 million

2    in collateral from Lehman, correct?

3    A    Yes.

4    Q    Because you were in the money facing Lehman on a mark

5    to market basis for approximately that amount, 116 million,

6    correct?

7    A    Yes.

8    Q    So from the inception of the trades as spreads have

9    widened and markets have moved, Lehman had posted collateral

10   to you to compensate you for those changes in market

11   movement, correct?

12   A    Lehman had posted collateral to us, yes.

13   Q    And that was to reflect the changes in the market,

14   correct?

15   A    That was to reflect the changes in the collateral value

16   as they calculated them.

17   Q    Well, not just the collateral value, Mr. Chu, in the

18   value of the positions.

19   A    Yes, sorry, I didn't speak precisely.  That was -- the

20   collateral was posted in respect of the positions as they

21   valued them.

22   Q    So as of the early termination date, do you have

23   payments from Lehman for all of those changes in value, from

24   inception of the trade through September 15th, 2008,

25   correct?

Page 218

1    A     Well, we had a -- yes.  We had a positive mark to

2    market per Lehman's marks.  And they had posted the amount

3    of that positive market to market to us.

4    Q     Right.  And it's not just Lehman's marks.  It's the

5    marks that you had adopted for your own purposes and for you

6    books and records, correct?

7    A     Yeah, we often used the Lehman marks for marking our

8    own book, yes.

9    Q     And you believed that was entirely consistent with your

10   obligations to your investors to mark your books in that

11   fashion, correct?

12   A     Well, interim month there really isn't official

13   reporting to investors because no capital is moving in and

14   out.  But yes, at month end, to the extent that we used

15   Lehman marks, we thought doing so was consistent with our --

16   the way we priced securities and derivatives, yes.

17   Q     And so with respect to the CARB trades, you were

18   holding collateral against the valuation of the CARB trades

19   as of September 15th, 2008, correct?

20   A     We were holding collateral, yes.

21   Q     You had an extended discussion about Intex and what

22   Intex can and can't do.  Do you remember that?

23   A     I do.

24   Q     We also discussed, I believe on Friday, that CARB,

25   unlike PCDS, is a pay as you go swap, correct?

Page 219

1   A    It is a pay as you go swap, that's right.

2   Q    Therefore, cash flows on the underlying are what drive

3   cash flows on the CDS, correct?

4   A    That's right.

5   Q    And what Intex gives you is cash flows, correct?

6   A    Intex is a cash flow engine, that's right.

7   Q    And unless there are shortfalls in cash flows, you

8   don't get paid anything as the protection buyer on a pay as

9   you go CDS, correct?

10  A    As a protection buyer, that's right, you pay out --

11  yeah, you would pay out the coupon basically, yeah.

12  Q    Right.  So that's money you'd be paying to Lehman over

13  the remaining life of these contracts if they had not been

14  terminated, correct?

15  A    That's right, yes.

16  Q    And by terminating the trades, you were relieved of

17  that obligation to pay Lehman on a going forward basis?

18  A    You mean the 150 basis point coupon?

19  Q    That's right --

20  A    That's right.  Yes, we were no longer paying the

21  running coupon.

22  Q    And the cash flow calculator in Intex could have told

23  you on 9/15/2008 what the expectations were for future cash

24  flows on those same underlying bonds, correct?

25  A    No, Intex wouldn't tell you what the market

Page 220

1    expectations for those cash flows would be.

2    Q    You had never previously used GMAC to price or value

3    the CARB trades in your portfolio, correct?

4    A    No, because we had markets from Lehman Brothers.

5    Q    And even though you housed those trades in your GMAC

6    hedge account, that's not a calculation you ran, which is

7    using GMAC spreads to value the cost, right?

8    A    No, we didn't.  We didn't, that's correct.  We used

9    CARB prices from Lehman to value CARB.

10   Q    Let's switch to PCDS, all right?  You were holding

11   collateral on 9/15/2008, consistent with the valuation of

12   the PCDS positions on your books at that point in time,

13   correct?

14   A    Well, we would -- we were holding collateral, which in

15   aggregate was basically equal to Lehman's marks.  As to

16   whether our marks are exactly the same as Lehman's marks on

17   9/12, I'm not certain.  I think they would have been in the

18   zone, but I don't think -- I don't know that they were

19   exactly the same, because our mark was basically the 829

20   mark.

21   Q    And the collateral you held with respect to the PCDS

22   positions, that reflected changes in spreads after the date

23   on which you had put on those trades with Lehman, correct?

24   A    Yes, it was the mark to market for a trade done prior

25   to that date.

Page 221

1    Q    Right, now unlike CARB in BCDS, you need to have a hard

2    default or a deferral to get paid the protection payments

3    you're owed on a BCDS, correct?

4    A    You have to have a credit event as defined in the

5    confirmation.

6    Q    That's right.  And there had not, in fact, been credit

7    events as defined in the confirmation was of 9/15/2008 for

8    the 19 names, correct?

9    A    No, there had not been any credit events in those

10   names.

11   Q    And your valuation methodology, the par minus preferred

12   equity price, effectively treats the calculation as if there

13   had been a credit event on every single reference

14   obligation, correct?

15   A    No, that's wrong.

16        MR. TAMBE:  No more questions, Your Honor.

17        THE COURT:  All right.  Mr. Chu, thank you very

18   much.

19        THE WITNESS:  Thank you, Your Honor.

20        THE COURT:  I greatly appreciate your patience

21   over these last couple of weeks.

22        THE WITNESS:  Okay.

23        THE COURT:  You can step down.

24        THE WITNESS:  Thank you very much, Your Honor.

25        THE COURT:  Okay.  Why don't we take a few minutes

Page 222

1    to talk about coming attractions?  So by my count,

2    Mr. Tracey, we are a full two days behind.

3              MR. TRACEY:  We're working to fix that.

4              THE COURT:  Okay.

5              MR. TRACEY:  May I hand up a first amended

6    testimony schedule --

7              THE COURT:  Sure, does --

8              MR. TRACEY:  -- which I've shared with --

9              THE COURT:  Do these folks have it?

10             MR. TRACEY:  Yes.

11             MR. TAMBE:  Got it this morning, Your Honor.

12             MR. TRACEY:  Okay, thank you.  I don't want to

13   overplay this, but I will point out that so far this

14   schedule has held perfectly.

15             MR. TAMBE:  He's putting it out there, Judge.

16             THE COURT:  The one you just handed to me?

17             MR. TRACEY:  Yes.

18             THE COURT:  Very funny.

19             MR. TAMBE:  We should backward test it.

20             THE COURT:  Okay.

21             MR. TAMBE:  We can go off the record for this,

22   Your Honor, so that --

23             THE COURT:  Yeah, we -- I think we can.

24        (Recessed at 5:12 p.m.; reconvened at 5:18 p.m.)

25             MR. TRACEY:  Ma'am, may I raise one more point,

Page 223

1    please?

2         THE COURT:  Sure.

3         MR. TRACEY:  This relates to something we talked

4    about before, which is a witness named Megan Philbin.

5         THE COURT:  Yes.

6         MR. TRACEY:  Who we subpoenaed but she's --

7         (Recessed at 5:18 p.m.; reconvened at 5:21 p.m.)

8         MS. SAWYER:  Premature to do so and we don't know

9    whether or not the witness will be unavailable given the way

10   the pace of the hearing is going.  Additionally, we

11   discussed this yesterday and to the extent Ms. Philbin's

12   designations go in, we had our own affirmative designations

13   and we haven't see, sort of, combined sets.  So I think we

14   need to work out some logistics -- certainly --

15        THE COURT:  Well, that level you can certainly

16   work out.

17        MS. SAWYER:  Yeah.

18        THE COURT:  Right?

19        MS. SAWYER:  There's also extensive objections to

20   her deposition testimony that would need to be resolved.

21        MR. TRACEY:  And we pointed that out, but there is

22   no issue that it's admissible.  I mean, I just -- the

23   stipulation specifically says that it is admissible and that

24   it meets the test of unavailability and they want to object

25   on that basis, so I'm surprised to (indiscernible) an

Page 224

1   objection.

2            MS. KELLER:  Your Honor, just to add this to

3   abhorrent (indiscernible) -- okay, thanks, Jay.

4            UNIDENTIFIED SPEAKER:  In a couple of minutes,

5   I'll be --

6            THE COURT:  I'm having a hard time knowing what's

7   going on at the moment, to be honest.  I mean, there's

8   something going on here.

9            MR. TRACEY:  I'm not sure what it is.  Let me read

10  you the -- I can read you the stipulation.

11           THE COURT:  Okay.

12           MR. TRACEY:  It says, number one, Ms. Philbin is

13  unavailable to testify at the hearing and as it is currently

14  scheduled on account of her medical condition.

15           THE COURT:  Okay.

16           MR. TRACEY:  Two, neither party will object to the

17  use of Ms. Philbin's deposition testimony at trial, pursuant

18  to Federal Rule of Civil Procedure 32(a)(4) --

19           THE COURT:  Okay.

20           MR. TRACEY:  -- which is what provides for the

21  admissibility of unavailable witnesses' testimony.  So --

22  and then it says for the avoidance of doubt, all objections

23  asserted during Ms. Philbin's deposition are preserved and

24  may be asserted during the hearing.  So I think it's very

25  clear.

Page 225

1          THE COURT:  So is the issue simply one of timing?

2          MS. SAWYER:  The issue is simply one of timing.  I

3    mean, to think if the witnesses' -- if the hearing gets

4    extended and the witness is available to testify live, then

5    that's the appropriate thing that should happen in this

6    situation.

7          THE COURT:  But Mr. Tracey is saying that in terms

8    of their presentation, that they want to put it in in their

9    case in chief.

10          MS. SAWYER:  I hear that.

11          THE COURT:  Right?

12          MR. TRACEY:  Right, and that's -- I --

13          THE COURT:  As a --

14          MR. TRACEY:  I would have thought we had the right

15    to determine what we put into evidence in our case.

16          MS. SAWYER:  I mean, it's certainly up to you, but

17    I think until we know whether or not she's available, it

18    seems premature to make the decision.

19          THE COURT:  Well, let's hypothesize that she

20    becomes available because it's April and we're still doing

21    this.  Then what?  Then you would say that -- then what

22    would happen?  Mr. Tracey would still say he gets to put the

23    deposition transcript in.  And you might -- no?

24          MS. SAWYER:  I would say no because the rest of

25    the stipulation says that they will not object to our

Page 226

1   efforts to have her -- to issue a trial subpoena and have

2   her testify live if the hearing gets extended.  So I think

3   what would happen is she would testify live, but you would

4   have already read her deposition testimony, which would be

5   the problem that we're presented with.

6          MR. TRACEY:  It's not a problem.  If -- we all

7   agreed this is admissible testimony.  So if she comes and

8   testifies again, presumably it will be consistent with that.

9   It was under oath, and you cross-examined, and it's

10  testimony.  So I just don't see the issue.  And I feel very

11  unfair to be precluded from putting evidence that I want to

12  put in in my case, especially with the stipulation I have,

13  which allows me to do it.  If they wanted to say you can't

14  put it in in your case, they could have asked for that and I

15  would have refused, and we would have been before Your

16  Honor.

17         THE COURT:  I mean, it seems to me that -- if she

18  becomes available again, either to testify live or for you

19  to continue her deposition to ask questions that you would

20  have asked her had you known then that she wouldn't be

21  available, you can do that.  But I don't see the -- it's a

22  unique circumstance.  I don't see the prejudice in her

23  testimony being put -- placed in the record and subject to

24  your objections and we'll go from there.

25         MR. TRACEY:  Okay.

Page 227

1              MR. TAMBE:  Our objections are in our counter

2    designations, so you have --

3              MS. SAWYER:  And our affirmative designations.  I

4    think it should be an entire package.

5              MR. TRACEY:  It will be everything.  No, it will

6    be a single transcript.  It won't be separate, all right?

7              MS. KELLER:  Your Honor, we have a marked up

8    transcript that shows QVT's designations and in a different

9    color, Lehman's designations.  And we have a combined list

10   of each parties' objections and a -- copies of all the

11   exhibits that are referred to.  And we would propose to let

12   Jones Day look at that and then give that package to Your

13   Honor.

14             THE COURT:  Okay.  You can take the entire week to

15   do it because I'm not going to be doing this the next six

16   days.  So --

17             MS. KELLER:  Okay, thank you.

18             THE COURT:  Okay?

19        (Chorus of thank you)

20             THE COURT:  All right.  We'll see you on Monday.

21   Thank you.

22        (Chorus of thank you)

23        (Whereupon these proceedings were concluded at 5:26

24   p.m.)

25

1                           I N D E X

2                     W I T N E S S E S

3

4    WITNESS                  BY                      PAGE

5    Tracy Fu                 Mr. Beck                 7

6                             Ms. Del Medico          26

7

8    Arthur Chu               Mr. Tambe               32

9                             Mr. Tracey             171

10                            Mr. Tambe              216

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 229

```
 1                    C E R T I F I C A T I O N

 2

 3        We, Sherri L. Breach, Tracey Williams, Nicole Yawn,

 4   Penny Skaw and Jamie Gallagher, certify that the foregoing

 5   transcript is a true and accurate record of the proceedings.

 6   Sherri L                Digitally signed by Sherri L Breach
                             DN: cn=Sherri L Breach, o, ou,
                             email=digital1@veritext.com, c=US
 7   Breach                  Date: 2017.02.08 15:31:34 -05'00'
     _____

 8   Sherri L. Breach

 9   Tracey                  Digitally signed by Tracey Williams
                             DN: cn=Tracey Williams, o, ou,
                             email=digital1@veritext.com, c=US
     Williams                Date: 2017.02.08 15:32:05 -05'00'
10   _____

11   Tracey Williams

12   Nicole                  Digitally signed by Nicole Yawn
                             DN: cn=Nicole Yawn, o, ou,
                             email=digital1@veritext.com,
     Yawn                    c=US
                             Date: 2017.02.08 15:32:39
13   _____   -05'00'

14   Nicole Yawn

15   Penny A                 Digitally signed by Penny A
                             Skaw
                             DN: cn=Penny A Skaw, o, ou,
     Skaw                    email=digital1@veritext.com,
                             c=US
16   _____   Date: 2017.02.08 15:33:29 -05'00'

17   Penny Skaw

18   Jamie                   Digitally signed by Jamie Gallagher
                             DN: cn=Jamie Gallagher, o, ou,
                             email=digital1@veritext.com, c=US
     Gallagher               Date: 2017.02.08 15:36:08 -05'00'
19   _____

20   Jamie Gallagher

21   DATE:  February 8, 2017

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501
```