**<u>EXHIBIT C</u>**

www.pwc.co.uk/services/business-recovery/administrations/lehman.html

# *Lehman Brothers International (Europe) – In Administration*

## Joint Administrators' sixteenth progress report, for the period from 15 March 2016 to 14 September 2016

*7 October 2016*



# *Important notice*

A Surplus arises in the Administration and rights to payment from that Surplus are currently being determined through the Waterfall court proceedings.

The precise amount of Surplus funds in excess of the c.£6.9bn Low case indicative financial outcome that will be available in due course, remains uncertain. Due to commercial sensitivity, confidentiality and/or legal privilege, we are unable to provide detailed commentary on certain issues which will impact this.

We reserve all rights concerning the relevance and calculation of all claims against the LBIE estate that might eventually share in the Surplus. No conclusion should be drawn or inferred from this report as to the way in which such claims will eventually be assessed or the allocation of the illustrative Surplus entitlements.

No inference should be taken or assumption made from the matters included in this report as to a view, conclusion or belief held by the Administrators with regard to the Waterfall proceedings.

**We caution creditors against using data in this report as a basis for estimating the value of their claims or their likely eventual entitlement to payment from the Surplus. LBIE, the Administrators, their firm, its members, partners and staff and advisers accept no liability to any party for any reliance placed upon this report.**

LBIE also expressly reserves all of its rights against third parties on all matters and no conclusion should be drawn by third parties as to LBIE's position or legal arguments on any such matters from references made in this report.

Whilst amounts included in this report are primarily stated in sterling, certain significant elements of LBIE's assets continue to be denominated in currencies other than sterling.

Unless it is clear otherwise, the figures within the report are rounded to the nearest £10 million, consistent with previous reports.

This report includes various defined terms as set out in the updated glossary of terms in Appendix F.

# *Contents*

**Section 1:**      *Purpose of the Administrators' report*                                      *4*

**Section 2:**      *Progress report*                                                            *5*

**Section 3:**      *Indicative financial outcome*                                               *9*

**Section 4:**      *Illustrative Surplus entitlements and related court process*                *14*


**Appendices**

**Appendix A:**      *Receipts and payments: cumulative and 6 months to 14 September 2016*       *20*

**Appendix B:**      *Litigation summary*                                                        *25*

**Appendix C:**      *Surplus entitlements court process (Waterfall I, II and III)*              *26*

**Appendix D:**      *Administrators' remuneration*                                              *30*

**Appendix E:**      *Statutory and other information*                                           *32*

**Appendix F:**      *Glossary of terms*                                                         *33*

# Section 1:
# Purpose of the Administrators' report

## Introduction

This report has been prepared by the Administrators of Lehman Brothers International (Europe) under Rule 2.47(3) of the Insolvency Rules.

This is the sixteenth such formal update to unsecured creditors and it provides details of progress made in the 6-month period 15 March 2016 to 14 September 2016. The statutory receipts and payments accounts for the same period are attached at Appendix A.

Wherever possible, again, we have sought not to duplicate information disclosed to creditors in previous updates and reports. Copies of previous progress reports and other important announcements can be found at *www.pwc.co.uk/ services/business-recovery/administrations/lehman.html*. Creditors who do not have intimate knowledge of matters being dealt with in the Administration by virtue of involvement in the Waterfall court proceedings, and who desire to better understand these matters, are advised to review our previous progress reports and other materials contained on the LBIE website where a significant amount of information has been posted for the benefit of all creditors.

We will host a 1-hour webinar on 27 October 2016, giving creditors an opportunity to hear a summary of the current circumstances of the Administration and activities that are planned for the next 6 months, and to participate in a question and answer session. Details of the webinar will be posted on the LBIE website in the usual way.

## Objective of the Administration

The Administrators continue to pursue the statutory objective and specific aims as set out in previous reports, which are summarised at Appendix E.

## Creditors' Committee

We continue to meet the Committee to review progress and consult on major issues by way of physical meetings, telepresence or audio conference calls.

We remain grateful to the members of the Committee for their continuing efforts in support of the Administration.

During the period, as a result of it disposing of its claim against LBIE, Lehman Brothers Commodity Services Inc. was replaced as a Committee member by its ultimate holding company and ongoing LBIE creditor, Lehman Brothers Holdings Inc. The individuals who represented Lehman Brothers Commodity Services Inc. at Committee meetings will continue to attend in the future, representing Lehman Brothers Holdings Inc.

Details of the Committee members are listed in Appendix E.

## Resignation of administrator

PD Copley resigned as an administrator effective from 24 June 2016 as a consequence of him resigning from the PricewaterhouseCoopers LLP partnership earlier in the year. There is no intention to appoint a replacement administrator.

Upon the application of the current Administrators, the UK High Court made an order on 9 August 2016 that PD Copley, MJA Jervis and DY Schwarzmann, each of whom was previously an administrator of LBIE, shall be discharged from liability under paragraph 98(1) Schedule B(1) to the Insolvency Act in respect of any action (or inaction) of theirs as an administrator of LBIE. Each of the discharges is to take effect from the date falling 42 days after the date of this report, except in respect of claims notified to the current Administrators before that date.

## Extension application

The UK High Court granted an extension of the Administration to 30 November 2016 in 2011. An application for a further extension of 6 years to 30 November 2022 will shortly be made to the UK High Court, reflecting the need to plan to continue the Administration for the expected duration of the Waterfall court proceedings.

## Future report and updates

The next formal progress report to creditors will be in 6 months' time.

In the interim, we will provide ad hoc updates in the event of any material developments concerning entitlements to the Surplus or other significant matters, through the LBIE website or by other means as appropriate. In particular, if the Waterfall II tranche C judgment is handed down in sufficient time, in our forthcoming webinar we will update our 'base case' illustrative Surplus entitlements calculation contained in Section 4 to this report.

Over the last 8 years, all announcements have been recorded on the LBIE website. During the next 6 months, the majority of non-statutory announcements that are more than 3 years old will be archived on the website.

Signed:

*AV Lomas*
Joint Administrator
Lehman Brothers International (Europe)
In Administration

# Section 2:
# Progress report

## Introduction

### LBIE 100p estate

The key issues which will determine the ultimate outcome of the estate and hence the eventual size of the Surplus continue to be:

- the litigation with AGR and the sums ultimately recovered, if any, by judicial or other means;

- LBIE's contribution claim against its Shareholders, if arising;

- the quantum and status of the BarCap claims;

- the resolution and outcome achieved in other Lehman estates, particularly MCF, where LBIE has material pending recoveries;

- the crystallisation or not of potential tax matters and post-Administration indemnities; and

- the duration of the Administration and the associated costs, both being driven by the eventual route taken and time required to resolve entitlements to the Surplus.

The first 3 matters above continue to be, or are now, subject to litigation with court timetables being outside of the control of LBIE.

### LBIE Surplus estate

The Administrators' updated indicative Low and High case financial outcome scenarios indicate an improved potential range of Surplus outcomes between c.£6.9bn and c.£8.0bn, entitlements to which remain to be determined.

The improvement in both cases includes an appreciation in unrealised gains in receivables denominated in foreign currencies. These gains are not hedged.

### Waterfall proceedings

The Waterfall II tranche C (cost of funding and related foreign law matters) hearing took place in November 2015 and we have recently been informed that judgment is expected to be handed down in early October 2016. Whatever is contained in that judgment, our current expectation is that one or more of the respondents in these proceedings will seek permission to appeal at least some aspects of the decision. Due to the timing in handing down of the judgment, we have been unable to refresh the contractual cost of funding assumption in the illustrative 'base case' Surplus entitlements calculation contained in Section 4 of this report.

Judgment on 6 of the 7 consequential matters that were not directly addressed in the Waterfall II tranches A and B judgments was received in the period and is posted on the LBIE website. The findings are broadly as had been anticipated by the Administrators and were handed down by the same judge who conducted the Waterfall II tranches A & B hearings. The 7th consequential matter has been dealt with by the judge who conducted the Waterfall II tranche C hearing and judgment on this is expected to be handed down with the Waterfall II tranche C judgment.

All judgments at first instance and from the UK Appeal Court remain subject to appeal which, if appealed further, ultimately to the UK Supreme Court, could extend into 2020 and perhaps beyond. In the absence of a consensual solution amongst creditors, LBIE has concentrated its efforts in the period on:

- progressing the existing Waterfall proceedings including preparation for appeal hearings;

- commencing new court applications in relation to major unresolved issues: contributory claims ('Waterfall III') and the proper treatment of the BarCap claims; and

- formulating and implementing initiatives to provide opportunities to Senior creditors, which are not party to the Waterfall proceedings, to dispose of their claims if that is their desire (e.g. the LBIE admitted claims auctions).

### Surplus entitlements claims resolution initiatives

#### Certification of unsecured claims

The second iteration of unsecured claim certificates was issued in June 2016 to all Senior creditors which set out, for illustrative purposes only, an indicative potential entitlement to the Surplus based on certain stated assumptions. The purpose of the certificates is to assist with the eventual agreement of entitlements.

The delivery of further updated certificates is scheduled for 2017 and is expected to reflect the impact from the Waterfall II tranche C and consequential matters judgments, the outcome of the Waterfall I UK Supreme Court judgment and a small number of changes to certain counterparties' claim attributes where queries have been raised or our analysis refined.

#### LBIE admitted claims auctions

2 separate auctions were successfully completed in the period, enabling eligible Senior creditors with aggregate admitted claims of c.£360m (361 in number) to successfully exit the Administration on a voluntary basis by disposing of their claims. We have developed a third iteration of this auction procedure with a launch date of 17 October 2016, which will provide Senior creditors, with aggregate admitted claims of c.£1.6bn, with the opportunity to conclude their LBIE exposure on set terms, if that is their desire. Details will be posted on the LBIE website after the launch.

*Other initiatives*

We continue to progress a proposal to distribute, by way of an interim distribution, a material element of Senior creditors' basic entitlements to judgment rate (i.e. 8% simple p.a.) Post-Administration Interest by means of a company voluntary arrangement targeted for mid-2017.

*Consensual solution discussions and outlook*

There has been limited scope to develop plans for an overall resolution of the Surplus estate with the respondents to the Waterfall proceedings in the absence of any further court judgments or changes in their respective outlooks. We are hopeful that the future handing down of judgments on Waterfall I (UK Supreme Court), Waterfall II tranches A and B (UK Appeal Court), Waterfall II tranche C (UK High Court) and Waterfall III (UK High Court), together with other progress in the Administration over the next 9 months, may provide a greater stimulus for such discussions to take place in the latter part of 2017.

There can be no certainty at this stage either that a consensual resolution will be reached before the natural conclusion of all Waterfall court proceedings or that we will be able to make the interim distribution noted above (which will require the support of the respondents to the Waterfall proceedings).

In the absence of a consensual solution being reached, 2020 would appear a current best estimate backstop date for the Administrators to have sufficient legal certainty concerning the Waterfall issues to be able to begin distribution of the Surplus remaining after an interim payment in mid-2017 (if any) of a material element of basic entitlements to judgment rate Post-Administration Interest.

**Infrastructure and costs**

All expenditure within the Administration continues to step down as circumstances allow. Specifically, our continuing headcount was materially reduced on 31 July 2016, leaving a 'core resource' that continues to manage the outstanding LBIE 100p estate and Surplus-related matters. At an appropriate time, operations may need to be scaled up again to enable LBIE to deliver distributions from the Surplus.

The contribution by the LBIE team, current and former, has been a major factor in securing the favourable outcome for creditors and the Administrators continue to appreciate and acknowledge this.

## Indicative financial outcome (Section 3)

A Surplus of between c.£6.9bn and c.£8.0bn is expected to be generated for eventual distribution to creditors. The updated indicative Low and High case Surplus outcomes have improved by c.£290m and c.£210m respectively, principally arising from unrealised favourable foreign exchange movements, improved forecast recoveries and litigation resolutions in the period.

Pending the judgment from the Waterfall III Application, the indicative financial outcome continues to take no account either of future recoveries from any potential contribution claim against its unlimited liability Shareholders or of their claims against LBIE.

## Illustrative Surplus entitlements (Section 4)

Due to the timing of the receipt of the Waterfall II tranche C judgment, it has not been possible to refresh the 'base case' illustrative Surplus entitlements calculation to reflect this judgment. We will refine our analysis of the impact of the latest judgment as soon as we are able to and will then provide this to all creditors by posting it on the LBIE website.

Accordingly, the assumptions that we have used to provide examples of illustrative Surplus entitlements, provided at page 14 in this report, remain largely unchanged from the previous report. These continue to assume that the Waterfall judgments handed down prior to 14 September 2016 are upheld on any subsequent appeal. However, certain adjustments have been made to reflect the Waterfall judgment handed down in the period, foreign exchange rate movements and the updated indicative financial outcome.

The 'base case' scenario, which assumes that no Senior creditor will be entitled to Post-Administration Interest in excess of the judgment rate, indicates that a Surplus 'excess' of c.£0.4bn would remain after payment of Post-Administration Interest, CCCs and any interest thereon, before taking account of Shareholder claims against LBIE and any contribution claims. The 'high cost of funding case' scenario, which assumes that certain Senior creditors will be entitled to Post-Administration Interest in excess of the judgment rate, indicates a Surplus 'shortfall' of c.£1.2bn (previously c.£1.1bn) before recoveries from any contribution claim that might be made against the Shareholders and before taking account of Shareholder claims against LBIE.

Both scenarios also assume a BarCap claim amount of only c.£80m/c.$150m is entitled to share in the Surplus. BarCap continues to assert (amongst other claims) that it also has an entitlement to a claim against the Surplus relating to the $777m that was paid direct by LBI, which could amount to c.£240m. LBIE is now seeking UK High Court directions in order to determine the status and quantum of the BarCap claims.

Also, further interaction has taken place with one of the Waterfall respondents with regard to one of its claims where uncertainty exists concerning the identity of the relevant claim currency and the impact on its CCC. Due to the size of the claim, consideration is being given to a judicial resolution and this is expected to be commenced in the next reporting period.

## Other significant developments in the reporting period

### House receivables

In the reporting period, c.£140m has been recovered, predominantly from Affiliates.

The majority of other Street recoveries being pursued are subject to legal proceedings. The largest such debt, owed by AGR, continues to be litigated and a court hearing on another debtor was heard in the period and judgment is awaited.

Further recoveries from Affiliates are expected, principally from ongoing distributions on agreed claims.

### Costs of the Administration

We have updated our future Administration costs estimate to c.£360m in both the indicative Low and High case outcomes. The outcomes are based on identical assumptions, in particular that the Waterfall proceedings will involve an extended appeal process and that the Administration will conclude in 2022.

Based on developments in the period, we have been able to revise downwards our costs accrual estimates by c.£30m.

We continue to caution that the costs estimates remain subject to significant uncertainties regarding assumed outcomes and timings.

### Priority claims

Priority claims include the potential liability for certain post-Administration indemnities that have been given by LBIE, and other potential claims (including tax) which may become payable in certain circumstances.

In the High case outcome, we continue to assume that all indemnities will terminate without liability and that the majority of LBIE's potential tax liabilities in various jurisdictions will not ultimately be assessed.

In the period, payments of c.£50m were made, including c.£40m (as anticipated) to the IRS in respect of US income tax and withholding tax obligations.

### Senior creditors

Admitted claims have increased in number by 3 to 2,853, with a total admitted claim value of c.£12.31bn. 15 unresolved claims remain (Proofs of Debt totalling c.£550m), excluding claims received from Shareholders. Of these, the BarCap claim (Proof of Debt value of c.£520m) and 3 claims that are the subject of legal proceedings (Proofs of Debt totalling c.£20m) represent more than 99% by value.

Significant progress has been made in the period to reduce the number of material claims subject to legal proceedings: a claim was settled following receipt of procedural approval from the Cayman Islands court; another claim was settled with the claim being withdrawn; and a further claim was subject to a substantive hearing for which judgment is awaited.

'Catch-up' dividends of c.£140m were paid in the period.

### Client Assets

The remaining securities held (c.£40m combined value) largely relate to debtors, which are the subject of long-running German litigation. In the period, a favourable judgment was handed down by the German Supreme Court, but the matter is unlikely to conclude without further judicial intervention.

### Client Money

The status of the 105 unresolved CME claimants is as follows:

- 2 claims of nominal value relate to the House debtor counterparties who are currently the subject of long-running German litigation; and

- 103 claims (c.$6m) relate to non-engaging counterparties in respect of which a UK High Court application for directions has been prepared.

There are 14 counterparties (with combined claims of c.$4m) who have received a partial recovery of their CME to date.

The uncertain status of the BarCap CME claim continues to block the final resolution of the pre-Administration Client Money estate. As a result, the timescale for closure remains uncertain.

**UK withholding tax**

The 2-day UK High Court hearing of the UK withholding tax application was held on 28-29 April 2016. Judgment has not yet been handed down but when available, subject to any appeal that might be made, a framework having due regard to the first instance ruling will be incorporated into the terms of any company voluntary arrangement that may be developed to enable a payment, in part or in full, of judgment rate Post-Administration Interest entitlements.

**Shareholders of LBIE**

As noted above, the Waterfall III proceedings were commenced in the period. As anticipated, LBL and others did initially request the UK High Court to delay the commencement of these proceedings, but no order was made in that regard and the proceedings are due to go to trial at the end of January 2017. At the current time, LBIE and LBL are conducting in-depth investigations into the history of the Lehman corporate structure, the basis upon which LBL held its one share in LBIE and the arrangements that were in place to govern the recharge by LBL of costs and expenses to other UK Lehman entities.

In the period, LBIE has had no material engagement from LBL concerning finalisation of the pre-appointment balances owed for services rendered by LBL. The balance shown owing by LBIE immediately prior to Administration on an unadjusted basis was c.£360m but, after making appropriate adjustments for services invoiced but not delivered (because of its insolvency), this balance is more than offset, leaving a residual balance owing to LBIE. LBIE is taking steps to agree this aspect of the claim with LBL.

LBIE is closely monitoring LBL's litigation with its former landlord and is reserving its own position because LBL purports to be able to recharge to LBIE a material part of any such claim that LBL itself admits in its own estate, in due course. LBIE's rights are reserved as regards its liability, if any, to LBL in this connection. The landlord's claim against LBL is scheduled to be heard in 2017, in lengthy UK High Court proceedings.

LBIE has had various discussions with LBHI2 and LBHI to consider a basis upon which the Waterfall III proceedings may be settled in a way which would give certainty to LBIE to be able to access a ring-fenced fund to meet any eventual shortfall that there might be against Post-Administration Interest and/or non-provable claims (e.g. CCCs) of Senior creditors. Such a settlement would also enable certain other UK Lehman estates to conclude their remaining insolvency processes on an expedited basis.

In the interim, no payments to or receipts from Shareholders have been assumed in this report.

# Section 3:
# Indicative financial outcome

## Introduction

An updated summary of the indicative Low and High case financial outcome scenarios for Senior creditors is set out below. This should be read in conjunction with the assumptions and commentary set out overleaf.

## Summary

| Page | House Estate at 14 September 2016 | Notes | Low £m | High £m | Difference £m |
|---|---|---|---|---|---|
| 20 | Cash deposits and government bonds | | 6,540 | 6,540 | - |
| 20 | Add back: interim dividends paid | | 12,310 | 12,310 | - |
| | **Total cash in hand and returned to date** | | **18,850** | **18,850** | **-** |
| | **Projected future movements** | | | | |
| 10 | Net Client Money benefit to the House Estate | 1 | 900 | 1,120 | 220 |
| 10 | House receivables | 2 | 320 | 800 | 480 |
| 11 | House securities | 3 | 50 | 60 | 10 |
| 12 | Future estimated costs | 4 | (360) | (360) | - |
| 12 | Priority claims^ | 5 | (570) | (70) | 500 |
| | **Total future cash expected to be recovered** | | **340** | **1,550** | **1,210** |
| | **Funds available for Senior creditors** | | **19,190** | **20,400** | **1,210** |
| 13 | Senior creditors | 6 | (12,330) | (12,400) | (70) |
| | **Surplus before Post-Administration Interest, non-provable claims, the Subordinated Debt and Shareholder claims** | | **6,860** | **8,000** | **1,140** |

^ Amounts included in priority claims do not rank for Post-Administration Interest.

## Low and High case movements in the period

The updated indicative Low and High case Surplus outcomes are c.£6.86bn and c.£8bn, representing increases of c.£290m and c.£210m respectively, since our previous report. The principal changes in the outcomes are:

| | Low £m | High £m | Comments |
|---|---|---|---|
| **Surplus as at 14 March 2016** | 6,570 | 7,790 | |
| **Movements in the period** | | | |
| Net Client Money benefit | 70 | 80 | Favourable unrealised foreign exchange movements and improved forecast future recoveries |
| House receivables | 110 | 80 | Favourable unrealised foreign exchange movements and improved forecast future recoveries |
| Future estimated costs | 30 | 30 | Reassessment of litigation and staff costs |
| Priority claims | (20) | - | Adverse foreign exchange movements on claims denominated in foreign currencies and tax revisions |
| Senior creditors | 80 | - | Litigation resolutions: POD withdrawn/settlement agreed below POD value |
| Other | 20 | 20 | Interest and other net receipts |
| | 290 | 210 | |
| **Surplus at 14 September 2016** | **6,860** | **8,000** | |

## Assumptions and commentary

The assumptions underlying the indicative future cash recoveries and payments and the resolution of pending Senior creditor claims are set out overleaf.

## Note 1 - Net Client Money benefit to the House Estate

| Pre-Administration Client Money estate | Low $m | High $m |
|---|---|---|
| **Projected Client Money available to distribute[1]** | | |
| Funds held at 14 September 2016 (in multiple currencies) | 1,420 | 1,420 |
| LBHI/LBB future recoveries[2] | 40 | 70 |
| | **1,460** | **1,490** |
| **Less future third party distributions** | | |
| Potential BarCap CME[3] | (260) | - |
| Future distributions of retained CME claims[4] and estimated funds to be paid to the UK High Court[5] | (10) | (10) |
| | **(270)** | **(10)** |
| **Projected future distributions to the House Estate ($m)** | **1,190** | **1,480** |
| **(£m)** | **900** | **1,120** |

1. It is assumed that the Administrators will not be required to trace and recover assets from the House Estate for the benefit of the Client Money pool.
2. This represents the combined potential future dividends on LBIE's LBHI guarantee claim of c.$1.01bn and LBB unsecured claim of c.€400m.
3. The potential BarCap CME claim is an assessment by LBIE as detailed below.
4. Future final distributions to 14 claimants with retained CME at a rate of 51.8% of total CME claims of c.$4m.
5. Includes 103 non-engaging counterparties with total CME claims of c.$6m and 2 counterparties subject to overseas court proceedings.

### Potential BarCap CME

Following further assessment in the period, the Low case outcome scenario now assumes that the BarCap maximum CME claim will be in the region of c.$260m. This amount represents an agreed and reconciled gross CME claim of c.$1.04bn less the $777m paid to it by LBI, and includes c.$150m relating to transactions in Korea which may, or may not, be subject to Client Money protection.

In the High case outcome scenario, BarCap is assumed to elect to hold a Senior claim rather than a CME claim.

A number of simplifying assumptions have been made for the illustrations above. Full details of the BarCap claims are set out in the UK High Court filings which can be found on the LBIE website.

## Note 2 - House receivables

House Estate receivables as at 14 September 2016, referred to below, are indicative only and significant matters remain unresolved, predominantly relating to litigation, which may materially impact this estimate.

| House receivables | Rec'd in period £m | Indicative future recoveries Low £m | High £m |
|---|---|---|---|
| **Litigation** | | | |
| AGR | - | - | 360 |
| Others | - | - | 30 |
| | **-** | **-** | **390** |
| **LBIE Zurich branch** | **-** | **40** | **50** |
| **Affiliates** | | | |
| MCF | 20 | 250 | 300 |
| LBHK | 40 | 10 | 10 |
| Other Affiliates | 30 | 20 | 30 |
| | **90** | **280** | **340** |
| **Client Assets claimants** | | | |
| Omnibus Trust assignment | 50 | - | - |
| In litigation | - | - | 20 |
| | **50** | **-** | **20** |
| **Receivables at 14 September 2016[1]** | **140** | **320** | **800** |

1. Excluded from the above are:
   - 13 counterparties with c.£60m of value owing to LBIE where payment is not forthcoming because of the ISDA Section 2(a)(iii) issue. LBIE continues to explore options for realising value from such claims; and
   - 3 claims with c.£130m of agreed/stipulated value against insolvent or restructured debtors where future distributions are possible, but not certain.

### AGR litigation

On 8 April 2016, LBIE filed its opposition to the dispositive motion seeking summary judgment in its favour, filed by AGR.

A reply by AGR, in further support of its motion, was filed in the New York Supreme Court on 9 May 2016.

A hearing in the New York Supreme Court of the dispositive motion was held on 22 July 2016. Judgment is currently awaited.

The judge encouraged the parties to consider mediation to resolve the dispute. LBIE is prepared to engage in such a process and is exploring this with AGR. In parallel, LBIE continues to progress the litigation. A substantive trial is not expected before 2018.

The indicative Low case outcome assumes nil recovery from AGR and the indicative High case outcome assumes c.£360m, which represents full recovery of the LBIE expert's valuation of c.$500m (net of unpaid premiums), excluding judgment rate interest due on any award.

No account is taken of AGR credit risk and accordingly no credit value adjustment is reflected, should that be relevant in due course. After the credit value adjustment, a claim value in excess of c.$200m (c.£150m) would be appropriate, in the view of LBIE's expert, excluding judgment rate interest due on any award.

Creditors are reminded that the eventual sum recovered could be anywhere within the indicated range, before interest.

### Others in litigation

There are currently 3 ongoing Street debtor litigation actions (excluding AGR) that are subject to UK, US or Korean court jurisdictions. Further details are provided at Appendix B.

Substantial progress was made in the period on the litigations, with hearings in UK and overseas courts and further progress is expected in the next 6 months.

### LBIE Zurich branch

We have continued to pursue the local liquidators and FINMA to recover the surplus funds of LBIE's Zurich branch. Progress continues to be very slow in recovering balances owed to LBIE, with further delays encountered in the period. The majority of these material balances are not contested but are subject to final verification and process resolution. We understand FINMA, as overseer of this process, continues a dialogue with the local liquidators. We have not been provided with any timeline for resolution.

### MCF

A further c.£20m distribution was received in the period.

MCF forecasts further enhanced recoveries, including from the run-off of the portfolio of mortgage-related assets in MCF's solvent subsidiaries, which should give rise to an improved recovery to LBIE of between c.£250m and c.£300m on its admitted claim in MCF.

### LBHK

In the period, c.£40m of assets were recovered, including c.£20m of securities transferred from LBHK to the House depot following a competing claim from one of LBIE's clients being resolved.

The future recoveries mainly relate to derived income on the returned securities, which is expected to be released to LBIE shortly.

### Other Affiliates

Following approval of the supplemental LBF settlement by Swiss regulatory authorities in the period, a final recovery of c.$20m has been made and c.$70m of post-Administration Client Money was returned to LBF.

Expected future recoveries relate to assumed distributions from LBSF and other insolvent Affiliate estates.

### Client Assets claimants

Omnibus Trust distribution monies relating to a claim that has been assigned to the House were transferred from post-Administration Client Money to the House Estate following receipt of appropriate final clearances.

The indicative High case outcome assumes recovery of debts that are subject to litigation in a German court, where a recent final judgment was handed down in favour of LBIE. The quantum of the claim award has yet to be determined.

## Note 3 - House securities

| Securities | Book value £m | Low £m | High £m |
|---|---|---|---|
| Available for sale | 50 | 40 | 50 |
| Subject to litigation in Korea | 10 | 10 | 10 |
| **House securities at 14 September 2016** | **60** | **50** | **60** |

'Available for sale' securities include equities returned from LBHK shortly before the period end. This holding has been sold since the period end realising c.£20m.

The other small number of remaining securities 'available for sale' has specific issues which will take time to resolve in order to realise value. The majority of remaining value relates to a holding that is subject to an annual buyback auction initiated by the issuer. The next tender date is late 2016.

## Note 4 - Future estimated costs

| Summary costs | Low £m | High £m |
|---|---|---|
| Future estimated costs at 1 January 2016 | (470) | (470) |
| **In the period** | | |
| Costs incurred in 6 months to 30 June 2016 | 50 | 50 |
| Movements in creditors and accruals | 20 | 20 |
| Costs forecast but not incurred[1] | 20 | 20 |
| **Future estimated costs at 30 June 2016** | **(380)** | **(380)** |
| Revisions to assumptions for further costs[2] | 10 | 10 |
| **Future estimated costs at 1 July 2016** | **(370)** | **(370)** |
| Costs paid in period to 14 September 2016 | 10 | 10 |
| **Future estimated costs at 14 September 2016** | **(360)** | **(360)** |

1. Principally reduced counterparty litigation costs.
2. Mainly reassessment of PwC and LBIE forecast staff costs.

On a calendar year basis, we prepare a detailed cost budget and a long-term forecast of the costs to complete the Administration. These forecasts are reviewed and updated at 6-monthly intervals and are discussed with the Committee.

The same assumptions have been made for the Low and High case outcomes reflecting the continuing uncertainties remaining regarding the future costs impact of the Waterfall proceedings, other counterparty litigation and the outcomes and timings of other matters.

The key assumptions underlying the costs estimate remain consistent with the last progress report, namely:

- litigation required to resolve the remaining disputed receivables and creditor claims will require legal processes, through to an initial trial, and include a cost contingency for unforeseen delays, potential appeals and respondent costs;

- a full court appeal process will be required to settle the Surplus entitlements matter (Waterfall I, II and III) culminating in the UK Supreme Court in each case;

- further Surplus directions hearings will be required;

- Administration activities will be significantly reduced from mid-2017, pending further clarification of the Surplus entitlements matter; and

- the Administration and any other related processes will be completed by the end of 2022.

## Note 5 - Priority claims

Priority claimants include the potential liability for post-Administration indemnities and other claims (including tax provisions) that could crystallise in certain circumstances, which would rank for payment in priority to Senior creditors. The movements in the period are summarised below.

| Priority claims | Low £m | High £m |
|---|---|---|
| Reported as at 14 March 2016 | (600) | (120) |
| **Movements in the period** | | |
| Tax payments | 40 | 40 |
| Other payments | 10 | 10 |
| Tax revisions | 10 | 10 |
| Foreign exchange movements | (30) | (10) |
| | **30** | **50** |
| **Priority claims at 14 September 2016** | **(570)** | **(70)** |
| **Comprising** | | |
| Tax provisions | (240) | (40) |
| Post-Administration indemnities | (240) | - |
| Pension Fund liability | (30) | (30) |
| Other reserves | (60) | - |
| **Priority claims at 14 September 2016** | **(570)** | **(70)** |

### Tax provisions

The Low case outcome assumes that the majority of LBIE's potential outstanding tax liabilities in various jurisdictions ultimately become payable to the relevant taxing authorities.

In the High case outcome, the assumption is that the majority of these tax liabilities will not be assessed. The tax provision of c.£40m could be further reduced in the future as a result of determinations by taxing authorities, which remain uncertain.

### Post-Administration indemnities

The indemnities have been provided to:

- suppliers of post-Administration IT, valuation and property services to LBIE;

- third parties, branches and Affiliates in order to facilitate the release of assets to LBIE; and

- nominees of LBIE acting on its behalf, including in respect of the return of assets to counterparties and the 3 LBIE admitted claims auctions.

Individual indemnities will cease upon expiry of a term set out in the relevant contracts either from commencement, cessation or a relevant jurisdictional limitation period.

**Pension Fund liability**

As previously reported, LBIE has agreed as part of a settlement agreement to make available funding to the Pension Fund to enable it to provide the defined benefits promised to its members. As at 14 March 2016, a residual reserve of c.£30m remained to meet future contributions.

In the current period, further nominal payments have been paid to the Pension Fund, with work concentrating on managing contingent liability exposures by a data cleanse exercise of the members' records and reconciliation to HMRC records.

**Other reserves**

In the Low case outcome, other reserves relate to a range of issues including adverse litigation (non-Waterfall) cost exposure.

## Note 6 - Senior creditors

Claims received from Shareholders are excluded from the Senior creditors analysis. The majority of pending unsecured claims by value are subject to litigation, and their eventual outcome may materially impact the estimates below.

| Senior creditors | Admitted to date[1] £m | Pending[2] Low £m | Pending[2] High £m | Indicative outcome[3] Low £m | Indicative outcome[3] High £m |
|---|---|---|---|---|---|
| Non-Affiliate creditors | (11,120) | (10) | (90) | (11,130) | (11,210) |
| Affiliate creditors | (1,160) | (10) | - | (1,170) | (1,160) |
| SCSO settled claims | (30) | - | - | (30) | (30) |
| Total | (12,310) | (20) | (90) | (12,330) | (12,400) |

1. Admitted to date includes claims agreed by Claims Determination Deeds and partial admittance letters where in certain cases legal challenge has been initiated by creditors on the balance of their Proof of Debt. The balance is included as a pending claim.

2. In the period, 2 claims were withdrawn and 3 claims were admitted with nominal Proofs of Debt value. In respect of claims subject to litigation, one was withdrawn (Proof of Debt value of c.£30m) and an appeal against a partial rejection was withdrawn following settlement of a c.£80m claim at c.£30m. 2 new claims with total Proofs of Debt of c.£1m have been received in the period. Proofs of Debt relating to remaining pending claims total c.£550m.

3. The indicative outcome includes the total value of the claims admitted to date and the indicative Low/High case value of pending claims.

**Assumptions**

For all compliant Proofs of Debt received by the Administrators where the claim has not yet been admitted, withdrawn or rejected (with the rejection appeal period having passed), we continue to make an appropriate reserve.

In a small number of cases, creditors have reverted to LBIE seeking to amend the value of their admitted claims. LBIE does not intend to reopen dialogue with individual creditors regarding their concluded Proofs of Debt and reserves continue

to be made based on the amounts previously admitted with no increased exposures being assumed.

*Low case outcome*

The indicative Low case outcome makes provision for pending claims at Proof of Debt value, except for:

- a nil value for the BarCap claim, as in this scenario it is assumed to be withdrawn in favour of a CME claim; and
- a specific value assessment in respect of 2 claims that are in litigation (a net c.£10m value reduction) and the remaining Affiliate claim.

*High case outcome*

The indicative High case outcome assumes for pending claims:

- a value of c.£80m for the BarCap claim, being the Proof of Debt value less the $777m payment made directly by LBI to BarCap;
- no reserve for litigated claims, except for a claim for which a specific value assessment has been applied (value of less than £5m);
- an assumed average settlement rate of 50% of the Proof of Debt value for 2 claims with total Proofs of Debt value of c.£3m;
- no value for the remaining Affiliate claim; and
- a nominal value for 8 claims with individual Proof of Debt values significantly below £1m each, based upon an assumed average settlement rate at the Proof of Debt value (a total value of less than £1m).

**Pending claims status**

15 creditors have submitted Proofs of Debt totalling c.£550m in response to which, due to specific legal, commercial and/or valuation issues, LBIE has yet to admit, reject or agree withdrawal.

The unresolved claims comprise:

- the BarCap claim (Proof of Debt value of c.£520m);
- 3 claims that are subject to litigation either in the UK or US (combined Proofs of Debt of c.£20m). Further details are provided at Appendix B;
- an Affiliate claim (Proof of Debt value of nil following revision in the period);
- a new claim currently under investigation with Proof of Debt value of c.£1m; and
- 9 claims with combined Proofs of Debt of c.£2m where CME offers have been made or rejection notices have been unable to be served, and counterparties are currently unresponsive. Accordingly, these types of claims are likely to require an application to the UK High Court in order to finalise them.

# Section 4:
# Illustrative Surplus entitlements and related court process

## Introduction

During the next reporting period, LBIE expects to receive the Waterfall II tranche C judgment. This will almost certainly be subject to appeal (at least in part) but in the meantime will represent the best guidance that LBIE has as to how cost of funding and related foreign law matters should be determined. Accordingly, we will consider its implications in detail and refine our analysis of how the Surplus eventually may be allocated between competing claims and we will then provide this to creditors.

The assumptions made in this report for illustrative Surplus entitlements, set out below, remain largely unchanged from the previous progress report. Certain adjustments have been made to reflect the Waterfall II tranches A and B consequential matters judgment in the period, foreign exchange rate movements and the improved High case indicative financial outcome.

Creditors are reminded that, on the basis of the Waterfall judgments handed down to date, Post-Administration Interest entitlements rank as first claims against the eventual Surplus, followed by non-provable claims (CCCs and contractual interest thereon, where relevant) and then by the Subordinated Debt claim. In the event that appeals against these judgments result in either:

- claim ranking priorities changing; and/or
- claims becoming inadmissible; and/or
- claim values becoming enhanced or reduced,

any individual creditor's claim against and/or recovery from the Surplus could be materially altered.

## BarCap claim assumption

The assumed available Surplus of c.£7.6bn (updated High case outcome of c.£8.0bn discounted by 5%) assumes that BarCap pursues and is paid a Senior claim of c.£80m/c.$150m, being its Proof of Debt value less $777m that it received from LBI (at 15 September 2008 US dollar exchange rate).

Accordingly, we have assumed that a BarCap claim of c.£80m will be within the pool of claims on which Post-Administration Interest will be paid and CCCs will be calculated.

In the event that BarCap has a Senior claim (rather than a CME claim), both the 'base case' and 'high cost of funding case' Surplus entitlements illustrations make no provision for any claim against the Surplus relating to the $777m amount. In the event that this assumption is incorrect, then the incremental claim against the Surplus by BarCap could be in the region of £240m.

## Contribution claim assumption

In the event of there eventually being no shortfall against the claims to the Surplus by Senior creditors, we assume that LBIE would not formally pursue a contribution claim against its Shareholders and that the remaining matters as between LBIE and its 2 unlimited liability Shareholders could be resolved through tripartite negotiation.

In the event that a shortfall to Senior creditors does arise, we assume that LBIE will pursue a contribution claim against its Shareholders. In light of the net recoveries already achieved in the LBHI2 and LBL estates, any recovery in respect of a successful contribution claim could be significant but, pending the outcome of the Waterfall III application to the UK High Court for directions, no value has been included in respect of potential recoveries under such claims.

## Illustrative Surplus entitlements

In our previous report, we set out an illustrative 'base case' and 'high cost of funding case' to demonstrate how, eventually, the Surplus may be allocated between different categories of claimant based on a set of key simplifying assumptions. Application of these assumptions resulted in an indicative Surplus 'excess' of c.£0.4bn arising in the 'base case' and a Surplus 'shortfall' of c.£1.1bn arising in the 'high cost of funding case'. For the purposes of this current report, whilst these simplifying assumptions remain largely unchanged, we have updated the scenarios as follows:

| Illustrative cases | Base £m | High CofF £m |
|---|---|---|
| Surplus excess/(shortfall) as at 14 March 2016 | 400 | (1,100) |
| Principal movements in the period[1] | | |
| Increase in Surplus[2] | 200 | 200 |
| FX movements on CCCs | (200) | (200) |
| FX movements on CCC-related non-provable contractual interest | - | (100) |
| Surplus excess/(shortfall) as at 14 September 2016 | 400 | (1,200) |

1. The impact of the consequential matters judgment to reduce entitlements is not separately disclosed due to materiality: 'base case' c.£20m/'high cost of funding case' c.£60m.

2. Assumes the eventual total Surplus value will be c.£7.6bn (updated High case outcome of c.£8.0bn discounted by 5%).

On the basis of the stated assumptions, in the 'high cost of funding case', non-provable CCCs and related interest claims would receive only 56% of total entitlement.

The 'base case' Surplus 'excess' of c.£0.4bn would reduce by c.£0.2bn and the 'high cost of funding case' Surplus 'shortfall' amount of c.£1.2bn would increase by c.£0.2bn in the event that BarCap successfully argues its entitlement to a claim against the Surplus relating to the $777m that it has recovered from LBI.

The examples provided are for **illustrative purposes only**. The Administrators express no view as to the likelihood of either outcome materialising in due course and caution against creditors assuming that these 2 illustrations represent the limits of the full range of potential outcomes.

### Certification of unsecured claims

To assist with the eventual agreement of individual creditor's entitlements to share in the Surplus, the Administrators have issued a second unsecured claim certificate which builds on and supplements the information provided in the first certificate last year.

The second certificate, issued on 15 June 2016, sets out, for indicative purposes, an illustration of creditors' potential entitlements to the Surplus based upon stated assumptions and methodology.

Following engagement with creditors after the issuance of the first certificate, we have also made a small number of adjustments resulting from contractual currency and balance disaggregation queries, where appropriate, and reissued updated certificates accordingly.

We are encouraged that the range and materiality of queries raised remains modest save for the one exception noted immediately below.

One material bilateral challenge to the information contained in the certificates has emerged and the additional claim against the Surplus that is at issue is c.£150m. Due to the size of the additional claim, it seems likely that UK High Court directions will be needed to resolve the matter and it is anticipated that proceedings will be commenced in the next reporting period.

A third certificate is scheduled for 2017 and is expected to reflect the impact of the Waterfall II tranche C and consequential matters judgments, the Waterfall I UK Supreme Court judgment and a further small number of changes to certain counterparties claim attributes where queries have been raised or our analysis refined.

### LBIE admitted claims auctions

As detailed in our last report, this initiative was launched in the period to provide a mechanism for creditors with an individual admitted claim value of below £10m to have the option to sell their LBIE claims to third party purchasers outside of the secondary debt market, which they perceive as burdensome. Participating admitted claims were aggregated into 3 claim pools, based on the dominant currency of each claim (US dollars, euros and other) for bidding purposes.

The first auction was held on 12 May 2016, with potential purchasers bidding on claim pools having been provided with certain information as to the characteristics of claims in each pool. c.£230m of Senior claims (266 in number) participated and successfully exited the Administration. An average premium of 44% on admitted claim values was realised across all three pools.

A second auction was held on 21 July 2016. The terms were different in certain key respects and the population of eligible creditors was widened to include signatories to the CRA and creditors with individual admitted claim values of between £10m and £18m. c.£130m of Senior claims (95 in number) participated and concluded their relationship with LBIE. An average premium of 46% on admitted claim values was realised on these claims.

We have developed a third auction proposal to enable a majority of remaining creditors who are not respondents to the Waterfall proceedings (as well as certain other excluded creditors) to potentially achieve a complete exit from the Administration. This is a further variation and will involve participating creditors setting their own selling price for bidders to decide whether or not they are prepared to meet this price. The auction process is planned to start on 17 October 2016 and we will provide details and updates on the LBIE website.

### Development of a consensual solution

In the absence of there being a credible basis for a consensual solution to the Waterfall dispute that is agreed by the vast majority of creditors, we will continue developing a proposal to distribute to Senior creditors a significant first interim payment of their basic entitlements to judgment rate (i.e. 8% simple p.a.) Post-Administration Interest by means of a company voluntary arrangement to launch in mid-2017, after the UK Supreme Court judgment on Waterfall I has been handed down.

## *Waterfall court proceedings*

### Waterfall II Application

The UK High Court handed down judgment on 6 of the 7 consequential matters connected to Waterfall II tranches A and B on 24 August 2016. The judgment is summarised at Appendix C.

The UK High Court is expected to hand down judgment on the tranche C matters (cost of funding and related foreign law issues) and the last of the 7 consequential matters connected to Waterfall II tranches A and B in early October 2016.

Further details of judgments received and the proceedings more broadly are available at the LBIE website. All of the judgments may be subject to appeal in due course.

### Waterfall III Application

We issued an application to the UK High Court on 25 April 2016 for directions to determine various issues concerning contributory claims and other affiliate matters including:

- the scope of any contribution claim LBIE may make against the Shareholders (LBL and LBHI2);

- the application of set-off in the context of any contribution claim;

- the nature of the liability for any contribution claim as between the Shareholders;

- certain aspects of the inbound LBL claim against LBIE (and/or LBEL), including LBL's proposed recharge of LBIE's own contingent contribution claim against LBL; and

- further issues as to whether LBL has any liability as a Shareholder of LBIE.

Following the case management hearing on 24 June 2016, a timetable for position papers and witness statements was set leading to a 4 week hearing scheduled to commence on 30 January 2017.

## *Other court proceedings*

### UK withholding tax application

To resolve the disagreement with HMRC regarding the status of UK withholding tax obligations in the context of payment of Post-Administration Interest, a 2-day hearing was held on 28-29 April 2016. Judgment is awaited.

### BarCap claims application

We also issued an application to the UK High Court on 5 September 2016 for directions in relation to the treatment of the BarCap claim entitlements into the House and Trust Estates. The aim is to seek clarity as to the final impact of the BarCap claims on the LBIE 100p, LBIE Surplus and Client Money estates. The issues to be considered include:

- the 'threshold issue' (i.e. whether the claim acquired from LBI can be shown to benefit from Client Money protection) and the status of Korean trades in the context of CME;

- whether, in respect of claim elements with CME, BarCap has an unsecured claim and the basis on which such claims should be valued;

- whether for claim elements for which BarCap has both CME and unsecured claim status, it is able to pursue an unsecured claim to the exclusion of a CME claim;

- the manner and date from which the $777m LBI payment to BarCap is to be applied by way of reduction to a CME claim or an unsecured claim; and

- the extent to which BarCap has potential entitlements to claim against the Surplus.

A case management hearing is scheduled for late November 2016 and hearing dates will be set thereafter.

## *Court process timetable*

An actual (date) and illustrative (half-year period) projected timeline is summarised below for Waterfall I, II and III proceedings and the BarCap claims proceedings, assuming all matters are ultimately determined by appeal to the UK Supreme Court.

| Matter | Key issues | Status | UK Appeal Court hearing | UK Supreme Court hearing |
|---|---|---|---|---|
| Waterfall I | Ranking of Subordinated Debt<br>Existence of CCCs<br>Extent of potential contribution claim | All appealed by LBHI2/LBL/LBHI | Held | 17 October 2016 |
| Waterfall II tranches A & B | Application of unsecured dividends to principal or interest first<br>Post-Administration Interest start date<br>Existence of claims for interest on CCCs<br>Release of CCCs by certain post-Administration contracts | Appealed by SCG/York<br>Appealed by Wentworth<br>Appealed by Wentworth<br>Appealed by Wentworth | 3 April 2017 | H2 2018 |
| | Supplemental questions on calculation of claims | First instance judgment | H1 2017 | H2 2018 |
| Waterfall II tranche C | Impact of cost of funding on Post-Administration Interest claims<br>Related foreign law issues | First instance judgment - pending | H1/H2 2017 | H2 2018 |
| Waterfall III | Scope and set-off of any contribution claim against LBL/LBHI2<br>Disputed inbound claims from LBL to LBIE<br>LBL proposed recharge to LBIE of the contribution claim | UK High Court hearing - 30 January 2017 | H2 2018 | H1 2020 |
| BarCap claims | Treatment of claims from BarCap | UK High Court hearing - H1 2017 | H2 2018 | H1 2020 |

In each of the proceedings, the earliest that judgments should be expected to be handed down is in a period 3 to 6 months after the hearing dates.

# *Appendices*

# *Appendix A:*
# Receipts and payments: cumulative and 6 months to 14 September 2016

### *House Estate receipts and payments: cumulative and 6 months to 14 September 2016*

| House Estate | Notes | Cumulative - 15 September 2008 to 14 March 2016 (GBP equivalent) £m | Period - 6 months to 14 September 2016 (GBP equivalent) £m | Cumulative - 15 September 2008 to 14 September 2016 (GBP equivalent) £m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Counterparties | 1 | 12,164 | 102 | 12,266 |
| Affiliate-related transfers from post-Administration Client Money | 2 | 840 | 15 | 855 |
| Other receipts | 3 | 12,542 | 31 | 12,573 |
| **Total receipts for the period/to date** | | **25,546** | **148** | **25,694** |
| **Payments** | | | | |
| Dividends paid | 4 | (12,161) | (143) | (12,304) |
| Administrators' remuneration and expenses | 5 | (978) | (22) | (1,000) |
| Legal and professional costs | 6 | (377) | (16) | (393) |
| Payroll and employee costs | 7 | (631) | (4) | (635) |
| Pension Fund settlement | 8 | (112) | (3) | (115) |
| Other payments | 9 | (4,511) | (58) | (4,569) |
| **Total payments for the period/to date** | | **(18,770)** | **(246)** | **(19,016)** |
| **Net movement in the period/to date** | | **6,776** | **(98)** | **6,678** |
| Foreign exchange translation differences^ | | (137) | 3 | (134) |
| **Total House Estate cash deposits and government bonds** | **10** | **6,639¯** | **(95)** | **6,544#** |

^  At this stage in the Administration, material receipts and payments in foreign currencies other than US dollars are converted to sterling as soon as practicable after receipt. Where currency sums are held for a short period, small translation differences can arise. US dollar receipts will be used to fund, in part, CCCs, in the event that they are ultimately decided to be admissible.
¯  Balances held in foreign currencies at 14 March 2016 were c.$1m and various other currencies c.£1m (equivalent).
#  Balances held in foreign currencies at 14 September 2016 were c.$62m and various other currencies c.£9m (equivalent).

## *Notes*

### General
Foreign currency transactions are reported in sterling at the rate prevailing on the relevant transaction date.

The transactions within the LBIE estate in the period:

- are reported on a cash receipts and payments basis in accordance with the Insolvency Act and Insolvency Rules; and
- were completed in accounts established and controlled by the Administrators.

Separate bank accounts are held for realisations from the House Estate and the Trust Estate.

### 1.  Counterparties
Receipts in the period comprise:

- c.£53m of further Affiliates distributions, principally MCF, LBHK and LBSF;
- c.£45m (c.£59m) relating to Omnibus Trust distributions on a claim assigned to the House, transferred from post-Administration Client Money; and
- c.£4m of further LBB distributions, transferred from pre-Administration Client Money.

**2.  Affiliate-related transfers from post-Administration Client Money**

c.£15m (c.$21m) of funds previously held in post-Administration Client Money was transferred to the House Estate arising from the LBF supplemental settlement approved in the period.

**3.  Other receipts**

Other receipts comprise:

- c.£12m of bank and bond interest received;
- c.£11m of VAT repayments received from HMRC;
- c.£6m of tax refunds arising from overseas taxing authorities and Affiliates in consideration for the surrender of group losses; and
- c.£6m of other realisations.

The above amounts are offset by c.£4m of excess cost contributions returned to 3 trust claimants in the period.

**4.  Dividends paid**

c.£143m of unsecured 'catch-up' dividends were paid in the period as further claims were admitted or blockers to prior distributions were resolved, bringing cumulative dividends paid to 14 September 2016 to c.£12.31bn.

**5.  Administrators' remuneration and expenses**

Payment deferral terms (as agreed with the Committee and referred to on page 31 of this report) account for differences between costs incurred and payments made in the period.

Out-of-pocket expenses below £1m were paid in the period.

**6.  Legal and professional costs**

Legal and other advisers' costs relate to advice given, and to court proceedings and litigation conducted, in numerous jurisdictions by a number of professional firms in connection with a range of issues across the Administration.

**7.  Payroll and employee costs**

Payments relate to salary and benefits for UK-based employees and third party contractors. This includes employee-related costs incurred on behalf of Affiliates, which are recovered by LBIE and included as other realisations.

**8.  Pension Fund settlement**

Further payments of c.£3m were made as part of a settlement agreement to the Pension Fund to enable it to provide the defined benefits promised to its members.

**9.  Other payments**

Other payments comprise:

- c.£44m of post-Administration US tax liabilities;
- c.£7m of VAT paid on invoices;
- c.£4m of occupancy and infrastructure costs; and
- c.£3m of other net sundry payments and reclassifications.

## 10.  Investment profile

### Current investment strategy

For immediate liquidity requirements, LBIE invests in short-term money market deposits. For other requirements, investments are held in government securities.

### Total balances

| House Estate | GBP equivalent £m |
|---|---|
| Short-dated government bonds[1] | 6,399 |
| Short-term deposits[2] | 112 |
| Interest-bearing accounts | 18 |
| Long-dated government bonds | 15 |
| **Total** | **6,544** |

1.   Average rate of return on bonds yet to mature (net of fund manager fees) of 0.216%.
2.   Average rate of return for 6 months ending 14 September 2016 of 0.26% for sterling deposits and 0.36% for US dollar deposits.

### Cash management and investment policies

Subject to meeting regulatory requirements, the continuing objectives of the policies are to provide:

- security for Administration funds;
- liquidity as required by the Administration; and
- appropriate returns (positive yield net of fees).

The primary objective continues to be ensuring the security of Administration funds. To meet this objective, a comprehensive counterparty credit risk policy is in place with clear limits on counterparties, instruments, amounts and duration. Compliance with policy is measured on at least a daily basis using live indicators, and any material breaches arising from market movements are reported immediately to the Administrators.

The cash is managed by a team of treasury professionals which meets with the Administrators on a regular basis.

### Policy for interest-bearing accounts and short-term deposits/notice accounts

Permitted banks must meet 5 key criteria:

- be headquartered in a sovereign state where the average long-term ratings from S&P, Moody's and Fitch are in the top 4 available tiers (AAA to AA-);
- be headquartered in a sovereign state within the top 3 tiers of the S&P banking industry country risk assessment;
- have a blended average long-term rating from S&P, Moody's and Fitch within the top 4 available tiers (AA to A);
- be a Prudential Regulation Authority or European Banking Authority approved counterparty; and
- have 5-year credit default swap prices, bond yields, equity volatility, capital buffers and financial ratios below a specified (prudent) threshold.

The counterparties are ranked in 3 tiers (1-3) based on their risk score (1 being least risky). To ensure diversification, counterparty limits are based on the tier to which they belong:

- 20% of funds under management with any single tier 1 or tier 2 bank; and
- 15% of funds under management with any single tier 3 bank.

In the period, funds were placed on short-term deposits/notice accounts for a maximum duration of 1 month due to increased market volatility. Since the period end, reflecting a return to more stable market conditions, our policy has reverted to short-term deposits/notice accounts being placed for a maximum duration of 12 weeks with tier 1 banks, 8 weeks with tier 2 banks and 4 weeks with tier 3 banks.

### Policy for government bonds

Eligible investments for the bond portfolios are short-dated government debt issued by the UK and quasi-government debt securities benefiting from an explicit, unconditional and irrevocable guarantee from the sovereign government.

The bond portfolio is managed on a day-to-day basis by an independent fund manager.

## Post-Administration Client Money receipts and payments: cumulative and 6 months to 14 September 2016

| Post-Administration Client Money | Notes | Cumulative - 15 September 2008 to 14 March 2016 (USD equivalent) $m | Period - 6 months to 14 September 2016 (USD equivalent) $m | Cumulative - 15 September 2008 to 14 September 2016 (USD equivalent) $m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Affiliate-related | | 724 | - | 724 |
| Other receipts | 1 | 7,056 | 1 | 7,057 |
| **Total receipts for the period/to date** | | **7,780** | **1** | **7,781** |
| **Payments** | | | | |
| Transfers to the House | 2 | (2,692) | (80) | (2,772) |
| Affiliate settlements | 3 | (1,473) | (71) | (1,544) |
| Other payments | | (3,497) | - | (3,497) |
| **Total payments for the period/to date** | | **(7,662)** | **(151)** | **(7,813)** |
| **Net movement in the period/to date** | | **118** | **(150)** | **(32)** |
| Foreign exchange translation differences^ | | 43 | - | 43 |
| **Total balances** | **4** | **161**~ | **(150)** | **11**# |
| **Comprising** | | | | |
| Segregated Affiliate post-Administration Client Money balance | | 92 | (92) | - |
| Other third party post-Administration Client Money balance∞ | | 69 | (58) | 11 |
| **Total balances** | | **161** | **(150)** | **11** |

^ The translation differences largely arise from translating other currencies into US dollars for reporting purposes.
~ Balances held in currencies other than US dollars at 14 March 2016 were c.€9m.
# Balances held in currencies other than US dollars at 14 September 2016 were c.€10m.
∞ Mainly relating to clients subject to debt recovery litigation in Germany.

## Notes

### 1. Other receipts

Distributions and derived income on securities received directly into the post-Administration Client Money account.

### 2. Transfers to the House

Transfers comprised a c.$59m (c.£45m) release of Omnibus Trust-related funds in settlement of a Client Assets claimant receivable following clearances being received and c.$21m (c.£15m) of Affiliate-related transfers resulting from a supplemental settlement agreement with LBF.

### 3. Affiliate settlements

Affiliate settlements mainly comprise return of funds to LBF under a supplemental settlement agreement.

### 4. Investment profile

*Total balances*

| Post-Administration Client Money | USD equivalent $m |
|---|---|
| Interest-bearing accounts | 11 |
| **Total** | **11** |

### Cash management and investment policies for client funds

The Client Money cash management policies for interest-bearing accounts are based on those used for the House Estate, modified to comply with the additional Client Money regulatory requirements. Client Money is not eligible for investment in government bonds and can be placed on money market deposits for a maximum duration of 30 days.

## Pre-Administration Client Money receipts and payments: cumulative and 6 months to 14 September 2016

| Pre-Administration Client Money | Notes | Cumulative - 15 September 2008 to 14 March 2016 (USD equivalent) $m | Period - 6 months to 14 September 2016 (USD equivalent) $m | Cumulative - 15 September 2008 to 14 September 2016 (USD equivalent) $m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Client Money pool recoveries | 1 | 2,166 | 49 | 2,215 |
| Funds received for the House | 2 | 69 | 6 | 75 |
| Interest | | 11 | 2 | 13 |
| **Total receipts for the period/to date** | | **2,246** | **57** | **2,303** |
| **Payments** | | | | |
| Client Money interim distribution | | (675) | - | (675) |
| Funds paid to the House | 2 | (68) | (6) | (74) |
| Legal costs | | (10) | - | (10) |
| **Total payments for the period/to date** | | **(753)** | **(6)** | **(759)** |
| **Net movement in the period/to date** | | **1,493** | **51** | **1,544** |
| Foreign exchange translation differences^ | | (83) | (44) | (127) |
| **Total balances** | **3** | **1,410~** | **7** | **1,417#** |

^  The cumulative translation differences principally arise from translating other currencies into US dollars for reporting purposes.
~  Balances held in currencies other than US dollars at 14 March 2016 were c.£396m.
#  Balances held in currencies other than US dollars at 14 September 2016 were c.£396m and c.€32m.

## Notes

### 1.  Client Money pool recoveries

Receipts in the period largely comprised:

- c.$36m as seventh and eighth distributions from LBB on LBIE's unsecured claim; and
- c.$13m as ninth and tenth distributions from LBHI in respect of LBIE's guarantee claim.

### 2.  Funds received for/paid to the House

Distributions from LBB in euros, received into the pre-Administration Client Money bank account in the period, included distributions relating to the House unsecured claim against LBB. Accordingly, these funds were then paid to the House bank account.

### 3.  Investment profile

| Pre-Administration Client Money | USD equivalent $m |
|---|---|
| Short-term deposits[1] | 1,381 |
| Interest-bearing accounts | 36 |
| **Total** | **1,417** |

1.  Average rate of return for 6 months ending 14 September 2016 of 0.28% for sterling deposits and 0.39% for US dollar deposits.

# *Appendix B:*
# Litigation summary

The following litigation is a matter of public record in the relevant legal jurisdiction noted below.

| Counterparty | Claim amount/ (POD value) | Type | Commenced | Court | Court reference |
|---|---|---|---|---|---|
| AG Financial Products Inc. | $500m/£(16)m | Debtor/Creditor | Nov. 2011 | Supreme Court of the State of New York | 653284/2011 |
| SAAD Trading, Contracting and Financial Services Company | $125m | Debtor | Jun. 2015 | Supreme Court of the State of New York | 652319/2015 |
| Kumho Industrial Co. Limited | KRW129bn | Debtor | Jul. 2015 | Seoul Central District Court | |
| Dietmar Hopp Stiftung GmbH<br><br>DH Besitzgesellschaft AG & Co KG | €26m | Trust debtors | Aug. 2010 | German Supreme Court | BGH XI ZR 9/14 |
| ExxonMobil Financial Services BV | $14m/£(5)m | Debtor/Creditor | Aug. 2014 | UK High Court | 2014-1006 |
| Employee | £(3)m | Creditor - rejection appeal | Dec. 2014 | UK High Court | 7942 of 2008 |

# *Appendix C:*
# Surplus entitlements court process
# (Waterfall I, II and III)

## Summary of Waterfall I UK Supreme Court process milestones in the current reporting period:

| | |
|---|---|
| *13 Apr. 2016* | LBL filed a statement of agreed facts and issues agreed between the parties |
| *19 Aug. 2016* | Appellants (LBL, LBHI2, LBHI) filed their respective cases |
| *13 Sep. 2016* | Administrators filed their respondent written case |

## Summary of Waterfall I UK Supreme Court process milestones expected in future reporting periods:

| | |
|---|---|
| *16 Sep. 2016* | CVI GVF (Lux) Master SARL to file its respondent written case |
| *17 Oct. 2016* | 4-day UK Supreme Court hearing to commence |

## Summary of Waterfall II UK High Court/UK Appeal Court process milestones in the current reporting period:

| | |
|---|---|
| *20 May 2016* | Wentworth and York each filed their respondent's skeleton arguments in the Appeals in respect of tranche A |
| *20 May 2016* | Senior Creditor Group filed their respondent's skeleton arguments in the Appeals in respect of tranches A & B |
| *17 Jun. 2016* | Administrators filed their respondent's skeleton argument in the Appeals in respect of tranches A & B |
| *23 Jun. 2016* | Wentworth, York, the Senior Creditor Group and the Administrators filed further written submissions in relation to supplemental issue 1(a) arising from the judgments of Mr Justice Hildyard in respect of tranches A & B |
| *24 Jun. 2016* | Interim hearing in respect of supplemental issue 1(a) before Mr Justice Hildyard (tranches A & B) |
| *21 Jul. 2016* | Senior Creditor Group and Wentworth filed further written submissions in relation to German law issues (tranche C) |
| *24 Aug. 2016* | Approved judgments handed down on supplemental issues 1(b), 1(c) and 2-5 (tranches A & B) |

## Summary of Waterfall II UK High Court/UK Appeal Court process milestones expected in future reporting periods:

| | |
|---|---|
| *Oct. 2016* | Approved judgment of Mr Justice Hildyard handed down on tranche C issues and supplemental issue 1(a) |
| *Oct. 2016* | Appeal notices to be filed in respect of supplemental issues (tranches A & B) |
| *3 Apr. 2017* | 6-day UK Appeal Court hearing on tranches A and B issues to commence |

**Summary of Waterfall III UK High Court process milestones in the current reporting period:**

| | |
|---|---|
| *25 Apr. 2016* | Application to seek a determination on various issues concerning contributory claims and other Affiliate issues, supported by the ninth witness statement of Russell Downs |
| *27 May 2016* | LBL made an application to stay the proceedings |
| *7 Jun. 2016* | LBHI made an application to be joined to the proceedings |
| *22 Jun. 2016* | LBL, LBHI2, LBEL and LBHI and the Administrators each filed their skeleton arguments in advance of the case management hearing |
| *24 Jun. 2016* | Case management hearing |
| *9 Aug. 2016* | Directions order following the case management hearing |

**Summary of Waterfall III UK High Court process milestones expected in future reporting periods:**

| | |
|---|---|
| *30 Sep. 2016* | LBL to file position paper |
| *10 Nov. 2016* | LBIE, LBHI2 and LBEL to file position papers in response |
| *2 Dec. 2016* | LBL to file reply position paper |
| *16 Dec. 2016* | Parties to file witness statements |
| *9 Jan. 2017* | Parties to file reply witness statements |
| *16 Jan. 2017* | Pre-trial review hearing to take place on procedural steps |
| *30 Jan. 2017* | 20-day UK High Court hearing to commence |

**Waterfall II Application**

**Tranche C matters (cost of funding and related foreign law issues) judgment**

| Matter | UK High Court judgment |
|---|---|
| What is meant by the 'cost of funding the relevant amount' in the default rate definition in the ISDA Master Agreements? In particular, is 'cost of funding' restricted to the cost of borrowing (i.e. debt) or can it also include the cost of other forms of funding (e.g. equity finance)? | **Pending** |
| Whether a creditor's certification of a cost of funding is conclusive and/or how can such certification be constrained by good faith and rationality? | **Pending** |
| Whether an assignee creditor can claim interest from LBIE at a higher rate than the rate that would have been payable to the assignor creditor had the assignment not taken place? | **Pending** |
| Whether, as a matter of German law in the circumstances of LBIE's Administration, a creditor can obtain an award for damages for late payment of a debt (i.e. a close-out amount) in the form of a rate of interest? If so, whether such an award can constitute a 'rate applicable to the debt apart from the administration'? | **Pending** |

**Consequential matters judgment**

| Supplemental issue | UK High Court judgment |
|---|---|
| 1(a). Whether, and in what circumstances, for a provable debt that is a close-out sum under a contract 'the rate applicable to the debt apart from the administration' in Rule 2.88(9) includes a contractual rate of interest that began to accrue only after it became due and payable due to action taken by the creditor post-administration? | **Pending** |
| 1(b). How is an entitlement to interest on a non-provable CCC that 'arises outside or other than from the administration' to be determined if such a rate would only accrue on a contingent or future debt if some action was taken post-administration and how is this to be assessed if the creditor did not take such action? | Entitlement arises only if an event or contingency occurs that entitles the creditor to such interest (e.g. close-out) and only in accordance with the terms of the contract. |
| 1(c). A. Where contractual interest first commences on a provable debt post-administration, is the 'rate applicable' for the intervening period from the date of administration that which is payable once the interest commences or a zero rate; and B. Should Post-Administration Interest be calculated by assessing the greater of the 'rate applicable' and Judgments Act 1838 rate separately for the periods prior to and post the commencement of contractual interest separately or combined? | A. The 'rate applicable' is zero for the period from the date of administration to the date when contractual interest arises.<br><br>B. The periods before and after the date on which contractual interest starts to run should be taken together, not separately. |
| 2. Whether, and if so in what circumstances, a CCC can arise from the discharge of a debt by way of set-off pursuant to Rule 2.85(3)? | A CCC cannot arise from the discharge of a debt by way of set-off under Rule 2.85(3). |
| 3. Whether, and if so to what extent, a non-provable claim to interest on a CCC should be reduced by Post-Administration Interest received by the creditor on its proved debt? | A non-provable claim to interest on a CCC is not to be reduced by interest paid to the creditor under Rule 2.88(7). |
| 4. Whether, to the extent that a creditor has a non-provable claim to interest, it has been released under the terms of the CRA or a CDD and if so, whether the Administrators would be directed not to enforce such a release? | Any such claim (to the extent such an entitlement exists) falls within the release provided by the CRA and the CDDs, and the Administrators would not be directed to pay such a claim. |
| 5. Whether, to the extent that a creditor has a non-provable claim for interest on a CCC, it has been released under the terms of the CRA or a CDD and, if so, whether the Administrators would be directed not to enforce such a release? | Any such claim falls within the release provided by the CRA and the Administrators would not be directed to pay it.<br>Any such claim does not fall within the release provided by a CDD. The Administrators would be directed to pay it. |

# Appendix D:
# Administrators' remuneration

## Analysis of Administrators' remuneration by grade and work activity

The table below provides an analysis of the Administrators' total hours incurred and the associated cost by staff grade and work activity for the previous time reporting period (to 31 December 2015) and the current period (to 30 June 2016), together with the forecast for the current and next period (to 31 December 2016).

| | Prior actual | | Current actual | | Current forecast | | Future forecast | |
| | 1 July 2015 to 31 December 2015 | | 1 January 2016 to 30 June 2016 | | 1 January 2016 to 30 June 2016 | | 1 July 2016 to 31 December 2016 | |
| | Hours | £'000 | Hours | £'000 | Hours | £'000 | Hours | £'000 |
|---|---|---|---|---|---|---|---|---|
| **By grade** | | | | | | | | |
| Partner | 2,932 | 2,529 | 2,283 | 2,003 | 1,525 | 1,451 | 1,697 | 1,539 |
| Director | 7,208 | 4,926 | 4,041 | 2,830 | 4,723 | 3,353 | 3,762 | 2,629 |
| Senior Manager | 19,141 | 9,880 | 8,654 | 4,720 | 7,623 | 4,126 | 7,513 | 4,115 |
| Manager | 17,580 | 6,926 | 6,473 | 2,746 | 9,183 | 3,681 | 4,815 | 2,074 |
| Senior Associate | 15,201 | 4,046 | 6,412 | 1,763 | 6,567 | 1,785 | 3,689 | 1,103 |
| Associate | 3,887 | 685 | 2,142 | 403 | 965 | 206 | 971 | 212 |
| **Total** | **65,949** | **28,992** | **30,005** | **14,465** | **30,586** | **14,602** | **22,447** | **11,672** |
| **Average hourly rate** | | **£440** | | **£482** | | **£477** | | **£520** |
| **By work activity** | | | | | | | | |
| Resolution of the 100p estate | 5,980 | 3,071 | 3,678 | 1,883 | 4,532 | 2,349 | 989 | 671 |
| Surplus | 15,446 | 7,416 | 5,268 | 3,014 | 7,459 | 3,628 | 6,508 | 3,747 |
| Finance and reporting | 11,337 | 4,289 | 5,143 | 2,230 | 6,000 | 2,630 | 2,718 | 1,276 |
| Infrastructure[1] | 33,186 | 14,216 | 15,916 | 7,338 | 12,595 | 5,995 | 12,232 | 5,978 |
| **Total** | **65,949** | **28,992** | **30,005** | **14,465** | **30,586** | **14,602** | **22,447** | **11,672** |

1.    Infrastructure includes information technology, tax, VAT and pensions and certain other back office functions.

## Staff profile

The table below provides a summary of the average staff numbers profile for the previous and current time reporting periods and the forecast average for the current and next time reporting periods.

| | Actual | | Forecast | |
| | Prior period ended 31 Dec 2015 | Current period ended 30 Jun 2016 | Current period ended 30 Jun 2016 | Future period ending 31 Dec 2016 |
|---|---|---|---|---|
| **Staff profile** | | | | |
| LBIE staff (including contractors)[1] | 142 | 68 | 74 | 42 |
| PwC staff [2] | 64 | 30 | 31 | 22 |
| Ratio of LBIE to PwC staff | 2.2 | 2.3 | 2.4 | 1.9 |

1.    As part of the Administration cost management programme, a proportion of the LBIE staff have moved to part-time employment contracts. To give a more accurate representation of the LBIE resource, staff numbers from 1 January 2016 are shown on a full-time equivalent basis.

2.    PwC staff numbers are calculated on the basis of 8 worked man-hours being equal to 1 full-time equivalent man-day.

We estimate that in the year ending 31 December 2016 the LBIE resource will reduce by 70%. In the corresponding period, the PwC resource will have reduced by 66%.

The fluctuating ratio of LBIE to PwC staff reflects PwC staff being released at shorter notice than LBIE staff as workload reduces.

## Administrators' remuneration in the current period

In the current time reporting period to 30 June 2016, total hours reduced by 55% compared to the period ended 31 December 2015, with a corresponding reduction in total costs of 50%.

All work activities reported reduced activity in the period as forecast. Total actual hours and costs in the period are broadly in line with the forecast. At a work activity level:

- residual 100p estate matters workload was below forecast as simplification processes have continued;

- Surplus activity was below forecast as there was less court-related support work required than expected;

- reporting function streamlining and simplification facilitated savings in excess of forecast; offset by

- infrastructure costs exceeding forecast principally as a result of additional work being required to progress the Pension Fund settlement relating to minimising contingent exposures.

## Administrators' remuneration forecast for the next period

The forecast 6-monthly time reporting period to 31 December 2016 indicates a 25% reduction in hours and a 19% reduction in costs compared with the current period. This reflects the activity across non-Surplus work streams continuing to reduce.

The increase of 8% in the average hourly rate predominantly reflects a grade mix change, with remaining work being more complex necessarily requiring more input from senior staff.

## Administrators' remuneration approval

Details of the statutory framework for the approval of the Administrators' remuneration, the role of the Creditors' Committee Adviser and the level and detail of disclosure provided by the Administrators are set out in our earlier reports.

Cumulative time costs accrued to 30 June 2016 are c.£969m. Total Administrators' remuneration and disbursements paid to 14 September 2016 are c.£1bn.

Time costs incurred in the period from 1 July 2016 to 14 September 2016, not reported in detail on page 30, are c.£5m. A full analysis of these costs will be included as part of the 6-month period to 31 December 2016 in the next progress report.

We continue to provide the Committee and its Adviser with detailed information relating to our remuneration and to Category 2 disbursements, in accordance with SIP 9.

## Creditors' rights

An explanatory note on the rights of creditors in relation to an administrator's remuneration and expenses and how to request further information can be found online at:
*http://www.icaew.com/~/media/Files/Technical/Insolvency /creditors-guides/a-creditors-guide-to-administrators-fees-010407.pdf*

You can also get a copy free of charge by telephoning Lesley Bingham on 0203 036 2661.

## Approvals by the Creditors' Committee

In the period, the Committee approved remuneration arrangements for 2016, which again require deferral of a significant proportion of the Administrators' time costs that will be incurred in the calendar year to be considered for approval in 2017 based upon performance.

The Committee has been provided with Category 2 disbursement information relating to the 3-month period to 31 March 2016 amounting to £267,996, with Category 2 disbursements of £340,095 being approved for payment in the period relating to a prior period.

In addition, Category 1 disbursements incurred in the 6-month period to 30 June 2016 amounted to £269,550, with £150,979 paid in the period.

# *Appendix E:*
# Statutory and other information

| | |
|---|---|
| **Court details for the Administration:** | High Court of Justice, Chancery Division, Companies Court<br>Court case number 7942 of 2008 |
| **Full name:** | Lehman Brothers International (Europe) |
| **Trading name:** | Lehman Brothers International (Europe) |
| **Registered number:** | 02538254 |
| **Registered address:** | Level 23, 25 Canada Square, London E14 5LQ |
| **Date of the Administration appointment:** | 15 September 2008 |
| **Administrators' names and addresses:** | AV Lomas, SA Pearson (both appointed 15 September 2008), R Downs (appointed 2 November 2011) and JG Parr (appointed 22 March 2013) of PricewaterhouseCoopers LLP, 7 More London Riverside, London SE1 2RT. MJA Jervis and DY Schwarzmann ceased to act on 2 November 2011. DA Howell ceased to act on 22 March 2013. PD Copley ceased to act on 24 June 2016 |
| **Appointor's name and address:** | High Court of Justice, Chancery Division, Companies Court on the application of LBIE's directors |
| **Objective being pursued by the Administrators:** | Achieving a better result for LBIE's creditors as a whole than would be likely if LBIE were wound up (without first being in Administration) |
| **Aims of the Administration:** | Recover and/or realise all House assets, including cash, securities and in-the-money financial contracts, on a managed basis<br>Admit unsecured creditors' claims and make distributions to creditors<br>Recover Client Assets and Client Money, assess the claims to such property and return all such property to its rightful owners on a systematic basis |
| **Division of the Administrators' responsibilities:** | In relation to paragraph 100(2) of Schedule B1 to the Insolvency Act, during the period for which the Administration is in force, any act required or authorised under any enactment to be done by either or all of the Administrators may be done by any one or more of the persons for the time being holding that office |
| **Details of any extensions for the initial period of appointment:** | The UK High Court on 2 November 2011 granted an extension of the Administration to 30 November 2016. A further extension application will shortly be made to the UK High Court for a 6-year extension |
| **Proposed end of the Administration:** | The Administrators have yet to determine the most appropriate exit |
| **Estimated dividend for unsecured creditors:** | Interim dividends paid to date at a cumulative rate of 100p/£1 |
| **Estimated values of the prescribed part and LBIE's net property:** | The prescribed part is not considered to be relevant as all Senior admitted creditors have been paid or reserved for at a rate of 100p/£1 |
| **Whether and why the Administrators intend to apply to court under Section 176A(5) of the Insolvency Act:** | Not applicable |
| **The European Regulation on Insolvency Proceedings (Council Regulation (EC) No. 1346/2000 of 29 May 2000):** | The European Regulation on Insolvency Proceedings does not apply to this Administration as LBIE is an investment undertaking |
| **Creditors' Committee members:** | Lehman Brothers Holdings Inc.<br>Ramius LLC<br>Lehman Brothers Commercial Corporation Asia Limited<br><br>During the period Lehman Brothers Commodity Services Inc. was replaced by Lehman Brothers Holdings Inc. as a Committee member |

# *Appendix F:*
# Glossary of terms

| Abbreviation | Term | Definition |
| --- | --- | --- |
| Administration | Administration | UK corporate insolvency process governed by the Insolvency Act 1986 applicable to LBIE following the granting of an administration order dated 15 September 2008 |
| Administrators | Joint Administrators | AV Lomas and SA Pearson were appointed as Joint Administrators of LBIE on 15 September 2008. R Downs was appointed on 2 November 2011. JG Parr was appointed on 22 March 2013. All are licensed in the United Kingdom to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales |
| Adviser | Adviser | An adviser retained to assist the Committee in considering the Administrators' remuneration requests |
| Affiliates | Affiliate entities | Various subsidiaries and affiliates of Lehman Brothers Holdings Inc. |
| AGR | AG Financial Products Inc. | A US-based affiliate of Assured Guaranty Corp. which provided credit protection to counterparties under credit default swaps |
| BarCap | Barclays Capital Inc. | Investment banking business of Barclays Bank PLC |
| Category 1 disbursements | Administrators' Category 1 disbursements | Costs that are directly referable to the Administration supplied by and paid to external third parties |
| Category 2 disbursements | Administrators' Category 2 disbursements | Costs that are directly referable to the Administration but not to a payment to an independent third party. They may include shared or allocated costs that can be allocated to the Administration on a proper and reasonable basis |
| Claims Determination Deed/CDD | Claims Determination Deed | A standardised legal document for agreeing claims under the Consensual Approach |
| Client Assets | Client Assets | Client securities which LBIE should have held as at 15 September 2008 |
| Client Money | Client Money | Client cash balances held by LBIE as at 15 September 2008 or received thereafter by LBIE and which are, in each case, subject to the UK Financial Conduct Authority's client money rules and/or applicable client money distribution rules |
| CME | Client Money Entitlement | The entitlement to receive a distribution from the pre-Administration Client Money pool |
| Committee | Creditors' Committee | Creditors voted to represent the general body of creditors of LBIE to assist the Administrators in discharging their functions set out in the Insolvency Act |
| Consensual Approach | Consensual Approach | A framework developed for the expedient resolution of the unsecured claims of financial trading counterparties |
| CRA | Claim Resolution Agreement | The claim resolution framework which governs the return of Client Assets. The CRA was proposed by the Administrators to clients in November 2009 and was accepted by over 90% of eligible Client Assets claimants |
| Currency Conversion Claim/CCC | Currency Conversion Claim | Non-provable claim derived from contractual rights to be paid in a currency other than sterling, where the value of sterling has declined as against the currency of the claim between the date of Administration and the date(s) of payment of distributions in respect of the claim |
| Customer Property | Customer Property as defined in SIPA | A combination of claims to securities and certain cash amounts relating to securities, as defined in SIPA |
| FINMA | FINMA | Swiss Financial Market Supervisory Authority FINMA |
| HMRC | HM Revenue & Customs | Organisation of the UK government primarily responsible for the collection of taxes |
| House Estate/House | House Estate | Dealings that relate to LBIE's general unsecured estate |
| Insolvency Act | Insolvency Act 1986 | Statutory legislation that provides the legal platform for matters relating to personal and corporate insolvency in the UK |
| Insolvency Rules | Insolvency Rules 1986 | Statutory rules that provide the legal platform for matters relating to personal and corporate insolvency in the UK |
| IRS | Internal Revenue Service | A bureau of the Department of the Treasury of the United States federal government with responsibility for collecting taxes and the interpretation and enforcement of the internal revenue code |
| ISDA/ISDA Master Agreement | International Swaps and Derivatives Association Master Agreement | Global trade association for over-the-counter derivatives standard documentation |
| LBB | Lehman Brothers Bankhaus A.G. | Affiliate entity subject to insolvency proceedings in Germany |
| LBEL | Lehman Brothers Europe Limited | Affiliate entity subject to insolvency proceedings in the UK |
| LBF | Lehman Brothers Finance S.A. (Switzerland) | Affiliate entity subject to insolvency proceedings in Switzerland |

| Abbreviation | Term | Definition |
|---|---|---|
| LBHI | Lehman Brothers Holdings Inc. | Ultimate parent of the Lehman group, incorporated in the USA and formerly subject to Chapter 11 bankruptcy protection from 15 September 2008. The plan of reorganisation became effective on 6 March 2012 |
| LBHI2 | LB Holdings Intermediate 2 Limited | Affiliate entity subject to insolvency proceedings in the UK |
| LBHK | Lehman Brothers Hong Kong | Collective group of affiliate entities subject to insolvency proceedings in Hong Kong: Lehman Brothers Asia Holdings Ltd, Lehman Brothers Commercial Corporation Asia Ltd, Lehman Brothers Asia Capital Company Ltd, Lehman Brothers Securities Asia Ltd, Lehman Brothers Futures Asia Ltd, Lehman Brothers Asia Ltd and Lehman Brothers Nominees (H.K.) Ltd |
| LBI | Lehman Brothers Inc. | US broker-dealer affiliate entity, incorporated in the USA which entered SIPA trusteeship on 19 September 2008 |
| LBIE | Lehman Brothers International (Europe) – In Administration | Private unlimited UK subsidiary of LBHI, acting as its main European broker dealer, subject to an administration order dated 15 September 2008 |
| LBL | Lehman Brothers Limited | UK service entity for the Lehman UK entities. LBL was placed into Administration on 15 September 2008 |
| LBSF | Lehman Brothers Special Financing Inc. | Affiliate entity subject to insolvency proceedings in the USA |
| MCF | Mable Commercial Funding Limited | Affiliate entity subject to insolvency proceedings in the UK |
| Omnibus Trust | Omnibus Trust | Trust under which the asset returns to LBIE by LBI of SIPA Customer Property relating to LBIE client positions are held and the assets constituting the trust property thereof |
| Pension Fund | Lehman Brothers Pension Scheme | Group pension scheme for employees of UK Lehman entities |
| Post-Administration Interest | Post-Administration Interest | Statutory interest payable pursuant to Rule 2.88(7) of the Insolvency Rules |
| Proof of Debt/POD | Proof of Debt or Statement of Claim | A formal document prescribed by the Insolvency Rules submitted to the Administrators by a creditor wishing to prove their claim. The form is made in writing or electronically under the responsibility of a creditor and signed by an authorised person |
| SCSO | Small Claims Settlement Offer | An initiative under which creditors with agreed claims up to £150,000 were offered a one-off payment of 90% of their agreed claim in full and final settlement |
| Senior | Senior unsecured creditor | Unsecured, non-preferential, non-Shareholder, not subordinated creditor |
| Senior Creditor Group/ SCG | Senior Creditor Group | Collectively 3 respondents to the Waterfall II Application: Burlington Loan Management Limited, CVI GVF (Lux) Master SARL and Hutchinson Investors, LLC |
| Shareholder(s) | Shareholder(s) of LBIE | LBL and/or LBHI2 |
| SIP 9 | Statement of Insolvency Practice 9 | Rules issued by the Joint Insolvency Committee which provide guidance to insolvency practitioners and creditors' committees in relation to the remuneration of, *inter alios*, administrators |
| SIPA | Securities Investor Protection Act 1970 | A US legal proceeding for handling the liquidation of a broker-dealer |
| Street | Street counterparties | Third party counterparties consisting of financial institutions, including asset managers, custodians and banks; and non-banking financial institutions, including pension funds and corporate entities |
| Subordinated Debt | Subordinated Debt | The subordinated liabilities arising pursuant to 3 intercompany loan agreements entered into between LBIE and LBHI2, each dated 1 November 2006, and which have been assigned by LBHI2 to the Wentworth joint venture companies |
| Surplus | Surplus | Assets remaining after the payment in full of Senior creditor claims and before Post-Administration Interest, non-provable claims, the Subordinated Debt and Shareholder claims |
| Trust Estate | Trust Estate | Client Assets, Client Money and Omnibus Trust |
| UK Appeal Court | Court of Appeal of England and Wales | The second most senior court in the English legal system for civil cases. Permission to appeal is required, either from the lower court or the Court of Appeal itself |
| UK High Court | High Court of England and Wales | Court of England and Wales which deals with all high value and high importance cases, and also has a supervisory jurisdiction over all subordinate courts |
| UK Supreme Court | Supreme Court of the United Kingdom | This is the court of last resort and highest appellate court in the United Kingdom for civil cases |
| VAT | Value Added Tax | A consumption tax levied on the sale of goods and services in the UK |
| Waterfall | Waterfall | Waterfall I, II and III legal proceedings |

| Abbreviation | Term | Definition |
|---|---|---|
| **Waterfall I Application/ Waterfall I** | Waterfall I Application | A joint application by LBIE, LBL and LBHI2 to the UK High Court issued on 14 February 2013 seeking a determination on statutory interest priority, contribution rights and other issues relating to LBIE and its Shareholders |
| **Waterfall II Application/ Waterfall II** | Waterfall II Application | An application to the UK High Court issued on 12 June 2014 seeking a further determination on issues that impact the rights of creditors to payment from the Surplus and the distribution of that Surplus in a timely manner |
| **Waterfall III Application/ Waterfall III** | Waterfall III Application | An application to the UK High Court issued on 25 April 2016 seeking a determination on issues relating to contributory claims |
| **Wentworth** | Wentworth | Wentworth Sons Sub-Debt SARL, a respondent to the Waterfall II Application |
| **York** | York | York Global Finance BDH, LLC, a respondent to the Waterfall II Application |

www.pwc.co.uk/services/business-recovery/administrations/lehman.html

© 2016 PwC. All rights reserved. Not for further distribution without the permission of PwC.
"PwC" refers to the network of member firms of PricewaterhouseCoopers International
Limited (PwCIL), or, as the context requires, individual member firms of the PwC network.
Each member firm is a separate legal entity and does not act as agent of PwCIL or any other
member firm. PwCIL does not provide any services to clients. PwCIL is not responsible or
liable for the acts or omissions of any of its member firms nor can it control the exercise of
their professional judgment or bind them in any way. No member firm is responsible or liable
for the acts or omissions of any other member firm nor can it control the exercise of another
member firm's professional judgment or bind another member firm or PwCIL in any way.

