# EXHIBIT D

UKSC 2015/0138, 2015/0137, 2015/0139

IN THE SUPREME COURT OF THE UNITED KINGDOM
ON APPEAL FROM HER MAJESTY'S COURT OF APPEAL (CIVIL DIVISION)
(ENGLAND AND WALES) ([2015] EWCA CIV 485)

IN THE MATTER OF LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN
ADMINISTRATION)

AND IN THE MATTER OF LB HOLDINGS INTERMEDIATE 2 LIMITED (IN
ADMINISTRATION)

AND IN THE MATTER OF LEHMAN BROTHERS LIMITED (IN
ADMINISTRATION)

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

BETWEEN:

(1) THE JOINT ADMINISTRATORS OF LB HOLDINGS INTERMEDIATE 2
LIMITED (IN ADMINISTRATION)
(2) LEHMAN BROTHERS HOLDINGS INC
(3) THE JOINT ADMINISTRATORS OF LEHMAN BROTHERS LIMITED (IN
ADMINISTRATION)

**Appellants**

– and –

(1) THE JOINT ADMINISTRATORS OF LEHMAN BROTHERS
INTERNATIONAL (EUROPE) (IN ADMINISTRATION)
(2) CVI GVF (LUX) MASTER SARL

**Respondents**

_____

**CASE OF CVI GVF (LUX) MASTER SARL**

_____

| | INDEX | Page |
|---|---|---|
| A | The Issue | 1 |
| B | The Basic Justice of the Case | 3 |
| C | Important Features of the Insolvency Process | 4 |
| D | Structure of Sixth Respondent's Case | 6 |
| E | Creditors First and Members Last | 8 |
| F | The Process of Collective Enforcement | 9 |
| G | Historical Development | 14 |
| H | The Statutory Waterfall | 16 |
| I | Provable Debts – General | 18 |
| J | Non-Provable Liabilities – General | 19 |
| K | Tort Claims which do not exist at the Cut-Off Date | 22 |
| L | Claims for Post-Insolvency Interest – Pre-1986 Cases | 24 |
| M | Foreign Currency Claims – Pre-1986 | 26 |
| | (1) *Re Dynamics Corporation of America* | 27 |
| | (2) *Re Lines Bros Ltd* | 30 |
| N | The Effect of the 1986 Act and Rules | 34 |
| O | The Law Commission and Cork Reports | 42 |
| | (1) *Law Commission Working Report No. 80* | 42 |
| | (2) *The Cork Report* | 44 |
| | (3) *Law Commission Report* | 45 |
| | (4) *DTI, Revised Framework for Insolvency Law* | 46 |
| P | Other Aspects of the 1986 Regime | 47 |
| | (1) *Set-Off* | 47 |
| | (2) *Contingent claims* | 50 |
| | (3) *Disclaimer* | 52 |
| | (4) *Bankruptcy* | 54 |
| Q | Merits | 55 |
| R | Shortfall in Non-Provable Claims | 61 |
| S | Lewison LJ's Ten Reasons | 62 |
| T | Conclusions | 68 |

1.   This Written Case is filed on behalf of the Sixth Respondent in response to the appeal by the Appellants in respect of paragraph (1) of the order of the Court of Appeal dated 1 May 2015 (the "Order").

2.   Paragraph (1) of the Order dismissed an appeal against the decision of David Richards J in which he held that currency conversion claims rank in LBIE's administration as non-provable liabilities, payable after the payment in full of all proved debts and statutory interest on those debts and before any distribution to shareholders.

3.   The Sixth Respondent submits that the decision of the Court of Appeal was correct for the reasons given by Moore-Bick LJ and Briggs LJ (Lewison LJ dissenting) and by David Richards J at first instance, as further developed and supplemented in this Written Case.

## A.   THE ISSUE

4.   The appeal in respect of paragraph (1) of the Order concerns the respective entitlements and priority of creditors and shareholders of a company in the event of a winding up or distributing administration.

5.   The factual situation which gives rise to the issue is straightforward:

(1)   Creditors enter into contracts with a company which entitle them to payment in a foreign currency.

(2)   The company subsequently goes into liquidation or distributing administration. For the purposes of proof, claims denominated in a foreign currency are valued by converting them into sterling as at the date of the winding up order. The liquidator or administrator pays the sterling amount of the proved debts and statutory post-insolvency interest in full in accordance with the Rules. The sterling sums received by way of dividend by creditors in respect of their proved debts, if converted into the relevant foreign currency at the date of payment, are, however, less than the full amount to which they are entitled under their contracts, given the depreciation in sterling since the date of the winding up order.

(3)   The liquidator or administrator is left with a surplus, after having paid all such proved debts and statutory post-insolvency interest, which is sufficient to discharge the unpaid balance of the creditors' foreign currency claims.

6.    The issue is whether, in such circumstances, that surplus is to be applied in discharging the unpaid balance of the creditors' foreign currency claims, which have not been satisfied as a result of the payment of dividends in sterling pursuant to the proof process, or is instead to be distributed to the shareholders of the company.

7.    In the present case, the issue arises in respect of a company, LBIE, which is an unlimited liability company. At the time of filing for administration, approximately 98% of LBIE's liabilities were denominated in non-sterling currencies (in particular, approximately 79% were in US dollars and 18% were in Euros).

8.    David Richards J and the Court of Appeal (Moore-Bick LJ and Briggs LJ, Lewison LJ dissenting) held that the surplus is to be applied in paying the unpaid balance of creditors' foreign currency claims. The Appellants contend, however, that the surplus should be distributed instead to the subordinated creditors and shareholders of LBIE, notwithstanding that, as a result, certain of LBIE's creditors have not been paid and will, as a result, never receive the full amount which LBIE is contractually obliged to pay them, and the subordinated creditors and shareholders will receive a corresponding windfall.

9.    The amounts at stake in respect of this issue are considerable. The unpaid balance of creditors' foreign currency claims against LBIE exceeds £1.6 billion and the surplus is estimated to be sufficient to discharge that unpaid balance in full.

10.    If the surplus is not applied in paying the unpaid balance of foreign currency creditors' claims, US dollar creditors and Euro creditors will, respectively, recover only about 88% and 95% of the principal foreign currency debt due to them by LBIE despite the availability in the estate of funds sufficient to repay them in full[1]. The recognition (and

---

[1]    These figures assume that the creditor's claim was admitted to proof prior to the making of the first distribution by the administrators. Where a proof of debt was disputed, or submission was delayed, the effect (due to further depreciation in the value of sterling) may be even more stark. A US dollar or Euro creditor whose claim was admitted to proof, and received catch up dividends as at today's exchange rate would, respectively, recover about 74% and 93% of the principal foreign currency debt due to them.

==payment) of currency conversion claims as non-provable liabilities is necessary in order to make such creditors whole. Permitting or requiring the surplus to be paid to the shareholders prior to the payment in full of such liabilities would, by contrast, confer on the members a windfall in excess of £1.6 billion at the expense of all creditors other than the sterling creditors of LBIE (being only 2% of the total creditors).==

## B.   THE BASIC JUSTICE OF THE CASE

11.   Standing back, and before embarking on the detail of the Case, justice indicates that the decision of the Court of Appeal is correct.

12.   As between creditor and debtor in respect of a claim denominated in a foreign currency, the creditor is entitled to payment in full in the relevant currency and should not be required to bear the exchange rate risk associated with receipt of payment in another currency.  As Lord Wilberforce stated in *Miliangos v Frank (Textiles) Ltd* [1976] A.C. 443 at 465F-G *"Justice demands that the creditor should not suffer from fluctuations in the value of sterling"*. So far as the creditor is concerned *"His contract has nothing to do with sterling: he has bargained for his own currency and only his own currency"*.

13.   The fundamental goal in establishing rules for dealing with claims denominated in a foreign currency is that the creditor should be put in the same position as if the defendant had complied with his obligations; i.e. the creditor should be made whole.  In *Miliangos* Lord Wilberforce stated that *"It is for the courts … to work out a solution in each case best adapted to giving the injured plaintiff that amount in damages which will most fairly compensate him for the wrong which he has suffered"*. When dealing with the practicalities of execution, that date should be the closest practicable date to the date of payment[2].

14.   The basic justice of the case does not change merely because the issue arises between the creditor and the shareholders of the debtor, as opposed to the debtor itself. The shareholders of the debtor are no more entitled than the debtor to require creditors to bear an exchange rate risk which, as a matter of contract, the parties had agreed would be borne by the debtor.

---

[2]   Outside of insolvency, foreign currency claims can be enforced, in an appropriate case, directly in the relevant foreign currency and any shortfall remaining after enforcement as a result of further currency movements can be recovered in a further enforcement; see *Choice Investments Ltd v Jeromnimon* [1981] 1 QB 149 and *Carnegie v Gissen* [2005] EWCA Civ 191.

15. The obvious justice of paying creditors whose claims are denominated in a foreign currency, in full, before any distributions are made to shareholders, is repeatedly and rightly emphasised in the decision of the majority in the Court of Appeal (see, in particular, Briggs LJ at [136], [153], [154], [156], [158] and [166], Moore-Bick LJ at [252]) and David Richards J at first instance at [90] and [98].

16. The justice of doing so is especially evident where, as here, the company is an unlimited liability company and the members have agreed to be ultimately liable for any outstanding amount of the company's debts that is not satisfied on enforcement.

## C.    IMPORTANT FEATURES OF THE INSOLVENCY PROCESS

17. Moore-Bick LJ at [252], when "*standing back for [a] moment to consider where the justice of the case lies*", referred to the decision of the House of Lords in *Miliangos* and said that "*This recognition of the need to give effect to the essential nature of foreign currency obligations suggests that, taken as a whole, the insolvency procedure should allow a foreign currency creditor to recover the true value of his debt, save to the extent that the demands of a pari passu distribution make that impossible. In my view in the case of a solvent company they do not*".

18. Neither a winding up nor an administration requires, let alone justifies, any distribution being made to shareholders in priority to paying creditors, including foreign currency creditors, in full in accordance with their underlying rights.  Such an outcome would be flatly inconsistent with fundamental principle and policy, the nature and effect of the statutory insolvency scheme and authority.

19. In this respect, it is important to bear in mind four important aspects of company and insolvency law:

    (1)    Creditors' claims have priority over the rights of shareholders *qua* shareholders.

    (2)    In an insolvency process creditors are to be paid in full before any distributions can be made to shareholders. The consequence of this principle is that, as between creditors and shareholders, a foreign currency creditor must be paid in full before any distributions can be made to shareholders.

4

(3)    All creditors with claims to a common fund should receive a *pari passu* share of that fund in the event of a shortfall. This principle regulates the position of creditors *inter se*. It requires the existence of a cut-off date for claims to be admitted to share in the fund and for such claims to be valued for the purposes of proof as at that cut-off date. The consequence of this is that, to ensure that the assets of the debtor are distributed *pari passu* amongst its creditors in respect of their proved claims, claims denominated in a foreign currency are valued as at the date of liquidation or administration by reference to the exchange rate on that date.  These rules are, however, concerned with the ensuring the *pari passu* treatment of creditors *inter se* and do not operate any further than is necessary for that purpose. If the outcome of the proof process is that the sterling dividends received by a foreign currency creditor, if converted at the date of receipt, are insufficient to discharge his claim in full, the creditor's claim must be paid in full before any distributions are made to shareholders.

(4)    If a winding up is to be a winding up, rather than a run-off, the rules must permit the collection and distribution of the company's assets to be concluded within a reasonable period. This is one reason why, for example, future liabilities are discounted to their present values and contingent claims are estimated.  The rules operate, however, to ensure that, save to the extent necessary to enable a company to be wound up within a reasonable period, creditors' rights are respected.  Thus, for example, the value of any contingent claim can be re-valued, with the benefit of hindsight, right up until the moment that any surplus is distributed to shareholders and indeed beyond. None of this has any impact on the right of a foreign currency creditor to be paid in full before any distributions are made to shareholders.  When any distribution is proposed to be made, the balance required to pay a foreign currency creditor in full is known. It does not permit distributions to be made to shareholders if a debt which is due and owing has not been paid and which, if the distribution is made, will never be paid.

20.    The insolvency process departs from the approach in *Miliangos* only to the extent necessary to ensure the *pari passu* treatment of creditors in the event of a shortfall.  Where the issue is not about the rights of creditors *inter se* but about the relative priority of creditors and shareholders, the basic justice of the approach in *Miliangos* reasserts itself.

5

21.    The basic flaw in the Appellants' case is that it seeks to apply rules, which are designed to ensure the *pari passu* treatment of creditors in the event of a shortfall, in a way which unjustifiably and unnecessarily infringes the fundamental principle that, as between creditors and shareholders, creditors are entitled to be paid in full before any distributions are made to shareholders, so as to produce a result that would be unjust for creditors.

22.    Briggs LJ was correct to say that the outcome contended for by the Appellants "*would merely cause a wholly unnecessary injustice, unsupported by any need to fulfil any policy requirement*" (at [154]).    The Appellants' case contains no satisfactory answer to this basic point.

## D.    STRUCTURE OF SIXTH RESPONDENT'S CASE

23.    The following sections of the Sixth Respondent's written case develop the following points:

(1)    It is a fundamental principle of company and insolvency law that the claims of creditors have to be satisfied in full before any funds can be distributed to shareholders (Section E below).

(2)    The general effect of the process of collective execution represented by a liquidation or a distributing administration is that the underlying debts of creditors are unaffected by the process and remain debts throughout and are discharged in the winding up or administration only to the extent that they are paid out of dividends or by way of insolvency set-off (Section F below).

(3)    This is consistent with the historical origins and development of the statutory insolvency scheme (Section G below).

(4)    These principles are reflected in the statutory waterfall which requires the assets of the company to be distributed in favour of provable debts, post-insolvency interest on proved debts, non-provable liabilities and shareholders in that order of priority (Section H below).

(5)    The statutory scheme requires the assets of the company to be distributed *pari passu* in respect of proved debts so that, in the event of a shortfall, they are all treated equally amongst themselves.    To achieve this, it is necessary to have a cut-off date

6

by reference to which claims are admitted to proof and to value such claims as at the date of liquidation. These rules are however intended to ensure the *pari passu* treatment of creditors as between themselves and accordingly apply for the purposes of proof and not for any other purpose (Section I below).

(6)    If there is a surplus, after payment of all prior ranking obligations in the statutory waterfall, it must be used to pay non-provable claims before any distributions are made to shareholders. Non-provable claims are any claims of creditors which, for one reason or another, are not discharged or are not discharged in full as a result of the payment of dividends or insolvency set-off in respect of proved debts (Sections J below; see also Sections K and L below).

(7)    Prior to 1986, the authorities dealing with claims denominated in a foreign currency established that, for the purposes of proof and to ensure *pari passu* distribution, such claims were valued by converting them into sterling as at the date of liquidation.  That valuation was not however in substitution for their underlying claims.  Consequently, creditors whose claims had not been satisfied in full as a result of the receipt of sterling dividends on their proved debt were, in the event of a surplus, entitled to be paid the unpaid balance of their claim before any distributions were made to shareholders (Section M below).

(8)    The 1986 Act and Rules did not alter the position.  To the contrary, the relevant rules were intended to codify the approach to such claims as set out in the decision of the Court of Appeal in *Re Lines Bros Ltd*.  In particular, Rule 2.86 provides that foreign currency claims are valued by converting them into sterling as at the date of administration "*for the purposes of proof*". Consistent with the pre-1986 position, Rule 2.86 did not create a new right in substitution for the underlying debt or extinguish that debt (Section N below).

(9)    The materials leading up to the introduction of the 1986 Act and Rules do not support the proposition that the confirmation of the common law position by the introduction of a specific rule, providing that for the purposes of proof foreign currency claims were to be valued by converting them into sterling, was intended to have a substantive effect and operate so as to substitute an obligation in sterling for what had previously been an obligation in a foreign currency (Section O below).

7

(10)   The rules dealing with set-off, contingent claims and disclaimer all support the conclusion that Rule 2.86 does not operate to give creditors a new sterling claim in substitution for and in discharge of their underlying foreign currency claim.  The Appellants are also wrong to suggest that non-provable foreign currency claims cannot exist in bankruptcy or that the Court of Appeal's analysis cannot apply in bankruptcy (Section P below).

(11)   The justice of paying creditors whose claims are denominated in a foreign currency in full before any distributions are made to shareholders, is self-evident.  The Appellants' attempts to answer the obvious injustice of not doing so are without merit (Section Q below).

(12)   Further issues would, of course, arise if the surplus was not sufficient to pay all non-provable claims in full.  This cannot, however, affect the basic analysis.  It simply reflects the fact that this aspect of the insolvency regime is not specifically dealt with in the statute or rules, but is a matter of judge-made law (Section R below).

(13)   None of the ten reasons relied upon by Lewison LJ or the further specific arguments made by the Appellants in their Written Case justifies the conclusion that currency conversion claims are effectively discharged by the collective process of winding up through the payment of sterling dividends which are insufficient to satisfy the foreign currency creditor's claim in full (Section S below).

## E.   CREDITORS FIRST AND MEMBERS LAST

24.   It is a fundamental principle of company and insolvency law (and trite law) that the claims of creditors have to be satisfied before any funds can be distributed to shareholders qua shareholders. The rights of members come last; per Lord Browne-Wilkinson in *Soden v. British & Commonwealth Holdings Plc* [1998] A.C. 298 at 324B-C.

25.   This principle is enshrined in Sections 107 and 143 of the 1986 Act and Rule 4.181. Thus, for example, section 143 provides, in relation to a compulsory liquidation, that:

> *"The functions of a liquidator of a company which is being wound up by the court are to secure that the assets of the company are got in, realised and distributed to the company's creditors and, if there is a surplus, to the persons entitled to it"*.

It has always been part of the duties of a liquidator to pay both provable and non-provable liabilities (see, further, paragraphs 62 and 63 below). Indeed, a failure to pay a debt of which the liquidator was or ought to have been aware had he performed his duties properly will result in a breach of statutory duty[3].

## F.    THE PROCESS OF COLLECTIVE ENFORCEMENT

26.    It is, as Moore-Bick LJ commented at [249], helpful to start with Lord Hoffmann's explanation in *Wight v Eckhardt Marine GmbH* [2003] UKPC 37, [2004] 1 A.C. 147 of the general nature and the effect (or lack of effect) of the collective winding up process on creditors' claims, as this provides the context within which the specific statutory rules operate. Lord Hoffmann said at [26] and [27]:

> *"[26] … It is first necessary to remember that a winding up order is not the equivalent of a judgment against the company which converts the creditor's claim into something juridically different, like a judgment debt. Winding up is, as Brightman LJ said in Re Lines Bros Ltd [1983] Ch 1, 20, "a process of collective enforcement of debts". The creditor who petitions for a winding up is "not engaged in proceedings to establish the company's liability or the quantum of the liability (although liability and quantum may be put in issue) but to enforce the liability"*.

> *[27]    The winding up leaves the debts of the creditors untouched. It only affects the way in which they can be enforced. When the order is made, ordinary proceedings against the company are stayed (although the stay can be enforced only against creditors subject to the personal jurisdiction of the court). The creditors are confined to a collective enforcement procedure that results in pari passu distribution of the company's assets. The winding up does not either create new substantive rights in the creditors or destroy the old ones. Their debts, if they are owing, remain debts throughout. They are discharged by the winding up only to the extent that they are paid out of dividends. But when the process of distribution is complete, there are no further assets against which they can be enforced. There is no equivalent of the discharge of a personal bankrupt which extinguishes his debts. When the company is dissolved, there is no longer an entity which the*

---

[3]    See, generally, McPherson, the Law of Company Liquidation at 9-138.

*creditor can sue. But even then, discovery of an asset can result in the company being restored to continue.*"

27. A central issue in *Wight v. Eckhardt* was whether "*the right to share in a liquidation is a new right which comes into existence in substitution for the previous debt*" (at [21]). Lord Hoffmann concluded that the right to share in a liquidation was not a new right which came into existence in substitution for the previous debt, stating that "… *the winding up order had no effect upon Eckhardt's debt …*" (at [35]). Two points are apparent from Lord Hoffmann's observations.

28. The first point is a general one which relates to the basic nature of the winding up process:

(1) Winding up operates, as between the creditors and the debtor, as one would expect from a process of collective execution. Creditors' claims are discharged only to the extent that they are paid out of the proceeds of execution and no distributions can be made to shareholders until creditors have been paid in full. The process is a process of execution by creditors against the assets of the debtor, not a compromise or arrangement between creditors and the debtor such as could be achieved by using a scheme of arrangement under Part 26 of the Companies Act 2006.

(2) The Appellants are wrong when it contends that Lord Hoffmann's comments were concerned solely with the effect of the winding up order as opposed to the process. He was not concerned solely with the effect of the order and his analysis is not limited in that way. Thus, when he referred to winding up, he referred to it as a "*process*" of collective execution. He also referred to the fact that the debts "*remain debts throughout*" and to the fact that "*they are discharged by the winding up only to the extent that they are paid out of dividends*" and that, unlike in bankruptcy, there is no provision for the discharge of the debtor.

(3) This analysis enables the scheme to operate consistently with the principle that creditors are entitled to be paid in full in priority to shareholders, despite the need, at the same time, to have rules which deal with the rights of creditors *inter se* in the event of a shortfall and which, for that purpose, may need to cut across creditors' underlying rights. Those rules only apply for the purposes of proof, and to

10

facilitate the making of *pari passu* distributions to creditors on their proved debts. They do not have effect, as between creditors and shareholders, so as to extinguish the underlying claim and replace it with a right solely to payment of the proved debt.

(4)    The description of the winding up process also closely reflects the way in which the statutory insolvency scheme originated and developed (see Section G below).

29.    Consistent with Lord Hoffmann's description of the winding up process, there is, as he said, no provision for the discharge of debts. Instead, the rules operate merely by providing that the office holder is not obliged to deal with proofs lodged after the last date for proving, and that a creditor who proves his debt late is not entitled to disturb earlier dividends; see Rules 11.3(2) and 4.182(2)[4].

30.    The second point is one that relates specifically to foreign currency claims. The decision in *Wight v. Eckhardt* is inconsistent with any suggestion that either the general process of collective execution or the specific requirement to value foreign currency claims by converting them into sterling at the date of liquidation for the purpose of proof has the effect of discharging the underlying debt and replacing it with an equivalent claim in sterling as at the date of liquidation. Thus:

(1)    The Appellant in that case sought to rely on the principle that claims of creditors are valued as at the date of the winding up order and on the fact that, as a result, no allowance is made for interest accruing after the winding up order or for subsequent exchange rate fluctuations which affect the sterling value of a debt in a foreign currency (at [23] and [24]). In this respect, it specifically relied on the decisions (which are considered in detail further below) in *Re Humber Ironworks* (1868) LR 4 Ch App 643 (which dealt with post-insolvency interest) and in *Re Dynamics Corporation of America* [1976] 1 WLR 757 and *In re Lines Bros Ltd* [1983] Ch 1) (which dealt with claims denominated in a foreign currency).

---

[4]    In *Armstrong Whitworth Securities Company* [1947] Ch 673 Jenkins J held that a creditor is entitled to submit a proof even after a liquidator has declared or made a partial distribution to shareholders and that the argument that the creditor was prevented from claiming "*ignore[s] the cardinal principle that in a winding-up shareholders are not entitled to anything until all debts have been paid*" adding that "*No case has been cited to me in which it has been held that r.104 has the effect as between creditors and shareholders of a company of defeating the claim of a creditor put in after a partial distribution amongst the shareholders, so far as regards the assets remaining undistributed at the date when the claim is received.*"

11

(2)    Lord Hoffmann's explanation of the winding up process specifically addressed the decisions in *Re Dynamics Corporation* and *Re Lines Bros Ltd*. Indeed, at [26] he started his observations by referring to the fact that "*Winding up is, as Brightman LJ said in Re Lines Bros [1983] Ch 1, 20 'a process of collective enforcement of debts'*" before continuing to explain the effect of that process.

(3)    *Re Dynamics Corpo*ration and *Re Lines Bros Ltd* must therefore be construed as having reached a conclusion that is consistent with Lord Hoffmann's description of the winding up process. As Moore-Bick LJ concluded at [250] "*… I find it difficult to reconcile these observations with the proposition that the conversion of a foreign currency debt into sterling for the purposes of proof has a substantive effect and operates so as to substitute an obligation in sterling for what had previously been an obligation in a foreign currency.*"

31.    Accordingly, *Wight v. Eckhardt* confirms that, absent any express specific statutory provision to the contrary, debts of creditors, if they are owing, "*remain debts throughout*" and "*are discharged by the winding up only to extent that they are paid out of dividends*" (at [27]) and that this is no less the position in relation to a debt denominated in a foreign currency as it is in relation to any other debt.

32.    It follows that a creditor with a claim denominated in a foreign currency who receives dividends in sterling which, if converted into the relevant foreign currency as and when paid to the creditor, are less than the full amount to which they are entitled under their contracts, has not had his underlying claim discharged in full.

33.    Given Lord Hoffmann's analysis it is, as Moore-Bick LJ stated, therefore "*not surprising … that a creditor who has a non-provable claim should be able to recover from the company if there are sufficient assets available after the satisfaction of all provable claims to enable it to do so*" (at [251]).

34.    In short, the liquidator having distributed the assets of the debtor *pari passu* between creditors and paid statutory interest, if there remains a surplus, the creditor is entitled, as against the shareholders, to say that his debt has not been discharged and that he is entitled to be paid in full.

35.    It also follows that what has been called a currency conversion claim is no more than "*the balance of the creditor's original contractual claim which has not been discharged by the process of early*

*conversion, proof and dividend under the relevant part of the insolvency scheme*" per Briggs LJ at [137]; see also Moore-Bick at [257].

36. It is therefore wrong to regard the statutory scheme as creating two new claims, namely a provable claim for the value as at the date of the commencement of the liquidation and a non-provable claim arising as the result of any foreign exchange movements after that date. The correct analysis is that there is simply an underlying foreign currency debt which has been discharged in part by the subsequent receipt of sterling dividends through the process of collective execution leaving a balance unpaid.

37. Lord Hofmann's description of winding up as "*a process of collective execution of debts*" which does not affect the underlying debt was not novel, as his citation from *Re Lines Bros Ltd* made clear. It closely reflects the origins of the statutory process (see Section G below) and his analysis has repeatedly been referred to and applied in later cases; see for example:

   (1) *Financial Services Compensation Scheme Ltd v Larnell (Insurances) Ltd* [2006] QB 808 per Lloyd LJ at 818 ("*It seems to me that Lord Hoffmann's analysis [in Wight v Eckhardt] is correct and that Judge Paul Baker QC was wrong to describe a creditor's rights under a contract (or in tort) as being converted into a trust. In so far as it is necessary to ascertain what the creditor's rights are, they have to be established in contract, tort, or otherwise as the case may be. The creditor's cause of action remains as it was before … It is only as regards giving effect to those rights in the insolvency that the rights are subjected to the statutory trust resulting from the duty of distribution imposed on the liquidator or trustee in bankruptcy*").

   (2) *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2006] UKPC 26 per Lord Hoffmann at [14] ("*The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established. That mechanism may vary in its details … In the case of personal bankruptcy, the bankrupt may afterwards be discharged from liability for his pre-bankruptcy debts. In the case of corporate insolvency, there is no provision for discharge. The company remains liable but when all its assets have been distributed, there is nothing more against which the liability can be enforced …*").

13

(3)  *Parmalat Capital Finance Ltd v Food Holdings Ltd* [2008] UKPC 23 per Lord Hoffmann at [8] ("*In other words, a winding-up order does not affect the legal rights of the creditors or the company.  It only puts into effect a process of collective execution against the assets of the company, for the benefit of all creditors*").

(4)  *Stichting Shell Pensioenfonds v. Krys* [2104] UKPC 41 per Lord Sumption and Lord Toulson at [32] ("*Liquidation is a mode of collective enforcement of claims arising under the general law*").

## G.  HISTORICAL DEVELOPMENT

38.  Lord Hoffmann's analysis reflects the fundamental nature of the relationship between the creditors and shareholders of a company and of the winding up process itself, which has existed ever since the origins of the modern law of limited liability and winding up.

39.  The modern regime of limited liability company law originated with the Companies Act 1862 (25 & 26 Vict c 89). This limited the liability of shareholders and, as a result, also removed the remedy of execution by the creditor directly against the shareholder, requiring instead such liability to be enforced through what was described as the collective process of winding up. However, it did not otherwise affect the relative rights or priority of creditors and shareholders or limit the extent of members' liability compared to that which existed under the previous regime.

40.  The position was considered in detail by the House of Lords in the leading case of *Oakes v Turquand* (1867) LR 2 HL 325; see Briggs LJ at [182]. As Lord Cranworth explained in detail (emphasis added):

(1)  Before the introduction of limited liability, creditors could issue execution directly against any shareholder in the event that execution against the company did not produce enough to satisfy their claims: "*the course which a creditor was to take in order to enforce a debt or demand, was to sue the incorporated company as his debtor, and having recovered judgment against that body, he was, in the first instance, to endeavour to levy his debt by an execution against it, and if that did not produce sufficient to satisfy him, then he was entitled to issue execution against any shareholder, or, within certain limits, against any of those who had been shareholders when his right arose*" (361).

14

(2)     The provisions which previously permitted a creditor to execute against a shareholder were repealed by the 1862 Act as a consequence of the introduction of limited liability: *"In the first place, all the enactments contained in the previous Acts for enforcing a debt or demand by execution against a shareholder are repealed. The creditor must, as under the former Acts, proceed **against** the company; but if, on recovering judgment **against** the company, he was unable to obtain satisfaction, he has no power to proceed **against** any individual shareholder. He must obtain an order for winding up the affairs of the company, by causing all its assets to be called in and distributed among all the creditors rateably, as in a bankruptcy"* (362).

(3)     The changes did not however make any difference as to who was liable as a shareholder: *"The first question then is, whether the change in the mode in which a creditor is obliged, under the Act of 1862, to seek relief, makes any difference as to who are liable to him as shareholders? I think not … I can discover nothing which would in such circumstances relieve from responsibility any person who, if there had been no change, would have been liable to an execution. <u>The winding-up is but a mode of enforcing payment</u>. It closely resembles bankruptcy, and a bankruptcy has been called a statutable execution for the benefit of all creditors. The same description may be given to a winding-up"* (363).

(4)     Nor were creditors otherwise intended to be affected by the introduction of limited liability: *"But if this change in the mode in which the creditor is to seek his remedy, makes no difference as to the persons liable to him, how is he affected by the introduction of the principle of limited liability? I cannot see that he is at all affected by it. His remedy is cut down in amount, but as to the persons liable to him the principle of limited liability has no effect. The introduction of that principle rendered necessary, as I have already stated, some substitute for the remedy by execution against individual shareholders, but it did no more. <u>It plainly left every shareholder subject to all previous liabilities</u>, except only that a line or boundary was fixed, beyond which his obligations could not be extended"* (364).

41.     The introduction of limited liability obviously had no necessary impact on unlimited liability companies. However, Lord Cranworth explained at (363) *"… experience had shown that the system of execution **against individual shareholders** often operated very unfairly, and the Legislature probably thought, and correctly thought, that companies with unlimited liability would be but few in number, and the remedy by winding up, which was necessarily adopted in the case of limited companies, was equally just and efficacious where there was no limit, and the same course of proceedings was therefore prescribed in both cases?"*. It remains the case, however, that the members of an

15

unlimited liability company are liable for any shortfall in payment of any debts which are outstanding at the time of any proposed distribution.

42. The position has remained essentially the same ever since. In *Ayerst (Inspector of Taxes) v C&K Construction Ltd* [1976] AC 167 Lord Diplock said at 176F "… *the making of a winding-up order brings into operation a statutory scheme for dealing with the assets of the company that is ordered to be wound up. The scheme is now contained in Part V of the Companies Act 1948 and extends to voluntary as well as to compulsory winding-up; but in so far as it deals with compulsory winding up its essential characteristics have remained the same since it was first enacted by the Companies Act 1862*".

43. Given that winding-up is a process of collective enforcement that, absent express statutory provision to the contrary, does not affect the underlying debt and limited liability operates merely to restrict the ability of the creditor to enforce its claim against shareholders beyond the limit of their liability, distributions cannot be made to shareholders where a creditor has not been paid in full and, if the distribution is made, will never be paid.

44. The fact that members of a company are entitled to wind up its affairs within a reasonable period, provides no justification for distributing the company's assets to them when, at the date of the proposed distribution, there are still outstanding debts of the company which are due and owing and which have not been paid in full. The need to be able to conclude the winding up of a company within a reasonable period does not justify failing to pay existing debts which remain due and owing but are unpaid when it is proposed to distribute any surplus to shareholders.

## H.    THE STATUTORY WATERFALL

45. The way in which the assets of a company in a winding up are to be distributed is governed by the statutory scheme. This addresses not merely the respective priority of creditors and shareholders but also other matters including the payment of expenses and the position of creditors *inter se*.

46. In *Re Nortel* Lord Neuberger said at [39]:

> "*In a liquidation of a company and in an administration (where there is no question of trying to save the company or its business), the effect of the insolvency legislation …, as interpreted and*

16

*extended by the courts, is that the order for payment out of the company's assets is, in summary terms, as follows:*

(1)    *Fixed charge creditors;*

(2)    *Expenses of the insolvency proceedings;*

(3)    *Preferential creditors;*

(4)    *Floating charge creditors;*

(5)    *Unsecured provable debts;*

(6)    *Statutory interest;*

(7)    *Non-provable liabilities; and*

(8)    *Shareholders."*

47.    The statutory waterfall confirms the general rule that members come last, reflecting the requirement that the company's property must be applied in satisfaction of its liabilities before it can be distributed to members (Sections 107 (voluntary winding-up) and 143 (winding-up by the court) of the Act). It also draws a distinction between certain types of claims by creditors, in particular between provable debts and non-provable liabilities.

48.    As the Court of Appeal (and David Richards J) held, currency conversion claims must be paid as part of category (7) (non-provable liabilities), after provable claims but before shareholders. This is because they are outstanding liabilities of the company in liquidation which are not eligible for proof but which, in accordance with the principle of members last, must be satisfied in full before any distributions are made to shareholders, and therefore rank as non-provable claims.

49.    It is, of course, open to a creditor to agree to subordinate payment of its debt to the payment by the debtor of other liabilities.  Whether and to what extent it has done so is a matter of construction of the relevant subordination agreement in each case. The Joint Administrators have addressed the effect of the subordinated debt agreements entered into by LBHI2 with LBIE, and the Sixth Respondent makes no submissions in this regard.

50.    It is helpful to make some general observations about provable and non-provable claims, before turning to deal with the authorities that consider specific kinds of non-provable claims, including currency conversion claims.

17

## I.    PROVABLE DEBTS - GENERAL

51.    The statutory scheme requires the company's assets to be distributed, after payment of various prior debts and expenses, *pari passu* in satisfaction of its provable debts (category (5) as referred to by Lord Neuberger).

52.    The statutory scheme includes various rules which are intended to ensure that this occurs.  In particular, in order for such a *pari passu* distribution between creditors to occur two things are necessary:

(1)    First, it is necessary to have a cut-off date by reference to which claims are admitted to proof thus enabling creditors to participate in the *pari passu* distribution; see *Re Nortel* per Lord Neuberger at [35] and per Lord Sumption at [130] ("*… the scheme depends on there being a common date as at which the fund falls to be valued and distributed pari passu …*").  The cut-off date is given effect, in a liquidation, by Rules 12.3 and 13.12.

(2)    Secondly, it is necessary for claims to be valued for the purposes of proof as at the cut-off date.  As Lord Hofffmann said in *Wight v. Eckhardt* at [28] "*The purpose of the rule that debts are valued at the date of winding up is to give effect to the principle of pari passu distribution.  It is a principle of fairness between creditors*".  The rules dealing with the valuation or quantification of unsecured claims, in a liquidation, are contained in Rules 4.86 to 4.94.

53.    As discussed below, the authorities hold that any balance of a foreign currency liability that remains unpaid as a result of exchange rate movements after the date of liquidation is not a provable claim as it is not captured by the rules which address these two requirements.

54.    It is sometimes said that the liquidation of a company and the distribution of its assets are to be treated as being notionally simultaneous.  However, even in the context of *pari passu* distribution in respect of provable debts, this characterisation does not operate as a rigid rule.  As Lord Hoffmann said in *Wight v. Eckhardt* at [29] "*The image of collecting and uno flatu distributing the assets of the company on the day of the winding up is a vivid one, but the courts apply it to give effect to the underlying purpose of fair distribution between creditors pari passu and not as a rigid rule*".  Thus, as he explained at [32], hindsight is used to re-value provable debts which

18

were contingent at the date of the winding up order with the result that "*Adjustments are made to give effect to the underlying principle of pari passu distribution between creditors*".

55.    To the extent that such rules dealing with the admission and valuation of claims depart from a creditor's contractual entitlement, they do so solely for the purposes of proof and not for any other purpose; Briggs LJ at [157] and Moore-Bick LJ at [257]; see also David Richards J at [110].  As Lord Hoffmann said, the rules exist to give effect to the principle of *pari passu* distribution and are concerned with fairness between creditors.  They do not apply any further than is strictly necessary for this purpose.

## J.    NON-PROVABLE LIABILITIES - GENERAL

56.    Non-provable liabilities are any claims of creditors which, for one reason or another, either are not provable at all or are not discharged in full as a result of the payment of dividends in respect of proved debts; see Lord Neuberger in *Re Nortel* at [54] ("*The third possibility is that it is not a provable debt within rule 13.12 and therefore it falls within category (7)*") (emphasis added).  A currency conversion claim is therefore a non-provable claim.

57.    The statutory provisions which identify which claims are provable and which claims are not provable have changed as, over the last three hundred years, the legislature has progressively widened the class of provable debts and correspondingly narrowed the class of non-provable liabilities.

58.    A short summary of the history was given by David Richards J in *Re T&N Ltd* [2005] EWHC 2870 at [76] to [85].  In brief:

(1)    Initially the concept of provable debts was very narrow.  Under Section 7 of the Bankrupts Act 1705 (4&5 Ann c 17), it was only liquidated debts that fell due for payment prior to the commencement of a bankruptcy that were provable. Everything else was non-provable with the result that the category of non-provable claims was very broad. The consequence in bankruptcy was that, although creditors with non-provable claims could not prove in the bankrupt's estate, they could continue to seek to recover those claims in the event of a surplus and also, prior to the introduction of the concept of discharge, from the bankrupt himself; see, for example, the decision in *Bromley v Goodere* (1743) 1 Atk 75.

19

(2) Proof in respect of certain types of contingent claims was increasingly permitted by Section 2 of the Bankrupts Act 1745 (19 Geo II c 32), Section 8 of the Bankrupts Act 1809 (49 Geo III c 121), Section 54 of the Bankrupts Act 1824 (5 Geo IV c 97), Section 178 of the Bankrupt Law Consolidation Act 1849 and Section 31 of the Bankruptcy Act 1869.

(3) In contrast, unliquidated claims for damages in tort were, for a long time, not provable in bankruptcy or corporate insolvency, originally because they were regarded as arising from personal wrongdoing by the bankrupt; see *Re T&N Ltd* at [77]. Indeed, certain of such claims were only admitted to proof by Section 382(2) of the 1986 Act and rule 13.12(2), with the latter rule being further amended following the decision in *Re T&N Ltd*.

59. The Appellants suggest that non-provable claims are claims which have been overlooked by the legislature. It may be more accurate to say that the view of the legislature as to what claims should as a matter of policy be provable has, over the years, changed so as to include more claims as provable claims.

60. As Lord Neuberger indicated, however, in *Re Nortel*, the category of non-provable claims, whilst it has been progressively narrowed, continues to exist (at [90] and [93]). Rule 12.3(2), for example, identifies certain specific categories of claims which are expressly provided to be non-provable and Rule 12.3(3) states that "*Nothing in this Rule prejudices any enactment or rule of law under which a particular kind of debt is not provable, whether on grounds of public policy or otherwise*"[5].

61. Whilst the category of claims which are non-provable has, as a result, narrowed over the years, it is important to note that this has been as a result of the legislature progressively widening the class of provable claims so as to enable creditors to share in the assets of

---

[5]   Even following the amendment to the Rules following the decision in *Re T&N*, unliquidated claims for damages in tort are only provable if "*all the elements necessary to establish the cause of action exist at that date except for actionable damage*": see Rule 13.12(2)(b). Prior to the decision in *Re Nortel* there was, for example, also a long line of cases which held that a claim for costs in litigation where the order for costs was only made after the date when the company went into liquidation was not provable; see Lord Neuberger at [87] to [90]. Those authorities dealing with orders for costs have now been overruled. However, it remains the case that where, for example, the liability derives from an obligation under an enactment, Rule 13.12(1)(b) excludes from proof any debt or liability to which the company became subject after the insolvency date which did not arise by reason of any obligation under an enactment incurred before that date. In *Re Nortel* Lord Neuberger set out at [77] the requirements which have to be satisfied for an obligation under an enactment to be treated as having been incurred before the relevant cut-off date.

20

the debtor in the event of a shortfall, not because it has decided that certain previously non-provable claims should be irrecoverable.

62.    Not all non-provable claims can be regarded as existing simply because they have been overlooked or excluded from proof for some specific policy reason. A claim may also be non-provable as a consequence of the general requirement that the assets of the company be distributed *pari passu* amongst its creditors and because it does not satisfy the consequential requirements for a cut-off date and the need to value claims as at the date of the insolvency:

(1)    The consequence of the fact that, as Lord Neuberger said in *Re Nortel* at [35], "*there has to be a cut-off date to determine the class of creditors who are to participate in the distribution of the company's available net assets*", is that any claim which does not 'exist' in the required sense prior to the cut-off date will necessarily be non-provable. As explained below, such claims include, for example, claims for unliquidated damages in tort where the relevant elements of the cause of action only accrued after the date of liquidation.

(2)    Certain claims or parts of claims are excluded from proof on the basis that they are regarded as incompatible with the *pari passu* distribution of the company's assets in respect of proved debts. Thus, for example, a right to interest under a contract in respect of the period after the date of the winding up order is not provable[6]. As discussed further below, the position is similar in relation to claims denominated in a foreign currency.

63.    Non-provable claims are, as Lord Neuberger indicated in *Re Nortel*, paid after provable claims and post-insolvency interest, but before any distributions are made to shareholders. This has always been the effect of the statutory scheme as interpreted by the courts, although this has become increasingly less visible in practice as the category of provable claims has widened and the category of non-provable claims has correspondingly narrowed.

---

[6]    Prior to 1986 a right to interest in respect of the period after the winding up order was regarded as a non-provable claim. However, in the event of a surplus after payment of all provable debts, it was payable in priority to any other non-provable claims. The position is now specifically addressed by Section 189(2) of the 1986 Act and Rule 2.88(7) of the Rules. As referred to above, as Lord Neuberger indicated in *Re Nortel* at [39] post-insolvency interest ranks after all proved debts but before other non-provable liabilities.

64. As Briggs LJ stated *"It has in my view always been part of the duties of a liquidator to pay the company's non-provable liabilities, to the extent that there are assets available for that purpose after payment of provable debts and (now) statutory interest … it is plainly not the case (and never has been) that the liquidator may distribute to members without regard to non-provable liabilities "* (at [185] to [286]); see also per Briggs LJ at [188], [189] and [203]; per Moore-Bick LJ at [246]; and Lewison LJ at [56], [60] and [121].

65. The statute has, however, never set out in any detail how such claims should be dealt with. As Briggs LJ commented, *"the rules by which distribution of the assets of a solvent company (solvent in the sense that provable debts could be paid in full) were effected were almost entirely judge-made"*; see at [140]. This has been the position ever since the introduction of the modern winding-up process when the category of non-provable claims was very much wider than it presently is.

66. It is next helpful to say something about how the insolvency regime operated before 1986 in relation to particular examples of non-provable claims, in particular: (a) unliquidated claims for damages in tort which did not exist as at the date of liquidation; and (b) post-insolvency interest; before addressing the pre-1986 cases which deal specifically with claims denominated in a foreign currency.

67. The relevant authorities illustrate that the mere fact that a claim does not satisfy the rules for provable claims does not mean that it has been discharged or extinguished. Instead, the consequence is that it ranks as a non-provable claim. Thus, for example, the fact that a claim may only have come into existence since the date of liquidation and thus after the cut-off date for the purposes of proof does not mean that it never has to be paid. Instead, it will rank as a non-provable claim which must be discharged in full before any distributions are made to shareholders.

## K.    TORT CLAIMS WHICH DO NOT EXIST AT THE CUT-OFF DATE

68. An unliquidated claim for damages in tort which has only come into existence after the cut-off date of the start of the liquidation and which therefore does not qualify as a provable claim constitutes a non-provable claim which has to be paid before any distributions are made to shareholders.

69. An example of this in the context of the pre-1986 regime is given by *R-R Realisations Ltd* [1980] 1 WLR 805[7]:

    (1) The company went into liquidation in October 1971. Subsequently in 1976 there was an accident at Bombay airport involving an aircraft powered by the company's engines and, following publication of the results of an inquiry in September 1978, various writs against the company were issued but not served on behalf of victims or their families.

    (2) The liquidators, who had paid all the company's known debts and paid a substantial sum to stockholders, issued a summons asking for leave to distribute the company's assets remaining in their hands among creditors and stockholders without providing for payment for any claim which might be owed by the company arising from the accident.

    (3) Megarry V-C commented that "*just as a man should seek to be just before he affects to be generous, so I think that an especial care is needed to ensure that all creditors are paid before distributions are made to the members*" and referred to the fact that the statute provided that "*It is only subject to the satisfaction of the company's liabilities that the company's property is distributed among the members*" (at 811D). He concluded that "*If I apply those conclusions to the present case, it becomes plain that the application must be refused*" adding that "*I have no doubt where the balance of justice lies*" (at 814D-E).

70. In *Re T&N Ltd* David Richards J agreed that "*It would indeed be extraordinary if a company's assets could be, and were required to be, distributed to shareholders without paying tort claims which had accrued since the liquidation date, or other claims not provable in the liquidation …*" (at [107]). He also said that, if necessary, the court would be prepared, as the case may be, either to lift the statutory stay on proceedings against a company in compulsory liquidation or refuse to grant a stay if the company was in voluntary liquidation, on the basis that "*where all provable debts have been paid in full and there is a surplus otherwise available for shareholders, I can see*

---

[7] See also *Islington Metal & Plating Works Ltd* [1984] 1 WLR 14 especially at 22-24 where Harman J referred at 24F-G to "*… the gross injustice which would be caused by ruling out a claim, in a liquidation where all "undoubted" creditors have been paid, by persons such as the tort claimants here is a consideration as must impel any judge to try and find a way of allowing them to prove*".

*no reason why the court would restrain a tort claimant from obtaining or executing a judgment*" (at [107])[8].

71.    The fact that non-provable claims which only came into existence after the date of liquidation and thus after the cut-off date have to be paid before any distributions are made to shareholders is entirely consistent with the fact that creditors have priority over shareholders and with the fact that creditors' underlying rights are discharged by the insolvency regime only to the extent that they are paid out of dividends. It is also consistent with treating currency conversion claims as non-provable liabilities.

## L.    CLAIMS FOR POST-INSOLVENCY INTEREST – PRE-1986 CASES

72.    The general effect of the statutory scheme in relation to provable and non-provable claims, as interpreted by the courts, can also clearly be seen from the authorities prior to 1986 which deal with claims for interest accruing after the date of liquidation under a pre-liquidation contract.

73.    The pre-1986 authorities dealing with post-insolvency interest are important because the reasoning in them was relied upon in *Re Dynamics Corporation* and *Re Lines Brothers* when considering the correct approach to foreign currency claims.

74.    The leading authority is the seminal decision of the Court of Appeal in *Re Humber Ironworks and Shipbuilding Co* (1869) LR 4 Ch App 643.   The judgments deal with the position both where the company is insolvent and unable to pay its proved debts in full and also with the position where there is a surplus:

(1)    Where the company is insolvent, nothing is allowed in respect of interest after the date of the winding up order. Selwyn LJ famously explained at 646-7 that "*I think the tree must lie as it falls; that it must be ascertained what are the debts as they exist at the date of the winding up, and that all dividends in the case of an insolvent estate must be declared in respect of the debts so ascertained*".

---

[8]    An example of the court taking such a course is *Gerard v. Worth of Paris Ltd* [1936] 2 All ER 905 where the Court of Appeal refused to grant a stay of garnishee proceedings against a company in member's voluntary liquidation which appeared to be solvent, Slesser LJ commenting at 910 that "*So far as we know, there are no other creditors, and that fact alone seems to me a sufficient reason*".

24

(2)     The position is different where there is a surplus. In this event, the creditors are described as being remitted to their rights under their contracts. Selwyn LJ said at 646 "… *I have already guarded myself from being supposed to say that the Court takes upon itself to alter the rights of the creditors to any further extent, or to deprive them of the right they have to interest at the full rate of £20 per cent if and when there is a surplus to pay it*". As Giffard LJ said at p.647, "*as soon as it is ascertained that there is a surplus, the creditor whose debt carries interest is remitted to his rights under the contract …*" In the event of a surplus, therefore, a creditor is entitled to be paid any post-insolvency interest to which he is entitled under his contract in priority to any distributions to shareholders.

(3)     The outcome was regarded as the just one. Selwyn LJ commented at 645 "*It is satisfactory that in forming that decision we are not fettered by any rule which obliges us to depart from what appears to us to be the justice of the case*".

75.     The effect of the decision in *Re Humber Ironworks* was therefore that, in corporate insolvency prior to 1986, a creditor was only entitled to prove for interest which had accrued up to the date of liquidation. However, a creditor who had an underlying right to interest was entitled to claim interest in respect of the period after the date of liquidation as a non-provable claim which was payable out of any surplus and in priority to any distribution to shareholders[9]. The creditor was able to do so by relying on its pre-existing right to interest under its contract that was not discharged by the liquidation. The language of remission to rights was just another way of expressing the point made by Lord Hoffmann in *Wight v Eckhardt*.

76.     There are a number of other pre-1986 authorities dealing with post-insolvency interest which are to similar effect. They include:

(1)     *Re W.W. Duncan & Co* [1905] 1 Ch 307 per Buckley J at 315 "*Now what do you admit to proof for dividend in the winding up of a company? The amount of the debt at the commencement of the winding up. That has nothing whatever to do with the payment of interest accruing due after the winding up if the company turns out to be solvent. There could not until the fact of solvency was ascertained be a right to claim that interest. The sum for which proof can be made is the amount which is entitled to rank for dividend against the assets*

---

[9]     At this stage, unlike the position in bankruptcy, absent such an underlying right to interest, the creditor was not entitled to interest for the delay caused by the insolvency. That defect was corrected by the 1986 Act (see below).

25

> *to such an extent as they will go. A compromise in respect of that right of proof is no compromise of the right to have interest if the company turns out, as it has in this case, to be solvent. I think, therefore, the liquidator ought to pay to the creditors of the classes D, E, and F, out of the surplus assets of the company, after paying 20s. in the pound, interest according to the rate which prevailed during the course of dealings between the company and the customers …”.*

(2)    *Re Fine Industrial Commodities Ltd* [1956] 1 Ch 256.  In that case Vaisey J commented at p. 262 that "… *it seems to me that when the time comes for dealing with the surplus it must no longer be deemed to be an insolvent company, but has to be treated as a company which is, and was, and always has been, solvent*" and referred in support of this at 263 to the judgment of Giffard LJ in *Re Humber Ironworks.*

77.    *Re Humber Ironworks* has been referred to with approval in subsequent authority at the highest level, including, as already mentioned, by Lord Hoffmann in *Wight v Eckhardt* at [23] and [24].

78.    The approach and reasoning in *Re Humber Ironworks* is consistent with the principle that shareholders come last and with the general effect of the process of collective execution, which is intended to be consistent with that principle.  Absent express statutory provision to the contrary, creditors' claims are not discharged by the insolvency process, save to the extent that they are actually paid. The various rules relating to proof, which are necessary to ensure that the assets of a company are distributed *pari passu* amongst its creditors in respect of their proved claims, do not apply if the issue is between creditors with non-provable claims and shareholders. Creditors are entitled to have their underlying claims satisfied in full, before any distributions are made to shareholders.

79.    This approach is consistent with treating currency conversion claims as non-provable liabilities which must be paid in priority to any distributions to shareholders, to which matter this Written Case now turns.

## M.    FOREIGN CURRENCY CLAIMS – PRE-1986

80.    Prior to 1986, the authorities dealing with claims denominated in a foreign currency established that, for the purposes of proof, such claims were valued by converting them into sterling as at the date of liquidation.  Such authorities are also consistent with the

fact that this was not in substitution for their underlying claims, with the result that such creditors were entitled to be paid any unpaid part of the full amount that they were owed, as a non-provable liability out of any surplus before any distributions were made to shareholders.

81.    The authorities in relation to foreign currency claims are more recent and less extensive than those dealing with post-insolvency interest, no doubt partly because, prior to the development of international trade and increasing foreign exchange fluctuations, the problem was not a material one and partly because, prior to the decision of the House of Lords in *Miliangos*, it was assumed that an English court was not entitled to give judgment for a sum of money expressed in a foreign currency.

### (1)    Re Dynamics Corporation of America

82.    The correct approach to the admission and valuation of claims denominated in a foreign currency for the purposes of proof, following the decision of the House of Lords in Miliangos, was first considered by Oliver J in *Re Dynamics Corporation of America* [1976] 1 WLR 757.

83.    *Re Dynamics Corporation* concerned a company that was insolvent and would be unable to to pay all provable debts in full.  The issue concerned the correct approach, following the decision of the House of Lords in *Miliangos*, to the valuation of claims denominated in a foreign currency for the purposes of proof.  The liquidator issued a summons seeking to determine whether the liquidator should value the claims by converting them into sterling on, amongst other dates, the date of commencement of the winding up, the date on which the proof for each such debt was admitted or the date on which distributions were to be made to creditors (759C-E).

84.    It is important to appreciate that the issue in *Re Dynamics Corporation* concerned the correct date to determine the exchange rate to be used for the purposes of valuing claims for the purposes of proof given the requirement of *pari passu* distribution.  It was not concerned with what the position would be if, after all proved debts and post-insolvency interest had been paid in full, there was a surplus.  There was no discussion in relation to non-provable claims.

85.   Oliver J's approach, in the context of the valuation of such claims for the purposes of proof, was as follows:

(1)   He identified the need for a common unit of account for provable debts: "*It is, of course, necessary in a liquidation, if a proportionate distribution among creditors of the available assets is to be achieved, that the claims of all creditors be reduced at some stage to a common unit of account*" (761D).

(2)   He referred to the need to value provable claims as at the date of the winding up: "*I take it to be well established that the purpose of both the Bankruptcy Act 1914 and its predecessors, and of the winding up provisions of the Companies Act 1948 and its predecessors, was to ascertain the liabilities of the bankrupt or of the company, as may be, as at the date of the bankruptcy or liquidation, and to secure the division of the debtor's property among the claimants pro rata according to the value of their claims at that date*" (761G-H and 763C-764E).

(3)   He drew an analogy with the position in relation to post-insolvency interest saying that it was no doubt for this reason that: "*a creditor claiming in respect of an interest bearing debt due and payable before the bankruptcy or winding up, cannot, in general, claim interest beyond the date of the bankruptcy or winding up*".  In this context he referred to the decision of the Court of Appeal in *Re Humber Ironworks* and quoted a lengthy extract from the judgment of Giffard LJ (762C to 763B).  Although he was, obviously, concerned solely with provable debts in the context of an insolvent company, he did not suggest that the approach of the Court of Appeal in *Re Humber Ironworks* to a situation where there was a surplus was incorrect.

(4)   He explained that such an approach was necessary if a *pari passu* distribution of the assets of an insolvency company was to be achieved: "*It is only in this way that a rateable, or pari passu, distribution of the available property can be achieved …*" (764E-F).

(5)   He discussed the correct date for valuing a claim denominated in a foreign currency for the purposes of proof, saying that "*What he is directed to do by the form of proof (and what all the previous authorities direct him to do) is to indicate the value of the claim at the date of the winding up*" (767E) saying that, if he is required to value his claim for the purposes of proof as at the date of the winding up, "*then the only appropriate value can, as I see it, be the exchange rate prevailing at that date, for that is the value which it actually would have had if it were then paid*" (767F-G).

28

(6)    He applied this approach to proofs of debt in respect of foreign currency claims: *"What the court is seeking to do in a winding up is to ascertain the liabilities of the company at a particular date and to distribute the available assets as at that date pro rata according to the amounts of those liabilities. In practice the process cannot be immediate, but notionally I think it is, and, as it seems to me, it has to be treated as if it were, although subsequent events can be taken into account in quantifying what the liabilities were at the relevant date. In the context of a liquidation, therefore, the relevant date for the ascertainment of the amount of liability is the notional date of discharge of that liability and … that date must, in my judgment, be the same for all creditors and it must be "the date of payment" for the purposes of any judgment which has been entered for the sterling equivalent at the date of payment of a sum expressed in a foreign currency"* (774G to 775A).

86.    Oliver J was concerned with the proper approach to foreign currency claims for the purposes of proof. A departure from the justice of the position as reflected in *Miliangos* was required to ensure the *pari passu* treatment of creditors in respect of their proved claims. There was no prospect of a surplus and thus no consideration of the position of non-provable claims in the event of a surplus.

87.    The decision in *Re Dynamics Corporation* is inconsistent with any suggestion that the conversion of a foreign currency debt into sterling for the purposes of proof operates to substitute an obligation in sterling for what had previously been an obligation in a foreign currency:

(1)    Oliver J was concerned with the correct approach to *valuing* a foreign currency claim for the purposes of proof, so as to provide a common currency of account. There is nothing in a process of valuation which necessitates the discharge of the underlying foreign currency claim and its replacement by a sterling claim.

(2)    He expressly adopted the approach of the Court of Appeal in *Re Humber Ironworks* to claims for interest (761G-763B). That case is inconsistent with any suggestion that the process of valuation of claims for the purposes of proof or the distribution of assets *pari passu* in respect of proved debts extinguishes a creditor's underlying claim to the extent that it is not provable or entitles a liquidator to ignore a non-provable claim when dealing with any surplus.

(3)   Oliver J's reasons for holding that such claims should be valued by reference to the exchange rate at the date of liquidation, rather than the date on which the proof for each such debt was admitted or the date on which distributions were to be made to creditors, were all based on the need to ensure a *pari passu* distribution of assets in respect of proved assets in an insolvent estate. None of those reasons is relevant where the court is concerned with a different situation where all proved debts and post-insolvency interest has been paid in full, and the issue is between creditors with non-provable claims and shareholders.

(4)   Given that there was, at the date of the case, no provision of the statute or rules which dealt with the conversion of foreign currency claims, there was no provision which Oliver J could have held had the effect of discharging the underlying foreign currency claim and substituting a new sterling claim.

### *(2)   Re Lines Bros Ltd*

88.   Further consideration was given as to the correct approach to foreign currency claims by the Court of Appeal in *Re Lines Bros Ltd* [1983] 1 Ch 1.

89.   The factual situation was slightly different. The liquidator had been able to pay all debts proved in full, for these purposes converting foreign currency claims into sterling at the exchange rate applicable at the date of liquidation, leaving a surplus. The surplus was not, however, sufficient to pay in full both post-insolvency interest and the balance owed in respect of foreign currency claims. The competition was therefore between creditors entitled to post-insolvency interest and creditors with foreign currency claims who had received less than the full amount that they were owed. There was no prospect of a distribution to members.

90.   It is important to appreciate the argument in that case. In *Re Lines Bros*, the Swiss currency creditor challenged the liquidator's approach to the admission of foreign currency claims for the purposes of proof. Its argument was, in essence, that the practice of converting foreign currency claims for the purposes of proof at the date of the commencement of the liquidation was, following the judgment of the House of Lords in *Miliangos*, now incorrect. In particular:

30

(1) It focussed on what "*pari passu*" distribution for the purpose of Section 302 of the Companies Act 1948 required (see 5D-G, and 7H-8F). It argued, in short, that, in the light of the judgment in *Miliangos*, *pari passu* distribution of the assets of an insolvent company for the purposes of proof required that, when dividends were paid, creditors received the same % of their underlying debt, irrespective of the currency in which the debt was owed (i.e. a dividend of 20% should lead to the receipt of £20/£100 debt, and $20/$100). It was argued that this is what "*pari passu*" meant.

(2) This argument, if accepted, would have required a re-calculation of the relative value of such claims as at the date of each dividend payment, taking into account the then applicable exchange rate, rather than using at all times the exchange rate as at the date of the commencement of the liquidation (i.e. there would not be a "*once and for all*" conversion as at the date of the liquidation for the purposes of proof, but multiple conversions depending on the timing of the dividend payments). This would enable the foreign currency creditor to obtain full payment of its underlying foreign currency debt before any question of post-insolvency interest arose.

91. The argument in *Re Lines Bros* was therefore also concerned with how foreign currency claims were to be valued for the purposes of proof. Unlike the present case, it was not concerned with whether, once proved debts and post-insolvency interest had been paid in full, creditors with foreign currency claims which had not been satisfied in full were entitled to be paid before any distributions were made to shareholders. The comments of the Court of Appeal, in particular in relation to whether, when valuing such claims for the purposes of proof, any conversion was to be "*once and for all*", need to be understood in that context.

92. The argument was rejected, the Court of Appeal holding that the old practice of valuing foreign currency claims for the purposes of proof by converting them into sterling at the exchange rate at the date of liquidation was correct. In considering how such claims should be treated for the purposes of proof, the Court of Appeal relied on the reasoning and approach, in the context of post-insolvency interest, adopted in *Re Humber Ironworks*:

(1) Lawton LJ stated at p.14F-G "*Ever since Re Humber Ironworks and Shipbuilding Co., LR 4 Ch App 643 it has been the practice to value the fund as at the date of liquidation. I can see*

31

*no reason why a different date should be fixed merely because one or more of the liabilities is stated in a foreign currency".*

(2)    Brightman LJ observed that *"The argument of the bank is that the conversion is to be recalculated from time to time"*(p.15F). He described the policy behind the *Miliangos* decision as being that *"the foreign currency debtor should not be entitled to impose on the foreign currency creditor the risk of a fall in the value of sterling. Justice demands that the risk shall be borne by the debtor, who is the party in default"* (16D), but said that such reasoning *"has no role to play in the distribution of the assets of an insolvent company"* where the competition for assets was between creditors (16D) because *"there is no particular reason, in the field of abstract justice, why the currency risks should be borne by one description of creditor rather than by another description of creditor when they are all directed to rank pari passu"* (16F). Brightman LJ concluded that *"The just course, as it seems to me, is to value the foreign debt once and for all at an appropriate date and to keep to that rate of conversion throughout the liquidation until all debts have been paid in full"* (16G).

93.    There is nothing in the reasoning which led to this conclusion which suggests that the conversion of a foreign currency debt into sterling for the purposes of proof operates to substitute an obligation in sterling for what had previously been an obligation in a foreign currency.

(1)    As in *Re Dynamics Corporation*, the Court of Appeal was simply concerned with valuing foreign currency claims for the purposes of proof so as to ensure a *pari passu* distribution.

(2)    The Court of Appeal cited *Re Humber Ironworks* with approval, Lawton LJ expressly commenting that *"When the liquidation starts, no further liabilities under contract become payable until such time as it is clear that the pre-liquidation liabilities have been satisfied in full; see Re Humber Ironworks …"* (14C) (emphasis added).

(3)    The statement that the just course is to value the foreign currency debt *"once and for all"* (16G) has to be understood in the context of the bank's argument that *"the conversion is to be re-calculated from time to time"* so that, on each dividend, each creditor received the same % distribution on its underlying claim (i.e. a dividend of 20% should lead to the receipt of £20/£100 debt, and $20/$100) (5D-F, 15F).

32

94.   The Court of Appeal also considered *obiter* the position in the event that there was a surplus after payment of all proved debts and post-insolvency interest and the issue was between the creditor whose foreign currency claim had not been satisfied in full and shareholders.

(1)   Brightman LJ stated at the start of his judgment that he would deal separately with the position which arises in relation to the surplus assets of the company remaining after its indebtedness so calculated as been paid in full (15D) and returned to deal with this issue at 20H to 22A.  He referred to the principle that, in the event of a surplus, creditors are remitted to their contractual rights: "… *when the problem arises for decision, it may be relevant to observe that the view has repeatedly been expressed in relation to interest that once the provable debts have been satisfied in full, so that the company has in that sense a surplus of assets, the duty of the liquidator is to discharge the contractual indebtedness of the company in respect of such debts to the extent that the contractual indebtedness exceeds the provable indebtedness.  '[A]s soon as it is ascertained that there is a surplus, the creditor whose debt carries interest is remitted to his rights under his contract …' per Giffard LJ in In Re Humber Ironworks and Shipbuilding Co., LR 4 Ch App 643, 647; and Selwyn LJ to the same effect, at p.645*" (21D-E).  He suggested that, given this, a liquidator may be under a duty to make good the shortfall before distributing the surplus: "*It may well be the duty of the liquidator, in the case of a wholly solvent liquidation, if a foreign currency creditor has been paid less than his full contractual currency debt, to make good the shortfall before he pays anything to shareholders*" (21F-G).

(2)   Oliver LJ, whilst also making it plain that the point should be left open for decision, said that certainly for his part he did not dissent from the proposition that the answer in a solvent situation may well be found in the way suggested by Brightman LJ (26F). The passage at (25) (relied upon by Lewison LJ at [79] of his judgment) has to be read both in the context of the argument being made and this subsequent acknowledgment.

95.   The discussion by Brightman LJ and Oliver LJ as to the position in the event of a surplus, where the issue was between creditors whose foreign currency claims had not been paid in full and shareholders, could not logically have arisen if the prior process of converting those claims into sterling for the purposes of proof had operated substantively by extinguishing the original underlying claim and substituting for it an equivalent claim in sterling.   The phrase "*once and for all*" cannot therefore have been

intended to mean that any exchange rate movements after the date of liquidation are irrelevant even if there is a surplus that would otherwise be distributed to members or to exclude the possibility of a non-provable claim in that event.

96.     Briggs LJ at [142] described both *Re Dynamics Corporation* and *Re Lines Bros Ltd* as decisions which were a judge-made adjunct to the law of bankruptcy (which was equally applicable to winding-up of an insolvent company) and the legal process of proof of debts. They proceeded "*by requiring that, as an exception to the Miliangos principle, proof of the debt constituted by a foreign currency obligation required conversion into sterling at the cut-off date, so that all proving creditors would be treated equally, in a single unit of account.*" The *obiter* comments referred to above regarding the position relating to currency conversion claims in a "solvent" liquidation recognised "*the injustice which might flow if a cut-off date conversion was rigidly applied*" (at [143]).

97.     The decision of the Court of Appeal in *Re Lines Bros* has also been cited and approved by subsequent authority at the highest level. It is to be noted that, as already mentioned, Lord Hoffmann's explanation of the winding up process in *Wight v Eckhardt* specifically addressed the decisions in *Re Dynamics Corporation* and *Re Lines Bros*. It has never been suggested in any of the cases that Brightman LJ's analysis of the position in the event of a surplus is incorrect.

98.     The position prior to the introduction of the 1986 Act and Rules was therefore that the valuation of a foreign currency debt in sterling for the purposes of proof did not operate to substitute an obligation in sterling for what had previously been an obligation in a foreign currency or extinguish the unpaid balance of any such claim. Any suggestion to the contrary is inconsistent with the principle that shareholders come last, with the general effect of the winding up process, with the decisions dealing with the position of non-provable claims and with the analysis in *Re Dynamics Corporation* and *Re Lines Bros Ltd*. *Re Lines Bros Ltd* itself suggested, consistent with the analysis of the Court of Appeal and David Richards J, that a claim for the outstanding balance due to a foreign currency creditor would give rise to a non-provable claim.

## N.    THE EFFECT OF THE 1986 ACT AND RULES

99.     There is nothing in the Act or Rules which had, or could possibly have had, the effect of discharging creditors' underlying entitlement to payment in a foreign currency and

34

replacing it with a claim in sterling calculated as at the date of liquidation or administration. Rule 2.86 was intended simply to codify the position in relation to such claims as reflected in the decision of the Court of Appeal in *Re Lines Bros Ltd*. As such, the outstanding balance of the foreign currency creditor's claim, which has not been satisfied by the payment of dividends in sterling, continues to exist and, as a matter of principle and justice, constitutes a non-provable liability that must be paid in priority to any distributions to shareholders.

100.  The 1986 Act and Rules did not make any material changes to the fundamental features of the liquidation of an insolvent company, to the relative ranking of provable and non-provable claims, or to the entitlement of a creditor to be satisfied in full before any surplus was distributed to shareholders.

101.  Three specific changes that were made were as follows:

(1)  The dividing line between provable and non-provable claims was changed once more so as to enlarge still further the scope of provable claims and to reduce *pro tanto* the scope of non-provable claims. Most significantly, claims for unliquidated damages in tort were made provable, provided, as initially enacted, that the cause of action had accrued prior to the date on which the company went into liquidation; see Rule 13.12(2) as it was originally drafted when the 1986 Act came into force. However, the fact that actionable damage is an essential ingredient of a cause of action in tort meant that, even after the introduction of the 1986 Act, many tort claims initially continued to be non-provable even under the new regime, as Sir Donald Nicholls V-C explained in *Re Kentish Homes* [1993] BCLC 1375 at 1382. The rule was subsequently further amended after the decision in *Re T&N Ltd*.

(2)  The position in relation to post-insolvency interest was expressly dealt with in Section 189(2) (for liquidations), which was later reflected in Rule 2.88 (upon the advent of distributing administrations). These provisions codified the existing law that any surplus after the payment of proved debts in full is, before being applied to any other purpose, to be applied in paying post-insolvency interest. However, the rule also changed the law by providing that post-insolvency interest was also payable out of the surplus on provable debts which did not otherwise accrue interest, thereby remedying the injustice identified as long ago as 1869 by Giffard LJ in *Re Humber Ironworks* at p.648 (*"I do not see with what justice interest can be computed*

*in favour of creditors whose debts carry interest, while creditors whose debts do not carry interest are stayed from recovering judgment, and so obtaining a right of interest"*).  It also provided that the rate of interest payable was the greater of the rate applicable apart from the insolvency and the rate specified in s.17 of the Judgments Act 1838.  This was to reflect the fact that the statutory stay on proceedings in a liquidation prevented creditors from obtaining judgment.

(3)    The requirement to value foreign currency claims by converting them into sterling as at the date of the commencement of the insolvency for the purposes of proof was reflected in Rule 4.91 (liquidation) and (later) Rule 2.86 (administration).  This was statutory codification of the decisions of Oliver J in *Re Dynamics Corporation* and of the Court of Appeal in *Re Lines Bros Ltd* in relation to the treatment of foreign currency claims for the purposes of proof.

102.    Rule 2.86 provides for the purpose of a distributing administration as follows (emphasis added):

> "*2.86.— Debt in foreign currency*
>
> *(1) <u>For the purpose of proving</u> a debt incurred or payable in a currency other than sterling, the amount of the debt shall be converted into sterling at the official exchange rate prevailing on the date when the company entered administration or, if the administration was immediately preceded by a winding up, on the date that the company went into liquidation.*
>
> *(2) "The official exchange rate" is the middle exchange rate on the London Foreign Exchange Market at the close of business, as published for the date in question. In the absence of any such published rate, it is such rate as the court determines."*

103.    Rule 2.86 forms part of Chapter 10 of the Rules which is concerned with distributions to creditors in respect of their proved debts and in particular with the machinery for proving a debt and with the quantification and valuation of claims for the purposes of proof.

104.    Rule 2.86(1) expressly provides that it operates *"For the purpose of proving a debt incurred or payable in a currency other than sterling"*.  The rule takes effect for the purpose of proving in

36

the insolvency and for no other purpose. It also refers simply to the "*amount of the debt*" being converted into sterling, not to the underlying debt being discharged.

105. This was the conclusion reached by the majority of the Court of Appeal, giving effect to the clear language of Rule 2.86. In particular, Briggs LJ emphasised that the language and context pointed firmly in favour of the conclusion that Rule 2.86(1) had no substantive effect on the underlying debt because:

(1)   The rule is expressed as being for the purpose of proof: i.e. to provide an exchange rate for the necessary conversion into sterling in order that the creditor can prove and participate in the *pari passu* distribution of assets [148].

(2)   Limiting its operation to the proof process reflects the prior judge-made rule [148].

(3)   Other rules make clear that the draftsman contemplated that a rule would be applied only for a specific limited purpose (i.e. Rules 2.105(2) and 11.13(2): "*for the purpose of dividend (and no other purpose)*"). The language of Rule 2.86 is very similar[10]; .

(4)   Any other interpretation renders the phrase "*for the purpose of proving*" otiose [150].

(5)   Those rules which do potentially lead to a substantive effect in some respects on the underlying debt (i.e. set-off) do not include equivalent language [150].

(6)   Other rules relating to the proof process are not intended to have a substantive or permanent effect; i.e. the valuation of contingent and future debts for the purpose of proof, under Rules 2.89 and 2.105.

See also Moore-Bick LJ at [257]-[259].

106. It would be extraordinary if the legislature had intended to extinguish a non-provable foreign currency claim when it used the words "*for the purposes of proof*", given the distinction which had only very recently been drawn by the Court of Appeal in *Re Lines Bros Ltd* between provable claims and non-provable claims. To the contrary, it is clear

---

[10]   As Briggs LJ said, any difference (i.e. the absence of "*and no other purpose*"), if of any relevance, could be explained as catering for the relevance of Rule 2.86 to the operation of set-off (see Rule 2.85(6), which cross-refers to Rule 2.86 (as does Rule 4.90(6) in a liquidation)) [149].

that, in using these words, it did not intend to any more than codify the approach taken by the Court of Appeal in relation to the proof of foreign currency claims.

107.  These linguistic and contextual pointers were all supported by the overriding justice of recognizing currency conversion claims:

(1)  As Briggs LJ observed at [152] and [153], "*there is no logical reason why the provision for conversion into sterling of a foreign currency amount by reference to a historical date should necessarily operate as a substantive permanent alteration of a creditor's contractual rights, except only to the extent that set-off is involved*" (see Section P(1) below regarding set-off) and "*… absent set-off there is no reason why the conversion for the purpose of proof should be anything more than a means of part-payment which is fair as between all proving creditors, leaving the foreign currency creditor with a remedy against a surplus if (but only if) sterling has depreciated in the meantime, and after all proving creditors have been paid in full with statutory interest.*".

(2)  Substantially the same point regarding the justice of arriving at such an interpretation of the effect of Rule 2.86 was made by Moore-Bick LJ at [252] "*Proof of the debt in the amount of its sterling equivalent does not demand the substitution of a sterling obligation for the foreign currency obligation and there is no reason why, as between the creditor and the company, the obligation cannot be discharged pro tanto by set-off or out of distributions at the rate prevailing at the time it occurs. Nor is there any reason in principle why any balance outstanding after all proved debts have been paid in full should not be the subject of an unprovable claim.*"

108.  If the legislature had intended that the conversion of a foreign currency debt into sterling for the purposes of proof operated so as to substitute an obligation in sterling for what had previously been an obligation in a foreign currency and to extinguish any balance, it would have done so expressly and in terms.  It certainly would not have done so by providing, in terms, that such conversion was "*for the purpose of proving a debt …*".

109.  LBL argues that the language of Rule 2.86 is "*consistent with currency conversion having substantive effect, because proving is the only way in which a creditor becomes entitled to participate in distributions in a winding up/administration*" (Grounds of Appeal at [12]; see also LBHI2's Grounds of Appeal at [15]).

(1)    This is a *non-sequitur*. It is necessary to prove a debt in order to obtain dividends from the estate in respect of a proved claim. But that does not mean that the proof process discharges the underlying debt and substitutes for it a new debt.   This is essentially the same argument based on the existence of the statutory trust in *Ayerst v. C&K (Construction) Ltd* that was rejected by Lord Hoffmann in *Wight v. Eckhardt* at [22].

(2)    Nor does it follow that a creditor can only ever receive payment if he proves for a claim, as the treatment of non-provable claims for damages in tort illustrates.

110.    The only case post-1986 in which the question of currency losses was alluded to prior to this case is consistent with such analysis. In *Re Barings (No.6); Hamilton v. Law Debenture Trustees Ltd* [2001] 2 BCLC 159 Morritt V-C held at [34] to [37] that post-liquidation exchange rate losses would be payable in priority to any payment to the holders of perpetual notes.

111.    One other change which occurred in 1986 was a general one relating to the definition of provable debts in a solvent liquidation:

(1)    Under the pre-1986 regime a distinction was drawn between claims which were provable in an insolvent liquidation and claims which were provable in a solvent liquidation. A wider category of claims were provable in a solvent liquidation than in an insolvent liquidation; see Sections 317 (which applied if the company was insolvent) and 316 of the 1948 Act as discussed in *Re Islington Metal Works* [1984] 1 WLR 14.

(2)    Under the 1986 regime the position was unified.  Rule 12.3 and 13.12 apply equally and uniformly to identify provable claims in a compulsory liquidation, in a creditors' voluntary liquidation and in a members' voluntary liquidation.

(3)    The reason for this change was identified by Briggs LJ: "*the main justification (apart from uniformity) of the choice actually made is that companies may move into and out of insolvency during a liquidation or distributing administration, so it is better to deal by a single process first with the claims of all those entitled on insolvency, leaving until later the just distribution of any*

*surplus, if there turns out to be one in fact*" (at [162])[11].  In other words, given the real practical risk that an apparently solvent company may turn out to be insolvent, it makes sense to ensure, in the first instance, that the assets are distributed *pari passu* amongst the creditors.

112.  The change in the rules so as to make the rules for proof the same in a solvent liquidation as they are in an insolvent liquidation did not affect the existence or treatment of non-provable claims.  This point was established by *Re T&N Ltd* in the context of unliquidated damages in tort:

(1)  It was contended that, as a result of such changes, if all provable debts and liquidation expenses were paid in full, the balance of the assets would require to be distributed to shareholders and that no payment or provision would be made for claims in tort accruing after the liquidation date (at [106]).  In other words, so the argument went, the effect of the change to the rules was that the only debts that could ever be paid were provable claims, and that all other claims could now be ignored.

(2)  David Richards J expressed the view however that "*it would indeed be extraordinary if a company's assets could be, and were required to be, distributed to shareholders without paying claims which had accrued since the liquidation date, or other claims not provable in a liquidation … In my judgment, this is not the position*" (at [107]).  This is plainly correct.  It would be extraordinary if, whilst enlarging the extent to which unliquidated claims for damages in tort were provable, at the same time the legislature had intended to extinguish any remaining claims which were still non-provable merely because they had only come into existence in the relevant sense after the date of liquidation.

---

[11]  The issues raised by a regime which contains different rules as to provable debts depending on whether the company is solvent or insolvent, and the problems caused by companies which may oscillate between the two states, were considered by the courts prior to the introduction of the 1986 Act; see *Re Berkeley Securities (Property) Ltd* [1980] 1 WLR 1589 and *Re Islington Metal Works* [1984] 1 WLR 14.  It is also important to bear in mind that, whilst a company is entitled to go into what is called members' voluntary liquidation, before doing so Section 89 merely requires the directors to make a statutory declaration that they have made a full inquiry into the company's affairs and that, having done so, they have formed the opinion that the company will be able to pay its debts in full, together with interest at the official rate.  Such a company may obviously turn out to be insolvent.  Accordingly, the 1986 Act contains provisions for such a liquidation to be converted into a creditors' voluntary liquidation.

(3)    David Richards J also said that, to deal with this issue, the court would if necessary be prepared, as the case may be, either to lift the statutory stay on proceedings against a company in compulsory liquidation or refuse to grant a stay if the company was in voluntary liquidation, on the basis that *"where all provable debts have been paid in full and there is a surplus otherwise available for shareholders, I can see no reason why the court would restrain a tort claimant from obtaining or executing a judgment"* (at [107]).

(4)    Rule 13.12(2) was amended following the decision in *Re T&N Ltd* to widen still further the extent to which unliquidated claims in tort are provable, such that it is now sufficient that *"all the elements necessary to establish the cause of action exist at [the relevant] date except for actionable damage"*. Any claim which does not satisfy the revised test in Rule 13.12(2) and only accrues after the cut-off date continues, however, to be a non-provable claim which must be discharged before any distribution is made to shareholders.

## O.    THE LAW COMMISSION AND CORK REPORTS

113.    There is nothing in the materials leading up to the introduction of the 1986 Act and Rules which would indicate that the introduction of a specific rule providing for conversion of a foreign currency debt into sterling for the purposes of proof was intended to have a substantive effect and operate so as to substitute an obligation in sterling for what had previously been an obligation in a foreign currency.

114.    In considering such materials it is necessary to bear in mind the state of the law at the time that they were prepared, as reflected in the authorities, and the issues which had by then been raised and decided by those cases.

115.    In any event, and whatever may have been the approach in earlier materials, by the time of the Law Commission's Final Report in October 1983, the Court of Appeal had set out the law in *Re Lines Bros Ltd* in a way which the Law Commission expressly stated that it considered was satisfactory.

### (1)    *Law Commission Working Report No.80*

116.    The Law Commission initially considered the issue of foreign currency claims in its Working Report No.80 which was published in 1981.  This report was prepared before the decision of the Court of Appeal in *Re Lines Bros Ltd*.

117.    The Law Commission referred to and expressly agreed with the approach of Oliver J in *Re Dynamics Corporation* (paragraphs 3.39 to 3.43) concluding that "*We have provisionally formed the view that it would be undesirable to propose any alteration of the rule laid down in the Dynamics Corporation case*".

118.    It then dealt with what it described as "*three minor matters*" (paragraphs 3.44 to 3.47):

(1)    The first concerned what principle should apply to the voluntary winding up of an insolvent company.  On this matter, the Law Commission's conclusion was that "*we believe that this question ought to be left for judicial decision and should be the subject of specific legislation*" (paragraph 3.44).

(2)    The second concerned the conversion of foreign debts in the liquidation, whether voluntary or compulsory, of solvent companies (paragraph 3.45).  At this stage, the

42

report was also concerned with the rules dealing with provable debts. Thus it stated "*It may be argued that the reasoning of Oliver J ... could apply to solvent, as well as to insolvent, companies: in both situations the purpose of winding-up is to ascertain the company's liability as at the date of its liquidation and to distribute its property among the claimants according to the value of their claims as at that date*". It is important to note that this paragraph has nothing to do with the treatment of non-provable debts. The purpose referred to applies to the proof process, but not to non-provable claims as, for example, the treatment of post-insolvency tort claims illustrates. In relation to provable debts, the Law Commission recognised that, consistent with the *Miliangos* principle, it could be said to be desirable in cases of a solvent liquidation to use the date of actual payment of creditors. However the Law Commission noted that, in many cases, it would not be clear if a company was solvent or not. It therefore concluded that it would not be practicable to devise different conversion dates for the purposes of proof depending on the solvency of the company as its solvency may be in doubt, with the result that, in its view, "*the initial conversion date must, in our view, be that of the winding up order in every case*". In other words, the same approach to proof of foreign currency claims should apply to solvent companies as was applied to insolvent companies.

(3)   The third matter concerned cases where, conversion of foreign currency debts having been duly made as at the date of the winding up, the company is found to be solvent (paragraph 3.46). The Law Commission expressed the view that, in such cases, there should not be a second, later, conversion of such debts as at the date of payment. Again, this is concerned with provable claims, not non-provable claims. The issue that was being considered is whether, even if you start with a common conversion date for a liquidation, if it later becomes clear that the company is solvent, a new conversion date should be applied for the purposes of proof. In other words, should the conversion date for provable claims be "*once and for all*" or not. Again, the Law Commission was not addressing non-provable claims.

119.   The Law Commission summarised its views at paragraph 3.47, stating that "*we support the view of Oliver J in the Dynamics Corporation case that the date of the winding-up order is the appropriate, once-for-all, date for the conversion of every foreign currency debt on the winding up of both solvent and insolvent companies*" adding that "*We should welcome comments on this conclusion and on our view that development of this area of the law could be left to judicial decision*".

120. The Law Commission's preliminary views were not concerned with the possibility of non-provable claims, were reached without the benefit of the views of the Court of Appeal in *Re Lines Bros Ltd* and in any event included the suggestion that development of this area of the law could be left to judicial decision.

### *(2)    The Cork Report*

121. The treatment of foreign currency claims was also considered by the Report of the Review Committee on Insolvency Law and Practice (the "Cork Report") which was published in June 1982.

122. In paragraph 1308 the Report referred to the decision of the House of Lords in *Re Miliangos* and to the obiter comments of Lord Wilberforce and Lord Cross and said that "*In two subsequent cases the Courts have declined to follow these dicta, holding that the conversion should be effected as at the date of the winding up order*". Although they are not identified by name, the two cases referred to are *Re Dynamics Corporation* and *Re Lines Bros*. It is not clear from the face of the report whether the reference to the second case was to the first instance decision in *Re Lines Bros Ltd* or to the decision of the Court of Appeal. Although the report was presented to Parliament by the Secretary of State for Trade in June 1982, which was four months after the Court of Appeal had handed down judgment, the Committee had reported more than a year previously on 30 April 1981[12]. In addition, the terms of the report suggest that it did not take account of the decision of the Court of Appeal.

123.  The Report dealt first with the position in relation to the relevant date for conversion for the purposes of proof.  It stated that "*The basis for both those decisions is that it is a primary purpose of the winding up of an insolvent company to ascertain the company's liabilities at a particular date and to distribute its assets pro rata amongst the creditors as at that date*" saying that "*we strongly recommend that any future Insolvency Act should expressly provide that the conversion of debts in foreign currencies should be effected as at the date of commencement of the relevant insolvency proceedings*" (paragraphs 1308 and 1309).  Such comments are concerned with the requirements of *pari passu* distribution, and not with the position where the court is considering whether a surplus should be used to discharge unpaid claims of creditors in full or be distributed to shareholders, and whether non-provable claims exist in that context.

---

[12]   There are a number of other aspects of the report that reflect developments up to December 1981 but not, as far as can be seen, after that date.

44

124. The Report continued by saying that *"we take the same view as the Law Commission (Working Paper No.80) that conversion as at that date should continue to apply, even if the debtor is subsequently found to be solvent. To apply a later conversion date only in the case where the exchange rate has moved to the advantage of the creditor, but (necessarily) not where it had moved against him, would, in our view, be discriminatory and unacceptable"* (paragraph 1309). Again, like the Law Commission, the Cork Committee was addressing the question of whether or not there should be a once and for all conversion for the purposes of proof. Furthermore, regardless of the answer to that question, it appears that such views were expressed without the benefit of the decision of the Court of Appeal in *Re Lines Bros*. If the Review Committee had been aware of that decision, one would have expected it to have referred specifically to Brightman LJ's comments and to have explained why it disagreed with them[13].

### (3)    Law Commission Report

125. The final report of the Law Commission on Private International Law Foreign Money Liabilities was published in October 1983, after the decision of the Court of Appeal in *Re Lines Bros Ltd*:

(1)    It referred without criticism to the *obiter* comments of Brightman LJ in *Re Lines Bros Ltd* commenting that *"There is no direct authority as to the rule governing the situation in which the debtor is solvent, but it was suggested, obiter, in the Lines Bros case that in those circumstances it might well be that a foreign currency creditor is entitled to be paid the balance of his full contractual debt before the shareholders receive anything"* (paragraph 2.23).

(2)    It addressed the question of the relevant date for conversion of foreign currency claims for the purposes of proof, agreeing that *"any future Insolvency Act should expressly provide that the conversion of debts in foreign currencies should be effected as at the date of the commencement of the relevant insolvency proceeding"* (paragraph 3.34) and saying that in both *Re Dynamics Corporation* and *Re Lines Bros Ltd* *"the contrary arguments were fully considered by the court, but were rejected for reasons which appear to us to be convincing"* (paragraph 3.36).

---

[13]    In addition, elsewhere in the report, the Review Committee refers to the position in relation to post-insolvency interest, commenting that *"Provided that there is a surplus after the proving creditors have been paid in full ... the company is to be treated as no longer insolvent"* (paragraph 1384). There is no indication in the report, however, that this general approach was not to apply to claims denominated in a foreign currency or that funds could be distributed to shareholders despite such creditors not having received the full amount that they were owed.

45

(3) It concluded that "*the present law relating to the conversion into sterling of foreign currency claims in relation to solvent and insolvent companies and to bankruptcy is satisfactory*" (paragraph 3.37).

126. There is nothing in these passages to suggest that, whatever it may or may not previously have thought, the Law Commission disagreed with Brightman LJ's suggested approach in the event that there was a surplus that might otherwise have to be distributed to shareholders:

(1) It is clear that paragraphs 3.34 to 3.36 are concerned with the different question of the appropriate date for conversion for the purposes of proof. Otherwise the Law Commission could not have said that the contrary arguments were considered in *Re Dynamics Corporation* and *Re Lines Bros Ltd* and rejected. Oliver J did not consider the position in the event that there was a surplus that would otherwise be available to shareholders; and the Court of Appeal in *Lines Bros Ltd* did not reject Brightman LJ's views as to what should happen in such a situation.

(2) The Law Commission would not have said that "*the present law in relation to the conversion into sterling of foreign currency claims … was satisfactory*", if it had disagreed with Brightman LJ's views as to what should happen if there was a surplus that would otherwise be available to shareholders.

### *(4)   DTI, Revised Framework for Insolvency Law*

127. The Department of Trade & Industry published a White Paper entitled A Revised Framework for Insolvency Law in February 1984. It did not refer to the quantification of foreign currency claims for the purposes of proof or suggest that, contrary to fundamental principle and policy and the views of the Court of Appeal in *Re Lines Bros Ltd*, the 1986 Act was intended to provide creditors with claims in a foreign currency with a new right in substitution for their old right.

## P.    OTHER ASPECTS OF THE 1986 REGIME

128.    It is necessary to deal with three other aspects of the statutory regime post-1986 for corporate insolvency which it is said throw light on the correct interpretation of Rule 2.86, namely the provisions relating to set-off, contingent claims and disclaimer.

129.    Ultimately the treatment of foreign currency claims depends on the true construction of Rule 2.86.  However, these other aspects are all consistent with the conclusion that Rule 2.86 does not operate to give creditors a new sterling claim in discharge of their underlying foreign currency claim.

### (1)    Set-Off

130.    The first such aspect is insolvency set-off.  Rule 2.85 deals with set-off for the purposes of distribution in an administration and is modelled on Rule 4.90 which deals with the position in a liquidation:

(1)    Rule 2.85(3) provides that an account shall be taken as at the date of the notice of intention to distribute of what is due from each party to the other in respect of the mutual dealings and the sums due from one party shall be set off against the sums due from the other.

(2)    The treatment of claims in a foreign currency for the purposes of set-off is addressed by Rule 2.85(6) which provides that Rules 2.86 to 2.88 shall apply for the purposes of this Rule in relation to any sums due to the company which, amongst other things, are payable in a currency other than sterling.  In other words, they are to be treated as converted into sterling as at the date of the administration.

131.    The effect of set-off is, of course, that the creditor and debtor are required to set off all claims and cross-claims.

132.    However, as Moore-Bick LJ explained at [250] there is nothing unjust in this because "*As a result the foreign creditor obtains full value for his debt at the time of payment, albeit through the mechanism of conversion into sterling (as indeed he would if he were to execute on assets held in this country).  It does not follow that the outstanding portion of the debt should cease to be denominated in the relevant foreign currency.*"

47

133. Accordingly, the rules relating to set-off do not infringe the principle that creditors have priority over shareholders or the principle that their claims should be paid in full before any distributions are made to shareholders. The relevant parts of their claims are paid in full, albeit by way of set-off, rather than by each party paying cash to the other.

134. The fact that the rules relating to set-off do not operate to affect the nature or existence of any unpaid balance is demonstrated by the decision of the Court of Appeal in *Re Kaupthing Singer & Friedlander Ltd* [2011] 1 BCLC 12. This case concerned the operation of insolvency set-off where one of the debts was a future debt. The argument was, in short, that the rules required that, for the purposes of set-off, future debts have to be discounted back to the date of administration, with the result that the debtor only had to pay, on the future due date, the balance after set-off at its discounted value. Not surprisingly, that argument was rejected. In more detail:

(1) The rules provide that, for the purposes of set-off, future debts need to be discounted back to the date of administration so that like can be set off against like. Thus Rule 2.85(7) states that *"Rule 2.105 shall apply for the purposes of this Rule to any sum due to or from the company which is payable in the future"*.

(2) The argument in *Re Kaupthing* was that Rule 2.015 required the relevant future debt owed by the creditor to be discounted back to the date of administration and that, having been discounted in this way, any balance still owing by the creditor after set-off was the balance as discounted in accordance with Rule 2.105, which the creditor submitted would however only fall due for payment on the future maturity date of the debt.

(3) The Court of Appeal rejected this argument. The future debt was discounted for the purposes of set-off. To the extent that the sum owed by the creditor was not extinguished by the set-off, the balance remained unaffected and un-discounted. In other words, despite the terms of Rule 2.85(7) which requires *"the __debt__ due to … the company"* to be discounted (emphasis added), it is only discounted to the extent necessary for the purposes of set-off.

(4) As Etherton LJ stated *"The purpose of insolvency set-off has nothing to do with the release of liabilities owed to the company save to the extent necessary to achieve those objectives"* (at [32]) and that it was necessary to construe the rules *"so as to produce a sensible meaning, in*

48

*accordance with a sound policy objective and general principles of insolvency administration*" (at [33]).

135.    There is nothing inconsistent with the above analysis and the decision of Lord Hoffmann in *Stein v Blake* [1996] 1 AC 243.  That case held that, on a bankruptcy, a claim and cross-claim were mandatorily set off against each other, with the result that all that was assignable was the amount after the set-off had occurred.  To this extent, as Lord Hoffmann said, it obviously "*affects the substantive rights of the parties by enabling the bankrupt's creditor to use his indebtedness to the bankrupt as a form of security*" (251D-E).  However, there is nothing in *Stein v Blake* to suggest that, if there is a balance after set-off, which is due to the creditor with a foreign currency claim, that balance cannot be treated in exactly the same way as the future debt was treated in *Re Kaupthing*.  In other words, that the balance of the foreign currency debt is unaffected by the conversion, which only applies to the extent necessary for the purposes of set-off, in the same way that the balance of the future debt in *Re Kaupthing* was unaffected.

136.    The argument that the effect of set-off as described in *Stein v Blake* was substantive, so as to create a new cause of action in respect of the balance which did not retain any of the characteristics of the original underlying claim, was raised by a Respondent's notice in *Kaupthing, Singer & Friedlander* and specifically rejected by the Court of Appeal at [36] and [37].  The Court of Appeal's judgments in that case are inconsistent with the argument now advanced by the Appellants.

137.    The question of whether currency conversion claims can arise as a consequence of the operation of insolvency set-off was addressed by David Richards LJ in his decision in *Re LBIE* [2016] EWHC 2131 (Ch). He concluded at [37]-[47] that, although the account for the purpose of Rule 2.85(3) takes place as at the date of the giving of a notice of distribution, set-off (and therefore discharge) of any relevant sums is treated as occurring as at the date of administration. If that is the case, such part of foreign currency claims as are required for set-off are, for that purpose, converted into sterling at the same date that they are discharged.  There is no scope for currency conversion claims arising out of insolvency set-off on this basis, and LBHI2's suggestion (at [134] of its case) that the existence of such claims may give rise to anomalous results in the context of set-off is therefore wrong.

49

### (2)  *Contingent claims*

138.  The second aspect of the statutory scheme concerns contingent claims.  Rule 2.81(1) requires the administrator to estimate the value of any debt which, by reason of it being subject to any contingency or for any other reason, does not bear a certain value and permits him to revise any estimate previously made.  Rule 2.81(2) provides that where the amount of a debt is estimated under this Rule, the amount provable in the administration in the case of that debt is the amount of the estimate for the time being.

139.  Rule 2.81 is concerned with estimating the value of contingent and other similar debts as at the date of the insolvency for the purposes of proof.  However, as Lord Hoffmann said in *Wight v. Eckhardt*, the cases on the use of hindsight to value such debts show that the scene does not freeze at the date of the winding up order, explaining that "*Hindsight is used because it is not considered fair to a creditor to value a contingent debt at what it might have been worth at the date of winding up when one knows that prescience would have known it to be worth more*".

140.  The effect of the rules is that it is open to a contingent claim to be re-valued at any time during the winding up or administration to take account of hindsight, although a creditor cannot upset previous distributions.  Furthermore, as Patten LJ commented in *Re Danka Business Systems plc* [2013] EWCA Civ 92 at [38] "*if the contingency does occur pre-distribution to members and so creates an actual liability of the company which the liquidator has not provided for then it would obviously be open to the creditor (absent agreement) to lodge an additional proof out of time which in a solvent liquidation the liquidator would have to deal with.*"

141.  The position goes further than this however.  A creditor who receives the estimated value of his contingent claim is not treated as having had his underlying claim necessarily paid in full.  This is so, even if the winding-up has come to an end, any surplus assets have been distributed to shareholders and the company has been dissolved such that it has ceased to exist.  Thus if, after the company has been dissolved, the contingency occurs, it is open to the creditor (if further assets have been identified so as to make it worthwhile) to apply to restore the company to the register and for the liquidation to be re-opened and for the creditor to make a new claim.

142.  This is illustrated by the decision of Hoffmann LJ in *Stanhope Pensions v Registrar* [1994] 1 BCLC 628:

(1)     The debtor company (Forte), passed a resolution for members' voluntary winding up. The liquidator advertised for claims in the normal way, paid the creditors and distributed the assets. The company was deemed dissolved on 8 February 1992 (630d-e).

(2)     The Applicant was the lessor of a property which had originally been leased to Forte. It was subsequently assigned by Forte to another company in the group (Post) which subsequently assigned it to BCCI. In January 1992 BCCI was wound up and stopped paying the rent and in June disclaimed the lease (630e-f).

(3)     The Applicant looked to Forte for the rent. But Forte had been dissolved. It accordingly applied for an order declaring the dissolution to be void. The intention was to enable Forte then to assert its right of indemnity against Post under the covenant implied under the assignment by Section 24(1)(b) of the Land Registration Act 1925 (630g).

(4)     Hoffmann LJ held that, whilst the power under Section 651 to declare a dissolution void remained exercisable, the dissolution was not final, the company might be revived, the liquidation re-opened and new or increased claims made (634i-635a).

143.    Whilst it is correct that, as Hoffmann LJ said, "*a company is certainly entitled to initiate and complete the process of winding up notwithstanding that it will thereby become unable to fulfil future or contingent obligations*" (634e), the mere payment of dividends equal to the estimated value of a contingent claim, and the subsequent distribution of any surplus to members and the conclusion of the winding up, does not discharge the creditor's underlying claim. This is entirely consistent with Lord Hoffmann's analysis in *Wight v. Eckhardt*.

144.    There is therefore nothing in the rules relating to the valuation of contingent debts for the purposes of proof which infringes the principle that creditors have priority over shareholders or the principle that their claims should be paid in full before any distributions are made to shareholders. Such claims are paid at their full estimated amount and can be re-valued using hindsight right up to the date of distribution.

51

145.  This interference with creditors' rights is, of course, necessary if shareholders are to be
able to wind up the affairs of the company within a reasonable period. But the rules are
designed to ensure that the best estimate can be made of the amount of the liability and
that this is paid in full. The rules relating to the valuation of contingent claims do not
infringe the principle that creditors have priority over shareholders or the principle that
their claims should be paid in full before any distributions are made to shareholders.
They provide no support for any suggestion that distributions can be made to
shareholders when the balance of a foreign currency claim which is due and owing has
not been paid.

### *(3)    Disclaimer*

146.  The third aspect concerns disclaimer. The significance of the position in relation to
disclaimer is that, to enable a company to be wound up within a reasonable period, the
1986 Act contains a specific statutory provision which makes it perfectly clear that
creditors' rights are affected (albeit by way of substitution of a right to damages of
equivalent value). Previous authority indicates however that, prior to such provision,
creditors had a non-provable claim and were entitled to payment in accordance with their
strict contractual rights. This was regarded as a matter of common justice.

147.  Disclaimer is dealt with in Sections 178 to 182 of the 1986 Act for liquidations (no
comparable provisions apply in an administration):

(1)    Section 178(1) of the 1986 Act provides that the liquidator may, by the giving of
the prescribed notice, disclaim any onerous property.

(2)    Section 178(4) states that such a disclaimer "*(a) operates to determine, as from the date of
the disclaimer, the rights, interests and liabilities of the company in or in respect of the property
disclaimed; (b) does not, except so far as necessary for the purpose of releasing the company from
any liability, affect the rights or liabilities of any other person*".

(3)    Section 178(6) provides that any person sustaining loss or damage in consequence
of the operation of a disclaimer is deemed to be a creditor to the extent of the loss
or damage and accordingly may prove for the loss or damage in the winding up.

52

148.  The position was different prior to the introduction of the disclaimer provisions in 1929. Future rent was regarded as not provable. Nor could the company divest itself of its obligations under the lease or convert the landlord's claim into a provable claim for damages.  The authorities held that, in the event of a surplus, the lessor was entitled to an injunction restraining the liquidator from making a distribution to shareholders without first making proper provision for his claim to future rent.

(1)  In *Gooch v London Banking Association* (1886) 32 Ch D 41 Pearson J, following what he regarded at p.43 as "*common justice and common sense*", granted an injunction to restrain a company in liquidation from distributing assets among its shareholders without setting aside sufficient assets to provide for future rent and other liabilities under a lease which were non-provable.

(2)  The same result was reached by the House of Lords (Scotland) in *Lord Elphinstone v The Monkland Iron and Coal Company Ltd* (1886) LR 11 App Cas 332 where it was held that a lessor could obtain an interdict against the liquidator dividing the surplus among the shareholders until some provision had been made to meet his future claims.  Lord Watson commented at p.336 "*When a limited company is in the course of being wound up voluntarily, I do not think a creditor, who is asserting future or even contingent claims against the company, can justly be said to resort to an extraordinary remedy when he seeks to have the liquidators judicially interpelled from dividing the surplus assets among the shareholders without making any provision to meet his claims when they shall arise*".  Lord Herschell L.C. stated at p.344 "*If any liability to the appellant existed on the part of the respondent company, he was entitled to have provision made for it by the liquidators before the assets of the company were distributed among the shareholders*".

(3)  In *Oppenheimer v British and Foreign Exchange Bank* (1877) 6 Ch D 744 it was held that the court would give the liquidator leave to distribute, thus protecting him from any risk of personal liability, but only if he retained a sum sufficient when invested at compound interest to fund the future liabilities.

149.  This position changed in 1929 with the express introduction of the right of disclaimer. Such a right obviously does have substantive effect on, for example, a landlord's claim under a lease.  But this is because it is the clear, express and inevitable effect of the relevant statutory provisions.  It is necessary as otherwise a company could not be wound up within a reasonable period.  The Sixth Respondent does not contend that no

53

provision in the 1986 Act or Rules can have substantive effect. But the fact that certain provisions have substantive effect does not mean that others do so.

150. In any event, any claim for damages under Section 178(6) simply converts the primary liability in the lease into a secondary liability for damages of an equivalent value. The amount of the claim is capable of being valued in a winding up to the extent that it is contingent or does not bear a certain value, and to be re-valued using hindsight. The intention of these provisions is, of course, that, so far as is consistent with the need to permit a company to wind up its affairs within a reasonable period, the creditor is entitled to receive full compensation for any loss or damage he suffers.

### (4)    Bankruptcy

151. The Appellant is also wrong to suggest that non-provable foreign currency claims cannot exist in bankruptcy or that the Court of Appeal's analysis cannot apply in bankruptcy subject to the effect of the discharge of the bankrupt.

152. The only difference in the statutory regime relating to bankruptcy concerns the effect of the statutory discharge of the person of the bankrupt from all bankruptcy debts. In that regard:

(1)    Section 281 of the 1986 Act provides that, subject to certain exceptions set out within the subsequent sub-paragraphs of Section 281, where a bankrupt is discharged, the discharge releases him from all bankruptcy debts.

(2)    Bankruptcy debts are defined in Section 382(1)(a) of the IA 1986 as including "*any debt or liability to which he is subject at the commencement of the bankruptcy*".

(3)    A discharged bankrupt will therefore normally be treated, as a matter of English law, as being released from foreign currency debts as a consequence of discharge. To the extent that, following the process of proof, there remains any outstanding balance in respect of the foreign currency debt, the bankrupt is released from liability for that debt.

(4)    This is consistent with the general approach to non-provable liabilities. Release of the bankrupt will extend to all non-provable liabilities which are bankruptcy debts

54

save to the extent expressly provided otherwise: see Section 281(6) ("*discharge does not release the bankrupt from such other bankrupt debts, not being provable in his bankruptcy, as are prescribed*"), Rule 12.3(2)(a) and Section 281(4) of the 1986 Act.

(5)    As observed in *Woodley v Woodley (No. 2)* [1994] 1 WLR 1167 at 1178, there is no logical or necessary link between the provability of a debt and its release on discharge: any link is a matter of policy.

153.   The release, however, is of the person of the bankrupt. The bankruptcy debts continue to exist, and the estate remains liable for those debts: for example, Section 281(1) and 282(2) make clear that the underlying bankruptcy debts remain and that a secured creditor may enforce his security for the payment of a debt from which the bankrupt is released.

154.   To the extent that there exist non-provable liabilities which: (i) are bankruptcy debts and (ii) are the subject of the release granted to the bankrupt as a consequence of discharge; such non-provable liabilities may therefore be enforced against the bankruptcy estate if and to the extent that any surplus exists. As in relation to corporate insolvency, the surplus can only be returned to the bankrupt after payment in full of all the bankrupt's creditors with interest and the payment of the expenses of the bankruptcy: Section 330(5) of the IA 1986. This requires the payment of all non-provable claims (including any currency conversions claims) from the surplus (if any) before it is returned to the bankrupt. Were this not correct, wealthy individuals could evade liability for non-provable liabilities (historically including large tort liabilities) through the mechanism of bankruptcy.

155.   Even if, contrary to the above, there was no mechanism for payment or enforcement of currency conversion claims in bankruptcy, that consequence would arise as a direct result of the inclusion of the provision for discharge.  The fresh start policy embodied in the concept of discharge and release ensures that a bankrupt is free from liability for his bankrupt debts. As Lord Hoffmann observed in *Wight v Eckhardt* there is no equivalent in corporate insolvency.

## Q.    MERITS

156.   Foreign currency liabilities are an inevitable consequence of a global economy in which English companies are free to denominate their assets and liabilities in the currencies of

their choosing.  Principle, policy and justice all require that the debtor pays the creditor what it owes in full before any distributions are made to shareholders unless the demands of *pari passu* distribution make that impossible.

157.  The proliferation of foreign currency liabilities is reflected by the fact that, as at the date of filing, foreign currency liabilities represented 98% of LBIE's total liabilities. The obvious justice of paying creditors whose claims are denominated in a foreign currency, in full, before any distributions are made to shareholders, is repeatedly emphasised in the decision of the majority in the Court of Appeal (see, in particular, Briggs LJ at [136], [153], [154], [156], [158] and [166], Moore-Bick LJ at [252] and David Richards J at first instance at [90] and [98]). Similar views about the injustice of distributions being made to shareholders in circumstances where creditors with outstanding claims have not been, and as result will not be, paid in full are reflected in numerous other cases, including, for example, *Re Humber Ironworks*,  *Re Lines Bros Ltd* at 22B-C, *Re Islington Metal Works* at 24F-G and *Re T&N Ltd* at [107].  Such statements reflect the fundamental principle of corporate and insolvency law that shareholders come last.

158.  English law recognises that foreign currency creditors ought, outside insolvency proceedings, to receive payment in full of the foreign currency sum due to them, irrespective of the place of incorporation of the debtor. Subject to the demands of *pari passu* distribution, the position ought not to change as a consequence of the debtor having entered an insolvency proceeding.

159.  Any other outcome would be unjust.  In this case it would lead to foreign currency creditors suffering a shortfall in recovery of their foreign currency liabilities exceeding £1.6 billion and a corresponding windfall for sub-ordinated creditors and shareholders. It would be wrong, for example, for US dollar creditors to receive only 88% of the principal sum due to them in circumstances where there are sufficient assets available to make them whole.

160.  The injustice is likely to be exacerbated in practice where, as will often be the case, the debtor's assets were denominated in one or more foreign currencies.  In the present case the overwhelming majority of LBIE's liabilities and assets were both in US dollars. However, whilst creditors' claims were required to be converted into sterling as at the date of administration for the purposes of proof, the administrators exercised their discretion not to convert LBIE's assets into sterling until a later date and at exchange

rates that turned out to be more favourable for the estate than the exchange rate at the date of administration. This is part of the reason for the surplus in the present case. On the Appellants' case, the subordinated creditors and shareholders would benefit from the difference between the historic exchange rate used for valuing provable claims and the exchange rate obtained when the administrators subsequently converted the assets into sterling. There is no justifiable reason for this[14].

161. The Appellants' case would also lead to unequal treatment of an insolvent company and its counterparty. If the insolvent company has a claim against its counterparty it will continue to be entitled to payment in the relevant foreign currency.

162. The Appellants seek to answer the obvious injustice that would result in the subordinated creditors and shareholders receiving a windfall in circumstances when creditors have not received the full amount that they are owed, by contending that currency conversion claims provide a foreign currency creditor with what they describe as a "one-way bet" against the company. The existence of currency conversion claims is, they say, unjust because foreign currency creditors will always receive dividends in sterling. If the foreign currency has depreciated against sterling, they will be better off having been paid in sterling (but will have no obligation to give credit for any excess) whilst if the foreign currency has appreciated they will recover any foreign currency loss before any distributions can be made to shareholders.

163. The short answer to this argument is that valuing foreign currency claims by converting them into sterling as at the date of liquidation or administration and the payment of dividends in sterling is simply the necessary consequence or price that has to be paid to ensure *pari passu* distribution amongst creditors in respect of their proved debts. The fact that, to ensure that creditors are treated fairly *inter se* in the event of a shortfall, it is

---

[14]   It is capable of producing outcomes which are self-evidently unfair. Imagine a company which has liabilities of US$ 100 million and assets of US$ 100 million. The company goes into liquidation. At that moment it is capable of paying its debts in full. Its liabilities are converted into sterling at the date of liquidation for the purposes of proof at say £1 : $1. Sterling subsequently depreciates to £2 : $1. At this later stage the assets are then sold and the proceeds converted into £200 million. On the Appellants' case, the creditors will receive a total of £100 million (which, by the time that the dividends are paid, is only worth US$ 50 million, leaving them with a net loss of US$ 50 million) and the shareholders will receive a distribution of £100 million. The creditors would suffer a loss not because the company was insolvent when it went into liquidation, but solely because of the different exchange rates used to value their claims and to convert the assets. Although the company was capable of paying its debts in full when it went into liquidation, on this scenario the creditors would suffer a loss and the shareholders would receive a benefit. There can be no possible justification for such a result.

necessary to have a cut-off date and to value claims as at that date, does not require, let alone justify, paying shareholders in priority to creditors.

164.   It is no answer to a creditor who has not been paid in full to say that in other liquidations, where sterling appreciates, other creditors may receive more than they are owed or that, if events had turned out differently, this might have happened to him.  As Lord Wilberforce said in *Miliangos* "*His contract has nothing to do with sterling: he has bargained for his own currency and only his own currency*" and "*Justice demands that the creditor should not suffer from fluctuations in the value of sterling*".

165.   In any event, the description of the position as a "*one-way bet*" in favour of the company is inapposite, inaccurate and unrealistic:

(1)   A bet is a voluntary action involving speculation on risk in the hope of profiting from the outcome. A foreign currency creditor has not agreed to enter into a bet, let alone a one-way bet.  To the contrary, he bargained for payment in foreign currency precisely to avoid having to bear foreign exchange risk.

(2)   Nor, even if there was a "*bet*" can it be regarded as "*one way*" so far as the creditor is concerned.  In most cases the company will be insolvent. In such cases, the creditor will suffer if sterling depreciates but is unlikely to benefit even if sterling appreciates.   If sterling depreciates this will reduce the value of the sterling dividends that he receives and increase his loss.   However, even if sterling appreciates, this will not mean that the creditor will make a foreign exchange profit on his underlying claim.  In most cases it will do no more than reduce the net loss that he would otherwise have suffered as a result of the debtor being insolvent; see Briggs LJ at [157].

(3)   Not only would creditors not have agreed to bear the exchange rate risk which had been forced on them, but it is not even one which they would usually be in a position to hedge.  As Briggs LJ said "*It is not a risk against which the creditor can easily hedge, since (even if while unpaid he has the financial resources) he does not know when, or how much, he will eventually be paid*" (at [137]).   Even if hedging was available, it would come at a cost which the creditor had not agreed to bear.

58

166.   Indeed, it would be more accurate to describe such an outcome as capable of giving a one-way bet to shareholders.

167.   If the Appellants are correct, it would, for example, be open to the directors to place a company which was borderline solvent into members' voluntary liquidation specifically to avoid having to continue to bear a foreign exchange risk which the company was contractually or otherwise required to meet.   The liquidator would, on their case, be required to pay creditors' claims within a year, calculated by converting the foreign currency amount of the liabilities into sterling at the date of liquidation.   This would offer shareholders a one-way bet. If sterling depreciated the amount that it would cost them to pay all claims in full would be reduced.   However, if sterling appreciated the company would be insolvent and the risk would be borne by creditors between themselves.   The moral hazard and potentially unjust consequences of such a regime are obvious.

168.   The Appellants seek to answer these difficulties by trying to bring into account other consequences of the statutory scheme.   They point, for example, to the right to payment of statutory post-insolvency interest at the Judgments Act rate, and suggest that, as a result, foreign currency creditors might overall be better off than they otherwise would have been; see LBHI2's case at [114] and [115].

169.   This does not avoid the basic injustice of not paying foreign currency creditors in full.  As David Richards J held in his judgment in *Waterfall IIA* [2015] EWHC 2269 (Ch) at [227] to [231], such other aspects of the statutory scheme are not intended to compensate foreign currency creditors for not being paid in full and cannot be brought into account in this way[15].  All creditors are entitled to statutory interest at the prescribed rate on their sterling proved debts in accordance with the Rules as compensation for delay in the payment of their claims.   Such provisions, which deal with post-insolvency interest on proved debts, say nothing about the continued existence of the underlying debts. If the foreign currency creditor is required to bring such statutory interest into account, he will not have received compensation for the delay in payment of his claim that all other creditors will receive and to which he is also entitled under the statute.   If those payments were to be treated as if they were further payments in discharge of the underlying debt, the result would be that sterling creditors would receive interest as compensation for

---

[15]   This aspect of David Richard J's decision in *Re Waterfall IIA* has been appealed, together with other aspects.   The appeal is due to be heard by the Court of Appeal in April 2017.

delay but foreign currency creditors would not. That would be contrary to the terms of the Rules.

170. It is also wrong to say that, in the present case, foreign currency creditors will receive an unjustified windfall or benefit as result of receipt of statutory interest at the Judgments Act rate:

    (1)    All creditors (and not just foreign currency creditors) are entitled to receive statutory interest at a minimum rate of 8% on their sterling proved debts. Any benefit from receiving interest at that rate is not particular to foreign currency creditors.

    (2)    Statutory interest compensates creditors for the delay in receiving payment of their sterling proved debts that has occurred since LBIE entered administration in 2008 and the existence of the moratorium on proceedings during the insolvency justifies paying interest at the Judgments Act rate.

    (3)    To the extent that 8% is considered to be a high rate in the current low interest rate environment, that is a matter for the legislature when setting the Judgments Act rate.

    (4)    An 8% rate is in any event lower than the equivalent judgment rate applicable in certain other jurisdictions (including, in particular, New York where judgment rate interest during the relevant period has been 9%).

    (5)    Many creditors are, in any event, entitled to receive statutory interest on their sterling proved debt at a higher contractual rate, which may also be a compound rate.

171. The Appellants have not identified any other reason why the legislature might have intended shareholders to be paid in priority to foreign currency creditors, other than an assumed desire to create simplicity and avoid practical complications.

172. The desire for simplicity cannot outweigh the fundamental injustice of making distributions to shareholders in priority to creditors and the suggested practical complications are in any event largely non-existent or illusory.

60

173. As at the date that any distribution is proposed to be made to shareholders, the amount necessary to pay foreign currency creditors' non-provable claims in full will be known. It will depend on exchange rate movements between the date of liquidation, when the claims were converted for the purposes of proof, and the timing of the proposed distribution. The liquidator simply pays what is necessary to pay the balance of the foreign currency claims in full, either in the relevant foreign currency or the sterling equivalent of that sum on the date of payment, and distributes any remaining surplus to shareholders. The position is no more complicated that that which exists whenever a debtor seeks to discharge a foreign currency debt by making a payment in sterling.

174. English insolvency law should be capable of dealing with foreign exchange claims in a way which recognises their increasing importance in a global economy and in a manner which does not penalise foreign currency creditors unless and to the extent that this is strictly necessary to satisfy the policies of the statutory insolvency regime including, in particular, the need to ensure *pari passu* distribution. Briggs LJ was correct to say that outcome contended for by the Appellants "*would merely cause a wholly unnecessary injustice, unsupported by the need to fulfil any policy requirement*" (at [154]).

## R.    SHORTFALL IN NON-PROVABLE CLAIMS

175. In the present case it is estimated that the surplus remaining after payment of all proved debts and post-insolvency interest is sufficient to discharge the unpaid balance of foreign currency claims in full. The issue in this case, therefore, is solely between foreign currency creditors, on the one hand, and subordinated creditors and shareholders, on the other hand.

176. Further issues would, of course, arise if the surplus was not sufficient to pay all non-provable claims in full. This cannot, however, affect the basic analysis:

(1)    The problem is not one which is, in some way, dependent on the existence of foreign currency claims, as opposed to any other type of non-provable claim[16]. Exactly the same issues would arise whenever non-provable claims exceed the

---

[16]    It is equally possible for the same problem to arise as result of, for example, non-provable unliquidated claims for damages in tort in situations comparable to that in *R-R Realisations* or statutory claims which are non-provable because they do not meet the requirements for such claims to be provable identified in *Re Nortel*.

amount of any surplus.   It would still be necessary to decide how the surplus should be distributed amongst such non-provable claims.

(2)   There is no reason to regard foreign currency claims as in some way less deserving than other claims, such as a claim for damages in tort by a pedestrian who was knocked down by one of the company's vehicles after the commencement of the insolvency, so as to entitle the court to ignore them.   Foreign currency claims are not treated as any less deserving than claims in tort in the context of proof, where both rank equally.   Nor indeed are the two categories mutually exclusive. There is no reason why such claims in tort could not themselves be denominated in a foreign currency (and therefore face a currency conversion loss absent the recognition of currency conversion claims as non-provable liabilities). In any event, the example is a bad one as such claims are likely to rank as an expense and be paid in full.

(3)   In any event, the mere fact that non-provable claims may, in a particular case, exceed the amount of any surplus, cannot be a reason for holding that some or all of such non-provable claims must somehow have been discharged by the proof process so as to permit the surplus to be distributed to the shareholders.

177.   It is correct that, as David Richards J commented in *Re T&N Ltd*, "*if there is a surplus but it was insufficient to pay all tort claims in full, the court would face a major issue as to how best to deal with this situation in a fair and sensible manner*" (at [107]).   However, this simply reflects the fact this aspect of the insolvency regime is not specifically dealt with in the statute or rules, but is a matter of judge-made law.   As Briggs LJ said at [165], the Chancery Division is well able to identify the appropriate and fair approach in such a situation.   It is not necessary for the Court, in this case, to try and provide a comprehensive guide to the treatment of non-provable liabilities, which neither statute nor authority has considered it necessary or appropriate to provide in the past.

## S.   LEWISON LJ'S TEN REASONS

178.   The reasons given by Lewison LJ for differing from the Judge's conclusion were specifically addressed and rejected by Moore-Bick and Briggs LJJ at [136]-[166] and [247]-[260].   They are also substantially addressed in the previous sections of this case.

179. The following paragraphs therefore only seek to summarise the answers to the points made by Lewison LJ.

> *(1)    We have seen that both the courts and Parliament have progressively expanded the range of claims that fall within the insolvency code as laid down in the Act and the rules. There is only one contractual obligation; and the liability created by that obligation is provable in accordance with the rules. I agree with Mr. Snowden that it is impossible to suppose that when rule 2.86(1) and rule 4.91(1) were introduced Parliament intended to split a unitary obligation to pay a sum into a foreign currency into two claims, one of which was provable and the other of which was not. That conclusion would run counter to the whole history of the gradual expansion of the range of claims that fall within the insolvency code. It would also entail the proposition that Parliament had positively created a non-provable claim when, again, the history of the legislation shows that Parliament has done its best to eliminate non-provable claims.*

180. The reference to the expansion of provable claims and the effect of the 1986 Act on foreign currency claims is misplaced for two main reasons:

(1)    The legislature and the courts have progressively expanded the range of provable claims. However, in each case, this has been to enable the creditors to share in the assets of the debtor in the event of a shortfall, not because it has decided that certain previously non-provable claims should not be recoverable at all. Even today, certain types of claims remain non-provable because they are not captured by the rules which are regarded as necessary to ensure *pari passu* distribution between creditors, in particular the cut-off rule and the rule that claims must be valued as at the cut-off date. The legislature has not decided to discharge such claims or permit assets to be distributed to shareholders in priority to them.

(2)    The 1986 Act and the introduction of Rules 2.86(1) and 4.91(1) did not split a previously unitary obligation into two claims. Even before the 1986 Act, foreign currency claims were provable by reference to their value as at the date of liquidation with any subsequently determined unpaid balance constituting a non-provable claim. The 1986 Act, in this respect, simply codified the approach taken by the Court of Appeal in *Re Lines Bros Ltd*. This did not involve creating a non-provable claim. It simply meant that the balance of the claim which was previously non-provable remained non-provable and payable only in the event of a surplus.

> *(2)    It would entail the rejection of the advice of the Cork Committee and, as I read it, the conclusion of the Law Commission.*

63

181.  The Law Commission and Cork Reports are consistent with the existence of currency conversion claims (see Section O above).  In particular:

(1)  The Law Commission Working Report and the Cork Report are concerned with the date for conversion of foreign currency claims for the purposes of proof.  They did not consider the position in relation to non-provable claims and appear to have pre-dated the views of Brightman LJ in *Re Lines Bros Ltd*.

(2)  The Law Commission's Final Report, which is the last such document prior to the 1986 Act, referred to Brightman LJ's comments on the position in the event of a surplus without criticism and concluded that the present law relating to solvent and insolvent companies was satisfactory.

(3)  *It would contradict the Government's stated aim of simplifying insolvency procedures.*

182.  It is the existence of non-provable liabilities, and not the recognition of currency conversion claims as non-provable liabilities, which potentially gives rise to a degree of complication.  Non-provable claims have always existed and, although the category has narrowed over the years, continue to exist.  Any claim which is not eligible for proof because it does not come within the relevant rules remains a non-provable claim.  Such claims, which are not limited to foreign currency claims, continue to form part of the statutory scheme and, if they arise, will need to be dealt with

183.  In any event, simplification is not the only aim of insolvency proceedings.  The legislation seeks to balance various aims, including "*support[ing] the maintenance of commercial reality and encourag[ing] the fulfilment of financial obligations*",[17] which aim the existence of currency conversion claims plainly furthers.

184.  Against that background, non-provable claims in respect of the balance of any foreign currency claim can hardly be said to add materially to the overall complexity of the scheme, or undermine the desire for simplicity (particularly in light of the comparative

---

[17]  Which aim is referred to in the Cork Report at [191] and reflects the more general policy behind the decision in *Miliangos* (as to which see Moore-Bick LJ at [251]: "*This recognition of the need to give effect to the essential nature of foreign currency obligations suggests that, taken as a whole, the insolvency procedure should allow a foreign currency creditor to recover the true value of his debt, save to the extent that the demands of a pari passu distribution make that impossible.  In my view in the case of a solvent company they do not.*")

rarity of liquidations producing a surplus sufficient to pay non-provable claims). There is no practical difficulty in determining the amount of any such claim and paying it before making any distributions to shareholders.

*(4)    It would contradict the conclusion of the Court of Appeal in Lines Bros that there should be a "once and for all" conversion of a foreign currency claim even if debts were paid in full.*

185.    This is, with respect, a fundamental mis-reading of the decision of the Court of Appeal in *Re Lines Bros Ltd* (see Section M(2) above):

(1)    The issue that the Court of Appeal considered was whether, for the purposes of proof, any conversion should be *"once and for all"* or whether the *pari passu* principle potentially required a number of different dates to be used. This aspect of their decision had nothing to do with the possibility of a non-provable claim.

(2)    The fact that their decision that any conversion should be *"once and for all"* had nothing to do with non-provable claims is demonstrated by Brightman LJ's approach in the event of a surplus. His views on the appropriate course in such event are inconsistent with him having decided that the creditor was forever limited to the amount of his claim converted into sterling as at the date of liquidation.

*(5)    It would contradict Oliver J's conclusion in Dynamics that the company's obligation was changed from an obligation to pay in foreign currency into an obligation to pay the sterling equivalent at the date of the winding up, and his statement in Lines Bros that payment in sterling discharges the debt.*

186.    This is also a mis-reading of Oliver J's decision. It is necessary to read that decision in the context of the issue and the arguments in that case (see Section M(1) above):

(1)    *In Re Dynamics Corporation* Oliver J was concerned solely with the valuation and discharge of provable claims and his reasoning depended on the need for a common unit of account to ensure the *pari passu* treatment of creditors in the event of a shortfall. He did not consider the position in the event of a surplus or the possibility of a non-provable claim.

(2)    The fact that his decision was consistent with the existence of a non-provable foreign currency claim in the event of a surplus is demonstrated by the fact that, in *Re Lines Bros Ltd*, he did not disagree with Brightman LJ's suggested approach in such a situation. If he had considered that the process of proof had converted the

65

debtor's obligation into a sterling obligation or that payment of the sterling amount would necessarily have discharged the creditor's underlying claim in full, he would have held that the situation considered by Brightman LJ could never arise.

*(6)    One must consider the position of a creditor whose debt has been converted from some foreign currency into sterling at the date of the winding up but **against** which sterling has appreciated between the date of the winding up and the date of payment. No one suggests that his debt should be revalued to reflect the prevailing exchange rate at the date of payment. The problem becomes all the more acute if one postulates a creditor who has claims in more than one currency (say dollars, euros and roubles) which have moved in different directions **against** sterling. It is not suggested that such a creditor should give credit for his currency gains against his currency losses. This is in marked contrast to the obligations to repay contained in rules 2.101(3) (alterations and withdrawals of proof) and rule 2.102(2) (revaluation of security). How can this be **justified**? Surely it can be **justified** only if, as Oliver J said in Dynamics, the original obligation to pay in foreign currency has been converted into an obligation to pay whatever is the sterling equivalent at the date of the winding up. In other words, the conversion is substantive, not merely procedural.*

187.   This does not fairly reflect the merits of the position (see Section Q above):

(1)    The fact that, for the purposes of ensuring *pari passu* treatment of creditors in the event of a shortfall it is necessary to convert foreign currency claims into sterling at the date of liquidation, does not justify forcing a foreign currency creditor to accept payment of less than he is owed if the debtor turns out to be able to pay his debt in full. The creditor is entitled to insist that the debtor pays the foreign currency amount that he owes and the shareholders can be in no better position. Anything else would be unjust.

(2)    The fact that it is possible that, in certain unusual circumstances, the foreign currency creditor may end up receiving more by way of sterling dividends than he is owed is simply a necessary function of the rules which are intended to ensure the *pari passu* distribution of the assets between creditors. This possibility does not justify depriving him of his right to payment in full in the event that sterling depreciates and there is a surplus that would otherwise be distributed to shareholders. Nor, for the reasons elaborated in Section Q, can it fairly be described as a one-way bet in his favour.

(3)    The position of a creditor with multiple claims in different currencies will depend on the facts. In many cases, there is likely to be a close-out provision entitling the debtor to pay the net sum or the debtor will have a right of set-off, such that this

issue will not arise. But where this is not the case, because the creditor and debtor have agreed to keep the obligations separate, the basic justice remains unchanged.

*(7)   Rule 4.91 applies in all cases of winding up, including a members' voluntary winding up where the directors have made the statutory declaration of solvency required to section 89; in other words to what Brightman LJ called a "wholly solvent company". If there is no question but that the company can pay all its debts and statutory interest, it is difficult to see the point of requiring foreign currency debts to be converted unless it is a once and for all conversion.*

188.   A liquidation is classified as a members' voluntary liquidation if the company's directors make a declaration of solvency in accordance with Section 89 of the Act. The declaration is the "*watershed*" which determines whether the liquidation is to be conducted initially as a members' voluntary liquidation or not: *De Courcy v Clement* [1971] Ch 693. It does not, however, necessarily follow that the company is in fact, or will throughout the course of the liquidation be, solvent. Likewise, notwithstanding that a company goes into creditors' voluntary liquidation with no such declaration being made, it does not follow that the company is not in fact, and will at no time in the course of the liquidation be, solvent. Given this, the application of a single process, dealing first with the provable claims of creditors so as to ensure that each creditor is treated equally, leaving until later the just distribution of any surplus, makes perfect sense; see Briggs LJ at [161]-[162].

189.   Furthermore, Lewison LJ's point, if correct, could not be limited solely to non-provable foreign currency claims. Thus it can equally be argued: if the company is a wholly solvent company, what is the point in having a cut-off date and requiring all claims to be valued as at that date? On this argument, it would follow that, by applying the rules in relation to proof to solvent liquidations, the legislature thereby intended to abolish all non-provable claims. The effect of this is that any tort claim or any statutory claim which only came into existence, in the relevant sense, after the date of liquidation would be extinguished. This would include Lewison LJ's victim of a traffic accident. This is plainly not what the legislature intended.

*(8)     It would run counter to Danka Business Systems in which this court held that, at least in the case of provable debts, a liquidator is entitled to make a distribution to members on the basis of provable debts having been proved in full and valued in accordance with the rules.*

190.   The decision in *Re Danka Business Systems* does not assist the Appellants. It does not suggest that distributions may be made to shareholders in circumstances where a creditor has a claim which is due and owing and which has not been paid in full. Instead it concerned whether, rather than estimate the amount of the liability and to pay the

estimated amount, a liquidator of a solvent company could be required to set aside a fund for the purposes of meeting certain contingent claims. It was held that he was not required to do so.

191. It does not follow, however, that payment of the estimated amount necessarily extinguished the creditor's claim. Indeed, *Re Stanhope Pensions v Registrar* indicates that it does not. Thus, if a further asset is later discovered, the company can be restored to the register, and the creditor can re-value his claim and receive a further payment, despite having previously been paid the full amount of his estimated claim.

*(9)    One of the fundamental principles of an insolvency law, as the Cork Committee said, is that the system should "deal comprehensively with, and in one way and other, discharge", all provable debts. Payment of a provable debt in full should discharge it if that principle is to be respected.*

192. This is, with respect, a *non-sequitur*. Payment of the full amount of a provable debt does discharge that provable debt. It does not follow that full payment of the proved debt should also discharge the amount of any debt or part of any debt which was not provable. This is not the case in relation to debts which carry interest. Payment of the amount of the proved debt does not discharge any non-provable claim for post-insolvency interest. This was not the case on the authorities prior to 1986 and nor is it the position under the 1986 Act. Nor similarly does it do so in relation to foreign currency claims, as indicated by Brightman LJ's comments in *Re Lines Bros Ltd*.

*(10)    As Oliver LJ said in Lines Bros, the insolvency code produces winners and losers, and even in a liquidation of a wholly solvent company some creditors do not receive their full contractual entitlement.*

193. The fact that, as a necessary consequence of the need to ensure *pari passu* distribution between creditors, there are sometimes winners and losers cannot justify causing injustice unnecessarily by permitting distributions to be made to members if this would leave creditors with claims that have not been paid in full and which, as a result, will not be paid in full. The recognition of currency conversion claims achieves justice and respects existing rights, whereas the position argued for by the Appellants does not.

## T.    CONCLUSIONS

194. The Sixth Respondent accordingly submits that the Appellants' appeal in respect of paragraph (1) of the Order should be dismissed for the following REASONS:

(1)    The general rule is that the underlying debts of creditors are unaffected by the collective process of administration, and are discharged only to the extent that they are paid out of dividends or by way of insolvency set-off.

(2)    The conversion into sterling of a provable debt pursuant to R.2.86 of the Rules is for the purpose of proof only.

(3)    Where sterling dividends paid in respect of proved debts are, if converted into the foreign currency at the date of receipt, insufficient to discharge in full the foreign currency liability owed by the debtor to the creditor, the unpaid balance of that liability remains a debt owed by the debtor to the creditor.

(4)    Any such unpaid balance of the creditor's foreign currency claim which has not been discharged as a result of the payment of dividends in sterling pursuant to the proof process ranks in LBIE's administration as a non-provable liability.

(5)    Such non-provable liabilities are payable in LBIE's administration from the surplus arising after payment in full of all proved debts and statutory interest on those debts, and before any distribution to subordinated creditors or shareholders.

..............................................
**ROBIN DICKER QC**

..............................................
**RICHARD FISHER**

..............................................
**CHARLOTTE COOKE**

**16 September 2016**

69