**<u>EXHIBIT E</u>**

www.pwc.co.uk/lehman

# *Lehman Brothers International (Europe) – In Administration*

## Joint Administrators' thirteenth progress report for the period from 15 September 2014 to 14 March 2015

*10 April 2015*



## *Important notice*

On page 8 of this report, we have set out an updated illustrative range of the amount of Surplus funds likely to be available after payment in full of the Senior claims of creditors. The precise amount of this future Surplus remains uncertain, and due to commercial sensitivity, confidentiality and/or legal privilege, we are unable to provide detailed commentary on certain issues which will impact this.

The rights of Senior and subordinated creditors, including Subordinated Debt holders, to share in the eventual Surplus remain to be determined. We reserve all rights concerning the relevance and calculation of all claims against the LBIE estate that might eventually share in the Surplus. No conclusion should be drawn or inferred from this report as to the way in which such claims will eventually be assessed. Such matters are the subject of the Waterfall I and II Applications, which are commented on in this report and all relevant papers are set out fully on the LBIE website.

**We caution creditors against using data in this report as a basis for estimating the value of their claims or their likely eventual entitlement to payment from the Surplus. LBIE, the Administrators, their firm, its members, partners and staff and advisers accept no liability to any party for any reliance placed upon this report.**

LBIE also expressly reserves all of its rights against third parties on all matters and no conclusion should be drawn by **third parties as to LBIE's position or** legal arguments on any such matters from references made in this report.

Whilst amounts included in this report are stated in sterling, certain elements of **LBIE's** assets continue to be denominated in currencies other than sterling.

The figures within the report are set out **in £'million rather than £'billion, but** continue to be rounded to the nearest £10 million consistent with previous reports.

This report includes various defined terms as set out in the updated glossary of terms in Appendix G.

# *Contents*

| | | |
|---|---|---|
| **Section 1:** | Purpose of the Administrators' report | 4 |
| **Section 2:** | Executive summary and financial update | 5 |
| **Section 3:** | Counterparty resolution | |
| **Section 3.1:** | House receivables | 12 |
| **Section 3.2:** | Senior creditors | 15 |
| **Section 4:** | Future costs of the Administration and priority claims | 20 |
| **Section 5:** | Trust Estate | |
| **Section 5.1:** | Omnibus Trust | 24 |
| **Section 5.2:** | Other Client Assets | 25 |
| **Section 5.3:** | Client Money estate | 26 |
| **Section 6:** | Surplus entitlements and related UK High Court process | 28 |

**Appendices**

| | | |
|---|---|---|
| **Appendix A:** | Receipts and payments: cumulative and 6 months to 14 March 2015 | 31 |
| **Appendix B:** | Supplemental schedules | 38 |
| **Appendix C:** | Litigation summary | 39 |
| **Appendix D:** | Surplus entitlement UK High Court process (Waterfall I and II) | 40 |
| **Appendix E:** | Administrators' remuneration | 42 |
| **Appendix F:** | Statutory and other information | 45 |
| **Appendix G:** | Glossary of terms | 46 |

# *Section 1:*
# Purpose of the Administrators' report

## Introduction

This report has been prepared by the Administrators of Lehman Brothers International (Europe) under Rule 2.47(3) of the Insolvency Rules.

This is the thirteenth such formal update to unsecured creditors and it provides details of progress made in the 6-month period 15 September 2014 to 14 March 2015. The statutory receipts and payments accounts for the same period are attached at Appendix A.

Wherever possible, again we have sought not to duplicate information disclosed to creditors in previous updates and reports. A copy of previous progress reports and other important announcements can be found at *www.pwc.co.uk/lehman*.

We will host a 1-hour webinar on 30 April 2015, giving creditors an opportunity to hear a summary of the current circumstances of the Administration and to participate in a question and answer session. Details of the webinar will be posted on the above LBIE website.

## Objective of the Administration

The Administrators continue to pursue the statutory objective and specific aims as set out in previous reports and which are summarised at Appendix F.

## Creditors' Committee

We continue to meet with the Committee to review progress and consult on major issues by way of physical meetings, telepresence or audio conference calls.

We remain grateful to the members of the Committee for their continuing efforts in support of the Administration.

The composition of the Committee members remains unchanged and member details are set out in Appendix F.

## Future report and updates

The next formal progress report to creditors will be in 6 **months' time.**

In the interim, we will provide ad hoc updates in the event of any material developments concerning entitlements to the Surplus or other significant matters through the LBIE website, or by other means as appropriate.

Signed:

*AV Lomas*
Joint Administrator
Lehman Brothers International (Europe)
In Administration

# *Section 2:*
## Executive summary and financial update

### *Overall progress since commencement of the Administration*

We have returned c.£35bn to counterparties in the form of cash or assets. Further additional returns in the region of £8bn ultimately may be available in due course.

Outstanding House issues principally pertain to a small number of disputed receivables or Senior claims which are pending court adjudications, and to the complex matters concerning entitlement to the Surplus which are being progressed with the assistance of the UK courts.

Trust Estate returns and claims agreement are now close to a conclusion with substantially all outstanding issues, which are within the control of LBIE, being expected to be finalised within the next reporting period.

The key cumulative returns to date together with updated total indicative Low and High case final outcome returns are detailed below.

| | | Indicative final outcome | |
| | Returned to date £m | Low £m | High £m |
|---|---|---|---|
| **House Estate returns** | | | |
| Distributions to unsecured creditors | 12,020 | 19,270 | 19,980 |
| Other creditor settlements[1] | 240 | 450 | 400 |
| **Trust Estate returns – third parties (net of appropriations)** | | | |
| Client Assets[2] | 14,120 | 14,150 | 14,130 |
| Omnibus Trust [2] | 3,890 | 4,290 | 4,200 |
| Pre-Administration Client Money (including payments in lieu thereof) | 60 | 70 | 70 |
| Post-Administration Client Money | 1,900 | 1,910 | 1,910 |
| **Trust Estate returns – Affiliates (net of appropriations)** | | | |
| Client Assets | 940 | 950 | 950 |
| Post-Administration Client Money | 1,770 | 1,890 | 1,890 |
| **Total returns** | **34,940** | **42,980** | **43,530** |

1. Includes overseas creditor settlements and certain priority payments.
2. The Low case outcome is higher than the High case outcome as more appropriations are assumed on the High case basis.

The final outcome returns are indicative. Creditors are reminded that the indicative values represent an estimate only and that significant matters remain unresolved that may materially impact this estimate.

### *Significant developments in the reporting period*

The principal movements in the High and Low case outcomes may be summarised as follows:

| | | Indicative final outcome | |
| | Page | Low £m | High £m |
|---|---|---|---|
| Surplus as at 14 September 2014 | | 4,940 | 7,390 |
| **In the period** | | | |
| **House receivables** | | | |
| AGR[1] | 13 | - | (210) |
| German bank settlement [2] | 12/16 | 200 | 50 |
| Other receivables | 12 | 100 | 90 |
| **Senior creditors** | | | |
| BarCap[3] | 19 | 100 | 100 |
| Other claims resolution | 16 | 670 | 140 |
| **Other movements** | | | |
| Other | | - | 30 |
| **Improvement in the period** | | **1,070** | **200** |
| **Surplus as at 14 March 2015** | | **6,010** | **7,590** |

1. The High case outcome has been revised downwards following exchange of expert valuation reports.
2. This movement reflects the aggregate impact from resolving 2 separate, but related, counterparties: 1 with a House receivable position, and the other with a Senior creditor position.
3. Our previous indicative financial outcome assumed a residual BarCap Senior claim of c.£100m in both the High and Low case. The High case outcome now assumes there would be no BarCap Senior claim arising. The Low case outcome now assumes a c.£520m claim (c.£928m claim value translated as at 15 September 2008), coincidentally offset by the LBI indemnity of $777m, translated to sterling at the current exchange rate.

In the last 6 months, in conjunction with progressing the agreement of outstanding unsecured claims and collection of House receivables via litigation as necessary, the Administrators have progressed legal proceedings seeking directions on 39 complex matters in the Waterfall II Application to allow the substantial House Surplus to be distributed. These UK High Court proceedings are planned to continue to October 2015 at least.

Outstanding issues, within the control of LBIE, relating to the Trust Estate (comprising the Omnibus Trust, Client Money and Client Assets estates) have continued to be addressed in the period with substantial resolution of these expected within the next 6 months. Certain factors relating to the Trust Estate remain outside of the control of LBIE, in particular the US litigation involving LBI and BarCap (which impacts Client Money) and certain non-engaging Trust Estate counterparties (potentially impacting all areas). Such issues will be advanced where possible in the next reporting period, including seeking UK High Court directions where appropriate, but these issues may delay formal closure of the respective trust estates in the short term.

In parallel with the Surplus directions hearings, we have begun the development of processes, infrastructure and data sources to support the eventual Surplus entitlement claims agreement and payment activity, in advance of either receiving the relevant court judgments or otherwise agreeing a commercial compromise between the respondents in the proceedings.

## House receivables (Section 3.1)

Following completion of a further 38 Street and Exchanges debtor groups, another c.£370m has been recovered, with only 18 Street groups remaining unresolved.

Future Street recoveries are largely dependent upon overseas branch fund repatriations or recovery of debts that are subject to legal proceedings. The largest debt that is subject to litigation, AGR, was subject to an exchange of expert valuation reports as part of the US court process on 27 March 2015. As a result, the High case indicative outcome has been reduced by c.£210m (net of exchange rate movements) to c.£330m.

Affiliate recoveries of c.£260m in the period mainly relate to distributions received on agreed claims, with future indicative recoveries expected to derive from further distributions or recoveries from insolvent Affiliate estates.

## Senior creditors (Section 3.2)

Monthly 'catch-up' dividends of c.£500m were paid in the period on eligible admitted claims.

Agreed/admitted claims have increased in number by 140 to 2,823, with the total agreed/admitted claim value increasing by c.£460m to c.£12.19bn.

A further 82 claims (Proofs of Debt totalling c.£210m) were either withdrawn or rejected in full in the period.

Approximately 130 claims remain (Proofs of Debt totalling c.£1.31bn), which, by value, represent the final c.2% of claims to be agreed in the indicative High case outcome estimate of total Senior creditor claims (if our High case assumptions are proven to be valid). Of these, 13 claims (Proofs of Debt totalling c.£1.04bn) are currently the subject of legal proceedings to determine their outcome.

## Future costs of the Administration and priority claims (Section 4)

Future Administration costs are estimated at c.£620m in both the indicative High and Low case outcomes, of which c.£110m had already been paid or committed as at 28 February 2015. The outcomes are based on identical assumptions, in particular that the Waterfall proceedings will involve an extended appeal process.

The revision to estimated future costs of c.£60m predominantly relates to a reduction in the reserve for future legal costs, in line with the reduced level of litigation now anticipated based on developments in the past 6 months. We continue to caution that the estimates remain subject to significant uncertainties regarding assumed outcomes and timings.

Priority claimants include the potential liability for certain indemnities that have been given by LBIE post-Administration, and other potential claims (including tax) that could crystallise in certain circumstances. There have been no significant movements in the period. In the High case outcome we continue to assume that all indemnities will terminate without liability and that a large part, but not all, of the tax provisions will be released.

The following further progress has been made towards closure of LBIE's Trust Estate:

### Omnibus Trust (Section 5.1)

Agreement was reached with the IRS resolving the US withholding tax treatment on distributions in excess of 100% of Best Claim value.

A further gross True-up and Catch-up distribution of c.$110m in aggregate was paid on 30 October 2014 to eligible beneficiaries.

Steps are in train for a final third distribution at a gross value equal to c.4% of consenting **beneficiaries'** Best Claim value and this is planned for June 2015, together with a final True-up and Catch-up distribution.

### Other Client Assets (Section 5.2)

33 individual Client Assets lines were returned in the period, with the return of the remaining 59 Client Assets lines being delayed by outstanding deed executions, non-responsive clients or market restrictions. LBIE will continue efforts to return the remaining assets in the next 6 months. Any assets that we are eventually unable to return may become the subject of a UK High Court application, intended to transfer those assets to the **court's control.**

All remaining Over-Claims were fully resolved in the period.

### Client Money estate (Section 5.3)

A further 20 CME counterparties (1,211 to date) were agreed and resolved in the period. The majority of the remaining 111 unresolved CME counterparties, with whom engagement has not been possible, will require UK High Court directions to finalise. Regardless, u**ntil such time as the status of BarCap's** claim is finally determined, the Client Money estate cannot be closed. The related LBI/BarCap litigation in the USA is ongoing and there is a risk that this will continue for some time yet. At some point, LBIE may need to commence further UK legal proceedings of its own in order to ascertain the status and **quantum of BarCap's claim against LBIE, if any.**

### Surplus entitlements and related UK High Court process (Section 6)

The Waterfall II Application in respect of the 39 Surplus entitlements matters has commenced. In view of their complexities and scope, the matters have been divided into 3 tranches, each tranche to be subject to a separate timetable and hearing. The first tranche (A) dealt with insolvency law questions, the second (B) will deal with release clauses in certain post-Administration contracts and the third (C) will deal with cost of funding under ISDA master agreements and similar contracts.

The Waterfall I Appeal hearing commenced on 23 March 2015 and the Waterfall II tranche A hearing commenced on 16 February 2015. Judgment in respect of both of these is expected before the summer, but both could be the subject of appeal.

We continue to **review the respondents' positions with a view to** developing a compromise solution to the Surplus entitlements, **with the hope that the respondents' appetites for this will** increase as the matters of major uncertainty begin to be resolved by the court proceedings. No timing can be put on when this may happen as a preferable solution, but no near term resolution is expected.

No assumptions are made in the indicative financial outcome as to recoveries under any LBIE contribution claims against its Shareholders or the agreement and admittance of **Shareholders' claims against LBIE (aggregate Proofs of Debt** c.£1.65bn) pending resolution of the above issues.

By the date of the next progress report (October 2015) it is likely that judgment in respect of the Waterfall I Appeal and in respect of tranche A of the Waterfall II Application will have been handed down. Based on these and other relevant assumptions, we intend to provide creditors with a Surplus indicative financial outcome in the next report, setting out on an illustrative basis a range of potential outcomes.

## *Indicative financial outcome*

Set out in the table below is an updated summary of the indicative Low and High case financial outcome scenarios for Senior creditors. This should be read in conjunction with the narrative and assumptions set out below and elsewhere in this report.

The indicative Low and High case outcomes have increased by c.£1.07bn and c.£200m, respectively, since our previous report, due to continued progress in Senior claims agreement at amounts below their originally claimed Proof of Debt values or withdrawal/rejection of claims, together with certain improved assumed House receivables. We have also changed our assumptions around the treatment of the BarCap claim in House receivables and Senior creditors.

| Page | House Estate at 14 March 2015 | Low £m | High £m | Difference £m |
|---|---|---|---|---|
| 31 | Cash deposits and government bonds | 6,540 | 6,540 | - |
| 31/33 | Add back: interim dividends paid and accrued to date | 12,190 | 12,190 | - |
| | **Total cash in hand and returned to date** | **18,730** | **18,730** | **-** |
| | **Projected future movements** | | | |
| 26 | Net Client Money benefit to the House Estate | 950 | 1,010 | 60 |
| 13 | House receivables | 900 | 1,010 | 110 |
| 38 | House securities | 70 | 80 | 10 |
| 20 | Future estimated costs | (620) | (620) | - |
| 21 | Priority claims[1] | (760) | (230) | 530 |
| | **Total future cash expected to be recovered** | **540** | **1,250** | **710** |
| | **Funds available for Senior creditors** | **19,270** | **19,980** | **710** |
| 15 | Senior creditors | (13,260) | (12,390) | 870 |
| | **Surplus before Post-Administration Interest, non-provable claims, Subordinated Debt and Shareholder claims** | **6,010** | **7,590** | **1,580** |

1.    Amounts included in priority claims do not rank for Post-Administration Interest.

The difference between the indicative Low and High case scenarios has continued to narrow and primarily now reflects the differing assumptions relating to outcomes of litigation, both in respect of House receivables (c.£110m) and Senior claims (c.£870m), and the extent to which priority claim payments are ultimately required to be made (c.£530m).



Creditors should take note that their individual entitlement to share in the Surplus is likely to depend upon a combination of some or all of the following factors: the timing of distributions made to them; the nature of their underlying contracts with LBIE; the terms of any agreements with LBIE that were entered into by the creditor post-Administration; and whether or not the courts eventually find that particular heads of claim exist as a matter of law.

## *Priorities for 2015*

The Administrators' **priorities for** the remainder of 2015 are:

- progression of the Waterfall directions applications and appeal, in parallel with the establishment of the necessary infrastructure for determining and processing claims against the Surplus and making payments against these claims, whilst continuing to seek a consensual solution:

- finalisation of House receivables and Senior claims consensual agreement initiatives:

- commencement and progression of House receivables and Senior claims litigation, as necessary, including negotiation of compromises, if appropriate:

- resolution of Omnibus Trust, other Client Assets and Client Money estate issues that are **within LBIE's control,** with subsequent UK High Court applications with a view to terminating the trusts, if appropriate: and

- ongoing simplification of operations, systems and processes in line with activity wind down, and associated reduction of Administration costs.

# Section 3:
## Counterparty resolution

# Section 3.1:
## House receivables

### Introduction

In the period, we have recovered a further c.£710m of House receivables including completion of a further 38 Street and Exchanges debtor groups, with only 18 Street groups now remaining (after reallocations and reclassifications in the period).

The future House receivables referred to below are indicative only and creditors are reminded that such recoveries represent an estimate only and that significant matters remain unresolved that may materially impact this estimate.

### Progress

Debtor receipts and securities recovered in the period, together with indicative future recoveries, are shown below.

| | Indicative future recoveries | |
|---|---|---|
| | Low £m | High £m |
| Reported as at 14 September 2014 | 840 | 1,720 |
| **In the period** | | |
| **Recoveries** | | |
| Street counterparties and Exchanges | (370) | (370) |
| Affiliates | (260) | (260) |
| Client Assets claimant debtors | (50) | (50) |
| Tax assets | (30) | (30) |
| | (710) | (710) |
| **Revisions[1]** | | |
| Street counterparties and Exchanges | 130 | (110) |
| Affiliates[2] | 610 | - |
| Client Assets claimant debtors | 10 | 100 |
| Tax assets | 20 | 10 |
| | 770 | - |
| **Debtors at 14 March 2015** | 900 | 1,010 |

1. Revisions in the period relate to updated estimates for indicative future recoveries since September 2014.
2. The improvement mainly relates to a change made in our treatment of an indemnity provided by LBI in respect of the BarCap claim and is offset by a grossing up of the BarCap claim in Senior creditors (see pages 14 and 19).

Continued progress has been made negotiating and recovering debts owed to LBIE by Affiliate and non-Affiliate counterparties. A total of c.£710m in cash and securities was received in the period and total indicative future recoveries of c.£900m and c.£1.01bn are estimated in the Low and High cases, respectively.

#### Street counterparties and Exchanges

During the last 6 months, a total of 35 Street debtor groups and the remaining 3 Exchanges groups were completed. Of the groups that settled, highlights included:

- a German bank settling a debt at c.£150m;
- a US bank paying a combination of cash and securities of c.£120m;
- the repatriation of c.£40m of Exchanges collateral held in Taiwan;
- a recovery of c.£30m from LBIE Seoul Branch; and
- a US fund paying c.£20m.

The Street debtor collection strategy has been to seek to negotiate settlement for the remaining debtor population where possible. This has largely proved successful, with only 1 new debt recovery legal proceeding being commenced in the period.

The revision to the indicative Low and High case outcomes reflects the settlement with a German bank on a gross not a net basis in respect of an associated unsecured claim (see note 2 of the bottom table on page 16). This improvement in the High case outcome is more than offset by the reduction in the AGR debt recovery following the exchange of expert reports (see page 13).

#### Affiliates

Recoveries of c.£260m from Affiliates comprised:

- c.£80m from LBHI in final settlement of LBIE's share of distributions from the LB Lux estate;
- c.£70m from LBHK as distributions on LBIE's unsecured House claims and recovery of securities subject to forward sale contracts;
- c.£40m from LBB as distributions on LBIE's unsecured House claim;
- c.£20m of securities released following settlement with Merit;
- c.£20m of excess segregated securities and derived income released to House from the client depot and post-Administration Client Money which originally related to clients of LBSF;
- c.£20m received from MCF as a further (third) distribution; and
- c.£10m of other recoveries, primarily from LBSF.

The c.£610m revision to the indicative Low case outcome mainly arises from the recognition of a receivable due from LBI relating to an indemnity provided by it in respect of the BarCap claim (this matter was treated in a different way in our previous reports – see page 19). In addition, higher estimates are now forecast for future distributions to be paid by Affiliate estates.

## Client Assets claimant debtors

Client Assets claimant debtor recoveries of c.£50m related to:

- c.£30m of appropriations and assignments arising from further Omnibus Trust Catch-up distributions (see Section 5.1): and

- c.£20m of other recoveries including appropriations of cash held as collateral for Client Assets claimants following resolution of potential Client Assets shortfalls.

The c.£100m revision to the indicative High case outcome assumes no US withholding tax will be paid to the IRS on distributions relating to Omnibus Trust claims assigned to LBIE, reflecting the agreement reached with the IRS in the period (see Section 5.1).

## Indicative outcome

House Estate debtors as at 14 March 2015 are set out below.

| | Rec'd in period £m | Indicative future recoveries | |
| --- | --- | --- | --- |
| | | Low £m | High £m |
| **Street counterparties & Exchanges** | | | |
| AGR litigation | - | - | 330 |
| Others – in litigation | - | - | 30 |
| LBIE Seoul Branch | 30 | 130 | 160 |
| LBIE Zurich Branch | - | 20 | 40 |
| Other debtors | 340 | - | 10 |
| **Total Street & Exchanges** | **370** | **150** | **570** |
| **Affiliates** | | | |
| LBI | - | 520 | - |
| MCF | 20 | 150 | 200 |
| LBHK | 70 | - | 20 |
| Others | 170 | 50 | 80 |
| **Total Affiliates** | **260** | **720** | **300** |
| **Client Assets claimant debtors** | | | |
| Omnibus Trust appropriations/assignments | 30 | 20 | 110 |
| Other recoveries | 20 | - | 20 |
| **Total Client Assets claimant debtors** | **50** | **20** | **130** |
| **Tax assets** | **30** | **10** | **10** |
| **Debtors at 14 March 2015** | **710** | **900** | **1,010** |

## Street counterparties and Exchanges

### AGR litigation

The highest value outstanding debt relates to AGR, which involves an ISDA OTC derivatives valuation dispute concerning 28 derivative transactions, which AGR terminated in July 2009. AGR, as the non-defaulting party, was required to determine the amount payable on termination, which it determined as c.$25m payable to AGR.

Under the terms of the ISDA, the loss determination must be made reasonably and in good faith. LBIE asserts that AGR's valuation of loss was not reasonable as AGR did not use a market-based valuation methodology.

LBIE had sought valuation advice from a third party to determine whether, prima facie, it had a case worth pursuing by litigation. The third party estimated the value of the 28 transactions to be up to c.$880m (c.£590m) receivable by LBIE, **prior to any adjustment for AGR's credit risk.**

LBIE has retained an expert to undertake a more detailed valuation of the 28 transactions, which will affect the quantum of L**BIE's claim in the litigation.** The expert has valued the 28 transactions at c.$500m (c.£340m) receivable by LBIE, prior to any adjustment for AGR's credit risk, or in excess of c.$200m (c.£130m) with such an adjustment. LBIE and AGR exchanged their respective expert reports on 27 March 2015.

The New York Supreme Court's judgment on the parties' respective motions to challenge parts of the previously reported court-appointed Special Referee's report and recommendation on the motion to compel AGR to disclose certain withheld documents is still pending, but is expected shortly.

Key future dates in the litigation are as follows:

- June 2015 - exchange supplemental expert reports (if any):

- July 2015 - complete expert depositions and file note of issue (completion of discovery): and

- September 2015 - file summary judgment motions.

The summary judgment hearing and the trial are likely to take place in 2016, at the earliest.

The indicative Low case outcome assumes nil recovery from AGR and the updated indicative High case outcome assumes c.£330m, which represents full recovery of **the LBIE expert's** valuation (net of unpaid premiums of c.£10m), before any **adjustment for AGR's credit risk.** This assessment excludes any uplift in respect of pre-judgment interest (of up to 9% p.a.). Creditors are reminded that the eventual sum recovered could be anywhere within the indicated range.

### Others – in litigation

There are currently 4 ongoing Street debtor litigation actions (excluding AGR) subject to UK or Greek court jurisdiction. Further details are provided at Appendix C.

### LBIE Seoul Branch

Surplus funds in the liquidation remain held in the branch in Seoul, pending their return to LBIE. c.£30m of funds were recovered in the period following completion of an audit of the branch accounts.

The branch liquidators have continued to progress disputed Affiliate claims and outstanding regulatory compliance issues, in order to close the liquidation. The liquidators expect to repatriate remaining surplus funds during the course of 2015, subject to resolution of a small number of remaining disputed claims.

### LBIE Zurich Branch

Surplus funds in the liquidation remain held in the branch in Zurich, pending local clearances being obtained.

LBIE has continued to engage with the local liquidators and regulator in an effort to satisfy the regulators' requirements. It is LBIE's understanding that the liquidators expect to obtain necessary local clearances shortly.

### Other debtors

All Exchanges debtors have now been settled.

The remaining other Street debtor population and amounts recoverable mainly relate to the following categories:

- claims against insolvent debtors where future distributions are forecast based upon a specific assessment;
- claims under trading contracts which have yet to terminate, where a general recovery assumption has been made; and
- potential cross-over claims, where the debtor concerned has submitted an unsecured claim against LBIE.

### Affiliates

### LBI

The new LBI indicative Low case future recovery relates to the indemnity provided by LBI in respect of the BarCap claim which was presented in previous progress reports as being netted against the value of the BarCap claim. This is explained in more detail in the Senior creditors section at page 19.

### MCF

The improvement in the Low case outcome reflects progress by MCF in resolving certain regulatory issues which impact potential recoveries from assets controlled by MCF.

LBIE continues to have a regular dialogue with MCF to understand its plans for resolution of the estate through the realisation of value from assets under its control. However, LBIE can have only limited influence in this respect.

### LBHK

The potential recoveries are mainly dependent upon resolution of a competing claim from 1 of LBIE's clients which LBIE expects to resolve prior to the end of 2015.

### Others

Expected future recoveries relate to distributions from LBSF and other insolvent Affiliate estates.

### Client Assets claimant debtors

The remaining Client Assets claimant debtors on an indicative Low case outcome primarily comprise of debtors previously classified as Omnibus Trust Non-Consenting beneficiaries and ineligible consenting beneficiaries.

The indicative High case outcome includes assumed additional recoveries from debts that are subject to litigation in a German court jurisdiction and that no US withholding tax is paid to the IRS in respect of distributions from the Omnibus Trust on assigned claims.

# Section 3.2:
## Senior creditors

### Introduction

Significant progress has been made in the period, with c.£460m of unsecured claims (original Proofs of Debt totalling c.£720m) being agreed/admitted for dividend, bringing the total agreed/admitted unsecured claims to c.£12.19bn. Approximately 130 unresolved claims with Proofs of Debt totalling c.£1.31bn continue to be progressed.

Claims of Shareholders are excluded from all analyses in this section.

### Monthly 'catch-up' dividends

'Catch-up' dividends continue to be paid monthly and c.£500m of such dividends were paid in the period as further claims were admitted, bringing cumulative dividends paid to 14 March 2015 to c.£12.02bn.

There will continue to be a monthly cut-off and 'catch-up' dividend payment programme for eligible Senior claims that have not yet received distributions.

### Indicative outcome

The estimated range of values for **LBIE's** total Senior liabilities, shown in the table below, is indicative only and creditors are reminded that significant matters remain unresolved that may materially impact this estimate.

| Senior creditors | Admitted/ agreed to date[1] £m | Pending[2] Low £m | High £m | Indicative outcome[3] Low £m | High £m |
|---|---|---|---|---|---|
| **Non-Affiliate creditors** | | | | | |
| Street Creditors | (6,950) | (960) | (150) | (7,910) | (7,100) |
| Client Assets claimant creditors[4] | (4,010) | (80) | (30) | (4,090) | (4,040) |
| Other third party creditors | (40) | (20) | (20) | (60) | (60) |
| **Total non-Affiliate creditors** | **(11,000)** | **(1,060)** | **(200)** | **(12,060)** | **(11,200)** |
| SCSO settled claims | (30) | - | - | (30) | (30) |
| **Affiliate creditors** | **(1,160)** | **(10)** | **-** | **(1,170)** | **(1,160)** |
| **Total** | **(12,190)** | **(1,070)** | **(200)** | **(13,260)** | **(12,390)** |

1. 'Admitted/agreed to date' includes claims agreed by Claims Determination Deeds and partial admittance letters where in certain cases legal challenge has been initiated by creditors on the balance of their Proof of Debt. The balance is included as a pending claim.
2. Proofs of Debt relating to pending claims total c.£1.3bn.
3. The indicative outcome includes the total value of the claims 'admitted/agreed to date' and the indicative Low/High case value of pending claims.
4. 'Client Assets claimant creditors' includes pending unsecured claims arising from Client Assets shortfalls.

### Pending claims – assumptions made

For all compliant Proofs of Debt received by the Administrators where the claim has not yet been agreed/admitted, withdrawn or rejected (with the rejection appeal period having passed), we continue to make an appropriate reserve.

The indicative Low case outcome (c.£1.07bn) assumes the aggregate of the higher of the values of (a) filed Proofs of Debt **and (b) LBIE's assessment of the pending** claims, combined with certain specific adjustments including reflecting the terms of settlements executed shortly after the period end.

The indicative High case outcome (c.£200m) assumes:

#### Non-Affiliate creditors

(a) c.£120m in aggregate for 13 claims subject to litigation (including damages or compensation claims) compared to a total Proof of Debt value of c.£1.04bn;

(b) c.£60m in aggregate for 13 pending claims (including 7 damages claims) with individual Proof of Debt values in excess of £4m (c.£160m Proof of Debt value in aggregate), not currently in a litigation procedure, based upon detailed specific assumptions;

(c) c.£10m in aggregate for 13 pending claims with individual Proof of Debt values between £1m and £4m (c.£20m Proof of Debt value in aggregate) based upon an assumed average settlement rate of 50% of the Proof of Debt value;

(d) c.£10m in aggregate for individual claims below a £1m Proof of Debt value, based on a high level review only, assuming that CME will be assigned to **LBIE's nominee,** Laurifer, and applying general percentage reductions or uplifts **to the counterparties' Proof of Debt value. Th**e population of claims below £1m comprises 33 claims (c.£10m Proof of Debt value in aggregate), together with 60 contingent and other claims which have a nil Proof of Debt value; and

#### Affiliate creditors

(e) specific assessments are made as to the eventual claims resolution.

## Claims agreement: status as at 14 March 2015

The status of non-Affiliate Senior claims is summarised in the table below.

| Unsecured claimants | No offers made | | | Offers made not agreed[1] | | | Admitted/ agreed claims[2,3] | | | In litigation | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No. of PODs | Proof of Debt £m | LBIE view £m | No. of offers | Proof of Debt £m | LBIE offer £m | No. of deeds | Proof of Debt £m | Agreed claim £m | No. | Proof of Debt £m | No. of PODs/ deeds | Proof of Debt £m | LBIE view/ offer/ agreed £m |
| **Where Proofs of Debt have been filed** | | | | | | | | | | | | | | |
| Street Creditors | 36 | (90) | (10) | 34 | (40) | (10) | 1,337 | (9,960) | (6,950) | 11 | (960) | 1,418 | (11,050) | (6,970) |
| Client Assets claimant creditors | 8 | (50) | - | 31 | - | - | 439 | (5,120) | (4,010) | 1 | (80) | 479 | (5,250) | (4,010) |
| Other third party creditors | 6 | (10) | (10) | 4 | - | - | 114 | (60) | (40) | 1 | - | 125 | (70) | (50) |
| **Total non-Affiliate Senior creditors** | **50** | **(150)** | **(20)** | **69** | **(40)** | **(10)** | **1,890** | **(15,140)** | **(11,000)** | **13** | **(1,040)** | **2,022** | **(16,370)** | **(11,030)** |

1.   'Offers made not agreed' includes 50 claims (in aggregate c.£1m) where CME offers have been made but counterparties have been unresponsive. Accordingly, the claims are likely to be included in any application to the UK High Court to finalise the Client Money estate.

2.   The admitted population excludes 860 creditors (c.£30m aggregate value) that have accepted the SCSO. It includes 5 agreed claims (c.£4m aggregate value) admitted shortly after the period end and 1 agreed claim (c.£1m) where CME has yet to be finalised.

3.   c.$1.5bn of non-Affiliate Client Money claims has **been waived or assigned to LBIE's nominee**, Laurifer, in exchange for admission as an unsecured claim.

The table below summarises the key changes to Senior creditors in the High and Low case indicative outcome scenarios as compared to 14 September 2014.

| Movements in the period | Proof of Debt £m | Indicative outcome | |
|---|---|---|---|
| | | Low £m | High £m |
| Senior creditors as at 14 September 2014 | (16,160) | (13,560) | (12,560) |
| **In the period** | | | |
| BarCap claim[1] | (420) | (420) | 100 |
| Rejections in full/withdrawals | 210 | 210 | 70 |
| Admitted claims | 30 | 320 | (70)[2] |
| Amendments to reserves for pending claims | (10) | 210[3] | 90 |
| New claims submitted | (20) | (20) | (20) |
| **Movement in the period** | **(210)** | **300** | **170** |
| **Senior creditors as at 14 March 2015** | **(16,370)[4]** | **(13,260)** | **(12,390)** |

1.   See explanation on page 19.

2.   A claim admitted for c.£110m in the period related to a legal entity which was part of a group where another group member settled its separate indebtedness to LBIE, in the period, in the sum of c.£150m when the group elected not to set off these balances. In previous progress reports, these 2 obligations were netted for indicative outcome purposes with an assumed admittance of the claim net of the debt resulting in a reported adverse movement of c.£70m relating to the admitted claim, but also a compensating favourable movement in the House receivables recoveries of c.£120m in the period.

3.   The Low case improvement predominantly relates to the terms agreed in settlement deeds for 4 claims executed shortly after the period end.

4.   Affiliate Proof of Debt values are excluded because certain Affiliate Proofs of Debt were very materially overstated and were not formally revised prior to settlement, but the settled claim amounts are however reflected in the Low and High case indicative outcome scenarios at c.£1.17bn and c.£1.16bn, respectively.

## *Progress*

### Claims agreement

#### *Non-Affiliate creditors*

In the period, 134 non-Affiliate claims against the House Estate with an aggregate value of c.£380m were agreed/admitted. This agreed/admitted amount was, in aggregate, c.£230m less than the associated submitted Proof of Debt values (net of Proofs of Debt value reductions of c.£30m agreed by LBIE with claimants in the period).

#### *Street Creditors*

Bilateral negotiation and Consensual Approach claims agreement processes have continued in the period. In particular:

- 31 offers with an aggregate value of c.£210m (Proofs of Debt of c.£300m) were issued following bilateral negotiation; and

- 94 claims (totalling c.£320m), including claims with a CME, were agreed/admitted under either the Consensual Approach or pursuant to bilaterally negotiated offers, resulting in a release of reserves totalling c.£190m.

#### *Client Assets claimant creditors*

In the period, 19 claims, including claims with CME, totalling c.£60m were agreed/admitted.

#### *Other third party creditors*

These claims relate to non-financial trading creditors and former overseas branch employees.

In the period, 21 offers totalling less than £10m were made and subsequently admitted, predominantly at offer values.

### *Affiliate creditors*

Progress on the 11 outstanding Affiliate claims previously reported and 1 new Affiliate claim made in the period comprised:

- 6 claims being admitted (value totalling c.£80m), predominantly for entities under common control;

- 3 claims being withdrawn; and

- 1 claim being rejected.

2 claims remained outstanding as at 14 March 2015.

### Withdrawals and rejections

Work on seeking consensual withdrawals of invalid claims or, if necessary, formally rejecting such claims has continued in the period.

Over the past 6 months, 41 claims (Proofs of Debt totalling c.£120m) were withdrawn, including 2 claims withdrawn as part of settlements which also discontinued appeals against full rejection notices. Accordingly, as at 14 March 2015, a total of 511 claims had been withdrawn (Proofs of Debt totalling c.£1.03bn).

In addition, where claimants had been unresponsive to withdrawal requests or had failed to supply requested supporting evidence:

- 38 full rejection notices were issued in the period (Proofs of Debt totalling c.£10m), with no appeal being made;

- 2 full rejection notices were issued in the period (Proofs of Debt totalling c.£10m) that were subject to appeal, 1 of which (Proof of Debt of c.£1m) was discontinued in the period; and

- 2 appeals in respect of full rejection notices issued in prior periods were discontinued (Proofs of Debt totalling c.£80m).

Consequently, as at 14 March 2015, a total of 238 claims (Proofs of Debt totalling c.£470m) had been rejected in full.

LBIE has continued to issue partial admittance/rejection letters in circumstances where full rejection was not appropriate. Over the past 6 months, 15 such letters (Proofs of Debt rejected totalling c.£20m) were issued, with 4 being subject to appeal. Also in the period, 3 appeals against partial rejection letters issued in current and prior periods were discontinued.

### *Appeals against rejections*

As commented upon above, significant progress has been made in the period in resolving appeals against full and partial rejections, as summarised below.

| Appeals | No. | Proof of Debt £m |
|---|---|---|
| Appeals against rejections – 14 September 2014 | 9 | (410) |
| **In the period** | | |
| New appeals against full/partial rejections | 6 | (20) |
| Appeal resolved – claim withdrawn | (2) | - |
| Appeal resolved – claim rejected | (2) | 10 |
| Appeal resolved – expense payment[1] | (2) | 80 |
| Appeal resolved – Proof of Debt revised | (2) | - |
| | (2) | 70 |
| Appeals against rejections – 14 March 2015 | 7 | (340) |

1. Expense payments of c.£1m were paid in the period to settle 2 claims in litigation (Proofs of Debt value c.£80m).

**New claims submitted**

Only 17 new claims were submitted in the period (Proofs of Debt totalling c.£20m).

**Pending claims (excluding litigation)**

*Non-Affiliate creditors*

50 creditors have submitted Proofs of Debt totalling c.£150m in response to which, due to specific legal, commercial and/or valuation issues, LBIE has not made offers.

69 creditors have submitted Proofs of Debt totalling c.£40m for which offers totalling c.£10m have been made to, but not yet accepted by, claimants. Reasons for non-acceptance include legal disputes, valuation differences and set-off negotiations.

*Street Creditors*

The 70 unresolved Street claims (Proofs of Debt totalling c.£130m) include:

- 15 damages-related claims (Proofs of Debt totalling c.£80m);

- 5 claims (Proofs of Debt totalling c.£20m) which remain subject to detailed bilateral negotiation processes;

- 1 claim (Proof of Debt of c.£10m) which was admitted shortly after the period end; and

- 24 claims of nominal value that relate to CME offers made, but to which counterparties are currently unresponsive.

*Client Assets claimant creditors*

The 39 pending claims (Proofs of Debt totalling c.£50m) include:

- 1 damages-related claim (Proof of Debt of c.£50m) which was withdrawn shortly after the period end; and

- 26 claims of nominal value where CME offers have been made, but to which counterparties are currently unresponsive. Accordingly, this type of claim is likely to be included in an application to the UK High Court to finalise the Client Money estate.

*Other third party creditors*

The remaining 10 other third party creditor claims (Proofs of Debt totalling c.£10m) are expected to be resolved shortly. The major claim by value is an Italian tax unsecured claim.

*Affiliate creditors*

Of the 2 remaining claims:

- 1 claim, and a related Client Assets claimant claim (see above), was withdrawn shortly after the period end as part of a settlement in return for an expense payment (included as an outstanding priority claim as at 14 March 2015 – see page 21); and

- 1 claim is contingent and will only crystallise in the event that the Affiliate receives any related claims from third parties. It is anticipated that the Affiliate will shortly declare a bar date for final claims submission to its estate that should facilitate a final resolution of this matter.

**Litigation**

Claims 'in litigation' that are currently subject to UK or overseas based legal proceedings are summarised below (further details are provided at Appendix C).

| Type of claim[1] | Jurisdiction | No. | Proof of Debt £m |
|---|---|---|---|
| Damages/compensation[2] | UK | 3 | (320) |
| LBI/BarCap | US | 1 | (520) |
| Debtor recovery | UK/US | 4 | (70) |
| Other | UK | 5 | (130) |
| Claims 'in litigation' | | 13 | (1,040) |

1. Of the 13 litigation claims, 7 arise from appeals against rejections of claims by LBIE.
2. Claims relate to alleged fraudulent misrepresentation, negligent/false misstatements, indemnification and other issues.

The number of litigation cases had been expected to increase significantly in the period as:

- escalation plans were progressed for Street debtor collections to encourage settlement or to commence litigation; and

- bilateral negotiations relating to remaining Senior claims were progressed to the point of either admittance or withdrawal/rejection.

In the event, the majority of issues were resolved by mutual agreement, with only 7 new legal proceedings commencing in the period (offset by 8 appeals against rejections being withdrawn in the period).

In addition, as detailed at Appendix C, of the 13 creditor proceedings as at 14 March 2015, 4 claims (Proofs of Debt totalling c.£130m) were settled shortly after the period end.

Court proceedings for the 9 remaining claims in litigation may be subject to lengthy timelines for resolution, particularly if subject to court appeals.

Other remaining unresolved claims may ultimately require court adjudication where mutually agreeable resolutions cannot be reached.

## BarCap

Since our last update there have been some further developments in the USA concerning the LBI/BarCap litigation. As a consequence, the scope of our dialogue with these counterparties has expanded to a degree and this has led us to modify the assumptions underpinning the presentation of the BarCap claim in the indicative financial outcome statement within this report as summarised below.

| BarCap indicative financial outcome | Low £m | High £m |
|---|---|---|
| **14 September 2014 progress report** | | |
| House receivables | - | - |
| Senior creditors – net of LBI indemnity | (100) | (100) |
| **House indicative financial outcome impact** | **(100)** | **(100)** |
| CME claim | - | - |
| **14 March 2015 progress report** | | |
| House receivables – LBI indemnity[1] | 520 | - |
| Senior creditors[2] | (520) | - |
| **House indicative financial outcome impact** | **-** | **-** |
| CME claim | - | - |
| **House indicative financial outcome movement** | **100** | **100** |

1.  $777m indemnity value translated into sterling at 14 March 2015 US dollar exchange rate.
2.  c.$928m BarCap Proof of Debt value translated into sterling at 15 September 2008 US dollar exchange rate.

In our previous report, in both the High and Low case outcomes the BarCap claim was shown net of the assumed recovery of a $777m indemnity provided by LBI. In this current report, the BarCap claim is shown in the Low case outcome without taking account of the LBI indemnity, which in turn is shown as a House receivable. In the High case outcome, it is assumed that either BarCap has no claim against LBIE or alternatively that a CME claim into the Client Money estate is agreed at an amount less than the LBI indemnity.

Notwithstanding this, there are a number of issues which need to be resolved before any claim from BarCap can be finalised and it is clear that this matter could take a significant further time to conclude. As a result, the manner in which this claim is dealt with in future indicative financial outcome statements may need to be revised when there is greater certainty of the outcome from the commercial dispute that currently exists between LBI and BarCap. In the interim, this change in the way that the claim is presented does not materially impact the level of Surplus that might arise in both the High and Low case indicative outcomes, but in the Low case outcome it would increase the ordinary unsecured claims pool for the purpose of eventually calculating entitlements to the Surplus.

## Subordinated Debt claims against LBIE and contribution claims against Shareholders

Certain of the interlinking issues impacting the determination of Shareholder claims, their ranking and the rights as between the Shareholders themselves are being considered in the Waterfall proceedings. Their eventual resolution is expected to coincide with resolution of the complex Surplus entitlement question.

No assumptions are made in the indicative financial outcome as to recoveries under any LBIE contribution claims against its Shareholders or the agreement and admittance of **Shareholders' claims** against LBIE (aggregate Proofs of Debt c.£1.65bn) pending resolution of the above issues.

# Section 4:
# Future costs of the Administration and priority claims

## Introduction

On a calendar year basis, we prepare a detailed annual cost budget and a long-term forecast of the costs to complete the Administration. These forecasts are reviewed and updated at 6-monthly intervals and are referred to below. Commentary set out below relates to these 6-monthly intervals, notwithstanding that actual receipts and payments included at Appendix A to progress reports are 6-monthly periods ended 14 March and 14 September.

We remind creditors that significant uncertainties remain regarding the Waterfall proceedings, other counterparty litigation and the outcomes and timings of other matters, which could materially affect future Administration costs.

## Future estimated costs

| | Low £m | High £m |
|---|---|---|
| Future estimated costs at 1 July 2014 | (790) | (790) |
| **In the period** | | |
| Costs incurred in 6 months to 31 December 2014 | 130 | 130 |
| Movements in creditors and accruals | (20) | (20) |
| **Costs paid in 6 months to 31 December 2014** | **110** | **110** |
| Reduction in estimate of future costs[1] | 60 | 60 |
| **Future estimated costs at 1 January 2015** | **(620)** | **(620)** |

1.  Principally relates to reduced future legal costs reflecting a reduction in expected litigation.

### Key assumptions

The key assumptions underlying the costs estimate are that:

• the remaining unresolved counterparties which can be resolved on a consensual basis will be largely finalised by mid-2015;

• the Trust Estate activities will be completed around mid-2015, subject to resolution of BarCap issues;

• planned reductions in operational support functions and infrastructure, including office floor space at Canary Wharf, will be completed by the end of 2015;

• the core ongoing activities of the Administration will enter their 'tail state' by early 2016, and the Administration and any other related processes will be completed by the end of 2020;

• litigation required to resolve disputed receivables and creditor claims will require full term legal processes, through to an initial trial, and include a further cost contingency for unforeseen delays and potential appeals;

• an extended court appeal process will be required to settle the Surplus entitlement matter (Waterfall I and II) ending in the UK Supreme Court; and

• Waterfall respondents' costs are not borne by the House Estate.

## Short-term costs forecast

The table below provides a summary of the major categories of Administration costs for the current and previous calendar half-year periods and forecast for the current and next half-year period.

| Costs | Prior 6 months to 30 Jun 2014 Actual £m | Current 6 months to 31 Dec 2014 Actual £m | Forecast £m | Future 6 months to 30 Jun 2015 Forecast £m |
|---|---|---|---|---|
| Employee | (40) | (30) | (30) | (20) |
| Administrators | (70) | (60) | (60) | (40) |
| Legal and professional | (20) | (20) | (20) | (30) |
| Building and occupancy | (10) | (10) | (10) | (10) |
| Contingency and other | (10) | (10) | (20) | (10) |
| **Total** | **(150)** | **(130)** | **(140)** | **(110)** |

## Movements between the current and prior period

### Employee and Administrators' costs

The principal driver of cost is headcount. These costs represented c.69% of total costs incurred in the current period.

The c.£20m reduction in the current period reflects the continuing reduction in the number of Lehman employees, fixed term contractors and PwC staff.

Further analysis of the headcount position is provided at Appendix E.

### Legal and professional costs

Legal and professional costs relate to external legal, valuation and other expert services.

Legal costs in total have not materially increased between periods; however, there has been an increase in activity relating to the Waterfall II Application and counterparty litigation, offset by a reduction in activity relating to Trust Estate, Affiliates and general counterparty disputes.

### Building, occupancy and other costs

These costs comprise the real estate, IT and other support services costs necessary to maintain LBIE's operational infrastructure. The costs have remained largely unchanged in the short term.

### Movements between the current period actual and forecast

Actual costs in the 6-month period to 31 December 2014 were substantially in line with the short-term forecast which included a c.£10m contingency that was not utilised in the period.

### Forecast for the 6 months to 30 June 2015

### Employee and Administrators' costs

The 33% reduction expected in the period reflects the continued reduction in the number of Lehman employees, fixed term contractors and PwC staff, commensurate with the reducing workload.

### Legal and professional costs

The c.£10m increase in legal costs expected in the period reflects a higher level of planned activity relating to the Waterfall I and II proceedings and the commencement of certain other unrelated proceedings.

### Contingency and other costs

The c.£10m reduction in the 6-month estimate for contingency and other costs largely reflects a lower general contingency in line with the reducing inherent uncertainties.

## Priority claims

Priority claimants include the potential liability for a range of indemnities given post-Administration and other potential claims (including tax provisions) that could crystallise in certain circumstances, thereby ranking for payment in priority to Senior creditors. The movements in the period are summarised below.

| | Low £m | High £m |
|---|---|---|
| Reported as at 14 September 2014 | (700) | (200) |
| **In the period** | | |
| Future settlement payments[1] | (40) | (40) |
| Further indemnities given in the period | (10) | - |
| Tax provision reassessment | - | 10 |
| Other | (10) | - |
| **Movement in the period** | **(60)** | **(30)** |
| **Priority claims at 14 March 2015** | **(760)** | **(230)** |

1.  Expense payments based upon settlement agreements entered into with Affiliate and non-Affiliate claimants shortly after the period end.

### Lehman Brothers Pension Scheme deficit claim

As previously reported, LBIE has agreed as part of a settlement agreement to provide a contribution towards the Pension Fund deficit. The purchase of a bulk annuity policy with a third party insurance company is being negotiated, following which the precise cost to LBIE will be determined. The deficit valuation risk for the period between the settlement agreement and completion is managed using an interest rate hedge and the total cost to LBIE of fulfilling its settlement obligations is not expected to exceed the £120m that has been included within priority claims in the current and previous indicative financial outcome statements.

# Section 5:
## Trust Estate

# *Section 5.1:*
# Omnibus Trust

## *Introduction*

A further True-up distribution from withholding tax reserve releases was made in the period. In addition, a third Catch-up distribution was also paid in the period to claimants whose claims were not agreed at the time of the earlier interim distributions.

Agreement was reached with the IRS during the period, resolving the US withholding tax treatment on distributions in excess of 100% of Best Claim value. This agreement should enable LBIE to be in a position shortly to release back to beneficiaries all of the excess reserves made in respect of US withholding tax on distributions, net of the appropriate tax.

A final distribution has been announced to take place in June 2015.

## *Progress*

### Claims

The total claims against the Omnibus Trust at Best Claim value as at 14 September 2014 comprised c.$8.64bn of agreed claims value and c.$20m of claims value relating to 8 unresolved Non-Consenting beneficiaries.

In the period, the remaining 8 Non-**Consenting beneficiaries'** claims were resolved either by bilateral settlement, agreement of claims or appropriate reserving in the House Estate for certain low value claims.

### Recoveries

The majority of Omnibus Trust securities held at the start of the period have now been sold, realising c.$30m in aggregate. The proceeds from a small number of remaining securities will be realised imminently in time for the final distribution and are not material to it.

### Indicative final outcome

The indicative High case final outcome estimate is summarised below.

| Omnibus Trust | Indicative outcome High $m |
|---|---|
| **Recoveries** | |
| Distributions to date and cash in hand | 9,520 |
| **Less** | |
| Bilateral settlements[1] | (250) |
| **Available for beneficiaries** | **9,270** |
| **Total of beneficiaries' Best Claim values** | **(8,410)** |
| **Gross distribution as a % of claims** | **110.2%** |

1.  A second bilateral settlement was agreed in the period. The 2 counterparties' claim returns are restricted to 100% of the agreed claim value.

The indicative High case final outcome assumes no further direct payments are made relating to tax or other liabilities.

### Second True-up distribution and third Catch-up distribution

A second gross True-up distribution of c.$80m (net of tax payable) has been made following the release of further excess tax reserves, and a gross Catch-up distribution of c.$30m was paid to eligible consenting beneficiaries on 30 October 2014. A cash distribution of c.$60m was made to 22 beneficiaries, after deduction of a US withholding tax reserve and net of recoveries to the House Estate via debtor appropriations and assignment of claims.

### US withholding tax

LBIE, its withholding agent and the IRS have now reached **agreement on LBIE's and its withholding agent's US federal** income tax withholding and reporting obligations in respect of distributions in excess of 100% of Best Claim value. The methodology agreed will follow, on a pro rata basis, the methodology applied to amounts distributed up to 100% of Best Claim value.

LBIE now expects to be in a position to release back to beneficiaries all of the excess reserves made in respect of US withholding tax on distributions, net of the appropriate tax, in the near future.

We are liaising with LBI to reach a consensus that there is no requirement for any additional specific US withholding tax to be paid by the Omnibus Trust from a $200m tax reserve held (previously agreed with LBI to be retained) to enable the full release of the tax reserve in the near future.

### Future distributions

The final third distribution at a gross value equal to c.4% of the Best Claim value is planned for June 2015, together with a final True-up and Catch-up distribution to be made after all issues relating to the US withholding tax treatment of distributions are fully resolved and remaining reserves are settled.

Formal notices were issued on the LBIE website on 16 March 2015.

### Residual funds

We do not anticipate that any residual funds will arise in the Omnibus Trust.

# Section 5.2:
## Other Client Assets

### Introduction

We have continued to return Client Assets and related post-Administration income as we resolve the last components of certain counterparties' claims. We expect all returns to engaging counterparties to be finalised within the next 6 months. Any remaining Client Assets and related post-Administration income of non-engaging counterparties will potentially become subject to a UK High Court application.

### Progress

#### Client Assets analysis

Movements in the client depot during the period (excluding Omnibus Trust and segregated Affiliate assets) are summarised below.

| | £m |
|---|---|
| Client Assets at 14 September 2014 | 50 |
| **In the period** | |
| Returns to clients | (10) |
| Transfers to House | (10) |
| Revaluation and other adjustments[1] | - |
| **Client Assets at 14 March 2015[2]** | **30** |

1.   Revaluations in the period were immaterial.
2.   Includes remaining excess segregated Client Assets and is net of claims for Client Assets shortfalls.

#### Client Assets returns

In the period, 33 individual Client Assets holdings were returned with a cumulative value of c.£10m. To date, in aggregate, c.9,500 individual holdings have been fully returned to counterparties, representing a total value of c.£14.1bn.

There remain 59 Client Asset lines which have not yet been returned because of outstanding deed executions, non-responsive counterparties or market restrictions. LBIE will continue efforts to return remaining holdings in the next 6 months, with any residual Client Assets held potentially becoming the subject of a UK High Court application.

#### LBHK

19 individual holdings of Client Assets previously released by LBHK, with a combined value of less than £5m, were returned to counterparties in the period as part of the above returns.

LBHK has yet to return 2 further Client Assets holdings. LBIE expects to expedite resolution of the related claims issues and the return of the impacted assets in the next 6 months.

#### Excess segregated Client Assets

The ongoing review of securities held in the client depot for holdings that exceed current client entitlements has resulted in further transfers to the House Estate of less than £10m in the period (c.£520m to date).

#### Over-Claims

An analysis of Over-Claims is set out below.

| | £m |
|---|---|
| Over-Claims at 14 September 2014 | 50 |
| Over-Claims resolved in the period | (50) |
| **Total Over-Claims remaining at 14 March 2015** | **-** |

The 2 outstanding Over-Claims with related claims to LBHK and LBI were resolved in the period.

#### Closure of the Client Assets estate

With the progress made in recent months to address remaining client positions and the progress anticipated in the next few months, it is likely that we will be able to conclude our work on the Client Assets estate prior to the end of the year.

Clients with remaining positions are being targeted to reach a closure of their positions on an expedited and pragmatic basis in order to minimise the scope (and potentially eliminate the need) for an application to the UK High Court. This will represent a significant step towards our 'tail state' phase, ending the associated costs of maintaining an in-house custody operation.

Finally, we have begun the process of issuing final closing statements to Client Assets claimants where required. This work will continue in the next reporting period.

We have continued to keep the FCA updated on these developments.

# *Section 5.3:*
## Client Money estate

### *Introduction*

Until such time as the status of BarCap's CME claim is finally determined, the pre-Administration Client Money estate cannot be closed. The current impasse regarding this issue has 2 significant near term consequences:

- firstly, that the small amount of Client Money funds held for non-contactable counterparties cannot be paid into court once the small number of remaining CME claims are resolved, which would otherwise enable us to close the Client Money estate; and

- secondly, that we are unable to determine the final net recovery to the House Estate from the Client Money estate (by reference both to any excess funds that might remain in the Client Money estate and to the remaining value in the CME claims that have been assigned to **LBIE's nominee,** Laurifer).

Whilst there has been a certain amount of further activity in the US courts on the substantive dispute that exists between LBI/BarCap, there is a risk that this dispute will continue for some time yet and eventually that LBIE may need to undertake further legal proceedings of its own in order to ascertain the **status and quantum of BarCap's claim against LBIE, if any.**

No BarCap CME claim has been assumed for reporting purposes within the Client Money estate, with instead a reserve for a Senior claim from BarCap being made in the House Estate (see page 19).

Set out in the table below is an analysis showing illustrative indicative Low and High case outcomes for the net Client Money impact on the House Estate.

| Pre-Administration Client Money estate | Low $m | High $m |
|---|---|---|
| **Projected Client Money to distribute** | | |
| Funds held at 14 March 2015 | 1,340 | 1,340 |
| LBB/LBHI future recoveries[1] | 70 | 160 |
| **Projected Client Money to distribute[2]** | **1,410** | **1,500** |
| **Less** | | |
| **Future distributions to claimants with retained CME[3] and estimated funds to be paid to the UK High Court** | **(10)** | **(10)** |
| **Projected future distributions to the House Estate ($m)[4]** | **1,400** | **1,490** |
| **(£m)[4]** | **950** | **1,010** |

1. This represents the combined **future dividends on LBIE's LBHI guarantee claim of c.$1.01bn and the LBB c.€400m** unsecured claim.

2. The illustration continues to assume that the Administrators will not be required to trace and recover assets from the House Estate for the benefit of the Client Money pool and that BarCap has no CME.

3. Future distributions at a rate of 51.8% of CME claim value.

4. During the period, we continued our hedging strategy dealing with the US dollar/euro to sterling currency risks related to the expected future distributions to the House Estate.

### *Progress*

#### Pre-Administration Client Money

##### *CM Determinations agreement*

LBIE has continued to engage with the relatively small population of counterparties with unresolved CME. A total of 20 CME claims (value c.$20m) have been resolved in the period, with 111 claims (value c.$20m) outstanding. Notwithstanding multiple attempts to contact these outstanding counterparties, engagement has not been possible with 103 of these and, as a result, resolution of these will require court directions. LBIE remains in dialogue with the other 8 counterparties.

| | Sep 14 | | Mar 15 | |
|---|---|---|---|---|
| **CME population** | **Cpty No.** | **CME $m** | **Cpty No.** | **CME $m** |
| **Resolved** | | | | |
| Resolved - repaid/assigned/waived[1] | 1,139 | 4,330 | 1,195 | 4,350 |
| Resolved - CME retained | 52 | 10 | 16 | 10 |
| | **1,191** | **4,340** | **1,211** | **4,360** |
| **Outstanding** | | | | |
| In progress[2] | 43 | 30 | 8 | 10 |
| Court directions required[3] | 89 | 10 | 103 | 10 |
| | **132** | **40** | **111** | **20** |
| **Total** | **1,323** | **4,380** | **1,322[4]** | **4,380** |

1. The LBI and LBF CME values included continue to be LBIE estimates.

2. Includes 4 counterparties where CME is contingent upon the outcome of matters that have not yet been resolved (e.g. litigation).

3. Counterparties that LBIE has been unable to establish contact with, that refuse to engage or that are dissolved.

4. The consolidation of 2 counterparties resulted in a net reduction of 1 to the total CME population.

##### *CME retained*

At the date of our last report, 52 counterparties had a retained CME. Movements in the period are summarised below.

| Pre-Administration Client Money estate | Cpty No. |
|---|---|
| CME retained at 14 September 2014 | 52 |
| **Less** | |
| CME assigned following reruns of Client Money settlement offer | (17) |
| CME waived or assigned | (3) |
| Transfer to 'court directions required' as LBIE's non-solicited payments have been returned | (18) |
| **Add** | |
| Resolution of outstanding claims by CME retention | 2 |
| **CME retained at 14 March 2015** | **16** |

### Interim Client Money distributions

During the period, interim distributions were paid to 12 Client Money creditors totalling less than $1m.

Total distributions of c.$680m have been paid to Client Money creditors to date.

### Client Money settlement offer

A second rerun of the Client Money settlement offer was paid to 12 counterparties on 31 October 2014.

A third rerun of the Client Money settlement offer was subsequently conducted in January 2015 for the benefit of 30 counterparties, which again was subject to a partial acceptance.

### Recoveries

The pre-Administration Client Money pool at 14 March 2015 was c.$1.34bn. This includes both recoveries and interest on funds held, including in the period:

- c.$390m received as 'catch-up' distributions from LBB on LBIE's c.€400m unsecured claim, received in December 2014 and January 2015;

- c.$40m received as a sixth distribution from LBHI; and

- c.$20m representing the final amount due from a counterparty in Taiwan.

Future recoveries will arise from:

### LBB

Under the terms of the settlement agreement, further distributions will be received in respect of LBIE's c.€400m unsecured claim in the LBB estate.

### LBHI

Further distributions under the guarantee claim are expected in due course.

### BarCap

BarCap has asserted that it acquired LBI's CME in accordance with the terms of a sale and purchase agreement entered into with LBI in September 2008.

Following the US Court of Appeal's denial of LBI's petition for a retrial, LBI has filed a petition for writ of certiorari with the US Supreme Court seeking review of the lower court rulings in favour of BarCap. LBI has also separately filed a motion with the US District Court seeking to confirm the scope of the US District Court's prior ruling in favour of BarCap.

The outcomes and timings of these proceedings are uncertain and outside of LBIE's control.

### Post-Administration Client Money recoveries and returns

The residual post-Administration Client Money pool has continued to reduce as funds are paid to clients or transferred to the House Estate as blocking issues are resolved. The remaining funds held mainly relate to 2 clients that are subject to House receivables litigation action in Germany. Remaining non-litigious issues are expected to be resolved by mid-2015.

The table below provides a breakdown of the post-Administration Client Money movements during the period.

| | $m | $m |
|---|---|---|
| Balance as at 14 September 2014 | | 60 |
| **In the period** | | |
| Returns[1] | (50) | |
| Receipts | 10 | |
| **Movement in the period** | | **(40)** |
| **Balance as at 14 March 2015** | | **20** |

1. c.$30m has been returned to clients direct and c.$20m has been transferred to the House.

# Section 6:
## Surplus entitlements and related UK High Court process

### Introduction

After making relevant reserves, LBIE currently has c.£4.3bn that could otherwise be distributed on account of Post-Administration Interest entitlements, subject to resolution of the matters being dealt with in the Waterfall I and II legal proceedings. By the end of 2015, Surplus funds are expected to have increased to c.£4.8bn.

All matters dealt with by the Waterfall I judgment at first instance (which was obtained in March 2014) are the subject of appeal, which was heard in the week commencing 23 March 2015. We ourselves appealed the judgment on 2 points:

- firstly, that Post-Administration Interest accrued during the period of the Administration, which has not been paid before the commencement of a subsequent liquidation, is neither provable nor payable in that subsequent liquidation; and

- secondly, that the contributory rule, applicable in the context of a liquidation, which would prevent LBIE's Shareholders from proving in a liquidation of LBIE for claims they may have against LBIE until they have discharged in full their liabilities as contributories, has no application in the Administration.

The majority of Waterfall activity over this past 6 months has been concentrated on the Waterfall II Application and LBIE's various interactions with the respondents and the UK High Court. Position papers and witness statements have been submitted, correspondence exchanged and meetings and hearings have been planned and attended. Whilst complex in their nature, the 39 matters that are addressed in Waterfall II have been marshalled efficiently and effectively through regular interaction with the respondents outside of court.

The Administrators' principal role in the Waterfall II proceedings is to ensure that the UK High Court hears all relevant arguments affecting the rights of creditors. To that end, we repeat our invitation to creditors generally to bring to our attention any arguments they consider the UK High Court ought to hear but which have not yet been made by any of the respondents or by ourselves. Details of the arguments currently being made are available on the LBIE website.

### Waterfall court proceedings

#### Waterfall I Appeal

The appeal hearing commenced on 23 March 2015 and concluded on 27 March 2015, dealing with the following substantive matters:

- priority ranking of the Subordinated Debt;

- existence and ranking of Currency Conversion Claims;

- **scope of the Shareholders' liability to contribute to any shortfall;**

- **LBIE's ability, in administration, to prove in an administration or liquidation of a Shareholder in respect of the Shareholder's liability to contribute to any shortfall;**

- whether the contributory rule or insolvency set-off applies in respect of a claim by LBIE in respect of the **Shareholders' liability to contribute to any shortfall;** and

- the status of Post-Administration Interest accrued during the period of the Administration in the event that it has not been paid before the commencement of a subsequent liquidation.

Judgment was reserved by the UK Appeal Court and is expected to be handed down before the Summer 2015 court recess. Aspects of that judgment may be appealable to the UK Supreme Court in due course.

#### Waterfall II Application

The Waterfall II Application deals with 39 different matters concerning entitlements to and calculation of Post-Administration Interest and non-provable claims (in particular Currency Conversion Claims, if any) against the Surplus. A summary of the court process milestones during the current and next reporting periods is set out at Appendix D. Further information is also available at *www.pwc.co.uk/lehman*.

At a case management hearing in November 2014, the UK High Court directed that the 39 matters should be divided into the following 3 tranches, each to be subject to a separate timetable:

- tranche A dealing primarily with the insolvency law matters;

- tranche B dealing with matters concerning the effect of release clauses in post-Administration contracts; and

- tranche C dealing with cost of funding matters, principally arising in respect of claims under ISDA Master Agreements.

The hearing of the tranche A matters commenced on 16 February 2015 and concluded on 26 February 2015, and considered the following matters in particular:

- whether, for the purpose of calculating Post-Administration Interest, distributions to creditors are notionally to be allocated first to accrued Post-Administration Interest or to the principal indebtedness;

- from what date Post-Administration Interest accrues in respect of contingent and future debts; and

- whether the receipt of Post-Administration Interest by a creditor in excess of a contractual interest entitlement should reduce any Currency Conversion Claim that creditor may have.

Ahead of the tranche A hearing, all parties reached agreement in respect of answers to 5 of the original tranche A matters and the court is invited to give directions accordingly. As part of the **Administrators' role in the proceedings, we invited creditors,** through a posting on the LBIE website, to make representations on these matters before they were presented to the UK High Court as agreed. No such representations were received.

During the course of the tranche A proceedings it was also agreed that a further 3 matters which have no apparent material significance in the Administration will be adjourned. These concern whether Currency Conversion Claims can arise in respect of certain non-standard master agreements and the impact on Currency Conversion Claims of certain types of non-standard claim transfer agreements. Further details have been posted on the LBIE website for creditor comment before finalisation.

A further case management conference was held on 9 March 2015 to determine matters concerning the procedural steps required for tranche B and tranche C.

## Operational infrastructure for Surplus entitlement claims handling

While key personnel and operating systems remain available to the Administrators, we have commenced designing and developing the processes, infrastructure and data sources that we expect to require in order to agree claims to the Surplus in due course.

A selection of individual claim characteristics is being assembled with the objective of producing claim attribution statements, containing all relevant information that might be needed to enable the calculation of entitlements to claim against the Surplus, if any, that attach to an individual unsecured claim against LBIE. Whilst we expect to be able to make significant progress towards operational readiness, our preparations will not be complete without further clarity from the courts regarding the precise circumstances in which such claims arise and are calculated.

## Future development of consensual proposals

We **continue to review the respondents' respective positions to** evaluate the prospects for a consensual solution to the calculation of Surplus entitlements, which would enable the ongoing Waterfall proceedings to be brought to an end. That review will continue as the various court proceedings continue, with the hope that the respondents might show a growing appetite to resolve the Surplus entitlements question consensually as the UK High Court progressively hands down its first instance judgments on the 39 matters and the UK Appeal Court hands down its judgment on the 10 separate other matters being appealed to it.

Whether resolution of the matters in dispute is achieved through court judgments or through a consensual compromise, it is likely that any 1 or more of a company voluntary arrangement, a scheme of arrangement or a company voluntary liquidation will be required to enable distribution of the Surplus. Whatever is eventually required, the manner in which entitlements to the Surplus will be determined and the process that will be followed for the agreement of such entitlements and the payment thereof will be set out for creditors. In due course, instructions will be provided to creditors regarding further actions that they may need to take, if any, in connection with their claims against the Surplus.

## Illustrative outcome scenarios

Pending the outcome of the Waterfall I and II proceedings, many of which are interrelated, or alternatively a consensual compromise being reached, it is not feasible to provide comprehensive illustrative outcome scenarios in this report.

By the date of the next progress report (October 2015) it is likely that judgment in respect of the Waterfall I Appeal and in respect of tranche A of the Waterfall II Application will have been handed down. Based on these and other relevant assumptions, we intend to provide creditors with a Surplus indicative financial outcome in the next report, setting out on an illustrative basis a range of potential outcomes.

# *Appendices*

# *Appendix A:*
# Receipts and payments: cumulative and 6 months to 14 March 2015

## House Estate receipts and payments: cumulative and 6 months to 14 March 2015

| House Estate | Notes | Cumulative - 15 September 2008 to 14 September 2014 (GBP equivalent) £m | Period - 6 months to 14 March 2015 (GBP equivalent) £m | Cumulative - 15 September 2008 to 14 March 2015 (GBP equivalent) £m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Counterparties | 1 | 11,315 | 555 | 11,870 |
| Depot securities | 2 | 9,941 | 123 | 10,064 |
| Other receipts | 3 | 3,094 | 11 | 3,105 |
| **Total receipts for the period/to date** | | **24,350** | **689** | **25,039** |
| **Payments** | | | | |
| Dividends paid | 4 | (11,515) | (503) | (12,018) |
| Administrators' remuneration | 5 | (863) | (58) | (921) |
| Affiliate settlements | 6 | (929) | (50) | (979) |
| Payroll and employee costs | 7 | (546) | (44) | (590) |
| Legal and professional costs | 8 | (326) | (17) | (343) |
| Other payments | 9 | (3,275) | (59) | (3,334) |
| **Total payments for the period/to date** | | **(17,454)** | **(731)** | **(18,185)** |
| **Net movement in the period/to date** | | **6,896** | **(42)** | **6,854** |
| Foreign exchange translation differences | | (136)^ | 1^ | (135)^ |
| **Total balances** | 10 | **6,760** | **(41)** | **6,719** |
| Less: Funds held subject to potential third party claims | 11 | (251) | 74 | (177) |
| **Total House Estate cash deposits and government bonds (see Section 2)** | | **6,509~** | **33** | **6,542#** |

^ At this stage in the Administration, material receipts and payments in foreign currencies are converted to sterling as soon as practicable after receipt. Where small currency sums are held for a short period or where currency collateral is held for a counterparty, small translation differences can arise.

~ Balances held in foreign currencies at 14 September 2014 were $33m and various other currencies £4m (equivalent).

# Balances held in foreign currencies at 14 March 2015 were $68m, €1m and various other currencies £4m (equivalent).

## Notes to House Estate receipts and payments account

### General

Foreign currency transactions are **reported in sterling at the rate prevailing on the relevant** transaction date.

The transactions within the LBIE estate in the period:

- are reported on a cash receipts and payments basis in accordance with the Insolvency Act and Insolvency Rules; and

- were completed in accounts established and controlled by the Administrators.

Separate bank accounts are held for realisations from the House Estate and the Trust Estate.

### 1. Counterparties

Receipts in the period comprise:

- £322m related to House and Exchanges third party debtors;

- £188m of distributions from debtor Affiliates, including £40m transferred from pre-Administration Client Money;

- £25m of House debtor appropriations and House assignments from the Omnibus Trust estate;

- £19m of House debtor appropriations of collateral received from clients in prior periods (see note 3); and

- £1m of Client Assets claimant debtor receipts.

### 2. Depot securities – sales and related income

Realisations of £123m relate to the disposal or redemption of securities and derived income from depot holdings, including £14m of derived income transferred from post-Administration Client Money, previously segregated for potential claims of clients of Affiliates.

### 3. Other receipts

Other receipts comprise:

- £25m of corporation tax, income tax and VAT repayments received from HMRC and other European tax authorities;

- £13m of bank and bond interest received;

- £11m of recovered or redirected funds which were mistakenly paid (by third parties) into House accounts (see note 9);

- £4m of funds previously held as post-Administration Client Money, segregated for potential Affiliate claims or clients of Affiliates, was transferred to the House Estate; and

- £9m of other realisations.

The above amounts are offset by:

- £32m of realised net losses in the period on forward contracts used to hedge the foreign exchange exposure on potential future US dollar and euro denominated pre-Administration Client Money recoveries into House. These are currently offset by similar foreign exchange gains on the sterling equivalent of estimated future pre-Administration Client Money recoveries included in the indicative financial outcome on page 8; and

- £19m of collateral received from clients in prior periods that has been appropriated to the House Estate in the current period (see note 1).

### 4. Dividends paid

£503m of unsecured dividends were paid in the period.

### 5. Administrators' remuneration and expenses

Payment deferral terms, as agreed with the Committee and referred to on page 44 of this report, account for differences between costs incurred and payments made in the period.

Out-of-pocket expenses of £2m were paid in the period.

### 6. Affiliate settlements

Payments relate to Affiliate settlements and asset return agreements.

### 7. Payroll and employee costs

Payments relate to salary and benefits for UK-based employees and third party contractors. This includes employee-related costs incurred on behalf of Affiliates, which are recovered by LBIE and included as 'other income'.

### 8. Legal and professional costs

Legal and other advisers' costs relate to advice given, and to court proceedings and litigation conducted, in numerous jurisdictions by a number of professional firms in connection with a range of issues across the Administration.

### 9. Other payments

Other payments comprise:

- £16m of VAT paid on invoices;

- £15m premium paid to hedge the foreign exchange exposure on future US dollar denominated receipts;

- repayment of £11m of recovered or redirected funds which was mistakenly paid by third parties into House accounts (see note 3);

- £9m occupancy and infrastructure costs; and

- £8m of other net sundry payments and reclassifications.

## 10. Investment profile

### Current investment strategy

For immediate liquidity requirements, LBIE invests in short-dated money market deposits. For other requirements, investments are made in short-dated government securities.

### Total balances

| House Estate | GBP equivalent £m |
|---|---|
| Short-dated government bonds[1] | 6,237 |
| Long-dated government bonds | 150 |
| Short-term deposits[2] | 232 |
| Notice accounts | 27 |
| Interest-bearing accounts | 73 |
| **Total** | **6,719** |

1. Average rate of return on bonds yet to mature (net of fund manager fees) on sterling of 0.48%.
2. Average rate of return for 6 months ending 14 March 2015 on sterling of 0.33%.

### Cash management and investment policies

Subject to meeting regulatory requirements, the continuing objectives of the policies are to provide:

- security for Administration funds;
- liquidity as required by the Administration; and
- appropriate returns (positive yield net of fees).

The primary objective continues to be ensuring the security of Administration funds. To meet this objective, a comprehensive counterparty credit risk policy is in place with clear limits on counterparties, instruments, amounts and duration. Compliance with policy is measured on at least a daily basis using live indicators, and any breaches arising from market movements are reported immediately to the Administrators.

The cash is managed by a team of treasury professionals which meets with the Administrators on a regular basis.

### Instruments used in the period

- interest-bearing accounts;
- short-term deposits/notice accounts; and
- government and quasi-government bonds.

### Policy for interest-bearing accounts and short-term deposits/notice accounts

Permitted banks must meet 5 key criteria:

- be headquartered in a sovereign state where the average long-term ratings from S&P, Moody's and Fitch are in the top 4 available tiers (AAA to AA-);
- be headquartered in a sovereign state within the top 3 tiers of the S&P banking industry country risk assessment;
- have a blended average long-term rating from S&P, Moody's and Fitch within the top 4 available tiers (AA- to A-);
- be a Prudential Regulation Authority approved counterparty; and
- have 5-year CDS prices, bond yields, equity volatility, capital buffers and financial ratios below a specified (prudent) threshold.

The counterparties are ranked in 3 tiers (1-3) based on their risk score (1 being least risky). To ensure diversification, counterparty limits are based on the tier to which they belong:

- 20% of funds under management with a tier 1 bank;
- 17.5% of funds under management with a tier 2 bank; and
- 15% of funds under management with a tier 3 bank.

Short-term deposits/notice accounts are placed for a maximum duration of 12 weeks with tier 1 banks, 8 weeks with tier 2 banks and 4 weeks with tier 3 banks.

### Policy for government bonds

Eligible investments for the bond portfolios are short-dated government debt issued by the UK and quasi-government debt securities benefiting from an explicit, unconditional and irrevocable guarantee from the UK government.

The bond portfolio is managed on a day-to-day basis by an independent fund manager.

In addition, long-term government bonds are held to hedge against the interest rate and inflation risks associated with the Pension Fund obligations (see page 21).

## 11. Funds held subject to potential third party claims

| House Estate | £m |
|---|---|
| Reserve for unpaid dividends | 172 |
| Ring-fenced for Client Assets claimants | 5 |
| **Total** | **177** |

## Post-Administration Client Money receipts and payments: cumulative and 6 months to 14 March 2015

| Post-Administration Client Money | Notes | Cumulative - 15 September 2008 to 14 September 2014 (USD equivalent) USD $m | Period - 6 months to 14 March 2015 (USD equivalent) USD $m | Cumulative - 15 September 2008 to 14 March 2015 (USD equivalent) USD $m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Affiliate-related | 1 | 661 | 51 | 712 |
| Other receipts | 2 | 6,962 | 11 | 6,973 |
| **Total receipts for the period/to date** | | **7,623** | **62** | **7,685** |
| **Payments** | | | | |
| Affiliate settlements | 3 | (1,309) | (50) | (1,359) |
| Transfers to the House | 4 | (2,658) | (29) | (2,687) |
| Transfers to clients direct | 5 | (2,050) | (23) | (2,073) |
| Other payments | 6 | (1,390) | (3) | (1,393) |
| **Total payments for the period/to date** | | **(7,407)** | **(105)** | **(7,512)** |
| **Net movement in the period/to date** | | **216** | **(43)** | **173** |
| Foreign exchange translation differences | | 50^ | (8)^ | 42^ |
| **Total balances** | **7** | **266⁻** | **(51)** | **215#** |
| Comprising | | | | |
| Segregated Affiliate post-Administration Client Money balance | | 204 | (9) | 195 |
| Other third party post-Administration Client Money balance | | 62 | (42) | 20 |
| **Total balances** | | **266** | **(51)** | **215** |

^ The translation differences set out above largely arise from translating other currencies into US dollars, for reporting purposes only.

⁻ Balances held in currencies other than US dollars at 14 September 2014 were €18m, £2m and various other currencies $26m (equivalent).

# Balances held in currencies other than US dollars at 14 March 2015 were €14m, £1m and various other currencies $17m (equivalent).

## Notes to post-Administration Client Money receipts and payments account

### 1.  Affiliate-related
Amounts relating to the disposal or redemption of securities and to derived income received directly into the segregated Affiliate accounts.

### 2.  Other receipts
Other receipts comprise:

- $7m of redemptions, coupons, dividends and investment income;

- $3m funds received in error; and

- $1m of other receipts.

### 3.  Affiliate settlements
Return of funds to Affiliates under the terms of settlement agreements with those Affiliates.

### 4.  Transfers to the House
Transfers to the House comprise:

- $23m of funds related to derived income previously segregated for potential claims of clients of Affiliates, cost contributions payable to the House or funds determined not to be post-Administration Client Money following investigation; and

- $6m of funds previously held subject to potential claims by Affiliates, which were transferred to the House Estate following settlements with Affiliates.

### 5.  Transfers to clients direct
Return of post-Administration Client Money direct to clients, including debtor appropriations to the House.

### 6.  Other payments
Other payments comprise repayment of $3m of funds received in error.

### 7.  Investment profile
*Total balances*

| Post-Administration Client Money | USD equivalent $m |
|---|---|
| Short-term deposits | 180 |
| Interest-bearing accounts | 35 |
| **Total** | **215** |

### *Cash management and investment policies for client funds*

The Client Money cash management policies for short-term deposits and interest-bearing accounts are based on those used for the House Estate, modified to comply with the additional Client Money regulatory requirements.

Client Money is not eligible for investment in government bonds and can be placed on money market deposits for a maximum duration of 30 days.

## Pre-Administration Client Money receipts and payments: cumulative and 6 months to 14 March 2015

| Pre-Administration Client Money | Notes | Cumulative - 15 September 2008 to 14 September 2014 (USD equivalent) USD $m | Period - 6 months to 14 March 2015 (USD equivalent) USD $m | Cumulative - 15 September 2008 to 14 March 2015 (USD equivalent) USD $m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Client Money pool recoveries | 1 | 1,642 | 442 | 2,084 |
| Funds received for the House | 2 | - | 63 | 63 |
| Interest | | 8 | - | 8 |
| **Total receipts for the period/to date** | | **1,650** | **505** | **2,155** |
| **Payments** | | | | |
| Client Money interim distribution | | (675) | - | (675) |
| Funds paid to the House | 2 | - | (62) | (62) |
| Legal costs | | (10) | - | (10) |
| **Total payments for the period/to date** | | **(685)** | **(62)** | **(747)** |
| **Net movement in the period/to date** | | **965** | **443** | **1,408** |
| Foreign exchange translation differences | | 4^ | (68)^ | (64)^ |
| **Total balances** | **3** | **969¯** | **375** | **1,344#** |

^  The translation differences principally arise from translating other currencies into US dollars, for reporting purposes only.

¯  Balances held in currencies other than US dollars at 14 September 2014 were £140m.

#  Balances held in currencies other than US dollars at 14 March 2015 were €322m and £140m.

## Notes to pre-Administration Client Money receipts and payments account

### 1.  Client Money pool recoveries

Receipts in the period comprised:

- $388m of 'catch-up' distributions from LBB on LBIE's unsecured claim;

- $38m of distributions from LBHI in respect of LBIE's guarantee claim; and

- $16m due from LBIE's operations in Taiwan.

### 2.  Funds received for/paid to the House

Distributions from LBB in euros, received into the pre-Administration Client Money bank account in the period, included distributions relating to the House unsecured claim against LBB. Accordingly, these funds were then paid to the House bank account. The difference of c.$1m relates to movements on the euro/US dollar exchange rate in the intervening period.

### 3.  Investment profile

| Pre-Administration Client Money | USD equivalent $m |
|---|---|
| Short-term deposits | 1,002 |
| Interest-bearing accounts | 342 |
| **Total** | **1,344** |

## Omnibus Trust receipts and payments: cumulative and 6 months to 14 March 2015

| Omnibus Trust | Notes | Cumulative - 15 September 2008 to 14 September 2014 (USD equivalent) USD $m | Period - 6 months to 14 March 2015 (USD equivalent) USD $m | Cumulative - 15 September 2008 to 14 March 2015 (USD equivalent) USD $m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Cash transferred from LBI | | 4,815 | - | 4,815 |
| Sale of equity securities returned by LBI | 1 | 3,980 | 26 | 4,006 |
| Sale of fixed income securities returned by LBI | 1 | 691 | 5 | 696 |
| Transfers | | 60 | 1 | 61 |
| Interest | | 3 | - | 3 |
| **Total receipts for the period/to date** | | **9,549** | **32** | **9,581** |
| **Payments** | | | | |
| Distributions to beneficiaries | 2 | (6,204) | (65) | (6,269) |
| House debtor appropriations | 3 | (2,323) | (25) | (2,348) |
| House assigned claims | 3 | (193) | (16) | (209) |
| US withholding tax reserve | | (104) | - | (104) |
| Fees recovered | 3 | (69) | - | (69) |
| Transfers | | (60) | (1) | (61) |
| Costs relating to disposal of securities | | (1) | - | (1) |
| **Total payments for the period/to date** | | **(8,954)** | **(107)** | **(9,061)** |
| **Total balances** | 4 | **595** | **(75)** | **520** |

## Notes to Omnibus Trust receipts and payments account

### 1. Sale of equity securities and fixed income securities returned by LBI

Realisations in the period relate to the disposal or redemption of securities and derived income from securities.

### 2. Distributions to beneficiaries

A second True-up distribution of released withholding tax reserves and a third Catch-up distribution were paid on 30 October 2014.

### 3. House debtor appropriations/House assigned claims/fees recovered

Under the Common Terms, certain deductions against gross distributions to beneficiaries were allowed for onward payment to the House.

### 4. Investment profile

#### Total balances

| Omnibus Trust | USD equivalent $m |
|---|---|
| Short-term deposits | 159 |
| Interest-bearing accounts | 361 |
| **Total** | **520** |

### Cash management and investment policies for Omnibus Trust funds

The investment policies for short-term deposits and interest-bearing accounts are focused on security of the funds. This is achieved by the application of a comprehensive credit risk model as used in the House Estate, subject to consideration of other regulatory requirements.

# *Appendix B:*
## Supplemental schedules

### House securities

Remaining House securities and depot-related asset recoveries as at 14 March 2015 are summarised below.

| | Book value Sep 14 £m | Sales/ redemptions £m | Client depot transfers[1] £m | Returns[2] £m | Debtor settlements[3] £m | Other movements[4] £m | Book value Mar 15 £m | Indicative future recoveries[5] Low £m | High £m |
|---|---|---|---|---|---|---|---|---|---|
| Available for sale | 50 | (90) | 10 | - | 70 | 10 | 50 | 50 | 60 |
| Assets recovered from LBHK | - | (10) | - | 30 | - | - | 20 | 20 | 20 |
| Reserved for Affiliates | 50 | - | - | (20) | (20) | (10) | - | - | - |
| **Total** | **100** | **(100)** | **10** | **10** | **50** | **-** | **70** | **70** | **80** |

1.  Releases to the House from excess segregated securities in Client Assets.
2.  Principally returns to Merit and repatriations from LBHK.
3.  Settlement with a Street counterparty and securities released following settlement with Merit in the period.
4.  'Other movements' mainly represent pricing adjustments in the period.
5.  **The indicative future recoveries for 'available for sale' assets represent an expected outcome following** adjustments for potentially illiquid assets. The securities recovered from LBHK were pre-sold prior to 14 March 2015 under a forward sale agreement with a broker-dealer.

### Affiliate securities and cash ring-fencing

Assets held in the House and Trust Estates, which are still subject to Affiliate claims at 14 March 2015, are set out below.

| | Securities £m | Cash £m | Total £m |
|---|---|---|---|
| Reported as at 14 September 2014 | 260 | 120 | 380 |
| **In the period** | | | |
| Returns to Affiliates[1] | (160) | (30) | (190) |
| Pricing and foreign exchange adjustments | (60) | 10 | (50) |
| Ring-fencing releases to the House[2] | (20) | - | (20) |
| Sales, redemptions and derived income[3] | (10) | 30 | 20 |
| **Movements in the period** | **(250)** | **10** | **(240)** |
| **Ring-fenced assets at 14 March 2015[4]** | **10** | **130** | **140** |
| **Relating to assets pending resolution** | | | |
| LBF-related | - | 110 | 110 |
| Other | 10 | 20 | 30 |
| **Ring-fenced assets at 14 March 2015** | **10** | **130** | **140** |

1.  Mainly returns to LBF and Merit.
2.  Predominantly releases following settlement with Merit.
3.  Receipts comprise the proceeds of sale, redemption or related derived income of securities segregated for Affiliates (largely LBF).
4.  The securities are held largely in the client depot, segregated for Affiliates. The cash is held in post-Administration Client Money (segregated Affiliate funds).

# *Appendix C:*
# Litigation summary

The following litigation is a matter of public record in the relevant legal jurisdiction noted below.

## *Debtor litigation*

| Counterparty | Claim | Type | Commenced | Court | Court reference |
|---|---|---|---|---|---|
| AG Financial Products Inc. | $880m | Street | Nov. 2011 | Supreme Court of the State of New York | 653284/2011 |
| DZ Bank AG Deutsche Zentral-Genossenschaftsbank | €32m | Street | Jul. 2014 | UK High Court | 2014-835 |
| Dietmar Hopp Stiftung GmbH | €26m | Trust | Aug. 2010 | German Supreme Court | BGH XI ZR 9/14 |
| DH Besitzgesellschaft AG & Co KG | | Trust | Aug. 2010 | German Supreme Court | BGH XI ZR 9/14 |
| ExxonMobil Financial Services BV | $14m | Street | Aug. 2014 | UK High Court | 2014-1006 |
| Athens Medical Centre SA | €10m | Street | Mar. 2011 | Multi-Member Court of First Instance of Athens | 53089/2011 |
| JP Morgan Chase Bank NA & Raiffeisen Bank International AG | £13m | Street | Feb. 2015 | UK High Court | 2015-688 |

## *Senior creditor litigation*

| Counterparty | POD £m | Type | Commenced | Court | Court reference |
|---|---|---|---|---|---|
| Barclays Capital Inc* | 517 | LBI litigation | Nov. 2009 | US Bankruptcy Court for the Southern District of New York | 09-01732-scc |
| Loreley Financing (Jersey) No. 26 Ltd | 124 | Damages – rejection appeal | Feb. 2013 | UK High Court | 7942 of 2008 |
| Granite Finance Limited | 114 | Damages | Feb. 2014 | UK High Court | 7942 of 2008 |
| IKB Deutsche Industriebank AG** | 85 | Damages – rejection appeal | Mar. 2014 | UK High Court | 7942 of 2008 |
| SAAD Investment Company Ltd | 77 | Other – rejection appeal | Jan. 2014 | UK High Court | 7942 of 2008 |
| The Bank of Nova Scotia** | 36 | Other – rejection appeal | Jun. 2014 | UK High Court | 7942 of 2008 |
| DZ Bank AG Deutsche Zentral - Genossenschaftsbank | 31 | Debtor | Jul. 2014 | UK High Court | 2014-835 |
| Raiffeisen Bank International AG | 16 | Debtor | Feb. 2015 | UK High Court | 2015-688 |
| AG Financial Products Inc. | 16 | Debtor | Nov. 2011 | Supreme Court of the State of New York | 653284/2011 |
| Merrill Lynch Credit Products LLC** | 9 | Other - rejection appeal | Nov. 2014 | UK High Court | 7942 of 2008 |
| Merrill Lynch Credit Products LLC** | 2 | Other - rejection appeal | Nov. 2014 | UK High Court | 7942 of 2008 |
| ExxonMobil Financial Services BV | 5 | Debtor | Aug. 2014 | UK High Court | 2014-1006 |
| Employee | 3 | Other - rejection appeal | Dec. 2014 | UK High Court | 7942 of 2008 |

* LBIE is not a party to this litigation but the outcome will impact LBIE as disclosed elsewhere in the progress report.

** Settled since 14 March 2015.

# *Appendix D:*
## Surplus entitlement UK High Court process (Waterfall I and II)

### Summary of Waterfall I Appeal UK Appeal Court process milestones in the current reporting period:

| | |
|---|---|
| *24 Oct. 2014* | CVI GVF (Lux) Master Sarl filed **respondent's** skeleton argument |
| *4 Mar. 2015* | LBHI filed **replacement appellant's** skeleton argument |
| *5 Mar. 2015* | LBIE filed **replacement appellant's** skeleton argument |
| *6 Mar. 2015* | LBL filed **replacement appellant's** skeleton argument |
| *6 Mar. 2015* | LBHI2 filed **replacement appellant's** skeleton argument |
| *6 Mar. 2015* | CVI GVF (Lux) Master Sarl filed replacement **respondent's** skeleton argument |
| *11 Mar. 2015* | LBL filed replacement **respondent's** skeleton argument |
| *12 Mar. 2015* | LBIE filed replacement **respondent's** skeleton argument |
| *13 Mar. 2015* | LBHI filed replacement **respondent's** skeleton argument |

### Summary of Waterfall II UK High Court process milestones in the current reporting period:

| | |
|---|---|
| *19 Sept. 2014* | Senior Creditor Group, Wentworth and York filed initial position papers re. 39 questions pursuant to procedural order of 25 June 2014 |
| *19 Sept. 2014* | Witness statement of RF Garvey of CarVal Investors GB LLP for the Senior Creditor Group re. interactions with the Administration |
| *19 Sept. 2014* | Witness statement of RS Bingham **of Zolfo Cooper LLC for Wentworth re. default rate pertaining to LBIE's** ISDA Master Agreement guarantee claims |
| *19 Sept. 2014* | Witness statement of Ms MD Mauro of York Capital Management for York re. prime brokerage agreements |
| *10 Oct. 2014* | AV Lomas (Administrator) filed position paper re. 39 questions pursuant to procedural order of 25 June 2014 |
| *31 Oct. 2014* | Senior Creditor Group, Wentworth and York filed a further reply position paper to position papers of respondents of 19 Sept. 2014 and Administrators of 10 Oct. 2014 |
| *31 Oct. 2014* | AV Lomas (Administrator) filed a witness statement to provide further context in relation to the issues to be determined in the application |
| *31 Oct. 2014* | Witness statement of A Zambelli of CarVal Investors GB LLP for the Senior Creditor Group re. the effect of Claims Determination Deeds on Currency Conversion Claims |
| *31 Oct. 2014* | Witness statement of Ms MN Browning of Baupost Capital LLC for the Senior Creditor Group to provide evidence relating to the CRA |
| *21 Nov. 2014* | Second case management hearing with Mr Justice David Richards – due to the complexities of the 39 issues, the issues to be split into 3 tranches with separate timetables |
| *22 Dec. 2014* | Witness statement of A Zambelli of CarVal Investors GB LLP for the Senior Creditor Group re. tranche A issue pursuant to procedural order of 21 Nov. 2014 |
| *15 Jan. 2015* | Witness statement of PM McKee of Baupost Group LLC for the Senior Creditor Group pursuant re. tranche C issues to procedural order of 21 Nov. 2014 |
| *27 Jan. 2015* | SA Pearson (Administrator) filed a witness statement re. tranche B issues, in particular relating to the CRA, pursuant to procedural order of 21 Nov. 2014 |
| *29 Jan. 2015* | PD Copley (Administrator) filed a witness statement re. tranche B issues, in particular relating to Claims Determination Deeds, pursuant to procedural order of 21 Nov. 2014 |
| *2 Feb. 2015* | Senior Creditor Group, Wentworth and York filed skeleton arguments in advance of the tranche A issues hearing |
| *9 Feb. 2015* | Administrators filed skeleton arguments in advance of the tranche A issues hearing |
| *13 Feb. 2015* | Senior Creditor Group, Wentworth and York filed supplemental reply skeleton arguments in advance of the tranche A issues hearing |
| *16 – 26 Feb. 2015* | 9-day court hearing of the tranche A issues |
| *2 Mar. 2015* | Witness statement of R Ryan of Elliott Management Corporation for Wentworth in response to the witness statements of A Zambelli and PD Copley |
| *3 Mar. 2015* | Witness statement of Ms MN Browning of Baupost Capital LLC for the Senior Creditor Group in response to the witness statement of SA Pearson |
| *3 Mar. 2015* | Witness statement of P Goldschmid of King Street Capital Management GP LLC for Wentworth in response to various witness statements |
| *9 Mar. 2015* | Third case management hearing with Mr Justice David Richards on procedural steps re. the hearings on tranche B and C issues and certain issues arising from the tranche A hearing were addressed |

**Summary of Waterfall I Appeal UK Appeal Court process milestones expected in the next reporting period:**

| | |
|---|---|
| *23 – 27 Mar. 2015* | 5-day court hearing |
| *June/July 2015* | Judgment expected to be handed down |

**Summary of Waterfall II Application UK High Court process milestones expected in the next reporting period:**

| | |
|---|---|
| *31 Mar. 2015* | Wentworth to write to the other parties stating its position on PM McKee witness statement re. tranche C issues |
| *6 Apr. 2015* | Proposed date for Senior Creditor Group to file position paper and statement of relevant facts in relation to issue 36A (tranche B) |
| *15 Apr. 2015* | Proposed date for Wentworth to file position paper and statement of relevant facts in relation to issue 36A (tranche B) |
| *24 Apr. 2015* | Proposed date for Administrators to file position paper (if advised) and statements of agreed facts in advance of the tranche B hearing |
| *1 May 2015* | Proposed date for Senior Creditor Group, Wentworth and York to file skeleton arguments in advance of the tranche B hearing |
| *8 May 2015* | Proposed date for Administrators to file skeleton argument in advance of the tranche B hearing |
| *13 May 2015* | Proposed date for Senior Creditor Group, Wentworth and York to file supplemental reply skeleton arguments in advance of the tranche B hearing |
| *18 May 2015* | Proposed date for 4-day court hearing of the tranche B issues |
| *May/June 2015* | Judgment may be handed down on tranche A issues |
| *June – Oct. 2015* | **In this period it is expected that the following milestones will occur:** |
| | Senior Creditor Group and Wentworth to file foreign law expert evidence re. tranche C issues |
| | Administrators to file reply foreign law expert evidence (if advised) re. tranche C issues |
| | Experts to file statements on issues agreed and not agreed re. tranche C issues |

The timings of the above milestones are subject to change, pending agreement as to the timetable between the parties and the UK High Court.

# *Appendix E:*
# Administrators' remuneration

## *Analysis of Administrators' remuneration by grade and work activity*

The table below provides an analysis of the Administrators' total hours incurred and the associated cost by staff grade and work activity for the previous time reporting period (to 30 June 2014), the current period (to 31 December 2014) and the forecast for the current and next period (to 30 June 2015).

| | Prior actual | | Current actual | | Current forecast | | Future forecast | |
| | 1 Jan 2014 to 30 June 2014 | | 1 July 2014 to 31 December 2014 | | 1 July 2014 to 31 December 2014 | | 1 Jan 2015 to 30 June 2015 | |
| | Hours | £'000 | Hours | £'000 | Hours | £'000 | Hours | £'000 |
|---|---|---|---|---|---|---|---|---|
| **By grade** | | | | | | | | |
| Partner | 6,146 | 5,151 | 4,642 | 3,771 | 5,933 | 4,877 | 3,939 | 3,165 |
| Director | 14,672 | 9,312 | 12,013 | 7,726 | 12,243 | 7,946 | 10,714 | 6,929 |
| Senior Manager | 36,387 | 17,598 | 32,268 | 15,801 | 28,988 | 14,261 | 25,412 | 12,579 |
| Manager | 48,113 | 17,673 | 38,914 | 14,229 | 37,105 | 13,768 | 27,496 | 10,176 |
| Senior Associate | 60,615 | 15,106 | 42,850 | 10,825 | 44,034 | 11,274 | 20,801 | 5,410 |
| Associate | 30,113 | 4,684 | 16,345 | 2,606 | 21,928 | 3,477 | 8,901 | 1,456 |
| **Total** | **196,046** | **69,524** | **147,032** | **54,958** | **150,231** | **55,603** | **97,263** | **39,715** |
| **Average hourly rate** | | **£355** | | **£374** | | **£370** | | **£408** |
| **By work activity** | | | | | | | | |
| Counterparty resolution | 32,745 | 11,560 | 21,369 | 7,862 | 24,369 | 8,847 | 10,765 | 3,751 |
| Transaction processing and control | 32,797 | 10,670 | 19,959 | 6,607 | 18,220 | 6,104 | 10,713 | 4,160 |
| Middle office | 26,709 | 9,025 | 15,124 | 5,293 | 15,637 | 5,419 | 6,932 | 2,859 |
| Surplus | 9,635 | 4,471 | 11,228 | 4,394 | 12,679 | 4,721 | 9,547 | 4,223 |
| Valuations | 13,211 | 4,502 | 9,135 | 3,799 | 10,156 | 3,799 | 4,876 | 1,993 |
| Simplification/data governance | 14,770 | 4,898 | 11,035 | 3,766 | 11,086 | 3,847 | 8,579 | 3,208 |
| *Information technology* | *22,916* | *6,641* | *20,130* | *6,590* | *18,228* | *5,864* | *16,859* | *6,365* |
| *Insolvency* | *16,886* | *5,846* | *15,181* | *5,208* | *16,340* | *5,728* | *12,274* | *4,421* |
| *Tax, VAT and pensions* | *8,260* | *4,841* | *7,203* | *4,655* | *8,010* | *4,857* | *4,653* | *3,322* |
| *Other back office functions* | *18,117* | *7,070* | *16,668* | *6,784* | *15,506* | *6,417* | *12,065* | *5,413* |
| Total other support functions | 66,179 | 24,398 | 59,182 | 23,237 | 58,084 | 22,866 | 45,851 | 19,521 |
| **Total** | **196,046** | **69,524** | **147,032** | **54,958** | **150,231** | **55,603** | **97,263** | **39,715** |

The above analysis excludes a further £100,419 (294 hours) of time costs deducted from taxation refunds received by LBIE from the Lehman tax group representative member, LBL, in the period. This amount was paid to PwC by LBL in respect of work done relating to the tax reclaim, and has been recharged to LBIE by deduction from the tax recoveries eventually refunded to it. All pre-Administration corporation tax recoveries have now been finalised and no further such time costs are likely to be incurred.

## Staff headcount profile

The table below provides a summary of the actual staff headcount profile for the previous and current time reporting periods and the forecast for the current and next time reporting periods.

| | Actual | | Forecast | |
|---|---|---|---|---|
| | **Prior period ended 30 Jun 2014** | **Current period ended 31 Dec 2014** | **Current period ended 31 Dec 2014** | **Future period ending 30 Jun 2015** |
| **Staff profile** | | | | |
| LBIE staff (including contractors) | 320 | 259 | 263 | 201 |
| PwC staff[1] | 198 | 143 | 148 | 98 |
| Ratio of LBIE to PwC staff | 1.6 | 1.8 | 1.8 | 2.0 |

1. PwC staff numbers are calculated on the basis of 8 worked man-hours being equal to 1 full-time equivalent man-day.

We estimate that in the period ending 30 June 2015 the LBIE headcount will reduce by c.22%. In the corresponding period, the PwC staff will have reduced by c.31%.

The fluctuating ratio of LBIE to PwC staff reflects PwC staff being released at shorter notice than LBIE staff (as explained in the last report) as workload reduces and the different pace at which individual roles on the Administration come to an end.

## Administrators' remuneration movements between the current period and the prior period

In the current time reporting period to 31 December 2014, total hours reduced by 25% compared to the period ended 30 June 2014, with a corresponding reduction in total costs of 21%.

The principal areas of reduced activity in the period were:

- counterparty resolution, as the unresolved debtor and creditor populations have further reduced;

- middle office, as the progress in settling outstanding claims has further reduced the associated claims agreement workload and certain diligence projects have concluded; and

- transaction processing and control, as the remaining volume of assets held in the House and client depots and associated income have continued to fall.

## Administrators' remuneration movements between the current period actual and forecast

The total actual hours and costs are broadly in line with the forecast.

Principal activity variances relate to:

- counterparty resolution, with actual hours and costs at c.90% of forecast, as the continued successful completion of outstanding debtor and creditor positions resulted in a release of resource earlier than planned; offset by

- transaction processing and control, with actual hours and costs at c.110% of forecast, due to additional testing being required prior to the transfer of the cash processing system and the return of Affiliate assets ahead of forecast.

## Administrators' remuneration forecast for the next period

The forecast 6-monthly time reporting period to 30 June 2015 indicates a 34% reduction in hours and a 28% reduction in costs compared with the current period.

The activity across the majority of work streams is forecast to continue to reduce significantly in line with future expected workloads.

The principal work stream exceptions, with only limited activity reductions, are:

- surplus with a 15% reduction in hours as significant Surplus-related activities continue relating to the Waterfall court hearings in the next period and the associated preparatory work in advance of the hearings, together with development of infrastructure for calculation and agreement of Surplus entitlements; and

- information technology with a 16% reduction in hours as planning and implementing data simplification measures continue, including a new 'tail state' data centre and decommissioning or consolidating data systems.

## Administrators' remuneration approval

Details of the statutory framework for the approval of the **Administrators' remuneration, the role of the Creditors'** Committee Adviser and the level and detail of disclosure provided by the Administrators are set out in our earlier reports.

We continue to provide the Committee and its Adviser with detailed information relating to our remuneration and to Category 2 disbursements, in accordance with SIP 9, on a quarterly basis.

The remuneration information contained in this report is extracted from the Q3 and Q4 2014 data packs which have been provided to the Committee and its Adviser.

## Approvals by the Creditors' Committee

The Committee has reviewed and approved all time costs for the period to 31 December 2014, including the deferred element relating to 2014 that was subject to Committee review in early 2015.

The Committee has also approved remuneration arrangements for 2015, which again require deferral of a significant **proportion of the Administrators' time costs that will be** incurred in the calendar year. Approval of the deferred element will be considered in early 2016, enabling the Committee to **judge the Administrators' performance a**gainst medium-term as well as short-term objectives in 2015.

The Committee has been provided with Category 2 disbursement information relating to the 6-month period to 31 December 2014 amounting to £1,169,058, with disbursements of £1,670,736 being approved for payment in the period.

Cumulative time costs accrued to 31 December 2014 are c.£885**m. Total Administrators' remuneration and** disbursements paid to 14 March 2015 are c.£920m.

# *Appendix F:*
## Statutory and other information

| | |
|---|---|
| **Court details for the Administration:** | High Court of Justice, Chancery Division, Companies Court<br>Court case number 7942 of 2008 |
| **Full name:** | Lehman Brothers International (Europe) |
| **Trading name:** | Lehman Brothers International (Europe) |
| **Registered number:** | 02538254 |
| **Registered address:** | Level 23, 25 Canada Square, London E14 5LQ |
| **Date of the Administration appointment:** | 15 September 2008 |
| **Administrators' names and addresses:** | AV Lomas, SA Pearson (both appointed 15 September 2008), PD Copley and R Downs (both appointed 2 November 2011) and JG Parr (appointed 22 March 2013) of PricewaterhouseCoopers LLP, 7 More London Riverside, London SE1 2RT. MJA Jervis and DY Schwarzmann ceased to act on 2 November 2011. DA Howell ceased to act on 22 March 2013 |
| **Appointor's name and address:** | High Court of Justice, Chancery Division, Companies Court on the application of LBIE's directors |
| **Objective being pursued by the Administrators:** | Achieving a better result for LBIE's creditors as a whole than would be likely if LBIE were wound up (without first being in Administration) |
| **Aims of the Administration:** | Recover and/or realise all House assets, including cash, securities and in-the-money financial contracts, on a managed basis<br>Admit unsecured creditors' claims and make distributions to creditors<br>Recover Client Assets and Client Money, assess the claims to such property and return all such property to its rightful owners on a systematic basis |
| **Division of the Administrators' responsibilities:** | In relation to paragraph 100(2) of Schedule B1 to the Insolvency Act, during the period for which the Administration is in force, any act required or authorised under any enactment to be done by either or all of the Administrators may be done by any 1 or more of the persons for the time being holding that office |
| **Details of any extensions to the initial period of appointment:** | The UK High Court on 2 November 2011 granted an extension of the Administration to 30 November 2016 |
| **Proposed end of the Administration:** | The Administrators have yet to determine the most appropriate exit |
| **Estimated dividend for unsecured creditors:** | Interim dividends paid to date at a cumulative rate of 100p/£1. Creditors are referred to Section 2 for the illustrative range of outcomes |
| **Estimated values of the prescribed part and LBIE's net property:** | The estimated value of LBIE's net property remains uncertain |
| **Whether and why the Administrators intend to apply to court under Section 176A(5) of the Insolvency Act:** | Such an application is considered unlikely |
| **The European Regulation on Insolvency Proceedings (Council Regulation (EC) No. 1346/2000 of 29 May 2000):** | The European Regulation on Insolvency Proceedings does not apply to this Administration as LBIE is an investment undertaking |
| **Creditors' Committee members:** | Lehman Commercial Paper Inc.<br>Ramius LLC<br>Lehman Brothers Asia Holdings Ltd |

# *Appendix G:*
## Glossary of terms

| Abbreviation | Term | Definition |
|---|---|---|
| Administration | Administration | UK corporate insolvency process governed by the Insolvency Act 1986 applicable to LBIE following the granting of an administration order dated 15 September 2008 |
| Administrators | Joint Administrators | AV Lomas and SA Pearson were appointed as Joint Administrators of LBIE on 15 September 2008. PD Copley and R Downs were appointed on 2 November 2011. JG Parr was appointed on 22 March 2013. All are licensed in the United Kingdom to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales and are partners of PricewaterhouseCoopers LLP |
| Adviser | Adviser | An adviser retained to assist the Committee in considering the Administrators' remuneration requests |
| Affiliates | Affiliate entities | Various subsidiaries and affiliates of Lehman Brothers Holdings Inc. |
| AGR | AG Financial Products Inc. | A US-based affiliate of Assured Guaranty Corp. which provided credit protection to counterparties under credit default swaps |
| BarCap | Barclays Capital Inc. | Investment banking business of Barclays Bank PLC |
| Best Claim value | Best Claim value | A customer's claim for the purposes of the Consensual Proposal is the higher of either: the value of the accepting customer's claim on 19 September 2008 (and, for the avoidance of doubt, excluding income accruing after 19 September 2008); and the market value of an accepting customer's claim, including income, on 30 November 2012 |
| Catch-up distribution | Catch-up distribution | Deferred Omnibus Trust distribution to consenting beneficiaries who now satisfy the eligibility criteria but did not participate in 1 or more of the previous Common Terms distributions |
| Category 2 disbursements | Administrators' Category 2 disbursements | Costs that are directly referable to the Administration but not to a payment to an independent third party. They may include shared or allocated costs that can be allocated to the Administration on a proper and reasonable basis |
| Claims Determination Deed | Claims Determination Deed | A standardised legal document for agreeing claims under the Consensual Approach |
| Client Assets | Client Assets | Client securities which LBIE should have held as at 15 September 2008 |
| Client Money | Client Money | Client cash balances held by LBIE as at 15 September 2008 or received thereafter by LBIE and which are in each case subject to the UK Financial Conduct Authority's client money rules and/or applicable client money distribution rules |
| CM Determination | Client Money Determination | The Administrators' assessments of the quantum of CME of a financial trading counterparty based on published principles |
| CME | Client Money Entitlement | The entitlement to receive a distribution from the pre-Administration Client Money pool |
| Committee | Creditors' Committee | Creditors voted to represent the general body of creditors of LBIE to assist the Administrators in discharging their functions set out in the Insolvency Act 1986 |
| Common Terms | Common Terms | Common terms between LBIE and consenting beneficiaries to the Consensual Proposal |
| Consensual Approach | Consensual Approach | A framework developed for the expedient resolution of the unsecured claims of financial trading counterparties |
| Consensual Proposal | Consensual Proposal | Proposal to Omnibus Trust claimants to settle on a consensual basis their claims in respect of securities and/or cash positions under the Common Terms. In settlement of the claims, each customer which is a party to the Common Terms is entitled to have allocated to it a share of the proceeds of the securities and cash received by LBIE from LBI |
| CRA | Claim Resolution Agreement | The claim resolution framework which governs the return of Client Assets. The CRA was proposed by the Administrators to clients in November 2009 and was accepted by over 90% of eligible Client Assets claimants |
| Currency Conversion Claims | Currency Conversion Claims | Non-provable claims derived from contractual rights to be paid in a currency other than sterling, where the value of sterling has declined as against the currency of the claim between the date of Administration and the date(s) of payment of distributions in respect of the claim |
| Customer Property | Customer Property as defined in SIPA | A combination of claims to securities and certain cash amounts relating to securities, as defined in SIPA |
| FCA | Financial Conduct Authority (previously the Financial Services Authority) | Regulator of providers of certain financial services in the UK - name change with effect from 1 April 2013 |
| HMRC | HM Revenue & Customs | Organisation of the UK government primarily responsible for the collection of taxes |
| House Estate (also referred to as House) | House Estate | Dealings that relate to LBIE's general unsecured estate |
| Insolvency Act | Insolvency Act 1986 | Statutory legislation that provides the legal platform for matters relating to personal and corporate insolvency in the UK |

| Abbreviation | Term | Definition |
|---|---|---|
| Insolvency Rules | Insolvency Rules 1986 | Statutory rules that provide the legal platform for matters relating to personal and corporate insolvency in the UK |
| IRS | Internal Revenue Service | A bureau of the Department of the Treasury of the United States federal government with responsibility for collecting taxes and the interpretation and enforcement of the internal revenue code |
| ISDA (also referred to as ISDA Master Agreement) | International Swaps and Derivatives Association Master Agreement | Global trade association for over-the-counter derivatives standard documentation |
| Laurifer | Laurifer Limited | Special purpose vehicle registered in Jersey set up for the purposes of the Trust Estate property return scheme |
| LB Lux | Lehman Brothers (Luxembourg) S.A. | Affiliate entity subject to insolvency proceedings in Luxembourg |
| LBB | Lehman Brothers Bankhaus A.G. | Affiliate entity subject to insolvency proceedings in Germany |
| LBF | Lehman Brothers Finance S.A. (Switzerland) | Affiliate entity subject to insolvency proceedings in Switzerland |
| LBHI | Lehman Brothers Holdings Inc. | Ultimate parent of the Lehman group, incorporated in the USA and formerly subject to Chapter 11 bankruptcy protection from 15 September 2008. The plan of reorganisation became effective on 6 March 2012 |
| LBHI2 | LB Holdings Intermediate 2 Limited | Affiliate entity subject to insolvency proceedings in the UK |
| LBHK | Lehman Brothers Hong Kong | Collective group of affiliate entities subject to insolvency proceedings in Hong Kong: Lehman Brothers Asia Holdings Ltd, Lehman Brothers Commercial Corporation Asia Ltd, Lehman Brothers Asia Capital Company Ltd, Lehman Brothers Securities Asia Ltd, Lehman Brothers Futures Asia Ltd, Lehman Brothers Asia Ltd and Lehman Brothers Nominees (H.K.) Ltd |
| LBI | Lehman Brothers Inc. | US broker-dealer affiliate entity, incorporated in the USA which entered SIPA trusteeship on 19 September 2008 |
| LBIE | Lehman Brothers International (Europe) – In Administration | Private unlimited UK subsidiary of LBHI, acting as its main European broker dealer, subject to an administration order dated 15 September 2008 |
| LBL | Lehman Brothers Limited | UK service entity for the Lehman Administration Companies. LBL was placed into Administration on 15 September 2008 |
| LBSF | Lehman Brothers Special Financing Inc. | Affiliate entity subject to insolvency proceedings in the USA |
| MCF | Mable Commercial Funding Limited | Affiliate entity subject to insolvency proceedings in the UK |
| Merit | Merit LLC | A limited liability company under the control of LBHI |
| Non-Consenting beneficiaries | Non-Consenting beneficiaries | Potential beneficiary under the Omnibus settlement agreement that did not make an offer to LBIE and therefore is not a party to the Common Terms |
| Omnibus Trust | Omnibus Trust | Trust under which the asset returns to LBIE by LBI of SIPA Customer Property relating to LBIE client positions are held and the assets constituting the trust property thereof |
| OTC | Over-the-counter | A market in which securities, or other financial products, are traded by direct dealer-to-dealer communications |
| Over-Claims | Over-Claims | Proprietary claims made for or in respect of securities in an amount which exceeds the amount which appears as the claim entitlement to securities of that type as documented in LBIE's books and records |
| Pension Fund | Lehman Brothers Pension Scheme | Group pension scheme for employees of UK Lehman entities |
| Post-Administration Interest | Post-Administration Interest | Statutory interest payable pursuant to Rule 2.88(7) of the Insolvency Rules |
| Proof of Debt (also referred to as POD) | Proof of Debt or Statement of Claim | A formal document prescribed by the Insolvency Rules submitted to the Administrators by a creditor wishing to prove their claim. The form is made in writing or electronically under the responsibility of a creditor and signed by an authorised person |
| SCSO | Small Claims Settlement Offer | An initiative under which creditors with agreed claims up to £150,000 were offered a one-off payment of 90% of their agreed claim in full and final settlement |
| Senior | Senior unsecured creditor | Unsecured, non-preferential, non-Shareholder, not subordinated creditor |

| Abbreviation | Term | Definition |
|---|---|---|
| Senior Creditor Group | Senior Creditor Group | Collectively 3 respondents to the Waterfall II Application: Burlington Loan Management Limited, CVI GVF (Lux) Master SARL and Hutchinson Investors, LLC |
| Shareholder(s) | Shareholder(s) of LBIE | LBL and/or LBHI2 |
| SIP 9 | Statement of Insolvency Practice 9 | Rules issued by the Joint Insolvency Committee which provide guidance to insolvency practitioners and creditors' committees in relation to the remuneration of, *inter alios*, administrators |
| SIPA | Securities Investor Protection Act 1970 | A US legal proceeding for handling the liquidation of a broker-dealer |
| Street | Street counterparties | Third party counterparties consisting of financial institutions, including asset managers, custodians and banks; and non-banking financial institutions, including pension funds and corporate entities |
| Street Creditors | Street Creditors | Senior creditors with financial trading claims without Client Assets |
| Subordinated Debt | Subordinated Debt | The subordinated liabilities arising pursuant to 3 intercompany loan agreements entered into between LBIE and LBHI2, each dated 1 November 2006, and which have been assigned by LBHI2 to the Wentworth joint venture companies |
| Surplus | Surplus | Assets remaining after the payment in full of Senior creditor claims and before Post-Administration Interest, non-provable claims, Subordinated Debt and Shareholder claims |
| True-up distribution | True-up distribution | Release of funds to those consenting beneficiaries who participated in previous Common Terms distributions and for whom attributable reserves were made in respect of US federal income tax liabilities |
| Trust Estate | Trust Estate | Refers to Client Assets, Client Money and Omnibus Trust |
| UK Appeal Court | Court of Appeal of England and Wales | The second most senior court in the English legal system for civil cases. Permission to appeal is required, either from the lower court or the Court of Appeal itself |
| UK High Court | High Court of England and Wales | Court of England and Wales which deals with all high value and high importance cases, and also has a supervisory jurisdiction over all subordinate courts |
| UK Supreme Court | Supreme Court of the United Kingdom | This is the court of last resort and highest appellate court in the United Kingdom for civil cases |
| VAT | Value Added Tax | A consumption tax levied on the sale of goods and services in the UK |
| Waterfall | Waterfall | Waterfall I and II legal proceedings |
| Waterfall I Appeal | Waterfall I Appeal | Appeal proceedings of all issues in respect of the Waterfall I Application judgment given by the UK High Court on 19 May 2014 |
| Waterfall I Application (also referred to as Waterfall I) | Waterfall I Application | A joint application by LBIE, LBL and LBHI2 to the UK High Court issued on 14 February 2013 seeking a determination on statutory interest priority, contribution rights and other issues relating to LBIE and its Shareholders |
| Waterfall II Application (also referred to as Waterfall II) | Waterfall II Application | An application to the UK High Court issued on 12 June 2014 seeking a further determination on issues that impact the rights of creditors to payment from the Surplus and the distribution of that Surplus in a timely manner |
| Wentworth | Wentworth | Wentworth Sons Sub-Debt SARL, a respondent to the Waterfall II Application |
| York | York | York Global Finance BDH.LLC, a respondent to the Waterfall II Application |

www.pwc.co.uk/lehman

© 2015 PwC. All rights reserved. Not for further distribution without the permission of PwC.
"PwC" refers to the network of member firms of PricewaterhouseCoopers International
Limited (PwCIL), or, as the context requires, individual member firms of the PwC network.
Each member firm is a separate legal entity and does not act as agent of PwCIL or any other
member firm. PwCIL does not provide any services to clients. PwCIL is not responsible or
liable for the acts or omissions of any of its member firms nor can it control the exercise of
their professional judgment or bind them in any way. No member firm is responsible or liable
for the acts or omissions of any other member firm nor can it control the exercise of another
member firm's professional judgment or bind another member firm or PwCIL in any way.

