UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x

IN RE:

LEHMAN BROTHERS HOLDINGS INC., et al.,


            Debtors,

——————————————————————x

U.S. BANK NATIONAL ASSOCIATION, et al.,

            Appellants-Claimants,

            -against-                                  No. 16 Civ. 5813 (CM)

LEHMAN BROTHERS HOLDINGS INC.,

            Appellee-Plan Administrator.

——————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/22/17

**DECISION AND ORDER AFFIRMING DECISION OF BANKRUPTCY COURT**

McMahon, C.J.:

Appellants-Claimants U.S. Bank National Association ("U.S. Bank"); Wilmington Trust

Company; Wilmington Trust, National Association; Law Debenture Trust Company of New

York; and Deutsche Bank National Trust (collectively, the "RMBS Trustees"), solely in their

respective capacities as indenture trustee, trustee, or separate trustee for 405 mortgage-backed

securities trusts (the "Trusts"), bring this appeal seeking reversal of a June 27, 2016 order issued

by the U.S. Bankruptcy Court for the Southern District of New York (Chapman, J.) (the

"Bankruptcy Court"), disallowing and expunging certain proofs of claim filed by the RMBS

Trustees (the "Expunged Claims") against Appellee-Plan Administrator Lehman Brothers

Holdings Inc. ("LBHI"). The RMBS Trustees allege that this order was based solely on a court-

ordered claims resolution protocol, which they assert did not apply to some of the Expunged

1

Claims, and which they allege expressly preserved their right to prove certain claims through the use of an alternative method of resolution such as statistical sampling.

For the reasons below, the Court affirms the Bankruptcy Court's order.

## Background and Procedural History

This appeal arises from the long-running bankruptcy proceeding involving LBHI and certain of its subsidiaries (the "Debtors"), which filed voluntary Chapter 11 petitions beginning in September 2008.[1] The RMBS Trustees are the designated trustees for the Trusts, which were created between 2002 and 2008 to securitize pools of residential mortgage loans purchased from LBHI. The mortgage loans had corresponding mortgage loan sale and assignment agreements ("MLSAAs") between LBHI and Structured Asset Securities Corporation ("SASCO," collectively with LBHI, "Lehman"), and each loan was deposited into the Trusts pursuant to a Trust Agreement (together with the MLSAAs, the "Governing Agreements"). Each MLSAA contains specific representations and warranties ("R&Ws") regarding the characteristics and origination of the mortgage loans, and under the Governing Agreements, Lehman agreed to repurchase the loans if it breached an R&W.

In a July 2, 2009 order, the Bankruptcy Court set September 22, 2009 as the deadline for filing proofs of claim against the Lehman estate (the "Bar Date"). It is undisputed that the RMBS Trustees, on or before the Bar Date, timely filed more than 300 proofs of claim arising from Lehman's alleged breaches of the R&Ws, and that LBHI has objected to these proofs of claim.

The RMBS Trustees' claims arise from the 405 Trusts and approximately one million mortgage loans. Their claims fall into two categories. Of the 405 Trusts served by the RMBS

---

[1] Unless otherwise indicated, "Dkt. No. __" refers to the instant docket, No. 16 Civ. 5813. References to the underlying Bankruptcy Court docket, *In re Lehman Brothers Holdings Inc.*, No. 08-13555, are designated as "08-13555 Dkt. No. __."

2

Trustees, 255 Trusts (the "Covered Trusts") include approximately 416,000 loans that constitute "Covered Loans." Covered Loans are loans on which Lehman has acknowledged that it made R&Ws regarding the nature or quality of the loans and the delivery thereof to the Trusts. Of those 416,000 Covered Loans, approximately half have been repaid in full or re-underwritten by the RMBS Trustees, leaving approximately 209,000 Covered Loans outstanding. (*See* R. at APP00536 n.3.)

The approximately 600,000 remaining loans in the Trusts (the "Transferor Loans") were originated by third parties and acquired by Lehman before being deposited in their respective Trusts (the "Transferor Trusts"). Generally, for the Transferor Loans, Lehman asserts that it only assigned or passed on the originators' R&Ws to the Trusts, meaning that Lehman itself made very limited R&Ws regarding the mortgage loans. (R. at APP00150-51.) Lehman also asserts that it is not liable for breaches of R&Ws where the right to "put back" the loan to a third-party originator has been passed through to a Trust. (R. at APP00010 n.3, APP00151.)

On August 22, 2014, the RMBS Trustees moved to estimate the value of their claims through statistical sampling, rather than through a loan-by-loan review (the "Estimation Motion"). (R. at APP00001-35.) As part of the Estimation Motion, the RMBS Trustees reviewed a sample of the Covered Loans – 4,579 files – for R&W breaches. The RMBS Trustees claimed that it took approximately two years to identify a statistically valid sample of Covered Loans, obtain loan files for the sample from third parties, review the loan files for R&W breaches, and analyze and extrapolate the results to the full set of Covered Loans. (*See* R. at APP00536.) Based on the results of the RMBS Trustees' sampling, they also requested that the Bankruptcy Court increase the reserve set aside to satisfy their claims from $5 billion to $12.143 billion.

On October 15, 2014, LBHI objected to the RMBS Trustees' Estimation Motion and cross-moved (the "Cross-Motion") for an order establishing a claims resolution protocol (the "Protocol") that would require the RMBS Trustees to prove their claims on a loan-by-loan basis. (R. at APP00127-530.)

On December 10, 2014, the Bankruptcy Court held an all-day hearing on the competing Estimation Motion and Cross-Motion, hearing evidence from four expert witnesses on the viability of estimating the RMBS Trustees' claims by sampling and the viability of LBHI's proposed Protocol.

On December 29, 2014, the Bankruptcy Court issued an order granting LBHI's Cross-Motion (the "Protocol Order"). (R. at APP00761-75.) The Protocol Order adopted LBHI's proposed Protocol (which was modified by the parties from LBHI's original proposal). The Protocol establishes a detailed multi-step process for reviewing the RMBS Trustees' claims on a loan-by-loan basis. The adoption of the Protocol Order necessarily meant that the Bankruptcy Court denied the RMBS Trustees' Estimation Motion.[2]

In essence, the Protocol mandates that the RMBS Trustees and the Debtors engage in an alternative dispute resolution ("ADR") process to attempt to resolve the claims submitted by the

---

[2] At oral argument before this Court, the RMBS Trustees asserted that the Bankruptcy Court never formally denied their Estimation Motion, and that therefore it remains pending, because the Bankruptcy Court did not docket a written order saying something to the effect of, "The Estimation Motion is DENIED." That argument is meritless. No such order was required to deny their motion. The Bankruptcy Court stated on the record at the hearing that, "as a matter of law, I'm not going to estimate these claims pursuant to 502(c)." (R. at SAPP00233; *see also* R. at SAPP00464 ("I said we're not going to do estimation . . . ."); R. at SAPP00523 (stating that the Bankruptcy Court "declined to allow" the RMBS Trustees to estimate their claims through statistical sampling).) Furthermore, the Bankruptcy Court granted LBHI's Cross-Motion for a competing form of relief. The adoption of the Protocol Order necessarily precluded the allowance of claims by estimation. I categorically reject the RMBS Trustees' too-clever-by-half argument, which violates the settled principle that courts do not exalt "form over substance." *E.g.*, *United States v. DiFrancesco*, 449 U.S. 117, 142 (1980).

4

RMBS Trustees. The Protocol Order makes clear that compliance with the Protocol is mandatory, stating that, "the Debtors shall have the right to seek the disallowance and expungement of any RMBS Claims for the RMBS Trustees' failure to comply with the procedures and deadlines set forth in the RMBS Protocol with respect to any such RMBS Claims . . . ." (R. at APP00764.)

The Protocol is a five-step process. First, the RMBS Trustees are required to collect and produce to LBHI the underlying loan files supporting their claims. Second, LBHI must review those files and determine whether it agrees that a valid claim exists for the file (an "Approved Claim File") or not (a "Rejected Claim File"). Third, for any Rejected Claim File or any Approved Claim File for which the RMBS Trustees dispute LBHI's proposed purchase price, the parties must engage in a non-binding negotiation procedure. Fourth, for claims that are not resolved through that negotiation procedure, the parties must engage in a formal non-binding dispute resolution procedure overseen by a neutral "Claim Facilitator." Fifth, the parties have the right to object to any proposal by the Claim Facilitator, in which case the claim proceeds to trial.

Although the Bankruptcy Court sided with LBHI, and ordered a loan-by-loan review under the Protocol, the Protocol Order states: "each of (i) the RMBS Trustees' right, if any, to seek to provide proof in support of the allowance of the RMBS Claims through the use of statistical sampling, and (ii) the Plan Administrator's right to object to the use of statistical sampling by the RMBS Trustees, is reserved." (R. at APP00765.)

It is undisputed that the RMBS Trustees did not submit any claims for review under the Protocol for any Transferor Loans, but did review and submit thousands of Covered Loans for review. The Bankruptcy Court granted a motion by the RMBS Trustees (the "Extension Motion") extending the March 31, 2016 claims submission deadline to May 31, 2016 for

approximately 3,900 specifically-listed Covered Loans not at issue here, but otherwise retained

the deadlines initially established by the Protocol. On March 31, 2016 – the cutoff date for all

other claims covered by the Protocol – the RMBS Trustees attempted to reserve (by letter)

approximately 11,000 claims arising from the Covered Loans for which they did not submit

documentation under the Protocol, asserting that they should be estimated via sampling per the

Bankruptcy Court's reservation of that right in the Protocol Order. (*See* R. at APP01159-61.)

On April 28, 2016, LBHI moved to disallow and expunge all claims related to the Trusts

that were not submitted to the Protocol – meaning all 11,000 Covered Loan claims that the

RMBS Trustees had attempted to reserve, and all claims arising from the Transferor Loans. On

June 9, 2016, the Bankruptcy Court held a hearing on the motion and, on June 27, 2016, granted

it, expunging all of the RMBS Trustees' claims not submitted to the Protocol (the "Expungement

Order").

On July 11, 2016, per Fed. R. Bankr. P. 8002, the RMBS Trustees timely filed their

Notice of Appeal. (R. at APP01287-94.) The RMBS Trustees assert jurisdiction under 28 U.S.C.

§ 158(a)(1), which gives the district courts jurisdiction over appeals "from final judgments,

orders, and decrees."

There are four issues presented on appeal:

(1) Whether this Court has jurisdiction to hear the appeal of the Bankruptcy Court's
    Expungement Order, which LBHI claims is interlocutory;

(2) Assuming jurisdiction exists, whether the Bankruptcy Court correctly concluded that
    the Transferor Loan claims should be expunged due to the RMBS Trustees' admitted
    failure to submit them to the Protocol;

6

(3) Whether the Bankruptcy Court was correct to expunge the 11,000 Covered Loan

claims that the RMBS Trustees attempted to reserve by letter; and

(4) Whether the Bankruptcy Court's entry of the Expungement Order violated the RMBS

Trustees' Due Process rights.

### Applicable Legal Standards

This Court has jurisdiction to hear appeals from decisions of a Bankruptcy Court

pursuant to 28 U.S.C. § 158(a), which provides in relevant part that, "The district courts of the

United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and

decrees; . . . [and,] with leave of the court, from other interlocutory orders and decrees" of the

Bankruptcy Court. This Court reviews the Bankruptcy Court's conclusions of law *de novo*, and

its findings of fact for clear error. *E.g.*, *Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere

Clubs, Inc.)*, 922 F.2d 984, 988 (2d Cir. 1990).

### Discussion

### A.    The Expungement Order Is a Final, Appealable Order

LBHI argues that the Court lacks jurisdiction over this appeal because the Bankruptcy

Court's July 27, 2016 Expungement Order is not a "final" order per 28 U.S.C. § 158(a)(1), but is

instead an interlocutory order.

The Court notes at the outset that LBHI failed to list this issue in its Counter Statement of

Issues to Be Presented on Appeal, (Dkt. No. 5 at 4), as required by Fed. R. Bankr. P. 8009(a)(2).

The RMBS Trustees urge this Court to conclude, therefore, that this issue was waived.

While recognizing that I have discretion to deem LBHI's argument waived, I decline to

do so. *See* *Zimmerman v. Jenkins (In re GGM, P.C.)*, 165 F.3d 1026, 1032 (5th Cir. 1999);

*Interface Group-Nevada, Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*,

7

145 F.3d 124, 132 (3d Cir. 1998). LBHI and the RMBS Trustees have fully briefed the issue, and it goes to this Court's jurisdiction to hear this appeal, which is not waivable.

LBHI argues that the Expungement Order is interlocutory because it resolved only some, not all, of the RMBS Trustees' many claims. However, "The standard for finality in bankruptcy matters is more flexible than in ordinary civil litigation, because bankruptcy proceedings often continue for long periods of time and discrete claims are resolved from time to time over the course of the bankruptcy proceeding." *Pegasus Agency, Inc. v. Grammatikakis (In re Pegasus Agency, Inc.)*, 101 F.3d 882, 885 (2d Cir. 1996). "Orders in bankruptcy cases may be immediately appealed if they resolve discrete disputes within the larger case." *LTV Steel Co. v. United Mine Workers of Am. (In re Chateaugay Corp.)*, 922 F.2d 86, 90 (2d Cir. 1990). "[F]or a bankruptcy court order to be final within the meaning of § 158(d), the order need not resolve all of the issues raised by the bankruptcy; but *it must completely resolve all of the issues pertaining to a discrete claim, including issues as to the proper relief.*" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 3 F.3d 49, 53 (2d Cir. 1993).

Here, the Expungement Order completely resolved all of the issues pertaining to thousands of discreet claims asserted by the RMBS Trustees, including all claims arising from the Transferor Loans. Courts have frequently concluded that Bankruptcy Court orders expunging claims are final orders for purposes of appeal. *See, e.g.*, *EDP Med. Comput. Sys., Inc. v. United States*, 480 F.3d 621, 626 (2d Cir. 2007); *In re 114 Tenth Ave. Assoc., Inc.*, 441 B.R. 416, 424 (S.D.N.Y. 2010); *Regen Capital I, Inc. v. Halperin (In re U.S. Wireless Data, Inc.)*, No. 04-12075, 2006 WL 6914921, at *1 (S.D.N.Y. June 21, 2006), *aff'd sub nom. ReGen Capital I, Inc. v. Halperin (In re Wireless Data, Inc.)*, 547 F.3d 484 (2d Cir. 2008).

8

By its own terms, the Expungement Order was "immediately effective and enforceable."

(R. at APP01286.) The Expungement Order disallowed and expunged many of the RMBS

Trustees' claims (as to which no order could possibly be more "final"). For the expunged claims,

the Expungement Order thus "leaves nothing for the court to do but execute the judgment,"

which is the essence of a final order. *Catlin v. United States*, 324 U.S. 229, 233 (1945). The

Expungement Order also reduced the $5 billion reserve (the "RMBS Reserve") by 5% to account

for the release of claims against SASCO. (*Id.*) That action, too, is both discrete and final.

This Court has jurisdiction over this appeal under 28 U.S.C. § 158(a)(1).

## B.   The Bankruptcy Court Did Not Err by Expunging the Transferor Loan Claims

The RMBS Trustees contend that the Protocol established by the Protocol Order applies

only to Covered Loans, not Transferor Loans, so the Bankruptcy Court should not have

expunged their Transferor Loan claims because the RMBS Trustees failed to submit them under

the Protocol. LBHI argues that the Protocol Order clearly applies to all of the claims arising from

the Trusts, and that the RMBS Trustees' failure to submit their Transferor Loan claims to the

Protocol properly resulted in the expungement of those claims. I agree with LBHI – and Judge

Chapman – that the claims were properly expunged.

### 1.   The RMBS Trustees' Estimation Motion

The RMBS Trustees' Estimation Motion sought to increase the RMBS Reserve – which

had been set aside for the "RMBS Claims" – from $5 billion to $12.143 billion. The RMBS

Trustees also asked that, "a hearing be scheduled to estimate and allow the RMBS Claims." (R.

at APP00010 ¶ 1; R. at APP00011 ¶ 5.)

The Estimation Motion does not specifically define the term "RMBS Claims," and this

Court is unaware of whether that term had been defined in any previous order. However, the

9

RMBS Trustees acknowledged that the term "RMBS Claims," as used in their Estimation Motion, was broader than just the claims arising from the Covered Loans. The Estimation Motion states that, "The number of Covered Loans sold to the RMBS Trusts and identified by the RMBS Trustees is approximately *416,000*." (R. at APP00010 ¶ 2 (emphasis added).) In the next paragraph, it states, "The total RMBS Claims arise from approximately 405 RMBS Trusts and approximately *1 million* mortgage loans." (*Id.* ¶ 3 (emphasis added).) The Estimation Motion goes on to concede that, "The RMBS Claims related to Covered Loans are a *subset* of the total RMBS Claims." (*Id.* (emphasis added).) Therefore, as used by the RMBS Trustees themselves, the term "RMBS Claims" is not limited to Covered Loans.

It is not disputed that the original $5 billion RMBS Reserve was an estimate of the reserve needed to satisfy both the Covered Loan claims and the Transferor Loan claims. (R. at APP00018 ¶ 28, APP00136 ¶¶ 6-8, APP00146 ¶¶ 35-36.) The order establishing the $5 billion RMBS Reserve was broadly worded to cover all proofs of claim filed by the RMBS Trustees in relation to the Lehman bankruptcy. No distinction between the two types of claims was noted when the $5 billion figure was presented by the parties to the Bankruptcy Court back in February 2012. (*See* 08-13555 Dkt. No. 25643 at 27-28.)

However, it is also not disputed that the proposed increase in the reserve that the RMBS Trustees sought was based on an estimate derived from a statistical sample of *only* Covered Loans; no Transferor Loans were used to calculate the $12.143 billion figure. (R. at APP00011 ¶ 4 ("[T]he RMBS Trusts' claims associated with Covered Loans containing breaches of representations and warranties total not less than $12.143 billion."); *see also* R. at APP00018 ¶¶ 27-28, APP00021 ¶ 36, APP00024 ¶ 44, APP00025 ¶ 46.)

10

Furthermore, it appears that the RMBS Trustees sought to increase the RMBS Reserve solely in order to satisfy their Covered Loan claims, and intended that their proposed estimation procedure would apply only to Covered Loans. For example, in the same Estimation Motion, the RMBS Trustees stated that their proposed estimation schedule would "afford[] the parties ample time to conduct expert discovery while ensuring the prompt estimation and allowance of the RMBS Claims *for Covered Loans* under Section 502(c)." (R. at APP00026 ¶ 47 (emphasis added).) In addition, in a footnote in the Estimation Motion, the RMBS Trustees stated that they "reserve, and do not waive, any of their rights in regard to their proofs of claims, *including claims related to breaches of representations and warranties concerning mortgage loans other than Covered Loans at issue in this Motion*." (R. at APP00011 n.4 (emphasis added).)[3]

## 2. LBHI's Cross-Motion

LBHI noticed the contradiction in the RMBS Trustees' Estimation Motion. On the one hand, the RMBS Trustees were purportedly seeking to increase the reserve set aside to satisfy "the RMBS Claims" and seeking a hearing to "estimate and allow the RMBS Claims." On the other hand, the RMBS Trustees proposed calculating the reserve based solely on a sample of Covered Loans (which are a "subset" of the RMBS Claims); proposed a hearing schedule for the "estimation and allowance of the RMBS Claims for *Covered Loans*" (emphasis added); and included a footnote purporting to preserve their claims arising from "mortgage loans other than Covered Loans at issue in this Motion." So in its Cross-Motion, LBHI took steps to correct any confusion or ambiguity.

---

[3] Of course, an argument mentioned only in a footnote is not considered to be "adequately raised or preserved for appellate review." *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993).

11

First, LBHI did what the RMBS Trustees did not: it defined the term "RMBS Claims."
The Cross-Motion defines RMBS Claims as the proofs of claim filed by the RMBS Trustees
totaling "approximately $37 billion in repurchase claims against LBHI and SASCO for damages
allegedly incurred by the trusts that issued residential mortgage-backed securities." (R. at
APP00133 ¶ 1.) It is undisputed that $37 billion represented the combined face value of *both* the
Covered Loan claims *and* the Transferor Loan claims. (*See* R. at APP00012 ¶ 10 & n.5,
APP01180.)

Having defined "RMBS Claims" to include *all* RMBS Claims – whether related to
Covered Loans or Transferor Loans – LBHI opposed the RMBS Trustees' Estimation Motion
and asked the Bankruptcy Court to establish a Protocol "to expeditiously reconcile and resolve
the RMBS Claims" – *all* of the RMBS Claims, not just a "subset" (to use the RMBS Trustees'
word) of those claims.

LBHI took yet another step to clarify that it wanted the proposed Protocol to resolve any
and all outstanding RMBS Claims. Cognizant of the contradiction in the RMBS Trustees'
Estimation Motion, LBHI argued in a footnote to its Cross-Motion that, "By confining their
Reserve and Estimation Motions to Covered Loans, the RMBS Trustees have *effectively
abandoned claims concerning Transferor Loans* . . . ." (R. at APP00147 n.11 (emphasis added).)

### 3. The Protocol Order and the Protocol

After a nine-hour hearing on the competing motions, the Bankruptcy Court did not grant
the RMBS Trustees' request to increase the value of the RMBS Reserve and rejected the RMBS
Trustees' proposal to estimate their claims. (*See supra* note 2.) Instead, she granted LBHI's
Cross-Motion to establish a Protocol to facilitate the review of "the RMBS Claims" on a loan-
by-loan basis. The parties jointly revised LBHI's draft Protocol and Protocol Order prior to entry
by the Bankruptcy Court.

12

At the hearing, no one talked about the claims arising under the Transferor Loans, and the

RMBS Trustees did not so much as mention, let alone address on the merits, LBHI's

abandonment argument. Instead, counsel for the parties hammered out the details of the

Protocol's procedure for reviewing the Covered Loans. They discussed the fact that 209,000 loan

files (the number of outstanding Covered Loans) would need to be reviewed under the Protocol.

(*E.g.*, R. at SAPP00158, 160-61, 166, 173-74, 185-86, 211, 306, 308, 326-30, 371, 374.) There

was extensive discussion of how long it would take and how expensive it would be to review the

209,000 files on a loan-by-loan basis. (*E.g.*, R. at SAPP00326-30, 371, 374, 395-96, 418.) The

parties also talked about the roughly 250 Covered Trusts (which contain only Covered Loans) at

issue. (*E.g.*, R. at SAPP00166, 225.)

The Protocol Order entered after the hearing states: "Capitalized terms not defined herein

shall have the same meaning ascribed to them *in the Cross-Motion*." (R. at APP00762 n.1

(emphasis added).) As discussed above, the Cross-Motion defined "RMBS Claims" to mean the

proofs of claim totaling "approximately \$37 billion in repurchase claims" – *i.e.*, to encompass

repurchase claims relating to both Transferor Loans and Covered Loans.[4] The term "RMBS

Claims" was not otherwise defined in the Protocol Order; therefore, for purposes of the Protocol

Order, the term "RMBS Claims" means what it meant in the Cross-Motion. It thus includes all of

the RMBS Trustees' repurchase claims, relating to both types of loans.

The Protocol Order made clear that compliance with the Protocol was not optional if the

RMBS Trustees wished to preserve their claims. The Protocol Order states that the Protocol

"shall be implemented to reconcile and determine *the RMBS Claims* filed by the RMBS

---

[4] It so happens that this definition is consistent with how the RMBS Trustees used the term in
their Estimation Motion, but that is of marginal interest only. A defined term is a defined term.
This definition came out of LBHI's Cross-Motion.

13

Trustees." (R. at APP00762 (emphasis added).) It states, ". . . the Plan Administrator and the

RMBS Trustees must engage in the RMBS Protocol in good faith and otherwise comply with the

provisions of the RMBS Protocol." (R. at APP00764.) The Protocol Order further clarifies that,

"the Debtors shall have the right to seek the disallowance and expungement of *any RMBS Claims*

for the RMBS Trustees' failure to comply with the procedures and deadlines set forth in the

RMBS Protocol with respect to any such RMBS Claims." (R. at APP00764 (emphasis added).)

Attached to the Protocol Order was the Protocol. The Protocol independently defines the

term "RMBS Claims," but the definition is different than the one used in the Protocol Order. The

Protocol defines the term "RMBS Claims" broadly to mean "claims for alleged breaches of

representations and warranties and document deficiencies." (R. at APP00770 § III(e)(i).) That,

obviously, is not as clear as the definition used in the Protocol Order, which adopted LBHI's

definition from the Cross-Motion. But it is perfectly consistent with the Protocol Order's

definition, since both Transferor Loan claims and Covered Loan claims are "claims for alleged

breaches of representations and warranties and document deficiencies." Nothing about the

expansive language used in this definition suggests that the term "RMBS Claims" was intended

to mean anything other than all such claims, which would encompass *both* Covered Loan claims

and Transferor Loan claims.

The Protocol goes on to explain that, "Any such RMBS Claim shall be submitted on a

loan-by-loan basis in accordance with the Trust Agreement or other governing agreement

providing a remedy for such alleged RMBS Claim." (*Id.* § III(e)(ii).) And "Any applicable claim

not submitted by the applicable RMBS Claim Cut-Off Date *shall be deemed waived and

disallowed and expunged in this case*." (*Id.* § III(e)(iv) (emphasis added).)

14

Therefore, the Protocol uses language as broad as the language of the Protocol Order –

language that, by its terms, indicates that both Covered Loan claims and Transferor Loan claims

must be submitted by the RMBS Trustees according to the Protocol's terms. If any claims "for

alleged breaches of representations and warranties and document deficiencies," whether arising

from Covered Loans or Transferor Loans, are not submitted under the Protocol, they will "be

deemed waived and disallowed and expunged."

But there is a shift away from this all-encompassing language as the Protocol delves into

the detailed step-by-step process for reviewing and resolving the individual claims. The

procedures in the Protocol are explicitly and exclusively directed toward resolution of the

Covered Loan claims, with no corresponding procedures for resolving Transferor Loan claims.

Every step in the Protocol applies expressly to Covered Loans, and only to Covered Loans.

First, in Step 0, the Protocol notes that the RMBS Trustees had sent direction letters to

Wells Fargo and Nationstar, "as master servicer[s] . . . of the *Covered Loans*," directing them to

have their primary servicers gather the relevant origination and servicing files. (R. at APP00767

(emphasis added).) Step 0 of the Protocol lays out the procedure for ensuring compliance with

those direction letters. The Protocol does not include similar instructions for gathering

origination and servicing files for Transferor Loans.

Second, under Step 1 of the Protocol, the RMBS Trustees are required to review the loan

files for completeness and confirm in writing whether the files "are sufficient for the RMBS

Trustees to review and assert claims, if any, arising from or related to *Covered Loans*." (R. at

APP00768 (emphasis added); *see also* R. at APP00769.) The Protocol does not include a

procedure for reviewing loan files to determine if Transferor Loan claims can be brought.

Third, the Protocol establishes deadlines that could only realistically result in review of the number of *Covered Loan* claims outstanding. Under Step 1, the Protocol provides that the RMBS Trustees had until June 30, 2015 to review the first 50,000 loan files, and then, starting July 1, 2015, were required to review no fewer than 17,000 files per month until the review was complete, which had to be by March 31, 2016. (R. at APP00769-70.) At that pace, the RMBS Trustees could be expected to review 203,000 loan files by the end of March 2016. At the time the Protocol was adopted, there were approximately 209,000 Covered Loans outstanding and an additional 600,000 Transferor Loans. It would have been physically impossible to review all of the Transferor Loans as well as the Covered Loans by March 2016 at the pace described in the Protocol. It was, however, possible to review all of the Covered Loans (and, indeed, that was the subject of extensive discussion at the Bankruptcy Court hearing that ended with the adoption of the Protocol Order and the Protocol).

In short, the language of the Protocol seems to be internally inconsistent. Even though the Protocol, like the Protocol Order, indicates that *all* "RMBS Claims" must be submitted pursuant to the Protocol or they will be waived and expunged, the procedures agreed to by the parties do not apply to Transferor Loans.

The Protocol and Protocol Order, standing alone, do not readily suggest an explanation for this apparent inconsistency, but there are at least three possibilities.

One possibility is that the parties intended to begin by reviewing the Covered Loan claims, and planned to come up with additional procedures for reviewing the Transferor Loan claims under the Protocol at a later date. No evidence in the record suggests that this is what the parties contemplated.

16

Another possibility (endorsed by the RMBS Trustees) is that the parties never intended the Transferor Loans to be governed by the Protocol Order and the Protocol, which is why no procedures were provided for reviewing the Transferor Loan claims. But this explanation requires the Court to ignore the use of the term "RMBS Claims" throughout the Protocol and Protocol Order, which would violate the rule against surplusage.

A third possibility (endorsed by LBHI) is that the RMBS Trustees never intended to submit their Transferor Loan claims to any Protocol process because they did not feel those claims were worth the expense of a loan-by-loan review. This seems perfectly logical and it avoids the violation of the canon against surplusage inherent in the RMBS Trustees' argument. However, the Court has searched the record in vain for evidence that the RMBS Trustees affirmatively indicated an intent to abandon the Transferor Loan claims during the time that the Protocol was being hammered out by the parties and adopted by the Bankruptcy Court.

In support of its position that the RMBS Trustees intended to abandon their Transferor Loan claims from the start, LBHI points to several colloquies with the Bankruptcy Court relating to an adversary proceeding involving one of U.S. Bank's Transferor Trusts, the GreenPoint Mortgage Funding Trust 2006-HE1 (the "GreenPoint Trust"), which held 29,000 Transferor Loans. (*See, e.g.*, R. at APP00949-74, SAPP00521-26.) These colloquies took place a year and more after the Protocol was adopted. In the colloquies, there was some discussion about submitting the GreenPoint Trust's loans through the Protocol. LBHI asserts that these discussions show that U.S. Bank and the other RMBS Trustees understood that Transferor Loans had to be submitted to the Protocol in order for claims related to those loans to be preserved.

The Court has reviewed each of these colloquies in great detail. For the most part, they are not terribly illuminating. What is clear is that, at the final colloquy discussing the GreenPoint

17

Trust, on March 10, 2016 (after the Protocol had been in place for more than a year), counsel for U.S. Bank (one of the RMBS Trustees) expressly stated (perhaps for the first time) her understanding that the GreenPoint Trust's loans were not subject to the Protocol because they were Transferor Loans. (*See* R. at SAPP00522 ("Why would Lehman seek an order in its adversary complaint last May if we were part of – if this trust, the GreenPoint [T]rust, which is a [T]ransferor Trust, why would it be part of the RMBS [P]rotocol?"), SAPP00523 ("I thought that the [C]overed [T]rusts are part of the RMBS [P]rotocol.").)

In response to these assertions by U.S Bank's counsel, LBHI asserted that, "there's no . . . confusion," that the GreenPoint Trust loans were covered by the Protocol. (R. at SAPP00524.) The Bankruptcy Court agreed, and asked counsel for U.S. Bank to "talk to others who perhaps were closer to the [P]rotocol and kind of get some clarity" on the question. (*Id.*)

Unfortunately, the RMBS Trustees never followed up on this isolated colloquy by asking the Bankruptcy Court to clarify the scope of the Protocol, or to settle whether it applied to Transferor Loans. Furthermore, this exchange (which appears to be the first time any of the RMBS Trustees raised on the record the issue of whether the Transferor Loans were governed by the Protocol) took place more than a year after the Protocol Order was signed, and only three weeks before the deadline by which the RMBS Trustees were required to submit documentation under Step 1 of the Protocol or risk the expungement of their "RMBS Claims."

### 4. The Extension Motion and the Expungement Motion

A week before the Protocol's Overall Claims Cut-Off Date of March 31, 2016, the RMBS Trustees filed their Extension Motion on March 24, 2016. The Extension Motion sought to extend the Overall Claims Cut-Off Date by two months so that two small batches of loan files, which are not at issue on this appeal, could be processed under the Protocol. (*See* R. at APP001065-78.)

18

In the Extension Motion, the RMBS Trustees stated that – other than the two batches of claims covered by the Extension Motion – "the RMBS Trustees will not submit *any additional RMBS Claims* (for Covered Loans *or otherwise*) under the Protocol." (R. at APP01071 (emphases added).) Further, the RMBS Trustees stated that, "*any such RMBS Claims* shall be deemed waived and released by the RMBS Trustees and disallowed and expunged upon entry of the order granting the [Extension] Motion." (*Id.* (emphasis added).)

On March 30, 2016, the Bankruptcy Court granted the RMBS Trustees' Extension Motion and incorporated into its order language that was almost identical to that proposed by the RMBS Trustees: other than the limited set of loans covered by the extension, "the RMBS Trustees shall not be entitled to assert any RMBS Claims (for Covered Loans *or otherwise*) under the Protocol Order not already submitted pursuant to the Protocol Order by March 31, 2016." (R. at APP01080 (emphasis added).)

The Bankruptcy Court's order also incorporated language proposed by the RMBS Trustees that carved out the GreenPoint Trust loans (which were still subject to an ongoing adversary proceeding) from the extension: "[T]his Order is without prejudice to the rights of any of the parties in the Green Point Adversary, including any right to seek or contest the application of the Protocol Order and/or Protocol to the loans which are the subject of the Green Point Adversary." (R. at APP01081; *see also* R. at APP01070 (proposing nearly identical language).) This carve-out would have been entirely unnecessary if it were undisputed that the Protocol applied only to Covered Loans, because the GreenPoint Trust loans were Transferor Loans. By proposing this carve-out, the RMBS Trustees apparently acknowledged that there was at least an ongoing dispute over whether the GreenPoint Trust (a Transferor Trust) was subject to the Protocol.

19

During the hearing on the Extension Motion, counsel for LBHI stated that, other than the few thousand loans covered by the Extension Motion, granting the motion would confirm that, "Any loans that had not been put through the [P]rotocol by that date [March 31, 2016] are, in essence, expunged or disallowed." (R. at APP01133.) Furthermore, LBHI's counsel stated: "But I do think just as one point of clarification the [T]ransfer[or] [L]oans have, in essence, as we've discussed several times – those will *fall to the side* and, just for administrative purposes, that will help us going forward." (R. at APP01134 (emphasis added).) Although the phrase "fall to the side" is not entirely clear, counsel for the RMBS Trustees did not attempt to clarify the status of the Transferor Loans during their argument. (*See* R. at APP01135-36.)

After the Bankruptcy Court granted the RMBS Trustees' Extension Motion, the March 31, 2016 deadline for the RMBS Trustees to submit documentation supporting their "RMBS Claims" under the Protocol passed without the RMBS Trustees submitting any Transferor Loans to the Protocol. On April 28, 2016, LBHI submitted its Expungement Motion, seeking to disallow and expunge all claims related to the Trusts that were not submitted to the Protocol. On June 9, 2016, the Bankruptcy Court held a hearing on the Expungement Motion.

At that hearing, the Bankruptcy Court questioned Mr. Top, counsel for the RMBS Trustees, on the RMBS Trustees' use of the phrase "the RMBS Trustees will not submit *any additional RMBS Claims* (for Covered Loans *or otherwise*)" in the Extension Motion:

> The Court: But the language of the order says [C]overed [L]oans or otherwise. What was the point of saying "or otherwise" – if you say that the [P]rotocol only relates to [C]overed [L]oans, and you were only seeking an extension relating to loans covered by the [P]rotocol, then why would the extension order have to include the words "or otherwise"? Because if we're all only talking about [C]overed [L]oans, you wouldn't have had to have the words "or otherwise."
>
> Mr. Top: Well, which may be why – again, we weren't trying to change the [P]rotocol, or do anything like that. I think that's what I told Your Honor when I

did this in March. Or otherwise doesn't mean anything to me, if (indiscernable) looking in terms of [C]overed [L]oans.

The Court: But lawyers are lawyers, right? So if there is no otherwise, and everything is [a] [C]overed [L]oan, there's no need to use the terminology "or otherwise." . . .

(R. at APP01204.)

Unfortunately for the RMBS Trustees, the Bankruptcy Court is correct. The phrase "or otherwise" does mean something. It means the Transferor Loans. All of the RMBS Claims were either Covered Loan claims or Transferor Loan claims. The RMBS Trustees have conceded this point; in their opening brief to this Court, they defined Transferor Loans as "loans in the RMBS Trusts that are not Covered Loans." (Br. for Appellant-Claimant at 6 n.5.) There is no possible explanation for the phrase "or otherwise" except as a reference to the Transferor Loans: it cannot possibly refer to Covered Loans and there is no third category of loans. By acknowledging that they would not submit any "any additional RMBS Claims (for Covered Loans or otherwise) under the Protocol," the RMBS Trustees were acknowledging that they would not be submitting Transferor Loan claims under the Protocol – and therefore, those claims (like all other claims not submitted under the Protocol) would be "deemed waived and released."

### 5. Conclusion

Admittedly, the Protocol is internally inconsistent about whether Transferor Loans would be (or even could be) submitted for review under its procedures. However, LBHI is correct that, at some point prior to the Overall Claims Cut-Off Date of March 31, 2016, the RMBS Trustees abandoned their Transferor Loan claims.

For almost two years, the parties operated under the Protocol. Not once did the RMBS Trustees ask the Bankruptcy Court to clarify whether its repeated use of the term "RMBS Claims" in the Protocol Order meant that the Protocol Order applied to Transferor Loan claims.

21

The RMBS Trustees never rebutted LBHI's assertion – first made way back in October 2014 in the Cross-Motion – that, by not including their Transferor Loan claims in the Estimation Motion, the RMBS Trustees had "effectively abandoned" those claims. The RMBS Trustees also carved out the GreenPoint Trust from the Extension Motion, which would have been entirely unnecessary if Transferor Loans were not governed by the Protocol in the first place. Finally, and most important, the RMBS Trustees cemented their decision to abandon the Transferor Loan claims by stating in the Extension Motion that they would not submit any more claims for Covered Loans "or otherwise" – a phrase that can only mean Transferor Loans.

The RMBS Trustees had numerous opportunities to preserve their Transferor Loan claims or clarify the scope of the Protocol Order. They chose not to seek clarification until it was too late. They also took no steps to advance their Transferor Loan claims outside of the Protocol until after the Overall Claims Cut-Off Date (the deadline for submitting "RMBS Claims") had passed. The RMBS Trustees did not attempt to estimate the value of the Transferor Loan claims via a separate estimation motion. They did not work to collect origination and servicing files for the Transferor Loans in anticipation that the Bankruptcy Court might require a loan-by-loan review. (*See* R. at APP01077 ("At this juncture . . . , the RMBS Trustees are not seeking to make any additional requests to servicers for loan files for additional mortgage loans other than those that have already been made.").) They did not prepare to prove their Transferor Loan claims at trial, or seek a date for doing so. Since filing their original proofs of claim nearly eight years ago, the RMBS Trustees have apparently done *nothing* to move these claims toward resolution.

The Court also finds LBHI's explanation – that the RMBS Trustees intentionally abandoned their Transferor Loan claims because they were too costly to review on a loan-by-loan basis – to be a plausible one.

22

In their original Estimation Motion, the RMBS Trustees categorized their motion as one

"to estimate and allow *the RMBS Claims*," yet ascribed *no value* to their Transferor Loan claims.

Their failure to account for the Transferor Loans in the Estimation Motion was what caused

LBHI to argue, as early as October 2014, that the RMBS Trustees had "effectively abandoned

claims concerning Transferor Loans."

At a status conference with the Bankruptcy Court on September 17, 2015, counsel for the

RMBS Trustees acknowledged that some RMBS Claims were so small that, "it's not worth our

while to review those loans" on a loan-by-loan basis. (R. at APP01053.) In their March 31, 2016

letter attempting to preserve a set of 11,000 Covered Loan claims (discussed in more detail

below), the RMBS Trustees acknowledged again that, for some loans, "the expense imposed by

Step 1 of the Protocol exceeds the anticipated recovery." (R. at APP01161.) The Bankruptcy

Court also acknowledged that it recalled this "cost-benefit" argument being presented by the

RMBS Trustees as the rationale for why they chose not to pursue their Transferor Loan claims

under the Protocol. (R. at APP001186.)

Whether or not the RMBS Trustees decided to abandon their Transferor Loan claims

based on a cost-benefit analysis, it is perfectly clear that they did at some point abandon them.

The final nail in the coffin was the acknowledgement that no claims "for Covered Loans or

otherwise" would be pursued beyond those already submitted under the Protocol.

Therefore, the Bankruptcy Court's decision to disallow and expunge the Transferor Loan

claims was not erroneous. That decision is affirmed.

## C.   The Bankruptcy Did Not Err by Expunging the Covered Loan Claims That Were Not Submitted Under the Protocol

In addition to disallowing and expunging the claims arising from the Transferor Loans,

the Expungement Order also wiped away a subset of approximately 11,000 Covered Loan claims

23

that the RMBS Trustees failed to submit under the Protocol. The RMBS Trustees attempted to
preserve these claims through a letter sent to LBHI's counsel on March 31, 2016 – the cutoff
date for all claims covered by the Protocol not subject to the extension.

When the Bankruptcy Court granted LBHI's Cross-Motion in the Protocol Order, it
added a paragraph reserving the RMBS Trustees' evidentiary rights to attempt to prove some
claims through statistical sampling: "[E]ach of (i) the RMBS Trustees' right, if any, to seek to
provide proof in support of the allowance of the RMBS Claims through the use of statistical
sampling, and (ii) the Plan Administrator's right to object to the use of statistical sampling by the
RMBS Trustees, is reserved." (R. at APP00765.) The RMBS Trustees argue that this reservation-
of-rights language preserved their right to request to estimate by sampling any subset of Covered
Loan claims that they chose not to submit under the Protocol, and that they exercised this right
by submitting their letter on March 31, 2016.

The reservation-of-rights language was discussed at the hearing on December 10, 2014.
The Bankruptcy Court stated that it would not permit estimation of the claims pursuant to Fed. R.
Bankr. P. 502(c), but that it would consider, "down the road," whether sampling could be used
for allowance of a smaller set of claims once the later steps in the Protocol were reached. (R. at
SAPP0233-244, 464.) The Bankruptcy Court explained that the parties would use the Protocol to
"narrow the field" of contested claims, and that, "we might actually get to a point where the
parties might agree on a sampling protocol." (R. at SAPP00480.) However, the Bankruptcy
Court made it clear that any use of sampling would have to come after the RMBS Trustees
"produce[d] the loan files," and that sampling would not serve as a substitute for a loan-by-loan
review. (*Id.*; *see also* R. at SAPP00483 ("We're going to have production of the loan files,
okay?").) Nowhere during the December 10, 2014 hearing did any party or the Bankruptcy Court

24

suggest that the RMBS Trustees would be permitted to "opt out" of the Protocol by refusing to provide loan files for certain claims.

The reservation-of-rights language in the Protocol Order did not permit the RMBS Trustees to preserve these 11,000 claims without first submitting the required documentation under the Protocol. The language was intended to preserve the possibility that, after claims were submitted under the Protocol, sampling could be used as a mechanism to reach a settlement on some groups of claims, or as an evidentiary method of proving some claims at trial. Otherwise, the RMBS Trustees could avoid compliance with the Protocol entirely by refusing to submit loan files for review and then moving again to estimate the claims via sampling. That is obviously not what the Bankruptcy Court contemplated, and is not what the plain language of the Protocol Order permitted.

Therefore, these 11,000 claims, like all of the Transferor Loan claims, were "not submitted by the applicable RMBS Claim Cut-Off Date" and, pursuant to the Protocol's terms, were "deemed waived and disallowed and expunged in this case." (R. at APP00770 § III(e)(iv).) The Bankruptcy Court's decision on this point is also affirmed.

## D. The Bankruptcy Court Did Not Violate the RMBS Trustees' Due Process Rights

Finally, the RMBS Trustees allege that the Bankruptcy Court violated their Due Process rights by failing to conduct an evidentiary hearing on the claims expunged by the Expungement Order. This argument is without merit. The RMBS Trustees walked away from the Transferor Loan claims and the 11,000 remaining Covered Loan claims when they failed to comply with the Protocol's requirements.

Furthermore, the RMBS Trustees never requested an evidentiary hearing before the Bankruptcy Court on the issue of sampling the small group of 11,000 Covered Loans that they

25

sought to preserve. Regardless, the Bankruptcy Court had already conducted a full-day evidentiary hearing on the sampling issue and had rejected using sampling as an alternative to the Protocol.

### Conclusion

For the reasons stated above, the Bankruptcy Court's decision is AFFIRMED.

Dated: February 22, 2017

_____

U.S.D.J.

BY ECF TO ALL COUNSEL