Hearing Date and Time: March 21, 2017 at 2:00 p.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3100
Christopher J. Cox

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------------- x | | |
| In re | : | Chapter 11 Case No. |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | 08-13555 (SCC) |
| **Debtors.** | : | (Jointly Administered) |
| ------------------------------------------------------------------- x | | |

**PLAN ADMINISTRATOR'S REPLY IN SUPPORT OF MOTION
PURSUANT TO THE AMENDED SPV ADR ORDER AND
SECTION 105(a) OF THE BANKRUPTCY CODE TO (I) ENFORCE
SETTLEMENT AND RELEASE AGREEMENT AND (II) GRANT
<u>ATTORNEYS' AND MEDIATOR'S FEES AND COSTS</u>**

Hearing Date and Time:  March 21, 2017 at 2:00 p.m. (Eastern Time)

## TABLE OF CONTENTS

**Page**

The Motion ................................................................................................................................. 1

The Response ............................................................................................................................ 1

Shinhan and LBSF Entered Into an Enforceable Settlement ..................................................... 2

A.   The April 20, 2016 Settlement Was Final, Binding, and Enforceable ............................... 3

B.   Shinhan's Interpretation of the Release Agreement Conflicts With the Plain
     Language ............................................................................................................................ 7

C.   Historical Context of the Parties' Contract Negotiations and the Pending Motion
     to Dismiss in Adversary Proceeding No.  10-03547 ......................................................... 11

LBSF Is Entitled to Attorneys' and Mediator's Fees and Costs ................................................. 13

Conclusion ................................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alvarez v. City of New York*,
    146 F. Supp. 2d 327 (S.D.N.Y. 2001)..................................................................................12

*B. Lewis Prods. v. Angelou*,
    01 Civ. 0530 (MBM), 2005 U.S. Dist. LEXIS 9032 (S.D.N.Y. Apr. 26, 2005) ...............5, 6, 7

*Barclays Capital Inc. v. Giddens (In re Lehman Bros.)*,
    478 B.R. 570 (S.D.N.Y. 2012)..........................................................................................3, 11

*Benicorp Ins. Co. v. Nat'l Med. Health Card Sys.*,
    447 F. Supp. 2d 329 (S.D.N.Y. 2006)....................................................................................8

*Estate of Brannon v. City of New York*,
    14-CV-2849 (AJN)(SN), 2015 U.S. Dist. LEXIS 145473 (S.D.N.Y. Oct. 19, 2015) ...............6

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*,
    74 N.Y.2d 475 (N.Y. 1989) ...................................................................................................5

*Conception Bay, Inc. v Koenig Iron Works, Inc.*,
    27 Misc. 3d 1230(A) (N.Y. Sup. Ct. 2010) .........................................................................5, 6

*Cruz v. OneSource Facility Servs.*,
    No. 03 Civ. 8233 (LAP), 2005 WL 2923517 (S.D.N.Y. Nov. 4, 2005) ...................................8

*Delyanis v. Dyna-Empire, Inc.*,
    465 F. Supp. 2d 170 (E.D.N.Y. 2006) ...................................................................................7

*Hallock v. State*,
    64 N.Y.2d 224, 474 N.E.2d 1178, 485 N.Y.S.2d 510 (1984)..................................................6

*Hanwha Corp. v. Cedar Petrochemicals, Inc.*,
    760 F. Supp. 2d 426 (S.D.N.Y. 2011)....................................................................................8

*Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*,
    No. 04 Civ. 1621(KMW)(AP), 2005 WL 1377853 (S.D.N.Y. June 9, 2005) ..........................7

*Johnson v. Fordham Univ.*,
    No. 11 Civ. 04670 (ALC), 2016 WL 450424 (S.D.N.Y. Feb. 4, 2016) ...................................8

*Milner v. City of New York*,
    10 Civ. 9384 (JGK) (GWG), 2012 U.S. Dist. LEXIS 108317 (S.D.N.Y. Aug. 2, 2012) ........12

*N. Fork Country, LLC v. Baker Publ'ns, Inc.*,
    436 F. Supp. 2d 441 (E.D.N.Y. 2006) ...................................................................................14

*Norton v. Corr. Med. Care, Inc.*,
    09-CV-587, 2010 U.S. Dist. LEXIS 110541, 2010 WL 4103016 (N.D.N.Y. Oct. 18, 2010)...8

*NSI Int'l, Inc. v. Mustafa*,
    CV 12-5528 (JFB) (AKT), 2014 U.S. Dist. LEXIS 42557 (E.D.N.Y. Feb. 25, 2014)..............8

*Olin Corp. v. Am. Home Assur. Co.*,
    704 F.3d 89 (2d Cir. 2012)..............................................................................................10, 11

*Omega Eng'g, Inc. v. Omega, S.A.*,
    432 F.3d 437 (2d Cir. 2005)....................................................................................................6

*Torres v. Costich*,
    935 F. Supp. 232 (W.D.N.Y. 1996) ......................................................................................16

*Vari-O-Matic Machine Corp. v. New York Sewing Machine Attachment Corp.*,
    629 F. Supp. 257 (S.D.N.Y. 1986).........................................................................................16

*Walker v. City of New York*,
    05-CV-0004 (JBW) (JMA), 2006 WL 1662702 (E.D.N.Y. June 15, 2006).............................7

*Winston v. Mediafare Entm't Corp.*,
    777 F.2d 78 (2d Cir. 1985).................................................................................................5, 14

**Statutes**

Bankruptcy Code Section 105(a) ....................................................................................................3

California Civil Code Section 1542 .............................................................................................11

Hearing Date and Time: March 21, 2017 at 2:00 p.m. (Eastern Time)

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (the "Plan") for certain entities in the above-referenced chapter 11 cases, on behalf of Lehman Brothers Special Financing Inc. ("LBSF" and, together with LBHI, "Lehman"), submits this reply (the "Reply") in support of the *Motion Pursuant to the Amended SPV ADR Order and Section 105(a) of the Bankruptcy Code to (I) Enforce Settlement and Release Agreement and (II) Grant Attorneys' and Mediator's Fees and Costs* and respectfully represents as follows:

## The Motion

1.  On January 30, 2017, the Plan Administrator filed its *Motion Pursuant to the Amended SPV ADR Order and Section 105(a) of the Bankruptcy Code to (I) Enforce Settlement and Release Agreement and (II) Grant Attorneys' and Mediator's Fees and Costs* [ECF No. 54675] (the "Motion"). The Motion seeks a court order enforcing the Settlement between LBSF and Shinhan Bank ("Shinhan" and, together with LBSF, the "Parties") and awarding attorneys' and mediator's fees against Shinhan and any other relief the Court deems appropriate.[1]

## The Response

2.  On February 17, 2017, Shinhan filed its *Response to Motion Pursuant to the Amended SPV ADR Order and Section 105(a) of the Bankruptcy Code to (I) Enforce Settlement and Release Agreement and (II) Grant Attorneys' and Mediator's Fees and Costs*

---

[1] Unless otherwise defined, capitalized terms shall have the meanings ascribed to such terms in the Motion.

1

[ECF No. 54817] (the "Response"). Shinhan opposes the Motion, arguing that, although the Parties agreed on all terms of the Settlement and even though the Release Agreement was final and signed by LBSF, Shinhan is not obligated to honor its Settlement with LBSF because it did not sign the Release Agreement. *See generally id.*

### Shinhan and LBSF Entered Into an Enforceable Settlement

3. LBSF and Shinhan have stipulated to virtually all of the relevant facts. *See* So-Ordered Stipulation [ECF No. 54677]. Where the Parties part ways is regarding the role of the Release Agreement. Shinhan's entire argument is premised on the assumption that the Settlement is not enforceable solely because Shinhan allegedly did not sign the Release Agreement. *See generally* Response. Yet, as discussed in the Opening Brief, the Settlement is enforceable separate and apart from the Release Agreement, and the only way to credit Shinhan's argument would require the Court to read words out of the Release Agreement, which would be improper.

4. Indeed, Shinhan wants to have it both ways. On the one hand, Shinhan hides behind the Release Agreement, arguing that it is not binding because Shinhan never signed it. On the other hand, Shinhan also actively relies on the Release Agreement to contend that the unexecuted Release Agreement somehow nullifies the Parties' prior binding Settlement. Shinhan's contention that the unexecuted Release Agreement gave it the unilateral option to void the Settlement based on the outcome of the BofA Order reflects a patently inequitable (and unintended) result, especially under the facts here. A unilateral option to void the Settlement after the BofA Order issued was not—and could not be—what the Parties intended when they entered into the Settlement.

2

### A. The April 20, 2016 Settlement Was Final, Binding, and Enforceable

5. As LBSF noted in the Motion, "the real issue in this dispute is not the enforceability of the Parties' April 20, 2016 Settlement, but instead whether Shinhan can renege on the Settlement because it did not sign a document entitled 'Release Agreement.'" Motion ¶ 26. Here, there can be no doubt that controlling New York and Second Circuit law establish that the April 20, 2016 Settlement was a final, enforceable agreement between the Parties.[2] As a general matter, "parties are free to enter into a binding contract without memorializing their agreement in a fully executed document." *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985). The four *Winston* factors easily establish that the Settlement was a binding, enforceable contract.

6. The requirements for formation of an enforceable contract under New York law are: "(1) at least two parties with legal capacity to contract; (2) mutual assent to the terms of an agreement with reasonably certain terms; and (3) consideration." *Conception Bay, Inc. v Koenig Iron Works, Inc.*, 27 Misc. 3d 1230(A) at *3 (N.Y. Sup. Ct. 2010); *see also* Restatement, Second, Contracts §§ 9, 12, 17; 1 Williston, Contracts (4th Ed) 200-09, § 3:2; 22 N.Y. Jur. 2d Contracts §§ 11, 13. An agreement may be enforced where it is "sufficiently 'definite and explicit so [that the parties'] intention may be ascertained to a reasonable degree of certainty.'" *B. Lewis Prods. v. Angelou*, 01 Civ. 0530 (MBM), 2005 U.S. Dist. LEXIS 9032, at *14 (S.D.N.Y. Apr. 26, 2005) (quoting *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 587 (2d Cir. 1987)). "[P]arties also should be held to their promises and courts should not be 'pedantic or meticulous' in interpreting contract expressions." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (N.Y. 1989); *see also id.*

---

[2] Here, the underlying transaction documents were governed by New York law, the Court-ordered mediation from which the Settlement and the Release Agreement arose occurred in New York City, and the Release Agreement itself, although unexecuted by Shinhan (as asserted by Shinhan), is governed by New York law. *See* Stipulated Ex. D § 6; *see also* Ex. H (Declaration of Joo Han Park).

3

(stating "[t]he conclusion that a party's promise should be ignored as meaningless 'is at best a last resort.'") (quoting *Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co.*, 232 N.Y. 112, 114 (N.Y. 1921)). "Courts are cautioned not to turn the requirements of definiteness and essential terms into a fetish" and, therefore, "[v]oiding an agreement for lack of essential terms 'is a step that courts should take only in rare and extreme circumstances.'" *Angelou*, 2005 U.S. Dist. LEXIS 9032, at *18 (quoting *Shann v. Dunk*, 84 F.3d 73, 81 (2d Cir. 1996).

7.  Importantly, courts in the Second Circuit and New York employ a "presumption in favor of enforcement reflects the value that courts place on negotiated settlement agreements." *Estate of Brannon v. City of New York*, 14-CV-2849 (AJN)(SN), 2015 U.S. Dist. LEXIS 145473, at *9 (S.D.N.Y. Oct. 19, 2015) (quoting *Willgerodt v. Hohri*, 953 F. Supp. 557, 560 (S.D.N.Y. 1997), *aff'd sub nom. Majority Peoples' Fund for 21st Century, Inc. v. Hohri*, 159 F.3d 1347 (2d Cir. 1998); *see also Hallock v. State*, 64 N.Y.2d 224, 230, 474 N.E.2d 1178, 485 N.Y.S.2d 510 (1984). And it is "an elementary principle of contract law that a party's subsequent change of heart will not unmake a bargain already made." *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 445 (2d Cir. 2005). That presumption in favor of settlement precludes Shinhan's "change of heart" here.

8.  The April 20, 2016 Settlement bears all the hallmarks of an enforceable contract. Shinhan and LBSF had the legal capacity to contract, there was mutual assent with certain terms, and the Settlement was supported by consideration. *See Conception Bay, Inc.*, 27 Misc. 3d 1230(A). Mutual assent to the terms of the agreement was clear when the Mediator sent his April 20, 2016 email confirming the Settlement: "the parties have agreed to settle this dispute: Shinhan Bank will pay Lehman $[REDACTED] in full and complete settlement."[3]

---

[3] As required by Paragraph 10(f) of the Amended SPV ADR Order, Shinhan was required to, and did, attend the mediation with an "Authorized Designee," who had complete settlement authority to negotiate all disputed amounts

4

Stipulated Ex. B. Shinhan never objected to the Mediator's email conveying the fact the Parties had settled the dispute. Further, both sides knew the essential terms of this simple agreement—Shinhan would pay LBSF the Settlement Amount and the Parties would provide mutual releases. This mutual assent was reinforced throughout the Parties' entire course of dealing over the next two months. Accordingly, the terms of the Settlement are "sufficiently definite and explicit" to allow the Court to ascertain the Parties' intention "to a reasonable degree of certainty." *See Angelou*, 2005 U.S. Dist. LEXIS 9032, at *14.

9. As set forth in the Motion (*see* Motion ¶ 39), Courts routinely enforce settlement agreements in situations factually analogous to the present situation. *See Delyanis v. Dyna-Empire, Inc.*, 465 F. Supp. 2d 170, 175 (E.D.N.Y. 2006) (enforcing oral settlement agreement where there was an "email to the mediator and [d]efendants' counsel . . . affirmatively stat[ing] that the case was settled and that the mediator could inform the Court of the settlement"); *see also Walker v. City of New York*, 05-CV-0004 (JBW) (JMA), 2006 WL 1662702, at *6 (E.D.N.Y. June 15, 2006) ("Under common law principles adopted by the federal courts, parties are free to enter into settlement without memorializing their agreement in a fully executed document, and such agreements are as enforceable as any other oral contract."); *Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*, No. 04 Civ. 1621(KMW)(AP), 2005 WL 1377853, at *4 (S.D.N.Y. June 9, 2005) ("[O]nce reached, a settlement agreement constitutes a contract that is binding and conclusive and the parties are bound to the terms of the contract even if a party has a change of heart between the time of the agreement to the terms of the settlement

---

and issues on behalf of Shinhan. Shinhan's agreement to settle the matter for the Settlement Amount must have been final or the Court's Amended SPV ADR Order requiring participation by an Authorized Designee with authority would have no binding effect on the Parties. Shinhan's belated attempt to back out of the Settlement by pointing to Shinhan's alleged "internal review and approval" process (Response ¶ 21) is in conflict with the Authorized Designee's powers and obligations under the Amended SPV ADR Order.

and the time it is reduced to writing." (internal quotations omitted)); *id.* at *9 (enforcing settlement agreement where parties exchanged emails containing all material terms).

10. The case law cited by Shinhan does not support a different result. Instead, even as paraphrased by Shinhan, that case law stands for the proposition that when there is an active disagreement as to essential material terms, then there cannot be mutual assent. That is most definitely not the case here—there has never been a dispute about the essential terms of the Settlement.

11. For example, Shinhan cites *Cruz v. OneSource Facility Servs.*, No. 03 Civ. 8233 (LAP), 2005 WL 2923517, at *3 (S.D.N.Y. Nov. 4, 2005) for the proposition that a "settlement agreement is not complete where ***the parties cannot finalize*** general release language." *See* Response ¶ 36 (emphasis added). Shinhan also cites *Hanwha Corp. v. Cedar Petrochemicals, Inc.*, 760 F. Supp. 2d 426, 433 (S.D.N.Y. 2011) for the proposition that "***parties who could not agree*** on a choice of law provision had not entered into a binding contract." Response ¶ 36 (emphasis added). Similarly, *Johnson v. Fordham Univ.*, No. 11 Civ. 04670 (ALC), 2016 WL 450424, at *5 (S.D.N.Y. Feb. 4, 2016) is cited for the proposition that the parties in that case had "no agreement on material terms because the scope of 'the non-disparagement and confidentiality provisions,' and how those provisions would be enforced, ***was unresolved***." Response ¶ 36 (emphasis added). Here, there was no unresolved dispute as to a single essential term of the Settlement.[4] The cases cited by Shinhan are simply inapposite.

---

[4] And the cases that Shinhan paraphrases in a more neutral manner fare no better. *See, e.g.*, *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys.*, 447 F. Supp. 2d 329, 338 (S.D.N.Y. 2006) (finding no "meeting of the minds" because "before it purportedly 'accepted' [plaintiff's] 'offer,' [defendant] was aware that the parties had very different understandings as to the scope of [plaintiff's] proffered release, and hence lacked a common intent on a material term of the supposed agreement."); *NSI Int'l, Inc. v. Mustafa*, CV 12-5528 (JFB) (AKT), 2014 U.S. Dist. LEXIS 42557 (E.D.N.Y. Feb. 25, 2014) (discussing whether stated terms were "material" in a breach of contract context, not whether—as here—the parties expressed mutual assent to material terms); *Norton v. Corr. Med. Care, Inc.*, 09-CV-587, 2010 U.S. Dist. LEXIS 110541, 2010 WL 4103016 (N.D.N.Y. Oct. 18, 2010) (material terms obviously were not agreed to when attorney transmitted a draft settlement agreement with the warning that "I have not gotten

6

12.     Accordingly, the Parties' Settlement was final and binding and must be enforced.[5]

### B.      Shinhan's Interpretation of the Release Agreement Conflicts With the Plain Language

13.     Shinhan's entire Response is based on the flimsy premise that the "Release Agreement" was intended to be a memorialization of the Parties' prior settlement negotiations and, because Shinhan did not sign the Release Agreement, the Settlement is unenforceable.  *See generally* Response.  Not only is this position inequitable, as discussed in more depth below, but it is completely unsupported by the facts—the binding Settlement and the Release Agreement were separate, bargained for agreements.  Shinhan's failure to sign the Release Agreement does not absolve Shinhan of liability for honoring the separate, enforceable Settlement.  The complete lack of merit to Shinhan's position is exposed through its tortured interpretation of the Release Agreement itself.

14.     In support of its contention that the Settlement and the Release Agreement are part of a unitary settlement negotiation history, Shinhan points to the "Effectiveness" clause in Section 5 of the Release Agreement, contending that there can be no enforceable settlement "unless and until Shinhan signs" the Release Agreement.  Response ¶ 50; *see also id.* ¶ 49.

15.     But that is simply not what the Release Agreement says.  Instead, the plain language of the Release Agreement says that the "***Release Agreement***" becomes effective upon both "execution" ***and*** "***payment . . . of the Settlement Amount*** to Lehman."  *See* Stipulated

---

all the comments back from my client, I do not anticipate major changes, but I can send you what I have with the caveat that there may be a few changes. OK?").

[5] Shinhan argues that, to its knowledge "LBSF has not settled any other case in this action via either a written agreement signed by only one side or an oral or other agreement made only as to the Settlement Amount." Response ¶ 89. But the fact that Shinhan is the ***only counterparty*** who reneged on a mediated settlement hurts, rather than helps, its position. Indeed, Shinhan's conduct here is at odds with the similarly situated counterparties who settled with LBSF before issuance of the BofA Order and followed through by signing Release Agreements and paying LBSF the agreed-upon settlement amounts following entry of the BofA Order.

7

Ex. D. at § 5. Thus, Shinhan's argument fails in two critical ways. First, it completely ignores language establishing that the "Effectiveness" clause governs the Release Agreement itself, not the Settlement, *i.e.*, the releases are automatically effective upon signature and payment. Second, Shinhan's interpretation requires the Court to read language out of the contract, *i.e.*, the requirement for payment to be made to make the releases effective.

16. As Shinhan itself contends, it "is beyond cavil that a contract must be interpreted 'to give full meaning and effect to all of its provisions.'" Response ¶ 55 (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012).[6] LBSF agrees. Accordingly, Shinhan cannot recognize some terms of the Effectiveness clause and ignore others, including that the Release Agreement becomes effective only upon execution ***and*** payment. *See* Stipulated Ex. D § 5.

17. As LBSF noted in the Motion, Shinhan's interpretation of the Release Agreement leads to an absurdity because it would allow both Parties to execute the Release Agreement, but then permit Shinhan to delay payment to LBSF indefinitely because, according to Shinhan, the settlement is not effective until the Effectiveness clause in the Release Agreement, requiring both signature and payment, is satisfied. Motion ¶ 29. Shinhan's attempt to respond to this conundrum speaks volumes. Now in its Response, Shinhan argues that if Shinhan delayed payment after execution, "Shinhan would then be in breach of Section 1 and LBSF could sue Shinhan in this Court pursuant to Section 6 of the Agreement." Response ¶ 58.

18. Shinhan's tortured interpretation cannot be squared with the plain language of the Release Agreement. If—under Shinhan's interpretation of the Release

---

[6] Notably, Shinhan excerpts only part of the relevant quote from *Olin Corp.*; the complete quote should have read "the words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions. . . . ***Any interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.***" *Olin Corp.*, 704 F.3d at 99 (emphasis added).

8

Agreement—Shinhan signed but then indefinitely delayed payment, LBSF would have no recourse against Shinhan for breach of contract because the Release Agreement would still not be effective, because it expressly requires both execution *and* payment before it is effective. Stipulated Ex. D. § 5. Shinhan's interpretation, which requires the Court to write essential provisions of the Release Agreement out of the contract, therefore, cannot reflect the intent of the Parties. *Olin Corp.*, 704 F.3d at 99; *see also Barclays Capital Inc. v. Giddens (In re Lehman Bros.)*, 478 B.R. 570, 586 (S.D.N.Y. 2012) ("Divining the parties' intent requires a court to 'give full meaning and effect to all of [the contract's] provisions.'").

19. Additionally, the Release Agreement itself is entitled "Release Agreement," not "Settlement Agreement" or "Settlement and Release Agreement."[7] *See* Stipulated Ex. D. The title "Release Agreement" is consistent with the operative terms of the document—the Release Agreement does not set forth the terms and conditions of the Settlement, other than referring to the already-agreed-upon Settlement Amount. *See generally id.* Instead, the Release Agreement memorializes the timing and mechanics for triggering the mutual releases and the timing of LBSF's obligation to dismiss Shinhan from the adversary proceeding after payment of the Settlement Amount. *See generally id.* Indeed, not a single draft of the Release Agreement (including the final, Lehman-executed version) includes the words "settlement"[8] or "settlement agreement." *See* Stipulated Ex. D. The pre-existing Settlement was a foregone conclusion and did not even warrant specific discussion in the Release Agreement. *See id.*

---

[7] Indeed, from the time Shinhan conspicuously wrote "we are pleased to report that Shinhan has agreed to accept" the Mediator's "*settlement* proposal" (Stipulated Ex. A), Shinhan treated the Settlement as a done deal. Shinhan's counsel for the first time referred to the Release Agreement as the "Settlement Agreement" on June 28, 2016 (the same day the BofA Order was issued and the day Shinhan decided to renege on its agreement to settle). Stipulated Ex. C. at 2.

[8] The Release Agreement does include one mention of "settlement," but it is merely a quotation of California Civil Code section 1542 (which governs general releases)—it is not a reference to the Settlement or indicative that the Release Agreement was intended to be a settlement agreement. *See* Stipulated Ex. D (Release Agreement) § 7.

9

20. Last, Shinhan's repeated invocation of the merger clause to argue that the Parties did not intend to be bound misses the mark. *See* Response ¶¶ 6, 18, 37, 53, 61-62. As an initial matter, the merger clause has no effect here because the Release Agreement was not signed. Shinhan is attempting to selectively use the Release Agreement, which Release Agreement Shinhan also claims it did not sign—it cannot have it both ways. But even if the Court considers the merger clause, it still does not support Shinhan's contention that it such a clause is conclusive evidence of the Parties' intent not to be bound *by the Settlement*; instead, the Release Agreement (and the merger clause) governed the release and dismissal of claims. As the court noted in *Milner v. City of New York*, 10 Civ. 9384 (JGK) (GWG), 2012 U.S. Dist. LEXIS 108317, at *21 (S.D.N.Y. Aug. 2, 2012), "while a merger clause might provide some evidence of intent not to be bound in other circumstances, *the situation here was far different because of the existence of a settlement that both parties had already agreed was 'binding.'*" (Emphasis added); *see also Alvarez v. City of New York*, 146 F. Supp. 2d 327, 336 (S.D.N.Y. 2001) (stating "[i]n a typical case, such a [merger] clause would indicate that the parties only intended to be bound by a written agreement. Under the unique circumstances of this case, however, the inclusion of the clause in the unexecuted stipulation has no such effect. All parties at the June 13th conference knew and agreed that they would either accept or reject the settlement terms by informing the Court within a specific period. Plaintiff communicated his acceptance within the stated period, and the settlement was reached."). As discussed above, the facts here similarly establish that the Parties' had already agreed to a binding Settlement; the inclusion of the merger clause in the Lehman-executed Release Agreement cannot nullify that prior agreement.

10

C.  **Historical Context of the Parties' Contract Negotiations and the Pending Motion to Dismiss in Adversary Proceeding No. 10-03547**

21.  Shinhan describes the issuance of the BofA Order during Shinhan's months-long delay in returning an executed Release Agreement as an innocent "confluence of events." *See* Response at ¶ 99 n.9.  But the historical context of Shinhan's drawn-out "internal review and approval process" (*id.* ¶ 21) paints a much different picture.  Below is a brief timeline of the relevant events:

- **December 14, 2015**:  Certain noteholders filed a motion to dismiss the adversary proceeding in which Shinhan was a named defendant.  *See LBSF v. Bank of America Nat. Association et al.*, Adv. Proc. No. 10-03547 (Bankr. S.D.N.Y. Dec. 14, 2015) [ECF No. 1195].

- **April 4, 2016**:  The motion to dismiss was fully briefed and awaited oral argument and disposition.  *See id.* at ECF No. 1308.

- **April 20, 2016**:  The Parties entered into the Settlement.

- **May 4, 2016**:  The Court heard oral argument on the motion to dismiss.  *Id.* at ECF No. 1342.

- **May 27, 2016**:  After Shinhan's delayed requests for additional documentation from LBSF, LBSF sent the Lehman-executed Release Agreement to Shinhan.

- **June 28, 2016**:  The Court issued the BofA Order (*id.* at ECF No. 1360), and thereafter Shinhan refused to honor the Settlement, execute the Release Agreement, and/or pay LBSF the Settlement Amount.

22.  As of the April 20, 2016 Settlement, there can be no doubt that both LBSF and Shinhan were aware of the motion to dismiss, which was fully briefed.  Shinhan certainly knew all of the legal arguments made by each side and knew that the disposition of the motion had the potential to either (a) dismiss Shinhan from the adversary proceeding or (b) subject Shinhan to years of further litigation and, potentially, legal liability for the full amount claimed by LBSF.  Thus, as of the April 20, 2016 Settlement, the uncertainty of those outcomes undoubtedly factored into the Parties' calculus when they decided to settle this dispute.

11

23. Once LBSF sent the Lehman-executed Release Agreement to Shinhan, on May 27, 2016, Shinhan also knew that oral argument on the motion to dismiss was held more than three weeks earlier, on May 4, 2016. Thus, when Shinhan induced LBSF to send it two original copies of the executed Release Agreement and while Shinhan held the Lehman-executed Release Agreement for the next month (from May 27, 2016 until the issuance of the June 28, 2016 BofA Order),[9] Shinhan knew that a decision on the submitted motion to dismiss could—and would—issue at any time.

24. Shinhan's current interpretation of the Release Agreement, which would allow Shinhan to bind LBSF while the Parties waited for the BofA decision, while maintaining the unilateral ability to tear up both the Settlement and the Release Agreement at any point, places enormous, unfair, and unintended power in Shinhan's hands. By entering into the Settlement and requesting an executed copy of the Release Agreement from LBSF, Shinhan minimized its risk. If the Court denied the motion to dismiss (thereby ensuring that Shinhan would be involved in years of litigation through the adversary proceeding and, potentially, liable for the full amount claimed by LBSF), then Shinhan would benefit from a compromise settlement reached in part due to uncertainty surrounding the motion to dismiss. In that circumstance, Shinhan would have undoubtedly countersigned the Release Agreement as repeatedly promised and paid LBSF the compromise Settlement Amount. If, on the other hand, the Court granted the motion to dismiss (as actually happened), then Shinhan would have a free pass—it could tear up the Release Agreement and not pay a dime to LBSF.[10]

---

[9] And this one-month delay occurred after Shinhan effectively had prolonged finalization of the Release Agreement by an additional month by (1) waiting three weeks to turn edits to the draft Release Agreement and (2) requesting additional documentation from LBSF. *See* Stipulated Ex. C at 4-8.

[10] Shinhan contends that LBSF's delivery of the executed Release Agreement (which undoubtedly bound LBSF to the Release Agreement) cannot constitute partial performance under the third *Winston* factor. Response ¶¶ 78-82. Lehman's execution of the Release Agreement (under Shinhan's theory), however, put LBSF at Shinhan's mercy in respect to the Settlement, by providing Shinhan with a free option as to whether to consummate the Settlement. The

12

25. Shinhan's "heads I win, tails you lose" interpretation is unsupported by the negotiation history and plain language of the Release Agreement, and the moral hazard[11] underlying Shinhan's argument clearly demonstrates that the Parties could not have intended such a result when they entered into the Settlement and were finalizing the Release Agreement. Allowing Shinhan to exercise this type of unilateral power would be inequitable. In this light, Shinhan's contention that it had a contractual right to its "change of heart" rings hollow. *See* Response ¶ 8.

### LBSF Is Entitled to Attorneys' and Mediator's Fees and Costs

26. As outlined above and in the Motion, the law and facts clearly demonstrate that Shinhan and LBSF are parties to an enforceable Settlement. By forcing LBSF to file a formal motion in the face of the overwhelming support for LBSF's position, Shinhan is needlessly imposing upon the Court's time and wasting the chapter 11 estates' limited resources. Awarding LBSF attorneys' and mediator's fees and costs under the facts of this dispute is appropriate under applicable case law and the Amended SPV ADR Order.

27. Here, Shinhan has known it had a final, binding Settlement since April 20, 2016. Instead of paying LBSF the agreed-upon Settlement Amount, Shinhan dragged its feet until this Court issued the BofA Order. Shinhan then reneged on the Settlement. Shinhan's actions find no support under the negotiation history, the Release Agreement language, or applicable case law.

---

fact that Shinhan decided to try to back out of the Release Agreement (and the Settlement) after the BofA Order was issued cannot undermine LBSF's diligent and good faith conduct here. *See N. Fork Country, LLC v. Baker Publ'ns, Inc.*, 436 F. Supp. 2d 441, 446 (E.D.N.Y. 2006) (finding partial performance where plaintiffs provided defendants with an updated accounts receivable statement and submitted a proposed stipulation to defendants for their review and signature).

[11] The economist Paul Krugman's definition of moral hazard is "any situation in which one person makes the decision about how much risk to take, while someone else bears the cost if things go badly." Krugman, Paul (2009) *The Return of Depression Economics and the Crisis of 2008*. W.W. Norton Company Limited. ISBN 978-0-393-07101-6.

13

28. In opposing the Motion and refusing to pay LBSF the Settlement Amount, Shinhan seeks a windfall. Shinhan was aware of the impending BofA Order since it first agreed to settle and did not express any reservations about waiting for the BofA Order before agreeing on a final settlement or about the enforceability of the Settlement or the Release Agreement until *after* the BofA Order was issued. Shinhan's *post hoc* contention that it was not bound by the Settlement or the Release Agreement is unsupported and unconscionable. Such conduct is vexatious, wonton, or oppressive and warrants an award of LBSF's attorneys' and mediator's fees and costs pursuant to the Amended SPV ADR Order and this Court's inherent authority to manage the cases before it. *See* Amended SPV ADR Order at ¶ 12(b); *see also Torres v. Costich*, 935 F. Supp. 232, 236 (W.D.N.Y. 1996) ("There is no general rule that attorney's fees should be awarded on a successful motion to enforce a settlement agreement, but a court may award fees in such circumstances under the court's inherent power to award attorney's fees to a successful litigant when the opposing party has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'"); *Vari-O-Matic Machine Corp. v. New York Sewing Machine Attachment Corp.*, 629 F. Supp. 257, 259 (S.D.N.Y. 1986) (awarding attorney's fees to plaintiff on successful motion to enforce settlement, since defendant had acted in bad faith in requiring plaintiff to file motion).

29. Rather than address the settlement enforcement-specific case law cited in LBSF's Motion, Shinhan instead relies on general attorneys' fees case law in the Second Circuit. *See* Response ¶ 98. But those cases are inapposite to this settlement enforcement dispute. And Shinhan's Response completely fails to address LBSF's requests for attorneys' fees and costs under the Amended SPV ADR Order. *See* Response ¶¶ 97-101. As such, LBSF's request for attorneys' and mediator's fees and costs in this settlement enforcement dispute is effectively unrebutted by Shinhan.

30. Accordingly, the Court should grant LBSF's reasonable request for (1) attorneys' fees incurred by LBSF following Shinhan's June 30, 2016 refusal to remit payment of the Settlement Amount to LBSF and relating to the current dispute concerning the enforceability of the Parties' Settlement and the Release Agreement, and (2) fees and costs paid to the Mediator associated with the current dispute concerning the enforceability of the Parties' Settlement and the Release Agreement.

### Conclusion

31. For the reasons set forth above and in the Motion, the Plan Administrator, on behalf of LBSF, submits that it has met the burden of establishing that the relief requested in the Motion is appropriate.

WHEREFORE the Plan Administrator, on behalf of LBSF, respectfully requests an order from the Court (i) enforcing the Settlement, and the Release Agreement, agreed to by the Parties and ordering Shinhan to pay LBSF the agreed-upon Settlement Amount; (ii) imposing upon Shinhan (1) attorneys' fees incurred by LBSF following Shinhan's June 30, 2016 refusal to remit payment of the Settlement Amount to LBSF and relating to the current dispute concerning the enforceability of the Parties' Settlement and the Release Agreement, and (2) fees and costs paid to the Mediator associated with the current dispute concerning the enforceability of the Parties' Settlement and the Release Agreement; and (iii) all such other and further relief as the Court deems just and proper.

Dated: March 2, 2017
       Redwood Shores, CA

*s/ Christopher J. Cox*
Christopher J. Cox
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3100

Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc.*