Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555-scc

5

6   - - - - - - - - - - - - - - - - - - - - - -x

7

8   In the Matter of:

9

10  LEHMAN BROTHERS HOLDINGS INC.,

11

12              Debtor.

13

14  - - - - - - - - - - - - - - - - - - - - - -x

15

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              February 14, 2017

21              9:35 AM

22

23  B E F O R E:

24  HON. SHELLEY C. CHAPMAN

25  U.S. BANKRUPTCY JUDGE

Page 2

1    08-13555-scc Lehman Brothers Holdings Inc.

2    Ch 11

3    Trial on Lehman's Objection to Claims of QVT [Doc #17468

4    Debtors' One Hundred Fifty-Fifth Omnibus Objection to Claims]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Beck and Sheila Orms

1    A P P E A R A N C E S :

2    JONES DAY

3        Attorneys for Debtors

4        250 Vesey Street

5        New York, New York 10281

6

7    BY:   LAURI W. SAWYER, ESQ.

8        JENNIFER DEL MEDICO, ESQ.

9        JAYANT W. TAMBE, ESQ.

10       RYAN J. ANDREOLI, ESQ.

11       REBEKAH BLAKE, ESQ.

12       SARAH EFRONSON, ESQ.

13       DAVID P. SULLIVAN, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   HOGAN LOVELLS US, LLP

 2        Attorneys for QVT

 3        875 Third Avenue

 4        New York, New York 10022

 5

 6   BY:  NICOLE E. SCHIAVO, ESQ.

 7        JOHN D. BECK, ESQ.

 8        DENNIS H. TRACEY, III, ESQ.

 9        BEN LEWIS, ESQ.

10        ROBIN E. KELLER, ESQ.

11        WILLIAM M. REGAN, ESQ.

12        DARYL L. KLEIMAN, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                P R O C E E D I N G S

2           THE COURT:  Good morning.

3           (Chorus of good morning)

4           THE COURT:  Ready when you are.

5           MR. TRACEY:  Ready.

6           THE COURT:  Ready?  Mr. Wollman?

7           Good morning.  You're still under oath.  Make

8    yourself comfortable.

9    DIRECT EXAMINATION (RESUMED)

10   BY MR. TRACEY:

11   Q    Good morning.  We're going to start again with 2108.

12   A    Okay.

13           MR. TRACEY:  Can you bring it up, please?  Okay.  And

14   we'll give Mr. Wollman (indiscernible).

15   BY MR. TRACEY:

16   Q    So I think when we broke yesterday, we had talked about

17   the earlier iteration of this and then we had gone to the final

18   which is Claimant's Exhibit 2108.  And I think where we left

19   off was I was asking you what changes you made to 2108 from the

20   prior iteration that we reviewed yesterday, what you called the

21   template?

22        So would you take the Court through any changes that you

23   made in the way that the spreadsheet works?

24   A    Sure.  So I guess, first, I would point out that the

25   template itself had changed as I was talking about -- so if you

Page 6

1   look at any of the trader tabs, you'll notice the way that the

2   Markit Partners' default assumptions were -- had changed since

3   that template.  And then --

4   Q    So before you go on, could you explain how the template

5   changed in regard to Markit Partners' calculations?

6   A    Yes.  So -- so if we just use "Lehman position/Joel" as an

7   example, I just clicked on that sheet.  And I'm now taking us

8   to column B of the spreadsheet.  And column B through W --

9   through Y, rather, on the original template, if you'll recall,

10  the only capability the spreadsheet had was to use 9/15 Markit

11  Partners.  Or rather, I should say, the only capability it had

12  would be to use one date which was whatever date would have

13  been in cell B1.

14      In this iteration, you can see -- well, the formula is not

15  here anymore but the way that the spreadsheet works now is that

16  it will use the default in cell B1 unless there is an override

17  in column Y.  So this allows for more than one Markit Partners

18  date for different positions.

19      And then additionally, the bid mid default assumption had

20  changed from 15 percent down to 10 percent as you can see in

21  cell W1.

22  Q    And could that default also be changed?

23  A    Yeah.  And it could be changed at a -- on a row by row

24  basis.  That capability existed in the original template as

25  well.

Page 7

1          And then finally, I'll point out that whereas the original

2     template had the calculation of the claim in column AN, I don't

3     recall if it had the calculation in column AO which was the

4     value itself independent of what Lehman's margin mark --

5     collateral mark was.

6          But those are -- those are -- those are the primary

7     changes.  Obviously, there's also more information in these

8     spreadsheets as well.

9     Q    Okay.  And just on that last point, just to be clear,

10    could you state again what the difference is between "Claim",

11    which is in AN, and "Value", which is in AO?

12    A    Sure.  I mean, you can see it by looking at the difference

13    in the formulas.  I'm just using AN4 and AO4 as a means of

14    comparison.  The only difference in the formula is that in

15    column AN, there is a subtraction of H4 which was the Lehman

16    mark.  And in column AO, there's no such subtraction.

17    Q    Okay.  Thank you.  So what I'd like to do is just ask you

18    a few questions about the individual trader sheets.  I think

19    you testified before that there are individual trader sheets in

20    CX2108 for each of the traders.  Would you describe for the

21    Court the genesis of those trader sheets, when you created

22    them, how you distributed them and how you got them back?

23    A    Sure.  So -- and I believe I touched on some of this

24    yesterday.  The -- once the template was finalized at least

25    from the perspective of the methodol -- the calculation

Page 8

1    functionality was finalized, the individual traders were

2    instructed to take -- to make a copy of that standardized

3    template and make a cop -- each trader would make their own

4    copy and they would value the positions that they were

5    responsible for.  And then they would save that in the same G

6    drive that the original template existed in.  And then once

7    those were saved there and I was alerted to their existence, I

8    then went and took those individual sheets and inserted them

9    into this -- this 2108 sheet.  And I would also -- certain

10   traders had other supporting calculation, other sheets that

11   their main sheet depended upon.  And so I -- it would be

12   required that I would pull those sheets in as well so that

13   their underlying sheets would continue to function.

14        So basically, once I had them, I aggregated them all in

15   and then I created the Lehman position master tab which was the

16   -- which would ultimately be the aggregation of all those

17   sheets where on a position by position basis, it would look to

18   the underlying sheet that was most relevant.

19   Q    Okay.  Thank you.  So what I'd like to do now is to take

20   you to the positions that you personally valued that you were

21   responsible for.

22   A    Sure.

23   Q    So could you take us to the sheet and show, if you can by

24   filtering the sheet and describing what you do, identify the

25   positions that you were responsible for?

Page 9

1    A    Sure.  I'm just pulling "Lehman Positions -  Joel", "Near

2    Lehman Positions - - Master" as I may need to reference both

3    sheets.  But I'll go off of "Lehman Positions -  Master"

4    primarily.

5         So -- so I'm on "Lehman Positions -  Master" and scrolling

6    over to column BC which has "The Marked By" column -- "Marked

7    By" field, rather, and I am filtering it to just show JW.  I

8    just selected JW, hit "Okay", and that shows 264 of 796

9    records.  I'll point out that that's for all the positions but

10   the "Unsettled Trades".  Those are separate below but we can

11   get to that later.  But this is the -- these are the positions

12   that are the non-unsettled trades that I marked.

13   Q    Okay.  And now for the questions that I'm going to ask you

14   now, I would like you to limit your answers to information you

15   gathered and calculations you made only between September 15th

16   and October 15th, 2008.  Okay?

17   A    Okay.

18   Q    All right.  So let's take these positions category by

19   category.  Did you value any of your positions using the market

20   quotation responses that were received under the market

21   quotation provision in the ISDA?

22   A    Yes, I did.

23   Q    Okay.  Can you isolate those for us?

24   A    Sure.  So I'm going to column EP which is "QVT Source" and

25   I am selecting -- there are four options there.  I'm selecting

1    the "List" option.

2        So this actually shows all the positions that use any

3    information from the market quotation process whether it was

4    positions that actually had three or more quotes and market

5    quotation was applicable, as well as those where there were

6    only one or two quotes that -- where I used that information as

7    well.

8    Q    Okay.  And is there a way to isolate those where you had

9    three or more quotes?

10   A    So there -- I don't believe there's an easy way to do that

11   on this sheet but I can go to the ABS list sheet and isolate

12   them that way.

13   Q    Okay.

14   A    So as I discussed, the only positions where there were

15   market quotations, three or more, were the ABS positions.  So

16   that's why they can all be found on the ABS list sheet.  And

17   further in the explanation column, which is in column M, that

18   describes the level used, which is in column M, you can see

19   that the explanation varies between mid or average.  The mid

20   would be those instances where we had three or more -- three or

21   more quotes.  So -- and per the ISDA requirement, it -- the

22   fact that we take the middle value because it removes the

23   highest and the lowest and what remains is the only value and

24   that happens to be the mid of those three.

25       So here, you can identify all six as rows -- well, row 3

Page 11

1   is the A-tabs 2004-1AB, rows 4 and 5, both of which are the

2   Commo 2005-3AB.  There are two of those positions with

3   different strikes.  The E-Trade, row 7, ETRD 2004-1AB, is the

4   fourth of those.  Going down to row 26, Midor, M-I-D-O-R,

5   2006-1AC.  And then finally, row 28, Ramp 2005-EFC4 and 9.

6   These are QVT and Quintessence aggregated so there are six

7   positions split by the two funds or the 12 market quotations

8   that we received.

9        I can show how this folds back to the sheet.

10  Q    Just take away -- if you could take one example and just

11  show how whatever level you determined here results in a claim.

12  A    Sure.  So why don't we start with the top one, row 3,

13  ACABS 2004-1AB.  You can see that the mid-level is 98, which is

14  the value found in M3.  That's the value that remains after the

15  highest and lowest are removed.

16       So if we go back to "Lehman Positions -  Master" and go to

17  row 8 which is ACABS-2004-1A-B_DS1.!, if you look at what is in

18  column AD, you'll see that is -- well, that's a reference to

19  the "Lehman Positions -  Joel" sheet.  And you'll see that the

20  reason given in column AE is list, the note -- there it says

21  "average of quote" so that actually is as we just described it.

22  It's the mid.  But if we click "Lehman Positions -  Joel", you

23  can see that -- and we go to the same column, column AD --

24  well, actually, here, so here, you'll see it's 97.88.  It's a

25  hard-coded value.  In the original sheet, it wouldn't have been

Page 12

1    a hard-coded value.  It would have referenced the ABS list

2    sheet but then it would have to do a calculation for accrued

3    interest.  So because that calculation is a QVT function call

4    that's not acceptable here.  The way the sheet was produced is

5    it hard-coded anything where there was even a part of it which

6    was that formula.

7         But you can see that this value is slightly lower than the

8    98 value that we saw on the ABS list where that difference is

9    the accrued interest.

10        So then going back to -- back to the "Lehman Positions -

11   Master" sheet, row 8, that value, 97.8794444, et cetera, that

12   is the same mark that's in column AL and that is ultimately the

13   value used in column AO for the market value.  It takes that

14   price divided by 100 times the notional in column C, you see

15   that that's approximately $8.8 million which is supposed to be

16   $8.99 million notional.

17   Q    So is it essentially 97.88 percent of the notional?

18   A    Correct.

19   Q    All right.  And so, if we went through each of the

20   positions that you valued through market quotation, would it

21   work the same way?

22   A    Yes.

23   Q    Okay.  All right.  So let's move on to those where you

24   used a market quotation but you didn't have three or more.

25   A    Sure.  So if we go back to that ABS list sheet, we can see

Page 13

1   the other ABS positions where -- where we didn't have -- where

2   we didn't have levels.  You can see that that varied between

3   certain positions we had three, some we had two, some we had

4   one.  Some of the (indiscernible) we had none.

5       But if we look at, for example -- let's look at the INMAN-

6   2004-1A-IVFL which is in row 8.  There you'll see that there

7   are two levels provided, one from Citi, one from RBS.  Citi

8   provided 100; RBS provided 98.  The calculation in column M

9   takes the average of everything between H and K which, in this

10  case, would just be the Citi and RBS levels.  The average of

11  198 is 99 which is shown in that column.

12      And then if we go back now to "Lehman Positions -  Master"

13  and look for INMAN -- I'm going back to "Lehman Positions -

14  Master".  I am looking at row 52 which is the INMAN position,

15  scrolling to column AD, and you can see that it's a level --

16  the override is 98.5 approximately which, again, would be the

17  99 level minus the accrued interest.  And that's what's being

18  used.

19  Q   Okay.  And if we went through all of the positions on the

20  ABS list where there were fewer than three quotations, would

21  the math work the same way on each of them?

22  A   Yes, they would.

23  Q   Okay.  Did you value any of your positions using broker

24  runs?

25  A   Yes, I did.

Page 14

1   Q    Could you -- would you be able to isolate those?

2   A    Yeah.  So I'll go back to column BP.  Whereas I had

3   originally filtered to just show the list, I will now filter to

4   just show the broker runs.  And that shows 68 of 796 records.

5   Q    Okay.  And could you take us through an example of how you

6   used the broker runs to value a position.

7   A    Sure.  So I'll just point out first that all of these are

8   indices.  All the positions valued under "Broker Run" are

9   either indices or tranches of indices.  And the indices are

10  either the CDX index in the case of corporate.  The ABX index

11  or the CMDX index --

12  Q    And before you go on, just a couple of questions.  How did

13  you decide whether to use broker run as a price source for

14  these positions?

15  A    So -- so I guess I'll offer to split it out between the

16  CDX indices which are the corporate and the structure products

17  indices which are the ABX and CMDX indices.

18       In the case of the CDX indices, you'll notice that all of

19  these are off-the-run indices by which I mean that they are

20  older.  They're not the most recent index.  If you look at CDX,

21  for example, I believe the most recent CDX being valued here is

22  CDX-5-IG which has a 12/20/2010 maturity.  At the time, I

23  believe CDX 10 would have been the on-the-run index, I think,

24  or close to it.  So these are already decently off-the-run

25  indices.  And they -- and similar -- and also the other

1   positions are the tranche positions where Markit Partners -- at

2   least we didn't have access to Markit Partners.  So basically,

3   the off-the-run indices, I endeavor to get broker runs for all

4   of them because, in my experience, Markit Partners was less

5   reliable on that.  I believe these are the only instances for

6   the indices that we had, the off-the-run indices where I could

7   find broker runs.  And so I used them.

8       In the case of ABX and CMBX, there -- those would have

9   been available in Markit Partners as well, but we didn't have

10  access to them through Markit Partners so our only source of

11  information for the ABX and CMBX would have been to use broker

12  runs.

13  Q    And one more question on that, when you used the broker

14  run, what was the date of the broker run?

15  A    So in the case of CDX, I -- and all the CDX indices, I

16  believe they were always 9/15.  In the case of ABX, those were

17  also 9/15, especially if they had corresponded to the RMBS

18  positions that were all valued on 9/15.  And the CMBX indices

19  used 9/15, 9/16 and 9/19.

20  Q    And why was there the variation for CMBX position?

21  A    So the CMBX positions didn't have the same corresponding

22  positions that the ABX had.  And they were valued from a

23  replacement perspective when we thought we would be able to

24  replace them.  I don't recall why there was the variation in

25  dates.  But there wasn't as obvious the selection as the ABX

Page 16

1   had.

2           THE COURT:  Could you say that again?

3           THE WITNESS:  Sure.

4           THE COURT:  I didn't understand the beginning about

5   the corresponding positions.

6           THE WITNESS:  Sure.  So if you look at all the ABX

7   positions, they're in an account.  So if I -- just as an

8   example, I'll start at row 678.

9           THE COURT:  Okay.

10          THE WITNESS:  -- on "Lehman Positions -  Master" --

11          THE COURT:  Yep.

12          THE WITNESS:  You'll see that all the ABX positions

13  here, it goes from 678 down through 709, they're all in account

14  Sub-Prime AAA, those ABX positions were hedges against the RMBS

15  positions.

16          THE COURT:  Got it.

17          THE WITNESS:  And then the -- right.  Those were all

18  on the market quotation, 9/15.

19          THE COURT:  Got it.  Thank you.

20  BY MR. TRACEY:

21  Q    So when it was associated with a hedged position where you

22  had a 9/15 date, you used 9/15 for these?

23  A    Yeah.  And to the extent that they were -- they were all

24  part of the same sort of collection of trades -- I mean, they

25  were related entities.  Like, these Sub-Prime AAA positions

Page 17

1    existed because we had those other RMBS positions.

2    Q    Okay.

3    A    So that we would have thought about them similarly --

4    correspon --

5    Q    Okay.

6    A    It (indiscernible), so to speak.

7    Q    Okay.  All right.  So if you could take us through an

8    example of how you used the broker run to value a position --

9    just pick any one.

10   A    Sure.  So we start with -- the tranches are a little bit

11   more involved.  We can start with CBX 3 as an example.  That's

12   row 380.  So you'll see, in column AE, it references "Reason:

13   Goldman run" and it shows column AG, the spread is 222 and a

14   half basis points with a recovery of .4 -- 222 and a half would

15   have been off of the run so it would have been quoted as a

16   spread.  And then --

17   Q    Be -- I'm sorry.

18   A    Sure.

19   Q    Before you go on.  Did you retain a copy of that Goldman

20   run?

21   A    Yes.

22   Q    Do you have the book in front of you, the white book?

23   A    Yes.

24   Q    Could you look at Claimant's Exhibit 1613?

25   A    1613, you said?

Page 18

1    Q     Yes.

2    A     Yes.

3    Q     Is that a copy of the Goldman run that you refer to in

4    line 830 380 -- excuse me.

5    A     Yes.

6    Q     Okay.  So would you -- first of all, could you explain

7    this broker run, what it is, who it comes from and what it

8    means?

9    A     Sure.  So this is a run that you can see it's from Andrei

10   Saunders at Goldman Sachs.  It was dated 9/15 11:30 a.m.  It's

11   -- the subject is "Off-the-run/On-the run rolls".  And so,

12   here, this kind of -- this -- you can see the -- basically,

13   this is just a run that talks about how one would roll from CDX

14   10 into another CDX.  So it's not necessarily an outright sort

15   of spread on any of the other runs but it gives you a relative

16   sense of where those two -- where the off-the-run indices would

17   trade relative to the on-the-run index.

18        So here, it shows that rolls into CDX 10 and then it gives

19   a spread of 187 and a half.  So that's saying that, at the

20   time, CDX 10 is 187 and a half.  If you wanted to roll from CDX

21   4 into CDX 10 or vice versa, you would have to make an

22   adjustment for the difference in spread and then these various

23   bid offers show you how much wider or tighter the roll would

24   be.

25        So in a case of CDX 3 as the example -- actually, if we

Page 19

1    could go to -- so here, we are -- I believe CDX 3 -- I can't

2    see it on the right-hand side.  Or maybe I can -- 'cause I can

3    go off of this.

4        (Pause)

5    A    So, right.  So go back to the Lehman -- the CDX 3 tab --

6    oh, it looks like now I've lost the filtering.  But here's a

7    (indiscernible) re-filter.  So it's still JW but it's -- sorry.

8    So I'm just re-filtering on column BP on the "Lehman Positions

9    - Master" tab.  Sorry.  I'm just going to re-filter on first

10   DC.  'Cause it looks like we had lost that filter as well.

11   Q    So what are you re-filtering for on BC?

12   A    Sorry.  Back to JW.  I'm just recreating where we were.

13   So back to BC filtered to JW.  And then if I go to BP back to

14   "List" -- and if we go to CDX -- I'm sorry -- not the "List";

15   rather, "Broker Run" -- sorry.  Filtering back BP to "Broker

16   Run".  And if we go to row 380 where it's CDX 3, you'll see

17   that the spread used here going all the way back to AG is 222

18   and a half.  Where here, we had sole protection.  So we are

19   looking for where Goldman's bid would be.  And so, you can see

20   that CDX 3 is negative 38/negative 35.  So if you take the 187

21   and a half and add 35 to it, you would get 222 and a half which

22   is what is shown in column AG.  So that -- that's what's being

23   used for CDX 3 IG.

24   Q    Okay.

25   Q    And then similar -- it would be similarly done for the

Page 20

1    indices.  For CDX 4, you could -- well, CDX 4 here, we had

2    protection.  I'm looking now at row 388.  This is where we

3    would be looking to replace protection that we had bought.

4    Here, you would take 187 and a half and add the 54, if you look

5    at CDX 4, which happens to be highlighted in this run anyway,

6    it shows negative 54/51.  So if you take 187 and a half and add

7    54, you get to the 241 and a half value that's shown in column

8    AG.

9    Q    Okay.

10   A    So then these spreads are used for these various indices

11   and then column AD takes those spreads and converts them to a

12   price.

13   Q    Okay.  And did you follow the same steps when valuing each

14   of the positions that you valued using a broker run?

15   A    Yes.  I mean, there would be slight variations.  For

16   example, row 480 shows CDX 3 high yield which is from a Credit

17   Suisse run where high yield trades in bond terms -- so rather

18   than being quoted in spread, it's quoted in price.  And then

19   you need to convert the price to a points up front and then

20   apply for an interest again.  But it's the same concept.

21   Q    Okay.  And did you save each of the runs that are listed

22   in column AE?

23   A    Yes, I believe so.

24   Q    All right.  I'm going to ask you to look at your book and

25   I'm going to ask you to look at certain of the exhibits and ask

Page 21

1    you whether those are broker runs that are listed in column AE.

2    A    Sure.

3    Q    So we already talked about 1613.  Could you look at 1612?

4    A    Sure.  1612.  Yes.

5    Q    Is that a broker run that you used to value positions?

6    A    So yes.  Well, it's probably more precisely described as a

7    broker run that I used in conjunction with another broker run

8    to arrive at a mark on position.

9    Q    Okay.

10         MR. ANDREOLI:  Could we just ask if Mr. Wollman could

11   scroll over so we can see column AE at 7?

12         THE WITNESS:  Oh, sure.

13         MR. ANDREOLI:  Thank you.

14         THE WITNESS:  Okay.  It's there.

15   BY MR. TRACEY:

16   Q    Okay.  And which positions -- can you tell which positions

17   you used this broker run to value?

18   A    Yes.  So this is also a Goldman run.  So this would be

19   rows 490 and 491.  So you can see that the rows above it, 488

20   and 489, are CDX 4-IG for 5-year, where it shows a spread in

21   rows AG, 488 and 489, of 241 and a half basis points which is

22   what we just described.  However, rows 490 and 491 are the

23   original 10-year.  So there needs to be an adjustment from the

24   5-year to the 10-year.  And so, this is what's being used to go

25   from the 5-year to the 10-year, a spread of 16 and a half basis

Page 22

1    points.

2    Q    Okay.  Now let me --

3             THE COURT:  Can I ask a question --

4             MR. TRACEY:  Yeah.

5             THE COURT:  -- before you move from that quote?  Mr.

6    Wollman, on -- instead of 1613, on the screenshot of the broker

7    run, it looks like you sent it to the Lehman QVT mailbox on

8    Tuesday, September 16th, right, at 3:52?

9             THE WITNESS:  Well, at 3:52?  I see at 4:17.  I'm

10   sorry.  1613.

11            THE COURT:  1613.

12            THE WITNESS:  I'm sorry, rather.  I'm sorry.  I was

13   looking at 1612.

14            THE COURT:  So the bottom e-mail, you originally sent

15   it to the Lehman QVT mailbox.  And it looks like you sent it

16   back to yourself at a later point.  But -- right?

17            THE WITNESS:  Yes.

18            THE COURT:  Okay.  So -- but on the screenshot

19   itself, right above Mr. Saunders' name, it says 9/15 at 11:30.

20   So would that be the moment of the grab that would --

21            THE WITNESS:  Oh, sorry.  Well, the 9/15, 11:30 --

22            THE COURT:  9/15, 11:30.

23            THE WITNESS:  Right.  So I think that's actually the

24   time that the message itself came.  So Andrei's message -- I

25   would have received it in my Bloomberg at 9/15 --

Page 23

```
 1                THE COURT:  Okay.

 2                THE WITNESS:  -- 11:30.  And then --

 3                THE COURT:  So you would have received it.  You

 4   wouldn't have queried and grabbed it.  It just would have --

 5                THE WITNESS:  Correct.  The grab would be around --

 6                THE COURT:  Okay.

 7                THE WITNESS:  -- the time that I sent the e-mail

 8   which would be 3:52 p.m. on Tuesday.

 9                THE COURT:  Okay.  But he generated that -- Mr.

10   Saunders generated that at the time above his name.

11                THE WITNESS:  I believe that's right.

12                THE COURT:  Okay.  So then go to 1612.  And my

13   confusion is that above Mr. Saunders' name, it says 9/11.

14                THE WITNESS:  Right.  So -- and that -- so that would

15   have been sent on 9/11.  So the issue is that I didn't have a

16   run on 9/15 for the 10-year.  So the 1613 would have been the

17   levels on 9/15 for the 5-year CDX which was the more liquid of

18   the --

19                THE COURT:  Hold on.  Hold on.  Hold on.

20                THE WITNESS:  Sure.

21                THE COURT:  I lost you on the numbers.

22                THE WITNESS:  I'm sorry.

23                THE COURT:  You just said 1613.  We're looking at

24   1612.

25                THE WITNESS:  Sorry.  So -- sorry.  So -- right.  As
```

Page 24

1    a factual matter, 1612 would have been a run that I received on

2    9/11.

3              THE COURT:  Okay.

4              THE WITNESS:  I was taking the next step of -- I'm

5    sure while I was still --

6              THE COURT:  Okay.  Go ahead.

7              THE WITNESS:  -- considering this --

8              THE COURT:  Okay.

9              THE WITNESS:  -- a 9/15 --

10             THE COURT:  Go ahead.

11             THE WITNESS:  Sorry.

12             THE COURT:  You can finish.

13             THE WITNESS:  I'll slow down.

14             THE COURT:  Slow down.

15             THE WITNESS:  So in computing the spread for this

16   position, the CDX 4-IG-150620_DS8 --

17             THE COURT:  Yes.

18             THE WITNESS:  -- I need to know what the spread is

19   for that maturity.

20             THE COURT:  Okay.

21             THE WITNESS:  We looked at 1613 which showed what the

22   spreads were for similar indices but shorter-dated.

23             THE COURT:  Okay.

24             THE WITNESS:  My recollection is that there were no

25   runs that showed what the spot -- what the 10-year spread would

Page 25

1    have been.  So under the assumption that the steepness of the

2    curve didn't change, i.e., the spread between the 5-year and

3    the 10-year would have been similar across that time.  I used

4    that same steepness and applied it to the 9/15 level.  But I

5    should have been more precise in saying that this is a

6    combination of those two runs.

7              So it's -- the 9/15 anchors where the 5-year thing

8    that says -- or -- the original 5-year and then this is

9    necessary to account for the term structure.

10             THE COURT:  Thank you.

11   BY MR. TRACEY:

12   Q    Okay.  Can we turn to Claimant's Exhibit 2140.

13   A    Yes.

14   Q    Can you describe what that document is?

15   A    Yes.  So this is a run that was sent by Zichron Yadav (ph)

16   at JPMorgan, Monday, September 15th, 2008, 7:36 p.m.  It's

17   titled "CDX 4 Tranche Indication".

18   Q    And did you use that broker run to value any of these

19   positions?

20   A    Yes, I did.

21   Q    Can you --

22             MR. ANDREOLI:  Your Honor, I'm sorry.  Can I

23   interpose --

24             THE COURT:  Yes.  I'm sorry.

25             MR. ANDREOLI:  -- an objection?  Can we just get some

Page 26

1   clarification on what the "From" line is here in the top e-

2   mail?

3           THE COURT:  On 2140?

4           MR. ANDREOLI:  Yes.

5           THE COURT:  From "Searcher".

6           MR. ANDREOLI:  Right.

7   BY MR. TRACEY:

8   Q    Do you know what "From Searcher" is?

9   A    Yes.

10  Q    What is it?

11  A    So when this was sent, we wouldn't have access to our

12  Bloombergs back in 2008.  It had been six years later.  So we

13  had the ability in this searcher account to search our

14  historical Bloombergs.  So this is -- in 2014, if I tried to

15  pull up a Bloomberg that I received in September 2008, I

16  wouldn't be able to do that.  But we had an archive of those

17  Bloomberg separately.

18          THE COURT:  Okay.  Hold on one second.

19          MR. ANDREOLI:  So I guess we just want to be clear.

20  This e-mail wasn't preserved in the same fashion as everything

21  else?

22          MR. TRACEY:  I can ask him.

23  BY MR. TRACEY:

24  Q    Was this e-mail preserved or is this a Bloomberg?

25  A    This is a Bloomberg, yes.

Page 27

1    Q    Okay.  Was the Bloomberg from Zichron Yadav saved in any

2    way back in 2008?

3    A    I'm not sure.

4    Q    So this particular one, you went and got in 2014?

5    A    Yes.

6    Q    But is this the broker run that you relied on in September

7    of 2008 to value those positions?

8    A    Yes.

9            THE COURT:  And how do you know that?

10           THE WITNESS:  Well, so, first off, my recollection,

11   because JPMorgan was the only one who was sending CDX 4 runs.

12   And I believe this would have been the only CDX 4 run.  But

13   more precisely, the prices match.

14           THE COURT:  Anything more from this side of the room?

15           MR. ANDREOLI:  I think we're going to do it on cross.

16   Thank you, Your Honor.

17           THE COURT:  Okay.

18   BY MR. TRACEY:

19   Q    Did you tell us what positions you valued using this run?

20   A    So with respect to these positions that we're talking

21   about now, the broker run positions, it would have been rows

22   184 through 187, CDX 4-IG-0_3-100620_DS 6 and DS 7 and their

23   Quintessence counterparts.

24   Q    Okay.  Let me take you to Joint Exhibit 109.

25           MR. ANDREOLI:  Sorry, Your Honor.

Page 28

```
 1              THE COURT:  Yes, Mr. Andreoli.

 2              MR. ANDREOLI:  Could we just see AE for that?  Can

 3    you (indiscernible) spreadsheet --

 4              THE COURT:  Yes.

 5              MR. ANDREOLI:  -- for a second?

 6        (Pause)

 7              THE WITNESS:  So -- so if you -- sorry.

 8              MR. ANDREOLI:  Thank you.

 9              MR. TRACEY:  Okay?

10              MR. ANDREOLI:  Thank you.

11    BY MR. TRACEY:

12    Q    So let's go to Joint Exhibit 109.  Can you describe

13    that --

14    A    Sorry.

15    Q    Sorry.  109.

16    A    Joint Exhibit 109.

17    Q    The beginning, yes.

18    A    Yes.

19    Q    Can you describe that document for the Court, please?

20    A    Yes.  This is a Bloomberg that I had received from Robert

21    Lynn (ph) at Credit Suisse on 9/15 at 17:11 or 5:11 p.m. that

22    has bids and offers on various CDX high yield indices, Series 3

23    through 10.

24    Q    Okay.  And did you save this at the time?

25    A    I sent it to Lehman at QVT on September 16th at 4:31 p.m.
```

Page 29

1    Q    And did you use this broker run to value any of the

2    positions on 2108?

3    A    Yes, I did.

4    Q    Can you just describe which ones?

5    A    Sure.  It's rows 480 through 483.  Those are the

6    CDX 3-HY-091220_DS10 and DS7.

7    Q    Okay.

8    A    Yeah.  I can't really -- and you can see -- if I go all

9    the way to the right, it says in column AE, "Credit Suisse Run"

10   and column AF says "Marked at 99 and an eighth/101 and an

11   eighth which are the prices that you see at the very bottom of

12   this run.

13   Q    Can you show us where those are?

14   A    Sorry.  On the run?

15   Q    Yeah.

16   A    The last line says HY-3-96S.  It says "Maturity

17   (indiscernible) 09".  It says "Bid 99 1/8" and "Offer 101 1/8".

18   Q    Turn to Joint Exhibit 72.

19   A    Joint Exhibit 72, you said?

20   Q    Yes.

21   A    Yes.

22   Q    Can you describe that document?

23   A    Yes.  This is a -- well, it's a series of screenshots that

24   I had sent to Lehman at QVT on September 16th, 2008 at 2:43

25   p.m.  They are ABX closing levels from Rachel Rhode (ph) at

Page 30

1    Deutsche Bank.  The original timestamp on those runs were 9/15

2    at 16:56 p.m.

3    Q    Okay.  And did you use those to value any positions?

4    A    Yes.  So these were used for all of the ABX positions in

5    rows 678 down to 709.

6    Q    Okay.  And if you can just show us where it refers to the

7    run?

8    A    Sure.  So you can see that it says -- well, so in column

9    AE, I'm looking at row 678.  It says "DB Run".

10   Q    And all those references to "DB Run" are to JX72?

11   A    Yes.

12   Q    Can you turn to 2141 -- Claimant's Exhibit 2141?

13   A    Yes.

14   Q    What is that document?

15   A    So this is a -- this is a message that I sent to Lehman on

16   September 21st, 2008.  It's a forward of CMBX update from Asim

17   Khan at Morgan Stanley that has CMBX runs.

18   Q    And did you use this to value any positions?

19   A    Yes, I did.

20   Q    Which ones?

21   A    So if we go back to the spreadsheet -- so this is the one,

22   the 061 DDD minus.  It says "Using 1550 offer" -- so I'm

23   looking at cell AF610.  And it says "Using 1550 offer from MS

24   9/15 and Market Calculator".

25   Q    Okay.  Could you turn to Claimant's Exhibit 1606?  Can you

Page 31

1    identify that document?

2    A    Sure.  Claimant's Exhibit 1606.

3    Q    1606.

4    A    Sorry.  There it is.  Yes.

5    Q    What is it?

6    A    It's a message that I sent to myself and I'm not sure if

7    anyone else where it says "JPM CMDX Very indicative cause to

8    trade".  It's from Andy Taylor at JPMorgan.  And it's a bunch

9    of CMDX runs as well.

10   Q    Okay.  And why did you send this to yourself in October of

11   2009?

12   A    Well, it says -- at the top, it says "Use this as source

13   for CMDX 062 BBB minus".  But these are the supports for -- on

14   the spreadsheet where it refers to the JPMorgan 9/16 run.

15   Q    And just to be clear, did you use this Bloomberg from Andy

16   Taylor at JPMorgan Securities in September and October of 2008

17   to value these positions?

18   A    Yes, I did.

19   Q    And which positions?

20   A    So if we go back to the spreadsheet, we can see for the

21   CMDX positions -- so rows 212 and 213 where it says 216 -- in

22   cell AF212 and AF213, it says "2165 offer on 9/16 JPM run,

23   entered into market calculator".  So that's for the

24   CMBX-06-2-BBB-minus-490315-87_DS1.!.  And then there are the

25   other CMBX runs from rows 604 through 613, excluding rows 610

Page 32

1    and 611, also all reference the JPM 9/16 run in the -- in

2    column AF.

3    Q    Okay.  If you could turn to Claimant's Exhibit 1557.  Can

4    you identify that document?

5    A    Yes.

6    Q    What is it?

7    A    It's a message I sent from myself to Lehman on Sunday,

8    September 21st, 2008.  It's forward of DB CMBX markets and it's

9    from Steve -- well, it's a forward from Michael George at

10   Deutsche Bank on 9/19 13:32 of a forward from Steven Schwartz

11   of a message at the same date at 13:26 with DB CMBX markets.

12   Q    And did you use this run for valuing any positions?

13   A    Yes, I did.

14   Q    For which ones?

15   A    So if you go back to the spreadsheet, so row -- so row 216

16   and row 217, those are CMBX-06-2-AA-490315_DS12.!.  Column AF

17   says "400 bid on 9/19 DB run, entered into market calculator".

18   Q    Okay.  And have we -- if you can tell me, have we covered

19   -- have we identified all the broker runs that are listed in AE

20   for your broker run positions?

21   A    Yes.  I believe we have.

22   Q    Okay.  Let's move on to Markit Partners.  Did you use any

23   -- did you use Markit Partners information to value any of your

24   positions?

25   A    Yes, I did.

Page 33

1    Q    And can you show those to the Court, please?

2    A    Yes.  So if I go to column BP and filter instead for

3    "Market" -- I was previously on "Broker Run"; now I am

4    selecting "Market".  And that filters down to the relevant

5    positions.

6    Q    And how many positions did you value using Markit

7    Partners?

8    A    So I'm losing the filtering -- I can't seem to see the

9    summary information on the bottom.  So -- I don't know why that

10   is.  I can count them but that might take a little while.  It

11   would be -- actually, I could probably do a formula to subtotal

12   this.  But it would probably be easier if I could just see the

13   bottom of the screen.

14         MR. TRACEY:  John, can you help on that?  You can't?

15   Okay.

16   BY MR. TRACEY:

17   Q    All right.  Well -- so --

18         MR. ANDREOLI:  Can he close it and reopen it?

19         THE WITNESS:  We could do that.  It would require me

20   to re-filter but that's relatively quick.  I can do that.

21         MR. TRACEY:  (Indiscernible)?

22      (Pause)

23         THE WITNESS:  Okay.  So if I go back to "Lehman

24   Positions -  Master" --

25      (Pause)

Page 34

1          THE WITNESS:  Sorry.  Slight technical difficulty.

2      (Pause)

3          MR. TRACEY:  Sorry, Judge.

4          THE COURT:  It's okay.

5      (Pause)

6          THE WITNESS:  Okay.  So if I go back to "Lehman

7  Positions -  Master" and if I go -- filter quickly on BC back

8  to JW and if I go to BP and go back to "Market" -- okay.  It

9  shows 58 of 796 records and these are those positions.

10 BY MR. TRACEY:

11 Q    Okay.  And if you would, let's start with the dates that

12 you used for Markit Partners information.

13 A    Yes.

14 Q    Would you describe for the Court what dates you used for

15 Markit Partners information and why?

16 A    Sure.  So you can see if you filter on column Y, you can

17 see -- those are the dates used for Markit Partners.  You can

18 see that they were either September 15th, 16th or 17th.  And

19 they were selected based upon generally on the liquidity of the

20 instrument.  So those positions that were most liquid and we

21 thought we could replace on 9/15, 9/15 was used.  Less liquid,

22 especially in light of the fact that the market quotation

23 process had failed, positions would be on 9/16.  And then those

24 positions that were less liquid still would have been used on

25 9/17.  Typically, those were the shorter dated off-the-run

Page 35

1   positions.

2       So as we go through these positions, it might be clearer.

3           THE COURT:  So are you saying that -- I'm sorry.  May

4   I?

5           MR. TRACEY:  Sure..

6           THE COURT:  So you're saying that when market

7   quotation -- you're calling the failure of market quotation

8   with the liquidity of the instrument?

9           THE WITNESS:  That was -- that was a component of it.

10  But basically, the -- I guess, I would say --

11          THE COURT:  Is that the hypothesis --

12          THE WITNESS:  Well, the entire exercise was to

13  determine what our replacement cost would be for various

14  positions.  If we received something back on the market

15  quotation list that we sent out, that indicated that at least

16  certain dealers were willing to offer it.  We could have

17  potentially transacted at that level.  Strong reason to suggest

18  that 9/15 was when we could have done it at that price even

19  though some of them had come back later one.  At least you had

20  a level that was supposed to reflect 9/15 pricing.

21          For other securities where we didn't even get that,

22  we had to figure out, well, where would we have replaced them

23  as we wouldn't even have known that we wouldn't have gotten the

24  levels until the subsequent day.  9/16 was, in principle, the

25  earliest we could have done it.  So arguably, 9/16 would have

Page 36

1    been when we replaced it.  That's at -- I used 9/15 on certain

2    cases that -- and you'll see why.  For example, on some of the

3    CDX 4 indices, as I have used broker runs on 9/15, I harmonized

4    that for CDX 4, a different CDX 4 index.  But in general, it

5    was 9/16 or later reflecting the fact that that is when we

6    would have been able to replace it.  That sort of would have

7    been the earliest we would have been able to replace it.

8            And then to the extent that even then, we could have

9    had information on 9/16 with respect to Markit Partners, but

10   you'll see some of the positions are particularly off-the-run.

11   And there are other as -- other positions that are particularly

12   illiquid.  And for those positions, I didn't believe that we

13   would have been able to replace those on 9/16 either.  And so

14   9/17 was used in those cases.

15           THE COURT:  Thank you.

16   BY MR. TRACEY:

17   Q    So you tied the date to when you thought you could have

18   replaced it.  Why couldn't you just replace -- why couldn't you

19   have just replaced all the transactions, all 836, on September

20   15th?

21   A    Well, there are, I guess, a few reasons.  First, 836 is a

22   big number.  And I don't know logistically that we could have

23   even done that even if we knew that that was the only thing we

24   could have done -- if that was the only thing we had to do that

25   day and we put all of our traders on doing it, I don't know

1     that we logistically could have done that.

2         But more importantly, I would say that we didn't know that

3     the market quotation process was -- how it was going to turn

4     out until it was over.  And it wasn't even really over until

5     the morning of 9/16 in terms of when we got levels back.  So

6     from that perspective, you would have had to go back in a time

7     machine and sort of say you knew that you -- you would have

8     known in advance that the process was going to fail and so you

9     needed to start -- go ahead and, you know, (indiscernible).  We

10    didn't know that when we had conducted a market quotation.

11    Q     Okay.  Well, why don't we take a couple of examples?

12    Could you take us through maybe an example of where you used

13    September 15th and why?

14    A     Sure.

15    Q     And then we'll go to the other one.

16    A     Sure.  So we can just filter on 9/15.  So you'll see there

17    are 10 of those transactions.  As I alluded to before, the

18    first sets correspond to CDX 4-H (indiscernible) and CDX 4 --

19    those are in rows 180 through 183.  And CDX 4 HYBB, which are

20    in rows 386 through 387.

21        As I mentioned when we were talking about broker runs, I

22    would have preferred to have just used a broker run on these as

23    they were off-the-run indices, but I don't recall being able to

24    find any broker runs.  So I had no choice; I couldn't use

25    broker runs on these.  And so, Markit Partners -- there was

Page 38

1    information available.  And to the extent that we used CDX 4

2    pricing on 9/15, I used 9/15 pricing on these indices as well.

3         The next two sets of securities are HSDC Finn (ph) and

4    UNH.  These are rows 446 through 447 and then 768 through 769.

5    Again, arguably, I -- it was a judgment call here in terms of

6    9/15 or 9/16.  I'll note that these are closer to on-the-run

7    and positions were between 10 to 15 million or so which was a

8    little bit bigger but not massive.  And they were slightly

9    tighter securities.  So that -- I should say, I don't recall

10   precisely why I used 9/15 but there was -- I was trading off

11   various factors in determining 9/15 versus 9/16 and ultimately

12   I arrived at 9/15 for these positions.

13   Q    Okay.  Could you give us an example of where you used

14   9/16?

15   A    Sure.  So I'll just go through the 9/16 positions.  So

16   you'll see there are 12 of those.  The first four positions are

17   rows 396 through 399, CFC 120920_DS11 and DS12.  There, this

18   used 9/16.  CFC having been -- having been acquired by Bank of

19   America, that was a little bit less liquid.  That part might

20   have influenced why 9/16, but again, I'm not sure on this

21   particular why I used 9/16 versus 9/15.  But again, it was the

22   same judgment, 9/15 versus 9/16 on this one.

23        MR. ANDREOLI:  Objection.  Move to strike, Your

24   Honor.  The witness is clearly saying he doesn't remember why

25   he did this but then he's offering explanations.

1           MR. TRACEY:  I'll rephrase.

2           THE COURT:  Okay.

3           MR. ANDREOLI:  And that's the prior answer as well --

4           THE COURT:  Okay.  Got you.

5           MR. ANDREOLI:  -- on the 9/15.

6    BY MR. TRACEY:

7    Q    So can you state whether you recall the app -- well, can

8    you state whether you can recall the application of those

9    criteria that you referred to back in September of 2008 as to

10   these positions?

11   A    I cannot specifically recall.

12   Q    Okay.  But can you recall the criteria that you used in

13   general?

14   A    Yes.

15   Q    Okay.  And what were those criteria?

16   A    So as I -- so this may be a bit repetitive from what I was

17   saying before but, in general, I was trying to determine what

18   the best date would be on a position by position basis for when

19   it would have likely been replaced.  And the decision about

20   when it would have been replaced in the portfolio would have

21   largely been a function of the liquidity of the position.

22   Those that were most liquid could be replaced the soonest.

23   Those that were least liquid, it would take longer to replace

24   both because just in prioritizing, we would choose to

25   prioritize the more liquid ones under the hopes that we could

Page 40

1    get quicker answers for, as well as the fact that if they're

2    illiquid, just by definition, they take more time to source.

3        So as a result of that, that's the condition.  In terms of

4    what influences liquidity itself, it would be the size of the

5    position, how close to on-the-run this position was.  So the

6    closer to on-the-run five-year, all else being equal, the more

7    liquidity; the smaller the position, all else being equal, the

8    more liquidity.

9        And then the position itself, there are certain names that

10   are just more liquid in the market than others.  And so those

11   names will factor in as well.

12        THE COURT:  So just one quick follow-up.  Was your

13   first choice in every respect across the board to replace if

14   you could?

15        THE WITNESS:  So when you said -- if we did --

16        THE COURT:  To actually replace.

17        THE WITNESS:  So if we -- you're saying if we did a

18   replacement trade?

19        THE COURT:  Yeah.  If --

20        THE WITNESS:  Yes.

21        THE COURT:  You know, if a miracle had occurred,

22   right, and there were -- the (indiscernible) would have been

23   extended to 48 hours.  I mean, you had said before --

24        THE WITNESS:  Yes.

25        THE COURT:  -- that 834 positions, if you put every

Page 41

1    trader on it, it would have been impossible.  But by

2    implication, I think -- I'm asking, was the first choice to

3    replace --

4                THE WITNESS:  So --

5                THE COURT:  -- to actually replace?

6                THE WITNESS:  So just to be clear, is your question

7    did we want to replace every position in our portfolio if we

8    could have?  That's not necessarily the case because some

9    positions would have widened out a great deal and it might not

10   have made sense to then replace --

11               THE COURT:  Okay.

12               THE WITNESS:  -- those wider levels.

13               THE COURT:  Okay.

14               THE WITNESS:  But to the extent that we would have

15   wanted to replace it, if we had -- if we could have replaced it

16   as an attractive level on that day, we would have endeavored to

17   do so.

18               THE COURT:  Or on the next day.

19               THE WITNESS:  Or on the next day or whenever we could

20   have.  And you can see, there are certain trades where we did

21   replace because either they were so necessary that we had to

22   replace.  And how ever long it took to do it, it took to do it

23   and we did it.  And there are other positions where we would

24   have replaced because both we wanted to replace it and it was

25   at a reasonable level to do it and so we would have done so.

Page 42

1    And then there are other positions that we didn't replace for

2    either of those reasons or others as well.

3           But the point about replacement that I'm making is

4    just the general framework for deciding how it is that we're

5    valuing it.  We were thinking about it from the perspective of

6    we bought these positions, we want to replace them, what's the

7    price that we would have replaced them at if we could have.

8    And whether or not we wanted to at those levels, that's what

9    we're trying to calculate.

10          THE COURT:  Thank you.

11   BY MR. TRACEY:

12   Q    Okay.  Let's turn to the bid-mid spread that you applied

13   to these positions.

14   A    Sure.  Did you want me to finish the 9/16 or did --

15   Q    Well, I guess the only question is, other than recalling

16   that you used those criteria that you just described, do you

17   have any specific recollection of the application of those

18   criteria in any of these positions?

19   A    Right.  The application for some of these positions, the

20   application of that criteria, yes.

21   Q    You have a memory of what you --

22   A    Yes.

23   Q    -- how you applied them?

24   A    And you can see, for example, that the DSCs are shorter --

25   are off-the-runs.  They're two years and seven years.

Page 43

```
 1              MR. ANDREOLI:  Objection, Your Honor.  Again, is he
 2    saying what he did in 2008 or is he just looking at the
 3    spreadsheet and talking about it?
 4              THE WITNESS:  So --
 5    BY MR. TRACEY:
 6    Q    The question is --
 7    A    Right.
 8    Q    The question is do you recall the application of those
 9    criteria back in 2008 to these specific --
10    A    To this --
11    Q    -- positions.
12    A    Right.  To this, specifically, the BSC?  No.
13    Q    Okay.  To any of the positions that are up on the screen.
14    A    No.
15    Q    Okay.  All right.  So let's go to the bid-mid spread.
16    A    Yes.
17    Q    Would you describe what approach you took to -- well,
18    actually, let's go to 9/17 first.  We didn't cover that.
19    A    Sure.
20    Q    Did you apply the same criteria when you valued the
21    positions that -- where you used the 9/17 date?
22    A    Yes.
23    Q    And do you have any memory, again, on -- I'm only asking
24    you if you recall valuing these positions back in
25    September/October 2008 the application of those principles.
```

Page 44

1    A    With respect to one of these positions, yes.

2    Q    Okay.  Why don't you tell us about that?

3    A    The Citadel position.

4    Q    Okay.

5    A    So if you look at rows 428 through 435, so that's

6    CITDEL-111220_DS1 and then there are other ones of different

7    dates, you can see an aggregate.  There's approximately just

8    under 40 million of notional across all of Citadel.  And you'll

9    also see that I have a note, in column AF, which talks about

10   using six percent bid-mid -- this is -- I am in cell AF428.

11   And it says, "Using 6% bid-mid (since 365 415 market on 9/12)".

12        So one thing to point out is this is the only position

13   where I used six percent bid-mid.  All the other positions are

14   ten percent bid-mid.  You'll notice that I'm using the six

15   percent bid-mid because I had referenced a market that was made

16   on 9/12.  So this was a dealer run that went out on 9/12 that

17   showed generally how wide this position was.  However, I used

18   9/17/2008 for this position even though it appears to be close

19   to on-the-run.  And I remember specifically looking for broker

20   runs for Citadel.  It was a hedge fund.  There were other

21   reasons why we would have been interested to know how Citadel

22   was behaving during this time.  There were no broker runs that

23   could be found during this week or for some period after as I

24   conducted this ending in October 15th.

25        Further, I noticed that Markit Partners pricing

Page 45

1    information was stale; it had barely moved between 9/12 to 9/15

2    or 9/16.  And 9/17 was the only -- was the first movement in

3    the position.  9/16 actually looks like it tightened -- sorry.

4    9/18 looks like it tightened.  Then 9/19 -- then it continues

5    to go back to the original levels for the remainder over the

6    period that I was looking at it.

7        And so, this was a situation where I specifically used

8    9/17 because the information that I saw on 9/15 and 9/16 just

9    looked so stale as to be -- as to be not credible to me.

10   Q    Okay.  So I think that's a good segue into the bid-mid

11   spreads.  You said that's the only position where you didn't

12   use ten percent.  Could you describe for the Court the criteria

13   you used in September/October 2008 to apply a bid-mid spread to

14   the markit position?

15   A    So -- right.  So ten percent was used in all other

16   instances and it was the default, as you can see in column W1.

17   We also had talked about the bid-mid spread as it applied in

18   the first iteration of the spreadsheet where it was defaulted

19   to 15 percent.  That's the level that I had just put in for the

20   sake of the calculator.

21       In discussions with -- so I don't recall specifically how

22   we arrived at ten percent.  So I don't know what was the reason

23   why it was ten percent as opposed to nine percent as opposed to

24   eleven percent.  But I do know that, generally, in our system

25   for month-end purposes on Markit Partners, during regular

1   times, five percent was the default bid-mid spread that we

2   would use just for marking positions.  So when Markit Part --

3   even though we would mark our portfolio at the mid each month,

4   and so, in some sense, the bid-mid is irrelevant because you're

5   just going to use the mid anyway, for the purposes of marking,

6   we still applied a bid-mid spread in Markit Partners that would

7   come in on month-end pricing and that was five percent.

8        And I know that was part of the logic for the discussion

9   about well, so, what should it be in this sort of environment.

10  And so, I don't know -- and so, again, so I don't know why we

11  agreed on ten percent, but I know that we knew that conditions

12  were worse than they normally were and there was an effort to

13  reflect that.  Also the fact that most of our positions were

14  not on-the-run positions.  They were off-the-run positions in

15  various sizes.

16       And so, this was -- there was also discussions -- I know

17  it was primarily with Arthur and Yu Sen about deciding what

18  would be a reasonable default given our portfolio and the

19  circumstances on 9/15.  And so, we had arrived at that number

20  and that's the number that I used, again without exception

21  except for -- with the only exception, rather, being the

22  Citadel case.

23  Q    Okay.  Let's turn to "Calculation".  Were there positions

24  that you valued using --

25             THE COURT:  Mr. Tracey, if you're going on to a new

Page 47

1    topic, I think it would be a good idea to take a short break.

2    All right?

3              MR. TRACEY:  Sure.

4              THE COURT:  Is this --

5              MR. TRACEY:  Yes.  This is a great time.

6              THE COURT:  -- now a good point -- okay.  So let's

7    just take six minutes.  We'll come back 10 minutes to the hour

8    and then we'll go to 12:30 on the dot.

9              MR. TRACEY:  Okay.

10             THE COURT:  All right?

11             MR. TRACEY:  Great.

12             THE COURT:  Do you think that you'll finish with Mr.

13   Wollman?

14             MR. TRACEY:  I'll finish well before then.

15             THE COURT:  Okay.  Great.

16        (Recess from 10:45 a.m. until 10:57 a.m.)

17             THE COURT:  Okay.

18             MR. TRACEY:  Okay.  Thank you.

19   DIRECT EXAMINATION (RESUMED)

20   BY MR. TRACEY:

21   Q    So before the break, we were -- I had asked you whether

22   you valued any positions using the calculation method.  Do you

23   recall that?

24   A    Yes.

25   Q    And did you?

Page 48

1    A    Yes, I did.

2    Q    Are you able to identify those trades?

3    A    Yes.  So we can go to column BP again.  And change it from

4    -- let's see.  Let's see what is there.  Well, I need to

5    unfilter some stuff.  So I'm just unfiltering the dates in

6    column Y that were previously used for discussing Markit

7    Partners.  And I am now going to column BP again and selecting

8    "Calculation".

9    Q    What does "calculation" mean?

10   A    So calculation is pretty much whatever's left.  So for --

11   for positions where we didn't have market quotations, any

12   responses, or replacement trades or broker runs or markit,

13   ultimately, we needed to arrive at a value on all of our

14   positions.  And so, these are where we use a calculation or

15   some sort of proxy to calculate the value for a position that

16   wasn't otherwise -- didn't otherwise have sources for it.

17   Q    Okay.  And do they fall into subcategories or groups?

18   A    There are breakouts between them.  There's the -- all the

19   implied write-down -- the full write-down positions that I had

20   talked about yesterday would all be cal -- would all be --

21   would be one category.  And then there's -- and there are a few

22   other positions that have similar methods.  But each position

23   is slightly different.

24   Q    Okay.  Well, why don't we just go through one example?

25   Can you choose -- just choose an example where you used the

Page 49

1    calculation method that would be illustrative.

2    A    Okay.  So -- okay.  So for any of these, I guess, one

3    example would be the way I dealt with -- let's say for

4    argument's sake, the -- I'll just -- I guess I'll just go with

5    the first one that's after all the implied write-down.

6         So the first set, rows 19 through 67, are all zero claim

7    positions.  So in some sense, they're kind of -- you know, not

8    even particularly relevant, but they are positions that we had

9    on and so we kept them at zero value.

10        The CDX 4 high yield 10 -- so on row 172, "Type by" is CDX

11   4-HY-10_15-100620_DS2.  If you look at -- if you look at column

12   AF, it says, "Using four point back to 20.75 offer".  So I

13   don't know if you recall, but in one of the responses that we

14   received yesterday from Morgan Stanley with respect to the CDX

15   tranches, he provided offer levels on both the CDX 4 and the

16   CDX 3 high yield tranches.  In the case of the CDX 4, we were

17   actually looking for a bid, not for an offer.  So we had the 20

18   and three-quarter offer that he had responded on the market

19   quotation, but we didn't have a corresponding bid.  So in here,

20   the calculation that we did is we assumed that there was a four

21   point bid offer on that tranche.  And so, if it was a 20 and

22   three-quarter, we assumed a 16 and three-quarter bid.  So that

23   value -- we used 16 and three-quarter to -- 16 and three-

24   quarters points up front to value this security.

25             THE COURT:  Where did you get the four from?

1              THE WITNESS:  That was sort of just a judgment that

2      we used based upon how illiquid these tranches are and that it

3      would be somewhere in the -- that context.  But there wasn't

4      anything more specific than that.

5      BY MR. TRACEY:

6      Q    And can you look at Claimant's Exhibit 1402, just on that

7      one?

8      A    Yes.

9      Q    Is that the broker run you were referring to?

10     A    Yes, it is.

11     Q    And where is the 20.75?

12     A    So if you go to the bottom e-mail from TJ Parmar (ph), he

13     says, "My closing offers on these are" and the next line is

14     "HY-4 10-15:/" -- there's no bid, then there's just a slash and

15     then it says 20.75.  So I read that as -- and he says closing

16     offers.  So I read that as a 20.75 offer as opposed to a bid.

17     Q    Okay.  I think you referred earlier -- well, let's look at

18     -- I think you referred earlier to the MLMI position.  Could we

19     look at that one, row 676?

20     A    Yes.

21     Q    Could you describe for the Court what that position was

22     and how you valued it?

23     A    So this was a pay-as-you-go CBS on an RMBS security.  And

24     I didn't have a run on this so I used ABX061BBB and BBB minus

25     as a proxy.  So you can see, in column AF and cell AF676, the

Page 51

1    note says, "Using 7.5 bid on ABX061BBB/BBB minus".  So I used

2    the ABX as a proxy.

3    Q    And can you look at Joint Exhibit 72?

4    A    Yes.

5    Q    Is that the run that you used to value the MLMI?

6    A    Yes.

7    Q    And what did you specifically use in here?

8    A    So if you go to the last page, page 3, you can see that at

9    the very bottom, it says, I think it's asterisk asterisk

10   ABX.HE.06-1**.  And then it shows, at the bottom, BBB/BBB

11   minus.  And it shows 7-16/10-16.  So these are in tics.  So

12   16-30 seconds, which is half a point.  So that's the seven and

13   a half points that I was referring to.

14   Q    Okay.  Okay.  And I think you referred earlier to

15   unsettled trades as another category.

16   A    Yes.

17   Q    Is that something that you can isolate on this

18   spreadsheet?

19   A    Yes.  So this requires going down below to row 802 where

20   you can see, cell A802 says "Unsettled Trades".  You'll see

21   that there are actually a few different components of unsettled

22   trades.  There's all the unsettled trades listed between rows

23   803 to 834.  Then there's the notion of partial unsettled

24   trades.  So these are trades where there were trades done but

25   they weren't on the whole position; they were only on part of

Page 52

1   the position that we had with Lehman.  And then there's another

2   section below -- then there's another unsettled trades, DB CBS,

3   but we can ignore that as that's not relevant in this matter.

4   But if you look at row 846, there's also an implied write-downs

5   deliver that relates to implied write-downs or attempted

6   physical delivery on some RMBS securities.  So these are also

7   attempted transactions that never settled.

8   Q    So can you just state the run numbers where there are

9   unsettled trades that are involved in this case?

10  A    So -- I guess it also sort of means exactly what you mean

11  by trades.  But purely -- so using that whole universe, I would

12  consider it to be unsettled trade of some sort.  So I would --

13  I would consider those to be rows 803 through 834, then rows

14  836 through 841, and then rows 847 through 854.

15  Q    Okay.  And can you describe for the Court how you valued

16  unsettled trades for purposes of the claim?

17  A    Right.  So just to just be clear about what I'm talking

18  about when I say unsettled trades, these are transactions that

19  we had entered into with Lehman prior to September 15th but

20  insomuch as they took time to settle and hadn't actually

21  settled by the time that Lehman had filed, they didn't actually

22  go through.  And we kept the original positions on our -- on

23  our books because in most instances, these trades were unwinds

24  or were attempted unwinds of positions that we had on with

25  Lehman and as I think others have described, in an effort to

Page 53

1    bring down our risk and to reduce the number of positions we

2    had, we attempted to sell some of these securities in advance

3    of their filing.  And while we had agreed on pricing on some of

4    those, they hadn't actually settled.  And so, in general, these

5    are all positions that would otherwise be part of our claim but

6    for the fact that we're breaking them out separately.

7              THE COURT:  Does this sort differently for unwinds

8    versus new trades?

9              THE WITNESS:  There's no -- there isn't -- I don't

10   believe there's anything that breaks that out.  I believe,

11   though, if you look at the notes in column AF, I believe it's

12   principally rows 831 through 834, where it talks about some ABX

13   trades we did that were new trades where it says we bought and

14   sold this in the cases of rows 831 and 832.  And in the cases

15   of rows 833 and 834, it talks about we bought and what

16   replacement cost would have been.  But I believe the other

17   trades are all situations where we had a position with Lehman

18   originally and we were attempting to unwind it.

19             THE COURT:  Thank you.

20   BY MR. TRACEY:

21   Q    And so, how did you value the unsettled trades positions?

22   A    So we just used the actual money that we had agreed to at

23   the time of the trade.

24   Q    So if you had agreed to unwind a trade for 100 basis

25   points, you would use that sale price?

Page 54

1    A    Yes.

2    Q    And did you consider using the same methods that you used

3    for the other positions on the unsettled trade?

4    A    Right.  So -- and I think we could have done that.  And,

5    in fact, you can see in the case of the partial trades, there

6    are the exact same positions where we've already valued them

7    for purposes of the claim where we hadn't traded them.  But to

8    the extent that we -- even though Lehman had failed, to the

9    extent that we had agreed to do the trade earlier, we were

10   still effectively giving them the benefit of that pre-filing

11   price.

12   Q    And if you had valued these trades using your normal

13   procedures, would it have been favorable to QVT or to Lehman?

14   A    It would have been favorable to QVT if we used the prices

15   prevailing after their filing.

16        I mean, you can see it on the -- you can see it on the

17   unsettled partial trades.  Those are positions where you see

18   the price that we used in the claim for these and there's the

19   identical position that would not -- the part that we hadn't

20   traded where that shows up in the claim otherwise.

21   Q    And just to be clear, why are the prices higher when its

22   value using other approaches as opposed to the actual agreed

23   price that Lehman gave you?

24   A    Right.  So in the vast majority of cases, we are -- this

25   is -- we are selling protection.  So, first of all, in the

1    course of selling protection, we are selling it to the bid side

2    of the market.  So when we go to unwind a trade, the dealer is

3    going to show us -- you know, where selling protection, they're

4    showing the bid.  If we were replacing, we're replacing it at

5    the offer side of the market.  So even if there was no change

6    in the level of the market, just at bid-ask, the replacement

7    cost would be higher than where we had sold.  So there's the

8    bid offer spread.

9        But then on top of that, these are trades that primarily

10   happened on September 11th.  And those would have been at

11   spreads that are tighter than spreads that you would have seen

12   on 9/15.

13   Q    Okay.  Let's go back to the spreadsheet.  I think there

14   was testimony earlier about adjustments that were made to the

15   claim after October 15th?

16   A    Yes.

17   Q    So I want to move away from the 9/15 to 10/15 period and

18   talk about any adjustments that were made after that.

19   A    Okay.

20   Q    So let's just go to the "Lehman Positions - Master".  And

21   just orient us.  Could you tell us what columns relate to the

22   pre-October 15 period and what columns relate to the post-

23   October 15 period?

24   A    So the columns that refer to the -- so "Lehman Positions -

25   Master", the columns BE and prior are the pre-October 15

Page 56

1   period.  The columns after BE, so BF and on, are post-October

2   15th.  That said, I should point out that there are some values

3   that would have changed in those columns after October 15th as

4   the adjustments were being made.  But structurally, that was

5   the structure pre-10/15.

6   Q    And so could you take us through the first set of changes

7   that were made for that claim number?

8   A    So --

9   Q    First of all, maybe you could tell us what the 10/15 claim

10  number was to start off with.

11  A    Actually, I'm not sure that it's on this spreadsheet.

12  There's a claim number, if we go to the "Response to", that

13  shows what the proof of claims number is, September 2009, which

14  you can see in column -- where you can see in cell R874.  And I

15  can talk about the adjustment -- there was only one adjustment

16  besides for the collateral change.  There was only one set of

17  adjustments that happened between October 2008 and September

18  2009.  So I can kind of walk it back to what that number would

19  have been.  But I don't know that it actually shows up on the

20  spreadsheet anywhere.

21  Q    Okay.  So before we get to that, which number matches the

22  proof of claim that was filed.

23  A    On September 2009, I believe it's -- I believe it's cell

24  R874.

25  Q    Okay.  And -- I'm sorry.  I misspoke.  I meant the

1    calculation statement that was submitted on October 15th.

2    A    Right.  So I don't think -- I don't know that there is

3    any --

4    Q    Okay.

5    Q    I don't know that that number is here.

6    Q    Okay.  So take us from the original to the adjusted first.

7    A    Right.  So -- right.  So the -- well, so there are two

8    aspects.  So going from -- on this tab, going from original to

9    adjusted, the only difference is the independent amount.  So

10   the difference between the original and adjusted is just a

11   result of the fact that I believe we had double counted the

12   independent amount initially.  And so that was fixed.

13        However, there is an additional adjustment that was made

14   between the calculation statement and this adjusted figure that

15   relates to exchange rate -- an exchange rate error that we had

16   on some of the unsettled trades.

17   Q    Please describe that.

18   A    So if you go to the "Lehman Positions - Master" tab, and

19   we go back to the area that we were just talking about, the

20   unsettled trades, you'll notice that there are three groups of

21   trades.  There's rows 816 and 817 relate to the iTraxx-9 Euro

22   Main.  Rows 819 and 820 also relate to the iTraxx-9 Euro Main

23   but a different default swap.  And then rows 839 and 840 relate

24   to an iTraxx-9 Euro SubFin position.  In all of those

25   instances, the original calculation statement used the dollars

Page 58

1    in our system.  But it failed to recognize that those were

2    euros as opposed to U.S. dollars.  iTraxx is a European index.

3    And so, when we made the currency adjustment, to the extent

4    that these were -- if you go to the column -- to the extent

5    that these were largely negative numbers, when you implied the

6    currency adjustment, it made it further negative.  And so, that

7    reduced the claim by approximately three million dollars once

8    we caught that mistake.

9    Q    Okay.  And approximately when was that?

10   A    I don't know when it was discovered.  I know that it made

11   its way in to the September 2009 proof of claims.  But I don't

12   know when during that approximate one year period it was

13   discovered.

14   Q    Okay.  And after the filing of the September 2009 proof of

15   claim, were there further adjustments?

16   A    Yes.  There were two sets of adjustments.

17   Q    Okay.  And are those -- can you find those on this

18   spreadsheet?

19   A    Yes.  So if we go to the -- so here -- so if we go to

20   column BI and columns BL -- so column BI -- well, cell BI3 has

21   the title "Adjust Reason".  And then cell BL3 has the title

22   "Further Adjust Reason".  And so those describe the adjustments

23   that were made.  The BI set of positions reference the first

24   batch.  And then the BL referenced the second batch of

25   adjustments.

Page 59

1   Q    Okay.  And are you able to identify the reasons for the

2   adjustments in BI?

3   A    Yes.

4   Q    How do you do that?

5   A    So first, I should -- I believe this may still be filtered

6   for me.  So let me just -- so these were adjustments that were

7   made not just on my position, the positions that I valued, but

8   across all the positions that QVT valued.

9        So -- well, let me see.  I don't know what it doesn't show

10  everybody.  Let me just see -- I'm just going to clear all the

11  filters.

12       So then I'm going to go and filter on column BI.  And

13  you'll see that there are five categories of reasons including

14  the blanks which are:  accrued interest, exchange rate,

15  incorrect factor, wrong initial mark and wrong initial V.

16             THE COURT:  It actually says "wrong mark IT date".

17             THE WITNESS:  Oh, sorry.  That's right.  "Wrong mark

18  IT date".  That's --

19  BY MR. TRACEY:

20  Q    And can you briefly describe what those categories relate

21  to?

22  A    Sure.  I can go -- I can just go one -- so accrued

23  interest -- I'll describe generally.  Accrued interest is -- so

24  if we think back to the way that the sheet is constructed, so

25  originally, what would happen is especially for the positions

Page 60

1    that use market quotations or another override, it would

2    reference the price that was received on the market quotation.

3    But that would be a clean price.  And then the formula didn't

4    do the adjustment of taking the clean price and then adding

5    accrued interest thereby lowering the price.  So once that

6    class of error was discovered, it was applied.  And so then the

7    accrued interest adjustment was made for those positions.

8    Q    Do you recall --

9              THE COURT:  Yes.  Mr. Andreoli?

10             MR. ANDREOLI:  Your Honor, could we just get a little

11   clarification that Mr. Wollman was the one who made these

12   changes in the worksheet.  I believe there's testimony last

13   week that Mr. Sale (ph) also was involved.

14   BY MR. TRACEY:

15   Q    Did you make the changes in the worksheet?

16   A    Yeah.  So with respect to all of the calculations in here,

17   those would have been my adjustments.

18   Q    The next one is exchange rate.  What does that relate to?

19   A    Yeah.  So that would just be an instance where the wrong

20   exchange rate was used on a particular date.

21   Q    And incorrect factor?

22   A    So those relate to RMBS securities primarily where what

23   would happen is that you -- you have a security.  You'd have a

24   CDS position.  You'd have the bond that it was referencing.

25   That bond might experience a write-down at some point in time.

Page 61

1    And as a result, the factor on the CDS would change.  However,

2    sometimes the bond would write down before there was a payment

3    made.  So if there was a situation where there was a write-down

4    right around the time of Lehman's filing, it might have assumed

5    that we had received a payment and the factor went down, but in

6    reality, we had never received the payment.  So the price

7    should have been on the pre -- the factor before application of

8    any assumed payments by Lehman.

9    Q    And what about wrong initial mark?

10   A    Wrong initial mark was an instance where, I believe, there

11   was a typo on -- or a formula mistake on -- I believe there was

12   one or more positions.  I can check exactly what it was.  But

13   it was just a -- it was referencing the wrong cell in one of

14   the calculations.

15   Q    And what is wrong mark IT date?

16   A    So there were -- there was a set of positions, I believe,

17   generally GMAC CDS, that in the original version had a -- I

18   can't -- I can't recall exactly what the date was but it was a

19   date outside of Lehman week, outside of 9/19 originally.  And

20   so that was corrected to use 9/16.

21   Q    How many of those were there?

22   A    I believe -- we can see with a filter on it.  I'm not sure

23   off the top of my head.  But -- so not all of these were

24   actually -- not all of these were -- the primary ones were Ford

25   and some of the GMACs.  There are some other GMs referenced

Page 62

1    here but those weren't -- weren't -- I think those were smaller

2    like a -- other factors.  You can see by the column BM which

3    shows the change in dollars, they're much smaller.  It's -- and

4    I believe it related possibly to other issues.  But there are

5    approximately 4 -- 10 -- approximately 15 or so of these.

6    Q    Okay.  And how were these errors discovered?

7    A    So it varied.  If not -- part of it was just in the course

8    of -- and most of it was just in the course of looking this

9    over as we were having discussions with Lehman about various

10   things and we were looking at the spreadsheet.  We would

11   discover, oh, there was just a calculation mistake, like it was

12   just a formulaic error.  And so, as we discovered them, over

13   some period of time, we corrected them.

14   Q    Okay.  Let's go to the "Further Adjusted Reasons".  Can

15   you describe what those adjustments were?

16   A    Sure.  So if I unfilter --

17        (Pause)

18   A    So I just unfiltered column BI and I am now filtering on

19   column BL.  So here, these are -- there's six different

20   categories.  There's adjusted spread for inversion of curve.

21   That's an adjustment that related to a CIT position, in

22   particular, where the original valuation replaced the position

23   with a longer dated CDS and used the longer dated CDS.  But

24   this was corrected to adjust for the maturity of the actual CDS

25   that we were using.  So I believe the replacement trade was a

Page 63

1    year longer in maturity.

2    Q    Okay.

3    A    And then changed recovery rate to 30 percent related to

4    just a typo on the MI sheet where all the positions but, I

5    believe, one had a 30 percent recovery rate and that one did

6    not.  So that was just harmonized with respect to that recovery

7    rate.

8         Effective date method corrected had to do, I believe, with

9    some of the ABS and CMBS positions where just in the

10   calculator, the effective date going in was off by one.  And so

11   that was just corrected by a day or so, so it was a relatively

12   minor change.

13        Fixed date and removed extra damage.  And just "removed

14   extra damage" is the same set of secur -- same set of issues

15   which are -- if you recall, when Arthur discussed the valuation

16   for the MI, the mortgage insurer positions, there was the

17   notion of having replaced with a longer dated CDS.  And there

18   was a calculation that added additional claim as a result of

19   that longer dated CDS.  This reversed that back out because to

20   -- consistent with the other calculations where that was not

21   applied, it did that and, you know, thereby reduced the claim

22   on those positions.

23        And then the final issue was a misused SocGen mark which

24   is that one of the -- one of the formulas on the PCDS sheet

25   looked at the wrong row.  It used -- I believe it was

Page 64

1   (indiscernible) used SocGen or -- yeah, I believe Santander was

2   originally referring to SocGen when it should have been

3   referring to Santander.  And so that correction was made.

4   Q    So if we could now look at what effects these adjustments

5   had on the total claims --

6   A    Right.  And the easiest way to see that is just if you go

7   back to Response 2.  And if you just subtract those two numbers

8   'cause those are all the sources of the change.  It was about a

9   $3.3 million reduction in claims.

10  Q    And that's -- that is the combined effect of the original

11  adjustment in the additional adjustment?

12  A    3.3 is those two columns, column BI and -- well, I forget

13  what the column B -- sorry.  It was BI and BL.  And then that's

14  the 3.2.  There was also that 3 million adjustment that took us

15  from the proof of claim back to the calculation statement.  So

16  you would add those two to go from calculation statement to

17  final claim.

18  Q    And based on -- after those adjustments, what is the

19  current amount of the claim?

20  A    So it's in cell T874, $264,998,675.11.

21       (Pause)

22  Q    Okay.  Final topic.  I just wanted to go back to the

23  discussion we had yesterday about Markit Partners data.

24  A    MarkIT.

25  Q    MarkIT Partners data.  And you testified that MarkIT

Page 65

1  Partners data was used in certain circumstances to mark QVT's

2  positions, is that correct?

3  A    Yes.

4  Q    And did you have an understanding back in 2008 about what

5  the source of Markit Partners data was?

6  A    Yes.

7  Q    What was it?

8  A    It was -- it was generally -- it was mid-level marks that

9  were provided by a number of dealers.

10 Q    And did it ever occur that Markit Partners data was -- did

11 Markit Partners evaluate the reliability of its (indiscernible)

12 in any way.

13        MR. ANDREOLI:  (Indiscernible).

14        THE COURT:  Fair enough.  If he knows.

15 BY MR. TRACEY:

16 Q    If you know.

17 A    Well, I can say that they reported statistics about the

18 information that they were presenting in their composite

19 figure.

20 Q    And what statistics did they provide you?

21 A    They had a depth figure which would indicate how many

22 dealers would have provided on that level.

23 Q    And did they -- give an example of what kinds of

24 statistics they would provide?

25 A    Right.  And so -- I'm sorry.

Page 66

1          THE COURT:  Go ahead.

2          MR. ANDREOLI:  Can we just get a little more

3    foundation on whether he knew this at the time or if this is

4    current?

5    BY MR. TRACEY:

6    Q    Sure.  Yeah.  I'm asking you only about your understanding

7    in 2008 based on your use of Markit Partners data for marking

8    positions.

9    A    Yes.

10   Q    So with that understanding, can you give us an example of

11   how Markit Partners would provide statistics to you about the

12   depth of their information?

13   A    Right.  So the only statistic that I was aware of at that

14   time was the number of contributors.  And I knew to the extent

15   that that number was low that would be considered to be a more

16   thinly reported figure than something that had a larger number

17   of dealers.

18   Q    And I think you testified yesterday that your system would

19   automatically pull in MarkIT Partners data?

20   A    Yes.

21   Q    And did it pull in data regardless of whether it was thin

22   or not?

23   A    Yes.  There was no -- there were no filters applied.

24   Q    And was that thinness information considered by the

25   traders in determining whether to use MarkIT Partners to mark

Page 67

1    positions?

2            MR. ANDREOLI:  Objection.  Foundation.

3            THE COURT:  Could you --

4    BY MR. TRACEY:

5    Q    Again, I'm --

6            THE COURT:  Could you repeat the question?  I'm

7    sorry.

8            MR. TRACEY:  Sure.

9    BY MR. TRACEY:

10   Q    The question was, back in 2008 when you, as a trader,

11   would use MarkIT Partners to mark a position, would you

12   consider whether the information was thin or not?

13   A    So I'll say -- so -- and I think we're talking largely

14   about the month-end Beardstown (ph) process is sort of

15   primarily how this is involved.  I can say that that

16   information is not displayed in Beardstown.  So there is no way

17   that if you were looking at Beardstown that you would know what

18   the depth is.  One could independently go out and check to see

19   what the depth was.  But that's not something that I did and I

20   don't know if others did or didn't do that.

21   Q    Okay.

22           MR. TRACEY:  Okay.  Thank you.  I have nothing

23   further, Your Honor.

24           THE COURT:  Okay.  All right.  So we're going to get

25   started with cross-examination?

1          MR. TAMBE:  We had discussed with Mr. Tracey whether

2    we could deal with the housekeeping issues.  One of the

3    housekeeping issues, I think, effects a topic --

4          THE REPORTER:  (Indiscernible).

5          MR. TAMBE:  Sorry.  We had discussed with Mr. Tracey

6    taking up the housekeeping issues before we start the cross-

7    examination.

8          THE COURT:  Okay.  The housekeeping issues that we

9    discussed yesterday?

10         MR. TRACEY:  I'm not sure we need to take up all of

11   them but apparently one of them relates to Mr. Wollman.  So I'm

12   happy to take that up if that's necessary.

13         THE COURT:  Okay.  So do we need to do this

14   separately or --

15         MR. TRACEY:  I'm not sure what the issue is.

16         MR. TAMBE:  Yeah.  I think so.

17         THE COURT:  Separately.  Okay.  So we'll go off the

18   record.  We'll take a break and we'll come back in 10 minutes.

19   Yes?  All right.  We'll shoot for 10 minutes.

20       (Recess from 11:33 a.m. until 11:56 a.m.)

21         THE COURT:  Okay, Mr. Wollman.  Ready?

22         THE WITNESS:  I'm just going to move this binder.

23   For now.  Just put it on the --

24         THE COURT:  Put it down on the floor, yeah.

25         Go ahead.

Page 69

1    CROSS-EXAMINATION

2    BY MR. ANDREOLI:

3    Q    Okay.  Mr. Wollman, this morning, I think we spent most of

4    the morning talking about Exhibit 2108.  That's the current

5    version of the claim calculation spreadsheet, right?

6    A    That's correct.

7    Q    And yesterday, there was some discussion about earlier

8    versions of that spreadsheet.  Do you recall that?

9    A    Yes, I do.

10   Q    Okay.  Why don't we come back to that spreadsheet?  I

11   believe it's Claimant's Exhibit 1552.

12        (Pause)

13   Q    And let's see if you want to open up your -- our copy

14   binders.

15   A    Yes.

16   Q    There's a sheet of the metadata.  We've stamped it CX1552M

17   with the M for metadata just in case you want to get your

18   bearings.

19   A    Sure.

20        (Pause)

21   Q    Okay.  And I think you looked at the metadata yesterday

22   and you noted that the spreadsheet was last edited on 9/21.

23   Does that sound familiar?

24   A    Yes.  And that's what it appears here.

25   Q    Okay.  And once again, you're the author of this

Page 70

1   spreadsheet, correct?

2   A    Yes.

3   Q    Okay.  And so you talked about the Lehman positions have

4   in the spreadsheet yesterday.  Do you recall that testimony?

5   A    I do.

6   Q    Okay.  I don't think we walked through the other tabs.

7            MR. ANDREOLI:  Could you, Randall, select on the

8   "Mid-Marks" tab, please?  And if you can go all the way to the

9   top?  Okay.

10  BY MR. ANDREOLI:

11  Q    And, Mr. Wollman, could you describe your understanding of

12  what this tab is?

13  A    So let me take a look.  I'm sorry.  Oh, I guess I can't --

14  Q    Oh, sorry.  If you'd like to see something, could you just

15  let us know.  Randall will scroll wherever you'd like to go.

16  A    Sure.  If you don't mind just scrolling to the right.

17       (Pause)

18  A    So it would be after -- keep going.  Okay.

19       I'm sorry.  What was your question again?

20  Q    Can you just explain for the Court what this tab shows,

21  what this sheet shows?

22  A    It looks like it would -- it looks like it's a --

23       Sir, if you'd go back to the left just --

24       It looks like it's information from our system, from QVT's

25  systems.  And I'm not sure exactly where it's from but that has

Page 71

1    information about our securities.

2    Q    It's from the Tiki (ph) system, right?

3    A    Well, so, from the Tiki system ultimately, but I'm not

4    sure how it's being produced from the Tiki system.

5    Q    What do you mean by produced?  Sorry.

6    A    Sure.  So they're very -- I think as I mentioned in my

7    direct, there are various ways of interacting with Tiki.  So

8    Tiki is effective just like a database.  But there are other

9    programs and processes that run off of the Tiki data.  So I

10   believe that this would be primarily Tiki data.  The reason why

11   I caveated that is that I notice the column "Mesh Short Code"

12   where Mesh is somebody who was affiliated with the Mordor (ph)

13   system that would have used -- rely on some information from

14   Tiki.  So I just wanted to draw that distinction that I'm not

15   sure if it was something that was provided from Mordor which

16   ultimately referenced Tiki data.  But that's all -- that's the

17   only point I was trying to make.

18   Q    Okay.  I think this may be the first time the Court has

19   heard about the Mordor system.  Can you just explain what that

20   is?

21           THE COURT:  No --

22           MR. ANDREOLI:  Do you remember from our pretrial

23   conference?

24           THE COURT:  I'm a mother.

25           MR. ANDREOLI:  Okay.

Page 72

1    BY MR. ANDREOLI:

2    Q    That's the margin system, is that right?

3    A    Well, sir, I have to confess.  I personally have not

4    interacted with Mordor that much.  My understanding of Mordor,

5    though, is that it was something used in our operational

6    department for handling a number of operational duties.

7            MR. ANDREOLI:  Okay.  So if you could scroll to the

8    right, Randall, columns -- starting with column O.

9    BY MR. ANDREOLI:

10   Q    So, Mr. Wollman, do you see starting with column O, you

11   have some columns that talked about bid mark, mid-mark and

12   various additional descriptions after that.  Can you just

13   describe for the Court what columns O through X are intended to

14   capture?

15   A    So, yeah.  So, I mean, I can describe -- so I -- just to

16   be -- I can describe what I think some of these are.  Like,

17   I'll know what bid mark and mid-mark are.  But with respect to

18   mid-market value currency, I'm not sure exactly how that's

19   being calculated in this context.  But I can --

20   Q    Okay.  Start with O and P --

21   A    Sure.

22   Q    -- if those are (indiscernible).

23   A    Sure.  So O is bid mark.  So that would be what's the mark

24   at the bid side.  And then P is mid-mark.  So what would the

25   mark be at the mid.  Then bid market value currency -- I'm

Page 73

1    guessing that -- so I think it relates to the bid mark and

2    looks at the market value based on that bid mark.  And then

3    mid-market value currency would do the same thing for the

4    mid-mark.

5        And --

6    Q    Okay.  Why don't we stop there?

7    A    Okay.

8    Q    So for mid-mark, those would be mid-marks that were in

9    QVT's system that QVT relied on for other purposes, right?

10   A    I would believe so.

11   Q    Okay.  And what would QVT use the bid mark column for?

12   A    So there are -- for any V purposes, I don't believe we

13   would.  We would keep track of that information internally, I

14   think, for various P&L reporting activities possibly by trader,

15   possibly for other -- just to kind of understand how much

16   dispersion there could be around it.  But I don't know that

17   that was used in any sort of formal way.

18   Q    So bid marks were not used in QVT's P&L reporting to

19   investors, right?

20   A    I don't recall an instance when it was used.  It might

21   have been used and I'm just not aware of it.

22   Q    So this morning, I think you testified about keeping track

23   of bid-mids and I think you said historically, there was some

24   five percent number?

25   A    Correct.

1   Q    And is that based on -- the five percent number based on

2   the difference between O and P in the spreadsheet?

3   A    Not -- sorry.  The five percent figure that I was

4   referring to related to the Beardstown process.  So the

5   Beardstown process would happen month-end.  So on a month-end

6   basis, you would see in Beardstown if there was, let's say for

7   argument's sake, Markit Partners had a 100 basis point mid, I

8   believe you would see 95 basis point bid, 105 -- sorry.  It

9   would be -- yeah.  It would use 95 basis point bid, 105 basis

10  point ask.  But -- and so in Beardstown, you would see 95/105.

11  But especially if this is, I believe, 9/11 data, I don't know

12  that it would necessarily incorporate that because it's not a

13  month-end calculation.

14  Q    So would Beardstown calculate that five percent bid-mid

15  for all CDS positions or just the MarkIT positions?

16  A    I believe it was just for the MarkIT positions.  Or at

17  least, the five percent that I was referring to was for MarkIT

18  positions.  I don't -- for other information -- if we would

19  have gotten an offer or a bid from a broker run, we wouldn't

20  have needed any further adjustment.

21  Q    Was that five percent bid-mid based on any historical

22  analysis or was it just the number that the trader shows?

23  A    Yeah.  I'm not -- I'm not sure how that was determined.

24  Q    Do you know when it was determined?

25  A    I do not.

Page 75

1    Q    But you're confident that it was in place in September

2    2008?

3    A    Yeah.

4    Q    Okay.  Let's go to the "Lehman Positions" tab, please.  So

5    you testified yesterday that this document, which is the 9/21

6    version of the claim calculation spreadsheet, contains MarkIT

7    spreads from September 15th for the positions where you could

8    pull that data, right?

9    A    Yes.

10    Q    And that is found in column V of the spreadsheet, right?

11    A    If we could just go to column V just to be sure, but

12    that's my recollection.

13    Q    So (indiscernible) V.  Sorry.

14    A    Yes.

15    Q    Okay.  And yesterday, I don't think we were seeing any

16    data in column V.  Is that just a spreadsheet error in pulling

17    data?  You see there data there now?

18    A    Right.  So I guess it would depend on what spreadsheet you

19    were looking at.  So presumably, this is a hard-coded version

20    of something because you wouldn't be able to get Markit

21    Partners now since you're not in QVT.

22    Q    Okay.

23         MR. ANDREOLI:  Randall, could you just scroll down to

24    column V, please?

25    BY MR. ANDREOLI:

Page 76

1   Q    So you'll see in various rows, there are MarkIT spread

2   populated in column V, right?

3   A    Yes.

4   Q    So as of 9/21 of 2008, you had already incorporated

5   certain of the MarkIT spreads into the claim calculation

6   spreadsheet, right?

7   A    Into -- what you said?

8   Q    The claim calculation spreadsheet.  This Exhibit 1552.

9   A    So -- right.  Well, so, when you say into the spread -- I

10  mean, all this is doing is looking up the 9/15 Markit Partners

11  spread for each position where it exists.

12  Q    Right.  And my question is that was done as of the 9/21

13  version, right, the ability to pull those MarkIT spreads into

14  the spreadsheet?

15  A    Yes.

16  Q    And as of September 21st of 2008, you had already

17  incorporated the responses QVT had received to the market

18  quotation process into Exhibit 1552, correct?

19  A    Yes.  I believe that's -- I had looked at a number of

20  those instances with its -- in columns O -- I guess I didn't

21  confirm that it was exhaustive but my recollection is that I

22  would have pulled them all in.

23  Q    And where is that information found?

24  A    So if you go to the right.  So keep going.  So yeah.  So

25  override.  For example, you'll see it says, in column AD, there

1    would be values and especially, for example, where I'm looking

2    at row 70 where it has an AMR position where it shows 17 and a

3    quarter and it shows list.  Column AB is 17 and a quarter,

4    column AE is list.

5    Q    Right.  So where it says "List" in AE, the override in

6    column AD is the result of the market quotation process.

7    A    Yeah.  It's a level from that process.  Actually, if you

8    click on cell AD70, we can see if that's actually -- yeah.  So

9    you can see here, it's directly referencing that -- that

10   position on the corporate list.

11   Q    Okay.  In the quotes that QVT had received in connection

12   with certain broker runs are also incorporated into this

13   version of the claim calculation spreadsheet, right?

14   A    Yeah.  So I believe, as I mentioned yesterday, there were

15   not very many of those.  I think it was just a handful.  And I

16   forget exactly how many it was but it certainly wasn't very

17   comprehensive.

18   Q    Okay.  So where can we find those?

19   A    So -- okay.  If we filter on AE -- I just want to see if

20   there are easy ways of doing this.  So if you look at the first

21   three that say "Credit Suisse Run", "DB Run" and "Goldman Run"

22   -- so right.  So those -- and if you scroll down -- yeah.  So

23   those are examples of that.

24   Q    Okay.  So now that you filtered for those categories, you

25   get the broker runs that are actually populated in AE, right?

Page 78

1   A    Yes.

2   Q    Okay.  So we've now talked about some of the information

3   that's included in Exhibit 1552 as of 9/21.  This version of

4   the spreadsheet does not include any of the individual traders'

5   valuations, correct?

6   A    Correct.

7   Q    And, in fact, there's no column in this version of the

8   spreadsheet that reflects the assignment of positions to the

9   individual traders, correct?

10  A    Yeah.  I don't believe so.  We can go all the way to the

11  right and just confirm that.  Yeah.  I don't -- just keep

12  going.  Yeah.  I don't see any instances of any initials or

13  anything of the sort.

14  Q    Okay.  So it's your understanding that as of 9/21, the

15  individual traders had not begun the process of valuing the

16  trades in the spreadsheet?

17  A    No, I don't know that that's necessarily the case.  I know

18  that it hadn't been the case that their sheets hadn't been

19  created but individual traders very well may have been looking

20  at assumption of their positions.  But it wouldn't have been in

21  the form of this calculator.

22  Q    You haven't seen any spreadsheets or other documents that

23  reflect valuations performed by the individual traders before

24  or on 9/21, have you?

25  A    No.  The only sheets I would have seen would have been the

1   sheets that they submitted to me at the end of their process.

2   So I wouldn't have seen the intermediate steps.

3   Q    And that was after 9/21, right, that you received anything

4   from the individual traders?

5   A    Yes.

6   Q    Okay.  Let's flip to a subsequent version of the

7   spreadsheet.  Let's -- Randall, could you show Claimant's

8   Exhibit 1565, please?  And Mr. Wollman --

9   A    Yeah.

10  Q    -- you have a hard copy of the meta data in your binder.

11  A    Sorry, it's at tab 15 --

12  Q    1565.

13  A    Okay.

14  Q    So the metadata shows that this spreadsheet was created on

15  9/16, is that consistent with your recollection of when you

16  initially created the claim calculation spreadsheet?

17  A    The first version of that, yes.

18  Q    Right.  And this one shows it last modified on 9/25 of

19  2008, do you recall working on the spreadsheet on about that

20  date?

21  A    Certainly, the 9/25?  I don't recall 9/25 in particular.

22  I sort of generally worked on it through that month, from 9/15

23  to 10/15.

24  Q    And you see the file name is Lehman claim.xls, right?

25  A    Yes.  That's the file name.

Page 80

1   Q    And if you look at the screen where we've now showing the

2   native, this is one of the versions of the claim calculation

3   spreadsheet, right?

4   A    Yes, I know that it's a version, but I don't know where in

5   the process, exactly, it falls out.

6   Q    Okay.  Well, let's look at some tabs and maybe we can

7   refresh your memory.  So at this point, you don't see any, and

8   Randall can scroll across for you on the bottom, you don't see

9   any individual trader tabs, right?

10  A    So yeah, could you just check all the tabs just so that I

11  can see.  Yeah.  I don't seem to see any.

12  Q    So this version, you would agree, is prior to the time

13  when you actually received and incorporated the individual

14  trader valuations, right?

15  A    Yes.

16  Q    Okay.  And you don't have any reason to doubt that this is

17  the version of the spreadsheet that was in existence on 9/25,

18  right?

19  A    It was the -- it was certainly -- I mean, I have no reason

20  to doubt that it was in existence on 9/25.  I can't be certain

21  that it was the only spreadsheet in existence on 9/25.

22  Q    Okay.  Let's go to -- let's scroll out to the right in the

23  Lehman positions tab, Randall.

24  A    Okay.

25  Q    In just scrolling through, do you see anything that would

1    help you understand where to place this version in time?

2    A    Sorry, scroll back to the left.  Keep going.  Yeah,

3    particular -- I'm looking for column Y.  Right, so this is  --

4    I mean, so this is -- yeah, this is still relatively early on.

5    It's before -- I'm sorry, can I see cell V-4 as well?

6             THE COURT:  I'm sorry, the question is the date that

7    this sheet was -- this version was created?

8             MR. ANDREOLI:  Right.  Does looking at the data

9    information that's actually in the sheet help him place this

10   version in time?

11            THE WITNESS:  Yeah, so V-4.  Yeah, if you could just

12   click on that, thanks.  Yeah, so this seems to still not yet

13   reflect some of the changes to the sheet.  So it's  -- it

14   appears to be -- well, actually I'm not even -- it's before I

15   made the changes to the spreadsheet to reflect additional

16   capability.  I guess I could check to see if there were more

17   sources provided, but it didn't appear to be the case, but --

18   so it's sort of more -- it's similar in timeframe.

19            MR. ANDREOLI:  Okay.

20            THE COURT:  I'm sorry, I'm confused.  I thought the

21   first question was regarding the metadata and what the metadata

22   showed.

23            MR. ANDREOLI:  Right, so the metadata shows that this

24   was last created on -- or last edited on 9/25.

25            THE WITNESS:  Right.

Page 82

1       THE COURT:  I'm sorry, I missed that.  I thought that

2    you asked him if the answer was that the metadata showed that

3    it was first created on 9/16.

4       MR. ANDREOLI:  Right.  And then he confirmed that it

5    was last edited on 9/25.

6       THE COURT:  I see, okay.

7       THE WITNESS:  Right.  So this is -- right, so this is

8    9/25.  The previous sheet was last saved on 9/21.  I was just

9    trying to identify what changes, if any, had been made over

10   those four days --

11      THE COURT:  Thank you.  Okay.

12      THE WITNESS:  -- but I'm not really sure.

13   BY MR. ANDREOLI:

14   Q    Okay.  Let's go to Joint Exhibit 86, please.  Take a look

15   at the e-mail and let me know when you're ready.

16   A    Yes, okay.

17   Q    Okay, so the bottom e-mail in the chain is an e-mail you

18   sent to your colleagues Mr. Chu, Mr. Sen, Mr. Knox, and Mr.

19   Brumm on September -- Saturday, September the 27th at 5:27

20   p.m., right?

21   A    Yes, that's correct.

22   Q    And you copied your colleagues Simon Berring and Lisa

23   First (ph), correct?

24   A    That's right.

25   Q    And in the text of the e-mail, you note that there are two

Page 83

1    files that you want your colleagues to pay attention to, right?

2    A    Yes.

3    Q    And the first one is the Lehman claim new.xls, right?

4    A    Yes.

5    Q    And you note that this is an updated version of positions

6    broken out by category, right?

7    A    Yes.

8    Q    The second file you describe is called marking

9    responsibility.xls, right?

10   A    Yes.

11   Q    And in your description of the marking responsibility

12   file, you noted that you had assigned each CDS to someone,

13   correct?

14   A    Yes.

15   Q    Although you noted that there were certain unknown

16   positions that belonged to Dan/Carlo, right?

17   A    Yes.

18   Q    What positions belong to Dan or Carlo?

19   A    As in which (indiscernible) were they?

20   Q    Yeah, or which -- you could start by saying which

21   accounts, what kind of positions did they trade that were in

22   this portfolio?

23   A    I'm not sure.  It would have been whatever positions that

24   they were responsible for but I wouldn't -- I don't know how I

25   would identify them now.

Page 84

```
 1    Q    Okay.  You don't remember historically what they were
 2    trading?
 3    A    Not which CDS's in particular it would have been at that
 4    time.
 5    Q    So at 5:27 on September the 27th, this was the first time
 6    you were providing this marking responsibility file to your
 7    colleagues, right?
 8    A    Yeah.  I don't know if that was the case.  It was
 9    certainly -- I was certainly providing it to them but I don't
10    know if that was the first time I necessarily communicated it
11    to it -- to them.
12    Q    Okay.  Well, let's go to the file.  Let's go to 5214.
13    Okay, so 5214, if you look at the metadata, which we provided,
14    the file name says --
15    A    Sorry, 5 --
16    Q    -- marking responsibility.xls.
17    A    Sorry, where -- 5214 is a -- that's just an exhibit?
18    Q    Yes.
19    A    An EX?  Yes.  Okay, yes, I see that.
20    Q    If you bring it up on the screen -- well, actually let's
21    check -- you're the author of this document, right?
22    A    That's correct.
23    Q    And it says that the date created is September 27th of
24    2008, right?
25    A    Yes.
```

Page 85

1   Q    And this is the document you're referring to in the prior

2   exhibit, right, Joint Exhibit 86?

3   A    Yes.  It seems to be, marking responsibility.

4   Q    The same name, right?

5   A    It has the same name.

6   Q    Okay.  Let's bring up the Excel.  Okay.  So are you

7   familiar with the spreadsheet, Mr. Wollman?

8   A    I don't recall having looked at this recently.

9   Q    But you created it, right?

10  A    That's what it says.

11  Q    And it shows a list of the (indiscernible) with Lehman,

12  right?

13  A    Sorry, we're looking at the master tab now, right?

14  Q    Yeah, that's where we're on now.

15  A    So -- yes and it's -- yes, it seems to have the master tab

16  --

17  Q    If you need to scroll down, just let Randall know.

18  A    Sorry, and the filter -- it seems to be filtered on

19  something, column C.  What is it filtered on?  AC -- okay.

20  Q    Okay.  And are those initials -- are those -- you see JW,

21  are those your initials?

22  A    Yes.

23  Q    And AC is Arthur Chu's initials?

24  A    Yeah.

25  Q    TK is Tom Knox's initials?

Page 86

1   A     Yes.

2   Q     YC is Yi Cen's initials?

3   A     Yes, that's correct.

4   Q     And those were the traders you were assigning

5   responsibility for valuing in the portfolio, right?

6   A     That's some of the traders.

7   Q     And Mr. Fu was another trader, right?

8   A     Yes, Mr. Fu as -- well, as well as Mr. Brumm as part of

9   the process.

10  Q     But Mr. Brumm didn't actually value any positions, right?

11  A     Well, he did value positions, he just didn't value any

12  positions that QVT or Quintessence had facing Lehman.

13  Q     What positions did Mr. Brumm value?

14  A     There were other positions where DB -- so as we discussed,

15  there are some Deutsche Bank positions that are not in this

16  case, but they appear in the spreadsheet.  I believe he may

17  have valued some positions which didn't become part of this

18  claim but were otherwise involved in the process -- the marking

19  process generally.

20  Q     Okay.  In your e-mail you noted that there were certain

21  unknown positions --

22  A     Yes.

23  Q     -- and you asked your colleagues to go through and claim

24  whichever you can.  Do you see that?  If you go back to --

25  maybe have a hard copy open of Joint Exhibit 86 and have the

Page 87

1   spreadsheet on the screen.

2   A     Sure, so Joint Exhibit 86?

3   Q     Right.  Is that the e-mail we were discussing where --

4   A     Yes.

5   Q     -- you circulated the marking responsibility spreadsheet,

6   right?

7   A     Yes.

8   Q     Okay.  And here you're saying there's some unknown

9   positions.  Is that -- the unknown positions, are those the

10  positions that have question mark in column C?

11  A     I think that's a reasonable inference.  I don't know,

12  though.

13  Q     Let's click on that, Randall.  Can we highlight the -- or

14  filter on the question mark, please?  Okay.  Does this refresh

15  your recollection as to what CDS Mr. Gold or -- I don't know

16  Carlo's last name, but --

17  A     Matoni (ph).

18  Q     Matoni.  What positions they had in the Lehman portfolio?

19  A     I mean, I would assume that it's a subset of these

20  positions, but I don't know which ones.

21  Q     Do you know who was ultimately assigned responsibility for

22  marking -- or valuing the positions that were traded by Mr.

23  Gold and Mr. Matoni?

24  A     What's -- I don't know what the positions are so I don't

25  know that I can answer that.

Page 88

```
 1              THE COURT:  Can I ask -- so on this sheet that we're
 2     looking at in the column D, there are two different categories.
 3     There's QVT Quintessence and then there's the DB intermediate,
 4     right?
 5              THE WITNESS:  Yes.
 6              THE COURT:  So DB intermediate is we're not talking
 7     about, right?
 8              THE WITNESS:  Right, yes.
 9              THE COURT:  Okay.  So on the QVT Quintessence, is
10     there a way that you could take those (indiscernible) and go
11     look back into a subsequent version and see who -- when you
12     sort for responsibility, would that tell you who --
13              THE WITNESS:  Yes, that --
14              THE COURT:  -- is in charge of them?
15              THE WITNESS:  That would.  The only point I was
16     making is that I don't know which of those -- so when you
17     filter down.
18              THE COURT:  Yeah.
19              THE WITNESS:  That's some set of positions.  I don't
20     know that it was -- that the question marks are exclusively Dan
21     and Carlo's positions.  If they were exclusively, then yes, I
22     could certainly do that.
23              THE COURT:  Understood, yes.  But it could be
24     hypothetically --
25              THE WITNESS:  Right, if let's --
```

Page 89

1            THE COURT:  It could be Mr. Chu.

2            THE WITNESS:  I'm sorry.  Right, right.  So for

3    example, if one person did all of these positions, then by

4    definition, that person would have done all of Dan and Carlo's

5    positions.  But I'm just saying I don't know which of those

6    positions are.

7            THE COURT:  Okay.

8            THE WITNESS:  So that's --

9            THE COURT:  I'll stop now.

10            THE WITNESS:  That's the only point I was making.

11            THE COURT:  Okay.

12   BY MR. ANDREOLI:

13   Q    Okay, so you see that you sent the marking responsibility

14   spreadsheet to your colleagues on

15   September 27th at 5:27 p.m.  You're not aware of having

16   circulated a marking responsibility sheet to them prior to that

17   time, are you?

18   A    Yeah.  I have no recollection of that.

19   Q    Okay.  If you look in the paragraph where you're

20   discussing the marketing responsibility spreadsheet, you note

21   and it's the sentence that starts with even -- "Even though I

22   assigned positions to everyone, many of these may have marked

23   IT partner marks, however please examine appropriateness of

24   mark and bid ask spread and decide if an override is

25   necessary."  Do you see that?

Page 90

1    A    Yes.

2    Q    And so you were instructing your colleagues to look at the

3    market partner marks and decide whether they should be

4    overridden or not, right?

5    A    Yes.

6    Q    And so your understanding was they had not begun the

7    process of deciding whether to override the market partner

8    marks as of 9/27 at 5:27 p.m., right?

9    A    Well, as I recall sort of looking through -- I guess we

10   haven't looked through Lehman claim/new yet, but at least in

11   the prior versions of the spreadsheets, there was only the 9/15

12   opinion and there was only -- and the 15 percent was applied.

13   So the only thing they could either do was sort of accept or

14   reject at that point.  So I think that was the -- sort of the

15   beginning of the discussion around using market partners.

16   Q    But my question was, to your knowledge, the traders had

17   not begun the process of deciding whether to override market

18   partner marks prior to 9/27 at 5:27 p.m., right?

19   A    No.  I don't know that I would say that because -- again,

20   this is just as it relates to the spreadsheet.  In terms of

21   what the other traders were doing in thinking about their

22   positions, I don't recall nor would I have necessarily known.

23   I mean, I'll just point out that here it says Lehman claim/new

24   is an updated version of the position.  So again, I don't have

25   a recollection of this e-mail, but that leaves me to believe

Page 91

1    that they were aware of at least the previous version of the

2    positions.  And so I don't know what, if anything, they were

3    doing with that.

4    Q    As of the time this e-mail, September 27th at 5:27 p.m.,

5    you hadn't started checking the market partner marks in

6    determining whether they were appropriate, had you?

7    A    For my positions?

8    Q    Yes.

9    A    I guess if I could look at the Lehman claim, new

10   spreadsheet, I could have -- I could tell you, but I don't

11   know.

12          MR. ANDREOLI:  Okay.  Would this be a good time to

13   break, Your Honor?

14          THE COURT:  I think it would be an excellent time to

15   break.  All right.  So you get a little longer today.  We'll be

16   back promptly to start up again at 2 o'clock.  All right?

17   Thank you.

18      (Recess from 12:29 p.m. until 2:14 p.m.)

19          THE COURT:  I apologize for being late.  Had a note

20   from Judge Katzman; kind of hard to interrupt when one is

21   talking.

22          Please come back.  I'm sorry.

23   CROSS-EXAMINATION (RESUMED)

24   BY MR. ANDREOLI:

25   Q    Ready, Mr. Wollman?

Page 92

1   A    Yes.

2   Q    All right.  So we're going to do one quick topic and then

3   we're going to go back to where we were.

4        So, Mr. Wollman, you're aware that QVT's claims LBSF were

5   placed into side a pocket after LBHI filed for bankruptcy,

6   correct?

7   A    Yes.

8   Q    And that side pocket is generally referred to within QVT

9   as the Lehman side pocket or the S25 side pocket, right?

10  A    Yes.

11  Q    And you personally have an interest in the Lehman side

12  pocket?

13  A    Yes.

14  Q    And you acquired that interest in Lehman's side pocket by

15  virtue of the fact that you were an investor in the QVT funds

16  prior to the creation of the side pocket, right?

17  A    Yes.

18  Q    In addition to your ownership interest in the side pocket,

19  you also have a separation and consulting agreement with QVT

20  Financial LP, right?

21  A    Correct.

22  Q    And QVT Financial LP is the investment manager for the QVT

23  funds?

24  A    Yes.

25           MR. ANDREOLI:  Your Honor, may I approach?

Page 93

1              THE COURT:  Yes.

2              THE WITNESS:  I think you gave me two copies.

3              MR. ANDREOLI:  Oh.  I'm sorry about that, Your Honor.

4              THE COURT:  That's okay.

5    BY MR. ANDREOLI:

6    Q    Okay.  Mr. Wollman, does that document look familiar to

7    you?

8    A    Yes, it does.

9              THE COURT:  Do you need an extra copy back?  Here.

10             MR. ANDREOLI:  Sorry.

11   Q    All right.  Mr. Wollman, sorry about that, we were just

12   printing copies in the break.

13        So you have before you Exhibit No. 5966, right?

14   A    Yes.

15   Q    Okay.  And that's a copy of your separation consulting

16   agreement that we just referenced, right?

17   A    That's correct.

18             MR. ANDREOLI:  And this copy, just for the record, is

19   unredacted.  We will be replacing it with a partially redacted

20   copy after court today.

21   Q    Okay.  So this agreement reflects the terms of your

22   separation from QVT, right?

23   A    It does.

24   Q    And it also reflects the terms of your continuing

25   consulting relationship with QVT, right?

Page 94

1    A     That's correct.

2    Q     Okay.  And the scope of the consulting relationship is you

3    working on this litigation, right?

4    A     Yes.

5    Q     And you're being paid an hourly rate to consult on the

6    litigation.

7    A     That's correct.

8    Q     And the rate is $875 an hour.

9    A     Yes.

10   Q     And how many hours have you billed to this matter since

11   you left QVT in April of 2016?

12   A     How many hours?  It would be approximately 450 hours or

13   so.

14   Q     Okay.  And what's the total amount billed in dollars?

15   A     Sure.  It's just around $400,000.

16   Q     Okay.  And does that reflect hours incurred through the

17   end of January?

18   A     Yes, that reflects hours more or less up until the

19   present.

20   Q     Okay.  And so it includes the time you've spent attending

21   trial in the last two weeks?

22   A     That's correct.

23   Q     Okay.  Let's go back to where we were, which was Joint

24   Exhibit 86.

25   A     Okay.

Page 95

1   Q   Mr. Wollman, your -- this was the document we were talking

2   about before the break, right?

3   A   Correct.

4   Q   And before the break we talked about some text in the

5   first two full paragraphs of the bottom e-mail.  Let me direct

6   your attention to the last sentence now.

7       In that sentence you say, "Let me know if you have any

8   questions/suggestions to help tomorrow go as quickly as

9   possible (I'll be in around 11 or so)."

10       So in that sentence you were saying that you were going to

11   the office the next day, QVT's office, right?

12   A   Yes.

13   Q   And you were going to QVT's office to perform valuation

14   work for the claim, right?

15   A   Yes.

16   Q   Okay.  And you were asking for suggestions to make it go

17   as quickly as possible, right?

18   A   Yes.

19   Q   Do you recall receiving any such suggestions?

20   A   In advance of the meeting or during the meeting?

21   Q   Yeah, in advance of the meeting.

22   A   In advance of the meeting I don't recall.

23   Q   Okay.  So you did, in fact, go into QVT's offices the next

24   day, Saturday, September 28th of 2008.

25   A   You mean Sunday?

Page 96

1    Q    Sorry, yes.

2    A    I believe so, yes.

3    Q    Okay.  And how long were you in the office on that day,

4    Sunday, September 28th?

5    A    I don't know.

6    Q    Some of your colleagues were with you in the office that

7    day?

8    A    Yes.

9    Q    And was Mr. Chu there?

10   A    I'm guessing he would have been, I don't have a specific

11   recollection, but I would think he would've been.

12   Q    Do you have a specific recollection of any of your

13   colleagues being there on Sunday, September 28th?

14   A    No.

15   Q    And so you were there to perform the valuations for the

16   LBSF transactions.  Do you know how long you were in the office

17   that day?

18   A    Sorry.  I think you already asked that.

19   Q    I already asked that and you said no.

20        Let's go to Exhibit 5943.  And it's a slip sheet with the

21   metadata on the back and Randall's pulled up in Excel.  And

22   just to get our bearings, you're the author of this document;

23   is that right?

24   A    Yes.

25   Q    And it says the date created is September 16th, 2008,

1    right?

2    A    Correct.

3    Q    And the name is Lehman claim new nick.XLS, right?

4    A    What is?

5    Q    The file name.

6    A    I'm sorry, what exhibit are we on?

7    Q    Oh, sorry, I'm -- did I say 5958?

8    A    I thought you said 5943.

9    Q    I'm having a tab problem.  All right.  5943 also created

10   by you on the 16th and the file name is meeting claim draw,

11   right?

12   A    5943, right?

13   Q    5943.

14   A    Yes.

15   Q    Thank you for catching me.

16   A    No problem.

17   Q    And that's the file name is Lehman claim-Joel, right?

18   A    Correct.

19   Q    And if we bring up the native on the screen, okay, take a

20   look at --

21         MR. ANDREOLI:  Randall, maybe you could just scroll

22   to the right for a few seconds.

23        (Pause)

24         MR. ANDREOLI:  Sorry, we're going to close it and

25   reopen it, we were seeing a data issue.

Page 98

1          (Pause)

2               MR. ANDREOLI:  Okay.  It looks like we're having an

3     issue with maybe the spread, maybe because it's hard coded and

4     can't see them.

5     Q    Does this look like the individual trader tab that you

6     created to value your positions?

7     A    I'll get to that in a second.

8     Q    Okay.

9               MR. ANDREOLI:  Why don't we just show it.

10              All right.  Well, we're waiting for the text cluster

11    to resolve itself.

12    Q    So I'll show you in a minute some of the tabs that have

13    trader's names in them, but at some point the traders completed

14    their valuation work, correct?

15    A    Yes.

16    Q    And that valuation was performed in their individual

17    trader spreadsheet, correct?

18    A    That's correct.

19    Q    And you aggregated those spreadsheets into what became the

20    Lehman claim calculation spreadsheet, which we've been

21    referring to as Exhibit 2108, right?

22    A    Yes.

23    Q    Okay.  So do you recall how the traders conveyed their

24    spreadsheets to you or transmitted their spreadsheets to you?

25    A    I believe they left it on the G drive.

Page 99

1    Q    So you haven't seen any e-mail correspondence where they

2    sent those spreadsheets to you, right?

3    A    Not that I can recall, no.

4    Q    So they saved them to the G drive and you picked them up

5    and inserted them into the larger master sheet.

6    A    Correct.

7    Q    And when you went through that process of incorporating

8    the individual trader sheets into the master sheet, you didn't

9    check any of the individual trader's work, did you?

10   A    What do you mean by check their work?

11   Q    Did you verify any of their calculations?

12   A    Well, I verified that their calculations were completed,

13   they produced values, but as to what their calculations were

14   doing, I don't believe I did.

15   Q    Okay.  So you didn't check to see if you agreed with the

16   dates that they were using for their valuations.

17   A    Sorry, if I agreed?

18   Q    Correct.

19   A    No, I didn't do that.

20   Q    Okay.  And to your knowledge, no one at the firm checked

21   to see if they agreed with the other trader's valuations,

22   right?

23   A    Sorry if anybody checked to see if they agreed with what -

24   -

25   Q    Right, if there was one person who checked all the work

Page 100

1    that the traders had done, to make sure they agreed with it.

2    A    I don't think there was any such person.

3    Q    Okay.  And you didn't check to see if the broker runs that

4    the other traders used in their valuations were reliable, did

5    you?

6    A    Sorry, they were reliable?  What do you mean by reliable?

7    Q    That you agreed that they represented an accurate value

8    for purposes of the valuation.

9    A    No, I didn't audit any of their work.

10   Q    Okay.  And you wouldn't know why any of the traders chose

11   to value positions as they did, right?

12   A    I wouldn't -- I mean I might have known in some instances,

13   and there may have been some discussions, but I guess it would

14   depend on the position.

15   Q    Okay.  All right.  We'll come back to the trader sheets

16   when we get technology working.

17        Let's switch to a new topic, Mr. Wollman.  Okay.  So

18   during your testimony yesterday you spoke about QVT's market

19   quotation process, right?

20   A    Correct, yes.

21   Q    And were you in the office on Sunday the 14th, the day

22   before Lehman filed for bankruptcy?

23   A    I don't believe so.

24   Q    Okay.  Were you aware that your colleagues had started

25   putting together a list of QVT's transactions with LBSF on that

Page 101

1   day?

2   A    I'm not sure if I was aware at that time.  I'm aware now.

3   Q    Okay.  So you recall looking at a spreadsheet yesterday in

4   court that was such a list.

5   A    Yes.

6   Q    Okay.

7           MR. ANDREOLI:  Let's go to that.  Why don't we go to,

8   Randall, Exhibit 5888.

9           THE WITNESS:  Sorry, Exhibit 5 --

10  Q    888, triple 8.  And this is an e-mail from Mr. Gold to

11  certain of your colleagues.  Is this the document you remember

12  seeing yesterday?

13  A    Yes, I believe so.

14  Q    Okay.

15          MR. ANDREOLI:  And, Randall, could you show the

16  native attachment, please?  And if you could scroll down.

17  Q    Okay.  You see that's a list in column C that identifies

18  the counterparty is LBSF, right?

19  A    Yes.

20  Q    Okay.  So you're not sure whether you saw this at the

21  time?

22  A    Yes, I mean, we could check if there's a Joel in there,

23  but I don't recall it.

24  Q    Where would you like to look, in column J?

25  A    Yeah, especially if I see names.  Yeah.  I don't see Joel.

Page 102

1   Q     Okay.  So you don't think you were involved in the

2   preparation or filling out this document.

3   A     I guess I wasn't in this e-mail and I'm not in the

4   spreadsheet so sitting here today my guess would be not, but I

5   don't recall really.

6   Q     So at some point you were tasked with identifying

7   transactions to include the market quotation process, right?

8   A     Correct.

9   Q     And none of your colleagues that are copied on this e-mail

10  provided you with a sheet to your knowledge?

11  A     This particular sheet?

12  Q     Right.

13  A     I don't recall.

14  Q     Okay.  And you were aware in September of 2008 that QVT

15  received margin statements from Lehman.

16  A     That as a general course of -- yeah, I'm aware of that.

17  Q     And you're aware that those margin statements listed the

18  transactions between the parties.

19  A     Yes.

20  Q     Did you look at those for purposes of putting together the

21  list of transactions that you included in the market quotation

22  process?

23  A     The margin statement?  I'm not sure.  I mentioned I don't

24  know -- the list that we're referring to, I don't recall

25  exactly how it was generated, I'm not sure if there was margin

Page 103

1    information that they came from or not, so I can't be sure.

2    Q    Okay.

3              MR. ANDREOLI:  Let's go to Joint Exhibit 53.

4    Q    Okay.  Mr. Wollman, Joint Exhibit 53 is a document I

5    believe you discussed with Mr. Tracey yesterday.  Do you recall

6    this e-mail?

7    A    Yes, I do.

8    Q    And in the first e-mail which you sent to Mr. Gold at

9    11:11 a.m. on September 15, you noted that you were thinking of

10   conducting a 1 p.m. BWIC OWIC (ph), correct?

11   A    Yes.

12   Q    And the BWIC OWIC you were referring to in the e-mail was

13   one of the requests for market quotations that you were

14   planning to send related to the LBSF transactions, right?

15   A    Correct.

16   Q    And when you noted that you were thinking of conducting

17   the BWIC OWIC at 1 p.m., you thought you'd be ready to send out

18   the document at that time, right?

19   A    Presumably.

20   Q    Okay.  And do you recall who tasked you with putting

21   together the BWIC OWIC for at least some of the transactions?

22   A    No, I do not.

23   Q    And do you recall how you came up with the 1 p.m. time

24   that's referenced in this e-mail?

25   A    No, I do not.

Page 104

1    Q    Did one of the managing members of QVT suggest that time

2    to you?

3    A    I don't recall that.

4    Q    After you sent this e-mail Mr. Gold responded about four

5    minutes later and he said, "Not yet, standby," right?

6    A    Correct.

7    Q    And you followed his instruction, you did not send it out

8    at that time.

9    A    Yes, I did not.

10        MR. ANDREOLI:  Let's go to Joint Exhibit 4.

11   Q    Okay.  So you may have discussed this with Mr. Tracey

12   yesterday.  This is an e-mail that you sent, the top e-mail to

13   Mr. Brum, and Mr. Gold, and Mr. Chu at 11:28 a.m. on September

14   15th, right?

15   A    Yes.

16   Q    And you were forwarding them a -- looks like a Bloomberg

17   you sent to yourself; is that right?

18   A    Yes.

19   Q    And you sent that Bloomberg to yourself at 11:02 a.m. on

20   the same day, right?

21   A    Yes.

22   Q    And in your note to Mr. Brum, Mr. Gold and Mr. Chu, you

23   noted "This is what I had originally drafted and was thinking

24   of circulating," right?

25   A    Yes.

Page 105

1    Q    And what you considered circulating was a list of the

2    ABX/CDS transactions, right?

3    A    Yes.

4    Q    And so at 11:28 you had completed the process of

5    identifying that group of transactions, right?

6    A    Yes.

7    Q    Let's go to Joint Exhibit 55.  Okay.  This is another e-

8    mail you mentioned or discussed with Mr. Tracey yesterday.  The

9    top e-mail in the chain is an e-mail that you sent to Mr. Brum,

10   Mr. Gold and Mr. Chu, 1:06 p.m. on September 15th, right?

11   A    Yes.

12   Q    And you were again forwarding them a Bloomberg message you

13   sent to yourself, right?

14   A    Yes.

15   Q    And the Bloomberg message you had sent to yourself was at

16   1:04 p.m., right?

17   A    Yes.

18   Q    In the top e-mail in the chain, you wrote that you had

19   made two minor changes to the language, one was to put in

20   offers wanted in comp and the second was to remove language

21   about currency since these are all USD, right?

22   A    Yes.

23   Q    And when you mentioned you were removing the language

24   about currency because they were all in USD, was that a

25   reference to just the ABX/CDS transactions, or was that all of

Page 106

1    the transactions between QVT and LBSF?

2    A    Just the ABX transactions.

3    Q    You concluded your e-mail, the top one by saying, "I will

4    send out as-is (formatting looks better in BBG unless they are

5    other concerns)", right?

6    A    Yes.

7    Q    So from your perspective, the ABX/CDS BWIC OWIC was in

8    final form as of 1:06 p.m., right?

9    A    You say from my perspective?  I mean, I didn't have any

10   other edits that I was contemplating, but I was waiting for

11   feedback from the others.

12   Q    Right.  Okay.  The subject line of the original e-mail

13   that you had sent to yourself, the Bloomberg message is

14   BWIC/OWIC/IOC Monday 9/15 3 p.m., right?

15   A    Yes.

16   Q    So you had already decided at 1:04 that you weren't

17   actually going to send out the market quotation request until 3

18   p.m., right?

19   A    I guess this was contemplated for 3 p.m.

20   Q    And that's when you wanted to send it out, right?

21   A    At the 1 o'clock timeframe, yeah.

22   Q    And where did that 3 p.m. time come from, was it provided

23   to you by one of the managing members?

24   A    No, I believe this is just my language.  Just when you

25   said 3 p.m., this is not the when sending out, this is when

Page 107

1   they'll be with OWIC would happen.

2   Q    Right, when you anticipated sending it out.

3   A    No, no, this would be when I would receive responses by 3

4   p.m.  The when with BWIC/OWIC should be 4.

5   Q    So you were saying at 1:04 p.m. that you would send it out

6   shortly and then receive responses by 3 p.m.

7   A    So when you say a BWIC or OWIC, or I guess people -- OWIC

8   is less popular, but BWIC/OWIC when you send it out, you send

9   it out four times.  So you say I want to do a BWIC/OWIC and

10  then you'll say at such and such time, this is when I'd like to

11  receive responses by.

12  Q    So you were contemplating at 1:04 sending it out at some

13  point shortly thereafter and then receiving responses at 3 p.m.

14  A    Yes.

15          THE COURT:  Can I ask a clarifying question?

16          THE WITNESS:  Sure.

17          THE COURT:  In a normal BWIC/OWIC situation --

18          THE WITNESS:  Yes.

19          THE COURT:  -- normal meaning not on September 15th -

20  -

21          THE WITNESS:  Right.

22          THE COURT:  -- when you say 3 p.m., you want to do

23  BWIC/OWIC at 3 p.m., does that mean you want to have -- do a

24  BWIC/OWIC at 3 p.m. or can you explain that?

25          THE WITNESS:  Right, so maybe I can just give some

Page 108

```
 1    context first, yeah.  In the normal --

 2             THE COURT:  You know what I mean by this?

 3             THE WITNESS:  Yes.

 4             THE COURT:  Okay.

 5             THE WITNESS:  Well, I think.  Why don't I speak

 6    generally.

 7             MR. ANDREOLI:  Mr. Wollman, can we get that

 8    demonstration on the record, please?

 9             THE COURT:  It's a onetime only.

10             THE WITNESS:  Yeah.  I don't think I can do it just -

11    -

12             THE COURT:  Do you understand my question though?

13             THE WITNESS:  Yeah.  So BWIC/OWIC bids one and in

14    competition --

15             THE COURT:  Yes.

16             THE WITNESS:  -- you're trying to have an auction

17    occur.

18             THE COURT:  That's this.

19             THE WITNESS:  Yes.

20             THE COURT:  Right.

21             THE WITNESS:  And so the auction you need a time when

22    people need to give you responses by.  So when you send it out,

23    you identify the time when you want people to come back to you.

24    Whether or not they actually come back to you at that time is a

25    separate matter, but that's the time that you are saying you'd
```

Page 109

1    like to conduct the process.

2              THE COURT:  Conduct an auction.

3              THE WITNESS:  So right.  So you'd like to have

4    responses in at that time, and then presumably at that time or

5    shortly thereafter you go through the process of who you want

6    to trade with, if anyone.

7              THE COURT:  Thank you.

8    BY MR. ANDREOLI:

9    Q    Okay.  So you ultimately didn't send out the BWIC/OWICs

10   shortly after 1:04, you sent them out closer to 3, right?

11   A    That's correct.

12   Q    And in the -- that two hour time period, approximate two

13   hour time period, were you involved in any communications with

14   counsel about the timing of the BWIC/OWIC process?

15   A    Sorry, was I personally?

16   Q    Yes.

17   A    I don't believe so.

18   Q    Okay.  Mr. Brum testified about contacts with counsel, did

19   he convey in -- on September 15th, 2008 any communications that

20   he had with counsel about the timing of the market quotation

21   process to you?

22   A    I don't recall.  I would have seen the final language

23   which would have been the end result of that process, but are

24   you talking about interim communications he had?

25   Q    No, I'm talking about the language of the documents.  I'm

Page 110

1    talking about the timing of sending it out.  Are you -- did Mr.

2    Brum convey any discussions he had with counsel about the

3    timing of the process to you?

4    A    I don't have any recollection of that.

5    Q    Okay.  Let's go to Exhibit 2077.  Okay.  So I think this

6    is another one that you discussed with Mr. Tracey yesterday.

7    So this is an e-mail you sent to Mr. Gold and Mr. Chu at 2:06

8    p.m. on September 15th, right?

9    A    Yes.

10   Q    Okay.  And in that e-mail you were directing Mr. Gold and

11   Mr. Chu to a file on QVT's drive, right?

12   A    Yes.

13   Q    And your understanding is that that file was the list of

14   positions to include in the BWIC/OWICs for the LBSF

15   transactions.

16   A    Yes.

17   Q    And as far as you knew the list was final as of 2:06 p.m.

18   on September 15th, right?

19   A    So when you say the list was final, that was my

20   understanding of the universe.

21   Q    Right.  You didn't make any changes to that list after

22   2:06 p.m.

23   A    I don't recall doing so.

24   Q    And so from a mechanical perspective, you could have send

25   out the market quotation request for those transactions at

Page 111

1    2:06, right?

2    A    Sorry.  I could have you said?

3    Q    Yes.

4    A    So at that time, 2:06, that would've just been the

5    aggregate levels, the aggregate positions that I had, but I

6    don't know that it was necessarily broken out into the various

7    subcomponents.

8    Q    The sheet you looked at yesterday with Mr. Tracey had the

9    subcomponents, didn't it?

10   A    Correct.

11   Q    So you're just not sure when subcomponents were created in

12   the list.

13   A    Exactly.

14   Q    So we looked at the ABX/CDS portion of the list and that

15   was final though as of 11:30, right?

16   A    You're saying the positions, I think the positions were

17   even earlier.  I think that was 11:02 I generated those

18   positions.

19   Q    Right.  So you're just not sure if the other tabs were

20   created, the corporate list and the EM list?

21   A    Correct.  I'm not sure -- I don't recall when the

22   splitting up of positions happened.  Right, so if you recall

23   that spreadsheet there were a number of tabs.  The master tab

24   had the universe of all the positions, and then there was the

25   subdividing into the other tabs, but I just don't recall when

Page 112

1    those individual tabs were created.

2    Q    Have you seen any e-mails that suggest that the splitting

3    happened after 2:06 p.m.?

4    A    I don't think I've seen any e-mails about splitting

5    period.

6    Q    Okay.  Why don't we go back to I think -- we're still

7    having a problem with one of the spreadsheets, but let's go to

8    the other ones.

9         Let's go to Exhibit 5950.

10   A    Did you say 5950?

11   Q    Yes.

12   A    I don't seem to have that.  Oh, no, I do, sorry, it's just

13   not in order.

14   Q    Okay.  For the next few exhibits, they're going to be I

15   think grouped together just a few out of place.  5950 shows you

16   were the author, right?

17   A    Yes.

18   Q    And it shows to be created 9/16, 2008, correct?

19   A    Yes.

20   Q    And the filing is a Lehman claim - Tom -- a Lehman claim-

21   Tom.xls, right?

22   A    Yes.

23   Q    And if you'd take a look at the spreadsheet, does this

24   appear to be the spreadsheet that Mr. Knox would have used to

25   populate his or value his transactions?

Page 113

1   A     I guess I would have to look and see his transactions.  It

2   looks like the general template.

3   Q     Okay.

4   A     The fact that it's Mr. Knox's I can't tell just by looking

5   at this.

6   Q     Okay.  What do we have to do to help you make that

7   determination?

8   A     So we should look and see, for example, we could look at

9   some of the positions he valued like the CDXEMs, you can see if

10  those are there.

11  Q     Okay.  Should we --

12         MR. ANDREOLI:  Randall, can we put a filter on for

13  the (indiscernible) in column B and go to --

14  Q     You said CDXEM?

15  A     Yeah.

16  Q     Is that CDX-EM?

17  A     So you'd be -- you can try CDX7 for example, I think CDX7,

18  hit okay.  So there.  So if you scroll to the right, actually

19  go to the left rather, keep going to the right, keep going,

20  yeah, so stop.  So it has some overrides, the 919, which I

21  believe he said that he used.

22         MR. ANDREOLI:  Randall, can you go back a couple of

23  columns, please?

24         THE WITNESS:  So just looking at column Y which shows

25  that he had over a 919 on those CDEXM's so it looks like at

Page 114

1    least some of these positions he's populated.

2    Q    Okay.  And you were the one who ultimately took Mr. Knox's

3    sheet and put it into a master tab, right?

4    A    Yes.

5    Q    Okay.  And if you look at the metadata it shows a date

6    modified of September 28th of 2008.

7    A    Yes.

8    Q    And is that when you took Mr. Knox's sheet and added it to

9    the Lehman positions master's tab?

10   A    I'm not sure if it -- it would've had to have been some

11   time after that, I'm not sure exactly when after that.

12   Sometime between the 28th and 15th.

13   Q    Okay.  So to your knowledge Mr. Knox's valuation work was

14   complete on the 28th?

15   A    I don't know.  Certainly this sheet seems to have been

16   complete on the 28th.  I don't know if he made any other

17   adjustments afterwards.

18   Q    Okay.  Let's go to 5959.  You see that this exhibit is

19   also created by you, right, you're the author?

20   A    Yes.

21   Q    Okay.  And date created is 9/16 of '08.

22   A    Yes.

23   Q    And it's in Lehman frame art serv, right?

24   A    Yes.

25            MR. ANDREOLI:  And if we can show the native.

Page 115

1    Q    Okay.  Is this the version of the spreadsheet that you

2    incorporated for Mr. Chu into the Lehman master tab?

3    A    Again I'd have to check.  I note that there's a preferreds

4    tab, actually you can click on that.  That looks similar in

5    nature to what I believe is called PCDS or I forget exactly

6    what's -- if it's called the same name in the final tab, but it

7    looks to be a valuation that Mr. Chu would have done.

8    Q    And the date modified in the metadata says 9/28/08, is

9    that consistent with your recollection that Mr. Chu completed

10   his valuation work on 9/28?

11   A    Right, I think I should say generally.  I don't know when

12   everyone necessarily completed their work.  This was when the

13   sheet was last modified so I believe I would've taken those

14   sheets and put them in.  I don't know if there were additional

15   -- if there was additional work done afterwards in either other

16   sheets that were modified or whether -- within the aggregated

17   sheet itself, but I know it was complete by October 15th.

18        So I think the -- maybe to be even a little clearer.

19   Certainly the main merging of sheets would have happened in and

20   around September 28th, or you know, shortly thereafter.  But in

21   terms of whether there was additional work done afterwards,

22   it's entirely possible because we didn't submit it for at least

23   another two weeks.  So -- but I don't recall what happened post

24   September 28th and pre-October 15th.

25   Q    Okay.  Let's go to Joint Exhibit 61 please.

Page 116

1   A    Yes.

2   Q    This is another e-mail that you briefly discussed with Mr.

3   Tracey yesterday.  This is an e-mail you sent to Mr. Chofflin

4   (ph) at Barclays September 15th, correct?

5   A    Yes.

6   Q    And this is a request for market quotations that you sent

7   for QVT's non-EMCDS transactions, right?

8   A    Correct.

9          MR. ANDREOLI:  And if we could show Mr. Wollman the

10  native attachment.

11      (Pause)

12         MR. ANDREOLI:  Your Honor, I think we're having

13  another technical issue.  Could we have two minutes?

14         THE COURT:  Sure.

15         MR. ANDREOLI:  Thank you.

16      (Pause)

17         MR. ANDREOLI:  Okay.  Are we ready?  Sorry about

18  that, Your Honor.

19  BY MR. ANDREOLI:

20  Q    So, Mr. Wollman, the cover of this e-mail notes non-

21  EM.xls, right?

22  A    Yes.

23  Q    In an earlier e-mail that you had sent to JPMorgan you had

24  actually -- you had sent the same Re line, right, it's a non-

25  EM.xls, but you actually included an EM tab; is that right?

Page 117

1    A    Yes, yes.

2    Q    Okay.  So that was inadvertent.

3    A    I believe so.

4    Q    And you weren't intending to ask for quotes on the EM

5    transaction on that list?

6    A    I don't believe I was.

7    Q    And the trader that you sent it to, including Ms. Jamie

8    Benderman, she wasn't an EM trader, was she?

9    A    Well, she was a sales person.

10   Q    But she didn't cover EM, did she?

11   A    I don't think so, she might have.  I don't think she did

12   for us.

13   Q    Okay.  And, in fact, when Mr. Knox sent the EM list to

14   JPMorgan he sent it to a different person at JPMorgan, right?

15   A    Yeah.  I don't recall who that was, but I don't recall

16   seeing Jamie Benderman on that list.

17   Q    Okay.  Let's go to Exhibit 20 -- I'm sorry, 2108 the claim

18   calculation spreadsheet.  Okay.  We're going to talk about the

19   transactions that you valued using Markit Partners information.

20        So -- okay.

21             MR. ANDREOLI:  So, Randall, if we could go to the

22   Lehman positions masters tab please, and if we could just focus

23   on the trades that Mr. Wollman valued.

24   Q     And, Mr. Wollman, the way you would do that is to filter

25   a column BC for your initials, right?

Page 118

1   A     Yes, that's the way I did it earlier this morning.

2   Q     Right.  Okay.  And then if we go to column BP, we can sort

3   for Markit and you see it says 58 of 796 records found, is that

4   the same number we saw this morning?

5   A     I believe so.

6   Q     Okay.  So you mentioned the column Y of the positions

7   master tab references the date that you chose to value the

8   particular Markit transactions, right?

9   A     Yes.

10  Q     And that comp shows that you did not use Markit spreads

11  from 9/15 to value all 58 transactions, right?

12  A     Correct, I used 9/15, 9/16 and 9/17.

13  Q     Right.  And you were here for opening arguments on January

14  30th, weren't you?

15  A     I think so, yes.

16  Q     And do you recall when QVT's counsel stated that QVT

17  traders had Markit's closing bids for each day during Lehman

18  week and that each trader used his judgment to select which bet

19  -- price best reflected the replacement cost.

20  A     I remember that generally.

21  Q     Okay.  So you and the other traders at QVT had closing

22  Markit spreads for all five days of Lehman week when you were

23  valuing QVT's positions with LBSF for the calculations, right?

24  A     Yes, we would have Markit spreads up until the -- all

25  spreads up until the date at which we valued it.

Page 119

1   Q     Okay.  And you could have compared the Markit spreads on

2   the various days of Lehman week to determine which you thought

3   best reflected replacement costs, right?

4   A     I could have -- sorry, what do you mean by that?

5   Q     So you could have compared 9/15 to 9/16 to 9/17, right?

6   A     You're saying like independently or I'm not sure I

7   understand your question.

8   Q     The Markit spreads for those dates were available to you,

9   right?

10  A     Yes, in our database.

11  Q     And you could have compared them to each other, right?

12  A     You're saying by looking through the database?

13  Q     Or pulling them into a spreadsheet --

14  A     Yes, yes.

15  Q     -- or however you would want to do it.

16  A     Yes.

17  Q     And did you, in fact, pull them into a spreadsheet?

18  A     We pulled them into this spreadsheet.

19  Q     Sorry, different question.  Did you pull the spreads for

20  each position that you valued on each date of Lehman week and

21  put them next to each other?

22  A     No.

23  Q     And the spread that's reflected in column V is the spread

24  from the date reflected in column Y, right?

25  A     Yes.

Page 120

1   Q    Okay.  And the notional value of each of these positions

2   is reflected in column M, right?

3   A    Column M, that's the maturity.

4   Q    Sorry, what did I say, notional -- sorry, notionals in C,

5   right?

6   A    Yes.

7   Q    And maturity is in M, right?

8   A    Correct.

9   Q    Okay.  Let's talk about bid mid-spreads for a second.  So

10  you testified earlier that you used or you came up with a 10

11  percent bid mid-spread to add generally to use as a default for

12  valuing the Markit transactions, right?

13  A    Yes.

14  Q    Okay.  And who was involved in that decision other than

15  you?

16  A    So I believe -- so I don't know recall specifically with

17  respect to the bid, generally those conversations around Markit

18  Partners, Markit partners would have involved Arthur Chu, Yu

19  Sen, myself, possibly other portfolio managers weighed in as

20  well, but I would think at least those two would have been

21  involved.

22  Q    And there's no document you've seen that memorializes why

23  you picked 10 percent, right?

24  A    No.

25  Q    Okay.  Let's go back to 2108.  All right.  So we're still

Page 121

1    filtered on just the transactions that you valued using Markit

2    spreads.

3            MR. ANDREOLI:  Randall, if we could filter on column

4    Y for the 9/15 transactions.

5    Q    Okay.  And we get ten records, right?

6    A    Yes.

7            MR. ANDREOLI:  Okay.  If you want to flip to, just in

8    hard copy, Randall, why don't you stay where you are.

9    Q    But you can flip in hard copy to tab 5951.

10   A    Sorry, Exhibit 5951?

11   Q    Yes.  And that should be a demonstrative exhibit.  And,

12   Mr. Wollman, does the first snapshot, is that the same ten

13   entries that you see on the screen now that you valued using

14   9/15 Markit spreads?

15   A    It appears to be, yes.

16   Q    Okay.  And so what we've done is we've focused on just

17   some columns when we talk about --

18           MR. TRACEY:  I'm sorry, Your Honor, I'm just having

19   trouble finding it.  Can you hold on?

20           MR. ANDREOLI:  Yeah.

21           MR. TRACEY:  Okay.  Thank you.

22   BY MR. ANDREOLI:

23   Q    Okay.  All right.  So these are the transactions you used

24   Markit spreads from 9/15 to value, right?

25   A    Yes.

Page 122

1    Q    And you thought Markit spreads on 9/15 were reliable for

2    those ten transactions, right?

3    A    Yes.

4    Q    Okay.  And you heard Mr. Regan say in opening that QVT's

5    traders used Markit prices for 9/15 when they thought they

6    probably could have traded on that date, right?

7    A    Yes.

8    Q    Is that why you chose 9/15 for these trades?

9    A    Sorry, is it -- did I choose these because I thought we

10   could have traded them on 9/15?

11   Q    Right.

12   A    That would've been part of it.  Obviously if I didn't

13   think we could have traded them on 9/15 I would not have used

14   9/15.

15   Q    All right.  Well, let's focus on HSBC trades that you

16   valued using 9/15 Markit prices.

17   A    Okay.

18   Q    So you're not actually sure why you used 9/15 prices or

19   spreads to value those positions, are you?

20   A    I can't tell you specifically why for HSBC FIN, I used

21   9/15.

22   Q    Okay.  So let's look at in the demonstrative to column N,

23   there was ten trades that you valued using 9/15 Markit spreads,

24   the maturities varied from June of 2010 to September of 2012,

25   right?

Page 123

1    A    Yes.

2    Q    And you used 9/15 Markit spreads to value the transactions

3    despite the difference in maturity, right?

4    A    Well, they were also -- I mean, some of these indices and

5    some of these are single names, they're not all the same type

6    of security.  For example, I used -- as I believe I mentioned

7    this morning, I used 9/15 for the CDX4 generally so that's --

8    that influences the date selection here as well.

9    Q    Right, irrespective of size or irrespective of maturity,

10   right?

11   A    Correct.

12   Q    And the CDX transactions that you're mentioning, those are

13   relatively short dated, right, they had less than two years to

14   maturity.

15   A    Yes.

16   Q    Okay.  And you used a 10 percent bid mid for all of these

17   transactions, right?

18   A    Yes.

19   Q    And that was regardless of the maturity, right?

20   A    Yes.

21   Q    And regardless of the notional size, right?

22   A    Yes.

23   Q    Okay.

24        MR. ANDREOLI:  Randall, if you could filter on column

25   Y for 9/16 please.

Page 124

1   Q    So the trades that we've just filtered for there's 12

2   transactions, that should be the second chart that's in Exhibit

3   9591.  Does that look right to you, Mr. Wollman?

4   A    So I'm just doing a quick cross-check here.  Yeah, those

5   seem to match.

6   Q    Okay.  And Markit spreads were available for all 12 of

7   these transactions on 9/15, right?

8   A    I would have assumed so.

9   Q    Did you ever check?

10  A    Did I ever?  I might have.

11  Q    You don't recall though.

12  A    Correct.

13  Q    And you testified you used 9/16 prices or spreads to value

14  transactions because you hadn't completed your market

15  quotation process until after the close of business on the

16  15th; is that right?

17  A    Yeah, generally 9/16 would be the earliest that we could

18  transact post-market quotation process.

19  Q    But QVT had actually entered into 19 replacements on the

20  15th, right?

21  A    Yes, I believe that was before the market quotation

22  processed that.

23  Q    Right.

24  A    Yes.  To be clear, I'm not saying we couldn't have traded

25  on 9/15, I'm saying we couldn't have traded after the market

Page 125

1    quotation process on 9/15.  The market quotation process had

2    not yet concluded by the end of 9/15.

3    Q    What do you mean by that?  You mean because you got some

4    responses the following morning?

5    A    Correct up till I believe it was 1 p.m. the next day.

6    Q    So at what time did you determine that the market

7    quotation process was closed?

8    A    I believe when we stopped receiving responses.  But I

9    don't know that we officially deemed it as closed/closed as in

10   please nobody respond to us anymore, it's just we didn't

11   receive any more responses.

12   Q    Well, you didn't know at the time that you weren't going

13   to receive any more responses, correct?

14   A    Correct.  I'm saying I don't think there was an official

15   let's call this thing closed per se, but at some point we

16   realized that it was closed.

17   Q    Okay.  And you see that trades in the second snapshot

18   that's in the demonstrative 5951 you see that the trades have

19   varying maturities ranging from 2009 to 2015, right?

20   A    Yes, again I'll point out that some of these are indices

21   as well, but that's correct.

22   Q    And you valued all of them using 9/16 Markit prices

23   despite that difference in maturity, right?

24   A    Yes.

25   Q    And you used the same bid mid-spread 10 percent to value

Page 126

1    these transactions, right?

2    A    Yes.

3    Q    And that was despite the difference in maturities.

4    A    Yes, again as I said, yes.

5    Q    And you used that same bid mid-spread despite the

6    difference in notional, right?

7    A    Yes.

8    Q    Okay.  Why don't we do 9/17.

9         MR. ANDREOLI:  So column Y, let's filter for 9/17.

10        THE WITNESS:  This is going to take me a little

11   longer to crosscheck.

12   Q    Just let Randall know when you need to move down.

13   A    Yeah, can you move down.

14        Yeah.  I believe that's right.

15   Q    Okay.  And you can see in the lower left-hand corner of

16   the screen there's 36 transactions that you valued using 9/17

17   Markit spreads, right?

18   A    Yes.

19   Q    And again Markit spreads for these 36 transactions were

20   available on 9/15, right?

21   A    I believe so.

22   Q    And you'll see that these 36 transactions in column M of

23   maturities range from 2010 to 2015, right?

24   A    Yes.

25   Q    And you valued them all using 9/17 Markit spreads despite

Page 127

1   the difference in maturities, right?

2   A    Yes.

3   Q    And you valued them all using 9/17 Markit spreads despite

4   the difference in notional size, right?

5   A    Yes.

6   Q    Other than the Citadel trades use the same 10 percent bid

7   mid for all these trades, right?

8   A    Yes.

9   Q    And that was despite a difference in notional size.

10  A    Yes.

11  Q    And that was despite the difference in maturities, right?

12  A    Yes.

13          MR. ANDREOLI:  Would now be a good time for a break,

14  Your Honor?

15          THE COURT:  Sure.  How much more do you think you

16  have?

17          MR. ANDREOLI:  I think less than hour, but let me

18  look at the book.

19          THE COURT:  Okay.  All right.  So why don't we try to

20  come back at 20 minutes after the hour.

21      (Recessed at 3:12 p.m.; reconvened at 3:26 p.m.)

22          THE COURT:  If you're uncomfortable, you can take

23  your jackets off, I really mean it.  Sometimes I force people

24  to take their jackets off.

25          All right.  So could we just get a level set on what

Page 128

1    we're going to do for the rest of the day and tomorrow in terms

2    of timing.  So you think you need another hour with Mr.

3    Wollman.

4              MR. ANDREOLI:  Maybe less, but.

5              THE COURT:  And then redirect do you think, Mr.

6    Tracey?

7              MR. TRACEY:  I'll have some redirect.  I don't think

8    it'll be much.

9              THE COURT:  And would it be your intention to start

10   with Professor Flutter (ph) whenever we finish or did you want

11   to do a hard stop and then just start tomorrow morning?

12             MR. TRACEY:  I think if it's after 4:30 we'll

13   probably quit for the day --

14             THE COURT:  Okay.

15             MR. TRACEY:  -- if it's okay and then start in the

16   morning.

17             THE COURT:  And then if you had your druthers, would

18   you like to start at 9:30?

19             MR. TRACEY:  That'd be wonderful, you read my mind.

20             MR. TAMBE:  So while we're on that subject, how long

21   do you think the direct is going to be of Professor Flutter?

22   With minimal interruptions from me.

23             MR. TRACEY:  With minimal interruptions from you I

24   would say two hours.

25             MR. TAMBE:  Okay.  That's fine.  We should not have a

Page 129

1    time crunch then.

2            MR. TRACEY:  I think we'll be done.

3            THE COURT:  Then I think all will be well.  Okay,

4    great.

5            MR. ANDREOLI:  Randall, could you please pull up

6    Exhibit 2090 please?  And it's a native.

7    BY MR. ANDREOLI:

8    Q    So this is one that we looked at yesterday, Mr. Wollman,

9    you can look at the hard copy in your binder just for the

10   metadata and then Randall will pull up the spreadsheet.

11        Okay.  Do you recall the file name as a document that we

12   looked at yesterday being BWIC BESH OWIC master (ph)?

13   A    Yes, I do.

14   Q    Okay.  I think you testified yesterday that the master

15   list is the full universe of transactions that were identified

16   to include a non-market quotation process?

17   A    Yes.

18   Q    And then the other tabs, the ABX index EM and single named

19   tabs were the lists that actually were sent; is that right?

20   A    Yes, although I should just point out that the single name

21   and index were combined as -- into one, two separate tabs but

22   sent out jointly, and then a separate ABX and a separate EM.

23   Q    Right.  Okay.  You testified yesterday that there were two

24   types of positions between QVT and LBSF that did not make it

25   into the master tab.  Do you recall that?

Page 130

1   A    Yes, I do.

2   Q    And I believe you said that they were interest rate swaps

3   and recovery swaps.

4   A    Yes.

5   Q    Okay.  And I think you were for Mr. Fu's testimony about

6   the interest rate swaps, right?

7   A    Yes.

8   Q    Okay.  And those have a TIFI (ph) includes USD I believe.

9   A    Yes.

10  Q    Can you identify what the TIFI is for the recovery swaps?

11  A    Yes.  Well, I can't off the top of my head.  It's the res

12  cap recovery swap, so the --

13  Q    If we show the 2108 can you identify them?

14  A    I should be able to, yes.

15          MR. ANDREOLI:  2108.

16          THE WITNESS:  Yeah.  I guess if you wouldn't mind

17  clearing the filter, yeah, and just do a search for res cap,

18  okay, sure.

19          So rows 656 and 657 res cap-120920_RS44.bang -- .!

20  and then the Q as well.

21  BY MR. ANDREOLI:

22  Q    So it's just the two, it's not the -- it's not 658 and

23  659?

24  A    That's correct.  Those were captured.  It's just those

25  two, the two res caps.

Page 131

1   Q    And when did you learn that these two res cap recovery

2   swaps had not been included in the market quotation process?

3   A    Very recently.

4   Q    And you actually did some work to try to figure out which

5   transactions had not been included prior to very recently,

6   right?

7   A    Sorry, can you be more specific?

8   Q    In the last year you assisted with identification of

9   positions that are not been included in the market quotation

10  process.

11  A    Sorry, just to be more specific, so are you referring to

12  with respect to my deposition?

13  Q    Yes, the transactions you identified in your deposition.

14  A    Yes.

15  Q    Okay.  And so you actually performed work to try to

16  identify transactions that were not included in the market

17  quotation process.

18  A    Yes.

19  Q    Okay.  So how did you miss these?

20  A    How did I miss these?  I guess -- I don't believe I

21  consulted the -- well, I don't believe I consulted the master

22  list --

23           THE COURT:  Can I just have -- you started with the

24  words I guess.

25           THE WITNESS:  Right.

Page 132

1           THE COURT:  Okay.  So if you know, great; if you

2      don't know, if you'd just let us know.

3           THE WITNESS:  Sure.  I can say definitively that I --

4      the earlier point in time I had not consulted the master list.

5      So I had just consulted the positions that were on the sheet

6      and the individual list positions and I looked through them and

7      somehow I had missed the RS, but I don't know how I missed it.

8      BY MR. ANDREOLI:

9      Q    Okay.  How did you end up valuing -- well, did you value

10     these two particular positions?

11     A    I did not.

12     Q    Okay.

13          MR. ANDREOLI:  Can we go to tab or I'm sorry, column

14     BC to see who did?

15     Q    That's Mr. Sand, right?

16     A    Yes.

17     Q    So I think in QVT's pretrial brief it said that there were

18     44 transactions that were not included in the market quotation

19     process; is that right?

20     A    I believe that's right, yes.

21     Q    So it's not actually 44 it's 46.

22     A    Yes.

23     Q    Okay.  And you were here during Mr. Knox's testimony

24     yesterday, right?

25     A    Yes.

Page 133

1    Q    And you recall his testimony about certain Venezuela

2    positions that he removed from the market quotation

3    solicitation that he sent on the EM list?

4    A    Yes.

5    Q    When was the first time you learned that Mr. Knox had

6    removed those Venezuela positions from the EM list?

7    A    Very recently.

8    Q    As in yesterday?

9    A    As in within the last week or so I believe.

10   Q    How did you learn that?

11   A    I believe that I saw it yesterday and I might have -- and

12   I think I was asked about it a couple of days prior to that, so

13   I was aware.

14   Q    Was it after the start of trial?

15   A    Yes.

16   Q    Okay.  And so how did you miss those when you were asked

17   to figure out which positions were not included in the market

18   quotation process?

19   A    So those were originally on my list, so I guess I just

20   hadn't realized that the list that went out was not that list.

21   Q    So when you tried to determine which positions market

22   quotations were sought on, you didn't actually go to a list

23   that was sent out?

24   A    I believe the initial check was against that spreadsheet,

25   so yes, I missed that.

Page 134

1    Q    And how many Venezuela positions did not get included in

2    the market quotation process?

3    A    I believe from yesterday Mr. Knox had mentioned there were

4    three positions, but QVT quintessence so I believe it would

5    have been six.

6    Q    So it's not 46 transactions that were not included in the

7    market quotation process it's 52?

8    A    That's correct.

9    Q    So yesterday you talked about some of the transactions

10    that were -- that you had discovered earlier were not included

11    in the market quotation process, right?

12    A    Yes.

13    Q    So that was the carb (ph) transactions, the ABX

14    transactions, the MLMI transactions and the STSU transactions,

15    right?

16    A    Yes.

17          MR. ANDREOLI:  And sorry, Randall, can we pull up to

18    2920?

19    Q    Okay.  And all of the transactions I've just listed are

20    included in the master sheet, right?

21    A    Yes.

22    Q    Okay.

23          MR. ANDREOLI:  And, Randall, can we filter column A

24    for ABX?  You can include ABX 2 I think.

25    Q    Is that considered an ABX trade?

Page 135

1    A    Yes.

2    Q    So I believe you mentioned yesterday that all of the

3    transactions I just listed were ABX transactions, right?

4    A    Yes.

5    Q    But that's not actually how the ABX transactions are

6    characterized in the claim calculation spreadsheet, right?

7    A    Sorry.  I don't know what you mean by characterize.

8    Q    So there's the column that identifies the transactions by

9    category, right, ABX, index, et cetera.

10   A    Sorry.  I'm not sure what you're calling the spreadsheet.

11            MR. ANDREOLI:  Yeah, can we go to 2108, Randall?

12            Okay.  Can you remove the filters?  Can we go to

13   column AY?

14       (Pause - conversation between Judge and counsel regarding

15   window)

16            THE COURT:  Sorry, didn't mean to interrupt your

17   train of thought.

18            MR. ANDREOLI:  It's okay.

19            THE COURT:  We were trying to figure out the

20   terminology on ABX versus ABF.

21   BY MR. ANDREOLI:

22   Q    Right, so column AY, Mr. Wollman, are you familiar with

23   that column?

24   A    Yeah.  I guess I'm just struggling to remember how -- if

25   we go to AY4, what is it?  Just that cell.  Yeah.  I'm not sure

Page 136

1   exactly how that's populated.

2         MR. ANDREOLI:  Okay.  Can we filter column B,

3   Randall, for ABX.

4   Q    Right.  So it characterizes index trades in this

5   spreadsheet, right?

6   A    Yes.  I mean they are both ABX and index, my question is

7   I'm not sure what AY is intended to signify necessarily.

8   Q    Okay.  And the ABX and CNBX transactions are similar in

9   some ways, right?

10  A    Yes.

11  Q    In what list did the CNBX trades go on?

12  A    I believe it was on the index list.

13  Q    Right.  And is that where you would have included them on

14  the -- in the list if you had actually included them?

15  A    The ABX?

16  Q    Yes.

17  A    You're saying if -- what would I have done at the time for

18  ABX?  Actually I'm not sure, it probably would've been an

19  expedite, I don't know for sure.

20  Q    Okay.  Earlier today, Mr. Wollman, you talked about

21  certain positions that QVT and Lehman had agreed to unwind

22  prior to Lehman's bankruptcy.

23  A    Trades that we --

24  Q    Do you recall that?

25  A    -- had entered into prior.

Page 137

1    Q    Yes.

2    A    Yes.

3    Q    Right.  And some of them were full on lines and some were

4    partials, right?

5    A    Yes.

6    Q    But for all of those on line positions, those were

7    agreements that Lehman and QVT reached prior to 9/15, right?

8    A    Yes.

9    Q    And you had been asked about how -- how QVT had valued

10   them other than in connection with the price that was agreed,

11   right?

12   A    Yes.

13   Q    But QVT and Lehman had an agreement to value them at that

14   price, right?

15   A    Yes, but the trades hadn't settled, so an unsettled trade,

16   despite the fact that it had been previously agreed upon is

17   sort of irrelevant, like if the trade doesn't settle the

18   trade's not done.

19        You're saying that the trade was agreed upon principal but

20   never actually settled.  So in other instances where we agree

21   upon trades with people and then they ultimately don't settle,

22   there's no additional form of recourse it's as if the trade

23   just never happened.

24        You're saying so if the trade had never happened, which it

25   didn't, in fact, happen because it never settled, then it would

Page 138

1    have been as if it was just part of our original positions, in

2    which case it would've been valued according to the replacement

3    methodology that we used.

4    Q    But you did have an agreement with Lehman to value it at a

5    certain price.

6    A    Yes, and they didn't fulfill their obligation.

7    Q    Okay.  Let's talk about broker runs.

8              MR. ANDREOLI:  So, Randall, can we bring up -- oh,

9    we're at 2108, can we filter BC for Mr. Wollman's initials?

10             THE COURT:  Did you testify earlier that those were

11   bids or offers?

12             THE WITNESS:  So, right, so I testified that the

13   levels we unwound them at were the bid side of the market --

14             THE COURT:  Right because --

15             THE WITNESS:  -- because we sold protection and there

16   was -- sorry, I'll rewind.

17             I testified earlier that the levels we had transacted

18   at were at the bid side of the market because we were selling

19   protection and then the dealer was showing us a bid on those

20   transactions.

21             MR. ANDREOLI:  May I approach, Your Honor?

22             THE COURT:  Yes.  Thank you.

23             THE WITNESS:  Okay.  Thanks.

24   BY MR. ANDREOLI:

25   Q    I've handed around Exhibit 5967, Mr. Wollman, if you could

Page 139

```
1    take a look at this document and let me know when you're

2    through.

3    A    Yes, okay.

4    Q    Okay.  So this is a memorialization of one of the unwinds

5    that happened on September 11th, right, that we've just been

6    discussing?

7    A    I believe so.  We can check the spreadsheet to see if it's

8    on there, but I believe it would've been captured there.

9    Q    Okay.  And this e-mail reflects the terms that you and

10   Lehman agreed to for this trade, right?

11   A    It appears to, yes.

12   Q    Okay.  Sorry, let's talk about broker runs.

13            MR. ANDREOLI:  Can we go back to 2108?

14            Okay.  Can you filter on BC for Mr. Wollman, after

15   we've done that, can we go to -- okay, that's good.  And then

16   filter column BP for broker run.

17   Q    Okay.  So these are the 68 trades and values for broker

18   runs, right?

19   A    Yes.

20   Q    And these -- you talked about these 68 trades earlier with

21   Mr. Tracey, right?

22   A    Yes.

23   Q    And so there's usually one broker run that's referenced

24   and I believe it's column AE; is that right?

25   A    Yes.
```

Page 140

1    Q    And that's the broker run that you actually used to value

2    these trades, right?

3    A    Yes.

4    Q    But that's not a full set of the broker runs that were

5    available for these trades on those dates, right?

6    A    In some cases they are, in other cases they are not.

7    Q    Okay.  Can you identify the trades where there were

8    multiple broker runs that you didn't use?

9    A    That's going to be hard to do from memory.  But I can say

10   -- I can make a general statement, which is that the opt to run

11   CDX indices would not have had very many broker runs, there

12   would be more broker runs on the ABS and CMBX.

13   Q    But do you know that there were no other broker runs than

14   the ones you used?

15   A    Do I know that there are no -- I can't say with certainty.

16   Q    And in 2008, QVT had a subscription or license for the B

17   quote service; is that right?

18   A    Yes.

19   Q    And can you describe for the Court what the B quote

20   service is?

21   A    So B quotes is a software that essentially catalogs a

22   bunch of Bloomberg messages and then offers a facility for

23   search those Bloomberg messages.

24   Q    So e-mails get sent to e-mail addresses, they go into B

25   quotes, right?

Page 141

1    A     Well, most of those are populated off of Bloomberg's, so

2    Bloomberg will go to Bloomberg addresses, and then those

3    Bloomberg's will be forwarded to a QVT e-mail and then that

4    serves the basic source information for what then the B quotes

5    program relies upon.

6    Q     So the purpose of B quotes is to collect broker runs and

7    so you as an individual can search the database to find the

8    best pricing information available, right?

9    A     Well, I think the way they characterized their value was

10   more of a real time parsing of broker runs, so that you could

11   see really what the sort of best bid/best offer was at any

12   point in time, given a large universe of Bloomberg's, competing

13   essentially with Bloomberg's own native search capabilities.

14   So you could search things on Bloomberg too, it's just this was

15   marketed as a quicker, faster way of, you know, comparing a

16   bunch of different things.

17   Q     And you didn't use the B quote service to look for any

18   broker runs for any of these trades, did you?

19   A     I don't believe I was using B quotes at that point.

20   Q     So the answer to my question is no?

21   A     Yes.  I'm sorry, yes, the answer to your question is no.

22   Q     To your knowledge, did any of the other traders that were

23   involved the valuation process use B quotes to look for broker

24   runs?

25   A     I'm not sure.

Page 142

1    Q    Okay.  Let's go to the CMBX trades.

2            MR. ANDREOLI:  Randall, could you filter column B for

3    -- no, you can stay where you are and just filter for CMBX?

4    CMBX, sorry.

5    Q    Okay.  And so these are -- I think you testified earlier

6    about these 14 trades that you value using broker runs, right?

7    A    Yes.

8    Q    And you used three different broker runs to value this

9    group of trades, right?

10   A    Yes.

11   Q    You used a broker run for Morgan Stanley from 9/15 to

12   value two trades, right?

13   A    Yes.

14   Q    You --

15   A    Actually if we can go to column AE it'll be easier to

16   confirm.

17   Q    Sure.  AF.

18   A    AF rather, yes.

19   Q    And you used a run from JPMorgan to value ten of these

20   positions, right?

21   A    Yes.

22   Q    And that's from -- that run was from 9/16, correct?

23   A    Yes.

24   Q    And then you used a run from 9/19 to value the remaining

25   two positions, right?

Page 143

1   A     Yes.

2   Q     And that 9/19 run was from Deutsche Bank, right?

3   A     Yes.

4   Q     And the two trades that you valued using the 9/19 Deutsche

5   run were the only CMBX trades where you were selling

6   protection, right?

7   A     Yes.

8   Q     And the run that you used to value those two trades from

9   DB was more favorable to QVT than the 9/16 run from JPM, right?

10  A     If I could pull up the run I could confirm that.

11  Q     Sure.  Would you like to see both?  Let's see --

12  A     Well, it shows what we used, so I can just check the bid

13  on 9/16.  Sorry I just don't remember what exhibit that is.

14  Q     The broker run for 9/16 is 1606.

15  A     I'm sorry JX or --

16  Q     I think it's in another file.

17  A     Oh, is it in the white one?  I have the white one.

18  Q     Yeah.  1606.

19  A     Yes.

20  Q     So using the DB run was favorable to -- from 9/19 was

21  favorable to QVT, right?

22  A     Yes.

23  Q     So, Mr. Wollman, you talked briefly today about the 12

24  transactions that you valued using the market quotation process

25  where you have three or more responses.  Do you recall that

Page 144

1    testimony?

2    A    Yes.

3    Q    And the -- you believe the three responses you received

4    were actionable, right, for those 12 trades?

5    A    I believe that the instructions were that they should be

6    actionable and so I interpreted the response as such.

7    Q    Okay.  And notwithstanding the fact that you received

8    those three responses, you didn't enter into replacement trades

9    for any of those, right?

10    A    No, but they were trading close to a hundred points up

11    front.

12    Q    And other than seeking market quotations on September

13    15th, you didn't make any effort to replace any of the

14    transactions valued, right?

15    A    Did I make any attempt to replace, I don't recall.

16          MR. ANDREOLI:  Can we flip to Exhibit 2147 please?  I

17    think it's out of order in our binder.

18          THE WITNESS:  But back to the black binder.

19    Q    Yeah, sorry, and actually maybe I think it's the last one

20    that's out of order.

21    A    I'm sorry, 2147 you said?

22    Q    Yeah.

23    A    CX-2147?

24    Q    Yes, the very last tab in the binder.

25    A    Yes.

Page 145

1          (Pause)

2     Q     The e-mail is on the screen and the metadata is in your

3     binder.  Let me know when you're ready.

4     A     Yes, I'm ready.

5     Q     Okay.  So you see this is an e-mail that you sent to Tom

6     on September 15th at 2:56 p.m., right?

7     A     Yes.

8     Q     And the subject line is BWIC OWIC 080915 3 p.m. EM

9     only.xls, right?

10    A     Yes.

11    Q     So this is the list for the EM trades that you were

12    intending to have Mr. Knox send out for the EM dealers, right?

13    A     Yes.

14    Q     And you see in the metadata it says that you sent it to

15    Thomas A. Knox@gmail.com, right?

16    A     Yes.

17    Q     Why did you send it to his Gmail account?

18    A     I don't know, but I have a good guess.  I'll let you

19    decide what to do with that.

20    Q     So you testified or I think you didn't use a personal e-

21    mail address for business purposes, right?

22    A     Correct.

23    Q     Did Mr. Knox use a personal e-mail for business purposes?

24    A     I don't believe so.

25    Q     Are you aware of any other e-mails you ever sent to Mr.

Page 146

1    Knox at his Gmail address that related to work matters?

2    A    No.

3    Q    Okay.  You remember you were deposed this past year in

4    August, right?

5    A    Yes, I do.

6    Q    Okay.  And in preparation for those depositions you talked

7    to Mr. San about the transaction T value, right?

8    A    Yes.

9    Q    And it's fair to say that Mr. San did not recall anything

10   about valuing those transactions at that time, right?

11   A    He had some general recollections, but nothing as it

12   applied to the specific securities at that time.

13              MR. ANDREOLI:  Just one moment.

14        (Pause)

15              MR. ANDREOLI:  Nothing further, Your Honor.

16              THE COURT:  All right.  Thank you.  Yes.

17              MR. TRACEY:  Before we start the redirect, I just

18   wanted to cover one document issue that I think we left open.

19              THE COURT:  Okay.

20              MR. TRACEY:  And it related to the market quotation

21   responses that I began to go through with Mr. Wollman

22   yesterday.

23              THE COURT:  Okay.

24              MR. TRACEY:  And we had a sidebar and I think off the

25   record we had a discussion about the admissibility of those

Page 147

1    documents without having to go through them individually.

2              THE COURT:  Yes.

3              MR. TRACEY:  And we've had discussions since then

4    with --

5              THE COURT:  It's working off of the -- using the

6    demonstrative as kind of a master.

7              MR. TRACEY:  Well, right, that was one thing we were

8    talking about.  I think the first thing we were talking about

9    is whether the actual documents would be admitted into evidence

10   as having been received by QVT in response to their market

11   quotation process.

12             THE COURT:  Right, right.

13             MR. TRACEY:  And so we've agreed and counsel can

14   correct me if I'm wrong, that the documents that are included

15   in the composite Exhibit 2087, are agreed to have been received

16   by QVT in response --

17             THE COURT:  Okay.

18             MR. TRACEY:  -- to market quotation; is that

19   accurate?

20             MR. ANDREOLI:  Sorry.  I think we checked to make

21   sure that the exhibits in the demonstrative, we're okay with

22   them coming in to show that they were received.  I don't know

23   that we double-checked the demonstrative against the actual

24   packet of exhibits.

25             THE COURT:  Okay.  Hold on.

Page 148

1            MR. ANDREOLI:  We've got too many to match at the

2       time.

3            THE COURT:  Let me make sure.  I'm looking at this

4       document --

5            MR. TRACEY:  That's the solicitation.

6            THE COURT:  And the back is responses.

7            MR. TRACEY:  Correct.

8            THE COURT:  Right?  So it's marked as Claimant's

9       Exhibit 2103, CSX-2103 and it's -- the heading is September 15,

10      '16 responses and then there's a series of actual exhibit

11      numbers.

12           MR. TRACEY:  Right.

13           THE COURT:  So you've agreed that each of these,

14      Lehman agrees, stipulates that these have been -- were

15      received.

16           MR. TRACEY:  That's my understanding.

17           THE COURT:  Admissible as having been received by

18      QVT.

19           MR. ANDREOLI:  I think for just point of

20      clarification, Your Honor --

21           THE COURT:  Yes.

22           MR. ANDREOLI:  -- that exhibit is not -- has an

23      incorrect page on it.  It's actually 2104 that has the

24      responses.

25           MR. TRACEY:  We've actually --

Page 149

1                    THE COURT:  I see.  So this one --

2                    MR. ANDREOLI:  The back page should be 2104.

3                    THE COURT:  The back page is 2104, okay.  We're

4       talking about the same universe, right?

5                    MR. TRACEY:  We are.  Just to make things a little

6       more complicated --

7                    THE COURT:  Sure, why not.

8                    MR. TRACEY:  -- we have revised 2104 in consultation

9       I believe with Jones Day --

10                   THE COURT:  Okay.

11                   MR. TRACEY:  -- to make a couple of corrections.

12           (Pause)

13                   THE COURT:  Get me an extra for good measure.  All

14      right.  So --

15                   MR. TRACEY:  So we're agreed that the responses

16      listed on 2104 have been -- were received by QVT --

17                   THE COURT:  Okay.

18                   MR. TRACEY:  -- in response to market quotations.

19                   There is not agreement on the specific and the rest

20      of the columns of the demonstrative.  That's our heritization

21      so it's demonstrative, it's the way we see it.

22                   THE COURT:  Now I don't understand because -- so 2104

23      there's an exhibit number that's unremarkable, right?

24                   MR. TRACEY:  Right.

25                   THE COURT:  And there's a market maker sender.

Page 150

1              MR. TRACEY:  Right.

2              THE COURT:  Right.  And then there's a date and time.

3              MR. TRACEY:  Right.

4              THE COURT:  And so you're not agreeing on the content

5    column is that the issue?

6              MR. TRACEY:  I think they don't agree on the content

7    column, right?

8              MR. ANDREOLI:  And I think you all are fixing a

9    couple of the date and time, they've been fixed.  Okay.

10             THE COURT:  Right, so I'm confused because that --

11             MR. TAMBE:  If I can help maybe, sometimes I can.

12             THE COURT:  Sometimes.

13             MR. TAMBE:  Sometimes.  So I think we're in agreement

14   that these are the exhibits that were received by QVT.

15             THE COURT:  Right.

16             MR. TAMBE:  We have no problem with the CVS column.

17             THE COURT:  Okay.

18             MR. TAMBE:  Nor do we have any issue with the market

19   maker sender.

20             THE COURT:  Okay.

21             MR. TAMBE:  I think we had a question about date and

22   time because sometimes they were being forwarded internally

23   within QVT, and what we wanted to make sure is what's picked up

24   as the date and time that it's --

25             THE COURT:  Okay.  Well --

Page 151

```
 1            MR. TAMBE:  -- received by QVT not forwarded
 2    internally.
 3            THE COURT:  And the content --
 4            MR. TAMBE:  Not that it -- we would characterize it
 5    this way, Your Honor.
 6            THE COURT:  All right.  So we're going to X out the
 7    content column.
 8            MR. TAMBE:  Yes.
 9            THE COURT:  But what I would suggest to make this the
10    most useful is that somebody at some point go back and check
11    the date and time, and as long as it's accurate and you agree
12    then let's put it in that way.
13            MR. TRACEY:  We will do that.
14            THE COURT:  All right?  Okay.  Great.
15            MR. TRACEY:  Thank you, Your Honor.
16            THE COURT:  Okay.  Are we going to be working from
17    this now?
18            MR. TRACEY:  No.
19            THE COURT:  No, okay.
20    REDIRECT EXAMINATION
21    BY MR. TRACEY:
22    Q    So, Mr. Wollman, on your cross-examination you were asked
23    some questions about a document we can pull it out if you don't
24    recall it, where you were preparing to do a BWIC OWIC at 3
25    o'clock.
```

Page 152

```
 1    A    Yes.

 2    Q    Do you recall that?

 3    A    Yes.

 4    Q    It was a little after 1 o'clock.

 5    A    Yes, I do.

 6    Q    Can you explain to the Court what your understanding was

 7    of that process?

 8    A    Yes.

 9    Q    And that you expected at that time in response to

10    BWIC/OWIC to have an auction at 3 o'clock.

11    A    Yes.

12    Q    Did you understand the market quotation process to be the

13    same process?

14    A    No.

15    Q    What was the difference in your mind?

16         MR. ANDREOLI:  Objection, foundation.

17    Q    And I'm only asking you what you knew and believed in

18    September of 2008.

19         THE COURT:  With respect to what a market quotation

20    process entailed?

21         MR. TRACEY:  Right.

22         THE COURT:  Okay.

23         THE WITNESS:  So at that point, that was preparing to

24    send out BWIC/OWIC there was none of the ISDA related language

25    associated with it.  By the time that the market quotation was
```

Page 153

```
 1   sent out I had a different understanding of what was required

 2   per the ISDA, and so particularly with respect to the language

 3   around as of time that that was different than when I had

 4   originally formulated the BWIC.

 5   BY MR. TRACEY:

 6   Q    So at the time you sent out the market quotation

 7   solicitations, did you expect there to be a --

 8           MR. TRACEY:  Your Honor, may I?  At 4 o'clock?

 9       (Laughter)

10           THE COURT:  We need the sketch artist back.

11           MR. ANDREOLI:  I don't object to the hand gestures,

12   but I do object to the leading.

13   BY MR. TRACEY:

14   Q    Did you expect there to be an auction I think is the --

15           THE COURT:  I think that's a fair question.

16           THE WITNESS:  Sorry, can you -- all the hand

17   gesturing.

18   Q    When you sent out the market quotation requests --

19   A    Yes.

20   Q    -- on September 15th, did you expect there to be an

21   auction at 4 p.m.?

22   A    No.

23   Q    What did you expect?

24   A    Well, I would hopeful that I would receive responses

25   around 4 p.m. and potentially could have resulted in an auction
```

Page 154

1      for certain securities, but ultimately I expected that I would

2      receive prices that were actionable prices as of 4 p.m.

3            And so it was indeterminate at that point when I would

4      receive it.  I mean, in fact, I don't believe there was any

5      language about any sort of deadline communicated in those

6      solicitations, so I didn't know when I would necessary receive

7      responses.  I just knew it would be great if I got them close

8      to 4 p.m.

9      Q      Okay.  And Mr. Andreoli asked you some questions about a

10     document that was marked as 5951.  Would you mind pulling that

11     up?

12     A      Sure, which?

13     Q      In the black binder.

14     A      Yes.

15     Q      And do you recall being asked a series of questions about

16     the fact that your -- with respect to say the September 15th

17     Markit Partners, M-a-r-k-i-t Partners data, that there were

18     different maturities and different notional amounts for the

19     positions.

20     A      Yes.

21     Q      Was maturity and notional amount the only considerations

22     that you considered in connection with determining what date

23     Markit Partners information would be used?

24     A      Yes.

25              MR. ANDREOLI:  Objection, foundation.

Page 155

1          MR. TRACEY:  In general or with respect to the

2     specific?

3          THE COURT:  I think with respect to the specific?

4          MR. ANDREOLI:  Well, no, let me -- it's in general.

5          THE COURT:  Maybe break it down.

6          MR. TRACEY:  I'll break it down.

7     BY MR. TRACEY:

8     Q    So in general, when you were determining what date Markit

9     Partners information to use --

10    A    Yes.

11    Q    -- did you consider any factors other than notional amount

12    in maturity?

13    A    Yes.

14    Q    What other factors were considered?

15    A    What the reference NME (ph) itself was, and whether I had

16    reason to also not believe the reliability of certain Markit

17    Partners' information, for example, in the case of Citadel I

18    believe I spoke about earlier, and then whether it was index

19    versus single name and, you know, and just generally the type

20    of reference NME.

21    Q    And what's the significance of index versus single name

22    for this purpose?

23    A    Sure.  So generally an index will be more liquid, it's not

24    always the case, especially with respect to certain off the run

25    securities.  But for example CDIX 4IG that we saw, even though

Page 156

```
1    it's off the run, at least there were runs that went on it, and

2    I was able to use a broker run on 9/15.

3        Whereas, you know, CDX 4H fall (ph) even though that's

4    shorter dated, I might have had reason to believe that it was

5    more liquid than a similarly short-dated corporate.

6    Q    Okay.  Mr. Andreoli asked you a question if you recall

7    about whether you used prices or spreads to value transactions

8    because you had not yet completed the market quotation process,

9    do you recall that?

10   A    Sorry, no, I didn't.

11           THE REPORTER:  I need you to repeat it.

12           MR. TRACEY:  I know how to get transcripts, it's the

13   old fashioned way.

14   BY MR. TRACEY:

15   Q    You were asked a question and I think you testified you

16   used and it says Nixon, I don't know what that means, what is

17   Nixon?

18           THE COURT:  It's very (indiscernible).

19           MR. TRACEY:  I don't have a good memory so -- 9/16

20   okay.

21           THE COURT:  9/16.

22   Q    So I'm going to read the question and answer.

23   A    Sure.

24   Q        "Q   And I think you testified you used 9/16 prices

25   or spreads to value transactions because you had completed your
```

Page 157

1    market quotation -- had not completed your market quotation

2    process until after the close of business on the 15th; is that

3    right?"

4    A    Yes, okay.

5    Q    And your answer was,

6             "Yeah, generally 9/16 would be the earliest that we

7    could transact post market quotation process."

8         Do you recall that?

9    A    Yes.

10   Q    Okay.  And my question is, the -- whether you were talking

11   about in that answer the selection of a date for market

12   quotation for Markit Partners' pricing information, is that

13   what you were referring to?

14   A    Yes.

15   Q    Okay.  Anything else?

16   A    Sorry.  I'm now totally lost.

17   Q    The reason I ask is because the question related to 9/16

18   prices or spreads.

19   A    Right.

20   Q    And I just want to make clear that all you were talking

21   about there was a selection of a date for use of Markit

22   Partners.

23   A    Yes, yes.

24   Q    Thank you.

25   A    I mean not -- and it could have been -- I guess it

Page 158

```
 1    wouldn't have necessarily been Markit Partners either it could

 2    have been the broker run as well, but with respect to sources

 3    where we did not receive information on the market quotation

 4    process itself.

 5    Q    And Mr. Andreoli asked you some questions about how you

 6    located broker runs.  Do you recall that?

 7    A    Yes.

 8    Q    And how, in fact, did you locate broker runs?

 9    A    I searched my Bloombergs.

10    Q    Okay.  And --

11    A    On Bloomberg.  Sorry.  I used Bloomberg to search my

12    Bloombergs.

13    Q    Okay.  And when you searched for Bloombergs on your

14    Bloomberg is it possible to identify all broker runs for a

15    particular security during a particular time?

16    A    Yes, it's possible, so long as you're using the right

17    search criteria.

18    Q    And why didn't you use BQuotes to do that?

19    A    Because I just generally didn't use BQuotes.

20    Q    And did you believe that Bloomberg was sufficient to

21    identify the broker runs that you were looking for?

22    A    Yeah.  I mean, I guess I was trying to make clear earlier,

23    he closes I think marketed more as in a tool for real time best

24    bid/best offer execution, so the problem is if you want to go

25    ahead and transact right now, you may have all these different
```

Page 159

1    runs and you might have them from different counterparties and

2    you have to go through and sort who's the best, how recent is

3    it, et cetera, BQuotes what they claim to be able to do is take

4    all your runs, kind of group them by reference entity, show

5    them the time, show the best bid, best offer.

6         The problem is sometimes that effort of aggregating

7    introduces some errors it doesn't always match the right things

8    and sometimes it kicks out certain Bloombergs that come in.

9         So from -- it's good as a real time -- it's a better real

10   time tool than Bloomberg because Bloomberg requires a lot more

11   manual searching and filtering and sorting, et cetera.  But

12   from the perspective of actually looking through a universe of

13   Bloomberg's, actually just using natively in Bloomberg is a

14   better way of doing it anyway.

15             MR. TRACEY:  I have nothing further, Your Honor.

16             THE COURT:  All right.  Thank you.  Anything more?

17             MR. ANDREOLI:  Can we just have one moment, Your

18   Honor?

19             THE COURT:  It actually never ends.

20             THE WITNESS:  I mentally assumed 4:30, so I'm still

21   20 minutes in the money.

22        (Pause)

23   RECROSS-EXAMINATION

24   BY MR. ANDREOLI:

25   Q    Okay.  Mr. Wollman, just a quick follow-up.

Page 160

```
 1          Mr. Tracey asked you a couple of questions about the
 2    BWIC/OWICs and you said by the time that the market quotation
 3    was sent out I had a different understanding of what was
 4    required per the ISDA.
 5          So despite that new understanding you still used the words
 6    BWIC/OWIC in the market quotation request, right?
 7    A    Yes.
 8    Q    You mentioned factors you considered in terms of deciding
 9    which date to use for Markit Partners' spreads.
10    A    Yes.
11    Q    And you said one of the factors could have been the
12    unreliability of Markit spreads.
13    A    Yes.
14    Q    There's nothing about unreliability of Markit spreads in
15    the claim calculation spreadsheet other than for Citadel,
16    right?
17    A    Yeah.  I was referring to that with respect to Citadel.
18    Q    Okay.  So no reason to question the reliability of Markit
19    for any of the other trades you valued, right?
20    A    Yeah.  I was making a more general statement.
21    Q    Okay.  Mr. Tracey asked you some questions about searching
22    Bloomberg as opposed to searching BQuotes.
23    A    Yes.
24    Q    Did you, in fact, search the way that Mr. Tracey suggested
25    for all runs that you may have received for a particular name
```

Page 161

1    at a given time?

2    A    I'm sorry.  I don't know that he necessarily specified a

3    way that I --

4    Q    Okay.  Stepping back.  Did you, in fact, search in

5    connection with calculating QVT's claims against Lehman for all

6    broker runs during a specified time for the trades you valued

7    using broker runs?

8    A    So the way you insert -- so, for example, maybe it's best

9    I show you by example.  Something like ABX, for example, I

10   would type MSGS which is search messages ABX.  And then I would

11   get back a bunch of messages all that ABX over --arranged, and

12   I would look through those.  I mean I would -- it doesn't -- by

13   definition when you do it, I guess there's more advanced

14   searching capabilities, but it would just return the -- in

15   reverse chronological order, well, yeah, in reverse

16   chronological order what the messages received are that matched

17   that tag and then I would look through them.

18   Q    So you ultimately picked one to rely on, right, for each

19   trade?

20   A    Yes.

21   Q    And you didn't save or preserve in the QVT.com all of

22   those broker runs you may have considered but rejected, right?

23   A    Did you say did I save the rejected ones?

24   Q    Right.

25   A    No.

Page 162

```
 1              MR. ANDREOLI:  No further questions.

 2              THE COURT:  All right.  Thank you.

 3              Thank you very much, Mr. Wollman.

 4              THE WITNESS:  Sure.

 5              THE COURT:  So before we leave for the day we had to

 6    discuss the issue you raised about an additional witness,

 7    right?  And when I left you, there may be going to be further

 8    discussions.

 9              Please, step down.

10              MR. TAMBE:  On the additional witness, Your Honor?

11              THE COURT:  Yes.

12              MR. TAMBE:  Deposition.

13              THE COURT:  The deposition issue.

14              MR. TAMBE:  We haven't had any further discussions,

15    Your Honor.

16              THE COURT:  Okay.  I'm going to botch the

17    pronunciation, DeSazio (ph).

18              MS. SAWYER:  DeSazio.

19              THE COURT:  Say it again.

20              MS. SAWYER:  DeSazio.

21              THE COURT:  So I need kind of a bid and an ask on

22    briefing, I haven't looked at it yet.

23              MS. KELLER:  Right.  Well I've made a proposal to Ms.

24    Sawyer and --

25              THE COURT:  Say -- go to a microphone so we can
```

Page 163

1    continue to record.

2              So the issue is that you would like to instead of

3    calling him, offer his deposition testimony?

4              MS. KELLER:  That's correct.  We thought of calling

5    him but we're of the view that we can use his deposition as of

6    right, and we would like to -- I suggested to Ms. Sawyer that

7    we both go back and designate and counter designate and object

8    to each other's designations and we will submit it as part of

9    our direct case for your review.  And I also have the Philbin

10   deposition, Your Honor, which by the way we have agreed on and

11   marked up, and I'd like to hand it up.

12             THE COURT:  So, Ms. Sawyer, did you need additional

13   time to think about this?

14             MS. SAWYER:  My colleagues have told me I received an

15   e-mail, but I don't check my e-mails during the day while I'm

16   in court, so this is the first I've heard it.

17             THE COURT:  We can take it up tomorrow.  I'm just

18   looking ahead on the list and it doesn't come up at least in

19   the third amended schedule.

20             MS. SAWYER:  Not until the 27th, Your Honor.

21             THE COURT:  Till the 27th, so we have some time.  So

22   we don't have to talk about not today.

23             MS. KELLER:  That's correct, we can talk about it

24   after court, she can certainly have time to respond if she

25   needs to put in papers.

Page 164

1                THE COURT:  Okay.  We'll leave it there and we'll

2     just make a mental note to talk about it tomorrow or the next

3     day or at some appropriate point if it remains unworked out.

4                MS. KELLER:  That would be great, yes.

5                THE COURT:  Okay?

6                MS. SAWYER:  Yes.

7                THE COURT:  Okay.  So was there anything else that we

8     needed to talk about today?

9                MS. KELLER:  Yeah.  Over the weekend, we exchanged

10    mark-ups of the Philbin deposition, Megan Philbin was --

11               THE COURT:  Yes, the one with the medical issue.

12               MS. KELLER:  -- she's ill and in lieu of her

13    testimony we've agreed to hand up a mark-up of her deposition.

14               MS. SAWYER:  I've certainly reviewed it.  I think we

15    objected to the admission of it, but we understand that you

16    were going to (indiscernible) so just --

17               THE COURT:  You understand?

18               MS. SAWYER:  You're going to be accepting to

19    deposition testimony.  I don't think that there's an agreement

20    that we think --

21               THE COURT:  Okay.  I'm not -- my mind is drawing a

22    blank on this.  When I -- my recollection is when we spoke

23    about this last, there was going to be an inquiry since -- let

24    me back up.

25               Because the trial is going to go for as long as it

Page 165

1   is, there was the thought that perhaps she would recover

2   sufficiently that Lehman could renew the request to have her

3   appear.  And I do not recall that that was definitively

4   rejected --

5            MS. SAWYER:  Right.

6            THE COURT:  -- but maybe that's my bad.

7            MS. KELLER:  Well, I had understood after we had that

8   conversation with Your Honor that Jones Day agreed to work out

9   the deposition language to submit to Your Honor that it is

10  unlikely she will be well enough to appear during the duration

11  of this trial, and that we would go forward with submitting it

12  as part of QVT's direct case.

13           THE COURT:  Okay.

14           MS. KELLER:  Subject to whatever happens down the

15  road.

16           THE COURT:  What I'm saying to you is I don't

17  remember that last piece, so that's why I'm looking at Ms.

18  Sawyer to see if that --

19           MS. KELLER:  Sure.

20           THE COURT:  -- is --

21           MS. SAWYER:  I don't remember that last piece either.

22  My understanding was is that Ms. Philbin's deposition was going

23  to be submitted at this time for your consideration, while we

24  were reserving all rights to seek further deposition or in-

25  person trial testimony to when she's able to testify.

Page 166

1              THE COURT:  Yes, that's what I thought.

2              MR. TRACEY:  You agree, for what it's worth, that's

3    my recollection.

4              THE COURT:  That's my recollection.  So I guess we

5    have --

6              MS. KELLER:  Well, we have an agreed form of marked

7    up deposition --

8              THE COURT:  Okay.  I guess what I'm stumbling on is

9    the agreed form.  That's the word that I think is causing --

10             MS. SAWYER:  (indiscernible)

11             THE COURT:  Okay.

12             MS. SAWYER:  We have exchanged drafts showing the

13   designations both parties made and the objections that both

14   parties made to Ms. Philbin's deposition testimony.  And I

15   believe that we are in agreement that things are highlighted

16   properly and the objections are noted properly to her

17   deposition testimony.

18             THE COURT:  Okay.

19             MS. SAWYER:  I do not think there's an agreement that

20   we will not potentially pursue her live testimony in the

21   future.

22             MS. KELLER:  Correct, Your Honor.  I don't know what

23   they're going to do to pursue down the road.  But I do have a

24   document to hand up which is her deposition.  And QVT's

25   designated sections are in one color and Lehman's designated

Page 167

```
 1    sections --

 2              THE COURT:  Okay.

 3              MS. KELLER:  -- are in another color and jointly

 4    designated sections are in a third color.

 5              THE COURT:  Okay.

 6              MS. KELLER:  And the objections back and forth are

 7    also included in the schedule, and we have the exhibits for

 8    Your Honor.  Would you --

 9              THE COURT:  So I can take that, but it's subject to

10    their --

11              MS. KELLER:  Reservation of rights.

12              THE COURT:  -- reservation of rights to continue to

13    seek additional either video -- additional deposition testimony

14    or trial testimony in some fashion.  You're hesitating at that

15    so I'm just --

16              MS. KELLER:  We are submitting this for your review

17    as part of our direct case.

18              MS. SAWYER:  We don't disagree with that, Your Honor.

19              THE COURT:  Okay.

20              MS. SAWYER:  But subject to our reservation of

21    rights.

22              THE COURT:  Okay?

23              MS. KELLER:  Yes.

24              THE COURT:  Okay.

25              MS. KELLER:  May I --
```

Page 168

1            THE COURT:  Sure.

2            MS. KELLER:  -- approach the Court?

3            THE COURT:  Yes.

4            MS. KELLER:  Would you like one or two sets?

5            THE COURT:  Two, if you have it.  Is that a burden?

6            MS. SAWYER:  We have a copy.

7            THE COURT:  That's okay.  We'll make due.

8            Okay.  So early day and an early day tomorrow 9:30.

9    All right.  All right.  Thank you all very much.

10        (Whereupon, these proceedings were concluded at 4:21 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 169

1

2                              I N D E X

3

4                         T E S T I M O N Y

5

6    WITNESS                EXAM BY              PAGE        LINE

7    Joel Wollman           Mr. Tracey            5           9

8    Joel Wollman           Mr. Andreoli         69           1

9    Joel Wollman           Mr. Tracey          151          21

10   Joel Wollman           Mr. Andreoli        159          23

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 170

1                           C E R T I F I C A T I O N

2

3      We, Lisa Beck, Jamie Gallagher and Sheila Orms certify that the

4      foregoing transcript is a true and accurate record of the

5      proceedings.

6      Lisa Beck
       Digitally signed by Lisa Beck
       DN: cn=Lisa Beck, o, ou,
       email=digital1@veritext.com,
7      c=US
       Date: 2017.02.16 12:13:55 -05'00'
       _____

8      Lisa Beck (CET**D 486)

9      AAERT Certified Electronic Transcriber

10     Jamie
       Gallagher
       Digitally signed by Jamie Gallagher
       DN: cn=Jamie Gallagher, o, ou,
       email=digital1@veritext.com, c=US
11     Date: 2017.02.16 12:16:31 -05'00'
       _____

12     Jamie Gallagher

13     Sheila Orms
       Digitally signed by Sheila Orms
       DN: cn=Sheila Orms, o, ou,
       email=digital1@veritext.com, c=US
14     Date: 2017.02.16 12:23:13 -05'00'
       _____

15     Sheila Orms

16

17

18     Veritext Legal Solutions

19     330 Old Country Road

20     Suite 300

21     Mineola, NY 11501

22

23     Date:  February 16, 2017

24

25