Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS INC.,

8

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  U.S. Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  February 15, 2017

17                  9:38 AM

18

19

20

21  B E F O R E :

22  HON SHELLEY C. CHAPMAN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO: KAREN / RACHEL

Page 2

1    Hearing re:   Trial on Lehman's Objection to Claims of QVT

2    (Doc # 17468 Debtors' One Hundred Fifty-Fifth Omnibus

3    Objection to Claims)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    HOGAN LOVELLS US LLP

4         Attorneys for QVT FUND LP

5         875 Third Avenue

6         New York, NY 10022

7

8    BY:  NICOLE E. SCHIAVO

9         WILLIAM M. REGAN

10        BEN LEWIS

11        JOHN D. BECK

12        DENNIS H. TRACEY, III

13        ROBIN E. KELLER

14        DARYL L. KLEINMAN

15

16

17

18

19

20

21

22

23

24

25

Page 4

1    JONES DAY

2           Attorneys for the Debtor

3           250 Vesey Street

4           New York, NY 10281

5

6    BY:   LAURI W. SAWYER

7           JENNIFER DEL MEDICO

8           JAYANT W. TAMBE

9           RYAN J. ANDREOLI

10          REBEKAH BLAKE

11          SARAH EFRONSON

12          DAVID P. SULLIVAN

13

14

15   PAUL PFLEIDERER, WITNESS

16

17   ALSO PRESENT TELEPHONICALLY:

18

19   PATRICK MOHAN

20

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2               THE COURT:  Good morning.  How are you?

3               MR. PFLEIDERER:  Good morning.

4               THE COURT:  Would you raise your right hand,

5    please.

6               Do you solemnly swear or affirm that all the

7    testimony you're about to give before the Court shall be the

8    truth, the whole truth and nothing but the truth?

9               MR. PFLEIDERER:  I do swear.

10              THE COURT:  Very good.  Have a seat, make yourself

11   comfortable.

12              MR. PFLEIDERER:  Thank you.

13              THE COURT:  If you need a break at any time, just

14   let us know.  You don't have to wait for one of the lawyers

15   to ask for a break.

16              MR. PFLEIDERER:  Thank you.

17              THE COURT:  All right?  Thank you.

18                    VOIR DIRE EXAMINATION

19   BY MR. TRACEY:

20   Q    Good morning.  Would you state your name, please?

21   A    My name -- excuse me, my name is Paul Pfleiderer.

22   Q    And what is your current occupation, Mr. Pfleiderer?

23   A    I am currently a professor of finance at the Graduate

24   School of Business at Stanford University.

25   Q    Would you -- I'd like to take you back through your

Page 6

1   educational background, if you don't mind.  Would you tell

2   us where you went to college and what degrees you graduated

3   with?

4   A    Yes.  I got a bachelor's degree at Yale College in

5   economics.  And then one year later I came back and spent

6   another four years at Yale getting a PhD in economics.

7   Q    And what positions of employment have you had since you

8   completed your education?

9   A    My -- my resume is actually quite simple.  I just got a

10  job as an assistant professor at Stanford and have been

11  there ever since.

12  Q    Okay.  Have you had different positions at Stanford?

13  A    Yes, I have.  I was initially appointed as an assistant

14  professor and then I think it was about four years later I

15  was promoted to an associate professor, and then associate

16  professor with tenure and then full professor and then

17  chaired professor.  It's a normal progression if you stay

18  someplace for a long time.

19  Q    Do you have a book of exhibits in front of you?

20  A    Yes, I do.

21  Q    Okay.  I'd like to ask you to take a look at CX-1689.

22  Is that the simple CV you just referred to?

23  A    Yes, it is.

24  Q    Okay.  In addition to your position as a professor of

25  finance, do you have any leaderships at the university?

1    A    Yes, I do.  For the last 3 1/2 years I've been -- I was

2    appointed to be a senior associate dean in the business

3    school, which entails having responsibility, in my case, for

4    the PhD program, administering that, and for basically

5    overseeing about half of the faculty in three different

6    groups in the business school, about 60 faculty members.

7    Q    And how long have you been teaching finance?

8    A    Starting as an assistant professor, it would be 30 --

9    let's see, 35 years.

10    Q    And during that time could you give us a sense of what

11    subjects you've taught?

12    A    So I've taught -- taught a wide variety of courses on

13    various different levels.  I've taught introductory finance

14    to MBAs, I just finished teaching to -- a program that we

15    have called our MSX Loan program, which is for mid-level

16    career executives.  And in that course I cover a lot of

17    topics in asset pricing, derivatives, option pricing and how

18    it relates to various things, including corporate finance.

19    So I've taught that on those levels.

20          I've also taught asset pricing in various ways, to

21    PhD students.  I've taught courses on private equity and

22    venture capital and general investment management over the

23    years.  And I recently taught courses on entrepreneurship

24    finance and -- and venture capital finance to various

25    groups, including in a few weeks I'll be teaching, in this

Page 8

1   case remotely, to a program that we have in Ghana where we

2   are trying to help small, medium enterprise managers scale

3   their businesses.

4   Q    And your teaching experience includes teaching MBA

5   students?

6   A    Yes, very much so, that -- that's been the bulk of it.

7   Q    And in addition, PhD students?

8   A    PhD students and -- and a number of executives as well,

9   on various -- various programs.  For quite a few years I

10  taught a course of options and derivatives for executives.

11  Q    And what types of students do you have in those

12  programs?

13  A    These are high level -- tend to be high level senior

14  executives understanding how options and derivatives, in

15  this case, could be used in a corporate setting, how they're

16  priced.

17  Q    Have you published any academic papers on the subjects

18  of trading or derivatives?

19  A    Yes, primarily on trading, determinants of bid-ask

20  spreads, volume, how information gets into prices, how

21  dealers end up having to price whatever they're trading in.

22  So that's been the bulk of my research.

23  Q    If you could turn to Claimant's Exhibit 1689 and

24  identify some of the writings that you published in the area

25  of trading?

Page 9

1    A     So the series of papers, starting about half way down

2    Page -- I guess this would be the second page, A Theory of

3    Intraday Trading Patterns: Volume and Price Variability;

4    Selling and Trading on Information in Financial Markets;

5    Divide and Conquer:  A Theory of Intraday and Day-of-the-

6    Week Mean Effects; Sunshine Trading and Financial Market

7    Equilibrium; Trading on Information in Financial Markets;

8    Trading Volume, those would be, at least a number of papers

9    that jump off the page that fit into that category.

10   Q     Thank you.  Have you ever testified as an expert

11   witness before?

12   A     Yes, quite a few times; several times in trial and then

13   a host of times in -- in deposition in various stages where

14   it did not end up in a trial.

15   Q     And have you testified as an expert witness on -- in

16   the area of valuation?

17   A      Yes, quite a few times.  As a matter of fact, I would

18   guess that probably three-quarters of the time involved

19   issues in valuation, probably in almost every case there

20   were issues in valuation, but in at least three-quarters of

21   the cases I would think that valuation was -- was central to

22   some of the issues.

23   Q     And I'd like to just take you through some of those

24   cases.  Could you perhaps give us some examples of cases in

25   which you have testified on valuation issues?  What's the

Page 10

1   first one?

2   A    Well, confining the list to those where I testified at

3   trial, the first time I believe I testified at trial was in

4   a case involving FIRREA.  In this particular case, the issue

5   was the valuation of what it would cost to replace

6   supervisory goodwill.

7          So the history is that when the savings and loan

8   crisis occurred, it turned out that of course a lot of the

9   savings and loans had to be rescued and oftentimes a

10  basically solvent savings and loan would acquire another

11  savings and loan.  But if you're acquiring something that's

12  underwater you have to be given something in return.  So at

13  that time something called supervisory goodwill was given,

14  where you would basically have additional capital on the

15  books that would allow you to -- to benefit from that.

16         And FIRREA was passed by Congress and took away

17  that supervisory goodwill and the Supreme Court, as I

18  understand it and recall, ruled that that was a taking and

19  so those savings and loans were able to go to the Federal

20  Court of Claims and sue the U.S. Government for the value of

21  that takings.  And so the whole issue was on what the cost

22  of replacing that supervisory goodwill would be.  And my

23  testimony was related to what it would cost to replace that,

24  given that they would have to do so in a way that didn't

25  incur any risk, because they didn't have any risk before.

Page 11

1    Q    And was your testimony accepted as an expert witness?

2    A    Yes, it was.

3    Q    In what subject?

4    A    I don't recall precisely, but I believe it was in

5    financial valuation, but I'm not sure that that was exactly

6    the term that was used.

7    Q    And what was the next case?

8    A    The next case, chronologically, I believe is testifying

9    in this courthouse with a bankruptcy case involving Iridium

10   and Motorola.  Iridium as the satellite company that went

11   bankrupt and at issue there was a question of the company's

12   solvency over a period of three years where the Committee of

13   Unsecured Creditors were attempting to clawback, from

14   Motorola, who was the prime contractor, a number of payments

15   that was made over that period of time.  So the whole

16   question was whether Iridium was solvent over that long

17   period.

18           And I testified that there was ample market

19   evidence, on the basis of investors putting money in at

20   various stages, banks, bondholders, equityholders, to

21   indicate that the company was solvent over that period of

22   time.

23   Q    And did you say that was in the bankruptcy court?

24   A    Yes.  Yes, it was.

25   Q    And was your testimony accepted as an expert witness?

Page 12

1    A    Yes, it was.

2    Q    What was the next case?

3    A    Again, to the best of my recollection, I think the next

4    case I testified at trial was quite a different setting.  It

5    was a jury trial, in federal district court in Charleston,

6    South Carolina.  And I was testifying for the Department of

7    Justice.  And this was a case involving I think it's proper

8    to call it a tax scam where if I, for instance, wanted to

9    participate in this scam, which of course I wouldn't, but if

10   I wanted to do so and I had stock that had a very low basis

11   and had appreciated a lot, I would pay a huge capital gain

12   on that if I were to sell it.  And so what the perpetrators

13   of this tax scam were doing was allowing me to take out a

14   loan against that stock, with that stock as collateral.  And

15   it was a nonrecourse loan, and they would basically give me

16   90 percent of the value of that stock.

17            And I had the right, if I did that, to come back

18   and repurchase the -- the -- the stock by paying off the

19   loan.  And so effectively what that company had given was --

20   was an option to me to buy the stock back at that price.

21   And so the whole business economics of this required valuing

22   that derivative claim, that -- that option.  And what I

23   showed was that the valuation of those options was way less

24   than the ten percent that they were collecting.  So it

25   wasn't -- it was a scam, it wasn't a viable -- a viable

Page 13

```
 1    business.
 2    Q    And in that case was your testimony accepted as an
 3    expert witness?
 4    A    Yes, it was.
 5    Q    And was that -- what was the subject matter, if you
 6    recall?
 7    A    Well, I would believe that it was -- and this is just -
 8    - I don't -- I don't recall exactly what the wording was,
 9    but I believe, again, financial economics, valuation of --
10    it may have been valuation of that derivative claim that was
11    embedded in there.  I'm not sure.
12    Q    And what was the next case in which you testified as an
13    expert witness?
14    A    Then the next case brought me back to this -- this
15    courtroom, I don't know if it was this courtroom, but this
16    building, and that was in this -- this matter where the
17    Committee -- the estate was suing -- I don't know if that's
18    the right word, but was attempting to get money back from
19    Barclays.  Barclays had acquired the broker-dealer and the
20    question was whether Barclays had gotten a windfall gain --
21    gain in terms of the consideration that was paid by Barclays
22    in it assuming some liabilities, versus the value of the
23    trading portfolio that was -- was acquired.
24    Q    And were there financial instruments involved in that
25    case?
```

Page 14

1    A    Yes.  A huge -- a huge number.  As I recall, and I'm

2    not sure exactly the number, but I think it was 12 -- 12,000

3    CUSIPs.  And some of those were -- were -- were quite easy

4    to value, some of them were equities, there were a lot of

5    asset-backed RMBS, ABS, but then there were a fairly large

6    amount, not necessarily number, but a fairly large value

7    that was in what were called Level 3 assets that were very

8    difficult to value.  I don't remember the particulars, but I

9    know that there was one, I think it was a CLO, that was

10   quite huge for which there was no trading.

11          It was a similar situation to, I think, some of

12   the issues here in the sense that it was carried on Lehman's

13   books, but there weren't -- it -- there wasn't a market in

14   it, so it was -- it was difficult to value.

15   Q    And what was the nature of your testimony in that case?

16   A    So I was asked to review the accounting for that, for

17   all those -- those CUSIPs.  I certainly didn't look at each

18   one individually, but to look at the processes that had been

19   done.  And one of the key issues, which again I think

20   resonates with some of what is arising in this matter, is

21   that those had to be marked at basically a bid.  So the

22   requirement, as I understand it, was that if you have, for

23   marketing purposes -- the accounting requirements required

24   to market it and bid what you -- what you could sell it for,

25   so as I recall some of the issues related to the -- to the

1    mid-bid adjustment.

2            So I -- I reviewed the general -- the general

3    processes.  Again, just from a view of the financial

4    economics underlying that, I wasn't testifying as an

5    accountant.  And -- and that was, I believe, factored into -

6    - into the review of the case.

7    Q    And was your testimony accepted as an expert in that

8    case?

9    A    Yes, it was.

10   Q    And on what subject?

11   A    Again I believe it was financial economics and

12   financial valuation or financial economics and valuation.

13   Q    Have you ever been a trader of derivative securities?

14   A    No, I've not.

15   Q    Have you ever been a trader at all?

16   A    No, I have not.

17   Q    Are you an expert in the ISDA close-out process?

18   A    I am not.

19   Q    And do you have a law degree?

20   A    I do not.

21   Q    So turning to this case, would you describe what you've

22   been asked to do in respect to this case?

23   A    Yes.  I was asked to review the methodologies that were

24   employed by QVT and their implementation to basically ask

25   whether they were reasonable given principles of economics

Page 16

1   and financial economics.

2   Q    And have you reached an opinion as to whether those

3   methodologies were reasonable in their principles of

4   financial economics?

5   A    Yes.  Yes, I have.

6   Q    And did you do your own valuation of the positions

7   between Lehman and QVT?

8   A    No.  I didn't take that as part of my assignment.  My

9   assignment is to just review whether the actual

10  methodologies that had been used were -- were reasonable.

11  Q    And in evaluating those methodologies, what standards

12  did you apply?

13  A    I applied the standards of what I understand based on

14  principles of economics and -- and finance, which include

15  considering how risk is priced and liquidity in the market

16  and such things, to see whether, I guess probably the best

17  way to put it, is whether there were any violations of those

18  -- those principles that were inherent in their

19  methodologies or in the way they were applied.

20  Q    And was your valuation based on generally accepted

21  principles and methods in the area of financial economics?

22  A    Yes, it was.

23  Q    And did you apply those principles and methods in a

24  manner that's generally accepted in the area of financial

25  economics?

Page 17

1              MR. TAMBE:  Objection.  Objection to both --

2              THE COURT:  Mr. Tambe?

3              MR. TAMBE:  -- foundation and leading.  Objection

4    to foundation and leading.  The phrase that's being used is

5    generally accepted in the area of financial economics.  It

6    doesn't sound like GAAP to me.  Is there -- what is the

7    standard that's being referred to here with

8    the --

9              THE COURT:  Well maybe you could --

10             MR. TAMBE:  -- witness's agreement --

11             THE COURT:  -- flesh out those words.

12             MR. TRACEY:  Sure.

13             THE COURT:  What was the terminology again, Mr.

14   Tracey?

15             MR. TRACEY:  Generally accepted principles of --

16             THE COURT:  Generally accepted principles and

17   methods?

18             MR. TRACEY:  -- and methods of financial

19   economics.

20   Q    Did you apply, in reviewing your -- in reviewing the

21   material that you reviewed in connection with this case, did

22   you apply principles of financial economics?

23   A    Yes, I did.

24   Q    And where did you develop the principles of financial

25   economics from?

Page 18

1   A     Well, I'm not --

2   Q     What's the source?

3   A     I should be careful here, I don't believe I developed

4   those principles, I've contributed a little bit to the body

5   of knowledge, but most of that body of knowledge has been

6   created over a long period of time.  So the -- the body of

7   knowledge that I would refer to are the basic principles of

8   how risk is basically priced in a market, what determines

9   bid-ask spreads and various things of that sort.  So there's

10  a -- there's a body of academic research that is both

11  theoretical and empirical that I'm drawing upon, starting

12  with things I learned as a PhD student and obviously over

13  the last 30 -- 30-some years after that.

14          So I -- I wouldn't say that I developed it, but

15  I've contributed a little bit to that literature, but that's

16  the basis for -- for my opinions to the extent that they are

17  based in financial economics, which is the assignment that I

18  had.

19  Q     Thank you.  And are you going to offer any opinions on

20  whether the actions of QVT complied with the IDSA agreements

21  that they had with Lehman?

22  A     No.  I have no expertise to opine on that.

23          MR. TRACEY:  Okay.  So I would tender Professor

24  Pfleiderer as an expert.

25          THE COURT:  All right.  Thank you.

Page 19

1              Mr. Tambe?

2              MR. TAMBE:  Yes, Your Honor.  I have one question

3     of clarification --

4              THE COURT:  Yes.

5              MR. TAMBE:  -- so I can shape my voir dire.  I

6     know from the examination that was just conducted, a general

7     scope of what Professor Pfleiderer is going to be opining

8     on.  Am I to assume that he is going to opine on the topics

9     that are set forth in the summary of opinions in his initial

10    report?

11             MR. TRACEY:  So some of them; I can't guarantee

12    it's going to be all of them.

13             MR. TAMBE:  No, no, that's fine.

14             THE COURT:  But no --

15             MR. TAMBE:  It's not going to be more than?

16             THE COURT:  -- that defines the outer limits of

17    it --

18             MR. TRACEY:  Yes.

19             THE COURT:  -- for the purposes of your --

20             MR. TAMBE:  Right.

21             THE COURT:  -- direct case?

22             MR. TRACEY:  The initial report --

23             THE COURT:  Yeah.

24             MR. TRACEY:  -- is the outer limits of what I'm

25    going to elicit from --

1            MR. TAMBE:  Okay.

2            MR. TRACEY:  -- this witness.

3            MR. TAMBE:  That's very helpful, Your Honor.

4            THE COURT:  Yes.  Thank you.

5    BY MR. TAMBE:

6    Q    Good morning, Professor Pfleiderer.

7    A    Good morning.

8    Q    A couple of points of clear up before we talk a little

9    bit about just a summary of opinions, because I do want to

10   talk about the summary of opinions and you're -- the basis

11   you have for opining those subject matters as a part of voir

12   dire.

13   A    Um hmm.

14   Q    But just stepping back.  The FIRREA case, that was not

15   a derivatives case, correct?

16   A    I don't believe derivatives were involved in any way.

17   I'll have to -- I'll have to think back, because the reason

18   I'm hesitating is because in many cases you have securities

19   with impeded derivatives; that was true in the tax case.

20   But in the FIRREA case, the issue there hinged upon the

21   pricing of preferred stock that the bank might issue.

22   Q    Sure.  And --

23   A    And I believe that's correct, there were no derivatives

24   that were directly involved.

25   Q    And I believe you described your testimony in the

Page 21

1    FIRREA case as relating to the valuation of supervisory

2    goodwill, correct?

3    A    It was related to the cost of replacing supervisory

4    goodwill by issuing preferred stock and basically backing it

5    up with risk free securities.  So it wasn't so much the

6    valuation of the supervisory goodwill, that had been taken

7    away, it was the replacement cost of replacing what had been

8    taken away.

9    Q    Okay.  And again, just to be clear, that had nothing to

10   do with the valuation of any derivatives that might have

11   been involved in the underlying matter, correct?

12   A    Yes.  Since I said I don't believe there were any

13   impeded derivatives that were important there.

14   Q    Okay.  Iridium vs. Motorola, that -- it was an opinion

15   about company solvency, correct?

16   A    Yes, that was.

17   Q    Again, not about derivatives, correct?

18   A    I would have to think back to some of the securities

19   that Iridium issued, but the -- the main answer is still

20   derivatives were not directly involved.

21   Q    Okay.  The jury trial, DOJ case, I think you used a

22   phrase, valuation of derivative claim that was embedded.

23   You don't mean derivative, in that sentence, as OTC

24   derivatives, you're -- you mean derivative claim as a

25   shareholder derivative claim, correct?

Page 22

1    A    Well, the nonrecourse loan involves embedded

2    derivative, which is -- which is an option, in this case a

3    call option.  And so it very much involves a derivative

4    claim in the valuation of that, it involved valuating that

5    derivative claim.

6    Q    But not in the sense of the word that we use

7    derivatives in this case, which are over-the-counter

8    derivatives transactions, correct?

9              MR. TRACEY:  Objection.

10             THE COURT:  Yes?

11             MR. TRACEY:  I think they're ships passing in the

12   night.

13             THE COURT:  They are ships passing in the night.

14   You want to try it again, Mr. Tambe?

15             MR. PFLEIDERER:  Sure.

16   Q    The derivative you're identifying that you opined on in

17   the jury trial in the DOJ case, that was not an over-the-

18   counter derivative of the type we're talking about in this

19   case, correct?

20   A    Well --

21             THE COURT:  I think the stumbling block is -- are

22   the words, of the type, right?  So in this case we're

23   talking about ABS, RMBS --

24             MR. TAMBE:  CBS, we're talking about credit

25   derivatives.

Page 23

1              THE COURT:  -- CBS, right.

2              MR. TAMBE:  Right.

3              THE COURT:  And Mr. Tambe is, I think asking a

4     question --

5              MR. TAMBE:  Trying to.  Yeah.

6              THE COURT:  -- trying to, as to whether or not the

7     types of derivatives here --

8              MR. TAMBE:  Right.

9              THE COURT:  -- which were traded to transactions

10    on which QVT effaced to Lehman, or the same or similar types

11    of transactions to that which you dealt with in the South

12    Carolina case.

13             MR. PFLEIDERER:  So I think -- I think the answer

14    to that is, no.  We use, in finance, the term derivative

15    very broadly to mean any security that derives value from

16    another security.

17             MR. TAMBE:  And that's all I wanted to clarify.

18             MR. PFLEIDERER:  Sure.

19    Q    When you used the phrase derivative in the jury trial

20    context, you were not talking about the type of products

21    we're talking about here?

22    A    That's correct.

23    Q    Okay.  The Barclays case, you and I spent some time on,

24    correct?

25    A    Yes.

Page 24

1   Q    And you did opine on about 12,000 CUSIPs, but those

2   were individual securities, correct?

3   A    I believe they were all individual securities, yeah.

4   Q    And in fact, you did not do an independent valuation of

5   a single one of those CUSIPs in the Barclays' case, correct?

6   A    Yes.  That was not what I was asked to do.

7   Q    You just reviewed what Barclays had done and opined on

8   the reasonableness of their approach, correct?

9   A    I believe that's correct.  Yes.

10  Q    Okay.  You were asked some questions about your

11  academic publications, and let's -- so let's go to the

12  binder that is in front of you, Exhibit 1689.  And generally

13  you were asked to identify, from your list of academic

14  papers, the ones that dealt with your academic research on

15  trading, volume, liquidity, things of that type, correct?

16  A    That's correct.

17  Q    And you started identifying papers that began on Page

18  2, about half way down, beginning with The Theory of

19  Intraday Trading Patterns.  You went down that page and it

20  looks like you went to the first couple items on the next

21  page; is that right?

22  A    Yes.

23  Q    So that's starting some time in 1988, correct?  That's

24  the first article?

25  A    That was when it was published.

Page 25

```
1    Q    Yes.

2    A    But I was doing research starting in 19 -- actually, my

3    dissertation research started in 1979, but that was the date

4    of the first publication.

5    Q    So the intraday trading patterns, liquidity and market

6    analyses that are reflected in these papers, on Page 2, over

7    on to Page 3, are not in the OTC derivatives markets, they

8    are in the equity and other markets, correct?

9    A    Generally many of the principles apply across all types

10   of market settings, but I think the examples, to the extent

11   that I used examples, were oftentimes in the -- the equity

12   markets.  But they involved principles of having a dealer

13   making a market in a context where you're trading securities

14   and subject to adverse selection and other sorts of risks.

15   So they generally had wider application than just in the

16   equity markets.

17   Q    Well, I'm not talking about the application of those

18   articles, I'm talking about what was the data that you

19   looked at when you published those articles.  You were not

20   looking at derivatives market data, correct?

21   A    Oh.  I -- I should clarify, these are all theoretical

22   articles.

23   Q    So you didn't look at any market data?

24   A    No, these were articles that looked at the theoretical

25   determinants of how volume would be determined and how bid-
```

Page 26

1    ask spreads would be determined, based upon various factors,

2    looking at equilibrium in a marketplace.  So they were not

3    empirical papers.

4    Q    And again to be clear, they did not address the

5    derivatives markets, correct?

6    A    They addressed markets in general, and that would

7    include derivatives markets, to the extent that there's

8    adverse selection, trading volume issues and things of that

9    sort.  So my intent in writing these papers was to talk

10   about markets in general, from a theoretical perspective.

11   Q    Okay.  Let's just talk about the summary of opinions,

12   and if we can just pull up CX-1687.  And I'm just going to

13   refer to the summary that's in your initial report and you

14   summarize in five subparts the topics in which you're

15   opining.  And so it would be Paragraph 33 and the sub -- and

16   it's at the bottom, it's in Subparts A through E.

17   A    Yes.

18   Q    And I'm going to take each one in turn.  I might skip

19   one or two, but let's just look at the first one, 33-A.

20   Just to be clear, you start by saying, "QVT followed a

21   logical and systematic process that relied on available

22   market data."  Let me just stop there.  In opining on that

23   topic, you did not actually look at available market data,

24   you looked at the data that QVT showed you, correct?

25   A    Well, I -- I didn't say that it relied on all available

Page 27

```
1    data, I said that it was relying on available market data.

2    Q    Well, just to be clear, you did not independently look

3    to see whether that was all available market data or only

4    some available market data; is that right?

5    A    No, that wasn't what I was -- I didn't think that that

6    was what I was asked to do.  I was asked, as I understood

7    it, to look at their process and whether they were using

8    market data to inform their -- inform their valuations.

9    Q    Okay.  And then the other phrase is select appropriate

10   marks, and thereto, in terms of the basis for your opinion,

11   you didn't compare QVT's marks to marks of other traders,

12   people outside of QVT; is that right?

13   A    No, I don't believe I did that.

14   Q    Okay.  And I know Mr. Tracey covered that you don't

15   have any independent basis for trading expertise, or trading

16   knowledge, correct?

17   A    I testified that I am not a trader.

18   Q    Okay. And you haven't done any academic research or

19   written papers about how derivatives traders trade?

20   A    No, I have not.

21   Q    Okay.  Let's go to the next one.  You use a phrase

22   here, in 33-B at the end, "generally accepted methodologies

23   and principles of finance."  And just to be clear, there are

24   generally accepted accounting practices, correct?

25   A    Right.
```

Page 28

1    Q    Right?

2    A    I -- I believe that's correct.  Yes.

3    Q    But those are published by an accounting body, correct?

4    A    Well, there's -- yes, I mean, there's U.S. standards

5    and there's international standards.  So yes, there are --

6    there are accounting bodies that publish those --

7    Q    Right.  And you --

8    A    -- or that set those rules.

9    Q    Right.  So you've got a lower g, lower a, generally

10   accepted methodologies and principles for finance.  Do you

11   see that?

12   A    Yes, I do.

13   Q    There is no similar body of accepted standards on

14   principles of finance, capital G, capital A methodologies

15   and principles of finance, correct?

16   A    If there is, I'm not aware of it.

17   Q    Right.  And in fact economists frequently disagree on

18   methodologies and processes, correct?

19   A    On a number of things they do.  There's some general

20   agreement on -- on some things, but there's certainly

21   disagreement on others.  Yes.

22   Q    And just going to 33-D.  You've got a sentence in there

23   about -- the second sentence, "I understand that under

24   Section 14 of the ISDA Master Agreement, QVT is a non-

25   defaulting party who is entitled to calculate its total

Page 29

1    losses, gains or costs if done reasonably and in good

2    faith."  You're not purporting to opine, as an expert, on

3    ISDA Master Agreements, correct?

4    A    Oh, absolutely not.  I -- I think Mr. Tracey asked me

5    that and I said that I'm not in any way opining on being an

6    expert in -- in ISDA.

7    Q    Okay.  And you did not independently conduct the

8    calculation of QVT's total losses, gains or costs, correct?

9    A    I'm sorry, could you repeat the question?

10   Q    You did not independently conduct a calculation of

11   QVT's total losses, Gaines or costs, correct?

12   A    Yes, that is correct.

13   Q    Next one, 33-E, please.  And here you are summarizing

14   an opinion on the outcome of QVT's analytical methods; do

15   you see that?

16   A    Yes, I do.

17   Q    And you end that summary by saying, "In compliance with

18   the guidelines in the ISDA Master Agreements;" do you see

19   that?

20   A    Yes, I do.

21   Q    "And generally accepted valuation methods used for

22   CDSs;" do you see that?

23   A    Yes, I do.

24   Q    Now you are not opining on what the ISDA Master

25   Agreements require, correct?

Page 30

1    A    No, I'm not.

2    Q    And you are not aware of any generally accepted

3    valuation method used for CDSs, generally.  You know what

4    QVT did, you don't know what other traders did?

5    A    Well, that's why I qualified it by saying, to my

6    knowledge, so I'm not -- I'm not saying with certainty that

7    -- and I, again, am not testifying as to what the ISDA

8    Master Agreement requires, so I'm just saying to my

9    knowledge.

10              MR. TAMBE:  Your Honor, based on this witness's

11   testimony --

12              THE COURT:  Yes?

13              MR. TAMBE:  -- there's certain aspects of the

14   opinions that we anticipate he might opine on, based on the

15   summary of opinions, that I believe he is -- he lacks the

16   experience or the qualifications to opine on those aspects

17   of his opinions.

18              I think to the extent he's opining on general

19   finance theory or economic theory, in a theoretical sense,

20   take it case by case, we don't have an objection to that.

21   But to the extent he's converting that financial theory or

22   economic theory into opinions or observations about

23   compliance with the ISDA or general valuation of CDSs, we

24   don't think he has established the qualifications or

25   experience to do that.

1              THE COURT:  All right.  Thank you.

2         So Lehman had originally raised these issues in

3    its prehearing memorandum, which was filed before this trial

4    started and indicated, in broad outline, what its concerns

5    were with respect to Professor Pfleiderer's qualifications.

6         Based on that, and a review of the expert report,

7    and in light of the voir dire that's just been conducted,

8    and in particular as Mr. Tambe has led Professor Pfleiderer

9    through the specific opinions that are outlined at Paragraph

10   33 of his report, I'm going to allow and qualify Professor

11   Pfleiderer as an expert under 702, with one exception.

12        And that exception is contained in Paragraph 33-E.

13   And notwithstanding Professor Pfleiderer indicating that his

14   views about compliance with the guidelines in the ISDA

15   Master Agreement are qualified by his knowledge, I don't

16   believe that Professor Pfleiderer, based on his own

17   testimony, has any expertise with respect to the guidelines,

18   compliance with the ISDA Master Agreement.

19        Moreover, I believe that the question of whether

20   or not QVT's methods and valuation complied with the ISDA

21   Master Agreements is a legal determination that's within the

22   province of the Court and not properly the subject of any

23   expert testimony.

24        So with that qualification, then Professor

25   Pfleiderer, excuse me, is qualified to testify.

Page 32

1          Did you want to take a break, Mr. Tracey, or did

2     you want to start right in?

3          MR. TRACEY:  Since we're going to have to --

4          THE COURT:  Either one is fine with me.

5          MR. TRACEY:  -- since we're going to have to take

6     a break relatively soon probably anyway, this is probably

7     just as good a time as any.

8          THE COURT:  Okay.  So why don't we take seven to

9     ten minutes, and then we start up.  All right?

10         Professor Pfleiderer, the rules are that you are,

11    of course, remain under oath and during the breaks,

12    including lunch, please do not discuss the case or your

13    testimony with anyone or be in anyone's presence while

14    they're doing the same.  All right?

15         MR. PFLEIDERER:  Okay.  Thank you.

16      (Recess)

17         THE COURT:  Professor Pfleiderer?

18                    DIRECT EXAMINATION

19    BY MR. TRACEY:

20    Q    Mr. Pfleiderer, have you prepared a written report in

21    connection with your engagement here?

22    A    Yes, I have.

23    Q    And I think Mr. Tambe may have referred to it, but is

24    that what we've marked as Claimant's Exhibit 1687?

25    A    It is.

Page 33

```
 1   Q    And would you describe for the Court the --

 2   A    Actually, I believe it's 1689.  Or am I -- oh, I'm

 3   sorry, I'm looking at the wrong one.  I apologize.

 4   Q    Is it 1687?

 5   A    Oh, yes, it is.

 6   Q    Okay.

 7   A    I'm sorry.

 8   Q    Would you describe for the Court what work you did in

 9   preparing this report?

10   A    So I started work on preparing the report pretty much

11   after the mediation, but I should observe that I was

12   involved before the mediation as an consulting expert, but

13   I'll put that aside and just talk about what I did after the

14   mediation.

15        And what I did was look at what QVT agents had

16   done in valuing the various positions of the 836 that they

17   had to value.  I looked carefully at the spreadsheet, which

18   I knew with the different number than what it is now, but I

19   looked very carefully through that and looked at a number of

20   other things to eventually get comfortable with the notion

21   that what QVT had done was reasonable, given the -- given

22   the market conditions at the time, and as I said, general

23   principles of economics.  So in broad terms, that's what I

24   did.

25   Q    And have you prepared a list of the documents that you
```

Page 34

1    reviewed in connection with preparing your report?

2    A    Yes, I believe that appears at appendix -- in my

3    report, Appendix C.

4    Q    And in general terms, could you describe for the Court

5    whether you have reviewed any transcripts of sworn testimony

6    in this case.

7    A    Yes, I have.  I reviewed a number of depositions that

8    were taken prior to trial, and obviously prior to -- to

9    writing this report.  And then afterward I've reviewed

10   others, but those obviously didn't factor into the report.

11   Q    And have you, since then, reviewed the sworn testimony

12   of QVT individuals given in this trial?

13   A    Yes, I have.

14   Q    And have you listened to any of that testimony?

15   A    Yes, for the past two days, Monday and Tuesday.

16   Q    And based on hearing the testimony at this trial, is

17   there anything that has changed your views that you

18   expressed in your initial report?

19   A    No, I understand that there were some corrections that

20   were made to the, as I recall, the market quotation process,

21   but other than that I heard nothing that I didn't factor in

22   at the time when I wrote the report.

23   Q    And did you have any assistance in preparing this

24   report?

25   A    Yes, I did.

Page 35

1    Q    And who assisted you?

2    A    I was assisted by a number of people at Brattle, which

3    is a litigation support and consulting firm.

4    Q    We'll go through the specifics, but I first want to ask

5    you whether, based on your review of the valuation

6    methodology that QVT used, based on the information that you

7    just described, have you formed an opinion on the

8    methodology that QVT used?

9    A    Yes.  I found it reasonable, given the market

10   conditions at the time and adhering to basic principles of

11   financial economics.

12   Q    And let's first discuss QVT's methodology.  Are you

13   aware of the approach that QVT used to prepare its loss

14   calculation in connection with the termination of its ISDA

15   Agreement with Lehman?

16   A    Yes, I am.

17   Q    And would you describe that, in general terms, what

18   that approach was?

19   A    So in general terms, they first sought market

20   quotations through a bid (indiscernible) competition to

21   satisfy -- and again, I'm not opining as an ISDA expert, but

22   to satisfy what I understood to be the requirements of ISDA

23   to first go to market quotation -- to solicit market

24   quotations.  And so they ended up, as I recall, getting 12

25   adhered to the need -- requirement to have three market

Page 36

1    quotations.  And when that standard was not met, then they

2    could revert to loss.

3    Q    And did you review the approach that QVT used in

4    calculating its loss in connection with its termination?

5    A    Yes, I did.  In fact, because that basically applied to

6    almost the entire portfolio because very few market

7    quotations were -- were received to go through the market

8    quotation process.

9    Q    And again, can you describe, in general terms, we'll

10   get into the specifics later, what your understanding was of

11   the overall approach that QVT used to calculate its loss.

12   A    So my general understanding is that when they were able

13   to make a replacement transaction, which they were in some

14   cases, that was registered as the -- as -- as the loss, as

15   the cost of replacement.  And then when that failed, they

16   had to use various other sources of information to determine

17   what they hypothetically could have replaced at, given that

18   they did not an actual replacement trade.

19   Q    And what types of information was that?

20   A    So in the mix of information that they would have had

21   would be, in some cases, market quotations that they'd

22   received in this solicitation for market quotations, but

23   less than three because if they had three they would have

24   done the market quotation process or they would have -- they

25   would have counted that as a market quotation.  So in some

Page 37

1   cases they had one or two bids or offers that they'd gotten

2   in their bids, one in competition or offers, one in

3   competition.  If -- so that was one piece of information, or

4   pieces of information that they had.

5   They also had information from Markit on a number of

6   positions that they could use.  And then they had some --

7   some broker runs, indications from brokers, as to what would

8   be paid for various positions, either at the bid or the

9   offer.  And in some cases they had to rely on -- on what we

10  would call market proxies because none of the former

11  information was available, reliable marks from Markit or

12  reliable broker runs or certain also unavailable in those

13  cases were -- were market quotations coming from the market

14  quotation process.

15  Q   And would you describe, again in general terms, we'll

16  get more specific, the overall portfolio that QVT was

17  performing this valuation on?

18  A   So there were 836 positions, contracts, transactions,

19  I've heard them called different -- different names,

20  securities would be another term.  And the predominant

21  number of those were credit default swaps, or in some cases

22  preferred credit default swaps, on various entities.  And

23  there were a few interest rate swaps.

24  Q   And did you gain an understanding of whether those

25  positions were liquid or illiquid or something else?

Page 38

1    A    The understanding that I gained was that there was an

2    array for spectrum of liquidity, but that much of it was --

3    was towards the illiquid part of the spectrum, and some of

4    it was -- was highly illiquid.

5    Q    Okay.  Well, what I'd like to do is talk about the

6    economics of the CDS to start.  We've all gotten, all ready,

7    an education before the professor came, but I think it would

8    be helpful just to go through it.  We prepared a

9    demonstrative exhibit that you can refer to, if you like.

10   It's Claimant's Exhibit 2148.

11        So if you could, would you please just describe

12   the economics of a CDS transaction?

13   A    On one level it's -- it's actually rather simple.  It's

14   an insurance contract where one party, the buyer of

15   protection, pays periodic premiums, either on a quarterly or

16   sometimes a monthly basis.  And what one is buying, by

17   paying those premiums, is protection for a loss on a credit

18   event.  So a credit event would be defined in various ways.

19   And in the situation where a credit event occurred and such

20   a loss was actually operative, then the buyer of protection

21   would basically be paid the difference between the face

22   value or par value of the security and whatever the security

23   was worth at the time of that credit event.

24   Q    And how does the buyer pay for the so called insurance?

25   A    Well, it -- it depends, to some extent, on how that is

Page 39

```
 1    sold.  In, shall I say, normal conditions, at least at this

 2    time, the buyer would pay a running spread, just pay a

 3    premium, periodic premium.  But for highly distressed

 4    referenced securities, it was oftentimes necessary to pay an

 5    upfront payment, to pay something in points.  So you -- you

 6    paid for much of the protection upfront.

 7    Q    And you referred to a referenced obligation.  Does

 8    either party need to own that referenced obligation?

 9    A    No.  It could be that one party owns it.  The

10    protection buyer, for example, could own it and use the

11    credit default swap as a hedge, but I think over time the --

12    the market has moved quite a bit away from that and many

13    buyers do not own the referenced obligation, rather what

14    they're doing is -- is buying an instrument that has a

15    certain payoff pattern that they want based upon their

16    belief about credit risk and what's being charged.  So it

17    could almost be said that in that case, I don't like to use,

18    necessarily, the word speculating, but they're -- they're

19    speculating on -- on the credit event and whether the price

20    is -- is -- is reflective of the risk.

21    Q    And now I'd like to turn to a slightly different

22    subject.  Are you familiar with the term short sale of

23    securities?

24    A    Yes, indeed.

25    Q    And would you describe that for the Court, please?
```

Page 40

1    A    So usually what we say is buy low, sell high.  So you

2    buy Google at a low price and you sell it later at a high

3    price, you make a profit.  What if you believe that Google

4    is going to decline in price, and you don't own any Google

5    shares?  What you can do is go into the market and short

6    Google, in which case you're going to be selling high, or

7    what you believe is high and the way you affect that is you

8    go out and borrow Google stock, and incidentally I'm just

9    using Google stock because it's -- it's something that came

10   to mind, but it could almost be any security, you -- you

11   would go out and basically find someone who would lend you

12   Google stock and you would sell it, and then if your hopes

13   come true, Google would decline in price and you could go

14   and buy it at that lower price.

15           So at first you're selling high, and then you're

16   buying low in the future.  And when you short that stock or,

17   to talk about it more broadly, any security, you have to

18   make the payments that are required on that security.  For

19   instance, on Google stock it would be any dividends, on any

20   other security, it would be any cash flows that the person

21   who lent that security to you would be entitled to receive.

22   So it's just reversing the timing of buy low, sell high.  To

23   sell high, buy low.

24   Q    And how do the economics of a short sale relate to the

25   economics of a purchase of protection in a CDS?

Page 41

1   A     So directionally they're very similar in the following

2   sense.  So if I were to buy a CDS on a corporate bond, then

3   I would have an increase, generally in my position, an

4   increase in value, if that corporate bond became distressed

5   and went down in price.  So on a credit default swap I gain

6   when the corporate bond goes down in price.  And again, if I

7   short the corporate bond, I gain if the corporate bond goes

8   down in price.  So in broad terms, directionally they have

9   the same exposure.

10  Q     And how does the position of a seller of insurance in a

11  CDS relate to the economic position a buyer of securities?

12  A     Well, in some sense it's the mirror image or the

13  reverse.  So if I told you protection, then I'm of course

14  hoping not to have to pay off.  And if the bond goes up in

15  price, that's because in all likelihood it's less likely

16  that a credit event is going to occur so the bond going up

17  in price will be something that will make a benefit for me -

18  - lead to a benefit for me, the protection seller.  So a

19  protection seller has the same, broadly speaking,

20  directional economics as someone who has bought the

21  underlying bond.

22  Q     And going back to the position of the buyer of

23  protection, why would someone -- why would an investor buy

24  protection through a CDS rather than selling the security

25  short?  What are the differences?

Page 42

1   A    Well, there are a number of reasons why a credit

2   default swap might be preferred over shorting the underlying

3   security.  One of the reasons is that a credit default swap

4   can be easier to enter into than shorting securities.  For

5   example, when I short a security I have to go out and find

6   someone who will lend that security.  And in most short

7   sales, the lender of that security can demand the security

8   back at any time.  And that would basically potentially

9   limit my ability to -- to gain by the short sale position.

10  Whereas, if I have a credit default swap, in some sense the

11  economic essence of that short is locked in.

12          In addition, when you short a security oftentimes

13  there's a cost to the short.  And so that would -- that

14  would make, everything else being equal, the credit default

15  swap more attractive.  So that would be -- those would be

16  two of the reasons why a credit default swap might be

17  preferred over taking an actual short sale position.

18  Q    Okay.  I'd like to turn to a variation on that.  Are

19  you familiar with the term PCDS?

20  A    Yes, I am.

21  Q    And what is the PCDS?

22  A    So a PCDS is basically a credit default swap on a

23  preferred security, preferred stock issued by a company,

24  oftentimes a bank or a financial institution.

25  Q    And how do preferred CDSs work in relation to CDSs that

Page 43

1    you just described?

2    A    Well, in many ways they're -- they're quite similar.

3    They're a form of insurance, the buyer of protection is

4    going to pay a premium.  The one notable difference -- well,

5    there are actually two notable differences.  One, which is

6    important, is that a preferred security is -- is lower down

7    in the capital structure, so it's more exposed to, shall I

8    call it, credit risk, in other words adverse things

9    happening to the company, because the debt, all the debt in

10   place comes before the -- the preferred in the priority

11   structure.  So that's one difference.

12           The other notable difference is that a preferred

13   security contract -- sorry, I misspoke, a preferred CDS has

14   an additional credit event written into the contract, which

15   would be a deferral of dividends on the preferred.  So a

16   preferred stock, and one of the reasons why preferred stocks

17   sometimes can be counted for capital if it's in -- issued by

18   a financial institution, is that you can, as the issuer,

19   defer or delay the dividends without triggering a default.

20   So when a issuer delays the dividends on the preferred

21   issue, that triggers a default -- excuse me, that triggers a

22   credit event in terms of the PCDS contract.

23   Q    And did you review the PCDSs in QVT's portfolio with

24   Lehman?

25   A    Yes, I did.

Page 44

1  Q    And would you describe what your understanding was of

2  their PCDS portfolio?

3  A    Well, my recollection is they had I think 60 positions

4  and there's one qualification.  They had basically not

5  bought protection but sold protection, as I recall, on some

6  preferreds on CVS, the -- the healthcare drugstore and

7  that's not what is -- what I'm going to talk about, but I --

8  that was another preferred that they had.

9          The primary issue or primary concerns, as I

10  understand it in this matter, relate to 60 transactions in

11  which they were long protection on preferred instruments and

12  those referenced 19 different financial institutions, some

13  in the United States and some -- some in -- in Europe and --

14  and Australia and New Zealand, I believe.

15  Q    And did you gain an understanding of the nature or

16  structure of the market for PCDS in 2008?

17  A    So my understanding is that Lehman, in I think it was

18  maybe 2005 or so, attempted to create a real market in these

19  instruments, PCDS, and it was a new market, if you will.

20  Trading had been -- hadn't been before.  And my

21  understanding is that Lehman was, for all intents and

22  purposes, the main, if not the only real effective market

23  maker in PCDS.  And that it was not a liquid -- liquid

24  instrument that was traded in the market.

25  Q    And what effect on the market did the failure of Lehman

Page 45

1    have on the PCDS market, at that time?

2    A    Well, when you only have one market maker, and that

3    market marker fails, there are a number of problems that

4    obviously occur.  One is you have difficulty in trading,

5    because the market maker is there to facilitate trading.

6    And you also have, and this is -- basically follows from

7    that, you also have difficulty, if you don't have trading,

8    getting market indications of where the -- where the price

9    would be.

10   Q    And did you review QVT's approach to the valuation of

11   its PCDS positions following Lehman's bankruptcy in 2008?

12   A    Yes, I did.

13   Q    And did QVT attempt to solicit market quotations from

14   the market on PCDS?

15   A    Yes, I believe it did.

16   Q    And do you know whether they received any?

17   A    No, they did not, as far as I understand.

18   Q    Was there any established methodology, to your

19   knowledge, for the valuation of PCDS claims, in 2008?

20   A    Certainly not for a situation where there was -- was no

21   trading and no market marker that was basically in -- in the

22   business of generating trades and that you could use to get

23   market indications of what the value would be.

24   Q    And so how did QVT calculate the value of its PCDS

25   positions?

Page 46

1    A    So QVT took the approach of that based on the

2    assumption, which I think was an extremely reasonable

3    assumption, and given that there were no market makers out

4    there that could do a business where they would sell

5    protection to one party and get protection from another so

6    that they wouldn't really have any risk on their books.

7    They took the approach, which I think is quite reasonable,

8    that if a dealer would be selling protection -- shall I say

9    take it; in other words, they wouldn't have a balance on the

10   other side -- that dealer would have to hedge the risk,

11   substantial risk, that would be faced if there was a credit

12   event.

13          And so they went back to this notion that we

14   talked about earlier, that a PCDS or a CDS has the

15   attributes of a short position in the underlying security.

16   And, in fact, what they did, if I look at it, is quite

17   sensible because it is the effective way for a dealer to

18   hedge risk, or anyone, if they don't have a counterparty on

19   the other side who's offering protection.

20   Q    Let's talk about hedging.  I think we've prepared some

21   slides that you can use if you like.  But I wonder if you

22   could describe for the Court the process of hedging a sale

23   of protection in the PCDS market.

24   A    Sure.  So I'm going to do this in a really simple way.

25   Some of the mechanics could be a little bit more

Page 47

1   complicated, but this in broad brushstrokes really captures

2   what is the exposure of a dealer and how the dealer can

3   mitigate effectively that risk.

4           So I start with today with the notion that we've

5   got a preferred out there is selling, let's say, at 80.  And

6   so, let's say you come to me -- you, Mr. Tracey come to me

7   and I'm a dealer, and you want to buy protection from me,

8   and so I'm going to sell you protection.  And the question

9   is, what price should I charge for this?

10          So here's what I would be thinking or considering,

11  some of the risks that I would face if I sold you

12  protection.  What if there's a credit event in the future,

13  and the preferred in that credit event is going to sell

14  probably quite a bit less than the 80 which it sells at

15  today; what am I going to owe you?  Well, I have to pay you

16  100 minus the value of the preferred at that time.  I have

17  to pay you $55.  So what should I charge you up front?  Now,

18  it might seem, well, I could charge you $55 up front and

19  just put the money aside and have it there in reserve.

20  Well, that would be both too much and too little to charge

21  you that amount and put it off to the side.  Because what

22  happens if there's a more severe credit event and the

23  preferred sells at 15?  Then I owe you 100 minus 15, I owe

24  you 85 and I've not put upside 85, so I've got a substantial

25  loss.

Page 48

1         So here's what I can do to effectively mitigate

2    that risk, which is a substantial risk, especially in a

3    brewing financial crisis.  Again, start out with the

4    preferred selling at 80.  What I'm going to do is I'll offer

5    protection to you and charge you the difference between 100

6    and 80; I'll charge you 20.  And I will receive then $20 at

7    the beginning.  What I'll then do is short the preferred,

8    which is selling at 80, and I'm going to receive 80 because

9    when I short, I go into the market, borrow the security, and

10   then sell it at 80.  So now I've got 100, and I can set that

11   aside in a riskless account.

12        So now let's go forward and assume that one of

13   these credit events occurs.  So let's say the credit event

14   occurs.  It's not a terrible credit event and the preferred

15   sells at 45.  So I owe you -- again, just to remind

16   ourselves -- I owe you 55 -- 100 minutes 45.  So I've got to

17   pay you 55.  But what I can do is I can close the short

18   position.  Now what does that mean?  It means I have to go

19   out into the market and buy the preferred back at 45, so I'm

20   going to pay 45.  But remember I've got 100 that I set aside

21   at the beginning, so I basically maybe put that into a

22   riskless bond.  I can cash that in, if you will, and receive

23   100, so I have no loss.  I've covered myself.

24        But now let's go and look at that worst case,

25   where the preferred is selling at 15.  Am I in trouble?

Page 49

1    Well, I owe you 85, so I'm going to have to pay you 85.

2    What I can do is close the short position.  But now the

3    preferred is selling at 15, so when I go out into the

4    market, I only have to pay 15.  And, again -- this is

5    important -- I've got 100 in my riskless account, so I

6    receive 100 and, again, my loss is zero.

7            So what's really happening here is the way that

8    I'm able to do this and not have any risk on this downside

9    is that I'm getting this payoff from the short.  The short

10   position is what's really making it so that I don't have to

11   worry about how severe the credit event is.  So the payoff

12   from the short was 55 -- I'm sorry, excuse me, I misspoke.

13   The payoff when the preferred sells at 45, the payoff in the

14   short if 35.  And I collected the 20 up front, so my total

15   payoff was 55, and what I owed in that case was 55.  And

16   then in the more severe credit event, my payoff on the short

17   was 65.  I collected, again, 25 from you up front, so I've

18   got 85, which is what I owe you.

19           And just graphically, you can see it here where

20   I'm the x-axis and, of course, (indiscernible), what I have

21   is the price of the preferred in case of a credit event.

22   And the more severe that credit event, the more the payment

23   I have to make.  That's the blue line; that's my loss.  If I

24   was unhedged, that would be a severe loss.  But I'm hedged,

25   which the lighter blue line at the top, which is the sum of

Page 50

1    the upfront 3, plus the payoff from the short position.

2              So this is really the only effective way that I

3    can sell you protection and manage the risk without

4    basically taking any risk.  Now, again, if I had access to

5    someone on the other side of the market who wanted to sell

6    me, as the dealer, the protection, then I could take that

7    protection from that seller and then just resell it to you,

8    probably at a bid ask spread.  And all I'm exposed to then

9    is the counterparty risk that whoever I bought that

10   protection from may not pay off.  But in absence of having

11   someone on the other side of the market, if I'm standing in

12   between as a dealer, then this is what I have to do.

13             So going back, QVT knew, I think with great

14   certainty based upon what it'd seen before in terms of this

15   market and interacting with Lehman trying to buy protection,

16   that there just weren't much -- there wasn't much interest,

17   if any, on the other side of the market.  So if you demanded

18   protection from the dealer, then the dealer would be --

19   again, I'll use the word naked, not out something to offset

20   the risk by having protection sold to that dealer -- this is

21   what the dealer would have to do.

22   Q    And you started off by saying that the dealer would

23   need to sell preferred into the market.  How did QVT

24   determine what the price of that preferred security would be

25   if the dealer sold into the market?

1    A    So what QVT did was look at actual prices.  So, here,

2    we've got some market prices.  And, again, we have to think

3    back, if QVT had had reliable pricing on PCDS, it could have

4    used that, with perhaps some adjustments made for what made

5    have happened over Lehman week, what happened between the

6    12th and the 15th.

7              But there were really no reliable PCDS pricing on

8    it because there just wasn't a market here of any

9    consequence.  So they had to go and look at the next best

10   thing, which was the pricing of the underlying prefer.  And

11   they observed, as I just have, that to hedge this risk, the

12   dealer would have to, as I say, short the prefer.

13             So what they did is they looked at the prices that

14   the preferred was selling at over the week.  And, of course,

15   those were prices that were set in a market where a dealer

16   wasn't selling.  In other words -- this is a hypothetical --

17   if you lay on top of whatever was happening that week, the

18   additional selling into the market of a dealer attempting to

19   hedge, the prices would be potentially lower -- potentially

20   much lower -- than what was actually observed.

21             So they took the prices that week.  And what they

22   did is recognizing that there would be significant market

23   impact, they took the lowest price that they saw over the

24   week as an indication of what that market impact might be.

25   Q    And when you said that the prices would be lower if

1    there were sales of securities, what is the economic

2    principle behind that?

3    A    Well, the economic principle is the following: First of

4    all, if I come into this market right here in the Courtroom

5    and I attempt to sell a huge amount of anything, I'm

6    potentially going to have to lower my price to get the

7    people in this Courtroom to buy.  Now that may not have been

8    the best setting to talk about this.  But in the open

9    market, if I go and sell a huge amount, there are only so

10   many buyers there that are positioned to buy it.

11          And the buyers are going to demand a lower price

12   to transact that, partly because I'm asking them to take

13   more of a particular risk.  Also, because they worry about

14   adverse selection or information that I might have.  Why is

15   someone selling a large amount of preferred?  What does that

16   individual or what does that entity know, especially if

17   they're selling preferred across a bunch of financials.

18          So the market -- and this is what I've done a lot

19   of my research on -- the market will respond to big sell

20   orders factoring in the possibility that the motive for

21   selling is because the seller views these as overpriced, a

22   good time to sell.  And if I know that you're selling me

23   something and your motive is potentially because you think

24   it's overpriced, I better take that into account and lower

25   the price.  So that happens across the board in all markets.

Page 53

1    So for all those reasons, there's going to be what we call

2    market impact.

3    Q    And how did QVT take that market impact into account in

4    its valuation?

5    A    Well, again, what they did is they looked for the

6    lowest price that the preferred was trading on over the

7    week.  And at this point, I have to say that that approach,

8    I can't really say has scientific basis.  That wouldn't be

9    the way that I would have thought about trying to gauge

10   market impact.  On the other hand, I'm not sure what would

11   be a good way.  There's no way that stands out as a perfect

12   way to do it.  The rationale behind this did have some

13   merit.  And the rationale is that if I see prices

14   fluctuating over time, the lower prices are likely to be

15   prices that happened because someone was selling, and the

16   higher prices would likely be ones where someone was buying.

17          So that was the rationale, which, again, does have

18   merit, and they employed that.  I wouldn't have approached

19   it that way.  But, I, again, am not sure exactly what I

20   would have done.  But I understand that the effect of this

21   was roughly to factor in about a 6 percent market impact.

22   And I would have guessed -- I shouldn't use the word guess -

23   - I would have, knowing that market, I would have thought

24   that it would be higher than 6 percent.  I think 6 percent,

25   it's fairly conservative given what I know about that market

Page 54

1    and the volumes that were trading.

2    Q    And when you said they used the lowest price of the

3    week, were those closing prices?

4    A    Yes, those were closing prices.

5    Q    And in reviewing the valuation of the PCDS in September

6    of 2008, in addition to the market impact of a potential

7    sale of preferred securities, were there any other affects

8    that you identified that would have affected the price of

9    PCDS at that time?

10   A    Yes, there were.  So, again, just to go back.  If I'm a

11   dealer having to hedge this risk, mitigate this risk by

12   shorting the securities, I face a number of other issues

13   beyond just selling those preferreds in the market and the

14   market impact, which we've discussed.  For instance, when I

15   borrow security, oftentimes, there's a cost to borrow.  I

16   have to pay a fee, if you will, to the individual or entity

17   that I'm borrowing the security from.  And that could be a

18   1/2 percent, 1 percent, 1-1/2 percent, it would depend upon

19   the setting.  But that would be potentially material --

20   potentially quite material to my calculations as a dealer.

21   Q    You refer to 1 percent; 1 percent for a period, some

22   period?

23   A    1 percent a year.  And, again, it varies quite a bit

24   depending upon the market conditions and the demand for

25   shorting.

Page 55

1   Q     And did QVT take into account in its calculations the

2   costs that a borrower -- costs that a dealer would have

3   incurred in borrowing securities?

4   A     No, it did not.

5   Q     And how would that affect the value of the PCDS?

6   A     Well, that would have definitely, to the extent that it

7   increased the cost of this hedge, it would increase the --

8   basically, the cost that the dealer would charge to QVT and

9   increase the amount of the claim here.

10  Q     Were there any other affects that you identified that

11  would have affected the value or price of the protection?

12  A     So another -- I should say there's also, just to

13  emphasize, when you short a security, the dealer would run

14  some risk that the lender would want it back, so might

15  charge you a little bit more for that risk as well.  But

16  another main issue here, a main concern, would be that the

17  PCDS contract gives the buyer of protection the right to

18  deliver to the seller of protection the cheapest security.

19  And that can be quite valuable, especially if there's quite

20  a bit of variability among what the prices of the securities

21  would be because I, as the protection buyer, have the right

22  to select whatever is cheapest.

23          And, of course, at the time that the protection is

24  put on, if I'm buying the protection from you, you don't

25  know which is going to be the cheapest to deliver security.

Page 56

1    If you were lucky, you might short that security, and then

2    you would be in a position where you wouldn't be adversely

3    affected by my delivering the cheapest to deliver security.

4    But if you chose one that ended up not being cheapest to

5    deliver, then there's an additional shortfall that's risk to

6    you.  And arguably, a dealer could have factored that into

7    the pricing as well, knowing that that's a benefit to the

8    protection buyer.

9    Q    And did you review which securities QVT used to obtain

10   its prices for the underlying preferred?

11   A    I did.

12   Q    And did QVT use the cheapest to deliver security in

13   those calculations?

14   A    My understanding is that the approach, generally

15   speaking, was to first look for the reference obligation and

16   to use pricing on that, unless there was little pricing or

17   if pricing on that was viewed as not reliable, and then

18   taking something else.  But there wasn't a decided effort to

19   take the cheapest security at the time, which could have

20   been a sensible thing to do.  Because if I'm selling, again,

21   protection to you, knowing that you're going to deliver the

22   cheapest to deliver, it probably makes sense for me today to

23   short what is the cheapest today.

24   Q    And if QVT had used the cheapest to deliver security in

25   their calculations, how would that have affected their

Page 57

1   claim?

2   A    That would have increased their claim by a material

3   amount.

4   Q    Were the -- I want to turn to a slightly different

5   subject, and that is the maturity of the PCDS.  Were the

6   maturities of the -- do you recall what the maturities of

7   the PCDS's were that were being guided here?

8   A    I don't require them all specifically.  But I think the

9   average, if I recall correctly, was around four or four and

10  a half years.  I may be wrong, my recollection may be wrong,

11  but I believe that's about what it was.

12  Q    And what you've been talking about here is selling

13  preferred securities to hedge that four-and-a-half-year

14  risk, right?

15  A    Yes, that is correct.

16  Q    And are the preferred securities that are being sold

17  four and a half year securities?

18  A    No.  Preferred securities oftentimes have very long

19  lives; in fact, some of them are perpetual or don't have a

20  maturity date.  So at first, it would appear that there's a

21  big mismatch.  I'm selling something to hedge, which is a

22  long-dated security, and the protection only runs for four

23  and a half, maybe five, six, seven years.

24          So what's important to understand here are several

25  things: First of all, cash flow payments that are received

Page 58

1    far out in the future are not worth much today.  I used to

2    teach my MBA students about what was called a Wal Disney

3    Sleeping Beauty buy, where Walt Disney issued bonds that had

4    a hundred-year life.  And the repayment of principle a

5    hundred years away was, in today's terms, worth 7 cents.  So

6    if you learn that Walt Disney wasn't going to pay that $100

7    in a hundred years, that would have caused the bond to go

8    down by 7 cents because it's so far out in the future.  So

9    that's one thing.  In any instrument, you're worried and put

10   more weight on what is near term.

11          But that's not the major point here.  The major

12   point here is that QVT is replacing these PCDS contracts at

13   a time when risk, especially in the financial sector, has

14   gone up remarkably.  And just a few days before, you had the

15   event where the government-sponsored entities Freddie and

16   Fannie, as they're affectionally known, were placed into

17   conservatorship, or receivership, by the U.S. government.

18   And the effect of that was to reduce greatly the value of

19   the preferred.

20          And we're now in a position on September 15th and

21   following when the whole market is in turmoil with the

22   failure -- the biggest bankruptcy in history -- failure of

23   Lehman Brothers and a great stress on the financial system.

24          So it was very reasonable for QVT, at this time,

25   to make the observation that if a dealer is going to hedge

1    this, they're looking at doing so in a financial crisis

2    basically that's brewing, is going to affect financial

3    firms, which is exactly the firms that have issued these

4    preferred securities.

5           And in the end, what that means is that the

6    insurance is really relevant to the short term.  That's what

7    you're really insuring because that's where the risk is

8    concentrated.  So the fact that the preferred is a long-

9    dated instrument and the protection is over four or five

10   years is a consideration, but a consideration of limited

11   significance here, partly because of what I talk about with

12   the Sleeping Beauty bond.  But much more because we're

13   entering a financial crisis and that's where you really need

14   the insurance protection, and the financial crisis is going

15   to basically play out over the next four or five years.  And

16   that means that the protection you're really seeking and the

17   pricing of the preferred is going to be related to what

18   happens in the next two, three, four years.

19   Q    And so in the end, what was the total amount that QVT

20   calculated as the value of its PCDS positions?

21   A    I believe it was 134 million.

22   Q    And based on all of the factors that you've described,

23   do you have an opinion as to whether that valuation was

24   reasonable under economic principles?

25   A    I think it was very reasonable, given the situation and

Page 60

1   the fact that QVT could look out in the marketplace and say,

2   there are no dealers here, there's no market, and a dealer

3   who would take this position would have to hedge this risk.

4   So I found it very reasonable.

5   Q    Okay.  I'd like to turn to a different subject, a

6   position that QVT had with Lehman called (INDISCERNIBLE).

7   Do you recall that?

8   A    I do.

9   Q    And would you describe, in general terms, what the

10  (INDISCERNIBLE) product was?

11  A    So the (INDISCERNIBLE) product was something that

12  basically had been put together by Lehman and was marketed

13  by Lehman, and Lehman was, to the best of my knowledge, the

14  sole market maker in it.  And what it was was a basket of

15  credit default swaps on very low, highly subordinated

16  tranches of asset-backed securitizations.  And the assets

17  that were backing it were, I believe, something like

18  100,000/99,000 loans to automobile buyers to basically

19  purchase automobiles -- either new or used automobiles.

20  Q    And were there particular originators or servicers of

21  those loans?

22  A    Yes, there were two.  So half of the securitizations

23  that were covered on this CDS that were part of the basket

24  were associated with Ford, and the other half were

25  associated with GM -- or GMAC.

Page 61

1    Q    And are you aware of whether there were any other

2    dealers in the market making a market for (INDISCERNIBLE) in

3    2008?

4    A    No.  I haven't seen no evidence at all that there was

5    any other dealer playing anything close to an active role,

6    other than Lehman.

7    Q    And can you give the Court any sense, based on your

8    review of this matter, of the size of the market for

9    (INDISCERNIBLE) in 2008?

10   A    Well, I think it was extremely limited.  As I

11   understand it, at the time of the filing, there, I believe,

12   were outstanding 95 million of basic open notional interest,

13   as I might call it, and QVT had 80 million of that.  So QVT

14   had about 84-85 percent of the market -- of what was issued

15   in terms of protection.

16   Q    That's purchases of protection?

17   A    Purchases of protection, yes.

18   Q    And did you review the methodology that QVT used to

19   value its (INDISCERNIBLE) position in 2008?

20   A    Yes, I did.  Yes, I did.

21   Q    Okay.  And did QVT request market quotations in the

22   market for the (INDISCERNIBLE)?

23   A    No, I believe this is one case where they made an error

24   and, for some reason, it didn't get included in the market

25   quotation process.

Page 62

1    Q    And do you have an understanding of whether there were

2    pricing services that provided pricing on (INDISCERNIBLE) in

3    2008?

4    A    I do not believe there were any prices that were

5    available, again, because there were basically no

6    transactions, or extremely sporadic transactions, as I would

7    call.  The last transaction that Lehman made -- well, I

8    shouldn't say it.  The last transaction that QVT made on

9    this was to sell back to Lehman some of its protection in, I

10   think, it was July of -- the Summer of 2008.

11   Q    What was the methodology that QVT did use to value

12   these positions?

13   A    So the problem, of course, here is that you have no

14   pricing on (INDISCERNIBLE), which is the basket, and then

15   you have no pricing available on the credit default swaps

16   that make up that basket, and then you have no reliable

17   pricing on the actual underlying instruments -- underlying

18   bonds -- that the credit default swaps reference because

19   there's really not much of a market there that's reliable.

20   So all the way down, you don't have reliable market

21   information.

22          So, in this case, QVT had to use what I think

23   would generally be spoken of as a proxy.  Find something

24   that would be traded in the market in a way that we could

25   get reliable market pricing that would be basically a proxy

Page 63

1    for, meaning that it's related to the pricing of what I

2    don't have information for.  And QVT chose to use GMAC,

3    created false swaps on GMAC, as an indicator of what was

4    happening in the market at that time and how to adjust for

5    what was happening.

6    Q    And you referred to this as a proxy.  Is the use of a

7    proxy an accepted method for valuation under economic

8    principles?

9    A    Yes, it is.

10   Q    And could you describe how that works?

11   A    Well, to make it as visual as possible, let's imagine

12   that there are various rooms where there are traders.  So we

13   get market pricing from traders.  So in Room 1, that's where

14   what we're trying to price is traded and there are no

15   traders in that room.  So when we got into that room, Room

16   1, there's no market pricing at all.  And that was really

17   the case for (INDISCERNIBLE).  And then we go into the

18   second room, the one that's closest, which might be pricing

19   on the underlying credit default instruments that make up

20   the basket, and there's no trading there.  So we sort of

21   have to go down the hall until we find a room where there's

22   a lot of traders trading something that's close enough to

23   what we want to price that we can get an accurate indication

24   of how, in this case, values had changed.

25            And QVT reasonably went down the hall a little bit

Page 64

1    of a distance to come up with the closest thing that would

2    capture -- or one of the closest things that would capture

3    what was happening in the market for automobile loans, given

4    we're entering into a financial crisis, unemployment rates

5    are going up, all kinds of things are happening, and they

6    chose to look at credit default swaps on GMAC.  And for that

7    room, we've got a lot of trading.  We've got enough trading

8    that we're getting reliable prices, so that's what they did.

9    Q    And you use the term close enough to the original

10   security.  Under economic principles, what are the standards

11   for knowing whether it's close enough?

12   A    Well, it's difficult to determine, and here's where

13   reasonable people could disagree.  It's difficult to

14   determine what the perfect pro -- well, first of all,

15   there's no perfect proxy, I shouldn't' have even said that -

16   - what the best proxy would be.  And what you're looking for

17   is something that's going to be affected by economic events

18   in roughly the same way as what you're trying to price.

19            So had QVT gone and used something that was

20   totally unrelated to the automobile loan market as a proxy,

21   that would not have been reasonable.  Because, unless you

22   have some firm foundation for believing that this other

23   thing, whatever it might be, is going to have the same

24   economic exposures as a basket of automobile loans, there's

25   no reason -- it's not reasonable to use that as a proxy.

Page 65

```
 1              But in using GMAC, that was obviously an entity

 2      that was exposed in a very significant way to automobile

 3      loans.  And the pricing on that and the change in the

 4      pricing on those CDS's on GMAC was a good proxy because,

 5      again, the economic exposures were closely in line.

 6      Q    And how did QVT use the -- let me back up.  You said

 7      earlier that these underlying loans were issued by both GMAC

 8      and by Ford?

 9      A    Yes, that's my understanding.

10      Q    And could QVT have used Ford CDS's for finance CDS's as

11      a proxy?

12      A    That would have been used potentially as a proxy as

13      well or some combination.  In principle, one could have used

14      Chrysler.  First, you hear that and you say, that doesn't

15      make sense.  Well, it does in a sense because what I'm

16      trying to determine is what is the risk, at this juncture --

17      Lehman week -- what is the risk to U.S., basically U.S.,

18      borrowers who had borrowed on their automobiles of paying it

19      off.  It really doesn't make much difference, at least in my

20      mind and I haven't heard an argument to the contrary,

21      whether it's a Ford that's been purchased or a Chrysler or a

22      GM car.

23              What we're really looking at is the risk of

24      borrowers, many of them with low FICO score.  A lot of the

25      loan-to-values were high here.  And, again, we're talking
```

Page 66

1    about the very subordinated tranches here.  So, arguably,

2    another proxy could have been any other instrument that was

3    exposed to loans made by U.S. customer to buy automobiles

4    here in the United States when the unemployment rate is

5    going up and a lot of things are happening.

6              So the answer is, Ford could have been used and

7    Chrysler and perhaps some other things.  As I understand it,

8    one of the reasons they used GMAC was that this was

9    interpreted this position as a hedge to some other positions

10   that they had, so they gravitated toward that.  And, in my

11   view, it was reasonable to use that as a proxy.  But there

12   are other proxies that could have been potentially used as

13   well, and it's difficult to determine X entity what the best

14   proxy would be.  Here's where some judgment comes into play.

15   Q    And how -- did you get an understanding of how QVT used

16   the GMAC CDS prices to -- as a proxy?

17   A    Yes.  So the valuation approach was to begin with the

18   mark that had been placed on the (INDISCERNIBLE) basket as

19   of December -- excuse me, I misspoke -- September 12, 2008,

20   and I believe that mark was 16.  And then to account for

21   what obviously happened that is extreme -- the bankruptcy of

22   Lehman Brothers and the heightening of the financial crisis

23   -- by looking at what happened to GMAC credit default swaps

24   from the 12th to the 19th.  And we'll talk in a moment, I

25   would guess, about why the 19th. So that was a 15 point

Page 67

1    increase, and so we add 15 to 16.

2            And then QVT realized that this is 80 million out

3    of a total market, at least at the time, of 85 million.  And

4    in going out and trying to get protection, to repurchase

5    protection in the market from a market where there are no

6    dealers available in (INDISCERNIBLE) because the one dealer

7    has now filed for bankruptcy, and all the other conditions,

8    they made an assumption that the, in sense the -- I'll call

9    it the market impact, but that the pricing would reflect an

10   additional 15 points.  And just having to convince someone

11   on the other side to take that position when you have a very

12   complicated illiquid instrument, so that's another 15

13   points.  So 16 plus 15 plus 15, ended up with, as I recall,

14   something -- it was around 46.

15   Q    So let's just go back to the first adjustment that you

16   referred to, the use of the change in GMAC prices from the

17   12th to the 19th of September.  Did you have an

18   understanding of why they used the 19th of September, as

19   opposed to the 15th of September, which was the early

20   termination date?

21   A    So my understanding was that this was a instrument

22   (INDISCERNIBLE) that was very illiquid and was going to be -

23   - take a while, a long time replace, and so -- and would

24   probably be done in increments over a period of time.  So

25   they took the 19th to reflect that it was going to take a

Page 68

1    longer period of time and that the trades would actually be

2    happening, not all on one day, but over a series of days,

3    maybe quite a bit more than five or six or seven or eight

4    days -- trading days -- and they took the 19th as a proxy --

5    and, again, we're talking about a proxy here -- of what the

6    pricing would be.

7    Q    Were you or did you become aware of any quotations on

8    the (INDISCERNIBLE) product that occurred in the vicinity of

9    September 15, 2008?

10   A    Well, not in September, but in August, I believe --

11   August 21st -- there was a quotation from Lehman, the only

12   market maker again, at 23.

13   Q    Let's just take a look at that quotation.  Could you

14   bring up Joint Exhibit 39?  Okay, it's going to be the last

15   page.  Is this the quotation that you're referring to?

16   A    Yes, it is.

17   Q    And where is the 23?

18   A    So the way that you get 23 is to subtract 77 from 100.

19   Q    Okay.  And is that your understanding of the price that

20   Lehman would have charged on August 21st for protection on

21   (INDISCERNIBLE)?

22   A    For selling protection, yes.

23   Q    And what was the significance of this pricing to you?

24   A    Well, again, this is on the 21st, and this was at a

25   somewhat stress time in the market, in the economy; storm

Page 69

1    clouds were gathering, if you will.  I believe that

2    unemployment was inching up a bit.  But between this time

3    and September 15th, obviously, a lot happened --

4    unemployment went up, we talked about Fannie and Freddie --

5    but most importantly, we had the Lehman Brother's

6    bankruptcy.

7             Just, I remember that day very well thinking we

8    were going into potentially a great depression, and I have

9    that memory vividly.  And I'm not saying that anyone else

10   thought that way, but I think other people did as well.  And

11   so we have a huge change in market conditions.  So at the

12   very least, one can say that if 23 was the right price the

13   21st of August, something much higher than 23 would be the

14   right price for basically replacing 80 million of this

15   (indiscernible) standards of 5 million over a period of time

16   after Lehman Brother's bankruptcy.

17   Q    And I think you said you've reviewed transcripts from

18   this trial.  Do you recall seeing questioning of QVT traders

19   on the question of whether they reviewed remittance reports

20   or Intex runs in connection with the (INDISCERNIBLE)

21   valuation?

22   A    Yes.  I believe that Arthur Chu was asked a series of

23   questions about that.

24   Q    And do you think it was -- do you have an opinion about

25   whether it was reasonable for QVT not to review remittance

Page 70

```
 1    reports and Intex runs in connection with this valuation?

 2                THE COURT:  Mr. Tambe.

 3                MR. TAMBE:  Objection, Your Honor.  This goes

 4    beyond the scope off the scoped opinions.  Plus the issue of

 5    remittance reports and Intex runs may have been of Mr. Chu

 6    on the stand, those remittance reports and other information

 7    was available back on September, 2008 and was available to

 8    this witness who did not look at it either.  So I don't

 9    think he should be opining that.

10                THE COURT:  Mr. Tracey.

11                MR. TRACEY:  Well, the latter point is neither

12    here nor there.  Actually, I think it supports the point.

13    But...

14                THE COURT:  I don't understand.  The latter point

15    being the one that the remittance reports were available.

16                MR. TRACEY:  And that he didn't look at them.

17                THE COURT:  Yes.

18                MR. TRACEY:  So would it make sense for us to

19    approach?

20                THE COURT:  Yeah, I think it would.

21                MR. TRACEY:  All right.

22    Q    Professor Pfleiderer, going back to the questions that

23    were asked of Mr. Chu about the review of remittance reports

24    and Intex runs.  Did your review of that testimony change

25    your opinion in any way?
```

Page 71

1    A    No, it did not.

2    Q    Why not?

3    A    Well, first of all, a remittance report and an Intex

4    run shows sort of the in-place snapshot of where the funding

5    is in a structured entity.  Intex can also be used to

6    forecast cash flows.  So one could have taken Intex, put in

7    various assumptions about, in this case, how people are

8    going to repay their automobile loans, what default rates

9    are going to be, and a number of other things.  And in the

10   end, if you turn those dials, you could get your own

11   expectation of what the cash flows in a particular tranche

12   would be.

13           But that in and of itself would not be sufficient

14   to come up with a price, because having expected cash flows

15   doesn't tell you what the price is.  You have to figure out

16   what the discount rate is to discount for risk.  So you

17   would have had to make additional assumptions about what

18   that discount rate is.

19           So, arguably, someone could go to Intex, make a

20   number of assumptions, including a very important assumption

21   about what the discount rate is for the risk.  And what has

22   to be considered here, is you're doing this at a time when

23   market conditions are really changing.  And you don't have -

24   - sitting in a room by yourself, you don't have reliable

25   evidence without looking at the window at what the market is

Page 72

1     pricing that risk at.

2              So it was entirely, in my sense -- and this is all

3     based upon sort of knowledge of asset pricing -- just having

4     expected cash flows, which involve a lot of assumptions,

5     isn't sufficient for pricing.  You also have to know what

6     the discount rate is.  It was entirely reasonable for QVT to

7     not do an exercise like that, which would involve making a

8     lot of assumptions that I'm sure would have been questioned,

9     but rather to base it primarily, almost exclusively, on just

10    looking at market prices of a proxy, which was GMAC.

11             MR. TAMBE:  I guess I'll just note my objection.

12    This is beyond the scope of disclosed opinions and

13    (indiscernible).

14             THE COURT:  All right, thank you.  You can take it

15    up on cross, Mr. Tambe.

16    Q    Based on all the factors that we've discussed, have you

17    reached an opinion as to whether QVT's valuation of its

18    (INDISCERNIBLE) position in September, 2008 was reasonable

19    under financial economic principles?

20    A    Yes.  I believe they sought out market information that

21    produced a reasonable proxy in what was a very difficult

22    pricing environment.

23    Q    I'd like to turn to another subject.  Did you become

24    aware in your review that QVT used market partners pricing

25    data to value a number of its positions?

Page 73

1    A    Yes.  I believe they used market, or Markit Partners

2    pricing data on about 370 of the positions.

3    Q    And what is your understanding of Markit pricing data?

4    A    So Markit is an aggregator of dealer notional pricing.

5    So, for the most part, what they do is collect at the end of

6    the day where dealers in a particular security think the

7    market is, and they aggregate that together and produce a

8    mid-market price.  It's neither an ask or a bid.

9    Q    And what is a midmarket price?

10   A    So a midmarket price is arguably halfway between that

11   offer price and the bid price.  So it's not a price at which

12   you could trade.  If you call -- let's say that Markit got

13   the price right in the sense that that's actually what

14   dealers were producing and they're going to stick by

15   whatever they said in terms of their midmarket price.  So

16   let's say that a 100.  If I call up a dealer and say, I want

17   to buy from you, the dealer is going -- and I want to buy it

18   from you at a 100, that's the price that I saw.  The dealer

19   is saying, wait just a minute, we're going to charge you

20   105.  And if I say to the dealer, okay, I'll sell you at

21   105, the dealer's going to say, wait a minute, I'm going to

22   sell you at 95.  That 100 was a price that's halfway in

23   between the price that I'm going to sell you at and -- you

24   know, halfway between the price I'll sell you and the

25   halfway -- and the price I'll buy you at.  So halfway in

Page 74

1   between 105 and 95, for example.

2   Q    And is that known as a bid-ask spread?

3   A    Yes, it would be.

4   Q    And what is the function in the market of a bid-ask

5   spread?

6   A    So a bid-ask spread exists for a whole slew of reasons.

7   First of all, it's the sources that dealers profit.  A lot

8   of the lights in the city here would go out if you didn't

9   have a bid-ask spread.  That's how the dealers make part of

10  their profits.  But there's more to it than that.  So a

11  dealer who is making a market is oftentimes going to be

12  taking some risk.  For example, a dealer market is one in

13  which a dealer might sell a position with the hopes very

14  quickly, or relatively quickly, of taking the opposite side.

15  So the dealer might buy from one entity and then turn around

16  and sell, hopefully, in a short period of time, to another

17  entity.  And so, if you buy at 95 and sell a little bit

18  later at 105, you make that profit.

19          The problem is if I buy at 105 and I don't find

20  someone on the other side to take that position to sell it

21  off at, now I've got that risk on my books.  And if it's a

22  illiquid market where it's going to be hard to find someone

23  on the other side, I may have that risk on my books for

24  quite some time.  So in an illiquid market, the dealer quite

25  reasonably reflects on the fact that they're going to be

Page 75

1    exposed to more risk and they're going to charge a spread --

2    bigger spread -- to account for that risk.

3            And then there's another reason that you have a

4    bid-ask spread.  And that is, if I'm a dealer and you show

5    up and you're real anxious to sell to me -- now, you're

6    probably a good trader, you don't reveal that -- but if

7    you're wanting to sell to me, I have to ask myself why are

8    you wanting to sell.  And it may be that you're just trying

9    to close out a position, you're trying to adjust your books

10   in hedge, but it's also the possibility that you realized

11   that this is overpriced and it's a good time to sell because

12   prices are too high.  It's the adverse selection we talk

13   about.

14           So to protect myself against adverse selection,

15   the fact that I might be dealing with someone who has more

16   information that I did, I'm going to slant the prices away

17   even more, so that when I'm trading with those people, I

18   don't lose too much.  And so for all those reasons, you have

19   a bid-ask spread.  And one of the important things is, in an

20   illiquid market, the bid-ask spread is going to be much

21   higher, partly because of the risk that I talked about.  And

22   arguably because adverse selection, this possibility that

23   because there's not much price (indiscernible), I might be

24   trading with someone who's got better information than I do,

25   is more severe in an illiquid market than what it is in a

Page 76

1    very liquid market.

2    Q    So you referred to the mid-price that Markit Partners

3    gives as a mid-price that can't be transacted at.  How do

4    you get from, if you're trying to determine a replacement

5    cost, how do you get from the mid-price to the replacement

6    cost?

7    A    So at that point, you need to consider what it is that

8    you're selling and how much, and make an estimate of what

9    you would actually be able to sell that at or buy it at.

10   And so, you would either -- if you're buying, you would add

11   something to the Markit price, or if you're selling, you

12   would subtract something from that price.  And you have to

13   use some judgment as to how big that spread bid-to-bid or

14   bid-to-offer adjustment is going to be.  And as I just

15   suggested a few minutes ago, it's going to generally be

16   larger the more illiquid the security is.

17   Q    And did QVT add those additional spreads to its

18   positions in calculating its loss?

19   A    Yes, it did.

20   Q    And did you find that reasonable?

21   A    Yes.  They used a range of adjustments from 3 percent

22   to 15 percent, with most of them being on the order of 10

23   percent.

24   Q    And did you do any review of available literature on

25   the question of mid-bid spreads or bid-ask spreads that

Page 77

1   existed in 2008?

2   A    I did in my initial report observe that there was one

3   academic article that did look at what happened to CDS

4   pricing before and after Lehman week, and it showed

5   graphically that there'd been an increase in the spreads.

6        MR. TRACEY:  Can we bring that up?  This is

7   Exhibit 5905.  You don't have it?  We can just look at the

8   hard copy.

9   Q    I think you have a book up there if you want to look at

10  it.  So can we go to the first page?  Is this the article

11  that you just referred to?

12  A    Yes, it is.

13  Q    And what in this article was your reference point for

14  spreads?

15  A    Well, in referencing this article, the only thing that

16  I relied upon was one graph that I think was on the screen

17  before here just a moment ago.

18        MR. TRACEY:  Can you bring up Page 30?

19  A    So the graph that I looked at was Panel B of Figure 1.

20  And what this is showing -- I should set the context for

21  this.  This was the bid-to-ask spread on European CDS's,

22  CDS's on European entities, and it was broken down to

23  financials and corporates.  I believe the financials are the

24  ones in orange or red, whatever that color is, and the

25  corporates, I believe, are in green.

1          In any event, what this shows is that during --

2     what it shows is what these were at various periods.  And

3     the systemic period is a period that I believe runs in the

4     author's analysis between September 1st and, I believe, the

5     end of March.  And what you can see is, in particular in the

6     financials, there was a huge jump in the early part of that

7     period, which encompasses Lehman week.

8          And I should emphasize that this data, first of

9     all, is for European entities.  Arguably, potentially at

10    least, the financial crisis began in the U.S., so U.S.

11    entities could have been affected by even more.  But more

12    importantly, what I would stress is that these are entities

13    or CDS contracts for which there was a fair about of data.

14    This was the more liquid part of the market.  But I wasn't

15    interested so much in showing the levels here, but rather

16    the increase in the level of the bid-ask spread.

17    Q    And how did that bear on your opinion as to QVT's use

18    of mid-bid spreads?

19    A    That the assumptions that they were making that

20    business was not usual during Lehman week, that spreads had

21    gone up, was certainly supported by at least this one

22    article.  And I searched for academic articles that had

23    basically gathered this data.  And at the time I filed my

24    initial report, this is the only one I was able to find.

25    There may be others that are out there, but it was the only

Page 79

1    one I was able to find.

2    Q    Okay.  So going back to QVT's valuation of the Markit

3    Partner's positions.  Did QVT use Markit data from the early

4    termination date in every instance?

5    A    No.  It used -- for the most part, it used September

6    16th, I believe, for around 260 of those out of 370.  It

7    used some on the 15th, and some on the 17th, and a few on

8    the -- very few, I believe, on the 18th, and some on the

9    19th.

10   Q    And did you have an understanding based on your review

11   of materials as to why the QVT traders chose those dates?

12   A    Well, here, they used their own judgment as to when

13   they could have traded based upon market conditions at that

14   time and based upon the nature of the instruments that they

15   were trading.

16   Q    And based on your overall review of the Markit

17   Partner's data and the information you received from the QVT

18   traders, do you have an opinion as to whether their approach

19   was reasonable?

20   A    Given what I observed and what I understood, it seemed

21   reasonable to me, again, given the market conditions at the

22   time.

23   Q    Let me turn to a different topic, and that is the

24   interest rate swaps.  Did you review QVT's valuation

25   approach with respect to the interest rate swaps positions

Page 80

1    it had with Lehman?

2    A    Yes, I did.

3    Q    And how many such positions were there?

4    A    I believe that there were two positions.

5    Q    And could you describe those positions in general

6    terms?

7    A    As I recall, those -- it was a, shall we say, plain

8    vanilla standard interest rate swaps and the two positions.

9    Whenever I say two positions, one was for QVT and one was

10   Quintessence.  So it was the same interest rate swap, but

11   one for QVT and one for Quintessence.

12   Q    And how did QVT value those interest rate swaps for

13   purposes of its swaps calculation?

14   A    My understanding is that they used the Bloomberg

15   calculator, Bloomberg valuation tool, on using September

16   15th information.

17   Q    Let me show you a document that we've marked as

18   Claimant's Exhibit 1568.  And if we could go to the second

19   page of that.  Did you review this in the course of your

20   work in this case, Professor Pfleiderer?

21   A    Yes, I did look at this.

22   Q    And what does this represent?

23   A    Well, this is the, as it says at the bottom of the main

24   page, for the interest rate swap valuation tool.

25   Q    And what does this tell you?

Page 81

1    A    Well, I guess various pieces of information, obviously,

2    that are needed for valuing the swap, but most importantly,

3    at least for this question of when the valuation was done.

4    As you can see, the valuation curve that is about two-thirds

5    down the page, the setting there is the 15th of September.

6    Q    And did you determine whether this was a reasonable way

7    to valuate interest rate swaps?

8    A    Yes.  My understanding is that this is a standard

9    approach that would be taken for valuing interest rate

10   swaps.

11   Q    Okay.  I'd like to turn to one last topic, and that is

12   collateral for CDS positions.  Do CDS counterparties

13   generally provide collateral for their positions with each

14   other?

15              MR. TAMBE:  Objection, Your Honor.

16              THE COURT:  Yes.

17              MR. TAMBE:  It goes beyond the scope of his

18   knowledge or foundation.

19              MR. TRACEY:  I think he testified that he teaches

20   about collateral and margin.  And he had this in his initial

21   report.  It's been disclosed; it's never been objected to.

22              MR. TAMBE:  No question of discl- -- I'm sorry,

23   are you done?

24              MR. TRACEY:  Yeah.

25              MR. TAMBE:  It's not a question of disclosure.

Page 82

1   It's a lack of any base to (indiscernible) upon that,

2   especially given the qualifications that mentioned at the

3   outset.  He doesn't have any experience with ISDA documents

4   or how close it's supposed to or why it's supposed to.

5              THE COURT:  But the question was not put in terms

6   of ISDA documentation.

7              MR. TRACEY:  No, it's just a -- sorry.

8              MR. TAMBE:  Listen, how (indiscernible) any

9   collat, there's no foundation.

10             THE COURT:  Could you ask a question --

11             MR. TRACEY:  Sure.

12             THE COURT:  -- that speaks to foundation.

13             MR. TRACEY:  Sure.

14  Q    Professor Pfleiderer, do you have any experience

15  teaching with regard to the collateral, the placing of

16  collateral to support CDS positions in the market?

17  A    Absolutely.  In all of the teaching that I do when

18  we're talking about derivatives, generally speaking --

19  futures, credit default swaps, whatever -- where there's

20  counterparty risk, I explain that there's a mark-to-market

21  process.  There's an initial margin that's oftentimes

22  posted, and then a mark-to-market margin depends upon what

23  type of...

24  Q    Well, before you get into it, I just want to --

25  A    I'm sorry.

Page 83

1   Q     -- what teaching you've done, what courses on this

2   subject.

3   A     So in any course, I think I can -- almost all courses

4   where I would be talking about derivatives, whether they be

5   swaps, futures, credit default swaps, you talk about

6   counterparty risk and how that's mitigated by the posting of

7   margin.  That's something that you would routinely explain

8   in -- maybe not the first day, but early on in the

9   discussion.

10          MR. TRACEY:  That's the foundation, Your Honor.

11          THE COURT:  I'm sorry?

12          MR. TRACEY:  I said, that's the foundation, Your

13  Honor.

14          THE COURT:  Yes, I agree.  All right, Mr. Tambe,

15  your objection is overruled.

16  Q    And so would you describe, please, for the Court how

17  that collateral process generally works in the market for

18  providing collateral on these positions?

19  A     Well, in the OTC market, the dealer that is involved

20  usually has the right and responsibility to set those marks.

21  And there's a determination of what the effect on collateral

22  is, just as the value of the positions changes.  So if it

23  changes in QVT's favor, in this example, that would be

24  collateral that would be released to QVT; or if it changed

25  in Lehman's favor, that would be additional collateral that

Page 84

1    would have to be posted.  That's the general idea.

2            And that mitigates the counterparty risk because,

3    to the extent that that collateral process works relatively

4    well, the amount that might be lost by either side is

5    lessoned.  Now what collateral doesn't do is, it certainly

6    doesn't guard against what we might call junk risk.  So the

7    collateral is set periodically, on a daily basis in most

8    cases.  And if the world changes rather dramatically over a

9    day, as it did over Lehman weekend -- I'll call it Lehman

10   weekend -- the 12th to the 15th, then that collateral is not

11   -- whatever was posted before that is not going to be

12   sufficient to cover whatever that bust would be.

13           The other important thing is that the collateral

14   is basically set at a mid-mark.  So we get back to what we

15   were talking about before where it's neither a bid or an

16   ask, if you will; it's just halfway in between in terms of

17   what it really represents.  So it doesn't reflect the cost

18   of replacing something when you have to go in the market and

19   pay a spread.

20   Q    And so one...

21           THE COURT:  Mr. Tracey, could I just ask you to

22   pause for a minute?

23           MR. TRACEY:  Sure.

24           THE COURT:  Could you come up for a moment?

25       [PAUSE]

Page 85

1    Q    Okay?  So Professor Pfleiderer, from an economics

2    standpoint, would the collateral value of a position

3    generally be equivalent to the value of a position upon

4    default by a counterparty?

5    A    No, it would not.

6    Q    Why not?

7    A    Partly, for the reasons that I just mentioned: One is,

8    the collateral is set at a particular point in time, and if

9    the replacement has to be done at a later time, the

10   collateral mark does not reflect what the cost of

11   replacement would be if prices had changed; and the second

12   is, if the collateral mark is a mid-mark and the replacement

13   is going to be done at either a bid or an ask.  So for those

14   two reasons, those alone would make the collateral mark not

15   relevant, or not dispositive for what the replacement cost

16   would be.

17          There's also the possibility that the collateral

18   mark is not accurate in the sense that -- when I say

19   accurate, I should probably say it a little bit more

20   carefully.  But if there's not been a lot of trading, market

21   activity, the dealer may have very little to go on in terms

22   of actually picking up where the market price is.  So that

23   means that, in principle -- I'm just talking in principle

24   here -- that the collateral mark could be stale one way or

25   another.

Page 86

1         So those three reasons -- a potentially stale

2    collateral mark, the fact that it doesn't account for a jump

3    in prices, and the fact that it is not a bid or an offer,

4    which is what replacement would entail -- means that the

5    collateral mark could potentially provide a starting point

6    for such a calculation, but can't be taken alone as an

7    indication, from an economic standpoint, of what the

8    replacement values would be.

9    Q    Okay.  And now, I'd like to basically direct your

10   attention to the entire portfolio that QVT valued.  Do you

11   have an opinion about whether under financial economic

12   principles, QVT's valuation was reasonable?

13   A    Yes.  I saw nothing that QVT did that was a violation

14   that went counter to basic financial economic principles.

15   Again, with -- I'm not going to make this a qualification,

16   but just the observation that this is being applied in a

17   situation of extreme distress, highly illiquid portfolio, at

18   a time when the market is in turmoil.  So there was, for

19   example, limited market information for valuing a lot of the

20   positions.  And so what would be done in the normal course

21   of business for fairly liquid instruments couldn't be done

22   in a very stressed situation for illiquid instruments.

23         But given what they did in that situation was, in

24   my view, consistent with the underlying economics and

25   financial principles.

Page 87

1   Q     Thank you.

2             MR. TRACEY:  I have no further questions at this

3   time.  As the Court's aware, Professor Pfleiderer has

4   submitted a rebuttal report.

5             THE COURT:  Yes.

6             MR. TRACEY:  And we would expect to ask further

7   questions on these and other topics when he testifies about

8   that.

9             THE COURT:  Okay, all right.  Thank you.  So this

10  is a perfect stopping point for the lunch break.  But I

11  understand we have a hard stop at 4:30.  So Mr. Tambe, I'll

12  leave it to you.  Do you want a half an hour, do you want 45

13  minutes?  We'll do whatever you like.

14            MR. TAMBE:  I think 45 minutes would be great,

15  Your Honor.

16            THE COURT:  Okay.  So then a few minutes before

17  1:00, five minutes to 1:00.

18            MR. TAMBE:  I assume the 4:30 hard stop still

19  applies.

20            THE COURT:  Yes.

21            MR. TAMBE:  It's still a consideration.

22            THE COURT:  Yes.

23            MR. TAMBE:  And we'll do the best we can.

24            THE COURT:  Well, yeah.

25            MR. TAMBE:  We'll get it done.

Page 88

1           THE COURT:  All right.  All right?  So we'll see

2    you at five minutes to 1:00.  All right?  Thank you.

3         [BREAK]

4                    P R O C E E D I N G S

5           THE COURT:  You scared them all away, Mr. Tambe.

6    You have that effect on people.

7           MR. TAMBE:  Thank you, Your Honor.  I can always

8    hide.  We'll move for a direct to verdict, Your Honor, now.

9           (Laughter)

10          MR. TAMBE:  Seeing no opposition...

11          THE COURT:  Call it a day.  I don't want you to

12   think that I don't take this seriously.  We've been at this

13   for a long time and we have a long way to go.  And every

14   once in a while a little humor lightens it up.

15          See, the powers of the judiciary, much as they're

16   in the news these days, don't extend to --

17          MR. TAMBE:  To jackhammers?

18          MS. SAWYER:  They took a lunch break.

19          (Pause)

20          MR. TRACEY:  Apologies, Your Honor.

21          THE COURT:  No problem.  Do you need a few more

22   minutes, Mr. Tracey?

23          MR. TRACEY:  No.

24              CROSS-EXAMINATION OF PROFESSOR PFLEIDERER

25   BY MR. TAMBE:

Page 89

1    Q    Good afternoon, Professor Pfleiderer.

2    A    Good afternoon.

3    Q    So let's start with the high level opinion you

4    expressed towards the end of your direct testimony, where

5    you've essentially concluded that the procedures and

6    methodologies followed by QVT were reasonable, correct?

7    A    Reasonable with regard to the conditions at the time

8    and general economic principles.

9    Q    And in reaching that conclusion, you spoke with the

10   traders at QVT, correct?

11   A    I spoke to some of the traders, yes.

12   Q    And you reviewed the spreadsheet, the calculations

13   spreadsheet prepared by QVT, correct?

14   A    Yes, I did.

15   Q    And you referenced any number of depositions that were

16   given in this case, correct?

17   A    I did.

18   Q    You did not do an independent line by line valuation of

19   each of the positions, correct?

20   A    That is correct.

21   Q    And you work with the Brattle Group, is that right?

22   A    The Brattle Group has been assisting me in all of this

23   since the arbitration, yes.  Mediation, I'm sorry, I

24   misspoke.

25   Q    And they've got about what, 2,000 hours of time into

Page 90

1    this matter?

2    A    I do not know.

3    Q    And you've got about 270 hours into this matter?

4    A    I believe that's correct, yes.

5    Q    So, none of that's been spent on an independent

6    valuation on any of these positions, correct?

7    A    None of my time has been spent on that, yes, that's

8    correct.

9    Q    And you don't know if any of Brattle Group's time has

10   been spent on independent valuation of these positions,

11   correct?

12   A    I do not know one way or another.

13   Q    You also work with something called FSG.

14        COURT REPORTER:  What's the name of the company?

15        MR. TAMBE:  Brattle Group.

16        MR. PFLEIDERER:  Brattle, B-R-A-T-T-L-E, after the

17   Street in Boston.

18        MR. TAMBE:  I didn't know that.

19        THE COURT:  Cambridge.

20        MR. PFLEIDERER:  Cambridge, that's it.

21        MR. TAMBE:  See, all these Cambridge jokes, I just

22   -- I'm an outsider looking in.

23        THE COURT:  Sorry, you're just not a member of the

24   club.

25        MR. TAMBE:  Absolutely, I'm not.  I'm reminded of

Page 91

1   that many times.

2   Q    And you also work with a group called the FSG, correct?

3   A    I did prior to the mediation.

4   Q    Okay.  And I take it FSG didn't do any line by line

5   valuation of QVT's positions correct?

6   A    Again, not to my knowledge, they did not.

7   Q    Now, and other than the traders, some of the traders of

8   QVT, you didn't speak to traders at any other entities to

9   inform your opinion as to whether QVT's methodology was

10  reasonable, correct?

11  A    That is correct.

12  Q    And you didn't speak to all the traders at QVT either,

13  correct?

14  A    I believe I spoke to most of them but I don't believe I

15  spoke to all of them.

16  Q    But you didn't speak to Mr. Knox, I take it?

17  A    I don't believe I did.

18  Q    All right, but you heard him testify?

19  A    I did hear him testify here a couple days ago.

20  Q    And you didn't speak to Mr. Cen.

21  A    I do not believe I spoke to Mr. Cen.

22  Q    You did speak to Mr. Chu frequently, correct?

23  A    Very frequently, yes.

24  Q    And Mr. Wollman?

25  A    Yes.

Page 92

1    Q    When it comes to some of the positions that you spend

2    more time talking about, the PCDS positions, you did not

3    speak to any other dealers in the market about how they

4    valued PCDS in and around Lehman week, correct?

5    A    Well, again, my understanding was that Lehman was

6    basically the only dealer that was actively making a market,

7    and so once Lehman had, I don't know if the right word is

8    expired, but once it ceased to do business, there wouldn't

9    be anyone to speak to.

10   Q    The question's just a little bit different.  You did

11   not speak to any other dealers in the market about how they

12   valued PCDS in and around Lehman week, correct?

13   A    I'm sorry.  I interpreted your statement to be dealers

14   in PCDS.  But if it's more generally dealers without regard

15   to whether they were making markets in PCDS, the answer is

16   no, I did not.

17   Q    But you know there were other dealers in the market who

18   had PCDS positions on the same side of the market as QVT,

19   correct?

20   A    My understanding is that Merrill Lynch had a position

21   but I don't know the details -- all the details about that.

22   Q    So as far as you know, with all the work you've done

23   and the few thousand hours from the Brattle Group, the only

24   other dealer that you're aware of that was in the market and

25   had a position on the same side as QVT is Merrill Lynch, is

Page 93

1    that right?

2    A    No, that was -- I knew that Merrill Lynch had some

3    positions; I don't know the full extent of what dealers had

4    positions.  So I should have qualified it by saying that.

5    Q    And you gave a tutorial on how a dealer would hedge a

6    PCDS transaction in this terrible post-Lehman world.  Do you

7    remember, we went through a demonstrative, right?

8    A    In the situation where it could offset the risk with

9    another entity on the other side.

10   Q    But you didn't talk to any dealers who actually had

11   PCDS risk as to how they went about valuing their PCDS

12   positions post Lehman, correct?

13   A    That is correct.

14   Q    And you yourself, just to be clear, you have no prior

15   experience or expertise in trading any credit derivatives,

16   correct?

17   A    That is correct.

18   Q    And no particular experience in valuing PCDS certainly,

19   correct?

20   A    Not as a trader or as a dealer, no.

21   Q    And your analysis did not include looking at how

22   dealers had historically hedged their PCDS exposure,

23   correct?

24   A    Yes, that is correct.

25   Q    But you knew generally from Mr. Chu that dealers sort

Page 94

1    of took long and short positions to offset their risk,

2    correct?

3    A    That is my understanding of what dealers mainly do in a

4    marketplace where they're making a two-way market, yes.

5    Q    And with respect to how a dealer in PCDS would behave,

6    that's the sole extent of your knowledge about what a dealer

7    would do, correct?  In the pre-Lehman world?

8    A    My understanding about dealers who make markets in OTC

9    market is that they're generally keeping a book with traders

10   with positions on both sides, yes.

11   Q    So, for example, you did not inquire to see if in the

12   pre-Lehman world, dealers were using shorting of preferred

13   equity to hedge PCDS protection they had written, correct?

14   A    The answer is no, I did not do that.

15   Q    And you didn't look to see if dealers had used, instead

16   of preferred equity to hedge their risk, whether they used

17   senior or subordinated debt of the same issuer, correct?

18   A    I didn't look explicitly at that, no.

19   Q    Again, with respect to the extent of your work on CARB,

20   other than speaking with QVT's traders, you didn't speak to

21   any other participants in the market about how they valued

22   their CARB positions, correct?

23   A    That is correct.  Again, my understanding, at least in

24   terms of the overall market at the Lehman filing was that

25   Lehman had about 85 percent of the total notional at that

Page 95

1    time.

2    Q    But you knew at least there were folks who had the

3    other side of the position form QVT, correct?

4    A    Well, mediated through Lehman, yes.

5    Q    But there were folks facing Lehman from the other side?

6    A    I don't know that for certain but my understanding

7    would be that would be the case because, again, that's what

8    Lehman would do in making a market -- a two-way market.

9    Q    Right.  So you didn't -- are you done?

10   A    I'm sorry.  I just qualified it by saying a two-way

11   market.

12   Q    And with that expectation, you didn't ask for the

13   identities of the folks who were on the other side of the

14   market, correct?

15   A    That is correct.

16   Q    And you could've gone and asked those folks on the

17   other side of the market in CARB how they valued their

18   positions, correct?

19   A    I would assume...  So, I did not ask but I would assume

20   that they would be using Lehman's marks as well for

21   collateral and for various things of that sort.  But I did

22   not ask anyone whether they had some particular way of

23   valuing it.

24   Q    And you have no way of knowing how they valued their

25   CARB positions after Lehman had failed, correct?

Page 96

1    A    That is correct.

2    Q    Same is true for PCDS?

3    A    That would be correct, yes.

4    Q    We'll come back to CARB in more detail but just again

5    in terms of the work you did or didn't do, the GMAC proxy,

6    do you remember that discussion?

7    A    Yes, I do.

8    Q    You didn't do any independent analysis to see how QVT's

9    contention that GMAC was a good proxy for CARB, you didn't

10    test that assumption in any way, did you, sir?

11    A    Well, the question is how you would go about testing

12    it.  You couldn't test it necessarily historically because

13    now you're looking for a good proxy in a market situation

14    where you're entering into a financial crisis.  So, one of

15    the problems we have in finance is how do you use historical

16    data to value something in a very different market

17    condition?  So, I don't know exactly how one would go back

18    and get historical data on what would be a good proxy for a

19    situation in a Lehman week, for example, when the market was

20    very much stressed.

21    Q    My question's very specific and you have a plane to

22    catch, right?  So, I'm going to ask my question again.

23    A    Sure.

24    Q    You didn't do any independent analysis to see how QVT's

25    contention that GMAC was a good proxy -- you didn't test

1   that assumption in any way, did you, sir?

2   A    I did not test it, no.

3   Q    You didn't, for example, look back at GMAC and CARB to

4   see if, in fact, they had been closely correlated in the

5   prior months?

6   A    And for the reasons that I was trying to explain.

7   Q    You didn't do it?

8   A    Well, I did do it.  That's correct.

9   Q    And generally for all the various positions you looked

10  at and opined on, you didn't do any kind of empirical

11  analysis of valuations or prices in the OCT derivatives

12  market for the time in question, correct?

13  A    Well, I need to answer that question carefully because

14  I have done some empirical analysis for my rebuttal report

15  on various issues, and I understand that I'm to talk only

16  about my initial report.  So if it's confined to that, I

17  believe for my initial report I did no formal empirical

18  analysis.

19  Q    Okay.  And it is directed to your initial report and

20  you should answer every question carefully.

21  A    I was trying to do that, yes.

22  Q    Right.  You had some testimony on direct about

23  collateral and security in derivatives transactions

24  generally, correct?

25  A    Yes.

Page 98

1    Q    You didn't ask to speak with QVT's auditors, did you,

2    sir?

3    A    I did not.

4    Q    You know that in addition to the collateral remarks

5    there were audited month-end valuations on QVT's books as of

6    the end of August 2008, correct?

7    A    I believe that is the case.

8    Q    And it's not your opinion that those were false, is it,

9    sir?

10   A    I have no opinion.

11   Q    As far as you know sitting here today, QVT valued its

12   positions exactly right as of the end of August 2008?

13   A    I -- as a financial economist, I wouldn't know how to

14   value -- what the term "exactly right" means.  In the case

15   of accounting, there is a notion of exactly right, but as a

16   financial economist, I wouldn't know what exactly right

17   means.

18   Q    It could depend on the economist?

19   A    I'm sorry?

20   Q    It could depend on the economist?

21   A    Well, there's always some disagreement about what

22   valuations would be, and that's in part why you have a

23   market.

24   Q    Putting aside what debate there could be about what

25   valuations could be, QVT did put a value on each of its

Page 99

1   positions as of the end of August 2008, correct?

2   A    I believe they need to for basically calculating NAV,

3   they need to put a value on their positions.

4   Q    And those are audited valuations, correct?

5   A    I believe that is correct.

6   Q    And investors who invest in QVT rely on those

7   valuations, correct?

8   A    Rely in the sense that they take those valuations as

9   the outcome of the process of marking to NAV and know -- I

10  would assume in most cases and I certainly understand that

11  NAV in a lot of cases is not a precise value in the sense

12  that it relies on information that is subject to some

13  judgment.

14          So it's relatively easy if I have a portfolio

15  that's composed of just Google stock to get a very accurate

16  market forecast.  Back in the Barclays matter, there was a

17  difficult in determining the value of illiquid securities.

18  And a value is assessed by an accounting process, but I

19  wouldn't say that that is necessarily the value that you

20  could trade it.

21          So, I want to be careful making a distinction

22  between a market-determined value in a very liquid market

23  and a mark to market process in calculating NAV that relies

24  on information that in some cases is not as accurate as what

25  you get in a very liquid market.

Page 100

1   Q     So, take all the care you want, but I only request you

2   answer my question.  And my question to you was investors

3   who invest in QVT rely on those valuations, correct?

4   A     Well, I would have -- the reason -- the reason I'm

5   being somewhat slow to answer this question is I don't know

6   when you say "rely" what you mean.  Did they take those as

7   absolutely precise, or did they take those as an indicator

8   of value?  So, they look at those and they understand that

9   that is the calculated NAV.

10  Q     So, close enough is good for audited financial

11  statements?  Is that what you're saying?

12  A     Audited financial statements need to be done as well as

13  they can but they're not necessarily, depending upon the

14  underlying securities, going to be accurate to the last

15  decimal place.

16  Q     And you're not saying that QVT's financial statements

17  were inaccurate in any way as of the end of August 2008, are

18  you, sir?

19  A     I'm not opining one way or another.

20  Q     Just as we round up what you did and didn't do, you're

21  not relying on any of the work done by CMRA and Dr.

22  Niculescu in any of the conclusions or opinions you're

23  expressing in your original report, correct?

24  A     That is correct.

25  Q     The folks at Brattle who were supporting you, when you

Page 101

```
 1    were reviewing the QVT claim spreadsheet, you didn't send

 2    them out to Bloomberg or Market to double-check the values

 3    that QVT was reporting, correct?

 4    A    I did not personally ask them to do that.  They may

 5    have done that but I did not personally ask them to do that.

 6    Q    They may have done all sorts of things, but as far as

 7    you know, they didn't?

 8    A    I can only testify here to what I asked them to do or

 9    what I know that they did by seeing some work product.

10    Q    And you didn't fire up the Bloomberg terminal yourself

11    and go double-check any of QVT's prices?

12    A    I did not.

13    Q    But you did go into Google and look at some

14    information, right?

15    A    No, I don't believe I did.  Not in conjunction with any

16    of QVT's claims.

17    Q    We'll again return to PCDS and CARB in greater detail,

18    but you talked in general about the lack of liquidity in

19    those products.  Do you remember that?

20    A    I do.

21    Q    And you're not saying that those products became

22    suddenly illiquid on September 15, 2008, are you, sir?

23    A    Oh, no.  They were illiquid before and potentially

24    became more illiquid after, but there wasn't a jump to

25    illiquidity from complete liquidity.
```

Page 102

1   Q    And in terms of the PCDS market, we will again talk

2   about the details of this, you never did any analysis to see

3   how large the market was for preferred equity issuances by

4   those 19 issuers that had -- that were the reference

5   obligations, correct?

6   A    Again, I'll make the qualification.  Before the filing

7   of my initial report, I did not; before my rebuttal report,

8   I did.

9   Q    So, in informing the judge about the reasonableness of

10  the PCDS methodology in your initial report, and it was a

11  reasonable methodology, you did not do any analysis into the

12  size of the preferred equity market, is that right?

13  A    No.  Again, with the qualification that I did something

14  afterward but, no, not before.

15  Q    You touched briefly upon market quotation.  You're not

16  expressing any opinion on whether QVT ran a reasonable

17  market quotation process, are you, sir?

18  A    Reasonable for the purposes of ISDA?  I'm not

19  specifying anything in terms of ISDA requirements.

20  Q    And in terms of market practice, you have no experience

21  in running market quotation processes for any purpose,

22  correct?

23  A    That is correct.

24  Q    While we're on the topic of market quotations, you were

25  discussing a scenario in the bid-ask discussion we had, and

Page 103

1    you said, well, one of the components of the bid-ask spread

2    is dealer profit, right?

3    A    That is correct.

4    Q    And then you had an explanation for saying, well, the

5    other thing that's included in the bid-ask spread is the

6    risk the dealer faces when it enters into a buy, and then

7    has to wait to make the sell, right?

8    A    That is a risk.

9    Q    That is a risk, right?  And that risk would be

10   heightened at the end of a trading day, correct?  Because

11   now you have overnight risk?

12   A    There would be overnight risk, typically.

13   Q    So when you ask for pricing information from a broker

14   or a dealer, the time of day you make that request could

15   factor into whether you get a quote or how wide the quote is

16   if you get one, correct?

17   A    That in principle is correct.

18   Q    You're not opining that it was reasonable for QVT to

19   have simply missed at your last count 44 transactions from

20   the market quotation process, correct?

21   A    I don't believe that...  I'm having trouble answering

22   that because as a financial economist, that's not a question

23   I can answer.  So perhaps I should just say that.

24   Q    They just missed it?

25   A    I would understand that errors would be made in a big

Page 104

1    process like this over a short period of time, but that's

2    not an opinion I'm offering as a financial economist.

3    Q    Right.  And as an expert witness in this case, you

4    didn't examine what care QVT did or did not take in

5    conducting the market quotation process, correct?

6    A    No, I did not.  Other than what I learned through

7    testimony, I didn't do any independent evaluation of that.

8    Q    Okay.  So, let's go into bid-ask spreads, all right?

9    And you talked generally about having reviewed the

10   spreadsheet and seeing that range of 3 percent to 15

11   percent.  Do you remember that?

12   A    I do.

13   Q    Okay.  And I think you said the vast majority of the

14   adjustments were 10 percent adjustments.

15   A    I believe the preponderant number was 10 percent, yes.

16   Q    So, let's just pull up the spreadsheet.  So we're

17   looking at what adjustment you're referring to.  So it's

18   Exhibit 21...?  It's going to come up in native form.  And

19   maybe we can sort this for market...?  And it'll probably

20   be...  You can start with Joel Wollman, JW in Column BC?

21   A    Column BP.

22   Q    BP?

23   A    BP I believe.

24   Q    Thank you.  Now let's scroll back to the left.  If you

25   want to go somewhere else, Professor Pfleiderer, just tell

Page 105

1    us.  We will go anywhere you want on the spreadsheet.  Now,

2    we've got to go a little bit right.  A little bit more

3    right.  And stop there.  Right, so we've got Columns B and W

4    up on the screen.  Those are the relevant columns when

5    you're talking about a 10 percent adjustment or a 15 percent

6    adjustment, (indiscernible) percent adjustment, right?

7    A    Yes.  Column has the bid mid spread that was applied.

8    Q    Okay.  So, I want to just get the terminology right,

9    because people talk about points and spreads and

10   percentages.  Right?  You understand Column W is a column

11   percentage -- percentages, correct?

12   A    That is correct.

13   Q    And it's a percentage that's either added or subtracted

14   to the mid, correct?

15   A    To the mid spread, yes.

16   Q    Okay.  So just so we are all on the same page, if the

17   mid is at 100 and you make a 10 percent adjustment, you're

18   adding and subtracting 10 points?

19   A    Yes.

20   Q    But if the mid is 10 and you're adding or subtracting

21   10 percent, it's one point?

22   A    That would be correct, yes.

23   Q    Okay.  Can you put a demonstrative just to make sure

24   we've got this concept?  We're going to put it up on the

25   screen.

Page 106

1          MR. TAMBE:  This doesn't have an exhibit number.

2     It's a demonstrative.

3          THE COURT:  Okay, thank you.  Should we mark it,

4     though, as something?

5          MR. TAMBE:  We're happy to mark it

6     (indiscernible).

7          THE COURT:  Do you have one for Mr. Tracey?  We

8     can just --

9          MR. TRACEY:  I don't have one.  And I would just

10    remind counsel that we have a stipulation where we have

11    agreed that demonstratives for exhibits will be provided in

12    advance of the testimony.  So, it's fine.  I don't have any

13    objections to using this now but in the future I'd like to

14    do that.

15         MR. TAMBE:  Obviously, the stipulation, that's not

16    ringing a bell, but (indiscernible) so I'm happy to do that.

17    And is there a time limit, like 24 hours in advance?

18         MR. TRACEY:  There's no time limit.  It's just

19    before.  And we can --

20         MR. TAMBE:  We're happy to.

21         THE COURT:  Okay.  All right.  So let's just mark

22    it as something.

23         MR. TAMBE:  As something.

24         WOMAN 1:  5970

25         MR. TAMBE:  5970.

Page 107

```
 1              THE COURT:  5970.  Are we using a DX?

 2              MR. TAMBE:  EX.  I think it's...

 3              WOMAN 1:  EX.

 4

 5              THE COURT:  EX?  Okay.

 6              MR. TAMBE:  Yeah, exhibit...  And it's just a

 7    demonstrative.

 8    Q    So I've got a demonstrative up there, Professor

 9    Pfleiderer, just so we can agree on some concepts, right?

10    So it's completely hypothetical, pre-Lehman, you've got a

11    bid and an ask of 4 versus 5.  Right?

12    A    Correct.

13    Q    And that would imply a mid of 4.5, correct?

14    A    That is correct.

15    Q    And a bid-ask spread of one point.

16    A    That would be correct, yes.

17    Q    Right.  And then if you were doing a percentage, a bid-

18    ask over the mid would be one divided by 4.5, correct?

19    A    That is correct.

20    Q    About 22 percent?

21    A    I believe the math works out, yes.

22    Q    Now we get into the post-Lehman world and the spreads

23    get larger.  The bid is 40, the ask is 50.

24    A    Correct.

25    Q    The mid is still -- is 45, right?
```

Page 108

1    A    Yes.

2    Q    The higher mid.  The bid-ask is, in points terms, 10

3    points wide, correct?

4    A    That is correct.

5    Q    But in percentage terms, it's still 22 percent?

6    A    That is also correct.

7    Q    Okay.

8    A    Per this example.

9    Q    Right.  So just because you have increasing spreads and

10   a rising mid doesn't necessarily mean that the bid-ask as a

11   percentage of mid is necessarily going to go up, correct?

12   A    That is correct.

13   Q    Okay.  And what QVT was adjusting for was that

14   percentage at the bottom.  In fact, it was the mid versus --

15   the mid as a percentage of the midpoint, correct?  It's the

16   mid bid adjustment as a percentage of the midpoint?

17   A    That is correct.

18   Q    Okay.  So, in your original report you had a discussion

19   of bid mids and you spoke on direct about a particular

20   academic paper that you had cited, correct?

21   A    Yes, that's correct.

22   Q    So, let's just pull up that exhibit.  I believe it's

23   5905.  And you can see on page 1.  That's the paper,

24   correct?  The paper by Mr. (indiscernible).

25   A    Yes, that is correct.

Page 109

1    Q    These aren't folks that you've ever worked with before,

2    correct?

3    A    That's also correct.

4    Q    And at least when we spoke at your deposition, you

5    didn't even know if this had been published anywhere,

6    correct?

7    A    I don't believe it was published at the time and I

8    haven't checked to see if it's been published now.

9    Q    Okay.  You're not aware of any prior work by these two

10   individuals, correct?

11   A    I -- sitting here today, I'm not.

12   Q    And I think you made the point that in citing this

13   report, there was really only one part of this report that

14   you were focused on, correct?

15   A    That is correct.

16   Q    And that's the panel you discussed with the judge,

17   Figure 1, Panel B, correct?

18   A    That's correct.

19   Q    It wasn't any of the other analysis done on this case?

20   A    That's correct, it was not relevant to my opinion.

21   Q    Now, that was not a paper you cited the first time you

22   submitted your original expert report, correct?

23   A    No, I believe that was included in an amended report

24   that I filed or submitted.  I don't know what the

25   terminology is.

Page 110

1   Q    So I think if you turn in the book I handed you, and we

2   can pull it up on the screen -- Exhibit 5963...  You

3   recognize that?  That's an errata you submitted related to

4   your original report, correct?

5   A    Yes, that is correct.

6   Q    And on Page 2, you have some changes to other parts of

7   the report but you state on Page 2 "The following text

8   should be appended at the end of Paragraph 95 on Page 44 of

9   the report." Do you see that?

10  A    I do.

11  Q    And there's a new footnote that's added, that goes

12  along with that new verbiage, and that's the (indiscernible)

13  cite, correct?

14  A    That is also correct.

15  Q    So, it's not part of your original analysis when you

16  put in your original expert report, but I assume before we

17  talk at your deposition you amend your report to

18  (indiscernible), correct?

19  A    That's my recollection, yes.

20  Q    Because you thought this was helpful and relevant to

21  the Court in assessing the reasonableness of QVT's

22  methodology, correct?

23  A    Well, I thought that it was an academic study that

24  showed substantially a change in the market during what I

25  think we've referred to as Lehman week or during the months

Page 111

1    of September.  So, that was pretty much what I was putting

2    it in for.

3    Q    So let's go to the page, Page 30 of this report.  And

4    the figure that you cited, and relied on, and discussed in

5    your direct was the middle figure, correct?

6    A    That is correct.

7    Q    And if you go back to our demonstrative, if you want to

8    draw a parallel, what that calculation is showing is the mid

9    value in points, correct?

10   A    The absolute amount, yes.

11   Q    The absolute amount.

12   A    That's correct.

13   Q    Now, we discussed this at your deposition as well.

14   This chart doesn't tell you what September 15, 2008 is,

15   correct?

16   A    That is correct.

17   Q    And there's data -- there's a dataset that underlies

18   this report?

19   A    There is.

20   Q    You never asked for that dataset at the time you did

21   either your original report or the amendment to your

22   original report, correct?

23   A    I asked for it subsequently, yes.

24   Q    Subsequently.  Yeah, I know.  But at the time you

25   amended your original report and drew the Court's attention

08-13555-mg   Doc 55026   Filed 02/16/17   Entered 03/09/17 11:55:13   Main Document
              Pg 112 of 191

Page 112

1    to Panel B, you were not using the dataset that underlies

2    the sticker, correct?

3    A    I didn't have access to that at the time.  That's

4    correct.

5    Q    The authors do describe the dataset they used, correct?

6    A    I believe that they do, yes.

7    Q    And they talk -- it's Data Screen is the source?

8    A    I'd have to go back and look.

9    Q    So, certainly at that time, before you amended your

10   original report, you could have obtained the dataset,

11   correct?

12   A    I'm not sure what the timing would be.  So, at the time

13   I came across this article, I saw that this was relevant.

14   It was an academic study that had gathered some data and

15   produced it in graphical form.  And I don't know how long it

16   would've taken to get the data and to do the analysis.  It

17   may have taken very little time, it may have taken a long

18   time.  I didn't consult with Brattle Group -- they would've

19   been the ones to do it -- how long that would've taken.

20   Q    So, without the data group or without the dataset, you

21   did the best you could, right?

22   A    I'm not sure what you mean by best I could.  I

23   presented, as we often do -- I see graphs of this sort all

24   the time in academic papers and in seminars -- I presented a

25   graph which contains a lot of data behind it.  I didn't have

Page 113

1   access to the data at the time.  I subsequently got access

2   to the data but I'm afraid I can't talk about that right now

3   because it was related to sometime afterward.  But I can

4   inform the Court about that at a subsequent time -- that

5   backs up the statements that I was making with relevance to

6   this graph.

7   Q    And we discussed this at your deposition -- the point

8   on that graph that represents September 15th is a little

9   hard to discern, correct?

10  A    It's not marked.  Just for the record, I don't remember

11  all the details but I do remember that the period in

12  question is the systemic period, and the line that is being

13  drawn here on the left hand side I believe is September 1st

14  or August 31st.  It's the end of August or the first part of

15  September.

16  Q    Well, just to be clear, the line we're talking about is

17  not the first gray line; it's the second gray line, right?

18  A    Well, it's the beginning of the systemic period.  It's

19  referring to the systemic period.

20          THE COURT:  I'm sorry, what is the second --?

21          MR. PFLEIDERER:  I'm sorry...

22          THE COURT:  Mr. Tambe, maybe you could --

23          MR. TAMBE:  Even better.  I've got a yardstick,

24  Judge.

25          THE COURT:  Well, I just want to know which gray

Page 114

1    line you're talking about for starters.  Whatever you folks

2    like.

3              MR. TAMBE:  Do you want me to approach or do you

4    want to take the yardstick?

5              MR. PFLEIDERER:  Well, I think it's easy just to

6    say that what these authors did was they gathered a lot of

7    data on European CDS contracts --

8              THE COURT:  Right, but I don't understand what the

9    XX is, okay?

10              MR. PFLEIDERER:  Oh, I'm sorry.  Okay, that's

11    important.

12              MR. TAMBE:  Sort of.

13              MR. PFLEIDERER:  So, it actually represents dates.

14    It's not terribly well done I will admit, but again, this is

15    what was available to me from these authors.  So, 01-01-06

16    is January 1, 2006.  01-01-08 is January 1, obviously, 2008.

17    And what they were looking at was how bid-ask spreads had

18    changed in various periods.

19              THE COURT:  Sure.  I'm just trying to understand

20    it.  So the next vertical gray line is -- what's the date,

21    September?

22              MR. PFLEIDERER:  I don't know.  I'd have to go

23    back and look in the article what the first line is.  But

24    the second line, that is the beginning of what they called

25    the systemic period.  That's September 1st, to the best of

Page 115

1   my recollection.  Either that or August 31st.

2           THE COURT:  Thank you.

3           MR. PFLEIDERER:  I'm sorry.

4   Q   And so the systemic period starts right around

5   September 1, 2008 and ends on what date?

6   A   I'd have to go back to look to refresh my memory but I

7   believe it was the end of March, maybe the beginning of

8   April.  But I'd want to check that.

9           THE COURT:  '09?

10          MR. PFLEIDERER:  Of '09, yes.  I'm sorry.

11  Q   So that's covering, what, like about a six-month period

12  in that?

13  A   Approximately so, yes.

14  Q   And when you saw that data and you had it up on your

15  screen in your office, you held a ruler up to it, right, to

16  try and figure out where September 15th was?

17  A   That is correct.

18  Q   Right?  And, in fact, at the deposition you held up a

19  yardstick and you walked up to the screen, you measured the

20  distance, and figured out where September 15th would be.

21  Right?

22  A   Approximately, yes.

23  Q   And you can do that now, correct?

24  A   I would have to make some calculations.  We'd have to

25  go back and look at what those dates are.  I'd have to put

Page 116

```
 1    my cell phone on and turn on the calculator to figure out

 2    what the fraction of the period is.  And then I'd have to --

 3    which we did in the deposition -- then I'd have to take the

 4    ruler and do that.

 5    Q    Right.

 6    A    So, I could do that.  Again, I've forgotten the data,

 7    so I can answer these questions much more directly with the

 8    data at hand.

 9    Q    And you recall from having done that at the deposition

10    that September 15, 2008 is in the top of that orange spine.

11    If I can approach?

12    A    Yes.

13    Q    It's not up here, is it?

14    A    I...  Again, with the data we could look carefully at

15    that.  I'd have to go back.  It was near -- it was near the

16    top; I don't know if it was at the top.  I'd have to go back

17    and...  The easiest thing to do is not to use the yardstick;

18    it's to look at the data.

19    Q    Well, the data would have been good to look at but

20    that's not what you looked at when you amended your report

21    to cite to this document, correct?

22    A    I did it subsequent to that, yes.

23    Q    Right.  In fact, all you had done with the data at the

24    time you amended your original report to include this

25    article was hold up a ruler to a computer screen, correct?
```

Page 117

1    A    At the time, that's what I did, yes.

2    Q    And that's the only panel you focused on, correct?

3    A    Well, I'm not sure what you mean, focused on.  I looked

4    at -- I obviously did this graph.  What was relevant to

5    looking at what was happening at the time at QVT was having

6    to replace a portfolio CDS is a period of time in that

7    systemic period, so I focused on that.  But I certainly

8    looked at the entire graph.  But the focus was on the

9    systemic period.

10   Q    Do you remember the deposition you gave on November

11   14th?  We talked about this.  I'm not sure if a copy of the

12   deposition is in your binder.  If it is --

13   A    Yes, it is.

14   Q    So if you can go to Page 80 of the deposition.

15   A    Is this in my binder or not?

16   Q    It should be in your binder, yes.  At the very end.

17   A    At the end.  I'm sorry.

18         THE COURT:  Page 80 running or Page 80 of the

19   mini-script?

20         MR. TAMBE:  Page 80 about the mini-script.  The

21   small square pages.  And we can pull up the transcript up on

22   the screen if that's easier for you to read, Professor

23   Pfleiderer.

24   Q    Now, let's to start reading from the bottom of Page 80

25   over on to Page 81.  At the very bottom of Page 80, Line 25.

Page 118

1    "Question:  Do you know anything about (indiscernible), who

2    are the authors of this paper, other than the fact that they

3    have this working paper?  Answer: I believe that I did look

4    at information about their affiliation, but I want to

5    emphasize here that I'm not relying on the analysis that

6    they're doing in this paper.  What I'm relying on, and I

7    want to be very specific about this, I'm relying on Page 30,

8    Panel B of Figure 1, which I take to be descriptive of the

9    information that they had gotten." I asked you those

10   questions and you gave me those answers, correct?

11   A    That is correct.

12   Q    Let's take a look at Panel C on Figure 1.  So those

13   same authors in the very next panel do a different type of

14   panel.  They actually look at the bid-ask spread relative to

15   mid quote, correct?

16   A    That's correct.

17   Q    All right.  And that's in percentage terms, correct?

18   A    I believe it probably is, yes.

19   Q    And in percentage terms, that's a very different

20   picture than what Panel B shows you, which is the one you

21   focused on, correct?

22   A    Well, it's different in the following sense.  It shows

23   again that there's a substantial effect during the systemic

24   period, but what's happening here is pre-crisis the spreads

25   were very, very low.  And so the way this works is that

Page 119

1    dealers will have probably a minimum spread just to make

2    their profit.  And so if the spread is very low, then I'm

3    dividing that minimum spread by a very low number.  So

4    that's why you see pre-crisis it's quite high.

5           But this tells the story as well for what's

6    important for the matter at hand, which is what happened to

7    spreads, either absolute spreads or the percentage spreads,

8    and this comports to both parts of your demonstrative:  What

9    happens during Lehman week?  What happens during the first

10   part of September?

11          And so it's showing that -- these two in tandem

12   show two things that are happening.  Panel B shows that the

13   absolute spreads are going up remarkably, but that's partly

14   because the spread itself, the mid spread is going up.  But

15   Panel B -- or Panel C shows the percentage, which is what

16   QVT ultimately takes here, is also going up.

17   Q    And the increase in the mid-price, correct, that's

18   already captured by the Markit Partners midmarket price,

19   correct?

20   A    That's correct.

21   Q    Okay.  And this red line and green line that we see in

22   Panel C, that's not the mid bid spread as a percentage of

23   mid; that's the bid-ask spread as a percentage of mid,

24   correct?

25   A    I believe that's what they would've calculated, just as

Page 120

1    they did, I believe, in Panel B.

2    Q    So you then, in fact, have to shift these

3    (indiscernible) down in half if you really want to see what

4    was going with the mid bid spread as a percentage of mid at

5    the relevant point in time, correct?

6    A    Well, what I'm looking at here is the change in the

7    level.  And in this case it's the level of the percentage.

8    So, whether you divide it by half or not, what you're seeing

9    is that there's a big increase over the beginning of the

10   systemic period, which includes the Lehman week.

11   Q    So let's go to Panel A on the same chart.  And just to

12   be clear, credit spreads continue to widen after September

13   15th, correct?

14   A    That is -- that is correct, yes.

15   Q    So, if you are looking at midmarket pricing from, say,

16   9-16, or 9-17, or 9-18, or 9-19, that reflects the rising

17   credit spreads after the early termination date, correct?

18   A    Well, you'd have to look at it a little bit more

19   closely to see what exactly is happening here.  And, again,

20   I have the numbers for this and it's much easier to look at

21   the numbers than to look at the graph.  But what was

22   happening during the systemic period was risk was

23   accumulating, there's no doubt about that, as a general

24   proposition.

25          And what you can see is, now that we're looking at

Page 121

```
 1    it, a rather interesting story.  It first hit the financial

 2    sector and then spilled over into the real economy, and

 3    that's what you see in the green line with the non-

 4    financial.

 5    Q    Right.  And you know from having looked at the data

 6    that, in fact, the credit spreads continued to widen after

 7    September 15th for the rest of that week of September 15th,

 8    correct?

 9    A    I -- again, I don't have the data in front of me but I

10    have looked at that data.

11    Q    I'm not saying it would be true with respect to panel

12    C, if you just go back down panel C, which is the percentage

13    panel.  Again, all you had was your ruler at the time.  But

14    even as a percentage terms, bid at spread, as a percentage

15    of NID, continued to increase after September 15th, correct?

16    A    Well, I'm not sure.  Again, we ... it, it's difficult

17    to do this without having the data.  The data would show you

18    exactly what was happening one each day, at least as

19    recorded through this dataset.  But what you can see is that

20    in percentage terms, the, I believe it's the financials,

21    which are the orange, are rising and then falling a bit --

22    this is in percentage terms -- and then for the non-

23    financials, it seems that they rise and stay steady, with

24    some variation, around a higher level.  I mean that's who

25    I'm interpreting the graph.
```

Page 122

1   Q    And when you judge the reasonableness of QVT's various

2   methodologies, did you try and put, on any of these graphs,

3   the point in time when QVT submitted its valuation

4   statement?

5   A    Well, first of all ...

6   Q    The question is, did you put on these graphs, a point

7   in time when QVT submitted its valuation statement?

8   A    I'm not sure what you mean by put on these graphs.  I

9   just, I just submitted the ... again, I'm having trouble

10  answering your question.  If your asking, did I look at

11  particular points on this graph that relate do different

12  days in Lehman week, I believe that I looked at that in

13  terms of when I looked at it with a ruler, to measure it, to

14  the extent that you could.  And then, of course, as I said,

15  I got further data and so, can, can do that more precisely.

16  Q    Question wasn't about Lehman week.  My question was,

17  did you look at that data, with a ruler or with a dataset,

18  as to what the state of the markets, this data was, on

19  10/15/2008, when the calculation statement was submitted?

20  A    I see.  So, you're asking, on the particular date,

21  10/15, again, I'm able to do that with the data.  I wasn't

22  able to do that with this particular graph.

23  Q    Not a question whether you were able to do it.  Did you

24  do it?

25  A    I did do it with the, with this particular graph

1    because I wasn't able to do it precisely.  (Indiscernible)

2    I'm sorry, I wasn't able to do it with this particular graph

3    because I wasn't able to do it precisely.

4              THE COURT:  I'm sorry.  Now, I'm confused about

5    the answer.  So, we're differentiating between what you were

6    able to do, solely with ... based on the graph, versus what

7    you could do more precisely, so to speak.  I don't know if

8    that's the right statistical term, but with the dataset?

9              MR. TAMBE:  That's correct.

10             THE COURT:  So, when you did your opening report,

11   you didn't do have a dataset, you only had the graph.

12             MR. TAMBE:  That's precisely right.

13             THE COURT:  So, Mr. Tambe is asking you, at that

14   point in time, just on the graph, did you attempt to draw a

15   vertical line on ... for 10/15, which is the date on which

16   QVT submitted its calculation statement?

17             MR. TAMBE:  And the yes-and-no answer is no, and

18   the reason is that you couldn't do it precisely because the

19   graph wasn't that precise.

20             THE COURT:  But my question to you is, did you not

21   do it because you thought, oh, I would I really like to do

22   that, I wish I had the dataset?  Or did you simply not do it

23   because it wasn't part of the analysis that you undertook at

24   that time with respect to your opinion as to the

25   reasonableness of what QVT did as of the time it submitted

Page 124

1    its calculation statement?

2            MR. TAMBE:  I think, looking back on it, if I

3    could have precisely identified the 15th from the graph, I

4    would have reported that, perhaps.  I couldn't precisely,

5    because of the nature of the graph, determine what was the

6    15th and what was the 16th, so I didn't do that.  I don't

7    think I was thinking about doing it for each day at the

8    time, though.

9            THE COURT:  Mr. Tracey is going to now object to

10   my question.

11           MR. TRACEY:  Well, I'm not going to object to it,

12   but I do think maybe there's a misunderstanding here because

13   I don't know that it's been established that the witness

14   even knew what they ... can I approach?

15           THE COURT:  Yeah, I think that that would be a

16   good idea.  Did I confuse things?

17   PAUSE

18           MR. TAMBE:  I think we have a way forward.

19           THE COURT:  Hold on one second.  I think, Jamie

20   muted the line while she's negotiating over the jackhammers.

21   We'll just start it up and I'll (indiscernible) the line

22   when we, when she comes back.  It's okay, you can go.

23           MR. TAMBE:  In all your conversations with QVT and

24   looking at the analysis that had been done by QVT, did QVT

25   tell you when they actually submitted their statement of

Page 125

1    calculation to Lehman?

2            MR. PFLEIDERER:  I'm pretty sure I knew that

3    because I think, in preparation for the mediation I knew

4    some of that chronology.  I wasn't paying particularly close

5    attention to it because it wasn't, at least at the time I

6    was hearing that, it didn't seem important for what I was

7    tasked to do.

8    Q    And generally, is it your recollection that it was

9    about a month after the early termination date that the

10   statement, the calculation statement was submitted?

11   A    I think it was sometime mid-October, maybe October

12   15th.

13   Q    The question simply is, back when you first came upon

14   this graph and this article, decided to add to your original

15   report, did you look at panel A or panel B or panel C and

16   say, let me see where October 15th lines up on this?

17   A    I did not ask that question, no.

18   Q    It wasn't relevant to your opinions or conclusions,

19   correct?

20   A    Well, as I would understand it, replacement

21   transactions were not made on October 15th.  It was just the

22   submission of the claim.  So, unless I'm told that the

23   market conditions on October 15th were important for

24   determining the size of the claim, I wouldn't understand why

25   you would look at October 15th ?

Page 126

1    Q    Back to my question ... you didn't look at, where

2    October 15th (indiscernible)?

3    A    That is correct.

4    Q    And that wasn't germane to your, the opinions you're

5    expressing in this case?

6    A    Again, because I wouldn't understand why October 15th,

7    the market conditions there, were relevant to the cost of

8    replacement.

9    Q    The ... I think you made a statement about, as I

10   understand it, replacement transactions were not made on

11   October 15th.  You just said that a few minutes ago.

12   A    I may have misspoke, so I should clean up the record

13   here.  I'm sorry.  What I understood was that QVT did,

14   obviously, some replacement transactions, but then in

15   calculating its claim, was calculating what it would have

16   cost to replace those transactions during the first few days

17   of what are called Lehman week, or over Lehman week.  Mostly

18   those calculations were done on the 16th, so, of September,

19   I believe, in terms of market pricing, mark IT pricing.  So,

20   I don't know, sitting here now, why I would look at October

21   15th, which is, I understand it, is the date that they

22   submitted their claim as being relevant to what was

23   happening at the time they would be calculating the cost or

24   replacement.

25   Q    Now, no part of your analysis or initial report,

Page 127

1   conducts any, contains any opinions about what transactions

2   QVT intended to replace, correct?

3   A    I don't believe so, no.

4   Q    And there's no analysis or description in your initial

5   report about QVT telling that they wanted to replace,

6   correct?

7   A    I don't believe I addressed that.

8   Q    Let's, let's talk a little bit about, in a little bit

9   more detail, about the discussion you had before lunch about

10  collateral.  Correct?  And you address collateral in your

11  original report, correct?

12  A    That is correct.

13  Q    And when you were testifying on direct, you made a

14  distinction, you said it's not that collateral is not

15  relevant, it's that it's not dispositive.  Is that right?

16  A    I may have said that.  Yes, I believe I did.

17  Q    And in fact, it would be a good place to start if you

18  were doing a valuation, to see how the market conditions

19  have changed from the last time collateral was calculated,

20  through the early termination date, correct?

21  A    In some cases it might be a good place to start, I

22  agree.

23  Q    And no part of your analysis took into account,

24  starting with the collateral calculations from September

25  11th, and seeing how the market had changed through

Page 128

1   September 15th, 2008, correct?

2   A    I would have to go back and verify that that's

3   absolutely true.  But, to the best of my knowledge, I don't

4   believe any part of my analysis about that.

5   Q    Now, you were aware that QVT was doing its own margin

6   calculations on a daily basis, correct?

7   A    I believe that that was the case.  That's my

8   understanding.

9   Q    And from time to time you've seen evidence of

10  information being exchanged between Lehman and QVT, pre-

11  bankruptcy, about what the marks were, correct?

12  A    I have a recollection of, of seeing that.  Right now I

13  don't remember the details.

14  Q    And you don't ... you, you do recall instances where

15  there were some differences?

16  A    I believe that's the case.  Again, I don't remember the

17  details.

18  Q    But you don't recall any situations where QVT and

19  Lehman had such a significant misunderstanding that they

20  initiated the dispute resolution procedures under the

21  contract, correct?

22  A    All I can say is I don't recall.

23  Q    Now, I think you testified that as September rolled on,

24  credit spreads widened, correct?

25  A    That was generally true, yes.

Page 129

```
 1   Q    And your expectation would be that the positions that

 2   QVT had on with Lehman became more valuable to QVT, correct?

 3            MR. TRACEY:  Objection, Your Honor, there's no

 4   timeframe on this.

 5            THE COURT:  Fair enough.

 6   Q    In September, it was your expectation that the

 7   positions that QVT had on with Lehman became more valuable

 8   to QVT.

 9            THE COURT:  Over what time period?

10   Q    From the first of September through the 14th of

11   September.

12   A    But I have to be very careful in answering this because

13   QVT had positions that were long, purchasing protection, and

14   they also had positions in which they were selling

15   protection.  So, when ... and let's just take it for a

16   moment, it's given that spreads are widening over this

17   period of time, then the QVT positions where it was long

18   protection, those would increase in value, but the positions

19   where QVT was offering protection, those would basically

20   decrease in value, because that would be Lehman's gain that

21   they were paying ... that they were basically paying a small

22   running spread in conditions that worsened.  So, we can't

23   make a global statement.

24   Q    Yeah, but you'd know enough about the portfolio here to

25   know that overall, QVT was long protection, right.
```

Page 130

1   A    Overall, it was long protection.  I was just saying

2   that position by position, you can't make that statement.

3   Q    And you also know given your teaching of collateral and

4   margin requirements and in your courses, that collateral is

5   posted on a net basis, correct?

6   A    That would be generally correct, yes.

7   Q    And that's our understanding of what happened here,

8   correct?

9   A    I believe that was what was done.

10  Q    And have you examined what happened to collateral

11  posting after Fannie and Freddie, as between QVT and Lehman?

12  A    I don't believe I examined that, no.

13  Q    And as a financial economist, your expectation would

14  be, given the shock of Fannie and Freddie, that Lehman would

15  posting collateral to QVT, correct?

16          MR. TRACEY:  Objection Your Honor.  I, I don't

17  think there's any foundation for what positions are being

18  discussed here.

19          MR. TAMBE:  All the positions between QVT and

20  Lehman.

21          MR. TRACEY:  Well, I'm going to object on the

22  grounds of vagueness.  I, I don't quite know what the

23  question is.

24          THE COURT:  I'm just taking a moment to try to

25  think about what the direct was.  And the direct was

Page 131

1   generally with respect to a general understanding of the

2   requirement of posting collateral in CDS transactions right?

3          MR. TRACEY:  It was jus the economic, the economic

4   structure of collateral.  IF there was nothing about QVT and

5   the witness didn't express any opinions on the specific

6   collateral relationship between QVT and Lehman, he just gave

7   economic principles that are to guide the court.  I have no

8   objection to cross-examination, but I think asking a witness

9   who hasn't studied a specific relationship, asking a witness

10  who hasn't studied a specific relationship, and hasn't

11  expressed any opinions on it, it's outside the scope.

12         MR. TAMBE:  That's fine.  If I can move on?  Maybe

13  just a clarification question for Professor Pfleiderer, you

14  didn't actually study the collateral movements between

15  Lehman and QVT as part of your ... the opinions you

16  submitted in this case?

17  A    That is correct.

18  Q    But as a financial economist, if you knew that QVT was

19  long protection, and a shock like Fannie and Freddie had

20  happened, the financial economist in you would expect that

21  QVT is more in the money, right?

22  A    I would expect that would potentially be the case if

23  the marks were registering that and, as we say, that the

24  overall position of QVT and its portfolio was long

25  protection.  But, you know, there, there are a lot of

Page 132

1   qualifications.  And as I said, I didn't study this in, in

2   any detail.

3   Q    So, you've got your theoretical view, but the details

4   might matter, in fact, in terms of what happened between

5   these parties, right?

6   A    Oh that's, that's the case in almost every situation.

7   There, there are details that can, can enter in, sometimes

8   not important, sometimes they're quite important.

9   Q    You've expressed an opinion, generally, about the use

10  of Mark IT Partners data by QVT, correct?

11  A    That is correct.

12  Q    And you noted, I think, on direct, that there was data

13  from Mark IT Partners for various dates used by QVT,

14  correct?

15  A    That is correct.

16  Q    Where QVT used Mark IT Partners' data for, from a date

17  other than September 15th, did you ask QVT to provide you

18  with September 15th data for those positions?

19  A    I did not.

20  Q    And where QVT used Mark It Partners' data for any date,

21  did you ask QVT to provide you with broker runs from that

22  date so you could compare what QVT had done to what the

23  broker runs showed.

24  A    The only information I would have about that was in

25  the, in the spreadsheet itself.

Page 133

```
 1   Q    So, if it's not in the spreadsheet, you didn't ask for

 2   it.

 3   A    That is correct, yes.

 4   Q    You do know that there are, I think, thousands of

 5   Bloomberg messages received by the traders of QVT on a daily

 6   basis, correct.

 7   A    That was some of the testimony that I heard in the past

 8   few days.

 9   Q    Right.  And you know that in those thousands of email

10   Bloomberg messages, are broker runs, from time to time,

11   correct?

12   A    That would be correct, yes.

13   Q    And what you saw and what you reviewed in opining that

14   QVT was reasonable is what QVT identified in the

15   spreadsheet, right?

16   A    That would be correct, yes.

17   Q    You didn't ask a single trader at QVT to go back to his

18   Bloomberg message box and search for other data, correct?

19   A    That is correct, yes.

20   Q    Do you like chameleons?

21        THE COURT:  Did you say chameleons?

22        MR. TAMBE:  Chameleons.

23   A    I don't think I have a special attachment with

24   chameleons, no.

25   Q    You've written about them?
```

Page 134

1    A    I have.

2    Q    You've written about chameleons in the form of models

3    used in finance and economics, correct?

4    A    I wrote a paper a few years ago about what I called the

5    misuse of models in finance and economics.  And I called it

6    Chameleons, and I can explain why I gave it that title.

7    Q    I'm sure you will.  So, let's go to 5946.  In Vivid

8    Color, that's your article, right?

9    A    Yes, it is.

10   Q    2014?

11   A    That is correct.

12   Q    After you were engaged to work on this matter, correct.

13        THE COURT:  I don't think that that's really a

14   chameleon, actually.  I think that's not a chameleon.  I'm

15   just saying.

16   Q    Was this peer reviewed?  Was this peer reviewed.

17        THE COURT:  I do not think that's a chameleon.

18   I'll let it go.

19   A    So, so, I will, I will tell you that I'm probably

20   guilty of doing a Google image search.

21        THE COURT:  You did a Google image search.

22   A    And so I ...

23        THE COURT:  I think Mr. Tracey is going to tell

24   you to stop talking.

25        MR. TAMBE:  And I have no ... he should just keep

Page 135

1    talking.  If you get your best information from Google ...

2              THE COURT:  Yeah, I'm pretty sure that's a gila

3    monster.

4              MR. PFLEIDERER:  Yeah?  And you know what?  I

5    think if you check on the website in a few days, I think I

6    will revise (indiscernible).  I probably am not allowed to

7    give you the credit for that.

8              THE COURT:  No, please.  Judges are having enough

9    problems these days.

10             MR. PFLEIDERER:  Thank you for pointing that out.

11             THE COURT:  Let's keep going.  We've got two hours

12   and 20 minutes left of your time.

13   Q    So, this is the article, title Chameleons, and the

14   subtitle is The Misuse of Theoretical Models in Finance and

15   Economics.  Right?

16   A    That is correct.

17   Q    And I, and this is, this is a article you'd written

18   after you were engaged in this matter, correct?

19   A    No, I don't believe that's true.  Well, the date on it,

20   I believe is after ... I don't know the exact timing,

21   because I wrote this over a period of time, so it's, it was

22   written at a time I think that was similar to the time that

23   I was engaged, but I, I just don't know the precise timing.

24   Q    And this one has a date of March 2014.  This is not an

25   article you've revised and updated since the March 2014

Page 136

1    data, correct?

2    A    I don't believe I have.

3    Q    In fact, in your CV, I think, you list this as the last

4    article on page four of your CV, with the 2014 days, right?

5    A    Well, I've ... yeah, that could be, that could be

6    correct, yes.

7    Q    So, it's a long article but I just want to draw your

8    attention to a few observations you make in t his article.

9    Let's start on page one.  And you start off with a joke at

10   the top.  You see that?

11   A    Yes.

12   Q    We'll let the Judge read the joke to herself.  I'm

13   going to go onto the substance of (indiscernible)

14        THE COURT:  You can keep going.

15   Q    Okay.  So, let's go to the first observation in your

16   introduction, right.  You start off by saying, "Theoretical

17   models in economics and finance must, of necessity, be based

18   on simplifying assumptions, assumptions that are on some

19   senses unrealistic.  This does not mean that the connection

20   between the model's assumptions and what we know about the

21   real world do not matter and can be ignored."  Those are

22   your words.  You wrote that, correct?

23   A    Correct.

24   Q    Let's go down two paragraphs.  You state at the bottom,

25   "The proposition that theoretical models are necessary to

Page 137

1    understanding our economic system, does not imply that

2    having some particular theoretical  model automatically

3    means we understand anything useful.  Correct?  You wrote

4    that, your words?

5    A    That's correct.  I did write that, yes.

6    Q    And you went on to talk about theoretical cherry

7    picking in the next two sentences, correct?

8    A    I did.

9    Q    Next page, page three.  You start off by stating at the

10   top of that page, "My reason for introducing the notion of

11   theoretical cherry picking, is to emphasize that since a

12   given result can almost always be supported by a theoretical

13   model, the existence of a theoretical model that leads to a

14   given result in and of itself, tells us nothing definitive

15   about the real world.  You wrote that correct?

16   A    That is correct.

17   Q    Your words.  Correct?

18   A    That is correct.

19   Q    I just want to ...  One other concept I want to pick up

20   -- I'm sorry to go back and forth a little bit.  On page

21   one, at the bottom of page one, over onto page two, it

22   starts with, "In empirical work," "In empirical work it is

23   well understood that biased and misleading results are

24   obtained if one cherry picks the data.  I.e., if one selects

25   data that generally support a desired result, and exclude

Page 138

1    the, that, those data that do not, this understandably is

2    viewed by careful empiricists as a mortal sin."  Your words

3    and your views, correct?

4    A    That's correct.

5    Q    And now let's just go to the conclusion.  In the middle

6    of the first paragraph, under Conclusion, on page 32.  Page

7    32, "Being logically correct," in the middle of that

8    paragraph.  You write there, in your conclusion, "Being

9    logically correct may earn a place for a theoretical model

10    on the book shelf, but when a theoretical model is taken off

11    the shelf and applied to the real world, it is important to

12    question whether the model's assumptions are in accord with

13    what we know about the work." Right?

14    A    That's correct.

15    Q    And that was one of the statements in your conclusion

16    in this article, correct?

17    A    That is correct.

18    Q    Okay.  So, one of the models you work with in this case

19    was the model you described on direct, the simplified PCDS

20    model.  Correct?

21    A    Well, the, the model that I ultimately apply in terms

22    of my opinion is what is required for a dealer to hedge a

23    naked position in which the dealer is (indiscernible)

24    protection.

25    Q    Right.  But I think we've already established that you

1    have no firsthand knowledge and you've done no testing of

2    what dealers actually did at any point in time, to hedge

3    their exposure when they wrote CD, PCDS protection, correct?

4    A    No.  What I'm saying is that this is an analysis of

5    what would be required to effectively hedge a position.  And

6    I will stand by the an analysis as being correct and I am

7    opining that QVT was reasonable in adopting that analysis,

8    under the premises that there were no dealers that were

9    making two-way markets and this was what would be required

10   for a dealer to offer protection without taking risk.

11   Q    Well, just to be clear, you say this is an analysis of

12   what would be required to effectively hedge a position, that

13   conclusion is based on your model, not from talking to

14   dealers who were in the market post-Lehman, doing anything

15   with PCDS, correct?

16   A    Well, there are two different exercises.

17   Q    (Indiscernible) two different exercises, but your

18   conclusion is not based on conversations with any dealers in

19   the post-Lehman world, correct?

20   A    But that would be an empirical analysis.

21   Q    Right, which you didn't do.

22   A    No, which I did not do.  That's correct.

23   Q    Now, you had some data that you could test your model

24   against.  In fact, it was in QVT's files.  You know what I'm

25   talking about, right?

Page 140

1   A    I'm not sure that I do.

2   Q    Oh, the Merrill Lynch offers.  That's post-Lehman,

3   that's a dealer offering to sell PCDS protection.  You could

4   take your model off the bookshelf and test it against those

5   values.  Correct?

6   A    Under the assumption that that was a dealer, or someone

7   offering protection, naked, if you will, not having, not

8   having a backdrop.

9   Q:   Well, you didn't take the Merrill Lynch offers into

10  account in any way whatsoever, right?

11  A    In my initial report I did not.

12  Q    So, if you look at CX1581 and CX1582 in the black

13  binder that I gave you ... you can start with 1581,

14  whichever one you prefer.  Right, that is from Merrill Lynch

15  -- do you see that?

16  A    Yes.

17  Q    Which by this point of time, I guess, has been acquired

18  by Bank of America, correct?

19  A    That acquisition, I believe, was made certainly before

20  this time, yes.

21  Q    And they're offering PCDS protection.  You understand

22  that, correct?

23  A    That's what I would read it to be, yes.

24  Q    And you don't see any discussion of points up front in

25  this email, do you, sir?

Page 141

1    A    No, I do not.

2    Q    And you see a cross-reference by this dealer to LT2CDS.

3    Do you see that?

4    A    Yes.

5    Q    And you know what that is, right?

6    A    I believe that is the, the running spread on whatever

7    is being offered and they're offering it at 750.

8    Q    Right.  I was asking about the next set of letters,

9    LT2CDS.  You know what that means, right?

10   A    I'd have to go back and refresh my memory.

11   Q    So, as you sit here, you have no idea what that means?

12   A    I did at one point, but I don't remember now.

13   Q    Maybe lower tier two capital.  That ring a bell?

14   A    I think that's right.  I don't remember now as I sit

15   here.

16   Q    So, in the real world, away from the bookshelf, there's

17   a dealer making an offer to sell PCDS, quoting a running

18   spread, no upfront points, right?

19   A    That's what I read it as, yes.

20   Q    And offering as a point of comparison, not the price of

21   preferred equity, but lower tier two CDS spreads, correct.

22   A    That's right, they're, they're, they're CDS.  That's

23   correct.

24   Q    Now, for each of these positions, you could have taken

25   your model off the bookshelf and said, where is our boss,

Page 142

1   preferred equity trading, on October 1, 2008?  Does this

2   pricing line up with your model on the bookshelf?  You could

3   have done that, right?

4   A    What I could do is, if I understood that this was a

5   dealer that was offering naked protection and charging this,

6   and wanted to avoid risk, I would have to conclude that

7   perhaps my model was wrong and there was some other way to

8   do it, but no one has ever told me that the model is wrong,

9   that there's another way to do it.  What I would expect here

10  is that this is a dealer who has an offsetting hedge on the

11  other side, because they're, they're long protection.

12  Q    Well, one of the things you could have done, instead of

13  guessing, is go to Merrill Lynch, and say hey, you put out

14  an offer back in October 2008, give me some more information

15  about what underlies that offer.  You didn't do that, did

16  you?

17  A    No, that would be an interesting thing to do.  I would

18  ...

19  Q    It would be.  You didn't do it, and QVT didn't do it,

20  as far as you know, right?

21  A    I did not do it.  I don't believe that QVT did it as

22  well.  But I don't know that for a fact.

23  Q    All right.  So, and I assume the answer is hold with

24  respect the next email, which is 1582, which is the next day

25  from Merrill with a, I think a slightly longer list.  See

Page 143

1   that?

2   A    Yes, I do.

3   Q    So, again, this does not factor into your analysis in

4   any way, correct?

5   A    I believe it's, these are for the same notional as the

6   day before.

7   Q    So, the answer to my question is no, I did not factor

8   ...

9   A    I'm sorry.  I was asking a question, just to position

10  this.  So, I'm sorry, I missed your question.

11  Q    Right.  So, the question is, this document, 1582, did

12  not factor into your analysis either.

13  A    That is correct.  Sorry.

14  Q    You could have also tested your bookshelf model by

15  going back to the inception of the PCDS trades and seeing if

16  your model gave you the right answer in the pre-Lehman work,

17  correct?

18  A    I, I would not expect that it would, because that would

19  be a different situation where if a dealer is making a two-

20  way market, then the model would not apply.  Again, you

21  apply models based upon assumptions that are realistic at

22  the time they're being applied.  So, I, I would not expect

23  that, basically, a long time ago, long before the, the

24  Lehman filing, when dealers were making a two-way market.

25  And I can elaborate on that if, if important to do so.

Page 144

```
 1   Q    You had some question in your mind as to whether

 2   Merrill Lynch was a dealer, do you remember?  You asked that

 3   question when we were discussing 1581 and 1582.  Correct?

 4   A    Well, it depends what you define a dealer as.  A party

 5   could come to have a position that it then wants to sell,

 6   and if it is a dealer in other markets you might call the

 7   dealer in that market.  But, I interpret a dealer to be an

 8   entity that is making a two-sided market in the OTC market,

 9   and routinely offering, offering to either sell or buy a

10   particular security to, to, to its customers or clients.

11   Q    Now is a good time for about a five- or ten-minute

12   break.

13              THE COURT:  Sure.

14   Q    I think we're making good progress, Your Honor.

15              THE COURT:  Okay.  We'll come back at 2:30.  Thank

16   you.

17   PAUSE

18              THE COURT:  All right.  Please come back.

19              MR. TAMBE:  I'd like to make a request, Your

20   Honor.

21              THE COURT:  Yeah.  Yes, go ahead.

22              MR. TAMBE:  Please.

23              THE COURT:  Miss Keller, do you want to pull that,

24   the curtain behind there.  If you're warm, Professor

25   Pfleiderer, you're very welcome to take your jacket off.  It
```

Page 145

```
 1    really is fine

 2            MR. PFLEIDERER:  I think I'm fine.  Thank you.

 3    Thank you for offering.

 4            THE COURT:  Sure.

 5            MR. TAMBE:  I hope you don't mind, I've taken mine

 6    off, it's just that I'm feeling the heat.

 7            THE COURT:  It's this time of year when the sun

 8    comes around in the afternoon and we don't have any air

 9    conditioning.

10            MR. TRACEY:  (Indiscernible) Your Honor.

11            MR. TAMBE:  You discussed this morning some of the

12    ways in which PCDS is different than CDS.  Do you remember

13    that?

14            MR. PFLEIDERER:  I do, yes.

15    Q    Let's talk about that just a little bit.  You know for

16    the bank issuers, the financial issuers that, in this case,

17    the 19 names, they have various types of securities

18    outstanding.  Correct?

19    A    That would be true, yes.

20    Q    So, they had senior debt, correct?

21    A    Correct.

22    Q    They have sub-debt.

23    A    Correct.

24    Q    And they have preferred equity.

25    A    Correct.
```

Page 146

1    Q     And common stock, right?

2    A     Yes.

3    Q     And in some ways, the preferred equity, the senior

4    debt, the sub-debt, have similar risks, correct?

5    A     Well, they're all exposed to the value of the assets,

6    and in, in a sense, the equity is, is most exposed.  It's,

7    it's at the bottom.  And the preferred is a little bit

8    senior to the, to the equity and less exposed, but more

9    exposed, and all the way up the chain into the senior debt,

10   which was least exposed.

11   Q     And if there were to be a hard credit event, a default,

12   a bankruptcy, that would affect the senior debt, the sub-

13   debt and the preferred equity, correct?

14   A     Well, the recovery in a bankruptcy or in a state of

15   default and bankruptcy, the senior debt would be the most

16   protected and may fully recover.  And the equity may be

17   wiped out, the preferred may be wiped out.  It would all

18   depend upon what the value of the assets were and what the

19   recovery was for the total value of the assets.

20   Q     So, now moving from the securities to CDS on those

21   securities, a hard default, a bankruptcy by the issuer,

22   would be a credit event both for the CDS and for the PCDS,

23   correct?

24   A     That would be correct.

25   Q     And in one of the ways that the preferred equity could

Page 147

1   trigger a credit event that is not shared by the other

2   classes of debt, is just a deferral, correct?

3   A    That is correct.

4            THE COURT:  Excuse me one moment.  Thank you very

5   much.  If I could ask someone on this side of the room to

6   prop the door open with a box or a chair, that would be

7   great.  Go ahead.

8   Q    So a credit event on the preferred could be triggered,

9   preferred CDS could be triggered by either a deferral or by

10  a hard default.  Correct?

11  A    That is correct.

12  Q    The prices at which the securities -- so, again, we're

13  back at the securities.  The debt securities, the preferred

14  equity, the prices at which those trade, would contain some

15  information about the likelihood or probability of default

16  as well as the likelihood or probability of deferral.

17  Correct?

18  A    Generally speaking that would be true. And it would

19  also depend upon recovery.

20  Q    And that's information embedded in the prices that one

21  could extract by examining the varying levels of prices but

22  different types of securities, correct?

23  A    You would have to make some assumptions to do that, but

24  there's a potential to get some information after making

25  some assumptions, yes.

Page 148

1    Q    So, for example, again, in the theoretical world, from

2    Friday, September 12th to Monday September 15th, one might

3    expect that the risk of default, a hard default, generally

4    went up for a lot of entities.  Is that right?

5    A    That would be my belief based upon the situation at

6    that time.  Yes.

7    Q    And again, your belief as a financial economist would

8    be, and the risk of deferral may have gone up as well.

9    Correct?

10   A    That would also be my belief, yes.

11   Q    And, in fact, you might start seeing some separation

12   where the likelihood of a deferral may have gone up much

13   more substantially than a likelihood of a default.

14   A    That's certainly possible, yes.

15   Q    But you could get that kind of information by examining

16   changes in prices of the relevant securities, from before

17   September 15th to after September 15th, correct?

18   A    There's a potential to gather information in that

19   respect, yes.

20   Q    And, as far as you know, that's not an exercise that

21   QVT undertook in examining its valuation of PCDS, correct?

22   A    I don't believe they did that, no.

23   Q    And that's not something you did either, correct?

24   A    That is not something that I did.

25   Q    Let's go to the demonstrative, because you have a

Page 149

1    demonstrative deck.

2             THE COURT:  The deck that Mr. Tracey used?

3    Q:   That Mr. Tracey handed out.  I think it's got Exhibit

4    number 2148.  And I just want to draw your attention to the

5    last page, page 9.  So, I think I follow your example and

6    sort of the pages leading up to this.  But just to be clear,

7    what you're showing on this page, with the zero profit loss

8    line, with respect to each series of dots, is what happens

9    when there's a creditor.  Correct.

10   A    That would be correct, yes.

11   Q    There's another chart that's not on here at all.

12   A    In other words, when there's not a credit event.

13   Q    Yeah.

14   A    Yes, that's correct.

15   Q    But that's a possibility that's not even addressed on

16   chart 9 in terms of the payoff to the (indiscernible),

17   correct?

18   A    Yes, indeed the ... just to make sure that we're on the

19   same page, at the bottom it says, "Price preferred stock in

20   the case of a credit event," so it's confining our attention

21   to that.

22   Q    So, if a dealer is looking at this potential

23   transaction, and doesn't have a crystal ball, or a time

24   machine, there are two potential future states of the world,

25   correct?  One with a credit event, one without a credit

Page 150

1    event.

2    A    That is correct.

3    Q    And let's just go through the cash flows if there's no

4    credit event.  If there's no credit event, and maybe we can

5    just go to your first slide, slide two.  This, this was your

6    generic CDS but generally, you would say this generic

7    applies to PCPS as well, correct?

8    A    Generally speaking, yes.

9    Q    So, CDS buyer enters into the trade, makes periodic

10   payments, would make those payments for five years.  And if

11   there's no credit event that triggers a protection payment,

12   you're out those payments.

13   A    That is correct.

14   Q    And putting aside pay-as-you go CDS -- talk about that

15   later -- you need to have a hard credit event for most CDS,

16   correct?

17   A    That is my understanding.  Yeah, that's correct.

18   Q    Now, in your model, you not only have the period

19   premium, but you've also got a fairly substantial upfront

20   payment that's being made by the CDS buyer to the CDS

21   seller, correct?

22   A    That is correct.

23   Q    So, I don't (indiscernible) have a picture for that,

24   but in our example you said it would be a $20 million, $20

25   upfront payment, correct?

Page 151

1    A     Twenty dollars per hundred in notional.

2    Q     Per hundred notional.  So, again, in the world, where

3    there is no credit event, the CDS seller gets $20 upfront.

4    A     Correct.

5    Q     And gets however many months of premium, correct?

6    A     Well, in my example there was no premium.  It was ...

7    Q     So, you assumed that away.

8    A     I assumed that away.  I assumed that it was just a

9    payment upfront.

10   Q     But in reality, you know, there's generally a premium,

11   correct.

12   A     It depends.  Right now, usually there's a 500 running

13   spread and then an upfront payment one way or another

14   depending upon the value.

15   Q     That's money to the dealer which the dealer doesn't

16   have to pay back if there's no credit event.

17   A     That is correct, yes.

18   Q     So, in these two states of the world, in your state of

19   the world, page nine, by doing this hedging exercise, the

20   dealers got zero profit loss if there is a credit event,

21   correct?

22   A     That's correct.

23   Q     In the other state of the world, where there is no

24   credit event, there's some positive number.

25   A     There would be a, there would be a gain.  That is

Page 152

1    correct.

2    Q    At least two, right, at least 20.  It's the upfront

3    payment.

4    A    That would be the gain.

5    Q    You'd never have to give that back?

6    A    That's right.

7    Q    So, the expected payout for this transaction is, what's

8    the probability of a credit event happening?  And what's the

9    probability of a credit event not happening?  Correct?

10   A    The expectation for the dealer would have to basically

11   take the probabilities over all of those.  What this is

12   doing is eliminating the downside.  In other words, it's a

13   case of saying the dealer doesn't want to take any risk,

14   wants to mitigate the downside risk, and this is, this is

15   the way you do it.

16   Q    But there's a really good way of eliminating all risk.

17   You simply don't do any transactions, right?  That's one way

18   you could eliminate risk.

19   A    That is entirely correct and that, presumably, is why,

20   or potentially that's why QVT did not get any, any bids.

21   Q    But this model is all about a world in which a

22   replacement trade, hypothetically, could happen.  And the

23   dealer would be looking at two scenarios, one in which there

24   is a credit event and the dealer is protected by making this

25   upfront demand, that you say.  And another world where there

Page 153

1     is no credit event, and the dealer gets 20 million and

2     doesn't have to pay it back.  Right?

3     A    That's right.  So, the, the whole basis for this is

4     exactly what you said.  One way to eliminate risk, if you

5     don't want to take risk, is not to trade at all.  And that's

6     what QVT was seeing.  And so, I think it was reasonable that

7     based upon seeing, just based upon what you said, not taking

8     risk is basically not entering into any transaction.  The

9     fact that QVT was unable to buy protection, even from

10    Lehman, before the Lehman bankruptcy, is an indication that

11    there weren't dealers or others that were wanting to take

12    that risk.

13    Q    I'm just staying in your theoretical world, not what

14    happened in the real world.  In the theoretical world that

15    you've constructed, you've described one leg of the future

16    world, correct, one in which there's a credit event?  Right?

17    A    Well, this, this, again, was labeled correctly, price

18    of preferred stock in the case of a credit event.  You're

19    absolutely right, that if there's not a credit event, the

20    dealer will gain.  I was picking upon what you said, which

21    was very simply, that if you don't want to take risk, one

22    way to eliminate the risk is not to trade at all, and that's

23    what QVT was seeing, and so, I'm simply, based upon this

24    observation, that's reason for them to come to the

25    conclusion that dealers didn't want to take that downside

Page 154

1    risk, and this is the way to hedge it away.

2    Q    I hear that from you, Professor Pfleiderer, but the

3    point is, their entire claim is based on PCDS, on what a

4    hypothetical dealer would charge, had it entered into the

5    trade, correct?

6    A    But if you're saying that a hypothetical dealer

7    wouldn't have entered into the trade, then you're saying

8    that they wouldn't have been able to replace it at all.

9    Q    Possibly.  But my point is a different one, which is,

10   nowhere in your demonstrative do you describe the world

11   where there's no credit event.

12   A    That's correct, yes.  Again, it's conditioned on a

13   credit event and getting rid of the downside risk.

14   Q    Nor do you state anywhere in your demonstrative or in

15   any of the analysis, any of the analysis that you've done,

16   on what the probabilities of deferral were at the time.

17   A    Now, this is based upon hedging a protection selling

18   position, given that you want to get rid of all the downside

19   risk, which a dealer, arguably would want to do if it was

20   going to be naked.  The alternative is not to offer

21   protection at all.  And I'm not sure, perhaps there's

22   something in the ISDA, and I'm not an expert in ISDA, but if

23   you hypothetically assume that you couldn't get any

24   protection, then I don't know how you value your claim.  So,

25   that, that's what I'm having trouble with in this, in this

Page 155

1    line of, of questioning.

2    Q    Just taking it small steps at a time.

3    A    Sure.

4    Q    What you did do and what you didn't do.  I think you

5    agreed with me that what you didn't do, and haven't

6    presented, is any analysis of the probability of deferral at

7    any point in time during Lehman week, correct?

8    A    That is correct, yes.

9    Q    And a dealer who was thinking about not just not losing

10   money, but potentially making money, might look at those two

11   worlds and say, "I have an upside and I have a flat

12   position."  Is that right?

13   A    Could I just go back to make sure that I ... just so

14   that ... question is clarified.  Were you asking, I think

15   there's a distinction, just to be made on the record, what

16   was the probability of a deferral during the Lehman week,

17   and what was the probability that a dealer would assess of

18   deferral over the life of the PCS contract.  And those are

19   two different things.  And so, I don't ... I made an answer,

20   gave an answer, but I just want to distinguish that those

21   are two different things.

22   Q    But regardless of whether that's one thing or two

23   different things, you didn't analyze either of them.

24   A    That's correct.  That is correct.

25   Q    All right.  Well, you could get some information about

Page 156

1    what the market thought about the probability of a deferral

2    by looking at the prices of preferred equity, correct?

3    A    Potentially, yes.

4    Q    So, let's just go to 2108, exhibit 2108, which is a

5    spreadsheet.  Before we pull up any particular tab, you did

6    study this, correct, in forming your opinions?

7    A    This, this isn't quite the spreadsheet that I looked at

8    because I believe this is the redacted one, but yes.

9    Q    So, you know there was a spreadsheet, it was redacted,

10   and that's the one we're using in this trial.

11   A    I, I, I believe that's .. this is the same, minus the

12   redacted parts.

13   Q    Okay.  And you know that Mr. Chu collected and

14   presented in one of these tabs various prices for various

15   preferred equity issued by the 19 reference issuers,

16   correct.

17   A    That is correct.

18   Q    You didn't conduct any analysis of that dataset to see

19   if you could glean any information about the probability of

20   default for any one of these issuers, correct?

21   A    I did not, no.

22   Q    Let's go to BCDS data.  And take ... can you see that

23   fine sir?

24   A    Yes, I can.

25   Q    So, I want to draw your attention to, let's go down to

Page 157

1    Wells Fargo, I think it's WFC, right.  So, you'll see for

2    WFC, you recognize that as one of the issuers, right?

3    A    That's correct.  That's Wells Fargo.

4    Q    So, you got one, two, three, four lines ... four lines

5    of data that's collected by Mr. Chu, correct?

6    A    That is correct.

7    Q    First of all, you didn't, you didn't try to collect any

8    additional data beyond what Mr. Chu was showing you,

9    correct?

10   A    I did not.

11   Q    So, there may well be lots of other Wells Fargo

12   preferred equity with pricing in the market, you didn't go

13   looking for it?

14   A    Not prior to, probably, my initial report.

15   Q    Yeah, not when you submitted your opinions to the

16   court, correct?

17   A    The initial report, yeah.

18   Q    And if you could scroll across to see what price Mr.

19   Chu actually used, so, you'll see in column K -- I think

20   you're familiar with this, right?  He uses the price of 80

21   to come up with a CDS mark of 19.9.

22   A    That is correct from what I see here.  Yes.

23   Q    So, now let's just go back to the left so we can see

24   all of the different prices, and stop right there.  Would it

25   help you to have the headings on so you know what dataset

Page 158

1   each is?  Can you do that please (indiscernible)?

2   A    I think those are just the dates.

3   Q    Yeah, just so when we're further down the spreadsheet,

4   you're not confused about what day we're on.

5   A    Yeah, that's fine.

6   Q    So, now let's go down to WFC.  And that's the

7   (indiscernible).  So, the price Mr. Chu used was the one

8   from the 18th of September of 80.1.  Do you see that?

9   A    That's correct.

10  Q    You can see that first WFC preferred equity is priced -

11  - we've got Citigroup closing the line as the comment, and

12  it looks like you've got prices on every single day, 96.5,

13  96, 91, 96, 99.  Do you see that?

14  A    That's correct.

15  Q    Right.  And that would suggest to you that there was a

16  very low risk of deferral on that WFC bond perceived by the

17  market, correct?

18  A    Well, we have to be careful here.  If you look in

19  Column B, you'll see that there's a difference between these

20  bonds.  One has a dividend of 9.75 percent and another has a

21  dividend of 5.95 percent.  So, going back to what I talked

22  about earlier this morning, when you short an instrument

23  such as a preferred, you, as the person who shorts, have to

24  pay whatever the lender is entitled to receive.  So, you're

25  going to be paying if you short the top bond, the 68 -- "low

Page 159

1    68 bond", I'll call it -- you're going to be paying 9.75

2    percent.  Whereas, if you short the 5.95, you're going to be

3    paying less.  So, if you were to short the bond that has a

4    higher dividend, you're going to have to be paying more when

5    you short it to whoever you've borrowed it from, and you're

6    doing this is a hedge.  You're going to charge whoever is

7    acquiring the protection for the fact that you have to pay

8    more.

9    Q    You anticipated a question I wasn't even asking you.  I

10   wasn't asking you about how someone shorts this.  I'm just

11   saying, if you look at that private equity, preferred equity

12   security from Wells Fargo, it's priced at 96.5, 96, 91, 96

13   and 99, right?  That's not suggesting a heightened risk of

14   deferral on that particular security in the first week of

15   September -- second week of September 2008, is it sir?

16   A    No.  We have to go back.  We see two bonds with

17   different dividends, and so you have to figure in the value

18   of receiving those dividends.  You're going to be receiving

19   dividends that are going to be higher.  And so, that's going

20   to make the bond higher.

21           THE COURT:  I think I'm going to just try to move

22   this along.  I think Mr. Tambe is trying to ask you a

23   different question.

24           PROF. PFLEIDERER:  Right.  I'm sorry.

25           THE COURT:  I think he's just asking you to look

Page 160

1    at the one security that he's focusing on --

2    PROF. PFLEIDERER:  Mm hmm.

3    THE COURT:  -- and not make a comparison.

4    PROF. PFLEIDERER:  Okay.

5    THE COURT:  Is that right, Mr. Tambe?

6    MR. TAMBE:  That's right.  That's exactly right.  IF the

7    mark --

8    THE COURT:  And looking at the market data and what the

9    market data tells you --

10   PROF. PFLEIDERER:  Okay.

11   THE COURT:  -- about the risk associated with the security

12   at these (indiscernible).

13   MR. TAMBE:  That's right.  That's all it is.  Yeah.

14   Q    I mean, in fact, regardless of what the coupon is, if

15   there's a deferral on September 16th, that coupon isn't

16   upgraded to immediate value.  You're not going to get that

17   coupon, right?

18   A    That's correct.

19   Q    Right.

20   A    That's correct.

21   Q    So, trading close to par, at least with respect to that

22   bond, the market seems to be saying these guys aren't going

23   to defer.

24   A    Well, I have to factor in again the level of the

25   dividend or coupon.  I call it the dividend.  But the

Page 161

1    probability of deferral that would be implied there is not

2    extraordinarily high.  But you have to be careful in

3    inferring what it is because you have to take into account

4    the coupon rate.

5    Q    Well, you've got to be careful about all sorts of

6    things, but you didn't do any of that analysis, right?

7    A    I did not do any of that analysis.

8    Q    Right.

9    A    That's correct.

10   Q    Okay.  So, and you didn't look at the possibility that

11   Wells Fargo might differ on one of these preferred equities

12   and not defer on the others.  That's not an analysis you

13   did?

14   A    Oh, you don't have to do that analysis because

15   remember, you can deliver the cheapest to deliver.

16   Q    Different question.  Not about the cheapest to deliver.

17   Did you look at the possibility that when Wells Fargo

18   decides to suspend dividends on a particular preferred

19   equity, it would do it for all preferred equity, or just for

20   one slice of the preferred equity?

21   A    Oh, that's a possibility, yes.

22   Q    Right.  But you didn't examine that, did you, sir?

23   A    No, I did not examine that in particular.

24   Q    And you have no understanding as to whether these bonds

25   have a pari passu clause in them, do you, sir?

Page 162

```
 1    A    At this -- sitting here today, I don't know that.  I'd

 2    have to look.

 3    Q    But you generally know that there could be pari passu

 4    clauses in some of these bonds, correct?

 5    A    It could be, yes.

 6    Q    And therefore, it might be difficult for Wells Fargo to

 7    suspend dividend payments on one security while continuing

 8    to make preferred -- continuing to make dividend payments on

 9    other securities, correct?

10    A    That would be the case, yes.

11    Q    But you didn't examine any of that?

12    A    Not on this or any of the other issues.  That's

13    correct.

14    Q    I know you generally observed in your report that there

15    was Markit partners there available for some of these

16    issuers on September 15th, 2000, correct?

17    A    For the PCDS.

18    Q    You don't note anywhere in your report how many

19    contributors there were to the Markit partners data, for any

20    data, during the week of September 15, 2008, correct?

21    A    No, I do not.

22    Q    You did observe that the main market maker, Lehman, had

23    ceased to exist, it had expired.  It was an x-broker dealer.

24    But there were other dealers in the market, broker dealers

25    in the market, who had PCDS positions on their books,
```

Page 163

1    correct?

2    A     That is my belief, yes.

3    Q     Do you know whether any of them contributed values to

4    Markit partners, even after Lehman had become an x-broker

5    dealer?

6    A     I do not know.

7    Q     Okay.  But generally, your view was Markit partners'

8    data was unreliable?

9    A     It's my understanding that there were points on the

10   curve where it was thin, was marked as thin, which means

11   that, as I understand it, when Markit does that, it means

12   that there aren't enough indications to really report a

13   reliable result.  That was my understanding.

14   Q     Even after Lehman had ceased to exist, there were more

15   than one or two reports in Markit partners for the PCDS that

16   Markit provided data for, correct?

17   A     I believe that's correct.  I'd have to go back and

18   check for sure, but I believe that's correct.

19   Q     But that wasn't Lehman providing those, correct?

20   A     I would have to assume that because at that point

21   Lehman was no longer in business that that was the other

22   market makers, or other dealers, that were providing

23   information.

24   Q     Just a -- I think we've covered this, but just a brief

25   discussion on market impact.  I think you observed in your

Page 164

1    report, and you may have also mentioned on direct, that this

2    was a large notional amount for PCDS.  Remember that?

3    A    It was.

4    Q    And your view was it's large because it's $371 million,

5    correct?

6    A    That was the total amount of notional over the 60

7    positions, I believe.

8    Q    Right.  But you know generally, any one of the PCDS

9    contracts was a notional far lower than that, correct?

10   A    On average, it would be that divided by 19, if you look

11   at the contracts for a particular issuer.

12   Q    And you didn't conduct any analysis of the liquidity in

13   the preferred equity market the week of September 15, 2008,

14   when you put in your original report, did you sir?

15   A    Before my original report, no; after, yes.

16   Q    Mr. Chu told you that he found the GMAC spreads to be a

17   good proxy for (indiscernible)?

18   A    I believe he testified that in testimony and I believe

19   that that was my understanding when I first started as a

20   consulting expert for QVT and had conversations with Arthur

21   Chu, yes.

22   Q    And ultimately you concluded that Mr. Chu's

23   methodology, QVT's methodology, was reasonable with respect

24   to (indiscernible), correct?

25   A    Again, as I explained this morning, it's difficult to

Page 165

1   determine what a proxy should be, but using something that

2   was exposed to automobile loans in the way the GMAC was, I

3   considered a good proxy for the exposures that were

4   underlying the (indiscernible) basket.

5   Q    So as soon as you prepared your initial report, you

6   actually looked in the (indiscernible) basket to see if it

7   was in there, right?

8   A    I did.

9   Q    And you never asked Mr. Chu why he hadn't used Ford

10  Motor Credit as an additional proxy?

11  A    I have a hazy recollection of discussions when I first

12  got involved in which certainly I understood that GMAC

13  originated securitizations were half and I believe that we

14  had discussions about why GMAC was a good proxy.  So, yes, I

15  believe those discussions certainly happened.

16  Q    And the question, again, was a little bit different.

17  A    I'm sorry.

18  Q    You never asked Mr. Chu why he had not used Ford Motor

19  Credit as a proxy?

20  A    Well, I'm not sure how those discussions went.  I think

21  there was some explanation as to why GMAC had been used, so

22  I didn't have to ask that question.  But if my memory is

23  correct, I don't' think I explicitly asked that question.  I

24  think I got the answer without asking it.  But my memory is

25  hazy because that was early on in the project.

Page 166

1   Q    That may have been early on in the project, but when

2   you rolled up your sleeves and got the (indiscernible) folks

3   to work on the initial report, did you go back and ask those

4   questions again and say, do I really understand what Mr.

5   Chu's done here?

6   A    I probably did, but I don't remember.  I don't remember

7   whether I thought I understood it at that point because

8   there had been numerous discussions about (indiscernible).

9   So, I don't recall whether I explicitly asked.

10  Q    And when Mr. Chu told you, I, Mr. Chu, believe it's a

11  good proxy to use because there's a correlation between GMAC

12  and (indiscernible), did you say, Mr. Chu, (indiscernible)?

13  A    I think he did.  As I recall -- again, this was in

14  discussions early on.  I think there were various supporting

15  pieces of analysis that he had shown me that indicated that

16  there was a rough correlation, yes.

17  Q    Right.  But you understood that none of that work that

18  he was showing you had been done before the calculation

19  statement was put in, correct?  That was all done after

20  October 15.

21  A    I don't know when it was done, so it could've been

22  before, it could've been done after.  I don't know.

23  Q    Well, in testifying about the reasonableness of the

24  calculation, you have no reason to believe that any of that

25  analysis had been done at the time the calculation statement

Page 167

1   was submitted, correct?

2   A    I don't know one way or another.

3   Q    And did you ever challenge Mr. Chu and say, well, GMAC

4   has a lot of other risk in it other than auto risk?

5   A    I don't think that I did.  I probably did, but I don't

6   recall specifically one way or another.

7   Q    But you do know that to be a fact, that GMAC has lots

8   of risk in it other than -- did have lots of risk in it

9   other than just auto risk, correct?

10  A    I don't think I had a full understanding of all the

11  exposures of GMAC.

12  Q    And that wasn't relevant to the opinion you rendered in

13  this case?

14  A    Well, the only question was whether it was a reasonable

15  proxy that would capture the underlying exposures.

16  Q    And you did no empirical testing to see if in fact that

17  was the case, correct?

18  A    In other words, before?

19  Q    Yeah.  When you submitted your original report?

20  A    Well, no, I'm talking about before the Lehman

21  bankruptcy in prior periods.  In any event, that was a silly

22  question for me to ask.  The answer is I didn't do an

23  empirical analysis.

24  Q    All right.

25  A    I should have just answered that way.

Page 168

1          MR. TAMBE:  If I can just look at my notes, Your

2    Honor?

3             THE COURT:  Sure.

4          MR. TAMBE:  This is almost done.  IF we could just

5    take a 10-minute break?

6             THE COURT:  Sure, that's fine.  So, we can come

7    back at 3:15.

8          MR. TAMBE:  That'd be great.  Thank you.

9    (Recess)

10            THE COURT:  Please have a seat.  At the end of the

11   day, we need to spend some time --

12         MR. BECK:  Certainly.

13   THE COURT:  -- talk about stuff.  You know, housekeeping

14   stuff.

15   MR. BECK:  Yep.

16   THE COURT:  Please come back, Professor.  I got rid of the

17   jackhammers.

18   MAN 1:  That's good.

19   MS. SAWYER:  Someone else (indiscernible) cannot

20   (indiscernible).

21   THE COURT:  It's okay.

22   MR. TAMBE:  Sorry, Your Honor.

23   THE COURT:  No problem.  I'm just trying to keep to the

24   schedule.  I don't mean to rush you.

25   MR. TAMBE:  I have no further questions for Professor

Page 169

1    Pfleiderer.

2    THE COURT:  Oh.  Okay.  Thank you.

3    REDIRECT EXAMINATION OF PROFESSOR PAUL PFLEIDERER

4    BY MR. TRACEY:

5    Q    Professor Pfleiderer, I'm going to ask you a few

6    additional questions.  Mr. Tambe asked you a number of

7    questions about whether you went out and talked to

8    (indiscernible) who were dealing in PCDS.  Do you recall

9    that?

10   A    I do.

11   Q    And you said you didn't, right?

12   A    I did not.

13   Q    And if you had decided to go out and talk to the

14   dealers in 2008 that were making (indiscernible) in PCDS,

15   who would you have talked to?

16   A    I'm not sure there was anyone to talk to.  Perhaps

17   there was, but I certainly didn't.  From all that I

18   understood about this market, there was basically little or

19   no trading activity and little or no making a market by

20   dealers.

21   Q    And in all the evidence that you've looked at, have you

22   seen any evidence there was any dealer making a two-way

23   market in PCBS after September 15th, 2008?

24   A    I'm not aware of anything, no.

25   Q    You answered some questions from Mr. Tambe about the

Page 170

1    manner in which a dealer was likely to hedge a sale of

2    protection in PCDS.  Do you recall that?

3    A    I do.

4    Q    And Mr. Tambe asked you questions about whether they

5    would hedge in some other way besides selling short?

6    A    I believe that was his question.

7    Q    Are you aware of any other way for a PCDS protection

8    seller, after September 15th, 2008, to hedge effectively a

9    sale of protection other than selling short securities, or

10   preferred securities?

11   A    Assuming that you don't have on the other side someone

12   who has sold you a protection.  So, in other words, if

13   you're -- and I'll use this word -- "doing it naked" without

14   someone having sold you protection to basically provide you

15   with that hedge, if you're doing it naked and have to

16   construct the hedge that eliminates the downside risk, this

17   is, in my view, the only way to do it.

18   Q    And what support do you have for the fact that a dealer

19   at that time couldn't go out and source protection from

20   other dealers?

21   A    Well, again, the knowledge that QVT had at the time was

22   it was trying throughout the summer to get more exposure to

23   PCDS and had queried Lehman several times, and Lehman wasn't

24   forthcoming with additional protection that it could sell.

25   Q    So, QVT couldn't source any protection in September of

Page 171

1    2008?

2    A    That was my understanding, yes.

3    Q    And Lehman couldn't source any either?

4    A    That was basically my understanding, yes.  I believe

5    that sort of what I saw was that Lehman was only willing to

6    do it if it was done non-switch.  In other words, you'd need

7    to buy something back.  Basically, we need to limit the

8    exposure that we've sold to you to offer you some new

9    exposure.  So, it was, as I interpreted that, meaning that

10   it wasn't wanting to take risks and it didn't have ways to

11   lay that risk off on the other side.  That was a certainly

12   reasonable interpretation for QVT to make.

13   Q    And we did see one offer of protection, October 1st and

14   October 2nd, from Merrill.  Do you recall that?

15   A    Yes.  I have seen that.

16   Q    Let's bring that up.  And it's Exhibit 1581 and 1582.

17   So, let's first look at the Claimant's Exhibits 1581 and

18   1582 at the bottom.  We have something else up there that

19   we're going to move to.

20            First of all, to you have any reason to believe

21   that Mr. Chu and the other QVT traders were aware of this

22   offer of protection were made in their valuation process?

23   A    Well, if I understand the chronology, I believe that

24   the valuation process was done primarily over two weekends

25   that would be prior to this.  And as far as I understand,

Page 172

1    they did not have this available to factor into the

2    analysis.  But that's my understanding from testimony that

3    I've heard and read.

4    Q    And is that why you didn't include this in your

5    analysis?

6    A    When I wrote my report, I'm not sure that I was even

7    aware of this, partly because it wasn't something that QVT

8    was using in its mix of information.

9    Q    And in evaluating the reasonableness of QVT's

10   valuation, would you find it appropriate to review something

11   that they were not aware of?

12   A    Well, it almost --

13            MR. TAMBE:  Objection.

14   A    -- sounds like an impossible --

15            MR. TAMBE:  Objection.  Leading, Your Honor.

16            THE COURT:  Yes, Mr. Tambe.

17            MR. TRACEY:  Sorry?

18            MR. TAMBE:  Objection.  Leading.  Calls for

19   speculation.

20            MR. TRACEY:  Well, I'll rephrase.

21            THE COURT:  Okay.

22   Q    Well, let me direct your attention to the Merrill Lynch

23   offers here.  Can we see 1582?  So, this is dated October

24   2nd, 2008, is it?

25   A    Yes.

Page 173

1    Q    And did you see in QVT's valuation the use of any

2    levels from October of 2008?

3    A    No.

4    Q    Let's look at 1581.  And that's dated October 1st,

5    correct?

6    A    Yes.  It appears to be, yes.

7    Q    Now, what I'd like to do is bring up at the same time

8    that Claimant's Exhibit 1788.  And what I'd like you to do

9    is to...

10   MR. TRACEY:  If you could, John, filter that for Merrill

11   Lynch.  And if you could also filter it for the maturity of

12   March 20, 2016?

13   Q    Okay.  Professor Pfleiderer, have you seen Claimant's

14   Exhibit 1788 before?

15   A    That's the spreadsheet?

16   Q    The spreadsheet.

17   A    Yes.  Yes.

18   Q    And if you could review the transactions by Lehman with

19   Merrill Lynch in the spreadsheet and compare them to the

20   offers by Merrill Lynch, and tell me what you observe?

21   A    Well, they're quite close.  If I'm reading this

22   correctly, what is being offered for sale, if you will, on

23   Wednesday and on Thursday is -- that's a subset, but very

24   close to what it seems that Merrill had with Lehman in this

25   log.

Page 174

1    Q    And what does that tell you about Merrill's position

2    with regard to these particular PCDSs?

3    A    Well, first of all, it says that -- at least what I

4    would interpret it to say is that Merrill had had positions

5    in these securities that is now offering TBS contracts --

6    PCBS contracts it's now offering for sale, offering to sell

7    protection, and that it had that originally with Lehman.

8    And so, presumably, after Lehman -- I guess we've already

9    used the term expired, or ceased to do business, then

10   obviously, that exposure no longer existed.  And so, very

11   likely, or it certainly is very far in the realm of

12   possibility that this is a situation where you have someone

13   that already has a hedge, potentially, that has purpose

14   protection, someone sold protection to this entity and now

15   Merrill is, shall I say, reselling it in the market because

16   it is already hedged.

17        MR. TAMBE:  Your Honor, move to strike that answer

18   as speculative.

19        MR. TRACEY:  Your Honor, Professor Pfleiderer is

20   interpreting documents that reflect a particular trading

21   pattern and I think, based on his extensive expertise in

22   trading, he's perfectly qualified to interpret it to

23   determine what it tells a person knowledgeable about

24   training.

25        THE COURT:  Two things.  One, is this something

Page 175

1    that you looked at in forming your opinions?

2              PROF. PFLEIDERER:  In forming the opinions from my

3    original report?

4              THE COURT:  Yes.

5              PROF. PFLEIDERER:  No.

6              THE COURT:  All right.  So, that...

7              MR. TRACEY:  So, we can come back to it later,

8    then.  That's fine.

9    Q    Professor Pfleiderer, you were asked some questions

10   about Exhibit 5946 of the picture?

11   A    The picture that I'm going to correct?  Yes.

12   Q    Could you describe the premise and the conclusions in

13   this article?

14   A    Yes.  I wrote this article because in other theoretical

15   models that are related to -- and I'll give an example --

16   related to the need for high levels of bank indebtedness, or

17   low levels of bank capital, make a number of assumptions

18   that are difficult to justify.  I wrote it because, for

19   example, there are a lot of models that are written by

20   academic people in finance about how optimal capital

21   structure is determined by CFOs.  And some of them involve

22   having to sell very difficult (indiscernible) differential

23   equations using lots of computer power.  And when I read

24   these models and I then think about actual CFOs making

25   decisions, it just doesn't connect because they don't have

1    the computing power or the ability to solve these models.

2            And a long time ago, Milton Friedman, a very

3    famous economist, argued that people do this as if.  So, a

4    billiard player is in solving the geometry of how to shoot

5    the ball, but does it as if he or she is solving that

6    problem.  But the issue there is that the billiard player

7    plays thousands and thousands of times and makes thousands

8    and thousands of shots and gets immediate feedback as to

9    what's happening and learns over time.  And we all do that.

10   When you learn to catch a ball or something of that sort,

11   you're doing it many times and getting immediate feedback as

12   to whether you are successful or not.

13           When you make a capital structure decision as a

14   CFO, you only make that decision maybe 10, 15 times a year,

15   probably even less than that.  And you don't get immediate

16   feedback as to whether that was the right decision or not.

17   So, it was a big disconnect for these models to sort of rely

18   on this as if argument when, if you just look at the human

19   beings, they don't have the capacity to do it.

20           So, there are a number of things that I bring up

21   in the paper that sort of look at whether you're really

22   making reasonable assumptions based upon what people can

23   actually do.

24   Q    And does the model that you're criticizing in this

25   paper apply to the hedging structure that was used for

Page 177

1    valuing PCBS?

2    A    No, it does not.  The assumptions that are made there

3    are, in my mind, at least, extremely compelling, and those

4    assumptions are that there were no dealers that were

5    effectively making a two-way market.  QVT had sought

6    protection and hadn't been able to get it.  So, a dealer

7    that was wanting to -- was asked to offer protection could

8    do what Mr. Tambe said and just not do it at all, which is

9    the easiest way not to take risks.  Or the only way -- and I

10   stand by this opinion -- the only way to do it effectively

11   to eliminate that downside risk, which was extreme,

12   potentially, in a financial crisis when you're talking about

13   preferreds, the only way to do that was too short.  And Mr.

14   Tambe's right that when you do that, you do preserve some

15   upside that if a credit event doesn't occur, you have that,

16   but you are getting rid of the downside.  And the fact that

17   we thought no one was really offering protection at this

18   time in a huge way, I think, makes this a compelling

19   argument.

20          Now, the question is why do, in many cases, a

21   dealer -- why is a dealer able to make a two-way market, why

22   do some people sell protection?  And the reason is that you

23   have people in the market who are speculating.  They look at

24   a credit default swap and they either think it's overpriced

25   or underpriced.  And the people that think it's overpriced

Page 178

1    are happy to sell it, and the people that think it's

2    underpriced are happy to buy it.  And that happens in the

3    stock market and everywhere else.  But if you don't have

4    both sides of that market, a dealer is not going to want to

5    take that risk, and so what I'm looking at here is what it

6    would cost for a dealer to hedge out that downside risk.

7    And there's a very, very straightforward model that uses

8    fundamental principles of financial economics.  It's not

9    making any assumptions about supercomputing power or

10   anything of the sort that I'm criticizing in this paper.

11   Q    Let me turn to what --

12            THE COURT:  Mr. Tracey, are you done asking him

13   about this paper?

14            MR. TRACEY:  No.

15            THE COURT:  May I have one, please?

16            MR. TRACEY:  Yes, absolutely.

17            THE COURT:  So, Professor Pfleiderer, Mr. Tracey

18   just asked you a number of questions about this paper, and

19   largely, your answers on, I think, the question related to

20   cherry picking of assumptions in connection with --

21            PROF. PFLEIDERER:  Right.

22            THE COURT:  -- a theoretical model.

23            PROF. PFLEIDERER:  That's part of what I wrote

24   about, yes.

25            THE COURT:  Right.

Page 179

1          PROF. PFLEIDERER:  Yes.

2          THE COURT:  But the concept of cherry picking, and

3     I think in the text of your paper here, you say that, "We

4     talk about cherry-picked assumptions don't necessarily stand

5     out as contrived and they often can't be defended as

6     simplifying assumptions that are made so that the model is -

7     -

8          PROF. PFLEIDERER:  Mm hmm.

9          THE COURT:  -- trackable."  You drop a footnote,

10    again repeating the observation of conscious design, and you

11    say, "(indiscernible), so the researcher may need to take a

12    step back and ask whether the assumptions unintentionally

13    are contrived and serve more to produce a particular result

14    than to simply the analysis."

15         PROF. PFLEIDERER:  That's correct.

16         THE COURT:  My question is, that the concept of

17    cherry picking, though, is equally applicable or of equal

18    concern with respect to actual facts and not assumptions,

19    correct?

20         PROF. PFLEIDERER:  Oh, yes.  That's correct.

21         THE COURT:  In other words, cherry picking is

22    simply selectively choosing data, results, opportunities,

23    from what's available in a way that is sought?

24         PROF. PFLEIDERER:  That is technically correct,

25    yes.

Page 180

1    THE COURT:  Okay.  Thank you.

2    Q    And in the course -- just to follow up on what the

3    Court asked -- in the course of your review on QVT's

4    valuation of its positions, were you alert to the

5    possibility of cherry picking data in order to contrive a

6    result?

7    A    I certainly was alert to it, but much more alert to it

8    after I saw the Lehman expert reports, where they were

9    making that -- maybe allegation's not the right word, but

10   that's the only word that comes to my mind.  But in any

11   event, when the Lehman experts use the word cherry picking,

12   I then went back and did some further analysis, which I

13   guess we're going to talk about in a month or so.

14   Q    And so, just for the time being, in reviewing what QVT

15   did, did you see any evidence that they were cherry picking

16   among the data they had to contrive a result?

17   A    No.

18   Q    Now, let's go to the alternative scenario that Mr.

19   Tambe mentioned where a dealer sells protection and hedges

20   it through the short sale of the underlying securities and

21   takes an upfront payment, whether that payment be 20 when

22   they prefer it as 80, or 30 when they prefer it as 70,

23   whatever it is.  And let's say -- first of all, does the

24   dealer know how it's going to turn out when he enters into

25   that trade and that hedge?

Page 181

1    A      No.  If he knew how it would turn out, then he or she

2    would know precisely what to charge.

3    Q     And so, in the event that there is no credit event,

4    does the dealer take risk on the short position that he's

5    entered into on that underlying preferred security?

6    A     In this case, not much.  The risk is that the preferred

7    would go above 100, in which case, then you've got a problem

8    because you have to buy back the preferred at a price above

9    100 and you don't have the wherewithal to do that, because

10   let's say you sold it at 70, collected 30, and then it goes

11   to 110, then you've got some risk.

12   So, it's not a perfectly riskless hedge, but at this time,

13   we're in a financial crisis or a brewing financial crisis,

14   the concern of a dealer would be things are going to go

15   south.  And the scenario where all of a sudden, things turn

16   around and become rosy and pricing goes a little bit above

17   100 was not something that the dealer would probably be --

18   well, reasonable be concerned about.  And if the dealer

19   were, the dealer would charge a little bit more to cover

20   that, which QVT obviously didn't factor in here, and I think

21   appropriately so.  That was not a significant risk.

22   Q     And again, in a situation where the dealer has entered

23   into a short sale of securities, I think you told us earlier

24   that the dealer would be required to pay the coupon to the

25   buyer.

Page 182

1    A    That is correct, yes.

2    Q    And is it possible that that coupon would be higher

3    than the premium that the dealer's being paid?

4    A    Well, I didn't -- in my simple example, I didn't factor

5    that in, so...

6    Q    Well, tell us how you would factor it in.

7    A    So, if you were to factor it in, that would be

8    potentially, if you really wanted to make it (indiscernible)

9    -- and again, a dealer -- I should put a parentheses here --

10   a dealer's only going to do this if the dealer thinks he or

11   she is gaining in doing this.  The dealer had no obligation.

12   This is not a market where you have an obligation to offer

13   something.  So, the dealer is going to make sure that he or

14   she is whole in terms of risk exposures and things of that

15   sort, and then only going to be motivated to do it if

16   there's some perception of profit.

17           So, a dealer that was going to short a security

18   that required payments of a certain amount, the coupons or

19   the dividends, would have to make sure that he or she was

20   recovering that, and would take that into account and charge

21   QVT upfront for that.  They're not going to make a

22   charitable contribution here.

23   Q    And that's an extra cost --

24   A    That would --

25   Q    -- that they would charge?

Page 183

1    A    -- potentially be an extra cost.  So, if the running

2    spread were equivalent to that, then potentially that would

3    wash out.  But that would be something additional to just

4    100 minus par.

5    Q    So, in the pure case where they charge 100 minus par

6    and there's no credit event, they would be exposed to a risk

7    of the losses on that coupon, correct?

8    A    They would have to be making those payments, until they

9    could close out the short position.  That's correct.

10   Q    And the concept here is that that short position would

11   have to be maintained for four and a half years to cover the

12   risk during the period of the PCDS, correct?

13   A    Well, potentially up to whatever the term is.  Of

14   course, if there's a credit event before, then you close out

15   the short position at that point.  So, if there's a

16   significant risk that a credit event would occur within the

17   first two years, let's say, then you would probably factor

18   in that you're less likely to be paying those coupons or

19   having to keep the short position open beyond that.

20   Q    But in Mr. Tambe's example, where there is no credit

21   event, Aare you paying it for the entire four and a half

22   years?

23   A    Yes, you would be because up until the end of the

24   contract, you'd have to worry about a credit event.  And it

25   may be that if things improve so that you no longer are

Page 184

1    really worried about this, you could sort of partially

2    hedge, you could close out part of it.  There are various

3    things you can do.  But you're absolutely right.  To have

4    the full hedge in place over time if it was a four-and-a-

5    half-year tenure, you would need to keep the short position

6    open for that period of time.

7    Q    And would you also need to pay the stock borrow cost

8    for that entire period?

9    A    Yes.  You would

10            MR. TAMBE:  Your Honor, objection.

11            THE COURT:  Yeah.

12            MR. TAMBE:  Leading nature.  The questions are

13   getting more and more leading as we go down.

14            MR. TRACEY:  I can rephrase it.

15            THE COURT:  Okay.

16   Q    Are there any other costs that a dealer would have to

17   incur in the event that there wasn't a credit event for four

18   and a half years?

19   A    So, there again, there's several costs.  One, of

20   course, is what we just talked about, having to pay the

21   dividend to the entity that you borrowed the preferred from,

22   and then as often the case, you do have to pay a fee, a

23   stock borrow cost, on top of that to compensate the lender

24   for basically doing you this service of allowing his or her

25   preferred to be lent.

Page 185

1   Q     Okay.  You were asked a series of questions about

2   whether you assessed the deferral risk of PCBS, or preferred

3   securities, yourself, correct?

4   A     Yes, I was asked that.

5   Q     And why didn't -- you testified that you did not do

6   that, correct?

7   A     I did not do that in an explicit way.

8   Q     Why didn't you do that?

9   A     Because the premise that was behind this analysis was

10  the simple premise that the risk of deferral was material in

11  a strong way here, that there was significant risk, and that

12  again, there weren't a lot of people lining up to offer

13  protection.  So, a dealer would be in a position of having

14  to consider significant deferral risk, where that's not

15  quantified in a precise way, but because it was significant,

16  would want to make sure that they weren't exposed to

17  significant risk.  And the only way to do that was to hedge

18  with the short position, and the only effective way to do

19  that was to hedge with the short position in the preferred

20  security.

21  Q     And are you aware of whether there are other experts in

22  this case who have looked at that issue?

23  A     In terms of the pricing of the PCBS?

24  Q     The risk of deferral based on the price of the

25  preferreds.

Page 186

```
 1    A    Yes.  I believe that Dr. Peter Niculescu and CMRA have

 2    looked at that.

 3    Q    Dr. who?

 4    A    I'll get the first name right and I'll insult him,

 5    perhaps.

 6              THE COURT:  The last name is spelled N-I-C-U-L-E-

 7    S-C-U.

 8              PROF. PFLEIDERER:  Yeah.

 9              MR. TRACEY:  I'm going to be finished, Your Honor.

10    May I have a moment?

11              THE COURT:  Sure.

12              MR. TRACEY:  I have nothing further, Your Honor.

13              THE COURT:  All right.  Thank you.

14              MR. TAMBE:  Can we just consult for a minute?

15              THE COURT:  Sure.

16              MR. TAMBE:  Your Honor, I have no further

17    questions.

18              THE COURT:  You have no further questions?

19              MR. TAMBE:  I have no further questions.

20              THE COURT:  Very good.

21              MR. TAMBE:  May I approach?  I just want to --

22              THE COURT:  Yes, of course.

23              MR. TAMBE:  (indiscernible)

24              PROF. PFLEIDERER:  (indiscernible)

25              THE COURT:  Thank you very much.
```

Page 187

```
 1                PROF. PFLEIDERER:  Thank you.

 2                THE COURT:  We've given you back 40 minutes.

 3                PROF. PFLEIDERER:  I appreciate that.  I'll get on

 4    my plane and get home.

 5                THE COURT:  Very excellent.  We'll see you --

 6                PROF. PFLEIDERER:  To weather that may not be any

 7    better than this.

 8                THE COURT:  Two weather -- oh, I --

 9                PROF. PFLEIDERER:  (indiscernible)

10                THE COURT:  I've been reading about that, but --

11                PROF. PFLEIDERER:  Yeah.

12                THE COURT:  -- sounds as if they've gotten it

13    under control (indiscernible).

14                PROF. PFLEIDERER:  Oh, yeah.  That was scary.

15                THE COURT:  That was very scary.

16                PROF. PFLEIDERER:  I agree.

17                THE COURT:  Safe travels.  We'll see you in a --

18                PROF. PFLEIDERER:  Thank you very much.

19                THE COURT:  -- couple of weeks.

20                PROF. PFLEIDERER:  Thank you much.

21                THE COURT:  We're going to keep talking among

22    ourselves, but you're free to leave.

23                PROF. PFLEIDERER:  Thank you.

24                THE COURT:  Okay.  I think we can keep the record

25    open, yes?
```

Page 188

```
 1              MR. TAMBE:  Sure.

 2              THE COURT:  So, first, if it's okay, I'd like to

 3     just talk about the schedule for this week.  And so,

 4     tomorrow is Thursday, February 16th, and we're going to be

 5     starting at 10:00.  I have actually a Lehman hearing at

 6     9:30, but you can come in and set up, and that won't take

 7     long.

 8              I'm going to need to take the lunch hour at 12:30

 9     to 1:30 tomorrow for a meeting, and then we'll resume.  And

10     then the related question, is the order of the witnesses,

11     Mr. Send versus Mr. Sale, and that's connected to the

12     discussion of the issues that Lehman raised this morning,

13     which I'm not sure if you want to talk about off the record

14     or not.

15              MR. TAMBE:  I think that would be better.

16              THE COURT:  Probably better, right.  Okay.  So,

17     that's one thing we have to talk about.  And then for

18     Friday, February 17th, I have on your list, Mr. Tracey, Mr.

19     Neumann, right?

20              MR. TRACEY:  Correct, Your Honor.  And he will be

21     finished by 2:00, and we don't currently have another

22     witness for the afternoon.

23              THE COURT:  Okay.

24              MR. TRACEY:  But we could probably scare one up.

25              THE COURT:  So I had a note about 2:00.  So, can
```

Page 189

1    we start on 10:00 -- I'm sorry.  I need to start at 10:00 on

2    Friday because I think I have a 9:30 on Friday.

3              MR. TRACEY:  I think we can get Mr. Neumann done -

4    -

5              THE COURT:  Okay.

6              MR. TRACEY:  -- from 10:00 to 10:00.

7              THE COURT:  Okay.  So, that's great.  And then

8    tomorrow, we can talk about what's going to happen after the

9    week off.

10             All right.  So, the two items that I have to

11   discuss are I don't think that I know when response papers

12   are coming in on the issue related to Mr. (indiscernible).

13             MS. SAWYER:  (indiscernible)

14             THE COURT:  Yes.

15             MS. SAWYER:  Yes.  I think we're going to speak to

16   Hogan this evening about that and maybe not --

17   (indiscernible) the need for --

18             THE COURT:  Okay.

19             MS. SAWYER:  -- opposition papers.  But I think

20   it's --

21             THE COURT:  Okay.

22             MS. SAWYER:  -- too soon to promise anything.

23             THE COURT:  So, that's on your --

24             MS. SAWYER:  It's on our to-do list.

25             THE COURT:  -- ball is in your court.  Okay.  And

Page 190

1    then why don't we take up...  Do you have anything else that

2    we should talk about?

3                MR. TRACEY:  I don't have any other items, Your

4    Honor.

5                THE COURT:  Okay.  Then we can close out the

6    record for today and why don't we meet in the conference

7    room.  Thanks.  Thank you everyone for your ongoing

8    patience.

9

10   (Whereupon these proceedings were concluded at 3:54 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 191

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya
     Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital1@veritext.com, c=US
Date: 2017.02.16 16:16:46 -05'00'

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 16, 2017