Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 08-13555-scc

5

6    - - - - - - - - - - - - - - - - - - - - - -x

7

8    In the Matter of:

9

10   LEHMAN BROTHERS HOLDINGS INC.,

11

12                Debtor.

13

14   - - - - - - - - - - - - - - - - - - - - - -x

15

16                United States Bankruptcy Court

17                One Bowling Green

18                New York, New York

19

20                February 16, 2017

21                10:09 AM

22

23   B E F O R E:

24   HON. SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

Page 2

1   08-13555-scc Lehman Brothers Holdings Inc.

2   Ch 11

3   Trial on Lehman's Objection to Claims of QVT [Doc #17468

4   Debtors' One Hundred Fifty-Fifth Omnibus Objection to Claims]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Beck, Dawn South and Sheila Orms

Page 3

1   A P P E A R A N C E S :

2   JONES DAY

3        Attorneys for Debtor

4        250 Vesey Street

5        New York, New York 10281

6

7   BY:   RYAN J. ANDREOLI, ESQ.

8        LAURI W. SAWYER, ESQ.

9        JAYANT W. TAMBE, ESQ.

10        JENNIFER DEL MEDICO, ESQ.

11        REBEKAH BLAKE, ESQ.

12        SARAH EFRONSON, ESQ.

13        DAVID P. SULLIVAN, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

1   HOGAN LOVELLS US, LLP

2        Attorneys for QVT Fund

3        875 Third Avenue

4        New York, New York 10022

5

6   BY:  DENNIS H. TRACEY, III, ESQ.

7        NICOLE E. SCHIAVO, ESQ.

8        JOHN D. BECK, ESQ.

9        BEN LEWIS, ESQ.

10        ROBIN E. KELLER, ESQ.

11        WILLIAM M. REGAN, ESQ.

12        DARYL L. KLEIMAN, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Good morning.  We're ready when you are,

 3      Mr. Tracey.

 4              MR. TRACEY:  QVT calls Yi Cen.

 5          (Pause)

 6              THE COURT:  Good morning, Mr. Cen.  Would you raise

 7      your right hand, please?

 8          (Witness sworn)

 9              THE COURT:  All right.  Please have a seat and make

10      yourself comfortable.  Let us know at any time if you would

11      like to take a break.

12      DIRECT EXAMINATION

13      BY MR. TRACEY:

14      Q    Good morning, Mr. Cen.

15      A    Good morning.

16              THE COURT:  I'm going to ask you to pull the

17      microphone a little bit towards you --

18              THE WITNESS:  Okay.

19              THE COURT:  -- and maybe bend it down a little bit

20      and let's see if that's better.

21              THE WITNESS:  Better?

22              THE COURT:  All right, Karen?  (Indiscernible).

23              THE WITNESS:  Is better?  No?

24              THE COURT:  Why don't you go --

25              THE WITNESS:  Hello.
```

Page 6

```
 1        (Pause)
 2   BY MR. TRACEY:
 3   Q    So let's do a test.  Could you give us your name for the
 4   record, please?
 5   A    Yes.  Can you hear me?
 6            THE REPORTER:  Yes.
 7            THE WITNESS:  Okay.  My name is Yi Cen.
 8            MR. TRACEY:  Is that okay?
 9            THE WITNESS:  Is that fine?
10            THE REPORTER:  Yes.
11            THE WITNESS:  Okay.
12            MR. TRACEY:  Okay.  Great.
13   BY MR. TRACEY:
14   Q    Mr. Cen, could you tell us a little bit about your
15   background, your educational background, please?
16   A    Sure.  So I start on my college.  I went to college in
17   Shanghai, China, University of -- Fudan University.  And after
18   graduate, I came here for studying Ph.D.  Is that clear?  So I
19   got my Ph.D. from University of Pennsylvania in 1994.
20   Q    Thank you.  And could you tell us your employment history
21   after college?
22   A    Sure.  So I went on to do a post doc for the University of
23   Rochester at the Fermilab National Lab in Chicago for about a
24   year.  Okay.
25            THE REPORTER:  (Indiscernible).
```

Page 7

1           THE WITNESS:  Okay.

2           So after I received my Ph.D., went on to do a post-

3    doctor study with University of Rochester but stationed in

4    Fermi National Lab in Chicago.  After a year of post-doc study,

5    I went -- got a job at the Theodore Equipment back in New

6    Jersey.  And a year later, I start work for Merrill Lynch at

7    downtown.

8    Q    And after your job in Merrill Lynch, where did you work?

9    A    Yeah.  After -- I don't remember, a year or a little over

10   a year in Merrill Lynch, I got a job in Deutsche Bank.  I

11   started Deutsche Bank at the risk management department.  Maybe

12   a year or a year and a half later, the department restructured

13   and I went on to start work for a proprietary group called QVT

14   and was --

15   Q    Proprietary training?  Sir?

16   A    Okay.  So that --

17   Q    And when did you start working there?

18   A    I don't remember exact year, '98 or '99.

19   Q    And did you later leave Deutsche Bank?

20   A    Yeah.  So 2004 is the year when the group spin off on

21   Deutsche Bank and start fund called QVT Financial.  So we, as a

22   group, all left Deutsche Bank a year.

23   Q    And what was your position at QVT?

24   A    So there's a -- so when I started QVT, I was an analyst

25   and then I graduated and became a portfolio manager.

Page 8

1    Q    And what was your position in 2008?

2    A    2008, I was portfolio manager mainly responsible for the

3    book (indiscernible) credit and capital (indiscernible) charge.

4    Q    And were you a partner of QVT?

5    A    Yes, I was.

6    Q    And were you a managing member?

7    A    No.

8    Q    And did you have positions in 2008 that were with Lehman

9    Brothers?

10   A    Yes.  We had a lot of single-name CDS positions, was a

11   counterparty in Lehman Brothers.

12   Q    And let me ask you now after -- did there come a time when

13   you left QVT?

14   A    2010 is the year I left the QVT, yeah.

15   Q    And what is your positioned employment now?

16   A    So after I left the QVT, I worked with (indiscernible) to

17   start a company.  I called it Lease Hill Capital Management.

18   So we tried to manage our own money and some other friends and

19   family friends' money.

20   Q    Okay.  So I'd like to take you back, if I can, to

21   September of 2008.  Did there come a time when you and your

22   partners at QVT had concerns about Lehman's financial

23   viability?

24   A    Yes.

25   Q    And --

Page 9

1   A    In the weeks lead to the bankruptcy, we were aware of

2   exposure to the Lehman.

3   Q    And did you take any steps to address that exposure to

4   Lehman?

5   A    Yes.  We were try to reduce all the derivative exposure to

6   the Lehman Brother and try to find a common party that will

7   take Lehman.

8   Q    And were you successful in doing that?

9   A    Not very successful.

10   Q    And what was the challenge with that?

11   A    I think it when you call all the brokers, everybody is not

12   willing to take exposure from Lehman when the situation

13   evolved.  And so, when you call several brokers and you don't

14   get (indiscernible) commitment to do the trades with you.

15   Q    So I'd like to now take you to September 15th, 2008.  So

16   you recall learning that Lehman had filed for bankruptcy

17   protection?

18   A    Yes.  I learned from the media but also we were closed

19   monitor the situation all day.  So we had a few telephone

20   conversation with banking partners and partners of QVT.

21   Q    And when you say the whole day, do you mean September 14th

22   or September 15th?

23   A    Well, I think we had -- I don't recall but at least for

24   me, I'd be monitoring both.

25   Q    And what steps did you take, if any, after you learned of

1  the Lehman filing with regard to your positions with Lehman?

2  A     So on the -- I think it was the afternoon, late afternoon,

3  we got the news that Lehman was filing.  So I think we had an

4  emergency telephone conference call.  And we were basically

5  prepared to going to the next day to try to repair all the

6  hedges that we had with Lehman with some other counterparties.

7  Q     To repair all the hedges.  What do you mean by that?

8  A     I mean, if there's a trade that -- with Lehman, so we need

9  to find the trades to replace those trades.

10  Q    And did you -- after learning of the actual filing, did

11  you attempt to replace those hedges?

12  A    Yes.  So September 15th -- September 15th, that's the day

13  -- Monday -- is that Monday?  So Monday we come in very early

14  and we start immediately make phone calls for all the phone

15  calls to all the brokers, try to get the trades done and been

16  working for days.

17  Q    And were you able to accomplish any replacement trades?

18  A    We did some.  I'm not sure how many.  But very difficult.

19  Q    Why was it difficult?

20  A    I think it was a panic and there was also a lot of parties

21  probably calling for doing the same trades.  So the brokers are

22  not very committal to do the trades.  So it's very difficult.

23  Q    Did there come a time when you participated in the

24  calculation of QVT's losses as a result of the termination of

25  the positions with Lehman?

1    A    Yes, I did.

2    Q    And do you recall approximately when that occurred?

3    A    I think it was one of the weekends after the bankruptcy

4    filing, the weekend.

5    Q    And do you recall who else was involved in that process?

6    A    I think mainly all the -- all the traders that responsible

7    for their book involving the calculation.  I mean, mostly

8    (indiscernible) and (indiscernible).

9    Q    And can you describe your role in the calculation process?

10   A    Yes.  My role is -- I was responsible for most of the

11   single-name CDS and some of the index CDS trades and the book

12   called Acquittal of Charge book.  So I was the one responsible

13   for calculating most of these trades.

14   Q    Okay.  I'd like to show you a document now.  And the

15   document will come up on your screen.  And it's Claimant's

16   Exhibit 2108.

17       Mr. Cen, do you recall seeing this document before?

18            MR. TRACEY:  If you could scroll to the left.  Why

19   don't you go to "Lehman's Positions - Master" and scroll to the

20   left?  Thank you.

21   BY MR. TRACEY:

22   Q    Do you recall seeing that document before?

23   A    Yeah.  I think this is the one, the aggregate calculation

24   sheet.

25   Q    And let's turn to the sheet marked "Lehman's Positions -

Page 12

1   Cen".

2   A    Yeah.

3   Q    Can you identify that sheet?

4   A    Yes.  That's a sheet I -- I could use and sent to Joel.

5   Q    And what was the purpose of you preparing that sheet?

6   A    To calculating the amount of loss.

7         MR. TRACEY:  So if we could -- John, could we filter

8   it to just show the positions that have the name "Cen" under

9   column BC, please?

10        I'm sorry.  Going back to "Positions" there.  Thank

11  you.

12     (Pause)

13  BY MR. TRACEY:

14  Q   So we filtered that summary sheet to show only the

15  positions that have your name next to them.  If you would just

16  look at those positions and tell us generally whether those

17  appear to be -- are they some of the positions that you valued?

18  A    Yes.

19        MR. TRACEY:  Could you scroll down?

20        THE WITNESS:  Yeah.  I can recognize them, yes.

21  BY MR. TRACEY:

22  Q   Okay.  What I'd like to do is ask you if you can recall

23  the price sources that you used to value the Lehman positions.

24  And when I ask you these questions, I want you to only describe

25  what you recall from the period September 15th, 2008 until

Page 13

1    October 15th, 2008 which is when the loss calculation went in.

2    So if you can't remember what you did during that period, we

3    don't want you to testify about it.  We just want you to

4    testify about that period.

5    A    Okay.

6    Q    So do you recall from that period what price sources you

7    used to value the positions?

8    A    The prices -- the pricing source -- foreign brokers that

9    we trade with, broker --

10           THE REPORTER:  (Indiscernible).

11           THE WITNESS:  Oh, okay.

12           Foreign brokers that we trade with and we have a

13   source from -- like if we have a name that we actually did a

14   trade replacement, these are the -- also the source.  And the

15   source that -- also we have a sheet that we send out to all the

16   brokers to solicit a quote.  And then there's also the last

17   resource (indiscernible).

18   Q    Okay.  I'd like to maybe focus first on the positions that

19   you used a replacement trade to value the position.

20           MR. TRACEY:  And so, John, if we could go to BP and

21   filter for replacement.

22   BY MR. TRACEY:

23   Q    Let me direct your attention to rows 220, 221, 228, 229,

24   378, 379, 770 and 771.  Are those -- do you recognize those as

25   positions that you valued using a replacement trade?

1    A    Yeah, I recognize them, yeah.

2    Q    Let me now direct your attention to a document in the book

3    that's in front of you.  And if you could turn to page -- or

4    Claimant's Exhibit 2142 which is, I think, the second document

5    in there.

6    A    Yes.

7    Q    If you could turn to those documents and identify what

8    they are?

9    A    So this seems to be a e-mail I forwarded from Bloomberg to

10   the -- to our central deposit trades to capture a trade.  That

11   says -- and I think it was traded with Goldman.  This document

12   suggests that.

13   Q    And does this relate to --

14        MR. TRACEY:  John, can you keep the replacement

15   trades up on 2108?

16   (Pause)

17   BY MR. TRACEY:

18   Q    So, Mr. Cen, I wonder if you can tell me what the

19   relationship is between the document that -- the first page of

20   Claimant's Exhibit 2142 and any of the trades on the

21   spreadsheet, if any.

22   A    Yeah.  This seems to be a 10 million trade under name of

23   CIT correspond to the top of a CIT.  I think that's just one of

24   the trades that we tried to replace the total amount, which is

25   45 million.  This is a 10 million trade with Goldman.

1  Q    Okay.  And could you look at the Exhibit 2142 and identify

2  any other documents in there that relate to replacement trades

3  for that CIT position?

4            MR. ANDREOLI:  Objection, Your Honor.

5            THE COURT:  Yes?

6            MR. ANDREOLI:  Foundation.  The other (indiscernible)

7  and the compilation.

8            THE COURT:  I'm sorry.

9            MR. ANDREOLI:  Sorry.

10            THE COURT:  Because it's in the "Lehman Positions -

11  Master"?

12            MR. ANDREOLI:  No, no.

13            THE COURT:  I --

14      MR. ANDREOLI:  In the compilation exhibit which is

15   2142.  So, for example, the second page.  I don't see Mr. Cen's

16        name anywhere.  Third page, same issue.  Fifth page, same

17                                                        issue.

18            MR. TRACEY:  Okay.  Well, Your Honor, I'll lay a

19  foundation as we go about it.

20            THE COURT:  Okay.

21            MR. TRACEY:  If he can identify them then --

22            THE COURT:  All right.

23            MR. TRACEY:  -- we'll go into the next one.

24            THE COURT:  Thank you.

25  BY MR. TRACEY:

Page 16

1  Q    So, Mr. Cen, I'd like you to identify which documents, if

2  any, relate to replacing that CIT position and please confine

3  your identification of exhibits to exhibits you actually have

4  seen before and can recognize.

5  A    I think 1320 -- this is the -- this is the e-mail

6  forwarded by Benny.  He's basically reporting the trade.  So if

7  I do some trade and a confirmation comes back from brokers,

8  they'll -- someone they will directly e-mail him and so he will

9  just forward to the -- thing.  So that's one of the CIT trades

10  here.

11  Q    And if I could just ask one follow-up question on that.

12  Do you recall that document, CX1320, from -- as a trade that

13  you did -- as a document of the trade you did between September

14  15th and October 15th?

15            THE COURT:  Okay.  Hold on just a second.  Mr.

16  Andreoli?

17            MR. ANDREOLI:  I mean, it's the same objection.  But

18  I don't know if he can cure it in the answer.

19            THE COURT:  Well --

20            MR. TRACEY:  Well, I'm trying to get to the

21  foundation.

22            THE COURT:  Well, he's trying -- he's --

23            MR. ANDREOLI:  Okay.

24            THE COURT:  Yeah.  I mean, I think he's just taking

25  it one step at a time.

Page 17

1    BY MR. TRACEY:

2    Q    So let me rephrase the question, Mr. Cen.

3    A    Uh-huh.  So basically, if you look at the Exhibit 1320,

4    it's -- it's captured the same 10 million trade -- that I

5    initially forwarded on the Bloomberg 10 million trade.

6    Q    Okay.

7    A    And the bottom part is just the same information that --

8    Q    Okay.  And just for clarification, Mr. Cen, do you

9    recognize Claimant's Exhibit 1320?  Can you identify that

10   document?

11   A    Yeah.

12   Q    Okay.

13            THE COURT:  So let me -- if you don't mind.

14            MR. TRACEY:  Please.

15            THE COURT:  So, Mr. Cen, if you look at the document

16   1320 --

17            THE WITNESS:  1320 --

18            THE COURT:  Right.  1320, the one that you've been

19   looking at, right --

20            THE WITNESS:  Yes.

21            THE COURT:  -- which you've just identified as being

22   linked to 1319, right, or reflecting the same trade?

23            THE WITNESS:  Yes.

24            THE COURT:  Right?  So your name doesn't appear in

25   the Chu block either at the top from Benny Chan (ph) or at the

1    bottom from Barry Chang (ph).  So I guess the question is how

2    would you have come to see that e-mail or to get it to forward

3    it on as you did in 1319 where you sent it to an e-mail address

4    called "Trades"?

5            THE WITNESS:  So --

6            THE COURT:  Do you understand my question?

7            THE WITNESS:  So the e-mail that -- that Benny Chan

8    forwarded, it basically captured the Bloomberg trade

9    (indiscernible) at the bottom.

10           THE COURT:  Okay.  Who is Benny Chan?

11           THE WITNESS:  Benny Chan is a trader -- at the time,

12   he is working with me at QVT.  He's -- he usually reports

13   trades and book trades.

14           THE COURT:  Okay.  So how did it get -- so are you a

15   blind copied on the Benny Chan e-mail?

16           THE WITNESS:  Not necessarily I will get the e-mail

17   but I recognize the Bloomberg portion of the trades.  That's

18   usually when I --

19           THE COURT:  Okay.

20           THE WITNESS:  When I did trade with the counterparty,

21   I will have it.

22           MR. TRACEY:  And -- can I follow up?

23           THE COURT:  Sure.  Go ahead.

24   BY MR. TRACEY:

25   Q    And do you recognize that Bloomberg from seeing it back in

Page 19

1    September of 2008?

2    A    Yeah.  I mean, I don't -- I cannot say exactly every

3    single line but I recognize this is the Bloomberg trades I was

4    doing with -- and Joel.

5    Q    Okay.  And just one follow-up question.

6    A    Okay.

7    Q    In the ordinary course, if you received a confirmation by

8    Bloomberg from Barry Chang -- if QVT received the Bloomberg

9    confirmation from Barry Chang, in the ordinary course of

10   business, if it was your trade, would you normally receive a

11   copy of it?

12   A    I may not get a copy if -- usually a broker will send me a

13   Bloomberg trade and I will recognize them.  But the

14   confirmation could send to one of our -- through e-mail send to

15   one of our traders and he will book the trades.

16   Q    Okay.

17   A    According -- but he will also recognize -- reconcile the

18   confirmation with my e-mail I sent early.

19   Q    Okay.  Is that --

20        MR. TRACEY:  Is that sufficient?

21        MR. ANDREOLI:  I mean, I think there's still been no

22   foundation laid to say that he actually saw this document.

23        MR. TRACEY:  Okay.  Well, we'll --

24        THE COURT:  He --

25        MR. TRACEY:  Go ahead.  Sorry, Your Honor.

Page 20

1            THE COURT:  The witness has testified that he recalls

2    having seen it.  So that's the testimony.

3    BY MR. TRACEY:

4    Q   Okay.  Let's turn to Claimant's Exhibit 1323.  Can you

5    identify that document?  And again, only if you can actually

6    identify the document itself.

7    A   Yes.  Those -- I think the bottom part is --

8            MR. ANDREOLI:  Objection, Your Honor.  Can we get the

9    spreadsheet taken off the monitor while he's looking at the

10   document?  I mean, to the extent it's refreshing his

11   recollection, that's something else.  That seems --

12           MR. TRACEY:  I'm not sure why this is (indiscernible)

13   but --

14           THE COURT:  Okay.  I think that --

15       (Pause)

16           THE COURT:  Unless it's distracting Mr. Cen, we're

17   going to leave the spreadsheet up there.

18           THE WITNESS:  I'm not looking at the spreadsheet.

19   I'm looking at the binder.

20           THE COURT:  Go ahead, sir.

21           THE WITNESS:  So, yes.  I can recognize.  This is

22   type of a trade I'll do and this is a confirmation that was

23   sent back.  This is -- was DB five million.

24   BY MR. TRACEY:

25   Q   And how does that relate to any of the trades that are on

Page 21

1    the spreadsheet?

2    A    This is -- this is all -- same part of trade tried to

3    replace the big position that we had, CIT.  And -- 'cause we

4    cannot get it done.  Nobody would trade you maybe even 20

5    million.  So the 10 million was probably was the largest you

6    can trade that day.  And so we have to break up, call all the

7    brokers.

8    Q    Okay.

9    A    So this is five million.

10   Q    Now turning to Claimant's Exhibit 1324, can you

11   identify --

12            THE COURT:  Mr. Tracey, why don't --

13            MR. TRACEY:  Sorry.

14            THE COURT:  Let's just pause for a moment.  And come

15   on up.

16       (Sidebar conference off the record)

17            THE COURT:  Do you want to come back up?  Okay.

18   BY MR. TRACEY:

19   Q    So based on --

20            THE COURT:  We had a little meet and confer in the

21   hope of coming up with some more efficient of going through

22   what you've been doing for the last 15 minutes or so, Mr.

23   Tracey.

24            MR. TRACEY:  And I apologize for being inefficient.

25   But --

Page 22

1          THE COURT:  No.

2          MR. TRACEY:  -- we've now agreed in an off-the-record

3    conversation that there's no dispute between the parties that

4    the replacement trades that this witness did are not disputed

5    as having occurred.

6          THE COURT:  As having occurred and as reflected in

7    the documents that you've been going through.

8          MR. TRACEY:  Correct, Your Honor.

9          THE COURT:  Okay.  Excellent.  That was not a

10   criticism of either side, just an ongoing effort on my part to

11   move things along whenever I see an opportunity.

12         MR. TRACEY:  Thank you, Your Honor.

13   BY MR. TRACEY:

14   Q    Now, Mr. Cen, I'd like to --

15         MR. TRACEY:  John, if you can just bring up the

16   spreadsheet.  And if you could unfilter it for replacement

17   trades and filter it for trades that are identified as "List".

18   BY MR. TRACEY:

19   Q    Mr. Cen, if you can recall from September/October 2008,

20   what was the approach that you took to valuing positions that

21   are designated as "List"?

22   A    I think, if I recall, the "List" is that we get -- we get

23   quotations back from various dealers and brokers.  And so, I

24   was given that list of the quotes and I used that quotes as a

25   spread and calculate using the (indiscernible) calculating

1              THE REPORTER:  Can you (indiscernible)?

2              THE WITNESS:  So once you get a spread back, it's

3      like a market.  And you use that spread.  You can calculate the

4      dollar amount of the value the trade (indiscernible).  And

5      using that dollar amount of value in the notional and then you

6      can calculate the amount of value associated with that trade

7      and you can basically calculate the loss versus what collateral

8      we have versus the trade -- the Lehman.

9      BY MR. TRACEY:

10     Q     Thank you.

11             MR. TRACEY:  Let's refilter and move to the positions

12     that are identified as MarkIT.

13         (Pause)

14             MR. TRACEY:  And again, we're filtering in column BP

15     on the "Lehman Positions - Master" sheet.

16         (Pause)

17     BY MR. TRACEY:

18     Q    Mr. Cen, with respect to those positions that are

19     identified as having been marked according to MarkIT Partners,

20     can you explain to the Court what approach you used to valuing

21     those positions?

22     A    Sure.  Markit Partner have aggregate -- there's dealers

23     quotes submitted every day.  So we use Markit Partner quotes.

24     And because Markit Partners probably usually only give you the

25     mid-market, so we assign a bid/ask spread.  And here, on

Page 24

1    average, we do something like 10 percent bid to mid spread.

2    And we calculate it based on the Markit Partner, same way that

3    we calculate from the quotation marks.  We use a spread and use

4    a (indiscernible) wherever calculate in CDS dollar value.

5    Q    Okay.

6            MR. TRACEY:  Could you scroll over to column Y, John?

7        (Pause)

8            MR. TRACEY:  Okay.  Thank you.  Could you scroll

9    down?

10    BY MR. TRACEY:

11    Q    Mr. Cen, I'd like you to look at column Y and the dates

12    that are in there.

13            MR. TRACEY:  Thank you.

14    BY MR. TRACEY:

15    Q    Do those represent the dates of Markit Partners

16    information that you used to value these positions?

17    A    Yeah.  So I think that's a reasonable dates we use, yeah.

18    Q    But do you -- the question is -- let me ask it

19    differently.  What do the dates in that column represent?

20    A    That dates correspond the Markit Partner quotation for

21    that day.

22    Q    Okay.

23    A    Yeah.

24    Q    And can you explain to the Court why you used in some

25    cases September 16 and in some cases September 17?

1    A    I think it would -- yes.  Sepetmeber 15 is the date that

2    it's totally chaotic a market.  We couldn't even get any trades

3    done and would have a few trades done but -- so I think that we

4    don't really think that September 15 had any realistic

5    quotation for a Market Partner because all the data was so

6    chaotic.  So that's why we resolved to -- 16 is the starting

7    date to look at the quotations.

8    Q    And in those cases where you used September 17, do you

9    recall what you did that, in general terms?

10   A    Well, I don't recall any exactly why any trade -- exactly

11   why we use the 17th, but in general, is because the 16th does

12   not have credible -- if I would think it would have credible

13   marks, that's why I would resolve to the 17th.  But I don't

14   recall specific ones.

15                THE COURT:  Yes, Mr. Andreoli.

16                MR. ANDREOLI:  Objection and motion to strike.  He

17   testified that he doesn't have a specific recollection about

18   specific trades.

19                MR. TRACEY:  I think the testimony was he remembered

20   a general principle but nothing specific about an individual --

21                THE COURT:  Yes.  All right.  I'm going to let the

22   testimony stand.

23                Can I ask my question, though?

24                MR. TRACEY:  Sure.

25                THE COURT:  You indicated, Mr. Cen that, as a general

1  matter, you would have gone to September 17th rather than

2  September 16th if you had believed that the marks or that the

3  data from Markit Partners on the 16th -- September 16th --

4  wasn't credible.  What is it about the data that you would have

5  seen for 9/16 that would have made you believe it was not

6  credible?  What characteristics of the data?

7           THE WITNESS:  Umm --

8           THE COURT:  If you recall.  If you don't then it's

9  okay.

10          THE WITNESS:  I can't specifically say anything --

11          THE COURT:  Okay.

12          THE WITNESS:  -- definitively.  But --

13          THE COURT:  Okay.

14          THE WITNESS:  -- that's usually -- I mean, if you

15  look at -- I think probably majority is in September 16.  If --

16  we would always try to use September 16.

17          THE COURT:  Okay.  Thank you.

18          MR. TRACEY:  And, John, if we could -- oh, let me --

19  BY MR. TRACEY:

20  Q    Before we go off this -- could you look, Mr. Cen, at

21  column W?  Are those the bid-mid adjustments that you made,

22  that you referred to earlier?

23  A    At column W?

24  Q    W, yes.

25  A    Yes.

Page 27

1   Q    Okay.  And again, only confining yourself to what you

2   recall from September of 2008, do you recall why you used the

3   three, five and ten percent bid-mid spreads?

4   A    I think by default, we all kind of agree ten percent is a

5   market condition we're going to use for the bid to mid because

6   the market is not very liquid for those names in general, but

7   also in the specific time period.  So there are a few -- there

8   are few which resolve tighter at five percent is because these

9   are very liquid investment great name type of trades and they

10  appear quite often and you see a lot of them also daily.

11       There's -- yeah.  There's even tighter ones, three

12  percent.  I think these are probably more relate to a very

13  liquid utilities, rails, those type of names.

14  Q    Thank you.

15            MR. TRACEY:  Now if we could go on to -- go back to

16  BP and unfilter for "Markit Partners".  And if you could filter

17  for "broker run"?

18  BY MR. TRACEY:

19  Q    So, Mr. Cen, I've filtered the spreadsheet for just those

20  that refer to broker run.  Do you recall what approach you used

21  to position a spread to identify it as a broker run?

22  A    So I think, if I recall, broker runs is the one that we

23  ask a broker for the quotes or the market.  And if we find it,

24  we will use that to -- for our calculation.

25  Q    Let me direct your attention to Claimant's Exhibit 2143,

Page 28

1    please.  That's in the book.

2    A    21 --

3    Q    43.

4    A    -- 43.  Okay.

5         (Pause)

6    Q    And again, limiting yourself to documents you actually can

7    identify from QVT's books and records, if you can identify

8    those documents, please do so.

9    A    So 2143 -- this seems to be a Bloomberg message that I

10   sent it to the central deposit that I got a quote for the Ford

11   Motor Co.  Ford Motor Co. spread is 15 points up front plus 500

12   running for five million.

13            THE REPORTER:  (Indiscernible).

14            THE WITNESS:  Oh, okay.

15            So most of information is captured on the subject

16   line that forward.  So it's the CDS for the Ford Motor Co.  And

17   it's 15 points up front plus 500 running.  And the five million

18   is the size in five-year CDS.  So this will be a quote that I

19   will use to calculate.

20            And if you look at -- the original message was sent

21   from Barclay on the September 15.  So when I calculate it,

22   probably that was the September 21st and I searched through my

23   own Bloomberg and this is the quotes I used.

24   BY MR. TRACEY:

25   Q    Okay.  Can you turn to the second page of that exhibit

Page 29

1   which is labeled Claimant's Exhibit CX1559?  Can you identify

2   that document?

3   A     Yeah.  This will be a run for the Sprint and Nextel bond

4   and the CDS.  So the CDS five years, 345/355, for example.

5   That would be the quotes there.

6   Q     And I note that there's no date, at least that I can see,

7   on the quote from Edward Bayliss (ph).  Do you know what date

8   that quote was received?

9   A     No.  I don't know what exact date.  But obviously, it has

10  to be before the September 21st and -- because as the previous

11  exhibition (sic), 21st the one I -- the date I do calculation.

12  I will go to my Bloomberg and search any message and find that

13  Bloomberg -- this type of quote message I forward.  But I don't

14  know why Bloomberg don't have a date.  Some has a date, some

15  does not have a date.

16  Q     Okay.  And turning to the third page, Claimant's Exhibit

17  1613, can you identify that document?

18  A     Yes.  These are usually the IG run we receive from the

19  brokers.  And this is the screen capture from Goldman that I

20  trade with a lot.

21         MR. TRACEY:  Okay.  And finally, I'd like to filter

22  it again on "Calculations".

23         (Pause)

24  BY MR. TRACEY:

25  Q     Mr. Cen, do you recall what approach you took for those

Page 30

1   positions that you identified as "Calculation"?

2   A    I think, in general, if we have a CDS quotes, we use a CDS

3   quote which -- and then you use a formula to calculate that all

4   value.  If we don't have a CDS quotes, I think we will try to

5   resolve that through looking at reference bond price.  And some

6   of these looks like using that bond price quotes to calculate

7   the CDS.

8   Q    And would you please look at Claimant's Exhibit 2144 which

9   is in your book?  And let's focus on the first one, first page,

10  which is Claimant's Exhibit 1572.  Can you identify that

11  document?

12  A    Yes.  That's -- that's a quotes for the reference bond

13  (indiscernible) subordinated bond 2011.  And quotes as of 13,

14  15.  That's the quote.

15  Q    And again, I don't see a date on that.  Do you know the

16  date that you --

17  A    I don't recall the date.  The original message -- again --

18  but has to be before the September 28th, I think.

19  Q    Okay.  And the next document is Claimant's Exhibit 1971.

20  Can you identify that document?

21  A    Yeah.  Looks like this is the one that -- the CDS

22  confirmation.

23  Q    And did you use this in connection with your valuations?

24  A    In this -- I think in this document, it points to the

25  strike price, a reference price, because this, I think, is

Page 31

1   reference to -- for the recovery swap.  Basically, you're

2   betting on what's the ultimate recovery rate.  So this document

3   indicating the trade was struck at a 48 percent recovery.  It's

4   the reference price.

5   Q    And did you use that price in connection with any of the

6   calculations on the spreadsheet?

7   A    Yes.  If we get a quotes for the recovery swap, recovery

8   swap indication price, then we calculate based on the

9   difference of the -- our strike and the recovery -- market

10  recovery.

11  Q    Mr. Cen, did you have a trade facing Lehman as of

12  September 15th, 2008 involving CDS as a reference obligation?

13  A    Reference obligation --

14  Q    A reference entity.  Do you recall a CDS?

15  A    CVS.

16  Q    CVS.

17  A    Oh, okay.  Yeah, yeah, yeah, yeah.

18  Q    Do you recall that?

19  A    Yeah.

20  Q    And did you value that -- what was that position?

21  A    So I think a CVS was one -- arbitrage position, a curve

22  arbitrage -- basically, you think that long-term, the CVS

23  creditor will not be great but short-term, they can manage.  So

24  then you would take that by a long-term protection and using

25  the short-term protection as a source of fund to pay the

1    premium.

2    Q    Okay.

3    A    So it's basically two leg of a trade.

4    Q    And do you recall what the underlying reference obligation

5    was for that CVS position?

6    A    On the CVS positions, I don't -- I think CVS -- and I

7    don't know exactly.  If I have to look at it --

8    Q    Oh, sure.

9    A    But --

10         MR. TRACEY:  Why don't we blow it up?  Can you bring

11   up 2108?

12      (Pause)

13         MR. TRACEY:  Okay.  Would you search for CVS?

14      (Pause)

15         MR. TRACEY:  Keep going down.  Now could you search

16   for other CVSs?

17      (Pause)

18         MR. TRACEY:  Just take all the filters off.  Thank

19   you.

20      (Pause)

21         MR. TRACEY:  Okay.  Thank you.

22   BY MR. TRACEY:

23   Q    So we've filtered for CVS.  Are any of those the positions

24   that you referred to?

25   A    Yes.  So this -- you can see we are selling our

Page 33

1    short-dated which is --

2    Q    Could you identify -- would you just identify the row that

3    you're talking about?

4    A    Oh.  234 to 237.

5    Q    Okay.

6    A    So you have to look at two at the time because one is a

7    QVT, one is a Quintessence.  So the top two represent a lease.

8    We are selling the CVS for short-dated, June of 2012, eight

9    million, eight and a half million.  And then the same notional

10   were long, 2017, June, of a CVS credit.

11           THE REPORTER:  (Indiscernible).

12           THE WITNESS:  June of 2017.

13   BY MR. TRACEY:

14   Q    And with respect to the CVS positions, did they reference

15   a preferred security or a debt security?  Do you know?

16   A    I don't remember that.

17   Q    Okay.

18           MR. TRACEY:  I have nothing further.

19           THE COURT:  All right.  Thank you.

20           Mr. Andreoli, should we take a brief break before you

21   start your cross-examination?

22           MR. ANDREOLI:  That'll be great, Your Honor.

23           THE COURT:  All right?  Okay.  Let's resume at 11:15.

24           Mr. Cen, you remain under oath during the break.

25   Please don't discuss the case or your testimony with anyone or

1   be in anyone's presence while they're doing the same.  All

2   right?

3             THE WITNESS:  Okay.  But I can go back to the seat or

4   I should --

5             THE COURT:  No.  You're -- you can take a little

6   break now and then you're going to come back and Mr. Andreoli

7   is going to do his cross-examination.

8             THE WITNESS:  Okay.

9             THE COURT:  All right?  Thank you.

10        (Recess from 11:06 a.m. until 11:21 p.m.)

11            THE COURT:  Yes.  Are you going to be just working

12   out of your binder?

13            MR. ANDREOLI:  I think so, Your Honor.

14            THE COURT:  Okay.

15            Please come back, Mr. Cen.  Yes.

16            Ready when you are.

17            MR. ANDREOLI:  Okay.

18   CROSS-EXAMINATION

19   BY MR. ANDREOLI:

20   Q    Good morning, Mr. Cen.

21   A    Good morning.

22   Q    So let's start I think where you left off with Mr. Tracey.

23   And you were discussing CVS entrees.  Do you recall that

24   testimony?

25   A    CVS?

Page 35

1    Q    Right.  Do you recall talking about that with Mr. Tracey?

2              THE COURT:  CVS.

3              THE WITNESS:  CVS.

4              THE COURT:  V as in victory.

5              THE WITNESS:  Yeah.  Yeah.

6    BY MR. ANDREOLI:

7    Q    Okay.  Okay.  If you could flip to tab 5972 in your

8    binder.  It's in the black binder.  Sorry.

9    A    Oh.  It's a different binder.  Okay.  What's the tab

10   number?

11   Q    5972.

12   A    Yep.

13   Q    Let me know when you're ready.

14   A    Yeah.

15   Q    You ready?

16   A    Do you want me to read this one first?

17   Q    Yes.

18   A    Okay.

19   Q    Yes, I do.  Go ahead.

20        (Pause)

21   A    Okay.  Yeah.

22   Q    Okay.  So I think when Mr. Tracey asked you about the CVS

23   trades, you couldn't recall what the underlying obligations

24   were, is that right?

25   A    Yeah.  From now -- but now I look at this and --

Page 36

1    Q    Okay.  So does this document, Exhibit 5972, refresh your

2    recollection that one of the CVS trades was a PCDS trade?

3    A    Yeah.

4    Q    Okay.  And what is a PCDS trade?

5    A    PCDS trade is a CVS that reference to a preferred -- a

6    preferred bond (indiscernible).

7    Q    As opposed to a senior debt like a regular CDS.

8    A    Right.  Preferred, yes.

9    Q    All right.  And --

10             MR. ANDREOLI:  Let's bring up --

11             MR. TAMBE:  Just one thing on the record, I think.

12             THE COURT:  Yes.

13             MR. TAMBE:  It says PCDS trade is a CDS.  I think he

14   said is a CVS.

15             MR. ANDREOLI:  Right.  Okay.

16             THE COURT:  Okay.  I'm lost.

17             MR. TAMBE:  The witness had said CDS which came up in

18   the transcript as CVS.  I didn't want that lost as we went on.

19             THE COURT:  Okay.

20             MR. TAMBE:  Thank you, Your Honor.

21             THE COURT:  Uh-huh.

22   BY MR. ANDREOLI:

23   Q    Okay.

24             MR. ANDREOLI:  And let's go to 2108, Randall.

25             THE COURT:  If we have any more external noise, I'm

Page 37

1    going to just quit.

2    BY MR. ANDREOLI:

3    Q    Okay.  Mr. Cen, this is the document you were looking at

4    earlier with Mr. Tracey, right?

5         Sorry.  You have to answer --

6              MR. ANDREOLI:  Should I close the window, Your Honor?

7              THE COURT:  Well, just pause for a moment.

8              Are the windows as closed as you can get them?

9              MR. TAMBE:  Without actually like pulling them in,

10   yes.  I think you said yesterday we shouldn't do that?

11   BY MR. ANDREOLI:

12   Q    So, Mr. Cen, this is the spreadsheet you were looking at

13   earlier with Mr. Tracey, correct?

14   A    Yes.

15   Q    Okay.

16              MR. ANDREOLI:  And, Randall, if you could filter on

17   column B for CVS.  Okay.

18   BY MR. ANDREOLI:

19   Q    So these are the four trades that you were discussing

20   earlier with Mr. Tracey, right?

21   A    Yes.

22   Q    Okay.

23              MR. ANDREOLI:  If we could scroll out to column BP.

24   BY MR. ANDREOLI:

25   Q    Okay.  So column BP, Mr. Cen, it says "List".  And does

1      that mean that you valued these trades using the responses QVT

2      received in its market quotation process?

3      A      Yes.

4      Q      Okay.  And when QVT sent its market quotation request to

5      dealers, do you know if QVT notified the dealers that the PCDS

6      trade was, in fact, a PCDS trade?

7      A      I'm not sure.  There looks like the booking the name of a

8      CVS trade only indicating is a regular CDS.  So I'm not sure

9      anybody send out -- specify anything (indiscernible).  It's

10     very rare -- PCDS is very rare.

11             MR. ANDREOLI:  Randall, if you could scroll down on

12     the tabs.  If you could show Mr. Cen the "Corporate List" tab,

13     please.

14     BY MR. ANDREOLI:

15     Q      And, Mr. Cen, is this the list as you understood it that

16     went out to dealers in connection with the market quotation

17     process for the single-name CDS trades facing Lehman?

18     A      To me, yeah, that looks like one.  The -- so I think when

19     I recognize it when I use the quotation pack to calculate using

20     the sheet, yes.

21             THE REPORTER:  (Indiscernible).

22             THE WITNESS:  To calculate the value of the CDS.

23             MR. ANDREOLI:  Okay.  Randall, could you filter on

24     column A?  Well, actually, sorry.

25     BY MR. ANDREOLI:

Page 39

1   Q    Before we do that, Mr. Cen, if we scroll down and if you

2   could look at the "Notes" column, column F.  And then just go

3   down.

4        So, Mr. Cen, you see in some cells, it says LCDS in column

5   F?  Do you see that?

6   A    Where?  Yeah.  Those are long CDS.

7   Q    Right.

8             MR. ANDREOLI:  And then if you keep scrolling down,

9   Randall --

10  BY MR. ANDREOLI:

11  Q    -- see some say PCDS?

12  A    Right.

13  Q    Okay.

14            MR. ANDREOLI:  So now, Randall, could we filter on

15  column A, please, for CVS?

16  BY MR. ANDREOLI:

17  Q    Okay.  You see, it doesn't reference PCDS in column F for

18  the CVS trades, right?

19  A    Yeah.  I saw that.

20  Q    Okay.  And so, is your understand that when the market

21  quotation request was sent out to dealers, the CVS was not

22  specified as a PCDS?

23  A    It doesn't look like specify as a PCDS.  Call it a

24  mistake.

25  Q    Okay.  And the PCDS trade here is the one that's specified

Page 40

1    in row C, right -- I'm sorry -- row 3.  Sorry.

2    A    Hmm?

3    Q    Row 3 is the PCDS trade?

4    A    Yes.

5    Q    Okay.

6    A    Short-dated one, yes.

7    Q    And that's the one you used a quote of 30 from JTM to

8    value, right?

9    A    That looks like, yeah.

10   Q    And so that's not an accurate quote for PCDS, right?

11   A    Probably not, I would think.

12   Q    So, Mr. Cen, you mentioned that PCDS was very rare.  Do

13   you recall having any conversations with anyone else at QVT

14   about PCDS in the 2008 time frame?

15   A    Within ourselves, among ourselves?

16   Q    Yes.

17   A    Probably yeah.  Yeah.

18   Q    Do you recall letting anyone know that you had a PCDS

19   trade with Lehman?

20   A    I'm not sure I talked -- I specifically talked to anybody

21   but it could be.  I don't know.

22   Q    Do you recall any of your partners having PCDS trades with

23   Lehman?

24   A    That I probably aware of, yeah.

25   Q    So you did know that some of your partners had PCDS

Page 41

1    trades?

2    A    Yeah.

3    Q    Which partners?

4    A    I would think Arthur Chu is the most likely one if I can

5    remember.

6    Q    But you're not sure.

7    A    Well, I'm not sure exactly but I know PCDS is the only

8    probably between him and me trades with Lehman.

9    Q    Okay.  So I think earlier with Mr. Tracey, you were

10   talking about your role in connection with the valuation

11   process.  Right?  Okay.  So your role --

12   A    Yes.

13   Q    -- consisted of filling out your version of the

14   spreadsheet and then providing it back to Mr. Wollman, is that

15   right?

16   A    Yes.

17   Q    Okay.  And the spreadsheet you were looking at earlier,

18   2108, it has the master list, you didn't edit that master list,

19   did you?

20   A    No.

21   Q    That's something Mr. Wollman was in control of?

22   A    He aggregate --

23   Q    Right.  And you weren't responsible for verifying any of

24   the other traders' valuations, were you?

25   A    The other packs?

Page 42

1    Q    Right.

2    A    No.

3    Q    And you weren't involved in any revisions that QVT

4    submitted to its calculation statement, were you?

5    A    I don't remember.

6    Q    You weren't involved in the process of sending the lists

7    that we just looked at a few minutes ago out to dealers, were

8    you?

9    A    I wasn't the one sending out the list but I called the

10   dealers, let them know that the list will be sent to them from

11   QVT.

12   Q    Okay.  Which dealers did you call?

13   A    I mean, I usually call all the dealers that I usually

14   trade with.

15   Q    Okay.

16   A    I cannot recall exactly who the --

17   Q    Okay.  That's something that we'd like to be clear about.

18   So do you have a recollection on specific dealers in connection

19   with this process?

20   A    I don't have a recollection specific to dealer but I

21   usually call them to let them know that we'll send a list to

22   them.

23   Q    So you're talking about other (indiscernible) that QVT

24   sent out prior to this, is that right?

25   A    I think in general practice, if we sent out any thing,

Page 43

1    solicited a quote, in order to have the dealer respond, I will

2    call them to let them know.

3    Q    Okay.  But just specifically, with respect to this one,

4    you don't remember calling particular dealers.

5    A    I don't remember.

6    Q    Okay.

7    A    And you weren't involved in drafting the language that

8    went into the requested dealers?

9    A    No.

10   Q    You were not involved in seeking legal advice as to the

11   market quotation process, were you?

12   A    No.

13   Q    And you didn't have any conversations with Mr. Brumm about

14   legal advice that QVT obtained about the market quotation

15   process?

16   A    No.

17        (Pause)

18   Q    Okay.  So you were provided a first draft of the

19   spreadsheet, like a template, then you fill in, right, with

20   your valuations?

21   A    Yeah.

22   Q    And when you received the template, it already had certain

23   information filled in, right?

24   A    Yeah.  The quotations.

25   Q    Okay.  So it had certain quotations from the dealers

Page 44

1  already filled in?  Is that what you mean?

2  A    Yes.  I cannot recall exactly, you know, what you're

3  asking for that.

4  Q    Okay.  Do you recall how Mr. Wollman provided you with the

5  template?

6  A    How?

7  Q    Like did he send it to you by e-mail or did he direct you

8  to a place on QVT shared drive?

9  A    I don't remember.

10  Q    Can I direct you to tab JX0086 in the binder?  And if you

11  can take a moment to read the first e-mail in the chain from

12  Mr. Wollman and let me know when you're ready.

13  A    86, right?  86?

14  Q    Yes, correct.  It should look like the one on your screen.

15       (Pause)

16  A    I -- okay.

17  Q    Okay.  So the bottom e-mail or the first e-mail on this

18  chain is an e-mail Mr. Wollman sent to you on Saturday,

19  September 27th at 5:27 p.m.  You see that?

20  A    Okay.

21  Q    And in the e-mail, Mr. Wollman directs you to two files on

22  QVT drive, correct?

23  A    Yes.

24  Q    In the first file, he mentions is a Lehman claim/new.xls,

25  correct?

Page 45

1    A    Yes.

2    Q    In the second file, he directs you to is called Marking

3    Responsibility.xls, right?

4    A    Yes.

5    Q    Okay.  And in the paragraph where he describes the marking

6    responsibility file, he notes that he had assigned each CDS to

7    someone but that there were some unknown positions that had not

8    yet been assigned, right?

9    A    Yes.  That appear on the e-mail.

10   Q    Okay.

11           MR. ANDREOLI:  Randall, can we open Exhibit 5214?

12   BY MR. ANDREOLI:

13   Q    Okay.  Mr. Cen, this is another spreadsheet that Randall's

14   going to bring up on the screen.  You can look in the binder if

15   you want to see the metadata on the document.

16   A    Okay.

17   Q    And if you can just go to your first copy binder for a

18   second, Mr. Cen, tab 5214.

19        (Pause)

20   A    Okay.

21   Q    Okay.  And if you flip over the first page, you'll see a

22   page of metadata.

23   A    This one, right?

24   Q    Yes.  Okay.

25   A    Uh-huh.

Page 46

1   Q    So you see in the third box, there's file information.  Do

2   you see that?  And the file name for this file is "Marking

3   Responsibility.xls?

4   A    Yes.

5   Q    And that's the same file name you just saw in the e-mail

6   that Mr. Wollman sent you?

7   A    Okay.

8   Q    And if you look at the screen now, which is the native

9   Excel, do you recognize this as the marking responsibility

10  spreadsheet that Mr. Wollman sent you on September 27th of

11  2008?  And if you need to look anywhere on the spreadsheet,

12  just let us know and we'll move the spreadsheet for you.

13  A    Well, I -- I don't remember specifically but this is the

14  spreadsheet that you open, right?

15  Q    Yes.

16  A    Okay.

17  Q    So do you recall receiving a spreadsheet from Mr. Wollman

18  in that time period letting you know which trades you were

19  responsible for valuing?

20  A    Well, I said I don't remember was attachment or was point

21  to the specific area.

22  Q    Right.  So a slightly different question.  But do you

23  remember receiving a spreadsheet from Mr. Wollman to let you

24  know which trades you were supposed to value?

25  A    Well, I receive a template, yes.  But I don't know --

Page 47

1    template spreadsheet for me to valuate.

2    Q    Okay.

3            THE COURT:  The question, Mr. Cen, is how did you

4    come to know which trades you were being expected to handle in

5    connection with the valuation process.

6            THE WITNESS:  Yes.  I received the template from Joel

7    Wollman which ask me to valuate these trades.

8            THE COURT:  Okay.

9    BY MR. ANDREOLI:

10   Q    And --

11           THE COURT:  So they're two different things.

12           THE WITNESS:  Okay.

13           THE COURT:  There's a template, right, and the trades

14   that you were going to populate into the template, right?

15           THE WITNESS:  Well --

16           THE COURT:  How did you know which trades you were

17   personally responsible for?  Which positions?  I'm sorry.

18           THE WITNESS:  Well, he -- well, first of all, Joel

19   Wollman sent me a template which include the positions I have.

20   But also, I know what my positions are which by the account, I

21   know which account is my account.

22   BY MR. ANDREOLI:

23   Q    Okay.  Maybe we can do it a slightly different way.  So if

24   you go back to Joint Exhibit 86, Mr. Cen, in your binder.  So

25   as I mentioned, there are two files that Mr. Wollman

Page 48

1   referenced.  The other one is Lehman Claim-new.xls, right?

2   A    Uh-huh.

3   Q    Okay.

4        MR. ANDREOLI:  So let's open, Randall, 5971.

5   BY MR. ANDREOLI:

6   Q    So, Mr. Cen, while that's being brought up, the

7   spreadsheet's being brought up on the screen.  You want to flip

8   in your binder to tab 5971 and you can see the file name.

9   A    Yes.

10  Q    If you look in your binder, Mr. Cen, in the same area,

11  where it says "File Information", this file name is Lehman

12  Claim-new.xls, right?

13  A    Okay.

14  Q    And that's the same file name that Mr. Wollman was

15  pointing you to on September 27, 2008, right?

16  A    Okay.

17  Q    Correct.  So is this document the template that Mr.

18  Wollman directed you to to perform your valuations?  And if you

19  need to look around, please let us know and we'll scroll around

20  for you.

21  A    Well, can you scroll to the right?

22       (Pause)

23  A    So this specific one, some of these trades are not my

24  responsibility.

25  Q    Right.  But you were provided with a template that had

Page 49

 1   more than just your trades.

 2   A    Similar to this, yeah.  Yeah.  I would say, yes.

 3           MR. ANDREOLI:  And if you -- Randall, while you're

 4   there --

 5           THE WITNESS:  'Cause you have a responsible -- maybe

 6   it's a different person here.

 7   BY MR. ANDREOLI:

 8   Q    Right.

 9           MR. ANDREOLI:  Can you drop down that -- yeah.  Can

10   you filter on Mr. Cen's initials, please?

11   BY MR. ANDREOLI:

12   Q    Okay.  Now that we filtered on your initials, does this

13   spreadsheet now look like the template that you were provided?

14   A    Yeah.  It looks like it, yes.  Yeah.

15   Q    Sorry.  Let me make the record clear.  We have to talk

16   alternating, okay?  So let me finish.

17        So is this spreadsheet, now that we filtered your name, is

18   this the spreadsheet that you were provided the template to

19   fill out?

20   A    It looks like one, yeah.

21   Q    And if we flip back to Joint Exhibit 86.  And sort of in

22   the middle of the "Marking Responsibility" paragraph, Mr.

23   Wollman notes:  "Even though I assigned positions to everyone,

24   many of these may have MarkIT Partner marks.  However, please

25   examine appropriateness of mark and bid/ask spread and decide

Page 50

1    if an override is necessary."

2        Do you see that?

3    A    Yes.

4    Q    Okay.  And so, after you received this e-mail from Mr.

5    Wollman, did you then engage in the analysis that he requested

6    looking at the appropriateness of the MarkIT Partner marks?

7    A    I think I would but I don't remember specifically.

8    Q    Well, you did it at some point in time, right?

9    A    Yes.

10   Q    And his suggestion that you do it suggests that you hadn't

11   done it yet, right?

12   A    I don't know if it's suggesting to me or to some other

13   persons.  But -- I don't understand the question.

14   A    I'm just trying to place it in time.  So he's directing

15   you and your partners to examining appropriateness of the marks

16   and the bid/ask spread, right?

17   A    Yeah.

18   Q    And so, you don't think you had done that work prior to

19   receiving this e-mail, do you?

20   A    I don't remember.  But I don't know if it's relevant.  I

21   don't know this necessarily say we didn't do the bid/ask

22   estimate.

23   Q    Okay.  Do you have any recollection of doing the bid/ask

24   estimate before September 27th?

25   A    I don't remember.

Page 51

1    Q    Okay.  At the bottom of the e-mail, Mr. Wollman writes,

2    "Let me know if you have any questions/suggestions to help

3    tomorrow go as quickly as possible.  (I'll be in by around 11

4    or so.)

5         And so, was Mr. -- well, you understood that to mean

6    that --

7              MR. ANDREOLI:  Well, strike that.

8    BY MR. ANDREOLI:

9    Q    Was there a meeting following the day on September 28th in

10   QVT's offices?

11   A    See, that's a date I don't remember 'cause I don't

12   remember when we did the first valuation, was the 21st or 28th,

13   I don't remember.  So that's why I don't remember this e-mail

14   was the first iteration or the second iteration.

15   Q    Did you do anything to prepare for your testimony today,

16   Mr. Cen?

17   A    What kind of preparation?

18   Q    Did you review any documents?

19   A    I review some documents that I was provided exhibit.

20   Q    Okay.  Did you see any documents that demonstrated that

21   you did valuation work before September 27th?

22   A    I don't remember.  21st?  I don't remember.

23   Q    Did you review any other spreadsheets other than the one

24   Mr. Tracey showed you this morning, Exhibit 2108, the master

25   spreadsheet?

Page 52

1    A    No, I did not open any spreadsheets, no.

2    Q    It was just that one, 2108, that you looked at in

3    preparation.

4    A    In preparation, I was looking at that one.

5    Q    Okay.  Mr. Cen, why don't we take a look at Exhibit 5961?

6    And this is another spreadsheet.  It's either the metadata

7    within the binder --

8         Okay.  For 5961, Mr. Cen, you'll see that the file name is

9    Lehman Claim-Sen.xls, do you see that?

10   A    Yes.

11   Q    And if you look at the spreadsheet on the screen, is that

12   the spreadsheet in which you performed your valuations?

13   A    It looks familiar, yeah.

14   Q    Okay.  And you'll see that the date modified in the

15   document says 9/28/2008 and the time modified says 15:42:30

16   which is 3:42.  Is that --

17   A    Where is the time -- where is the timeline?

18   Q    So in the metadata.

19   A    On the next page?

20   Q    On the right-hand side, yes.  On the right-hand side, it

21   has "Time Modified".

22   A    "Time Modified" 15:42:30.  Is that what you referenced

23   here?

24   Q    Yes.

25   A    Yeah, I saw that.

Page 53

1    Q    Okay.  And is that consistent with your memory that you

2    completed your valuations at 3:42 on September 28th?

3              MR. TRACEY:  I'm going to object.  I'm not sure

4    there --

5              THE COURT:  Yes.

6              MR. TRACEY:  -- has been evidence --

7              MR. ANDREOLI:  I --

8              THE COURT:  There has not yet been that statement.

9              THE WITNESS:  I cannot remember --

10             THE COURT:  Hold on.  (Indiscernible) one second.  Do

11   you want to just look back over your notes?

12             MR. ANDREOLI:  Sure, sure, sure.  Yeah.  Okay.

13   BY MR. ANDREOLI:

14   Q    Sir, did you complete your valuation work on September

15   28th?

16   A    So I cannot -- exact date I cannot remember all the when

17   is complete.  I don't -- I don't remember the date exactly.  I

18   remember it was a weekend and we were working on the

19   valuations.

20   Q    Okay.  Okay.  Okay.  Mr. Cen, Mr. Tracey directed your

21   attention before --

22             MR. ANDREOLI:  And actually, I'm going to go 2108,

23   please.

24   BY MR. ANDREOLI:

25   Q    Okay.

Page 54

1      MR. ANDREOLI:  If we could filter for Mr. Cen's

2  initials in column BC.  And filter in column BP for "Broker" --

3  I'm sorry -- for "List".  Okay.

4  BY MR. ANDREOLI:

5  Q    And I think you mentioned that these are the trades that

6  you valued using responses QVT received to its market quotation

7  requests, is that right?

8  A    Yeah.

9  Q    Okay.  These aren't all the trades that QVT received

10  market quotation responses on that you valued, right?

11  A    I'm not sure the -- I'm not sure.

12  Q    What does that mean?

13  A    Whatever it is says.

14  Q    Okay.  Do you recall seeing market quotation responses

15  that you did not use in your valuations?

16  A    I don't recall the specific but if I do, so I will

17  basically base it on the quotations not from credible dealers.

18  Either they don't usually trade or they don't provide a

19  credible marks.  But I don't remember specifically I exclude

20  them.

21  Q    Okay.  Let's go to --

22      MR. ANDREOLI:  Randall, if you could remove the

23  filtering on source.  And could you remove the filtering on Mr.

24  Cen's initials to BC?  And then can we filter in column B on

25  "VC"?

1    BY MR. ANDREOLI:

2    Q    Okay.  Mr. Cen, did you trade CDS on VC?

3    A    Visteon?  Yes.

4    Q    Okay.  And so, if you leave column BC up here, you see

5    that you were responsible for valuing some of these VC

6    positions and Mr. Wollman was responsible for valuing others,

7    is that right?

8    A    I see all the -- basically, it was my name.

9    Q    Right.  Do you see in rows 6, 7, 174 and 175 Mr. Wollman's

10   initials in column BC?

11   A    Oh, okay.  But these are different accounts.  These are

12   related different trades, yes.  Five, ten track, yes.

13   Q    Okay.  And --

14            MR. ANDREOLI:  Okay.  Can we go to the corporate --

15   BY MR. ANDREOLI:

16   Q    So Visteon was a single-name corporate CDS, is that right?

17   A    Yes.

18   Q    Okay.

19   A    And if you notice that the account VC is for single-name

20   basically on trades.

21   Q    Okay.

22            MR. ANDREOLI:  And if we go to the --

23   BY MR. ANDREOLI:

24   Q    So if you got quotes in response to your market quotation

25   request, it would be in the corporate list tab, is that right?

Page 56

1   A    I assume.  I --

2   Q    Okay.

3        MR. ANDREOLI:  Let's go to the corporate list tab,

4   please.

5        THE WITNESS:  The list, yeah.  Okay.

6        MR. ANDREOLI:  And if we -- Randall, if you could

7   filter in column A for VC.  Okay.

8   BY MR. ANDREOLI:

9   Q    So you see that you received market quotations on some of

10  these VC positions, right?

11  A    Yeah, I see that.

12  Q    Okay.  But you didn't use them in your valuation, right?

13  A    I don't remember.

14  Q    Okay.  You said that if you didn't use responses to the

15  market quotation process, you didn't think the dealer was

16  credible, right?

17  A    I say in general, if I didn't use it, I find them not

18  credible so I didn't use them.

19  Q    Okay.  So --

20  A    Very rare.

21  Q    Okay.  Are you saying that --

22        MR. ANDREOLI:  So, Randall, can you scroll over to

23  the right?  Okay.

24  BY MR. ANDREOLI:

25  Q    So you see on row 48, there are two responses, one from

```
 1    JPM and one from MS, right?

 2    A    Okay.

 3    Q    And more generally, there's several of these positions

 4    have quotes from MS, which is Morgan Stanley, right?

 5    A    Yes.  Morgan Stanley, yeah.

 6    Q    And Morgan Stanley was axed according to the note, right?

 7    A    Okay.

 8    Q    So you didn't believe that the axed quotes that you got

 9    from Morgan Stanley were credible?

10    A    I don't remember.  I -- what did I do with the Visteon.  I

11    don't even --

12    Q    Okay.

13    A    -- remember --

14    Q    Let's go back.  Let's go back.

15    A    -- what did I use for the --

16    Q    Let's go back --

17    A    -- calculation.

18    Q    -- to the "Lehman Positions - Master tab".

19              MR. ANDREOLI:  "Lehman Positions - Master".

20              THE COURT:  Can I interrupt for one second?

21              Mr. Cen, what does the word "axed" mean in this

22    context?

23              THE WITNESS:  Axed means you can call them for a

24    trade.

25              THE COURT:  Say that again, please.
```

Page 58

1    BY MR. ANDREOLI:

2    Q    It means they're interesting in trading, right?

3    A    Axed means that you can call them and make a real trade.

4         THE COURT:  Thank you.

5         MR. ANDREOLI:  Okay.  So let's scroll out to --

6    Randall, can we see column BP, please?

7    BY MR. ANDREOLI:

8    Q    Okay.  So for the trades that you valued, which are below

9    row 175, you used MarkIT, right?

10        (Pause)

11   A    Yes.

12   Q    And you'll see that Mr. Wollman used "List" to value the

13   trades that he valued, right?

14   A    Yes.  I saw this.

15   Q    Okay.

16   A    Yeah.

17   Q    And some of the trades that Mr. Wollman valued have the

18   same maturity as the trades that you valued, right?

19   A    Yeah.  That looks like, yeah.

20        MR. ANDREOLI:  Let's go to -- let's do the filtering,

21   Randall.  Let's filter column BP for "Broker Run".  And let's

22   go to Mr. Cen's initials in column BC.

23   BY MR. ANDREOLI:

24   Q    Okay.  So Mr. Tracey put this population of trades up on

25   the screen earlier.  Do you remember that?

Page 59

1    A    Uh-huh.

2    Q    Okay.  And so I think you talked about the Ford loan CDS,

3    Sprint and Nextel CDS, right?

4    A    Yep.

5    Q    And CDX trade.  Do you remember that?

6    A    I -- we didn't talk about CDX -- oh, yes, we did, yeah.

7    Q    Okay.  So you didn't talk about the RAD trades, right?

8    A    We didn't.

9    Q    Did not, right?

10   A    You say did we talk about that trade?

11   Q    Right.

12   A    We didn't.

13   Q    Right.

14        MR. ANDREOLI:  So let's go to column AE.  I'm sorry.

15   AF.

16   BY MR. ANDREOLI:

17   Q    Okay.  So for those -- so let's just start with a little

18   background.  What is RAD?

19   A    I think it's a Rite Aid.

20   Q    Right.  Okay.  And in column AF, which is the note for --

21   in rows 230, 231, it says, "using 5Y 40-45/43.5 from Goldman",

22   right?

23   A    Yes.

24   Q    And you're referring to a run you received from Goldman

25   there, right?

Page 60

1    A    Yes.

2    Q    Do you recall what the date of that run was?

3    A    No.

4    Q    And you didn't see a run from Goldman in preparation for

5    your testimony here today, did you?

6    A    From Goldman?  I don't -- I don't recall.

7    Q    Okay.

8             MR. ANDREOLI:  Randall, can we just go to Exhibit

9    5961?  Can we do the same thing?  Let's do -- well, actually,

10   let's just look at the same rows, 230, 231.

11   BY MR. ANDREOLI:

12   Q    So these are the same two Radian trades, right?

13   A    Rite Aid, uh-huh.

14   Q    And -- sorry.  5961 is the spreadsheet that we already

15   talked about.  This is the Lehman Claim-Cen spreadsheet that

16   you filled out, right?

17   A    This is my spreadsheet.  Is that what you're saying?

18   Q    Yes.

19   A    Okay.

20   Q    This is the one that we looked at before.  You can look at

21   the metadata if you'd like.  File name is Lehman Claim-Cen.

22   A    Okay.

23   Q    Okay.  So if you go to column AE in this spreadsheet,

24   there was a different note, right?

25   A    Yeah.

1    Q    Okay.  And it says "Using 5Y 34-36 off Citi run", right?

2    A    Okay.

3    Q    Okay.  Do you recall why you moved from a Citi run of 34

4    to 36 to a Goldman run that was 40.5 to 43.5?

5    A    I don't remember.  Which one was -- which one -- this is

6    my spreadsheet, right?

7    Q    Yes.

8    A    I don't remember.  Which -- which is the one that being

9    used --

10   Q    So we can show you --

11   A    -- for the claims?  Like, which one is the one they send?

12   Q    I'm not sure I can actually testify to that.  If you look

13   at 2108, can I make the representation --

14          MR. ANDREOLI:  Sure.

15   Q    -- that that's the final? 2108's the final.  That's the

16   one that has the Goldman run in it.

17          MR. ANDREOLI:  Can you just go back to 2108, Randall?

18   Okay.

19   BY MR. ANDREOLI:

20   Q    So this is what's been presented to us as the final.

21        So you don't remember how you switched, is that right?

22   A    No.  I don't remember I switched.

23          MR. ANDREOLI:  Let's go to Exhibit 5973.

24        (Pause)

25          THE WITNESS:  Okay.

Page 62

1    BY MR. ANDREOLI:

2    Q    Okay.  So you'll see this is an e-mail you sent to Lehman

3    at QVT.com --

4    A    Yes.

5    Q    -- on September 21, right?

6    A    Yes.

7    Q    Okay.  And the subject line says "Citi/Rite-Aid update",

8    right?

9    A    Yep.

10   Q    And then there's, in the lower right-hand corner, there's

11   numbers 34-36, right?

12   A    Yes.

13   Q    So this is the broker run that you used to populate the

14   earlier version of your spreadsheet, right?

15   A    Yes.

16   Q    Okay.  There's no date on the broker run that you're

17   forwarding, right?

18   A    Yeah.  I said earlier probably Bloomberg sometimes --

19   depend on how you forward that, yes.  This one did not have a

20   date associated with the --

21   Q    Right.  So you can't --

22   A    -- (indiscernible).

23   Q    So you can't tell sitting here today what the date was,

24   right?

25   A    It has to be before 21st.  That's all I can tell.

Page 63

1   Q    And did you check for broker runs on Rite-Aid that you

2   received on September 15th to do your valuation?

3   A    The valuation -- when we calculate valuation, it's

4   calculated only a date is September 21st.  And when we -- when

5   I calculate, I go -- search for earliest the quote, earliest

6   the broker quotes.  And when I -- whichever the quotes I

7   receive from the Bloomberg, if this one's September 15th then

8   we use the September 15.  If this one's September 17, I use the

9   September 17.

10  Q    Okay.

11         MR. ANDREOLI:  Let's go to Exhibit 5976, please.

12  BY MR. ANDREOLI:

13  Q    Okay.  So is this 5976 -- is this a broker run for Morgan

14  Stanley on Rite-Aid from September 15th of 2008?

15  A    Okay.

16  Q    And you received it, right?  If you look on the second

17  page of the metadata, you'll see your name in the bcc line.

18         MR. ANDREOLI:  Second page, Randall.

19  BY MR. ANDREOLI:

20  Q    And, Mr. Cen, if it's easier, the hard copy's in the

21  binder, if you prefer --

22  A    Okay.

23  Q    -- looking at it like that.

24  A    Okay.  Yeah.  Okay.  If my name is there --

25  Q    Okay.

Page 64

1    A    -- it's there.

2    Q    Okay.  But you didn't use this broker run that you

3    received on the 15th of September in your valuation, right?

4    A    Not -- not in my valuation.  I did not use it.

5    Q    Okay.

6    A    But --

7             MR. ANDREOLI:  Let's go --

8             THE WITNESS:  May I?

9             MR. ANDREOLI:  Let's go back to the "Lehman

10   Position".  And let's go back to 2108, please.  Actually, let's

11   just move on.

12   BY MR. ANDREOLI:

13   Q    Do you recall that QVT had a BQuotes (ph) database?

14   A    Yeah.

15   Q    And what was the BQuotes database?

16   A    I think it we use the third party to capture the Bloomberg

17   --

18   Q    Did you --

19   A    -- message and then kept in the file.  I think, if I

20   remember that.

21   Q    And did you use the BQuotes database to search for broker

22   runs in connection with doing your valuation of these

23   transactions?

24   A    I don't remember.  At that time, BQuote database was

25   complete, like -- I don't remember the date, if I use that or

Page 65

1     not use that.  But -- I don't remember the BQuote.  When was

2     that database completed?  Like, was it before the Lehman or

3     after the Lehman.  That I don't recall.

4     Q    Okay.

5              MR. ANDREOLI:  Let's go to -- Randall, if we could

6     reset the filters in 2108.  Okay.  Can we go to Mr. Cen's

7     initials in column BC?  And then MarkIT in column BP.  And then

8     if we could go to column W, please.  And can we filter for

9     three percent?

10    BY MR. ANDREOLI:

11    Q    Okay.  So, Mr. Cen, you'll see that the 46 positions, you

12    see in the lower left-hand corner, that you used three percent

13    of bid-mid spread to add to these transactions, right?

14    A    Yes.

15    Q    And I think you said on direct that you used three percent

16    because you thought these positions were very liquid, right?

17    A    Yes.

18    Q    But despite the fact that they were very liquid, you

19    didn't value them using MarkIT data from 9/15, right?

20    A    I'm not -- so we -- I use everything from -- study from

21    9/16th.  Even though it's a liquidate doesn't mean like you can

22    trade on the 9/15, right?  9/16 is the -- 9/15 I told you was

23    the total chaotic day, so I don't even use that.

24    Q    Did you try to enter into trades for any of these names on

25    September 15th?

Page 66

1   A    These trades?  No, because I don't have a time.  I have so

2   many more important trades to replace.  These names are -- is

3   not going to move too much.  So --

4   Q    You said that you picked ten percent default bid-mid to

5   use in valuing many of the MarkIT transactions, right?

6   A    Yeah.

7   Q    Have you ever seen any document that describes why you did

8   that?

9   A    No.  I don't --

10       (Pause)

11           MR. ANDREOLI:  Okay.  Randall, can we clear the

12   filtering.  Let's go to the TiFi.  Can we search in column B

13   for DRI?  Can we go to column BC?

14   BY MR. ANDREOLI:

15   Q    Okay.  So, Mr. Cen, we focused on four trades with the

16   type DRI.  Do you remember what DRI stands for?

17   A    I forgot.

18   Q    Okay.  And but you valued these, right?

19   A    Yeah.

20   Q    Okay.  And if we go to column BP, we'll see that you

21   valued two using "List" and two using MarkIT, right?

22   A    Yeah.

23   Q    Was DRI a single-name CDS?

24   A    Yeah.

25   Q    So let's go to the "Corporate List" tab, please.

Page 67

```
 1              MR. ANDREOLI:  Okay.  Can we filter, Randall --

 2    filter column A for DRI, please?

 3    BY MR. ANDREOLI:

 4    Q    Okay.  So you see --

 5              MR. ANDREOLI:  Let's scroll out to the right.

 6    BY MR. ANDREOLI:

 7    Q    Okay.  So you got two quotes on one of these DRI

 8    transactions and one quote on the other, right?

 9    A    Yes.

10    Q    Okay.  And you used the two quotations to value that DRI

11    position, right?

12    A    For the short-dated.

13    Q    Okay.  Let's go back to column A just so you can see which

14    one the short-dated is.

15    A    It's the first one is short-dated.

16    Q    Right.

17    A    Yeah.

18    Q    So that's the one you used to quote for.

19    A    Yes.

20    Q    And you didn't use the quote on the second one, right?

21    A    No.  And this was the longer dated so the quotes are

22    probably not that -- as accurate as a market data.  Market data

23    has a full curve and longer date because they have a multiple

24    quotes to compile for each data points.  That's why longer

25    dated market data probably is better.
```

Page 68

1   Q    So for the first position, you got two quotes, right?  And

2   you used the average of the two quotes to value the

3   transaction?

4   A    Probably I -- I don't remember.

5             MR. ANDREOLI:  If we go back to the "Lehman

6   Positions - Master".  Okay.  And if we go to -- let's go to AG,

7   I think.

8   BY MR. ANDREOLI:

9   Q    Okay.  So what's the mark you used -- the spread you used?

10  A    It's 142 and a half.

11  Q    Right.  And that was the average of the two quotes we saw,

12  right?

13  A    Yes, uh-huh.

14  Q    But if you were actually entering into a replacement, you

15  would have done with the 185 you received, right?

16  A    I'm not sure which one -- can you go back the other mark?

17       (Pause)

18  A    I don't remember what would be -- I don't remember why UBS

19  is more credible than JPMorgan.  On either case, I don't know.

20  Q    But UBS was axed, right?  They were saying they wanted to

21  trade with you?

22  A    Yes.  I -- I didn't enter these axes but I just used the

23  average.  I don't remember -- if I value these things and if

24  there's a average quote, I just use average quote.  I don't

25  necessarily want to pick any one specifically.

Page 69

1  Q    But if you were actually doing a replacement trade, you

2  would have done the replacement trade.

3  A    If I do a replacement trade, I will call people with axe,

4  yes.

5  Q    Okay.

6        MR. ANDREOLI:  Let's go back to Fred 961 which is the

7  Lehman Claim-Cen sheet.  Okay.  And let's scroll down to row

8  268.  Okay.  Can we go down a little bit more, Randall?

9  BY MR. ANDREOLI:

10 Q    Okay.  And you see, Mr. Cen, at row 268 to 279, there's a

11 GMAC Ford credit account and a bunch of trades associated with

12 that?

13 A    Yeah.

14       MR. ANDREOLI:  If you could scroll out to the right?

15 I think it's column AE.  Yeah.  Sorry.  Go back.  Column Y.

16 Okay.

17 BY MR. ANDREOLI:

18 Q    Mr. Cen, did you use 9/25 MarkIT marks to value these

19 trades?

20 A    If this is my spreadsheet, I probably did.

21 Q    And why would you use MarkIT spreads from 10 days after

22 Lehman's bankruptcy to value these trades?

23 A    I don't remember but, in general, I think a GMAC was a

24 very -- very distressed at the time, almost filings.  So I

25 don't remember specifically why I had to use 9/25 instead of

Page 70

1    early date.

2    Q    Was Ford distressed at that time?

3    A    Ford was distressed as well, yeah.

4    Q    So MarkIT didn't have marks for -- or spreads for 9/15 or

5    the week of Lehman's bankruptcy filing?

6    A    I don't recall.

7         MR. ANDREOLI:  Let's go back to "Lehman Positions -

8    Master" tab.  Yeah, that's right.

9    BY MR. ANDREOLI:

10   Q    So we're back in Exhibit 2108 which is the final version.

11        MR. ANDREOLI:  Let's clear the filters, Randall and

12   go back to the same area starting 268, I think.  Yeah.  Okay.

13   BY MR. ANDREOLI:

14   Q    And do you see that the date in this sheet is 9/16?

15   A    Okay.

16   Q    Do you recall the date being changed from 9/25 to 9/16

17   after submission of the calculations statement?

18   A    No.  Maybe somebody find the mark.

19   Q    So you weren't involved in that?

20   A    I don't have a recollection so I don't remember, in fact,

21   how they changed.

22        MR. ANDREOLI:  Just confer for a moment, Your Honor?

23        THE COURT:  Sure.

24      (Pause)

25   BY MR. ANDREOLI:

Page 71

1    Q     Just a couple additional questions, Mr. Cen.

2          Did you have a meeting with Michael Newman of Lehman

3    Brothers a few weeks after Lehman Brothers filed for

4    bankruptcy?

5    A     Meeting with Michael Newman after bankruptcy?

6    Q     Yes.

7    A     I don't remember.

8    Q     And so you left the company in -- you left QVT in 2010, is

9    that right?

10   A     '10, yeah.

11   Q     Okay.  Do you have any agreements with QVT relating to

12   your testimony today?

13   A     No.

14          MR. ANDREOLI:  Okay.  Nothing further, Your Honor.

15          THE COURT:  All right.  Thank you.  Mr. Tracey?

16          MR. TRACEY:  Very briefly, Your Honor?

17          THE COURT:  Yes.

18          MR. TRACEY:  I know the Court has a breaking point

19   (indiscernible) but I'll be done long before that.

20          THE COURT:  I can give you some leeway.  No problem.

21   REDIRECT EXAMINATION

22   BY MR. TRACEY:

23   Q     I just wanted to clarify one part of your testimony.

24          Do you recall telling Mr. Andreoli that this is with

25   regard to calling dealers on September 15th?

Page 72

1   A     Uh-huh.

2   Q     I think you testified that you couldn't remember any

3   specific dealers that you called on September 15th, is that

4   right?

5   A     Right.  I don't remember a specific dealer I call.

6   Q     But what I want to clarify is do you have a recollection

7   that, in fact, you did call dealers on September 15th without

8   regard to who they were, to tell them that a market quotation

9   would come?

10  A     Yeah.

11          MR. TRACEY:  That's all I have.  Thank you.

12          THE COURT:  Okay.

13          Mr. Cen, thank you very much.

14          THE WITNESS:  Okay.

15          THE COURT:  You're excused.

16      (Witness excused)

17          THE COURT:  Okay.  Well done timing wise and

18  otherwise.

19          All right.  So we'll be back at 1:30, right, with Mr.

20  Sale?

21          MR. TRACEY:  Yes, Your Honor.

22          THE COURT:  All right.  And do you expect that that

23  will take the remainder of the day?

24          MR. TRACEY:  It's the only witness we have and I --

25          THE COURT:  Right.

```
 1              MR. TRACEY:  I suspect it will take most of the

 2     afternoon.

 3              THE COURT:  Okay.  All right.  Thank you very much.

 4          (Recess from 12:25 p.m. until 1:39 p.m.)

 5     DAWN

 6              THE COURT:  Okay.  Ready when you are.

 7              MR. TRACEY:  Okay.  Your Honor, QVT calls Julian

 8     Sale.

 9              THE COURT:  Mr. Sale, would you please stand up and

10     raise your right hand.

11                        JULIAN SALE, WITNESS, SWORN

12              THE COURT:  Very good.  Have a seat, make yourself

13     comfortable.  Let us know if you would like a break or need

14     some water.

15              Yes, Ms. Sawyer?

16              MS. SAWYER:  Your Honor, I just want to note for the

17     record --

18              THE COURT:  Yes.

19              MS. SAWYER:  -- that Lehman has an objection to this

20     witness being called.

21              THE COURT:  Okay.

22              MS. SAWYER:  The objection is going to be filed under

23     seal with the Court, but I just wanted to note our objection

24     before his examination began.

25              THE COURT:  Right.  And we -- based on conversations
```

Page 74

```
 1   that we have had I've indicated to you my disposition of

 2   Lehman's objection and we're going to move forward on that

 3   basis.

 4              MS. SAWYER:  Thank you, Your Honor.

 5              THE COURT:  All right?  Thank you.

 6                      DIRECT EXAMINATION

 7   BY MR. TRACEY:

 8   Q    Would you state your full name for the record, please?

 9   A    Julian Robert Sale.

10   Q    And Mr. Sale, would you tell us about your educational

11   background, please.

12   A    I graduated from the London School of Economics with a

13   degree in economics with computing.

14   Q    And --

15              COURT REPORTER:  I'm sorry, I didn't hear the answer.

16              THE WITNESS:  I'm sorry.  A degree in economics with

17   computing.

18   BY MR. TRACEY:

19   Q    And do you have any other degrees or licenses?

20   A    I do not, no.

21   Q    Would you briefly describe after you graduated from

22   college your employment background?

23   A    So my first job was working for an UK English merchant

24   bank called Hambros.  I was training in their foreign exchange

25   department and I traded sterling-based interest rate products
```

Page 75

1    until -- from about 1986 to 1992.

2        I left Hambros and joined a bank -- NatWest Bank.  NatWest

3    were -- had a group within their equities division that was

4    trading long (indiscernible) equity derivatives and they needed

5    an interest rate specialist to hedge some of the interest rate

6    risk in their portfolio, so I joined them in 1992 in London.

7    That effort did not succeed and so NatWest transferred me to

8    New York in 1994.  And we started building a product -- a

9    department that eventually came the Prime Brokerage department

10   at NatWest.

11       NatWest was then subsequently taken over by Deutsche Bank,

12   and we continued in the same department but effectively now

13   under the Deutsche Bank banner until

14   around -- I left Deutsche Bank in 2005.

15   Q    And when you were at Deutsche Bank did you work at the QVT

16   desk at all?

17   A    I did not, no.

18   Q    And after you left Deutsche Bank in 2005 what did you do?

19   A    So I left in 2005, I took a little time off, and then was

20   approached by Dan Gold and Nick Brumm.  We had a little bit of

21   a relationship.  We were managing directors at Deutsche Bank so

22   we'd known each other through some events from -- some managing

23   director events at Deutsche Bank.  And also QVT used to prime

24   broker their product with Deutsche Bank Prime Brokerage and so

25   I knew them.  So we knew each other.  And after I left, they

Page 76

1    approached me about

2    joining -- to join QVT.

3    Q    And did you at some point join QVT?

4    A    I joined QVT in August of 2005.

5    Q    And what was your position when you joined?

6    A    CFO.

7    Q    And what were your responsibilities there as CFO?

8    A    So I think overall I was responsible for the non-investing

9    part of the portfolio.  So I think all the senior members of

10   the firm were all investment specialists and they needed

11   someone on a more senior role but in a non-investment side.  So

12   I -- the bulk of my responsibilities was the

13   non-investment side of the business.

14   Q    And were your responsibilities any different in 2008 from

15   what you just described?

16   A    No.

17   Q    And did -- how long did you stay with QVT?

18   A    I started in August 2005 and I left officially at the end

19   of 2015.

20   Q    And do you have any agreement with QVT regarding your

21   departure?

22   A    I do, yes.

23   Q    Let me ask you, if you have a book there to turn to

24   Claimant's Exhibit 2149.  Is it in the book?  Oh, it's in the

25   pocket, yes.

Page 77

1    A    Okay.  Yeah, I've got it.

2    Q    Is -- can you identify Claimant's Exhibit 2149?

3    A    That is my separation agreement.

4    Q    And there are certain sections of this agreement that have

5    black marks on them.  Are those black marks on the original?

6    A    No.

7    Q    Okay.  So under this agreement, what were the terms of

8    your arrangement with QVT?

9    A    So as I said, I left in the end of 2015, this agreement

10   was earlier in May of 2015, it's -- it governs my separation

11   but also the termination and transition from QVT.  So a

12   lot -- in that year of 2015, I was responsible for making sure

13   that all of the duties that I was currently doing at that point

14   were transitioned to someone else within QVT and properly

15   transitioned; they were properly trained for what they needed

16   to do.  So that was part of it.

17        The second part there was a number of obligations as a

18   departing partner, solicitation and things like that.

19        And then the other part was governing my relationship with

20   QVT on continuing to work with them on the claims against

21   Lehman Brothers.

22   Q    And what responsibilities did you have under this

23   agreement with regard to the claims against Lehman Brothers?

24   A    Generally the same as I was doing before while I was full-

25   time employed.

1    Q    And would you describe generally for the Court what those

2    responsibilities were?

3    A    So I probably was taking lead in our claims against the

4    Lehman prime brokerage, Lehman's repo.  I had worked with the

5    estate as well on some of the other ISDA agreements that we

6    had.  And I was probably taking the lead, I think, on the

7    relationship between QVT and Lehmans as we tried to -- through

8    the life tried to sort of see if we could resolve this issue in

9    a -- before we got to this stage.

10   Q    Okay.  Let's go back to the agreement.  Under the

11   agreement, did you withdraw as a partner of QVT?

12   A    Partially yes.  I think in most respects, I withdrew as a

13   partner, but I still stayed on as a partner for the purposes of

14   this Lehmans.

15   Q    For the purposes of?

16   A    Of the Lehman's component.

17   Q    And there's a section of this agreement called Lehman

18   allocation.  Are you familiar with that?

19   A    Yes.

20   Q    And would you describe what the agreement was between you

21   and QVT as referenced in the Lehman allocation, which I think

22   is Section 2(b) of your agreement?

23   A    Yes.  So this described what I could potentially be paid

24   depending on various scenarios.  It described about how I

25   potentially could get paid --

Page 79

1    Q    Okay.

2    A    -- for working on this.

3    Q    And would you describe how that allocation was intended to

4    work?

5    A    So it's -- you first of all take whatever --

6              COURT REPORTER:  (Indiscernible).

7              THE WITNESS:  I'm sorry.  Am I speaking too fast or

8    I'm okay?

9              COURT REPORTER:  (Indiscernible).

10             THE WITNESS:  I'm sorry.  It's based on the final

11   claim amount that's agreed with the estate, less a base number,

12   which is approximately $58 million, multiplied by a percentage,

13   that percentage is 2 and a quarter percent, and then that

14   number is then converted into actual dollars as opposed to

15   claim amount received by QVT.

16   BY MR. TRACEY:

17   Q    And when you say it's converted to dollars through a claim

18   amount what does that mean?

19   A    So it's -- I don't think anyone thinks that Lehman is

20   going to pay 100 cents on the dollar, so there will be some

21   value of the claim in the markets, and so it'll be based on

22   that value in the market.

23   Q    Okay.  And do you have an understanding of why the amount

24   is over $58 million?

25   A    I think at the time that was sort of the understanding of

Page 80

1    where the current level of the valuation by the estate was.

2    Q    And are there any conditions to your receipt of the Lehman

3    allocation?

4    A    Yes.  It's not automatic that I receive this even if there

5    is a claim value higher than 58 million.  This is part of a

6    portfolio, and so the general partner will receive an

7    allocation in that portfolio and only if the overall value of

8    that portfolio, which includes other transactions, does the

9    general partner receive an allocation then I will receive cash

10   out of that allocation.

11   Q    And under what circumstances will -- would the general

12   partner receive an allocation as opposed to not receive an

13   allocation?

14   A    So overall, we need to have made a profit for the

15   investors in this portfolio.  So any losses that are previously

16   taken have to be recovered.  Any losses in other parts of the

17   portfolio have to be made up assuming that there's a positive

18   amount of money after those events.  Then the general partner

19   receives an incentive and that was part of the allocation paid

20   to me.

21   Q    And did you have any conversations with anyone at QVT

22   about how the structure and amount of the Lehman allocation was

23   determined?

24   A    So my understanding was when -- obviously, we discussed

25   this as I was transitioning and negotiating this document --

Page 81

1    but my understanding was that this formula was a proxy for how

2    I might have got paid at QVT had I stayed a full-time employee.

3    Q    And had you stayed at QVT as a full-time employee, would

4    your pay have been subject to the condition that we discussed a

5    few minutes ago, that is, that the general partner would be --

6    would receive an allocation from the portfolio?

7    A    Potentially, yes.  There was other income to the manager,

8    but ultimately, we could only pay our employees what we

9    received from our investors.

10            COURT REPORTER:  (Indiscernible).

11            MR. TRACEY:  Did you hear that last thing?

12            COURT REPORTER:  (Indiscernible).

13            MR. TRACEY:  Okay.

14   BY MR. TRACEY:

15   Q    Okay.  And in addition to the Lehman allocation that's set

16   forth in Claimant's Exhibit 2149, do you have any interest in

17   what's been called the side pocket?

18   A    I do, yes.

19   Q    And would you just describe for the Court what the side

20   pocket is?

21   A    The side pocket just generally or my interest?

22   Q    Just generally and then we'll talk about your interest.

23   A    The side pocket was an attempt in 2008 after the

24   bankruptcy of Lehmans -- we had claims at that point.  We

25   didn't know what those claims were going to be worth or -- we

Page 82

1    had claims of course against a whole bunch of Lehman entities.

2    And what we were trying to do was isolate any benefit for any

3    recoveries made on those claims just to those investors that

4    were invested in September 2008.  So by creating a side pocket

5    with just the members of or the partners of QVT at that point,

6    any payment that we received in the future would just go to

7    those people that lost money in 2008.

8    Q    And what is your interest in the side pocket?

9    A    So I have -- I was an investor in QVT Funds in 2008.  So

10   like everybody else, I have an allocation to that side pocket.

11   I'm also an investor in -- currently in QVT Funds and some of

12   those funds have purchased side pocket interests subsequent to

13   2008.  So part of that portfolio is made up of side pocket

14   interest.

15   Q    And do you know the approximate percentage of your

16   interest in the side pocket?

17   A    I think it's somewhere between 10 and 20 basis points.

18   Q    Okay.  I'd like to take you back to 2008 now and talk

19   about your reporting to your investors.  Was it among your

20   responsibilities to be responsible for reporting to investors?

21   A    Yes.

22   Q    And what financial reporting did QVT do at that time to

23   its investors?

24   A    So the two main reports that we sent to our investors,

25   each month we prepared an NAV statement, evaluation of each

1   investor's account at QVT, that was prepared with Citco.

2   Citco, at the time, were our administrator, they were our

3   official books and records.  So we would work with Citco to

4   come up with a valuation of the portfolio.  And through that

5   evaluation of each individual's account, and that was provided

6   by Citco.  And then each year our funds would be audited by

7   PWC, PricewaterhouseCoopers, and that -- the results of that

8   audit would be sent by Pricewaterhouse to our investors.

9   Q    And as part of your monthly and annual reporting, did you

10  put -- did QVT put values on its positions, including its

11  derivative positions?

12  A    Yeah.  We attempted every month to put a valuation on

13  every position.

14  Q    And did you also do so annually?

15  A    Annually, yes, because that was our December month end, so

16  yes.

17  Q    And did you have a policy for the valuation of your

18  positions back in 2008?

19  A    I think back in 2008 our valuation procedures were

20  governed by or guided by two policies.  In our offering

21  documents, the documents that we provided to our investors,

22  there was a description of how we would determine NAV, our net

23  asset value, which included valuation of instruments.  And also

24  in 2008 was the first time that we were required to follow FAS-

25  157, which was standard from the accounting industry on how to

Page 84

1    value securities.

2    Q    And you said FAS, can you explain what that is?

3    A    This is the financial accounting standards board.  These

4    are -- this is the board that gives guidance on how to produce

5    GAAP financials.

6    Q    And what is GAAP?

7    A    Generally accepted accounting principles, I think.  I hope

8    I don't know.

9    Q    Okay.  Could you turn to Defendant's Exhibit 5254?  Can

10   you identify that document?

11   A    This looks like -- this is the annual audit that we sent

12   to our investors.  This one is for QVT Fund, but there would

13   have been something similar for the Quintessence Fund.  This

14   would have been the financials that -- prepared by PWC that

15   would have gone to our investors in early 2009 for the year

16   2008.

17   Q    Okay.  And does -- do these financial statements include a

18   statement of your valuation policy --

19   A    They do, yes.

20   Q    -- for 2008?

21   A    They do, yes.

22   Q    Can you identify that for the Court?

23   A    The policy starts on page 43 under the section investments

24   and valuations, and there's a section on general valuation

25   principles, and then it continues through to page 46 where

Page 85

1    there's a description of FAS-157.

2    Q    Okay.  And would you summarize what is required by

3    FAS-157?  I know it's complicated, but if you could just give

4    the -- a brief summary.

5    A    Yeah.  I think that first line under the paragraph that's

6    headed by FAS-157.  What -- my understanding was that prior to

7    2008 there was a number of ways that a portfolio could be

8    valued, and what FAS was trying to do was come up with a single

9    definition, which they called fair value, and they defined fair

10   value as the price that would be received to sell an asset or

11   pay to transfer a liability in an orderly transaction between

12   market participants on the measurement date.

13   Q    Okay.  And can you -- I'd like to direct your attention to

14   the last two sentences in that paragraph.  Maybe you could read

15   them into the record.

16   A    "The transaction to sell the asset or to transfer the

17   liability is a hypothetical transaction at the measurement date

18   considered from the perspective of the market participant that

19   holds the asset or owns the liability.  Therefore the objective

20   of fair value measurement is determined an exit price for the

21   asset or liability."

22   Q    And what is an exit price for the asset or liability?

23   A    This was I think quite an important principle that this

24   FAS-157 was trying to describe.  It is the price -- it says in

25   the first line, it's the price that would be received to sell

Page 86

1   an asset.  So you're looking at it from your own perspective,

2   if you (indiscernible) a position, if you hold a position it's

3   the price that you would get if you sold that position or

4   hypothetical price if you sold that position on the valuation

5   date.

6   Q    And did QVT follow that guidance in marketing its

7   positions in 2008?

8   A    Yes.

9   Q    And did FAS-157 provide for any guidance on what types of

10  pricing inputs would be used by reporting entities to value

11  their positions?

12           MS. SAWYER:  Objection.

13           THE COURT:  Yes, Ms. Sawyer?

14           MS. SAWYER:  Foundation.

15           THE COURT:  Are you speaking to the previous

16  question?

17           MS. SAWYER:  Well to two questions before --

18           THE COURT:  Okay.  Go ahead.

19           MS. SAWYER:  -- I believe, and then this question

20  just --

21           THE COURT:  All right.

22           MS. SAWYER:  We need to establish some foundation I

23  think.

24           THE COURT:  All right.  So --

25           MR. TRACEY:  Sure.

1          THE COURT:  -- I think Ms. Sawyer was standing up as

2     you were wrapping up the previous question, so can you do a

3     little more foundation with respect to both?  This question --

4     the pending question and the previous question.

5          MR. TRACEY:  Sure.

6     BY MR. TRACEY:

7     Q    What was your personal involvement in the process of

8     reporting the value of positions that QVT held to investors?

9     A    So it was my team that was overall responsible for valuing

10    the portfolio, reviewing the portfolio, and working with Citco

11    on the NAV, and it was the same team and people appointed to me

12    that were responsible for working with PWC on the production of

13    the financials.

14    Q    And whose -- was it your responsibility to ensure that the

15    reporting was in accordance with FAS-157?

16    A    Overall I would say I also signed off on the -- on our

17    financials, but they were our financials, they were the

18    financials of QVT management, so I would say I was responsible

19    for preparing those financials.

20    Q    Okay.  So let me go back to the question I asked, which

21    was did FAS-157 provide for any guidance on what types of

22    pricing inputs would be used by reporting entities to value

23    their positions?

24          THE COURT:  Okay.

25          MS. SAWYER:  I still have a foundational objection.

Page 88

1              THE COURT:  Maybe you can articulate it a little more

2     clearly.

3              MS. SAWYER:  Should we approach?

4              THE COURT:  Yeah, why don't you.

5         (Sidebar conference off the record)

6     BY MR. TRACEY:

7     Q    Mr. Sale, what was your understanding in 2008, if any,

8     about what guidance was provided by FAS-157 on pricing inputs

9     for marketing positions?

10    A    So both 157 and our internal policies emphasized using

11    third-party prices.

12    Q    Let me -- you actually referred I think to a guidance in

13    your offering memorandum in addition to what's in the financial

14    statements?

15    A    Yes.

16    Q    Let me ask you to look at Joint Exhibit 29.  Can you

17    identify that document?

18    A    This is the offering document for QVT's Overseas feeder,

19    QVT Overseas Limited.

20    Q    And how does that relate to QVT Fund?

21    A    Monies -- investors came in either through a domestic

22    feeder if they're American or came in through an offshore

23    feeder if they were tax exempt or foreign.  Those feeders would

24    essentially move their monies down to the QVT Fund and we would

25    run it as one portfolio.

Page 89

```
 1   Q    And does this document have any guidance with respect to

 2   the valuation of QVT's positions?

 3   A    Yes.  There's a lot of disclosure in here, but I think

 4   particularly on valuations I think it starts on page 85,

 5   determination of net asset value.

 6   Q    Okay.  And let me direct your attention to a section of

 7   that.  If you could look at page 86.

 8   A    Yes.

 9   Q    There's a sentence that begins about two-thirds of the way

10   down, I'll read it to you.  It says:

11        "The investment manager (in consultation with and subject

12   to the approval of the board of directors) will not price a

13   long position above the level at which it desires but

14   determines that it cannot sell such position due to a lack of

15   real rather than indicative buyers."

16        Do you see that?

17   A    Uh-huh.

18   Q    Would you describe what that's referring to?

19   A    Again, this is the same principle of trying to price to

20   third parties.  We did have liquid positions in the portfolio,

21   and just because something was a liquid that in itself was not

22   a reason for the manager to market where it thought it was

23   worth.  What we're trying to say here is that there still is a

24   presumption that we will price it to what the rest of the

25   market is trading or where we believe the market would trade
```

1   it.

2   Q    And to the extent that you are aware, did QVT follow the

3   guidance of FAS-157 in reporting its net asset value in 2008?

4   A    Yes.

5   Q    And to the extent of your knowledge did QVT follow the

6   valuation policy that's set forth in this offering memorandum

7   in 2008?

8   A    Yes.

9   Q    And I think you testified that you would do this valuation

10  process on a monthly basis.  Did you have valuations on a daily

11  basis as well?

12  A    We attempted to do what would better describe as a profit

13  and loss each day.  We only did a net asset value once a month,

14  that was the time that or the date that investors could

15  withdraw or subscribe.  But we did try to value the portfolio

16  or at least the stuff that was -- prices that were available on

17  a daily basis.

18  Q    And did QVT remark every position each day?

19  A    If there was prices available in the market then we could

20  remark a position.  If nothing was available the systems tend

21  to just inherit the previous days price.

22  Q    I'd like to turn to the subject of the filing -- the

23  bankruptcy filing of Lehman.  In the period leading up to the

24  filing was there any concern on the part of QVT about Lehman's

25  viability?

Page 91

1   A   Yes.

2   Q   And were any steps taken to address that risk?

3   A   We did try and reduce quite substantially our overall

4   relationship with Lehmans, yes.

5   Q   And did you participate in that process?

6   A   I did, yes.

7   Q   And what did you personally do to reduce your exposure to

8   Lehman?

9   A   So we had a number of relationships with Lehmans not just

10  the LBSF relationship that we're talking about here, we had a

11  very large prime brokerage relationship.  There was I think

12  that month there was approximately $2 billion of long and short

13  securities within Prime Brokerage.  We actually had a repo

14  relationship where we were borrowing or lending bonds.  Some of

15  those bonds were the Argentinean and Venezuelan sovereign

16  bonds, there was also U.S. bonds as well.  And we also had

17  relationships -- much smaller relationships with two other

18  derivative entities.

19            THE COURT:  Ms. Sawyer?

20            MS. SAWYER:  I just --

21            THE COURT:  Hold on one second.

22            COURT REPORTER:  We also had relationships with --

23            THE WITNESS:  Two other smaller Lehman entities.

24            Was that it?

25            MS. SAWYER:  I just wanted to note -- or I guess

Page 92

1   object for the record to the use of Lehmans as a general term

2   when we have sort of specific Lehman entities being referred

3   to.  So if we could maybe have some follow up to clean up this

4   that would be great.

5            THE COURT:  Okay.  Mr. Sale, going forward, to the

6   extent that you can, differentiate between the prime broker, on

7   the one hand, and Lehman Brothers Holdings, LBSF, and the other

8   Lehman counterparties on the other hand.  If you can do that,

9   it would make the record a little cleaner.

10           THE WITNESS:  Yes, Your Honor.

11           THE COURT:  All right.  Thank you.

12  BY MR. TRACEY:

13  Q    So for my next questions, I'm going to be focusing on

14  LBSF.

15  A    Yeah.

16  Q    Did you seek to recover in the period prior to the

17  bankruptcy filing any margin that was posted with Lehman?

18  A    Yes.  I was reminded of this.  I don't remember it

19  explicitly, but I was reminded by an e-mail that I saw

20  preparing, first of all, for the depositions that we had asked

21  Lehman Brothers in the week prior to their failure to return

22  the initial margin.

23  Q    And let me see if I can refresh your recollection again.

24  Would you look at Joint Exhibit 45, please.

25  A    Yes.

Page 93

1    Q    Is this the e-mail you're referring to?

2    A    It is, yes.

3    Q    And you don't recall this?

4    A    I don't recall actually sending the e-mail, but I

5    was -- now I -- you know, it's familiar now, but it wasn't at

6    the time.

7    Q    And did you -- did this refresh your recollection that you

8    had been seeking return of the initial margin?

9    A    It did, yes.

10   Q    And are you aware that a collateral call was made by QVT

11   to LBSF on September 16th, 2008?

12   A    Again, I'm aware now, I don't remember it at the time, but

13   I'm aware now.

14   Q    Okay.  Let me direct your attention to Defendant's Exhibit

15   5169.  Is this the collateral call that you became aware of?

16   A    Yes.

17   Q    Okay.  And this refers to a "MTM movement from EOB 9/12 to

18   9/15 for plus 12 million in QVT and 1.3 million in

19   Quintessence."  Do you see that?

20   A    I do, yes.

21   Q    And have you compared those numbers to what's in QVT's

22   actual books and records?

23   A    I've tried, yes.

24   Q    And have you looked at the mark-to-market change from 9/12

25   to 9/15 on QVT's books and records?

Page 94

```
 1    A    Yes.

 2    Q    And let me --

 3              MR. TRACEY:  Could I ask, John, to bring up 2111?

 4         (Pause)

 5              MR. TRACEY:  Thank you.

 6    BY MR. TRACEY:

 7    Q    So, Mr. Sale, I've placed in front of you Claimant's

 8    Exhibit 2111.  Can you identify that document?

 9              THE COURT:  Yes?

10              MS. SAWYER:  I have an objection.

11              THE COURT:  Okay.

12              MS. SAWYER:  There is --

13              THE COURT:  You want to come up?

14              MS. SAWYER:  Maybe.  It might be easiest, yes.

15    Sorry.

16              THE COURT:  I don't know how to deal with a maybe

17    answer.

18         (Sidebar conference off the record)

19    BY MR. TRACEY:

20    Q    So, Mr. Sale, can you identify this document?

21    A    This is a spreadsheet.  I think it was a spreadsheet that

22    I prepared and it shows the mark-to-market value in our systems

23    for each one of the CDSs against LBSF.

24    Q    And --

25    A    I'm sorry.  And each column represents that value on
```

Page 95

1    different days.

2    Q    Okay.  And would you describe, please, how you prepared

3    this document and what the source of the information was.

4    A    This is an extract from Tiki.  Tiki is our internal

5    computer system, and this is a dump from its database.

6    Q    Okay.  And so if you could focus on column A and tell me

7    what's listed in column A?

8    A    So this, the thing we call a TiFi, which is just an

9    internal unique identifier, it's unique to QVT, but it's how we

10   referenced a particular instrumental security.

11   Q    Okay.  And then going to columns B through G, could you

12   describe what those represent?

13   A    So each column represents a different day, and it is the

14   market value of that position as of the close of business that

15   day.

16   Q    In QVT's books and records?

17   A    In QVT's books and records.  I'm sorry, yeah.

18   Q    Okay.  So let's -- and in order to determine the mark-to-

19   market value change from one day to another how would you do

20   that?

21   A    I would subtract one day from the other.

22   Q    Okay.  So let's look at the mark-to-market value on

23   September 12th for the LBSF positions.  I don't think there's a

24   total so --

25   A    Yeah, I think -- can you not include the date at the top?

Page 96

1    And just --

2        (Pause)

3    Q    Okay.  So what is the total mark-to-market value in QVT's

4    books as of September 12th?

5    A    It would help -- if there was commas it would be easier to

6    see, but it's -- excellent.  Thank you.

7        So that shows that this portfolio on QVT's books was worth

8    115 million on the 12th.

9    Q    Okay.  So let's go to the 15th.

10        MR. TRACEY:  John, if you could do that again that

11    was great.

12        THE WITNESS:  If you just drag it and drop it across

13    with that help?  And that shows 110 million.

14   BY MR. TRACEY:

15   Q    Okay.  And so roughly speaking what was the change in

16   mark-to-market value of the LBSF positions between

17   September 12th and September 15th?

18   A    Showing negative five million dollars, that means in our

19   books and records we're showing that it actually went against

20   us and in Lehman's favor by five million dollars.

21   Q    And did you look at in connection with determining what

22   QVT's books and records showed the collateral value -- the

23   initial collateral value that was being held against the LBSF

24   positions?

25   A    Yes.

Page 97

1    Q    Let's go to Claimant's Exhibit 2108, please.  Would the

2    initial margin be in this 2108 (indiscernible)?

3    A    Yes.  Yes.

4    Q    Do you know where it would be?

5            MR. TRACEY:  Can you scroll the tabs across?  There

6    should be a tab for -- per margin at the end there.

7    BY MR. TRACEY:

8    Q    Okay.  What does that sheet represent?

9    A    This was a snapshot, you can see the date in the far left-

10   hand corner, this was a snapshot from a system that we called

11   Modo (ph).  Modo was a subsystem of Tiki, and that was the

12   system that was used to -- used for margin with our various

13   bank counterparties.  And so this is a view of the Lehman's

14   portfolio as we saw it in September 2008.

15   Q    Do you know more specifically what date these numbers

16   represent in the Modo system?

17   A    I think this was close of business of 2000 -- sorry --

18   September the 11th.  So what we would be seeing on the 12th.

19   Q    Okay.  And can you determine what the initial margin was

20   against these positions at that time?

21   A    Yeah.  Can you scroll a little bit further to the right?

22   You should see something called -- on that page.  There should

23   be something called initial margin.  Yeah, column O.  There.

24       That one actually allowed us to sum it, you can see right

25   at the bottom line there you can see sum is.  Again, without

1   the commas, but 18.6 million.

2   Q    18.6 million.  So that was the initial margin that had

3   been posted by QVT as of September 11th, 2008?

4   A    Slightly different.  This was -- the initial margin was

5   netted off against variation margin, so effectively the amount

6   of margin -- Lehman's was actually overall posting to us at

7   that point because the variation margin was so large, but the

8   amount was reduced down by the initial margin.  So it had the

9   effect of then giving us $10 and we giving them 3, net, net,

10  they gave us 7, but my silly example the 3 was the initial

11  margin, yes.

12  Q    Okay.  And if one were to determine what the net amount

13  was due from Lehman to QVT in initial margin net of the mark-

14  to-market from September 12th to September 15th what would that

15  amount be?

16  A    This is the $17 million.

17            THE COURT:  Hold on.  Hold on one second.  I'm sorry.

18            MS. SAWYER:  Objection.  I think vague -- or

19  ambiguous question.  I think the question is not clear at all.

20            MR. TRACEY:  Well, I'll ask it again.

21            THE COURT:  Okay.

22  BY MR. TRACEY:

23  Q    We talked before about what the mark-to-market change was

24  between September 12th and September 15th, correct?

25  A    Yes.

Page 99

1    Q     And what was that number?

2    A     Approximately five negative.

3    Q     Five million negative?

4    A     Five million negative, yeah.

5    Q     And if one were to net out that number against the initial

6    margin that was being held by Lehman what would the amount be?

7    A     The number there is the $18 million; that's the initial

8    margin component.  So I would subtract $5 million from

9    $18 million, the initial margin component and the variation

10   margin component, and that would get you to the $13 million.

11   Here, we're talking both for QVT and Quintessence, so it's

12   combined numbers.  So just adding the two numbers on the

13   e-mail from what we were just talking about.

14   Q     And in -- okay.  Let me ask you about practices in the

15   market with regard to initial margin.  Do you have experience

16   with dealing with dealers on initial margin?

17   A     Yes.

18   Q     And collateral payments?

19   A     Yes.

20   Q     And were you involved in that process at QVT?

21   A     Yes.

22   Q     And what is the -- is there a standard in the industry as

23   to whether as to what happens to initial margin when the

24   positions that underlie it are terminated?

25   A     The amount of initial margin is always, at least in my

Page 100

1   experience, always paid by the hedge fund to the bank.  It is

2   initially paid when a transaction is entered into.  And then

3   when that transaction is terminated, finishes, matured then the

4   bank is obliged to return that initial margin.

5   Q    And just one more question on margin calls.  Did -- when

6   there was a margin call between Lehman and QVT in 2008 did

7   Lehman send confirmations of the margin amounts?

8   A    Yeah.  The banks were always the calculation agents, so

9   Lehman is included.  So they would send some sort of statement,

10  a paper statement, sometimes an electronic statement, with the

11  calculation and the net margin call.

12  Q    And let me turn to -- ask you to turn to Joint

13  Exhibit 49.  Can you identify that document?

14  A    Yes.

15  Q    What is it?

16  A    This looks like a paper margin call from LBSF to QVT

17  Funds.

18  Q    And were you knowledgeable about the standard form of

19  Lehman Brothers collateral statement back in 2008?

20  A    I think so, yes.

21  Q    And is this in the standard format?

22  A    Yes.

23  Q    I'd like to direct your attention not so much to the

24  numbers but to the text that's included on page 2.

25  A    Okay.

Page 101

1          MR. TRACEY:  It's pretty small.  I don't know if John

2     can --

3          THE WITNESS:  Yeah.  It helps a little bit.

4          MR. TRACEY:  There we go.  Okay.  Thanks John.  Oh,

5     that's great.

6     BY MR. TRACEY:

7     Q    Could you -- well, why don't you read the first paragraph

8     into the record, if you don't mind.

9     A    All right.

10         "The below estimated value/values are as of the date

11    indicated and do not represent actual bids or offers by Lehman

12    Brothers.  There can be no assurance that actual trades could

13    be completed at such values.  Unless otherwise specified, the

14    below valuations represent mid-market valuations.  Mid-market

15    values attempt to approximate the current economic value of a

16    given position using prices and rates at the average of the

17    bids and the offer for the respective underlying assets or

18    reference rates.  Discussions of trade values in general and

19    indicative or firm price quotations and actual trade prices in

20    particular may vary significantly from these written estimated

21    values and a result -- as a result of various factors which may

22    include, but are not limited to, a prevailing credit spread,

23    market liquidity, position size, transaction and financing

24    costs, hedging costs, and risks and the use of capital and

25    profit."

Page 102

1    Q      Thank you.

2           I'd like to go back and clarify one thing about the

3    marking of positions by QVT.

4    A      Yeah.

5    Q      You testified earlier, I believe, that daily marks were

6    updated if information was available?

7    A      Yes.

8    Q      What -- in general terms what did you mean by that in

9    terms of available information?

10   A      With certain instruments there was always a readily

11   available price, so -- equity prices, a lot of pricing

12   information available from the exchanges, certain other OTC

13   securities, trade on a regular enough basis so that those

14   prices are reported or available and so they could be easily

15   collected each day.  But other securities, the prices are not

16   transparent in the market, they may be not published, it may be

17   something that you actually have to speak to a dealer

18   explicitly about to get a price.  And so there's no public

19   dissemination of that price on a regular basis.

20   Q      And so are you familiar with QVT's position with LBSF in

21   PCDS back in 2008?

22   A      Yes.

23   Q      And was that a position that was marked on a daily basis?

24   A      It was not marked on a daily basis, no.

25   Q      And are you familiar with the carve position with Lehman?

Page 103

1    A    Yes.

2    Q    And was that marked on a daily basis?

3    A    No, it was not.

4    Q    I'd like to show you another document; it is Defendant's

5    Exhibit 5130.

6    A    Can I just add something to the PCDS?

7    Q    Sure.

8    A    Just to make it super clear, we often used to model

9    certain positions.  So certain things like time and interest

10   rates might move on a daily basis which may cause small changes

11   in a value position.  But the major inputs like the credit

12   spread, those things that I was about we didn't mark, was

13   talking about those.

14   Q    Okay.  Thank you.

15        So can you open your book to Exhibit 5130?

16   A    Yep.

17   Q    Can you identify that document?

18   A    This is an e-mail chain.  I think working from the back it

19   starts with offer to on the Sunday just before the bankruptcy

20   to myself and Chris Perez.  Chris Perez was at the time a risk

21   officer and also included is Nick Brumm and Dan Gold.  And

22   Arthur is asking Chris and myself to update our Lehman

23   exposures.

24   Q    And in the e-mail that you send to Mr. Chu and

25   Mr. Perez on September 14th you use -- you say this -- "This is

Page 104

1   the trade date position as of the close of business."  I think

2   it's Friday, but it's F-I-R-D-A-Y.

3   A    Yeah.

4   Q    Is that Friday?

5   A    Spell check didn't help me there.

6   Q    What's -- what is a trade date position?

7   A    So these are the positions as if everything -- as of the

8   trade as of Friday.  Some positions may not have settled by

9   then, but their positions are actually on your books and

10  records as of Friday.

11  Q    Okay.  And what was the purpose for your providing this

12  information to them?

13  A    This was something from our systems.  Again, this would

14  have some from Tiki and this showed our exposure as of that

15  Friday evening.

16  Q    And did you -- are you familiar with the term jump to

17  default exposure?

18  A    Yes.

19  Q    And does this include jump to default exposure?

20  A    No, this is -- again all the numbers, you know, back to

21  that idea of FAS-157 and our valuation policy we were looking

22  at how we would unwind a portfolio, so this is based on that

23  exit price concept.

24       So a jump to default, you know, obviously when something

25  as major as Lehmans going bankrupt it's going to have a big

Page 105

1    change in the market, so jump to default is a concept that

2    tries to capture that.

3    Q    Let me ask you to take a look at one more document; it's

4    Joint Exhibit 37.  That's actually an e-mail but it has a

5    native attachment.  So maybe you can look at the e-mail first.

6    And if you can identify that for the Court.

7    A    So again, it's an e-mail from me.  It's in July of 2008

8    and I am sending some information about our current or then

9    current exposures to Lehmans to the managing members, including

10   Chris Perez and Weh Lu (ph).  Weh was one of our programmers.

11   Q    And when you referred to Lehman in that answer, what

12   entities were you referring to -- entity or entities?

13   A    The overall relationship with Lehmans.

14   Q    Okay.

15           MR. TRACEY:  Can you bring up the attachment, please?

16   BY MR. TRACEY:

17   Q    Okay.  So the document that's now up on the screen, do you

18   recognize that document?

19   A    I do, yes.

20   Q    What is it?

21   A    So this was the attached document.  You can see it's

22   calculated as of close of business July 10th, and it is looking

23   at our total exposure to the various Lehman entities.  So you

24   can see just in -- it looks like I didn't completely fill them

25   in -- but in column E is the actual Lehman entity, and column D

Page 106

1    is the type of relationship.

2    Q    And is this in fact the -- if you can recall -- the

3    attachment to the e-mail that's Joint Exhibit 37?

4    A    I believe it is.

5    Q    And did you prepare this?

6    A    I did, yes.

7    Q    And toward the bottom of the column on column D there is

8    an entry for JTD exposure.  What is that?

9    A    I think there's two things here that are important.  We

10   had large amounts of CDS exposure -- of CDS protection rather

11   on Lehman Brothers written by other dealers so those would have

12   increased in value had Lehmans gone bankrupt.

13       And then a couple of lines above is something I call cost

14   to replacement pay as you go, and this was to try and capture

15   what it would cost us to -- pay as you go were particularly a

16   liquid portfolio -- and that was there to try and -- correct

17   space in the spreadsheet to see how much it would cost us to

18   replace some of these transactions should Lehmans have gone

19   bankrupt buying and from other counterparties.

20   Q    And the column -- or row 15 is limited to pay as you go?

21   A    I don't know at the time whether it's just pay as you go

22   or whether it's just for that concept.

23   Q    Okay.  And going back to 17, I'm not sure I heard an

24   answer to my question.  What is JTD exposure?

25   A    This is trying -- I think I was asking for Chris or Arthur

Page 107

1   to estimate what some of the hedges in our portfolio had

2   Lehmans gone bankrupt what that would have made for us.

3   Q     And what does JTD stand for?

4   A     Jump to default.

5   Q     And do you ever recall Arthur or Chris following up with

6   you on what the JTD exposure was?

7   A     Not at the time.  I think I've reviewed some e-mails as

8   part of the preparation that maybe there was -- it was 2- or

9   300 million, but --

10  Q     But do you recall any follow up with you?

11  A     No.

12  Q     Let me direct your attention to -- actually, before we go

13  there, I want to go back to the side pocket that you referred

14  to earlier.

15  A     Uh-huh.

16  Q     Were you involved in the valuation of the claims within

17  the side pocket?

18  A     Do you mean the original 265 million or --

19  Q     Let me rephrase it.  When was the side pocket created?

20  A     The side pocket was created at the end of September 2008.

21  Q     And what was contained within the Lehman side pocket at

22  that time?

23  A     That particular side pocket had the claims against the

24  various legal entities -- or we actually thought about it more

25  as product types, but the various claims against the businesses

Page 108

1    or legal entities that we were in Lehmans, so that was Prime

2    Brokerage, there was -- and then the claim for LBSF.

3    Q    And does the side pocket have a net asset valuation every

4    month?

5    A    Yes.

6    Q    And for September of 2008 do you recall what the net asset

7    value was in that side pocket?

8    A    Zero.

9    Q    And what was the basis for that?

10   A    I had no idea what was the value at that point.  We hadn't

11   actually -- we hadn't finished even our own claim for that.

12   Q    And did that net asset value change over time?

13   A    Yeah, there was two components for -- if we use the LBSF.

14   There was first of all the concept of a notional or a quantity,

15   and that was the number, the overall value of our claim, and

16   that number was fixed each month.  It did have one small

17   change.  As you know we made a correction to our claims in

18   around 2010, but it started off at approximately 290- or 280-

19   something million and then stayed at that number.  We made the

20   adjusted and it's been at 260- or whatever the number is now.

21   So that didn't change, but the valuation of that changed each

22   month.

23   Q    And what was the valuation of the notional amount based

24   on?

25   A    Again, we were the same principles as we were talking

Page 109

1    about earlier on, we were trying to get third-party prices from

2    the market and trying to guesstimate or estimate rather what

3    the market would pay for us.  So again, back to that definition

4    we were looking to see where we would sell our long position

5    and using third-party inputs.

6    Q    And do you recall approximately what percentage of the

7    notional amount was placed on the claim as a valuation of the

8    exit price?

9    A    So I think the first couple of months while we were just

10   seeing what was happening in the market we used a price of

11   zero, but by the year end we were using a price of

12   approximately five percent -- or I think five percent actually.

13   Q    And since that time has that percentage changed?

14   A    Yes.  As the market has developed for Lehman's claims more

15   people have been involved, there's been more certainty as

16   events have moved forward, and it's easier to quantify the

17   value of a Lehman's claim now that those market prices have

18   changed.

19           MR. TRACEY:  Could we bring up 2108 one more time?

20   BY MR. TRACEY:

21   Q    I just have one more subject for you.  I've placed in

22   front of you what's been marked as 2108.

23   A    Uh-huh.

24   Q    Can you identify this sheet that is labeled Response 2?

25   A    Can you scroll a little bit more to the left?  Yes.

Page 110

1   Q    What is it?

2   A    So this was a sheet -- you can see there's a lot of

3   redacted stuff on it -- but this was a sheet that I worked on

4   in I think 2013.  There was an effort between ourselves and

5   Lehmans to see if we could try and negotiate a deal on this --

6   or negotiate a value for this position, and this

7   was --

8            MS. SAWYER:  Your Honor, I'm just going to object.

9   This seems to be going into an area of post hoc analysis, and

10  it was done after October 2008.

11           THE COURT:  I'm not --

12           MS. SAWYER:  And potentially settlement discussions

13  between Lehman and QVT.

14           THE COURT:  I'm not sure.

15           MR. TRACEY:  I have no intention of getting into

16  that.

17           THE COURT:  I don't think that was the intention.

18           So, Mr. Sale, you know that anything having to do

19  with mediation and settlement discussions should not be

20  disclosed.

21           THE WITNESS:  Yes.

22           THE COURT:  So right now the question simply is what

23  this is.  So --

24           MS. SAWYER:  Right.  And in his answer, he was saying

25  this is -- referring to the negotiations back and forth between

Page 111

1    Lehman and QVT.

2              THE COURT:  Well we know those occurred.

3              MS. SAWYER:  Understood.

4              THE COURT:  Okay?  So let's just take it a step at a

5    time.

6              MS. SAWYER:  Okay.

7              THE COURT:  Okay?

8              MR. TRACEY:  Okay.

9    BY MR. TRACEY:

10   Q    So without disclosing anything about the mediation or

11   discussions with Lehman, I simply want to know what this

12   document is and what content it has?

13   A    This was -- we were provided a portfolio and valuations by

14   Lehmans as part of that and this was a reconciliation between

15   the way we represented the claim on a line by line level and

16   then trying to reconcile those against Lehman's positions.

17   Q    Okay.

18             MS. SAWYER:  Your Honor, to the extent that's what

19   that is then this is a document that should be protected under

20   408.

21             MR. TRACEY:  Well we already went through this.  We -

22   - there were -- there was some information on here that was

23   received from Lehman and we redacted that, and there was some

24   information that was prepared by QVT and we've retained that.

25   So we've already dealt with this issue.

Page 112

```
 1              THE COURT:  Maybe I'm confused, but I thought that we

 2    had days ago figured this out.  So --

 3              MS. SAWYER:  I thought we had, too.  It's a little

 4    unclear based upon the (indiscernible) testimony as to what he

 5    believed this is and whether we have redacted sufficient

 6    information or not.

 7              THE COURT:  Maybe this would be a good point to take

 8    a break --

 9              MR. TRACEY:  Sure.

10              THE COURT:  -- and we could try to hash this out.

11              MR. TRACEY:  Okay.

12              THE COURT:  All right?  So, Mr. Sale, during the

13    break you remain under oath.  Please do not discuss your

14    testimony or the case with anyone or be in anyone's presence

15    while they're doing the same.

16              Why don't we try to come back in 15 minutes, but

17    we'll start with -- why don't you come up and try to figure

18    this out?

19         (Recess 2:48 p.m. until 3:07 p.m.)

20              THE CLERK:  All rise.

21              THE COURT:  All right.  Mr. Sales.

22              We have the windows completely shut now, but if it

23    gets too warm, you're welcome to take your jackets off or

24    otherwise try to become cooler.  Cooler than you already are.

25    Go ahead.
```

Page 113

1             MR. TRACEY:  Thank you, Your Honor.

2    DIRECT EXAMINATION (RESUMED)

3    BY MR. TRACEY:

4    Q    I'd like to finish up with just a couple more questions on

5    the net asset values of the side pocket.

6    A    Okay.

7    Q    I think you testified earlier that there are two

8    components to the valuation of the side pocket, right?

9    A    Yes.

10   Q    And one of them is the notional amount of the claim --

11   A    Yes.

12   Q    -- against Lehman; is that correct?

13   A    That's right, yes.

14   Q    And the other is a discount factor?

15   A    A price.

16   Q    A price.

17   A    Yeah.

18   Q    And would you just explain to the Court how that price is

19   determined?

20   A    So over time, the methods we used over time changed

21   depending on the amounts of information that was in the market.

22   But prices started to develop for agreed claims where other

23   market participants would buy those agreed claims off other

24   people, monotize their position, and then that bank or dealer

25   would hold the position.

Page 114

1        So we had that information that was available to us, but

2    we didn't have an agreed claim.  And so what we tried to do was

3    to use that as an input into a model where we tried to adjust

4    or try and understand how a third party might take our claim as

5    is and what type of discount would they want against an agreed

6    claim to purchase that position from QVT.

7    Q    And was that valuation process reviewed by your auditors

8    at the end of the year?

9    A    Yes.  The auditors reviewed it monthly.  It was reviewed

10   by Citco because they produced the NAV on an annual basis that

11   was part of the diligence that PWC did.  It was obviously an

12   important part of our portfolio so they diligenced that

13   valuation.  And we also used a third-party valuation later in -

14   - not around this period, but later but in about 2011, Duff &

15   Phelps, and they also diligenced

16   the -- our methods.

17   Q    And did you receive an opinion on your financial

18   statements for 2008 from PricewaterhouseCooper?

19   A    We did, yes.

20   Q    And what was that opinion?

21   A    It was an unqualified opinion.

22   Q    And since then have you received opinions on your

23   financial statements?

24   A    Yes.

25   Q    And what have those opinions been?

Page 115

```
 1   A     Again, all unqualified.

 2             MR. TRACEY:  I have nothing further.  Thank you.

 3             THE COURT:  Thank you.

 4             MS. SAWYER:  It'll just take me a moment, Your Honor.

 5             THE COURT:  Yeah.

 6        (Pause)

 7             THE COURT:  Thank you.

 8             THE WITNESS:  Thank you.

 9             THE COURT:  Why don't you take the white binder away

10   just to --

11             THE WITNESS:  I'm not going to need this?

12             THE COURT:  -- make it a little roomier.

13             THE WITNESS:  All right.  Okay.

14             THE COURT:  You have water there, Mr. Sale?

15             THE WITNESS:  I do.  Thank you, yes.

16             THE COURT:  Okay.  Go ahead.

17   CROSS-EXAMINATION

18   BY MS. SAWYER:

19   Q     In the week prior to Lehman's bankruptcy, QVT was

20   concerned about Lehman.  Is that fair?

21   A     That's true, yes.

22   Q     And QVT wanted to make sure that it was on top of all the

23   payments that should have gone back and forth between QVT and

24   Lehman, right?

25   A     Yes.
```

Page 116

1    Q    And one area that QVT was particularly focused on in the

2    weeks before Lehman's bankruptcy was margin, right?

3    A    Yes.

4    Q    For example, if QVT made a margin call on Lehman, QVT

5    wanted to make sure it actually received those monies from

6    Lehman, right?

7    A    Yes.

8    Q    Now it was important for QVT to make sure that it was

9    getting the appropriate amount of collateral from Lehman

10   especially as Lehman was becoming more unstable, right?

11   A    Correct, yes.

12   Q    Because collateral is an important protection for QVT,

13   right?

14   A    Yes.

15   Q    And one of the things that you did, I believe you

16   testified on direct, was tried to get back the initial margin

17   that QVT had posted to LBSF, right?

18   A    Yes.

19   Q    And the initial margin had been posted pursuant to the

20   ISDA master agreements between LBSF and QVT and Quintessence,

21   correct?

22   A    Yes.

23   Q    And as we looked at it it was about $18.6 million at the

24   time of bankruptcy, right?

25   A    Uh-huh.

Page 117

1    Q    I'd like you to look at 5116 in your binder.

2    A    Okay.

3    Q    This is an e-mail from you to Ms. Fang copying Mr. Brumm

4    on September 11th, 2008.  Do you see that?

5    A    Yes.

6    Q    And the re: line is LEH margin, right?

7    A    Subject line, yes, yeah.

8    Q    And Ms. Fang was responsible for determining margin and

9    making margin calls at QVT in September of 2008, wasn't she?

10   A    She was the person responsible for the margin, yes.  The

11   systems would do a lot of the calculations, but once the

12   calculation was done by the system then she would be involved,

13   in that she's moving the margin back and forth or reconciling

14   the margin and then moving it back and forth, yes.

15   Q    And she was the primary person at QVT's operations

16   department responsible for coordinating margin between QVT and

17   the banks, correct?

18   A    Yes.

19   Q    And in Defendant's Exhibit 5116 you tell Ms. Fang, "Please

20   make sure that you prioritize any Lehman margin calls."  Do you

21   see that?

22   A    Yes.

23   Q    And you also tell her that if she has even the slightest

24   concern she could speak to Nick straight away, right?

25   A    Yes.

Page 118

1   Q     And that reference to Nick is a reference to Mr. Brumm,

2   right?

3   A     Correct.

4   Q     And you conclude your e-mail to Ms. Fang by saying, "Can

5   you send us a note when you get calls and when they are paid?"

6   Do you see that?

7   A     Yeah.

8   Q     And because QVT wanted to make sure that it was making

9   whatever margin calls it could on LBSF the week before Lehman's

10  bankruptcy, right?

11  A     Yes.

12  Q     And QVT wanted to track when it received the payments from

13  Lehman or LBSF in connection with those margin calls, right?

14  A     Uh-huh.

15  Q     And this is -- is that a yes?

16  A     Sorry, yes.  Sorry.

17  Q     This is consistent with what we just talked about, that a

18  margin at QVT was a priority during the week before Lehman's

19  bankruptcy, right?

20  A     Yes.

21  Q     I'd like to look at Joint Exhibit 45, which is in the

22  front of your binder.

23  A     Okay.

24  Q     And you looked at this document on direct with

25  Mr. Tracey.  Do you recall that?

Page 119

1    A    Yes.

2    Q    And you said that you didn't remember sending this

3    e-mail, correct?

4    A    I didn't.

5    Q    But you don't have any doubt that you sent the e-mail do

6    you?

7    A    I don't, no.

8    Q    And you do confirm that you were trying to return -- get

9    the return of the initial margin, correct?

10   A    (Indiscernible), yes.

11   Q    And this is specifically trying to get the initial margin

12   back from LBSF, correct?

13   A    Yeah.  I don't think it -- we had a number of

14   relationships, but I think yes, I think this is LBSF.

15   Q    I'd like to look at Defendant's Exhibit 5114.  Are you

16   there?

17   A    I am, yes.

18   Q    And this is an e-mail chain among you, Ms. Fang,

19   Mr. Metter (ph), and Mr. Brumm on September 11th, 2008.  Do you

20   see that?

21   A    Yes.

22   Q    And starting at the bottom e-mail Ms. Fang writes to you,

23   "LBSF is call QVT for 710K today."  Do you see that?

24   A    Yep.

25   Q    Meaning that LBSF was making a margin call on QVT on

Page 120

1   Thursday, September 11th, 2008, right?

2   A    From the rest it's ambiguous.  It could say is on call or

3   is calling.  It's --

4   Q    But the next e-mail she's --

5   A    -- but the next if you read up --

6   Q    Sorry.

7   A    I'm sorry.  It's -- that one sentence by itself is

8   ambiguous.  But I think if you read up I think the inference is

9   that Lehmans is calling for 700,000.

10  Q    Because in the next e-mail up at 2:45 Ms. Fang says,

11  "Should I pay the call or hold off?"  Right?

12  A    Yes.

13  Q    And going back down to the bottom e-mail Ms. Fang says, "I

14  heard from Adam -- I heard Adam said you were trying to pull

15  back some margin from them.  Any update yet?"

16  A    Yes.

17  Q    And that's referring to whether there was any update on

18  whether you were going to get the initial margin back from

19  LBSF, correct?

20  A    I'm guessing so, yes.

21  Q    Okay.  And LBSF never did agree to return to initial

22  margin to QVT did it?

23  A    It did not.

24  Q    I'd like you to look at Joint Exhibit 47.  Are you there?

25  A    Yes.

Page 121

```
 1    Q     Okay.  This is an e-mail chain among you, Mr. Brumm, and

 2    Ms. Fang on Friday September 12th, 2008.  Do you see that?

 3    A     Yeah.

 4    Q     And in the bottom e-mail to you Mr. Brumm, Ms. Fang

 5    states, "The data show we can call LBSF today for plus 8.MM QVT

 6    and plus 870K Quint."  Do you see that?

 7    A     Yes.

 8    Q     And Ms. Fang was sending this e-mail to you and Mr. Brumm

 9    because you guys were keeping your eyes on the collateral

10    situation with LBSF, right?

11    A     Yes.

12    Q     And Mr. Brumm asks in response, "Does this reflect any

13    decrease in initial margin?"  Right?

14    A     Yes.

15    Q     And Ms. Fang responds by says, "There's no change in IM."

16    Meaning there'd been no change or decrease in the initial

17    margin, right?

18    A     I'm guessing so, yes.

19    Q     And so on the top Mr. Brumm told Ms. Fang to make the call

20    right away on LBSF, right?

21    A     Uh-huh.

22    Q     And this is the Friday before bankruptcy, correct?

23    A     Yep.

24    Q     And so Mr. Brumm is telling Ms. Fang to make the margin

25    call of about $9 million on LBSF as soon as possible, right?
```

Page 122

1    A      That's what it looks like it says, yes.

2    Q      There was some sense of urgency to get this call out,

3    right?

4    A      Yes.

5    Q      QVT wanted to make sure as things became more unstable

6    that it had all the margin it could have, correct?

7    A      Yes.

8    Q      And Ms. Fang did in fact promptly send out this margin

9    call didn't she?

10   A      I don't know.  I don't know.

11   Q      So let's look at Defendant's Exhibit 5008.

12   A      Okay.

13   Q      And if you look at the bottom e-mail at 10:51 a.m., you

14   see Ms. Fang to Ms. Blonco (ph).  Are you there?  I'm sorry,

15   sir.

16   A      I am, yeah.  What was the previous one, sorry?

17   Q      The previous one was I believe 47.

18   A      Okay.  Yeah.

19   Q      So Ms. Fang sent out this e-mail to Ms. Blonco at LBSF a

20   minute after Mr. Brumm told her to do so, correct?

21   A      Yep.

22   Q      And Ms. Fang's e-mail to -- well, let me back up.  You

23   know that Patricia Blonco is the LBSF margin counterparty to

24   Ms. Fang?

25   A      I think she was the opposite, yeah.

Page 123

1   Q    Right.

2   A    Her opposite rather.

3   Q    And this margin call made by Ms. Fang in Defendant's

4   Exhibit 5008, this isn't an attempt to recover any initial

5   margin that QVT had posted to LBSF is it?

6   A    Not if you follow the chain from before, no.  It just

7   looks like this is a mark-to-market.

8   Q    Right.  And in response to QVT's margin call on September

9   12th, 2008 LBSF says that they can agree to the Quint call and

10  they suggest a lower number for the QVT call.  Do you see that?

11  A    Yes.

12  Q    And in response at the top Ms. Fang agrees to LBSF's

13  proposal and asks LBSF to please send in the call, right?

14  A    Yes.

15  Q    And so in this Defendant's Exhibit 5008 on

16  September 12th, 2008, QVT and LBSF had agreed upon a margin

17  call to be paid by LBSF to QVT, right?

18  A    Yes.

19  Q    And LBSF did, in fact, pay that margin call on

20  September 12th, 2008 didn't it?

21  A    I believe they did, yes.

22  Q    I'd like you to look at Defendant's Exhibit 5130.  And if

23  you'd go to the second page of this document, the one that's

24  landscape oriented.  You had looked at this with

25  Mr. Tracey as well.

Page 124

1    A    Yes.

2    Q    Do you recall that?

3    A    Yep.

4    Q    And this is that e-mail chain where Mr. Chu asks you and

5    Mr. Perez to update exposures to Lehman, right?

6    A    Yes.

7    Q    And you provide the table, which is the trade date

8    position as of the close of Friday, right?

9    A    Uh-huh, yep.

10   Q    And that's a table you created, right?

11   A    Yes, I did.

12   Q    And you pulled the information from that table from the

13   Tiki system?

14   A    From Tiki, yes.

15   Q    And I believe you described Tiki as QVT's books and

16   records, right?

17   A    Yes.  They weren't our official books and records; that

18   was the administrator.  But this was our books and

19   records -- our (indiscernible) books and records.

20   Q    And among other things, this table shows that the

21   mid-market value of the derivatives positions between QVT and

22   LBSF is about 116.9 million doesn't it?

23   A    Yep.

24   Q    And that precise amount is seen in the row LBSF in the

25   column sum of TD derivative value, right?

Page 125

1    A    That's right, yes.

2    Q    And the next row down says LBSF margin, right?

3    A    Yep.

4    Q    And that reflects the amount of collateral that Lehman had

5    posted to QVT in connection with those same derivatives

6    transactions as of the close of business on Friday, September

7    12th, right?

8    A    Yes.

9    Q    And so, as of the time that you generated this trade, this

10   trade report, this table, QVT had slightly more collateral --

11   held slightly more collateral than the mid-market value of the

12   transactions, right?

13   A    Yes, the mid-market value as we've spoken about, yes.

14   Q    And you don't recall, when you sent this e-mail in

15   Defendant's Exhibit 5130, anybody objecting to your analysis to

16   point out that the value of the derivatives transactions was

17   inaccurate, did you?

18   A    No one told me that the valuations that we were using as

19   of Friday night were inaccurate, no.

20   Q    Okay.  It would have been important for --

21            COURT REPORTER:  (Indiscernible).

22            THE WITNESS:  Friday night.

23   BY MS. SAWYER:

24   Q    It would have been important for QVT to know if the

25   valuations of its derivatives transactions were inaccurate as

Page 126

1    it was assessing its exposure to Lehman this weekend, correct?

2    A    Yes.

3    Q    I'd like to look at Joint Exhibit 37, which Mr. Tracey

4    showed to you.  It's actually not in the binder, but it's a

5    native document, so you can just look at it on the screen.

6    A    Okay.

7    Q    So this is that July 2008 exposure.  And so, if we could

8    look at the native attachment.  Do you recall this document?

9    A    Yes.

10   Q    And Mr. Tracey directed your attention to row 17 of this

11   document where it says "JTD Exposure".  Do you see that?

12   A    Yes.

13        MS. SAWYER:  And if you could shrink the picture a

14   little bit so we can see.

15   BY MS. SAWYER:

16   Q    And you write over in the comment column, "Arthur, Chris

17   to check."  Do you see that?

18   A    Yes.

19   Q    And you were asking Arthur or Chris to quantify the value

20   -- the amount of the JDT exposure, right?

21   A    Yes.

22   Q    And you said you recall that they calculated something in

23   the 200- to $300 million range, right?

24   A    From other e-mails.  I don't know if it was directly off

25   this one, but from other e-mails that I reviewed.

Page 127

1   Q    And you also testified on direct that QVT had bought a

2   large amount of CDS protection on Lehman, right?

3   A    Yes.

4   Q    And that protection would cover the joint -- jump to

5   default exposure that we're talking about, right?

6   A    No.  I think that was -- that was what I was talking

7   about.  That was the jump to default.  That was the value of

8   that portfolio if Lehmans failed.

9   Q    Right.  But the CDS that Lehman -- I'm sorry -- that QVT

10  purchased on Lehman would cover that jump to default exposure,

11  correct?

12  A    No.  The jump to default was that.  If we had CDS

13  exposure, we had CDS positions.  If Lehmans failed, those would

14  jump in value>  And so that -- what I was trying to suggest

15  there was that that was the value of that CDS portfolio of other

16  parties.

17  Q    Okay.  But you had testified on direct that setting aside

18  the CDS transactions between QVT and LBSF, that QVT had

19  additional purchased CDS protection on Lehman, correct?

20  A    Yes.

21  Q    And a significant amount of that, correct?

22  A    Yes.

23          THE COURT:  Mr. Tracey, yes?

24          MR. TRACEY:  I have an objection, Your Honor, on

25  relevance grounds.  We made a motion in limine to address the

Page 128

1    question of whether there is any relevance to independent non-

2    LBSF positions offsetting the LBSF positions and I --

3                MR. TAMBE:  Can we approach, please?

4                THE COURT:  Sure.

5         (Sidebar conference off the record)

6                THE COURT:  We're just going to take a few minutes to

7    try to resolve this in a way that's a little more conducive.

8    All right?  So you can get up and walk around, Mr. Sale.

9         (Off the record)

10               MS. SAWYER:  You ready?

11               THE COURT:  Yep.

12   BY MS. SAWYER:

13   Q    You talked about that you pulled information from

14   Tiki and that's what you colloquially refer to as books and

15   records, right?

16   A    Yes.

17   Q    And Tiki is a system that QVT built itself, right?

18   A    Yes.

19   Q    And you also talked about daily P&L that was calculated,

20   QVT, and that was done on a daily basis using Tiki as well,

21   right?

22   A    Yes.  Yes.

23   Q    And you indicated that QVT tried to go through and ascribe

24   a value to every single position in Tiki on a daily basis,

25   right?

Page 129

1    A    Yes.

2    Q    But that there were certain positions, I think you said

3    PCDS and Carb that weren't updated daily, right?

4    A    Yes.

5    Q    But there was nothing that precluded them from being

6    updated daily was there?

7    A    If you -- if we could have got prices from the market then

8    we could have updated them.

9    SHEILA

10   Q    Or if you'd had information from the market you could have

11   updated that in Tiki as well, correct?

12   A    Yes.

13   Q    And you also testified about a model for PCDS that would

14   look at things like interest rates and things like that and so

15   there might be variations from day to day, correct?

16   A    Uh-huh.

17   Q    And so you could've changed the inputs into that PCDS

18   model, correct, to update the values?

19   A    If we could have gotten market inputs for it, yes.  If we

20   got market inputs, this is exactly the same concept, if market

21   inputs were available, so if someone wanted to express a PCS

22   price as an absolute price or as a spread, if it gave it a

23   spread, we actually had to model that against our particular

24   instruments.

25   Q    All right.  And you said -- but PCS and Carb were also

Page 130

1    though marked at the end of the month, correct?

2    A    Yes.

3    Q    And that was a more intensive process done at month end,

4    right?

5    A    That's right, yes.

6    Q    And you testified that it was reviewed by Citco because it

7    was for NAV reporting purposes, right?

8    A    Yes.

9    Q    And so both PCDS and Carb had been marked as of August

10   31st, 2008, right?

11   A    The month end, yeah, if it was a weekend, but yes, month

12   end.

13   Q    And month end August, that was reviewed by Citco, right?

14   A    Yes.

15   Q    And Citco signed off on it, correct?

16   A    Yes.

17   Q    And those month end August financials had not been

18   restated, have they?

19   A    They have not, no.

20   Q    And those month end financials for August 2008, those were

21   done in compliance with GAAP and FAS 157, right?

22   A    Yes.

23   Q    And the daily P&L information that was available in Tiki,

24   that was used for purposes of the estimated performance reports

25   that Mr. Gold sent to the QVT investors, right?

Page 131

1    A    Yes.

2    Q    And Tiki's the only possible source for that information

3    at QVT, right?

4    A    Yes.

5    Q    And QVT regularly sent estimated performance reports to

6    its investors, right?

7    A    We would, in normal times, we we resending -- we would

8    send a mid-month, so we would send one each month; at other

9    times we might send, I think during post-Lehman we would send

10   it on a more regular basis.

11   Q    So in the time of September 2008, they were coming out

12   more than twice a month, right?

13   A    When we started that, it was about that time.  I can't

14   remember exactly when.

15   Q    And Mr. Gold himself wrote a lot of the investor updates

16   that QVT would send to its investors, right?

17   A    He did, yes.

18   Q    But the other managing members would review the investor

19   updates before they went out to the investors.

20   A    I guess I'd say yes.

21   Q    And care was taken to ensure that everything reported to

22   QVT's investors in these updates was a hundred percent

23   accurate, right?

24   A    As best as we could, yes.

25   Q    I'd like you to look at Defendant's Exhibit 5464.  Are you

Page 132

1    there?

2    A    I am, yes.

3    Q    And this is one of the investor updates that was sent to

4    QVT's investors on September 11th, 2008, right?

5    A    Yes.

6    Q    And the first section of this September 11 investor update

7    is entitled "estimated returns of feeder funds," do you see

8    that?

9    A    Yes.

10   Q    And that section details the estimated returns of the

11   funds through the period of September 1st, 2008 to September

12   10th, 2008, right?

13   A    Yeah.

14   Q    And that information came -- would have came from QVT's

15   Tiki system, correct?

16   A    Yep.

17   Q    And QVT believed these estimated returns were accurate as

18   of September 11th, 2008 when they sent them to QVT's investors,

19   right?

20   A    To the best that we could do at the time, yes.

21   Q    I'd like you to look at Defendant's Exhibit 5465, which I

22   think is the next one in your binder.

23        And this is an update that was sent to QVT's investors on

24   Sunday evening, September 14th, 2008, do you see that?

25   A    I do.

Page 133

1    Q    So just three days after the last investor update that we

2    saw, right?

3    A    Uh-huh.

4    Q    And -- is that a yes?

5    A    Oh, yes, sorry, yes.

6    Q    And that's consistent with what you said that around the

7    time of the Lehman bankruptcy the investor updates became more

8    frequent, correct?

9    A    Yeah.  I don't know if this is the one -- there was --

10   during that period, yes, we got more frequent.

11   Q    And this also has the same first section called estimated

12   returns of feeder funds, do you see that?

13   A    I do, yeah.

14   Q    And this section details in this Defendant's Exhibit 5465

15   estimates the returns for the period of September 1st, 2008 to

16   and including September 12th, 2008.  Do you see that?

17   A    Uh-huh.

18   Q    Is that a yes?

19   A    Oh, yes, sorry.

20   Q    And that information would've also come from QVT's Tiki

21   system, right?

22   A    Yes.

23   Q    And QVT believed that these estimated returns being

24   reported to its investors in September 14, 2008 was accurate,

25   correct?

Page 134

```
 1   A     Yes.

 2   Q     I'd like you to look at Defendant's Exhibit 5204.

 3   A     Yep.

 4   Q     And this is an update to QVT's investors that was sent on

 5   September 23rd, 2008, correct?

 6   A     Yes.

 7   Q     And the first section of this September 23rd investor

 8   update which is Defendant's Exhibit 5204 is also entitled

 9   "estimated returns of feeder funds."  Do you see that?

10   A     Yes.

11   Q     And this section on the September 23rd investor update

12   provides the estimated returns for the period September 1st,

13   2008 to and including September 22nd, 2008, right?

14   A     Yes.

15   Q     And just like the other investor updates, this information

16   would've come from QVT's Tiki system, right?

17   A     Yes.

18   Q     And QVT believed that these estimated returns being

19   communicated to its investors on September 23rd, 2008 were

20   accurate, right?

21   A     Yes.

22   Q     And if you go down on this document, just below the middle

23   of the page, you see a heading that says "update on

24   (indiscernible) party exposure."  Do you see where that is?

25   A     Yes.
```

Page 135

```
 1    Q    And I'm actually going to back you up to look at the

 2    sentence right before it, that says "these estimates take into

 3    account."  Do you see where I'm at?

 4    A    Uh-huh.  I'm sorry, yes.  I'll get that right once.

 5    Q    Ready?

 6    A    Yes.

 7    Q    "These estimates take into account all losses due to

 8    Lehman Brothers but assign no value to any claims the funds

 9    expect to receive in the bankruptcy proceedings."  Do you see

10    that?

11    A    Yes.

12    Q    And that's true, that the estimated returns reported in

13    Defendant's Exhibit 5204 took into account all losses due to

14    the Lehman Brothers bankruptcy, right?

15    A    Yes.

16    Q    And for that LBSF portion of those losses, QVT had lost a

17    bunch of transactions that had some value, but they also got

18    some collateral, correct?

19    A    Yes.

20    Q    If you go down to the bottom of this page in Defendant's

21    Exhibit 5204, about five lines up from the bottom it has a

22    sentence that starts "to put this in context."  Do you see

23    where I'm at?

24    A    I do, yes.

25    Q    And so Mr. Gold advised QVT's investors on Tuesday,
```

Page 136

1   September 23rd, 2008 and he says "to put this in context, at

2   the time of Lehman Brothers' failure, the QVT funds had no net

3   exposure in the sense that they owned CDS on Lehman large

4   enough to offset the loss of initial margin and derivatives

5   contract, equity and prime brokerage and repo, and any other

6   credit exposures to Lehman."  Do you see that?

7   A    Yes.

8   Q    And that was true in September of 2008 that QVT owned

9   enough CDS on Lehman to offset the losses that QVT experienced

10  as these losses that QVT experienced as a result of Lehman's

11  bankruptcy, right?

12  A    That's what it says there, yes.

13  Q    And that's what Mr. Gold told the investors on September

14  23rd, right?

15  A    That's what's written there, yes.

16  Q    And if you go to the next page right before the heading

17  that says Morgan Stanley and Goldman Sachs --

18  A    Uh-huh.  Yes.

19  Q    -- the sentence right before that it says "I

20  believe" -- Mr. Gold tells the investors, "I believe that a

21  majority of our month to date losses would have been sustained

22  even if the QVT funds had had no direct relationship with

23  Lehman simply because of the market conditions unleased by

24  Lehman's value."  Do you see that?

25  A    Yes.

Page 137

1   Q    And that was true that QVT's losses to date in September

2   2008 would have happened even if QVT had had no direct

3   relationship with Lehman, right?

4   A    That's what it says there, yes.

5   Q    That's what Mr. Gold told the investors on September 23rd,

6   2008, right?

7   A    Yep.

8   Q    You talked with --

9        Oh, I don't think you answered verbally.

10  A    Oh, sorry, yes.

11  Q    Or the court reporter didn't pick it up.

12       You talked with Mr. Tracey about QVT's annual financial

13  statements.

14  A    Yes.

15  Q    And in 2008 and in 2009, QVT's auditor who looked at the

16  financial statements was Pricewaterhousecoopers, right?

17  A    Correct.

18  Q    And you were also involved in the preparation of the

19  annual financial statements, right?

20  A    Yes.

21  Q    And the managing members would review them before they

22  were sent to the investors too, correct?

23  A    Yes.

24  Q    And care was taken at QVT to ensure that the disclosures

25  and its annual financial statements were accurate, right?

Page 138

1    A    Correct.

2    Q    And I believe you testified that those financial

3    statements were distributed to QVT's investors, correct?

4    A    Yes.

5    Q    I'd like you to look at Defendant's Exhibit 2554.

6    A    Okay.

7    Q    Are you there?

8    A    Yes.

9    Q    And this is the consolidated financial statements of QVT

10   fund LP on -- dated December 31st, 2008, right?

11   A    Yes.

12   Q    And if you could turn to page -- and you signed off on

13   this particular financial statement before it was sent to QVT's

14   investors, right?

15   A    Yes.

16   Q    If you could turn to page 51.  Do you see there's a

17   heading that says exposure to Lehman Brothers?

18   A    Yes.

19   Q    And if you could go to the second sentence under that

20   heading it says "at the time of Lehman's filings, the fund did

21   not have significant direct net exposure to Lehman as the fund

22   held credit default swap positions on Lehman large enough to

23   offset the majority of the loss of initial margin and

24   derivatives contracts, equity and prime brokerage, and margin

25   and repurchase agreements."  Do you see that?

Page 139

```
 1                 THE COURT:  Yes, Mr. Tracey?

 2                 MR. TRACEY:  I'm sorry, I have a continuing objection

 3      to this.  This is the same line that we started to go down

 4      earlier, I objected to it.  And the fact that there were --

 5      well, I don't want to repeat it, but I'll approach and repeat

 6      it if the Court would like that.

 7                 THE COURT:  Hold on one second.

 8                 So, Ms. Sawyer, are you going somewhere other than

 9      what we had discussed when we talked about this about a half an

10      hour ago?

11                 MS. SAWYER:  No.

12                 THE COURT:  You can come on up.

13            (Sidebar conference off the record)

14                 THE COURT:  Go ahead, Ms. Sawyer.

15      BY MS. SAWYER:

16      Q    So I had just read to you a sentence out of Defendant's

17      Exhibit 5254, do you recall that?

18      A    This was the financial stuff, yes.

19      Q    Right.  And that sentence that I read to you about the

20      credit default swap positions that QVT held on Lehman Brothers,

21      do -- that was accurate at the time it was disclosed to QVT's

22      investors, correct?

23      A    We certainly believed it at the time, yes.

24      Q    And if you could -- looking at the next two sentences in

25      that same section "exposure to Lehman Brothers," starting with
```

Page 140

1   the sentence that says "prior to the Lehman bankruptcy," do you

2   see that?

3   A    Yes.

4   Q    It says "prior to the Lehman bankruptcy, the funds had

5   entered into derivatives positions with Lehman.  The net value

6   of these derivatives contracts increased substantially

7   following Lehman's failure as credit spreads widened."  Do you

8   see that?

9   A    Yes.

10   Q    And that was an accurate statement made by QVT in its 2008

11   financial statements, that the value of QVT's derivatives

12   contracts with Lehman increased in value following Lehman's

13   failure, right?

14   A    Yes.

15   Q    And continuing on in that section, the next sentence says

16   "even though --" sorry.  "Even though at the time of Lehman's

17   failure the fund held collateral from Lehman in amounts close

18   to the positive mark to market value of derivatives positions,

19   valued as of the business date preceding Lehman's filing for

20   bankruptcy (less required initial margin), the fund did not

21   have sufficient collateral to cover the replacement costs, and

22   the mark to market gains in respect to such derivative

23   positions resulting from their rapid increase in value

24   following Lehman's value."  Do you see that?

25   A    I do, yes.

Page 141

1   Q     And it was accurate as QVT disclosed, that QVT did hold

2   collateral from Lehman in amounts close to the mark to market

3   value of the derivatives positions valued prior to Lehman's

4   bankruptcy, right?

5   A     It's -- what you're saying there is if you are using a

6   marking value or a process of marking to the exit price on

7   9/12, then the amounts of collateral that we held was very

8   similar to the exit price on 9/12.

9   Q     So if you're looking at the mark to market value of the

10  transactions as of 9/12, the collateral that QVT held in

11  connection with those transactions was approximately the same,

12  correct?

13  A     If you define mark to market as the exit via the

14  portfolio, yes.

15  Q     Well, you referred to mark to market value in these

16  financial statements, correct?

17  A     Yes.

18  Q     And that's what you told the investors, correct?

19  A     Yes.

20  Q     And -- but QVT believed, continuing that sentence "that it

21  didn't have sufficient collateral to cover replacement costs

22  and mark to market movements following Lehman's bankruptcy,"

23  right?

24  A     Yes.

25  Q     And these mark to market movements referenced in QVT's

Page 142

1   financial statements happened after September 15th, correct?

2   A    No.

3   Q    Well, we saw earlier as of the close of business on

4   September 15th, 2008, Mr. Tracey put up a spreadsheet that the

5   mark to market movement in QVT's books and records was actually

6   move in Lehman's favor, correct?

7   A    If -- what we're stating there, you know, on the

8   methodology that we were using, we weren't really valuing the

9   portfolio on 9/15, I don't think it's fair to say that a

10  portfolio that had so much protection would have actually gone

11  $5 million against us.

12      I think if we look to that spreadsheet, a lot of positions

13  weren't marked that night.  We didn't attempt to mark the

14  portfolio on 9/15.  And if we had, it would've still been at an

15  exit price, not an entry price.

16  Q    But when we looked at the spreadsheet, which I believe was

17  2111 -- thank you, Claimant's Exhibit 2111 --

18  A    Yeah.

19  Q    -- do you remember you added up the prices on 9/12 --

20  A    Yes.

21  Q    -- you added up the mark to market values on 9/15 and

22  QVT's Tiki system showed a $5 million move in Lehman's favor

23  between those days, correct?

24  A    That's what was in the system, yes.

25              THE COURT:  Yes, Mr. Tracey?

Page 143

1          MR. TRACEY:  I'm sorry to interrupt.  I don't really

2     mean to interrupt but there was a typo in the answer to the

3     last question.  The last -- the transcript says we did attempt

4     to mark the portfolio on 9/15, and in fact, the witness said we

5     did not.

6          THE COURT:  That's true.  All right.

7          THE WITNESS:  Yes, that's what I said.

8          THE COURT:  Has the correction been made?

9          THE REPORTER:  Yes.

10          THE COURT:  Okay.  Thank you.  Okay.

11     BY MS. SAWYER:

12     Q    And so looking at QVT's books and records, the mark to

13     market movement happened after September 15th, 2008, correct?

14          MR. TRACEY:  Objection, Your Honor, I don't know what

15     mark to market movement we're talking about right now.

16          THE COURT:  Fair enough.

17     Q    The mark to market movement that's referred to in the

18     disclosures to the QVT investors, the mark to market movement

19     that happened, following Lehman's failure, that mark to market

20     movement happened after September 15th, correct?

21     A    We never tried to value the -- Lehman's portfolio from

22     about 9/15 onwards, and so there were timing changes in that

23     portfolio, but I don't think it's fair to say that books and

24     records were showing -- if you just look the pure numbers, but

25     we made no attempt to value that portfolio in any --

Page 144

1    Q    Sorry, go ahead.

2    A    -- in any correct way.

3    Q    But you made a disclosure, QVT made a disclosure on

4    September 23rd to its investors, based upon his Tiki records

5    for the values through September 22nd, correct?

6    A    Uh-huh.

7    Q    And so it's your testimony that QVT made no effort to make

8    sure that it's Tiki system was accurate before it went out with

9    that report to its investors?

10   A    No.  I think what I'm trying to say is we made no attempt

11   to try and value the portfolio.  These were now claims on the

12   estates, we made no attempt to try and value those positions.

13   Q    But there were values for those positions in the Tiki

14   system, correct?

15   A    Yes.

16   Q    And I just want to -- we're both fast talkers, so I have

17   to make sure we take turns.

18   A    Okay.

19   Q    But there were values for all those positions in the Tiki

20   system, correct?

21   A    There were, yes.

22   Q    And there were values for those positions in the Tiki

23   system through the week of Lehman's bankruptcy, correct?

24   A    There were values in the system, yes.

25   Q    And those values in the Tiki system, those were used for

Page 145

1    the report that was sent to the investors on September 23rd,

2    2008, correct?

3    A    On the 23rd, I think the only -- I don't know.  Because

4    those positions were taken out of the portfolio I think later

5    in that week, but I think all we were trying to say there is

6    that we had a portfolio that was worth a certain amount on 9/12

7    and we had collateral, which -- so.

8    Q    That's not what was reported to the investors on September

9    23rd, 2008, was it?

10            MR. TRACEY:  I'm sorry.

11            THE COURT:  Mr. Tracey, yes.

12            MR. TRACEY:  I think counsel interrupted the witness.

13   He was right in the middle of a sentence.  I

14   just --

15            THE COURT:  Let's try to slow down just a little bit.

16            MS. SAWYER:  I apologize.

17            THE COURT:  All right.  So if you could go back to

18   the pending question.

19   BY MS. SAWYER:

20   Q    The pending question was that's not what was reported to

21   the investors on September 23rd, 2008, was it?

22   A    We provided an estimate of what we thought, an estimate of

23   the value of the portfolio and the NAV calculation on the 23rd,

24   yes.

25   Q    And that estimate that was provided to the investors on

Page 146

1   September 23rd, that was through September 22nd, correct?

2   A    I don't have it in front of me, but yes.

3   Q    And you testified earlier that that information came from

4   the Tiki system, right?

5   A    Yes.

6   Q    If you could turn to the next page of Defendant's Exhibit

7   5254.  It's the next paragraph in the section, "exposure to

8   Lehman Brothers" on the top of page 52.  Do you see where I'm

9   at?  It starts --

10  A    The fund --

11  Q    -- "the fund has exercised its rights"?

12  A    Yes.

13          THE COURT:  Can I try to get some clarification on

14  the last line of questioning?  So a report went out to the

15  investors on the 23rd of September, right?

16          THE WITNESS:  Yes.

17          THE COURT:  And I think what you've said in response

18  to Ms. Sawyer's question is that the numbers that were reported

19  to the investors were based on what was in Tiki as of that

20  date.

21          THE WITNESS:  Yes.

22          THE COURT:  And that there had been no attempt to

23  place a value on the claim or the exposures, or the positions,

24  prior to that?

25          THE WITNESS:  At that point onwards -- so a lot of

Page 147

1    positions and we've done this in months prior to September, a

2    lot of positions we only marked on a monthly basis because

3    there wasn't good information in the month or the process was

4    onerous to get the information.

5         THE COURT:  Okay.

6         THE WITNESS:  So we had priced the CDS -- the PCDS

7    portfolio, Carb and a bunch of other positions on the month

8    end, and we persisted that price through September and pretty

9    much until when we took those positions off in mid-September

10   when we canceled the positions out and replaced those positions

11   with the collateral value that we seized from Lehman's.

12        So it is correct in saying that the amounts were from

13   Tiki, what I don't want to suggest is that those were

14   valuations that we had done every night with the right level of

15   diligence to understand exactly what those things in the market

16   would be worth.

17        THE COURT:  Thank you.

18   BY MS. SAWYER:

19   Q    You hoped those valuations were accurate enough to report

20   to the investors, correct?

21   A    Yes.

22   Q    And if you could go back to Defendant's 2554, we were

23   looking at on page 52, the first paragraph at the top.

24   A    Yep.

25   Q    This paragraph's talking about the bankruptcy claims that

Page 148

1    might be filed, and I'll give you a minute to look at it,

2    because it's a long paragraph.

3         (Pause)

4    A    Yes, read it.

5    Q    And that paragraph's generally talking about the

6    bankruptcy claims that QVT has or may file, correct?

7    A    Yes.

8    Q    And if you look at the last sentence of the paragraph, QVT

9    states, "The valuation of such claims is subject to

10   considerable uncertainty and such valuation may not be

11   indicative of the amount that the fund may ultimately realize

12   upon settlement of the claims," correct?

13   A    Correct.

14   Q    And QVT didn't disclose in its December 2008 annual

15   financial statements the dollar value of any claims it had

16   asserted against Lehman, did it?

17   A    I don't think it did, no.

18   Q    In fact, QVT never has disclosed to its investors the

19   dollar amount of any claims it has filed against Lehman,

20   correct?

21   A    I think with the numbers being the filings that we made,

22   that we objected to?

23   Q    The filings might be in the bankruptcy docket you're

24   saying?

25   A    Perhaps I don't know.

Page 149

1   Q    But QVT hasn't made any efforts to advise its investors as

2   to the dollar value of any claims asserted against Lehman,

3   correct?

4   A    I don't know of any document where we've actually told

5   with a full 100 percent number.

6   Q    And you recall that QVT's investors were concerned about

7   QVT's exposure to Lehman, right?

8   A    Yes.

9   Q    And when QVT's investors would ask about Lehman and the

10  claims against Lehman, those were just high level discussions

11  that QVT would have with its investors, right?

12  A    Yes.

13  Q    QVT would tell its investors there's a dispute about the

14  valuation of derivatives and that dispute is sizeable, but

15  wouldn't put any dollar numbers on it, correct?

16  A    I can't talk for other people, but myself I did not go

17  into huge amounts of detail on the total value of the claim.

18  Obviously we gave, when we started reporting the value of S25,

19  which was the side pockets, then they had an estimate of the

20  current valuation.  But I personally did not discuss the real

21  details of the size of our claim.

22  Q    But the disclosure of the S25 or the Lehman side pocket,

23  that didn't reflect the dollar value of the claim being

24  asserted against Lehman, did it?

25  A    Just estimates of its value.

Page 150

1   Q   And as you testified on direct, that estimate of a value

2   was the notional, the actual claim number --

3   A   Yeah.

4   Q   -- asserted against Lehman multiplied by some price that

5   QVT determined, correct?

6   A   Yes.

7   Q   And what's the current price or percentage that QVT's

8   using to discount that claim value for purposes of the Lehman

9   side pocket?

10   A   I don't know what they're currently using, so I haven't

11   been at QVT for a good many months now.

12   Q   So you don't know?

13   A   I don't know.

14   Q   What was the price that you last know?

15   A   The last number I knew we changed the methodology a little

16   bit at the end, we based our number on the last number that we

17   had the $58 million in Lehman's and the concern we had,

18   especially as we went into the discussions through mediation

19   and so that we may know more information about Lehman's

20   positions and where they might settle the transaction.  And we

21   didn't -- we wouldn't be able to reflect that number.  The

22   instructions we had from the mediator is what was --

23          THE COURT:  Stop.  Okay.  We're not going to go

24   anything that happened --

25          THE WITNESS:  Okay.

Page 151

1              THE COURT:  -- in the mediation.  I'm sorry to

2      abruptly stop you.

3              THE WITNESS:  That's fine.

4      BY MS. SAWYER:

5      Q    I think you were explaining the methodology and the

6      question I had was just what was the last price that you recall

7      that was being placed on the Lehman side pocket.

8      A    On the LBSF portion of it, I think it was of the order of

9      30 or $40 million, but don't quote me.  Sorry.

10             MS. SAWYER:  Your Honor, could we take a brief break?

11             THE COURT:  Yes, of course.

12             MS. SAWYER:  Thank you.

13             THE COURT:  How much more do you think you have, Ms.

14     Sawyer?

15             MS. SAWYER:  I think maybe 45 minutes, an hour at the

16     most.

17             THE COURT:  Okay.  All right.  So we're going to

18     shoot for finishing up at 5:30 subject to redirect.  Okay.

19     Let's come back in ten minutes, then at 4:15.

20             MS. SAWYER:  Thank you.

21         (Recess from 4:05 p.m. until 4:23 p.m.)

22             THE COURT:  Welcome back.  You're in the homestretch,

23     Mr. Sale.

24     CROSS-EXAMINATION (RESUMED)

25     BY MS. SAWYER:

Page 152

1    Q    I'd like to step back and talk about the margin process in

2    general at QVT.  I think you testified on direct that QVT

3    calculated margin on a daily basis using a system called

4    Morador, right?

5    A    Yes.

6    Q    And that Morador would take valuations of the positions

7    every day from QVT's Tiki system, right?

8    A    Yes.

9    Q    And QVT also received collateral marks from Lehman on a

10   daily basis for each day -- for each trade, correct?

11   A    Yes.

12   Q    And the collateral marks from Lehman would be uploaded

13   into the Morador system so they could be compared with QVT's

14   Tiki marks, right?

15   A    Yep.

16   Q    And you'd try to compare them so you could do direct

17   comparisons trade-by-trade, right?

18   A    Yes, basically reconciliation of that comparison.

19   Q    And that's what QVT did, that's what QVT's Morador's

20   system did is it --

21   A    Yes.

22   Q    -- tried to reconcile the valuations received from Lehman

23   with the valuations on its Tiki system, correct?

24   A    Yes.

25   Q    And so someone could then ask Morador or sit down at

Page 153

1   Morador and see the comparison between the Lehman values and

2   the Tiki values, correct?

3   A    Yes.

4   Q    And generally QVT would accept Lehman's values if they

5   were more favorable to QVT, correct?

6   A    They were the calculation agent, so they were the ones who

7   determined the amounts of margins, so yes, we would take their

8   values.

9   Q    And you would take their values particularly if they were

10  more favorable to QVT, correct?

11  A    Yes.

12  Q    And QVT could also use the Morador system to just see what

13  its own margin calculations would be, correct?

14  A    Yes.

15  Q    And if there was an issue related to a discrepancy between

16  the valuations between QVT and Lehman, if that was significant,

17  Ms. Fang would that elevate to you or someone else at QVT,

18  right?

19  A    Yes, a small differences, it was a very large portfolio so

20  large differences I'm sure she wouldn't, but if it was a

21  significant position she would normally talk to a trader to see

22  whether or not there was a genuine pricing issue.

23  Q    And if it was particularly significant, she might elevate

24  it to you, correct?

25  A    She never did.  I was normally more involved if there

Page 154

1   wasn't a real issue, I would normally be talking to say the

2   credit department of the bank just to say that we're not

3   ignoring you, we are actually -- there is a genuine issue in

4   which I'd resolve it.

5   Q    Right.  And you don't recall her ever elevating an issue

6   to you like that, do you?

7   A    Not with Lehman's, no.

8   Q    I'd like you to look at Defendant's Exhibit 5169, this is

9   a document that Mr. Tracey showed you on direct, correct?

10  A    Yes.

11  Q    And Ms. Fang's making the $13.3 million margin call on the

12  morning of September 16th, 2008 to Lehman, right?

13  A    Yes.

14  Q    And she didn't just make that number up, did she?

15  A    She did not, no.

16  Q    And you explained that in order to get to that number,

17  you'd have to take the $5 million move in Lehman's favor

18  showing up in the Tiki system and net it against the initial

19  margin that QVT had posed with LBSF, correct?

20  A    That's what I believed the calculation was, yes.

21  Q    But that demand -- so you're essentially demanding the

22  return of all of the initial margin that QVT had posted for

23  LBSF, right?

24  A    Yes.

25  Q    But that demand for the initial margin is not made

Page 155

1    explicit in Ms. Fang's e-mail, is it?

2    A    It is not, no.

3    Q    And it wouldn't have been Ms. Fang's normal process to

4    demand the return of all the initial margin from a bank, would

5    it?

6    A    No, I would characterize it slightly differently.  We

7    would demand the return of initial margin once a transaction

8    had terminated.

9    Q    But a daily margin call like this, it wouldn't have been

10   normal process to try to demand a return of all the initial

11   margin QVT had posted with the bank, would it?

12   A    If we terminated all the transactions with somebody the

13   day before, yes, we would.

14   Q    But that's not made explicit in this e-mail.

15   A    It's not made explicit in this e-mail, no.

16   Q    And Ms. Fang normally wouldn't give a person seeking a

17   return of all that initial margin, would she?

18   A    Yes, she would.  I think if it was during the normal

19   margin process that we'd terminate the transaction and the

20   daily process would be a combination of the change in initial

21   margin and the changing variation margin, so it would be a

22   normal process.

23        To go and renegotiate the margin levels, would not be her

24   responsibility, but just the normal mechanics of a transaction,

25   changing a value or being terminated would be her

Page 156

1    responsibility.

2    Q    And so if Ms. Fang was seeking the return of all of the

3    initial margin from a bank, she would've made that explicit in

4    her request, correct?

5    A    I don't know what she would've done.  I don't think we

6    ever had this situation before, so I don't know how it would

7    have been.

8    Q    But she certainly wouldn't have described it as the mark

9    to market movement from EOB 9/12 to 9/15, would she?

10   A    Again, I read this it's not clear it's initial margin,

11   it's not a standard e-mail, it was probably something written

12   on the fly.

13   Q    And when you talked to Ms. Fang about this e-mail, her

14   memory was that she was standing right behind her telling her

15   to send the e-mail, correct?

16   A    I think -- I don't think she -- you know, I'm

17   putting -- I don't think she remembered exactly what was going

18   on.  What she said to me was that she remembered that I was

19   behind her.

20   Q    And you were behind her directing her to send this e-mail,

21   right?

22   A    I don't remember sending this e-mail.

23   Q    You didn't send this e-mail, Ms. Fang did, correct?

24   A    Yeah.

25   Q    And Ms. Fang explained to you that she remembered you

Page 157

1    standing behind her telling her to send this e-mail.

2    A    If that's what she said, yeah.

3    Q    I'd like to talk to you a little bit about -- a little bit

4    more about the Lehman side pockets.  So you testified I believe

5    on direct that in September 2008 that Lehman -- I'm sorry, QVT

6    created a side pocket in which QVT put all of the Lehman

7    bankruptcy claims, right?

8    A    Yes, there was a whole bunch of different entities, and we

9    put all of them in into one bucket.

10   Q    And how many claims are we talking about went into this?

11   A    There were claims against the prime brokerage unit, I

12   think claims against the repo unit, claims against the U.S.

13   broker dealer, claims against LBSF, LBOTC, one other is the

14   counterpart, just falling out of my brain I'm sorry.

15   Q    Are we talking about 25 claims?

16   A    No, there was like five or six claims on different

17   business units, but they were sometimes the same -- we took

18   that business units, not in exact legal entities, because our

19   prime brokerage, for example, was over two Lehman entities.

20   Q    And when the Lehman side pocket was created, the

21   transactions between LBSF and QVT and Quintessence, that are

22   the subject of these claims, they were moved or they were

23   booked out in QVT's active trading book, correct?

24   A    Yes.

25   Q    And they were -- and QVT booked out the transactions

Page 158

```
 1    between QVT and Quintessence and LBSF at the collateral levels

 2    that QVT had on its books for those transactions as of

 3    September 11th, 2008, right?

 4    A    Yes.

 5    Q    But when they were put into the side pocket, the side

 6    pocket was not even zero, right?

 7    A    At that point what we had is we knew we didn't have any

 8    derivatives at that point, so they were worth nothing.  We had

 9    the collateral against it, so we netted the collateral off

10    against it and then we had claims.

11         So we didn't put the -- just to be clear, we didn't put

12    the CDS positions in a side pocket, we put the claim in the

13    side pocket.

14    Q    And when you put the claim or claims in this case --

15    A    Yes.

16    Q    -- into the side pocket, you valued them at zero in

17    September 2008.

18    A    Initially, yes.

19    Q    And you have an interest in the Lehman side pocket.  I

20    believe you testified to that, correct?

21    A    I do, yes.

22    Q    You said it was in the range of 10 to 20 basis points.

23    I'd like you to look at Defendant's Exhibit 5965.  I think the

24    copy in the binder is quite poor, but you can read it better on

25    the screen?
```

Page 159

1   A    Yeah, it's less words on the screen, yeah.

2   Q    And you recognize this document, don't you?

3   A    Yes.

4   Q    And this is a document that you created, right?

5   A    I did, yes.

6   Q    And this document reflects the side pocket interest held

7   by a number of individuals at QVT, correct?

8   A    Yes.

9   Q    It looks like it has Mr. Chu, Mr. Gold, Mr. Wollman,

10  yourself, Mr. Brumm, Mr. Fu, Mr. Cen.  Do you see that?

11  A    Yes.

12  Q    And in preparing this document, Defendant's Exhibit 5965,

13  you endeavored to be as accurate as possible; is that correct?

14  A    It was quite a calculation, but I tried my best, yes.

15  Q    Okay.  And if you look, it -- I'm going to focus on the

16  columns that say 2015 direct and 2015 indirect.

17  A    Uh-huh.

18  Q    So you broke out the 2015 interest for these individuals

19  into their direct/indirect interests, correct?

20  A    Yes.

21  Q    And so to determine an individual's total interest in the

22  Lehman side pocket, you need to add their direct interest and

23  their indirect interest together, correct?

24  A    Yes.

25  Q    You said that you left QVT at the end of 2015.

Page 160

1   A   Yes.

2   Q   You were partner when you left, right?

3   A   Yes.

4   Q   But not a managing member?

5   A   I was never a managing member.

6   Q   And you left QVT because it became obvious that you

7   weren't going to become a managing member or get promoted any

8   further in the firm, right?

9   A   Yes.

10  Q   And since you left QVT, you've continued to work for QVT

11  as a consultant relating to this litigation, right?

12  A   I have, yes.

13  Q   And as part of that departure and the consultancy, you

14  entered into an agreement with QVT that Mr. Tracey showed you,

15  correct?

16  A   Yes.

17  Q   It looks like it's Claimant's Exhibit 2149.

18          THE COURT:  Is it in the other book?

19          THE WITNESS:  Yeah.

20          MS. SAWYER:  It should be in my book.

21          THE WITNESS:  Am I missing it?

22          MS. SAWYER:  Oh, somebody's telling me that the tabs

23  are a little hard to follow, like it's hidden behind a tab,

24  it's Claimant's Exhibit 2194.

25          THE WITNESS:  2149?

Page 161

```
 1                    MS. SAWYER:  2149.

 2                    THE COURT:  So it's apparently hidden if you go --

 3                    THE WITNESS:  Do you what it's hidden behind?

 4                    THE COURT:  It's right before 515008.

 5                    MS. SAWYER:  5008?

 6                    THE COURT:  Yes, it's right before that.  It's the

 7     exhibit immediately before that.

 8                    THE WITNESS:  Oh, yeah, yeah.

 9                    MS. SAWYER:  Sneaky.

10                    THE WITNESS:  Yes, sorry.

11     BY MS. SAWYER:

12     Q    That's okay.  This is the agreement that you looked at

13     with Mr. Tracey, correct?

14     A    It is, yes.

15     Q    And this is, in fact, your separation agreement from QVT,

16     right?

17     A    Yeah.

18     Q    And you negotiated this agreement with QVT?

19     A    I did, yes.

20     Q    And this agreement provides for among other things, create

21     or recover a percentage of any resolution of this matter so

22     long as it's above some minimum threshold, correct?

23     A    Yes.

24     Q    And so tell me about those negotiations, who was involved?

25     A    Myself and -- primarily it was myself, Nick Brum and
```

Page 162

1    Arthur Chu.

2    Q    And did you have counsel representing you?

3    A    I had an employment counsel who reviewed the documents, it

4    wasn't negotiated in parts, just reviewed the overall

5    separation agreement.

6    Q    When you say he wasn't reviewing this part, which part are

7    you referring to?

8    A    Any negotiations --

9         THE COURT:  Hold on, hold on.  Mr. Sale, you're not

10   represented by counsel at this moment, are you?  Not these

11   folks, personally.

12        THE WITNESS:  No, I'm not.

13        THE COURT:  Okay.  I just want to -- because Ms.

14   Sawyer is asking you questions about your interactions with an

15   attorney, I just wanted to draw to your attention that you are

16   entitled to protection of the attorney/client privilege.

17        THE WITNESS:  Okay.

18        THE COURT:  And that in response to Ms. Sawyer's

19   questions, you are entitled to not reveal the substance of any

20   communications you may have had with counsel.

21        THE WITNESS:  Okay.

22        THE COURT:  If you would like to, it is certainly

23   your right to waive the attorney/client privilege --

24        THE WITNESS:  Okay.

25        THE COURT:  -- but because, as far as I am aware, you

Page 163

1    are not represented in your individual capacity at this moment

2    in this matter, I just wanted to bring that to your attention.

3              THE WITNESS:  Thank you.

4              THE COURT:  Okay.

5              MS. SAWYER:  And I apologize, Your Honor, I was not

6    trying to --

7              THE COURT:  No, I know you weren't trying, but I just

8    thought it was important to make the witness aware of that.

9              MS. SAWYER:  And I'll be more sensitive.

10   BY MS. SAWYER:

11   Q    Mr. Sale, you said you had counsel review the terms of the

12   agreement generally.

13   A    Yes.

14   Q    And did QVT have counsel that was representing them in

15   connection with the negotiations?

16   A    They had their internal counsel.

17   Q    And when you say their internal counsel, who are you

18   referring to?

19   A    Fateet (ph), Fateet (indiscernible).

20   Q    And at the time of the -- at what time did these

21   negotiations occur?

22   A    They were probably -- they probably started seriously

23   negotiating it maybe March or April of 2015.  I think this

24   document is signed May.  But it was -- it took a while to

25   negotiate.

Page 164

1   Q    And at the time of these negotiations, you were actively

2   involved in the litigation of these claims; is that fair?

3   A    Yes.

4   Q    You'd spent a lot of effort working in connection with

5   these claims, right?

6   A    (indiscernible) yes.  For all the claims against the

7   Lehman's entities, but yes.

8   Q    And you knew that there was a possibility you might be

9   called as a witness in this litigation at the time you were

10  negotiating this agreement, correct?

11  A    It was possible, yes.

12  Q    You'd signed the proofs of claim on behalf of QVT,

13  correct?

14  A    Uh-huh.  Yes.

15  Q    And you'd been identified as a fact witness in QVT's

16  interrogatory responses at this time?

17  A    Yes.

18  Q    And did anyone raise a concern to you that you -- that

19  this agreement, giving you an interest in the litigation might

20  not be permissible?

21  A    No.

22  Q    And you're aware that Mr. Wollman has been serving as a

23  consultant for this litigation as well since he left QVT,

24  correct?

25  A    Yes.

Page 165

1    Q    And Mr. Wollman's being paid on an hourly basis for his

2    consulting services, correct?

3    A    I don't know the terms of his transaction.

4    Q    You're not aware of how he's being compensated?

5    A    I've heard, but I don't know what.

6    Q    And was there a discussion of you being compensated on an

7    hourly basis for your consulting services in connection with

8    this litigation?

9    A    I don't remember one, no.

10   Q    You don't remember asking for that?

11   A    I didn't want that.

12   Q    You didn't want that.  And why didn't you want that?

13   A    I wanted to stay involved.  I've been working on this the

14   whole of Lehman's claim for the last seven, eight years at this

15   point, seven years.  And it was something I wanted to stay

16   involved on the transaction, and I wanted to be compensated as

17   if I still was at QVT for this purpose.

18   Q    And prior to your departure from QVT, you were going to

19   share in any recovery of the claim that was recovered in this

20   case.

21   A    Yes.

22   Q    And you wanted to ensure that notwithstanding your

23   departure from QVT that you be compensated in the same way; is

24   that correct?

25   A    That was the idea, yes.

Page 166

1    Q    And that was something you asked for.

2    A    I probably did, but the conversations went back and forth,

3    but I think I was one that probably suggested it, but I can't

4    say I explicitly the one who was suggested that.

5    Q    And the compensation that you believed you were going to

6    receive, that was in connection with an anticipated management

7    fee being earned by the management company, correct?

8    A    Not a management fee, no, an incentive fee.

9    Q    An incentive fee.  And can you explain to me how that

10   incentive fee would work?

11   A    So as -- so a hedge fund received normally or potentially

12   receives two fees, the management fee that you describe, but

13   that is an annual fee.  At this point I don't think there's any

14   annual fee being charged on this particular transaction on the

15   side pockets.

16       But also we receive an incentive fee, we get a percentage

17   of profits.  That is not done on an individual line item basis,

18   obviously we manage portfolios, so if overall we make money for

19   our investors in a particular year, then they share a portion

20   of that profit with us with QVT with the management company.

21       If we lose money for our investors, then the following

22   year we have to make that back money, and once we -- what's

23   called the high watermark, when we're back to the high

24   watermark, then we'll start earning fees from that point

25   onwards.  But it's in the -- it's on a portfolio basis not on a

Page 167

1   particular transaction or security basis.

2   Q   When you were at QVT as a chief financial officer, you

3   would share in that incentive fee that would be paid.

4   A   I was a partner and I received bonuses like other people.

5   The amounts were determined by the managing members, there was

6   no explicit guarantee, but if they thought I did a good enough

7   job then I would get a bonus.

8   Q   And who else at QVT would share in this incentive fee?

9   A   I think all the employees and partners would somehow

10  receive bonuses at the end of each year if they earned it.

11  Q   Including all the managing members, correct?

12  A   Yes.

13  Q   And the managing members would determine how to allocate

14  that incentive fee on an annual basis.

15  A   To the extent, yes, on an annual basis if we got -- we got

16  bonuses annually.

17  Q   If we could look at Claimant's Exhibit 2149, Section 2(b)

18  which is on the second page.

19  A   Is that another hidden one?

20  Q   It's the one we were just looking at, so it's the one

21  right before --

22  A   Oh, okay.

23  Q   -- 5008.

24  A   Okay.  I'm sorry.

25  Q   That's all right.

Page 168

1   A     Yes, sorry.

2   Q     So before we go to it specifically --

3              MS. SAWYER:  Well, let me strike that.

4   BY MS. SAWYER:

5   Q     So this Lehman allocation that's shown in Section 2(b),

6   this is what purports to provide you what you would have earned

7   in connection with this incentive fee if you had stayed at QVT,

8   is that correct?

9   A     This is the calculation of what I would receive and what I

10  understand.  I wasn't involved obviously in my own bonus

11  amounts in prior years, but what I understand is this was a

12  proxy for what I might have received if I was still at QVT.

13  Q     Now, is the incentive fee -- you said it was different

14  than the management fee, correct?

15  A     Yes.

16  Q     And then is the incentive fee different than something

17  called carried interest?

18  A     No, it's the same in this case.

19  Q     Okay.  What do you mean by in this case?

20  A     Sometimes -- it's the difference between a concept of

21  whether you're dealing with a corporate entity or a

22  partnership.

23  Q     And so in connection with the Lehman side pocket and the

24  Lehman claims in this situation, other than the incentive fee

25  and the individuals interest in the side pocket, are there

Page 169

1   other ways that individuals at QVT are going to recover as a

2   result of any claims determination here?

3   A   Yes, I think if I understand your question correctly, the

4   indirect column on that chart that we were looking at a few

5   minutes ago, QVT funds, funds managed by QVT purchased QVT

6   interest from investors that wanted to liquidate.

7       So, in effect, the funds bought back their own shares and

8   those shares included at the time S-25 and then when we

9   reorganized the funds it included the CSI, which was the

10  combination of all the side pockets.

11      So if you were an investor in the funds, you indirectly

12  owned some side pocket interest.  Did that -- did I make that

13  clear, I'm sorry if --

14  Q   I'm not sure if I'm following.  So for you, for

15  example --

16  A   Yes.

17  Q   -- you have an interest in the side pocket.

18  A   Yes.

19  Q   And you have your Lehman allocation in this agreement

20  we're looking at, correct?

21  A   Yes.

22  Q   And that Lehman allocation is supposed to reflect your

23  share of any incentive fee resulting from the resolution of

24  these claims, correct?

25  A   Yes.

Page 170

1  Q    Other than that, are there any other -- is there any other

2  recovery you're going to receive when these claims are disposed

3  of?

4  A    So I also own some QVT 4, which is one of the feeder funds

5  into QVT.  And that owns some side pockets.

6  Q    And that interest you own in QVT 4, that interest in the

7  side pocket is not reflected on the chart we looked at showing

8  the interest in the side pocket.

9  A    That was the indirect column.

10 Q    That's the indirect column.  Okay.  So then other than the

11 direct and indirect columns and your Lehman allocation, are

12 there any other sources of recovery when these claims are

13 disposed for you?

14 A    I think that covers it.

15 Q    Okay.  Now, looking at the Lehman allocation section in

16 this agreement, which is Section 2(b) --

17 A    Yeah.

18 Q    -- what is the number, the $58 million, what does that

19 number represent?

20 A    That was understanding of what the last most valuation

21 from Lehman Brothers of the claims.

22 Q    So the objection number?

23 A    I think it's slightly different but.

24 Q    Okay.  And then what's the JRS percentage, how is that

25 determined?

Page 171

```
 1   A     That is the percentage -- that's the 2.25.  It's described
 2   a bit further down.  That was a number -- that is the amount,
 3   that's the percentage of that difference between the final
 4   claim and the 58 million that I will receive.
 5   Q     So that's the percentage that you recover when you take
 6   the final claim number and subtract out the 58 million?
 7   A     Yes, times 2.25 and that will be the valuing claim
 8   dollars, and then we have to convert that into actual dollars
 9   by multiplying through.  If you see further down, it talks
10   about contacts of claim price at 66 and a quarter.
11   Q     And that 66 and a quarter, what does that represent?
12   A     That represents the current valuation of a claim dollar.
13   I think at the time when we -- Lehman's claims were trading at
14   approximately 66 percent or LBSF claims, rather, were trading
15   at approximately 66 percent, so that was the conversion rate
16   from a claims dollar to an actual dollar.
17   Q     And so -- then below that, below these different
18   definitions that you're looking at, there's a schedule of what
19   you might recover based upon what the final claim number is,
20   and assuming that LBSF claims are trading at approximately
21   66.25, correct?
22   A     Correct, yes.
23   Q     And so if the claim is paid at -- is determined to be $200
24   million, you'd recover personally $2.1 million, correct?
25   A     With one other caveat.  If -- this $2 million can only be
```

Page 172

1    paid out of an allocation.  So that first of all relies upon

2    that the management company receives an allocation from the

3    CSI, and that's dependent on other investments in the CSI.

4         Remember we talked about an allocation was on a whole

5    portfolio, so it isn't just driven by the Lehman's claim, the

6    dollars have to be there available to pay as well.

7    Q    And so where did the dollars come from to pay it?

8    A    Come from the CSI.

9    Q    And the CSI is the consolidated special investment --

10   A    That's right.

11   Q    -- is what the side pocket got moved into over time,

12   correct?

13   A    Plus other positions, yes.

14   Q    So how does the CSI get dollars in this circumstance?

15   A    So if we settle this claim, it'll -- and it monetizes, it

16   gets dollars and there will be an allocation on that.  But that

17   will be -- or rather there will be a calculation but you have

18   to then add in the performance of the other instruments that

19   are in that portfolio.

20        So first of all, if there's any losses from previous

21   years, they have to be recovered, and if there are losses from

22   other positions, they have to be paid before there's anything

23   paid to the management company.

24   Q    And you said you have to evaluate it or add in the

25   performance of the other instruments in that portfolio.  What

Page 173

1    portfolio -- what else is in that portfolio?  Strike that.

2         What portfolio are you referring to?

3    A    So the CSI was -- QVT created a lot of side pockets

4    through (indiscernible).  The Lehman's one was one called S25,

5    it started at S1, so -- and as part of our restructuring in

6    2012, the funds every investor had some number of side pockets,

7    depending on when they invested.  I think the last one was 27

8    or 28.

9         Some -- and some had matured before 2012, but those that

10   hadn't, were all combined into one single fund.  So there were

11   a number of different types of instruments in that.

12   Q    So the portfolio you're referring to is the portfolio of

13   the combined special investments?

14   A    Yes, which was all of the side pockets that were still

15   around in 2012 when we consolidated the funds.  I'm sorry.

16             THE COURT:  May I ask a question?

17             MS. SAWYER:  Yes.

18             THE COURT:  When the Lehman side pocket was created,

19   it was one side pocket?

20             THE WITNESS:  It was, yes.

21             THE COURT:  Okay.  And now are you saying that that

22   side pocket is now part of a larger side pocket?  In other

23   words, it lives in a side pocket with other non-Lehman

24   positions or investments?

25             THE WITNESS:  With other side pockets, yes.

Page 174

```
 1                  THE COURT:  Okay.

 2                  THE WITNESS:  So we took --

 3                  THE COURT:  In the restructuring.

 4                  THE WITNESS:  In the restructuring, we took all the

 5     side pockets, so every investor had some combination of side

 6     pockets.  We took them all back into a common pool, and then

 7     gave every investor the same dollar value of a single fund,

 8     which was the combined --

 9                  THE COURT:  Okay.

10                  THE WITNESS:  -- side pocket.

11                  THE COURT:  So is it -- is -- following on what's on

12     the page in 2149 and your testimony, is it accurate that the

13     Lehman allocation in terms of becoming monetized and given to

14     you --

15                  THE WITNESS:  Yes.

16                  THE COURT:  -- strike that.

17                  Is it correct that for someone who holds an interest

18     in the Lehman side pocket or the Lehman claims how much they

19     actually receive is subject to other deductions and offsets on

20     account of non-Lehman related activity in the side pocket?

21                  The last question you asked, you answered of Ms.

22     Sawyer's relating to it depends on how the other investments

23     perform and other costs, suggests that if the only thing that

24     existed were the Lehman claims and the Lehman side pocket and

25     $50 were coming out of it, you would get the $50.  But that
```

Page 175

```
 1    now, the Lehman side pocket lives in a larger pool, and before

 2    that $50 comes out, there might be deductions related to other

 3    investments in the portfolio.

 4             THE WITNESS:  Exactly.  But that's --

 5             THE COURT:  Is that right?

 6             THE WITNESS:  -- for the managing -- not for the

 7    investor, but for the managing --

 8             THE COURT:  Yes, for the -- thank you.

 9    BY MS. SAWYER:

10    Q    And so your payment's not only subject to that, but it's

11    also subject to your compliance with the agreement 2194,

12    correct?

13    A    Yes.

14    Q    2149.

15    A    Yeah.

16    Q    And in terms of your obligations under this agreement,

17    that's to cooperate with QVT in the prosecution of these

18    claims, correct?

19    A    Yes.

20    Q    As you did before, correct?

21    A    Yes.

22    Q    And that would include testifying as a witness, right?

23    A    If they need me, yes.

24    Q    What does QVT stand for?

25    A    I don't know if it has a definition anymore.
```

Page 176

1  Q    Did it at one point?

2  A    I think so.  I think it may have stood for Quantitative

3  Value Trading, but I think it's one of those things that's been

4  lost in the midst of time.

5           MS. SAWYER:  May I have a moment, Your Honor?

6           THE COURT:  Sure.

7       (Pause)

8           MS. SAWYER:  I don't have any further questions.

9           THE COURT:  Thank you.

10          MS. SAWYER:  But I reserve our right to recall Mr.

11 Sale in Lehman's case-in-chief.

12          THE COURT:  Did you hear that last part, Mr. Tracey?

13          MR. TRACEY:  They're reserving --

14          THE COURT:  The right to recall Mr. Sale in Lehman's

15 case in chief.

16          MR. TRACEY:  I'll have to reserve my position on

17 that.

18          THE COURT:  Well, why don't -- we can talk about that

19 after Mr. Sale is done for the day.

20      (Pause)

21                    REDIRECT EXAMINATION

22 BY MR. TRACEY:

23 Q    So there was a number of questions that were asked of you

24 during Ms. Sawyer's cross-examination about the collateral

25 marks that QVT had on its positions basing LBSF, do you recall

Page 177

1    that?

2    A     Yes.

3    Q     And there were also a series of questions about

4    communications with investors on September 23rd of the overall

5    results of the QVT funds, correct?

6    A     Yes.

7    Q     Well, I'd like to go through that with you, maybe starting

8    to get perspective back on September 11th.

9    A     Okay.

10   Q     What was the last date on which -- for which QVT received

11   a collateral statement from Lehman?

12   A     We received one on the Thursday.

13   Q     What date is that?

14   A     That was the 11th, which was actionable, which was the one

15   we talked about in the testimony as well, the movement on the

16   Friday.  I would have to double-check, but we may have received

17   one from Lehman on 9/12, which would've been actionable on

18   9/15, but I don't know if we received that or not.

19   Q     Okay.  So is it correct to say that the last time -- that

20   the last date on which Lehman the valuation agent provided a

21   collateral valuation to you was for September 11th.

22             MS. SAWYER:  Objection, leading.

23             THE COURT:  Yes, Ms. Sawyer?

24             MS. SAWYER:  Leading.

25             MR. TRACEY:  I'm just trying to clarify.

Page 178

```
 1    BY MR. TRACEY:

 2    Q    What was the last date on which -- for which Lehman

 3    provided a collateral valuation to QVT, to the best of your

 4    recollection?

 5    A    9/11 for 9/12.

 6    Q    Okay.  And when you say 9/11 for 9/12, is the valuation

 7    for 9/11 or for 9/12?

 8    A    For close of business 9/11, which would have been

 9    delivered to us on Friday, September the 12th.

10    Q    Okay.  And are you aware of any collateral valuation that

11    was given to you by Lehman after that time?

12    A    I would have to double-check the records, they may well

13    have given us a valuation on 9/12.

14    Q    Okay.  Any after that?

15    A    No.

16    Q    Okay.  And the -- is the collateral value that Lehman gave

17    you the same as the replacement cost for a terminated

18    transaction?

19    A    No, it's quite different, if you look to just the health

20    warning that Lehman's put on their own collateral on that paper

21    collateral call, it very explicitly talks about all the

22    differences between what the collateral call is or what the

23    mark to market is, and the actual prices in the market, so we

24    were -- the collateral we were -- the presses we were using,

25    you know, this concept of an exit price where we could have
```

Page 179

1    monetized the portfolio, which is very different from where we

2    could have actually repurchased the portfolio.

3         If you think about it on the week before we were talking

4    about what was the portfolio worth, what could we sell it for.

5    But on the day when we had to replace the transactions it was

6    the reverse, it was what would someone sell us, what could we

7    buy the portfolio for, how much would it cost us to buy the

8    portfolio.

9    Q    Okay.  So let's move to September 15th, and I'll take an

10   example.  Are you aware that QVT had PCDS positions with LBSF

11   on Santander in there?

12   A    Yes.

13             MS. SAWYER:  Objection, beyond the scope of cross.

14             MR. TRACEY:  I'm pursuing exactly the point that Ms.

15   Sawyer pursued.

16             THE COURT:  I think what Mr. Tracey is doing is

17   leading up to something by using an example of a particular

18   position.  Is that --

19             MR. TRACEY:  That's precisely right.

20             THE COURT:  Okay.

21             MS. SAWYER:  Okay.

22             THE COURT:  Still objection?

23             MS. SAWYER:  We'll see where it goes.

24             THE COURT:  Okay.  Go ahead.

25   BY MR. TRACEY:

Page 180

1    Q    Okay.  So on September 15th, what happened to that

2    Santander and their PCDS?

3              THE COURT:  So I can tell that they're still

4    objecting.

5              MS. SAWYER:  We just haven't stood up yet.

6              THE COURT:  Even though their mouths aren't moving.

7    And I think the point is that it sounds as if you are precisely

8    asking literally what happened to that Santander position and

9    that was not part of -- that's beyond the scope.

10             MR. TRACEY:  But that's not what I'm doing, Your

11   Honor.

12             THE COURT:  I know that's not what you're doing.  So

13   I think we just have to give Mr. Tracey a little bit of margin

14   here, so to speak, and I'm going to assume that you're going to

15   connect it up to the larger issues relating to the valuation of

16   PCDS.

17             MR. TRACEY:  Absolutely, Your Honor, and I'm trying

18   to use an example to make it clear, and then I will tie it to

19   the exact questioning that Ms. Sawyer asked.

20             MS. SAWYER:  Well, see where it goes, but to the

21   extent it's tied up with valuation of PCDS or something like

22   that, that's certainly beyond the scope of my cross as well.

23             MR. TRACEY:  I'm just using a PCDS as an example, so

24   that we can understand the difference between a collateral mark

25   and replacement value and what happened to the marking process

Page 181

1    from September 15th to September 23rd, that's what we're trying

2    to do here.  And that's important information for this Court to

3    understand.

4              THE COURT:  All right.  So let's see where it goes

5    and then you can renew your objection and/or take it up on

6    redirect.  All right.  Go ahead, please.

7    BY MR. TRACEY:

8    Q    Just to be clear, I'm talking about the Santander PCDS,

9    just as an example of a position --

10   A    Okay.

11   Q    -- opposite to LBSF.

12   A    Okay.

13   Q    What happened to that position on September 15th?

14   A    It was terminated.

15   Q    Okay.  So there was no position adverse to LBSF as of

16   September 15th in that Santander proceedings; is that correct?

17   A    It was closed out, terminated on September the 15th, yes.

18   Q    Okay.  And did QVT do anything to try to update its marks

19   in its books with respect to that example of a Santander PCDS

20   that was terminated on September 15th?

21   A    No.

22   Q    And would it be normal in the course of business to update

23   any valuations for a terminated position?

24   A    No.

25   Q    So let's take September 16th, sample PCDS with Santander,

Page 182

1    was there any effort to update the valuation in that terminated

2    transaction on September 16th?

3    A    No.

4    Q    So can you tell anything, anything at all about the value

5    of the positions with Lehman based on marks on September 16th?

6    A    No.

7    Q    You can't -- can you tell anything about a replacement

8    value from those marks?

9    A    No.

10   Q    Can you even tell anything about the mid-mark on September

11   16th?

12   A    Before September 16th?

13   Q    Yeah.

14   A    No.

15   Q    September 17th?

16   A    No.

17   Q    18th?

18   A    Again, no.

19   Q    All the way up to the 23rd?

20   A    All no.

21   Q    And if you looked in the books and records of QVT, where

22   would you look for replacement value of the Lehman marks on

23   September 16th?

24   A    Trying to understand your question.  If we were trying to

25   estimate, we would look into the side pockets.

Page 183

1   Q     But is there anything in the marks on September 16th on

2   the Tiki system that shows you what the replacement value would

3   be for that Santander PCDS on September 16th?

4   A     No, not at all.

5   Q     Or on September 15th?

6   A     No.

7   Q     And I think you've testified to this before, but was there

8   any value placed on the Lehman claim in the books and records

9   of QVT at any time in September?

10  A     No.

11  Q     So you couldn't find that in the books and records, could

12  you?

13  A     It wasn't there.

14  Q     Ms. Sawyer asked you some questions about the disclosure

15  to investors.  I'd like you to look at Exhibit 5254.

16  A     The annual financial statements, yes.

17  Q     Correct.

18  A     Yeah.

19  Q     I'd like to direct your attention to the passage at the

20  bottom of page 51.  And I think, do you recall Ms. Sawyer

21  reading to you the section beginning "the net value of these

22  derivative contracts"?

23  A     Yes, I do.

24  Q     And was that an accurate statement at the time?

25  A     It's true.

Page 184

1    Q    Including the part that says, "The funds did not have

2    sufficient collateral to cover the replacement cost and mark to

3    market gains in respect to such derivative positions, resulting

4    from their rapid increase in value, following Lehman's

5    failure"?

6    A    That's also a true statement.

7    Q    Let me direct your attention to page 52 of Exhibit 5254.

8    A    Yes.

9    Q    And the -- would you read to yourself the first paragraph

10   on that page?

11   A    Yes.

12   Q    And was that a disclosure to your investors relating to

13   the Lehman claims?

14   A    Yes.

15   Q    Were you involved in preparing these financial statements

16   and these notes?

17   A    Yes.

18   Q    And did you work with PWC to make sure that they were

19   comfortable with the notes and financial statements?

20   A    I did, yes.

21   Q    And did they -- were they comfortable with that disclosure

22   to the investors?

23   A    Yes.

24   Q    Did they approve it?

25   A    Yes.

Page 185

1    Q    Did they give you an unqualified opinion?

2    A    Yes.

3    Q    I want to turn to the interest in the side pocket that Ms.

4    Sawyer talked to you about --

5    A    Uh-huh.

6    Q    -- Exhibit 5965.

7    A    Yes.

8    Q    I'm having a hard time reading it, but can you tell me the

9    total direct and indirect interest of all of the insiders

10   listed there in the Lehman side pocket?

11   A    As of 2015.

12   Q    As of 2015.

13   A    It would be the sum of the 2015 direct column and 2015, so

14   for all QVT people, it's -- looking for just the names listed

15   or the total QVT people, I'm sorry?

16   Q    Any QVT people, is it --

17   A    Any QVT people, the direct is 9.68 I think it says there

18   and the indirect is 8.13, so what's that, approximately 17

19   percent, 18 percent.

20   Q    Okay.  And so approximately 83 percent of the side pocket

21   is owned by non-QVT investors?

22   A    Yes.

23   Q    And I'd just like to clarify the questions that you were

24   asked about the carried interest.

25   A    Uh-huh.

Page 186

```
 1   Q    I think you were asking questions about what if a payment
 2   were made from Lehman as a result of this claim.
 3   A    Yes.
 4   Q    And if that payment, if it were made, go into the -- what
 5   is now the CSI, the consolidated --
 6   A    Yes.
 7   Q    -- what do you call it, the CSI?
 8   A    Consolidated Speculative Interest I think it's --
 9   Q    Right.  And that's the side pocket of side pockets, right?
10   A    Yes.
11   Q    So it has a lot of things other than the Lehman claims.
12   A    I don't know how much is left in there now, there's a
13   number of things that have fallen off, but it does, I believe,
14   have positions in it.
15   Q    Okay.  And if there is a payment to the CSI, do I
16   understand correctly that the management company may have a
17   right to a carried interest in those CSI profits.
18   A    It may have, yes.
19   Q    Okay.  But the right of the general partner to receive
20   that carried interest depends on the performance of all of the
21   investments in the CSI, not just the Lehman claims.
22   A    Just the portfolio.
23             THE COURT:  Just --
24             MS. SAWYER:  I'm just going --
25             THE COURT:  Ms. Sawyer.
```

Page 187

1          MS. SAWYER:  -- to object, there's a lot of leading

2     going on.

3          MR. TRACEY:  I am leading, but I'm just trying to

4     clarify.  I can ask more general questions.

5          THE COURT:  Well, I think the question you just asked

6     is a better form of a question that I attempted to ask.

7          MR. TRACEY:  That's what I was trying to do, Your

8     Honor, but not to --

9          THE COURT:  You were trying to.  I think since we are

10    just trying to clarify the prior questions, a little bit of

11    leading I don't have a problem with, so do you remember the

12    question, Mr. Sale?

13         THE WITNESS:  Can you repeat it, just to make sure?

14         MR. TRACEY:  Sure.

15    BY MR. TRACEY:

16    Q    Does the right of the GP to receive a carried interest

17    depend on the performance of all of the positions in the CSI?

18    A    Yes.

19    Q    And if there were a -- again a hypothetical a $100 gain in

20    the Lehman claims, but a $100 loss in the performance of other

21    positions, could that negate the right of the GP to receive the

22    carried interest?

23    A    Yes, because the investors got zero return.  The investors

24    had zero return.

25         MR. TRACEY:  Can you give me a moment, Your Honor?

Page 188

1            THE COURT:  Sure.

2       (Pause)

3            MR. TRACEY:  I have nothing further, thank you.

4            THE COURT:  All right.  Thank you.

5            MS. SAWYER:  I don't have any further questions.

6            THE COURT:  All right.  Thank you very much, Mr.

7   Sale, you can step down.

8            THE WITNESS:  Thank you.

9            THE COURT:  All right.  Shall we take a few minutes

10  to talk about tomorrow and anything else that you might want to

11  talk about?

12           MS. SAWYER:  Yes.  I've also been reminded that we

13  have transcripts from Tuesday to hand out --

14           THE COURT:  Sure, thank you.

15           MS. SAWYER:  -- that I should've probably done

16  earlier.

17           THE COURT:  Okay.  And so tomorrow is Friday the 17th

18  and we're scheduled to have Mr. Newman.

19           MR. TRACEY:  Yes, Your Honor.

20           THE COURT:  And I have a 9:30 tomorrow morning which

21  I should be able to be done by 10 o'clock, and then Mr. Newman

22  has a -- has to conclude by 2, correct?

23           MR. TRACEY:  Yes, Your Honor.

24           THE COURT:  So is that going to be -- are we going to

25  be stressed to get that done in terms of having a very short

Page 189

1    lunch, just to plan the day.

2            MR. TRACEY:  We think about two hours for direct.

3            THE COURT:  Okay.

4            MS. SAWYER:  We may be stressed for time if we only

5    have four hours.

6            THE COURT:  Okay.  And the 2 o'clock is a hard stop?

7    Yes?

8            MR. TRACEY:  It's his hard stop.  We can pursue it

9    again today and find out, but his lawyer -- we've been in touch

10   with his lawyer and he's the one who's told us.

11           THE COURT:  Is he not local?

12           MS. KELLER:  He is, but he's leaving town with his

13   family for a vacation.

14           THE COURT:  I see, for President's week, I see.

15   Okay.  Well I can't really offer another solution, I have an

16   emergency DIP financing hearing tomorrow morning, so I can't

17   push them off.  So if it doesn't kill you, we can take a 20

18   minute lunchbreak, we'll just do the best we can.

19           And if he does have, you know, a half hour of

20   flexibility just to -- I mean, the 2 o'clock is an excess of

21   caution time and we could get a little bit of leeway.  So we'll

22   just have to deal with it.

23           All right.  And then anything else?  Ms. Keller?

24           MS. KELLER:  Your Honor, just looking down the road a

25   little bit.

Page 190

1              THE COURT:  Yes, sure.

2              MS. KELLER:  We would like to get a sense of the

3     order or at least the identity of the witnesses.

4              THE COURT:  Well, let me not get that far down the

5     road.  Let me go down the road to the 27th where I still have

6     to hear back from you regarding Mr. Dezzazio (ph).

7              MS. KELLER:  I believe that we have reached an

8     agreement on the submission of his deposition in lieu of

9     testimony.

10             THE COURT:  In lieu of his testimony.

11             MS. KELLER:  Yes.

12             MS. SAWYER:  I think that that's true.

13             THE COURT:  Okay.

14             MS. SAWYER:  And so, yes --

15             THE COURT:  All right.

16             MS. SAWYER:  -- I think that's been resolved.

17             THE COURT:  So that means that on the 27th, we will

18    be having Mr. Gold and Mr. Fox.

19             MS. KELLER:  And who?  No, Lehman will be calling Mr.

20    Fox on their case.

21             THE COURT:  Okay.  On the schedule that I have for

22    Mr. Tracey it indicates Mr. Fox on that day, is that incorrect?

23             MR. TRACEY:  We reached agreement with Lehman

24    to --

25             THE COURT:  Go out of order?

Page 191

```
 1              MR. TRACEY:  -- to wait for them to call Mr. Fox and

 2      then we'll cross-examine.

 3              THE COURT:  I see.  So on the 27th then it'll be only

 4      Mr. Gold.

 5              MR. TRACEY:  Yes.

 6              THE COURT:  Okay.

 7              MR. TRACEY:  And, oh, we may also need a witness from

 8      Bloomberg, the interest rate swap issue.

 9              MS. SAWYER:  I think that's perhaps something we

10      should discuss.

11              MR. TRACEY:  Okay.

12              MS. SAWYER:  I'm not sure what the issue is, but it

13      sounds like something we should potentially guess.

14              THE COURT:  Okay.  So just in terms of planning, that

15      day is only a half day, and I have to be on a 2 p.m. train, so

16      that that means for my sanity, I need a hard stop at like

17      12:30.

18              MR. TRACEY:  So we'll consult with Lehman about how

19      long we expect Mr. Gold to take, and if that's not going to

20      work we'll do something else.

21              MS. SAWYER:  What do you mean do something else?

22              MR. TAMBE:  Who is the next for you?

23              MS. SAWYER:  Nicholas.

24              THE COURT:  On the 28th it says McDougal and

25      Nicholas.
```

Page 192

1          MR. TAMBE:  I'm fine with --

2          THE COURT:  Okay.  So all right you'll --

3          MR. TRACEY:  We'll consult and we'll supply a new

4     schedule, hopefully tomorrow.

5          THE COURT:  Okay.  Whenever, that's fine.  Okay.  So,

6     Ms. Keller, and you wanted to go into Lehman's case in chief.

7          MS. KELLER:  Just if we could get a heads-up on the

8     identity and order of their witnesses.

9          MS. SAWYER:  I think by some time mid-week, this

10    coming week we should be able to do that.  We need to have a

11    pretty good sense as to when QVT's case will finish, just given

12    our witnesses availabilities to try to -- and we have a lot of

13    -- we have a week, but we also have an isolated days, so trying

14    to figure out what makes the most sense.

15         THE COURT:  Right.

16         MS. SAWYER:  So I think by the middle of next week we

17    should be able to have something for QVT.

18         THE COURT:  Is that all right?

19         MS. KELLER:  The middle of next week, Your Honor?

20         THE COURT:  Yeah.

21         MS. KELLER:  Okay.  And one last thing on the last

22    schedule that we handed out, we had moved Professor Gold in to

23    March 20th for direct and rebuttal, rather than bring him back

24    from London twice to testify in court.  And then Mr. Henderson,

25    Lehman's expert can go on after him, but that I've not heard

Page 193

1    back from them as to whether that's acceptable.

2              MR. TAMBE:  What am I supposed to say.

3              MS. SAWYER:  I don't think we knew this was an issue,

4    so.

5              MR. TAMBE:  In principle, we're fine with Professor

6    Gold and if he is to testify, to testify around the 20th and --

7              THE COURT:  I think Ms. Keller's point is that direct

8    and rebuttal at the same time and not have to -- well, it's

9    already -- yeah.

10             MR. TAMBE:  That should be fine.

11             MS. KELLER:  Thank you.

12             THE COURT:  Okay.  That sounds like it's okay.

13             MR. TAMBE:  Yes.

14             THE COURT:  Okay.  I think we're done for the day.

15   Thank you very much, we'll see you in the morning.

16        (Whereupon, these proceedings were concluded at 5:23 p.m.)

17

18

19

20

21

22

23

24

25

Page 194

1

2                          I N D E X

3

4                        T E S T I M O N Y

5    WITNESS                EXAM BY              PAGE      LINE

6    Yi Cen                 Mr. Tracey

7    Yi Cen                 Mr. Andreoli

8    Yi Cen                 Mr. Tracey

9    Julian Sale            Mr. Tracey

10   Julian Sale            Ms. Sawyer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 195

1                       C E R T I F I C A T I O N

2

3     We, Lisa Beck, Jamie Gallagher and Sheila Orms certify that the

4     foregoing transcript is a true and accurate record of the

5     proceedings.

6     Lisa Beck
      Digitally signed by Lisa Beck
      DN: cn=Lisa Beck, o=Veritext, ou,
      email=digital@veritext.com, c=US
7     _____   Date: 2017.02.20 13:37:20 -05'00'

8     Lisa Beck (CET**D 486)

9     AAERT Certified Electronic Transcriber

10    Dawn South
      Digitally signed by Dawn South
      DN: cn=Dawn South, o=Veritext, ou,
      email=digital@veritext.com, c=US
11    _____   Date: 2017.02.20 13:37:57 -05'00'

12    Dawn South (CET**D 408)

13    Shelia G. Orms
      Digitally signed by Shelia G. Orms
      DN: cn=Shelia G. Orms, o=Veritext,
      ou, email=digital@veritext.com, c=US
14    _____   Date: 2017.02.20 13:40:21 -05'00'

15    Sheila Orms

16

17

18

19    Veritext Legal Solutions

20    330 Old Country Road

21    Suite 300

22    Mineola, NY 11501

23

24    Date:  February 16, 2017

25