WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard L. Levine
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

------------------------------------------------------------------x

**REPLY TO RESPONSE TO, AND IN**
**FURTHER SUPPORT OF, PLAN ADMINISTRATOR'S**
**FIVE HUNDRED NINETEENTH OMNIBUS OBJECTION TO CLAIMS**

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. files this reply to Maverick's response [ECF No.

53435] (the "Response") to, and in further support of, the Plan Administrator's Five Hundred

Nineteenth Omnibus Objection to Claims (No Liability Claims) [ECF No. 53107] (the

"Objection"),[1] and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.    Maverick seeks to recover many millions of dollars from LBHI as a

guarantor even though Maverick admits that Maverick was a net debtor to the purported primary

"obligor," LBIE, *as of the date of* (i) Maverick's settlement with LBIE and (ii) the termination of

the applicable "securities contracts" and "master netting agreements" with LBIE (for purposes of

Bankruptcy Code Section 562(a)) pursuant to that settlement (the "Settlement Date").  In fact,

Maverick made a cash payment to LBIE of $30 million under that settlement.

2.    Because Maverick suffered no damages as of when damages are measured

– as they must be – on the Settlement Date, the Court must dismiss the Maverick Claims on the

basis of section 562(a) alone.  Maverick's illogical argument that its damages should be

measured on *an un-netted basis* (*i.e.*, measured according to the value of its long positions

without reference to any of its offsetting or other short positions) does not overcome LBHI's

argument under section 562(a).  This is because Maverick concedes that, by reason of the setoff

effectuated through its settlement with LBIE, Maverick recovered the full value of its long

positions as of the Settlement Date.

3.    Further, Maverick's current attempt to decouple its long positions from

any offsetting short positions is not only contrary to the Prime Brokerage Documents and the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Objection or the Plan.

2

terms of the Maverick Claims themselves, but it is contrary to all commercial reality. Outside of bankruptcy, when a brokerage customer maintains both a long and short position in the same security, the customer's economic exposure is measured on a net basis. Maverick is arguing, however, that it should be entitled to collect from LBHI up to the value of its long positions notwithstanding any offsetting or other short positions. This nonsensical position, if accepted, would mean that Maverick could recover more from LBIE and LBHI in their insolvency proceedings than Maverick could have recovered from LBIE and LBHI had they never commenced such proceedings. Maverick's attempt to collect such a windfall at the expense of other unsecured creditors should not be countenanced.

4.      In sum, as demonstrated in the Objection and below, the Maverick Claims are entirely devoid of merit because, among many other reasons, Maverick was fully satisfied by LBIE, so there can be no guarantor liability on the part of LBHI.

## THE UNSUCCESSFUL MEDIATION

5.      On September 19, 2017, following the service of the Objection and the Response, LBHI filed a Notice of ADR Procedures [ECF No. 53677] commencing an alternative dispute resolution process for the Maverick Claims in the hopes that the parties could reach a consensual resolution. On December 19, 2016, LBHI and Maverick attended an all-day mediation. Although the mediation session ended without a resolution, the mediation was adjourned to allow the parties additional time to attempt to reach a settlement. On January 30, 2017, the Mediator declared the mediation terminated.

WEIL:\96022686\13\58399.0011

## REPLY

**I.    The Maverick Claims Should Be Disallowed And Expunged**

**A.    The Maverick Claims Have Been Satisfied In Full**

6.    In the Objection, LBHI demonstrated that: (i) Maverick terminated its PB Agreement and other Prime Brokerage Documents with LBIE on the Settlement Date (¶ 25); (ii) the relevant date for measuring Maverick's damages under section 562(a) of the Bankruptcy Code was, therefore, the Settlement Date (¶¶ 23-25); (iii) the Maverick Claims have been satisfied in full because Maverick received full credit for the value of its securities and cash as of the Settlement Date under Maverick's settlement with LBIE (¶ 26); and, fatally, (iv) Maverick has conceded that it recovered the full value of its assets when measured as of the Settlement Date (¶¶ 26-27).[2]

7.    In the Response, Maverick asserts a number of arguments in an attempt to avoid the damages measurement date dictated by section 562(a).  As shown below, none of its arguments withstands scrutiny.

**i.    *The PB Agreements Are Securities Contracts And Master Netting Agreements***

8.    Maverick first contends that its claims are not subject to section 562(a) because they are not based on "securities contracts"; more specifically, Maverick argues that they are not based on securities contract-aspects of the Prime Brokerage Documents, which, according to Maverick, would be only those aspects that deal with the "purchase, sale, or loan" of securities.  (Response ¶ 41.)  Rather, Maverick argues, its claims are based on "custodial" obligations of LBIE under the PB Agreement, which should fall outside section 562(a).  (*Id.*)

---

[2] That Maverick can have no guarantee claims against LBHI is further demonstrated by Maverick's payment of $30 million to LBIE, the purported primary "obligor", under its settlement with LBIE.

4

9.    Notwithstanding its other numerous infirmities, this argument fails because it ignores the undisputed fact that the PB Agreement, by its own express terms, also is a "master netting agreement," and, therefore, subject to section 562(a) for that reason as well. (*See* Objection ¶ 24; Estimation Obj. at Ex. B (PB Agreement) ¶ 4.) Maverick never addresses this point in the Response.

10.    Maverick's "securities contract" avoidance argument also is wrong for a number of other reasons.

11.    First, Maverick's surgical view of what constitutes a "securities contract" is contrary to the Second Circuit's determination that the Bankruptcy Code "defines 'securities contract' with extraordinary breadth." *See Picard v. Ida Fishman Revocable Tr.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 773 F.3d 411, 417 (2d Cir. 2014) ("*Madoff*"). Indeed, under the Bankruptcy Code, a "securities contract" is not limited to contracts for the "purchase, sale, or loan of securities," as argued by Maverick. (*See* Response ¶ 41.) Section 741(7)(A) contains an expansive definition of the term. Maverick relies only on subsection (i) of the definition and ignores the ten other subsections, most of which are applicable to the Prime Brokerage Documents.[3]

---

[3] *See* 11 U.S.C. § 741(7) (defining "securities contract" to include: (i) a contract for the purchase, sale, or loan of a security . . . including any repurchase or reverse repurchase transaction on any such security . . . (iv) any margin loan; (v) any extension of credit for the clearance or settlement of securities transactions . . . (vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph . . . (viii) any combination of the agreements or transactions referred to in this subparagraph . . . (ix) any option to enter into any agreement or transaction referred to in this subparagraph . . . (x) a master agreement that provides for an agreement or transaction referred to in clause (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), or (ix), together with all supplements to any such master agreement, without regard to whether the master agreement provides for an agreement or transaction that is not a securities contract under this subparagraph, except that such master agreement shall be considered to be a securities contract under this subparagraph only with respect to each agreement or transaction under such master agreement that is referred to in clause (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), or (ix); or (xi) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this subparagraph, including any guarantee or reimbursement obligation by or to a stockbroker, securities clearing agency, financial institution, or financial participant in connection with any agreement or transaction referred to in this subparagraph, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562").

5

12.    <u>Second</u>, Maverick's argument that a "securities contract" must govern the actual "purchase, sale, or loan" of a security is inconsistent with both the plain terms of the statutory definition (*see supra* fn. 3) and the Second Circuit's holding in *Madoff*, which found that brokerage account agreements – similar in function to the Prime Brokerage Documents – were "securities contracts" because they were agreements by which the broker-dealer <u>could</u> "acquire or dispose of securities" on behalf of customers and that "[w]ere it not for the Account Documents, there would be no basis for a customer to make deposits or request withdrawals." *Madoff*, 773 F.3d at 418-19.   On such basis, the Second Circuit found that the account agreements were contracts for the "purchase, sale, or loan of a security," even though no actual purchases or sales had ever been made. *Id.*   More importantly, the court found that the account agreements were (i) "master agreements" providing for the "purchase, sale, or loan of a security" under section 741(7)(A)(x), because the account agreements "establish[ed] the mutual undertaking[] between two counterparties that anticipat[ed] executing future securities transaction[s]", and (ii) a "reimbursement obligation by or to a stockbroker" under section 741(7)(A)(xi) because the "Account Documents obligate[d] [the broker] to reimburse its customers upon a request for withdrawal." *Id.* at 419.   The Second Circuit's analysis of the *Madoff* account agreements applies with full force to the Prime Brokerage Documents which govern the entire relationship between Maverick and LBIE.

13.    <u>Third</u>, Maverick's argument that LBIE's "custodial obligations" under the Prime Brokerage Documents are *severable* from its obligations regarding the purchase and sale of securities likewise fails in light of *Madoff*, which held that an agreement merely conferring an obligation to reimburse a customer after a request for a withdrawal – a request to return cash or securities – constitutes a "securities contract." *Id.*   Thus, the very portion of the contract that

6

Maverick seeks to sever is itself a "securities contract." This distinguishes the Prime Brokerage

Documents from the contract at issue in *Calyon New York Branch v. American Home Mortgage.*

*Corp.* (*In re American Home Mortgage, Inc.*), 379 B.R. 503, 520-23 (Bankr. D. Del 2008). In

that case, the bankruptcy court held that the portion of the parties' agreement providing for the

*servicing of mortgage loans* was (i) severable under state law from the portion of the contract

which was a securities contract and (ii) not itself a securities contract; here, the portion of the PB

Agreement that Maverick seeks to sever is a securities contract itself. (Moreover, as discussed

above, the PB Agreement is a master netting agreement.)

14.    <u>Fourth</u>, Maverick's severability argument (with respect to sections of the

PB Agreement) ignores LBHI's argument that the Prime Brokerage Guaranty itself is a separate

"securities contract" and a "master netting agreement" pursuant to sections 741(7)(A)(xi) and

101(38A)(A) of the Bankruptcy Code, respectively. (*See* Objection ¶ 24.) Section 741(7)(A)(xi)

defines the term "securities contract" as:

> any security agreement or arrangement or other credit enhancement ***related to*** any
> agreement or transaction referred to in this subparagraph, ***including any***
> ***guarantee*** or reimbursement obligation by or to a stockbroker, securities clearing
> agency, financial institution, or financial participant ***in connection with any***
> ***agreement or transaction referred to in this subparagraph***, but not to exceed the
> damages in connection with any such agreement or transaction, measured in
> accordance with section 562. (Emphasis added.)

Section 101(38A)(A) of the Bankruptcy Code defines the term "master netting agreement" as:

> an agreement providing for the exercise of rights, including rights of netting,
> setoff, liquidation, termination, acceleration, or close out, under or in connection
> with one or more contracts that are described in any one or more of paragraphs (1)
> through (5) of section 561(a), or ***any security agreement or arrangement or other***
> ***credit enhancement related to one or more of the foregoing, including any***
> ***guarantee or reimbursement obligation related to 1 or more of the foregoing.***
> (Emphasis added.)

Regardless of whether certain obligations arising under the PB Agreement are severable, section

562(a) applies because each of the Maverick Claims is based upon a guaranty of the PB

Agreement and there can be no question that such guaranty qualifies as a "security agreement or arrangement or other credit enhancement *related to*" a "securities contract" or "master netting agreement."

> **ii.** ***The Prime Brokerage Guarantee Terminated On The Settlement Date, And Section 562(a) Would Apply Even If It Had Not Been Terminated***

15.     Maverick also seeks to avoid the application of section 562(a) by arguing that the Prime Brokerage Guarantee never was terminated. (Response ¶ 38.) This argument fails for two reasons: (i) Maverick terminated the Prime Brokerage Guarantee by entering into its Settlement Agreement with LBIE and (ii) section 562(a) would apply even if the Prime Brokerage Guarantee had not been terminated.

16.     As to whether the Prime Brokerage Guarantee was terminated on the Settlement Date, the guarantee provided in relevant part:

> This Guarantee will remain in full force and effect until the first to occur of . . .
> (b) **the <u>Obligations</u> <u>are</u> <u>no</u> <u>longer</u> <u>in</u> <u>existence</u>**. (Estimation Obj. at Ex. C (Prime Brokerage Guarantee) at 1 (emphasis added).)

The Prime Brokerage Guarantee defines the term "Obligations" as "all obligation[s] under the Agreements" and defines the term "Agreements" to include the PB Agreements, the GMSLAs, the Letter Agreement among LBIE, LBI and Maverick, and the MLAs (*i.e.*, the Prime Brokerage Documents). (*Id.*)

17.     Pursuant to the terms of the LBIE/Maverick Settlement Agreement, all "Obligations" under the Prime Brokerage Documents were, in the words of the guaranty, "no longer in existence" from and after the Settlement Date. Specifically, the Settlement Agreement provides:

> (a) The Relevant Agreements and all transactions thereunder (to the extent that they have not previously been terminated) **are terminated** as between LBIE and each Maverick Entity . . . .

8

> (b) this Deed shall be in full and final settlement of all rights, obligations, liabilities and claims (whether present or future, whether actual, prospective or contingent and whether as creditor or by way of proprietary claim by statute, at common law or in equity, howsoever arising and whether or not presently known or unknown) ("Claims") which LBIE and each Maverick Entity may have against one another, including but not limited to, Claims against each other under or relating to the Relevant Agreements and all transactions thereunder . . . ."

(Estimation Obj. at Ex. E (Settlement Agreement ) §§ 2.1(a), (b); *id*. Schedule 2 (defining "Relevant Agreements" to include each applicable PB Agreement, GMSLA, and MLA)).) The Settlement Agreement thus extinguished any obligations of LBIE (and, indeed, Maverick owed and paid LBIE $30 million). The Prime Brokerage Guarantee, by its very terms, thereby was terminated because "the Obligations [were] no longer in existence."

18.    But, even assuming, *arguendo*, that the Prime Brokerage Guarantee was not terminated as a result of the Settlement Agreement, section 562(a) still would establish the measurement date for the Maverick Claims because nothing in section 562(a) requires a *guarantee* to be terminated for such section to apply. As the title of section 562 states, it governs the measurement of damages "in connection with" (among other things) the termination of securities contracts and master netting agreements. Certainly, damages under a guarantee constitute damages "in connection with" such an agreement; this is true regardless of whether the guarantee itself has been terminated. Maverick cites no case that would require an alternate finding.

19.    Further, Maverick's reading of section 562(a) (Response ¶ 38) would create an unsupportable two-tiered system of measuring damages. Under this hypothetical system, primary claims would be measured in accordance with section 562 where a covered contract was rejected, terminated, accelerated, or liquidated, but related guarantee claims would be measured at a different date. Such a "two sets of books" system is unsupported by anything

WEIL:\96022686\13\58399.0011

in the Bankruptcy Code and is incompatible with the nature of guarantees, which are to provide assurance that the liability of the principal obligor is satisfied.

### iii.    *The PB Agreements Were Terminated In All Respects, Not Only As To LBIE*

20.    Maverick next asserts that section 562(a) does not apply to the measurement of the Maverick Claims because the Prime Brokerage Documents were terminated only as to LBIE, not as to LBHI.  (Response ¶¶ 39-40.)  This argument fails for several reasons.

21.    <u>First</u>, Maverick's contention that the Prime Brokerage Documents were terminated only as to LBIE but not LBHI is illogical given that all substantive obligations arising under the Prime Brokerage Documents were between Maverick and LBIE (and/or LBI), as opposed to LBHI – which was <u>not</u> a brokerage firm and could not perform brokerage functions.

22.    <u>Second</u>, even if the Prime Brokerage Documents were terminated only with respect to LBIE, the Maverick Claims seek damages based on *LBIE's* obligations under the Prime Brokerage Documents.

23.    <u>Third</u>, if, as now suggested by Maverick, LBHI itself owed obligations under the Prime Brokerage Documents (which it did not and could not as shown below), then the Prime Brokerage Documents were executory as between LBHI and Maverick and were rejected on March 12, 2012 (the "Effective Date" of the Plan).  *See* Plan § 11.1 (providing that executory contracts not expressly assumed were rejected on the Effective Date).  Under section 562, the date for measuring damages would be the rejection date – *i.e.*, March 12, 2012.  Thus, even if the Settlement Agreement did not terminate the Prime Brokerage Documents as to LBHI, Maverick's reliance on the Petition Date as the proper valuation date has no basis in law.

### iv.    *Under Section 562(a), Maverick Is Not Entitled To Any Recovery*

24.    After making the foregoing arguments that section 562 should not apply, Maverick concedes that, if section 562 does apply, it controls the valuation of the Maverick

10

Claims. (Response ¶ 42.) This concession and section 562 render damage calculations based on the Petition Date entirely irrelevant. Maverick nevertheless uses its Petition Date valuation of $118.1 million as the starting point for its damage calculation: Maverick credits its recovery from LBIE of $101.9 million as of the Settlement Date and states it should be permitted to collect up to $16.2 million from LBHI for the decline in value of its assets from the Petition Date to the Settlement Date based on state law, citing *Ivanhoe Building & Loan Ass'n of Newark, New Jersey v. Orr*, 295 U.S. 243, 246-47 (1935). (Response ¶ 25.) Maverick is wrong for two principal reasons.

25.     First, *Ivanhoe* and its progeny stand for the proposition that a creditor may assert the full amount of its claim against a bankrupt guarantor, notwithstanding the creditor's recovery of some but not all of the amount owed from the primary obligor. Critically, such case law does not allow the creditor to recover <u>more</u> than the value of its claim. Here, the valuation of the Maverick Claims is governed by section 562(a) and, as of such date, Maverick was made whole by LBIE. 11 U.S.C. § 562(a). *See generally Bank of Montreal v. Am. HomePatient, Inc. (In re Am. Home Patient, Inc.)*, 414 F.3d 614, 620 (6th Cir. 2005), *reh'g & reh'g en banc denied* (Oct. 3, 2005) (rejecting argument that New York law governs the determination of damages because "[r]esort to state law is appropriate and/or necessary when a gap exists in federal bankruptcy law[,] . . . [but when the Code's] specific provisions leave no gap . . . [the specific Code provision] control[s] any conflicting provisions of state law") (internal quotation marks omitted). As established above, under section 562, the Maverick Claims are valued at $101.9 million and Maverick was made whole by LBIE, so, as a matter of bankruptcy law, Maverick has no rights against LBHI under *Ivanhoe*.

WEIL:\96022686\13\58399.0011

26.    <u>Second</u>, Maverick's argument that it would be permitted to collect more than the $101.9 million amount of its claims is contrary to the Court-approved treatment afforded to guarantee claims under the Plan.  Section 8.13 of the Plan, titled "Maximum Distribution," provides in pertinent part:

> (a) An . . . Allowed Guarantee Claim that receives Distributions . . . that combined with Distributions or other consideration provided on the corresponding Primary Claim . . . equal the Allowed amount of such Guarantee Claim (or such amount as may be agreed to by a holder and the Debtors) shall . . . be deemed satisfied in full as to such . . . Allowed Guarantee Claim against the applicable Debtor.

> (b) In no event shall . . . an Allowed Guarantee Claim receive Distributions . . . that combined with Distributions or other consideration provided on the corresponding Primary Claim . . . are in excess of the Allowed amount of the Guarantee Claim (or such amount as may be agreed to by a holder and the Debtors).

In short, the Plan prohibits what Maverick seeks: a distribution on a guarantee claim when the holder already has received the full amount of such claim from the primary obligor.

**B.    As A Result Of Netting, Maverick Cannot Establish An Underlying Claim Against LBIE And LBHI Therefore Has No Liability As A Guarantor**

27.    As established in the Objection, Maverick failed to meet its burden of establishing even a *prima facie* guarantee claim, specifically, the existence of an amount owed by the primary obligor.  (*See* Objection ¶¶ 28-34.)  Quite simply, Maverick cannot establish a guarantee claim against LBHI when it cannot establish any unsatisfied obligations of LBIE.  As set forth in the Objection, Maverick admitted in its proofs of claim that netting was appropriate and sought in such claims the value of its long positions "less any amounts owed by Maverick in connection with the Prime Brokerage Documents."  (*See id.* ¶ 30; *see, e.g.*, Maverick Claims ¶ 3.)  In other words, Maverick (appropriately) asserted a guarantee claim for the *net* amount owed to it by LBIE (if any) and, it turned out, there was <u>nothing</u> <u>owed</u> <u>by</u> <u>LBIE</u> <u>on</u> <u>a</u> <u>net</u> <u>basis</u>. Specifically, after accounting for Maverick's obligations owing to LBIE, including what

12

Maverick owed LBIE based on short positions, Maverick <u>was</u> <u>a</u> <u>net</u> <u>debtor</u> <u>to</u> <u>LBIE</u> at the Settlement Date.

28.     In the Response and, notwithstanding the Confirmation Order's prohibition on claim amendments absent Court approval and the contrary language of the Maverick Claims, Maverick contends that its claims against LBIE should not be net with what it owed to LBIE. Maverick instead now contends it is entitled to a windfall recovery based solely on the value of its long positions – with no offset for its short positions or other obligations back to LBIE under the Prime Brokerage Documents. (Response ¶ 32).

29.     As noted above, such argument is entirely inconsistent with commercial reality. Such argument also should and does fail as a matter of law, whatever measurement date the Court determines should control. Indeed, Maverick's argument that "LBHI is . . . wrong that it could have invoked any right of setoff" because "New York law prohibits an absolute and unconditional guarantor from attempting to invoke setoff rights with respect to separate contracts to which it is not a party" (Response ¶ 35) entirely misconstrues LBHI's position: LBHI is not asserting a counterclaim or defense under the guarantee; rather, its point is that Maverick cannot establish any unpaid obligations <u>of LBIE</u> on a net basis as to which Maverick can look to LBHI as secondary obligor. Moreover, although the Prime Brokerage Guarantee was "absolute and unconditional," an unconditional guaranty does not waive a defense of setoff absent a specific disclaimer. *See Hack v. Stang*, 2015 WL 5139128, at *5 (S.D.N.Y. Sept. 1, 2015) ("The Court observes that promissory notes often contain 'absolute and unconditional' clauses barring setoffs, but that in every case found by the Court, those clauses <u>explicitly</u> disclaimed such setoffs") (emphasis in original). Here, there was no such disclaimer of setoff rights.[4]

---

[4] To the extent the Prime Brokerage Guarantee's silence with regard to set-off creates an inconsistency with LBIE's right to set-off under the PB Agreement, paragraph 32 of the PB Agreement provides that any inconsistency

WEIL:\96022686\13\58399.0011

30.     Further, the PB Agreements continued Lehman's rights under predecessor agreements between the parties.  (Estimation Obj. at Ex. B (PB Agreement) ¶ 32 ("The rights, remedies, benefits and protections afforded to each Lehman Brothers Entity under this Agreement and under any Contract you may have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that any Lehman Brothers Entity may have").)  LBIE was contractually entitled to netting under the predecessor Master Prime Brokerage Agreement.  (*See* Master Prime Brokerage Agreement, dated June 24, 1999 (attached hereto as Exhibit 1) ¶ 13.1(d).)[5]  Further, to the extent that the Maverick Claims rely on the S&P Letter (Estimation Obj. ¶ 5), that letter expressly entitles LBHI to "setoff, counterclaim, or withhold payment" "to the extent such right is provided to [LBIE] under the Borrower Agreement."  (Objection at Ex. C (S&P Letter at 1).)

31.     And contrary to Maverick's assertion (*see* Response ¶ 35), the fact that LBHI was not a party to the GMSLA and MLA is irrelevant to the setoff analysis because LBIE was a party to those agreements and was entitled to net obligations owing between the parties to determine its liability.  Because LBIE ultimately had no liability to Maverick under such agreements, LBHI can have no guarantor liability.  Indeed, as highlighted above, Maverick *conceded* in its proofs of claim that its claims against LBHI must be reduced by the amount Maverick owed to LBIE.

---

amongst the various contracts "be resolved in favor of the provision which affords Lehman Brothers with the maximum rights, remedies, benefits or protections." (Estimation Obj. at Ex. B (PB Agreement) ¶ 32.)

[5] "[A]n account shall be taken (as at the Termination Date) of what is due from each party to the other under this Agreement (on the basis that each party's claim against the other in respect of the delivery to it of securities or Equivalent Securities under this Agreement equals the Default Market Value thereof) and the sums due from one party shall be set off against the sums due from the other and only the balance of the account shall be payable (by the party having the claim valued at the lower amount)."

14

32.     Finally, Maverick's protestations that it was "unable to secure a setoff of the full amounts it was owed" by LBIE (Response ¶ 3) are based on Maverick's improper calculation of its claims as of the Petition Date.  The bottom line is that Maverick's assertion that it did not receive full satisfaction from LBIE is facially implausible given that Maverick admits that it made a $30 million cash payment to LBIE under the settlement.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("If the factual context renders respondents' claim implausible – if the claim is one that simply makes no economic sense – respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary"). [6]

### C.     Maverick Contractually Waived Any Right To Recover Its Claimed Losses

#### i.     *LBHI Is Not Precluded From Relying On Exculpation Provisions*

33.     Notwithstanding Section 562 and assuming, *arguendo*, that the Petition Date valuation was relevant to the calculation of Maverick's Claims, the Objection also established that Maverick's claim to $16.2 million in economic dollars from LBHI for the diminution in market value of its long positions between the Petition Date and the Settlement Date (the "Diminution Damages") is prohibited by the broad exculpatory provisions of the PB Agreements.  These provisions protect both LBIE and LBHI from all liability for "any loss caused, directly or indirectly, by . . . conditions beyond Lehman Brothers' control" (Objection ¶ 36; Estimation Obj. at Ex. B (PB Agreement) ¶28) and from all liability "in connection with the execution, . . . purchasing or selling of securities, . . . or other action, except for gross

---

[6] Maverick states that the amounts owing between LBIE and Maverick must be examined on a fund-by-fund basis on the Petition Date (Response ¶ 35 & n.21), but both the Prime Brokerage Guarantee (Prime Brokerage Guarantee at 1) and the Settlement Agreement between LBIE and Maverick (Settlement Agreement at Background (C), § 1.1, Schedule 2) treat these amounts at issue on an aggregate basis.

15

negligence or willful misconduct on Lehman Brothers' part."  (Objection ¶ 36; Estimation Obj. at Ex. B (PB Agreement) ¶ 20.)

34.    As set forth in the Objection, this Court previously has held that Diminution Damages like those sought by Maverick are barred by such exculpatory provisions (*see Stonehill*; *Newport* and *Providence*), which holdings are now the law of the case.  *See also In re MF Global Inc.*, Case No. 11-2790 (MG), 2014 WL 4361552, at *5 (Bankr. S.D.N.Y. Sept. 4, 2014) (discussed in Objection ¶¶ 40-41).  Further, the applicability of such exculpation language is confirmed by Maverick's concession in its Estimation Objection that the Maverick Claims are based on LBIE's execution and/or handling of securities or other property or other action.  (Estimation Obj. at ¶ 16; Objection ¶ 41.)

35.    And contrary to Maverick's assertion (Response ¶¶ 46-47), statements made by LBHI's counsel at the hearing on the *Newport* and *Providence* matters do not preclude LBHI from relying on the exculpation provisions.  LBHI's position in the *Newport* and *Providence* matters was that <u>direct</u> claims against a Lehman prime broker (whether LBIE or LBI) for damages tied to the diminution in value of securities were exculpated.  The Court agreed and, therefore, such ruling is now law of the case.  LBHI's position in the instant matter is that, because Maverick can have no direct claims against <u>LBIE</u> under law of the case, there are no claims for which LBHI can be secondarily liable.  Although there was some discussion at the *Newport* and *Providence* hearing about how the Court's *Newport* and *Providence* ruling might impact a guarantee claim, such issue was neither briefed nor before the Court.  Moreover, in *Newport* and *Providence*, the claimants had not yet received a full recovery on their claims from their primary obligor, and all parties agreed that an amount would still need to be paid before the claims would be satisfied as a result of the primary obligor's distributions.  Here, in contrast,

16

Maverick has received the full value Maverick was entitled to from LBIE as a result of setoff. Accordingly, there are simply no amounts owed by LBIE to Maverick that can form the basis for an enforceable guarantee claim. Further, at the *Newport* and *Providence* hearing, neither the Court nor the parties considered the critical fact that LBHI was a party to the PB Agreement, so it is, itself, a direct beneficiary of the exculpation clauses.

### ii. *Application Of The Exculpatory Provisions In The Underlying Contracts Is Not Inconsistent With The Nature Of The Guarantees*

36.     Maverick further contends that reading the exculpatory clauses to preclude a recovery under the Prime Brokerage Guarantee would be inconsistent with the nature of guarantees of payment.  (Response ¶ 49.)  Maverick is simply wrong.  The difference between a guarantee of payment, which the Prime Brokerage Guarantee is by its terms, and a guarantee of collection is that a guarantee of collection requires the creditor to exhaust the ordinary means of collection against the principal before instituting a proceeding against the guarantor.  Here, LBHI does not contend that Maverick failed to exhaust its remedies against LBIE or that Maverick was prohibited from filing and pursuing a claim against LBHI before obtaining a recovery from LBIE.  Rather, the fact that Maverick could pursue remedies against LBHI before pursuing LBIE does not in any manner preclude LBHI from showing that Maverick either had no net claim against LBIE or was made whole by LBIE.  As established above, such argument would not constitute a defense or counterclaim of a guarantor, which Maverick asserts (incorrectly) was waived in the Prime Brokerage Guarantee.  The Objection's arguments are that (i) the primary obligor had no obligations to Maverick, (ii) if the primary obligor had obligations to Maverick, such obligations were fully satisfied, and (iii) Maverick in any event waived its claim for the damages it is seeking in the underlying contract.  None of these arguments is inconsistent with a guarantee of payment.

17

### iii.    The Exculpatory Provisions, By Their Terms, Apply To The Maverick Claims

37.    Maverick has proffered several arguments as to why the Court should ignore the law of the case and hold that the exculpatory clauses are inapplicable here, but these *ipse dixit* assertions (Response ¶¶ 46-66) are only unpersuasive attempts to re-write an agreement through self-serving contract interpretation and pure speculation about the intent of the parties.

38.    <u>First</u>, the fact that the Maverick Claims are guarantee claims while the *Stonehill Claims* and *Newport* and *Providence Claims* were direct claims is a distinction without a difference. The Court's ruling regarding direct claims applies to Maverick's direct claims against LBIE. If LBIE has no direct liability, LBHI can have no guarantor liability.

39.    <u>Second</u>, Maverick's argument that the exculpation provisions are inapplicable because the Maverick Claims are "based on the right to have their property returned to them, not a claim for damages or losses" (Response ¶ 52) is meaningless language (especially in the context of a guaranty) and, in any event, contradicted by Maverick's prior admissions. (*See* Estimation Obj. ¶ 16 ("LBIE's failure to comply with such obligations was compensable by an award of money damages"); *id*. ¶ 18 ("damages resulting from LBIE's failure to comply with the PB Agreements, and LBHI's resulting liability under the PB Agreements (as a co-party) and the LBHI Guarantee (as a guarantor), must be calculated based on the value of all cash and securities custodied with LBIE on the date of breach"); *id*. ¶ 28 ("the proper quantification of the amounts owed by LBHI must be assessed under U.S. law, which provides for calculation of damages and allowed claims as of the LBHI Petition Date, and thus protects Maverick from precisely the deterioration in the value of their custodied cash and securities that was suffered here").)

18

40.    Third, in its argument that LBIE's entrance into administration does not fall under the "government restrictions" or "suspension of trading" exculpations (Response ¶¶ 53-57) Maverick fails to explain why the outcome should be any different here than it was in the *Stonehill*, *Newport*, and *Providence* decisions.    The PB Agreement's "government restrictions" language is identical to the language at issue in Stonehill and is arguably broader than the "Applicable Law" exculpation in *MF Global*.    Further, Maverick does not even attempt to explain why the "suspension of trading" exculpation would be inapplicable here after the same exculpation was found to be triggered in *MF Global* and *Stonehill*.    Finally, Maverick's entire "this was not a force majeure" argument (Response ¶¶ 52-60) ignores the elephant in the room: the financial crisis that engendered, and was then aggravated by, the Lehman chapter 11 filings was a historically unique event—at least since the Great Depression—to which it regularly was and is compared.

41.    Fourth, Maverick's attempt to recast the PB Agreement's broad exculpation for any liability other than "gross negligence or willful misconduct on Lehman Brothers' part" as a narrow exculpation of "specific types of operational errors" (Response ¶¶ 61-62) is not supported by the text of the PB Agreement – or anything else.

## II.    **LBHI Has No Liability For Claims that Have Not Been Asserted**

### A.    **Maverick Cannot Be Allowed To Amend Its Claims**

42.    In the Objection, LBHI argued that Maverick could not amend its proofs of claim to assert (as suggested in Maverick's objection to the Estimation Motion) that LBHI is liable to Maverick (i) directly (*i.e.*, not as guarantor) under the PB Agreements (the "Direct PB Agreement Claims") and (ii) for breaches of the New York Uniform Commercial Code (the "UCC Claims").    (Objection ¶¶ 43-51.)    In a footnote in the Response, Maverick now appears also to be asserting that LBHI is liable to Maverick for unspecified "damages for lost investment

opportunities and other items" (the "Lost Opportunities Claim" and, together with the Direct PB Agreement Claims and the UCC Claims, the "Additional Claims"). (Response ¶ 25, n. 13.) Maverick takes this position even though, more than *seven* years after the bar date, Maverick has still not sought leave of the Court to amend and thus the Additional Claims have never been pleaded or otherwise presented in a meaningful way.[7]

43.     In its Response, Maverick first asserts that there is no need for an amendment to assert the Additional Claims because LBHI was on notice of "the general size and nature of the claims asserted." (Response ¶ 69.) Such *ipse dixit* is not supported by the record. The Maverick Claims assert *only* guarantee liability against LBHI -- not direct liability.[8] Further, the Maverick Claims fail to assert the prospect of *any* claims arising under the Uniform Commercial Code (the "UCC") or *any* claims for lost investment opportunities, whether based on purported breaches by LBIE or LBHI. Thus, it cannot be said that LBHI was aware of the "nature" of the Additional Claims prior to the Bar Date.

44.     Maverick then asserts that, if its proofs of claim are inadequate, it "should be afforded an opportunity to seek leave to amend." (Response ¶ 70, n. 33.) The only case cited by Maverick in support of this request is *In re Alexander's Inc.*, 176 B.R. 715 (Bankr. S.D.N.Y. 1995), which denied an amendment to a proof of claim. Further, Maverick's argument that it should be entitled to amend because it reserved the right to do so in the Maverick Claims is inconsistent with the case law. *See Aristeia Capital, LLC v. Calpine Corp. (In re Calpine Corp.)*,

---

[7] Pursuant to the order confirming the Debtors' chapter 11 plan, "[a]fter the Effective Date [of the Plan], . . . a proof of Claim relating to a prepetition Claim may not be filed or amended without authority from the Court." (Confirmation Order [ECF No. 23023] ¶ 86.)

[8] In these chapter 11 cases, the distinction between guaranty claims and direct claims is significant: Under the Plan, direct claims are entitled to a higher recovery than guaranty claims. As noted in the Objection, Maverick checked the relevant box on the front of each Maverick Claim to indicate that each was based on a guarantee and submitted a Guarantee Questionnaire for each Maverick proof of claim.

No. 07-8493, 2007 WL 4326738, at *5 (S.D.N.Y. Nov. 21, 2007) ("Simply adding language to the Original Claim reserving the right to file an amendment does not allow a party to circumvent this Court's orders.").

45. Moreover, any motion by Maverick to amend the Maverick Claims to assert the Additional Claims would be futile. Indeed, the Second Circuit rejected a proposed amendment to a proof of claim under analogous facts. *See Midland Cogeneration Venture v. Enron Corp.* (*In re Enron Corp.*), 419 F.3d 115, 133 (2d Cir. 2005) ("*Enron I*"). There, the creditor filed a timely <u>direct</u> claim against the debtor and later, just six months after the bar date, sought to amend to include a <u>guarantee</u> claim. *Enron I*, 419 F.3d at 120. The bankruptcy court <u>denied</u> the motion to amend and the creditor appealed, arguing that the bankruptcy court improperly speculated that granting the motion "would 'open the floodgates' to similar late-filed claims, thereby prejudicing Enron and having an adverse impact on the bankruptcy proceedings generally." *Id.* at 121. The Second Circuit affirmed the bankruptcy court, finding that the creditor's position that its "failure to file its proof of claim by the bar date should be absolved because Enron 'knew' it was potentially liable to [the creditor] tends to undermine the process of distinguishing between asserted and unasserted claims by requiring creditors to submit proofs of claim in order to participate in the bankruptcy reorganization." *Id.* at 131. The Court also found that the record provided "ample support" for the bankruptcy court's conclusion that the creditor's claim was "sufficiently large and insufficiently distinguishable from the other guarantee-based claims that permitting its late filing would be unduly prejudicial to Enron." *Id.* at 132-33.

46. Similarly, in *In re Enron Creditors Recovery Corp.*, 370 B.R. 90 (Bankr. S.D.N.Y. 2007) ("*Enron II*"), the bankruptcy court again denied a creditor's motion to amend its claim to include guarantee claims. There, too, the court found that a "proof of claim, filed more

21

than 15 months after the Bar Date, will present an 'unquantifiable risk' of a flood of late-filed guarantee claims." *Enron II*, 370 B.R. at 102. The court further found that even the attachment of the executed guarantee to the original proof of claim did not constitute an informal proof of claim or sufficiently provide notice to Enron of the guarantee claim. *Id.* at 105.

47.    Just as the claimants in Enron I and Enron II were precluded from amending their claims to belatedly assert guaranty liability, Maverick should not be allowed to amend its guaranty claims to assert direct or other liability – given how absurdly untimely any such motion would be.[9]

**B.    Even If Maverick Could Amend, The Direct PB Agreement Claims Would Fail**

48.    As demonstrated in the Objection, even if the Court were to allow Maverick to amend its proofs of claim to try to assert the Direct PB Agreement Claims (which it should not), the amendment would be futile because such claims fail for many of the same reasons Maverick's guarantee claims fail. (Objection ¶¶ 45-48.)

49.    In support of the Direct PB Agreement Claims, Maverick misleadingly cites to caselaw standing for the proposition that when two or more parties undertake the same obligation, they are presumed to do so jointly. (Response ¶ 72.) Such case law is inapplicable. Maverick has not, and cannot, cite to a single obligation undertaken by LBHI in the Prime Brokerage Documents for which it (as opposed to LBIE or LBI) can be directly liable, such as

---

[9] *See also In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 121 (Bankr. S.D.N.Y. 2010), *aff'd sub nom. CVI GVF (Lux) Master S.a.r.l. v. Lehman Bros. Holdings Inc.*, 445 B.R. 137 (S.D.N.Y. 2011) ("[a]llowing the filing of late claims also would expose the Debtors to the risk of a virtually never ending claims resolution process"); *Aristeia Capital, L.L.C. v. Calpine Corp.* (*In re Calpine Corp.*), 2007 WL 4326738, at *7 (S.D.N.Y. Nov. 21, 2007) (denying amendment that purported to detail and clarify debtor's liability under an agreement); *Gulf States Exp. Co. v. Manville Forest Prod. Corp. (In re Manville Forest Prod. Corp.)*, 89 B.R. 358, 375, n. 21 (Bankr. S.D.N.Y. 1988), *aff'd*, 99 B.R. 543 (S.D.N.Y. 1989) (denying "attempt to quantify damages" through informal amendment of claim); *Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*, 2011 WL 4965150, at *5 (S.D.N.Y. Oct. 19, 2011) (refusing to allow an amendment where "defendants could, and should, have asserted their . . . claims prior to the bar dates . . . [and] [m]ore importantly, defendants have not pointed to any court that has excused their failure to file proofs of claim").

the obligation to execute trades or return cash or securities.  This is because, again as referenced above, LBHI is a holding company that could not perform the functions of a broker-dealer and was not subject to the capital requirements and other regulations applicable to broker-dealers.  In fact, LBHI was not legally permitted to hold securities or execute trades on behalf of customers. Maverick thus has not, and cannot, establish that the parties intended for LBHI to undertake brokerage-type obligations under the PB Agreements, such as trading or the custody and return of securities or cash.[10]

### C.   Even If Maverick Could Amend, The UCC Claims Would Fail

50.   LBHI also established in the Objection that Maverick cannot establish a direct claim under the UCC.  (Objection ¶¶ 49-51.)  In its Response, Maverick did not deny that there can be no stand-alone direct claims against either LBHI or LBIE arising under the UCC. Maverick instead suggests it was attempting to assert guarantee claims under the UCC. (*See* Response ¶ 67 ("[The UCC] does not address any claim [a] customer might have against a guarantor under a stand-alone guarantee.").  Where there is no direct claim against the primary obligor, however, there can be no guarantee claim.

### D.   Even if Maverick Could Amend, The Lost Opportunities Claims Would Fail

51.   As noted, the Maverick Claims do not assert (or even hint at) the Lost Opportunities Claims, nor do Maverick's two vague footnote references (Estimation Obj. at n. 3; Response at n. 13) begin to allege elements of such claims.  Indeed, Maverick has failed to allege a <u>single</u> fact to substantiate a basis for such claims, whether in the Maverick Claims or

---

[10] The mere fact that LBHI was listed as a party to the PB Agreement does not establish its joint and severally liability for obligations that were undertaken only by the Lehman broker-dealers.  *See Abundance Partners LP v. Quamtel, Inc.*, 840 F. Supp. 2d 758, 767 (S.D.N.Y. 2012) ("Where the plain language of a contract signed by multiple parties indicates that only one party has assumed an obligation, only that party will be held liable for a failure to perform."); *Kranze v. Cinecolor Corp.*, 96 F. Supp. 728, 729 (S.D.N.Y. 1951) ("Where, as here, two or more parties to a contract promise separate performances, each party is bound only for the performance he promised.").

subsequent Court pleadings.  But even assuming, *arguendo*, that Maverick was permitted by the Court to amend to try to assert Lost Opportunities Claims, such claims would require dismissal because any purported damages based on "lost investment opportunities" would be entirely speculative since such investments would be entirely hypothetical.  *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261 (1986).  Courts routinely have held that claims for hypothetical lost profits on hypothetical investments are not capable of proof with sufficient certainty to withstand a motion to dismiss.  *See, e.g., In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6696407, at *11 (S.D.N.Y. Nov. 3, 2015) ("In cases involving bonds or loans, it is often proper to compare the cash flows received with those that would have been received if the plaintiff had invested in a hypothetical interest-bearing deposit . . . .  However, Berkshire Bank has not pleaded information about any specific investment, so we cannot assess whether Berkshire Bank suffered any net loss on any mortgage or other loan. Accordingly, we dismiss Berkshire Bank for failure to plead damages"); *ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 2015 WL 247404, at *5, 9 n.2 (N.Y. Sup. Ct., New York Cty. Jan. 14, 2015), *aff'd*, 133 A.D.3d 444 (1st Dep't 2015) (dismissing lost profits claim and observing that "New York courts have consistently applied the standards set by the *Kenford* cases and imposed liability for consequential damages only where the parties contemplated the imposition of such damages at the time of contracting, and the damages were capable of proof with reasonable certainty"); *ACCD Glob. Agric. Inc. v. Perry*, 2013 WL 840706, at *2 (S.D.N.Y. Mar. 1, 2013) ("plaintiffs' complaint here simply asserts that plaintiffs 'would [have made] over $1 million per year in profits'—and makes no other proffer whatsoever concerning that allegation. This is insufficient to support a claim for lost profits, even at the motion to dismiss stage."); *Kantor v. 75 Worth St., LLC*, 95 A.D.3d 718,

24

718–19 (1st Dep't 2012) (affirming dismissal where "plaintiff's claim for lost profits is too speculative to sustain a cause of action").

## **CONCLUSION**

52.    For all of the reasons stated above and in the Objection, LBHI has no liability for the Maverick Claims and the Maverick Claims should be expunged in their entirety without leave to amend.

Dated:  March 13, 2017
     New York, New York

/s/ *Richard L. Levine*
Richard L. Levine
Garrett A. Fail

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates*

25

## Exhibit 1

Master Prime Brokerage Agreement

\_\_\_ \_\_\_\_ **1999**

## LEHMAN BROTHERS INTERNATIONAL (EUROPE)

M. Fund USA Ltd

## MASTER PRIME BROKERAGE AGREEMENT

# CONTENTS

| Clause | | Page |
|---|---|---|
| PART A: INTRODUCTION | | 1 |
| | 1. Interpretation | 1 |
| | 2. Scope of Agreement: Single Agreement | 1 |
| PART B: TRANSACTIONS, PAYMENTS AND DELIVERIES | | 2 |
| | 3 Transactions, Payments and Deliveries | 2 |
| PART C: FINANCING ARRANGEMENTS | | 2 |
| | 4. Provision of Cash Finance and Securities Finance | 2 |
| | 5. Securities and Cash Accounts | 3 |
| PART C: MARGIN | | 4 |
| | 6. Margin Requirement: Margin Specification | 4 |
| | 7. Obligation to maintain minimum Aggregate Credit Balance | 5 |
| | 8. Margin Deficits | 6 |
| PART D: CASH AND SECURITIES | | 6 |
| | 9. Payment and Delivery | 6 |
| | 10. Charged Securities | 9 |
| | 11. Dividends, Securities Events and voting rights | 11 |
| PART E: TERMINATION | | 13 |
| | 12. Events of Default | 13 |
| | 13. Close-out | 14 |
| | 14. Tax Event | 15 |
| PART F: GENERAL | | 17 |
| | 15. Interest and Fees | 17 |
| | 16. Reports and Valuation | 17 |
| | 17. Representations and Warranties | 18 |
| | 18. Use of name of Prime Broker | 20 |
| | 19. Notices and Other Communications | 20 |
| | 20. Agreement | 21 |
| | 21. Non-assignability; Termination | 22 |
| | 22. Governing Law | 22 |
| | 23. No Waivers, etc. | 23 |
| | 24. Waiver of Immunity | 23 |
| | 25. Confidentiality | 23 |
| | 26. Recording | 23 |

06/24/99     14:32                                                                                            NO.110    P07

27. Force Majeure ........................................................................... 24
28. Payments in Euros ...................................................................... 24


SCHEDULE 1 ....................................................................................... 26
      Definitions
SCHEDULE 2 ....................................................................................... 34
      Jurisdictions in which Charged Securities are to be delivered
SCHEDULE 3 ....................................................................................... 35
      Particulars of Counterparty's agent for service of process

**THIS MASTER PRIME BROKERAGE AGREEMENT** is made on
_____ 6 | 24 _____ 1999

**BETWEEN**

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**, incorporated
under the laws of England and Wales with unlimited liability, of One
Broadgate, London EC2M 7HA, United Kingdom (the *Prime Broker*) and

**MAVERICK FUND USA, LTD.** of Dallas, Texas (the *Counterparty*)

**WHEREAS**

(A)     The Prime Broker through its Prime Brokerage Division provides
financing, settlement and other services to its customers for the purposes of and
in connection with the acquisition, holding and disposal by such customers of
securities and the effecting by such customers of transactions in derivatives.

(B)     This Agreement sets out the terms under which the Prime Broker will
provide those services to the Counterparty and the arrangements which will
apply in connection with those services.

**IT IS AGREED AS FOLLOWS**

**PART A: INTRODUCTION**

1.     **Interpretation**

1.     This Agreement is to be interpreted in accordance with Schedule 1.

2.     **Scope of Agreement: Single Agreement**

2.1     This Agreement, which constitutes this document and all Product
Annexes, shall apply (save where the parties agree otherwise) in respect of all
Transactions entered into between the parties and all Transactions between the
Counterparty and a Third Party which the Counterparty requests the Prime
Broker to settle on the Counterparty's behalf, and in respect of all related
matters referred to in this Agreement.

2.2     All Transactions and arrangements contemplated by this Agreement are
entered into in reliance on the fact that this document and all Product Annexes
and settlement requests, acknowledgements, instructions and confirmations
form a single agreement between the parties, and the parties would not
otherwise enter into any Transaction or arrangements contemplated by this
Agreement.

## PART B: TRANSACTIONS, PAYMENTS AND DELIVERIES

### 3.    Transactions, Payments and Deliveries

3.1    Wherever the Counterparty wishes the Prime Broker to enter into a Transaction, or to settle a Transaction on the Counterparty's behalf, or to make or receive any other delivery or payments to, from or on behalf of the Counterparty, it shall issue a request to the Prime Broker to do so, in the manner specified in the relevant Product Annex. The terms of the relevant Product Annex shall apply, in addition to other terms of this Agreement, in relation to any Transaction, payment, delivery or other arrangements entered into or made in consequence of such a request.

## PART C: FINANCING ARRANGEMENTS

### 4.    Provision of Cash Finance and Securities Finance

*Cash Finance*

4.1    The Prime Broker may at its discretion -

    (a)    provide financing to the Counterparty;

    (b)    discharge any money obligation of the Counterparty under or in connection with a Transaction.

4.2    Except to the extent that cash of the relevant currency is for the time being credited to a Cash Account and available for the purpose, the discharge by the Prime Broker of a money obligation of the Counterparty under clause 4.1(b) shall for the purposes of this Agreement be treated as a loan by the Prime Broker to the Counterparty of the sum discharged.

4.3    Subject to the terms of this Agreement and in particular to clause 13 (netting and close-out on default), any loan to the Counterparty under clause 4.1 or 4.2 shall give rise to an obligation of the Counterparty to repay to the Prime Broker the amount lent together with fees and interest thereon as agreed between the Counterparty and the Prime Broker at such time or times as may have been agreed or, in default of such agreement, within two Business Days after demand.

*Securities Finance*

4.4    The Prime Broker may -

    (a)    advance securities to the Counterparty;

(b)    discharge any obligation of the Counterparty to deliver securities
under or in connection with a Transaction.

4.5    Except to the extent that securities of the description and amount in
question are for the time being credited to a Securities Account and available
for the purpose, the discharge by the Prime Broker under clause 4.4(b) of an
obligation of the Counterparty to deliver Securities shall for the purposes of
this Agreement be treated as an advance by the Prime Broker to the
Counterparty of the Securities so delivered.

4.6    Subject to the terms of this Agreement and in particular to clause 13
(netting and close-out on default), any such advance of securities to the
Counterparty shall give rise to an obligation of the Counterparty to deliver
Equivalent Securities together with fees and interest thereon to the Prime
Broker at such time or times as may have been agreed or, in default of such
agreement, within 3 Business Days after demand, and to make such payments
as are provided by clause 11 with respect to Income on such securities.

4.7    Unless otherwise agreed, any borrowing of cash or securities, or any
repos or reverse repos of securities, entered into by the Prime Broker with third
parties for the purpose of making cash or securities available under this
Agreement shall be entered into by the Prime Broker as principal and the
Counterparty shall have no rights or obligations under any such transactions.

4.8    The terms of this clause 4 may be supplemented by those of any Product
Annex and by any terms that may be agreed between the Prime Broker and the
Counterparty in relation to any Transaction.

5.    Securities and Cash Accounts

5.1    The Prime Broker shall open and maintain one or more Cash Accounts
and one or more Securities Accounts.

5.2    The parties agree that:

(a)    all cash lent or advanced by the Prime Broker to or on behalf of
the Counterparty shall be debited to a Cash Account in the appropriate
currency;

(b)    all cash paid or treated as paid by or on behalf of the
Counterparty to the Prime Broker shall be credited to a Cash Account in
the appropriate currency;

(c)    whenever securities are advanced by or on behalf of the Prime
Broker to the Counterparty a debit in respect of the relevant amount of

securities of that description shall be posted to an appropriately
designated Securities Account;

(d)     whenever securities are delivered or treated as delivered by or on
behalf of the Counterparty to the Prime Broker a credit in respect of the
relevant amount of securities of that description shall be posted to an
appropriately designated Securities Account;

(e)     Charged Securities shall be credited to an appropriately
designated Charged Securities Account.

5.3     For the purposes of this Agreement cash shall be treated as paid to the
Prime Broker by the Counterparty, and securities shall be treated as delivered
to the Prime Broker by the Counterparty, if they are paid or delivered to the
Prime Broker by a Third Party in settlement of a Third Party Transaction.

5.4     The parties agree that -

(a)     the Prime Broker may debit to a Cash Account in the appropriate
currency any amount which it is entitled to debit to a Cash Account
under any term of this Agreement;

(b)     the Prime Broker may debit to a Securities Account relating to
securities of any description any quantity of securities of the relevant
description that it is entitled to debit to a Securities Account under any
term of this Agreement.

**5.5     The parties agree that Cash held by the Prime Broker under this
Agreement will not be held as client money pursuant to the Financial
Services (Client Money) Regulations 1991.**

**PART C: MARGIN**

**6.     Margin Requirement: Margin Specification**

6.1     For the purposes of this Agreement -

(a)     the *Margin Requirement* means an amount expressed in a Base
Currency Value calculated by the Prime Broker from time to time by
reference to the Transactions and Relevant Derivatives Transactions for
the time being outstanding, the balances on the Cash Accounts and the
Market Value of Eligible Securities held on the Securities Accounts in
accordance with the Margin Specification for the time being applicable
to the Counterparty;

(b)    the *Margin Specification* means a schedule notified by the Prime
Broker to the Counterparty setting out the factors by reference to which
and the manner in which the Margin Requirement is to be determined.

6.2    The Prime Broker may from time to time at its sole discretion and
without restriction vary the Margin Specification applicable to the Counterparty
by notice to the Counterparty which notice may be oral and confirmed in
writing.    Such a notice shall take effect from the time specified in the notice
(which may not be earlier than three Business Days after the time when the
notice is given).    **For the avoidance of doubt, the Counterparty
acknowledges that it will be bound by all variations of the Margin
Specification on receipt of such notice and will have no right to dispute
such variations absent bad faith by the Prime Broker.**

7.    **Obligation to maintain minimum Aggregate Credit Balance**

7.1    The Counterparty shall ensure that at all times there is an Aggregate
Credit Balance of an amount not less than the Margin Requirement.

7.2    For the purposes of this Agreement the Aggregate Credit Balance at any
time is the amount obtained by combining the Market Value at that time of:

(a)    all credit balances on Cash and Securities Accounts (such
balances being counted as positive items);

(b)    all debit balances on Cash and Securities Accounts (such
balances being counted as negative items); and

(c)    all Relevant Derivatives Transactions (such values being positive
amounts if they have positive mark-to-market values for the
Counterparty, and negative amounts if they have negative
mark-to-market values for the Counterparty).

The sum of such combination is referred to in this Agreement as the *Aggregate
Credit Balance* if it is positive and the *Aggregate Debit Balance* if it is
negative.

7.3    The Counterparty may, with the consent of the Prime Broker, not to be
unreasonably withheld, deliver cash or securities to the Prime Broker for credit
to an appropriate Account.

7.4    For the purposes of this Agreement -

(a)    if at any time there is an Aggregate Credit Balance of an amount
less than the Margin Requirement, there is a Margin Deficit of an
amount equal to the deficiency;

(b)     if at any time there is an Aggregate Debit Balance, there is a
Margin Deficit of an amount equal to the sum of the Aggregate Debit
Balance and the Margin Requirement.

### 8.     Margin Deficits

8.1     If at any time there is a Margin Deficit the Counterparty shall pay or
transfer to the Prime Broker cash or securities of an aggregate Market Value at
least sufficient to ensure that following such payment or transfer (and the
related alterations to the balances on the cash and/or Securities Accounts and
any consequent change to the Margin Requirement) there will be no Margin
Deficit.

8.2     The Counterparty shall comply with clause 8.1 within the period
specified in the notice and, if no such period is specified, not later than close of
business on the Business Day following that on which the notice is given.

### PART D: CASH AND SECURITIES

### 9.     Payment and Delivery

9.1     Unless otherwise agreed and subject to the terms of this Agreement -

(a)     any cash paid, or treated as paid, by the Counterparty to the
Prime Broker pursuant to this Agreement (other than payments which
the Prime Broker is entitled to apply in or towards satisfaction of a debt
owed by the Counterparty to the Prime Broker) shall be repayable by the
Prime Broker to the Counterparty on demand;

(b)     the Prime Broker shall be obliged to deliver to the Counterparty
on demand Equivalent Securities in respect of any securities (other than
Charged Securities) delivered, or treated as delivered, by the
Counterparty to the Prime Broker (other than deliveries which the Prime
Broker is entitled to apply in or towards satisfaction of an obligation of
the Counterparty to deliver Equivalent Securities to the Prime Broker in
respect of securities advanced to the Counterparty).

9.2     The Prime Broker may apply any cash or securities paid or delivered, or
treated as paid or delivered, to the Prime Broker by the Counterparty pursuant
to this Agreement in or towards satisfaction of any amounts owed to the Prime
Broker by the Counterparty (whether or not in the relevant currency) or (as
applicable) any obligation of the Counterparty to deliver securities of the
relevant kind to the Prime Broker.

9.3    In no circumstances shall the Prime Broker be obliged to make any
payment of cash or transfer of Equivalent Securities or Charged Securities to or
to the order of the Counterparty if -

(a)    immediately after that payment or transfer there would be a
Margin Deficit; or

(b)    the Prime Broker determines, in its reasonable discretion, that the
cash, Charged Securities, or Equivalent Securities are required for the
discharge of obligations under current or proposed Transactions or
current or proposed Relevant Derivatives Transactions; or

(c)    the Prime Broker determines, in its reasonable discretion, that the
cash or Equivalent Securities are required to be retained in respect of
payments, expenses, obligations or liabilities which the Prime Broker
has suffered or incurred in respect of past Transactions or past Relevant
Derivatives Transactions.

9.4    Except in relation to Charged Securities -

(a)    all right, title and interest in and to securities and cash which are
delivered or paid, or treated as delivered or paid, by the Counterparty to
the Prime Broker under this Agreement shall pass to the Prime Broker
upon receipt thereof regardless of the purpose of such delivery;

(b)    any reference in this Agreement or in any other agreement or
communication between the parties (however expressed) to the Prime
Broker's obligation to release or redeliver or account for or act in
relation to securities to the Counterparty shall be construed as a
reference to an obligation to redeliver or release or account for or act in
relation to Equivalent Securities.

9.5    Unless otherwise agreed, all cash paid by one party to the other under
this Agreement shall be in immediately available, freely convertible funds of
the relevant currency. All such payments shall be made to the account
specified for payments in that currency (or for any particular payment) by the
party that is to receive the payment. Where the payment is in euros (whether
denominated in the euro unit or a national currency unit) the receiving party
shall specify either an account denominated in the euro unit or, where the
payment is denominated in a national currency unit, an account denominated in
that national currency unit. All securities or Equivalent Securities to be
delivered by one party to the other under this Agreement -

(a)    shall be in suitable form for transfer and shall be accompanied by
duly executed instruments of transfer or assignment in blank (where

required for transfer) and such other documentation as the transferee
may reasonably request; or

(b)      shall be transferred through the book entry system of Euroclear or
Cedel; or

(c)      shall be transferred through any other agreed securities clearance
system; or

(d)      shall be transferred by any other method mutually acceptable to
the Prime Broker and the Counterparty.

9.6      Partly-paid securities or Equivalent Securities which the Counterparty
intends to deliver to the Prime Broker under this Agreement shall be notified as
such prior to delivery. The Prime Broker may in its absolute discretion refuse
to accept any delivery of securities or Equivalent Securities which are partly-
paid and, if such securities or Equivalent Securities are actually delivered
before the Prime Broker has decided to accept or reject them, the Counterparty
shall not be entitled to require the redelivery of such securities or Equivalent
Securities until such reasonable time as the Prime Broker has so decided (and
then only in accordance with the provisions of this Agreement and any relevant
Product Annex).

9.7      Securities or Equivalent Securities delivered to the Prime Broker will
not be deemed to have been accepted by the Prime Broker until such time as
they have been transferred into the sole name of the Prime Broker or its
nominee.

9.8      Where the Counterparty intends to deliver to the Prime Broker securities
or Equivalent Securities which are Restricted Securities, the Counterparty shall
before such delivery give the Prime Broker written notice of that intention,
specifying the securities or Equivalent Securities concerned and describing
fully the applicable restrictions, prohibitions or impediments.    The Prime
Broker may in its absolute discretion refuse to accept any delivery of securities
or Equivalent Securities which are Restricted Securities and, if such securities
are actually delivered before the Prime Broker has decided to accept or reject
them, the Counterparty shall not be entitled to require the redelivery of such
securities until such reasonable time as the Prime Broker has so decided (and
then only in accordance with the provisions of this Agreement and any relevant
Product Annex).

9.9      Unless otherwise agreed and subject to clause 11, all cash payable by
one party to the other under this Agreement shall be paid free and clear of, and
without withholding or deduction for, any taxes or duties of whatsoever nature
imposed, levied, collected, withheld or assessed by any authority having power

to tax, unless the withholding or deduction of such taxes or duties is required by law. In that event, unless otherwise agreed, the paying party shall pay such additional amounts as will result in the net amounts receivable by the other party (after taking account of such withholding or deduction) being equal to such amounts as would have been received by it had no such taxes or duties been required to be withheld or deducted: provided that no such additional amounts shall be payable by the Prime Broker in respect of any interest.

9.10    The parties shall execute and deliver all necessary documents and take all necessary steps to procure that all right, title and interest in any securities (other than Charged Securities) or Equivalent Securities shall upon transfer pass to the party to which the transfer is being made in accordance with this Agreement, free from all liens, claims, charges and encumbrances.

9.11    Deliveries of securities or cash payments made under this Agreement may be subject to the rules, regulations, customs and practices of any payment or settlement system through which the delivery or payment is made (the *Settlement Rules*) and, where they conflict with the terms of this Agreement, the Settlement Rules shall prevail.

9.12    Any obligation of the Prime Broker to make a payment of cash or transfer of securities under this Agreement is an obligation in the exercise of its reasonable discretion to make such payment or transfer to the Counterparty and the Prime Broker may decline to give effect to any request or instruction by the Counterparty to make any such payment or transfer to, or to the order of, a third party (other than a banker or custodian for the Counterparty).

## 10.    Charged Securities

10.1    Notwithstanding any other provision of this Agreement, the Counterparty hereby with full title guarantee, as security for the payment of all its obligations and liabilities to the Prime Broker under this Agreement, charges in favour of the Prime Broker by way of first fixed charge any securities which the Counterparty may at any time deliver, or be treated as delivering, to the Prime Broker (other than any securities which the Prime Broker is entitled to apply in or towards satisfaction of an obligation of the Counterparty to deliver Equivalent Securities to the Prime Broker in respect of securities loaned to the Counterparty) and which are issued in any of the jurisdictions listed in Schedule 2 (*Charged Securities*). The Counterparty hereby covenants with the Prime Broker that it will not allow any Security Interest to subsist or be created over any of the Charged Securities other than the security created in favour of the Prime Broker under this Agreement.

10.2    The Counterparty hereby irrevocably and by way of security for the payment by it of the amounts and the performance of its obligations under this Agreement appoints the Prime Broker as its true and lawful attorney (with full power to appoint substitutes and to sub-delegate) on behalf of the Counterparty and in the Counterparty's own name or otherwise, at any time and from time to time, to sign, seal, deliver and complete all transfers, renunciations, proxies, mandates, assignments, deeds and documents and do all acts and things which the Prime Broker may, in its reasonable discretion, consider to be necessary or advisable to perfect or improve its security over the Charged Securities or to give proper effect to the intent and purposes of this Agreement or to enable or assist in any way in the exercise of any power of sale of the Charged Securities (whether arising under this Agreement or implied by statute or otherwise).

10.3    Subject to the provisions of applicable law, on the occurrence of an Event of Default and without prior notice to the Counterparty, the Prime Broker may sell or otherwise dispose (and instruct any nominee of the Prime Broker to sell or otherwise dispose) of all the title to and interest in the Charged Securities or (as the Prime Broker may elect and without prejudice to any later exercise of this power) the whole or part of the equitable interest divested of the legal title for such consideration (which may comprise or include shares or debentures), upon such terms and generally in such manner as the Prime Broker may, in its sole and absolute discretion, think fit.

10.4    The provisions of the Law of Property Act 1925 (or any statutory re-enactment, variation or modification thereof or any law of similar effect in any jurisdiction) relating to the power of sale conferred by that Act are hereby varied so that section 103 shall not apply.

10.5    The Prime Broker shall not be liable for any loss or damage occasioned by any sale or disposal of the Charged Securities (or interest therein) or arising out of the exercise of or failure to exercise any of its powers under this power of sale or for any neglect or default to pay any instalment or accept any offer or notify the Counterparty of any such matter or for any other loss of any nature whatsoever in connection with the Charged Securities, except as may be caused by the Prime Broker's bad faith, negligence or wilful misconduct.

10.6    All moneys (net of any costs, expenses or losses incurred by the Prime Broker arising in connection with the exercise of the powers) arising from the exercise of the powers of the Prime Broker set out above in this Clause 10 shall be credited to an appropriate Cash Account.

### 11. Dividends, Securities Events and voting rights

11.1 Subject to clauses 11.2 and 11.3, if on an Income Payment Date in respect of any securities there is a credit or debit balance on a Securities Account in respect of those securities the Prime Broker shall, on the date such Income is paid or distributed by the issuer -

(a) where there is a credit balance on the Securities Account, credit a Cash Account with a sum equal to the United States Dollars equivalent amount paid by the issuer or, in the case of a distribution by way of additional securities, credit those additional securities to the Securities Account;

(b) where there is a debit balance on the Securities Account, debit a Cash Account with a sum equal to the United States Dollars equivalent amount paid by the issuer or, in the case of a distribution by way of additional securities, debit those additional securities to the Securities Account;

11.2 The amount credited under clause 11.1(a) shall not include any amount -

(a) which is deducted or withheld in respect of tax by or on behalf of the issuer of the securities in question (or would have fallen to be so withheld or deducted in respect of the securities in question if the Prime Broker had held such securities at the relevant date);

(b) which is required to be accounted for to the United Kingdom Inland Revenue pursuant to Schedule 23A to or (in the case of Charged Securities) sections 118A to 118K of the Income and Corporation Taxes Act 1988 in respect of the relevant securities; or

(c) which is or might be recovered by the Prime Broker or any other holder of the securities from any relevant taxation authority outside the United Kingdom in respect of the Income in question;

and shall not exceed the lesser of -

(A) the actual amount initially received in cash by the Prime Broker from the issuer in respect of the relevant Income (or which would have been so received if the Prime Broker had held the securities in question at the relevant date); and

(B) the amount which the Counterparty would have initially received in cash from the issuer in respect of the Income if the Counterparty had held the securities in question at the relevant date

net, in either case, of an amount which is or, as the case may be, would have been held or deducted or withheld in respect of tax by or on behalf of the issuer. In this clause 11.2 *"relevant date"* means, in relation to any Income, the date by reference to which the identity is determined of those holders to whom that Income is paid.

11.3    Where clause 11.1(b) applies and any amount is or might be recoverable by the Prime Broker or any other holder of the relevant securities from any relevant taxation authority outside the United Kingdom in respect of the Income in question the amount debited under clause 11.1(b) shall include an equivalent amount: provided that to the extent that any amount is actually so recovered by the Prime Broker an amount equal to that recovered shall be credited to a Cash Account upon receipt.

11.4    The Prime Broker shall inform the Counterparty if the Prime Broker becomes aware of the occurrence or prospective occurrence of a Securities Event with respect to any securities credited to a Securities Account.

11.5    Where a Securities Event under which the holder of securities has or is offered any right or option is to occur with respect to any securities which are for the time being credited or debited to a Securities Account, the Counterparty (in the case of securities which are credited to a Securities Account) or the Prime Broker (in respect of securities which are debited to a Securities Account) may within a commercially reasonable time before the latest time for the exercise of the right or option give written notice to the other party that it wishes to receive in respect of the relevant credit or debit balance Equivalent Securities in such form as will arise if the right is exercised or, in the case of a right which may be exercised in more than one manner, is exercised in such manner as is specified in such written notice.

11.6    A notice given under clause 11.5 by the Counterparty shall not be effective -

(a)    where it refers to a Securities Event which involves the payment of money by the holder of securities to which it refers, unless the Counterparty pays to the Prime Broker, for value not later than the due date of the relevant payment, an amount equal to that becoming due in respect of the action specified in the notice; or

(b)    if it would cause a Margin Deficit to arise.

11.7    Whenever a call becomes payable in respect of partly-paid securities which are credited to a Securities Account, the Counterparty shall pay to the Prime Broker, for value not later than the day on which the call is payable, a sum equal to that payable in respect of the amount of the securities so credited.

11.8   Where a Securities Event occurs in relation to securities credited to a Securities Account and no notice is given under clause 11.5, the Prime Broker shall credit or debit the Accounts with such postings as would reflect the taking of such action as the Prime Broker may in its reasonable discretion determine in relation to the Securities Event.

11.9   The Prime Broker agrees that to the extent that it holds securities of the same description as any securities in respect of which there is a credit balance on a Securities Account at a time when a right to vote arises in respect of such securities it shall use its reasonable endeavours to arrange for the voting rights attached to such securities to be exercised in accordance with instructions of the Counterparty provided that such instructions are received in such period as is reasonably necessary for the Prime Broker to exercise such rights prior to the exercise of such right and that the Prime Broker does not owe any obligation to procure the exercise of voting rights in respect of those securities in accordance with the instructions of any other person.

**PART E: TERMINATION**

**12.   Events of Default**

12.1   The occurrence of any of the following events with respect to a party constitutes an *Event of Default* in relation to that party (the *Defaulting Party*, the other party being the *non-Defaulting Party*) -

(a)   the Counterparty fails to eliminate a Margin Deficit on the due date in accordance with clause 8, and the Prime Broker serves a Default Notice on the Counterparty; or

(b)   the party fails to make a payment of cash or delivery of securities (other than in the circumstances referred to in clause 12.1(a) above) by the due date for such payment or delivery, such failure not having been remedied within 1 Business Day following written notice of such failure given to that party by the other party, and the Non-Defaulting Party serves a Default Notice on the Defaulting Party; or

(c)   the party fails to comply with or perform any material agreement or obligation (other than an obligation of a kind referred to in clause 12.1(a) or (b) above) to be complied with or performed by the party in accordance with this Agreement and such failure, if capable of remedy, is not remedied within 1 Business Day following written notice of such failure given to that party by the other party, and the Non-Defaulting Party serves a Default Notice on the Non-Defaulting Party; or

NO.110   P21

(d)   an Act of Insolvency occurs with respect to the party and (except in the case of an Act of Insolvency which is the presentation of a petition for winding-up or any analogous proceeding or the appointment of a liquidator or analogous officer of the Defaulting Party in which case no such notice shall be required) the non-Defaulting Party serves a Default Notice on the Defaulting Party; or

(e)   any representations made by the party are incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, and the Non-Defaulting Party serves a Default Notice on the Defaulting Party; or

(f)   the party admits to the other party that it is unable to, or intends not to, perform any of its material obligations under this Agreement, and the non-Defaulting Party serves a Default Notice on the Defaulting Party; or

(g)   the party is suspended or expelled from membership of or participation in any securities exchange or association or other self regulating organisation, or suspended from dealing in securities by any government agency, or any of the assets of the party are transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation, and the Non-Defaulting Party serves a Default Notice on the Defaulting Party.

## 13.   Close-out

13.1   On the occurrence of an Event of Default the following shall immediately occur -

(a)   any obligation of the Prime Broker to use reasonable endeavours to settle any Third Party Transaction on behalf of the Counterparty shall cease, and the Prime Broker may inform the Third Party that the Prime Broker will not settle any such Transaction;

(b)   all other outstanding obligations of each party to deliver securities or Equivalent Securities or to pay cash to the other under this Agreement shall fall due for performance immediately (and so that performance of the respective obligations of the parties with respect to delivery of securities or Equivalent Securities or payment of cash shall be effected only in accordance with the following provisions of this clause 13.1);

(c)   the Non-Defaulting Party shall establish, as at the Termination Date, the Default Market Values of all securities, Equivalent Securities

00/ 24/ 99      14:32                                                    NO.110    P22

and cash to be delivered or paid by each party under clause 13.1(b) above;

(d)    on the basis of the sums so established, an account shall be taken (as at the Termination Date) of what is due from each party to the other under this Agreement (on the basis that each party's claim against the other in respect of the delivery to it of securities or Equivalent Securities under this Agreement equals the Default Market Value thereof) and the sums due from one party shall be set off against the sums due from the other and only the balance of the account shall be payable (by the party having the claim valued at the lower amount) and such balance shall be due and payable on the next following Business Day. For the purposes of this calculation, all sums not denominated in the Base Currency shall be converted into the Base Currency at the Spot Rate prevailing at the relevant time.

13.2    Neither party may claim any sum by way of consequential loss or damage in the event of a failure by the other party to perform any of its obligations under this Agreement.

13.3    Each party shall immediately notify the other on becoming aware of an Event of Default, or an event that, upon the serving of a Default Notice, would be an Event of Default, occurs in relation to it.

14.    Tax Event

14.1    This clause 14 shall apply if either party notifies the other that -

(a)    any action taken by a taxing authority or brought in a court of competent jurisdiction (regardless of whether such action is taken or brought with respect to a party to this Agreement); or

(b)    a change in the fiscal or regulatory regime (including, but not limited to, a change in law or in the general interpretation of law but excluding any change in any rate of tax),

has or will, in the notifying party's reasonable opinion, have a material adverse effect on that party in the context of a Transaction.

14.2    If so requested by the other party, the notifying party will furnish the other with an opinion of a suitably qualified adviser that an event referred to in clause 14.1(a) or (b) above has occurred and affects the notifying party.

14.3    Where this clause 14 applies, the party giving the notice referred to in clause 14.1 may, so far as it is within its power to do so and subject to clause

14.4 below, terminate the Transaction with effect from a date specified in the notice, not being earlier (unless so agreed by the other party) than 30 days after the date of the notice.

14.4   If the party receiving the notice referred to in clause 14.1 so elects, it may override that notice by giving a counter-notice to the other party. If a counter-notice is given, the party which gives the counter-notice will be deemed to have agreed to indemnify the other party against the adverse effect referred to in clause 14.1 so far as relates to the relevant Transaction.

14.5   Where a Transaction is terminated as described in this clause 14, the party that has given the notice to terminate shall indemnify the other party against any reasonable legal and other professional expenses incurred by the other party by reason of the termination.

14.6   The amount payable by one party to the other in respect of the termination of a Transaction under this clause 14 shall be the amount agreed between the parties or, in default of such agreement, an amount calculated by the Prime Broker on the basis of the calculations set out at clause 13.1 save that only the obligations under the affected Transaction would be accelerated.

14.7   This clause 14 is without prejudice to clause 9.9 (obligation to pay additional amounts if withholding or deduction required); but an obligation to pay such additional amounts may, where appropriate, be a circumstance that causes this clause to apply.

14.8   The Counterparty shall indemnify and hold the Prime Broker, its directors, officers, employees and agents harmless from and against all Taxes, expenses, claims, actions, liabilities, costs or proceedings which they may incur or which arise directly or indirectly in connection with the entering into, or acting in respect of, this Agreement or any Transaction or as a result of any dealings with Third Parties pursuant to the terms of this Agreement and/or any Transaction made hereunder and shall in particular pay any stamp duty or other transfer tax arising in respect of any Transaction hereunder.

### PART F: GENERAL

### 15.    Interest and Fees

15.1   Interest shall be payable on credit and debit balances on Cash Accounts, and the Counterparty shall pay remuneration to the Prime Broker in respect of Transactions, at such rates, at such times and calculated in such manner as may have been agreed or, in default of agreement, as may from time to time be notified by the Prime Broker to the Counterparty, such notification to take

effect three Business Days from the date on which it is given or at such later time as is specified in the notification.

15.2    Fees shall be payable by the Counterparty to the Prime Broker for the services provided by the Prime Broker under this Agreement in accordance with the scale notified to the Counterparty from time to time, any such notification to take effect three Business Days from the date on which it is given or at such later time as is specified in the notification. .

15.3    If on any date amounts would otherwise be payable in the same currency by each party to the other under clauses 15.1 and 15.2, then, on such date, each party's obligations to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

15.4    Any amount payable by a party under this Agreement which is not paid when due shall bear interest from the date on which payment became due until the date of actual payment at a rate equal to LIBOR plus two per cent or, if greater, the rate for the time being prescribed as the rate of interest payable in respect of judgement debts.

16.    **Reports and Valuation**

16.1    The Prime Broker shall provide reports to the Counterparty relating to Transactions and to balances on the Securities and Cash Accounts in such form and in such manner and with such frequency as the parties may agree.

16.2    Any value ascribed to any Transaction or any securities or Cash in any report provided by the Prime Broker relates only to the relevant value for the purpose of the calculation of Margin referred to in Part C above.    Such valuation does not purport to indicate the open market value, or the value that the Prime Broker may attribute to the Transaction, securities or cash for any other purpose.

17.    **Representations and Warranties**

17.1    Each party represents and warrants to the other that -

(a)    it is duly authorised to execute and deliver this Agreement (including each Product Annex), to enter into the Transactions contemplated under this Agreement and to perform its obligations under this Agreement and

all Transactions, and has taken all necessary action to authorise such execution, delivery and performance;

(b)    it will engage in this Agreement and all Transactions to which it is a party as principal (except that the Prime Broker may in exceptional circumstances act as settlement agent for the Counterparty in settling Transactions);

(c)    the person signing this Agreement (including any Product Annex) on its behalf is, and any person representing it in entering into a Transaction will be, duly authorised to do so on its behalf;

(d)    it has obtained all authorisations of any governmental or regulatory body required in connection with this Agreement and the Transactions contemplated under this Agreement and such authorisations are in full force and effect;

(e)    the execution, delivery and performance of this Agreement and all Transactions will not violate any law, ordinance, charter, bye-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected;

(f)    it has satisfied itself and will continue to satisfy itself as to the tax implications of the Transactions contemplated under this Agreement;

(g)    in connection with this Agreement and each Transaction:

(i)    it is not relying on any advice (whether written or oral) of the other party, other than the representations expressly set out in this Agreement;

(ii)    it has made and will make its own decisions regarding the entering into of any Transaction based upon its own judgement and upon advice from such professional advisers as it has deemed it necessary to consult;

(iii)    the other party is not acting as a fiduciary or an advisor for it and all decisions have been the result of arms' length negotiations between the parties;

(iv)    it understands the terms, conditions and risks (including, without limitation, tax risks or risks associated with the introduction of the euro or the occurrence or non-occurrence of any other event associated with economic and monetary union in the European Community) of each Transaction and is willing to assume

(financially and otherwise) those risks and it has received no assurance or guarantee as to the expected performance or result of any transaction;

(h)   at the time it delivers, or is treated as delivering, to the other party any securities or Equivalent Securities it will have the full and unqualified right to make such delivery and that (except in the case of Charged Securities) upon such delivery the other party will receive all right, title and interest in and to those securities free of any lien, claim, charge or encumbrance and such delivery shall not violate or conflict with any law, treaty, rule, regulation or determination of any Governmental Authority binding upon it or, where the party delivering such securities or Equivalent Securities is the Counterparty, any law, treaty, rule, regulation or determination of any Governmental Authority which is binding on the Prime Broker and of which the Prime Broker has given written notice to the Counterparty for the purposes of this paragraph;

(i)   where the Counterparty is not resident in the United Kingdom, it will at the Prime Broker's request provide any necessary certificate of non-residence or other appropriate documentation necessary to minimise the incidence of UK taxation in respect of income arising in respect of securities that are the subject of any Transaction.

On the date on which any Transaction is entered into and on each day on which securities or Equivalent Securities are to be transferred under this Agreement, each of the parties hereto entering into such Transaction shall each be deemed to repeat all the foregoing representations. For the avoidance of doubt and notwithstanding any arrangements that the Counterparty may have with any other person, the Counterparty will be liable as a principal for its obligations under this Agreement and each Transaction.

17.2   On the date on which any Transaction is entered into and on each day on which securities or Equivalent Securities are to be transferred by the Counterparty to the Prime Broker under this Agreement the Counterparty shall be deemed to represent and warrant to the Prime Broker that there is no prohibition, impediment or restriction imposed by virtue of any national or local law or regulation or by any agreement preventing or restricting dealings in or transfers of any securities or Equivalent Securities subject to that Transaction, or which are to be so delivered, other than such as are fully described in a notice given by the Counterparty to the Prime Broker prior to the delivery of such securities in accordance with clause 9.8;

### 18.    Use of name of Prime Broker

18.1    Except with the express prior written agreement of the Prime Broker, the Counterparty shall not in any advertisement or general publication issued by it -

    (a)    use any name or description containing the words "Lehman Brothers"; or

    (b)    otherwise indicate that it is carrying on any activity in association with or by or under the authority of the Prime Broker or of any company or entity affiliated to or associated with the Prime Broker.

### 19.    Notices and Other Communications

19.1    Any notice or other communication to be given under this Agreement -

(a)    shall be in the English language and, except where expressly otherwise provided in this Agreement, shall be in writing;

(b)    may be given in any manner described in clause 19.2 below;

(c)    shall be sent to the party to whom it is to be given by GPL or at the address or number set out in Schedule 3.

19.2    Any such notice or other communication shall be effective -

(a)    if in writing and delivered in person or by courier, at the time when it is delivered;

(b)    if sent by GPL, at the time of transmission;

(c)    if sent by telex, at the time when the recipient's answerback is received;

(d)    if sent by facsimile transmission, at the time when the transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(e)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), at the time when that mail is delivered or its delivery is attempted;

(f)    if sent by electronic messaging system, at the time that electronic message is received;

except that any notice or communication which is received, or delivery of which is attempted, after close of business on the date of receipt or attempted

delivery or on a day which is not a day on which commercial banks are open for business in the place where that notice or other communication is to be given shall be treated as given at the opening of business on the next following day which is such a day.

19.3   Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

19.4   The Prime Broker shall be entitled to rely on, and to treat as genuine, any requests, instructions, information or other communications reasonably believed by the Prime Broker to have been made or given by or on behalf of the Counterparty, notwithstanding that any such communication may afterwards be found not to have been made or given by or on behalf of the Counterparty.

19.5   Any GPL instructions received by the Prime Broker may be treated as conclusive both as to content and authority without any further investigation on the part of the Prime Broker.

20.    Agreement

20.1   This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for Transactions.   Each provision and agreement herein shall be treated as separate from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

20.2   If there is a conflict between the provisions of any Product Annex and the provisions of this document, the provisions of the Product Annex shall prevail.

21.    Non-assignability; Termination

21.1   Subject to clause 21.2 below, the rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned, charged or otherwise dealt with by either party without the prior written consent of the other party.   Subject to the foregoing, this Agreement and any transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

21.2   Clause 21.1 above shall not preclude a party from assigning, charging, or otherwise dealing with all or any part of its interest in any sum payable to it under clause 13 above (net sums payable on default) above.

21.3   Either party may terminate this Agreement by giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

21.4   All remedies under this Agreement shall survive termination in respect of the relevant Transaction and termination of this Agreement.

21.5   The introduction of the euro or the occurrence or non-occurrence of any other event associated with economic and monetary union in the European Community shall not have the effect of altering any term of this Agreement or discharging or excusing performance under this Agreement or any transaction hereunder (whether or not a Transaction), nor give a party the right unilaterally to alter or terminate any transaction hereunder (whether or not a Transaction). In particular, but without limiting the generality of the above, no event referred to in this clause 21.5 shall constitute a Tax Event under clause 14.1(a).

## 22.   Governing Law

22.1   This Agreement shall be governed by and construed in accordance with the laws of England.  The parties hereby irrevocably submit for all purposes of or in connection with this Agreement and each Transaction to the jurisdiction of the Courts of England.

22.2   Nothing in this clause 22 shall limit the right of any party to take proceedings in the courts of any other country of competent jurisdiction.

22.3   The Counterparty hereby appoints the person identified in Schedule 3 as its agent to receive on its behalf service of process in such courts.  If such agent ceases to be its agent, the Counterparty shall promptly appoint, and notify the Prime Broker of the identity of, a new agent in England.

## 23.   No Waivers, etc.

23.1   No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy under this Agreement by any party shall constitute a waiver of its right to exercise any other remedy under this Agreement.  No modification or waiver of any provision of this Agreement and no consent by any party to a departure from it shall be effective unless and until such modification, waiver or consent shall be in writing and duly executed by both of the parties hereto.  For the avoidance of doubt a variation of the Margin Specification pursuant to clause 7.2 shall not be deemed to be a variation of this Agreement.  Without limitation on any of the foregoing, the failure to give a notice pursuant to clause 7 above (notice of Margin Deficit) will not constitute a waiver of any right to do so at a later date.

### 24.    Waiver of Immunity

24.1    The Counterparty hereby waives, to the fullest extent permitted by applicable law, all immunity (whether on the basis of sovereignty or otherwise) from jurisdiction, attachment (both before and after judgement) and execution to which it might otherwise be entitled in any action or proceeding in the Courts of England or of any other country or jurisdiction, relating in any way to this Agreement or any Transaction, and agrees that it will not raise, claim or cause to be pleaded any such immunity at or in respect of any such action or proceeding.

### 25.    Confidentiality

25.1    Each party undertakes with the other that it shall use all reasonable endeavours to keep confidential (and to ensure that its officers, employees, agents and professional and other advisers keep confidential) any information which relates to the contents of this Agreement. Neither party shall use for its own business purposes or disclose to any third party any such confidential information without the consent of the other party.

### 26.    Recording

26.1    The parties agree that each may without further notice electronically record all telephone conversations between them.

### 27.    Force Majeure

27.1    The Prime Broker shall not be responsible for any losses, costs or damages suffered or incurred by the Counterparty resulting directly or indirectly from:

(a)    any action, omission, suspension of trading, decision or ruling of any exchange or regulator, governmental or other body or of any other person which is beyond the Prime Broker's control (including, without limitation, any floor broker, exchange, dealing or clearing house error or delay);

(b)    any war, strike, lock-out, national disaster, act of terrorism, delay in postal service or any other delay or inaccuracy in the transmission of orders or other information, or any breakdown, failure or malfunction of any telecommunication or computer system;

provided that the Prime Broker shall use reasonable efforts to inform the Counterparty of the occurrence of any such event.

### 28.    Payments in euros

28.1 Any amount in euros (whether denominated in the euro unit or a national currency unit) payable under this Agreement shall at the option of the party under the obligation to make the payment (or on the occurrence of an Event of Default, the Non-Defaulting Party) be payable in the euro unit or, where denominated in a national currency unit, in that national currency unit. For the avoidance of doubt, amounts payable under this Agreement shall include amounts to be credited or debited to a Cash Account.

28.2 For the purposes of the set off calculation in clause 15.3, in relation to euro amounts the Prime Broker may treat any or all national currency units and/or the euro unit either as separate currencies or as the same currency.

**Lehman Brothers International (Europe)**

By: _____ _____

Title: _____ _____

Date: _____ _____

**Maverick Fund USA, Ltd.**

By: *Michell P*

Title: *Controller, Maverick Capital, Ltd*
      *General Partner*

Date: *6/24/99*

## SCHEDULE 1

### Definitions

1.    In this Agreement the following expressions have the following meanings:

*Account* A Securities Account and/or a Cash Account as the case requires;

*Act of Insolvency* Shall occur with respect to a party upon -

> (i)    its making a general assignment for the benefit of, or entering into a reorganisation, arrangement, or composition with creditors; or

> (ii)    its admitting in writing that it is unable to pay its debts as they become due; or

> (iii)    its seeking, consenting to or acquiescing in the appointment of any trustee, administrator, receiver or liquidator or analogous officer of it or any material part of its property; or

> (iv)    the presentation or filing of a petition in respect of it (other than by the other party to this Agreement in respect of any obligation under this Agreement) in any court or before any agency alleging or for the bankruptcy, winding-up or insolvency of such party (or any analogous proceeding) or seeking any reorganisation, arrangement, composition, re-adjustment, administration, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such petition (except in the case of a petition for winding-up or any analogous proceeding, in respect of which no such 30 day period shall apply) not having been stayed or dismissed within 30 days of its filing; or

> (v)    the appointment of a receiver, administrator, liquidator or trustee or analogous officer of such party or over all or any material part of such party's property;

> (vi)    the convening of any meeting of its creditors for the purposes of considering a voluntary arrangement as referred to in section 3 of the Insolvency Act 1986 (or any analogous proceeding); or

> (vii)    any act preparatory to any of (i) - (vi) above;

*Aggregate Credit Balance* Has the meaning given in clause 7.2;

*Aggregate Debit Balance* Has the meaning given in clause 7.2;

00/24/00      14:02                                                          NO.110    D33

*Agreement* This document including the Schedules, together with all Product Annexes and Confirmations;

*Base Currency* The currency agreed between the parties to be the Base Currency or, in the absence of such agreement, US dollars;

*Base Currency Value* means, on any day in relation to a security:

(a)     where such security is denominated in Base Currency, the Value of such security on such day; and

(b)     where such security is not denominated in Base Currency, the equivalent in Base Currency on such day of the Value of such security converted at the Spot Rate for the previous business day;

and on any day in relation to a currency the equivalent in Base Currency on such day of the Value of such currency converted at the Spot Rate for the previous business day;

*Business Day* A day on which banks in London and in the centre in which the principal Exchange for dealing in the relevant securities is situated are open for a full range of business;

*Cash Account*       An account maintained by the Prime Broker for the recording of cash balances in accordance with this Agreement;

*Charged Securities Account* An Account for recording Charged Securities held by the Prime Broker;

*Charged Securities* Has the meaning given in clause 10;

*Default Market Value* with respect to any securities on any date:

(i)     in the case of securities to be delivered to the Defaulting Party,

    (aa) if the non-Defaulting Party has between the occurrence of the relevant Event of Default and the Default Valuation Time (as defined below) sold securities forming part of the same issue and being of an identical type and description to those securities and in substantially the same amount as those securities, the net proceeds of sale (after deducting all reasonable costs, fees and expenses incurred in connection therewith); and

    (bb) failing such sale before the Default Valuation Time, the Market Value of such securities at the Default Valuation Time;

    (ii)    in the case of securities to be delivered by the Defaulting Party,

        (aa)  if the non-Defaulting Party has between the occurrence of the relevant Event of Default and the Default Valuation Time purchased securities forming part of the same issue and being of an identical type and description to those securities and in substantially the same amount as those securities, the cost of such purchase (including all reasonable costs, fees and expenses incurred in connection therewith); and

        (bb)  failing such purchase before the Default Valuation Time, the amount it would cost to buy such securities at the Default Valuation Time at the best available offer price therefor (and where different offer prices are available for different delivery dates, such offer price in respect of the earliest available such delivery date) on the most appropriate market, together with all reasonable costs, fees and expenses that would be incurred in connection therewith (calculated on the assumption that the aggregate thereof is the least that could reasonably be expected to be paid in order to carry out the Transaction),

in each case as determined by the non-Defaulting Party; and for this purpose the *Default Valuation Time* means, with respect to any securities:

    (A) if the relevant Event of Default occurs during normal business hours on a day which is a dealing day in the most appropriate market for securities of the relevant description (as determined by the non-Defaulting Party), the close of business in that market on the following dealing day;

    (B) in any other case, the close of business on the second dealing day in that market after the day on which the relevant Event of Default occurs.

Where the amount of any securities sold or purchased as mentioned in (i), (ii) and (ii)(aa) above is not identical to that of the securities to be valued for the purposes of this definition, the Default Market Value of those securities shall be ascertained by dividing the net proceeds of sale or cost of purchase by the amount of the securities sold or purchased so as to obtain a net unit price and multiplying that net unit price by the amount of the securities to be valued.

*Default Notice* A written notice served by the Non-Defaulting Party on the Defaulting Party under clause 12 stating that an event shall be treated as an Event of Default for the purposes of this Agreement;

*Eligible Security* means at any time a security listed in the Margin Specification which satisfies all the conditions of the Margin Specification and which is freely transferable and capable of being freely settled through a clearance system and ownership of which shall in each case be evidenced by book entry, without the need for any document of transfer of any kind;

*Equivalent Securities* Has the meaning given in paragraph 2 below;

*Euro* The currency of the member states of the European Union that adopt a single currency in accordance with the Treaty establishing the European Communities, as amended by the Treaty on European Union;

*Euro Unit* has the meaning given to those terms in the European Council Regulation on the legal framework for the introduction of the euro which is expected to come into force on 1 January 1999;

*FX Transaction* A contract for the sale of one currency against a purchase of another currency;

*Governmental Authority* Any government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government;

*Income* With respect to any securities at any time, all interest, dividends or other distributions thereon;

*Income Payment Date* With respect to any securities, the date on which Income is paid in respect of such securities, or, in the case of registered securities, the date by reference to which particular registered holders are identified as being entitled to payment of Income;

*GPL* The data communication system established between the Prime Broker and the Counterparty for the transmission of data and information for the purposes of this Agreement;

*LIBOR* in relation to any sum in any currency, the one-month London Inter-Bank Offered Rate in respect of that currency as quoted on page 3750 of the Telerate Service (or such other page as may replace Page 3750 on that service) as of 11.00 a.m., London time, on the date on which it is to be determined;

*Margin Call* A notification given to the Counterparty by the Prime Broker requiring the Counterparty to eliminate a Margin Deficit;

*Margin Deficit* Has the meaning given in clause 7.3;

*Margin Requirement* Has the meaning given in clause 6.1(a);

*Margin Specification* Has the meaning given in clause 6.1(b);

*Market Value*

(a)    With respect to any securities or any balance on a Securities Account as of any time on any date, the price for such securities at such time on such date obtained from a source selected by the Prime Broker. Where the Prime Broker determines that both bid and offer prices are available and the relevant Securities have been credited to the Securities Account, then the bid price shall be used. Where the Prime Broker determines that both bid and offer prices are available and the relevant Securities have been debited to the Securities Account, then the offer price shall be used. Where the Prime Broker determines that only mid market prices are available, the mid market price will be used for both credits and debits of the relevant Security. Where different prices are obtained for different delivery dates, the price so obtainable for the earliest available such delivery date) (provided that the price of securities that are suspended shall (for the purposes of calculating an Aggregate Credit Balance or Aggregate Debit Balance where there is a credit balance on the Securities Account in respect of those securities) be nil unless the parties otherwise agree and (for all other purposes) shall be the price of those securities as of close of business on the dealing day in the relevant market last preceding the date of suspension). For these purposes any sum in a currency other than the Base Currency shall be converted into the Base Currency at the Spot Rate prevailing at the relevant time;

(b)    With respect to any Relevant Derivatives Transaction, the mark-to-market value of that transaction as determined by the Prime Broker in such manner as may be agreed between the Prime Broker and the Counterparty or provided by the Margin Specification or, in default of any such agreement or provision, in such manner as the Prime Broker may in its absolute discretion think fit;

*National Currency Unit* has the meaning given to those terms in the European Council Regulation on the legal framework for the introduction of the euro which is expected to come into force on 1 January 1999;

*Product Annex* A document signed by the parties and expressed to relate to and form part of this Agreement;

*Relevant Derivatives Transaction* A derivatives transaction between the Prime Broker and the Counterparty which in accordance with the Margin Specification applicable to the Counterparty is to be taken into account in calculating the Margin Requirement applicable to the Counterparty;

*Restricted Securities* Securities which are subject to any prohibition, impediment or restriction imposed by virtue of any national or local law or regulation or by any agreement preventing or restricting dealings in or transfers of such securities;

*Securities Account* An account maintained by the Prime Broker for the recording of securities balances in accordance with this Agreement;

*Securities Event* An event in relation to any securities such as is described in paragraph 2.3 below;

*Securities Transaction* A Transaction for the purchase or sale of securities, entered into between the Counterparty and a Third Party or a contract for the notional sale or purchase of securities entered into between the Counterparty and the Prime Broker;

*Security Interest* A mortgage, charge, pledge, lien or other encumbrance of any kind;

*Spot Rate* Where an amount in one currency is to be converted into a second currency on any date, unless the parties otherwise agree, the spot rate of exchange quoted by Lehman Brothers Inc for the sale by it of such second currency against a purchase by it of such first currency;

*Taxes* Any present or future tax, duty, levy, impost or charge of a similar nature payable to or imposed by any supra-national, governmental, federal, state, provincial, local, governmental, municipal taxing authority, body or official, of any jurisdiction (together with any related penalties, damages, fines, surcharges and similar charges);

*Termination Date* The date on which an Event of Default occurs under clause 12;

*Third Party* A person, other than the Prime Broker, who is the counterparty to a Transaction entered into by the Counterparty;

*Third Party Transaction* A Securities Transaction entered into between the Counterparty and a Third Party;

*Transaction* A transaction for the purchase or sale, or notional purchase or sale, of securities, or a transaction of any other kind referred to in a Product Annex.

2.1    For the purposes of this Agreement securities are *"equivalent"* to other securities if they are (i) of the same issuer, (ii) part of the same issue and (iii) of an identical type, nominal value, description and (except where otherwise

stated) amount as those other securities. Securities will be equivalent to other securities notwithstanding that those securities have been redenominated into euro or the nominal value of the securities has changed in connection with such redenomination.

2.2    Subject to paragraph 2.3 below, *"Equivalent Securities"* means, in relation to any securities or any balance on a Securities Account, securities equivalent to those securities or to the securities represented by that balance.

2.3    In relation to securities (the *"relevant securities"*) which are partly paid or have been converted, sub-divided, consolidated, redeemed, made the subject of a takeover offer, capitalization issue, rights issue or event similar to any of the foregoing, *"Equivalent Securities"* means -

(a)    in the case of conversion, subdivision or consolidation, securities equivalent to the securities into which the relevant securities have been converted, subdivided or consolidated provided that, if appropriate, notice has been given in accordance with clause 11.5, and subject to sub-paragraph (i) below;

(b)    in the case of redemption, a sum of money equivalent to the proceeds of the redemption;

(c)    in the case of a takeover offer, a sum of money or securities equivalent to the consideration or alternative consideration of which one party has given notice to the other in accordance with clause 11.5, and subject to sub-paragraph (i) below;

(d)    in the case of a call on partly-paid securities, securities equivalent to the paid-up securities provided that the party by whom the Equivalent Securities are receivable has paid to the other party a sum of money equal to the sum due in respect of the call;

(e)    in the case of a capitalization issue, securities equivalent to the relevant securities together with the securities allotted by way of bonus thereon;

(f)    in the case of a rights issue, securities equivalent to the relevant securities together with the securities allotted thereon, provided that the party by whom the Equivalent Securities are receivable has given notice to the other party in accordance with clause 11.5 and has paid to the other party all sums due in respect thereof, and subject to sub-paragraph (i) below;

(g)    if income in the form of securities, or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities is

distributed, securities equivalent to the relevant securities provided that notice has been given in accordance with clause 11.5, and subject to sub-paragraph (i) below ;

(h)     in the case of any event similar to any of the foregoing, securities equivalent to the relevant securities together with or replaced by a sum of money or securities or other property equivalent to that received in respect of such securities as a result of that event;

(i)     in the case of any event which occurs in circumstances where clause 11.8 applies, such, or such combination of, securities, money and other property as is appropriate to reflect the postings made by the Prime Broker under that clause.

## SCHEDULE 2

### Jurisdictions in which Charged Securities are to be delivered

Hong Kong

Ireland

Singapore

United Kingdom

### SCHEDULE 3

**Particulars of Counterparty's agent for service of process**

## MASTER PRIME BROKERAGE AGREEMENT

### PRODUCT ANNEX: PAYMENTS AND DELIVERIES

**THIS PRODUCT ANNEX** is entered into on the ___24th___ day of ___Jun___ 1999

**BETWEEN**

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** incorporated under the laws of England and Wales with unlimited liability, of One Broadgate, London EC2M 7HA, United Kingdom (the *Prime Broker*) and

**MAVERICK FUND USA, LTD.** of Dallas, Texas (the *Counterparty*)

**THIS PRODUCT ANNEX**

1.     This Product Annex relates to and forms part of the Master Prime Brokerage Agreement made between the Prime Broker and the Counterparty dated ___6/24/99___ (the *Master Agreement*). This Product Annex applies in respect of all payments of cash and/or deliveries of securities made between the parties unless the parties otherwise agree.

**DEFINITIONS**

2.     Terms defined in the Master Agreement have the same meanings in this Product Annex. In addition, in this Product Annex the following words and phrases have the following meanings-

*Delivery Request* A formal request from the Counterparty in the form, and containing the information, set out in the Schedule to this Product Annex;

*Requested Settlement Date* In relation to a Delivery Request, the date specified as the Settlement Date in the Delivery Request;

*Usual Settlement Date* In relation to a Delivery Request the earliest time it is reasonably practicable for the Prime Broker to make the requested delivery or payment, having regard to customary market practice and the time and date on which the Delivery Request is received.

**DELIVERIES AND PAYMENTS TO THE PRIME BROKER**

3.     Whenever the Counterparty wishes to deliver securities or pay cash to the Prime Broker it shall notify the Prime Broker of its intention to do so. Upon receipt of such securities or cash the Prime Broker shall, if such securities are of a type reasonably acceptable to the Prime Broker or such cash

is of a currency reasonably acceptable to the Prime Broker, credit such securities or cash to an appropriate Account.

## DELIVERIES AND PAYMENTS TO THE COUNTERPARTY

4.1    Whenever the Counterparty wishes the Prime Broker to deliver securities or cash to the Counterparty, the Counterparty shall formally request the Prime Broker to do so by serving a Delivery Request on the Prime Broker.

4.2    The Prime Broker may, by giving written or oral notice to the Counterparty, reject a Delivery Request if immediately following compliance with such a request there would be a debit balance on the appropriate Securities or Cash Account, and may reject any other Delivery Request.

4.3    Unless a Delivery Request is rejected the Prime Broker shall deliver the requested securities or cash in accordance with the Delivery Request, except that the Prime Broker may deliver the securities or cash on the Usual Settlement Date if that date is later than the Requested Settlement Date.

4.4    Securities and cash delivered to the Counterparty pursuant to clause 4.3 above shall, except to the extent that securities of the amount and description in question or, as appropriate, cash of the amount and currency in question, are for the time being credited to an Account and available for the purpose, be treated as having been loaned by the Prime Broker to the Counterparty. The Counterparty shall, subject to the terms of this Agreement, be obliged to deliver to the Prime Broker, on demand, Equivalent Securities in respect of any securities loaned to the Counterparty. Cash loaned by the Prime Broker to the Counterparty shall, subject to the terms of this Agreement, be repayable on demand.

## MISCELLANEOUS

5.    The Counterparty warrants to and for the benefit of the Prime Broker that it will not make any payments of cash to the Prime Broker under this Product Annex other than pursuant to or for the purpose of or in connection with Transactions made or to be made with or through the Prime Broker.

**Lehman Brothers International (Europe)**

By: ...............................

Title: ...............................

Date: ...............................

**Maverick Fund USA, Ltd.**

By: *Michelle P*

Title: Controller, Maverick Capital, Ltd
Fund Adviser

Date: 6/24/99

03/24/99    14:32    NO.110    P46

## MASTER PRIME BROKERAGE AGREEMENT

## PRODUCT ANNEX: FX TRANSACTIONS

**THIS PRODUCT ANNEX** is entered into on the 24th day of June 1999

**BETWEEN**

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** incorporated under the laws of England and Wales with unlimited liability, of One Broadgate, London EC2M 7HA, United Kingdom (the *Prime Broker*) and

**MAVERICK FUND USA, LTD.** of Dallas, Texas (the *Counterparty*)

**THIS PRODUCT ANNEX**

1.      This Product Annex relates to and forms part of the Master Prime Brokerage Agreement made between the Prime Broker and the Counterparty dated ⌐ 24 98 (the *Master Agreement*). This Product Annex applies in respect of all FX Transactions unless the parties otherwise agree.

**DEFINITIONS**

2.      Terms defined in the Master Agreement have the same meanings in this Product Annex. In addition, in this Product Annex the following words and phrases have the following meanings-

*Back-To-Back Contract*   A contract between the Prime Broker and the Counterparty arising upon novation of a Third Party Transaction, as described in clause 4.6;

*Confirmation*   A confirmation of any FX Transaction sent by the Prime Broker to the Counterparty in the form, and containing the information, set out in Schedule 3 to this Product Annex;

*Contractual Settlement Date*   In relation to an FX Transaction, the date specified as the "Settlement Date" in the relevant Confirmation;

*Principal Transaction Request*   A formal request from the Counterparty, signed on its behalf by a person duly authorised for the purpose, requesting the Prime Broker to enter into a Principal Transaction;

*Settlement Request*   A formal request from the Counterparty in the form, and containing the information set out in Schedule 1 to this Product Annex and

signed on its behalf by a person duly authorised for the purpose, requesting the Prime Broker to settle a Third Party Transaction.

### TRANSACTIONS

3.      The Counterparty may from time to time request the Prime Broker-

(a)     to settle an FX Transaction entered into between the Counterparty and a Third Party which is an "Affiliate" of the Prime Broker (a *Third Party Transaction*).   For this purpose "Affiliate" means a subsidiary or holding company (as such terms are defined in section 736 of the Companies Act 1985) of the Prime Broker or any subsidiary of any such holding company; or

(b)     to enter into an FX Transaction with the Counterparty (a *Principal Transaction*).

### THIRD PARTY TRANSACTIONS

4.1     Whenever the Counterparty wishes the Prime Broker to settle a Third Party Transaction, it shall formally request the Prime Broker to do so by serving a Settlement Request on the Prime Broker.

4.2     The Prime Broker may reject a Settlement Request by giving oral or written notice to that effect to the Counterparty.  Within one Business Day following receipt by the Prime Broker of a Settlement Request the Prime Broker may send a Confirmation to the Counterparty by GPL.    Such Confirmation shall not be deemed to be a binding acceptance by the Prime Broker of the Settlement Request and the Prime Broker may reject any Settlement Request at any time up to and including the Contractual Settlement Date. The Prime Broker shall be deemed to have accepted the terms of a Third Party Transaction only on settling such Third Party Transaction.

4.3     On acceptance of a Settlement Request the Prime Broker shall, subject to the terms of this Agreement, use its reasonable endeavours to effect settlement of the Third Party Transaction on the Contractual Settlement Date.

4.4     Unless any particular settlement method is specified in the Settlement Request the Prime Broker may effect settlement, or attempt to do so, by any means it may reasonably agree with the Third Party or otherwise consider appropriate including, in particular, a means which does not provide for payment-against-payment.

4.5     Save where a Third Party Transaction is novated in accordance with clause 4.6 below, the Prime Broker shall, as between the Prime Broker and the

Third Party, act as the Counterparty's agent in settling any Third Party Transaction and the Prime Broker may inform the Third Party, or its agent, that the Prime Broker is acting as agent of the Counterparty.

4.6     The Prime Broker may, in its absolute discretion, agree with a Third Party that a Third Party Transaction shall be novated on terms that the rights and obligations of the Counterparty in respect of the Transaction shall be assumed by the Prime Broker. The Counterparty appoints the Prime Broker as its agent to agree any such novation on its behalf. Upon novation of a Third Party Contract there shall arise a Back-To-Back Contract between the Prime Broker and the Counterparty, in identical terms to the novated Third Party Contract except that-

(a)     the rights and obligations of the Prime Broker and the Counterparty under the Back-To-Back Contract shall be equivalent to the rights and obligations of the Third Party and the Prime Broker respectively under the novated Third Party Contract; and

(b)     the Prime Broker shall be obliged to perform its obligations under the Back-To-Back Contract only if and to the extent that the Third Party performs its obligations under the novated Third Party Contract.

4.7     The Counterparty shall indemnify the Prime Broker, its directors, officers and employees, and hold them harmless from and against all taxes, fees, expenses, actions, liabilities, costs, losses, or proceedings arising in connection with the settlement, or attempted settlement, of a Third Party Transaction (including any novated Third Party Transaction) or any failure to settle any such Transaction save to the extent such taxes, fees, expenses, actions, liabilities, costs, losses or proceedings result from the wilful default or negligence of the Prime Broker.

4.8     The Prime Broker shall be liable in respect of any failure by the Third Party to settle its obligations under a Third Party Transaction (including any novated Third Party Transaction) on the Contractual Settlement Date or at all.

4.9     The Prime Broker shall give oral or written notice to the Counterparty of the failure of any Third Party Transaction (including any novated Third Party Transaction) to settle on the Contractual Settlement Date as soon as reasonably practicable after becoming aware of the failure.

4.10    The Prime Broker shall, on the Contractual Settlement Date of a Third Party Transaction, credit or debit, as appropriate, appropriate Cash Accounts in respect of cash paid or received, or due to be paid or received, by the Prime Broker in settlement of the Transaction.

4.11   The Prime Broker may reverse any entries made under clause 4.10 above if the relevant Transaction does not settle within such period following the Contractual Settlement Date as the Prime Broker considers reasonable.

### PRINCIPAL TRANSACTIONS

5.1   Whenever the Counterparty wishes to enter into a Principal Transaction with the Prime Broker, it shall formally request the Prime Broker to do so by serving a Principal Transaction Request on the Prime Broker in a form agreed with the Prime Broker.

5.2   Service of a Principal Transaction Request shall constitute an offer by the Counterparty to enter into the Transaction, and that offer may not be amended or revoked without the consent of the Prime Broker.

5.3   The Prime Broker may reject a Principal Transaction Request by giving oral or written notice to that effect to the Counterparty. Within one Business Day following acceptance by the Prime Broker of a Principal Transaction Request the Prime Broker may send a Confirmation to the Counterparty by GPL. Such Confirmation shall not be deemed to be a binding acceptance by the Prime Broker of the Principal Transaction Request and the Prime Broker may reject any Principal Transaction Request at any time up to and including the Contractual Settlement Date. The Prime Broker shall be deemed to have accepted the terms of a Principal Transaction only on settling such Principal Transaction.

5.4   Unless the parties otherwise agree, cash which would otherwise fall to be paid by one party to the other on the Contractual Settlement Date of a Principal Transaction or a Back-To-Back Transaction shall not be paid but shall instead be credited (in the case of payments otherwise due to the Counterparty) or debited (in the case of payments otherwise due to the Prime Broker) to an appropriate Cash Account.

5.5   Cash credited to a Cash Account pursuant to clause 5.4 above shall, for the purposes of clause 8 of the Master Agreement, be treated as having been paid by the Counterparty to the Prime Broker. Cash debited to a Cash Account pursuant to clause 5.4 above shall, except to the extent that cash of the relevant currency is for the time being credited to a Cash Account and available for the purpose, be treated as having been loaned by the Prime Broker to the Counterparty and shall, subject to the terms of this Agreement, be repayable on demand.

**Lehman Brothers International
(Europe)**

By: ...............................

Title: ...............................

Date: ...............................

**Maverick Fund USA, Ltd.**

By: _Michael_

Title: _Controller Maverick Capital Ltd_
_General Partner_

Date: _6/24/99_

06/24/99          14:32                                                             NO.110     P54

## MASTER PRIME BROKERAGE AGREEMENT

## PRODUCT ANNEX: SECURITIES

**THIS PRODUCT ANNEX** is entered into on the 24ᵗʰ day of June 1999

**BETWEEN**

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** incorporated under the laws of England and Wales with unlimited liability, of One Broadgate, London EC2M 7HA, United Kingdom (the *Prime Broker*) and

**MAVERICK FUND USA, LTD.** of Dallas, Texas (the *Counterparty*)

**THIS PRODUCT ANNEX**

1.     This Product Annex relates to and forms part of the Master Prime Brokerage Agreement made between the Prime Broker and the Counterparty dated _6/24/99_ (the *Master Agreement*). This Product Annex applies in respect of all Securities Transactions unless the parties otherwise agree.

**DEFINITIONS**

2.     Terms defined in the Master Agreement have the same meanings in this Product Annex. In addition, in this Product Annex the following words and phrases have the following meanings-

*Back-To-Back Contract*  A contract between the Prime Broker and the Counterparty arising upon novation of a Third Party Transaction, as described in clause 4.6;

*Confirmation*  A confirmation of a Transaction sent by the Prime Broker to the Counterparty in the form, and containing the information, set out in Schedule 3 to this Product Annex;

*Contractual Settlement Date*  In relation to a Transaction, the date specified as the "Settlement Date" in the relevant Confirmation;

*Principal Transaction Request*  A formal request from the Counterparty requesting the Prime Broker to enter into a Principal Transaction;

*Settlement Request*  A formal request from the Counterparty substantially in the form, and containing the information, set out in Schedule 1 to this Product Annex and signed on its behalf by a person duly authorised for the purpose, requesting the Prime Broker to settle a Third Party Transaction.

06/24/99     14:32                                                           NO.110    P55

### TRANSACTIONS

3.   The Counterparty may from time to time request the Prime Broker-

(a)   to settle a Securities Transaction entered into between the Counterparty
and a Third Party (a *Third Party Transaction*); or

(b)   to enter into a Securities Transaction under which the Prime Broker
agrees to purchase securities from, or sell securities to, the Counterparty
(a *Principal Transaction*).

### THIRD PARTY TRANSACTIONS

4.1   Whenever the Counterparty wishes the Prime Broker to settle a Third
Party Transaction, it shall formally request the Prime Broker to do so by
serving a Settlement Request on the Prime Broker.

4.2   The Prime Broker may reject a Settlement Request by giving oral or
written notice to that effect to the Counterparty. Within one Business Day
following receipt by the Prime Broker of a Settlement Request the Prime
Broker may send a Confirmation to the Counterparty by GPL.    Such
Confirmation shall not be deemed to be a binding acceptance by the Prime
Broker of the Settlement Request and the Prime Broker may reject any
Settlement Request at any time up to and including the Contractual Settlement
Date. The Prime Broker shall be deemed to have accepted the terms of a Third
Party Transaction only on settling such Third Party Transaction.

4.3   Unless any particular settlement method is specified in the Settlement
Request the Prime Broker may effect settlement, or attempt to do so, by any
means it may reasonably agree with the Third Party or otherwise consider
appropriate including, in particular, a means which does not provide for
delivery-against-payment.

4.4   Save where a Third Party Transaction is novated in accordance with
clause 4.6 below, the Prime Broker shall, as between the Prime Broker and the
Third Party, act as the Counterparty's agent in settling any Third Party
Transaction and the Prime Broker may inform the Third Party, or its agent, that
the Prime Broker is acting as agent of the Counterparty.

4.5   The Prime Broker may, in its absolute discretion, agree with a Third
Party that a Third Party Transaction shall be novated on terms that the rights
and obligations of the Counterparty in respect of the Transaction shall be
assumed by the Prime Broker. The Counterparty appoints the Prime Broker as
its agent to agree to any such novation on its behalf. Upon novation of a Third
Party Contract there shall arise a Back-To-Back Contract between the Prime

Broker and the Counterparty, in identical terms to the novated Third Party Contract except that-

(a)    the rights and obligations of the Prime Broker and the Counterparty under the Back-To-Back Contract shall be equivalent to the rights and obligations of the Third Party and the Prime Broker respectively under the novated Third Party Contract; and

(b)    the Prime Broker shall be obliged to perform its obligations under the Back-To-Back Contract only if and to the extent that the Third Party performs its obligations under the novated Third Party Contract.

4.6    The Counterparty shall indemnify the Prime Broker, its directors, officers and employees, and hold them harmless from and against all taxes, fees, expenses, actions, liabilities, costs, losses, or proceedings arising in connection with the settlement, or attempted settlement, of a Third Party Transaction (including any novated Third Party Transaction) or any failure to settle any such Transaction save to the extent such taxes, fees, expenses, actions, liabilities, costs, losses or proceedings result from the wilful default or negligence of the Prime Broker.

4.7    The Prime Broker shall not be liable in respect of any failure by the Third Party to settle its obligations under a Third Party Transaction (including any novated Third Party Transaction) on the Contractual Settlement Date or at all.

4.8    The Prime Broker shall give oral or written notice to the Counterparty of the failure of any Third Party Transaction (including any novated Third Party Transaction) to settle on the Contractual Settlement Date as soon as reasonably practicable after becoming aware of the failure.

4.9    The Prime Broker shall, on the Contractual Settlement Date of a Third Party Transaction, credit or debit, as appropriate, appropriate Accounts in respect of securities and cash paid, delivered or received, or due to be paid, delivered or received, by the Prime Broker in settlement of the Transaction.

4.10    The Prime Broker may reverse any entries made under clause 4.9 above if the relevant Transaction does not settle within such period following the Contractual Settlement Date as the Prime Broker considers reasonable.

PRINCIPAL TRANSACTIONS

5.1    Whenever the Counterparty wishes to enter into a Principal Transaction with the Prime Broker, it shall formally request the Prime Broker to do so by serving a Principal Transaction Request on the Prime Broker in a form agreed with the Prime Broker.

5.2    Service of a Principal Transaction Request shall constitute an offer by the Counterparty to enter into the Transaction, and that offer may not be amended or revoked without the consent of the Prime Broker.

5.3    The Prime Broker may reject a Principal Transaction Request by giving oral or written notice to that effect to the Counterparty. Within one Business Day following acceptance by the Prime Broker of a Principal Transaction Request the Prime Broker may send a Confirmation to the Counterparty by GPL. Such Confirmation shall not be deemed to be a binding acceptance by the Prime Broker of the Principal Transaction Request and the Prime Broker may reject any Principal Transaction Request at any time up to and including the Contractual Settlement Date. The Prime Broker shall be deemed to have accepted the terms of a Principal Transaction only on settling such Principal Transaction.

5.4    Unless the parties otherwise agree, securities or cash which would otherwise fall to be delivered by one party to the other on the Contractual Settlement Date of a Principal Transaction or a Back-To-Back Transaction shall not be delivered or paid but shall instead be credited (in the case of deliveries or payments otherwise due to the Counterparty) or debited (in the case of deliveries or payments otherwise due to the Prime Broker) to an appropriate Account.

5.5    Securities or cash credited to an Account pursuant to clause 5.4 above shall, for the purposes of clause 8 of the Master Agreement, be treated as having been delivered or paid by the Counterparty to the Prime Broker.

5.6    Securities and cash debited to an Account pursuant to clause 5.4 above shall, except to the extent that securities of the amount and description in question or, as appropriate, cash of the amount and currency in question are for the time being credited to an Account and available for the purpose, be treated as having been loaned by the Prime Broker to the Counterparty. The Counterparty shall, subject to the terms of this Agreement, be obliged to deliver to the Prime Broker, on demand, Equivalent Securities in respect of any securities loaned to the Counterparty. Cash loaned by the Prime Broker to the Counterparty shall, subject to the terms of this Agreement, be repayable on demand.

**Lehman Brothers International
(Europe)**

**Maverick Fund USA, Ltd.**

**By:**    ...............................

**Title:**    ...............................

**Date:**    ...............................

**By:**    _Michelle R_

**Title:**    _Controller, Maverick Capital, Lt_
_General Partner_

**Date:**    _6/24/99_

USIA

## "REG X" LETTER

Dear Sirs

*In order for Lehman Brothers International (Europe) ("LBIE") to establish your account please
address the REG X letter below to LBIE, if applicable.*

### [to be addressed to LBIE on Principal's letterhead]

Date:

Lehman Brothers International (Europe)
One Broadgate
London EC2M 7HA
United Kingdom

Dear Sirs

### Re: Prime Brokerage Agreement

With respect to the above agreement entered into between us we, with full knowledge and
understanding of the terms set forth below, represent and warrant to you and for your benefit
that,                                                              , is not:

-        a United States person;

-        a foreign person controlled by U.S. persons; or

-        a foreign person acting on behalf of or in conjunction with U.S. persons

as such terms are defined or used in Regulation X issued by the Board of Governors of the
Federal Reserve System under the Securities Exchange Act 1934 (as amended) of the United
States of America. Each transaction carried or executed by Lehman Brothers International
(Europe) on our behalf shall constitute a representation by us that the above statements remain in
effect. We will promptly inform you should there be any change in our status that would effect
any of these representations.

Yours faithfully

For and on behalf of:



**Inland Revenue**

Financial Intermediaries
and Claims Office

## FOREIGN DIVIDENDS AND QUOTED UNITED KINGDOM EUROBOND INTEREST

### ELIGIBLE PERSON'S DECLARATION

This form is for use by a person

- to whom foreign dividends, or quoted UK Eurobond interest, or the proceeds of sale or other realisation of coupons for those dividends or interest, are payable; and
- who is eligible to receive the dividends, interest or proceeds without deduction of UK tax *(see note 1 overleaf)*.

The declaration below relates to all the dividends, interest or proceeds of sale or other realisation of coupons arising on foreign holdings and quoted UK Eurobonds *(but see note 1(c) overleaf)*.

Please read the notes overleaf carefully before completing the form in CAPITAL letters.

**Declaration and Undertaking**

| | |
|---|---|
| **Name of declarant** *(See note 4)* | Maverick Fund USA, Ltd |
| **Address of declarant** *(See note 5)* | 300 Crescent Court Suit R50 Dallas TX 75201 |
| **Name of collecting agent** | **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** |

*It is a serious offence to make a false declaration*

I declare that, in relation to the foreign dividends or quoted UK Eurobond interest, or the sale proceeds or other realisation of coupons for those dividends or interest to which this declaration relates

- I am eligible to receive the income without deduction of United Kingdom tax.

I declare that

- the information contained in this declaration is correct to the best of my knowledge and belief.

I undertake to notify the collecting agent named above of any foreign dividends, quoted UK Eurobond interest or proceeds of sale or other realisation of coupons to which the declaration does not apply or has ceased to apply.

| | |
|---|---|
| **Signature** *(See note 6)* | *Michele* |
| **Date** | 6/24/99 |
| **Capacity in which signed** | |

**CA1**

1041-13

Form **W-8**
(Rev. November 1992)
Department of the Treasury
Internal Revenue Service

**Certificate of Foreign Status**

Please Print or type

| Name of owner (If joint account, also give joint owner's name.) (See Specific Instructions.) | U.S. taxpayer identification number (if any) |

Permanent address (See Specific Instructions.) (Include apt. or suite no.)

City, province or state, postal code, and country

Current mailing address, if different from permanent address (Include apt. or suite no. or P.O. box if mail is not delivered to street address.)

City, town or post office, state, and ZIP code (If foreign address, enter city, province or state, postal code, and country.)

List account information here (Optional; see Specific Instructions.)

| Account number | Account type | Account number | Account type |

**Notice of Change in Status.**—To notify the payer, mortgage interest recipient, broker, or barter exchange that you no longer qualify for exemption, check here ......... ▶ ☐
If you check this box, reporting will begin on the account(s) listed.

Please Sign Here

**Certification.**—(Check applicable box(es)). Under penalties of perjury, I certify that:

☐ For INTEREST PAYMENTS, I am not a U.S. citizen or resident (or I am filing for a foreign corporation, partnership, estate, or trust).

☐ For DIVIDENDS, I am not a U.S. citizen or resident (or I am filing for a foreign corporation, partnership, estate, or trust).

☐ For BROKER TRANSACTIONS or BARTER EXCHANGES, I am an exempt foreign person as defined in the instructions below.

Signature _____  Date _____

## General Instructions

(Section references are to the Internal Revenue Code unless otherwise noted.)

### Purpose

Use Form W-8 or a substitute form containing a substantially similar statement to tell the payer, mortgage interest recipient, middleman, broker, or barter exchange that you are a nonresident alien individual, foreign entity, or exempt foreign person not subject to certain U.S. information return reporting or backup withholding rules.

Caution: Form W-8 does not exempt the payee from the 30% (or lower treaty) nonresident withholding rates.

### Nonresident Alien Individual

For income tax purposes, "nonresident alien individual" means an individual who is neither a U.S. citizen nor resident. Generally, an alien is considered to be a U.S. resident if:

• The individual was a lawful permanent resident of the United States at any time during the calendar year, that is, the alien held an immigrant visa (a "green card"), or

• The individual was physically present in the United States for:

(1) at least 31 days during the calendar year, and

(2) 183 days or more during the current year and the 2 preceding calendar years (counting all the days of physical presence in the current year, one-third the number of days of presence in the first preceding year, and only one-sixth of the number of days in the second preceding year).

See Pub. 519, U.S. Tax Guide for Aliens, for more information on resident and nonresident alien status.

Note: If you are a nonresident alien individual married to a U.S. citizen or resident and have made an election under section 6013(g) or (h), you are treated as a U.S. resident and may not use Form W-8.

### Exempt Foreign Person

For purposes of this form, you are an "exempt foreign person" for a calendar year in which:

1. You are a nonresident alien individual or a foreign corporation, partnership, estate, or trust.

2. You are an individual who has not been, and plans not to be, present in the United States for a total of 183 days or more during the calendar year, and

3. You are neither engaged, nor plan to be engaged during the year, in a U.S. trade or business that has effectively connected gains from transactions with a broker or barter exchange.

If you do not meet the requirements of 2 or 3 above, you may instead certify on Form 1001, Ownership, Exemption, or Reduced Rate Certificate, that your country has a tax treaty with the United States that exempts your transactions from U.S. tax.

### Filing Instructions

When To File.—File Form W-8 or substitute form before a payment is made. Otherwise, the payer may have to withhold and send part of the payment to the Internal Revenue Service (see Backup Withholding below). This certificate

generally remains in effect for three calendar years. However, the payer may require you to file a new certificate each time a payment is made to you.

Where To File.—File this form with the payer of the qualifying income who is the withholding agent (see Withholding Agent on page 2). Keep a copy for your own records.

### Backup Withholding

A U.S. taxpayer identification number or Form W-8 or substitute form must be given to the payers of certain income. If a taxpayer identification number or Form W-8 or substitute form is not provided or the wrong taxpayer identification number is provided, these payers may have to withhold 20% of each payment or transaction. This is called backup withholding.

Note: On January 1, 1993, the backup withholding rate increases from 20% to 31%.

Reportable payments subject to backup withholding rules are:

• Interest payments under section 6049(a).

• Dividend payments under sections 6042(a) and 6044.

• Other payments (i.e., royalties and payments from brokers and barter exchanges) under sections 6041, 6041A(a), 6045, 6050A, and 6050N.

If backup withholding occurs, an exempt foreign person who is a nonresident alien individual may get a refund by filing Form 1040NR, U.S. Nonresident Alien Income Tax Return, with the Internal Revenue

(Continued on back)

Printed on recycled paper    Cat. No. 10230M    Form **W-8** (Rev. 11-92)



6/24/99    ~~1998~~

Gentlemen

**RE:  Client Money Regulations**

We are regulated in the conduct of our investment business in the United Kingdom by the
Securities and Futures Authority ("SFA"). In accordance with the SFA Client Money Rule, we
are writing to advise you that we ("the firm") will not treat any funds which we receive from you,
or hold on your behalf in the course of carrying on investment business, as client money under the
Rules. This means that your money will not be subject to the protections conferred by the Rules
and, as a consequence, your money will not be segregated from the money of the firm and will be
used by the firm in the course of the firm's business and you will therefore rank as a general
creditor of the firm.

Please confirm your agreement to the above by signing and returning the attached copy of this
letter at your earliest convenience.

Yours faithfully
**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

Agreed and accepted as of the date first written above:

Maverick Fund USA, Ltd

By: _Michell_____
Controller
Maverick Capital, Ltd
General Partner