Joshua Dorchak
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178

Attorneys for Deutsche Bank AG and Affiliates

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                               :
In re                                                          :  Chapter 11
                                                               :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*   :  Case No. 08-13555 (SCC)
                                                               :
                                            Debtors.       :  (Jointly Administered)
                                                               :
---------------------------------------------------------------x

**OBJECTION OF DEUTSCHE BANK AG AND AFFILIATES
TO MOTION OF PLAN ADMINISTRATOR TO ESTIMATE CLAIMS
FOR RESERVE AND DISTRIBUTION PURPOSES**

Deutsche Bank AG and its affiliates (collectively, "Deutsche Bank" or the "Claimant"), by their attorneys, Morgan, Lewis & Bockius LLP, hereby object to the Plan Administrator's *Motion Pursuant to Sections 8.4, 9.3, and 14.1 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors to Estimate Claims for Reserve and Distribution Purposes* [ECF #54094] (the "Motion"), based on the facts set forth in the accompanying Declaration of Michael Sutton (the "DB Declaration") and for the reasons set forth below.

**PRELIMINARY STATEMENT**

1.   The Claimant's Guarantee Claims are prima facie valid. If allowed in the U.S. Dollar ("USD") equivalents of the Primary Claims as agreed by LBIE, which were admitted for payment in British Pounds Sterling ("GBP") in LBIE's Administration, the Guarantee Claims undisputedly would be entitled to a distribution from LBHI today by the plain terms of the Plan.

DB3/ 201343619v1

The thrust of the Motion is that, because the Plan Administrator considers the Claimant's Primary Claims to be "paid in full" and expects (without purporting to be certain) that they will receive "substantial" further payments, the Claimant's Guarantee Claims must be "estimated" at zero for all purposes (i.e., expunged), to avoid "unduly delaying" the administration of this longstanding and dramatically successful bankruptcy case. The Motion contradicts the Bankruptcy Code, the applicable precedent and the Plan, and should be denied on numerous procedural and substantive grounds.

2. First, the Motion does not seek to estimate the Guarantee Claims; the Motion seeks to expunge them. Claims estimation pursuant to Section 502(c)(1) is designed to fix the allowed amount of a claim based on a streamlined assessment of its merits. The Motion asks this Court to value the Guarantee Claims at zero based not on their merits but on their allegedly likely future superfluity. To expunge a prima facie valid claim, a debtor must object to it; and the Plan Administrator has never objected to these claims or submitted any evidence on their merits.

3. Second, even if the Motion really were an estimation Motion, the Guarantee Claims are liquidated and noncontingent. Section 502(c)(1) of the Bankruptcy Code does not permit the estimation of noncontingent and liquidated claims, even if they are disputed; and the Plan (§ 9.3) does not permit the estimation of claims beyond the limits of the Bankruptcy Code.

4. Third, even if the Motion really were an estimation Motion and the Claims really were contingent or unliquidated, Section 502(c)(1) of the Bankruptcy Code only permits estimation to avoid <u>unduly</u> delaying the administration of the case. The Plan Administrator invokes the complexity of addressing the merits of the Claims -- but giving a claimant its day in court cannot be a source of "undue" delay. The Plan Administrator also invokes the potential

burden of chasing the Claimant all over the world to compel disgorgement of excess distributions -- but something that the Plan (§ 18.3(e)) ensures will not happen cannot be a source of any delay at all. In any event, holding reserves (in assets, not cash, at LBHI's request) to protect about 1% of the $49 billion in Disputed Claims cannot be unduly delaying the administration of this case, in which distributions to date total over $100 billion, including over 150% of the initial estimated recovery for LBHI's unsecured creditors.

5.     Fourth, the factual premise of the Motion is incorrect: the Primary Claims have not necessarily been "paid in full" by LBIE. Although these claims have received 100% of the GBP equivalents of their admitted amounts from LBIE, the "full" amount payable by LBIE on these claims is a complex question of the validity of certain "non-provable" claims and the relative priority of such claims (if valid), statutory interest and subordinated claims -- all of which is being litigated before the English Courts in the "Waterfall Applications" (described below).

6.     Fifth, even if the GBP equivalents of the Primary Claims were the fixed and final amounts of the Primary Claims, it is undisputed that if the Guarantee Claims were allowed today at the USD equivalents of the Primary Claims, LBHI would owe the Claimant a distribution of at least 13% on each of the Guarantee Claims pursuant to Plan § 18.3(d) (the "Currency Conversion Obligation"). The Guarantee Claims should be preserved unless it is <u>certain</u> that they will <u>never</u> be needed, and the Plan Administrator cannot make that assertion today. Crucially, several outcomes in the Waterfall Applications could result in LBIE paying the Claimant an aggregate amount that exceeds the GBP equivalent of the Primary Claims but is <u>not</u> sufficient to discharge LBHI's Currency Conversion Obligation on the Guarantee Claims. In fact, LBHI is actively supporting several such unfavorable outcomes for the Claimant in the Waterfall Applications.

That is, the Plan Administrator is simultaneously asking the English Courts to deprive the Claimant of LBIE's "surplus" and asking this Court to deprive the Claimant of the Guarantee Claims because it is likely to be overcompensated by LBIE's "surplus."

7.    Sixth, even if LBIE were ultimately to pay the Claimant the amounts that the Plan Administrator predicts, the Plan Administrator improperly assumes that future payments from LBIE will fully discharge LBHI's obligations on the Guarantee Claims. This Court has not ruled on whether any types of future payments from LBIE -- for example, statutory interest, which the English High Court has held is "unconnected" to contractual obligations -- would be "consideration provided on the corresponding Primary Claim" under Plan § 18.3(a). To the extent LBIE's future payments are not such consideration, the amounts of the Primary Claims remain unchanged, but these payments from LBIE necessarily will not defray LBHI's obligations on the Guarantee Claims under Plan § 18.3(a), and LBHI will remain liable for the Currency Conversion Obligation. To the extent LBIE's future payments are such consideration, the amounts of the Primary Claims necessarily will have increased, thereby increasing LBHI's potential obligations on the Guarantee Claims for any shortfall from LBIE versus the aggregate payable and, in any event, for the Currency Conversion Obligation. This Court will not have sufficient information to decide these issues until the English Courts have determined the viability and nature of further types of payments on the Primary Claims.

8.    Finally, the Motion is perversely premature. The Plan Administrator chose to renew this dispute weeks ahead of an expected ruling from the Supreme Court of the United Kingdom in the Waterfall I Application. That ruling will provide clarity on some of the Claimant's disputed entitlements from LBIE and recoveries thereon, and thus partial clarity on the Claimant's worst-case ultimate recovery from LBIE. This clarity necessarily will assist the

Claimant and LBHI in resolving, or at least narrowing, their disputes. Accordingly, if this Court does not deny the Motion, the Motion should be deferred until the UK Supreme Court has ruled on Waterfall I and the parties have had the opportunity to negotiate or, absent a resolution, to update their briefs and return to this Court -- furthering judicial efficiency, either way.

9. In summary, the quantum of LBHI's obligations on the Guarantee Claims is not presumptively zero; it is an open question, which depends in part on the numerous material factual and legal variables underlying LBIE's ultimate obligations on the Primary Claims. Neither the Bankruptcy Code nor the Plan permits the Plan Administrator to sweep all these issues aside and expunge the claims by the guise of "estimation" in the name of "efficiency." The Motion should be denied.

## BACKGROUND

10. By the Motion, the Plan Administrator seeks effectively to expunge, without objecting to them, forty-nine Guarantee Claims held by Deutsche Bank (Motion, Ex. A, items 64-112) based on LBHI's guaranty of the primary obligations of LBIE. The Guarantee Claims are prima facie valid, noncontingent, and liquidated.[1] Pursuant to an agreement reached after the initial version of the Motion was filed in late 2015 [ECF #49954], the Plan Administrator is maintaining reserves for all of the Guarantee Claims (in assets, not cash, at LBHI's request) based on the allowed amounts of the Primary Claims, and Deutsche Bank has agreed that its recoveries on the Guarantee Claims shall not exceed the amounts reserved. DB Decl. ¶¶ 6-7.[2]

---

[1] Exhibit A to the Motion shows the liquidated amount of each Guarantee Claim. Many of the claims were originally filed to include then undetermined amounts, but these amounts are irrelevant to the Motion, because all of the claims are reserved for based on fixed amounts.

[2] Deutsche Bank has agreed to limit its recoveries on the Guarantee Claims to the amounts reserved for them, but has not agreed to cap the allowed amounts of the claims. DB Decl. ¶ 8. Deutsche Bank reserves its rights to amend the liquidated portions of the Guarantee Claims to the extent permitted by the Bankruptcy Code and the Plan Confirmation Order.

DB3/ 201343619v1

5

11. The principal amounts of the Primary Claims have been agreed and admitted for payment by LBIE in its Administration, and the Claimant has received distributions from LBIE in GBP at the GBP equivalent of such agreed amounts. *Id.* ¶ 5. There is no question that if the Guarantee Claims were allowed today at the USD equivalents of the Primary Claims, every Guarantee Claim would be entitled to a distribution from LBHI pursuant to Plan § 8.13(a) and § 8.13(d). That is because every Primary Claim was either in GBP or converted to GBP for admission and payment in LBIE's case at the conversion rate in effect on September 15, 2008; whereas, under the Plan, payments received from LBIE in GBP on the Primary Claim are converted into USD for the purpose of determining whether the Guarantee Claim has been satisfied in full at the conversion rate in effect on December 6, 2011, when the GBP had weakened against the USD. *See* Plan § 8.13(d).[3]

12. If there were no "surplus" at LBIE, there would be no issue of "estimating" the Guarantee Claims: they would be Disputed Claims, subject to potential objection on the merits. As matters stand, the Plan Administrator is asking this Court to expunge the Guarantee Claims before it is known whether the Plan Administrator's current expectations and assumptions about the "surplus," which the Claimant disputes, are correct. The validity, priority, nature and amount of further payments from LBIE in respect of the Primary Claims will remain unclear until the final resolution of the ongoing "Waterfall Applications" being heard by the English Courts in connection with LBIE's Administration since February 2013.[4]

---

[3] To illustrate: An undisputed USD 179.37 Primary Claim under a contract with LBIE is admitted at GBP 100.00 against LBIE and the Guaranty Claim is allowed at USD 179.37 against LBHI; but a GBP 100.00 distribution from LBIE on the Primary Claim creates only a USD 155.93 credit against the Guaranty Claim at LBHI. The USD 23.44 difference between USD 179.37 and USD 155.93 in this example is the Currency Conversion Obligation.

[4] LBIE's Administrators provide summaries of the issues, outcomes and schedules in the Waterfall Applications at: http://www.pwc.co.uk/services/business-recovery/administrations/lehman.html.

DB3/ 201343619v1

6

13. The Claimant highlights below just some of the dozens of highly complex, interconnected issues being considered by the English Courts in the Waterfall Applications that are relevant to the Motion.

"Waterfall I Application":

- if the LBIE Administration converts to a Liquidation, is no statutory interest payable for the period prior to the conversion;

- are creditors that received distributions in GBP on debts converted from another currency to GBP entitled to no true-up payment where the GBP has weakened against the original currency; and

- do LBIE's billions of dollars of subordinated debt rank prior to statutory interest on "provable" debts and "non-provable" claims, and does interest on subordinated debt (which could potentially be at a high rate) rank equally with statutory interest on "provable" debts.

"Waterfall II Application":

- does statutory interest begin to accrue on admitted claims that were contingent or unmatured on the commencement date only when such claims became fixed, and not from the commencement date forward; and

- must payments of contractual or statutory interest be offset against the creditor's currency conversion claim, if any; and

- were entitlements to contractual or statutory interest or currency conversion true-ups waived in any of the various agreements entered into between LBIE and creditors after the commencement date.

*See* DB Decl. ¶¶ 10-11. Virtually every question above that is definitively answered "Yes" by the English Courts will decrease the Claimant's entitlement and/or recovery in the "surplus" at LBIE -- potentially, in certain combinations, substantially so (as discussed below). *See id.* ¶ 12.

14. For these and numerous other reasons, what the Claimant actually will recover from LBIE and how those recoveries should be applied as a matter of English law remain decidedly uncertain. The UK Supreme Court's decision on the Waterfall I Application, which is

expected to be issued within a few weeks, will clarify many issues, although the Waterfall II Application (in several distinct phases) is currently only at the Court of Appeal. *See id.* ¶¶ 13-14.[5]

15.  The Plan Administrator would like this Court to ignore the Waterfall Applications, but they matter. The simple reason why is that the Waterfall Applications could result in the Claimant receiving insufficient further payments from LBIE to discharge LBHI's Currency Conversion Obligation -- except that, if the Motion is granted first, the Claimant will not have any Guarantee Claims, and LBHI will have a blatant windfall, and this Court will have been misled. The more complex reason why is that the Waterfall Applications will determine the nature and amount of any future payments from LBIE to the Claimant, which must be the starting point for this Court to decide which, if any, of those future payments are components of the Primary Claims, "consideration on the related Primary Claims" under Plan § 8.13(a), or something else, which in turn will dictate whether LBHI has obligations or not on the Guarantee Claims under Plan § 8.13(a) and/or § 8.13(d).

**ARGUMENT**

16.  The Motion should be denied because the Plan does not permit estimation of the Guarantee Claims and because, in any event, the Plan Administrator has not remotely met its burden of showing that the merely disputed status of the Guarantee Claims is so unduly delaying the administration of this case as to justify their effective expungement. The Motion should also be denied for the independent reason that it is based on assumptions of fact and law that are disputed and could prove wrong.

---

[5] There is also a "Waterfall III Application," concerning intercompany claims and liabilities between LBIE and its members, LB Holdings Intermediate 2 Limited and Lehman Brothers Limited, as well as Lehman Brothers Europe Limited, which will be heard by the High Court in two phases over the course of 2017. DB Decl. ¶ 15.

### A. The Plan Does Not Permit the Guarantee Claims to be Estimated.

17. The Plan § 9.3 permits claim estimation only "to the extent permitted by the Bankruptcy Code." As an initial matter, Bankruptcy Code § 502(c) permits certain open-ended claims to be estimated "for purpose of allowance," such that "an estimation under 502(c) generally should result in an allowed claim for all purposes in the bankruptcy case." Collier on Bankruptcy ¶ 502.04[3] (16th ed. 2015). While the statute arguably permits a claim to be "allowed" at zero based on a streamlined assessment of its merits, it should not permit a claim to be effectively expunged, as here, without addressing its merits at all.

18. In any event, it is clear that estimation can only apply to specified types of claims. This Court has summarized the "gating requirements" for claim estimation under the Bankruptcy Code as follows:

> In order to seek estimation, however, a party must demonstrate that the gating requirements for estimation are met -- namely, that the claim to be estimated is contingent or unliquidated and that the delay associated with the fixing or liquidation of such claim would be "undue."

*In re Lightsquared, Inc.,* No. 12-12080, 2014 WL 5488413, at *3 (Bankr. S.D.N.Y. Oct. 30, 2014) (citing *In re Dow Corning Corp.,* 211 B.R. 545, 562-63 (Bankr. E.D. Mich. 1997)). In considering whether to estimate a claim, "it is within [the court's] sound discretion and not the obligation of [the court] to estimate a claim." *Id.* (brackets in original) (citing *In re Apex Oil Co.,* 107 B.R. 189, 193 (Bankr. E.D. Mo. 1989)). Because the Guarantee Claims are neither contingent nor unliquidated, they cannot be estimated under the Plan.

#### 1. The Guarantee Claims Are Neither Contingent Nor Unliquidated.

19. As this Court has noted, it is well settled that: "Upon default of the principal on the underlying debt, liability on a guaranty becomes fixed and is no longer contingent because all predicates to enforcement have occurred." *Lightsquared,* 2014 WL 5488413, at *3 (citing

DB3/ 201343619v1

9

cases). "Nor does the fact that the [primary obligor] may be able to satisfy the claim render a guaranty claim contingent." *Id.,* 2014 WL 5488413, at *4 (citing cases). Likewise, a guaranty claim is not unliquidated simply because the value of any consideration paid by the primary obligor will be credited against the recovery on the guaranty claim -- even if there is a "likelihood that the [claimant] will be repaid in full" through sources other than the guaranty claim. *Id.,* 2014 WL 5488413, at *5.

20. Finally, it is well settled that "the existence of a dispute over either the underlying liability or the amount of a debt does not automatically render the debt either contingent or unliquidated." *In re Mazzeo*, 131 F.3d 295, 304-05 (2d Cir. 1997) (noting the "overwhelming body of precedent" as so holding).

21. Based on this Court's direct and explicit precedent, the Guarantee Claims are neither contingent nor unliquidated.

### 2. The Bankruptcy Code Does Not Implicitly Permit Estimation of Fixed and Liquidated Claims for Allowance Purposes.

22. The principle that, as Judge Gerber held in *Adelphia*, "section 502(c)(1), by its terms … does not authorize estimation of a liquidated claim" is consistent with the vast majority of the case law. *In re Adelphia Bus. Solutions, Inc.,* 341 B.R. 415, 424 (Bankr. S.D.N.Y. 2003); *see, e.g., In re Audre, Inc.*, 216 B.R. 19, 30 (9th Cir. BAP 1997) ("Resorting to § 502(c) is only appropriate when the claim is either contingent or unliquidated. If the debt does not fit this definition, estimation is inappropriate.") (reversing bankruptcy court); *In re Continental Airlines,* 981 F.2d 1450, 1461 (5th Cir. 1993) ("[I]n cases where a claim is neither contingent nor unliquidated, estimation is simply inappropriate.") (internal quotation marks omitted); *In re Comdisco, Inc.,* 271 B.R. 273, 281 (Bankr. N.D. Ill. 2002) ("Section 502(c) allows [a] Court to estimate only contingent and unliquidated claims, but not claims that are merely disputed."); *In*

*re S. Cinemas, Inc.,* 256 B.R. 520, 533 (Bankr. M.D. Fla. 2000) (under Section 502(c), "where a claim is neither contingent nor unliquidated, estimation is simply inappropriate."); *In re Nugent,* 254 B.R. 14, 38 (Bankr. D.N.J. 1998) ("a court may only estimate contingent or unliquidated claims" under Section 502(c)).

23. The Plan Administrator's purported precedent in support of the Motion only shows how extraordinary and improper the relief sought in the Motion actually is:

- The three estimation orders entered by Judge Peck in this case (i) were solely for purposes of establishing reserves, and expressly not for purposes of allowance or distribution, and (ii) did not estimate any nonduplicative or noncontingent claim at zero. *See* Motion ¶ 24 n.7.

- In *Enron*, Judge Gonzalez estimated a claim, where: (i) the Plan expressly provided for the estimation of any claim, without reference to the Bankruptcy Code; (ii) the Court had already disallowed and expunged the claim on the merits and because it was late filed; (iii) the Plan expressly provided that disallowed claims were entitled to no reserves; and (iv) the motion was heard only one year after the plan had gone effective and only two "very conservative" distributions had been made. *In re Enron Corp.,* No. 01-16034, 2006 WL 544463, at *2-3, 7 (Bankr. S.D.N.Y. Jan. 17, 2006).

- Likewise, in *Oakwood Homes* and *Genesis Health*, the Delaware District Court held that a claim already disallowed on the merits could be estimated at zero for reserve purposes. *In re Oakwood Homes Corp.,* 329 B.R. 19, 22 (D. Del. 2005) (plan expressly provided for reserves at the claim amount determined by court order); *In re Genesis Health Ventures, Inc.,* 272 B.R. 558 (Bankr. D. Del. 2002), *aff'd*, 112 F. App'x 140 (3d Cir. 2004).

- In *Adelphia*, Judge Gerber held that estimation of a certain liquidated claim was permissible to determine plan feasibility, but expressly (i) rejected the assertion that a liquidated claim may be estimated as to "actual allowance … with such little due process," and (ii) agreed with the claimant that "section 502(c)(1), by its terms … does not authorize estimation of a liquidated claim." *Adelphia,* 341 B.R. at 422, 424; *cf. In re Teigen,* 228 B.R. 720, 723-24 (Bankr. D.S.D. 1998) (called "unpersuasive" in *Lightsquared,* 2014 WL 5488413, at *5).

DB3/ 201343619v1

11

- In *Wallace's Bookstore*, the Eastern District of Kentucky Bankruptcy Court held that a liquidated claim could be estimated, but only because the scope of the Plan's estimation procedures "expand[ed] considerably on § 502(c)," by including any disputed claims, whether or not they were contingent or unliquidated, and even whether or not they would allegedly cause undue delay. *In re Wallace's Bookstores, Inc.,* 317 B.R. 720, 723-24 (Bankr. E.D. Ky. 2004).

Because the Plan in this case (§ 9.4) expressly limits estimation "to the extent permitted by the Bankruptcy Code," the Plan Administrator's precedent is all off point -- except for (i) Judge Gerber's decision, which directly and expressly contradicts the Plan Administrator's position, on both statutory and due process grounds, *see Adelphia,* 341 B.R. at 422, 424, and (ii) the South Dakota Bankruptcy Court's 1998 decision in *In re Teigen,* 228 B.R. 720, 723-24 (Bankr. D.S.D. 1998), which this Court called "unpersuasive" in *Lightsquared,* 2014 WL 5488413, at *5.[6]

24.     The Motion, in a word, overreaches. Because the Guarantee Claims are neither contingent nor unliquidated, they cannot be estimated under the Bankruptcy Code or the Plan. *See Audre,* 216 B.R. at 30; *Continental Airlines,* 981 F.2d at 1461; *Adelphia,* 341 B.R. at 424; *see also* Plan § 9.3.

### B.     The Guarantee Claims Are Not Unduly Delaying This Case.

25.     The Motion does not come close to meeting the independent gating requirement of undue delay. *See Lightsquared,* 2014 WL 5488413, at *3. Any "delay" caused by the Plan itself -- here, by the Plan Administrator's obligation under Plan § 8.4 to reserve for the prima facie valid Guarantee Claims until it is prepared to address their merits under Plan § 6(b)(i) -- cannot be "undue" for purposes of administering this case, especially at this point in this case.

---

[6] The Plan Administrator also cites (¶ 24) a stray comment from Judge Peck at an unspecified hearing in 2012 and a series of orders in which this Court granted, without objection, the Plan Administrator's initial motion to estimate LBIE Guarantee Claims [ECF #49954], none of which has any precedential weight.

### 1. The "Delay" of Which the Plan Administrator Complains Is Not an Estimation Issue.

26. As an initial matter, Section 502(c) of the Bankruptcy Code permits estimation of a claim whose "fixing or liquidation … would unduly delay the administration of the case." Here, as shown, the Guarantee Claims are already fixed and liquidated, and are reserved for based on liquidated amounts. Something that is already done cannot delay the case.

27. The Plan Administrator admits that the parade of "delays" that it conjures up in the Motion are not matters of fixing or liquidating claims, but rather, matters of claims "resolution," which is not relevant to Section 502(c). In any event, resolving a liquidated claim on the merits, however complex or burdensome, cannot be a cause of "undue" delay at any point in any case.[7] The purported ancillary problem of chasing "parties around the world" to ensure against excessive distributions cannot be a cause of delay because it is entirely hypothetical: the Guarantee Claims are not receiving distributions, and even if they were, Plan §8.13(e) permits the Plan Administrator to withhold excess distributions preemptively.

### 2. The "Delay" Cannot Be "Undue" at This Point in This Case.

28. Even if this Court should be willing to consider the claims resolution process to be a potential source of "delay" under Section 502(c), the Plan Administrator's maintaining an agreed limited reserve for the Guarantee Claims, so that the Guarantee Claims can be resolved on the merits if need be, cannot reasonably be considered "unduly" prejudicial to LBHI's creditors at this point in this case. It has been five years since the Plan's effective date. The Lehman Debtors are about to make a twelfth distribution to creditors, bringing the total net amount distributed to about $115 billion, including over 150% of the estimated recoveries to most of

---

[7] The Motion (¶ 35) includes a brief assault on the merits of an unspecified number of the Guarantee Claims as being supported only by a general guaranty. The Plan Administrator has been free to object to any such claims on this ground for years, and cannot litigate a generic merits issue in passing in the Motion. For the record, the Claimant disputes that any such claims are invalid and stands ready to brief the issue in the proper context.

LBHI's unsecured creditors in the Disclosure Statement. ECF #54684 (Quarterly Report) at 28; ECF #53706 (Eleventh Distribution Notice) at 4; *cf.* ECF #19629 (Disclosure Statement) at 6. By contrast, in the *Enron* decision misguidedly cited by the Plan Administrator, Judge Gonzalez estimated certain disallowed claims in light of the fact that the plan had gone effective just one year earlier and only two "very conservative" distributions had been made. *Enron,* 2006 WL 544463, at *7. Finally, the Guarantee Claims make up about 1% of the $49.3 billion in unresolved claims, ECF #54684 (Quarterly Report) at 28, and the Debtors' claim objection deadline has been extended to September 6, 2018, ECF #54122 (Order) at 2. Here, there is no exigency at all, much less one that need or should be addressed by depriving the Claimant of its day in court on the merits of the Guaranty Claims.

      **C.**      **The Guarantee Claims Are Not Meritless or Superfluous.**

      29.      The Motion should be denied, because the Guarantee Claims cannot be estimated for the several reasons given above. But the Motion is not only improper procedurally; the substantive allegations and assumptions underlying the Motion are disputed and may be wrong. The Guarantee Claims are not superfluous, because without them the Claimant <u>may</u> be deprived of its full recovery under the Plan. For this simple reason, the Motion should be denied.

      30.      As a starting point, the Guarantee Claims would not be paid in full under the Plan today, if they were allowed in the same amounts as the Primary Claims: distributions would be payable from LBHI to satisfy the Currency Conversion Obligation. That is a fact, and has been for years. The Plan Administrator essentially admits as much (¶¶ 19-20), but insists (¶ 29) that the Guarantee Claims at some point "will ultimately be satisfied in full as a result of distributions from LBIE alone." That is a prediction. Because this prediction is based on factual and legal assumptions that may prove incorrect, the Motion must be denied.

31.     The Plan Administrator's prediction is based on (i) data observed in the secondary market for LBIE claims, which is irrelevant to the Claimant's rights under the Plan and in any event merely reflects others' predictions, and (ii) LBIE's Administrators' website, which is inadmissible hearsay and in any event is rife with caveats and disclaimers.[8] And neither source directly addresses the Guarantee Claims actually held by the Claimant. That is, the Plan Administrator asks this Court to expunge these particular Guarantee Claims against LBHI because other people are acting or talking optimistically about claims against LBIE. That cannot be enough. To expunge these Guarantee Claims, the Plan Administrator must show <u>with certainty</u> that they will never be needed -- which it cannot do and does not try to do.

32.     Deutsche Bank, of course, hopes to maximize its recoveries on the Primary Claims, but is not so optimistic as to voluntarily waive the protection of the Guarantee Claims. DB Decl. ¶ 16. Deutsche Bank has been closely monitoring the Waterfall Applications and has concluded that, as of today, even assuming future payments from LBIE constitute consideration on the Primary Claims, there are several possible outcomes in which LBIE will pay creditors in respect of the Primary Claims and statutory interest less than would be necessary to discharge LBHI's Currency Conversion Obligation. *Id.* ¶ 17.

33.     In one scenario, if (a) the English Courts rule with finality in the Waterfall I Application that LBIE (i) owes no accrued statutory interest for the period of administration, if it converts from administration to liquidation, and (ii) has no obligation for currency conversion true-ups, and (b) LBIE converts to liquidation and makes all outstanding payments promptly

---

[8] For example: "In the absence of a consensual solution being reached, 2020 would appear a current best estimate backstop date for the Administrators to have sufficient legal certainty concerning the Waterfall issues to be able to begin distribution of the Surplus remaining after an interim payment [dependent on creditors' consent] in mid-2017 (if any) of a material element of basic entitlements." Available at: http://www.pwc.co.uk/business-recovery/ recovery/ administrations/lehman/lbie-16th-progress-report.pdf.

DB3/ 201343619v1

15

thereafter, then the Primary Claims could ultimately recover from LBIE much less than would be necessary to discharge LBHI's Currency Conversion Obligation. *Id.* ¶ 18.

34. In a second scenario, if (a) the English Courts rule with finality in the Waterfall I Application that LBIE must pay subordinated debt claims in priority to statutory interest on claims such as the Primary Claims and that statutory interest on such subordinated claims (at relatively high interest rates) ranks equally with statutory interest on claims such as the Primary Claims, and (b) if the English Courts rule with finality in the Waterfall II Application that claimants with ISDAs are entitled to high costs of funding, then the non-ISDA-based Primary Claims could ultimately recover from LBIE less than would be necessary to discharge LBHI's Currency Conversion Obligation. *Id.* ¶ 19.[9]

35. In a third scenario, if (a) the English Courts rule with finality (i) in the Waterfall I Application that LBIE has no obligation at all for currency conversion true-ups, or (ii) in the Waterfall II Application that certain terms in post-administration agreements effectively waive currency conversion true-ups, and (b) the English Courts rule with finality in the Waterfall II Application that statutory interest does not begin to accrue on contingent claims until they are fixed, then certain Primary Claims could ultimately recover from LBIE much less than would be necessary to discharge LBHI's Currency Conversion Obligation. *Id.* ¶ 20.

36. In the Waterfall Applications, LBHI (in Waterfall I) and the joint venture in which LBHI has a substantial economic interest (in Waterfall II) have been actively litigating in support of almost all of the components of the scenarios described above. *Id.* ¶ 21.[10] That is,

---

[9] The outcome would be even worse for the Claimant in this scenario for certain Primary Claims if, in addition, the English Courts rule with finality in the Waterfall II Application that statutory interest does not begin to accrue on contingent claims until they are fixed. DB Decl. ¶ 19.

[10] The joint venture is described in the Debtors' most recent Quarterly Report [ECF #54684] at 22.

DB3/ 201343619v1

16

LBHI is telling the English Courts that such scenarios are the just and proper result and simultaneously telling this Court that such scenarios are inconceivable. *See id.*

37. Deutsche Bank does not believe that any of the scenarios described above is more likely than not to occur. *See id.* ¶ 17. But as of today, these scenarios (and others), which would make LBHI liable for some portion of the Currency Conversion Obligation, <u>could</u> occur. *See id.* In fact, LBHI is petitioning the English Courts to <u>make</u> them occur. *See id.* ¶ 21. The Plan (§ 8.4) requires the Plan Administrator, absent a court order or agreement with the claimant, to establish reserves against the amount that <u>could</u> become payable on a Disputed Claim as filed, not on the amount that the Plan Administrator (or even the claimant) believes <u>most likely</u> to become payable. The Plan Administrator cannot use claim "estimation" to evade its reserve obligations, because a court order determining reserves is available only "to the extent permitted by the Bankruptcy Code and Bankruptcy Rules." Plan § 8.4; *cf. id.* § 9.3.

38. Moreover, even assuming the Claimant will receive substantial further payments from LBIE, the Plan Administrator implicitly and improperly assumes throughout the Motion that those payments -- potentially including contractual interest, statutory interest and/or currency conversion true-ups, beyond the agreed principal amount of the Primary Claims -- would constitute "consideration provided on the corresponding Primary Claim[s]" under Plan § 8.13(a) and would count against the Claimant's aggregate recoveries on the Primary Claims <u>and</u> the Guarantee Claims. This is yet another crucial open question.

39. To the extent future payments to the Claimant from LBIE (e.g., statutory interest) are <u>not</u> "consideration provided on the corresponding Primary Claim[s]" under Plan § 18.3(a), the amounts of the Primary Claims remain unchanged, but these payments necessarily will not defray LBHI's obligations on the Guarantee Claims under Plan § 18.3(a), and LBHI will remain

liable for the Currency Conversion Obligation. Notably, in the Waterfall II Application, the High Court has held that the purpose of statutory interest "is to compensate creditors for the delay occasioned by the insolvency …" and "[i]t is unconnected with any right to interest under the contract or to the lack of any such right …."[11] If, as the Claimant believes, statutory interest is not consideration <u>on</u> the Primary Claim and if currency conversion claims are either held invalid in Waterfall I or held waived in Waterfall II, then LBHI's Currency Conversion Obligation should remain payable under the Plan §§ 18.3(a) and 18.3(d).[12]

40. To the extent future payments to the Claimant from LBIE <u>are</u> "consideration provided on the corresponding Primary Claim[s]" under Plan § 18.3(a), it follows that the amounts of the Primary Claims and the Guarantee Claims will increase likewise. It is the role of this Court to resolve the parties' potential dispute over the application of Plan § 18.3(a) to any further payments related to the Primary Claims, but that inquiry will remain premature until the English Courts have determined the nature, amount and timing of those payments in the first instance.

41. As demonstrated above, the essential flaw of the Motion on the substantive level is that the Plan Administrator treats open factual and legal questions as foregone conclusions. Many of these open questions will be answered in the UK Supreme Court's decision on the Waterfall I Application, which is expected to be issued within the next few weeks, as the Plan Administrator is doubtless aware. Simply stated, the landscape surrounding the Motion will change. Accordingly, if this Court sees fit to overlook the Motion's several procedural improprieties and wishes to address the substance of the Plan Administrator's assumptions, then

---

[11] The High Court's decision is summarized by the LBIE Administrators at: https://www.pwc.co.uk/business-recovery/administrations/lehman/lehman-waterfall-ii-supplemental-issues-24-august-2016.pdf.

[12] Another variable in the Waterfall II Application is the "Bower v Marris" issue: whether LBIE's distributions to date should be applied first to statutory interest and second to principal claim amount, or vice versa. DB Decl. ¶ 12.

this Court should defer the Motion until after the decision on the Waterfall I Application is issued. This will give the parties the opportunity to reconsider their positions and either resolve their disputes or return to this Court with updated arguments.

## CONCLUSION

For the foregoing reasons, Deutsche Bank respectfully requests that the Motion be denied.

Dated:   New York, New York
         March 21, 2017

                                          **MORGAN, LEWIS & BOCKIUS LLP**

By:   */s/ Joshua Dorchak*
      Joshua Dorchak
      101 Park Avenue
      New York, New York  10178
      212.309.6000
      joshua.dorchak@morganlewis.com

      Attorneys for Deutsche Bank AG and Affiliates