1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11

12                  U.S. Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  March 2, 2017

17                  1:34 PM

18

19

20

21   B E F O R E :

22   HON SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: KAREN / RACHEL

1   Hearing re: Trial on Lehman's Objection to Claims of QVT

2   (Doc # 17468 Debtors' One Hundred Fifty-Fifth Omnibus

3   Objection to Claims)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S :

 2

 3    HOGAN LOVELLS US LLP

 4         Attorneys for QVT FUND LP

 5         875 Third Avenue

 6         New York, NY 10022

 7

 8    BY:  NICOLE E. SCHIAVO

 9         WILLIAM M. REGAN

10         BEN LEWIS

11         JOHN D. BECK

12         DENNIS H. TRACEY, III

13         ROBIN E. KELLER

14         DARYL L. KLEIMEN

15

16    DR. PETER NICULESCU - Witness

17

18

19

20

21

22

23

24

25
```

1   JONES DAY

2         Attorneys for the Debtor

3         250 Vesey Street

4         New York, NY 10281

5

6   BY:   LAURI W. SAWYER

7         DAVID P. SULLIVAN

8         JAYANT W. TAMBE

9         RYAN J. ANDREOLI

10        JENNIFER L. DELMEDICO

11        REBEKAH BLAKE

12        SARAH EFRONSON

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2              THE COURT:  Welcome back, Dr. Niculescu.  How are

3      you?

4              DR. NICULESCU:  Thank you, Your Honor.

5              THE COURT:  You're still under oath.

6              DR. NICULESCU:  Yes, Your Honor.

7              THE COURT:  All right.  Mr. Tambe, we're ready

8      when you are.

9              MR. TAMBE:  Good afternoon, Your Honor.

10                CROSS EXAMINATION OF PETER NICULESCU

11     BY MR. TAMBE:

12     Q    All right, Dr. Niculescu, let's talk about PCDS.

13     A    Yes, sir.

14     Q    And let's start, as we did, with CARB with just some of

15     the basic structure and mechanics.  If you're the protection

16     buyer on a PCDS contract, you have the obligation of making

17     a series of fixed payments, correct?

18     A    Yes, that's correct.

19     Q    And what you hope to earn is a credit protection

20     payment coming your way, if certain events occur, correct?

21     A    That's correct.

22     Q    And those could be either hard defaults, bankruptcies,

23     correct?

24     A    Yes.

25     Q    Or they could be deferrals of dividend payments,

Page 6

1    correct?

2    A    Yes.

3    Q    Either one of those would trigger a floating payment

4    back to the buyer of protection, correct?

5    A    That's correct.

6    Q    At inception of the PCDS contracts and the ones at

7    issue in this case, there were no points upfront, correct?

8    A    That is my understanding, yes.

9    Q    There was a running spread?

10   A    Correct.

11   Q    And at inception, the value of each PCDS contract was

12   zero, correct?

13   A    Well by definition, if there's no points upfront then I

14   think that's the definition that you're referring to.

15   Q    Even though on day one there are arguably two cash flow

16   streams that one can calculate, at the inception of the

17   PCDS, correct?

18   A    Yes.

19   Q    One is the payment stream of fixed payments going out,

20   if you're the protection buyer?

21   A    Yes.

22   Q    And the other is the floating rate payment coming back

23   to you, again as the protection buyer?

24   A    Yes.  Again, to be -- not to be misleading, you're --

25   we have to find some probability weight on some potentially

Page 7

1    large payment.

2    Q    Right.

3    A    Yes.

4    Q    So there will be -- it'll be probability weighted

5    return stream of a floating payment?

6    A    Yes.

7    Q    And on day one the present value of the outgoing money

8    has to be equal to the present value of the incoming money.

9    That's you want the value is zero, correct?

10   A    Yes.   The market's assessment of those two have to be

11   equal.

12   Q    Now, as time goes on the market value for PCDS can

13   change, correct?

14   A    Yes.

15   Q    And one of the things that could cause it to change is

16   an increased probability of a deferral, correct?

17   A    Yes.

18   Q    And if that were to happen the party that's a

19   protection buyer would be in the money, so to speak, right?

20   A    Yes.

21   Q    All right.   Well let's take Bear Stearns as an example,

22   okay?

23   A    Yes.

24   Q    So you're in February of 2008 and you had bought

25   protection on Bear Stearns say a year ago, or 18 months

Page 8

1    before that.

2    A    Yes.

3    Q    Right?  And now Bear Stearns is looking a little

4    precarious in February of 2008, correct?

5    A    Yes.

6    Q    And so you have a big mark to market positive that

7    you're a protection buyer on Bear Stearns, correct?

8    A    I -- I'm not familiar with what actually happened with

9    CDS and Bear Stearns, but I'd see no reason to doubt that.

10   Q    But you do know, from your experience in the market,

11   that Bear Stearns was somewhat distressed in February of

12   2008, correct?

13   A    Indeed I do, yes.

14   Q    In fact, so distressed that they ultimately got taken

15   over by JPM, correct?

16   A    Correct.

17   Q    Right.  And those folks who had brought protection on

18   Bear Stearns, in the hopes of a payout, that when Bear

19   Stearns defaulted they'd get a big payment, they didn't get

20   that big payment, did they, sir?

21   A    No, they did not.

22   Q    Because JPM came in, took over Bear Stearns and the

23   risk of default went down dramatically, correct?

24   A    Correct.

25   Q    Okay.  And something similar happened with Merrill

Page 9

1    Lynch, right?  If you had bought protection on Merrill

2    Lynch, the week before Lehman Weekend, you were probably in

3    the money pretty substantially, correct?

4    A    Correct.

5    Q    All right.  And come Monday morning, Bank of America

6    has bought Merrill Lynch the risk of deferral or default has

7    gone down dramatically, correct?

8    A    Indeed, although they had not, in fact, affected a

9    purpose, they made an announcement and the risk had gone

10   down.

11   Q    All right.  And so again, if you are sitting, on

12   September 15th, 2008, yes Lehman's gone bankrupt, but there

13   are other data sources available to you, as you're thinking

14   about deferral risk.  You have the experience of Fannie and

15   Freddie to think about, right?

16   A    Yes.

17   Q    But you've also got the experience of Merrill Lynch and

18   Bear Stearns to think about, correct?

19   A    Yes.

20   Q    Okay.  So just because Fannie and Freddie resulted in a

21   particular outcome where the debt was covered by the U.S.

22   Government but the equity was not, no reason to believe that

23   that's the only scenario in people's minds on September

24   15th, correct?

25   A    Oh, I quite agree.

Page 10

1    Q    In fact, again, another differentiating factor between

2    Fannie Mae and Bear Stearns and Merrill Lynch is Merrill and

3    Bear Stearns were not government sponsored entities, but

4    Fannie and Freddie were, correct?

5    A    That's correct.

6    Q    And in fact, the other lesson on the morning of

7    September 15th was unless you get bought by a JP Morgan or a

8    Bank of America, the government's going to let you fail,

9    right?

10   A    That is one lesson people could draw.  I wouldn't

11   necessarily say it's the only lesson they could draw.

12   Q    No.  But it's in addition to the lesson you discussed

13   with the judge yesterday, which was the Frannie/Freddie

14   lesson, there were a bunch of other lessons that people

15   could have had in their minds on September 15th, 2008?

16   A    I agree.

17   Q    Right.  So the Fannie Freddie piece is just one piece

18   of the puzzle.  There are lots of other examples and case

19   studies that people could think about, as they thought about

20   deferral and default risk of financial institutions on the

21   morning of September 15th, 2008?

22   A    I agree.  I agree.

23   Q    There was a discussion you had I think with the Court

24   yesterday about is there a one for one relationship in the

25   change in price of the preferred security and the value of

Page 11

1    PCDS.  Do you recall that?

2    A    Yes.

3    Q    And I believe you said there isn't a one to one

4    relationship.

5    A    Not necessarily at all times, no.

6    Q    Is it close to one to one?

7    A    It depends on the price of the preferred, the

8    qualability of the preferred and the term of the PCDS

9    contract.

10   Q    So what's the range?  Is it from one to one to say five

11   to one?

12   A    I've seen numbers as low as .4 --

13   Q    Yeah.

14   A    Numbers as high as 1.5.  They may range beyond that, I

15   don't recall as I sit here exactly what the range is.

16   Q     But as you sit here, the numbers that came to mind was

17   if it's not a one to one relationship, it could be .4 to 1

18   or 1 to 1.15?

19   A    Correct.

20   Q    Okay.  How about 1 to 100?

21   A    No.

22   Q    1 to 50?

23   A    No.

24   Q    Not possible, right?

25   A    No.

Page 12

1   Q    Okay.  Now, you would agree with me that if you were

2   simply looking at the price for preferred and trying to

3   value a PCDS, one of the things you have to take into

4   account are the different maturities of the PCDS and the

5   preferred, correct?

6   A    Correct.

7   Q    You'd also have to take into account what the coupon or

8   fixed rates were on the two different instruments, correct?

9   A    Correct.

10  Q    And I think in addition to those two, you also have

11  identified something called a basis risk that you'd have to

12  take into account, correct?

13  A    Correct.

14  Q    And that is additive, that's not another name for what

15  we just talked about?

16  A    No, that's additive.

17  Q    And the basis risk is another disconnect between the

18  underlying the derivative, correct?  There's a difference, a

19  differential?

20  A    There's a difference in demand and supply between those

21  two sectors.

22  Q    So for example, the price of the preferred security

23  could be really driven by pure supply and demand as opposed

24  to other macroeconomic factors, correct?

25  A    I'm not sure I understand the question.

Page 13

1    Q    So.  Let's -- yes, (indiscernible).  One morning

2    investors could wake up and say, I just don't want

3    preferreds.  They may be very attractive, they may have good

4    interest rates, I just don't want anything that says

5    preferred in it.  I'm just going to dump it all.

6    A    I suspect you'd find other investors who would want to

7    buy it at that point.

8    Q    Sure.  But you could have different investor sentiment

9    being expressed in the price of a preferred security,

10   correct?

11   A    If you're proposing that the markets could be

12   irrational or provide arbitrage opportunities, then I would

13   agree from time to time they can.  There are limitations on

14   that.  People want to make money and insofar as you present

15   an opportunity that appears to be an attractive investment

16   opportunity, people tend to take that opportunity.

17            MR. TAMBE:  I'm going to have to pause for a

18   second because my real-time is not real-time.

19            THE COURT:  Are we having a problem with the

20   bandwidth today?

21            COURT REPORTER:  No.

22            THE COURT:  Yeah, sure.

23            MR. TAMBE:  Sorry, thank you.

24            THE COURT:  Is anyone else over there having the

25   same problem?

Page 14

1          (The Court and Court Reporter confer)

2     Q     So the concept we were just discussing in thinking

3     about the price of the preferred security was the concept of

4     investor sentiment, and you said that could be a factor,

5     correct?

6     A     I don't disagree with the possibility that relative

7     value opportunities or disagreements can open up from time

8     to time.  I would say only that they are limited by overall

9     people's intention to try to make money in a market and to

10    pursue those opportunities.

11    Q     Sure.  And you could have actually different sectors of

12    investors behaving differently, retail investors as opposed

13    to institutional investors, correct?

14    A     You can.

15    Q     Retail investors are more likely to get spooked?

16    A     I'm not sure if I agree with that.

17    Q     Not something you've studied?

18    A     Well, I have at various points in the past.  No, that's

19    not fair.  Certainly anybody can buy a retail instrument,

20    you don't have to be a retail investor.  The reputation of

21    retail preferred is that they tend to trade at higher prices

22    or lower spreads than institutional preferred.  But if the

23    price drops institutional buyers can come in and buy them.

24    Q     So if there were a difference that would get arbitraged

25    away by the institutional investors?

Page 15

1   A    That at least is the theory.

2   Q    Okay.  So let's move from investor sentiment to other

3   factors that might drive the pricing of preferred

4   securities.  Certainly deferral risk, correct?

5   A    Yes.

6   Q    But from day to day, if you simply saw a change in the

7   price, the price of a preferred security fell --

8   A    All right.

9   Q    -- from say Friday, just to take an example, Friday,

10   September 12th to Monday, September 15th, one conclusion you

11   might draw is, okay, deferral risk is gone, correct?

12   A    Yes.

13   Q    But you couldn't rule out the default risk had also

14   gone, correct?

15   A    Not if you just observe the preferred in isolation, no.

16   Q    And so to try and isolate deferral risk you would

17   compare the preferred security to another security of the

18   same issuer that didn't have the deferral component, but

19   also had the default component, right?

20   A    Yes.

21   Q    Such as senior debt or sub debt, correct?

22   A    Yes.

23   Q    A few more general questions before we get to Case 1

24   and Case 2, which is going to be a lot of fun.

25   A    Sorry.

Page 16

1    Q    So on the general questions, let's talk about the shape

2    of the market, because you spent some time talking about

3    that.  So let's go to a slide you used, that was -- that's

4    Exhibit CX-2159 and it's Page 26.

5    A    If somebody has a copy of my hardcopy, that would be

6    helpful.

7         (Counsel confer)

8         MR. TAMBE:  Sorry Judge, my fault, I should have

9    checked before we (indiscernible).

10   A    Thank you.

11        MR. TRACEY:  Do you have the other materials

12   there?

13   A    I don't have anything here at the moment.

14        MR. TRACEY:  Okay.

15        MR. TAMBE:  So let's make sure you have --

16        THE COURT:  Okay.  Let's get you back your

17   binders.

18   A    Do you want me to give that to Mr. Tracey now?  Mr.

19   Tracey gave me his copy; I think you can probably give him

20   that one.

21        (Pause)

22   Q    So yesterday you had discussed for the Court Slide 26

23   from CX-2159.  And this was isolated to the 19 referenced

24   entities, correct?

25   A    Yes.

Page 17

1   Q    And in fact, if you go to your source document, CX-

2   1788, you'll see that there were -- there was more sales and

3   purchases of PCDS protection by Lehman in the relevant time

4   period, correct?

5   A    Yes.

6   Q    And similarly, if you go to Slide 28 in 2159, again

7   there you focused on the 19 names and you've included, under

8   "Other," about 161 notional.  But here you're focusing just

9   on notional purchased by Lehman, correct?

10  A    That's correct.

11  Q    So you're not seeking to identify, in this slide,

12  people who may have brought protection from Lehman, correct?

13  A    That's not the purpose of this slide.  I think other

14  slides handle that.

15  Q    All right.  And you focused on folks who had sold

16  protection to Lehman, because you were trying to see who

17  else was potentially in a position that Merrill Lynch was in

18  at bankruptcy, correct?

19  A    Well, in part, yes.  I wanted to get a picture of the

20  scale and scope of the market, or the transactions, the

21  sources and the uses.

22  Q    Speaking of sources and uses, there was also relevant

23  information on the other side, folks who had been sold

24  protection by Lehman, correct?

25  A    Yes.

Page 18

1    Q    Because those folks would be in the position of having

2    to value the protection that they had purchased from Lehman,

3    correct?

4    A    Correct.

5    Q    And those would be folks that, perhaps, QVT might want

6    to speak with to see how to value this terribly illiquid

7    product, the sole market maker for which had disappeared,

8    correct?

9    A    I'm not sure whether those folks would have had

10   expertise in valuation or not, or whether QVT should have

11   spoken with them, but I agree that they were on the same

12   side of the market as QVT.

13   Q    Well, at least some of the folks who were on the same

14   side of the market as QVT were large broker dealers,

15   correct?

16   A    I don't recall, right now, to whom all of the people

17   where that Lehman had sold protection.  You'll have to

18   remind me of that.

19   Q    You do know, because I think -- were you here for Mr.

20   Neumann's testimony?

21   A    I was not, but I think I -- I've looked at the

22   testimony.

23   Q    You read the transcript?  You know the weekend before

24   Lehman filed for bankruptcy, Mr. Neumann and Mr. Chu had

25   some conversations about who's active in the market,

Page 19

1    correct?

2    A    Correct.

3    Q    And you were, in fact, shown an email yesterday about

4    folks that the traders at Lehman thought were active in the

5    market, correct?

6    A    That's right.

7    Q    And you said, based on the subpoenaed documents that

8    you'd reviewed, you didn't think any of those dealers were

9    active in the market; is that right?

10   A    That's right.

11   Q    Okay.  I just want to be sure about this.  So you think

12   the folks at Lehman who were speaking with QVT on September

13   the 14th, 2008 just had it wrong?

14   A    That's -- I'd seen no evidence to support their

15   assertion.

16   Q    Well, the only evidence that you have looked at is the

17   evidence that came back in response to subpoenas, correct?

18   A    I think I've seen an email or two as well, from Mr. Chu

19   on that matter, but I'd have to go back and look at the

20   record to remember that precisely.  Certainly the subpoena

21   evidence was a significant part of it.

22   Q    And you don't know, if in response to subpoenas, the

23   major dealers who got the subpoenas simply said, hey Lehman,

24   here's our books and records, come on in, get whatever you

25   want.  That's not what that did, is it?

Page 20

1    A    I would assume not.

2    Q    They gave a limited set of responses, correct?

3    A    My understanding is they would have gone a search on

4    terms such as PCDS.

5    Q    But you don't know what they did?

6    A    Well, I understand that -- what the request was, and I

7    would have every reason to believe the request was

8    fulfilled.  I have no reason to believe otherwise.

9    Q    But that was the sum and substance of your

10   investigation was to look at what came back in response to

11   subpoenas, a couple emails that you believe you saw from Mr.

12   Chu and you concluded the traders at Lehman, who identified

13   dealers who were active, as of September 14th, 2018 that was

14   just wrong?

15   A    That's my understanding.  As I sit here, that's the

16   best information that I have on that topic.

17   Q    And you know in addition to that email, there were

18   conversations between Mr. Neumann and Mr. Chu about who was

19   active in the market, correct?

20   A    I have no reason to doubt that.  I don't recall that

21   specifically, but I have no reason to doubt that.

22   Q    In fact, not just before the bankruptcy filing, but

23   after the bankruptcy filing with Lehman Mr. Chu and Mr.

24   Neumann spoke about this, because Mr. Neumann was going to

25   tell Mr. Chu who else is in the market that Mr. Chu can

Page 21

1    speak with, right?

2    A    I wouldn't dispute it.

3    Q    And do you know whether Mr. Chu called any of those

4    dealers and other parties identified by Mr. Neumann?

5    A    My understanding is he called at least one, beyond that

6    I'm -- I don't recall as I sit here.

7    Q    I think you said yesterday that Mr. Chu was trying to

8    replace the PCDS trades.  Can you identify a single document

9    under the -- other than the market quotation request sent

10   out by QVT, where QVT attempted to replace the risk it had

11   with Lehman?

12   A    No, as I sit here I cannot.

13   Q    In fact, you did discuss the Merrill Lynch offers,

14   correct?  October 1 and October 2?

15   A    Yes.

16   Q    Do you know the story behind those?  Do you know

17   whether Mr. Chu saw those?

18   A    My understanding is he did not.

19   Q    Just missed those completely?

20   A    That's what I've been told.

21   Q    So notwithstanding your belief that he was desperate to

22   replace risk, the two -- the only two offers that you're

23   aware of in the maker to sell PCDS protection after

24   September 15, 2008, Mr. Chu missed completely?

25   A    I -- sir, I'm sorry, I didn't express a belief that he

Page 22

1    was desperate to replace risk.  I'm not informed as to his

2    motivation; I'm simply trying to do a valuation on a

3    replacement trade.

4    Q    So you're trying to do a valuation as if he intended to

5    replace, but you have no knowledge as to whether or not he

6    in fact intended to replace?

7    A    That's not something that I have sought to inform

8    myself about, nor did I consider it relevant to the task I

9    was assigned, which was to compute a reasonable range for a

10   replacement cost.

11   Q    All right.  So let's go back to what you have seen and

12   what you -- your slides are based on CS-1788, if we can pull

13   that up.  And it's electronic, so.

14            All right.  So you're familiar with this document,

15   right?

16   A    This appears to be the Lehman trade log; is that

17   correct?

18   Q    Right.

19   A    Yes.

20   Q    And yesterday when it came up on the screen it had

21   already been prefiltered, so the only trades we saw on the

22   screen were the Merrill Lynch trades that matched up with

23   the Merrill Lynch offer.  Do you remember that?

24   A    Yes, I do.

25   Q    Okay.  So this is unfiltered.  This is everything on

Page 23

1   it, right?

2   A    Yes.  I take your word for it.

3   Q    Okay.  So one thing we can do is see who else,

4   throughout the history of this blotter, had sold protection

5   to Lehman, correct?

6   A    Yes, one can.

7   Q    And you know how to do that; you know which filter to

8   run, correct?

9   A    Yes, I mean, I think you just -- I don't remember

10  whether it's a P or S field, or what the notionals are, but

11  it's certainly something one can do.

12  Q    But this was part of your analysis, right, that

13  supports the slides that were presented to the Court?

14  A    Yes, it was.

15  Q    So which is the PODS?

16  A    Oh, I don't remember.  I -- you asked me -- this was

17  asked to me yesterday and I don't remember.  But I'd look it

18  up and we'd determine it.

19  Q    Okay.  So hypothetically, let's assume that P is where

20  Lehman has purchased protection from counterparties.

21  A    Okay.

22  Q    Fair assumption?

23  A    I believe that would align with what we saw yesterday

24  on the Merrill Lynch filter.

25  Q    Yeah, but you're not sure?

Page 24

```
 1   A    As I sit here, I mean, whether it was a P or an S, I'm

 2   not going to debate.

 3   Q    Well, long or short, it didn't matter, right?

 4   A    Of course it mattered.

 5   Q    Let's filter for P -- D, column D.  All right.  So am I

 6   right, so that if I filter for P, I find everyone on

 7   Merrill's side of the market, at least without doing any

 8   other filter, right?

 9   A    Again, presuming that my memory is correct and that

10   we're talking about the same thing, we're not playing games,

11   yes, absolutely.

12   Q    No, I don't want to play games.  It does matter to me

13   whether you know what P or S is, but we're not playing

14   games.

15   A    Well, and --

16   Q    Let's go down to Merrill Lynch on --

17   A    Fair enough, sir.  Fair enough.  I mean, purchase or

18   sale and the question in my mind was whether it's from

19   Lehman's perspective or from somebody else's perspective.

20   As I sat here yesterday I didn't remember which one it was,

21   and I think that's a simple matter of fact.  I don't think

22   we need to discuss that.

23   Q    Let's confirm.

24         THE COURT:  Now I'm completely unclear.  So do you

25   know, as you're sitting here now, having looked at this
```

Page 25

1   again, from whose perspective it is, P or S?

2   A    As I sit here at the moment, I do not.  If we scroll to

3   the Merrill Lynch trades I could confirm.

4              THE COURT:  All right.

5              MR. TAMBE:  We're going to do that.

6              THE COURT:  Okay.  Okay.

7   Q    Let's go on to Merrill Lynch.

8   A    Right.

9   Q    So you see a lot of Merrill Lynch names there, correct?

10  A    I do.

11  Q    Okay.  Does this help inform you as to whether the P is

12  a purchase from Lehman's perspective?

13  A    If we could make one further accommodation and do the

14  filter we did yesterday so I confirm the trades match up,

15  that would be helpful to me.

16  Q    Okay.  Sure.  Let's go over --

17  A    Filter on the trade date.

18  Q    It's -- actually I think it's --

19  A    Oh, excuse me, the maturity date I think is the right

20  thing to filter on.

21  Q    That's what you want to go to?

22  A    Yeah.

23  Q    Maturity date?  So why don't you tell us what to do.

24  A    2016, March 20th.

25  Q    Does that --

Page 26

1   A    Very good.  They're all Ps, so these are purchases of

2   protection on the part of Merrill Lynch -- on the part of

3   Lehman sales from Merrill Lynch.

4   Q    Okay.  So now we've established that we're on the same

5   page.

6   A    Yep.

7   Q    You know what the Ps are?

8   A    Yes.

9   Q    Ps are purchases -- the Ps are purchases of protection

10  by Lehman?

11  A    Correct.

12  Q    Okay.  So now that we've got that established, let's go

13  back and see who else sold protection to Lehman.

14          So let's clear the filters.  And now let's just

15  filter Column D for P.  And having done that, you'd agree

16  with me, would you not, Dr. Niculescu, that that is a

17  collection of all the counterparties who sold protection to

18  Lehman at some point in time in this blotter, correct?

19  A    Yes.

20  Q    The reason I said "at some point in time" is some of

21  these trades were terminated or unwound before September

22  2008, correct?

23  A    Yes.

24  Q    You know that?

25  A    I have no reason to doubt it.  And I think if we

Page 27

1    scrolled to the right we could determine that conclusively,

2    but I would not -- I don't want to waste the Court's time on

3    that point.

4    Q    So let's make sure we're not including in the

5    population folks who may have sold protection to Lehman and

6    unwound it.

7    A     Yeah.

8    Q     Let's see who was around in September 2008.

9    A     Fair enough.

10   Q     So let's go ahead and put that filter on.  Let's go to

11   the right and you tell me if I'm getting this right, Dr.

12   Niculescu.  Column O, let's just filter it for blanks.

13   A     Okay.

14   Q     So no full termination.

15              MR. TAMBE:  And hold on, Randall, one more.

16   Q     Column M, do we need to do anything there?

17   A     This is a trade assignment date, so the trade was

18   presumably assigned to another party.  So again we'd need to

19   do the same filter.

20   Q     So just focus on the blanks.  All right.  Now let's go

21   all the way to the left.  So we've removed from our

22   population any trades that were assigned, correct?

23   A     Yes.

24   Q     And we've removed from our population any trades that

25   were partially or fully terminated, correct?

Page 28

1    A    Yes.   That was correct.

2    Q    Okay.   So what's left is the population of

3    counterparties who had sold protection to Lehman on PCDS,

4    correct?

5    A    Are we confident these are all PCDS and there were no

6    debt CDS included here?   It says preferred CDS trades as the

7    tab, I presume -- let me make the assumption that's an

8    accurate tab.

9    Q    Well, CDS is in here.

10   A    Yes.

11   Q    And CDS was a preferred CDS, correct?

12   A    A CDS on a preferred security?

13   Q    Yeah.

14   A    Yes.

15   Q    Okay.

16   A    My question was whether there are any CDS on -- debt

17   had appeared in this spreadsheet or not.   I'm going to

18   presume that they did not.

19   Q    Well, it's a spreadsheet that you worked with and

20   relied on certainly in preparing your demonstratives,

21   correct?

22   A    Indeed.   But I don't remember, on every spreadsheet

23   that I've worked and relied upon, every constituent part.

24   I'm not going to be able to recall that.

25   Q    So let's scroll down this list of counterparties who

Page 29

1    were in the same position as Merrill Lynch and had trades

2    that relied on that side of the market in September 2008.

3    A    Yes.

4           MR. TAMBE:  Scroll down slowly.  Randall, can you

5    go to the top, please?

6    Q    All right.  So you start with AIG CDS, Inc., correct?

7    A    Yes.

8    Q    It's a big institution?

9    A    It was.

10   Q    Let's go down to Alliance Bernstein.  Big asset

11   manager, correct?

12   A    My former employer.

13   Q    You got Bank of America in there; do you see that?

14   A    Yes.

15   Q    You got Deutsche Bank AG London?

16   A    Yes.

17   Q    Again, big dealer, sophisticated?

18   A    Whether this is a dealer part of Deutsche Bank or what

19   was it part of, I'm not sure, but yes, Deutsche Bank is a

20   big dealer.

21   Q    And active in the derivatives market, correct?

22   A    Yes, indeed.

23   Q    In fact, that's where the folks at QVT came from, from

24   Deutsche Bank?

25   A    Oh, did they?

Page 30

```
 1    Q    Is there a question?

 2    A    Did they?  That was a question.  Yes, I wasn't aware.

 3    Q    Oh, you didn't know where they came from?

 4    A    No.

 5    Q    Okay.  Well, let's keep going down.  Goldman Sachs

 6    Capital Markets, dealer?

 7    A    I'm familiar with the institution, yes.

 8    Q    Good dealer?

 9    A    I would hope so.

10    Q    Not in the morality sense of the word, but big dealer.

11    A    Even in the morality sense when I was there.

12    Q    Fair enough.  No quarrels here.  Goldman Sachs

13    International, same entity, right?

14    A    Related, yes.

15    Q    Dealer, right?

16    A    Yes.

17    Q    Okay.  Then you've got the Merrill Lynch.  Let's keep

18    going down.  Then you've got Toronto Dominion Bank.

19    A    Okay.

20    Q    Smaller dealer, right?

21    A    Yes.

22    Q    Okay.  So --

23    A    In London.

24    Q    -- in addition to Merrill Lynch there were other

25    dealers on the same side as Merrill Lynch with live trades
```

Page 31

```
 1    in PCDS facing Lehman at September 15 2008, correct?

 2    A    Yes.

 3    Q    Okay.  Now let's look at the other side of the market.

 4    A    Could you do me one small favor before we do that, sir?

 5    I'm sorry, it may be out of place and if it is, Your Honor,

 6    you'll correct me.  Would it be possible to screen out the

 7    GSE tickers just to see what is -- the remaining slides of

 8    the population?

 9    Q    Sure.

10    A    And if that's inappropriate, please -- sorry.

11            THE COURT:  No.  It's fine.

12    Q    I'm not sure why we're doing it, but can you do it when

13    Mr. Tracey is asking you questions?

14    A    Sure.

15    Q    Okay.  Let's do it then.  All right.  So now let's look

16    at the other side of the market.

17    A    Yeah.

18    Q    Let's remove the filter for P and go to S.  Now, having

19    done that, now we've got folks who are in the same position,

20    economically, as the QVTs of the world; they have bought

21    protection from Lehman --

22    A    Yes.

23    Q    -- correct?

24    A    Yes.

25    Q    All right.  Let's take a look at who's on that list.
```

Page 32

1    You got Citibank.  Go up.  Let's not forget, you got BNP

2    Paribas at the top, right?  Dealer?

3    A    Yes.

4    Q    Not big in the U.S. but a big global dealer, right?

5    A    Um hmm.  Small position here.  Yes.

6    Q    Well, it's not their position here that matters,

7    they're someone who's knowledgeable about securities

8    derivatives, correct?

9    A    I agree.

10   Q    Yeah.  Citibank, dealer?

11   A    Yes.

12   Q    Okay.  Deutsche Bank -- that's the QVT desk, so let's

13   go down.  In addition to the QVT desk you've got the

14   Deutsche Bank AG London there.

15   A    Yes.

16   Q    All right.  So you're -- they're both on the buy side

17   and they're on the sell side, correct?

18   A    Yes.

19   Q    Let's keep going down.  Hartford Life and

20   (indiscernible) Insurance company, and they've got a number

21   of positions on the same side of the market as QVT, correct?

22   A    That's correct.

23   Q    Not a dealer, but a large financial institution,

24   correct?

25   A    That's correct.  Yes.

Page 33

1    Q    Let's keep going down.  You have QVT coming up.

2    A    And a couple of Platinum Groves I saw.  Yes.

3         COURT REPORTER:  Could you repeat that?

4    A    And a couple of Platinum Groves I saw.  Yes.  That's a

5    hedge fund, money manager.

6    Q    Let's keep going.  And you got Toronto Dominion Bank on

7    that side as well.  Okay?

8    A    Yes.

9    Q    So certainly there were dealers and sophisticated

10   financial institution both on the same side of the market as

11   QVT and on the other side of the market as QVT, correct?

12   A    Correct.

13   Q    I think you testified yesterday that Lehman was the

14   only market marker in PCDS; is that right?

15   A    That's my understanding.  Yes, that's correct.

16   Q    Now, one of the names we did not see either in the

17   purchase side or the sell side, when you just went through

18   this list, was JP Morgan Chase.

19   A    That's true.

20   Q    Are you aware of testimony, by Mr. Neumann, that JP

21   Morgan may have been a market marker in PCDS?

22   A    I am aware of the email that was shown to me yesterday

23   that included JP Morgan Chase.  What Mr. Neumann said I

24   can't recall as I sit here.

25   Q    But if Mr. Neumann had said that, your view again would

Page 34

1   be he was just mistaken?

2   A    Not -- no, I would take what he said at face value and

3   would want to try verify it.  My understanding from that

4   attempt at verification is I could find no supporting

5   evidence that they were in fact a dealer.

6   Q    Okay.  I mean, helpfully informed, you don't know

7   whether JP Morgan was funded with that dealership, correct?

8   A    No, I don't know that.

9   Q    And nor do we.  But you did not make any independent

10  inquiries, independent of this spreadsheet or anything else,

11  to determine whether or not JP Morgan in fact was one of the

12  dealers that had trades on with Lehman as of September 2008?

13  A    Well --

14          THE COURT:  Hold on just a second.

15          MR. TRACEY:  I have an objection, Your Honor.

16          THE COURT:  Yes?

17          MR. TRACEY:  And I think I need to approach, if

18  that's --

19          THE COURT:  Okay.

20          MR. TRACEY:  -- okay?

21      (Bench conference off the record)

22  Q    All right.  Let's move on to another topic.

23  A    Very well.

24  Q    And we'll stop here just briefly that -- I want to

25  discuss one of the graphs in your demonstrative there, which

Page 35

1    is Slide 30.

2    A    Yes.

3    Q    And what you're showing here is a comparison between

4    two different indices, correct?

5    A    Yes.

6    Q    And you've got a line there for 9/15/2008, correct?

7    A    Yes.

8    Q    When was it that QVT submitted its calculations there?

9    A    I don't recall exactly.  I think perhaps a month

10   afterwards, October of 15 -- I don't -- I don't recall

11   exactly.  I'm sure it's in the record.

12   Q    Right.  So October 15th would be where on this graph?

13   A    Well, I think you can put it half way between the

14   October 1 and November 1 lines.

15   Q    So just to be clear, and then maybe you can mark it.

16   Do you want a pool cue, so you can just point it out to the

17   judge to where you think that is?

18   A    Presuming it will be approximately here.

19   Q    Right.  So it's after that peak that begins sometime in

20   early October, and that peak is over by the middle of

21   October, correct?

22   A    Yes.

23   Q    Okay.  And you know that the analysis that QVT did was

24   a backward-looking analysis.  They didn't do the valuation

25   on September 15th itself, correct?

Page 36

1    A    I would assume that they did the valuation some days

2    afterwards.  I haven't spoken with them precisely about when

3    the valuation was, but it would be reasonable to think that

4    people were fairly busy on September 15th.

5    Q    And since you don't know when they did it, if I asked

6    you to assume that there's been testimony in this case that

7    they completed their analysis on September 28th, 2008, where

8    would that be on this graph?

9    A    Well, I think you just move over, right before October

10   1st.

11           MR. TAMBE:  Okay.  But if I could just approach?

12           THE COURT:  Go ahead.

13   Q    It would be the bottom there -- somewhere around the

14   bottom of this spike in your graph?

15   A    Presumably, somewhere close to that.

16   Q    Okay.  So now we're going to start getting into Case 1

17   and Case 2.  And central to both Case 1 and Case 2 is your

18   methodology and your approach of trying to measure deferral

19   risk, correct?

20   A    I think that's an overstatement. I'm trying to measure

21   the risk of a credit event.  My point here, in emphasizing

22   deferral risk, is to note that as preferred stock prices

23   dropped more sharply than bond prices, they did so, at least

24   in part, because of the increase in deferral risk.  But my

25   actual analysis is an attempt to find the implied

Page 37

1    probability of a credit event implied by the -- in the case

2    of the 13 instruments, implied by the price of the preferred

3    stock.

4    Q    Let's look at Slide 31 in your deck.  So I think you

5    described this yesterday.  And you use the example of

6    Citigroup and you're showing two dramatically different

7    boxes, right?

8    A    Yes.

9    Q    Let's get back into the fruit salad.  Those aren't

10   apples to apples, are they, sir?

11   A    Not precisely because in the first one I have PCDS and

12   CDS and the second one I don't have any traded PCDS levels.

13   Q    All right.

14   A    So I've had to impute the deferral risk from the price

15   of the underlying preferred security in the second box.

16   Q    But -- and the impression -- I believe the opinion you

17   wish to express is that box on the right, the gray box in

18   the right is that much bigger than the gray box on the left

19   because there's a huge amount of deferral risk, right?

20   A    I think as of September 15th the preferred prices had

21   dropped a lot more than the debt prices, implying a

22   significant increase in deferral risk.

23   Q    But --

24           COURT REPORTER:  I didn't hear you.

25   A    I'm sorry, I think --

Page 38

```
 1            COURT REPORTER:  (Indiscernible).

 2    A    A significant increase in deferral risk.

 3    Q    But that gray box on the right side, we're going to get

 4    to this, is built, it's painted, using your methodology,

 5    right?

 6    A    Yes, it is.  Absolutely.

 7    Q    And your curve -- sorry.

 8    A    I'm sorry.  Absolutely, it is.

 9    Q    All right.  And that's using your curve construction

10    techniques, correct?

11    A    It is.  Absolutely.  I want to be clear on that point,

12    this is not a complete third party analysis here.  This is a

13    presentation consistent with the analysis I've done

14    elsewhere, and is presented in this document.

15    Q    Except, the gray box on the left doesn't reflect your

16    curve construction analysis; does it, sir?

17    A    No, the gray box on the left did not need to because I

18    had PCDS pricing out for five years.

19    Q    So what if you had actually used your methodology to

20    create a gray box for the transaction on the left?  What

21    would that look like?

22    A    I haven't examined that.

23    Q    You haven't examined that?

24    A    No.  Because, again, I have PCDS pricing on the left.

25    If I had PCDS pricing on the right I would have used that.
```

1   Q    Right.  But to gauge how good you are at curve

2   construction, it might have been interesting, would it not

3   have been, to go back to a PCDS price and use your

4   methodology to say, what does that gray box look like when I

5   use my curve construction methodology, wouldn't it?

6   A    I appreciate the point, but that's not an exercise I

7   undertook.

8   Q    So comparing those two boxes is not really comparing

9   apples to apples; is it, sir?

10  A    Oh, I think it is.  I think that in both cases we're

11  trying to figure out the market implied probability of a

12  credit event and split that probability out between default

13  and deferral risk.  I've had to use a different technique,

14  in the second box, because I didn't have data available to

15  me that I would have liked to have had.

16  Q    The question I have for you is, and what we're going to

17  debate this afternoon, is how good is your technique?  And

18  you could have tested how good your technique was by going

19  back to a known, observed price and seeing, what does my

20  technique show when I use my technique with a known price,

21  correct?

22  A    I appreciate your point, but I think that the technique

23  is a fairly -- is a standard technique in the market.  So

24  I'm simply applying standard methodologies.

25  Q    Well, you don't know what technique was used in coming

Page 40

1   with the PCDS price on the left; do you, sir?  You just know

2   the price?

3   A    That's correct.

4   Q    So you don't know whether the person that created that

5   price used anything that resembled your curve construction

6   methodology, correct?

7   A    I know that they believed that they had an insight into

8   the market and to supply and demand of the market in that

9   particular moment in time, and that's what informed them and

10  I'm confident on that point.  But as to how they

11  accomplished it, I don't have any insight.

12  Q    And you're not aware of anyone else in the market

13  actually constructing curves on PCDS the way you have,

14  correct?

15  A    I don't think that there was a lot of activity in PCDS,

16  so no, I'm not surprised.  I don't think -- I'm not aware of

17  anybody else constructing any curves on PCDS during this

18  time.

19  Q    So notwithstanding all that, your view is this is still

20  apples to apples, correct?

21  A    Well, with the proviso that I -- that you have

22  introduced, and that I accept.  And that I think I was

23  explicit about in the report, that the boxes on the left are

24  constructed using CDS and PCDS levels and the box on the

25  right, (indiscernible) has to use the underlying preferred

Page 41

1   securities.

2   Q    So you got an organic apple on the left, you've got a

3   genetically modified one on the right, right?

4           THE COURT:  That's exactly what I was going to

5   say.

6   A    I can accept that point.

7   Q    Well, the word that comes to mind is frankenfoods, but

8   I won't say that.

9           THE COURT:  No.

10  Q    All right.  Let's move on.

11  A    I would disagree with that one.

12  Q    I'm sure you would.  I'm sure you would.  So let's get

13  -- let's move on to your curve construction, right?  So you

14  constructed curves in sort of two different settings, Case 1

15  and Case 2, correct?

16  A    Yes.  I -- well, I constructed -- to be exact, I

17  constructed 19 curves.

18  Q    Right.

19  A    I did it the same way, but I did one for each reference

20  entity.

21  Q    You say you did it the same way, but there was a

22  difference in the data you had for Case 1 versus Case 2,

23  correct?

24  A    Yes.

25  Q    Because in Case 1 you had a PCDS offer and you built

Page 42

1    your curves around that offer, correct?

2    A    Correct.

3    Q    In Case 2 you did not have a PCDS offer, you built your

4    curves to fit a particular price, correct?

5    A    Correct.

6    Q    Okay.  So you were somewhat more constrained in Case 1

7    as compared to Case 2, correct?

8    A    No, I'm not -- no, I don't think I was more

9    constrained, I think I had more work to do in Case 2.  I had

10   to make adjustments and calculate options and things of that

11   type.

12   Q    Yeah, well it's about six different steps, right?

13   A    Yes.

14   Q    Let me get to Case 1 in your deck.  So that's Page 34

15   at your deck where you have your Case 1, beginning on Page

16   34.  But you proceed that page with a couple of citations,

17   and so let's go to Page 33.  And I think you talked briefly

18   about these two publications yesterday, correct?

19   A    Yes.

20   Q    Now, neither of these publications tell you what the

21   shape of your curve is going to be, correct?

22   A    Oh no, that's correct.

23   Q    So these are just basically telling you the basic

24   modeling approach to constructing curves, correct?

25   A    Correct.

Page 43

```
 1   Q    It's not telling you whether you're going to have a

 2   upward sloping curve or a downward sloping curve, right?

 3   A    That is correct.

 4   Q    And it's not going to tell you whether you're going to

 5   have a squiggly curve, right?

 6   A    It will not tell you the shape of the curve.

 7   Q    This gives you --

 8   A    It tells you the technique to construct the curve.

 9   Q    It's giving you the basic financial theory behind

10   constructing curves, correct?

11   A    That is correct.

12   Q    Okay.  But the curve you actually end up with is based

13   on all the assumptions that you make in taking that finance

14   theory and putting it in practice, correct?

15   A    Yes.

16   Q    Okay.  So we get to Case 1 and you've got the six names

17   -- the six name subset from the Merrill Lynch offers; it's

18   Page 34?

19   A    Yes.

20   Q    And all you get from Merrill Lynch and those offers,

21   with respect to these six names, is a maturity date, the

22   name of the referenced entity, the spread and then, as a

23   cross reference, the lower Tier 2 CDS spreads, correct?

24   A    Correct.  Yes.

25   Q    Merrill didn't send along, with its offers, a curve?
```

1    A    They did not.

2    Q    You got points in time, correct?

3    A    Correct.

4    Q    Okay.  And so let's go to the next page, Page 35.  And

5    the case if two of the transactions, or two of the names,

6    the points in time you got from Merrill Lynch were exactly

7    the points in time that QVT wanted them, correct?

8    A    Correct.

9    Q    So there what you did, and that's RBS, you simply took

10   the 750 basis points and you got the value?

11   A    Correct.

12   Q    You didn't construct a curve?

13   A    No.

14   Q    No shape?  Right?  It didn't matter to you?

15   A    No.  Didn't matter.  I could have done so, but there

16   was no need to.

17   Q    Okay.  And the same thing with UBS, straight, correct?

18   A    Correct.

19   Q    Now, for the other four names, all you had was a point

20   in time, and that point in time didn't line up with the QVT

21   point in time, correct?

22   A    Correct.

23   Q    So you had to construct your curve?

24   A    I did have to.

25   Q    So let's build a curve.  So it's 5987.

Page 45

1          THE COURT:  Should I take out a colored pen?

2    Q    Well, you're going to tell us, Dr. Niculescu, how you

3    value the PCDS depends on how you construct the curve,

4    right?

5    A    That's -- that is correct.

6    Q    Right?  That's what drives your valuation, correct?

7    A    That's correct.

8    Q    Okay.  So let's be sure we get this curve construction

9    right and we understand exactly what you did to construct

10   your curve.

11   A    Certainly.

12   Q    Right.  Okay.  So what you got from Merrill wasn't a

13   curve, you got a dot?

14   A    That's correct.

15   Q    Okay.  And that's 7 1/2 years out, correct?

16   A    That's right.

17   Q    And you want to try and value something that's a lot

18   shorter dated than that?

19   A    About 4 1/2 years, I think.

20   Q    Okay.  So that's the dots you got and what you ended up

21   with is your Slide 36.  Maybe we can have both up at the

22   same time.  That would be great.  So your Slide 36 shows

23   that the dot is right on your curve, correct?

24   A    That's right.

25   Q    And that's not because you're particularly good at

Page 46

1   curve construction, you constructed your curve around the

2   dot, correct?

3   A   That's correct.

4   Q   Okay.

5   A   I used the dot as an input.  I'm taking that price as a

6   valid market price.

7   Q   So and you knew nothing about Merrill Lynch's curve,

8   correct?

9   A   I had no other information about Merrill Lynch beyond

10  the quote that was given as we just discussed.

11  Q   So for all you know, Merrill Lynch, if it had a PCDS

12  curve, had a curve that just went straight out at 750,

13  correct?

14  A   Well, no.  As I've given my opinion yesterday, I think

15  that a reasonable market participant at the time would have

16  expected there to be a front loading of deferral risk here

17  and so would have constructed a curve that reflected that.

18  Q   I'm not asking for your opinion, I'm asking for what

19  you know.  As far as you know, Merrill Lynch could have had

20  a flat curve, correct?

21  A   I know nothing about what curve Merrill Lynch itself

22  could have had.

23  Q   And Merrill Lynch could have had an upward sloping

24  curve, correct, as far as you know?

25  A   Again, I know nothing about what Merrill Lynch could

Page 47

1   have had, and in answer to your question about knowing as

2   opposed to supposing, the answer has to be yes, but with my

3   earlier proviso so as that answer is not misleading.

4   Q     But the curve you constructed is higher than the

5   Merrill Lynch point up until the Merrill Lynch point,

6   correct?

7   A     Yes.

8   Q     And all other things being equal, having that curve be

9   higher than the Merrill Lynch point, you're increasing the

10  value of PCDS -- of the PCDS in QVT's claim, correct?

11  A     That is -- the value goes up slightly, yes.

12  Q     And in fact, if you just -- and so assuming it was a

13  downward sloping curve, that it was just a flat level of

14  750, you'd come up with the lower valuation, correct?

15  A     Yes.

16  Q     And if you assumed it was actually an upward sloping

17  curve, you'd come up with an even lower valuation, correct?

18  A     That is correct.

19  Q     So the line you drew is based on a whole bunch of

20  assumptions about what a referenced market maker, where a

21  market marker in September 2008, end of September 2008,

22  would have done and would have thought about the curve for

23  PCDS, correct?

24  A     Yes, that is correct.

25  Q     But you haven't spoken to Merrill Lynch that put this

Page 48

1    offer out, correct?

2    A    I have not had that opportunity, no.

3    Q    Did you ask the folks at QVT to subpoena Merrill Lynch

4    on your behalf and get more information about this stock?

5    A    No, I don't believe anybody has subpoenaed Merrill

6    Lynch in this respect, neither Hogan Lovells nor Jones Day.

7    In my experience it's usually not very profitable to ask

8    people what they were thinking, that long ago in the past,

9    about a quotation they may have given.  But no, to my

10   knowledge nothing of that type has happened.

11   Q    Now, you talked about some of the theory underlying why

12   you constructed the curve the way you did, correct?

13   A    Yes.

14   Q    And what you said is, well, you assumed that the

15   financial crisis would not last forever, correct?

16   A    Yes.

17   Q    And you said, well therefore the risk will change over

18   time, correct?

19   A    Yes.

20   Q    And so what you tried to do was try and figure out what

21   curve would fit your views of the financial crisis, correct?

22   A    What curve would fit the curves that I am of the

23   opinion a reasonable market marker would have had at the

24   time, correct?

25   A    But the views you were pulling together were not in

Page 49

1    October 2008, right?

2    A    I -- sorry, can you ask the question again?  I'm not --

3    Q    You're --

4    A    -- sure I understand.

5    Q    -- sitting at your work station with all the folks from

6    CMRA behind you --

7    A    Yes.

8    Q    -- sometime in 2014 or 2015, trying to construct this

9    curve, correct?

10   A    Yes.

11   Q    And you're looking back and you know how long the

12   crisis has lasted?

13   A    Well, indeed.  I would have had a much more abrupt

14   change in the curve if I had wanted to really follow the

15   actual trajectory of the crisis.

16   Q    But you didn't --

17   A    It would have been steeper and then would have come --

18   reverted much more quickly.  But certainly I do have

19   hindsight.  I was trying very hard to make sure that I could

20   put myself into the shoes of somebody sitting there on

21   September 15th, 2008 with the information they had

22   available, with the market commentary I could find from that

23   time as my assistance constructing these curves.

24   Q    And now --

25   A    But I take your point, one has hindsight.  You have to

Page 50

1    try to distance yourself, if at all possible, from that

2    hindsight, that's what I attempted to do.

3    Q    Part of your hindsight, and part of your analysis was

4    that in the long term, from your five onward, the

5    differential between deferral risk and default risk would be

6    fixed; is that right?

7    A    That is correct.

8    Q    Okay.  And you used that assumption in this model,

9    correct?

10   A    I used that assumption in this model.

11   Q    Okay.  So again, so we start off with one dot, but now

12   you've got another constraint that you're adding in as an

13   assumption, correct?

14   A    Yes.  That's one of the two primary assumptions I need

15   to make in order to develop this curve.  I need to have some

16   fixed point on a long term.

17   Q    Right.  So again I think what you're trying to

18   hypothetically say is a dealer sitting back in 2008 would

19   say at five years from now there's going to be this

20   equilibrium, correct?

21   A    Situation normal, yes.

22   Q    And that equilibrium, in your view, is going to

23   continue till the end of time, correct?

24   A    Yes.  That's the projection, is that we continue to

25   have a ratio of preferred to debt that was stable, as it had

08-13555-mg   Doc 55104   Filed 03/24/17   Entered 03/24/17 11:55:23   Main Document
Pg 51 of 125

Page 51

1    been prior to this crisis.

2    Q    And that point is some point lower than the dot you

3    have that you started with in the example of Barclays,

4    correct?

5    A    Yes.  Just to be clear, what you're seeing on Page 36

6    is a spread curve --

7    Q    Right.

8    A    -- which is ultimately the curve that gets put into the

9    calculator.  Underlying the spread curve is a hazard rate

10   curve.  The spread curve, to be clear to the Court, shows

11   the incremental spread from Year 0 through the number of

12   years on the page.  So for five years, for example, it's

13   slightly more than 800 basis points.

14            Underlying this, there's a hazard rate curve, that

15   is the incremental probability of loss for each year, one

16   year after the other.  So that the hazard rate curve will be

17   lower than the spread curve, when the spread curve is

18   downward sloping, like this.

19   Q    But was that not an important curve to show the judge

20   when you put your demonstratives together?

21   A    Well, I think that the -- I'd be happy to provide it.

22   I think that the ultimate curve that I wanted to show was

23   the curve that is used to generate the CDS valuation, which

24   is what I've shown here.

25   Q    Okay.  So maybe I'm mistaken.  This is the ultimate

Page 52

1    curve you used to show the CDS valuation?

2    A    Correct.  Yes.

3    Q    Okay.

4    A    The hazard rate curve is used to build this curve.

5    This curve is what we're going to the calculator to

6    calculate the CDS value.

7    Q    And your hazard rate curve, you got the hazard rate, if

8    I'm using the term correctly --

9    A    Um hmm.

10   Q    -- fixed from your five onward, correct?

11   A    That's correct.

12   Q    And it's fixed at ten percent above the senior CDS

13   rate, correct?

14   A    Adjusted for recovery rates, yes.

15   Q    Adjusted for recovery?

16   A    That's to say the hazard rate is the loss rate, so I

17   shouldn't say just for recovery rates, yes, the hazard rate

18   is ten percent higher.

19   Q    Okay.  And having constructed the Barclays curve, you

20   know that that five year onward rate, which is a fixed rate

21   in your model --

22   A    Yes.

23   Q    -- would be a number or a line lower than the dot,

24   correct?

25   A    Yes.

Page 53

1    Q      How much lower than the dot?

2    A      No, I don't recall.  I'd have to go back to my

3    spreadsheet.  But --

4    Q      Which spreadsheet?

5    A      The ones that generated this that I provided to Lehman.

6    Q      So we may go there.

7    A      Very good.

8    Q      But it's some line below the dot, right?

9    A      Yes.

10   Q      I'm going to try this to see if we can --

11   A      Please.

12   Q      -- (indiscernible).

13          MR. TAMBE:  I don't know what color this is,

14   Judge, but we'll try.  So -- and this is demonstrative only,

15   right?

16   A      Fair enough.  I take your point.

17   Q      We're starting at year five somewhere.

18   A      Yeah.

19   Q      We'll put a dot here.  And let's assume that this goes

20   out, right?

21   A      Yes.

22   Q      That's in your hazard model.  And this is before you

23   build the ultimate curve you're working with, you make an

24   assumption starting in year five there's going to be this

25   straight line which is 1.1 times the senior CDS, correct?

1    A    That -- the senior CDS hazard rate.  Yes, that's

2    correct.  Yes.

3    Q    Okay.  And I still --

4    A    I'm just simply taking market implied loss data from

5    the debt market, which was relatively liquid the five year

6    and on, debt CDS market was relatively liquid.

7    Q    Okay.  Let's be clear, you're doing two different

8    things there, sir?

9    A    Yeah.

10    Q    You're making an assumption that from Year 5 onward,

11    that there's going to be this fixed rate 1.1 times the

12    senior CDS rate, correct?

13    A    The senior CDS hazard rate, yes.

14    Q    And the senior CDS hazard rate is something you can

15    observe, correct?

16    A    Yes.

17    Q    So you said, from year 5 onward, I'm just going to

18    assume that's fixed, correct?

19    A    Correct.

20    Q    Now, what if sitting in Year 0, right, that's where the

21    dealer is sitting?

22    A    Yeah.

23    Q    The dealer says, you know what, there's some such thing

24    known as a business cycle, maybe seven years from now, it

25    ain't going to be smooth sailing, there's going to be risk

Page 55

1    seven years from now.  Possible, right?

2    A    Incremental deferral risk.

3    Q    Incremental deferral risk, possible, correct?

4    A    Certainly.  Or you could simply increase the ten

5    percent if you wished.

6    Q    But as you raise this line, correct, you go higher and

7    higher on this five year out line, then you've got a balance

8    for that.  The early part of your curve has to go to come

9    down, correct?

10   A    Correct.

11   Q    Right.

12   A    Yes, as -- absolutely.  I want to make sure this is

13   clear, and I'm in full agreement with you.  There are two

14   major assumptions here and the backend assumption is one of

15   those assumptions.

16   Q    Right.  And that backend assumption is an assumption

17   you make not based on any empirical data, right?

18   A    No, it based on empirical data.

19   Q    That once you look beyond five years, business cycles

20   go away?

21   A    No, no.  I'm simply going back to the ratio of PCDS to

22   CDS in the first half of 2008; that's my empirical data.

23   Q    But that's a point in time, right?  The first half of

24   2008 was a period in time.  You're saying that that

25   relationship of 1.1 is going to begin in year five and just

Page 56

1    going to last forever?

2    A    That's correct, yes.

3    Q    Well, you don't have any empirical basis to say that

4    that relationship had lasted at that level, unchanged

5    forever; do you, sir?

6    A    No, no.  I mean, nor could one.  There is no such data.

7    But you have to make a reasonable assumption.  I mean, we

8    can argue with the assumption, whether it should be 10

9    percent, or 12 percent, or 15 percent, or 8 percent.  There

10   is going to be some -- you have to make some sort of

11   increment to long term debt hazard rates.  And the question

12   is really how high can or should you think deferral risk

13   would be in the future.

14   Q    But you pegged it at 1.1 --

15   A    Yes.

16   Q    -- and if you pegged it at 1.2 or 1.3, your valuations

17   would have been lower, correct?

18    A    That is correct.  Yes.

19   Q    And no empirical data that you relied on, to say it's

20   got to 1.1 over the long term, or 1.2 over the long term,

21   correct?

22   A    Well, long term empirical data doesn't exist, therefore

23   we have to use the data that is available to us.

24   Q    Right.  But again, this methodology, where you have to

25   use the data that's available to you, that's your

Page 57

1    methodology, correct?

2    A     Well, of course.  I was asked to do a valuation, so

3    I've used my methodology.  I've developed a methodology, but

4    my point is anybody who develops a methodology of this type

5    has to make some assumption here.  I'm making what I believe

6    to be a defensible assumption.

7    Q     Well, you know I'd question the defensibility of that

8    assumption, because that assumption is assuming it's at 1.1

9    flat all the way out, correct?

10   A     Yes, sir, it is.

11   Q     And you would agree with me that we didn't eradicate

12   business cycles in September 2008, correct?

13   A     I agree that there could be incremental deferral risk

14   at various points in the future, but I think that it's a

15   reasonable and defensible assumption.

16   Q     So let's go back to that point, right?  So you say it's

17   a reasonable defensible assumption.  I think you'd said

18   before that you'd tried to use a scientific method to your

19   approach here.

20   A     I don't recall if I used the word scientific or not,

21   but I certainly tried to use a rigorous approach.

22   Q     Is it not a scientific approach?

23   A     People use the science in many different contexts and

24   ways.  I -- as a financial economist and a recovering

25   macroeconomist, I'm not sure I'd apply the word science to

Page 58

1    all of these concepts.

2    Q    So let's go to your transcript -- deposition

3    transcript.

4    A    Very good.

5    Q    Page 342.

6    A    And if I used it there, then I used it there.

7    Q    It's kind of important, Professor.

8    A    Is it?

9    Q    Dr. Niculescu.

10   A    Thank you.

11   Q    Sorry.  I shouldn't make you a professor.

12   A    Please don't do that to me.

13   Q    It's kind of important though, isn't it?  Where you're

14   using a scientific method or not?  Those words matter; don't

15   they, sir?

16   A    I didn't intend them to matter if I used them, no.

17   what I intend to say is that I am using a rigorous

18   analytical model based approach.  If that appears to be

19   science to some people, so well and good.

20   Q    Well, I'm not the one who said it was science, you did.

21   Let's go to Page 342 of your transcript.

22           MAN:  The second line.

23   Q    Second line.  Okay.  So 341, that's where the question

24   begins.  And I can't read that, so.  I think -- so question

25   starting on Page 341, Line 20.

Page 59

1          "I think the phrase you used -- I think -- I have,

2     I think done better, so qualitatively between simply using

3     the prices for doing what you've done, such is calculating

4     the implied losses, you think calculating implied losses is

5     the better methodology?"

6          On Page 342, Line 3, "I think it's the more

7     sophisticated methodology.  Now whether something is better

8     or not ultimately in these circumstances, comes down to what

9     a counterparty is prepared to pay.  What I've done here is a

10    financed theoretic approach.  One might characterize it as a

11    scientific approach, using as much of the data as I can find

12    available.  Having said that, I still have assumptions that

13    have to be made about how a reasonable actor would perform

14    in this space."  And I'm going to stop it there, but that's

15    the phrase I was referring to.  Your statement that one

16    might characterize what you have done as a scientific

17    approach.

18         You didn't follow a scientific approach, did you,

19    sir?

20    A    In fact what I said here I think is quite accurate, and

21    I'm glad that we reviewed it.  I said one might characterize

22    it as a scientific approach.  I agree, one might, many

23    might.  And I go on to say, having said that, I still have

24    assumptions that have to be made about how a reasonable

25    actor would perform in this space.  So I think these two

Page 60

1    sentences taken together accurately convey the intent I was

2    trying to convey in the deposition, and the same intent I'm

3    trying to convey here today.

4    Q    Which is, unlike a scientific approach, which might be

5    subject to peer review by others, your methodology and your

6    assumptions are only subject to review in this court,

7    correct?

8    A    Oh, I welcome review from Lehman.  I'm sure I'll get

9    it.  No --

10   Q    You're getting it right now.

11   A    -- a scientific approach -- a scientific approach does

12   not imply everywhere and always that there was peer review.

13   The scientific method and philosophy does not require that

14   either, it requires, primarily, a process of conjecture and

15   reputation.  Conjecture as to the type of approach you may

16   use and examination of the results that approach creates,

17   develops.  And a question as to whether those results are

18   reasonable or not.  And indeed I've done exactly that.  I've

19   conjected as to an approach that might be used.  I've

20   calculated the results, I've compared those results with

21   what I think a reasonable person might have done at the

22   time.  I've observed the spread curve that's downward

23   sloping, but not terrible downward sloping.  And so I

24   conclude that on that basis of the -- I have performed or

25   conject and reputation, it seems to pass the first

Page 61

1    reasonableness test.

2              Now, of course I have to make assumptions.  And

3    indeed, although I don't profess to be a scientist,

4    scientists have to make assumptions as well.

5    Q    So just to answer my question, you did not submit your

6    methodology and your curve construction and the shape of

7    your curve for peer review by scientists and economists,

8    correct?

9    A    Correct.

10   Q    Okay.  And different people, using the same building

11   blocks of curve construction, might come up with curves that

12   look very different, correct, than yours?

13   A    I would be curious to see just how different they would

14   be.  I think that the major assumptions I have made here are

15   well within the bounds of reasons, so I would be somewhat

16   surprised to see results that varied substantially from the

17   results that I've generated here. But if you have evidence

18   to the contrary, I'd be very happy to look at it.

19   Q    One of the things you might discover, had you submitted

20   your -- the application of your methodology to data is that

21   people differed with your application of your methodology to

22   the actual data, correct?

23   A    I have no particular information on that score.

24   Q    And again, going back to the curve construction point,

25   if someone were to use the same building blocks as you, but

Page 62

1    construct a flat curve, that would be a lower valuation,

2    correct?

3    A    Yes, it would be, indisputably.

4    Q    And if someone constructed an upward sloping curve,

5    that would be an even lower valuation, correct?

6    A    Indisputably, it would be a lower valuation.

7    Q    And others still might say, we're not going to do all

8    of this curve construction stuff.  I'm just going to look at

9    the change in price of preferred securities from 9/12 to

10   9/15 and based my analysis on that change in the value,

11   correct?

12   A    One could a lot of things.  One could take the

13   difference from par and -- to preferred price.  One could

14   look at the -- you could do a lot of different things that

15   might be reasonable.

16   Q    Now, in terms of testing how reasonable your

17   assumptions were, we know you didn't go back to the July

18   2008 price observation to see how your theory fit that price

19   observation, correct?

20   A    That is correct; I did not.

21   Q    And in fact, you didn't do that with respect to any

22   prior observed PCDS transaction, correct?

23   A    No, that is correct.

24   Q    Let's go back to the diagram, because we started

25   talking about one additional assumption you've made, this is

1    Exhibit 5987.

2    A    Yes.

3    Q    So you start with a dot, the next assumption is from

4    year five onward you're going to have this fixed spread?

5    A    Yes.

6    Q    Now you've got to make some assumption about the first

7    five years, correct?

8    A    That's right.

9    Q    And the model you end up with, the curve you end up

10   with, in the first two years, is higher than the next three

11   years, correct?

12   A    That's correct.

13   Q    What's the assumption that underlies that?

14   A    The assumption is that the financial crisis would be

15   front loaded, would reach and stay at its peak for two

16   years, would then drop in intensity for the following three

17   years, and then revert to a normal long term equilibrium.

18   Q    Right.  So at the end of two years it would drop in

19   intensity.  You put a number behind that, right?

20   A    Yes, I did.

21   Q    It would drop in half?

22   A    The increment over the long term would drop by half.

23   Q    Okay.  So I'm going to draw --

24   A    Please.

25   Q    -- on this 5987.  For the first two years you've got

1    something high up there?

2    A    Yeah.

3    Q    And then the half it drops by is the distance between

4    that upper line and that lower line, correct?

5    A    Correct.

6    Q    That's what you mean by half?

7    A    Correct.

8    Q    You pick the halfway point and you say there --

9    A    Yeah, a bit higher.  Yeah.

10    Q    Is that good?

11    A    Yeah, it looks good.  Surely, sir.

12    Q    All right.  In terms of your assumptions, that's the

13    stair step we built, correct?

14    A    That's correct.

15    Q    Now, you're valuing transactions that are what, about

16    4.4 years out on average?

17    A    That's right.

18    Q    And what you have done is you have this higher spread

19    now, in the first 4.4 years, correct?

20    A    That's right.

21    Q    And that's based entirely on your assumptions as to

22    what happens from Year 5 onward and what's going to happen

23    from Year 2 to Year 3, correct?

24    A    That is correct.  Those are the pivotal assumption that

25    I've had to make.  Yes.

Page 65

1   Q     And then, because that doesn't look like what you

2   showed the judge, because what you showed the judge was a

3   smooth line, not a stair step.  Let's go there, 36.

4             MR. TAMBE:  If you can put 36 on the demonstrative

5   up.

6             FEMALE:  I don't think we can, because the

7   demonstrative (indiscernible).

8             MR. TAMBE:  Oh, we can't?  Sorry.  Okay.  Can't do

9   that.

10  Q     So we will just look at the demonstrative 36.  All

11  right?  That's a smooth line, right?

12  A     Yes.

13  Q     And you create that smooth line by sort of filling in

14  the points and you get a smooth line from Point A to the

15  end, correct?

16  A     Not exactly.  The smooth line is the accumulation of

17  these points.  So as you go out you get part of the hazard

18  rate from the first two years still affects the results, but

19  in Year 3 you also get the hazard rate from Year 2 to 3 of

20  that kind of spread and so the spread is a little bit lower,

21  and as you go further out the spread gets lower and lower.

22             But I mean, to your point here, Mr. Tambe, the

23  hazard rate function is quite clean and quite simple.  And

24  as you've drawn a midway point, I can't vouch for its

25  accuracy, that looks as though it's actually close to the

Page 66

1    700 basis points on this drawing, I don't know whether it is

2    or not.  But I think the point is that there is some hazard

3    rate function that underlies the Merrill Lynch spread quote.

4    I'm presuming that it is going to be somewhat lower than

5    that spread quote from five years on out, and therefore,

6    somewhat higher, at least in the early part.

7         Now it may be actually similar for Years 2, 3 and

8    4.  But on average it will be higher.  And I think it's the

9    average that's important to understand in the course,

10   because it's the average that causes the valuation, it's the

11   average spread of 4 1/2 years that is what generates the

12   valuation.  So I'm sort of looking at that average spread,

13   versus the average spread for 7 1/2 years is what's key here

14   in the valuation context.

15   Q    Why don't you turn in your slide deck back to 30.

16   A    To 30?

17   Q    Please.

18         MR. TAMBE:  Sorry, Randall, keep the demonstrative

19   up.

20   A    Yes, sir.

21   Q    So Slide 30 is where you're showing this difference

22   between preferred yield spread to debt, correct?

23   A    Yes.

24   Q    So someone sitting, on 9/15, sees the spread increase

25   tremendously, correct?

Page 67

1   A     Correct.

2   Q     Doesn't know whether it's going to stay at that

3   increased level for a week, a month, two years, five years,

4   ten years, correct?

5   A     That's why we do valuations as of a certain date.

6   That's right.

7   Q     Well, then you get to October 1, 2008 and now the

8   spread differential is down dramatically.

9   A     Yes, indeed.  Debt spreads widen substantially as

10  preferred spreads did not widen as much.  So you saw the

11  spread narrowing as debt spreads increased.  Yes.

12  Q     All right.  So someone sitting there might have a very

13  different view of how long a crisis was going to last,

14  whether it was going to last for a week, a month, a year,

15  two years, five years or forever?

16  A     Oh, certainly the analysis can change from time to

17  time, there's no doubt about that.

18  Q     And someone sitting at October 15 submitting a $383

19  million valuation to the Lehman estate might have a

20  different view of what's going to happen to preferred

21  securities over the next week, month, five years, ten years,

22  correct?

23  A     Indeed.  I'm -- I was asked to do a valuation as of

24  September 15th, which I understand to be the relevant date,

25  so that's what I've attempted to do.  But I absolutely agree

Page 68

1    that people's evaluations will change from week to week and

2    month to month.

3    Q    Okay.  All you're doing here in your curve construction

4    is using these basic building blocks, that is in Case 1 you

5    start with a dot from Merrill Lynch, you then add the

6    assumption about what happened from Year 5 onward, you add

7    the assumption about the two years versus the latter three

8    years, correct?

9    A    Yes, I do.

10   Q    And then you create a curve, correct?

11   A    That is correct.  Yes.

12   Q    Now, if (indiscernible) assumed that there would be a

13   short heightened period of spreads and then it would turn

14   back normally within a year, evaluations might be lower,

15   correct?

16   A    They might be higher.  I would want to run the

17   valuation.  I mean, it's the -- if -- I'm sorry, they might

18   be higher.  I would want to run the valuation.  If you

19   credit the 700 basis point spread of 7 1/2 years, but you

20   truly believed that all of the risk was in the next one to

21   two years, all of the incremental preferred risk was in the

22   next one to two years, and that they -- then the risk

23   followed the risk of the debt implied default, then you

24   would tremendously front load that incremental preferred

25   risk.

Page 69

1   Q    So one of the things you didn't use in Case 1 is you

2   did not look at the prices of the preferred securities of

3   these six names, correct?

4   A    No, I did not.

5   Q    Right.  Because the prices of the preferred securities

6   would give you another data point that you could use to

7   check whether your curve construction was correct or not.

8   A    Not necessarily.  I disagree --

9   Q    Can I just stop you there for a second?

10  A    -- with that point.

11  Q    You disagree with that point?

12  A    Yes.

13  Q    Okay.  But in Case 2 all you had -- you didn't have a

14  dot, all you had were the prices of the preferred

15  securities, correct?

16  A    Correct.

17  Q    Okay.  But you did have prices for preferred securities

18  in these six names in Case 1, correct?

19  A    Yes.  They are available.  I didn't examine them.

20  Q    So you didn't do that cross check to say, okay, when I

21  don't have the price and all I have is the spread from

22  Merrill Lynch, do my methods line up, correct?

23  A    Yes.  I -- and the reason is because, as you've asked,

24  what was it that Merrill Lynch did, I don't know what

25  Merrill Lynch did.  I don't know what they were -- what

Page 70

1   method they used or how they were approaching it.  And so I

2   simply want to use, and did use, the Merrill Lynch quotes.

3   Q    So as we move from Case 1 to Case 2 --

4             THE COURT:  Before --

5             MR. TAMBE:  Yeah?

6             THE COURT:  -- you move from Case 1 to Case 2,

7   we've just been at it for about an hour and 20 minutes.

8             MR. TAMBE:  Sure.

9             THE COURT:  Is this a good time --

10            MR. TAMBE:  Yeah, absolutely.

11            THE COURT:  -- to take a break?

12            MR. TAMBE:  Yes.

13            THE COURT:  Because when we come back it'll be a

14  segment that gets us to the end of our day together.

15            MR. TAMBE:  Sure.

16            THE COURT:  All right?  Yes.

17            MR. TAMBE:  And just for recordkeeping --

18            THE COURT:  I'm sorry?

19            MR. TAMBE:  That's fine.  For recordkeeping, what

20  I'll do is mark as --

21            THE COURT:  Yes.

22            MR. TAMBE:  -- if it's helpful to the Court, mark

23  what I've written on as Exhibit 5987-A and provide copies --

24            THE COURT:  Perfect.

25            MR. TAMBE:  -- to the other side and to Your

Page 71

1    Honor.

2            THE COURT:  Okay.  Great.  All right. Let's come

3    back at 3 o'clock and we'll continue till 4:30.

4        (Recess)

5            THE COURT:  Oh, we've taken our jackets off.

6    Excellent.

7            MR. TAMBE:  Thank you, Your Honor.

8    Q    Dr. Niculescu --

9    A    Yes, Mr. Tambe.

10   Q    -- just before we leave Case 1, I just want to finish

11   up on Case 1.  One of the calculations you do is you

12   extrapolate, and I forget the term you used yesterday,

13   heuristic calculation to go from the six names to the

14   population, correct?

15   A    Yes.

16   Q    All right. I don't -- I confess, I don't know what that

17   word means, but that's the calculation you did, right?

18   A    I'm sure Google can tell you.

19   Q    Okay.  All right.  So -- I don't trust Google.  Page 37

20   of your demonstrative, so that's your calculation -- so

21   let's just set the stage here.  That's the number you

22   arrived at when you start with the Merrill Lynch offer,

23   correct?

24   A    Yes.

25   Q    And that's for four of the names, you do your curve

Page 72

1    construction?

2    A    Yes.

3    Q    Right?  And that gives you the valuations you see in

4    the second to last column on the right, correct?

5    A    Correct.

6    Q    And you apply it to the notionals of each position and

7    you come up with a $29.6 million number, correct?

8    A    Yes.

9    Q    Right.  So that's your Case 1 valuation for those six

10   names.  And then what you do, I think, towards the end of

11   the demonstrative deck, is you've extrapolated that to the

12   population, to all 19 names, correct?

13   A    That is -- the other 13, yes.

14   Q    Sorry, the other 13.  So that's on Slide 30 -- 49.  And

15   what you call the Merrill floor is $89 million, correct?

16   A    Yes.

17   Q    And so just rough orders of magnitude, to go from the

18   six names to the other 13, and the $89 million is for all 19

19   names now, correct?

20   A    That is for all 19 names.

21   Q    That's the population?

22   A    That's the population.

23   Q    Apples to apples, these lines are all apples to apples

24   in your world, correct?

25   A    Within the provisos we've made, yes.

Page 73

1    Q    Right.  So it's roughly you go from 29.6 to 89, was

2    about three times?

3    A    Yes.

4    Q    Okay.  And all you're doing there is looking at the

5    notional size and saying, I was valuing a notional that was

6    one-third the total, I'm going to apply that same to the

7    full population?

8    A    I think the numbers were of the order of 123 million

9    notional for the Merrill names, and 371 million total.  So,

10   exactly right.

11   Q    Okay.  All right.  So let's go back to 37 then.  If you

12   were to assume that you know nothing about the Merrill

13   curve, and that the conservative thing to do here is just

14   take a flat line, you could have run that calculation?

15   A    Yes, I could have.

16   Q    So just, again, to be clear on, say, Barclays, where

17   they -- the dot you have is at 700 basis points, instead of

18   creating that downward sloping curve, if you just said, it's

19   700 all the way through, you could have calculated a

20   valuation both in percentage of notional terms and dollar

21   terms, correct?

22   A    Correct.

23   Q    And directionally you know that if you had done that

24   for every line that you create a curve, you'd come up with a

25   number that is lower than your 29.6 number, correct?

Page 74

1   A    Yes.  For the four names it would be lower, and

2   therefore for the 29.6 total it would be lower, yes.

3   Q    Do you know how much lower, sir?

4   A    I don't recall if I know that number.

5   Q    Okay.  I've tried to do that calculation --

6   A    Okay.

7   Q    -- I'm going to show you the number and see if that

8   jogs your memory.

9   A    Very good.

10   Q    Now fair warning and prefatory remarks.  You've got to

11   go to Bloomberg to do those calculations, correct?

12   A    Yes, you do.

13   Q    Okay.  So you can't just do those on your calculator?

14   A    No.

15   Q    This is 5985.  Okay.  Because what you did is -- the

16   curve you took, you took your curve to Bloomberg's CDS

17   calculator and had Bloomberg calculate the number for you,

18   correct?

19   A    That's right.

20   Q    And so what I attempted to do, and asked someone to do

21   for me, was let's just assume there's no curve, it's just a

22   flat line.  Go to the same Bloomberg calculator, what number

23   do you get.  That's what I've attempted to do.  There's

24   Bloomberg screenshots attached to it.  Generally, if we'd

25   done that, and I don't expect you to verify this for me, but

Page 75

```
 1    as an approach, if one had gone to the Bloomberg calculator

 2    and said, we're going to use flat spreads, it should give

 3    you a result, correct?

 4    A     Yes.

 5    Q     And it'll give you a lower number than the one you've

 6    come up with, correct?

 7    A     That is correct.

 8    Q     Since you're going to be back tomorrow, probably, if

 9    you want to point out to me any mistakes we've made in

10    running the Bloomberg, you can.

11             THE COURT:  You're not entitled to give the

12    witness homework, Mr. Tambe.

13             MR. TAMBE:  It's in fairness to the witness, Your

14    Honor.

15    Q     So roughly it drops your value by about 6 million,

16    correct?

17    A     That's what this page shows.

18    Q     Okay.  And so if you were to extrapolate that using the

19    same heuristic approach, it would drop your Merrill floor

20    from 89 down by I guess $18 million?

21    A     If you say so, I --

22    Q     It's three --

23    A     -- haven't done the calculation.

24    Q     It's three to one, right?

25    A     That's correct, yes.
```

Page 76

1    Q     Okay.  Okay.  So two other issues with Case 1, right?

2    So we can go up, please.  The Case 1 starting point are

3    October 1, October 2 offers from Merrill, correct?

4    A     Yes.

5    Q     And stuff had happened between September 15th and

6    October 1, correct?

7    A     Invariably, yes.

8    Q     Well, some pretty nasty stuff had happened between

9    September 15th and October 1, right?

10   A     And -- bad and good stuff.

11   Q     So --

12   A     We saw a sharp decline, as we saw yesterday, in

13   preferred prices early in the week of September 15th and

14   then a recovery.  But yes, good and bad stuff had happened.

15   Q     And you made no effort to walk back the Merrill offers

16   to the September 15th environment; didn't you, sir?

17   A     I certainly made an effort.  I concluded that that was

18   not a reasonable exercise to perform.

19   Q     So you don't express an -- a walk back opinion or walk

20   back results in your report; do you, sir?

21   A     No, I addressed it in my rebuttal report instead.

22   Q     In contrast to sort of the heuristic approach of simply

23   applying, mathematically, the Merrill results to the rest of

24   the population, you offered that as a calculation, but you

25   didn't believe that that was a proper calculation to do; is

Page 77

1    that right?

2    A    I'm sorry, can you ask the question again?

3    Q    The exercise we just went through, to go from 29.6

4    million to 89 million --

5    A    Yes?

6    Q    -- you've offered up that calculation --

7    A    Yes.

8    Q    -- but you have reservations about that calculation; do

9    you not, sir?

10   A    I do.

11   Q    Okay.  Because there's different populations of names,

12   correct?

13   A    Correct.

14   Q    In fact, the Merrill Lynch offers generally have -- I

15   think they're all non-U.S. names; is that right?

16   A    That is correct.

17   Q    Whereas the population of PCDS had a variety of non-

18   U.S. and U.S. names, correct?

19   A    That is correct.

20   Q    And some of those U.S. names, their preferred

21   securities were trading at fairly high valuations, correct?

22   A    Yes.  Wachovia was trading very well, others were

23   trading very poorly, like Citi.

24   Q    I think you meant to say Wells Fargo was trading very

25   well?

Page 78

1    A    I'm sorry, you're correct.  I stand corrected.  It was

2    Wells Fargo, yes.  Wachovia was not trading well.  Yes,

3    thank you.

4    Q    And CBA, Commonwealth Bank of Australia, that was

5    trading pretty well?

6    A    CBA and A&Z were both trading well.  CBA and A&Z were

7    other trading -- A&Z.

8    Q    And I think HVD was another non-U.S. name, not in the

9    Merrill population but in the trade population, correct?

10   A    That's correct.

11   Q    And that was trading pretty well, correct?

12   A    It was.

13   Q    All right.  And so you could make the case that it's

14   not just a mathematical heurithmatic calculation, but you

15   could do a weighted calculation to use the Merrill results

16   to arrive at a more accurate population result, correct?

17   A    I'm not -- I haven't thought about how you would do the

18   weighting.

19   Q    So you haven't thought about it and you haven't done

20   it?

21   A    No.

22   Q    Okay.

23   A    No, that's why I presented what I call the heuristic

24   approach.

25   Q    On average, have you done any analysis to see, on

Page 79

1    average, how did the Merrill Lynch names compare to the non-

2    Merrill Lynch names?

3    A    Yes, I have, at one point, but it was a long time ago

4    at this stage and I don't recall any details about it.  My

5    general recollection was I thought that the credit quality

6    of the non-Merrill names was no better than that of Merrill

7    names, conceivably worse.  But I have no details I could

8    give you on that at this point.  And I'd be happy to see

9    data to support or contradict that belief.

10   Q    You can't give me homework either.  All right.  So now

11   let's go to PCDS Case 2.  So let's -- you start off with I

12   think Page 39 of your demonstrative -- or Page 38 of your

13   demonstrative.  On Page 38 and 39, again, you refer to some

14   publications. Do you see that?

15   A    Yes.

16   Q    Again, these publications are talking about general

17   approaches to modeling and valuation, correct?

18   A    They are talking about general approaches, yes.

19   Q    Not telling you exactly how to construct the curves you

20   constructed, correct?

21   A    No.

22   Q    So now your curve construction in Case 2 was more

23   involved than in Case 1, correct?

24   A    Yes.

25   Q    Okay.  So let's go to 40, just to list out all the

Page 80

1    steps you took.  All right.  So you got no PCDS offer that

2    you can observe in the market, so you start with the price

3    of an underlying preferred security and you build your way

4    up to finally get to a valuation, correct?

5    A    Correct.

6    Q    I have a question for you, is that the order in which

7    you did your math?

8    A    The -- effectively.  The second and third steps have to

9    be simultaneously.  That is to say, the option adjusted

10   preferred stock spread curve depends upon the value of the

11   embedded call option.  The two have to be calculated at the

12   same moment.

13   Q    So you were calculating two variables at the same time?

14   A    Correct.  I'm iterating until those two variable

15   together result in the price of the preferred stock.

16   Q    So and you used the word iteration.

17   A    Yes.

18   Q    You're running, what thousands and thousands of

19   calculations?

20   A    We're running thousands of simulations, which then

21   iterate in order to find the price of the preferred stock,

22   yes.

23   Q    Okay.  So two and three are not really distinct,

24   they're run simultaneously, correct?

25   A    They're two distinct concepts, so I needed to lay them

1    out as two distinct concepts.  But they have to be computed

2    simultaneously.

3    Q    So that's a mathematical simulation that you run?

4    A    Yes.

5    Q    How about -- so let's assume two and three are really

6    the same step or at the same time.  How about just the order

7    of operations, is the order of operations accurately set

8    forth on that slide?

9    A    I think so.  Adjusting for hedging involves changing

10   the price of the preferred stock and rerunning two and

11   three.  I could switch the adjustment for the CDS bond basis

12   and put it at five instead of four, I suppose.  But what

13   happens here, let me explain it, is I find a right price --

14   Q    Can you just focus on my question?

15   A    Sorry, sir.

16   Q    The question was, order of operation.  And that's a

17   phrase you know, right?  Order of operations?

18   A    Indeed.

19   Q    It matters in math, correct?

20   A    Indeed.

21   Q    So four plus -- no, let's do it on a piece of paper.

22   Give me a blank piece of paper.  I just want to make sure

23   this point gets through.  We're both talking about the same

24   order of operation, but not different ones.  Okay?  Let me

25   start writing.

Page 82

1    A     Sure.

2    Q     All right.  If I do four plus two plus eight, it

3    doesn't matter what the order of operation is, correct?

4    A     Correct.

5    Q     You're going to get to the same result, right?

6    A     Correct.

7    Q     Multiple by eight, now the order of operations matters,

8    correct?

9    A     And there is a convention in mathematics, My Dear Aunt

10   Sally.

11          COURT REPORTER:  (Indiscernible)?

12   A     My Dear Aunt Sally.

13   Q     Multiplication, division --

14   A     Addition --

15   Q     Actually, (indiscernible) is exact.

16   A     -- subtraction.  Yes.

17          THE COURT:  What are you two talking about?

18          MR. TAMBE:  We're just doing the build up to get

19   to the point.

20   Q     So the point is, order of operations matters in math?

21   A     Correct.

22   Q     Okay.  Going back to your curve construction, order of

23   operations matters in what math you're doing to construct

24   your curve, correct?

25   A     I'm not sure that I can accept that until you can point

```
1    to me to what it is in particular you have in mind.

2    Q    Okay.  When you say adjust for hedging --

3    A    Yes?

4    Q    -- right, you list that as step five?

5    A    Correct.

6    Q    And you say you adjust for hedging after you have found

7    the option adjusted preferred stock spread curve, correct?

8    A    Yes.

9    Q    I thought in response to an answer just a few minutes

10   ago you said to adjust for hedging you have to go back and

11   rerun two and three, correct?

12   A    That is correct.  Yes.

13   Q    Okay.  That's what I meant by order of operations, this

14   is not linear, you go one, two, three, four, five, back to

15   two and three, to get down to six?

16   A    No.  It is linear for Scenario 1.

17   Q    But Scenario 1 you're making no adjustments for

18   hedging, sir.

19   A    Indeed.  Yes, exactly.

20   Q    You're assuming the issue away?

21   A    Indeed.  So and then put Scenarios 2, 3 and 4, or

22   Scenario 2 and -- (indiscernible) estimate scenario, I then

23   have to introduce hedging, which then causes me to re-

24   compute steps two and three.

25   Q    So in fact when you did the math, anything other than
```

Page 84

1    your base case, your Scenario 1, you did one, two, three,

2    four, five, went back to two and three to get the six?

3    A    Correct.  Yes.

4    Q    Okay.  So that's not what's shown on this Exhibit 40,

5    correct?

6    A    Well, I certainly did not intend it to be misleading,

7    but I'm happy to make the clarification.

8    Q    It's not a question of misleading, sir, it's a question

9    of the complexity of your calculations.  And you've got

10   words on the Slide 40 that suggest those were the steps you

11   followed, in that order.  In fact, you describe them in the

12   subsequent pages.

13   A    Yes.

14   Q    In reality what you did was you did step one, you found

15   a price.  In steps two and three you ran thousands of

16   simultaneous calculations.

17   A    I mean of the order of a thousand, yes.  Of the order

18   of a thousand, but then we have to iterate in order to find

19   the price.  Yes.

20   Q    Once you got back you made an adjustment for CDS bond

21   basis, correct?

22   A    Yes.

23   Q    And then other than your base case scenario, you then

24   made an adjustment for hedging?

25   A    Correct.

Page 85

1    Q    And then you went back and ran two and three again?

2    A    Correct.

3    Q    Okay.  And then you created your PCDS spread curve that

4    you would use to price the positions, correct?

5    A    Absolutely.  That's accurate.  I appreciate the

6    clarification.  Yes.

7    Q    And again, same rule as in Case 1, the higher your

8    curve in the prompt years, the first five years, the higher

9    the valuation of the PCDS that you come up with, correct?

10   A    Correct.

11   Q    Why don't we stay on this?  When you say find the right

12   price, the higher the price the lower your valuation,

13   correct?

14   A    Correct.

15   Q    All other things being equal?

16   A    Yes.

17   Q    Okay.  Number four, adjusting for bond -- CDS bond

18   basis --

19   A    Yes.

20   Q    -- that was a negative eight basis point adjustment

21   that you made?

22   A    Yes.

23   Q    So again, the more negative that basis, the lower your

24   valuation, correct?

25   A    Correct.

Page 86

1    Q    So instead of adjusting by negative eight basis points,

2    if you'd adjusted, for example, by negative 20 basis points,

3    the curves would be shifted down, correct?

4    A    They would go down by about -- yes, the values by about

5    $600,000.  Yes.

6    Q    And if you went down to minus a hundred basis points,

7    they'd go down by a lot more, correct?

8    A    Yes.

9    Q    And that's not a linear function.  There's a lot of

10   complex math here, correct?

11   A    It's -- no, I mean, the CDS bond basis is you're just

12   going to adjust the CDS spread curve that goes into the

13   Bloomberg calculator you showed earlier, it's not precisely

14   linear, but it's not radically different from linear for

15   those sizes of movements.

16   Q    But you don't stop after you adjust for CDS bond basis,

17   because the next thing you do, in everything except for your

18   base case, you then make a further adjustment for hedging,

19   correct?

20   A    Yes.

21   Q    And that increases the value of the positions --

22   A    Correct.

23   Q    -- generally, correct?

24   A    Yeah.

25   Q    And then you go back and run the curves again, correct?

Page 87

```
 1    A    Correct.

 2    Q    Okay.  None of the materials you cite in your report or

 3    on the demonstratives actually spell out doing a PCDS

 4    valuation (indiscernible)1:34:49; do they, sir?

 5    A    Indeed.  The PCDS market didn't really exist, so I

 6    didn't expect --

 7              COURT REPORTER:  I'm sorry/

 8    A    The PCDS market didn't really exist, I would not have

 9    expected to find significant literature on PCDS valuations.

10    I looked for it and I did not find any such literature, so I

11    had to develop a reasonable approach.

12    Q    And it's, as far as you know, a unique approach,

13    correct?

14    A    Insofar as that nobody else has done it, it is by

15    definition a unique approach.

16    Q    And if someone else were to start with the basic

17    building blocks, finding the right price, they might

18    disagree with you what the right price was, correct?

19    A    Well, I'm quoting Exchange traded prices on securities

20    that traded at the time, so I would be a little surprised,

21    but I'd be happy to have the conversation.

22    Q    Well, someone else might say, I see the Exchange traded

23    prices, but I also see the Bloomberg prices, I'm going to

24    use the Bloomberg prices, correct?

25    A    They might say that.  I would disagree that that would
```

Page 88

1    be a reasonable approach.

2    Q    But every single day hundreds of thousands of bankers

3    around the world turn on their dealer broker terminals and

4    use Bloomberg data, correct?

5    A    Yes, they do.  But I can't speak to how much attention

6    they paid to the prices of particular preferred stock issue

7    on September 15th, 2008.

8    Q    And in fact, unlike spending a year and a half, 18

9    months on a complicated expert engagement, they make split

10   second decisions for billions of dollars, off of what they

11   see on their Bloomberg terminals, correct?

12   A    I certainly have the experience that people look at the

13   prices that are shown on Bloomberg terminals with a certain

14   degree of skepticism.  It's not an automatically accepted

15   price.

16   Q    When you're making split second trading decisions, sir,

17   you're not building models and iterating thousands and

18   thousands of calculations and then going back and adjusting

19   for hedging, correct, sir?

20   A    It depends on what technology you have available to

21   you.  If I'd been trading these instructions at Goldman

22   Sachs at this time, no.  Though I was -- not that I was at

23   that company at this time.  I would certainly have wanted to

24   have a fulsome set of analytics available to me at a push

25   button.  Having said that, your point, I thought, was about

Page 89

1    the accuracy of Bloomberg prices.  It's a simple matter to

2    conclude the price is potentially not a representative price

3    for where I can transact in the marketplace.  That can be

4    done in a split second.

5    Q    Sir, not my question.  My question was some other

6    trader or valuator might have a different view of what the

7    right price is, than you do, correct?

8    A    I can hardly dispute it, but without being misleading I

9    think that finding an actual transaction price is quite

10   solid evidence.

11   Q    How about broker runs, broker runs on preferred

12   security prices the week of September 15th, 2008?  Someone

13   would rely on those, couldn't they, sir?

14   A    Potentially, yes.

15   Q    And those prices could be different than what you call

16   the right price, correct?

17   A    They could -- you might well be able to find other

18   securities on those broker runs.  Again, the issue here,

19   just to be clear, in finding the right price, is you have

20   both an accurate price at which you can transaction, you

21   also need to find the price of the cheapest security within

22   the deliverable basket.  So you can deliver any one of a

23   number of securities into a PCDS contract.  If you can find

24   a security of a higher price, that doesn't matter, you need

25   to try to find a security with the widest spread, the

Page 90

1    largest implied losses, in order to calculate this contract.

2              Now it is possible that somebody could find

3    security prices that were lower than mine.  It's also

4    possible they could find security prices that were higher

5    than mine.  I they found prices that were higher, it

6    wouldn't be relevant.  If they had found prices that were

7    lower, it would be relevant.

8    Q    So, I just want to understand your criteria, because I

9    thought your criteria for picking the right price was

10   whether it was Exchanged traded or not, not whether it was

11   the cheapest to deliver.

12   A    What I've done in this exercise is I've found exchanged

13   traded prices.  I have been unable to determine accurately

14   what the cheap -- the price would be at the cheapest to

15   deliver security, because I don't have access to enough

16   transaction prices.  It's possible that if I had access to

17   more prices that actually transacted, I would find some that

18   were a lower, or that implied greater losses.

19   Q    So again, just going back on my point.

20   A    Yes.

21   Q    Someone else might have a completely different view of

22   what the right price is, correct?

23   A    They might have a view that the right price was lower,

24   yes.

25   Q    The point is very simple, sir.  You go through all

1   these six steps --

2   A    Yeah.

3   Q    -- there's lots and lots of calculations and

4   assumptions behind those steps.  Someone else working with

5   the same building blocks could come up with a very, very

6   different value, correct, sir?

7   A    Well, indeed.  And to take your point --

8   Q    You've answered the question.  Thank you.  Let's go to

9   CX-2108.  Are you familiar with this document, sir?

10  A    It looks familiar, but you could perhaps refresh my

11  memory.

12  Q    Well, I'm not sure how I do that without you just sort

13  of looking at the document.  I put it before you.  I know

14  you've seen it, but you've got to tell us whether you

15  remember seeing it.

16  A    Could you --

17          THE COURT:  If you want to drive around the

18  document, just tell Mr. Tambe, okay?

19  A    Yes.  Could we please scroll down on this document?

20  Thank you.  And scroll up, please?  Very good.  Now could

21  you please -- let's look at some of these other tabs to try

22  and refresh my memory, please?  Okay.  Okay. Can we start in

23  the first tab, please, the disclaimer?  Okay.  And response

24  to?  Thank you.  Lehman Position's Master.  Thank you.

25  Market Responsible.  Thank you.  The next tab?  Thank you.

Page 92

1    Arthur.  Can we scroll down on this tab, please?  Very good.

2    We can stop there.  Thank you.  Could we just go to the very

3    top of Arthur's tab, please?  Okay.  And we can go to the

4    next tab, please?  And the next one?  And the next one?  And

5    the next one?  And the next one?  And the next one?  And the

6    next one?  And the next one?  And the next one?  And the

7    next one?  Very good.

8             Let's go to the right on the tabs, please?  Can we

9    go to the QVT data, please?  Is that available to me?  All

10   right.  And the Trade Details tab, please?  Hmm.  What else

11   is to the right?  Anything else to the right?  And any other

12   tabs to the right?  Can we see the Adjusted Claim, please?

13   All right.

14            Very good.  We can go back to the tab you have.

15   This appears to be the data supporting the QVT claim.  As I

16   sit here, I don't recall the specifics of this data sheet,

17   but I've -- I have no reason to believe I haven't reviewed

18   it.  I've reviewed very many data sheets.

19   Q    Did you rely on the data in the PCDS data tab in

20   forming your opinions, sir?

21   A    No.

22   Q    Okay.  Thank you.  Let's go to your demonstrative, Page

23   41.  So in your analysis, step one was finding the right

24   price, correct?

25   A    Yes.

Page 93

1   Q      And what you explained yesterday was the -- what you

2   defined as the right price was information you got on

3   Exchange traded preferred securities, correct?

4   A      For 8 of the 13 names, that's correct, yes.

5   Q      And the point you made was that the Bloomberg, the BGN

6   data lagged behind other data, correct?

7   A      That's right.

8   Q      Different problem than the Markit problems you

9   described to the Court yesterday, correct?

10  A      The Markit problems related to PCDS data, we're here

11  talking about the data for the underlying preferred stock

12  prices.  These are different issues, yes.

13  Q      And you would agree with me that the BGN data is data

14  compiled by Bloomberg to a number of different contributors,

15  correct?

16  A      Bloomberg tends not to reveal how they do this.  They

17  say it's proprietary.  A standard pricing source would use

18  data from a variety of dealers and use some algorithm to

19  distill that data into a signal data point.  Therefore, it's

20  reasonable to presume that's what Bloomberg does, but they

21  don't tell us.

22  Q      And nonetheless, even though Bloomberg doesn't tell you

23  what their secret sauce is, you, when you were working at a

24  bank, and hundreds of thousands of other bankers paid lots

25  and lots of money to Bloomberg to get their data, correct?

1    A    Well, I -- we -- and we still pay lots of money to

2    Bloomberg, but mainly to use their analytics rather than

3    their data.

4    Q    Okay.  So you think --

5    A    It data is helpful in some cases.  Their data is

6    helpful in some cases, they have very good indicative data

7    in the corporate bond universe, for example.  They have

8    quite a lot of good pricing data.  But the quality of data

9    varies from sector to sector.

10   Q    Other than lagging behind, you identified for the

11   Court no other issue with the BGN data on preferred

12   securities, correct?

13   A    No.  And indeed I've used pricing service data for 5 of

14   the 13 securities.  As I say, it is difficult to be certain

15   what the price of the cheapest to deliver preferred was on

16   that date.

17   Q    We spoke early on this afternoon about what might cause

18   prices of preferred securities to move.  Do you remember

19   that?

20   A    Yes, I do.

21   Q    And so the Exchange traded prices that you're

22   reflecting on 41, those are the preferred securities that

23   are traded on exchanges in $25 par amounts, correct?

24   A    That is correct.

25   Q    That's different from the institutional market, which

Page 95

1    is $100 par amount, correct?

2    A    That's correct.

3    Q    So you might have institutions trading on Exchanges,

4    but you also have a lot of retail investors trading on

5    Exchanges, correct?

6    A    That's correct.

7    Q    You made no effort, as you looked at those prices, and

8    decided the Exchange prices were the right prices to account

9    for differences in investor sentiment; did you, sir?

10   A    I don't know of any way of doing that.  But let me

11   speak to the point, because it is a point --

12   Q    Answer the question.  You didn't do it.

13   A    It's a point that was -- I considered and concluded --

14   I had two conclusions.  One is I didn't see a strong method

15   of making such an adjustment.  And secondly, I concluded

16   that any such adjustment would have increased the value --

17   my valuation.  And so I did not pursue it for that reason.

18   Q    Let's just be clear.  The line you have there on Page

19   41, if you had used the data points on the BGN line, the

20   higher price, your valuation would have been lower, correct?

21   A    Again, it's important to use the cheapest to deliver

22   security.  So whether you're using an Exchange traded price

23   or a pricing service price, you're trying -- you -- the

24   proper analysis is to find the price of the cheapest to

25   deliver security.  It doesn't matter whether the pricing

Page 96

1   service price is higher or lower.  If the pricing service

2   price were lower than that would be a better choice.  If it

3   were higher, then the Exchange traded security would be a

4   better choice.

5   Q    Just to be clear.  What you told the Court yesterday is

6   you picked the Exchange traded prices because they were

7   traded on an exchange and BGN lacked, and that's the only

8   basis you gave when you testified yesterday; is that right,

9   sir?

10  A    Well, I mean that is correct.  That is correct.  And --

11  Q    Let's move on then.  Let's go to Slide 43.

12  A    -- I make the point in my report in chief as well.

13  Q    You make lots of points in your report in chief.

14         Let's go to 43.  All right.  So now, let's do some

15  curve construction the way we did in Case 1.

16         THE COURT:  But before you move on, about two

17  questions ago, in response to one of Mr. Tambe's questions,

18  you indicated that you didn't do a particular variation on

19  your methodology, and you observed that that would have

20  resulted in a higher price.

21  A    A higher claim.  Yes --

22         THE COURT:  A higher claim?

23  A    -- a higher valuation.  Yes.

24         THE COURT:  Yes.  So what?

25  A    I want to --

Page 97

1          THE COURT:  Well, why did the fact that had you

2     done it in that iteration it would have results in a higher

3     claim, why was that a reason for not doing that as part of

4     your methodology?

5     A    I adopted the stance, throughout my construction, Your

6     Honor, of when I had to make a decision about an assumption

7     or an approach, to try, if I had to err, to err on the side

8     of conservatism.

9          THE COURT:  Thank you.

10    Q    All right.  So we're going to talk about case

11    construction under Case 2 now.  And just to reset the record

12    let's --

13    A    Yes, sir.

14    Q    -- go back to how you did it on Case 1, how you did it

15    differently for Case 2.  So put back up, just for reference,

16    the document we looked at earlier this afternoon.

17    A    Yes.

18    Q    Right?  Which is 5987-A and there, when you started

19    with your clean sheet of paper, to draw a curve you had a

20    point, you had a offer from Merrill Lynch for 7 1/2 years

21    out, correct?

22    A    That's right.

23    Q    Okay.

24    A    Thank you.  Ah, okay.

25    Q    Now I've handed you, Dr. Niculescu, an exhibit marked

Page 98

1    5988.  And that's not terribly informative, because that's

2    completely blank, right?  And that's how you began Case 2,

3    correct?  You didn't have a data point to even begin the

4    curve construction, correct?

5    A    Well, I had the price of the relevant preferred stock

6    security.

7    Q    Yeah, but your left axis isn't a price axis; is it,

8    sir?

9    A    No.

10   Q    Right.  So you're trying to solve for spread, and

11   you've got a blank sheet of paper, right?

12   A    I had a little bit more information than a blank sheet

13   of paper.

14   Q    So let's start building in what information you had.

15   A    Yes.

16   Q    You know the name of the issuer, in this case it's

17   going to be Credit Agricole, right?

18   A    Yes, sir.

19   Q    And you're going to know Credit Agricole's senior CDS

20   spread, correct?

21   A    Yes.

22   Q    And so you can go out to your five-year point and pin

23   that flat line that you discussed earlier, correct?

24   A    That is correct.

25   Q    That's where you start, right?

Page 99

1    A     That's where I start.

2    Q     Okay.  Let's do that.  So again, not to scale, I'm just

3    going to draw a block.  So you start by drawing a line,

4    right?  At -- starting at Year 5, flat all the way through,

5    correct?

6    A     That's correct.

7    Q     So -- and that's an assumption you made, correct?

8    A     Yes.

9    Q     You still don't have anything else to anchor this line.

10   You're now trying to fill in Year 0 through 5, correct?

11   A     That's correct, yes.

12   Q     And the curve you draw, unlike Case 1, doesn't have to

13   go to any particular point, correct?

14   A     It has to result in a set of discounted cash flows that

15   equal the price.

16   Q     So it can have pretty much any shape, as long as you

17   solve that to the price that you're covering, correct?

18   A     Well, I tell it what shape it has to have.  I use the

19   same process, that you described so well, in Method 1.

20   Q     Right, you tell the curve what it should look like,

21   correct?

22   A     I tell the curve that it should have a peak the first

23   two years, that the incremental hazard rate should drop by

24   half for the next three years, and then it should revert to

25   its long term level.

Page 100

1   Q    Correct.  And again, so you tell the curve what it's

2   going to look like and -- something like this --

3   A    Something --

4   Q    -- would you say?

5   A    -- something like that, yes.

6   Q    Right.  And with those rules you again run thousands of

7   calculations until you can match up that spread to the price

8   that you call the right price, correct?

9   A    To the observable price of the preferred stock security

10  and market, yes.

11  Q    Speaking about curves, right, the yield curve for U.S.

12  Treasuries --

13  A    yes?

14  Q    -- that's a yield curve that's based on transactions

15  that occur in the market with investors buying and selling

16  securities of various maturities, correct?

17  A    Yes.

18  Q    So there it's not someone like you telling the curve

19  what it should be, it's investors making decisions and

20  saying, here's how much I want to be paid to lend the

21  government money for six months, for a year, for five years,

22  et cetera, correct?

23  A    Correct.

24  Q    Right.  That's not the process you used, you told the

25  curve what it should look like, right?

Page 101

1    A    Yes.  Anybody doing this analysis has to make an

2    assumption of the shape of that curve.  In order to do a

3    valuation you have to make that assumption.  I made an

4    assumption.

5    Q    Well, again the assumption you made has the spreads a

6    lot higher, in Years 1 and 2, high in Years 3 to 5 and then

7    pinned down at 1.1 of the senior spread for the rest of the

8    maturity, correct?

9    A    Correct.

10   Q    And someone else looking at building a curve might have

11   a very differently shaped curve which is a lot lower than

12   your curve the first few years, correct?

13   A    People can make different assumptions.  I believe --

14   I'm of the opinion that this is one of the more reasonable

15   assumptions one could make.

16   Q    Right.  And in fact you have not looked at any other

17   opinions about constructing PCDS curves in any of the

18   literature you've read, correct?

19   A    I didn't see any discussion of PCDS curve construction

20   in and about September 15th of 2008.

21   Q    Well, or since, correct?

22   A    Or since.

23   Q    And again, to complete the thought.  So you start out

24   by telling the curve it should look like Exhibit 5988 and

25   then you convert that into the curve you showed the Court in

Page 102

1   Page 43 of your demonstrative, correct?

2   A   Yes.  But in order not to be misleading, but the

3   positions of those first two lines are determined by the

4   price of the security and the embedded call option of the

5   security.

6   Q   Well, not quite, right?  The positions of those first

7   two lines you also determine what you do with the third

8   line, and where you place the third line, correct?

9   A   Correct.  Yes.

10   Q   Okay.  So because if you would assumed higher risk from

11   Years 5 on out, the first two lines would be in a different

12   place, correct?

13   A   That is correct.  Yes.

14   Q   And the first two lines would be in a different place

15   if you said, this is going to be a short-lived crisis, at

16   the end of Year 1 it's going to fall down and it's going to

17   go something like this for the remainder of time, correct?

18   A   So there you've made two different assumptions.

19   Q   Sure.

20   A   One is that it stays higher in the future.  If you kept

21   the old assumption that it was lower in the future, then the

22   spread in the first year would be much, much higher.

23   Q   Okay.  Again, assumptions that people could make as

24   they were constructing these curves, correct?

25   A   Correct.  Yes.

Page 103

1    Q    And you had no empirical data to say it's got to be

2    this set of instructions to draw my curve, correct?

3    A    I don't believe such empirical data exists but I

4    attempted to make a reasonable set of assumptions.

5    Q    Right.  And we already discussed this, that this

6    approach, where you start with a blank sheet of paper, and

7    solve back for a curve, without any data points on PCDS,

8    this is not an analysis you -- excuse me, this is not an

9    analysis you tried to replicate through your Case 1 names,

10   correct?

11   A    Correct.

12   Q    Okay.  Because that would be another way of testing how

13   good you were at constructing a curve on a blank sheet of

14   paper, correct?

15   A    Not necessarily.  Merrill Lynch was axed in Case 1, so

16   I have no initial comfort with the thought that their axed

17   PCDS positions would match any particular valuation or would

18   cast doubt or support on any particular calculation.

19   Q    Right.  But you didn't even change?

20   A    That's correct.

21   Q    Okay.  All right.  This question came up yesterday,

22   right, about Merrill Lynch being axed, right?

23   A    Yes.

24   Q    And what you mean by that is, they have sold protection

25   to Lehman?

Page 104

```
1    A    Yes.

2    Q    Right?  And Lehman had gone away?

3    A    Yes.

4    Q    And you're assuming that they wanted to replace that

5    exposure with others in the market, correct?

6    A    I think it is likely, yes.

7    Q    So you're assuming Merrill Lynch is sitting in the

8    middle, it's got people selling protection to Merrill Lynch,

9    it has sold protection to Lehman, the Lehman leg has gone

10   away and so Merrill is sitting looking at protection being

11   sold to Merrill by a bunch of third parties?

12   A    Potentially CDOs or -- yes.

13   Q    Right.  And Merrill Lynch is obligated, because in that

14   position it's the protection buyer --

15   A    Yes.

16   Q    -- to make fixed payments to those third parties for

17   the remaining life of those deals, correct?

18   A    Correct.

19   Q    As we discussed at the very beginning, that could be a

20   losing proposition for Merrill if a deferral event never

21   occurs, correct?

22   A    That is correct.

23   Q    And that's the risk that Merrill Lynch is trying to

24   offset by offering protection on those names to the market,

25   correct?
```

Page 105

1   A    Yes.

2   Q    Okay.

3   A    I have said yes, but I fear again I've been misleading.

4   While the simple answer is accurate, it's also the case that

5   there was a market valuation of that PCDS at that moment, so

6   their potential loss is not just the loss of the premium,

7   it's the loss of that market valuation.

8   Q    But again, the risk that Merrill Lynch is trying to

9   reduce, by offering protection on these PCDS is the risk

10  that it'll make these fixed payments for a number of years

11  without receiving any protection payment in return, correct?

12  A    That is one risk.  Merrill Lynch, most likely, had

13  these positions mark to market and considered there was a

14  market value to the positions.

15  Q    You don't know --

16  A    That market value reflects the underlying premium and a

17  risk premium.

18  Q    You don't know what Merrill Lynch was thinking, at all,

19  when it made that offer to The Street, other than it made

20  the offer, correct?

21  A    Correct.  However, it would be highly unusual for a

22  dealer not to mark to market its positions.

23  Q    I get that.  But you looked at the exhibit with me this

24  morning.  The blotter.

25  A    Yes.

Page 106

1   Q    There were lots of other similar positions where

2   Merrill Lynch had sole protection to Lehman, which weren't

3   part of the offer.

4   A    That may very well be.  I have nothing to add about

5   that.

6   Q    All right.  Let's...  So, in your steps so far you have

7   picked the right price, then you've drawn the curve by

8   telling the curve what it should look like, correct/

9   A    Correct.

10  Q    And now you're making some other adjustments, correct?

11  A    Yes.

12  Q    We're onto the next step.  And so the next adjustment

13  you make is you say, all right, I'm going to account for the

14  CDS bond basis differential, correct?

15  A    Correct.  Again, just to be fulsome, you mentioned -- I

16  mentioned the option adjusted spread and I'm happy to go

17  past that if you wish, sir.

18  Q    No, no, you're absolutely right.  Let's go back and do

19  that in sequence.  So that's on Page 42.  Order of

20  operations matters, right?

21  A    Not necessarily.  They tend to be commutative.  So...

22  Q    So, this is what you're referring to -- you're trying

23  to value the indebted call option, correct?

24  A    Yes.

25  Q    And you're trying to remove a feature from the

Page 107

1    underlying -- or account for a feature of the underlying

2    preferred equity, correct?

3    A    Correct.

4    Q    We discussed this afternoon, early this afternoon, that

5    one of the adjustments you make when you're looking at an

6    underlying on a derivative is you want to account for

7    maturity differences, right?

8    A    Yes.

9    Q    Is that what you're doing here?

10   A    No.  This is a little bit beyond that.  It includes

11   that and it's a little beyond that.

12   Q    So, you are accounting for maturity differences by

13   doing this calculating and then you're making some other

14   adjustments, is that right?

15   A    The additional adjustment is to value the call option

16   that the issuer holds that may well be exercised long after

17   the maturity of the PCDS contract but that nonetheless

18   affects the value of the preferred stock itself.

19   Q    I just want to be clear on this.  Your calculation

20   includes a component of your calculation is immaturity

21   adjustment, correct?

22   A    Indeed.  The cash... Let me try to be clear.  The cash

23   flows that I'm valuing in the PCDS only run out to the

24   maturity of the PCDS.

25   Q    Whereas the price you're looking at, which is the

Page 108

1    underlying security price, that's for a security that could

2    well be perpetual, correct?

3    A    That is correct, yes.

4    Q    And what you're trying to remove from that price or

5    after that price -- what you're trying to account for in the

6    price is that optionality?

7    A    The call optionality, indeed, yes.

8    Q    Because if you didn't do that, your theory would be

9    wrong?

10   A    Yes, the theory would be in appropriate if I didn't

11   adjust for the call option.

12   Q    Talk to me now.  (indiscernible) bond basis adjustment.

13   Now we're on Page 44 and this is the step where you make a

14   deduction of 8 basis points for the bond basis differential.

15   And what I want to ask you about is your source for that,

16   and I have to find that place in my binder.  So, looking at

17   Slide 44, it doesn't tell us exactly where you got that

18   from, but there is an exhibit and it's in the black binder

19   and we'll pull it up on the screen.  So, Tab 24 on the black

20   binder, which is X1526.  I believe, and we've discussed this

21   before -- if you go to Page 47 of that exhibit...it's...

22              THE COURT:  Numbered or Bates?

23              MR. TAMBE:  So, the Bates Numbers is 6078 are the

24   last four digits.

25   Q    The chart you have in your demonstrative is based on,

Page 109

1    it looks like, the bottom left chart on that page.  Is that

2    right?

3    A    That is correct, yes.  It's the page entitled CDS Bond

4    Basis, sir?

5    Q    Yes.  And that's the document you relied on to come up

6    with the eight basis point adjustment, correct?

7    A    That is correct.

8    Q    Okay.  Now, those lines, those are lines drawn by J.P.

9    Morgan, correct?

10   A    Yes.

11   Q    And they're drawn the basis of some index, correct?

12   A    That's their index, yes.

13   Q    And that's not an index that you examined the

14   constituent parts of when you put your report together,

15   correct?

16   A    They did not make that available to me, no.

17   Q    And you didn't in the course of your work call up JPM

18   and say, can you please tell me what's under these lines,

19   because they're an important part of a calculation on

20   submitting to the Bankruptcy Court?

21   A    Well, as a matter of fact, I'm not sure whether my team

22   did or didn't.  We may have but we didn't -- whether we did

23   or not, we certainly did get it.

24   Q    Not a question you didn't get it -- you don't even know

25   if you asked for it?

Page 110

```
 1   A    As I sit here today, I can't tell you whether my team

 2   asked for it or not.

 3   Q    So, you tried to find, I guess, on both lines what

 4   those lines tell you about September 15, 2008, correct?

 5   A    Yes.

 6   Q    And you didn't have the underlying data, correct?

 7   A    That is correct.  I only have the picture here.

 8   Q    Did you hold up a ruler to this diagram to figure out

 9   where September 15th is, sir?

10   A    Yes, I did.  In fact, I put red lines over it on a

11   computer and looked at the gridlines, and the gridlines came

12   out to September 15th, being that one point that you see

13   there -- the 8 basis point --

14   Q    I'm just trying to picture this.  When you said you put

15   gridlines on your computer...

16   A    Yeah?

17   Q    ...I'm looking at a PDF document, I guess.

18   A    Yeah.

19   Q    You drew lines on it?

20   A    We inserted that into an application where you can draw

21   gridlines over it, and yes, that's what we did.

22   Q    So you drew lines on it and how thick were the lines?

23   A    Not particularly thick.

24   Q    Well, if the lines are kind of thick, you might go from

25   September 15th to September 16th and not even know it,
```

```
                                                        Page 111
```

1   right?

2   A    Well, you appear to have a date here of September 17th

3   on the report, and the last point would be September 17th,

4   and you can see individual movements day by day.  So I think

5   that the conclusion that the September 15th point is the

6   eight basis points -- point was substantiated by those

7   number of days.

8   Q    I understand what you did.  Can I give you a ruler so

9   you can show what you did?

10  A    Sure.  Sure.

11  Q    So, I've got a yardstick.

12  A    Very good.

13  Q    So, can you just show us what you did to get to the

14  eight basis point assumptions, please?

15  A    Sure.  What we did was to simply draw gridlines across

16  this, matching up to each one of these date lines.  So, for

17  example, this data point here matches this point, matches

18  the 12th.  And each one of these data points is one day.  We

19  count them out.  But this is September 12th, this is

20  September 15th, this is September 16th, and this is

21  September 17th, which was the publication date.

22          THE COURT:  When you're pointing to a data point,

23  what are you pointing to?

24          DR. NICULESCU:  So, I'm pointing to this black

25  line here.

Page 112

1          THE COURT:  Yes?

2          DR. NICULESCU:  And you'll see that there's a

3  little notch here --

4          THE COURT:  I see that.  But then you're saying

5  this is --

6          DR. NICULESCU:  And that refers to --

7          THE COURT:  I understand that but then --

8          DR. NICULESCU:  -- which refers to this date right

9  here.  Thereby this is the 15th, this is the 16th, and this

10  is the 17th.

11          THE COURT:  How do you know that that's the 15th?

12          DR. NICULESCU:  Well, because this is Friday and

13  this is (indiscernible).  There's no data on the 13th and

14  14th (indiscernible).  And if you count back to the number

15  of (indiscernible) they match up.  Each time there's a

16  little jiggle (indiscernible) day.

17          THE COURT:  I'm just not following the little

18  jiggles.  I don't...  There are no...  I see the curve but I

19  don't see any points.  I don't...  For example, if you look

20  at August 29th, right?  How do you know which day is which?

21          DR. NICULESCU:  This...  (indiscernible) I think

22  that this is the (indiscernible) point.

23          THE COURT:  Right.

24          DR. NICULESCU:  And if you look at September 12th,

25  it's right down here (indiscernible) --

Page 113

```
 1              THE COURT:  Right.  Right, but there's no -- but
 2    you're moving across the access arbitrarily.  There's
 3    nothing that tells you where -- there are no data points on
 4    there.  There are no points.
 5              DR. NICULESCU:  So, I know that this is a
 6    different data point than this once -- we just moved
 7    (indiscernible) instead.
 8              THE COURT:  Right.  But how do you know...?  For
 9    example, in the long decline after August 29th to September
10    --
11              DR. NICULESCU:  Right.  I can't distinguish what
12    (indiscernible) precisely.
13              THE COURT:  Yes, that's my point.
14              DR. NICULESCU:  I can distinguish these points
15    here.
16              THE COURT:  Oh, I understand.  Right.
17              DR. NICULESCU:  I can distinguish this point, this
18    (indiscernible)...
19              THE COURT:  Right.
20              DR. NICULESCU:  Thereby this has to be
21    (indiscernible) --
22              THE COURT:  Because it's a weekend.
23              DR. NICULESCU:  This has to be September 16th, and
24    this has to be September 17th.
25              THE COURT:  Okay, thank you.
```

Page 114

1           DR. NICULESCU:  (indiscernible)

2           THE COURT:  Okay, I understand.  Thank you.

3           DR. NICULESCU:  You're welcome.

4    Q    This adjustment that you make, the 8 basis point

5    adjustment is one -- the negative 8 basis points.  And it

6    reduces your valuation, correct?

7    A    That is correct, yes.  By about $50,000 I think.

8    Q    So at last -- right, but only $50,000.

9    A    Correct.

10   Q    In fact, if you had made an adjustment of 50 or 100

11   negative basis points, there would be a lot more than

12   $50,000, correct?

13   A    Yes.  It would be of the order of 4 or 5 million.  Yes,

14   I mean, or 100...yeah.

15           THE COURT:  I'm sorry.  And how do you know that

16   it's eight?

17           DR. NICULESCU:  That is just by eyesight.  That is

18   just by drawing a line directly parallel --

19           THE COURT:  Right.

20           DR. NICULESCU:  (indiscernible) and

21   (indiscernible) at this point (indiscernible) for example.

22           THE COURT:  Okay, thank you.

23   Q    The total number of hours spent by you and your team on

24   this assignment as of January 30th I think is 6,415 hours,

25   is that right?

Page 115

```
 1    A     That's what I've seen.

 2    Q     For a total cost of $5 million, correct?

 3    A     That's what I've seen.

 4    Q     How much time do you spend drawing lines on this page?

 5    A     Not very many.

 6    Q     I would think not.  Now, in this report --

 7    A     We have a lot of documents to review, sir.

 8    Q     If you get to 49, the next two pages down on this very

 9    same document where you drew lines --

10    A     Yes, sir?

11    Q      -- at the top of the page there there's a section

12    called High Grade Most Positive and Most Negative CDS Bond

13    Basis.  Do you see that?

14    A     Yes.

15    Q     And there's individual names identified as most

16    positive and most negative.  Do you see that?

17    A     I do.

18    Q     And the last name there under 12, under Most Negative

19    is Sun Trust Bank.  Do you see that?

20    A     Yes, I do.

21    Q     And you recognize that as STI, correct?

22    A     It's one of the entities, yes.

23    Q     And it's one of the entities in the portfolio that you

24    were asked to value, correct?

25    A     Correct.
```

Page 116

1    Q    And for that entry, the basis is a negative 326 basis

2    points, correct?

3    A    That is correct.

4    Q    Right.  Okay, but you didn't use that data point, an

5    actual number in your calculation, correct?

6    A    No, I don't have it for the other names.  And in any

7    event, that's for September 17th.

8    Q    Let's go back to 47.  In fact, again, at the bottom of

9    that (indiscernible).  Again, that 8 basis point number that

10   you're using which reduces your valuation, and that's the

11   only number you use there, you don't even know what drives

12   those lines; what are the underlying components, correct?

13   A    As I say, they're not made available.  No, that's

14   correct.

15   Q    One of the components is identified in the document and

16   you don't use that, correct?

17   A    That's correct.

18   Q    And you didn't try to find the individual basis spreads

19   for any of the other components, did you, sir?

20   A    I don't think that we were able to find them for all of

21   the other components.  That's not data that we were able to

22   determine.

23          MR. TAMBE:  Maybe a short break right now?

24          THE COURT:  Sure.

25          MR. TAMBE:  I'm not sure what your timing looks

Page 117

 1   like.

 2              THE COURT:  No, that's fine.  We can -- I think

 3   those folks will be assembling quiet, but we can take a

 4   break for maybe ten minutes.

 5              MR. TAMBE:  That's fine.

 6              THE COURT:  IS that enough time?

 7              MR. TAMBE:  Yeah, it's enough time.  I'm not going

 8   to be done today.

 9              THE COURT:  No, I know you're not going to be done

10   today.  So we'll just go to a stopping -- we'll go to a

11   reasonable stopping point on or around 4:30.

12              MR. TAMBE:  And Mr. Tracey and I would just like

13   to speak with you.

14              THE COURT:  Sure.  Do you want to do that now or

15   do you want to do it after the break?

16              MR. TAMBE:  I can do that now.

17              MR. TRACEY:  Why don't we do it after the break?

18   I just have to...

19              MR. TAMBE:  Sorry.

20              (Break)

21   Q    So, Dr. Niculescu, I want to go back to your curve

22   construction methodology one more time.

23   A    Yes.

24   Q    And if we can go to the overhead, please?  So this is

25   Exhibit 597A.  And you've described for the Court the

Page 118

1    macroeconomic basis for your stepdown, correct?

2    A    Yes.

3    Q    And when I say macroeconomic, what I mean is those

4    assumptions about the crisis will last a couple of years,

5    then it will abate, and then it will disappear -- those are

6    macro assumptions, correct?

7    A    Macro financial system assumptions, yes.

8    Q    Right.  As distinguished from issuer-specific

9    assumptions.  What's Wells Fargo going to do for the next

10   two years?  What's Wells Fargo going to do years two through

11   five?  That's not the analysis you did, correct?

12   A    No.  That is correct, yes.  Having said that, the

13   curves are individual to each issuer.

14   Q    I understand you created individual curves but your

15   assumption was that the same macroeconomic financial

16   assumptions about the severity and length of the crisis

17   would apply equally to Wells Fargo as, say, a Wachovia,

18   correct?

19   A    Yes.  Although given the differences in the names,

20   Wells Fargo might well have had a much less inverted curve,

21   for example.  It varies by the issue where you have that

22   data.

23   Q    Or it may not have an inverted curve at all?

24   A    That's possible.  I don't recall.

25   Q    Your general recollection is most of your curves were

1    inverted, correct?

2    A    Yes, correct.

3    Q    Because that's what you told the curves to look like?

4    A    No.  I told the long end to get fixed at a long debt

5    curve plus a spread.  And then I asked the algorithm to find

6    the short spreads that resulted in a sort of discounted cash

7    flows that equaled the price of the preferred stock.

8    Q    You did more than that.  You told the algorithm what

9    rules to follow, you told the algorithm what that

10   relationship would be between the first line and the second

11   line, and then onto the fixed third line, correct?

12   A    I didn't do more than that; I did precisely that in the

13   way that you are describing.

14   Q    It wasn't like you just said to the algorithm, please

15   give me a curve; you fed inputs into the algorithm.  It gave

16   you the curve that you specified, correct?

17   A    I don't have access to artificial intelligence.  No, I

18   do have to tell the algorithm how to do it.

19   Q    So, it drew the curve you told it to draw?

20   A    It drew the increments in the second -- the first two

21   stages the way I asked it to -- the way I told it to draw

22   those increments.

23   Q    And the valuation turns on where you put those first

24   two lines because that's the first five years, correct?

25   A    Yes, that's correct.

Page 120

1    Q    Right.

2              THE COURT:  Can I ask a question, Dr. Niculescu?

3    Do you have in your work papers or otherwise what in my lay

4    terms I would call sensitivity analyses?  In other words,

5    showing how to the extent that you varied each of your steps

6    by a certain increment, how that would affect the outcome,

7    similar to the way you've testified on certain other points

8    of your analysis?

9              DR. NICULESCU:  Yes, I've done various other

10   drafts of the report.  Varied assumptions.

11             THE COURT:  I don't want to get into drafts of the

12   report and violate any of the stipulations that the parties

13   have in that regard.  I'm simply asking the empirical

14   question of whether you run sensitivity analyses to see, for

15   example, if you used a different, you know -- if you used

16   seven for the CDS bond differential, what that would do to

17   the number that comes out of the model?

18             DR. NICULESCU:  Yes, I did use different

19   structures at various points before settling on this one.

20   Those structures were in earlier drafts, but I did use

21   different structures.

22             THE COURT:  Okay.

23             MR. TAMBE:  So, I think any testimony about

24   structures that were in drafts and work papers for which we

25   are not producing are stricken, Judge.  We didn't have the

Page 121

1    opportunity to review a sensitivity --

2              THE COURT:  Well, I didn't ask about structures.

3    I'm trying to ask a question about if instead of using eight

4    you used seven -- very simplistic.  Or if, as Mr. Tambe's

5    been going with you, instead of using 1.1 you used 1.2 as of

6    a certain date, if you ran those in all of your iterations?

7              DR. NICULESCU:  I ran a number of iterations of

8    that type, yes.  I mean, in the case of the eight basis

9    points, what would seven have been, what would 20 have been,

10   what would 50 have been, for example?  In the case of the

11   shape of the curve, yes, I changed the shape of the curve at

12   various points, experimentally.  I changed recovery rates, I

13   changed the long-term increments.  I made a variety of tests

14   like that.

15             The issue that I'm faced with is that those were

16   developments that are in both sensitivity analyses and

17   preparatory work that led up to this final product.

18             THE COURT:  I understand.

19   Q    Let's turn in your deck, Dr. Niculescu, to Page 46.

20   Now, this is an analysis that you did of changes in the

21   prices of preferred equity securities, correct?

22   A    Yes.  Not an analysis; I simply observed prices from

23   the exchanges -- reported from the exchanges.

24   Q    So, that's the next part of my question.  The changes

25   you're looking at are for exchange-traded preferred

Page 122

1   securities, correct?

2   A    That's correct.

3   Q    And the only use -- use that you make of this analysis

4   is to make the adjustment for hedging, correct?

5   A    It is an input to support my adjustment for hedging,

6   yes.

7   Q    And so, whether you look at your min to max or your

8   close to close, you're looking at a change in prices of the

9   exchange-traded securities of somewhere between 9.7 and

10  13.1, on average, correct?

11  A    That's correct.

12  Q    And I think you then use that for hedging purposes to

13  talk about your 10 percent scenario and your 15 percent

14  scenario, correct?

15  A    That is an input.  In response to a question from the

16  Court yesterday, I tried to be clear that these numbers do

17  not (indiscernible) my hedging sensitivities.  They are an

18  element that I considered in coming up with the adjustments

19  to price that I use for hedging, which, in fact, has not

20  just one component, but three components.

21  Q    And I think you said earlier this morning that just

22  because the prices have changed in the underlying securities

23  by 10 percent, doesn't mean the valuation or the PCDS has

24  changed by 10 percent, correct?

25  A    That's correct.  It may have changed by (indiscernible)

Page 123

1    or more.

2    Q    I think the range you gave was .4 to 1.5 or something

3    like that?

4    A    I think that's the range I gave.  As I say, I can't

5    vouch for that range.  That's my best recollection, as I

6    said...

7    Q    So let's take a look at a demonstrative.  5986.

8         THE COURT:  Thank you.

9    Q    Sir, on Exhibit 5986 what we have calculated is the

10   change in the PCDS valuation from QVT's books and records as

11   of 9-12-2008, which is about 15 or $16 million, to their

12   claim  of $134 million, which, I think is about a seven-

13   fold, 700 percent increase.  Do you see that?

14   A    I do.

15   Q    And the calculation that you've come up with is 101

16   million to 129 million, which is anywhere between a 553

17   percent to a 734 percent change in valuation, correct?

18   A    Actually, the top end of my range is 144 million, so it

19   would be a larger number.

20   Q    Even higher, right?  As compared to the change in the

21   prices that you calculated, which are in the range of 9.7

22   percent to 13.1 percent, correct?

23   A    For these particular securities, that's correct, yes.

24   I'm not opining on the 9-12 valuation.

25   Q    Okay.

Page 124

1           MR. TAMBE:  I think we can stop here.

2           THE COURT:  Okay, very good.  So, how much longer

3   do you think you have tomorrow?

4           MR. TAMBE:  Very little.  And I may be done -- I

5   should go back (indiscernible).

6           THE COURT:  Okay.  And then we'll hear from Mr.

7   Tracey.

8           MR. TRACEY:  It'll be fairly limited.

9           THE COURT:  Okay.  Good.  Thank you very much.

10  Have a nice evening.  Did we pick a start time for tomorrow?

11          MR. TAMBE:  Any time that works for you.

12          THE COURT:  10 o'clock?

13          MR. TRACEY:  10 o'clock?  That'd be good.

14          THE COURT:  All right, 10 o'clock.  All right, so,

15  I'll let you tidy up and we'll let the other folks come in.

16  Have a good evening, everyone.

17          (Whereupon these proceedings were concluded at

18  4:27:11 PM.)

19

20

21

22

23

24

25

Page 125

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya

6    Ledanski Hyde

7

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde,
o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2017.03.24 10:00:14 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 6, 2017