Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS INC.,

8

9            Debtor.

10

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                  U.S. Bankruptcy Court

14                  One Bowling Green

15                  New York, NY   10004

16

17                  February 17, 2017

18                  10:22 AM

19

20

21  B E F O R E :

22  HON SHELLEY C. CHAPMAN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO: KAREN / RACHEL

1   Hearing re: Hearing re: Trial on Lehman's Objection to

2   Claims of QVT (Doc # 17468 Debtors' One Hundred Fifty-Fifth

3   Omnibus Objection to Claims)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   HOGAN LOVELLS US LLP

 4         Attorneys for QVT FUND LP

 5         875 Third Avenue

 6         New York, NY 10022

 7

 8   BY:  WILLIAM M. REGAN

 9         ROBIN E. KELLER

10         DARYL L. KLEINMAN

11

12   JONES DAY

13         Attorneys for the Debtor

14         250 Vesey Street

15         New York, NY 10281

16

17   BY:  LAURI W. SAWYER

18         DAVID P. SULLIVAN

19

20   ALSO PRESENT TELEPHONICALLY:

21

22   MICHAEL NEUMANN

23

24

25
```

Page 4

1                      P R O C E E D I N G S

2              THE COURT:  All right.  Good morning, Mr. Regan.

3      How are you?

4              MR. REGAN:  Good morning, Your Honor.  QVT calls

5      Michael Neumann.

6              THE COURT:  Very good.  Mr. Newman, good morning.

7      Would you raise your right hand, sir?

8              Do you solemnly swear or affirm that all the

9      testimony you're about to give before the Court shall be the

10     truth, the whole truth and nothing but the truth?

11             MR. NEUMANN:  I do.

12             THE COURT:  Very good.  Have a seat.  Make

13     yourself comfortable.  Let us know if you need a break at

14     any time.

15             MR. NEUMANN:  Thank you.

16             THE COURT:  You'll have to pull that microphone a

17     little bit towards you.

18             MR. NEUMANN:  Okay.  Thank you very much.

19             THE COURT:  All right.  Good.

20                      DIRECT EXAMINATION

21     BY MR. REGAN:

22     Q    Mr. Neumann, would you introduce yourself for the

23     record, please.

24     A    My name is Michael Neumann.

25     Q    And I'd like to briefly cover your educational

Page 5

1   background and work history.  Did you attend college?

2   A    Yes, I did.  Boston College.

3   Q    And did you graduate from Boston College?

4   A    In 1987.

5   Q    Do you have any post-graduate education?

6   A    Columbia Business School, 1999.

7   Q    And what did you do during that interim period between

8   1987 and 1999?

9   A    I worked for a company called Euro Brokers in the World

10  Trade Center.

11  Q    Say it again.

12  A    A company called Euro Brokers in the World Trade

13  Center.

14  Q    And what did you do there?

15  A    I worked in interest rate options.

16  Q    And what did you do for work after you obtained your

17  MBA?

18  A    I went to work for Lehman Brothers in 1999.

19  Q    And what did you do at Lehman Brothers?

20  A    I worked in the credit sales group.

21  Q    And what does the credit sales group or what did it do

22  back in 1999?

23  A    We had a -- we had clients that were investors, bond

24  funds, hedge funds, and we sold them derivatives, corporate

25  bonds and other related things.

Page 6

1   Q    Were there different desks or areas within credit

2   sales?

3   A    Yes, there was.

4   Q    And what were those?

5   A    We had --

6           MS. SAWYER:  Objection, Your Honor.

7           THE COURT:  I'm sorry?

8           MS. SAWYER:  I just want a time frame on the

9   question.  So are we talking about in 1999 or are we --

10          THE COURT:  Fair enough.

11  Q    When did you start in 1999?

12  A    Yes, there was -- there was different sales groups.

13  There was a distressed sales team, there was a high yield

14  sales team, there was an investment grade sales team.

15  Q    Was there something called a bank coverage desk?

16  A    Bank coverage desk was part of the -- it's like a

17  subset of the investment grade group, and I started in that

18  -- in the bank coverage desk in 1999.

19  Q    And was there something called a credit derivatives

20  desk?

21  A    The credit derivatives desk was something that evolved

22  out of the bank coverage desk, sometime I'll say like 2001

23  or '2.

24  Q    And did you have any involvement with the credit

25  derivatives desk?

Page 7

1   A     Yes, I did.  I was a sales person.

2   Q     And was there something called a hedge fund coverage

3   desk?

4   A     Yes, the hedge fund coverage desk evolved out of that

5   same credit derivatives desk and sometime I'd say around

6   call it 2004.

7   Q     And did you have any involvement with the hedge fund

8   coverage desk?

9   A     Yes, I was a salesperson.

10  Q     At the time you joined Lehman in 1999, did you have any

11  official position or title?

12  A     I was an associate.

13  Q     Did that title change at any point in time?

14  A     Yes.  I was promoted several times.

15  Q     At any point in time were you promoted to managing

16  director?

17  A     Yes, I -- I believe in 2006 or '07.

18  Q     And how long were you with Lehman?

19  A     Until the -- until the bankruptcies, from '99 to '08.

20  Q     And what did you do after that?

21  A     I went to work for Barclays Bank where I work now.

22  Q     And what do you do at Barclays?

23  A     Right now I'm the head of the distressed sales group at

24  Barclays, which is also a part of credit sales.

25  Q     And has that changed since 2008 when you joined

Page 8

1    Barclays?

2    A    Yes. I started at Barclays as -- still on that hedge

3    fund group as part of investment grade sales, but I moved

4    over to high yield sales I believe in around 2011 and then

5    beginning of 2016 I took over this role in distressed sales.

6    Q    Let me back up a step.  Have you or I ever met or

7    spoken before today?

8    A    I don't -- I don't exactly remember.  I'm sorry.

9    Q    Other than at your deposition in this case, have you

10   met or spoken with anyone at Hogan Lovells regarding QVT?

11   A    No.

12   Q    And what did you do to prepare for your testimony

13   today?

14   A    I read my deposition and I spoke with my attorney.

15   Q    And who is that?

16   A    Josh Liston.

17   Q    And what firm is Mr. Liston with?

18   A    Actually I don't remember that either.  Sorry.

19   Q    Is he with Hogan Lovell?

20   A    I don't believe so, no.  I'm sorry.

21   Q    Did you speak with anyone at QVT to prepare for your

22   testimony today?

23   A    I did not.

24   Q    So I think you mentioned, going back to your time at

25   Lehman, that there were different sales groups, one for

Page 9

```
 1    investment grade, high yield and structured credit; is that

 2    right?

 3    A     And from a time frame standpoint, the structured credit

 4    group didn't really get going until call it 2003 or '04, but

 5    yes, that's right.

 6    Q     So from that time forward did you at -- did people at

 7    Lehman refer to those as sales desks?

 8              MS. SAWYER:  Objection.  Leading.

 9              THE COURT:  Yes?  Well, we're just in the

10    background portion, so for the sake of expediency I'm going

11    to allow it.  All right?

12    Q     Were there sales desks in credit sales at Lehman in

13    2003 to --

14    A     Yes.

15    Q     -- 2008 time period?

16    A     Yes, there were.

17    Q     And focusing on the structured credit sales desk, which

18    I think you said you were a part of, what did that desk

19    focus on?

20    A     Credit derivatives.

21    Q     And by credit derivatives you mean?

22    A     Credit default swaps, credit options, things called

23    tranches, synthetic CDOs and a variety of other products

24    that are derived from corporate bonds.

25    Q     And were you personal involved with credit default swap
```

Page 10

1    transactions?

2    A    Yes.

3    Q    Any particular types?

4    A    Every type we did, so the credit default swaps, options

5    on credit default swaps, PCDS, to -- I'm sure other things,

6    I -- that I'm not thinking of.

7    Q    Did you have any involvement with corporate CDS?

8    A    Yes.

9    Q    Sovereign CDS?

10    A    Yes.

11    Q    Did you have any involvement with mortgage products?

12    A    Some, yes.

13    Q    In the 2005 to 2008 time period approximately what

14    percentage of your time was spent on credit default swap

15    transactions?

16    A    I believe that credit default swaps were more than --

17    more than half of what I did, I'd say between call it 50 and

18    70 percent of the revenue I generated was associated with

19    default swaps.

20    Q    And what types of customers did you deal with --

21    A    Mostly --

22    Q    -- for credit default swaps?

23    A    -- mostly hedge funds and banks.

24    Q    And in the 2005 to 2008 time period, approximately how

25    many customers did you personally deal with?

Page 11

1   A     Between 10 and 20.  I'd say 15.

2   Q     And in the 2005 to 2008 time period who at Lehman did

3   you report to?

4   A     I believe Peter Hornick was my boss in that time frame.

5   Q     And in that same time frame from 2005 to 2008, were

6   there also trading desks at Lehman?

7   A     Yes, there were.

8   Q     And were there trading desks involved with credit

9   sales?

10  A     Yes, we interacted with the trading desks every day as

11  part of our business.

12  Q     So can you explain to the Court what the difference is

13  involved between the sales desk and the trading desk, back

14  in 2005 to 2008?

15  A     Yes.  The trading desks were responsible for buying and

16  selling the risk and managing that risk.  So whether that

17  was proprietary or facilitating customer flow, the traders

18  would make bids and offers and buy and sell corporate bonds

19  and derivatives.  Salespeople's main responsibilities was to

20  deal with the clients who wanted to invest in those

21  products.

22  Q     And was it a one trading desk for credit sales, or was

23  there more than one?

24  A     So there was -- for every discipline we had, for every

25  sales desk we had there was a corresponding trading desk.

Page 12

```
 1    So there was a high yield trading desk, there was a

 2    distressed trading desk, there was a -- we had a credit

 3    default swap trading desk also.

 4    Q    And physically, how were these desks set up within the

 5    office?

 6    A    We were laid out pretty close together, I'd say maybe a

 7    space towards the size of this room, but everybody pretty

 8    packed together.

 9    Q    Just the sale desk or the sales desk --

10    A    Sales plus -- sales plus trading.  Like trading would

11    be on their own rows, sales would be on their own rows, and

12    we were all within shouting distance.

13    Q    And how would the sales desk interact with the trading

14    desk when a customer wanted to do a trade, a CDS trade, for

15    example?

16    A    So the -- if it was a case of a client calling Lehman

17    and asking for a price or a market or a bid or an offer, the

18    salesperson would stand up and either verbally ask, like

19    either shouting or walking over, or it could be done over

20    some sort of the email or Bloomberg, or -- and then the

21    trader would respond to that inquiry and the salesperson

22    would relay that to the client and then go from there.

23    Q    You said the salesperson would relay the information to

24    the client.  Was the salesperson's role just a relaying

25    role, or was there any discretion to the salesperson's role?
```

Page 13

1    A    The salespeople had certainly a lot of input on how to

2    engage the client, but the decision on the price to show the

3    client came from trading.

4    Q    Did the sales personnel have discretion to seek a

5    different price or a better price?

6    A    Yes.

7    Q    And did you ever do that in your CDS trading capacity?

8    A    Yes.

9    Q    Who were the traders on the CDS trading desk in the

10   2007 to 2008 time period?

11   A    Well, the -- we had -- I'm -- I don't -- I don't recall

12   exactly what the lineup was on the CDS desk in particular.

13   And there was some CDS that was traded away from what we

14   kind of referred to as the CDS desk.  There was -- at the

15   time there was a decision, or whatever the right word is,

16   where some of the more -- it may be more efficient for some

17   of the corporate bond traders to also trade CDS.

18   Q    Was there a preferred trading desk?

19   A    Yes, there was a preferred trading desk.

20   Q    Was there a preferred sales desk?

21   A    There was not a specific preferred sales desk, no.  The

22   preferred trading desk was considered a subset of the

23   financials desk, which was actually a subset of the

24   investment grade desk.

25   Q    And what products did the preferred trading desk deal

Page 14

1   with?

2   A    They dealt in --

3            MS. SAWYER:  Objection.  Foundation.

4            MR. REGAN:  I'm not sure --

5            THE COURT:  Do you know what products the

6   preferred trading desk dealt with?

7            MR. NEUMANN:  Yes.  Yes, I do.  They --

8   Q    What were those?

9   A    -- they dealt in primarily preferred securities, which

10  are subordinated securities of companies and they also dealt

11  in something called auction rate securities and they dealt

12  in preferred CDS.

13  Q    From time to time did customers ever come to you

14  directly for prices or levels on CDS positions that they

15  had?

16  A    Yes.

17  Q    And did you provide responses?

18  A    Yes.

19  Q    And how did you get the price or level to provide to a

20  customer in those situations?

21  A    We would generally ask the trading desk.

22  Q    Were there any other sources that you would use for

23  price information?

24  A    We had a group that was responsible for client

25  valuations for marking.  At the time the process of that was

Page 15

1    not as sophisticated as it is now in my current job, for

2    example.  So it a little more of a kind of deciding at the

3    time what the best way to respond to the client was.

4    Q    And was it -- was there any particular time that

5    clients would come to you for marks?

6    A    Yes.

7    Q    When was that?

8    A    It was often, but certainly at the -- at the end of

9    every month we'd get a lot of requests.

10   Q    Switching gears a bit, when you were back at Lehman,

11   did you do business with QVT?

12   A    I did.

13   Q    And when did that start?

14   A    I think -- I think around 2000 or 2001.

15   Q    And how were you introduced to QVT?

16   A    There was a trader on my desk who knew -- I believe

17   knew Dan Golden, I believe I was introduced to Dan by that

18   trader on the phone.

19   Q    And that -- what type of business did you initially do

20   with QVT?

21   A    Initially just high yield bonds, is my recollection.

22   Q    And did the nature or type of work that you did with

23   QVT change over time?

24   A    Yes, it did.

25   Q    How so?

```
 1   A    They started looking at derivatives and when I got more

 2   into derivatives at Lehman then we started doing more

 3   business and a lot of it was centered around credit

 4   derivatives.

 5   Q    And was there any particular person at QVT that you

 6   dealt with on the derivatives front?

 7   A    Yes.  Arthur Chu, mostly.

 8   Q    And do you know when Arthur Chu joined QVT?

 9   A    I think it was 2001, 2002.

10   Q    And when Arthur Chu joined QVT, did that change the

11   nature or quantity of volume of business that you did with

12   QVT?

13   A    Yes, it did.  It --

14   Q    And how so?

15   A    -- increased by a good amount.

16   Q    Did you know Mr. Chu when he was at Lehman?

17   A    I knew who he was, but I didn't know him personally.

18   He introduced himself before he actually went over to work

19   at QVT.

20   Q    From the time that Mr. Chu joined QVT, was there a

21   Lehman person with primary responsibility for the QVT

22   relationship?

23   A    Can you ask that again, please?

24   Q    Beginning with the time that Mr. Chu joined QVT --

25   A    Um hmm.
```

Page 17

1   Q      -- did anyone at Lehman have primary responsibility for

2   the QVT relationship?

3   A      I did.

4   Q      After moving to Barclays, did you continue to do

5   business with QVT?

6   A      I did.

7   Q      And do you still today do business with QVT?

8   A      Yes.

9   Q      And is there any difference in the nature or quantity

10  of the business that you do with QVT today as compared to

11  when you were back at Lehman?

12  A      Yes.  It's substantially less now than it used to be.

13  Q      You mentioned preferred credit default swap, correct?

14  A      Yes.

15  Q      What is that?

16  A      Those were credit default swaps that instead of

17  referencing corporate bonds, they referenced the preferred

18  securities of a particular company, issuer.

19  Q      And were there any particular types of issuers that

20  PCDS referenced?

21  A      The primary issuer of preferred securities, at the

22  time, was financial companies, banks, insurance companies

23  and so the majority of PCDS trades were done on financial

24  companies, but there were other companies that also issued

25  preferreds and there was other types of PCDSs also possible.

Page 18

1    Q    And while you were at Lehman did you ever sell PCDS to

2    your customers?

3    A    I did.

4    Q    In the 2005 to 2008 time period approximately how much

5    of your business was PCDS?

6    A    It was a small percentage of what I did.  I'd say five

7    percent or maybe less than five.

8    Q    Who created PCDS?

9    A    I don't know if there was a single creator.  It was --

10   it was a Lehman product that was developed by the

11   combination of the preferred trading desk, the financial

12   trading desk and the -- and our strategy team.

13   Q    And do you know what year or when Lehman developed the

14   PCDS product?

15   A    I don't remember exactly.  I think it was around '03 or

16   '4, but right around there.

17   Q    And was there any particular group within Lehman that

18   had responsibility for developing the PCDS product?

19           MS. SAWYER:  Objection.  Foundation.

20   Q    To the extent you know?

21           THE COURT:  Is there something more than that, Ms.

22   Sawyer?

23           MS. SAWYER:  There is.  If we could approach

24   briefly?

25           THE COURT:  Sure.

1          (Bench conference not recorded on the record)

2     Q    Mr. Neumann, do you know whether there was any

3     particular person or group of persons at Lehman that were

4     responsible for developing the PCDS product?

5     A    There were certain individuals that were -- I would

6     call spearheaded the effort, yes.

7     Q    Do you know who they people were?

8     A    I would say the traders on the -- on the preferreds

9     desk, Tom Corcoran would be one of those people, and then on

10    the strategy said I would say Ashish Shah was probably

11    the --

12              THE COURT:  Mr. Neumann --

13              MS. SAWYER:  I just wanted to note my objection.

14              THE COURT:  -- I want to be sure that your answers

15    reflect what you actually know, as opposed to your making an

16    assumption or a very educated guess based on your

17    recollection or experience.

18              So there are some words that you are using that

19    indicate some question about whether your testimony reflects

20    what you actually can remember and know.  So if you would

21    please take some care to give answers that only reflect what

22    you know.

23              MR. NEUMANN:  I understand.

24              THE COURT:  I would appreciate it.

25    Q    And do you know whether those individuals you

Page 20

1  mentioned, Tom Corcoran and Ashish Shah, do you know whether

2  they were involved in the development of the PCDS product?

3  A    I know they were involved in the development of the

4  PCDS product, yes.

5  Q    And do you have any knowledge or understanding as to

6  what Lehman's business rationale was in creating the PCDS

7  product?

8  A    Yes.

9  Q    And what is your understanding?

10 A    We believed that derivatives on preferreds would be an

11 attractive investment opportunity for both sellers and

12 buyers of protection, for a variety of reasons.

13 Q    And what are those reasons?

14 A    In the case of the buyers, it was an --

15         MS. SAWYER:  Objection, Your Honor.  Foundation.

16         THE COURT:  What's the basis of your knowledge on

17 this topic, Mr. Neumann?

18         MR. NEUMANN:  I was directly involved in the

19 selling and marketing of the product and I was directly

20 involved in conversations around when it was being developed

21 and why it would be a good product for Lehman to develop.

22         THE COURT:  Okay. Go on.

23 Q    So I believe you testified that there were reasons that

24 Lehman believed the product would be attractive to both

25 buyers and sellers of protection and I think you were

Page 21

1    describing those features?

2    A    Yes.  In the case of the buyers of protection, it was

3    an ability to go short risk something that was very

4    difficult to be short risk otherwise.  Preferreds are very

5    difficult to borrow, there's -- there was rules about

6    borrowing them that made it very difficult.  So a PCDS would

7    allow an investor to be short risk in something that

8    otherwise they couldn't.

9         And then in the case of the sellers of protection,

10   there was a variety of reasons.  One would be that a lot of

11   preferreds weren't necessarily either -- easy to buy either,

12   they weren't necessarily available in institutional size.

13   But if you could find a derivative way of doing that you

14   could sell protection.  Also it may be a case where the

15   spread available on the PCDS was something that was

16   attractive, relative to its rating or relative to the

17   underlying security.  So the sellers in protection have

18   motivation also.

19   Q    On the buyer side I think you mentioned that it would

20   be difficult to short preferreds?

21   A    That's right.

22   Q    What is your understanding of why that is?

23   A    They -- the preferreds are mostly, just because they're

24   not lent out, so a corporate bond typically is lent out by

25   holders and therefore they can be borrowed and shorted.  In

Page 22

1   the case of preferreds it's much more difficult, so the

2   available amount to borrow, and therefore to short, is

3   smaller.  Also there was a rule, I believe it's called the

4   uptick rule, where you could only short -- you could only

5   sell it if you -- under certain conditions, and you weren't

6   allowed, otherwise, to sell it.  So it was just a very

7   difficult undertaking to be short risk at the preferred

8   level.

9   Q    And how did a PCDS address those issues?

10  A    Because a PCDS is a contract just like a CDS contract,

11  where you buy protection, you're paying a -- an annual

12  premium.  And up to the maturity of that contract you own

13  protection on that -- on the preferred level of the

14  corporation that you're -- that you're trying to be short

15  risk.

16  Q    And I believe you said you were involved in the

17  marketing of the PCDS product; is that correct?

18  A    Yes.

19  Q    And in the course of marketing the PCDS product did you

20  become familiar with how the product worked?

21  A    Yes.

22  Q    If you could turn to Exhibit 1040 in the binder that's

23  in front of you.  It's a fairly lengthy one, so take a

24  moment to flip through it.

25  A    It's right here at the beginning?

Page 23

1    Q    First tab.  Yeah.

2    A    Okay.  There, I see it.  Okay.

3    Q    Do you recognize this document?

4    A    I recognize it, yes.

5    Q    And what do you recognize it to be?

6    A    It was a slide deck prepared by the trading and

7    strategy group to start marketing, or I should say, to

8    market PCDS to clients of the firm.

9    Q    And did you use presentations like this when you were

10   marketing PCDS to your clients?

11   A    Yes.

12   Q    At the top of the first slide, in very, very small

13   print, the first sentence there says, "This material has

14   been prepared by hybrid capital.  It is not a product of

15   Lehman Brothers Research Department."  Do you know what

16   hybrid capital is?

17   A    Yes.  Hybrid capital is -- preferred securities are

18   considered hybrid capital, and hybrid capital, just the term

19   hybrid refers to the fact that its debt-like and equity-like

20   at the same time.

21   Q    Was hybrid capital a desk or a division at Lehman

22   Brothers?

23   A    Well, seeing this word I think they did start calling

24   themselves that, the Hybrid Capital Team, but they were --

25   it was the preferred desk, and that's how we knew them.  But

Page 24

1   yes, there was a -- somewhat of a branding effort made to

2   call themselves Hybrid Capital.

3   Q    And underneath the picture of the globe there, on the

4   right-hand side, there's some more very small print.  I

5   believe it says, "PCDS and Preferred CDS are service marks

6   of Lehman Brothers, Inc."  Do you know what that means?

7              MS. SAWYER:  Objection.  Foundation.

8              THE COURT:  The question is whether he knows.

9              MR. NEUMANN:  I don't know for certain. I believe

10  it's --

11             THE COURT:  Do you know what a service mark is?

12             MR. NEUMANN:  I don't know what a service mark is.

13             THE COURT:  Okay.

14  Q    Do you know whether Lehman Brothers attempted to or did

15  in fact trademark PCDS in any way?

16  A    I assume we -- that we did, but I don't --

17             THE COURT:  Don't assume.  Only if you know.

18             MR. NEUMANN:  I don't -- okay.  I don't know for

19  certain.

20  Q    If you can turn to the page that has the Bates Number

21  185 on the bottom right-hand corner.  They're just slides,

22  "Benefits of Preferred CDS."  Do you see that?

23  A    Yes.

24  Q    The first sentence or the first bullet in that slide

25  says, "PCDS will increase the focus, demand and subsequently

1    liquidity in this part of the capital structure."  Do you

2    see that?

3    A     Yes.

4    Q     As a result of your efforts in marketing PCDS to your

5    clients, did you have any understanding as to what that

6    language meant?

7    A     Yes.

8    Q     And what is that understanding?

9    A     The preferred level of the capital structure was not

10   the -- very actively traded, from an institutional

11   standpoint, especially relative to corporate bonds.  And one

12   of the things that made corporate bonds more liquid at the

13   time was the development of the CDS market.  So when the CDS

14   market developed it gave investors more options on how to

15   manage their risk and it increased -- or we believed it

16   increased the liquidity available in the corporate bond

17   market, because it was a derivatives market.  We believed

18   that the same thing would happen in the PCDS market.

19   Q     The second bullet reads, "PCDS will enable participants

20   to put on short positions whereas it is difficult to short

21   most preferred cash securities due to NYSE rules on, quote

22   locate to borrow, end quote."  Do you have any understanding

23   as to what that language means?

24   A     Yes.

25   Q     And what is that?

Page 26

1   A     Locate to borrow means you're not allowed to short

2   something unless you have the borrow already lined up.  So

3   you can't assume that you're going to find the borrow, you

4   actually have to have the borrow.

5   Q     And how did PCDS address that issue at all?

6   A     Similar to what I mentioned earlier, the PCDS contract,

7   you didn't have to locate a borrow, all you needed to do was

8   enter into a contract to own protection on the -- at the

9   preferred level of the issuer.

10  Q     Have you ever heard the term guaranteed borrow?

11  A     Yes, I have heard the term guaranteed borrower.

12  Q     And was that a term that was used at Lehman Brothers in

13  connection with PCDS?

14          MS. SAWYER:  Objection.  Leading.

15          MR. NEUMANN:  I don't remember.

16  Q     What is your understanding of what the --

17          THE COURT:  Okay.  Hold -- Mr. Regan.  When Ms.

18  Sawyer makes an objection, you have to give me an

19  opportunity to address it.

20          MR. REGAN:  Sure.

21          THE COURT:  All right?  I know we're going quickly

22  here.  Let's dial it back, all right?  I'm trying to balance

23  moving it along and not leading so try to ask questions in a

24  more open-ended way.  All right?

25  Q     As you sit here today, do you have any understanding of

Page 27

1    what the term guaranteed borrow means?

2    A    I know what guaranteed borrow means, yes.

3    Q    What is that?

4    A    If you -- it refers to if you borrow a security from

5    someone they have to deliver the security.  And there's --

6    they make an assurance of that, because there is a

7    possibility, if you borrow a security, that you actually

8    won't get delivered a security, in cases of extreme -- if

9    there -- if the borrows extremely difficult.  And it -- so a

10   guarantee on that makes it such that the parties enter into

11   that and it might be at a different price than if it was not

12   a guaranteed borrow.

13   Q    And what, if anything, does the notion of guaranteed

14   borrow have to do with PCDS?

15   A    Well, it would simply be that this -- the -- it points

16   to the -- it's very difficult to short preferred securities

17   because you would not, probably wouldn't necessarily be able

18   to line up a guaranteed borrow and you could get caught in a

19   very sticky situation of not being able to keep your short

20   and get what they call bought in, so -- which would involve

21   you having to pay a very high price to buy the securities.

22   You would not only lose your short, you would lose lots of

23   money.  So again, it refers to the idea that preferred

24   securities are very difficult to borrow.

25   Q    The second dash under the second bullet reads, "Many

Page 28

```
1    cash positions are hard to find and many cash structures are

2    not accepted by some accounts."  Do you know what that

3    language means?

4    A    Yes.

5    Q    And what does it mean?

6    A    That refers to what I mentioned earlier is that

7    investors who are interested in going long risk, if they

8    want to -- if they're interested, at the preferred level

9    because they find a yield attractive, actually finding

10   enough securities that you could buy at the price you're

11   interested is can be difficult.  And also this hybrid

12   capital type of structure, there may be reasons why

13   investors weren't allowed to hold that particular security.

14   One of those reasons would be if it's -- for example, a

15   perpetual security where it has no maturity date.  The

16   preferred CDS contract allowed investors to enter into a

17   long risk position without having to deal with any of those

18   issues.

19   Q    The third bullet reads, "The five-year term of the

20   standard PCDS contract will further enable for capital

21   structure arbitrage and term structure arbitrage."  Do you

22   have an understanding as to what that language means?

23   A    Yes.

24   Q    And what is your understanding?

25   A    Capital structure arbitrage is a term used to -- if
```

Page 29

1    you're looking at a corporation that issues different types

2    of securities, senior debt, subordinated debt, preferred

3    securities in equity, stock or an example you can -- and

4    arbitrage is a term that in this case it just refers to I

5    want to -- I would buy one of them, versus selling the

6    other, and believe that I had a structural advantage being

7    in one versus the other.

8    Q    And how would a five year term play into that concept?

9    A    The five-year term, since you know that it's a what we

10   call a bullet risk, you know -- you know exactly what the

11   characteristics are, the duration of -- managing the risk

12   and the duration of that product is much more easily derived

13   than looking at a longer dated hybrid capital security.  So

14   again, it was a simplified way of looking at the preferred

15   level of a corporate issuer.  Five years, very

16   straightforward, as opposed to a 30 or noncall 5 or a

17   perpetual or some other instrument.

18   Q    You used the term bullet risk?

19   A    Yes.

20   Q    What does that mean?

21   A    Bullet risk is a term that's used to mean not callable.

22   Q    The last bullet on that page says, "Future iterations

23   may include synthetic CDO origination."

24   A    Yes.

25   Q    Do you have an understanding of that language means?

Page 30

1   A    Yes, I do.

2            MS. SAWYER:  Object --

3            THE COURT:  Yes, Ms. --

4            MS. SAWYER:  -- to the foundation of that

5   particular question given that he's not -- was not involved

6   in the development of this product.

7            THE COURT:  What's the basis of your knowledge of

8   what synthetic CDO origination is in relation to PCDS?

9   A    I was actively involved in the synthetic CDO market

10  with investors in my role at Lehman Brothers.  And PCDS

11  became an option for us to place into those CDOs and I was

12  aware of that as a source of protection that could be sold

13  to clients.

14           THE COURT:  Go ahead, Mr. Regan.

15  Q    Can you explain what you just meant by PCDS being

16  placed into synthetic CDO?

17  A    Yes.

18  Q    So synthetic CDO is a CDO that's -- or the collateral

19  is default swaps and the vast majority of the synthetic CDOs

20  were just regular corporate CDS, so just CDS.  But as the

21  product developed over the years, and PCDS started coming

22  into the market, the CDO desk and the trading desk

23  determined that PCDS could be used in those structures, and

24  in fact did use them in the structure.

25  Q    And how were PCDS used in those structures?

Page 31

1          MS. SAWYER:  Objection.  Foundation.

2          MR. REGAN:  He's --

3          THE COURT:  Why don't you come up.  I'm --

4     (Bench conference not recorded on the record)

5  Q    The last question was how were PCDS in CDO -- synthetic

6  CDO structured?

7  A    They were used either instead of or in addition to

8  credit default swaps.

9  Q    Now, can you explain for the Court how that worked?

10  A    Yes.  In order to create the spread necessary to create

11  the synthetic CDO, what we called, slices of risk, so these

12  would be senior -- for -- a simplified version, I guess

13  would be a Triple A slice, a Double A slice, Single A slice,

14  Triple B slice and then equity, those -- in order to get

15  that spread, in order to create those underlying synthetic

16  CDO slices, you needed to start with cash flows from CDS.

17  And so the CDS would essentially provide the income into the

18  structure that then would issue these synthetic CDO

19  obligations.

20  Q    The CDS that would be involved in the CDO structures

21  that you're talking about, would those be sales of CDS or

22  purchases of CDS?

23  A    So you needed to have -- the default swaps themselves

24  needed to be -- that risk -- that protection needed to be

25  sold into the structure, but you also needed to find a buyer

Page 32

1   of that protection.  So the -- in a sense the buyers

2   provided the spread, because they're the ones paying the

3   spread, so the buyer is paying the spread and then that

4   spread was taken and sliced up and put in the synthetic

5   CDOs.

6   Q    The last bullet here says that, "Future iterations,

7   presumably of PCDS, may include synthetic CDO originations."

8   Do you know if that in fact came to pass?

9   A    It did happen, yes.

10  Q    And what effect did that have on the market for PCDS,

11  if any?

12  A    I don't remember exactly what effect it had on the

13  market.

14  Q    Do you know if it made PCDS more liquid or less liquid?

15          MS. SAWYER:  Objection.  Leading and foundation.

16          THE COURT:  Yeah.

17  Q    If you could turn to the page that has the Bates Number

18  1878 in the right-hand corner. The slide is titled "Likely

19  Participants in PCDS."  Do you see that?

20  A    Yes.

21  Q    In the second bullet, the second sentence there reads,

22  "A wide array of, quote, deliverable, end quote, securities

23  also creates optionality plays with respect to cheapest to

24  deliver alternatives."  Do you have any understanding as to

25  what that language means?

Page 33

```
 1   A    Could you -- I thought you said the second bullet, but

 2   --

 3   Q    I'm sorry.

 4        THE COURT:  He did.  He misspoke.

 5   Q    I may have misspoke.  First bullet --

 6   A    Okay.

 7        THE COURT:  Second sentence.

 8   Q    Second sentence.

 9   A    Yes, I understand what that means.

10   Q    And what is your understanding?

11   A    Cheapest to deliver refers to if a credit event happens

12   or a trigger event happens on the contract in question,

13   there often is a variety of securities that could be

14   delivered into the contract to settle that contract.  And

15   the holder of the protection has the option of which one of

16   those securities to deliver.  And it can be advantageous if

17   there's something that's trading say a lot -- at a lot lower

18   or cheaper price than other securities that are available to

19   deliver.

20   Q    If you'd turn to the next page which has the Bates

21   Number ending in 1879.  The slide is titled, "PCDS

22   Applications."  Do you see that?

23   A    Yes.

24   Q    In the second bullet and the first dash, the document

25   reads, "Hedge Funds Short Credit Without a Short Squeeze."
```

Page 34

1    Do you have an understanding as to what that language means?

2    A    Yes.

3    Q    And what is your understanding?

4    A    Hedge funds would be able to go short risk at the

5    preferred level without fear of being a short squeeze.  And

6    a short squeeze is defined as if the borrow gets very

7    difficult on what you were short, the price of that security

8    can start going higher because there is a -- an issue in the

9    repo market with how to settle the -- those repos.

10            And in fact, the price can get, in the case of a

11   bad squeeze, the price can go up dramatically or even end in

12   an -- someone who's shorting getting what they call bought-

13   in, which I described before, which means that you have to

14   go out -- to satisfy your obligation you have to go out and

15   buy the security at whatever price its available and to

16   deliver it to settle your repo contract.  So a squeeze can

17   be very painful experience for someone who is short risk.

18   Q    If you could turn to the page ending in 1881.  There's

19   the slide titled "Trading Ideas."  Do you see that?

20   A    Yes.

21   Q    And then two pages later, on 1883, there's a slide

22   titled "A Higher Carry Long or a More Volatile Short."  And

23   focusing on that second half of that -- the language, "a

24   more volatile short," do you have an understanding as to

25   what that language means?

Page 35

1    A    Yes.

2    Q    And what is your understanding?

3    A    Well, volatility is the speed of the market and the --

4    if you consider the risk of a -- if you're looking at a

5    corporation as issuing debt or issuing securities the senior

6    debt tends to be the last volatile, the equity tends to be

7    the most volatile, preferreds would be closest to -- come

8    closest to the equity.

9    Q    And is a more volatile short a good thing or a bad

10   thing?

11   A    If you're short risk, you want volatility, generally

12   speaking.  So yes, you would -- that would be an

13   advantageous thing, all things equal.

14   Q    The first dash under the "A More Volatile Short"

15   heading reads, "If you are bearish on a credit you can buy

16   preferred CDS instead of senior CDS."  Do you have an

17   understanding as to what that language means?

18   A    Yes.

19   Q    And what is your understanding?

20   A    If you go short risk of a -- at the senior level of a

21   company, so you buy protection and you go short risk, the

22   recovery, in the event of a bankruptcy, the recovery at the

23   senior level could actually end up being quite high

24   depending on what kind of company it is.  At the preferred

25   level, given where it is in the capital structure, the

1   general thought is the recovery would be much lower, if not

2   zero.  So if you owned protection on a preferred CDS you

3   stood to make a lot more money if you were right, than if

4   you bought protection at -- in senior.

5   Q    The next dash on that slide reads, "A company is more

6   likely to miss a preferred dividend than to default

7   outright.  As a result, PCDS should widen more than senior

8   CDS in the widening environment."  Do you have an

9   understanding as to what that language means?

10   A    Yes.

11   Q    And what is your understanding?

12   A    The preferred CDS contract had an additional trigger.

13   So when the -- in the corporate CDS market there was a --

14   bankruptcy and failure to pay were the triggers that would

15   put that -- create the credit event that needed to be

16   settled.  But in the preferred CDS there was an additional

17   trigger, and that was a deferral of the preferred security.

18           A corporation has the ability, in most cases, to

19   defer a dividend on their preferred without being considered

20   having failed to pay on a -- on a debt obligation, and

21   therefore accelerated in bankruptcy.  So therefore, the

22   preferred CDS contract has additional value away from the

23   senior CDS because it has an additional trigger.

24   Q    And what, if anything, does that additional trigger

25   have to do with spreads widening more or less?

Page 37

1   A    Well, as -- one of the things that a corporation can do

2   to try to protect itself when they're in financial stress is

3   to -- is to defer preferred dividend payments to try to keep

4   cash -- you know, to keep -- to stay liquid.  And because of

5   that, the likelihood, as a company moves into financial

6   distress, of deferring their dividend, can go up very high

7   and it would be higher.  The odds are -- the probabilities

8   are, excuse me, that the company would prefer its dividend,

9   excuse me, defer its dividend before it would file for

10  bankruptcy.

11  Q    If you would turn to the page ending in 1888?

12            MS. SAWYER:  Your Honor?

13            THE COURT:  Yes.

14            MS. SAWYER:  May we briefly approach?

15            THE COURT:  Sure.

16        (Bench conference not recorded on the record)

17            THE COURT:  All right.  Ms. Sawyer?

18            MS. SAWYER:  Yes.  I just wanted to state Lehman's

19  objection to this line of questioning as to Mr. Neumann's

20  understanding of a document that he did not draft and he did

21  not prepare.  Mr. Neumann is not an expert witness, he's a

22  fact witness.  And any relevance of his understanding of

23  this document is, we believe, not relevant or admissible.

24            THE COURT:  All right.  Well, it remains to be

25  seen if and how its relevant to the issues in the case, but

Page 38

1      I note your objection.  And my understanding is that Mr.

2      Regan is almost finished with this particular subset of his

3      examination.  Yes?

4              MR. REGAN:  Yes.

5              THE COURT:  All right.  So you've been at i6t for

6      an hour now, Mr. Neumann.  We're going to take a short

7      break.  We're going to come back at 11:25.  I am aware of

8      your time constraints today, and we are going to honor

9      those, but we're going to have to discuss contingency

10     planning, if you will.  So during the break you remain under

11     oath.  I'm not canceling your vacation.  No worries.

12             MR. NEUMANN:  If LaGuardia wasn't as bad as it is,

13     it wouldn't -- I could stay longer.

14             THE COURT:  I understand.  No worries.

15             We're going to take a short break.  We're going to

16     come back at 25 minutes after the hour.  During the break,

17     sir, please do not discuss the case or your testimony with

18     anyone or be in anyone's presence while they're doing the

19     same.  All right?

20             MR. NEUMANN:  I understand.

21             THE COURT:  Thank you.

22         (Recess)

23             THE COURT:  Okay.

24     Q   Mr. Neumann, did you, at any point in time, come to

25     have a conversation with QVT about the PCDS product?

Page 39

1    A    Yes.

2    Q    And do you recall at approximately what period of time

3    those conversations take place?

4    A    I don't remember the beginning conversations, but from

5    the -- from the time that we started marketing the PCDS

6    product through the time of the bankruptcy were all times I

7    was talking about PCDS to QVT.

8              THE COURT:  Could you be more specific?  Who at

9    QVT?

10             MR. NEUMANN:  Arthur Chu for certain.  I don't

11   remember specifically talking to other people at QVT about

12   PCDS, but I do remember talking to Arthur Chu.

13             THE COURT:  Thank you.

14   Q    And what do you recall of those conversations with Mr.

15   Chu?

16   A    The beginning conversations were an introduction to the

17   product and my belief that it was an opportunity for QVT to

18   be short risk at the preferred level of issuers.

19   Q    And did Mr. Chu express interest in PCDS?

20   A    He did.

21   Q    What, if anything, do you recall about Mr. Chu's

22   interest in PCDS?

23   A    I don't recall a specific thing that he was interested

24   in.  Our discussions were about the opportunity of being

25   able to be short risk for many of the reasons outlined, for

Page 40

1    example, on those slides we looked at before.  He and I, do

2    I recall conversations where he and I both agreed that the

3    spread associated with this risk were too tight, they should

4    -- that the default swap protection, given the level of risk

5    involved, should cost more.  And that because of the market,

6    the sellers of protection, whether that was individual

7    sellers or in the case of a CSO, had pushed the market to

8    spreads that were too tight relative to the risk, and that

9    it was a good opportunity, therefore, to be short risk by

10   buying protection.

11   Q    And at some point in time did QVT and Lehman begin to

12   enter into PCDS transactions?

13   A    Yes, we did.

14   Q    And do you recall approximately when that was?

15   A    I don't recall exactly.  I think around 2004 or '5.

16   Q    And do you have any recollection as to how many PCDS

17   transactions QVT and Lehman entered into?

18   A    I don't -- I don't recall exactly.  It was -- it was in

19   the tens I would say, not hundreds, but I don't remember the

20   number.

21   Q    And do you have any recollection as to the total

22   notional value of the PCDS transactions that QVT and Lehman

23   entered into?

24   A    I don't have a recollection of the total notional

25   value.

Page 41

1   Q    How many other clients did you market PCDS to in the

2   2005 to 2008 time frame?

3   A    I marketed PCDS to every client that I covered.

4   Q    And approximately how many of those clients entered

5   into PCDS transactions with Lehman?

6   A    I think another three or four.

7   Q    Do you recall which clients those were?

8   A    Deutsche Bank, Deutsche Bank R -- or known to us at the

9   time DBR, they were considered to be -- they were a client

10  even though they are part of Deutsche Bank, because they

11  were a hedge fund house within Deutsche Bank.  They were

12  also a fairly significant counterparty and probably the only

13  other counterparty I would identify as somewhat significant

14  to PCDS.  And then I believe there were a handful of other

15  funds, Taconic Capital comes to mind, Toronto Dominion comes

16  to mind, that were also possible counterparties, but not

17  significant.

18  Q    Do you have any recollection as to which of your

19  clients were the -- purchased the most PCDS protection?

20  A    QVT.

21  Q    And can you quantify that in any way?

22  A    I don't know -- like I said, I think it was tens, not

23  hundreds of trades.  I think it was probably hundreds of

24  millions of notional, but not billions of notional.

25  Q    In the course of your efforts to market PCDS to your

Page 42

1    clients, did you come to have any understanding as to

2    whether the introduction of the product was succeeding in

3    the market?

4    A     My belief was, at the time of the inception of the

5    product, that it was going to be a big product.  And the

6    trading desk often would taut their successes in terms of

7    making it a more viable product in the market.  But in terms

8    of ultimately, from what I initially thought what PCDS would

9    become to what it became, it was -- it was a disappointment,

10   it was less than we thought it would be.  Fewer clients,

11   less -- fewer trades, less profitability.

12   Q     And do you have any understanding as to why that is?

13            MS. SAWYER:  Objection.  Lack of foundation.

14            THE COURT:  You're going to need to lay some

15   foundation.

16   Q     In the course of your efforts to market PCDS to your

17   clients, did any of your clients decline to enter into PCDS

18   transactions?

19   A     Yes.

20   Q     And is -- and did any of those clients indicate to you

21   reasons for that?

22   A     Yes.

23   Q     What were those reasons?

24   A     The primary reason, they were concerned about

25   liquidity.

Page 43

1    Q    And what do you mean liquidity?

2    A    Liquidity is the ability to buy and sell a security or

3    derivative contract with ease.

4    Q    And why, if at all, was that an issue with respect to

5    PCDS, for your clients?

6              MS. SAWYER:  Objection.

7              THE COURT:  Okay.  We're now -- we have -- first

8    of all, there's hearsay, second of all there's -- asking the

9    witness to put meanings around words that he's indicating

10   were spoken by other people.  You're going to have to ask

11   this in a different way.

12   Q    Do you have any understanding, based on your marketing

13   efforts, why PCDS was not as successful as you had hoped?

14   A    Yes.

15   Q    What is your understanding?

16   A    In order for --

17             MS. SAWYER:  Objection, Your Honor.  I'm just -- I

18   still think there's a foundational issue.

19             MR. REGAN:  I don't think --

20             THE COURT:  Come on up.

21        (Bench conference not recorded on the record)

22             THE COURT:  I don't recall what question was

23   pending when we took our break.

24             MR. REGAN:  I have to confess I don't either.

25             THE COURT:  All right.

1    Q    So the question was, and I think there's an objection,

2    do you have any understanding, based upon your marketing

3    efforts, why PCDS was not as successful as you had hoped.

4             MS. SAWYER:  I still have an objection, but we're

5    proceeding, I presume.

6             THE COURT:  Okay.  Yes, go ahead.  Go ahead.

7             MR. REGAN:  That question's no good?

8             THE COURT:  That question he can answer.

9             MR. NEUMANN:  I said yes.  And I said the primary

10   reason I believe is we couldn't find enough clients and even

11   competitors to actively trade the product.

12   Q    Did any other dealers, to your knowledge, become market

13   makers in PCDS during the 2005 to 2008 time period?

14   A    I believe JP Morgan became a market marker. I don't

15   know if other dealers definitely did.

16   Q    Do you have any knowledge as to when JP Morgan became a

17   market maker?

18   A    I don't remember.

19   Q    And do you have any knowledge as to the quantity of

20   PCDS that JP Morgan traded?

21   A    I don't have any knowledge on how much they traded.

22   Q    Do you have any knowledge as to the amount of PCDS that

23   JP Morgan traded in comparison to the amount that Lehman

24   traded?

25   A    I don't.

Page 45

1  Q     In the course of your marketing efforts with PCDS at

2  any point in time did you have to value PCDS positions?

3  A     I'm not sure I understand the question.

4  Q     Did you have to, at any point -- in the course of your

5  duties, did you have to determine whether a price was a good

6  price or a negative -- a bad price?

7  A     As a constant part of my role as a salesperson, I would

8  try to advise clients and our traders on whether or not I

9  thought something was valued fairly, richly or cheaply,

10 including PCDS.

11 Q     And how would you go about reaching conclusions of that

12 type with regard to PCDS?

13 A     With PCDS in particular there were several things that

14 we would -- that I remember doing in order to try to help

15 the trading desk and clients assess value.  One of them was

16 look at the existing market, if there was one, for PCDS.

17 Another was to look at the CDS market, because we believed

18 that there was a spread associated with PCDS in relation to

19 CDS that could be too tight or too wide.  We would also look

20 at the relationship of PCDS to the underlying preferred

21 securities.

22 So if those securities were trading at a price that made

23 PCDS look too wide or too tight, that would be an input.  We

24 would also look at the underlying corporate bonds of that --

25 of that issuer and, again, look at the relationship between

Page 46

1    CDS and those corporate bonds and compare that to the

2    relationship of PCDS to the preferreds.

3    Those were -- those are examples I remember using often.

4    Q    One of the examples that you mentioned was comparing

5    PCDS to the underlying preferred, is that right?

6    A    Yes.

7    Q    How would you do that?

8    A    We would take a look at the preferred security itself,

9    what price it was trading.  That price would have a yield.

10   And there was something known as an option-adjusted spread,

11   which can be derived from, again, analytics that were

12   available on our website plus on Bloomberg, which we used

13   every day.  And we could look at that spread and compare

14   that back to the PCDS spread and determine if we thought

15   that was fair.  There were other inputs that would help us

16   with that.  One of them would be the price itself of the

17   preferred security.

18            It if was a price that as below par, significantly

19   below par, that would be something that would indicate

20   something was potentially more attractive than something

21   that was above par, as an example of the (indiscernible).

22            THE COURT:  I'm sorry.  I was taking notes and I

23   may not have seen exactly when you stood up, so...

24            MS. SAWYER:  No, that's fine.  I just think we

25   need some clarity because the witness is testifying that we

1   did certain things.

2           THE COURT:  Yes.

3           MS. SAWYER:  And I think it should be clarified,

4   who is we?

5           THE COURT:  Well, who is we?  In what context?

6   And when?

7           MR. NEUMANN:  When I used the words we, I was

8   referring to Lehman Brothers, and I was referring to our

9   trading desk and sales desk.

10          THE COURT:  Okay.  So that's...  Thank you.  But

11  that doesn't make the answer more specific.  Because that

12  describes that category of people who might've done it.  So,

13  the question is to ask specifically who did the set of

14  things that you just described and in what timeframe?

15          MS. SAWYER:  Your Honor, may I...?

16          THE COURT:  Yeah.

17          MS. SAWYER:  I also think to the extent he's

18  talking about what the trading desk has done, then there's a

19  foundational problem and we have to strike the response as

20  not responding to what he did.

21          THE COURT:  Okay.  You know what?  We're going to

22  take a few minutes.  I want you folks to join me in the

23  conference room, all right?  I assure you you're going to be

24  on time to do what you need to do.  All right?

25          MR. REGAN:  Thank you.

Page 48

```
 1              (Pause)

 2              THE COURT:  All right, thank you, everyone, for

 3    your patience.  What we're going to do is we're going to

 4    take a 20-minute break so that everyone can hydrate and have

 5    a granola bar, and then -- or whatever, and we're going to

 6    then, when we resume in 20 minutes, we're going to go no

 7    later -- we're going to just go until we're done for the

 8    day.  No later than 2 p.m.  All right?  And, Mr. Neumann,

 9    your counsel's going to talk to you about a few logistical

10    matters only during the break, which is permissible.

11              MR. NEUMANN:  Understood.

12              THE COURT:  Okay.

13              MR. NEUMANN:  Thank you.

14              THE COURT:  All right.  We'll see you in 20

15    minutes.

16              MR. REGAN:  Thank you, Your Honor.

17              THE COURT:  Thank you.  Are you going to switch

18    out?

19              (Break)

20              THE COURT:  All right, are you ready to resume,

21    Mr. Regan?

22              MR. REGAN:  I think so.

23              THE COURT:  Very good.

24    Q    Mr. Newman, if you would turn to Tab CX-1101 in your

25    binder.  Do you recognize this exhibit?
```

1   A    Yes.

2   Q    What is it?

3   A    It's a Bloomberg that I sent to Arthur Chu at QVT about

4   PCDS.

5   Q    And what time period was this Bloomberg sent?

6   A    It's in July of 2007.

7   Q    And what information are you conveying to Mr. Chu in

8   this Bloomberg?

9   A    I'm conveying to him where we have -- we have what we

10  call axes, which can be offers or bids where we believe that

11  our offer or bid is something that -- there's something that

12  we want to do the most or that we think the client should be

13  most interested in.

14  Q    And at the top of the email you say -- or Bloomberg,

15  rather, you say, "Arthur, here's the PCDS cocktail..." and

16  an interesting spelling of delicious.  What, if anything,

17  did you mean by that?

18  A    I think just humorous.  Calling it a cocktail.  Simply,

19  there's a few things on there.  And delicious is spelled

20  that way as just to perhaps get him to notice when he

21  perhaps wouldn't otherwise have noticed.

22  Q    Towards the bottom of the Bloomberg, there's a row that

23  starts with SocGen, do you see that?

24  A    Yes.

25  Q    And it says "Backslash 39, 10 million to work 10

1   million." What, if anything, did you mean by "to work 10

2   million"?

3   A    It means that we're offering 10 million notional of the

4   SocGen PDS at 39 -- PCDS, excuse me, at 39 basis points but

5   it's contingent on getting an order on another 10 million.

6   So that would be -- if he decided he wanted to lift us at 39

7   on 10, then he would also be giving us an order on 10.

8   Otherwise, we might not want to do that 10 at 39.

9   Q    Other than the to work pricing, is the other data

10  listed on Exhibit CX-1101 -- are those actionable offers to

11  Mr. Chu?

12  A    Those are actual offers to Arthur Chu...  Yes, yes,

13  they are.

14  Q    I may have misspoke.  Were they actionable offers?

15  A    Oh, actionable.  Yes.  Actionable offers.  They were

16  intended to be actionable offers, yes.

17  Q    How can you tell that from the face of this exhibit?

18  A    I don't know how you can tell from the face of this

19  exhibit.

20  Q    So, do you know if Lehman and QVT traded as a result of

21  the offers contained in Exhibit 1101?

22  A    I don't.

23  Q    If you would turn to Exhibit 1202 in your binder.  Do

24  you recognize this exhibit?

25  A    Yes.

Page 51

1   Q    What is it?

2   A    It's a Bloomberg exchange between Arthur Chu, QVT, and

3   I.

4   Q    And can you decipher from the Bloomberg who is telling

5   whom what?

6   A    The top part, the "Good morning", and "Good to see

7   you", and "Jonathan" is Arthur writing to me.  And "Do you

8   have any PCDS to offer?" that's his question to me.  And

9   then I'm the person who replied at the bottom.

10  Q    And what was your reply to Mr. Chu's question?

11  A    I see "PCDS coverage nearly bare.  Can still try and

12  arrange some swap into Aussie PCDS short by unwinding your

13  fave Euro shorts.  So if there's a short you're not in love

14  with..."

15  Q    What did you mean -- I'm sorry, did I interrupt?

16  A    No.

17  Q    What did you mean, "PCDS coverage nearly bare"?

18  A    I meant that I didn't have a lot -- we didn't have a

19  lot to show in PCDS, whether it be offers or bids.  Just we

20  didn't have much to show.

21  Q    Why was that?

22  A    I'm not sure.  I don't know why it was that we didn't

23  have a lot to show.  I don't remember.

24  Q    Do you recall at any point in time in 2008 when Mr. Chu

25  was seeking to buy PCDS from Lehman and Lehman was unable to

Page 52

1    sell it to him?

2              THE COURT:  Yes, Ms. Sawyer?

3              MS. SAWYER:  Objection.  Leading.

4              THE COURT:  I think that's all right.  Do you have

5    the question in mind, Mr. Neumann?

6    A    Would you ask the question again, please?

7    Q    Sure.  Do you recall any point in time in 2008 where

8    Mr. Chu was seeking to buy PCDS protection and Lehman was

9    not able to sell it to him?

10   A    I don't remember a specific date, but I definitely

11   remember that happening, yes.

12   Q    Do you recall if that happened early in 2008, closer to

13   the bankruptcy...?

14   A    I don't recall when specifically in 2008 it happened,

15   except that leading up to the bankruptcy, I do remember well

16   that it was very difficult to trade PCDS.

17   Q    Was it -- for you personally was it difficult to trade

18   PCDS?

19   A    Yes.  Yes, it was.

20   Q    And what factors made it difficult for your personally

21   to trade CDS -- PCDS?

22   A    In order to trade PCDS I had to, as I described

23   earlier, I'd need to go to a trader to get a price and then

24   have that price -- that price be actionable.  It was

25   difficult to actionable prices from traders through -- in

Page 53

1   2008, broadly, but especially as the bankruptcy approached.

2   Q    And for purposes of QVT in particular, what, if

3   anything, did traders tell you when you tried to get

4   actionable levels for Mr. Chu?

5        MS. SAWYER:  Objection, Your Honor.  Calls for

6   hearsay.

7        THE COURT:  You can respond, Mr. Regan, to the

8   objection.

9        MR. REGAN:  We'll just move on.

10       THE COURT:  Okay.

11  Q    Going back to Exhibit 1202, after noting that PCDS

12  coverage nearly bare, you write "Can still try and arrange

13  some swaps into Aussie PCDS." What did you mean by that?

14  A    What I meant was that we didn't want to offer

15  protection on the names he was looking for, that he wanted

16  to buy protection on -- that he was trying to buy protection

17  on -- on Australian Bank PCDS.  But I said -- I was offering

18  him to essentially make a deal with us where if he could

19  show us offerings in some of the Euro banks, then we would

20  show him offerings in some of the Australian banks.

21  Q    And why were you proposing that deal rather than make

22  an offer on PCDS?

23  A    I don't remember specifically why I was offering this

24  deal.

25  Q    To your knowledge, at any point in 2008 did there come

1   a point in time when you were not able to offer Mr. Chu new

2   protection on PCDS?

3   A    I remember not being able to offer protection to QVT --

4   Arthur Chu at QVT on PCDS on numerous occasions, yes.

5   Q    During 2008, were you able to offer Mr. Chu PCDS

6   protection on swaps?

7        MS. SAWYER:  Objection.  Leading?

8        THE COURT:  Perhaps you can ask it in a more open-

9   ended way.

10  Q    Were there any other ways that you were able to offer

11  Mr. Chu protection rather than just new PCDS protection?

12  A    Looking at this Bloomberg suggests that I could -- we

13  would offer on swap, but I don't recall specifically a

14  particular swap or a particular conversation surrounding a

15  swap in order to be able to offer PCDS.  But clearly here

16  was a circumstance where that was the way that we would

17  offer -- consider offering what he was looking for.

18  Q    Were you involved in any discussions in 2008 at Lehman

19  regarding whether Lehman could or could not offer new PCDS

20  protection?

21  A    I discussed with the traders on my desk on numerous

22  occasions our ability to offer protection or not in PCDS.

23  Q    And what did you --

24  A    In 2008.

25  Q    And what did you learn as a result of those

1    conversations?

2    A    It was a very difficult time in financial markets

3    broadly.  PCDS was not -- it was, as I spoke earlier, not a

4    significant percentage of what we did; it was actually not a

5    primary focus of the desk at the time.  They had a lot of

6    other things going wrong that were much larger positions,

7    much more financially threatening positions.  And so to get

8    their attention in order to be able to transact on PCDS, I

9    learned it became very difficult.  And the direct

10   conversations I would have with a trader on a desk would be

11   -- I recall the trader seeing things like I can't --

12            MS. SAWYER:  Your Honor?

13            THE COURT:  Hold on.  Please pause for a second.

14   Go ahead, Ms. Sawyer.

15            MS. SAWYER:  I just want to say -- object to the

16   hearsay nature of this.  And I think the witness was about

17   to continue to provide such hearsay.

18            THE COURT:  Okay.  So, first, I'd like there to be

19   a timeframe around --

20            MR. REGAN:  2008.

21            THE COURT:  I'd like there to be a timeframe

22   around the answer.

23            MR. REGAN:  Summer of 2008?  Are you asking me?  I

24   apologize.  I really thought you were asking me to narrow

25   the question.

1          THE COURT:  Yes, I am asking you to narrow the

2     question and to try also to stay away from eliciting

3     hearsay, all right?  Ms. Sawyer, anything more?

4          MS. SAWYER:  I also think that there's a relevance

5     objection to -- related to what we discussed off the record.

6          THE COURT:  Sure.  But relevance I'm going to

7     leave to you.

8          MS. SAWYER:  Okay.

9          THE COURT:  All right?

10         MS. SAWYER:  Thank you.

11         THE COURT:  So, where we stand after that

12    interchange is you're going to try to ask Mr. Neumann a more

13    narrowly focused question in terms of a timeframe, and we're

14    going to try to not elicit hearsay testimony with respect to

15    what traders may or may not have told him.

16    Q    I believe you testified that at some point in 2008, you

17    were unable to offer QVT new PCDS protection, correct?

18    A    Correct.

19    Q    And was that the case in the summer of 2008?  July and

20    August of 2008?

21    A    I recall it was -- yes, in the summer of 2008.  I do

22    recall that, yes.

23    Q    Why were you unable to offer QVT new PCDS protection in

24    that time period?

25    A    I was not the person that decided whether we could

Page 57

1    offer protection or not.

2    Q    What did you tell QVT, if anything, as to why you could

3    not offer them any protection?

4    A    I don't recall exactly what I said to QVT in regards to

5    not being able to offer protection.

6    Q    Turning back to Exhibit 1202, there are three dashes

7    down towards the bottom.  The top one says, "Working on

8    holder (indiscernible) EOS and Lloyd, but it's slow going."

9    What, if anything, did you mean by that statement?

10   A    What I meant by that statement is that we were trying

11   to find some protection on those two banks and that we had

12   somebody that we knew held protection that was considering

13   to sell protection, but it was difficult to convince them to

14   part with that protection.  So we were trying to do it.  And

15   so I was providing information that those were two

16   possibilities, although slow going, meaning it could take a

17   while.

18   Q    What do you mean when you say you were trying to find

19   protection?

20   A    We wanted to buy protection on those banks.  We knew

21   that QVT -- I knew --

22   Q    Let me stop you.

23   A    I knew.

24   Q    When you say we knew, you mean --

25   A    I know, as being the coverage for QVT -- I knew that

Page 58

1    they were potentially interested in buying protection on

2    those banks.  And so, I was providing some information that

3    it was possible that we could find some protection but it

4    was not -- I wasn't going to -- we were -- Barc -- excuse

5    me, that's where I work now -- Lehman Brothers was not going

6    to offer protection without finding someone to sell it to

7    us.

8    Q    If you would turn to Exhibit 1235 in your binder.  Do

9    you recognize this exhibit?

10   A    Yes.

11   Q    What is it?

12   A    It's a Bloomberg between Arthur Chu and myself.

13   Q    And can you explain what information is being conveyed

14   in this Bloomberg?

15   A    I don't know exactly what was being conveyed in this.

16   I could -- I don't know.

17   Q    Don't speculate.  Can you tell which statements are by

18   you and which statements are by Mr. Chu?

19   A    In this case, I'm not 100 percent sure.

20   Q    Do you recall whether in September of 2008, Mr. Chu had

21   sought to buy protection on PCDS from you?

22   A    I don't recall if exactly in September of 2008 he was

23   trying to buy protection from me.  I don't recall exactly,

24   no.

25   Q    If you could turn to --

1            THE COURT:  Can I ask you one question just so I

2    understand?  So, at this point in time, we're in September 9

3    of 2008, right?  A couple days -- less than a week before

4    the final...  So, at that point in time, QVT -- Lehman had

5    sold to QVT and QVT was holding a block of PCDS, right?

6            MR. NEUMANN:  Correct.

7            THE COURT:  Call it X.  And what Mr. Chu was

8    asking you is, he wants more, right?  He wanted to increase

9    his holdings of PCDS?

10           MR. NEUMANN:  I'm not certain from reading this

11   exhibit if that's what's at stake.  My recollection is that,

12   yes, he wanted he wanted to add to his position.

13           THE COURT:  He wanted more?

14           MR. NEUMANN:  My recollection is he did, but I

15   don't know if this was the one that --

16           THE COURT:  Okay.

17           MR. NEUMANN:  -- that this particular Bloomberg

18   says that.

19           THE COURT:  Thank you.

20   Q    Do you recall -- aside from this exhibit, do you recall

21   Mr. Chu wanting to add more PCDS to QVT's portfolio?

22   A    Yes, I do.

23   Q    And do you recall at any time in the summer of 2008

24   that you were not able to do that for him?

25   A    Yes, I do.

Page 60

1    Q    Do you recall why that was?

2    A    Yes.  I would ask the traders if we could offer PCDS,

3    and they would tell me we could not.  And those traders on

4    our desk were -- you had an exhibit up before where you

5    listed the traders.  I don't know which of those traders it

6    was specifically but I know that I asked one of these people

7    that's listed on that cheat if they could offer PCDS, and I

8    was told we could not.  I recollect that.

9    Q    Who did you ask?

10   A    I don't remember which trader but one of those traders

11   listed on that sheet.

12   Q    If you would turn to Exhibit 1194 in your binder.  Do

13   you recognize Exhibit 1194?

14   A    Yes.

15   Q    And what is it?

16   A    It's a Bloomberg exchange between Arthur Chu and

17   myself.

18   Q    And what is the date on that exchange?

19   A    August 13, 2008.

20   Q    And is the lower cased writing at the top of that

21   Bloomberg message, is that Mr. Chu?

22   A    That is Mr. Chu, yes.

23   Q    What does Mr. Chu ask you?

24   A    He's asking me if there's any PCDS that we could offer,

25   but he's not interested in a swap; he just wants me to see

Page 61

1    if I can offer it outright, no swap.

2    Q    And swap means?

3    A    It means that I would offer him some protection if he

4    could offer me some on a different name.

5    Q    In response to Mr. Chu you write "At this point, need

6    to sell stuff on swap.  We can prob rustle up some WFCPCDS

7    but that's a name that would prob only widen (indiscernible)

8    someone else's deferral; not actually defer themselves." Can

9    you explain what you meant by that?

10   A    Yes.  WFC stands for Wells Fargo.  Wells Fargo, I

11   recall at the time, compared to a lot of the other banks,

12   was actually considered to be in good financial condition or

13   at least much better financial condition than others.  And

14   so, we were able to -- I recall, able to offer protection on

15   Wells Fargo but it was not something that clients were

16   interested in.  I recall that clients were not interested in

17   it, but we could offer it.

18          And I'm making the point below that one of the

19   reasons why it's not really interesting is they would -- I

20   recall Wells Fargo, because of their better financial

21   condition, was not a bank that was likely to defer on their

22   preferred securities.  Whereas it was speculated in the

23   market at the time that other banks may have to do exactly

24   that.

25   Q    If you would turn to Exhibit 1185, please?  Do you

Page 62

1    recognize Exhibit 1185?

2    A    Yes.

3    Q    What is it?

4    A    It's a Bloomberg exchange between Arthur Chu and

5    myself.

6    Q    And how do you know it's a Bloomberg exchange with Mr.

7    Chu?  It helps there's metadata on Page 2.

8    A    It's -- I just -- this is a very familiar exchange

9    between the two of us at the time.

10   Q    Can you explain what information is conveyed in Exhibit

11   1185?

12   A    He's asking me about the NBI monetization trades.  I

13   don't remember what those are.  And then he asked me if I

14   had anything to offer in Aussie PCDS banks.  Again, he's

15   asking to offer protection on Australian banks at the PCDS

16   level --

17   Q    Sorry.

18   A    And I sent back -- when I said, "sent you back your

19   Bloomberg with our levels" I assume that was in regards to

20   NBA.  A, because I'd say Point Number 2, responding to his

21   Number 2, I again said that we potentially can offer it but

22   only on a switch.  So we can offer ANZ, which is Australia

23   New Zealand Bank, and CBA, which was Commonwealth Bank of

24   Australia, if you'd be willing to take profits at any of

25   these.  And I list these names:  Credit Agricole, Barclays,

Page 63

1    BNP, Dresdner, HypoVereins, and Rabobank, and I said maybe I

2    can offer those Aussies outright but on switch would be most

3    likely.

4              So, outright means that we might be able to but

5    that's because we're going to have to go buy protection on

6    these names in order to offer those.  So if Arthur can't

7    sell them or QVT couldn't sell them, I'd have to find

8    somebody else.

9    Q    A prior exhibit that we looked at used the term swap.

10   Is there any difference between on swap or on switch?

11   A    No.

12   Q    And were you ever able to offer Mr. Chu Aussies

13   outright?

14   A    I don't remember.

15   Q    Do you recall approximately at what point in time in

16   2008 was your last PCDS trade with Mr. Chu?

17   A    Could you ask that question again?

18   Q    Do you recall when you last trade with -- when your

19   last PCDS trade with Mr. Chu was?

20   A    I don't recall.

21   Q    Did QVT ask you to provide month-end pricing for its

22   PCDS positions at any point in time?

23   A    Yes.

24   Q    Did QVT ask you to do that in 2008?

25   A    Yes, I'm sure they did.

Page 64

1   Q     And when QVT made those requests, did you respond to

2   them?

3   A     I'm sure that I responded.  I don't remember how I

4   responded but I'm sure that I did, yes.

5   Q     When QVT asked you to provide month-end levels for

6   their PCDS positions, how did you go about doing that?

7   A     The way I would go about PCDS is I would go to the

8   trading desk and I would tell them that QVT is asking for

9   month-end marks on their PCDS positions and I needed to try

10  to help.  And I would ask the trading desk for help in doing

11  that.

12  Q     And the trading desk would provide you with levels on

13  QVT's PCDS positions?

14  A     Sometimes they would; sometimes they wouldn't.

15  Q     When they did, do you convey those levels to QVT?

16  A     My recollection is sometimes I went and took exactly

17  the trading desk and immediately conveyed it to QVT; other

18  times I would sit down on my own and analyze what the

19  traders had come up with as prices, and look to see if I

20  thought that those prices looked reasonable.  And if I did

21  not, I would go back to the trading desk and say that I

22  thought that the prices didn't look reasonable and that I

23  would like them to reevaluate.

24  Q     Was Megan Philbin one of the traders that you went to?

25  A     She was.

Page 65

1    Q    If you would turn to Exhibit 1104 in your binder...  Do

2    you recognize this exhibit?

3    A    Yes.

4    Q    What is it?

5    A    It's a Bloomberg between -- from me to Megan Philbin.

6    Q    And what's the date on that Bloomberg?

7    A    July 31, 2007.

8    Q    In the subject line you write "Now that I lifted the

9    jump ball, QVT is scraping for some levels." What did you

10   mean by "now that I lifted the jump ball"?

11   A    I don't remember what the circumstance was, but a jump

12   ball is a situation where a trader gets an opportunity to

13   trade something but it's a very quick time window.  And so I

14   don't know which client was involved but I had done a trade

15   with Megan and I'm using that fact that we traded as sort of

16   an intro to say that QVT is looking for levels on PCDS, and

17   because I helped her, can she help me?

18   Q    And when you say, "QVT is scraping for some levels on

19   PCDS," what did that mean?

20   A    They were looking for -- in this case, based on the

21   date, they were looking -- I believe they were looking for

22   marks on PCDS for their month end.

23   Q    And what does "even WAGS are finding" mean?

24   A    WAGS stands for wild-ass guesses, and I'm basically

25   asking -- I'm asking her if she can help because at this

Page 66

1   point I have nothing.  I just need something to go back to

2   the client with.

3   Q    Do you recall what you went back to the client with at

4   this point in time?

5   A    I don't.

6   Q    Do you recall why you asked Ms. Philbin for WAGS?

7   A    I don't recall.

8            THE COURT:  Stop.

9            MR. REGAN:  Sorry.

10           MS. SAWYER:  Objection.  (Laughter) We're

11   negotiating.

12           THE COURT:  It mischaracterizes the testimony.

13           MS. SAWYER:  Yes.

14   Q    Did you indicate that -- so you indicated to Ms.

15   Philbin that --

16           THE COURT:  You can say it.

17   Q    -- wild-ass guesses would be fine?

18           THE COURT:  I know it's a term.

19   A    Yes, I indicated that to her.  Yes.

20   Q    Why did you indicate this?

21   A    I don't recall specifically in regards to this

22   particular exchange on Bloomberg.  I do remember well going

23   to the trading desk and asking them for help on month-end

24   marks on PCDS -- had become very challenging.  They were not

25   either willing or able to provide those marks.  And in order

Page 67

1   to be responsive to the client, I needed to have them help

2   me.

3            MS. SAWYER:  I would move to strike everything

4   after "I don't recall".

5            THE COURT:  Yes.  Sustained.  And, again, Mr.

6   Regan, if you could keep us very specifically in timeframes.

7   The email that we're looking at is in July of 2007.  And I

8   myself am confused about the time period that we're talking

9   about.

10  Q    Do you recall any particular point in time when it

11  became difficult to get (indiscernible) levels for QVT?

12  A    I cannot pinpoint when it became difficult exactly, no.

13           THE COURT:  Can I ask a clarifying question?  Does

14  this level mean the same thing as mark?  Or does level --

15  can level mean bids or offers?

16           MR. NEUMANN:  Level could mean either.

17           THE COURT:  Thank you.

18  Q    If you would turn to Exhibit 5094 in your binder.  Do

19  you recognize this exhibit?

20  A    Yes.

21  Q    And what do you recognize it to be?

22  A    It's a Bloomberg.  I believe that the top, when it says

23  "Mike, please provide quotes from the following PCDS" that

24  that is from Arthur Chu.  And I believe how I responded or,

25  I should say, the group of people that work with me -- so

Page 68

1   Benjamin Pearlman, Sarah Gregg, Allison (indiscernible) --

2   that we responded to QVT with this Bloomberg.

3   Q    And do you know whether these are actionable bids and

4   offers?

5   A    I do not know for certain if they're actual bids or --

6   actionable bids or offers, no.  I don't know for certain.

7   Q    Were you providing QVT with actionable bids and offers

8   on PCDS in August of 2008?

9              MS. SAWYER:  Objection.  Leading.

10             THE COURT:  I'll allow it.

11  A    My recollection is it was rare in August of 2008 that

12  we were offering PCDS in a lot of names or even a handful of

13  names to QVT.  No.  My recollection is we did not do that.

14  Q    Do you know whether the levels or marks provided in

15  Exhibit 5094 were month-end process being provided to QVT?

16  A    They look like month-end prices, yes.  There's a July

17  31st date and an August 30.  So that strongly suggests that

18  that's what it is for, yes.

19  Q    If you would turn to Exhibit 1216 in your binder...  Do

20  you recognize Exhibit 1216?

21  A    Yes.  It's a Bloomberg.

22             MS. SAWYER:  Is this different than the last

23  exhibit with that?

24             MR. REGAN:  Yes.

25             MS. SAWYER:  Okay.

1              MR. REGAN:  Different times.  Different data.

2              THE COURT:  Okay.

3    Q    Do you recognize Exhibit 1216?

4    A    Yes.

5    Q    What do you recognize it to be?

6    A    It's a Bloomberg exchange between, I believe, Arthur

7    Chu and myself, with Arthur writing the "Mike, please

8    provide..." and me responding with the quotes at the bottom.

9    Q    And what type of quotes are you providing at the

10   bottom?

11   A    It looks like month-end quotes.

12   Q    Are those -- are you offering to transact with Mr. Chu

13   at those prices?

14   A    Month-end quotes were not given to clients for the

15   purpose of transacting.  They were not meant to be live

16   prices, no.

17   Q    And turning back to Exhibit 5094, were you offering to

18   transact with Mr. Chu at the prices listed on 5094?

19   A    No.

20   Q    Were these month-end levels being provided to QVT?

21   A    Yes.  These are month-end levels provided to QVT.  Yes.

22

23   Q    These were the last month-end levels that were provided

24   to QVT before the Lehman bankruptcy, is that right?

25   A    Yes.

1  Q    What, if anything, do you recall about obtaining these

2  month-end levels from the trading desk?

3  A    My recollection, it was extremely difficult to get

4  quotes from the trading desk on PCDS, whether it be month-

5  end purposes or lodge pricing.

6  Q    Do you have any specific recollections of the August

7  2008 month-end levels in your efforts to get those from the

8  trading desk?

9  A    I don't have specific recollections around August, the

10  end of August, no.

11  Q    Do you have specific recollections of trying to get

12  month-end levels from the trading desk in the summer of

13  2008, so June to August 2008?

14  A    Yes.  In the summer of 2008, I remember many times

15  going to the desk, asking them for levels on PCDS and not

16  being able to get what I needed.  Yes.

17  Q    For month-end level purposes?

18  A    For month-end level purposes, yes.

19  Q    And -- but the trading desk did give you month-end

20  levels in the summer of 2008, is that right?

21  A    Yes.

22  Q    I believe you testified earlier that at certain points

23  in time you would look at the month-end levels and do your

24  own analysis on those month-end levels, is that correct?

25  A    Yes.

Page 71

1    Q    Did you do that for the month-end levels that you got

2    in the summer of 2008?

3    A    I don't remember specifically if I did.

4    Q    In the summer of 2008, do you recall reaching any

5    conclusions as to the reliability of the month-end levels

6    that you received from the trading desk?

7    A    Yes.

8         MS. SAWYER:  Objection.

9         THE COURT:  Hold on one second.

10        MS. SAWYER:  Foundation.

11        THE COURT:  Give me the question again, Mr. Regan.

12        MR. REGAN:  In the summer of 2008, do you recall

13   reaching any conclusions as to the reliability of the month-

14   end levels that you received from the trading desk?

15        THE COURT:  So your objection is to the meaning of

16   reliability?  Do you want to come up?

17        MS. SAWYER:  Yes.  Thank you, Your Honor.

18        (Pause)

19   Q    Backing up a step, do you recall obtaining levels --

20   month-end levels for QVT from the trading desk in the summer

21   of 2008?

22   A    Yes.

23   Q    And what do you recall about that?

24   A    I recall it being a difficult process to obtain month-

25   end marks, month-end levels from the desk on behalf of QVT

Page 72

1    in PCDS.

2    Q    And what do you mean by "it became difficult"?

3    A    Have to ask several times, get limited to no response,

4    get some sort of partial response, those types of things.

5    And I remember those things happening and remember also

6    being frustrated and remember wishing to -- remember well

7    wishing to help the client as best I could during a

8    difficult time.

9    Q    But you recall that the trading desk did, in fact,

10    provide you with month-end levels for QVT in the summer of

11    2008?

12    A    Yes.

13    Q    And I believe you testified that you recall performing

14    your own analysis of those month-end levels that you got

15    from the trading desk in the summer of 2008, is that right?

16           THE COURT:  Hold on.

17           MS. SAWYER:  Objection.  Leading.

18           THE COURT:  Okay, I'm going to -- let me ask you

19    this question.  Did there come a point -- do you recall, did

20    there come a point in time at which you could no longer get

21    levels for the PCDS for QVT?  Month-end mark.  Levels in the

22    sense of month-end marks?  Or marks of any -- at any point

23    in time?

24           MR. NEUMANN:  My recollection is it was very

25    difficult.  I don't believe it was ever impossible, if

Page 73

1    that's what you're looking for.  I don't recall a time when

2    I could not possibly get an answer from the desk; I recall

3    having to work very, very hard to get a response from the

4    desk and then having to look at that -- at the work and try

5    to come up with whether that was reasonable, and having to

6    do that.  I remember that well because it was a difficult

7    process, but I don't remember ever not being able to reply

8    to the clients.

9              THE COURT:  So given the paucity of information

10   that you were getting in response to your requests, what was

11   it that informed your analysis of the marks that you were

12   getting from the traders during the summer of 2008?  You

13   testified a little while ago that sometimes you got marks

14   and you turned around and you sent them to Mr. Chu, and

15   sometimes you would look at them and do your own analysis.

16   What differentiated the former exercise from the latter, if

17   you recall?  And if you don't, it's perfectly fine.

18             MR. NEUMANN:  I don't remember exactly.  What I

19   was describing before was that I thought -- maybe I

20   misunderstood the question -- what I thought I was

21   describing was a broader sense of like, getting a month-end

22   mark on PCDS and taking that and looking at it and deciding

23   from just looking at it if I thought I needed to go back and

24   do some analysis on it.  Whether that -- if I specifically

25   remember August 2008 doing that, I don't remember.  Do I

Page 74

1    remember doing that?  Absolutely, I did that.  So I'm not

2    sure what -- on the timing, if I can help anymore, but

3    that's what I remember clearly doing.

4              THE COURT:  Okay.  All right, thank you.

5    Q    With regards to the summer of 2008, which I think is --

6    is that your recollection, that you do recall doing it in

7    the summer of 2008?

8              THE COURT:  Mr. Regan, it's just -- the problem is

9    that summer is not helpful because summer begins in June and

10   summer ends on September 20th or 21st, I can never remember.

11   So, summer is just not that helpful.

12             MR. REGAN:  I'll try again?

13             THE COURT:  Sure.

14   Q    Do you recall doing that in the June-August time period

15   2008?

16   A    I can't say with 100 percent certainty that I remember

17   doing it in the summer of 2008.  I feel certain that I did

18   but I can't sit there and recall myself sitting at a desk

19   and doing that analysis.  I'm sorry.

20   Q    With that reference to the time period, what is it that

21   you recall doing?

22   A    I would take levels from the traders, I would look at

23   them, I would sit down at my desk and get on my Bloomberg,

24   and I would start looking at the securities themselves and

25   also the CDS.  So, what I described before.  I would look at

Page 75

1   the preferred securities themselves, I would look at CDS and

2   the names in question, I would look at the corporate bonds

3   of the names in question.  And I would, using my own

4   analysis, try to decide if I felt like these were things

5   that were worthy of sending back to a client.  I used the

6   term WAG before.  That -- I was trying to provide the best

7   possible analysis we could with the understanding between

8   the client and Lehman Brothers that what I was providing

9   were quotations and not live actionable markets.

10  Q    Do you recall the results of that analysis that you did

11  at any point in time in 2008?

12  A    I don't.  I don't recall the results of analysis in

13  terms of a numerical response.  I recall finding things that

14  I thought were incorrect and needed to be -- or at least

15  appeared incorrect and needed to be addressed.

16  Q    What do you mean by that?

17  A    I mean, I went back to the trader and I said, "This

18  looks wrong.  Can you take a closer look?"

19  Q    And do you recall -- you don't recall when you did

20  that?

21  A    I don't recall better than to say that it happened in

22  relation to month-end marks, but I don't recall specifically

23  when it happened.

24  Q    Do you recall -- at any point in time did you analyze -

25  - at any point in time in 2008, did you analyze the

Page 76

1   reliability of month-end levels that you had received from

2   the trading desk?

3   A    My process of going back and looking at levels received

4   from traders before I sent them to the clients or, generally

5   speaking, before I sent them to the clients, was a function

6   of my wanting to evaluate their reliability.  So, yes, I was

7   evaluating the reliability of the marks, the levels.

8   Q    And what, if any, conclusions did you reach in 2008 as

9   to the reliability of the marks you received from the

10  trading desk?

11  A    Well, based on analysis and Bloombergs like the one

12  that you showed before where we weren't able to offer

13  protection on Aussie banks, my experience, my recollection

14  is it was -- these month-end marks had become less and less

15  reliable as the bankruptcy approached.  And they were our

16  best efforts to provide information, but they were not

17  actionable levels.  So in that regard they were not

18  reliable.

19       And as I also described before, we did not have a

20  sophisticated client valuations group that would've provided

21  the proper controls for an exercise like this.  This was an

22  exercise -- I remember well -- that was an exercise of

23  trying to piece things together as best we could during a

24  very, very tumultuous time.

25  Q    If you would turn to Exhibit 1293 in your binder...  I

Page 77

1   believe there should be a native spreadsheet attached to

2   that that should hopefully pop up on your screen.  Can we

3   put the spreadsheet on the screen?

4   A    I'm sorry, what number did you say?

5   Q    1293.

6   A    I see it, okay.

7   Q    Do you recognize the hardcopy document that's in your

8   binder that's marked as Exhibit 1293?

9   A    PCDS trade logged --

10           THE COURT:  Hold on.  Yes, Ms. Sawyer?

11           MS. SAWYER:  I just...  I think the question is

12   whether he recognizes the hardcopy document in the binder,

13   and I think his answer was something different

14   so...potentially move to strike or he can ask it again.

15           THE COURT:  Okay, wait.  The hardcopy document in

16   the binder is just an email transmission, right?

17           MS. SAWYER:  Right.

18           THE COURT:  So was the question whether he

19   recognizes this?

20           MR. REGAN:  Do you recognize that page?

21           MS. SAWYER:  Right.  And I think he was looking at

22   the spreadsheet in his answer, so that's potentially part of

23   the confusion because the spreadsheet's up on the screen.

24           MR. REGAN:  We can do it again.

25           THE COURT:  Okay, now I'm completely confused.

Page 78

1    So...okay.

2              MS. SAWYER:  I think the question just needs to be

3    asked again.

4              THE COURT:  Okay.

5              MS. SAWYER:  Just to make sure...

6              THE COURT:  Go ahead.

7    Q    Mr. Neumann, do you recognize the hardcopy page that is

8    in your binder that we've marked as CX-1293?

9    A    Yes.

10   Q    What do you recognize it to be?

11   A    It looks like an email that Megan Philbin created.

12   Q    And what is the date of that email?

13   A    September 15, 2008.

14   Q    And --

15             MS. SAWYER:  Your Honor, I'd ask for some

16   foundation to be laid regarding this document that Mr.

17   Neumann's not copied on.

18             THE COURT:  Fair enough.

19   Q    Who is Megan Philbin?

20   A    Megan Philbin was a trader at Lehman Brothers, who

21   traded among other things PCDF.

22   Q    What is the date of Exhibit 12 -- the cover tab to

23   Exhibit 1293?

24   A    September 15, 2008.

25   Q    If you could take the cover page off the screen...?  Do

Page 79

1     you recognize the attachment to Exhibit 1293?

2          MS. SAWYER:  Your Honor, I don't think we've

3     established any foundation in connection with the cover

4     email.

5          THE COURT:  We haven't.  Unless I'm missing it.  I

6     apologize.  What was the question and answer again with

7     respect to the cover email?

8          MR. REGAN:  What do you recognize it to be?

9          THE COURT:  All right, but the question is --

10         MS. SAWYER:  My objection is that there's been no

11    demonstration that this witness has any personal knowledge

12    about this document, as opposed to just reading the

13    information off the document.

14         THE COURT:  Yes.  Exactly.  Right.  Have you ever

15    seen this document before, Mr. Neumann, that you can recall?

16         MR. NEUMANN:  And by document, you mean the Excel

17    Spreadsheet or do you mean the email?

18         THE COURT:  No.  I mean the email.

19         MR. NEUMANN:  Yeah, the email I don't know.  I

20    don't recall.  Sorry.

21         MR. REGAN:  (indiscernible) may be nearing the

22    end.

23         THE COURT:  Sure.  Okay.  Why don't we come back

24    in five minutes, okay?

25         (Pause)

Page 80

1          THE COURT:  The logistics...?

2          MR. REGAN:  Yes, Your Honor.

3          THE COURT:  Yes.  And we're going to be okay for

4    Monday morning?

5          MR. LISTON:  I'm 99 percent certain that we will

6    and we'll have that confirmed later today.  We didn't have

7    access to his calendar but we understand the desire to have

8    it done on the 27th, and we'll make it so.

9          THE COURT:  Okay.  All right, thank you very much.

10         MS. SAWYER:  Thank you.

11         THE COURT:  All right, we'll come back in five

12   minutes.

13         (Pause)

14         THE COURT:  Good to go?

15         MR. REGAN:  Your Honor, I have no further

16   questions.  After we come back.

17         THE COURT:  Thank you very much.

18         MR. REGAN:  Thank you.

19         THE COURT:  All right.  So, Mr. Neumann, why don't

20   we let you leave, all right?  And we're going to work out

21   the logistics but in any event, you remain under oath and

22   you're not to have, please, any communication with anyone

23   about the case, including members of personnel of QVT, and

24   we'll see you again at some point.  And have a very nice

25   week off.

Page 81

1          MR. NEUMANN:  Thank you, Your Honor.

2          THE COURT:  All right?  Thank you.  We can let him

3   leave and then we'll finish up our logistics.  Thank you,

4   sir.  We can go off the record now, right?  Thank you,

5   Karen.

6       (Whereupon these proceedings were concluded at 1:33 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 82

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya                  Digitally signed by Sonya Ledanski
                            Hyde
6    Ledanski Hyde          DN: cn=Sonya Ledanski Hyde,
                            o=Veritext, ou,
7                           email=digital@veritext.com, c=US
                            Date: 2017.03.24 14:08:15 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 20, 2017