Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                U.S. Bankruptcy Court

13                One Bowling Green

14                New York, NY  10004

15

16                February 28, 2017

17                10:01 AM

18

19

20

21   B E F O R E :

22   HON SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: KAREN / RACHEL\

1    Hearing re: Trial on Lehman's Objection to Claims of QVT

2    (Doc # 17468 Debtors' One Hundred Fifty-Fifth Omnibus

3    Objection to Claims)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    A P P E A R A N C E S :

2

3    HOGAN LOVELLS US LLP

4            Attorneys for QVT FUND LP

5            875 Third Avenue

6            New York, NY 10022

7

8    BY:   NICOLE E. SCHIAVO

9            WILLIAM M. REGAN

10           BEN LEWIS

11           JOHN D. BECK

12           DENNIS H. TRACEY, III

13           ROBIN E. KELLER

14           DARYL L. KLEIMEN

15

16

17

18

19

20

21

22

23

24

25

Page 4

```
 1    JONES DAY

 2          Attorneys for the Debtor

 3          250 Vesey Street

 4          New York, NY 10281

 5

 6    BY:   LAURI W. SAWYER

 7          DAVID P. SULLIVAN

 8          JAYANT W. TAMBE

 9          RYAN J. ANDREOLI

10          JENNIFER L. DELMEDICO

11          REBEKAH BLAKE

12          SARAH EFRONSON

13

14    ALSO PRESENT TELEPHONICALLY:

15

16    CHARLES WITTMANN-TODD

17

18

19

20

21

22

23

24

25
```

Page 5

1                      P R O C E E D I N G S

2            THE COURT:  Good morning, Karen.  Good morning.

3    How is everyone?

4            MAN:  Fine.  Thanks, Your Honor.

5            MR. TRACEY:  Good morning.

6            THE COURT:  Ready?  Ready when you are.

7            MR. TRACEY:  Ready?  Okay.

8            THE COURT:  Yes.

9            MR. TRACEY:  Thank you, Your Honor.

10           MS. KELLER:  Your Honor, good morning.

11           THE COURT:  Good morning, Ms. Keller.

12           MS. KELLER:  One very brief housekeeping matter?

13           THE COURT:  Sure.

14           MS. KELLER:  I think last week the Debtors emailed

15   to your chambers their amended witness list --

16           THE COURT:  Yes.

17           MS. KELLER:  -- and schedule of testimony.  We'd

18   like to hand up a claimant's fifth amended testimony

19   schedule which --

20           THE COURT:  I think I missed the fourth.

21           MS. KELLER:  No, you missed the fourth?

22           THE COURT:  I did miss the fourth.  I think that

23   was a super-secret one that Mr. Tracy had that --

24           MR. TRACEY:  I --

25           THE COURT:  -- he never shared with me.

Page 6

```
 1              MS. KELLER:  I think that's true, Your Honor.

 2              THE COURT:  Right?

 3              MR. TRACEY:  It was the trial bulletin.

 4              THE COURT:  Remember?  It was superseded --

 5              MR. TRACEY:  It didn't fly.

 6              THE COURT:  -- before you could even send it to

 7   me.  So, okay whatever it is.

 8              MS. KELLER:  Well, I thought it was the sixth, but

 9   I'm told it's the fifth.

10              MS. SAWYER:  But, Your Honor --

11              MS. KELLER:  Simply for the purpose --

12              THE COURT:  Well, let Ms. Keller finished.

13              Okay.  Go ahead.

14              MS. KELLER:  -- of bridging so that you have today

15   and tomorrow's witness schedule that --

16              THE COURT:  Okay.

17              MS. KELLER:  -- we'll be presenting.  Your Honor,

18   we recognize that the Debtors have proposed a full day for

19   each of their experts, and we're not seeking to curtail

20   that, we're simply proposing that as each witness finishes,

21   the next begins, if that's possible on a day.  And if we do

22   it that way we may be able to stay within the time period

23   allocated --

24              THE COURT:  Okay.  I'm --

25              MS. KELLER:  -- by Your Honor.
```

Page 7

1              THE COURT:  -- and so now I'm not following you.

2              MS. KELLER:  Okay.  May I hand --

3              THE COURT:  Yes.

4              MS. KELLER:  -- may I approach and hand this up to

5    you?

6              THE COURT:  Sure.  Do you have --

7              MS. SAWYER:  Well, that's my concern --

8    that's my concern, Your Honor.

9              THE COURT:  Okay.  Do you have a --

10             MS. SAWYER:  Is they're proposing a schedule for

11   our witnesses that they're handing to you.

12             But I do have a copy, I just received it --

13             THE COURT:  Do you have a copy?

14             MS. SAWYER:  -- a moment ago.  Yes.

15             THE COURT:  Okay.  So let me get on the same page

16   as all of you.  Okay.

17             MS. KELLER:  So starting today, Your Honor, we

18   have Mr. McDougall.

19             THE COURT:  Yes.

20             MS. KELLER:  And then Mr. Niculescu.

21             THE COURT:   Dr. Niculescu.

22             MS. KELLER:  Dr. Niculescu.

23             THE COURT:  Okay.  And Dr. Niculescu will also be

24   tomorrow?

25             MS. KELLER:  Correct.

Page 8

1            THE COURT:  Right?  And tomorrow we're together

2    for a whole --

3            MS. KELLER:  Did I get it right that Your Honor

4    must finish tomorrow at four?

5            THE COURT:  That's today.

6            MS. SAWYER:  That's today.

7            MS. KELLER:  That's today.  Okay.

8            THE COURT:  With a caveat that -- I'm going to get

9    in trouble, watch this.  The thing -- I have something at

10   four, another Lehman matter.  It's possible that I could get

11   through that in half an hour or 45 minutes.  So if we're at

12   the point in the day where there's something that we could

13   accomplish in an additional 45 minutes to an hour, I would

14   be happy to have you wait.  I would be happy to ask the 4

15   o'clock people, how long do you think you need so that we

16   could continue, rather than send you away at 4 o'clock.

17           If you would rather go away at 4 of course, that's

18   fine, too.  Okay?  So --

19           MS. KELLER:  That sounds fine.  Why don't we see

20   where --

21           THE COURT:  So we can --

22           MS. KELLER:  -- we are.

23           THE COURT:  -- see what happens.

24           MS. SAWYER:  That's fine, Your Honor.

25           THE COURT:  All right.  So that's today.  Tomorrow

Page 9

1    I have no restrictions, right?  I had no restrictions on my

2    time tomorrow whatsoever.  Okay?  So that --

3            MS. KELLER:  Should we start at --

4            THE COURT:  -- that means that --

5            MS. KELLER:  -- 9:30, perhaps?

6            THE COURT:  Okay.  I can do that.  So on your

7    schedule, we're going to amend Wednesday the 1st to be 9:30

8    to 5:30.

9            MS. KELLER:  Yeah.

10           THE COURT:  Okay?

11           MS. SAWYER:  Yes.

12           MS. KELLER:  And then we hope Mr. -- Professor

13   Niculescu -- Dr. Niculescu will be done on the first, but on

14   the chance that he rolls over, we show that in brackets on

15   Tuesday, March 2nd.

16           THE COURT:  Okay.  Thursday, March 2nd.

17           MS. KELLER:  And -- Thursday, March 2nd.

18           THE COURT:  Right.

19           MS. KELLER:  And if he doesn't roll over, or just

20   has a little bit to do, then perhaps Mr. Bruce could start

21   that day.

22           THE COURT:  Okay.  So now we're at the point that

23   it's Lehman's case?

24           MS. KELLER:  Switching to Lehman's, yes.

25           THE COURT:  Okay.  So go ahead, Ms. Sawyer.

Page 10

1          MS. SAWYER:  I mean we have no problems having our

2    witnesses be available to start earlier.  This is not the

3    schedule we proposed, and Ms. Keller called me last week

4    suggesting that maybe we try to limit the examination of our

5    expert witnesses to be able to consolidate the schedule.  I

6    mean I don't -- we don't have any fundamental problem with

7    if Mr. -- or Dr. Niculescu is finished, Mr. Bruce would

8    start, but some of our expert witnesses do have availability

9    issues, so I can't agree --

10          THE COURT:  Sure.

11          MS. SAWYER:  -- to the schedule as written.

12          THE COURT:  Okay.

13          MS. SAWYER:  And so, you know, I think it is

14    something we probably should have discussed before we -- it

15    was proposed on our behalf.

16          THE COURT:  Okay.  But there's -- I mean, all that

17    this does is reflect a way to get -- okay.

18          The morning of the 28th, which is on this

19    schedule, is not a day that I'm available.

20          MS. SAWYER:  I didn't -- we -- I wasn't aware of

21    that. I mean, I wasn't aware that we had court on the

22    morning of the 28th.

23          THE COURT:  The morning of March 28th.

24          MS. KELLER:  Okay.

25          THE COURT:  I have baby judges here all week that

Page 11

1   week.  So we haven't -- according to our books and records,

2   we haven't given you past the 23rd.

3             MS. SAWYER:  That's my understanding, too, Your

4   Honor.

5             THE COURT:  So what I have had open up, just in

6   the last 48 hours, though, is the afternoon of the 29th --

7        (The Court and clerk confer)

8             THE COURT:  the 30th.

9             MS. SAWYER:  The 30th?

10            MS. KELLER:  The 30th.

11            THE COURT:  Yes.  I have the 30th beginning at

12   about 11:30.

13            MS. SAWYER:  Okay.

14            MS. KELLER:  Not the 29th, Your Honor?

15        (The Court and clerk confer)

16            THE COURT:  We could probably do something about

17   the 29th.  Right, but the 30th definitely starting at 11:30.

18            So the point is, I know you want to get done, I'm

19   sure you want to get done, I have increased availability.

20   They're entitled to put on their case the way they want to

21   put on their case, including whether or not, you know, we

22   start a witness with an hour in the day to go.  So I

23   appreciate this, I'll add it to my list -- my stack of

24   schedules and we'll see what happens.

25            MS. SAWYER:  We're certainly committed, Your

Page 12

1    Honor, to be as --

2              THE COURT:  Sure.

3              MS. SAWYER:  -- efficient as possible.

4              THE COURT:  Understood.

5              MS. SAWYER:  And we'll just let you know as to

6    what makes sense, given our witnesses' limitations.

7              THE COURT:  Okay.

8              MS. KELLER:  There's just one other point, Your

9    Honor.

10             THE COURT:  sure.

11             MS. KELLER:  I advised Ms. Sawyer that Kelly Fang,

12   who was listed for the 20th of March, on the Debtor's

13   schedule, is away the last two weeks in March.  She would be

14   available on the 16th or earlier.

15             MS. SAWYER:  I think that's something we can

16   discuss offline.  I don't think --

17             THE COURT:  Sounds good.

18             MS. SAWYER:  -- we need to discuss it at this

19   time.

20             THE COURT:  Okay.  Sounds good.

21             All right.  So for today we know what we're doing,

22   and I think for tomorrow we know what we're doing.  Okay.

23             MS. SAWYER:  Thank you.

24             THE COURT:  And before we get to Mr. McDougall,

25   are we going to -- do you have -- I don't know who I'm

Page 13

1    talking to, but do you have an understanding with respect to

2    what you want to do on Daubert/voir dire of Dr. Niculescu?

3              MR. TAMBE:  So, Your Honor, we'll probably do what

4    we did with Professor Pflederer --

5              THE COURT:  Okay.

6              MR. TAMBE:  -- which is a brief voir dire on scope

7    of opinions and qualifications.

8              THE COURT:  Is that all right?

9              MR. TRACEY:  That's fine.

10             THE COURT:  Okay.

11             MR. TRACEY:  That's fine, Your Honor.

12             THE COURT:  Anything else, housekeeping?

13             All right, so.

14             MR. LEWIS:  QVT calls Christopher McDougall.

15        (The Court and clerk confer)

16             THE COURT:  Ready when you are.

17             MR. LEWIS:  Thank you, Your Honor.

18             THE COURT:  Would you please stand up, Mr.

19   McDougall --

20             MR. MCDOUGALL:  Yes.

21             THE COURT:  -- and raise your right hand.  Do you

22   solemnly swear or affirm that all the testimony you're about

23   to give before the Court shall be the truth, the whole truth

24   and nothing but the truth?

25             MR. MCDOUGALL:  Yes.

Page 14

1          THE COURT:  All right.  Please have a seat and

2    make yourself comfortable.  And let us know at any time if

3    you need a break.

4          MR. MCDOUGALL:  Great.

5          DIRECT EXAMINATION OF CHRISTOPHER MCDOUGALL

6    BY MR. LEWIS:

7    Q    Good morning, Mr. McDougall.  Please, can you state

8    your full name for the record?

9    A    Yes.  Christopher McDougall.

10   Q    And Mr. McDougall, do you recall your deposition on the

11   28th of July 2016?

12   A    I recall that it happened, yes.

13   Q    And have you and I spoken other than during your

14   deposition?

15   A    No.

16   Q    Have you spoken to anyone at Hogan Lovells other than

17   during your deposition?

18   A    I have not.

19   Q    Have you spoken to anyone at QVT other than during your

20   -- since your deposition?

21   A    No.

22   Q    Mr. McDougall, were you previously employed by Lehman

23   Brothers?

24   A    Yes, I was.

25   Q    And when did you begin working there?

Page 15

1   A     Approximately August of 2003.

2   Q     And when did you leave Lehman Brothers?

3   A     Well, I was employed at the date of the bankruptcy

4   filing, that's -- I continued to go to the office for a few

5   more months until things were resolved with severance and

6   such items.

7   Q     And in which group or department at Lehman did you

8   work, immediately after you joined Lehman Brothers?

9   A     At that time I was in the mortgage middle office group.

10  Q     And what was your title at that time?

11  A     I believe it was senior analyst.

12  Q     And did you change groups or departments at any time

13  while you were employed by Lehman?

14  A     Yes.

15  Q     And when was that?

16  A     Approximately August of '04.

17  Q     And into which group did you move?

18  A     I joined the structured finance trading desk.

19  Q     And did you stay in the structured finance trading

20  group from 2004 until the time that you left Lehman?

21  A     Yes.

22  Q     And did your title change at any point during your time

23  with Lehman?

24  A     Yes.

25  Q     What did it change from and to, if you recall?

Page 16

1    A    I know that it changed to vice president.

2    Q    And what did you do after you left Lehman?

3    A    Can you be more specific?

4    Q    Sure.  Did you undertake any further studies after

5    leaving Lehman?

6    A    Yes.  I attended a master's program.

7    Q    And by whom are you currently employed?

8    A    A company called Eastern Generation.

9    Q    And what line of business -- what line of business are

10   they in?

11   A    Probably it's in the energy industry.

12   Q    Thank you.  Now Mr. McDougall, during your time at

13   Lehman Brothers, what categories of securities did you

14   trade?

15   A    The book was generally known as the consumer ABS book,

16   asset backed securities book.  So credit card loans -- or

17   securities backed by credit card debt, auto loans, student

18   loans primarily.

19   Q    And during your time at Lehman Brothers did you ever

20   trade a product known as CARB?

21   A    Yes.

22   Q    And do you recall anyone else at Lehman trading CARB,

23   apart from yourself?

24   A    Yes.  I believe Mr. McNiff traded CARB as well.

25   Q    Did you consider yourself to be Lehman's primary CARB

Page 17

1   trader?

2   A    During the period that I traded it, I would consider

3   myself the primary trader.

4   Q    I'm taking you a step back.  Please, could you describe

5   your understanding of the CARB product for the Court?

6   A    CARB was a derivative product that referenced a series

7   of auto loan securitizations.

8   Q    And when you say a reference to a series of auto loan

9   securitizations, did CARB reference any particular tranches

10  of those securitizations?

11  A    The -- the securities that I recall trading or the CARB

12  product that I recall trading referenced the Triple B

13  tranches of those securitizations.

14  Q    And do you recall how many auto ABS deals were

15  referenced by CARB?

16  A    I believe it was eight.

17  Q    And do you recall how it was determined, at CARB's

18  inception, which auto ABS deals would be referenced by CARB?

19  A    I recall working -- I recall reviewing the

20  securitizations on the market at the time, and -- and

21  proposing the basket of eight securities that CARB should

22  reference.

23  Q    And how would you describe the basket of eight

24  securities that CARB did reference?

25  A    They were issued by GM and Ford, four and four, I

Page 18

```
 1    believe was the split.

 2    Q    And how did CARB reference those eight underlying

 3    (indiscernible)?

 4    A    Can you be more specific?

 5    Q    Sure.  Was the performance of CARB in any related to

 6    the underlying -- the eight underlying auto ABS deals?

 7             MS. EFRONSON:  Objection.  Leading.

 8             THE COURT:  Why don't you ask it a different way?

 9             MR. LEWIS:  Of course.  Right.

10    Q    Was there any relationship, in terms of performance,

11    between CARB and the securities that it referenced?

12    A    Generally, yes.

13    Q    How so?

14    A    So in the -- on a day to day basis, you know to the

15    extent that it traded, CARB traded at a value at which it

16    traded kind of independent, but the sort of long term payout

17    of a CARB position would depend upon the performance of the

18    underlying securities.

19    Q    Did you trade CARB as eight individual CDS or at one

20    package?

21    A    As one package.

22    Q    And were you involved in the development of the CARB

23    product?

24    A    Yes.

25    Q    Are you aware of any discussions with anyone at QVT, in
```

Page 19

1    relation to CARB, while it was being developed?

2    A    Yes.

3    Q    And with whom were those discussions had?

4    A    Arthur Chu.

5    Q    Mr. McDougall, you should have in front of you a binder

6    of documents and there are tabs on the outside.  If you

7    could turn, please to document that is CX-1127.

8    A    Excuse me.

9    Q    And if it helps, John will put up a soft copy of the

10   document on the screen as well.  And do you recognize this

11   document?

12   A    I don't specifically recall this -- this document, but

13   I see it.

14   Q    Do you see that it was sent from an email address

15   cmdougall1@bloomberg.net?

16   A    Yes.

17   Q    Was that your Bloomberg address on January 16th, 2008?

18   A    I believe so.

19   Q    Do you have any reason to believe that you did not send

20   this message?

21   A    No.

22   Q    And do you see, looking at the attachments line, that

23   there are four attachments to this message?

24   A    Yes.

25   Q    If we could quickly look at those attachments one by

Page 20

1     one.  The first one runs from the second page and if it

2     looks at the bottom right-hand corner, there's a number.  So

3     the first document runs from LEH-QVT_0008626 --

4                MS. SAWYER:  Objection.  Relevance.

5                THE COURT:  Well, I don't -- it depends on what

6     the question is going to be.  Is it objection to relevance

7     or something else?

8                MS. SAWYER:  May I approach?

9                THE COURT:  Okay.  Come on up.

10         (Bench conference not recorded)

11                THE COURT:  Okay.  So the pending question was

12    asking you, Mr. McDougall, to look at the first attachment,

13    I believe, yes?

14                MR. MCDOUGALL:  Yes.

15    Q    And Mr. McDougall, if it helps, that first attachment

16    runs from Page 8626 to 8648.  And my question is simply what

17    do you recognize this document to me?

18    A    I recognize it as what it says it is.  I believe it

19    would generally be described as an ISDA document.

20    Q    And looking at the second attachment, which runs from

21    8649 through to 8671, what do you recognize that document to

22    be?

23    A    This -- looking at it briefly right now, it's -- is it

24    the same document?  I believe it's the same document.

25    Q    And then turning to the third attachment, which starts

Page 21

1    at Page 8672 and runs to Page 8681.

2    A    Yes.

3    Q    What do you recognize that document to be?

4    A    This is a piece of Lehman Brother's research from the

5    U.S. MBS/ABS strategy team.

6    Q    And did this research piece relate to the CARB product?

7    A    Yes.  It's an introduction to CARB.

8    Q    And then turning to the fourth and final attachment,

9    which begins at Page 8682 and runs to the last page, 8708.

10   Same question, what do you recognize that document to be?

11           MS. SAWYER:  Objection.  Foundation.

12           THE COURT:  Yeah, we are at the point of there not

13   being any foundation for this.  This is simply asking the

14   witness to identify documents and not even establishing that

15   he has any recollection from the date of the documents.  So

16   I think before we go any further you need to lay the

17   foundation.

18   Q    Okay.  Mr. McDougall, you testified that the research

19   piece related to CARB; is that correct?

20   A    Yes.

21   Q    And does the slide deck beginning on Page 8682 also

22   relate to CARB?

23           THE COURT:  It's not a question of whether or not

24   these documents relate to CARB.

25   Q    Mr. McDougall, were these marketing materials sent to

Page 22

1    your clients in relation to CARB?

2              THE COURT:  Mr. McDougall, let me interject.  It's

3    2017, this is a document dated 2008.  If you remember

4    specifically, please tell us. If you don't remember, you're

5    obligated to tell us that as well.  It's perfectly -- it's

6    an everyday occurrence that people cannot recollect things

7    that happened that long ago, so the questions are simply

8    designed to ask you for your best recollection as you sit

9    here today.  Don't assume, don't speculate, simply give us

10   your best recollection.  All right?

11             MR. MCDOUGALL:  Yes.  Thank you.

12             THE COURT:  All right.

13             MR. MCDOUGALL:  The one thing I checked -- well

14   the undisclosed recipients, so I don't.

15   Q    Mr. McDougall, if I could show you a document which

16   might help refresh our recollection on this.  Could you turn

17   to exhibit DX-5040 in your book?

18   A    5040?

19   Q    Yes, please.  And looking at the lower message in that

20   chain, from yourself, and if you could look at the portion

21   of the message that has two asterisks next to it.  Does this

22   refresh your recollection as to whether the research piece

23   and presentation slides were distributed to Lehman's

24   clients?

25             MS. SAWYER:  Objection.  Foundation.

Page 23

1          MR. MCDOUGALL:  Not necessarily.

2          THE COURT:  Hold on.

3      (Bench conference not recorded)

4   Q    Mr. McDougall, turning back to Exhibit 1127, do you

5   have a recollection today as to whether you distributed the

6   research piece and the slide deck to Lehman's clients in the

7   2007 to 2008 time period?

8   A    I don't recall specifically who that email went to.

9   Q    But do you have a recollection, at all, as to whether

10  those two documents were sent to Lehman's clients, at that

11  point in time?

12  A    Sorry, could you repeat the question?

13  Q    Your answer was that you didn't recall specifically who

14  that email went to, and the separate question was whether

15  you had a recollection as to whether those documents were

16  sent to Lehman's clients in the time period between 2007 and

17  Lehman's filing.

18  A    I don't recall.

19  Q    And turning back to the first page of Exhibit 1127, in

20  your email you say that Markit will, "handle the marketing

21  of CARB."  What did you mean by that?

22          MS. SAWYER:  Objection.  Foundation.

23          THE COURT:  Well, those are his words, so he --

24  you can answer, Mr. McDougall.

25          MR. MCDOUGALL:  So I believe --

08-13555-mg    Doc 55106    Filed 03/24/17    Entered 03/27/17 11:12:57    Main Document
Pg 24 of 157

1           THE COURT:  Let me clarify.  You can answer as to

2    your understanding.

3           MR. MCDOUGALL:  Um hmm.

4           THE COURT:  But to the extent that the question

5    asks for you to give a view about what -- independently

6    about what Markit might have been doing, that's outside the

7    scope of the question.

8           MR. MCDOUGALL:  Okay.  I believe it was

9    referencing the fact that we were having conversations with

10   Markit to have them -- it says "marketing of CARB to the

11   rest of the dealer community," so to increase the number of

12   banks that traded CARB.

13   Q    And you say that that would create better liquidity.

14   What did you mean by that?

15   A    The thought at the time was more dealers trading a

16   product and Markit administrating the product could lead to

17   better liquidity in the product.

18   Q    Okay.  And in Paragraph 2 you say that, "We believe

19   from this point CARB could be up and running, as part of the

20   Markit indexes, relatively soon."  What did you mean by

21   that?

22   A    I was putting forth the idea that something would work

23   out with Markit, in terms of having them market and

24   administrate this product and we would move forward

25   relatively soon.  I don't know what kind of time horizon I

Page 25

1    was referring to.

2    Q    And do you know whether CARB was ultimately included in

3    those Markit indices?

4    A    It was not.

5    Q    And what was your understanding as to why CARB was not

6    included in the Markit indices?

7    A    As far as I recall today, the dealer community was not

8    as interested in trading the product as we maybe initially

9    thought.

10   Q    And Mr. McDougall, if you turn to the back of Exhibit

11   CX-1127, and three pages from the back, on Page 8706 there's

12   a list of contacts at Lehman Brothers.  Is that what you

13   understand Page 8706 to reflect?

14   A    That page was contact information, yes.

15   Q    And is that your contact information listed as at that

16   point in time?

17   A    Yes.

18   Q    And do you know to whom this contact information was

19   provided, in the 2007, 2008 period?

20   A    It was provided to many people.

21   Q    Please, could you summarize the categories of people

22   outside Lehman to whom this contact if was provided, in

23   relation to the CARB product in that time period?

24   A    Clients.

25   Q    And did Lehman's clients contact you, in that time

Page 26

```
 1   period, in relation to the CARB product?

 2   A    Yes.

 3   Q    And did you have communications, during that time

 4   period, with Lehman's clients, in relation to the CARB

 5   product?

 6   A    Some of them, yes.

 7   Q    Did you have communications with anyone at QVT during

 8   that time period related to the CARB product?

 9   A    I believe so.  I'm just pausing on the time period that

10   we're thinking about.  Is this in the same time period as

11   the email, I guess?

12   Q    The time period I had in mind was from the inception of

13   CARB to Lehman's filing.

14   A    Okay.

15   Q    What would that time period represent to you?

16   A    So this is the time period of CARB's existence and

17   Lehman Brother's operating as an ongoing concern?  Yeah, so

18   late 2007 through September of 2008.

19   Q    And did CARB trade after Lehman filed for bankruptcy,

20   as far as you know?

21              MS. EFRONSON:  Objection.

22              THE COURT:  I'm sorry, I was looking at an

23   exhibit, and I missed the question --

24              MR. LEWIS:  I can rephrase --

25              THE COURT:  -- and the objection.
```

Page 27

```
 1              MR. LEWIS:  -- if that's --

 2              THE COURT:  Okay.  Go ahead.

 3    Q    To your knowledge, did CARB trade after Lehman's filing

 4    in 2008?

 5    A    Not that I know of.

 6    Q    So within the time period from CARB's inception in late

 7    2007 to Lehman's collapse in September 2008, did you

 8    communicate with anyone at QVT in relation to the CARB

 9    product?

10    A    Yes.

11    Q    And who was that?

12    A    Arthur Chu.

13    Q    And do you recall whether you provided any written

14    materials to Mr. Chu in relation to the CARB product?

15    A    I don't recall.

16    Q    And Mr. McDougall, could you please turn to Exhibit

17    2162?

18    A    Sorry, what was the --

19    Q    Oh, sorry.  2162.

20    A    What were the first letters?

21    Q    CX.

22    A    2162?  Okay.

23    Q    Thank you.  And at the top there's an email from Mr.

24    Charles Spero at Lehman, to Mr. Chu, copying yourself.  Who

25    is Mr. Spero, at this point in time?
```

Page 28

```
 1   A    I don't know his specific title, but he was a senior

 2   member of the trading desk I worked on, the structured

 3   finance trading group.

 4   Q    And if you look at the earliest message in this chain,

 5   from a Mr. David De Luca, to Arthur Chu, copying Ian

 6   Kennedy, do you see that at the bottom of that message there

 7   are two attachments, CARB Index Prima Final and CARB

 8   Presentation -- CARB Prima Presentation.pdf.  Who was

 9   Mr. De Luca -- what role did Mr. De Luca fulfill at Lehman

10   at this point in time, if you know?

11   A    I don't know.

12   Q    And do you know what those documents, CARB Index Prima

13   Final.pdf and CARB Prima Presentation.pdf, do you know what

14   those documents were?

15           MS. EFRONSON:  Objection, Your Honor.  We don't

16   have the attachments here.

17           MS. SAWYER:  And it's not his email.

18           MS. EFRONSON:  And it's not his email.

19           THE COURT REPORTER:  I can't hear you.

20           MS. EFRONSON:  Objection.  The attachments are

21   missing, and it's also not Mr. McDougall's email.

22           THE COURT:  Do we have the attachments?

23           MR. LEWIS:  Your Honor, if we turn -- if you --

24   Mr. -- if everyone could keep one finger in this exhibit and

25   then turn to Exhibit 2158.  You'll see it's CX-2158.
```

Page 29

```
 1              MS. SAWYER:  Objection, Your Honor.

 2              THE COURT:  Yes?

 3              MS. SAWYER:  This document doesn't have Mr.

 4     McDougall.

 5              THE COURT:  Okay.  Karen tells me to speak up.  So

 6     take that microphone away from Mr. Tambe and pull it --

 7     okay.

 8              So we are -- you have us in 2162.  Now we're in

 9     2158 --

10              MR. LEWIS:  Yes --

11              THE COURT:  -- which has the attachments?

12              MR. LEWIS:  So I think, Your Honor, it's the same

13     email chain?

14              THE COURT:  Yes.

15              MR. LEWIS:  2162 is a reply which copies Mr.

16     McDougall.  2158 is Mr. Chu's email, which includes the

17     attachments.

18          (Counsel confer)

19              MS. SAWYER:  Your Honor, this calls for

20     speculation, because we just don't know if they're the same

21     attachments.

22              THE COURT:  Could you come up again, please?

23          (Bench conference not recorded)

24              THE COURT:  Here you go.

25              MAN:  May I approach, Your Honor?
```

1          THE COURT:  Sure.  I'm giving you my best Post-

2     its.

3          MAN:  I appreciate it.  I will return it.  Excuse

4     me.

5     Q    Mr. McDougall, while you were at Lehman, apart from

6     CARB, did you trade any other auto loan backed derivative

7     products?

8     A    Not that I recall.

9     Q    And while at Lehman, were you aware of anyone else at

10    Lehman who trade day other auto loan backed derivative

11    products?

12    A    Not that I call.

13    Q    Did you ever trade, while at Lehman, the individual

14    component CDS of CARB?

15    A    Not that I recall.

16    Q    And are you aware of anyone else at Lehman who traded

17    the individual component CDS of CARB?

18    A    I am not.

19    Q    Did Lehman make two way markets in CARB?

20    A    Yes.

21    Q    And are you aware of any other dealers who were making

22    two way markets in CARB, at any point in time?

23    A    I am not aware of that.

24    Q    And are you aware of anyone, apart from Lehman or

25    Lehman's counterparties, who traded CARB?

Page 31

```
 1    A    I am not.

 2    Q    Did you ever trade CARB with any other dealer?

 3    A    Not that I recall.

 4    Q    And are you aware of anyone making a two way market on

 5    the component CDS of CARB?

 6    A    I am not aware of that.

 7    Q    While at Lehman, did you send out CARB runs offering to

 8    sell or buy protection in CARB?

 9    A    Yes.

10    Q    And did those runs include the prices at which Lehman

11    was willing to transact in CARB?

12    A    Yes.

13    Q    Did you send any CARB runs to QVT?

14    A    It's possible.

15         THE COURT:  Could we have a time frame on the

16    question, please?

17         MR. LEWIS:  Sorry.  Yeah.

18    Q    Between CARB's inception in late 2007 and the 15th of

19    September, 2008 did you send any CARB runs to QVT?

20    A    It's possible.

21    Q    Were you determined -- were you responsible for

22    determining the bid offer spread used in CARB?

23    A    During the time frame that I was trader, yes.

24    Q    And how did you calculate the bid offer spread used in

25    CARB runs?
```

```
 1   A     It wasn't so much of a calculation as a sort of market

 2   based judgment.

 3   Q     And what factors went into that judgment call?

 4   A     Excuse me.  The -- sorry, repeat the question.

 5   Q     Sure. That -- if -- there's a bottle of water there if

 6   you want.  What factors went into that judgment call?

 7   A     The things we considered in making markets on CARB, as

 8   far as I recall, included conditions -- market conditions in

 9   the ABS market, market conditions in the sort of broader

10   credit markets, and then kind of our positioning in the

11   product, and kind of relevant data points.

12   Q     And, when you speak about your -- Lehman's positioning

13   in the product, did you consider whether, on an aggregate

14   basis, Lehman was net long or net short CARB in determining

15   prices in the bid offer spreads?

16   A     Generally, that would be something I would have in

17   mind.

18   Q     And, as far as you recall, did you ever use Intex to

19   price CARB?

20   A     Not that I recall.

21   Q     What was the typical size of each CARB transaction?

22   A     I don't recall.

23   Q     And, in setting the price levels in the bid/ask

24   spreads, in the CARB runs, did you ever use a model to

25   arrive at those numbers?
```

Page 33

1    A    Sorry, can you repeat the question?

2    Q    Sure.  Did you ever use a model to arrive at the price

3    levels of bid/ask spreads used in the CARB runs?

4    A    A model would be used to translate a given spread to a

5    price that we would then quote.  But there was more of an

6    input than sort of a driver of the market that we would

7    quote.

8    Q    And, when you talk about a model translating spread to

9    price, would that be the CDSW screen in Bloomberg?

10   MS. EFRONSON:  Objection, leading.

11   MR. LEWIS:  I can rephrase, sorry.

12   THE COURT:  Okay.

13   Q    When you testified about a model used to translate

14   spread to price, what model were you referring to?

15   A    I believe my colleague, John Lee, maintained a model

16   that would help calculate that.

17   Q    And was anyone beside yourself responsible for

18   calculating the bid and offer levels on the two-way CARB

19   markets that Lehman was publishing?

20   MS. EFRONSON:  Objection, calls for speculation.

21   THE COURT:  Could you repeat the question?

22   MR. LEWIS:  Was anyone apart from yourself responsible for

23   calculating the bid/offer levels on the two-way CARB markets

24   that Lehman was publishing?

25   THE COURT:  If you know, you can answer.

Page 34

1    MR. MCDOUGALL:  During the time that I was the trader on

2    CARB, I would determine the bid and offer.

3    Q    And during which time period were you the trader on

4    CARB?

5    A    I believe the time period was late 2007 to early 2008.

6    Q    Mr. McDougall, please can you turn to Exhibit CX1132?

7    Do you recognize this message exchange?

8    A    I don't recall it specifically, but I see it.

9    Q    And who is Mr. -- what role did Mr. McNiff perform at

10   Lehman at this point in time?

11   A    Not sure of his title, but he was another senior member

12   of the trading team, I know more senior than I.

13   Q    And, if you look at the lower message, it's -- it

14   appears to be from yourself, on the 5th of February, 2008.

15   What do you recognize that document to be?

16   A    Can you be more specific?

17   Q    Do you see the message -- the lowest message on the

18   page?

19   A    Yes.

20   Q    At 8:36?

21   A    Yes.

22   Q    Oh.  What do you understand that message to be

23   conveying to its recipient?

24   A    Yes.  That looks like a run, as we've been calling it,

25   an indication of bid and offer prices for CARB tranches.

Page 35

1    Q    And, if you look at the line that starts, "CARB 07-

2    1BBB," at what price was Lehman offering to buy and to sell

3    CARB as of this date?

4    A    Per this document, Lehman would buy at 84 and sell at

5    86.

6    Q    And do you have any reason to believe that you didn't

7    send this document on the 5th of February?

8    A    I do not.

9    Q    And below that, there are -- there's a reference to

10   CARB 07-1AAA and CARB 07-1A.  Did you ever trade those CARB

11   securities?

12   A    I don't believe so.

13   Q    To your knowledge, were those tranches of CARB ever

14   traded?

15   A    I don't believe so.

16   Q    Which tranches of CARB do you understand to have been

17   traded?

18   A    I know I traded the BBB.

19   Q    And then Mr. McNiff responds, and he says, "Do you look

20   at where GM and FMCC CDS is trading when you quote this?"

21   What did you understand him to be asking you?

22   A    Recalling from where I sit today, he's asking me if I

23   look at GM and Ford, the issuers on the securities within

24   CARB, if where their corporate parents are trading in the

25   corporate credit markets.

Page 36

1   Q     And, if you look at your response, which is the top

2   message, what did you mean by, "Yeah, was bidding at wide

3   FMCC at one point"?

4   A     I believe, on a spread basis, I'm saying the bid, the

5   spread that corresponded to what in this example is 84, was

6   greater than where FMCC was trading in the corporate credit

7   markets.

8   Q     And then you go on to say, "Arthur started covering

9   then and brought it back up."  What did you mean by that?

10  A     To the best that I recall, I believe I'm saying Arthur

11  at QVT was covering, meaning taking the opposite direction

12  of their original position, and that caused the market for

13  CARB to go higher.

14  Q     So, did you understand Arthur's trading, or Mr. Chu's

15  trading, to have moved the CARB market?

16  MS. EFRONSON:  Objection, leading.

17  THE COURT:  Sustained.

18  Q     Did you have an understanding at this point --

19  THE COURT:  Could we -- could you ask the witness about the

20  last sentence in the top email, please?

21  MR. LEWIS:  Oh, sure.

22  Q     Mr. McDougall, you say from there, "Have just moved it

23  with auto CDS moves that have been through."  What did you

24  mean by that?

25  A     I believe I'm saying... the auto CDS reference is

Page 37

1    another way of speaking about the GM and FMCC spreads.  So,

2    just under -- you know, underscoring the idea that I'm

3    following what GM and FMCC are doing, kind of directionally.

4    Q    And, when you said, "Arthur started covering then and

5    brought it back up," did you have an understanding as to

6    whether Mr. Chu's trades had an effect on the CARB market?

7    MS. EFRONSON:  Objection, leading.

8    THE COURT:  Could we limit the question to what he meant by

9    the words on the page?

10   Q    When you say "brought it back up," what did you mean by

11   that?

12   A    I believe I'm referencing the price of CARB BBB.

13   Q    And what had caused the price of CARB BBB to be brought

14   back up?

15   A    Based on this email, I'm saying Arthur's covering.

16   Q    Thank you, Mr. McDougall.  If you could turn, please,

17   to Exhibit --

18   THE COURT:  I'm sorry.  Before you leave this page, could

19   you -- Mr. McDougall, could you just explain what the words

20   at the very end of the top block, "but have been through,"

21   means?

22   MR. MCDOUGALL:  So, I believe what I'm saying is that,

23   whereas, initially in this statement, I was saying wide to

24   FMCC CDS, now I'm saying we're through, so tighter than

25   where that was previously.  So, through is kind of a way of

Page 38

1   saying tighter in the -- on a -- when thinking about these

2   products on a spread basis.

3   THE COURT:  Okay.  Thank you.

4   Q    Mr. McDougall, one last question on this one.  When you

5   refer to FMCC in your -- in the top line of your top email,

6   is it your understanding that you were referring to Ford,

7   the carmaker, or to a different Ford entity?

8   MS. EFRONSON:  Objection, leading.

9   MR. LEWIS:  I can rephrase it.

10  THE COURT:  Okay.

11  Q    When you refer to FMCC, which Ford entity were you

12  referring to?

13  A    I think that reference is specifically the Ford Motor

14  Credit Corp, if I recall correctly, so their financing arm.

15  Q    And what's your understanding of any difference between

16  Ford and FMCC in terms of the type of business they do?

17  A    I believe one arm is the manufacturer and one arm --

18  the credit corporation is the consumer finance portion of

19  the business.

20  Q    Mr. McDougall, if you could please turn to Exhibit

21  CX1132?  Oh, sorry, 1131, one page -- one prior.  And the

22  bottom email here is a message from Jaime Aldama to yourself

23  and Mr. Spero, 5th of February, 2008.  Mr. Aldama's email

24  states that Markit is in talks with a consortium of dealers

25  to launch an index linked to auto ABS securities.  And Mr.

Page 39

1   Spero responds, copying yourself, and says that he assumes

2   they're speaking of CARB.  Did you have the same

3   understanding at this point in time?

4   MS. EFRONSON:  Objection, calls for speculation.

5   THE COURT:  If you recall, you can answer, Mr. McDougall.

6   MR. MCDOUGALL:  It seems reasonable that I would think that

7   as well.

8   Q    And the text of Mr. Aldama's email states that, quote,

9   "The specter of rising delinquencies on auto loans has many

10  looking for ways to hedge against their exposure in that

11  sector of the ABS market," and then goes on to say that

12  investors were interested in, quote, "shorting the auto

13  sector of the ABS market, particularly the subordinate

14  tranches."  Is that consistent with your understanding at

15  this point in time?

16  MS. EFRONSON:  Objection, mischaracterizing the document.

17  THE COURT:  Would you refocus us on the section that you're

18  looking at, please?

19  Q    So, Mr. McDougall, if you look at Mr. Aldama's email on

20  Exhibit CX1131, and the bottom half of that email, there's a

21  sentence that begins, "The specter of rising delinquencies

22  on auto loans has many looking for ways to hedge against

23  their exposure in that sector of the ABS market."  And then

24  it goes on to say that investors were -- or certain

25  investors were interested in shorting the auto sector of the

Page 40

1   ABS market, particularly the subordinate tranches.  And the

2   question was whether that was -- that description was

3   consistent with your understanding at the time.

4   A    I don't know.

5   Q    Fair enough.  And there's a reference here to the

6   subordinate tranches of auto ABS.  Did CARB BBB reference

7   subordinate tranches of auto ABS?

8   A    Yes.

9   Q    And, Mr. McDougall, if you could please turn to Exhibit

10  1144?  And what do you recognize this exhibit to be?

11  A    This appears to be a Bloomberg exchange or email.

12  Q    And who is --

13  A    An exchange between myself and Xavier Goss.

14  Q    And who is Xavier Goss?

15  A    As far as I recall, he was an ABS -- he was a client at

16  Blackrock.

17  Q    And you say, "Working with Markit is dead at this

18  point.  Will continue to quote CARB to provide liquidity to

19  guys that have been involved, but it barely trades at this

20  point."  What did you mean by that?

21  A    So, it appears the Markit initiative discussed earlier

22  is not going anywhere.  And this is me saying we'll continue

23  to make -- to quote markets in the product, but that, you

24  know, trading activity is low at this point.

25  Q    And when you say "it barely trades," were you referring

Page 41

1    to CARB?

2    A    I believe so, yes.

3    Q    And then you reply to Mr. Goss, "The dealers that came

4    to us originally faded."  What did you mean by that?

5    A    I believe I'm saying the indications that we had sort

6    of based our thinking on to go to market with had changed.

7    Q    And, Mr. McDougall, if you don't mind turning to the

8    next one, which is CX1145?  What do you recognize this

9    exhibit to be?

10    A    So, at the top, it's me forwarding a message to -- or

11    looks like an internal group, and the below message is a

12    message from Markit.

13    Q    And, in that below message from Markit, it states,

14    quote, "Markit has received an indication from the broad

15    dealer group that there is insufficient interest in moving

16    forward with the development of this index."  Did you

17    understand that statement to relate to the CARB product?

18    A    I think he's referencing a product called ABX.Auto,

19    which I believe was -- in the conversations we were having,

20    was analogous to CARB.

21    Q    And Mr. Logan says that there was insufficient interest

22    in moving forward.  Was that consistent with your

23    understanding at the time?

24    A    I believe so.

25    Q    And Mr. Logan goes on to say, if and when there is a

Page 42

1   renewed desire to bring the product to market, we look

2   forward to working with you.  Are you aware of any renewed

3   desire to bring the CARB product to market?

4   A    I don't know.

5   Q    So, Mr. McDougall, if you look at the period between

6   the 1st of August, 2008, and the 15th of September, 2008,

7   apart from Lehman, are you aware of any other dealer trading

8   CARB during that period?

9   A    Not that I'm aware of.

10  Q    And do you recall Lehman entering any trades in CARB in

11  September 2008?

12  MS. EFRONSON:  Objection, foundation.

13  THE COURT:  You can answer, if you know, to the extent that

14  you know.

15  MR. MCDOUGALL:  Sorry, can you repeat the question?

16  Q    Do you recall Lehman entering any trades in CARB in

17  September of 2008?

18  A    I don't recall.

19  Q    And do you recall how many CARB counterparties had open

20  positions with Lehman at the time Lehman filed for

21  bankruptcy?

22  A    I don't know.

23  Q    If you could, please turn to Exhibit CX1263.  There's a

24  hard copy of the email in your binder, and then John will

25  put a copy of the attachment up on your screen.  The email

Page 43

1   is from a Mr. James Whitticom.  That's -- Linda, that's W-H-

2   I-T-T-I-C-O-M.  And what role did Mr. Whitticom fulfill at

3   Lehman at this point in time?

4   A    He was another member of the structured finance trading

5   team.

6   Q    And, if you look at the Excel document --

7   THE COURT:  Hold on one second.  Yes?

8   MS. EFRONSON:  Objection, foundation, Your Honor.

9   THE COURT:  Are you going to get there?

10  MR. LEWIS:  I'm just going to ask if this refreshes his

11  recollection as to the open positions.

12  MS. EFRONSON:  We would ask that the spreadsheet gets

13  removed until there's foundation.

14  Q    I think you testified that Mr. Whitticom had a role in

15  the ABS team at Lehman; is that correct?

16  A    He was another member of the team, yes.

17  Q    And do you have an understanding of what Mr. Whitticom

18  was sending to himself on the Sunday the 14th of September,

19  2008?

20  MR. LEWIS:  Let me retract that one.

21  THE COURT:  Good idea.

22  MR. LEWIS:  Thank you.  Thank you.

23  Q    Did Mr. Whitticom have any involvement with the CARB

24  products, to your knowledge?

25  A    Can you be more specific?

Page 44

1   Q    What is your understanding as to Mr. Whitticom's

2   involvement, if any, in the -- in relation to the CARB

3   product?

4   A    I don't recall.

5   Q    Did -- are you aware of whether Mr. Whitticom had any

6   role in recording Lehman's trades in the CARB product?

7   MS. EFRONSON:  Objection, calls for speculation.

8   THE COURT:  If he knows.  If you know.

9   MR. MCDOUGALL:  I don't recall specifically Mr. Whitticom's

10  responsibilities.

11  MR. MCDOUGALL:  Your Honor, may we approach quickly?

12  THE COURT:  Okay.  None of this is a reflection on you.

13  But, secondly, we're going to take a break now, since you've

14  been up there for an hour.  So, we'll come back in 10

15  minutes, by which time we'll have resolved this issue.  You

16  remain under oath during the break.  Please do not discuss

17  your testimony or the case with anyone or be in anyone's

18  presence while they're doing the same.  All right?  We'll

19  resume at 11:15 as a group.  Do you want to do this here or

20  do you want to step into the conference room?

21  MR. MCDOUGALL:  Whatever Your Honor prefers.

22  THE COURT:  Why don't we step in the conference room so I

23  can look at what you're trying to show me?

24  CLERK:  Recess.

25  (Recess)

Page 45

1    THE COURT:  All right?  Everyone ready?  Okay.

2    Q    Mr. McDougall, you testified previously about the time

3    period in which you traded CARB.  What was that time period?

4    A    From what I recall, it was -- I believe I said late

5    '07, early '08.

6    Q    And did anyone take over your responsibilities for

7    trading CARB?

8    A    I believe Mr. McNiff took on the trading of CARB.

9    Q    And do you recall when he took on those

10   responsibilities?

11   A    Not specifically, no.

12   Q    Mr. McDougall, could you please turn to an exhibit --

13   it's at the front of your book; it's Exhibit JX39?

14   A    Okay.

15   Q    And, if you turn to Page 60523?  And, if your eyesight

16   is very good, nine lines up from the bottom, do you see your

17   name and email address there?

18   A    I do.

19   Q    And then, turning to the last page of the exhibit,

20   60525, and looking at the subject line, what do you

21   understand that subject line to represent?

22   MS. EFRONSON:  Objection.

23   THE COURT:  Yes?

24   MS. EFRONSON:  Foundation.

25   THE COURT:  Did you receive this email, Mr. McDougall?

Page 46

1   MR. MCDOUGALL:  I believe so, based on my email being in the

2   recipient list.

3   THE COURT:  Okay.  All right.  You -- can you ask the

4   question again, please?

5   MR. LEWIS:  Sure.

6   Q    Mr. McDougall, do you have any reason to believe you

7   did not receive this email?

8   A    I do not.

9   Q    And what do you understand the subject line of this

10  email to represent?

11  A    This is a market on the CARB BBB.

12  Q    And, as at this date, August 21st, 2008, at what price

13  was Lehman offering to buy and to sell CARB?

14  A    Lehman would buy at 77 and sell at 81.

15  Q    And are you aware of any CARB BBB runs sent out by

16  Lehman after 21st of August, 2008?

17  A    Not that I'm aware of.

18  Q    Mr. McDougall, did traders at Lehman have any

19  responsibility for marking their own books?

20  A    I believe generally that was a responsibility of a

21  trader, for the products they traded.

22  Q    And how often were traders supposed to do that?

23  A    I remember it being a daily process.

24  Q    And did that responsibility also extend to the CARB

25  trades?

Page 47

1   A    I don't see why CARB would be different.

2   Q    And do you specifically recall marking your book in

3   relation to CARB positions during the period that you were

4   trading CARB?

5   A    I do not.

6   Q    And do you specifically recall changing Lehman's daily

7   CARB marks in relation to the prices at which Lehman was

8   quoting CARB in its runs at that time?

9   MS. EFRONSON:  Objection, leading.

10  THE COURT:  You can answer the question.

11  MR. MCDOUGALL:  Can you repeat the question?

12  MR. LEWIS:  Sure.

13  Q    Do you specifically recall changing Lehman's daily CARB

14  marks, consistent with the prices at which Lehman was

15  quoting CARB in its runs at that time?

16  A    I don't recall.

17  Q    And do you specifically recall changing Lehman's daily

18  CARB marks consistent with the prices at which Lehman

19  actually traded CARB?

20  A    I don't recall.

21  Q    And, during the period that you traded CARB, was QVT

22  one of your largest customers for CARB?

23  A    From what I recall, yes.

24  Q    And, Mr. McDougall, if we could just quickly run

25  through a few documents?  If you turn to Exhibit 2152,

Page 48

1   CX2152?  It's a message you sent on 24th of January, 2008.

2   What do you recognize this document to be?

3   A    This appears to be a Bloomberg update related to

4   products I was trading at the time.

5   Q    And, Mr. McDougall, could you turn to Exhibit CX2154?

6   What do you recognize this document to be?

7   A    This is a Bloomberg message indicating there would be

8   some auto-related bonds to trade, or kind of up for bid,

9   later that day or at some other time.

10  Q    And, if you turn to the next one, 2155, what do you

11  recognize that document to be?

12  A    This looks like a Bloomberg message also that I sent,

13  offering a caret GM auto loan bond.

14  Q    And, at 2156, what do you recognize that document to

15  be?

16  A    Another Bloomberg update.  I'm posting that -- I

17  believe it's -- I believe I was trading the DD Ford bond

18  that is referenced below.

19  Q    And then just two more, Mr. McDougall.  At Exhibit

20  2160, what do you recognize that exhibit to be?

21  A    Bloomberg message with some color, or notes on auto

22  loan bonds that were up for bid at a previous time.

23  Q    And then, turning to Exhibit CX2161, what do you

24  recognize that document to be?

25  A    Yeah, again, color from bonds that were -- it looks

Page 49

1   like trading elsewhere that were in for bid.

2   MR. LEWIS:  Your Honor, if I may have a moment, I may be

3   done.

4   THE COURT:  Of course.

5   MR. LEWIS:  Your Honor, no further questions.

6   THE COURT:  Very good.  Thank you.

7   MS. EFRONSON:  Your Honor, may I just have a few moments?

8   THE COURT:  Of course.

9   MS. EFRONSON:  Thank you.

10   THE COURT:  All right?

11   MS. EFRONSON:  Yes.

12   THE COURT:  Cross-examination, very good.

13          CROSS-EXAMINATION OF CHRISTOPHER MCDOUGALL

14   BY MS. EFRONSON:

15   Q    Good afternoon, Mr. McDougall.  Sarah Efronson on

16   behalf of Lehman.  I just have a few questions for you.

17   A    Okay.

18   Q    If you could turn to the document in the binder that

19   Mr. Lewis gave you, CX2155?

20   A    Okay.

21   Q    Okay?  And, in the second line of the communication, it

22   says, "6MM Caret 07-1C."  Do you see that?

23   A    Yes.

24   Q    Okay.  And what is that?

25   A    That is -- so, the 6 plus MM is $6 million of principal

Page 50

```
 1    balance.  And then Caret 07-1C is a particular auto ABS

 2    bond.

 3    Q    Okay.  And is that one of the components of CARB?

 4    A    I believe so.

 5    Q    And then, looking further at that same line, it says,

 6    "12 Percent YLD at 14CPR - 4 Percent CDR - 100 Percent

 7    Severity."  Do you see that?

 8    A    I do.

 9    Q    Okay.  And those are inputs into Intex for bond

10    modeling, right?

11    A    They could be used for that, yes.

12    Q    And, if you go down further into the communication, it

13    says, one line down, Asterisk, "This scenario implies 5

14    percent lifetime CUM losses and bond doesn't break."  Do you

15    see that?

16    A    Yes.

17    Q    And what does it mean that the bond doesn't break?

18    A    I believe, from what I recall, that's the bond does not

19    take losses.  You wouldn't expect to receive less than your

20    full principal back.

21    Q    And, if you can turn to CX2160 in the same binder,

22    please?

23    A    21-6-0?

24    Q    Yes.  And, looking down about five lines into the

25    communication, it says, "Caret 07-1C."  And is that also a
```

Page 51

1   component of CARB?

2   A    It's the same bond as the previous email, so yes.

3   Q    Okay.  And, again, it says, following that, "9.5

4   percent YLD - 15 CPR 5 CPR - 75 percent."  What is that?

5   A    I believe that's the yield that that price equates to

6   under the assumptions around CPR loss severity, et cetera.

7   Q    And you stated before that those are inputs that you

8   can put into Intex for bond modeling, right?

9   A    Yeah, they would be assumptions to run through a model.

10  Q    And those assumptions could be run on Intex?

11  A    I believe so, yes.

12  Q    And, again, looking about two lines down from where we

13  are, it says, "This scenario puts losses at 5 percent, two

14  times historical worst-case and bonds don't break."  And

15  what is "bonds don't break"?  What does that mean?

16  A    Again, as they wouldn't -- they'd pay full principal

17  back.  You wouldn't lose any principal.

18  Q    And, in the last line of this communication, it says,

19  "Del-Qs are down, consistent with historical seasonality."

20  Do you see that?

21  A    Yes.

22  Q    And what does that mean?

23  A    I think Del-Qs references delinquencies.

24  THE COURT:  Ms. Efronson, for the completeness of the

25  record, could you back up a couple of words before "Del-Qs"?

Page 52

1    MS. EFRONSON:  Absolutely.

2    Q    So, looking at the line above that, it says, "Our early

3    read on Jan performance from Apart and DCAT is that 30-60

4    Del-Qs are down, consistent w/ historical seasonality."  And

5    my question is:  what does "consistent with historical

6    seasonality" mean?

7    A    I guess I'm trying to compare what we're seeing in the

8    January numbers and how that looks similar to what we've

9    seen in prior Januarys, or winters.

10   Q    And can you explain what historical seasonality is?

11   A    From what I recall, based on what I'm seeing here, I

12   think we had an expectation of -- or history was a reference

13   point for the performance of these underlying loans, kind of

14   over time.

15   MS. EFRONSON:  Your Honor, may I have a moment?

16   THE COURT:  Sure.

17   MS. EFRONSON:  No further questions.  Thank you, Mr.

18   McDougall.

19   THE COURT:  All right.  Anything more?

20   MR. TRACEY:  Nothing from us, thank you.

21   THE COURT:  You're good?  Thank you very much, Mr.

22   McDougall.  You can step down.

23   MR. TRACEY:  Just take a moment to get ordered, Your Honor?

24   THE COURT:  Yes, take as long as you need.

25   MR. TRACEY:  You can sit right there.

Page 53

1    MR. NICULESCU:  (indiscernible)?

2    MR. TRACEY:  Yeah.

3    THE COURT:  Yeah, (indiscernible).

4    Dennis, do you have another one of these I could have?

5    MR. TRACEY:  (indiscernible)

6    THE COURT:  Do you have one more of these?

7    MR. TRACEY:  I think we're straightened out here, Your

8    Honor.  QVT --

9    THE COURT:  Do you need more time?

10   MAN:  No, we're fine.

11   THE COURT:  Okay.

12   MR. TRACEY:  QVT calls Dr. Peter Niculescu.

13   THE COURT:  Very good.  Good morning, Dr. Niculescu.  Would

14   you please stand up, sir?  Raise your right hand.  Do you

15   solemnly swear or affirm that all the testimony you're about

16   to give before the Court shall be the truth, the whole

17   truth, and nothing but the truth?

18   MR. NICULESCU:  Yes.

19   THE COURT:  Very good.  Have a seat.  Make yourself

20   comfortable.  Has someone provided you with a bottle of

21   water?

22   MR. LEWIS:  Apparently not.

23   THE COURT:  All right.  Mr. Lewis is going to do the honors.

24   Let us know if you need a break at any time.

25   MR. NICULESCU:  Thank you.

1           DIRECT EXAMINATION OF PETER NICULESCU

2    BY MR. TRACEY:

3    Q     Good morning.

4    A     Good morning.

5    Q     Would you state your name for the record, please?

6    A     Peter Steven Niculescu.

7    Q     And what is your current position of employment?

8    A     I am a partner at Capital Market Risk Advisors.

9    Q     You have provided us, Dr. Niculescu, with your CV,

10   which we've included in that book, I believe, as Claimant's

11   Exhibit 1639.

12   A     Yes.

13   Q     Is that correct?

14   A     Yes, it is.

15   Q     Okay.  I'd like to ask you about your background first.

16   So, would you start by telling us your educational

17   background?

18   A     Certainly.  I have an undergraduate degree from the

19   Victoria University of Wellington in New Zealand, a B.A.

20   Honors in Economics.  I have Master's Degrees and a PhD from

21   Yale University, with a specialization in finance.

22   Q     And, in addition to your education, do you have any

23   professional qualifications or training?

24   A     Yes, I am a chartered financial analyst charter holder.

25   I am a chartered financial analyst charter holder.

Page 55

1    Q     And, after you completed your doctorate, did you take a

2    position of employment?

3    A     Yes, I did.

4    Q     And what was that?

5    A     After I completed my doctorate, I went to work at what

6    was then Sanford C. Bernstein Company Incorporated, now part

7    of AllianceBernstein.

8    Q     And what was your position there?

9    A     My position began as a research analyst, writing models

10   of corporate bond options, long-dated options.  And I then

11   became a portfolio manager, investing in corporate,

12   government, and mortgage-backed securities.

13   Q     And how long were you at what's now AllianceBernstein?

14   A     About 18 months.

15   Q     And where did you go after that?

16   A     I went to Salomon Brothers, where I worked in bond

17   market research and bond portfolio analysis.

18   Q     And specifically what were your responsibilities there?

19   A     My responsibilities were in government bond research

20   and corporate bond research.

21   Q     And how long were you at Salomon Brothers?

22   A     I left Salomon Brothers in early 1990.

23   Q     And where did you go after that?

24   A     I went to Goldman Sachs.

25   Q     And what was your position there?

Page 56

1   A     I entered Goldman Sachs doing work as a corporate bond

2   strategist, sitting on the corporate bond trading desk,

3   advising traders on market opportunities, valuation,

4   hedging, advising the capital markets desk, and also

5   speaking with customers and proposing transactions for

6   customers.

7   Q     And did your position evolve at Goldman Sachs?

8   A     Yes.  In late 1992, I was asked to head the mortgage

9   research group, and oversaw the development of mortgage-

10  backed security research, both for agency product and for

11  non-agency product.

12  Q     And did your title at Goldman Sachs change at any

13  point?

14  A     Yes, I became a managing director.

15  Q     And when was that, if you recall?

16  A     I believe it was in 1996.

17  Q     And did you continue to run the mortgage research group

18  the entire time you were at Goldman Sachs?

19  A     Yes, I did, although I subsequently also took

20  responsibilities as co-head of fixed income research and

21  head of the fixed income research strategy group, which

22  included, for example, asset-backed research, corporate

23  research, emerging markets, and so on and so forth.

24  Q     And what were your responsibilities as the co-head of

25  the fixed income group?

Page 57

1    A    That group included all of the technology required to

2    support valuation and modeling, as well as the analytical

3    models that were developed to support transactions, trading,

4    risk management, and hedging, as well as advice,

5    recommendations to clients and customers.

6    Q    And your responsibilities as part of the strategy

7    group, what were they?

8    A    As part of the strategy group, it was -- the strategy

9    group at Goldman Sachs sat on the trading desks at that

10   time, advised the desks about relative valuations of

11   different asset classes, hedging of those asset classes,

12   risks on the asset classes, and also provided

13   recommendations to the customers, customer base.

14   Q    And how long were you at Goldman Sachs?

15   A    I left Goldman Sachs in early 1999.

16   Q    And where did you go then?

17   A    I went to Fannie Mae.

18   Q    And what position did you have initially at Fannie Mae?

19   A    I took a position as the head of strategy for the

20   company's mortgage and balance sheet holdings.  So, all of

21   the assets that were held on balance sheet and funded, I had

22   a position to provide strategy recommendations to the

23   company and risk recommendations to the company.

24   Q    And what was the size of that balance sheet?

25   A    The size varied, but it was upwards of $900 billion by

1    early 2002.  Early 2002, it was upwards of $900 billion.

2    Q    And did your position at Fannie Mae change?

3    A    Yes.  In late 2002, I was asked to take direct

4    responsibility for running that position, that book of all

5    our mortgage investments and our liquid investment

6    portfolio, which, as I mentioned, was -- the mortgage

7    investments was upwards of 900 billion.  There was another

8    approximately 50 billion of shorter-dated, non-mortgage,

9    liquid investment products, such as asset-backed securities

10   and corporate debt.

11   Q    And did you have a trading desk that reported to you at

12   that time?

13   A    Yes.  We had several trading desks, trading desks who

14   traded mortgage-backed securities, trades -- trading desks

15   that traded mortgage loans.  And, on the debt side, we were

16   responsible for debt issuance, calling debt, buying

17   securities for the liquid investment portfolio, asset-backed

18   securities, and so on and so forth.

19   Q    And did your responsibilities or position at Fannie Mae

20   change after that?

21   A    Yes, it did again.  In late 2004, I was asked also to

22   be responsible for the company's capital management.  I had

23   earlier, as head of strategy for the balance sheet, had

24   responsibility for the company's risk-based capital

25   calculations, and worked closely with the regulator at that

1    point.  Starting in late 2004, I was also asked to take

2    responsibility for the company's preferred debt issuance and

3    management, and oversaw a considerable amount of preferred

4    debt sales in late 2004, and again in 2007 and 2008.

5    Q    And did there come a time that you left Fannie Mae?

6    A    Yes.  I left Fannie Mae a couple of weeks after the

7    company was put into conservatorship, which happened on

8    September 6th, 2008.

9    Q    And what position did you take at that time?

10   A    I wound up, after a few months, joining CMRA, first as

11   a consultant and later as a partner at CMRA.

12   Q    And what is the business of CMRA?

13   A    It's -- the business is to advise on risk management

14   and valuation.  We have a variety of clients, two principal

15   lines of business.  One is to advise financial institutions

16   on risk management practice, to advise their boards of

17   directors.  For example, the role of the chief risk officer,

18   correct evaluation of risk, scenario analysis, things of

19   that type.  The second role is a litigation support role,

20   advising law firms and their clients on litigation-related

21   matters to complex financial issues, in particular to

22   derivatives, litigation negotiation, and mediation matters.

23   Q    And, in the course of your time there, have you been

24   engaged to value credit derivatives?

25   A    Yes.  We have done extensive valuation work on a wide

Page 60

1    range of credit derivatives since I have been at CMRA, more

2    than a dozen matters which we have advised clients on for

3    the derivative valuation, either doing the valuations

4    ourselves or reviewing them for clients across hundreds of

5    individual contracts on a client-by-client basis, many

6    thousand contracts overall, where we've looked at and

7    reviewed those valuations.

8    Q    I'm sorry, Dr. Niculescu, could you just slow down a

9    little bit?

10   A    Certainly.  Thank you.  Where we have done, reviewed,

11   or performed valuation on several thousand credit derivative

12   products.

13   Q    And have you been engaged to provide expert testimony

14   at any time in the past?

15   A    Yes, I have.

16   Q    On approximately how many occasions?

17   A    I have provided expert testimony in Court on two

18   occasions, and I've been deposed on a couple of other

19   occasions.

20   Q    Did any of those involve credit derivatives?

21   A    Yes.  I've given testimony on credit derivatives on

22   behalf of Lehman Brothers International Europe, LBIE.  And

23   I've given testimony on credit derivatives in a matter

24   involving the Bank of New York Mellon Trust Company versus

25   Solstice ABS CDO.

Page 61

1    Q    And you also mentioned two matters in which you

2    testified in Court.  Could you describe those, please?

3    A    Yes.  One was several years ago, which is why it's no

4    longer on my CV.  It was a matter in London between the

5    Intercontinental Exchange and a trader in sugar contracts, a

6    company called Fluxo-Cane.  The matter concerned the

7    liquidation of Fluxo-Cane's sugar positions by the Exchange.

8    Q    And the other one?

9    A    The other one was more recent.  It was last year.  It

10   was in a Court in Guernsey and the Channel Islands between

11   the liquidators of Carlyle Capital Corporation and the

12   management and board of directors of Carlyle Capital

13   Corporation.

14   Q    And have you been engaged to provide services in

15   connection with the current matter?

16   A    Yes, I have.

17   Q    And what is the scope of your engagement?

18   A    I was asked to do a bottoms-up independent valuation of

19   the PCDS contracts in the matter and the CARB contract in

20   the matter, with a view to calculating a reasonable range of

21   valuations for those contracts, and also to providing

22   opinion on what would be the most reasonable single-point

23   estimate valuation for those contracts.

24   Q    Thank you.

25   MR. TRACEY:  I would tender this witness as an expert in

Page 62

1    valuation.

2    THE COURT:  All right.  Thank you.

3    MR. TAMBE:  Can I just have a moment, Your Honor?

4    THE COURT:  Yes.  Mr. Tambe?

5    MR. TAMBE:  Can I get some water here, Your Honor?

6    THE COURT:  Yes.

7    BY MR. TAMBE:

8    Q    Right.  Good morning, Dr. Niculescu.

9    A    Good morning, Mr. Tambe.

10   Q    Good to see you again.

11   A    My pleasure.

12   Q    All right, let's just start with some of your

13   background, and then I'm going to ask you some questions

14   about the scope of your opinions.

15   A    Yes.

16   Q    Those are the two areas in which I will ask you some

17   questions.  You went through your work history.  You have

18   never been a trader in derivative products, correct?

19   A    No, I have had a desk reporting to me that traded

20   derivatives products, and I have myself personally on

21   occasion traded derivative products.

22   Q    Let's go through your work history, then.  Let's pull

23   up the same exhibit that was up, 1639.  And let's start with

24   Sanford Bernstein and Company.

25   A    Yes.

Page 63

1    Q    I take it, in that employment, you did not trade any

2    derivatives products, correct?

3    A    That is correct.

4    Q    Let's go up to Salomon Brothers, '87 to 1990.  You did

5    not trade any derivatives products at Salomon Brothers,

6    correct?

7    A    Correct.

8    Q    Let's go to Goldman Sachs, 1990 to 1999.  The positions

9    you had at Goldman Sachs were first in the fixed income

10   research department and then the mortgage research

11   department.  Do you see that?

12   A    Yes, I do.

13   Q    So, neither of those are trading functions, correct?

14   A    That is correct.

15   Q    And then, when you got to Fannie Mae, you were there

16   from 1999 to 2008.  I think you told Mr. Tracey that you may

17   -- you had some traders reporting to you at Fannie Mae, but

18   you were not a derivatives trader at Fannie Mae, correct?

19   A    No, no.  I had a group of about -- I think, perhaps,

20   about 80 people reporting to me who executed trades for me

21   and for which I was responsible, which I oversaw.  That

22   included people who traded derivatives products.  I would

23   rarely myself trade those products; it did happen on

24   occasion that, when a very senior person was absent, and I

25   was present, that I needed to and did step in and execute

Page 64

1    trades myself.

2    Q    And the derivatives products you're talking about,

3    those are not credit derivatives, those are other types of

4    derivatives products, correct?

5    A    Correct.

6    Q    Interest rate derivatives, for example?

7    A    That's correct.

8    Q    And the product you're opining on, in this case, are

9    full creditor derivatives products, correct?

10   A    That is correct.

11   Q    Clearly, with respect to PCDS and CARB, you had no

12   particular experience or prior experience trading either of

13   those products, correct?

14   A    Indeed, very few people did.  I did not.  No.

15   Q    And CARB and PCDS was not the subject of a research or

16   analysis that you'd ever done prior to this engagement in

17   this case, correct?

18   A    I had not completed any research on CARB or PCDS prior

19   to this involvement.  I had been aware of another single

20   PCDS contract on behalf of another client, but the client

21   had concluded it wasn't worthwhile doing any research on it.

22   We examined it and did no evaluation of that contract.

23   Q    Right.  And my question was a narrow question, right?

24   PCDS and CARB was not the subject of any research or

25   analysis that you had done prior to this engagement,

Page 65

1    correct?

2    A    I think that's fair.  As I say, I had examined one

3    other PCDS contract on behalf of another client, but had not

4    concluded with any analysis that would lead to an opinion.

5    Q    Now you had a team at CMRA helping you do the work you

6    did in this case, correct?

7    A    Yes.

8    Q    Okay.  About 5,000 hours of work?

9    A    I think a little bit more than that at this point.

10   Q    Not a single individual on that team had ever been a

11   dealer in credit derivatives, correct?

12   A    We -- that is correct.

13   Q    I think you described it in terms of the scope of what

14   you were asked to do was to create an independent bottom's

15   up analysis, correct?

16   A    Yes.

17   Q    You are not offering any opinion on the methodologies

18   actually used by QVT to calculate its claim in this case,

19   correct?

20   A    That is correct.  I'm aware of what they have done.  I

21   haven't done the work necessary to formulate an opinion on

22   their methodologies.

23   Q    Well, and you're offering no opinion as to whether the

24   methodology that was followed by QVT was a reasonable

25   methodology, correct?

Page 66

1    A    That's correct.  Not having done the work necessary to

2    formulate that opinion, I am not in a position to offer the

3    opinion.

4    Q    And you're not offering an opinion as to whether or not

5    QVT acted in good faith, correct?

6    A    That is correct.

7    Q    In response to my prior question, you said you're aware

8    of what QVT has done.

9    A    Yes.

10   Q    When you submitted your original report in this case,

11   you had not even examined the methodology, correct?

12   A    I had examined their results.  I am loosely aware of

13   their methodology in some places, but I haven't spent any

14   detailed time thinking about it.

15   Q    And in conducting your independent bottom's up

16   analysis, at the very outset of your engagement, you were

17   told what the result was that QVT had obtained, correct?

18   A    I was aware of the result they had obtained, yes.

19   Q    So before you did a single calculation, you knew what

20   the result was that QVT had obtained, and using the

21   methodologies that QVT had used, correct?

22           THE COURT:  Hold on.  Yes?

23           MR. TRACEY:  Objection, Your Honor.  I think this

24   is beyond the scope of (indiscernible).  I think we're

25   getting into cross-examination.

Page 67

1              THE COURT:  Why don't you move on, Mr. Tambe?

2              MR. TAMBE:  Yes, we'll move on.

3    Q    You are not offering any opinions as to what is

4    required by the ISDA master agreement, in terms of either a

5    loss calculation or a market quotation methodology, correct?

6    A    My opinion on this matter is not formulated in terms of

7    the requirements from an ISDA master.  But I would say that

8    my point estimates and my preferred estimates evaluation and

9    my opinion could well serve as the basis for a loss

10   calculation under the ISDA master.

11   Q    In the course of your work, withdraw that.  As part of

12   the opinions that you're offering, you're not offering any

13   opinions as to the books and records and valuations on the

14   books and records of QVT, are you sir?

15   A    Insofar as those books and records reflect valuations

16   provided by Lehman Brothers, then I am offering opinions on

17   some of those valuations.

18   Q    But that's the extent to which you're offering any

19   opinion of those valuations, correct?

20   A    As I sit here at this moment, that's all I can recall.

21   Yes.

22   Q    And you're not offering any opinion as to QVT's actual

23   losses and costs, as a result of the termination of the

24   Lehman Master Agreement, correct?

25   A    Insofar as that is a term that is included in the

Page 68

1    definition of replacement costs under the ISDA, then indeed,

2    yes, I am offering an opinion of the replacement cost of the

3    PCDS and CARB transactions.

4    Q    So in order to give credence to your valuations, your

5    bottom's up valuation, the Court has to conclude that the

6    loss definition includes a two-term replacement cost.  Is

7    that right?

8    A    My calculations are based on my calculation of

9    replacement cost.

10   Q    Okay.  And so whether or not that's a relevant

11   calculation for purposes of the loss definition, will turn

12   on whether the Court concludes that replacement cost is a

13   concept included in the loss definition, correct?

14   A    My valuations would be different, if they were not

15   conducted on a replacement cost basis.

16   Q    And that's the only basis on which you have conducted

17   those valuations.

18   A    That is correct.

19   Q    Now is it fair to say that on PCDS and CARB, the

20   valuation methodologies you used are different than what you

21   understand the valuation methodologies used by QVT to be?

22   A    Yes, indeed.  They were created independently, so I

23   should not necessarily expect them to be the same.  They

24   were not the same.

25            MR. TAMBE:  Your Honor, at this time, we're going

Page 69

1    to renew our objection pursuant to Daubert, to limit or

2    exclude entirely Dr. Niculescu's testimony.  And I'm

3    prepared to argue that further.

4              THE COURT:  Okay.

5              MR. TAMBE:  But outside the presence of the

6    witness, if possible?

7              THE COURT:  Yes.  All right, Dr. Niculescu, if you

8    could exit the courtroom for a short while?  You will remain

9    under oath, and please do not discuss the case or your

10   testimony with anyone or be in anyone's presence while

11   they're doing the same, all right?  And someone will come

12   and let you know when you can come back in.

13             DR. NICULESCU:  Thank you.

14             THE COURT:  Okay, Mr. Tambe.  So all I have --

15   there is very minimal on this --

16             MR. TAMBE:  Yeah.

17             THE COURT:  -- in the pre-trial brief.  So why

18   don't I let you just --

19             MR. TAMBE:  Sure.

20             THE COURT:  -- elaborate on your position?

21             MR. TAMBE:  The starting point is a statement made

22   by QVT in its brief.  And I highlighted this in the opening

23   remarks, where on Slide 1, and it's quoting from Page 56 of

24   QVT's brief, QVT said, "Look, the only issue in this case is

25   whether QVT valued the QVT transactions reasonably and

Page 70

1   good."

2            Now I think on that issue, I think Dr. Niculescu

3   just told us that that is not something he's opining on.

4   He's not opining on QVT's methodologies.  He's not opining

5   on QVT's good faith, all right?

6            The other thing that he's not expressing an

7   opinion on is the other part of the loss definition as to

8   whether the calculation that QVT has come up with is in fact

9   QVT's losses and costs.

10           He's done a separate valuation using different

11   methodologies and come up with ranges of numbers and

12   pinpoint numbers.  It's a valuation exercise, but it doesn't

13   inform the Court at all in terms of whether what QVT did was

14   reasonable, and whether QVT's methodologies were reasonable

15   methodologies, because he used completely different

16   methodologies.

17           The final point, which is, he conceded that what

18   he's calculated is replacement cost.  And the calculation

19   would be very different if he was valuing something other

20   than replacement cost.  I think we went through this during

21   the opening.

22           I don't think replacement costs is a term that

23   appears anywhere in the loss definition.  If that's all he's

24   done, it's not part of loss definition.  Again, I'm not sure

25   what this trial within a trial is all about because we're

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400

Page 71

1    going to spend a fair amount of time today and tomorrow

2    examining Dr. Niculescu on the methodologies he used to come

3    up with numbers, and whether those are sound methodologies

4    or not.

5            That won't inform you or us at all about whether

6    that says QVT's methodologies are reasonable or in good

7    faith or not.  So I think it's completely irrelevant to any

8    issue that actually has to be decided by this Court, and

9    that's a basis under Daubert, to exclude the testimony of

10   Dr. Niculescu and his opinions.

11           THE COURT:  Thank you.

12           MR. TRACEY:  May I respond, Your Honor?

13           THE COURT:  Yes, you may.

14           MR. TRACEY:  Your Honor, I don't think we disagree

15   on what the scope of Dr. Niculescu's testimony was going to

16   be here.  He spent a huge amount of time and effort coming

17   up with an independent valuation of these two absolutely

18   critical, illiquid securities that are at the center of, and

19   87 percent of the valuation difference between the two

20   parties.

21           And he has developed that entirely independently

22   based on his own review objectively.  And that is relevant

23   in this case for several reasons.  First, Mr. Tambe said

24   that it is QVT's position that as long as their valuation

25   was reasonable and in good faith, that we win.

Page 72

1          And that's exactly what we say.  Well, Mr. Tambe

2     hasn't agreed to that.  Mr. Tambe continues to say, and did

3     in his opening statement, that results have to be reasonable

4     as well.  And if Mr. Tambe, on behalf of Lehman Brothers,

5     would like to withdraw that, then I can go onto my next

6     argument.  But as --

7          THE COURT:  So your point is that one way of

8     demonstrating that the result is reasonable is by showing

9     that you can come up with the same results by a completely

10    different methodology?

11         MR. TRACEY:  Correct, Your Honor.  And that's well

12    accepted in the law, in specifically relating to ISDA

13    closeouts.  So the -- there's the case of Merrill Lynch

14    against UISAF, which is 2012 West Law 1202034, Southern

15    District of New York, Judge Sullivan.

16         It was a case that was very similar to our case.

17    It was an ISDA closeout.  There was a default.  The non-

18    defaulting party had performed the two steps.  First was the

19    market quotation step, just as we did here, and then, a loss

20    calculation.

21         The market quotation did not succeed.  There was

22    an argument about whether it had been done properly.  The

23    Court found that it had been done properly, and they

24    defaulted to the loss calculation.  And Merrill Lynch, which

25    was the non-defaulting party, presented expert evidence in

Page 73

1    that case, which included three independent objective ways

2    to calculate the losses, which were independent of and

3    different from what the non-defaulting party had presented.

4            And Judge Sullivan accepted -- not only accepted

5    the evidence, but relied on it in making a determination

6    that the loss calculation was reasonable.  So that's a very

7    straightforward precedent.  This is well-accepted, and we

8    believe that this testimony will be extremely enlightening,

9    not only for that, but overall, for the Court to hear an

10   expert in this field talk about the structure of the market,

11   what was the buying and selling patterns, what's hedging all

12   about.

13           Dr. Niculescu can be very, very helpful, I think,

14   to the Court on the overall concepts in addition to coming

15   up with reasonable ranges for you to compare, where QVT came

16   out.  And I would note that actually, there are documents on

17   which Dr. Niculescu relies that weren't available to QVT.

18           So we heard about, for example, a market quotation

19   process that had been done by another counterparty to Lehman

20   in the carve area.  That wasn't something that QVT had any

21   access to.  Lehman provided to us as part of this case, and

22   of course, Dr. Niculescu considered that in the course of

23   his work.

24           That wasn't something that was available to QVT,

25   but it's very telling, I think, when you hear the valuation

Page 74

1    and where it comes out, and the fact that if you use an

2    entirely different approach, you come out in the same

3    general neighborhood.

4            THE COURT:  So are you saying, though, that if I

5    agree with you and if I agree with Dr. Niculescu, that it

6    would render what QVT actually did completely irrelevant?

7    If QVT, on those two weekends, spent the weekend drawing

8    numbers out of a hat and put those numbers down on their

9    calculation statements, and Dr. Niculescu outlines a

10   detailed methodology that comes to the same number, do you

11   win?

12           MR. TRACEY:  No.

13           THE COURT:  So I would also have to find that what

14   QVT actually did to calculate its termination amounts was

15   reasonable?

16           MR. TRACEY:  Yes.

17           THE COURT:  Two separate things?

18           MR. TRACEY:  Yes.  The only possible exception to

19   that would be if Your Honor determined that the Court needed

20   to make an independent judgment about what the losses were

21   here.  For example, not this case, but if market quotation

22   wasn't properly done, the Court might find itself --

23           THE COURT:  Hypothetically.

24           MR. TRACEY:  Hypothetically, the Court might find

25   itself in a position of having to determine the loss under

Page 75

1    the ISDA contract itself, based on the evidence that goes in

2    in the course of this trial.  I don't think that's going to

3    happen here, but that would be an exception to what you

4    described earlier.

5              THE COURT:  So similar to what happened in the Sal

6    Oppenheim case?

7              MR. TRACEY:  Right.

8              THE COURT:  What about the line of questions that

9    we cut off, the fact that Dr. Niculescu knew where he was

10   supposed to come out?

11             MR. TRACEY:  You know, if Lehman wants to make

12   that argument and cross-examine him on it, he's -- they're

13   free to do it.  I think the key point is did he perform an

14   objective evaluation?  Did he follow standard methodologies?

15   Were they consistent with the literature that he's going to

16   site?  And were his judgments reasonable?  And I think all

17   of that will show, that these are very, very strong, very,

18   very rigorous valuations.

19             THE COURT:  Okay, thank you.  Anything, Mr. Tambe,

20   briefly?

21             MR. TAMBE:  Just very briefly, Your Honor.  I

22   think the point you raised at the very end is a relevant

23   point, which is, he had -- he sort of know -- he knew what

24   the bogey was going in.  And even with all of that --

25             THE COURT:  Every expert knows what the bogey is

Page 76

1    going in, right?

2           MR. TAMBE:  Yeah, but even with --

3           THE COURT:  I mean, it depends -- it doesn't

4    matter what the case is.  You know who hires you.  You kind

5    of know where you're supposed -- you kind of know the goal

6    that you're driving towards, right?

7           MR. TAMBE:  You do, but again, let's put down the

8    context of why he's being offered here.  Given that he's not

9    opining on their methodology or good faith --

10          THE COURT:  Right.

11          MR. TAMBE:  -- the whole reason he exists is so

12   that he can say, "I'm objective and independent."

13          THE COURT:  Right.

14          MR. TAMBE:  That's the only reason why he has

15   anything, under their view, anything to say here.  But that

16   critical, for the threshold element of his analysis is

17   suspect, because he's told on day one, that's the number,

18   right?  And even --

19          THE COURT:  But on the cross-examination, you're

20   going to go through and you're going to show me --

21          MR. TAMBE:  Yeah.

22          THE COURT:  -- 16 different ways how if you --

23   bury assumptions or do other things, you get a different

24   answer, right?

25          MR. TAMBE:  I'm absolutely going to do that, if he

Page 77

1    does testify and give his opinions.  And that's part of the

2    problem here.  We'll do all of that, and what will you have

3    at the end of it?  You will have a conclusion that perhaps

4    Dr. Niculescu's valuation methodology, completely separate

5    from QVT's was maybe not reasonable.

6          THE COURT:  What about Mr. Tracey's argument that

7    in the event that I have to come up with values on my own

8    for some or all or portions of the portfolio, that it would

9    be -- that that's something I could rely on?  To the extent

10   that you don't discredit what he says.  You stumped him, Mr.

11   Tracey.

12         MR. TRACEY:  (indiscernible).

13         MR. TAMBE:  It's like another compliment

14   (indiscernible).  Let me confirm that because I'm just -- I

15   want to be careful about how I respond, yeah.

16         THE COURT:  Getting a lifeline.

17         MR. TAMBE:  Yeah.  I'm --

18         THE COURT:  I think we're going to have to wait

19   and see what happens, because I, despite Mr. Tracey's

20   optimism, I can't rule out the possibility that as to one or

21   more buckets of the positions that need to be valued, that I

22   might end up having to be writing on a clean slate.

23         I, as I'm sitting here right now, don't have in my

24   mind all of Lehman's experts, and the subject matter on

25   which they're going to opine.

Page 78

1           MR. TAMBE:  But I think, and that's -- now that

2     I've had a few minutes to think about the problem of that.

3     They have the obligation, as a non-defaulting party, to

4     reasonably and in good faith come up with a number as a

5     loss.

6           THE COURT:  Yes.

7           MR. TAMBE:  If they fail to do that, as you

8     conclude --

9           THE COURT:  Right.

10          MR. TAMBE:  -- that you can't rely on their

11    numbers because you conclude either they weren't in good

12    faith or they weren't reasonable or whatever reason.

13          THE COURT:  Right.

14          MR. TAMBE:  I don't think necessarily the next

15    place you go is to say, "Well, who else has given me a

16    reasonable number?" because we know from Mr. Gold's

17    testimony yesterday, which I thought was quite remarkable,

18    no hit to that.

19          There is an answer available, but there were no

20    losses of costs incurred by QVT.  Yes, you've got this

21    hypothetical calculation of a replacement trade, and he

22    described it in a way, that again, was fairly remarkable,

23    lost profit opportunities of what they could have earned,

24    had the trades not been terminated, right?

25          That -- none of that's got anything to do with

Page 79

1    what Dr. Niculescu's testifying about.  And that's the other

2    problem, so even --

3                THE COURT:  Well, I don't agree.  I mean, first of

4    all, QVT will, I'm quite sure, will characterize that

5    testimony very differently.  But putting that to one side,

6    there are -- we have heard testimony about subsets of trades

7    that, for example, didn't make their way into market

8    quotation.

9                MR. TRACEY:  Right.

10               THE COURT:  And then, we have heard about

11   different subsets of trade as to which a market quotation

12   did not succeed.

13               MR. TRACEY:  Yeah.

14               THE COURT:  So I don't know at this point,

15   frankly, what the answers are with respect to the extent

16   that I find myself in a position of needing or of

17   disagreeing with QVT's valuation.  What happens?

18               So I hear your reservations about this.  I don't

19   think it rises to the level of a Daubert exclusion.

20   Frankly, and I'll say this to Mr. Tracey, it's not about the

21   fact that he's done an extraordinary amount of work, that

22   you know, that if anything, will go to the rigor and, of his

23   analysis, maybe.

24               MR. TRACEY:  I'd argue the opposite.  I could just

25   --

1            THE COURT:  Well, you know, you're free to do

2    that, but I'm not there in terms of excluding him on a

3    Daubert challenge.  And I'll be very interested to hear your

4    cross-examination.

5            MR. TRACEY:  Sure.  No pressure, though.

6            THE COURT:  No pressure.  So --

7            MR. TRACEY:  Very well.

8            THE COURT:  Do you want to take you until one

9    o'clock, Mr. Tracey?

10           MR. TRACEY:  Sure.

11           MR. TAMBE:  There's a (indiscernible) issue I want

12   to discuss before he takes the stand, a small point.  Your

13   Honor, there's just one issue we want to discuss?

14           THE COURT:  Yes?

15           MR. TAMBE:  We received last night their

16   demonstrative deck for Dr. Niculescu.

17           THE COURT:  The one that I was handed?

18           MR. TAMBE:  Yeah.  And on Page 7, there's an

19   analysis of Bloomberg pricing, which I believe is identical

20   to the analysis in the rebuttal report on Page 71, Exhibit

21   14.

22           THE COURT:  Okay.

23           MR. TAMBE:  So we've got that issue again of

24   whether he's going to talk about his original report or if

25   he's going to talk about the rebuttal issues before our

Page 81

1    experts have even testified.

2         THE COURT:  I thought we had an agreement that

3    rebuttal was going to wait until rebuttals --

4         MR. TRACEY:  Well, the rebuttal absolutely will

5    wait, and virtually everything that he's going to testify

6    about is in his initial report.  This particular slide

7    doesn't rebut anything that was in the Lehman reports.

8         THE COURT:  The Lehman report?

9         MR. TRACEY:  In other words, he doesn't have to --

10   he's not going to say, "And the Lehman expert said X, and I

11   disagree with that."  This is just part of his thinking as

12   to why he couldn't use these prices.

13        He didn't put it in his report until the rebuttal

14   report, because he -- I don't think he knew that it -- there

15   was going to be a challenge on it, but it is part of his

16   initial thinking.  And --

17        THE COURT:  But that just sounded -- what you just

18   said sounds like rebuttal.

19        MR. TRACEY:  Well, it's -- it was put in in the

20   rebuttal report, but it was part of his thinking in the

21   initial process, in other words, why not use these prices?

22   I don't -- frankly, it doesn't matter to me if he says it

23   now or later.  I think it's a little more coherent for the

24   Court to hear his discussion of this.

25        THE COURT:  Is there -- can you link this to

Page 82

```
 1    something in his opening report?

 2            MR. TRACEY:  It's just why he didn't choose to

 3    rely on prices in the market.  And --

 4            THE COURT:  Is that in and of itself in the

 5    opening report?

 6            MR. TAMBE:  I don't think that issue is addressed

 7    in the opening report.  When he says, you know, "There's a

 8    price in the market, but I'm not using them because of

 9    something like Page 7 of the demonstrative."

10            MR. TRACEY:  I --

11            MR. TAMBE:  It's a long report, though, so --

12            MR. TRACEY:  Yeah, I'd have to look.

13            THE COURT:  I'll tell you what.  Why don't I let

14    you get started?

15            MR. TRACEY:  Okay.  And --

16            THE COURT:  And then, hold this or carve it out.

17    And then, over the lunch break --

18            MR. TRACEY:  Perfect.

19            THE COURT:  -- you can take a better look.  You

20    can attempt to find something in the opening report that

21    this is linked to.  You can either work it out or we'll

22    figure it out after we come back.

23            MR. TRACEY:  Okay.

24            THE COURT:  So for the purposes of keeping it

25    clean, why don't you just rip this page out from his version
```

Page 83

1    of the deck, and then we can give it back to him, if we

2    figure out that's appropriate?  Thank you.  Welcome back.

3              DR. NICULESCU:  Thank you.  I take it I may

4    proceed.

5              MR. TRACEY:  We just would note that we did take

6    one page, Page 12, out of your book, so don't --

7              THE COURT:  Seven.

8              MR. TRACEY:  Oh, Seven, excuse me.  So don't

9    expect to see it there.

10             DR. NICULESCU:  Ah yes.  That's (indiscernible),

11   thank you.

12   Q    Okay.  Dr. Niculescu, I'd like to start with the CARB

13   product.  Is that a product on which you've done work and

14   provided evaluation?

15   A    Yes.  It is.

16   Q    And what is the CARB product?

17   A    CARB stands for CDS on auto receivables.  It was a

18   product created by Lehman in 2007, apparently, to try to

19   catalyze derivative trading in auto asset-backed securities.

20   Analogous to the trading that had been catalyzed in the

21   subprime MBS sector through the development of the AVX.HE

22   Indexes.

23             It contained eight reference entities, the

24   underlying components were CDS on auto ABS.  The only CARB

25   that traded was a triple-B CARB, although others were

Page 84

1    offered.  And so, I will just be talking about the triple-B

2    CARB at this point, that referenced subordinate tranches of

3    those auto ABS.

4    Q    And in general terms, what was QVT's position in CARB?

5    A    QVT was one of the larger participants in the CARB

6    market.  They had wanted to buy protection on the auto ABS

7    sector by buying protection from Lehman and CARB.

8    Q    And in what amount?

9    A    They had a net position at the -- by the end of their

10   transactions of $80 million, although they had purchased

11   larger quantities earlier on and then sold them back.

12   Q    And have you performed a valuation of that position as

13   of September 15, 2008?

14   A    Yes, I have.

15   Q    And before we get into the details of it, I wonder if

16   you could just high level, take us through the process that

17   you followed and the result that you got?

18   A    Yes.  I would like to do that by moving to the first

19   slide, which is Page 3 in my book, which is an overview of

20   the method that I used to value QVT's CARB position.  It was

21   made easier by the fact that I had a market quote from

22   Merrill Lynch, an unqualified market quote, that was

23   provided to me by Lehman, where they quoted an offer to sale

24   protection to the one other counterparty that at the time

25   had a long position in the protection in CARB.

Page 85

1            The other counterparty had a position of only $15

2       million, which was much smaller than QVT's position of $80

3       million.  Merrill Lynch provided that quote in spread terms.

4       So basis point premium, perhaps 1,200 or 1,400 basis points

5       per year of spread.

6            As Mr. McDougall said, that spread then has to be

7       converted to price, so I did that conversion.  Then, I

8       needed to do an adjustment for the size of the position from

9       $15 million up to $80 million.

10           And doing those two fairly simple steps, results

11      in a valuation of the QVT's position of between $29 and $36

12      million.  QVT's valuation was $37 million.

13      Q    Okay.  Before we get into the details, I'd like to just

14      ask you some general questions.  First of all, in your -- in

15      the book in front of you, we've marked as Claimant's Exhibit

16      1637, what I believe is your initial report in this matter.

17      Could you identify that, please?

18      A    Yes, that's correct.

19      Q    And did you write that report?

20      A    Yes, I did.

21      Q    And did you have assistance in writing that report?

22      A    Yes, I did.

23      Q    And could you describe generally what assistance you

24      had?

25      A    Yes.  I have a team of people who assisted me on this

Page 86

1    matter directly at CRMA, one of whom was a specialist in

2    credit derivative products, having traded several billion

3    dollars of credit derivative products as an investor.  And a

4    number of other assistants who worked with me on developing

5    analytics and looking through documents and data.  I also

6    used assistance from an external company, Numerics, that

7    specializes in creating financial algorithms for valuation

8    work.

9    Q    And were you provided documents in connection with your

10   work in this matter?

11   A    Yes, a considerable volume of documents.

12   Q    Would you describe for the Court in general terms what

13   categories of documents you were provided and reviewed?

14   A    Yes.  Goodness.  I received documents, all of the

15   documents in the matter from QVT and from Lehman.  In

16   addition, there was considerable third party disclosure

17   through their subpoena process.  I understand many -- most

18   of the large banks were subpoenaed by -- in this matter, and

19   I've seen a large volume of documents from them.

20           And there were many other types of documents that

21   I looked at.  For example, trustee reports on some of the

22   underlying securities.  I went out to try to find market

23   data, market pricing from Bloomberg, from IDC and other

24   sources, Market Partners.  I reviewed academic literature

25   and papers on valuation techniques.  And finally, I looked

Page 87

1   for market commentary, contemporaneous market commentary

2   from traders and research at the time describing market

3   conditions.

4   Q    Did you review any academic or industry research or

5   literature in connection with your work?

6   A    Yes, yes, I did.

7   Q    And what kind?

8   A    So there was research published on the relevant sectors

9   of the preferred market and the auto and consumer ABS

10   market.  I reviewed the contemporaneous publications from

11   the street industry research on those markets.  There were

12   also academic papers on valuation techniques.  And I went

13   through the literature on valuation techniques to ensure

14   that we were consistent with current thinking of valuation.

15   Q    And can you estimate approximately how many documents

16   you reviewed all told in connection with this engagement,

17   you or your team?

18   A    I haven't done that estimate.  It must be at least in

19   the hundreds of thousands, though.

20   Q    And did you review any deposition testimony?

21   A    Oh yes, I also reviewed deposition testimony and trial

22   testimony.

23   Q    And have you reviewed other expert reports in this

24   matter?

25   A    I have reviewed the other expert reports in this

Page 88

1   matter, yes.

2   Q    And approximately how many hours have you and your team

3   spent on this engagement?

4   A    Yeah, I think it's more than 6,000 hours at this point.

5   Q    And is there any way to divide that up generally

6   between CARB and PCDS?

7   A    I haven't been able to do a precise estimate of that

8   division.  PCDS was considerably more complex than CARB.

9   The CARB valuation was simple, although it took quite a lot

10  of work to research the market environment.  I would provide

11  a rough estimate that the time spent on CARB would be

12  between 1,000 and 2,000 hours out of those 6,000.

13  Q    Okay.  So let's go back to CARB, and I'd like to ask

14  you some general questions about the trading in CARB.  Did

15  you, as part of your analysis review the trading by Lehman

16  in the CARB product?

17  A    Yes, Lehman helpfully provided us with the trade log in

18  CARB.  And the next slide demonstrates that trade log.  This

19  is what Lehman calls their net, what was the net CARB

20  position that was reported through our taking that trade log

21  and working through it.  The way it's captured here is that

22  the CARB is an index, so a negative value means that Lehman

23  has sold the index short.  A positive value means they own

24  the index.  When Lehman sells the index short, Lehman buys

25  protection on the index.  When they own the index, they have

Page 89

1   sold protection on the index.

2            So looking at this picture, this is their net CARB

3   position, as a result of the transactions they did.  You'll

4   see that their first transaction that we see reported here

5   was in October 2007, early October 2007.  When they sold $50

6   million of the index, they bought protection of $50 million

7   of the index.

8            They apparently covered that protection quite

9   quickly, and then went out and bought the index to $25

10  million.  And from then on, you'll see that their net

11  position stayed within a fairly narrow range, diverged a

12  little bit in March of 2008, but generally stayed within

13  plus or minus $15 or $20 million of notional, and for the

14  last month or so, was essentially flat.

15  Q    And have you looked at the trading to see what the

16  trading was of QVT and other counterparties?

17  A    Yes, I have.  And the next exhibit shows that.  Here, I

18  have gone back to Lehman's trade log and pulled out the QVT

19  transactions.  This is Lehman's historical trading, over all

20  the entire life history of the CARB.  QVT, on a gross basis,

21  had bought $170 million notional of protection on CARB, then

22  sold back $19 million, so they had a net position at the end

23  of the period of $80 million.

24           Interestingly, QVT had bought more protection than

25  all of the other counterparties put together, which was only

Page 90

1       $126 million.  They were more than half of the market for

2       protection purchases over that entire time period.

3       Q     And are -- were there any dealers that you found, who

4       were making a market in CARB other than Lehman?

5       A     No.  I looked at that quite carefully, and I'm

6       confident that there were no other dealers making the market

7       in CARB.

8       Q     And what do you base that on?

9       A     Well, several facts.  First, we saw, I think earlier

10      today in Mr. McDougall's testimony, an email from Market

11      Partners.  Lehman had approached Market Partners to ask them

12      if they would sponsor or would be involved with the CARB

13      index, as they have been with the subprime mortgage index.

14             In order to do that, Market Partners needs to get

15      prices daily from the dealer community, and they are

16      reported -- Market reported back that they were unable to

17      get those prices from the dealer community.  From my

18      experience, if the dealer community's unwilling to price

19      something daily, then they're not really willing to make a

20      market on it.

21             Sometimes, they may price it without making a

22      market, but if they're making a market, then they will

23      certainly price it.  So I think that was fairly clear, that

24      they were not going to -- the dealer community outside of

25      Lehman was not going to be involved in CARB.

Page 91

1            Secondly, I heard Mr. McDougall say that he

2     doesn't believe that anybody else in the dealer community

3     was making a market in CARB.  And I'm not surprised at that.

4     Indeed, we'd gone through all of the thousands of pages of

5     documents provided under subpoena, which referenced the

6     subpoena's reference CARB.  And we have not found anything

7     on that record from the dealer community that suggests that

8     they were active in CARB.

9            And lastly, the other counterparty, QVT had a net

10    position at the end of $80 million.  The other counterparty

11    had a position of $15 million.  The other counterparty did

12    solicit market quotations, and they, in their summary to

13    Lehman of the results of that process, they noted that

14    Lehman was the only trader in the product.  So I am

15    confident that there were no other market makers or dealers

16    active in making a market in CARB at this time.

17    Q    And what is the significance, if any, to your valuation

18    that there were no other dealers trading in CARB?

19    A    It means that the other dealers, if they took on a CARB

20    position would have not been confident that they could

21    resell that position to another party.  They might have had

22    to expect to hold the risk position potentially for a

23    considerable period of time, as there wasn't an active

24    market in CARB.

25            It helps explain why the cost of protection could

Page 92

1    go up very substantially, where -- in order to find a

2    replacement, because the dealer who would sell you

3    protection would be unable to resell that protection.  They

4    also would be unable to hedge it.

5              So it explains a reluctance on the part of dealers

6    to offer to sell protection to offer to sell protection and

7    underpins what might otherwise seem to be very high

8    valuations.  It explains those valuations.

9              MR. TAMBE:  Your Honor, we move to strike the

10   testimony as to what dealers would have done, whether

11   (indiscernible) been confident.  We'll be establishing

12   (indiscernible) that his experience is not based on his work

13   as a dealer, nor does he have any particular experience in

14   dealers in this market.  He could talk about how he did his

15   valuation, but in terms of what other dealers did or must

16   have done or must have thought, I think there's absolutely

17   no basis for it.  We move to strike that, Your Honor.

18             MR. TRACEY:  I have a response, but I hesitate to

19   have an open discussion on this.

20             THE COURT:  I agree.

21             MR. TRACEY:  Maybe if we can --

22             THE COURT:  Can you move on and we can come back

23   to the point?

24             MR. TRACEY:  I'm done with that, and we can argue

25   when --

Page 93

1              THE COURT:  All right, let's move on and we can

2     come back to that point.

3     Q    Dr. Niculescu, did you review as part of your

4     valuation, the marks that were placed on CARB by Lehman?

5     A    Yes, yes, I did.

6     Q    And what did you find when you reviewed Lehman's marks

7     on the CARB product?

8     A    Lehman provided daily marks to QVT.  Those marks

9     included accrued interest.  When you take out the accrued

10    interest, you see the marks in fact never changed from early

11    July through September, there was the mark on the protection

12    that QVT owned was always 16 percentage points.

13              Now Lehman made offerings in the market, a two-way

14    market, bids and offers from time to time through this

15    period.  The last one they made was on August 21st.  We show

16    it here at that time, Lehman made an offer to sell

17    protection at 23 and to buy protection at 19.  The midpoint

18    is therefore 21 percent.  It's the midpoint that is useful

19    as a comparison to Lehman's daily marks.

20              It was considerably different than Lehman's daily

21    marks, and their market offers changed from time to time.

22    The daily marks did not.  I therefore concluded that their

23    daily marks are not reliable on the occasion of where Lehman

24    itself had placed the market for CARB.

25    Q    Okay.  I'd like to turn, if I may, to the methodology

Page 94

1    that you used to value the CARB product.  Can you explain to

2    the Court your overall approach to the valuation before we

3    get into the specifics of what you did here?

4    A    Yes.  I think this is valid for valuing really any

5    fixed income product and any derivative product.  At base,

6    you are looking for actual market prices on some product

7    that bears some relation to the product you are trying to

8    value.

9          If you can get a price on the exact product you

10   are trying to value, then that's what you use.  If you

11   can't, you try to find prices on products that are

12   relatively similar, and then by a process of interpolation

13   or extrapolation, derive the price of the product that you

14   are trying to value.

15         For example, in the derivatives, you may have a

16   four-year credit default swap and see prices for three-year

17   and five-year credit default swaps, and say, we'll

18   interpolate between them to price the four-year credit

19   default swap.

20         In other cases, you may not have any prices for

21   credit default swaps, you may need to go to the price of an

22   underlying security in order to impute what the price of the

23   credit default swap is.  But the basic principle is to try

24   to look for market prices and then find an analytically

25   rigorous way of extrapolating or interpolating from those

Page 95

1    prices to the price of what it is you are trying to value.

2    That's the general procedure.

3    Q    Okay, thank you.  And I'm just noticing that the court

4    reporter is struggling to keep up, so we both have to be a

5    little slower.

6    A    I appreciate that.

7    Q    Okay.  So following up on your methodology, were you

8    able to find any actual transactions in the CARB product

9    that you could use as a price source for your valuation?

10   A    No, there were no actual transactions, but there were

11   market quotes provided in CARB at the relevant time.

12   Q    And did you use a, quote, "quotation," for your

13   methodology?

14   A    Yes, yes, I did.

15   Q    And what quotation did you use?

16   A    The next page shows the market quotes received by the

17   other counterparty that was long protection with Lehman,

18   CARB Party A.  They had requested market quotes for a $15

19   million size position from Citigroup, from Merrill Lynch,

20   and from RBS.

21   Q    Why don't we take a look at that?  Maybe I'll bring up

22   Joint Exhibit 73, John?  Do you recognize that as the market

23   quotation that you relied on?

24   A    Well, yes.  This is provided by CARB Counterparty A as

25   a summary that they gave to Lehman of the quotes they

Page 96

1    received.  As we see, it says, "Only markets are traded by

2    Lehman."  And we have the eight component parts of the CARB.

3    Caret refers to a GMAC-issued security, Ford owed to a Ford

4    Motor credit-issued security.  I'm so sorry.  Thank you.

5    Caret refers to a GMAC-issued security.  And Ford owed to a

6    Ford Motor credit-issued security.

7         So reading across the first line, "2006-1D, this

8    is the first deal issued by GMAC and ABS in 2006 and this is

9    the D tranche, the most subordinate of the tranches."  And

10   then, we have a Citibank priced quote of 95.  That is given

11   in index equivalent terms, which means that the price of

12   protection would be 100 minus 95 or five points.

13        Going to the far right, we see RBS, the Royal Bank

14   of Scotland.  They had a price quote of $85, meaning the

15   price and protection would be 100 minus 85 or 15 points.  In

16   the middle, we see Merrill Lynch.  They provided spread

17   quotes instead of price quotes.  The first one is 1,250

18   basis points, which is the premium that Merrill Lynch would

19   have charged to sell protection on the caret 061D's.

20        And you see the other spread quotes down the page

21   for the other component parts.  The CARB Counterparty A then

22   provided a price that they calculated, which converted the

23   Merrill Lynch spread quote into a bond price equivalent.

24   Q    Why don't we take a look at each of those quotes

25   individually?  In your book, could you turn within Joint

Page 97

1    Exhibit 73, to Page 1807?  Do you have that in front of you?

2    A    I do.

3    Q    And can you explain for the Court what you understand

4    this to be?

5    A    Yes.  So this is an email from RBS, Royal Bank of

6    Scotland Greenwich Capital Markets, and it is in a response

7    to a question.  And we see the question here.  It says, "Hi,

8    I'm looking to buy protection on the following list of

9    names, and equal proportions AON," which stands for all or

10   none, "at 150 basis points running, fixed cap and implied

11   right down.

12           Now these are the terms and conditions of the CARB

13   contract, 150 basis point running premium which a fixed cap

14   and an implied right down structure.  Where could I do this

15   in terms of points upfront?  Total size is $15 million."

16           RBS responds with the points up front for each one

17   of the component parts, as they have to, because it's an all

18   or none request.  The first component part is 15 points.

19   That corresponds to the 85 points we saw in the previous

20   page.

21           Interestingly, RBS says at the top, "These

22   indications are good for today," which is a -- and this is

23   on September 16th at 10:49 a.m., this is an interesting

24   statement.  On the one hand, it includes the word

25   indication, which suggests that the levels may not be firm.

Page 98

1    On the other hand, it says these -- they're good for today,

2    which suggests that the levels may be firm.

3              THE COURT:  Mr. Tracey, I'm sorry, but I don't

4    know what --

5              MR. TRACEY:  Am I confusing --

6              THE COURT:  I don't know what this is.

7              MR. TRACEY:  Okay, okay.  Let me --

8              THE COURT:  I mean, I can read the words on the

9    page, but I just don't -- maybe I missed it.

10             MR. TRACEY:  Sure.

11             THE COURT:  But I don't know what this is.

12             MR. TRACEY:  Sure, let me --

13             THE COURT:  To, from.

14             MR. TRACEY:  Sure.  Let me back up.  Apologies,

15   Your Honor.

16             THE COURT:  No, it's me.  It's not you.

17   Q    So, Dr. Niculescu, can you describe, in general terms,

18   what you understand Joint Exhibit 73 to be?

19   A    Yes, yes, indeed.  Joint Exhibit 73 describes the

20   results of the market quotation process that CARB Party A

21   conducted.

22   Q    And before you go on, could you state who CARB Party A

23   is, without using their name?

24   A    It is another fund or a hedge fund that had a position

25   with -- where they had purchased protection on CARB from

Page 99

1    Lehman, in a size of $15 million notional.

2    Q    So were they in this -- in the same position as QVT in

3    regard to their position in CARB?

4    A    They were on the same side of the market as QVT.  There

5    were only two counterparties that held -- that owned

6    protection on CARB from Lehman.  CARB Fund A and QVT.  There

7    were two or three on the other side of the market, but only

8    two that owned protection.

9    Q    Okay.  And so, is it your understanding that as a

10   result of Lehman's filing, the positions of CARB

11   Counterparty A were terminated?

12   A    That would be -- yes, that would be my understanding.

13   Q    Okay.  And that -- and this would be their market

14   quotation solicitation?

15   A    Yes.

16   Q    Okay.  And who did CARB Counterparty A reach out to for

17   a market quotation solicitation on CARB?

18   A    They reached out to three counterparties, to Citigroup,

19   to Merrill Lynch, and to RBS.

20   Q    Okay.  And what was the volume that they were asking

21   for prices on?

22   A    $15 million.

23   Q    Okay.  And did they get responses from those three

24   dealers?

25   A    Yes.

Page 100

1   Q    Okay.  And do you understand Joint Exhibit 73 to be the

2   responses that they received?

3   A    Yes.

4   Q    Okay.  And how did you get a hold of this document?

5   A    This document was provided to us by Lehman.

6   Q    Okay.

7           MR. TRACEY:  Your Honor, have I fixed my problems?

8           THE COURT:  So on Exhibit 0073, and we're looking

9   at the Page that ends in Bates 807, there is a block of text

10  that says, "Hi, I am looking to buy protection."  So is --

11  that was -- what you're saying is, that that's the substance

12  of the market quotation?

13          DR. NICULESCU:  Yes.

14          THE COURT:  And you were able to discern from the

15  documents that you reviewed, that that request went out to

16  the three parties that you identified?

17          DR. NICULESCU:  Yes.

18          THE COURT:  And the answer came back to the MQ

19  process from this page, from RBS, with these indications?

20          DR. NICULESCU:  That's correct.

21          THE COURT:  So did the original -- so when it came

22  back, was the pricing inserted?  I'm just trying to

23  understand literally what went out in the -- when Mr. Chaney

24  says, "These indications are good for today," that refers to

25  the plus 15 points upfront on the caret 06?

Page 101

```
 1                 DR. NICULESCU:  That's -- that is correct.

 2                 THE COURT:  Okay.  So the original document that

 3     went out -- maybe I'll ask Mr. Tracey.

 4                 MR. TRACEY:  We don't have that document --

 5                 THE COURT:  Okay.

 6                 MR. TRACEY:  This is the only thing we got.  But

 7     we expect --

 8                 THE COURT:  I -- well, that's what I'm --

 9                 MR. TRACEY:  Yeah.

10                 THE COURT:  That's my confusion, okay?

11                 MR. TRACEY:  Right.  We expect that what this was,

12     was a -- the hi and the text were the request from CARB

13     Counterparty A, which is the other party in QVT's position.

14                 THE COURT:  To the market.

15                 MR. TRACEY:  To the market, asking for quotes.

16                 THE COURT:  Right.

17                 MR. TRACEY:  And the -- it probably listed the

18     eight --

19                 THE COURT:  The eight CARB securities.

20                 MR. TRACEY:  CARB securities, right.  And said,

21     all or nothing, I'd like a quote on CBS's on these eight.

22                 THE COURT:  So when it came back --

23                 MR. TRACEY:  It would have the numbers.

24                 THE COURT:  It would have the numbers, okay.

25     Having used up the available time to (indiscernible)
```

1    confusion, we're going to have to stop there, all right, so

2    that I could dial into my call.  We'll come back in an hour,

3    all right?  And you'll have to remind me at the top, if Mr.

4    Tambe, if you still want to take up that last objection.

5              MR. TRACEY:  Yes, Your Honor.

6              THE COURT:  All right?

7              MR. TAMBE:  Okay.

8              THE COURT:  We'll see you in an hour.

9              MR. TAMBE:  Thank you.

10             THE COURT:  The same rules apply over the lunch

11   break.

12             DR. NICULESCU:  Thank you, Your Honor.

13        (Recess)

14             MR. TAMBE:  Before we start, if you could take up

15   the objection from before the lunch break?

16             THE COURT:  Yes.

17             MR. TRACEY:  We'll just save it for rebuttal, it's

18   not a problem.

19             MR. TAMBE:  Different point.

20             THE COURT:  Different point.

21             MR. TRACEY:  Oh, okay.

22             THE COURT:  I think it was the, about the

23   testimony, about that one answer.  Hold on a second.  All

24   right, so we had left off with my forcing you to explain

25   page (indiscernible) in Bates 807, and that's where we had

Page 103

1    left off.

2    Q    Thank you, Your Honor.  Let's go back to Page 807,

3    which I think you said was a market quotation submitted by

4    RBS in response to Counterparty A's request, is that

5    correct?

6    A    Yes, that's correct.

7    Q    And what I'd like to do, if I can, is focus you on the

8    nnumebrs that are on the column in the middle of the page,

9    and ask you to interpret them for us.  What is it that you

10   understand these numbers to mean, in terms of the price

11   that's being quoted by RBS?

12   A    Certainly.  The contract is a contract for a credit

13   protection at 150 basis point running premium.  With that in

14   mind, the -- RBS's offering to sell to somebody protection

15   on the 061D tranche of caret, caret 061D for a price of 15

16   percentage points up front.  So the buyer of protection will

17   pay 15 percent up front, and 150 basis points, running,

18   while caret 06 -- well, caret 071C, they'll charge a full 80

19   points up front, (indiscernible) 07A, they'll charge 55

20   points up front.

21        The CARB consists of these eight components, and

22   so if you simply average the points up front, the average

23   points up front is the price at which RBS is prepared to

24   sell protection to CARB Fund A in a $15 size notional.  Now,

25   you average them, I think the total is 42.5, so they're

Page 104

1    asking for 42.5 percent of $15 million in order to sell

2    protection to Fund A.  Fund A will then also pay 150 basis

3    points per year, running (indiscernible) on that notional.

4    Q    And I don't have a calculator here, but, so would it be

5    fair to say that RBS is saying, If you pay me about $7

6    million, I will sell you protection on $15 of these eight

7    underlying CDSes?

8    A    Approximately, yes.

9    Q    Okay.

10             THE COURT:  Dr. Niculescu, when you reviewed this

11   data, did you do anything independently to -- I'll use the

12   word vet it, or verity it?

13             DR. NICULESCU:  Yes, yes, I did.

14             THE COURT:  What did you do?

15             DR. NICULESCU:  I did a couple of things.  Looked

16   at the circumstances surrounding these offerings being made

17   by these counterparties, to see whether the offerings appear

18   to be reasonable in the context of current market

19   developments, and in the context of what has happening in

20   September 2008.  I looked at market commentary on yield

21   spreads, or prices for other consumer ABS products.  I

22   looked at market commentary about the shape of the market,

23   the state of the market.  I looked at the fundamental

24   economic developments.  I considered the credit-worthiness

25   and credit support of each one of these tranches.

Page 105

1          THE COURT:  I simply meant with respect to what

2     was sent by RBS, not -- your answer gets more generally into

3     topics I'm sure Mr. Tracey is going to cover, but --

4          DR. NICULESCU:  I only have the worlds on the page

5     in front of me, Your Honor.

6          THE COURT:  Thank you.

7     Q    Okay.  so let's -- we've talked about one of the three

8     market quotations that was received.  I'd like to now turn

9     to the second one, and direct your attention to Page Lehman

10    QVT 61806, can you turn to that page?

11    A    Yes.

12    Q    And would you describe for the Court what you

13    understand that page to be reflecting?

14    A    This is the response from Citi, to the same request.

15    And Citi has written their points up front.  They say in the

16    text (indiscernible) levels below, our points up front,

17    assuming 150 basis points running.  So now it gets to the

18    RBS quote, but at very different, much lower levels.

19          Interestingly, importantly, Citi says level

20    indications only as of 9/16.  I take that to mean that these

21    are not actionable or executable levels.  If I saw that

22    given to me when I requested a quotation, I would not expect

23    to be able to act on that information.

24    Q    Okay.  And again, the numbers that are next to each of

25    the underlying components, those represent upfront costs

Page 106

1    that Citibank is saying they would charge for protection for

2    each of those underlyings?

3    A    That's correct, yes.  Our points upfront, yes.

4    Q    Okay.  And in the same way, if you wanted to figure out

5    how much you would have to pay Citibank for protection, you

6    would average those percentages, multiply it by 15 million,

7    and you'd get the price?

8    A    That's correct.

9    Q    Now, let's turn to the third quotation, which I gather

10   is more complicated.  It's the quotation that's on 61808.

11   Could you describe for the Court what that page represents?

12   A    Yes, this is a response from a couple of people at

13   Merrill Lynch.  The most significant part of the response, I

14   think, follows the same question that was posed to RBS, the

15   very same words, "Hi, I'm looking to buy protection on the

16   following list of names," et cetera.  What Merrill Lynch has

17   done is they've filled in data on each one of these eight

18   component parts.  But instead of conveniently giving us

19   points upfront, they've given us a basis point spread, which

20   is in the case of caret 061D, 1251 basis points.

21         They also show the rating of each one of those

22   underlying bonds, and what I believe to be the weighted

23   average life.  So caret 061D was rated AAA/AA/A, and had a

24   weighted average life of 1.81 years.  Also on the page, as

25   you go further up, there's some other conversation that

Page 107

1    Tracy Keegan responds to with a 7CPR.  I don't know exactly

2    what that, the significance of that is.  But what we do have

3    is we have in the body, starting at the valuation, or the

4    pricing on the caret 061D, a series of spreads, or

5    (indiscernible), starting at 1250 basis points, and going

6    through 1600 and so on through the end.

7            And these are the premiums that Merrill Lynch is

8    saying that they would charge in order to sell protection on

9    each one of these component parts.  So it's 150 basis points

10   running spread.  They would charge the 1250 on the 061Ds,

11   1600 on the 062Ds, a simple average of these numbers is 1450

12   basis points.

13   Q    And so just to make sure we understand, let's take the

14   caret 061D, the first one, and Merrill Lynch is saying --

15   correct me if I'm wrong, if you want to buy protection on

16   this component, you'll have to pay me 12.5 percent per year.

17   A    Yes, that's right.  You'll have to pay be 12.5 percent

18   per year.  The current contract was written at 150 basis

19   points.  That's no longer a market level.  Merrill Lynch now

20   wants 1250 for caret 061D, it wants 1450 for the collection

21   as a simple average, for the eight.

22   Q    Okay.  And so unlike the other two, it does not have a

23   points upfront, is that correct?

24   A    That's correct.

25   Q    Okay.  So how did you --

Page 108

1            THE COURT:  I'm sorry to interrupt you, but the

2     column that has the years?

3            DR. NICULESCU:  Yes.

4            THE COURT:  Can you explain again what that

5     indicates?

6            DR. NICULESCU:  I think it almost certainly

7     indicates the weighted average life of each one of the

8     underlying bonds.  Now, that's not noted on the sheet.  But

9     the column is very close to whatever computer's a weighted

10    average life.  And the reason that I come to this collusion

11    is that what Merrill Lynch appears to have done is it's

12    taken descriptive information on each one of these bonds off

13    a database, and populated that descriptive information onto

14    the sheet here.  This is not an unusual thing to do, people

15    do this.

16           THE COURT:  Okay, so then the basis points that it

17    quotes are what it would pay per year, in order to sell the

18    protection?

19           DR. NICULESCU:  That's right, that's correct.

20           THE COURT:  So then, but then you say that you did

21    a simple, arithmetic average.

22           DR. NICULESCU:  Right.

23           THE COURT:  But how could that be the case when

24    each of the lines runs for a different period of time?  In

25    other words, on the Caret 061D, the life, if you will, is

Page 109

1   1.81 years at 1250 basis points, but then you go down to the

2   Caret 072, where they're charging 1600 basis points, the

3   life is 3.56 years.  If that's a stupid question, you can

4   (indiscernible) --

5              DR. NICULESCU:  No, not at all, that's a more

6   educated question.  The answer is the simple average is

7   nothing but a simple average.  The correct way of averaging

8   these spreads is to weight them by the duration of each of

9   the component parts.

10             THE COURT:  Yes.

11             DR. NICULESCU:  If I do that, the average is,

12  depending on the way I -- depending on the exact way that I

13  would (indiscernible) for projections is about 1492 basis

14  points.

15             THE COURT:  Okay, but the 1450 that's in Page 8 of

16  the deck there --

17             DR. NICULESCU:  Yes.

18             THE COURT:  Is the simple average, not the

19  weighted average.

20             DR. NICULESCU:  Yes, correct.  It is just a simple

21  average, for illustrative purposes, intended to minimize,

22  rather than increase confusion.

23             THE COURT:  Okay.

24  Q    Okay, so you've got these three quotes.  You have no

25  other pricing information.  What do you do with the three

Page 110

1    quotes, in order to arrive at a value of QVT's CARB

2    position?

3    A    There is a standard conversion process for credit

4    structured product of this type, for the subprime ABX index,

5    for example, also for the CARB index, which is to use a

6    concept called spread duration to convert the spread into a

7    price, or a value.

8    Q    And just to be clear, you're talking only about the

9    Merrill Lynch quote, not the other two?

10   A    That is correct.  The other two already exist in points

11   upfront, the Merrill Lynch quote now would have to be

12   converted.  The Merrill Lynch quote is the one quote that

13   Party A used, and it's the quote that I would use, because

14   Citigroup says they're indicative, so I believe I cannot use

15   it.

16        RBS says indications are good for today.  I don't

17   have further information to vet the RBS quote.  When it says

18   good for today, I suspect this is executable, when it says

19   indications, I now know, and am no longer confident it is

20   executable.  I therefore have elected not to use the RBS

21   quote, which takes me to the same quotation that CARB Fund A

22   used, which is the Merrill Lynch quotation, but now I have

23   to convert that quotation into price.

24   Q    Okay.  And how do you do that?

25   A    I used this concept called spread duration.  Spread

Page 111

1    duration is defined as the change in price for a 100 basis

2    point change in spread.  And this is a standard conversion

3    that's used in the subprime ADX.  Lehman itself, in its

4    introduction to CARB, references it.

5            The formula is simply the product of spread

6    duration times, the current CDS spread minus the fixed rate.

7    So if the current spread were, for example, on Caret 061D,

8    1250 basis points, I subtract 150, I then have 1100 basis

9    points, I multiply it by the spread duration, and that gives

10   me the cost of protection.

11   Q    And is that method that you've described, is that a

12   standard methodology for converting spreads to prices?

13   A    It is, absolutely standard.

14           MR. TAMBE:  Objection, foundation, Your Honor.

15           THE COURT:  Fair enough, go ahead.

16   Q    Sure.  Dr. Niculescu, are you familiar with the

17   methodologies that are used in the industry for converting

18   spreads to prices?

19   A    Yes.

20   Q    How are you familiar with that?

21   A    Generally speaking, in all fixed income duration, or

22   spread duration is used, because it is definitionally, the

23   rate of change of price for a change in spread or yield.

24   And so it is a common measure that's been used in this

25   market ever since 1938 or 1939, in the market for credit

Page 112

1   derivative products, such as the ABX subprime market, and

2   the CARB market, that has been defined as the conversion

3   factor, I would reference the Lehman introduction to CARB,

4   for example, which uses the spread duration.  My own

5   experience in ABX, also, speaks to the use of spread

6   duration.

7   Q    You mention the Lehman publication, let's take a look

8   at that.  Can you pull up Defendant's Exhibit 5037, please?

9   That's in your book, it's in the back, and it's Exhibit

10  5037, if you want to turn to it.  Is that the document you

11  referred to, that lies on spread duration as a methodology?

12  A    Yes, it is.

13  Q    And would you point us to where you're referring to?

14  A    You need to go to Page 5, and to the second paragraph

15  on Page 5.  Yes.  What we'll see here, that the index that's

16  marked by Lehman Brothers and trades on price, rather than

17  spread terms, and is quoted as a percentage of par, so this

18  explains the otherwise confusing fact that these indexes

19  trade in bond-equivalent terms, so 97 would be a value

20  protection of $3.

21         It goes on to say the CARB index premium is fixed

22  at 150 basis points, we've seen this before, and has a

23  spread duration of about three years, or three percent, is

24  the same concept.  That that was the spread duration at the

25  time that his was written, clearly, that the duration can

Page 113

1    change from time to time.

2           They then go on to explain, for example, if

3    spreads widen by 100 basis points, the CARB index would

4    trade at about 97, would trade down from par to 97.  So what

5    happens is the 100 basis point move, the one percent move

6    multiplied by three is a three percent change in the current

7    value of the CARB index, or $3 change in the value of the

8    protection purchase, the value of the protection.

9    Q    So for any change in spread, if you know the spread

10   duration, you can just multiple it and come up with a change

11   in price, is that right?

12   A    From par, you multiply the change from par, and you

13   apply the change in price.  This works -- yes, this is the

14   standard method.  And it's appropriate, and these

15   circumstances, it's relatively highly priced index

16   component.

17   Q    Okay, and how do you go about determining a spread

18   duration for this CARB position?

19   A    Well, we have one spread duration given to us already

20   by Lehman as a starting point.  And then I looked at that,

21   and went a little further in trying to refine the spread

22   duration for this valuation purpose.

23   Q    All right, why don't we take a look at Joint Exhibit

24   38, which is in the beginning of your book.  Could you

25   describe what this document is, as you understand it?

Page 114

1    A    Yes.

2    Q    And how it relates to what you're describing?

3    A    Yes, this is an update on August 15th, 2008, on the

4    CARB BBB, showing Lehman's bid and offer on that index, at

5    that time.  And as they do with indexes, they bid it at 79

6    and 1630 seconds, that's 79.5.  They offered it at 83.5,

7    that was a change of a half a point on the day.  That means

8    that they were bidding the index, 79.5, means they were

9    offering to sell protection at 100 minus 79.5, or 20.5.

10         The spread for that bid side was 882 basis points.

11   The coupon, which was also the running spread, or premium

12   for the CARB index, was 150 basis points, we see that.  The

13   spread on bid side was 882, the spread on the offer side was

14   739.  The coupon was 150 basis points, and they helpfully

15   show us the spread duration that they're using of 2.8.  It's

16   a little bit lower than the three that they had mentioned in

17   the introduction to CARB.

18         Now, it turns out that if you take 882, and you

19   subtract from it 150 basis points, you get 732.  If you

20   multiply 7.32 times 2.8, you get almost exactly 20.5, which

21   is the cost of protection.  So this simply illustrates that

22   what Lehman said it was doing in its introduction is in fact

23   what it was doing in its offerings.

24   Q    So is it fair to say that what you have here when you

25   have the 882 is the equivalent of the kind of quote that

Page 115

1    Merrill Lynch provided, in spread terms, not price terms?

2              THE COURT:  Yes, Mr. Tambe?

3              MR. TAMBE:  Objection, leading, Your Honor.  This

4    is complicated enough, I'd rather have the witness testify.

5              THE COURT:  Well, what I'm trying to understand is

6    the methodology, that, to be entirely simplistic, gets me to

7    an apples to apples basis between the way that Merrill's

8    quoting, and the way that Citi, and RBS, and Lehman were

9    quoting.

10             MR. TRACEY:  And that's exactly what I was trying

11   to draw a comparison between.

12             THE COURT:  Right, so you objection on foundation

13   --

14             MR. TAMBE:  No, on leading basis.

15             THE COURT:  No, I understand.  I'm still back at

16   the prior objection, so then we've gone through step by

17   step, and now this is just the punchline.

18             MR. TRACEY:  Yeah, and I'm just really repeating

19   what the witness has already said, just to make sure that

20   it's absolutely clear on the record.

21             THE COURT:  Right.

22             MR. TRACEY:  It's not -- I'm not trying to lead

23   the witness anywhere, he's already taken me there.

24             THE COURT:  No, I understand.  So Mr. Tambe, I'm

25   not -- I mean, I hear you, it sounds leading.  But it's

Page 116

1    really just kind of getting the last point in what I have

2    viewed as a chain of statements.

3             MR. TAMBE:  It may well be the last point, Your

4    Honor, but again, in this particular instance, maybe the

5    objection isn't sustained, but I do have a concern that as

6    we go through this -- this is complicated.  There are many

7    things this witness has done that she should be explaining,

8    not shortcutting and saying, "Isn't this the same as X?"

9             THE COURT:  All right, well in the spirit of

10   having some structure to it, I'm going to continue to allow

11   Mr. Tracey to ask more finely-tuned questions.  You can

12   renew your objection from time to time, and I will tell you

13   that I may become more vocal that I've been during the first

14   13 days of this case, to make sure that I understand.  And

15   if I raise something that you might not have -- oh well.

16            MR. TAMBE:  Mm hmm, sure.

17            THE COURT:  Okay?

18            MR. TAMBE:  Yep.

19            THE COURT:  All right.  Now, can you re-ask your

20   question, please, Mr. Tracey?

21   Q    Sure.  I wanted to know if the spread of 882 that we

22   see on Joint Exhibit 38, is the equivalent of the -- in

23   pricing terms, of the spread that was listed by Merrill

24   Lynch, when they were offering, in spread terms, to sell

25   protection.

Page 117

1    A    Yes, it is.  But the complication here is that the

2    Merrill Lynch spread was on each of the component parts.

3    And so as Your Honor accurately described, we needed to find

4    an accurate average of those component parts.  The simple

5    average is 1450, the duration-weighted average would

6    probably be closer to 1490.  So that would be the analogous

7    spread.  It's on the same side of the market, it's the offer

8    to sell protection, or to buy the index.  So in that sense,

9    it's analogous.

10            And it's notable that from August 15th through

11   September 15th -- September 16th, the date of the offer,

12   that spread provided by Lehman at 882 was now provided by

13   Merrill at 14 -- call it 1490.  So there'd been a very

14   substantial lightening.  Analogous as well, just Lehman did

15   a --

16            THE COURT:  I'm sorry, but we've got that 150

17   points up front.

18            DR. NICULESCU:  Correct.

19            THE COURT:  So we're not in apples to apples.

20   Because the Merrill spread didn't have 150 points up front.

21            DR. NICULESCU:  It does.  There is a -- you can

22   buy this contract at 882, that is to say you can buy

23   protection on this at 882.  You can buy protection from

24   Merrill at 1419.  And the Merrill also includes the 150

25   basis points.  So essentially, what you pay here is 882 for

Page 118

1    Lehman, and what you're paying for Merrill is 1205.  You're

2    not paying 882 plus 150, you're paying an 882 total amount,

3    and for Merrill, you're paying a 1490 total amount.  They

4    are apples to apples.

5              THE COURT:  Okay.

6    Q    Okay.  So focusing again on Joint Exhibit 38, Lehman is

7    saying you have to pay 882 spread per year for protection on

8    this.

9    A    Yes.

10   Q    And do I understand your testimony correctly that they

11   also provided the other kind of price, that is, the upfront

12   price?

13   A    Yes.

14   Q    Okay.  And that was what?

15   A    20.5, that's 100 minus 79.5, 20.5.

16   Q    So do I understand you correctly that here, unlike

17   Merrill Lynch, we know both types of pricing?

18   A    Yes, we know both the spread and the upfront price, and

19   we see explicitly their duration assumption, which is needed

20   to go from the spread to the upfront price.

21   Q    Okay, and that's 280 here?

22   A    2.80, yes.

23   Q    Okay, and so we're trying to come up with a spread

24   duration that will take that 1490 number, and get to an

25   upfront price, is that correct?

Page 119

1    A    That's correct.  Perhaps I could venture to assist the

2    Court in one other respect, if I may.  If the spread shown

3    here by Lehman had been 150 basis points instead of 882,

4    then the index would have been at par, the cost of

5    protection would have been zero.  And the formula would have

6    been 150 basis point spread minus 150 basis point

7    (indiscernible) equals zero, times the spread duration, the

8    cost of protection is par, is zero.

9    Q    Okay.  So now we've got the Merrill spreads, and we're

10   trying to come up with a spread duration, to convert it to

11   an actual price.  How do you do that?  You have a spread

12   duration here on Joint Exhibit 38, do you use that?

13   A    No.  I go out, and I don't believe I can -- I believe

14   that would overstate the value of the claim, if I used the

15   2.8 duration.

16   Q    Why would that be?

17   A    The reason is that as spreads widen, in this case from

18   882 to 1490, spread duration tends to get a little bit

19   shorter.  This is just a matter of bond mathematics.  It's

20   an analytical matter, but it's a fact, spread duration tends

21   to shorten as spreads widen slightly, and for securities of

22   this type.  And so I felt it was necessary to recompute the

23   spread duration, for if I used the Lehman duration of 2.8, I

24   would have inflated or overstated the value that I believe

25   Merrill Lynch would have asked in points.

Page 120

1   Q    Okay, and what do you need to know in order to adjust

2   that spread duration in an appropriate way?

3   A    You need to be able to project the cash flows on the

4   eight underlying securities.  And in order to do that, you

5   need to have some assumption that you can put into a cash

6   flow mechanism such as Intex, in order to project how those

7   securities will pay over time.  The most -- the common

8   assumption is a prepayment rate, that tells you how many

9   auto loans are going to be prepaid every year, over the

10  remaining life of the securities.  Once you put that

11  assumption in, you can project the cash flows.

12          If you put that assumption in, and you put in the

13  spread of each of the components, Intex will report to you

14  the spread duration of each of those components.

15  Q    Okay, and did you go through that process?

16  A    Yes, yes, I did.

17  Q    Okay, let's turn to your Slide 10.  Could you describe

18  for the Court how you went through that process, to

19  determine that spread duration?

20  A    Yes.  So here we have in the orange box, the Lehman

21  spread duration, for reference.  I did not use it.  Instead,

22  I computed using Intex the spread duration, I did so using

23  two methods.

24          The first method was where I took the most recent

25  recorded prepayment rate, the so-called ABS rate.  That was

Page 121

1    reported on September 15th, it's entirely relevant.  And I

2    simply assumed that that prepayment rate remained constant

3    throughout the remaining life of each one of these

4    securities.  I'm of the opinion that that is a conservative

5    assumption.  As prepayment rates decline, the average lives

6    extend.  The security becomes longer.  As it becomes longer,

7    the spread duration goes up.

8            Now, prepayments had been slowing considerably in

9    the few months up to this point.  And slowing despite the

10   fact that seasonally, they would tend to increase at that

11   time.  Prepayments and auto loans tends to track how

12   frequently people trade in their cars.  When you trade in

13   your car, you trade off your auto loan, and get a new loan.

14   So in worse economic environments, people tend to trade in

15   their cars less frequently, and prepayments tend to go down.

16           I think that it could be that the right prepayment

17   projection that a dealer might have made at a time would be

18   appropriate payments to continue to decline.  I think I

19   remember reading Mr. McDougall, in testimony suggesting

20   that.  I would agree with that.  I don't have any particular

21   factual basis to project a decline at that point, and so

22   instead, I just decided to leave that prepayment projection

23   constant.

24           If I do that, and I input each one of the spreads

25   for each one of the eight component parts, I compute a

Page 122

1    spread duration -- Intex computes for me a spread duration

2    of 2.6, a little bit less than Lehman's 2.8.  That's my

3    first method.

4    Q    Okay.  And you used two methods, why did you use two

5    methods?

6              THE COURT:  Can I stop you before you move on,

7    (indiscernible)?

8              MR. TRACEY:  Sure.

9              THE COURT:  You're talking about prepayment rates.

10             DR. NICULESCU:  Yes.

11             THE COURT:  So you're talking about not Joe

12   Consumer makes his car payment every month.  You're taking

13   about Joe Consume has five car payments left, and prepays

14   the rest of those payments.

15             DR. NICULESCU:  Yes.  Joe Consumer decided to sell

16   his Pontiac and buy Buick, and when he did that, he had to

17   pay off the Pontiac loan, which had five months left on it,

18   and get a new loan for the Buick.

19             THE COURT:  And you're saying that the decline in

20   the rate of prepayment is a driver of the pricing of

21   protection on CARB?

22             DR. NICULESCU:  It is.  It's a driver of how long

23   you can project these securities to stay outstanding.  And

24   these securities all extended --

25             THE COURT:  The securities that are in the CARB

Page 123

1    basket, or the securities being the actual auto loans that

2    Joe Consumer is paying off?

3            DR. NICULESCU:  The securities being the

4    securities referenced by the CDS in the CARB basket, which

5    are these subordinate tranches of deals that are backed by

6    the loans that Joe Consumer has.

7            THE COURT:  Okay.

8            DR. NICULESCU:  And as Joe Consumer pays that more

9    slowly, these particular tranches tend to extend, they get

10   longer, and as their average lives get longer, somebody

11   looking to sell protection on them will find that protection

12   exposes them to risk for a longer period of time.

13   Q    And so am I correct that the slower the prepayments,

14   the higher the spread duration?

15   A    Yes.

16   Q    And so you need it to figure out the level of

17   prepayments to get to your spread duration?

18   A    That is correct, yes.

19   Q    So in method one, you said you used the most recent

20   prepayment numbers, correct?

21   A    That's correct.

22   Q    Did you use a different method in method two to predict

23   those prepayments?

24   A    Oh yes, yes.  So on method two, I went back to the

25   sheet, the offering sheet that Merrill had provided to fund

Page 124

1    Counterparty A, and I observed that there are what appear to

2    be weight average lives written on that sheet for each one

3    of those components.

4    Q    All right, let's just go back to that and make sure

5    that we are together.  That's back in Joint Exhibit 73?  And

6    are you talking about the weighted average lives in the

7    Merrill Lynch quote in Joint Exhibit 73?

8    A    I am.

9    Q    And show us where those are?

10   A    Can you go to the page that shows the Merrill Lynch

11   offering, please?

12   Q    It's 1808.

13   A    Here we are, yes.  So you'll see that what Merrill

14   Lynch has done is populated each of the eight lines form

15   caret 061B through (indiscernible) 7AC, shown the rating,

16   shown the weighted average life, and shown the spread or

17   premium that they would require.

18          And so here we have a series of weighted average

19   lives, starting at 8.18 years, caret 061D, which is a very

20   short, very subordinate piece, but it's a very short piece,

21   out to one of the most recently-issued pieces, caret 072,

22   3.56 years.  So my intention here was by trial and error to

23   put in prepayment rates into Intex, until the weighted

24   average life of the underlying security matched this

25   weighted average life.  And so that's what I've done, I've

Page 125

1    matched those weighted average lives by iterating on the

2    prepayment rate.

3    Q    Okay.  And so when you performed that, what spread

4    duration do you get?

5    A    I get a spread duration of 2.3, instead of 2.6.  It's a

6    shorter spread duration.  These weighted average lives

7    appear to be consistent with somewhat faster prepayments,

8    and the prepayment rate that was reported most recently on

9    September 15th, 2008.  I'll note, however, that there is

10   something else on the Merrill Lynch sheet that is in

11   conflict with --

12   Q    Before we get to a conflict, I want to make sure we

13   understand where we are now.

14   A    Certainly.

15   Q    So we started with a Lehman spread duration number of

16   2.8, remember.

17   A    Yes.

18   Q    And you adjusted under your first method to 2.6, is

19   that right?

20   A    Yes, yes.

21   Q    And as a result of that adjustment, does the value of

22   the protection go up or down?

23   A    The value of the protection goes down.  And I'll tell

24   you by exactly how much, it goes down by 0.2 over 2.8.  It

25   goes down by a little bit less than 10 percent.

Page 126

1   Q    Okay.  And do I follow you that when you do your second

2   method, and adjust it again, the price goes down again.

3   A    Correct, yes, so it goes down in this case from what it

4   would have been by 0.5 of 2.8, so it goes down by that,

5   slightly less than 20 percent.  0.5 over 2.8.

6   Q    So under either of your scenarios, the price of

7   protection is lower than using Lehman spread duration?

8   A    Yes, that's correct.

9   Q    All right, so now we've got those two spread durations,

10  and we can move forward, but you wanted to talk about a

11  conflict.

12  A    Yes, if you go back to the Exhibit 1808, you'll see

13  that there is written on the page 7CPR, a couple of lines

14  above.  I am of the opinion that likely refers to a

15  prepayment projection used for valuation, but I don't have

16  any other basis to support that conclusion.  I see it on the

17  page, but I haven't been able to vet it in any other way.

18  If I were to use a 7CPR, the spread duration would in fact,

19  be considered to be higher than this.  I have no done that.

20  I know it's on the page, but I have no further information

21  that allows me to use it in one way or another.

22  Q    Would the spread duration, if you used 7CPR, would be

23  higher than either of your two methods?

24  A    Correct.

25  Q    And that would be a higher value and a higher cost?

Page 127

1    A     Correct.

2    Q     But you haven't used it.

3    A     I haven't used it, I have no other basis to presume its

4    use.

5    Q     Okay.  So now we've got the 2.3 and 2.6 spread

6    durations, how do you turn those into prices?

7    A     So those spread durations then must be multiplied -- in

8    fact, the spread duration for each of the eight component

9    parts has been multiplied by the spread for each of the

10   eight component parts, the spread that Merrill Lynch quoted,

11   then summed up, and the results I show on the next slide,

12   where I've now converted the Merrill Lynch quote using

13   method one and method two using price terms, this is percent

14   of notional.  Method one, with the longer duration, has the

15   higher value, it's 34.8 percent.  Method two is 31.6

16   percent.  This is for $15 million size, and it compares to

17   Lehman's offer, on August 21st, of 23 percent, for what is

18   commonly, as Mr. McDougall said, a $5 million to $10 million

19   market.

20   Q     And so to get to an actual dollar number, how would you

21   take your percentage numbers and get to a dollar number for

22   2000?

23   A     The problem I face is that $18 is a very different

24   amount than $15.  And if Merrill Lynch were prepared to ask

25   to be paid between 31 and 35 percent of 15 million, I am of

Page 128

1   the opinion they would have wanted considerably more money

2   in order to sell protection on $80 million.  So my task

3   really now is to bale up a reasonable adjustment for the

4   much larger size of the QVT position, that's my next task.

5   Q    And how do you know about --

6   MR. TAMBE:  I'll just note my objection to foundation to

7   part of that answer.  I understand the calculation he's

8   done, I have the objection to foundation.

9            THE COURT:  It's an assumption, correct?  It's an

10   assumption, it's not based on any empirical --

11            DR. NICULESCU:  The size adjustment?

12            THE COURT:  Yes.

13            DR. NICULESCU:  The size adjustment is based on

14   empirical data.

15            MR. TRACEY:  We're going to take the Court through

16   that.

17            THE COURT:  Okay.

18   Q    Okay, what did you base your size adjustment on?

19   A    I observed a trade, a transaction that Lehman had done

20   with QVT on July 17th, 2008.

21   Q    Okay, let's take a look at that.  John, could you bring

22   up Lehman's Exhibit 1173?  Okay, so before we get into this,

23   just, could you tell us why we're looking at these

24   documents, and what they have to do with a size adjustment?

25   A    Certainly.  What we'll see is that Lehman did a $10

Page 129

1    million trade with QVT on July 17th, and minutes after they

2    did the trade, they sent out an email broadly updating the

3    market, saying that trading in CARB leads the market at a

4    new level.  So that $10 million trade, Lehman said a few

5    minutes later, caused them to move their price on

6    protection.  In fact, a $10 million trade caused them to

7    lower their price of protection by a point and a half in

8    July of 2008.

9            THE COURT:  I'm sorry, I totally missed, where is

10   that?

11           MR. TRACEY:  We're going to take the Court through

12   it.  That's just the -- that's the introduction.

13           THE COURT:  That was the preview?  I see.  Okay.

14           MR. TRACEY:  All right, so let's --

15           THE COURT:  Sorry, I don't mean to be impatient.

16           MR. TRACEY:  No, no, we're getting to it quickly.

17           DR. NICULESCU:  It's exciting stuff.

18   Q    Okay, so Dr. Niculescu, if you could look at Claimant's

19   Exhibit 1173, and tell us what you see there.

20   A    Yes, so this is an email sent by John (indiscernible)

21   on Thursday, July 17th at 9:12 AM.  It's a CARB auto-update.

22   It shows their bids and offerings on their three CARB

23   indexes.  Only the last one, the 071 BBB is relevant, and

24   ever traded.  You see, we're now familiar with these things,

25   at this point, that the spread duration at this time was

Page 130

1    3.0.

2              Now, I will look to the offered side of

3    protection, as that's what relevant here today, which was 84

4    points.  That was where they would offer the index where

5    Lehman would be prepared to buy protection.  That's a spread

6    of 683 basis points.  They would buy protection at 100

7    minutes 84, that is, they would pay 16 points.

8    Q    Okay, so that's an offer.

9    A    I will note that they -- they also note spreads assumed

10   most stressed are underlying cash flows.  This is just, they

11   just project cash flows, no defaults -- I beg your pardon.

12   Spreads assume most stress to underlying cash flows.  They

13   simply project these cash flows, with no presumption of nay

14   defaults being embedded in the project.

15   Q    And so do I understand you that 1173 is an offer by

16   Lehman?  Or a quotation?

17   A    I'm sorry, 1173?

18   Q    Yes, Claimant's Exhibit 1173 (indiscernible) --

19   A    Oh, I beg your pardon.  Claimant's Exhibit, yes, this

20   is a bid and offer for protection by Lehman, it's a two-way

21   market.

22   Q    Okay.  Now turn, if you would, to Claimant's Exhibit

23   1174, and tell me what that represents.

24   A    This is a trade confirmation from somebody,

25   (indiscernible), it would be (indiscernible) at Lehman to

Page 131

1    Arthur Chu and others, please confirm the following trade:

2    Lehman sells 10 million CARB 071 BBB to QVT at 84.

3            Then clarification, Lehman is selling the

4    index/buying protection on this trade.  So Lehman is buying

5    protection from QVT for 10 million.  Lehman pays just under

6    1.6 million, that's a 16 points, based on the accrual start

7    date, at 150 basis point running spread.  So they're paying

8    effectively the 16 points on a $10 million transaction.

9    Q    Okay.  So that's the trade.  And then if you would turn

10   to Claimant's Exhibit 1175, and tell me what that

11   represents.

12   A    Yes, now note the date, the time.  It's the same date,

13   July 17th, at 9:20 AM.  You'll note that the previous email

14   that updated the CARB level was at 9:12 AM, so this is some

15   eight minutes later.  And the subject says CARB auto-

16   updated, trading BBBs, LVS, this means leaves, trading BBBs

17   leaves 82.5, 85.5.  And as you look at the change, you'll

18   see that the change for the 071 BBB, in the body, is 1.5

19   points.

20           So what happened here is we had one update at

21   9:12, we had a trade with QVT for 10 million, Lehman comes

22   out shortly afterwards with an update that as a result of

23   trading in BBBs, we know this is a $10 million, the market

24   has moved by a point and a half, so QVT could no longer sell

25   protection to Lehman at 16 points, it could only sell

Page 132

1    protection to Lehman at 14.5 points.  In other words, that

2    $10 million trade was enough to move the market by 1.5

3    points.

4    Q    And just to be clear, what is leaves 82.16, 85.16 in

5    the subject mean?

6    A    It means that that is the new market level, that

7    reading has caused the market to move to that level.  It now

8    leaves the market at 82.5, 85.5.

9    Q    Okay.  And what is the significance of that 1.5 point

10   move on a $10 million trade, to your analysis?

11   A    The significance was to me is that this was indeed a

12   market that was very thin, even in July, and even with the

13   sponsoring party, Lehman, that sponsored the index, a

14   relatively small trade of 10 million would cause Lehman to

15   move the price of the index at that time by 1.5 points,

16   presumably in order to encourage somebody else to buy

17   protection, and discourage people from selling protection.

18   So they had (indiscernible) little appetite for this risk,

19   and as somebody came in and sold them 10 million protection,

20   they didn't want to buy any more protection, so they moved

21   the market in order to encourage people to buy protection,

22   and discourage others form selling protection.

23           MR. TAMBE:  Objection, move to strike, lack of

24   foundation, speculation.

25           THE COURT:  Okay, so I need to go back.  So the

Page 133

1     first thing that you looked at with Mr. Tracey was Exhibit

2     1173, right?  (indiscernible) Thursday, 9:12, right?

3                DR. NICULESCU:  Yes.

4                THE COURT:  And then eight minutes later is

5     Exhibit 1175, right?

6                DR. NICULESCU:  Yes.

7                THE COURT:  And you're saying in those eight

8     minutes, a trade occurred that moved the market?

9                DR. NICULESCU:  That's right.

10               THE COURT:  And how do you know that?

11               DR. NICULESCU:  Because Lehman says that there was

12    an update of trading eight minutes after the first run, they

13    say update trade in BBBs leaves 82.5, 85.5.  That's what

14    they're saying in the second email.

15               THE COURT:  Okay.  And how do you know what

16    trading they're referring to?

17               DR. NICULESCU:  We've seen the Lehman trade log,

18    and there was one trade, there was that 10 million trade,

19    and so that was the trade that (indiscernible).

20               THE COURT:  The $10 million trade that's at 1174?

21               MR. TRACEY:  Yes.

22               DR. NICULESCU:  The trade was reported at -- yeah,

23    we see it at what is it, Claimant's 1174?  Yes, that's

24    right, that's the trade that was on that date.

25               THE COURT:  And there's some other document that

Page 134

1    shows when that trade occurred?

2              DR. NICULESCU:  No, not to my knowledge.  The

3    trade confirm went out at 2:57 PM, but the only trade in the

4    Lehman trade log that day was this trade.

5              MR. TAMBE:  I still have my objection to

6    foundation, form, and speculation.  I just don't think

7    there's any basis for the testimony.

8              THE COURT:  Could you come up for a moment,

9    please?  We're going to take a nine-minute break, you're

10   welcome to stay here or take a walk.

11             (Recess)

12             THE COURT:  Have a seat.  Thank you for your

13   patience.

14             DR. NICULESCU:  You're welcome.

15             THE COURT:  Okay, Mr. Tracey.

16             MR. TRACEY:  Okay.  Thank you, your honor.

17             THE COURT:  When we last -- when we left off, I

18   was asking Dr. Niculescu about the trade that had moved the

19   CARB pricing.

20   Q    And Dr. Niculescu, you were asked some questions by the

21   Court about how you know that the trade that is referred to

22   in these documents was the one that moved the market?  And

23   could you describe how you know that?

24   A    Yes.  This is something of detective work, indeed.

25   There was one trade reported that day on the Lehman trade

Page 135

1    log, for $10 million.  That trade was the trade with QVT.

2    It's reported in the confirm here.  Confirms typically go

3    out somewhat later in the day that the trade happens.

4    They're executed by the back office.  It says confirm went

5    out around 3:00 PM that day.

6           But the trade, Lehman reported as of 9:20 that

7    there was a trade in its email, and that it led the market

8    to 1.5 lower, in terms of protection, than it had been

9    previously.  And so putting these pieces together, there was

10   that one trade on that day.  It was reported by Lehman at

11   9:20 in the morning, therefore that has to have been the

12   trade that moved the market by that amount.

13   Q    Okay.  I'd like to bring up that log, and show it to

14   you, if I may?

15   A    Yes.

16   Q    That's Claimant's Exhibit 2078.  Okay, and placed

17   before you, what's been previously marked as Claimant's

18   Exhibit 2078, can you identify that document?

19   A    This looks like the Lehman trade log for CARB.

20   Q    Okay.  Can you scroll to the right, John?  Now, what

21   I'd like to do -- is it your understanding that this

22   reflects all of the trades for CARB?

23   A    Yes.

24   Q    And now we've filtered this to reflect only the trades

25   that took place on July 17th, 2008.  (indiscernible) in

Page 136

1    Column P.  Do you see what's left on the CARB log?

2    A    Yes.

3    Q    And does that -- what does that reflect?

4    A    This reflects one trade, was allocated across two

5    parties, QVT fund and QVT financial Quintessence.  The total

6    amount is the sum of the two notionals in Column F.  And if

7    you sum that, I believe it sums to 10 million, that has a

8    maturity date of 2014, it shows the upfront fee, which sums

9    to the number shown, I believe, on the trade confer.  And

10   the other details are as you would have expected.

11   Q    And do you conclude -- what do you conclude from this?

12   A    Well, I conclude from the Lehman trade log, which I

13   take to be accurate, that Lehman did one trade on July 17th,

14   2008.  That was the trade with QVT.  It is the trade that is

15   described in the Lehman email that confirms that trade.  The

16   conditions and terms match precisely.  And it has to have

17   been the trade that was executed immediately prior to 9:20

18   AM, because of Lehman's email saying that trading in CARB

19   BBBs leaves the market at 85.5, at a new level.  I think

20   there can be no doubt this is the trade that's being

21   referred to, and this was the consequence of that trade.

22   Q    Okay, and so you've stated that that trade moved the

23   market 1.5 points.  How do you use that to determine a size

24   adjustment for the size of QVT's trade?

25   A    The size of QVT's trade was $80 million, which was 65

Page 137

1    million more than the size quoted by Merrill Lynch to fund

2    Party A.  I can see that a $10 million trade back in July

3    moved the market by 1.5.  I therefore make an assumption.

4    My assumption is that the market sensitivity in September,

5    without Lehman being present, was the same as the market

6    sensitivity in July, when Lehman was present.  And I can

7    simply take the new larger size, incremental size, and

8    multiply it by the size adjustment for $10 million.

9           So what I do is I take 65 million, which is 6.5

10   times 10 million, and then multiply it by 1.5 points.  The

11   result of multiplying 6.5 by 1.5 is 9.75, so I proposed

12   adjusting the price by 9.75 points.  Now, I would seek to

13   explain that, if you will --

14   Q    Please explain how you come to that conclusion.

15   A    There's a number of assumptions here.  First, what I'm

16   doing is I'm trying to move up a demand curve by saying that

17   if a certain price, let's say 34, was good for 15 million,

18   what would the price have to be to be good for something

19   that's 65 points, $65 million larger?  How much more would I

20   have to pay to move it up that amount?  And I observed there

21   was a price sensitivity back in July, 1.5 per 10 million, so

22   I'm applying that sensitivity.

23          Now, there's two possible flaws I see with this

24   approach.  On the positive size, the approach is strictly

25   data-driven.  Whenever possible, I like to find data to

Page 138

1   support my results, rather than simply depending on my

2   experience, or others.  And this is purely data-drive.  I

3   have a data observation, I know the size of the trade, I

4   know the sensitivity of the impact of the trade, so it's

5   data-driven.  The flaws, however, one's a positive flaw,

6   one's a negative flaw.

7            On the positive size, in September of 2008, the

8   sponsor to CARB, Lehman, had gone out of business.  Anybody

9   else looking to step in had less vested interest in

10  maintaining the product, had little idea of where they could

11  go with the product, where they could resell it, might have

12  had to take a significant risk position.  And the market was

13  substantially liquid, and more volatile than it had been in

14  July.  People were less willing, in my experience, to take

15  on new risk positions in September than they had been in

16  July.

17           Furthermore, even Lehman, between July and August,

18  had widened its own bid-ask spread on CARB from three points

19  to four points, indicating that it, itself was less inclined

20  to take on new CARB positions, even in August, than it had

21  been in July.  Collectively, these points would suggest that

22  the size adjustment may not be big enough.  Perhaps instead

23  of 9.75 points, it should be 10 or 15 points.  I don't have

24  data, specific data that allows me to calculate what that

25  number would be, but I can't say that a larger size

Page 139

1    adjustment would be unreasonable, either.  Therefore, I'm

2    not offering it, but I couldn't rule out the reasonableness

3    of a larger-size adjustment.

4            On the other side of the ledger, it's not always

5    the case that a market impact of the type I've described

6    here, the 1.5 points, just continues ad infinitum, for every

7    $10 million.  It may not be the case that a full 9.75 points

8    would actually have been necessary on September 15th, 2008.

9    And my experience, once the price goes up enough, maybe you

10   find other people coming into the market anyway,

11   irrespective of what the first entail sensitivity was to

12   size.

13           And my experience in consulting with my team that

14   have experience also in credit derivative products, we

15   concluded that it might be reasonable, based on our

16   experience, that a 200 basis point spread concession might

17   have been enough to encourage other entrants into the market

18   at this time, in order to handle this much larger size

19   position.  So if Merrill Lynch had quoted a spread that on a

20   duration-adjusted basis, was approximately 492 basis points,

21   perhaps a spread of 1692 basis points would have been enough

22   to clear the full $80 million size.

23           And so I offer those two possible, excuse me,

24   those two possible methods to compute the size adjustment.

25   The first one is the 9.75 point method.  The second one is

Page 140

1    the 200 basis point incremental yield spread method, which

2    is based on my own experience and my team's experience.

3    Q    How do those two methods change the value?

4    A    Well, so if I use the 9.75 point scenario, all I'm

5    doing is adding 9.75 points to the previous price that

6    you've seen there, which rounds to between 41.3 and 44.6

7    percent of the $18 million of the notional.  If I do the 200

8    basis point scenario on the following page, the numbers vary

9    between 36 percent, and 39.8 percent.  And you see

10   underneath it, on my Page 14, what that translates into as

11   dollars, for replacement cost of the $18 million notional

12   position.

13   Q    And so having reached those conclusions, first of all,

14   do you have any views as to which of the methods is more

15   valid?  Or do you rely equally on the two?

16   A    I am inclined toward method one, in place of method

17   two.  Method two, as you may remember, used the weighted

18   average lives on a sheet that Merrill Lynch had provided.

19   In my opinion, those weighted average lives most likely came

20   off a descriptive database, along with the ratings, and were

21   a previously-calculated weighted average life, and were

22   likely not updated.

23        If Merrill Lynch had proposed to use them, in its

24   conversion, I strongly suspect they would have done the

25   conversion themselves and shown the points upfront, instead

Page 141

1    of showing the spread.  But they did not show the points

2    upfront.  In fact, elsewhere on the email chain, they show a

3    second at 7CPR, which could have been another prepayment

4    assumption.  I therefore tend to discount method two, the

5    weighted average life method, as less likely as a prepayment

6    projection method used in method one.

7              THE COURT:  Mr. Tambe.

8              MR. TAMBE:  Objection, lack of foundation,

9    speculation, to the extent that prior answer was speculating

10   about what Merrill had or had not done.

11             MR. TRACEY:  If I may, Your Honor, I don't think

12   the witness was speculating about what Merrill did or did

13   not do.  He's basing his price on an assumption about what

14   he believes Merrill was pricing this at, his assumption, and

15   he's making clear his assumptions, and obviously Lehman can

16   cross-examine on those assumption.

17             THE COURT:  It's an assumption, then.

18             MR. TRACEY:  It's an assumption.

19             THE COURT:  Fair enough, okay.

20             MR. TRACEY:  Okay.  I'd like to go back for a

21   movement --

22             THE COURT:  So just to tie it up, so this slide,

23   which is on Page 14 of the deck, this provides the range

24   that you showed initially on Page 3 of the deck, yes?  29, a

25   range of 29 to 36?

Page 142

1          DR. NICULESCU:  That is correct, yes.

2          THE COURT:  Taking the lowest in the 200 basis

3    point scenario, and the higher in the -- the lower in the

4    200 basis point scenario, and the higher at the 9.75.

5          DR. NICULESCU:  That is correct, yes.

6          THE COURT:  Thank you.

7    Q    Okay, I'd like to go back, just to two points that we

8    touched on, but didn't talk about.  If you could open up

9    again to Joint Exhibit 73, and the quotes are on the second,

10   third, and fourth page, we've been through those, but I'd

11   like to focus for a moment on the first page.

12   A    Yes.

13   Q    And once again, could you just describe what you

14   believe this page represents, in broad terms?

15   A    Yes, this is a summary, provided by Fund Party A to

16   Lehman, of their market quotation process, listing the index

17   equivalent prices they received from Citi and RBS, and also

18   showing a price that they calculated, shown as calculate

19   price, based on the Merrill Lynch spread quotes, for each of

20   the eight components of the CARB index.

21   Q    And so do you understand that to be that that party

22   converted the spreads in the Merrill Lynch quote to prices?

23   A    Yes.

24   Q    And why didn't you use those prices?

25   A    Because they're wrong.

Page 143

1    Q     And how are they wrong?

2    A     Well, I examined the prices carefully, based on the

3    data provided to me by Lehman from Fund Party A.  They made

4    a host of mistakes, the most prominent one of which is they

5    simply took the spread, and they put it into a bond price

6    calculator, instead of computing the points upfront value of

7    the CDS.  And the bond has a different coupon, it has a

8    different price.  You simply can't do that calculation that

9    way.  They make a number of other mistakes in their use of

10   that calculator as well.

11         But the bottom line is the calculation is simply

12   incorrect.  And I can't sign off on something that is

13   incorrect, particularly when the methodology to convert from

14   spread to prices is well-known, it's well-accepted.  Lehman

15   mentioned in its introduction, Lehman uses it, you can

16   simply use the same methodology, and it's simple to do.

17   Q     The other question I would have for you is if you look

18   at the quotations that were used for your calculation, they

19   date dated September 16, 2008, is that correct?

20   A     That's correct.

21   Q     And you know that the early termination date in this

22   case is September 15th, correct?

23   A     Yes.

24   Q     Did you consider whether that would affect your

25   analysis of these prices, as applied to a case in which the

Page 144

1   price must be determined as of September 15th?

2   A    Yes, I did consider it.  I concluded there is should be

3   no effect.  I saw no basis, based on any data, to presume

4   that the price would have changed between the 15th and the

5   16th, and in particular, as a request on the morning of the

6   16th.  And indeed, for an index that is this illiquid, it

7   trades by appointment, I saw no basis to make an adjustment.

8   Q    Did you do anything to assess the reasonableness of the

9   result that you reached?

10  A    Yes, yes, I did.  Quite a few things.  But really the

11  first point, I think, to make, is that we are looking at a

12  change in spread from 882 basis points offered by Lehman for

13  5 to 10 million back in August, August 15th.  So 1492 basis

14  points offered by Merrill Lynch in September 16th.  So it

15  was a substantial change.  And so I looked to see whether

16  that change would, in fact, be reasonable.  And really, the

17  first and most overarching issue is that it is Lehman's

18  bankruptcy.  Lehman was the sponsor of the CARB product,

19  they had a vested interest in maintaining its trading.

20  Merrill Lynch did not, and presumably would have had to take

21  on that risk position themselves.  People were disinclined

22  to take on risk positions.  And so I'm not surprised to see

23  some spreads, actionable spreads at much wider levels than

24  the ones that Lehman had proposed.

25            But in addition, I wanted to examine the other

Page 145

1    factors that drive, or cause spreads to change, and

2    performers to change, and so I did that, and went to look

3    for market commentary in the sector at the time, and found

4    fairly extensive market commentary relating to consumer ABS.

5    I should mention at this point that the consumer ABS sector

6    is quite distinct from the mortgage MBS sector, developments

7    that affect mortgage-backed securities do not always affect

8    consumer ABS and vice versa.  And in fact, the worst and

9    positive developments for MBS in August that did not affect

10   consumer ABS.

11           But I uncovered a number of research commentaries,

12   trading commentaries contemporaneous with these events.  The

13   first one I show here is dated September 5th, from JP

14   Morgan.  As of September 5th, they say AAA consumer ABS

15   spreads had reached record widths, high spreads, reflecting

16   mainly thin demand, and increased center servicer headlines.

17   Q    Dr. Niculescu, could you just be a little slower?

18   A    Certainly.  You need me to repeat this?

19           THE COURT:  Can I help you in that regard, and ask

20   the question of when you on this slide, and it looks like

21   you're quoting a JP Morgan speculation, are referring to

22   consumer ABS?

23           DR. NICULESCU:  Yes.

24           THE COURT:  What comprises consumer ABS?

25           DR. NICULESCU:  It comprises, as Mr. McDougall

Page 146

1    said this morning, primarily credit card receivables, auto

2    receivables, some people classify student loans as part of

3    consumer ABS.

4              THE COURT:  So when this -- when JP Morgan's

5    talking about consumer ABS, it's talking about not just auto

6    ABS?

7              DR. NICULESCU:  No, they are also including credit

8    card receivables.

9              THE COURT:  Thank you.

10             DR. NICULESCU:  However, the consumer ABS sector

11   tends to be traded in one place, and tends to be distinct

12   from the MBS sector.  For example, at Goldman Sachs, I had

13   MBS research, and separately I had ABS research that spans

14   all of those sectors.

15             THE COURT:  Got it, thank you.

16   A    The rest of the JP Morgan quote I think points to some

17   of the fundamental deteriorations that could affect consumer

18   ABS sharp weakening on the employment picture, for example.

19   There was another quote here, Credit Suisse, in their

20   explicitly non-mortgage ABS commentary on September 17th,

21   saying the bold, the only thing that is certain is the

22   spreads have gap out, and bid-asks have widened, as the few

23   dealers lefts aren't really sure where they will be able to

24   retail, that is to sell paper.  By the end of the month,

25   September 30, Barclay's noted consumer ABS at all-time wades

Page 147

1    in September.  So we have clear statement by the dealer

2    community here that consumer ABS spreads had widened into

3    and through September, supporting that whatever level Lehman

4    had provided in August of 882, even if Lehman had still been

5    around, would likely have been a considerably wider level by

6    mid-September.

7              Next, we go to the underlying fundamentals.  The

8    underlying fundamentals were worsening.  It was possible

9    that the economy was going into a significant recession.  On

10   September 5th, Deutsche Bank noted that the spike in

11   unemployment, the highest level in five years, should put an

12   additional level of pressure on consumer ABS products.

13   Again, the reasoning here is as those unemployment pictures

14   worsen, people will start to default on their consumer

15   loans.  UBS, excuse me, my old friends here, made that clear

16   on September 16th.  The consumer ABS market's already

17   experiencing the rising tide of delinquency that accompany

18   economic downturn and go on to speculate about possible

19   future events.

20             In addition to the fundamental economic market,

21   there was specific servicer risk relating to auto ABS that

22   people mentioned.  If you go back to Lehman's introduction

23   to CARB in 2007, they make a point of noting that in the

24   event of a servicing transfer due to bankruptcy, you're

25   likely to see a disruption, due to lack of experience and

Page 148

1    operational issues.  The lack of comfort in the continuing

2    operation of the major auto dealers could certainly have

3    been a factor, and the need of one of the dealers had the

4    fact, if you expected the bankruptcy that ultimately

5    occurred, if you expected that in September, you might well

6    have seen that the values of the vehicles would have gone

7    down, the recovery values of that vehicle collateral would

8    have been impaired.

9            A new servicer might not have been as effective,

10   and a new servicer might well have asked for more money to

11   do the job.  The only money available to the servicer comes

12   from the trust structure, and it comes therefore out of

13   credit support payments, that might otherwise ensure the

14   performance of the subordinate traches (indiscernible).  You

15   update that to September 5th, and JP Morgan is saying the

16   seller servicer risks simply overshadow everything else on

17   auto ABS.  So now we have another factor that would explain

18   the spread widening between August and mid-September.

19           With this as a backdrop, I then turn to the actual

20   credit of the underlying assets that are referenced by the

21   CARB.  I show on my Slide 20 an example, this is caret 071,

22   shown as of September 15th, 2008.  (indiscernible) 73,000

23   auto loans left, a good amount of them paid off already,

24   amortized away, or in some cases, prepaid.  And if you look

25   at the notes on the right, 44 percent of the original issued

Page 149

1   notes have also been paid off, those were the A1s and part

2   of the A2s, the most senior and shortest cash flows.

3           As payments come in, either amortizing or

4   prepayment, the senior and early cash flows get paid off

5   first.  As losses come in, of course, they come in from the

6   bottom of the structure.  In 071s, we are interested in

7   Class C, that's our reference entity.  It's 1.5 percent of

8   the original size of the deal.  There's about a half of

9   percent of Class Ds underneath it, and some residual

10  payments that were going at that time to the depositor.  So

11  this is the structure that we're looking at here.

12          With that in mind, I think it's worth looking at

13  the underlying credit of the CARB loans, on Page 21.  I'll

14  point you to caret 020071, this was the deal of which

15  Tranche C is the second-to-the-lowest subordinate tranche.

16  We'll note that although these are called prime deals,

17  because the average credit score the average FICO is a prime

18  FICO, they're mixed.  They had some very good-quality loans,

19  and some very low-credit-quality loans in the same deal.

20  Some regulators would say that a FICO of less than 660 is

21  subprime.  The FICO is reported at lower than 650 for the

22  20071s, that was 26.8 percent at origination, so about a

23  quarter of the deal.

24          Part of this deal is already paid off, and it's

25  likely that the highest quality part of the deal has already

Page 150

1    paid off, leaving a larger proportion of subprime loans, a

2    very significant volume of loans that have more than 110

3    percent of loan to value ratio, the concentration in the

4    stakes that people were most concerned about at the time.

5           Almost 10 percent of the deal has interest rates

6    greater than 10 percent.  Well, this is very curious,

7    because a lot of loans in this deal have relatively low

8    interest rates.  The automakers were incentivizing for

9    people to buy cars by providing submarket financing rates of

10   two percent, and such like.  But here we have a tail in the

11   deal that has a very high set of interest rates.

12          So collectively, we have a large part of this

13   deal, a quarter to a third of the original balance that was

14   comprised of credit-quality loans that were, I think,

15   considered at the time to be of concern to people who

16   specialized in the credit.

17          And it's important, I think, at that point, to

18   really examine the risk and return framework that people

19   would have adopted, in looking at assets of this type that I

20   adopted, and looking at ABS, when I was buying the Fannie

21   Mae, to try to weight the risks and returns that you face

22   here.  It is not the case, necessarily, that these

23   subordinate traches were necessarily going to suffer credit

24   losses, far from.  There was a chance that they might.  It

25   wasn't an 80 percent chance, it wasn't even a 50 percent

Page 151

```
 1    chance.  But the premiums that people were asking also

 2    reflected a much lower probability of taking losses to these

 3    tranches.

 4              So Merrill Lynch quoting 1492 basis points,

 5    they're essentially saying they want to be paid 14.9 percent

 6    per year to guarantee this performance.  Well, in theory,

 7    that would translate into about a one in seven probability

 8    of losing your investment every year.  Now, clearly, Merrill

 9    Lynch likely thought that losing their investment was less

10    than one in seven, or they wouldn't have offered that

11    spread.  They wanted some compensation for taking the risk.

12    Did they think it was -- would a reasonable investor, not

13    Merrill Lynch, would I at the time thought the change was

14    one in 10, or one in 12, or one in 15?  Possibly, something

15    in that order of magnitude.

16              And when I look at the sort of, of size of the

17    subprime components here, of the high loan to value

18    components, and I contrast that with the credit support

19    available to my tranche.  I could say, "Yes, it might well

20    be reasonable that I would presume that there was a one in

21    10, or one in 12, or one in 15 chance of my tranche being

22    hit significantly with credit losses, and therefore that

23    that spread makes some sense to me.

24              MR. TAMBE:  So, if I could interject, I object to

25    this point, to the narrative nature of that answer, and all
```

Page 152

1    the instances therein where he was just speculating and

2    saying -- making statements without foundation.  So I just

3    want to preserve the objection.

4              THE COURT:  All right, fair enough.

5              MR. TRACEY:  I'm just about finished with CARB.

6              THE COURT:  Can I just ask one follow-up question?

7              MR. TRACEY:  Sure.

8              THE COURT:  So what you're suggesting is that the

9    pricing may reflect a bit of a disconnect with a more

10   granular analysis of the underlying potential performance of

11   the loans that are in the trusts?

12             DR. NICULESCU:  Your Honor, no, I wouldn't suggest

13   that.  I would suggest --

14             THE COURT:  You were just talking about a one in

15   seven chance of there being a default, or a one in ten

16   chance.

17             DR. NICULESCU:  Correct.

18             THE COURT:  And that nonetheless, the pricing to

19   sell protection was what it is.  I thought you were

20   suggesting that there wasn't necessarily a connection, if

21   somebody had peeled back all the layers, and looked at the

22   chance that in fact, there would be a default in payment on

23   the underlying loans?  Was that not what you were saying?

24             DR. NICULESCU:  I was trying to say the opposite,

25   I apologize.

Page 153

1              THE COURT:  Okay.

2              DR. NICULESCU:  My attempt was to say that the

3      pricing was consistent with a one in --

4              THE COURT:  Pricing of the protection --

5              DR. NICULESCU:  Price of protection.

6              THE COURT:  Yes.

7              DR. NICULESCU:  Consistent with a one in seven

8      chance, annually.  In the fixed income markets, people

9      demand and receive a risk premium for taking risks.  In this

10     case, the risk of selling protection.  If I, as an investor,

11     had truly believed there was a one in seven chance each year

12     that my investment would be wiped out, I would want a lot

13     more than 14 percent return to take that risk.  So if I'm

14     getting 14 percent return, what therefore must be my

15     projected expectation of loss?  Something lower than one in

16     seven.  Could it be one in 10, one in 12, one in 15?

17     Possibly in that range.

18             THE COURT:  Thank you.

19             DR. NICULESCU:  If I look at these

20     characteristics, these to me are consistent with a one in

21     10, one in 15 chance of loss each year.

22             THE COURT:  Thank you.

23     Q    Okay.  I'd like to take you back to the bottom line

24     values that you came to, and ask you to remind us of what

25     the value is that you came to, and how it compares to other

Page 154

1   values that you have observed.

2   A   I put that together for the Court on Slide 22.  My

3   range, between 36 and 45 percent for an $80 million size,

4   the Merrill Lynch valuation based on my method one and

5   method two was between 32 and 35 percent, for $15 million

6   size.  Going from the bottom, we see that Lehman had a

7   valuation of 15 percent for the 80 million.  Citi Group had

8   a valuation of 18 percent.

9           However, the Citigroup number was listed as

10  indicative levels only, and so I have ignored it, as did

11  Fund Party A.  RBS, their quote for a $15 million size was

12  43 percent.  I had not used it, although I note it does say

13  it's good for today.  QVT's valuation was 46 percent,

14  slightly above the top end of my computed range.

15  Q   And how did the values that you developed convert to

16  dollars?

17  A   You'll see that on Page 23.  It's just a multiplication

18  of the price times 80 million.  So for CMRA, that's between

19  29 and 36 million.  Lehman is at 12 million, QVT is at 37

20  million.

21  Q   Okay, Your Honor, that completes the CARB portion of

22  the direct.

23           THE COURT:  Okay, Mr. Tambe?

24           MR. TAMBE:  Can I ask just one clarification

25  question, just to smooth things out.  The Lehman number the

Page 155

1   witness has is 12 million, just I don't have a source for

2   that.

3            MR. TRACEY:  That's Mr. (indiscernible)'s books

4   and records.

5            MR. TAMBE:  Okay, thank you.

6            THE COURT:  All right, so it probably does make

7   sense to call it a day, for the day, so that Mr. Tambe

8   doesn't end up midstream, in his cross-examination, all

9   right?

10           MR. TRACEY:  Good.  Thank you, Your Honor.

11           THE COURT:  Okay, all right.  If you would just

12  tidy up a bit, so that the 4:00 folks can move up to the

13  front.  And did we talk about a starting time for tomorrow?

14  You have to remind me.

15           MR. TRACEY:  We talked about 9:30, but if you

16  don't want to see us until 10:00, we'll sleep in.

17           THE COURT:  Well, no, you may -- if you want to

18  sleep in, I'll be here at 9:30.  If you want to sleep in,

19  I'm willing to do 10:00.

20           MR. TRACEY:  We'll make (indiscernible)

21           MR. TAMBE:  I think we'll go off the record now,

22  if we're talking about --

23           MR. TRACEY:  About sleeping plans.

24           THE COURT:  Yeah, we can.  Sleeping plans, we're

25  off the record.

Page 156

1          (Whereupon these proceedings were concluded at

2    3:58 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 157

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya Ledanski

6    Hyde

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 2, 2017