Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   CASE NO. 08-13555-scc

4   - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS INC.,

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - x

11                  U.S. Bankruptcy Court

12                  One Bowling Green

13                  New York, New York

14

15                  March 24, 2017

16                  10:03 AM

17

18  B E F O R E :

19  HON. SHELLEY C. CHAPMAN

20  U.S. BANKRUPTCY JUDGE

21

22

23

24

25  ECRO - KAREN

1   HEARING RE:  Doc #53107 Plan Administrators Five Hundred

2   Nineteenth Omnibus Objection to Claims (No Liability Claims)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sheila Orms and Dawn South

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES, L.L.P.

3         Attorneys for LBHI

4         767 Fifth Avenue

5         New York, NY  10153

6

7    BY:  ADAM M. LEVINE, ESQ.

8         GARRETT A. FAIL, ESQ.

9         RICHARD L. LEVINE, ESQ.

10

11   SHEARMAN & STERLING, LLP

12        Attorneys for the Maverick Entities

13        599 Lexington Avenue

14        New York, NY  10022

15

16   BY:  WILLIAM J. F. ROLL, III, ESQ.

17        RANDALL L. MARTIN, ESQ.

18

19

20

21

22

23

24

25

Page 4

```
 1                   P R O C E E D I N G S

 2              THE COURT:  Please have a seat.

 3              How is everyone?

 4              ALL:  Very good, Your Honor.

 5              THE COURT:  Okay.  Who am I going to hear from?

 6              MR. LEVINE:  Thank you, Your Honor, Richard Levine

 7    from Weil Gotshal for LBHI as plan administrator.

 8              THE COURT:  Okay.

 9              MR. LEVINE:  Your Honor --

10              THE COURT:  You know, I'll say my usual, I've read

11    the papers, but in light of the degree of complexity for the

12    -- although you say it's not complex, but in light of the

13    sheer volume of the different arguments, I'm happy to let

14    you make whatever presentation you like and the same goes

15    for the Maverick parties.

16              MR. LEVINE:  Thank you, Your Honor.

17              So, as you know, we believe that if we are right

18    about the application of Section 562, then our motion should

19    be granted in its entirety so that will be my focus.  But

20    I'd like to start, Your Honor, with the Maverick LBIE

21    settlement.

22              The first thing I'd like to read from is --

23              THE COURT:  Can I ask you one --

24              MR. LEVINE:  Sure.

25              THE COURT:  -- overarching background question.
```

1           MR. LEVINE:  Sure.

2           THE COURT:  So this is all came in the first round

3    incident to the estimation motion.

4           MR. LEVINE:  That's right.

5           THE COURT:  Okay.  So in terms of, you know, given

6    that we're at an advanced point in the case, and this is not

7    dispositive in any way, it's just information for me, are

8    there other similar claims structurally similar claims that

9    have been allowed or disallowed either with respect to an

10   LBHI guarantee of a levy obligation or LBIE obligation or an

11   LBHI guarantee of an LBI obligation?  And if you don't know

12   the answer that's fine, as a legal matter it's neither here

13   nor there, it's just information.

14          MR. LEVINE:  I'll defer to Mr. Fail on that.  But

15   it's my understanding that no, that there were two of these

16   "Libby" guarantee claims, SRM, which we argued to Your Honor

17   last summer and then mediated and then this one, where there

18   were among the few Libby guaranteed claims that were

19   withdrawn from the estimation objection.

20          Most of the Libby guarantee claims were resolved

21   with the estimation objection and you estimated at zero

22   because Libby was being a hundred percent payout.  There

23   were only a handful --

24          THE COURT:  Payor, you said, payor.

25          MR. LEVINE:  Right, so Libby was paying a hundred

Page 6

1    percent on claims.  So it was only a few guarantee claims

2    against LBHI that had settled with Libby before they knew

3    that Libby was going to be a hundred percent payor who

4    objected to the estimation motion.

5            The estimation motion was withdrawn as to those

6    claims because we wanted to get rid of the vast majority

7    where there was no objection, so there was only a handful

8    that survived.

9            And as far as I know, the only one outstanding is

10   SRM and Maverick.  SRM is a little bit more complicated

11   because it's governed by UK law, remember we don't that

12   makes a difference --

13           THE COURT:  I remember, right.

14           MR. LEVINE:  -- but it does, it did require both

15   sides to be in those horrible English expert law

16   declarations --

17           THE COURT:  I wouldn't agree with the

18   characterization as horrible, but.

19           MR. LEVINE:  Well, they're not written in American

20   English for sure.

21           THE COURT:  No comment.

22           MR. LEVINE:  Garrett, do you want to add anything

23   to add?

24           MR. FAIL:  Yeah, thank you, Your Honor, Garrett

25   Fail.

Page 7

1          THE COURT:  Yes, Mr. Fail.

2          MR. FAIL:  Your Honor, is correct, there are a

3    number of claims that are still outstanding on -- of Libby

4    guarantees, guarantees by LBHI of Libby primary obligations

5    that are subject to a motion to estimate clams.  There's

6    essentially two parties that are still outstanding with

7    those, the number of claims that they have acquired, but

8    there's only two parties there.

9          These -- the two that Mr. Levine referenced SRM

10   and Maverick are the only two in the claims objection where

11   LBHI filed an objection because the parties are asking for

12   more than they -- they're looking for no more than --

13         THE COURT:  The notion on that are the primary

14   obligation at Libby.

15         MR. FAIL:  Exactly.  And I'm not aware of any L

16   claims against LBHI where the primary obligation was LBIE

17   that have been allowed by LBHI.

18         THE COURT:  Okay.  All right.  Thank you.

19         MR. LEVINE:  So what I was going to -- since our

20   focus is on 562 --

21         THE COURT:  Right.

22         MR. LEVINE:  -- and I'll get to the legal issues

23   there in a few minutes.  I thought what I'd like to do is

24   start with the key elements, which we think allow us to win

25   if 562 applies.

1           The first is a statement in Maverick's objection

2    to the estimation motion which I don't think, you know, by

3    any means they're walking away from.  Your Honor doesn't

4    need to read along with me, but if you want to --

5           THE COURT:  I have it.  I have tab 4.

6           MR. LEVINE:  Tab 4.

7           THE COURT:  Tab 4, yes.

8           MR. LEVINE:  Page 11, paragraph 22, and I'm

9    reading the second half of the paragraph about five lines up

10   from the bottom.

11          And this is their statement, and again I don't

12   think it's --

13          THE COURT:  Hold on, tab 4 -- sorry.

14          MR. LEVINE:  No problem, tab 4, page 11.

15          THE COURT:  Page 11, yes.

16          MR. LEVINE:  Paragraph 22.

17          THE COURT:  The Ivanho rule.

18          MR. LEVINE:  On paragraph 23, sorry, next

19   paragraph, I can't read my numbers.  So if you go about

20   halfway or three quarters of the way down that paragraph,

21   the last sentence begins towards the right-hand column "in

22   light of the cancellation."

23          THE COURT:  Yes.

24          MR. LEVINE:  So this is their statement "In light

25   of the cancellation of indebtedness that would otherwise

Page 9

1    have been owed to Libby, Maverick concedes that it already

2    has effectively received approximately 101.9 million in

3    value from Libby, in connection with the Libby settlement

4    agreement, reflecting an offset of the approximate value of

5    the securities and cash that Libby may have been obligated

6    to return to Maverick under English law."

7          So that's our first kind of point, which is that

8    if we're right, that the settlement, and it wasn't exactly

9    the settlement but for purpose of the estimation motion,

10   we're using the date and the valuation that they assert,

11   they got the value of their cash and securities as of the

12   settlement date under the settlement.

13         So that's a valuation date, they got what they're

14   entitled to.  As we understand their argument, they say, no,

15   you use the petition date.

16         THE COURT:  They say you use the petition date --

17         MR. LEVINE:  Right.

18         THE COURT:  -- for the purpose of the guarantee.

19         MR. LEVINE:  Of valuing, right, of valuing the

20   claim.

21         THE COURT:  For the purpose of asserting a claim

22   on the guarantee.

23         MR. LEVINE:  That's right.  Then the second thing

24   that I wanted to bring out is actually in the settlement

25   agreement itself, so that is behind tab 4, now we're going

1    to tab E behind tab 4, which is the Libby settlement --

2    settlement between Libby and Maverick.

3              THE COURT:  Yes.

4              MR. LEVINE:  And there I'd like you to turn to

5    page 4 --

6              THE COURT:  Okay.

7              MR. LEVINE:  -- of the settlement.  And it's

8    actually part of -- it's 2.1.A, and this is where it

9    provides for termination, the relevant agreements and

10   they're actually in Schedule 2 to the settlement, and they

11   list all the agreements at issue, the prime brokerage

12   agreements, the marginal lending agreements, and the global

13   mass of secured lender agreements, so they're all listed in

14   Schedule 2 and then defined as the relevant agreements.

15             The relevant agreements and all transactions

16   thereunder, to the extent that they have not previously been

17   terminated are terminated as between Libby and each Maverick

18   entity.

19             And I will tell Your Honor that we saw in

20   discovery any documents suggesting an earlier termination,

21   and you'll remember they actually served the notice of

22   termination, but Maverick was like most Libby claimants,

23   they didn't serve a notice of termination, so there was no

24   prior termination.

25             And I don't understand them to be arguing there

1   was a prior termination.

2            THE COURT:  No, I think in this point their

3   argument is that essentially it doesn't matter because the

4   words say that they're terminated as between LBIE and each

5   Maverick entity and therefore that does not affect the

6   obligations of LBHI and therefore, it does not implicate or

7   mean that 562(a) is controlling.

8            MR. LEVINE:  Right and --

9            THE COURT:  And in response to this, you say,

10  well, look all the obligations --

11           MR. LEVINE:  I can sit down.

12           THE COURT:  All the obligations are terminated, so

13  the fact that these words limit it to LBIE, is neither here

14  nor there.

15           MR. LEVINE:  Right.  I mean, that's exactly right,

16  it's really those three arguments you were just hinting at

17  that LBHI was not a broker dealer.  LBHI could not form the

18  prime brokerage functions, in fact, in the prime brokerage

19  agreement it expressly provides that a prime brokerage

20  account, the opening words are "a prime brokerage account

21  open pursuant to this agreement will be opened at Lehman

22  Brothers, Inc."

23           And so clearly Lehman Brothers, Inc. was the prime

24  broker that, in fact, it was Libby but it had to be either

25  LBI or Libby --

1              THE COURT:  Sure.

2              MR. LEVINE:  -- because LBHI was not a broker or

3      could not trade for customers, could not custody --

4              THE COURT:  Could not custody --

5              MR. LEVINE:  -- security or cash.  So that in

6      terms of the obligations on the Lehman side on the -- under

7      the prime brokerage agreements, it was terminated as to

8      Libby, there was nothing left for LBHI to do.  LBHI was

9      technically a party and benefitted from things like

10     exculpation provisions, but it didn't have any obligations

11     because it couldn't interact with customers.

12             Secondly obviously to the extent that their claims

13     are guarantee claims, and under the proof of claim, and

14     we'll look at that in a moment, I'm not sure you're going to

15     pull one out, all the claims are guarantee claims.

16             THE COURT:  They're guarantee claims.

17             MR. LEVINE:  So if they're guarantee claims --

18             THE COURT:  Right.

19             MR. LEVINE:  -- and the primary claims are against

20     Libby and it's been terminated as to Libby, and the only

21     question is whether Libby owes them something as to which

22     we're guarantor.  Well, I don't think it matters whether it

23     was terminated as to LBHI when, to the extent their claims

24     are a guaranteed claim.

25             THE COURT:  And I think finally the argument would

Page 13

1   be that if, in fact, it was not terminated as to LBHI, so

2   that there were still somehow leaning obligations of LBHI

3   after the Libby/Maverick settlement, then it was an

4   executory contract and it was rejected pursuant to the plan,

5   and that was just about the same date as the settlement, the

6   effective date of the plan, so it was rejected and 562 would

7   still apply.

8          So that's our response to the argument that it

9   wasn't terminated as to LBHI.  So if we are right that

10  Section 562 controls, then we think there's no room to

11  argument, no room to argue, other than as of that date, the

12  contracts were terminated, the security contracts, the

13  master agreements were terminated and they got full value.

14         Now, as I understand Maverick's main theory it's

15  very different.  The main theory is that the value of their

16  long positions, and they say you don't take into account the

17  short positions, the offsetting short positions, you just

18  look at their long positions, to decrease from the petition

19  date which is they say when you value it, 562 doesn't apply,

20  to the settlement date by 16.2 million.  And that they're

21  entitled to that diminution in value from petition date to

22  settlement date because all they were able to get from Libby

23  is the value at the settlement date, and not the value at

24  the petition date.

25         Of course, we think well, it doesn't matter what

1    the value is of the petition date, but that's their argument

2    as I understand it.

3              THE COURT:  Well, in support of that argument,

4    they say, for example, if for some reason, their claim

5    against LBHI would have had to have been valued prior to the

6    settlement date, you would be stuck with valuation as of the

7    petition date.

8              MR. LEVINE:  Well, I -- that may have been true,

9    but the -- once they terminated their contracts, 562 kicks

10   in.  I mean, 562 --

11             THE COURT:  562 kicks in not only with respect to

12   the termination of the prime brokerage agreement, but also

13   with respect to the guarantee agreement.

14             MR. LEVINE:  Right, for multiple reasons.  Number

15   one, we think the guarantee agreement under the definition

16   in the Code in Section 741 --

17             THE COURT:  Is the securities --

18             MR. LEVINE:  -- is the securities contract, right,

19   and to the extent the prime brokerage agreement is the

20   master netting agreement, then the guarantee of the master

21   netting agreement is also a securities contract.

22             The -- I lost my train of thought, I'm sorry.

23             THE COURT:  I'm sorry, my fault.

24             MR. LEVINE:  So, you know, we think 562 applies,

25   but so to get these diminution damages, reduction in value,

Page 15

1    and we're accepting their numbers for the motion to dismiss

2    hearing, we're not agreeing with them, we're just accepting

3    them for purposes of -- for example, they value -- their

4    settlement they value is supposedly as of February 13th,

5    2012.  Because that's, according to their affidavit,

6    basically when the business deal was done.

7                Now, my guess is, is that the reason they're using

8    that day, so the actual settlement date of March 30th, 2012

9    is because it moved against them, but I don't know that, and

10   we're not challenging that --

11               THE COURT:  We're not going there at a sufficiency

12   hearing.

13               MR. LEVINE:  At a sufficiency hearing.

14               THE COURT:  Right.

15               MR. LEVINE:  We're accepting their number.  So --

16   but to get those diminution damages, that 16.2 million they

17   need to establish 562 doesn't apply, they need to convince

18   Your Honor that your rulings in Stonehill, Newport, and

19   Providence and the decision of MF Global on exculpation

20   provisions precluding diminution damages doesn't apply here,

21   they're wrong.

22               THE COURT:  And just to stop in the decision tree,

23   even if 562 were held not to apply, you say the exculpation

24   would kick in and would knock out the liability of LBHI on

25   the guarantee nonetheless, correct?

Page 16

1              MR. LEVINE:  On the diminution damages.

2              THE COURT:  The diminution damages.

3              MR. LEVINE:  They make an assertion that as of the

4    petition date for five of the six funds, you know, five

5    funds they chose, so we know what the sixth one would have

6    done to the number, the net amount, and this is on a net

7    basis owed by Libby to Maverick was 4.3, 4.3 million.

8              So we would say that if they're right that 562

9    doesn't apply or worst cast is a 4.3 million --

10             THE COURT:  Yes.

11             MR. LEVINE:  -- then we'd say, once we take into

12   account that sixth fund, it's likely -- well, we know it's

13   going to be less than 4.3, whether it's going to be any

14   positive amount, I mean, I actually know the number, but it

15   was provided in mediation so I can't say it unless counsel

16   agrees, but in the public record, we know that for five of

17   the six funds all that Libby owed Maverick as of the

18   petition date was 4.3 million on a net basis.

19             And as you know, Your Honor, we think this notion

20   that our guarantee was only of long positions and not net,

21   makes no sense.  I mean, the function of a guarantee

22   obviously is to make sure that the primary obligor makes the

23   claimant whole.  Right.

24             If all Libby owed to Maverick was 4.3 million

25   because Maverick owed Libby this much and Libby owed it that

Page 17

```
 1     much, it seems crazy to say that we have to pay them this
 2     windfall that we don't get to take into -- well, we're
 3     guaranteeing more the net amount, that they get to claim and
 4     get this windfall.
 5             So we think that doesn't make sense.  So we think
 6     that to get the 16.2 diminution damages, two of the three
 7     arguments are is that 562 doesn't apply, we think they lose.
 8     The exculpation provisions don't preclude the diminution
 9     damages, and we think they lose the law of the case, and at
10     global.  And then there's this issue of they only look at
11     their long positions, and I think that's contrary to the
12     nature of a guarantee.  We think that's contrary to the
13     nature of the parties agreements.
14             Now, we made a mistake in our opening brief, we
15     cited to Your Honor the netting provision in the prime
16     brokerage agreement, which provide for netting.  And they
17     correctly pointed out in their opposition that that only
18     applied if Maverick was in default.
19             But there's, you know, sometimes it's lucky to be
20     on the side of a good contract.  Paragraph 32 of the prime
21     brokerage agreement, Your Honor --
22             THE COURT:  What tab am I in?
23             MR. LEVINE:  Okay.  You are in tab 4B. Your Honor,
24     I actually have some excerpts printed out, would you --
25             THE COURT:  I can -- it's easier for me to just
```

Page 18

1    use my little tabs here.  So I'm with you.

2            MR. LEVINE:  4B, and if you go to the prime

3    brokerage agreement --

4            THE COURT:  So this is --

5            MR. LEVINE:  4B.

6            THE COURT:  -- LBI, prime brokerage agreement.

7            MR. LEVINE:  Right, the only prime brokerage

8    agreement with LBI.

9            THE COURT:  Well, it says LBI.

10           MR. LEVINE:  Yeah, it's with LBI, but this is the

11   one that governed the relationship, there was no separate

12   one with LBIE.

13           THE COURT:  Okay.  You folks agree with that?

14           MR. BELL:  Correct, we do, Your Honor.

15           THE COURT:  Okay.  So I'm in tab 4B, and what

16   page?

17           MR. LEVINE:  And if you go to paragraph 32 so

18   we're towards the end.

19           THE COURT:  Numbered paragraph 32.

20           MR. LEVINE:  On page 9.

21           THE COURT:  Yes, cumulative rights entire

22   agreement.

23           MR. LEVINE:  Right.  If you go to the second

24   sentence, it's about four lines down in towards the right-

25   hand margin, "to the extent that the provisions of any

Page 19

1    contracts you have with any Lehman Brothers entity, whether

2    heretofore or hereafter entered into are inconsistent

3    whether the inconsistency be within the contracts or a

4    single contract, the conflict shall be resolved in favor of

5    the provision which affords Lehman Brothers with the maximum

6    rights, remedies, benefits or protections."

7              So to the extent that the provisions of a

8    contract, a prior contract heretofore entered into are

9    inconsistent with this, Lehman gets the best provision.

10             THE COURT:  Okay.  And how does that help with

11   respect to the netting provision?

12             MR. LEVINE:  Because if you go to our tab 3, which

13   is our reply brief, attached to our reply brief was the

14   prior prime brokerage agreement, it's Exhibit 1, it's in

15   terms of the ECF filings, page 27 of 80.  Lehman Brothers

16   International Europe LBIE National Prime Brokerage

17   Agreement.  At tab 3, page 27 of 80.

18             THE COURT:  Yes.

19             MR. LEVINE:  Okay.  So if we go to page -- well,

20   I'm sure there's a page number, it's page 42 of 80, I'm

21   looking at Section 12, termination.

22             THE COURT:  Yes.

23             MR. LEVINE:  "Events of default," of course we

24   have to figure out what an event of default is, "the

25   occurrence of the following events with respect to a party

Page 20

1    constitutes an event of default in relation to that party,"

2    the defaulting party, the other party being the non-

3    defaulting party.

4            And then we turn to the next page, 12.1D provides

5    "an active insolvency occurs with respect to the party,

6    except in the case of an active insolvency which is the

7    presentation of a petition for winding up or any analogous

8    proceeding or the appointment of a liquidator or analogous

9    officer of the defaulting party, in which case, no such

10   notice will be required, the non-defaulting party serves the

11   default notice."

12           Well, from our perspective it's clear that Libby's

13   appointment of an administrator was covered by D, no notice

14   was required, so there was an event of default, it makes

15   sense Libby filed, sought administration was an event of

16   default.

17           You go to the next section, Section 13, close-out

18   on the occurrence of an event of default the following shall

19   immediately occur, Part C provides that the non-defaulting

20   party, Maverick, had to calculate the amounts, and then

21   Section D on page 44 of 80 makes clear that there's

22   automatic net.

23           THE COURT:  Okay.

24           MR. LEVINE:  So that under the prime brokerage

25   agreement in effect, there was a provision which said prior

Page 21

1    agreements they're better for Lehman control, this prior

2    agreement makes clear that there's automatic netting in the

3    event of an event of default.

4              So we think that makes clear that they're netting

5    that.

6              THE COURT:  So just to encapsulate that, you're

7    saying that notwithstanding that they were right with

8    respect to, I'll call it the LBI PB agreement that under the

9    LBI PB agreement, you have to revert to this constellation

10   of provisions in the previous PB agreement, which was, in

11   fact, with LBIE, and that gave you the advantage of netting

12   notwithstanding the fact that your status as a non-

13   defaulting party.

14             MR. LEVINE:  Right, correct.  And, you know,

15   frankly I think that's kind of standard and it's kind of

16   surprising to me that the LBI prime brokerage agreement

17   didn't provide for automatic netting.  I think this is kind

18   of typical, you know, if things end, you figure out who owes

19   what to what, whom to whom, and you net.

20             So that we think that that's very important.  And

21   maybe it's time to look at the proofs of claim.

22             THE COURT:  Okay.  That's tab 5.

23             MR. LEVINE:  That's tab 5.  As far as I know,

24   they're all the same except for which Maverick fund it is,

25   the amount claimed, and which guarantee they rely on.

Page 22

1        So the language we're going to look at as far as I

2    know, and I checked very carefully is the same -- each of

3    the six proofs of claim.  The difference on the guarantees

4    are three of them rely on the corporate resolution, and

5    three of them rely on the 2002 direct guarantee by LBHI.

6        Now, in fact, that 2002 direct guarantee was

7    replaced by a later guarantee, there was a direct guarantee

8    and the one that we think governs here even though it's not

9    mentioned in the proofs of claim, is a direct guarantee,

10   we're not contesting the application of that direct

11   guarantee, we clearly don't accept the fact that the

12   corporation resolution is enforceable, we don't accept the

13   fact that the S&P letter is enforceable, but we think none

14   of that matters for today because there's a direct guarantee

15   which we acknowledge is enforceable.

16       So anyway, so I'm just looking at the very first

17   one behind tab 5 which is the one from Maverick Wong and

18   Hanst (ph) Fund Limited.  And of course, on the first page,

19   on the form page, they check this box if all or part of your

20   claim is based on the guarantee.  And then if we actually

21   look at the text paragraph 1 just recites the filing.  The

22   second paragraph 1 provides "this proof of claim is filed in

23   debtor's bankruptcy case by Maverick, Wong and Hanst

24   Unlimited.  Maverick has a claim, the claim against the

25   debtor on account of the debtor's full guarantee pursuant,"

Page 23

1    and they refer to the corporate resolution, "of the payment

2    of all liabilities, obligations and commitments of Libby."

3            So clearly that paragraph is only talking about

4    the guarantee.  If we go to paragraph 2, again recites the

5    three agreements, the prime brokerage agreement, the

6    marginal lending agreement, and the global mass of

7    securities lending agreement, and then at the very bottom,

8    the last three words on that page it continues, "The Lehman

9    entities agree to provide certain prime brokerage services

10   to Maverick," and then it defines the different agreements

11   as the prime brokerage documents, and that's important,

12   prime brokerage documents, "under the terms of the prime

13   brokerage documents, Libby has a lien and first priority

14   security interest in certain assets held or controlled by

15   Libby."

16           Okay.  Well, that certainly sounds like a right to

17   net, if you have a lien and first priority security interest

18   on the assets.  And it continues in that same vein, "Such

19   assets are held as collateral by Libby as Asian and Bayleaf

20   (ph) or itself and all other affiliates of Libby, in

21   connection with Maverick's obligations under the prime

22   brokerage documents."

23           Again it sounds like they're admitting that we get

24   to net.  Then importantly, the last sentence of paragraph 2

25   reads, "As of the petition date, the Lehman entities have

Page 24

1  custody of Maverick's assets pursuant to the prime brokerage

2  documents, in the amount of 1.286 million," that's

3  aggregates across the six claims of 187 million.

4          "This proof of claim constitutes a demand for

5  payment under the guarantee."  Then when describing the

6  claim in paragraph 3, "Maverick hereby asserts the claim,

7  the initial amount of that 1.3 million less any amounts owed

8  by Maverick, in connection with the prime brokerage

9  documents."

10          Okay.  Now, in their opposition, Maverick argues

11  well, that's not netting, well, you know, sounds to me like

12  netting.  And they drop a footnote, which also sounds like

13  netting.

14          THE COURT:  Footnote 3.

15          MR. LEVINE:  Footnote 3.  "For the avoidance of

16  doubt, the initial claim amount is a gross claim and does

17  not take into account any amounts or obligations that

18  Maverick may owe to the Lehman entities under the terms of

19  the prime brokerage documents."

20          THE COURT:  Well, that is a -- that language is to

21  protect them from an accusation that they overstated the

22  claim.

23          MR. LEVINE:  Right, right, but it's certainly

24  consistent --

25          THE COURT:  No, I understand.

Page 25

```
1              MR. LEVINE:  -- to their understanding that they

2     only got a net claim.

3              THE COURT:  Right.

4              MR. LEVINE:  Then they say, "the initial claim

5     amount may change depending on the current value of the

6     assets in custody until such time as Maverick exercises any

7     remedies it may have to liquidate the claim."  Well, it's

8     claim.

9              Now, we don't agree with that, we think that

10    either it's the petition date under 502 or the determination

11    or rejection date under 562, but that was their claim,

12    that's fine.

13             Then we go with the additional (indiscernible),

14    because now remember they're asserting they have direct

15    claims under the PB agreements, and --

16             THE COURT:  But they're seeking to amend to assert

17    them, they don't have direct claims under the filed

18    documents, right?

19             MR. LEVINE:  Well, as I understand it, they argue

20    that those direct claims are embedded in here.

21             THE COURT:  In here?

22             MR. LEVINE:  Yes.  They have suggested that if

23    they're wrong about that, they'd like to amend, but they

24    don't admit that they need to amend, as I understand their

25    position.
```

1            THE COURT:  Okay.  Well, I can ask them about

2    that.

3            MR. LEVINE:  The -- I'm reading just now from

4    paragraph -- from footnote 13 of their opposition, "As noted

5    in footnote 3 of the estimation objection, Maverick's claim

6    also asserted and reserve rights with respect to various

7    other entitlements, such as interest, legal fees and other

8    damages, including damages for loss investment opportunities

9    and other items."

10           Now, we agree that they (indiscernible) mention

11    interest and fees, but we think it's completely inaccurate

12    to say that the Maverick claims also asserted and reserved

13    rights with respect to other entitlements including damages,

14    including damages for investment opportunities and other

15    items.  We just don't think they're here.

16           So we think that to the extent they think they've

17    already asserted them, that's just wrong, and to the extent

18    that they want to assert them, they have to move to amend

19    the proof of claim, and of course we would argue it's much,

20    much too late for that.

21           THE COURT:  Could you address -- there seems to be

22    an argument that somehow this is not capable of being

23    resolved in a sufficiency hearing basis.

24           MR. LEVINE:  Well, we think that's just wrong

25    because there are no disputes.  If 562 applies, we think the

Page 27

1    -- well, we think that the fact -- our 562 argument relies

2    entirely on legal disputes, that the facts underlying those

3    arguments are not in dispute, that the settlement agreement

4    with Libby and Maverick was where all the prime brokerage

5    documents were terminated, there was no prior termination.

6           They admit that they got the value of their

7    assets, their cash and securities as of around that date.

8    So those are the only factual issues, we're not disputing

9    the money and I don't think they're disputing the

10   termination.

11          All they're raising is legal arguments, 562

12   doesn't apply because the prime brokerage documents are not

13   securities contracts and are not master netting agreements.

14   And the guarantee is not a security to the contract or

15   master netting agreements, we think those are issues of law

16   which Your Honor can resolve.

17          They argue that the prime brokerage documents were

18   only terminated as to Libby, not as to LBHI.  Again, we

19   think there's no dispute the language of the settlement

20   agreement, the question is what is the legal impact of the

21   termination.  Was there anything against LBHI that could

22   have survived and if there was, wasn't -- didn't that mean

23   that it was an executory contract which was rejected on the

24   date of the effectiveness of the plan.

25          So we think that clearly under the 562 argument,

Page 28

1     it clearly can be resolved because the facts aren't that we

2     rely on are not in dispute, or we're not disputing them at

3     least for purposes of this hearing, and they're just legal

4     issues.

5             There's also the question of netting.  We think

6     that -- or their right to diminution damages, we think that

7     clearly is another legal issue.  The language of the prime

8     brokerage documents and the exculpatory language, we think

9     as a matter of law, as Your Honor has held in three

10    different cases and consistent with MF Global precludes

11    diminution damages.

12            So that we think that Your Honor -- so even if

13    Your Honor rejects the 562(a) argument, you certainly can

14    rule as a matter of law that there are no diminution

15    damages, which would then just leave a question of whether

16    they're entitled to the 4.3 million net amount owed to them

17    as of the petition date or some greater or lesser amount I

18    guess.

19            But it seems to me, you know, let me -- because as

20    you know, I have never gotten over show and tell, I can't

21    leave without a handout, so I'd like to hand up one and

22    counsel and approach the bench.

23            THE COURT:  And then I'll ask you to wrap up.

24            MR. LEVINE:  Okay.

25            THE COURT:  This is just a demonstrative, right?

Page 29

1           MR. LEVINE:  This is just a demonstrative.  These

2    are numbers.  So -- okay.  So the top of this is supposed to

3    be our summary of the proofs of claim.

4           THE COURT:  Uh-huh.

5           MR. LEVINE:  And as we see it, it's purely a

6    guarantee claim in which they seek 187.3 million in the

7    aggregate, but expresses, when we look at the sample group

8    of claim, expressly minus any amounts owed by Maverick back

9    to Libby, and they think fees and expenses which are

10   unliquidated and interest which is unliquidated, and we

11   don't think they're entitled to those either for the normal

12   reasons, and then no other claims asserted.

13          Then in their current theory which comes from

14   their objection to the estimation motion, and their response

15   to our objection to their claim, there are guarantee claim

16   components, in which they assert that not 187.3 million, but

17   the value of their long positions, just their long positions

18   without netting was 118.1 at the petition date, that they

19   received 101.9 million in value as of the settlement date,

20   and therefore, that difference is the 16.2 they're asking

21   for we say that since you value it under 562 with the

22   settlement date, there's nothing that's owed to them.

23          Fees and expenses and interest are still

24   unliquidated.  In terms of the second page, there are other

25   claims, they're not saying they have asserted, they want to

Page 30

1     amend to assert direct claims under the prime brokerage

2     documents.  Those do not seek any incremental damages, so we

3     understand it, it's still the 16.2 as opposed to the 187.3

4     on the proofs of claim.

5              Now, we obviously have various responses that are

6     not asserted in the proofs of claim, LBHI did not assume any

7     broker dealer obligations, and all the other defenses that

8     apply to the guarantee claims apply.

9              And then they have consequential damages.  And all

10    we know about the consequential damages are what's in that

11    footnote I read to you before, which simply says that they

12    have consequential damages without offering any factual

13    support, any -- well, let me read it to you.

14             In addition -- this is from the estimation motion

15    objection footnote 3 --

16             THE COURT:  Which is tab?

17             MR. LEVINE:  Tab 4, I'm sorry.  Tab 4, page 4.

18             THE COURT:  Okay.

19             MR. LEVINE:  Footnote 13, and they basically

20    repeat this in their response to the objection motion they

21    refer back to this paragraph.  But this is basically all

22    they said about --

23             THE COURT:  Other damages.

24             MR. LEVINE:  -- other damages, or lost investment

25    opportunities is what they call it.

1          In addition to the 16.2 million recoverable by

2     Maverick, the Maverick entities proofs of claim also reserve

3     the right to seek interest and legal fees, and also

4     generally asserted and preserve the right to pursue all

5     amounts payable in connection with the prime brokerage

6     agreements.

7          And actually what it says the prime brokerage

8     documents, which is a full list of agreements, not just the

9     PB agreements and the guarantees.  "Although Maverick

10    believes the $16.2 still owed to it provides ample

11    justification to deny the estimation motion with respect to

12    the Maverick entities.

13          "Maverick expects that it may in the future

14    continue to pursue any rights it may have to collect

15    interest, legal fees, or other damages, including damages

16    for lost investment opportunities or other items."

17          And that footnote is basically repeated in their

18    most recent objection, but lost investment opportunities, I

19    mean, we know under New York law it's virtually --

20          THE COURT:  You don't have to spend time on this.

21          MR. LEVINE:  Okay.  The final thing is I got

22    handed a note by Mr. Fail, let me just make a couple of

23    points that he asked me to make.

24          Another reason that Section 562 applies to the

25    guarantee claims is that 562 talks about damages, it's not -

Page 32

```
 1    - in their papers they kind of suggest 562 is a measure of a

 2    claim, how much a claim should be, but that's not right.

 3    562 talks about damages.  And then they say, well, New York

 4    law says you could calculate damages on the date of breach,

 5    and I agree with that.

 6           But here we have a Bankruptcy Code provision,

 7    which under the supremacy clause controls, which says that

 8    if under 562, if 562 applies, damages are measured as of the

 9    termination date, rejection date, liquidation date.

10           And finally, we think that a fundamental problem

11    with Maverick's approach under 562 is that it would suggest

12    that where 562 applies to a primary obligor, it might not

13    apply to a guarantor --

14           THE COURT:  You have a two tiered system with two

15    sets of books.

16           MR. LEVINE:  -- two tier, you got it, Your Honor.

17           Then I'll sit down and let Your Honor -- thank you

18    very much for your patience.

19           THE COURT:  Sure.

20           MR. FAIL:  Can I just correct?  Sorry.  One more

21    thing and I won't correct Rick, Garrett Fail, Weil Gotshal

22    for the record.  Your Honor asked the question before if we

23    were aware of any claims against LBHI that had a primary

24    obligor Libby that were allowed, I said I wasn't.  I've

25    since had a chance to check with my client, there was one
```

Page 33

1    claim that was allowed where the amount received by the

2    counterparty was less than the claim allowed by Libby or the

3    claim asserted against LBHI due to certain unique

4    circumstances of an agreement.

5            So we allowed one guarantee claim against LBHI,

6    where we appropriately think the guarantee should be paid.

7    In terms of the estimation motion, I said that there were

8    largely two parties that were still disputing that.  There

9    are two additional claims, plus or minus a million dollars

10   each that are also outstanding --

11           THE COURT:  Okay.

12           MR. FAIL:  -- that are disputing it.  Other

13   parties have claims outstanding with respect to estimation,

14   but they won't be litigated if there's an agreement that

15   those claims will be withdrawn on a date certain in the

16   future.

17           THE COURT:  Okay.

18           MR. FAIL:  And in terms of claims that are being

19   litigated, other Libby related, we spoke about SRM, Newport

20   and Providence you're aware of.

21           THE COURT:  Yes.

22           MR. FAIL:  And there's one additional claim that

23   I'm aware of, Highland, which is in mediation, a $5 million

24   claim, so I just wanted to be complete for the record.

25           THE COURT:  All right.

```
 1              MR. FAIL:  All the unique circumstances.

 2              THE COURT:  It was just by way of background for

 3    me, it's neither here nor there in terms of legal arguments.

 4              MR. FAIL:  I agree, thank you.

 5              MR. ROLL:  Good morning, Your Honor.

 6              THE COURT:  How are you?

 7              MR. ROLL:  I'm fine, Your Honor, how are you?

 8              THE COURT:  Good.

 9              MR. ROLL:  William Roll of Sherman & Sterling

10    appearing on behalf of the Maverick entities.  I'm here with

11    my colleague, Randall Martin.

12              Just a program though if I might, Your Honor --

13              THE COURT:  Sure.

14              MR. ROLL:  -- if it's all right with the Court, I

15    was hoping to afford Mr. Martin to argue at least some of

16    this because he's --

17              THE COURT:  Of course.

18              MR. ROLL:  -- done 99 percent of the work, so he

19    should have at least some of the fun.

20              THE COURT:  Delighted.

21              MR. ROLL:  My intention is if we get things like

22    the exculpatory provisions --

23              THE COURT:  Sure.

24              MR. ROLL:  -- and the proof of claims, I'm going

25    to turn that over to him.
```

1          THE COURT:  Sure.  I want to ask you a couple of

2     questions, though --

3          MR. ROLL:  Of course.

4          THE COURT:  -- right off the bat.

5          So suppose there was no Lehman filing broadly

6     speaking and life just went on.

7          MR. ROLL:  Yes.

8          THE COURT:  Right?  And the Maverick entities

9     decide to part ways with Libby.  And they terminated the

10    prime brokerage agreement.

11         MR. ROLL:  Uh-huh.

12         THE COURT:  Give me back my stuff, we're going to

13    go to another broker dealer.

14         MR. ROLL:  Right.

15         THE COURT:  Okay.  And at that moment in time, the

16    custody and securities were worth less than what they were

17    when you gave them to Libby.

18         MR. ROLL:  Uh-huh.

19         THE COURT:  Would you have a right to call in the

20    guarantee for the diminution in value?

21         MR. ROLL:  Well, there would be no diminution in

22    value, as Your Honor has articulated that hypothetical,

23    because we would be looking at just that one date.

24         THE COURT:  I'm sorry, no, my hypothetical is that

25    on the -- at the commencement of the relationship with the

1    prime broker --

2           MR. ROLL:  Right.

3           THE COURT:  -- with LBHI as a guarantor --

4           MR. ROLL:  Right.

5           THE COURT:  -- you -- custodies, securities that

6    were say a billion dollars --

7           MR. ROLL:  Correct.

8           THE COURT:  -- okay.  And then you decide you're

9    going to go with a different broker dealer, right, and you

10   terminate.  And you say to Libby, give me back my stuff,

11   right.  And Libby says, sure, here's your stuff.  Okay.  Or

12   Libby says, and you agree, well, we don't want back our

13   stuff, we just want the value of our stuff.  And the value

14   of the stuff on that date is half a million dollars less,

15   right.  You get to go ask for that half a million dollars

16   from your guarantor?

17          MR. ROLL:  No.

18          THE COURT:  Why not?

19          MR. ROLL:  Because we would have -- well, Your

20   Honor started with a very big if.  No bankruptcy filing, so

21   we're in a normal relationship, so we, Maverick, would be

22   taking a risk in that circumstance of asking for its

23   securities back --

24          THE COURT:  Why is that --

25          MR. ROLL:  -- at a time when the value would've

Page 37

1     diminished.

2              THE COURT:  Why does that not apply in this

3     situation?

4              MR. ROLL:  Because of the application of 502 in

5     the Bankruptcy Code, because of the fact that --

6              THE COURT:  So you get more in bankruptcy than you

7     would out of bankruptcy?

8              MR. ROLL:  Because --

9              THE COURT:  You get an enhanced claim against a

10    bankrupt guarantor.

11             MR. ROLL:  In these -- in the circumstances

12    presented here --

13             THE COURT:  That's pretty good stuff.

14             MR. ROLL:  It's good stuff, but it's consistent

15    with the law.  And I think it's important to note that Your

16    Honor's hypothetical, it's a fair question, but in that

17    circumstance, Maverick could have taken -- made the choice

18    at any point along the way to say, give me my stuff back.

19             THE COURT:  Right.

20             MR. ROLL:  With the bankruptcy having intervened,

21    we didn't have that choice.  So in Your Honor's hypothetical

22    we could have said, well, you know --

23             THE COURT:  You realize what you just said.  When

24    the bankruptcy intervened, you didn't have that choice.  So

25    that's consistent with the application of the exculpation.

Page 38

1       It's the absence of choice that was --

2               MR. ROLL:  In terms of the number, because --

3       that's all I was really getting at, Your Honor.  Because

4       when the bankruptcy intervened, when -- and let's, you know

5       --

6               THE COURT:  Go back to my hypothetical, you know,

7       because a guarantee is a guarantee is a guarantee --

8               MR. ROLL:  Correct.

9               THE COURT:  -- according to you.

10              MR. ROLL:  Right.

11              THE COURT:  So when you -- you get a guarantee

12      from LBHI parent --

13              MR. ROLL:  Uh-huh.

14              THE COURT:  -- and then you decide to terminate --

15              MR. ROLL:  Right.

16              THE COURT:  -- and your stuff is worth less, you

17      have a guarantee.  Well, I don't understand why out of

18      bankruptcy you would not be able to then say, make good on

19      the guarantee.

20              MR. ROLL:  We have a guarantee for whatever the

21      obligation is at that point.

22              THE COURT:  At the point of the termination.

23              MR. ROLL:  No, no.  In this particular instance,

24      there was no termination.  The value of the guarantee

25      derives from the claim we're able to assert under Section

Page 39

1     502 of the Bankruptcy Code against LBIE on or LBHI and LBIE

2     on the petition date --

3              THE COURT:  But the claim was unliquidated on the

4     petition date.

5              MR. ROLL:  Understood.  But New York law says,

6     it's a New York law governing contract, New York law says

7     the damages are measured from the date of the breach.  The

8     breach occurred on the date they went into administration,

9     which is the same date that LBHI filed for Chapter 11.

10             So that's when things begin.  And on that date, we

11    have a claim against LBIE under New York law for the amount

12    of the securities, i.e., you know, what they're holding

13    because they breached the obligations to return those.

14             We have a claim under the guarantor, as of that

15    same date for that same amount, but we can't exercise it, we

16    can't exercise the right under the guarantee because LBHI

17    has filed.

18             So at that point and from that point, we have a

19    claim for 108, at least 118 the value of the securities at

20    that point in cash, which they don't dispute.  Every day

21    from that point, until we get to March of 2012, and under

22    the LBHI theory today, everything changes at that point.

23             They say, well, the settlement agreement is

24    entered into, it effectuates a payment in full to Maverick,

25    the liability under all the agreements, including guarantee

Page 40

```
1    is extinguished and everybody goes home, but that's not

2    quite right.

3              That doesn't take into account the -- two things,

4    two sets of things.  The first thing is the facts, what

5    actually happened at that point, which is there was a --

6    LBIE's liability and the damages was actually compromised at

7    that point, following a real live negotiation engaged in by

8    real live people coming up with a real live agreement, which

9    Mr. Levine quoted from, and I'm going to quote from too.

10             That said because of the positions taken in that

11   negotiation and because of the application of UK insolvency

12   law, all you're going to get, Maverick, at this point, is

13   the value that UK insolvency law would say you get, which is

14   the value of the cash and securities at that point, the

15   10149.

16             But it didn't change what was owed to us under the

17   guarantee, the amount of the claim for which was fixed as of

18   the petition date, unless there's some basis on which it can

19   be set that got terminated, and this was a question Your

20   Honor put to Mr. Levine at the very beginning of his

21   argument, you know, which is -- if it's not terminated --

22             THE COURT:  But you're assuming your conclusion.

23   You're assuming that simply because there was an LBHI

24   petition date --

25             MR. ROLL:  Uh-huh.
```

Page 41

1           THE COURT:  -- and you can come up with a number -

2  -

3           MR. ROLL:  Right.

4           THE COURT:  -- a value of the securities on that

5  petition date, that that's the amount you get to assert

6  against LBHI on the guarantee.  But that's not an argument,

7  that's just ipsy dipsy, I mean --

8           MR. ROLL:  Under 502, the amount of claimants

9  fixed as of petition.

10          THE COURT:  But that assumes that 562(a) does not

11  apply.

12          MR. ROLL:  Well, 562(a) does not apply, and I can

13  go right into that if Your Honor would like.  This may be

14  the nub of it, you know, they say the agreement -- the

15  guarantee was terminated for two sets of reasons --

16          THE COURT:  Forget about whether it's terminated

17  or not.  Assume it's not terminated.

18          MR. ROLL:  If the guarantee -- if it is not

19  terminated and if the guarantee was terminated and 562 does

20  not apply, there should be absolutely no dispute that we're

21  entitled to what Section 502 would say, we can assert

22  against the guarantor which is the value as of the petition

23  date.  Their entire argument on sufficiency rests on the

24  notion that we were somehow paid in full, which relates to

25  the very factee set of issues surrounding the numbers, and I

Page 42

1    was going to get to --

2            THE COURT:  What do you mean factee issues

3    surrounding the numbers?  There's no facts surrounding the

4    numbers.  You say you should be able to assert a claim on

5    the guarantee for the 118 so essentially you can get

6    distributions from LBHI that would catch you up and give you

7    full recovery on the 118 as opposed to the 101, that you've

8    already gotten.

9            MR. ROLL:  I was referring to the back and forth

10   between the parties in the negotiations, the evidence of

11   which is not at all before the Court at this stage, that

12   resulted in the number of 101.9 at the time we did the

13   settlement with LBIE, that's what I was referring to.

14           But the second part of their, you know, you were

15   paid in full argument is that the guarantee was terminated,

16   and therefore 562 kicks in and that's how you measure the

17   damages.  But let's think about that.  562 requires at least

18   three things, a specific party, a specific kind of an

19   agreement, and a specific action being undertaken on behalf

20   -- by that party with respect to that agreement.

21           We're not going to fight about, you know, the

22   specific party here, you know, whether it's a securities

23   contract or whatever, but we do take issue with the notion

24   that the guarantee was actually terminated in connection

25   with the settlement, because it clearly was not.

Page 43

1           The settlement agreement itself says, quite

2    clearly that it's terminating the relationship between LBIE

3    and Maverick and not anybody else, and it specifically

4    reserves to Maverick the right to pursue claims against any

5    other Lehman entity.

6           THE COURT:  Sure, but you know, this is where you

7    go into your, you know, your Ivanho argument which you think

8    is a show stopper.  But the fact of the matter is that all

9    of that only stands for the proposition that had claims

10   against LBIE, claims -- if LBIE had not been 100 percent

11   payor, you would unquestionably be able to assert the full

12   amount of that claim against LBHI so that you could become

13   paid in full, but you got paid in full by LBIE on the 101.

14          MR. ROLL:  We got paid 101, but that was not --

15   that was clearly not payment in full in the eyes of the

16   Maverick people.

17          THE COURT:  So let me ask you a different

18   question.  Let's take a little walk around the Bankruptcy

19   Code.

20          MR. ROLL:  Okay.

21          THE COURT:  502(b)(6).

22          MR. ROLL:  502(b)(6), okay.

23          THE COURT:  All right.  The cap on lease rejection

24   damages.

25          MR. ROLL:  Okay.

1          THE COURT:  See, he is smarter than you, he knows

2    exactly what it is.

3          MR. MARTIN:  We were going to bring up this

4    example, Your Honor.

5          THE COURT:  Okay.  All right.  So 502(b)(6) says

6    if, you know, if you reject a lease, your damages are capped

7    pursuant to 502(b)(6).

8          MR. ROLL:  Right.

9          THE COURT:  Right.  And the landlord might say,

10   well, that's really nice, tenant debtor, but I've got this

11   nice guarantee.  Okay.  So I would think that you would tell

12   me, see, that's just like this, we've got this guarantee so

13   that the allowance of the lesser amount pursuant to the

14   Bankruptcy Code doesn't mean that I don't get to assert the

15   full amount of my damages against my guarantor, right.

16          MR. ROLL:  Correct.

17          THE COURT:  Okay.  However, under the Bankruptcy

18   Code if your guarantor is a debtor it doesn't work that way,

19   the cap applies.

20          So this notion that there's some greater ability

21   to recover under applicable -- I put in air quotes, although

22   air quotes have been much maligned nowadays -- applicable

23   non-bankruptcy law, you know, doesn't necessarily fly.   And

24   here I draw an analogy to the way 562(a) works both as a

25   matter of policy and actually by its terms --

1          MR. ROLL:  Uh-huh.

2          THE COURT:  -- to rebut the concept that, you

3     know, a guarantee, is a guarantee, is a guarantee, and you

4     get more than your -- the obligation owed to you by your

5     primary obligor, which is in fact what you're seeking.

6          MR. ROLL:  Right.

7          THE COURT:  You're seeking more than what your

8     primary obligor owed you.

9          MR. ROLL:  Because of the operation of UK

10    insolvency rules so we get the value of the securities on

11    that date.  And there is law from the southern district,

12    stated in our papers, which they don't deal with, unless I

13    missed it, and I don't think I did, the Instituto (ph) case

14    on page 14 of our --

15         THE COURT:  Uh-huh.

16         MR. ROLL:  -- objection, which basically says that

17    the discharge -- a guarantor's obligations on the guarantee

18    are not discharged by reason of discharge of the primary

19    obligor's obligations as a result of foreign bankruptcy law.

20    That's still good law from the district court here, and they

21    don't address it at.

22          So as a result of that that discharge at the level

23    of 101.9 as a result of the negotiations we had with them

24    over what counted and what didn't to get to the final

25    number, means that we still retain the full amount of the

Page 46

1    claim against the guarantor, you know, irregardless of what

2    happens in connection with the foreign bankruptcy

3    proceeding.

4            So you still have that, and if you combine that

5    with Ivanho (ph) that means we can still recover -- we can

6    still assert the full amount of the claim against the co-

7    obligor/guarantor up to the point of payment in full,

8    payment in full being defined by New York law in this

9    circumstance, because damages are measured as of the date of

10   the breach, against the guarantor.

11           So -- and I sense that Your Honor apprehends that

12   this is the argument, because this is where the Court

13   started with Mr. Levine, so I know that I'm not saying

14   anything that Your Honor doesn't already know that we're

15   going to say, but that really is the nub of the argument.

16           What I would say with respect to the hypothetical

17   scenarios and the 506(b), you know, I'm not smart enough to

18   parse 506(b) on the fly, maybe Mr. Martin can do it, he

19   can --

20           THE COURT:  502(b)(6).

21           MR. ROLL:  502(b)(6), I'm sorry -- you know, maybe

22   he can do it and fix whatever I've left unfixed at that

23   point, but respectfully we're not dealing with a

24   hypothetical circumstance.

25           THE COURT:  But we're not -- but we're also not

Page 47

1    dealing with New York law, we're dealing with the Bankruptcy

2    Code and we're dealing with the operation of 562(a) --

3              MR. ROLL:  Right.

4              THE COURT:  -- under the Bankruptcy Code two

5    securities contracts.

6              MR. ROLL:  But -- right.

7              THE COURT:  Which is -- the prime brokerage

8    agreement certainly is, and which the guarantee certainly

9    is.

10             MR. ROLL:  Well we'll assume that for the purposes

11   of this argument, but that's only two -- that's two-thirds

12   -- or that's one-third, and I'll concede the other third --

13             THE COURT:  Why isn't --

14             MR. ROLL:  Because it was not terminated.  It was

15   not terminated in connection with the settlement, period,

16   full stop, because of what the parties did and because of

17   what the documents provide.

18             THE COURT:  Well but there's terminate and there's

19   terminated, right?  To the extent that the underlying

20   relationship terminates, right, let's go back to my

21   502(b)(5) example --

22             MR. ROLL:  Uh-huh.

23             THE COURT:  -- to the extent that the underlying

24   relationship terminates I'm not exactly sure what the

25   termination of a guarantee means.  There are no ongoing --

Page 48

1    there's no ongoing relationship between the primary obligor

2    and the primary obligee, but the obligation of the guarantor

3    to pay it is what it is as of that moment in time.

4              MR. ROLL:  But the guarantee itself tells us what

5    it means for the guarantee to not exist -- for the

6    obligations under the guarantee to not exist.  And we should

7    look at that.  There's only one instance in which the

8    guarantee itself -- and this is the one that's toward the

9    back of the book, I forget which tab it is -- but it's the

10   one that the parties have referred to as the LBHI guarantee.

11             THE COURT:  Uh-huh.

12             MR. ROLL:  4(c).

13             THE COURT:  Uh-huh.

14             MR. ROLL:  If Your Honor would look at the --

15             THE COURT:  But you have to deal with the language

16   that says that -- the termination language that says that

17   all obligations --

18             MR. ROLL:  Uh-huh.

19             THE COURT:  -- are terminated.

20             MR. ROLL:  You're talking about the language in

21   the settlement agreement.

22             THE COURT:  Yeah.

23             MR. ROLL:  All obligations of LBIE.

24             THE COURT:  No, but that's not exactly right.

25             Let me -- you show me what you wanted to show me.

```
 1              MR. ROLL:  I'll show -- well let's go to the --

 2      let's talk about the settlement agreement first --

 3              THE COURT:  Sure.

 4              MR. ROLL:  -- because we're on it, and then we'll

 5      go back to the guarantee.

 6              THE COURT:  What's -- give me the tab, please.

 7              MR. MARTIN:  4(e).

 8              MR. ROLL:  4(e) for the settlement agreement.

 9              THE COURT:  4(e).  Okay.

10              MR. ROLL:  If Your Honor would look at paragraph

11      2.1(a), I think this is one of those that Mr. Levine may

12      have actually pointed Your Honor to.

13              THE COURT:  Yep.

14              MR. ROLL:  But it says the relevant agreements and

15      all transactions thereunder --

16              THE COURT:  Uh-huh.

17              MR. ROLL:  -- are terminated as between LBIE and

18      each Maverick entity.  It doesn't say anything about LBHI,

19      it doesn't say anything about the --

20              THE COURT:  No, I'm thinking of --

21              MR. ROLL:  -- guarantee.

22              THE COURT:  -- a different provision.  I'll have

23      to find it.

24              MR. ROLL:  Okay.  But this one doesn't go away, I

25      mean this one is here.
```

Page 50

1            The second part of that, subsection (b) says that

2    this deed shall be a full and final settlement of all

3    rights, obligations, liabilities, and claims, et cetera, et

4    cetera, which LBIE and each Maverick entity may have against

5    one another, including, but not limited to, and it goes on

6    from there.  And it doesn't say anything about LBHI.

7            THE COURT:  Well --

8            MR. ROLL:  And they knew about LBHI at the time

9    and they knew about the guarantee.

10           You can then look at paragraph 2.3, which is the

11   release language, the releases, which are actually once

12   litigated you can say that's the most operative part of any

13   settlement agreement most important, and the one where it's

14   most important to be clear provides that it's only the

15   Maverick entities and LBIE that are releasing each other

16   with respect to all claims.

17           Again, the parties knew about LBHI and the

18   guarantee.

19           THE COURT:  But the guarantee says that the

20   guarantee will remain in full force and effect until the

21   first two occur of --

22           MR. ROLL:  Right.

23           THE COURT:  -- the obligations defined term, no

24   longer in existence, and the prime brokerage guarantee

25   defines obligations as all obligations under the agreements,

Page 51

1    a defined term, and the defined term agreements includes the

2    prime brokerage agreements, the GMSLAs, and the letter

3    agreement, and the MLAs.  So --

4              MR. ROLL:  But the obligations no longer being in

5    existence is not a termination under this language.

6    Termination is -- this is the point I was trying to get to

7    before.  Termination is effectuated by notice.  Obligations

8    no longer being in existence means, has to be based on the

9    other language in this document, paid in full, and that has

10   to mean --

11             THE COURT:  You're ignoring the language --

12             MR. ROLL:  -- under New York law.

13             THE COURT:  -- that says the guarantee will remain

14   in full force and effect.

15             MR. ROLL:  Right.  Until the first --

16             THE COURT:  Until the obligations are no longer in

17   existence.

18             MR. ROLL:  But the obligations are in fact in

19   existence.  The obligations are still in existence because

20   we have not been paid in full --

21             THE COURT:  Can you hold on one second?

22             MR. ROLL:  Certainly.

23             THE COURT:  Hold on one second.

24        (Pause)

25             THE COURT:  Okay.  Go ahead, Mr. Roll, sorry.

1          MR. ROLL:  I would just contend, Your Honor, that

2     that -- you know, termination is the trigger for 562.  My

3     point is that the obligations no longer being in existence

4     is not a termination point, it has to do with actual payment

5     in full.

6          And the reason I say that is, that position is

7     consistent with the rest of the language in the agreement,

8     which actually indicates that there are certain

9     circumstances in which the obligations still remain.  In

10    fact the very next sentence.  Termination of this guarantee

11    shall not affect the guarantor's liability hereunder as to

12    the obligations incurred or arising out of transactions

13    entered into it prior to the termination thereof.

14         So obligations still being in existence is

15    separate and apart from termination.  It's a separate

16    concept.

17         THE COURT:  Okay.

18         MR. ROLL:  And there's actually another provision

19    in here that says the obligations can spring back to life if

20    they -- even if they've been paid in full and a bankruptcy

21    proceeding allows them to be avoided -- payments to Maverick

22    to be avoided.

23         So termination and obligations being paid in full

24    are two different concepts in this guarantee, and I think it

25    was carefully drafted for that reason, and -- or to

Page 53

1    establish that or to leave to be a readily ascertainable

2    inference to draw from the document.

3            And it must mean, I think any way, and we've made

4    this point in the papers, that paid in full doesn't relate

5    to terminating the obligations of LBIE as a result of the

6    operation of UK (indiscernible) and the settlement and

7    whatever was done there and whatever was left open or not,

8    but rather New York law, which says the damages are measured

9    as of the petition date, which is the date of the breach.

10           THE COURT:  Okay.  Do you want to -- we should

11   turn to anything you want to say about exculpation and we

12   should turn to anything you want to say about direct claims

13   and/or amendments.

14           MR. ROLL:  Yeah, on that, Your Honor, I'll turn it

15   over to Mr. Martin who will cover exculpation.

16           THE COURT:  Okay.

17           MR. ROLL:  Probably the other items as well, but

18   if not I can come back on this.

19           THE COURT:  Okay.

20           MR. ROLL:  Thank you, Your Honor.

21           MR. MARTIN:  Good morning, Your Honor.

22           THE COURT:  Good morning.

23           MR. MARTIN:  Thank you for indulging out --

24           THE COURT:  No problem.

25           MR. MARTIN:  -- tag team presentation.

Page 54

1          THE COURT:  Always like it when the younger person

2    teaches the older person a thing or two.

3          MR. MARTIN:  I don't think that's going to happen

4    today, but --

5          MR. ROLL:  I actually appreciate it too, Your

6    Honor.

7          MR. MARTIN:  Could I touch on briefly the example

8    in the question that you opened with to Mr. Roll?

9          THE COURT:  Sure.

10          MR. MARTIN:  Because I think that you're creating

11    a hypothetical that can't and won't happen in the real

12    world.  And it is the case that we are not asserting a claim

13    for one penny more than we are entitled to outside of

14    bankruptcy.

15          You raised the hypothetical in which we went --

16          THE COURT:  Hold on one second.

17      (Pause)

18          THE COURT:  Go ahead.

19          MR. MARTIN:  You proposed a hypothetical in which

20    we wanted to terminate our relationship with the Lehman

21    entities outside of bankruptcy.

22          THE COURT:  Uh-huh

23          MR. MARTIN:  Every day outside of bankruptcy that

24    we have a long position open, we're betting on Apple stock,

25    for instance, we are assuming the risk that Apple stock goes

Page 55

1    up or down.

2            THE COURT:  Yes.

3            MR. MARTIN:  So it's custody with them, but every

4    day we have it with them.

5            THE COURT:  You do have that risk, right.

6            MR. MARTIN:  And so if we tell them we want to

7    terminate the relationship, please give us our securities

8    back or the monetary (indiscernible) --

9            THE COURT:  Uh-huh.

10           MR. MARTIN:  -- they have to give it back to us.

11           THE COURT:  Uh-huh.

12           MR. MARTIN:  If they take two years to execute

13   that instruction and during that two years after which we've

14   told them we don't want to be invested in Apple stock --

15           THE COURT:  Uh-huh.

16           MR. MARTIN:  -- we get the Apple stock back and

17   its declined in value --

18           THE COURT:  Right.  That's --

19           MR. MARTIN:  -- in that case, yes, the guarantee

20   kicks in.

21           THE COURT:  That's a fair clarification.

22           But here this goes right -- this takes us right to

23   exculpation.  Here LBIE filed.

24           MR. MARTIN:  It filed, that's right.

25           THE COURT:  And that's what caused the delay.

Page 56

1          MR. MARTIN:  I don't think that our claim was

2    caused by a bankruptcy.  Our claim is based on the fact --

3          THE COURT:  Why didn't you get your securities

4    back sooner?  You didn't get your securities back sooner

5    because there was a bankruptcy.

6          MR. MARTIN:  But surely that's not what the force

7    majeure clause was intended to capture and pick up.

8          THE COURT:  You don't think?

9          MR. MARTIN:  It talks about tornados, it talks

10    about insurrections, it does not reference --

11          THE COURT:  It does not reference --

12          MR. MARTIN:  -- bankruptcy.

13          THE COURT:  -- specifically -- well Judge Glenn in

14    MF Global certainly thought that suspension of trading by

15    SIPA with respect to LBI was pretty much of a financial

16    tornado.

17          MR. MARTIN:  Respectfully we think he's wrong.

18    It's a term of art in the financial world.  On suspension of

19    trading I think we have a half page footnote --

20          THE COURT:  Okay.

21          MR. MARTIN:  -- citing what a suspension of

22    trading means.

23          Critically I also think that the MF Global

24    language and exculpation clause also included a reference to

25    all laws.  This one does not.  So there is an important

Page 57

1    distinction between the language that was at issue in that

2    case and our language.

3            And the other thing, Your Honor, that makes it I

4    think crystal clear to me, that the guarantee could not have

5    been eviscerated by a force majeure clause, is that the

6    guarantee itself says as much.

7            I'm at the third paragraph of paragraph -- of tab

8    C --

9            THE COURT:  Okay.

10           MR. MARTIN:  -- behind tab 4 --

11           THE COURT:  Okay.

12           MR. MARTIN:  -- and there's a provision in the

13   guarantee that expressly notes that the obligations under

14   the guarantee kick in if we are the subject of a claw-back

15   resulting from a preference.

16           THE COURT:  Where are you?

17           MR. MARTIN:  It's the third full paragraph down,

18   Your Honor.  It's about two-thirds of the way down.

19           THE COURT:  This guarantee is?

20           MR. MARTIN:  Correct.  And if you read that whole

21   paragraph what you'll see is that it expressly and

22   unambiguously contemplates that they will have to pay us

23   under the guarantee if we are the subject of a claw-back

24   with respect to a preference or a fraudulent conveyance.

25           THE COURT:  Okay.

1          MR. MARTIN:  That can mean one thing only.

2          Now, I know we're not making a claim based on a

3     preference and I know we're not making a claim based on a

4     fraudulent conveyance, but what this unambiguously means is

5     that if as a consequence of a bankruptcy we don't get paid

6     in full this guarantee is triggered.  The parties said as

7     much.

8          And what else is a guarantee for?

9          THE COURT:  It doesn't say that, let alone

10    unambiguously say that, but it's interesting.

11         MR. MARTIN:  A preference would be consequence of

12    a bankruptcy.

13         THE COURT:  I'm going to decline your invitation

14    to go down that path, because that's not what this says.

15    It's --

16         MR. MARTIN:  Your Honor, we had some points to

17    make on netting as well if you'd like to hear those.  I

18    don't know if those are the --

19         THE COURT:  I actually would not.  I think I'm

20    okay on netting.

21         The only other thing that I'm interested in

22    hearing is about this concept that there's either an

23    embedded direct claim in the claims that were filed or that

24    the Maverick entities ought to be allowed to amend to assert

25    a direct claim, which seems to include some notion of lost

Page 59

1    investment opportunities.  Is that on you or Mr. Roll?

2            MR. MARTIN:  I can handle it, Your Honor.

3            MR. ROLL:  That's perfectly fine.  Counsel is

4    being generous to us and preserving our right.

5            We're not taking the position that there is a

6    direct claim embedded in the proof of claim.

7            THE COURT:  Okay.  Because I didn't see.

8            MR. MARTIN:  And it's not there.

9            THE COURT:  Okay.

10           MR. MARTIN:  However, and this is critical, and

11   this speaks importantly to a point that you were discussing

12   with Mr. Roll.  An absolute and unconditional guarantee of

13   payment is a standalone document under New York law and a

14   standalone series of obligations.

15           So our point on the direct claim is that it is so

16   similar to the claim asserted with respect to the guarantee

17   claim that we should be permitted opportunity to amend, if

18   necessary, although that only comes into play if you

19   disagree with Mr. Roll that 562 doesn't apply because the

20   guarantee wasn't terminated.  We don't need the direct claim

21   otherwise so there's no need for you to resolve that unless

22   you go against us on 562.

23           THE COURT:  But here's the part I don't

24   understand.  If you think you have a claim for the delta

25   between 101- and 118- --

Page 60

```
 1              MR. MARTIN:  Uh-huh.

 2              THE COURT:  -- which you do.

 3              MR. MARTIN:  Correct.

 4              THE COURT:  Okay?  Then you think you have a claim

 5    for lost investment opportunities, because I assume that the

 6    theory of the claim is that if we had had that $5 million

 7    for that period of time we would have invested in all this

 8    great stuff and we would have made all this money.

 9              So the notion that you have that claim but you

10    didn't assert that, it just doesn't make any sense.

11              MR. MARTIN:  You're switching I think from the

12    direct claim to the consequential damages claim, and those

13    are two different things in my mind.  And I do think, Your

14    Honor, the proof of claim did adequately address our theory

15    of consequential damages.

16              THE COURT:  You think a guarantee claim includes a

17    claim for loss investment opportunities?

18              MR. MARTIN:  I think our proof of claim --

19              THE COURT:  Really?

20              MR. MARTIN:  -- adequately stated -- yes, Your

21    Honor.

22              THE COURT:  Where does it say that?

23              MR. MARTIN:  Under tab 5, page 2, the first --

24    sorry -- the last sentence, it's about halfway down on page

25    2 in Roman I.
```

Page 61

1              THE COURT:  Uh-huh.

2              MR. MARTIN:  This is a very broad and very general

3     statement, Your Honor.  We said, this proof of claim

4     constitutes a demand for payment under the guarantee.  This

5     is a payment of any amount owed as a result of the breach of

6     the guarantee which occurred under New York State law as of

7     the petition date.

8              THE COURT:  So you can say to me today that

9     statement means that we have a claim for lost investment

10    opportunities for $50 million?  Surprise LBHI, how's your

11    reserve looking?  I mean that's --

12             MR. MARTIN:  There should be --

13             THE COURT:  -- it doesn't work that way.  Okay?

14    It doesn't work that way.

15             MR. MARTIN:  Are there any other points that Your

16    Honor would like to be addressed?

17             THE COURT:  All right.

18             MR. MARTIN:  Thank you, Your Honor.

19             THE COURT:  Thank you.  Clean up, anyone?

20             MR. LEVINE:  Yeah, Your Honor, I'd appreciate -- I

21    can be very quick.

22             THE COURT:  I'm going to hold you to that.

23             MR. LEVINE:  Fair enough.  You've been very

24    generous with your time.

25             Okay.  So the first thing, I just wanted to

Page 62

1    enforce a few things that Your Honor questioned counsel

2    about.  In terms of the exculpation provision and what

3    happened after Libby filed for administration, on page 8 of

4    their response --

5              THE COURT:  And counsel cited a district court

6    case that says it's dispositive in their favor of that

7    argument that --

8              MR. LEVINE:  Well what I was going to point you

9    to, Your Honor --

10             THE COURT:  Yeah.

11             MR. LEVINE:  -- was their own statement.  I'm

12   reading from their brief, and you know, that in opposition

13   to the current objection, the one they filed.

14             Libby -- under the -- this is tab 2, page 8, if

15   you want to read along, paragraph 22.  The Maverick claims

16   are straightforward.  Under the prime brokerage agreements

17   and the New York Uniform Commercial Code, Libby was

18   obligated to return all custody, cash, and securities to the

19   Maverick entities upon request.  Libby however was not in

20   the position to do so after having commenced its

21   administration proceedings.

22             To me that consistently would require rulings.

23   That is under clause 28 of the PB agreement.  You'll agree

24   that Lehman Brothers will be liable for any loss caused

25   directly or indirectly by government restrictions, exchange

Page 63

1    or market rulings -- that doesn't really apply -- suspension

2    of trading.  They couldn't perform.  They admit the reason

3    they have a new offer is because once Libby filed for an

4    administration it wasn't able to trade, it wasn't able to

5    perform.  To me that's clearly covered.

6            In terms of the lost opportunities, the last

7    sentence of paragraph 29 of the PB agreement says, in no

8    event with Lehman Brothers be liable for any special,

9    indirect, incidental, or consequential damages.  Lost

10   investment opportunities or quintessential for consequential

11   damages.  Consequential damages you almost never get unless

12   you have a specific instrument you can point to.

13           In terms of the guarantee.  Your Honor I think was

14   completely on point when you were directly counsel to the

15   last paragraph on the first page of the guarantee.  This

16   guarantee will remain in full force and effect until --

17   until means something -- the first two occur of the

18   obligations are no longer in existence.

19           As you pointed out the obligations refer back to

20   Libby's obligations as a guarantee.  It's not direct

21   obligations, it's guaranteed obligations.  Libby's

22   obligations were completely released and extinguished by the

23   settlement.

24           And in terms of the distinction which I don't

25   really understand between termination and ending of the

Page 64

1   guarantee, the next sentence says, termination of this

2   guarantee shall not effect.  Clearly it understood the prior

3   sentence to relate to a termination of the guarantee.

4            As you know that, you know, we don't think it

5   matters for 562 whether the guarantee was terminated, even

6   though we think it was, because it governs damages in

7   relation to securities contracts, master nettings

8   agreements, the damages at issue are those that are running

9   under the prime brokerage documents which I think is clearly

10  under the very, very broad language of the second circuit

11  in --

12           THE COURT:  Madoff.

13           MR. LEVINE:  -- Card versus Ira Fishman (ph),

14  including they specifically call out were it not for the

15  account documents -- I'm reading from the second circuit

16  decision -- were it not for the account documents there

17  would be no basis for a customer to make deposits or request

18  withdrawals.

19           Their attempt to distinguish the PB agreement from

20  the definition of a securities contract, because what they

21  want was to get their securities back and not buy or sell

22  trades, is specifically described by the second circuit as

23  something that made the account agreements there a

24  securities contract.

25           And finally, Your Honor, I mean just to be kind of

Page 65

1    crude, they paid $30 million.  They paid $30 million to

2    Libby.

3             You know, you can't have an obligation to the

4    priming obligor and think you have a guarantee claim, it

5    just doesn't make sense.

6             THE COURT:  Okay.

7             MR. LEVINE:  Thank you.

8             THE COURT:  All right.  So, last licks, Mr. Roll?

9             MR. ROLL:  Please, Your Honor.

10            THE COURT:  Sure.

11            MR. ROLL:  And I promise, I will be quicker than

12   Mr. Levine.  And I appreciate the time --

13            THE COURT:  Sure.

14            MR. ROLL:  -- I appreciate everyone's patience.

15            The last point we paid $30 million, we would have

16   paid a lot less if we had gotten full credit for the

17   securities cash that they had that they owed us, so that's a

18   red herring.

19            THE COURT:  What do you mean if you had gotten

20   full credit --

21            MR. ROLL:  If we had gotten everything that we

22   thought we were entitled to under -- from LBIE, if all the

23   positions had been closed out as we requested and the

24   resisted in the course of the negotiations we would have

25   ended up paying less.

Page 66

```
1            So it's -- it doesn't mean that we weren't

2    entitled to --

3            THE COURT:  Okay.  Well I don't want -- I'm not --

4            MR. ROLL:  But --

5            THE COURT:  I really am trying to resist anyone

6    luring me away -- into contested facts, so.

7            MR. ROLL:  Well I was going to stop at that point.

8    The bottom line on that is, it is part of a set of contested

9    facts which is inappropriate at a sufficiency hearing, and

10   they know full well that there was a lot more to the story

11   of what went on in those negotiations and what's in the

12   papers, because --

13           THE COURT:  Okay.  But you're doing precisely what

14   I said I'm not -- I don't believe that there's a need to go

15   beyond the undisputed facts --

16           MR. ROLL:  Okay.

17           THE COURT:  -- of using the 101- and comparing it

18   to the 118- that is now being sought.

19           MR. ROLL:  Then I'll close on this point, Your

20   Honor.

21           With respect to the termination of the guarantee

22   as a matter of fact it was not terminated, absolutely --

23           THE COURT:  What about the plan provision?  What

24   about the argument that once you get to the plan it's over,

25   it's rejected?
```

Page 67

1           MR. ROLL:  As an executory contract?

2           THE COURT:  Yeah.

3           MR. ROLL:  I think it fails the countrymen test,

4    there were no remaining obligations on the part of Maverick,

5    so I don't think it actually qualifies as an executory

6    contract.  And we saw that for the first time in their reply

7    brief, you know, that's my knee reaction to that.  It's the

8    first we had heard of that.  But again, I don't think it

9    meets the test for an executory contract.

10          This is the point I wanted to close on.  The

11   guarantee was not terminated as a matter of fact or law or

12   else there would have been no reason for the existence in

13   the settlement agreement of the provision that preserved for

14   us the right to proceed against other Lehman entities.  That

15   can only mean that we had the right to proceed on other

16   obligations held by other Lehman entities, including LBHI,

17   including the guarantee.

18          And on the proof of claim issue, you know, LBHI is

19   really claiming they're surprised by the consequential

20   damages point which we have been discussing with them for

21   quite some time and they know it --

22          THE COURT:  It's not a question of what you've

23   been discussing with them, it's a question of what the proof

24   of claim says, so.

25          MR. ROLL:  And if they believe it's not fairly set

Page 68

1    forth, if the Court believes it's not fairly set forth we

2    would respectfully ask for the opportunity to move to amend

3    to make that claim, because we believe sincerely it's been

4    clear to them all along, and if need be to make it clearer

5    we'll do it in writing.

6                  THE COURT:  Okay.

7                  MR. ROLL:  Thank you, Your Honor.

8                  THE COURT:  Thank you.

9            So you can probably tell that I spent a lot of

10   time on this before today, but I very much wanted to hear

11   from you, because the issues are many, and here's the thing,

12   you're entitled to, and I think this probably merits a full-

13   blown written opinion.  When that would occur just look

14   around.  Starting trial in another Lehman matter on

15   April 3rd, 150 million at issue.  As soon as that's over

16   starting trial on another Lehman matter in which the amount

17   at issue is $2 billion.  That promises to take me into 2018,

18   and that's just Lehman.  I have a full docket otherwise.  So

19   I don't want to deprive you of what's you're entitled to,

20   but I'd also like to help you progress beyond today.

21           So I'm going to give you my bullet points, what my

22   ruling -- what the decision will look like.  Beyond that I

23   can't give you a date when I would issue a formal memorandum

24   opinion, but perhaps this could provide the bases for you to

25   have further discussions and figure out whether you want to

Page 69

1   wait, you know, exercise appeal rights, et cetera, et

2   cetera.

3           If there were 48 hours in the day or if there were

4   two of me I could move more quickly, but it just -- it is

5   what it is.  So it was a good happenstance that I was able

6   to even fit you in today for this hearing.

7           So the bottom line is that the Maverick claims

8   should be disallowed and expunged.  The claims have been

9   satisfied in full by LBIE.  Although claims are typically

10  valued under the Code as of the petition date, here Section

11  562(a) is applicable and provides an alternative date for

12  valuing claims that arise from the rejection, liquidation,

13  termination, or acceleration of certain specified contracts,

14  including master netting agreements, in quotes, and

15  securities contracts, in quotes.

16          So the prime brokerage agreements are securities

17  contracts and master netting agreements with the meaning of

18  Section 562(a).

19          Maverick's arguments that its claims are not based

20  on the securities contract aspects of the prime brokerage

21  documents and thus are not subject to 562 fails because the

22  argument is contrary not only to courts expansive reading of

23  the term securities contracts, and more specifically the

24  second circuits holding in the Madoff case find that

25  brokerage account agreement similar to those here are in

Page 70

1    fact securities contracts, and that's explored in some

2    detail at pages 5 to 7 of Lehman's reply.

3            Mavericks' severability agreement, as I'll call

4    it, ignores the fact that the prime brokerage guarantee is a

5    separate securities agreement under the Code, and regardless

6    whether certain obligations arising under the prime

7    brokerage agreements are severable, which I don't believe

8    that they are, Section 562(a) applies here because the

9    claims are based upon a guarantee which qualifies as "a

10   security agreement or other arrangement or other credit

11   enhancement related to a securities contract or a master

12   netting agreement."  And once again, these definitions of

13   these important terms are spelled out on Lehman's reply on

14   page 7.

15           So the operative date for valuing the claims un

16   562(a) is the settlement date, which is March 30, 2012, the

17   date of the Maverick LBIE settlement.

18           Each of the prime brokerage agreements, including

19   the guarantee, terminated on the settlement date.  Pursuant

20   to the terms of the settlement agreement all quote/unquote

21   obligations under the prime brokerage documents were -- to

22   use the words of that agreement -- no longer in existence

23   from and after the settlement date.  Therefore, Maverick's

24   reliance on the petition date for the valuation of its

25   claims is simply not correct.  The prime brokerage

Page 71

1    agreements were terminated in all respects functionally not

2    only as to LBIE.

3            Moreover, 562(a) would apply even if the guarantee

4    had not been terminated, because nothing in 562(a) requires

5    a guarantee be terminated for such section to apply.  562

6    governs the measurement of damages, quote/unquote, in

7    connection with, among other things, the termination of

8    securities contracts and master netting agreements.

9            As Lehman correctly points out, Maverick's reading

10   of Section 562(a) would limit its applicability and in

11   effect create a two-tier system of measuring damages.

12           First, primary claims in accordance with Section

13   562(a) as of the date of contract rejection, termination,

14   acceleration, or liquidation; and two, related guarantee

15   claims measured as of a different date.

16           I believe that this is incompatible with the

17   policy behind such guarantees, which are given in essence to

18   assure that the liability of the prime principal obligator,

19   the primary obligor is satisfied, which is what occurred

20   here.

21           Value of the Maverick guarantee claims are covered

22   by Section 562(a), they were valued at one hundred and one

23   point nine million dollars as of the settlement date, which

24   was the date that Maverick was made whole by LBIE.

25           Maverick cited Ivanho, but Ivanho and its progeny

Page 72

1    merely stand for the proposition that a creditor cannot

2    recover more than the value of its claims or damages, and

3    Ivanho does not enable Maverick to assert additional

4    guarantee claim rights against LBHI.

5              Accordingly, I believe that Maverick cannot

6    establish a guarantee claim against LBHI because it cannot

7    establish any unsatisfied obligations of its primary

8    obligor, LBIE.

9              Maverick recovered the full value of its long

10   positions as of the settlement date.  It would be contrary

11   to commercial practice and commercial reality for a

12   brokerage customer to be able to recover more from its

13   primary obligor and guarantor in bankruptcy than it would

14   outside of bankruptcy where a customer's economic exposure

15   is measured on a net basis with the value of its long

16   positions offset against its short positions.

17             In addition for reasons that I will elaborate

18   further in a more complete written opinion, I do believe

19   that Judge Glenn was correct in MF Global, I do believe that

20   under the principles that he articulated and the terms of

21   the documents here that the exculpation provisions would

22   themselves preclude the allowance of in essence what is the

23   diminution claim being asserted by the Maverick entities.

24             Finally, I do not believe that Maverick should be

25   allowed to amend its claims in any respects.  Failed

Page 73

1    guarantee claims they are clear on its face and I don't

2    believe that they have -- that it would be appropriate to

3    allow them the opportunity to expand upon the theories of

4    liability or the amount or nature of damages which had been

5    asserted in the guarantee claims.

6            So that's kind of the short form of what I would

7    write.  I suppose I could give you the option of entering an

8    order and attaching the transcript, or just ask you to wait,

9    or a third option behind door number 3 would be to continue

10   to talk to one another and see if you can come to a

11   consensual resolution.

12           So it's not that I don't believe that this --

13   every claimant's claim is very important, but I just have a

14   reality of what I'm dealing with in terms of when I'd be

15   able to turn something out that I would be willing to sign

16   as a memorandum opinion.

17           MR. ROLL:  We understand that, Your Honor.  I --

18   respectfully I think we would choose a combination of one

19   and three, three being we'll continue to talk, and one being

20   not waiting.  I mean we understand Your Honor is busy.  If

21   Your Honor is inclined or is willing to enter an order with

22   the transcript attached that allows the right to -- affords

23   us the right and the opportunity to take to the next level

24   we would appreciate that.

25           THE COURT: Well I think fairness you'd have -- I'd

Page 74

1    want you to discuss that.

2            MR. ROLL:  Okay.

3            THE COURT:  Because I really don't want to be in

4    the position of depriving anyone of due process in any

5    respect and what they're entitled to, and I don't like -- I

6    don't want anyone to feel that I'm giving them short shrift.

7            MR. ROLL:  I understand that, Your Honor.  We're

8    sort of -- I'm trying to balance --

9            THE COURT:  Yeah, me too.

10           MR. ROLL:  -- the need to get moving on it --

11           THE COURT:  Me too.

12           MR. ROLL:  -- and again, I don't want to burden

13   the Court.  So we will continue to talk and if we may would

14   the Court permit us to get back to Your Honor --

15           THE COURT:  Sure.

16           MR. ROLL:  -- with how to proceed?

17           THE COURT:  Absolutely.

18           MR. ROLL:  I will say this though, I've seen in

19   other instances how capable the Court is in terms of turning

20   things out quickly and fully under tough circumstances, so.

21           THE COURT:  Well but just to be clear, because you

22   know, among us who, you know, practice in this building a

23   lot people who know what 502(b)(6) is --

24           MR. ROLL:  You will never let me forget that.

25           THE COURT:  -- do not -- you're not -- no, you're

1    not allowed to give him a hard time when you go back to the

2    office.

3            MR. ROLL:  I'll give him a very good time, because

4    he did well.

5            THE COURT:  Good.  I do turn out things very

6    quickly, very voluminous things, but often those are

7    instances in which I have a real live living, breathing,

8    struggling to breath debtor --

9            MR. ROLL:  Understood.

10           THE COURT:  -- and that makes for greater urgency.

11   So I'm trying to not dig myself deeper here, but --

12           MR. ROLL:  That's fine, Your Honor.  We're happy

13   to accommodate that, we'll talk to our friends on the other

14   side and we'll see what we can do.

15           THE COURT:  Okay.

16           MR. ROLL: Thank you, Your Honor.

17           THE COURT:  All right.  Thank you very much.

18      (A chorus of thank you)

19           THE COURT:  Just together just email chambers and

20   just let us know which path you have elected to take, and

21   you need not call out the party who's accenting.

22      (Laughter)

23           THE COURT:  Okay?  If there's a descent.  If

24   there's agreement, great.  If there's a descent just say,

25   you know, we're going to wait or whatever it is we're going

Page 76

1    to do.

2            MR. ROLL:  Very well, Your Honor.

3            THE COURT:  All right.

4        (A chorus of thank you)

5            THE COURT:  Thanks a lot.  Have a great weekend.

6        (Whereupon these proceedings were concluded at 11:36

7    AM)

8                        *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                          RULINGS

4                                                    PAGE

5    Doc #53107 Plan Administrators Five Hundred        69

6    Nineteenth Omnibus Objection to Claims

7    (No Liability Claims)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 78

1                       C E R T I F I C A T I O N

2

3      We, Sheila Orms and Dawn South, certify that the foregoing

4      transcript is a true and accurate record of the proceedings.

5      Sheila Orms      Digitally signed by Sheila Orms
                        DN: cn=Sheila Orms, o, ou,
                        email=digital1@veritext.com, c=US
6      _____   Date: 2017.03.27 17:15:22 -04'00'

7      Sheila Orms

8      Certified Electronic Transcriber

9      Dawn South       Digitally signed by Dawn South
                        DN: cn=Dawn South, o, ou,
                        email=digital1@veritext.com, c=US
       _____   Date: 2017.03.27 17:17:23 -04'00'

10

       Dawn South

11

       AAERT Certified Electronic Transcriber CET**D-408

12

13     Date:  March 27, 2017

14

15

16

17

18

19     Veritext Legal Solutions

20     330 Old Country Road

21     Suite 300

22     Mineola, NY 11501

23

24

25