# EXHIBIT 1

**United States Bankruptcy Court/Southern District of New York Declaration**

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re:<br>Lehman Brothers Holdings Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held<br>Lehman Brothers Holdings Inc. | Case No. of Debtor<br>08-13555 (JMP) |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)     0000029759

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

| Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)<br><br>Standard Chartered Bank<br>1 Madison Avenue<br>New York, NY 10010<br>Attn: Marc Chait<br>Tel: 212 667 0395 | With Copy to:<br><br>Lovells LLP<br>590 Madison Avenue, 7th Floor<br>New York, NY 10022<br>Attn: Matthew Morris, Esq.<br>Telephone number: (212) 909-0600<br>E-mail: matthew.morris@lovells.com | ☐ Check this box to indicate that this claim amends a previously filed claim.<br><br>**Court Claim Number:**_____<br>*(if known)*<br><br>Filed on: _____ |
|---|---|---|
| Name and address where payment should be sent (if different from above)<br><br><br>Telephone number:                    Email Address: | | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

**1.    Amount of Claim as of Date Case Filed:** **$90,084.37 (plus all applicable accrued interest, fees, costs of collection and other charges)** If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐    Check this box if all or part of your claim is based on a Derivative Contract.*
☐    Check this box if all or part of your claim is based on a Guarantee.*
* **IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD ALL SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**
☒    Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

**2.    Basis for Claim:** Contingent Liability and Outstanding Fees on a Letter of Credit - See Attached Rider
(See instruction #2 on reverse side.)

**3.    Last four digits of any number by which creditor identifies debtor:** _____
    **3a.    Debtor may have scheduled account as:** Schedule G- Executory Contracts and Unexpired Leases,
    Guarantees, Guarantee dated on or about 26 March 2007
        (See instruction #3a on reverse side.)

**4.    Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff:    ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe:_____
Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
**Amount of Secured Claim: $** _____    **Amount Unsecured: $** _____

**5.    Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐    Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐    Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐    Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐    Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐    Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐    Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$_____

**6.    Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $** _____
(See instruction #6 on reverse side.)

**7.    Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8.    Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See definition of "redacted" on reverse side.)
**DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.** If the documents are not available, please explain:

| Date:<br><br>9/21/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Mu Chut, Director, Standard Chartered Bank |
|---|---|

**FOR COURT USE ONLY**

**FILED / RECEIVED**

SEP 2 2 2009

**EPIQ BANKRUPTCY SOLUTIONS, LLC**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## RIDER TO PROOF OF CLAIM FILED BY STANDARD
## CHARTERED BANK AGAINST LEHMAN BROTHERS
## HOLDINGS INC., REGARDING LETTER OF CREDIT
## ISSUED IN FAVOR OF WFP TOWER A CO. LIMITED PARTNERSHIP

### A.    INTRODUCTION

1.      This rider to the attached Proof of Claim of Standard Chartered Bank ("**SCB**") is incorporated into the Proof of Claim in its entirety as if fully set forth therein.

2.      This claim arises out of that certain Irrevocable Standby Letter of Credit, dated March 10, 2004, (Credit No. 777-52-0025081-L) (the "**LC**")[1] issued by SCB in favor of WFP Tower A Co. Limited Partnership ("**WFP Tower**") for the account of Lehman Brothers Holdings Inc. ("**LBHI**"), and that certain Letter of Credit Agreement, dated June 26, 1998 (as amended by Amendment No. 1, dated as of March 8, 2004), between LBHI, Lehman Brothers International (Europe) ("**LBIE**"), Lehman Brothers Inc. ("**LBI**") and SCB (the "**LC Agreement**").[2]

3.      SCB files this Proof of Claim against LBHI to preserve its rights against LBHI in the event that there is any drawing by any party on the LC and to claim the Outstanding Fees (as defined below) owed to SCB by LBHI.

### B.    BASIS FOR CLAIM

4.      SCB issued the LC, with WFP Tower as beneficiary, for the account of LBHI (the "**Borrower**"), which was the applicant of the LC.  At the time of issuance, the LC was in the aggregate principal amount of up to $36,114,000.00 (the "**LC Limit**").[3]

5.      Pursuant to the LC, WFP Tower, as the beneficiary, could draw on the LC up to the LC Limit if certain events occurred pursuant to that certain Third Amendment of Lease, dated March 15, 2004, between LBI and WFP Tower (the "**Third Amendment of Lease**").[4]

---

[1] A copy of the LC is attached hereto as Exhibit A.

[2] A copy of the LC Agreement, as amended, is attached hereto as Exhibit B.

[3] All capitalized terms not expressly defined herein shall have the meaning ascribed to them in LC and the LC Agreement.

[4] A copy of the Third Amendment of Lease is attached hereto as Exhibit C.

6.      LBHI is a "Borrower" under, and as defined in, the LC Agreement. Section 2 of the LC Agreement (entitled **"Repayment of Drawings"**) states that, in the event that there is any drawing made by a beneficiary (like WFP Tower) under any letter of credit issued pursuant to the LC Agreement, "the Borrower(s) will pay the face amount of such drawing to [SCB] on demand, such reimbursement obligation to be absolute and unconditional under any and all circumstances . . . and irrespective of any set-off, counterclaim or defense to payment which the Borrower may have had against such Beneficiary or [SCB]."

7.      Pursuant to the second recital paragraph of the LC Agreement, "[e]ach of the Borrowers shall be solely and severally liable for all obligations hereunder with respect to a Letter of Credit for which such Borrower is the applicant." Further, pursuant to section 1 of the LC Agreement ("Letter of Credit Fee"), "[e]ach Borrower, as applicable, will pay, quarterly in arrears, a letter of credit fee equal to one-fifth of one percent (20% of 1%) on the undrawn amount of Letters of Credit outstanding with respect to which such Borrower is the applicant."

8.      As the Borrower under the LC Agreement which applied for the LC, LBHI is solely liable for any amounts due under the LC Agreement, including all fees thereunder in connection with the LC.

9.      On September 15, 2008, LBHI filed a voluntary Chapter 11 petition with the U.S. Bankruptcy Court for the Southern District of New York (the **"Court"**).

## C.    DAMAGES

10.     LBHI, as the Borrower under the LC Agreement which applied for the LC, is responsible for the full face amount of any drawing made under the LC (see section 2 of the LC Agreement). Should such a drawing be made, LBHI would become immediately liable to SCB for the full face amount of such drawing, in addition to interest "at a rate per annum . . . equal to [SCB]'s cost of funds." SCB files this Proof of Claim to expressly preserve its rights against LBHI should any such drawing be made on LC (the **"Repayment of Drawings Obligation"**). SCB will later supplement this

Proof of Claim should it believe there are any amounts owing from LBHI under the Repayment of Drawings Obligation.

11.    LBHI, as the Borrower under the LC Agreement that applied for the LC, is also responsible for all fees due to SCB in connection with the LC.

12.    As of the date of the filing of this Proof of Claim, LBHI owes SCB $90,084.37 (the **"Outstanding Fees"**). Further, interest continues to accrue on the Outstanding Fees and legal fees and additional costs have been, and continue to be, incurred by SCB in connection with the enforcement and protection of its rights under the LC and the LC Agreement (together with the Outstanding Fees and the Repayment of Drawings Obligation, the **"Claim"**). A statement of all amounts due and owing to SCB will be calculated and added to the Claim at a later time via a supplement to this Proof of Claim.

D.    **RESERVATION OF RIGHTS**

13.    SCB expressly reserves any and all defenses, counterclaims or objections, including without limitation, the right of setoff, recoupment or similar right, remedy or defense against any claims or counterclaims asserted by LBHI, LBIE, LBI or any third-party in relation to this Proof of Claim.

14.    The filing of this Proof of Claim is not an election of remedies and is without prejudice to SCB's rights to assert claims against LBHI, LBIE, LBI or any other third-parties, whether arising out of or relating to the facts and circumstances underlying the claim, or otherwise. SCB hereby expressly preserves any and all rights, claims, causes of action, defenses, counterclaims or objections, or any similar rights, remedies or defenses against all persons or entities, whether in this court or elsewhere, whether currently existing or arising in the future, against whom it determines it may have claims.

E.    **AMENDMENT OF CLAIMS**

15.    SCB reserves all rights to adjust, amend, increase, decrease, or withdraw this Proof of Claim, based on (without limitation, as a result of future events) to reflect the discovery and analysis of additional information, the correction of any errors, the resolution of disputes, the calculation of additional legal fees and/or other additional costs incurred by SCB in connection with the enforcement

and protection of its rights under the LC, the LC Agreement and the assertion of any rights of setoff or

recoupment.

**F.    OTHER**

16.    No judgment has been rendered on this claim.

17.    The execution and filing of this Proof of Claim is not: (i) a waiver or release of the

rights of SCB against any other entity or person that may be liable for all or any part of the claim

asserted herein; (ii) a waiver of the right to withdraw the reference with respect to the subject matter of

the claim, any objection or other proceeding commenced with respect thereto or any other proceedings

commenced against or otherwise involving LBHI, LBIE, LBI or SCB; or (iii) an election of remedies

that waives or otherwise affects any other remedy.

18.    All notices governing this Proof of Claim should be sent to Standard Chartered Bank, 1

Madison Ave, 3rd Floor, New York, N.Y.   10010, Attn: Marc Chait; with copy to Lovells LLP, 590

Madison Avenue, New York, NY 10022, Attn: Matthew P. Morris, Esq..


Dated:   September 21, 2009
         New York, New York


                              Standard Chartered Bank


                              By:    _____
                                     Name:   Marc Chait
                                     Title:  Director

## <u>List of Exhibits</u>

1) **Exhibit A: LC**

2) **Exhibit B: LC Agreement**

3) **Exhibit C: Third Amendment of Lease**

# **Exhibit A**



# DUPLICATE

| Irrevocable Standby Letter of Credit | Standard Chartered Bank |
|---|---|
| Credit Number : 777-52-0025081-L<br>Date of Issue : March 10,2004 | One Madison Ave., 3rd Floor<br>New York, NY 10010<br>USA<br>SWIFT address SCBLUS33 |
| Beneficiary:<br>WFP TOWER A CO. L.P.<br>C/O BROOKFIELD FINANCIAL PROPERTIES<br>L.P. 200 LIBERTY PLAZA NEW YORK,<br>NEW YORK 10006<br>ATTN: KATHLEEN KANE<br>TEL: 212-417-7017<br>FAX: 212-417-7195 | Date of Expiry: June 30,2005<br>Place of Expiry: AT OUR COUNTERS |
| | Applicant:<br>LEHMAN BROTHERS HOLDINGS INC.<br>745 7TH AVENUE<br>NEW YORK, NEW YORK 10019 |
| Partial drawing: Allowed | L/C Amount: USD 36,114,000.00 Exactly<br>US DOLLAR THIRTY SIX MILLION ONE HUNDRED<br>FOURTEEN THOUSAND AND<br>00/100 |

GENTLEMEN:

WE HEREBY ESTABLISH OUR IRREVOCABLE TRANSFERABLE STAND-BY LETTER OF CREDIT
NO. 777-52-0025081-L IN YOUR FAVOR AT THE REQUEST OF AND FOR ACCOUNT OF LEHMAN
BROTHERS HOLDINGS INC TO THE AGGREGATE AMOUNT OF USD $36,114,000.00 (THIRTY SIX
MILLION ONE HUNDRED FOURTEEN THOUSAND DOLLARS UNITED STATES DOLLARS).
AVAILABLE BY YOUR DRAFT(S) DRAWN ON US AND ACCOMPANIED BY THIS LETTER OF
CREDIT.

THIS LETTER OF CREDIT SHALL BE VALID UNTIL JUNE 30, 2005

THIS LETTER OF CREDIT IS SUBJECT TO THE CONDITION THAT IT SHALL BE AUTOMATICALLY
EXTENDED FOR SUCCESSIVE PERIODS OF ONE YEAR EACH BUT NOT BEYOND JULY 30, 2024
UNLESS WE NOTIFY YOU BY CERTIFIED MAIL/COURIER , RETURN RECEIPT REQUESTED AT
LEAST THIRTY (30) DAYS PRIOR TO ANY EXPIRATION DATE THAT WE ELECT NOT TO EXTEND
THIS LETTER OF CREDIT, WHEREUPON YOU MAY DRAW FOR THE FULL AMOUNT OF THIS
LETTER OF CREDIT.

THE TERM "BENEFICIARY" INCLUDES ANY SUCCESSOR BY OPERATION OF LAW OF THE NAMED
BENEFICIARY, INCLUDING, WITHOUT LIMITATION, ANY LIQUIDATOR, REHABILITATOR,
RECEIVER OR CONSERVATOR.

EXCEPT AS EXPRESSLY STATED HEREIN, THIS UNDERTAKING IS NOT SUBJECT TO ANY
AGREEMENT, CONDITION, OR QUALIFICATION. THE OBLIGATION OF STANDARD CHARTERED
BANK UNDER THIS LETTER OF CREDIT IS THE INDIVIDUAL OBLIGATION OF STANDARD

777-52-0025081-L                              Page 1 of 3

Standard
Chartered

CHARTERED BANK AND IS IN NO WAY CONTINGENT UPON REIMBURSEMENT WITH RESPECT
THERETO.

ALL DRAFTS DRAWN HEREUNDER MUST STATE: "DRAWN UNDER STANDARD CHARTERED
BANK , ONE MADISON AVENUE 3RD FLOOR, NEW YORK, NEW YORK 10010 LETTER OF CREDIT
NO. 777-52-0025081-L  DATED MARCH 10, 2004 ." ALL DRAFTS DRAWN HEREUNDER MUST BE
ACCOMPANIED BY BENEFICIARY'S CERTIFICATE PURPORTEDLY SIGNED BY AN AUTHORIZED
OFFICER OF BENEFICIARY STATING "WE ARE ENTITLED TO DRAW UPON THIS LETTER OF
CREDIT PURSUANT TO THE TERMS OF A THIRD AMENDMENT OF LEASE BETWEEN WFP TOWER
A. CO. L.P. AND LEHMAN BROTHERS INC." PARTIAL DRAWINGS ARE PERMITTED UNDER THIS
LETTER OF CREDIT.

WE HEREBY UNDERTAKE THAT ALL DRAWINGS MADE UNDER AND IN COMPLIANCE WITH THE
TERMS OF THIS CREDIT NO. 777-52-0025081-L SHALL BE PROMPTLY HONORED IN
IMMEDIATELY AVAILABLE FUNDS IMMEDIATELY UPON RECEIPT AT OUR COUNTERS AT ONE
MADISON AVENUE, 3RD FLOOR, NEW YORK, NEW YORK 10010 AS PER YOUR PAYMENT
INSTRUCTIONS.

THIS LETTER OF CREDIT MAY BE TRANSFERRED BY BENEFICIARY (AND ITS SUCCESSORS) IN
ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK  AND UCP  (HEREINAFTER
DEFINED).
THE COST OF ANY SUCH TRANSFER SHALL BE PAID BY THE APPLICANT.

IF THE DRAWING REQUEST IS PRESENTED IN COMPLIANCE WITH THE TERMS OF THIS LETTER
OF CREDIT  TO US AT SUCH ADDRESS PAYMENT WILL BE MADE NOT  LATER THAN TWENTY
FOUR HOURS FOLLOWING SUCH PRESENTMENT.  PAYMENT UNDER THIS LETTER OF CREDIT
SHALL BE
MADE IMMEDIATELY AVAILABLE FUNDS BY WIRE TRANSFER TO SUCH ACCOUNT AS MAY BE
DESIGNATED BY THE BENEFICIARY IN THE  APPLICABLE DRAWING REQUEST.

THIS LETTER OF CREDIT IS SUBJECT TO AND GOVERNED BY THE LAWS OF THE STATE OF
NEW YORK AND THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS 1993
REVISION INTERNATIONAL CHAMBER OF COMMERCE, NO.500 ("UCP") AND IN THE EVENT OF
ANY CONFLICT, THE LAWS OF THE STATE OF NEW YORK WILL CONTROL IF THIS CREDIT
EXPIRES DURING AN INTERRUPTION OF BUSINESS AS DESCRIBED IN ARTICLE 17 OF SAID
PUBLICATION 500. THE BANK HEREBY SPECIFICALLY AGREES TO EFFECT PAYMENT IF THIS
CREDIT IS DRAWN AGAINST WITHIN THIRTY (30) DAYS AFTER THE RESUMPTION OF BUSINESS.

--------------------------------------------------------------------------------
----
We hereby engage with you that all documents drawn under and in compliance with the terms of this
Letter of Credit will be duly honored upon presentation for payment on or before the expiry date of this
Letter of Credit.

This Letter of Credit to be issued subject to Uniform Customs and Practice for Documentary Credits (1993

777-52-0025081-L                              **Page 2 of 3**



Revision), International Chamber of Commerce, Publication No. 500.
-----------------------------------------------------------------------------------------------------------------------
----
Standard Chartered Bank


_____
Authorized Signature


_____
Authorized Signature


777-52-0025081-L                              **Page 3 of 3**

# DUPLICATE



**Standard
Chartered**

| Amendment to Standby Letter of Credit | Standard Chartered Bank |
|---|---|
| Credit Number : 777-52-0025081-L<br>Date of Amendment : March 11,2004<br>Number of Amendment : 01 | One Madison Ave., 3rd Floor<br>New York, NY 10010<br>USA<br>SWIFT address SCBLUS33 |
| Beneficiary:<br>WFP TOWER A CO. L.P.<br>C/O BROOKFIELD FINANCIAL<br>PROPERTIES<br>L.P. ONE LIBERTY PLAZA NEW YORK,<br>NEW YORK 10006<br>Attn: KATHLEEN KANE<br>TEL:212-417-7017<br>FAX:212-417-7195 | Applicant:<br>Lehman Brothers Inc<br>101 Hudson Street 31st FL<br>Jersey City, NJ 07302 |
|  | This amendment is to be considered as part of the above-mentioned Credit and must be attached thereto. |

This credit is amended as follows:


The  address of beneficiary is amended to:
WFP TOWER A CO. L.P.
C/O BROOKFIELD FINANCIAL PROPERTIES
L.P. ONE LIBERTY PLAZA
NEW YORK, NEW YORK 10006
ATTN:KATHLEEN KANE
TEL:212-417-7017
FAX:212-417-7195

All other terms and conditions remain unchanged.

---
This Letter of Credit is subject to Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce, Publication No. 500.
---


----------------------
Authorized Signature


----------------------
Authorized Signature

DU~ LICA~ **Standard
Chartered** 💲

| Automatic extension to Standby Letter of Credit | Standard Chartered Bank |
|---|---|
| Credit Number : 777-52-0025081-L<br>Date of extension : 26 March 2007 | One Madison Ave., 3rd Floor<br>New York, NY 10010<br>USA<br>SWIFT address SCBLUS33 |
| Beneficiary:<br>WFP TOWER A CO. L.P.<br>C/O BROOKFIELD FINANCIAL<br>PROPERTIES<br>L.P. ONE LIBERTY PLAZA NEW YORK,<br>NEW YORK 10006<br>Attn: KATHLEEN KANE<br>TEL:212-417-7017<br>FAX:212-417-7195 | Applicant:<br>LEHMAN BROTHERS HOLDINGS INC.<br>745 7TH AVENUE<br>NEW YOR, NEW YORK 10019 |
| | This automatic extension is to be considered as part of the above-mentioned Credit and must be attached thereto. |

OUR AUTO EXTENSION CLAUSE NOW TO READ:

THIS LETTER OF CREDIT IS SUBJECT TO THE CONDITION THAT IT SHALL BE AUTOMATICALLY EXTENDED FOR SUCCESSIVE PERIODS OF ONE YEAR EACH BUT NOT BEYOND JULY 30, 2024 UNLESS WE NOTIFY YOU BY CERTIFIED MAIL/COURIER , RETURN RECEIPT REQUESTED AT LEAST THIRTY (30) DAYS PRIOR TO ANY EXPIRATION DATE THAT WE ELECT NOT TO EXTEND THIS LETTER OF CREDIT, WHEREUPON YOU MAY DRAW FOR THE FULL AMOUNT OF THIS LETTER OF CREDIT. SUCH NOTIFICATION WILL BE SENT TO THE ADDRESS INDICATED ABOVE OR AT SUCH OTHER ADDRESS AS MAY BE REQUESTED BY YOU IN WRITING FROM TIME TO TIME

All other terms and conditions remain unchanged.

--------------------------------------------------------------------------------
This Letter of Credit is subject to Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce, Publication No. 500.
--------------------------------------------------------------------------------

*Yvonne Boykle*
Authorized Signature

*[signature]*
Authorized Signature

777-52-0025081-L                    Page 1 of 1

# **Exhibit B**

# LEHMAN BROTHERS

## FACSIMILE

| | | | |
|---|---|---|---|
| **DATE:** | Tuesday, August 20, 2002 | **PAGES (INCLUDING COVER):** | 10 |
| **TO:** | Bill Hughes | | |
| **FAX:** | 212-649-7576 | | |
| **FROM:** | Cindy Cheung | | |
| **MESSAGE:** | Please call me if you have any questions on this document.    Regards. | | |

The information contained in this facsimile message is intended only for the personal and confidential use of the designated recipients named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

PLEASE ENTER OFFICE ADDRESS HERE

**MEMORANDUM**
**21 August 2002**

To:      Robert Reddington
         Credit Administration

From:    Esther Wahl

Re:   Account Documentation Lehman Brothers Holdings Inc.

   1.  Letter of Credit Agreement for Lehman Brothers Inc. and Lehman Brothers International
       Europe in the amount of US$75 million dated June 26, 1998

We should be grateful for your assistance in retaining the enclosed originals in the safe and placing the
copies of the documentation in your files under the relationship name above. Please acknowledge receipt of
the above mentioned documentation by initialing a copy of this memo and returning it to me. Thank you!

_____
Authorized Signature

Received and acknowledged:

_____   Date:_____

Robert –
We will be issuing a SBLC in the
amount of $100 mm w/c is $25 mm
more than the amount in the Agreement.
We will be receiving a new L/c Agreement
to cover the additional amount.

Regards,
Esther

FILE

## Standard Chartered

| Security Lodgement | | |
|---|---|---|

| | | | |
|---|---|---|---|
| **Customer:** | Lehman Brothers Inc. (formerly Shearson Lehman Brothers Inc.) | **Date:** | 04/03/2003 |
| **Account manager:** | Bill Hughes | | |
| **Expiry date:** | | **Primary document ref:** | 3852 |
| **Date lodged:** | 09/04/2002 | **Uplifted by:** | |
| **Date temp. uplifted:** | | | |
| **Date perm. taken out:** | | | |
| **Current status:** | Checked | | |
| **Document type:** | Agreement | | |
| **Narrative:** | Letter of Credit Agreement dated 26 Jun 98 in the amount of USD75MM for Lehman Brothers Inc.and/or Lehman Brothers International Europe | | |

**RECEIVED/INITIATED BY** _____

**CHECKED BY** _____

**CUSTODIAN** _____

**CUSTODIAN** _____

LEHMAN BROTHERS    8/20/02 6:58    PAGE  2/10    LEHMAN BROTHERS

## LETTER OF CREDIT AGREEMENT

In consideration of Standard Chartered Bank (the "Bank") issuing at its discretion from time to time irrevocable letters of credit (each, a "Letter of Credit") at the request of Lehman Brothers Inc. ("LBI"), and/or Lehman Brothers International Europe ("LBIE"), in an aggregate amount not to exceed **Seventy-five Million Dollars ($75,000,000)** at any one time outstanding, LBI and LBIE hereby agree with the Bank to the following Letter of Credit Agreement ("Agreement"). As used herein, the term "Borrower(s)" shall mean any party which has a drawing outstanding hereunder.

Each of LBI and/or LBIE shall be solely and severally liable for all obligations related thereto under a Letter of Credit. In no event shall a drawing by LBI (along with its attendant obligations) be deemed a joint obligation of LBIE, nor shall a drawing by LBIE (along with its attendant obligations) be deemed a joint obligation of LBI. An Event of Acceleration may only be treated as such with respect to the Borrower which caused such Event of Acceleration to occur and any acceleration of a Letter of Credit therefore, will relate only to the Letter of Credit for which the Borrower causing the Event of Acceleration is liable.

### 1.  LETTER OF CREDIT FEE

(a) LBI and/or LBIE will pay, quarterly in arrears, a letter of credit fee equal to one-fifth of one percent (20% of 1%) on the amount outstanding. This fee is computed for actual days elapsed on the basis of a 360-day year, from the day that the Bank issues a Letter of Credit.

(b) If any applicable law or regulation, or judicial or governmental interpretation thereof, shall impose, modify or deem applicable any reserve, special deposit, capital or similar requirement in connection with the Bank's obligations hereunder or under the Letters of Credit which results in any additional cost to the Bank in connection with this Agreement or the Letters of Credit, then the Bank shall provide to the Borrower(s) a certificate reasonably detailing such increased cost, the calculation of such increased cost, and the effective date of such increased costs, which certificate shall be conclusive and binding, absent manifest error, and the Borrower(s) shall pay to the Bank, on the payment dates for the fees set forth in (a) above, the appropriate additional amounts as

SCANNED:

LODGED: 4 Sep 02

compensation for such increased costs. Notwithstanding the foregoing, (i) in no event shall the Borrower(s) have any liability to the Bank for such increased costs for periods prior to the date of this agreement and (ii) the Borrower(s) shall have the option within ten days from the date that the Borrower (s) receives such certificate to terminate any Letter of Credit upon written notice to the Bank, which notice must be signed by the Borrower(s) and the beneficiary of each Letter of Credit which is terminated. Notwithstanding the foregoing, the Borrowers shall pay the Bank for such accrued increased costs.

2.  **REPAYMENT OF DRAWINGS**

In the case of any drawing made under a Letter of Credit, the Borrower(s) will pay the face amount of such drawing to the Bank on demand, such reimbursement obligation to be absolute and unconditional under any and all circumstances (except for the gross negligence or the willful misconduct of the Bank) and irrespective of any set-off, counterclaim or defense to payment which the Borrower may have or have had against such Beneficiary or the Bank, including (without limitation) any defense based on the failure of such demand to conform to the terms of the Letter of Credit or any non-application or misapplication by the Beneficiary of the proceeds of such drawings unless said defense arises from the gross negligence or willful misconduct on the part of the Bank. The unpaid amount of any such drawing shall bear interest, from the date that payment of such amount is made by the Bank to the beneficiary under the Letter of Credit until the date that the Borrower(s) reimburses the Bank for the amount so paid, at a rate per annum (for actual days elapsed on the basis of a 360-day year) equal to the Bank's cost of funds.

3.  **REPRESENTATIONS AND WARRANTIES**

LBI and LBIE hereby represent and warrant severally as of the date hereof to the Bank and the Bank represents and warrants to LBI and LBIE as of the date hereof as follows:

(a)  the execution, delivery and performance by each of LBI and LBIE and the Bank of this Agreement have been duly authorized by all necessary corporate action and do not conflict with or result in a default or breach under either LBI, LBIE's or the Bank's Certificate of Incorporation or By-laws, any applicable law, regulation or order of any governmental body or agency;

(b) this Agreement constitutes the valid and legally binding obligation of LBI, LBIE and the Bank enforceable by the Bank against LBI and LBIE and by LBI and LBIE against the Bank, respectively, in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency or other laws affecting creditors' rights generally, or by general principles of equity.

## 4.   CONTINUING OBLIGATIONS

The respective obligations of LBI and/or LBIE and the Bank under this Letter of Credit shall be binding upon each of them and their respective successors and assigns.

## 5.   LIABILITY OF THE BANK

Neither the Bank nor any of its officers or directors shall be liable to the Borrower (s) for (a) the use which may be made by the Borrower(s) of any Letter of Credit; (b) the validity, sufficiency or genuineness of any documents presented to the Bank with respect to a drawing made under any Letter of Credit, provided, however, that such documents do not appear to be invalid, insufficient, or forged on their face; (c) any other circumstances resulting in the payment or nonpayment by the Bank of any amounts drawn under a Letter of Credit, except in the case of gross negligence, bad faith or willful misconduct of the Bank or any of its employees. In addition, the Borrower hereby agrees at all times to protect, indemnify and save harmless the Bank and its correspondents from and against any and all claims, actions, suits and other legal proceedings, and from and against any and all loss, claims, demands, liabilities, damages, costs, charges, reasonable counsel fees and other expenses which the Bank or its correspondents may at any time sustain or incur by reasons of or arising out of the issuance of any Letter of Credit, provided, however, that the Borrower shall not be liable to the extent such loss, harm, damage, liability or other expense arise out of the gross negligence or willful misconduct of the Bank, nor shall the Borrower be liable to the Bank for consequential damages, lost profits or other incidental losses.

6. **MODIFICATION OF DRAFTS AND CREDITS**

In the event of any extension of maturity of the Letter of Credit, any increase in the maximum aggregate amount of Letters of Credit to be issued under this Agreement, or any other modification of the terms of any Letter of Credit or drafts drawn thereunder, which extension, increase or modification shall be made only in writing by the Borrower(s) and the Bank, this Agreement shall continue to be binding upon the Borrower(s) and the Bank with respect to such Letter of Credit or draft so extended, increased or otherwise modified and with respect to any action taken by the Bank in accordance with such extension, increase or other modification.

7. **ACCELERATION**

Upon the occurrence of any of the following:

(a) failure in the payment of any interest due and payable under this Agreement and continuance of such failure for a period of ten days after receipt by the Borrower (s) of written notice by the Bank of such failure;

(b) failure in the payment upon demand of amounts advanced under any Letter of Credit and continuance of such failure for a period of five business days after receipt by the Borrower(s) of written notice by the Bank of such failure;

(c) if the Borrower(s) shall voluntarily become the subject of any insolvency proceedings, or shall make an assignment for the benefit of its creditors or if a trustee, receiver or custodian is appointed for the purposes of the reorganization or liquidation of the Borrower(s) or if any involuntary insolvency proceedings are commenced against the Borrower(s) and continue undismissed for a period of 30 days;

then the Bank may by written notice to the Borrower(s) either (i) demand payment of the maximum amount available to be drawn under any issued and unexpired Letters of Credit ("Total Principal Available") or (ii) demand that the Borrower(s) deliver to the Bank U.S. Government Treasury Securities whose market value (as determined in the Wall Street Journal published on the day that the Bank makes such a demand) is equal to 102% of the Total Principal Available. Upon the occurrence of (i) or (ii) the Borrower (s) shall, at its option, either (x) cause each Letter of Credit to

be terminated or (y) without necessity of further act or evidence, be and become thereby unconditionally obligated to pay or pledge to the Bank such maximum amount so demanded. Amounts paid or pledged to the Bank pursuant to this Section 7 shall be applied against principal and interest payable to the Bank pursuant to this Agreement hereof.

The Bank hereby also agrees that it will, upon the earlier of (i) the date on which any Letter of Credit for which the Borrower(s) has paid or pledged funds or securities to the Bank in accordance with "C" above, shall be returned to the Bank for cancellation and (ii) the expiration date, in each case provided that such Letter of Credit was not drawn upon, refund to the Borrower(s) any amounts received by the Bank pursuant to Section 7. The Bank shall be entitled to retain an additional amount, reasonably determined by the Bank, to secure payment of any interest and fees owing or to be owing by the Borrower(s) to the Bank in connection with the Letters of Credit and any costs and expenses of collection and enforcement of the obligations of this Agreement. Any funds being so released from the account shall be delivered at the direction of the Borrower(s). The Bank shall review the amount of interest in the account at least quarterly to determine whether the Bank, in its sole discretion, is willing to release any such interest, which is calculated from and including the first day of deposit until the day it is refunded at a rate equal to the average of the 90-day treasury bill rates in effect during the period of time such amounts are held by the bank.

8. **CONSTRUCTION AND INTERPRETATION**

This Agreement shall be governed by and construed in accordance with the laws of the State of New York. Any provision hereof which may prove to be unenforceable under the laws of any jurisdiction shall not affect the validity of any other provision hereof in such jurisdiction or the validity of any provision hereof in any other jurisdiction.

Each Letter of Credit shall be subject to the Uniform Customs and Practice for Documentary Credits and (to the extent not inconsistent with said Uniform Customs and Practice) the laws of the State of New York, including the Uniform Commercial Code as promulgated therein.

9.   **NOTICES**

Notices and demands hereunder shall be in writing and will be sufficient if delivered by hand, by first

class mail postage prepaid, or by tested cable, bank wire, telex or facsimile transmission, at the following

addresses, or to such other address as the recipient shall have designated to the sender by written notice

hereunder.

**If to LBI :**

    Lehman Brothers Inc.
    200 Vesey Street, 24th Floor
    New York, NY 10285
    Attn: Treasurer
    Fax # (212) 526-1467

**If to LBIE:**

    Lehman Brothers International (Europe)
    One Broadgate, 5th Floor
    London EC 7HA
    Attn: Ray O'Connell, Director
    Fax# 4471-260-2207

**If to the Bank:**

    Standard Chartered Bank
    Attn: LC Department
    7 World Trade Center
    26th Floor
    New York, NY 10048

10.   **RIGHT OF SET OFF**

It is expressly recognized and acknowledged by the Borrower that the Bank does not waive its common

law or statutory rights of set off, except that the Bank shall have no right of set off against any account at

the Bank containing cash and/or securities and commodities in segregation on behalf of the Borrower's

customers in accordance with the Net Capital Rule (Rule 15C3-3) under the Securities Exchange Act of

1934 or regulations promulgated thereunder by self regulatory organizations or otherwise, or rules

promulgated by the Commodities            Futures Trading Commissions or regulations promulgated

thereunder by self regulatory organizations thereof or otherwise.

11.  **OBLIGATIONS OF THE BORROWERS**

The obligations of the Borrowers under this Agreement shall be absolute and unconditional and irrevocable, and shall be paid under all circumstances whatsoever, including, without limitation, the following circumstances:

A.  any lack of enforceability of any Letter of Credit;

B.  the existence of any claim, set-off, defense or other right which the Borrowers may have at any time against the beneficiary of any Letter of Credit, and

C.  any statement or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any material respect.

12.  **THE AGREEMENT**

This Agreement supersedes any previous Agreement, except for Letters of Credit which are currently outstanding as of the date of signing, and governed by such previous Agreement.

13.  **HEADINGS**

The headings of the paragraphs contained herein are for reference only and shall not control or affect the meaning or construction of any of the terms or provisions of this Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of this ___June 26___ 1998.

**LEHMAN BROTHERS INC.**

By: _____

Title: _PVP_

By: _____

Title: _Managing Director + Treasurer_

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By: _____

Title: _Authorized Signatory_

By: _____

Title: _Authorized Signatory_

**Standard Chartered Bank**

By: _____

Title: _____

By: _____

Title: _____

## LEHMAN BROTHERS INC.

## OUR INDEMNITY TO YOU WITH RESPECT

## TO TELEPHONIC INSTRUCTIONS

In connection with our banking business with you, including, the issuance and amendments of standby letter(s) of credit, we hereby authorize and request you to act on any instructions(s) given to you by telephone and emanating, or purportedly emanating, from any one of the following seven persons:

| NAME | TITLE |
|---|---|
| Marc Silverman | Managing Director & Treasurer |
| Kathryn Bopp Flynn | Senior Vice President & Assistant Treasurer |
| Rhonda Teadore | First Vice President |
| Kevin Harrison | Vice President |
| Steve Engel | Assistant Vice President |
| Merlene Gittens | Assistant Vice President |
| Jennifer Woldt | Authorized Person |

We agree that your determination of whether the person telephoning is one of the above listed officers shall be conclusive, in the absence of gross negligence or willful misconduct.

Each such verbal instruction will have the same validity and effect as if contained in a writing signed on our behalf by an authorized officer.

For and on behalf of Lehman Brothers Inc.

By: _Rhonda Teadore_      By: _Marc C. S.___

Title: _FVP_      Title: _Managing Director + Treasurer_

Dated: _June 26, 1998_

## Standard ⚡ Chartered

---

### Security Lodgement

| | | | |
|---|---|---|---|
| **Customer:** | Lehman Brothers Inc. (formerly Shearson Lehman Brothers Inc.) | **Date:** | 03/24/2004 |
| **Account manager:** | Bill Hughes | | |
| **Expiry date:** | | **Primary document ref:** | 3852.1 |
| **Date lodged:** | 03/23/2004 | **Uplifted by:** | |
| **Date temp. uplifted:** | | | |
| **Date perm. taken out:** | | | |
| **Current status:** | Checked | | |
| **Document type:** | Amendment | | |
| **Narrative:** | Amendment #1 dated 08 Mar 04 to Letter of Credit Agreement dated 26 Jun 1998 | | |

**RECEIVED/INITIATED BY** _____

**CHECKED BY** _____

**CUSTODIAN** _____

**CUSTODIAN** _____

**AMENDMENT NO. 1 DATED AS OF MARCH 8, 2004**
**TO LETTER OF CREDIT AGREEMENT DATED JUNE 26, 1998**

Amendment No. 1, dated as of March 8, 2004 (the "Amendment"), between LEHMAN BROTHERS INC. ("LBI"), LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("LBIE"), LEHMAN BROTHERS HOLDINGS INC. ("LBH") and STANDARD CHARTERED BANK (the "Bank") to that certain letter of credit agreement, dated June 26, 1998 (as amended from time to time, the "Agreement"), between and among LBI, LBIE and the Bank.

WHEREAS, LBI, LBIE and the Bank have agreed to amend the LC Agreement to include LBH as a party to the Agreement, on and subject to terms and conditions hereof.

NOW, THEREFORE, IT IS AGREED:

1.      All terms used but not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

2.      The first recital paragraph of the Agreement is hereby deleted and replaced with the following:

In consideration of Standard Chartered Bank (the "Bank") issuing at its discretion from time to time irrevocable letters of credit (each, a "Letter of Credit") at the request of Lehman Brothers Inc. ("LBI") and/or Lehman Brothers International (Europe) ("LBIE"), and/or Lehman Brothers Holdings Inc. ("LBH", together with LBIE and LBI, the "Borrowers")) in an aggregate amount not to exceed Seventy-five Million Dollars (US$75,000,000) at any one time outstanding, LBI, LBIE and LBH hereby agree with the Bank to the following Letter of Credit Agreement ("Agreement").

3.      The second recital paragraph of the Agreement is hereby deleted and replaced with the following:

Notwithstanding anything in this Agreement to the contrary: Each of the Borrowers shall be solely and severally liable for all obligations hereunder with respect to a Letter of Credit for which such Borrower is the applicant. In no event shall a drawing by one of the Borrowers (along with its attendant obligations) be deemed a joint obligation of either or both of the other Borrowers. An event of acceleration under Section 7 may only be treated as such with respect to the Borrower (and the Letter(s) of Credit for which such Borrower is the applicant) that caused such event or to which such event relates. The Bank shall have no right of set off, under statute or common law, with respect to the obligation of one Borrower against the obligations of the Bank to any other Borrower.

4.      The first sentence of Section 1(a) of the Agreement is hereby amended by deleting the phrase "LBI and/or LBIE" and replacing such phrase with "Each Borrower, as applicable," and deleting the words "amount outstanding" and replacing it with "undrawn amount of Letters of Credit outstanding with respect to which such Borrower is the applicant".

5.      Section 3 of the Agreement is hereby amended by deleting all the occurrences of the phrase "LBI and LBIE", "LBI, LBIE" and LBI, LBIE's" and replacing all such phrases with "each of the Borrowers".   Section 3(a) is further amended by deleting the phrase "each of" in the first line of such Section.

6.      Section 4 of the Agreement is hereby amended by deleting the phrase "LBI and/or LBIE" and replacing such phrase with "each of the Borrowers".

·1·

7.    Section 9 of the Agreement is hereby amended by deleting the address for LBI
and the address for the Bank and adding the following:

"If to LBH:
Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, New York 10019
Attn: Treasurer
Fax: 646-758-3204

"If to LBI:
Lehman Brothers Inc.
745 Seventh Avenue
New York, New York 10019
Attn: Treasurer
Fax: 646-758-3204

"If to the Bank:
Standard Chartered Bank
One Madison Ave.
New York, New York 10010
Attn: Gene Messina
Fax: 212-667-0593

8.    Except as expressly modified hereby, the terms and provisions of the Agreement
shall remain in full force and effect and be enforceable against LBI, LBIE, LBH and the Bank.

9.    All representations and warranties in the Agreement are deemed made as of the
date hereof.

10.    This Amendment shall become effective as of the date first written above when
the Bank shall have received counterpart of this Amendment executed by LBI, LBIE and LBH.

11.    As used in the Agreement and all other instruments and documents executed in
connection therewith, the term "Agreement" shall mean the Agreement as amended hereby.

12.    The execution, delivery and effectiveness of this Amendment shall neither
operate as a waiver of any rights, power or remedy of the Bank under the Agreement nor constitute a waiver
of any provision of the Agreement.

13.    This Amendment may be executed in any number of counterparts and by
different parties hereto in separate counterparts, each of which when so executed and delivered shall be
deemed to be an original and all of which taken together shall constitute but one and the same agreement.
Delivery of an executed counterpart of a signature page to this Amendment by telecopier shall be effective
as delivery of a manually executed counterpart of this Amendment.

14.    This Amendment shall be governed by and construed in accordance with the
laws of the State of New York, without regard to conflicts of law.

-2-

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly
authorized representatives as of the date first written above.

LEHMAN BROTHERS INC.

By: _____

Name: Paolo Tonucci
Title:  Senior Vice President

LEHMAN    BROTHERS    INTERNATIONAL
(EUROPE)

By: _____

Name: Janet Birney
Title:  Vice President

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name: Heidemarie Echtermann
Title:  Managing Director

STANDARD CHARTERED BANK

By: _____

Name: William Hughes
Title: Senior Vice President

By: _____

Name: Esther Wahl
Title: Vice President

-3-

# **Exhibit C**

## THIRD AMENDMENT OF LEASE

AGREEMENT, dated as of March 15, 2004, between **WFP TOWER A CO. L.P.**, a Delaware limited partnership, having an address c/o Brookfield Financial Properties, L.P., One Liberty Plaza, New York, New York 10006 ("Landlord") and **LEHMAN BROTHERS INC.**, a Delaware corporation, having an address at 745 Seventh Avenue, New York, New York 10019 ("Tenant").

## W I T N E S S E T H

WHEREAS, Landlord and Tenant entered into an Amended and Restated Lease, dated as of November 9, 2000 (the "Original Lease"), as amended by a First Amendment of Lease, dated as of December 22, 2000 (the "First Amendment") and a Second Amendment of Lease, dated as of June 12, 2001 (the "Second Amendment"; the Original Lease, as amended by the First Amendment and the Second Amendment, is called the "Lease"); and

WHEREAS, pursuant to the Lease, Landlord agreed to lease to Tenant and Tenant agreed to hire from Landlord, (a) the entire 27th, 28th and 29th floors and a portion of the 19th floor (the "Original Premises"), (b) the entire 20th floor and portions of each of the 19th, 21st and 22nd floors (the "Area A Premises"), (c) the entire 31st through 40th floors, the entire 8th floor and a portion of the 30th floor (the "Area B Premises") and (d) the entire 6th and 7th floors (the "Additional Space"; the Original Premises, the Area A Premises, the Area B Premises and the Additional Space are collectively called the "Premises"), in the building known as One World Financial Center and located at 200 Liberty Street, New York, New York (the "Building"); and

WHEREAS, Tenant's obligation to lease the Premises pursuant to the Lease, and/or Tenant's right to terminate the Lease, has been the subject of the litigation captioned *WFP Tower A Co., L.P. v. Lehman Brothers Inc.*, Index No. 02-603298 (the "Action"), filed September 12, 2002, in the Supreme Court of the State of New York for the County of New York (the "Court"); and

WHEREAS, in order to settle the Action, (a) Landlord has agreed on the terms and conditions more particularly hereinafter set forth in this Agreement (i) to terminate the Lease as to certain substantial portions of the Premises, (ii) to enter into a lease (as amended from time to time, the "CWT Lease") of a substantial portion of such space with Cadwalader, Wickersham & Taft LLP (together with its successors and assigns, "CWT") and to grant therein certain rights to CWT that Landlord was not obliged to grant; (iii) to cause an affiliate of Landlord to lease space in another building to Morgan & Finnegan, LLP (together with its successors and assigns, "M&F") in order to accommodate Landlord's ability to enter into the CWT Lease, and (iv) to certain other matters and (b) Tenant has agreed on the terms and conditions more particularly hereinafter set forth in this Agreement (i) to surrender possession of those portions of the Premises as to which Landlord has agreed to terminate the Lease, (ii) to make certain payments to Landlord, (iii) to undertake certain tenant inducement obligations and pay certain leasehold improvement costs in respect of the leases to CWT and to M&F and (iv) to certain other matters.

NOW, THEREFORE, Landlord and Tenant agree as follows:

ffny01\lastme\450047.9

1.     **Defined Terms.**  All capitalized terms used herein but not defined shall have the meanings ascribed to them in the Lease.

2.     **Partial Surrender.**  (a)  Effective as of June 30, 2004 (the "Surrender Date") (i) the Lease and the term thereof shall end and expire with respect to (A) the entire Area B Premises, (B) the entire 19th and 20th floors of the Building and (C) the portion of the 21st floor of the Building shown hatched on Exhibit A-1 annexed hereto (the "21st Floor Surrender Space"; the spaces described in clauses (A), (B) and (C) are collectively called the "Surrender Space"), as fully and completely as if the Surrender Date were the date fixed in the Lease for the end and expiration of the Lease and the term thereof with respect to such space, (ii) except for (A) the payment to be made by Tenant to Landlord pursuant to Section 4(b)(i)(B) below, (B) the Release Exclusions (as hereinafter defined) and (C) claims for liability arising from the negligence or willful misconduct of a party in the Surrender Space from and after the date of this Agreement, after the date of this Agreement neither Tenant nor Landlord shall have any further liability or obligation whatsoever to the other in connection with the Surrender Space, (iii) Landlord shall indemnify and hold Tenant harmless from and against any and all claims, liabilities, damages, obligations, costs and expenses (including, without limitation, reasonable attorneys fees and disbursements) arising after the date of this Agreement in respect of the Surrender Space, but excluding any such items arising from or relating to the matters described in clauses (A), (B) and (C) of this Section 2(a) and (iv) Tenant and Landlord each hereby release the other from any and all claims, liabilities, damages and obligations of any kind or nature, known or unknown, that may exist as of the date of this Agreement in respect of the Surrender Space, except for (x) any indemnification obligation that Tenant may have to Landlord under Section 6.12 of the Original Lease in respect of the 19th and 20th floors of the Building to the extent such indemnification obligation relates to a matter covered by Tenant's insurance and (y) any amounts that either party may owe to the other under Sections 2.04, 2.05 and 2.07 (as amended) of the Original Lease in respect of the Surrender Space for periods ending on or before the Surrender Date, and Landlord and Tenant may continue to exercise all of their respective rights under such sections of the Lease in accordance with the provisions thereof (the matters described in clauses (x) and (y) are collectively called the "Release Exclusions").

      (b)     On the date of this Agreement, Tenant has delivered to Landlord vacant possession of the Surrender Space, in its "as is" condition, free and clear of all tenancies and other encumbrances, and Landlord hereby accepts Tenant's delivery of the Surrender Space in its "as is" condition on the date of this Agreement. Any improvements, furniture, fixtures, equipment and other property in the Surrender Space on the date of this Agreement shall be deemed abandoned by Tenant and shall, without further act, be the property of Landlord. Tenant acknowledges and agrees that, subject to Landlord's obligations to Tenant under Section 2(a) above, between the date of this Agreement and the Surrender Date, Landlord and persons authorized by Landlord may access the Surrender Space and may perform work and alter the Surrender Space to prepare the Surrender Space for occupancy by the next tenant.

      (c)     Tenant represents to Landlord that, as of the date of this Agreement and as of the Surrender Date, Tenant has taken no action which would subject the Surrender Space, and/or any and all improvements, furniture, fixtures, equipment and other property installed in and forming part of the Surrender Space, to any tenancies or other encumbrances.

-2-

(d).    Upon the surrender of the Surrender Space, the Premises shall consist of
(i) the Additional Space, (ii) the entire 27th, 28th and 29th floors of the Building, (iii) the portion
of the 21st floor of the Building that is not included in the 21st Floor Surrender Space and which
is shown hatched on Exhibit A-2 annexed hereto (the "Remaining 21st Floor Space") and (iv) the
portion of the 22nd floor of the Building that was included in the Area A Premises and which is
shown hatched on Exhibit A-3 annexed hereto (the spaces described in clauses (i) through (iv)
are collectively called the "Remaining Premises"). The following table sets forth, with respect to
each portion of the Remaining Premises: (A) the RSF contained therein, (B) Tenant's Share (for
PILOT Payments), and (C) Tenant's Operating Share.

| Floor | RSF | Tenant's Share | Tenant's Operating Share |
|---|---|---|---|
| 6 | 73,817 | 4.7022% | 4.8569% |
| 7 | 73,708 | 4.6953% | 4.8497% |
| Remaining 21st Floor Premises | 14,876 | .9476% | .9787% |
| 22 | 5,307 | .3381% | .3492% |
| 27 | 28,303 | 1.8029% | 1.8622% |
| 28 | 28,303 | 1.8029% | 1.8622% |
| 29 | 27,738 | 1.7669% | 1.8251% |
| Total: | 252,052 | 16.0559% | 16.5840% |

(e)    Promptly after the Surrender Date, Landlord shall construct a demising
wall and make such other alterations to the common areas on the 21st floor of the Building as
may be necessary in order to separately demise the 21st Floor Surrender Space and the
Remaining 21st Floor Space. Tenant shall reimburse Landlord within 30 days after request
accompanied by copies of paid invoices for 50% of the actual out-of-pocket costs so incurred by
Landlord, but in no event shall Tenant's obligation under this Section 2(e) exceed $25,000.00.

3.    **Consideration for Settlement and Surrender.**    In consideration of the
settlement of the Action and the termination of the Lease as to the Surrender Space and the other
modifications of the Lease effected by this Agreement and as a condition to the effectiveness of
this Agreement, Tenant shall:

(a)    Pay to Landlord on the date of this Agreement $106,865,371.00 by wire
transfer of immediately available federal funds to the account set forth on Exhibit B annexed
hereto, as a surrender payment for the termination of the Lease.

-3-

(b)    Pay to Landlord on the date of this Agreement $9,589,234.00 by wire transfer of immediately available federal funds to the account set forth on Exhibit B annexed hereto, in payment of rent arrearages due from Tenant to Landlord in respect of the Additional Space.

(c)    Pay to Landlord on the date of this Agreement $127,289.00 by wire transfer of immediately available federal funds to the account set forth on Exhibit B annexed hereto, in payment of the following amounts in respect of the 19th and 20th floors of the Building and the 21st Floor Surrender Space: (i) 2003 Operating Expenses of $14,637.00 (ii) 2004 Operating Expenses (through February) of $33,027.00 and (iii) 2003/2004 PILOT (through February) of $79,625.00.

(d)    Pay to Landlord on the date of this Agreement $21,900,000.00 by wire transfer of immediately available federal funds to the account set forth on Exhibit B annexed hereto, in payment of brokerage commissions and agency fees incurred or earned by Landlord in respect of the leases to CWT and to M&F.

(e)    Cause to be constructed, in accordance with plans to be provided to Tenant by Landlord, in the portion of the Surrender Space leased to CWT (the "CWT Premises"), improvements having a value of $23,854,500.00, but in no event shall Tenant be required to pay more than $23,854,500.00 for the construction and/or installation of such improvements in the CWT Premises, it being agreed that the maximum obligation and/or liability for the obligations set forth in this Section 3(e) is $23,854,500.00.

(f)    Cause to be constructed, in accordance with plans to be provided to Tenant by Landlord, in space leased by an affiliate of Landlord to M&F at Three World Financial Center, New York, New York (the "M&F Premises"), improvements having a value of $9,820,720.00, but in no event shall Tenant be required to pay more than $9,820,720.00 for the construction and/or installation of such improvements in the M&F Premises, it being agreed that the maximum obligation and/or liability for the obligations set forth in this Section 3(f) is $9,820,720.00.

(g)    Deliver to Landlord the Letter of Credit described in Section 7 below.

4.    **Terms Applicable to Remaining Premises.** (a) Except as expressly set forth in this Agreement, from and after the Surrender Date the Lease shall continue in full force and effect with respect to the Remaining Premises on all of the same terms and conditions as are set forth in the Lease in respect of the Remaining Premises. Commencing on the day after the Surrender Date, (x) all references in the Lease to the "Original Premises" shall be deemed to refer to the 27th, 28th and 29th floors of the Building, (y) all references in the Lease to the "Area A Premises" shall be deemed to refer to the space on the 21st and 22nd floors of the Building that is then included in the Premises and (z) all references in the Lease to the "Area B Premises," and all provisions of the Lease relating exclusively to the Area B Premises, shall be deemed deleted from the Lease. Landlord and Tenant agree that commencing on the day after the Surrender Date, the annual Fixed Rent payable in respect of the Remaining Premises is as follows:

-4-

(i)    With respect to the Additional Space:

| Period | Annual Fixed Rent |
|--------|-------------------|
| July 1, 2004 - Additional Space Expiration Date (August 31, 2006) | $7,081,200.00 |

(ii)    With respect to the 27th, 28th and 29th floors:

| Period | Annual Fixed Rent |
|--------|-------------------|
| July 1, 2004 - May 31, 2005 | $4,217,200.00 |
| June 1, 2005 -May 31, 2010 | $4,638,920.00 |
| June 1, 2010 - Original Premises Expiration Date (December 31, 2015) | $5,060,640.00 |

(iii)    With respect to the Remaining 21st Floor Premises:

| Period | Annual Fixed Rent |
|--------|-------------------|
| July 1, 2004 - January 22, 2006 | $788,428.00 |
| January 23, 2006 - January 22, 2011 | $862,808.00 |
| January 23, 2011 - January 22, 2016 | $937,188.00 |
| January 23, 2016 - Area A Premises Expiration Date (December 31, 2021) | $1,011,568.00 |

(iv)    With respect to the portion of the Remaining Premises on the 22nd floor of the Building:

| Period | Annual Fixed Rent |
|--------|-------------------|
| July 1, 2004 - July 31, 2006 | $281,271.00 |
| August 1, 2006 - July 31, 2011 | $307,806.00 |
| August 1, 2011 - July 31, 2016 | $334,341.00 |
| August 1, 2016 - Area A Premises Expiration Date (December 31, 2021) | $360,876.00 |

-5-

(b)    Landlord and Tenant further agree that:

(i)    until and including the Surrender Date, Tenant shall
continue to pay Rent in respect of the entire Premises (i.e.,
both the Surrender Space and the Remaining Premises) in
accordance with the Lease; provided, that (A) in respect of
the Remaining Premises, Fixed Rent for the period from
March 1, 2004 to and including the Surrender Date shall be
in the same annual amounts as are set forth in Section 4(a)
above for the period immediately after the Surrender Date
and (B) in respect of the Surrender Space, for the period
from March 1, 2004 to and including the Surrender Date,
Tenant shall pay Fixed Rent to Landlord (notwithstanding
any provision of the Lease to the contrary) in the amount of
$7,899,728.00, which amount shall be paid on the date of
this Agreement by wire transfer of immediately available
federal funds to the account set forth on Exhibit B annexed
hereto;

(ii)    the Base PILOT Amount means (A) in respect of all space
on the 21st, 22nd, 27th, 28th and 29th floors of the
Building, the PILOT (excluding any amounts described in
Section 2.04(b)(ii) of the Original Lease) for the PILOT
year commencing on July 1, 2000 and (B) in respect of the
Additional Space, the PILOT (excluding any amounts
described in Section 2.04(b)(ii) of the Original Lease) for
the PILOT year commencing on July 1, 2004;

(iii)    the Base Operating Year means (A) in respect of the 27th,
28th and 29th floors of the Building, calendar year 2000,
(B) in respect of the space on the 21st and 22 floors of the
Building, calendar year 2001 and (C) in respect of the
Additional Space, calendar year 2004;

(iv)    any and all work required to be performed by Landlord in
respect of any space included in the Remaining Premises
has been performed;

(v)    all work allowances or other amounts required to be paid
by Landlord in respect of any space included in the
Remaining Premises have been paid, other than (A)
$520,660.00 in respect of the Remaining 21st Floor
Premises and (B) $53,070.00 in respect of the portion of the
Remaining Premises on the 22nd floor of the Building; and

-6-

(vi)    Landlord, at Tenant's expense, shall reasonably cooperate with Tenant's efforts to obtain emergency generator service from Dow Jones & Company, Inc. or from other tenants of the Building.

5.    **Certain Modifications of the Lease.**  Effective as of the date of this Agreement, the Lease is hereby amended as follows:

(a)    Section 1.06 of the Original Lease is deleted in its entirety.

(b)    The last paragraph of Section 2.02(b) of the Original Lease is deleted in its entirety.

(c)    The last sentence of Section 2.07(b) of the Original Lease is deleted and the following is inserted in lieu thereof:

> "Notwithstanding the foregoing, if by the date that is two years after the end of the last PILOT Year or the last Operating Year (as applicable) a portion of which fell within the Term, Landlord shall not have issued to Tenant a bill for a PILOT Payment or an Operating Payment, Tenant shall not be required to make any further payments with respect to any PILOT Year or Operating Year."

(d)    Section 3.01(a)(viii) of the Original Lease is deleted in its entirety.

(e)    The last two sentences of Section 3.01(e) of the Original Lease are deleted in their entirety.

(f)    The reference to "$750,000" in the last sentence of Section 4.02(a) of the Original Lease is deleted and "$500,000" is inserted in lieu thereof.

(f)    Sections 4.04(e), 4.04(f), 4.09 and 4.10 of the Original Lease are deleted in their entirety.

(g)    A new Section 5.03(c) is added to the Original Lease as follows (and all references in the Lease to Landlord granting consent to a proposed assignment or sublease shall be deemed to include the deemed granting of such consent in accordance with the Lease):

> "Landlord hereby agrees to respond to Tenant's request for Landlord's consent to an assignment or sublease in accordance with this Section 5.03 within 20 days, if Tenant does not request a recognition agreement for a Qualifying Sublease (and 30 days if Tenant requests a recognition agreement for a Qualifying Sublease), after Landlord's receipt of a Transfer Notice; provided, that

-7-

if (i) Landlord fails to respond to Tenant's request for
such consent within said 20 day period (or 30 day
period, as applicable) and (ii) Tenant gives to Landlord
a second notice enclosing Tenant's original request and
stating in bold capital letters: "**IF LANDLORD
FAILS TO RESPOND TO THIS REQUEST FOR
CONSENT TO ASSIGNMENT OR SUBLEASE
(AS THE CASE MAY BE) WITHIN 5 BUSINESS
DAYS OF RECEIPT OF THIS NOTICE, THEN
LANDLORD'S       CONSENT       TO       SUCH
ASSIGNMENT OR SUBLEASE (AS THE CASE
MAY BE) SHALL BE DEEMED GRANTED IN
ACCORDANCE WITH SECTION 5.03 OF THE
LEASE**," and Landlord continues to fail to respond to
the request after the expiration of such 5 Business Day
period, then Landlord's consent to such assignment or
sublease shall be deemed given.   Notwithstanding
anything to the contrary contained herein, even if
Landlord's consent shall be deemed to have been given
to a Qualifying Sublease, Landlord shall not be deemed
to have agreed to recognize the subtenant under a
Qualifying Sublease until Landlord has entered into a
recognition  agreement  with  such  subtenant  in
accordance with the provisions of Section 5.06."

    (h)     Section 5.06(D) of the Original Lease is deleted and the following is
inserted in lieu thereof:

"A "Qualifying Sublease" is a sublease entered into
with Landlord's prior written consent, to a single
subtenant which is a bona fide third party, which is not
an Affiliate of Tenant and which meets the
Non-disturbance Net Worth Test, of not less than an
entire Floor of the Building, and, in the case of Floors
27, 28 and 29, includes all of either Floor 27 or Floor
29."

    (i)     Section 8.21 of the Original Lease is deleted in its entirety.

    (j)     Articles 9, 11 and 13 of the Original Lease are deleted in their entirety.

    (k)     Section 12.01 of the Original Lease is deleted (and Exhibit M of the
Original Lease shall no longer be applicable) and the following is inserted
in lieu thereof:

ffny01\lasune\450047.9

"Tenant, at Tenant's sole cost and expense, and subject to the other provisions of this Lease, including <u>Article 4</u>, shall have the non-exclusive right to install telecommunication conduit risers within the Building's core telecommunication closets to serve the Original Premises. Tenant shall have the right (i) to obtain telecommunication service from the suppliers of its choice and (ii) to create two points of entry into the Building, if necessary, where designated by Landlord. The number of conduit risers per closet, and the routes for such risers from the Building's points of entry to the closets on each applicable floor of the Original Premises, shall be mutually agreed between Landlord and Tenant, it being agreed that Landlord shall provide Tenant with the most direct routes then available in Landlord's reasonable judgment taking into account the present and future needs of the Building (but any costs necessary to create or accommodate such routes shall be borne by Tenant)."

(l)    Sections 3 and 4 of the First Amendment are deleted in their entirety.

Tenant confirms that Tenant does not have any renewal or extension rights in respect of any portion of the Remaining Premises and that Tenant does not have any expansion right, right of first offer, right of first refusal or other right to lease any portion of the Building not included in the Remaining Premises.

6.    **Provisions Applicable to the Additional Space.**    (a)  Tenant confirms that (i) the Additional Space Commencement Date is deemed to have occurred (A) in respect of the 6th floor of the Building, on November 16, 2002 and (B) in respect of the 7th floor of the Building, on December 1, 2002 and (ii) the Additional Space Expiration Date is August 31, 2006.

(b)    Notwithstanding any provisions of Article 5 of the Original Lease to the contrary, if Tenant delivers to Landlord a Transfer Notice in respect of a proposed sublease of all or a portion of the Additional Space which constitutes a Qualifying Lease Proposal, Tenant may, in such Transfer Notice, request that Landlord enter into a direct lease (a "<u>Direct Lease</u>") with the proposed subtenant (the "<u>Proposed Subtenant</u>") for a term commencing on the day after the Additional Space Expiration Date and expiring on a date not later than August 31, 2018. Provided that Landlord is otherwise willing to approve the proposed sublease in question (which approval shall be granted or withheld in accordance with the applicable provisions of the Lease), then Landlord shall proceed in good faith to negotiate a Direct Lease with the Proposed Subtenant on the terms set forth in the Qualifying Sublease Proposal, and otherwise on terms and conditions as would customarily be agreed to by Landlord (exercising its judgment in a good faith commercially reasonable manner) in negotiating a lease of the type in question in the absence of such proposed sublease. Tenant acknowledges that there can be no assurance that any such negotiations between Landlord and the Proposed Subtenant will be successful, and, subject

-9-

to the immediately preceding sentence, Landlord shall have no liability or obligation to Tenant, nor shall any of Tenant's obligations to Landlord under the Lease be diminished in any respect, if Landlord and the Proposed Subtenant are unable to agree on the terms of such Direct Lease. If Tenant delivers to Landlord a Transfer Notice which includes the request described in this Section 6(b), the time periods set forth in Section 5.03(c) of the Original Lease (as amended by this Agreement) shall apply to Landlord's approval or disapproval of the proposed sublease in question, and to the determination of whether the Transfer Notice constitutes a Qualifying Lease Proposal (provided that if Tenant gives the bold capital letter notice described in Section 5.03(c) of the Original Lease, such notice shall also expressly state that Landlord's failure to timely respond shall constitute Landlord's agreement that the sublease in question satisfied the requirements of a Qualifying Lease Proposal), but shall not apply to the negotiation of a Direct Lease with the proposed subtenant in question.

(c)     "Qualifying Lease Proposal" means a proposal which (i) is for one-quarter of one floor or more of the Additional Space, (ii) is to a Proposed Subtenant that has a financial condition reasonably satisfactory to Landlord taking into account the Proposed Subtenant's obligations to Landlord as a direct tenant for the proposed term in question, (iii) neither the space in question nor any portion thereof, for all or any portion of the term of such Direct Lease (A) has been leased by Landlord to another tenant or (B) is subject to a right to lease on the part of any other person (contained in a lease or other written agreement) that has not been waived, (iv) provides for fixed rent payments to Landlord under the Direct Lease equal to or greater than the greater of (A) fair market rent (taking into account all of the terms of the Direct Lease) then being obtained in similar direct lease transactions in comparable buildings in downtown Manhattan and (B) (x) $35.00 per rentable square foot per annum for the period commencing on September 1, 2006 to and including August 31, 2008, (y) $42.50 per rentable square foot per annum for the period commencing on September 1, 2008 to and including August 31, 2013 and (z) $48.50 per rentable square foot per annum for the period commencing on September 1, 2013 to and including August 31, 2018, (v) is not structured to disproportionately benefit Tenant during the period prior to the Additional Space Expiration Date, (vi) is to a Proposed Subtenant which, in Landlord's judgment (exercised in a good faith commercially reasonable manner), is in keeping with the first class standards maintained at the World Financial Center, One Liberty Plaza and One Chase Manhattan Plaza and (vii) is to a Proposed Subtenant which is not (A) Mellon Financial Corp. or any Affiliate of Mellon Financial Corp., (B) any entity (excluding CWT and any existing subtenant of Tenant in the Building on the date of this Agreement) if such entity or an Affiliate of such entity is then leasing or subleasing space in the World Financial Center or (C) any other entity in respect of which Landlord would have the right under the terms of the Lease to disapprove a proposed sublease or assignment to such entity (except that the provisions of Section 5.03(a)(D) of the Original Lease shall not apply).

(d)     Landlord and Tenant shall reasonably cooperate with each other in marketing the Additional Space, and each shall give the other the opportunity to speak to such party's prospects to determine whether it is feasible to negotiate with such prospect a combined sublease and Direct Lease as contemplated under this Section 6. Anything contained in this Section 6 to the contrary notwithstanding, until a Direct Lease is executed and delivered by both Landlord and a Proposed Subtenant, and subject to the provisions of Sections 6(b) above, Landlord shall have the right to lease, or grant rights to lease, all or any portion of the Additional

-10-

Space to any person or entity selected by Landlord (provided such party is not an Affiliate of Landlord, and for purposes hereof, the term "Control" as used in the definition of "Affiliate" in the Original Lease shall also include, as to any entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity), and Landlord shall have no obligation to negotiate or enter into a Direct Lease with a Proposed Subtenant if Landlord 'is then negotiating a transaction which Landlord would prefer to consummate with any other person pursuant to which such other person would lease or have a right to lease the space in question or any portion thereof.

(e)    If Landlord and the Proposed Subtenant shall execute and deliver a Direct Lease, then Landlord shall

(i)    reimburse Tenant for, or pay to Tenant when the same is payable by Tenant, a portion of any work allowance paid or payable by Tenant to such Proposed Subtenant, such portion to be equal to the product of (A) the total work allowance so paid or payable by Tenant to such Proposed Subtenant but not in excess of the lesser of (x) then market work allowances being offered in similar direct lease transactions (for the same term as the combined term of the proposed sublease and Direct Lease in question) in comparable buildings in downtown Manhattan and (y)(1) $50.00 per rentable square foot of the Direct Lease if the term of the proposed sublease commenced before September 1, 2004 and (2) $45.00 per rentable square foot of the Direct Lease if the term of the proposed sublease commenced on or after September 1, 2004, multiplied by (B) a fraction, the numerator of which is the number of days in the period commencing on the first day of the term of the Direct Lease to and including the scheduled expiration date of the initial term of the Direct Lease, and the denominator of which is the number of days in the period commencing on the date of the sublease to and including the scheduled expiration date of the initial term of the Direct Lease (the "Brookfield Fraction");

(ii)    reimburse Tenant for a portion of the value of any free rent period (such value to be equal to the fixed rent that would have been paid by the Proposed Subtenant during such free rent period if such Proposed Subtenant had been obligated to pay fixed rent during such period at the rate initially payable under such sublease) actually received by such Proposed Subtenant, such portion to be equal to the product of (A) the value of the total free rent period actually received by such Proposed Subtenant but not in excess of the lesser of (x) then market free rent periods being offered in similar direct lease transactions in comparable buildings in downtown Manhattan and (y)(1) 15 months, if the term of the proposed sublease commenced before September 1, 2004 and (2) 12 months, if the term of the proposed sublease commenced on or after September 1, 2004, multiplied by (B) the Brookfield Fraction; and

-11-

(iii)    reimburse Tenant for a portion of the brokerage commission actually paid by Tenant to the Proposed Subtenant's broker (but not to any broker, advisor or agent representing Tenant) in respect of the proposed sublease and the Direct Lease (it being acknowledged that except for the portion of such commission for which Landlord is obligated hereunder and claims of any other brokers (other than the acknowledged broker or brokers representing Tenant) against Tenant which are based on dealings with Landlord, as to which claims Landlord shall indemnify and hold Tenant harmless, Tenant shall be responsible for the payment of, and shall indemnify and hold Landlord harmless against, any commission or other compensation payable to any party by reason of the consummation of such proposed sublease and such Direct Lease), such portion to be equal to the product of (A) the amount of the commission actually paid by Tenant to the Proposed Subtenant's broker but not in excess of one customary brokerage commission (i.e., no override) computed based on the formula attached as Exhibit E, multiplied by (B) the Brookfield Fraction.

Nothing contained in this Section 6 shall be construed (X) to require Landlord to offer to a Proposed Subtenant under a Direct Lease any free rent, work allowance or other concession of any nature whatsoever, Landlord's sole obligation being to reimburse Tenant for a portion of the amounts described in clauses (i) through (iii) above to the extent actually paid or payable by Tenant or (Y) to obligate Landlord to pay or reimburse Tenant for any costs of converting the floors constituting the Additional Space into multi-tenanted floors.

(f)    If Landlord and the Proposed Subtenant shall execute and deliver a Direct Lease, and Tenant and such Proposed Subtenant shall have executed and delivered a sublease under which the term commences no later than March 1, 2006, Tenant shall pay to Landlord (or an Affiliate of Landlord designated by Landlord), within 10 days after invoice from Landlord (or such Affiliate), a brokerage fee of $750,000.00.

(g)    Nothing contained in this Section 6 shall be construed to diminish any right of Landlord (i) to exercise any of the rights granted to Landlord in Section 5.02 of the Original Lease, (ii) to disapprove any proposed sublease in accordance with the terms of the Lease or (iii) to lease, or grant rights to lease, to any other person or entity the Additional Space or any portion thereof for any period after the Additional Space Expiration Date.

7.    **Letter of Credit.**    (a)    Concurrently with the execution and delivery of this Agreement and as a condition to the effectiveness hereof, Tenant has delivered to Landlord a Letter of Credit (as hereinafter defined) in the initial amount of $36,114,000.00, to be held and administered in accordance with the provisions of this Section 7. "Letter of Credit" means an unconditional, irrevocable letter of credit substantially in the form annexed hereto as Exhibit C and issued by a bank satisfactory to Landlord. Landlord hereby approves either National Australia Bank Limited or Standard Chartered Bank for the issuance of the initial Letter of Credit. The Letter of Credit shall provide that it is assignable by Landlord, without charge to Landlord, and shall either (x) expire on the date (the "LC Date") which is 20 days after the 20th anniversary of the Commencement Date (as such term is defined in the CWT Lease) of the CWT

-12-

Lease (the "CWT Commencement Date") or (y) be automatically self-renewing until the LC Date. If any Letter of Credit scheduled to expire before the LC Date is not renewed at least 26 days prior to the expiration thereof, Landlord may draw upon the Letter of Credit and hold the proceeds thereof in accordance with the further provisions of this Section 7. If Landlord shall draw a Letter of Credit under the preceding sentence, then (i) the cash so drawn down (the "Cash Proceeds") shall be the property of Landlord and neither Tenant nor CWT shall have any right, title or interest, present or reversionary, contingent or otherwise, in the Cash Proceeds (ii) Landlord, until the LC Date or any earlier Termination (as hereinafter defined), shall hold the Cash Proceeds in a separate account in the sole dominion and control of Landlord ("Landlord's Account") in a bank that is regulated by the Federal Reserve Board, has assets of not less than $75,000,000,000.00 and has a full service banking office in New York, New York, and Landlord shall not withdraw the Cash Proceeds from such account except as provided in clauses (iv), (v) or (vi) below or pursuant to Section 7(c) or Section 7(d) below; (iii) any and all earnings on the Cash Proceeds shall be the property of Landlord (and shall not be included within the term "Cash Proceeds" as used in this Section 7) and may be withdrawn from Landlord's Account and retained by landlord at any time and from time to time, (iv) if Landlord is holding Cash Proceeds on any date on which Tenant is entitled to reduce the amount of a Letter of Credit under Section 7(b) below, Landlord shall pay to Tenant, from Landlord's funds, an amount equal to the amount that the Letter of Credit may be so reduced (and Landlord shall no longer be required to hold such amount in Landlord's Account), (v) on the LC Date, if a Termination has not theretofore occurred, Landlord shall pay to Tenant from Landlord's funds, an amount equal to the Cash Proceeds then held by Landlord (and Landlord shall no longer be required to maintain Landlord's Account) and (vi) if, at any time after Landlord has received Cash Proceeds and while Landlord is required to hold Cash Proceeds in Landlord's Account, Tenant shall tender to Landlord a Letter of Credit in the amount then required under this Section 7, Landlord shall pay to Tenant, from Landlord's funds, an amount equal to the Cash Proceeds in Landlord's Account (and Landlord shall no longer be required to maintain Landlord's Account), such payment to be made within 24 hours after Landlord's receipt of the Letter of Credit, by wire transfer of immediately available federal funds to an account designated by Tenant. In no event shall any Letter of Credit or any Cash Proceeds be considered a security deposit of CWT or of Tenant or in any way part of CWT's or Tenant's estate in any proceeding under Title 11 of the United States Code (or in any similar proceeding then available to such party under applicable state or federal law, including, without limitation, bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar state or federal laws relating to the enforcement of creditors' rights generally, or under general principles of equity).

(b)    Provided that on any applicable Reduction Date (as hereinafter defined) (i) a Termination has not occurred and (ii) no Non-Reduction Event (as hereinafter defined) has occurred and is continuing, Tenant may reduce the amount of the Letter of Credit on the applicable dates set forth below (each, a "Reduction Date") to the applicable amount (each, a "Full Reduction Amount") set forth below:

| Reduction Date | Full Reduction Amount |
| --- | --- |
| 10th anniversary of the CWT Commencement Date | $18,057,000.00 |
| 15th anniversary of the CWT Commencement Date | $ 9,028,500.00 |

-13-

Notwithstanding any provisions of this <u>Section 7(b)</u> to the contrary, if, on any Reduction Date, a Termination has not occurred but a Non-Reduction Event has occurred and is continuing, then (A) Tenant may nevertheless reduce the amount of the Letter of Credit on such Reduction Date to the applicable amount (each, a "<u>Partial Reduction Amount</u>") set forth below:

| Reduction Date | Partial Reduction Amount |
|---|---|
| 10th anniversary of the CWT Commencement Date | $27,085,500.00 |
| 15th anniversary of the CWT Commencement Date | $13,542,250.00 |

and (B) if, on the date that is 180 days after such Reduction Date (such 180 day period is called the "<u>Partial Reduction Period</u>") a Termination has not occurred, then notwithstanding that a Non-Reduction Event may then be continuing, Tenant may reduce the Letter of Credit to the Full Reduction Amount first set forth above which would have been applicable had there been no Non-Reduction Event continuing on such Reduction Date and (C) if at any time during such Partial Reduction Period a Termination has not occurred and no Non-Reduction Event is then continuing, then Tenant may reduce the Letter of Credit to the Full Reduction Amount first set forth above which would have been applicable had there been no Non-Reduction Event continuing on the preceding Reduction Date. In the event of a partial termination of the CWT Lease (other than by reason of a Termination) in respect of a portion of the space initially demised under the CWT Lease, then Tenant may reduce the amount of the Letter of Credit by an amount equal to the product of (x) the lesser of $36,114,000.00 or the then applicable Full or Partial Reduction Amount (without reference to any prior reduction under this sentence or under <u>Section 7(c)</u> below) multiplied by (B) a fraction, the numerator of which is the rentable square footage of the portion of the space initially demised under the CWT Lease as to which the CWT Lease has been so terminated, and the denominator of which is 458,350. If Tenant is entitled to reduce the amount of the Letter of Credit under any provision of this <u>Section 7(b)</u>, Tenant may deliver to Landlord a replacement Letter of Credit or an amendment to the Letter of Credit (the form and substance of such amendment to be reasonably satisfactory to Landlord) reducing the amount of the Letter of Credit by the amount of the applicable reduction, and Landlord shall, within 5 days after request to do so, execute any amendment and other documents as are reasonably necessary to reduce the amount of the Letter of Credit in accordance with the terms hereof. If Tenant is prepared to deliver a replacement Letter of Credit, Landlord and Tenant shall concurrently exchange the old Letter of Credit for the new Letter of Credit, and the parties shall cooperate in order to effect such concurrent exchange, which cooperation may include entering into an escrow arrangement with a mutually acceptable escrow agent pursuant to which the Letters of Credit shall be delivered to such escrow agent who shall concurrently release the old Letter of Credit to Tenant and the new Letter of Credit to Landlord. "<u>Non-Reduction Event</u>" means either (X) that CWT is then in default under the CWT Lease in the payment of not less than 2 months of the fixed rent then payable under the CWT Lease or (Y) that CWT is then, voluntarily or involuntarily, the subject of a proceeding under Title 11 of the United States Code (or any similar proceeding under applicable state or federal law, including, without limitation, bankruptcy, insolvency, fraudulent conveyance, reorganization or other similar state or federal laws relating to the enforcement of creditors' rights generally). A Non-Reduction Event shall be deemed to be continuing so long as the event giving rise thereto is continuing and no Termination has occurred.

-14-

(c)    Landlord may draw down and unconditionally and irrevocably retain the full amount of the Letter of Credit (or any Cash Proceeds) if (i) the CWT Lease is terminated by reason of a default under the CWT Lease on the part of the tenant thereunder or (ii) the CWT Lease is rejected (or otherwise similarly terminated) by the tenant thereunder (or by any trustee or other fiduciary for the benefit of such tenant) in any proceeding under Title 11 of the United States Code (or in any similar proceeding then available to such tenant under applicable state or federal law, including, without limitation, bankruptcy, insolvency, fraudulent conveyance, reorganization or other similar state or federal laws relating to the enforcement of creditors' rights generally) (a termination of the CWT Lease described in clause (i) or clause (ii) is called a "Termination"). If, as a result of a change in the law as it exists on the date of this Agreement, the Lease may be, and is, by reason of a Termination, terminated in part, then Landlord shall have the right to draw down and unconditionally and irrevocably retain a portion of the Letter of Credit (or any Cash Proceeds) equal to the product of (A) the lesser of $36,114,000.00 or the then applicable Full or Partial Reduction Amount (without reference to any prior reduction under this sentence or as a result of a partial termination of the CWT Lease under the provisions of Section 7(b) above) multiplied by (B) a fraction, the numerator of which is the rentable square footage of the portion of the space initially demised under the CWT Lease as to which the CWT Lease has been so terminated, and the denominator of which is 458,350. If Landlord shall have drawn upon the Letter of Credit (or the proceeds thereof) in accordance with this Section 7(c), neither Landlord nor Tenant shall have any further obligation or liability to the other in respect of the amount so drawn down. Without limiting the generality of the preceding sentence, Tenant shall have no obligation to replenish the amount so drawn down by Landlord.

(d)    Landlord shall return to Tenant, within 2 Business Days after the occurrence of any of the events described in clauses (i) through (v) below, the Letter of Credit (or an amount equal to any Cash Proceeds) then held by Landlord (and Landlord shall have no further obligation to maintain Landlord's Account), and Tenant shall have no further obligation to Landlord under this Section 7, if (i) on the 20th anniversary of the CWT Commencement Date, a Termination has not theretofore occurred, (ii) at any time the CWT Lease has been terminated (and Landlord is not disputing the fact that the CWT Lease has been so terminated) for reasons other than a Termination (including, without limitation, by reason of the exercise by either party thereto of a right to terminate such lease following a casualty or condemnation, a termination thereof by reason of a default thereunder on the part of Landlord or a voluntary surrender of such lease by the tenant thereunder that is accepted in writing by Landlord), (iii) the interest of the lessee under the CWT Lease is assigned by the then tenant thereunder and, in connection with such assignment, Landlord releases CWT (and any Successor Entity, as such term is defined in the CWT Lease) from any further liability under the CWT Lease, (iv) the interest of the lessee under the CWT Lease is assigned by the then tenant thereunder to Landlord or any Affiliate of Landlord or (v) the entire premises demised under the CWT Lease is subleased by the then tenant thereunder to Landlord or an Affiliate of Landlord and pursuant to the terms of such sublease, the rent payable by the subtenant to the then tenant under the CWT Lease is not less (other than to an immaterial extent) than the rent payable by CWT under the CWT Lease.

-15-

ffny01\lastme\450047.9

(e)    With respect to Landlord's rights as set forth in this Section 7 to hold and retain Cash Proceeds, Tenant hereby expressly waives and releases (i) the right to interpose any substantive or procedural defense of the law of guarantee, indemnification or suretyship; (ii) all rights and remedies accorded by applicable law to guarantors or sureties, including without limitation, any extension of time conferred by any law now or hereafter in effect; (iii) the right to interpose any defense, set off or counterclaim of any nature or description in any action or proceeding; and (iv) any right or claim of right to cause a marshalling of CWT's assets or to cause Landlord to proceed against CWT and/or any collateral held by Landlord at any time or in any particular order. Nothing contained in this Section 7(e) shall be construed as a waiver of Tenant's right to prosecute an action against Landlord for damages if Tenant believes that Landlord has drawn on a Letter of Credit or withdrawn Cash Proceeds from Landlord's Account, in either case, other than in accordance with the provisions of this Agreement.

(f)    Without limiting the generality of Section 7(e) above, Landlord's rights as set forth in this Section 7 to draw down and retain the proceeds of the Letter of Credit (subject to the express provisions of Sections 7(b), (c), (d) and (e) above) shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Tenant, including, without limitation:

(i)    any amendment, modification or extension of the CWT Lease;

(ii)    any extension of time for performance, whether in whole or in part, of any obligation under the CWT Lease, whether given prior to or after default thereunder;

(iii)    any exchange, surrender or release, in whole or in part, of any security which may be held by Landlord at any time for or under the CWT Lease;

(iv)    any other guaranty of the CWT Lease or any obligation thereunder now or hereafter executed by Tenant or anyone else;

(v)    any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any covenant, claim, cause of action, right or remedy which Landlord may, at any time, have under the CWT Lease or with respect to any guarantee of the CWT Lease or any security which may be held by Landlord at any time for or under the CWT Lease or with respect to CWT;

(vi)    any act or thing or omission or delay to do any act or thing which may in any manner or to any extent vary the risk of Tenant or which would otherwise operate as a discharge of Tenant as a matter of law;

(vii)    the release of any other guarantor from liability for the performance or observance of any obligation, whether by operation of law or otherwise;

-16-

(viii)   except as set forth in Section 7(d) above, Landlord's consent to any assignment or subletting or the assignment or successive assignments of the Lease by CWT or its successors, or any subletting of the premises demised under the Lease by CWT or its successors or its subtenants of any tier;

(ix)    the failure to give Tenant any notice whatsoever;

(x)     any right, power or privilege that Landlord may now or hereafter have against any person, entity or collateral;

(xi)    except as set forth in Section 7(d) above, any assignment, conveyance, mortgage, merger or other transfer, voluntary or involuntary (whether by operation of law or otherwise), of all or any part of CWT's interest in the Lease; or

(xii)   any assignment, conveyance, mortgage, merger or other transfer, voluntary or involuntary (whether by operation of law or otherwise) of all or part of the interest or rights of Landlord under the Lease.

(g)     Tenant expressly acknowledges that Landlord's rights as set forth in this Section 7 to draw down and retain the proceeds of the Letter of Credit have been negotiated as part of the settlement of the Action and that the amount which Landlord is entitled to receive is liquidated and is not dependent in any way on the amount of any loss or damages suffered by Landlord by reason of the Termination of the CWT Lease. Landlord shall have no obligation to Tenant whatsoever, in the event Landlord draws down and retains the proceeds of the Letter of Credit, to account to Tenant for the proceeds of the Letter of Credit, to prove to Tenant the loss or damages suffered by Landlord by reason of the Termination of the CWT Lease or to in any way mitigate or reduce any loss or damages that Landlord may suffer by reason of the Termination of the CWT Lease.

(h)     If, at any time that Landlord is holding a Letter of Credit, the senior unsecured debt rating of the bank issuing such Letter of Credit shall fall below A- from Standard & Poor's (or its successor) or A3 from Moody's Investors Services (or its successor), then Landlord may require Tenant, within 30 days after notice from Landlord, to substitute, in place of the Letter of Credit then held by Landlord, a new Letter of Credit from a bank having at least the rating described above. If Tenant shall fail to so substitute a new Letter of Credit within such 30 day period, then Landlord shall have the right to draw on the Letter of Credit and hold the proceeds thereof as Cash Proceeds in accordance with all of the applicable provisions of this Section 7.

8.    **Settlement of Litigation.** Concurrently with the execution and delivery of this Agreement and as a condition to the effectiveness of this Agreement, Landlord and Tenant are executing and delivering the Stipulation of Discontinuance attached hereto as Exhibit D to dismiss the Action with prejudice and without costs. Either Landlord or Tenant may, without notice to the other party, file a copy of such stipulation with the Court.

-17-

9.     **Notices.**  The parties hereby confirm that their addresses for notices under the Lease are as follows:

| | |
|---|---|
| If to Landlord: | WFP Tower A Co. L.P.<br>One Liberty Plaza<br>New York, New York 10006<br>Attention:  President |
| With a copy to: | Brookfield Financial Properties, L.P.<br>One Liberty Plaza<br>New York, New York 10006<br>Attention:  General Counsel |
| If to Tenant: | Lehman Brothers Inc.<br>745 Seventh Avenue<br>New York, New York 10019<br>Attention:  Corporate Real Estate<br>          Jaime Fuertes, Vice President |
| With a copy to: | Lehman Brothers Inc.<br>745 Seventh Avenue<br>New York, New York 10019<br>Attention:  Beth E. Anisman, Esq.<br>          Vice President and Real Estate Counsel |
| And a copy to: | Piper Rudnick LLP<br>1251 Avenue of the Americas<br>New York, New York 10020<br>Attention:  Martin Polevoy, Esq. |

10.     **Brokers.** (a)  Tenant acknowledges that Tenant has dealt with several brokers (including, without limitation, Julien J. Studley, Inc. ("Studley") and CB Richard Ellis Real Estate Services, Inc. (f/k/a Insignia/ESG, Inc.) and CB Richard Ellis, Inc. (collectively, "CBRE")) in connection with the potential disposition of all or portions of the Premises. Except for the commission due to Studley for the leasing of the Surrender Space to CWT (the "CWT Commission"), Tenant shall be responsible for, and shall indemnify and hold harmless Landlord from and against, all loss, cost, liability and expense (including, without limitation, reasonable attorney's fees and disbursements) arising out of any claim for a fee, commission or other compensation in connection with the surrender of the Surrender Space and/or the other transactions effected by the terms of this Agreement made by (i) Studley; (ii) CBRE or (iii) any broker other than Studley or CBRE who alleges such a claim based on dealings with Tenant.

(b)     Landlord shall be responsible for, and shall indemnify and hold harmless Tenant from and against, all loss, cost, liability and expense (including, without limitation, reasonable attorney's fees and disbursements) arising out of any claim for a fee, commission or

-18-

other compensation in connection with the surrender of the Surrender Space and/or the other transactions effected by the terms of this Agreement made by any broker other than Studley (except to the extent set forth in Section 10(c)) or CBRE and who alleges such a claim based on dealings with Landlord.

(c)    Landlord shall pay the CWT Commission to Studley pursuant to a separate agreement between Landlord and Studley. Landlord shall indemnify and hold harmless Tenant from and against all loss, cost, liability and expense (including, without limitation, reasonable attorney's fees and disbursements) arising out of any claim by Studley for a fee, commission or other compensation by reason of the leasing of the Surrender Space to CWT.

11.    **Confidentiality.**  Without the prior written consent of the other, which consent may be withheld in the sole and absolute discretion of either party, neither Landlord nor Tenant, nor any of their respective officers, shareholders, partners, directors, employees or representatives, shall disclose, divulge, communicate or otherwise reveal to any person or in any press release, the business provisions (including the payments and other financial provisions) of this Agreement or of any other document or agreement executed or delivered in connection with this Agreement, except (a) in connection with any action or proceeding involving the Lease, (b) to the extent legally compelled (by deposition, interrogatory, subpoena, civil investigative demand or similar legal process) to disclose such provisions, (c) as to the disclosure, divulgence, communication or other revelation to attorneys, accountants, CBRE, Studley or other professional consultants or advisors, (d) to the extent required by securities laws or compliance provisions of other laws or regulations or of any securities, bond or commodities exchange, (e) by Tenant, to a prospective assignee of Tenant's interest in the Lease or a prospective subtenant of all or any part of the Premises, (f) to a prospective purchaser of the Building or a prospective mortgagee or lessor of the Building or (g) to a prospective purchaser or prospective mortgagee as to (x) any equity interest of Landlord or its subsidiaries, affiliates and related companies or Tenant or its subsidiaries, affiliates and related companies or (y) any assets of Landlord or its subsidiaries, affiliates and related companies or its subsidiaries, affiliates and related companies.

12.    **Miscellaneous.**  (a)  Except as expressly set forth in this Agreement, the Lease shall remain unmodified and in full force and effect, and the Lease as modified herein is ratified and confirmed.  All references in the Lease to "this Lease" shall hereafter be deemed to refer to the Lease, as amended by this Agreement.

(b)    This Agreement may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.

[NO FURTHER TEXT ON THIS PAGE]

-19-

IN WITNESS WHEREOF, Landlord and Tenant have executed this Agreement as of the day and year first above written.

Landlord:    WFP TOWER A CO. L.P.

By:   WFP Tower A Co. G.P. Corp.,
general partner

By:   _____
Name: Dennis Friedrich
Title: President and Chief Operating Officer

Tenant:    LEHMAN BROTHERS INC.

By:   _____
Name:
Title:

-20-

IN WITNESS WHEREOF, Landlord and Tenant have executed this Agreement as of the day and year first above written.

Landlord:     WFP TOWER A CO. L.P.
            By:   WFP Tower A Co. G.P. Corp.,
                general partner

            By:   _____
                Name:
                Title:

Tenant:      LEHMAN BROTHERS INC.

            By:   _____
                Name: *Mark Marucci*
                Title: *Managing Director*

-20-

## EXHIBIT A-1

### 21st Floor Surrender Space

ffny01\lastme\450047.9

EXHIBIT A-1
21st FLOOR



Liberty Street

West Street

South End Avenue

Albany Street

ALL AREAS, CONDITIONS AND DIMENSIONS ARE APPROXIMATE.

ONE WORLD FINANCIAL CENTER
NEW YORK, NY

## EXHIBIT A-2

### Remaining 21st Floor Space

-22-

ny01\lastrne\450047.9



EXHIBIT A-2
21st FLOOR

Liberty Street

West Street

Albany Street

ALL AREAS, CONDITIONS AND DIMENSIONS ARE APPROXIMATE.

ONE WORLD FINANCIAL CENTER
NEW YORK, NY

## EXHIBIT A-3

### 22nd Floor Space

ffny01\lastme\450047.9

EXHIBIT A-3
22nd FLOOR



Liberty Street

West Street

Albany Street

ALL AREAS, CONDITIONS AND DIMENSIONS ARE APPROXIMATE.

ONE WORLD FINANCIAL CENTER
NEW YORK, NY

## **EXHIBIT B**

### **Landlord's Wiring Instructions**

WFP Tower A Co. LP
JP Morgan Chase
Account Number:  304-140732
ABA Number:       021-000-021

-24-

## EXHIBIT C

### Form of Letter of Credit

ffhy01\lastme\450047.9





# ORIGINAL

**Standard Chartered**

| Amendment to Standby Letter of Credit | Standard Chartered Bank |
|---|---|
| Credit Number : 777-52-0025081-L | One Madison Ave., 3rd Floor |
| Date of Amendment : March 11,2004 | New York, NY 10010 |
| Number of Amendment : 01 | USA |
| | SWIFT address SCBLUS33 |
| Beneficiary: | Applicant: |
| WFP TOWER A CO. L.P. | Lehman Brothers Holdings Inc. |
| C/O BROOKFIELD FINANCIAL | 745 7th AVENUE |
| PROPERTIES L.P. | NEW YORK, NEW YORK 10019 |
| ONE LIBERTY PLAZA NEW YORK, | |
| NEW YORK 10006 | |
| Attn: KATHLEEN KANE | |
| TEL:212-417-7017 | |
| FAX:212-417-7195 | |
| | This amendment is to be considered as part of the above-mentioned Credit and must be attached thereto. |

This credit is amended as follows:

The name and address of beneficiary is amended to:
WFP TOWER A CO. L.P.
C/O BROOKFIELD FINANCIAL PROPERTIES L.P.
ONE LIBERTY PLAZA NEW YORK,
NEW YORK 10006
ATTN:KATHLEEN KANE
TEL:212-417-7017
FAX:212-417-7195

All other terms and conditions remain unchanged.

_____

This Letter of Credit is subject to Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce, Publication No. 500.
_____



_____
Authorized Signature


_____
Authorized Signature



# ORIGINAL



## Standard Chartered

| Irrevocable Standby Letter of Credit | Standard Chartered Bank |
|---|---|
| Credit Number : 777-52-0025081-L<br>Date of Issue :  March 10,2004 | One Madison Ave., 3rd Floor<br>New York, NY 10010<br>USA<br>SWIFT address SCBLUS33 |
| Beneficiary:<br>WFP TOWER A CO. L.P.<br>C/O BROOKFIELD FINANCIAL PROPERTIES<br>L.P., 200 LIBERTY PLAZA NEW YORK,<br>NEW YORK 10006<br>ATTN:  KATHLEEN KANE<br>TEL:    212-417-7017<br>FAX:    212-417-7195 | Date of Expiry:  June 30,2005<br>Place of Expiry: AT OUR COUNTERS |
| | Applicant:<br>LEHMAN BROTHERS HOLDINGS INC.<br>745 7TH AVENUE<br>NEW YORK, NEW YORK 10019 |
| Partial drawing: Allowed | L/C Amount: USD 36,114,000.00 Exactly<br>US DOLLAR THIRTY SIX MILLION ONE HUNDRED<br>FOURTEEN THOUSAND AND<br>00/100 |

GENTLEMEN:

WE HEREBY ESTABLISH OUR IRREVOCABLE TRANSFERABLE STAND-BY LETTER OF CREDIT
NO. 777-52-0025081-L  IN YOUR FAVOR AT THE REQUEST OF AND FOR ACCOUNT OF LEHMAN
BROTHERS HOLDINGS INC TO THE AGGREGATE AMOUNT OF USD $36,114,000.00 (THIRTY SIX
MILLION ONE HUNDRED FOURTEEN THOUSAND DOLLARS UNITED STATES DOLLARS).
AVAILABLE BY YOUR DRAFT(S) DRAWN ON US AND ACCOMPANIED BY THIS LETTER OF
CREDIT.

THIS LETTER OF CREDIT SHALL BE VALID UNTIL JUNE 30, 2005

THIS LETTER OF CREDIT IS SUBJECT TO THE CONDITION THAT IT SHALL BE AUTOMATICALLY
EXTENDED FOR SUCCESSIVE PERIODS OF ONE YEAR EACH BUT NOT BEYOND JULY 30,  2024
UNLESS WE NOTIFY YOU BY CERTIFIED MAIL/COURIER., RETURN RECEIPT REQUESTED AT
LEAST THIRTY (30) DAYS PRIOR TO ANY EXPIRATION DATE THAT WE ELECT NOT TO EXTEND
THIS LETTER OF CREDIT, WHEREUPON YOU MAY DRAW FOR THE FULL AMOUNT OF THIS
LETTER OF CREDIT.

THE TERM "BENEFICIARY" INCLUDES ANY SUCCESSOR BY OPERATION OF LAW OF THE NAMED
BENEFICIARY, INCLUDING, WITHOUT LIMITATION, ANY LIQUIDATOR, REHABILITATOR,
RECEIVER OR CONSERVATOR.

EXCEPT AS EXPRESSLY STATED HEREIN, THIS UNDERTAKING IS NOT SUBJECT TO ANY
AGREEMENT, CONDITION, OR QUALIFICATION.  THE OBLIGATION OF STANDARD CHARTERED
BANK UNDER THIS LETTER OF CREDIT IS THE INDIVIDUAL OBLIGATION OF STANDARD



Standard
Chartered

CHARTERED BANK AND IS IN NO WAY CONTINGENT UPON REIMBURSEMENT WITH RESPECT THERETO.

ALL DRAFTS DRAWN HEREUNDER MUST STATE: "DRAWN UNDER STANDARD CHARTERED BANK , ONE MADISON AVENUE 3RD FLOOR, NEW YORK, NEW YORK 10010 LETTER OF CREDIT NO. 777-52-0025081-L DATED MARCH 10, 2004 ." ALL DRAFTS DRAWN HEREUNDER MUST BE ACCOMPANIED BY BENEFICIARY'S CERTIFICATE PURPORTEDLY SIGNED BY AN AUTHORIZED OFFICER OF BENEFICIARY STATING "WE ARE ENTITLED TO DRAW UPON THIS LETTER OF CREDIT PURSUANT TO THE TERMS OF A THIRD AMENDMENT OF LEASE BETWEEN WFP TOWER A CO. L.P. AND LEHMAN BROTHERS INC." PARTIAL DRAWINGS ARE PERMITTED UNDER THIS LETTER OF CREDIT.

WE HEREBY UNDERTAKE THAT ALL DRAWINGS MADE UNDER AND IN COMPLIANCE WITH THE TERMS OF THIS CREDIT NO. 777-52-0025081-L SHALL BE PROMPTLY HONORED IN IMMEDIATELY AVAILABLE FUNDS IMMEDIATELY UPON RECEIPT AT OUR COUNTERS AT ONE MADISON AVENUE, 3RD FLOOR, NEW YORK, NEW YORK 10010 AS PER YOUR PAYMENT INSTRUCTIONS.

THIS LETTER OF CREDIT MAY BE TRANSFERRED BY BENEFICIARY (AND ITS SUCCESSORS) IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND UCP (HEREINAFTER DEFINED).
THE COST OF ANY SUCH TRANSFER SHALL BE PAID BY THE APPLICANT.

IF THE DRAWING REQUEST IS PRESENTED IN COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT TO US AT SUCH ADDRESS PAYMENT WILL BE MADE NOT LATER THAN TWENTY FOUR HOURS FOLLOWING SUCH PRESENTMENT. PAYMENT UNDER THIS LETTER OF CREDIT SHALL BE
MADE IMMEDIATELY AVAILABLE FUNDS BY WIRE TRANSFER TO SUCH ACCOUNT AS MAY BE DESIGNATED BY THE BENEFICIARY IN THE APPLICABLE DRAWING REQUEST.

THIS LETTER OF CREDIT IS SUBJECT TO AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS 1993 REVISION INTERNATIONAL CHAMBER OF COMMERCE, NO. 500  ("UCP") AND IN THE EVENT OF ANY CONFLICT, THE LAWS OF THE STATE OF NEW YORK WILL CONTROL IF THIS CREDIT EXPIRES DURING AN INTERRUPTION OF BUSINESS AS DESCRIBED IN ARTICLE 17 OF SAID PUBLICATION 500. THE BANK HEREBY SPECIFICALLY AGREES TO EFFECT PAYMENT IF THIS CREDIT IS DRAWN AGAINST WITHIN THIRTY (30) DAYS AFTER THE RESUMPTION OF BUSINESS.

---

We hereby engage with you that all documents drawn under and in compliance with the terms of this Letter of Credit will be duly honored upon presentation for payment on or before the expiry date of this Letter of Credit.

This Letter of Credit to be issued subject to Uniform Customs and Practice for Documentary Credits (1993



Revision), International Chamber of Commerce, Publication No. 500.

Standard Chartered Bank

_Yrome Korbije_
Authorized Signature

_[signature]_
Authorized Signature

## EXHIBIT D

### Form of Stipulation of Discontinuance

-26-

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x
WFP TOWER A CO. L.P.,                              Index No. 02-603298

                Plaintiff,

    -against-                                     **STIPULATION**

LEHMAN BROTHERS INC.,
                                                   IAS Part 19
               Defendant.         Hon. Edward H. Lehner
-----------------------------------------------------------------x

      IT IS HEREBY STIPULATED AND AGREED, by and between plaintiff WFP Tower A

Co., L.P., by its attorneys, Friedman Wang & Bleiberg, P.C., and defendant Lehman Brothers

Inc., by its attorneys, Swidler Berlin Shereff Friedman, LLP, that the captioned action and each

and every cause of action therein is hereby discontinued with prejudice and with each party to

bear its own costs.

Dated: New York, New York
      March 2, 2004

FRIEDMAN, WANG & BLEIBERG, P.C.    SWIDLER BERLIN SHEREFF FRIEDMAN LLP


By:_____    By:_____
     Peter N. Wang                             Andrew J. Levander
90 Park Avenue                           The Chrysler Building
New York, New York 10016                 405 Lexington Avenue
(212) 682-7474                           New York, NY 10174
                                         (212) 973-0111

*Attorneys for Plaintiff WFP Tower A Co. L.P.*    *Attorneys for Defendant Lehman Brothers Inc.*

40023lv3

**EXHIBIT E**

**Commission Computation**

A commission shall be computed using the percentages of aggregate rentals set forth in the following schedule:

For the 1st year or any fraction thereof: ................................................................................ 5.00%
For the 2nd year or any fraction thereof: ............................................................................... 4.00%
For the 3rd, 4th and 5th years or any fraction thereof: ......................................................... 3.50%
For the 6th year up to and including the 10th year or any fraction thereof: ............... 2.50%
For the 11th year up to and including the 15th year or any fraction thereof: ............ 2.00%
For the 16th year up to and including the 20th year or any fraction thereof: ............. 1.00%

No commission shall be payable for any additional rent payable (a) by reason of increases in taxes and/or the costs of maintaining or operating the Property or (b) with respect to the furnishing of electric energy to the demised space. Portions of the term during which rent is abated (i.e., so called "free rent") or any landlord's work allowance for the construction and/or alteration of the space demised thereby in excess of market, shall be treated as follows: (i) the total amount of the free rent allowance or excess work allowance shall be averaged evenly over the entire term (starting from term commencement); (ii) the average amount of free rent or work allowance per year shall be deducted from the rent for that year (with the rent during any abatement period deemed to be at the rate per rentable square foot for the next succeeding period during which rent is payable); and the lease commission rates set forth above shall then be applied to the net amount for each year of the term, after the free rent or work allowance has been subtracted.

ffny01\lastme\450047.9

# H A N D   D E L I V E R Y

**FILED / RECEIVED**

SEP 2 2 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

RECEIVED BY: _____

DATE _____

9:18

TIME