# EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Chapter 11** |
| **LEHMAN BROTHERS HOLDINGS INC.,** | ) | **Case No. 08-13555 (SCC)** |
| *et al.,* | ) | **(Jointly Administered)** |
| Debtors. | ) | |
| | ) | |

### REPORT REGARDING EXPERT OPINION OF JUDITH K. FITZGERALD

**Part I.  Qualifications and Background**

**A.      Qualifications**

My Curriculum Vitae is attached hereto and incorporated herein by reference as Exhibit 1.

I will confine this portion of my report to a summary of my qualifications.

I am an attorney in good standing and licensed to practice in the state courts of

Pennsylvania and the federal courts in the Western District of Pennsylvania.  I have also practiced

in the federal courts in the Southern District of West Virginia and the Eastern District of Virginia

on a *pro hac vice* basis.  I am a 1970 graduate of the University of Pittsburgh, and a 1973

graduate of the University of Pittsburgh School of Law.  I was admitted to the Bar of the

Commonwealth of Pennsylvania in 1973.

I took the oath of office as a United States Bankruptcy Judge on October 30, 1987.  I sat

in the Western District of Pennsylvania for over 25 years and during that time, also sat by

designation in the District of Delaware for 20 years, the Eastern District of Pennsylvania for 8

years, and the United States Virgin Islands for 9 years.  I served as Chief Judge in the Western

District of Pennsylvania Bankruptcy Court for 5 years.   My experience on the bench

encompassed business and individual reorganization cases in chapter 11, individual and business cases in chapter 7, individual cases in chapter 13, and family farmer cases in chapter 12.  I adjudicated hundreds of chapter 11 cases and thousands of chapter 13 cases through plan confirmation.  I have considered and ruled on hundreds of motions to approve settlements as stand-alone motions and in conjunction with plan confirmation.  Many of the cases on my docket required a determination of the reasonableness of settlement agreements for the purposes of liquidating and/or paying claims, including assessing whether the agreements were entered into at arm's length and in good faith.

Immediately before I was appointed to the bench, I was an Assistant United States Attorney for the Western District of Pennsylvania for nearly 12 years.  In that capacity, I actively litigated civil, criminal, and bankruptcy cases and argued cases on appeal to the United States Court of Appeals for the Third Circuit.  Prior to my employment with the Office of the United States Attorney, I served as a judicial law clerk.

I retired from my position as a United States Bankruptcy Judge on May 31, 2013.  Thereafter, I accepted an offer as a tenured faculty member at a newly formed law school, the Indiana Tech Law School, from July 8, 2013 through July 5, 2015, where I taught Contracts, Commercial Transactions, and Bankruptcy.  I am currently a Professor of Practice at the University of Pittsburgh School of Law.  Previously I was an Adjunct Professor at the University of Pittsburgh School of Law for many years where I taught Bankruptcy and Advanced Bankruptcy.

On December 1, 2013, I affiliated as Of Counsel with the Pittsburgh based law firm of Tucker Arensberg, P.C. and I have been a shareholder since August 31, 2014.

2

The primary areas of my practice for the past forty years have been complex litigation in bankruptcy, criminal, and civil contexts both as a judge and as a litigator, and teaching and practicing bankruptcy and commercial law. I have received numerous recognitions and honors including honorable mention as one of the top ten bankruptcy judges in history by Law 360, the Lawrence P. King Award for Excellence in the Field of Bankruptcy, election to the American Law Institute, election to the American College of Bankruptcy, recognition for dedicated judicial service by both the Western Pennsylvania Trial Lawyers Association and by the Debtors' Bar Association, the naming of a chapter of the American Inn of Court in my honor, various awards from the National College of Bankruptcy Judges and others.

Regarding the opinion I have been asked to render, my experience has been informed by the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, and the Federal Rules of Bankruptcy Procedure (and cases interpreting same) which (1) require the bankruptcy court to rule on motions to approve settlements brought pursuant to Federal Rules of Bankruptcy Procedure 9019 and 9033 and as part of the plan confirmation, plan implementation, and post-confirmation matters that are brought before the court and (2) address the duties of trustees and debtors-in-possession regarding matters affecting the bankruptcy estate. From time to time I also considered the general standards applicable to settlements of class actions under Federal Rule of Civil Procedure 23. As a Bankruptcy Judge who sat in four jurisdictions, I examined and ruled on hundreds of settlement agreements that emanated from those jurisdictions and that were often affected by laws or interpretations thereof, as well as from many other states and territories of the United States and, from time to time, from foreign jurisdictions. I presided over bankruptcy cases in which indenture trustees, bond trustees, mortgage servicers, and other representatives or agents of loan parties appeared. In addition, as a practitioner, I have prepared, submitted, and advised

3

clients both in Western Pennsylvania and in various jurisdictions throughout the United States regarding settlement agreements and have prosecuted settlement agreements in various bankruptcy courts. As a professor of law, I have taught students about the requirements for entering into and gaining bankruptcy court approval of settlement agreements and about the nature of duties of trustees, debtors-in-possession, and creditors' committees, and I have been a speaker and panelist numerous times where I addressed such issues. I have also served as a court-appointed receiver, where I dealt with contractual, statutory and common law duties in connection with charitable organizations and the obligations owed to the public regarding the charity's assets. My collective experience gives me the necessary background and expertise to address the matter on which I have been asked to opine.

As a United States Bankruptcy Judge addressing the reasonableness of settlements, I attended to the applicable law, gained an understanding of the provisions of the settlement and the facts that supported or failed to support the necessity or advisability of the settlement, assessed the likelihood that the parties could comply with the terms of the settlement, balanced the benefit of the settlement with the burdens created thereby, addressed whether the settlements were made in good faith and/or were arm's length transactions, evaluated the business judgment behind the settlement and, in some circumstances, whether the settlement comported with fiduciary obligations owed to the bankruptcy estate. I have also conducted numerous estimation hearings and addressed estimation issues in many cases. I applied a similar methodology in reaching my opinion in this matter, recognizing, however, that the RMBS Trustees' contractual duties to both known and unknown investors are assigned by the governing documents.

**B.     Compensation**

My compensation for this matter is $900 per hour plus expenses.  Other attorneys at Tucker Arensberg, P.C., acting under my instruction and control, charge rates which vary from $225 - $700 per hour.  Paralegal rates range from $100 to $200 per hour.  Hourly rates are subject to an annual adjustment.  My compensation is not based on the opinions I render in, or the outcome of, this matter.

**C.     Expert Testimony In The Past Four Years**

- In December 2016, I testified as an expert witness in the trial of *Mine Safety Appliances Company v. The North River Insurance Company,* in the Bankruptcy Court of Common Pleas of Allegheny County, Pennsylvania, Civil Division No.  G.D. 10-007432.

- In July 2014, I testified as an expert witness at a discovery deposition in the case of *United States Fidelity & Guaranty & Co. et al. v. American Re-Insurance et al.*, Index No. 604517/2002, pending in the Supreme Court of the State of New York, New York County.

- In October 2015, I testified as an expert in the arbitration proceeding in *Ponderosa Pine Energy, LLC v. Tenaska Energy, Inc*., *et al.*, in Dallas, Texas.

- In October 2015, I testified as an expert witness (via video) in the matter of *Susan McMahon v. Medical Protective Company*, No. 13-CV-0991-JFC (WDPA), in the United States District Court for the Western District of Pennsylvania.

- In October 2015, I testified in a discovery deposition in the matter of *Gregory S. Hancock v. Scott R. Goldberg, et al.*, No. CV 2014-003367, pending in the Superior Court of the State of Arizona, in and for the County of Maricopa.

**D.     Publications In The Past Four Years**

- *Oh Dear! What Can The Matter Be? What Will Become Of My Oil And Gas Lease In Bankruptcy?*, in process of publication by Energy & Mineral Law Institute (co-author with James W. Kane)
- *The Powers of The U.S. Congress: Where Its Constitutional Authority Begins and Ends*, in progress with Brien Hallett as primary author, to be published by ABC-CLIO (co-author of Chapter 5, The Power to Regulate Bankruptcies with Professor Nancy Marcus)

- Commercial Law League and Tucker Arensberg Blogpost: "Third Circuit Rules that A Homeowner's Mortgage Insurance Obligation Is Not Modified By A Mortgage Modification" (Mar. 2017)
- Commercial Law League and Tucker Arensberg Blogpost: "Alternative Dispute Resolution (ADR): Is it Right for You?" (Jan. 2016)
- Commercial Law League Blogpost: "The Last Screen: A Cautionary Tale" (Nov. 2015)
- Commercial Law League Blogpost: "Growing Medical Marijuana, Problematic In Bankruptcy, and Out" (Aug. 2015)
- The National Edition, Rutter Group, *Practice Guide, Bankruptcy* (2010 - present) (co-editor)
- *Planning for the Time of Trouble: Cabrera v. Collazo, A Case in Point,* Commercial Law World Magazine, Summer 2014

**E.    Material Reviewed**

The documents on which I specifically relied are cited in this Report. I have been provided with every document I requested.

**F.    Summary Of Opinion**

Lehman Brothers Holdings, Inc. ("LBHI" or "Debtor") and certain LBHI affiliated Debtors filed for bankruptcy relief under chapter 11 of the Bankruptcy Code in 2008, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), administratively consolidated at Case 08-13555 (the "Bankruptcy Proceeding"). In connection with the Bankruptcy Proceeding I have been retained by counsel to the RMBS Trustees[1] to offer an independent opinion on the reasonableness of the settlement agreement between LBHI and the "Institutional Investors"[2] dated November 30, 2016, as modified March 17, 2017 (the "RMBS

---

[1] The "RMBS Trustees" are (1) U.S. Bank National Association, (2) TMI Trust Company, successor to Law Debenture Trust Company of New York, (3) Wilmington Trust Company and Wilmington Trust, National Association, and (4) Deutsche Bank National Trust Company (collectively, the "RMBS Trustees").

[2] The "Institutional Investors" are fourteen institutional investors represented by Gibbs & Bruns LLP as signatories to the RMBS Settlement: Aegon USA Investment Management, LLC; Blackrock Financial Management, Inc.; Cascade Investment, L.L.C.; Federal Home Loan Bank Of Atlanta; Goldman Sachs

Settlement") Doc. 55096 Exhibit "B," as a means of resolving the RMBS Trustees' claims in the Bankruptcy Proceeding submitted through the Protocol (as defined below) (the "RMBS Claims") on behalf of each Trust[3] and against LBHI.[4]  I note at the outset that although some settlements arrive at an agreed upon dollar amount to be paid by one party to another, this one does not do so. There is no agreement on the amount of the allowed RMBS Claims and the parties' views are very far apart.[5]  I am evaluating the RMBS Settlement which provides a process to determine the allowed amount of the RMBS Claims.

To reach my conclusions, I:

- familiarized myself with relevant pleadings and documents filed in or related to the Bankruptcy Proceeding;

- reviewed the RMBS proofs of claim and various governing agreements upon which those claims were based;

- read reports of certain expert witnesses regarding the RMBS Claims;

- reviewed the opinions of the presiding Bankruptcy Judge;

---

Asset Management, L.P.; Invesco Advisers, Inc.; Kore Advisors, L.P.; Metropolitan Life Insurance Company; Pacific Investment Management Company, LLC; Sealink Designated Activity Company, Through Its Investment Manager Neuberger Berman Europe Limited; The TCW Group, Inc., on behalf of itself and its subsidiaries; Thrivent Financial for Lutherans; Voya Investment Management LLC; and Western Asset Management Company.

[3] The RMBS Settlement applies to 244 Trusts as listed in Exhibit "A" to the RMBS Settlement (referred to hereafter as the "RMBS Trusts").  The 244 Trusts exclude transferor loan Trusts as well as Trusts that have terminated.  Since the list was compiled one additional Trust terminated reducing the number to 243, and there are five Trusts that contain loans for which no claims were submitted through the Protocol: (i) ARC 2004-1; (ii) SAIL 2004-4; (iii) SASCO 2005-11H; (iv) SASCO 2006-RF1; and (v) SASCO 2007-RF1. These five RMBS Trusts would receive no allocation.  The number of RMBS Trusts included in the RMBS Settlement may continue to decrease.

[4] Additional claims were submitted by the RMBS Trustees against certain of LBHI's affiliated debtors (collectively, the "LBHI Debtors"), but they are not subject to this opinion.

[5] For instance, in its objection to the RMBS Reserve Motion, Lehman averred that the established $5 billion reserve was "more than double in size to the $2.4 billion reserve proposed by its estimation motion, and almost five times Lehman's low end estimate for the RMBS Claims." Doc. 46525, p. 32, ¶58.  LBHI also asserted that there were "compelling arguments for *lowering the reserve by at least 50%,* including comparisons with benchmarks set in prior settlements of similar claims brought by the same RMBS Trustees against different RMBS sponsors." *Id.* p. 24, n. 16.

- reviewed the opinion on appeal involving other claims submitted by the RMBS Trustees;

- reviewed the protocol established per the Bankruptcy Court for the review and resolution of the RMBS Claims (the "Protocol");

- evaluated the substantial costs and protracted time required to comply with the Protocol;

- reviewed case law regarding settlements, claims objections, claims estimations, and other relevant bankruptcy and non-bankruptcy law; and

- reviewed information concerning the merits of the RMBS Settlement as well as a prior, withdrawn settlement offer.

I also reviewed the version of the November 30, 2016 settlement agreement (the "November Version") reached by LBHI and the Institutional Investors (which held a large economic stake and worked with LBHI in arriving at the RMBS Settlement). I considered the RMBS Trustees' receipt of the terms of the settlement and ensuing discussions with LBHI to, *inter alia,* improve the terms for the benefit of the investors including requiring notice to the investors, adding certain appeal rights, and developing the litigation process in Exhibit "G."[6] Finally, I considered the terms of the RMBS Settlement itself, relative to alternatives in the event that the RMBS Settlement offer is rejected.

---

[6] A settlement offer (of which I was provided a copy) proposed by LBHI and dated as of October 26, 2015 (the "2015 Proposal") was presented to the RMBS Trustees. The RMBS Trustees retained and consulted with experts to advise them regarding the adequacy of that offer as to each Trust. On April 6, 2016, LBHI withdrew the 2015 Proposal. Of relevance is the fact that the 2015 Proposal offered to allow the RMBS Claims in the gross amount of $2.44 billion (the net would be calculated based on certain deductions specified in the offer) on the condition that all affected Trusts accepted the offer. If 100% acceptance by the Trusts was not attained, then reductions would apply to the allowed claims. The offer also required a minimum level of participation by the Trusts, without which the 2015 Proposal could be terminated by LBHI. Under the RMBS Settlement, certain non-monetary terms of the withdrawn offer have been enhanced as more fully explained *infra*.

8

Among other things, a Chapter 11 bankruptcy affords parties the opportunity to negotiate to resolve disputed claims. As noted, LBHI and the RMBS Trustees have been unable to agree on the allowed amount of the RMBS Claims and are billions of dollars apart. The Trustees proposed a statistical sampling process to resolve the RMBS Claims. LBHI insisted that the process had to be loan-by-loan despite the cost and delay involved. Judge Chapman agreed with LBHI, stating that she would not estimate the RMBS Claims and imposed the Protocol, but did not then provide parameters for any claims litigation that might ultimately be required. Transcript of Hearing, Dec. 10, 2015, at 109:17 -110:5 (Doc. 49007).

Exhibit "G" to the RMBS Settlement sets up the litigation process the parties have agreed upon, assuming the Bankruptcy Court concurs, and removes the uncertainty as to what the process will be and when it will begin. In my opinion, Exhibit "G" provides a fair and practical way to timely go about resolving the RMBS Claims, abating the risk that RMBS Claims will not have a source of payment and enabling RMBS Claims to be paid sooner rather than later.[7]

The November Version proposed by LBHI and the Institutional Investors did not afford the Certificate Holders (the investors including the Institutional Investors are collectively referred to as the "Certificate Holders") the opportunity to comment before the RMBS Trustees accepted or rejected the settlement proposal. Moreover, the RMBS Trustees were not afforded the ability to provide investors with information regarding the terms of the November Version (including their initial allocable percentage) prior to acceptance. Notice is a critical element for settling claims in bankruptcy. The RMBS Settlement now enables notice to be given and the RMBS Trustees have caused notice to be given. Several Certificate Holders have provided comments to

---

[7] Section 3.06 of the RMBS Settlement provides that the distributions on account of any allowed RMBS Claim are to be made in accordance with the Governing Agreements.

9

the RMBS Trustees as the result of the notice of the RMBS Settlement, and I have reviewed and considered those comments.

The November Version had no rights of appeal for any party but as the result of negotiations by the RMBS Trustees the RMBS Settlement now provides limited appeal rights to the RMBS Trustees, as described in more detail below.  In considering the overall settlement and the relative importance of appeal rights, this change is an enhancement.

It is my opinion, to a reasonable degree of professional certainty, that the RMBS Settlement sets forth a reasonable methodology to liquidate the disputed RMBS Claims, and that entry into the RMBS Settlement, in the circumstances of this Bankruptcy Proceeding, would be appropriate for all RMBS Trusts except for the five identified in note 3 *supra*.

**G.      Summary Of Methodology, Materials Reviewed and Factors Considered in Reaching My Opinion**

My methodology in assessing the RMBS Settlement and rendering this opinion was to apply my 25 years of experience as a Bankruptcy Judge, along with my knowledge of the law from teaching as well as from my experience in practice since leaving the bench, to evaluate the nature of the dispute, the intricacies of the bankruptcy process in addressing such disputes and the reasonableness and sufficiency of the terms of the RMBS Settlement itself.

In light of the fact that the Bankruptcy Court must approve the RMBS Settlement under the provisions of Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and appellate cases that impose standards for applying Rule 9019, I utilize an analysis that draws upon that Rule and those standards.

In concert with the Rule 9019 factors, in reaching my opinion I also considered the litigation positions of LBHI in disputing the RMBS Claims and the cost, time and efforts of the RMBS Trustees in pursuit of the RMBS Claims. I further considered the opinions of other experts retained by the RMBS Trustees, as well as applicable law regarding residential mortgage backed securitization trusts[8] and settlements by RMBS trustees.[9]

Finally, to assess the benefit of the RMBS Settlement to the Certificate Holders, (as defined below), in addition to what is set forth above, I:

- reviewed the representations and warranties alleged to have been breached[10] and evaluated the difficulty, time and expense required to prove breaches without the certainty provided by Exhibit "G" to the RMBS Settlement;

- considered the actions undertaken by the RMBS Trustees to ascertain the allowed amount of the RMBS Claims arising pursuant to the Governing Agreements, as defined below, with respect to breaches of representations and warranties;

- took note of the significant effort undertaken by RMBS Trustees in negotiating certain changes to and entering into the RMBS Settlement and the changes made

---

[8] I have been told to assume that the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. § 77aaa, *et seq.* would apply to only six of the RMBS Trusts at issue. The RMBS Trusts that are governed by the TIA are: RLT 2008-AH1; SASCO 2003-GEL1; SASCO 2003-NP1; SASCO 2004-GEL2; SASCO 2004-GEL3; and SASCO 2004-NP1 (collectively the "Indenture Trusts"). With respect to trusts not governed by a trust indenture, the certificates issued in New York trusts that utilize governing agreements like those here are excluded from the Trust Indenture Act under Section 304(a). *Ret. Bd of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 169 (2d Cir. 2014), *cert. denied* 136 S.Ct. 796, 193 L.Ed.2d 711 (2016); *accord Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*, 172 F. Supp. 3d 700, 707-707, fn. 1 (S.D.N.Y. 2016).

[9] Courts analyzing settlements focus on the actions of a trustee under applicable trust documents and non-bankruptcy law. The factors typically include whether: (1) the trustee assessed ability to collect on any judgment; (2) the trustee obtained advice of experts; (3) the experts were provided with the necessary information; (4) the trustee acted in accord with the governing agreements and not in self-interest; (5) the trustee gave notice to investors and considered their views; and (6) the settlement is the result of arm's length negotiations. *See, e.g., In re U.S. Bank N.A. v. Federal Home Loan Bank of Boston*, Case No. 652382/2014, 2015 N.Y. Misc. LEXIS 5003 (N.Y.S. 2015); *Bank of New York Mellon v. Ret. Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago,* 127 A.D.3d 120, 4. N.Y.S.3d 204 (N.Y.S. 2015); *In re U.S. Bank Nat. Ass'n,* 51 Misc. 3d 273, 27 N.Y.S.3d 797 (N.Y.S. 2015); *In re Residential Capital, LLC*, 497 B.R. 720 (Bankr. S.D.N.Y. 2013).

[10] At my request the RMBS Trustees provided me with a summary of the ten most common representations and warranties on which the RMBS Claims are based.

for the benefit of the Certificate Holders that resulted from RMBS Trustees' participation in the negotiations;

• factored in the Bankruptcy Court Order Approving and Establishing Notice Procedures (Doc. 55154), the notices of settlement transmitted to Certificate Holders, and the notices of the 9019 Motion (as defined below) and response deadlines and hearing date, transmitted to Certificate Holders;

• recognized that the RMBS Settlement provides that distributions will be made in accordance with the Governing Agreements (*see, e.g.,* Doc. 55232, p. 16, ¶3.06);

• considered the recommendation of the Institutional Investors; and

• considered the comments provided by other Certificate Holders as of the date of this Report.

At the conclusion of my analysis, I formed the opinion summarized above to a reasonable degree of professional certainty.

## Part II.        Analysis

### A.        Overview

I was retained to provide an independent opinion regarding the reasonableness of the RMBS Settlement as a means of resolving the RMBS Trustees' claims on behalf of each RMBS Trust (as defined below) against LBHI.  Only those RMBS Claims submitted pursuant to the Protocol and against LBHI are at issue here.

I spoke with counsel for the RMBS Trustees to gain an understanding of the nature of the litigation involved in the Bankruptcy Proceeding that led to the RMBS Settlement.  I considered the opinions of other experts that advised the RMBS Trustees, and, should the RMBS Trustees decide to reject the RMBS Settlement, the cost in terms of the time and delay that would result from their efforts to establish the dollar amount of the RMBS Claims, recover the distributions,

and pay the Certificate Holders as well as the fees and expenses incurred and likely to be incurred.

**B.      Factual Background Of The Dispute**

**1.  The RMBS Transactions**

Before filing bankruptcy, LBHI and certain LBHI affiliates, including Structured Asset Securities Corporation ("SASCO"), were the sellers, sponsors or depositors for 406 residential backed mortgage securitizations (commonly referred to as "RMBS" transactions) each involving a trust ("Trust"), whereby the LBHI Debtors "pooled" and sold or contributed approximately 1.8 million mortgage loans into the Trusts (the "Mortgage Loans").   The Honorable Shelley C. Chapman (who, following Judge James Peck's retirement, was assigned as the presiding judge in the Bankruptcy Proceeding) described this process in an unrelated Memorandum Decision "Overruling Debtors' Objection to CMBS Claims and Denying Request For Subordination Pursuant To Sections 510(a)-(c) Of The Bankruptcy Code" in the LBHI Bankruptcy Proceeding:

> Here, the MBS were packaged, "issued," marketed, and sold by the Debtors through a securitization process in which LBHI assembled collections of mortgage loans (footnote omitted) and then transferred the pooled mortgages to SASCO.    Although the collections of pooled mortgages ultimately were deposited in non-debtor securitization trusts (the "Trusts") by SASCO, because the Trusts were vehicles with no reporting obligations, employees, officers, or directors, they were referred to under federal securities rules and regulations only as "issuing entities." (*Cita*) [Objection at ¶¶ 9-10].   The Trusts provided MBS certificates to SASCO, which served as the "depositor" for the MBS and, under the federal securities laws, also was considered the "issuer" of the MBS. [footnote omitted].    SASCO then sold the certificates to investors through underwriters.

*In re Lehman Bros. Holdings, Inc*., 513 B.R. 624, 627-28 (Bankr. S.D.N.Y. 2014).

13

The certificates were issued to the Certificate Holders.  The monthly mortgage payments and other proceeds from the Mortgage Loans are collected by the servicer.[11] Those funds are used to pay certain trust expenses and thereafter to pay interest and principal to Certificate Holders based upon the distribution provisions of various agreements (the "Governing Agreements") which include Trust Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Sale and Assignment Agreements and/or other pooling and/or servicing agreements related to the Trusts.

In connection with the sale, sponsor or deposit arrangements, LBHI and certain LBHI affiliates entered into the Governing Agreements that contain representations and warranties by the selling entities to the Trusts relating to the quality and nature of the Mortgage Loans, the borrowers, and the underlying mortgaged properties.  The Governing Agreements establish the requirements that trigger repurchase obligations and set forth the respective rights and obligations of the parties.  Under the Governing Agreements, the LBHI Debtors were obligated, *inter alia,* to

---

[11]   Servicers are not selected by the Trustees.  The servicer performs services related to the Mortgage Loans themselves.  Those functions may include:
- Collection of interest and principal on loans
- Making required advances
- Investor accounting and reporting (e.g., taxes and escrow)
- Escrow management for taxes and insurance
- Cash management
- Customer services
- Collection of outstanding payments and/or foreclosure activities
- Loan modification determinations

Thomas P. Lemke, Gerald T. Lins & Marie E. Picard, Mortgage-Backed Securities: Developments and Trends in the Secondary Mortgage Market §12.6 (2016-2017 ed. 2016)("Mortgage-Backed Securities").

replace or repurchase Mortgage Loans under certain circumstances as set forth therein. The

repurchase price is set in the Governing Agreements and is defined as the "Purchase Price." [12]

### 2. Selected Bankruptcy Matters

As noted above, the Bankruptcy Proceeding began in 2008. On July 2, 2009, the

Bankruptcy Court set a bar date of September 22, 2009 (the "Bar Date"), for filing claims. *See*

"Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3)

Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice

Thereof and Approving the Proof of Claim Form" (Doc. 4271) (the "Bar Date Order"). Prior to

the Bar Date, the RMBS Trustees filed proofs of claim alleging breaches by LBHI and SASCO[13]

of certain representations and warranties set forth in the Governing Agreements concerning the

Mortgage Loans held by the Trusts. Notices were provided to the Certificate Holders of the filing

of the proofs of claim, as well as other activities in the bankruptcy case, including recently

---

[12] *See, e.g.,* Trust Agreement, dated as of April 1, 2007 for BNC Mortgage Loan Trust 2007-2 Mortgage Pass-Through Certificates Series 2007-2, §1.01, p. 48 ("2007-2 Trust Agreement") which defines "Purchase Price" as follows:

> Purchase Price: With respect to the purchase of a Mortgage Loan or related REO Property pursuant to this Agreement, an amount equal to the sum of (a) 100% of the unpaid principal balance of such Mortgage Loan; (b) accrued interest thereon at the applicable Mortgage Rate, from the date as to which interest was last paid to (but not including) the Due Date in the Collection Period immediately preceding the related Distribution Date; (c) the amount of any costs and damages incurred by the Trust Fund as a result of any violation of any applicable federal, state or local predatory- or abusive-lending law arising from or in connection with the origination of such Mortgage Loan; and (d) any unreimbursed Servicing Advances with respect to such Mortgage Loan. The Master Servicer, the Servicer, the Custodian (or the Trustee or the Securities Administrator, if applicable) shall be reimbursed from the Purchase Price for any Mortgage Loan or related REO Property for any Advances made or other amounts advanced with respect to such Mortgage Loan or related REO Property that are reimbursable to the Master Servicer or the Servicer under this Agreement or the Servicing Agreement (or to the Trustee or the Securities Administrator, if applicable), together with any accrued and unpaid compensation due to the Master Servicer, the Securities Administrator, the Servicer, the Custodian or the Trustee hereunder or thereunder.

[13] There are no claims against SASCO involved in the RMBS Settlement.

published notices regarding the RMBS Settlement.[14]   The LBHI Debtors filed and, by Order

dated December 6, 2011 (Doc. 23023) ("Confirmation Order"), had confirmed the "Modified

Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated

Debtors" dated August 31, 2011, as subsequently supplemented, amended or modified, including

by the Plan Supplement (the "Plan").   The Modified Third Amended Joint Chapter 11 Plan of

LBHI at Doc. 22737 was updated with additional modifications at Doc. 22973, Exhibit "A," filed

on December 5, 2011.   The Plan became effective on March 6, 2012.[15]   LBHI is the Plan

Administrator for the Plan.   Twelve distributions have been made to creditors as provided under

the Plan.[16]   No distributions have been made to the RMBS Trustees on account of the 244 RMBS

Trusts inasmuch as the claims made by the RMBS Trustees are disputed.   With respect to setting

a reserve and the payment of disputed claims, the Plan contained the following provision in

Section 8.4 "Disputed Claims Holdback":

> On the date of the first Distribution that is at least forty-five (45) days (or
> such fewer days as may be agreed between the applicable Debtor and the
> holder of the applicable Disputed Claim) after the date on which a
> Disputed Claim becomes an Allowed Claim against a Debtor, such Debtor
> shall remit to the holder of such Allowed Claim Available Cash equal to the
> amount that would have been distributed from the Effective Date
> through and including the date of such Distribution on account of such
> Allowed Claim had such Claim been Allowed as of the Effective Date

---

[14] *See, e.g.,* "Notice to the Holders of Certificates Issued by Structured Asset Securities Corporation
Mortgage Pass-Through Certificates, Series 2005-4XS", by Wilmington Trust (April 20, 2015);  "Notice
Regarding Receipt of a Settlement Offer Concerning Certain Claims Against the LBHI Debtors Belonging
to the RMBS Trustees, Dated March 20, 2017" at: http://www.lbhirmbssettlement.com/notice.php; and
"Notice Providing Further Information About The Proposed RMBS Trust Settlement Agreement, Dated
As Of November 30, 2016, And Modified As Of March 17, 2017 (The "Proposed Settlement
Agreement"), From Lehman Brothers Holdings, Inc. And All Affiliated Debtors (The "LBHI Debtors")"
dated April 21, 2017, at: http://www.lbhirmbssettlement.com/2d_Notice.pdf.

[15] *See* "Notice Of Effective Date And Distribution Date In Connection With The Modified Third
Amended Joint Chapter 11 Plan Of Lehman Brothers Holdings Inc. and Its Affiliated Debtors."  Doc.
26039.

[16] *See* "Notice Regarding Twelfth Distribution Pursuant To The Modified Third Amended Joint
Chapter 11 Plan Of Lehman Brothers Holdings Inc. and Its Affiliated Debtors."  Doc. 55129.

together with any interest earned on the lesser of (i) such amount and (ii) the amount retained with respect to such Claim pursuant to this provision, [i]n each case, but only the extent that such interest is attributable to the amount of the Allowed Claim; *provided,* that (x) such amount shall be paid first out of Available Cash retained on account of such Allowed Claim and second out of Available Cash other than Available Cash retained on account of other Disputed Claims and (y) if the amount available for Distribution pursuant to the foregoing clause (x) is insufficient to remit all Distributions required to be made to such holder pursuant to this sentence, such holder shall receive the amount of such insufficiency on the next subsequent date(s) of Distribution before the holders of any other Claims against such Debtor receive any further Distributions out of Available Cash (other than Available Cash retained on account of other Disputed Claims) from such Debtor.

Doc. 23023-1, p. 88 - 89.

On March 14, 2011, LBHI filed the "One Hundred Ninth Omnibus Objection to Claims (Insufficient Documentation)" ("Claims Objection") (Doc. 15008) seeking to disallow and expunge the RMBS Claims, among others, on the basis that the RMBS Trustees violated the Bar Date Order by not providing sufficient supporting documentation or information.[17] LBHI also sought to disallow and expunge thousands of Mortgage Loans from the RMBS Claims arguing that the RMBS Claims lacked sufficient detail to state a valid *prima facie* claim. Doc. 15008, p. 2, ¶ 2. LBHI subsequently averred that approximately 4,700 mortgage loans were identified as having claims for breaches and that the remaining claims had insufficient detail. The 4,700 mortgage loan breaches resulted in claims of $209 million. However, LBHI asserted that the remaining claims failed to identify any claim amounts or provide any documentation supporting liability, as required by the Bar Date Order and the underlying Governing Agreements. Doc. 46526, p. 21, ¶ 29. The Bankruptcy Court deferred ruling and stated it would schedule an

---

[17] LBHI filed other claims objections to the RMBS Claims at Docs. 14492, 14493, 14494 and 16079.

evidentiary hearing upon the request.  Transcript of Hearing, June 30, 2011, at 70:19-72:5 (Doc. 18251).

### 3. The Estimation Motions, The Reserve, The Protocol and The First Settlement Offer, Which Was Withdrawn By LBHI

In January 2012, LBHI filed a motion to estimate the RMBS Claims at $2.4 billion (the "Estimation Motion") for purposes of establishing the claims reserve as required under the Plan. Doc. 24254.  LBHI alleged that the value of the RMBS Claims, if proven, would be between $1.1 billion and $2.4 billion.  The RMBS Trustees filed objections to the Estimation Motion, alleging that the claims should be estimated at $15 billion for reserve purposes. (Docs. 24484, 24485, 24491; *See also* Docs. 24476, 24483 and 24492 that sought different amounts for reserve purposes.

The parties took the same positions at the hearing on the Estimation Motion on January 26, 2012, before Judge Peck.  At the conclusion of the hearing, Judge Peck declined to rule because, to reach a factual determination on the "right number," he would need, among other things, additional testimony and evidence.  The Judge stated:

> I suspect that all of this is much more art than it is science; that there is no one clearly correct estimate of a future that hasn't yet unfolded . . . .

Transcript of Hearing, Jan. 26, 2012, at 85:21-23 (Doc. 24756).

Judge Peck instructed the parties to reach a settlement on an "agreed number" because "the amount of the reserve impacts other creditors in a material way" and all creditors would benefit from "an agreement concerning a fair and appropriate estimate for these claims." Transcript of Hearing, Jan. 26, 2012, at 84:14-86:7 (Doc. 24756).  The Estimation Motion was consensually resolved by agreement of the parties as reflected in the "Reserve Order" dated

18

February 22, 2012, which estimated the RMBS Claims at $5 billion for reserve purposes.[18]  Doc. 25643.

So as to establish the RMBS Claims, the Trustees entered into agreements with various experts to conduct a loan review based upon statistical sampling.  In May 2013, the RMBS Trustees retained Duff & Phelps LLC, ("Duff & Phelps") to "(a) review the sampling and selection work performed by Cowen,[19] (b) review and analyze the procedures followed and findings made by Digital Risk,[20] and (c) opine on the amount of the RMBS Trusts' claims, based on its review and analysis."  Duff & Phelps completed its analysis in August 2014.  *See* Doc. 53730, p. 17, ¶¶ 47, 48.

On August 22, 2014, after receiving the Duff & Phelps' analysis, the RMBS Trustees filed a Motion to Increase the Reserve (1) to $12.143 billion and (2) to Estimate and Allow Their Claims for Covered Loans[21] at $12.143 Billion Pursuant to § 502(c) of the Bankruptcy Code (the

---

[18] From a $5 billion reserve amount, 95% was for claims against LBHI with 5% for claims against SASCO.  The $5 billion reserve has been reduced to $4.75 billion to exclude claims against SASCO.  Doc. 53163.

[19] Cowen & Company, LLC is "a financial services firm with expertise in the mortgage origination sector, [retained] to construct a random sample to produce a statistically sufficient estimate of the overall breach rates for the Covered Loans at issue."  Affidavit of Edmond Esses from Duff & Phelps.  (Doc. 53732, p. 4, n 8).

[20] Digital Risk LLC "was primarily responsible for communicating with the master servicers to retrieve the 5,000 loans that constituted the Sample from the applicable servicers."  Doc. 53732, p. 4, n. 8.  Digital Risk holds itself out as "an independent third-party reviewer that performs due diligence on loans contained in securities" whose "diversified solutions address each phase of the mortgage life cycle while evaluating and monitoring mortgage exposure at the loan level to provide invaluable insight of the key reasons for – and indicators of – credit fraud and operations risk to predict and to manage loan performance as well as help prevent repurchase risk."  *See* http://www.digitalrisk.com/solutions (last visited May 25, 2017).  Digital Risk states that is has successfully completed "over $800 million of rigorous loan reviews for the GSE's. . . ." *See* http://www.digitalrisk.com/services/quality-control (last visited May 25, 2017).

[21] At that time, "Covered Loans" were Mortgage Loans as to which the RMBS Trustees aver LBHI would have "liability for material breaches of the representations and warranties made on those loans."  Doc. 46078, p. 10, ¶ 2.  Since that time additional Mortgage Loans have been identified.  *See* Doc. 52342.

"Reserve Motion"). Doc. 46078. The Reserve Motion applied to 255 Trusts.[22] Doc. 46078, p. 10, ¶ 3.

Submitted with the Reserve Motion was the Declaration of James H. Aronoff, then Managing Director of Duff & Phelps, who described "Breach Findings"[23] and concluded that they adversely and materially affected the value of the Mortgage Loans underlying the Covered Trusts. Doc. 46085, p. 5, ¶ 10. Also appended was the Declaration of Charles A. Parekh, Ph.D., of Duff & Phelps dated August 21, 2014 (Doc. 46080). Dr. Parekh's declaration reflected that Duff & Phelps had analyzed claims related to breaches in 255 RMBS Trusts that had closed on or after September 15, 2002 ("Covered Trusts"), by sampling 5,000 loans from a population of 149,568 Mortgage Loans. The declaration averred that the sampling analysis was valid, because the sample that been selected for review was based upon a sound methodology including (1) in a manner to produce unbiased results, (2) of a sufficient size to provide a confidence level of 95%, (3) with results that could be extrapolated to the corresponding loan population, and (4) by determining breach rates that could be used to accurately estimate repurchase claims. Further, the sampling reflected that the Covered Loans in the "Covered Trusts had realized losses of $15.680 billion and were estimated to suffer an additional $5.548 billion in Projected Losses." Doc. 46080, p. 7. Finally, Dr. Parekh concluded that a loan-by-loan review by the Bankruptcy Court

---

[22] Since that time, 12 of these Trusts have terminated.

[23] The "Breach Findings" were divided into four major groupings: "(a) Borrower Credit Breach Findings (i.e. findings related to the credit history of a borrower); (b) Borrower Capacity Breach Findings (i.e. findings regarding the ability of a borrower to fulfill financial obligations); (c) Collateral Breach Findings (i.e. findings that relate to the property securing the mortgage loan); and, (d) Compliance Breach Findings (i.e. findings regarding a failure to comply with the related legal and regulatory requirements pertaining to the origination of a mortgage loan). Doc. 45085, pp. 13 -16, ¶¶ 29 - 38. Exhibit "D" set forth the 44 subcategories, with a breach count within each subcategory. Doc. 46085-4. Exhibit "E" contained a description of the "Breach Finding Categories." Doc. 45085-5.

would cost $250 million and involve many years of professional and court time.[24]  Doc. 46080, p.

26.

On October 15, 2014, LBHI filed a cross-motion to implement a claims resolution

protocol to resolve the RMBS Claims (the "Cross-Motion").  Doc. 46526.  LBHI averred that

"with respect to approximately 65% of all mortgage loans for which the RMBS Trustees asserted

a claim, the material representations were made by parties unaffiliated with LBHI, and

accordingly, LBHI bears no, or extremely limited, potential liability."  Doc. 46526, p. 27, ¶46.

LBHI asserted that to "require LBHI to compensate the trusts for their losses, the Governing

Agreements specifically require RMBS Trustees to prove each of the following for each

mortgage loan: (1) a breach of a representation and warranty; (2) that the breach materially and

adversely affected the value of the mortgage loan; and (3) that prompt notice of the breach was

provided to LBHI."  Doc. 46526, p. 26, ¶43.  LBHI further protested the RMBS Trustees had had

at least "seven years to comply with the letter and spirit of the underlying [G]overning

[A]greements [ ] which required the RMBS Trustees to identify and present to LBHI or SASCO

those loans containing alleged deficiencies.  Yet the RMBS Trustees repeatedly failed to do so."

Doc. 46526, p. 10 - 11, ¶ 1 - 2.

LBHI argued that the RMBS Trustees were contractually bound by, and legally precluded

from contesting, the $5 billion amount of the reserve.  LBHI also asked the Bankruptcy Court to

require the RMBS Trustees to prove the losses on the RMBS Claims on a loan-by-loan basis.

LBHI averred that the Bankruptcy Court had established ADR procedures pursuant to an

Alternative Disputes Resolution Procedures Order for Indemnification Claims of the Debtors

---

[24] The Trustees submitted over 90,000 RMBS Loans under the Protocol.  Of those, LBHI has agreed
that approximately 1000 are worthy of recompense.

Against Mortgage Loan Sellers (Doc. 45277) to facilitate the resolution of LBHI's claims against thousands of counter-parties that allegedly sold certain LBHI Debtors the deficient Mortgage Loans.  Doc. 46526, p. 11, ¶ 3.  LBHI asserted that a determination on a loan-by-loan basis was what was required by the Governing Agreements.  Doc. 46526, p.15, ¶ 13.

LBHI pointed to statements they attributed to Judge Peck, who was the presiding judge, that the RMBS Trustees would be required to prove residential and mortgage loan breaches. *See* Transcript of Hearing, June 30, 2011, at 71:11-16 (Doc. 18251).  LBHI apparently viewed Judge Peck's comments as requiring proof of breach as to each Mortgage Loan upon which each RMBS Claim was based.  The Cross-Motion contained a protocol which LBHI asserted was necessary to preserve LBHI's "downstream indemnification rights" to pursue claims against the sellers of Mortgage Loans.  LBHI.  Doc. 46526, p. 51, ¶ 99.

Moreover, in stating its position regarding the loan-by-loan analysis for proving breaches and the value of the RMBS Claims, LBHI argued that:

> [A] breach alone does not trigger a claim.  The trust only has a valid claim if the breach has a material and adverse effect on the value of the related mortgage loan. This claim element can be viewed as similar to traditional "but-for" causation. Importantly, any number of factors exclusive to alleged breaches may cause mortgage loans to lose value, such as (i) borrower loss of income sources, (ii) borrower illness or other financial hardship, or (iii) a borrower decision to walk away from "upside down" mortgages.

Doc. 46526, p. 26, ¶ 44.

The RMBS Trustees filed an objection to the Cross-Motion (Doc. 46960) on November 14, 2014, wherein they again asserted that proceeding through statistical sampling, versus on a loan-by-loan basis, was appropriate.  They refuted the averments of LBHI that the RMBS Trustees had been dilatory in pursuing claims, noting that the RMBS Trustees actually had spent

two years completing the statistical sampling, including the review and analysis of thousands of the underlying Mortgage Loans in the sample.  Doc. 46960, p. 6, ¶ 5.

LBHI filed an extensive Reply Brief (Doc. 47185) again arguing that the sampling was inadequate and that under the Governing Agreements a loan-by-loan analysis was required along with a showing that for each deficient loan, the RMBS Trustees must prove what it had previously asserted, *i.e.*: "(1) a breach of a representation and warranty; (2) that the breach materially and adversely affected the value of the mortgage loan; and (3) that prompt notice of the breach was provided to LBHI."  Doc. 47185, p. 10, ¶ 7.  The Reply Brief was supported by the Declaration of Professor William N. Goetzmann dated December 3, 2014, who opined that the analyses set forth on behalf of the RMBS Trustees by Parekh and Aronoff were "not based on a sound and reliable methodology for valuing the RMBS Trustees' claims" and were "based on unreasonable assumptions and lack any empirical or logical support."  Doc. 47188, p. 5, ¶ 10.  The RMBS Trustees filed a supplement at Doc. 47233 on December 8, 2014, to counter Debtors' arguments that statistical sampling cases cited in the RMBS Trustees' papers were inapplicable.

On December 10, 2014, Judge Chapman conducted a lengthy hearing during which the RMBS Trustees and LBHI argued their positions and presented witnesses regarding the proposed protocol.  The first issue addressed by the Bankruptcy Court was whether to approve the RMBS Trustees' motion for estimation of claims under Bankruptcy Code Section 502(c).  The Bankruptcy Court framed the issue early on as "whether or not the claims are subject to estimation under 502(c)."  Transcript of Hearing Dec. 10, 2014, at 36:1-4, Doc. 49007.  In discussing the process, counsel for the RMBS Trustees advised the Bankruptcy Court that

23

Aurora[25] (previously a Lehman entity) was the Master Servicer on 250 of the 255 Covered Trusts and was obligated to "tell Lehman about problems," and that Lehman was "well aware of it and they had a duty to self-report but didn't." *Id.* at 38:14-39:2. Notably, the Bankruptcy Court appeared to be critical of the RMBS Trustees for acting in concert in bringing their claims, which Judge Chapman seemed to believe would increase the number of claims she would have to determine. After several hours of argument the Bankruptcy Court ruled "as a matter of law, I'm not going to estimate these claims pursuant to 502(c) we're going to move to the allowance of the claims." *Id.* at 109:17-20.

The Bankruptcy Court established the Protocol for proving the claims by Order dated December 29, 2014 (Doc. 47569), as amended.[26] The Protocol set forth steps in a process for (1) the review of the mortgage loan files underlying the RMBS Claims, (2) the assertion by the RMBS Trustees of RMBS Claims as defined in the Protocol, (3) the response by the LBHI Debtors with respect to asserted RMBS Claims, and (4) the mechanism for resolving disputes regarding the asserted RMBS Claims.

As described by Chief Judge McMahon of the United States District Court for the Southern District of New York in her "Decision and Order Affirming Decision of Bankruptcy Court" (No. 16 CIV 5813 (CM), Doc. 36, p. 5) ( the "Appeal Order"):

---

[25] Aurora Bank was a Lehman subsidiary. In 2012 Lehman sold Aurora to Nationstar. The sale is described in Exhibit 99.4 of Disclosures Relating to Nationstar Mortgage Holdings Inc.*, et al.* filed with the SEC.
  *See*  https://www.sec.gov/Archives/edgar/data/1507951/000119312512306813/d381728dex994.htm.
[26] The Protocol Order was amended on March 30, 2016, by "Order Granting Motion of RMBS Trustees To Extend The Overall Claim File Cut-Off Date For Certain Loans Under The Protocol Order And Related Relief" (Doc. 52367).

The Protocol is a five-step process.[27] First, the RMBS Trustees are required to collect and produce to LBHI the underlying loan files supporting their claims. Second, LBHI must review those files and determine whether it agrees that a valid claim exists for the file (an "Approved Claim File") or not (a "Rejected Claim File"). Third, for any Rejected Claim File or any Approved Claim File for which the RMBS Trustees dispute LBHI's proposed purchase price, the parties must engage in a non-binding negotiation procedure. Fourth, for claims that are not resolved through that negotiation procedure, the parties must engage in a formal non-binding dispute resolution procedure overseen by a neutral "Claim Facilitator." Fifth, the parties have the right to object to any proposal by the Claim Facilitator, in which case the claim proceeds to trial.

The Bankruptcy Court established a deadline for the RMBS Trustees to place the RMBS Claims into the Protocol, along with all supporting documentation that would allow the Plan Administrator to review those claims. On June 24, 2016, the RMBS Trustees filed a status report regarding the Protocol (Doc. 53161) in which the RMBS Trustees reported that

[O]n May 31, 2016, the RMBS Trustees completed their obligations under Step 1 of the Protocol. The RMBS Trustees submitted to the Plan Administrator RMBS Claims arising from a loan-by-loan review of 218,622 loans on a rolling basis in thirty deliveries from March 17, 2015 through May 31, 2016.

Doc. 53161, p. 3.

The status report stated that 92,981 of the reviewed loans had breaches of representations and warranties that materially and adversely affected the value of the loans and/or the interests of Certificate Holders, and thus submitted RMBS Claims in respect of such loans to the Plan Administrator. The RMBS Trustees further determined that "47,441 loans of the 218,622 loans were paid off in full or are expected to be paid off in full and were not reviewed under the Protocol." Doc. 53161, p. 3-4. The Plan Administrator accepted 1,025 Claim Files (1.34%),

---

[27] The first step, information gathering, was designated as "Step 0."

rejected 51,798 Claim Files (67.53%) and determined not to review 23,876 Claim Files (31.13%) as LBHI deemed them to have insufficient documentation for review. The RMBS Trustees in turn accepted 1,113 of the Rejected Claims, resubmitted 49,293 Rejected Claims, and rescinded 156 Rejected Claims as the loans were paid without loss.

In August 2016, the RMBS Trustees filed an appeal from a final order of the Bankruptcy Court that disallowed and expunged certain claims filed by RMBS Trustees for alleged breaches of representations and warranties by LBHI. An issue on appeal was whether the Protocol reserved the RMBS Trustees' right to prove the claims through alternative methods such as statistical sampling, although the Bankruptcy Court read the Protocol to say the RMBS Claims had to be established by a certain deadline, on a loan-by-loan basis, not through estimation. In February 2017, United States District Court Judge McMahon affirmed and upheld Judge Chapman's Order[28] expunging claims involving approximately 600,000 remaining loans in the Trusts referred to as the "Transferor Loans." Appeal Order, p. 21. The District Court also upheld the expungement of 11,000[29] of the Covered Loans that had not been submitted to the Protocol by the Cut-off Date. Appeal Order, pp. 23-25.

On September 9, 2016, the RMBS Trustees filed another Status Report at Doc. 53640. In it, the RMBS Trustees noted that the Protocol was not working as intended and requested a conference with the Bankruptcy Court. They also identified a number of significant issues raised by LBHI that, if resolved, would accelerate the Protocol process. Doc. 53640, p. 5-6. Those issues remain unresolved.

---

[28] The RMBS Trustees have appealed this ruling to the United States Court of Appeals for the Second Circuit. *See* Doc. 39, Case 1:16-cv-05813-CM.

[29] The RMBS Trustees determined that these 11,000 Covered Loans individually had insufficient losses to warrant the cost of a loan-by-loan review. *See* "RMBS Trustees' Objection to Debtors' Motion to Disallow and Expunge Certain RMBS Claims. . . ." Doc. 52951, Exhibit "C".

The RMBS Trustees also reported that the number of claims files submitted to LBHI had increased to 94,564 and LBHI had responded to all of those submitted through September 4, 2016, as follows: 989 Claims Files were approved (1.0%); 64 were approved with a disputed Purchase Price (0.1%); 63,227 were rejected (66.9%); and 30,384 were deemed by LBHI to have insufficient documentation for review (32.0%).  The RMBS Trustees noted their disagreement with LBHI's assertion that the Claims Files are incomplete or have insufficient documentation. After review of the Plan Administrator's responses, the RMBS Trustees rescinded 1,156 of the Rejected Claims Files and removed 827 RMBS Claims on Mortgage Loans that have since paid off without any loss.

The September Status Report stated that although the RMBS Trustees had complied with their obligations, LBHI had not yet filed what it was required to file under the Protocol.  That is, the Protocol required LBHI to submit Approved Claims Reports and Rejected Claims Reports (Protocol IV. d-f) which LBHI had not submitted.  In addition, 91,528 RMBS Claims Files were unresolved as they each remained subject to the process of "negotiation of a mutually acceptable allowed claim" under Step 3 of the Protocol (Protocol V.a and V.b).  In connection with the negotiation, there had been 37 meetings by phone or in person to negotiate mutually acceptable allowed claims.  At the then current pace of meetings and review, Step 3 alone would take more than 12 years to complete.  The RMBS Trustees therefore requested that Step 4 be implemented and that the categories of issues or disputes be submitted to a Claims Facilitator. (Protocol V.c).

In the interim, on August 30, 2016, LBHI filed its "Second Objection to Certain RMBS Trust Claims and Motion to Disallow and Expunge Certain RMBS Trust Claims for Insufficient Documentation" (Doc. 53620) (the "Second Expungement Motion") which sought to disallow and expunge 36,351 RMBS Claims on the grounds that the proof was insufficient.  The 36,351

27

RMBS Claims LBHI sought to disallow and expunge "consist[ed] of (i) 20,890 loans for which the Trustees have failed to assert a claim amount that reflects the amounts they would be due under the Protocol; and (ii) 15,461 loans for which the Trustees have failed to provide two documents that are necessary under the Protocol for the Plan Administrator to review the alleged damages." Doc. 53620, p. 6, ¶ 1.

The Second Expungement Motion was opposed by the RMBS Trustees by a response filed on September 29, 2016. Doc. 53730. The RMBS Trustees reasserted their compliance with the Protocol and LBHI's failure to comply. The RMBS Trustees also contended that the claims' calculation that LBHI was demanding was not required by either the Governing Agreements or the Protocol and that the two documents LBHI asserted were necessary under the Protocol to assess the 15,461 loans, *i.e.* a "loan loss certification" and a "corporate expense" log, were not required by the Protocol and were not needed as "[t]he RMBS Trustees have provided voluminous and detailed evidence of the Purchase Price" for each of those loans. Doc. 53730, p. 7, ¶ 16-17 *et seq.* Duff & Phelps summarized in the Affidavit of Edmond Esses (Doc. 53732) the actions taken by the RMBS Trustees to provide data and other evidence to LBHI with respect to Mortgage Loans that comprise the Trust Claims. Doc. 53730. *See also* Affidavit Of Allen Pfeiffer, Doc. 53731.

### 4.      The RMBS Settlement

The Second Expungement Motion was set for hearing on October 20, 2016. That hearing was postponed while the Institutional Investors by their counsel Gibbs & Bruns LLP, negotiated a proposed settlement with LBHI. The resulting settlement agreement was the November Version

28

that was presented to the RMBS Trustees for acceptance, an action urged by the Institutional Investors, and which ultimately became the RMBS Settlement.

The November Version negotiated by LBHI and the Institutional Investors did not enable the RMBS Trustees to give notice to Certificate Holders before accepting that proposal and provided for a waiver of appeal rights in all circumstances, even though there was nothing in the agreement that specified a trial process.

After receiving the November Version, the RMBS Trustees proposed certain modifications to LBHI. The RMBS Trustees and LBHI agreed to material changes to the terms of the November Version which have been incorporated into the RMBS Settlement.  The changes made the RMBS Settlement reasonable and include: (1) a notice provision by which all Certificate Holders are provided the opportunity to provide comments to the RMBS Trustees about the RMBS Settlement; (2) a limited right on behalf of the RMBS Trustees to appeal if the Bankruptcy Court determines the amount of the allowed RMBS Claims falls below a certain negotiated threshold; and (3) an agreed-upon methodology for the presentation of evidence regarding the breaches and valuation of the RMBS Claims based upon those breaches with a specified minimum timeframe for presentation of evidence.  *See* Doc. 55096, Exhibit "G."

The RMBS Settlement is a significant achievement toward resolution of the RMBS Claims.  It enables the issues to be heard by the Bankruptcy Court beginning in this calendar year, which otherwise would not occur because, as of today, Step 3 of the Protocol is far from complete[30] as to all RMBS Claims and Step 4 has not begun.  The parties have agreed that the Protocol is "suspended until the earlier of the conclusion of the Estimation hearing or the

---

[30] I am advised by Duff & Phelps that Step 3 of the Protocol is only approximately 3% complete.

termination of the [RMBS] Settlement Agreement." Doc. 55133, p. 3. Judge Chapman has not

yet issued a decision regarding what form of evidence, if any, she would permit as a basis for

allowance of the RMBS Claims. Thus, the parties bargained for and reached agreement on

evidence to be admitted, provided that Judge Chapman concurs, as described in Exhibit "G."

Exhibit "G" removes the risk that the Bankruptcy Court would limit the RMBS Trustees' ability

to produce evidence and specifies the process and procedures that will govern at the hearing on

LBHI's objection to allowance of the RMBS Claims. If Judge Chapman does not concur, the

Agreement may be terminated.

**C.      The RMBS Settlement Provides An Appropriate Mechanism To Determine The
          Allowed Amount Of The RMBS Claims And Is Reasonable**

In bankruptcy cases, settlements are governed by Rule 9019 and cases that delineate

criteria a bankruptcy court uses to consider in approving a settlement. In essence, a court

assesses the benefits and burdens of the settlement. One critical component of Rule 9019 is that

entities with an interest in the outcome are provided notice and an opportunity to appear and be

heard. Notice has been provided to Certificate Holders as described below.

**1.      Proper Notice and Opportunity to be Heard**

One aspect of the RMBS Settlement that bears critical focus is the addition of the notice

provisions. The November Version agreed to by the Institutional Investors and LBHI provided

no opportunity to the RMBS Trustees to notify other investors of the November Version as then

proposed. The RMBS Trustees reasonably addressed with LBHI the defect in the November

Version because it would not afford investors (other than the Institutional Investors) with notice

of the proposed settlement and to consider what the terms of settlement would mean within each

specific Trust. The RMBS Trustees undertook additional negotiations with LBHI and obtained a

notice period that was adequate to advise all Certificate Holders of the pending RMBS Settlement

which materially affects their rights, and to solicit their comments.  As agreed, LBHI moved for[31]

and received Bankruptcy Court approval[32] of the notice program.

Pursuant to that approved process, the RMBS Trustees caused notice to be published on

websites.[33]  Specific matters, such as where to view the RMBS Settlement and how to contact the

RMBS Trustees, were addressed in the notices, which included links to those matters.   In

addition, Gibbs & Bruns posted on its website that the RMBS Settlement is pending.[34]  News

services also reported the settlement.[35]

On March 21, 2017, the RMBS Trustees caused notice to be given to all Certificate

Holders[36] of the RMBS Settlement offer, the proposed settlement terms, and the fact that the offer

materially affects their interests.  *See* Notice dated March 20, 2017.   The Notice contained

important information, identified each Trust affected by the RMBS Settlement, advised all

recipients to read it and to consult with their legal and financial advisors, and requested responses

not later than May 5, 2017 as the RMBS Settlement had to be accepted or rejected on a final basis

---

[31] *See* "Notice of Presentment Of Order Approving Notice Procedures With Respect To Proposed RMBS Settlement Agreement." Doc. 55096.

[32] *See* "Order Approving and Establishing Notice Procedures With Respect to Proposed RMBS Settlement and Agreement." Doc. 55154.

[33] *See* http://www.lbhirmbssettlement.com/notice.php (http://www.lbhirmbssettlement.com/notice.pdf (March 20, 2017) and http://www.lbhirmbssettlement.com/2d_Notice.pdf (April 21, 2017)). *See also,* regarding Certificate Holders who acquired their interest from DTC, http://www.DTCC.com .

[34] *See* http://www.gibbsbruns.com/14-institutional-investors-in-rmbs-issued-by-lehman-announce-binding-offer-by-the-plan-administrator-to-the-lehman-estate-to-four-rmbs-trustees-to-settle-mortgage-repurchase-claims-for-244-rmbs-trusts-04-03-2017/.

[35] *See, e.g.,* Randles, Jonathan, *Lehman Floats RMBS Settlement Worth at Least $1 Billion*, Wall Street Journal, April 6, 2017 6:17 p.m. https://www.wsj.com/articles/lehman-floats-rmbs-settlement-worth-at-least-1-billion-1491517041; Jack Newsham, *BlackRock, Others Back $2B Deal with Lehman Estate*, Law360, April 3, 2017.

[36] As originally offered in the November Version, only the Institutional Investors had notice of the proposed settlement, and the RMBS Trustees were required to keep the proposal confidential until after acceptance.

on or before June 1, 2017.  As of this writing, I have been provided with one comment returned by a beneficial owner with holdings in multiple trusts who recommended that the RMBS Settlement be accepted.  I have also been provided with letters from various Certificate Holders who either do not approve or raise concerns about the RMBS Settlement.[37]

As a result of the RMBS Trustees' efforts, the Certificate Holders in each RMBS Trust have had notice of, and the opportunity to comment on or advise, the RMBS Trustees of their views concerning acceptance or rejection of the RMBS Settlement.  With respect to obtaining a copy of and providing comments to the Trustees, the March 20, 2017 and April 21, 2017 notices satisfy the Bankruptcy Court's order regarding Notice Procedures.  *See* Doc. 55096, p. 8-9, ¶9. *See also* Doc. 55154.

Pursuant to the Bankruptcy Court's Order, additional notice of the 9019 Motion, the deadline for objections and the hearing are required.  Doc. 55096 p. 5-6, ¶9.  *See also* Doc. 55154, p.2.  The RMBS Trustees have caused notices of the 9019 Motion to be posted on websites and have arranged publication in papers of wide circulation including: The Wall Street Journal; Global; Wall Street Journal, Digital Network; the New York Times, National; NYT.com; The Financial Times, Worldwide; Investors.com; Reuters.com; and Economist.com.  *See, e.g.*, NY Times at B6, May 15, 2017; Financial Times at 16, May 15*,* 2017; The Wall Street Journal at B8, May 15, 2017.  The RMBS Trustees also issued a press release to PR Newswire, World Financial Markets.       *See*     RMBS     Settlement     website: http://www.lbhirmbssettlement.com/pdflib/LBHI%20RMBS%20Settlement_%20Notice%20of% 209019%20Motion%20wedits%20-%204pmCopy.pdf).   The notices and publications explain, *inter alia,* that LBHI filed the 9019 Motion; the date (July 6, 2017), time (10:00 a.m. prevailing

---

[37]I reserve the right to modify this opinion in the event that more comments are forthcoming.

Eastern Time), and place (in Courtroom 623, One Bowling Green, New York, New York 10004

before Judge Chapman) of the hearing; the way to submit objections (as more particularly

detailed in the notice); each person who must be served and the address for each. The Notice also

states that if no objection is received by June 22, 2017 at 12:00 noon (EDT), the Bankruptcy

Court may grant the relief requested.

The RMBS Trustees are complying with the Bankruptcy Court's order and have provided

"sufficient and effective notice in satisfaction of federal and state due process requirements and

other applicable law to put the parties in interest in these Chapter 11 Cases and others, including

the Institutional Investors and the investors in each Trust, on notice of the Motion and the RMBS

Settlement Agreement. . . ." *See* "Order Approving And Establishing Notice Procedures With

Respect To Proposed RMBS Settlement Agreement." Doc. 55154, p. 2.

### 2.    Investors' Views Of The RMBS Settlement Offer Solicited and Considered

The Institutional Investors bargained for the RMBS Settlement and whole-heartedly

support it.[38]  To date, with the exception of Certificate Holders of a small number of Trusts,[39] no

---

[38] As set forth in the RMBS Settlement, the Institutional Investors' "holdings include 25% or more of the [unpaid principal balance of securities ("UPB") of 69 of the [RMBS] Trusts, which Trusts account for approximately 35% of the total UPB across all of the Trusts." Doc. 55232, Exhibit "D," p. 89. The Institutional Investors initially negotiated the RMBS Settlement with LBHI and support the RMBS Settlement as now proposed. REDACTED

The Institutional Investors sent a letter to each of the RMBS Trustees asserting that:

[T]his offer is one the Trustees certainly should accept. It *virtually ensures* the Trusts claims will be allowed in an amount no less than $2.416 billion, because Lehman has agreed to seek estimation at that amount. In addition, while setting a functional floor on the recovery, the offer establishes no ceiling; instead the Trustees are free to put on whatever proof they wish, to advocate for an increased estimation if they possess evidence they believe warrants it. And finally, by making the estimation final as to both the Trusts and Lehman, it ends both the hemorrhage of dollars caused by the protocol and eliminates

instructions directing any RMBS Trustee to reject the RMBS Settlement and no indemnity agreements, in form and substance satisfactory to the RMBS Trustees, have been offered and delivered to any RMBS Trustee from any Certificate Holder.

At this juncture there is unanimous support of the Institutional Investors with a large economic stake in the outcome, who, as stated above, have notified the RMBS Trustees that in the view of the Institutional Investors the RMBS Settlement is in the best interests of the RMBS Trusts. Various comments by certain other Certificate Holders have been given to the RMBS Trustees for their consideration.[40] Likewise, in reaching my conclusions, I have considered all of the comments provided to date, some of which make assumptions that, in my opinion, are unwarranted based on what has occurred in the Bankruptcy Proceeding so far. In addition, as to each RMBS Trust where Certificate Holders commented to the RMBS Trustees, I requested information regarding the number of Covered Loans in the applicable RMBS Trusts. I received

---

the risk—through elimination of appeals—that this hemorrhage of funds will resume. In short, there is no reasonable basis on which the Trustees could or should refuse this guarantee of a certain recovery of more than $1.1 billion in cash, with the opportunity to obtain more.

*Id. (emphasis in original)*

Despite this clearly expressed preference for entering into the RMBS Settlement, the Institutional Investors have neither instructed, under any RMBS Trust in which they hold the requisite percentage of the RMBS Certificates, the RMBS Trustees to approve the RMBS Settlement, nor have they offered an indemnity to the RMBS Trustees. ████████████████ REDACTED ████████████████
████████████████████████████████

[39] Holders of Certificates in certain Trusts have sent letters to the respective RMBS Trustees directing those Trustees to not become an "Accepting Trustee" of the RMBS Settlement and to prosecute the Trust's claims under the Protocol.

[40] It should be noted that the Governing Agreements do not require the RMBS Trustees to accept or reject the RMBS Settlement as to any RMBS Trust. The RMBS Settlement affords the RMBS Trustees the right but not the obligation to terminate the RMBS Settlement under certain specified circumstances for any particular as to which the RMBS Settlement was accepted.

information from Duff & Phelps regarding the number of those loans which but for the RMBS Settlement could potentially be tried on a loan-by-loan basis.

Among the topics raised by the comments I have considered are these:

**The Gibbs & Bruns Fee.** Gibbs & Bruns led the negotiations for the Institutional Investors. In its letter to the RMBS Trustees recommending acceptance of the RMBS Settlement, Gibbs & Bruns advised that the Institutional Investors hold approximately $6 billion of the unpaid principal balance of securities issued by the RMBS Trusts listed on Exhibit "A" to the RMBS Settlement. This represents 25% or more of the unpaid principal balance of 69 of the RMBS Trusts, or 35% of the total unpaid principal balance across all of the RMBS Trusts. *See* Doc. 55232, Exhibit "D." Gibbs & Bruns negotiated with LBHI over several years prior to signing off on the RMBS Settlement. Certain Certificate Holders are troubled by the allegedly excessive legal fees charged by Gibbs & Bruns, which will be paid first out of the proceeds of the RMBS Settlement at the same percentage distribution as the allowed RMBS Claims and other allowed Class 7 claims.

Paragraph 6.05 of the RMBS Settlement sets the fee at 4.75% of the first $2.416 billion of the allowed RMBS Claims without the need for Gibbs & Bruns to submit any form of estate retention or fee application. Doc. 55232, p. 67. At the current percentage payout of approximately 39.1% of the allowed claims, Gibbs & Bruns would receive a fee in excess of $43 million. The fee is comparable to those in some other RMBS settlements negotiated by Gibbs & Bruns. Fees paid ranged from approximately $37.84 to $85 million. *See* "RMBS Settlements - Analysis of Gibbs & Bruns Fee Amounts" prepared by Duff & Phelps, draft dated May 15, 2017.

To the extent that any RMBS Trustee declines to enter into the RMBS Settlement for any particular Trust, that Trust would not participate in the distribution on the allowed claims. In that

event, that Trust would not share in the benefits or burdens of the RMBS Settlement and, therefore, would not bear any portion of the Gibbs & Bruns fee. However, the total cost of litigating the loans with breaches in that specific Trust (or negotiating any settlement for a different deal with LBHI) would be borne entirely by that Trust.

**Timing and Method of Trial.** The RMBS Settlement provides for a claims allowance process. That process is not the type of estimation conducted for the purpose of setting a reserve[41] for distribution under the Plan.

I am aware that certain Certificate Holders have expressed opposition to the trial procedure set out in the RMBS Settlement. Having reviewed their comments, however, my opinion is that the RMBS Settlement is a reasonable way to resolve all of the RMBS Claims. The comments proffered the loan-by-loan trial approach as an alternative to Exhibit "G," but my opinion is that the Bankruptcy Court would not authorize that alternative.

Certain Certificate Holders have suggested that loan-by-loan trials could be completed within 18 - 24 months in this Bankruptcy Proceeding. I disagree. First, this is not the only bankruptcy pending before Judge Chapman. In my experience as a bankruptcy judge with a docket of complex cases and knowing how much time is required to prepare for, conduct, decide and issue opinions and orders in such matters, I find it highly unlikely that Judge Chapman, with the busy docket of complex cases she has, would agree to spend every day of the next 18 - 24 months for loan-by-loan (or even trust-by-trust) trials. That proposed time frame posits an impossibly aggressive schedule. *See* the calculation in the May 10, 2017 letter from Gibbs &

---

[41] The reserve in this Bankruptcy Proceeding was established years ago and LBHI is already required to maintain assets sufficient to pay the distribution percentage applied to the $4.75 billion claims reserve for at least as long as there is no determination of the allowed RMBS Claims.

Bruns to Franklin H. Top III, *et al*, observing that to resolve 91,000 loan claims in 18 to 24 months would require resolution of 175 claims per day or one every 2.4 minutes. Gibbs & Bruns May 10, 2017 Letter at p. 3. It is entirely possible that the judge, aware of the time required for loan-by-loan trials and having heard the evidence of breaches as to the RMBS loans involved in the RMBS Trusts that accept the RMBS Settlement, would impose some consolidation and limit the time for trial, just as she will under the RMBS Settlement.

Second, the RMBS Settlement enables the RMBS Trustees to produce evidence of breaches in a consolidated fashion that, without this agreement, Judge Chapman may or may not permit. Third, there is no assurance that a loan-by-loan trial process would result in a superior recovery for the Certificate Holders. In order to ascertain the magnitude of loans that would have to be tried if the RMBS Settlement is rejected, I requested information from the RMBS Trustees as to each RMBS Trust that provided comments. They assigned the calculation to Duff & Phelps. That calculation shows, that as of April 28, 2017, in each of the 12 RMBS Trusts from which negative comments were provided by least 25% of the Certificate Holders, there were a minimum of 58 and a maximum of 4,529 loans.[42] Even if the Bankruptcy Court allotted one hour per individual loan to prove breaches, the time to be devoted to just the one Trust that held 58 loans would be more than one week of trial time. Given the schedule in Exhibit "G," my opinion is that the Bankruptcy Court could not devote the hours required for a loan-by-loan evidentiary process. *See* Duff & Phelps Chart dated May 26, 2017 of Covered Trusts with Certificate Holders who provided comments to the RMBS Trustees.

The comments also proffered that a trial based on statistical sampling would lead to a better result. Again, I disagree. LBHI used its own expert to challenge the statistical sampling

---

[42] There are over 15,000 loans within the 12 RMBS Trusts.

methodology and results generated by experts retained by the RMBS Trustees.  I anticipate a similar challenge by LBHI to any effort of a non-accepting RMBS Trust to use statistical sampling for trial purposes.   Which of those diametrically opposed expert opinions the Bankruptcy Court would accept in a trial based a loan-by-loan review or on a sampling technique, as suggested by certain Certificate Holders, is another unknown factor that could materially affect the process.  While the "exemplar" basis provided in Exhibit "G" is not identical to a statistical sampling, in my opinion, it affords the RMBS Trustees the same opportunity to prove the breaches as they would have had with a sampling method.  Moreover, there is no assurance as to what trial process the Bankruptcy Court would order for any Trust that opts out of the RMBS Settlement.  Nor is there any assurance that the Bankruptcy Court would not send all of the non-accepting Trusts back to the Protocol and wait to address any form of trial until the Protocol process is complete.[43]  Such a ruling, alone, could delay trials for years because the Protocol is taking an inordinately long time to get through Stage 3 and to Stage 4.  The Trustees submitted over 90,000 RMBS Loans under the Protocol.  Of those, LBHI has agreed that approximately 1,000 (.01%) are worthy of recompense.  The substantial legal issues that are not yet resolved (including causation) may have to be litigated regarding each loan.  The expense, including attorney fees, of litigating and appealing each loan would fall on the individual RMBS Trust that is not part of the RMBS Settlement.

There are also risks and costs other than out-of-pocket costs that would befall the individual Trust.  The delay in distribution from seeking rulings and appealing, loan-by-loan, could also be substantial and would affect the non-settling RMBS Trusts.  There is no certainty as

---

[43] Alternatively, the Bankruptcy Court may do something else entirely.

to what portion of the RMBS Claims Reserve would be retained for any Trust that declines the RMBS Settlement.[44]

**Number of Trial Days.**  Concern was expressed to the effect that the minimum 14-day, on-the-record hearing time will be insufficient for the RMBS Trustees to establish material breaches.  I disagree.  Exhibit "G" establishes that the parties may present their direct testimony through written declaration and will identify all the exemplar loans and exhibits they intend to introduce well before trial.  The parties have stipulated to admissibility of the majority (if not all) of the relevant documents regarding the loans and the Governing Agreements.  They have agreed to meet before trial to resolve any objections to the admissibility of the large volume of documents likely to be offered.

In addition, I am informed that the Bankruptcy Court will conduct pre-trial procedures that will minimize time customarily spent in trial regarding legal issues, arguments, expert reports, etc.  Purposes of the pre-trial include expediting disposition of the action, establishing early and continuing control so that the case will not be protracted by lack of management, and improving the quality of the trial through more thorough preparation.  *See* Federal Rule of Bankruptcy Procedure 7016(a).  With all of these pre-trial procedures in place, it is my opinion

---

[44] Note that the Plan does not provide for early distributions.  LBHI took the position that distributions are required only after each disputed proof of claim is fully resolved.  *See* Plan, Section 9.2, Doc. 22973. *See also* Letter dated September 30, 2015 from LBHI counsel advising that "no distributions are to be made on the [resolved] Claim until the disputed portions of the balance of the Claim are resolved. Nothing in the Protocol Order requires or provides otherwise.  Thus, unless one or more of the Approved Claim Files constitute the entirety of a proof of claim filed by the RMBS Trustees, no distribution can or will be made on such Approved Claim File until all other Claims asserted in the applicable proof(s) of claim also have been."  Thus, there is uncertainty as to when distributions to any non-settling RMBS Trust will be made in the event that the RMBS Trustees decide not to accept the RMBS Settlement on behalf of all of the RMBS Trusts.  As to the RMBS Trusts that accept the RMBS Settlement, however, that Settlement provides for a distribution promptly after the claims allowance process ends.

based on my experience as a litigator and as a trial judge, that the time reserved for trial is adequate for the RMBS Trustees to present their evidence.

Moreover, it is not uncommon for a trial court to limit the time each side is permitted to present its case and there is no assurance that a limitation would not be imposed in any loan-by-loan trial. Rule 7016 permits a court to "establish[] a reasonable limit on the time allowed to present evidence," (Rule 7016(c)(2)(O)) and to "adopt[] special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems" (Rule 7016(c)(2)(L)). Inasmuch as the Bankruptcy Court has agreed to a period of "at least" 7 hearing days on the record per side under the RMBS Settlement, the court has already indicated that more time will be available if the Bankruptcy Court finds it necessary. Whether the Bankruptcy Court would extend that courtesy under other circumstances is not ascertainable at this time.

**Settlement Amount.** LBHI asserted on many occasions that, absent the RMBS Settlement, it will seek allowance of the RMBS Claims at substantially lower than $2.416 billion. However, for purposes of resolving the process which will govern the allowance trial, LBHI will agree to allowance of $2.416 billion and will not appeal any higher allowed claim. At the same time, the RMBS Settlement puts no restrictions on the RMBS Trustees in terms of proving that the RMBS Claims have a greater value than $2.416 billion and should be allowed in that higher amount.

Certain Certificate Holders view this concession by LBHI as though the court will automatically value the RMBS Claims at $2.416 billion. I disagree. There is already a reserve for these claims to be valued at $4.75 billion and the judge knows that the reserve was established by agreement. Further, Judge Chapman has set a period of "at least" 14 hearing days "on the

record" to afford the time needed to hear and consider all of the evidence that will be presented

regarding the extent and amounts of claims.  Doc. 55232, p.94.  It is highly unlikely that a judge

with her background, skill and awareness of the circumstances that led to the RMBS Settlement

will ignore the RMBS Trustees' evidence as developed through the Protocol that she imposed.

With or without the process planned through Exhibit "G," there is no way to know what

evidence will be credited or the amount that Judge Chapman will allow.  Without the RMBS

Settlement, there is nothing to preclude the court from disallowing the RMBS Claims in their

entirety.  However the RMBS Settlement sets a $2.416 billion number that LBHI has agreed to

advocate while preserving the "up-side" to the Trustees who have the right to advocate for a

substantially larger sum.  If the Bankruptcy Court allows the RMBS Claims at an amount of no

less than $2 billion (assuming all RMBS Trusts stay in the settlement pool), the Bankruptcy Court

need not spend the time and resources to make proposed findings of fact and conclusions of law,

because there is no appeal in that instance.  Doc. 55232, p. 59.  This eliminates much of the delay

inherent in writing a complicated opinion, and enables distributions to be made promptly.

**Lack of Indemnity Provided to Any RMBS Trustee.**  Although Certificate Holders in a

small number of RMBS Trusts have directed their particular RMBS Trustee to not accept the

RMBS Settlement, none has provided the indemnity contemplated in the Governing Agreements.

Several have specifically indicated that they are not inclined to provide an indemnity.  In my

opinion, a direction without an indemnity is not an adequate reason for any particular Trust to

refuse to accept a settlement that provides the advantages that the RMBS Settlement offers and to

return, instead, to the lengthy, expensive, long-delayed process encompassed in the Protocol and

the uncertainty of an alternative process or better outcome, which could create unnecessary risk to

the RMBS Trustees.  To date, LBHI has agreed to a miniscule number of claims put through the

Protocol by the RMBS Trustees and there is no assurance that LBHI would not return to that mode as to any loan that is not resolved through the RMBS Settlement. As such, the costs to a non-accepting Trust likely would be substantial. Without indemnities in form and substance satisfactory to the RMBS Trustees to assure that potentially substantial costs can be funded, and with no alternative presented by any objecting Certificate Holder regarding a claim liquidation process that is any more certain to lead to better recoveries in a cost-effective way and in the time-frame that the RMBS Settlement affords, my opinion is that the RMBS Settlement is the most reasonable viable option available for each RMBS Trust (other than 5 identified in note 3 *supra* those that will receive no distribution) for resolving the RMBS Claims.

**Summary**. My experience has taught me that no settlement is ever perfect, particularly from the point of view of the entity who wants to be paid. However, having evaluated the provisions of this one, my opinion is that the RMBS Settlement is reasonable and has benefits, overall, that outweigh burdens. One significant benefit to the RMBS Trusts is that the cost and expense of preparing and presenting evidence of breaches and losses is shared and no one individual RMBS Trust has to singularly bear the cost of the claims' litigation. On an individual Trust basis, in addition to the particularities I address herein, I view avoidance of the numerous uncertainties that exist without the RMBS Settlement as important to the determination of whether it is a reasonable settlement as to that Trust.

These factors, as well as the others identified herein, weigh heavily in favor of accepting the RMBS Settlement even as to those Trusts which decry provisions of the RMBS Settlement. Having considered the comments, and based on what I perceive to be the substantial risks in the event that the RMBS Settlement is not approved and the substantial costs and delays inherent in waiting for loan-by-loan trials or for some other unknown claims resolution process, it is

nonetheless my opinion that the RMBS Settlement is reasonable and preferable to the likely return to the Protocol and any subsequent trials.

### 3.    The Terms of the RMBS Settlement

In assessing the RMBS Settlement's benefits and burdens, I am cognizant that the RMBS Settlement must be approved by the Bankruptcy Court and also by the United States District Court.[45]  Bankruptcy courts are required to assess the reasonableness of a proposed settlement in terms of what is in the best interests of the bankruptcy estate and its creditors.  Appellate courts have articulated factors that a bankruptcy court should use in making that assessment.  Drawing upon the method by which bankruptcy courts assess approvals of settlements is a useful way of analyzing the reasonableness of the RMBS Settlement.

---

[45] Because of jurisdictional limitations on the Bankruptcy Court's power to enter final orders in matters of this type, the RMBS Settlement requires a submission to the District Court to review the findings and conclusions of the Bankruptcy Court.  Federal Bankruptcy Rule 9033 provides that in proceedings involving issues and relief of the nature sought here, a bankruptcy judge shall file proposed findings of fact and conclusions of law and a district court will review those findings *de novo*.  The Bankruptcy Court in New York has a local rule as well.  Local Bankruptcy Rule 9033-1.  A district court will review a bankruptcy court's proposed findings of fact and conclusions of law under Rule 9033 which sets forth the following standard of review:

> [T]he district judge shall make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with this rule.  The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions.

Federal Rule of Bankruptcy Procedure 9033(d).  *See Opinion and Order* filed 11/10/14, *Tronox Incorporated v. Anadarko Petroleum Corporation (In re Tronox)*, Case 14-cv-05495, Doc. 32 (S.D.N.Y 2012).

The Rule 9033 process of reviewing the propriety of the RMBS Settlement differs from the bankruptcy appeal process applicable to court orders on claims allowance, which is the ultimate purpose of the RMBS Settlement.  The allowance or disallowance of claims is typically the kind of matter on which a bankruptcy court can enter a final order.

43

In the Second Circuit, the seminal case of *Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*[46] identifies those factors as: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) whether the parties negotiated in good faith and at arm's length.[47]

To avoid duplication, I will combine certain parts of the seven factors in my analysis. A review of the proposed RMBS Settlement shows that the various factors weigh in favor of approval and the RMBS Settlement is well above the lowest point in the range of reasonableness. Although a settlement can provide a finite dollar amount, here there has been no agreement on the amount. LBHI has agreed to proffer an estimate and allowance of the RMBS Claims at $2.416 billion. Without that agreement, LBHI is free to pursue a value at less than $2.416 billion. However, under the RMBS Settlement the RMBS Trustees are not foreclosed from presenting

---

[46] *Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007).

[47] *Id.*, 478 F.3d at 462. *See also In re MF Global Inc.*, 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012) (stating standard that settlement must be "fair, equitable, and in the best interests of the estate," *i.e.* that settlement falls above the lowest point in the range of reasonableness); *City Sanitation, LLC. v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82 (1st Cir. 2011) (bankruptcy court should determine whether settlement falls below the lowest point in the range of reasonableness).

evidence of claims that exceed $2.416 billion.  The Institutional Investors support a settlement amount that is not less than $2.416 billion.

> **Factors 1 and 2: The balance between the litigation's possibility of success and the settlement's future benefits; the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment.**

In addition to lack of consensus on the amount, LBHI and the RMBS Trustees have been unable to reach agreement on whether the vast majority of the RMBS Claims are valid.  LBHI has agreed to only a small percentage of RMBS Claims as being valid, as explained in the various RMBS Trustees' status reports.  There is no date set for the Bankruptcy Court to hear the disputes and there is no agreement as to the mechanics of the litigation itself, all of which is addressed in the RMBS Settlement.  That is, without the RMBS Settlement and Exhibit "G," the parties are left with substantial uncertainty as to when and how RMBS Claims allowance proceeding would occur.  The RMBS Settlement eliminates that uncertainty and provides significant benefits to the Certificate Holders as a result.

The process by which the RMBS Settlement came about has been detailed above.[48]  The RMBS Trustees improved the November Version by, *inter alia,* (1) adding notice to Certificate Holders, (2) including a limited right of appeal for the RMBS Trustees regarding certain possible findings of the Bankruptcy Court while excluding any right of appeal for LBHI, and (3) insisting on an evidentiary process that would afford the RMBS Trustees the right to present evidence in

---

[48] The parties were engaged in the Protocol when the 2015 Proposal was made.  After the RMBS Trustees examined its terms, the 2015 Proposal was withdrawn, and the parties continued to engage in the Protocol.  The Institutional Investors continued efforts to settle with LBHI.  In November 2016, LBHI and the Institutional Investors presented a renewed settlement offer (the November Version) to the RMBS Trustees and the RMBS Trustees became directly involved in negotiations thereafter.

support of the RMBS Claims.  All of those enhancements are in the paramount interest of the Certificate Holders.

### a.  Right to Appeal[49]

As part of the additional bargaining, the RMBS Trustees raised concerns about the lack of any appellate rights in the November Version, particularly as there was no floor to the amount of the claims allowance being presented to the Bankruptcy Court.  As a result of the additional efforts of the RMBS Trustees, LBHI agreed to present a settlement offer which contains the following appellate rights:  (1) should the Bankruptcy Court rule that the allowed claims total less than $2 billion, the RMBS Trustees, but not LBHI, have a right to appeal; (2) should the Bankruptcy Court determine the total allowed claims to be between $2.0 billion and $2.416 billion, the allowed claims will be fixed at $2.416 billion and no party will have a right to appeal; and (3) should the Bankruptcy Court determine the total allowed claims to be more than $2.416 billion, the total allowed claims will be the amount set by the Bankruptcy Court and no party will have a right to appeal.  S*ee* RMBS Settlement, § 3.02(c), p. 13-14.  LBHI has agreed to forfeit its right to appeal any order of the Bankruptcy Court, including one which would place a value on the RMBS Claims greater than $2.416 billion, adding certainty to the outcome and eliminating costs of appeals and years of delay.[50]

---

[49] A right to appeal is distinguishable from the Rule 9033 review discussed *supra.*

[50] In my experience dealing with complex issues in mega-bankruptcy cases, I have had reports of the expense associated with efforts to evaluate the cases and ready matters for trial.  In this regard, I have determined that the costs incurred here, without considering legal fees, have been high and will only increase an approved settlement.  As of December 31, 2016, the non-legal fee cost incurred by the RMBS Trusts to undergo the difficult and expensive processes necessary to prove the RMBS Claims was a collective $135 million dollars, an amount that I consider to be high, regardless of the allowed amount of the underlying claims as there is no assurance that the Bankruptcy Court will value the RMBS Claims at an amount higher than the $2.416 billion that the Debtor will propose and, likewise, the Bankruptcy Court could value the RMBS Claims at less than what the Debtor proposes.

46

I am unaware of any accepted methodology used to assess the dollar value of appellate rights as standards of review are rarely simple to apply and there are numerous unknown and unpredictable factors at play. For example, the standard of review on appeal varies depending on the nature of the issues presented to an appellate court.[51] To the extent that there are pure questions of fact in dispute on appeal, the applicable standard is abuse of discretion,[52] which is a difficult standard to prove, particularly in the situation where the trial court conducted a full and fair hearing and made findings as a result of the evidence adduced.[53]

Where, as here, findings of fact and conclusions of law could be interspersed, a federal district court acting as an appellate court will use *de novo* review.[54] *De novo* review could involve an entirely new proceeding before a different judge who has had little, if any, involvement in the underlying LBHI/RMBS Trustee disputes. Discovery may be required;

---

[51] On appeal, a district court acts as the first level of appellate review for orders from a bankruptcy court. A district court will review a bankruptcy court's conclusions of law de novo and findings of fact for clear error. A finding of fact is clearly erroneous where the reviewing court is left with "definite and firm conviction that a mistake has been committed." *Ahuja v. LightSquared Inc. (In re LightSquared, Inc.)*, 534 B.R. 522, 525 (S.D.N.Y. 2015), *aff'd*, 644 F. App'x 24 (2d Cir. 2016), *cert. denied sub nom. Sanjiv Ahuja v. LightSquared Inc.*, 137 S. Ct. 335, 196 L. Ed. 2d 262 (2016)("A bankruptcy court's conclusions of law are reviewed *de novo* and findings of fact are reviewed for clear error."); *In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 426 (2d Cir. 2009)("We will determine that a finding is 'clearly erroneous' when we are left with the definite and firm conviction that a mistake has been made."); *See also Nevada Power Company v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 407 (S.D.N.Y. 2007)("A district court functions as an appellate court in reviewing judgments rendered by bankruptcy courts. Findings of fact are reviewed for clear error. A finding of fact is clearly erroneous if the court is 'left with the definite and firm conviction that a mistake has been committed.' A bankruptcy court's conclusions of law, by contrast, are reviewed de novo." (footnotes omitted)).

[52] *Bittner v. Borne Chemical Co.*, 691 F.2d 134, 136 (3d Cir. 1982); *In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984); *In re Enron Corp.*, 2006 Bankr. LEXIS 4294 (Bankr. S.D.N.Y. Jan. 17, 2006).

[53] A district court abuses its discretion if it "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or render[s] a decision that cannot be located within the range of permissible decisions." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008)(internal citation and quotation marks omitted).

[54] Where mixed questions of law and fact are presented, the district court will review the bankruptcy court's decision *de novo*. *In re LightSquared, Inc.*, 534 B.R. at 525.

different legal rulings could be issued; and another trial or hearing could be ordered.  All of this would significantly increase the expense and delay before any payments are made on the RMBS Claims.

Regardless of the standard of review to be employed, the consequences of delay and the risk of  lengthy appeals in bankruptcy matters is very high given that the initial appeal is to the United States District Court, then to the Court of Appeals,[55] and finally to the United States Supreme Court.  At each of those stages, a remand, a partial or complete reversal, or a partial or complete affirmance could result – any of which could lead to additional appeals.  As these lengthy and time consuming processes proceed, no final order allowing the claims would be issued and no money from LBHI would be paid on account of the RMBS Claims.  Likewise

---

[55] Orders of a district court in its appellate capacity are subject to plenary review by a Court of Appeals. A Court of Appeals will independently review the factual determinations and legal conclusions of the bankruptcy court and accept the bankruptcy court's findings of fact unless they are clearly erroneous. Review of the bankruptcy court's conclusions of law is *de novo. Mazzeo v. U.S. (In re Mazzeo)*, 131 F.3d 295 (2d Cir. 1997)*, aff'g sub nom In re Mazzeo*, 213 B.R. 625 (E.D.N.Y. 1996)*, as amended* Dec. 3, 1996 ("An order of a district court functioning in its capacity as an appellate court in a bankruptcy case is subject to plenary review. [ ]. Thus, we "'independently review the factual determinations and legal conclusions of the bankruptcy court.' " [ ]." (internal citations omitted)); *See also The Argo Fund Ltd. v. Bd. of Directors of Telecom Argentina, S.A. (In re Bd. of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 168–69 (2d Cir. 2008)("When a district court sits as an appellate court reviewing a judgment of the bankruptcy court, the district court's decisions are subject to plenary review.   [ ].  We 'review independently the factual findings and legal conclusions of the bankruptcy court, accepting its findings of fact unless they are clearly erroneous and reviewing its conclusions of law de novo.'" (internal citations omitted)).

Specific to bankruptcy settlements, district courts and courts of appeals will review the bankruptcy court's statement of the applicable standards for approval of settlements under Federal Rule of Bankruptcy Procedure 9019 *de novo* and will review the reasonableness of the bankruptcy court's application thereof for abuse of discretion.  *In re Iridium Operating LLC*, 478 F.3d at 461, n. 13 ("The bankruptcy court's articulation of Rule 9019's standard for evaluating a settlement is a legal issue subject to *de novo* review. We review for abuse of discretion the reasonableness of that court's application of the Rule in approving the Settlement."); *See also Krys v. Official Committee of Unsecured Creditors of Refco Inc. (In re Refco Inc.)*, 505 F.3d 109, 116 (2d Cir. 2007)("Like the district court, we review the bankruptcy court's articulation of the legal standards applicable to the evaluation of a settlement under Bankruptcy Rule 9019 *de novo,* including the bankruptcy court's view of the principles governing who may contest the settlement as a "party in interest" under § 1109(b).  The bankruptcy court's application of those principles to the settlement is reviewed for abuse of discretion. (internal citations omitted)).

during that time, LBHI could pay out all of its funds, excepting only the amounts the Bankruptcy

Court has required to be kept in reserve for the RMBS Claims, depleting the LBHI estate and

eliminating recovery of amounts in excess of the reserve.[56]  As LBHI liquidates other assets, if

any, the funds over the amounts required to be held in the disputed claims reserve can be used to

pay other allowed claims and creditors.  There is no guaranty that there will be sufficient monies

available to fund a distribution to pay a large-dollar decision on the merits issued 2 to 4 years

down the road.

All appeals are costly and time-consuming.  Appeals add delay, and, based on my

experience when billions of dollars are at issue, it is my opinion that the parties will fight long

and hard to be successful on appeal.  In assessing the benefits of entering into the RMBS

Settlement, I have considered the cost and delay inherent in the process without the settlement

and the fact that both LBHI and the RMBS Trustees have the right to appeal, whereas under the

RMBS Settlement, LBHI is giving up all rights to appeal and the RMBS Trustees are preserving a

limited right to appeal.  Without the RMBS Settlement, rulings will not be final during appeal

periods.[57]  The time necessary to prosecute any appeal would produce major delays in the

---

[56] LBHI filed its quarterly report as of December 31, 2016 reflecting cash on hand available in the
disputed claims reserve of $1.089 billion.  *See* Operating Report: Quarterly Financial Report as of
December 31, 2016 Balance Sheets and Accompanying Schedules, Doc. 55127, p. 6.

[57] If claims determinations and the orders allowing or disallowing each were made on a "loan-by-
loan" basis then the appeals may also be heard on a loan-by-loan basis.  The cost to file each appeal or
cross-appeal from each order of a bankruptcy court to a district court as of this writing is $298.00 and
the fee to pursue an appeal or cross-appeal to a court of appeals is $500.  After separate appeals are
filed, the appeals sometimes are consolidated. The filing fee for each appeal or cross-appeal would
have to be paid.  Regardless of the filing fee cost, the appeal process itself would add additional delay
(and one to three years would likely) before the claims determination orders would be final
and distributions could be made to the RMBS Trusts.  Without the RMBS Settlement, if the
Bankruptcy Court determined the claims at a lower amount than that sought by the RMBS Trusts,
LBHI, in all likelihood, would ask the Bankruptcy Court to reduce the reserve to enable LBHI to make
further distributions to creditors other than the RMBS Trusts.  Obtaining stays of bankruptcy court
orders pending appeal requires the posting of supersedeas bonds – yet another cost.  Bankruptcy Rule of

payment of any of the RMBS Claims, which have not been paid for the numerous years this Bankruptcy Proceeding has been pending.

For these reasons, including that the likelihood of reversal on appeal after trial is low, it is my opinion that the value of the appeal rights in this case at this time is inconsequential. So the limitation on appeal rights imposed by the RMBS Settlement is a reasonable alternative to the cost, delay, and uncertainty of outcome that would result from any appeal.

On balance, from my experience as a bankruptcy judge and a litigator, it is my opinion that the certainty provided by the RMBS Settlement compared with the risks associated with traditional litigation (the costs and delay of which will be discussed further below) inures to the benefit of the Certificate Holders and weighs in favor of acceptance of the RMBS Settlement as a reasonable settlement.

### b. Evidentiary Process

As yet, the Bankruptcy Court has not determined when or how the claims allowance litigation will go forward. Moreover, without the implementation of the RMBS Settlement, there is no agreed upon way to litigate the RMBS Claims that are not yet resolved by the Protocol. Exhibit "G" to the RMBS Settlement sets up the litigation process the parties have agreed upon, assuming the Bankruptcy Court concurs, and removes the uncertainty as to what the process will be. The detailed procedures include that the Hearing (as defined in Exhibit "G") span *at least* 14 hearing days, or a total of 98 hours, on the record and the LBHI Debtors will be allotted 7 days

---

Procedure 8007 requires a motion for a stay pending appeal to be filed initially with a bankruptcy court when or before a notice of appeal is filed along with the request for approval of a supersedeas bond. *See* Rule 8007(a)(1),(2). If a bankruptcy court does not grant a stay, the appellant may request the district court to issue a stay and that court may also require a supersedeas bond. *See* Rule 8007(c). In the absence of stays pending appeal, LBHI could continue to make distributions and deplete available monies for distribution to the RMBS Trust in the event an appellate court ultimately reversed an adverse bankruptcy court ruling.

(or a total of 49 hours) to present their case, including rebuttals, and 7 days (or a total of 49 hours) will be allotted to the RMBS Trustees.[58]   Certain Certificate Holders contend that the allotted time of at least 14 hearing days on the record will be insufficient to introduce detailed, loan-level findings regarding material breaches.   As noted, I disagree.   In my opinion, Exhibit "G" provides a reasonable method to timely fix the allowed amount of the RMBS Claims.    The RMBS Settlement also assures that RMBS Claims will be allowed and enables them to be paid sooner rather than later because, until the Bankruptcy Court determines that amount, the RMBS Claims will not be paid.

Bankruptcy courts have wide discretion in setting a claims estimation process for the allowance of claims.[59]   Although the Bankruptcy Code does not explicitly detail procedures for estimating claims, a bankruptcy court may use whichever method is best suited to the circumstances to value the claim.[60]   Similarly, where an actual estimation hearing takes place, there is the possibility of a range of recoveries regarding the value of RMBS Claims, *i.e.,* there is no certainty as to what the Bankruptcy Court would allow as the claim for any particular breach as to any particular loan or any particular trust.[61]

Given that the RMBS Trustees have been endeavoring to comply with the Protocol for the Covered Loans, having conducted the loan-by-loan review, which confirmed the huge number of RMBS Claims at issue and the impracticability of trying more than 90,000 claims on an

---

[58] *See* discussion in text, *infra,* at "Number of Trial Days."

[59] *See* 11 U.S.C. § 502(c) which provides for estimation of claims for purposes of allowance.

[60] *In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984); *In re Enron Corp.*, 2006 Bankr. LEXIS 4294 (Bankr. S.D.N.Y. Jan. 17, 2006).

[61] Certain Certificate Holders note that the RMBS Trustees realize that the RMBS Settlement may result in an allowed RMBS Claim of $2.416 billion or less.   That proposition ignores that that the allowed RMBS claim could be much higher than $2.416 billion and Exhibit "G" enables the Trustees to prove a higher amount.

individualized basis, it seems likely that Judge Chapman would look to a streamlined process such as a consolidated issue technique for evidentiary purposes.[62] The RMBS Settlement provides such a process. Judge Chapman's prior ruling indicated that she would only engage in a claims allowance process which, despite its label as a claims' estimation, is what the RMBS Settlement accomplishes. Trials of batches of loans with similar alleged breaches can be issue-determinative and would bind the parties with respect to the RMBS Claims. However, without the proposed RMBS Settlement taking effect, the specific methodology would be left completely to the discretion of the Bankruptcy Court with attendant uncertainty to the RMBS Trustees as to what evidence would be admissible, how much time the Bankruptcy Court would allot for trial, and how many years would pass without a final order. The RMBS Settlement affords the RMBS Trustees the opportunity to present their evidence in support of the RMBS Claims to the Bankruptcy Court for its determination of the amount of the allowed claims on which distributions will be made by LBHI. Without the settlement there is no certainty as to where or how the RMBS Claims will be resolved and the Certificate Holders will be subjected to uncertainty, delay, and the possible adverse consequences of even more protracted litigation.

In addition, the effort already put into and the expense associated with the review of 171,663 Covered Loans, of which 94,564 RMBS Claims with material breaches were submitted to LBHI per the Protocol, was substantial. Doc. 53640, p. 2, § I.A. The RMBS Trustees retained various experts to assist in that review and relied on their opinions. If the Protocol continues as it

---

[62] *See* Federal Rule of Civil Procedure 42(a)("If actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay.") Rule 42 is made applicable to adversary proceedings and contested matters arising in the context of bankruptcy by Federal Rules of Bankruptcy Procedure 7042 and 9014(c).

has so far, the costs to the RMBS Trusts will continue to be substantial,[63] and the continued delay in resolving and collecting the RMBS Claims is weighty.   The time value of money is a customary consideration.[64]   The RMBS Settlement provides the opportunity for a timely resolution of the significant issues between the parties by establishing a methodology for prompt resolution that avoids loan-by-loan trials while preserving the ability of the RMBS Trustees to present evidence of the amounts of the RMBS Claims that should be allowed.   While it has been postulated by some that a loan-by-loan adjudication taking 18 to 24 months to complete would be a better approach, in my opinion it is unlikely that loan-by-loan trials would be ordered by the Bankruptcy Court.   In analyzing the time necessary to try cases on a loan-by-loan basis, the Bankruptcy Court would recognize that even if the Bankruptcy Court allowed for a one hour trial per loan, adjudicating over 90,000 loans would take decades with the result that a 24 month time frame for adjudication is impossible.

The RMBS Settlement, in my opinion, fulfills the Bankruptcy Court's expectation that the parties agree on a reasonable method for determination of the RMBS Claims, and, for that reason, likely will be given due regard by the Bankruptcy Court when it adjudicates the reasonableness of the settlement.

---

[63] Certain experts retained by the RMBS Trustees have opined that completion of the Protocol could take years to accomplish.  The attendant expense, inconvenience and delay, in addition to the likelihood that no collection on any claims award will occur for possibly a decade or more, favor settlement.

[64] The calculation of the time value of money is beyond the scope of this opinion.

**Factors 3 and 4: The paramount interests of the creditors, including each affected class's relative benefits; the degree to which creditors either do not object to or affirmatively support the proposed settlement and whether other parties in interest support the settlement.**

The RMBS Trustees have been actively involved in the LBHI bankruptcy. They have taken steps to preserve the RMBS Claims, litigated the Claims Reserve and litigated and submitted 94,564 RMBS Claims through the Protocol. Based on documents and pleadings filed of record, the RMBS Trustees are aware that LBHI is not paying 100% to its unsecured Class 7 creditors. As of this writing, the percentage being distributed to Class 7 creditors under the Plan is approximately 39%. Pursuing collection of any claims award that would be allowed based on the Mortgage Loans at issue will result, at best, in a partial recovery.

At this stage in this Bankruptcy Proceeding, filed 9 years ago, Plan distributions may no longer increase significantly and there can be a diminution of available funds as other creditors are paid. This is material to an analysis that a distribution in the near future is beneficial to the Certificate Holders because collection will become increasingly difficult over time. Distributions are generally made semi-annually to creditors whose claims have been allowed. The RMBS Claims have not yet been allowed. The Bankruptcy Court has required a Claims Reserve of $4.75 billion and there is the possibility that LBHI will not have funds sufficient to pay anything more than the then-current distribution percentage for any amount in excess of that $4.75 billion in allowed RMBS Claims. As each distribution of LBHI estate funds is authorized, there is less likelihood that any funds over and above the percentage required by the reserve will be available to pay the RMBS Claims at the conclusion of litigation. This problem is compounded by the likelihood that even if the RMBS Trustees presented evidence on a loan-by-loan basis (which the

present Protocol ordered by the Bankruptcy Court may require) there is no reason to believe that allowed claims would be any greater than what may result from the estimation process prescribed in Exhibit "G."

There is significant risk that protracted litigation, whether under the Protocol or otherwise, in an effort to seek a larger allowed claim will take so long, while semi-annual distributions continue to be made to other creditors, that there will be insufficient funds to satisfy any larger claims award either in whole or in part. Balanced against LBHI's agreement in the RMBS Settlement to seek $2.416 billion as a reasonable estimation of the value of the RMBS Claims (assuming 100% participation by the various RMBS Trusts)[65] accepting the RMBS Settlement is a reasonable way to add predictability to an otherwise uncertain outcome and to end the expenses incurred in the Protocol process.

Based on the circumstances facing the RMBS Trustees and my experience in confirming plans and approving initial distribution percentages, my opinion is that a prompt distribution at a known initial percentage is preferable to one that will follow years of litigation. There is no assurance that claims would be allowed in amounts greater than that which will follow from the Exhibit G process or that funds would be available to pay more than the percentage allocated to Class 7 claims under the Plan.

While the issue of the specific allocation percentages is outside the scope of my opinion, it was reasonable for the RMBS Settlement to address the issue. The RMBS Settlement authorizes the RMBS Trustees to prepare an initial percentage allocation. They retained an

---

[65] *See* RMBS Settlement, § 3.02(a), p. 13. Another significant benefit to the RMBS Settlement is that LBHI will forfeit rights to appeal, addressed more fully in text, *supra*.

independent valuation expert, Duff & Phelps, to determine the initial allocation[66] of the allowed

RMBS Claims among the Trusts that accept the RMBS Settlement.[67]    Based on its industry

experience, familiarity with the loans at issue and the claims submitted in connection with the

Protocol, Duff & Phelps provided the RMBS Trustees with an allocation methodology and

schedule, which the RMBS Trustees sent to the Institutional Investors and the LBHI Debtors.[68]

In addition to the support of the Institutional Investors, LBHI, as the other party involved,

has proffered this settlement and supports it as a means of affording distributions to all creditors

in a timely manner.    LBHI's support enhances the likelihood that the Bankruptcy Court will

approve the RMBS Settlement.

Given the circumstances faced in this Bankruptcy Proceeding by the RMBS Trustees, it is

my opinion that the RMBS Settlement is reasonable and in the best interests of the Certificate

Holders in each individual Trust.    In so stating, I recognize that any individual    Certificate

Holder may disagree with the initial percentage allocation and also that any specific Trust may

opt out of the RMBS Settlement.    Should that occur, however, my opinion regarding the

reasonableness of the process prescribed in the RMBS Settlement would not change.

---

[66] In the event that any RMBS Trusts terminate without a loss or otherwise do not accept the RMBS Settlement, the percentages will change.

[67] On March 27, 2017, I spoke with representatives of Duff & Phelps including Allen Pfeiffer (a Managing Director and Global Leader of Dispute Consulting – Complex Valuation and Bankruptcy Litigation), Edmond Esses (a Director, Disputes and Investigations Practice) and Jennifer Press (a Managing Director, Complex Asset Solutions practice) regarding the methodology employed to prepare the initial allocation among the RMBS Trusts.  From having heard valuation analyses throughout my tenure on the bankruptcy bench, I am aware that certain methodologies are customary, depending upon the asset that is subject to valuation.  Duff & Phelps utilized a standard approach within the loan valuation industry to calculate the initial percentage of the eventual distribution applicable to each loan group.  *See* RMBS Settlement, §3.04 (Allocation Formula).

[68] Neither the Institutional Investors nor the LBHI Debtors provided any substantive comments or changes to the Duff & Phelps allocation methodology and schedule.  *See* Notice dated April 21, 2017.

**Factor 5: The competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement.**

The RMBS Trustee counsel, the Institutional Investors and LBHI counsel are well qualified and experienced in Bankruptcy and RMBS issues. Those parties have all been represented by experienced counsel throughout the discussions that led to the RMBS Settlement.

I have been informed that the RMBS Trustees also engaged experts for assistance in analyzing the benefits and burdens of the RMBS Settlement. They have elicited expert advice from highly regarded and skilled retired judges regarding the interpretation and impact of various New York and bankruptcy laws on their ability to establish valid RMBS Claims for the benefit of the Certificate Holders.[69] They have retained well-qualified financial experts to assist in analyzing, classifying and valuing the breaches of representations and warranties and their materiality with respect to the Mortgage Loans. Based on its industry experience, familiarity with the loans at issue and the claims submitted in connection with the Protocol, Duff & Phelps, well qualified financial experts, provided the RMBS Trustees with an allocation methodology and schedule, which the RMBS Trustees sent to LBHI to be included, and now is included, in the RMBS Settlement. The RMBS Trustees have expended substantial resources in time and money in undertaking statistical sampling and then, when the Bankruptcy Court refused to accept that method of proving the RMBS Claims, in examining hundreds of thousands of Mortgage Loans, loan-by-loan.

---

[69] I have reviewed the reports of retired Southern District of New York Chief Bankruptcy Judge Arthur J. Gonzalez dated March 8, 2016, and retired New York State Supreme Court and State Supreme Court Appellate Division Justice Anthony J. Carpinello dated March 4, 2016.

The RMBS Trustees have also considered the breaches of representations and warranties that came to light as the result of the loan-by-loan analysis, their materiality and the risks of litigation that would inevitably flow from efforts to prove the value of the RMBS Claims. Through their counsel, they have advocated their theories and requests on behalf of the Certificate Holders, to the extent the Bankruptcy Court has permitted so far, and despite years of litigation, have not yet had the opportunity to present evidence to support their claims. The experts retained by the RMBS Trustees have advised that without an agreement with LBHI approved by the Bankruptcy Court, proving the RMBS Claims pursuant to the Protocol will take years and could nonetheless result in costly trials on the remaining unresolved claims, and decisions subject to appeal by any party. In my opinion, RMBS Trustees were assisted by skilled counsel and independent experts who assessed risks, delay, and costs.

Another part of this analysis looks to the experience of the judge presiding over the matter. The bankruptcy judge who will review the RMBS Settlement has been assigned to this case for several years and is clearly able to assess the benefits that the RMBS Settlement provides to the bankruptcy estate and its creditors, including the Certificate Holders. In the Protocol, the Bankruptcy Court preserved "each of (I) the RMBS Trustees' right, if any, to seek to provide proof in support of the allowance of the RMBS Claims through the use of statistical sampling, and (ii) the Plan Administrator's right to object to the use of statistical sampling by the RMBS Trustees." Doc. 47569, p. 5. The possibility of sampling was limited, if it would ever be approved, to a time after the RMBS Trustees complied with the loan-by-loan submission of claims to the Protocol, with the idea that the parties might agree on a trial process. Nonetheless, the Bankruptcy Court made clear that sampling would not be a substitute for production and review, loan-by-loan.

The Bankruptcy Court anticipated that a method other than multiple trials on a loan-by-loan basis would be utilized to determine the scope of breaches and quantify the monetary component attributable to such breaches.  The RMBS Settlement affords the RMBS Trustees the ability to use a streamlined method which the Bankruptcy Court will likely consider to be a positive development in enabling distributions and in moving the LBHI bankruptcy cases toward conclusion.

An additional consideration is how the trial judge has been perceived by the appellate courts as determined by affirmation or reversal on appeal, particularly on issues similar to those involved in the dispute at hand.  There has been only one ruling in the Bankruptcy Proceeding that is material to this factor.  Judge Chapman's order disallowing and expunging 11,000 of the Covered Loan Claims and all of the Transferor Loan Claims that were not submitted to the Protocol was recently upheld by Chief Judge McMahon in her "Decision and Order Affirming Decision of Bankruptcy Court dated February 22, 2017."  Appeal Order, Doc. 36.  Although the RMBS Trustees appealed, alleging, *inter alia*, a denial of due process because Judge Chapman had not conducted an evidentiary hearing on the expunged claims, Judge McMahon found the argument to be without merit and affirmed the Bankruptcy Court.

In ascertaining how the trier of fact has ruled in the case to date, a review of Judge Chapman's few rulings regarding the RMBS Trusts indicates that she has generally adopted procedures requested by LBHI.  Those rulings resulted in the RMBS Trustees incurring millions of dollars of costs in preparing a loan-by-loan review and analysis of LBHI's breaches of material representations and warranties.  Until now, Judge Chapman has declined to consider any form of estimation of the RMBS Claims and has ordered a loan-by-loan review for asserting claims and their determination.

59

Based on the above, my opinion is that the RMBS Settlement is beneficial to the Certificate Holders, as well as to all parties in interest and creditors of the bankruptcy estate. The RMBS Settlement provided the RMBS Trustees with sufficient time to obtain the comments of the Certificate Holders. Further, a decision by the RMBS Trustees to enter into the RMBS Settlement, after due consideration, with the advice of skilled counsel and experts, and the support of the Institutional Investors, would cut off the costs, time and delay associated with the Protocol.

**Factor 6: The nature and breadth of releases to be obtained by officers and directors.**

Section 3.03 of the RMBS Settlement contains a release of Claims by the RMBS Trusts against "Released Parties," a defined term in the agreement, which includes the LBHI Debtors and various affiliates and subsidiaries (listed on Exhibit "C" to the RMBS Settlement) and their respective present and former directors, officers, employees, auditors, advisors (including financial advisors), legal counsel, representatives, and agents. Doc. 55096. In the event that the RMBS Trustees decide to accept the RMBS Settlement, upon final allowance of the claims, there will be no further entitlement to pursue the Released Parties for anything more than the allocable share of each participating RMBS Trust. This type of release is customary in bankruptcy settlements and is included, in part, to ensure that the final order approving a settlement remains the final order and that the distributions resulting from that order will be all that are required to be paid. However, a release is not reasonable or customary for the 5 RMBS Trusts as to which the RMBS Trustees are not pursuing RMBS Claims and which, therefore, will receive no distributions from the RMBS Settlement. See note 3, *supra*.

**Factor 7: The parties negotiated in good faith and at arm's length.**

In my opinion, the RMBS Trustees have acted at arm's length and in good faith for the benefit of the Certificate Holders. Their efforts to establish proof by statistical sampling was a reasonable, cost-effective way to assess both breaches and the value of the Mortgage Loans. When the Bankruptcy Court denied their request to substantiate the RMBS Claims in that fashion, the RMBS Trustees quickly agreed upon methodologies and strategies (including which experts to hire for advice) to achieve cost efficiencies. They then engaged in the loan-by-loan review required by the Bankruptcy Court even though hundreds of thousands of loan files had to be located and reviewed to ascertain, among hundreds of Governing Agreements, similarities in representations and warranties, breaches and materiality of those breaches. The purpose for that review was to establish the value of the claims that could be recovered for the Certificate Holders, not for self-interest by any RMBS Trustee. When presented with the November Version, the RMBS Trustees actively participated in discussions to include terms that provided greater protection and benefits to the Certificate Holders.

The parties who negotiated the RMBS Settlement, all of which hold vastly different views of the RMBS Claims, were represented by experienced counsel. The parties disagreed about the method by which the RMBS Trustees could offer proof of the Trust's losses resulting from material breaches of representations and warranties by LBHI. At arm's length, the parties bargained for and reached the RMBS Settlement, which, from my experience, offers a fair process by which to move the issues forward promptly and resolve the RMBS Claims to enable them to be allowed and paid.

With all of the factors considered, my opinion is that the RMBS Settlement achieves a fair result in that it provides an agreed upon and fair process to litigate the disputes in the Bankruptcy Court.

**D.    Given The Situation Faced By The RMBS Trustees In This Bankruptcy Proceeding A Decision To Enter Into The RMBS Settlement Would Be Appropriate**

As time has passed without resolution or payment on the RMBS Claims and with the additional work performed by the RMBS Trustees, their counsel, and their experts plus the additional arm's length negotiations that led to the current RMBS Settlement, in my opinion, the benefits to the Certificate Holders of the RMBS Settlement outweigh its burdens.

It is my opinion that the RMBS Settlement is a reasonable way to resolve the pending disputes regarding the allowance of the RMBS Claims on behalf of each RMBS Trust in view of:

- the complexity and number of legal issues raised;

- the multiplicity of pleadings;

- the expense already incurred in the intensive loan-by-loan review conducted on behalf of the RMBS Trustees;

- the experience of counsel;

- the opinions of various expert witnesses;

- the time delays already experienced in the effort to recover payment on account of the RMBS Claims;

- the likelihood of extensive additional delays and increased costs should the Bankruptcy Court require a process other than that set forth on Exhibit "G;"

- the opportunity afforded to the RMBS Trustees to produce evidence in support of the RMBS Claims;

- the agreed-upon pre-trial process;

- the amount of time allotted for trial;

- the support of the Institutional Investors;

- the provisions of the RMBS Settlement that require distributions to be made in accordance with the Governing Agreements;

- the good faith and arm's length efforts to settle; and

- the possibility of expensive and lengthy appeals in the absence of the RMBS Settlement.

**Part III.        Conclusion**

In summary, for all the foregoing reasons, based upon my 43 years of legal experience as a United States Bankruptcy Judge, a law professor, and a practicing commercial lawyer, it is my opinion that the RMBS Settlement provides a reasonable methodology with attendant cost savings, to timely resolve whether and to what extent LBHI breached representations and warranties that materially affected more than 90,000 loans and the value of the contractual claims which make up the RMBS Claims.[70]

My opinion, as expressed herein, is rendered to a reasonable degree of professional certainty.

I reserve the right to modify this opinion should additional information be provided.

*Judith K. Fitzgerald*

Judith K. Fitzgerald

Date:   May 28, 2017

---

[70] However, the RMBS Settlement is not reasonable as to the 5 RMBS Trusts identified in note 3, *supra,* that will receive no distribution from the RMBS Settlement but would be required to provide a release if they accepted it.

63

**EXHIBIT 1 - CURRICULUM VITAE**

BANK_FIN:559990-x 031917-178189

*HONORABLE JUDITH KLASWICK FITZGERALD (RET)*

Tucker Arensberg, P.C.
Suite 1500, 1 PPG Place
Pittsburgh, PA  15222
(412) 594-3933 (office)
jfitzgerald@tuckerlaw.com

## PROFILE - CHAPTER 11 BANKRUPTCY EXPERIENCE (INCLUDING MASS TORT)

As a sitting U.S. Bankruptcy Judge, I presided over and confirmed hundreds of chapter 11 plans of reorganization including more asbestos and mass tort chapter 11 plans, most that utilized § 524 and § 105 injunctions, than any other sitting judge.  I presided over a broad range of bankruptcies that encompassed both large and small companies and hundreds of their affiliates. Among them were companies with mass tort legacy liabilities including Federal Mogul, Owens Corning, W.R. Grace, United States Minerals, USG, Armstrong World Industries, Kaiser Aluminum, AC&S, Combustion Engineering, AB Lummus Global, MidValley, Dresser Industries, Pittsburgh Corning, Swan Transportation, North American Refractories, Global Industrial Technologies, Specialty Products Holding Co., Flintkote and others.  I have addressed the legal, business, insurance and financial issues and business practices confronting companies facing legacy asbestos claims.  Since returning to private practice, I have served as an expert witness and as an advisor regarding the postconfirmation impact of certain plan or trust provisions on matters as diverse as contract or indemnity damages, settlement negotiation practices, malpractice claims, allocation of fees, restructuring, and insurance/reinsurance disputes.  I have been deposed in several matters and have testified as an expert in the United States District Court for the Western District of PA, in the Court of Common Pleas of Allegheny County, Pennsylvania, and in an arbitration conducted in Dallas, Texas as well as in depositions in New York, Arizona, Texas and Pennsylvania.

## PROFESSIONAL EXPERIENCE

August 31, 2013 - Present
    Tucker Arensberg, P.C.
    (September 1, 2015 – present: Shareholder)
    (February 2017 – present: Board of Directors)
    (December 1, 2013 – August 31, 2015: Of Counsel)

    Representative Engagements:
    Representing Debtor-in-Possession in chapter 11 reorganization with over 11,500 potential creditors and notice parties
    Representing  administrative claimant  in settlement negotiations with debtor

HONORABLE JUDITH KLASWICK FITZGERALD (RET)
Page 2

<u>Expert witness in bankruptcy and bankruptcy-related matters</u>

Testifying in a breach of contract/bad faith insurance dispute regarding reasonableness of fees

Testifying in arbitration regarding the effect of bankruptcy on a contractual indemnity

Testifying in a legal malpractice action and professional responsibility dispute

Testifying regarding customary mediation procedures in a dispute regarding good faith insurance negotiations

Serving as a court-appointed expert in a 16 million dollar fee dispute

Serving as court-appointed expert in asbestos trust budget and discovery disputes

Serving as a judge in a moot oral argument involving a billion dollar dispute

Advising a large asbestos trust regarding administration and claims matters

Assisting counsel to the board of a public company on restructuring proposals

<u>Consultant</u>

Consulting in a quarter-billion dollar insurance/re-insurance litigation

Consulting regarding various contract interpretation disputes

Consulting regarding lien perfection and priority dispute

Consulting regarding various bankruptcy claims, PBGC issues, disclosure requirements and other disputes

Consulting in a legal malpractice action and professional responsibility dispute

<u>Court-appointed Receiver</u>

Liquidating a not-for-profit cultural organization

<u>Mediator and Arbitrator in numerous bankruptcy, civil and criminal cases</u>

Hold a Certificate of Completion of Bankruptcy Mediation Training (40 hours) from St. John's University and the American Bankruptcy Institute

Completed mediation training with other organizations

<u>Other Professional Qualifications</u>:

Panel Mediator, U.S. Bankruptcy Court, District of Delaware

Alternative Dispute Resolution, Neutral Evaluation, Mediation Panel Member, U. S. District Court, Western District of PA

Panel Mediator, U.S. Bankruptcy Court, Western District of PA

Member of FedArb (Federal Arbitration, Inc.), an association of former federal judges who now serve as arbitrators and mediators in complex commercial cases

Mediation Council of Western Pennsylvania

May 18, 2015 - Present
<u>Professor of Practice</u>
University of Pittsburgh School of Law
3900 Forbes Avenue
Pittsburgh, PA 15260

Teaching Bankruptcy and Advanced Bankruptcy; other courses to be determined

July 8, 2013 - July 5, 2015
<u>Tenured, Full Professor of Law</u>
Indiana Tech Law School
1600 East Washington Blvd.
Fort Wayne, IN 46803

Teaching Contracts, Commercial Transactions and Bankruptcy
Faculty responsibilities included Faculty Secretary; Promotion and Tenure Committee;
Dean's Search Committee; Long Range Planning Committee; Admissions Committee
(chair); Library Advisory Committee (chair); Faculty Senate (law school representative);
Graduate Council (law school representative); Mentoring Committee; Experiential Learning
Task Force (chair of cross-curricular hypothetical development for Fall 2014-15 1L class and
Spring  2L class); various other task forces established by the Dean to address particular
needs; student mentor; junior faculty mentor;  advisor to assigned students at risk; CLE
presentations to bench and bar

October 30, 1987 - May 31, 2013
<u>Judge, United States Bankruptcy Court Western District of Pennsylvania</u>
5490 U.S. Steel Tower, 600 Grant Street
Pittsburgh, PA 15219
(Chief Judge Jan. 8, 2000 through Dec. 31, 2004)

October 1, 1991 - June 30, 1996 and January 1, 1998 - May 31, 2013
<u>Judge, sitting by special designation in the United States Bankruptcy Court District of
Delaware</u>
Marine Midland Plaza
824 Market Street
Wilmington, DE 19801

HONORABLE JUDITH KLASWICK FITZGERALD (RET)
Page 4

May 13, 1993 - June 30, 2001

Judge, sitting by special designation in the United States Bankruptcy Court Eastern District of Pennsylvania

900 Market Street, Suite 400

Philadelphia, PA 19107

July 1, 2004 - December 31, 2008 (and completing assigned cases until retirement on May 31, 2013)

Judge, sitting by special designation in the District Court of the Virgin Islands

Bankruptcy Division, District of St. Thomas and St. John

5500 Veterans Drive, Room 310

St. Thomas, Virgin Islands 00802

2004 - 2014

Adjunct Professor of Law

Bankruptcy since 2004 and Advanced Bankruptcy since 2008
Secured Transactions (Fall Term, 1997)

University of Pittsburgh School of Law

3900 Forbes Avenue

Pittsburgh, PA 15260

January 1976 - October 1987

Assistant United States Attorney

633 U.S. Post Office & Courthouse
Seventh & Grant Street

Pittsburgh, PA 15219

- Supervisor of the Erie branch office
- Responsible for all civil and criminal litigation in the seven counties of northwestern Pennsylvania
- Grand jury investigations and prosecution of complex criminal matters, including tax fraud, RICO, narcotics, and major white collar crimes
- Prosecution and defense of civil matters, including torts, medical malpractice, admiralty, immigration and environmental claims, bankruptcies, injunctions, Social Security appeals
- Appellate brief writing and oral argument of cases before the U.S. Court of Appeals for the Third Circuit
- Lecturer for and participant in various seminars conducted by the U.S. Department of Justice and various universities

March 1974 - December 1975
   Law Clerk to Judge Gwilym A. Price, Jr.
   Superior Court of Pennsylvania
   Pittsburgh, PA 15219

July 1973 - February 1974
   Law Clerk to President Judge John N. Sawyer
   Beaver County Court of Common Pleas
   Beaver, PA 15009

## COURT ADMISSIONS

Pennsylvania Supreme Court, October 4, 1973
United States District Court, Western District of Pennsylvania, October 4, 1973
United States Court of Appeals for the Third Circuit, February 11, 1976
United States Tax Court, December 14, 1983
United States Supreme Court, July 1, 1985
*Pro hac vice* admissions in Southern District of West Virginia and Eastern District of Virginia

## EDUCATION

University of Pittsburgh School of Law
1973 - Juris Doctor (University Scholarship and Pitman Fellowship recipient)

University of Pittsburgh
1970, 1971 - Political Science Graduate Courses on Fellowship

University of Pittsburgh
1970 - B.S. Psychology, B.A. English Writing

## GRADUATE AWARDS AND ACTIVITIES (Available Upon Request)

## PROFESSIONAL RECOGNITIONS AND AWARDS

- Law 360 Honorable Mention as one of the Top Ten Bankruptcy Judges in History
- Western Pennsylvania Trial Lawyers Recognition for Dedicated Judicial Service, 2014
- The Judith K. Fitzgerald Bankruptcy American Inn of Court named in my honor, 2013
- Debtors' Bar Association of Western Pennsylvania Recognition for Dedicated Judicial Service, 2013
- Lawrence P. King Award for Excellence in the Field of Bankruptcy, 2011
- NCBJ Eagle Award, 2011
- Elected to Membership in the American Law Institute, 2008
- Association of Insolvency & Restructuring Advisors, 2007
- Conrad B. Duberstein "Mensch" Award, Presented by NCBJ, 2006
- Elected as a Fellow of the American College of Bankruptcy, 2004
- Turnarounds & Workouts - Top Ten Bankruptcy Judges (3 years)
- Who's Who of American Women, 1991 - present
- Oxford's Who's Who, 1992 – present
- Barron's Who's Who of Distinguished Professionals, 2015 - present
- United States Department of Justice Special Achievement Awards
- Federal Criminal Investigators Special Service Award, 1988
- United States Department of Commerce Operation Exodus Outstanding Performance Award, 1986
- Pittsburgh Magazine Special Recognition Award, 1980

## PROFESSIONAL ACTIVITIES (GOVERNMENT RELATED)

1992 - 1998    <u>Advisory Committee of Bankruptcy Judges</u>

Administrative Office of the United States Courts, Chair, 1994 - 1996

1993 - 1997    <u>Chambers and Courtroom Umbrella Group</u>

Administrative Office of the United States Courts

(Dealt with automation and technology matters in the federal courts)

1994 - 1998    <u>Chambers Case Management User Group</u>, Chair, 1995 - 1998

(Monitored automation and technology projects under the auspices of the Chambers and Courtroom Umbrella Group)

1994 - 2002    <u>Executive Sponsor, BK CHASER Automation Project</u>

Bankruptcy CHASER Ad Hoc Working Group

(A project that enhanced the utility of information in the court's databases for purposes of judicial case management and ended upon implementation.)

| | |
|---|---|
| 1994 - 1998 | <u>Education Committee</u><br>United States Court of Appeals for the Third Circuit |
| 1995 - 1996 | <u>Bankruptcy Case Management & Statistics Umbrella Group</u><br>Administrative Office of the United States Courts<br>(Dealt with automation and technology matters in the bankruptcy courts, particularly regarding the clerk's offices) |
| 1997 | <u>Bankruptcy Statistics and Data Collection Project</u><br><u>Administrative Office of the United States Courts</u><br>(Evaluated bankruptcy data needs of various constituencies as part of a technology modernization project) |
| 1998 - 2002 | <u>Program Planner,</u> Bankruptcy and Commercial Law Presentations<br>Third Circuit Judicial Conferences |
| 2001 - 2005 | <u>Nonvoting Bankruptcy Judge Representative</u><br>Third Circuit Judicial Council |
| 2002 - 2005 | <u>Member, Judicial Council</u><br>Bankruptcy and Magistrate Judges Committee of the United States Court of Appeals for the Third Circuit |
| 2006 - Present | <u>Founding Member and Program Planner,</u> Third Circuit Bankruptcy Education Committee |
| Various | <u>Program Planner,</u> PA Bar Institute; Commercial Law League of America, ABI, Inns of Court |

## **<u>PROFESSIONAL ACTIVITIES (NON-GOVERNMENT RELATED)</u>**

| | |
|---|---|
| 1973 - present | <u>Allegheny County Bar Association</u><br><br>Member of Audit and Technology Utilization Committees<br>Member, Federal Court, Bankruptcy and Commercial Litigation, and Women and the Law Sections<br>Formerly Chair, Audit Committee<br>Member, Finance Committee, Continuing Legal Education<br>Speakers' Bureau and Public Relations Committees |

Trustee, Criminal Trial Lawyers of Allegheny County
Editor of Newsletter of Criminal Trial Lawyers Association
Nominating Committee

1987 - present    National Conference of Bankruptcy Judges
2010 - 2012, Associate Editor, American Bankruptcy Law Journal
2008 - 2015, Founder and Inaugural Chair, NCBJ Next Generation Program
2002 - 2003, Immediate Past President
2001 - 2002, President
2000 - 2001, Vice President/President Elect; Chair of Elections and Site Selection
1995 - 1998, Treasurer
1999 - 2000, Chair, Endowment for Education
1987 - present - various committees and task forces

1988 - present    American Bankruptcy Institute
2002 - 2007 - Director
Various - Co-chair, Committee on Mass Torts; Member, Nominations Committee
Originator of Law Student Writing Competition for Bankruptcy Litigation Committee, now a competition of the ABI itself
Originator of Mid-Atlantic Regional Program and First Judicial Chair
Judicial Liaison
Planner, Caribbean Conference
Member, Education and Membership Committees
Member, Bankruptcy Litigation Committee and Chair of Project Subcommittee Liaison with Commercial Law League of America
Member, Mediation Committee

1988 - 1993    Federal Investigators Association

Various dates    American Bar Association
Member, National Conference of Federal Trial Judges, Public Education Committee, Business Litigation Section

1991 - present    Commercial Law League of America
2002 - present    Member of Bankruptcy Section Executive Council
2004 - 2006    Member of National Ethics Committee

| | |
|---|---|
| 1992 - 2014 | <u>National Conference of Bankruptcy Clerks</u> |
| 1992 - present | <u>Women's Bar Association of Western PA</u><br>Founding Member |
| 1992 - 2014 | <u>American Inns of Court, Honorable Amy Reynolds  Hay Chapter</u><br>Founding Member and Master (Since 1995, Honorary Master) |
| 1995 - present | <u>International Women's Insolvency and Restructuring Confederation (IWIRC)</u><br>Charter Member, Pittsburgh Chapter |
| 2000 - present | <u>Federal Bar Association</u><br>Awarded Lifetime Honorary Membership, 2001 |
| 2001 - 2006 | <u>Association of Trial Lawyers of America</u><br>Judicial Fellow - Position discontinued by the Association |
| 2001 – 2010,<br>2013 – present | <u>Turnaround Management Association</u>, Pittsburgh Chapter |
| 2002 - 2006 | <u>International Bar Association</u> |
| 2004 - present | <u>American College of Bankruptcy</u><br>Chair, Liaisons Committee<br>Program Developer for Law School Liaison Subcommittee<br>Program Developer for Third Circuit Education Program (October 12, 2012)<br>Member, Judicial Outreach Committee<br>Member, Third Circuit Education Committee |
| 2008 - present | <u>American Law Institute</u><br>Elected Member<br>Currently Consultative Group Member for Consumer Contracts |
| 2010 - present | <u>The Judith K. Fitzgerald Western Pennsylvania Bankruptcy American Inn of Court</u><br>Founding Member and Counselor<br>Chair at various times of Program, Membership and Business Planning Committees |

| 2013 - present | The Pennsylvania Bar Association |
|---|---|
| 2013 - 2015 | The Allen County [Indiana] Bar Association |
| 2013 - 2015 | The Benjamin Harrison American Inn of Court |
| 2015 - present | FedArb (Federal Arbitration, Inc.) |
| | An organization of former federal judges who serve as arbitrators and mediators in complex civil cases |
| 2015 - present | Mediation Council of Western Pennsylvania |
| 2016 - present | Bar Association of the Third Federal Circuit |

## **MISCELLANEOUS**

- Various Interviews in TV, radio and print news media regarding bankruptcy and insolvency matters

- Various podcasts and debates on bankruptcy topics including commentary on U.S. Supreme Court cases and matters of current interest to insolvency practitioners

- Participant in various symposia on insolvency matters, including The DePaul Institute Symposium; the View from the Bench in Washington, D.C.; colloquium on international issues regarding chapter 11 reorganization in Washington, D.C. at the French Embassy; judicial roundtable on international insolvency issues in Dublin, Ireland and cross-border mass tort judicial perspectives in London, United Kingdom

- Judge, Moot Court Trial and Appellate Competitions for University of Pittsburgh School of Law

- Judge, Tax Moot Court Competition at Duquesne University School of Law

- Former Lecturer substituting for the Adjunct Professor, Trial Tactics Duquesne University Law School

- Guest Lecturer in Bankruptcy, University of Miami School of Law

- Instructor and Lecturer for professional groups including:

  The Federal Judicial Center; U.S. Attorney General's Advocacy Institute; University of Pittsburgh School of Law Intensive Trial Advocacy Course; Third Circuit Court of Appeals Judicial Conference; National Conference of Bankruptcy Judges; The American Inns of Court; The Commercial Law League of America; IWIRC; Law Education Institute; American Bankruptcy Institute; The Pennsylvania Bar Association; Allegheny County Bar Association; Pennsylvania Bar Institute; Professional Education Systems, Inc.; Pennsylvania Institute of Certified Public Accountants; The Association of Insolvency & Restructuring Advisors; The Bar Association of the U.S. Virgin Islands; The Internal Revenue Service; The Bankruptcy Bar Association of the Southern District of Florida; The State Bar Association of Nevada (Family Law Practitioners); The Kentucky Bar Association; National Association of Chapter 13 Trustees; Georgetown University Law Center; The Advanced E-Discovery Institute and Views from the Bench; LexisNexis Mealey Conference Groups; DePaul University Business and Commercial Law Symposium; Southern Illinois University School of Law; The Association of Insolvency & Restructuring Advisors; Turnaround Management Association; Commercial Finance Association; Perrin Conferences; Emory Bankruptcy Developments Journal Symposium; The National Association of Attorneys General; The Indiana Tech Law School Lunch and Learn; The Judith K. Fitzgerald Bankruptcy American Inn of Court; American College of Bankruptcy; Equipment Leasing and Finance Agency; The American Bar Association; Allen County Bar Association; Energy and Mineral Law Foundation

## SELECTED CIVIC ACTIVITIES including service on not-for-profit boards

**Available on Request**

## SELECTED PUBLICATIONS

*Oh Dear! What Can The Matter Be? What Will Become Of My Oil And Gas Lease In Bankruptcy?*, in process of publication –in Vol. 37 Energy & Mineral Law Institute (co-author with James W. Kane)

*The Powers of The U.S. Congress: Where Its Constitutional Authority Begins and Ends*, (co-author of Chapter 5, "The Power to Regulate Bankruptcies" with Professor Nancy Marcus)y ABC-CLIO, Brien Hallet, Ed. (2016)

Commercial Law League and Tucker Arensberg Blogpost: "Third Circuit Rules that A Homeowner's Mortgage Insurance Obligation Is Not Modified By A Mortgage Modification" (Mar. 2017)

Commercial Law League and Tucker Arensberg Blogpost: "Alternative Dispute Resolution (ADR):  Is it Right for You?" (Jan. 2016)

Commercial Law League Blogpost:  "The Last Screen: A Cautionary Tale" (Nov. 2015)

Commercial Law League Blogpost: "Growing Medical Marijuana, Problematic In Bankruptcy, and Out" (Aug. 2015)

The National Edition, Rutter Group, Practice Guide, Bankruptcy (2010 - present) (co-editor with U.S. Bankruptcy Judge Mary Walrath and Retired U.S. Bankruptcy Judge and Law Professor Arthur Gonzalez)

Planning for the Time of Trouble:  *Cabrera v. Collazo*, A Case in Point (Commercial Law World Magazine, Summer 2014)

Bankruptcy and Divorce:  Support and Property Division, Second Edition, Aspen Law Business (1994) (co-author) (with annual supplements through 2003)

"When Worlds Collide: Bankruptcy and Its Impact on Domestic Relations and Family Law, Second Edition, American Bankruptcy Institute (2003) (co-author)

Bankruptcy Issues for State Trial Court Judges: A Publication of the American Bankruptcy Institute supported by a grant from the National Conference of Bankruptcy Judges Endowment Fund for Education (c.1995) (co-author)

"Wrestling With Bankruptcy and Divorce Laws in Property Division and Support Issues," 6 JOURNAL OF THE AMERICAN ACADEMY OF MATRIMONIAL LAWYERS 1 (1990) (co-author)

"Wrestling With Bankruptcy and Divorce Laws in Property Division and Support Issues," 6 AMERICAN JOURNAL OF FAMILY LAW, No. 2, 109 (1992) (co-author)

Closing Bankruptcy Cases (a manual for the Federal Judicial Center) (1991) (author)

"Litigating Property Settlement and Support Issues -- A Perspective From the Bankruptcy Bench" Published as a chapter in BANKRUPTCY ISSUES IN MATRIMONIAL CASES:  A PRACTICAL GUIDE, Prentice Hall Law & Business (1992) (co-author)

"The Appraiser In Bankruptcy Court:  Getting Appointed, Getting Paid and Testifying as Experts, "Vol. 5 AMEA APPRAISER, No. 2 (Summer 1992) (author)

"The Judge's Role in Insolvency Proceedings: The View From the Bench; The View From the Bar," Symposium in conjunction with St. John's University School of Law, published at Vol. 10, No.2 Am. Bankr. Inst. L. Rev.511 (Winter 2002)

"Forum Shopping, First Day Order and Case Management Issues in Bankruptcy," (Symposium at DePaul University Law School), published at Vol. 1, No. 4 DePaul Business and Commercial Law Journal 515 (Summer 2003)

"We All Live in a Yellow Submarine: BAPCPA's Impact on Family Law Matters," (Symposium at Southern Illinois School of Law) (author), published at 31 Southern Illinois University Law Journal 563 (Spring 2007)

"Chapter 11 Reorganization Processes in Mass Tort Cases: Success or Failure?" (Mealey's) (author)

"Caswell and Leser, Polar Approaches to Support Arrearages in Chapter 13," 10 Norton Bankruptcy Law Adviser, Clark Boardman Callaghan (Oct. 1992) (co-author)

Chapter 5, "Abstention," Chapter 11 Theory and Practice - A Guide to Reorganization, Queenan, Hendel and Hillinger, eds. (1994)

"Evaluating Involuntary Bankruptcies," Commercial Law League of America (1996)

"Snippets," a column in The Conference News, a quarterly publication of and for the National Conference of Bankruptcy Judges (1998 - 2013) (author)

A Local Rules Guide for Pennsylvania Western District Bankruptcy Court, Pennsylvania Education Systems, Inc., 1989 (collection of forms) (author)

Pennsylvania Law of Juvenile Delinquency & Deprivation, Bisel, 1976 (editor and senior researcher,  annual supplement preparer)

U.S. Attorney's Office Forms Manual, 1979-1985 (contributor)

Ideas and Figures, University of Pittsburgh Literary Magazine, 1968 (contributor)