**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
                                                      :  )

| | |
|---|---|
| In re | )  Chapter 11 Case No. |
| | ) |
| Lehman Brothers Holdings Inc., et al., | )  08-13555 (SCC) |
| | ) |
| Debtors. | )  Jointly Administered |
| | ) |

------------------------------------------------------------ x

**AFFIDAVIT OF ADAM SCOZZAFAVA IN SUPPORT OF LBHI DEBTORS'**
**RULE 9019 MOTION TO APPROVE THE RMBS SETTLEMENT AGREEMENT**

STATE OF DELAWARE    )
                               ) ss.:
NEW CASTLE COUNTY )

ADAM SCOZZAFAVA, being duly sworn, deposes and says:

1. I am a Vice President of Wilmington Trust Company ("**WTC**") and Wilmington Trust, National Association ("**WTNA**"). I have been employed by WTC and WTNA since January 2008. I have personal knowledge of the facts set forth herein. I offer this affidavit in support of the *Motion of Lehman Brothers Holdings Inc. Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C § 105(A) for Entry of Order (A) Approving RMBS Settlement Agreement, (B) Making Certain Required Findings Regarding Decision of RMBS Trustees and LBHI Debtors to Enter into RMBS Settlement Agreement, (C) Scheduling Estimation Proceeding to Determine RMBS Claims and Approving Related Procedures Regarding Conduct of Hearing, and (D) Granting Related Relief* (the "**Motion**"). Specifically, I offer this affidavit in support of the Trustee Findings set forth in Exhibit F of the RMBS Settlement Agreement.[1]

2. WTC and WTNA, respectively, act as trustee or as successor trustee for certain trusts (the "**Wilmington Trusts**") each of which are residential mortgage-backed securitization ("**RMBS**") trusts sponsored by a subsidiary of Lehman Brother Holdings Inc. ("**LBHI**").

3. Proof of claims were timely filed by WTC or WTNA, as applicable, or their predecessors, in their respective capacities as trustee or successor trustee for each of the Wilmington Trusts (WTC and WTNA, each acting solely in their respective capacities as trustee or successor trustee for the applicable Wilmington Trust, are hereafter referred to collectively as "**Wilmington**"). The proofs of claims asserted, among other things, breaches of representations

---

[1] Any terms not defined here are defined in RMBS Settlement Agreement.

2

and warranties made by LBHI in Mortgage Loan Sale and Assignment Agreements, which agreements were assigned to the Wilmington Trusts under the terms of the applicable Trust Agreements.

4.     U.S. Bank National Association, Law Debenture Trust Company of New York, and Deutsche Bank National Trust Company, each in their respective capacities as trustee, successor trustee or separate trustee (the "**Other Trustees**") for other RMBS trusts sponsored by a subsidiary of LBHI (the "**Other Trusts**") also filed proofs of claims.[2]

5.     LBHI objected to the proofs of claims filed by Wilmington and the Other Trustees (or their predecessors) (the "**Claims**").

6.     Wilmington retained Alston & Bird LLP to respond to those objections and to assert the Claims of the Wilmington Trusts. The lawyers at Alston & Bird LLP that advised Wilmington are competent counsel with experience in the areas of bankruptcy; bankruptcy litigation; claims arising from breaches of representations or warranties given in connection with RMBS; and settlement of claims arising from breaches of representations or warranties given in connection with RMBS.

7.     Wilmington and the Other Trustees (collectively, the "**Trustees**"), retained Duff & Phelps and re-underwriting experts to assist in prosecuting the Claims. Duff & Phelps has substantial experience evaluating claims arising in mortgage put-back claims in RMBS on behalf of trustees and in the review of mortgage loan documentation for other participants in RMBS transactions.

---

[2] TMI Trust Company subsequently became the successor to Law Debenture Trust Company of New York.

8. Later, Wilmington also retained Holwell Shuster & Goldberg as special litigation counsel to assert the Claims of the Wilmington Trusts. Holwell Shuster & Goldberg is a law firm experienced in commercial and bankruptcy litigation matters, including RMBS "put-back" claims.

9. The Trustees and LBHI Debtors have made numerous efforts to try to resolve the Claims of the Wilmington Trusts and the Other Trusts (collectively, the "**Trusts**").

### 1. OCTOBER 2015 SETTLEMENT AGREEMENT

10. I understand that on October 26, 2015, the Institutional Investors[3] and the LBHI Debtors informed counsel for the Trustees that they had reached an agreement to resolve the Claims (the "**October 2015 Settlement Agreement**"), which they wanted to present to the Trustees for their consideration. A true and correct copy of the October 2015 Settlement Agreement is attached to the Affidavit of Brad Zwetzig in Connection with RMBS Trustees' Statement in Support of LBHI Debtors' 9019 Motion (the "**U.S. Bank Affidavit**") as **Exhibit 2**.

11. The Institutional Investors and the LBHI Debtors agreed to share the October 2015 Settlement Agreement with the Trustees on the condition that the Trustees agreed to keep the agreement confidential. After agreeing to the confidentiality pre-requisite, the Trustees received a copy of the October 2015 Settlement Agreement.

12. Between November 2015 and early February 2016, the Trustees worked with their counsel and legal and financial consulting experts to evaluate the October 2015 Settlement Agreement. In February 2016, counsel for the Trustees conveyed to the LBHI Debtors, based on preliminary work performed by their consulting experts, the number of Trusts for which the

---

[3] The Institutional Investors at that time comprised a group of institutional investors who were represented then, as now, by Gibbs and Bruns LLP.

Trustees might be advised to accept the settlement. Thereafter, and prior to the Trustees' acceptance deadline, the LBHI Debtors formally withdrew the October 2015 Settlement Agreement.

13.  I understand that following the LBHI Debtors' withdrawal of the October 2015 Settlement Agreement, the LBHI Debtors and the Institutional Investors participated in mediation. At the request of the mediator, the Trustees provided certain information to the mediator, on a confidential basis, to enable him to facilitate a revised settlement.

## 2. NOVEMBER 2016 SETTLEMENT AGREEMENT

14.  On November 30, 2016, the LBHI Debtors sent to the Trustees on a confidential basis a settlement agreement that the Institutional Investors and the LBHI Debtors had executed (the "**November 2016 Settlement Agreement**") for consideration by the Trustees. A true and correct copy of the November 2016 Settlement Agreement is attached to the U.S. Bank Affidavit as **Exhibit 3**.

15.  I was the officer of Wilmington primarily responsible to work with counsel and experts on a day-to-day basis to manage the process of evaluating the November 2016 Settlement Agreement. My responsibilities included coordinating the evaluation process, selecting and working with experts, meeting or speaking with counsel for the Trustees on a frequent basis, and facilitating requests for, and delivery of, relevant data and information needed to evaluate the agreements. I consulted with senior officers of Wilmington as appropriate as part of fulfilling these responsibilities.

**2.1. The Expert Selection Process**

16. The Trustees decided to retain an expert to provide an independent opinion on the reasonableness of the November 2016 Settlement Agreement as a means of resolving the Trustees' claims in the LBHI Debtors bankruptcy cases.

17. The Trustees considered a variety of factors in selecting an expert to evaluate the November 2016 Settlement Agreement, including: (a) credentials, including significant bankruptcy court experience; (b) experience in evaluating the reasonableness of settlements; (c) experience with settlements in complex bankruptcy cases; (d) testifying experience; (e) availability; and (f) absence of conflicts.

18. Taking these factors into consideration, the Trustees selected the Honorable Judge Judith K. Fitzgerald (Ret.) to provide an independent opinion on the reasonableness of the RMBS Settlement Agreement. Judge Fitzgerald's credentials are set forth in Part 1.A, C. and D to her report (the "**Fitzgerald Report**", a copy of which is attached as **Exhibit 2** to the Declaration of Judith K. Fitzgerald in Connection with RMBS Trustees' Statement in Support of LBHI Debtors' 9019 Motion (the "**Fitzgerald Declaration**")) and Exhibit 1 to the Fitzgerald Report. A copy of a supplement to the Fitzgerald Report (the "**Report Supplement**"), discussed below, is attached to the Fitzgerald Declaration as **Exhibit 3**.

19. The Trustees provided a copy of the November 2016 Settlement Agreement to Judge Fitzgerald. She provided comments to the Trustees concerning the November 2016 Settlement Agreement, including comments to certain provisions that she believed needed to be changed to make the offer reasonable. For example Judge Fitzgerald believed, as did the Trustees, that a necessary modification of the November 2016 Settlement Agreement was the removal of restrictions on the Trustees' ability to disclose the terms of the settlement offer to

Investors and solicit their views about the offer in advance of accepting same. *See* Fitzgerald Report at p. 9, and 29-31, 45. In this affidavit, I use the term "Investor" to mean any of the following: certificateholders, noteholders, beneficial owners of certificates, and/or investment managers or advisors acting on behalf of beneficial owners of certificates.

20. The Trustees provided feedback to the LBHI Debtors (including Judge Fitzgerald's comments), which led ultimately to a March 2017 modification of the November 2016 Settlement Agreement. In a letter dated March 17, 2017, the Institutional Investors sent to the Trustees a modified version of the November 2016 Settlement Agreement (the "**RMBS Settlement Agreement**") for their review and consideration. The revisions to the November 2016 Settlement Agreement that resulted in the terms and provisions contained in the RMBS Settlement Agreement addressed the issues raised by the Trustees and Judge Fitzgerald. A true and correct copy of the March 17, 2017 letter that the Institutional Investors sent to the Trustees is attached to the U.S. Bank Affidavit as **Exhibit 4**. A true and correct copy of the RMBS Settlement Agreement that accompanied Exhibit 4 is to the U.S. Bank Affidavit as **Exhibit 5**.

21. In March 2017, counsel for the Trustees requested that Judge Fitzgerald provide an independent opinion on the reasonableness of the RMBS Settlement Agreement as a means of resolving the Trustees' claims in the LBHI Debtors' bankruptcy cases.

22. The RMBS Settlement Agreement afforded the Trustees until June 1, 2017 to accept or reject it. *See* Exh. 5, § 1.01.

23. I continued to work with counsel and other experts as the June 1, 2017 deadline for the Trustees to accept or reject the RMBS Settlement Agreement approached.

### 2.2. The Trustees' Communications with Investors

24. On Monday, March 20, 2017, the Trustees sent a notice to Investors in the Covered Trusts informing them about the RMBS Settlement Agreement (the "**March 2017 Notice**"). A true and correct copy of the March 2017 Notice is attached to the U.S. Bank Affidavit as **Exhibit 6**. The March 2017 Notice included basic terms of the RMBS Settlement Agreement and urged all interested persons to carefully review the RMBS Settlement Agreement. *See* U.S. Bank Aff., Exh. 6 at 3. The March 2017 Notice also informed Investors that the Trustees had retained Judge Fitzgerald to advise them in their evaluation of the RMBS Settlement Agreement, and further advised Investors that if they wished to have their views concerning whether the Trustees should accept or reject the RMBS Settlement Agreement considered by the Trustees and/or Judge Fitzgerald, the Investors should contact the Trustees immediately, and certainly no later than May 5, 2017. *See* U.S. Bank Aff., Exh. 6 at 4-5.

25. In order to deliver the March 2017 Notice and to facilitate the Trustees' future communications with Investors, the Trustees retained Garden City Group, LLC ("**GCG**") to establish a website (the "**Settlement Website**") and publicly disseminate the Trustees' notices. I understand that, at the Trustees' direction, GCG disseminated the March 2017 Notice to certificateholders in the Covered Trusts and posted on the website: (i) the March 2017 Notice, (ii) the RMBS Settlement Agreement, and (iii) the March 17, 2017 letter from the Institutional Investors urging the Trustees to accept it.

26. Apart from the Trustees' efforts, the RMBS Settlement Agreement was publicized in other ways. For example, counsel for the Institutional Investors published a press release on April 3, 2017, a true and correct copy of which is attached to the U.S. Bank Affidavit as **Exhibit 7**. Media sources published articles (collectively, the "**Articles**") concerning the settlement. A

8

true and correct copy of one example of these Articles is attached to the U.S. Bank Affidavit as **Exhibit 8**.

27.    The Trustees' notices stated that Wilmington had established a dedicated electronic mailbox at RMBSSettlement@wilmingtontrust.com for Investors to contact Wilmington to discuss the RMBS Settlement Agreement. Several Investors did contact Wilmington to share their views.

28.    Some Investors wished to discuss giving a direction to Wilmington concerning rejecting the RMBS Settlement. Upon receipt of those letters, Wilmington asked the Investors to verify their holdings, asked Duff and Phelps to calculate the Investors' Voting Rights in the applicable trust(s), and reviewed carefully the Investors' correspondence. Wilmington also promptly provided the correspondence to Judge Fitzgerald for her consideration.

29.    Some Investors posed questions and/or requests for additional information. In response to those inquiries, the Trustees, through GCG, disseminated to Investors an April 21, 2017 notice (the "**April 21, 2017 Notice**") in which they provided additional information about the RMBS Settlement Agreement that was directly responsive to those requests. A true and correct copy of the April 21, 2017 Notice is attached to the U.S. Bank Affidavit as **Exhibit 9**. The April 21, 2017 Notice also reminded Investors again to contact the Trustees "immediately and certainly no later than May 5, 2017" if they had views that they wanted the Trustees and/or their experts to consider when deciding whether to accept or reject the RMBS Settlement Agreement. *See* U.S. Bank Aff., Exh. 9, pp. 5-6.

30.    The Trustees disseminated a third notice on April 27, 2017 (the "**April 27, 2017 Notice**"), alerting certificate holders and any interested parties of the LBHI Debtors' filing of its 9019 Motion. A true and correct copy of the April 27, 2017 Notice is attached to the U.S. Bank

Affidavit as **Exhibit 10**. The April 27, 2017 Notice further publicized that a hearing on the 9019 Motion was scheduled to occur on July 6, 2017 before this Court. *See* U.S. Bank Aff., Exh. 10, at 2.

31. Some of the Investors who sent letters on or before May 5, 2017 requested to speak with Wilmington or its counsel, which Wilmington accommodated. In addition, one group of Investors sent requests for additional information in its May 5th letter and in a follow-up e-mail to counsel for the Trustees and the LBHI Debtors on May 15, 2017. I understand that counsel for Wilmington participated in a number of telephone calls with that Investor group's counsel. After receiving each of the Investor groups' requests for information, I met (by way of several conference calls) with counsel to Wilmington (which calls sometimes included the Other Trustees and counsel to the Other Trustees) to consider what responsive information Wilmington (and the Other Trustees) could share with Investors, in light of at least the following considerations: privacy laws, confidentiality restrictions imposed on the Trustees, fair disclosure, and the risk of prejudicing the Trustees' ability to maximize the value of their Claims. Following those discussions, the Trustees posted additional information on the Settlement Website that was in response to each of the May 5th and May 15th requests. In a June 1, 2017 notice to Investors that is discussed below, the Trustees flagged for Investors that this additional information had been posted.

**2.3. The Trustees' Coordination and Facilitation of Judge Fitzgerald's Evaluation**

32. Throughout the evaluation process, the Trustees took steps to enable Judge Fitzgerald to perform a thorough and robust analysis. Wilmington's counsel participated in scheduled conference calls, in-person meetings with Judge Fitzgerald on a weekly basis and at times more frequently, as well as additional *ad hoc* telephone calls.

33. In response to requests posed by Judge Fitzgerald, the Trustees provided her with (among other documents and information): representative copies of the Governing Agreements, summaries of certain agreement provisions, examples of the representations and warranties that were breached, information related to the Protocol, and a summary of the costs required to comply with the Protocol. The materials that the Trustees provided to Judge Fitzgerald consisted of thousands of pages of documents and data. Trustees' counsel also facilitated a conference call between Judge Fitzgerald and Duff and Phelps to address and answer certain of her questions.

34. In addition to the regular conference calls discussed above, Judge Fitzgerald participated in four in-person meetings with counsel for the Trustees.

35. After completing her analysis, Judge Fitzgerald provided her written report to the Trustees. In her report, Judge Fitzgerald set forth a number of opinions, including her opinions that:

> to a reasonable degree of professional certainty, that the RMBS Settlement sets forth a reasonable methodology to liquidate the disputed RMBS Claims, and that entry into the RMBS Settlement, in the circumstances of this Bankruptcy Proceeding, would be appropriate ….

Fitzgerald Report at p. 10, and that:

> the RMBS Settlement provides a reasonable methodology with attendant cost savings, to timely resolve whether and to what extent LBHI breached representations and warranties that materially affected more than 90,000 loans and the value of the contractual claims which make up the RMBS Claims.

Fitzgerald Report at p. 63.[4]

---

[4] Judge Fitzgerald also stated that:

> However, the RMBS Settlement is not reasonable as to the 5 RMBS Trusts identified in note 3, *supra,* that will receive no distribution from the RMBS Settlement but would be required to provide a release if they accepted it.

Fitzgerald Report at n. 70. One of those five Trusts, SASCO 2005-11H, is a Wilmington Trust.

36. In her report, Judge Fitzgerald noted that a small number of Investors had directed the Trustee to reject the RMBS Settlement Agreement as to Trusts in which they held securities but had not offered to provide indemnity to the Trustees. Judge Fitzgerald opined that a direction without a satisfactory indemnity was not an adequate reason for a Trustee to opt out of the RMBS Settlement Agreement "that provides the advantages that the RMBS Settlement offers and to return, instead, to the lengthy, expensive, long-delayed process encompassed in the Protocol and the uncertainty of an alternative process or better outcome, which could create unnecessary risk to the RMBS Trustees." Fitzgerald Report at p. 41.

37. Within a few days of delivering her report to the Trustees, but before June 1, 2017, U.S. Bank, as trustee, received additional correspondence from Investors, which it reviewed and passed along to Judge Fitzgerald. As a result, Judge Fitzgerald issued the Report Supplement, in which she confirmed that she had reviewed the additional correspondence, which had not caused her to change any of her opinions or recommendations.

### 3. WILMINGTON'S DETERMINATIONS

38. On May 31, 2017 I met in person with Kyle Barry, Vice President and Internal Counsel to M&T Bank;[5] Patrick Tadie, Group Vice President of WTNA and Roseline Maney, Administrative Vice President of WTC and WTNA, Jason Solomon and John C. Weitnauer of Alston & Bird LLP. Gary Hills, Vice President of WTNA participated in that meeting by phone. During that meeting, all of the participants discussed Judge Fitzgerald's report, alternatives to the RMBS Settlement and considered any other factors that could be relevant to whether to accept the RMBS Settlement Agreement, including Investor comments. Counsel responded to all of our

---

[5] Mr. Barry's responsibilities are to provide legal support and counsel to the corporate trust divisions of WTC and WTNA, which are direct or indirect wholly-owned subsidiaries of M&T Bank.

questions, and then counsel was excused while we met to make Wilmington's determinations for each Trust. Wilmington determined to accept the RMBS Settlement Agreement with respect to 42 of the 43 Covered RMBS Trusts that it administers.[6]

### 4. THE TRUSTEES' NOTICE TO INVESTORS OF THEIR ACCEPTANCE

39.  Immediately upon accepting the RMBS Settlement Agreement for the Accepting Trusts on June 1, 2017, the Trustees issued the June 2017 Notice informing Investors of their decisions, which GCG posted on the Settlement Website. *See* Affidavit of Jose Fraga in Connection with RMBS Trustees' Statement in Support of LBHI Debtors' 9019 Motion (the "**Fraga Affidavit**"), ¶ 15. The June 2017 Notice informed Investors of the Trustees' decision to accept the RMBS Settlement Agreement with respect to 238 Covered Trusts. Fraga Aff., Exhibit G. The June 2017 Notice also reminded Investors of the deadline for responses to the LBHI Debtors' 9019 Motion, and for any Investors to provide direction and indemnity acceptable to the Trustees directing the Trustees to terminate the RMBS Settlement Agreement as to a specific Accepting Trust.[7] *Id.*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 29th day of June 2017 in Wilmington, Delaware.

*/s/ Adam Scozzafava*
Adam Scozzafava

---

[6] We determined not to accept the RMBS Settlement on behalf of SASCO 2005-11H. See note 3, above. On June 5, 2017, Wilmington's counsel gave notice that SASCO 2004-15 had terminated and that it would be a Terminated Trust, as that term is used in the RMBS Settlement Agreement.

[7] On June 22, 2017, Wilmington gave notice that it was terminating the RMBS Settlement Agreement as it related to SASCO 2006-S4 due to the receipt of an acceptable direction from Investors in that trust.

Sworn to and subscribed before me
this 29th day of June 2017.

/s/ *[signature]*

NOTARY PUBLIC
Commission Expires:

*[Notary seal: PATRICK A. ZANAR, NOTARY PUBLIC, STATE OF DELAWARE, MY COMMISSION EXPIRES JAN. 19, 2018]*