# EXHIBIT A

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel:  (212) 728-8000
Fax:  (212) 728-8111
Paul V. Shalhoub
Todd G. Cosenza

ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 974-7468
Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)

*Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates*

| |
|---|
| **The complete 9019 Motion and related exhibits (the "Motion") associated with this Notice can be found for review and downloaded, free of charge, at (i) the website of the Debtors' Claims and Noticing Agent, Epiq Bankruptcy Solutions, LLC ("Epiq") available at http://dm.epiq11.com/LBH (the Motion is located within Docket No. 55232) or (ii) the website of the RMBS Trustees' Noticing Agent, The Garden City Group ("GCG") available at http://lbhirmbssettlement.com/pdflib/Lehman_Brothers_Holdings_Inc_Motion.pdf.** |
| **You may also request a copy of the Motion, free of charge, by directly contacting (i) Epiq at (646) 282-2400 or email at Lehman@epiqsystems.com or (ii) GCG at (855) 907-3115 or email at Questions@lbhirmbssettlement.com.** |

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                    )
In re                                               )      Chapter 11 Case No.
                                                    )
Lehman Brothers Holdings Inc., <u>et al.</u>,       )      08-13555 (SCC)
                                                    )
          Debtors.                                  )      Jointly Administered
                                                    )
------------------------------------------------------------x

**NOTICE OF MOTION OF LEHMAN BROTHERS HOLDINGS INC.
PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C. § 105(A) FOR
ENTRY OF ORDER (A) APPROVING RMBS SETTLEMENT
AGREEMENT, (B) MAKING CERTAIN REQUIRED FINDINGS
REGARDING DECISION OF RMBS TRUSTEES AND LBHI DEBTORS
TO ENTER INTO RMBS SETTLEMENT AGREEMENT, (C)
SCHEDULING ESTIMATION PROCEEDING TO DETERMINE RMBS
CLAIMS AND APPROVING RELATED PROCEDURES REGARDING
<u>CONDUCT OF HEARING, AND (D) GRANTING RELATED RELIEF</u>**

          **PLEASE TAKE NOTICE** that, on April 27, 2017 Lehman Brothers Holdings Inc. (the

"<u>Plan Administrator</u>"), as Plan Administrator under the *Modified Third Amended Joint Chapter*

*11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors*, on behalf of itself and the

other affiliated debtors in the above-captioned cases (collectively, the "LBHI Debtors") filed the

Motion of Lehman Brothers Holdings Inc. Pursuant To Fed. R. Bankr. P. 9019 And 11 U.S.C.

§ 105(a) For Entry Of Order (A) Approving RMBS Settlement Agreement, (B) Making Certain

Required Findings Regarding Decision Of RMBS Trustees And LBHI Debtors To Enter Into

RMBS Settlement Agreement, (C) Scheduling Estimation Proceeding To Determine RMBS

Claims And Approving Related Procedures Regarding Conduct Of Hearing, And (D) Granting

Related Relief (the "Motion").   Capitalized terms used but not defined herein shall have the

meanings given to them in the Motion.

   **PLEASE TAKE FURTHER NOTICE** that a hearing will be held on the Motion before

the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the United States

Bankruptcy Court for the Southern District of New York, Courtroom 623, One Bowling Green,

New York, New York 10004 (the "Bankruptcy Court") on **July 6, 2017 at 10:00 a.m.**

**(prevailing Eastern Time)**, or as soon thereafter as counsel may be heard.

   **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion (including

approval of the Trustee Findings and the Debtors' Findings) must be made in writing, state with

particularity the grounds therefor, conform to the Federal Rules of Bankruptcy Procedure and the

Local Bankruptcy Rules for the Southern District of New York, be filed electronically in text

searchable portable document format (PDF) with the Court in accordance with General Order M-

399 (General Order M-399 can be found at www.nysb.uscourts.gov, the official website for the

Court), by registered users of the Court's case filing system and by all other parties in interest

(with a hard copy delivered directly to the Judge's Chambers), and be served in accordance with

General Order M-399, and upon (i) the chambers of the Honorable Shelley C. Chapman, One

Bowling Green, New York, New York 10004, Courtroom 23; (ii) Willkie Farr & Gallagher LLP,

787 Seventh Avenue, New York, New York 10019 (Attn: Paul V. Shalhoub, Esq. and Todd G. Cosenza, Esq.) and Rollin Braswell Fisher LLC, 8350 East Crescent Parkway, Suite 100, Greenwood Village, Colorado 80111 (Attn: Michael A. Rollin, Esq. and Maritza D. Braswell, Esq.), attorneys for LBHI and certain of its affiliates; (iii) Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002 (Attn: Kathy Patrick, Esq. and Robert Madden, Esq.), attorneys for the Institutional Investors; (iv) Chapman & Cutler LLP, 111 West Monroe Street, Chicago, Illinois 60603 (Attn: Franklin H. Top III, Esq. and Scott A. Lewis, Esq.), Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178 (Attn: Michael S. Kraut, Esq.), Seward & Kissel LLP, 1 Battery Park Plaza, New York, New York 10004 (Attn: M. William Munno, Esq. and Daniel E. Guzman, Esq.), Alston & Bird LLP, 1201 West Peachtree Street, Suite 4900, Atlanta, Georgia 30309 (Attn: John C. Weitnauer, Esq.), Holwell Shuster & Goldberg LLP, 750 Seventh Avenue, 26th Floor, New York, New York 10019 (Attn: Michael S. Shuster, Esq.) and Nixon Peabody LLP, 437 Madison Avenue, New York, New York 10022 (Attn: Dennis Drebsky, Esq.), attorneys for the Trustees; and (v) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: William K. Harrington, Esq., Susan D. Golden, Esq., and Andrea B. Schwartz, Esq.) so as to be actually filed and received by no later than **June 22, 2017 at 12:00 noon (EDT)** (the "Objection Deadline").

> **PLEASE TAKE FURTHER NOTICE** that the relief requested in the Motion may be granted without a hearing if no objection is timely filed and served as set forth above and in accordance with the order, dated June 17, 2010, implementing certain notice and case management procedures in these cases (Docket No. 9635) (the "Case Management Order").

Dated:  April 27, 2017
        New York, New York

/s/ Paul V. Shalhoub
Paul V. Shalhoub
Todd G. Cosenza
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel:  (212) 728-8000
Fax:  (212) 728-8111

Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)
ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 974-7468

*Attorneys for Lehman Brothers Holdings Inc. and
Certain of Its Affiliates*

# EXHIBIT B

## AFFIDAVIT

**STATE OF TEXAS**                    )
                                     )  ss:
**CITY AND COUNTY OF DALLAS)**

I, Jeff Aldridge, being duly sworn, depose and say that I am the Advertising Clerk of the Publisher

of THE WALL STREET JOURNAL, a daily national newspaper of general circulation throughout

the United States, Asia and Europe, and that the notice attached to this Affidavit has been regularly

published in THE WALL STREET JOURNAL for Global distribution for

1   insertion(s) on the following date(s):

MAY-15-2017;

ADVERTISER: Lehman Brothers Holdings Inc.;

and that the foregoing statements are true and correct to the best of my knowledge.



Sworn to before me this
15  day of  May          2017

_____
Notary Public

TOBY A. BREITEN
Notary Public
STATE OF TEXAS
My Comm. Exp. April 24, 2018

ADVERTISEMENT

## Legal Notices
To advertise: 800-366-3975 or WSJ.com/classifieds

### BANKRUPTCIES

# COMMODITIES



A refinery complex belonging to Citgo's parent and Venezuelan state oil company PdVSA.

# Dozens of Creditors Crowd Around Citgo

By JULIE WERNAU

Bondholders looking for compensation if Venezuela defaults know that one big pot of money remains: the assets of state-owned oil refiner Citgo Holdings Inc.

But there is a problem. Dozens of companies are lining up with claims on those same funds.

Venezuela last year pledged all of Citgo's equity as collateral to bondholders and to state-owned Russian oil producer Rosneft in debt deals. In addition, at least 43 companies—including ConocoPhillips Co. and Canadian mining firm Crystallex International Corp.—are pursuing legal claims against the government, according to the World Bank's International Center for Settlement of Investment Disputes. These companies say they weren't paid when Venezuela's government expropriated their assets there.

Now, with Wall Street judging that a default may only be a matter of time, it is becoming clear that there isn't nearly enough of Citgo to go around.

"There are more hands out than there are assets to pay them," said Russ Dallen, a partner at investment bank Caracas Capital Markets, based in the Venezuelan capital.

A default would trigger rights enabling any of the claimants to attempt to seize Citgo, triggering cross-default clauses in Venezuelan sovereign bonds if they remain unpaid once a final court order is issued, according to Credit Suisse. Attorneys say that would send creditors into a frenzied legal battle for assets that could take years to resolve.

Citgo reported in bond-offering documents that its 2015 equity value was $8.3 billion. But many analysts believe the true figure is at least $3 billion lower now, and possibly more as rising oil prices and growing stockpiles of fuel squeezed profits for refiners. It also reflects a multibillion-dollar dividend Citgo paid to its parent, Petróleos de Venezuela SA, or PdVSA, the state-owned oil company.

Meanwhile, claims on Citgo appear to be ballooning. Venezuela's total potential liabilities related to claims pending before the International Center for Settlement of Investment Disputes could reach around $30 billion, Credit Suisse estimated in March. These companies are converging on Citgo because it is Venezuela's most accessible source of dollar-based assets, attorneys say.

Based in Houston, Citgo owns refineries in Lake Charles, La.; Corpus Christi, Texas; and Lemont, Ill. The company also owns valuable networks of pipelines and fuel-distribution terminals in the eastern U.S.

Earlier this month, bondholders Sam Cardin (D., Md.) and Marco Rubio (R., Fla.), along with a number of other senators, proposed legislation calling for President Donald Trump to prevent Russian oil giant Rosneft from seizing the company. Foreign control of Citgo would pose a "significant risk" to U.S. energy and national security, the legislation said. Rosneft is currently under U.S. sanctions, which would prevent a takeover of U.S. assets.

"The price here is Citgo and we are getting closer to it," said Robert L. Weigel, a lawyer for Crystallex, which won a $1.4 billion arbitration award last year against Venezuela before the government's expropriation of a gold mine in 2008.

Crystallex is suing PdVSA to recoup a $22 billion dividend that Citgo transferred to its parent in 2015, according to a 2016 exchange offering circular, using the proceeds of a U.S. bond sale. That was after Pd-VSA abandoned plans in early 2015 to sell the subsidiary outright. As Venezuela's most significant asset in the U.S., Citgo it is a "natural target" for judgment creditors, Crystallex wrote.

ConocoPhillips is locked in litigation over U.S. oil rigs drilling in Venezuela that then-President Hugo Chávez declared state property in 2007. The company has asked a U.S. court to cancel the lien Rosneft has on Citgo's stock and declare the pledge a fraudulent transfer, intended to remove assets in Venezuela from the U.S. that could be seized by creditors.

PdVSA said in court filings that any move to cancel the lien is premature and would strip Venezuela of its immunity rights as a sovereign nation. An attorney for Rosneft didn't respond to requests for comment.

PdVSA avoided default last month after scraping together a $2.1 billion payment. This year, Venezuela, PdVSA and Citgo together owe more than $30 billion.

Lee C. Buchheit, a sovereign-debt lawyer with Cleary Gottlieb Steen and Hamilton LLP, warned that any effort by bondholders to claim Citgo shares after a default would entitle Citgo creditors to demand immediate repayment of their loans to the company. That move could financially devastate the refiner.

"Everyone in the game is a big boy and they know the only way Citgo is worth anything is if it is a going concern," Mr. Dallen of Caracas Capital Markets said.

—Alison Sider contributed to this article.

## Coming Due

Venezuela owes $10 billion to bondholders in 2017 and chances for a default are growing



2017 bond payments due

| | |
|---|---|
| $4 billion | |

1Q 2017   2Q   3Q   4Q

Percentage probability of a Venezuelan default

1  2  3  4  5  6  7  8  9  10
years

Sources: Venezuela Opportunity Fund (bond payments); Reuters (percentage probabilities)

THE WALL STREET JOURNAL.

### Remaining Value Is Open Question

Creditors and companies around the world are mounting competing claims for Citgo's assets in the increasingly likely event of a Venezuelan default. But it isn't clear how much value remains.

Citgo, the Houston-based subsidiary of Venezuela's state-owned oil company Petróleos de Venezuela SA, is the largest foreign owner of U.S.-domestic refinery capacity. With three refineries in the U.S., and a network of terminals and pipelines running across 24 states, the company has increasingly become a source of cash for struggling Venezuela.

What the company is worth today is unclear, and estimates vary widely. PdVSA said last year in a bond document that Citgo's 2015 equity value was $8.3 billion. But many analysts place the value much lower than that. One banker calculated that Citgo's equity was worth between $3 billion and $5 billion, based in part on a Moody's Investors Service's 2017 earnings forecast.

Whatever Citgo's value, it is almost certainly less than the more than $20 billion in arbitration claims against the Venezuelan government, made by companies operating in Venezuela whose assets were nationalized under the government's socialist regime.

Citgo was founded in 1910 as Cities Service Co. by Henry Doherty, an oil pioneer from Columbus, Ohio, Over the next 20

years, it expanded through the discovery of oil fields in Kansas and the purchase of refineries in Oklahoma and Texas. In 1964, the company shortened its name to Citgo to sound catchier in marketing campaigns.

Occidental Petroleum Corp. acquired Cities Service in 1982. A year later, Occidental sold the Citgo brand to Southland Corp., owner of 7-Eleven stores.

In 1986, Southland sold 50% of Citgo's equity to PdVSA for $290 million. The deal gave Citgo access to Venezuelan crude for the next 20 years, Pd-VSA provided half of Citgo's working-capital requirements through the supply of crude and petroleum products. In 1990, Pd-VSA acquired the remaining half of Citgo for $665.5 million.

By 2019, one of the most profitable years for refining margins, analysts anticipated that a sale of Citgo would fetch between $8 billion and $11 billion. Recently, Venezuela has relied on the PdVSA unit to plug its financial holes. In 2015, Citgo transferred $2.2 billion to the Venezuelan government through a special dividend using the proceeds of a U.S. bond sale, according to a 2016 exchange offering. Last year, PdVSA pledged 100% of shares in Citgo to its creditors.

There are also $5500 bonds owned Citgo's refinery indebtedness in 29 states and the District of Columbia. While Citgo's oil brand-ings logo may be a familiar sight to many motorists, the stations are independently owned and operated, and not included in the company's valuation.

—Julie Wernau
and Alison Sider

## LEGAL NOTICES
### ADVERTISE TODAY
(800) 366-3975 | www.sales.legalnotices@wsj.com
sales@legalnotices.wsj.com | www.wsj.com/classifieds

© 2017 Dow Jones & Company, Inc. All Rights Reserved.          DOW JONES

**B2 | Monday, May 15, 2017**   THE WALL STREET JOURNAL.

## INDEX TO BUSINESSES

These indexes cite notable references to most parent companies and individuals in today's edition. Articles on regional pages inserts aren't cited in these indexes.

### A - C
adidas ......................B1,B6
AgriKettler ...................B8
Akari Therapeutics ....B10
Alphabet .....................
Amazon.com ................B1
A.J.L. Mueller-Rosenbaum ..B7
Apple ..........................B1
Argo Genesis ...............
Chemtrade ..................B6
BASF ...........................
BellSouth Group ..........B6
Bonfils .......................B6
China Cinda Asset
   Management .............B2
China Construction
   Bank ........................B3
China National
   Petroleum .................B3
China Telecom ............B10

Citgo Holdings ............B1,B2
Kasperzin LLP ..............B2
Langan Precision ........B10
Maersk Line ................B7
McGrowth ....................B8
Morgan Stanley ...........B7

### D - G
Danone .......................
Deutsche Westen ........B10
Dream Hotel ...............B10
Eurobank ....................B4
Farmedmira ................
Facebook .....................B4
Ford Motor ..................B6
Goldman Sachs Group B3

### H - M
Nissan Motor ..............B6
Petrobras de ...............
Procter & Gamble ........B4

### S - W
Summit Commodity
Siemens ......................
Taiwan Semiconductor
   Manufacturing ..........B10
Televisa ......................B10
Urban Produce ............B8
Wayfair .......................B1
Williams-Sonoma .........B1

## INDEX TO PEOPLE

### B - D
Bartels, Paul ...............B6
Bhatia, Mickey ............B8
Cockedine, Keith .........B6
Davies, Steven ............B6

### F - G
Fogel, Greg .................B8
Friedmann, Peter ........B7

Gehry, Frank ...............B1
Griffith, Elmo ..............B2
Gur, Shaul ..................

### I - M
Mozingo, Louise ..........B1

### P - Y
Pfitzenmaier, Tomas ...B6
Stmer, Robert ............B7
Stroopard, Michael .....B7
Tan, H...... .................
Weissaard, Matthias ...B7
Yuessi, Alm... .............

## BUSINESS & FINANCE



This year, Venezuela, Citgo and its parent company PDVSA together owe more than $10 billion.

## CITGO

*Continued from the prior page* said Robert L. Weigel, a lawyer for Crystallex, which won a $1.4 billion arbitration award last year against Venezuela following the government's expropriation of a gold mine in 2008.

Crystallex is suing PdVSA to recoup a $2.2 billion dividend that Citgo transferred to its parent in 2015, according to a 2016 exchange offering circular, using the proceeds of a U.S. bond sale. That was after PdVSA abandoned plans in early 2015 to sell the subsidiary outright. As Venezuela's

most significant asset in the U.S., Citgo it is a "natural target" for judgment creditors, Crystallex wrote.

ConocoPhillips is locked in litigation over U.S. oil rigs drilling in Venezuela that then-President Hugo Chávez declared state property in 2007. The company has asked a U.S. court to cancel the lien

Rosneft has on Citgo's stock and declare the pledge a fraudulent transfer, intended to remove assets to Venezuela from the U.S. that could be seized by creditors.

PdVSA said in court filings that any move to cancel the lien is premature and would strip Venezuela of its immunity rights as a sovereign nation. An attorney for Rosneft didn't respond to requests for comment.

PdVSA avoided default last month after scraping together a $2.1 billion payment. This year, Venezuela, PdVSA and Citgo together owe more than $10 billion.

Lee C. Buchheit, a sovereign-debt lawyer with Cleary Gottlieb Steen and Hamilton LLP, warned that any effort by bondholders to claim Citgo shares after a default would entitle Citgo creditors to demand immediate repayment of their loans to the company. That move could financially devastate the refiner.

"Everyone in the game is a big boy and they know the only way Citgo is worth anything is if it is a going concern," Mr. Ballen of Caracas Capital Markets said.

—*Alison Sider contributed to this article.*

## DEBT

*Continued from the prior page* Corp. have piled into the business of advising on stock listings in the offshore market of Hong Kong.

The same thing has happened in Chinese dollar-bond underwriting, where competition among Chinese banks has pushed the number of firms per deal to an average of 6.4 in 2017, more than double the average for 2011 and roughly triple the number involved in similar deals in the U.S., the U.K. or Germany, according to Dealogic. Some recent Chinese

dollar deals have involved more than 20 banks, according to Dealogic.

The competition hits offshore bond deals, where companies have paid $385 million in fees for underwriting their dollar-bond deals this year, second only to U.S. issuers, according to Dealogic. But fees on such deals for corporate clients were on average a little more than half of what they were for U.S. deals, Thomson Reuters data show.

Fees aren't distributed evenly among investment banks, as they tend to be in the U.S. or Europe, where orders go in a shared pool and other underwriters can see the names of investors in a bond issue and the amount they are buying.

In mainland as well as offshore Chinese bond deals, Chinese issuers urge banks to compete for fees, awarding the biggest amounts to those that snag the most investor orders. One way of amassing that business is through anonymous orders, known as "account or-

ders," that are credited to the bank that receives them.

The use of x-orders is now relatively rare in most other markets around the globe, bankers say. Decades ago, bankers in the U.S. and Europe shifted to a more transparent system, arguing that it ensures a steady and diverse base of investors and helps the bonds trade smoothly.

Some investors say they like x-orders because the anonymity lets them preserve relationships with their favorite banks without offending others on the deal. Many Chinese banks say x-orders help them show their corporate clients that they are earning their fees.

Bankers say x-orders are common in Chinese offshore deals, and can represent as much as 75% of orders.

Some global banks say they are uncomfortable with anonymous orders, and have walked away from deals involving them. Other Western bankers say they feel pressure to place x-orders to keep a top spot in

the bond-underwriting league tables—an important factor when pitching new business.

One challenge is that investors sometimes place duplicate x-orders with multiple banks to make sure they can get all the bonds they want to buy, which can make demand seem larger than it really is, bankers say.

Last year, **China Cinda Asset Management** Co. enlisted 23 banks to ensure the smooth launch of a dollar-denominated bond it was using to bolster capital. Cinda initially aimed to raise as much as $4.45 billion. Bankers on the deal say orders, mostly anonymous, at one point were thought to total about $10 billion. By the time pricing was finished and all the orders reconciled, the value had shrunk to $3.2 billion. Cinda didn't respond to requests for comment.

X-orders also make it impossible to know whether investors are stable long-term holders, or fast-trading hedge funds—and thus, how the bonds will trade.

## APPLE

*Continued from the prior page* signed to project companies' identities. Amazon, named after the rainforest, last week started planting trees in the glass spheres at the base of its new Seattle headquarters.

Apple's late CEO, Steve Jobs, helped initiate the boom. In 2009, he enlisted British architect Norman Foster, designer of the Reanut Tower in New York, to help bring a showcase corporate headquarters to Silicon Valley.

Apple, which recently set a record by topping $800 billion in market capitalization, says the new campus is designed to bring together disparate staff and foster collaboration to create new products.

Since unveiling plans in 2011, Apple's design team has

sought to influence everything from sprinklers to door handles. It commanded so much time of architects that Foster + Partners, which is based in London, eventually opened an office in the Bay Area to better manage requests, two architects said.

Foster + Partners didn't respond to requests for comment. Apple declined to comment.

Some observers see signs of hubris in the architectural bonanza. Ms. Mozingo, of UC Berkeley, believes Silicon Valley's current move to trade flexible, bland workplaces for corporate statements could backfire, tying companies to a place and hindering their ability to relocate or innovate in a dynamic market.

"Once you invest that much cash, you become a different kind of company," Ms. Mozingo said.

ADVERTISEMENT

# Legal Notices

**BANKRUPTCIES**

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111
Paul V. Shalhoub
Todd G. Cosenza

ROLLIN BRASWELL FISHER LLC
8301 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 974-7468
Michael A. Rollin
Maritza Dominguez Braswell (pro hac vice)

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re                                    Chapter 11 Case No.
Lehman Brothers Holdings Inc., et al.,   08-13555 (SCC)
                Debtors.                 (Jointly Administered)

NOTICE OF MOTION OF LEHMAN BROTHERS HOLDINGS INC.
PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C. § 105(a) FOR ENTRY OF ORDER
(A) APPROVING RMBS SETTLEMENT AGREEMENT, (B) MAKING CERTAIN REQUIRED
FINDINGS REGARDING DECISION OF RMBS TRUSTEES AND LBHI DEBTORS TO ENTER
INTO RMBS SETTLEMENT AGREEMENT, (C) SCHEDULING DISTRIBUTION HEARING
TO DETERMINE RMBS CLAIMS AND APPROVING RELATED PROCEDURES REGARDING
CONTENT OF HEARING, AND (D) GRANTING RELATED RELIEF

(full legal notice text continues)

## AMAZON

*Continued from the prior page* livery, but some retailers and logistics companies say they are facing growing pressure to ship online orders faster. Wayfair offers free shipping on orders over $49, but delivery times can range from one or two days to just over two weeks. Pottery Barn charges on a sliding scale based on price, with delivery costs running above $100 for more expensive items. Furniture sold and shipped directly by Amazon is free for Prime members and on orders over $25, while items sold by third-party sellers may cost extra.

To guarantee two-day shipping to 99% of consumers, a retailer or logistics company would need up to a dozen large warehouses spread around the country, plus around 110 smaller facilities to stage deliveries to customers' homes, said Troy Cooper, chief operating officer at XPO Logistics Inc., which manages distribution centers and fulfills online orders for large retailers like IKEA.

By comparison, a retailer can deliver furniture within a week to most customers simply by planting a large distribution center on each coast,

similar to how they would manage inventory for brick-and-mortar stores, Mr. Cooper said.

Amazon is expected to rely on XPO and other third-party logistics providers to manage distribution centers and handle delivery of furniture and appliances for the near future, even as it brings more of its logistics in house in other parts of its business, people familiar with the company's plans say. Amazon declined to

*Shoppers are still generally willing to pay for delivery of furniture.*

comment on its delivery plans. XPO declined to comment on its relationship with Amazon.

Rising sales may be helping reduce the cost burden for online furniture retailing. Costs go up for transportation companies as deliveries get more spread out and infrequent.

"Just in the last year, furniture has taken off," said Richard Phillips, Jr., chief executive at Pilot Freight Services, a Lima, Pa.-based trucking company that makes larger e-commerce deliveries. The com-

pany's No. 1 business-to-consumer shipment has shifted to furniture, from TVs.

Pilot is one of many logistics companies building out nationwide networks to handle bulky items as retailers look for cheaper ways to ship furniture and appliances ordered online.

XPO made 12 million home deliveries last year, up from 9 million in 2015. Estes Express Lines, one of the largest U.S. trucking companies, started a "final mile" service in December after noticing retailers were mixing in more home deliveries.

These companies are filling in part a void left by United Parcel Service Inc. and FedEx Corp., whose executives have complained about bulky items gumming up distribution centers designed to process millions of small packages at lightning speed.

Boston-based Wayfair started building out its own delivery network about a year and a half ago, said Chief Executive Niraj Shah. The company got into doing its own deliveries because it is vital to retaining customers.

He said he isn't worried about Amazon. The giant retailer is hardly a new entrant to the space, and it is hard to get the customer-service side of the equation right, he said.

For Wayfair, delivery times can range from one or two days to just over two weeks,

(photo caption)

P2GW135000-0-B00200-1——————AL

**B2 | Monday, May 15, 2017**  THE WALL STREET JOURNAL.

## INDEX TO BUSINESSES

These indexes cite notable references to most parent companies and individuals in today's edition. Articles on regional pages inserts aren't cited in this index.

**A**
adidas...............................B1,B6
agriaton..........................B6
AirAsia..............................B1
Airbus................................B1
Akari Theraceutics......B10
Alphabet.........................B1,B3
Amazon.com....................B2
American Airlines
Group............................B1,B5
A.Z. Mueller-Alberg......B7

**B**
Arga Genesis
Chemical.......................B6
Banca Popale
e Espereza.....................B10
BASF.................................B3
BetterLife Greenwich...B6
BioFit...............................B6
Boeing..............................B1,B5

**C**
Carter................................B5
CBL & Associates
Properties.....................B9
CBRE Global
Investors......................B9
China Cinda Asset
Management................B10
China National
Petroleum.....................B2
China Telecom...............B7
Citgo Holdings...............B2
Citigroup...........................B6

Comex Technologies.....A2
Companie Financiere
Richemont..............B1,B6
ConocoPhillips..............B2
CrystalRex
International................B2

**D**
Danone.............................B6
Desktop Metal...............B6
Deutsche Bank..............B6
Drexim Holdings..........B6

**E**
ExxonMobil.....................B1

**F**
FamerMac.......................B6
FarmerMac.....................A3,B9
Finnair Oyj....................B2
Ford Motor.....................B5

**G**
Goldman Sachs.............B9

**H**
Happy&Bird....................B7
HSBC Holdings..............B6

**I**
JBG................................B9
Jones Lang LaSalle......B7

**K-L**
Kasperksy Labs.............B6

Maersk Line...................B7
LVMH................................B1

**M**
Maersk Line...................B7
Microsoft.........................B1,A1,B3
Morgan Stanley............B10

**N**
Nissan Motor................B7
Norwegian Air
Shuttle..........................B1

**O**
Oechrke...........................B5

**P**
PetroBeco de
Venezuela.....................B2
Procter & Gamble......B6

**R**
Rosneft Oil.....................B2,B3
Rosneft...........................B2
Ryanair Holdings..........B1

**S**
SoftBank Group.............B10
Southwest Airlines......B1
Summit Commodity
Brokerage.....................B6
Swatch Group................B1

**T**
Uber Technologies.......B1
Urban Produce...............B6

**W**
Wayfair...........................B2
Williams-Sonoma.........B2

## INDEX TO PEOPLE

**A**
Alsop, William...............B1

**B**
Bortek, Paul..................B6
Bhatia, Mohan..............B9

**C**
Carter, Michael.............B5
ColterBox, Keith...........B6

**D**
Davies, Simon...............B6

**F**
Fernandes, Tony..........B1
Foyrll, Greta.................B5
Friedmann, Peter........B7

**G**
Gehrz, Fred..................B6

Griffith, Emma..............B7

**H**
Heinemann, Klaus......B2

**I**
Ingels, Bjarke..............B1
Israeli, Ofer..................B6

**K**
Kamisakes, Walter.....B3

**L**
Lathrop, Gary...............B5
Levandowski,
Anthony........................B1

**M**
Milliotkin, Jon..............B7
Montin, Michael...........B6

Montiyo, Luanda.........B2

**P**
Pfitzenmaier, Tomas..B6

**R**
Risch, Michael..............B2

**S**
Stoner, Spencer...........B7
Sollender, Dan.............A7
Storaard, Michael.......A7
Suiter, Matthew...........A7

**T**
Tan, H......................B7
Tinseth, Randy.............B2

**V**
Viseirick, Kimberly......A7
Venssoopf, Matthias...B5

## BUSINESS & FINANCE



A Boeing 737 Max being assembled for Indonesia's Lion Air at Boeing's facility in Renton, Wash.

### AIRLINES

Continued from the prior page

That has inspired aircraft makers to find a sweet spot for their new jets that satisfies airlines that are fixated on costs and less willing to split deals between more than one plane maker.

Building new jets requires billions of dollars in investment, and potential sales increasingly have become winner-take-all battles for Airbus and Boeing, said Klaus Heinemann, a veteran aviation financier who backed a number of discount carriers and recently stepped down as chairman of **Finnair** Oyj, Finland's flag carrier. "It's a bigger gamble," said Mr. Heinemann. "If you get it wrong, you really get it wrong."

The discount airlines, for instance, took a central role in the design of the 737 Max, as well as the Airbus A320neo family, both of which have new and more fuel-efficient engines that make them cheaper to operate.

The discount carriers also are gravitating to the largest version of the jet they have selected as markets mature and passenger numbers increase. One-third of the Boeing jets sold are configured with the maximum number of seats permitted by regulators, said Randy Tinseth, vice president of marketing at Boeing Commercial Airplanes.

Airbus began delivering its A320neo jetliner to customers last year, and with a head start it has so far outsold the Boeing Max jet.

The competition has increased urgency at both companies to add more seats and cost-saving features.

Adding an extra emergency door allowed Boeing to boost the capacity of the 737 Max 8 jets offered to Ryanair to 197 seats from 189. Ryanair carried more than 100 million passengers last year, making it Europe's biggest airline by that measure.

Airbus has tinkered with the interior layout of its jets to fit more seats at the behest of the discounters, shrinking the size of bathrooms.

Kiran Rao, executive vice president for strategy and marketing at Airbus, said it also plans to introduce larger overhead bins. That would allow passengers to more easily fit carry-on bags.

Meanwhile, Boeing is in talks with airlines, including big budget carriers, about an even longer version of its 737, which would seat about 230 passengers.

### CITGO

Continued from the prior page

companies are converging on Citgo because it is Venezuela's most accessible source of dollar-based assets, attorneys say.

Based in Houston, Citgo owns refineries in Lake Charles, La.; Corpus Christi, Texas; and Lemont, Ill. The company also owns valuable networks of pipelines and fuel-distribution terminals in the eastern U.S.

Earlier this month, Sens. Ben Cardin (D., Md.) and Marco Rubio (R., Fla.), along with a number of other senators, proposed legislation calling for President Donald Trump to prevent Russian oil giant Rosneft from seizing the company. Foreign control of Citgo would pose a "significant risk" to U.S. energy and national security, the legislation said. Rosneft is currently under U.S. sanctions, which would prevent a takeover of U.S. assets.

"The price here is Citgo and we are getting closer to it," said Robert L. Weigel, a lawyer for Crystallex, which won a $1.4 billion arbitration award last year against Venezuela following the government's expropriation of a gold mine in 2008.

Crystallex is making Rosneft's U.S. exposure part of its argument as it seeks to recoup a $2.2 billion dividend that Citgo transferred to its parent in 2015, according to a 2016 exchange offering circular, using the proceeds of a U.S. bond sale. That was after PdVSA abandoned plans in early 2015 to sell the subsidiary outright. As Venezuela's most significant asset in the U.S., Citgo it is a "natural target" for judgment creditors, Crystallex wrote.

ConocoPhillips is locked in litigation over U.S. oil rigs drilling in Venezuela that then-President Hugo Chávez declared property in 2007.

The company has asked a U.S. court to cancel the lien Rosneft has on Citgo's stock and declare the pledge a fraudulent transfer, intended to remove assets to Venezuela from the U.S. that could be seized by creditors.

PdVSA said in court filings that any move to cancel the lien is premature and would strip Venezuela of its immunity rights as a sovereign nation. An attorney for Rosneft didn't respond to requests for comment.

—Alison Sider
contributed to this article.

### AMAZON

Continued from the prior page

logistics companies say they are facing growing pressure to ship online orders faster. Wayfair offers free shipping on orders over $49, but delivery times can range from one or two days to just over two weeks. Pottery Barn charges on a sliding scale based on price, with delivery costs running above $100 for more expensive items. Furniture sold and shipped directly by Amazon is free for Prime members and on orders over $25, while items sold by third-party sellers may cost extra.

To guarantee two-day shipping to 99% of consumers, a retailer or logistics company would need up to a dozen large warehouses spread around the country, plus around 10 smaller facilities to stage deliveries to customers' homes, said Troy Cooper, chief operating officer of XPO Logistics Inc., which manages distribution centers and fulfills online orders for large retailers like IKEA. By comparison, a retailer can deliver furniture within a week to most customers simply by planting a large distribution center on each coast, similar to how they would manage inventory for brick-and-mortar stores, Mr. Cooper said.

Amazon is expected to rely on XPO and other third-party logistics providers to manage distribution centers and handle delivery of furniture and appliances for the near future, even as it brings more of its logistics in house in other parts of its business, people familiar with the company's plans say. Amazon declined to comment on its delivery plans. XPO declined to comment on its relationship with Amazon.

Rising sales may be helping reduce the cost burden for online furniture retailing. Costs go up for transportation companies as deliveries get more spread out and infrequent.

"Just in the last year, furniture has taken off," said Richard Phillips, Jr., chief executive at Pilot Freight Services, a Lima, Pa.-based trucking company that makes larger e-commerce deliveries. The company's No. 1 business-to-consumer shipment has shifted to furniture, from TVs.

Pilot is one of many logistics companies building out nationwide networks to handle bulky items as retailers look for cheaper ways to ship furniture and appliances ordered online. XPO made 12 million home deliveries last year, up from 9 million in 2015. Estes Express Lines, one of the largest U.S. trucking companies, started a "final mile" service in December after noticing retailers were mixing in more home deliveries.

These companies are filling in part a void left by United Parcel Service Inc. and FedEx Corp., whose executives have complained about bulky items gumming up distribution centers designed to process millions of small packages at lightning speed.

Wayfair started building out its own delivery network about a year and a half ago, said Chief Executive Niraj Shah.

He said he isn't worried about Amazon. The giant retailer is hardly a new entrant to the space, and it is hard to get the customer-service side of the equation right, he said.

For Wayfair, delivery times can range from one or two days to just over two weeks.

### APPLE

Continued from the prior page

started planting trees in the glass spheres at the base of its new Seattle headquarters.

Apple's late CEO, Steve Jobs, helped initiate the boom. In 2009, he enlisted British architect Norman Foster, designer of the Hearst Tower in New York, to help bring a showcase corporate headquarters to Silicon Valley.

Apple, which recently set a record by topping $800 billion in market capitalization, says the new campus is designed to bring together disparate staff and foster collaboration to create new products.

Since unveiling plans in 2011, Apple's design team has sought to influence everything from sprinklers to door handles. It commanded so much time of architects that Foster + Partners, which is based in London, eventually opened an office in the Bay Area to better manage requests, two architects said.

Foster + Partners didn't respond to requests for comment. Apple declined to comment.

Some observers see signs of hubris in the architectural bonanza. Ms. Mozingo, of UC Berkeley, believes Silicon Valley's current move to trade flexible, bland workplaces for corporate statements could backfire, tying companies to a place and hindering their ability to relocate or innovate in a dynamic market.

"Once you invest that much cash, you become a different kind of company," Ms. Mozingo said.

---

ADVERTISEMENT

## Legal Notices

**BANKRUPTCIES**

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007
Attn: Paul V. Shalhoub
Todd G. Cosenza

ROLLIN BRASWELL FISHER LLC
8390 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 945-7416
Attn: Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)

*Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re                                    Chapter 11 Case No.
Lehman Brothers Holdings Inc., et al.,   08-13555 (SCC)
                                         (Jointly Administered)

**NOTICE OF MOTION OF LEHMAN BROTHERS HOLDINGS INC. PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C. § 105(a) FOR ENTRY OF ORDER (A) APPROVING RMBS SETTLEMENT AGREEMENT, (B) MAKING CERTAIN REQUIRED FINDINGS REGARDING DECISION OF RMBS TRUSTEES AND LBHI DEBTORS TO ENTER INTO RMBS SETTLEMENT AGREEMENT, (C) SCHEDULING ESTIMATION PROCEEDING TO DETERMINE RMBS CLAIMS AND APPROVING RELATED PROCEDURES REGARDING CONDUCT OF HEARING, AND (D) GRANTING RELATED RELIEF**

PLEASE TAKE NOTICE that, on April 27, 2017, Lehman Brothers Holdings Inc. (the "Plan Administrator"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors*, on behalf of itself and the other affiliated debtors in the above-referenced cases (collectively, the "LBHI Debtors") filed the Motion of Lehman Brothers Holdings Inc. Pursuant To Fed. R. Bankr. P. 9019 and 11 U.S.C. § 105(a) For Entry Of Order (A) Approving RMBS Settlement Agreement, (B) Making Certain Required Findings Regarding Decision Of RMBS Trustees And LBHI Debtors To Enter Into RMBS Settlement Agreement, (C) Scheduling Estimation Proceeding To Determine RMBS Claims And Approving Related Procedures Regarding Conduct Of Hearing, And (D) Granting Related Relief (the "Motion"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

PLEASE TAKE FURTHER NOTICE that a hearing will be held on the Motion before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 623, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court") on **July 6, 2017 at 10:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion (including approval of the Trustee Findings and the Debtors' Findings) must be made in writing, must work particularize the grounds therefor, conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, be filed electronically on the court's Electronic Case Filing System (the "ECF") with the court (a) in accordance with General Order M-399 (General Order M-399 can be found at www.nysb.uscourts.gov) by the undersigned pursuant to the court's case filing system and by (c) other parties in interest (with a hard copy delivered to the Judge's Chambers), and be served so as to be received in accordance with General Order M-399, and upon (i) the chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 623; (ii) Weil, Gotshal & Manges LLP, 767 Seventh Avenue, New York, New York 10019, (Attn: Paul V. Shalhoub, Esq. and Todd G. Cosenza, Esq.) and Rollin Braswell Fisher LLC, 8390 East Crescent Parkway, Suite 100, Greenwood Village, Colorado 80111 (Attn: Michael A. Rollin, Esq. and Maritza D. Braswell, Esq.), attorneys for LBHI and certain of its affiliates; (iii) the Office of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: William K. Harrington, Esq., Susan D. Golden, Esq. and Andrea B. Schwartz, Esq.) so as to be actually filed and received by **June 22, 2017 at 12:00 noon (EDT)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that the relief requested in the Motion may be granted without a hearing if no objection is timely filed and served as set forth above and in accordance with the order, dated June 17, 2010, implementing certain notice and case management procedures in these cases (Docket No. 9635) (the "Case Management Order").

Dated: April 27, 2017
        New York, New York

/s/ Paul V. Shalhoub
Paul V. Shalhoub
Todd G. Cosenza
WEIL GOTSHAL & MANGES LLP
767 Seventh Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)
ROLLIN BRASWELL FISHER LLC
8390 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 945-7416

*Attorneys for Lehman Brothers Holdings Inc. and Certain of Its Affiliates*

**AFFIDAVIT OF PUBLICATION**

**IN THE MATTER OF:** *Lehman Brothers Holdings, Inc.*

**STATE OF NEW YORK**

                    **SS:**

**COUNTY OF NEW YORK**

I, Hania Owsinski, being duly sworn, herby certify that (a) I am the Account Planner, US Advertising of FT Publications, Inc. Publisher of the FINANCIAL TIMES, a daily newspaper published and of general circulation worldwide including the City and County of New York, and (b) that the Notice of which the annexed is a copy was published in THE FINANCIAL TIMES ON THE 15th DAY of May 2017.

                    HANIA OWSINSKI, ACCOUNT PLANNER, US ADVERTISING:

**SWORN TO ME BEFORE THIS:**

15th day of May, 2017

**NOTARY PUBLIC**

NICOLE ELEZA SCHWARTZ
Notary Public, State of New York
Registration #02SC6325918
Qualified in New York County
Commission Expires June 8, 2019

**FINANCIAL TIMES COMPANIES**

## Technology. Virtual money

# Alt-coin bets spur online crypto craze

**Bitcoin still leads the way as a rash of new currencies pushes the market's value past $50bn**

IZABELLA KAMINSKA and PAUL MURPHY

Most organisations have some IT workers who slip under the radar but what is that quiet tech guy doing when he should be fixing the server?

He may be pursuing a new career specialising in crypto currencies, also known as alt-coins.

In virtual terms at least, he could soon be earning 20 times his salary as he joins the latest online investing craze, which has shades of dotcom exuberance.

Using digital money loaned on an online exchange, IT staff (mainly those at financial services companies) are betting on alt-coins during working hours.

An investment of a few thousand dollars a month ago in "muse", a newly fashionable currency, is now worth close to $500,000. Last week alone the price rose 278 per cent. At that trajectory, the IT guy will be a dollar-millionaire by Thursday.

Except these are not real-world dollars. This virtual money, one of the many variants on bitcoin, the original crypto currency that has been around for more than eight years. There is, however, a speculative frenzy for a new line of investment in the crypto market through initial coin offerings (ICOs).

Aping the real-world process of floating a company on a stock market, this crypto version involves a group publishing a business plan, commonly known as a white paper, and then promoting the sale to speculators through internet forums.

The ICOs raise money in existing crypto currencies, mostly bitcoin and "ether", another popular token. Many of the more than $50 alt-coins on the market are bitcoin copies, others are simply contracts that sit embedded in other crypto currency protocols such as Ethereum — a platform that mimics bitcoin's blockchain technology but adds a smart contract feature.

The bitcoin copies are mineable — which means the number of coins in circulation expands — whereas the contracts tend to be non-mineable, with a capped number of coins in circulation.

"The ICO appeals to people who have a lot less competence to evaluate what they're investing in," said Jorge Stolfi, a computer science professor at the State University of Campinas in Brazil, who made a prominent case to the US Securities Exchange Commission about the dangers of bitcoin last year.

The first example of this was the Ethereum platform itself, which launched in 2014 with ether tokens. It initially raised $18bn at $0.40 a token; the tokens are now valued at $90 apiece.

While close to $400m was raised through ICOs last year — and $1.2bn in total — in recent weeks there has been an explosion of issues. These include "zrcoin", which claims to base its value on cubic zirconia, and Voise, a decentralised music platform.

The total market capitalisation of all alt-coins burst past $50bn last week. Bitcoin itself has almost doubled in price since March, but some alt-coins have jumped four or fivefold in the past week.

"The applicable crowd psychology textbook here is Extraordinary Popular Delusions and the Madness of Crowds," said Richard Gerard, author of a forthcoming analysis of the industry to be called Attack of the 50-Foot Blockchain.

Whether the faceless IT guy cited at the start of this article will ever manage to turn his muse into real-world cash is a burning question.

In recent weeks crypto traders have been hit by a sudden inability to withdraw dollars after a crackdown by numerous banks previously used to access the real-world payments system. Technical limitations associated with the bitcoin platform have also slowed trade settlements, making the crypto currency unusable for day-to-day transactions.

One specialist OTC crypto currency trader said: "It's a real concern, and we've started to use ether to move money around a lot more now as it will actually be there when you need it."

The delays have had the most effect on bitcoin's primary use; servicing the dark markets often used by drug dealers. One of them, AlphaBay, has said it is increasingly using ether.

Locked in the market and stuck with no immediate use for their alt-coins and tokens, many speculators have been happy to chase the ICO fad.

This month TokenCard, a company claiming to have a blockchain development called New Alchemy, was able to boast of raising $16m in three minutes. The prospect of regulatory intervention is not concerning all investors. Many insist they are dealing in a utility, not buying an interest in a company, and so should remain out of regulatory reach.

"It is very hard to say if they should be regulated or not. It really depends on the nature of the rights and features of the particular token or coin, or the grants to the holder," said David Shearer, a partner at Norton Rose Fulbright. While some token sales grant rights similar to holding equity in a company, others offer fewer rights.

An ICO called "belch", an investment fund powered by artificial intelligence, promises holders the right to receive 60 per cent of the venture's quarterly profits while reinvesting a further 25 per cent in its portfolio.

The phenomenon is reminiscent of the early days of the still-unregulated eurobond markets, which mushroomed in size in the 1960s and 1970s and became an important source of alternative dollar funding for corporations from out because of stricter money controls.

In the style of penny stocks, for every successful token issued there are many more that fail. With ICOs, uncertainty over exactly what it is you are buying adds to the risk.

"People are willing to spend on something, but they own nothing. It's a promise from a development team which may or may not be useful to people in the market" said Arthur Hayes, a trader for BitMex, a crypto currency derivative exchange. "I think it's interesting that people can raise $10m in minutes based on a dream."



A bit behind: crypto traders were hit by an inability to withdraw dollars after banks cracked down — Chris Ratcliffe/Bloomberg

**$50bn** Total market capitalisation of all alt-coins

**278%** The rise in the value of 'muse' in last week alone

---

## Legal Notices

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111
Paul V. Shalhoub
Todd G. Cosenza

ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 974-7468
Michael A. Rollin
Maritza Dominguez Braswell (pro hac vice)

Attorneys for Lehman Brothers Holdings Inc. and Certain of its Affiliates

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                          Chapter 11 Case No.

Lehman Brothers Holdings Inc., et al.,   08-13555 (SCC)

Debtors.                        Jointly Administered

NOTICE OF MOTION OF LEHMAN BROTHERS HOLDINGS INC.

PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C. § 105(A) FOR ENTRY OF ORDER (A) APPROVING RMBS SETTLEMENT AGREEMENT, (B) MAKING CERTAIN REQUIRED FINDINGS REGARDING DECISION OF RMBS TRUSTEES AND LBHI DEBTORS TO ENTER INTO RMBS SETTLEMENT AGREEMENT, (C) SCHEDULING ESTIMATION PROCEEDING TO DETERMINE RMBS CLAIMS AND APPROVING PROCEDURES REGARDING CONDUCT OF HEARING, AND (D) GRANTING RELATED RELIEF

PLEASE TAKE NOTICE that, on April 27, 2017 Lehman Brothers Holdings Inc. (the "Plan Administrator"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors, on behalf of itself and the other affiliated debtors in the above-captioned cases (collectively, the "LBHI Debtors") filed the Motion of Lehman Brothers Holdings Inc. Pursuant To Fed. R. Bankr. P. 9019 And 11 U.S.C. § 105(a) For Entry Of Order (A) Approving RMBS Settlement Agreement, (B) Making Certain Required Findings Regarding Decision Of RMBS Trustees And LBHI Debtors To Enter Into RMBS Settlement Agreement, (C) Scheduling Estimation Proceeding To Determine RMBS Claims And Approving Procedures Regarding Conduct Of Hearing, And (D) Granting Related Relief (the "Motion").

PLEASE TAKE FURTHER NOTICE that a hearing will be held on the Motion before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 623, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court") on July 6, 2017 at 10:00 a.m. (prevailing Eastern Time), or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that the relief requested in the Motion may be granted without a hearing if no objection is timely filed and served as set forth above and in accordance with the order, dated June 17, 2010, implementing certain notice and case management procedures in these cases (Docket No. 9635) (the "Case Management Order").

Dated: April 27, 2017
       New York, New York

/s/ Paul V. Shalhoub
Paul V. Shalhoub
Todd G. Cosenza
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111

Michael A. Rollin
Maritza Dominguez Braswell (pro hac vice)
ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 974-7468
Michael A. Rollin

Attorneys for Lehman Brothers Holdings Inc. and Certain of its Affiliates

The complete 9019 Motion and related exhibits (the "Motion") associated with this Notice can be found for review and downloaded, free of charge, at (i) the website of the Debtors' Claims and Noticing Agent, Epiq Bankruptcy Solutions, LLC ("Epiq") available at http://dm.epiq11.com/LBH (the Motion is located within Docket No. 55232) or (ii) the website of the RMBS Trustees' Noticing Agent, The Garden City Group ("GCG") available at http://lbhirmbssettlement.com/pdf/lbi/Lehman_Brothers_Holdings_Inc_Motion.pdf.

You may also request a copy of the Motion, free of charge, by directly contacting (i) Epiq at (646) 282-2400 or email at LehmanExpq@epiqsystems.com or (ii) GCG at (855) 907-3115 or email at Questions@lbhirmbssettlement.com.

Transactions trapped
### How panic spread after Bitfinex was cyber hacked

Huge wealth built trading crypto currencies is worth nothing if it remains frozen in cyber space — a state of frustration readily understood by customers of Hong Kong-based Bitfinex, one of the most prominent and popular bitcoin exchanges globally.

In August last year, Bitfinex suffered a cyber hack that saw 120,000 bitcoins stolen from customer balances. As compensation, the exchange issued IOUs called BFX, but those digital promises were subsequently redeemed earlier this year, with customers having their accounts at Bitfinex credited with dollar balances. As customers moved to withdraw those dollars it emerged that Bitfinex was suddenly unable to process these transactions. On April 13, Bitfinex officially alerted customers to the fact it was "experiencing delays in the processing of outbound USD wires to customers" because "the normal channels that we have been operating through in the past are currently unavailable".

The issue was unilateral action by those correspondent banks Bitfinex had been using as a gateway to the world's real money payments systems.

On April 17, the exchange announced that "all incoming wires to Bitfinex will be blocked and refused by our Taiwan banks", adding that it was continuing to work on alternative solutions for customers who wanted either to deposit or withdraw in fiat.

Panic spread through the ranks of customers as Bitfinex prices diverged from all other exchanges by more than $200, leading some reportedly to fly to Taiwan to open local bank accounts in the hope of accessing frozen funds.

A video has surfaced where Bitfinex's chief security officer, Phil Potter, says: "There's been lots of cat and mouse tricks that everyone in the bitcoin industry has to avail themselves of." Izabella Kaminska

---

### Banks
# JPMorgan looks to Dublin for custody business expansion

LAURA NOONAN — HONG KONG

JPMorgan Chase is going on a hiring spree in Dublin to expand its custody and fund services so it can take on the world's biggest trust banks.

The US bank currently employs 500 people in the Irish capital in custody and fund services, transaction services, and technology and operations.

It will recruit what it described as a "significant" number of people for the custody and fund services business over the next three years, said James Kenny, JPMorgan's head of investor services.

JPMorgan is about to buy a 150,000 sq ft space in a landmark Dublin development called Capital Docks, which could accommodate more than 1,000 people. The move was initially linked to the UK's Brexit vote, as US banks seek alternative routes to the EU once Britain leaves the bloc.

"Growth plans are driving our real estate plan," Mr Kenny told the Financial Times, adding that custody and fund services would be the biggest target area.

Custody and fund services, where banks safeguard and administer investment assets for institutions, hedge funds and other clients, have become more attractive in recent years because they require relatively little capital.

JPMorgan has traditionally been the world's third-biggest fund custodian, as measured by industry league tables for assets under custody, after BNY Mellon and State Street. It is expected to jump to second place after securing a $1.3tn mandate from BlackRock.

Daniel Pinto, head of JPMorgan's investment bank, has increased the technology budget for custody and fund services by 50 per cent over the past three years.

Demand for financial services talent in Dublin is likely to shoot up as insurers, banks and other financial services groups contemplate expanding their operations there after the UK leaves the EU.

Mr Kenny said JPMorgan's impression is that some jobs can be "filled by people moving from other countries" because Ireland has a "very flexible immigration policy".

"The binding constraint in Ireland isn't really around the supply of qualified people; it's around infrastructure — the infrastructure in the city, the supply of housing . . . the capacity in the school system, the domestic transport infrastructure," he said.

US bank JPMorgan employs 500 people in the Irish capital

---

### Financials
# Private equity fundraising in Europe hits post-crisis high

JAVIER ESPINOZA — NEW YORK

Private equity fundraising across Europe hit its highest level last year since 2008 at €74.5bn, a 37 per cent increase, as investors hunted for value in a low interest rate environment, a report shows.

Trade group Invest Europe's 2016 report on private equity in the continent revealed the sector's investments totalled €53.7bn last year, the second highest amount in almost a decade.

Nearly 6,000 companies across Europe benefited from investment, 83 per cent of which were small and medium-sized enterprises, it found.

"This data demonstrates high investor confidence in European private equity, in an otherwise low-yield global investment environment," said Michael Collins, Invest Europe's chief executive. "All European economies are now growing and investors value the proven ability of European fund managers to find attractive investment opportunities across sectors and geographies."

In the last four years, European private equity funds have raised more than €240bn — in excess of twice the amount raised in the four years following the financial crisis, 2009 to 2012.

Pension funds accounted for more than a third of capital raised in 2016.

The report offered a breakdown of the fundraising by sector. Consumer goods and services in Europe received the largest amount, at 28 per cent of the total — representing a 25 per cent year-on-year increase for the sector.

The technology sector took a fifth of the investment, as did business-to-business products and services, according to Invest Europe, which represents European private equity and venture capital firms and their investors.

By geography, France and Benelux-based companies received more than a third of private equity investments in 2016. Investments in southern Europe were 19 per cent of the total, mainly driven by increases in Italy and Spain.

Companies in the UK and Ireland and in Germany, Austria and Switzerland each had about 17 per cent share of the total investment, followed by the Nordic countries at 9 per cent.

It has become easier to raise funds both in the US and Europe as investors look for profits in a record-low interest rate environment and as hedge funds lose their appeal. In New York, Apollo is set to raise $20bn from investors this year. CVC expects to enjoy the largest European fundraising ever, at €18bn.

---

## Contracts & Tenders

BHARAT HEAVY ELECTRICALS LIMITED
(A Govt. of India Undertaking)

NOTICE INVITING TENDER
Bids are invited from manufacturers for supply of the following:

NIT No./Tender Ref
NIT No.: NIT_32660 (www.bhel.com)

727022368  dt: 06.06.17

| ITEM DESCRIPTION | REQUIREMENT NOS. |
|---|---|
| GATE CHANNELS SET6/PS2 | 55000 |
| GATE CHANNELS RH140 | 55000 |
| GATE CHANNELS RH240 | 55000 |
| GATE CHANNELS RH340 | 55000 |
| GATE CHANNELS RH240 | 55000 |



**The New York Times**

620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

MAY 15 _____ 2012

I, Alice Weber, in my capacity as a Principal Clerk of the Publisher of **The New York Times** a

daily newspaper of general circulation printed and published in the City, County and State of New York,

hereby certify that the advertisement annexed hereto was published in the editions of

**The New York Times** on the following date or dates, to wit on

MAY 15 2017    Bb

_Alice Weber_

Sworn before me the

15 day of May, 2017

_Deirdre C. Deignan_

Notary Public

DEIRDRE C. DEIGNAN
Notary Public, State of New York
Registration #01DE6271693
Qualified In Nassau County
Commission Expires Nov. 5, 2020

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111
Paul V. Shalhoub
Todd G. Cosenza

ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 974-7468
Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re                                          Chapter 11 Case No.

Lehman Brothers Holdings Inc., et al.,         08-13555 (SCC)

Debtors.                                        Jointly Administered

### NOTICE OF MOTION OF LEHMAN BROTHERS HOLDINGS INC. PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C. § 105(A) FOR ENTRY OF ORDER (A) APPROVING RMBS SETTLEMENT AGREEMENT, (B) MAKING CERTAIN REQUIRED FINDINGS REGARDING DECISION OF RMBS TRUSTEES AND LBHI DEBTORS TO ENTER INTO RMBS SETTLEMENT AGREEMENT, (C) SCHEDULING ESTIMATION PROCEEDING TO DETERMINE RMBS CLAIMS AND APPROVING RELATED PROCEDURES REGARDING CONDUCT OF HEARING, AND (D) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that, on April 27, 2017 Lehman Brothers Holdings Inc. (the "Plan Administrator"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors*, on behalf of itself and the other affiliated debtors in the above-captioned cases (collectively, the "LBHI Debtors") filed the Motion of Lehman Brothers Holdings Inc. Pursuant To Fed. R. Bankr. P. 9019 And 11 U.S.C. § 105(a) For Entry Of Order (A) Approving RMBS Settlement Agreement, (B) Making Certain

The complete 9019 Motion and related exhibits (the "Motion") associated with this Notice can be found for review and downloaded, free of charge, at (i) the website of the Debtors' Claims and Noticing Agent, Epiq Bankruptcy Solutions, LLC ["Epiq"] available at http://dm.epiq11.com/LBH (the Motion is located within Docket No. 55232) or (ii) the website of the RMBS Trustees' Noticing Agent, The Garden City Group ("GCG") available at http://lbhirmbssettlement.com/pdffile/ Lehman_Brothers_Holdings_Inc._Motion.pdf.

You may also request a copy of the Motion, free of charge, by directly contacting (i) Epiq at (646) 282-2400 or email at Lehman@epiqsystems.com or (ii) GCG at (855) 907-3115 or email at Questions@lbhirmbssettlement.com.

(iv) Chapman & Cutler LLP, 111 West Monroe Street, Chicago, Illinois 60603 (Attn: Franklin H. Top III, Esq. and Scott A. Lewis, Esq.), Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178 (Attn: Michael S. Kraut, Esq.), Seward & Kissel LLP, 1 Battery Park Plaza, New York, New York 10004 (Attn: M. William Munno, Esq. and Daniel E. Guzman, Esq.), Alston & Bird LLP, 1201 West Peachtree Street, Suite 4900, Atlanta, Georgia 30309 (Attn: John C. Weitnauer, Esq.), Holwell Shuster & Goldberg LLP, 750 Seventh Avenue, 26th

## MEDIA

## Dystopian Drama and Partisan Humor: Politics Jolts the Idiot Box Awake

From First Business Page

Stephen Colbert, whose politically engaged comedy is helping him supplant Mr. Fallon as No. 1 in late night.

As the big broadcast networks and ad buyers descend on Manhattan this week for the start of the annual advertising sales season known as upfronts, the Colbert-Fallon role reversal says everything you need to know about the political charge that's shaking up the television world.

A year ago, the television-world chatter was all about how Mr. Colbert had played second fiddle at the CBS advertiser presentation to the dancing, singing and absolutely joyful comedian who follows him in the late night schedule, James Corden.

The thinking at the time had it that people wanted a party-like-it's-1999 late night experience, which Jimmy Fallon and Mr. Corden offered and Mr. Colbert, then struggling in the ratings, presumably did not. Now, as Alexander Nazaryan wrote in the Newsweek piece on Mr. Fallon's new standing, "Americans want rage."

Actually, it seems, a good subset of them want "woke."

It's tempting to declare this the age of "Woke TV," but that seems to tread too close to Pepsi/Kylie territory.

"Woke," after all, gained prominence as a hashtag in the early

days of the Black Lives Matter movement, signifying that "you're down with the historical fight against prejudice," arising from "a specific context of black struggle," as my colleague Amanda Hess wrote in The New York Times Magazine last year.

Its meaning broadened so that when MTV registered it on its new slang list, it defined it as "being aware," which is one reason a blog post on the Oxford Dictionaries' website concluded in November that "'woke' has been racially sanitized for a mainstream audience."

When applied to television, both usages are in play. And, given that they're often referring to television that appeals to people distraught over the Trump presidency, perhaps the genre should be referred to as "Resistance TV."

Whatever you call it, it's not for everyone. There's no concurrent surge in scripted television shows capturing the pro-Trump zeitgeist, though there would seem to be an audience for one ("alt-TV?").

"There are people out there who are very disconnected from the popular culture," Lionel Chetwynd, the writer and executive producer who has made a career of being the rare conservative in Hollywood, told me last week. "There is a restless throng that can become a market if you speak to them in the language they can hear"

He says he's working on a new show that will do that.

Also, as André Brock, a professor of communication studies at the University of Michigan, told me last week, "For every 'woke' TV show, there are seven sitcoms about whiteness," adding, "they just rebooted Baywatch." (Mr. Brock was using the original 'woke' definition but said he was fine with its broader usage in the current political climate.)

Resistance/Woke/Whatever-You-Want-to-Call-It TV didn't dominate the Top 10 shows this television season. According to Nielsen, among the most-watched shows were the sitcom "The Big Bang Theory," which has an average audience of 14 million people on CBS; the zombie thriller "The Walking Dead," the second-most watched show, with an average audience of more than 11 million people on AMC; "The Voice" with more than 10.6 million people on NBC; and "This Is Us" with nearly 10 million people tuning in on NBC.

That speaks to a semblance of parity in television's emerging cultural divide, as my colleagues at The Upshot captured late last year. Combing through Facebook likes, they found that "The Walking Dead," for instance, was among the most popular shows in rural areas and "The Big Bang Theory" was among the most popular shows in urban ones. The audience for the new streaming hit "The Handmaid's

Tale" may pale in comparison, given that Hulu had 12 million users at the last official count. (Netflix counts nearly 99 million.)

But something's going on for sure, considering that Hulu says the show's premiere a few weeks ago was the biggest in the company's short history.

Based on the Margaret Atwood novel of the same name, "The Handmaid's Tale" is about oncemodern women forced into indentured servitude to bear children. The production team's

### Jovial TV? Nah, 'Americans want rage.' Or at least 'woke.'

embrace of the political moment is extraordinary by historical television standards.

Hulu happily accepted Planned Parenthood's promoting the program's premiere, which came a couple of weeks after Mr. Trump signed legislation to cut off federal funding to the group. Planned Parenthood promoted the show's debut with a statement calling it "a terrifying cautionary tale about a future without reproductive rights" and

including a plea from Ms. Moss as well.

Hillary Clinton picked up the theme a week later at Planned Parenthood's 100th anniversary gala, warning, "We didn't look up from our phones until it was too late."

"We think that Planned Parenthood is an essential part of the fabric of this country and we don't want to back away from having an association," said the show's executive producer, Warren Littlefield.

Mr. Littlefield pointedly wouldn't have been so quick to sign off on that kind of overtly political cross promotion in the job he's best known for, the former president of NBC Entertainment.

His own career progression says it all. He helped preside over NBC's rise to the top of the broadcast television ratings, drawing audiences of tens of millions with hits like "Seinfeld." That was "a show about nothing," the perfect subject for those carefree days before September 11.

Now he's the executive producer of a (so-far) niche show, on a newer streaming network, about a cataclysmic backslide for women that critics credit for having resonance today. What both "Seinfeld" and "Handmaid's Tale" have in common is that they're good, and smart.

That brings me to the key ingredients in all of this: television's sophistication and a leap into original programming by the streaming services, which, led by Netflix and Amazon, took spending on original programming to almost $50 billion last year, according to Boston Consulting Group.

In this Peak TV era, there's room for everything, especially shows that hit the political moment. That doesn't mean being merely topical or overt. "The idea of, 'Hey, be politically aware, deal with the politics of the moment' — good," David Nevins, the Showtime chief executive told me. "'Be politically correct' — the caricature of lefty identity politics — not so interesting."

Quality has to be part of the equation. The money is there to do it, and the market is there for it. And this is where the idiot box's self-improvement comes in.

You could argue that with the rise of television "much of our public discourse has become dangerous nonsense," as Neil Postman wrote in his brilliantly prescient 1985 book "Amusing Ourselves to Death" about how television was turning everything, including news and politics, into entertainment. The shift from print to video as the dominant media, he warned, would produce a population "distracted by trivia," making "their public business a vaudeville act."

That raises the question: If television got us here, can it get us out?

---

## Viewers' Eyes May Drift, but Marketers Are Sticking With Broadcast Television

From First Business Page

through pipes."

"You could set up a drone to take water from a reservoir and use fascinating technology and cutting-edge approaches to deliver it, but there's a good reason we use these systems," he said.

In interviews, ad buyers and television executives pointed to a variety of reasons that advertisers remain attracted to ABC, NBC, Fox and CBS. Ratings aside, television still reaches more people and provides a reliable way for an

ad to be seen on a full screen with sound. There is a limited amount of inventory, in contrast to the endless reach of the web, and marketers know rates will spike if they wait to buy airtime.

It also does not hurt that Facebook and YouTube have had trouble in recent months with ads showing up next to objectionable content.

"Sales directors at the networks are going to say, 'We have premium content that is problematically produced, and it's been vetted and won't be an issue for your

brand to be associated with it,'" said Brad Adgate, a veteran media analyst. "With Google and Facebook, you've seen stuff where they've had to say that they have to do a better job."

Still, there are serious questions about how sustainable all of this is. Trend lines certainly suggest things could go in the other direction. Networks are having trouble showing how many people are watching their content across a wide variety of platforms, audiences are growing accustomed to platforms where they can watch

shows without commercials, and marketers are eager to find better ways to target potential customers.

And at present, broadcast television is holding an edge thanks to an older audience. The median age for scripted TV's No. 1 show, "The Big Bang Theory," and one of its top reality shows, "The Voice," is 55. Among 18- to 49-year-olds, ratings in broadcast television fell by 8 percent this season.

"If you just look at where the business is going, we're in a transitional phase now where to a large degree, boomers are keeping television as we define it today afloat," said Kevin Reilly, the chief creative officer of Turner Entertainment.

Advertisers are aware that this may not last forever.

GroupM predicted that digital platforms would be taking a growing share of new advertising dollars. Still, even though digital players are surging, television remains the established older statesman for advertisers. GroupM noted that television accounted for 42 percent of advertising investments last year, compared with 31 percent for digital.

The sophistication of Google's and Facebook's ability to target ads is no small matter, though, and TV networks have been scrambling to find ways to compete in that arena.

Digital companies are capable of targeting audiences so narrow that they can pinpoint, say, Idaho residents in long-distance relationships who are contemplating buying a minivan. (Facebook's ads manager says that description matches 3,300 people.)

As attractive as that slicing and dicing can be, television appears to have an advantage in terms of the actual commercial time it can offer marketers.

"It's great if I can target someone I know is a truck driver who searched for the word 'truck' who visited my site a lot, but where do I get them to watch my ad?" asked Joe Marchese, the newly named

head of ad sales for Fox Networks Group. "Who's going to make him or her watch it?"

And television still offers an enormous audience.

"The number of minutes we show commercials is way more than YouTube or Facebook on a video basis — many multiples more," Mr. Marchese said.

Rishad Tobaccowala, chief strategist for the Publicis Groupe, one of the world's largest advertising companies, said the millions who saw commercials on a hit show like "This Is Us" could also be more valuable.

"If you basically put that same advertising, say a million dollars, within Facebook and Google, the reality of it is that people are going to see those things in a very splintered fashion," he said.

The so-called upfront season offers advertisers a chance to buy the bulk of their ads before marquee shows return in September. This creates a level of competition that advertisers cannot help but participate in.

It also fosters a power dynamic that probably sounds foreign to a generation of consumers who tend to see automatically placed ads on YouTube content that could have been made a day earlier by

anyone.

"What the networks do say is: 'Great, I'm going to invite all my potential clients and clients to a room at the same time on the same day where I'm going to show my shows that I may or may not actually put up this fall and may not keep for two episodes,'" said Dave Morgan, the founder and chief executive of Simulmedia, which works with advertisers on targeted TV ads. "'And I'm going to make you sit next to your competitors and basically say here's the price of it, and if you don't pay this price now, it's going to cost you 30 percent more in six months.'"

Mass marketers aiming to drive people to, say, their stores or car dealerships rely on long-held TV plans to align with their product launches, and pulling out could be both expensive and risky.

"The reason it's priced high and reason you have to buy in advance is because your competitors might buy it out," Mr. Morgan continued. "It's like the Cold War but for brands, he said, adding, "If they have a bunch of missiles, you need a bunch more missiles."

And so, for a week in mid-May, the networks still have the upper hand.

BENJAMIN NORMAN FOR THE NEW YORK TIMES
Ad buyers at last year's preseason showcases, known as upfronts, where billions in advertising time is sold.

---

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111
Paul V. Shalhoub
Todd G. Cosenza

ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 974-7468
Michael A. Rollin
Maritza Dominguez Braswell *(pro hac vice)*

*Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                        Chapter 11 Case No.

Lehman Brothers Holdings Inc., et al.,        08-13555 (SCC)

      Debtors.                                (Jointly Administered)

NOTICE OF MOTION OF LEHMAN BROTHERS HOLDINGS INC.
PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C. § 105(A) FOR ENTRY OF ORDER
(A) APPROVING RMBS SETTLEMENT AGREEMENT, (B) MAKING CERTAIN REQUIRED
FINDINGS REGARDING DECISION OF RMBS TRUSTEES AND LBHI DEBTORS TO ENTER
INTO RMBS SETTLEMENT AGREEMENT, (C) SCHEDULING ESTIMATION PROCEEDING
TO DETERMINE RMBS CLAIMS AND APPROVING RELATED PROCEDURES REGARDING
CONDUCT OF HEARING, AND (D) GRANTING RELATED RELIEF

PLEASE TAKE NOTICE that, on April 27, 2017 Lehman Brothers Holdings Inc. (the "Plan Administrator"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors*, on behalf of itself and the other affiliated debtors in the above-referenced chapter 11 cases (the "LBHI Debtors") filed the Motion of Lehman Brothers Holdings Inc. Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. § 105(a) For Entry Of Order (A) Approving RMBS Settlement Agreement, (B) Making Certain Required Findings Regarding Decision Of RMBS Trustees And LBHI Debtors To Enter Into RMBS Settlement Agreement, (C) Scheduling Estimation Proceeding To Determine RMBS Claims And Approving Related Procedures Regarding Conduct Of Hearing, And (D) Granting Related Relief (the "Motion"). Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

PLEASE TAKE FURTHER NOTICE that a hearing will be held on the Motion before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 623, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court") on July 6, 2017 at 10:00 a.m. (prevailing Eastern Time), or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion (including approval of the Trustee Findings and the Debtors' Findings) must be made in writing, state with particularity the grounds therefor, conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, be filed electronically in text searchable portable document format (PDF) with the Court (in accordance with General Order M-399 (General Order M-399 can be found at www.nysb.uscourts.gov, the official website for the Court), by registered users of the Court's case filing system and by all other parties in interest in such a hard copy delivered directly to the Judge's Chambers; and be served in accordance with General Order M-399 and upon (i) the chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 21; (ii) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 (Attn: Paul V. Shalhoub, Esq. and Todd G. Cosenza, Esq.); and Andrea B. Schwartz, Esq.) so as to be actually filed with and received by no later than June 22, 2017 at 12:00 noon (EDT) (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that, if no objections are received in the Motion may be granted without a hearing if no objection is timely filed and served as set forth above and in accordance with the order, dated June 17, 2010, implementing certain notice and case management procedures in these cases (Docket No. 9635) (the "Case Management Order").

Dated: April 27, 2017
          New York, New York

/s/ Paul V. Shalhoub
Paul V. Shalhoub
Todd G. Cosenza
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111

Michael A. Rollin
Maritza Dominguez Braswell *(pro hac vice)*
ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 974-7468

*Attorneys for Lehman Brothers Holdings Inc. and Certain of Its Affiliates*

The complete 9019 Motion and related exhibits (the "Motion") associated with this Notice can be found for review and downloaded, free of charge, at (i) the website of the Debtors' Claims and Noticing Agent, Epiq Bankruptcy Solutions, LLC ("Epiq") available at http://dm.epiq11.com/LBH (the Motion is located within Docket No. 55151) or (ii) the website of the RMBS Trustees' Noticing Agent, The Garden City Group ("GCG") available at http://lbhirmbssettlement.com/pdflib/ Lehman_Brothers_Holdings_Inc_Motion.pdf.

You may also request a copy of the Motion, free of charge, by directly contacting (i) Epiq at (646) 282-2400 or email at lehmannotice@epiqsystems.com or (ii) GCG at (855) 907-3115 or email at QuestionsLBHIrmbssettlement.com.

---

## A Sports Betting App Raises $12 Million

By MICHAEL J. de la MERCED

SAN FRANCISCO — As the two big daily fantasy sports sites, DraftKings and FanDuel, seek to merge to bolster their struggling businesses, a start-up with a different approach to sports betting has garnered some prominent new backers.

WinView, which lets users make free wagers on sports games in real time, plans to announce on Monday that it has raised $12 million in a new round of financing.

The backers are Graham Holdings, the former owner of The Washington Post; Discovery Communications; Ted Leonsis, the owner of the Washington Wizards and the Washington Capitals; and LionTree, a boutique investment bank.

The new investors represent the latest show of support for WinView as the company promotes a different way for fans to play alongside sporting events. With the company's apps for Apple and Android devices, users can make predictions on developments in a

game in real time and win cash prizes.

So far, WinView offers the chance to play alongside National Football League, National Basketball Association and Major League Baseball games.

For Tom Rogers, the former TiVo chief executive who became WinView's chairman last year, the company's business offers a new way for sports fans to engage with games in real time. He also suggested that the company could offer solace for broadcasters like ESPN, whose business has been decimated by a drop in viewers.

"The entire sports television world, I think, is still the last bastion of live TV and simultaneous live audiences," he said. "The viewing experience has to be changed, and it has to become more interactive and social. The only way to counter that is to coordinate the mobile device so that is part of the marketing message."

The service has about 330,000 users, Mr. Rogers said, even though it spends little on marketing, in contrast to the daily fantasy

sports operators' enormous ad spending. WinView mostly relied on social media spots on YouTube, Facebook and Instagram.

The company has sought to differentiate itself from daily fantasy sports in another fundamental way: Because WinView does not charge an entry fee, it says that it can operate legally nationwide. DraftKings and FanDuel are fighting to legalize their business in a number of states.

For now, WinView is supported by advertising from Pepsi-Co and others. Mr. Rogers said that the company had sought to get play options, similar to how its European competitors operate.

The new round of financing will go toward adding more sports and working with Discovery's Eurosport network to expand beyond American sports. Mr. Rogers also pointed to another avenue for WinView to explore: viewers of e-sports.

"The gamers watching the gamers, the way e-sports has always been watched, don't have a way to game themselves," he said.

# EXHIBIT C

**Tammy Ollivier**

| | |
|---|---|
| **From:** | sfhubs@prnewswire.com |
| **Sent:** | Monday, May 22, 2017 6:00 AM |
| **To:** | Tammy Ollivier; GCGBuyers |
| **Subject:** | PR Newswire: Press Release Distribution Confirmation for Garden City Group. ID#1846377-1-1 |

Hello

Your press release was successfully distributed at: 22-May-2017 09:00:00 AM ET

Release headline: LBHI RMBS Trustees' Notice of Motion Seeking Approval of Settlement in Lehman Bankruptcy Cases
Word Count: 1082
Product Selections:
World Financial Markets
Visibility Reports Email
Complimentary Press Release Optimization
European Finance Microlist
Asia Finance Microlist
Full Latin America Banking/Finance Microlist
PR Newswire ID: 1846377-1-1

View your release:* http://www.prnewswire.com/news-releases/lbhi-rmbs-trustees-notice-of-motion-seeking-approval-of-settlement-in-lehman-bankruptcy-cases-

1

300454410.html?tc=eml_cleartime

Thank you for choosing PR Newswire!

Regards,

Your 24/7 Content Services Team
888-776-0942
PRNCS@prnewswire.com

Discover how to measure strategic goals across channels to assist in achieving your communications objectives: http://www.prnewswire.com/knowledge-center/Matching-Measurement-to-Medium-Press-Release-Metrics-across-Channels.html

US Members, find audience, engagement and other key metrics for your release by accessing your complimentary Visibility Reports in the Online Member Center: https://portal.prnewswire.com/Login.aspx

* If the page link does not load immediately, please refresh and try again after a few minutes.



# EXHIBIT D



**To investors who want to retire comfortably.**
If you have a $500,000 portfolio, download the guide by *Forbes* columnist and money manager Ken Fisher's firm. It's called
*The Definitive Guide to Retirement Income.* Even if you have something else in place right now, it *still* makes sense to request
your guide!   Click Here To Download Your Guide!
FISHER INVESTMENTS*

UP AND DOWN WALL STREET

# Stocks Don't Blink an Eye Over Comey Firing

FBI Director James Comey's firing kills tax reform for '17, but the global rally doesn't need Trump's agenda.

Email   Print   1 Comments   Order Reprints   A  A

By RANDALL W. FORSYTH
May 11, 2017 11:36 a.m. ET



Drew Angerer/Getty Images

Prepared by GCG

**IF YOU HAVE AN INTEREST IN LEHMAN BROTHERS HOLDINGS, INC. RESIDENTIAL MORTGAGE-BACKED SECURITIZATION TRUSTS** created during the period 2002 through 2008, a proposed settlement may affect your rights.

◆ Click here for more information

**Most Popular**

1. **Valeant Pharmaceuticals: Feeling Sentimental?**

2. **Alibaba: What to Expect From Q4 Earnings**

3. **Snap CEO Spiegel Explains They Don't**

❖ My Profile

**Market**Watch

LATEST
NEWS

4:04 P.M. ET   U.S. stocks close lower on weak retail stocks

4:02 P.M. ET   Nasdaq Composite closes down 0.2% as Snap Inc.'s shares tumble 21%

4:02 P.M. ET   S&P 500 finishes off 0.2%; Dow ends down 0.1%

**DOW** 20,919 -23.69 -0.11% ▼   **NASDAQ** 6,116 -13.18 -0.22% ▼   **S&P 500** 2,394 -5.18 -0.22% ▼

NEWS VIEWER   MARKETS   INVESTING   PERSONAL FINANCE   RETIREMENT   ECONOMY   REAL ESTATE

Watchlist   ⚠ Alerts   Games   🔍

**BULLETIN**   Dow drops for third day, other indexes lower as well Thursday

**NEW YORK MARKETS AFTER HOURS**   Market Snapshot   Winners and Losers

Home > Industries > Internet/Online Services > The Ratings Game

GET EMAIL ALERTS

# Snap shares crater 21% after results, but some analysts say don't give up yet

Published: May 11, 2017 3:21 p.m. ET

🗨 7

Aa 🖶

*Looks like an early Twitter so far, says RBC Capital*



Prepared by GCG

**IF YOU HAVE AN INTEREST IN
LEHMAN BROTHERS HOLDINGS, INC.
RESIDENTIAL MORTGAGE-BACKED
SECURITIZATION TRUSTS** created
during the period 2002 through
2008, a proposed settlement may
affect your rights.

◆ **Click here for more information**

**QUOTE
REFERENCES**

Sponsored by

| SNAP -4.93 -21.48% | MS -0.22 -0.52% |
| GS -0.14 -0.06% | JPM -0.29 -0.33% |

SHOW ALL REFERENCES ⌄

DJIA ▼ 20919.42 -0.11%   S&P 500 ▼ 2394.44 -0.22%   Nasdaq ▼ 6115.96 -0.22%   U.S. 10 Yr ▲ 8/32 Yield 2.394%   Crude Oil ▲ 47.76 0.91%   Euro ▼ 1.0866 -0.03%

Eliza Ghriskey ▼
WSJ+

# THE WALL STREET JOURNAL.

U.S. Edition ▼ | May 11, 2017 | Today's Paper

Home   World   U.S.   Politics   Economy   Business   Tech   Markets   Opinion   Arts   Life   Real Estate

Search 🔍

## What's News

# Trump Planned Firing Before Letter

President Trump said he decided to fire FBI Director James Comey before receiving a letter from Deputy Attorney General Rod Rosenstein that was critical of Comey this week, contradicting previous statements from the White House that the firing was a response to Mr. Rosenstein's memo. 🗨 613  24 minutes ago

### MORE COVERAGE

- Live Updates: Aftermath of Comey's Dismissal
- Officials Accept Findings of Election Hacking
- Sessions Interviews Replacement Candidates



### Rosenstein Pressed White House to Correct the Record on Comey Firing

Deputy Attorney General Rod Rosenstein pressed White House counsel Don McGahn to correct what he felt was an inaccurate depiction of the events surrounding FBI Director James Comey's firing. 🗨 278

### McCabe: Agents Supported Comey

Acting FBI Director Andrew McCabe rejected White House criticism that former chief James Comey had lost the confidence of FBI agents. 🗨 464  14 minutes ago

- Senate Subpoenas Documents From Flynn

### Amid Retail Funk, Macy's Says 'We're Not Dead'



Macy's troubles showed no sign of abating as the department store reported another quarter of falling sales, ahead of a flurry of results from other retailers battling similar problems with store traffic and online competition.

- Heard on the Street: Falling Sales Mean Tougher Fixes
- Retail Stocks Drag on the Market

### How Telecom Speculator Howard Jonas Made Billions From Verizon, AT&T



#### HEARD ON THE STREET

### AIG Gets a CEO Who Can Stand Up to Icahn

AIG is poised to choose a strong hand to restore confidence in the insurance giant. AIG plans to name industry veteran Brian Duperreault as chief executive, The Wall Street Journal has reported.



### U.S. Weighs Expanding Laptop Ban to Europe Routes



#### STREETWISE

### An Algorithm, an ETF and an Academic Study Walk Into a Bar



### Bots, Denial of Service Are Latest Weapons in Net Neutrality Battle



#### CHINA CIRCUIT

### What Facebook Could Learn From China's Censors

## Markets

| U.S. | EUROPE | ASIA | FX | RATES | FUTURES |
|------|--------|------|-----|-------|---------|

1D
5D
3M
6M
1Y

| | | | |
|------|------|------|------|
| DJIA | 20919.42 | -23.69 | -0.11% |
| S&P 500 | 2394.44 | -5.19 | -0.22% |
| Nasdaq | 6115.96 | -13.10 | -0.22% |
| Russell 2000 | 1369.98 | -9.61 | -0.69% |
| DJ Total Mkt | 24797.24 | -69.20 | -0.28% |

May 11 '17, 4:14 PM EDT                    MARKETS →

## Opinion                                 →

### Comey Fails the Collins Test
By James Freeman | Best of the Web

### Giving Nominees the Blue Slip
Review & Outlook

### No Relief Like Passing Checkpoint Charlie
By Peter Friedman | Commentary

Prepared by GCG

IF YOU HAVE AN INTEREST IN LEHMAN BROTHERS HOLDINGS, INC. RESIDENTIAL MORTGAGE-BACKED SECURITIZATION TRUSTS created during the period 2002 through 2008, a proposed settlement may affect your rights.

◆ Click here for more information

☰ SECTIONS    𝕿 HOME    🔍 SEARCH

The New York Times    WHY THE TIMES    daksha.joshi ▾    ⚙

ART REVIEW
Please Smell the Art: Anicka Yi Will See That You Do

ART REVIEW
The Psychosexual World of Carol Rama Still Shocks

...to See in New York Art Galleries This Week

PAID POST: HENNESSY
Laser Installations Create Vivid Experiences With Tricks of Light

SHOW US YOUR WA...
Educating Throu...
Poetry

IF YOU HAVE AN INTEREST IN LEHMAN BROTHERS HOLDINGS, INC. RESIDENTIAL MORTGAGE-BACKED SECURITIZATION TRUSTS created during the period 2002 through 2008, a proposed settlement may affect your rights.
Prepared by GCG                                                                    ◆ Click here for more information

ART & DESIGN | ART REVIEW

# Please Smell the Art: Anicka Yi Will See That You Do

By KAREN ROSENBERG    MAY 11, 2017

    



"Lifestyle Wars" (2017), in the Anicka Yi exhibition at the Guggenheim Museum. This piece houses an ant farm within an installation of aluminum racks, computer hardware and LED lights.
Byron Smith for The New York Times

When Anicka Yi won the Guggenheim's Hugo Boss Prize, an award of $100,000 paired with a solo exhibition at the museum that confers it, art lovers familiar with her heady synthesis of sculpture, biography and biotech wondered what sights — and smells — might await them.

Ms. Yi, 45, collaborates with biologists, forensic scientists and perfumers to make art that tests the boundaries of perception and personal hygiene. She has injected snails with the human bonding hormone oxytocin, attempted to bottle the rarefied scent of a blue-chip megagallery and cultivated a feminist "collective bacteria" based on samples from women in the art world. Although her work can be visually seductive, she often asks us to



| | | | | |
|---|---|---|---|---|
| SECTIONS | HOME  SEARCH | *The New York Times* | GIVE NOW | daksha.joshi |

 1. Trump Warns Comey and Says He May Cancel Press Briefings

 2. In a Private Dinner, Trump Demanded Loyalty. Comey Demurred.

 3. Frances's First Lady, a Confidante and Coach, May Break the Mold

PAID POST: TITO'S VODKA
Vodka for Dog People? An Unlikely Partnership Is Saving Pets
 

4. BEST OF LATE NIGHT
Stephen Colbert Declares Victory After Trump Insults Him

IF YOU HAVE AN INTEREST IN **LEHMAN BROTHERS HOLDINGS, INC. RESIDENTIAL MORTGAGE-BACKED SECURITIZATION TRUSTS** created during the period 2002 through 2008, a proposed settlement may affect your rights.
Prepared by GCG    ◆ Click here for more information

FASHION & STYLE

# Dior in the Desert



**Vanessa Friedman**
ON THE RUNWAY · MAY 12, 2017

    





Dior's 2018 cruise collection, which was shown on Thursday in the Santa Monica Mountains near Los Angeles. Chris Delmas/Agence France-Presse — Getty Images

### On the Runway

Vanessa Friedman writes about news happening in the fashion industry, from business decisions to designer moves.

Roberto Cavalli Names a New Creative Director — MAY 10

Can Coach Create an American Fashion Empire? — MAY 9

A New Age in French — Modeling — MAY 8

The Color of Protest — MAY 5

Activism at the Met Gala — MAY 4

See More »

When it comes to shows, fashion loves a venue metaphor: museums, art galleries, palatial chateaus — buildings and exotic destinations of historic and cultural value to which only it has entree, the better to suggest the extraordinary values brands hope will be associated with their collections.

BREAKING: Mac's Early Broad Retail Rout





**INVESTOR'S BUSINESS DAILY**

# MARKET TREND

Enter Ticker/Keyword

MARKET TREND    STOCK LISTS    RESEARCH    NEWS    IBD VIDEOS    HOW TO INVEST    LEADERBOARD    SWING TRADER    MARKETSMITH    STORE    SIGN IN

**IF YOU HAVE AN INTEREST IN LEHMAN BROTHERS HOLDINGS, INC. RESIDENTIAL MORTGAGE-BACKED SECURITIZATION TRUSTS** created during the period 2002 through 2008, a proposed settlement may affect your rights.
Prepared by GCG                                                                    ◆ Click here for more information

## STOCK MARKET TODAY



### Stocks Cut Losses, But These 4 Leaders Just Fine; Can Snap Recover In 2017?

May 11, 2017
Amid a broad decline for stocks, Snap is close to giving back all the gains from its initial public offering at 17 a share.



### Stock Indexes Skid; Microsoft Down On Margin Guidance

May 11, 2017
Apple slowed for a second straight session after three solid up days in a row.



### Stocks Open Lower; Caterpillar, Merck Lead Upside

May 11, 2017
Stocks opened lower Thursday, despite some positive economic news and a continued surge in oil prices.



### Snap Is Losing Facebook Clone War; This Dow Drug Stock Nears Buy

May 10, 2017
Stock futures were steady late Wednesday, while Snapchat parent crashed and Dow drug giant Merck popped to near a buy point.



### Nasdaq, S&P 500 End Higher; Boeing, Disney Trip Up

## TODAY'S SPOTLIGHT

**IBD Trading Summit**
Attend a Summit in Indianapolis (5/13) or Austin (6/3) to learn about swing trading and growth stocks!

**Don't Miss The MoneyShow**
Join IBD investing experts for free workshops at Las Vegas and learn more about IBD products.

**Try SwingTrader For Free**
Download our app! Get instant push notifications on buy points, sell signals, and more!





# RUN OF SITE 300X250





# RUN OF SITE 728X90





May 11, 2017

**GARDEN CITY**
CAMPAIGN LAUNCH SCREENSHOTS

On The Economist.com

The Economist Group

# ECONOMIST_RUN OF SITE_300X250_US, EUROPE, ASIA



The Economist Group

# ECONOMIST_RUN OF SITE_728X90_US, EUROPE, ASIA

3



The Economist Group

ECONOMIST_RUN OF SITE_ADDED VALUE_300X250_US, EUROPE, ASIA

4



The Economist Group

# EXHIBIT E

Dated: March 20, 2017

**NOTICE REGARDING RECEIPT OF A SETTLEMENT OFFER CONCERNING CERTAIN CLAIMS AGAINST THE LBHI DEBTORS BELONGING TO THE RMBS TRUSTEES (DEFINED BELOW) AND/OR THE RESIDENTIAL MORTGAGE-BACKED SECURITIZATION TRUSTS LISTED IN <u>EXHIBIT A</u> HERETO AND FURTHER IDENTIFIED BY CUSIP NUMBERS ON THE WEBSITE LOCATED AT <u>http://www.LBHIrmbssettlement.com</u> (THE "<u>RMBS TRUSTEES' WEBSITE</u>") AT THE TAB ENTITLED "LIST OF COVERED RMBS TRUSTS" (COLLECTIVELY, THE "<u>COVERED RMBS TRUSTS</u>" AND EACH A "<u>COVERED RMBS TRUST</u>").[1]**

**THE PROPOSED SETTLEMENT AGREEMENT MATERIALLY AFFECTS THE INTERESTS OF HOLDERS OF CERTIFICATES, NOTES OR OTHER SECURITIES ISSUED BY THE COVERED RMBS TRUSTS (THE "<u>CERTIFICATEHOLDERS</u>"). CERTIFICATEHOLDERS AND OTHER NOTICE RECIPIENTS SHOULD READ CAREFULLY THIS NOTICE AND THE MATERIALS REFERENCED HEREIN IN CONSULTATION WITH THEIR LEGAL AND FINANCIAL ADVISORS.**

> **NOTICE IS HEREBY GIVEN BY:**
>
> **Deutsche Bank National Trust Company**
> **Law Debenture Trust Company of New York**
> **U.S. Bank National Association**
> **Wilmington Trust Company and Wilmington Trust, National Association**

**EACH, IN ITS CAPACITY AS TRUSTEE, SEPARATE TRUSTEE, SUCCESSOR TRUSTEE, OR OTHER SIMILAR CAPACITIES OF THE COVERED RMBS TRUSTS (COLLECTIVELY, THE "<u>RMBS TRUSTEES</u>" AND EACH AN "<u>RMBS TRUSTEE</u>"), TO THE CERTIFICATEHOLDERS.**

**THIS NOTICE CONTAINS IMPORTANT INFORMATION FOR CERTIFICATEHOLDERS AND OTHER PERSONS POTENTIALLY INTERESTED IN THE COVERED RMBS TRUSTS. ALL DEPOSITORIES, CUSTODIANS AND OTHER INTERMEDIARIES RECEIVING THIS NOTICE, AS APPLICABLE, ARE REQUESTED TO EXPEDITE THE RE-TRANSMITTAL TO CERTIFICATEHOLDERS IN A TIMELY MANNER.**

This notice (the "<u>Notice</u>") is given to you by the RMBS Trustees under certain applicable Trust Agreements or other similar agreements governing the Covered RMBS Trusts (the "<u>Governing Agreements</u>").

---

[1]    Any CUSIP numbers appearing in this Notice, the exhibit hereto or on the website maintained by the RMBS Trustees have been included solely for the convenience of the Certificateholders. The RMBS Trustees assume no responsibility for the selection or use of such numbers and make no representations as to the correctness of the CUSIP numbers appearing herein or therein.

**BACKGROUND**

On September 15, 2008, Lehman Brothers Holdings, Inc. ("LBHI") filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (*In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (SCC)) and on subsequent dates thereafter, affiliates of LBHI (including Structured Assets Securities Corp., together with LBHI and all affiliated debtors, the "LBHI Debtors") also filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

The RMBS Trustees (or predecessor trustees, where applicable) filed proofs of claim in the Chapter 11 Cases on behalf of certain RMBS Trusts (the "RMBS Trusts") asserting claims arising out of, among other things, alleged breaches of representations and warranties concerning mortgage loans in the RMBS Trusts under the Governing Agreements (collectively, the "Claims").

On December 29, 2014, the Bankruptcy Court entered an *Order Establishing a Protocol to Resolve Claims Filed by Trustees on behalf of Certain Issuers of Residential Mortgage-Backed Securities* (available on the docket for the Chapter 11 Cases at ECF No. 47569) setting forth a protocol (the "Protocol") for the review of mortgage loan files, the assertion of the Claims by the RMBS Trustees on behalf of the RMBS Trusts, the response by the LBHI Debtors to the Claims, and a mechanism for resolving disputes regarding the Claims. The RMBS Trustees have since been pursuing Claims in accordance with the terms of the Protocol, and continue to do so, with expenses paid from assets of the RMBS Trusts.

**THIS NOTICE CONCERNS A SETTLEMENT OFFER CONCERNING CLAIMS AGAINST THE LBHI DEBTORS.** IN ORDER TO BIND ANY COVERED RMBS TRUST OR RELATED CERTIFICATEHOLDERS, THE PROPOSED SETTLEMENT AGREEMENT MUST BE ACCEPTED ON A FINAL BASIS, IF AT ALL, ON OR BEFORE JUNE 1, 2017 AS DESCRIBED HEREIN. IF FINALLY ACCEPTED BY THE RMBS TRUSTEES AND APPROVED BY BOTH THE BANKRUPTCY COURT AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (THE "DISTRICT COURT") AS CONTEMPLATED BY THE PROPOSED SETTLEMENT AGREEMENT (SUBJECT TO OTHER CONDITIONS PRECEDENT), THE PROPOSED SETTLEMENT AGREEMENT WOULD BIND THE ACCEPTING COVERED RMBS TRUSTS AND RELATED CERTIFICATEHOLDERS.

THE PROPOSED SETTLEMENT AGREEMENT STATES THAT ANY FINAL ACCEPTANCE OF THE SETTLEMENT IS CONDITIONED UPON (I) ENTRY BY THE DISTRICT COURT OF AN ORDER APPROVING THE SETTLEMENT AND FINDING, AMONG OTHER THINGS AS SET FORTH IN EXHIBIT F TO THE PROPOSED SETTLEMENT AGREEMENT, THAT EACH RMBS TRUSTEE ACTED WITHIN THE BOUNDS OF ITS DISCRETION, REASONABLY, AND IN GOOD FAITH WITH RESPECT TO ITS EVALUATION AND ACCEPTANCE OF THE PROPOSED SETTLEMENT AGREEMENT (THE "TRUSTEE FINDINGS"); (II) THE TRUSTEE FINDINGS BECOMING A FINAL ORDER; AND (III) THE RECEIPT BY THE ACCEPTING TRUSTEES OF EITHER AN ACCEPTABLE REMIC OPINION OR AN IRS PRIVATE LETTER RULING.

2

THE SETTLEMENT OFFER AND RELATED COURT APPROVAL PROCEDURES MATERIALLY AFFECT THE INTERESTS OF THE CERTIFICATEHOLDERS, AND THE RMBS TRUSTEES REQUEST THAT ALL CERTIFICATEHOLDERS AND OTHER NOTICE RECIPIENTS READ THIS NOTICE, THE PROPOSED SETTLEMENT AGREEMENT, AND RELATED MATERIALS CAREFULLY IN CONSULTATION WITH THEIR LEGAL AND FINANCIAL ADVISORS.

**THE SETTLEMENT OFFER AND THE PROPOSED SETTLEMENT AGREEMENT**

A group of fourteen (14) institutional investors (the "Institutional Investors") have submitted to the RMBS Trustees a settlement offer (the "Settlement Offer") from the LBHI Debtors in the form of an RMBS Trust Settlement Agreement (the "Proposed Settlement Agreement"), dated as of November 30, 2016, and modified as of March 17, 2017 (the "Modification Date"), concerning certain Claims of the Covered RMBS Trusts. The Institutional Investors request that the RMBS Trustees evaluate and accept the Proposed Settlement Agreement. On or about November 30, 2016, the RMBS Trustees were provided with the Proposed Settlement Agreement, which has since been modified, only after, and upon the condition that, they agreed to keep confidential and not disclose the existence or terms of the Proposed Settlement Agreement until after the Modification Date. The RMBS Trustees are issuing this Notice to all Certificateholders and other interested parties before deciding whether to accept or reject the Settlement Offer.

A copy of the Proposed Settlement Agreement, together with a copy of the Institutional Investors' letter to the RMBS Trustees concerning the Proposed Settlement Agreement, is available at the RMBS Trustees' Website at the tab entitled "Certain Relevant Documents" (available at http://lbhirmbssettlement.com/Settlement_Agreement.pdf). A copy of the Institutional Investors' letter to the RMBS Trustees concerning the Proposed Settlement Agreement is available at the RMBS Trustees' Website at the tab entitled "Certain Relevant Documents" (available at http://lbhirmbssettlement.com/Institutional_Investors_Letter.pdf). Capitalized terms used but not defined herein will have the meanings assigned to them in the Proposed Settlement Agreement. This Notice attempts to summarize certain terms of the Proposed Settlement Agreement; please refer to the Proposed Settlement Agreement itself for the actual terms of the Settlement Offer.

Under the terms of the Proposed Settlement Agreement, the LBHI Debtors would allow a Class 7 General Unsecured claim in the Chapter 11 Cases against LBHI (the "Allowed Claim") in an amount to be determined by the Bankruptcy Court after an Estimation Proceeding in accordance with the procedures set forth in Exhibit G to the Proposed Settlement Agreement. In the Estimation Proceeding, under Section 502(c) of the Bankruptcy Code, the LBHI Debtors will seek Estimation of the Covered Loan Claims arising under or related to the Accepting Trusts, for purposes of setting the amount of the Allowed Claim, at a total amount of $2,416,000,000, without prejudice to the rights of the LBHI Debtors to argue in furtherance of such estimation that an amount lesser than $2,416,000,000 is correct, reasonable, or legally and factually supportable, as described further in the Proposed Settlement Agreement. The Accepting Trustees will be entitled to seek Estimation of the Covered Loan Claims in the Estimation Proceeding at an amount greater than $2,416,000,000. To the extent that the Bankruptcy Court decides that the Allowed Claim should be set at an amount (i) less than $2,000,000,000, such decision may be appealed by the RMBS Trustees; (ii) between $2,000,000,000 and

3

$2,416,000,000, the Allowed Claim will be set at $2,416,000,000; and (iii) greater than $2,416,000,000, the Allowed Claim will be set at such greater amount. [2] The Bankruptcy Court's decision may be appealed by the Accepting Trustees only if the Estimation is for an amount less than $2,000,000,000. Under no circumstances may the LBHI Debtors appeal the Bankruptcy Court's decision that sets the amount of the Allowed Claim.

The Allowed Claim will include any interest thereon to the extent provided by Section 8.4 of the Plan and will be paid net of the Legal Fees (as determined in accordance with the attorneys' fee provision set forth in Section 6.05 of the Proposed Settlement Agreement). The Net Allowed Claim will be allocated, and the Allocable Share of the Net Allocated Claim calculated, in accordance with a formula provided in Section 3.04 of the Proposed Settlement Agreement. Following the acceptance of the Proposed Settlement Agreement, the Parties, including the RMBS Trustees, will have no ability to adjust, amend, or revise the allocation formula as to any Covered RMBS Trust for which an RMBS Trustee accepts the Proposed Settlement Agreement.

In exchange for the Allowed Claim, the LBHI Debtors would receive releases and waivers with respect to Covered Loan Claims (as defined in the Proposed Settlement Agreement). Please refer to the Proposed Settlement Agreement for further details concerning the Net Allowed Claim, the allocation of same, the proposed releases, and the other terms of the Settlement Offer.

For the Proposed Settlement Agreement to bind the Covered RMBS Trusts or related Certificateholders, the RMBS Trustees must accept the Settlement Offer pursuant to a process that is set forth in the Proposed Settlement Agreement. The RMBS Trustees are permitted to accept or reject the Settlement Offer separately as to each Covered RMBS Trust. Under certain conditions, if a sufficient number of Covered RMBS Trusts reject the Settlement Offer, the LBHI Debtors may terminate the Proposed Settlement Agreement. In order to bind any Covered RMBS Trust or related Certificateholders, the RMBS Trustees must accept or reject the Proposed Settlement Agreement on a final basis, on or before June 1, 2017. Please refer to the Proposed Settlement Agreement for further details concerning the other dates relevant to the Settlement Offer.

ANY CERTIFICATEHOLDERS WHO WISH TO HAVE THEIR VIEWS CONCERNING WHETHER THE RMBS TRUSTEES SHOULD ACCEPT OR REJECT THE PROPOSED SETTLEMENT AGREEMENT FOR THEIR RELATED COVERED RMBS TRUST(S) TO BE CONSIDERED BY THE RMBS TRUSTEES AND/OR THEIR EXPERTS ARE REQUESTED TO CONTACT THE RMBS TRUSTEES IMMEDIATELY AND CERTAINLY NO LATER THAN MAY 5, 2017. **GIVEN THE IMPENDING DEADLINES, THE RMBS TRUSTEES LIKELY WILL NOT BE IN A POSITION TO MEANINGFULLY CONSIDER, IF AT ALL, VIEWS OF CERTIFICATEHOLDERS OR OTHER INFORMATION THAT THEY RECEIVE AFTER MAY 5, 2017.** PLEASE

---

[2] The $2 billion and $2.416 billion figures described in subparts (i), (ii) and (iii) of this paragraph would be reduced proportionately if one or more Covered Trusts is excluded from the Proposed Settlement Agreement. *See* Proposed Settlement Agreement, § 3.02.

COMMUNICATE WITH THE APPLICABLE RMBS TRUSTEE(S) USING THE CONTACT INFORMATION OF SUCH RMBS TRUSTEE AVAILABLE AT THE RMBS TRUSTEES' WEBSITE AT THE TAB ENTITLED "RMBS TRUSTEES' CONTACT INFORMATION" (AVAILABLE AT http://lbhirmbssettlement.com/trustee_contact.php).

The RMBS Trustees' fees and expenses relating to their evaluation of the Proposed Settlement Agreement, including expert fees and expenses, are being paid from assets of the Covered RMBS Trusts pursuant to the RMBS Trustees' rights to payment of fees and expenses under Governing Agreements and related court orders.

**THE PROPOSED SETTLEMENT AGREEMENT REMAINS UNDER THE REVIEW OF THE RMBS TRUSTEES AND THEIR EXPERT**.  The RMBS Trustees have retained the Honorable Judith Fitzgerald (Ret.) as an expert to assist them with an independent evaluation of the Settlement Offer as set forth in the Proposed Settlement Agreement.  Each RMBS Trustee also has engaged legal counsel to advise it with respect to relevant legal matters affecting the particular Covered RMBS Trusts that it administers.  The RMBS Trustees are reviewing the Proposed Settlement Agreement with the assistance of Judge Fitzgerald and each RMBS Trustee's legal counsel.  It is anticipated that Judge Fitzgerald will provide a report to the RMBS Trustees concerning her evaluation of the Settlement Offer.

As of the date of this Notice, none of the RMBS Trustees has made any final determination, on behalf of the Covered RMBS Trusts for which it serves as trustee, as to the reasonableness of, or the advisability of accepting, the Proposed Settlement Agreement. Although the RMBS Trustees are working together in their evaluation of the Proposed Settlement Agreement, each RMBS Trustee will assess the Proposed Settlement Agreement and make its own decision as to whether to accept or reject the Proposed Settlement Agreement on behalf of each Covered RMBS Trust for which it serves as trustee.

Certificateholders are encouraged to check the RMBS Trustees' Website regularly for updates that may impact particular Covered RMBS Trusts or groups of Covered RMBS Trusts.

**OTHER MATTERS**

This Notice summarizes certain terms of the Proposed Settlement Agreement (including the Trustee Findings) and is not a complete summary or statement of the material terms thereof, of relevant law or of relevant legal procedures.  Certificateholders and other potentially interested persons are urged to review carefully the Proposed Settlement Agreement and to consider its implications, including without limitation the releases of the Covered Loan Claims and other actual or potential claims related to Covered Loans.  The RMBS Trustees may send further notices with respect to the matters addressed herein and developments relating to the Settlement Offer, all of which will be made available at the RMBS Trustees' Website at the tab entitled "Notices" (available at http://lbhirmbssettlement.com/notice.php).  You may also obtain any documents filed with the Court on the docket for the Chapter 11 Cases by logging on to PACER at https://www.pacer.gov (password required) or by visiting LBHI's claims agent website at http://www.lehman-docket.com (no password required).

For inquiries, or to furnish any direction pursuant to the Governing Agreements with respect to the matters discussed herein, Certificateholders are directed to contact the applicable

RMBS Trustee using the contact information of such RMBS Trustee available at the RMBS Trustees' Website at the tab entitled "RMBS Trustees' Contact Information" (available at http://lbhirmbssettlement.com/trustee_contact.php).  Certificateholders will be required to verify their holdings before receiving information from the applicable RMBS Trustee.  Please be advised that with respect to any particular inquiry from individual Certificateholders, an RMBS Trustee may conclude that a specific response to such inquiry is not consistent with requirements under applicable law and regulation of equal and full dissemination of information to all Certificateholders.

Certificateholders and other persons interested in the Covered RMBS Trusts should not rely on the RMBS Trustees, their counsel, experts or other advisors retained by the RMBS Trustees, as their sole source of information.  Certificateholders and other potentially interested persons are urged to consult with their own legal and financial advisors.

Please note that this Notice is not intended and should not be construed as investment, accounting, financial, legal, tax or other advice by or on behalf of the RMBS Trustees, or their directors, officers, affiliates, agents, attorneys or employees.  Each person or entity receiving this Notice should seek the advice of its own advisors in respect of all matters set forth herein.

Please be further advised that each of the RMBS Trustees reserves all of the rights, powers, claims and remedies available to it under the Governing Agreements and applicable law.  No delay or forbearance by an RMBS Trustee to exercise any right or remedy accruing upon the occurrence of a default, or otherwise under the terms of the Governing Agreements, other documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or an acquiescence therein.

Receipt of this Notice should not be construed as evidence or acknowledgment of any requirement applicable to, or of any right or authority on the part of any recipient under the Governing Documents to direct, the matters addressed herein, or of any obligations on the part of any RMBS Trustee with respect thereto, and each RMBS Trustee expressly reserves all rights in determining appropriate actions and requirements concerning these matters.

Each of the RMBS Trustees expressly reserves all rights in respect of each applicable Governing Agreement, including without limitation its right to recover in full its fees and costs (including, without limitation, fees and costs incurred or to be incurred by such RMBS Trustee in performing its duties, indemnities owing or to become owing to such RMBS Trustee, compensation for such RMBS Trustee's time spent and reimbursement for fees and costs of counsel and other agents it employs in performing its duties or to pursue remedies) and its right, prior to exercising any rights or powers in connection with any applicable Governing Agreement at the request or direction of any Certificateholder, to receive security or indemnity satisfactory to it against all costs, expenses and liabilities that might be incurred in compliance therewith, and all rights that may be available to it under applicable law or otherwise.

> **Deutsche Bank National Trust Company**
> **Law Debenture Trust Company of New York**
> **U.S. Bank National Association**
> **Wilmington Trust Company and Wilmington Trust, National Association**

**EXHIBIT A**

**Covered RMBS Trusts**

## EXHIBIT A

**TRUSTS**

| No. | Trust Name |
|---|---|
| 1 | ARC 2002-BC10 |
| 2 | ARC 2002-BC8 |
| 3 | ARC 2002-BC9 |
| 4 | ARC 2004-1 |
| 5 | BNC 2006-1 |
| 6 | BNC 2006-2 |
| 7 | BNC 2007-1 |
| 8 | BNC 2007-2 |
| 9 | BNC 2007-3 |
| 10 | BNC 2007-4 |
| 11 | LABS 2004-1 |
| 12 | LABS 2007-1 |
| 13 | LMT 2005-1 |
| 14 | LMT 2005-2 |
| 15 | LMT 2005-3 |
| 16 | LMT 2006-1 |
| 17 | LMT 2006-2 |
| 18 | LMT 2006-4 |
| 19 | LMT 2006-8 |
| 20 | LMT 2006-9 |
| 21 | LMT 2007-1 |
| 22 | LMT 2007-10 |
| 23 | LMT 2007-2 |
| 24 | LMT 2007-3 |
| 25 | LMT 2007-4 |
| 26 | LMT 2007-5 |
| 27 | LMT 2007-6 |
| 28 | LMT 2007-7 |
| 29 | LMT 2007-8 |
| 30 | LMT 2007-9 |
| 31 | LMT 2008-2 |
| 32 | LMT 2008-6 |
| 33 | LXS 2005-1 |
| 34 | LXS 2005-10 |
| 35 | LXS 2005-2 |
| 36 | LXS 2005-3 |
| 37 | LXS 2005-4 |

| | |
|---|---|
| 38 | LXS 2005-6 |
| 39 | LXS 2005-8 |
| 40 | LXS 2006-1 |
| 41 | LXS 2006-10N |
| 42 | LXS 2006-11 |
| 43 | LXS 2006-12N |
| 44 | LXS 2006-13 |
| 45 | LXS 2006-15 |
| 46 | LXS 2006-17 |
| 47 | LXS 2006-19 |
| 48 | LXS 2006-20 |
| 49 | LXS 2006-3 |
| 50 | LXS 2006-5 |
| 51 | LXS 2006-7 |
| 52 | LXS 2006-8 |
| 53 | LXS 2006-9 |
| 54 | LXS 2007-1 |
| 55 | LXS 2007-10H |
| 56 | LXS 2007-11 |
| 57 | LXS 2007-12N |
| 58 | LXS 2007-14H |
| 59 | LXS 2007-15N |
| 60 | LXS 2007-16N |
| 61 | LXS 2007-17H |
| 62 | LXS 2007-18N |
| 63 | LXS 2007-20N |
| 64 | LXS 2007-3 |
| 65 | LXS 2007-5H |
| 66 | LXS 2007-6 |
| 67 | LXS 2007-7N |
| 68 | LXS 2007-8H |
| 69 | LXS 2007-9 |
| 70 | RLT 2008-AH1 |
| 71 | SAIL 2003-BC1 |
| 72 | SAIL 2003-BC10 |
| 73 | SAIL 2003-BC11 |
| 74 | SAIL 2003-BC12 |
| 75 | SAIL 2003-BC13 |
| 76 | SAIL 2003-BC2 |
| 77 | SAIL 2003-BC3 |
| 78 | SAIL 2003-BC4 |
| 79 | SAIL 2003-BC5 |
| 80 | SAIL 2003-BC8 |

| 81 | SAIL 2003-BC9 |
|---|---|
| 82 | SAIL 2004-1 |
| 83 | SAIL 2004-10 |
| 84 | SAIL 2004-2 |
| 85 | SAIL 2004-3 |
| 86 | SAIL 2004-4 |
| 87 | SAIL 2004-5 |
| 88 | SAIL 2004-6 |
| 89 | SAIL 2004-8 |
| 90 | SAIL 2004-9 |
| 91 | SAIL 2005-1 |
| 92 | SAIL 2005-10 |
| 93 | SAIL 2005-11 |
| 94 | SAIL 2005-2 |
| 95 | SAIL 2005-3 |
| 96 | SAIL 2005-4 |
| 97 | SAIL 2005-5 |
| 98 | SAIL 2005-6 |
| 99 | SAIL 2005-7 |
| 100 | SAIL 2005-8 |
| 101 | SAIL 2005-9 |
| 102 | SAIL 2005-HE3 |
| 103 | SAIL 2006-1 |
| 104 | SAIL 2006-2 |
| 105 | SAIL 2006-4 |
| 106 | SAIL 2006-BNC3 |
| 107 | SARM 2004-10 |
| 108 | SARM 2004-16 |
| 109 | SARM 2004-18 |
| 110 | SARM 2004-20 |
| 111 | SARM 2004-5 |
| 112 | SARM 2004-9XS |
| 113 | SARM 2005-11 |
| 114 | SARM 2005-12 |
| 115 | SARM 2005-15 |
| 116 | SARM 2005-17 |
| 117 | SARM 2005-20 |
| 118 | SARM 2005-22 |
| 119 | SARM 2005-23 |
| 120 | SARM 2005-3XS |
| 121 | SARM 2005-6XS |
| 122 | SARM 2005-8XS |
| 123 | SARM 2006-1 |

| 124 | SARM 2006-10 |
| 125 | SARM 2006-11 |
| 126 | SARM 2006-12 |
| 127 | SARM 2006-2 |
| 128 | SARM 2006-3 |
| 129 | SARM 2006-4 |
| 130 | SARM 2006-5 |
| 131 | SARM 2006-6 |
| 132 | SARM 2006-7 |
| 133 | SARM 2006-8 |
| 134 | SARM 2006-9 |
| 135 | SARM 2007-1 |
| 136 | SARM 2007-10 |
| 137 | SARM 2007-11 |
| 138 | SARM 2007-2 |
| 139 | SARM 2007-3 |
| 140 | SARM 2007-4 |
| 141 | SARM 2007-6 |
| 142 | SARM 2007-8 |
| 143 | SARM 2008-2 |
| 144 | SASCO 2003-12XS |
| 145 | SASCO 2003-15A |
| 146 | SASCO 2003-17A |
| 147 | SASCO 2003-18XS |
| 148 | SASCO 2003-25XS |
| 149 | SASCO 2003-26A |
| 150 | SASCO 2003-28XS |
| 151 | SASCO 2003-29 |
| 152 | SASCO 2003-30 |
| 153 | SASCO 2003-34A |
| 154 | SASCO 2003-35 |
| 155 | SASCO 2003-36XS |
| 156 | SASCO 2003-38 |
| 157 | SASCO 2003-39EX |
| 158 | SASCO 2003-3XS |
| 159 | SASCO 2003-6A |
| 160 | SASCO 2003-GEL1 |
| 161 | SASCO 2003-NP1 |
| 162 | SASCO 2003-S1 |
| 163 | SASCO 2003-S2 |
| 164 | SASCO 2004-10 |
| 165 | SASCO 2004-11XS |
| 166 | SASCO 2004-13 |

| 167 | SASCO 2004-15 |
| 168 | SASCO 2004-16XS |
| 169 | SASCO 2004-17XS |
| 170 | SASCO 2004-18H |
| 171 | SASCO 2004-19XS |
| 172 | SASCO 2004-20 |
| 173 | SASCO 2004-21XS |
| 174 | SASCO 2004-22 |
| 175 | SASCO 2004-23XS |
| 176 | SASCO 2004-2AC |
| 177 | SASCO 2004-4XS |
| 178 | SASCO 2004-6XS |
| 179 | SASCO 2004-7 |
| 180 | SASCO 2004-9XS |
| 181 | SASCO 2004-GEL1 |
| 182 | SASCO 2004-GEL2 |
| 183 | SASCO 2004-GEL3 |
| 184 | SASCO 2004-NP1 |
| 185 | SASCO 2004-S2 |
| 186 | SASCO 2004-S3 |
| 187 | SASCO 2004-S4 |
| 188 | SASCO 2005-1 |
| 189 | SASCO 2005-10 |
| 190 | SASCO 2005-11H |
| 191 | SASCO 2005-14 |
| 192 | SASCO 2005-15 |
| 193 | SASCO 2005-17 |
| 194 | SASCO 2005-2XS |
| 195 | SASCO 2005-3 |
| 196 | SASCO 2005-4XS |
| 197 | SASCO 2005-5 |
| 198 | SASCO 2005-7XS |
| 199 | SASCO 2005-9XS |
| 200 | SASCO 2005-GEL2 |
| 201 | SASCO 2005-GEL3 |
| 202 | SASCO 2005-GEL4 |
| 203 | SASCO 2005-RF1 |
| 204 | SASCO 2005-RF2 |
| 205 | SASCO 2005-RF4 |
| 206 | SASCO 2005-RF5 |
| 207 | SASCO 2005-RF6 |
| 208 | SASCO 2005-RF7 |
| 209 | SASCO 2005-S1 |

210   SASCO 2005-S2
211   SASCO 2005-S3
212   SASCO 2005-S4
213   SASCO 2005-S5
214   SASCO 2005-S6
215   SASCO 2005-S7
216   SASCO 2005-SC1
217   SASCO 2006-BC2
218   SASCO 2006-BC3
219   SASCO 2006-BC4
220   SASCO 2006-BC6
221   SASCO 2006-GEL1
222   SASCO 2006-GEL2
223   SASCO 2006-GEL3
224   SASCO 2006-GEL4
225   SASCO 2006-RF1
226   SASCO 2006-RF2
227   SASCO 2006-RF3
228   SASCO 2006-RF4
229   SASCO 2006-S1
230   SASCO 2006-S2
231   SASCO 2006-S3
232   SASCO 2006-S4
233   SASCO 2006-Z
234   SASCO 2007-BC1
235   SASCO 2007-BC2
236   SASCO 2007-BC3
237   SASCO 2007-BC4
238   SASCO 2007-BNC1
239   SASCO 2007-GEL1
240   SASCO 2007-GEL2
241   SASCO 2007-MLN1
242   SASCO 2007-OSI
243   SASCO 2007-RF1
244   SASCO 2007-TC1

# EXHIBIT F

Dated:  April 21, 2017

**NOTICE PROVIDING FURTHER INFORMATION ABOUT THE PROPOSED RMBS TRUST SETTLEMENT AGREEMENT, DATED AS OF NOVEMBER 30, 2016, AND MODIFIED AS OF MARCH 17, 2017 (THE "<u>PROPOSED SETTLEMENT AGREEMENT</u>"), FROM LEHMAN BROTHERS HOLDINGS, INC. AND ALL AFFILIATED DEBTORS (THE "<u>LBHI DEBTORS</u>").**

**THE PROPOSED SETTLEMENT AGREEMENT MATERIALLY AFFECTS THE INTERESTS OF HOLDERS OF CERTIFICATES, NOTES OR OTHER SECURITIES (THE "<u>CERTIFICATEHOLDERS</u>") ISSUED BY THE RESIDENTIAL MORTGAGE-BACKED SECURITIZATION TRUSTS LISTED IN <u>EXHIBIT A</u> HERETO AND FURTHER IDENTIFIED BY CUSIP NUMBERS ON THE WEBSITE LOCATED AT <u>http://www.LBHIrmbssettlement.com</u> (THE "<u>RMBS TRUSTEES' WEBSITE</u>") AT THE TAB ENTITLED "LIST OF COVERED RMBS TRUSTS" (COLLECTIVELY, THE "<u>COVERED RMBS TRUSTS</u>" AND EACH A "<u>COVERED RMBS TRUST</u>"). [1] CERTIFICATEHOLDERS AND OTHER NOTICE RECIPIENTS SHOULD READ CAREFULLY THIS NOTICE AND THE MATERIALS REFERENCED HEREIN IN CONSULTATION WITH THEIR LEGAL AND FINANCIAL ADVISORS.**

**NOTICE IS HEREBY GIVEN BY:**

**Deutsche Bank National Trust Company**
**TMI Trust Company, successor to Law Debenture Trust Company of New York**
**U.S. Bank National Association**
**Wilmington Trust Company and Wilmington Trust, National Association**

**EACH, IN ITS CAPACITY AS TRUSTEE, SEPARATE TRUSTEE, SUCCESSOR TRUSTEE, OR OTHER SIMILAR CAPACITIES OF THE COVERED RMBS TRUSTS (COLLECTIVELY, THE "<u>RMBS TRUSTEES</u>" AND EACH AN "<u>RMBS TRUSTEE</u>"), TO THE CERTIFICATEHOLDERS.**

**THIS NOTICE CONTAINS IMPORTANT INFORMATION FOR CERTIFICATEHOLDERS AND OTHER PERSONS POTENTIALLY INTERESTED IN THE COVERED RMBS TRUSTS. ALL DEPOSITORIES, CUSTODIANS AND OTHER INTERMEDIARIES RECEIVING THIS NOTICE, AS APPLICABLE, ARE REQUESTED TO EXPEDITE THE RE-TRANSMITTAL TO CERTIFICATEHOLDERS IN A TIMELY MANNER.**

This notice (the "<u>Notice</u>") is given to you by the RMBS Trustees under certain applicable Trust Agreements or other similar agreements governing the Covered RMBS Trusts

---

[1] Any CUSIP numbers appearing in this Notice, Exhibit A hereto or on the RMBS Trustees' Website have been included solely for the convenience of the Certificateholders.  The RMBS Trustees assume no responsibility for the selection or use of such numbers and make no representations as to the correctness of the CUSIP numbers appearing herein or therein.

(the "<u>Governing Agreements</u>").  Capitalized terms used but not defined herein shall have the meanings assigned to them in the Proposed Settlement Agreement.

**THE RMBS TRUSTEES' MARCH 20, 2017 NOTICE TO HOLDERS AND THE PROPOSED SETTLEMENT AGREEMENT**

In a prior notice to Certificateholders dated March 20, 2017 (the "<u>March 20, 2017 Notice to Holders</u>"), the RMBS Trustees informed Certificateholders that, on March 17, 2017, a group of fourteen (14) institutional investors represented by Gibbs and Bruns LLP (the "<u>Institutional Investors</u>") submitted to the RMBS Trustees a settlement offer from the LBHI Debtors (the "<u>Settlement Offer</u>") concerning the Covered Loan Claims and in the form of the Proposed Settlement Agreement.  The RMBS Trustees' March 20, 2017 Notice to Holders referenced certain terms of the Proposed Settlement Agreement; please refer to the Proposed Settlement Agreement itself for the full and complete terms.  A copy of the Proposed Settlement Agreement, together with a copy of the Institutional Investors' letter to the RMBS Trustees concerning the Proposed Settlement Agreement, is available at the RMBS Trustees' Website at the tab entitled "Certain Relevant Documents" (available at http://lbhirmbssettlement.com/Settlement_Agreement.pdf).  A copy of the March 20, 2017 Notice to Holders also is posted on the RMBS Trustees' Website at the tab entitled "Notices" (available at http://lbhirmbssettlement.com/notice.pdf).

Since the publication of the March 20, 2017 Notice to Holders, the RMBS Trustees have received questions relating to the Proposed Settlement Agreement.  The RMBS Trustees are sending this notice to provide additional information, including information that is intended to respond to those questions.

**CIRCUMSTANCES LEADING UP TO THE PROPOSED SETTLEMENT AGREEMENT**

On October 26, 2015, the Institutional Investors[2] and the LBHI Debtors informed the RMBS Trustees that they had reached an agreement (the "<u>October 2015 Settlement Agreement</u>") that they wanted to deliver to the RMBS Trustees for their consideration that, if accepted by the RMBS Trustees, would settle the claims asserted in the RMBS Trustees' proofs of claim against the LBHI Debtors.  The Institutional Investors and the LBHI Debtors agreed to share the October 2015 Settlement Agreement with the RMBS Trustees only if the RMBS Trustees agreed to keep the agreement confidential.  The RMBS Trustees agreed to keep it confidential and received a copy of the October 2015 Settlement Agreement.

Some of the material terms of the October 2015 Settlement Agreement, which the Institutional Investors and the LBHI Debtors had executed, included:

- the LBHI Debtors agreed to allow an unsecured Class 7 claim to settle the claims in the RMBS Trustees' proofs of claim for $2.44 billion in exchange for releases;

---

[2]    The Institutional Investors at that time comprised a group of fifteen (15) institutional investors who were represented then, as now, by Gibbs and Bruns LLP.

- the RMBS Trustees were not permitted to disclose the offer unless and until they accepted it;

- the $2.44 billion would be allocated based on each trust's estimated lifetime losses, except that estimated lifetime losses associated with Transferor Loans would be reduced by 99%; and

- the LBHI Debtors had the right to terminate the October 2015 Settlement Agreement if the RMBS Trustees opted out of the settlement as to a certain threshold of trusts.[3]

The RMBS Trustees worked with experienced counsel to consider the settlement offer and retained experts to advise the RMBS Trustees and their other experts: (i) the Honorable Anthony J. Carpinello (Ret.), a former Associate Justice of the New York State Supreme Court, Appellate Division, Third Department, to advise the RMBS Trustees and other experts as to issues relating to New York law; (ii) the Honorable Arthur Gonzalez (Ret.), the former Chief Judge for the United States Bankruptcy Court for the Southern District of New York, to advise the RMBS Trustees and other experts as to issues relating to bankruptcy law and process and the Federal Rules of Evidence; and (iii) Ronald Greenspan of FTI Consulting to serve as the "top-level" expert to advise the RMBS Trustees whether they should accept the settlement as to each applicable trust.

Between November 2015 and early February 2016, the RMBS Trustees worked with those experts to evaluate the October 2015 Settlement Agreement. In February 2016, the RMBS Trustees conveyed to the LBHI Debtors, based on preliminary work performed by experts, the number of trusts for which the RMBS Trustees might be advised to accept the settlement. Subsequently, the LBHI Debtors formally withdrew the October 2015 Settlement Agreement.

Beginning in the spring of 2016, the LBHI Debtors and the Institutional Investors participated in mediation. At the request of the mediator, the RMBS Trustees provided certain information to the mediator, on a confidential basis, to enable him to facilitate a revised settlement offer.

On November 30, 2016, the LBHI Debtors sent to the RMBS Trustees on a confidential basis a settlement agreement that the Institutional Investors and the LBHI Debtors had executed (the "November 2016 Settlement Agreement") for consideration by the RMBS Trustees. The November 2016 Settlement Agreement, if accepted by the RMBS Trustees, would settle the claims asserted in the RMBS Trustees' proofs of claim against the LBHI Debtors. The November 2016 Settlement Agreement included the following terms:

- the LBHI Debtors would file a motion with the Bankruptcy Court to estimate the RMBS Trustees' claims at $2.44 billion, if the RMBS Trustees would agree that their claims could be estimated by the Bankruptcy Court;

---

[3]      Pursuant to the terms of the October 2015 Settlement Agreement, the RMBS Trustees had the right to learn the opt-out threshold. Because the RMBS Trustees undertook to make the determinations whether to accept or reject the October 2015 Settlement Agreement on a trust-by-trust basis, they did not exercise their right to learn the opt-out threshold, as that threshold was not relevant to their trust-by-trust determinations.

- although the LBHI Debtors would argue that the estimation should be $2.44 billion, the RMBS Trustees would be permitted to argue that the Estimation should be whatever amount they believed was warranted;

- the LBHI Debtors and the RMBS Trustees would agree that the Bankruptcy Court's Estimation of the RMBS Trustees' claims would become the value of the Allowed Claim, and neither party could appeal the decision; and

- an expert selected by the RMBS Trustees would determine the allocation of the Allowed Claim among the accepting trusts.

The RMBS Trustees were not authorized to disclose the November 2016 Settlement Agreement to third parties without the LBHI Debtors' prior written consent.

As contemplated in the November 2016 Settlement Agreement, the RMBS Trustees requested that Duff & Phelps LLP ("Duff & Phelps"), the financial advisory firm retained by the RMBS Trustees in the Bankruptcy Proceeding to assist the RMBS Trustees with the Protocol, prepare a reasonable allocation methodology and schedule. Based on its industry experience, familiarity with the loans at issue and the claims submitted in connection with the Protocol, Duff & Phelps provided the RMBS Trustees with an allocation methodology and schedule, which the RMBS Trustees sent to the Institutional Investors and the LBHI Debtors. Neither the Institutional Investors nor the LBHI Debtors provided any substantive comments or changes to the Duff & Phelps allocation methodology and schedule.

On March 17, 2017, the Institutional Investors submitted to the RMBS Trustees the Proposed Settlement Agreement, which reflected the Duff & Phelps allocation methodology and schedule in Section 3.04 and Exhibit H with no substantive changes. Following a February 22, 2017 decision of the United States District Court for the Southern District of New York affirming a decision of the U.S. Bankruptcy Court for the Southern District of New York expunging the RMBS Trustees' claims relating to Transferor Loans, the Proposed Settlement Agreement deleted from the November 2016 Settlement Agreement the resolution of the RMBS Trustees' claims involving Transferor Loans (and contemplated releases relating thereto) and, accordingly, reduced the amount that the LBHI Debtors would seek to estimate the Allowed Claim by $24 million, from $2.44 billion to $2.416 billion. On March 24, 2017, the RMBS Trustees filed a notice of appeal of the District Court's decision to the Second Circuit.

The Institutional Investors and the LBHI Debtors, not the RMBS Trustees, negotiated the initial $2.44 billion amount and subsequently the $2.416 billion amount. At the Estimation Proceeding, the RMBS Trustees intend to argue that the Allowed Claim for Covered Loan Claims should be set in an amount greater than $2.416 billion.

In addition, the Proposed Settlement Agreement contained the following modifications to the November 2016 Settlement Agreement that the RMBS Trustees had requested:

- the RMBS Trustees were permitted to disclose the Proposed Settlement Agreement to Certificateholders promptly after receipt and were given additional time to solicit Certificateholder feedback for their experts and themselves to consider before the Acceptance Date;

4

- although the LBHI Debtors are waiving their appellate rights under all circumstances, the RMBS Trustees may appeal if the Bankruptcy Court estimates the Covered Loan Claims at less than $2 billion;

- if the Bankruptcy Court estimates the Covered Loan Claims between $2 billion and $2.416 billion, the Allowed Claim would be set at $2.416 billion;

- the RMBS Trustees bargained for detailed procedures for the Estimation Proceeding that are memorialized in Exhibit G to the Proposed Settlement Agreement and are required to be approved by the Bankruptcy Court, including (i) that the Hearing (as defined in Exhibit G) shall be scheduled for at least 14 hearing days, or a total of 98 hours, on the record and (ii) the LBHI Debtors will be allotted 7 days (or a total of 49 hours) to present their case, including rebuttals, and 7 days (or a total of 49 hours) will be allotted to the RMBS Trustees; and

- the RMBS Trustees are not required to accept or reject the Proposed Settlement Agreement as to all Covered RMBS Trusts; rather, any RMBS Trustee (i) may accept the Proposed Settlement Agreement as to certain Covered RMBS Trusts and (ii) has the right, but not the obligation, to terminate the Proposed Settlement Agreement as to one or more of its Accepting Trusts in the event the applicable Accepting Trustee has been directed, before the 9019 Objection Deadline, to terminate the Proposed Settlement Agreement as to such Accepting Trust or Accepting Trusts in a manner acceptable to the Accepting Trustee, but only for the Accepting Trust or Accepting Trusts for which such a direction has been provided.

As stated in the RMBS Trustees' March 20, 2017 Notice to Holders, if the RMBS Trustees' rejection of the Settlement Offer as to Covered RMBS Trusts exceeds a threshold agreed upon by the Institutional Investors and the LBHI Debtors (but not disclosed in the Proposed Settlement Agreement), then the LBHI Debtors may terminate the Proposed Settlement Agreement. The RMBS Trustees do not know what threshold of opt-outs by Covered RMBS Trusts would give the LBHI Debtors the right to terminate the Proposed Settlement Agreement. As with the October 2015 Settlement Agreement, because the RMBS Trustees have undertaken to make the determinations whether to accept the Proposed Settlement Agreement on a trust-by-trust basis, they have not exercised their right to learn the opt-out threshold because it is not relevant to their trust-by-trust determinations.

Also as stated in the March 20, 2017 Notice to Holders, counsel for the RMBS Trustees retained the Honorable Judith Fitzgerald (Ret.), the former Chief Judge of the United States Bankruptcy Court for the Western District of Pennsylvania, to advise the RMBS Trustees on the reasonableness of the Proposed Settlement Agreement for each Covered RMBS Trust as a means for resolving the claims asserted by the RMBS Trustees against the LBHI Debtors.

ANY CERTIFICATEHOLDERS WHO WISH TO HAVE THEIR VIEWS CONCERNING WHETHER THE RMBS TRUSTEES SHOULD ACCEPT OR REJECT THE PROPOSED SETTLEMENT AGREEMENT FOR THEIR RELATED COVERED RMBS TRUST(S) TO BE CONSIDERED BY THE RMBS TRUSTEES AND/OR THEIR EXPERTS ARE REQUESTED TO CONTACT THE RMBS TRUSTEES IMMEDIATELY AND CERTAINLY NO LATER THAN MAY 5, 2017. **GIVEN THE IMPENDING DEADLINES,**

**THE RMBS TRUSTEES LIKELY WILL NOT BE IN A POSITION TO MEANINGFULLY CONSIDER, IF AT ALL, VIEWS OF CERTIFICATEHOLDERS OR OTHER INFORMATION THAT THEY RECEIVE AFTER MAY 5, 2017.** PLEASE COMMUNICATE WITH THE APPLICABLE RMBS TRUSTEE(S) USING THE CONTACT INFORMATION OF SUCH RMBS TRUSTEE AVAILABLE AT THE RMBS TRUSTEES' WEBSITE AT THE TAB ENTITLED "RMBS TRUSTEES' CONTACT INFORMATION" (AVAILABLE AT http://lbhirmbssettlement.com/trustee_contact.php).

As of the date of this Notice, none of the RMBS Trustees has made any final determination, on behalf of the Covered RMBS Trusts for which it serves as trustee, as to the reasonableness of, or the advisability of accepting, the Proposed Settlement Agreement. Although the RMBS Trustees are working together in their evaluation of the Proposed Settlement Agreement, each RMBS Trustee will assess the Proposed Settlement Agreement and make its own decision as to whether to accept or reject the Proposed Settlement Agreement on behalf of each Covered RMBS Trust for which it serves as trustee.

Certificateholders are encouraged to check the RMBS Trustees' Website regularly for updates that may impact particular Covered RMBS Trusts or groups of Covered RMBS Trusts.

**OTHER MATTERS**

This Notice references certain terms of the Proposed Settlement Agreement, the October 2015 Settlement Agreement and the November 2016 Settlement Agreement, respectively, and is not a complete summary or statement of the material terms thereof, of relevant law, or of relevant legal procedures. Certificateholders and other potentially interested persons are urged to review carefully the Proposed Settlement Agreement and to consider its implications, including without limitation the releases of the Covered Loan Claims and other actual or potential claims related to Covered Loans. The RMBS Trustees may send further notices with respect to the matters addressed herein and developments relating to the Settlement Offer, all of which will be made available at the RMBS Trustees' Website at the tab entitled "Notices" (available at http://lbhirmbssettlement.com/notice.php). You may also obtain any documents filed with the Court on the docket for the Chapter 11 Cases by logging on to PACER at https://www.pacer.gov (password required) or by visiting LBHI's claims agent website at http://www.lehman-docket.com (no password required).

For inquiries, or to furnish any direction pursuant to the Governing Agreements with respect to the matters discussed herein, Certificateholders are directed to contact the applicable RMBS Trustee using the contact information of such RMBS Trustee available at the RMBS Trustees' Website at the tab entitled "RMBS Trustees' Contact Information" (available at http://lbhirmbssettlement.com/trustee_contact.php). Certificateholders will be required to verify their holdings before receiving information from the applicable RMBS Trustee. Please be advised that with respect to any particular inquiry from individual Certificateholders, an RMBS Trustee may conclude that a specific response to such inquiry is not consistent with requirements under applicable law and regulation of equal and full dissemination of information to all Certificateholders.

Certificateholders and other persons interested in the Covered RMBS Trusts should not rely on the RMBS Trustees, their counsel, experts or other advisors retained by the RMBS

Trustees, as their sole source of information.  Certificateholders and other potentially interested persons are urged to consult with their own legal and financial advisors.

Please note that this Notice is not intended and should not be construed as investment, accounting, financial, legal, tax or other advice by or on behalf of the RMBS Trustees, or their directors, officers, affiliates, agents, attorneys or employees.  Each person or entity receiving this Notice should seek the advice of its own advisors in respect of all matters set forth herein.

Please be further advised that each of the RMBS Trustees reserves all of the rights, powers, claims and remedies available to it under the Governing Agreements and applicable law. No delay or forbearance by an RMBS Trustee to exercise any right or remedy accruing upon the occurrence of a default, or otherwise under the terms of the Governing Agreements, other documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or an acquiescence therein.

Receipt of this Notice should not be construed as evidence or acknowledgment of any requirement applicable to, or of any right or authority on the part of any recipient under the Governing Documents to direct, the matters addressed herein, or of any obligations on the part of any RMBS Trustee with respect thereto, and each RMBS Trustee expressly reserves all rights in determining appropriate actions and requirements concerning these matters.

Each of the RMBS Trustees expressly reserves all rights in respect of each applicable Governing Agreement, including without limitation its right to recover in full its fees and costs (including, without limitation, fees and costs incurred or to be incurred by such RMBS Trustee in performing its duties, indemnities owing or to become owing to such RMBS Trustee, compensation for such RMBS Trustee's time spent and reimbursement for fees and costs of counsel and other agents it employs in performing its duties or to pursue remedies) and its right, prior to exercising any rights or powers in connection with any applicable Governing Agreement at the request or direction of any Certificateholder, to receive security or indemnity satisfactory to it against all costs, expenses and liabilities that might be incurred in compliance therewith, and all rights that may be available to it under applicable law or otherwise.

**Deutsche Bank National Trust Company**
**TMI Trust Company, successor to Law Debenture Trust Company of New York**
**U.S. Bank National Association**
**Wilmington Trust Company and Wilmington Trust, National Association**

**EXHIBIT A**

**Covered RMBS Trusts**

**EXHIBIT A**

**TRUSTS**

| No. | Trust Name |
|---|---|
| 1 | ARC 2002-BC10 |
| 2 | ARC 2002-BC8 |
| 3 | ARC 2002-BC9 |
| 4 | ARC 2004-1 |
| 5 | BNC 2006-1 |
| 6 | BNC 2006-2 |
| 7 | BNC 2007-1 |
| 8 | BNC 2007-2 |
| 9 | BNC 2007-3 |
| 10 | BNC 2007-4 |
| 11 | LABS 2004-1 |
| 12 | LABS 2007-1 |
| 13 | LMT 2005-1 |
| 14 | LMT 2005-2 |
| 15 | LMT 2005-3 |
| 16 | LMT 2006-1 |
| 17 | LMT 2006-2 |
| 18 | LMT 2006-4 |
| 19 | LMT 2006-8 |
| 20 | LMT 2006-9 |
| 21 | LMT 2007-1 |
| 22 | LMT 2007-10 |
| 23 | LMT 2007-2 |
| 24 | LMT 2007-3 |
| 25 | LMT 2007-4 |
| 26 | LMT 2007-5 |
| 27 | LMT 2007-6 |
| 28 | LMT 2007-7 |
| 29 | LMT 2007-8 |
| 30 | LMT 2007-9 |
| 31 | LMT 2008-2 |
| 32 | LMT 2008-6 |
| 33 | LXS 2005-1 |
| 34 | LXS 2005-10 |
| 35 | LXS 2005-2 |
| 36 | LXS 2005-3 |
| 37 | LXS 2005-4 |

| 38 | LXS 2005-6 |
| 39 | LXS 2005-8 |
| 40 | LXS 2006-1 |
| 41 | LXS 2006-10N |
| 42 | LXS 2006-11 |
| 43 | LXS 2006-12N |
| 44 | LXS 2006-13 |
| 45 | LXS 2006-15 |
| 46 | LXS 2006-17 |
| 47 | LXS 2006-19 |
| 48 | LXS 2006-20 |
| 49 | LXS 2006-3 |
| 50 | LXS 2006-5 |
| 51 | LXS 2006-7 |
| 52 | LXS 2006-8 |
| 53 | LXS 2006-9 |
| 54 | LXS 2007-1 |
| 55 | LXS 2007-10H |
| 56 | LXS 2007-11 |
| 57 | LXS 2007-12N |
| 58 | LXS 2007-14H |
| 59 | LXS 2007-15N |
| 60 | LXS 2007-16N |
| 61 | LXS 2007-17H |
| 62 | LXS 2007-18N |
| 63 | LXS 2007-20N |
| 64 | LXS 2007-3 |
| 65 | LXS 2007-5H |
| 66 | LXS 2007-6 |
| 67 | LXS 2007-7N |
| 68 | LXS 2007-8H |
| 69 | LXS 2007-9 |
| 70 | RLT 2008-AH1 |
| 71 | SAIL 2003-BC1 |
| 72 | SAIL 2003-BC10 |
| 73 | SAIL 2003-BC11 |
| 74 | SAIL 2003-BC12 |
| 75 | SAIL 2003-BC13 |
| 76 | SAIL 2003-BC2 |
| 77 | SAIL 2003-BC3 |
| 78 | SAIL 2003-BC4 |
| 79 | SAIL 2003-BC5 |
| 80 | SAIL 2003-BC8 |

| 81 | SAIL 2003-BC9 |
| 82 | SAIL 2004-1 |
| 83 | SAIL 2004-10 |
| 84 | SAIL 2004-2 |
| 85 | SAIL 2004-3 |
| 86 | SAIL 2004-4 |
| 87 | SAIL 2004-5 |
| 88 | SAIL 2004-6 |
| 89 | SAIL 2004-8 |
| 90 | SAIL 2004-9 |
| 91 | SAIL 2005-1 |
| 92 | SAIL 2005-10 |
| 93 | SAIL 2005-11 |
| 94 | SAIL 2005-2 |
| 95 | SAIL 2005-3 |
| 96 | SAIL 2005-4 |
| 97 | SAIL 2005-5 |
| 98 | SAIL 2005-6 |
| 99 | SAIL 2005-7 |
| 100 | SAIL 2005-8 |
| 101 | SAIL 2005-9 |
| 102 | SAIL 2005-HE3 |
| 103 | SAIL 2006-1 |
| 104 | SAIL 2006-2 |
| 105 | SAIL 2006-4 |
| 106 | SAIL 2006-BNC3 |
| 107 | SARM 2004-10 |
| 108 | SARM 2004-16 |
| 109 | SARM 2004-18 |
| 110 | SARM 2004-20 |
| 111 | SARM 2004-5 |
| 112 | SARM 2004-9XS |
| 113 | SARM 2005-11 |
| 114 | SARM 2005-12 |
| 115 | SARM 2005-15 |
| 116 | SARM 2005-17 |
| 117 | SARM 2005-20 |
| 118 | SARM 2005-22 |
| 119 | SARM 2005-23 |
| 120 | SARM 2005-3XS |
| 121 | SARM 2005-6XS |
| 122 | SARM 2005-8XS |
| 123 | SARM 2006-1 |

| 124 | SARM 2006-10 |
| 125 | SARM 2006-11 |
| 126 | SARM 2006-12 |
| 127 | SARM 2006-2 |
| 128 | SARM 2006-3 |
| 129 | SARM 2006-4 |
| 130 | SARM 2006-5 |
| 131 | SARM 2006-6 |
| 132 | SARM 2006-7 |
| 133 | SARM 2006-8 |
| 134 | SARM 2006-9 |
| 135 | SARM 2007-1 |
| 136 | SARM 2007-10 |
| 137 | SARM 2007-11 |
| 138 | SARM 2007-2 |
| 139 | SARM 2007-3 |
| 140 | SARM 2007-4 |
| 141 | SARM 2007-6 |
| 142 | SARM 2007-8 |
| 143 | SARM 2008-2 |
| 144 | SASCO 2003-12XS |
| 145 | SASCO 2003-15A |
| 146 | SASCO 2003-17A |
| 147 | SASCO 2003-18XS |
| 148 | SASCO 2003-25XS |
| 149 | SASCO 2003-26A |
| 150 | SASCO 2003-28XS |
| 151 | SASCO 2003-29 |
| 152 | SASCO 2003-30 |
| 153 | SASCO 2003-34A |
| 154 | SASCO 2003-35 |
| 155 | SASCO 2003-36XS |
| 156 | SASCO 2003-38 |
| 157 | SASCO 2003-39EX |
| 158 | SASCO 2003-3XS |
| 159 | SASCO 2003-6A |
| 160 | SASCO 2003-GEL1 |
| 161 | SASCO 2003-NP1 |
| 162 | SASCO 2003-S1 |
| 163 | SASCO 2003-S2 |
| 164 | SASCO 2004-10 |
| 165 | SASCO 2004-11XS |
| 166 | SASCO 2004-13 |

| | |
|---|---|
| 167 | SASCO 2004-15 |
| 168 | SASCO 2004-16XS |
| 169 | SASCO 2004-17XS |
| 170 | SASCO 2004-18H |
| 171 | SASCO 2004-19XS |
| 172 | SASCO 2004-20 |
| 173 | SASCO 2004-21XS |
| 174 | SASCO 2004-22 |
| 175 | SASCO 2004-23XS |
| 176 | SASCO 2004-2AC |
| 177 | SASCO 2004-4XS |
| 178 | SASCO 2004-6XS |
| 179 | SASCO 2004-7 |
| 180 | SASCO 2004-9XS |
| 181 | SASCO 2004-GEL1 |
| 182 | SASCO 2004-GEL2 |
| 183 | SASCO 2004-GEL3 |
| 184 | SASCO 2004-NP1 |
| 185 | SASCO 2004-S2 |
| 186 | SASCO 2004-S3 |
| 187 | SASCO 2004-S4 |
| 188 | SASCO 2005-1 |
| 189 | SASCO 2005-10 |
| 190 | SASCO 2005-11H |
| 191 | SASCO 2005-14 |
| 192 | SASCO 2005-15 |
| 193 | SASCO 2005-17 |
| 194 | SASCO 2005-2XS |
| 195 | SASCO 2005-3 |
| 196 | SASCO 2005-4XS |
| 197 | SASCO 2005-5 |
| 198 | SASCO 2005-7XS |
| 199 | SASCO 2005-9XS |
| 200 | SASCO 2005-GEL2 |
| 201 | SASCO 2005-GEL3 |
| 202 | SASCO 2005-GEL4 |
| 203 | SASCO 2005-RF1 |
| 204 | SASCO 2005-RF2 |
| 205 | SASCO 2005-RF4 |
| 206 | SASCO 2005-RF5 |
| 207 | SASCO 2005-RF6 |
| 208 | SASCO 2005-RF7 |
| 209 | SASCO 2005-S1 |

210   SASCO 2005-S2
211   SASCO 2005-S3
212   SASCO 2005-S4
213   SASCO 2005-S5
214   SASCO 2005-S6
215   SASCO 2005-S7
216   SASCO 2005-SC1
217   SASCO 2006-BC2
218   SASCO 2006-BC3
219   SASCO 2006-BC4
220   SASCO 2006-BC6
221   SASCO 2006-GEL1
222   SASCO 2006-GEL2
223   SASCO 2006-GEL3
224   SASCO 2006-GEL4
225   SASCO 2006-RF1
226   SASCO 2006-RF2
227   SASCO 2006-RF3
228   SASCO 2006-RF4
229   SASCO 2006-S1
230   SASCO 2006-S2
231   SASCO 2006-S3
232   SASCO 2006-S4
233   SASCO 2006-Z
234   SASCO 2007-BC1
235   SASCO 2007-BC2
236   SASCO 2007-BC3
237   SASCO 2007-BC4
238   SASCO 2007-BNC1
239   SASCO 2007-GEL1
240   SASCO 2007-GEL2
241   SASCO 2007-MLN1
242   SASCO 2007-OSI
243   SASCO 2007-RF1
244   SASCO 2007-TC1

# EXHIBIT G

Dated:  June 1, 2017

**NOTICE REGARDING ACCEPTANCE OF THE PROPOSED RMBS TRUST SETTLEMENT AGREEMENT, DATED AS OF NOVEMBER 30, 2016, AND MODIFIED AS OF MARCH 17, 2017 (THE "<u>PROPOSED SETTLEMENT AGREEMENT</u>"), FROM LEHMAN BROTHERS HOLDINGS, INC. AND ALL AFFILIATED DEBTORS (THE "<u>LBHI DEBTORS</u>").**

**THE PROPOSED SETTLEMENT AGREEMENT MATERIALLY AFFECTS THE INTERESTS OF HOLDERS OF CERTIFICATES, NOTES OR OTHER SECURITIES (THE "<u>CERTIFICATEHOLDERS</u>") ISSUED BY THE RESIDENTIAL MORTGAGE-BACKED SECURITIZATION TRUSTS LISTED IN <u>EXHIBIT A</u> HERETO AND FURTHER IDENTIFIED BY CUSIP NUMBERS ON THE WEBSITE LOCATED AT <u>http://www.lbhirmbssettlement.com</u> (THE "<u>RMBS TRUSTEES' WEBSITE</u>") AT THE TAB ENTITLED "LIST OF COVERED RMBS TRUSTS" (COLLECTIVELY, THE "<u>COVERED RMBS TRUSTS</u>" AND EACH A "<u>COVERED RMBS TRUST</u>").[1] CERTIFICATEHOLDERS AND OTHER NOTICE RECIPIENTS SHOULD READ CAREFULLY THIS NOTICE AND THE MATERIALS REFERENCED HEREIN IN CONSULTATION WITH THEIR LEGAL AND FINANCIAL ADVISORS.**

   **NOTICE IS HEREBY GIVEN BY:**

  **Deutsche Bank National Trust Company**
  **TMI Trust Company, successor to Law Debenture Trust Company of New York**
  **U.S. Bank National Association**
  **Wilmington Trust Company and Wilmington Trust, National Association**

**EACH, IN ITS CAPACITY AS TRUSTEE, SEPARATE TRUSTEE, SUCCESSOR TRUSTEE, OR OTHER SIMILAR CAPACITIES OF THE COVERED RMBS TRUSTS (COLLECTIVELY, THE "<u>RMBS TRUSTEES</u>" AND EACH AN "<u>RMBS TRUSTEE</u>"), TO THE CERTIFICATEHOLDERS.**

**THIS NOTICE CONTAINS IMPORTANT INFORMATION FOR CERTIFICATEHOLDERS AND OTHER PERSONS POTENTIALLY INTERESTED IN THE COVERED RMBS TRUSTS. ALL DEPOSITORIES, CUSTODIANS AND OTHER INTERMEDIARIES RECEIVING THIS NOTICE, AS APPLICABLE, ARE REQUESTED TO EXPEDITE THE RE-TRANSMITTAL TO CERTIFICATEHOLDERS IN A TIMELY MANNER.**

  This notice (the "<u>Notice</u>") is given to you by the RMBS Trustees under certain applicable Trust Agreements or other similar agreements governing the Covered RMBS Trusts

---

[1]  Any CUSIP numbers appearing in this Notice, Exhibit A hereto or on the RMBS Trustees' Website have been included solely for the convenience of the Certificateholders.  The RMBS Trustees assume no responsibility for the selection or use of such numbers and make no representations as to the correctness of the CUSIP numbers appearing herein or therein.

(the "Governing Agreements").  Capitalized terms used but not defined herein shall have the meanings assigned to them in the Proposed Settlement Agreement.

## THE PROPOSED SETTLEMENT AGREEMENT AND PRIOR NOTICES TO HOLDERS

In a prior notice to Certificateholders dated March 20, 2017 (the "March 20 Notice"), the RMBS Trustees informed Certificateholders that, on March 17, 2017, a group of fourteen (14) institutional investors represented by Gibbs and Bruns LLP (the "Institutional Investors") sent to the RMBS Trustees a settlement offer from the LBHI Debtors (the "Settlement Offer") concerning the Covered Loan Claims (as defined in the Proposed Settlement Agreement) and in the form of the Proposed Settlement Agreement.

The March 20 Notice also informed Certificateholders that the RMBS Trustees had retained the Honorable Judith Fitzgerald (Ret.) ("Judge Fitzgerald") as their expert to assist them with an independent evaluation of the Settlement Offer as set forth in the Proposed Settlement Agreement.  In addition, the March 20 Notice invited Certificateholders who had questions, who wished to have their views considered concerning whether the RMBS Trustees should accept or reject the Proposed Settlement Agreement, or who wished to furnish any direction pursuant to the Governing Agreements to contact the RMBS Trustees in writing via specified e-mail addresses for each of the RMBS Trustees.

Following the publication of the March 20 Notice, the RMBS Trustees received questions relating to the Proposed Settlement Agreement.  In response to those questions, the RMBS Trustees provided a second notice, dated April 21, 2017 (the "April 21 Notice"), to provide additional information about the Proposed Settlement Agreement.  In response to additional questions, the RMBS Trustees recently posted on the RMBS Trustees' Website at the tab entitled "Certain Relevant Documents" (available at http://lbhirmbssettlement.com/doc.php) additional materials relating to the Proposed Settlement Agreement and/or the Covered Loan Claims.

On April 27, 2017, the RMBS Trustees disseminated worldwide a notice (the "April 27 Notice" and together with the March 20 Notice and the April 21 Notice, the "Notices to Holders") alerting Certificateholders and any other interested parties of the filing of the *Motion of Lehman Brothers Holdings Inc. pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. § 105(a) for Entry of Order (A) Approving RMBS Settlement Agreement, (B) Making Certain Required Findings Regarding Decision of RMBS Trustees And LBHI Debtors to Enter into RMBS Settlement Agreement, (C) Scheduling Estimation Proceeding to Determine RMBS Claims and Approving Related Procedures regarding Conduct of Hearing, and (D) Granting Related Relief* [Docket No. 55232] (the "9019 Motion").  The April 27 Notice further publicized that a hearing on the 9019 Motion is scheduled to occur on July 6, 2017 before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York.

Each of the Notices to Holders is posted on the RMBS Trustees' Website at the tab entitled "Notices" (available at http://lbhirmbssettlement.com/notice.php).

**ACCEPTANCE OF THE PROPOSED SETTLEMENT AGREEMENT ON BEHALF OF CERTAIN RMBS TRUSTS IN RELIANCE ON THE RECOMMENDATION OF JUDGE FITZGERALD AND SUBJECT TO THE APPROVAL OF THE BANKRUPTCY COURT**

Following completion of her review, Judge Fitzgerald provided the RMBS Trustees with a *Report regarding Expert Opinion of Judith K. Fitzgerald*. In her report, Judge Fitzgerald opined "to a reasonable degree of professional certainty, that the RMBS Settlement sets forth a reasonable methodology to liquidate the disputed RMBS Claims, and that entry into the RMBS Settlement, in the circumstances of this Bankruptcy Proceeding, would be appropriate for all RMBS Trusts except for the five identified in note 3 [of the report]." Those five RMBS Trusts are identified in Exhibit C to this Notice. Judge Fitzgerald's report and *curriculum vitae*, as well as her supplemental statement to the report, are available on the RMBS Trustees' Website at the tab entitled "Certain Relevant Documents" (available at http://lbhirmbssettlement.com/doc.php).

On June 1, 2017, which was the Acceptance Deadline under the Proposed Settlement Agreement, the RMBS Trustees notified the LBHI Debtors and the Institutional Investors that they have accepted the Proposed Settlement Agreement, subject to the conditions set forth therein, with respect to the RMBS Trusts identified in Exhibit B hereto (the "Accepting Trusts") and have rejected the Proposed Settlement Agreement with respect to the five (5) RMBS Trusts identified in Exhibit C hereto (the "Rejecting Trusts"). The RMBS Trustees also did not accept the Proposed Settlement Agreement as to SASCO 2003-38, which terminated between the date when the Proposed Settlement Agreement was offered to the RMBS Trustees and the Acceptance Date. A copy of the Proposed Settlement Agreement, as accepted and executed by the RMBS Trustees for the Accepting Trusts, is available on the RMBS Trustees' Website at the tab entitled "Certain Relevant Documents" (available at http://lbhirmbssettlement.com/doc.php).

The RMBS Trustees' acceptance of the Proposed Settlement Agreement on behalf of the Accepting Trusts is subject to Final Court Approval (as defined in the Proposed Settlement Agreement) following a hearing on the 9019 Motion, as set forth in Section 2.03(c) of the Proposed Settlement Agreement, and other conditions set forth in the Proposed Settlement Agreement. The objection deadline for the 9019 Motion is set for June 22, 2017 at 12:00 noon (EDT), and the hearing on the 9019 Motion is scheduled for July 6, 2017 at 10:00 a.m. (EDT). A copy of the 9019 Motion has been made available on the RMBS Trustees' Website at the tab entitled "Relevant Filings in the Lehman Brothers Holdings Bankruptcy Cases" (available at http://lbhirmbssettlement.com/relevantdocs.php).

As noted in the April 21 Notice, the RMBS Trustees have the right, but not the obligation, to terminate the Proposed Settlement Agreement as to one or more of the Accepting Trusts in the event the applicable RMBS Trustee has been directed and provided with a satisfactory indemnity, before the 9019 Objection Deadline, to terminate the Proposed Settlement Agreement as to such Accepting Trust or Accepting Trusts in a manner acceptable to the RMBS Trustee, but only for the Accepting Trust or Accepting Trusts for which such a direction has been provided.

**ANY CERTIFICATEHOLDERS WHO WISH TO OPPOSE THE RELIEF SOUGHT IN THE LBHI DEBTORS' 9019 MOTION, OR TO OFFER A DIRECTION AND INDEMNITY TO THE RMBS TRUSTEES CONCERNING WHETHER THE RMBS TRUSTEES SHOULD TERMINATE THE PROPOSED SETTLEMENT AGREEMENT WITH RESPECT TO A PARTICULAR ACCEPTING TRUST SHOULD**

**DO SO NO LATER THAN JUNE 22, 2017.** PLEASE COMMUNICATE WITH THE APPLICABLE RMBS TRUSTEE(S) USING THE CONTACT INFORMATION OF SUCH RMBS TRUSTEE AVAILABLE AT THE RMBS TRUSTEES' WEBSITE AT THE TAB ENTITLED "RMBS TRUSTEES' CONTACT INFORMATION" (AVAILABLE AT http://lbhirmbssettlement.com/trustee_contact.php).

**OTHER MATTERS**

This Notice references certain terms of the Proposed Settlement Agreement and is not a complete summary or statement of the material terms thereof, of relevant law, or of relevant legal procedures. Certificateholders and other potentially interested persons are urged to review carefully the Proposed Settlement Agreement and to consider its implications, including without limitation the releases of the Covered Loan Claims and other actual or potential claims related to Covered Loans.

The RMBS Trustees may send further notices with respect to the matters addressed herein and developments relating to the Settlement Offer, all of which will be made available at the RMBS Trustees' Website at the tab entitled "Notices" (available at http://lbhirmbssettlement.com/notice.php). You may also obtain any documents filed with the Court on the docket for the Chapter 11 Cases by logging on to PACER at https://www.pacer.gov (password required) or by visiting LBHI's claims agent website at http://www.lehman-docket.com (no password required).

For inquiries, Certificateholders are directed to contact the applicable RMBS Trustee using the contact information of such RMBS Trustee available at the RMBS Trustees' Website at the tab entitled "RMBS Trustees' Contact Information" (available at http://lbhirmbssettlement.com/trustee_contact.php). Certificateholders will be required to verify their holdings before receiving information from the applicable RMBS Trustee. Please be advised that with respect to any particular inquiry from individual Certificateholders, an RMBS Trustee may conclude that a specific response to such inquiry is not consistent with requirements under applicable law and regulation of equal and full dissemination of information to all Certificateholders.

Certificateholders and other persons interested in the Covered RMBS Trusts should not rely on the RMBS Trustees, their counsel, experts or other advisors retained by the RMBS Trustees, as their sole source of information. Certificateholders and other potentially interested persons are urged to consult with their own legal and financial advisors.

Please note that this Notice is not intended and should not be construed as investment, accounting, financial, legal, tax or other advice by or on behalf of the RMBS Trustees, or their directors, officers, affiliates, agents, attorneys or employees. Each person or entity receiving this Notice should seek the advice of its own advisors in respect of all matters set forth herein.

Please be further advised that each of the RMBS Trustees reserves all of the rights, powers, claims and remedies available to it under the Governing Agreements and applicable law. No delay or forbearance by an RMBS Trustee to exercise any right or remedy accruing upon the occurrence of a default, or otherwise under the terms of the Governing Agreements, other

documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or an acquiescence therein.

Receipt of this Notice should not be construed as evidence or acknowledgment of any requirement applicable to, or of any right or authority on the part of any recipient under the Governing Documents to direct, the matters addressed herein, or of any obligations on the part of any RMBS Trustee with respect thereto, and each RMBS Trustee expressly reserves all rights in determining appropriate actions and requirements concerning these matters.

Each of the RMBS Trustees expressly reserves all rights in respect of each applicable Governing Agreement, including without limitation its right to recover in full its fees and costs (including, without limitation, fees and costs incurred or to be incurred by such RMBS Trustee in performing its duties, indemnities owing or to become owing to such RMBS Trustee, compensation for such RMBS Trustee's time spent and reimbursement for fees and costs of counsel and other agents it employs in performing its duties or to pursue remedies) and its right, prior to exercising any rights or powers in connection with any applicable Governing Agreement at the request or direction of any Certificateholder, to receive security or indemnity satisfactory to it against all costs, expenses and liabilities that might be incurred in compliance therewith, and all rights that may be available to it under applicable law or otherwise.

**Deutsche Bank National Trust Company**
**TMI Trust Company, successor to Law Debenture Trust Company of New York**
**U.S. Bank National Association**
**Wilmington Trust Company and Wilmington Trust, National Association**

**EXHIBIT A**

**Covered RMBS Trusts**

**EXHIBIT A**

**TRUSTS**

| No. | Trust Name |
|---|---|
| 1 | ARC 2002-BC10 |
| 2 | ARC 2002-BC8 |
| 3 | ARC 2002-BC9 |
| 4 | ARC 2004-1 |
| 5 | BNC 2006-1 |
| 6 | BNC 2006-2 |
| 7 | BNC 2007-1 |
| 8 | BNC 2007-2 |
| 9 | BNC 2007-3 |
| 10 | BNC 2007-4 |
| 11 | LABS 2004-1 |
| 12 | LABS 2007-1 |
| 13 | LMT 2005-1 |
| 14 | LMT 2005-2 |
| 15 | LMT 2005-3 |
| 16 | LMT 2006-1 |
| 17 | LMT 2006-2 |
| 18 | LMT 2006-4 |
| 19 | LMT 2006-8 |
| 20 | LMT 2006-9 |
| 21 | LMT 2007-1 |
| 22 | LMT 2007-10 |
| 23 | LMT 2007-2 |
| 24 | LMT 2007-3 |
| 25 | LMT 2007-4 |
| 26 | LMT 2007-5 |
| 27 | LMT 2007-6 |
| 28 | LMT 2007-7 |
| 29 | LMT 2007-8 |
| 30 | LMT 2007-9 |
| 31 | LMT 2008-2 |
| 32 | LMT 2008-6 |
| 33 | LXS 2005-1 |
| 34 | LXS 2005-10 |
| 35 | LXS 2005-2 |
| 36 | LXS 2005-3 |
| 37 | LXS 2005-4 |

| | |
|---|---|
| 38 | LXS 2005-6 |
| 39 | LXS 2005-8 |
| 40 | LXS 2006-1 |
| 41 | LXS 2006-10N |
| 42 | LXS 2006-11 |
| 43 | LXS 2006-12N |
| 44 | LXS 2006-13 |
| 45 | LXS 2006-15 |
| 46 | LXS 2006-17 |
| 47 | LXS 2006-19 |
| 48 | LXS 2006-20 |
| 49 | LXS 2006-3 |
| 50 | LXS 2006-5 |
| 51 | LXS 2006-7 |
| 52 | LXS 2006-8 |
| 53 | LXS 2006-9 |
| 54 | LXS 2007-1 |
| 55 | LXS 2007-10H |
| 56 | LXS 2007-11 |
| 57 | LXS 2007-12N |
| 58 | LXS 2007-14H |
| 59 | LXS 2007-15N |
| 60 | LXS 2007-16N |
| 61 | LXS 2007-17H |
| 62 | LXS 2007-18N |
| 63 | LXS 2007-20N |
| 64 | LXS 2007-3 |
| 65 | LXS 2007-5H |
| 66 | LXS 2007-6 |
| 67 | LXS 2007-7N |
| 68 | LXS 2007-8H |
| 69 | LXS 2007-9 |
| 70 | RLT 2008-AH1 |
| 71 | SAIL 2003-BC1 |
| 72 | SAIL 2003-BC10 |
| 73 | SAIL 2003-BC11 |
| 74 | SAIL 2003-BC12 |
| 75 | SAIL 2003-BC13 |
| 76 | SAIL 2003-BC2 |
| 77 | SAIL 2003-BC3 |
| 78 | SAIL 2003-BC4 |
| 79 | SAIL 2003-BC5 |
| 80 | SAIL 2003-BC8 |

| 81  | SAIL 2003-BC9 |
| 82  | SAIL 2004-1 |
| 83  | SAIL 2004-10 |
| 84  | SAIL 2004-2 |
| 85  | SAIL 2004-3 |
| 86  | SAIL 2004-4 |
| 87  | SAIL 2004-5 |
| 88  | SAIL 2004-6 |
| 89  | SAIL 2004-8 |
| 90  | SAIL 2004-9 |
| 91  | SAIL 2005-1 |
| 92  | SAIL 2005-10 |
| 93  | SAIL 2005-11 |
| 94  | SAIL 2005-2 |
| 95  | SAIL 2005-3 |
| 96  | SAIL 2005-4 |
| 97  | SAIL 2005-5 |
| 98  | SAIL 2005-6 |
| 99  | SAIL 2005-7 |
| 100 | SAIL 2005-8 |
| 101 | SAIL 2005-9 |
| 102 | SAIL 2005-HE3 |
| 103 | SAIL 2006-1 |
| 104 | SAIL 2006-2 |
| 105 | SAIL 2006-4 |
| 106 | SAIL 2006-BNC3 |
| 107 | SARM 2004-10 |
| 108 | SARM 2004-16 |
| 109 | SARM 2004-18 |
| 110 | SARM 2004-20 |
| 111 | SARM 2004-5 |
| 112 | SARM 2004-9XS |
| 113 | SARM 2005-11 |
| 114 | SARM 2005-12 |
| 115 | SARM 2005-15 |
| 116 | SARM 2005-17 |
| 117 | SARM 2005-20 |
| 118 | SARM 2005-22 |
| 119 | SARM 2005-23 |
| 120 | SARM 2005-3XS |
| 121 | SARM 2005-6XS |
| 122 | SARM 2005-8XS |
| 123 | SARM 2006-1 |

124    SARM 2006-10
125    SARM 2006-11
126    SARM 2006-12
127    SARM 2006-2
128    SARM 2006-3
129    SARM 2006-4
130    SARM 2006-5
131    SARM 2006-6
132    SARM 2006-7
133    SARM 2006-8
134    SARM 2006-9
135    SARM 2007-1
136    SARM 2007-10
137    SARM 2007-11
138    SARM 2007-2
139    SARM 2007-3
140    SARM 2007-4
141    SARM 2007-6
142    SARM 2007-8
143    SARM 2008-2
144    SASCO 2003-12XS
145    SASCO 2003-15A
146    SASCO 2003-17A
147    SASCO 2003-18XS
148    SASCO 2003-25XS
149    SASCO 2003-26A
150    SASCO 2003-28XS
151    SASCO 2003-29
152    SASCO 2003-30
153    SASCO 2003-34A
154    SASCO 2003-35
155    SASCO 2003-36XS
156    SASCO 2003-38
157    SASCO 2003-39EX
158    SASCO 2003-3XS
159    SASCO 2003-6A
160    SASCO 2003-GEL1
161    SASCO 2003-NP1
162    SASCO 2003-S1
163    SASCO 2003-S2
164    SASCO 2004-10
165    SASCO 2004-11XS
166    SASCO 2004-13

| 167 | SASCO 2004-15 |
| 168 | SASCO 2004-16XS |
| 169 | SASCO 2004-17XS |
| 170 | SASCO 2004-18H |
| 171 | SASCO 2004-19XS |
| 172 | SASCO 2004-20 |
| 173 | SASCO 2004-21XS |
| 174 | SASCO 2004-22 |
| 175 | SASCO 2004-23XS |
| 176 | SASCO 2004-2AC |
| 177 | SASCO 2004-4XS |
| 178 | SASCO 2004-6XS |
| 179 | SASCO 2004-7 |
| 180 | SASCO 2004-9XS |
| 181 | SASCO 2004-GEL1 |
| 182 | SASCO 2004-GEL2 |
| 183 | SASCO 2004-GEL3 |
| 184 | SASCO 2004-NP1 |
| 185 | SASCO 2004-S2 |
| 186 | SASCO 2004-S3 |
| 187 | SASCO 2004-S4 |
| 188 | SASCO 2005-1 |
| 189 | SASCO 2005-10 |
| 190 | SASCO 2005-11H |
| 191 | SASCO 2005-14 |
| 192 | SASCO 2005-15 |
| 193 | SASCO 2005-17 |
| 194 | SASCO 2005-2XS |
| 195 | SASCO 2005-3 |
| 196 | SASCO 2005-4XS |
| 197 | SASCO 2005-5 |
| 198 | SASCO 2005-7XS |
| 199 | SASCO 2005-9XS |
| 200 | SASCO 2005-GEL2 |
| 201 | SASCO 2005-GEL3 |
| 202 | SASCO 2005-GEL4 |
| 203 | SASCO 2005-RF1 |
| 204 | SASCO 2005-RF2 |
| 205 | SASCO 2005-RF4 |
| 206 | SASCO 2005-RF5 |
| 207 | SASCO 2005-RF6 |
| 208 | SASCO 2005-RF7 |
| 209 | SASCO 2005-S1 |

210   SASCO 2005-S2
211   SASCO 2005-S3
212   SASCO 2005-S4
213   SASCO 2005-S5
214   SASCO 2005-S6
215   SASCO 2005-S7
216   SASCO 2005-SC1
217   SASCO 2006-BC2
218   SASCO 2006-BC3
219   SASCO 2006-BC4
220   SASCO 2006-BC6
221   SASCO 2006-GEL1
222   SASCO 2006-GEL2
223   SASCO 2006-GEL3
224   SASCO 2006-GEL4
225   SASCO 2006-RF1
226   SASCO 2006-RF2
227   SASCO 2006-RF3
228   SASCO 2006-RF4
229   SASCO 2006-S1
230   SASCO 2006-S2
231   SASCO 2006-S3
232   SASCO 2006-S4
233   SASCO 2006-Z
234   SASCO 2007-BC1
235   SASCO 2007-BC2
236   SASCO 2007-BC3
237   SASCO 2007-BC4
238   SASCO 2007-BNC1
239   SASCO 2007-GEL1
240   SASCO 2007-GEL2
241   SASCO 2007-MLN1
242   SASCO 2007-OSI
243   SASCO 2007-RF1
244   SASCO 2007-TC1

**EXHIBIT B**

**Accepting Trusts**

| Trust Name | Trustee |
|------------|---------|
| ARC 2002-BC10 | TMI Trust |
| ARC 2002-BC8 | TMI Trust |
| ARC 2002-BC9 | TMI Trust |
| BNC 2006-1 | U.S. Bank |
| BNC 2006-2 | U.S. Bank |
| BNC 2007-1 | U.S. Bank |
| BNC 2007-2 | U.S. Bank |
| BNC 2007-3 | Wilmington Trust |
| BNC 2007-4 | TMI Trust |
| LABS 2004-1 | U.S. Bank |
| LABS 2007-1 | TMI Trust |
| LMT 2005-1 | U.S. Bank |
| LMT 2005-2 | U.S. Bank |
| LMT 2005-3 | U.S. Bank |
| LMT 2006-1 | Wilmington Trust |
| LMT 2006-2 | U.S. Bank |
| LMT 2006-4 | Wilmington Trust |
| LMT 2006-8 | U.S. Bank |
| LMT 2006-9 | TMI Trust |
| LMT 2007-1 | TMI Trust |
| LMT 2007-10 | U.S. Bank |
| LMT 2007-2 | U.S. Bank |
| LMT 2007-3 | U.S. Bank |
| LMT 2007-4 | TMI Trust |
| LMT 2007-5 | TMI Trust |
| LMT 2007-6 | U.S. Bank |
| LMT 2007-7 | U.S. Bank |
| LMT 2007-8 | U.S. Bank |
| LMT 2007-9 | TMI Trust |
| LMT 2008-2 | TMI Trust |
| LMT 2008-6 | TMI Trust |
| LXS 2005-1 | Wilmington Trust |
| LXS 2005-10 | Wilmington Trust |
| LXS 2005-2 | U.S. Bank |
| LXS 2005-3 | Wilmington Trust |
| LXS 2005-4 | U.S. Bank |
| LXS 2005-6 | Wilmington Trust |

| | |
|---|---|
| LXS 2005-8 | Wilmington Trust |
| LXS 2006-1 | Wilmington Trust |
| LXS 2006-10N | U.S. Bank |
| LXS 2006-11 | U.S. Bank |
| LXS 2006-12N | U.S. Bank |
| LXS 2006-13 | Wilmington Trust |
| LXS 2006-15 | U.S. Bank |
| LXS 2006-17 | Wilmington Trust |
| LXS 2006-19 | U.S. Bank |
| LXS 2006-20 | U.S. Bank |
| LXS 2006-3 | U.S. Bank |
| LXS 2006-5 | Wilmington Trust |
| LXS 2006-7 | Wilmington Trust |
| LXS 2006-8 | U.S. Bank |
| LXS 2006-9 | Wilmington Trust |
| LXS 2007-1 | U.S. Bank |
| LXS 2007-10H | U.S. Bank |
| LXS 2007-11 | Wilmington Trust |
| LXS 2007-12N | U.S. Bank |
| LXS 2007-14H | U.S. Bank |
| LXS 2007-15N | U.S. Bank |
| LXS 2007-16N | U.S. Bank |
| LXS 2007-17H | U.S. Bank |
| LXS 2007-18N | U.S. Bank |
| LXS 2007-20N | U.S. Bank |
| LXS 2007-3 | U.S. Bank |
| LXS 2007-5H | U.S. Bank |
| LXS 2007-6 | U.S. Bank |
| LXS 2007-7N | U.S. Bank |
| LXS 2007-8H | U.S. Bank |
| LXS 2007-9 | U.S. Bank |
| RLT 2008-AH1 | U.S. Bank |
| SAIL 2003-BC1 | U.S. Bank |
| SAIL 2003-BC10 | U.S. Bank |
| SAIL 2003-BC11 | U.S. Bank |
| SAIL 2003-BC12 | TMI Trust |
| SAIL 2003-BC13 | U.S. Bank |
| SAIL 2003-BC2 | U.S. Bank |
| SAIL 2003-BC3 | TMI Trust |
| SAIL 2003-BC4 | TMI Trust |
| SAIL 2003-BC5 | U.S. Bank |

| | |
|---|---|
| SAIL 2003-BC8 | U.S. Bank |
| SAIL 2003-BC9 | U.S. Bank |
| SAIL 2004-1 | Deutsche Bank |
| SAIL 2004-10 | U.S. Bank |
| SAIL 2004-2 | U.S. Bank |
| SAIL 2004-3 | U.S. Bank |
| SAIL 2004-5 | U.S. Bank |
| SAIL 2004-6 | U.S. Bank |
| SAIL 2004-8 | U.S. Bank |
| SAIL 2004-9 | U.S. Bank |
| SAIL 2005-1 | U.S. Bank |
| SAIL 2005-10 | U.S. Bank |
| SAIL 2005-11 | U.S. Bank |
| SAIL 2005-2 | U.S. Bank |
| SAIL 2005-3 | U.S. Bank |
| SAIL 2005-4 | U.S. Bank |
| SAIL 2005-5 | U.S. Bank |
| SAIL 2005-6 | U.S. Bank |
| SAIL 2005-7 | U.S. Bank |
| SAIL 2005-8 | U.S. Bank |
| SAIL 2005-9 | U.S. Bank |
| SAIL 2005-HE3 | U.S. Bank |
| SAIL 2006-1 | U.S. Bank |
| SAIL 2006-2 | U.S. Bank |
| SAIL 2006-4 | U.S. Bank |
| SAIL 2006-BNC3 | U.S. Bank |
| SARM 2004-10 | TMI Trust |
| SARM 2004-16 | TMI Trust |
| SARM 2004-18 | TMI Trust |
| SARM 2004-20 | TMI Trust |
| SARM 2004-5 | TMI Trust |
| SARM 2004-9XS | TMI Trust |
| SARM 2005-11 | TMI Trust |
| SARM 2005-12 | TMI Trust |
| SARM 2005-15 | TMI Trust |
| SARM 2005-17 | TMI Trust |
| SARM 2005-20 | TMI Trust |
| SARM 2005-22 | U.S. Bank |
| SARM 2005-23 | U.S. Bank |
| SARM 2005-3XS | Wilmington Trust |
| SARM 2005-6XS | U.S. Bank |

Accepting Trusts – Page 3 of 6

| | |
|---|---|
| SARM 2005-8XS | U.S. Bank |
| SARM 2006-1 | U.S. Bank |
| SARM 2006-10 | U.S. Bank |
| SARM 2006-11 | U.S. Bank |
| SARM 2006-12 | U.S. Bank |
| SARM 2006-2 | U.S. Bank |
| SARM 2006-3 | U.S. Bank |
| SARM 2006-4 | U.S. Bank |
| SARM 2006-5 | U.S. Bank |
| SARM 2006-6 | U.S. Bank |
| SARM 2006-7 | U.S. Bank |
| SARM 2006-8 | U.S. Bank |
| SARM 2006-9 | U.S. Bank |
| SARM 2007-1 | TMI Trust |
| SARM 2007-10 | U.S. Bank |
| SARM 2007-11 | TMI Trust |
| SARM 2007-2 | TMI Trust |
| SARM 2007-3 | TMI Trust |
| SARM 2007-4 | TMI Trust |
| SARM 2007-6 | TMI Trust |
| SARM 2007-8 | U.S. Bank |
| SARM 2008-2 | U.S. Bank |
| SASCO 2003-12XS | Wilmington Trust |
| SASCO 2003-15A | TMI Trust |
| SASCO 2003-17A | TMI Trust |
| SASCO 2003-18XS | Wilmington Trust |
| SASCO 2003-25XS | U.S. Bank |
| SASCO 2003-26A | TMI Trust |
| SASCO 2003-28XS | Wilmington Trust |
| SASCO 2003-29 | Wilmington Trust |
| SASCO 2003-30 | Wilmington Trust |
| SASCO 2003-34A | TMI Trust |
| SASCO 2003-35 | Wilmington Trust |
| SASCO 2003-36XS | Wilmington Trust |
| SASCO 2003-39EX | U.S. Bank |
| SASCO 2003-3XS | Wilmington Trust |
| SASCO 2003-6A | TMI Trust |
| SASCO 2003-GEL1 | U.S. Bank |
| SASCO 2003-NP1 | U.S. Bank |
| SASCO 2003-S1 | Wilmington Trust |
| SASCO 2003-S2 | TMI Trust |

Accepting Trusts – Page 4 of 6

| SASCO 2004-10 | U.S. Bank |
| SASCO 2004-11XS | U.S. Bank |
| SASCO 2004-13 | U.S. Bank |
| SASCO 2004-15 | Wilmington Trust |
| SASCO 2004-16XS | Wilmington Trust |
| SASCO 2004-17XS | U.S. Bank |
| SASCO 2004-18H | Wilmington Trust |
| SASCO 2004-19XS | U.S. Bank |
| SASCO 2004-20 | U.S. Bank |
| SASCO 2004-21XS | U.S. Bank |
| SASCO 2004-22 | Wilmington Trust |
| SASCO 2004-23XS | Wilmington Trust |
| SASCO 2004-2AC | U.S. Bank |
| SASCO 2004-4XS | Wilmington Trust |
| SASCO 2004-6XS | U.S. Bank |
| SASCO 2004-7 | U.S. Bank |
| SASCO 2004-9XS | U.S. Bank |
| SASCO 2004-GEL1 | U.S. Bank |
| SASCO 2004-GEL2 | U.S. Bank |
| SASCO 2004-GEL3 | U.S. Bank |
| SASCO 2004-NP1 | U.S. Bank |
| SASCO 2004-S2 | U.S. Bank |
| SASCO 2004-S3 | U.S. Bank |
| SASCO 2004-S4 | U.S. Bank |
| SASCO 2005-1 | Wilmington Trust |
| SASCO 2005-10 | Wilmington Trust |
| SASCO 2005-14 | U.S. Bank |
| SASCO 2005-15 | Wilmington Trust |
| SASCO 2005-17 | Wilmington Trust |
| SASCO 2005-2XS | Wilmington Trust |
| SASCO 2005-3 | U.S. Bank |
| SASCO 2005-4XS | Wilmington Trust |
| SASCO 2005-5 | Wilmington Trust |
| SASCO 2005-7XS | U.S. Bank |
| SASCO 2005-9XS | Wilmington Trust |
| SASCO 2005-GEL2 | U.S. Bank |
| SASCO 2005-GEL3 | U.S. Bank |
| SASCO 2005-GEL4 | U.S. Bank |
| SASCO 2005-RF1 | U.S. Bank |
| SASCO 2005-RF2 | U.S. Bank |
| SASCO 2005-RF4 | U.S. Bank |

Accepting Trusts – Page 5 of 6

| SASCO 2005-RF5 | U.S. Bank |
| SASCO 2005-RF6 | U.S. Bank |
| SASCO 2005-RF7 | U.S. Bank |
| SASCO 2005-S1 | U.S. Bank |
| SASCO 2005-S2 | U.S. Bank |
| SASCO 2005-S3 | U.S. Bank |
| SASCO 2005-S4 | U.S. Bank |
| SASCO 2005-S5 | U.S. Bank |
| SASCO 2005-S6 | TMI Trust |
| SASCO 2005-S7 | TMI Trust |
| SASCO 2005-SC1 | U.S. Bank |
| SASCO 2006-BC2 | U.S. Bank |
| SASCO 2006-BC3 | U.S. Bank |
| SASCO 2006-BC4 | U.S. Bank |
| SASCO 2006-BC6 | U.S. Bank |
| SASCO 2006-GEL1 | U.S. Bank |
| SASCO 2006-GEL2 | U.S. Bank |
| SASCO 2006-GEL3 | U.S. Bank |
| SASCO 2006-GEL4 | U.S. Bank |
| SASCO 2006-RF2 | U.S. Bank |
| SASCO 2006-RF3 | U.S. Bank |
| SASCO 2006-RF4 | U.S. Bank |
| SASCO 2006-S1 | U.S. Bank |
| SASCO 2006-S2 | Wilmington Trust |
| SASCO 2006-S3 | Wilmington Trust |
| SASCO 2006-S4 | Wilmington Trust |
| SASCO 2006-Z | U.S. Bank |
| SASCO 2007-BC1 | TMI Trust |
| SASCO 2007-BC2 | U.S. Bank |
| SASCO 2007-BC3 | U.S. Bank |
| SASCO 2007-BC4 | U.S. Bank |
| SASCO 2007-BNC1 | U.S. Bank |
| SASCO 2007-GEL1 | U.S. Bank |
| SASCO 2007-GEL2 | U.S. Bank |
| SASCO 2007-MLN1 | TMI Trust |
| SASCO 2007-OSI | TMI Trust |
| SASCO 2007-TC1 | U.S. Bank |

**EXHIBIT C**

**Rejecting Trusts**

| **Trust Name** | **Trustee** |
| --- | --- |
| ARC 2004-1 | U.S. Bank |
| SAIL 2004-4 | U.S. Bank |
| SASCO 2005-11H | Wilmington Trust |
| SASCO 2006-RF1 | U.S. Bank |
| SASCO 2007-RF1 | U.S. Bank |