**Hearing Date: July 6, 2017 at 9:00 a.m. (ET)**

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel:  (212) 728-8000
Fax:  (212) 728-8111
Paul V. Shalhoub
Todd G. Cosenza

ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 974-7468
Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                                                        )
In re                                                   )    Chapter 11 Case No.
                                                        )
Lehman Brothers Holdings Inc., et al.,                  )    08-13555 (SCC)
                                                        )
Debtors.                                                )    Jointly Administered
                                                        )
------------------------------------------------------- x

**DECLARATION OF PAUL V. SHALHOUB IN SUPPORT OF THE**
**OMNIBUS REPLY IN FURTHER SUPPORT OF THE MOTION OF LEHMAN**
**BROTHERS HOLDINGS INC. PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C**
**§ 105(A) FOR ENTRY OF ORDER (A) APPROVING RMBS SETTLEMENT**
**AGREEMENT, (B) MAKING CERTAIN REQUIRED FINDINGS REGARDING**
**DECISION OF RMBS TRUSTEES AND LBHI DEBTORS TO ENTER INTO RMBS**
**SETTLEMENT AGREEMENT, (C) SCHEDULING ESTIMATION PROCEEDING TO**
**DETERMINE RMBS CLAIMS AND APPROVING RELATED PROCEDURES**
**REGARDING CONDUCT OF HEARING, AND (D) GRANTING RELATED RELIEF**

I, Paul V. Shalhoub, Esq. declare pursuant to 28 U.S.C. § 1746:

1.      I am an attorney-at-law of the State of New York and a partner of Willkie Farr & Gallagher LLP.  I submit this declaration in support of the *Omnibus Reply in Further Support of the Motion of Lehman Brothers Holdings Inc. Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. § 105(A) for Entry of Order (A) Approving RMBS Settlement Agreement, (B) Making Certain Required Findings Regarding Decisions of RMBS Trustees and LBHI Directors to Enter into RMBS Settlement Agreement, (C) Scheduling Estimation Proceeding to Determine RMBS Claims and Approving Related Procedures Regarding Conduct of Hearing, and (D) Granting Related Relief.*  [Dkt. No. 55232.]

2.      Attached as **Exhibit 1** is a true and accurate copy of the Motion of Lehman Brothers Holdings Inc. Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. § 105(A) for Entry of Order (A) Approving RMBS Settlement Agreement, (B) Making Certain Required Findings Regarding Decision of  RMBS Trustees and LBHI Debtors to Enter into RMBS Settlement Agreement, (C) Scheduling Estimation Proceeding to Determine RMBS Claims and Approving Related Procedures Regarding Conduct of Hearing, and (D) Granting Related Relief, dated April 27, 2017.  [Dkt. No. 55232.]

3.      Attached as **Exhibit 2** is a true and accurate copy of the expert opinion of Judith K. Fitzgerald, dated May 28, 2017.

4.      Attached as **Exhibit 3** is a true and accurate copy of the Preliminary Objection of the Investor Group to the Motion of Lehman Brothers Holdings Inc., dated June 6, 2017.  [Dkt. No. 55432.]

5.      Attached as **Exhibit 4** is a true and accurate copy of the letter regarding the preliminary objection of the Investor Group, dated June 27, 2017. [Dkt. No. 55650.]

6.      Attached as **Exhibit 5** is a true and accurate copy of the Limited Objection of Royal Park Investments SA/NV to the Motion of Lehman Brothers Holdings Inc., dated June 22, 2017.  [Dkt. No. 55614.]

7.      Attached as **Exhibit 6** is a true and accurate copy of the Limited Objection of Royal Park Investments SA/NV to the Motion of Lehman Brothers Holdings Inc., dated June 22, 2017.  [Dk. No. 55615]

8.      Attached as **Exhibit 7** is a true and accurate copy of the Objection of Claimants Sylvia Vega Sutfin, Michelle Seymour, Cheryl McNeil, Linda Howard-James, Isabel Uajardo and Denise Colombo to the Motion of Lehman Brothers Holdings, Inc., dated June 21, 2017.  [Dkt. No. 55609.]

9.      Attached as **Exhibit 8** is a true and accurate copy of iFreedom Direct Corporation's Limited Objection and Reservation of Rights Concerning the Motion of Lehman Brothers Holdings, Inc., dated June 22, 2017.  [Dkt. No. 55616.]

10.      Attached as **Exhibit 9** is a true and accurate copy of the Limited Objection of Five Points, LLC to the Motion of Lehman Brothers Holdings Inc., dated June 22, 2017.  [Dkt. No. 55613.]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 30, 2017
       New York, New York

By:   /s/ Paul V. Shalhoub
                    Paul V. Shalhoub

# Exhibit 1

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel:  (212) 728-8000
Fax:  (212) 728-8111
Paul V. Shalhoub
Todd G. Cosenza

ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 974-7468
Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                                                         )
In re                                                    )    Chapter 11 Case No.
                                                         )
Lehman Brothers Holdings Inc., <u>et al.</u>,           )    08-13555 (SCC)
                                                         )
Debtors.                                                 )    Jointly Administered
                                                         )
------------------------------------------------------- x

**NOTICE OF MOTION OF LEHMAN BROTHERS HOLDINGS INC.**
**PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C § 105(A) FOR**
**ENTRY OF ORDER (A) APPROVING RMBS SETTLEMENT**
**AGREEMENT, (B) MAKING CERTAIN REQUIRED FINDINGS**
**REGARDING DECISION OF RMBS TRUSTEES AND LBHI DEBTORS**
**TO ENTER INTO RMBS SETTLEMENT AGREEMENT, (C)**
**SCHEDULING ESTIMATION PROCEEDING TO DETERMINE RMBS**
**CLAIMS AND APPROVING RELATED PROCEDURES REGARDING**
<u>**CONDUCT OF HEARING, AND (D) GRANTING RELATED RELIEF**</u>

**PLEASE TAKE NOTICE** that, on April 27, 2017 Lehman Brothers Holdings Inc. (the

"<u>Plan Administrator</u>"), as Plan Administrator under the *Modified Third Amended Joint Chapter*

*11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors*, on behalf of itself and the

other affiliated debtors in the above-captioned cases (collectively, the "LBHI Debtors") filed the

Motion of Lehman Brothers Holdings Inc. Pursuant To Fed. R. Bankr. P. 9019 And 11 U.S.C.

§ 105(a) For Entry Of Order (A) Approving RMBS Settlement Agreement, (B) Making Certain

Required Findings Regarding Decision Of RMBS Trustees And LBHI Debtors To Enter Into

RMBS Settlement Agreement, (C) Scheduling Estimation Proceeding To Determine RMBS

Claims And Approving Related Procedures Regarding Conduct Of Hearing, And (D) Granting

Related Relief (the "Motion").  Capitalized terms used but not defined herein shall have the

meanings given to them in the Motion.

   **PLEASE TAKE FURTHER NOTICE** that a hearing will be held on the Motion before

the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the United States

Bankruptcy Court for the Southern District of New York, Courtroom 623, One Bowling Green,

New York, New York 10004 (the "Bankruptcy Court") on **July 6, 2017 at 10:00 a.m. (prevailing

Eastern Time)**, or as soon thereafter as counsel may be heard.

   **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion (including

approval of the Trustee Findings and the Debtors' Findings) must be made in writing, state with

particularity the grounds therefor, conform to the Federal Rules of Bankruptcy Procedure and the

Local Bankruptcy Rules for the Southern District of New York, be filed electronically in text

searchable portable document format (PDF) with the Court in accordance with General Order M-

399 (General Order M-399 can be found at www.nysb.uscourts.gov, the official website for the

Court), by registered users of the Court's case filing system and by all other parties in interest

(with a hard copy delivered directly to the Judge's Chambers), and be served in accordance with

General Order M-399, and upon (i) the chambers of the Honorable Shelley C. Chapman, One

Bowling Green, New York, New York 10004, Courtroom 23; (ii) Willkie Farr & Gallagher LLP,

2

787 Seventh Avenue, New York, New York 10019 (Attn: Paul V. Shalhoub, Esq. and Todd G.

Cosenza, Esq.) and Rollin Braswell Fisher LLC, 8350 East Crescent Parkway, Suite 100,

Greenwood Village, Colorado 80111 (Attn: Michael A. Rollin, Esq. and Maritza D. Braswell,

Esq.), attorneys for LBHI and certain of its affiliates; (iii) Gibbs & Bruns LLP, 1100 Louisiana,

Suite 5300, Houston, Texas 77002 (Attn: Kathy Patrick, Esq. and Robert Madden, Esq.),

attorneys for the Institutional Investors; (iv) Chapman & Cutler LLP, 111 West Monroe Street,

Chicago, Illinois 60603 (Attn: Franklin H. Top III, Esq. and Scott A. Lewis, Esq.), Morgan, Lewis

& Bockius LLP, 101 Park Avenue, New York, New York 10178 (Attn: Michael S. Kraut, Esq.),

Seward & Kissel LLP, 1 Battery Park Plaza, New York, New York 10004 (Attn: M. William

Munno, Esq. and Daniel E. Guzman, Esq.), Alston & Bird LLP, 1201 West Peachtree Street, Suite

4900, Atlanta, Georgia 30309 (Attn: John C. Weitnauer, Esq.), Holwell Shuster & Goldberg LLP,

750 Seventh Avenue, 26th Floor, New York, New York 10019 (Attn: Michael S. Shuster, Esq.)

and Nixon Peabody LLP, 437 Madison Avenue, New York, New York 10022 (Attn: Dennis

Drebsky, Esq.), attorneys for the Trustees; and (v) the Office of the United States Trustee for the

Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New

York, New York 10014 (Attn: William K. Harrington, Esq., Susan D. Golden, Esq., and Andrea

B. Schwartz, Esq.) so as to be actually filed and received by no later than **June 22, 2017 at 12:00**

**noon (EST)** (the "Objection Deadline").

　　**PLEASE TAKE FURTHER NOTICE** that the relief requested in the Motion may be

granted without a hearing if no objection is timely filed and served as set forth above and in

accordance with the order, dated June 17, 2010, implementing certain notice and case

management procedures in these cases (Docket No. 9635) (the "Case Management Order").

3

Dated:  April 27, 2017
          New York, New York

/s/ Paul V. Shalhoub
Paul V. Shalhoub
Todd G. Cosenza
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel:  (212) 728-8000
Fax:  (212) 728-8111

Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)
ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 974-7468

*Attorneys for Lehman Brothers Holdings Inc. and
Certain of Its Affiliates*

**Hearing Date: July 6, 2017 at 10:00 a.m. (ET)**
**Objection Deadline: June 22, 2017 at 12:00 noon (ET)**

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel:  (212) 728-8000
Fax:  (212) 728-8111
Paul V. Shalhoub
Todd G. Cosenza

ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 974-7468
Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)

*Attorneys for Debtors Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                                                        )
  In re                                                 )    Case No. 08-13555 (SCC)
                                                        )
Lehman Brothers Holdings Inc., et al.,                  )    Chapter 11
                                                        )
        Debtors.                                        )    Jointly Administered
                                                        )
------------------------------------------------------- x

**MOTION OF LEHMAN BROTHERS HOLDINGS INC.**
**PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C § 105(A) FOR**
**ENTRY OF ORDER (A) APPROVING RMBS SETTLEMENT**
**AGREEMENT, (B) MAKING CERTAIN REQUIRED FINDINGS**
**REGARDING DECISION OF RMBS TRUSTEES AND LBHI DEBTORS**
**TO ENTER INTO RMBS SETTLEMENT AGREEMENT, (C)**
**SCHEDULING ESTIMATION PROCEEDING TO DETERMINE RMBS**
**CLAIMS AND APPROVING RELATED PROCEDURES REGARDING**
**CONDUCT OF HEARING, AND (D) GRANTING RELATED RELIEF**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

JURISDICTION AND VENUE ...............................................................................................6

RELEVANT BACKGROUND ..................................................................................................6

A.    The Bankruptcy Filing and Bar Date. .......................................................................6

B.    Establishment of the RMBS Trusts and Claims Asserted by the Trustees. ...............6

C.    The RMBS Reserve. ...................................................................................................8

D.    Prior Settlement Efforts and Attempts to Resolve the Trusts' Claims. .....................9

E.    Establishment of the Protocol. ..................................................................................10

F.    Negotiations Regarding Settlement of the Covered Loan Claims. ...........................13

THE RMBS SETTLEMENT AGREEMENT .........................................................................14

RELIEF REQUESTED ............................................................................................................23

BASIS FOR RELIEF ...............................................................................................................24

A.    THE BALANCE BETWEEN THE LITIGATION'S POSSIBILITY OF SUCCESS AND
      THE SETTLEMENT'S FUTURE BENEFITS .........................................................25

B.    THE LIKELIHOOD OF COMPLEX AND PROTRACTED LITIGATION ...................28

C.    THE PARAMOUNT INTERESTS OF CREDITORS ....................................................29

D.    SUPPORT FOR THE SETTLEMENT BY CERTIFICATEHOLDERS ..........................30

E.    THE NATURE OF THE RELEASES TO BE OBTAINED BY LBHI DEBTORS'
      OFFICERS AND DIRECTORS ...................................................................................30

F.    THE PROPOSED SETTLEMENT AGREEMENT SATISFIES THE REMAINING
      IRIDIUM FACTORS ...................................................................................................30

NOTICE AND PROCEDURE .................................................................................................31

CONCLUSION .........................................................................................................................32

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. of Chicago (In re Ionosphere Clubs, Inc.)*,
    156 B.R. 414 (S.D.N.Y. 1993) ....................................................................24

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
    699 F.2d 599 (2d Cir. 1983) ...............................................................24, 31

*In re Hibbard Brown & Co.*,
    217 B.R. 41 (Bankr. S.D.N.Y. 1998) .............................................................24

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007) ....................................................................25

*Nellis v. Shugrue*,
    165 B.R. 115 (S.D.N.Y. 1994) ..................................................................24

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) ....................................................................24

*In re Purofied Down Prods. Corp.*,
    150 B.R. 519 (S.D.N.Y. 1993) ..................................................................24

**Statutes**

11 U.S.C. § 105(a) .........................................................................................25

Fed. R. Bankr. P. 9019 ....................................................................................24

**TO THE HONORABLE SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE:**

Lehman Brothers Holdings Inc. (the "Plan Administrator"), as Plan Administrator

under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and

Its Affiliated Debtors* (the "Plan"), on behalf of itself and the other affiliated debtors in the above-

captioned cases (collectively, the "LBHI Debtors"), files this motion (the "Motion"), pursuant to

Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section

105(a) of title 11 of the United States Code (the "Bankruptcy Code"), for entry of an order granting

the relief sought herein and respectfully represents:

## PRELIMINARY STATEMENT

1. By this Motion, the Plan Administrator seeks entry of an order, substantially

in the form attached hereto as Exhibit A (the "Proposed Order"), approving the settlement

agreement attached hereto as Exhibit B (the "RMBS Settlement Agreement").[1]  If approved, the

RMBS Settlement Agreement would establish a streamlined process to determine and resolve the

claims that were submitted through the Protocol for alleged breaches of representations and

warranties concerning mortgage loans in certain residential mortgage-backed securitizations

("RMBS").

2. The RMBS Settlement Agreement does not "settle and compromise" the

allowed amount of the Trustees' claims.  Instead, pursuant to the RMBS Settlement Agreement,

the Plan Administrator has agreed to a process in which it will request this Court to estimate and

allow the Covered Loan Claims that the Trustees submitted through the Protocol in the aggregate

---

[1]     Capitalized terms not otherwise immediately defined herein have the meanings ascribed to them in the
RMBS Settlement Agreement or later in this Motion, as applicable.

amount of $2.416 billion, without prejudice to the rights of the Trustees to argue that the amount should be higher.[2]

3. Although the Plan Administrator believes that the value of the contractual remedy for the claims for breach submitted in the Protocol is far less than $2.416 billion, the Plan Administrator agreed to this path in exchange for (i) the Trustees' agreement to a streamlined estimation process subject to a limited right to appeal that will allow this Court to resolve such claims fairly, finally and expeditiously and (ii) the Institutional Investors' agreement to recommend to the Trustees that they accept the terms of the RMBS Settlement Agreement and also that the Institutional Investors advise the Court that allowance of the Covered Loan Claims at an amount not less than $2.416 billion reflects a fair and reasonable resolution. The compromises set forth in the RMBS Settlement Agreement are fair and reasonable and will, among other things, both significantly accelerate Plan distributions that otherwise might be delayed for years and save many millions of dollars in litigation costs.

4. As further described below, the Plan Administrator has been working to resolve the Trustees' claims at a fair and reasonable level for over five years. For a variety of reasons, prior settlement efforts have failed. Notably, these failures occurred while other large financial institutions, like JPMorgan, Citibank and Bank of America, were able to resolve similar type claims (at levels comparable to those offered by the Plan Administrator). Observing the market resolving similar large put-back claims, the Plan Administrator reached out to counsel to

---

[2]     The Transferor Loan Claims are not part of the RMBS Settlement Agreement and, although the disallowance of those claims already has been ordered by this Court and affirmed by the District Court, the Trustees further appealed the disallowance of such claims to the Second Circuit. The LBHI Debtors believe the Trustees' appeal is wholly without merit.

2

the Institutional Investors, who hold or represent holders of the largest economic stakes in big bank

RMBS, including those sponsored by the LBHI Debtors,[3] and began exploring settlement.

5.      From January 2015 through October 2015, the Plan Administrator and the

Institutional Investors engaged in a confidential mediation under the auspices of JAMS mediator,

David Geronemus.  That process produced an agreement between the Plan Administrator and the

Institutional Investors to allow both the Covered Loan Claims and the Transferor Loan Claims in

the amount of $2.44 billion, and the Institutional Investors presented that agreement to the Trustees

for their consideration at the end of October 2015.  Thereafter, the Trustees engaged multiple

experts to assist them in their evaluation of the settlement agreement.  In early February 2016, the

Trustees informed the Plan Administrator and the Institutional Investors of the number of Trusts

for which they believed such settlement would be recommended for acceptance by their expert.

Even though the agreement and settlement of the claims for $2.44 billion was supported by the

Institutional Investors, the number of Trusts for which the settlement was going to be

recommended for acceptance fell below an acceptable threshold to the Plan Administrator.

Accordingly, the Plan Administrator ultimately withdrew the proposed settlement agreement in

early April 2016.

6.      The Plan Administrator and the Institutional Investors nevertheless

remained committed to consummating their agreement as promptly and efficiently as possible.

Armed with results from the Court ordered Protocol, the Plan Administrator was in a unique and

unprecedented position.  The universe of mortgage loan files supporting the Trustees' put-back

claims had been fixed by the Protocol.  Moreover, all of the loan files submitted by the Trustees,

together with the evidence and arguments proffered by the Trustees in support of their claims, had

---

[3]      The Institutional Investors hold approximately $6 billion of the unpaid principal balance of securities
issued by Trusts subject to the RMBS Settlement Agreement.

been reviewed by the Plan Administrator.[4]  Unlike prior motions to seek estimation of the claims,

estimation was now possible because of the data provided by the Protocol.

7.     The estimation process contemplated by the RMBS Settlement Agreement

was developed to enable the Plan Administrator to request the allowance of the claims asserted by

the Trustees in the Protocol at a level the Institutional Investors would accept, while at the same

time allowing the Trustees to attempt to prove the claims at a higher amount.   The Plan

Administrator believes that the unique process proposed by the RMBS Settlement Agreement is

the best possible path forward in view of the existing facts and circumstances.  Among other things,

the agreed upon process allows the Plan Administrator to seek the allowance of the Covered Loan

Claims at what it considers the very high end of an acceptable settlement of the claims, while at

the same time within the acceptable range of the largest economic stakeholders (i.e., the

Institutional Investors).  In addition, the estimation process largely eliminates the risks of appeal

and therefore will allow the Plan Administrator to achieve finality, avoid continued litigation, and

stem the continued incurrence of substantial ongoing litigation and costs relating to resolving these

claims.  It also allows the parties to leverage the extensive efforts made through the Protocol to

date as a comprehensive basis for estimation of the asserted claims.

8.     Pursuant to the terms of the RMBS Settlement Agreement, the Trustees may

condition their acceptance of the settlement on certain findings (the "Trustee Findings") being

made with respect to their determination to enter into the settlement.[5]  Similarly, it is a condition

---

[4]     As explained below, the Plan Administrator contends that the Trustees did not deliver sufficient documents
        and information for certain alleged breaches pursuant to the terms of the Protocol and the Plan Administrator
        has moved to disallow and expunge those claims.  *See Lehman Brothers Holdings Inc.'s Second Objection
        to Certain RMBS Trust Claims and Motion to Disallow and Expunge Certain RMBS Trust Claims for
        Insufficient Documentation* (Docket No. 53620).  The Trustees disagree. (Docket Nos. 53730, 53731, 53732).
        This motion has been held in abeyance as settlement discussions proceeded.

[5]     Under the RMBS Settlement Agreement, the Trustee Findings will be made by the District Court after
        considering proposed findings of fact and conclusions of law submitted by this Court.

4

to the LBHI Debtors' obligations under the settlement that the Court make certain findings (the "Debtors' Findings") with respect to their decision to enter into the RMBS Settlement Agreement. The Trustee Findings and the Debtors' Findings are attached as Exhibits F and I, respectively, to the RMBS Settlement Agreement and are incorporated in the Proposed Order.  In sum, the required findings generally require that the Court determine that the Trustees, on the one hand, and the Plan Administrator, on the other, have acted reasonably and in good faith in agreeing to the RMBS Settlement Agreement.  The record fully supports both the Trustee Findings and the Debtors' Findings.

9.    By order dated April 6, 2017 (Docket No. 55154) (the "Scheduling Order"), this Court scheduled a hearing to consider this Motion for July 6, 2017 (the "Settlement Hearing") and approved the form and manner of notice for the Settlement Hearing.  The Debtors and the RMBS Trustees will provide the notice of the Settlement Hearing and the RMBS Settlement Agreement in the manner required by the Scheduling Order.  Although the Trustees have until the June 1, 2017 Acceptance Date to provide written notice to the Institutional Investors and the Plan Administrator of their acceptance or rejection of the RMBS Settlement Agreement, the Plan Administrator believes that they have agreed to a process that will provide certificateholders with more certain and favorable economics than they would achieve through completing Steps 3, 4 and 5 of the Protocol and therefore believes that the Trustees will accept the modification to the Protocol embodied in the RMBS Settlement Agreement.  Thus, the Plan Administrator is moving for approval of the RMBS Settlement Agreement concurrently with the Trustees' review and consideration of the proposed settlement so that the Estimation Proceeding can take place in October 2017 as provided in the RMBS Settlement Agreement (assuming this Motion is approved).

5

10.     For the reasons explained below, the Plan Administrator has determined in the exercise of its sound business judgment that the RMBS Settlement Agreement represents a fair and equitable resolution of the Covered Loan Claims and satisfies the Second Circuit's standard for approval of a compromise under Bankruptcy Rule 9019.  The Plan Administrator respectfully requests that the Court approve the RMBS Settlement Agreement, make the required Trustee Findings and Debtors' Findings, and grant the other relief requested herein.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Plan Administrator believes that this Motion is a "core proceeding" arising in these cases.  Pursuant to the RMBS Settlement Agreement, the Plan Administrator has agreed to request that this Court submit the proposed Trustee Findings to the District Court for approval.  Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELEVANT BACKGROUND

**A.     The Bankruptcy Filing and Bar Date.**

12.     On September 15, 2008 (the "Petition Date"), the LBHI Debtors filed these cases.  On July 2, 2009, the Court entered an order setting forth the procedures and deadlines for filing proofs of claim.  Pursuant to that order, the LBHI Debtors provided notice of the bar date of September 22, 2009 (the "Bar Date") to all known and potential creditors, including to the Trustees.

**B.     Establishment of the RMBS Trusts and Claims Asserted by the Trustees.**

13.     Prior to the Petition Date, certain of the LBHI Debtors, in the ordinary course of business, would acquire residential mortgage loans either originated or purchased by their subsidiaries and securitize such loans. Securitization of the loans entailed the establishment

6

of a trust or other special purpose vehicle to acquire the loans, hold the loans, and issue securities supported by proceeds of the loans.  In connection with the securitizations, certain of the LBHI Debtors made certain representations and warranties regarding the quality and nature of certain of the loans or the documents included in the applicable loan file.  The Governing Agreements typically provide that the applicable trustee may seek a contractually defined repurchase of a loan in the event there are certain breaches of representations or warranties.  In order to assert such a claim, the Governing Agreements require a trustee to establish that: (i) a breach of a representation and warranty exists; (ii) the breach adversely and materially affects the value of the related mortgage loan; and (iii) prompt notice of the breach was provided to the LBHI Debtors.

14.    On or around the Bar Date, certain trustees, including the Trustees, filed proofs of claims asserting approximately $37 billion in repurchase claims premised on allegations that certain of the LBHI Debtors: (i) breached various representations and warranties regarding the quality and characteristics of hundreds of thousands of mortgage loans; and (ii) provided deficient mortgage loan files.  Such claims arise from approximately 406 Trusts and approximately 1.8 million mortgage loans.  The claims related to the Covered Loans[6] (the "Covered Loan Claims"), which are being resolved by the RMBS Settlement Agreement, are a subset of the total universe of the alleged claims.  As of the Modification Date, 244 of the Trusts asserted RMBS Claims in the Protocol on account of the Covered Loans aggregating a total of alleged purchase price of approximately $16.772 billion.[7]

---

[6]    The RMBS Settlement Agreement defines "Covered Loans" to mean (i) the Mortgage Loans identified as the "Covered Loans" in the *RMBS Trustee's Motion to (i) Increase the Reserve to $12.143 Billion and (ii) Estimate and Allow Their Claims for Covered Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code*, dated August 22, 2014 (*See* Docket No. 46078), and (ii) the additional Mortgage Loans identified as "Covered Loans" in the *Status Report of the RMBS Trustees with respect to Compliance with the Protocol and Motion to Extend the Overall Claim File Cut-Off Date for Certain Loans under the Protocol Order and Grant Related Relief* (*See* Docket No. 52342).  *See* §1.08 of the RMBS Settlement Agreement.

[7]    Of the 406 RMBS trusts, as of the Modification Date, (a) 244 Trusts assert Covered Loan Claims subject to the RMBS Settlement Agreement, and (b) 16 trusts are Terminated Trusts.  Of the 406 RMBS trusts, certain

C.    **The RMBS Reserve.**

15.    On December 6, 2011, the Court approved and entered an order (Docket No. 23023) confirming the Debtors' chapter 11 plan (the "<u>Plan</u>").

16.    On January 12, 2012, the LBHI Debtors moved to estimate the claims asserted by the RMBS Trustees, including the Covered Loan Claims (Docket No. 24254), under section 502(c) for the purposes of establishing a reserve for such claims under the Plan.  Without estimation of such claims, the LBHI Debtors would have been required to establish a reserve based on the $37 billion face amount of the Claims, which would have foreclosed their ability to make meaningful distributions to other creditors under the Plan.  Using a seven-step methodology, the LBHI Debtors estimated at the time that the amount of the claims – *if able to be proven* – would fall between $1.1 and $2.4 billion.  Accordingly, the LBHI Debtors proposed a reserve of $2.4 billion.  (*Id.* at 12-13).  This estimate was solely for the purposes of establishing a reserve, and it was not an estimate of the LBHI Debtors' likely or potential liability at the time.  The Trustees objected, contending that the reserved amount should be at least $15.3 billion. The parties ultimately agreed to establish a reserve (the "<u>RMBS Reserve</u>") sufficient to make distributions on account of a $5 billion claim in connection with such claims.  On February 22, 2012, the Court entered an order (Docket No. 25643, the "<u>Reserve Order</u>") approving the $5 billion RMBS Reserve.

17.    When the Reserve Order was entered, the LBHI Debtors believed that the actual amount of the Claims would be significantly less than $5 billion, whereas the RMBS Trustees believed the actual value of the claims to be much higher.  However, the RMBS Reserve

---

contain loans that are Transferor Loans.  There is overlap because certain Trusts are "hybrid" trusts, that is to say they contain both Covered Loans and Transferor Loans.

was agreed upon to advance these cases and to allow the LBHI Debtors to make prompt and meaningful distributions to creditors under the Plan.  The Plan became effective on March 6, 2012, and the LBHI Debtors have made a number of interim distributions to creditors.

**D.    Prior Settlement Efforts and Attempts to Resolve the Trusts' Claims.**

18.    The Reserve Order required the Trustees and the LBHI Debtors to participate in mediation to attempt to settle the allowed amount of the claims filed by the Trustees. The parties ultimately participated in a mediation (the "First Mediation") before the Honorable Gary McGowan in July 2012, but were unable to reach an agreement.

19.    Earlier in the cases, on March 14, 2011, the LBHI Debtors filed the One Hundred Ninth Omnibus Objection to Claims ("First Insufficient Documentation Objection") (Docket No. 15008) seeking to disallow and expunge the claims on the basis that the Trustees failed to identify the loans they claim had breaches or provide sufficient supporting documentation. The First Insufficient Documentation Objection was just one of a number of objections the LBHI Debtors filed based on the LBHI Debtors' view of similar issues. (*See, e.g.*, Docket Nos. 14492, 14493, 14494, & 16079).

20.    In response to the LBHI Debtors' objections, the RMBS Trustees responded in the following ways: (i) the Bank of New York Mellon, as trustee, permitted all of its claims to be expunged; (ii) Hong Kong and Shanghai Banking Corporation, as trustee, permitted all of its claims to be expunged except for those relating to identified breaches in certain of the underlying loans; and (iii) Bank of America, N.A., as trustee, transferred nearly all of its claims to U.S. Bank, N.A. ("U.S. Bank") and Citibank, N.A./Wilmington Trust Company ("Citibank/Wilmington") as successor trustees.  Only Citibank/Wilmington, Deutsche Bank National Trust Company, U.S. Bank, and Wells Fargo Bank, N.A. challenged the objections.

21.    On June 30, 2011, the Court held a hearing on the LBHI Debtors' motions

9

to disallow certain claims.  (*See* 6/30/11 Hr'g. Tr. (Docket No. 18251)).  At the conclusion of that hearing, the Court reserved decision as to the remaining claims and encouraged the parties to consider other means of resolving their dispute.  The Court also indicated that the RMBS Trustees would be put to the task of proving their claims in the absence of a consensual resolution.  Despite the LBHI Debtors' and the Trustees' later efforts to consensually resolve the Trustees' claims, no agreement was reached.

**E.      Establishment of the Protocol.**

22.      On August 22, 2014, the Trustees filed a motion requesting that the existing RMBS Reserve be increased to $12.143 billion (Docket No. 46078, the "Trustees Reserve Motion").  On October 15, 2014, the Plan Administrator filed an objection to the Trustees Reserve Motion and also filed the *Cross Motion to Establish A Protocol to Resolve Claims Filed by RMBS Trustees* (Docket No. 46526, the "Cross-Motion").  On December 10, 2014, the Court, after a full day evidentiary hearing, granted the LBHI Debtors' Cross-Motion and rejected the Trustees' motion to increase the reserve amount to $12.143 billion.  (*See* 12/10/14 Hr'g Tr. (Docket No. 49007)).

23.      On December 29, 2014, the Court entered an order (Docket No. 47569, the "Protocol Order"), approving the Plan Administrator's proposed protocol (the "Protocol") to reconcile and determine the RMBS Claims (as defined in the Protocol Order) on a loan-by-loan basis.  The Protocol Order and Protocol established the following multi-step process to address the claims:

> Steps 0-1: *Production and review of claims files.*  In Steps 0-1, the Trustees were required to collect and submit claim files, along with alleged RMBS Claims, to the Plan Administrator by March 31, 2016.  Under the Protocol, an RMBS Claim package was required to include: (i) the mortgage loan file; (ii) a statement describing either (a) the specific alleged defect and the representation or warranty violated or (b) the specific document allegedly missing; (iii) a statement of how the breach or defect entitles the Trustee to a claim under the applicable Governing

10

Agreements and applicable law; (iv) a calculation of the purchase price; and (v) a statement describing any notice of breach given to the LBHI Debtors.

Step 2:   *Review of claims files by the Plan Administrator.*  In this second step, the Plan Administrator reviewed the claim files and determined whether the Trustees proved a material breach.  If proven, the Plan Administrator approved the file and then either approved or recalculated the purchase price.  If not approved, the Plan Administrator prepared a statement explaining the basis for rejection of the file.

Step 3:   *Non-binding negotiation procedure for rejected claims and disputed approved claims.*  In Step 3, the Trustees could resubmit rejected claim files to the Plan Administrator with a rebuttal to allow for negotiation of a mutually acceptable allowed claim or dispute an approved claim to enable negotiation of a mutually acceptable allowed claim.  If the parties could not resolve the disputed issues, the parties were to proceed to Step 4.

Step 4:   *Non-binding dispute resolution procedure to resolve claims files disputes.*  In Step 4, the Plan Administrator was to submit disputed rejected claim files and disputed approved claims remaining after Step 3 for resolution to one or more neutral claim facilitators, who was to oversee a non-binding dispute resolution process.  The claims facilitators were to either approve or disapprove the Plan Administrator's approval or rejection of the claim file and provide a proposed claim amount, if applicable.

Step 5:   *Court review and approval of claim amounts.*  In this final step, agreed claim amounts were to be approved by the Court, and disputed claims were to remain subject to objection and allowance by the Court on a loan-by-loan basis.

24.   In an attempt to settle the allowed amount of the RMBS Claims before undertaking a process with the time and expense associated with the Protocol, the Plan Administrator and the Institutional Investors, as a follow up to the First Mediation, participated in a second mediation (the "Second Mediation"), commencing in January 2015 before JAMS mediator, David Geronemus, but were unable to reach an immediate agreement.

25.   The Plan Administrator and the Trustees thus participated in Steps 0-1 of the Protocol from December 2014 through the Protocol's Claims Cut-Off Date of March 31, 2016. The Plan Administrator and the Trustees also participated in Steps 2 and 3 of the Protocol until it was suspended.  Pursuant to the RMBS Settlement Agreement, on March 30, 2017, the LBHI Debtors and the Trustees informed the Court of the existence of the settlement and that they

11

believed it was appropriate to suspend the Protocol until the earlier of the conclusion of the Estimation Hearing or the termination of the RMBS Settlement Agreement.  The effect of the settlement is to forego the remaining alternative dispute resolution mechanisms embodied in the Protocol (business to business negotiations and mediations) and proceed directly to resolution of the claims by the Court.

26.    On March 24, 2016, the Trustees requested that they be allowed to submit an additional number of Covered Loans into the Protocol.  (*See* Docket No. 52342 ("Extension Motion")).  The Court granted the Extension Motion and ordered that all additional RMBS Claims not submitted to the Protocol would be disallowed and expunged upon entry of that Order.

27.    On April 28, 2016, the Plan Administrator filed a *Motion to (A) Disallow and Expunge Certain RMBS Claims and (B) Release Certain Related Claims Reserves.* (*See* Docket No. 52640 (the "Expungement Motion")).  The Expungement Motion sought the disallowance and expungement of certain proofs of claims for which no RMBS Claims were asserted by the deadline established by the Protocol and were not subject to the Extension Motion. On June 27, 2016, the Court entered an order (the "Expungement Order") granting the Expungement Motion.  (*See* Docket No. 53163).  On July 11, 2016, the Trustees appealed the Expungement Order to the United States District Court for the Southern District of New York (the "District Court").  (*See* Docket No. 53308).  On February 24, 2017, the District Court affirmed the Expungement Order. (*See* Docket No. 54934).  On March 24, 2017, the Trustees appealed the District Court's affirmance.

28.    On August 30, 2016, the Plan Administrator filed a *Second Objection in Certain RMBS Trust Claims and Motion to Disallow and Expunge Certain RMBS Trust Claims for Insufficient Documentation* (Docket No. 53620) (the "Insufficient Documentation Objection").

12

In the Insufficient Documentation Objection, the Plan Administrator sought to disallow certain RMBS Claims on the basis that the Trustees had failed to provide to the Plan Administrator certain required documentation and information in connection with the Protocol with respect to a number of Covered Loans submitted to the Protocol. The RMBS Trustees filed a brief and affidavits in opposition to the Insufficient Documentation Objection on September 29, 2016. (Docket Nos. 53730, 53731, 53732). This matter has been continually adjourned as the parties attempted to reach agreement on the RMBS Settlement Agreement.[8]

**F.    Negotiations Regarding Settlement of the Covered Loan Claims.**

29.    On October 26, 2015, during the course of the Protocol, the Plan Administrator and the Institutional Investors entered into a settlement agreement whereby the Covered Loan Claims and the Transferor Loan Claims would be settled for $2.44 billion. While this settlement agreement was presented to the Trustees, as explained above, the Plan Administrator ultimately withdrew the settlement because the settlement would not have been accepted by a sufficient number of Trusts asserting the Covered Loan Claims.

30.    The Plan Administrator and the Institutional Investors remained committed to resolving the Covered Loan Claims and on November 30, 2016, after years of litigation, negotiation, mediation, and meet-and-confers, the Plan Administrator and the Institutional Investors entered into a prior version of the RMBS Settlement Agreement attached to this Motion and presented it to the Trustees. Following additional negotiations between the Plan Administrator, the Institutional Investors, and the Trustees, on March 17, 2017, the Plan Administrator and the Institutional Investors entered into a modified form of the RMBS Settlement

---

[8]    While this matter has been adjourned, the Plan Administrator may prosecute the objection or the bases of the objection as part of the Estimation Proceeding.

13

Agreement and presented the modified agreement to the Trustees for their consideration and, hopefully, acceptance.  As explained in further detail below, under the RMBS Settlement Agreement, the Plan Administrator has agreed to seek allowance of the Covered Loan Claims at $2.416 billion.  The Institutional Investors have previously agreed that the allowance of the Covered Loan Claims for $2.416 billion is a fair and reasonable resolution of those claims, and have supported a settlement of the claims at that amount.  The Institutional Investors continue to believe that a settlement at that amount is fair and reasonable, and they therefore support estimation of the Covered Loan Claims so long as the amount estimated is not less than $2.416 billion.

## THE RMBS SETTLEMENT AGREEMENT

31.    The key terms of the RMBS Settlement Agreement are as follows.[9]

**A.    General Economic Terms.**

32.    Generally, under the RMBS Settlement Agreement, the Plan Administrator and the Institutional Investors (and the Trustees, assuming their acceptance) have agreed to seek estimation of the Covered Loan Claims in an amount determined by the Court in an estimation proceeding (the "Estimation Proceeding") pursuant to section 502(c) of the Bankruptcy Code.  The Plan Administrator has agreed to seek estimation of the Covered Loan Claims in the amount of $2.416 billion, as an allowed class 7 general unsecured claim in these cases; the Trustees have the ability to seek estimation of the claims in a higher amount.

33.    Under the RMBS Settlement Agreement, among other terms:

a.    if the Court estimates the Covered Loan Claims at $2 billion or more, all parties will have waived their right to appeal the Court's decision;

---

[9]    The summary of the RMBS Settlement Agreement is qualified in its entirety by the terms and conditions of the RMBS Settlement Agreement.  Such terms and conditions control to the extent that there is any conflict or inconsistency between this summary and the RMBS Settlement Agreement.

              b.      if the Court estimates the Covered Loan Claims at less than $2 billion, the Trustees (but not the Plan Administrator) may appeal the Court's decision;

              c.      if the Court estimates the Covered Loan Claims in an amount between $2 billion and $2.416 billion, the allowed claim will be equal to $2.416 billion (and neither the Trustees nor the Plan Administrator may appeal); and

              d.      if the Court estimates the Covered Loan Claims in an amount greater than $2.416 billion, such greater amount will be the allowed claim (and neither the Trustees nor the Plan Administrator may appeal).

**B.**     **Limited Waiver of Appellate Rights.**

       34.     Under the RMBS Settlement Agreement, the Court shall not be required to make findings of fact or conclusions of law when determining the Allowed Claim of the Covered Loan Claims (except as provided in Section 3.02(c)(ii) of the RMBS Settlement Agreement, which is detailed below), and the Net Allowed Claim amount decided by the Court as a result of the Estimation Proceeding shall be final, binding, not subject to appeal or reconsideration, and shall be conclusive of the LBHI Debtors' liability to the Participating Trusts or in any way related to the Covered Loan Claims of the Participating Trusts; provided, however, that to the extent that the Court decides that the Allowed Claim should be set at an amount less than $2 billion, the RMBS Settlement Agreement provides that (i) the Court will make findings of fact and conclusions of law when determining the Allowed Claim, and (ii) the Accepting Trustees shall have the right to appeal the Court's decision.  Under no circumstances may the Plan Administrator appeal the Bankruptcy Court's decision in which it sets the amount of the Allowed Claim.  *See id.* at § 3.02(c)(i) and (ii).

**C.**     **Conduct of the Estimation Proceeding.**

       35.     The RMBS Settlement Agreement provides that the Estimation Proceeding will be conducted in accordance with the procedures set forth in <u>Exhibit G</u> of the RMBS Settlement

Agreement.  These procedures were extensively negotiated by the Trustees and are a requirement

to their proceeding with the RMBS Settlement Agreement.  Such procedures provide for, among

other things:

(i)     the Estimation Proceeding will commence no earlier than October 16, 2017;

(ii)    the Estimation Proceeding will be scheduled for at least 14 hearing days, or

a total of 98 hours, on the record, with the Plan Administrator being allotted

7 days (or a total of 49 hours) to present their case, including rebuttals, and

7 days (or a total of 49 hours) to be allotted to the RMBS Trustees;

(iii)   agreement to a pre-Estimation Proceeding expert discovery schedule

(generally running from May through September 2017) and requirements

for submission of each party's expert reports;

(iv)    deemed withdrawal of all pending motions concerning the Covered Loans

and the Protocol;

(v)     each party will submit a single pre-trial brief (no more than 50 pages in

length) no less than 15 days prior to the Estimation Proceeding; and

(vi)    other requirements regarding identification of witnesses and exhibits, and

agreements as to certain evidence to be offered into evidence at the

Estimation Proceeding.

**D.    Allocation of the Net Allowed Claim Among Participating Trusts.**

36.     Each Participating Trust[10] will receive an allocable share of the Net Allowed

Claim (i.e., the allowed amount of the Covered Loan Claims, as determined by the Court in the

---

[10]    "Participating Trust" is defined under the RMBS Settlement Agreement to mean any Trust that (i) accepts
the RMBS Settlement Agreement and (ii) is included within (a) Final Court Approval and (b) the estimation
of the Covered Loan Claims (the "Estimation") and Estimation Proceeding.  *See* § 3.02(a) of the RMBS
Settlement Agreement.

Estimation Proceeding, plus interest thereon to the extent provided by Section 8.4 of the Plan, less

the Legal Fees[11]) pursuant to Section 3.04 of the RMBS Settlement Agreement. (The parties have

agreed under the RMBS Settlement Agreement that if there are any Excluded Trusts,[12] the Net

Allowed Claim will be reduced by the amounts that had been allocated to the Excluded Trusts

under Section 3.04 of the RMBS Settlement Agreement.) Pursuant to Section 3.04 of the RMBS

Settlement Agreement, the Net Allowed Claim shall be allocated among the relevant trusts by the

Accepting Trustees by calculating for each such trust its "Allocable Share" of the Net Allowed

Claim, pursuant to the binding determination of the Expert (who will perform any required

calculations).[13] To the extent that the loans in any Accepting Trust are divided by the Governing

Agreements into groups of loans ("Loan Groups") so that ordinarily only certain classes of

investors benefit from the proceeds of particular Loan Groups, those Loan Groups shall be deemed

to be separate Accepting Trusts solely for purposes of the allocation methodologies set forth in the

Settlement Agreement.[14] The allocated percentage for any given Trust shall be (i) the dollar

amount of the claims asserted pursuant to the Protocol by the relevant trust as determined by the

Expert, *divided by* (ii) the dollar amount of claims asserted pursuant to the Protocol by the relevant

trusts as determined by the Expert expressed as a percentage.[15] The Initial Allocated Percentages

---

[11]  "Legal Fees" are defined under the RMBS Settlement Agreement to mean 4.75% of the first $2.416 billion of the Allowed Claim to be paid to counsel to the Institutional Investors for its work relating to the Settlement. *See id.* at §§ 3.01, 6.05.

[12]  "Excluded Trusts" are defined under the RMBS Settlement Agreement to mean any Trusts that (i) do not accept the RMBS Settlement Agreement, (ii) are not included within Final Court Approval, or (iii) are not included within the Estimation and Estimation Proceeding. *See id.* at § 3.02(a).

[13]  "Expert" is defined under the RMBS Settlement Agreement to mean the professional firm retained or to be retained by one or more of the Accepting Trustees to make the calculations required in connection with the allocation of the Net Allowed Claim.

[14]  *See id.* at §3.04.

[15]  *See id.*

for each Trust are attached to the RMBS Settlement Agreement as Exhibit H.  In the event that all Trusts become Accepting Trusts and no Trusts become Excluded Trusts, the Allocated Percentage for each Trust will be the same as set forth on Exhibit H.  For any Participating Trust, the Allocable Share will be equal to the Net Allowed Claim multiplied by the Allocated Percentage (with the final allocated percentage being determined by the Expert within 30 days of the date the Net Allowed Claim has been determined by the Court).

37.    Plan Payments on each Participating Trust's Allocable Share shall be deposited into the related Trust's collection or distribution account pursuant to the terms of the Governing Agreements, for further distribution in accordance with the distribution provisions of the Governing Agreements as though such Plan Payments are a subsequent recovery available for distribution on the related distribution date.  If the Governing Agreement for a Participating Trust does not include the concept of subsequent recovery, the deposit into that Trust will be distributed as though it was unscheduled principal available for distribution on the related distribution date.[16] Accordingly, the RMBS Settlement Agreement and its claims allocation will prevent a windfall to any one Trust, Institutional Investor, or any other certificateholder in any Trust, treat the Participating Trusts equitably and in accordance with their contractual rights under the Governing Agreements, and maximize recoveries for all Participating Trusts.[17]

**E.    Release of Claims.**

38.    For and in consideration of the Allowed Claim, and the other agreements in the RMBS Settlement Agreement, the Participating Trusts, the Accepting Trustees for the

---

[16]    See id. at § 3.06.

[17]    The Allocation Formula will not be binding on the LBHI Debtors nor it will affect the LBHI Debtors' right to account for and allocate the Allowed Claim in accordance with their own analyses of the RMBS Claims and in the best interests of the bankruptcy estate.  See id. at § 3.04.

Participating Trusts, and any and all persons claiming by, through, or on behalf of such

Participating Trusts (including any investors claiming derivatively for any such trust), and any and

all agents or appointees acting on behalf of the Accepting Trustees will irrevocably and

unconditionally grant a full, final, and complete release, waiver, and discharge of all of their claims

against the Released Parties[18] that were asserted, or that could have been asserted in the Covered

Loan Claims filed or asserted in the Bankruptcy Proceeding or in the Protocol by the Accepting

Trustees on behalf of the Participating Trusts.[19]

        39.    Article IV of the RMBS Settlement Agreement identifies particular claims

which will ***not*** be released under the agreement, including: (i) the rights and obligations of third

party guarantors or financial-guaranty providers associated with any Trust where the rights and

obligations are wholly independent of the rights and obligations of the Trustees of or Investors in

such Trust, the Trustees, or the Trusts; (ii) any rights or claims against any party that is not a

Released Party; (iii) any rights or claims to enforce the terms of the RMBS Settlement Agreement;

(iv) any direct individual claims for securities fraud or other alleged disclosure violations

("Disclosure Claims") that any certificateholder, bondholder, or noteholder in the Trusts

(collectively, the "Investors") seek to assert based upon such Investor's purchase or sale of

securities; (v) claims against parties other than the Released Parties related to the origination and/or

sale of the mortgage loans sold or securitized by the LBHI Debtors; (vi) any obligation of any

Master Servicer or Servicer that is not a debtor in the Bankruptcy Proceeding that pertains to the

---

[18]    Released Parties shall mean (i) any and all LBHI Debtors and their affiliates and subsidiaries identified on
Exhibit C to the RMBS Settlement Agreement, and their respective present and former directors, officers,
employees, auditors, advisors (including financial advisors), legal counsel, representatives, and agents, and
(ii) Aurora Commercial Corp., f/k/a Aurora Bank, FSB, f/k/a Lehman Brothers Bank, FSB, and Aurora
Loan Services, LLC, and their respective present and former directors, officers, employees, auditors,
advisors (including financial advisors), legal counsel, representatives, and agents. *See id.* at §§ 1.29, 3.03.

[19]    *See id.* at § 3.03.

servicing of the mortgage loans held by the Trusts; (vii) any existing obligation under the

Governing Agreements to provide and/or procure, as applicable, documents needed to cure

document defects; and (viii) claims, liabilities, rights, obligations, or other relationships held by

one or more LBHI Debtors against one or more other LBHI Debtors.[20]  The RMBS Settlement

Agreement nonetheless is clear that nothing in the agreement is intended to or shall be read to alter,

modify, or amend any order of the Court, any provision in the Plan, or provision of law concerning

the assertion or timeliness of any Disclosure Claims or any other claims.  *See id.*  In other words,

all applicable bar dates and deadlines in prior Court orders, under the Plan, or at law, still apply.

**F.      Acceptance of the RMBS Settlement Agreement.**

40.     The RMBS Settlement Agreement establishes a multi-step approval process

to ensure that the affected relevant parties, including the Trustees, would have the appropriate

opportunity to accept or reject the proposed settlement.  First, on November 30, 2016, the

Institutional Investors (who are holders and/or authorized investment managers for holders of over

$6 billion of the unpaid principal balance of securities issued by the RMBS Trusts) accepted and

entered into a prior version of the RMBS Settlement Agreement.  Discussions and negotiations

thereafter proceeded between the Trustees, the Institutional Investors, and the Plan Administrator

regarding the terms of the agreement.  After months of additional discussions and negotiations, the

Plan Administrator and the Institutional Investors agreed to modify the agreement that had been

presented to the Trustees on November 30, 2016, and executed a modified version of the RMBS

Settlement Agreement, which was presented to the Trustees on March 17, 2017 (the "Modification

Date").

---

[20]      *See id.* at Article IV.

41.    The Trustees, on behalf of the Trusts, have until June 1, 2017 (the "Acceptance Date") to elect to participate in the RMBS Settlement Agreement.  In connection therewith, the Institutional Investors submitted through their counsel a letter to each of the Trustees expressing their support for the Settlement and requesting that each Trustee enter into the RMBS Settlement Agreement.  During the time between the Modification Date and the Acceptance Date, the Trustees will have the opportunity to review the RMBS Settlement Agreement and its terms.  As part of this process, the RMBS Trustees can solicit input from Investors, and retain experts to assist them as necessary to inform themselves concerning the RMBS Settlement Agreement.[21]  On or prior to the Acceptance Date, each Trustee must provide written notice to the Institutional Investors and the Plan Administrator evidencing acceptance (or rejection) of the RMBS Settlement Agreement on behalf of the Trusts they represent.

**G.    The Trustee Findings and the Debtors' Findings.**

42.    The RMBS Settlement Agreement provides that the Trustee Findings must be approved by order of the Court and then, the District Court.  The Trustee Findings required to be included within Final Court Approval are that:

(i)    the Court and the District Court have jurisdiction to hear and adjudicate the Motion;

(ii)    adequate and reasonable notice of the Motion was provided to certificateholders, noteholders, and any other parties claiming rights in any Accepting Trust, and constitutes due and sufficient notice in satisfaction of federal and state due process requirements and other applicable law;

---

[21]    *See id.* at § 2.04.

(iii)    any objections that were raised or could have been raised in opposition to the Motion are overruled and/or waived; and

(iv)    the Accepting Trustees acted in good faith and exercised reasonable discretion in evaluating and entering into the RMBS Settlement Agreement.

43.    Similarly, it is a condition to the LBHI Debtors' obligations under the settlement that the Court make the Debtors' Findings.  The Debtors' Findings required to be included within Final Court Approval are set forth in Exhibit I to the RMBS Settlement Agreement and are that:

(i)    the Court and the District Court have jurisdiction to hear and adjudicate the Motion;

(ii)    adequate and reasonable notice of the Motion was provided to all interested parties, and constitutes due and sufficient notice in satisfaction of federal and state due process requirements and other applicable law;

(iii)    any objections that were raised or that could have been raised in opposition to the Motion are overruled and/or waived; and

(iv)    each of the Plan Administrator and the other LBHI Debtors acted in good faith and exercised sound business judgment in connection with its determination to enter into the RMBS Settlement Agreement and approval of the RMBS Settlement Agreement is in the best interests of the LBHI Debtors, their respective estates, and creditors.

44.    The required Trustee Findings and Debtors' Findings have been included in the Proposed Order.

**H.    Bar Order.**

45.    Pursuant to Section 2.07 of the RMBS Settlement Agreement, the Plan Administrator agreed to request the entry of an order barring Investors in the Accepting Trusts from asserting claims against the Accepting Trustees with respect to their evaluation and acceptance of the RMBS Settlement Agreement and implementation of the RMBS Settlement Agreement in accordance with its terms.  In the event that the Court determines it is appropriate to approve the RMBS Settlement Agreement and make the proposed Trustee Findings, the Plan Administrator respectfully submits that the Court will have more than ample basis on which to bar these types of claims and therefore requests that the Court include the necessary bar language within the Proposed Order.

<u>**RELIEF REQUESTED**</u>

46.    The Plan Administrator, in its informed business judgment, submits that the RMBS Settlement Agreement is in the best interests of the LBHI Debtors' estates and should be approved pursuant to section 105(a) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.  Accordingly, the Plan Administrator respectfully requests that this Court enter an order, substantially in the form of the Proposed Order (which includes the Trustee Findings and the Debtors' Findings), granting this Motion and approving the RMBS Settlement Agreement.  In order to satisfy the requirements of the RMBS Settlement Agreement, the Plan Administrator also respectfully requests that the Court submit any order approving this Motion to the District Court for approval of the Trustee Findings.[22]

---

[22]    Although the Plan Administrator firmly believes that this Court has core jurisdiction to hear and determine all aspects of the Motion, including those that relate to the Trustee Findings, the Trustees required as a condition to proceeding that the Trustee Findings be approved by the District Court.

## BASIS FOR RELIEF

47.    Rule 9019(a) provides, in part, that "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).   This rule empowers bankruptcy courts to approve a settlement agreement where "it is supported by adequate consideration, is 'fair and equitable,' and is in the best interests of the estate." *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. of Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993).   The Court's analysis is not a mechanical process, but rather contemplates a "range of reasonableness .. . which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion...." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

48.    The decision to approve a particular settlement lies within the sound discretion of the Bankruptcy Court. *See Nellis v. Shugrue,* 165 B.R. 115, 122-23 (S.D.N.Y. 1994); *In re Ionosphere Clubs, Inc.*, 156 B.R. at 426.   Discretion should be exercised by the Bankruptcy Court "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *Shugrue*, 165 B.R. at 123 ("[T]he general rule [is] that settlements are favored and, in fact, encouraged.").

49.    To approve a proposed settlement, the Court need not definitively decide the numerous issues of law and fact raised by the settlement.  Rather, the Court should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (citing *Newman v. Stein*, 464 F.2d at 693); *see also In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("the court need not conduct a 'mini-trial' to determine the merits of the underlying [dispute]").

24

50.    This Court also has the authority to approve a settlement under section

105(a) of the Bankruptcy Code, which allows it to "issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." *See* 11 U.S.C. §

105(a).

51.    In deciding whether a particular settlement falls within the "range of

reasonableness," courts consider the following "*Iridium*" factors: (i) the balance between the

litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of complex

and protracted litigation, "with its attendant expense, inconvenience, and delay"; (iii) the

paramount interests of creditors; (iv) whether other parties in interest support the settlement; (v)

"the nature and breadth of releases to be obtained by officers and directors"; (vi) the "competency

and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy

court judge" reviewing the settlement; and (vii) "the extent to which the settlement is the product

of arm's-length bargaining." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re*

*Iridium Operating LLC),* 478 F.3d 452, 462 (2d Cir. 2007) (internal citations and quotations

omitted).

52.    The Plan Administrator respectfully submits that each of the *Iridium* factors

weighs in favor of this Court's approval of the RMBS Settlement Agreement.

## A.    THE BALANCE BETWEEN THE LITIGATION'S POSSIBILITY OF SUCCESS AND THE SETTLEMENT'S FUTURE BENEFITS

53.    The RMBS Settlement Agreement is the result of tough, arm's-length

negotiations between sophisticated parties. As part of these negotiations, the Plan Administrator,

the Institutional Investors, and the Trustees (assuming their acceptance) each will have concluded

that determining the Net Allowed Claim (i.e., the allowed amount of the Covered Loan Claims

submitted in the Protocol) in the manner contemplated by the RMBS Settlement Agreement was

25

reasonable and appropriate based on their own assessments of the possibility of success of the litigation and the benefits of the Settlement. The terms of the Settlement reflect the Plan Administrator's reasonable assessment of the risk, as well as the substantial expense and delay of completing the Protocol (including protracted Step 5 litigation and attendant appeals), and the related impact on the LBHI Debtors' future distribution efforts, balanced against the benefits to all parties of more near term and certain resolution of such litigation. While the Plan Administrator believes that the Protocol ultimately would result in an amount far less than that asserted by the Trustees and even the $2.416 billion amount, that assessment is not without risk and the RMBS Settlement Agreement will allow the LBHI Debtors to determine the Covered Loan Claims sooner than the Protocol's multistep process, save the substantial costs that would arise from completing that process, eliminate the risk of appeal and expedite distributions to all creditors, which will undoubtedly conclude the LBHI Debtors' cases significantly sooner than contemplated under the expected timeframe of the Protocol.

54.     While the Plan Administrator continues to dispute the validity and the magnitude of the Covered Loan Claims, it is patently clear that, absent the estimation process contemplated by the RMBS Settlement Agreement, continuing to resolve the Covered Loan Claims through the Protocol will require an enormous undertaking and an extraordinary amount of additional time and expense. This is not because the Protocol has not been successful to date. Through the Protocol, there were over 90,000 loans in over 250 RMBS trusts for which the Trustees alleged in excess of $16 billion of claims against the LBHI Debtors. The parties diligently and successfully completed each of Steps 0-1 and 2 of the Protocol. The Plan Administrator has reviewed each claim that was supported by the documentation required for a complete review, and has approved or rejected each such claim. In Step 3 of the Protocol, the Trustees pursued billions

of dollars of claims that the Plan Administrator does not believe are due under the terms of the

Governing Agreements.  To continue with Steps 3 and 4 (business level discussions and formal

claims facilitation procedures, respectively) followed by Step 5 (judicial determination on a loan-

by-loan basis) would only result in years of additional expense and litigation.

55.     Such litigation can be avoided through an informed estimation hearing now

that the parties have the subject loan files and results of Steps 0-1 and 2 of the Protocol.  A more

expeditious process is provided by the RMBS Settlement Agreement pursuant to the Estimation

Proceeding.  Although the Estimation Proceeding may require up to 3 weeks of complete hearing

days (the Plan Administrator believes that the proceeding could be much shorter, but the Trustees

required a substantial number of hearing days as a condition to moving forward with the RMBS

Settlement Agreement), it is essentially appeal free and such a proceeding will be substantially

shorter than what would be required by a full-blown, loan-by-loan trial on the merits and attendant

appeals.  The Covered Loan Claims have been pending for over seven years and the Protocol for

over two years.  It is now time to put an end to this protracted process and enormous expense to

the LBHI Debtors' estates.[23]

56.     The Covered Loan Claims involve a multitude of issues, arguments, and

analyses from both sides.   Particularly in the context of numerous complex mortgage

securitizations and the varied loan products in each, the Plan Administrator submits that the time

and complexity of the litigation at issue, the difficulty inherent in predicting the success of either

party with respect to any particular disputed issue, and the risks and unnecessary distractions

associated with complex and protracted claims loan-by-loan litigation render the RMBS

---

[23]     The LBHI Debtors initially envisioned that the successive Protocol steps would substantially narrow the
areas and loan counts in dispute. Regretfully, although Steps 1 and 2 produced substantial loan-level
information and narrowed the scope of claims being pursued, the LBHI Debtors and the Trustees were unable
to resolve a meaningful amount of the claims in Step 3.

Settlement Agreement particularly reasonable and appropriate. The RMBS Settlement Agreement thus provides certainty to the LBHI Debtors with respect to one of the single largest set of outstanding disputed claims against the LBHI Debtors' estates and removes hurdles to resolving substantial impediments to completing the bankruptcy process for the LBHI Debtors, which has been ongoing since 2008.

57.    In short, although the potential outcome of the Covered Loan Claims after a lengthy litigation process could be less than the Net Allowed Claim that will be determined pursuant to the Estimation Proceeding, the substantial cost and delay of completing the Protocol, including loan-level litigation in Step 5, and likely appeals, make proceeding with the Estimation Proceeding a more efficient and reasonable way to resolve these claims in the best interests of all parties, including the LBHI Debtors' estates and creditors.

## B.    THE LIKELIHOOD OF COMPLEX AND PROTRACTED LITIGATION

58.    The Covered Loan Claims, if not resolved by the RMBS Settlement Agreement, will continue in loan-by-loan litigation through Step 5 of the Protocol. As set out above, the litigation of alleged representation and warranty breaches alone is extremely complex, labor-intensive, costly and time-consuming.

59.    Already, the history of the Protocol and these cases has shown that the litigation and related process will be contentious and drawn out. The RMBS Settlement Agreement avoids these costs and delays. Pursuant to the agreement, the Estimation Proceeding will conclude in approximately 3 weeks (which, although lengthy, is substantially less than the years that would be required for loan-level litigation). Moreover, the Plan Administrator has agreed to waive its appeal rights, as it is confident in the Court's ability to fairly evaluate and determine the Covered Loan Claims. For their part, the Trustees will have waived their appellate rights as well, provided the Net Allowed Claim amount determined by the Court is not less than

28

$2 billion. Although the Plan Administrator believes the Court could estimate the claims well below $2.416 billion based on the results of the Protocol and the evidence to be adduced at the Estimation Proceeding, the Plan Administrator has agreed to seek estimation and allowance at $2.416 billion in order to achieve finality and minimize appellate risk while providing for favorable and reasonable economics to certificateholders.

60.    In addition, the Institutional Investors support estimation so long as the amount estimated is not less than $2.416 billion and agree that a settlement at this amount is fair and reasonable. Unlike the Trustees, who do not hold an economic interest in the allowed amount of the Covered Loan Claims, the Institutional Investors are some of the largest economic stakeholders in the RMBS. The RMBS Settlement Agreement enables the Plan Administrator to present and the Court to consider that the largest economic stakeholders in the RMBS have agreed and are willing to accept allowance in the amount of $2.416 billion. This informs the Plan Administrator's belief that the RMBS Settlement Agreement eliminates the likelihood of complex and protracted litigation.

## C.    THE PARAMOUNT INTERESTS OF CREDITORS

61.    The RMBS Settlement Agreement is beneficial to the LBHI Debtors' estates and their stakeholders because the proposed Settlement will resolve one of the single largest groups of unsecured claims that are outstanding against the LBHI Debtors, thereby providing much-needed predictability with respect to the LBHI Debtors' future distributions under the Plan. Moreover, the certainty of the proposed Settlement avoids the necessity of continuing to set aside substantial reserves for the potential payment of the Covered Loan Claims, which have delayed and reduced recoveries by other stakeholders. The RMBS Settlement Agreement also provides the framework for a prompt determination of the Covered Loan Claims in a fair and reasonable manner and before the Court most familiar with the LBHI Debtors and these types of claims.

Furthermore, it is indisputable that the loan-by-loan litigation of the Covered Loan Claims would burden the LBHI Debtors' estates with significant legal expenses. Even if the Plan Administrator were to defeat each claim, the legal fees and other burdens of litigation would necessarily harm the LBHI Debtors' estates and reduce and delay Plan distributions to creditors. Thus, the Settlement is in the paramount interest of creditors.

## D.    SUPPORT FOR THE SETTLEMENT BY CERTIFICATEHOLDERS

62.    The RMBS Settlement Agreement is supported by 14 Institutional Investors, who are holders, and/or authorized investment managers for holders, of over $6 billion in certificates in the Trusts regarding the Covered Loan Claims.

## E.    THE NATURE OF THE RELEASES TO BE OBTAINED BY LBHI DEBTORS' OFFICERS AND DIRECTORS

63.    The RMBS Settlement Agreement releases the LBHI Debtors, their non-Debtor affiliates and the LBHI Debtors' officers and directors of any and all claims that were asserted, or that could have been asserted, by the Trusts or anyone claiming by or through the Trusts related to the Covered Loan Claims. This expansive release provides certainty and finality to the Lehman estate, and eliminates potential residual exposure from indemnification or other claims. As the releases are solely tied to the Covered Loan Claims and do not extend to indemnify the officers and directors from non-Covered Loan Claims in the LBHI Debtors' bankruptcy, this *Iridium* factor weighs in favor of approval.

## F.    THE PROPOSED SETTLEMENT AGREEMENT SATISFIES THE REMAINING IRIDIUM FACTORS

64.    For the reasons stated above, the Plan Administrator believes that the paramount interests of all parties are best served by approval of the RMBS Settlement Agreement. Moreover, the final two *Iridium* factors are also satisfied because the RMBS Settlement Agreement

30

was negotiated in good faith and from arm's-length bargaining positions, and all parties were represented by experienced and sophisticated counsel.

* * * * *

In sum, the Plan Administrator, determined, in exercising its sound business judgment, that the RMBS Settlement Agreement is fair, equitable, and eminently reasonable to the LBHI Debtors' estates and creditors, thereby satisfying the standards of Bankruptcy Rule 9019. The timely and final resolution of these extensive claims is in the best interests of the LBHI Debtors and their creditors. The Plan Administrator therefore submits that the RMBS Settlement Agreement is fair and well within the range of reasonableness — and certainly not "below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d at 608. Accordingly, the Plan Administrator respectfully requests that the Court approve the RMBS Settlement Agreement.

## <u>NOTICE AND PROCEDURE</u>

65. No trustee has been appointed in these cases. The Plan Administrator will provide notice of this Motion in accordance with the Scheduling Order. In addition, the Trustees have provided or will provide notice of this Motion and the RMBS Settlement Agreement in accordance with the notice procedures set forth in the Scheduling Order. The Plan Administrator submits that no other or further notice need be provided. No previous request for the relief sought herein has been made to this Court or any other court.

66. This Motion sets forth the legal authorities upon which the Motion is based. Accordingly, the Plan Administrator respectfully submits that the Motion itself satisfies the requirements of the local bankruptcy rules that a separate memorandum of law be submitted herewith.

67. No prior motion for the relief set forth herein has been made to this or any other court.

31

## CONCLUSION

**WHEREFORE**, the Plan Administrator respectfully requests the entry of the Proposed

Order granting the relief requested herein and such other and further relief as the Court may

deem just and proper.

Dated:  New York, New York
April 27, 2017

> /s/ Paul V. Shalhoub
> Paul V. Shalhoub
> Todd G. Cosenza
> WILLKIE FARR & GALLAGHER LLP
> 787 Seventh Avenue
> New York, New York 10019
> Tel:  (212) 728-8000
> Fax:  (212) 728-8111
>
> Michael A. Rollin
> Maritza Dominguez Braswell (*pro hac vice*)
> ROLLIN BRASWELL FISHER LLC
> 8350 East Crescent Parkway, Suite 100
> Greenwood Village, Colorado 80111
> Tel: (303) 945-7415
> Fax: (303) 974-7468
>
> *Attorneys for Debtors Lehman Brothers Holdings*
> *Inc. and Certain of Its Affiliates*

# EXHIBIT A

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

In re :       )      Case No. 08-13555 (SCC)

Lehman Brothers Holdings Inc., et al.,      )      Chapter 11

Debtors.      )      Jointly Administered

-------------------------------------------------------- x

## ORDER APPROVING RMBS SETTLEMENT AGREEMENT

Upon the motion, dated April 27, 2017 (the "Motion"),[1] of Lehman Brothers Holdings Inc. (the "Plan Administrator") as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (the "Plan"), on behalf of itself and the other affiliated debtors in the above-captioned cases (collectively, the "LBHI Debtors"), pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") for approval of that certain RMBS Trust Settlement Agreement entered into as of November 30, 2016, and modified as of March 17, 2017 (the "RMBS Settlement Agreement"), by and among the LBHI Debtors, the Institutional Investors and, upon acceptance as described in the Settlement Agreement, the Accepting Trustees, all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and it appearing that venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this proceeding on the Motion is a core proceeding

---

[1]      Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

pursuant to 28 U.S.C. §157(b); and the RMBS Settlement Agreement requiring that this Court submit the Trustee Findings contained herein to the District Court for consideration and approval; and notice of the Motion having been given in accordance with this Court's April 6, 2017 scheduling order (Docket No. 55154) (the "Scheduling Order"); and it appearing that no other or further notice need be provided; and the Court having found that the RMBS Settlement Agreement is reasonable, fair and equitable and supported by adequate consideration; and that the relief requested in the Motion is in the best interests of the LBHI Debtors' estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefore, it is hereby

FOUND AND DETERMINED that:

1.    This Court has jurisdiction to hear Motion and adjudicate the Motion.

2.    Certificateholders, noteholders, and any other parties claiming rights in any Accepting Trust, and all parties entitled to receive notice of the Motion, have been provided with notice that was reasonable, adequate, and was the best notice practicable, was reasonably calculated to put interested parties on notice of the Motion, and constitutes due and sufficient notice of the Motion in satisfaction of federal and state due process requirements and other applicable law.  All such persons have been given the opportunity to be heard in opposition to the Motion.

3.    Any objections that were raised or that could have been raised in opposition to the Motion, that have not been withdrawn or resolved, are overruled and/or waived.

4.    Each of the Accepting Trustees acted within the bounds of its discretion, reasonably, and in good faith with respect to its evaluation and acceptance of the RMBS Settlement Agreement concerning the applicable Accepting Trust(s).

2

5.     Each of the Plan Administrator and the other LBHI Debtors has acted in good faith and exercised sound business judgment in connection with its determination to enter into and execute the Settlement Agreement.  Approval of the Settlement Agreement is in the best interests of the LBHI Debtors, their respective estates and creditors.

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

A.     The Motion is granted.

B.     Pursuant to Bankruptcy Rule 9019, the RMBS Settlement Agreement (including all annexed Exhibits thereto) is approved.

C.     To the extent not already authorized, the Plan Administrator and the other LBHI Debtors, acting through the Plan Administrator, are authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary or appropriate to consummate the RMBS Settlement Agreement and perform any and all obligations contemplated therein.

D.     The Estimation Proceeding shall be conducted in accordance with the procedures set forth in Exhibit G of the RMBS Settlement Agreement.

E.     Pursuant to section 105(a) of the Bankruptcy Code, the Accepting Trustees are authorized and directed to take such actions as they reasonably deem necessary or appropriate to consummate the RMBS Settlement Agreement and to perform any and all obligations contemplated therein.

3

F.    This Order and the RMBS Settlement Agreement is binding and effective on the LBHI Debtors, the Institutional Investors, and the Accepting Trustees, as well as any successor to any of the forgoing.

G.    Investors in the Accepting Trusts shall be barred from asserting claims against the Accepting Trustees with respect to their evaluation and acceptance of the RMBS Settlement Agreement and implementation of the RMBS Settlement Agreement in accordance with its terms.

H.    The allocation set forth in Section 3.04 of the RMBS Settlement Agreement shall in no way be binding on the Plan Administrator or the other LBHI Debtors or affect each such party's right to account for and allocate the Allowed Claim in accordance with its own analyses of the Claims and in the best interests of the Estate, and such right hereby is expressly preserved; provided, that, the Plan Administrator's and other LBHI Debtors' account and allocation of the Allowed Claim shall in no way affect the allowance and priority of such claim or manner in which the Allowed Claim is allocated among the Trusts as provided in Section 3.04 of the RMBS Settlement Agreement.

I.    The terms of this Order shall be effective and enforceable immediately upon its entry.

J.    This Court retains exclusive jurisdiction to hear and determine any dispute regarding the interpretation or enforcement of the RMBS Settlement Agreement until the closing of the LBHI Debtors' bankruptcy cases.  The

4

Court otherwise retains jurisdiction with respect to all matters arising from

or related to the implementation of this Order.

Dated: _____, 2017
        New York, New York

 

                                  _____
                                  THE HONORABLE SHELLEY C. CHAPMAN
                                  UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

**RMBS Settlement Agreement**

## RMBS TRUST SETTLEMENT AGREEMENT

This RMBS Trust Settlement Agreement ("Settlement Agreement") is entered into as of November 30, 2016 (the "Agreement Date"), and modified as of March 17, 2017 (the "Modification Date"), by and among Lehman Brothers Holdings Inc. (the "Plan Administrator") and the other Debtors in the Bankruptcy Proceeding (as defined below) (collectively, the "LBHI Debtors") and the authorized Investment Advisors (as defined below) and Investors (as defined below) identified in the attached signature pages (collectively, the "Institutional Investors"); and, upon acceptance as described below, the Accepting Trustees (defined and set forth herein). Each of the LBHI Debtors and the Institutional Investors may be referred to herein as an "Initial Party" and collectively as the "Initial Parties." Upon acceptance by the Accepting Trustees, each of the Accepting Trustees and the Initial Parties may be referred to herein as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, certain of the LBHI Debtors were the Seller, Sponsor, and/or Depositor for certain residential mortgage-backed securitizations (collectively, the "RMBS");

WHEREAS, certain of the LBHI Debtors are parties to certain applicable Trust Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Sale and Assignment Agreements and/or other agreements governing or related to the RMBS (the "Governing Agreements");

WHEREAS, pursuant to the Governing Agreements, certain of the LBHI Debtors have contributed or sold loans originated by various entities into the RMBS (the "Mortgage Loans");

WHEREAS, the LBHI Debtors commenced bankruptcy cases in the United States Bankruptcy Court for the Southern District of New York, styled or related to *In re Lehman Brothers Holdings Inc., et al.*, Chapter 11 Case No. 08-13555 (the "Bankruptcy Proceeding");

WHEREAS, certain trustees for the RMBS filed proofs of claim in the Bankruptcy Proceeding asserting claims arising out of, among other things, alleged breaches of representations and warranties concerning the Mortgage Loans by certain of the LBHI Debtors under the Governing Agreements;

WHEREAS, as of the Modification Date, the 244 RMBS identified on the attached Exhibit A (the "Trusts") have not been terminated and the proofs of claim filed by the trustees for such Trusts (the "Trustees") on behalf of and/or relating to such Trusts (the "Proofs of Claim") assert, among other things, claims on behalf of the Trusts;

WHEREAS, as of the Modification Date, the 16 RMBS identified on the attached Exhibit B (the "Terminated Trusts") were terminated and the proofs of claim filed by the then trustees for such Terminated Trusts on behalf of and/or related to such Trusts (the "Terminated Trusts Proofs of Claim") assert, among other things, claims on behalf of the Terminated Trusts;

WHEREAS, on December 29, 2014, the Court presiding over the Bankruptcy Proceeding entered an Order Establishing a Protocol to Resolve Claims Filed by Trustees on Behalf of Certain Issuers of Residential Mortgage-Backed Securities (Docket No. 47569) (the "Protocol Order") setting forth a protocol (the "Protocol") for the review of mortgage loan files, the assertion of RMBS Claims (as defined in the Protocol Order) by the Trustees, the response by the LBHI Debtors to such claims, and a mechanism for resolving disputes regarding such claims;

WHEREAS, the LBHI Debtors dispute the validity of the Proofs of Claims and the RMBS Claims (collectively, the "Claims"), as well as the Terminated Trusts Proofs of Claim, and subject to the terms of this Settlement Agreement, waive no rights and preserve all of their defenses with respect to the Claims and the Terminated Trusts Proofs of Claim except as expressly stated herein;

WHEREAS, the Trustees maintain the validity of the Claims and, subject to the terms of this Settlement Agreement, waive no rights with respect to the Claims except as expressly stated herein;

WHEREAS, the Institutional Investors are represented by Gibbs & Bruns, LLP ("Gibbs & Bruns") and, through counsel, engaged in extensive arm's length and good faith settlement negotiations with the LBHI Debtors regarding the Claims and the Terminated Trusts Proofs of Claim that included the use of David Geronemus of JAMS, as mediator, and the exchange of confidential materials;

WHEREAS, pursuant to this Settlement Agreement, the Parties wish to provide for an efficient, cost-effective, and equitable mechanism for fully and finally resolving the disputes between the Trustees and the LBHI Debtors regarding the Claims relating to Covered Loans (defined below) (the "Covered Loan Claims");

WHEREAS, this Settlement Agreement shall be presented to the Trustees for their consideration and approval, upon which approval the Trustees shall become Accepting Trustees (as defined herein) and Parties to this Settlement Agreement as set forth herein; and

WHEREAS, the Parties therefore enter into this Settlement Agreement to set forth their mutual understandings and agreements for terms for resolving the disputes regarding the Covered Loan Claims.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms:

## ARTICLE I.   DEFINITIONS

As used in this Settlement Agreement, in addition to the terms otherwise defined herein, the following terms shall have the meanings set forth below (the definitions to be applicable to both the singular and the plural forms of each term defined if both forms of such term are used in this Settlement Agreement).  Any capitalized terms not defined in this Settlement Agreement

shall, with respect to any particular Trust, have the definition given to them in the Governing Agreements for that Trust.

1.01. "Acceptance Date" means June 1, 2017, unless extended as provided herein.

1.02. "Accepting Trustees" means the Trustees that expressly accept the Settlement Agreement pursuant to Section 2.03.

1.03. "Accepting Trusts" means the Trusts for which an Accepting Trustee has accepted the Settlement Agreement pursuant to Section 2.03.

1.04. "Allocable Share" means, for any Participating Trust, the share of the Net Allowed Claim allocable to that Trust, as set forth in Section 3.04.

1.05. "Allocated Percentage" has the meaning set forth in Section 3.04.

1.06. "Allowed Claim" has the meaning set forth in Section 3.01.

1.07. "Bankruptcy Court" means the court presiding over the Bankruptcy Proceeding.

1.08. "Covered Loans" shall mean (a) the Mortgage Loans identified as the "Covered Loans" in The RMBS Trustees' Motion to (i) Increase the Reserve to $12.143 Billion and (ii) Estimate and Allow Their Claims for Covered Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code (ECF Doc. No. 46078), dated August 22, 2014, filed by the Trustees in the Bankruptcy Proceeding, and (b) the additional Mortgage Loans identified as "Covered Loans" in the Status Report of the RMBS Trustees with respect to Compliance with the Protocol and the Motion to Extend the Overall Claim File Cut-Off Date for Certain Loans under the Protocol Order and For Related Relief (ECF Doc. No. 52342).

1.09. "District Court" means a United States District Court for the Southern District of New York.

1.10. "Effective Date" shall mean the date of Final Court Approval.

1.11. "Estimation" shall mean the estimation of the Covered Loan Claims under the Trusts, supported by legal and loan review professionals and expert analysis and analytics, pursuant to 11 U.S.C. § 502(c).

1.12. "Estimation Proceeding" means an estimation proceeding, conducted by the Bankruptcy Court pursuant to 11 U.S.C. § 502(c), in accordance with the procedures set forth in Exhibit G hereto, at which proceeding the Bankruptcy Court will estimate and assign a value to the Covered Loan Claims, which value will constitute the full and final Allowed Claim amount as provided herein.

1.13. "Excluded Trust" has the meaning set forth in Section 3.02(a).

1.14. "Expert" means the professional firm retained or to be retained by one or more of the Accepting Trustees to make the calculations required in connection with the allocation of the Net Allowed Claim pursuant to Section 3.04.

1.15. "Final Court Approval" shall mean the later of the dates that the Trustee Findings Order and the order approving this Settlement Agreement (which may include the Trustee Findings Order) becomes a Final Order.

1.16. "Final Order" shall mean an order or judgment of a court of competent jurisdiction that has not been modified, amended, reversed, vacated, or stayed, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure (or any analogous rule applicable to such court); provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure (or any analogous rule applicable to such court) may be filed relating to such order shall not cause an order not to be a Final Order.

1.17. "Governmental Authority" shall mean any United States or foreign government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to the foregoing, or any other authority, agency, department, board, commission, or instrumentality of the United States, any State of the United States or any political subdivision thereof or any foreign jurisdiction, and any court, tribunal, or arbitrator(s) of competent jurisdiction, and any United States or foreign governmental or non-governmental self-regulatory organization, agency, or authority (including the New York Stock Exchange, Nasdaq, and the Financial Industry Regulatory Authority).

1.18. "Institutional Investors" shall mean the authorized Investment Advisors and Investors identified in the attached signature pages.

1.19. "Investment Advisor" shall mean the following Institutional Investors: BlackRock Financial Management Inc.; Goldman Sachs Asset Management, L.P.; Invesco Advisers, Inc.; Kore Advisors, L.P.; Pacific Investment Management Company LLC; Sealink Designated Activity Company, through its investment manager Neuberger Berman Europe Limited; The TCW Group, Inc. on behalf of itself and its subsidiaries; and Western Asset Management Company, and, for the avoidance of doubt, shall not include (i) any of the individual clients or funds whose assets are managed by such Investment Advisor or (ii) any affiliates of such Investment Advisor.

1.20. "Investors" shall mean all certificateholders, bondholders and noteholders in the Trusts, and their successors in interest, assigns, pledgees, and/or transferees, and beneficial

holders of certificates, bonds or notes in the Trusts claiming rights through certificateholders, bondholders and noteholders in the Trusts, including but not limited to the Institutional Investors.

1.21.    "Liquidated Loans" means Covered Loans that, per information reported by the servicer or master servicer as of January 31, 2017 are not Non-Liquidated Loans, and for which an RMBS Claim was submitted under the Protocol and, as of January 31, 2017, had not been withdrawn.

1.22.    "Net Allowed Claim" has the meaning set forth in Section 3.01.

1.23.    "Non-Liquidated Loans" means Covered Loans that, per information reported by the servicer or master servicer as of January 31, 2017, were performing to some extent under the applicable mortgage loan documents, loans that were in default but had yet to have been foreclosed upon, or loans that had been foreclosed upon but the real property that secures the repayment of the mortgage loan had not been sold and for which the final loss suffered by the trust has not been reported by the applicable servicer or master servicer, and for which an RMBS Claim was submitted under the Protocol and, as of January 31, 2017, had not been withdrawn.

1.24.    "Participating Trust" has the meaning set forth in Section 3.02(a).

1.25.    "Party in Interest" shall have the same meaning as the term "party in interest" is used in 11 U.S.C. 1109(b), and shall include any Investor.

1.26.    "Person" shall mean any individual, corporation, company, partnership, limited liability company, joint venture, association, trust, or other entity, including a Governmental Authority.

1.27.    "Plan" shall mean the LBHI Debtors' third amended joint chapter 11 plan confirmed by the Bankruptcy Court on December 6, 2011 (Docket No. 23023).

1.28.    "Plan Payments" shall mean distributions under the Plan on account of the Net Allowed Claim.

1.29.    "Released Parties" shall mean: (i) any and all LBHI Debtors, including, without limitation, Lehman Brothers Holdings Inc., Structured Asset Securities Corporation, BNC Mortgage LLC, Finance America LLC, and LBHI Debtors' affiliates and subsidiaries identified on Exhibit C hereto, and their respective present and former directors, officers, employees, auditors, advisors (including financial advisors), legal counsel, representatives, and agents; and (ii) Aurora Commercial Corp., f/k/a Aurora Bank, FSB, f/k/a Lehman Brothers Bank, FSB, and Aurora Loan Services, LLC (collectively, "Aurora"), and their respective present and former directors, officers, employees, auditors, advisors (including financial advisors), legal counsel, representatives, and agents.

1.30.    "Required Tax Conclusions" shall mean, except as otherwise described in Subsection 1.30(v) below, all of the following U.S. federal income tax conclusions (or their substantive equivalents) for each Accepting Trust, or portion thereof, for which a timely, valid and continuing REMIC election (as defined in the Internal Revenue Code of 1986, as amended

(the "Internal Revenue Code") has been made, and remains in effect, in accordance with the applicable Governing Agreements (each, a "REMIC Trust"):

(i) none of (a) the execution of this Settlement Agreement, (b) the methodology for determining, and the right to receive, an Allocable Share of the Net Allowed Claim, or (c) the receipt of Plan Payments, will cause such REMIC Trust to fail to meet the requirements of Internal Revenue Code Section 860D(a)(4);

(ii) the receipt of Plan Payments by such REMIC Trust will be treated as payments received on qualified mortgages within the meaning of U.S. Treasury Regulation Section 1.860G-2(g)(1)(ii);

(iii) the distribution of Plan Payments in accordance with the applicable Governing Agreements and the Settlement Agreement will not cause any regular interest in such REMIC Trust to fail to qualify as a "regular interest", as defined in Internal Revenue Code Section 860G(a)(1) and will not cause the sole class of residual interest in such REMIC Trust to fail to qualify as a "residual interest", as defined in Code section 860G(a)(2);

(iv) the receipt of Plan Payments by such REMIC Trust will not be treated as a "prohibited transaction" within the meaning of Internal Revenue Code Section 860F(a)(2) or as a contribution that is subject to the tax imposed under Internal Revenue Code Section 860G(d)(1); and

(v) in the case of a REMIC Opinion only, none of (a) the right to receive an Allocable Share of the Net Allowed Claim, (b) the receipt of Plan Payments or (c) the distribution of Plan Payments in accordance with the applicable Governing Agreements and the Settlement Agreement, will cause such REMIC Trust to fail to qualify as a REMIC as defined in Internal Revenue Code Section 860D.

1.31.  "REMIC Opinion" shall mean the opinion of tax counsel, reasonably acceptable to the LBHI Debtors and the Accepting Trustees, experienced in the U.S. federal income taxation of "real estate mortgage investment conduits," that concludes at a "will" level of certainty, subject to customary assumptions and exceptions and based on all of the relevant facts and circumstances, that a court of competent jurisdiction would agree and render a judgment on each of the Required Tax Conclusions.  For purposes of this Settlement Agreement, each of the following law firms shall be considered acceptable to the LBHI Debtors and the Accepting Trustees for purposes of rendering a REMIC Opinion: K&L Gates LLP; Cadwalader, Wickersham & Taft LLP; and Mayer Brown LLP.

1.32.  "RMBS Reserve" means the reserve maintained by the LBHI Debtors pursuant to that certain order of the Bankruptcy Court dated February 22, 2012 (Docket No. 25643).

1.33.  "Settlement" means the negotiated settlement set forth in this Settlement Agreement, including all terms and conditions thereof.

1.34.  "Transferor Loans" means the Mortgage Loans sold into, deposited into or otherwise conveyed into the Trusts that are not Covered Loans.

1.35.    "Transferor Trusts" means all Trusts that contain solely Transferor Loans.

1.36.    "Trustee Findings" shall mean the findings of fact and conclusions of law set forth on Exhibit F annexed hereto

1.37.    "Trustee Findings Order" shall mean an order when entered by the District Court after considering certain proposed findings of fact and conclusions of law submitted by the Bankruptcy Court, or by a court of competent jurisdiction if the District Court declines to enter such order on the basis of the District Court's jurisdiction, containing, among other things, the Trustee Findings.

1.38.    "Trustees" shall mean U.S. Bank National Association, Law Debenture Trust Company of New York, Wilmington Trust Company, Wilmington Trust National Association, Deutsche Bank National Trust Company, in each case acting in their respective capacities as trustees, co-trustees, separate trustees and/or successor trustees of the applicable Trust(s).

ARTICLE II.  SETTLEMENT PROCESS

2.01.    Effective Date for the LBHI Debtors and Institutional Investors.  This Settlement Agreement shall be binding and effective upon the LBHI Debtors (subject to Bankruptcy Court approval) and the Institutional Investors as of the Agreement Date and shall continue to be binding and irrevocable until: (i) such time as the LBHI Debtors or the Accepting Trustees shall exercise any right they may have to terminate the Settlement Agreement under Section 2.03(c) below; or (ii) the date Final Court Approval becomes legally impossible.  Promptly following the Modification Date, the LBHI Debtors shall request that the Bankruptcy Court schedule and hold a chambers conference at a time and date mutually agreeable to the Initial Parties and the Trustees so that the LBHI Debtors and the Institutional Investors may inform the Court of the existence and terms of this Settlement Agreement.  The LBHI Debtors and the Institutional Investors agree that, subject to acceptable confidentiality arrangements, counsel for the Trustees shall be informed of and entitled to attend such conference.  At that chambers conference, the Plan Administrator and the Trustees shall inform the Bankruptcy Court that they believe it is appropriate to suspend the Protocol until the earlier of the conclusion of the Estimation Hearing or the termination of this Settlement Agreement.

2.02.    Presentation of Settlement to Trustees/Intervention.

(a)    Request Letter.  This Settlement Agreement shall be presented to the Trustees for their review, evaluation, and acceptance within one (1) business day of the Modification Date as follows:  The Institutional Investors shall submit, through their counsel, a letter (in the form annexed hereto as Exhibit D) to each of the Trustees expressing their support for the settlement and requesting and urging that each enter into the Settlement Agreement.

(b)    Intervention in Court Approval Process.  Following the filing of the 9019 Motion (as defined in Section 2.03(a) below), the Institutional Investors shall jointly file a motion for leave to intervene (or a similar pleading) in the Bankruptcy Court (and, at the appropriate time, the District Court (or such other court of competent jurisdiction)  in connection with such court's consideration of the entry of the Trustee Findings Order), to

evidence their support for the Settlement, the Settlement Agreement, the Trustee Findings Order, the entry of an order by the court barring Investors in the Participating Trusts from asserting claims against the Trustees for the Participating Trusts with respect to their evaluation and acceptance of the Settlement Agreement and implementation of the Settlement Agreement in accordance with its terms, and Final Court Approval.  Each of the Institutional Investors shall use its reasonable best efforts to prosecute the intervention, to support the Settlement, and to obtain Final Court Approval of the Settlement Agreement and entry of the Trustee Findings Order.  The Institutional Investors' obligation to use reasonable best efforts shall continue until the earliest of (i) Final Court Approval, (ii) the date Final Court Approval becomes legally impossible, (iii) the date on which the LBHI Debtors or the Accepting Trustees terminate the Settlement Agreement pursuant to Section 2.03(c), below, or (iv) any material breach by the LBHI Debtors of the Settlement Agreement (which breach is not cured or waived within 90 days of written notice of such breach having been provided by a Party).

    2.03.   Acceptance by Trustees/Final Court Approval.

    (a)   Acceptance of Settlement Agreement/Notice.  On or prior to the Acceptance Date, each Trustee shall provide written notice to the Institutional Investors and the LBHI Debtors accepting or rejecting the Settlement separately on behalf of each Trust and an executed signature page for this Settlement Agreement to the Institutional Investors and the LBHI Debtors, all in accordance with the notice provisions set forth in Section 6.17 hereof, subject to Sections 2.03(c) and 2.06 below; provided, however, if any Trust listed on Exhibit A is terminated after the Modification Date but before the date the LBHI Debtors commence Plan Payments on the Net Allowed Claim, the Trustee that was the trustee for such Trust shall provide written notice to the Institutional Investors and the LBHI Debtors of such fact and such trust shall also be considered a Terminated Trust.

    Within 21 days after the Modification Date, the LBHI Debtors shall file a motion (the "Scheduling Motion") requesting that the Bankruptcy Court enter an order (1) approving a notice program with respect to its consideration of the 9019 Motion (as defined below), (2) setting a date by which all objections to the 9019 Motion must be filed and served (which deadline shall be at least twenty-one  (21) days after the Acceptance Date, the "9019 Objection Deadline"), and (3) setting the date of the hearing to consider approval of the 9019 Motion.

    Within 21 days of the Bankruptcy Court order granting the Scheduling Motion, the LBHI Debtors shall file a motion with the Bankruptcy Court (which may include the Scheduling Motion, the "9019 Motion") requesting that the Bankruptcy Court enter an order (i) approving this Settlement Agreement and containing the Trustee Findings (which shall be submitted by the Bankruptcy Court to the District Court) and the Debtors' Findings (defined below), (ii) setting the date on which the Estimation Proceeding will begin, which date shall be no earlier than October 16, 2017; and (iii) providing that the Estimation Proceeding shall be conducted in accordance with the procedures set forth in Exhibit G hereto.

Notice of the Settlement Agreement and the 9019 Motion shall be provided by the Accepting Trustees to all Investors and all financial guaranty institutions known to the Accepting Trustees to have an interest in the Trusts in the manner approved by the Bankruptcy Court.

Notice of the Settlement Agreement and the 9019 Motion shall be provided by the LBHI Debtors to those parties required to receive notice in the Bankruptcy Proceeding, and all known servicers and master servicers of loans in the Trusts, all known mortgage originators (including all known brokers, bulk sellers, and correspondents against whom the LBHI Debtors may have indemnity claims arising from the Settlement Agreement), and any other person who the LBHI Debtors shall conclude may have a claim or interest in the Trusts or the Settlement Agreement in the manner approved by the Bankruptcy Court.

Upon the Acceptance Date, this Settlement Agreement shall continue in effect for such Accepting Trustee(s) and the associated Trusts unless and until:  (i) the Bankruptcy Court has issued an order that has become a Final Order denying approval of the Settlement Agreement or declines to submit the Trustee Findings to the District Court; (ii) the District Court or, if the District Court declines to exercise jurisdiction, a different court of competent jurisdiction, has issued an order that has become a Final Order denying approval of the Settlement Agreement or entry of the Trustee Findings Order; (iii) the date on which obtaining Final Court Approval becomes legally impossible; or (iv) the Settlement Agreement is terminated in accordance with Section 2.03(c) below.

(b)    Best Efforts.  During the period during which Final Court Approval is being sought, the Accepting Trustees, the LBHI Debtors, and the Institutional Investors shall each be obligated to use their reasonable best efforts to obtain Final Court Approval of the Settlement and the entry of the Trustee Findings Order so long as there has been no material breach of this Settlement Agreement.  The Parties' obligation to use reasonable best efforts to obtain Final Court Approval shall continue in effect regardless of any intervening court decisions or regulatory actions issued after the Acceptance Date, or if any Party discovers facts that are additional to, inconsistent with, or different from those which they knew at the time they entered into this Settlement Agreement, until such time as Final Court Approval becomes legally impossible.

(c)    The LBHI Debtors' and the Accepting Trustees' Right to Terminate.  The LBHI Debtors and the Institutional Investors have entered into a confidential letter agreement that provides the LBHI Debtors the right to terminate this Settlement Agreement in the manner provided in clauses (i) and (ii) in the immediately following sentence (the "Confidential Letter Agreement") (the Trustees shall be entitled to know such confidential agreed-upon percentages provided they agree to hold such agreed-upon percentages in confidence, and the LBHI Debtors shall be entitled to disclose such percentages to the Bankruptcy Court and the District Court).

The LBHI Debtors shall have the right to terminate this Settlement Agreement in the event that (i) Trustees for a percentage (as agreed upon in the Confidential Letter Agreement) of Trusts that are not Transferor Trusts measured by the number of such

Trusts and the amount of losses on the Mortgage Loans in such Trusts, as of the Modification Date, have not accepted this Settlement Agreement by the Acceptance Date, (ii) an agreed-upon percentage (as agreed upon in the Confidential Letter Agreement) of Trusts that are not Transferor Trusts measured by the number of such Trusts and the amount of losses on the Mortgage Loans in such Trusts, are not included within Final Court Approval of the Settlement Agreement, (iii) (x) the REMIC Approval is not obtained by the date that is one year after the Trustee Findings Order becomes a Final Order or (y) the LBHI Debtors form the good faith belief that no REMIC Approval will take place, or (iv) the Bankruptcy Court does not include within the order approving this Settlement Agreement the findings of fact and conclusions of law set forth on Exhibit I hereto (the "Debtors' Findings").

An Accepting Trustee shall have the right to terminate this Settlement Agreement as to one or more of its Accepting Trusts (i) in the event that an Accepting Trust or Accepting Trusts are not included within Final Court Approval, but only for the Accepting Trust or Accepting Trusts that are not included within Final Court Approval, (ii) in the event the applicable Accepting Trustee has been directed, prior to the 9019 Objection Deadline, to terminate this Settlement Agreement as to such Accepting Trust or Accepting Trusts in a manner acceptable to the Accepting Trustee, but only for the Accepting Trust or Accepting Trusts for which such a direction has been provided, or (iii) the Bankruptcy Court does not include within the order approving this Settlement Agreement the proposed Trustee Findings for submission by the Bankruptcy Court to the District Court.

The LBHI Debtors shall have the right to terminate this Settlement Agreement, and an Accepting Trustee shall have the right to terminate this Settlement Agreement as to one or more of its Accepting Trusts, in the event that: (i) the Bankruptcy Court has not entered an order approving this Settlement Agreement (inclusive of the Debtors' Findings and the proposed Trustee Findings) by July 31, 2017; or (ii) the Bankruptcy Court does not agree that the Estimation Hearing will be conducted in accordance with the terms set forth in Exhibit G (including the admission of the Institutional Investor Statement annexed hereto as Exhibit E).

The LBHI Debtors and the Accepting Trustees shall provide written notice to each other and the Institutional Investors of the exercise of their right to terminate this Settlement Agreement in accordance with the terms of this paragraph. The LBHI Debtors' and the Accepting Trustees' right to terminate this Settlement Agreement upon the occurrence of any of the events described in this paragraph shall be waived if not exercised, by providing notice as set forth in the preceding sentence, within 20 days following the occurrence of the applicable event.

2.04.    Trustee Review.  The Trustees shall have until the Acceptance Date to conduct an investigation of the Settlement Agreement and its terms.  The Trustees may conduct such diligence, may solicit input from Investors, and may retain experts to assist them as they deem necessary to inform themselves concerning the Settlement Agreement.

2.05.    Effect of Termination.  In the event that this Settlement Agreement is terminated

as provided for herein, the Settlement Agreement shall be null and void as to those Trusts for which it is terminated, and all pending claims filed by or on behalf of such Trusts shall be resolved pursuant to the Protocol Order, as amended by the Bankruptcy Court as appropriate in light of the suspension of the Protocol referred to in Section 2.03(a) herein and approved by the Bankruptcy Court, or in such other manner as the Bankruptcy Court shall direct.

2.06.   <u>REMIC Approval/Trustee Findings/Other Trustee Conditions</u>.  The Trustees may condition their acceptance of this Settlement Agreement upon:

(i) the District Court's approval of the Trustee Findings;

(ii) the Trustee Findings Order becoming a Final Order;

(iii) the receipt by the Accepting Trustees of the earlier of either:

(a) (a) A REMIC Opinion, in form and substance reasonably acceptable to the Accepting Trustees and LBHI Debtors, from legal counsel reasonably acceptable to the Accepting Trustees and the LBHI Debtors but retained by and at the expense of the LBHI Debtors, with respect to the REMIC Trusts that comprise the Accepting Trusts on behalf of which the Accepting Trustees (each acting as trustee, indenture trustee or separate trustee, as applicable) accepted the Settlement Agreement. The LBHI Debtors shall use their reasonable best efforts to obtain the REMIC Opinion for all REMIC Trusts that are, or are within, or that comprise, an Accepting Trust within 180 days of the Acceptance Date.

(b) A private letter ruling(s), or similar guidance, acceptable to the Parties, applicable to the REMIC Trusts that are, or are within, or that comprise, an Accepting Trust from the Internal Revenue Service containing the Required Tax Conclusions (the "REMIC Private Letter Ruling"). Only if, and after, (i) the LBHI Debtors notify the Accepting Trustees that it would not be possible or practicable for them to obtain an opinion of counsel as described in Section 2.06(iii)(a) or (ii) the Accepting Trustees determine that a REMIC Opinion delivered to them is not acceptable in form, content, or counsel providing the REMIC Opinion, the Accepting Trustees shall begin the process to cause requests for such letter ruling(s) to be submitted, if necessary, to the Internal Revenue Service as promptly as practicable, shall use reasonable best efforts to pursue such requests, and such requests may not be abandoned, unless an acceptable REMIC Opinion has been obtained, without the consent (which shall not unreasonably be withheld) of the LBHI Debtors and the Institutional Investors. In the event that the provisions of Section 3.06 of this Settlement Agreement are modified, the Accepting Trustees shall, if necessary, update their request(s) to the Internal Revenue Service to take account of such modifications. The LBHI Debtors shall use their reasonable best efforts to

assist the Accepting Trustees' preparation and pursuit of the request for the rulings.

Receipt of the first to occur of either an acceptable REMIC Opinion or the REMIC Private Letter Ruling shall constitute the "REMIC Approval" as that term is used herein. The Parties acknowledge and agree that pursuit of the REMIC Approval shall not delay the commencement and conduct of the Estimation Proceeding, and such proceeding may take place and be completed while the applicable Parties pursue a REMIC Approval.

2.07 <u>Bar Order</u>. In connection with the entry of the Trustee Findings Order, the LBHI Debtors, the Accepting Trustees, and the Institutional Investors shall request the entry of an order barring Investors in the Accepting Trusts from asserting claims against the Accepting Trustees with respect to their evaluation and acceptance of the Settlement Agreement and implementation of the Settlement Agreement in accordance with its terms, provided however that the entry of such a bar order is not a condition of Final Court Approval.

2.08. <u>LBHI Representations</u>. The LBHI Debtors represent to the Trustees that each of the entities identified on <u>Exhibit C</u> hereto is an affiliate or subsidiary of one or more of the LBHI Debtors.


# ARTICLE III. <u>SETTLEMENT TERMS</u>

3.01. <u>Settlement Consideration and Payment</u>.

The Settlement consideration shall consist of an allowed Class 7 General Unsecured claim in the Bankruptcy Proceeding against Lehman Brothers Holdings Inc. in an amount to be determined by the Bankruptcy Court in the Estimation Proceeding (the "<u>Allowed Claim</u>"), *plus* interest thereon to the extent provided by Section 8.4 of the Plan, *less* the Legal Fees (as defined and determined in accordance with the attorneys' fee provision in Section 6.05) (the "<u>Net Allowed Claim</u>"). In accordance with the allocation methodology in Section 3.04, each Participating Trust shall be awarded its Allocable Share of the Net Allowed Claim. Distributions on account of the Allocable Shares of the Net Allowed Claim shall be made by the LBHI Debtors in accordance with, and on the periodic distribution dates contained in, the Plan (the "<u>Plan Payments</u>"), following the Final Expert Calculation, as defined in Section 3.04 below, and receipt of the REMIC Approval.

Unless otherwise directed in writing by the applicable Accepting Trustee prior to the making of Distributions on account of the Allocable Shares of the Net Allowed Claim, the LBHI Debtors shall make all such Distributions to the applicable Accepting Trustee for the Participating Trusts.

The LBHI Debtors shall have no responsibility for the maintenance or distribution of amounts paid to the Accepting Trustees on account of the Net Allowed Claim.

To the extent that any Accepting Trustee is the party responsible for distributing

payments for a given Trust under the applicable Governing Agreement(s), that Accepting Trustee shall use its reasonable best efforts to distribute the amounts received from the LBHI Debtors on account of the Allocable Shares of the Net Allowed Claim promptly.

Notwithstanding the foregoing, to the extent that any Accepting Trustee or other party responsible for calculating or distributing Plan Payments for a given Trust forms a good-faith belief that guidance from a court is necessary or appropriate for resolving ambiguities or disputes concerning the distribution of Plan Payments, the Accepting Trustee or other party responsible for calculating or distributing such Plan Payments shall have the right to seek guidance from a court of competent jurisdiction before distributing those amounts.  Any decision to seek such guidance shall have no effect on, and shall not change, the timing of Plan Payments under this Settlement Agreement or under the Plan.

3.02    The Estimation Proceeding.

(a)    The LBHI Debtors shall include in the 9019 Motion a request seeking Estimation of the Covered Loan Claims arising under or related to the Accepting Trusts pursuant to 11 U.S.C. § 502(c) (the "Estimation Motion").  In the Estimation Proceeding, the LBHI Debtors shall seek Estimation of the Covered Loan Claims arising under or related to the Accepting Trusts, for purposes of setting the amount of the Allowed Claim under Section 3.01 herein, at a total amount of $2,416,000,000.00 (TWO BILLION, FOUR HUNDRED SIXTEEN MILLION AND 00/100 DOLLARS), without prejudice to the rights of the LBHI Debtors to argue in furtherance of such estimation that an amount different from $2.416 billion is correct, reasonable, or legally and factually supportable (provided, however, that (x) if all Trusts are not Accepting Trusts, (y) if any Accepting Trust is not included within Final Court Approval, or (z) if any Accepting Trust is not included within the Estimation and Estimation Proceeding (whether because it has become a Terminated Trust or for any other reason) (the Trusts listed in clauses (x), (y) and (z), the "Excluded Trusts"), the Parties agree that the $2.416 billion will be reduced by an amount equal to $2.416 billion multiplied by the sum of the Initial Allocated Percentages (as defined in Section 3.04 below) of the Excluded Trusts).  A "Participating Trust" is any Accepting Trust that is not an Excluded Trust.).

(b)    The Accepting Trustees shall agree and consent to the Estimation Motion solely to the extent of agreeing to estimation of the Covered Loan Claims of the Participating Trusts pursuant to 11 U.S.C. § 502(c) pursuant to this Settlement Agreement.  The Accepting Trustees shall be entitled to seek estimation of the Covered Loan Claims of the Participating Trusts in the Estimation Proceeding at whatever sum they choose.

(c)    The LBHI Debtors and the Accepting Trustees agree that, except as provided below in Section 3.02(c)(ii), the Bankruptcy Court shall not be required to make findings of fact or conclusions of law when determining the Allowed Claim, and the Net Allowed Claim amount decided by the Bankruptcy Court as a result of the Estimation Proceeding, shall be final, binding, not subject to appeal or reconsideration, and shall be conclusive of the LBHI Debtors' liability to the Participating Trusts or in any way related to the  Covered Loan Claims of the Participating Trusts; provided however, that:

(i) to the extent that the Bankruptcy Court decides that the Allowed Claim should be set between $2,000,000,000 (TWO BILLION AND 00/100 DOLLARS) and $2,416,000,000 (TWO BILLION, FOUR HUNDRED SIXTEEN MILLION AND 00/100 DOLLARS), the Allowed Claim shall be set, and deemed to be set, for all purposes with respect to the Covered Loan Claims of the Participating Trusts as $2,416,000,000 (TWO BILLION, FOUR HUNDRED SIXTEEN MILLION AND 00/100 DOLLARS) (provided, however, if there are any Excluded Trusts, the Parties agree that the $2 billion and the $2.416 billion will be reduced by an amount equal to the $2 billion and the $2.416 billion multiplied by the sum of the Initial Allocated Percentages of the Excluded Trusts); and

(ii) to the extent that the Bankruptcy Court decides that the Allowed Claim should be set at an amount less than $2,000,000,000 (TWO BILLION AND 00/100 DOLLARS) (reduced by an amount equal to the $2 billion multiplied by the sum of the Initial Allocated Percentages of any Excluded Trusts), the Bankruptcy Court shall make findings of fact and conclusions of law when determining the Allowed Claim, and the Accepting Trustees retain, and do not waive, any right to appeal the Bankruptcy Court's decision in which it sets the amount of the Allowed Claim) (provided, however, if any Accepting Trusts become Excluded Trusts after the Court sets the Allowed Claim, the Parties agree that the amount determined in a Final Order by the Bankruptcy Court or, if applicable, an appellate Court, will be reduced by an amount equal to such amount multiplied by the sum of the Initial Allocated Percentages of those Excluded Trusts)..

For the avoidance of doubt, under no circumstances may the LBHI Debtors appeal the Bankruptcy Court's decision in which it sets the amount of the Allowed Claim.

3.03.    Release of Claims.  For and in consideration of the allowance of the Allowed Claim and the other agreements and consideration provided herein, the Participating Trusts, the Accepting Trustees for the Participating Trusts, and any and all persons claiming by, through, or on behalf of such Participating Trusts (including any Investors claiming derivatively for any such trust) and any and all agents or appointees acting on behalf of the Accepting Trustees (collectively, the "Releasors"), irrevocably and unconditionally grant a full, final, and complete release, waiver, and discharge of the Released Parties, as of the Effective Date, for any and all claims (as defined in section 101 of the Bankruptcy Code) that were asserted, or that could have been asserted, in the Covered Loan Claims filed or asserted in the Bankruptcy Proceeding or in the Protocol by the Accepting Trustees on behalf of the Participating Trusts (collectively, all such claims being defined as the "Trust Released Claims"); provided, however, that the Participating Trusts' Allocable Shares and any claims of any Trust arising out of or relating to Transferor Loans are not released, waived or discharged by operation of this Settlement Agreement and are not a Trust Released Claim.  Upon Final Court Approval:  (a) each of the Claims filed or asserted by the Accepting Trustees on behalf of or related to the Participating Trusts shall be allowed as provided herein for Covered Loan Claims and otherwise shall be disallowed and expunged only with respect to Covered Loan Claims; (b) the LBHI Debtors shall no longer be required to maintain any amounts in the RMBS Reserve on account of the Trust Released Claims; and (c) the Allocable Shares shall be conclusive of the Debtors' liability relating to the Covered Loan Claims of the Participating Trusts.  Except as provided herein, no

**EXECUTION VERSION**

distributions from the LBHI Debtors shall be required on account of the Trust Released Claims. For the avoidance of doubt, nothing in this Section 3.03 is intended to address claims related to Trusts that are not Participating Trusts or claims arising out of or related to Transferor Loans.

3.04 <u>Allocation Formula</u>.  The Net Allowed Claim shall be allocated amongst the relevant trusts by the Accepting Trustees by calculating for each such trust its "Allocable Share" of the Net Allowed Claim as described below, pursuant to the binding determination of the Expert who will perform any calculations required.  To the extent that the collateral in any Accepting Trust is divided by the Governing Agreements into groups of loans ("<u>Loan Groups</u>") so that ordinarily only certain classes of investors benefit from the proceeds of particular Loan Groups, those Loan Groups shall be deemed to be separate Accepting Trusts solely for purposes of the allocation methodologies set forth below.  The Accepting Trustees may fully and conclusively rely on the Expert's determinations and calculations without any obligation to independently re-verify the same.

The allocated percentage for any given Trust (the "<u>Allocated Percentage</u>") shall be (a) the dollar amount of the claims asserted pursuant to the Protocol by the relevant trust as determined by the Expert, *divided by* (b) the dollar amount of claims asserted pursuant to the Protocol by the relevant trusts as determined by the Expert, expressed as a percentage.  Attached hereto as <u>Exhibit H</u> is a list of the Allocated Percentages for each Trust (assuming that each Trust becomes a Participating Trust) (for purposes of this Agreement such allocated percentages shall be deemed the "<u>Initial Allocated Percentages</u>").

For purposes of determining the dollar amounts used in <u>Exhibit H</u>, the Expert has used the following methodology. For all Liquidated Loans, the Expert used total dollar amount of the loss on each such loan that was the subject of an RMBS Claim that was reported to the Trustee by the applicable servicer or master servicer as of January 31, 2017.  For all Non-Liquidated Loans the Expert has used the Purchase Price, including the impact of any balance modifications, of each such loan as of January 31, 2017 *less* the market value of such loan as of January 31, 2017 using the Andrew Davidson & Co.'s LoanKinetics model.

In the event that all Trusts become Accepting Trusts and no Trusts become Excluded Trusts, the Allocated Percentage for each Trust will be the same as set forth on <u>Exhibit H</u>. However, in the event that any Trust does not become an Accepting Trust or any Trust becomes an Excluded Trust, the Allocated Percentage will be recalculated in accordance with the methodology described above with only the following changes: the dollar amount of claims asserted under the Protocol of any Trust that is not a Participating Trust will be set at zero.

For any Participating Trust, the Allocable Share will be equal to the Net Allowed Claim multiplied by Allocated Percentage. The Expert shall calculate the Allocable Share for each Participating Trust within thirty (30) days of the date the Net Allowed Claim has been determined by the Bankruptcy Court (the "<u>Final Expert Calculation</u>" and the "<u>Final Allocated Percentages</u>"). In performing the Final Expert Calculation, the Expert shall be permitted to make such adjustments as are necessary to ensure that the effects of rounding do not cause the sum of the Allocable Shares to exceed the amount of the Net Allowed Claim.

EXECUTION VERSION

3.05.  Plan Administrator's Allocation.

The Parties agree (a) that the allocation set forth in Section 3.04 above shall in no way be binding on the LBHI Debtors or affect the LBHI Debtors' right to account for and allocate the Allowed Claim in accordance with their own analyses of the Claims and in the best interests of the Estate, and (b) the Bankruptcy Court order approving this Settlement Agreement shall expressly preserve such right; provided, that, the LBHI Debtors' account and allocation of the Allowed Claim shall in no way affect the allowance and priority of such claims or manner in which the Allowed Claim is allocated among the Trusts as provided in Section 3.04 above.

3.06  Subsequent Recovery/Repayment of Principal.

(a)    Plan Payments on each Participating Trust's Allocable Share shall be deposited into the related Trust's collection or distribution account pursuant to the terms of the Governing Agreements, for further distribution in accordance with the distribution provisions of the Governing Agreements  as though such Plan Payments  are a subsequent recovery available for distribution on the related distribution date; and further provided that if the Governing Agreement for such a Trust does not include the concept of "subsequent recovery," Plan Payments to such Trust shall be distributed as though they are unscheduled principal available for distribution on the related distribution date), subject to Section 3.04. If distribution of Plan Payments to a trust would become payable to a class of REMIC residual interests, whether on the initial distribution of such Plan Payments or on any subsequent distribution date that is not the final distribution date under the Governing Agreement for such Trust, such Plan Payment shall be maintained in the distribution account, and the party responsible for distributing payments under the Governing Agreements of a given trust shall distribute it on the next distribution date according to the provisions of this Subsection 3.06(a).

(b)    In connection with the distribution of Plan Payments to Participating Trusts pursuant to Subsection 3.06(a), to the extent permitted under each Trust's Governing Agreement, the applicable Accepting Trustee, or the party responsible for calculating certificate balances pursuant to the terms of the Governing Agreements of a given Participating Trust, will apply the amount of the Plan Payment for that Trust to increase the balance of securities within that Trust (other than any class of REMIC residual interests) *in the reverse order of* previously allocated losses, as though such Plan Payment was a subsequent recovery; and further provided that if the Governing Agreement for a particular Participating Trust does not include the concept of "subsequent recovery," to the extent permitted under each Trust's Governing Agreement, the securities for such Trust shall be increased, *in reverse order of* previously allocated losses, as though the Plan Payment was distributed as though it was unscheduled principal), but in each case by not more than the amount of such losses previously allocated to that class of securities pursuant to the Governing Agreements.  Investors shall not be entitled to payment in respect of interest on the amount of such increases for any interest accrual period relating to the distribution date on which such increase occurs or any prior distribution date. For the avoidance of doubt, this Subsection 3.06(b) is intended only to increase the balances of the related classes of securities, as provided for herein, and shall not affect the distribution of Plan Payments on the Net Allowed Claim

**EXECUTION VERSION**

provided for in Subsection 3.06(a).

(c)     Should the party responsible for calculating distributions and/or making distributions to Investors under the terms of the Governing Agreements of a given Trust or a court determine that the payment procedure described in Sections 3.06(a) and 3.06(b) may not conform to the terms of the Governing Agreement for a particular Accepting Trust, the distribution described above shall be modified to distribute that Trust's Plan Payments as a payment of principal under the Governing Agreement for that Trust, or in such other manner as the party responsible for calculating distributions under the terms of the Governing Agreements of a given Trust or a court should determine is in conformance with the terms of the Governing Agreement for a particular Trust.

(d) Notwithstanding anything to the contrary set forth in this Section 3.06 or any other provision of this Settlement Agreement, each Accepting Trustee and/or the party responsible for such implementation shall be entitled, prior to implementing the forgoing Subsections 3.06(a)-(c), to seek further guidance from a court of competent jurisdiction regarding the applicable procedures under the Governing Agreements related to the distribution of Plan Payments or determining the balance of securities potentially affected by distribution of the Plan Payments.  Any such Accepting Trustee's or other implementing party's decision to seek such guidance shall have no effect on, and shall not change, the timing of Plan Payments to the Accepting Trustees under this Settlement Agreement or under the Plan.

3.07.    No Alteration of Trigger Dates or Similar Credit Support Measurement Dates. Neither the Net Allowed Claim nor any allocation or application thereof pursuant to Section 3.04, nor the receipt of any Plan Payments pursuant to Section 3.06 shall be deemed to reverse the occurrence of any transaction-related trigger in any Participating Trust.

3.08.    Responsibility for Distribution of Plan Payments.  An Accepting Trustee (to the extent it is the party responsible for making distributions under the applicable Governing Agreement(s)), or the party responsible for making distributions under the applicable Governing Agreement(s) if it is not the Accepting Trustee, shall administer distribution of the Plan Payments under the terms of the Governing Agreements.  No party (including the LBHI Debtors and the Institutional Investors), other than the party responsible for calculating and causing the distributions under the applicable Governing Agreements, shall have any liability to Accepting Trustees, the Participating Trusts, any Investor in such Trusts, or any other Person in connection with the determination of the Net Allowed Claim, the Allocated Percentages, the Final Expert Determination or the administration or distribution of the Plan Payments, including under any indemnification obligation that exists under any Governing Agreement.

3.09.    Expert Calculation of Final Allocated Percentages to be Conclusive.  In the absence of bad faith or manifest error, the Expert's calculations of the Final Allocated Percentages and each Participating Trust's Allocable Share shall be binding on all Participating Trusts.

3.10.    Full Satisfaction.  The determination and allowance of the Net Allowed Claim

under the Plan pursuant to this Settlement Agreement shall be in full and final satisfaction of any and all Covered Loan Claims of the Participating Trusts (but not the Excluded Trusts or the Transferor Trusts) and, except for Plan Payments, there shall be no further recovery against the LBHI Debtors by a Participating Trust on account of any of the Trust Released Claims.

3.11.    Release of RMBS Reserve.  Notwithstanding anything to the contrary contained herein, following the Bankruptcy Court's determination of the Allowed Claim if the REMIC Approval has not occurred on or before October 31, 2018, the Accepting Trustees, solely in their capacity as trustee for Participating Trusts and not on behalf of any other Trusts, shall not oppose any request or motion by the LBHI Debtors to reduce the RMBS Reserve to the amount necessary to make distributions under the Plan on account of the Allocable Shares.

ARTICLE IV.  CLAIMS NOT RELEASED

4.01.    Financial-Guaranty Provider Rights and Obligations.  To the extent that any third party guarantor or financial-guaranty provider with respect to any Trust has rights or obligations wholly independent of the rights or obligations of the Trustee of or Investors in such Trust, the Trustees, or the Trusts, the releases and waivers in Article III are not intended to and shall not release such rights, if any, provided, however, that the LBHI Debtors reserve all rights with respect to the position they may take on whether the resolution of the Covered Loan Claims pursuant to this Settlement Agreement shall offset or otherwise bar any claims asserted by a third party guarantor or financial-guaranty provider.

4.02.    Mortgage Originator and Third Party Guarantor Claims.  The Parties do not release or waive any rights or claims against any party that is not a Released Party, including: (a) repurchase and indemnity claims any Trustee or any Released Party may have against any mortgage originator (including brokers, bulk sellers, and correspondents), and (b) claims against any third party guarantor or financial-guaranty provider with respect to the Trusts, if any.

4.03.    Settlement Agreement Rights.  The Parties do not release or waive any rights or claims against each other to enforce the terms of this Settlement Agreement.

4.04.    Disclosure Claims/Bar Date.  The releases and waivers in Article III do not include any direct individual claims for securities fraud or other alleged disclosure violations ("Disclosure Claims") that an Investor may seek to assert based upon such Investor's purchase or sale of securities; provided, however, that the question of the extent to which any payment made or benefit conferred pursuant to this Settlement Agreement may constitute an offset or credit against, or a reduction in the gross amount of, any such claim shall be determined in the action in which such claim is raised, and, notwithstanding any other provision in this Settlement Agreement, the Parties reserve all rights with respect to the position they may take on that question in those actions and acknowledge that all other Persons similarly reserve such rights. Notwithstanding the foregoing, the Investment Advisers for themselves, and not for any individual clients or funds they advise, state that they do not own any Disclosure Claims and hereby irrevocably, fully and finally release any Disclosure Claims to the extent they own such claims personally, and such Investment Advisers agree not to assist or advise any of the individual clients or funds that they advise in bringing any Disclosure Claim except to the extent legally required.  Nothing in this provision shall bar any individual client, or any fund advised

**EXECUTION VERSION**

by an Investment Adviser, from asserting its own Disclosure Claims on its own behalf.  Nothing in this Settlement Agreement is intended or shall be read to alter, modify, or amend any order of the Bankruptcy Court, any provision in the Plan, or provision of law concerning the assertion or timeliness of any Disclosure Claims or any other claims.

4.05.    Repurchase Obligations of Unaffiliated Mortgage Sellers.  Claims against parties other than the Released Parties related to the origination and/or sale of Mortgage Loans sold or securitized by the LBHI Debtors are not released.  To the extent that the LBHI Debtors, or any successors or assigns of the LBHI Debtors, elect to pursue any third-parties, unaffiliated with the LBHI Debtors, for recovery based on the Trust Released Claims related to the origination and/or sale of  Covered Loans, the Accepting Trustees agree to use commercially reasonable efforts to assist such pursuit (provided that the LBHI Debtors shall reimburse the Accepting Trustees in full, in cash, for their reasonable and necessary fees, costs and expenses in providing such assistance); *provided, however*, neither the Accepting Trustees nor their counsel, advisors or experts shall be obligated to disclose or provide to the LBHI Debtors any work product or attorney-client privileged information.

4.06.    Obligations of Master Servicers and Servicers.  This Settlement Agreement shall not release or affect any obligation of any Master Servicer or Servicer not a debtor in the Bankruptcy Proceeding, including without limitation Aurora, under any of the Governing Agreements that pertain to the servicing of Mortgage Loans held by the Trusts.

4.07.    Correction of Certain Document Defects.  The releases and waivers in this agreement do not release any party from any existing obligation under the Governing Agreements to provide and/or procure, as applicable, documents needed to cure document defects, provided however, that any claims for monetary damages against the LBHI Debtors based upon the failure to cure such defects shall be included with the Trust Released Claims, and further provided that nothing in this Section 4.07 is intended to or shall be interpreted to create new obligations on the part of any party.

4.07.    Inter-Debtor Claims.  This Settlement Agreement shall not waive, release or discharge any claims, liabilities, rights, obligations or other relationships held by one or more LBHI Debtors against one or more other LBHI Debtors.

## ARTICLE V.  RELEASE OF UNKNOWN CLAIMS

5.01.    Each of the Parties acknowledges that it has been advised by its attorneys concerning, and is familiar with, California Civil Code Section 1542 and expressly waives any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to the provisions of the California Civil Code Section 1542, including that provision itself, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH, IF KNOWN BY HIM

OR HER MUST HAVE MATERIALLY AFFECTED HIS OR
HER SETTLEMENT WITH THE DEBTOR."

5.02.    The Parties acknowledge that inclusion of the provisions of this Article V to this
Settlement Agreement was a material and separately bargained for element of this Settlement
Agreement.

## ARTICLE VI. <u>MISCELLANEOUS PROVISIONS</u>

6.01.    <u>Terminated Trusts</u>.  Effective as of the Modification Date, the Accepting Trustees
agree that they will not pursue any claims of, or on behalf of, any Terminated Trust, but make no
representations as to whether any assignees of claims relating to Terminated Trusts will pursue
or not pursue such claims.  For the avoidance of doubt, the definition of "Trust" does not include
any "Terminated Trusts."  The Accepting Trustees agree that, as of the Modification Date, they
will no longer pursue any rights with respect to any of the Terminated Trusts Proofs of Claim,
and acknowledge that they have no standing to oppose and will not oppose any objection filed by
the LBHI Debtors to the Terminated Trusts Proofs of Claim.

6.02.    <u>Holdings</u>.  Each of the Institutional Investors shall continue to hold securities
issued by at least one of the Accepting Trusts sufficient to support its individual standing to
prosecute any intervention in any proceeding seeking entry of the Trustee Findings Order (the
"<u>Required Holdings</u>").  Such maintenance of Required Holdings shall continue until the earliest
of:  (i) the date on which Final Court Approval is obtained; (ii) such time as Final Court
Approval becomes legally impossible; or (iii) any material breach of the Settlement Agreement
by the LBHI Debtors or any Accepting Trustee, which breach is not cured or waived within
ninety (90) days of written notice of such breach having been provided by a party to the
Settlement Agreement; provided, however, that continued holding is not required if prohibited by
law, regulation, contract, or fiduciary obligations.  The requirements of this Section 6.02 shall be
met if any investor, fund, or entity included within the definition of that Institutional Investor
maintains holdings in compliance with this Settlement Agreement.  For the avoidance of doubt,
other than as set forth above and/or as otherwise required by federal or state securities laws, this
Settlement Agreement shall not restrict the right of any Institutional Investor to sell or exchange
any security issued by a Trust free and clear of any encumbrance.  No Trustee shall be required
to provide any oversight with respect to the Institutional Investors' compliance with this Section
6.02.  The Parties agree that the aggregate amounts of securities collectively held by the
Institutional Investors for each Trust may be disclosed publicly, but that the individual holdings
of each Institutional Investor shall remain confidential, subject to review only by the LBHI
Debtors and the Trustees unless required by law, regulation, or process.

6.03.    <u>No Inconsistent Directions</u>.  Except for providing the Request Letter, the
Institutional Investors agree that between the date hereof and the Effective Date, with respect to
the securities issued by the Trusts, they will not, individually or collectively, direct, vote for, or
take any other action that they may have the right or the option to take under the Governing
Agreements or join with any other Investors or Trustees to cause the Trustees to enforce (or seek
derivatively to enforce) any Claims for any Trust.  Nothing in this Settlement Agreement shall
restrict the ability of, or require, any Trustee to demand that any other Investor who seeks to
direct the Trustee regarding the Settlement must post the indemnity or bond, if any, required or
permitted by the Governing Agreements for the applicable Trust.

6.04.   No Amendments to Governing Agreements.  The Parties agree that this Settlement Agreement reflects a compromise of disputed claims and is not intended to, and shall not be argued or deemed to constitute, an amendment of any term of any Governing Agreement; provided, however, that compliance with this Settlement Agreement and its Exhibits, including the provisions relating to Plan Payments, shall be deemed compliance with the applicable Governing Agreements and no Party or Investor shall make any subsequent claim to the contrary.

6.05.   Legal Fees.  As payment of the attorneys' fees for counsel to the Institutional Investors for its work relating to the Settlement, Gibbs & Bruns shall be allocated, without conveyance to the Accepting Trusts, 4.75% of the first $2,416,000,000 of the Allowed Claim (the "Legal Fees") by the Plan Administrator, without the requirement of submitting any form of estate retention or fee application, as an allowed Class 7 General Unsecured Claim in the Bankruptcy Proceeding against Lehman Brothers Holdings Inc.  Distributions under the Plan on account of the Legal Fees shall be made at such times as distributions are made on account of the Allowed Claim in accordance with, and on the periodic distribution dates contained in, the Plan.

6.06.   Voluntary Agreement.  Each Party acknowledges that it has read all of the terms of this Settlement Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right and enters into this Settlement Agreement voluntarily and without duress.  This Settlement Agreement is a settlement of disputed matters.

6.07.   No Admission of Breach or Wrongdoing.  The LBHI Debtors have denied and continue to deny any breach, fault, liability, or wrongdoing.  This denial includes, but is not limited to, allegations of breaches of representations and warranties, violations of state or federal securities laws, and other claims sounding in contract or tort in connection with any securitizations, including those for which any LBHI Debtor was the Seller, Sponsor, Servicer, or Depositor.  Neither this Settlement Agreement, whether or not consummated, any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, whether or not consummated, shall be construed as, or deemed to be evidence of, an admission or concession on the part of the LBHI Debtors with respect to any claim or of any breach, liability, fault, wrongdoing, or damage whatsoever, or with respect to any infirmity in any defense that the LBHI Debtors have or could have asserted.  No statements made by any Party to this Settlement Agreement in support of the Settlement or the Trustee Findings Order shall be admissible in any other proceeding for any purpose.

6.08.   Concerning the Trustees.  The provisions of this Settlement Agreement shall not affect the rights and obligations of the Trustees under the applicable Governing Agreements, which shall equally apply to each and every such Trustee's rights and obligations under the Settlement Agreement.  Nothing in this Settlement Agreement shall be construed to imply that any Trustee owes any greater duties under the Governing Agreements than it would otherwise owe under those agreements.

6.09.   Counterparts.  This Settlement Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Settlement Agreement.  Delivery of a signature page to this Settlement Agreement by facsimile or other electronic means shall be effective as

delivery of the original signature page to this Settlement Agreement.

6.10.   <u>Joint Drafting</u>.  Following the Modification Date, this Settlement Agreement shall be deemed to have been jointly drafted by the Parties, and in construing and interpreting this Settlement Agreement, no provision shall be construed and interpreted for or against any of the Parties because such provision or any other provision of the Settlement Agreement as a whole is purportedly prepared or requested by such Party.

6.11.   <u>Entire Agreement</u>.  This document contains the entire agreement between the Parties, and may only be modified, altered, amended, or supplemented in writing signed by the Parties, at the relevant point in time, or their duly appointed agents.  All prior agreements and understandings between the Parties concerning the subject matter hereof are superseded by the terms of this Settlement Agreement.

6.12.   <u>Specific Performance</u>.  It is understood that money damages are not a sufficient remedy for any breach of this Settlement Agreement, and the Parties shall have the right, in addition to any other rights and remedies contained herein, to seek specific performance, injunctive, or other equitable relief as a remedy for any such breach.  The Parties hereby agree that specific performance shall be their only remedy for any violation of this Agreement.

6.13.   <u>Authority</u>.  Each Party represents and warrants that each Person who executes this Settlement Agreement on its behalf is duly authorized to execute this Settlement Agreement on behalf of the respective Party, and that such Party has full knowledge of and has consented to this Settlement Agreement.

6.14.   <u>No Obligation to Amend</u>.  No Party shall be under any obligation to participate in the amendment of any term of any Governing Agreement and shall not have any liability to any other Party or Person in connection with any amendment to any term of any Governing Agreement that any Party or other Person determines is necessary to implement the terms of this Settlement Agreement.

6.15.   <u>No Third Party Beneficiaries</u>.  There are no third party beneficiaries of this Settlement Agreement.

6.16.   <u>Headings</u>.  The headings of all sections of this Settlement Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

6.17.   <u>Notices</u>.  All notices or demands given or made by one Party to another Party relating to this Settlement Agreement shall be in writing and either personally served or sent by registered or certified mail, postage paid, return receipt requested, overnight delivery service, or by electronic mail transmission, and shall be deemed to be given for purposes of this Settlement Agreement on the earlier of the date of actual receipt or three days after the deposit thereof in the mail or the electronic transmission of the message.  Unless a different or additional address for subsequent notices is specified in a notice sent or delivered in accordance with this Section, such notices or demands shall be sent as follows:

To:    Institutional Investors
       c/o Kathy Patrick
       Gibbs & Bruns LLP
       1100 Louisiana
       Suite 5300
       Houston, TX 77002
       Tel: 713-650-8805
       Email: kpatrick@gibbsbruns.com

To:    The LBHI Debtors
       c/o Paul Shalhoub
       c/o Todd Cosenza
       Willkie Farr & Gallagher LLP
       787 Seventh Avenue
       New York, NY 10019
       Tel: 212-728-8000
       Email: pshalhoub@willkie.com
              tcosenza@willkie.com

       c/o Michael Rollin
       c/o Maritza Dominguez Braswell
       Rollin Braswell Fisher LLC
       8350 E. Crescent Parkway, Suite 100
       Greenwood Village, CO 80111
       Tel: 303-945-7415
       Email: mrollin@RBF.Law
              mbraswell@RBF.Law

To:    The Accepting Trustees, at such addresses identified in writing by the
       applicable Accepting Trustee to the other Parties.

6.18.    Disputes and Bankruptcy Court Approval. This Settlement Agreement, and any disputes arising under or in connection with this Settlement Agreement, are to be governed by and construed in accordance with the laws of the State of New York, without giving effect to the choice of laws principles thereof. Except as otherwise provided in this Settlement Agreement, each of the Parties hereto consents to the exclusive jurisdiction of the Bankruptcy Court to hear and determine any dispute regarding the interpretation or enforcement of this Settlement Agreement until the closing of the LBHI Debtors' bankruptcy cases. Thereafter, each of the Parties hereto consents to the non-exclusive jurisdiction of the federal and state courts of New York with respect to such matters.

6.19.    Press Statements. In the event the Parties agree to make this Settlement Agreement public, the Parties shall agree in advance on the text of a permissible disclosure concerning this Settlement Agreement, which shall be factual and non-disparaging. The Parties agree that any subsequent press statements concerning this Settlement Agreement also shall be factual and non-disparaging. At any time on or after the Modification Date, each Trustee may provide notice of this Settlement Agreement and its terms publicly and/or to such present and

former Investors of the Trusts and other persons, including all financial guaranty institutions and securities administrators known to the Trustees to have an interest in the Trusts, as such Trustee determines, in its sole discretion, is necessary or appropriate.

6.20.    Fiduciary Obligations.  Nothing in this Settlement Agreement shall be construed to require any Party to breach any investment management agreement or fiduciary obligation to comply with this Settlement Agreement.

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

**EXECUTION VERSION**

IN WITNESS WHEREOF, each Party by its duly authorized representative has executed this Settlement Agreement as of the date first written above:


Lehman Brothers Holdings Inc., as Plan
Administrator for Lehman Brothers Holding Inc.
and the other LBHI Debtors

By: _____

Name: _____

Title: _____

**EXECUTION VERSION**

Gibbs & Bruns, LLP,
counsel to, and authorized signatory for:

AEGON USA Investment Management, LLC,
BlackRock Financial Management, Inc.,
Cascade Investment, L.L.C.,
Federal Home Loan Bank of Atlanta,
Goldman Sachs Asset Management, L.P.,
Invesco Advisers, Inc.,
Kore Advisors, L.P.,
Metropolitan Life Insurance Company,
Pacific Investment Management Company, LLC,
Sealink Designated Activity Company, through its investment manager
        Neuberger Berman Europe Limited
The TCW Group, Inc., on behalf of itself and its subsidiaries
Thrivent Financial for Lutherans,
Voya Investment Management LLC, and
Western Asset Management Company.

By: _____

Name: __Robert Madden_____

Title: __Partner_____

# EXHIBIT A

## TRUSTS

| No. | Trust Name |
|-----|------------|
| 1 | ARC 2002-BC10 |
| 2 | ARC 2002-BC8 |
| 3 | ARC 2002-BC9 |
| 4 | ARC 2004-1 |
| 5 | BNC 2006-1 |
| 6 | BNC 2006-2 |
| 7 | BNC 2007-1 |
| 8 | BNC 2007-2 |
| 9 | BNC 2007-3 |
| 10 | BNC 2007-4 |
| 11 | LABS 2004-1 |
| 12 | LABS 2007-1 |
| 13 | LMT 2005-1 |
| 14 | LMT 2005-2 |
| 15 | LMT 2005-3 |
| 16 | LMT 2006-1 |
| 17 | LMT 2006-2 |
| 18 | LMT 2006-4 |
| 19 | LMT 2006-8 |
| 20 | LMT 2006-9 |
| 21 | LMT 2007-1 |
| 22 | LMT 2007-10 |
| 23 | LMT 2007-2 |
| 24 | LMT 2007-3 |
| 25 | LMT 2007-4 |
| 26 | LMT 2007-5 |
| 27 | LMT 2007-6 |
| 28 | LMT 2007-7 |
| 29 | LMT 2007-8 |
| 30 | LMT 2007-9 |
| 31 | LMT 2008-2 |
| 32 | LMT 2008-6 |
| 33 | LXS 2005-1 |
| 34 | LXS 2005-10 |
| 35 | LXS 2005-2 |
| 36 | LXS 2005-3 |
| 37 | LXS 2005-4 |

- 1 -

| 38 | LXS 2005-6 |
| 39 | LXS 2005-8 |
| 40 | LXS 2006-1 |
| 41 | LXS 2006-10N |
| 42 | LXS 2006-11 |
| 43 | LXS 2006-12N |
| 44 | LXS 2006-13 |
| 45 | LXS 2006-15 |
| 46 | LXS 2006-17 |
| 47 | LXS 2006-19 |
| 48 | LXS 2006-20 |
| 49 | LXS 2006-3 |
| 50 | LXS 2006-5 |
| 51 | LXS 2006-7 |
| 52 | LXS 2006-8 |
| 53 | LXS 2006-9 |
| 54 | LXS 2007-1 |
| 55 | LXS 2007-10H |
| 56 | LXS 2007-11 |
| 57 | LXS 2007-12N |
| 58 | LXS 2007-14H |
| 59 | LXS 2007-15N |
| 60 | LXS 2007-16N |
| 61 | LXS 2007-17H |
| 62 | LXS 2007-18N |
| 63 | LXS 2007-20N |
| 64 | LXS 2007-3 |
| 65 | LXS 2007-5H |
| 66 | LXS 2007-6 |
| 67 | LXS 2007-7N |
| 68 | LXS 2007-8H |
| 69 | LXS 2007-9 |
| 70 | RLT 2008-AH1 |
| 71 | SAIL 2003-BC1 |
| 72 | SAIL 2003-BC10 |
| 73 | SAIL 2003-BC11 |
| 74 | SAIL 2003-BC12 |
| 75 | SAIL 2003-BC13 |
| 76 | SAIL 2003-BC2 |
| 77 | SAIL 2003-BC3 |
| 78 | SAIL 2003-BC4 |
| 79 | SAIL 2003-BC5 |
| 80 | SAIL 2003-BC8 |

EXECUTION VERSION

| | |
|---|---|
| 81 | SAIL 2003-BC9 |
| 82 | SAIL 2004-1 |
| 83 | SAIL 2004-10 |
| 84 | SAIL 2004-2 |
| 85 | SAIL 2004-3 |
| 86 | SAIL 2004-4 |
| 87 | SAIL 2004-5 |
| 88 | SAIL 2004-6 |
| 89 | SAIL 2004-8 |
| 90 | SAIL 2004-9 |
| 91 | SAIL 2005-1 |
| 92 | SAIL 2005-10 |
| 93 | SAIL 2005-11 |
| 94 | SAIL 2005-2 |
| 95 | SAIL 2005-3 |
| 96 | SAIL 2005-4 |
| 97 | SAIL 2005-5 |
| 98 | SAIL 2005-6 |
| 99 | SAIL 2005-7 |
| 100 | SAIL 2005-8 |
| 101 | SAIL 2005-9 |
| 102 | SAIL 2005-HE3 |
| 103 | SAIL 2006-1 |
| 104 | SAIL 2006-2 |
| 105 | SAIL 2006-4 |
| 106 | SAIL 2006-BNC3 |
| 107 | SARM 2004-10 |
| 108 | SARM 2004-16 |
| 109 | SARM 2004-18 |
| 110 | SARM 2004-20 |
| 111 | SARM 2004-5 |
| 112 | SARM 2004-9XS |
| 113 | SARM 2005-11 |
| 114 | SARM 2005-12 |
| 115 | SARM 2005-15 |
| 116 | SARM 2005-17 |
| 117 | SARM 2005-20 |
| 118 | SARM 2005-22 |
| 119 | SARM 2005-23 |
| 120 | SARM 2005-3XS |
| 121 | SARM 2005-6XS |
| 122 | SARM 2005-8XS |
| 123 | SARM 2006-1 |

| | |
|---|---|
| 124 | SARM 2006-10 |
| 125 | SARM 2006-11 |
| 126 | SARM 2006-12 |
| 127 | SARM 2006-2 |
| 128 | SARM 2006-3 |
| 129 | SARM 2006-4 |
| 130 | SARM 2006-5 |
| 131 | SARM 2006-6 |
| 132 | SARM 2006-7 |
| 133 | SARM 2006-8 |
| 134 | SARM 2006-9 |
| 135 | SARM 2007-1 |
| 136 | SARM 2007-10 |
| 137 | SARM 2007-11 |
| 138 | SARM 2007-2 |
| 139 | SARM 2007-3 |
| 140 | SARM 2007-4 |
| 141 | SARM 2007-6 |
| 142 | SARM 2007-8 |
| 143 | SARM 2008-2 |
| 144 | SASCO 2003-12XS |
| 145 | SASCO 2003-15A |
| 146 | SASCO 2003-17A |
| 147 | SASCO 2003-18XS |
| 148 | SASCO 2003-25XS |
| 149 | SASCO 2003-26A |
| 150 | SASCO 2003-28XS |
| 151 | SASCO 2003-29 |
| 152 | SASCO 2003-30 |
| 153 | SASCO 2003-34A |
| 154 | SASCO 2003-35 |
| 155 | SASCO 2003-36XS |
| 156 | SASCO 2003-38 |
| 157 | SASCO 2003-39EX |
| 158 | SASCO 2003-3XS |
| 159 | SASCO 2003-6A |
| 160 | SASCO 2003-GEL1 |
| 161 | SASCO 2003-NP1 |
| 162 | SASCO 2003-S1 |
| 163 | SASCO 2003-S2 |
| 164 | SASCO 2004-10 |
| 165 | SASCO 2004-11XS |
| 166 | SASCO 2004-13 |

| 167 | SASCO 2004-15 |
| 168 | SASCO 2004-16XS |
| 169 | SASCO 2004-17XS |
| 170 | SASCO 2004-18H |
| 171 | SASCO 2004-19XS |
| 172 | SASCO 2004-20 |
| 173 | SASCO 2004-21XS |
| 174 | SASCO 2004-22 |
| 175 | SASCO 2004-23XS |
| 176 | SASCO 2004-2AC |
| 177 | SASCO 2004-4XS |
| 178 | SASCO 2004-6XS |
| 179 | SASCO 2004-7 |
| 180 | SASCO 2004-9XS |
| 181 | SASCO 2004-GEL1 |
| 182 | SASCO 2004-GEL2 |
| 183 | SASCO 2004-GEL3 |
| 184 | SASCO 2004-NP1 |
| 185 | SASCO 2004-S2 |
| 186 | SASCO 2004-S3 |
| 187 | SASCO 2004-S4 |
| 188 | SASCO 2005-1 |
| 189 | SASCO 2005-10 |
| 190 | SASCO 2005-11H |
| 191 | SASCO 2005-14 |
| 192 | SASCO 2005-15 |
| 193 | SASCO 2005-17 |
| 194 | SASCO 2005-2XS |
| 195 | SASCO 2005-3 |
| 196 | SASCO 2005-4XS |
| 197 | SASCO 2005-5 |
| 198 | SASCO 2005-7XS |
| 199 | SASCO 2005-9XS |
| 200 | SASCO 2005-GEL2 |
| 201 | SASCO 2005-GEL3 |
| 202 | SASCO 2005-GEL4 |
| 203 | SASCO 2005-RF1 |
| 204 | SASCO 2005-RF2 |
| 205 | SASCO 2005-RF4 |
| 206 | SASCO 2005-RF5 |
| 207 | SASCO 2005-RF6 |
| 208 | SASCO 2005-RF7 |
| 209 | SASCO 2005-S1 |

| 210 | SASCO 2005-S2 |
| 211 | SASCO 2005-S3 |
| 212 | SASCO 2005-S4 |
| 213 | SASCO 2005-S5 |
| 214 | SASCO 2005-S6 |
| 215 | SASCO 2005-S7 |
| 216 | SASCO 2005-SC1 |
| 217 | SASCO 2006-BC2 |
| 218 | SASCO 2006-BC3 |
| 219 | SASCO 2006-BC4 |
| 220 | SASCO 2006-BC6 |
| 221 | SASCO 2006-GEL1 |
| 222 | SASCO 2006-GEL2 |
| 223 | SASCO 2006-GEL3 |
| 224 | SASCO 2006-GEL4 |
| 225 | SASCO 2006-RF1 |
| 226 | SASCO 2006-RF2 |
| 227 | SASCO 2006-RF3 |
| 228 | SASCO 2006-RF4 |
| 229 | SASCO 2006-S1 |
| 230 | SASCO 2006-S2 |
| 231 | SASCO 2006-S3 |
| 232 | SASCO 2006-S4 |
| 233 | SASCO 2006-Z |
| 234 | SASCO 2007-BC1 |
| 235 | SASCO 2007-BC2 |
| 236 | SASCO 2007-BC3 |
| 237 | SASCO 2007-BC4 |
| 238 | SASCO 2007-BNC1 |
| 239 | SASCO 2007-GEL1 |
| 240 | SASCO 2007-GEL2 |
| 241 | SASCO 2007-MLN1 |
| 242 | SASCO 2007-OSI |
| 243 | SASCO 2007-RF1 |
| 244 | SASCO 2007-TC1 |

**EXHIBIT B**

**TERMINATED TRUSTS**

| No. | Trust Name |
|-----|------------|
| 1 | LABS 2003-1 |
| 2 | SASCO 2003-10 |
| 3 | SASCO 2003-14 |
| 4 | SASCO 2003-16 |
| 5 | SASCO 2003-20 |
| 6 | SASCO 2003-21 |
| 7 | SASCO 2003-4 |
| 8 | SASCO 2003-8 |
| 9 | SASCO 2003-NP2 |
| 10 | SASCO 2003-NP3 |
| 11 | SASCO 2003-RNP2 |
| 12 | SASCO 2004-NP2 |
| 13 | SASCO 2007-RF2 |
| 14 | SASC 2003-32 |
| 15 | SASC 2004-3 |
| 16 | SASC 2005-6 |

## EXHIBIT C

## SUBSIDIARIES AND AFFILIATES

| No. | Company Name |
|-----|--------------|
| 1 | Lehman Brothers Holdings Inc. |
| 2 | 314 Commonwealth Ave. Inc. |
| 3 | Acesco Holdings Inc |
| 4 | Appalachian Asset Management Corp. |
| 5 | Battle Station LHCI., Inc. |
| 6 | Brookson Corp. |
| 7 | Brookwood Energy And Properties Inc. |
| 8 | Campus Door, Inc. |
| 9 | Capital Crossing Securities Corp II |
| 10 | Da Group Holdings Inc. |
| 11 | Diogenes Holdings Inc. |
| 12 | Diogenes Management Company Inc. |
| 13 | Dl Mortgage Corporation |
| 14 | DOLCAP INC |
| 15 | E.F.H. Insurance Agency Of Pennsylvania, Inc. |
| 16 | Fleet Street Condos Inc. |
| 17 | Frah Special Services Inc. |
| 18 | Future Financial Holdings Inc. |
| 19 | GA Dekalb Inc. |
| 20 | Industrial Holdings Corporation |
| 21 | LB Brickstone Inc. |
| 22 | LB Eastview, Inc. |
| 23 | LB Funding Corp II |
| 24 | LB Hercules Agency, Inc. |
| 25 | LB I Group Inc. |
| 26 | LB Lakeside I Inc. |
| 27 | LB Lakeside II Inc. |
| 28 | LB Lakeside III Inc. |
| 29 | LB LIH Corp. |
| 30 | LB Skypower Inc. |
| 31 | LB Transaction No. 5 Inc. |

| 32 | LB Verve Condos Inc. |
| 33 | LB Windsor Capital One Bloor Street East Inc. |
| 34 | LB Windsor Kitchener Inc. |

| No. | Company Name |
| --- | --- |
| 35 | LB Windsor Pointz Avenue Inc. |
| 36 | LBMB CAPITAL PARTNERS V EAGLE ENERGY HOLDINGS |
| 37 | LBMB FUND (B) EAGLE ENERGY HOLDINGS LP |
| 38 | LBMB FUND EAGLE ENERGY HOLDINGS LP |
| 39 | LBMB PARTNERS EAGLE ENERGY HOLDINGS LP |
| 40 | LBTC Transfer Inc. |
| 41 | LCPI Properties, Inc. |
| 42 | Lehman ABS Corporation |
| 43 | Lehman Aircraft Securitization Holdings Inc. |
| 44 | Lehman Ali Inc. |
| 45 | Lehman Brothers  Asset Management Inc. |
| 46 | Lehman Brothers (Israel) Inc. |
| 47 | Lehman Brothers Bancorp, Inc. |
| 48 | Lehman Brothers Commercial Corporation |
| 49 | Lehman Brothers Commodity Services Inc. |
| 50 | Lehman Brothers Communications Associates Inc |
| 51 | Lehman Brothers Derivative Products Inc. |
| 52 | Lehman Brothers Europe Inc. |
| 53 | Lehman Brothers Finance (Japan) Inc. |
| 54 | Lehman Brothers Financial Products Inc. |
| 55 | Lehman Brothers Futures Asset Management Corp |
| 56 | Lehman Brothers International Services Inc. |
| 57 | Lehman Brothers Investment Holdings Company |
| 58 | Lehman Brothers Investments Japan Inc. |
| 59 | Lehman Brothers Merchant Banking Partners II |
| 60 | Lehman Brothers Mortgage Opportunity |
| 61 | Lehman Brothers OTC Derivatives Inc. |
| 62 | Lehman Brothers Overseas Inc. |
| 63 | Lehman Brothers Pera Inc. |
| 64 | Lehman Brothers Special Financing Inc. |
| 65 | Lehman Brothers U.K. Holdings (Delaware) Inc. |
| 66 | Lehman Brothers Venture Associates, Inc. |

| No. | Company Name |
|---|---|
| 67 | Lehman Brothers/FW Inc. |
| 68 | Lehman Brothers/Rosecliff Inc. |
| 69 | Lehman Commercial Paper Inc. |
| 70 | Lehman Housing Capital Inc. |
| 71 | Lehman Housing Lending Corp. |
| No. | Company Name |
| 72 | Lehman Investments Inc. |
| 73 | Lehman Pass-Through Securities Inc. |
| 74 | Lehman Tax Credit Advisor Inc. |
| 75 | Lehman VIP Holdings Inc. |
| 76 | LHCI GP VI Inc. |
| 77 | LHCI GP VII Inc. |
| 78 | LHCI GP VIII Inc. |
| 79 | LHCI GP X, Inc. |
| 80 | LHCI GP XI, Inc |
| 81 | LHCI Martinsburg GP Inc. |
| 82 | Libro Holdings I Inc. |
| 83 | LPTG Inc. |
| 84 | LW-GP2B, Inc |
| 85 | LW-GP2D, Inc. |
| 86 | LW-LP Inc. |
| 87 | LW-LP Properties Inc. |
| 88 | MBR/GP Corp. |
| 89 | MMP Funding Corporation |
| 90 | NJ Atlantic Inc. |
| 91 | NJ Somerset Inc. |
| 92 | NP Investment I Co. |
| 93 | PAC Aircraft Management Inc. |
| 94 | PAMI 5-7 East 17th Street Inc. |
| 95 | PAMI Newark Inc. |
| 96 | PAMI PPC I Inc. |
| 97 | PAMI Public/Private II, Inc. |
| 98 | PAMI Raymond Inc. |
| 99 | Petro L Corporation |
| 100 | Principal Transactions II Inc. |
| 101 | Principal Transactions Inc. |
| 102 | Property Asset Management Inc. |
| 103 | Real Estate Private Equity Inc. |

| 104 | Rock Hill Investors Inc. |
| 105 | SBA 2011 Acquisition Co Inc. |
| 106 | SASCO ARC CORPORATION |
| 107 | Select Asset Inc. |
| 108 | Sharpstown Center Inc. |
| **No.** | **Company Name** |
| 109 | Shearson Financial Services Of TX Inc. |
| 110 | Solar Finance Inc |
| 111 | Structured Asset Securities Corp |
| 112 | Structured Options Inc. |
| 113 | Thai Holding I Inc. |
| 114 | Thai Holding II Inc. |
| 115 | Tulsa Hotels LS, Inc |
| 116 | Warren Atlantic Inc. |
| 117 | Warren/GP Corp. |
| 118 | West Bay Club Development Corp. |
| 119 | West Bay Realty Inc. |
| 120 | Wharf Reinsurance Inc. |
| 121 | Winter Garden Inc. |
| 122 | Woodlands Commercial Corporation |
| 123 | Lehman Re Inc. |
| 124 | BK II Properties Inc. |
| 125 | ASIA INDO OPPORTUNITY I LTD |
| 126 | ASIA INDO OPPORTUNITY II LTD |
| 127 | BALLYBUNION INVESTMENT LIMITED |
| 128 | BALLYBUNION INVESTMENT NO 2 LIMITED |
| 129 | BALLYBUNION INVESTMENT NO 3 LIMITED |
| 130 | BIRCH Y.K. |
| 131 | BISON II SP. Z.O.O. |
| 132 | CAPITAL GROWTH INVESTMENTS LTD. |
| 133 | CENTRAL TOKYO HOLDINGS INC. |
| 134 | CENTRAL TOKYO INVESTMENTS INC. |
| 135 | CENTRAL TOKYO PROPERTIES INC. |
| 136 | CEREP III INVESTMENT D S.ÀR.L. |
| 137 | CIMT LIMITED |
| 138 | CJC INVESTMENTS INC |
| 139 | CYGNUS Y.K. |
| 140 | DYNAMO INVESTMENTS LIMITED |

| 141 | EAGLE HOLDINGS II INC |
| 142 | EAST DOVER LIMITED |
| 143 | ELMWOOD Y.K. |
| 144 | FALCON HOLDINGS II INC. |
| 145 | FALCON HOLDINGS III INC. |
| 146 | FALCON HOLDINGS IV INC. |
| **No.** | **Company Name** |
| 147 | FALCON INVESTOR I INC. |
| 148 | FALCON INVESTOR II INC. |
| 149 | FALCON INVESTOR III INC. |
| 150 | FALCON INVESTOR IV INC. |
| 151 | FALCON INVESTOR IX INC. |
| 152 | FALCON INVESTOR V INC . |
| 153 | FALCON INVESTOR VI INC. |
| 154 | FALCON INVESTOR VII INC. |
| 155 | FALCON INVESTOR VIII INC. |
| 156 | FALCON INVESTOR X INC. |
| 157 | GAINSBOROUGH INVESTMENTS BV |
| 158 | GKI KOREA DEVELOPMENT LIMITED |
| 159 | GKI KOREA MANAGEMENT LIMITED |
| 160 | GLOBAL KOREA INVESTMENTS LTD |
| 161 | GLOBAL TAIWAN INVESTMENTS LTD |
| 162 | GLOBAL THAI PROPERTY FUND |
| 163 | GRA FINANCE CORPORATION LTD. |
| 164 | HOLLYHOCK YK |
| 165 | HONG KONG TRUST NO. 1 |
| 166 | IVANHOE LANE PTY LTD |
| 167 | JAPAN REAL ESTATE INVESTMENT PARTNERSHIP INC. |
| 168 | JAPAN TK INVESTOR I (CAYMAN) HOLDINGS INC. |
| 169 | JASMINE Y.K. |
| 170 | KENILWORTH INVESTMENTS 1 LTD |
| 171 | KENILWORTH INVESTMENTS 2 LTD |
| 172 | KINGFISHER CAPITAL CDO LTD |
| 173 | L.B.A. YK |
| 174 | LAMCO Services Ltd |
| 175 | LB ALPHA FINANCE CAYMAN LIMITED |
| 176 | LB BETA FINANCE CAYMAN LIMITED |
| 177 | LB CANADA SKYPOWER |
| 178 | LB DAME LP S.ÀR.L. |

| No. | Company Name |
|-----|--------------|
| 179 | LB DAME S.ÀR.L. |
| 180 | LB FINANCE JAPAN HEAD OFFICE |
| 181 | LB FUNDING BV |
| 182 | LB HONG KONG FUNDING TRUST |
| 183 | LB INDIA HOLDINGS MAURITIUS I LTD |
| 184 | LB INDIA HOLDINGS MAURITIUS II LTD |
| **No.** | **Company Name** |
| 185 | LB INVESTMENT MGMT COMPANY LTD (f/k/a LB INDIA HOLDINGS CAYMAN II LIMITED) |
| 186 | LB INVESTMENTS (UK) LTD |
| 187 | LB LUX RE HOLDINGS S.A.R.L |
| 188 | LB MAURITIUS I LTD. |
| 189 | LB OFFSHORE PARTNERS II LTD. |
| 190 | LB OFFSHORE PARTNERS LTD |
| 191 | LB OFFSHORE RE MEZZANINE ASSOC,LTD. |
| 192 | LB OPPORTUNITY HOLDING INC |
| 193 | LB RE FINANCING NO.1 LIMITED |
| 194 | LB SHELF CI IV |
| 195 | LB VINTNERS (LUXEMBOURG) S.ÀR.L. |
| 196 | LB VINTNERS BRIDGE (LUXEMBOURG) S.ÀR.L. |
| 197 | LB3 GMBH |
| 198 | LBD YK |
| 199 | LBE YK |
| 200 | LBHK FUNDING (CAYMAN) NO. 1 LIMITED |
| 201 | LBHK FUNDING (CAYMAN) NO. 2 LIMITED |
| 202 | LBHK FUNDING (CAYMAN) NO. 4 LIMITED |
| 203 | LBMB ASSOCIATES IV (EUROPE) S.A.R.L |
| 204 | LBMB EUROPE MGMT CORP SARL |
| 205 | LBO FUNDING (CAYMAN) LIMITED |
| 206 | LBQ FUNDING (CAYMAN) LIMITED |
| 207 | LBQ HONG KONG SERVICES LIMITED |
| 208 | LBREP GAITHERSBURG HOLDINGS LLC |
| 209 | LBS HOLDINGS SARL |
| 210 | LBSP HOLDING (IRLAND) PUBLIC LTD |
| 211 | LBSP LIMITED |
| 212 | LCPI DHS  (f/k/a LB SHELF II, INC.) |
| 213 | LEHMAN BROTHERS (CAYMAN ISLANDS) LTD. |
| 214 | LEHMAN BROTHERS (THAILAND) LIMITED PCO-NEWTHB |
| 215 | LEHMAN BROTHERS ASEAN OPPORTUNITY LTD |

**EXECUTION VERSION**

| 216 | LEHMAN BROTHERS ASIA ISSUANCE CO LTD |
|-----|---------------------------------------|
| 217 | LEHMAN BROTHERS AUSTRALIA SECURITIES PTY LIMITED |
| 218 | LEHMAN BROTHERS CAPITAL (THAILAND) LIMITED |
| 219 | LEHMAN BROTHERS CDO ASSOCIATES (CAYMAN) II, LTD |
| 220 | LEHMAN BROTHERS CDO ASSOCIATES (CAYMAN), LTD |
| 221 | Lehman Brothers Global Services Ltd. |
| **No.** | **Company Name** |
| 222 | LEHMAN BROTHERS HK OLYMPUS FUNDING TRUST |
| 223 | LEHMAN BROTHERS HOLDINGS SCOTTISH LP |
| 224 | LEHMAN BROTHERS HOLDINGS SCOTTISH LP2 |
| 225 | LEHMAN BROTHERS HOLDINGS SCOTTISH LP3 |
| 226 | LEHMAN BROTHERS HOLDINGS, INC. UK BRANCH |
| 227 | LEHMAN BROTHERS HY OPPORTUNITIES KOREA INC. |
| 228 | Lehman Brothers Investments Japan Inc. |
| 229 | LEHMAN BROTHERS LATIN AMERICA LIMITED |
| 230 | LEHMAN BROTHERS OFFSHORE COMMUNICATIONS ASSOCIATES LTD. |
| 231 | LEHMAN BROTHERS OFFSHORE REAL ESTATE ASSOCIATES II LTD. |
| 232 | LEHMAN BROTHERS OFFSHORE REAL ESTATE ASSOCIATES LTD |
| 233 | LEHMAN BROTHERS OPPORTUNITY LTD. |
| 234 | LEHMAN BROTHERS PACIFIC SERVICES |
| 235 | LEHMAN BROTHERS SOUTH EAST ASIA INVESTMENTS PTE LIMITED |
| 236 | LEHMAN BROTHERS UK INVESTMENTS LTD |
| 237 | LEHMAN RISK SERVICES (BERMUDA) LTD. |
| 238 | LEHMAN SCOTTISH FINANCE LP |
| 239 | LEHMAN VIP INVESTMENT LDC |
| 240 | LUXEMBOURG FINANCE S.A.R.L. |
| 241 | LUXEMBOURG RESIDENTIAL PROPERTIES LOAN FINANCE SARL |
| 242 | M&L DEBT INVESTMENTS HOLDINGS PTY |
| 243 | M&L DEBT INVESTMENTS PTY LIMITED |
| 244 | MAEWHA K-STARS LTD |
| 245 | MARLIN INTERNATIONAL Y.K. |
| 246 | MEISHO ESTATE Y.K |
| 247 | MICT LIMITED |
| 248 | NOVACORP REALTY/GP INC. |
| 249 | OPAL FINANCE HOLDINGS IRELAND LIMITED |
| 250 | PHUKET HOTEL 3 HOLDING COMPANY LIMITED |
| 251 | REVIVAL HOLDINGS LIMITED |
| 252 | SATURN INVESTMENT INC |

| 253 | SERAFINO INVESTMENTS PTY LTD |
|-----|------------------------------|
| 254 | SOGKI DEVELOPMENT INC. |
| 255 | SOGKI INC. |
| 256 | SOGKI MANAGEMENT INC |
| 257 | SOGTI INC. |
| 258 | SOR INVESTOR I INC |
| **No.** | **Company Name** |
| 259 | SOR INVESTORS IV INC |
| 260 | SOUTHWESTERN FIRST CAPITAL LLC |
| 261 | TAHOE Y.K. |
| 262 | TCP CAP VI GP (EUROPE) L.P. INC. |
| 263 | TMIC LIMITED |
| 264 | VINTNERS BIDCO S.C.A. |
| 265 | VINTNERS S.ÀR.L. |
| 266 | Y.K. SAPPHIRE INVESTMENT I |
| 267 | YELLOWTAIL INTERNATIONAL Y.K. |
| 268 | YK DUCKHORN |

<u>**EXECUTION VERSION**</u>

<u>**EXHIBIT D**</u>

**INSTITUTIONAL INVESTOR REQUEST LETTER**



Robert J. Madden
rmadden@gibbsbruns.com
713.751.5266

*Via Email and Federal Express*

March _____, 2017

Franklin H. Top III
Scott A. Lewis
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603

Michael S. Kraut
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, New York 10178

*Counsel for U.S. Bank National Association,
solely in its capacity as Indenture Trustee for
Certain Mortgage-Backed Securities Trusts*

John C. Weitnauer
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309

*Counsel for Wilmington Trust Company and
Wilmington Trust, National Association, each
solely in its capacity as Trustee for Certain
Mortgage-Backed Securities Trusts*

M. William Munno
Daniel E. Guzmán
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004

*Counsel for Law Debenture Trust Company of
New York, solely in its capacity as Separate
Trustee for Certain Mortgage-Backed
Securities Trusts*

Dennis Drebsky
NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022

*Counsel for Deutsche Bank National Trust
Company, solely in its capacity as Trustee for
Certain Mortgage-Backed Securities Trusts*

Re:     <u>Binding Settlement Offer from Lehman to Trustees of RMBS Trusts</u>

Dear Counsel:

This firm represents 14 large institutional investors who collectively are holders, and/or authorized investment managers for holders, of approximately $6 billion of the unpaid principal balance of securities ("UPB") issued by the RMBS Trusts listed on Exhibit "A" to the attached RMBS Trust Settlement Agreement (the "Trusts").  Our clients' holdings include 25% or more of the UPB of 69 of the Trusts, which Trusts account for approximately 35% of the total UPB across all of the Trusts.

Our clients have engaged in extensive, mediated negotiations with representatives of the LBHI estate in an effort to reach a proposed settlement, that our clients would be willing to recommend, of the claims set forth in the Proofs of Claim filed by your clients on behalf of the Trusts.

We understand the LBHI debtors have advised you of the terms of a binding offer they have agreed to make to the Trustees to settle these claims.  A copy of that binding offer is enclosed with this correspondence for your review.

Our clients have advocated settlement in this matter for some time, in no small part because of the significant expense that has been imposed on the Trusts by virtue of the Court-ordered Protocol.  Though those earlier efforts did not lead to a settlement the Trustees were able to accept, this offer is one the Trustees certainly should accept. It <u>virtually ensures</u> the Trusts claims will be allowed in an amount no less than $2.416 billion, because Lehman has agreed to seek estimation at that amount. In addition, while setting a functional floor on the recovery, the offer establishes no ceiling; instead, the Trustees are free to put on whatever proof they wish, to advocate for an increased estimation if they possess evidence they believe warrants it. And, finally, by making the estimation final as to both the Trusts and Lehman, it ends both the hemorrhage of dollars caused by the protocol and eliminates the risk--through elimination of any appeals--that this hemorrhage of funds will resume. In short, there is no reasonable basis on which the Trustees could or should refuse this guarantee of a certain recovery of more than a $1 billion in cash, with the opportunity to obtain more.

Accordingly, on behalf of our clients, we ask each of the Trustees to exercise their independent business judgment to accept the settlement on the Trusts' behalf.  Though this is not a binding instruction from our clients, all of our clients believe the settlement is in the best interests of all of the Trusts included in the settlement, so they urge the Trustees to accept it.

Very truly yours,

_____

Robert Madden
On behalf of the Institutional Investors

Cc:

AEGON USA Investment Management, LLC,
BlackRock Financial Management, Inc.,

Cascade Investment, L.L.C.,
Federal Home Loan Bank of Atlanta,
Goldman Sachs Asset Management, L.P.,
Invesco Advisers, Inc.,
Kore Advisors, L.P.,
Metropolitan Life Insurance Company,
Pacific Investment Management Company, LLC,
Sealink Designated Activity Company, through its investment manager
        Neuberger Berman Europe Limited
The TCW Group, Inc., on behalf of itself and its subsidiaries
Thrivent Financial for Lutherans,
Voya Investment Management LLC, and
Western Asset Management Company.

## EXHIBIT E

## THE INSTITUTIONAL INVESTOR STATEMENT

The "Institutional Investors" are AEGON USA Investment Management, LLC, BlackRock Financial Management, Inc., Cascade Investment, L.L.C., Federal Home Loan Bank of Atlanta, Goldman Sachs Asset Management, L.P., Invesco Advisers, Inc., Kore Advisors, L.P., Metropolitan Life Insurance Company, Pacific Investment Management Company, LLC, Sealink Designated Activity Company, through its investment manager Neuberger Berman Europe Limited, The TCW Group, Inc., on behalf of itself and its subsidiaries, Thrivent Financial for Lutherans, Voya Investment Management LLC, and Western Asset Management Company. The Institutional Investors are holders, and/or authorized investment managers for holders, of approximately $6 billion in certificates in 195 of the trusts for whose benefit the Covered Loan Claims are being pursued.

The Institutional Investors have previously agreed that a settlement of the Covered Loan Claims for an allowed Class 7 General Unsecured Claim of $2.416 billion was fair and reasonable, and have supported a settlement of the claims at that amount. The Institutional Investors continue to believe, today, that a settlement at that amount is fair and reasonable. Therefore, the Institutional Investors support Lehman's request that the Bankruptcy Court estimate the Claims so long as the amount estimated is not below an allowed Class 7 General Unsecured Claim of $2.416 billion.

EXECUTION VERSION

## EXHIBIT F

### TRUSTEE FINDINGS

1. This Court has jurisdiction to hear this motion and adjudicate the Motion.

2. Certificateholders, noteholders, and any other parties claiming rights in any Accepting Trust have been provided with notice that was reasonable, adequate, and was the best notice practicable, was reasonably calculated to put interested parties on notice of this Motion, and constitutes due and sufficient notice of this Motion in satisfaction of federal and state due process requirements and other applicable law. All such persons have been given the opportunity to be heard in opposition to the Motion.

3. Any objections that were raised or that could have been raised in opposition to the Motion, that have not been withdrawn or resolved, are overruled and/or waived.

4. Each of the Accepting Trustees acted within the bounds of its discretion, reasonably, and in good faith with respect to its evaluation and acceptance of the Trust Settlement Agreement dated as of November 30, 2016 and modified as of March 17, 2017 (the "Settlement Agreement") concerning the applicable Accepting Trust(s).

## EXHIBIT G

**I.    CLAIMS AND DEFENSES TO BE TRIED**

### a.  The Plan Administrator's Position Statement

The RMBS Trustees allege that LBHI: (i) breached certain representations and warranties regarding the quality and characteristics of certain mortgage loans, or (ii) provided deficient mortgage loan files to the RMBS Trusts, when they sold loans into certain residential mortgage-backed securitization trusts.  LBHI will ask the Bankruptcy Court to estimate the claims related to those mortgage loans that have not already been disallowed or expunged from the RMBS Trustees' proofs of claim, in particular those loans that have been placed into the RMBS Protocol by the RMBS Trustees.  The loan-by-loan analysis conducted by the Plan Administrator through steps 1 and 2 of the RMBS Protocol and additional evidence will provide various bases upon which the Court can make a realistic assessment of the outcome of the RMBS Trustees' claims, without the undue delay that would likely occur if the Parties were to adjudicate these claims in their entirety.

### b.  The RMBS Trustees' Position Statement

The following claims will be estimated:  claims arising out of alleged breaches of representations and warranties made by the LBHI Debtors in applicable Trust Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Sale and Assignment Agreements and/or other agreements governing or related to the Trust and Terminated Trusts (the "Governing Agreements") concerning Mortgage Loans in the residential mortgage-backed securitizations identified on Exhibit A (the "Trusts").  The RMBS Trustees allege that the LBHI Debtors breached one or more of their representations and warranties under the Governing Agreements with respect to certain loans in the RMBS Trusts in a manner that materially and adversely affected the value of the loans or certificateholders' interests in the loans.  The RMBS Trustees intend to demonstrate that the LBHI Debtors breached their representations and warranties with respect to over 91,000 loans through evidence derived from the RMBS Trustees' loan-by-loan review and presented to the LBHI Debtors as required by the RMBS Protocol; and the absence of any legally or factually supported bases proffered by the Plan Administrator during the RMBS Protocol for the rejection of the Trustees' claims.

**II.    NATURE AND LENGTH OF THE HEARING**

The Parties agree that their claims and defenses will be determined at an estimation hearing that the parties will jointly request the court schedule no earlier

than Monday, October 16, 2017 (the "Hearing").[1]  The Hearing shall be conducted in accordance with the procedures set forth herein.

The Parties agree that the Hearing shall be scheduled for at least 14 hearing days, or a total of 98 hours, on the record.  The LBHI Debtors will be allotted 7 days (or a total of 49 hours) to present their case, including rebuttals, and 7 days (or a total of 49 hours) will be allotted to the RMBS Trustees.  Each Party's allotted time will run during its (i) opening and closing statements and (ii) direct or cross examination of any witness.  Either side is free to use less than its allotted time. The scheduling of the dates on which the Hearing shall be conducted shall be at the discretion of the Court.

Each side shall be allowed to present opening statements of up to two hours in length and closing statements of up to two hours in length.  Each Party will be able to reserve and reallocate its time for opening and closing statements.

III.    **TIMING AND CONTENT OF EXPERT REPORTS, AND EXPERT DISCOVERY**

The Parties agree to pre-Hearing expert discovery pursuant to the following schedule:

| | |
|---|---|
| Parties disclose the identity and subject matter of Experts then expected to provide Affirmative Reports, and Lehman to identify such settlements that it intends to use in its Expert Reports | Wednesday, May 10, 2017 |
| Simultaneous exchange of Affirmative Reports, and the Parties to identify exemplar loans to be used in their case-in-chief | Thursday, June 3, 2017 |
| Simultaneous exchange of Rebuttal Reports, the Parties to identify exemplar loans to be used by their rebuttal experts, and the RMBS Trustees to identify such settlements that they intend to use in their Expert | Friday, July 14, 2017 |

---

[1] Should the date of the Hearing in this section be moved to a later date, the Parties will meet and confer in good faith to negotiate appropriate modifications of the dates set forth in Section III of this agreement.

| Reports | |
|---|---|
| Simultaneous exchange of Reply Reports with any additional exemplar loans.[2] | Monday, August 21, 2017 |
| Completion of Expert Depositions | Thursday, September 21, 2017 |

*Expert Reports.*  Each expert witness must provide a signed written report that contains:

    i.  a complete statement of the opinions the witness is expected to express and the basis for such opinions;

   ii.  the facts or data relied upon by the witness in forming any such opinions and, to the extent the witness' opinions include or rely upon the results of any quantitative calculations or estimates, the underlying data and all formulae, macros and any other information necessary to allow the opposing party to reproduce such quantitative calculations or estimates[3];

  iii.  any assumptions that the expert was provided and relied upon in forming the opinions to be expressed;

  iv.  any exhibits prepared in connection with the written report;

   v.  the witness's qualifications, including a list of all publications authored in the previous 10 years;

  vi.  a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

 vii.  a statement of the compensation to be paid in connection with the case.

*Information Excluded from Disclosure.*  The Parties shall not be required to disclose and no witness may be examined regarding (i) drafts of any report, calculation, analysis or estimate, regardless of the form in which the draft is recorded; (ii) other notes or writing taken or prepared by or for the testifying expert; or (iii) communications involving any expert witness regardless of the form of the communications, including but not limited to any communication between (x) any expert witness and the Parties' attorneys, (y) any expert witness and the witness's staff, and (z) communications between testifying experts and consulting experts.  Additionally, there shall be no disclosure of materials prepared by or for consulting experts. The Parties further agree that the provision of any materials to an expert witness and/or the witness's staff shall not

---

[2] Any reply shall be limited to addressing materials, opinions or arguments raised in rebuttal reports.

[3] To the extent any such data, calculations or estimates are in the form of or rely upon computer data files, the witness shall produce all such data files, in the electronic format used by the witness, and sufficient documentation or explanation to enable one reasonably skilled in the art to understand and use such data files.

constitute a subject matter waiver of the attorney client privilege or any other privilege or protection.

IV.    **PRE-TRIAL BRIEFS AND SUBMISSIONS**

All pending motions concerning the Covered Loans and RMBS Protocol are deemed withdrawn.  Each of the Parties shall submit a single pre-trial brief addressing reasonably anticipated disputes concerning substantive law no less than 15 days prior to the Hearing.  Each of the pre-trial briefs shall be no longer than 50 pages in length.  The pre-trial brief shall be the only pre-hearing brief or submission submitted by the Parties with respect to disputes concerning substantive law.  For the avoidance of doubt, nothing in this agreement shall prejudice the right of any Party to make, in connection with the Hearing, arguments or challenges based on the sufficiency, completeness or timeliness of materials, loan files, or documentation submitted by any Party under the Protocol or arguments or challenges based on compliance with the requirements of the Protocol by any Party, including but not limited to any arguments made by any Party in connection with *Lehman's Second Objection to Certain RMBS Trust Claims and Motion to Disallow and Expunge Certain RMBS Trust Claims for Insufficient Documentation* [Doc. No. 53620].

V.    **WITNESSES**

No less than 75 days prior to the Hearing, the Parties shall submit a preliminary list of the witnesses that they may present at the Hearing.  Each Party shall make a good-faith effort to include on its preliminary witness list all of the individuals (and only those individuals) that the Party believes it will present at the Hearing.  No less than 45 days prior to the Hearing the Parties shall submit final witness lists of those individuals they expect to call at the Hearing.

Direct testimony of witnesses may be presented by written declaration, which shall be provided by Lehman no less than 30 days before the hearing, and shall be provided by the RMBS Trustees no less than 15 days prior to the Hearing.  Notwithstanding the foregoing, the Parties shall each be permitted to present direct testimony of any witness at the Hearing.  Depositions of fact witnesses, if any, shall be completed at least 15 days prior to the Hearing.  In addition to hearing witnesses, the Parties shall also each be entitled to take the deposition of up to three fact witnesses. Such depositions shall be completed no later than 15 days before the hearing date.

For the removal of doubt, both the Trustees and Lehman shall be permitted to depose any witness identified by the other side as a Hearing witness.  Should either side wish to add a witness based on developments during the Hearing, that Party shall provide sufficient advance notice such that the other Party will have the opportunity to depose that witness before he/she testifies at the Hearing.  Each Party reserves all objections to the designation of any person as a witness or deponent.

## VI.    EXHIBITS

On the dates set forth in Section III, the Parties shall identify for one another, by Loan Number, any specific loans that they intend to introduce as exemplar loans in their cases-in-chief at the Hearing.  The Parties reserve the right to request that they be allowed to introduce additional exemplar loans, however, the other Party shall have the right to move to exclude such exemplar loans.

No less than 30 days prior to the Hearing, the Parties shall exchange lists of exhibits (not including demonstratives or exemplar loans, which is addressed above) that they expect to be offered in their cases-in-chief.  The parties will cooperate in good faith to create a Bates Numbered set of all documents that will be offered as trial exhibits.  The Parties may supplement their exhibit lists before and during the Hearing if, in good faith, it is necessary to do so.

If a Party objects to the other Party's proposed use of any testimony or exhibits, that Party shall provide prompt notice to the other Party no later than 10 days prior to the Hearing, or in the case of later added exhibits, promptly after the exhibits are identified, and the Parties shall promptly attempt to resolve the objection.

## VII.    EVIDENCE

The Parties may offer into evidence before the Court, at the Hearing, without objection by any Party:

(i)      the RMBS Trust Settlement Agreements entered into by and between the LBHI Debtors and the Institutional Investors on October 26, 2015 and November 29, 2016;

(ii)     materials concerning other settlement agreements in disputes involving residential mortgage-backed securities.  Each Party will identify within 15 days of the execution by LBHI and the Institutional Investors of the Settlement Agreement to which this Exhibit G is appended, a preliminary list of those settlements that it wishes to admit into evidence;

(iii)    the Institutional Investor Statement attached as Exhibit [ ] to the Settlement Agreement;

(iv)     the RMBS Claim Files, as defined in the Protocol Order;

(v)      the loan origination and servicing files for each of the loans as to which the RMBS Trustees assert a claim;

(vi)     the RMBS Claim, as defined in the Protocol, for each such claim;

(vii)    the Claim Tracking Spreadsheet, as defined in the Protocol;

(viii)   the Approved Claims Report, as defined in the Protocol;

(ix)    the Rejected Claims Report, as defined in the Protocol;

(x)     any disputed Approved Claims, as referenced in the Protocol;

(xi)    Rejected Claim File rebuttals, as referenced in the Protocol;

(xii)   the Plan Administrator's Statement, as defined in the Protocol;

(xiii)   any other materials exchanged between the Parties (including but not limited to the Nationstar and Intex datatapes in support of the Purchase Price) during the Protocol;

(xiv)   the Governing Agreements related to the Trusts; and

(xv)    the holdings of the Institutional Investors, which shall be updated and certified by the Institutional Investors as of the first day of the Estimation Hearing.

For the avoidance of doubt, items (iv)-(xiii) above are intended to refer to materials exchanged during the Protocol and the agreement herein extends only to materials that were, in fact, so exchanged by the Parties.

With respect to the foregoing categories or documents, while the Parties agree that such documents will be admitted into evidence, they reserve all rights to present arguments as to reliability, competency, weight, relevance, timeliness or any other arguments concerning the Court's consideration of such evidence.  In addition, the Parties reserve all rights to seek to introduce additional evidence at the Hearing.

## EXHIBIT H

## ALLOCATION PERCENTAGES

| Trustee | Trust Name / Loan Group | Initial Allocated Percentage |
|---|---|---|
| Deutsche Bank | SAIL 2004-1 / 1 | 0.004308% |
| Deutsche Bank | SAIL 2004-1 / 2 | 0.001292% |
| Law Debenture | ARC 2002-BC10 / 1 | 0.000000% |
| Law Debenture | ARC 2002-BC10 / 2 | 0.001084% |
| Law Debenture | ARC 2002-BC10 / 3 | 0.001060% |
| Law Debenture | ARC 2002-BC8 / 1 | 0.008188% |
| Law Debenture | ARC 2002-BC8 / 2 | 0.000561% |
| Law Debenture | ARC 2002-BC9 / 1 | 0.000000% |
| Law Debenture | ARC 2002-BC9 / 2 | 0.000169% |
| Law Debenture | BNC 2007-4 / 1 | 0.598969% |
| Law Debenture | BNC 2007-4 / 2 | 0.319296% |
| Law Debenture | LABS 2007-1 / 1 | 0.213542% |
| Law Debenture | LABS 2007-1 / 2 | 0.665016% |
| Law Debenture | LMT 2006-9 / 1 | 0.007225% |
| Law Debenture | LMT 2006-9 / 2 | 0.142322% |
| Law Debenture | LMT 2006-9 / 3 | 0.059861% |
| Law Debenture | LMT 2007-1 / 1 | 0.104230% |
| Law Debenture | LMT 2007-1 / 2 | 0.015085% |
| Law Debenture | LMT 2007-1 / 3 | 0.051720% |
| Law Debenture | LMT 2007-4 / 1 | 0.081740% |
| Law Debenture | LMT 2007-4 / 2 | 0.179616% |
| Law Debenture | LMT 2007-4 / 3 | 0.030551% |
| Law Debenture | LMT 2007-4 / 4 | 0.030503% |
| Law Debenture | LMT 2007-4 / 5 | 0.007382% |
| Law Debenture | LMT 2007-5 / 1 | 0.068732% |
| Law Debenture | LMT 2007-5 / 2 | 0.000000% |
| Law Debenture | LMT 2007-5 / 3 | 0.207011% |
| Law Debenture | LMT 2007-5 / 4 | 0.082310% |
| Law Debenture | LMT 2007-9 / 1 | 0.082662% |
| Law Debenture | LMT 2007-9 / 2 | 0.000000% |
| Law Debenture | LMT 2008-2 / 1 | 0.139862% |

| Law Debenture | LMT 2008-6 / 1 | 0.034315% |
|---|---|---|
| Law Debenture | LMT 2008-6 / 2 | 0.015777% |
| Law Debenture | SAIL 2003-BC12 / 1 | 0.000000% |
| Law Debenture | SAIL 2003-BC12 / 2 | 0.001352% |
| Law Debenture | SAIL 2003-BC12 / 3 | 0.000000% |
| Law Debenture | SAIL 2003-BC3 / 1 | 0.000000% |
| Law Debenture | SAIL 2003-BC3 / 2 | 0.002550% |
| Law Debenture | SAIL 2003-BC4 / 1 | 0.000000% |
| Law Debenture | SAIL 2003-BC4 / 2 | 0.002132% |
| Law Debenture | SARM 2004-10 / 1 | 0.049816% |
| Law Debenture | SARM 2004-10 / 2 | 0.041340% |
| Law Debenture | SARM 2004-10 / 3 | 0.069912% |
| Law Debenture | SARM 2004-10 / 4 | 0.005914% |
| Law Debenture | SARM 2004-16 / 1 | 0.081050% |
| Law Debenture | SARM 2004-16 / 2 | 0.025806% |
| Law Debenture | SARM 2004-16 / 3 | 0.071327% |
| Law Debenture | SARM 2004-16 / 4 | 0.006938% |
| Law Debenture | SARM 2004-16 / 5 | 0.006614% |
| Law Debenture | SARM 2004-16 / 6 | 0.024738% |
| Law Debenture | SARM 2004-18 / 1 | 0.076254% |
| Law Debenture | SARM 2004-18 / 2 | 0.033334% |
| Law Debenture | SARM 2004-18 / 3 | 0.068914% |
| Law Debenture | SARM 2004-18 / 4 | 0.011927% |
| Law Debenture | SARM 2004-18 / 5 | 0.000184% |
| Law Debenture | SARM 2004-20 / 1 | 0.092546% |
| Law Debenture | SARM 2004-20 / 2 | 0.046727% |
| Law Debenture | SARM 2004-20 / 3 | 0.020287% |
| Law Debenture | SARM 2004-20 / 4 | 0.002601% |
| Law Debenture | SARM 2004-20 / 5 | 0.001475% |
| Law Debenture | SARM 2004-5 / 1 | 0.004269% |
| Law Debenture | SARM 2004-5 / 2 | 0.017610% |
| Law Debenture | SARM 2004-5 / 3 | 0.035427% |
| Law Debenture | SARM 2004-5 / 4 | 0.002673% |
| Law Debenture | SARM 2004-5 / 5 | 0.001785% |
| Law Debenture | SARM 2004-9XS / 1 | 0.010376% |
| Law Debenture | SARM 2005-11 / 1 | 0.046958% |
| Law Debenture | SARM 2005-11 / 2 | 0.020525% |
| Law Debenture | SARM 2005-11 / 3 | 0.029317% |
| Law Debenture | SARM 2005-11 / 4 | 0.002855% |

| Law Debenture | SARM 2005-11 / 5 | 0.002325% |
|---|---|---|
| Law Debenture | SARM 2005-12 / 1 | 0.065902% |
| Law Debenture | SARM 2005-12 / 2 | 0.029879% |
| Law Debenture | SARM 2005-12 / 3 | 0.041953% |
| Law Debenture | SARM 2005-12 / 4 | 0.024114% |
| Law Debenture | SARM 2005-12 / 5 | 0.012730% |
| Law Debenture | SARM 2005-12 / 6 | 0.000000% |
| Law Debenture | SARM 2005-15 / 1 | 0.058291% |
| Law Debenture | SARM 2005-15 / 2 | 0.005084% |
| Law Debenture | SARM 2005-15 / 3 | 0.009176% |
| Law Debenture | SARM 2005-15 / 4 | 0.000000% |
| Law Debenture | SARM 2005-15 / 5 | 0.000000% |
| Law Debenture | SARM 2005-17 / 1 | 0.010736% |
| Law Debenture | SARM 2005-17 / 2 | 0.030931% |
| Law Debenture | SARM 2005-17 / 3 | 0.141143% |
| Law Debenture | SARM 2005-17 / 4 | 0.000000% |
| Law Debenture | SARM 2005-17 / 5 | 0.040697% |
| Law Debenture | SARM 2005-17 / 6 | 0.000000% |
| Law Debenture | SARM 2005-20 / 1 | 0.006759% |
| Law Debenture | SARM 2005-20 / 2 | 0.158112% |
| Law Debenture | SARM 2005-20 / 3 | 0.021248% |
| Law Debenture | SARM 2005-20 / 4 | 0.057642% |
| Law Debenture | SARM 2007-1 / 1 | 0.488971% |
| Law Debenture | SARM 2007-1 / 2 | 0.039373% |
| Law Debenture | SARM 2007-11 / 1 | 0.400153% |
| Law Debenture | SARM 2007-11 / 2 | 0.124982% |
| Law Debenture | SARM 2007-11 / 3 | 0.155263% |
| Law Debenture | SARM 2007-2 / 1 | 0.568272% |
| Law Debenture | SARM 2007-2 / 2 | 0.048575% |
| Law Debenture | SARM 2007-3 / 1 | 0.538650% |
| Law Debenture | SARM 2007-3 / 2 | 0.004111% |
| Law Debenture | SARM 2007-3 / 3 | 0.013387% |
| Law Debenture | SARM 2007-3 / 4 | 0.000000% |
| Law Debenture | SARM 2007-4 / 1 | 0.837854% |
| Law Debenture | SARM 2007-6 / 1 | 0.254836% |
| Law Debenture | SARM 2007-6 / 2 | 0.477651% |
| Law Debenture | SARM 2007-6 / 3 | 0.227329% |
| Law Debenture | SASCO 2003-15A / 1 | 0.002203% |
| Law Debenture | SASCO 2003-15A / 2 | 0.004188% |

| Law Debenture | SASCO 2003-15A / 3 | 0.000917% |
| Law Debenture | SASCO 2003-15A / 4 | 0.000000% |
| Law Debenture | SASCO 2003-17A / 1 | 0.011847% |
| Law Debenture | SASCO 2003-17A / 2 | 0.010668% |
| Law Debenture | SASCO 2003-17A / 3 | 0.000000% |
| Law Debenture | SASCO 2003-17A / 4 | 0.000598% |
| Law Debenture | SASCO 2003-26A / 1 | 0.001135% |
| Law Debenture | SASCO 2003-26A / 2 | 0.000000% |
| Law Debenture | SASCO 2003-26A / 3 | 0.037971% |
| Law Debenture | SASCO 2003-26A / 4 | 0.000000% |
| Law Debenture | SASCO 2003-26A / 5 | 0.000000% |
| Law Debenture | SASCO 2003-26A / 6 | 0.001571% |
| Law Debenture | SASCO 2003-26A / 7 | 0.000365% |
| Law Debenture | SASCO 2003-34A / 1 | 0.004542% |
| Law Debenture | SASCO 2003-34A / 2 | 0.003370% |
| Law Debenture | SASCO 2003-34A / 3 | 0.010398% |
| Law Debenture | SASCO 2003-34A / 4 | 0.000633% |
| Law Debenture | SASCO 2003-34A / 5 | 0.029231% |
| Law Debenture | SASCO 2003-34A / 6 | 0.005114% |
| Law Debenture | SASCO 2003-6A / 1 | 0.000347% |
| Law Debenture | SASCO 2003-6A / 2 | 0.001655% |
| Law Debenture | SASCO 2003-6A / 3 | 0.002655% |
| Law Debenture | SASCO 2003-6A / 4 | 0.001979% |
| Law Debenture | SASCO 2003-S2 / 1 | 0.004955% |
| Law Debenture | SASCO 2005-S6 / 1 | 0.579689% |
| Law Debenture | SASCO 2005-S7 / 1 | 0.365128% |
| Law Debenture | SASCO 2005-S7 / 2 | 0.455817% |
| Law Debenture | SASCO 2007-BC1 / 1 | 1.057679% |
| Law Debenture | SASCO 2007-BC1 / 2 | 0.982354% |
| Law Debenture | SASCO 2007-MLN1 / 1 | 0.944060% |
| Law Debenture | SASCO 2007-MLN1 / 2 | 1.324885% |
| Law Debenture | SASCO 2007-OSI / 1 | 1.052390% |
| Law Debenture | SASCO 2007-OSI / 2 | 1.196287% |
| US Bank | ARC 2004-1 / 1 | 0.000000% |
| US Bank | ARC 2004-1 / 2 | 0.000000% |
| US Bank | BNC 2006-1 / 1 | 0.634371% |
| US Bank | BNC 2006-1 / 2 | 0.595645% |
| US Bank | BNC 2006-2 / 1 | 0.203133% |
| US Bank | BNC 2006-2 / 2 | 0.735519% |

| US Bank | BNC 2007-1 / 1 | 0.987162% |
|---------|----------------|-----------|
| US Bank | BNC 2007-1 / 2 | 0.886811% |
| US Bank | BNC 2007-2 / 1 | 1.137371% |
| US Bank | BNC 2007-2 / 2 | 1.028894% |
| US Bank | LABS 2004-1 / 1 | 0.007673% |
| US Bank | LABS 2004-1 / 2 | 0.008799% |
| US Bank | LMT 2005-1 / 1 | 0.047402% |
| US Bank | LMT 2005-1 / 2 | 0.067437% |
| US Bank | LMT 2005-1 / 3 | 0.029578% |
| US Bank | LMT 2005-1 / 4 | 0.018448% |
| US Bank | LMT 2005-1 / 5 | 0.045656% |
| US Bank | LMT 2005-1 / 6 | 0.003233% |
| US Bank | LMT 2005-2 / 1 | 0.110091% |
| US Bank | LMT 2005-2 / 2 | 0.086622% |
| US Bank | LMT 2005-2 / 3 | 0.078927% |
| US Bank | LMT 2005-2 / 4 | 0.026577% |
| US Bank | LMT 2005-2 / 5 | 0.074712% |
| US Bank | LMT 2005-3 / 1 | 0.075870% |
| US Bank | LMT 2005-3 / 2 | 0.060637% |
| US Bank | LMT 2005-3 / 3 | 0.035600% |
| US Bank | LMT 2005-3 / 4 | 0.021575% |
| US Bank | LMT 2006-2 / 1 | 0.005721% |
| US Bank | LMT 2006-2 / 2 | 0.011030% |
| US Bank | LMT 2006-2 / 3 | 0.004150% |
| US Bank | LMT 2006-2 / 4 | 0.002940% |
| US Bank | LMT 2006-8 / 1 | 0.321303% |
| US Bank | LMT 2007-10 / 1 | 0.080406% |
| US Bank | LMT 2007-10 / 2 | 0.493666% |
| US Bank | LMT 2007-10 / 3 | 0.001068% |
| US Bank | LMT 2007-2 / 1 | 0.018559% |
| US Bank | LMT 2007-2 / 2 | 0.032447% |
| US Bank | LMT 2007-2 / 3 | 0.121884% |
| US Bank | LMT 2007-3 / 1 | 0.028116% |
| US Bank | LMT 2007-6 / 1 | 0.020340% |
| US Bank | LMT 2007-6 / 2 | 0.159604% |
| US Bank | LMT 2007-7 / 1 | 0.037798% |
| US Bank | LMT 2007-7 / 2 | 0.000697% |
| US Bank | LMT 2007-7 / 3 | 0.226436% |
| US Bank | LMT 2007-8 / 1 | 0.151236% |

<u>EXECUTION VERSION</u>

| US Bank | LMT 2007-8 / 2 | 0.039659% |
|---------|----------------|-----------|
| US Bank | LMT 2007-8 / 3 | 0.350808% |
| US Bank | LXS 2005-2 / 1 | 0.407721% |
| US Bank | LXS 2005-2 / 2 | 0.067132% |
| US Bank | LXS 2005-4 / 1 | 0.242492% |
| US Bank | LXS 2005-4 / 2 | 0.189077% |
| US Bank | LXS 2006-10N / 1 | 0.177095% |
| US Bank | LXS 2006-10N / 2 | 0.000000% |
| US Bank | LXS 2006-10N / 3 | 0.000000% |
| US Bank | LXS 2006-11 / 1 | 0.546454% |
| US Bank | LXS 2006-11 / 2 | 0.025908% |
| US Bank | LXS 2006-12N / 1 | 0.068131% |
| US Bank | LXS 2006-12N / 2 | 0.000000% |
| US Bank | LXS 2006-12N / 3 | 0.000000% |
| US Bank | LXS 2006-15 / 1 | 1.087065% |
| US Bank | LXS 2006-19 / 1 | 1.315674% |
| US Bank | LXS 2006-20 / 1 | 1.191402% |
| US Bank | LXS 2006-3 / 1 | 0.655467% |
| US Bank | LXS 2006-8 / 1 | 0.396812% |
| US Bank | LXS 2006-8 / 2 | 0.315565% |
| US Bank | LXS 2006-8 / 3 | 0.350715% |
| US Bank | LXS 2007-1 / 1 | 1.089568% |
| US Bank | LXS 2007-1 / 2 | 0.244584% |
| US Bank | LXS 2007-1 / 3 | 0.000000% |
| US Bank | LXS 2007-10H / 1 | 1.763647% |
| US Bank | LXS 2007-10H / 2 | 0.386591% |
| US Bank | LXS 2007-12N / 1 | 0.000000% |
| US Bank | LXS 2007-12N / 2 | 0.846426% |
| US Bank | LXS 2007-12N / 3 | 0.000000% |
| US Bank | LXS 2007-14H / 1 | 2.649003% |
| US Bank | LXS 2007-15N / 1 | 0.116525% |
| US Bank | LXS 2007-15N / 2 | 0.375078% |
| US Bank | LXS 2007-15N / 3 | 0.000000% |
| US Bank | LXS 2007-15N / 4 | 0.000000% |
| US Bank | LXS 2007-15N / 6 | 0.000000% |
| US Bank | LXS 2007-15N / 1C | 0.156605% |
| US Bank | LXS 2007-16N / 1 | 0.139360% |
| US Bank | LXS 2007-16N / 2 | 0.725591% |
| US Bank | LXS 2007-16N / 3 | 0.094417% |

| US Bank | LXS 2007-16N / 4 | 0.000000% |
|---------|-------------------|-----------|
| US Bank | LXS 2007-17H / 1 | 1.713333% |
| US Bank | LXS 2007-18N / 1 | 0.622723% |
| US Bank | LXS 2007-18N / 2 | 0.549264% |
| US Bank | LXS 2007-20N / 1 | 0.868777% |
| US Bank | LXS 2007-3 / 2 | 0.933371% |
| US Bank | LXS 2007-3 / 1A | 0.144193% |
| US Bank | LXS 2007-3 / 1B | 0.620399% |
| US Bank | LXS 2007-3 / 3A | 0.199179% |
| US Bank | LXS 2007-3 / 3B | 0.256320% |
| US Bank | LXS 2007-3 / 4A | 0.000000% |
| US Bank | LXS 2007-3 / 4B | 0.084520% |
| US Bank | LXS 2007-5H / 1 | 0.351476% |
| US Bank | LXS 2007-5H / 2 | 0.408046% |
| US Bank | LXS 2007-5H / 3 | 0.941454% |
| US Bank | LXS 2007-6 / 1 | 1.656792% |
| US Bank | LXS 2007-6 / 2 | 0.720225% |
| US Bank | LXS 2007-6 / 3 | 1.128605% |
| US Bank | LXS 2007-7N / 1 | 0.298622% |
| US Bank | LXS 2007-7N / 2 | 0.149496% |
| US Bank | LXS 2007-7N / 3 | 0.000000% |
| US Bank | LXS 2007-8H / 1 | 3.215265% |
| US Bank | LXS 2007-9 / 1 | 0.705272% |
| US Bank | LXS 2007-9 / 2 | 0.000000% |
| US Bank | RLT 2008-AH1 / 1 | 0.038943% |
| US Bank | SAIL 2003-BC1 / 1 | 0.001775% |
| US Bank | SAIL 2003-BC1 / 2 | 0.000000% |
| US Bank | SAIL 2003-BC10 / 1 | 0.000000% |
| US Bank | SAIL 2003-BC10 / 2 | 0.001061% |
| US Bank | SAIL 2003-BC10 / 3 | 0.000316% |
| US Bank | SAIL 2003-BC11 / 1 | 0.000923% |
| US Bank | SAIL 2003-BC11 / 2 | 0.000000% |
| US Bank | SAIL 2003-BC13 / 1 | 0.000000% |
| US Bank | SAIL 2003-BC13 / 2 | 0.001758% |
| US Bank | SAIL 2003-BC13 / 3 | 0.000000% |
| US Bank | SAIL 2003-BC2 / 1 | 0.000000% |
| US Bank | SAIL 2003-BC2 / 2 | 0.000308% |
| US Bank | SAIL 2003-BC2 / 3 | 0.000000% |
| US Bank | SAIL 2003-BC5 / 1 | 0.008841% |

| US Bank | SAIL 2003-BC5 / 2 | 0.000000% |
|---------|-------------------|-----------|
| US Bank | SAIL 2003-BC8 / 1 | 0.000000% |
| US Bank | SAIL 2003-BC8 / 2 | 0.000000% |
| US Bank | SAIL 2003-BC8 / 3a | 0.002498% |
| US Bank | SAIL 2003-BC8 / 3b | 0.001917% |
| US Bank | SAIL 2003-BC9 / 1 | 0.000000% |
| US Bank | SAIL 2003-BC9 / 2 | 0.000000% |
| US Bank | SAIL 2003-BC9 / 3 | 0.003657% |
| US Bank | SAIL 2004-10 / 1 | 0.000000% |
| US Bank | SAIL 2004-10 / 2 | 0.020774% |
| US Bank | SAIL 2004-10 / 3 | 0.009093% |
| US Bank | SAIL 2004-10 / 4 | 0.019061% |
| US Bank | SAIL 2004-2 / 1 | 0.000000% |
| US Bank | SAIL 2004-2 / 2 | 0.004715% |
| US Bank | SAIL 2004-2 / 3 | 0.000000% |
| US Bank | SAIL 2004-3 / 1 | 0.002379% |
| US Bank | SAIL 2004-3 / 2 | 0.017431% |
| US Bank | SAIL 2004-4 / 1 | 0.000000% |
| US Bank | SAIL 2004-4 / 2 | 0.000000% |
| US Bank | SAIL 2004-4 / 3 | 0.000000% |
| US Bank | SAIL 2004-5 / 1 | 0.000651% |
| US Bank | SAIL 2004-5 / 2 | 0.000929% |
| US Bank | SAIL 2004-6 / 1 | 0.002381% |
| US Bank | SAIL 2004-6 / 2 | 0.001584% |
| US Bank | SAIL 2004-8 / 1 | 0.000000% |
| US Bank | SAIL 2004-8 / 2 | 0.002003% |
| US Bank | SAIL 2004-8 / 3 | 0.000000% |
| US Bank | SAIL 2004-8 / 4 | 0.003276% |
| US Bank | SAIL 2004-8 / 5 | 0.011847% |
| US Bank | SAIL 2004-9 / 1 | 0.000745% |
| US Bank | SAIL 2004-9 / 2 | 0.004372% |
| US Bank | SAIL 2004-9 / 3 | 0.001530% |
| US Bank | SAIL 2005-1 / 1 | 0.000000% |
| US Bank | SAIL 2005-1 / 2 | 0.018902% |
| US Bank | SAIL 2005-1 / 3 | 0.020621% |
| US Bank | SAIL 2005-10 / 1 | 0.000018% |
| US Bank | SAIL 2005-10 / 2 | 0.000000% |
| US Bank | SAIL 2005-10 / 3 | 0.018075% |
| US Bank | SAIL 2005-11 / 1 | 0.002021% |

| US Bank | SAIL 2005-11 / 2 | 0.000000% |
|---|---|---|
| US Bank | SAIL 2005-11 / 3 | 0.025150% |
| US Bank | SAIL 2005-2 / 1 | 0.013629% |
| US Bank | SAIL 2005-2 / 2 | 0.004903% |
| US Bank | SAIL 2005-3 / 1 | 0.000000% |
| US Bank | SAIL 2005-3 / 2 | 0.010890% |
| US Bank | SAIL 2005-3 / 3 | 0.004563% |
| US Bank | SAIL 2005-3 / 4 | 0.000000% |
| US Bank | SAIL 2005-4 / 1 | 0.062889% |
| US Bank | SAIL 2005-4 / 2 | 0.052243% |
| US Bank | SAIL 2005-5 / 1 | 0.000000% |
| US Bank | SAIL 2005-5 / 2 | 0.044159% |
| US Bank | SAIL 2005-5 / 3 | 0.030846% |
| US Bank | SAIL 2005-5 / 4 | 0.027217% |
| US Bank | SAIL 2005-6 / 1 | 0.000000% |
| US Bank | SAIL 2005-6 / 2 | 0.012233% |
| US Bank | SAIL 2005-6 / 3 | 0.023835% |
| US Bank | SAIL 2005-6 / 4 | 0.048166% |
| US Bank | SAIL 2005-7 / 1 | 0.027160% |
| US Bank | SAIL 2005-7 / 2 | 0.037440% |
| US Bank | SAIL 2005-8 / 1 | 0.031559% |
| US Bank | SAIL 2005-8 / 2 | 0.055215% |
| US Bank | SAIL 2005-9 / 1 | 0.000000% |
| US Bank | SAIL 2005-9 / 2 | 0.000000% |
| US Bank | SAIL 2005-9 / 3 | 0.037779% |
| US Bank | SAIL 2005-HE3 / 1 | 0.031341% |
| US Bank | SAIL 2005-HE3 / 2 | 0.031600% |
| US Bank | SAIL 2006-1 / 1 | 0.020272% |
| US Bank | SAIL 2006-2 / 1 | 0.043225% |
| US Bank | SAIL 2006-4 / 1 | 0.000000% |
| US Bank | SAIL 2006-4 / 2 | 0.009465% |
| US Bank | SAIL 2006-4 / 3 | 0.016682% |
| US Bank | SAIL 2006-BNC3 / 1 | 1.853131% |
| US Bank | SAIL 2006-BNC3 / 2 | 1.984505% |
| US Bank | SARM 2005-22 / 1 | 0.224487% |
| US Bank | SARM 2005-22 / 2 | 0.088204% |
| US Bank | SARM 2005-22 / 3 | 0.000000% |
| US Bank | SARM 2005-22 / 4 | 0.000000% |
| US Bank | SARM 2005-22 / 5 | 0.153723% |

| US Bank | SARM 2005-23 / 1 | 0.152283% |
|---------|------------------|-----------|
| US Bank | SARM 2005-23 / 2 | 0.127682% |
| US Bank | SARM 2005-23 / 3 | 0.147378% |
| US Bank | SARM 2005-23 / 4 | 0.000000% |
| US Bank | SARM 2005-6XS / 1 | 0.158228% |
| US Bank | SARM 2005-8XS / 1 | 0.167643% |
| US Bank | SARM 2006-1 / 1 | 0.090431% |
| US Bank | SARM 2006-1 / 2 | 0.043361% |
| US Bank | SARM 2006-1 / 3 | 0.000000% |
| US Bank | SARM 2006-1 / 4 | 0.189958% |
| US Bank | SARM 2006-1 / 5 | 0.032162% |
| US Bank | SARM 2006-1 / 6 | 0.110819% |
| US Bank | SARM 2006-1 / 7 | 0.000000% |
| US Bank | SARM 2006-1 / 8 | 0.101616% |
| US Bank | SARM 2006-10 / 1 | 0.000000% |
| US Bank | SARM 2006-10 / 2 | 0.051032% |
| US Bank | SARM 2006-10 / 3 | 0.054674% |
| US Bank | SARM 2006-11 / 1 | 0.285091% |
| US Bank | SARM 2006-11 / 2 | 0.052407% |
| US Bank | SARM 2006-11 / 3 | 0.034068% |
| US Bank | SARM 2006-12 / 1 | 0.415504% |
| US Bank | SARM 2006-12 / 2 | 0.047158% |
| US Bank | SARM 2006-2 / 1 | 0.088211% |
| US Bank | SARM 2006-2 / 2 | 0.116346% |
| US Bank | SARM 2006-2 / 3 | 0.090787% |
| US Bank | SARM 2006-2 / 4 | 0.284508% |
| US Bank | SARM 2006-2 / 5 | 0.098247% |
| US Bank | SARM 2006-3 / 1 | 0.108397% |
| US Bank | SARM 2006-3 / 2 | 0.059825% |
| US Bank | SARM 2006-3 / 3 | 0.110221% |
| US Bank | SARM 2006-3 / 4 | 0.119412% |
| US Bank | SARM 2006-4 / 1 | 0.153813% |
| US Bank | SARM 2006-4 / 2 | 0.072317% |
| US Bank | SARM 2006-4 / 3 | 0.093587% |
| US Bank | SARM 2006-4 / 4 | 0.023258% |
| US Bank | SARM 2006-4 / 5 | 0.246539% |
| US Bank | SARM 2006-4 / 6 | 0.133100% |
| US Bank | SARM 2006-4 / 7 | 0.000000% |
| US Bank | SARM 2006-5 / 1 | 0.061507% |

| US Bank | SARM 2006-5 / 2 | 0.135872% |
|---------|-----------------|-----------|
| US Bank | SARM 2006-5 / 3 | 0.190280% |
| US Bank | SARM 2006-5 / 4 | 0.052103% |
| US Bank | SARM 2006-5 / 5 | 0.094904% |
| US Bank | SARM 2006-6 / 1 | 0.133156% |
| US Bank | SARM 2006-6 / 2 | 0.188455% |
| US Bank | SARM 2006-6 / 3 | 0.098324% |
| US Bank | SARM 2006-7 / 1 | 0.021553% |
| US Bank | SARM 2006-7 / 2 | 0.075574% |
| US Bank | SARM 2006-7 / 3 | 0.147236% |
| US Bank | SARM 2006-7 / 4 | 0.064788% |
| US Bank | SARM 2006-8 / 1 | 0.000000% |
| US Bank | SARM 2006-8 / 2 | 0.140340% |
| US Bank | SARM 2006-8 / 3 | 0.000000% |
| US Bank | SARM 2006-8 / 4 | 0.000000% |
| US Bank | SARM 2006-9 / 1 | 0.121490% |
| US Bank | SARM 2006-9 / 2 | 0.012400% |
| US Bank | SARM 2006-9 / 3 | 0.050361% |
| US Bank | SARM 2006-9 / 4 | 0.000000% |
| US Bank | SARM 2007-10 / 1 | 0.418956% |
| US Bank | SARM 2007-10 / 2 | 0.352233% |
| US Bank | SARM 2007-8 / 1 | 0.524086% |
| US Bank | SARM 2007-8 / 2 | 0.233335% |
| US Bank | SARM 2008-2 / 1 | 0.176724% |
| US Bank | SASCO 2003-25XS / 1 | 0.016419% |
| US Bank | SASCO 2003-39EX / 1 | 0.034170% |
| US Bank | SASCO 2003-GEL1 / 1 | 0.004737% |
| US Bank | SASCO 2003-NP1 / 1 | 0.004274% |
| US Bank | SASCO 2004-10 / 4 | 0.040548% |
| US Bank | SASCO 2004-11XS / 1 | 0.037679% |
| US Bank | SASCO 2004-11XS / 2 | 0.001614% |
| US Bank | SASCO 2004-13 / 1 | 0.000000% |
| US Bank | SASCO 2004-13 / 2 | 0.041289% |
| US Bank | SASCO 2004-17XS / 1 | 0.028814% |
| US Bank | SASCO 2004-19XS / 1 | 0.026352% |
| US Bank | SASCO 2004-20 / 1 | 0.000574% |
| US Bank | SASCO 2004-20 / 2 | 0.008173% |
| US Bank | SASCO 2004-20 / 3 | 0.005517% |
| US Bank | SASCO 2004-20 / 4 | 0.020767% |

| US Bank | SASCO 2004-20 / 5 | 0.008046% |
|---------|-------------------|-----------|
| US Bank | SASCO 2004-20 / 6 | 0.000000% |
| US Bank | SASCO 2004-20 / 7 | 0.000021% |
| US Bank | SASCO 2004-20 / 8 | 0.008707% |
| US Bank | SASCO 2004-21XS / 1 | 0.049709% |
| US Bank | SASCO 2004-21XS / 2 | 0.016566% |
| US Bank | SASCO 2004-2AC / 1 | 0.042243% |
| US Bank | SASCO 2004-6XS / 1 | 0.025015% |
| US Bank | SASCO 2004-7 / 1 | 0.033747% |
| US Bank | SASCO 2004-7 / 2 | 0.001088% |
| US Bank | SASCO 2004-7 / 3 | 0.005477% |
| US Bank | SASCO 2004-9XS / 1 | 0.046737% |
| US Bank | SASCO 2004-9XS / 2 | 0.009750% |
| US Bank | SASCO 2004-GEL1 / 1 | 0.011649% |
| US Bank | SASCO 2004-GEL2 / 1 | 0.008805% |
| US Bank | SASCO 2004-GEL3 / 1 | 0.002683% |
| US Bank | SASCO 2004-NP1 / 1 | 0.007823% |
| US Bank | SASCO 2004-S2 / 1 | 0.005952% |
| US Bank | SASCO 2004-S3 / 1 | 0.006036% |
| US Bank | SASCO 2004-S3 / 2 | 0.013127% |
| US Bank | SASCO 2004-S4 / 1 | 0.059859% |
| US Bank | SASCO 2005-14 / 1 | 0.008746% |
| US Bank | SASCO 2005-14 / 2 | 0.008792% |
| US Bank | SASCO 2005-14 / 3 | 0.020391% |
| US Bank | SASCO 2005-14 / 4 | 0.041388% |
| US Bank | SASCO 2005-3 / 1 | 0.058777% |
| US Bank | SASCO 2005-7XS / 1 | 0.071050% |
| US Bank | SASCO 2005-7XS / 2 | 0.078792% |
| US Bank | SASCO 2005-GEL2 / 1 | 0.010236% |
| US Bank | SASCO 2005-GEL2 / 2 | 0.001913% |
| US Bank | SASCO 2005-GEL3 / 1 | 0.016596% |
| US Bank | SASCO 2005-GEL4 / 1 | 0.029040% |
| US Bank | SASCO 2005-RF1 / 1 | 0.000040% |
| US Bank | SASCO 2005-RF2 / 1 | 0.000869% |
| US Bank | SASCO 2005-RF4 / 2 | 0.000913% |
| US Bank | SASCO 2005-RF5 / 1 | 0.000212% |
| US Bank | SASCO 2005-RF5 / 2 | 0.000000% |
| US Bank | SASCO 2005-RF6 / 1 | 0.000017% |
| US Bank | SASCO 2005-RF7 / 1 | 0.000682% |

| US Bank | SASCO 2005-S1 / 1 | 0.016985% |
|---------|-------------------|-----------|
| US Bank | SASCO 2005-S1 / 2 | 0.074697% |
| US Bank | SASCO 2005-S2 / 1 | 0.107416% |
| US Bank | SASCO 2005-S3 / 1 | 0.232562% |
| US Bank | SASCO 2005-S4 / 1 | 0.043521% |
| US Bank | SASCO 2005-S5 / 1 | 0.379139% |
| US Bank | SASCO 2005-SC1 / 1 | 0.212532% |
| US Bank | SASCO 2006-BC2 / 1 | 0.659689% |
| US Bank | SASCO 2006-BC2 / 2 | 0.008230% |
| US Bank | SASCO 2006-BC3 / 1 | 0.042642% |
| US Bank | SASCO 2006-BC3 / 2 | 0.086333% |
| US Bank | SASCO 2006-BC4 / 1 | 0.021788% |
| US Bank | SASCO 2006-BC4 / 2 | 0.049696% |
| US Bank | SASCO 2006-BC6 / 1 | 0.772772% |
| US Bank | SASCO 2006-BC6 / 2 | 0.670175% |
| US Bank | SASCO 2006-GEL1 / 1 | 0.018225% |
| US Bank | SASCO 2006-GEL2 / 1 | 0.008997% |
| US Bank | SASCO 2006-GEL3 / 1 | 0.007282% |
| US Bank | SASCO 2006-GEL3 / 2 | 0.000000% |
| US Bank | SASCO 2006-GEL4 / 1 | 0.046913% |
| US Bank | SASCO 2006-RF1 / 1 | 0.000000% |
| US Bank | SASCO 2006-RF1 / 2 | 0.000000% |
| US Bank | SASCO 2006-RF2 / 1 | 0.001991% |
| US Bank | SASCO 2006-RF3 / 1 | 0.000480% |
| US Bank | SASCO 2006-RF3 / 2 | 0.000000% |
| US Bank | SASCO 2006-RF3 / 3 | 0.000398% |
| US Bank | SASCO 2006-RF3 / 4 | 0.000000% |
| US Bank | SASCO 2006-RF4 / 1 | 0.000000% |
| US Bank | SASCO 2006-RF4 / 2 | 0.000225% |
| US Bank | SASCO 2006-RF4 / 3 | 0.000000% |
| US Bank | SASCO 2006-S1 / 1 | 1.286686% |
| US Bank | SASCO 2006-Z / 1 | 0.125224% |
| US Bank | SASCO 2006-Z / 2 | 0.163178% |
| US Bank | SASCO 2007-BC2 / 1 | 0.018223% |
| US Bank | SASCO 2007-BC2 / 2 | 0.056520% |
| US Bank | SASCO 2007-BC3 / 1 | 0.682815% |
| US Bank | SASCO 2007-BC3 / 2 | 0.617148% |
| US Bank | SASCO 2007-BC4 / 1 | 1.341653% |
| US Bank | SASCO 2007-BC4 / 2 | 1.475628% |

| US Bank | SASCO 2007-BNC1 / 1 | 0.950916% |
| US Bank | SASCO 2007-BNC1 / 2 | 1.402866% |
| US Bank | SASCO 2007-GEL1 / 1 | 0.199334% |
| US Bank | SASCO 2007-GEL2 / 1 | 0.255981% |
| US Bank | SASCO 2007-RF1 / 1 | 0.000000% |
| US Bank | SASCO 2007-RF1 / 2 | 0.000000% |
| US Bank | SASCO 2007-TC1 / 1 | 0.238499% |
| Wilmington Trust | BNC 2007-3 / 1 | 1.032133% |
| Wilmington Trust | BNC 2007-3 / 2 | 0.490340% |
| Wilmington Trust | LMT 2006-1 / 1 | 0.128637% |
| Wilmington Trust | LMT 2006-1 / 2 | 0.023404% |
| Wilmington Trust | LMT 2006-1 / 3 | 0.051984% |
| Wilmington Trust | LMT 2006-4 / 1 | 0.011941% |
| Wilmington Trust | LMT 2006-4 / 2 | 0.001525% |
| Wilmington Trust | LXS 2005-1 / 1 | 0.166349% |
| Wilmington Trust | LXS 2005-1 / 2 | 0.167067% |
| Wilmington Trust | LXS 2005-1 / 3 | 0.054199% |
| Wilmington Trust | LXS 2005-10 / 1 | 0.305489% |
| Wilmington Trust | LXS 2005-10 / 2 | 0.200249% |
| Wilmington Trust | LXS 2005-3 / 1 | 0.242947% |
| Wilmington Trust | LXS 2005-3 / 2 | 0.227732% |
| Wilmington Trust | LXS 2005-3 / 3 | 0.105695% |
| Wilmington Trust | LXS 2005-6 / 1 | 0.264233% |
| Wilmington Trust | LXS 2005-6 / 2 | 0.187614% |
| Wilmington Trust | LXS 2005-6 / 3 | 0.214582% |
| Wilmington Trust | LXS 2005-8 / 1 | 0.270499% |
| Wilmington Trust | LXS 2005-8 / 2 | 0.195244% |
| Wilmington Trust | LXS 2006-1 / 1 | 0.287423% |
| Wilmington Trust | LXS 2006-1 / 2 | 0.218340% |
| Wilmington Trust | LXS 2006-13 / 1 | 0.731870% |
| Wilmington Trust | LXS 2006-13 / 2 | 0.043277% |
| Wilmington Trust | LXS 2006-17 / 1 | 1.227788% |
| Wilmington Trust | LXS 2006-17 / 2 | 0.000000% |
| Wilmington Trust | LXS 2006-5 / 1 | 0.744378% |
| Wilmington Trust | LXS 2006-5 / 2 | 0.234677% |
| Wilmington Trust | LXS 2006-7 / 1 | 0.876394% |
| Wilmington Trust | LXS 2006-7 / 2 | 0.369689% |
| Wilmington Trust | LXS 2006-9 / 1 | 0.538173% |
| Wilmington Trust | LXS 2006-9 / 2 | 0.328633% |

DB1/ 91137811.2

| | | |
|---|---|---|
| Wilmington Trust | LXS 2007-11 / 1 | 1.110351% |
| Wilmington Trust | SARM 2005-3XS / 1 | 0.037970% |
| Wilmington Trust | SASCO 2003-12XS / 1 | 0.003221% |
| Wilmington Trust | SASCO 2003-18XS / 1 | 0.008246% |
| Wilmington Trust | SASCO 2003-28XS / 1 | 0.004696% |
| Wilmington Trust | SASCO 2003-29 / 1 | 0.005971% |
| Wilmington Trust | SASCO 2003-29 / 2 | 0.001001% |
| Wilmington Trust | SASCO 2003-29 / 3 | 0.003988% |
| Wilmington Trust | SASCO 2003-29 / 4 | 0.002210% |
| Wilmington Trust | SASCO 2003-29 / 5 | 0.005912% |
| Wilmington Trust | SASCO 2003-30 / 1 | 0.025074% |
| Wilmington Trust | SASCO 2003-30 / 2 | 0.001480% |
| Wilmington Trust | SASCO 2003-30 / 3 | 0.015082% |
| Wilmington Trust | SASCO 2003-35 / 1 | 0.000555% |
| Wilmington Trust | SASCO 2003-35 / 2 | 0.001603% |
| Wilmington Trust | SASCO 2003-35 / 3 | 0.013751% |
| Wilmington Trust | SASCO 2003-35 / 4 | 0.019244% |
| Wilmington Trust | SASCO 2003-36XS / 1 | 0.023291% |
| Wilmington Trust | SASCO 2003-38 / 1 | 0.009282% |
| Wilmington Trust | SASCO 2003-38 / 2 | 0.003798% |
| Wilmington Trust | SASCO 2003-3XS / 1 | 0.004044% |
| Wilmington Trust | SASCO 2003-S1 / 1 | 0.020231% |
| Wilmington Trust | SASCO 2004-15 / 1 | 0.000156% |
| Wilmington Trust | SASCO 2004-15 / 2 | 0.000000% |
| Wilmington Trust | SASCO 2004-15 / 3 | 0.012284% |
| Wilmington Trust | SASCO 2004-15 / 4 | 0.000677% |
| Wilmington Trust | SASCO 2004-16XS / 1 | 0.032070% |
| Wilmington Trust | SASCO 2004-18H / 1 | 0.000796% |
| Wilmington Trust | SASCO 2004-22 / 1 | 0.015932% |
| Wilmington Trust | SASCO 2004-23XS / 1 | 0.039230% |
| Wilmington Trust | SASCO 2004-23XS / 2 | 0.055258% |
| Wilmington Trust | SASCO 2004-4XS / 1 | 0.015873% |
| Wilmington Trust | SASCO 2004-4XS / 2 | 0.016730% |
| Wilmington Trust | SASCO 2005-1 / 1 | 0.062667% |
| Wilmington Trust | SASCO 2005-1 / 2 | 0.006624% |
| Wilmington Trust | SASCO 2005-1 / 3 | 0.000000% |
| Wilmington Trust | SASCO 2005-1 / 4 | 0.000000% |
| Wilmington Trust | SASCO 2005-1 / 5 | 0.001916% |
| Wilmington Trust | SASCO 2005-1 / 6 | 0.074564% |

| Wilmington Trust | SASCO 2005-1 / 7 | 0.043110% |
|---|---|---|
| Wilmington Trust | SASCO 2005-10 / 1 | 0.042529% |
| Wilmington Trust | SASCO 2005-10 / 2 | 0.017863% |
| Wilmington Trust | SASCO 2005-10 / 3 | 0.000000% |
| Wilmington Trust | SASCO 2005-10 / 4 | 0.000000% |
| Wilmington Trust | SASCO 2005-10 / 5 | 0.000000% |
| Wilmington Trust | SASCO 2005-10 / 6 | 0.000000% |
| Wilmington Trust | SASCO 2005-10 / 7 | 0.002397% |
| Wilmington Trust | SASCO 2005-10 / 8 | 0.038340% |
| Wilmington Trust | SASCO 2005-11H / 1 | 0.000000% |
| Wilmington Trust | SASCO 2005-15 / 1 | 0.006576% |
| Wilmington Trust | SASCO 2005-15 / 2 | 0.035261% |
| Wilmington Trust | SASCO 2005-15 / 3 | 0.008890% |
| Wilmington Trust | SASCO 2005-15 / 4 | 0.042647% |
| Wilmington Trust | SASCO 2005-15 / 5 | 0.014276% |
| Wilmington Trust | SASCO 2005-17 / 1 | 0.001003% |
| Wilmington Trust | SASCO 2005-17 / 2 | 0.005479% |
| Wilmington Trust | SASCO 2005-17 / 3 | 0.019832% |
| Wilmington Trust | SASCO 2005-17 / 4 | 0.037825% |
| Wilmington Trust | SASCO 2005-17 / 5 | 0.042364% |
| Wilmington Trust | SASCO 2005-2XS / 1 | 0.047617% |
| Wilmington Trust | SASCO 2005-2XS / 2 | 0.048195% |
| Wilmington Trust | SASCO 2005-4XS / 1 | 0.062751% |
| Wilmington Trust | SASCO 2005-4XS / 2 | 0.047130% |
| Wilmington Trust | SASCO 2005-4XS / 3 | 0.010096% |
| Wilmington Trust | SASCO 2005-5 / 1 | 0.077738% |
| Wilmington Trust | SASCO 2005-5 / 2 | 0.029624% |
| Wilmington Trust | SASCO 2005-5 / 3 | 0.023057% |
| Wilmington Trust | SASCO 2005-5 / 4 | 0.000009% |
| Wilmington Trust | SASCO 2005-9XS / 1 | 0.107536% |
| Wilmington Trust | SASCO 2005-9XS / 2 | 0.080869% |
| Wilmington Trust | SASCO 2006-S2 / 1 | 1.811246% |
| Wilmington Trust | SASCO 2006-S3 / 1 | 1.020158% |
| Wilmington Trust | SASCO 2006-S4 / 1 | 1.465131% |
| **Total** | | **100.000000%** |

## EXHIBIT I

### DEBTORS' FINDINGS

1. This Court has jurisdiction to hear this motion and adjudicate the Motion.

2. All parties entitled to receive notice of the Motion have been provided with notice that was reasonable, adequate, and was the best notice practicable, was reasonably calculated to put interested parties on notice of this Motion, and constitutes due and sufficient notice of this Motion in satisfaction of federal and state due process requirements and other applicable law. All such persons have been given the opportunity to be heard in opposition to the Motion.

3. Any objections that were raised or that could have been raised in opposition to the Motion, that have not been withdrawn or resolved, are overruled and/or waived.

4. Each of the LBHI Debtors has acted in good faith and exercised sound business judgment in connection with its determination to enter into and execute the Settlement Agreement. Approval of the Settlement Agreement is in the best interests of the LBHI Debtors, their respective estates and creditors.

# Exhibit 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 11** |
| **LEHMAN BROTHERS HOLDINGS INC.,** | ) **Case No. 08-13555 (SCC)** |
| *et al.,* | ) **(Jointly Administered)** |
| Debtors. | ) |

**REPORT REGARDING EXPERT OPINION OF JUDITH K. FITZGERALD**

**Part I.  Qualifications and Background**

**A.      Qualifications**

My Curriculum Vitae is attached hereto and incorporated herein by reference as Exhibit 1. I will confine this portion of my report to a summary of my qualifications.

I am an attorney in good standing and licensed to practice in the state courts of Pennsylvania and the federal courts in the Western District of Pennsylvania.  I have also practiced in the federal courts in the Southern District of West Virginia and the Eastern District of Virginia on a *pro hac vice* basis.  I am a 1970 graduate of the University of Pittsburgh, and a 1973 graduate of the University of Pittsburgh School of Law.  I was admitted to the Bar of the Commonwealth of Pennsylvania in 1973.

I took the oath of office as a United States Bankruptcy Judge on October 30, 1987.  I sat in the Western District of Pennsylvania for over 25 years and during that time, also sat by designation in the District of Delaware for 20 years, the Eastern District of Pennsylvania for 8 years, and the United States Virgin Islands for 9 years.  I served as Chief Judge in the Western District of Pennsylvania Bankruptcy Court for 5 years.   My experience on the bench

encompassed business and individual reorganization cases in chapter 11, individual and business cases in chapter 7, individual cases in chapter 13, and family farmer cases in chapter 12. I adjudicated hundreds of chapter 11 cases and thousands of chapter 13 cases through plan confirmation. I have considered and ruled on hundreds of motions to approve settlements as stand-alone motions and in conjunction with plan confirmation. Many of the cases on my docket required a determination of the reasonableness of settlement agreements for the purposes of liquidating and/or paying claims, including assessing whether the agreements were entered into at arm's length and in good faith.

Immediately before I was appointed to the bench, I was an Assistant United States Attorney for the Western District of Pennsylvania for nearly 12 years. In that capacity, I actively litigated civil, criminal, and bankruptcy cases and argued cases on appeal to the United States Court of Appeals for the Third Circuit. Prior to my employment with the Office of the United States Attorney, I served as a judicial law clerk.

I retired from my position as a United States Bankruptcy Judge on May 31, 2013. Thereafter, I accepted an offer as a tenured faculty member at a newly formed law school, the Indiana Tech Law School, from July 8, 2013 through July 5, 2015, where I taught Contracts, Commercial Transactions, and Bankruptcy. I am currently a Professor of Practice at the University of Pittsburgh School of Law. Previously I was an Adjunct Professor at the University of Pittsburgh School of Law for many years where I taught Bankruptcy and Advanced Bankruptcy.

On December 1, 2013, I affiliated as Of Counsel with the Pittsburgh based law firm of Tucker Arensberg, P.C. and I have been a shareholder since August 31, 2014.

2

The primary areas of my practice for the past forty years have been complex litigation in bankruptcy, criminal, and civil contexts both as a judge and as a litigator, and teaching and practicing bankruptcy and commercial law. I have received numerous recognitions and honors including honorable mention as one of the top ten bankruptcy judges in history by Law 360, the Lawrence P. King Award for Excellence in the Field of Bankruptcy, election to the American Law Institute, election to the American College of Bankruptcy, recognition for dedicated judicial service by both the Western Pennsylvania Trial Lawyers Association and by the Debtors' Bar Association, the naming of a chapter of the American Inn of Court in my honor, various awards from the National College of Bankruptcy Judges and others.

Regarding the opinion I have been asked to render, my experience has been informed by the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, and the Federal Rules of Bankruptcy Procedure (and cases interpreting same) which (1) require the bankruptcy court to rule on motions to approve settlements brought pursuant to Federal Rules of Bankruptcy Procedure 9019 and 9033 and as part of the plan confirmation, plan implementation, and post-confirmation matters that are brought before the court and (2) address the duties of trustees and debtors-in-possession regarding matters affecting the bankruptcy estate. From time to time I also considered the general standards applicable to settlements of class actions under Federal Rule of Civil Procedure 23. As a Bankruptcy Judge who sat in four jurisdictions, I examined and ruled on hundreds of settlement agreements that emanated from those jurisdictions and that were often affected by laws or interpretations thereof, as well as from many other states and territories of the United States and, from time to time, from foreign jurisdictions. I presided over bankruptcy cases in which indenture trustees, bond trustees, mortgage servicers, and other representatives or agents of loan parties appeared. In addition, as a practitioner, I have prepared, submitted, and advised

clients both in Western Pennsylvania and in various jurisdictions throughout the United States regarding settlement agreements and have prosecuted settlement agreements in various bankruptcy courts.  As a professor of law, I have taught students about the requirements for entering into and gaining bankruptcy court approval of settlement agreements and about the nature of duties of trustees, debtors-in-possession, and creditors' committees, and I have been a speaker and panelist numerous times where I addressed such issues.  I have also served as a court-appointed receiver, where I dealt with contractual, statutory and common law duties in connection with charitable organizations and the obligations owed to the public regarding the charity's assets.  My collective experience gives me the necessary background and expertise to address the matter on which I have been asked to opine.

As a United States Bankruptcy Judge addressing the reasonableness of settlements, I attended to the applicable law, gained an understanding of the provisions of the settlement and the facts that supported or failed to support the necessity or advisability of the settlement, assessed the likelihood that the parties could comply with the terms of the settlement, balanced the benefit of the settlement with the burdens created thereby, addressed whether the settlements were made in good faith and/or were arm's length transactions, evaluated the business judgment behind the settlement and, in some circumstances, whether the settlement comported with fiduciary obligations owed to the bankruptcy estate.  I have also conducted numerous estimation hearings and addressed estimation issues in many cases.  I applied a similar methodology in reaching my opinion in this matter, recognizing, however, that the RMBS Trustees' contractual duties to both known and unknown investors are assigned by the governing documents.

**B.    Compensation**

My compensation for this matter is $900 per hour plus expenses.  Other attorneys at Tucker Arensberg, P.C., acting under my instruction and control, charge rates which vary from $225 - $700 per hour.  Paralegal rates range from $100 to $200 per hour.  Hourly rates are subject to an annual adjustment.  My compensation is not based on the opinions I render in, or the outcome of, this matter.

**C.    Expert Testimony In The Past Four Years**

- In December 2016, I testified as an expert witness in the trial of *Mine Safety Appliances Company v. The North River Insurance Company,* in the Bankruptcy Court of Common Pleas of Allegheny County, Pennsylvania, Civil Division No.  G.D. 10-007432.

- In July 2014, I testified as an expert witness at a discovery deposition in the case of *United States Fidelity & Guaranty & Co. et al. v. American Re-Insurance et al.*, Index No. 604517/2002, pending in the Supreme Court of the State of New York, New York County.

- In October 2015, I testified as an expert in the arbitration proceeding in *Ponderosa Pine Energy, LLC v. Tenaska Energy, Inc*., *et al.*, in Dallas, Texas.

- In October 2015, I testified as an expert witness (via video) in the matter of *Susan McMahon v. Medical Protective Company*, No. 13-CV-0991-JFC (WDPA), in the United States District Court for the Western District of Pennsylvania.

- In October 2015, I testified in a discovery deposition in the matter of *Gregory S. Hancock v. Scott R. Goldberg, et al*., No. CV 2014-003367, pending in the Superior Court of the State of Arizona, in and for the County of Maricopa.

**D.    Publications In The Past Four Years**

- *Oh Dear! What Can The Matter Be? What Will Become Of My Oil And Gas Lease In Bankruptcy?*, in process of publication by Energy & Mineral Law Institute (co-author with James W. Kane)
- *The Powers of The U.S. Congress: Where Its Constitutional Authority Begins and Ends*, in progress with Brien Hallett as primary author, to be published by ABC-CLIO (co-author of Chapter 5, The Power to Regulate Bankruptcies with Professor Nancy Marcus)

- Commercial Law League and Tucker Arensberg Blogpost: "Third Circuit Rules that A Homeowner's Mortgage Insurance Obligation Is Not Modified By A Mortgage Modification" (Mar. 2017)
- Commercial Law League and Tucker Arensberg Blogpost: "Alternative Dispute Resolution (ADR): Is it Right for You?" (Jan. 2016)
- Commercial Law League Blogpost: "The Last Screen: A Cautionary Tale" (Nov. 2015)
- Commercial Law League Blogpost: "Growing Medical Marijuana, Problematic In Bankruptcy, and Out" (Aug. 2015)
- The National Edition, Rutter Group, *Practice Guide, Bankruptcy* (2010 - present) (co-editor)
- *Planning for the Time of Trouble: Cabrera v. Collazo, A Case in Point,* Commercial Law World Magazine, Summer 2014

## E.    Material Reviewed

The documents on which I specifically relied are cited in this Report.  I have been provided with every document I requested.

## F.    Summary Of Opinion

Lehman Brothers Holdings, Inc. ("LBHI" or "Debtor") and certain LBHI affiliated Debtors filed for bankruptcy relief under chapter 11 of the Bankruptcy Code in 2008, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), administratively consolidated at Case 08-13555 (the "Bankruptcy Proceeding").  In connection with the Bankruptcy Proceeding I have been retained by counsel to the RMBS Trustees[1] to offer an independent opinion on the reasonableness of the settlement agreement between LBHI and the "Institutional Investors"[2] dated November 30, 2016, as modified March 17, 2017 (the "RMBS

---

[1] The "RMBS Trustees" are (1) U.S. Bank National Association, (2) TMI Trust Company, successor to Law Debenture Trust Company of New York, (3) Wilmington Trust Company and Wilmington Trust, National Association, and (4) Deutsche Bank National Trust Company (collectively, the "RMBS Trustees").

[2] The "Institutional Investors" are fourteen institutional investors represented by Gibbs & Bruns LLP as signatories to the RMBS Settlement: Aegon USA Investment Management, LLC; Blackrock Financial Management, Inc.; Cascade Investment, L.L.C.; Federal Home Loan Bank Of Atlanta; Goldman Sachs

Settlement") Doc. 55096 Exhibit "B," as a means of resolving the RMBS Trustees' claims in the

Bankruptcy Proceeding submitted through the Protocol (as defined below) (the "RMBS Claims")

on behalf of each Trust[3] and against LBHI.[4]  I note at the outset that although some settlements

arrive at an agreed upon dollar amount to be paid by one party to another, this one does not do so.

There is no agreement on the amount of the allowed RMBS Claims and the parties' views are

very far apart.[5]  I am evaluating the RMBS Settlement which provides a process to determine the

allowed amount of the RMBS Claims.

To reach my conclusions, I:

- familiarized myself with relevant pleadings and documents filed in or related to the Bankruptcy Proceeding;

- reviewed the RMBS proofs of claim and various governing agreements upon which those claims were based;

- read reports of certain expert witnesses regarding the RMBS Claims;

- reviewed the opinions of the presiding Bankruptcy Judge;

---

Asset Management, L.P.; Invesco Advisers, Inc.; Kore Advisors, L.P.; Metropolitan Life Insurance Company; Pacific Investment Management Company, LLC; Sealink Designated Activity Company, Through Its Investment Manager Neuberger Berman Europe Limited; The TCW Group, Inc., on behalf of itself and its subsidiaries; Thrivent Financial for Lutherans; Voya Investment Management LLC; and Western Asset Management Company.

[3] The RMBS Settlement applies to 244 Trusts as listed in Exhibit "A" to the RMBS Settlement (referred to hereafter as the "RMBS Trusts").  The 244 Trusts exclude transferor loan Trusts as well as Trusts that have terminated.  Since the list was compiled one additional Trust terminated reducing the number to 243, and there are five Trusts that contain loans for which no claims were submitted through the Protocol: (i) ARC 2004-1; (ii) SAIL 2004-4; (iii) SASCO 2005-11H; (iv) SASCO 2006-RF1; and (v) SASCO 2007-RF1. These five RMBS Trusts would receive no allocation.  The number of RMBS Trusts included in the RMBS Settlement may continue to decrease.

[4] Additional claims were submitted by the RMBS Trustees against certain of LBHI's affiliated debtors (collectively, the "LBHI Debtors"), but they are not subject to this opinion.

[5] For instance, in its objection to the RMBS Reserve Motion, Lehman averred that the established $5 billion reserve was "more than double in size to the $2.4 billion reserve proposed by its estimation motion, and almost five times Lehman's low end estimate for the RMBS Claims."  Doc. 46525, p. 32, ¶58.  LBHI also asserted that there were "compelling arguments for *lowering the reserve by at least 50%*, including comparisons with benchmarks set in prior settlements of similar claims brought by the same RMBS Trustees against different RMBS sponsors."  *Id.* p. 24, n. 16.

- reviewed the opinion on appeal involving other claims submitted by the RMBS Trustees;

- reviewed the protocol established per the Bankruptcy Court for the review and resolution of the RMBS Claims (the "Protocol");

- evaluated the substantial costs and protracted time required to comply with the Protocol;

- reviewed case law regarding settlements, claims objections, claims estimations, and other relevant bankruptcy and non-bankruptcy law; and

- reviewed information concerning the merits of the RMBS Settlement as well as a prior, withdrawn settlement offer.

I also reviewed the version of the November 30, 2016 settlement agreement (the "November Version") reached by LBHI and the Institutional Investors (which held a large economic stake and worked with LBHI in arriving at the RMBS Settlement). I considered the RMBS Trustees' receipt of the terms of the settlement and ensuing discussions with LBHI to, *inter alia,* improve the terms for the benefit of the investors including requiring notice to the investors, adding certain appeal rights, and developing the litigation process in Exhibit "G."[6] Finally, I considered the terms of the RMBS Settlement itself, relative to alternatives in the event that the RMBS Settlement offer is rejected.

---

[6] A settlement offer (of which I was provided a copy) proposed by LBHI and dated as of October 26, 2015 (the "2015 Proposal") was presented to the RMBS Trustees. The RMBS Trustees retained and consulted with experts to advise them regarding the adequacy of that offer as to each Trust. On April 6, 2016, LBHI withdrew the 2015 Proposal. Of relevance is the fact that the 2015 Proposal offered to allow the RMBS Claims in the gross amount of $2.44 billion (the net would be calculated based on certain deductions specified in the offer) on the condition that all affected Trusts accepted the offer. If 100% acceptance by the Trusts was not attained, then reductions would apply to the allowed claims. The offer also required a minimum level of participation by the Trusts, without which the 2015 Proposal could be terminated by LBHI. Under the RMBS Settlement, certain non-monetary terms of the withdrawn offer have been enhanced as more fully explained *infra*.

Among other things, a Chapter 11 bankruptcy affords parties the opportunity to negotiate to resolve disputed claims. As noted, LBHI and the RMBS Trustees have been unable to agree on the allowed amount of the RMBS Claims and are billions of dollars apart. The Trustees proposed a statistical sampling process to resolve the RMBS Claims. LBHI insisted that the process had to be loan-by-loan despite the cost and delay involved. Judge Chapman agreed with LBHI, stating that she would not estimate the RMBS Claims and imposed the Protocol, but did not then provide parameters for any claims litigation that might ultimately be required. Transcript of Hearing, Dec. 10, 2015, at 109:17 -110:5 (Doc. 49007).

Exhibit "G" to the RMBS Settlement sets up the litigation process the parties have agreed upon, assuming the Bankruptcy Court concurs, and removes the uncertainty as to what the process will be and when it will begin. In my opinion, Exhibit "G" provides a fair and practical way to timely go about resolving the RMBS Claims, abating the risk that RMBS Claims will not have a source of payment and enabling RMBS Claims to be paid sooner rather than later.[7]

The November Version proposed by LBHI and the Institutional Investors did not afford the Certificate Holders (the investors including the Institutional Investors are collectively referred to as the "Certificate Holders") the opportunity to comment before the RMBS Trustees accepted or rejected the settlement proposal. Moreover, the RMBS Trustees were not afforded the ability to provide investors with information regarding the terms of the November Version (including their initial allocable percentage) prior to acceptance. Notice is a critical element for settling claims in bankruptcy. The RMBS Settlement now enables notice to be given and the RMBS Trustees have caused notice to be given. Several Certificate Holders have provided comments to

---

[7] Section 3.06 of the RMBS Settlement provides that the distributions on account of any allowed RMBS Claim are to be made in accordance with the Governing Agreements.

9

the RMBS Trustees as the result of the notice of the RMBS Settlement, and I have reviewed and considered those comments.

The November Version had no rights of appeal for any party but as the result of negotiations by the RMBS Trustees the RMBS Settlement now provides limited appeal rights to the RMBS Trustees, as described in more detail below.  In considering the overall settlement and the relative importance of appeal rights, this change is an enhancement.

It is my opinion, to a reasonable degree of professional certainty, that the RMBS Settlement sets forth a reasonable methodology to liquidate the disputed RMBS Claims, and that entry into the RMBS Settlement, in the circumstances of this Bankruptcy Proceeding, would be appropriate for all RMBS Trusts except for the five identified in note 3 *supra*.

## G.    Summary Of Methodology, Materials Reviewed and Factors Considered in Reaching My Opinion

My methodology in assessing the RMBS Settlement and rendering this opinion was to apply my 25 years of experience as a Bankruptcy Judge, along with my knowledge of the law from teaching as well as from my experience in practice since leaving the bench, to evaluate the nature of the dispute, the intricacies of the bankruptcy process in addressing such disputes and the reasonableness and sufficiency of the terms of the RMBS Settlement itself.

In light of the fact that the Bankruptcy Court must approve the RMBS Settlement under the provisions of Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and appellate cases that impose standards for applying Rule 9019, I utilize an analysis that draws upon that Rule and those standards.

In concert with the Rule 9019 factors, in reaching my opinion I also considered the litigation positions of LBHI in disputing the RMBS Claims and the cost, time and efforts of the RMBS Trustees in pursuit of the RMBS Claims. I further considered the opinions of other experts retained by the RMBS Trustees, as well as applicable law regarding residential mortgage backed securitization trusts[8] and settlements by RMBS trustees.[9]

Finally, to assess the benefit of the RMBS Settlement to the Certificate Holders, (as defined below), in addition to what is set forth above, I:

- reviewed the representations and warranties alleged to have been breached[10] and evaluated the difficulty, time and expense required to prove breaches without the certainty provided by Exhibit "G" to the RMBS Settlement;

- considered the actions undertaken by the RMBS Trustees to ascertain the allowed amount of the RMBS Claims arising pursuant to the Governing Agreements, as defined below, with respect to breaches of representations and warranties;

- took note of the significant effort undertaken by RMBS Trustees in negotiating certain changes to and entering into the RMBS Settlement and the changes made

---

[8] I have been told to assume that the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. § 77aaa, *et seq.* would apply to only six of the RMBS Trusts at issue. The RMBS Trusts that are governed by the TIA are: RLT 2008-AH1; SASCO 2003-GEL1; SASCO 2003-NP1; SASCO 2004-GEL2; SASCO 2004-GEL3; and SASCO 2004-NP1 (collectively the "Indenture Trusts"). With respect to trusts not governed by a trust indenture, the certificates issued in New York trusts that utilize governing agreements like those here are excluded from the Trust Indenture Act under Section 304(a). *Ret. Bd of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 169 (2d Cir. 2014), *cert. denied* 136 S.Ct. 796, 193 L.Ed.2d 711 (2016); *accord Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*, 172 F. Supp. 3d 700, 707-707, fn. 1 (S.D.N.Y. 2016).

[9] Courts analyzing settlements focus on the actions of a trustee under applicable trust documents and non-bankruptcy law. The factors typically include whether: (1) the trustee assessed ability to collect on any judgment; (2) the trustee obtained advice of experts; (3) the experts were provided with the necessary information; (4) the trustee acted in accord with the governing agreements and not in self-interest; (5) the trustee gave notice to investors and considered their views; and (6) the settlement is the result of arm's length negotiations. *See, e.g., In re U.S. Bank N.A. v. Federal Home Loan Bank of Boston*, Case No. 652382/2014, 2015 N.Y. Misc. LEXIS 5003 (N.Y.S. 2015); *Bank of New York Mellon v. Ret. Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago*, 127 A.D.3d 120, 4. N.Y.S.3d 204 (N.Y.S. 2015); *In re U.S. Bank Nat. Ass'n*, 51 Misc. 3d 273, 27 N.Y.S.3d 797 (N.Y.S. 2015); *In re Residential Capital, LLC*, 497 B.R. 720 (Bankr. S.D.N.Y. 2013).

[10] At my request the RMBS Trustees provided me with a summary of the ten most common representations and warranties on which the RMBS Claims are based.

for the benefit of the Certificate Holders that resulted from RMBS Trustees' participation in the negotiations;

- factored in the Bankruptcy Court Order Approving and Establishing Notice Procedures (Doc. 55154), the notices of settlement transmitted to Certificate Holders, and the notices of the 9019 Motion (as defined below) and response deadlines and hearing date, transmitted to Certificate Holders;

- recognized that the RMBS Settlement provides that distributions will be made in accordance with the Governing Agreements (*see, e.g.,* Doc. 55232, p. 16, ¶3.06);

- considered the recommendation of the Institutional Investors; and

- considered the comments provided by other Certificate Holders as of the date of this Report.

At the conclusion of my analysis, I formed the opinion summarized above to a reasonable degree of professional certainty.

## Part II.    Analysis

## A.    Overview

I was retained to provide an independent opinion regarding the reasonableness of the RMBS Settlement as a means of resolving the RMBS Trustees' claims on behalf of each RMBS Trust (as defined below) against LBHI.  Only those RMBS Claims submitted pursuant to the Protocol and against LBHI are at issue here.

I spoke with counsel for the RMBS Trustees to gain an understanding of the nature of the litigation involved in the Bankruptcy Proceeding that led to the RMBS Settlement.  I considered the opinions of other experts that advised the RMBS Trustees, and, should the RMBS Trustees decide to reject the RMBS Settlement, the cost in terms of the time and delay that would result from their efforts to establish the dollar amount of the RMBS Claims, recover the distributions,

and pay the Certificate Holders as well as the fees and expenses incurred and likely to be incurred.

## B.    Factual Background Of The Dispute

### 1.    The RMBS Transactions

Before filing bankruptcy, LBHI and certain LBHI affiliates, including Structured Asset Securities Corporation ("SASCO"), were the sellers, sponsors or depositors for 406 residential backed mortgage securitizations (commonly referred to as "RMBS" transactions) each involving a trust ("Trust"), whereby the LBHI Debtors "pooled" and sold or contributed approximately 1.8 million mortgage loans into the Trusts (the "Mortgage Loans").   The Honorable Shelley C. Chapman (who, following Judge James Peck's retirement, was assigned as the presiding judge in the Bankruptcy Proceeding) described this process in an unrelated Memorandum Decision "Overruling Debtors' Objection to CMBS Claims and Denying Request For Subordination Pursuant To Sections 510(a)-(c) of The Bankruptcy Code" in the LBHI Bankruptcy Proceeding:

> Here, the MBS were packaged, "issued," marketed, and sold by the Debtors through a securitization process in which LBHI assembled collections of mortgage loans for sale to investors (footnote omitted) and then transferred the pooled mortgages to SASCO.   Although the collections of pooled mortgages ultimately were deposited in non-debtor securitization trusts (the "Trusts") by SASCO, because the Trusts were vehicles with no reporting obligations, employees, officers, or directors, they were referred to under federal securities rules and regulations only as "issuing entities." (*Cita*) [Objection at ¶¶ 9-10].   The Trusts provided MBS certificates to SASCO, which served as the "depositor" for the MBS and, under the federal securities laws, also was considered the "issuer" of the MBS. [footnote omitted].   SASCO then sold the certificates to investors through underwriters.

*In re Lehman Bros. Holdings, Inc.*, 513 B.R. 624, 627-28 (Bankr. S.D.N.Y. 2014).

The certificates were issued to the Certificate Holders. The monthly mortgage payments and other proceeds from the Mortgage Loans are collected by the servicer.[11] Those funds are used to pay certain trust expenses and thereafter to pay interest and principal to Certificate Holders based upon the distribution provisions of various agreements (the "Governing Agreements") which include Trust Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Sale and Assignment Agreements and/or other pooling and/or servicing agreements related to the Trusts.

In connection with the sale, sponsor or deposit arrangements, LBHI and certain LBHI affiliates entered into the Governing Agreements that contain representations and warranties by the selling entities to the Trusts relating to the quality and nature of the Mortgage Loans, the borrowers, and the underlying mortgaged properties. The Governing Agreements establish the requirements that trigger repurchase obligations and set forth the respective rights and obligations of the parties. Under the Governing Agreements, the LBHI Debtors were obligated, *inter alia,* to

---

[11]  Servicers are not selected by the Trustees. The servicer performs services related to the Mortgage Loans themselves. Those functions may include:

- Collection of interest and principal on loans
- Making required advances
- Investor accounting and reporting (e.g., taxes and escrow)
- Escrow management for taxes and insurance
- Cash management
- Customer services
- Collection of outstanding payments and/or foreclosure activities
- Loan modification determinations

Thomas P. Lemke, Gerald T. Lins & Marie E. Picard, Mortgage-Backed Securities: Developments and Trends in the Secondary Mortgage Market §12.6 (2016-2017 ed. 2016)("Mortgage-Backed Securities").

replace or repurchase Mortgage Loans under certain circumstances as set forth therein. The

repurchase price is set in the Governing Agreements and is defined as the "Purchase Price." [12]

### 2. Selected Bankruptcy Matters

As noted above, the Bankruptcy Proceeding began in 2008. On July 2, 2009, the

Bankruptcy Court set a bar date of September 22, 2009 (the "Bar Date"), for filing claims. *See*

"Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3)

Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice

Thereof and Approving the Proof of Claim Form" (Doc. 4271) (the "Bar Date Order"). Prior to

the Bar Date, the RMBS Trustees filed proofs of claim alleging breaches by LBHI and SASCO[13]

of certain representations and warranties set forth in the Governing Agreements concerning the

Mortgage Loans held by the Trusts. Notices were provided to the Certificate Holders of the filing

of the proofs of claim, as well as other activities in the bankruptcy case, including recently

---

[12] *See, e.g.,* Trust Agreement, dated as of April 1, 2007 for BNC Mortgage Loan Trust 2007-2 Mortgage Pass-Through Certificates Series 2007-2, §1.01, p. 48 ("2007-2 Trust Agreement") which defines "Purchase Price" as follows:

> Purchase Price: With respect to the purchase of a Mortgage Loan or related REO Property pursuant to this Agreement, an amount equal to the sum of (a) 100% of the unpaid principal balance of such Mortgage Loan; (b) accrued interest thereon at the applicable Mortgage Rate, from the date as to which interest was last paid to (but not including) the Due Date in the Collection Period immediately preceding the related Distribution Date; (c) the amount of any costs and damages incurred by the Trust Fund as a result of any violation of any applicable federal, state or local predatory- or abusive-lending law arising from or in connection with the origination of such Mortgage Loan; and (d) any unreimbursed Servicing Advances with respect to such Mortgage Loan. The Master Servicer, the Servicer, the Custodian (or the Trustee or the Securities Administrator, if applicable) shall be reimbursed from the Purchase Price for any Mortgage Loan or related REO Property for any Advances made or other amounts advanced with respect to such Mortgage Loan or related REO Property that are reimbursable to the Master Servicer or the Servicer under this Agreement or the Servicing Agreement (or to the Trustee or the Securities Administrator, if applicable), together with any accrued and unpaid compensation due to the Master Servicer, the Securities Administrator, the Servicer, the Custodian or the Trustee hereunder or thereunder.

[13] There are no claims against SASCO involved in the RMBS Settlement.

published notices regarding the RMBS Settlement.[14]    The LBHI Debtors filed and, by Order

dated December 6, 2011 (Doc. 23023) ("Confirmation Order"), had confirmed the "Modified

Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated

Debtors" dated August 31, 2011, as subsequently supplemented, amended or modified, including

by the Plan Supplement (the "Plan").    The Modified Third Amended Joint Chapter 11 Plan of

LBHI at Doc. 22737 was updated with additional modifications at Doc. 22973, Exhibit "A," filed

on December 5, 2011.    The Plan became effective on March 6, 2012.[15]    LBHI is the Plan

Administrator for the Plan.    Twelve distributions have been made to creditors as provided under

the Plan.[16]    No distributions have been made to the RMBS Trustees on account of the 244 RMBS

Trusts inasmuch as the claims made by the RMBS Trustees are disputed.    With respect to setting

a reserve and the payment of disputed claims, the Plan contained the following provision in

Section 8.4 "Disputed Claims Holdback":

> On the date of the first Distribution that is at least forty-five (45) days (or
> such fewer days as may be agreed between the applicable Debtor and the
> holder of the applicable Disputed Claim) after the date on which a
> Disputed Claim becomes an Allowed Claim against a Debtor, such Debtor
> shall remit to the holder of such Allowed Claim Available Cash equal to
> the amount that would have been distributed from the Effective Date
> through and including the date of such Distribution on account of such
> Allowed Claim had such Claim been Allowed as of the Effective Date

---

[14] *See, e.g.,* "Notice to the Holders of Certificates Issued by Structured Asset Securities Corporation
Mortgage Pass-Through Certificates, Series 2005-4XS", by Wilmington Trust (April 20, 2015); "Notice
Regarding Receipt of a Settlement Offer Concerning Certain Claims Against the LBHI Debtors Belonging
to the RMBS Trustees, Dated March 20, 2017" at: http://www.lbhirmbssettlement.com/notice.php; and
"Notice Providing Further Information About The Proposed RMBS Trust Settlement Agreement, Dated
As Of November 30, 2016, And Modified As Of March 17, 2017 (The "Proposed Settlement
Agreement"), From Lehman Brothers Holdings, Inc. And All Affiliated Debtors (The "LBHI Debtors")"
dated April 21, 2017, at: http://www.lbhirmbssettlement.com/2d_Notice.pdf.

[15] *See* "Notice Of Effective Date And Distribution Date In Connection With The Modified Third
Amended Joint Chapter 11 Plan Of Lehman Brothers Holdings Inc. and Its Affiliated Debtors." Doc.
26039.

[16] *See* "Notice Regarding Twelfth Distribution Pursuant To The Modified Third Amended Joint
Chapter 11 Plan Of Lehman Brothers Holdings Inc. and its Affiliated Debtors." Doc. 55129.

together with any interest earned on the lesser of (i) such amount and (ii) the amount retained with respect to such Claim pursuant to this provision, [i]n each case, but only the extent that such interest is attributable to the amount of the Allowed Claim; *provided,* that (x) such amount shall be paid first out of Available Cash retained on account of such Allowed Claim and second out of Available Cash other than Available Cash retained on account of other Disputed Claims and (y) if the amount available for Distribution pursuant to the foregoing clause (x) is insufficient to remit all Distributions required to be made to such holder pursuant to this sentence, such holder shall receive the amount of such insufficiency on the next subsequent date(s) of Distribution before the holders of any other Claims against such Debtor receive any further Distributions out of Available Cash (other than Available Cash retained on account of other Disputed Claims) from such Debtor.

Doc. 23023-1, p. 88 - 89.

On March 14, 2011, LBHI filed the "One Hundred Ninth Omnibus Objection to Claims (Insufficient Documentation)" ("Claims Objection") (Doc. 15008) seeking to disallow and expunge the RMBS Claims, among others, on the basis that the RMBS Trustees violated the Bar Date Order by not providing sufficient supporting documentation or information.[17]   LBHI also sought to disallow and expunge thousands of Mortgage Loans from the RMBS Claims arguing that the RMBS Claims lacked sufficient detail to state a valid *prima facie* claim.  Doc. 15008, p. 2, ¶ 2.  LBHI subsequently averred that approximately 4,700 mortgage loans were identified as having claims for breaches and that the remaining claims had insufficient detail.  The 4,700 mortgage loan breaches resulted in claims of $209 million.  However, LBHI asserted that the remaining claims failed to identify any claim amounts or provide any documentation supporting liability, as required by the Bar Date Order and the underlying Governing Agreements.  Doc. 46526, p. 21, ¶ 29.  The Bankruptcy Court deferred ruling and stated it would schedule an

---

[17] LBHI filed other claims objections to the RMBS Claims at Docs. 14492, 14493, 14494 and 16079.

evidentiary hearing upon the request.  Transcript of Hearing, June 30, 2011, at 70:19-72:5 (Doc. 18251).

### 3.  The Estimation Motions, The Reserve, The Protocol and The First Settlement Offer, Which Was Withdrawn By LBHI

In January 2012, LBHI filed a motion to estimate the RMBS Claims at $2.4 billion (the "Estimation Motion") for purposes of establishing the claims reserve as required under the Plan. Doc. 24254.  LBHI alleged that the value of the RMBS Claims, if proven, would be between $1.1 billion and $2.4 billion.  The RMBS Trustees filed objections to the Estimation Motion, alleging that the claims should be estimated at $15 billion for reserve purposes. (Docs. 24484, 24485, 24491; *See also* Docs. 24476, 24483 and 24492 that sought different amounts for reserve purposes.

The parties took the same positions at the hearing on the Estimation Motion on January 26, 2012, before Judge Peck.  At the conclusion of the hearing, Judge Peck declined to rule because, to reach a factual determination on the "right number," he would need, among other things, additional testimony and evidence.  The Judge stated:

> I suspect that all of this is much more art than it is science; that there is no one clearly correct estimate of a future that hasn't yet unfolded . . . .

Transcript of Hearing, Jan. 26, 2012, at 85:21-23 (Doc. 24756).

Judge Peck instructed the parties to reach a settlement on an "agreed number" because "the amount of the reserve impacts other creditors in a material way" and all creditors would benefit from "an agreement concerning a fair and appropriate estimate for these claims." Transcript of Hearing, Jan. 26, 2012, at 84:14-86:7 (Doc. 24756).  The Estimation Motion was consensually resolved by agreement of the parties as reflected in the "Reserve Order" dated

February 22, 2012, which estimated the RMBS Claims at $5 billion for reserve purposes.[18]  Doc. 25643.

So as to establish the RMBS Claims, the Trustees entered into agreements with various experts to conduct a loan review based upon statistical sampling.  In May 2013, the RMBS Trustees retained Duff & Phelps LLC, ("Duff & Phelps") to "(a) review the sampling and selection work performed by Cowen,[19] (b) review and analyze the procedures followed and findings made by Digital Risk,[20] and (c) opine on the amount of the RMBS Trusts' claims, based on its review and analysis."  Duff & Phelps completed its analysis in August 2014.  *See* Doc. 53730, p. 17, ¶¶ 47, 48.

On August 22, 2014, after receiving the Duff & Phelps' analysis, the RMBS Trustees filed a Motion to Increase the Reserve (1) to $12.143 billion and (2) to Estimate and Allow Their Claims for Covered Loans[21] at $12.143 Billion Pursuant to § 502(c) of the Bankruptcy Code (the

---

[18] From a $5 billion reserve amount, 95% was for claims against LBHI with 5% for claims against SASCO.  The $5 billion reserve has been reduced to $4.75 billion to exclude claims against SASCO.  Doc. 53163.

[19] Cowen & Company, LLC is "a financial services firm with expertise in the mortgage origination sector, [retained] to construct a random sample to produce a statistically sufficient estimate of the overall breach rates for the Covered Loans at issue."  Affidavit of Edmond Esses from Duff & Phelps.  (Doc. 53732, p. 4, n 8).

[20] Digital Risk LLC "was primarily responsible for communicating with the master servicers to retrieve the 5,000 loans that constituted the Sample from the applicable servicers."  Doc. 53732, p. 4, n. 8.  Digital Risk holds itself out as "an independent third-party reviewer that performs due diligence on loans contained in securities" whose "diversified solutions address each phase of the mortgage life cycle while evaluating and monitoring mortgage exposure at the loan level to provide invaluable insight of the key reasons for – and indicators of – credit fraud and operations risk to predict and to manage loan performance as well as help prevent repurchase risk."  *See* http://www.digitalrisk.com/solutions (last visited May 25, 2017).  Digital Risk states that is has successfully completed "over $800 million of rigorous loan reviews for the GSE's. . . ."  *See* http://www.digitalrisk.com/services/quality-control (last visited May 25, 2017).

[21] At that time, "Covered Loans" were Mortgage Loans as to which the RMBS Trustees aver LBHI would have "liability for material breaches of the representations and warranties made on those loans."  Doc. 46078, p. 10, ¶ 2.  Since that time additional Mortgage Loans have been identified.  *See* Doc. 52342.

"Reserve Motion"). Doc. 46078. The Reserve Motion applied to 255 Trusts.[22] Doc. 46078, p.

10, ¶ 3.

Submitted with the Reserve Motion was the Declaration of James H. Aronoff, then

Managing Director of Duff & Phelps, who described "Breach Findings"[23] and concluded that

they adversely and materially affected the value of the Mortgage Loans underlying the Covered

Trusts. Doc. 46085, p. 5, ¶ 10. Also appended was the Declaration of Charles A. Parekh, Ph.D.,

of Duff & Phelps dated August 21, 2014 (Doc. 46080). Dr. Parekh's declaration reflected that

Duff & Phelps had analyzed claims related to breaches in 255 RMBS Trusts that had closed on or

after September 15, 2002 ("Covered Trusts"), by sampling 5,000 loans from a population of

149,568 Mortgage Loans. The declaration averred that the sampling analysis was valid, because

the sample that been selected for review was based upon a sound methodology including (1) in a

manner to produce unbiased results, (2) of a sufficient size to provide a confidence level of 95%,

(3) with results that could be extrapolated to the corresponding loan population, and (4) by

determining breach rates that could be used to accurately estimate repurchase claims. Further, the

sampling reflected that the Covered Loans in the "Covered Trusts had realized losses of $15.680

billion and were estimated to suffer an additional $5.548 billion in Projected Losses." Doc.

46080, p. 7. Finally, Dr. Parekh concluded that a loan-by-loan review by the Bankruptcy Court

---

[22] Since that time, 12 of these Trusts have terminated.

[23] The "Breach Findings" were divided into four major groupings: "(a) Borrower Credit Breach Findings (i.e. findings related to the credit history of a borrower); (b) Borrower Capacity Breach Findings (i.e. findings regarding the ability of a borrower to fulfill financial obligations); (c) Collateral Breach Findings (i.e. findings that relate to the property securing the mortgage loan); and, (d) Compliance Breach Findings (i.e. findings regarding a failure to comply with the related legal and regulatory requirements pertaining to the origination of a mortgage loan). Doc. 45085, pp. 13 -16, ¶¶ 29 - 38. Exhibit "D" set forth the 44 subcategories, with a breach count within each subcategory. Doc. 46085-4. Exhibit "E" contained a description of the "Breach Finding Categories." Doc. 45085-5.

would cost $250 million and involve many years of professional and court time.[24]   Doc. 46080, p. 26.

On October 15, 2014, LBHI filed a cross-motion to implement a claims resolution protocol to resolve the RMBS Claims (the "Cross-Motion").   Doc. 46526.   LBHI averred that "with respect to approximately 65% of all mortgage loans for which the RMBS Trustees asserted a claim, the material representations were made by parties unaffiliated with LBHI, and accordingly, LBHI bears no, or extremely limited, potential liability."   Doc. 46526, p. 27, ¶46. LBHI asserted that to "require LBHI to compensate the trusts for their losses, the Governing Agreements specifically require RMBS Trustees to prove each of the following for each mortgage loan: (1) a breach of a representation and warranty; (2) that the breach materially and adversely affected the value of the mortgage loan; and (3) that prompt notice of the breach was provided to LBHI."   Doc. 46526, p. 26, ¶43.   LBHI further protested the RMBS Trustees had had at least "seven years to comply with the letter and spirit of the underlying [G]overning [A]greements [ ] which required the RMBS Trustees to identify and present to LBHI or SASCO those loans containing alleged deficiencies.   Yet the RMBS Trustees repeatedly failed to do so." Doc. 46526, p. 10 - 11, ¶ 1 - 2.

LBHI argued that the RMBS Trustees were contractually bound by, and legally precluded from contesting, the $5 billion amount of the reserve.   LBHI also asked the Bankruptcy Court to require the RMBS Trustees to prove the losses on the RMBS Claims on a loan-by-loan basis. LBHI averred that the Bankruptcy Court had established ADR procedures pursuant to an Alternative Disputes Resolution Procedures Order for Indemnification Claims of the Debtors

---

[24] The Trustees submitted over 90,000 RMBS Loans under the Protocol.   Of those, LBHI has agreed that approximately 1000 are worthy of recompense.

21

Against Mortgage Loan Sellers (Doc. 45277) to facilitate the resolution of LBHI's claims against thousands of counter-parties that allegedly sold certain LBHI Debtors the deficient Mortgage Loans.  Doc. 46526, p. 11, ¶ 3.  LBHI asserted that a determination on a loan-by-loan basis was what was required by the Governing Agreements.  Doc. 46526, p.15, ¶ 13.

LBHI pointed to statements they attributed to Judge Peck, who was the presiding judge, that the RMBS Trustees would be required to prove residential and mortgage loan breaches.  *See* Transcript of Hearing, June 30, 2011, at 71:11-16 (Doc. 18251).  LBHI apparently viewed Judge Peck's comments as requiring proof of breach as to each Mortgage Loan upon which each RMBS Claim was based.  The Cross-Motion contained a protocol which LBHI asserted was necessary to preserve LBHI's "downstream indemnification rights" to pursue claims against the sellers of Mortgage Loans.  LBHI.  Doc. 46526, p. 51, ¶ 99.

Moreover, in stating its position regarding the loan-by-loan analysis for proving breaches and the value of the RMBS Claims, LBHI argued that:

> [A] breach alone does not trigger a claim.  The trust only has a valid claim if the breach has a material and adverse effect on the value of the related mortgage loan.  This claim element can be viewed as similar to traditional "but-for" causation.  Importantly, any number of factors exclusive to alleged breaches may cause mortgage loans to lose value, such as (i) borrower loss of income sources, (ii) borrower illness or other financial hardship, or (iii) a borrower decision to walk away from "upside down" mortgages.

Doc. 46526, p. 26, ¶ 44.

The RMBS Trustees filed an objection to the Cross-Motion (Doc. 46960) on November 14, 2014, wherein they again asserted that proceeding through statistical sampling, versus on a loan-by-loan basis, was appropriate.  They refuted the averments of LBHI that the RMBS Trustees had been dilatory in pursuing claims, noting that the RMBS Trustees actually had spent

two years completing the statistical sampling, including the review and analysis of thousands of the underlying Mortgage Loans in the sample.  Doc. 46960, p. 6, ¶ 5.

LBHI filed an extensive Reply Brief (Doc. 47185) again arguing that the sampling was inadequate and that under the Governing Agreements a loan-by-loan analysis was required along with a showing that for each deficient loan, the RMBS Trustees must prove what it had previously asserted, *i.e.*: "(1) a breach of a representation and warranty; (2) that the breach materially and adversely affected the value of the mortgage loan; and (3) that prompt notice of the breach was provided to LBHI."  Doc. 47185, p. 10, ¶ 7.  The Reply Brief was supported by the Declaration of Professor William N. Goetzmann dated December 3, 2014, who opined that the analyses set forth on behalf of the RMBS Trustees by Parekh and Aronoff were "not based on a sound and reliable methodology for valuing the RMBS Trustees' claims" and were "based on unreasonable assumptions and lack any empirical or logical support."  Doc. 47188, p. 5, ¶ 10.  The RMBS Trustees filed a supplement at Doc. 47233 on December 8, 2014, to counter Debtors' arguments that statistical sampling cases cited in the RMBS Trustees' papers were inapplicable.

On December 10, 2014, Judge Chapman conducted a lengthy hearing during which the RMBS Trustees and LBHI argued their positions and presented witnesses regarding the proposed protocol.  The first issue addressed by the Bankruptcy Court was whether to approve the RMBS Trustees' motion for estimation of claims under Bankruptcy Code Section 502(c).  The Bankruptcy Court framed the issue early on as "whether or not the claims are subject to estimation under 502(c)."  Transcript of Hearing Dec. 10, 2014, at 36:1-4, Doc. 49007.  In discussing the process, counsel for the RMBS Trustees advised the Bankruptcy Court that

Aurora[25] (previously a Lehman entity) was the Master Servicer on 250 of the 255 Covered Trusts and was obligated to "tell Lehman about problems," and that Lehman was "well aware of it and they had a duty to self-report but didn't." *Id.* at 38:14-39:2. Notably, the Bankruptcy Court appeared to be critical of the RMBS Trustees for acting in concert in bringing their claims, which Judge Chapman seemed to believe would increase the number of claims she would have to determine. After several hours of argument the Bankruptcy Court ruled "as a matter of law, I'm not going to estimate these claims pursuant to 502(c) we're going to move to the allowance of the claims." *Id.* at 109:17-20.

The Bankruptcy Court established the Protocol for proving the claims by Order dated December 29, 2014 (Doc. 47569), as amended.[26] The Protocol set forth steps in a process for (1) the review of the mortgage loan files underlying the RMBS Claims, (2) the assertion by the RMBS Trustees of RMBS Claims as defined in the Protocol, (3) the response by the LBHI Debtors with respect to asserted RMBS Claims, and (4) the mechanism for resolving disputes regarding the asserted RMBS Claims.

As described by Chief Judge McMahon of the United States District Court for the Southern District of New York in her "Decision and Order Affirming Decision of Bankruptcy Court" (No. 16 CIV 5813 (CM), Doc. 36, p. 5) ( the "Appeal Order"):

---

[25] Aurora Bank was a Lehman subsidiary. In 2012 Lehman sold Aurora to Nationstar. The sale is described in Exhibit 99.4 of Disclosures Relating to Nationstar Mortgage Holdings Inc.*, et al.* filed with the SEC.

*See* https://www.sec.gov/Archives/edgar/data/1507951/000119312512306813/d381728dex994.htm.

[26] The Protocol Order was amended on March 30, 2016, by "Order Granting Motion of RMBS Trustees To Extend The Overall Claim File Cut-Off Date For Certain Loans Under The Protocol Order And Related Relief" (Doc. 52367).

The Protocol is a five-step process.[27] First, the RMBS Trustees are required to collect and produce to LBHI the underlying loan files supporting their claims.   Second, LBHI must review those files and determine whether it agrees that a valid claim exists for the file (an "Approved Claim File") or not (a "Rejected Claim File").   Third, for any Rejected Claim File or any Approved Claim File for which the RMBS Trustees dispute LBHI's proposed purchase price, the parties must engage in a non-binding negotiation procedure.   Fourth, for claims that are not resolved through that negotiation procedure, the parties must engage in a formal non-binding dispute resolution procedure overseen by a neutral "Claim Facilitator."   Fifth, the parties have the right to object to any proposal by the Claim Facilitator, in which case the claim proceeds to trial.

The Bankruptcy Court established a deadline for the RMBS Trustees to place the RMBS Claims into the Protocol, along with all supporting documentation that would allow the Plan Administrator to review those claims.  On June 24, 2016, the RMBS Trustees filed a status report regarding the Protocol (Doc. 53161) in which the RMBS Trustees reported that

[O]n May 31, 2016, the RMBS Trustees completed their obligations under Step 1 of the Protocol.   The RMBS Trustees submitted to the Plan Administrator RMBS Claims arising from a loan-by-loan review of 218,622 loans on a rolling basis in thirty deliveries from March 17, 2015 through May 31, 2016.

Doc. 53161, p. 3.

The status report stated that 92,981 of the reviewed loans had breaches of representations and warranties that materially and adversely affected the value of the loans and/or the interests of Certificate Holders, and thus submitted RMBS Claims in respect of such loans to the Plan Administrator.  The RMBS Trustees further determined that "47,441 loans of the 218,622 loans were paid off in full or are expected to be paid off in full and were not reviewed under the Protocol."  Doc. 53161, p. 3-4.  The Plan Administrator accepted 1,025 Claim Files (1.34%),

---

[27] The first step, information gathering, was designated as "Step 0."

rejected 51,798 Claim Files (67.53%) and determined not to review 23,876 Claim Files (31.13%) as LBHI deemed them to have insufficient documentation for review. The RMBS Trustees in turn accepted 1,113 of the Rejected Claims, resubmitted 49,293 Rejected Claims, and rescinded 156 Rejected Claims as the loans were paid without loss.

In August 2016, the RMBS Trustees filed an appeal from a final order of the Bankruptcy Court that disallowed and expunged certain claims filed by RMBS Trustees for alleged breaches of representations and warranties by LBHI. An issue on appeal was whether the Protocol reserved the RMBS Trustees' right to prove the claims through alternative methods such as statistical sampling, although the Bankruptcy Court read the Protocol to say the RMBS Claims had to be established by a certain deadline, on a loan-by-loan basis, not through estimation. In February 2017, United States District Court Judge McMahon affirmed and upheld Judge Chapman's Order[28] expunging claims involving approximately 600,000 remaining loans in the Trusts referred to as the "Transferor Loans." Appeal Order, p. 21. The District Court also upheld the expungement of 11,000[29] of the Covered Loans that had not been submitted to the Protocol by the Cut-off Date. Appeal Order, pp. 23-25.

On September 9, 2016, the RMBS Trustees filed another Status Report at Doc. 53640. In it, the RMBS Trustees noted that the Protocol was not working as intended and requested a conference with the Bankruptcy Court. They also identified a number of significant issues raised by LBHI that, if resolved, would accelerate the Protocol process. Doc. 53640, p. 5-6. Those issues remain unresolved.

---

[28] The RMBS Trustees have appealed this ruling to the United States Court of Appeals for the Second Circuit. *See* Doc. 39, Case 1:16-cv-05813-CM.

[29] The RMBS Trustees determined that these 11,000 Covered Loans individually had insufficient losses to warrant the cost of a loan-by-loan review. *See* "RMBS Trustees' Objection to Debtors' Motion to Disallow and Expunge Certain RMBS Claims. . . ." Doc. 52951, Exhibit "C".

The RMBS Trustees also reported that the number of claims files submitted to LBHI had increased to 94,564 and LBHI had responded to all of those submitted through September 4, 2016, as follows: 989 Claims Files were approved (1.0%); 64 were approved with a disputed Purchase Price (0.1%); 63,227 were rejected (66.9%); and 30,384 were deemed by LBHI to have insufficient documentation for review (32.0%). The RMBS Trustees noted their disagreement with LBHI's assertion that the Claims Files are incomplete or have insufficient documentation. After review of the Plan Administrator's responses, the RMBS Trustees rescinded 1,156 of the Rejected Claims Files and removed 827 RMBS Claims on Mortgage Loans that have since paid off without any loss.

The September Status Report stated that although the RMBS Trustees had complied with their obligations, LBHI had not yet filed what it was required to file under the Protocol. That is, the Protocol required LBHI to submit Approved Claims Reports and Rejected Claims Reports (Protocol IV. d-f) which LBHI had not submitted. In addition, 91,528 RMBS Claims Files were unresolved as they each remained subject to the process of "negotiation of a mutually acceptable allowed claim" under Step 3 of the Protocol (Protocol V.a and V.b). In connection with the negotiation, there had been 37 meetings by phone or in person to negotiate mutually acceptable allowed claims. At the then current pace of meetings and review, Step 3 alone would take more than 12 years to complete. The RMBS Trustees therefore requested that Step 4 be implemented and that the categories of issues or disputes be submitted to a Claims Facilitator. (Protocol V.c).

In the interim, on August 30, 2016, LBHI filed its "Second Objection to Certain RMBS Trust Claims and Motion to Disallow and Expunge Certain RMBS Trust Claims for Insufficient Documentation" (Doc. 53620) (the "Second Expungement Motion") which sought to disallow and expunge 36,351 RMBS Claims on the grounds that the proof was insufficient. The 36,351

RMBS Claims LBHI sought to disallow and expunge "consist[ed] of (i) 20,890 loans for which the Trustees have failed to assert a claim amount that reflects the amounts they would be due under the Protocol; and (ii) 15,461 loans for which the Trustees have failed to provide two documents that are necessary under the Protocol for the Plan Administrator to review the alleged damages." Doc. 53620, p. 6, ¶ 1.

The Second Expungement Motion was opposed by the RMBS Trustees by a response filed on September 29, 2016. Doc. 53730. The RMBS Trustees reasserted their compliance with the Protocol and LBHI's failure to comply. The RMBS Trustees also contended that the claims' calculation that LBHI was demanding was not required by either the Governing Agreements or the Protocol and that the two documents LBHI asserted were necessary under the Protocol to assess the 15,461 loans, *i.e.* a "loan loss certification" and a "corporate expense" log, were not required by the Protocol and were not needed as "[t]he RMBS Trustees have provided voluminous and detailed evidence of the Purchase Price" for each of those loans. Doc. 53730, p. 7, ¶ 16-17 *et seq*. Duff & Phelps summarized in the Affidavit of Edmond Esses (Doc. 53732) the actions taken by the RMBS Trustees to provide data and other evidence to LBHI with respect to Mortgage Loans that comprise the Trust Claims. Doc. 53730. *See also* Affidavit Of Allen Pfeiffer, Doc. 53731.

### 4.    The RMBS Settlement

The Second Expungement Motion was set for hearing on October 20, 2016. That hearing was postponed while the Institutional Investors by their counsel Gibbs & Bruns LLP, negotiated a proposed settlement with LBHI. The resulting settlement agreement was the November Version

28

that was presented to the RMBS Trustees for acceptance, an action urged by the Institutional Investors, and which ultimately became the RMBS Settlement.

The November Version negotiated by LBHI and the Institutional Investors did not enable the RMBS Trustees to give notice to Certificate Holders before accepting that proposal and provided for a waiver of appeal rights in all circumstances, even though there was nothing in the agreement that specified a trial process.

After receiving the November Version, the RMBS Trustees proposed certain modifications to LBHI. The RMBS Trustees and LBHI agreed to material changes to the terms of the November Version which have been incorporated into the RMBS Settlement.  The changes made the RMBS Settlement reasonable and include: (1) a notice provision by which all Certificate Holders are provided the opportunity to provide comments to the RMBS Trustees about the RMBS Settlement; (2) a limited right on behalf of the RMBS Trustees to appeal if the Bankruptcy Court determines the amount of the allowed RMBS Claims falls below a certain negotiated threshold; and (3) an agreed-upon methodology for the presentation of evidence regarding the breaches and valuation of the RMBS Claims based upon those breaches with a specified minimum timeframe for presentation of evidence.  *See* Doc. 55096, Exhibit "G."

The RMBS Settlement is a significant achievement toward resolution of the RMBS Claims.  It enables the issues to be heard by the Bankruptcy Court beginning in this calendar year, which otherwise would not occur because, as of today, Step 3 of the Protocol is far from complete[30] as to all RMBS Claims and Step 4 has not begun.  The parties have agreed that the Protocol is "suspended until the earlier of the conclusion of the Estimation hearing or the

---

[30] I am advised by Duff & Phelps that Step 3 of the Protocol is only approximately 3% complete.

termination of the [RMBS] Settlement Agreement." Doc. 55133, p. 3. Judge Chapman has not

yet issued a decision regarding what form of evidence, if any, she would permit as a basis for

allowance of the RMBS Claims. Thus, the parties bargained for and reached agreement on

evidence to be admitted, provided that Judge Chapman concurs, as described in Exhibit "G."

Exhibit "G" removes the risk that the Bankruptcy Court would limit the RMBS Trustees' ability

to produce evidence and specifies the process and procedures that will govern at the hearing on

LBHI's objection to allowance of the RMBS Claims. If Judge Chapman does not concur, the

Agreement may be terminated.

**C.     The RMBS Settlement Provides An Appropriate Mechanism To Determine The Allowed Amount Of The RMBS Claims And Is Reasonable**

In bankruptcy cases, settlements are governed by Rule 9019 and cases that delineate

criteria a bankruptcy court uses to consider in approving a settlement. In essence, a court

assesses the benefits and burdens of the settlement. One critical component of Rule 9019 is that

entities with an interest in the outcome are provided notice and an opportunity to appear and be

heard. Notice has been provided to Certificate Holders as described below.

**1.     Proper Notice and Opportunity to be Heard**

One aspect of the RMBS Settlement that bears critical focus is the addition of the notice

provisions. The November Version agreed to by the Institutional Investors and LBHI provided

no opportunity to the RMBS Trustees to notify other investors of the November Version as then

proposed. The RMBS Trustees reasonably addressed with LBHI the defect in the November

Version because it would not afford investors (other than the Institutional Investors) with notice

of the proposed settlement and to consider what the terms of settlement would mean within each

specific Trust. The RMBS Trustees undertook additional negotiations with LBHI and obtained a

notice period that was adequate to advise all Certificate Holders of the pending RMBS Settlement

which materially affects their rights, and to solicit their comments.  As agreed, LBHI moved for[31]

and received Bankruptcy Court approval[32] of the notice program.

Pursuant to that approved process, the RMBS Trustees caused notice to be published on

websites.[33]  Specific matters, such as where to view the RMBS Settlement and how to contact the

RMBS Trustees, were addressed in the notices, which included links to those matters.  In

addition, Gibbs & Bruns posted on its website that the RMBS Settlement is pending.[34]  News

services also reported the settlement.[35]

On March 21, 2017, the RMBS Trustees caused notice to be given to all Certificate

Holders[36] of the RMBS Settlement offer, the proposed settlement terms, and the fact that the offer

materially affects their interests.  *See* Notice dated March 20, 2017.  The Notice contained

important information, identified each Trust affected by the RMBS Settlement, advised all

recipients to read it and to consult with their legal and financial advisors, and requested responses

not later than May 5, 2017 as the RMBS Settlement had to be accepted or rejected on a final basis

---

[31] *See* "Notice of Presentment Of Order Approving Notice Procedures With Respect To Proposed RMBS Settlement Agreement."  Doc. 55096.

[32] *See* "Order Approving and Establishing Notice Procedures With Respect to Proposed RMBS Settlement and Agreement."  Doc. 55154.

[33] *See* http://www.lbhirmbssettlement.com/notice.php  (http://www.lbhirmbssettlement.com/notice.pdf (March 20, 2017) and http://www.lbhirmbssettlement.com/2d_Notice.pdf  (April 21, 2017)).  *See also,* regarding Certificate Holders who acquired their interest from DTC, http://www.DTCC.com .

[34]   *See*   http://www.gibbsbruns.com/14-institutional-investors-in-rmbs-issued-by-lehman-announce-binding-offer-by-the-plan-administrator-to-the-lehman-estate-to-four-rmbs-trustees-to-settle-mortgage-repurchase-claims-for-244-rmbs-trusts-04-03-2017/.

[35] *See, e.g.,* Randles, Jonathan, *Lehman Floats RMBS Settlement Worth at Least $1 Billion*, Wall Street Journal, April 6, 2017 6:17 p.m. https://www.wsj.com/articles/lehman-floats-rmbs-settlement-worth-at-least-1-billion-1491517041; Jack Newsham, *BlackRock, Others Back $2B Deal with Lehman Estate*, Law360, April 3, 2017.

[36] As originally offered in the November Version, only the Institutional Investors had notice of the proposed settlement, and the RMBS Trustees were required to keep the proposal confidential until after acceptance.

on or before June 1, 2017.  As of this writing, I have been provided with one comment returned by a beneficial owner with holdings in multiple trusts who recommended that the RMBS Settlement be accepted.  I have also been provided with letters from various Certificate Holders who either do not approve or raise concerns about the RMBS Settlement.[37]

As a result of the RMBS Trustees' efforts, the Certificate Holders in each RMBS Trust have had notice of, and the opportunity to comment on or advise, the RMBS Trustees of their views concerning acceptance or rejection of the RMBS Settlement.  With respect to obtaining a copy of and providing comments to the Trustees, the March 20, 2017 and April 21, 2017 notices satisfy the Bankruptcy Court's order regarding Notice Procedures.  *See* Doc. 55096, p. 8-9, ¶9. *See also* Doc. 55154.

Pursuant to the Bankruptcy Court's Order, additional notice of the 9019 Motion, the deadline for objections and the hearing are required.  Doc. 55096 p. 5-6, ¶9.  *See also* Doc. 55154, p.2.  The RMBS Trustees have caused notices of the 9019 Motion to be posted on websites and have arranged publication in papers of wide circulation including: The Wall Street Journal; Global; Wall Street Journal, Digital Network; the New York Times, National; NYT.com; The Financial Times, Worldwide; Investors.com; Reuters.com; and Economist.com.  *See, e.g.*, NY Times at B6, May 15, 2017; Financial Times at 16, May 15, 2017; The Wall Street Journal at B8, May 15, 2017.  The RMBS Trustees also issued a press release to PR Newswire, World Financial       Markets.       *See*       RMBS       Settlement       website: http://www.lbhirmbssettlement.com/pdflib/LBHI%20RMBS%20Settlement_%20Notice%20of% 209019%20Motion%20wedits%20-%204pmCopy.pdf).  The notices and publications explain, *inter alia,* that LBHI filed the 9019 Motion; the date (July 6, 2017), time (10:00 a.m. prevailing

---

[37]I reserve the right to modify this opinion in the event that more comments are forthcoming.

Eastern Time), and place (in Courtroom 623, One Bowling Green, New York, New York 10004

before Judge Chapman) of the hearing; the way to submit objections (as more particularly

detailed in the notice); each person who must be served and the address for each. The Notice also

states that if no objection is received by June 22, 2017 at 12:00 noon (EDT), the Bankruptcy

Court may grant the relief requested.

The RMBS Trustees are complying with the Bankruptcy Court's order and have provided

"sufficient and effective notice in satisfaction of federal and state due process requirements and

other applicable law to put the parties in interest in these Chapter 11 Cases and others, including

the Institutional Investors and the investors in each Trust, on notice of the Motion and the RMBS

Settlement Agreement. . . ." *See* "Order Approving And Establishing Notice Procedures With

Respect To Proposed RMBS Settlement Agreement." Doc. 55154, p. 2.

### 2.    Investors' Views Of The RMBS Settlement Offer Solicited and Considered

The Institutional Investors bargained for the RMBS Settlement and whole-heartedly

support it.[38] To date, with the exception of Certificate Holders of a small number of Trusts,[39] no

---

[38] As set forth in the RMBS Settlement, the Institutional Investors' "holdings include 25% or more of the [unpaid principal balance of securities ("UPB") of 69 of the [RMBS] Trusts, which Trusts account for approximately 35% of the total UPB across all of the Trusts." Doc. 55232, Exhibit "D," p. 89. The Institutional Investors initially negotiated the RMBS Settlement with LBHI and support the RMBS Settlement as now proposed. *See* Exhibit "E" to the RMBS Settlement which states that the "Institutional Investors are holders and/or authorized investment managers for holders of approximately $6 billion in certificates in 195 of the trusts for whose benefit the Covered Loan Claims [i.e., those at issue] are being pursued."
The Institutional Investors sent a letter to each of the RMBS Trustees asserting that:

[T]his offer is one the Trustees certainly should accept. It *virtually ensures* the Trusts claims will be allowed in an amount no less than $2.416 billion, because Lehman has agreed to seek estimation at that amount. In addition, while setting a functional floor on the recovery, the offer establishes no ceiling; instead the Trustees are free to put on whatever proof they wish, to advocate for an increased estimation if they possess evidence they believe warrants it. And finally, by making the estimation final as to both the Trusts and Lehman, it ends both the hemorrhage of dollars caused by the protocol and eliminates

33

instructions directing any RMBS Trustee to reject the RMBS Settlement and no indemnity agreements, in form and substance satisfactory to the RMBS Trustees, have been offered and delivered to any RMBS Trustee from any Certificate Holder.

At this juncture there is unanimous support of the Institutional Investors with a large economic stake in the outcome, who, as stated above, have notified the RMBS Trustees that in the view of the Institutional Investors the RMBS Settlement is in the best interests of the RMBS Trusts. Various comments by certain other Certificate Holders have been given to the RMBS Trustees for their consideration.[40] Likewise, in reaching my conclusions, I have considered all of the comments provided to date, some of which make assumptions that, in my opinion, are unwarranted based on what has occurred in the Bankruptcy Proceeding so far. In addition, as to each RMBS Trust where Certificate Holders commented to the RMBS Trustees, I requested information regarding the number of Covered Loans in the applicable RMBS Trusts. I received

---

the risk—through elimination of appeals—that this hemorrhage of funds will resume. In short, there is no reasonable basis on which the Trustees could or should refuse this guarantee of a certain recovery of more than $1.1 billion in cash, with the opportunity to obtain more.

*Id. (emphasis in original)*

Despite this clearly expressed preference for entering into the RMBS Settlement, the Institutional Investors have neither instructed, under any RMBS Trust in which they hold the requisite percentage of the RMBS Certificates, the RMBS Trustees to approve the RMBS Settlement, nor have they offered an indemnity to the RMBS Trustees. (*See* Exhibit "E" [The Institutional Investor Statement] to the RMBS Settlement). Exhibit "E" also states that the Institutional Investors previously agreed that a settlement for an allowed Class 7 claim of $2.416 billion was fair and reasonable and continue to support a settlement in an amount that is not below $2.416 billion.

[39] Holders of Certificates in certain Trusts have sent letters to the respective RMBS Trustees directing those Trustees to not become an "Accepting Trustee" of the RMBS Settlement and to prosecute the Trust's claims under the Protocol.

[40] It should be noted that the Governing Agreements do not require the RMBS Trustees to accept or reject the RMBS Settlement as to any RMBS Trust. The RMBS Settlement affords the RMBS Trustees the right but not the obligation to terminate the RMBS Settlement under certain specified circumstances for any particular as to which the RMBS Settlement was accepted.

information from Duff & Phelps regarding the number of those loans which but for the RMBS Settlement could potentially be tried on a loan-by-loan basis.

Among the topics raised by the comments I have considered are these:

**The Gibbs & Bruns Fee.**   Gibbs & Bruns led the negotiations for the Institutional Investors.  In its letter to the RMBS Trustees recommending acceptance of the RMBS Settlement, Gibbs & Bruns advised that the Institutional Investors hold approximately $6 billion of the unpaid principal balance of securities issued by the RMBS Trusts listed on Exhibit "A" to the RMBS Settlement.  This represents 25% or more of the unpaid principal balance of 69 of the RMBS Trusts, or 35% of the total unpaid principal balance across all of the RMBS Trusts.  *See* Doc. 55232, Exhibit "D."   Gibbs & Bruns negotiated with LBHI over several years prior to signing off on the RMBS Settlement.  Certain Certificate Holders are troubled by the allegedly excessive legal fees charged by Gibbs & Bruns, which will be paid first out of the proceeds of the RMBS Settlement at the same percentage distribution as the allowed RMBS Claims and other allowed Class 7 claims.

Paragraph 6.05 of the RMBS Settlement sets the fee at 4.75% of the first $2.416 billion of the allowed RMBS Claims without the need for Gibbs & Bruns to submit any form of estate retention or fee application.   Doc. 55232, p. 67.   At the current percentage payout of approximately 39.1% of the allowed claims, Gibbs & Bruns would receive a fee in excess of $43 million.  The fee is comparable to those in some other RMBS settlements negotiated by Gibbs & Bruns.  Fees paid ranged from approximately $37.84 to $85 million.  *See* "RMBS Settlements - Analysis of Gibbs & Bruns Fee Amounts" prepared by Duff & Phelps, draft dated May 15, 2017.

To the extent that any RMBS Trustee declines to enter into the RMBS Settlement for any particular Trust, that Trust would not participate in the distribution on the allowed claims.  In that

event, that Trust would not share in the benefits or burdens of the RMBS Settlement and, therefore, would not bear any portion of the Gibbs & Bruns fee. However, the total cost of litigating the loans with breaches in that specific Trust (or negotiating any settlement for a different deal with LBHI) would be borne entirely by that Trust.

**Timing and Method of Trial.** The RMBS Settlement provides for a claims allowance process. That process is not the type of estimation conducted for the purpose of setting a reserve[41] for distribution under the Plan.

I am aware that certain Certificate Holders have expressed opposition to the trial procedure set out in the RMBS Settlement. Having reviewed their comments, however, my opinion is that the RMBS Settlement is a reasonable way to resolve all of the RMBS Claims. The comments proffered the loan-by-loan trial approach as an alternative to Exhibit "G," but my opinion is that the Bankruptcy Court would not authorize that alternative.

Certain Certificate Holders have suggested that loan-by-loan trials could be completed within 18 - 24 months in this Bankruptcy Proceeding. I disagree. First, this is not the only bankruptcy pending before Judge Chapman. In my experience as a bankruptcy judge with a docket of complex cases and knowing how much time is required to prepare for, conduct, decide and issue opinions and orders in such matters, I find it highly unlikely that Judge Chapman, with the busy docket of complex cases she has, would agree to spend every day of the next 18 - 24 months for loan-by-loan (or even trust-by-trust) trials. That proposed time frame posits an impossibly aggressive schedule. *See* the calculation in the May 10, 2017 letter from Gibbs &

---

[41] The reserve in this Bankruptcy Proceeding was established years ago and LBHI is already required to maintain assets sufficient to pay the distribution percentage applied to the $4.75 billion claims reserve for at least as long as there is no determination of the allowed RMBS Claims.

Bruns to Franklin H. Top III, *et al*, observing that to resolve 91,000 loan claims in 18 to 24 months would require resolution of 175 claims per day or one every 2.4 minutes. Gibbs & Bruns May 10, 2017 Letter at p. 3. It is entirely possible that the judge, aware of the time required for loan-by-loan trials and having heard the evidence of breaches as to the RMBS loans involved in the RMBS Trusts that accept the RMBS Settlement, would impose some consolidation and limit the time for trial, just as she will under the RMBS Settlement.

Second, the RMBS Settlement enables the RMBS Trustees to produce evidence of breaches in a consolidated fashion that, without this agreement, Judge Chapman may or may not permit. Third, there is no assurance that a loan-by-loan trial process would result in a superior recovery for the Certificate Holders. In order to ascertain the magnitude of loans that would have to be tried if the RMBS Settlement is rejected, I requested information from the RMBS Trustees as to each RMBS Trust that provided comments. They assigned the calculation to Duff & Phelps. That calculation shows, that as of April 28, 2017, in each of the 12 RMBS Trusts from which negative comments were provided by least 25% of the Certificate Holders, there were a minimum of 58 and a maximum of 4,529 loans.[42] Even if the Bankruptcy Court allotted one hour per individual loan to prove breaches, the time to be devoted to just the one Trust that held 58 loans would be more than one week of trial time. Given the schedule in Exhibit "G," my opinion is that the Bankruptcy Court could not devote the hours required for a loan-by-loan evidentiary process. *See* Duff & Phelps Chart dated May 26, 2017 of Covered Trusts with Certificate Holders who provided comments to the RMBS Trustees.

The comments also proffered that a trial based on statistical sampling would lead to a better result. Again, I disagree. LBHI used its own expert to challenge the statistical sampling

---

[42] There are over 15,000 loans within the 12 RMBS Trusts.

methodology and results generated by experts retained by the RMBS Trustees. I anticipate a similar challenge by LBHI to any effort of a non-accepting RMBS Trust to use statistical sampling for trial purposes. Which of those diametrically opposed expert opinions the Bankruptcy Court would accept in a trial based a loan-by-loan review or on a sampling technique, as suggested by certain Certificate Holders, is another unknown factor that could materially affect the process. While the "exemplar" basis provided in Exhibit "G" is not identical to a statistical sampling, in my opinion, it affords the RMBS Trustees the same opportunity to prove the breaches as they would have had with a sampling method. Moreover, there is no assurance as to what trial process the Bankruptcy Court would order for any Trust that opts out of the RMBS Settlement. Nor is there any assurance that the Bankruptcy Court would not send all of the non-accepting Trusts back to the Protocol and wait to address any form of trial until the Protocol process is complete.[43] Such a ruling, alone, could delay trials for years because the Protocol is taking an inordinately long time to get through Stage 3 and to Stage 4. The Trustees submitted over 90,000 RMBS Loans under the Protocol. Of those, LBHI has agreed that approximately 1,000 (.01%) are worthy of recompense. The substantial legal issues that are not yet resolved (including causation) may have to be litigated regarding each loan. The expense, including attorney fees, of litigating and appealing each loan would fall on the individual RMBS Trust that is not part of the RMBS Settlement.

There are also risks and costs other than out-of-pocket costs that would befall the individual Trust. The delay in distribution from seeking rulings and appealing, loan-by-loan, could also be substantial and would affect the non-settling RMBS Trusts. There is no certainty as

---

[43] Alternatively, the Bankruptcy Court may do something else entirely.

to what portion of the RMBS Claims Reserve would be retained for any Trust that declines the RMBS Settlement.[44]

**Number of Trial Days.**  Concern was expressed to the effect that the minimum 14-day, on-the-record hearing time will be insufficient for the RMBS Trustees to establish material breaches.  I disagree.  Exhibit "G" establishes that the parties may present their direct testimony through written declaration and will identify all the exemplar loans and exhibits they intend to introduce well before trial.  The parties have stipulated to admissibility of the majority (if not all) of the relevant documents regarding the loans and the Governing Agreements.  They have agreed to meet before trial to resolve any objections to the admissibility of the large volume of documents likely to be offered.

In addition, I am informed that the Bankruptcy Court will conduct pre-trial procedures that will minimize time customarily spent in trial regarding legal issues, arguments, expert reports, etc.  Purposes of the pre-trial include expediting disposition of the action, establishing early and continuing control so that the case will not be protracted by lack of management, and improving the quality of the trial through more thorough preparation.  *See* Federal Rule of Bankruptcy Procedure 7016(a).  With all of these pre-trial procedures in place, it is my opinion

---

[44] Note that the Plan does not provide for early distributions.  LBHI took the position that distributions are required only after each disputed proof of claim is fully resolved.  *See* Plan, Section 9.2, Doc. 22973. *See also* Letter dated September 30, 2015 from LBHI counsel advising that "no distributions are to be made on the [resolved] Claim until the disputed portions of the balance of the Claim are resolved. Nothing in the Protocol Order requires or provides otherwise.  Thus, unless one or more of the Approved Claim Files constitute the entirety of a proof of claim filed by the RMBS Trustees, no distribution can or will be made on such Approved Claim File until all other Claims asserted in the applicable proof(s) of claim also have been."  Thus, there is uncertainty as to when distributions to any non-settling RMBS Trust will be made in the event that the RMBS Trustees decide not to accept the RMBS Settlement on behalf of all of the RMBS Trusts.  As to the RMBS Trusts that accept the RMBS Settlement, however, that Settlement provides for a distribution promptly after the claims allowance process ends.

based on my experience as a litigator and as a trial judge, that the time reserved for trial is adequate for the RMBS Trustees to present their evidence.

Moreover, it is not uncommon for a trial court to limit the time each side is permitted to present its case and there is no assurance that a limitation would not be imposed in any loan-by-loan trial. Rule 7016 permits a court to "establish[] a reasonable limit on the time allowed to present evidence," (Rule 7016(c)(2)(O)) and to "adopt[] special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems" (Rule 7016(c)(2)(L)).  Inasmuch as the Bankruptcy Court has agreed to a period of "at least" 7 hearing days on the record per side under the RMBS Settlement, the court has already indicated that more time will be available if the Bankruptcy Court finds it necessary.  Whether the Bankruptcy Court would extend that courtesy under other circumstances is not ascertainable at this time.

**Settlement Amount.**  LBHI asserted on many occasions that, absent the RMBS Settlement, it will seek allowance of the RMBS Claims at substantially lower than $2.416 billion. However, for purposes of resolving the process which will govern the allowance trial, LBHI will agree to allowance of $2.416 billion and will not appeal any higher allowed claim.  At the same time, the RMBS Settlement puts no restrictions on the RMBS Trustees in terms of proving that the RMBS Claims have a greater value than $2.416 billion and should be allowed in that higher amount.

Certain Certificate Holders view this concession by LBHI as though the court will automatically value the RMBS Claims at $2.416 billion.  I disagree.  There is already a reserve for these claims to be valued at $4.75 billion and the judge knows that the reserve was established by agreement.  Further, Judge Chapman has set a period of "at least" 14 hearing days "on the

record" to afford the time needed to hear and consider all of the evidence that will be presented

regarding the extent and amounts of claims.  Doc. 55232, p.94.  It is highly unlikely that a judge

with her background, skill and awareness of the circumstances that led to the RMBS Settlement

will ignore the RMBS Trustees' evidence as developed through the Protocol that she imposed.

With or without the process planned through Exhibit "G," there is no way to know what

evidence will be credited or the amount that Judge Chapman will allow.  Without the RMBS

Settlement, there is nothing to preclude the court from disallowing the RMBS Claims in their

entirety.  However the RMBS Settlement sets a $2.416 billion number that LBHI has agreed to

advocate while preserving the "up-side" to the Trustees who have the right to advocate for a

substantially larger sum.  If the Bankruptcy Court allows the RMBS Claims at an amount of no

less than $2 billion (assuming all RMBS Trusts stay in the settlement pool), the Bankruptcy Court

need not spend the time and resources to make proposed findings of fact and conclusions of law,

because there is no appeal in that instance.  Doc. 55232, p. 59.  This eliminates much of the delay

inherent in writing a complicated opinion, and enables distributions to be made promptly.

**Lack of Indemnity Provided to Any RMBS Trustee.**  Although Certificate Holders in a

small number of RMBS Trusts have directed their particular RMBS Trustee to not accept the

RMBS Settlement, none has provided the indemnity contemplated in the Governing Agreements.

Several have specifically indicated that they are not inclined to provide an indemnity.  In my

opinion, a direction without an indemnity is not an adequate reason for any particular Trust to

refuse to accept a settlement that provides the advantages that the RMBS Settlement offers and to

return, instead, to the lengthy, expensive, long-delayed process encompassed in the Protocol and

the uncertainty of an alternative process or better outcome, which could create unnecessary risk to

the RMBS Trustees.  To date, LBHI has agreed to a miniscule number of claims put through the

Protocol by the RMBS Trustees and there is no assurance that LBHI would not return to that mode as to any loan that is not resolved through the RMBS Settlement.  As such, the costs to a non-accepting Trust likely would be substantial.  Without indemnities in form and substance satisfactory to the RMBS Trustees to assure that potentially substantial costs can be funded, and with no alternative presented by any objecting Certificate Holder regarding a claim liquidation process that is any more certain to lead to better recoveries in a cost-effective way and in the time-frame that the RMBS Settlement affords, my opinion is that the RMBS Settlement is the most reasonable viable option available for each RMBS Trust (other than 5 identified in note 3 *supra* those that will receive no distribution) for resolving the RMBS Claims.

**Summary**.  My experience has taught me that no settlement is ever perfect, particularly from the point of view of the entity who wants to be paid.  However, having evaluated the provisions of this one, my opinion is that the RMBS Settlement is reasonable and has benefits, overall, that outweigh burdens.  One significant benefit to the RMBS Trusts is that the cost and expense of preparing and presenting evidence of breaches and losses is shared and no one individual RMBS Trust has to singularly bear the cost of the claims' litigation.  On an individual Trust basis, in addition to the particularities I address herein, I view avoidance of the numerous uncertainties that exist without the RMBS Settlement as important to the determination of whether it is a reasonable settlement as to that Trust.

These factors, as well as the others identified herein, weigh heavily in favor of accepting the RMBS Settlement even as to those Trusts which decry provisions of the RMBS Settlement. Having considered the comments, and based on what I perceive to be the substantial risks in the event that the RMBS Settlement is not approved and the substantial costs and delays inherent in waiting for loan-by-loan trials or for some other unknown claims resolution process, it is

42

nonetheless my opinion that the RMBS Settlement is reasonable and preferable to the likely return to the Protocol and any subsequent trials.

### 3.    The Terms of the RMBS Settlement

In assessing the RMBS Settlement's benefits and burdens, I am cognizant that the RMBS Settlement must be approved by the Bankruptcy Court and also by the United States District Court.[45]  Bankruptcy courts are required to assess the reasonableness of a proposed settlement in terms of what is in the best interests of the bankruptcy estate and its creditors.  Appellate courts have articulated factors that a bankruptcy court should use in making that assessment.  Drawing upon the method by which bankruptcy courts assess approvals of settlements is a useful way of analyzing the reasonableness of the RMBS Settlement.

---

[45] Because of jurisdictional limitations on the Bankruptcy Court's power to enter final orders in matters of this type, the RMBS Settlement requires a submission to the District Court to review the findings and conclusions of the Bankruptcy Court.  Federal Bankruptcy Rule 9033 provides that in proceedings involving issues and relief of the nature sought here, a bankruptcy judge shall file proposed findings of fact and conclusions of law and a district court will review those findings *de novo*.  The Bankruptcy Court in New York has a local rule as well.  Local Bankruptcy Rule 9033-1.  A district court will review a bankruptcy court's proposed findings of fact and conclusions of law under Rule 9033 which sets forth the following standard of review:

> [T]he district judge shall make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with this rule.  The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions.

Federal Rule of Bankruptcy Procedure 9033(d).  *See Opinion and Order* filed 11/10/14, *Tronox Incorporated v. Anadarko Petroleum Corporation (In re Tronox)*, Case 14-cv-05495, Doc. 32 (S.D.N.Y 2012).

The Rule 9033 process of reviewing the propriety of the RMBS Settlement differs from the bankruptcy appeal process applicable to court orders on claims allowance, which is the ultimate purpose of the RMBS Settlement.  The allowance or disallowance of claims is typically the kind of matter on which a bankruptcy court can enter a final order.

In the Second Circuit, the seminal case of *Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*[46] identifies those factors as: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) whether the parties negotiated in good faith and at arm's length.[47]

To avoid duplication, I will combine certain parts of the seven factors in my analysis.  A review of the proposed RMBS Settlement shows that the various factors weigh in favor of approval and the RMBS Settlement is well above the lowest point in the range of reasonableness. Although a settlement can provide a finite dollar amount, here there has been no agreement on the amount.  LBHI has agreed to proffer an estimate and allowance of the RMBS Claims at $2.416 billion.  Without that agreement, LBHI is free to pursue a value at less than $2.416 billion. However, under the RMBS Settlement the RMBS Trustees are not foreclosed from presenting

---

[46] *Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007).

[47] *Id.*, 478 F.3d at 462.  *See also In re MF Global Inc.*, 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012) (stating standard that settlement must be "fair, equitable, and in the best interests of the estate," *i.e.* that settlement falls above the lowest point in the range of reasonableness); *City Sanitation, LLC. v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82 (1st Cir. 2011) (bankruptcy court should determine whether settlement falls below the lowest point in the range of reasonableness).

44

evidence of claims that exceed $2.416 billion.  The Institutional Investors support a settlement

amount that is not less than $2.416 billion.

> **Factors 1 and 2: The balance between the litigation's possibility of
> success and the settlement's future benefits; the likelihood of complex
> and protracted litigation, with its attendant expense, inconvenience,
> and delay, including the difficulty in collecting on the judgment.**

In addition to lack of consensus on the amount, LBHI and the RMBS Trustees have been

unable to reach agreement on whether the vast majority of the RMBS Claims are valid.  LBHI

has agreed to only a small percentage of RMBS Claims as being valid, as explained in the various

RMBS Trustees' status reports.  There is no date set for the Bankruptcy Court to hear the disputes

and there is no agreement as to the mechanics of the litigation itself, all of which is addressed in

the RMBS Settlement.  That is, without the RMBS Settlement and Exhibit "G," the parties are

left with substantial uncertainty as to when and how RMBS Claims allowance proceeding would

occur.  The RMBS Settlement eliminates that uncertainty and provides significant benefits to the

Certificate Holders as a result.

The process by which the RMBS Settlement came about has been detailed above.[48]  The

RMBS Trustees improved the November Version by, *inter alia,* (1) adding notice to Certificate

Holders, (2) including a limited right of appeal for the RMBS Trustees regarding certain possible

findings of the Bankruptcy Court while excluding any right of appeal for LBHI, and (3) insisting

on an evidentiary process that would afford the RMBS Trustees the right to present evidence in

---

[48] The parties were engaged in the Protocol when the 2015 Proposal was made.  After the RMBS Trustees examined its terms, the 2015 Proposal was withdrawn, and the parties continued to engage in the Protocol.  The Institutional Investors continued efforts to settle with LBHI.  In November 2016, LBHI and the Institutional Investors presented a renewed settlement offer (the November Version) to the RMBS Trustees and the RMBS Trustees became directly involved in negotiations thereafter.

support of the RMBS Claims.  All of those enhancements are in the paramount interest of the Certificate Holders.

### a.  Right to Appeal[49]

As part of the additional bargaining, the RMBS Trustees raised concerns about the lack of any appellate rights in the November Version, particularly as there was no floor to the amount of the claims allowance being presented to the Bankruptcy Court.  As a result of the additional efforts of the RMBS Trustees, LBHI agreed to present a settlement offer which contains the following appellate rights:  (1) should the Bankruptcy Court rule that the allowed claims total less than $2 billion, the RMBS Trustees, but not LBHI, have a right to appeal; (2) should the Bankruptcy Court determine the total allowed claims to be between $2.0 billion and $2.416 billion, the allowed claims will be fixed at $2.416 billion and no party will have a right to appeal; and (3) should the Bankruptcy Court determine the total allowed claims to be more than $2.416 billion, the total allowed claims will be the amount set by the Bankruptcy Court and no party will have a right to appeal.  *See* RMBS Settlement, § 3.02(c), p. 13-14.  LBHI has agreed to forfeit its right to appeal any order of the Bankruptcy Court, including one which would place a value on the RMBS Claims greater than $2.416 billion, adding certainty to the outcome and eliminating costs of appeals and years of delay.[50]

---

[49] A right to appeal is distinguishable from the Rule 9033 review discussed *supra.*

[50] In my experience dealing with complex issues in mega-bankruptcy cases, I have had reports of the expense associated with efforts to evaluate the cases and ready matters for trial.  In this regard, I have determined that the costs incurred here, without considering legal fees, have been high and will only increase an approved settlement.  As of December 31, 2016, the non-legal fee cost incurred by the RMBS Trusts to undergo the difficult and expensive processes necessary to prove the RMBS Claims was a collective $135 million dollars, an amount that I consider to be high, regardless of the allowed amount of the underlying claims as there is no assurance that the Bankruptcy Court will value the RMBS Claims at an amount higher than the $2.416 billion that the Debtor will propose and, likewise, the Bankruptcy Court could value the RMBS Claims at less than what the Debtor proposes.

I am unaware of any accepted methodology used to assess the dollar value of appellate rights as standards of review are rarely simple to apply and there are numerous unknown and unpredictable factors at play. For example, the standard of review on appeal varies depending on the nature of the issues presented to an appellate court.[51]  To the extent that there are pure questions of fact in dispute on appeal, the applicable standard is abuse of discretion,[52] which is a difficult standard to prove, particularly in the situation where the trial court conducted a full and fair hearing and made findings as a result of the evidence adduced.[53]

Where, as here, findings of fact and conclusions of law could be interspersed, a federal district court acting as an appellate court will use *de novo* review.[54]  *De novo* review could involve an entirely new proceeding before a different judge who has had little, if any, involvement in the underlying LBHI/RMBS Trustee disputes. Discovery may be required;

---

[51] On appeal, a district court acts as the first level of appellate review for orders from a bankruptcy court. A district court will review a bankruptcy court's conclusions of law de novo and findings of fact for clear error. A finding of fact is clearly erroneous where the reviewing court is left with "definite and firm conviction that a mistake has been committed." *Ahuja v. LightSquared Inc. (In re LightSquared, Inc.*), 534 B.R. 522, 525 (S.D.N.Y. 2015), *aff'd*, 644 F. App'x 24 (2d Cir. 2016), *cert. denied sub nom. Sanjiv Ahuja v. LightSquared Inc.*, 137 S. Ct. 335, 196 L. Ed. 2d 262 (2016)("A bankruptcy court's conclusions of law are reviewed *de novo* and findings of fact are reviewed for clear error."); *In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 426 (2d Cir. 2009)("We will determine that a finding is 'clearly erroneous' when we are left with the definite and firm conviction that a mistake has been made."); *See also Nevada Power Company v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 407 (S.D.N.Y. 2007)("A district court functions as an appellate court in reviewing judgments rendered by bankruptcy courts. Findings of fact are reviewed for clear error. A finding of fact is clearly erroneous if the court is 'left with the definite and firm conviction that a mistake has been committed.' A bankruptcy court's conclusions of law, by contrast, are reviewed de novo." (footnotes omitted)).

[52] *Bittner v. Borne Chemical Co.*, 691 F.2d 134, 136 (3d Cir. 1982); *In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984); *In re Enron Corp.*, 2006 Bankr. LEXIS 4294 (Bankr. S.D.N.Y. Jan. 17, 2006).

[53] A district court abuses its discretion if it "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or render[s] a decision that cannot be located within the range of permissible decisions."  *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008)(internal citation and quotation marks omitted).

[54] Where mixed questions of law and fact are presented, the district court will review the bankruptcy court's decision *de novo*.  *In re LightSquared, Inc.*, 534 B.R. at 525.

different legal rulings could be issued; and another trial or hearing could be ordered.  All of this would significantly increase the expense and delay before any payments are made on the RMBS Claims.

Regardless of the standard of review to be employed, the consequences of delay and the risk of  lengthy appeals in bankruptcy matters is very high given that the initial appeal is to the United States District Court, then to the Court of Appeals,[55] and finally to the United States Supreme Court.  At each of those stages, a remand, a partial or complete reversal, or a partial or complete affirmance could result – any of which could lead to additional appeals.  As these lengthy and time consuming processes proceed, no final order allowing the claims would be issued and no money from LBHI would be paid on account of the RMBS Claims.  Likewise

---

[55] Orders of a district court in its appellate capacity are subject to plenary review by a Court of Appeals. A Court of Appeals will independently review the factual determinations and legal conclusions of the bankruptcy court and accept the bankruptcy court's findings of fact unless they are clearly erroneous. Review of the bankruptcy court's conclusions of law is *de novo*. *Mazzeo v. U.S. (In re Mazzeo)*, 131 F.3d 295 (2d Cir. 1997)*, aff'g sub nom In re Mazzeo*, 213 B.R. 625 (E.D.N.Y. 1996)*, as amended* Dec. 3, 1996 ("An order of a district court functioning in its capacity as an appellate court in a bankruptcy case is subject to plenary review. [ ].  Thus, we "'independently review the factual determinations and legal conclusions of the bankruptcy court.' " [ ]." (internal citations omitted))*; See also The Argo Fund Ltd. v. Bd. of Directors of Telecom Argentina, S.A. (In re Bd. of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 168–69 (2d Cir. 2008)("When a district court sits as an appellate court reviewing a judgment of the bankruptcy court, the district court's decisions are subject to plenary review.    [ ].  We 'review independently the factual findings and legal conclusions of the bankruptcy court, accepting its findings of fact unless they are clearly erroneous and reviewing its conclusions of law de novo.'" (internal citations omitted)).

Specific to bankruptcy settlements, district courts and courts of appeals will review the bankruptcy court's statement of the applicable standards for approval of settlements under Federal Rule of Bankruptcy Procedure 9019 *de novo* and will review the reasonableness of the bankruptcy court's application thereof for abuse of discretion.  *In re Iridium Operating LLC*, 478 F.3d at 461, n. 13 ("The bankruptcy court's articulation of Rule 9019's standard for evaluating a settlement is a legal issue subject to *de novo* review. We review for abuse of discretion the reasonableness of that court's application of the Rule in approving the Settlement."); *See also Krys v. Official Committee of Unsecured Creditors of Refco Inc. (In re Refco Inc.)*, 505 F.3d 109, 116 (2d Cir. 2007)("Like the district court, we review the bankruptcy court's articulation of the legal standards applicable to the evaluation of a settlement under Bankruptcy Rule 9019 *de novo,* including the bankruptcy court's view of the principles governing who may contest the settlement as a "party in interest" under § 1109(b).  The bankruptcy court's application of those principles to the settlement is reviewed for abuse of discretion. (internal citations omitted)).

during that time, LBHI could pay out all of its funds, excepting only the amounts the Bankruptcy Court has required to be kept in reserve for the RMBS Claims, depleting the LBHI estate and eliminating recovery of amounts in excess of the reserve.[56]  As LBHI liquidates other assets, if any, the funds over the amounts required to be held in the disputed claims reserve can be used to pay other allowed claims and creditors.  There is no guaranty that there will be sufficient monies available to fund a distribution to pay a large-dollar decision on the merits issued 2 to 4 years down the road.

All appeals are costly and time-consuming.  Appeals add delay, and, based on my experience when billions of dollars are at issue, it is my opinion that the parties will fight long and hard to be successful on appeal.  In assessing the benefits of entering into the RMBS Settlement, I have considered the cost and delay inherent in the process without the settlement and the fact that both LBHI and the RMBS Trustees have the right to appeal, whereas under the RMBS Settlement, LBHI is giving up all rights to appeal and the RMBS Trustees are preserving a limited right to appeal.  Without the RMBS Settlement, rulings will not be final during appeal periods.[57]  The time necessary to prosecute any appeal would produce major delays in the

---

[56] LBHI filed its quarterly report as of December 31, 2016 reflecting cash on hand available in the disputed claims reserve of $1.089 billion.  *See* Operating Report: Quarterly Financial Report as of December 31, 2016 Balance Sheets and Accompanying Schedules, Doc. 55127, p. 6.

[57] If claims determinations and the orders allowing or disallowing each were made on a "loan-by-loan" basis then the appeals may also be heard on a loan-by-loan basis.  The cost to file each appeal or cross-appeal from each order of a bankruptcy court to a district court as of this writing is $298.00 and the fee to pursue an appeal or cross-appeal to a court of appeals is $500.  After separate appeals are filed, the appeals sometimes are consolidated. The filing fee for each appeal or cross-appeal would have to be paid.  Regardless of the filing fee cost, the appeal process itself would add additional delay (and one to three years would not be unusual) before the claims determination orders would be final and distributions could be made to the RMBS Trusts.  Without the RMBS Settlement, if the Bankruptcy Court determined the claims at a lower amount than that sought by the RMBS Trusts, LBHI, in all likelihood, would ask the Bankruptcy Court to reduce the reserve to enable LBHI to make further distributions to creditors other than the RMBS Trusts.  Obtaining stays of bankruptcy court orders pending appeal requires the posting of supersedeas bonds – yet another cost.  Bankruptcy Rule of

payment of any of the RMBS Claims, which have not been paid for the numerous years this Bankruptcy Proceeding has been pending.

For these reasons, including that the likelihood of reversal on appeal after trial is low, it is my opinion that the value of the appeal rights in this case at this time is inconsequential. So the limitation on appeal rights imposed by the RMBS Settlement is a reasonable alternative to the cost, delay, and uncertainty of outcome that would result from any appeal.

On balance, from my experience as a bankruptcy judge and a litigator, it is my opinion that the certainty provided by the RMBS Settlement compared with the risks associated with traditional litigation (the costs and delay of which will be discussed further below) inures to the benefit of the Certificate Holders and weighs in favor of acceptance of the RMBS Settlement as a reasonable settlement.

### b. Evidentiary Process

As yet, the Bankruptcy Court has not determined when or how the claims allowance litigation will go forward. Moreover, without the implementation of the RMBS Settlement, there is no agreed upon way to litigate the RMBS Claims that are not yet resolved by the Protocol. Exhibit "G" to the RMBS Settlement sets up the litigation process the parties have agreed upon, assuming the Bankruptcy Court concurs, and removes the uncertainty as to what the process will be. The detailed procedures include that the Hearing (as defined in Exhibit "G") span *at least* 14 hearing days, or a total of 98 hours, on the record and the LBHI Debtors will be allotted 7 days

---

Procedure 8007 requires a motion for a stay pending appeal to be filed initially with a bankruptcy court when or before a notice of appeal is filed along with the request for approval of a supersedeas bond. *See* Rule 8007(a)(1),(2). If a bankruptcy court does not grant a stay, the appellant may request the district court to issue a stay and that court may also require a supersedeas bond. *See* Rule 8007(c). In the absence of stays pending appeal, LBHI could continue to make distributions and deplete available monies for distribution to the RMBS Trust in the event an appellate court ultimately reversed an adverse bankruptcy court ruling.

(or a total of 49 hours) to present their case, including rebuttals, and 7 days (or a total of 49 hours) will be allotted to the RMBS Trustees.[58]  Certain Certificate Holders contend that the allotted time of at least 14 hearing days on the record will be insufficient to introduce detailed, loan-level findings regarding material breaches.  As noted, I disagree.  In my opinion, Exhibit "G" provides a reasonable method to timely fix the allowed amount of the RMBS Claims.   The RMBS Settlement also assures that RMBS Claims will be allowed and enables them to be paid sooner rather than later because, until the Bankruptcy Court determines that amount, the RMBS Claims will not be paid.

Bankruptcy courts have wide discretion in setting a claims estimation process for the allowance of claims.[59]  Although the Bankruptcy Code does not explicitly detail procedures for estimating claims, a bankruptcy court may use whichever method is best suited to the circumstances to value the claim.[60]  Similarly, where an actual estimation hearing takes place, there is the possibility of a range of recoveries regarding the value of RMBS Claims, *i.e.,* there is no certainty as to what the Bankruptcy Court would allow as the claim for any particular breach as to any particular loan or any particular trust.[61]

Given that the RMBS Trustees have been endeavoring to comply with the Protocol for the Covered Loans, having conducted the loan-by-loan review, which confirmed the huge number of RMBS Claims at issue and the impracticability of trying more than 90,000 claims on an

---

[58] *See* discussion in text, *infra,* at "Number of Trial Days."

[59] *See* 11 U.S.C. § 502(c) which provides for estimation of claims for purposes of allowance.

[60] *In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984); *In re Enron Corp.*, 2006 Bankr. LEXIS 4294 (Bankr. S.D.N.Y. Jan. 17, 2006).

[61] Certain Certificate Holders note that the RMBS Trustees realize that the RMBS Settlement may result in an allowed RMBS Claim of $2.416 billion or less.  That proposition ignores that that the allowed RMBS claim could be much higher than $2.416 billion and Exhibit "G" enables the Trustees to prove a higher amount.

individualized basis, it seems likely that Judge Chapman would look to a streamlined process such as a consolidated issue technique for evidentiary purposes.[62]  The RMBS Settlement provides such a process.  Judge Chapman's prior ruling indicated that she would only engage in a claims allowance process which, despite its label as a claims' estimation, is what the RMBS Settlement accomplishes.  Trials of batches of loans with similar alleged breaches can be issue-determinative and would bind the parties with respect to the RMBS Claims.  However, without the proposed RMBS Settlement taking effect, the specific methodology would be left completely to the discretion of the Bankruptcy Court with attendant uncertainty to the RMBS Trustees as to what evidence would be admissible, how much time the Bankruptcy Court would allot for trial, and how many years would pass without a final order.  The RMBS Settlement affords the RMBS Trustees the opportunity to present their evidence in support of the RMBS Claims to the Bankruptcy Court for its determination of the amount of the allowed claims on which distributions will be made by LBHI.  Without the settlement there is no certainty as to where or how the RMBS Claims will be resolved and the Certificate Holders will be subjected to uncertainty, delay, and the possible adverse consequences of even more protracted litigation.

In addition, the effort already put into and the expense associated with the review of 171,663 Covered Loans, of which 94,564 RMBS Claims with material breaches were submitted to LBHI per the Protocol, was substantial.  Doc. 53640, p. 2, § I.A.  The RMBS Trustees retained various experts to assist in that review and relied on their opinions.  If the Protocol continues as it

---

[62] *See* Federal Rule of Civil Procedure 42(a)("If actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay.") Rule 42 is made applicable to adversary proceedings and contested matters arising in the context of bankruptcy by Federal Rules of Bankruptcy Procedure 7042 and 9014(c).

has so far, the costs to the RMBS Trusts will continue to be substantial,[63] and the continued delay

in resolving and collecting the RMBS Claims is weighty.    The time value of money is a

customary consideration.[64]    The RMBS Settlement provides the opportunity for a timely

resolution of the significant issues between the parties by establishing a methodology for prompt

resolution that avoids loan-by-loan trials while preserving the ability of the RMBS Trustees to

present evidence of the amounts of the RMBS Claims that should be allowed.    While it has been

postulated by some that a loan-by-loan adjudication taking 18 to 24 months to complete would be

a better approach, in my opinion it is unlikely that loan-by-loan trials would be ordered by the

Bankruptcy Court.    In analyzing the time necessary to try cases on a loan-by-loan basis, the

Bankruptcy Court would recognize that even if the Bankruptcy Court allowed for a one hour trial

per loan, adjudicating over 90,000 loans would take decades with the result that a 24 month time

frame for adjudication is impossible.

The RMBS Settlement, in my opinion, fulfills the Bankruptcy Court's expectation that the

parties agree on a reasonable method for determination of the RMBS Claims, and, for that reason,

likely will be given due regard by the Bankruptcy Court when it adjudicates the reasonableness of

the settlement.

---

[63] Certain experts retained by the RMBS Trustees have opined that completion of the Protocol could take years to accomplish.  The attendant expense, inconvenience and delay, in addition to the likelihood that no collection on any claims award will occur for possibly a decade or more, favor settlement.

[64] The calculation of the time value of money is beyond the scope of this opinion.

**Factors 3 and 4: The paramount interests of the creditors, including each affected class's relative benefits; the degree to which creditors either do not object to or affirmatively support the proposed settlement and whether other parties in interest support the settlement.**

The RMBS Trustees have been actively involved in the LBHI bankruptcy. They have taken steps to preserve the RMBS Claims, litigated the Claims Reserve and litigated and submitted 94,564 RMBS Claims through the Protocol. Based on documents and pleadings filed of record, the RMBS Trustees are aware that LBHI is not paying 100% to its unsecured Class 7 creditors. As of this writing, the percentage being distributed to Class 7 creditors under the Plan is approximately 39%. Pursuing collection of any claims award that would be allowed based on the Mortgage Loans at issue will result, at best, in a partial recovery.

At this stage in this Bankruptcy Proceeding, filed 9 years ago, Plan distributions may no longer increase significantly and there can be a diminution of available funds as other creditors are paid. This is material to an analysis that a distribution in the near future is beneficial to the Certificate Holders because collection will become increasingly difficult over time. Distributions are generally made semi-annually to creditors whose claims have been allowed. The RMBS Claims have not yet been allowed. The Bankruptcy Court has required a Claims Reserve of $4.75 billion and there is the possibility that LBHI will not have funds sufficient to pay anything more than the then-current distribution percentage for any amount in excess of that $4.75 billion in allowed RMBS Claims. As each distribution of LBHI estate funds is authorized, there is less likelihood that any funds over and above the percentage required by the reserve will be available to pay the RMBS Claims at the conclusion of litigation. This problem is compounded by the likelihood that even if the RMBS Trustees presented evidence on a loan-by-loan basis (which the

present Protocol ordered by the Bankruptcy Court may require) there is no reason to believe that allowed claims would be any greater than what may result from the estimation process prescribed in Exhibit "G."

There is significant risk that protracted litigation, whether under the Protocol or otherwise, in an effort to seek a larger allowed claim will take so long, while semi-annual distributions continue to be made to other creditors, that there will be insufficient funds to satisfy any larger claims award either in whole or in part. Balanced against LBHI's agreement in the RMBS Settlement to seek $2.416 billion as a reasonable estimation of the value of the RMBS Claims (assuming 100% participation by the various RMBS Trusts)[65] accepting the RMBS Settlement is a reasonable way to add predictability to an otherwise uncertain outcome and to end the expenses incurred in the Protocol process.

Based on the circumstances facing the RMBS Trustees and my experience in confirming plans and approving initial distribution percentages, my opinion is that a prompt distribution at a known initial percentage is preferable to one that will follow years of litigation. There is no assurance that claims would be allowed in amounts greater than that which will follow from the Exhibit G process or that funds would be available to pay more than the percentage allocated to Class 7 claims under the Plan.

While the issue of the specific allocation percentages is outside the scope of my opinion, it was reasonable for the RMBS Settlement to address the issue. The RMBS Settlement authorizes the RMBS Trustees to prepare an initial percentage allocation. They retained an

---

[65] *See* RMBS Settlement, § 3.02(a), p. 13. Another significant benefit to the RMBS Settlement is that LBHI will forfeit rights to appeal, addressed more fully in text, *supra.*

independent valuation expert, Duff & Phelps, to determine the initial allocation[66] of the allowed

RMBS Claims among the Trusts that accept the RMBS Settlement.[67]   Based on its industry

experience, familiarity with the loans at issue and the claims submitted in connection with the

Protocol, Duff & Phelps provided the RMBS Trustees with an allocation methodology and

schedule, which the RMBS Trustees sent to the Institutional Investors and the LBHI Debtors.[68]

In addition to the support of the Institutional Investors, LBHI, as the other party involved,

has proffered this settlement and supports it as a means of affording distributions to all creditors

in a timely manner.   LBHI's support enhances the likelihood that the Bankruptcy Court will

approve the RMBS Settlement.

Given the circumstances faced in this Bankruptcy Proceeding by the RMBS Trustees, it is

my opinion that the RMBS Settlement is reasonable and in the best interests of the Certificate

Holders in each individual Trust.   In so stating, I recognize that any individual   Certificate

Holder may disagree with the initial percentage allocation and also that any specific Trust may

opt out of the RMBS Settlement.   Should that occur, however, my opinion regarding the

reasonableness of the process prescribed in the RMBS Settlement would not change.

---

[66] In the event that any RMBS Trusts terminate without a loss or otherwise do not accept the RMBS Settlement, the percentages will change.

[67] On March 27, 2017, I spoke with representatives of Duff & Phelps including Allen Pfeiffer (a Managing Director and Global Leader of Dispute Consulting – Complex Valuation and Bankruptcy Litigation), Edmond Esses (a Director, Disputes and Investigations Practice) and Jennifer Press (a Managing Director, Complex Asset Solutions practice) regarding the methodology employed to prepare the initial allocation among the RMBS Trusts.   From having heard valuation analyses throughout my tenure on the bankruptcy bench, I am aware that certain methodologies are customary, depending upon the asset that is subject to valuation.   Duff & Phelps utilized a standard approach within the loan valuation industry to calculate the initial percentage of the eventual distribution applicable to each loan group.   *See* RMBS Settlement, §3.04 (Allocation Formula).

[68] Neither the Institutional Investors nor the LBHI Debtors provided any substantive comments or changes to the Duff & Phelps allocation methodology and schedule.   *See* Notice dated April 21, 2017.

**Factor 5:  The competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement.**

The RMBS Trustee counsel, the Institutional Investors and LBHI counsel are well qualified and experienced in Bankruptcy and RMBS issues.  Those parties have all been represented by experienced counsel throughout the discussions that led to the RMBS Settlement.

I have been informed that the RMBS Trustees also engaged experts for assistance in analyzing the benefits and burdens of the RMBS Settlement.  They have elicited expert advice from highly regarded and skilled retired judges regarding the interpretation and impact of various New York and bankruptcy laws on their ability to establish valid RMBS Claims for the benefit of the Certificate Holders.[69]  They have retained well-qualified financial experts to assist in analyzing, classifying and valuing the breaches of representations and warranties and their materiality with respect to the Mortgage Loans.  Based on its industry experience, familiarity with the loans at issue and the claims submitted in connection with the Protocol, Duff & Phelps, well qualified financial experts, provided the RMBS Trustees with an allocation methodology and schedule, which the RMBS Trustees sent to LBHI to be included, and now is included, in the RMBS Settlement. The RMBS Trustees have expended substantial resources in time and money in undertaking statistical sampling and then, when the Bankruptcy Court refused to accept that method of proving the RMBS Claims, in examining hundreds of thousands of Mortgage Loans, loan-by-loan.

---

[69] I have reviewed the reports of retired Southern District of New York Chief Bankruptcy Judge Arthur J. Gonzalez dated March 8, 2016, and retired New York State Supreme Court and State Supreme Court Appellate Division Justice Anthony J. Carpinello dated  March 4, 2016.

The RMBS Trustees have also considered the breaches of representations and warranties that came to light as the result of the loan-by-loan analysis, their materiality and the risks of litigation that would inevitably flow from efforts to prove the value of the RMBS Claims. Through their counsel, they have advocated their theories and requests on behalf of the Certificate Holders, to the extent the Bankruptcy Court has permitted so far, and despite years of litigation, have not yet had the opportunity to present evidence to support their claims. The experts retained by the RMBS Trustees have advised that without an agreement with LBHI approved by the Bankruptcy Court, proving the RMBS Claims pursuant to the Protocol will take years and could nonetheless result in costly trials on the remaining unresolved claims, and decisions subject to appeal by any party. In my opinion, RMBS Trustees were assisted by skilled counsel and independent experts who assessed risks, delay, and costs.

Another part of this analysis looks to the experience of the judge presiding over the matter. The bankruptcy judge who will review the RMBS Settlement has been assigned to this case for several years and is clearly able to assess the benefits that the RMBS Settlement provides to the bankruptcy estate and its creditors, including the Certificate Holders. In the Protocol, the Bankruptcy Court preserved "each of (I) the RMBS Trustees' right, if any, to seek to provide proof in support of the allowance of the RMBS Claims through the use of statistical sampling, and (ii) the Plan Administrator's right to object to the use of statistical sampling by the RMBS Trustees." Doc. 47569, p. 5. The possibility of sampling was limited, if it would ever be approved, to a time after the RMBS Trustees complied with the loan-by-loan submission of claims to the Protocol, with the idea that the parties might agree on a trial process. Nonetheless, the Bankruptcy Court made clear that sampling would not be a substitute for production and review, loan-by-loan.

The Bankruptcy Court anticipated that a method other than multiple trials on a loan-by-loan basis would be utilized to determine the scope of breaches and quantify the monetary component attributable to such breaches.  The RMBS Settlement affords the RMBS Trustees the ability to use a streamlined method which the Bankruptcy Court will likely consider to be a positive development in enabling distributions and in moving the LBHI bankruptcy cases toward conclusion.

An additional consideration is how the trial judge has been perceived by the appellate courts as determined by affirmation or reversal on appeal, particularly on issues similar to those involved in the dispute at hand.  There has been only one ruling in the Bankruptcy Proceeding that is material to this factor.  Judge Chapman's order disallowing and expunging 11,000 of the Covered Loan Claims and all of the Transferor Loan Claims that were not submitted to the Protocol was recently upheld by Chief Judge McMahon in her "Decision and Order Affirming Decision of Bankruptcy Court dated February 22, 2017."  Appeal Order, Doc. 36.  Although the RMBS Trustees appealed, alleging, *inter alia*, a denial of due process because Judge Chapman had not conducted an evidentiary hearing on the expunged claims, Judge McMahon found the argument to be without merit and affirmed the Bankruptcy Court.

In ascertaining how the trier of fact has ruled in the case to date, a review of Judge Chapman's few rulings regarding the RMBS Trusts indicates that she has generally adopted procedures requested by LBHI.  Those rulings resulted in the RMBS Trustees incurring millions of dollars of costs in preparing a loan-by-loan review and analysis of LBHI's breaches of material representations and warranties.  Until now, Judge Chapman has declined to consider any form of estimation of the RMBS Claims and has ordered a loan-by-loan review for asserting claims and their determination.

Based on the above, my opinion is that the RMBS Settlement is beneficial to the Certificate Holders, as well as to all parties in interest and creditors of the bankruptcy estate. The RMBS Settlement provided the RMBS Trustees with sufficient time to obtain the comments of the Certificate Holders. Further, a decision by the RMBS Trustees to enter into the RMBS Settlement, after due consideration, with the advice of skilled counsel and experts, and the support of the Institutional Investors, would cut off the costs, time and delay associated with the Protocol.

### Factor 6: The nature and breadth of releases to be obtained by officers and directors.

Section 3.03 of the RMBS Settlement contains a release of Claims by the RMBS Trusts against "Released Parties," a defined term in the agreement, which includes the LBHI Debtors and various affiliates and subsidiaries (listed on Exhibit "C" to the RMBS Settlement) and their respective present and former directors, officers, employees, auditors, advisors (including financial advisors), legal counsel, representatives, and agents. Doc. 55096. In the event that the RMBS Trustees decide to accept the RMBS Settlement, upon final allowance of the claims, there will be no further entitlement to pursue the Released Parties for anything more than the allocable share of each participating RMBS Trust. This type of release is customary in bankruptcy settlements and is included, in part, to ensure that the final order approving a settlement remains the final order and that the distributions resulting from that order will be all that are required to be paid. However, a release is not reasonable or customary for the 5 RMBS Trusts as to which the RMBS Trustees are not pursuing RMBS Claims and which, therefore, will receive no distributions from the RMBS Settlement. See note 3, *supra*.

**Factor 7: The parties negotiated in good faith and at arm's length.**

In my opinion, the RMBS Trustees have acted at arm's length and in good faith for the benefit of the Certificate Holders. Their efforts to establish proof by statistical sampling was a reasonable, cost-effective way to assess both breaches and the value of the Mortgage Loans. When the Bankruptcy Court denied their request to substantiate the RMBS Claims in that fashion, the RMBS Trustees quickly agreed upon methodologies and strategies (including which experts to hire for advice) to achieve cost efficiencies.  They then engaged in the loan-by-loan review required by the Bankruptcy Court even though hundreds of thousands of loan files had to be located and reviewed to ascertain, among hundreds of Governing Agreements, similarities in representations and warranties, breaches and materiality of those breaches.  The purpose for that review was to establish the value of the claims that could be recovered for the Certificate Holders, not for self-interest by any RMBS Trustee.  When presented with the November Version, the RMBS Trustees actively participated in discussions to include terms that provided greater protection and benefits to the Certificate Holders.

The parties who negotiated the RMBS Settlement, all of which hold vastly different views of the RMBS Claims, were represented by experienced counsel.  The parties disagreed about the method by which the RMBS Trustees could offer proof of the Trust's losses resulting from material breaches of representations and warranties by LBHI.  At arm's length, the parties bargained for and reached the RMBS Settlement, which, from my experience, offers a fair process by which to move the issues forward promptly and resolve the RMBS Claims to enable them to be allowed and paid.

With all of the factors considered, my opinion is that the RMBS Settlement achieves a fair result in that it provides an agreed upon and fair process to litigate the disputes in the Bankruptcy Court.

**D.      Given The Situation Faced By The RMBS Trustees In This Bankruptcy Proceeding A Decision To Enter Into The RMBS Settlement Would Be Appropriate**

As time has passed without resolution or payment on the RMBS Claims and with the additional work performed by the RMBS Trustees, their counsel, and their experts plus the additional arm's length negotiations that led to the current RMBS Settlement, in my opinion, the benefits to the Certificate Holders of the RMBS Settlement outweigh its burdens.

It is my opinion that the RMBS Settlement is a reasonable way to resolve the pending disputes regarding the allowance of the RMBS Claims on behalf of each RMBS Trust in view of:

- the complexity and number of legal issues raised;

- the multiplicity of pleadings;

- the expense already incurred in the intensive loan-by-loan review conducted on behalf of the RMBS Trustees;

- the experience of counsel;

- the opinions of various expert witnesses;

- the time delays already experienced in the effort to recover payment on account of the RMBS Claims;

- the likelihood of extensive additional delays and increased costs should the Bankruptcy Court require a process other than that set forth on Exhibit "G;"

- the opportunity afforded to the RMBS Trustees to produce evidence in support of the RMBS Claims;

- the agreed-upon pre-trial process;

- the amount of time allotted for trial;

- the support of the Institutional Investors;

- the provisions of the RMBS Settlement that require distributions to be made in accordance with the Governing Agreements;

- the good faith and arm's length efforts to settle; and

- the possibility of expensive and lengthy appeals in the absence of the RMBS Settlement.

**Part III.        Conclusion**

In summary, for all the foregoing reasons, based upon my 43 years of legal experience as a United States Bankruptcy Judge, a law professor, and a practicing commercial lawyer, it is my opinion that the RMBS Settlement provides a reasonable methodology with attendant cost savings, to timely resolve whether and to what extent LBHI breached representations and warranties that materially affected more than 90,000 loans and the value of the contractual claims which make up the RMBS Claims.[70]

My opinion, as expressed herein, is rendered to a reasonable degree of professional certainty.

I reserve the right to modify this opinion should additional information be provided.

*Judith K. Fitzgerald*

Judith K. Fitzgerald

Date:   May 28, 2017

---

[70] However, the RMBS Settlement is not reasonable as to the 5 RMBS Trusts identified in note 3, *supra,* that will receive no distribution from the RMBS Settlement but would be required to provide a release if they accepted it.

**EXHIBIT 1 - CURRICULUM VITAE**

BANK_FIN:559990-x 031917-178189

*HONORABLE JUDITH KLASWICK FITZGERALD (RET)*

Tucker Arensberg, P.C.
Suite 1500, 1 PPG Place
Pittsburgh, PA  15222
(412) 594-3933 (office)
jfitzgerald@tuckerlaw.com

## PROFILE - CHAPTER 11 BANKRUPTCY EXPERIENCE (INCLUDING MASS TORT)

As a sitting U.S. Bankruptcy Judge, I presided over and confirmed hundreds of chapter 11 plans of reorganization including more asbestos and mass tort chapter 11 plans, most that utilized § 524 and § 105 injunctions, than any other sitting judge.  I presided over a broad range of bankruptcies that encompassed both large and small companies and hundreds of their affiliates. Among them were companies with mass tort legacy liabilities including Federal Mogul, Owens Corning, W.R. Grace, United States Minerals, USG, Armstrong World Industries, Kaiser Aluminum, AC&S, Combustion Engineering, AB Lummus Global, MidValley, Dresser Industries, Pittsburgh Corning, Swan Transportation, North American Refractories, Global Industrial Technologies, Specialty Products Holding Co., Flintkote and others.  I have addressed the legal, business, insurance and financial issues and business practices confronting companies facing legacy asbestos claims.  Since returning to private practice, I have served as an expert witness and as an advisor regarding the postconfirmation impact of certain plan or trust provisions on matters as diverse as contract or indemnity damages, settlement negotiation practices, malpractice claims, allocation of fees, restructuring, and insurance/reinsurance disputes.  I have been deposed in several matters and have testified as an expert in the United States District Court for the Western District of PA, in the Court of Common Pleas of Allegheny County, Pennsylvania, and in an arbitration conducted in Dallas, Texas as well as in depositions in New York, Arizona, Texas and Pennsylvania.

## PROFESSIONAL EXPERIENCE

August 31, 2013 - Present
        Tucker Arensberg, P.C.
        (September 1, 2015 – present: Shareholder)
        (February 2017 – present: Board of Directors)
        (December 1, 2013 – August 31, 2015: Of Counsel)

    Representative Engagements:
        Representing Debtor-in-Possession in chapter 11 reorganization with over 11,500 potential creditors and notice parties
        Representing  administrative claimant  in settlement negotiations with debtor

<u>Expert witness in bankruptcy and bankruptcy-related matters</u>

    Testifying in a breach of contract/bad faith insurance dispute regarding reasonableness of fees

    Testifying in arbitration regarding the effect of bankruptcy on a contractual indemnity

    Testifying in a legal malpractice action and professional responsibility dispute

    Testifying regarding customary mediation procedures in a dispute regarding good faith insurance negotiations

    Serving as a court-appointed expert in a 16 million dollar fee dispute

    Serving as court-appointed expert in asbestos trust budget and discovery disputes

    Serving as a judge in a moot oral argument involving a billion dollar dispute

    Advising a large asbestos trust regarding administration and claims matters

    Assisting counsel to the board of a public company on restructuring proposals

<u>Consultant</u>

    Consulting in a quarter-billion dollar insurance/re-insurance litigation

    Consulting regarding various contract interpretation disputes

    Consulting regarding lien perfection and priority dispute

    Consulting regarding various bankruptcy claims, PBGC issues, disclosure requirements and other disputes

    Consulting in a legal malpractice action and professional responsibility dispute

<u>Court-appointed Receiver</u>

    Liquidating a not-for-profit cultural organization

<u>Mediator and Arbitrator in numerous bankruptcy, civil and criminal cases</u>

    Hold a Certificate of Completion of Bankruptcy Mediation Training (40 hours) from St. John's University and the American Bankruptcy Institute

    Completed mediation training with other organizations

<u>Other Professional Qualifications</u>:

    Panel Mediator, U.S. Bankruptcy Court, District of Delaware

    Alternative Dispute Resolution, Neutral Evaluation, Mediation Panel Member, U. S. District Court, Western District of PA

    Panel Mediator, U.S. Bankruptcy Court, Western District of PA

    Member of FedArb (Federal Arbitration, Inc.), an association of former federal judges who now serve as arbitrators and mediators in complex commercial cases

    Mediation Council of Western Pennsylvania

HONORABLE JUDITH KLASWICK FITZGERALD (RET)

Page 3

May 18, 2015 - Present

<u>Professor of Practice</u>

University of Pittsburgh School of Law

3900 Forbes Avenue

Pittsburgh, PA 15260

Teaching Bankruptcy and Advanced Bankruptcy; other courses to be determined

July 8, 2013 - July 5, 2015

<u>Tenured, Full Professor of Law</u>

Indiana Tech Law School

1600 East Washington Blvd.

Fort Wayne, IN 46803

Teaching Contracts, Commercial Transactions and Bankruptcy

Faculty responsibilities included Faculty Secretary; Promotion and Tenure Committee; Dean's Search Committee; Long Range Planning Committee; Admissions Committee (chair); Library Advisory Committee (chair); Faculty Senate (law school representative); Graduate Council (law school representative); Mentoring Committee; Experiential Learning Task Force (chair of cross-curricular hypothetical development for Fall 2014-15 1L class and Spring 2L class); various other task forces established by the Dean to address particular needs; student mentor; junior faculty mentor; advisor to assigned students at risk; CLE presentations to bench and bar

October 30, 1987 - May 31, 2013

<u>Judge, United States Bankruptcy Court Western District of Pennsylvania</u>

5490 U.S. Steel Tower, 600 Grant Street

Pittsburgh, PA 15219

(Chief Judge Jan. 8, 2000 through Dec. 31, 2004)

October 1, 1991 - June 30, 1996 and January 1, 1998 - May 31, 2013

<u>Judge, sitting by special designation in the United States Bankruptcy Court District of Delaware</u>

Marine Midland Plaza

824 Market Street

Wilmington, DE 19801

HONORABLE JUDITH KLASWICK FITZGERALD (RET)

May 13, 1993 - June 30, 2001

<u>Judge, sitting by special designation in the United States Bankruptcy Court Eastern District of Pennsylvania</u>

900 Market Street, Suite 400

Philadelphia, PA 19107

July 1, 2004 - December 31, 2008 (and completing assigned cases until retirement on May 31, 2013)

<u>Judge, sitting by special designation in the District Court of the Virgin Islands</u>

Bankruptcy Division, District of St. Thomas and St. John

5500 Veterans Drive, Room 310

St. Thomas, Virgin Islands 00802

2004 - 2014

<u>Adjunct Professor of Law</u>

Bankruptcy since 2004 and Advanced Bankruptcy since 2008
Secured Transactions (Fall Term, 1997)

University of Pittsburgh School of Law

3900 Forbes Avenue

Pittsburgh, PA 15260

January 1976 - October 1987

<u>Assistant United States Attorney</u>

633 U.S. Post Office & Courthouse
Seventh & Grant Street

Pittsburgh, PA 15219

- Supervisor of the Erie branch office
- Responsible for all civil and criminal litigation in the seven counties of northwestern Pennsylvania
- Grand jury investigations and prosecution of complex criminal matters, including tax fraud, RICO, narcotics, and major white collar crimes
- Prosecution and defense of civil matters, including torts, medical malpractice, admiralty, immigration and environmental claims, bankruptcies, injunctions, Social Security appeals
- Appellate brief writing and oral argument of cases before the U.S. Court of Appeals for the Third Circuit
- Lecturer for and participant in various seminars conducted by the U.S. Department of Justice and various universities

March 1974 - December 1975
  <u>Law Clerk to Judge Gwilym A. Price, Jr.</u>
  Superior Court of Pennsylvania
  Pittsburgh, PA 15219

July 1973 - February 1974
  <u>Law Clerk to President Judge John N. Sawyer</u>
  Beaver County Court of Common Pleas
  Beaver, PA 15009

**COURT ADMISSIONS**

Pennsylvania Supreme Court, October 4, 1973
United States District Court, Western District of Pennsylvania, October 4, 1973
United States Court of Appeals for the Third Circuit, February 11, 1976
United States Tax Court, December 14, 1983
United States Supreme Court, July 1, 1985
*Pro hac vice* admissions in Southern District of West Virginia and Eastern District of Virginia

**EDUCATION**

University of Pittsburgh School of Law
1973 - Juris Doctor (University Scholarship and Pitman Fellowship recipient)

University of Pittsburgh
1970, 1971 - Political Science Graduate Courses on Fellowship

University of Pittsburgh
1970 - B.S. Psychology, B.A. English Writing

**GRADUATE AWARDS AND ACTIVITIES (Available Upon Request)**

HONORABLE JUDITH KLASWICK FITZGERALD (RET)

Page 6

## PROFESSIONAL RECOGNITIONS AND AWARDS

- Law 360 Honorable Mention as one of the Top Ten Bankruptcy Judges in History
- Western Pennsylvania Trial Lawyers Recognition for Dedicated Judicial Service, 2014
- The Judith K. Fitzgerald Bankruptcy American Inn of Court named in my honor, 2013
- Debtors' Bar Association of Western Pennsylvania Recognition for Dedicated Judicial Service, 2013
- Lawrence P. King Award for Excellence in the Field of Bankruptcy, 2011
- NCBJ Eagle Award, 2011
- Elected to Membership in the American Law Institute, 2008
- Association of Insolvency & Restructuring Advisors, 2007
- Conrad B. Duberstein "Mensch" Award, Presented by NCBJ, 2006
- Elected as a Fellow of the American College of Bankruptcy, 2004
- Turnarounds & Workouts - Top Ten Bankruptcy Judges (3 years)
- Who's Who of American Women, 1991 - present
- Oxford's Who's Who, 1992 – present
- Barron's Who's Who of Distinguished Professionals, 2015 - present
- United States Department of Justice Special Achievement Awards
- Federal Criminal Investigators Special Service Award, 1988
- United States Department of Commerce Operation Exodus Outstanding Performance Award, 1986
- Pittsburgh Magazine Special Recognition Award, 1980

## PROFESSIONAL ACTIVITIES (GOVERNMENT RELATED)

1992 - 1998   Advisory Committee of Bankruptcy Judges

Administrative Office of the United States Courts, Chair, 1994 - 1996

1993 - 1997   Chambers and Courtroom Umbrella Group

Administrative Office of the United States Courts

(Dealt with automation and technology matters in the federal courts)

1994 - 1998   Chambers Case Management User Group, Chair, 1995 - 1998

(Monitored automation and technology projects under the auspices of the Chambers and Courtroom Umbrella Group)

1994 - 2002   Executive Sponsor, BK CHASER Automation Project

Bankruptcy CHASER Ad Hoc Working Group

(A project that enhanced the utility of information in the court's databases for purposes of judicial case management and ended upon implementation.)

| | |
|---|---|
| 1994 - 1998 | <u>Education Committee</u><br>United States Court of Appeals for the Third Circuit |
| 1995 - 1996 | <u>Bankruptcy Case Management & Statistics Umbrella Group</u><br>Administrative Office of the United States Courts<br>(Dealt with automation and technology matters in the bankruptcy courts, particularly regarding the clerk's offices) |
| 1997 | <u>Bankruptcy Statistics and Data Collection Project</u><br><u>Administrative Office of the United States Courts</u><br>(Evaluated bankruptcy data needs of various constituencies as part of a technology modernization project) |
| 1998 - 2002 | <u>Program Planner,</u> Bankruptcy and Commercial Law Presentations<br>Third Circuit Judicial Conferences |
| 2001 - 2005 | <u>Nonvoting Bankruptcy Judge Representative</u><br>Third Circuit Judicial Council |
| 2002 - 2005 | <u>Member, Judicial Council</u><br>Bankruptcy and Magistrate Judges Committee of the United States Court of Appeals for the Third Circuit |
| 2006 - Present | <u>Founding Member and Program Planner,</u> Third Circuit Bankruptcy Education Committee |
| Various | <u>Program Planner,</u> PA Bar Institute; Commercial Law League of America, ABI, Inns of Court |

## <u>PROFESSIONAL ACTIVITIES (NON-GOVERNMENT RELATED)</u>

| | |
|---|---|
| 1973 - present | <u>Allegheny County Bar Association</u><br><br>Member of Audit and Technology Utilization Committees<br>Member, Federal Court, Bankruptcy and Commercial Litigation, and Women and the Law Sections<br>Formerly Chair, Audit Committee<br>Member, Finance Committee, Continuing Legal Education<br>Speakers' Bureau and Public Relations Committees |

HONORABLE JUDITH KLASWICK FITZGERALD (RET)

Trustee, Criminal Trial Lawyers of Allegheny County

Editor of Newsletter of Criminal Trial Lawyers Association

Nominating Committee

1987 - present    <u>National Conference of Bankruptcy Judges</u>

2010 - 2012, Associate Editor, American Bankruptcy Law Journal

2008 - 2015, Founder and Inaugural Chair, NCBJ Next Generation Program

2002 - 2003, Immediate Past President

2001 - 2002, President

2000 - 2001, Vice President/President Elect; Chair of Elections and Site Selection

1995 - 1998, Treasurer

1999 - 2000, Chair, Endowment for Education

1987 - present - various committees and task forces

1988 - present    <u>American Bankruptcy Institute</u>

2002 - 2007 - Director

Various - Co-chair, Committee on Mass Torts; Member, Nominations Committee

Originator of Law Student Writing Competition for Bankruptcy Litigation Committee, now a competition of the ABI itself

Originator of Mid-Atlantic Regional Program and First Judicial Chair

Judicial Liaison

Planner, Caribbean Conference

Member, Education and Membership Committees

Member, Bankruptcy Litigation Committee and Chair of Project Subcommittee Liaison with Commercial Law League of America

Member, Mediation Committee

1988 - 1993    <u>Federal Investigators Association</u>

Various dates    <u>American Bar Association</u>

Member, National Conference of Federal Trial Judges, Public Education Committee, Business Litigation Section

1991 - present    <u>Commercial Law League of America</u>

2002 - present    Member of Bankruptcy Section Executive Council

2004 - 2006    Member of National Ethics Committee

HONORABLE JUDITH KLASWICK FITZGERALD (RET)

Page 9

| | |
|---|---|
| 1992 - 2014 | <u>National Conference of Bankruptcy Clerks</u> |
| 1992 - present | <u>Women's Bar Association of Western PA</u><br>Founding Member |
| 1992 - 2014 | <u>American Inns of Court, Honorable Amy Reynolds  Hay Chapter</u><br>Founding Member and Master (Since 1995, Honorary Master) |
| 1995 - present | <u>International Women's Insolvency and Restructuring Confederation (IWIRC)</u><br>Charter Member, Pittsburgh Chapter |
| 2000 - present | <u>Federal Bar Association</u><br>Awarded Lifetime Honorary Membership, 2001 |
| 2001 - 2006 | <u>Association of Trial Lawyers of America</u><br>Judicial Fellow - Position discontinued by the Association |
| 2001 – 2010,<br>2013 – present | <u>Turnaround Management Association</u>, Pittsburgh Chapter |
| 2002 - 2006 | <u>International Bar Association</u> |
| 2004 - present | <u>American College of Bankruptcy</u><br>Chair, Liaisons Committee<br>Program Developer for Law School Liaison Subcommittee<br>Program Developer for Third Circuit Education Program (October 12, 2012)<br>Member, Judicial Outreach Committee<br>Member, Third Circuit Education Committee |
| 2008 - present | <u>American Law Institute</u><br>Elected Member<br>Currently Consultative Group Member for Consumer Contracts |
| 2010 - present | <u>The Judith K. Fitzgerald Western Pennsylvania Bankruptcy American Inn of Court</u><br>Founding Member and Counselor<br>Chair at various times of Program, Membership and Business Planning Committees |

| | |
|---|---|
| 2013 - present | <u>The Pennsylvania Bar Association</u> |
| 2013 - 2015 | <u>The Allen County [Indiana] Bar Association</u> |
| 2013 - 2015 | <u>The Benjamin Harrison American Inn of Court</u> |
| 2015 - present | <u>FedArb (Federal Arbitration, Inc.)</u><br>An organization of former federal judges who serve as arbitrators and mediators in complex civil cases |
| 2015 - present | <u>Mediation Council of Western Pennsylvania</u> |
| 2016 - present | <u>Bar Association of the Third Federal Circuit</u> |

## <u>MISCELLANEOUS</u>

- Various Interviews in TV, radio and print news media regarding bankruptcy and insolvency matters

- Various podcasts and debates on bankruptcy topics including commentary on U.S. Supreme Court cases and matters of current interest to insolvency practitioners

- Participant in various symposia on insolvency matters, including The DePaul Institute Symposium; the View from the Bench in Washington, D.C.; colloquium on international issues regarding chapter 11 reorganization in Washington, D.C. at the French Embassy; judicial roundtable on international insolvency issues in Dublin, Ireland and cross-border mass tort judicial perspectives in London, United Kingdom
- Judge, Moot Court Trial and Appellate Competitions for University of Pittsburgh School of Law

- Judge, Tax Moot Court Competition at Duquesne University School of Law

- Former Lecturer substituting for the Adjunct Professor, Trial Tactics Duquesne University Law School

- Guest Lecturer in Bankruptcy, University of Miami School of Law

- Instructor and Lecturer for professional groups including:

  The Federal Judicial Center; U.S. Attorney General's Advocacy Institute; University of Pittsburgh School of Law Intensive Trial Advocacy Course; Third Circuit Court of Appeals Judicial Conference; National Conference of Bankruptcy Judges; The American Inns of Court; The Commercial Law League of America; IWIRC; Law Education Institute; American Bankruptcy Institute; The Pennsylvania Bar Association; Allegheny County Bar Association; Pennsylvania Bar Institute; Professional Education Systems, Inc.; Pennsylvania Institute of Certified Public Accountants; The Association of Insolvency & Restructuring Advisors; The Bar Association of the U.S. Virgin Islands; The Internal Revenue Service; The Bankruptcy Bar Association of the Southern District of Florida; The State Bar Association of Nevada (Family Law Practitioners); The Kentucky Bar Association; National Association of Chapter 13 Trustees; Georgetown University Law Center; The Advanced E-Discovery Institute and Views from the Bench; LexisNexis Mealey Conference Groups; DePaul University Business and Commercial Law Symposium; Southern Illinois University School of Law; The Association of Insolvency & Restructuring Advisors; Turnaround Management Association; Commercial Finance Association; Perrin Conferences; Emory Bankruptcy Developments Journal Symposium; The National Association of Attorneys General; The Indiana Tech Law School Lunch and Learn; The Judith K. Fitzgerald Bankruptcy American Inn of Court; American College of Bankruptcy; Equipment Leasing and Finance Agency; The American Bar Association; Allen County Bar Association; Energy and Mineral Law Foundation

## SELECTED CIVIC ACTIVITIES including service on not-for-profit boards

**Available on Request**

## SELECTED PUBLICATIONS

*Oh Dear! What Can The Matter Be? What Will Become Of My Oil And Gas Lease In Bankruptcy?*, in process of publication –in Vol. 37 Energy & Mineral Law Institute (co-author with James W. Kane)

*The Powers of The U.S. Congress: Where Its Constitutional Authority Begins and Ends*, (co-author of Chapter 5, "The Power to Regulate Bankruptcies" with Professor Nancy Marcus)y ABC-CLIO, Brien Hallet, Ed. (2016)

HONORABLE JUDITH KLASWICK FITZGERALD (RET)

Page 12

Commercial Law League and Tucker Arensberg Blogpost: "Third Circuit Rules that A Homeowner's Mortgage Insurance Obligation Is Not Modified By A Mortgage Modification" (Mar. 2017)

Commercial Law League and Tucker Arensberg Blogpost: "Alternative Dispute Resolution (ADR):  Is it Right for You?" (Jan. 2016)

Commercial Law League Blogpost:  "The Last Screen: A Cautionary Tale" (Nov. 2015)

Commercial Law League Blogpost: "Growing Medical Marijuana, Problematic In Bankruptcy, and Out" (Aug. 2015)

The National Edition, Rutter Group, Practice Guide, Bankruptcy (2010 - present) (co-editor with U.S. Bankruptcy Judge Mary Walrath and Retired U.S. Bankruptcy Judge and Law Professor Arthur Gonzalez)

Planning for the Time of Trouble:  *Cabrera v. Collazo*, A Case in Point (Commercial Law World Magazine, Summer 2014)

Bankruptcy and Divorce:  Support and Property Division, Second Edition, Aspen Law Business (1994) (co-author) (with annual supplements through 2003)

"When Worlds Collide: Bankruptcy and Its Impact on Domestic Relations and Family Law, Second Edition, American Bankruptcy Institute (2003) (co-author)

Bankruptcy Issues for State Trial Court Judges: A Publication of the American Bankruptcy Institute supported by a grant from the National Conference of Bankruptcy Judges Endowment Fund for Education (c.1995) (co-author)

"Wrestling With Bankruptcy and Divorce Laws in Property Division and Support Issues," 6 JOURNAL OF THE AMERICAN ACADEMY OF MATRIMONIAL LAWYERS 1 (1990) (co-author)

"Wrestling With Bankruptcy and Divorce Laws in Property Division and Support Issues," 6 AMERICAN JOURNAL OF FAMILY LAW, No. 2, 109 (1992) (co-author)

Closing Bankruptcy Cases (a manual for the Federal Judicial Center) (1991) (author)

"Litigating Property Settlement and Support Issues -- A Perspective From the Bankruptcy Bench" Published as a chapter in BANKRUPTCY ISSUES IN MATRIMONIAL CASES:  A PRACTICAL GUIDE, Prentice Hall Law & Business (1992) (co-author)

"The Appraiser In Bankruptcy Court:  Getting Appointed, Getting Paid and Testifying as Experts, "Vol. 5 AMEA APPRAISER, No. 2 (Summer 1992) (author)

"The Judge's Role in Insolvency Proceedings: The View From the Bench; The View From the Bar," Symposium in conjunction with St. John's University School of Law, published at Vol. 10, No.2 Am. Bankr. Inst. L. Rev.511 (Winter 2002)

"Forum Shopping, First Day Order and Case Management Issues in Bankruptcy," (Symposium at DePaul University Law School), published at Vol. 1, No. 4 DePaul Business and Commercial Law Journal 515 (Summer 2003)

"We All Live in a Yellow Submarine: BAPCPA's Impact on Family Law Matters," (Symposium at Southern Illinois School of Law) (author), published at 31 Southern Illinois University Law Journal 563 (Spring 2007)

"Chapter 11 Reorganization Processes in Mass Tort Cases: Success or Failure?" (Mealey's) (author)

"Caswell and Leser, Polar Approaches to Support Arrearages in Chapter 13," 10 Norton Bankruptcy Law Adviser, Clark Boardman Callaghan (Oct. 1992) (co-author)

Chapter 5, "Abstention," Chapter 11 Theory and Practice - A Guide to Reorganization, Queenan, Hendel and Hillinger, eds. (1994)

"Evaluating Involuntary Bankruptcies," Commercial Law League of America (1996)

"Snippets," a column in The Conference News, a quarterly publication of and for the National Conference of Bankruptcy Judges (1998 - 2013) (author)

A Local Rules Guide for Pennsylvania Western District Bankruptcy Court, Pennsylvania Education Systems, Inc., 1989 (collection of forms) (author)

Pennsylvania Law of Juvenile Delinquency & Deprivation, Bisel, 1976 (editor and senior researcher, annual supplement preparer)

U.S. Attorney's Office Forms Manual, 1979-1985 (contributor)

Ideas and Figures, University of Pittsburgh Literary Magazine, 1968 (contributor)

# Exhibit 3

Daniel A. Fliman (DFliman@kasowitz.com)
Michael A. Hanin (MHanin@kasowitz.com)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

Nicole Gueron (ngueron@cgr-law.com)
Isaac B. Zaur (izaur@cgr-law.com)
CLARICK GUERON REISBAUM LLP
220 Fifth Avenue, 14th Floor
New York, New York 10001
Telephone:  (212) 633-4310
Facsimile:  (646) 478-9484

*Counsel for the Investor Group*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| Lehman Brothers Holdings Inc., et al., | 08-13555 (SCC) |
| Debtors. | Jointly Administered |

**PRELIMINARY OBJECTION OF THE INVESTOR GROUP
TO THE MOTION OF LEHMAN BROTHERS HOLDINGS INC.
PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C. § 105(a)**

Certain institutional investors who are beneficial owners of certificates ("Certificates")

issued by certain residential mortgage-backed securities ("RMBS") trusts (the "Trusts")[1] that,

---

[1]    The "Investor Group" consists of, each on behalf of its advisory clients: Whitebox Advisors LLC, Deer Park Road Management Company, LP, Tilden Park Capital Management LP, Prophet Capital Asset Management, Tricadia Capital Management LLC, BlueMountain Capital Management LLC, Poet Advisors, FFI Fund Ltd., FYI Ltd., Olifant Fund, Ltd., and Strongbow Fund Ltd.  The Investor Group holds Certificates with an aggregate unpaid principal balance of more than $1.5 billion (including 25% or more of multiple Trusts) issued by 117 of the 244 Trusts for which the Trustees are currently pursuing claims pursuant to the *Order Establishing a Protocol to Resolve Claims Filed by Trustees on Behalf of Certain Issuers of Residential Mortgage-Backed Securities*, dated December 29, 2014 [Docket No. 47569].

through their trustees (the "Trustees"), have entered into the proposed RMBS Trust Settlement

Agreement (the "Settlement Agreement") annexed as Exhibit B to the *Motion of Lehman*

*Brothers Holdings Inc. Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C § 105(a) for Entry of*

*Order (A) Approving RMBS Settlement Agreement, (B) Making Certain Required Findings*

*Regarding Decision of RMBS Trustees and LBHI Debtors to Enter Into RMBS Settlement*

*Agreement, (C) Scheduling Estimation Proceeding to Determine RMBS Claims and Approving*

*Related Procedures Regarding Conduct of Hearing, and (D) Granting Related Relief*, dated

April 27, 2017 [Docket No. 55232] (the "9019 Motion"), hereby file this preliminary objection

to the 9019 Motion (the "Preliminary Objection"), and respectfully state as follows:

## PRELIMINARY OBJECTION

The Investor Group preliminarily objects to the 9019 Motion based on its present

understanding of the relevant facts.  Specifically, the Investor Group objects to: entry of the

proposed "Trustee Findings" in Exhibit F to the Settlement Agreement; the "Bar Order"

discussed in Paragraph 45 of the 9019 Motion and Section 2.07 of the Settlement Agreement;

and Paragraph G of the Proposed Order annexed as Exhibit A to the 9019 Motion.

The Investor Group requires additional information to properly assess the proposed

settlement of these multi-billion dollar RMBS claims.  Contemporaneously herewith, the

Investor Group is serving the Trustees with discovery requests in furtherance thereof,[2] and

---

[2]    The Investor Group informally requested such information from the Trustees by letter on May 5, 2017, and
again via email on May 15, 2017.  The Trustees failed to provide any meaningful response to either inquiry.

reserves all rights to supplement this Preliminary Objection.

Dated:  June 6, 2017
        New York, New York

KASOWITZ BENSON TORRES LLP

 /s/ Daniel A. Fliman
Daniel A. Fliman
(DFliman@kasowitz.com)
Michael A. Hanin
(MHanin@kasowitz.com)
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

*Counsel for the Investor Group*

CLARICK GUERON REISBAUM LLP

 /s/ Nicole Gueron
Nicole Gueron (ngueron@cgr-law.com)
Isaac B. Zaur (izaur@cgr-law.com)
220 Fifth Avenue, 14th Floor
New York, New York 10001
Telephone:  (212) 633-4310
Facsimile:  (646) 478-9484

*Conflicts counsel for the Investor Group*

# Exhibit 4

# WILLKIE FARR & GALLAGHER

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

June 27, 2017

**BY ECF AND EMAIL**

The Honorable Shelley C. Chapman
United States Bankruptcy Judge
United States Bankruptcy Court for the
 Southern District of New York
One Bowling Green
New York, NY 10004

Attn:  Jamie M. Eisen, Esq.

Re:  Lehman Brothers Holdings Inc. ("LBHI"), et al.
      Case No. 08-13555 (SCC) (the "LBHI Debtors")

Dear Ms. Eisen:

As you know, by motion dated April 27, 2017 [Docket 55232] (the "Motion"), LBHI moved for entry of an order approving that certain RMBS Trust Settlement Agreement entered into as of November 30, 2016, and modified as of March 17, 2017 (the "Settlement Agreement"), by and among the LBHI Debtors, the Institutional Investors and the Accepting Trustees (each as defined in the Settlement Agreement). On June 6, 2017, certain investors (represented by Kasowitz Benson Torres LLP) in various of the Trusts subject to the Settlement Agreement filed a preliminary objection to the Motion [Docket 55432] (the "Preliminary Objection"). In order to resolve the Preliminary Objection, LBHI, the Institutional Investors and the Accepting Trustees have agreed to, among other things, the terms reflected in the attached. The Preliminary Objection will be withdrawn in advance of the hearing on the Motion.

Please do not hesitate to contact me if you have any questions.

Respectfully submitted,


/s/ Paul V. Shalhoub
Paul V. Shalhoub

Attachment


New York   Washington, DC   Paris   London   Milan   Rome   Frankfurt   Brussels

The Honorable Shelley C. Chapman
Attn:  Jamie Eisen, Esq.
June 27, 2017
Page 2

cc:    Robert Madden, Esq.
       Counsel to the Accepting Trustees
       Dan Fliman, Esq.

The Debtors and other parties to the Settlement Agreement have engaged in discussions with the Investor Group that filed a preliminary objection to the Settlement Motion on June 6, 2017 [Docket No. 55432].  In the course of those discussions, the Investor Group expressed concerns with Exhibit E to the Settlement Agreement and opposed introduction into evidence of the Institutional Investors' statement in Exhibit E "that a settlement at [$2.416 billion] is fair and reasonable."  The Investor Group contends that admitting Exhibit E into evidence would be unfairly prejudicial unless (a) the Investor Group is permitted to take discovery of the Institutional Investors' bases and motivations for making the statement in Exhibit E; and (b) the Investor Group is permitted to file a statement addressing the bases and motivations for the Institutional Investors' statement and expressing the Investor Group's belief that settlement at $2.416 billion is neither fair nor reasonable.  The Debtors disagree with the Investor Group's views and believe that introduction of Exhibit E into evidence, which was negotiated by the parties to the Settlement Agreement, is fair and appropriate.  Nonetheless, in consideration of the Investor Group withdrawing its objection to the Motion, the Debtors, the Trustees and the Institutional Investors have agreed:  (i) to strike Exhibit E from the Settlement Agreement; (ii) that neither Exhibit E, nor the Institutional Investors' views on what constitutes a fair or reasonable settlement of the Claims, shall be admissible for any purpose in connection with the Motion or the proposed Estimation Proceeding; (iii) that the Institutional Investors shall express no position, in connection with the hearing on the Motion or the Estimation Proceeding, concerning the claim amount that they believe is fair and reasonable; (iv) that the agreements set forth in the foregoing clauses (i), (ii) and (iii) are not and shall not be deemed to be admissions of liability or concessions of any argument or defense by any party in connection with either the Motion or the Estimation Proceeding and were agreed to in order to resolve the Investor Group's preliminary objection; (v) that the parties to the Estimation Proceeding may offer into evidence before the Court, at any hearing or otherwise, and without objection as to admissibility by any other party, the RMBS Trust Settlement Agreement entered into by and between the LBHI Debtors and the Institutional Investors dated October 26, 2015, which shall be admissible in the Estimation Proceeding; and (vi) with respect to the foregoing clause (v), the parties to the Estimation Proceeding agree that although such settlement agreement will be admitted into evidence, they reserve all rights to present arguments as to reliability, competency, weight, relevance, timeliness or any other arguments concerning the Court's consideration of such evidence.

# Exhibit 5

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
ARTHUR C. LEAHY
STEVEN W. PEPICH
LUCAS F. OLTS
DARRYL J. ALVARADO
HILLARY B. STAKEM
J. MARCO JANOSKI GRAY
JUAN CARLOS SANCHEZ
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

*Bankruptcy Counsel to Royal Park Investments SA/NV*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | Jointly Administered |

**LIMITED OBJECTION OF ROYAL PARK INVESTMENTS SA/NV TO MOTION OF LEHMAN BROTHERS HOLDINGS INC. PURSUANT TO FED. R. 9019 AND 11 U.S.C § 105(A) FOR ENTRY OF ORDER (A) APPROVING RMBS SETTLEMENT AGREEMENT, (B) MAKING CERTAIN REQUIRED FINDINGS REGARDING DECISION OF RMBS TRUSTEES AND LBHI DEBTORS TO ENTER INTO RMBS SETTLEMENT AGREEMENT, (C) SCHEDULING ESTIMATION PROCEEDING TO DETERMINE RMBS CLAIMS AND APPROVING RELATED PROCEDURES REGARDING CONDUCT OF HEARING, AND (D) GRANTING RELATED RELIEF**

Royal Park Investments SA/NV ("Royal Park"), the named plaintiff and proposed class representative in the class action styled as *Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. U.S. Bank National Association, as Trustee*, Civ. No. 1:14-cv-02590-VM-JCF (S.D.N.Y.) (the "Class Action"), pending in the United States District Court for the Southern District of New York (the "District Court"), for itself and the putative class it represents in the Class Action (the "Class"), hereby submits this limited objection (the "Limited Objection") to the motion (the "Trustee 9019 Motion") [Doc. No. 55232] of Lehman Brothers Holdings Inc. (the "Plan Administrator"), as Plan Administrator under the confirmed chapter 11 plan (the "Plan") of the Plan Administrator and its affiliated chapter 11 debtors (collectively with the Plan Administrator, the "LBHI Debtors"), for approval of a settlement (the "Proposed Settlement") pursuant to the settlement agreement attached to the Trustee 9019 Motion as Exhibit B (the "Settlement Agreement") among the LBHI Debtors, certain institutional holders of residential mortgage-backed securities issued by 244 securitization trusts (the "Trusts"), and (subject to such trustees' acceptance) the trustees of the Trusts (the "Accepting Trustees").   As and for its Limited Objection, Royal Park respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Royal Park does not generally oppose approval of the Settlement or dispute the mechanism proposed in the Settlement Agreement for estimating and allocating the Accepting Trustees' claims against the LBHI Debtors on behalf of the Trusts.  Although the actions of U.S. Bank National Association ("U.S. Bank"), as trustee of certain of the Trusts, during the LBHI Debtors' chapter 11 cases may have squandered substantial value that *could have* been recovered from the LBHI Debtors on behalf of the Trusts, Royal Park, individually and on behalf of the

Class, recognizes that, under the circumstances that presently exist, the Settlement likely represents an acceptable – yet unfortunate – outcome.   However, Royal Park is extremely concerned that the Proposed Settlement, whether intentionally or not, attempts to improperly shield U.S. Bank from liability in the Class Action that has been pending since 2014 and which is in active discovery.

2.      Specifically, Royal Park's concerns with respect to the Settlement are the potential unintended consequences of the Trustee Findings and the Bar Order (each as defined below) required by the Settlement Agreement.  The language of the Trustee Findings and the Bar Order do not expressly reference the Class Action or any of the claims and causes of action presently asserted (or that could be asserted) in the Class Action.   Given the absence of any limiting language in the proposed order granting the Trustee 9019 Motion (the "Proposed Order"), Royal Park believes that U.S. Bank may later attempt to assert that the effects of the Trustee Findings and the Bar Order extend beyond their apparently intended limited scope.  As discussed below, the addition of very straightforward limiting language in the Proposed Order will foreclose the possibility of such an improper result in the first instance.  Indeed, what is tantamount to a such a release of claims by a non-debtor against another non-debtor is not authorized by the Plan, the Bankruptcy Code, or (to the extent ordered solely by this Court) the United States Constitution as interpreted by the United States Supreme Court, *see generally Stern v. Marshall*, 564 U.S. 462 (2011) nor would this Court or the District Court have subject-matter jurisdiction to effectuate such a result.  *See* 28 U.S.C. §1334(b).

## BACKGROUND

### A.    The Class Action

3.    The Class Action was filed on April 11, 2014 against U.S. Bank, in its capacity as trustee of certain of the Trusts.  On August 31, 2015, U.S. Bank answered the complaint.

4.    In the complaint, Royal Park alleges, among other things, that U.S. Bank breached certain duties as trustee by failing to take appropriate action after discovering material breaches of representations and warranties by parties that sold loans to certain of the Trusts and other issues with the servicing of the loans in several of the Trusts covered by the Proposed Settlement – specifically the Trusts known as BNC 2007-2, LXS 2006-10N, LXS 2006-15, LXS 2007-7N and SARM 2006-9 (the "Trusts at Issue").  In essence, Royal Park alleges that U.S. Bank intentionally took virtually no action to enforce loan sellers' obligations to repurchase defective loans or loan servicers' obligations to properly service the loans, resulting in billions of dollars in losses to the trusts alleged in the Class Action, including the five above Trusts at Issue which are part of the Settlement Agreement.

5.    On December 21, 2016, Royal Park filed a motion (the "Class Certification Motion") to appoint itself as class representative for the Class, appoint Robbins Geller Rudman & Dowd LLP as class counsel, and certify the Class, defined as all persons and entities who held certificates in certain trusts, including the Trusts at Issue, at any time between the date of issuance to no later than 60 days after notice of class certification and opportunity to opt out is issued, and who were damaged as a result of U.S. Bank's conduct alleged in the complaint in the Class Action.  Briefing on the Class Certification Motion is completed and the parties are awaiting a ruling by the District Court.

-4-

**B.    The Trustee 9019 Motion**

6.      The Plan Administrator, for itself and on behalf of the other LBHI Debtors, filed

the Trustee 9019 Motion on April 27, 2017.  Pursuant to the Trustee 9019 Motion, the LBHI

Debtors seek, among other related relief, entry of an order approving the Settlement Agreement.

Two provisions of the Proposed Order are the subject of this Limited Objection.

7.      First, the Settlement Agreement calls for the Court to recommend, and the District

Court to approve, certain findings of fact with respect to the Accepting Trustees' conduct, as set

forth in <u>Exhibit F</u> to the Settlement Agreement, including (among others) the following finding

("Trustee Finding #4"):

> Each of the Accepting Trustees acted within the bounds of its
> discretion, reasonably and in good faith with respect to its
> evaluation and acceptance of the Trust Settlement Agreement
> dated as of November 30, 2016 and modified as of March 17, 2017
> (the "Settlement Agreement") concerning the applicable Accepting
> Trust(s).

<u>See</u> Settlement Agreement, Art. 1.36, 1.37, 2.03, and Ex. F.  The proposed language of Trustee

Finding #4 is mirrored in paragraph 4 of the Proposed Order.

8.      Second, the Settlement Agreement requires the imposition of a bar order (the "Bar

Order") precluding investors in the Trusts (like Royal Park and members of the Class as to the

Trusts at Issue) from asserting certain claims against the Accepting Trustees.    Settlement

Agreement, Art. 2.07.  The Bar Order is incorporated into the Proposed Order, as follows:

> Investors in the Accepting Trusts shall be barred from asserting
> claims against the Accepting Trustees with respect to their
> evaluation and acceptance of the RMBS Settlement Agreement and
> implementation of the RMBS Settlement Agreement in accordance
> with its terms.

Proposed Order, ¶ G.

1280132_1

## LIMITED OBJECTION

9.        Royal Park maintains that to avoid any potential impact of the Trustee Findings and the Bar Order on the Class Action and the Trusts at Issue, these provisions must be appropriately limited by the express language of the Proposed Order.

10.       Neither Trustee Finding #4 nor the Bar Order appears on its face to be expressly intended to extend to conduct of the Accepting Trustees predating or post-dating the Proposed Settlement.  However, it is not difficult to foresee an attempt to construct an argument that because the Accepting Trustees' conduct in entering into the Proposed Settlement has been deemed reasonable by this Court and the District Court, the actions that eventually placed the Accepting Trustees in the position of entering into the Proposed Settlement in the first instance were, perforce, reasonable.

11.       Following that same logic, it does not stretch the imagination to envision U.S. Bank (whether in the Class Action or in any future matter) asserting that the Bar Order bars claims against it that relate in any way to the claims being settled through the Proposed Settlement, or that the Proposed Settlement somehow fixes the amount of damages that can be recovered from U.S. Bank on account of its own wrongdoing.  Clearly, that would be an inequitable and unjust – and legally impermissible[1] – result.

12.       The simplest way to eliminate any possibility of an improper future attempt to utilize Trustee Finding #4, the Bar Order, and the Court's approval of the Proposed Settlement to foreclose or limit any claims or causes of action in the Class Action is to include language in any

---

[1]    To the extent the parties to the Proposed Settlement intend for Trustee Finding #4, the Bar Order, or any other provision of the Proposed Order or the Settlement Agreement to release, preclude, or otherwise adversely impact the claims and causes of action of Royal Park or the Class against U.S. Bank, both this Court and the District Court lack jurisdiction to enter the Proposed Order under the auspices of the Debtors' bankruptcy cases because such claims and causes of action do not arise under the Bankruptcy Code, did not arise in the LBHI Debtors' bankruptcy cases, and do not relate to the LBHI Debtors' bankruptcy cases. *See* 28 U.S.C. §1334(b).

-6-

1280132_1

order granting the Trustee 9019 Motion expressly circumscribing the scope thereof.  Royal Park

respectfully submits that including the following language (the "Protective Language") in the

Proposed Order would adequately resolve its concerns:

> Nothing in this Order is intended to, does, or shall release, enjoin, preclude, or otherwise adversely impact any claim or cause of action, asserted or unasserted, that any current or former investor in any of the Accepting Trusts has against any Accepting Trustee or any other person or entity, other than claims specifically arising out of the Accepting Trustee's evaluation and acceptance of the Settlement Agreement and implementation of the Settlement Agreement in accordance with its terms.  For the avoidance of doubt, this Order does not and is not intended to (a) extinguish or (b) provide any finding or determination that prevents the continued prosecution of the claims and causes of action asserted in the cases styled as Royal Park Investments SA/NV v. U.S. Bank National Association, as Trustee, No. 14-cv-02590-VM (S.D.N.Y.) and Royal Park Investments SA/NV v. Wells Fargo Bank, N.A., as Trustee, No. 14-cv-09764-KPF-SN (S.D.N.Y.)

## CONCLUSION

WHEREFORE, Royal Park respectfully submits that the Trustee 9019 Motion should not

be granted unless the order issued in connection therewith includes the Protective Language.

Dated: June 22, 2017
      New York, New York

**ROBBINS GELLER RUDMAN & DOWD LLP**

  /s/    Samuel H. Rudman
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
58 South Service Road, Suite 200
Melville, New York 11747
631.367.7100  Telephone
631.367.1173  Facsimile

ARTHUR C. LEAHY
STEVEN W. PEPICH
LUCAS F. OLTS
DARRYL J. ALVARADO
HILLARY B. STAKEM
J. MARCO JANOSKI GRAY

1280132_1

JUAN CARLOS SANCHEZ
655 West Broadway, Suite 1900
San Diego, California 92101-3301
619.231.1058  Telephone
619.231.7423  Facsimile

*Counsel to Royal Park Investments SA/NV*

# Exhibit 6

**LOWENSTEIN SANDLER LLP**
Michael S. Etkin, Esq.
1251 Avenue of the Americas, 17th Floor
New York, New York 10022
212.262.6700 (Telephone)
212.262.7402 (Facsimile)

Andrew Behlmann, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500 (Telephone)
973.597.2400 (Facsimile)

*Bankruptcy Counsel to Royal Park Investments SA/NV*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | Jointly Administered |

**LIMITED OBJECTION OF ROYAL PARK INVESTMENTS SA/NV TO MOTION OF LEHMAN BROTHERS HOLDINGS INC. PURSUANT TO FED. R. 9019 AND 11 U.S.C § 105(A) FOR ENTRY OF ORDER (A) APPROVING RMBS SETTLEMENT AGREEMENT, (B) MAKING CERTAIN REQUIRED FINDINGS REGARDING DECISION OF RMBS TRUSTEES AND LBHI DEBTORS TO ENTER INTO RMBS SETTLEMENT AGREEMENT, (C) SCHEDULING ESTIMATION PROCEEDING TO DETERMINE RMBS CLAIMS AND APPROVING RELATED PROCEDURES REGARDING CONDUCT OF HEARING, AND (D) GRANTING RELATED RELIEF**

Royal Park Investments SA/NV ("Royal Park"), named plaintiff and proposed class representative in the class action styled as *Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. Wells Fargo Bank, N.A., as Trustee*, Civ. No. 1:14-cv-09764-KPF-SN (S.D.N.Y.) (the "Class Action"), pending in the United States District Court for the Southern District of New York (the "District Court"), for itself and the putative class it represents in the Class Action (the "Class"), hereby submits this limited objection (the "Limited

Objection") to the motion (the "Trustee 9019 Motion') [Doc. No. 55232] of Lehman Brothers

Holdings Inc. (the "Plan Administrator"), as Plan Administrator under the confirmed chapter 11

plan (the "Plan") of the Plan Administrator and its affiliated chapter 11 debtors (collectively with

the Plan Administrator, the "LBHI Debtors"), for approval of a settlement (the "Proposed

Settlement") pursuant to the settlement agreement attached to the Trustee 9019 Motion as

Exhibit B (the "Settlement Agreement") among the LBHI Debtors, certain institutional holders

of residential mortgage-backed securities issued by 244 securitization trusts (the "Trusts"), and

(subject to such trustees' acceptance) the trustees of the Trusts (the "Accepting Trustees").  As

and for its Limited Objection, Royal Park respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Royal Park does not generally oppose approval of the Settlement or dispute the

mechanism proposed in the Settlement Agreement for estimating and allocating the Accepting

Trustees' claims against the LBHI Debtors on behalf of the Trusts.  Although the actions of

Wells Fargo (as defined below), as trustee of certain of the Trusts, during the LBHI Debtors'

chapter 11 cases may have squandered substantial value that *could have* been recovered from the

LBHI Debtors on behalf of the Trusts, Royal Park, individually and on behalf of the Class,

recognizes that, under the circumstances that presently exist, the Settlement likely represents an

acceptable – yet unfortunate – outcome.  However, Royal Park is extremely concerned that the

Proposed Settlement, whether intentionally or not, attempts to improperly shield Wells Fargo

from liability in the Class Action that has been pending since 2014 and recently survived a

motion to dismiss.

2.      Specifically, Royal Park's concerns with respect to the Settlement are the

potential unintended consequences of the Trustee Findings and the Bar Order (each as defined

below) required by the Settlement Agreement.  The language of the Trustee Findings and the Bar

Order do not expressly reference the Class Action or any of the claims and causes of action

presently asserted (or that could be asserted) in the Class Action.  Given the absence of any

limiting language in the proposed order granting the Trustee 9019 Motion (the "Proposed

Order"), Royal Park believes that Wells Fargo may later attempt to assert that the effects of the

Trustee Findings and the Bar Order extend beyond their apparently intended limited scope.  As

discussed below, the addition of very straightforward limiting language in the Proposed Order

will foreclose the possibility of such an improper result in the first instance.  Indeed, what is

tantamount to a release of claims by a non-debtor against another non-debtor is not authorized by

the Plan, the Bankruptcy Code, or (to the extent ordered solely by this Court) the United States

Constitution as interpreted by the United States Supreme Court, see generally Stern v. Marshall,

564 U.S. 462 (2011), nor would this Court or the District Court have subject-matter jurisdiction

to effectuate such a result.  See 28 U.S.C. § 1334(b).

## BACKGROUND

### A.    The Class Action

3.    The Class Action was filed on December 11, 2014 against Wells Fargo Bank,

National Association, in its capacity as trustee of various RMBS trusts ("Wells Fargo").[1]  Royal

Park filed an amended complaint (the "Amended Complaint") on March 13, 2015.

---

[1]    Law Debenture Trust Company of New York ("LDT") was appointed as separate trustee of certain Trusts by order of the State of Minnesota District Court, Fourth Judicial District, County of Hennepin, entered on July 24, 2013 (the "Separate Trustee Order").  Pursuant to the Separate Trustee Order, LDT was responsible for taking actions to enforce claims on behalf of the Trusts against various entities that sold, transferred, or assigned mortgage loans to the relevant Trusts or may be liable to the Trusts for breaches of representations and warranties related to the mortgage loans in the relevant Trusts.  LDT is not currently a defendant in the Class Action.  However, to the extent that Royal Park later determines that LDT should be named as a defendant, Royal Park's concerns regarding the Proposed Settlement apply equally to any claims it might assert (both individually and on behalf of the Class) against LDT with respect to any of the Trusts.

4.      In the Amended Complaint, Royal Park alleges, among other things, that Wells Fargo breached certain duties as trustee by failing to take appropriate action after discovering material breaches of representations and warranties by parties that sold loans to the Trusts, and other issues with the servicing of the loans in one of the Trusts identified in the Proposed Settlement, known as SASCO 2007-BC1.  In essence, Royal Park alleges that Wells Fargo took virtually no action to enforce loan sellers' obligations to repurchase defective loans or properly service the loans, resulting in billions of dollars in losses to the Trusts.

5.      On January 6, 2017, the District Court entered an order directing that any motion for class certification in the Class Action was required to be filed no later than fourteen days after Wells Fargo filed its answer.

6.      On March 30, 2017, the District Court entered an order denying in part and granting in part Wells Fargo's motion to dismiss the Class Action and three related actions.

7.      On May 12, 2017, Wells Fargo filed its answer in the Class Action.  Accordingly, on May 26, 2017, Royal Park filed a motion (the "Class Certification Motion") to appoint itself as class representative for the Class, appoint Robbins Geller Rudman & Dowd LLP as class counsel, and certify the Class, defined as follows:

> All persons and entities who held Certificates in (1) ABFC 2006-OPT1 and (2) Structured Asset Securities Corporation Mortgage Loan Trust 2007-BC1 (collectively, the "Covered Trusts") at any time between the date of issuance to no later than 60 days after notice of class certification and opportunity to opt out is issued and were damaged as a result of Wells Fargo Bank, N.A.'s conduct alleged in the Complaint.

Briefing on the Class Certification Motion is currently scheduled to be completed on or about July 17, 2017.

**B.      The Trustee 9019 Motion**

8.      The Plan Administrator, for itself and on behalf of the other LBHI Debtors, filed the Trustee 9019 Motion on April 27, 2017.  Pursuant to the Trustee 9019 Motion, the LBHI Debtors seek, among other related relief, entry of an order approving the Settlement Agreement. Two provisions of the Proposed Order are the focus of this Limited Objection.

9.      First, the Settlement Agreement calls for the Court to recommend, and the District Court to approve, certain findings of fact with respect to the Accepting Trustees' conduct, as set forth in Exhibit F to the Settlement Agreement, including (among others) the following finding ("Trustee Finding #4"):

> Each of the Accepting Trustees acted within the bounds of its discretion, reasonably and in good faith with respect to its evaluation and acceptance of the Trust Settlement Agreement dated as of November 30, 2016 and modified as of March 17, 2017 (the "Settlement Agreement") concerning the applicable Accepting Trust(s).

See Settlement Agreement, Art. 1.36, 1.37, 2.03, and Ex. F.   The proposed language of Trustee Finding #4 is mirrored in paragraph 4 of the Proposed Order.

10.      Second, the Settlement Agreement requires the imposition of a bar order (the "Bar Order") precluding investors in the Trusts (like Royal Park and members of the Class, as to the SASCO 2007-BC1 Trust) from asserting certain claims against the Accepting Trustees. Settlement Agreement, Art. 2.07.  The Bar Order is incorporated into the Proposed Order, as follows:

> Investors in the Accepting Trusts shall be barred from asserting claims against the Accepting Trustees with respect to their evaluation and acceptance of the RMBS Settlement Agreement and implementation of the RMBS Settlement Agreement in accordance with its terms.

Proposed Order, ¶ G.

## LIMITED OBJECTION

11.    Royal Park maintains that to avoid any potential impact of the Trustee Findings and the Bar Order on the Class Action, these provisions must be appropriately limited by the express language of the Proposed Order.

12.    Neither Trustee Finding #4 nor the Bar Order appears on its face to be expressly intended to extend to any conduct of the Accepting Trustees other than directly in connection with the Proposed Settlement.  However, it is not difficult to foresee an attempt to construct an argument that because the Accepting Trustees' conduct in entering into the Proposed Settlement has been deemed reasonable by this Court and the District Court, the actions that eventually placed the Accepting Trustees in the position of entering into the Proposed Settlement in the first instance were, perforce, reasonable.

13.    Following that same logic, it does not stretch the imagination to envision Wells Fargo (whether in the Class Action or in any future matter) asserting that the Bar Order bars claims against it that relate in any way to the claims being settled through the Proposed Settlement, or that the Proposed Settlement somehow fixes the amount of damages that can be recovered from Wells Fargo on account of its own wrongdoing.  Clearly, that would be an inequitable and unjust – and legally impermissible – result.

14.    To the extent the parties to the Proposed Settlement *do* intend for Trustee Finding #4, the Bar Order, or any other provision of the Proposed Order or the Settlement Agreement to release, preclude, or otherwise adversely impact the claims and causes of action of Royal Park or the Class against Wells Fargo, the first proposed finding contained in paragraph 1 of the Proposed Order is inappropriate because (a) both this Court and the District Court lack jurisdiction to enter the Proposed Order under the auspices of the Debtors' bankruptcy cases

-6-

because such claims and causes of action do not arise under the Bankruptcy Code, did not arise

in the LBHI Debtors' bankruptcy cases, and do not relate to the LBHI Debtors' bankruptcy

cases, see 28 U.S.C. § 1334(b), and to the extent an order on the Trustee 9019 Motion is entered

solely by this Court, the provisions thereof exceed this Court's constitutional adjudicatory

authority pursuant to Stern.

15.    The simplest way to eliminate any possibility of an improper future attempt to

utilize Trustee Finding #4, the Bar Order, and the Court's approval of the Proposed Settlement to

foreclose or limit any claims or causes of action in the Class Action is to include language in any

order granting the Trustee 9019 Motion expressly circumscribing the scope thereof.  Royal Park

respectfully submits that including the following language (the "Protective Language") in the

Proposed Order would adequately resolve its concerns:

> Nothing in this Order is intended to, does, or shall release, enjoin,
> preclude, or otherwise adversely impact any claim or cause of
> action, asserted or unasserted, that any current or former investor
> in any of the Accepting Trusts has against any Accepting Trustee
> or any other person or entity, other than claims against the
> Accepting Trustees specifically arising out of the Accepting
> Trustees' evaluation and acceptance of the Settlement Agreement
> and implementation of the Settlement Agreement in accordance
> with its terms.  For the avoidance of doubt, this Order does not and
> is not intended to (a) extinguish or (b) provide any finding or
> determination that prevents the continued prosecution of the claims
> and causes of action asserted in the case styled as *Royal Park
> Investments SA/NV v. Wells Fargo Bank, N.A., as Trustee*, No. 14-
> cv-09764-KPF-SN (S.D.N.Y.).

*[ signature page follows ]*

-7-

## CONCLUSION

WHEREFORE, Royal Park respectfully submits that the Trustee 9019 Motion should not

be granted unless the order issued in connection therewith includes the Protective Language.

Dated: June 22, 2017
     New York, New York

**LOWENSTEIN SANDLER LLP**

  */s/ Michael S. Etkin*
Michael S. Etkin, Esq.
1251 Avenue of the Americas, 17th Floor
New York, New York 10022
212.262.6700  Telephone
212.262.7402  Facsimile
metkin@lowenstein.com

Andrew Behlmann, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500  Telephone
973.597.2400  Facsimile
abehlmann@lowenstein.com


*Bankruptcy Counsel to Royal
  Park Investments SA/NV*

**ROBBINS  GELLER  RUDMAN  &  DOWD
LLP**
Arthur C. Leahy
Steven W. Pepich
Lucas F. Olts
Darryl J. Alvarado
Hillary B. Stakem
J. Marco Janoski Gray
Juan Carlos Sanchez
655 West Broadway, Suite 1900
San Diego, California 92101-3301

619.231.1058  Telephone
619.231.7423  Facsimile

Samuel H. Rudman
58 South Service Road, Suite 200
Melville, New York 11747
631.367.7100  Telephone
631.367.1173  Facsimile

*Counsel to Royal Park Investments SA/NV*

# Exhibit 7

Gary Gwilliam (Bar No. 33430)
Randall E. Strauss (Bar No. 168363)
**GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER**
1999 Harrison Street, Suite 1600
Oakland, California 94612-3528
Telephone:  (510) 832-5411
Fax:  (510) 832-1918
Email:  GGwilliam@giccb.com, rstrauss@giccb.com

Mark S. Bostick (Bar No. 111241)
**WENDEL, ROSEN, BLACK & DEAN LLP**
1111 Broadway, 24th Floor
Oakland, California 94607-4036
Telephone:  (510) 834-6600
Fax:  (510) 834-1928
Email:  mbostick@wendel.com

Attorneys for Claimants, Sylvia Vega-Sutfin, Michelle Seymour,
Cheryl McNeil, Linda Howard-James, Isabel Guajardo and
Denise Colombo

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | Case No. 08-13555 (SCC) |
| | (Jointly Administered) |
| Debtors. | |

### OBJECTION OF CLAIMANTS SYLVIA VEGA-SUTFIN, MICHELLE SEYMOUR, CHERYL MCNEIL, LINDA HOWARD-JAMES, ISABEL UAJARDO AND DENISE COLOMBO TO MOTION OF LEHMAN BROTHERS HOLDINGS INC. PURSUANT TO FED. R. BANK. P. 9019 AND 11 U.S.C. § 105(A) FOR ENTRY OF ORDER (A) APPROVING RMBS SETTLEMENT AGREEMENT AND OTHER REQUESTED RELIEF

### <u>Introduction</u>

Claimants Sylvia Vega-Sutfin, Michelle Seymour, Cheryl McNeil, Linda Howard-James,

Isabel Guajardo and Denise Colombo (collectively, the "Claimants") hereby object to the Motion

of Lehman Brothers Holdings Inc., pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy

Procedure and section 105(a) of title 11 of the United States Code for Entry of Order (A)

Approving RMBS Settlement Agreement, (B) Making Certain Required Findings Regarding

Decision of RMBS Trustees and LBHI Debtors to Enter Into RMBS Settlement Agreement, (C)

Scheduling Estimation Proceeding to Determine RMBS Scheduling RMBS Claims and

Approving Related Procedures Regarding Conduct of Hearing , and (D) Granting Related Relief

("Motion") on the grounds that the proposed Settlement Agreement is not in the best interests of

the various debtors, bankruptcy estates and creditors because the Plan Administrator has failed to

identify how the ultimate estimated RMBS Covered Loan Claims will be allocated among the

various LBHI Debtors.  Absent such information, it is impossible to determine if the Settlement

Agreement is truly in the interests of creditors.

### Factual and Procedural Background

1.      Claimants are former employees of BNC Mortgage Inc.("BNC").

2.      Lehman Brothers Bank FSB owns 100% of the equity of BNC.  [Case 09-10137,

Doc #2].  BNC served as Lehman Brothers' originator of subprime mortgage loans, which

Lehman then packaged into mortgage-backed securities that were sold to investors, including

hedge funds, insurers, banks and pension funds.

3.      On November 8, 2005, the Claimants filed a complaint against BNC in the

Superior Court of Sacramento County, California, Case No. 05AS05161 ("Complaint"), alleging

claims for employment discrimination, harassment, retaliation, wrongful termination under the

California Fair Employment and Housing Act (Cal. Govt. Code §§12900 *et seq.*) ("FEHA") and

intentional infliction of emotional distress, and seeking compensatory damages against BNC and

other third party defendants, and also seeking punitive damages allowable under California law

for BNC's malicious and despicable conduct as alleged in the Complaint.  Among other things,

three of the Claimants alleged that when they had reported what they believed were fraudulent

and illegal business practices to their superior officers at BNC, they were subsequently subjected

to retaliation and a hostile work environment.  All of the claimants alleged that they were

subjected to sexual harassment, and that BNC took no action in response to their complaints to

correct any of this illegal conduct.  Adjudication of those state law claims was delayed by BNC's

procedural maneuvers and a state court appeal it filed.

4.      On January 9, 2009, BNC filed its petition for relief under chapter 11 of the

Bankruptcy Code.

5.      On or about July 7, 2009, the Claimants filed timely proofs of claim in the BNC

case, registered as Claim Nos. 5222, 5223, 5224, 5225, 5226 and 5227, as amended on June 8,

2017 (collectively, the "Claims").[1]  The Claims are subject to pending objections.

6.      On December 6, 2011, the Bankruptcy Court entered its Order Confirming

Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its

Affiliated Debtors  [ECF No. 23023] ("Order Confirming Plan").

7.      To the best of Claimants knowledge, in the BNC estate, excluding Claimants'

Claims, there are 23 allowed claims totaling $734,308.61.[2]  To the best of Claimants knowledge,

the BNC estate has $15 million in assets.  Quarterly Finance Report as of December 31, 2016,

filed herein on March 29, 2017 [ECF No. 55127].

### Objection

The Court may only approve the RMBS Settlement Agreement if it satisfies the *Iridium*

factors.[3]  The RMBS Settlement Agreement cannot be approved, because, as proposed, it is not

in the paramount interest of creditors.

Under the terms of the proposed RMBS Settlement Agreement, the Plan Administrator

and Trustees agree to a claims estimation process pursuant to Bankruptcy Code § 502(c) for the

Covered Loan Claims.  If the Court estimates the Covered Loan Claims at $2 billion or more, all

parties will waive their right to appeal.  If the Court estimates the Covered Loan Claims at less

than $2 billion, the Trustees may appeal the Court's decision.  If the Court estimates the Covered

Loan Claims in an amount between $2 billion and $2.416 billion, the allowed claim will be equal

to the higher amount, and all parties waive their rights to appeal.  If the Court estimates the

---

[1] The Amended Claims as aggregated total $4,500,000.00.

[2] This does not include unliquidated and contingent claims or claims that have been
subordinated.

[3] *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),* 478
F.3d 452, 462 (2d Cir. 2007)

Covered Loan Claims in an amount greater than $2.416 billion, the greater amount will be the

allowed claim and all parties waive their rights to appeal.  The Plan Administration claims that

this process is beneficial to the LBHI Debtors' estates and creditors but there is insufficient

information in either the Motion or the Settlement Agreement to support that broad brush

statement.

Prior to reaching the proposed Settlement Agreement, the Court had ordered the LBHI

Debtors and the RMBS Trustees to follow a strict Protocol to reconcile and determine the RMBS

Claims on a loan by loan basis.  See, Motion [ECF No. 55232], pp 10-11.  Under the detailed

steps of the Protocol, the Trustees were required to submit the claims files, the mortgage loan

file, a statement describing the specific alleged defect and the representation and warranty

violated or the document missing and a statement of how the breach entities the Trustee to a

claim under the applicable governing Agreements and applicable law and a calculation of the

purchase price and a statement of describing any notice given of breach given to a LBHI Debtor.

Id.  As part of that analysis, the Plan Administrator would, could or should know which LBHI

Debtor was responsible for which claim and how each claim could, should or would be allocated.

Under the RMBS Settlement Agreement, the allocation of claim liability is silent.

Creditors of LBHI Debtors have no idea what portion of $2.416 billion in liability will be

allocated to which LBHI Debtors and how that will impact their returns.  In BNC, the presently

allowed claims are $734,308.61.  Without the crucial information of what portion of RMBS'

claim liability will be assigned to BNC and each LBHI Debtor, it is impossible to conclude that

the proposed RMBS Settlement Agreement is in the paramount interests of the LBHI Debtors

and their creditors.

This lack of information is compelling because it illustrates a fundamental problem with

the RMBS Settlement Agreement.  The Plan Administrator is the single administrator for each

LBHI Debtor and may have a conflict of interest in allocating the liability for the RMBS

Covered Loan Claims among each of the LBHI Debtors.  When the Plan was confirmed no such

conflict was apparent because the LBHI Debtors promised creditors that the Plan would be a

100% full payout plan.  However, now that the Plan Administrator is essentially agreeing to the RMBS Covered Loan Claims liability in a range within $2 billion, it appears that the Plan is far from a 100% payout Plan.  It appears that under the terms of the Settlement Agreement, the Plan Administrator may choose which LBHI Debtor to assign liability for the RMBS Covered Loan Claims.  There is a conflict in that the Plan Administrator has not and will not disclose how the liability for the Covered Loan Claims will be allocated among the various LBHI Debtors.  The Plan Administrator is a fiduciary for each LBHI Debtor, and in that respect, owes a duty to each LBHI Debtor to minimize the claims asserted against it.  In the absence of disclosing to the creditors of the each LBHI Debtor how the RMBS Covered Loan liability will be assigned and how each LBHI Debtor's payout to creditors will be affected, the proposed RMBS Settlement cannot be in the paramount interest of creditors.

Claimants' objection to the Motion and RMBS Settlement Agreement can be resolved in one of two ways.  The Plan Administrator can amend the proposed Settlement Agreement to exclude BNC's estate from any liability relating to the RMBS Covered Loan Claims, including any guaranty or indemnification claims by the related LBHI Debtors; or, alternatively, the Plan Administrator can provide written assurances that BNC will not be liable for the RMBS Covered Loan Claims, or the guaranty and indemnification claims from the related LBHI Debtors. Absent such amendment or assurances, the BNC estate risks turning from a 100% payout estate as promised in the Plan, to zero percent plan at the discretion of the Plan Administrator.

## Conclusion

If the adjustments or assurances resolving this objection as proposed above are declined, Claimants request that the Motion be denied based on insufficient evidence to determine the effect of the RMBS Settlement Agreement on individual estates and the consequent lack of evidence showing that its approval  is in the paramount interests of creditors.

DATED June 20, 2017                    GWILLIAM, IVARY, CHIOSSO, CAVALLI &
                                       BREWER


                                       By: /s/ Gary Gwilliam
                                          Gary Gwilliam
                                          Attorneys for Claimants, Sylvia Vega-Sutfin,
                                          Michelle Seymour, Cheryl McNeil, Linda
                                          Howard-James, Isabel Guajardo and Denise
                                          Colombo

DATED:  June 21, 2017                  WENDEL, ROSEN, BLACK & DEAN LLP


                                       By: /s/ Mark S. Bostick
                                          Mark S. Bostick
                                          Attorneys for Claimants, Sylvia Vega-
                                          Sutfin, Michelle Seymour, Cheryl McNeil,
                                          Linda Howard-James, Isabel Guajardo and
                                          Denise Colombo

# Exhibit 8

FENSTERSTOCK & PARTNERS, LLP
100 Broadway, 8th Floor
New York, New York 10005-4514
Telephone: (212) 785-4100
Facsimile: (212) 785-4040
Lani A. Adler

COHNE KINGHORN, P.C.
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378
George Hofmann

*Attorneys for iFreedom Direct Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | |
| Debtors. | Case No. 08-13555 (SCC) |

**iFREEDOM DIRECT CORPORATION'S LIMITED OBJECTION AND
RESERVATION OF RIGHTS CONCERNING MOTION OF LEHMAN BROTHERS
HOLDINGS INC. PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C. §105(A) FOR
ENTRY OF ORDER (A) APPROVING RMBS SETTLEMENT AGREEMENT, (B)
MAKING CERTAIN REQUIRED FINDINGS REGARDING DECISION OF RMBS
TRUSTEES AND LBHI DEBTORS TO ENTER INTO RMBS SETTLEMENT
AGREEMENT, (C) SCHEDULING ESTIMATION PROCEEDING TO DETERMINE
RMBS CLAIMS AND APPROVING RELATED PROCEDURES REGARDING
CONDUCT OF HEARING, AND (D) GRANTING RELATED RELIEF**

iFreedom Direct Corporation ("iFreedom"), through its undersigned counsel, hereby submits this limited objection and reservation of rights concerning the Motion of Lehman Brothers Holdings Inc. Pursuant to Fed. R. Bankr. P. 9019 And 11 U.S.C. §105(A) for Entry of Order (A) Approving RMBS Settlement Agreement, (B) Making Certain Required Findings Regarding Decision of RMBS Trustees and LBHI Debtors to Enter Into RMBS Settlement Agreement, (C) Scheduling Estimation Proceeding to Determine RMBS Claims and Approving Related Procedures Regarding Conduct of Hearing, and (D) Granting Related Relief (referred to herein as the "Motion") as follows:

1.      iFreedom is a Salt Lake City, Utah based mortgage originator.  iFreedom has both brokered and sold certain mortgage loans to Lehman Brothers Bank ("LBB"), which loans LBHI claims were then purportedly transferred and/or assigned to LBHI.

2.      iFreedom and LBHI are currently involved in litigation in the United States District Court for the District of Utah.[1]  At issue in this litigation is whether iFreedom has a duty to indemnify LBHI for amounts that LBHI paid to Fannie Mae and Freddie Mac pursuant to settlement agreements LBHI entered into with each of Fannie Mae and Freddie Mac.  LBHI has also filed an adversary proceeding against iFreedom in this Court asserting indemnification claims arising out of the Fannie Mae and Freddie Mac settlements.[2]

3.      Paragraph 2.03(a) of the proposed Settlement Agreement (as defined in the Motion) requires that notice of the Settlement Agreement shall be provided to "all known mortgage originators (including all known brokers, bulk sellers, and correspondents against whom the LBHI Debtors may have indemnity claims arising from the Settlement Agreement)."

4.      iFreedom has been advised by LBHI that there are loans outside of the Fannie

_____

[1] Case No. 2:15-CV-00868-TC
[2] Adversary No. 15-01426 (SCC)

Mae and Freddie Mac settlements for which it may seek indemnification. Because iFreedom received notice of the Settlement Agreement, it appears that LBHI believes that LBHI may assert indemnity claims against iFreedom for certain loans covered by the Settlement Agreement ("Possible Indemnity Claim Loans").

5.      The Motion and Settlement Agreement do not provide sufficient information to enable iFreedom to determine if some, all, or none of the Possible Indemnity Claim Loans would be covered by the Settlement Agreement. iFreedom has no knowledge, and LBHI has not provided it with any information, of the terms and conditions of transfers made by LBB to LBHI of the loans LBB acquired or obtained by brokerage from iFreedom, which loans LBHI may have transferred or assigned to RMBS Trustees, or of the transfers of such loans by LBHI to any of the RMBS Trustees. However, it is possible that iFreedom has defenses to any claims which allege that iFreedom has, or caused, any liability with respect to any loans that are covered by the Settlement Agreement, but LBHI has not provided iFreedom with any information as to whether any claims by the RMBS Trustees that are to be addressed under the Settlement Agreement allege any liability with respect to loans originated or brokered by iFreedom or what the allegations of the RMBS Trustees are with respect to any Possible Indemnity Claim Loans.

6.      To the extent that Possible Indemnity Claim Loans are included in the proposed Settlement Agreement and LBHI could assert claims for indemnification against iFreedom based thereon, iFreedom is entitled to an opportunity to participate in the settlement discussions regarding, and/or to potentially assume – if appropriate after consideration of whether the claim against LBHI is based on  allegations on which LBHI could assert claims for indemnification against iFreedom– the defense of the RMBS Trustees' claims covering the Possible Indemnity Claim Loans if necessary.

7.      Under New York law, "an indemnitee who fails to provide an indemnitor notice of a settlement cannot recover reimbursement without establishing that there was liability, without a good defense, and that the amount of the settlement was reasonable.  However, if the indemnitor does receive notice of the underlying action, the general rule is that the indemnitor will be bound by any reasonable good faith settlement the indemnitee might thereafter make." *In re Residential Capital, LLC,* 536 B.R. 132, 146 (Bankr. S.D.N.Y. 2015) (internal citations and alterations omitted).

8.      "Fundamentally, the importance of notice is based on the objective of giving an indemnitor the opportunity to defend or settle a claim.  *Combustion Eng'g, Inc. v. Imetal*, 235 F. Supp. 2d 265, 273 (S.D.N.Y. 2002).  "Notice sufficient to give the indemnitor a meaningful opportunity to defend is the indispensable element to be proven by the party seeking indemnity*..." Atlantic Richfield Co. v. Interstate Oil Transport Co.,* 784 F.2d 106, 113 (2d Cir. 1986).

9.      At a minimum, if iFreedom is not provided an opportunity to participate in the settlement discussions or defend the claims as they pertain to Possible Indemnity Claim Loans, then, for that reason alone, iFreedom does not have sufficient notice of the RMBS settlement. iFreedom does not waive any other arguments with respect to notice of the proposed RMBS settlement.

10.     iFreedom files this objection to place the Court and all parties on notice that it objects to approval of the Settlement Agreement to the extent that it covers any Possible Indemnity Claim Loans and – unless LBHI waives any right to seek indemnification thereof – affirmatively requests that it be permitted to participate in the settlement negotiations and, if appropriate, assume the  defense on a loan by loan basis of the RMBS Trustees' claims, as to

which claims, LBHI believes it will be entitled to indemnification from iFreedom.

11.     This objection is not to be construed as an admission by iFreedom that it has a

duty to indemnify LBHI and iFreedom reserves all rights and defenses that it may possess related

to the Possible Indemnity Claim Loans.  Without limiting the generality of the foregoing,

iFreedom reserves its right to a jury trial and an adjudication by an Article III court of any

disputes with LBHI, and iFreedom disputes the subject matter jurisdiction of this Court to

adjudicate any claims LBHI might assert against iFreedom related to the Possible Indemnity

Claim Loans.  Until iFreedom has a meaningful opportunity to review the Possible Indemnity

Claim Loans covered by the Settlement Agreement, if any, and make an informed decision on

settlement and potential duty to indemnify, it cannot be bound by the Settlement Agreement and

objects to this Court's approval of the same.

Dated: June 22, 2017
        New York, New York

                                    Respectfully submitted,

                                    FENSTERSTOCK & PARTNERS, LLP

                                    By____/s/ Lani A. Adler_____
                                    FENSTERSTOCK & PARTNERS, LLP
                                    100 Broadway, 8th Floor
                                    New York, NY  10005-4514
                                    Telephone: (212) 785-4100
                                    Facsimile: (212) 785-4040

                                    and

                                    George Hofmann
                                    COHNE KINGHORN, P.C.
                                    111 East Broadway, 11th Floor
                                    Salt Lake City, Utah 84111
                                    Telephone: (801) 363-4300
                                    Facsimile: (801) 363-4378

                                    *Attorneys for iFreedom Direct Corporation*

-5-

# Exhibit 9

STROOCK & STROOCK & LAVAN LLP

Hearing Date: July 6, 2017 at 10:00 a.m. (ET)
Objection Deadline: June 22, 2017 at 12:00 noon (ET)
Related ECF No. 55232

Kristopher M. Hansen
Michael C. Keats
Jonathan D. Canfield
180 Maiden Lane
New York, NY 10038-4982
(212) 806-5400

*Counsel to Five Points, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| **In re:** | : | Case No. 08-13555 (SCC) |
|  | : |  |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | Chapter 11 |
|  | : |  |
| **Debtors.** | : | Jointly Administered |
|  | : |  |

---------------------------------------------------------------- x

### LIMITED OBJECTION OF FIVE POINTS, LLC TO THE MOTION OF LEHMAN BROTHERS HOLDINGS INC. TO (A) APPROVE THE RMBS SETTLEMENT AGREEMENT, (B) MAKE CERTAIN REQUIRED FINDINGS IN CONNECTION THEREWITH, (C) SCHEDULE THE ESTIMATION PROCEEDING AND APPROVE THE RELATED PROCEDURES, AND (D) GRANT RELATED RELIEF

To The Honorable Judge Shelley C. Chapman, United States Bankruptcy Judge:

Five Points, LLC ("Five Points"), as a beneficial owner of certificates, notes or other securities (collectively, "Certificates") issued by various residential mortgage-backed securities ("RMBS") trusts set forth on Exhibit A to the RMBS Settlement Agreement[1] (the "Covered Trusts"), by and through its undersigned counsel, Stroock & Stroock & Lavan LLP ("Stroock"), hereby submits this limited objection (this "Objection") to the *Motion of Lehman Brothers Holdings Inc. Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. § 105(a) for Entry of Order (A) Approving RMBS Settlement Agreement, (B) Making Certain Required Findings Regarding*

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the RMBS Settlement Motion (as defined below) and/or RMBS Settlement Agreement.

*Decision of RMBS Trustees and LBHI Debtors to Enter Into RMBS Settlement Agreement, (C)
Scheduling Estimation Proceeding to Determine RMBS Claims and Approving Related
Procedures Regarding Conduct of Hearing, and (D) Granting Related Relief* [Docket No.
55232] (the "RMBS Settlement Motion"), and in support hereof, respectfully states as follows:

## OBJECTION

1.     The RMBS Settlement Agreement incorporates language, including in section
3.06 thereof, regarding distributions to certificateholders that could be used to modify the
payment "waterfall" set forth in the underlying RMBS trust documents that govern the
Certificates (the "Trust Documents").  This language is substantially similar to that contained in
other global settlements and has been the source of significant interpretive disputes and
additional time-consuming and expensive litigation which, in turn, has had dramatic effects on
the recoveries to investors by significantly extending distribution timelines and creating
contractual uncertainties.  *See*, *e.g.*, *In re Bank of N.Y. Mellon*, 51 N.Y.S.3d 356 (N.Y. Sup. Ct.
2017); *In re Bear Stearns Mortg. Funding Trust*, No. 62-TR-CV-16-35, 2016 WL 6330665
(Minn. Dist. Ct. Oct. 13, 2016); *U.S. Bank Nat. Ass'n v. Federal Home Loan Bank of Bos.*, No.
652382, 2016 WL 9110399 (N.Y. Sup. Ct. Aug. 12, 2016).

2.     This Court should not allow the RMBS Settlement Agreement to serve as a
mechanism by which certificateholders' bargained-for rights contained in the underlying Trust
Documents are inappropriately modified.  Instead, the Plan Administrator and/or the Accepting
Trustees should only be able to modify the waterfall provisions contained in the Trust
Documents in accordance with the relevant procedures set forth therein.  Accordingly, Five
Points objects to, and opposes the inclusion of, any language in the RMBS Settlement

2

Agreement to the extent that such language amends, modifies or otherwise alters the distribution

waterfall set forth in the Trust Documents.

3.      Likewise, the RMBS Settlement Agreement should not be approved until

certificateholders have been given a full and fair opportunity to evaluate the merits of the

proposed settlement and make a proper determination as to whether their respective Covered

Trusts should terminate the RMBS Settlement Agreement and not participate in the claim

estimation procedures.[2]  Although section 2.03(c) of the RMBS Settlement Agreement provides

a mechanism by which an Accepting Trustee may terminate the RMBS Settlement Agreement

with respect to one or more Accepting Trusts, such termination requires that certificateholders

(with the requisite power and authority) direct their respective Accepting Trustee to initiate a

withdrawal in a manner acceptable to the Accepting Trustee, including the provision of a

satisfactory indemnity, prior to the 9019 Objection Deadline (which is today).  However, neither

the Plan Administrator, nor any of the Accepting Trustees, have provided sufficient information

to certificateholders to enable them to make a reasonable determination as to whether or not to

direct their respective Accepting Trustee to terminate the RMBS Settlement Agreement and

withdraw from the protocol.[3]

4.      Importantly, the issues raised in this Objection are further compounded by the fact

that the order approving the RMBS Settlement Agreement requires the Court to make certain

findings related to the conduct of the Accepting Trustees, including that each of the Accepting

Trustees "acted within the bounds of its discretion, reasonably, and in good faith with respect to

---

[2]      Five Points is a significant holder of Certificates and has a controlling interest in several Covered Trusts.

[3]      The various notices posted to the official "RMBS Trustees' Website" on March 20, 2017, April 21, 2017 and June 1, 2017 provide only trivial information regarding the proposed settlement, and are of little utility to certificateholders to evaluate the economic implications of the estimation protocol.

its evaluation and acceptance of the RMBS Settlement Agreement concerning the applicable

Accepting Trust(s)." Proposed Order, ¶ 4. What's more, section 2.07 of the RMBS Settlement

Agreement also requires the LBHI Debtors, the Accepting Trustees and the Institutional

Investors to request entry of an order barring Investors from asserting claims against the

Accepting Trustees with respect to the trustees' evaluation, acceptance and implementation of

the RMBS Settlement Agreement. This two-pronged attack on the rights of certificateholders is

not only unfair, it is inappropriate given the informational disadvantage such holders face.

Accordingly, this Court should not approve the RMBS Settlement Agreement and reward the

Plan Administrator and other LBHI Debtors, the Accepting Trustees and the Institutional

Investors for creating a construct that assures participation is a *fait accompli*.[4]

WHEREFORE, for the reasons set forth herein, Five Points objects to the RMBS

Settlement Motion and approval of the RMBS Settlement Agreement in its present form, and

hereby reserves all rights and remedies at law, in equity or otherwise, in connection therewith,

including raising additional objections at the hearing to approve the RMBS Settlement

Agreement.

Dated: June 22, 2017
      New York, New York

STROOCK & STROOCK & LAVAN LLP

By:  /s/ Kristopher M. Hansen
       Kristopher M. Hansen
       Michael C. Keats
       Jonathan D. Canfield
       180 Maiden Lane
       New York, NY 10038-4982
       (212) 806-5400

       *Counsel to Five Points, LLC*

---

[4]      It is unclear to Five Points whether the Court has jurisdiction to make such findings, or to issue the requested bar order.