Hearing Date: July 6, 2017 at 9:00 a.m. (ET)

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111
Paul V. Shalhoub
Todd G. Cosenza

ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Tel: (303) 945-7415
Fax: (303) 974-7468
Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)
*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
|                                                    )
In re                                               )    Chapter 11 Case No.
                                                    )
Lehman Brothers Holdings Inc., et al.,              )    08-13555 (SCC)
                                                    )
    Debtors.                                        )    Jointly Administered
                                                    )
------------------------------------------------------------x

**DECLARATION OF ZACHARY TRUMPP IN SUPPORT OF THE
MOTION OF LEHMAN BROTHERS HOLDINGS INC.
PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C § 105(A) FOR
ENTRY OF ORDER (A) APPROVING RMBS SETTLEMENT
AGREEMENT, (B) MAKING CERTAIN REQUIRED FINDINGS
REGARDING DECISION OF RMBS TRUSTEES AND LBHI DEBTORS
TO ENTER INTO RMBS SETTLEMENT AGREEMENT, (C)
SCHEDULING ESTIMATION PROCEEDING TO DETERMINE RMBS
CLAIMS AND APPROVING RELATED PROCEDURES REGARDING
<u>CONDUCT OF HEARING, AND (D) GRANTING RELATED RELIEF</u>**

I, Zachary Trumpp, under penalty of perjury, declare as follows:

1. I am Senior Vice President in the residential mortgage group of Lehman Brothers

Holdings Inc. ("<u>LBHI</u>" or the "<u>Plan Administrator</u>"), one of the entities that is the subject of the

above-captioned chapter 11 case. I have read *the Motion of Lehman Brothers Holdings Inc. Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. §105(A) for Entry of Order (A) Approving RMBS Settlement Agreement, (B) Making Certain Required Findings Regarding Decision of RMBS Trustees and LBHI Debtors to Enter Into RMBS Settlement Agreement, (C) Scheduling Estimation Proceeding to Determine RMBS Claims and Approving Related Procedures Regarding Conduct of Hearing, and (D) Granted Related Relief* (the "9019 Motion"), and am authorized to submit this declaration (the "Declaration") in support of the 9019 Motion.

2. Capitalized terms used but not defined herein have the meanings given to them in the 9019 Motion.

3. I provide this Declaration in support of approval of the 9019 Motion, which seeks entry of an order approving a settlement agreement (the "RMBS Settlement Agreement"). As described in the 9019 Motion, the RMBS Settlement Agreement establishes a streamlined process to determine and resolve certain loan-level repurchase claims asserted by certain trusts against LBHI (the "Covered Loan Claims").[1] Although the Settlement Agreement does not settle and compromise the allowed amount of the Covered Loan Claims, it provides for an agreed-upon process pursuant to which the Plan Administrator will request that the Court estimate and allow the Covered Loan Claims that the Trustees submitted through the Protocol in the aggregate amount of $2.416 billion (as may be adjusted pursuant to the RMBS Settlement Agreement), without prejudice to the rights of the Trustees to argue that the amount should be higher.

---

[1] The RMBS Settlement Agreement defines "Covered Loans" to mean (i) the Mortgage Loans identified as the "Covered Loans" in the RMBS Trustee's *Motion to (i) Increase the Reserve to $12.143 Billion and (ii) Estimate and Allow Their Claims for Covered Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code*, dated August 22, 2014 (Docket No. 46078), and (ii) the additional Mortgage Loans identified as "Covered Loans" in the Status Report of the RMBS Trustees with respect to Compliance with the Protocol and the Motion to Extend the Overall Claim File Cut-Off Date for Certain Loans under the Protocol Order and For Related Relief (Docket No. 52342). *See* §1.08 of the RMBS Settlement Agreement.

2

4. Unless otherwise stated, I have personal knowledge of the facts set forth in this Declaration and, if called to testify as a witness, I could testify to the truth of the matters set forth herein.

## BACKGROUND

5. I began my career on January 2, 1999 as a Financial Analyst with Aurora Loan Services ("Aurora"), an entity related to LBHI that was involved in the mortgage loan origination and servicing business. Over the course of my career at Aurora, I held the following positions: Senior Financial Analyst; Assistant Vice President, Financial Planning and Analysis; Assistant Vice President, Secondary Marketing; Vice President, Contract Administration; Vice President, Loss Management; and Vice President Loan Administration.

6. Between 2005 and 2008, I developed and oversaw the loss management function at Aurora. In this role, I was responsible for establishing and developing the department tasked with identifying residential mortgage loans with the potential for breaches, and for reviewing such loans. During my tenure in this position, my team reviewed thousands of loans and resolved claims worth several billion dollars on behalf of Aurora, LBHI, and Debtor-developed securitizations. As such, I have direct and personal knowledge of the claims universe and remediation thereof within the Lehman residential mortgage platform.

7. In February 2009, I left Aurora and joined the residential mortgage group at LBHI as a Vice President. There I oversee loan repurchases, indemnifications, and related litigation, including residential mortgage-backed securities ("RMBS") litigation and downstream claims. In 2013 I was promoted to Senior Vice President.

8. In 2009, I helped to develop and manage the process LBHI used to evaluate and prosecute loan-level repurchase and indemnification claims for its whole loan portfolio. At that

3

time I also developed and oversaw the process LBHI used to validate claims from "up-stream" purchasers, such as the Trusts that acquired securitized loans as part of RMBS transactions.

9. In 2009, the Trustees filed proofs of claim for RMBS trusts against LBHI. I am familiar with this litigation and have been primarily responsible for managing the estate's valuation of the alleged damages suffered by the Trusts.

10. In December of 2014, this Court established a Protocol for loan-by-loan submission and review of the RMBS Claims at issue. At all times, I have been the primary business person at LBHI responsible for management of the Protocol. In carrying out my responsibilities, I have engaged in numerous meet and confers with the Trustees or their representatives regarding the Protocol, the submission and valuation of the RMBS Claims, and the documentation required by the Protocol.

## THE RMBS CLAIMS

11. The LBHI Debtors filed the chapter 11 cases on September 15, 2008 (the "Petition Date") and the Court entered an order establishing September 22, 2009 as the deadline to file proofs of claim against the LBHI Debtors (the "Bar Date"). Prior to the Bar Date, certain trustees, including the Trustees, submitted proofs of claim against certain of the LBHI Debtors seeking approximately $37 billion in repurchase claims. Such claims arise from approximately 406 Trusts and approximately 1.8 million mortgage loans, and are premised on alleged breaches of representations and warranties made by LBHI in connection with the securitization of certain loans into the Trusts. The Covered Loan Claims subject to the RMBS Settlement Agreement are a subset of the total universe of the alleged claims.

## PRIOR LITIGATION AND SETTLEMENT NEGOTIATIONS

12. On March 14, 2011, the LBHI Debtors filed the One Hundred Ninth Omnibus Objection to Claims ("First Insufficient Documentation Objection") (Docket No. 15008) seeking

4

to disallow and expunge certain claims on the basis that the RMBS trustees failed to provide sufficient supporting documentation to demonstrate breaches of the applicable representations and warranties. The First Insufficient Documentation Objection was just one of a number of objections filed based on the LBHI Debtors' view of similar issues. (*See, e.g.*, Docket Nos. 14492, 14493, 14494, & 16079).

13. On June 30, 2011, the Court held a hearing on the LBHI Debtors' motions to disallow some of the claims asserted by the RMBS trustees. (*See* 6/30/11 Hr'g. Tr. (Docket No. 18251)). At the conclusion of that hearing, the Court, among other things, encouraged the parties to resolve the claims asserted consensually. Despite the LBHI Debtors' efforts to resolve these claims without further court intervention, no agreement was reached.

14. On January 12, 2012, the LBHI Debtors moved to estimate the claims asserted by the RMBS trustees, including the Covered Loan Claims (Docket No. 24254), to establish a reserve for such claims under the LBHI Debtors' chapter 11 plan. Had the Court not permitted the estimation of such claims, the LBHI Debtors would have been required to establish a reserve based on the $37 billion face amount asserted. When the LBHI Debtors moved to estimate such claims, they determined that the value of the claims, if proven by the RMBS trustees, could fall between $1.1 and $2.4 billion. Accordingly, the LBHI Debtors proposed a reserve amount of $2.4 billion, the upper limit of their estimate of the value of the RMBS Claims. The RMBS trustees, nonetheless, objected to the proposed reserve amount, contending that the reserve should be no less than $15.3 billion. The parties ultimately agreed to establish a $5 billion reserve (the "RMBS Reserve") so the LBHI Debtors could continue to make distributions to their other creditors. The Court approved the RMBS Reserve on February 22, 2012 (Docket No. 25643, the "Reserve Order").

5

15. The Reserve Order required that the RMBS trustees and the LBHI Debtors participate in mediation to try and settle the allowed amount of the claims filed by the trustees, and the parties participated in their first mediation on July 31, 2012 (the "First Mediation") before the Honorable Gary McGowan to attempt to resolve the RMBS Claims. However, the parties were unable to reach an agreement.

16. Following the First Mediation, the parties had periodic discussions in an attempt to find ways to resolve the RMBS Claims.

17. On August 22, 2014, the Trustees filed a motion requesting that the existing RMBS Reserve be increased to $12.143 billion (Docket No. 46078, the "Trustees' Reserve Motion"). On October 15, 2014, LBHI filed an objection to the Trustees' Reserve Motion and also filed the *Cross Motion to Establish A Protocol to Resolve Claims Filed by RMBS Trustees* (Docket No. 46526, the "Cross-Motion"). On December 10, 2014, the Court granted LBHI's Cross-Motion and rejected the Trustees' Reserve Motion. (*See* 12/10/14 Hr'g Tr. (Docket No. 49007)).

18. On December 29, 2014, the Court entered an order (Docket No. 47569, the "Protocol Order"), approving the LBHI Debtors' proposed protocol (the "Protocol") to reconcile and determine the RMBS Claims.[2] The Protocol Order and Protocol established the following five-step process to address the RMBS Claims:

    a.     Steps 0-1: The Trustees were required to collect and submit claim files to the Plan Administrator by March 31, 2016;

    b.     Step 2: The Plan Administrator reviewed the claim files and determined whether the Trustees proved material breach;

    c.     Step 3: The Trustees were allowed to resubmit any claim files that were rejected at Step 2 with a rebuttal to allow the parties to further negotiate

---

[2] The term "RMBS Claims" is defined in the Protocol Order.

6

    whether the claim would be accepted or rejected by the Plan Administrator;

  d. <u>Step 4</u>: Any claims that remained unresolved after Step 3 would be submitted to one or more neutral claim facilitators, who would approve or reject the Plan Administrator's decisions regarding the remaining claims and would provide a proposed claim amount for any accepted claims.

  e. <u>Step 5</u>: Finally, the Court would approve agreed-upon claim amounts and the remaining claims would be subject to objection and allowance by the Court.

19. Following the establishment of the Protocol, the Plan Administrator and the Institutional Investors participated in another mediation starting in January 2015 before JAMS Mediator, David Geronemus (the "<u>Second Mediation</u>"). Once again, the parties were unable to reach an agreement.

20. Following the Second Mediation, the parties participated in the Protocol and, as before, motions were filed with the Court in an effort to resolve certain of the RMBS Claims. On April 28, 2016, the Plan Administrator filed a *Motion to (A) Disallow and Expunge Certain RMBS Claims and (B) Release Certain Related Claims Reserves*. (*See* Docket No. 52640 (the "<u>Expungement Motion</u>")). The Expungement Motion sought the disallowance and expungement of all RMBS Claims that had not been submitted to the Protocol. On June 27, 2016, the Court entered an order (the "<u>Expungement Order</u>") granting the Expungement Motion. (*See* Docket No. 53163). As part of the Expungement Order, the Court also reduced the reserve for the RMBS Claims that related to expunged SASCO Claims by $250 million. On July 11, 2016, the Trustees appealed certain aspects of the Expungement Order to the United States District Court for the Southern District of New York (the "<u>District Court</u>"). (Docket No. 53308). The Trustees did not appeal the Expungement Order as it related to the SASCO claims and the reduction of the reserve. On February 24, 2017, the District Court affirmed the Expungement Order. (*See* Docket No. 54934). On March 24, 2017, the Trustees appealed the District Court's affirmance.

7

21. On August 30, 2016, the Plan Administrator filed a Second Objection in Certain RMBS Trust Claims and Motion to Disallow and Expunge Certain RMBS Trust Claims for Insufficient Documentation (Docket No. 53620) (the "Insufficient Documentation Objection"). In the Insufficient Documentation Objection, the Plan Administrator sought to disallow certain RMBS Claims on the basis that the Trustees had failed to provide LBHI with certain required documentation in connection with the Protocol with respect to a number of Covered Loans submitted to the Protocol. The RMBS Trustees opposed the Insufficient Documentation Objection on September 29, 2016. This matter was continually adjourned as the parties continued to work toward reaching an agreement on the RMBS Settlement Agreement.

22. On October 26, 2015, while the Protocol was still underway, the Plan Administrator and the Institutional Investors entered into a settlement agreement whereby the Covered Loan Claims and the Transferor Loan Claims would be settled for $2.44 billion. This agreement was presented to the Trustees, but the Plan Administrator decided to withdraw the settlement offer as the settlement would not have been accepted by a sufficient number of Trusts. As both the Plan Administrator and the Institutional Investors were determined to resolve the Covered Loan Claims, negotiations continued, and on November 30, 2016, the Plan Administrator and the Institutional Investors entered into a prior version of the RMBS Settlement Agreement that is the subject of the 9019 Motion and proposed it to the Trustees. Following its proposal to the Trustees, the Plan Administrator, the Institutional Investors and the Trustees engaged in further negotiations regarding the terms of the proposed settlement agreement. Thereafter, on March 17, 2017, the Plan Administrator and the Institutional Investors entered into a modified form of the RMBS Settlement Agreement and submitted it to the Trustees. The Accepting Trustees have accepted the Settlement on behalf of the vast majority of the Trusts.

23. The key terms of the RMBS Settlement Agreement are summarized in paragraphs 32 through 45 of the 9019 Motion. I am familiar with the terms and provisions of the RMBS Settlement Agreement and believe that the 9019 Motion accurately summarizes those terms and provisions.

24. The RMBS Settlement Agreement is the culmination of extensive, good faith and arms' length negotiations, represents an exercise of sound business judgment on the part of LBHI and the other LBHI Debtors, is in the best interests of the estates and creditors, is supported by the Institutional Investors, and should be approved by the Court.

## THE IRIDIUM FACTORS

**A.  The Balance Between the Litigation's Possibility of Success and the Settlement's Future Benefits**

25. The RMBS Settlement Agreement is the result of hard-fought arm's-length negotiations between sophisticated parties. As part of these negotiations, the Plan Administrator, the Institutional Investors, and the Accepting Trustees each have concluded that determining the Net Allowed Claim as contemplated by the RMBS Settlement Agreement was reasonable and appropriate based on their own assessments of the possibility of success of the litigation and the benefits of the Settlement. The terms of the Settlement reflect the LBHI Debtors' reasonable assessment of the risk, as well as the substantial time and expense, of completing the Protocol (including protracted Step 5 litigation and attendant appeals), and the related impact on the LBHI Debtors' future distribution efforts, balanced against the benefits to all parties of more near term and certain resolution of such litigation. While the Plan Administrator believes that the Protocol ultimately could result in an amount substantially less than that asserted by the Trustees and even the $2.416 billion amount, that assessment is not without risk and the RMBS Settlement Agreement will allow the LBHI Debtors to determine the Covered Loan Claims sooner than the

Protocol's multistep process, save the substantial costs that would arise from completing that process, and eliminate the risk of appeal and expedite distributions to all creditors, which will conclude the LBHI Debtors' cases significantly sooner than contemplated under the expected timeframe of the Protocol.

26.  In the event the RMBS Settlement Agreement is not approved by this Court, the parties will have to continue operating under the Protocol, which would involve undertaking and completing Steps 3 and 4, and then proceeding to Step 5 to determine unresolved claims. Given the substantial difference in views regarding the validity of claims submitted under the Protocol, the Plan Administrator believes Step 5 would be necessary to judicially determine thousands of loan-level claims. This would entail a voluminous and protracted loan-file-by-loan-file litigation of the underlying loans that would take many years,[3] which could be avoided altogether by the Court's approval of the RMBS Settlement Agreement.

27.  Although the parties may have differing views as to the likelihood of success in this litigation, the parties agree that the proposed RMBS Settlement Agreement will provide substantial benefits to the LBHI Debtors, Participating Trusts, and other stakeholders relative to the alternative. Continuing under the Protocol will involve significant loan-by-loan litigation on the inclusion and exclusion of claims against the estate, which would be expensive, tax this Court, and delay recoveries for the other creditors while the litigation and near certain appeals played out.[4]

28.  The Covered Loan Claims involve a variety of issues, arguments, and analyses from both sides. In the context of numerous complex mortgage securitizations and the varied

---

[3] *See* Protocol (Docket No. 47569).

[4] Although Steps 1 and 2 of the Protocol produced substantial loan-level information that should have narrowed the number of RMBS Claims, the Trustees resubmitted nearly every claim in Step 3, without regard to the LBHI Debtors' rebuttal statements and evidentiary support.

10

loan products in each, the time and complexity of the litigation at issue, the difficulty inherent in predicting the success of either party with respect to any particular disputed issue, and the risks and unnecessary distractions associated with complex and protracted claims loan-by-loan litigation render the RMBS Settlement Agreement particularly reasonable and appropriate. The RMBS Settlement Agreement thus provides certainty to the LBHI Debtors with respect to one of the single largest set of outstanding disputed claims against the LBHI Debtors' estates and removes hurdles to completing the bankruptcy process for the LBHI Debtors.

29. Although the potential outcome of the Covered Loan Claims after a lengthy litigation process could be more or less than the Net Allowed Claim that will be determined pursuant to the Estimation Proceeding, the substantial cost and delay of completing the Protocol, including loan-level litigation in Step 5, and likely appeals, make proceeding with the Estimation Proceeding a more efficient and reasonable way to resolve these claims in the best interests of all parties, including the LBHI Debtors' estates and creditors.

**B.    The Likelihood of Complex and Protected Litigation**

30. The Covered Loan Claims, if not resolved by the RMBS Settlement, will continue in loan-by-loan litigation for many years through Step 5 of the Protocol. As previously explained, the litigation of alleged representation and warranty breaches is extremely complex, labor-intensive, costly, and time-consuming. The history of the Protocol and these cases has shown that the litigation and related process will be contentious and drawn out. The RMBS Settlement Agreement will avoid the drawn-out litigation that otherwise would be necessary to resolve the Covered Loan Claims. Indeed, instead of waiting many years to complete the Protocol, the RMBS Settlement Agreement is intended to estimate the Covered Loan Claims at their present value had the parties actually complete Steps 3 to 5 of the Protocol. Pursuant to the

RMBS Settlement Agreement, the Estimation Proceeding will conclude in approximately three weeks and will prevent the aforementioned years of protracted litigation.

31. In addition, the Plan Administrator will waive its appeal rights and the Trustees will waive their appellate rights, provided the Net Allowed Claim amount determined by the Court is not less than $2 billion. Although the Plan Administrator believes the Court could estimate the claims below $2 billion based on the results of the Protocol and the evidence to be adduced at the Estimation Proceeding, the Plan Administrator has agreed to seek estimation and allowance at $2.416 billion to achieve finality and minimize appellate risk.

32. In addition the Institutional Investors support this process and the settlement embodied in the RMBS Settlement Agreement, which informs the Plan Administrator's views regarding the appropriateness of the settlement.

C. **The Paramount Interests of Creditors**

33. In my view, the RMBS Settlement Agreement is beneficial to the LBHI Debtors' estates and their stakeholders because the proposed Settlement will resolve one of the single largest groups of unsecured claims that are outstanding against the LBHI Debtors, thereby providing predictability with respect to the LBHI Debtors' future distributions under the Plan. Moreover, the certainty of the proposed Settlement avoids the necessity of continuing to set aside substantial reserves for the potential payment of the Covered Loan Claims, which have delayed and reduced recoveries by other stakeholders. The RMBS Settlement Agreement also provides the framework for a prompt determination of the Covered Loan Claims in a fair and reasonable manner and before the Court most familiar with the LBHI Debtors and these types of claims. Furthermore, protracted loan-by-loan litigation of the Covered Loan Claims would burden the LBHI Debtors' estates with significant legal expenses, significantly beyond that which will be expended in an Estimation Proceeding. Even if the Plan Administrator were to defeat each

claim, the legal fees and other burdens of litigation would necessarily harm the LBHI Debtors' estates and reduce and delay Plan distributions to creditors. Thus, the Settlement is in the paramount interest of creditors.

**D.    Support for the Settlement By the Parties in Interest**

34.    The Trustees, the only parties with standing to litigate this action, entered into the Settlement Agreement and support the Estimation Process to be established by it. Approval of the RMBS Settlement Agreement (and the process which the agreement will establish) also is supported by the 14 Institutional Investors, who are holders, and/or authorized investment managers for holders, of over $6 billion in certificates in the Trusts regarding the Covered Loan Claims. In addition, none of the certificate holders have stated that the Estimation Process established by the Settlement Agreement is not fair or reasonable.

**E.    The Nature of the Releases to Be Obtained by LBHI Debtors' Officers and Directors**

35.    The RMBS Settlement Agreement releases the LBHI Debtors, their non-Debtor affiliates and the LBHI Debtors' officers and directors of any and all claims that were asserted, or that could have been asserted, by the Accepting Trusts or anyone claiming by or through the Accepting Trusts related to the Covered Loan Claims (except to the extent set forth in Article IV of the settlement agreement). This release provides certainty and finality to the LBHI Debtors' estates, and eliminates potential residual exposure from indemnification or other claims. As the releases are tied to the Covered Loan Claims and do not extend to indemnify the officers and directors from non-Covered Loan Claims in the LBHI Debtors' bankruptcy, this Iridium factor weighs in favor of approval.

**F.    The Proposed Settlement Agreement Satisfies the Remaining Iridium Factors**

36.    For the reasons stated above, I believe that the paramount interests of creditors are best served by approval of the RMBS Settlement Agreement. Moreover, as noted above, the

RMBS Settlement Agreement was negotiated in good faith and from arm's-length bargaining positions by sophisticated parties, and all parties were represented by experienced and sophisticated counsel.

## **CONCLUSION**

37.     Based on all of the factors described above, the Plan Administrator concluded that the RMBS Settlement Agreement is fair, in the best interests of creditors and falls above the lowest point in the range of reasonableness.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: June 30, 2017
Hutchinson, KS

_____
Zachary Trumpp