Hearing Date and Time: September 15, 2017 at 10:00 AM
Response Deadline: September 8, 2017 at 4:00 PM

CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3000
Franklin H. Top, III (admitted *pro hac vice*)

Attorneys for U.S. Bank National Association, as Trustee

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | CHAPTER 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | CASE No. 08-13555 (SCC) |
| Debtors. | (Jointly Administered) |

**RESPONSE TO THE PLAN ADMINISTRATOR'S OBJECTION TO CERTAIN CLAIMS FILED BY U.S. BANK N.A.**

---

NOW COMES, U.S. Bank National Association (*"U.S. Bank"*), by and through its undersigned attorneys, to respond to the Plan Administrator's Objection to Certain Claims Filed by U.S. Bank (ECF 55976). In support of this response (the *"Response"*), U.S. Bank states as follows:

On September 15, 2008, Lehman Brothers Holdings Inc. ("*LBHI*"), filed a voluntary petition for bankruptcy under Chapter 11 of 11 U.S.C. §101 *et seq*. (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*"). At various times thereafter, other affiliates, including SASCO, likewise filed for relief under Chapter 11 of the Bankruptcy Code (collectively with LBHI, the "*Debtors*"). On July 2, 2009, the Bankruptcy Court established September 22, 2009 as the bar date for filing claims against the Debtors (ECF 4271, the "*Bar Date Order*"), a mere 82 days from the order establishing the bar date.

U.S. Bank (or its predecessor, as Trustee) timely filed proofs of claim for claims arising under the Custodial Agreements and the NIMs (each, as defined herein). These claims are for fees and expenses incurred (and to be incurred) for U.S. Bank's continued service under agreements and contracts that have not been terminated. As such, the amount of the claim for each of the transactions covered by these proofs of claim changes over time.

**I. Custodial Claims.**

U.S. Bank serves as custodian (as such, the *"Custodian"*) for a number of residential mortgage backed securities (*"RMBS"*) transactions sponsored by one or more of the Debtors. For each RMBS transaction, one of the Debtors deposited mortgage loans (*"Mortgage Loans"*) into the relevant RMBS trust. For each RMBS transaction, there is one or more custodial agreements between the trustee for such RMBS transaction and a custodian, including the Custodian, whereby the custodian holds the mortgage loan files delivered by one or more of the Debtors for the transaction (each, a *"Custodial Agreement"* and, collectively, the *"Custodial Agreements"*). Attached hereto as Exhibit A is a true and correct copy of that certain Custodial Agreement dated as of January 1, 2004 by and between U.S. Bank National Association, as Custodian, and HSBC Bank USA, as Trustee for the Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-1, one of the transactions sponsored by the Debtors (the *"Sample Custodial Agreement"*).

Under the terms of a typical Custodian Agreement, the primary obligation of the Custodian is to hold certain documents with respect to mortgage loans held by the RMBS trust. These duties are described as follows:

> <u>Obligations of the Custodian; Ownership of Mortgage Loan Documents</u>. With respect to each Custodial File that is delivered to the Custodian or that come into the possession of the Custodian pursuant to this Agreement, the Custodian acknowledges and agrees that the

2

> Custodian is the custodian for the Trustee exclusively and that the Trustee of the Mortgage Loans has the legal right to, at any time and in its absolute discretion, direct, in writing, the Custodian to release any Custodial File or all Custodial Files to the Trustee or the Trustee's designee, as the case may be, at such place or places as the Trustee may designate. The Custodian shall hold each Custodial File received by it for the exclusive use and benefit of the Trustee, and shall make disposition thereof only in accordance with this Agreement and the written instructions furnished by the Trustee. The Custodian shall segregate and maintain continuous custody of all mortgage documents constituting the Custodial File in secure and fire resistant facilities in accordance with customary standards for such custody. The Custodian shall conduct, or cause to be conducted, periodic audits of the Custodial Files held by it under this Agreement in accordance with this Agreement and of the related accounts, records and computer systems, in such a manner as shall allow the Trustee to verify the accuracy of the Custodian's record keeping. The Custodian shall not be responsible to verify (i) the validity, legality, enforceability, sufficiency, due authorization or genuineness of any document in the Custodial File or of any Mortgage Loans or (ii) the collectability, insurability, effectiveness including the authority or capacity of any Person to execute or issue any document in the Custodial File, or suitability of any Mortgage Loan unless specified otherwise in this Agreement. The Custodian shall promptly report to the Trustee any failure on its part to hold the Custodial Files and maintain its accounts, records and computer systems as herein provided and promptly take appropriate action to remedy such failure.

Sample Custodial Agreement, Section 4.  The list of individual documents which make up the file are listed in Section 2, and include, but are not limited to, such documents as the original mortgage note, any guarantee, the original recorded mortgage, the original assignment of the mortgage loan, the original primary mortgage insurance policy and the title commitment and the original mortgage title insurance policy (each, a *"Mortgage Loan File"*).

With respect to the Custodian, it typically has obligations under each relevant Custodial Agreement to review each Mortgage Loan File and deliver a custodial certificate with respect to the contents of each Mortgage Loan File.  Further, the Custodian is generally required to deliver

3

loan files from time to time to the trustee as necessary - for example, to prosecute actions with respect to the relevant Mortgage Loans.[1]

In connection with many, if not all, of the Debtors' sponsored RMBS transactions, including those involving the Custodian, the obligation to pay for the services of the custodian falls upon LBHI or one of its affiliates. In the case of the Sample Custodial Agreement, Structured Asset Securities Corporation ("*SASCO*") is responsible for the ongoing fees and expenses. Section 6 of the Sample Custodial Agreement provides:

> Fees and Expenses of Custodian. All fees of the Custodian for its services under this Agreement, and any expenses incurred by the Custodian (including but not limited to counsel fees), will be promptly paid and reimbursed by the Depositor pursuant to a fee letter between the Depositor and the Custodian.

LBHI executed and presented to U.S. Bank a fee letter under which the fees and expenses of the Custodian for RMBS and certain other transactions were calculated, and is therefore aware of the fees and expenses generated under the terms of the relevant Custodial Agreements.[2] U.S. Bank will provide a copy of this fee letter to counsel to LBHI and SASCO prior to the hearing. The Term of the Agreement is set forth in Section 17 of the Sample Custodial Agreement. Section 17 of the Agreement provides:

> Term of Agreement. Unless terminated pursuant to Section 7, Section 8 or Section 16 hereof, this Agreement shall terminate upon the final payment or other liquidation (or advance with respect thereto) of the last Mortgage Loan or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan, and the final remittance of all funds due the Trustee under the Trust Agreement. In such event, all

---

[1]  In fact, LBHI itself may need the custodial files being held by custodians in support of any action it may take with respect to individual mortgage loans.

[2]  In some, but not all of the custodial arrangements (and not in the Sample Custodial Agreement), if LBHI or the relevant Debtor fails to pay the custodial fees and expenses of the custodian after a certain period of time (generally 60 days), the custodian has the right to seek payment of such fees from the transaction. The Custodian is not asserting claims with respect to transactions for which it has been paid from the relevant trust – benefitting the Estates by reducing their respective primary obligation to pay these fees.

4

>    documents remaining in the Custodial Files shall be released in accordance with the written instructions of the Trustee.

Thus, the duties and obligations of the Custodian under the Custodial Agreements are ongoing and will continue until the termination of the transactions, and therefore fees and expenses continue to accrue for most of the relevant custodial arrangements.

The damages to the Custodian under the Custodial Agreements as of the petition date are the present value of the anticipated fees and expenses due under each of the agreements until such agreements have terminated. Notwithstanding the fact that the Debtors are responsible for the fees and expenses of the Trustee under these agreements *into the future* (albeit discounted to present value), the Custodian has requested that the Debtors pay only the unpaid fees and expenses incurred, and have in fact provided the Debtors with the amounts due for each of those transactions earlier this year. This is yet again another benefit to the Debtors – paying the actual fees and expenses (and cutting off such fees and expenses at a date certain) reduces the obligation of the Debtors by permitting the Debtors to pay only those amounts actually incurred as opposed to including an estimation for fees into the future. One could argue that it would be most equitable to both sides to wait to liquidate these claims until the end of the case.

The Custodian is reviewing the list of custodial accounts to verify that LBHI or one of the other Debtors is in fact responsible for such fees and expenses, and reducing the claim by those transactions, which at this time, have *de minimis* claims.

The Debtors requested additional information with respect to these claims earlier this year, and most of the requested information is already in their hands. The average claim for the RMBS transaction even nine years after the petition date is modest on an individual trust basis. The Debtors are well aware of the costs of the Custodian by virtue of providing the fee letter

5

under which virtually all of the custodial relationships are governed. Requiring the Custodian to comply with an onerous set of criteria to permit the allowance of a claim for the relatively modest fees on a per trust basis,[3] and thereafter the Plan Administrator reviewing the documents produced by the Custodian in accordance with this request, does not make economic sense for either party. This is particularly true when the discount to these claims due to bankruptcy is considered. Had the Custodian filed these claims on an individual basis, query whether the Debtors would have simply allowed and paid them on an administrative basis. To the extent the Debtors feel the need to review the claims, an audit based on a limited number of individual trust claims seems more appropriate.

**II.     NIMs and certain CDO claims**

    **a.     The Expense Claim**

U.S. Bank (the *"Trustee"*) serves as trustee and/or administrator with respect to certain NIMs and RMBS related CDO transactions, which are transactions that hold securities issued by other RMBS or similar trusts. For example, the SASCO Net Interest Margin Notes, Series 2006-NC1 holds certificates representing a 100% interest in each of the SASCO Mortgage Pass Through Certificates, Series 2006-NC1, Class X and P. U.S. Bank serves as Trustee and Administrator under the terms of the Indenture by and among SASCO NIM Company 2006-NC1 as Issuer and SASCO ARC Corporation as Co-Issuer and U.S. Bank National Association as Indenture Trustee dated as of October 20, 2006 (the "*Sample Indenture*" a copy of which is attached as Exhibit B), the Administration Agreement entered into by the same parties, and a Sale and Collection Agreement dated October 20, 2006 among SASCO NIM Company 2006-

---

[3] While the fees on a per trust basis are modest, the aggregate fees are more meaningful.

6

NC1, as Issuer, Structured Asset Securities Corporation, as Seller and U.S. Bank National Association as Indenture Trustee and Administrator.

Under the terms of the Sample Indenture, the Trustee is entitled to be indemnified by SASCO and LBI. Section 6.07 of the Sample Indenture provides as follows:

> <u>Compensation and Indemnity</u>. As compensation for its services hereunder and under the Sale and Collection Agreement and any other Operative Agreement (including in its capacity as Note Registrar, Preference Share Paying Agent, Paying Agent and Securities Intermediary), the Indenture Trustee shall be entitled to receive the Indenture Trustee Fee (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) payable by Lehman Brothers Inc. together with reimbursement for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, payable by the Issuer, provided, however, that such reimbursable amounts may not exceed $100,000 during any Anniversary Year. Such expenses shall include the reasonable compensation and expenses, disbursements and advances, if any, of the Indenture Trustee's agents, counsel, accountants and experts. The Issuer agrees to cause the Seller and Lehman Brothers Inc. (who hereby agree) to, and the Seller and Lehman Brothers Inc. shall, jointly and severally indemnify the Indenture Trustee (including in its capacities as the Note Registrar, Paying Agent and Securities Intermediary) against any and all loss, liability or expense (including attorneys' fees) incurred by the Indenture Trustee in connection with the administration of this trust and the performance of its duties under the Operative Agreements to the extent provided in Section 6.07(c). The Indenture Trustee shall notify each of the Issuer, the Seller and Lehman Brothers Inc. promptly of any claim for which it may seek indemnity. Failure by the Indenture Trustee to so notify the Issuer, the Seller and Lehman Brothers Inc. shall not relieve the Seller and Lehman Brothers Inc. of its obligations hereunder. The Issuer shall or shall cause the Seller and Lehman Brothers Inc. to defend any such claim, and the Indenture Trustee, the Paying Agent and the Securities Intermediary may have separate counsel and the Issuer shall or shall cause the Seller and Lehman Brothers Inc. to pay the fees and expenses of such counsel to the extent provided in Section 6.07(c). Neither the Seller nor Lehman Brothers Inc. need reimburse any expense or indemnify against any loss, liability or expense incurred by the Indenture Trustee, the Note Registrar, the Paying Agent or the Securities Intermediary to the extent attributable to such Person's own willful misconduct, negligence or bad faith.

The bankruptcies of LBHI and SASCO have caused the Trustee to incur legal fees and expenses with respect to each of the NIMs and RMBS CDO transactions, including, but not limited to, the cost of reviewing relevant documentation to determine its relative rights, as Trustee, for each transaction vis-à-vis the Debtors, preparing and filing the Proof of Claim herein, monitoring the bankruptcy proceeding, and determining, with advice of counsel, how best to proceed.  Section 6.07(c) provides a waterfall for the payment of the expenses of the Trustee pursuant to the indemnification provision set forth above.  It provides:

> (c) Notwithstanding anything to the contrary in this Section 6.07, any reimbursements and indemnities to the Indenture Trustee pursuant to this Section 6.07 shall be payable, first, from the Note Payment Account prior to payments on the Notes; and second, to the extent not paid pursuant to clause first within 60 days of first being incurred, by the Seller and Lehman Brothers Inc. If any amounts shall be on deposit in the Note Payment Account subsequent to the payment of any reimbursement or indemnification amounts pursuant to clause second of the preceding sentence, then reimbursement for such payment shall be payable out of amounts on deposit in the Note Payment Account prior to payments on the Notes on any Payment Date first to the Seller and Lehman Brothers Inc., to the extent of the payment made by such entity to the Indenture Trustee pursuant to the preceding sentence.

While the Trustee is able to pay its past and ongoing expenses in connection with these transactions for trusts that have funds going through the note payment account, many of these transactions have yet to receive distributions on the underlying securities held by such trust. Accordingly, SASCO (the Seller) and LBI are jointly and severally responsible to the Trustee for these expenses.  A spreadsheet detailing these expenses, at a reduced rate, was sent to the Debtors in April, 2017 of this year.

The Trustee has settled the identical claim with LBI for an allowed claim of $361,000 (or roughly $6,118 for each of the 59 trusts), a discount to the "reduced" claim the Trustee incurred. The Trustee has made an identical offer to resolve these claims to the Debtors.

8

As reflected in Section 6.07(c) above, to the extent SASCO pays the expenses of the Trustee in accordance with the indemnity, SASCO would have the right to be reimbursed for these amounts from the first proceeds received into the note payment account.

**b. Other Claims set forth in the NIMs Proof of Claims.**

While the filed claims for these transactions included other theories of liability against the Debtors, the Trustee has only pursued claims for the expenses in the continuing administration of these trusts.

**c. The Reserve Maintained for NIMs Claims**

The Trustee is mindful that a reserve has been maintained for the claims it has asserted for NIMs transactions. The Trustee will agree to a reduction in the amount of the Reserve of over $8,000,000 to a new reserve amount of $1,000,000 pending the resolution of these NIMs proof of claims.

**III.    Claims 31047 and 31050.**

U.S. Bank filed each of these claims, as trustee, at the direction and request of the holder of certificates issued by the SASCO Mortgage Loan Trust 2007-RNP1 and Residential Loan Trust 2008-AH1. U.S. Bank has reached to the last known counsel for the holder and has not received a response. To the extent that the Debtors provide U.S. Bank with the applicable releases of these claims by the interested holder, U.S. Bank is willing to withdraw the two claims filed for these transactions.

**WHEREFORE**, subject to the above reduction of the reserve and the withdrawal of the claims in Section III above, U.S. Bank respectfully requests that the relief set forth in the Objection be denied.

Dated: September 8, 2017
       Chicago, Illinois

    Respectfully submitted,

    By: /s/ Franklin H. Top III

    Counsel to U.S. Bank National Association, as Trustee