Page 1



1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC.,

9

10          Debtor.

11

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

13

14                  U.S. Bankruptcy Court

15                  One Bowling Green

16                  New York, New York

17

18                  January 31, 2017

19                  10:05 AM

20

21

22

23   B E F O R E :

24   HON SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

1    Trial on Lehman's Objection to Claims of QVT (Doc #17468

2    Debtors' One Hundred Fifty-Fifth Omnibus Objection to

3    Claims)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach

```
 1    A P P E A R A N C E S :

 2    JONES DAY

 3         Attorneys for Debtors

 4         250 Vesey Street

 5         New York, New York 10281

 6

 7    BY:  LAURI W. SAWYER, ESQ.

 8         JENNIFER DEL MEDICO, ESQ.

 9         JAYANT W. TAMBE, ESQ.

10         RYAN J. ANDREOLI, ESQ.

11         REBEKAH BLAKE, ESQ.

12         SARAH EFRONSON, ESQ.

13

14    HOGAN LOVELLS US, LLP

15         Attorneys for QVT

16         875 Third Avenue

17         New York, New York 10022

18

19    BY:  JOHN D. BECK, ESQ.

20         DENNIS H. TRACEY, III, ESQ.

21         BEN LEWIS, ESQ.

22         ROBIN E. KELLER, ESQ.

23         BILL REGAN, ESQ.

24

25
```

Page 4

1                      P R O C E E D I N G S

2              THE COURT:  Good morning.

3          (A chorus of good morning)

4              THE COURT:  I'm just going to open the window --

5      the blinds to get -- so you can see the snow.

6              Feeling better today, Mr. Tambe?

7              MR. TAMBE:  Feeling wonderful, Your Honor.  Thank

8      you.  So is the frog.

9              THE COURT:  Sorry.

10             MR. TAMBE:  I said so is the frog.

11             THE COURT:  All right.  Ready when you are.  We

12     were up to CARB.

13             MR. TAMBE:  We were up to CARB.  Yeah.  So we'll

14     start with CARB, Slide 61.

15             So if you go to Slide 61, that's a snapshot from

16     one of their -- one of QVT's value -- internal spreadsheets

17     and that's how the transactions are reflected on that

18     spreadsheet.  They're called Auto Triple B, B spoke is the

19     name, and then they're divided up between QVT and the

20     Quintessence Fund.  So there's two QVT trades.  There's two

21     quintessence trades and those are the notional amounts.  I

22     think you've heard generally in round numbers it was an 80

23     million trade.  Those are the notionals and if you turn to

24     Slide 62 what you see is that really each CDS is packaging

25     these eight other underlying CDS, so CDS on those eight

Page 5

1    names that you see on Slide 62.

2              A couple of minutes on just what those underlying

3    securities are.  Those securities are automobile, financing,

4    receivables.  So just like --

5              THE COURT:  So it's like RNBS.

6              MR. TAMBE:  It's like RNBS.  Right.

7              THE COURT:  But just autos instead of palms.

8              MR. TAMBE:  Yeah.  And just like RNBS this is a

9    structured finance transaction that underlies the CDS.  So

10   consumer goes out and buys a car, finances it.  That piece

11   of paper, the financing piece of paper gets sold to a trust.

12             THE COURT:  Right.

13             MR. TAMBE:  It is now in a special purpose vehicle

14   --

15             THE COURT:  Yeah.

16             MR. TAMBE:  -- and that special purpose vehicle

17   collects payments from consumers, right, and then there's a

18   waterfall and really what you're talking about referencing

19   here is a particular slice of that --

20             THE COURT:  Yeah.

21             MR. TAMBE:  -- waterfall for each of these

22   securitizations.  So it's not GMAC debt.  It's not Ford

23   debt.  You know, it's financing that's been provided by GMAC

24   or FMCC sold to a special purpose vehicle, so it's

25   bankruptcy remote from GMAC and FMCC.  And really the cash

Page 6

1   flows of that structure are going to turn on --

2           THE COURT:  Whether or not --

3           MR. TAMBE:  -- how consumers pay --

4           THE COURT:  -- people make the car payments.

5           MR. TAMBE:  Exactly.  Right.

6           THE COURT:  Right.

7           MR. TAMBE:  And there are all sorts of bells and

8   whistles that the experts can get into about what kind of

9   protections and subordination elements there were in these

10  deals, and exactly what the risk characteristics were of

11  each of these slices.  Right.

12          But now we come back up to CARB.  What CARB is is

13  a CDS on these eight names.  So it's a basket of underlying

14  CDS.

15          One thing to note on Slide 62 is at inception

16  that's what the credit ratings were for each of these

17  issuances.  As of 9/15 the three highlighted ones show an

18  upgrade.  The ratings have been increased.  Right.  And you

19  may (indiscernible) that and say, wait a second, these are

20  Triple B auto consumer receivables, what causes these to get

21  upgraded.

22          And part of what you're going to hear is this was

23  -- these were seasoned deals.  There was a history of these

24  deals and there were cash flows, and every month the

25  servicer reports would come up and tell you what the cash

Page 7

1   flows are.  There are models that you can run in INTEX which

2   is a bond modeling cash flow modeling software available to

3   QVT and everyone else in the market.

4           Those particular tranches were doing pretty well,

5   so much so that they got upgraded.  And that's what the

6   ratings were for those three bonds as of 9/15.

7           If you go to Slide 63 it tells you a little bit

8   about how these were documented, and I'm sure we'll walk

9   through the confirm and the relevant parts of the

10  confirmation.  But these are documented as if the parties

11  have entered into eight separate CDS on the basket.  And

12  you'll see that other counterparties who did go out to the

13  market and seek market quotations sought market quotations

14  on an all or nothing basis or the eight slices.

15          We're not suggesting the slices could be traded

16  separately, but in terms of how they were documented there

17  was a clear direction in the documents that this is a

18  collection of eight transactions bundled into one.

19          And that obviously has some relevance when you

20  start talking about notional sizes and what's the exposure

21  and what are you really exposed to, is it a single $80

22  million trade or is it really slices, eight different slices

23  and each of the four transactions are different notional

24  amounts, five million, ten million, two million, for

25  purposes of valuation especially when you don't seek market

Page 8

1     quotations on these because they -- these are part of the

2     44.  They didn't go out and get market quotations on these,

3     and they came up with a completely different valuation

4     methodology to figure out what number to put on these deals.

5              These questions become relevant, what's a

6     reasonable way of looking at the deal.  Well, let's start

7     with the document and the document tells you this is eight

8     separate transactions within each of the trades.

9              Slide 64.  This is an e-mail from February of

10    2008, so long before the bankruptcy, from Mr. Choo (ph) to

11    John McNiff (ph) at Lehman.  Just a few points to make on

12    this.

13             Again, you're going to hear a lot about how QVT

14    blindly accepted Lehman's value somehow.  Here's a question,

15    does your crack (sic) research team have any actual curves

16    on these things.  So he's saying, give me curves on these

17    things.

18             I tried running some stuff on INTEX.  It looks

19    like maybe three bonds are bullet proof (indiscernible).

20    I'm not sure what Mr. Choo meant by that.  He can tell you.

21    But the reason I bring this to your attention is he knew

22    INTEX was out there.  You could run these deals and model

23    these deals on INTEX.  As far as we know he didn't even try

24    to do that in connection with valuing these trades post-

25    bankruptcy.

Page 9

1       (Pause)

2           I think we've covered the basic points on 65.

3   There's four different positions.  The total notional is 80,

4   but it's really sliced differently.  First of all, it's

5   sliced by trade into different notional amounts.  And then

6   in reality each trade is a bundling of eight transactions.

7           As of 9/15 on their books and records had a value

8   of 16.79 million.  That's the 9/15 valuation that's used for

9   the 9/16 collateral call.  So that's the book and record --

10  books and records that I'm referring to.  They didn't seek

11  market quotation on CARB.  They adopted a new methodology

12  which they did not test.  All right.  They just -- and we'll

13  get to the methodology.

14          They just -- it's a brand new methodology, hadn't

15  used it before, and didn't test to see if it made sense

16  based on the history of the pricing of these trades and how

17  the trades have performed over time.  And the change in

18  valuation is about $20 million, all right, from the book

19  value to the claim number.

20          There were other counterparties that were able to

21  get market quotations, so we'll talk about fun day, so it's

22  name has been redacted for confidentiality.  Same side of

23  the market as QVT, smaller notional size, but they went to

24  the market and they got quotes from three dealers.  Standish

25  Mellon -- they didn't insist on confidentiality so we know

1   their name -- opposite side of the market.  They also went

2   out and got market quotes.  There were a total of five

3   different dealers that provided these two counterparties

4   with market quotations.  I think there's an overlap of one

5   name.  That's why it's five and not six.

6          Let's get to QVT valuation methodology.  So they

7   start with Lehman's valuation on 9/12/08 and you can say in

8   one sense what they're trying to do is roll that forward for

9   market impact.  If that's all they said, I would say not a

10  bad approach.  That makes sense.  You see where the market

11  was on 9/12 and you roll it forward.  But they don't roll it

12  forward to 9/15.  They roll it forward to 9/19 because they

13  look at how much -- and I'm putting GMAC in quotes, both air

14  quotes and quotes on the Slide 67 because we really don't

15  have any records showing what GMAC they were talking about.

16  There are no screenshots from QVT saying this is the GMAC

17  CDS that we were looking at.

18          THE COURT:  As opposed to big GMAC.

19          MR. TAMBE:  Big -- I --

20          THE COURT:  Some other --

21          MR. TAMBE:  Subordinated senior, what bond, what

22  tranche, or GM, we don't know.

23          THE COURT:  Okay.

24          MR. TAMBE:  And nor could they identify that for

25  us.  We've I think reverse engineered what we think they

Page 11

```
 1    were referring to.  But, again, in terms of process and

 2    reasonableness, no records of this, just GMAC widened by 15

 3    points over this entire week period.

 4              So they add 15 points for that.  So they start

 5    with the Lehman number and they say, first of all, the first

 6    assumption is GMAC is a perfect proxy even though Ford Motor

 7    Credit is also part of this deal.  No analysis of Ford.  Mr.

 8    Choo who was intimately familiar with the product should

 9    have known that.  You can fairly conclude he did know that,

10    but ignored the Ford aspect.

11              And let's just halt there for a second because

12    GMAC is a little different than Ford Motor Credit.  All

13    right.  Their financial condition was different of the Ford

14    and GM.  You're going to hear a lot about there is a

15    correlation because if GM goes under people who bought GM

16    cars may not get service so they may default.  So there

17    ought to be some correlation between GM risk, the

18    manufacturer risk and the GMAC risk and the auto receivables

19    risk.

20              I'll tell you two things.  That analysis were

21    never -- was never done at the time.  So all of that is

22    going to be post hac and, frankly, no such analysis has ever

23    been presented by QVT.  And even if you just focused on GMAC

24    you would be ignoring the F -- the Ford Motor side of the

25    equation.
```

Page 12

1          The other thing that GMAC did which got GMAC into

2     a lot of trouble is they went into the subprime mortgage

3     business.  So not only were they financing cars, they were

4     financing subprime mortgages.  So if you're looking at GMAC

5     you're including a bunch of stuff that's not correlated with

6     and certainly not based on auto ABS receivables.

7          And if there was some thoughtful process and a

8     rational -- and a rationale for doing so, there's no

9     evidence of that.

10          Slide 68.  I think we've covered these points in

11     terms of what happened.  They were intimately involved with

12     the development of CARB.  You're going to see Mr. Choo was

13     involved in that.  It relied on Lehman's prices.  No

14     evidence of material disagreements where they're saying,

15     hey, Lehman, you just got this wrong.  You're not

16     calculating this the right way.

17          And, frankly, Mr. Choo begins with Lehman's

18     valuation as of 9/12 as a starting point.  It's what he does

19     next that we have the issue with, which is this 9/12 to 9/19

20     analysis.  Clearly using Ford Motor Credit would have

21     resulted in a lower valuation even if you accept the week

22     long, which we don't.  Right.  But you really should be

23     looking at the move from 9/12 to 9/15.  After 9/15 all sorts

24     of other factors are affecting the GMAC spread.

25          And they have the data from 9/12 to 9/15, and this

Page 13

1   is what we believe they had.  Right.  They had Broka runs.

2   We've talked about BROKA (ph) runs in discovery in this

3   case.  Slide 70, this is a BROKA run from JPMorgan on GMAC

4   and FMCC.  And that kind of shows you day by day on GMAC

5   five-year CDS what the bid offers were that were being

6   quoted by Ford Motor Credit.   And you can see the change

7   from 9/12 to 9/15.  It goes from a 29/30 bid offer on GMAC

8   to a 32/34.  That's about a three to four point move.

9   Right.

10          But then if you go to the bottom of the week

11   you're looking at 44 to 45.5 and that's where you have the

12   15 point move.  And you can see how much of that happens

13   17th, 18th, 19th, long after the Lehman bankruptcy, long

14   after they have terminated the contracts and they've fixed

15   the point in time for the valuation of those contracts.

16          THE COURT:  And what's the stated rationale for --

17   their stated rationale for picking the 9/19 date

18   particularly if these were -- hadn't gone out, not

19   particularly, but and these hadn't gone out for any market

20   quotations, correct?

21          MR. TAMBE:  I believe -- as I understand the

22   rationale it is simply that they had a large position in

23   this basket, that there was a liquidity in the market --

24          THE COURT:  And that they would not have been able

25   to replace --

Page 14

1          MR. TAMBE:  They would not have been able to

2     replace.

3          THE COURT:  I see.

4          MR. TAMBE:  Some combination of those -- I believe

5     that's what it is.

6          THE COURT:  Okay.

7          MR. TAMBE:  Mr. Choo will tell you exactly what

8     his thought --

9          THE COURT:  Okay.

10         MR. TAMBE:  -- process was.  I do know there was

11    very little analysis done by Mr. Choo before he picked 15

12    and then another 15 on top.  But we're talking about the

13    first 15, which is just the move from Friday to -- from

14    Friday to Friday.  Right.

15         THE COURT:  And then this other column shows Ford

16    Motor --

17         MR. TAMBE:  Ford Motor Credit.  Right.

18         THE COURT:  -- Credit.

19         MR. TAMBE:  So lower spreads, similar move by the

20    three point move, three or four point move from the 12th to

21    the 15th, but not as much of a move from Friday to Friday.

22    Available to them, not used.

23         Let's go to 71.  There's a -- so I'm not sure if

24    this is double counting or more of the same, but the idea

25    is, well, not only do we get the 15 point move, but we

Page 15

1    should also get another 15 points on top of the Friday --

2    the prior Friday's close for a liquidity adjustment because

3    $80 million is such a big number.  It may be a big number in

4    the CARB market, which is a trade on those eight names, but,

5    again, we're talking about a derivative which is really

6    comprised of eight separate derivatives which are based on

7    an underlying which has cash flows, can be modeled, can be

8    priced.  There's no basis for saying that there should be a

9    15 point charge, especially when you look at those

10   individual slices of what they were really valuing, the 32

11   slices, eight slices in each deal, four trades.

12           If you -- and let's not forget the charges are not

13   really the benefit of their bargain.  That's what a dealer

14   gets paid.  But if you are going to add some charge to a

15   move from the Friday to the Monday, we've done that math.

16   We think it should be one point.  You'll have Mr. Bruce talk

17   about why that's an appropriate adjustment for this

18   instrument at that point in time.

19           And what we've broken out is using their

20   methodology by starting with Lehman's Friday mark, first if

21   you adjust for just the Friday to Monday move on Slide 70,

22   that's about a $9.2 million difference.  And then on Slide

23   71 if you adjust for the additional liquidity adjustment

24   that's another $11.2 million difference.

25           So you can -- to remove those two overreaches on

1    their part, unreasonable assumptions on their part, you can

2    roll the 9/12 price forward to 9/15 and get a valuation.

3              Now we heard a lot from both Professor Flider (ph)

4    and Dr. Nicholeski (ph) about, well, that can't possibly be

5    right because when you do that analysis which is starting

6    with Mr. Choo's starting point and rolling it forward to

7    9/15 you end up with a value that's lower than the last

8    price offered by Lehman sometime in August.  Right.  And Dr.

9    Flider says it doesn't require a PhD in economics to explain

10   -- and he was quite emphatic about it.

11             Can you play the clip?

12             So I asked him about this and I got a lecture.

13        (Clip of video recording played back from 10:24 a.m. to

14   10:27 a.m.)

15             MR. TAMBE:  And Dr. Nicholeski says something

16   quite similar.  Right.  And I agree with Professor Flider

17   for a lot of it.  Right.  There are a lot of things that

18   happened after the Lehman bankruptcy that caused things to

19   get worse and credit spreads to widen and markets to go into

20   freefall.  But I wish he had used his PhD before making this

21   conclusion about the valuation because consistent with his

22   PhD work he probably would have looked at some data and he

23   would have looked to see what really happened in the

24   markets, how did the markets behave and not just for some

25   generalized period after Lehman bankruptcy, what happened on

1   the 15th.

2           So let's turn to Slide 72.  That's using Bloomberg

3   pricing on the value of the underlying car bonds over this

4   time period from August 21 through September 19th.  Yeah,

5   they do fall off, but not on 9/15, not on 9/16 a little bit.

6   They really fall off a cliff between 9/18 and 9/19.  Right.

7           So, again, if the -- the goal here is valuing

8   these transactions on 9/15.  The market reacted the way the

9   market reacted.  That's what the data shows.  This was --

10  this wasn't isolated.

11          Let's go to Slide 74.  This is the ABX.  So the

12  ABX is also part of the 44 trades that they did not seek

13  market quotations on.  But what's the ABX?  It is an index

14  traded much more widely than CARB, CDS on subprime home

15  mortgage securitizations, okay, and it's got different

16  vintages post-7/06 and different tranches.

17          What we've highlighted in yellow are for Triple

18  A's and Triple B's ones that actually went up in value from

19  August 21 to September 15th.  So, again, eye of the storm,

20  worst of the worst, that's the market reacting and you have

21  to look at what products you're dealing with and what

22  happened to those products.  I'm not suggesting these other

23  -- the point I'm making is responding --

24          THE COURT:  It's illustrative.

25          MR. TAMBE:  It's illustrative of Professor

Page 18

1    Flider's view which I think is a very commonly held view.

2    Right.  Things went to hell so obviously the claim value

3    must rise.  Well, not so fast.  Let's look at what -- the

4    days that we're looking at, what the products are and what

5    happened in those products.  Let's use the data.

6            And it may well be, I don't think that's the case,

7    it may well be that these auto securitizations faltered,

8    but, in fact, they didn't.  Right.  And we're not looking at

9    that.  We're not making that part of the analysis.  We're

10   looking at what was the state of the market on 9/15.

11           All right.  Let's go to the PCDS.  Go to Slide 77,

12   please.

13           So one thing that might be helpful for this, if we

14   can just compare this slide to Slide 66 from the QVT deck.

15   I think we have a PDF of the QVT deck.  And it's -- so we're

16   off of the printed.

17           THE COURT:  66 in their deck?

18           MR. TAMBE:  Yeah.  In -- 66 in their deck.  Yeah.

19   In the hard copy of --

20       (Pause)

21           THE COURT:  Okay.

22           MR. TAMBE:  SO just a few points of comparisons so

23   we can see what's on and what's not.

24           So the first thing that you might notice that is

25   QVT has 60 long PCDS positions.  And we say there are 62

1    PCDS transactions and we're both right because there, in

2    fact, are 60 longs, but what they do not analyze in their

3    PCDS section are the two shorts where they sold us

4    protection.  They sold Lehman protection.

5              There's a line item on our Slide 77 for CVS and

6    you'll see that.  That's (indiscernible) so it's down.  It's

7    about 8.8 million.  It's a negative number.  Do you see

8    that?

9              THE COURT:  Yes.

10             MR. TAMBE:  Yeah.

11             THE COURT:  That's the drug store?

12             MR. TAMBE:  Yeah.  That's the drug store.  And

13   there's a preferred security off of that and they have that

14   position.  Valued it completely differently, right, so this

15   model of taking the bond price and hundred minus the bond

16   price, not used with CVS and not part of their analysis.

17             THE COURT:  All right.

18             MR. TAMBE:  So that's the 60 versus 62.

19             Staying with our Slide 77.  You heard a lot about

20   the notional amount of these trades being $380,000 roughly,

21   right?  That's all the trades including the two short

22   trades.  Slide 66 on their deck they talk about a 371

23   million notional.

24             But what's missing from that diagram is the

25   individual trades.  What are the notionals of the individual

Page 20

1    amounts.  This isn't a single, this isn't a basket trade.

2    These are separate transactions, different line items,

3    different issuers, different PCDS.  There isn't a single

4    block of 371 million that needs to be traded by anyone

5    anywhere.

6              So if you look at our Slide 77 you'll see what the

7    notionals actually were.  And most of them were less than

8    $25 million.

9              THE COURT:  So unlike the CARB these did not have

10   -- these would not go out as blocked.

11             MR. TAMBE:  No.  No.  Absolutely not.  They're

12   absolutely separate --

13             THE COURT:  Separate --

14             MR. TAMBE:  -- transactions.  Right.

15             So, I mean, you -- because you heard a lot about

16   sort of that this location and illiquidity in the PCDS

17   market and how could you possibly move if a dealer wanted to

18   move.  You heard a lot about what a dealer might or might

19   not do.  Right.  I don't think you're going to hear from any

20   dealers on their side, but you heard a lot of speculation

21   about how a dealer might price this and could you possibly

22   move 371 million notional.

23             THE COURT:  But did they put a -- these went out

24   from market quotation?

25             MR. TAMBE:  It did.

1              THE COURT:  And they went out one by one?

2              MR. TAMBE:  They went out one by one on a

3     spreadsheet so there were --

4              THE COURT:  On a spreadsheet one by one.

5              MR. TAMBE:  Yeah.

6              THE COURT:  But they didn't have to -- if you

7     wanted to bid -- if you wanted to transact you could

8     transact for AB and Ambro --

9              MR. TAMBE:  Yeah.

10             THE COURT:  -- 9 million --

11             MR. TAMBE:  You didn't have to do --

12             THE COURT:  -- notional.

13             MR. TAMBE:  -- all or nothing.  No.  You could do

14    line by line.

15             THE COURT:  Okay.

16             MR. TAMBE:  And I believe they got no responses

17    back on PCDS.

18             So you heard a lot about the 371 being a very

19    large number.  But -- and you heard a lot about how, well,

20    dealers would go out in the market and use preferred

21    securities and short those as a way of hedging.

22             Well, the preferred equity issuance market is

23    massive.  So I've wrote a number down there.  It's in the

24    tens of billions.  Right.  And we have a couple of

25    screenshots on Slide 79 and these -- they're Bloomberg, but

Page 22

1    you would get this from the SEC reports for Wells Fargo and

2    Citi, the year end 12/31/2008 report.  And towards the

3    bottom you'll see a reference to total liabilities in the

4    WFC piece, preferred equity 31,332.

5              THE COURT:  Yes.

6              MR. TAMBE:  Okay.  That's 31 billion preferred

7    equity issuance just for WXC.  Citi preferred equity 70.664.

8    Again, that's 70 billion 664.  That's just two of the

9    issuers.

10             So there's a lot of preferred equity out there.

11   You don't see all of it trading because some of it is

12   institutional and doesn't trade on the stock exchange.  The

13   so-called retail preferred equity does trade on markets and

14   you can get data on that.

15       (Pause)

16             And you might hear about some of the data from

17   them, but I don't think you're going to hear about all of

18   the data from them about the size and liquidity in that

19   market the week of 9/15.

20             I'm going to go to Slide 80.

21             So this is -- the change in value from their own

22   September 15th valuations to the claim valuation is quite

23   large.  It's $120 million difference.  You will see on

24   Slide 66 of their deck, for reasons that remain unclear to

25   me they keep focusing on this percentage of notion.  We've

1    come up with a value of 36 percent of notional is what they

2    say.

3           If you look at how much that changed just for

4    them, as of 9/15 on their books and records that value was

5    about 3.9 percent of notion.  So they've gone from a

6    valuation -- so if that's a relevant metric to compare to

7    notional they've gone from 3.9 of notional to 36 percent of

8    notional.  That's close to ten times.  It's less than ten

9    times, but it's close to ten times.  (Indiscernible).

10   That's about a thousand percent increase.

11          Let's go to Slide 81 in our deck.

12          So now we're going into the area that was

13   discussed in the motion in limine and this, I think, is fair

14   game because this is the data.  This is how many PCDS

15   transactions did Lehman have, what were the characteristics,

16   what were the notionals:  261 transactions, 160 would be

17   sole protection which is like what we did with QVT.  We sold

18   them protection, and 101 where we bought protection, and

19   those are the notional amounts.

20          You heard about a spreadsheet that was used at the

21   deposition of Jonathan Fox.  So let's just rewind that as

22   to what that spreadsheet was about.  And they said, well, it

23   was produced the night before the deposition.  Right.  We

24   had produced starting in November 2015 44 gigabytes, 44

25   gigabytes of derivatives questionnaire and other data from

Page 24

1   other counterparties.  And we supplemented that with PCDS

2   specific information long before Mr. Fox's deposition.

3        We didn't expect Mr. Fox to memorize 44 gigs of

4   information.  It was a summary sheet where we had gone in,

5   the estate had gone in, extracted the PCDS information from

6   all of those derivatives questionnaires and prepared a

7   spreadsheet so you would have a listing of here are the PCDS

8   transactions.  And that's Exhibit 5160.

9        Can we pull that up?

10        And let's just focus on the data part.  I'm not

11   going to go the valuation.  That's the last column.  We're

12   just going to talk about the data, who are the

13   counterparties and what are they doing.

14        So the counterparties are in Column C and let's

15   just scroll down slowly down Colum C.  You had Deutsche

16   Bank.  You had Goldman.  You had Hartford Life, Merrill

17   Lynch, SQVT, redacted once, Toronto Dominion Bank.

18        So you certainly have dealers who are buying and

19   selling protection to Lehman.  SO let's now reduce this just

20   to people who are on the same side of the market as they

21   are.  So let's sort this so we're looking only at the sales.

22   It will be a few columns over.  It's Column J.

23        Okay.  Now let's go back again to see who the

24   counterparties are.  So these are just the counterparties

25   that Lehman has sold PCDS protection to:  (Indiscernible),

Page 25

1    Citibank, Deutsche Bank.  Let's keep going up.  So you have

2    a few hedge funds coming up now, Elliott & Associates.

3    You've got a life insurance company.  You've got Hartford,

4    back again to a dealer, Merrill Lynch, looks like

5    (indiscernible).  Let's go up to Platinum, another hedge

6    fund, I think now deceased.    QVT --

7              THE COURT:  Platinum?

8              MR. TAMBE:  Platinum, yeah, I think that's the

9    same Platinum.

10             THE COURT:  Deceased here.

11             MR. TAMBE:  Yeah.

12       (Laughter)

13             MR. TAMBE:  I think it's the same Platinum.  I'm

14   not sure.

15             THE COURT:  Yeah.  It's here.

16             MR. TAMBE:  And then Toronto Dominion Bank.

17   Right.  So what you see is who are the folks, same side of

18   the market as QVT.  You heard a lot about how dealers would

19   behave and how dealers would react and how they would price

20   PCDS.  You saw pages and pages of analysis.  Well, if QVT

21   were to try and replace the (indiscernible) they would face

22   a dealer and that dealer would then go and sell short PCDS

23   and they would charge you 40 points up front and all of

24   that.  Right.  None of that analysis was done at the time,

25   by the way.  It's all post hac.

Page 26

1                    Here's what dealers facing Lehman actually did.

2     Right.  I'm still not going to a valuation because you've

3     told me I can't go to the valuation.  But if you want to

4     know how dealers facing Lehman actually behave with respect

5     to PCDS, same side of the market as these guys, the data is

6     there.

7                    THE COURT:  Well, explain it to me, though.  If

8     I'm not looking at the valuation --

9                    MR. TAMBE:  Right.

10                   THE COURT:  -- what is this -- what is this

11    telling me?  These are parties who were selling protection.

12                   MR. TAMBE:  Who bought protection from Lehman.

13                   THE COURT:  Who bought protection from Lehman.  So

14    these parties were similarly situated to QVT.

15                   MR. TAMBE:  In the sorting I've gotten rid of the

16    buys.  So this is both buy and sell information.  What

17    you're looking at right now is just the sales.  All right.

18    So the same side of the market as QVT.

19                   THE COURT:  I'm sorry.  I'm just --

20                   MR. TAMBE:  Yeah.

21                   THE COURT:  -- I'm still not --

22                   MR. TAMBE:  I should slow down.  I --

23                   THE COURT:  I'm still not --

24                   MR. TAMBE:  -- can slow down.

25                   THE COURT:  -- with you.

Page 27

1          MR. TAMBE:  Yeah.

2          THE COURT:  These are parties who bought -- you

3    said sells, but they bought protection.  The sale is from

4    Lehman.

5          MR. TAMBE:  From Lehman's perspective.

6          THE COURT:  Okay.  But they --

7          MR. TAMBE:  Lehman sold the protection.

8          THE COURT:  -- bought protection --

9          MR. TAMBE:  Yeah.

10         THE COURT:  -- from Lehman.  And -- but what is

11   this -- what is the -- if I'm not looking at the value what

12   is this showing me?

13         MR. TAMBE:  It's showing you, first of all, that

14   there are lots of other parties in the market because

15   they've said they were somehow uniquely situated.

16         THE COURT:  Okay.

17         MR. TAMBE:  They weren't unique.  It's also giving

18   you some indication of what dealers were doing in the market

19   because you've heard a lot about how dealers would respond.

20   In fact, their entire valuation methodology --

21         THE COURT:  Wait.  Explain that.  I don't

22   understand that.

23         MR. TAMBE:  Right.  So let's --

24         THE COURT:  What --

25         MR. TAMBE:  -- go to that slide.

Page 28

1              THE COURT:  What does this --

2              MR. TAMBE:  Let's go to --

3              THE COURT:  What does this show -- and --

4              MR. TAMBE:  Sure.  So let's compare two things.

5     Let's go to their slide deck starting on Slide 77.  And on

6     77 they -- that's their formula.  That's, in fact, what Mr.

7     Choo did, par minus value of preferred.  Okay.

8              THE COURT:  Uh-huh.

9              MR. TAMBE:  What follows after that is an analysis

10    that's post hac.  That's the analysis done long after the

11    fact to show why that makes sense.  And I will get back to

12    why Mr. Choo's methodology --

13             THE COURT:  Right.  So this was --

14             MR. TAMBE:  -- doesn't make sense.

15             THE COURT:  -- the whole concept of you couldn't

16    do an actual transaction so you would have to get a short

17    position in the underlying --

18             MR. TAMBE:  Right.

19             THE COURT:  -- securities, right?

20             MR. TAMBE:  Right.

21             THE COURT:  Okay.

22             MR. TAMBE:  And then you were told a dealer

23    wouldn't do that kind of transaction without charging you a

24    lot of points up front.  That's what Slide 80 is about.

25             THE COURT:  Okay.

1            MR. TAMBE:  Right.  You have dealers who are in

2    the market who are facing the same type of risk that QVT is

3    facing.  They're not valuing their positions using anything

4    like this.

5            MR. TRACEY:  I --

6            MR. TAMBE:  And there's a --

7            MR. TRACEY:  I'm going to have to --

8            THE COURT:  Okay.

9            MR. TRACEY:  -- object.  We're going right to the

10   question of how --

11           THE COURT:  Hold on.  Well, that's why I --

12           MR. TRACEY:  I apologize.

13           THE COURT:  -- keep asking.  That's why -- no.

14   That's fine.  I just -- that's why I keep asking what I'm

15   looking at other than here were entities similarly situated

16   to QVT with respect to PCDS.  But I still don't understand

17   what data I'm look -- what I'm looking at --

18           MR. TAMBE:  Sure.

19           THE COURT:  -- not valuation.  What am I looking

20   at?  Is that what you mean, Mr. Tracey?  I --

21           MR. TRACEY:  Yes.  That's exactly, Your Honor.

22           THE COURT:  Okay.

23           MR. TRACEY:  Other than trying to make the point

24   that they valued it differently I don't see what the point

25   of this entire --

Page 30

1              THE COURT:  Well, I guess --

2              MR. TRACEY:  -- line of --

3              THE COURT:  -- what I'm trying to figure out is

4       are you showing that they got quotes.  I --

5              MR. TAMBE:  I'm not showing they got quotes.

6              THE COURT:  Okay.  So --

7              MR. TAMBE:  Here's what I'm going to.  We know

8       what QVT did at the time.  They just did par minus the bond

9       price.

10             THE COURT:  Right.

11             MR. TAMBE:  You now have this extended explanation

12      backing into why par minus bond price is somehow reasonable,

13      and it's all based on this hedging theory where the dealer

14      is going to charge you a very large amount upfront to hedge.

15      Okay.  No dealer is going to take the stand and explain

16      that's how they would have done a transaction.

17             Professor Flider who has never traded any credit

18      derivative in his life is going to give you the economic

19      theory of hedging, but he has no possible way of knowing how

20      a dealer would have actually hedged this risk.

21             No one from their side has a basis for explaining

22      to you what's on these slides.  This is theory that's not

23      supported by any evidence that we've seen in this case.

24      Right.

25             THE COURT:  Okay.

Page 31

```
 1              MR. TAMBE:  But we do have some evidence.  It may

 2   be of marginal or limited relevance, some of it highly

 3   relevant.  Right.  What's highly relevant is that they were

 4   dealers in the same position as QVT.  That's just a fact.

 5   They had positions facing Lehman where they were in the same

 6   position as QVT.

 7              THE COURT:  And?

 8              MR. TAMBE:  And they valued their transactions and

 9   they put a value on it.

10              THE COURT:  Okay.

11              MR. TAMBE:  That value may be a high value or a

12   low value.

13              THE COURT:  Right.

14              MR. TAMBE:  We're going to leave that off

15   completely.

16              THE COURT:  Yes.

17              MR. TAMBE:  Right.  We're going to go to the other

18   place that QVT has gone a couple of times, percentage of

19   notion.  Right.  They're saying percentage of notional is

20   somehow relevant.  Thirty-six percent of notional is a

21   measure that you should take into account.  It's right there

22   in their slides.

23              What I pointed out to you is look at how much that

24   percentage of notional has changed --

25              THE COURT:  Right.
```

Page 32

1              MR. TAMBE:  -- from pre-bankruptcy to post-

2      bankruptcy.

3              THE COURT:  I'm with you a hundred --

4              MR. TAMBE:  Right.

5              THE COURT:  -- percent.  I'm still not --

6              MR. TAMBE:  And you can see --

7              THE COURT:  -- at the --

8              MR. TAMBE:  -- exactly that information for each

9      of these counterparties --

10             THE COURT:  But that's a value --

11             MR. TAMBE:  -- facing Lehman.

12             THE COURT:  -- that's valuation.

13             MR. TAMBE:  It's a different issue.  The issue is

14     if you're saying we're entitled to a very large spread

15     because dealers would have behaved a particular way, you

16     have evidence -- the only evidence you're going to have

17     about what dealers did --

18             THE COURT:  Okay.  What --

19             MR. TAMBE:  -- is here.

20             THE COURT:  So other than with respect to the

21     value they placed what does -- what's the -- what did the

22     dealers do?  What am I looking at?  What --

23             MR. TAMBE:  You're getting two or three pieces of

24     information.  Let's go to the basic one.

25             THE COURT:  Okay.

1          MR. TAMBE:  Yes, the first basic is QVT is not the

2    only person on that side of the market.

3          THE COURT:  Okay.

4          MR. TAMBE:  Lots of other people are there.

5          THE COURT:  All right.

6          MR. TAMBE:  Two, they're not uniquely situated.

7    They said their 371 million is somehow an outsized position.

8    If you look at the Hartford, the Hartford had a notional --

9          THE COURT:  Okay.

10          MR. TAMBE:  -- of 383 million.

11          THE COURT:  Okay.

12          MR. TAMBE:  Again, not unique.  Right.  So those

13    two pieces, fair game.  You can look at that and they rebut

14    this notion that somehow they were unique in a particularly

15    tough spot.  Right.

16          THE COURT:  Okay.

17          MR. TAMBE:  The third piece, which we're getting

18    to, which is where I think QVT has the objection is what did

19    these dealers do --

20          MR. TRACEY:  Your Honor, I'm just going to have to

21    --

22          THE COURT:  Okay.

23          MR. TRACEY:  I hate to interrupt an opening

24    argument.  I don't do it.  But --

25          MR. TAMBE:  (Indiscernible).

Page 34

1          MR. TRACEY:  -- this is really a back door way of

2     saying exactly what he's not supposed to be talking about

3     based on --

4          THE COURT:  Well, I'm not --

5          MR. TRACEY:  -- Your Honor's ruling.

6          THE COURT:  I'm wait -- I'm still waiting for --

7     I'm -- whether you call it a percent of notional or some

8     other description of an amount of their value, I don't think

9     that's fair game.  I'm waiting for something that says, and

10    these similarly situated counterparties did X and QVT didn't

11    do X.

12         MR. TAMBE:  We don't know what these other

13    counterparties did.  All we --

14         THE COURT:  Okay.

15         MR. TAMBE:  -- know is what's in the derivatives

16    questionnaire.  Right.

17         THE COURT:  Okay.

18         MR. TAMBE:  But, similarly, they don't know what a

19    dealer would have done.  All they have presented to you is

20    some theory of some fantastic charge that the dealer would

21    have imposed had a dealer done a transaction hypothetically

22    the week of 9/15.

23         So there's no evidence supporting any of that

24    analysis.  There never will be.

25         THE COURT:  Okay.

1          MR. TAMBE:  Right.  All you're going to have is

2     Professor Flider as saying, as a matter of economic theory

3     this ought to be the way it would have been done.  Right.

4          THE COURT:  But can't they make the argument that

5     their position is even stronger because there were all these

6     other parties who had PCBS and in the aggregate nobody would

7     have wanted to transact?

8          MR. TAMBE:  It would be pure speculation, Judge.

9     It would be pure speculation to say nobody would have wanted

10    to transact.  They don't know that.  They don't know that.

11    All the other counterparties out there are managing their

12    risk.  They're dealing with it.  How they're dealing with it

13    they're not -- now we're getting to the -- now we're being

14    disadvantaged by not being able to talk about the valuation

15    because now they're somehow saying, well, what they did in

16    those circumstances was reasonable.

17         THE COURT:  But -- okay.  But you don't know one

18    way or the other, and subject to the ongoing limitation that

19    --

20         MR. TAMBE:  Uh-huh.

21         THE COURT:  -- a proof of claim valuation --

22         MR. TAMBE:  Yeah.

23         THE COURT:  -- is -- doesn't mean anything, you

24    don't know whether these counterparties used the same

25    methodology as QVT did or not, right?

1           MR. TAMBE:  But that's why the percentage of

2    notional is important.  Right.  If these counterparties had

3    gone to the measure used by QVT which will tell you why it

4    results in this massive inflation of a value, you would see

5    that in the pre-bankruptcy and --

6           THE COURT:  Okay.

7           MR. TAMBE:  -- the post-bankruptcy --

8           THE COURT:  Okay.  But here's the thing.  Okay.

9    You're making that up.  I mean, that -- you could -- you

10   could say, look, the answer is ten --

11          MR. TAMBE:  Uh-huh.

12          THE COURT:  -- right.  And then I would say, yeah,

13   but ten is one plus nine or two plus or eight or seven plus

14   three.  You have no idea if -- even if -- even if the

15   percent -- the notional percentages did or did not align --

16   somebody makes sausage.  You don't know how the sausage was

17   made one way or the other.

18          So what?

19          MR. TAMBE:  Well, I could have a bunch of sausage

20   in one corner, but if I see a pig walking by I say, that

21   looks different.  That's not the sausage.  I may not know

22   what's in the sausage, but that ain't no pig.  That's a

23   difference.  If it's -- and that's what I mean by an

24   outlier.  I'm not looking at the individual valuations and

25   saying, these are relevant and these should drive it.  But

Page 37

1    when you have a lot of counterparties with a lot of

2    transactions --

3            THE COURT:  So what you're saying is that if I

4    were to look at the valuation column, which I'm not going to

5    look at --

6            MR. TAMBE:  Right.

7            THE COURT:  -- I would see --

8            MR. TAMBE:  I'm not asking you to look at the

9    valuation column.  I'm actually saying, don't look at the

10   valuation column.  Look at the analysis that we did which is

11   looking at the percentage of notional.  So we're not looking

12   --

13           THE COURT:  Right.  But percentage of notional is

14   a proxy for -- is a backdoor way of looking at valuation.

15           MR. TAMBE:  It --

16           MR. TRACEY:  Your Honor, I --

17           MR. TAMBE:  -- could be, but I'm --

18           MR. TRACEY:  -- I really have to object to this.

19   Mr. Tambe has spent the last 20 minutes doing exactly what

20   --

21           THE COURT:  I'm --

22           MR. TRACEY:  I'm sorry.

23           THE COURT:  But I'm arguing on your behalf.

24           MR. TRACEY:  I understand.

25       (Laughter)

```
 1              THE COURT:  So --

 2              MR. TRACEY:  I know.  Sorry.

 3              THE COURT:  So when I -- you know, the rules are

 4     when I'm doing that you don't have to.  Right.

 5         (Laughter)

 6              THE COURT:  I don't -- I mean, it's a combination

 7     of either I'm not understanding or I think you're doing

 8     indirectly what I said that you couldn't do directly because

 9     I don't understand how percent of notional is anything other

10     than saying, look, QVT's valuation is dramatically skewed

11     and different from, by a big, big, big factor than what

12     everybody else did.  And the fact --

13              MR. TAMBE:  Uh-huh.

14              THE COURT:  -- is we just don't know, so.

15              MR. TAMBE:  All I would say then, Judge, is we get

16     a fair amount of -- we've heard a lot of argument about

17     illiquidity in the market --

18              THE COURT:  Sure.

19              MR. TAMBE:  -- the state that they were in, the

20     difficulty they were having, what dealers would or would not

21     do.  All I would suggest to you is we have some data of some

22     relevance on these issues.  As the trial unfolds and as they

23     present their evidence on these issues I would like the

24     opportunity to come back to this issue because I do think it

25     is a point that is --
```

1                    THE COURT:  Well, I think it's --

2                    MR. TAMBE:  -- of some relevance.

3                    THE COURT:  I think the point -- a point that you

4     made yesterday which QVT may argue as a legal matter in

5     terms of how to apply the ISDA we should do.

6                    But I think one of the points that you were making

7     was they say they exercise their judgment.

8                    MR. TAMBE:  Uh-huh.

9                    THE COURT:  They say it was reasonable.  How do

10    you know?  What did you compare it to?

11                   MR. TAMBE:  Right.

12                   THE COURT:  So that's a fair game question.

13                   MR. TAMBE:  But if that's a fair game question,

14    Your Honor, then that's exactly what we're using these

15    values for.

16                   THE COURT:  Well, but this is all in retrospect.

17    This is --

18                   MR. TAMBE:  But --

19                   THE COURT:  -- a compilation of stuff that you got

20    from the DQs --

21                   MR. TAMBE:  But their whole explanation, their

22    whole justification --

23                   THE COURT:  Sure.  But you --

24                   MR. TAMBE:  -- for it is after the fact.

25                   THE COURT:  I under -- I understand.  But you can

1    go back in the time machine and say on the weekend of

2    whatever, whatever --

3              MR. TAMBE:  Uh-huh.

4              THE COURT:  -- did you look at this, did you look

5    at that, did you look at this, did you think of this, did

6    you think of that.  I mean, you can go --

7              MR. TAMBE:  (Indiscernible) --

8              THE COURT:  -- through all of that.

9              MR. TAMBE:  -- they didn't look at any of that

10   stuff.  Right.  But --

11             THE COURT:  Okay.  Well --

12             MR. TAMBE:  But that's what makes --

13             THE COURT:  But like your point --

14             MR. TAMBE:  -- that's what makes --

15             THE COURT:  But your point -- but like your point

16   about the INTEX (ph) --

17             MR. TAMBE:  Yeah.

18             THE COURT:  -- right, look, they knew that INTEX

19   was out there, why didn't you look at it.

20             MR. TAMBE:  Right.

21             THE COURT:  So I think we should move on.

22             MR. TAMBE:  Okay.  We'll move on.

23             THE COURT:  Let's move on from this point and

24   we'll just put a bookmark there that you can take another

25   shot at it, but --

1              MR. TAMBE:  Okay.  So let's -- forget about what

2     everyone actually did.  Right.  There are lots of other

3     people doing things with PCDS.  Let's just examine what QVT

4     did.  Okay.

5              So we know that at the time they didn't do any

6     back testing.  So Mr. Choo says I'm going to come up with

7     this new valuation methodology, the cheapest to deliver

8     security, lowest price of the week of 9/15 and I'm going to

9     do a hundred minus that price.  That's all I'm going to do.

10    Okay.

11             He could have done some analysis to see, well,

12    does this make any sense, what does this really imply.  Yes,

13    I'm getting a big number, it's a thousand percent higher

14    than what I had before, but it doesn't make any sense.

15    Right.

16             So look at Slide 83.  So this is just applying the

17    QVT methodology to other points in time and saying, okay,

18    what did that mean for the values you had on your books --

19    I'm going from right to left.  It may be unorthodox, from

20    right to left.  9/15/08, right, if you use their value it's

21    107.7.  The books and records are 14 on that day.  That's a

22    $19 million difference.

23             Let's go to the collateral mark, right, where they

24    have demanded and obtained collateral from Lehman as of

25    9/11.  Right.  That's the last Lehman value.  If you use

Page 42

1    QVT's new methodology, those positions should have been

2    valued at 95 million.  Instead they were valued at 15.5

3    million.  That's all the collateral they held for those

4    positions.  There was roughly $80 million under-

5    collateralized on that basis.

6           The most interesting one is at inception.  Right.

7    No (indiscernible) that at inception the PCDS had a zero

8    value.  That's how they're priced.  If you apply that same

9    pricing methodology at inception you've got a $44 million in

10   the money set of positions.  That makes no sense, absolutely

11   no sense.  Right.  And it displays one of the essential

12   flaws with using this methodology.

13          And it's referred to in Dr. O'Cain's (ph) report

14   as the par effect.  What's built into this valuation from

15   day one if you use this methodology is that day one gain,

16   which simply did not exist as a matter of how these were

17   priced at inception.  They weren't priced on that basis.

18   They weren't marked on that basis.  They weren't valued or

19   traded on that basis.  And simply checking inception prices

20   would have revealed that to Mr. Choo, that there's a flaw in

21   this approach somewhere.

22          So let's go to Slide 87.

23       (Pause)

24          So -- and this is a schematic.  This is just to

25   illustrate the point I think I just made.

Page 43

1           We took a particular DB bond.  This is one that

2    was used by Mr. Choo at the end to price the PCDS on

3    Deutsche Bank.  This is 87.  So at inception the bond had a

4    value of about 89 percent.  And you'll see it holds steady

5    through the summer, starts declining and is -- has declined

6    some by 9:15 and Lehman's posting collateral as that value

7    declines.

8           It declines a lot more after 9/15, bounces back a

9    little bit, and then declines again right at the beginning

10   of October.  Okay.  That's what the bond price is doing.  He

11   only looks at it really on 9 -- that week of 9/15 to 9/19,

12   but that's what it did over its life.

13          Let's go to Slide 88.

14          If you start with a inception PCDS value of zero

15   and we say, okay, as the bond price changes we're going to

16   adjust the PCDS price.  I'm not saying that's the right way

17   to value PCDS, but if you're looking at a bond price, look

18   at the changes in the bond price.  Bond's getting riskier,

19   PCDS is getting more value.  Right.

20          A couple of caveats.  You'll see we've underlined

21   same final maturity as preferred.  That's another problem

22   with the approach they're using.  Yes, there's some

23   relationship between preferred prices and the PCDS value.

24   You've got to take into account this par effect.  But you

25   also have to take into account the maturity effect.  The

Page 44

1    PCDS is going to last for four or five years, on average 4.4

2    years, I think.  The underlying preferreds can last for a

3    very, very, very long time.  No analysis was done at the

4    time about any of that.  Right.

5            Now you're going to hear lots about the analysis

6    that's done by Dr. Nicholeski after the fact, but nothing

7    done at the time to say, am I taking into account this

8    maturity effect, that I'm really using an instrument that's

9    effectively perpetual or very, very long-dated and has risks

10   running out over that time period versus something that's a

11   four to five-year instrument.  Okay.

12           Let's go to Slide 89.

13           89, the green line is simply Mr. Choo's par minus

14   bond price just graphed out from the beginning through

15   October.  Right.  And it's always above.  It's moving with

16   the bond prices, but it's got this built in benefit from day

17   one which in reality never existed.  And simple back testing

18   would have shown there's a problem.  At least let's try to

19   figure out what the problem is.

20           Slide 90, that is -- that's simply a calculation

21   of that differential for each security because you'll see in

22   column, in section price you have bonds trading at 97, 93,

23   101.  You have one highlighted one.  I think that's SunTrust

24   STI trading at 66.  At inception zero month to market value.

25   You have that Deutsche Bank bond highlighted there.  That

Page 45

1    was trading at 89.18.

2              So if you add up all of that excess par benefit as

3    we refer to it, $44 million that's just built into this

4    formula because that adjustment wasn't made for par effect.

5              There's another issue, and we can go to Slide 91.

6              Even though 9/15 is the valuation date the bonds

7    -- the positions are actually valued on the lowest day of

8    the week.  All right.  That's part of Mr. Choo's

9    methodology.  So for this Deutsche Bank bond the lowest

10   price was not on 9/15.  The lowest price was a few days

11   later.  That's what we call a timing benefit.  Right.  It's

12   just -- if you just isolate that issue, if you accept

13   everything else Mr. Choo does, there's a timing benefit from

14   simply picking the lowest day of the week.

15             THE COURT:  Is there a stated rationale for that

16   -- for picking the lowest point in the week?

17             MR. TAMBE:  I believe the rationale we've heard is

18   volume, liquidity, it would take a long time to get this in

19   the market, and we're told $371 million would move the

20   market.  But that's frankly, I think, the wrong statement to

21   make because you're not -- you don't have $371 million of DB

22   PCDS.

23             Let's go to our Slide 77.

24             THE COURT:  You have a collection of --

25             MR. TAMBE:  Yeah.  It's --

Page 46

1           THE COURT:  -- smaller notional --

2           MR. TAMBE:  The DB is ten million.  Right.  And DB

3   is a fairly large bank.  I don't know how large their

4   preferred equity outstanding was.  But there's no -- the

5   point is no such analysis was even attempted.  Right.  We

6   hear lots about it now with Professor Flider and Dr.

7   Nicholeski, but in terms of what they were thinking and what

8   the rationale was behind picking this new methodology at the

9   time, there's no such analysis.

10          Slide 94.  This is not our data.  This is data

11  from Professor Flider, I believe.  I think Dr. Nicholeski

12  uses this data, some of this data.

13          So these are two indices of preferred securities.

14  There's some overlap with the names.  We're not suggesting

15  they match the profile.  But the top line is a Wells Fargo

16  preferred security index.  The bottom one is an S&P

17  preferred security index.

18          And there's -- the S&P one has all sorts of names

19  in it, financials, industrials.  The Wells Fargo one I think

20  has more financials, but also has a variety of names in it.

21  But this is illustrative.

22          A couple of points.  Yeah.  Spreads do widen.

23  Market gets -- this is the bond price and the bond prices

24  are going down and we're posting collateral.  Right.  We are

25  valuing that increased value of the PCDS transactions as the

Page 47

1    underlying preferreds get more distressed.

2           But see what happens after 9/15.  It gets a lot

3    worse for a while and then comes right back up.  When is the

4    valuation done?  The valuation statement is submitted on

5    October 15th.  Off the chart here, two weeks after the last

6    line.  They're looking back at this entire time period and

7    saying, we're going to pick the lowest point in time which

8    is not on 9/15 for almost any of these securities, long

9    after 9/15.  It's not a valuation as of 9/15.

10          And the other point is as of October 1 and October

11   2 both of these indices are actually lower than September

12   15th.  And that's relevant because of Slide 95.

13          So before the calculation statement is submitted

14   these two emails go in to QVT.  QVT that is bereft of PCDS

15   protection would love, love, love to get some PCDS

16   protection, but it only gets offers from Merrill Lynch on

17   not one, but two days offering to sell PCDS protection on

18   some of the names, not all the names, some of the names in

19   their portfolio.  I believe their position is they were

20   unaware of these two submissions.

21          THE COURT:  These were unsolicited?

22          MR. TAMBE:  I believe they're unsolicited.  They

23   come out.  There's a blast e-mail from Merrill Lynch.

24       (Pause)

25          MR. TAMBE:  So this is -- you want to know what a

Page 48

1    dealer would do?  On October 1 or October 2 this is what a

2    dealer is prepared to do.  Right.  The whole discussion --

3    and if I could turn your attention back to their slide deck

4    and, in particular, page 80.  Right.  The key piece here is

5    that four million upfront.  Do you see that?

6           And I followed the math along and they said, it's

7    ten minus six and there's the four that's going to be the

8    loss and that's what needs to be covered so the dealer is

9    protected at the end.  Effectively, what they're saying on

10   that slide is the cost of insurance is the amount of the

11   loss.  The amount of the loss is the cost of the protection

12   and that will be points up front.

13          Look at the Merrill Lynch e-mails.  In the eye of

14   the storm, two weeks after the Lehman bankruptcy zero points

15   up front.  So this fiction about, oh, the hedging costs.

16   You would have to go in the market and you would charge this

17   massive up front amount, 40 points.  You would charge the

18   entire insured loss to buy the insurance.

19          But they disregard, ignore, don't take into

20   account the October 1 and October 2 e-mails from Merrill

21   Lynch.  Dr. Nicholeski tries to build on that.  We think

22   there's flaws with that because Dr. Nicholeski ignores what

23   QVT did.  He makes no attempt to justify QVT's valuation.

24   He says, I'm going to do a completely separate valuation and

25   I'm going to use Merrill Lynch as my starting point.

Page 49

1           So 96 we're not going to talk about.  97 we're not

2      going to talk about and 98 we're not going to talk about

3      because you've told me I can't talk about them, but maybe

4      later we can talk about it.

5           (Laughter)

6           MR. TAMBE:  We get to 99.  Well, I would like to

7      make a proffer at some point on that point because I think

8      it is relevant.  We'll do that.  We can do that in writing.

9           THE COURT:  Okay.

10          MR. TAMBE:  Go to Slide 99.  So just to get a

11     sense of -- and this is from Dr. O'Cain on comparing sort of

12     their valuation QVT's valuation, putting some numbers around

13     this par effect, maturity benefit, timing benefit to say,

14     you know, how does that reduce the claim and what does it

15     bring the valuation down to, right, and some alternatives

16     that Dr. O'Cain had done.  And, again, this has nothing to

17     do with third party data. This is working within the data

18     that's fair game here.

19          And that's a point of comparison for how much we

20     believe their claim is inflated, and the basis for all of

21     that inflation is this untested valuation methodology which

22     was done with very little analysis.  You now have after the

23     fact analysis about points up front and the massive charge

24     for insurance which is equal to the insured loss.  And that

25     doesn't fly either.  That's what they're really left with

Page 50

1    when you strip away the excesses that are built into that

2    formula.

3            Slide 101, Argentina.  And I have a question mark.

4    This is not like the others.  Right.  The others are about

5    valuation.  This is a slightly different issue.

6            So there is a merging market CDS, number of

7    emerging market CDS transactions with Lehman.  They replace

8    the risk.  They enter into new CDS.  They incur replacement

9    costs.  No quarrel on that.  They're putting on good

10   replacement trades.

11           There's a collection of Argentina trades that they

12   then unwind subsequently.  I'm going to slow down because I

13   think I'm losing you.

14           THE COURT:  No.  I'm listening.

15           MR. TAMBE:  Okay.  So Lehman goes down.  They've

16   terminated all the Lehman trades.  They replace the

17   Argentina risk.  We say to replace the risk --

18           THE COURT:  Uh-huh.

19           MR. TAMBE:  -- fairly part of your claim some of

20   the Argentina trades then they unwind.  And they unwind

21   because apparently they are told by either LBI or LBIE, not

22   a debtor here, that some bonds that you thought you had you

23   don't actually have.  They're held up.  So you don't need to

24   hedge them anymore so we're going to unwind those hedges

25   based on information and communications they have not with

1    LBSF, not with LBHI, but with other non-debtors.

2              That's what we're objecting to.  The unwind costs

3    for unwinding those hedges which were based -- and I don't

4    think we'll hear an explanation -- on some information of

5    infusion in their communications with some other non-debtor.

6    That has no place in a claim against LBSF and LBHI about

7    valuing the terminated swaps with LBSF.  They're being

8    compensated for the hedges, recurring the replacement costs.

9    We're saying, yeah, that's -- we're going to allow that.

10   Right.

11             The fact that you may have been mislead by someone

12   else, assuming that's what happened, and therefore had to

13   unwind those hedges, that's not on -- that's not at the cost

14   of LBSF's creditors.

15             This is a slight variation, I think, of what was

16   -- what you saw before.  What now the second to last column

17   has is not just their 9/15 values, but what we've tried to

18   insert in there are the Market Quotations be obtained.  So

19   that's the 12 transactions in which they actually got a

20   Market Quotation as that is defined in the ISDA.  And those

21   transactions where they actually replaced and incurred

22   replacement costs.

23             So if you roll their September 15th valuation

24   forward using that -- those adjustments, the September 15th

25   valuation is 137 versus the 382 that they have as part of

Page 52

1   their claim.  And their claim obviously is net of collateral

2   of 117 million.

3            THE COURT:  Where is the Argentina number that you

4   just told me about?

5            MR. TAMBE:  The Argentina number, I believe, we

6   have covered it in the replacement trades so when they

7   initially put on the replacement trades it should be in

8   here.  But it should not be part of what we recognized as

9   their unwinding of those Argentina trades later on in the

10  week.

11           THE COURT:  Okay.

12           MR. TAMBE:  So it shouldn't be part of 137. It is

13  part of 382.  It's part of their claim.  It's not part of

14  where we think --

15           THE COURT:  But which --

16           MR. TAMBE:  -- think are --

17           THE COURT:  -- which bucket is it in?

18           MR. TAMBE:  Oh, it will be in emerging markets.

19  Yes.

20           THE COURT:  It will be in emerging markets even

21  though --

22           MR. TAMBE:  Yes.

23           THE COURT:  -- it's slightly different.

24           MR. TAMBE:  Yeah.

25           THE COURT:  Right.

Page 53

1                MR. TAMBE:  Yes.

2                THE COURT:  Okay.

3                MR. TAMBE:  So let's end with a couple of points.

4           We've got the words, the loss definition, and

5      you've had time to review those and interpret them and

6      you're going to do it again in the context of this case.

7                You've heard some views about the words, the loss

8      definition, which I think not surprisingly are probably

9      words that Professor Golden might use in describing the

10     intent of the loss provision.  And, in fact, the two

11     references that do exist to Professor Golden in the pretrial

12     brief talk about the intent of the drafters of the market

13     intent.

14               For reasons that we've said in the Daubert part of

15     our brief we don't think that's fair game at all for

16     consideration by the Court.  It's not admissible.  There's

17     no basis for that.

18               But let's talk a little bit about what that

19     animates because I think that -- thinking about what the

20     unspoken or unwritten words that lie behind the loss

21     definition animate -- animates a lot of the positions I

22     think you're going to hear from QVT.

23               Now I'm going to talk a little bit about one

24     particular issue that came up in the legal --

25               THE COURT:  Let me ask you --

Page 54

1            MR. TAMBE:  Yeah.

2            THE COURT:  Let me ask you a question along these

3      lines.

4            MR. TAMBE:  Uh-huh.

5            THE COURT:  So after the fact when Lehman points

6      out a mistake to QVT --

7            MR. TAMBE:  Uh-huh.

8            THE COURT:  -- or QVT on its own realizes a

9      mistake, and what I mean by a mistake is we added wrong,

10     right, we added up the numbers wrong.  Here's the right

11     number, right, versus a large part of your argument now was,

12     look, if they had back-tested this methodology they would

13     have uncovered these flaws in it.  Right.  You would -- you

14     know, go -- going along, but continuing to a mistake.

15     Right.

16            So there's those two sets of issues where you

17     would look at the number that they gave and you would say,

18     well, that can't be right.  You don't get to make a math

19     mistake and then bring in Professor Golden to say, but they

20     acted reasonably and in good faith so they should recover

21     notwithstanding that they made a math mistake, right?

22            So this is all about what's reasonable, right, and

23     how you judge what's reasonable, and all of this argument

24     about the intent and not second guessing to me doesn't -- it

25     doesn't advance the ball of answering the question.  I know

Page 55

1     that I actually had a question in there.

2               But it -- is it the case that if somebody makes a

3     mistake, but they made the mistake in good faith at the time

4     that they win?  I mean, I -- this is just a --

5               MR. TAMBE:  And we can go the -- but let me react

6     to that.

7               THE COURT:  Yeah.

8               MR. TAMBE:  (Indiscernible) question.

9               If it's purely a clerical error.  You have the

10    data.  You put it in your spreadsheet and get a fact finger

11    error.  You didn't put in the right number.  We would have

12    any number of instances where parties have amended their

13    claim --

14              THE COURT:  Right.

15              MR. TAMBE:  -- to correct for those kinds of

16    errors and, in fact, I think in this case there was a

17    correction of the calculation amount because something may

18    have been double counted.  I think that's a different type

19    of error.  I think contract law generally recognizes those

20    types of errors differently.

21              THE COURT:  But I'm saying the ISDA doesn't

22    protect the --

23              MR. TAMBE:  Oh, absolutely not.

24              THE COURT:  -- party who made the error.

25              MR. TAMBE:  Absolutely not.

1          THE COURT:  That's my point.

2          MR. TAMBE:  I mean, if you look in the events of

3    default one of the events of default is breach of contract,

4    not good faith or unreasonable breach of contract.  You

5    breach the agreement, that amounts to an event of default

6    which can ripen into a termination event.  Right.

7          So it's not like there's a safe harbor built into

8    the ISDA that says, if you make good faith mistakes and

9    don't follow what the ISDA says, that's not seen as an event

10   of default.  No.  Breach of the agreement is an event of

11   default.  Right.

12         And just going to the other point which is when I

13   talk about the flaws in their methodology, I -- I'm making,

14   I think, two points.  One that it's flawed.  But the point

15   is the process.  They're going to talk about the

16   reasonableness of their process.  Right.  And when you're

17   adopting a new methodology, a different way of looking at

18   something that's complex, I think the reasonable -- the

19   reasonableness inquiry that you undertake has to look at

20   what do you do -- what did you do, QVT, to satisfy yourself

21   that this was reasonable.

22         That's -- it's not a question of going back after

23   the fact and saying, oh, you made this mistake and you made

24   that mistake of methodology.  It's did you put some thought

25   into it at the time because that would be an indication that

Page 57

1      you were reasonable and careful and acting in good faith as

2      opposed to pick a methodology results in a huge number,

3      thousand percent increase in your valuation compared to

4      notional, and that becomes part of your claim.

5              That's the distinction I'm drawing.  Right.

6              THE COURT:  Okay.

7              MR. TAMBE:  Okay.  There was a particular piece

8      that I wanted to go back to in the legal discussion because

9      I saw in Professor Golden's report and I saw it in the

10     slides, and I don't have the slides in front of me.  I'll --

11     I do.  In the printed it's 27 in the QVT.

12             THE COURT:  Okay.

13             MR. TAMBE:  And the proposition, I think, is that

14     there was a deliberative tradeoff between the regulators and

15     dealers to soften the blow when the second method was

16     adopted in 1992 and you enhance the attractiveness of the

17     global derivatives markets, et cetera, et cetera.

18             There's some -- because second method has been

19     adopted business the regulators have sort of blessed this

20     wider and more expansive view of loss.  I think that's the

21     implication here.

22             Let's think about it.  All right.  What regulators

23     are we talking about?  The regulators of QVT, no.  We're

24     talking about the regulators for the banks.  That's who

25     we're talking about.  Those are the regulators that

1    Professor Golden is referring to there.  What do those

2    regulators care about, the failure of QVT, no.  They care

3    about the failure of the banks that they regulate.

4         Why is this an issue in 1992 or at any time?  It's

5    about regulatory capital.  If you have these massive

6    derivatives positions the dealers want to hold as little

7    collateral as possible, as little regulatory capital as

8    possible.  The regulators are saying, how is that going to

9    be enough, what if you fail, when you fail, if you're owed

10   money, right, if you're owed money as the defaulting party

11   are you going to be protected or do we have to come in and

12   bail you out.

13        In that context do you seriously think, Judge,

14   that the regulators are saying a counterparty facing a

15   failed dealer should have the run of the road to come up

16   with any valuation it wants?  This is fiction, Judge.  This

17   is fiction.  Those two things were concepts discussed at the

18   same time, but entirely independent.

19        But when you start talking about market intent and

20   drafters intent and --

21        THE COURT:  Well --

22        MR. TAMBE:  -- market practice this --

23        THE COURT:  -- I --

24        MR. TAMBE:  -- is what happens.

25        THE COURT:  You know, we haven't done the Daubert

1    portion of it.  But I don't think any of this comes in.

2              MR. TAMBE:  Sure.

3              THE COURT:  I don't think any of this is relevant.

4    You haven't had a chance to argue it yet, but preview I'm

5    interpreting the ISDA.  I don't think it's ambiguous.  I

6    don't think I get into this kind of, you know, expansive

7    (indiscernible) on, you know, regulators and intent and the

8    300 people who drafted the ISDA and what they were thinking

9    and all of that stuff.

10             So when we get to it we can get to it again.

11             MR. TAMBE:  Let me just check with my --

12             THE COURT:  Sure.

13        (Pause)

14             MR. TAMBE:  Thank you, Your Honor.

15             THE COURT:  Okay.  All right.  So I think we

16   agreed we were going to take a brief break and then you were

17   going to start, Mr. Tracey.

18             MR. TRACEY:  I'll -- I want to put a couple of the

19   things that Mr. Tambe said into context after the break and

20   then we'll put on our first witness.

21             THE COURT:  Okay.  Did we say we were doing that?

22             MR. TAMBE:  No.  We didn't say we were doing that.

23             MR. TRACEY:  I'm -- I don't know that we discussed

24   it.  But I thought it would be useful.

25             MR. TAMBE:  Well, then I might think it's useful

Page 60

1     to respond then.

2          (Laughter)

3               MR. TAMBE:  If you don't -- (indiscernible).

4               THE COURT:  We hadn't talked about having reply

5     openings.  So would you feel tremendously aggrieved if I

6     said let's just get started with the testimony?

7               MR. TRACEY:  That's fine, Your Honor.  I will --

8     I'll find an opportunity to --

9               THE COURT:  Okay.

10              MR. TRACEY:  -- put it all in context.

11              THE COURT:  I'll look forward to it.  Okay.  So

12    let's come back at 11:30 and we'll do the first bit of the

13    testimony and then we'll take your lunch break.  All right.

14              MR. TRACEY:  Thank you.

15              MR. TAMBE:  Thank you, Your Honor.

16              THE COURT:  Thank you.

17         (Recess taken at 11:22 a.m.; reconvened at  11:41 a.m.)

18              THE COURT:  All right.

19              MR. REGAN:  How are you?

20              THE COURT:  Good morning.

21              MR. REGAN:  QVT is going to call Nick Brumm to the

22    stand.

23              THE COURT:  Very good.

24              MR. REGAN:  We have witness binders for the Court

25    and (indiscernible) if that would be helpful.

Page 61

1              THE COURT:  Thank you.

2              Please come up, Mr. Brumm.

3              MR. BRUMM:  Thank you, Your Honor.

4         (Pause)

5              THE COURT:  Would you raise your right hand,

6    please, sir?

7                    NICHOLAS BRUMM, WITNESS, SWORN

8              THE COURT:  All right.  Please have a seat.

9              THE WITNESS:  Thank you.

10             THE COURT:  Make yourself comfortable.  If at any

11   time --

12             THE WITNESS:  Thank you.

13             THE COURT:  -- you would like a break, just let us

14   know.

15             THE WITNESS:  Okay.

16             THE COURT:  You're going to find -- have to find

17   the sweet spot with that microphone so that we can record

18   you --

19             THE WITNESS:  Okay.

20             THE COURT:  -- but we don't get any feedback.

21             THE WITNESS:  Okay.

22             THE COURT:  Okay.  Go ahead.

23             THE WITNESS:  Does this sound okay so far or --

24             THE COURT:  So far so good.

25             THE WITNESS:  Okay.

Page 62

1                        DIRECT EXAMINATION

2    BY MR. REGAN:

3    Q    Mr. Brumm, please introduce yourself for the record.

4    A    Good morning.  My name is Nicholas Brumm although I

5    commonly go by Nick.

6    Q    Did you attend college?

7    A    I did attend college.

8    Q    Where?

9    A    I attended Harvard College where I studied French and

10   American history and literature.  I was originally a member

11   of the class of 1989, but I chose to graduate a year early

12   in 1988 so I could take up an exchange fellowship at a

13   school in France, a school in Paris called ENS.  While I was

14   at ENS I was also cross-registered at the University of

15   Paris where I did a masters degree in medieval history.

16   Q    Do you have any other graduate or professional degrees?

17   A    I do.  I have degrees in law.  After completing my year

18   at ENS in Paris I went to Oxford University in England.  My

19   parents were living there at the time and I received a BA at

20   law from Oxford University and then I came and did a one-

21   year LOM at Columbia Law School here in New York.

22   Q    And what year did you complete that LOM?

23   A    I completed the LOM in 1992.  The BA was completed the

24   prior year in 1991.

25   Q    What did you do after completing your legal education?

Page 63

1    A    After I completed my legal education I spent the summer

2    studying for the bar exam which I took and passed, and I

3    then started work at Cravath, Swaine and Moore where I had

4    been a summer associate previously.

5    Q    And what type of work did you do at Cravath?

6    A    Well, I was there for about seven and a half years so I

7    did a wide variety of corporate work.  I was in the

8    corporate department the whole time.  I did a lot of mergers

9    and acquisitions, international and domestic securities

10   offering, high yield lending, bank lending.  I also did a

11   little bit of work on antitrust and potential litigation

12   arising out of corporate deals that I worked on.

13   Q    When did you leave Cravath?

14   A    I left Cravath -- well, I left Cravath formally in

15   2000.  I actually was on a -- not really a leave of absence,

16   a (indiscernible) I would call it to a German law firm that

17   Cravath had a close relationship with in 1997.  That firm

18   was called Hengeler Mueller, H-E-N-G-E-L-E-R Mueller,

19   M-U-E-L-L-E-R, double L-E-R.  It was a German law firm that

20   was -- specialized in corporate work, particularly

21   (indiscernible) financials.

22   Q    At some point did you leave Cravath?

23   A    I did leave Cravath in 2000 to take a new job.

24   Q    And where did you go?

25   A    I took a job with Deutsche Bank in New York.

Page 64

1    Q    And what would you -- what were you hired to do at

2    Deutsche Bank?

3    A    At Deutsche Bank I was hired to work in a proprietary

4    trading group in the investment bank.  The -- when I was

5    considering leaving Cravath I had recently reunited with, at

6    our tenth college reunion, with an old college friend, Dan

7    Gold, the CEO now of QVT.  He was at the time working in a

8    proprietary trading group that he had founded in the early

9    1990s at Deutsche Bank, and he suggested that I come work

10   with him there.  The group was at that point moving into

11   credit and distressed and more legally intensive types of

12   investing.  And so he was interested in having someone with

13   a legal background join the group.

14   Q    Were you hired as a lawyer at Deutsche Bank?

15   A    No, I was not.  I was hired into -- purely as a

16   business role.  My title was director.  In an investment

17   banking sense meaning essentially the level below a managing

18   director which is, you know, typically the -- one of the

19   most senior titles at an investment bank.

20   Q    Are you currently licensed as a lawyer?

21   A    I'm still a member of the New York Bar, but for the

22   past 15 years or so I've stated my status as inactive for

23   CLE purposes.  That means I send in currently my $375 every

24   two years.  I remain a member of the bar, but I -- my

25   understanding is that also I would have to undergo extensive

Page 65

1    CLE training to practice again, so.

2         (Laughter)

3              And to be clear I'm not a -- I'm not admitted in

4    any other jurisdiction other than New York State.

5    Q    So you said you went to Deutsche Bank.  How long were

6    you at Deutsche Bank?

7    A    I was at Deutsche Bank from 2000 to the beginning of

8    2004 when I became an employee of QVT financial which was

9    the newly set up investment manager that the QVT group

10   created as part of the process of spinning out of Deutsche

11   Bank.

12   Q    Who else was part of the QVT group you mentioned?

13   A    It -- the other managing members were part of the QVT

14   group.  The other managing members today of QVT I should say

15   are Dan Gold who I've mentioned, our CEO, also Arthur Choo,

16   Tracy Foo.  There was a -- there was at the time a -- one

17   other managing member, Lars Baeder who left our firm

18   (indiscernible).

19   Q    And was it just the four managing members or were there

20   others?

21   A    No.  There were others.  I believe our group had grown

22   to about 20 or 30 people.  We had hired some people in

23   anticipation of spinning out and taking a lot of functions

24   that we had not historically had to do ourselves,

25   accounting, legal, HR.  So we had grown into about 20 or 30

Page 66

1    people at the time we spun out from Deutsche Bank.

2    Q    You used the term QVT Group.  How is that different

3    from QVT Financial?

4    A    So QVT Financial is an investment manager that we

5    created in 2003.  While we were still at Deutsche Bank with

6    Deutsche Bank's agreement as part of the process of spinning

7    out the existing QVT Group, but also the portfolio of

8    investments held and managed by that group to outside

9    investors.  We actually had outside investors already while

10   at Deutsche Bank, but they represented a minority of the

11   capital.  And the rest of the capital was effectively

12   Deutsche Bank's capital.

13            And what we were doing was that we were spinning

14   out in such a way that Deutsche Bank would end up on a

15   minority of the positions and the outside investors who had

16   raised additional money for them would own a majority of it

17   and we would end up fully independent of Deutsche Bank as

18   employees of this new investment manager that we were

19   creating.

20   Q    And what is QVT Fund?

21   A    QVT Fund was in 2008 the primary flagship fund and

22   investment and trading vehicle for our investors and primary

23   fund managed by QVT Financial.

24   Q    And what is Quintessence Fund?

25   A    So Quintessence Fund is a fund that was carved out of

Page 67

1      QVT Fund in 2007.  It was essentially another spinout where

2      we took a pro rata portion of the assets and liabilities of

3      the QVT Fund that belonged to the largest investor in the

4      QVT Fund and spun it out into a separate fund, a so-called

5      fund of one meaning that there was one investment group only

6      that was invested in that fund.

7              The reason for that was that that investor had

8      grown to be relatively large, roughly ten percent of our

9      total assets under management and we and they both wanted

10     them to have a fund where subscription and redemption

11     activity in the main fund would not affect them, and

12     likewise their own subscription and redemption activity

13     would not affect the main fund.  So it was a separation.

14             But the two funds essentially traded on a pari

15     passu basis or in parallel really.  So every time we brought

16     on a position we would just put on the same position pro

17     rata for Quintessence.  In fact, you know, for the CDS

18     trades that are at issue in this case we had actually split

19     the trade.  So we -- you know, we -- so --

20     Q    Okay.  What was the pro rata distribution that you

21     mentioned?

22     A    It was roughly ten percent of the total and I think

23     that remained -- that was certainly the case in 2008.  I

24     think it was fairly constant over the -- from the spinout to

25     2008 -- through 2008.

Page 68

1  Q    Was QVT Financial the manager entity registered with

2  any regulatory authorities?

3  A    QVT Financial is today registered with the SEC as a

4  registered investment advisor.  We registered in 2012 when

5  we were first required to do so.  We're also today

6  registered with the CFTC and we're registered with a couple

7  of foreign regulators, the Monetary Authority of Singapore

8  where we have some operations and also the Securities

9  Exchange Board of India which is their primary market

10  regulator because we have some operations in India, too.

11          And I should say that we were registered in 2008,

12  but we registered from 2004 until 2015 with the UK's FSA.

13  It was our UK investment subsidiary that was registered with

14  them.  We deregistered in 2015 when we closed our London

15  office and --

16  Q    At the time QVT separated from Deutsche Bank did QVT

17  have an investment strategy?

18  A    Yes.  We had a number of investment strategies.  I

19  mean, I mentioned that I had been hired in part because we

20  were pushing into credit trading more, so that certainly

21  became a very big focus from the time I was hired in 2000 to

22  2004 and an even bigger focus after that I would say.

23          Credit trading involves the trading of corporate

24  and sovereign bonds, you know, and also the use of credit

25  derivatives.  We were a fairly early participant in the

Page 69

1    credit derivatives market from the early 2000s.  When it was

2    really first getting off the ground and while we were still

3    at DB we had a number of other trading strategies as well.

4    We were -- I -- the credit trading had grown out of what was

5    originally one of our core strategies which was convertible

6    bond arbitrage and that's a strategy we also continued to

7    pursue.

8              And then we had a number of equity trading

9    strategies as well including long short relative value

10   equity trading, closed end fund arbitrage, risk arbitrage,

11   some kind of special situation investing, and we also were

12   -- had increasingly begun to trade asset backed securities

13   and we were -- over time we got into additional areas from

14   the (indiscernible) commodities.

15   Q    Did QVT's investment strategy change in any way by

16   September 2008?

17   A    No.  I wouldn't say it really changed.  I mean, I

18   mentioned we got into some additional areas.  So I think

19   areas that we really weren't doing in '04 very extensively

20   at least that we got into by '08 were trading of credit

21   derivatives on asset backed securities.  That was a --

22   became an important area for us.  We were doing commodities

23   investing to a certain extent, commodities derivatives.  We

24   had also started to do a little bit of private equity

25   investing at that point.

1          And so I think, you know, we at the time in 2004

2     and afterwards we thought of our set of strategies and our

3     competitive edge as really being our flexibility to go into

4     new areas as they developed and not be tied to a specific

5     product set or set -- or geographic focus regardless of how

6     attractive the opportunities were or not at the time that

7     you were making those investments.  And I think it was also

8     part of our strategy to try to marry or synthesize

9     qualitative and quantitative types of investing.

10          So by qualitative I mean kind of fundamental

11     analysis of credits and companies.  And the quantitative

12     methods we sought to use were derivatives theory, you know,

13     computer programming.  I mean, one area I think I didn't

14     mention that we got -- we did get into in -- by 2008 that we

15     wanted to know for was doing a certain amount of statistical

16     arbitrage investing.  So investing driven by a computer

17     algorithm that tells you to, you know, buy and sell amounts

18     of stocks.  We had a group that had -- that was doing that

19     for us in 2008 which was not something we had done

20     historically.

21     Q    And what was the peak size of the fund prior to

22     September 2008?

23     A    The peak size of our -- the peak size of our AUM

24     including this Deutsche Bank money that we continued to

25     manage at the time, the QVT Fund and the Quintessence Fund,

Page 71

1   those three pools was -- I think it peaked out at around $13

2   billion.

3   Q     And by AUM you mean?

4   A     I'm sorry.  By AUM I mean assets under management.

5   Q     And how did the QVT Fund perform financially in 2007?

6   A     Well, 2007 was a very strong year for us.  In fact, so

7   2004, 5, and 6 had all -- we had very good performance.

8   2007 was particularly strong because we had a large short

9   position in subprime RNBS so that really drove very strong

10  performance that year.  I believe we finished the year up 39

11  percent.

12  Q     And how did QVT perform in 2008?

13  A     2008 was a horrific year for us.  We -- even before

14  Lehman's failure we were down significantly, I believe

15  approximately 15 percent at -- as of August 31 which was,

16  you know, which was over a billion dollars.  And, you know,

17  we just lost more money from there.  I mean, we lost a

18  billion dollars in -- close to a billion dollars I think in

19  September.  The fourth quarter we lost several billion

20  dollars more.

21          So we finished the year down roughly 36 percent

22  which, you know, was horrific, but the S&P was down a

23  similar amount, so.

24  Q     What is the size of QVT Fund today?

25  A     It's much smaller.  We have 2.3 billion of assets under

Page 72

1    management today.

2    Q    Going back to September of 2008 did QVT have outside

3    investors?

4    A    Yes.  QVT did have outside investors.  The outside

5    investors were approximately 90 percent of the investment in

6    QVT although I should note the investors didn't invest

7    directly in the QVT Fund or the Quintessence Fund.  They

8    invested through what's called a master feeder structure.

9    It's very common among hedge funds where essentially there

10   is -- there are one or more feeder funds that feed into a

11   master fund.  Often those feeder funds are structured in

12   separate ways that are desirable for the investors from a

13   tax or other point of view.

14              So one would typically have a domestic feeder, one

15   or more international feeders, and, in fact, that is what

16   QVT -- both the QVT Fund and Quintessence Funds had.  So

17   that's what the investors were invested in.

18   Q    What is your current position at QVT?

19   A    I am a managing member at QVT.  I'm one of the four

20   managing members.

21   Q    And what do you do as a managing member?

22   A    So the managing members are responsible for running the

23   overall business of QVT and that includes responsibility for

24   managing the investment portfolio of QVT.

25   Q    We -- you know, we have some specialization among

Page 73

1   ourselves either -- both by sector and kind of investment

2   area product a little bit.  But we also collaborate a lot

3   and work together.  We -- the four of us constitute the

4   firm's investment committee which, you know, reviews the

5   portfolio regulations and approves new positions of any

6   size.

7   Q    And did you have the same role back in 2008?

8   A    I did.  I think -- you know, as we -- as we've grown as

9   a form we've formalized many of our processes over time

10  including the -- this investment committee I just mentioned.

11  But I've had the same position essentially since inception.

12  Q    Do you serve any legal function at QVT?

13  A    I do not.  We have throughout the time I was there had

14  a general counsel and one or more additional senior counsel

15  who have worked with the general counsel.

16  Q    With regard to your role as a portfolio manager do you

17  have any particular focus yourself?

18  A    Well, today my focus is primarily on long short equity

19  value driven trading and in the past as I mentioned I've

20  focused a fair amount on distressed investing including in

21  bankruptcy situations, both here at -- in the U.S. and

22  internationally.

23  Q    In 2008 where was QVT's office located?

24  A    QVT's office in 2008 was located where we're still

25  located which is 1177 Avenue of the Americas.  That's 6th

Page 74

1    Avenue between 45th and 46th Streets.

2    Q    Can you describe the physical setup of your office back

3    in 2008?

4    A    Sure.  I mean, again, it's very similar to how it was

5    -- how it is today.  It's primarily an open floor trading

6    environment.  So, you know, we sit in rows with, you know,

7    looking at -- sort of we sit back to back with an aisle down

8    the center looking at expensive computer screens.  We --

9    that way we've found we can, you know, very easily swivel,

10   walk over, you know, if necessary to go over into another

11   row.  You can stand up and, you know, call for people's

12   attention or whatever.  So that's the environment in which

13   we work.

14         Around the edge of the trading floor then are a

15   bunch of, you know, offices and conference rooms.  Really

16   nobody works too much in the office.  They mostly work --

17   they work out there and we use the kind of rooms around the

18   perimeter of the trading floor for meetings.

19   Q    I would ask you to open your witness binder and turn to

20   Exhibit 2105, CX2105.

21   A    Is that after all the --

22   Q    Hopefully it will be right at the end.

23   A    Oh, I see.  Sorry.  Excuse me.

24   Q    Do you recognize Exhibit 2105?

25   A    I do.

1    Q    What is it?

2    A    This exhibit is a depiction of the central row at QVT

3    where the managing members sat or sits and sit and where

4    certain other traders sat.

5    Q    And can you identify the individuals shown in Exhibit

6    2105?

7    A    Sure.  You have the four managing members of QVT, Dan

8    Gold at the bottom, our CEO.  To his right Arthur Choo,

9    another managing member.  Back to back to Dan Gold Tracy

10   Foo, a third managing member, and then on Tracy's right you

11   have me and I'm the fourth managing member.

12          The other individuals identified are Yi Sen (ph)

13   at the top on Tracy's left.  Mr. Sen was a -- he was a

14   partner of QVT Financial and a -- primarily a credit trader

15   in 2008.  He's no longer with our firm.

16          And along the bottom you have on Arthur Choo's

17   right you have Joel Wolman (ph).  Joel was an asset backed

18   trader focusing principally on mortgage related securities

19   including RNBS in particular and certain other asset backed

20   securities.  He worked very closely with Arthur which is why

21   they sat next to each other and he was, at the time in 2008

22   he was a managing director of QVT Financial.  He has also

23   retired from QVT Financial.

24          And then the last individual is Tom Knox.  Tom was

25   our principal emerging markets trader.  He traded those

Page 76

1    positions under Dan's supervision.  And he also left our

2    firm a number of years ago.

3    Q    Does Exhibit 2105 accurately depict where the listed

4    individuals sat back in 2008?

5    A    Yes.  I believe it does.

6    Q    If you could turn your binder to what should hopefully

7    be the next exhibit, 2106.

8    A    Yes.  Thank you.

9    Q    Do you recognize Exhibit 2106?

10   A    I do.

11   Q    What is it?

12   A    It is a picture of our trading floor and it has on it

13   the seats of the -- or I guess it depicts -- it's sticking

14   in their names where these people sat in 2008.

15   Q    And does it accurately depict where they sat in 2008?

16   A    I believe it does.  Yes.

17   Q    And was it as messy as Mr. Tracey indicated?

18   A    Yes.  It was messy in 2008 and it's still messy today.

19   Q    How many employees did QVT have in September 2008?

20   A    In September 2008 we had 110 employees of which a

21   little over 90 were based in New York.

22   Q    How many employees does QVT have today?

23   A    Today we have 75 of whom 55 are based in New York.

24   Q    In 2008 did QVT's portfolio include credit default

25   swaps?

Page 77

1    A    Yes, it did.  We had a -- it was a major instrument in

2    our portfolio then and we had very large size in CDS in

3    2008.

4    Q    Can you quantify that very large size in any way?

5    A    Sure.  I mean, we've mentioned the AUM number of 12 or

6    13 billion.  We had more in positions than we had in NAV

7    because we had long and short positions.  So while we had

8    low net exposure we had a lot of gross exposure in the form

9    of significant longs and shorts.

10          So the way we defined exposure which was generally

11   looking at the dollar value of positions that we were long

12   and for CDS also using the full notional amount of that CDS

13   we had roughly 30 billion of long exposure and 30 billion of

14   short exposure at the start of 2008.  And of that amount the

15   gross amount long and short of credit derivatives that we

16   had was roughly $23 billion.

17   Q    Did that composition of the CDS portfolio change over

18   time in 2008?

19   A    Yes.  We reduced it and our positions generally in

20   2008.  Looking at August 31, August month end of 2008 we had

21   about two-thirds of those long and short positions left of

22   our -- of overall long and short positions.  And for the

23   credit derivatives I believe we've reduced it to about $16

24   billion worth of long and short credit derivatives.

25   Q    Did the types of CDS in the portfolio change over the

Page 78

1   course of 2008?

2   A     There was some change over the course of 2008, not -- I

3   mean, I wouldn't say so much in the types.  The types were

4   the same throughout.  As I said we reduced it.  I mean, one

5   of the main areas we reduced was some of the broker dealer

6   and other financial shorts that we had got reduced over

7   time.  That was in part based on our experience with the

8   Bear Sterns rescue where markets, you know, (indiscernible)

9   Bear Sterns, other brokerage dealer credits to trade very

10  wide creating profits on shorts, then whipsawed back after

11  Bear Sterns was rescued to much higher levels.

12            So, you know, what we discovered in the course of

13  that we took significant losses in March when the portfolio

14  in Bear Sterns was saved was that trying to use broker

15  dealer and other financial shorts to protect our portfolio

16  was not a tremendously successful strategy, you know,

17  particularly when the government stepped in to save a

18  failing institution like Bear Sterns.

19            So for that reason throughout much of 2008 we were

20  concentrated on trying to reduce our overall exposures, and

21  in particular reduce -- and by reducing those overall

22  exposures reduce our need for this large hedge that we had

23  created involving broker dealer and other financial

24  institution shorts.

25  Q     Did QVT have something called PCDS in its portfolio in

Page 79

1   2008?

2   A     We did.

3   Q     And why was that?

4           MS. SAWYER:  Objection.  Foundation.

5           THE COURT:  I'm not following you, Ms. Sawyer.

6           MS. SAWYER:  I think he's testified as to the type

7   of trading he did at QVT and --

8           THE COURT:  Uh-huh.

9           MS. SAWYER:  -- we're now asking about a type of

10  trading that I'm not sure Mr. Brumm did.  So that's my --

11  the basis of my foundation objection.

12          THE COURT:  All right.

13          MR. REGAN:  I think Mr. Brumm said he was one of

14  the four managing members.

15          THE COURT:  Okay.  Well  --

16  BY MR. REGAN:

17  Q     How did QVT come to have PCDS in its portfolio in 2008?

18  A     Well, I was not the trader on PCDS, but I was aware

19  that we had PCDS in 2008.  And we came to have it just

20  because we thought it was a very cheap form of protection on

21  potential financial issuer distress, default, deferral even

22  on preferreds.  At the time that my partner, Arthur, began

23  acquiring the portfolio of PCDS the spreads were just

24  extremely low on the PCDS, you know, in absolute terms. I

25  mean, we were talking, you know, less than a hundred basis

Page 80

1  points often for many of these trades as an annual premium.

2  So less than -- one basis point is one one-hundredth of a

3  percent.

4           And so it just didn't have to pay out a lot of

5  money over five years to be long this protection that

6  protected you not just against a default by the issuer, but

7  even a deferral on their preferred stock.

8  Q    Did you say that Mr. Choo was the trader responsible

9  for the PCDS portfolio?

10  A    Yes.

11  Q    Does QVT calculate a net asset value from time to time?

12  A    Yes.  QVT calculates a net asset value monthly which it

13  disseminates to its investors.

14  Q    And how does QVT go about doing that?

15  A    QVT calculates the net asset value by first marking all

16  its positions and then valuing other assets and liabilities.

17  And then in conjunction with its third party administrator

18  -- who in 2008 was a firm called Citgo, today it's a firm

19  called Hedge Serve -- a net asset value is calculated and

20  applied, you know, by -- to each feeder, to each share class

21  of each feeder and disseminated to investors.

22  Q    What role, if any, do individual QVT traders play in

23  determining net asset value?

24  A    Well, the QVT traders are responsible for gathering

25  marks, particularly to the extent that they can't be

Page 81

1    gathered directly from live pricing feeds, you know, such as

2    closing prices for the New York Stock Exchange, prices for

3    listed futures, government bonds.  All those things

4    obviously come in directly and don't require trader

5    involvement.

6             For over the counter products including corporate

7    bonds, credit derivatives, some other positions, the traders

8    need to manually gather marks, the traders and/or a

9    valuation group.  But in 2008 it was more the traders were

10   responsible for gathering those marks.

11   Q    At present who within QVT is responsible for preparing

12   the NAV?

13   A    So within QVT responsibility for preparing the NAV lies

14   with our valuation group and with our accounting area.

15   Today we also have a valuation committee that meets to

16   review the work of a valuation group and in particular that

17   looks at situations where it may be difficult to get -- to

18   have a mark because there just aren't a lot of, you know --

19   there aren't a lot of quotes being received from brokers on

20   positions or there -- there's -- it's a very -- it's a

21   private investment.  It's hard to value in some ways.  So we

22   make sure that there's discussion about how those things are

23   being marked.

24   Q    Who are the current members of the valuation committee?

25   A    So I'm actually the current chair of the valuation

Page 82

1    committee.  We have one managing member on it who rotates

2    typically over a period of years, and then we have our chief

3    accounting officer, our chief operating officer, our

4    treasurer, our chief compliance officer, the head of our

5    valuation group.  We have another member of the investment

6    staff, at least one kind of rotate through the committee.

7    So currently one of my partners is who is on -- who is part

8    of our investment staff is on the committee.  And there's

9    one other kind of operations valuation (indiscernible)

10   company.

11   Q    And how if at all in 2008 did the NAV process differ

12   from the way it's done today?

13   A    Well, I mean, it was essentially the same, but in 2008

14   it was a far more laborious and manual process.  It -- it's

15   both that, you know, our technology and the market has moved

16   on somewhat in terms of ability to gather marks on OTC

17   positions.  And it -- it's both of those factors.

18   Q    Was there a valuation committee back in 2008?

19   A    I'm sorry.  There was not a valuation committee or if

20   there was it didn't have the same form as the current

21   valuation committee.  There was no managing member who sat

22   on it, for instance, and it's role was probably a little bit

23   less formal.  I don't recall whether there was actually a

24   valuation committee or just a valuation group in 2008.

25   Q    Was there a QVT person responsible for the NAV

Page 83

1   calculation back in 2008?

2   A     Yes.  Our chief accounting officer who has since been

3   promoted to be our chief operating officer and still with

4   the firm would have had ultimate internal responsibility

5   within QVT for the calculation.

6   Q     And who is that person?

7   A     His name is Daniel Collins.

8   Q     Does QVT currently have a chief financial officer?

9   A     No.  We do not currently have a chief financial

10  officer.  We've really combined that role with the role of

11  the chief operating officer which is the role that Dan

12  Collins fulfills.  Also, we didn't really have -- we had --

13  we didn't have anyone with the title of treasurer in 2008.

14  That was something that the chief financial officer at the

15  time, Julian Sale, S-A-L-E, he performed that role with

16  assistance from people in the operations functions.

17           Today we have the -- a lot of the prime brokerage

18  facing role for which she was responsible at the time more

19  delegated to a treasurer who takes care of those matters.

20  Q     Can you describe in a little more detail Mr. Sale's

21  role with regards to the NAV process in 2008?

22  A     Sure.  In 2008 Mr. Sale was also involved in the NAV

23  process and he was involved in supervising Mr. Collins who

24  was the chief accounting officer at that time regarding the

25  NAV process.

Page 84

1   Q     Back in 2008 was the NAV prep time or the NAV

2   the only way in which QVT marked its positions?

3   A     No.  QVT also had a daily P&L process which was

4   essentially a way of estimating our performance for

5   ourselves.  It was for internal purposes.  It was often

6   looked at, you know, in dollar terms rather than percentage

7   terms.  So, you know, the portfolio was up X million or down

8   X million dollars yesterday as opposed to putting it in the

9   percentage terms that were most relevant to how investors

10  thought about performance.

11        And the way the daily P&L process worked is, you

12  know, I mentioned that there were many instruments in the

13  portfolio for which live data was available.  That live data

14  was being pulled into our systems.  And so we could see, you

15  know, at the end of the day if, in fact, you know, for

16  certain things we could even see during the day, you know,

17  how -- directly the impact it was having in our portfolio.

18        So, you know, that would have included things like

19  listed equities, other listed instruments like listed

20  futures.  It would have included government bonds for which,

21  you know, there are at least U.S. government bonds and other

22  developed market government bonds for which there are

23  pricing feeds available.

24        But for instruments like over the counter

25  instruments essentially our portfolio chiefly credit

Page 85

1    instruments, including credit derivatives and other less

2    liquid types of positions, obviously a private security of

3    any type, the -- there would only be daily P&L to the extent

4    that a portfolio manager directly remarked that position.

5    It was a manual process.  There was nothing that happened

6    automatically.

7            And our practice at the time was to remark really

8    at the discretion of the portfolio manager which essentially

9    meant that it happened when there were significant intra-

10   month changes in the value of a position.  So, you know, if

11   a company suddenly filed for bankruptcy you would mark them

12   -- and you were along the bonds you would mark the bonds

13   down based on the market pricing you then saw post-

14   bankruptcy even if it was the middle of the month.

15   Q    And did that situation happen at all in September 2008?

16   A    Yes.  In September 2008 we definitely marked a number

17   of positions intra-month.

18   Q    Do you recall what event precipitated those steps?

19   A    Well --

20           MS. SAWYER:  Objection.  Foundation.

21           THE COURT:  The question was if he recalls.

22   Okay.

23           MS. SAWYER:  Okay.  I just -- it goes to still my

24   point about the trader -- you know, that he's talking about

25   what other traders are doing and just that point.

Page 86

1             MR. REGAN:  I'm just talking about the daily

2      marking process.

3             THE COURT:  Okay.  It's only to the extent of your

4      personal knowledge and to the extent that you remember.  No

5      speculation.

6             THE WITNESS:  Okay.

7             THE COURT:  But you can answer.

8             THE WITNESS:  Okay.  Well, I recall that we

9      engaged in general portfolio marking exercises at certain

10     points in September of 2008 that were more akin to our month

11     end process, essentially asking the traders to, you know,

12     make sure that they gathered marks and looked at the marks

13     on the OTC positions so that we could state performance to

14     our investors intra-month.

15     BY MR. REGAN:

16     Q    And did QVT have an auditor in 2008?

17     A    Yes, we did.  We've had a -- the same auditor since

18     inception as an independent group of funds in 2004 and that

19     auditor is PricewaterhouseCoopers.  They continue to audit

20     us today.

21     Q    Did PricewaterhouseCoopers play any role in the monthly

22     NAV process?

23     A    No.  PricewaterhouseCoopers doesn't play any role in

24     the monthly NAV process except really with respect to the

25     month of December which is our year end where they then come

Page 87

1    in and audit the NAV that's established by us and by our

2    third party administrator.  So, you know, for once -- for

3    year end they do audit that NAV essentially and they look in

4    great detail at our marking of individual positions.

5    Q    Is PWC or was -- in 2008 was PWC in any way involved in

6    the daily P&L marking process that you described?

7    A    No.  They were not involved in any way in the daily P&L

8    marking process.

9              THE COURT:  Can I ask one question?  So on any

10   given day with respect to the P&L marking process it was

11   fairly likely that it was not accurate because you said that

12   for positions for which there was data that would be pulled

13   live, that would all happen automatically.  But other than

14   that it had to do with who was manually correcting their

15   marks or not --

16             THE WITNESS:  Right.

17             THE COURT:  -- right?

18             THE WITNESS:  That's correct.  I mean, I would say

19   the daily P&L process was an estimate of the overall P&L and

20   the idea was, you know, where there are significant changes

21   you should put that into the system so, you know, we know

22   what's happening and we're not suddenly surprised at month

23   end with regard to individual positions.  I mean, I think,

24   you know, that's a bad thing to do when as a team you're

25   managing a large complex pool of investments.  You don't

Page 88

1    want to surprise your colleagues particularly with bad news.

2           But that's essentially right.  I mean, there was a

3    lag with respect to, you know, how good the estimate was

4    based on exactly that, how good, you know, and up to date

5    the inputs were that people were putting in.  And, you know,

6    as I said it was a very laborious process particularly back

7    in 2008 to collect all these marks.  You know, our portfolio

8    was very large.  We had to go out to a lot of dealers.  We

9    couldn't just pull these off of Bloomberg runs or something.

10   That could be one source.  But often you had to go and

11   specifically request marks on less liquid positions from

12   dealers.

13          And, you know, that tells the dealer something,

14   too.  I mean, it's information about your having the

15   position and whatever -- so it's not necessarily something

16   you wanted to do every day even if -- if we just tried to

17   mark the portfolio super accurately every day particularly

18   back then it would have consumed a large portion of our work

19   day to do that.  I mean, it was quite normal on the month

20   ends, which is what we called them, for us all to stay till,

21   you know, fairly late in the evening, eight, nine, ten,

22   11:00 sometimes to make sure that all the marks were in.

23          And, you know, particularly at month end we had a

24   process then of documenting them in this separate piece of

25   internal software we created called Beardstown (sic) where

1   the marks would be recorded and could be reviewed by the

2   valuation group, et cetera.

3          THE COURT:  Thank you.

4          THE WITNESS:  Yeah.

5   BY MR. REGAN:

6   Q    Mr. Brumm, can you describe for the Court QVT's

7   business relationships with Lehman?

8   A    Sure.  We had a number of business relationships with

9   Lehman dating back even to our time as the QVT Group with

10  then Deutsche Bank.  We had a trading relationship with them

11  dating back to that time, and then when we became an

12  independent firm -- and I should say that included the

13  trading of credit derivatives, I believe, back then.  But,

14  you know, through the Deutsche Bank ISDA of course which we

15  were under.  And then when we became an independent firm

16  with them we added to that.  We needed to have a direct ISDA

17  trading relationship with them, of course.  So we entered

18  into a number of ISDA agreements with them for the different

19  products that they traded.

20          In addition, they also became a significant prime

21  broker to us and as part of that prime brokerage

22  relationship they were one of our main repo and reverse repo

23  counterparties.

24  Q    With regard to the prime brokerage arrangement, which

25  Lehman entity or entities was that with?

1    A     The prime brokerage arrangements were with LBIE, Lehman

2    Brothers International Europe which was their main offshore

3    broker dealer and with Lehman Brothers Inc., LBI.  But we

4    were principally funded for -- from LBIE.  That's

5    essentially where the securities positions were and the

6    entity through which the margin funding was extended.

7              I -- LBI acted as a custodian or sub-custodian to

8    -- for LBIE.  It was a complicated relationship.

9    Q     What types of business did QVT and LBIE or LBI do

10   through the prime brokerage arrangement?

11   A     So the prime brokerage relationship was essentially a

12   way for Lehman to lend money to the QVT and Quintessence

13   Funds on the strength of the collateral that they held in

14   the long and short positions that we had.

15             So I had mentioned earlier that, you know, we had

16   roughly 60 billion of long positions versus -- sorry --

17   roughly 60 billion of long and short positions, excuse me,

18   versus our 13 billion of AUM coming in to -- or 12 -- I

19   guess it was closer to 12 at that point coming in to the

20   beginning of 2008.

21             So the way we were able to do that was essentially

22   Lehman and other prime brokers, at least these are for the

23   so-called cash positions meaning not the derivatives, the

24   long and short securities positions, they would look at that

25   book of positions and they would say, you know, for those

Page 91

1    positions because you have a long -- longs and shorts and

2    they're offsetting, I'm willing to either lend you money to

3    partress (sic) the long positions that you don't want to

4    fully fund yourself or I'm willing to let you use some of

5    the proceeds from the sale of the short securities, the

6    short positions, the cash that's generated when you sell

7    those, for the same purpose.

8            So it was just so-called funding, you know, via

9    your shorts.  So on that basis I'm going to require you to

10   put up a far smaller amount of money which is, you know,

11   your margin requirement.  And the rest is effectively a loan

12   from Lehman on which they charge interest.  And that's how a

13   prime broker makes money from its customers.

14           MS. SAWYER:  I'm just going to --

15           THE COURT:  Ms. Sawyer.

16           MS. SAWYER:  -- move to strike the testimony about

17   what a prime broker does and how a prime broker does it and

18   how a prime broker thinks about it.

19           MR. REGAN:  On what basis?

20           MS. SAWYER:  Lack of personal foundation -- lack

21   of personal knowledge.

22           MR. REGAN:  He was the other counterparty.

23           THE COURT:  He is not the prime broker.  So -- all

24   right.  We're going to strike that portion of the testimony.

25   BY MR. REGAN:

Page 92

1   Q    Mr. Brumm, did to your knowledge LBIE or LBI file for

2   bankruptcy?

3   A    Yes.  They both ended up filing.  One filed under the

4   UK insolvency arrangements, LBIE, and LBI filed for

5   bankruptcy.

6   Q    And did QVT have claims against those entities?

7   A    We did have claims against those entities.

8   Q    And what is the current status of those claims?

9   A    Those claims have been settled.  They've been paid.

10  Q    In addition to the prime brokerage arrangement, what

11  other types of transactions did QVT have with Lehman?

12  A    Well, I mentioned that there were several ISDAs in

13  place.  There's the ISDA that is at issue in this case,

14  which was the issue -- which was the ISDA with Lehman

15  Brothers Special Financing Inc. as guaranteed by Lehman

16  Brothers Holdings Inc. which was the parent -- top parent

17  company of the Lehman group.  And there were two other

18  ISDAs, one with Lehman Brothers Commodity Services and one

19  with Lehman Brother OTC Derivatives, I think it was called.

20  LBOTC is what it was known as.  Those were also guaranteed

21  by LBHI, the parent company.

22  Q    What types of transactions were done under the Lehman

23  Brothers Commodity Services or Lehman Brothers OTC

24  Derivatives ISDAs?

25  A    Well, the Lehman Brothers Commodity Services as the

Page 93

1    name implies was the commodity transactions.  The Lehman

2    Brothers OTC Derivatives was for equity swaps or, you know,

3    certainly at least for short equity positions, I think.  I

4    know we had one under it, a borrow arrangement where we were

5    essentially able to get shorter stock synthetically through

6    a equity swap.

7           I don't recall why Lehman had these separate

8    entities.  It wasn't typical necessarily of a broker dealers

9    typically, or ISDA counterparties I should say.  Our ISDA

10   counterparties usually transacted just through one entity.

11   There were maybe a couple that transacted through multiple

12   entities.  Lehman for some reason had segmented its business

13   by product type.  So special finance -- Lehman Brothers

14   Special Financing Inc handled the credit derivatives that we

15   had.  The equity swap was LBOTC or swaps, and for

16   commodities transactions they wanted us to transact through

17   Lehman Brothers Commodity Services.

18           MS. SAWYER:  Your Honor, I'm going to move to

19   strike the testimony regarding how Lehman Brothers divided

20   up its derivatives business and why.

21           MR. REGAN:  They divided --

22           MS. SAWYER:  Again, the witness does not have

23   personal knowledge as to why Lehman's doing it.

24           I'm also not sure what the relevance is, but okay.

25           MR. REGAN:  I think the witness just testified

Page 94

1    that Lehman Brothers with QVT divided up its ISDA business

2    in a certain way and that's all he was testifying to.

3              THE COURT:  I -- to the extent that it's a factual

4    description of who the Lehman counterparties were, that's

5    fine because that's fact.  As opposed to why Lehman did that

6    same objection and the same -- we'll strike any part of that

7    testimony.  I don't think the witness actually said anything

8    about why he thinks Lehman did it that way.  So -- okay.

9    BY MR. REGAN:

10   Q    To your knowledge did Lehman Brothers Commodity

11   Services or Lehman Brothers OTC Derivatives file for

12   bankruptcy?

13   A    Yes.  They both filed for bankruptcy.

14   Q    Did QVT submit claims against those entities?

15   A    We did submit claims against those entities.

16   Q    What is the current status of those claims?

17   A    Those claims were resolved in 2015 around the time this

18   litigation got going (indiscernible).

19   Q    Mr. Brumm, if I can ask you to turn back to the front

20   of your witness binder?

21   A    Yes.

22   Q    And turn your attention to JX-1, Exhibit 1.

23   A    Okay.

24        (Pause)

25   Q    Have you ever seen Exhibit 1 before?

Page 95

1   A   Yes, I have.

2   Q   What is it?

3   A   Exhibit 1 is an ISDA master agreement between Lehman

4   Brothers Special Financing Inc and QVT Fund, LP.

5   Q   And if you could turn your attention to page 18 --

6   A   Okay.

7   Q   -- which has the Bates Number QVT Fund 159 at the

8   bottom.

9   A   Yes.  I see it.

10   Q   What information is shown on that page?

11   A   So on this page is shown the signatures of QVT Fund

12   acting through its general partner and of Lehman Brothers

13   Special Financing Inc.

14   Q   And who signed that signature page for QVT?

15   A   I signed the signature page for QVT Associates GP, LLC

16   as did my partner, Lars Baeder.

17   Q   Turning to the next page of the document.

18   A   Okay.

19   Q   What information is shown on that page?

20   A   This is the schedule to the ISDA master agreement dated

21   as of February 25, 2005 between LBSF and QVT Fund, LP.

22   Q   And what type of information is set forth in the

23   schedule?

24   A   So the schedule to the ISDA master typically sets forth

25   the parties' elections with respect to certain matters that

Page 96

1    they're either able or required to make collections to.

2    It's also a -- on the schedule that parties attach or insert

3    specific provisions that are not an election that is -- you

4    can make under the master, but that they wish to customize

5    their agreement with because the ISDA form permits you not

6    only to customize by making elections, but also by adding

7    your own agreements with respect to other matters.

8    Q    If you could turn to page 28 of Exhibit 1 --

9    A    Sure.

10   Q    -- which has the Bates number QVT Fund 160 -- 169,

11   sorry.

12   A    Okay.

13   Q    What information is shown on that page?

14   A    So showing on this page are the signatures of Lehman

15   Brothers Special Financing Inc and QVT Fund, LP.

16   Q    And who signed for the QVT entity?

17   A    So the QVT Fund -- for the QVT Fund entity it was

18   executed by its general partner and I signed for the general

19   partner as one of its managing members as again did my

20   colleague, Lars Baeder.  This was executed at the same time

21   that the ISDA agreement itself was executed.  The -- it was

22   typical to execute the schedule as well as the agreement

23   itself.

24            And it was executed for Lehman by Allison M.

25   Kareen (ph) who was also the authorized signatory who

Page 97

1    executed the agreement itself on behalf of Lehman.

2    Q    If you could turn forward in the document three pages.

3    A    Sure.  Yeah.

4    Q    Page Number -- Bates Number QVT Fund 172 at the bottom.

5    A    Yes.  I'm there.

6    Q    What information is shown on that page?

7    A    So on this page is -- it's a -- it's shown to be a

8    credit support annex.  So this was an annex to the ISDA

9    master agreement pursuant to which the parties established

10   the basis on which they would post collateral to each other.

11   Q    And does that annex appear to be complete to you?

12   A    It does appear to be complete to me.  It has both the

13   printed form which is the first ten pages to Bate stamp 181

14   and the annex -- the support annex that's labeled on Bates

15   stamp 182.  The -- again, like the ISDA master it was normal

16   for the parties.  They really needed to make a number of

17   elections under the credit support annex and it was also

18   frequent that parties would customize, you know, certain

19   provisions of the credit support annex by inserting

20   provisions that were then negotiated in the annex.

21   Q    If you could turn forward to page 16 of the annex --

22   A    Yeah.

23   Q    -- which should have the Bates Number QVT Fund 187.

24   A    Correct.

25   Q    What information is shown on that page?

Page 98

1   A    So shown on this page are the signatures of Lehman

2   Brothers Special Financing Inc. and QVT Fund, LP acting

3   through its general partner, QVT Associates GP, LLC.

4   Q    And which individual signed for the QVT entities?

5   A    I signed again for the QVT entity as did my partner,

6   Lars Baeder.

7   Q    If you could turn to the next tab in your binder --

8   A    Yes.

9   Q    -- Exhibit 2, JX-2.

10  A    Okay.

11  Q    What is this document?

12  A    This document is an ISDA master agreement dated as of

13  June 18th, 2007 between Lehman Brothers Special Financing

14  Inc. and Quintessence Fund, LP.

15  Q    And if you could turn to page 18 of Exhibit 2.

16  A    Okay.

17  Q    What information is shown on that page?

18  A    Shown on this page are the signatures of the parties to

19  the ISDA master agreement.

20  Q    And which QVT parties is a party to this ISDA master

21  agreement?

22  A    So this agreement was signed by Quintessence Fund, LP

23  acting through its general partner, QVT Associates GP, LLC.

24  I signed as an managing member of QVT Associates GP, LLC and

25  Julian Sale, our then CFO, signed as an authorized party.

Page 99

```
 1    Q    If you would turn to the next page of Exhibit 2, what

 2    information is shown there?

 3    A    So this is the schedule to that same ISDA master

 4    agreement dated as of June 18th, 2007 between LBSF and

 5    Quintessence Fund.

 6    Q    And does that schedule appear to be complete?

 7    A    Yes, it does.  And on page 28 it was signed by the same

 8    signatories, by Julian Sale and by me on behalf of QVT

 9    Associates GP, LLC for Quintessence Fund, LP.

10    Q    If you could skip forward three pages --

11    A    Yes.

12    Q    -- to the one Bates Number QVT Fund 219.

13    A    Yes.

14    Q    What information is shown on that page?

15    A    This is an ISDA credit support annex to the ISDA master

16    agreement we've just looked at.

17    Q    And does that credit support annex appear to be

18    complete?

19    A    It does.  Let me just look through it.

20         (Pause)

21    A    It does appear to be complete.

22    Q    And if you could turn to the last page of that exhibit

23    which should hopefully have the Bates Number QVT Fund 234.

24    A    Yes.  I'm there.

25    Q    What information is shown there?
```

Page 100

1    A    So shown here are the signatures of the parties to the

2    credit support annex including the annex under which they

3    make the elections that they can make and include the

4    additional agreements that they wish to make.  And the -- it

5    was signed by Lehman Brothers Special Financing Inc. and for

6    Quintessence Fund, LP by its general partner, QVT Associates

7    GP, LLC.  The signatories were again me and Julian Sale, our

8    CFO.

9    Q    To the best of your knowledge are there any differences

10   between Exhibit 1 and Exhibit 2 other than the QVT entity

11   that is a counter party?

12   A    The agreements were supposed to be substantially

13   identical to each other.  So I believe that they're the

14   same.  The one area where I think they may be a little

15   different is on (indiscernible) relating specifically to the

16   size of the fund.  Quintessence Fund was much smaller than

17   the QVT Fund.  It was about ten percent.

18            So, for instance, there's something that's

19   typically an agreement that the ISDA counterparty -- the

20   dealer counterparty I should say requires something called

21   an NAV floor.  So once the NAV of the fund falls below a

22   certain level it gives the ability -- the dealer the ability

23   to terminate the ISDA.  So that floor would have been set at

24   a different level because it's usually set with regard to

25   the starting level of assets.

Page 101

```
 1              Just -- so just because Quintessence Fund was much

 2    smaller it would have had a lower probably net asset floor,

 3    but I haven't gone through those types of terms

 4    individually.

 5    Q    Were the QVT and Quintessence master agreements

 6    supported by payment guarantees in any way?

 7    A    Yes.  Each was supported by a guarantee from Lehman

 8    Brothers Holdings Inc.  That was the structure that Lehman

 9    had in place.

10    Q    Did QVT and Lehman enter into CDS transactions under

11    Exhibits 1 and 2?

12    A    Yes, they did.  Those were the agreements under which

13    the CDS were entered into.

14    Q    When Lehman and QVT entered into those CDS transactions

15    was there any other documentation involved?

16    A    Yes.  There was what was called a confirmation and the

17    confirmation formed with the ISDA master the terms of the

18    transaction.

19    Q    Are you aware whether ISDA has published different

20    versions of the master agreement?

21    A    Yes.  I'm aware of at least two versions and I think

22    there may have been earlier versions, too, but there -- the

23    two versions that are current in the marketplace are the

24    1992 master agreement and the 2002 master agreement.

25    Q    Which version are the QVT Lehman master agreements?
```

Page 102

```
 1   A     They're 1992 master agreements.

 2   Q     From QVT's perspective why did QVT and Lehman use the

 3   1992 form?

 4   A     We used the 1992 form because it -- in my view and it

 5   was my understanding it was the view of market participants

 6   generally at the time that the 1992 form was more even

 7   handed.  It was more -- each party was treated the same way.

 8   The 2002 version was perceived in the market to afford the

 9   dealer party more flexibility.

10   Q     Were you involved in the negotiation of the QVT Fund

11   ISDA with Lehman?

12   A     I was involved.

13   Q     If I can direct your attention back to Exhibit 1 --

14   A     Yes.

15   Q     -- on page 20 of that document.

16   A     Okay.

17   Q     It should be Bates Number 161.

18   A     Bates 161?

19   Q     I'm sorry.  Yeah, 161.

20   A     Yeah.

21   Q     If I could direct your attention to paragraph F on that

22   page.

23   A     Okay.

24   Q     What information is shown in paragraph F?

25   A     Paragraph F is the parties' elections with regard to
```

Page 103

1    early termination.

2    Q    And what did the parties elect with respect to early

3    termination?

4    A    So just looking at the first part of the sentence, the

5    parties -- it says, for purposes of Section 6(e) of this

6    agreement market quotation in the second method will apply.

7    So those were two separate elections that the parties could

8    make:  One for market quotation versus loss and the other

9    first method or second method.

10   Q    Do you recall negotiating this section?

11   A    I do recall negotiating this section.

12   Q    What do you recall about that negotiation?

13   A    I recall that we requested that market quotation and

14   second method be used and that Lehman resisted the use of

15   market quotation and suggested that we use loss instead.

16   Q    Why did QVT request market quotation and second method?

17   A    Well, market quotation and second method was generally

18   considered in the marketplace to be the fairest, you know,

19   most even set of elections.  It was standard for hedge funds

20   of at least our size to request and receive market quotation

21   and second method.  In fact, I don't even remember any of

22   our ISDA -- other ISDA counterparties even suggesting that

23   they wanted anything other than market quotation.  It was

24   just -- it was the standard.  That's what it was.

25   Q    And you mentioned first method and second method.  What

Page 104

1    are the differences between those two terms?

2    A    So first method, under first method where there's a

3    default or a termination -- that leads to a termination

4    event the non-defaulting party does not have to make a

5    payment to the defaulting party if after doing its

6    calculation via either market quotation or loss, depending

7    on which is selected, it finds itself owing a net amount to

8    the defaulting party.

9           First method was really -- it wasn't something

10   people even discussed at least relative to users like hedge

11   funds or any size.  At that point it was sort of automatic

12   that it was going to be second method.  As I understood it

13   there was a clear regulatory preference for second method,

14   too, because obviously where you have first method, you

15   know, you create a risk that (indiscernible) markets may not

16   actually be paid because the defaulting party cannot

17   collect.

18           THE COURT:  Ms. Sawyer.

19           MS. SAWYER:  Yes.  I object and I move to strike

20   his testimony about what the regulators' view of ISDA is in

21   the first method versus second method.

22           THE COURT:  Do you have a basis for your statement

23   as to what the regulators' view was?

24           THE WITNESS:  It was my understanding that was the

25   background of first method and second method at the time.

Page 105

1    But I -- I've not talked directly with regulators about it

2    or anything --

3              THE COURT:  All right.

4              THE WITNESS:  -- like that.

5              THE COURT:  Thank you.

6    BY MR. REGAN:

7    Q    Were the QVT ISDA -- QVT Lehman ISDA master agreements

8    automatic termination agreements?

9    A    No.  They were not automatic termination agreements.

10   Q    Based on your understanding of the ISDA what, if any,

11   rights did Lehman Brothers Holdings' Chapter 11 filing give

12   QVT?

13   A    So Lehman Brothers Holdings Inc. which was the entity

14   that filed in the early morning hours of September 15th was

15   the guarantor under these ISDAs.  In ISDA speak that's a

16   credit support provider.  And what a credit support

17   provider, essentially when events occur with respect to a

18   credit support provider they're the same as an event

19   occurring with respect to the counterparties.

20              So the fact that LBHI had filed for bankruptcy

21   even though LBSF, our counterparty, had not and LBOTC and,

22   you know, these other ISDAs that I mentioned gave us the

23   right to exercise the early termination under the ISDAs.

24   Q    Backing up a step, in 2008 did QVT at any point in time

25   come to have concerns about Lehman's financial condition?

Page 106

```
 1    A    Yes.  We had a lot of concern in 2008 about Lehman's

 2    financial condition.

 3    Q    Within 2008 did that concern change at any particular

 4    point in time?

 5    A    Sure.  I mean, it changed at various points as, you

 6    know, things went on in the market and Lehman's -- the price

 7    for Lehman's securities changed.  It changed around -- and

 8    we thought Bear Sterns might fail and they were ultimately

 9    rescued, although, you know, at great expense to the common

10    shareholders.

11         And it -- we became especially concerned beginning

12    in September and particularly after what was essentially a

13    failure of Fanny and Freddie that caused the government to

14    step in and place the -- those entities into

15    conservatorship.

16    Q    And why did the Fanny and Freddie conservatorship

17    impact QVT's concerns about Lehman?

18    A    Well, I think we were just very concerned about the

19    impact on financial markets of the conservatorship.  What it

20    said about the financial system, the value of financial

21    assets, particularly real estate related assets, and also

22    how the process had been handled with the way that a line

23    had essentially been drawn between the senior insubordinated

24    debt which received the support of the U.S. government and

25    the preferred and common which did not was essentially, you
```

Page 107

1    know, rendered close to valueless by the way the

2    conservatorship was initially implemented.

3    Q    What steps, if any, did QVT take to address its

4    concerns about Lehman's financial condition?

5    A    So we addressed our concerns primarily by seeking to

6    reduce across the whole relationship as much as we could our

7    exposure to Lehman.  So what was involved there was

8    principally trying to move prime brokerage and repo

9    positions to other prime brokers and repo counterparties.

10         Lehman was one of our prime brokers, but it was

11   not our largest prime broker.  We -- Deutsche Bank was, in

12   fact, our largest prime broker and we had a number of other

13   prime brokers.  So we were able to move long and short

14   positions away from Lehman to those prime brokers.

15         On -- for repo Lehman, in contrast, was one of our

16   main repo counterparties and so, you know, we needed to find

17   other people who could -- we had to undo those transactions

18   with Lehman.  We had to move those transactions to other

19   counterparties who could accept those bonds and provide repo

20   financing on them.

21         So the -- that was the principal area of our

22   focus.  For derivatives we also tried to move some

23   positions, but it was a lot harder to move positions.  You

24   know, you have an unfettered right, obviously, to move your

25   loan and short cash positions that are in prime brokerage or

Page 108

1   in repo.  You have an unfettered right.  Those trades need

2   to actually happen and settle and whatever.  But it's not

3   like there's a third party who has any say so.

4           That's not how credit derivatives work.  When you

5   -- or derivatives in general.  When you want to move

6   derivatives under an ISDA which is called an novation, the

7   party who is going to step into your shoes and face Lehman

8   obviously needs to consent.  And that was a problem.  You

9   know, there were many dealers who did not want to increase

10  their own exposure to Lehman by stepping into derivatives

11  positions that faced Lehman.

12          So we weren't really able to novate very many of

13  our derivatives after exploring our ability to do so.

14          There were some additional steps we were taking,

15  too.  One was to try to make sure that we were fully

16  margined to the extent that we were -- or collateralized I

17  guess I should say on the derivatives to the extent that we

18  were permitted to call for collateral.  So we tried to call

19  for collateral.

20          We also asked Lehman to waive voluntarily the

21  initial margin, what in ISDA speak is called the independent

22  amount which is the -- essentially the amount of money that

23  the non-dealer counterparty puts up with the dealer for the

24  privilege of entering into the derivative transaction with

25  them.  It's not something that a dealer ever puts up with

Page 109

1    the counterparty.  It's one way.

2    Q    Can you take a step back and explain for the Court how

3    the margin or collateral process works under an ISDA for a

4    CDS transaction?

5    A    Sure.  I mean, it's essentially --

6              MS. SAWYER:  Objection.  Foundation.

7              MR. REGAN:  In the QVT Lehman context.

8              THE WITNESS:  Sure.  It's essentially governed by

9    the credit support annex document that we were -- we just

10   were looking at.

11             So the way it works is -- I mentioned independent

12   amount or initial margin.  That's an amount of money that

13   the non-dealer counterparty puts up with the dealer.  It's a

14   requirement in order to enter into the trade.  And that

15   amount of money is designed to protect the dealer from non-

16   performance by the end user counterparty.

17             Although it's important to understand that the

18   margin that is posted doesn't go into a, you know, special

19   segregated account or something.  It's money that is just

20   typically cash, although there's typically other eligible

21   collateral consisting of essentially highly liquid

22   government securities.  In our case it was only cash I

23   believe that was ever posted.

24             That cash is used by the dealer counterparty in

25   its business.  The same rules apply when cash is posted back

Page 110

1    to the end user counterparty, here the QVT Funds.

2            The way that cash gets posted back to the end user

3    counterparty is through variation margin.  So variation

4    margin is distinct from initial margin is the margin that

5    one counterparty posts to the other for changes in the value

6    of the derivative position.

7            So say, for example, QVT purchased a CDS at 100

8    basis points running on some credit and that credit then

9    deteriorates and is now trading in the market at 200 basis

10   points running.  Well, the CDS contract is in the money.

11   It's more valuable and it's -- it -- the amount that it's in

12   the money is the difference between, you know, the 100 basis

13   point spread and the 200 basis point spread, and on that

14   basis a -- it's -- a mark is established, you know, what's

15   the value of the position today at a midmarket level.  And

16   the party who is in the money can then call the party -- the

17   other party for that amount of collateral.

18           But one of the important things to remember is

19   that no matter how far into the money you go, the initial

20   margin can never be recovered by the non-dealer

21   counterparty, here QVT, until the end of the trade.  So the

22   initial margin always remains with the dealer counterparty.

23   It's essentially a deduction against the mark to market.

24   BY MR. REGAN:

25   Q    And what about variation margin?

Page 111

1    A    Sorry.  That was variation margin that I was just --

2    oh, does it -- it goes back --

3    Q    Does it --

4    A    -- and forth on a daily basis between the parties.  I'm

5    sorry.

6    Q    And what happens to variation margin upon one

7    counterparty's default?

8    A    So upon a counterparty's default whatever margin you

9    have is applied against the value of the derivatives.

10           THE COURT:  Mr. Regan, Mr. Brumm has been at it

11   for about an hour and a half now.  So are you getting to a

12   good stopping point for --

13           MR. REGAN:  I think this --

14           THE COURT:  -- the lunch break?

15           MR. REGAN:  -- is a good stopping point.

16           THE COURT:  What do you think?

17           THE WITNESS:  Perfect.

18           THE COURT:  Okay.

19       (Pause)

20           THE COURT:  Let's take more like an hour today

21   than we did yesterday.  So let's come back say at five

22   minutes to two.

23           So, Mr. Brumm, the rules are that you remain under

24   oath during the lunch hour.

25           THE WITNESS:  Okay.

Page 112

1                    THE COURT:  So it's a lonely lunch.

2                    THE WITNESS:  Okay.

3                    THE COURT:  You're not to discuss the case or your

4    testimony with anyone --

5                    THE WITNESS:  Okay.

6                    THE COURT:   -- or to be in anyone's presence

7    while they're discussing the case --

8                    THE WITNESS:  Okay.

9                    THE COURT:  -- or your testimony.

10                   THE WITNESS:  All right.

11                   THE COURT:  Okay.

12                   THE WITNESS:  I'll go into the hallway.

13                   THE COURT:  Well, not quite that bad, but --

14        (Laughter)

15                   THE COURT:  Thank you very much.

16        (Recessed at 1:00 p.m.; reconvened at 2:01 p.m.)

17                   THE COURT:  Please come up, Mr. Brumm.

18                   THE WITNESS:  Thank you, Your Honor.

19        (Pause)

20                   THE COURT:  Okay.  Ready when you are.

21   BY MR. REGAN:

22   Q    Mr. Brumm, prior to the lunch break you testified about

23   a prime brokerage relationship that QVT had with Lehman.  Do

24   you recall that testimony?

25   A    I do.

Page 113

1  Q    In connection with that relationship are you familiar

2  with something called a QES strategy, Q --

3  A    Yes.  I am familiar with --

4  Q    ES --

5  A    I am familiar with the QES strategy.

6  Q    And what is that?

7  A    That is the -- that was our name internally for the

8  statistical arbitrage strategy that I also mentioned in my

9  testimony prior to lunch.

10 Q    And what, if anything, did QVT do with respect to the

11 QES strategy in September 2008?

12 A    So the QES strategy unlike our other strategies was

13 custodied (sic) exclusively at Lehman or, sorry, I should

14 really say PB or prime brokered exclusively at Lehman

15 meaning that for the rest of our strategies we used a

16 variety of prime brokers really depending on the asset and

17 the balances and the financing rates available.

18        But QES which was a strategy that involved the

19 algorithmic trading of many, many listed equity securities

20 in relatively small size was -- we decided that because of

21 the difficulties of administrating a strategy like that and

22 perhaps because of the (indiscernible) I guess I'm a little

23 hazy on.  But for whatever reason we decided it would be

24 custom -- it would be PB'd exclusively at a single prime

25 broker which was Lehman Brothers.

Page 114

1          So there were a lot of positions because this

2     portfolio of listed equities securities ran in through the

3     hundreds and maybe thousands of individual line items and

4     positions and that was exclusively at Lehman Brothers.

5          And that actually made the task of moving PB

6     positions away from Lehman to other prime brokers somewhat

7     complex and time consuming.  There were just a lot of

8     individual line items, a lot of things to move, a lot of

9     trades that could fail.

10    Q    And just before the lunch break we were also discussing

11    variation margin.  Do you recall that testimony?

12    A    I do recall the testimony regarding variation margin.

13    Q    And did the Lehman QVT ISDA agreement involve variation

14    margin in any way?

15    A    Yes.  The Lehman QVT credit support annex to the ISDA

16    master agreement provided for variation margin and we --

17    Lehman would call us for variation margin as appropriate and

18    we would call them for variation margin.

19    Q    How was variation margin calculated under the Lehman

20    QVT ISDA agreement?

21    A    So under the Lehman QVT ISDA agreement variation margin

22    was calculated as a net amount payable from one side to the

23    other.  So essentially before lunch I believe I was

24    describing the way the mark to market was calculated on an

25    individual position.  So it would be calculated for each

Page 115

1    position line by line by both Lehman and by QVT and those

2    would be compared.  And the result of that would be a final

3    agreed number.

4          Of course our number would probably be a little

5    bit different from their number, but the credit support

6    annex actually includes a concept of a minimum transfer

7    amount, essentially, you know, where, you know, the amount

8    required to be transferred on a net basis.  And if it was

9    less than a certain amount they just wouldn't make a

10   transfer.  It wouldn't be like you were collateralized down

11   to the last dollar.

12         So, you know, if their valuations were roughly in

13   line with ours or vice versa, then we would agree on the net

14   amount to be transferred from one -- either from Lehman to

15   us or from us to Lehman.  And that took place on a daily

16   basis.

17   Q    Okay.  Did QVT and Lehman ever disagree on margin

18   calculations?

19   A    Yes.  There were disagreements from time to time I

20   believe on margin calculations.

21   Q    And were any of those agreements in -- disagreements in

22   2008?

23   A    Yes.  I don't recall the instances, but it's -- the way

24   it would typically work is that someone in our operations

25   area would go through the details of the individual line

Page 116

1    item valuations with someone on the Lehman side and, you

2    know, if there were things that were different between what

3    we were showing in our system and what they were showing in

4    their system or on their margin statement or the backup for

5    it, then the procedure was for that to be raised with, you

6    know, the responsible trader or the CFO, typically the

7    responsible trader because he would know about the valuation

8    position.

9    Q    How were any disagreements about margin resolved as

10   between QVT and Lehman?

11   A    Well, I don't recall the specifics of how any

12   disagreements were resolved in 2008.  I do recall that in

13   2007 this was an issue for us both with Lehman and with a

14   number of other ISDA counterparties around some of the RNBS

15   positions that I mentioned in my testimony before lunch,

16   credit derivative positions.

17         And, you know, there the -- it was resolved

18   typically by discussion with the trading desk itself because

19   they were really the ones who were placing the valuations on

20   the positions.  And typically the best way to resolve it

21   would be to have evidence of the fact that the mark that the

22   -- that Lehman or different dealer, which this happened not

23   just with respect to Lehman in 2007 but with respect to many

24   dealers in RNBS that their mark was not kind of current for

25   what had happened recently on the market, a trade or some

Page 117

1    other evidence of where a specific security or derivative

2    was likely to trade if a trade were to occur.  That's

3    typically how it was resolved.

4    Q    In the Lehman QVT ISDA agreement is there a formal

5    dispute resolution mechanism for margin?

6    A    Yes.  In the Lehman QVT ISDA agreement there is a

7    formal dispute resolution mechanism.  That dispute

8    resolution mechanism is set forth in the base provisions of

9    the credit support annex, so it's not something we specially

10   agreed with Lehman or indeed with any other counterparty

11   under any ISDA to the best of my recollection of those

12   ISDAs.

13            But I've never seen that formal dispute resolution

14   utilized either way.  That's to say that with respect to

15   Lehman I don't recall us ever using the formal dispute

16   resolution procedure and I don't recall Lehman ever, you

17   know, initiating the formal dispute resolution either.  And

18   that's also true with our other ISDA counterparties, like

19   people just don't use the formal dispute resolution

20   procedure.

21   Q    Why not?

22            MS. SAWYER:  Objection.  Move to strike.  He's --

23   he goes beyond just the QVT Lehman relationships and talks

24   about what other dealers are doing in connection with their

25   counter -- or their disputes.

Page 118

1          THE COURT:  Do you have direct knowledge of that,

2    Mr. Brumm?

3          THE WITNESS:  I have direct knowledge and I meant

4    to state it only in terms of our ISDAs.  We have ISDAs with

5    all the other leading dealers or, you know, the vast

6    majority of them I guess I would say and my comment was

7    meant to be, you know, relative to a Morgan Stanley, a

8    Goldman Sachs with whom we have had and continue to have

9    ISDAs; that I -- we've never used that dispute resolution

10   procedure with them nor have we ever used it -- nor have

11   they ever used it, you know, invoked it versus us or

12   something.

13         MS. SAWYER:  That's different than his testimony

14   before I moved to strike.  So --

15         THE COURT:  Yes.  Okay.  Fair enough.  All right.

16   So the previous testimony will stand corrected by the

17   clarification.  Okay.

18   BY MR. REGAN:

19   Q    With respect to the clarified testimony, why not?  Why

20   have you not invoked the formal dispute resolution

21   mechanisms?

22   A    Well, the reason that we've never invoked it is that if

23   you look at how the formal dispute resolution mechanism

24   works it essentially calls -- first it calls -- it calls in

25   any event for the parties to consult with one another.  So,

Page 119

1    you know, that's step one anyway.

2          And as I mentioned a moment ago, the dealers'

3    margin systems are -- the marks in the margin systems are

4    fed from the trading desk typically.  That was certainly our

5    understanding of all the dealers that we dealt with and, you

6    know, certainly our understanding for Lehman.

7          So when you raise a issue with collateral at the

8    operations area they say, speak to the trading desk because

9    that's where the marks are coming from and of course that's

10   the group at the dealer that has the best knowledge of what

11   the market price, you know, is that they believe this

12   derivative to be trading at or really quoted at I think I

13   can say.

14   Q    So --

15   A    So that's why we would go directly to the trading desk

16   if we had a disagreement about valuation.

17   Q    Does the formal dispute mechanism in the QVT Lehman

18   agreement have something called a valuation agent?

19   A    Yes, it does.  And so moving on from what it says, you

20   know, in terms of consultation to what the next step is, so

21   if the parties can't agree on what the appropriate valuation

22   is, you know, say we protest to Lehman.  Hey, we don't think

23   this is the right valuation on these RNDS, like look at

24   where other stuff is trading.  You know, indeed look at, you

25   know, look at how long it's been since this thing's trading.

Page 120

1    You've seen what's going on in the market, you know, that

2    sort of thing and they say, well, we just think this is the

3    right mark.  We're not going to move it.

4            So then the next step in the formal dispute

5    resolution procedure is for the valuation agent who is a

6    person appointed under the schedule to the annex that we

7    were looking at before lunch to reach out to other market

8    makers.  It's really a process very akin to the market

9    quotation process.  It, in fact, uses many of the same

10   defined terms including reference market maker.  And the

11   valuation agent is supposed to reach out to four reference

12   market makers and obtain quotes from them and then take an

13   average of the quotes it receives.

14   Q    And who was the valuation agent in the QVT Lehman ISDA

15   master agreements?

16   A    So under the QVT Lehman ISDA master agreement the

17   valuation agent was Lehman.  They were also the so-called

18   calculation agent which didn't apply for margin purposes,

19   but essentially the calculation agent is the person who

20   makes all the calculations required under a specific

21   transaction.

22            So, you know, if you had an equity swap and events

23   occurred with respect to the equity like a dividend or

24   something the calculation agent makes those calculations.

25   And the norm across all our ISDAs and, you know, I -- our

Page 121

1    few counterparties advised us at the time we entered into

2    those ISDAs was that the dealer is always the calculation

3    agent/valuation agent.  So while the ISDAs kind of provide,

4    you know, in this kind of evenhanded way for there to be an

5    independent valuation and calculation agent, I think that

6    was -- that's not a provision that an end user like a hedge

7    fund could take advantage of.

8              In fact, in our Lehman ISDA it specifically says

9    that, you know, they're the calculation agent and valuation

10   agent.  It's only if a termination event occurs with respect

11   to them and we don't actually terminate that we have the

12   right to then seek an -- to have an independent valuation

13   agent appointed.

14   Q    Under the Lehman QVT ISDA agreements were there

15   informal ways that QVT could challenge margin calculations?

16   A    Sure.  I mean, I think, you know, the first step in the

17   formal procedure, which was the consultation, is, you know,

18   is basically the way that we would challenge it.  I mean,

19   you could call that informal or you could call that step one

20   in the following.  We just never proceeded to step two.

21   Q    I'm sorry.  I got yelled at for the same thing

22   yesterday, sir.

23              UNIDENTIFIED SPEAKER:  (Indiscernible).

24              THE WITNESS:  Okay.  I'm sorry.  I don't recall

25   exactly what I said, so maybe -- would you like me to answer

Page 122

1    the question again or how should we proceed?  I'll try to

2    speak more slowly.

3                UNIDENTIFIED SPEAKER:  Lehman (Indiscernible) QVT

4    Lehman ISDA agreement --

5                THE COURT:  Let's --

6    BY MR. REGAN:

7    Q    Were there informal --

8                THE COURT:  Mr. Regan, why don't you re-ask the

9    question?  Everyone take a deep breath.  I know you're

10   trying to give us a lot of information as quickly as

11   possible, but it -- this time is all yours.  So just take as

12   long as you like.  Okay.

13               Go ahead.

14               THE WITNESS:  Thank you and my apologies.

15   BY MR. REGAN:

16   Q    Under the QVT Lehman ISDAs were there informal ways

17   that QVT challenged margin calculations?

18   A    Yes, or that is to say that we challenged using the

19   first step in the formal procedure which was the consult

20   with Lehman.  So I would call it really more the first step

21   in the formal procedure than utilizing the -- utilizing

22   informal means.  But as I've said we never progressed to the

23   formal -- to the second step of the formal procedure which

24   is the, you know, actual insistence on the valuation agent

25   trying to obtain four quotations from reference market

Page 123

1    makers.

2    Q    And what was the purpose of variation margin?

3    A    The purpose of variation margin was to protect the

4    party who was in the money from at least a part of the risk

5    of a default in performance by the party who was out of the

6    money.

7    Q    And what do you mean by protect?

8    A    Well, I mean, if a -- if there's a default by the party

9    that's out of the money and a termination event, the full

10   market value of that -- of the terminated transaction

11   becomes payable.  So, you know, if the non-defaulting party

12   is in the money on a net basis across all the terminated

13   transactions, then there's going to be an amount payable to

14   the non-defaulting party.  And, you know, the -- if that

15   non-defaulting party was also in the money prior to, there's

16   some protection that the non-defaulting party has from

17   having had variation margin posted to it.

18          So the idea was, you know, it's really the mark to

19   market post --

20          MS. SAWYER:  Objection just to the extent we're

21   going down --

22          THE WITNESS:  Let him finish his answer.

23          MS. SAWYER:  Well, he's saying the --

24          THE COURT:  Wait.  Wait.  Wait.  Wait.

25          MS. SAWYER:  -- idea was --

Page 124

1          THE COURT:  Wait.  Wait.

2          MS. SAWYER:  Sorry.  Objection.  Lack of personal

3   knowledge.

4          THE COURT:  Okay.  I missed it.  What was the

5   question?

6          MR. REGAN:  What is the -- what was the purpose of

7   variation margin, and the preceding questions were all about

8   the Lehman QVT ISDA.  So the question is under the Lehman --

9          THE COURT:  Right.  What --

10          MR. REGAN:  -- QVT ISDA --

11          THE COURT:  Isn't it implicit?  I mean, all along

12   this is from his perspective.  Right.

13          MS. SAWYER:  I agree.  I think -- I could have

14   waited to move to strike, but I think the witness was

15   shifting gears to say about the idea of variation margin and

16   sort of a legal conclusion or a legal interpretation --

17          THE COURT:  Okay.

18          MS. SAWYER:  -- language as opposed to based upon

19   his personal experience with variation margin.

20          THE COURT:  Mr. Brumm, I was taking your continued

21   answer to be all in the context of your personal knowledge

22   and not that you were offering views more broadly on what

23   other folks may have -- may have not thought, yes?

24          THE WITNESS:  That's correct, Your Honor.  I was

25   trying to offer my understanding of the purpose of variation

Page 125

1    margin.

2            THE COURT:  For you?

3            THE WITNESS:  For me.  For -- right.

4            THE COURT:  Okay.

5    BY MR. REGAN:

6    Q    With regards to QVT's ISDA with Lehman what was the

7    purpose of variation margin?

8    A    So with regard to QVT's ISDA with Lehman the purpose of

9    variation margin was to protect the party that was in the

10   money at least in part if there was a default by the party

11   that was out of the money.

12   Q    Why do you say at least in part?

13   A    Well, I say at least in part because variation margin

14   isn't really designed and can't really protect you fully

15   from the risk of a default by your counterparties,

16   particularly when your counterparty is a major dealer and

17   their default is going to impact the markets, enhance the

18   termination value of your transaction significantly.

19   Q    Why can't variation margin fully protect you in those

20   circumstances?

21           MS. SAWYER:  Objection.  Calls for speculation.

22           THE COURT:  You can answer it.

23           THE WITNESS:  Okay.  I can tell you why I don't

24   think it could fully protect the QVT Funds at that time

25   under the terms of our agreements.

Page 126

1           So there were several reasons.  The first is that

2    variation margin under our agreements is at midmarket.

3    Indeed, that's generally the case under ISDA.  I mean, the

4    form of the credit support -- the credit CSA specifies that

5    it's at midmarket and you can -- in contrast when you

6    replace your -- when you go to value your terminated

7    transactions you're directed to value them on your side of

8    the market.  So already it's not going to compensate you for

9    bid offer -- for bid mid or offer mid-spread, what traders

10   commonly refer to as bid offer spread because it's a mid-

11   mark.

12           So that's not going to be in your margin even if

13   prices don't move at all from the date that the margin was

14   done as of.  And that's really the second factor which is

15   that you're only protected to the extent that the pricing,

16   the marks that were used to establish your margin are good

17   accurate marks at that time.

18           As I identified with respect to, you know, some of

19   our 2007 margin disputes with dealers regarding RNDS

20   including Lehman, it -- you do get into situations where

21   there are marks that are stale or, you know, they just

22   simply -- you're talking about an illiquid derivatives part

23   that hasn't traded in a while.  It hasn't been remarked.

24   It's the dealer that's providing those marks in the first

25   instance.

Page 127

1          So if those marks are not fully reflective and you

2     can't get the dealer to make them fully reflective of where

3     you think those positions are, you're also not going to be

4     protected when a big market event occurs and suddenly

5     reveals, you know, the value of those positions.

6          And that's really the third point which is the so-

7     called jump to default risk or replacement risk which is

8     where you -- your margin marks are obviously backward

9     looking.  In the case of, you know, QVT and Lehman our last

10    margin marks from them were essentially from September 11th.

11    That was the last time margin was exchanged was on September

12    12th.

13         So, you know, where you have a default that is a

14    default by a major dealer that really moves markets at --

15    it's going to move very much the value of your portfolio.

16    Well, if you're mostly long credit protection, long things

17    that increase in value in a financial crisis then you're not

18    going to have margin at all for that jump to default risk.

19    You couldn't possibly have it because the pricing that makes

20    that risk apparent only happens after the weekend on

21    September 15th.

22         So margin's just not designed to prevent you -- to

23    protect you from that.  It's not designed to protect you

24    from where your positions move to in a default.  It's

25    designed to protect you against what the value was on

Page 128

1    September 11th.

2             So for those reasons it does not fully protect you

3    and it did not fully protect us here which is why we've

4    submitted a large claim.

5    BY MR. REGAN:

6    Q    If you could turn to Exhibit 46, JX-46 in your book.

7         (Pause)

8    Q    Do you recognize Exhibit 46?

9    A    I do recognize Exhibit 46.

10   Q    What is it?

11   A    It's an e-mail chain that I received.

12   Q    And who are the individuals on this e-mail chain?

13   A    So the e-mails (sic) on this e-mail chain are Arthur

14   Choo, Adam Medder (ph), Julian Sale, and then ultimately it

15   was forwarded to me.

16   Q    And when was it forwarded to you?

17   A    It was forwarded to me on Thursday, September 11th at

18   10:35.

19   Q    Do you recall receiving this e-mail?

20   A    I do recall receiving this e-mail.

21   Q    In the top e-mail in the chain --

22   A    Yes.

23   Q    -- from Adam to you Adam wrote in the second sentence,

24   "I explained to Arthur on his last question yet we are not

25   required to lift offers, but the quotations should be

Page 129

1    actionable in accordance with the market quotation

2    definition."  Do you see that sentence?

3    A    I do see that sentence.  Yeah.

4    Q    When you received this e-mail what, if any,

5    understanding did you have with regards to what Mr. Medder

6    meant by the phrase, "we are not required to lift the

7    offers"?

8    A    Well, I understood that he had -- what he had -- he

9    had explained to Arthur who had asked a question that you

10   can see lower down in this e-mail chain.  Arthur asked, in

11   fact, "Do we get to lift the dealers or are they just

12   quotes?  That is my question."  That he's explaining to

13   Arthur that the quotes that the dealers give in a market

14   quotation process do need to be actionable or should be

15   actionable, but that we are not required to trade with the

16   dealers.  So lift the offers is trader jargon for to accept

17   someone's offer, agree to their offer, enter into a trade.

18            So Adam says that he conveyed to Arthur that

19   there's no obligation to trade, but that we should -- if we

20   were to do a market quotation process we should be seeking

21   actionable offers.

22   Q    The top e-mail on the chain is September 11th, 2008.

23   What is the date on the other e-mails in the chain?

24   A    So the other e-mails on the chain appear to all be

25   dated Monday, September 8th, 2008, and they start at 10:54

Page 130

1    a.m. and there's a series of backs and forth and go to 12:34

2    p.m. on September 8th.

3    Q    Had QVT started preparing its market quotation process

4    on September 8, 2008?

5    A    No, we had not.

6    Q    So moving forward to September 13th and September 14th,

7    2008 the weekend before Lehman filed what, if anything, did

8    QVT do that weekend with regards to its concerns about

9    Lehman's financial condition?

10   A    So over the weekend of September 13th and 14th I recall

11   that we had a number of conference calls among the QVT

12   partners where we discussed our exposure to Lehman and the

13   steps that we had been taking to reduce it.

14        I recall that we also discussed the proposed ISDA

15   netting trading session that ISDA and the government

16   authorities including New York Fed proposed to organize.  It

17   was a -- the concept was that there would be a trading

18   session that would last several hours on Sunday where

19   parties could agree that if Lehman filed they would enter

20   into certain trades.  And the idea was that those trades

21   were supposed to take Lehman out of the middle of positions

22   that they might have.

23        I think we concluded that the whole approach was

24   highly unrealistic, that little volume would be traded in

25   this netting session, and that in any event the terms on

Page 131

1   which we were doing it, I think trading sort of went away if

2   Lehman didn't file, you know, didn't really seem to make any

3   sense.

4           And so we looked into participating, but we really

5   didn't end up participating in any particular way, although

6   trying to understand who it would work and, you know, what

7   it said about the likelihood of Lehman failure that consumed

8   a fair amount of time.

9   Q    And on the weekend of September 13th and 14th did QVT

10  prepare market quotation requests?

11  A    No.

12  Q    Okay.  On the weekend of September 13th and 14th did

13  QVT believe that Lehman would be allowed to file for

14  bankruptcy?

15  A    No.  I mean, as I said earlier I think we became

16  concerned when we heard about this netting session, although

17  it just seemed to -- it seemed to kind of show how difficult

18  it would be to get any net reduction of risk.  And we just

19  presumed, as we had really all along the prior week, even

20  while we were trying to reduce our exposures to Lehman, that

21  the government would not allow Lehman to file at least in a

22  sort of uncontrolled, completely unsupported way,

23  particularly with regards to its OTC derivatives and other

24  market making functions, including prime brokerage.

25          I mean, I recall actually thinking that Lehman

Page 132

1    would be a very -- just the way Lehman was structured from

2    what we saw vis-à-vis our relationship where the derivatives

3    were housed in separate units.  That wasn't typical of many

4    of our counterparties.  I thought that may not be protected

5    more easily, but, you know, by government action because it

6    wasn't intermingled with other stuff the way, you know, for

7    Deutsche Bank, for example, everything is in Deutsche Bank

8    AG.

9              But, you know, the -- ultimately the -- we were

10   just wrong.  I mean, the government decided -- felt that it

11   needed to let them, you know, file in the way that it did

12   and it was -- the one thing we were right about was it was a

13   truly gigantic mess and we just -- the market impact was

14   tremendous and we didn't think they would let that happen,

15   particularly after how they had behaved with Bear Stern.

16             So as I said we were very wrong about that.

17   Q    So moving forward to the morning of September 15th,

18   2008 what is the first thing you recall about that day?

19   A    I mean, the whole day was pandemonium, like I don't

20   recall, you know, the first thing other than rolling out of

21   bed at a very early hour and scrambling to the office as

22   quickly as I could to analyze what was going on.

23   Q    And from QVT's perspective what was the impact of

24   Lehman's bankruptcy filing on QVT's portfolio?

25   A    I mean, it was disastrous.  You know, as I mentioned

Page 133

1    were levered several times to our NAV through our long and

2    short side.  Even though we had minimal net exposure -- net

3    long or short exposure we had a very large portfolio of

4    securities, derivatives, other positions.  When you have

5    that you're always net long risk so you're going to lose

6    money when the markets move.

7              And particularly the way our portfolio was

8    positioned at the time we were typically -- our shorts were

9    more liquid than our longs.  And so, you know, as a result

10   it was hard to trade some of the longs and the -- they just

11   have a tendency to go down more, frankly, when they do

12   trade.

13             So it was just -- the whole day was complete

14   pandemonium as we tried to figure out how to reduce risk in

15   our portfolio.

16   Q    Did QVT adopt any particular plan of action after it

17   learned of the Lehman bankruptcy filing?

18   A    So the one thing that we decided very early on besides

19   just trying to continue the risk reducing exposure reducing

20   that we had been doing vis-à-vis the Lehman entities that we

21   faced that were not yet bankrupt, the prime brokerage, the

22   repo, we were continuing those efforts, was that given that

23   LBHI was a credit support provider under the ISDA and that

24   we could do an early termination, that we wanted to do an

25   early termination.

Page 134

1    Q    Why is that?

2    A    Well, I think the main reason was we just wanted

3    certainty as to what our positions were.  We couldn't

4    tolerate a situation where we didn't know whether we were

5    going to have these positions or not.  And we -- I think

6    like as like a portfolio manager it's axiomatic that you

7    need to know what your risk is in order for you to take any

8    actions with respect to it.

9         The one thing you can't tolerate is not knowing

10   what your positions are.  And so we just wanted the

11   certainty of knowing that we terminated our derivatives

12   positions, and that we didn't have them, and that we knew

13   what we were -- we couldn't take the risk that things were

14   going to get frozen.  The government, you know, came in and

15   did various things throughout the week to other entities

16   like we didn't know what was going to happen.  And we didn't

17   want to find ourselves in a position where we didn't know

18   what our positions were.

19        That's why we were trying to take down our --

20   continue to take down our exposures as much as possible to

21   the entities where we had prime brokerage and repo.  And,

22   you know, for ISDA the way you do it, and it's an all or

23   none decision, is you terminate the ISDA and all the

24   transactions are terminated.  So that's what we did.

25   Q    Did QVT consider waiting to terminate until a later

Page 135

1    date?

2    A    No.

3    Q    Why not?

4    A    We just wanted certainty.  I mean, we just wanted it to

5    know that we didn't have these positions anymore.  We

6    couldn't tolerate -- couldn't manage them if we didn't know

7    if there were going to be some kind of zombie position and,

8    you know, end up -- be unclear if we could have them or not

9    have them or -- so we just terminated.

10   Q    How does certainty help manage the portfolio?

11   A    Well, you can't manage your positions unless you know

12   what they are.  That's really it.  So --

13   Q    Who at QVT was involved in the decision to terminate?

14   A    The -- I was involved.  Dan was involved.  Tracy was

15   involved.  Arthur was involved.

16   Q    And who ultimately made the decision?

17   A    The managing members made the decision jointly.

18   Q    Did anyone recommend a different termination date?

19   A    No.

20   Q    What, if any, understanding did you have as to what

21   that decision required QVT to do?

22   A    I understood that it required us to give notice to

23   Lehman of the early termination and to set an early

24   termination date, and then to value the positions as -- on

25   that early termination date or as soon thereafter as

Page 136

1    practicable.

2    Q    Do you know what time on September 15th, 2008 QVT made

3    the decision to terminate?

4    A    No.  I know it was very early in the morning, before

5    9:00, but I don't know what time it was.

6    Q    After QVT made the decision to terminate what happened

7    next?

8    A    So after we made the decision to terminate we had to

9    draft a termination notice and deliver that to Lehman, and

10   then we had to draft a market quotation solicitation and

11   disseminate that to reference market makers.

12   Q    If you could turn to Exhibit 67 in your book --

13   A    Okay.

14   Q    -- JX-67.

15   A    Yeah.

16        (Pause)

17   Q    What is JX-67?

18   A    JX-67 is the termination notice that we delivered to

19   Lehman Brothers on behalf of QVT Fund and Quintessence Fund.

20   Q    Exhibit 67 appears to have two other letters.  Do you

21   know what those are?

22   A    Yes.  These are the -- I think a moment ago I said that

23   there was the termination notice; that the first page was

24   the termination notice we delivered to Lehman.  I guess more

25   properly I should have said it's the termination notice we

Page 137

1    delivered to Lehman Brothers Special Financing Inc.  And the

2    two pages that follow are notices to Lehman Brothers

3    Commodities Services Inc.  There are two of them because

4    they were delivered both on behalf of the QVT and

5    Quintessence Fund and behalf of an entity called Piney

6    Branch Park Inc. which was a trading subsidiary of the funds

7    and I guess had to deliver its own notice for some reason.

8    Q    Turning back to the first letter who signed that

9    letter?

10   A    The first letter is signed by me and by Dan Gold.

11   Q    And what time was the letter sent?

12   A    Well, I believe this date that's marked on the side of

13   it and the time is September 15th, p.m. 1:02.  That's the

14   time it was delivered.  So it must have been sent shortly

15   before that.  It was hand-delivered to Lehman Brothers'

16   headquarters which is just a few blocks from our office.

17   Q    And is the time stamp on Exhibit 67 consistent with

18   your recollection of the time that the termination notice

19   was delivered?

20   A    It is.

21   Q    And what date does the Exhibit 67 establish as the

22   early termination date?

23   A    It establishes the early termination date as September

24   15th, 2008.

25   Q    Prior to sending this letter did QVT do any actual

Page 138

1    trading in CDS that it also had had with Lehman?

2    A    Yes.  We did do certain replacement trades starting

3    early in the morning of September 15th.

4    Q    Do you know what time that started?

5    A    It started very early in the morning.  I believe my

6    partner, Arthur Choo, was trading -- he was certainly

7    trading positions.  Some of them may have been replacement

8    trades at five or 6 a.m.

9    Q    And why was QVT engaging in replacement trades at that

10   time?

11   A    Because I think he was assuming, as was I, too, that

12   the positions that we had with Lehman were lost one way or

13   another; that regardless of whether we terminated them that

14   day, a subsequent day or we didn't exercise the early

15   termination right under the ISDA we weren't going to get

16   paid under them.  I mean, we -- not only was Lehman in

17   bankruptcy, but we could see that their senior securities

18   were trading at very low cents on the dollar.

19   Q    All right.  Did QVT replace all of its CDS positions

20   with Lehman that morning?

21   A    No.  We did not replace all of our CDS positions.

22   Q    Do you know who QVT determined which positions to

23   replace and which ones not to replace?

24   A    I know that an analysis had been done by Arthur of

25   certain positions that he wanted very much to replace

Page 139

1    because were concern -- they were typically -- well, I

2    remember at least for one position, and I believe this was

3    typical of many of the others, that these were positions

4    that were hedges for specific longs that we had.

5            So I remember in particular one position that I

6    participated in the trading of where -- which was a -- an

7    issuer called CIT, a large financial where we had a bond

8    position that was being hedged with CDS and we just went out

9    starting first thing on Monday morning and bought as much

10   essentially CDS protection on CIT as we could.  In fact, a

11   number of us all participated.  That's why I remember it.  I

12   did one of the trades and perhaps assisted on some others

13   where we just went to as many different dealers as possible

14   and tried to buy CIT CDS protection as a replacement for

15   protection that had been lost.

16   Q    Earlier I think you said that after making the decision

17   to terminate you needed to prepare notice and also to

18   prepare market quotation solicitations.  How did you go

19   about preparing market quotation solicitations on September

20   15th, 2008?

21   A    Well, we had -- we went about preparing market

22   quotation solicitations by draft -- for -- there were sort

23   of two separate streams of work.  One was drafting the terms

24   of the request, the language that we would put to the

25   reference market makers, and the other stream of work was

Page 140

1   putting together the positions that we would actually then

2   attach and figuring out how to divide them up, what way made

3   the most sense to facilitate the market quotation process.

4   And that was a stream of work that my partner, Joel Wolman,

5   primarily worked on.

6   Q    And who, if any, took the lead on drafting the market

7   quotation language?

8   A    I took the lead on drafting the market quotation

9   language consulting with outside counsel on that.

10          MS. SAWYER:  Your Honor, just before questions get

11  answer -- asked about this, you know, I think that we have

12  an unresolved issue that we were discussing yesterday about

13  this very situation.  Also, I don't -- you know, I want to

14  give fair warning about if the questions and answers go

15  beyond -- well, the questions and answers go too far because

16  I think our position is, is that there is a waiver based

17  upon interrogatories which are judicial admissions that need

18  to be accepted by the Court.

19          THE COURT:  All right.  Yes.

20          MR. REGAN:  So, Your Honor, we have heard your

21  concerns both for waiver and against waiver over the last

22  few days.  If you take a look at Exhibit 2107 in that

23  binder, this is an excerpted and anonymized version of our

24  privilege log.

25          THE COURT:  Okay.

Page 141

1           MS. SAWYER:  We don't have any.  We just have --

2           THE COURT:  We just --

3           MS. SAWYER:  -- slip sheet.

4           THE COURT:  We just have --

5           MR. REGAN:  I'm sorry.  It's on -- I guess it's

6    being on the screen.  It's electronic.

7           THE COURT:  Well, okay.  Okay.

8           MR. REGAN:  So this is the excerpts from the

9    privilege log for --

10          THE COURT:  Okay.  I need to understand what you

11   think we're doing right now.

12       (Laughter)

13          THE COURT:  Before I listen to you, what are we

14   doing right at this moment?  Ms. Sawyer is reacting to the

15   fact that Mr. Brumm mentioned consultation with counsel.

16          So the first question is, do we need to take a

17   break and do we need to excuse a whole bunch of people?

18          MS. SAWYER:  Yes.

19          THE COURT:  That's my first question.

20          MS. SAWYER:  I believe we do including the

21   witness.

22          THE COURT:  So this is going to be a little

23   ungamely, maybe that's the word, because there's lots of

24   folks here, right?  So is this what we need to do now?

25          MR. REGAN:  I think we need to address the issue.

Page 142

```
 1              MS. SAWYER:  I don't think the -- I agree.  I

 2      think the issue is not resolved.

 3              THE COURT:  Okay.  All right.  So I'm going to

 4      rely on you folks to make sure that everyone who shouldn't

 5      be here is not here.  I'm going to put the phone on mute and

 6      I'm going to stay right here.  All right.

 7              So we're going to take a break to talk about

 8      stuff.

 9              MR. REGAN:  Of course.

10              MR. TAMBE:  Your Honor, can I just run down the

11      hall?

12              THE COURT:  Of course.  While everybody else takes

13      up your --

14              MR. TAMBE:  I don't want to --

15              THE COURT:  -- positions.  We won't wait for you

16      --

17          (Laughter)

18              THE COURT:  -- Mr. Tambe.

19              MR. TAMBE:  Thank you, Your Honor.

20          (Pause)

21              THE COURT:  Please come up, sir.

22              UNIDENTIFIED SPEAKER:  Yes, ma'am.

23              THE COURT:  Yes, sir.

24              UNIDENTIFIED SPEAKER:  Yes, ma'am.

25              THE COURT:  Can I help you?
```

Page 143

1            UNIDENTIFIED SPEAKER:  I --

2            THE COURT:  Please step back to the podium.

3            UNIDENTIFIED SPEAKER:  Oh, sure.  I'm sorry.

4            THE COURT:  Okay.  Right behind the podium.  Can

5    you identify -- what?  No.  That's okay.  Can you tell us

6    who you are?

7            UNIDENTIFIED SPEAKER:  Sure.  My name is

8    (indiscernible).  I'm a reporter for Law 360.

9            THE COURT:  For Law 360.  Okay.  So we're going

10   into a sealed session.

11           UNIDENTIFIED SPEAKER:  Okay.

12           THE COURT:  Okay.

13           UNIDENTIFIED SPEAKER:  Okay.  Well, I mean,

14   there's a --

15           THE COURT:  Can I ask --

16           UNIDENTIFIED SPEAKER:  It's -- Your Honor, it's

17   fine if you say it, although --

18           THE COURT:  I'm glad you think so.

19           UNIDENTIFIED SPEAKER:  Yes.  You know, but when

20   other attorneys say it, that's -- it doesn't have --

21           THE COURT:  Okay.  Well --

22           UNIDENTIFIED SPEAKER:  -- quite the same --

23           THE COURT:  -- here's the way it works --

24           UNIDENTIFIED SPEAKER:  I don't believe it has

25   quite the same --

Page 144

1          THE COURT:  Here's the way it works in --

2          UNIDENTIFIED SPEAKER:  -- stance.

3          THE COURT:  -- my courtroom.

4          UNIDENTIFIED SPEAKER:  Yes, ma'am.

5          THE COURT:  I'm in charge.

6          UNIDENTIFIED SPEAKER:  Yes, ma'am.

7          THE COURT:  All right.  If you have a concern, you

8     direct it to me.  You do not argue with reporters.

9          UNIDENTIFIED SPEAKER:  Well, no.  They directed it

10    at me, ma'am.

11         THE COURT:  Don't give me a lecture on this being

12    an open courtroom.  I'm --

13         UNIDENTIFIED SPEAKER:  No.  I'm not --

14         THE COURT:  -- fully aware of that.

15         UNIDENTIFIED SPEAKER:  But, no.  They --

16         THE COURT:  Your attitude leaves a lot to be

17    desired.  I'm going to ask you to step out --

18         UNIDENTIFIED SPEAKER:  Sure thing.

19         THE COURT:  -- right now and when we go back on an

20    open session I'll make sure to have somebody bring you back

21    in.

22         UNIDENTIFIED SPEAKER:  Lovely.  Thank you.

23         THE COURT:  All right.  Thank you very much.

24       (Sealed session held from 2:47 p.m. to 3:00 p.m. and

25    transcribed under separate cover)

Page 145

```
 1          (Recess taken at 3:00 p.m.; reconvened at 4:07 p.m.)

 2                THE COURT:  Did anyone find the reporter who

 3     wanted to come back?

 4                UNIDENTIFIED SPEAKER:  He was sitting outside.

 5                THE COURT:  Could you just take a look and let him

 6     know we're going -- we're --

 7                UNIDENTIFIED SPEAKER:  Not that it

 8     (indiscernible).

 9                THE COURT:  Yes.  The --

10          (Laughter)

11                THE COURT:  Okay.  I want to thank everybody for

12     your patience.  Are we going to go right back onto an open

13     session or -- I think we are, right?

14                MR. TRACEY:  Yes, we can.

15                THE COURT:  So I think we need to get the witness

16     for one person.

17                MS. SAWYER:  Yes.

18                MR. TRACEY:  Yeah.

19          (Pause)

20                THE COURT:  Thank you for your patience, sir.

21                UNIDENTIFIED SPEAKER:  You're welcome.

22                THE COURT:  That's the -- there's a journalist on

23     the phone line who was put on mute all that time.

24          (Pause)

25                THE COURT:  Okay.  Mr. Brumm, we're ready for you
```

Page 146

1    again.  I wanted to thank everybody for your patience while

2    we sorted out some issues.

3            So, Mr. Regan, you've had an opportunity to talk

4    to your colleagues and understand what the game plan is,

5    yes?

6            MR. REGAN:  I believe so, yes.

7            THE COURT:  Okay.

8            MR. REGAN:  For the reason that the Court has

9    eluded to we're going to jump forward in the chronology of

10   September 15th to 4 p.m.

11           THE WITNESS:  Okay.

12                 DIRECT EXAMINATION, CONT'D.

13   BY MR. REGAN:

14   Q    The market quotation solicitations have been sent.

15   What --

16   A    Okay.

17   Q    -- happens next after that?  And don't make any

18   references to people who don't work for QVT.

19   A    Oh -- sorry.

20       (Laughter)

21           MS. SAWYER:  You don't need this now.  You don't

22   need this now.

23           MR. REGAN:  Was that fair?

24           THE COURT:  Okay.  No.  No.

25       (Laughter)

Page 147

1              MR. REGAN:  Reference market makers --

2              THE COURT:  You need to answer the questions

3    honestly.  To the extent that you give an answer and counsel

4    for Lehman feels they have an objection to make, they're

5    going to make an objection.  But our hope is that we're

6    going to move the testimony along quickly.

7              So I -- you can ask whatever question you like,

8    but you have to tell the truth, obviously.

9              THE WITNESS:  Okay.

10             THE COURT:  All right.

11         (Laughter)

12             THE WITNESS:  I'm absolutely going to tell the

13   truth.

14             MR. REGAN:  All right.  Where should we start?

15   BY MR. REGAN:

16   Q    What were the results of the market quotation

17   solicitation process?

18   A    The results of the market quotation solicitation

19   process were that we received back a number of responses

20   starting a little before 4 p.m. and going to I think it was

21   as late as 8:20 p.m. that evening, and we received some

22   responses the following day.

23             However, the -- for most of the responses that we

24   received the dealers had only filled out a small number of

25   positions or line items on the market quotation request.

Page 148

1    And so there are only 12 transactions for which we received

2    the requisite three, at least three quotations from

3    reference market makers.

4    Q    Did QVT on September 15th, 2008 seek market quotations

5    for all of its Lehman CDS?

6    A    No, we did not.  We thought that we had.  We intended

7    to do so, but we discovered in the course of discovery for

8    this litigation that there was a small group of positions

9    that had not been included in the market quotation requests.

10   Q    Which positions were those to the extent you recall?

11   A    Sure.  They were primarily asset backed positions.

12   They included the CARB transactions.  They included some

13   other illiquids.  They also included a couple of more liquid

14   things.  One was this ABX index.  One was ITRAX -- I think

15   it was an ITRAX sub fin which was a very specific, it's a

16   support -- subordinated fin (indiscernible) financial.

17   ITRAX was an index on European financials.  I think that was

18   also a more liquid thing.

19         So there wasn't actually a lot of commonality

20   other than they were all supposed to be on the asset backed

21   list.

22   Q    Do you know why those positions were not included in

23   the market quotation solicitation?

24   A    I don't know why.  I think an error was made either in

25   querying the system regionally for the full range of CDS

Page 149

1    transactions that we had versus Lehman.  We had although

2    they were all CDS as contracts (indiscernible), we actually

3    had them -- we had CDS subdivided into a number of different

4    types in our system.  There was pay as you go.  There was

5    credit index.  It was -- there was more complexity in our

6    system.

7            And that may have resulted in us not getting all

8    of them or it's possible that it was because we had them all

9    in a master sheet and when we went to subdivide it into the

10   different market quotations that we sent out to different

11   desks that it occurred that way; that we just didn't -- we

12   somehow manually doing subdivision didn't get them in.

13           MS. SAWYER:  Your Honor, I would move to strike

14   everything after the witness said, I don't know why.

15   Everything else was just speculation from the witness.

16           THE COURT:  So you don't know why?

17           THE WITNESS:  I don't know why.

18           THE COURT:  All right.  We're going to leave it at

19   that.

20   BY MR. REGAN:

21   Q    You mentioned quarrying the system.  What did you mean

22   by quarrying the system?

23   A    So quarrying the system is asking the system to, you

24   know, give you a report or list for me all the transactions

25   of a certain type or with a certain counterparty or in a

Page 150

1    certain count range.  And, you know, it's basically if you

2    don't ask the question the right way you're not going to get

3    a hundred percent of the positions.

4    Q    And who at QVT on September 15th quarried the system to

5    identify Lehman facing CDS?

6    A    That was Joel Wolman who did that.

7                THE COURT:  So, Mr. Brumm, you said that these

8    positions, I think 44 of them first came to your attention

9    during discovery in this litigation.

10               THE WITNESS:  Yes.

11               THE COURT:  Sometime in 2016?

12               THE WITNESS:  I think it was in 2016.  Yes.

13               THE COURT:  So can you describe to me -- so these

14   positions, how did they exist between the early termination

15   day and when you discovered them?  They were in some kind of

16   limbo?  I'm just trying to understand.

17               THE WITNESS:  Sure.

18               THE COURT:  So they had been terminated as a legal

19   matter because September 15th was the termination date.  And

20   then how did they exist, where were they on your books and

21   records, how did you account for them?  I'm just trying to

22   understand how they could have remained out there, but not

23   kind of known.

24               THE WITNESS:  Sure.  No.  Let me clarify because

25   that's not the status that they had.  The positions were

Page 151

1    known.  We just thought that they had been included on these

2    spreadsheets that we generated for the dealers that we had

3    requested --

4              THE COURT:  I see.

5              THE WITNESS:  -- market quotations.  So we

6    believed that we had requested market quotation on them.  We

7    treated them the same way on our --

8              THE COURT:  I see.

9              THE WITNESS:  -- books and records as --

10             THE COURT:  Okay.

11             THE WITNESS:  -- everything for which we didn't

12   receive back market quotations.

13             THE COURT:  Thank you.

14             THE WITNESS:  And we resorted to loss --

15             THE COURT:  Okay.

16             THE WITNESS:  -- for those positions, so.

17             THE COURT:  Okay.  Thank you.

18   BY MR. REGAN:

19   Q    What, if any, benefits did QVT obtain by not sending

20   out those positions for market quotation requests?

21   A    I --

22             MS. SAWYER:  Objection to form.

23             THE COURT:  I don't understand the objection, Ms.

24   Sawyer.

25             MS. SAWYER:  It just -- I didn't understand the

Page 152

1    question.

2            THE COURT:  The word, benefits?

3            MS. SAWYER:  Yes.

4            MR. REGAN:  Plain English.  I mean --

5            THE COURT:  No.  Try it again.

6    BY MR. REGAN:

7    Q    Did QVT earn any profits as a result of not sending out

8    these positions in the market quotation requests?

9            THE COURT:  No.  That's not a good one either.

10       (Pause)

11   BY MR. REGAN:

12   Q    Did QCT receive any financial benefits as a result of

13   not sending out these positions in the market quotation

14   requests?

15   A    I don't believe we received any financial benefits by

16   doing so.  I don't think it -- it was not something we

17   intended to do.  I don't see how it would have been in our

18   interest to do so, in particular for the CARB transactions

19   we would have been very happy to receive any type of

20   quotation back on them because it would have been great to

21   be able, depending on the price, potentially to replace

22   those transactions.  And that was a -- that was part of what

23   we were doing when we sent out these market quotations.  It

24   was a chance to approach dealers and potentially source

25   replacement transactions.

Page 153

1           So I don't think it helped us at all in

2   particular.

3   Q    Did you want the market quotation process to fail on

4   September 15th?

5   A    I did not.

6   Q    Did anyone else at QVT on September 15th indicate to

7   you that they wanted the market quotation process to fail?

8   A    No one ever made any such indication.

9   Q    Did you in any way delay in sending out the market

10  quotation requests on September 15th, 2008?

11  A    We did not.

12  Q    Lehman has written in its prehearing brief that QVT

13  sabotaged the market quotation process in order to get to

14  the more flexible loss provision.  Do you agree with that

15  statement?

16  A    No.  That's just not true.  We were trying to follow

17  the agreement as best as we could.

18  Q    In addition to preparing the termination notice and the

19  market quotation requests what, if anything else, was QVT

20  doing on September 15th?

21  A    Well, I think as I discussed a little bit earlier we

22  were actively trading our portfolio.  There was some

23  replacement CDS transactions.  But, you know, Lehman, like

24  it was a large part of our portfolio, but like there was --

25  it was not a majority or even close to it.  There were lots

Page 154

1    of other positions to attend to, lots of other trading that

2    got done.

3    Q    So after the market quotation process failed what

4    happened next in terms of the Lehman CDS that QVT had?

5    A    So after the market quotation process failed we

6    essentially put aside dealing with CDS for a number of days.

7    I mean, the first, you know, few days after September 15th

8    were chaotic as well and we were mostly involved in trying

9    to manage our portfolio.  And then the impacts on the

10   markets particularly later in the week of government

11   interventions including the short selling ban, rescue of

12   AIG, et cetera, which was moving the markets around in ways

13   that were so volatile we couldn't even have imagined that

14   they would have occurred.

15        So that's what we were primarily doing in the

16   first few days after Lehman filed.  For that reason we

17   deferred until the weekend any further consideration of how

18   to proceed with respect to valuing our Lehman claims.

19   Q    And when you say the weekend which weekend are you

20   referring to?

21   A    The weekend after Lehman filed.  So we decided at some

22   point that week, I don't recall when, that we would have a

23   series of working valuation sessions over the weekend to

24   develop a calculation statement that would set forth our

25   valuation of the CDS and our claims versus Lehman.

Page 155

1   Q    And was there one or more than one working valuation

2   session?

3   A    There was more than one.  We met on the two weekends

4   after Lehman filed, so I think the dates are September 20,

5   21 and then I guess it must be 27 and 28.

6   Q    And where did these working sessions take place?

7   A    These sessions occurred around the desk that I showed

8   you earlier this morning.

9   Q    And who participated in these working sessions?

10  A    The participants in the working sessions were the

11  traders of these products, so it was myself, Arthur Choo,

12  Joel Wolman, Tracy Foo, Yi Sen, Tom Knox.

13  Q    And how long did the working sessions last?

14  A    I think they were sort of five to six hours on average.

15  I mean, we -- you know, it had been a pretty hectic week

16  both weeks, so at some point we got ourselves into the

17  office.  We started doing this work and, you know, we went

18  for a number of hours on Saturday and Sunday, and then came

19  in the -- after Saturday came in the following day.

20  Q    Did Dan Gold attend the working sessions?

21  A    No.  Dan Gold did not attend the working sessions.  I

22  at the time and still today, and certainly for Tracy and

23  Arthur lived in the city.  Dan has lived in Westchester for

24  some period of time.  So that was a factor.

25          Another factor was that we decided that he -- we

Page 156

1  really needed one of us to focus full time on the portfolio

2  and also on communications with investors.  And we decided

3  that should be Dan.  So we decided we didn't really all need

4  to be in the office working on this, and particularly

5  because Dan had kind of been less involved in trading most

6  of these products.  He had certainly traded CDS, but the

7  rest of us had been more directly involved.

8  Q    And what happened at the working sessions that you

9  mentioned?

10  A    So at the working sessions that I mentioned we talked

11  about how to develop a loss calculation from the information

12  that we had and we then implemented that methodology.  And,

13  you know, the methodology was essentially -- I mean,

14  obviously for the 12 transactions we had market quotations

15  on we used that.

16         For the -- we decided, you know, sort of right

17  away that for the -- we should use the transactions that

18  were replacement transactions to price the transactions that

19  we had replaced.  And it wasn't typically as simple as just

20  saying, okay, I'll adopt that value.  It wasn't that much

21  more complicated.  But, you know, I think I -- I think that

22  one point that I can't recall whether I addressed in my

23  testimony this morning or not was the fact that you could

24  really only trade to the liquid five-year point particularly

25  because it was a crisis environment.

Page 157

1           So like where we had a four and a half or a four

2    year CDS we didn't have the luxury of asking a dealer to do

3    a replacement trade right to that maturity date.  We had to

4    trade to the five-year, current five-year maturity point so

5    five years forward from September 15th, 2008, or I think

6    more technically then the contention had already arisen go

7    into the market of trading to a designated date in

8    September.  It's always the 20th day of the month.

9           So, you know, that was what was available.  So

10   then in order to -- in some cases maybe you had three years

11   and you could only trade for five years.  So in order to

12   determine loss on those replacement trades you needed to

13   look at a curve and adjust based on the curve.  So, you

14   know, a curve is, you know, for the one, three, five, seven,

15   ten year points there are different spreads, there are

16   different markets.  Typically credit curves are rising

17   meaning that, you know, to go out further in time there's

18   further uncertainty.  So the spread will be wider to a later

19   maturity date.

20          However, in periods of stress curves typically

21   invert and can become quite inverted, you know, when a

22   company is close to bankruptcy or there is significant

23   distress because the dollar prices need to converge, and in

24   order for a shorter dated bond to trade at the same dollar

25   price as a longer dated bond it has to be at a wider credit

Page 158

1    spread.

2              So we had to look at certain curve data for some

3    of the replacement trades and, you know, based on that curve

4    make an estimate of to our maturity date based on where we

5    traded the five year trade what would the replacement value

6    be.  And there we actually -- it was quite useful in the EM

7    context in particular that we had curve data that had been

8    supplied to us as part of the market quotation process.

9    Q    So I think you mentioned CDS where you got three

10   requests or three responses --

11   A    Yes.

12   Q    -- in replacement trades.

13   A    Yes.

14   Q    What (indiscernible), if any, did QVT develop with

15   respect to CDS that didn't fit either of those categories?

16   A    Right.  So that was a large portion of the overall

17   universe of CDS.  And so what we decided there was that we

18   should use the best available information on what the market

19   pricing would have been for us to replace the transaction.

20              And in order to determine what was the best

21   available information we broke the portfolio up among the

22   traders for the products, essentially putting the trader who

23   had been trading the product or the specific credit in the

24   case of corporate credits in charge of determining what was

25   the best available market information.

Page 159

1                And the -- we had a number of sources that we

2      used.  One of them was the actual responses that we had

3      received to the market quotations that were -- did not -- in

4      number were not sufficient to generate a market quotation as

5      defined under the ISDA.  So if you have less than three it's

6      not a market quotation.  But we received one or two on many

7      of the -- on a number of the line items.

8                And so that was one source that we could use.  And

9      in general I -- the traders preferred that source over some

10     of the other sources because they considered it the most

11     indicative.  But it was left up to the individual trader to

12     make that decision with respect to the name.

13               The other sources that they could look at, there

14     were two.  One was unsolicited broker runs.  So these are

15     typically Bloomberg messages or they can be disseminated in

16     other ways, but it's typically Bloomberg messages that

17     dealers disseminate saying, you know, they may show a mid.

18     More typically they will show a bid and offer I would say.

19     And, you know, this -- it was, you know, particularly for

20     some of the indexes, some of the more liquid things there

21     were examples of those out there.

22               And very helpful the way they show a bid offer, of

23     course, it helps you -- it shows you what the spread was.

24               Of course in looking at any unsolicited broker

25     run, a trader or someone else that can do a valuation has to

Page 160

1    have a view or take a view as to how real that quotation is

2    or was, does this person actually know where this thing is

3    trading.  You know, quotes are always indicative typically.

4    You know, although maybe sometimes they affix some

5    information like, you know, buyer or seller next to the

6    quote that tells you which way they're going.  Sometimes

7    they might also show a size or something.

8           And, you know, obviously in looking at a credit

9    derivative you could look at a similarly dated bond that

10   might be on a broker run, too.  So that was another source.

11          And then the last source that traders could use

12   were Mark IT -- market we said at the time, but here I'll be

13   trying to say Mark IT as much as possible.

14   Q    Mark IT for the court reporter.

15   A    Right.

16          THE COURT:  Uh-huh.

17          THE WITNESS:  So Mark IT was a service that the

18   dealers had created and ultimately spun off as an

19   independent company that they owned equity stakes in at the

20   time that was a compendium of dealer pricing.

21          So the way this originated is when we first traded

22   credit derivatives years ago at QVT every month when you

23   went to mark your portfolio the credit derivatives were

24   actually one of the hardest things to mark because they were

25   two different dates.  They were on different credits.  There

Page 161

1    was nowhere to go.  I mean, it -- you might have a five-

2    year, but not, you know, your year on someone's Bloomberg

3    run.  So you had to request marks from all the dealers.

4              Of course over time this became very burdensome to

5    dealers and they created Mark IT as a kind of clearing house

6    of their marks.  So they would feed in their views of what

7    the marks were on different credits and Mark IT would spit

8    back out to end users on the other side for, to the extent

9    they had it because they didn't always have everything, they

10   would, you know, for the following credit for the, you know,

11   five-year maturity point the mark today is, and that was

12   supposed to represent as I understand it the kind of closing

13   market level.  It was an average of the marks submitted by

14   the dealers to Mark IT of what the midmarket level would

15   have been.

16             The dealer -- I mean, there was -- the dealers I

17   think decided, oh, yeah, certainly that's how it was

18   presented.  There was no bid or offer information presented

19   as part of Mark IT.  It was always set up so that they would

20   only provide a midmarket level and you could also as a user

21   see the so-called depth of the market meaning this wasn't a

22   market at all.  It was -- you could see the number of

23   dealers that were contributing on a particular line.  So you

24   would have a sense based on that of, you know, where you saw

25   13 or 14 dealers contributing to the five-year mark on

Page 162

1    whatever credit, you know, that was at least -- you know,

2    there were a lot of data points that were contributing to

3    the average.  That's what we knew.

4    BY MR. REGAN:

5    Q    So using all those data sources that you described what

6    did the traders at these working sessions do with that data?

7    A    So the -- using the data points -- well, the different

8    data sources I think I would say that I described the

9    traders at these sessions would determine what they thought

10   was the best representation of the replacement value of the

11   transaction as of the early termination date.

12            THE COURT:  Okay.  Can I just ask you to be a --

13   talking in generalities, the traders, we, but there are --

14   we've gone through it since we started, a lot of different

15   types of products, different traders.

16            Are you saying that folks came into the office and

17   that there was an organizational session, here's what we're

18   going to do, or are you saying that kind of intuitively,

19   organically, individually everyone who was doing this

20   exercise for their particular segments just did this?  I'm

21   just trying to understand.  You're describing this kind of

22   thing that happened and, you know, I'm sure that other folks

23   might ask you questions about it.  But --

24            THE WITNESS:  Of course.

25            THE COURT:  -- I'm just listening to it and I

Page 163

1    don't really understand what you mean.

2              THE WITNESS:  Okay.  Let me try to clarify.

3              THE COURT:  Okay.

4              THE WITNESS:  So I think to the question you just

5    asked of, you know, was there an organizational meeting, I

6    don't recall like a big organizational kick off session or

7    something.  We came in.  We discussed how we would be doing

8    this.  We --

9              THE COURT:  Well, that's just -- that -- you came

10   in and you discussed how you were going to be doing it.

11             THE WITNESS:  Right.

12             THE COURT:  Well, what did -- what was that

13   discussion?

14             THE WITNESS:  Sure.  I have to say it's hard for

15   me to recall the details of that at --

16             THE COURT:  Okay.  That's --

17             THE WITNESS:  -- you know, in eight years which is

18   -- so I --

19             THE COURT:  That's understandable.

20             THE WITNESS:  So --

21             THE COURT:  That's fine.

22             THE WITNESS:  So there was a -- I remember there

23   was discussion.  There was a form of spreadsheet that was

24   created.  One of the decisions that was made was that for

25   the Mark IT positions that did not have -- that were

Page 164

1    midmarkets and so where we needed either a bid mid or an

2    offer mid-spread to decide what our replacement transaction

3    value was we made a decision that there would be kind of a

4    default of ten percent based on the levels we were seeing in

5    the market for where the credits that were in our portfolio

6    were trading.

7            And then we decided that individual traders would

8    have the ability to override that to have a lower or a

9    higher spread based on the specifics of that transaction.

10   So that's one thing I remember discussing --

11           THE COURT:  Okay.

12           THE WITNESS:  -- that arose in the sheet.

13           But to answer your question of was it this or was

14   it that, it was frankly a little bit of a hybrid.  I mean,

15   this was not a -- there was an organic element to this in

16   that this was a valuation exercise very akin to the monthly

17   valuation NEV process that we went through where we marked

18   our OTC positions.

19           So, you know, it wasn't like -- people had never

20   done, obviously, a loss valuation per se, but they had done

21   valuation exercises and they understood that, you know,

22   essentially what's now codified in gap is how you go about

23   doing it was just that you look for external pricing

24   sources.  You take the best external pricing sources and,

25   you know, there's just a lot of judgment that goes into

Page 165

1    that.  I mean, there's no two ways around that.

2            The -- you know, like Mark IT is not like, you

3    know, something that is, you know, the be all and end all or

4    is even necessarily correct when the markets are thin.  And

5    we had seen that many, many times already over many years at

6    that point.  There are -- it's just a collection of

7    opinions.  And so it matters how many opinions are collected

8    in it and it also matters what you think the bid offer is

9    off of that collection of opinions.

10           And so we left it to the individual traders to

11   make those decisions.  You know, there were discussions

12   regarding individual positions.  I think as I testified

13   earlier I wasn't actually involved in marking individual

14   positions directly, but I did participate in discussions

15   around some of them, around the details of, you know, well,

16   what do you think, should we use this spread, should we do

17   this, should we do that.   Like I have a -- I have this from

18   Mark IT for this date.  I have this, you know, for a later

19   date because, you know, we did as part of this use Mark IT

20   data from multiple dates because we were trying to get to

21   answer the question, where do I think I could really have

22   replaced this transaction.

23           And so the quality of the data matters a lot and,

24   you know, when you're trading the position and looking at

25   how other things are moving in the market and looking at

Page 166

1    potentially other sources, the other sources I mentioned,

2    broker runs, you have a sense of where you think you should

3    market, and you don't know a hundred percent.  I mean,

4    there's no right answer here.  But you know, you know, how

5    you think to do it and we told everyone to do it, you know,

6    in that way, like to do what they thought was right

7    essentially.

8              THE COURT:  Okay.  Thank you.

9    BY MR. REGAN:

10   Q    How did QVT keep track of the results of the process

11   you described?

12   A    So the results of the process were compiled in, you

13   know, what I think is just -- we're now calling it in this

14   litigation the white book.  It was an Excel spreadsheet.

15   The format was developed, I think, by my partner, Joel

16   Wolman, because he had the central role of collecting all

17   these.  It -- the spreadsheet, we broke up the kind of

18   master list into different tabs for different people.

19              But I think if I recall correctly everyone --

20   everyone's tab had everything on it.  It's just, you know,

21   you had the responsibility to fill out the things that were

22   listed, you know, under you on a separate tab that was

23   called mark responsibility.

24              So everyone had the same kind of form to work from

25   if you will.  And they then went and filled it out and we

Page 167

1    kept track of the information  that we used, the levels that

2    we set, so.

3              MR. REGAN:  Can we bring up Exhibit 1020 on the

4    screen?

5         (Pause)

6              THE WITNESS:  So this is --

7              MS. SAWYER:  Your Honor --

8              THE WITNESS:  -- not in my binder.  I imagine --

9              THE COURT:  Yes.

10             THE WITNESS:  -- I --

11             MS. SAWYER:  We actually have a number of

12   objections to this exhibit --

13             THE COURT:  Okay.

14             MS. SAWYER:  -- and --

15             THE COURT:  Can you give me the number again, Mr.

16   Regan?

17             MR. REGAN:  1020.  It is a large spreadsheet so

18   there's just a placeholder in the binder.  It's not one you

19   can print out.

20             THE COURT:  I see.  Okay.

21             MR. REGAN:  So it's up on your screen right now.

22             THE COURT:  All right.  Give me a second.

23        (Pause)

24             THE COURT:  Okay.  Ms. Sawyer.

25             MS. SAWYER:  I have a number of objections to this

Page 168

1     --

2              THE COURT:  Okay.

3              MS. SAWYER:  -- exhibit.  The first is, is this

4     exhibit was -- I don't think this witness has personal

5     knowledge about the creation of this document.

6              But, additionally, this document is filled with

7     hearsay and it also contains, as we've seen in deposition

8     testimony, a lot of inconsistence and unreliable and

9     inaccurate information.

10             It also contains settlement information within it.

11    It's a massive spreadsheet that contains all of this

12    information in it and so there are extensive parts of it

13    which would be extremely objectionable and inadmissible.

14             THE COURT:  Okay.

15             MR. REGAN:  The witness --

16             THE COURT:  So can you describe again, this is the

17    spreadsheet into which all of the QVT personnel uploaded

18    their work product in connection with calculating loss?

19             MR. REGAN:  Yes.

20             THE COURT:  Okay.

21             MS. SAWYER:  Well, I also would note this is not

22    the 2008 version.  This is a much later version of it

23    because it contains information from settlement and

24    mediation discussions --

25             THE COURT:  Okay.  So that's --

Page 169

1                MS. SAWYER:  -- with Lehman.

2                THE COURT:  So that's problematic.

3                MR. REGAN:  So I'm sorry.  Where is that on this

4      spreadsheet?

5                MS. SAWYER:  The response to I think contains most

6      of that information.

7                MR. REGAN:  Can you scroll over to --

8                MS. SAWYER:  It's a tab.  But if -- also, I mean

9      --

10                MR. REGAN:  Where is the mediation information?

11                MS. SAWYER:  Yeah.  I don't --

12                MR. REGAN:  This was originally a joint exhibit

13      and they pulled their consent to it late.  So it's a

14      surprise.

15                MS. SAWYER:  Okay.  It's -- I don't think I -- I

16      think we lodged our objections in writing to this exhibit.

17      But that -- setting that aside, I mean, this --

18                THE COURT:  Okay.

19                MS. SAWYER:  -- this document --

20                THE COURT:  If it's got settlement -- if it's got

21      values from mediation or settlement I'm not going to --

22                MS. SAWYER:  Yeah.

23                THE COURT:  -- look at it because --

24                MR. REGAN:  Right.  It shouldn't.

25                THE COURT:  -- I don't want to see it.  Right.

Page 170

1          MS. SAWYER:  And if you go way up to the top bill,

2     I mean, not that the Court should be seeing it, but that's

3     -- you're --

4          MR. REGAN:  (Indiscernible) highlighted in yellow

5     at the top is settlement.

6          THE COURT:  So the first -- let's try to take

7     these one at a time.  The first or the first one that I

8     think you should deal with is, is this a modern day version

9     or is this a 2008 version because if it's a modern day

10    version and the witness has no knowledge of its full

11    creation then it's not useful.

12         MR. REGAN:  We didn't get a chance to ask him.

13         THE COURT:  Okay.  Well -- but the first question

14    is you need to say whether or not this is a 2008 --

15         MR. REGAN:  This is the 2008 version as far as I

16    know.  If that's not correct tell me --

17         MS. SAWYER:  No.  I don't think --

18         MR. REGAN:  -- why.

19         MS. SAWYER:  -- it's the 2008 version.  I mean, I

20    think it's clear that this is a subsequent version.  I don't

21    know if the 2008 version has frankly ever been produced.

22         MR. REGAN:  You said there was mediation

23    information in this.  Where is it?

24         MS. SAWYER:  In --

25         UNIDENTIFIED SPEAKER:  Go to the top.

Page 171

1                MR. REGAN:  Well, I mean, I --

2                UNIDENTIFIED SPEAKER:  Can you take it off the

3      screen so --

4                THE COURT:  Take it off the screen.

5                MR. REGAN:  Sorry.  I mean, I'm --

6                MR. TRACEY:  I'm familiar with where this --

7                THE COURT:  And it's --

8                MR. TRACEY:  You -- I -- it's all --

9                MR. REGAN:  (Indiscernible) settlement mediation

10     and also I think (indiscernible) positions mastered.

11                MS. SAWYER:  Right.

12                MR. REGAN:  Everything below is post-dated.

13                MR. TRACEY:  Yeah.  So may I --

14                THE COURT:  Sure.

15                MR. TRACEY:  Okay.  So the spreadsheet was

16     developed for the purpose of the original calculation

17     process that --

18                THE COURT:  In 2008?

19                MR. TRACEY:  In 2008 which Mr. Brumm referred to.

20                THE COURT:  Right.

21                MR. TRACEY:  It is as he said a (indiscernible) of

22     spreadsheets that were provided by each of the traders.

23                THE COURT:  Uh-huh.

24                MR. TRACEY:  And so you can -- there -- and there

25     are -- there must be 25 tabs.  So some number of those are

Page 172

1    the tabs that the individual traders used to record their

2    valuations.  Those are all in there.  There's then a tab

3    called master where they're all combined --

4               THE COURT:  Uh-huh.

5               MR. TRACEY:  -- and that has the -- all the

6    positions that each of them valued plus the total.  Then

7    there is a bunch of tabs with the support, the backup

8    support --

9               THE COURT:  Uh-huh.

10              MR. TRACEY:  -- for it.  And everything I've

11   described so far is from September of 2008.

12              THE COURT:  Okay.

13              MR. TRACEY:  In addition to that there are other

14   tabs that were created later.  And one of them is the

15   Response 2 tab, which was a tab that was created to provide

16   to Lehman in the course of the mediation.

17              So from my standpoint I would agree that the

18   Response 2 tab should not be --

19              THE COURT:  But isn't it broader than that?  And

20   I'm just dealing with the 2008 versus not.  So shouldn't --

21   I thought, Mr. Tracey, you said that there was this tab that

22   dealt with -- that reflects information created and given to

23   Lehman in connection with the mediation, but that you

24   identified a certain number of tabs and then beyond that

25   everything was created after.

Page 173

1                    So shouldn't we strip the document of --

2                    MR. TRACEY:  We should.

3                    THE COURT:  -- of everything that's post-2008?

4                    MR. TRACEY:  Yeah.  We weren't planning on

5        referring to any of that.  So we're happy to strip it out.

6        That --

7                    THE COURT:  Okay.  I think the --

8                    MR. TRACEY:  -- may not be the only objection.

9                    MS. SAWYER:  I think that's not the only

10       objection.

11                   THE COURT:  Okay.  So I'm --

12                   MS. SAWYER:  The foundation --

13                   THE COURT:  -- just trying to take them one at a

14       time.

15                   MS. SAWYER:  Right.  But I think then we have a

16       foundation issue because we have a 2015, you know, created

17       -- I don't know if that's the date on the metadata, but 2015

18       modified document that we're just going to take some stuff

19       out.  But we don't know if what's left is what was there in

20       September 2008.  And as Mr. Tambe's argued that there's a

21       lot of post hac analysis that we think should not be

22       involved in this case.

23                   And so it's -- we need to know what the snapshot

24       was of the --

25                   THE COURT:  So snapshot --

Page 174

1              MS. SAWYER:  -- workbook in September --

2              THE COURT:  -- was the word --

3              MS. SAWYER:  -- 2008 as opposed to --

4              THE COURT:  -- that I was struggling with.  So is

5       there --

6              MS. SAWYER:  -- as opposed to cutting this one

7       back?

8              THE COURT:  Sure.  Is there not a snapshot version

9       from 2008?  There's not?

10             MR. TRACEY:  I don't believe there is.  I believe

11      the spreadsheet was continually updated.  However, we -- Mr.

12      Wolman is intimately familiar with this spreadsheet and can

13      tell us under oath what was in there in 2008 and we can --

14      you know, we can provide sworn testimony on that subject.

15             MS. SAWYER:  That was -- not to switch to another

16      part of my objection, but that was why I -- that was my

17      initial objection is this is not Mr. Brumm's spreadsheet.

18      Mr. Brumm, you know --

19             THE COURT:  Uh-huh.

20             MS. SAWYER:  -- we -- Mr. Wolman is on the witness

21      list to come.

22             THE COURT:  Uh-huh.

23             MS. SAWYER:  Mr. Wolman should talk about this

24      spreadsheet to lay a foundation for it to the extent we --

25      that that's possible because this is a potentially

Page 175

 1   problematic document and we shouldn't be just using it

 2   without having that foundation laid.

 3           MR. TRACEY:  That makes sense.

 4           MR. REGAN:  (Indiscernible).

 5           THE COURT:  Hold on.

 6           MR. TRACEY:  That makes sense.  We can do it that

 7   way.

 8           THE COURT:  Okay.

 9           MR. TRACEY:  We may have to call Mr. Choo again

10   afterwards because he's coming after -- he's coming before

11   Mr. Wolman and he has to testify about the spreadsheet.

12           THE COURT:  Mr. Wolman has to testify about --

13           MR. TRACEY:  Mr. Wolman --

14           THE COURT:  -- the spreadsheet.

15           MR. TRACEY:  If we're going to follow this

16   approach Mr. Wolman has to first identify it, but then Mr.

17   Choo, who was going to go on tomorrow, needs to speak about

18   it.  So I may have to break up his testimony to do it this

19   way.  But I'm fine with that.

20           MS. SAWYER:  I mean, or -- yeah.  I was going to

21   say --

22           THE COURT:  But --

23           MS. SAWYER:  -- or Mr. Wolman can lay --

24           THE COURT:  But here's what I'm not under --

25           MS. SAWYER:  -- the foundation first --

Page 176

```
1              MR. TRACEY:  Yeah.

2              THE COURT:  Right.

3              MR. TRACEY:  Well, that's what I'm saying.

4              MS. SAWYER:  -- is at least --

5              MR. TRACEY:  That's what I'm saying.  So I'll call

6     Mr. Wolman --

7              THE COURT:  But what are we going to do with Mr.

8     --

9              MR. TRACEY:  We can skip over it.

10             THE COURT:  -- Brumm?

11             MR. TRACEY:  We can skip over it.

12             MR. REGAN:  We were just going to introduce what

13    it was and the purpose that it was used for.

14             THE COURT:  Okay.  But you're not suggesting that

15    we then resume --

16             MR. TRACEY:  No.

17             MR. REGAN:  No.

18             THE COURT:  Fine.

19             MS. SAWYER:  Why don't we just -- I want to make

20    sure I have -- I had multiple conversations happening.

21             THE COURT:  Yeah.

22             MS. SAWYER:  Mr. -- you would call Mr. Wolman just

23    for purposes of laying the foundation for 888 and then call

24    Mr. Choo and then call Mr. Wolman back for his examination.

25    So it would just be for the limited purposes of laying the
```

Page 177

1    foundation for 888?  Just because we have a lot going on we

2    just had planned on the witness order, so --

3              MR. TRACEY:  Yeah.  I can do it that way.  That's

4    fine.

5              MS. SAWYER:  Okay.

6              THE COURT:  Is that acceptable?

7              MS. SAWYER:  I mean --

8              MR. TAMBE:  And then our plan would be to just

9    cross-examine Mr. Wolman once when he's done.  So he lays a

10   foundation if he can.  Mr. Choo uses that document.  Mr.

11   Choo testifies.  Then Mr. Wolman comes back and finishes the

12   rest of his examination and then we cross-examine Mr.

13   Wolman.

14             MR. TRACEY:  That's fine, too.

15             THE COURT:  Okay.  I mean, the fact is that to the

16   -- the document, it is what it is and to the extent that

17   other QVT personnel relied on the document and you can

18   accurately identify the document that they relied on, to the

19   extent that it turns out it has errors in it they relied on

20   a document with errors.  So that it just is what it is.

21             MS. SAWYER:  Understood.

22             THE COURT:  Right?

23             MR. TRACEY:  Exactly.

24             THE COURT:  Okay.  All right.  You can keep going.

25   BY MR. REGAN:

Page 178

1   Q    During the weekend sessions that you described, Mr.

2   Brumm, did any QVT trader at any time during the process

3   express a desire or plan to use the methodology because it

4   would inflate the claim against Lehman?

5           MS. SAWYER:  Objection.  Leading.

6           THE COURT:  Sustained.

7   BY MR. REGAN:

8   Q    Lehman wrote in its pretrial brief that Mr. Gold

9   provided the QVT personnel working during these sessions

10  with a directive to inflate the claim.  Do you agree with

11  that statement?

12  A    No.  That --

13          MS. SAWYER:  Objection.  Is there a cite for that?

14  Is that an exact quote?

15          MR. REGAN:  Directive, I think, is on page 1 or

16  page 2.

17          MS. SAWYER:  Yeah.  That's a quote, though, that

18  you were reading?

19          MR. REGAN:  I was not reading a quote.

20          MS. SAWYER:  Okay.

21          THE COURT:  Okay.  Let's have a quote.  This is --

22      (Pause)

23  BY MR. REGAN:

24  Q    On page 7, just as -- it's page 7 of this document, but

25  it's the first paragraph of the preliminary statement.

1          THE COURT:  Am I in the debtor's prehearing

2      memorandum?

3          MR. REGAN:  Yes.

4          THE COURT:  Okay.

5          MS. SAWYER:  On page -- page 7 of mine is not the

6      preliminary statement.

7          MR. REGAN:  Go to -- if you go to the preliminary

8      statement.

9          MS. SAWYER:  Okay.

10         MR. REGAN:  First paragraph, third sentence and

11     the fourth sentence.

12         THE COURT:  Would you read them, please?

13         MR. REGAN:  Sure.   The third sentence of the

14     preliminary statement says:

15         "As QVT watched financial markets move after the

16     early termination date QVT's CEO, Dan Gold, sought an

17     opportunity to extract from Lehman hundreds of millions of

18     dollars more than what QVT had actually lost as of the early

19     termination date."

20     BY MR. REGAN:

21     Q    In connection with the working sessions that you

22     described did Mr. Gold issue any such instruction in sum or

23     substance?

24     A    No.

25         MS. SAWYER:  Objection to the form of the

Page 180

1    question.  Ambiguous.  I mean -- well, it doesn't reflect --

2            THE COURT:  It's not --

3            MS. SAWYER:  -- what is --

4            THE COURT:  -- a proper question.  It doesn't --

5    it's a different question from the text that you read.

6    BY MR. REGAN:

7    Q    Did Mr. Gold issue any instruction in connection with

8    the weekend working sessions that QVT personnel should claim

9    losses that QVT had not actually incurred?

10   A    No, he did not.

11        (Pause)

12   Q    To your knowledge did any QVT trader use a methodology

13   that resulted in QVT claiming a loss that it did not -- QVT

14   did not actually incur?

15   A    No.  I think that the QVT traders involved in the

16   valuation process tried to use methods that tried to

17   determine what the replacement value of the terminated

18   transactions was as of the terminate -- as of the early

19   termination date.

20   Q    Mr. Brumm, if you could turn to Exhibit 91, J-91 in

21   your binder.

22        (Pause)

23   Q    What is J-91, JX-91?

24   A    JX-91 is the initial calculation statement demand under

25   the ISDA master agreements that QVT and Quintessence sent to

Page 181

1    Lehman Brothers Special Financing and Lehman Brothers

2    Holdings Inc. on October 15, 2008.

3    Q    And who signed that calculation statement?

4    A    On page 2 I see my signature and the signature of Dan

5    Gold.

6    Q    What was the amount of QVT's claim in Exhibit 91?

7    A    The amount of QVT's claim, it says, we demand payment

8    for the QVT Fund $365,771 --

9              UNIDENTIFIED SPEAKER:  (Indiscernible).

10             THE WITNESS:  I'm sorry.  QVT Fund, LP demands

11   payment of U.S. dollars 365,771,593.

12   BY MR. REGAN:

13   Q    And for Quintessence?

14   A    Quintessence Fund, LP demands payment of U.S. dollars

15   41,307,802.

16   Q    And is there any backup for those numbers?

17   A    Yes.  Annexed to the calculation statement is a

18   spreadsheet that starts at Bates Number ending 239 that sets

19   forth for each individual transaction our ID; the Lehman ID;

20   the quantity; the spread meaning the premium that was

21   required to be paid I believe under the contract; the

22   maturity; the reference obligation; the method we used,

23   whether it was loss, unpaid amount, market quotation.  I

24   believe that's the full range of methods; and then the close

25   out value as set forth there.

Page 182

1   Q    Was there any other backup material that QVT used to

2   create Exhibit 91?

3   A    Well, Q -- it was created out of the workbook that we

4   did.  I see in the back, too.  So if you flip all the way

5   back, so if -- it -- first it totals for QVT and

6   Quintessence the numbers that I eluded to.  I think the QVT

7   total is -- I don't know where it is.  This seems to only

8   have the Quintessence backup as I look at it, but -- because

9   I'm just seeing a Quintessence total on Bates page 260.

10          And then you see there's also market quotation

11   details that are provided and then there's a schedule that

12   is the wire instructions.  So these numbers were taken

13   directly from the workbook that we had prepared.

14   Q    If you can turn to the next tab in your binder, Exhibit

15   92.

16   A    Okay.

17   Q    What is Exhibit 92?

18   A    So Exhibit 92 is a notice and revised demand of

19   payment.  This was submitted the following day on October

20   16th, 2008.  So essentially what this does is it records the

21   fact that the -- we had set off the collateral that Lehman

22   had posted to us, the variation margin that we were talking

23   about earlier today which was in the amount of I think

24   approximately $117,000,000 for QVT and Quintessence.  We had

25   set that off against the demand that we had made the prior

Page 183

1    day.  And that got us to a net claim of, I won't read the

2    number in full, but approximately 260.4 million for QVT Fund

3    and 29.2 million for Quintessence Fund.

4    Q    And who signed the October 16 letter?

5    A    The October 16th letter was signed by me again and by

6    my partner, Tracy Foo, fellow managing member.

7    Q    If you can turn back to Exhibit 91 for just a moment.

8    A    Okay.  Yes.

9    Q    And to the page that ends in the Bates Number QVT Fund

10   249.

11   A    Okay.

12   Q    What information is shown on that page?

13   A    I'm sorry.  This was the total I was looking for.  This

14   is the total for QVT Fund, the grand total of 365 million

15   that ties to the first page.  I must have been flipping too

16   quickly.

17   Q    It's late in the day.  It's okay.

18           MR. REGAN:  Your Honor, I think you said you had a

19   hard 5:00 stop.

20           THE COURT:  I do.

21           MR. REGAN:  Now is a convenient time to do that --

22           THE COURT:  Okay.

23           MR. REGAN:  -- if that works for you.

24           THE COURT:  All right.  So we're going to resume

25   with Mr. Brumm tomorrow.

Page 184

1          MR. REGAN:  Yeah.  I don't -- hopefully not for

2    that long, but --

3          THE COURT:  Okay.  All right.  And then we'll have

4    cross-examination --

5          MS. SAWYER:  Yes, Your Honor.

6          THE COURT:  -- and then we'll go on from there.

7    And tomorrow morning we're going to start at 10:00.  Yes?

8          MR. REGAN:  Sounds good.

9          THE COURT:  Okay.  All right.  Thank you.  Same

10   rules apply to the evening.

11         THE WITNESS:  Absolutely.  Thank you.

12         THE COURT:  You can talk about the weather or

13   other good things.  Okay.  Thank you very much.  Thank you

14   for your patience today.

15       (Whereupon, the proceedings concluded at 4:59 p.m.)

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3     OPENING STATEMENTS                                PAGE

4          By Mr. Tambe                                 4

5

6

7

8

9

10                       W I T N E S S E S

11

12    WITNESS                   BY                      PAGE

13    Nick Brumm              Mr. Regan                 62

14

15

16

17

18

19

20

21

22

23

24

25

Page 186

1                    C E R T I F I C A T I O N

2

3        I, Sherri L. Breach, certify that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sherri Breach    Digitally signed by Sherri Breach
                      DN: cn=Sherri Breach, o=Veritext,
                      ou, email=digital@veritext.com,
                      c=US
7    _____    Date: 2017.02.02 15:32:13 -05'00'

8    Sherri L. Breach

9    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

10

11

12   DATE:  February 2, 2017

13

14

15

16

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501