**Hearing Date and Time: October 13, 2017 at 9:30 a.m.  (Prevailing Eastern Time)**
**Objection Date and Time: October 6, 2017 at 4:00 p.m.  (Prevailing Eastern Time)**

Peter J. Behmke
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 PARK AVENUE
NEW YORK, NEW YORK 10178
*Attorneys for Lehman Brothers Holdings Inc. and*
*Certain of Its Affiliates*

Andrew J. Rossman
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 MADISON AVENUE
NEW YORK, NEW YORK 10010
*Attorneys for Official Committee of Unsecured Creditors of*
*Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
                                       :
In re                                  :    Chapter 11 Case No.
                                       :
LEHMAN BROTHERS HOLDINGS INC., et al., :    08-13555 (SCC)
                                       :
Debtors.                               :    (Jointly Administered)
                                       :
-------------------------------------------------------------------x
```

**NOTICE OF MOTION PURSUANT TO RULE 9019 OF THE FEDERAL**
**RULES OF BANKRUPTCY PROCEDURE AND SECTION 105(a) OF THE**
**BANKRUPTCY CODE FOR APPROVAL OF SETTLEMENT AGREEMENT**
**AMONG CITIBANK, N.A., AND CERTAIN OF ITS AFFILIATES, AND LEHMAN**
**BROTHERS HOLDINGS INC., AND CERTAIN OF ITS AFFILIATES**

PLEASE TAKE NOTICE that a hearing on the annexed motion, dated September 29,

2017 (the "Motion"), of Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"),

as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman*

*Brothers Holdings Inc. and Its Affiliated Debtors*, on behalf of itself, Lehman Brothers Special

Financing Inc. ("LBSF") and the other Lehman Entities,[1] together with the Official Committee

of Unsecured Creditors (the "Creditors' Committee," and together with LBHI, the "Movants"),

pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

and section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") for approval of

a settlement agreement among the Plan Administrator, on behalf of LBHI, LBSF and the other

Lehman Entities, and Citibank, N.A. ("Citibank") and the other Citibank Entities,[2] all as more

fully described in the Motion, will be held before the Honorable Shelley C. Chapman, United

States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs

House, Courtroom 623, One Bowling Green, New York, New York 10004 (the "Bankruptcy

Court"), on October 13, 2017 at 9:30 a.m. (Prevailing Eastern Time) (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in

writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court for

the Southern District of New York, shall set forth the name of the objecting party, the basis for

the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court

electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with two hard copies

---

[1]  As used herein, the term "Lehman Entities" means LBHI, LBSF, Lehman Brothers
Commercial Corp. ("LBCC"), Lehman Brothers Commodity Services Inc. ("LBCS"), and
Lehman Brothers Financial Products Inc. ("LBFP").

[2]  As used herein, the term "Citibank Entities" means Citibank, Citigroup Global Markets
Inc. ("CGMI"), Citigroup Financial Products Inc. ("Citi Financial"), Citigroup Global Markets
Ltd. ("CGML"), Citi Canyon Ltd. ("Citi Canyon"), CitiMortgage, Inc. ("CitiMortgage"),
Citibank A.S., Citibank Korea Inc. ("Citi Korea"), Citi Swapco Inc. ("Citi Swapco"), and
Citigroup Energy Inc. ("Citi Energy").

delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable

Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 623; (ii)

attorneys for LBHI and certain of its affiliates, Curtis, Mallet-Prevost, Colt & Mosle LLP, 101

Park Avenue, New York, NY 10178 (Attn: Turner P. Smith and Peter J. Behmke); (iii) attorneys

for the Creditors' Committee, Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue,

22nd Floor, New York, New York 10010 (Attn: Andrew J. Rossman, Christopher Kercher and

Calli Ray); (iv) the Office of the United States Trustee for Region 2, U.S. Federal Office

Building, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: William K.

Harrington, Esq., Susan Golden, Esq. and Andrea B. Schwartz, Esq.); and (v) attorneys for

Citibank, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New

York, New York  10019-6064 (Attn: Stephen Shimshak and Claudia Hammerman), so as to be

so filed and received by no later than October 6, 2017 at 4:00 p.m.  (Prevailing Eastern Time)

(the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received

by the Objection Deadline, the relief requested shall be deemed unopposed and the Bankruptcy

Court may enter an order granting the relief sought without a hearing.

*[signature page follows]*

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the

Hearing and failure to appear may result in relief being granted or denied upon default.

Dated:    September 29, 2017
          New York, New York

CURTIS, MALLET-PREVOST, COLT & MOSLE
LLP

By: /s/ Peter J. Behmke
Peter J. Behmke
*Attorneys for Lehman Brothers Holdings Inc. and
Certain of Its Affiliates*

QUINN EMANUEL URQUHART & SULLIVAN,
LLP

By: /s/  Andrew J. Rossman
Andrew J. Rossman
*Attorneys for the Official Committee of
Unsecured Creditors*

4

Peter J. Behmke
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 PARK AVENUE
NEW YORK, NEW YORK 10178
*Attorneys for Lehman Brothers Holdings Inc. and*
*Certain of Its Affiliates*

Andrew J. Rossman
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 MADISON AVENUE
NEW YORK, NEW YORK 10010
*Attorneys for Official Committee of Unsecured Creditors of*
*Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
                                          :
```
**In re**                                 :        **Chapter 11 Case No.**
                                          :
**LEHMAN BROTHERS HOLDINGS INC., et al.,**  :        **08-13555 (SCC)**
                                          :
**Debtors.**                              :        **(Jointly Administered)**
                                          :
                                          :
```
----------------------------------------------------------------x
```

**MOTION PURSUANT TO RULE 9019 OF THE FEDERAL**
**RULES OF BANKRUPTCY PROCEDURE AND SECTION 105(a) OF THE**
**BANKRUPTCY CODE FOR APPROVAL OF SETTLEMENT AGREEMENT**
**AMONG CITIBANK, N.A., AND CERTAIN OF ITS AFFILIATES, AND**
**LEHMAN BROTHERS HOLDINGS INC., AND CERTAIN OF ITS AFFILIATES**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan

Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman*

*Brothers Holdings Inc. and Its Affiliated Debtors* (the "Plan"), on behalf of itself,

Lehman Brothers Special Financing Inc. ("LBSF") and the other Lehman Entities,[3] and

the Official Committee of Unsecured Creditors (the "Creditors' Committee," and

together with LBHI, the "Movants"), file this motion (the "Motion") and respectfully

represent:

**Relief Requested**

1.       By this Motion, the Movants seek approval, pursuant to Rule 9019(a) of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 105(a)

of title 11 of the United States Code (the "Bankruptcy Code"), of a global settlement of

disputes among the Lehman Entities and the Citibank Entities[4] (the "Settlement"), the

terms of which are set forth in that certain Settlement Agreement, dated as of September

29, 2017 among the Citibank Entities, the Lehman Entities, and the Creditors Committee

(the "Settlement Agreement"),[5] and request that such approval be immediately effective

---

[3]  As used herein, the term "Lehman Entities" means LBHI, LBSF, Lehman Brothers Commercial Corp. ("LBCC"), Lehman Brothers Commodity Services Inc. ("LBCS"), and Lehman Brothers Financial Products Inc. ("LBFP").

[4]  As used herein, the term "Citibank Entities" means Citibank, N.A. ("Citibank"), Citigroup Global Markets Inc. ("CGMI"), Citigroup Financial Products Inc. ("Citi Financial"), Citigroup Global Markets Ltd. ("CGML"), Citi Canyon Ltd. ("Citi Canyon"), CitiMortgage, Inc. ("CitiMortgage"), Citibank A.S., Citibank Korea Inc. ("Citi Korea"), Citi Swapco Inc. ("Citi Swapco"), and Citigroup Energy Inc. ("Citi Energy").

[5]  The summary of the Settlement Agreement herein is qualified in its entirety by the terms and conditions of the Settlement Agreement.  The terms and conditions of the Settlement Agreement control to the extent that there is any conflict or inconsistency between this summary and the Settlement Agreement. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Settlement Agreement.  In the event the Settlement Agreement does not become effective for any reason, the Parties agree that neither this Motion, the Settlement Agreement, nor any act performed or document executed pursuant to or in furtherance thereof shall be deemed to be, or used as, an admission with respect to, or waiver of, any right, claim or defense

2

and enforceable.  The Settlement Agreement provides for the resolution of all Disputed

Matters between the parties thereto, and puts an end to years of contentious litigation.

2.       Under the Settlement Agreement, approximately $1.74 billion will be

returned to the Lehman Entities.  Prior to the Petition Date, LBHI had deposited $2

billion with Citibank.  Prior to the date of this Motion, the Lehman Entities maintained

deposit accounts with Citibank with an aggregate balance of approximately

$2,093,445,729.  Under the Settlement Agreement, Citibank will return, and LBHI will

receive, approximately $1,743,445,729 from those deposit accounts.  The Lehman

Entities and the Citibank Entities will dismiss the Relevant Adversary Proceedings (as

defined below) and execute broad general releases.  The Settlement Agreement was

negotiated in good faith and at arm's length, and from the standpoint of the Lehman

Entities, falls above the lowest range of reasonableness, as required by the cases applying

Bankruptcy Rule 9019.

3.       The Plan Administrator has determined, in the exercise of its sound

business judgment, that the Settlement Agreement is in the best interests of LBHI, LBSF,

the other Lehman Entities, and their respective estates and creditors.  Entry of an order

approving and authorizing the Settlement Agreement is a condition precedent to the

effectiveness of the Settlement Agreement.

### Procedural Background

4.       Commencing on September 15, 2008, and periodically thereafter (as

---

asserted by the Citibank Entities or Lehman Entities in the Relevant Adversary
Proceedings (as defined herein) or with respect to any of the Relevant Claims (as defined
herein).

3

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries, including

LBSF, commenced with this Court voluntary cases (together, the "Chapter 11 Cases")

under chapter 11 of the Bankruptcy Code.

5.      On September 14, 2010, LBSF commenced Adversary Proceeding No. 10-

03547 (SCC), captioned *Lehman Bros. Special Financing Inc. v. Bank of America N.A.,*

*et al., (In re Lehman Bros. Holdings Inc.)*, Case No. 08-13555 (SCC) (the "Bank of

America Litigation"), challenging, among other things, (a) the enforceability of certain

contractual provisions purporting to modify LBSF's right to receive payments in

connection with the early termination of certain swap agreements with certain issuers of

notes; and (b) the distribution of funds to certain holders of notes.  LBSF named Citibank

as a "Trustee Defendant" and a "Noteholder Defendant," and Citicorp Nominees Pty Ltd.

("Citi Nominees") and CGMI as "Noteholder Defendants" in the Bank of America

Litigation.

6.      On September 14, 2010, LBSF commenced Adversary Proceeding No. 10-

03542 (SCC), captioned *Lehman Bros. Special Financing Inc. v. U.S. Bank N.A., et al.,*

*(In re Lehman Bros. Holdings Inc.)*, Case No. 08-13555 (SCC) (the "U.S. Bank

Litigation"), challenging, among other things, the enforceability of certain contractual

provisions purporting to modify LBSF's right to receive payments in connection with the

early termination of certain swap agreements with certain issuers of notes.

7.      On September 14, 2010, LBFP commenced Adversary Proceeding No. 10-

03544 (SCC), captioned *Lehman Brothers Financial Products Inc. v. The Bank of New*

*York Mellon Trust Co. N.A., et al., (In re Lehman Brothers Holdings Inc.)*, Case No. 08-

4

13555 (SCC) (the "LBFP BNY Litigation"), challenging, among other things, the

enforceability of certain contractual provisions purporting to modify LBFP's right to

receive payments in connection with the early termination of certain swap agreements

with certain issuers of notes.

8.      On September 14, 2010, LBSF commenced Adversary Proceeding No. 10-

03545 (SCC), captioned *Lehman Brothers Special Financing Inc. v. The Bank of New*

*York Mellon Trust Corp., et al., (In re Lehman Brothers Holdings Inc.)*, (the "LBSF BNY

Litigation"), challenging, among other things, the enforceability of certain contractual

provisions purporting to modify LBSF's right to receive payments in connection with the

early termination of certain swap agreements with certain issuers of notes.

9.      On October 1, 2010, LBSF commenced Adversary Proceeding No. 10-

03809 (SCC), captioned *Lehman Bros. Special Financing Inc. v. Wells Fargo N.A., et al.,*

*(In re Lehman Bros. Holdings Inc.)*, Case No. 08-13555 (SCC) (the "Wells Fargo

Litigation," and together with the Bank of America Litigation, the U.S. Bank Litigation,

the LBFP BNY Litigation, and the LBSF BNY Litigation, the "Flip Clause Litigation"),

challenging, among other things, the enforceability of certain contractual provisions

purporting to modify LBSF's right to receive payments in connection with the early

termination of certain swap agreements with certain issuers of notes.

10.     On December 6, 2011, the Court approved and entered an order

confirming the Plan [ECF No. 23023].  The Plan became effective on March 6, 2012.

11.     On February 8, 2012, LBHI commenced Adversary Proceeding No. 12-

1043 (SCC), captioned *Lehman Bros. Holdings Inc. v. CitiMortgage, Inc., (In re Lehman*

5

*Bros. Holdings Inc.)*, Case No. 08-13555 (SCC) (the "CitiMortgage Litigation"), seeking, among other things, to recover or to avoid the transfer of certain settlement funds allegedly transferred by LBHI to CitiMortgage on or about August 29, 2008. CitiMortgage filed an answer to LBHI's Complaint, [ECF No. 21], dated September 19, 2014, denying all claims and asserting numerous defenses.

12.    On February 8, 2012, LBHI, LBSF, LBCS, LBCC, and the Creditors' Committee (collectively, "Plaintiffs") commenced Adversary Proceeding No. 12-1044 (SCC), captioned *Lehman Bros. Holdings Inc., et al v. Citibank, N.A., et al., (In re Lehman Bros. Holdings Inc.)*, Case No. 08-13555 (SCC) (the "Citibank Litigation," and together with the Flip Clause Litigation and the CitiMortgage Litigation, the "Relevant Adversary Proceedings").  On December 19, 2014, Plaintiffs' filed their *Third Amended Complaint and Claims Objection*, [ECF No. 99], in the Citibank Litigation (the "Amended Complaint").  Pursuant to the Amended Complaint, Plaintiffs, among other things: (a) challenge Citibank's ability to set off against a $2 billion cash deposit of LBHI; (b) challenge the validity and enforceability of a September 9, 2008 amendment to a Guaranty dated January 7, 2004; (c) challenge Citibank's alleged retention of $204 million owed to LBCC under the Citibank CLS Settlement Services Amended and Restated Agreement for CLS User Members among Lehman Brothers Inc. ("LBI"), LBCC, and Citibank, N.A. (London Branch), dated as of October 28, 2004 ("CLS Agreement"); (d) challenge approximately $15 million in Disputed CLS Transfers (as defined below); (e) challenge the amount and validity of various "Citi Derivatives Claims" (as later defined herein) arising from the early termination of various swap

6

agreements and other financial derivatives contracts, and assert that the Citibank Entities

owe the Lehman Entities more than $200 million as a result of such early terminations;

(f) seek the return of LBHI's $2 billion cash deposit; (g) seek the disallowance, reduction,

and equitable subordination of Citi's claims, including the Citi Derivatives Claims; and

(h) seek damages, as well as statutory interest under New York law and other costs and

fees.[7]

13.     The Citibank Entities that are defendants in the Citibank Litigation

(collectively, the "Citi Defendants") filed an answer to the Amended Complaint, dated

April 9, 2015, [ECF No. 107] (the "Answer"), denying all claims and asserting numerous

defenses.

14.     The Parties engaged in extensive fact and expert discovery over the course

of almost five years.  Party and third-party productions totaled over 1.4 million

documents, over thirty expert witnesses provided expert reports, and approximately 170

depositions were taken in the case.  Multiple summary judgment motions were filed,

including with respect to Citibank's claims against LBHI for post-petition interest and

fees, Citibank's ability to set off LBHI's $2 billion cash deposit, the validity and

enforceability of the September 9, 2008 amendment to a Guaranty dated January 7, 2004,

and whether certain trades were rightfully within the trade population for Citi Derivatives

Claims.

---

[7] On March 12, 2015, the Court so-ordered that certain *Stipulation Dismissing Counts IX And X Of The Third Amended Complaint With Prejudice* [ECF No. 106], pursuant to which Plaintiffs' dismissed claims against Citibank for recovery of a $500 million transfer allegedly made to Citibank on or about September 14, 2008.

15.     Following discovery and substantial pre-trial motion practice (including motions *in limine*), trial of the Citibank Litigation commenced on April 25, 2017.  Over the next four months, the Court presided over 42 days of trial, including substantial fact and expert testimony.

16.     In late August, 2017, the Parties agreed to renew settlement discussions and invited the Court to confer during the process.  In early September 2017, those settlement discussions commenced, following a five-day mediation, on September 13, 2017, the Parties agreed to the terms of a global settlement, the terms of which are embodied in the Settlement Agreement, resolving all of the Settled Claims (as defined below) and dismissing the Relevant Adversary Proceedings pursuant to the terms of the Settlement Agreement.

## Jurisdiction

17.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## The Disputed Matters

18.     The Settlement Agreement provides for the resolution of all Disputed Matters between the Lehman Entities and the Citibank Entities.[8]

19.     <u>First</u>, the Settlement Agreement resolves all of the Relevant Claims

---

[8] The Settlement Agreement defines "Disputed Matters" as "the Relevant Claims and the Relevant Adversary Proceedings, including any and all Actions arising from or relating to the matters, facts, and circumstances described in the Relevant Claims and the Relevant Adversary Proceedings."

asserted by the Citibank Entities against the Lehman Entities, including the following

proofs of claim, including any claims for post-petition interest, fees, and costs against any

of the Lehman Entities on account of such claims (collectively, the "Settled Claims"):[9]

| Creditor | Debtor | Claim # |
|---|---|---|
| Citibank | LBHI | 797 |
| Citibank | LBCS | 17932 |
| Citibank | LBHI | 29873 |
| Citibank | LBSF | 67733 |
| Citibank | LBCC | 67734 |
| Citibank | LBHI | 67736 |
| CGMI | LBHI | 68119 |
| Citi Financial | LBSF | 17926* |
| Citi Financial | LBHI | 29637* |
| CGML | LBCS | 29880 |
| CGML | LBSF | 29881 |
| CGML | LBHI | 29882 |
| Citi Canyon | LBSF | 17895 |
| CitiMortgage | LBHI | 17899 |
| Citi Canyon | LBHI | 17913 |
| Citibank A.S. | LBHI | 17918 |
| Citibank (as assignee of Citi Korea) | LBHI | 17921* |
| Citi Swapco | LBSF | 17933 |
| Citi Swapco | LBHI | 17934 |
| Citi Energy | LBHI | 17936 |
| Citi Energy | LBCS | 17937 |

* Settled Claims do not include certain portions of the proof of claim allowed pursuant to
prior settlement agreement dated September 3, 2015 among certain of the Lehman
Entities and Citibank Entities.

20.    Second, the Settlement Agreement resolves all of the pending litigation in

the Relevant Adversary Proceedings between the Citibank Entities and the Lehman

---

[9]  The Settlement Agreement does not affect any claims held by the Citibank Entities that
were asserted in properly filed proofs of claim and not otherwise identified in the
Schedules to the Settlement Agreement.

Entities before this Court, including the Citibank Litigation, the CitiMortgage Litigation

and the Flip Clause Litigation, each as more fully described below.

### The Citibank Litigation

21.     Plaintiffs' Amended Complaint in the Citibank Litigation involves

numerous disputed issues concerning, among other things, the amount and validity of the

Citi Derivatives Claims (as defined below), Citibank's status as secured creditor and

whether Citibank is entitled to offset certain of its claims against certain of the Lehman

Entities' deposit accounts, Citibank's entitlement to post-petition interest on its claims,

and claims related to Citibank's provision of services under the CLS Agreement and

LBHI's guarantee thereof.  All of these issues will be resolved under the Settlement

Agreement.

### The Citi Derivatives Claims

22.     Prior to the Commencement Date, certain LBHI-affiliated parties (the

"Lehman Subsidiaries")[10] traded financial derivatives with certain of the Citibank Entities

pursuant to certain master agreements (collectively, the "Master Agreements"),

including: the 1992 ISDA Master Agreement (Multicurrency-Cross Border) dated as of

October 6, 2005 among LBSF and Citi Canyon (the "LBSF-Canyon Agreement"); the

1992 ISDA Master Agreement (Multicurrency-Cross Border) dated as of May 14, 1992

among Citibank, N.A., New York and LBSF (the "LBSF-Citibank Agreement"); the

1987 ISDA Interest Rate and Currency Exchange Agreement dated as of August 15, 1989

---

[10]  As used herein, the term "Lehman Subsidiaries" means LBSF, LBCC, and
LBCS.

among Salomon Brothers Holding Company Inc. (n/k/a Citi Financial) and LBSF (the

"LBSF-Financial Agreement"); the 1992 ISDA Master Agreement (Multicurrency-Cross

Border) dated as of February 16, 2000 among Salomon Brothers International Limited

(n/k/a CGML) and LBSF (the "LBSF-CGML Agreement"); the 1992 ISDA Master

Agreement (Multicurrency-Cross Border) dated as of March 29, 1993 among Citibank,

N.A., New York and LBCC (the "LBCC-Citibank Agreement"); the 1992 ISDA Master

Agreement (Multicurrency-Cross Border) dated as of February 1, 2006 among LBCS and

Citi Energy (the "LBCS-Energy Agreement"); the 1992 ISDA Master Agreement

(Multicurrency-Cross Border) dated as of April 17, 2007 among LBCS and CGML (the

"LBCS-CGML ISDA Agreement"); the EFET General Agreement Concerning the

Delivery and Acceptance of Electricity Version 2.1(a) dated as of March 13, 2008 among

LBCS and CGML (the "LBCS-CGML EFET Agreement"); and the 1992 ISDA Master

Agreement (Multicurrency-Cross Border) dated as of August 16, 1996 among Salomon

Swapco Inc. (n/k/a Citi Swapco) and LBSF (the "LBSF-Swapco Agreement").

23.    On August 29, 2008, the Lehman Subsidiaries and certain of the Citibank

Entities entered into the Close-out Amount Multilateral Agreement (the "Close-out

Amount Agreement") which amended certain of the Master Agreements[11] to specify that

the parties agreed to use the "Close-out Amount" method to determine the settlement

amount due upon early termination, so that the Early Termination Amount upon an Event

---

[11]    The following seven Master Agreements were amended by the Close-out
Amount Agreement:  the LBSF-Citibank Agreement, the LBSF-Financial Agreement, the
LBSF-CGML Agreement, the LBCC-Citibank Agreement, the LBCS-Energy Agreement,
the LBCS-CGML ISDA Agreement, and the LBSF-Swapco Agreement.

of Default would be calculated by the Non-Defaulting Party pursuant to the Close-out

Amount definition in the 2002 ISDA Master Agreement.  The Close-out Amount

Agreement did not amend the LBSF-Canyon Agreement or the LBCS-CGML EFET

Agreement.

24.     LBHI was a guarantor of the Lehman Subsidiaries' obligations under each

of the Master Agreements.  Its chapter 11 filing was an Event of Default under the Master

Agreements.  The Citi Defendants terminated the Master Agreements on or after the

Commencement Date.  Under each of the Master Agreements, the terminating party was

designated as the party (the "Determining Party") responsible for providing a calculation

statement setting forth the amounts due (if any) among the parties upon termination, and

each of the Master Agreements contained provisions governing the calculation of such

amounts (the "Early Termination Amounts").  The seven Master Agreements that had

been amended by the Close-out Amount Agreement required the Determining Party to

calculate the respective Early Termination Amount in accordance with the definition of

"Close-out Amount" as provided in the form 2002 ISDA Master Agreement.  The LBSF-

Canyon Agreement required the Determining Party to calculate the Early Termination

Amount in accordance with the definition of "Market Quotation" or, under certain

circumstances, the definition of "Loss," as provided therein.  The LBCS-CGML EFET

Agreement required the Determining Party to calculate the Early Termination Amount in

accordance with the definition of "Settlement Amount" provided therein.

25.     The Citi Defendants calculated the Early Termination Amounts and filed

bankruptcy claims for the Early Termination Amounts in the Chapter 11 Cases, including

12

claims against LBHI as guarantor of the Lehman Subsidiaries' obligations (collectively,

the "Citi Derivatives Claims").  The Citi Derivatives Claims are asserted in the following

proofs of claim filed in the Chapter 11 Cases:

| Creditor | Debtor | Claim # |
|---|---|---|
| Citibank | LBSF | 67733 |
| Citibank | LBCC | 67734 |
| Citibank | LBHI | 67736 |
| Citi Financial | LBSF | 17926 |
| Citi Financial | LBHI | 29637 |
| CGML | LBCS | 29880 |
| CGML | LBSF | 29881 |
| CGML | LBHI | 29882 |
| Citi Canyon | LBSF | 17895 |
| Citi Canyon | LBHI | 17913 |
| Citi Swapco | LBSF | 17933 |
| Citi Swapco | LBHI | 17934 |
| Citi Energy | LBHI | 17936 |
| Citi Energy | LBCS | 17937 |

26.    In the Amended Complaint, Plaintiffs allege that the Citibank Defendants'

calculation of the Early Termination Amounts breached the terms of the respective

Master Agreements and seek various relief, including, among other things, a judgment (a)

sustaining Plaintiffs' objections to the Citi Derivatives Claims and reducing, disallowing,

or expunging such claims, (b) determining that the Citi Defendants breached the Master

Agreements and owe the Lehman Subsidiaries damages of approximately $200 million,

and (c) equitably subordinating the Citi Derivatives Claims.

27.    In the Answer, the Citibank Defendants deny all claims and assert

numerous defenses.

28.    The dispute among Plaintiffs and the Citibank Defendants over the Citi

Derivatives Claims has been proceeding before this Court as part of the Citibank

13

Litigation and will be resolved pursuant to the Settlement Agreement.

### **Citibank's Right of Setoff Against the $2 Billion Deposit**

29.     On June 12, 2008, LBHI placed a $2 billion deposit with Citibank which remained at Citibank through LBHI's bankruptcy filing and which, pursuant to the Stipulation and Order dated April 15, 2009, was transferred to Account No. 204354000 at Citibank (the "$2 Billion Deposit").  In Proofs of Claim Nos. 29873 and 67736 against LBHI, Citibank asserts that various claims asserted in the Chapter 11 Cases, including certain of the Citi Derivatives Claims, are secured by the $2 Billion Deposit (and other LBHI deposits) pursuant to a purported right of setoff.  In addition, Citibank asserts that, as a secured creditor and swap participant (as that term is defined by 11 U.S.C. § 101(53C)), it is entitled to post-petition interest on its claims.

30.     In the Amended Complaint, Plaintiffs, among other things, challenge Citibank's retention of the $2 Billion Deposit, challenge Citibank's entitlement to post-petition interest on its claims, and seek a judgment awarding LBHI damages against Citibank in an amount not less than $2 billion, or in the alternative, ordering Citibank to return the $2 Billion Deposit to LBHI's estate, as well as statutory interest under New York law and other costs and fees.

31.     In the Answer, the Citibank Entities deny all claims and assert numerous defenses.

32.     The disputes relating to the $2 Billion Deposit and the parties' claims for post-petition or statutory interest have been proceeding before this Court as part of the Citibank Litigation and will be resolved pursuant to the Settlement Agreement.

14

### The Bracebridge-Related Claims

33.     Prior to the Commencement Date, LBSF traded financial derivatives with

FFI Fund Ltd., FYI Ltd., and Olifant Fund, Ltd., funds controlled by Bracebridge Capital,

LLC (collectively, "Bracebridge").  Plaintiffs allege that on September 11, 2008, LBSF,

Citibank, and Bracebridge entered into a three-way step-out transaction (the "Collapse

Transaction"), under which LBSF simultaneously terminated certain credit default swap

transactions with Citibank (the "Terminated Trades") and novated certain credit default

swap transactions with Bracebridge to Citibank (the "Novated Trades").  Citibank and

Bracebridge included the Terminated Trades and Novated Trades, respectively, in their

proofs of claim against LBSF.

34.     In the Amended Complaint, Plaintiffs allege, among other things, that the

Collapse Transaction was binding and effective as of September 11, 2008, and as a result,

no amounts are due from LBSF to Citibank on account of the Terminated Trades.  In the

Answer, the Citibank Entities deny all claims asserted by LBSF arising from the Collapse

Transaction and assert numerous defenses.

35.     On March 28, 2013, Bracebridge intervened as defendants in the Citibank

Litigation, and, on March 9, 2015, filed an answer to the Amended Complaint asserting

counterclaims against Plaintiffs, [ECF No. 104].  Bracebridge disputed the effectiveness

of the Collapse Transaction and contended that the Novated Trades were part of the

population of trades between LBSF and Bracebridge as of the Commencement Date.

36.     On May 21, 2015, Lehman and Bracebridge reached a settlement and on

June 9, 2015, this Court entered an order approving the *Stipulation Concerning Dismissal*

15

*of Adversary Proceeding and Counterclaims Solely with Respect to Defendant Intervenors*, [ECF No. 110], in the Citibank Litigation, dismissing with prejudice all claims and counterclaims among Plaintiffs and Bracebridge in the Citibank Litigation.

37.    The dispute among Plaintiffs and the Citibank Defendants relating to the Collapse Transaction has been proceeding before this Court as part of the Citibank Litigation and will be resolved pursuant to the Settlement Agreement.

**The CLS Related Claims**

38.    On or about September 9, 2008, LBHI and Citibank executed an amendment (the "September Amendment") to the Guaranty dated as of January 7, 2004 by LBHI in favor of Citigroup and its subsidiaries and affiliates (the "2004 Guaranty"). Among other things, the September Amendment purported to include among the obligations covered by the 2004 Guaranty obligations of LBI and obligations arising under the CLS Agreement.  On or about November 8, 2007, LBSF, Lehman Brothers International (Europe) ("LBIE"), and Citibank entered into an Affiliate Election Agreement.

39.    Under the CLS Agreement and Affiliate Election Agreement, Citibank acted as the designated settlement member of LBI, LBCC, LBSF, and LBIE (each, a "Lehman CLS User" and collectively the "Lehman CLS Users") with CLS Bank, and Citibank cleared and settled foreign exchange transactions for the Lehman CLS Users through the CLS system.

40.    Citibank provided CLS services during the week of September 15-19, 2008.  However, Citibank alleges that during that week the Lehman CLS Users failed to

16

make all payments due to Citibank under the CLS Agreement, and Citibank accordingly

withheld certain payments due to the Lehman CLS Users under the CLS Agreement.

Citibank terminated the CLS Agreement on September 19, 2008.

41.    Beginning on September 19, 2008, Citibank unwound the currency

positions of the Lehman CLS Users, calculated the final net currency positions of each of

these entities, and asserted the final amounts due to, or from, as the case may be, each of

the Lehman CLS Users (hereinafter, the "Citibank-CLS Unwind Amounts").

42.    Citibank asserts that the Citibank-CLS Unwind Amount for each Lehman

CLS User includes amounts attributable to (1) the fee Citibank applied to trades

transacted in the market to unwind the respective Lehman CLS User's positions (the

"Commercial Spread"), and (2) the costs allocated to the respective Lehman CLS User

that Citibank claims it incurred in carrying short positions before unwinding them, netted

against the gains on carrying that Lehman CLS User's long currency positions (the "Cost

of Carry").

43.    Citibank calculated the Citibank-CLS Unwind Amount for LBCC as a

payable due from Citibank to LBCC of $198,473,976 (the "Citibank-LBCC-CLS Unwind

Amount").  Citibank filed Proof of Claim No. 67734 in the Chapter 11 Cases against

LBCC (the "Citibank-LBCC Proof of Claim") and in it, noted the Citibank-LBCC-CLS

Unwind Amount.  Citibank's calculation of the Citibank-LBCC-CLS Unwind Amount

includes (1) Commercial Spread amounts charged to LBCC on the relevant unwind trades

totaling $1,444,425 (the "LBCC-CLS Commercial Spread") and (2) Cost of Carry

allocated to LBCC of -$135,038 (the "LBCC-CLS Cost of Carry").  On or about

17

September 19, 2008, Citibank debited $4,510,919 (the "Disputed LBCC-CLS Debit")

from an account owned by LBCC used by both LBCC and LBIE for the settlement of

CLS transactions, among other things, purportedly in partial settlement of amounts due

from LBIE to Citibank under the CLS Agreement.  In the Citibank-LBCC Proof of

Claim, Citibank alleges, among other things, that (1) with respect to the LBCC-Citibank

Agreement, the "[a]mount payable by LBCC as a result of the designation of an Early

Termination Date [is $18,017,039]," plus interest and legal fees (the "LBCC Swap

Claim") and (2) Citibank may set off the LBCC Swap Claim against amounts Citibank

owes LBCC under the CLS Agreement (the "LBCC ISDA-CLS Setoff Claim").

44.    Citibank calculated the Citibank-CLS Unwind Amount for LBI as a

receivable owing by LBI to Citibank of $1,260,326,894 (the "Citibank-LBI-CLS Unwind

Amount"), exclusive of interest and legal fees.  Citibank filed Proof of Claim No. 67736

in the Chapter 11 Cases against LBHI alleging, among other things, that LBHI has

guaranteed LBI's obligations under the CLS Agreement (the "LBHI-CLS Guaranty

Claim") and asserting Citibank's claim in respect of the Citibank-LBI-CLS Unwind

Amount, and reserving the right to seek interest and legal fees.  Citibank's calculation of

the Citibank-LBI-CLS Unwind Amount includes (1) Commercial Spread amounts

charged to LBI on the relevant unwind trades totaling $25,813,112 (the "LBI-CLS

Commercial Spread") and (2) Cost of Carry allocated to LBI of $6,120,577 (the "LBI-

CLS Cost of Carry").

45.    Citibank calculated the Citibank-CLS Unwind Amount for LBSF as a

receivable owing by LBSF to Citibank of $584,897 (the "Citibank-LBSF-CLS Unwind

Amount"), exclusive of interest and legal fees.  Citibank filed Proof of Claim No. 67733

in the Chapter 11 Cases against LBSF (the "Citibank-LBSF Proof of Claim"), asserting,

among other things, Citibank's claim in respect of the Citibank-LBSF-CLS Unwind

Amount, and reserving the right to seek interest and legal fees.  Citibank's calculation of

the Citibank-LBSF-CLS Unwind Amount includes (1) Commercial Spread amounts

charged to LBSF on the relevant unwind trades totaling $560,640 (the "LBSF-CLS

Commercial Spread"), and (2) Cost of Carry allocated to LBSF of $135,016 (the "LBSF-

CLS Cost of Carry").

    46.    Before the Commencement Date, CGML and LBSF were parties to a

credit default swap transaction, which bore the reference number in LBSF's records of

20345417.  Plaintiffs allege that CGML novated its interest in the credit default swap

transaction to a third party and that in connection with that novation, CGML owed a

payment to LBSF of $9,823,000.  Plaintiffs allege that on September 2, 2008, CGML

paid $9,823,000 to LBSF, and that on September 10, 2008, the September 2 payment was

reversed through the Fed-Wire system.  Plaintiffs further allege that on September 8,

2008, CGML paid $9,823,000 to LBSF and that on September 15, 2008 the same amount

($9,823,000) was included in that day's CLS pay-in-pay-out schedule as an amount due

from LBSF.  CGML subsequently filed Proof of Claim No. 29881 in the Chapter 11

Cases (the "CGML Proof of Claim"), including a response to the Court-ordered

Derivative Questionnaire.  The Derivative Questionnaire reflects that CGML owed a

"cash break" to LBSF of $9,823,000, with identification number C61F00856 (hereinafter,

the "Disputed LBSF Amount, and together with the Disputed LBCC-CLS Debit, the

19

"Disputed CLS Transfers").  Plaintiffs assert that the novation transaction was intended

to settle through the CLS system and that the amount Citibank claims LBSF owes to

Citibank under the CLS Agreement has been inflated improperly by the Disputed LBSF

Amount.  Plaintiffs also assert that the Disputed LBSF Amount is not set forth in the

CGML Proof of Claim.  Citibank asserts that the Disputed LBSF Amount is a "cash

break" that CGML owed LBSF under the parties' credit default swap agreement and that

the Disputed LBSF Amount is not payable by Citibank to LBSF as a Citibank-CLS

Unwind Amount.

47.    Because Citibank contends that the Citibank-CLS Unwind Amounts for

the Lehman CLS Users were calculated in an integrated fashion such that the amounts are

mutually dependent, Citibank was unwilling to pay to LBCC the amount that Citibank

calculated it owed to LBCC under the CLS Agreement (net of available setoffs) unless

and until Plaintiffs accepted Citibank's calculation of the Citibank-CLS Unwind

Amounts.

48.    On May 14, 2013, this Court entered the *Stipulation and Order Between*

*Plaintiffs Lehman Brothers Holdings Inc., Lehman Brothers Commercial Corp., Lehman*

*Brothers Special Financing Inc., and Official Committee of Unsecured Creditors and*

*Defendants Citibank, N.A. and Citigroup Global Markets Ltd. with Respect to Certain*

*Continuous Linked Settlement Agreement Unwind Amounts*, [ECF No. 26], in the

Citibank Litigation, approving a limited agreement by which, among other things, LBHI,

LBCC, LBSF, and the Creditors' Committee accepted Citibank's calculation of (1) the

Citibank-LBCC-CLS Unwind Amount due from Citibank to LBCC under the CLS

Agreement, (2) the Citibank-LBI-CLS Unwind Amount due from LBI to Citibank under

the CLS Agreement, and (3) the Citibank-LBSF-CLS Unwind Amount due from LBSF to

Citibank under the CLS Agreement, with certain exceptions and subject to the reservation

of certain rights, in exchange for Citibank's agreement to pay the Citibank-LBCC-CLS

Unwind Amount net of certain setoffs asserted by Citibank.  Citibank paid to LBCC the

amount of $166,956,937, which represents (a) the Citibank-LBCC-CLS Unwind Amount,

less (b) a holdback of $31,517,039 to preserve Citibank's right, if any, to set off (i) the

principal amount of the LBCC Swap Claim ($18,017,039) and (ii) interest on the

principal amount of the LBCC Swap Claim ($13,500,000).

49.     In the Amended Complaint, Plaintiffs, among other things, challenge the

September Amendment under 11 U.S.C. §§ 544 and 548 and New York state law, and

object to the LBHI-CLS Guaranty Claim "to the extent" it is "based on improper

calculations of the amounts alleged to be owed."  Plaintiffs also seek in the Amended

Complaint a judgment awarding damages for Citibank's retention of funds owing to

LBCC, sustaining objections to Citibank's claims arising under the CLS Agreement, and

awarding damages to LBSF in an amount not less than $14.3 million on account of the

Disputed CLS Transfers.

50.     In the Answer, the Citibank Entities deny all claims and assert numerous

defenses.

51.     The disputes among Plaintiffs and the Citibank Entities relating to the

September Amendment, the CLS Agreement, and the Affiliate Election Agreement have

been proceeding before this Court as part of the Citibank Litigation and will be resolved

21

pursuant to the Settlement Agreement.

**The CitiMortgage Litigation**

52.      On or about August 29, 2008, LBHI and CitiMortgage entered into an

agreement (the "CitiMortgage Agreement"), whereby LBHI allegedly transferred

$10,000,000 (the "CitiMortgage Payment") in settlement of certain claims previously

asserted by CitiMortgage against LBHI.  LBHI contends that the CitiMortgage Payment

was made within 90 days of the Commencement Date, and that LBHI had become

insolvent and/or undercapitalized as of August 29, 2008.  LBHI further contends that it

did not receive reasonably equivalent value in return for the CitiMortgage Payment.

53.      In the CitiMortgage Litigation, LBHI seeks, among other things, to avoid

the CitiMortgage Payment as a preferential transfer pursuant to 11 U.S.C. § 547(b) and as

a constructively fraudulent transfer pursuant to 11 U.S.C. §§ 544 and 548 and applicable

state law; to recover and automatically preserve the $10,000,000 for the benefit of the

estate pursuant to 11 U.S.C. §§ 550(a) and 551.

54.      In its answer, CitiMortgage denies all claims and asserts numerous

defenses.

55.      The CitiMortgage Litigation has been proceeding before this Court and

will be resolved pursuant to the Settlement Agreement.

**The Flip Clause Litigation**

56.      At various times prior to the Commencement Date, LBSF entered into

credit default swap transactions (the "Swaps") evidenced by agreements (the "Swap

Agreements") with certain special-purpose entities (the "Issuers").  Under the Swap

22

Agreements, the Issuers sold "credit protection" to LBSF with respect to various entities

(collectively, the "Reference Entities") in exchange for periodic premium payments by

LBSF to the respective Issuer.

57.     Each of the Issuers, along with its respective trustee(s) (the "Trustees"),

entered into an indenture (the "Indentures").  The Indentures, among other things, govern

the Issuers' payment obligations on certain notes (the "Notes") they issued and sold to

investors (the "Noteholders").  The Issuers used the proceeds from the sale of the Notes

to acquire assets (the "Collateral") that served as collateral for the Issuers' obligations to

LBSF under the Swap Agreements and for the Issuers' obligations under the Notes.

58.     The Indentures generally provide that the Noteholders will receive interest

payments on the Notes from, *inter alia*, LBSF's premium payments under the Swaps, and

that they will be repaid principal from the available proceeds of the Collateral but, in

most instances, only *after* payment of any amounts due to LBSF under the Swap

Agreements.  Accordingly, LBSF contends that if LBSF has a claim against an Issuer

under the relevant Swap Agreement, LBSF's right to payment has priority ("Senior

Payment Priority") over any claims of the respective Noteholders.

59.     LBSF further contends that its Senior Payment Priority was subject to

modification under the terms of the Indentures if LBSF was in default under the Swap

Agreements.  Upon a default by LBSF, such as a bankruptcy filing by LBSF or LBHI, the

Indentures generally provide that the Noteholders' claims against an Issuer have priority

over any claims of LBSF (the so-called "Priority Flip").  In that circumstance, the Priority

Flip changes LBSF's position to junior payment priority for any early termination

23

payment due under the Swaps.

60.    LBHI's chapter 11 filing constituted an event of default under the Swap Agreements.  Accordingly, the Trustees terminated the Swaps.  As a result of those early terminations, LBSF asserts that it is owed early termination payments by the Issuers consistent with its Senior Payment Priority.  Nevertheless, in reliance on the Priority Flip, certain of the Issuers have made distributions of interest and principal to the Noteholders (other Trustees continue to hold the Collateral proceeds pending the outcome of the Flip Clause Litigation).  LBSF contends that, if the Priority Flip had not been effected, it would be entitled to additional amounts consistent with its Senior Payment Priority, and that the amounts distributed to the Noteholders would be correspondingly reduced. LBSF contends in the Flip Clause Litigation that the Priority Flip is unenforceable under 11 U.S.C. §§ 365(e)(1) and 541(c)(1),[12] and violates the automatic stay under 11 U.S.C. § 362(a), or, alternatively, that the Priority Flip is avoidable pursuant to various other provisions of the Bankruptcy Code.  LBSF seeks, among other things, a judgment that it is entitled to Senior Payment Priority, and is entitled to recover and preserve the value of the Senior Payment Priority for the benefit of the estate pursuant to 11 U.S.C. §§ 550(a) and 551.  In addition to the foregoing, in the Bank of America Litigation, LBSF seeks various relief to recover amounts distributed to the Noteholders.[13]

---

[12]  In addition to the foregoing, LBSF contends in the Bank of America Litigation that the Priority Flips are unenforceable under 11 U.S.C. § 363(l).

[13]  In the Bank of America Litigation, LBSF seeks additional relief with respect to the Pyxis Transaction and the Federation Transactions, as those terms are defined in LBSF's Fourth Amended Complaint.

61.     LBSF named Citibank as a "Trustee Defendant"[14] and Citi Nominees, CGMI, OSDF Ltd. and Starling Strategies Ltd. as "Noteholder Defendants" in the Bank of America Litigation.  Additionally, various Citibank Entities and affiliates of Citibank Entities may be recipients of amounts traceable to a Priority Flip challenged by LBSF.

62.     On July 19, 2016, this Court entered an order granting the Noteholder Defendants' Omnibus Motion to Dismiss, dismissing with prejudice Counts I-XVI, XVIII, and XIX in the Bank of America Litigation.  This order is currently on appeal before the United States District Court for the Southern District of New York.   On August 29, 2016, this Court entered an order dismissing Counts XX-XXIII in the Bank of America Litigation regarding the Pyxis Transaction, as alleged against the Noteholder Defendants.  The remaining counts of the Bank of America Litigation relating to the Pyxis and Federation Transactions are proceeding before this Court.

63.     The disputes among the Citibank Entities and the Lehman Entities relating to the Flip Clause Litigation, including those proceeding before this Court and on appeal to the District Court, will be resolved pursuant to the Settlement Agreement, including as to the Citibank Releasees (as defined in the Settlement Agreement).

## The Settlement

64.     Over the past nine years, the Parties undertook numerous attempts to resolve the Disputed Matters through negotiation, without success.  Given the

---

[14] Citibank was the Trustee for Pebble Creek LCDO 2007-2.  Citibank was named as a "nominal" defendant as Trustee for ZAIS Investment Grade Limited X, an Issuer which, in a noteholder capacity, received early termination payments challenged by LBSF.

complexities of the Parties' financial dealings, and the hundreds of factors impacting the

amount one Party might owe to another, and the vast amounts at stake, the Parties were

unable to achieve a pretrial settlement, and this case proceeded to trial, which

commenced on April 25, 2017.

65.    Over the next four months, the Court presided over forty-two (42) days of

trial, including substantial fact and expert testimony.  In late August 2017, with dozens of

trial days likely still ahead, the Parties agreed to renew settlement discussions and invited

the Court to confer during the process.  In early September 2017, those settlement

discussions commenced, and following a five-day mediation, the Parties agreed in

principle to a global settlement.  The final and binding terms of the Parties' settlement are

embodied in the Settlement Agreement, which, subject to Court approval, will resolve all

of the Settled Claims and result in the dismissal of the Citibank Entities and their

affiliates from the Relevant Adversary Proceedings.

66.    Pursuant to the Settled Claims, the Citibank Entities asserted

approximately $2.1 billion in claims against the Lehman Entities, the majority of which

were asserted in full against LBSF, LBCC, or LBCS as primary obligor, and LBHI as

guarantor.  The Settled Claims involve more than thirty-thousand (30,000) transactions,

including complex derivatives transactions, and include guaranty claims and claims based

on loans.  The Citi Derivatives Claims being settled here total approximately $1.8 billion.

The Relevant Adversary Proceedings involve dozens of causes of action based on equally

complex pre-Commencement Date financial transactions involving the Citibank Entities

and the Lehman Entities.  Attempting to settle these disputes on an individual or

piecemeal basis has proven to be difficult and impractical.  Accordingly, the Plan

Administrator determined, in the exercise of its sound business judgment, that a global

settlement had the potential to produce a settlement that is fair and reasonable, and in the

best interests of the Lehman Entities and their respective estates and creditors.  The Plan

Administrator submits that the global Settlement embodied in the Settlement Agreement

achieves that result.

## **The Settlement Agreement**

67.    The Settlement Agreement will result in the return of approximately $1.74

billion to the Lehman Entities.  Prior to the Petition Date, LBHI had deposited $2 billion

with Citibank.  Prior to the date of this Motion, the Lehman Entities maintained deposit

accounts with Citibank with an aggregate balance of approximately

$2,093,445,729.  Under the Settlement Agreement, Citibank will return, and LBHI will

receive, approximately $1,743,445,729 from those deposit accounts.

68.    Other material terms of the Settlement Agreement are as follows:

**Timing and Process**:  The Parties have agreed that:

(i)    the Parties have a binding and enforceable settlement as of
the Settlement Date, subject only to Bankruptcy Court approval of the
Settlement Agreement by Final Order (as defined in the Plan);

(ii)    counsel for LBHI would file this  motion (the "Approval
Motion") on the date hereof seeking approval of the material terms of the
Settlement Agreement;

(iii)    the Parties will use reasonable efforts to have the Approval
Motion heard on shortened notice at the earliest time at which the
Bankruptcy Court is available;

(iv)    no later than five (5) business days following the date that
an order approving the Settlement Agreement becomes a Final Order (as
defined in the Plan) (the "Turnover Date"), Citibank will debit $350

27

million (the "<u>Debit Amount</u>") from the $2 Billion Deposit and transfer the
Debit Amount to a Citibank-owned account for the exclusive benefit of
the Citibank Entities; and

(v)    Citibank shall turnover any remaining amounts in the $2
Billion Deposit, as well as all amounts held in certain other accounts at
Citibank set forth on the Schedules to the Settlement Agreement
(collectively, the "<u>Turnover Amount</u>") to LBHI on the Turnover Date.

**Relevant Claims**:  The claims subject to the Settlement Agreement (the
"<u>Relevant Claims</u>") include:

(i) the Settled Claims, and

(ii) the "Subrogated Claims," which include:

(a) Citibank's claim against Lehman Brothers Commercial
Corporation Asia Limited ("<u>LBCCA</u>") for alleged obligations of
LBCCA in the aggregate approximate amount of HKD 2.18 billion
under (1) the Committed Revolving Loan Agreement with
Guarantee dated as of August 28, 2007 (as subsequently amended)
between LBCCA and Citibank, and (2) the ISDA Master
Agreement dated as of July 12, 2007 between LBCCA and
Citibank; as set forth in claim number 441-B0047 filed in
LBCCA's foreign insolvency proceeding;

(b) Citibank's claim against Lehman Brothers Securities
N.V. ("<u>LBSN</u>") in the aggregate approximate amount of CHF 2.7
million in LBSN's foreign insolvency proceeding; and

(c) Citibank A.S.'s claim against LB UK RE Holdings Ltd.
("<u>LBUK</u>") in the aggregate approximate amount of GBP 10.4
million in LBUK's foreign insolvency proceeding.

The transactions contemplated by the Settlement will not be subject to any
further internal approvals by the Parties, other than the Parties' rights to
review and comment on the Settlement Agreement and related
documentation.

**Treatment of Relevant Claims**:  The Settlement Agreement provides
that:

(i)    On the Turnover Date, (a) the Relevant Claims asserted against
LBHI will be deemed satisfied and withdrawn with prejudice, and
(b) the Relevant Claims asserted against any party other than LBHI

28

shall be irrevocably assigned on an "as-is" basis to LBHI, in each case without any further action by any party;

(ii)     On the Turnover Date, the Citibank Entities agree and acknowledge that LBHI, as Plan Administrator, will have complete discretion, in accordance with the Plan, to determine the ultimate treatment of the Relevant Claims (e.g., the manner in which they are allowed, reserved-for, expunged, etc.).

(iii)     In the event the assignment of any Subrogated Claim is not permitted under applicable law, the parties will enter into mutually agreeable documentation to provide LBHI a 100% participation interest in the Subrogated Claims or otherwise transfer the economic benefit of the Subrogated Claims to LBHI;

(iv)     LBHI acknowledges and confirms that the Citibank Entities do not promise, guarantee or warrant that the Lehman Entities are entitled to exercise any subrogation rights, and covenants and agrees that the Citibank Entities shall not be liable for any claims, damages or losses incurred by Lehman if (a) the assignment of the Relevant Claims is not recognized or enforced for any reason in the bankruptcy or insolvency proceeding of the primary obligor liable for the Relevant Claim, or (b) LBHI is unable to receive any distribution, payment, or recovery on account of the Relevant Claims, *provided*, *however*, that Citibank shall promptly transfer to the Turnover Account the amount of any payments or distributions received by any Citibank Entity in respect of any of the Relevant Claims after the Turnover Date;

(v)     LBHI will indemnify, reimburse, and hold harmless the Citibank Entities for any fees (including counsel fees incurred after the Turnover Date), costs, expenses, fines, or other amounts incurred by, or imposed on, the Citibank Entities resulting from the assignment of the Assigned Claims and Subrogated Claims, including any amounts incurred by the Citibank Entities in connection with their assisting LBHI in defending or responding to any challenge or objection to the assignment of the Assigned Claims and Subrogated Claims, any challenge or objection to LBHI's asserted subrogation rights, or other means of transferring the economic benefits of the Subrogated Claims to LBHI; *provided, however,* that prior to incurring any counsel fees, the Citibank Entities must confer in good faith and cooperate with LBHI to determine the most cost-effective means of effectuating the transfer of the economic benefit of any challenged claims,

29

including at LBHI's option, providing LBHI a 100% participation interest in such claims or otherwise transferring their economic benefit to LBHI.

(vi)    To the extent not paid in cash within thirty (30) days of written notice from Citibank, Citibank shall receive an allowed administrative expense claim against LBHI in an amount equal to the reasonable and documented fees, costs, expenses, fines, or other amounts incurred by, or imposed on, the Citibank Entities that are indemnified by LBHI under this Settlement Agreement.

**Dismissal of Relevant Adversary Proceedings**:  Not later than two (2) business days following the Turnover Date, the Lehman Entities, as applicable, will dismiss with prejudice each of the Citibank Releasees, as applicable, from the Relevant Adversary Proceedings, with each party to bear its own costs.

**<u>Mutual Releases</u>**:

The Settlement Agreement contains the following releases which will occur automatically on the Turnover Date:

(i)    All of the Lehman Entities and the Committee hereby do and shall be deemed to irrevocably, unconditionally, and forever generally release, waive, and discharge each and every one of the Citibank Entities, all of their parents, subsidiaries, and affiliates, including, without limitation, Citicorp Nominees Pty Ltd., Starling Strategies Ltd., OSDF Ltd., Citigroup Investments Inc., CGI Private Equity, L.P., LLC., and Citigroup Alternative Investments LLC., and (in each case solely in their capacities as such) all of their respective property, current and former officers, directors, employees, divisions, branches, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, successors, predecessors, and representatives (each a "<u>Citibank Releasee</u>" and collectively, the "<u>Citibank Releasees</u>") from and in respect of all Disputed Matters; *provided, however,* that the foregoing release, waive, and discharge shall not release, waive, or discharge any right or obligation under this Settlement Agreement, including the right to enforce this Settlement Agreement;

30

and *provided further,* that in the event that any of Citicorp Nominees Pty Ltd., Starling Strategies Ltd., OSDF Ltd., Citigroup Investments Inc., CGI Private Equity, L.P., LLC., or Citigroup Alternative Investments LLC seeks to assert, amend, or assign to any party any Action against any Lehman Entity arising from or relating to the matters, facts, and circumstances described in the Disputed Matters, the foregoing release, waiver, and discharge of that particular Citibank Releasee shall be null and void.

(ii)          All of the Citibank Entities hereby do and shall be deemed to irrevocably, unconditionally, and forever generally release, waive, and discharge each and every of the Lehman Entities and all of their parents, subsidiaries, and affiliates (in each case who are debtors in the Chapter 11 Cases), the Committee, and (in each case solely in their capacities as such) all of their respective property, current and former officers, directors, employees, divisions, branches, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, successors, predecessors, and representatives (each a "<u>Lehman Releasee</u>" and collectively, the "<u>Lehman Releasees</u>") from and in respect of the Disputed Matters; *provided, however,* that the foregoing release, waiver, and discharge shall not release, waive, or discharge (i) any claim held by the Citibank Entities that has been asserted in a properly filed proof of claim that is not a Relevant Claim, (ii) any claim held by any of the Citibank Entities asserted in a Relevant Claim that has been previously allowed under the Plan pursuant to a prior settlement between any of the Citibank Entities and any of the Lehman Entities, and (iii) any right or obligation under this Settlement Agreement, including the right to enforce this Settlement Agreement.

(iii)        Each Lehman Entity and the Committee confirms and agrees that it will commence no further Actions against any of the Citibank Releasees, including that it will not object to or otherwise challenge claims

31

filed by any of the Citibank Releasees in the
Chapter 11 Cases, and releases and waives any such
further Action, objection or challenge; *provided,
however,* that the foregoing confirmation and
agreement shall not release, waive or discharge any
right or obligation under this Settlement Agreement,
including the right to enforce this Settlement
Agreement; and *further provided, however*, that
nothing in this section shall prevent any Lehman
Entity from asserting any counterclaim or defense
in any Action commenced against it by any
Citibank Releasee after the Settlement Date.

(iv)     The Citibank Entities' and the Lehman Entities'
mutual release of each shall include a full and final
release of all claims related to the Collapse
Transaction. Citibank covenants that: (i) neither it
nor any Citibank Entity will pursue any legal or
equitable claims against Bracebridge related to the
Collapse Transaction; and (ii) neither it nor any
Citibank Entity will seek to assign to any party any
claims related to the Collapse Transaction.

**Litigation Standstill**:  The Parties shall immediately suspend all ongoing
discovery and litigation among them until the earlier of (i) the date on
which the Bankruptcy Court denies the Approval Motion, or (ii) such
other date as mutually agreed by Movants and Citibank.

**Choice of Law/Jurisdiction**:  The Settlement Agreement will be
construed and enforced in accordance with, and the rights of the Parties
shall be governed by, the laws of the State of New York (including
Section 5-1401 of the New York General Obligations Law), without
regard to conflicts of laws principles that would require the application of
the law of another jurisdiction.  The Bankruptcy Court shall have
exclusive jurisdiction over any action or proceeding with respect to the
Settlement Agreement and each Party agrees to submit to such jurisdiction
and to waive any defense based on the location or jurisdiction of such
court.

69.     Although the Plan Administrator contends that many of the claims

asserted by the Citibank Entities are greatly overstated and, if litigated to finality, would

be greatly reduced in amount, the Plan Administrator acknowledges that there are

hundreds of variables at play, and that the outcome of litigation is inherently uncertain.

Accordingly, the terms of the Settlement represent a fair compromise of the Parties'

competing positions on a multitude of legal and factual disputes, taking into account the

record in the Relevant Adversary Proceedings and the remaining uncertainty.  Thus, the

Plan Administrator has determined in its informed business judgment that entering into

the Settlement is in the best interests of LBHI, LBSF, the other Lehman Entities, and

their respective estates and creditors.  Absent consummation of the Settlement

Agreement, the Lehman Entities and the Citibank Entities likely would proceed with

additional litigation, which could include time-consuming and expensive legal

proceedings, including potential appeals, as well as the risks attendant to such litigation.

The Settlement Agreement will enable the Lehman Entities to avoid expending further

resources in connection with these disputes, while recovering approximately $1.74 billion

for the Lehman Entities' estates and creditors.

### The Settlement Agreement Is in the Lehman Entities' Best Interests and Should Be Approved

70.     The Plan Administrator, on behalf of LBHI, LBSF, and the other Lehman

Entities, submits that the Settlement Agreement is in the best interests of LBHI, LBSF,

the other Lehman Entities, and their respective estates and creditors, and should be

approved under Rule 9019 of the Bankruptcy Rules.  Bankruptcy Rule 9019(a) provides

"[o]n motion by the trustee and after notice and a hearing, the court may approve a

compromise and settlement."  Fed. R. Bankr. Proc. 9019(a).  This rule empowers

bankruptcy courts to approve settlements "if they are in the best interests of the estate."

*In re Drexel Burnham Lambert Group, Inc*., 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

The settlement need not result in the best possible outcome for the debtor, but must not

"fall below the lowest point in the range of reasonableness." *Id.* (quotations omitted);

*accord Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re*

*Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

71.    Compromises are "a normal part of the process of reorganization." *Prot.*

*Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414,

424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

Compromises may be effected separately during the reorganization proceedings or in the

body of the plan itself. *In re Drexel Burnham Lambert Group, Inc*., 138 B.R. 723, 758

(Bankr. S.D.N.Y. 1992).  The decision to approve a particular compromise lies within the

sound discretion of the bankruptcy court. *See Nellis v. Shugrue*, 165 B.R. 115, 123

(S.D.N.Y. 1994).  The Court's discretion may be exercised "in light of the general public

policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr.

S.D.N.Y. 1998).  A proposed compromise settlement implicates the issue of whether it is

"fair and equitable, and . . . in the best interest of the [debtor's] estate." *In re Best*

*Products*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).  The

Court must apprise itself "of all facts necessary for an intelligent and objective opinion of

the probabilities of ultimate success should the claim be litigated." *Anderson*, 390 U.S. at

424.

72.    Courts typically consider the following factors in determining whether a

settlement should be approved: (i) the probability of success in litigation, with due

consideration for the uncertainty in fact and law; (ii) the difficulties of collecting any

litigated judgment; (iii) the complexity and likely duration of the litigation and any

attendant expense, inconvenience, and delay; (iv) the proportion of creditors who do not

object to, or who affirmatively support, the proposed settlement; (v) the competence and

experience of counsel who support the settlement; (vi) the relative benefits to be received

by members of any affected class; (vii) the extent to which the settlement is truly the

product of arm's-length bargaining and not the product of fraud or collusion; and (viii)

the debtor's informed judgment that the settlement is fair and reasonable. *See id.*; *In re

Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998); *In re Best Prods. Co.*,

168 B.R. at 50.

      73.     While a court must evaluate "all . . . factors relevant to a fair and full

assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424, a

court need not conduct a "mini-trial" of the merits of the claims being settled, *Cosoff*, 699

F.2d at 608, or conduct a full independent investigation, *Drexel Burnham*, 134 B.R. at

505.  Moreover, in reviewing a proposed global compromise, the Court need not be

aware of or decide the particulars of each individual claim resolved by the settlement or

"assess the minutia of each and every claim"; rather, the Court need only "canvass the

issues and see whether the settlement falls below the lowest point in the range of

reasonableness." *Shugrue*, 165 B.R. at 123 (internal citations omitted).  As one court

explained in assessing a global settlement of claims, "[t]he appropriate inquiry is whether

the Settlement Agreement in its entirety is appropriate for the . . . estate." *Air Line Pilots

Ass'n, Int'l v. Am.  Nat'l Bank & Trust Co.  (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414,

430 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

74.     Here, the Settlement Agreement will benefit LBHI, LBSF, their estates,
and their creditors and the other Lehman Entities.  First, the Settlement Agreement will
result in the turnover of approximately $1.74 billion in deposits to LBHI's estate when
Citibank returns, after debiting the Debit Amount, the remaining balance of the $2 Billion
Deposit as well as the other deposit accounts set forth on Schedule C of the Settlement
Agreement.  The Plan Administrator has determined, in the exercise of its business
judgment, the Settlement Amount is reasonable in light of the complexities of the
Relevant Adversary Proceedings, and the attendant risks and the likely costs of litigating
the Settled Claims to finality.  Second, entry into the Settlement Agreement will avoid
future disputes and litigation, including what could be protracted appeals, concerning the
Settled Claims and Relevant Adversary Proceedings.

75.     In addition, the Settlement is the product of extensive arm's length
negotiations and is not the product of collusion or fraud.  Rather, the Settlement is the
result of the Parties' shared recognition of the litigation risks to which each side is
exposed, and the realization that litigating all of the Settled Claims and Relevant
Adversary Proceedings to a final resolution will be exorbitantly expensive and time-
consuming.  The Parties thus negotiated in good faith, at arm's length, to resolve the
Settled Claims and Relevant Adversary Proceedings.  The Settlement will result in the
return of approximately $1.74 billion to the Lehman Entities and their respective estates,
as well as the assignment or withdrawal of significant Disputed Claims (as defined in the
Plan).

76.     For the reasons stated above, and in the Plan Administrator's informed

business judgment, the compromises set forth in the Settlement Agreement are a "fair and equitable" resolution of the Parties' dispute, well within the "range of reasonableness," and are in the best interests of LBHI, LBSF, the other Lehman Entities, and their respective estates and creditors. Accordingly, the Plan Administrator requests that the Settlement Agreement be approved, effective immediately upon entry of an Order granting the relief requested herein.

### The Bankruptcy Court Has Authority Pursuant to Section 105(a) of the Bankruptcy Code to Approve the Settlement Agreement

77.     The Plan Administrator also seeks approval of the Settlement Agreement pursuant to section 105(a) of the Bankruptcy Code. This Court has authority under the broad equitable powers of the Bankruptcy Code set forth in section 105(a) to approve the Settlement Agreement. *See, e.g.*, *In re A.H. Robbins*, 880 F.2d 769, 776 (4th Cir. 1989) (section 105(a) authorizes the court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code); *In re Joint E. & S. Dis. Asbestos Litig.*, 878 F. Supp. 473 (E.D.N.Y. & S.D.N.Y. 1995) and 129 B.R. 710 (E.D.N.Y. & S.D.N.Y. 1991) (holding that section 105(a) of the Bankruptcy Code authorizes the federal courts in bankruptcy cases to approve a settlement modifying distributions, obligations, and payment procedures under a trust).

78.     This Court has granted similar relief in these Chapter 11 Cases pursuant to section 105(a) of the Bankruptcy Code. *See* Order Approving the Settlement Agreement Relating to Restructured Asset Certificates with Enhanced Returns, Series 2006-20AT Credit Default Swap Agreement and Trust Agreement [ECF No. 49408]; Order Approving the Settlement Agreement Relating to Exum Ridge CBO 2007-2 Credit

Default Swap Agreement and Indenture [ECF No. 48318]; Order Pursuant to Rule 9019

of the Federal Rules of Bankruptcy Procedure and Section 105(a) of the Bankruptcy

Code for Approval of Partial Settlement Agreement Relating to SGS HY Credit Fund I

(Exum Ridge CBO 2006-3) Swap Agreement and Indenture [ECF No. 45451]; Order

Approving Partial Settlement Agreements Relating to Certain Credit Default Swap

Agreements and Trust Agreements [ECF No. 39624]; Order Pursuant to Section 105(a)

of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Partial Settlement

Agreement Relating to Airlie CDO I, Ltd.  [ECF No. 39017]; Order Pursuant to Section

105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Partial Settlement

Agreement Relating to Pebble Creek LCDO 2007-3, Ltd.  [ECF No. 36867]; Order

Approving Settlement Agreement and Indemnity Between Lehman Brothers Special

Financing Inc. and Deutsche Bank Trust Company Americas, as Trustee, Relating to

Credit Default Swap Agreement [ECF No. 30096].

79.      The use of the Court's equitable authority is justified and appropriate here.

## **Notice**

80.      No trustee has been appointed in these Chapter 11 Cases.  The Movants

have served notice of this Motion in accordance with the procedures set forth in the

Second Amended Order entered on June 17, 2010, governing case management and

administrative procedures for these cases [ECF No. 9635] on (i) the U.S. Trustee; (ii) the

Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United

States Attorney for the Southern District of New York; (v) the attorneys for Citibank; and

(vi) all parties who have requested notice in the Chapter 11 Cases.  The Movants submit

that no other or further notice need be provided.

81.     No previous request for the relief sought herein has been made by the

Movants to this or any other Court.

## **Waiver of Bankruptcy Rule 6004(h)**

82.     The Movants request that any order approving the Motion be effective

immediately upon entry and that the Court waive the applicability of Bankruptcy Rule

6004(h).

*[signature page follows]*

39

WHEREFORE the Movants respectfully requests that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:    September 29, 2017
          New York, New York

                                        Respectfully submitted,


                                        CURTIS, MALLET-PREVOST, COLT &
                                        MOSLE LLP

                                        By: /s/ Peter J. Behmke                        
                                        Peter J. Behmke
                                        *Attorneys for Lehman Brothers Holdings
                                        Inc. and Certain of Its Affiliates*


                                        QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP

                                        By: /s/ Andrew J. Rossman                   
                                        Andrew J. Rossman
                                        *Attorneys for the Official Committee of
                                        Unsecured Creditors*

40