# WILLKIE FARR & GALLAGHER LLP

TODD G. COSENZA

212 728 8677
tcosenza@willkie.com

787 Seventh Avenue
New York, NY 10019-6099
Tel:  212 728 8000
Fax:  212 728 8111

October 16, 2017

**VIA EMAIL AND ECF**

The Honorable Shelley C. Chapman
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10014

Re:  *In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)*

Dear Judge Chapman:

I am counsel to Lehman Brothers Holdings Inc. ("Lehman" or the "Plan Administrator"). I write to respectfully seek the Court's resolution of a dispute arising from the Trustees' refusal to make their primary expert and fact witness, Mr. James Aronoff, available for more than a single day of deposition. The Trustees have designated Mr. Aronoff as an expert witness who will opine on most aspects of their case, including the validity of the breach claims that the Trustees submitted through the Protocol process. At the same time, Mr. Aronoff has asserted that he was the "boss" of the "team that directed and oversaw the [Trustees'] forensic loan review" during the Protocol. (Deposition of James Aronoff, Tr. at 63:5-12 (selections attached as Exhibit A); Aronoff Opening Report at 2.) In short, while the Trustees have elected to select Mr. Aronoff as an expert witness in connection with the upcoming Estimation Proceeding, he is also a key fact witness on the subject of the Proceeding -- the validity and valuation of the breach claims that the Trustees submitted to the Protocol. Because Mr. Aronoff is both a fact and expert witness, the Plan Administrator is entitled to two days of deposition. The Trustees disagree. (*See* Exhibits B, C.)

The Trustees first retained Mr. Aronoff and Duff & Phelps in May 2013 to manage the review of a sample of loans. (Aronoff Opening Report at 11; Aronoff Tr. at 59:25-60:14.) After testifying at the hearing that led to the establishment of the Protocol, Mr. Aronoff was involved in the Trustees loan review under the Protocol. (Aronoff Tr. at 60:15-30.) Although Mr. Aronoff left Duff & Phelps in December 2015, after this estimation proceeding began, the Trustees reengaged him in February 2017 to review and opine on the very Protocol claim submission process that he "designed and implemented." (Aronoff Tr. at 62:12-14, 73:23-74:17.)

In his report, Mr. Aronoff disclosed that he was "a member of the team that directed and oversaw the forensic loan review" during the Protocol. (Aronoff Opening Report at 2.) He explained that his role was to provide "input into the identification of the Loan Review Firms . . . and the policies to be used to identify and support the Breach Findings during the review process. . . ." (Aronoff Opening Report at 3.) Mr. Esses testified that Mr. Aronoff was the person who, among other things, determined whether the breaches found by the Loan Review Firms retained by the Trustees had a material and adverse effect on the value of the loans, and made the final decision on whether to submit Breach Claims to the Plan Administrator. (Deposition of Edmund Esses (attached as Exhibit D), Tr. at 69:24-70:5, 114:19-24; 249:25-250:12, 262:23-263:2.) Mr. Aronoff testified that he was "responsible for the scope [of the protocol] and was responsible for making sure that there was an understanding among the loan review firms and Duff & Phelps with [respect to] the [loan review] exercise." (Aronoff Tr. at 86:24-87:9.) He also "provide[d] . . . oversight and guidance as to . . . whether or not a particular fact pattern was, in fact, a breach finding . . . ." (Aronoff Tr. at 85:10-22.)

In advance of the first day of Mr. Aronoff's deposition, the Plan Administrator requested additional time to depose Mr. Aronoff as a fact witness, based on the testimony of Mr. Esses discussed above. The Trustees denied this request. (*See* Exhibit D.) As expected, given that the Plan Administrator was limited to seven hours of tape time for Mr. Aronoff on October 6, it was unable to cover both the substance of the nearly 200 pages of Mr. Aronoff's expert reports and the full extent of his central role in the Protocol process that led to those expert reports. Therefore, the Plan Administrator requested that the Trustees make Mr. Aronoff available for a second day of deposition. (Aronoff Tr. at 279:11-280:21.) After first suggesting on the day of Mr. Aronoff's deposition that the Trustees might be willing to entertain the possibility of additional time, the following business day, the Trustees conditioned any further consideration of the request on the Plan Administrator's willingness to identify the topics that would be covered in any potential further deposition. (*See* Exhibit C.)

As I discussed, Mr. Aronoff is both a critical fact witness and an expert witness. Under Exhibit G, the Plan Administrator is entitled to take a deposition of each witness the Trustees intend to call at the hearing and additional fact depositions of the Trustees' witnesses, and there is no requirement that the Plan Administrator provide an outline of its questioning in advance of such depositions. The Trustees' decision to retain Mr. Aronoff as an expert in this case does not insulate him from being deposed as a fact witness regarding matters that are highly relevant to the matters to be tried at the Estimation Proceeding. The Plan Administrator therefore is entitled to a second day of deposition testimony from Mr. Aronoff.

The Plan Administrator respectfully requests that the Court order the Trustees to produce Mr. Aronoff for an additional day of deposition.

Sincerely,

Todd G. Cosenza

cc: All counsel (via email)

# EXHIBIT A

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

     SOUTHERN DISTRICT OF NEW YORK

3

     Case No. 08-13555 (SCC)

4    ----------------------------------x

5    IN RE

6    LEHMAN BROTHERS HOLDING, INC., et al.,

7                          Debtors.

8    ----------------------------------x

9                          787 Seventh Avenue

                           New York, New York

10

                           October 6, 2017

11                         9:36 a.m.

12

13            VIDEOTAPED DEPOSITION of JAMES H.

14   ARONOFF, taken by the Debtors, held at the

15   aforementioned time and place, before Sherri

16   Flagg, a Registered Professional Reporter,

17   Certified LiveNote Reporter, and Notary Public.

18

19                   *    *    *

20

21

22

23

24

25

Page 58

James H. Aronoff

1    of certain issuers of residential mortgage-
2    backed securities.
3    Q.    Okay.  Is it all right if we refer
4    to that as "the protocol"?
5    MR. HEALY:  Objection to form.
6    The order is an order.  Do you mean it
7    would include both the order and the
8    document attached with it --
9    MR. DAVIS:  Fair enough.
10   MR. HEALY:  -- when you use the
11   term "protocol"?
12   MR. DAVIS:  Fair enough.
13   BY MR. DAVIS (continuing):
14   Q.    If you turn back to page, I guess,
15   7 of 24, there is an attachment to this order.
16   Do you see that?
17   A.    I do.
18   Q.    And the attachment is labeled RMBS
19   Claim Protocol.  Do you see that?
20   A.    Yes.
21   Q.    Is this attachment a document you
22   have seen before?
23   A.    It appears to be something I
24   reviewed in advance of my report, yes.

Page 59

James H. Aronoff

1    Q.    Okay.  Now, you mentioned you
2    reviewed drafts of this as well?
3    A.    Way back, way back when, when I
4    was in the early stages of the development of
5    this document.  I thought that's what you were
6    referring to.  I've seen the final protocol.
7    Q.    Okay.  For what purpose were you
8    reviewing drafts of this?
9    MR. HEALY:  I'm going to just
10   caution Mr. Aronoff that to the extent
11   that you are being asked to disclose the
12   content of privileged communications with
13   the trustee counsel, you should not
14   respond to the question.  And if we need
15   to, we'll step out and discuss the
16   issues.
17   THE WITNESS:  Can I hear the
18   question again, please.
19   (Requested portion read.)
20   A.    As part of the team at Duff
21   working on this engagement, I was engaged by
22   counsel for the trustees to review the
23   document.
24   Q.    Okay.  So the final protocol was

Page 60

James H. Aronoff

1    entered in late December of 2014; is that
2    right?
3    A.    That appears to jibe with the
4    entered date at the top of the page I'm looking
5    at.
6    Q.    And the trustees retained Duff &
7    Phelps to manage the trustees' loan review
8    under the protocol; is that right?
9    A.    Yes.
10   Q.    At that time in December of 2014,
11   you were a managing director at Duff & Phelps;
12   is that right?
13   A.    That's correct.
14   Q.    And you remained at Duff & Phelps
15   through December of 2015; is that correct?
16   A.    Yes.
17   Q.    Did you join Baker Tilly
18   immediately after leaving Duff & Phelps?
19   A.    January 4th, 2016.
20   Q.    Did you continue to work on the
21   protocol when you joined Baker Tilly?
22   A.    I'm not sure I understand the
23   question.
24   Q.    Did you continue to work on

Page 61

James H. Aronoff

1    supervision or -- strike that.
2    Did you continue to work on
3    managing the trustees' loan review under the
4    protocol when you moved to Baker Tilly in
5    January of 2016?
6    A.    No.
7    Q.    Why did you leave Duff & Phelps?
8    MR. HEALY:  Objection to form.
9    A.    Because I had an opportunity to be
10   a partner at Baker Tilly and I wanted to be
11   part of a professional partnership.
12   Q.    Did anyone else, any of your
13   colleagues from Duff & Phelps, move to Baker
14   Tilly at or around that time with you?
15   A.    No.
16   Q.    Did anyone else from Duff & Phelps
17   move to Baker Tilly later on?
18   A.    Yes.
19   Q.    And which of your colleagues moved
20   from Duff & Phelps to Baker Tilly?
21   A.    Richard Sauerwein.
22   Q.    How do you spell that last name?
23   A.    S-A-U-E-R-W-E-I-N.
24   Q.    Anyone else?

16 (Pages 58 - 61)

Page 62

James H. Aronoff

1
2  A.  Charlie Campbell, C-A-M-P-B-E-L-L.
3  Q.  Anyone else?
4  A.  Not that I'm aware of.
5  Q.  Were -- was Mr. Sauerwein working
6  on the engagement connected with the protocol
7  review while with you at Duff & Phelps?
8  A.  Yes.
9  Q.  Was Mr. Campbell working on that
10 engagement with you at Duff & Phelps?
11 A.  Yes.
12 Q.  At some point after you joined
13 Baker Tilly, were you engaged by the lawyers
14 for the trustees in connection with this
15 estimation proceeding?
16 A.  Yes.
17 Q.  When were you engaged?
18 A.  I believe somewhere around
19 February of 2017.
20 Q.  And what was the scope of the
21 engagement when you were engaged in February
22 2017?
23 A.  It was to provide the opinions
24 that appear in my affirmative report.
25 Q.  Between January of 2016 and

Page 63

James H. Aronoff

1
2  February of 2017, did you do any work in
3  connection with the Lehman bankruptcy?
4  A.  No.
5  Q.  Okay.  Now, back to December of
6  2014 after the protocol was issued, at that
7  time you were a senior member of the team
8  responsible for managing the trustees' loan
9  review; is that right?
10 A.  Yes.
11 Q.  What do you mean by senior member?
12 A.  I was the boss.
13 Q.  Who was on the team?
14 A.  I call my lieutenants -- my senior
15 professionals were Mr. Sauerwein and
16 Mr. Campbell, who I just -- and then there were
17 a number of other people that would be involved
18 in my work stream as well as other work
19 streams, like Mr. Esses, some analysts, some
20 other people that were part of the team.
21 But to the -- and to the extent --
22 to the extent the subject -- to the extent they
23 were working on matters or activities related
24 to the subject matter I was responsible for, I
25 considered them to be on my team.

Page 64

James H. Aronoff

1
2  Q.  What was the subject matter you
3  were responsible for?
4  A.  It was the substance and -- the
5  substantive aspects of the forensic loan
6  reviews that were to be conducted under the
7  protocol.
8  Q.  And that included both the breach
9  findings and the determination whether those
10 breach findings adversely and materially
11 affected the value of the loan?
12 MR. HEALY:  Objection to form.
13 A.  Yes, among other things.
14 Q.  Okay.  What were the other things?
15 A.  Well, one that comes to mind is
16 the sufficiency or the use, the appropriate use
17 of any particular form of supporting
18 information or documentation as a basis for the
19 identification of a breach finding, as well as
20 getting involved in the interpretation of
21 various information sources, breach findings,
22 scope of the reps and warranties that were
23 mapped to those breach findings and the like.
24 Q.  Can I just ask you to take a quick
25 look at your rebuttal report, which is marked

Page 65

James H. Aronoff

1
2  as Exhibit 68, on page 35, paragraph 57.
3  A.  I'm sorry, what paragraph?
4  Q.  It's paragraph 57.  It's a long
5  paragraph.  It actually begins on page 34.
6  A.  Paragraph 57?
7  Q.  Yeah.  This paragraph, in kind of
8  the middle on page 35, it references two senior
9  Duff & Phelps professionals responsible for the
10 final review and submission of claims during
11 the protocol.  Do you see that?
12 A.  I don't yet.
13 Q.  Okay.
14 A.  I see that.
15 Q.  All right.  And I just want to
16 confirm:  Who are those two senior Duff &
17 Phelps professionals you were referring to?
18 A.  I was referring to Campbell and
19 Sauerwein on there.
20 Q.  And they were working under your
21 direction at the time?
22 A.  I'm sorry, what time?
23 Q.  Up until you left Duff & Phelps.
24 A.  That's correct.
25 Q.  Now, if you look at your opening

17 (Pages 62 - 65)

Page 66

James H. Aronoff

1
2 report again?
3     A.    In this hearing?
4     Q.    In Exhibit 67.  Exhibit 67, page
5 8.  This section is entitled Familiarity and
6 Role in the Trustees' Review and Analysis
7 Pursuant to the Protocol.  Do you see that?
8     A.    Yes.
9     Q.    Okay.  And right in the beginning
10 there, in the second sentence, you say that you
11 (as read):
12         ...had input into the
13     identification of the loan review firms
14     retained to conduct the initial loan file
15     review and the policies to be used to
16     identify and support the breach findings
17     during the review process, such as the
18     evidentiary sources to be used to
19     determine whether breaches existed.
20         Do you see that?
21     A.    Yes.
22     Q.    Okay.  What do you mean by
23 "input"?
24     A.    I was part of the team that
25 determined if the loan review firms that were

Page 67

James H. Aronoff

1
2 going to be engaged and on which, at that time,
3 I believed I was going to use their information
4 and their findings to offer opinions.  So I was
5 part of the team that determined the
6 suitability and the appropriateness of
7 retaining the specific firms that were
8 retained, from my perspective.
9         For example, others might look at
10 their technological capabilities in terms of
11 producing reports or might analyze the systems
12 they used.  But in terms of the quality and
13 experience of the personnel, their familiarity
14 and understanding of what this exercise was,
15 and just a basic understanding that they saw
16 the world the same way I did in terms of having
17 a common understanding of what the exercise
18 [sic] were and what a breach is, I was part of
19 the team that identified the loan review firms.
20     Q.    Okay.  Other than Duff & Phelps
21 employees, who else was on that team?
22         MR. HEALY:  Objection to form.
23     A.    The trustees and trustees'
24 counsel.  As I note in here, some of the
25 initial recommendations for firms to retain

Page 68

James H. Aronoff

1
2 came out of relationships that one or more
3 trustees might have had with a firm, in
4 addition to relationships and information about
5 those firms we might have had internally at
6 Duff & Phelps.
7     Q.    Do you know who made the final
8 decision about which firms to select?
9     A.    I don't.
10     Q.    So we've been talking about the
11 first half of that sentence.  There's a second
12 half of the sentence, too, which speaks of the
13 policies to be used to identify and support the
14 breach findings during the review process.  Do
15 you see that?
16         MR. HEALY:  Objection to form.
17     A.    Yes.
18     Q.    And did you also have input into
19 those policies?
20     A.    To the extent those policies were
21 Duff-generated or information that Duff was
22 providing to the firms, yes.  And to the extent
23 we were evaluating--we, Duff--were evaluating
24 the policies in place at the existing firm, I
25 would have been involved in evaluating whether

Page 69

James H. Aronoff

1
2 they were doing things in a way that we felt
3 was consistent with our view of industry custom
4 and practice.
5     Q.    Did Duff & Phelps provide the loan
6 review firms with the policies they were to use
7 in order to identify and support the breach
8 findings?
9     A.    In part.
10     Q.    Okay.  Which part did they
11 provide?  Sorry, which part did Duff & Phelps
12 provide?
13     A.    Duff & Phelps provided guidance
14 and input during the process to the extent
15 there was any--"concern's" too strong a
16 word--to the extent there was any indication
17 that there may have been a misunderstanding or
18 a miscommunication between what was being
19 submitted to Duff & Phelps and what the firm
20 intended to communicate to Duff & Phelps.
21         So there was a constant iterative
22 process where certain definitions about the way
23 certain things should be treated was going on.
24         But in terms of -- the firms that
25 were hired were all very experienced forensic

18 (Pages 66 - 69)

Page 70

```
1         James H. Aronoff
2  loan review firms and, for the most part, the
3  due diligence that was conducted around these
4  firms assured us, assured me as -- from my
5  perspective--I can't speak for anyone else--
6  that they knew what they were doing and they
7  knew how to conduct loan reviews.
8         And so it wasn't as if Duff &
9  Phelps gave them a policies and procedures or
10 instruction manual and told me how to run their
11 loan reviews.
12    Q.   Okay.  So Duff & Phelps did not
13 give them a written set of policies and
14 procedures pursuant to which they would
15 identify and support the breach findings?
16        MR. HEALY:  Objection, form,
17    foundation.
18    A.   What was the last part of the
19 question?  I'm sorry.
20    Q.   Let me restate the question.
21        So Duff & Phelps did not provide
22 the loan review firms with a written set of
23 policies and procedures pursuant to which those
24 firms would identify and support the breach
25 findings under the protocol, correct?
```

Page 71

```
1         James H. Aronoff
2         MR. HEALY:  Same objection.
3    A.   From a substantive standpoint, not
4  to my knowledge.  The distinction I'm making is
5  there was a great deal of information that was
6  exchanged with the firms to drive conformity of
7  results.
8         So in terms of forms of reports,
9  forms of narratives, agreement about labels of
10 how certain things would be described, there
11 was a great deal of specific instruction, and
12 chastising to those that didn't follow it, to
13 make sure that the information was provided in
14 a form that would allow us to do -- engage in
15 the next step of the process.
16    Q.   But just to make sure I
17 understand, what do you mean from a substantive
18 standpoint they were not provided with written
19 policies?
20    A.   I didn't feel the need to
21 communicate to any of the firms what a
22 misrepresentation of income was, how to read a
23 1003.  We didn't hire firms that didn't have a
24 very high level of experience and expertise in
25 understanding how to conduct a forensic loan
```

Page 72

```
1         James H. Aronoff
2  review.
3    Q.   So what were you referencing in
4  this paragraph on page 8 of your opening report
5  when you used the term "policies to be used to
6  identify and support the breach findings"?
7    A.   That's in connection with the
8  identification of the loan review firms.  As I
9  said, the firms that were ultimately selected,
10 we had a high comfort level with.
11        But before that determination was
12 made, we needed to make sure that they, in
13 fact, did have their own understanding.  And
14 we -- to the extent they had written policies
15 and work flows or a system that captured data,
16 we analyzed that to make sure that, in fact,
17 they -- as I said, they were looking at the
18 world in the same way that we understood these
19 reviews would be conducted.  And if we had
20 3,000 people, we'd conduct them ourselves.
21    Q.   So the policies you're referring
22 to here are the policies of each of the
23 individual loan review firms?
24        MR. HEALY:  Objection, misstates
25    his testimony, form.
```

Page 73

```
1         James H. Aronoff
2    A.   Yes, but not exclusively.  As I
3  said before, there was -- there were what I
4  would call policy or subject matter discussions
5  that were conducted with the firms on an
6  ongoing basis.  So I'm referring to both of
7  those things in this sentence.
8    Q.   Okay.  But there was no
9  standardized set of written guidelines issued
10 to the loan review firms?
11    A.   No.
12        MR. HEALY:  Objection to form.
13        MR. DAVIS:  Let me just finish the
14    question.
15    Q.   There was no standardized set of
16 written guidelines issued to the loan review
17 firms by which they would be instructed to
18 identify and support the breach findings; is
19 that right?
20        MR. HEALY:  Objection to form.
21    A.   Not that I recall.
22    Q.   Is it fair to say that you had
23 significant input into the design and
24 implementation of the trustees' loan review
25 during the protocol?
```

19 (Pages 70 - 73)

Page 74

James H. Aronoff

1
2  A.    More earlier on than later on. I
3  think it was always significant. It's just --
4  if you mean significant by the amount of time I
5  spent, the amount of time I was called in, as
6  opposed to issues being handled by my
7  lieutenants, decreased as we started to get
8  into a rhythm with -- and an understanding with
9  the loan review firms of how this process would
10 be undertaken.
11     Q.    Okay. But right now I'm focusing
12 on design and implementation of the trustees'
13 loan review during the protocol. So at least
14 with respect to the design of the trustees'
15 loan review during the protocol, is it fair to
16 say you had significant input into that?
17     A.    Yes.
18     Q.    Okay. If you'd turn to page 12 of
19 your opening report, at the top of the page it
20 says "After the protocol was established, Duff
21 & Phelps, on behalf of the trustees, worked
22 to" -- and then there's a list of items. Do
23 you see that?
24     A.    Yes.
25     Q.    Okay. The first is collect the

Page 75

James H. Aronoff

1
2  loan files. How many loan files were
3  collected; do you know?
4     A.    No.
5     Q.    Do you have any idea of order of
6  magnitude?
7     A.    No.
8     Q.    Were you -- you were supervising
9  this process?
10     A.    No.
11     Q.    Okay. Who was supervising the
12 process of collection of the loan files?
13     A.    I believe it was Edmond Esses and
14 one of the attorneys for the trustees.
15     Q.    Do you have any sense of the
16 volume of records that was ultimately
17 assembled?
18     A.    Massive.
19     Q.    And how were the files maintained?
20         MR. HEALY: Objection to form,
21     vague and ambiguous.
22     Q.    How were the loan files
23 maintained?
24     A.    I don't know how to answer that
25 question. I don't know by who or when or...

Page 76

James H. Aronoff

1
2     Q.    Okay. Do you know by whom they
3  were maintained?
4     A.    No.
5         MR. HEALY: Objection to form,
6     vague and ambiguous.
7     Q.    Sitting here today, do you have
8  access personally to all of the loan files at
9  issue in the case?
10         MR. HEALY: Sitting in the witness
11     chair in this conference room?
12     Q.    Do you understand what I mean?
13     A.    I thought that's -- that's how I
14 understood it.
15     Q.    Fair enough, okay.
16         When you go back to your office or
17 at any point in time today, would you have
18 access to all of the loan files that are at
19 issue in this case?
20         MR. HEALY: Objection to form,
21     vague and ambiguous.
22         MR. DAVIS: I'll withdraw it.
23     Q.    While you were working on your
24 reports in this case, did you have access to
25 all of the loan files that are at issue in this

Page 77

James H. Aronoff

1
2  case?
3         MR. HEALY: Same objection.
4     A.    I had access to the loan files for
5  the mortgage loans that were the subject of my
6  opinion.
7     Q.    And how did you have access to
8  them?
9     A.    Through a database system.
10     Q.    What database system is that?
11     A.    I believe we called it Relativity.
12     Q.    And who maintained -- who
13 maintains the Relativity database system?
14     A.    I believe it's Relativity.
15     Q.    Okay. What do you need to do if
16 you need to search Relativity for a loan file?
17     A.    You asked if I had access. You
18 log in and review.
19     Q.    Have you logged in and reviewed
20 loan files on Relativity yourself?
21     A.    Infrequently.
22     Q.    Okay. But you understand how to
23 log into Relativity?
24     A.    My team does.
25     Q.    Okay. So you don't personally log

20 (Pages 74 - 77)

Page 82

James H. Aronoff

1
2 frequently, if at all, in terms of the -- in
3 terms of the loans or that -- that did
4 essentially the same thing as one of these
5 better-known companies, though the example that
6 comes to mind is, I think, in maybe one or two
7 breach findings, Salary.com was used instead of
8 BLS. But it was such a small incident of
9 occurrences across the 76,000 breach findings
10 that it wasn't -- it didn't raise to the level
11 of being described in this section.
12        But if that source was used, it
13 would have been described in the related breach
14 narrative and would have given the Plan
15 Administrator the opportunity to appropriately
16 question or rebut that claim based on that
17 included-but-not-limited-to source.
18    Q.    Okay. But did Duff & Phelps
19 provide the loan review firms with a list of
20 third-party sources they were permitted to use?
21    A.    Not to my knowledge.
22    Q.    Okay. What determined when a
23 third-party source would be consulted in
24 connection with a loan review?
25        MR. HEALY: Objection to form.

Page 83

James H. Aronoff

1
2    A.    To the extent an underwriter at
3 the loan review firm was trying to establish
4 whether or not there was a deficiency or defect
5 of a certain type, they would rely on other
6 information outside of the file to verify
7 whether or not the information retained in the
8 file was accurate.
9    Q.    Did the loan review firms review
10 third-party sources for every loan file?
11    A.    I don't know.
12    Q.    What did the loan review -- what
13 did the loan review firms do with information
14 they collected from third-party loan sources?
15 Excuse me.
16        What did the loan review firms do
17 with third-party information they collected
18 from third-party sources?
19        MR. HEALY: Objection to form.
20    Q.    If you know?
21        MR. HEALY: Vague, assumes facts,
22 ambiguous.
23    A.    The only time I would know what
24 they did with it is if they used that
25 information to support a breach claim. What

Page 84

James H. Aronoff

1
2 they did with it in those cases where the
3 information in the file was accurate or they
4 didn't feel the third-party tool provided them
5 with a necessary clarity of decisioning that
6 they needed, I don't know what they did with
7 those.
8    Q.    So there wasn't any policy or
9 procedure in place that required the loan
10 review firms to give Duff & Phelps all of the
11 information they gathered from third-party
12 sources in connection with any given loan; is
13 that right?
14    A.    That's my recollection, yes.
15    Q.    Did Duff & Phelps ever collect
16 information itself from third-party sources in
17 connection with this loan review process?
18        MR. HEALY: Objection, overbroad.
19    A.    I don't believe so.
20    Q.    So can you tell me whether all of
21 the third-party materials collected by the loan
22 review firms for a loan with a breach finding
23 was included in the loan file that was
24 transmitted to the Plan Administrator in the
25 protocol?

Page 85

James H. Aronoff

1
2        MR. HEALY: Objection to form,
3    compound, vague and ambiguous, may
4    misassume facts.
5    A.    Can I hear the question again,
6 please.
7        (Requested portion read.)
8    A.    I can't. But it shouldn't have
9 been that way.
10    Q.    What was your role in determining
11 which claims would be sent to the Plan
12 Administrator under the protocol?
13    A.    Are we running into tape -- okay.
14        My role would primarily have been
15 to provide kind of oversight and guidance as to
16 the necessary support and whether or not a
17 particular fact pattern was, in fact, a breach
18 finding of the type that we intended to submit.
19        In the very rare case, either
20 Charlie or Rich and I would sit down and talk
21 about a particular loan or groups of loans with
22 similar issues.
23    Q.    Who made the final decision on
24 whether a particular breach finding materially
25 and adversely affected the value of the loan?

22 (Pages 82 - 85)

Page 86

James H. Aronoff

1
2  A.    I did, up until the time I left.
3  Q.    And I was going to ask you:  Do
4  you know who took over that responsibility
5  after you left?
6  A.    I believe -- my understanding is
7  is that there was a sufficiently large number
8  of every type of breach finding, and that the
9  materiality statements that I had used for
10 those types of findings and fact patterns were
11 used.  As to what individual took ownership of
12 that decision or not, I'm not sure.  I have an
13 idea but I'd be speculating.
14        MR. DAVIS:  Okay.  I think we have
15     to break for a minute to change the tape.
16        VIDEO TECHNICIAN:  The time is
17     11:46 a.m.  This is the end of Video 1.
18     We're off the record.
19        (Recess taken.)
20        VIDEO TECHNICIAN:  The time is
21     11:58 a.m.  We're back on the record.
22     This is Video 2.
23 BY MR. DAVIS (continuing):
24 Q.    So, Mr. Aronoff, as we've already
25 discussed, you were involved in designing the

Page 87

James H. Aronoff

1
2  trustees' review during the protocol; is that
3  right?
4        MR. HEALY:  Objection to form,
5     asked and answered.
6  A.    I was responsible for the scope
7  and was responsible for making sure that there
8  was an understanding among the loan review
9  firms and Duff & Phelps with the exercise.
10 Q.    And were you involved in the
11 mapping of representations and warranties?
12 A.    From a substantive standpoint,
13 yes.
14 Q.    And what do you understand mapping
15 of representations and warranties to be?
16 A.    When I talk about mapping of
17 representation and warranties, you talk about
18 certain deficiencies or defects that would
19 result in a breach of a particular rep and
20 warranty and would typically be identified as
21 one of a certain kind of breach finding.
22        So for every rep and warranty,
23 there were -- there could be certain fact
24 patterns, defects, deficiencies with respect to
25 a loan; and those types of deficiencies were

Page 88

James H. Aronoff

1
2  described as breach findings.  And in that
3  respect, every breach finding would be mapped
4  or related to one or more reps and warranties.
5  Q.    And is there a document that you
6  maintain that constitutes this map?
7  A.    I am fairly certain that --
8  there's no one map but I'm fairly certain that
9  with respect to the loans that were being
10 reviewed by any individual loan review firm,
11 they were provided with the appropriate maps
12 relating to the trusts in which the loans they
13 were reviewing were contained.
14        (Exhibit 75:  Excerpt from
15     transcript of testimony of Mr. Aronoff
16     December 10, 2014, was marked for
17     identification.)
18 BY MR. DAVIS (continuing):
19 Q.    So, Mr. Aronoff, the court
20 reporter has marked as Exhibit 75 a transcript,
21 an excerpt from a transcript of testimony dated
22 December 12th, 2014.  And I would ask you to
23 turn to page 196.
24 A.    Well, that's the first page.
25 Q.    The first page.

Page 89

James H. Aronoff

1
2        This, I believe, is a transcript
3  of your testimony in the Bankruptcy Court back
4  in March of 2015 concerning the subject of your
5  declarations from 2014 that we spoke about
6  earlier.  Is that right?
7        MR. HEALY:  Objection.
8  Q.    Excuse me, that's true.  I'm
9  sorry.  This testimony was from December of
10 2014, actually, December 10th, 2014 --
11        MR. HEALY:  Is there a question?
12 Q.    -- if you look at the front.  Do
13 you recall testifying in December of 2014 in
14 Bankruptcy Court?
15 A.    Yes.
16 Q.    Okay.  Would you turn to page 213.
17 Do you remember who was examining you at this
18 time in Bankruptcy Court?
19 A.    No.
20 Q.    I believe it was Mr. Munno.  Does
21 that refresh your recollection?
22 A.    Is there a question?
23 Q.    Yeah.  Do you recall whether it
24 was Mr. Munno who was examining you in
25 Bankruptcy Court?

23 (Pages 86 - 89)

Page 278

James H. Aronoff

1
2    Q.    How about a borrower whose title
3 on the application was psychiatrist assistant
4 but whose actual title was medical assistant.
5    A.    What about that?
6    Q.    Again, would that be sufficient to
7 support a breach claim for misstatement of
8 employment?
9        MR. HEALY:  Objection, incomplete
10    hypothetical.
11    Q.    Again, assuming that there were no
12 other problems with the recitation of the
13 borrower's employment besides that?
14        MR. HEALY:  Same objection.
15    A.    But it's not always a matter of
16 whether there are other problems; it's a matter
17 of looking at who the borrower might be based
18 on other information they provided on the
19 application to determine, one, whether that's a
20 difference that makes a difference and, two, to
21 look at other things, other facts regarding the
22 borrower that may lead to a reasonable
23 conclusion that the job title they stated is
24 overstating what their title really is.
25        Personally, based just on hearing

Page 279

James H. Aronoff

1
2 those two titles, I don't know what a
3 meaningful distinction would be.  But that's
4 not to say, given the rest of the file, I
5 couldn't find an explanation as to why it was
6 not only a fact that they weren't in the job
7 they said they were but that the
8 misrepresentation of that job title in this
9 case was material and adverse to the interests
10 of the loan.
11        MR. HEALY:  Mr. Davis, I'm
12    informed that you have now run over the
13    seven-hour limit, which we have been
14    abiding by in our depositions.
15        MR. DAVIS:  And as you know,
16    Mr. Healy, we've made our position known
17    that we feel we're entitled to a second
18    day of deposition because Mr. Aronoff is
19    a fact witness in this case, as has been
20    made abundantly clear by this deposition;
21    and therefore, in order to understand
22    what he might testify to at trial, we
23    need to understand both what his expert
24    opinion is and what his fact testimony
25    may be.

Page 280

James H. Aronoff

1
2        And we are entitled to depose fact
3 witnesses under our Exhibit G and the
4 process by which we've been abiding.  And
5 so it's our position that we should have
6 a second day with Mr. Aronoff so that I
7 can finish this examination.
8        MR. HEALY:  Our position is that
9 the deposition that was scheduled and
10 agreed to, which was for a day, has been
11 concluded.
12        I've told you that we're willing
13 to discuss your request for more time,
14 but the deposition that we had set is
15 done and you've had your seven hours.
16 And, you know, if you feel you're in the
17 middle of something and you need five
18 minutes to ask two questions to complete
19 it, I'm, you know, happy to entertain
20 that.  But I think otherwise this
21 deposition is ended.
22        I have a handful of cross-
23 examination questions that I intend to
24 ask so that we're finished.  And I think
25 that's where we are and we can pick up a

Page 281

James H. Aronoff

1
2 discussion about your request for a
3 second Aronoff deposition on Monday.
4        MR. DAVIS:  Well, I was about to
5 move to another line of questioning, so I
6 can't represent that I have only a few
7 more questions --
8        MR. HEALY:  Okay.
9        MR. DAVIS:  -- to give at this
10 time.  So I don't think it's really
11 appropriate for you to cross-examine the
12 witness at this time because I don't
13 believe the deposition is concluded.
14        MR. HEALY:  Well, we disagree
15 about that.
16        MR. DAVIS:  If that's what you
17 choose to do, I can't stop you,
18 obviously.
19        MR. HEALY:  Okay.
20        VIDEO TECHNICIAN:  Counsel, may we
21 change the media before you start?  We're
22 pretty close to the end of it.
23        MR. HEALY:  How much time do you
24 have?
25        VIDEO TECHNICIAN:  About five

71 (Pages 278 - 281)

# EXHIBIT B

# WILLKIE FARR & GALLAGHER LLP

TODD G. COSENZA
212 728 8677
tcosenza@willkie.com

787 Seventh Avenue
New York, NY 10019-6099
Tel:  212 728 8000
Fax:  212 728 8111

October 2, 2017

**<u>VIA EMAIL</u>**

Michael S. Shuster
Holwell Shuster & Goldberg LLP
750 Seventh Avenue, 26th Floor
New York, NY 10019

Re:  *In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)*

Dear Michael:

On behalf of the Plan Administrator.

On September 22, 2017, the Trustees disclosed that they would be calling James H. Aronoff as an "expert" witness at the upcoming estimation proceeding. Mr. Aronoff has submitted a series of expert reports in this matter. In these expert reports, he has disclosed that he was involved in designing and structuring the Trustees' process for reviewing and submitting Breach Claims to the Plan Administrator. On several occasions, we have expressed to you that Mr. Aronoff's role in the process makes him a fact witness in this case.

At his deposition on Thursday, September 28, Edmond Esses explained that Mr. Aronoff's role in the Trustees' Protocol process was even broader than what had been indicated in his expert reports. Indeed, for example, Mr. Esses testified that Mr. Aronoff::

- made the final decisions over which Breach Claims were actually submitted to the Plan Administrator. (Esses, 69:24-70:5 ("the decisions about whether or not to send claims to the Plan Administrator"));

- was responsible for "mapping" the representations and warranties to the governing agreements for the Trustees' breach findings. (Esses, 87:13-20); and

- "made a final AMA determination" on the claims that were submitted to the Plan Administrator. (Esses, 114:19-24 *see also* 249:25-250:12, 262:23-263:2).

Mr. Esses' testimony has confirmed that —in addition to his purported role as an "expert"— Mr. Aronoff is an essential fact witness. Therefore, the Plan Administrator requests that the Trustees make Mr. Aronoff available for an additional day of deposition during the week of October 9.

The Plan Administrator continues to reserve all of its rights.

Sincerely,

Todd G. Cosenza

cc: All counsel (via email)

2

# HOLWELL SHUSTER & GOLDBERG LLP

*750 Seventh Avenue, 26th Floor*
*New York, New York 10019*
*Tel: (646) 837-5151*
*Fax: (646) 837-5150*
*www.hsgllp.com*

*Michael S. Shuster*
*646-837-5153*
*mshuster@hsgllp.com*

October 3, 2017

**VIA EMAIL**

Todd Cosenza
Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY 10019

Re:    *In re Lehman Brothers Holdings Inc. RMBS Claims Estimation Hearing*

Dear Todd:

      We write on behalf of the RMBS Trustees in response to your letter dated October 2, 2017 regarding the Plan Administrator's request to make Mr. Aronoff available for a second day of deposition testimony.  The Trustees will not do so.  Mr. Aronoff is properly designated as an expert opining on the Trustee's loan review process during the Protocol, and his involvement in that process, which the Plan Administrator has been aware of for several years now, is consistent with his expert role.  Indeed, each of the tasks you raise in your letter—designing the Trustees' review, including participating in the "mapping" of representations and warranties, as well as making decisions regarding breach claims and materiality determinations—are similar to the tasks typically undertaken by experts evaluating RMBS putback claims for litigation purposes. That the loan review here took place during the Protocol does not transform Mr. Aronoff into a fact witness nor permit the Plan Administrator additional deposition time.

Very Truly Yours,

Michael S. Shuster

cc:    All counsel (via email)

# EXHIBIT C

| | |
|---|---|
| **From:** | Dwight Healy <dhealy@hsgllp.com> |
| **Sent:** | Wednesday, October 11, 2017 10:59 AM |
| **To:** | Davis, Joseph; Neil R. Lieberman; Waisnor, Jonathan D.; Michael Shuster; Franklin H. Top III; Scott A. Lewis; Weitnauer, Kit; Solomon, Jason; Sigler, Sage; Munno, M. William; Guzman, Daniel; .JPM.Kraut, Michael; Moore, James O.; anna.goldenhersh@morganlewis.com; Dorit Ungar Black; Daniel P. Goldberg; Lani A. Perlman; Drebsky, Dennis |
| **Cc:** | Yanez, Antonio; McCallen, Benjamin; Watson, Leah; Glasner, Evan; Cosenza, Todd; Neskovic, Gorana |
| **Subject:** | RE: In re Lehman Brothers - RMBS Estimation Proceeding:  Aronoff |

Joe:

You seem to be unfamiliar with the role of an expert in RMBS putback litigation.  Mr. Aronoff role in designing and overseeing the loan review process was in the context of his role as the expert who would opine on the results of the loan review. An expert always testifies as to the basis of his/her opinion, and indeed courts in the RMBS context have required the expert to have knowledge regarding the process by which loans were reviewed and the standards used to evaluate breaches and assess materiality. That reality does not transform the expert into a fact witness. And it certainly does not mean that you are somehow entitled to two days with Mr. Aronoff. If it did, then Mr. Grice would be both a fact witness – as to the "audit" he allegedly conducted of the Trustees' loan review process – and an expert – as to his opinions supported by his "audit."

Although we have been prepared to discuss with you some additional time with Mr. Aronoff your reluctance to identifying any topics that you did not have an opportunity to cover with Mr. Aronoff during the seven hours of examination last Friday makes clear that in fact you have adequate time already. We nonetheless remain willing to engage in such discussions.

Dwight

**From:** Davis, Joseph [mailto:JDavis@WILLKIE.COM]
**Sent:** Tuesday, October 10, 2017 9:36 PM
**To:** Dwight Healy <dhealy@hsgllp.com>; Neil R. Lieberman <nlieberman@hsgllp.com>; Waisnor, Jonathan D. <JWaisnor@willkie.com>; Michael Shuster <mshuster@hsgllp.com>; Franklin H. Top III <top@chapman.com>; Scott A. Lewis <slewis@chapman.com>; Weitnauer, Kit <kit.weitnauer@alston.com>; Solomon, Jason <jason.solomon@alston.com>; Sigler, Sage <sage.sigler@alston.com>; Munno, M. William <munno@sewkis.com>; Guzman, Daniel <guzman@sewkis.com>; .JPM.Kraut, Michael <mkraut@morganlewis.com>; Moore, James O. <james.moore@morganlewis.com>; anna.goldenhersh@morganlewis.com; Dorit Ungar Black <dblack@hsgllp.com>; Daniel P. Goldberg <dgoldberg@hsgllp.com>; Lani A. Perlman <lperlman@hsgllp.com>; Drebsky, Dennis <ddrebsky@nixonpeabody.com>
**Cc:** Yanez, Antonio <ayanez@willkie.com>; McCallen, Benjamin <BMcCallen@willkie.com>; Watson, Leah <LWatson@willkie.com>; Glasner, Evan <EGlasner@willkie.com>; Cosenza, Todd <TCosenza@willkie.com>; Neskovic, Gorana <GNeskovic@willkie.com>
**Subject:** RE: In re Lehman Brothers - RMBS Estimation Proceeding: Aronoff

Dwight,

Thanks for the response.  As you know, our position is that Mr. Aronoff is both a fact and expert witness, and that we are entitled to depose him in each capacity, for a total of two days.  Your email seems to suggest the Trustees agree that Mr. Aronoff has factual knowledge about the protocol process about which we are entitled to depose him.  Mr. Aronoff is no less a fact witness than Mr. Esses or Mr. Pfeifer.  In fact, Mr. Aronoff testified he was the "boss" of the Trustees' loan review process, and Mr. Esses testified that "Mr. Aronoff and his team" made the decision whether to send a claim to the Plan Administrator in the Protocol.  We don't agree that by choosing to call Mr. Aronoff as an expert witness you can immunize him from testifying as a fact witness.  Moreover, Mr. Aronoff repeatedly relies on the fact that he was "involved in the forensic loan review conducted under the protocol and the decisions made by the Trustees" to support his expert opinions, creating a direct link between his role as fact witness and his role as expert witness.

I did not conclude my examination of Mr. Aronoff in either capacity.  I can assure you that the continued examination will cover his role in the protocol process and his expert opinions.  We are under no obligation to provide an outline of the remainder of the examination, and we will not do so.  Please let us know the Trustees' position.

Joe

**Joseph G. Davis**
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. | Washington, DC 20006-1238
Direct: +1 202 303 1131 | Fax: +1 202 303 2131
jdavis@willkie.com | vCard | www.willkie.com bio

---

**From:** Dwight Healy [mailto:dhealy@hsgllp.com]
**Sent:** Tuesday, October 10, 2017 4:19 PM
**To:** Davis, Joseph <JDavis@WILLKIE.COM>; Neil R. Lieberman <nlieberman@hsgllp.com>; Waisnor, Jonathan D. <JWaisnor@willkie.com>; Michael Shuster <mshuster@hsgllp.com>; Franklin H. Top III <top@chapman.com>; Scott A. Lewis <slewis@chapman.com>; Weitnauer, Kit <kit.weitnauer@alston.com>; Solomon, Jason <jason.solomon@alston.com>; Sigler, Sage <sage.sigler@alston.com>; Munno, M. William <munno@sewkis.com>; Guzman, Daniel <guzman@sewkis.com>; .JPM.Kraut, Michael <mkraut@morganlewis.com>; Moore, James O. <james.moore@morganlewis.com>; anna.goldenhersh@morganlewis.com; Dorit Ungar Black <dblack@hsgllp.com>; Daniel P. Goldberg <dgoldberg@hsgllp.com>; Lani A. Perlman <lperlman@hsgllp.com>; Drebsky, Dennis <ddrebsky@nixonpeabody.com>
**Cc:** Yanez, Antonio <ayanez@willkie.com>; McCallen, Benjamin <BMcCallen@willkie.com>; Watson, Leah <LWatson@willkie.com>; Glasner, Evan <EGlasner@willkie.com>; Cosenza, Todd <TCosenza@willkie.com>; Neskovic, Gorana <GNeskovic@willkie.com>
**Subject:** RE: In re Lehman Brothers - RMBS Estimation Proceeding: Aronoff

Joe:

 On Friday I said that I was prepared to continue the discussion of your request for more time on Monday, and this is the first I have heard from you. As you know, we don't share your view that Mr. Aronoff is a fact witness. He is an expert testifying to the same topics typically covered by a reunderwriting/forensic review expert. The fact that such an expert designs or addresses the review process that was used to identify breaches hardly makes him a fact witness.

Having attended the deposition and based on the transcript, it appears to us that you were able to question Mr. Aronoff regarding both his involvement in the loan review process and his opinions, so we do not see a basis for your request for additional time.

2

Nevertheless, if you feel that there were topics that you were unable to cover in the time allotted for every other witness in this case, please identify them so that we can engage in a meaningful and informed discussion of your request for more time.


Dwight



Dwight Healy
Holwell Shuster & Goldberg LLP
750 Seventh Avenue, 26th Floor
New York, NY 10019
(646) 837-8406 (office)
(917) 848-9777 (mobile)
www.hsgllp.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---

**From:** Davis, Joseph [mailto:JDavis@WILLKIE.COM]
**Sent:** Tuesday, October 10, 2017 12:58 PM
**To:** Neil R. Lieberman <nlieberman@hsgllp.com>; Waisnor, Jonathan D. <JWaisnor@willkie.com>; Michael Shuster <mshuster@hsgllp.com>; Franklin H. Top III <top@chapman.com>; Scott A. Lewis <slewis@chapman.com>; Weitnauer, Kit <kit.weitnauer@alston.com>; Solomon, Jason <jason.solomon@alston.com>; Sigler, Sage <sage.sigler@alston.com>; Munno, M. William <munno@sewkis.com>; Guzman, Daniel <guzman@sewkis.com>; .JPM.Kraut, Michael <mkraut@morganlewis.com>; Moore, James O. <james.moore@morganlewis.com>; anna.goldenhersh@morganlewis.com; Dorit Ungar Black <dblack@hsgllp.com>; Daniel P. Goldberg <dgoldberg@hsgllp.com>; Dwight Healy <dhealy@hsgllp.com>; Lani A. Perlman <lperlman@hsgllp.com>; Drebsky, Dennis <ddrebsky@nixonpeabody.com>
**Cc:** Yanez, Antonio <ayanez@willkie.com>; McCallen, Benjamin <BMcCallen@willkie.com>; Watson, Leah <LWatson@willkie.com>; Glasner, Evan <EGlasner@willkie.com>; Cosenza, Todd <TCosenza@willkie.com>; Neskovic, Gorana <GNeskovic@willkie.com>
**Subject:** RE: In re Lehman Brothers - RMBS Estimation Proceeding: Aronoff

Dwight,

You mentioned on Friday that we would hear from you about scheduling another day to continue Mr. Aronoff's deposition.  Please let us know the Trustees' position and what dates might work.

Thanks.

Joe

**Joseph G. Davis**
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. | Washington, DC 20006-1238
Direct: +1 202 303 1131 | Fax: +1 202 303 2131
jdavis@willkie.com | vCard | www.willkie.com bio

---

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

# EXHIBIT D

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Chapter 11

5    Case No. 08-13555(SCC)

6    -----------------------------------x

7

     IN RE

8

     LEHMAN BROTHERS HOLDINGS INC., et al.,

9

                    Debtors.

10

11   -----------------------------------x

                    September 28, 2017

12                  9:36 a.m.

13

14

15        Videotaped Deposition of EDMOND

16   ESSES, taken by Debtors, pursuant to

17   Notice, held at the offices of Willkie Farr

18   & Gallagher LLP, 787 Seventh Avenue, New

19   York, New York, before Todd DeSimone, a

20   Registered Professional Reporter and Notary

21   Public of the State of New York.

22

23

24

25

Page 66

1           E. ESSES
2           Charlie and Rich, Mr. Campbell
3    and Mr. Sauerwein, worked under the
4    direction of Mr. Aronoff in, among other
5    things, reviewing and approving claims for
6    submission.
7    Q.    Did you not review and approve
8    claims for submission?
9    A.    It wasn't my -- it wasn't my
10   primary responsibility.
11   Q.    How much of your time did you
12   spend doing that?
13   A.    A really rough estimate, when I
14   say a really rough estimate, it would be 10
15   to 20 percent of my time, if anything.
16   Again, I was not primarily responsible for
17   that part of the review.
18   Q.    Were there certain types of
19   loans or claims or some other delineation
20   that routed loan-level review to you?
21   A.    No.
22   Q.    It could have been any of the
23   same types of loans or claims that would
24   have been reviewed by Mr. Campbell or
25   Mr. Sauerwein?

Page 67

1           E. ESSES
2           MR. HEALY:  Objection, calls
3    for speculation.
4    A.    Would you mind asking that
5    question again?
6    Q.    The loans that you reviewed
7    could have been the exact same kind that
8    either Mr. Campbell or Mr. Sauerwein might
9    have reviewed, there was no distinction?
10   A.    I don't believe I testified
11   that I reviewed loans.  I may have -- we
12   can read back my testimony, but that wasn't
13   my intention.
14   Q.    Fair enough.  You said you -- I
15   believe you said you reviewed and approved
16   claims?
17   A.    Can we read back?  Because I
18   may have -- I may have -- that wasn't my
19   intention.
20   Q.    Why don't we cut through it.
21   Why don't you tell me what you did do.
22   A.    Again, primarily responsible
23   for the logistical issues.
24   Q.    And other than that -- I asked
25   whether -- well, you said that you spent 10

Page 68

1           E. ESSES
2    to 20 percent of your time doing something
3    with respect to claims?
4    A.    I reviewed them for consistency
5    and to ensure that under, you know, these
6    were Charlie's main responsibility, but to
7    ensure that the work product was up to Duff
8    & Phelps' standards, I guess is a way of
9    saying it.
10   Q.    Was that a quality control
11   function?
12   A.    Not specifically, no.
13   Q.    And was the 10 to 20 percent of
14   your time reviewing -- performing that
15   function, was that based on a sampling of
16   claims that had been reviewed by somebody
17   else?
18   A.    No.
19   Q.    How were those 10 to 20 percent
20   of your time performing that function, how
21   was it decided that you would perform that
22   function?
23   A.    It was my decision.  It was my
24   choice.
25   Q.    And how did you get those --

Page 69

1           E. ESSES
2    well, what is it that you did in that 10 to
3    20 percent of the time to make sure that
4    the claims were up to Duff & Phelps
5    standards?
6           MR. HEALY:  Objection to the
7    extent that that mischaracterizes his
8    testimony.
9    A.    Sure.  To say that a little bit
10   differently, I just wanted to stay in the
11   loop and know what was going on at a
12   detailed level.
13   Q.    What specifically did you do to
14   do that?
15   A.    Okay.  I reviewed the breach
16   submissions, the breach findings.
17   Q.    Are those the breach findings
18   that are found in the claims tracking
19   spreadsheet?
20   A.    It is, yes.
21   Q.    Did you ever make any changes
22   to them?
23   A.    Not that I specifically recall.
24   If I had a question or a suggestion, I
25   would have took it to Charlie.

18 (Pages 66 - 69)

Page 70

E. ESSES

1
2    Q.    Were these all claims that
3    were -- had been decided would be made to
4    the Plan Administrator?
5    A.    Not necessarily.
6    Q.    There could be somewhere a
7    review was performed and a decision was
8    made not to submit it it to the Plan
9    Administrator?
10    A.    It's possible.  Not that I
11    specifically recall.
12    Q.    Did you make the decision about
13    whether or not to send claims to the Plan
14    Administrator?
15    A.    No.
16    Q.    Who did?
17    A.    Mr. Aronoff and his team.
18    Q.    Well, specifically the names of
19    the people in addition to Mr. Aronoff who
20    decided to submit claims to the Plan
21    Administrator.
22    A.    Sure.  Mainly Mr. Campbell.
23    Q.    Did Mr. Aronoff review
24    Mr. Campbell's work or did they sort of
25    split up the burden?

Page 71

E. ESSES

1
2    A.    I'm not sure.
3    Q.    Is Mr. Campbell the person who
4    was the first person to make a decision
5    with respect to any claim whether or not he
6    thought it should be -- form the basis of a
7    claim submitted to the Plan Administrator?
8    A.    There was a significant --
9    significant, you know, several layers of
10    review in place with each, you know,
11    quality control, you know, at several
12    levels.
13        Mr. Aronoff was ultimately
14    responsible for making that -- making that
15    determination.
16    Q.    Did he review all the claims?
17    A.    I'm not sure.
18    Q.    What do you think?
19    A.    I don't want to speculate.
20    Q.    Well, do you have a basis on
21    which to believe that Mr. Aronoff reviewed
22    all the claims?
23    A.    I don't have a basis to think
24    one way or the other.
25    Q.    Do you believe Mr. Campbell

Page 72

E. ESSES

1
2    would have reviewed all the claims?
3    A.    I do.
4    Q.    Do you believe Mr. Sauerwein
5    would have reviewed all the claims?
6    A.    I don't -- I'm not sure one way
7    or the other.
8    Q.    Did Mr. Sauerwein report to
9    Mr. Campbell?
10    A.    Charlie and Rich shared
11    responsibilities in reporting to Jim.
12    Q.    By Jim, you mean Mr. Aronoff?
13    A.    Mr. Aronoff, yes.
14    Q.    In the course of the review
15    that you performed, did you look at
16    anything other than the breach findings?
17    A.    Yes.
18    Q.    What did you look at?
19    A.    We also had these packets of
20    documents that were the supporting
21    evidence.  I may have looked at those.
22    Q.    Are you referring to what you
23    call the claim file?
24    A.    Not the RMBS claim file as
25    defined by the protocol, but the claim

Page 73

E. ESSES

1
2    package I think was one of the terms we've
3    used to refer to it, the claim package; the
4    claim package, potentially the loan file.
5    Q.    Did you make a judgment on a
6    claim-by-claim basis what documents to look
7    at?
8    A.    I'm sorry, I don't understand
9    the question.
10    Q.    When you were performing the
11    review that you're describing, did you look
12    at all of the documents in the claim
13    package?
14    A.    I may have.
15    Q.    Did you look at all the claims
16    in the loan file -- I'm sorry, all the
17    documents in the loan file?
18    A.    I may have.
19    Q.    On what basis would you decide
20    to look at documents as contrasted with
21    just looking at the breach findings?
22        MR. HEALY:  Objection to the
23    form of the question.
24    A.    I'm not sure that I had a
25    specific basis for making that

19 (Pages 70 - 73)

Page 114

1          E. ESSES
2  as may be applicable in a particular
3  agreement?
4          MR. HEALY:  Objection to form,
5  asked and answered.
6     A.    I hope I'm not
7  mischaracterizing my earlier testimony, but
8  we can refer to that, but I believe -- my
9  understanding was that there was a mapping
10 between the breach categories and the
11 representations and warranties, and that
12 Jim's team made a final determination of
13 materiality of AMA and whether to submit
14 that claim to the Plan Administrator.
15    Q.    In what form is that mapping?
16    A.    The spreadsheet form.
17    Q.    And who are the members of the
18 team that were responsible for that?
19    A.    As I've testified earlier --
20 can we refer to my earlier testimony?  I
21 believe I answered this specific question.
22    Q.    I don't think you did.  I want
23 to know -- I'm asking specifically about
24 the materiality determination, as you
25 referred to it, or the AMA determination as

Page 115

1          E. ESSES
2  we referred to it, who made that -- who
3  were the members of the team that made that
4  determination?
5          MR. HEALY:  Objection.  That's
6  not the question you just asked him, so
7  that sounds like a new question.
8          I will object on the grounds
9  that I think it is vague and ambiguous and
10 repetitive and may misstate his testimony,
11 or may misassume facts.
12    Q.    Did Mr. Aronoff make that final
13 AMA determination?
14    A.    My understanding was that
15 Mr. Aronoff made a final AMA determination
16 with the assistance of the members of his
17 team.
18    Q.    And did Mr. Aronoff review and
19 make that determination with respect to
20 every loan-level claim, a specific
21 determination on a specific set of facts
22 applicable to a specific borrower?  That's
23 what I would like to know.
24    A.    You will have to ask
25 Mr. Aronoff.

Page 116

1          E. ESSES
2     Q.    Is that because you don't know?
3     A.    That's because I don't know.
4     Q.    Do you have a belief?
5     A.    As I've testified, my
6  understanding of the process was that
7  breach findings were submitted through the
8  Duff & Phelps quality control process, with
9  an ultimate determination made by
10 Mr. Campbell under the direction and
11 oversight of Mr. Aronoff.
12    Q.    Did Mr. Campbell make a
13 recommendation one way or the other to
14 Mr. Aronoff about whether or not he
15 believed the particular breach findings
16 adversely and materially affected the value
17 of the loan or the interest of the
18 depositor therein as may be applicable?
19    A.    I don't know.
20    Q.    And on the loans that you
21 reviewed, did you make a recommendation
22 with respect to whether you thought the
23 breach findings were AMA?
24    A.    Absolutely not.
25    Q.    Why do you say "absolutely

Page 117

1          E. ESSES
2  not"?
3     A.    It was not my role.  I'm not --
4  I'm not sure that I'm qualified to do that.
5     Q.    Do you believe Mr. Campbell is
6  qualified to do that?
7     A.    Under the direction and
8  oversight of Mr. Aronoff.
9     Q.    Mr. Campbell is qualified to do
10 it under the direction and management of
11 Mr. Aronoff; is that what you believe?
12    A.    I believe Mr. Aronoff is the
13 expert in this case and Mr. Aronoff is
14 qualified to do so.  Whether he felt, you
15 know, you will have to ask him about that
16 detail.
17    Q.    And what do you believe makes
18 Mr. Aronoff qualified to do so?
19    A.    I don't have a -- I don't have
20 a specific belief one way or -- I mean, you
21 know, we can refer to his report on his
22 background and his experience, but I'm not
23 sure I'm one to judge whether he is, you
24 know, experienced and qualified.
25    Q.    Is there anybody else at Duff &

30 (Pages 114 - 117)

Page 246

1        E. ESSES
2    Q.    Did it happen?
3    A.    I don't have a specific
4 recollection, but I can say with certainty
5 that it did happen.
6    Q.    And who made that decision?
7    A.    Well, Mr. Campbell under the
8 direction of Mr. Aronoff.
9    Q.    Based on what considerations?
10   A.    I'm not sure.
11   Q.    What do you -- what's the best
12 of your knowledge?
13   A.    That Mr. Aronoff made a
14 determination to the materiality on a
15 claim-by-claim basis.
16   Q.    Looking at each and every
17 claim?
18   A.    Either him or his team, yes.
19   Q.    How was the information about
20 the claim communicated to Mr. Aronoff for
21 purposes of him being able to make that
22 determination?
23       MR. HEALY:  Objection to the
24 extent it misstates his testimony.
25   A.    The information reviewed

Page 247

1        E. ESSES
2 through the several-layer -- multiple-layer
3 QC, quality control, process was, you know,
4 as I testified, was captured into a
5 database and made its way through each
6 level of the quality control process.
7    Q.    And did Mr. Aronoff then access
8 that database in order to make those
9 determinations?
10       MR. HEALY:  Same objection.
11   A.    I don't know.
12   Q.    What are the range of
13 possibilities of the different ways where
14 Mr. Aronoff was able to review the claims
15 in order to make a determination about
16 whether the breach adversely and materially
17 affected the value of the loan or the
18 interests of the depositor?
19       MR. HEALY:  Same objection, and
20 calls for speculation.
21   A.    My understanding of the process
22 was that Jim, Mr. Aronoff, worked closely
23 with and oversaw and directed Mr. Campbell
24 in the making of that determination.
25   Q.    I'm asking more about the

Page 248

1        E. ESSES
2 mechanics of how Mr. Aronoff saw the claims
3 at the time that he was making the AMA
4 determination.
5       MR. HEALY:  Same objection I've
6 made, and I'll also note that I think you
7 have just misstated his testimony, or
8 ignored it, I'm not sure which.
9    A.    I don't know.
10   Q.    What about Mr. Campbell, do you
11 know how Mr. Campbell saw the claims in
12 order to help Mr. Aronoff make the AMA
13 determination?
14   A.    I do know that.
15   Q.    How?
16   A.    I worked closely with
17 Mr. Campbell.
18   Q.    How did he see the claims in
19 order to make the AMA determination?
20   A.    The data was loaded into a
21 database and the claim packages were made
22 available and he reviewed them on the
23 screen.
24       I wasn't with him, you know,
25 all day, every day, but I understood that's

Page 249

1        E. ESSES
2 what he was doing, editing on the screen
3 and making that determination on, you know,
4 on each and every claim.
5    Q.    Each and every one of the
6 92,000 or so claims that were submitted to
7 the Plan Administrator?
8    A.    It's possible -- I think the
9 answer is yes, subject to my earlier
10 testimony.
11   Q.    And I want to clarify something
12 I said.  I said approximately 92,000
13 claims.  I believe there were claims, any
14 number of claims on about 92,000 loans.
15 Does that sound correct to you?
16   A.    Originally 94,000,
17 approximately 94,000 loans.
18   Q.    So subject to your prior
19 testimony, your understanding is that
20 Mr. Campbell made an AMA determination with
21 respect to each claim asserted in
22 connection with each of the approximately
23 92,000 loans that were submitted to the
24 Plan Administrator?
25   A.    I said 94,000, but yes.

63 (Pages 246 - 249)

Page 250

E. ESSES

2  Q.  How many times did it occur
3  that a breach was reviewed but a finding of
4  AMA was not satisfied?
5     A.  I don't know.
6     Q.  Did it happen every day?
7     A.  I don't know.
8     Q.  Can you give me any sense of
9  dimension about how many times that
10 happened?
11    A.  I cannot.
12    Q.  What about were there specific
13 claim types in which a breach would not
14 satisfy the requirement to establish AMA?
15    A.  I don't believe so.
16    Q.  It was a loan-by-loan
17 determination?
18    A.  Breach-by-breach determination,
19 yes.
20    Q.  So really it could be multiple
21 determinations within each loan, correct?
22    A.  Correct.
23    Q.  Depending upon the facts and
24 circumstances of each particular loan?
25    A.  Okay.

Page 251

E. ESSES

2  Q.  Does that sound right?
3  A.  Yeah.
4  Q.  And what were the facts and
5  circumstances about each particular loan
6  that one would consider in making that AMA
7  determination from the perspective of the
8  trustees' review process?
9     A.  I don't know.
10    Q.  Because you never did that?
11    A.  It wasn't my responsibility.
12    Q.  But you observed it?
13    A.  Yes, I observed it.
14    Q.  Did you keep track of every
15 time you found a breach but didn't find
16 AMA?
17       MR. HEALY:  Him personally?
18       MR. ROLLIN:  No, in the
19 trustees' review process.
20    A.  That would have -- yes, that's
21 something that we would have information
22 on.
23    Q.  Would Mr. Aronoff know about
24 that?
25    A.  I don't know.

Page 252

E. ESSES

2  Q.  Mr. Aronoff was the final
3  decision-maker, wasn't he?
4     A.  I believe so, yes.
5     Q.  So if there was a determination
6  about whether AMA had been satisfied with
7  respect to any particular loan, that would
8  ultimately be Mr. Aronoff's decision,
9  correct?
10       MR. HEALY:  Objection.  I think
11 that misstates his testimony.
12    A.  Right.  It was delegated to his
13 very competent and qualified staff.
14    Q.  When you said "right," were you
15 responding to the objection or were you
16 responding to my question?
17    A.  I was responding to your
18 question with the rest of my sentence.
19    Q.  So in response to my question,
20 your answer was "Right.  It was delegated
21 to his very competent and qualified staff"?
22    A.  To the extent you are reading
23 me back my testimony, that sounds like what
24 I said.
25    Q.  Do you have any sense of how

Page 253

E. ESSES

2  many determinations on the question of AMA
3  were made by Mr. Aronoff personally as
4  contrasted with members of his staff?
5     A.  I don't know.
6     Q.  And who were the members of his
7  staff that were involved in the AMA
8  determination?
9     A.  Mr. Campbell.
10    Q.  Is that the only person?
11    A.  Mr. Sauerwein was involved as
12 well.
13    Q.  Going back to the question of
14 proof, I asked you what was the proof that
15 the trustees used to establish whether or
16 not the question of AMA had been satisfied,
17 and I don't believe I have an answer to
18 that.
19       What is the proof that the
20 trustees used to answer that question?
21       MR. HEALY:  Objection.  I think
22 it has been asked and answered.
23    A.  I don't understand the
24 question.
25    Q.  What things did the trustees

64 (Pages 250 - 253)

Page 254

1        E. ESSES
2  consider in making the determination of
3  whether or not a breach adversely and
4  materially affected the value of the loan
5  or the interest of the depositor therein?
6      A.    At a minimum, they considered
7  the breach finding description narrative,
8  at a minimum.  There may have been other
9  things that I'm not specifically aware of.
10     Q.    Anything else that you can
11 think of?  You said at a minimum.  I just
12 want to make sure I've exhausted your
13 knowledge.
14     A.    I think Mr. Aronoff and his
15 team took into account whether the breach
16 finding fit the definition of AMA, which I
17 generally understand to be an increased
18 risk of loss on an ex-ante basis.
19     Q.    And how was an increase in the
20 risk of loss measured?
21     MR. HEALY:  Objection.
22 Objection to form.
23     A.    I don't specifically know, and
24 respectfully, I don't believe I'm here to
25 testify to that.  I'm not the expert in

Page 255

1        E. ESSES
2  this matter.
3      Q.    You are not an expert at all,
4  you are a fact witness, and I'm asking you
5  what you know.
6      A.    As I answered, I don't know.
7      Q.    Was there anything in the
8  process that was done that was intended to
9  measure the increase in risk of loss on any
10 particular loan?
11     A.    There was.
12     Q.    What was that?
13     A.    There was specific instructions
14 to the review firms.
15     Q.    What were those instructions?
16     A.    It varied on a breach category
17 by breach category.
18     Q.    Please proceed.
19     A.    Sure.  We gave them
20 instructions on which breach findings to
21 collar.  We made it clear that -- they had
22 some general understanding with their
23 experience in review, forensic reviews, and
24 we gave them instructions not to send up
25 certain claims.

Page 256

1        E. ESSES
2      Q.    I want to go back to my
3  question, because I think you misunderstood
4  it.
5        My question was, what in the
6  process was done that was intended to
7  measure the increased risk of loss on any
8  particular loan, measure the amount of the
9  increase?
10     MR. HEALY:  I'm just going to
11 object on the grounds that contains
12 assumptions that are unwarranted.
13     Q.    You can answer.
14     A.    As I've previously answered,
15 the instructions and thresholds provided to
16 the review firms, in the first instance,
17 were meant to, at a first level, weed out
18 any findings that Mr. Aronoff would not
19 have believed to be -- fit the standard of
20 AMA.
21     Q.    You understand that when
22 there's an increase in something, that
23 something starts in a place, and then it
24 goes up in some measured way; does that
25 make sense to you?

Page 257

1        E. ESSES
2      MR. HEALY:  Objection,
3  argumentative, misassumes facts.
4      A.    That makes sense to me.
5      Q.    So I would like to know what it
6  was that you did in the trustees' side of
7  the protocol process that measured that
8  increase in the risk of loss on the loans.
9      A.    As I've answered, we had
10 procedures, policies and procedures,
11 instructions in place, to, for example,
12 filter out findings that decreased the risk
13 of loss as opposed to increased.
14     Q.    So what findings decreased the
15 risk of loss?
16     A.    Sure.  So, for example, you
17 know, our description, misrep of occupancy,
18 applied to primary home and second home,
19 not if the, you know, to the extent of the
20 review firm found a stated investor
21 property that turned out to be a primary
22 owner-occupied home, that was not a finding
23 we were interested in seeing.
24     Q.    Any others?
25     A.    And, you know, to take any

65 (Pages 254 - 257)

Page 258

E. ESSES

2 example, and this would be applicable
3 across the board, if there was certain
4 misstatements or omissions of material
5 facts that decreased the risk of loss with
6 regard to any of the various categories.
7     Q.    And I would like to know what
8 those are.
9     A.    Sure.  I mean, these are, you
10 know, the occupancy one stands out as --
11 not as the most likely, but the most
12 obvious to me, but it is possible that
13 there was a mortgage loan schedule that had
14 an LTV listed that was lower -- higher,
15 sorry, excuse me, higher than the actual
16 LTV.
17     Q.    Other than those instances in
18 which you found that a certain breach
19 actually decreased the risk of loss, what
20 other breach findings did you weed out
21 because they did not meet the standard of
22 AMA?
23     A.    There were other instructions
24 to the review firms where I believe, my
25 understanding was Mr. Aronoff would not

Page 259

E. ESSES

2 deem that to be AMA, so, you know, we
3 instructed the review firms not to cite
4 those instances.
5     Q.    And what were those instances?
6     A.    So I can give you another
7 example.
8     Q.    Just to be clear, I'm not
9 asking for an example.  I'm asking for you
10 to tell me everything that you know.
11     A.    Okay.  I think of it in terms
12 of specific instructions, so for me it is
13 helpful to describe it in terms of -- we
14 can go, you know, example by example to the
15 extent -- to the best of my recollection,
16 but to start with one instruction that
17 fits, I think fits this category, is we had
18 a threshold for variance in
19 misrepresentation of income that was 5
20 percent.
21     Q.    So if you had a 5 percent or
22 less misrepresentation of income, that
23 would not be AMA?
24        MR. HEALY:  Objection.  I think
25 that slightly misstates his testimony, but

Page 260

E. ESSES

2 he can certainly answer.
3     A.    We instructed the review firms
4 not to cite those -- that as a breach
5 finding.
6        I can't tell you whether -- I
7 cannot tell you whether that would have or
8 not have been deemed AMA, but, you know, we
9 are talking about thousands of loans,
10 hundreds of -- tens of thousands of claims,
11 and this was the instruction determined as
12 sort of like a filter for this AMA
13 determination to be made by Mr. Aronoff and
14 his team.
15     Q.    Okay.  Next.  You gave me the
16 example of 5 percent or less on misrep
17 income.
18     A.    Okay.  Owner occupancy, as we
19 previously discussed, that is binary or
20 trinary.  Misrepresentation of debt, so
21 there are certain instructions with regard
22 to post-close debt that we had that cutoff
23 after a certain period of time.
24        So, for example, you know, for
25 mortgage debt, that was the month following

Page 261

E. ESSES

2 the origination of the loan, and for
3 installment debt, you know, we asked the
4 review firms to only cite to a post-close
5 installment debt in the month following the
6 month of close if there were inquiries on
7 the credit report.
8     Q.    So that one, if you have a
9 post-closing debt, and by post-closing, I
10 mean after the closing of the subject loan
11 that occurred 29 days after closing of the
12 subject loan, that is AMA, and if you've
13 got one that is 32 days after the closing
14 of the subject loan, that's not AMA?
15        MR. HEALY:  Objection to form.
16 I think that misstates his testimony.
17     A.    What I testified is that the
18 instruction to the review firm was to flag
19 that as a defect for Mr. Aronoff to make
20 the ultimate determination.
21        But, in your example, which was
22 not exactly accurate, if it was in the
23 following -- following the month of close,
24 then that wouldn't have even come to our
25 attention at all.  We just told the review

66 (Pages 258 - 261)

Page 262

E. ESSES

1 firms we don't even want to see those.
2
3    Q.   Other examples?
4    A.   With regard to a
5 misrepresentation of employment, the review
6 firms were instructed certainly to flag
7 where they found a misstatement or omission
8 of a job title, and to the extent that the
9 job title was similar enough or not
10 material, have a significant enough
11 difference, we asked the review firms not
12 to flag those even if it was slightly --
13 slightly different.
14    Q.   That goes back to the question
15 that I asked earlier, and that has to do
16 with measurement.
17       Was there any point in the
18 process for the trustees in which they
19 established a baseline risk of loss on a
20 loan?
21       MR. HEALY:  Objection to form,
22 vague and ambiguous.
23    A.   I understood that to be part of
24 the AMA determination to the extent, you
25 know, the way you've described it would fit

Page 263

E. ESSES

1
2 in with Mr. Aronoff's opinion.
3    Q.   Do you believe that Mr. Aronoff
4 established a baseline risk of loss for
5 every loan that was ultimately made as part
6 of a claim back to the Plan Administrator?
7       MR. HEALY:  Objection, vague
8 and ambiguous.
9    A.   To the extent that's -- I don't
10 know.
11    Q.   It's true, isn't it, that the
12 trustee -- the trustees never performed any
13 calculations to establish what the baseline
14 risk of loss was on any particular loan in
15 the protocol, right?
16       MR. HEALY:  Objection, vague
17 and ambiguous.
18    A.   That wasn't my testimony.  I'm
19 not sure.
20    Q.   There was no point in the
21 protocol where the trustees, for example,
22 ran the loans through some sort of a model
23 that measured or quantified a risk of loss,
24 correct?
25       MR. HEALY:  Objection,

Page 264

E. ESSES

1
2 argumentative and vague and ambiguous.
3    A.   Not for the purpose of -- I
4 don't believe for the purpose of
5 determining AMA.
6    Q.   Not to establish a baseline
7 risk of loss and not to establish a new
8 risk of loss in light of the alleged
9 breach, correct?
10       MR. HEALY:  Objection to form,
11 vague and ambiguous.
12    A.   I don't know how Mr. Aronoff
13 would define baseline and increased in his
14 opinion, so I'm not sure I can -- I can
15 answer that question.
16    Q.   Well, I'm talking about what
17 happened in the protocol, not in connection
18 with his expert opinion.
19       Was there ever a time where the
20 trustees established a baseline risk of
21 loss on the loans and then established a
22 new revised risk of loss on the loans based
23 on the allegations of breach?
24       MR. HEALY:  Same objection, and
25 asked and answered.

Page 265

E. ESSES

1
2    A.   I believe Mr. Aronoff made
3 that -- made that determination of AMA,
4 which to the extent, as I've testified that
5 it includes an increased risk of loss, I
6 believe he made that determination.
7    Q.   How?
8    A.   You'll have to ask Mr. Aronoff.
9    Q.   Do you know?
10    A.   I don't know.
11    Q.   Did he perform any kind of a
12 quantitative analysis?
13    A.   I testified earlier that I
14 don't believe we ran a model for that
15 purpose, as you've described, but I don't
16 know -- I don't know -- I don't know.
17    Q.   Did you perform any analysis
18 around the pricing of the loan, that is
19 what their price was upon securitization
20 and what their price would be now that you
21 have allegations of breach?
22    A.   I don't believe so.
23    Q.   Do you not believe so, or you
24 know that that didn't happen?
25    A.   I can pretty certainly say that

67 (Pages 262 - 265)