WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
Todd G. Cosenza
Joseph G. Davis (*pro hac vice*)
Benjamin P. McCallen

ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Telephone: (303) 945-7415
Facsimile: (303) 945-7468
Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)

*Attorneys for Debtors Lehman Brothers Holdings Inc.*
*and Certain of its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x
                                                          )
In re                                                     )    Case No. 08-13555 (SCC)
                                                          )
Lehman Brothers Holdings Inc., *et al.*,                  )    Chapter 11
                                                          )
            Debtors.                                      )    Jointly Administered
                                                          )
--------------------------------------------------------- x

**LEHMAN BROTHERS HOLDINGS INC.'S PRETRIAL BRIEF AND SUMMARY OF**
**EVIDENCE IN SUPPORT OF ESTIMATION OF THE REMAINING COVERED LOAN**
**CLAIMS AT $2.38 BILLION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION...................................................................................................1

I.   THE TRUSTEES BEAR THE BURDEN OF PROVING
     ENTITLEMENT TO RECOVERY ON EACH LOAN. ........................7

II.  THE TRUSTEES' CLAIMS SUFFER FROM AN INCURABLE
     FAILURE OF PROOF:  THEY HAVE OFFERED NO FACTS
     TO ESTABLISH THE NECESSARY LINK BETWEEN
     ALLEGED BREACHES AND CLAIMED LOSSES.............................8

     A.   The Trustees Must Establish The Elements Of A Breach Of
          Contract Claim, Including Proximate Cause. .................................10

     B.   The Trustees Are Asking For Damages, Not Enforcement Of
          The Repurchase Provisions Of The MLSAAs................................13

     C.   The Trustees Have Failed To Meet Their Burden Of Proof For
          AMA Even Under The Repurchase Provisions Of The
          MLSAAs. .......................................................................................16

          1.   The Trustees Ignored Key Aspects Of The Elements Of
               A Contractual Repurchase Claim........................................18

          2.   The Trustees' Position That They Need Not Prove
               AMA Connected To Actual Loss Is Mistaken....................21

III. THE TRUSTEES' KEY BREACH CLAIMS CONTAIN
     FUNDAMENTAL AND PERVASIVE FLAWS. ....................................23

     A.   The Trustees' Loan Review Process Was Unreliable, Which
          Renders Their Estimated Claim Value Equally Unreliable. ...........24

     B.   Each Category Of The Trustees' Claims Suffers From
          Fundamental Flaws. .......................................................................29

          1.   The Evidence Supporting The Misrepresentation
               Claims Was Largely Unreliable And Insufficient. ..............30

               a.   No Fraud and No Default........................................32

          2.   The Trustees' Missing Documents Claims Should Be
               Valued At Zero. ...................................................................35

          3.   The Trustees' Regulatory Claims Are Unsupported...........36

          4.   The Trustees' Underwriting Claims Were Unsupported
               By A Review Of The Relevant Underwriting
               Guidelines. ..........................................................................37

**IV.**   **EVEN UNDER THEIR THEORY OF THEIR CLAIMS, THE TRUSTEES STILL HAVE NOT MET THEIR BURDEN TO QUANTIFY ALLEGED LOSSES.** ..........................................................................**37**

    **A.**   The Trustees' Inclusion Of Impermissible Interest In Their Calculation Of Alleged Losses On Liquidated Loans Permits Their Claim To Be Disallowed In Full. ............................................................38

    **B.**   The LoanKinetics Calculation Of Estimated Market Value Of Active Loans Is Unreliable. ............................................................40

**V.**   **THE TRUSTEES FAILED TO PROVIDE REQUIRED DOCUMENTATION THE PLAN ADMINISTRATOR NEEDED TO PERFORM ITS REVIEW OF SOME OF THE DISPUTED MORTGAGE LOANS.** ..................................................................................**42**

**VI.**   **THE PLAN ADMINISTRATOR'S PROPOSED $2.38 BILLION ALLOWED CLAIM IS FAIR AND REASONABLE.** ...........................**44**

    **A.**   The Settlement With The Institutional Investors. ............................................45

    **B.**   Comparable Settlements Analysis. .................................................................46

    **C.**   Rates Of Success Necessary To Prove Entitlement To Approximately $2.38 Billion. ........................................................................48

    **D.**   Settlements of Collapsed Trusts. ....................................................................49

**CONCLUSION** ...............................................................................................................**50**

# TABLE OF AUTHORITIES

**Page**

**CASES**

*ACE Sec. Corp., Home Equity Loan Tr., Series 2006-SL2 v. DB Structured Prods., Inc.*,
25 N.Y.3d 581 (2015) ............................................................................14

*ACE Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 ex rel. HSBC Bank USA, N.A.
v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543 (S.D.N.Y. 2014) ....................................13, 16

*In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007) ........................................7

*Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 151 A.D.3d 83
(N.Y. 1st Dep't 2017) ............................................................................33

*In re Babcock & Wilcox Co.*, 274 B.R. 230 (Bankr. E.D. La. 2002) ....................................46, 47

*Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096 (DLC), 2015 WL 4163343
(S.D.N.Y. July 10, 2015) ............................................................................34

*Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096 (DLC), 2015 WL 2449313
(S.D.N.Y. May 22, 2015) ............................................................................13, 15

*In re Chemtura Corp.*, 448 B.R. 635 (Bankr. S.D.N.Y. 2011) ........................................7, 47, 48

*In re Cont'l Airlines*, 981 F.2d 1450 (5th Cir. 1993) ....................................................7

*In re Dow Corning Corp.*, 215 B.R. 346 (Bankr. E.D. Mich. 1997) ............................................7

*In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 544463
(Bankr. S.D.N.Y. Jan. 17, 2006) ............................................................................16

*In re Erdheim*, 180 B.R. 42 (Bankr. E.D.N.Y. 1995) ....................................................33

*FDIC v. U.S. Mortg. Corp.*, 132 F. Supp. 3d 369 (E.D.N.Y. 2015) ............................................34

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441
(S.D.N.Y. 2015) ............................................................................35

*Ferro Union, Inc. v. M/V TAMAMONTA*, 317 F. Supp. 2d 456 (S.D.N.Y. 2004) ........................38

*FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283 (S.D.N.Y. 2008) ................................31

*In re Garlock Sealing Techs., LLC*, 504 B.R. 71 (Bankr. W.D.N.C. 2014) ................................47

*In re Gen. Growth Props., Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011) ....................................39

*In re Hawker Beechcraft, Inc.*, 486 B.R. 264 (Bankr. S.D.N.Y. 2013) ....................................11

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08-cv-8426 (WHP), 2011 WL 4943341
(S.D.N.Y. Oct. 17, 2011) ...........................................................................................22

*LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.*, No. 01-cv-4389 (AGS),
2002 WL 181703 (S.D.N.Y. Feb. 5, 2002) ...............................................................22

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 47 A.D.3d 103
(N.Y. 1st Dep't 2007) ................................................................................................34

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195 (2d Cir. 2005) ...........20

*Last Time Beverage Corp. v. F & V Distribution Co., LLC*, 98 A.D.3d 947
(N.Y. 2d Dep't 2012) .................................................................................................33

*Lin v. Metro. Life Ins. Co.*, No. 07-cv-3218, 2009 WL 806572
(S.D.N.Y. Mar. 30, 2009) ..........................................................................................22

*In re Lyondell Chem. Co.*, 542 F. App'x 41 (2d Cir. 2013) .......................................................10

*MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*,
No. 12-cv-7322 (HB), 2013 WL 4399210 (S.D.N.Y. Aug. 15, 2013) ...............13, 15

*MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*,
No. 12-cv-7322 (PKC), 2015 WL 764665 (S.D.N.Y. Jan. 9, 2015), *reconsideration
denied*, No. 12-cv-7322 (PKC), 2015 WL 797972 (S.D.N.Y. Feb. 25, 2015) ...........19, 20, 21

*In re Momentum Mfg. Corp.*, 25 F.3d 1132 (2d Cir. 1994) .......................................................16

*In re Moore*, 307 B.R. 394 (Bankr. S.D.N.Y. 2004) .................................................................39

*In re Nat'l Energy & Gas Transmission Inc. v. Liberty Elec. Power, LLC*, 492 F.3d 297
(4th Cir. 2007) ...........................................................................................................39

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520 (2d Cir. 2004) .........................11, 12

*Nomura Asset Acceptance Corp. Alt. Loan Tr. v. Nomura Credit & Capital, Inc.*,
No. 653390/2012, 2014 WL 2890341 (Sup. Ct. N.Y. Cty. June 26, 2014) .............16

*Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96
(N.Y. 1st Dep't 2015), *reargument granted*, 29 N.Y.3d 992 (2017)....................13, 15

*PPX Enters., Inc. v. Fredericks*, 94 F. Supp. 2d 477 (S.D.N.Y. 2000) .................................8, 12

*In re Ralph Lauren Womenswear*, 197 B.R. 771 (Bankr. S.D.N.Y. 1996) ....................................7

*Resolution Trust Corp. v. Key Fin. Servs., Inc.*, 280 F.3d 12 (1st Cir. 2002) .......................13, 15

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi. v. Bank of N.Y.
Mellon*, 775 F.3d 154 (2d Cir. 2014), *cert. denied*, 136 S. Ct. 796 (2016) ..............8

*In re RLR Celestial Homes, Inc.*, 108 B.R. 36 (Bankr. S.D.N.Y. 1989) .......................................11

*Sevenson Envtl. Servs., Inc. v. N.Y. State Thruway Auth.*, 149 Misc. 2d 268
   (N.Y. Ct. Cl. 1990) ...........................................................................................37

*Severstal U.S. Holdings, LLC v. RG Steel, LLC*, 865 F. Supp. 2d 430 (S.D.N.Y. 2012) ............34

*In re Specialty Prods. Holding Corp.*, No. 10-11779-JKF, 2013 WL 2177694
   (Bankr. D. Del. May 20, 2013) .....................................................................47

*Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328 (S.D.N.Y. 2012) ..............22

*Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250 (S.D.N.Y. 2005) ..............................12

*In re TOUSA, Inc.*, 503 B.R. 499 (Bankr. S.D. Fla. 2014) ..........................................................11

*U.S. Bank, Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 147 A.D.3d 79
   (N.Y. 1st Dep't 2016) ....................................................................................14

*U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386
   (S.D.N.Y. 2016) ...............................................................8, 15, 19, 21, 23, 31, 33, 35

*W. & S. Life Ins. Co. v. Bank of N.Y. Mellon*, No. A1302490, 2017 WL 3392855
   (Ohio Ct. Com. Pl. Aug. 4, 2017)..................................................................23

*Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205 (1886) .................................................11

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003 (2d Cir. 1991) .....37, 38

## STATUTES

11 U.S.C. § 101(5) .........................................................................................................11

11 U.S.C. § 502(b)(2) .....................................................................................................39

11 U.S.C. § 502(c) ...........................................................................................................7

11 U.S.C. § 502(g)(1) ....................................................................................................10

N.Y. Ins. Law § 3105(a) ...............................................................................................22

## TREATISES

3 Collier on Bankruptcy ¶ 365.10[1] ...........................................................................11

Restatement (Second) of Contracts § 352.....................................................................37

Restatement (Second) of Contracts § 356 cmt. a ........................................................12

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Pursuant to the RMBS Trust Settlement Agreement, approved by the Court on July 6, 2017 ("RMBS Settlement Agreement"),[1] the Plan Administrator submits this Pretrial Brief in support of its request to estimate at $2.38 billion the covered loan claims submitted by certain trustees (the "Trustees")[2] on behalf of 225 trusts that are collateralized by Residential Mortgage Backed Securities ("RMBS") sponsored by Lehman Brothers Holdings Inc. and certain of its affiliates ("LBHI").[3]

## INTRODUCTION

As the Court has observed, there is no "Lehman."  Rather, what remains is a Plan Administrator authorized and directed by a confirmed Chapter 11 plan to monetize the remaining assets of the Debtors' estates, fairly resolve disputed claims and distribute the estates' cash to creditors as soon as reasonably practical.  This unique proceeding, in which the Plan Administrator has agreed to ask the Court to estimate the Trustees' covered loan claims at $2.38 billion (the "Estimation Proceeding"), is the result of a settlement driven by the Plan Administrator's desire to achieve a fair resolution of the Trustees' claims in a reasonable time frame, rather than prosecute all of its potential objections to the Trustees' claims, which would require many more years of litigation.  The Plan Administrator has proposed a generous but reasonable allowed claim of $2.38 billion that could, under the facts and law, be estimated at a

---

[1]   Capitalized terms used but not defined herein have the meanings given them in the RMBS Settlement Agreement.

[2]   The Trustees are Deutsche Bank National Trust Company, Law Debenture Trust Company of New York, U.S. Bank National Association, Wilmington Trust Company and Wilmington Trust, National Association.

[3]   Pursuant to the RMBS Settlement Agreement, the Plan Administrator agreed to seek allowance for 91,151 loans and 188,317 breach claims at $2.416 billion, to be adjusted depending on the number of trusts that accepted the settlement.  Subsequently, a small number of trusts opted-out or collapsed, lowering the agreed upon estimation amount to $2.38 billion.  The Trustees have informed the Plan Administrator that they no longer act on behalf of those trusts, which accordingly are no longer a part of this proceeding.

much lower amount.  Thus, in addition to rebuffing the Trustees' evidence on the value of their

claims, LBHI will present evidence to support the $2.38 billion amount that the Court can safely

accept as more than adequate.

Inhibiting the Plan Administrator's efforts to wind down the estate were hundreds of

proofs of claim filed by the Trustees on or about the bar date, which significantly overstated the

Trustees' claims.  Initially, they claimed $37 billion in damages.  Given the size of the alleged

claims, the Plan Administrator repeatedly sought to have the Trustees present, support, and

quantify their claims, so that allowable claims could be determined at a level fair to all creditors.

Following document insufficiency objections in 2011, Judge Peck advised the Trustees that they

would be put to their proof, but the Trustees substantially failed to provide the necessary loan-

level detail.  In 2012, the Plan Administrator engaged the Trustees in mediation, which failed.

Two years later, in 2014, the Trustees moved to estimate certain of their claims at over

$12 billion based on a flawed and inappropriate sampling methodology.  In December 2014, this

Court heard evidence on the Trustees' motion to estimate and the Plan Administrator's cross-

motion to establish a loan-level review protocol.  The Court denied the former and granted the

latter, establishing a multi-step Protocol process for the Trustees to identify and provide

sufficient support for valid claims in good faith and for any disputes on those claims to be

resolved by the parties and, only if necessary, the Court.

Unfortunately, the Trustees did not approach the Protocol in a manner that would allow

that process to succeed.  They adopted a purely adversarial posture, submitting claims based on

inadequate presentations of the evidence and aggressive interpretations of the governing law,

leading to 193,148 breach claims on 94,566 loans.  Collectively, the Trustees sought an allowed

claim of $16.77 billion on account of the Covered Loans, an amount orders of magnitude greater

than comparable RMBS global resolutions.  Under the weight of the enormous number of unsupported claims generated by the Trustees' flawed approach, the Protocol process collapsed.

The Plan Administrator, nevertheless, continued to pursue its goal of an expeditious and fair resolution of the claims.  With that goal in mind, it turned to a group of fourteen institutional investors (the "Institutional Investors"), including, among others, Goldman Sachs Asset Management, BlackRock, MetLife and PIMCO.  The Institutional Investors represented the Trusts' largest certificateholders—the economic parties in interest—and have successfully negotiated several other large-scale RMBS global resolutions.  As the Court is aware, after reaching agreement with the Institutional Investors to resolve these claims for $2.44 billion in October 2015, that proposed settlement effort was frustrated by the Trustees early last year based on a purported "expert" report that the Trustees have steadfastly refused to disclose.

However, the Plan Administrator continued to work diligently toward a resolution, leading to the RMBS Settlement Agreement (entered into on March 17, 2017 by the Plan Administrator, the Trustees and the Institutional Investors) that gave rise to this Estimation Proceeding.  The agreed-upon purpose of the Estimation Proceeding is for the Court to estimate the allowed claim amount that would have resulted from the completion of the Protocol, and specifically to consider whether the Trustees have shown that they are entitled, under the Protocol, to an allowed claim greater than $2.38 billion.

At the hearing, the Court will hear evidence that the Protocol was cut short because of the Trustees' blunderbuss approach to that process, an assessment that has been confirmed by the Trustees' recent decision not to pursue at the hearing ***40% of the breach claims*** that they submitted to the Protocol.  This confirms that the Trustees' approach was deeply flawed.

This Estimation Proceeding has unearthed the root causes of the failure of the Protocol. The Trustees took legal and factual positions that cannot be supported. Most critically, the Trustees took the position that they need not establish any nexus between the alleged breaches and the vast damages—over $16 billion in the Protocol—they were claiming. The Trustees demand recovery on liquidated loans even when it is clear that the loss was caused by something other than the alleged breach. The Trustees also demand to recover on active, non-liquidated loans that are *still* performing (in many instances a decade after origination). This approach turns the contracts, equity and the purpose of these proceedings on their head, and would result in an enormous windfall at the expense of other estate creditors.

The Trustees' approach is contrary to well-established law. The Trustees' claims for breach of the Mortgage Loan Sale and Assignment Agreements ("MLSAAs") require the Trustees to prove all the basic elements of a breach of contract claim, including proximate cause. The Trustees overlook these basic contractual principles, and instead stake out a position that is indefensible under applicable law, and finds no support in the MLSAAs. While the Trustees suggest they are bringing repurchase claims under the MLSAAs, they are, in fact, not seeking to enforce repurchase obligations. Instead, the Trustees are asking for a damages remedy that is not provided for in those contracts. In doing so, they rely on case law that does not take into account that they are pursuing claims under chapter 11 of the Bankruptcy Code. They also interpret the MLSAAs' requirement that breaches must "materially and adversely *affect* the value of the loan" ("AMA") in a way that essentially writes that requirement out of the contract. Having taken these extreme positions in the Protocol (which they continue to assert through their opinion witnesses in this Estimation Proceeding), the Trustees—who have the burden of proof—are left without a way to satisfy their burden if the Court does not agree with their positions.

4

The Trustees' approach also led them to choose quantity over quality in selecting breach claims.  Both the Trustees' and the Plan Administrators' experts agree that every loan tells a unique story, and many loan files are thousands of pages long.  Perhaps it is not surprising that in submitting nearly 200,000 claims on nearly 100,000 loans to the Protocol over 15 months, the Trustees' process yielded claims with insufficient facts to establish the existence of a breach.  The Trustees also failed to take into account the totality of information in the loan file, and ignored information available from alternative sources, especially contradictory evidence.  Rather than present a complete picture of the evidence they reviewed, the Trustees identified only the evidence they believed would tend to support a claim, forcing the Plan Administrator to waste significant money and resources to review the entire file to determine what was left unsaid.

Having submitted one-sided claims that by their own admission bore no established connection to any losses, the Trustees calculated their claimed losses in a manner that included not only prepetition interest that they are not entitled to under the documents, but also billions of dollars in postpetition interest on defaulting loans.  Section 502(b)(2) of the Bankruptcy Code expressly disallows any claim for such interest.  In a typically adversarial and aggressive approach, the Trustees now argue that because the Plan Administrator has approved certain claims through the Protocol that would total approximately $300 million in damages calculated using the Purchase Price, the Plan Administrator—and by extension, apparently, the Court—is now "foreclosed" from deducting interest the Trustees either are not entitled to receive under the applicable agreements or expressly are prohibited from receiving by statute on those or any other claims that remain in dispute.  In any event, that position is belied by the express terms of the Protocol, which preserves Lehman's rights to assert any defenses with respect to disputed claims.  Ex. 1 at 4 (Order Establishing a Protocol ("Protocol Order")).

The Trustees' failure to offer evidence in support of their breach claims during the Protocol and in the Estimation Proceeding, and the evidence that has been and will be presented by the Plan Administrator, present an overwhelming case that if the Protocol proceeded to its ultimate conclusion, the allowed claim would be substantially less than $2.38 billion. Nonetheless, the Plan Administrator has agreed to seek an allowed claim of $2.38 billion because it would be in the best interests of the creditors. The RMBS Settlement Agreement approved by the Court with a resulting estimation eliminates future appeals, the attendant risk, cost and delay that would be associated with appeals, and achieves finality and certainty for the estate and all creditors, including the Trustees.

Indeed, the RMBS Settlement Agreement was designed to reach an outcome that would be fair to RMBS certificateholders, the ultimate beneficiaries of the disputed RMBS claims, notwithstanding the Trustees' regrettable approach throughout these proceedings and in the Protocol. The Plan Administrator seized the initiative to identify a fair level for the Trustees' claims, and agreed, through the RMBS Settlement Agreement, to seek estimation at $2.38 billion. As the Plan Administrator will demonstrate at trial, this claim amount is: (i) consistent with comparable settlements of large-scale RMBS matters, including Countrywide, Citigroup, JP Morgan and ResCap; (ii) supported by the actions of the Institutional Investors—sophisticated parties (including Goldman Sachs, BlackRock, PIMCO, and MetLife) who, unlike the Trustees, actually hold a financial stake in the outcome of these proceedings; and (iii) at a level already adopted by the Trustees themselves in connection with their sale of identical claims held by trusts that have been collapsed during the pendency of the Protocol and this Estimation Proceeding. Finally, to corroborate the propriety of the $2.38 billion level, the Plan Administrator will present the Court with calculations that show the extent to which the Trustees

would have to succeed on various categories of their claims to generate a claim amount at that

level.  For each of these reasons, and others to be presented at trial, the Trustees' claims should

be allowed at $2.38 billion, notwithstanding that the Trustees would not be able establish claims

of more than $300 million given the Trustees' flawed approach to proving their claims.

## I.    THE TRUSTEES BEAR THE BURDEN OF PROVING ENTITLEMENT TO RECOVERY ON EACH LOAN.

Section 502(c) of the Bankruptcy Code provides that this Court may estimate the value of

claims if litigating the precise value of those claims would "unduly delay the administration of

the case."  11 U.S.C. § 502(c).  Bankruptcy courts have broad discretion to select the valuation

method that best suits the circumstances of the case, "so long as the procedure is consistent with

the fundamental policy of Chapter 11 that a reorganization 'must be accomplished quickly and

efficiently.'"  *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 278 (Bankr. S.D.N.Y. 2007)

(citation omitted).  A court's principal consideration in estimating a claim should be "to promote

a fair distribution to creditors through a realistic assessment of uncertain claims."  *In re Cont'l

Airlines*, 981 F.2d 1450, 1461 (5th Cir. 1993).

To allow the Trustees' claims, the Court must determine the number and amount of

claims that have validity under applicable law.  *See In re Dow Corning Corp.*, 215 B.R. 346, 354

(Bankr. E.D. Mich. 1997) (estimation "includes the determination of whether the debtor is liable

on the claim—that is, whether the claim is valid").  Any claims that would be disallowed as a

matter of law should be estimated at zero.  *See In re Ralph Lauren Womenswear*, 197 B.R. 771,

775-78 (Bankr. S.D.N.Y. 1996).  Within that framework, the Court may "estimate the expected

value of [the Trustees' claims] based on the probability of the success of various potential

outcomes if decided on the merits."  *In re Chemtura Corp.*, 448 B.R. 635, 650 (Bankr. S.D.N.Y.

2011).

The Trustees' claims for breach of the MLSAAs are governed by New York law.  *See,
e.g.*, Ex. 2 at § 2.04 (MLSAA, dated Dec. 1, 2002).  Under New York law, the Trustees bear the
burden of proving each element of their claim by a fair preponderance of the credible evidence,
including the amount, if any, of damages.  *PPX Enters., Inc. v. Fredericks*, 94 F. Supp. 2d 477,
483 (S.D.N.Y. 2000).  This burden must be met with respect to each alleged breach for each
loan.  *See, e.g.*, *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi. v. Bank of
N.Y. Mellon*, 775 F.3d 154, 162 (2d Cir. 2014) (RMBS defendant's "alleged misconduct must be
proved loan-by-loan and trust-by-trust"), *cert. denied*, 136 S. Ct. 796 (2016); *U.S. Bank, Nat'l
Ass'n v. UBS Real Estate Sec. Inc.* ("*UBS*"), 205 F. Supp. 3d 386, 412 (S.D.N.Y. 2016).

## II.    THE TRUSTEES' CLAIMS SUFFER FROM AN INCURABLE FAILURE OF PROOF:  THEY HAVE OFFERED NO FACTS TO ESTABLISH THE NECESSARY LINK BETWEEN ALLEGED BREACHES AND CLAIMED LOSSES.

The Trustees have repeatedly exaggerated their damages claims.  According to the
Trustees' latest attempt to quantify their claims, LBHI is liable for $11.2 billion of damages
based on breaches of representations and warranties for tens of thousands of underlying
mortgage loans.  The Trustees have, at the same time, failed to provide the individualized, loan-
by-loan proof required to support those damages claims, even though they have been warned for
years that there would be consequences for those failures.  Rather, throughout the Protocol and in
this Estimation Proceeding, the Trustees have taken the position that they are not required to
prove that the alleged breaches had any causal connection to a default or the losses suffered on
the loans.  Instead, they assert that if they prove a breach "significantly increased the risk of loss"
on the loan at the time the loan was securitized—which in their view does not require any
individualized proof beyond the fact of the breach—they are entitled to recover ***all losses*** on that
loan in the amount of the Purchase Price under the Governing Agreements, which is generally

defined in the Trust Agreements as the unpaid principal balance, plus interest and expenses. This position is untenable; it leads to absurd results and an enormous potential windfall for the Trusts. For example, according to the Trustees, if a borrower overstated his income by 6% on the loan application, and paid his mortgage for five years, but defaulted due to his death, the Trustees would be entitled to recover from the estate the entire unpaid principal balance on the loan plus interest and expenses. *See* Ex. 3 at 202:2-203:6 (Oct. 6, 2017 Deposition Transcript of James H. Aronoff ("Aronoff Tr.")).

This theory fails to recognize that the Trusts' claims arise out of executory contracts that have been rejected by LBHI, as the Trustees have acknowledged in the past,[4] leaving the Trustees with breach of contract claims under New York law, a fundamental element of which is causation. They also ignore the differences between the extra-contractual damages remedy they seek in this case, and the contract-based repurchase claims adjudicated in the various cases on which they rely (and improperly argue through the expert reports they submitted) to assert that they need not prove any element of causation. The self-selected "put-back" cases on which the Trustees seem to rely do not address the question presented here, which is how to value the Trustees' contractual claims for damages in this chapter 11 proceeding.

Even if the non-bankruptcy, put-back jurisprudence were to govern their claims, the Trustees admittedly applied a standard inconsistent with those decisions when gathering and presenting evidence in support of the claims in the Protocol. No case supports the AMA standard proposed and employed by the Trustees in the Protocol, which would essentially write the AMA requirement out of the contracts. Moreover, the logical extension of the Trustees' position is that a performing loan would be removed and repurchased, even immediately

---

[4] Ex. 4 at 58:11-13 (Dec. 10, 2014 Hr'g Tr.) (Munno: "But the dispositive point is that these governing documents are executory contracts. They were not assumed, they were rejected.").

following securitization, a proposition which makes no commercial sense because it would remove the loan's cash flow from the RMBS. And even were the Trustees' risk-of-loss theory appropriate, they have offered no evidence that there was any increased risk of loss for any alleged breaches, much less a "significant" increase in the risk of loss. The Trustees did not calculate a baseline risk of loss or a new "breach-based" risk of loss in order to measure any alleged increase and, therefore, they cannot meet the burden under their own formulation of the AMA requirement.

In the Protocol, and consistent with applicable law, the Trustees were required to demonstrate a causal connection between the breach claims they asserted and the claimed losses. *See* Ex. 1 at Ex. A, § III.e.vi.3 (Protocol Order). They chose to take a different position, affirmatively declining to take causation into account when presenting their claims—a position they maintain. Instead, they claimed that their burden of proof is satisfied by identifying the type of breach (such as a non-trivial misrepresentation of income), and asserting that such a breach by definition tends to increase the risk of loss on a loan, a position they now buttress in this Estimation Proceeding through *ipse dixit* conclusions to that effect by "experts." As a result, the Trustees' breach claims suffer from a fundamental failure of proof, which by itself precludes the Trustees from showing that their claims are worth more than $2.38 billion.

A.    **The Trustees Must Establish The Elements Of A Breach Of Contract Claim, Including Proximate Cause.**

When a debtor rejects an executory contract pursuant to section 365 of the Bankruptcy Code, the Code directs the court to treat the contract as if it had been breached immediately before the date of the bankruptcy petition's filing, such that all claims arising from that breach are deemed prepetition claims. 11 U.S.C. § 502(g)(1); *In re Lyondell Chem. Co.*, 542 F. App'x 41, 42 (2d Cir. 2013). The Bankruptcy Code defines a "claim" to include a "right to an equitable

remedy for breach of performance if such breach gives rise to a right to payment," 11 U.S.C.

§ 101(5), such as, for example, a repurchase claim under the MLSAAs, *id.*

 "If the contract is executory and the debtor rejects it, the non-debtor party is left with a

pre-petition unsecured claim for breach of contract." *In re Hawker Beechcraft, Inc.*, 486 B.R.

264, 277 (Bankr. S.D.N.Y. 2013).  Rejection of an executory contract also cuts off a contractual

counter-party's specific performance right under that contract.  *See In re TOUSA, Inc.*, 503 B.R.

499, 504 (Bankr. S.D. Fla. 2014) ("rejection [of a contract under § 365] deprives the nondebtor

party of a specific performance remedy that it might otherwise have under applicable non

bankruptcy law for breach of the contract . . .") (alteration in original) (quoting 3 Collier on

Bankruptcy ¶ 365.10[1]); *In re RLR Celestial Homes, Inc.*, 108 B.R. 36, 37 (Bankr. S.D.N.Y.

1989).  "Upon rejection of the contract, the [plaintiffs] will have an unsecured prepetition claim

for damages." *Id.* at 43.

Pursuant to 11 U.S.C. § 365, LBHI rejected all executory contracts except those it

specifically assumed as set forth in the Plan Supplement, which did not include the MLSAAs.

Ex. 5 at Article XI, section 11.1 (Third Amended Plan).  Because the MLSAAs were executory

contracts (which the Trustees have acknowledged), the Trustees are left with a prepetition claim

for damages, governed by New York law.  *See, e.g.*, Ex. 2 at § 2.04 (MLSAA, dated Dec. 1,

2002).

A bedrock principle of New York law is that a plaintiff can only recover damages for

breach of contract if the breach "directly and proximately caused" the damage.  *Nat'l Mkt. Share,

Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis omitted).  Damages must

be "such . . . as actually follow or may follow from the breach of the contract." *Id.* (quoting

*Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209 (1886)).  Thus, "damages must be

11

. . . directly traceable to the breach, not remote or the result of other intervening causes." *Nat'l*

*Mkt. Share*, 392 F.3d at 526 (citations omitted).  This is so because "[t]he central objective

behind the system of contract remedies is compensatory, not punitive." *Topps Co. v. Cadbury*

*Stani S.A.I.C.*, 380 F. Supp. 2d 250, 261-62 (S.D.N.Y. 2005) (quoting Restatement (Second) of

Contracts § 356 cmt. a (1981)).  The party claiming breach bears the burden to prove

causation.  *See PPX Enters.*, 94 F. Supp. 2d at 483.

In the Protocol, the Trustees were required to submit a "statement of how the breach of a

representation and warranty or a document defect entitles the RMBS Trustee to a claim under the

applicable governing agreements and applicable law."  Ex. 1 at Ex. A, § III.e.vi.3 (Protocol

Order).  The Trustees have taken the position that the only relevant standard to meet their burden

under the Protocol is what they refer to as the "materiality" standard in the repurchase provisions

of the MLSAAs, which, they claim, does not require proof of any causal connection between the

breach and the claimed losses.  July 27, 2017  Amended Expert Report of James H. Aronoff

("Aronoff Report") at 41 ("[A] misstatement by a borrower is itself material"); Ex. 6 at 111:9-19

(Sept. 28, 2017 Deposition Transcript of Edmond Esses ("Esses Tr.")); June 1, 2017 Expert

Report of Fiachra T. O'Driscoll ("O'Driscoll Report") at ¶ 48 ("[A]ll intentional

misrepresentations and omissions of material facts materially and adversely affect the value of

the loan.")[5].  The information the Trustees submitted to the Plan Administrator under the heading

"Materiality Basis" included only one of four rote formulations based on the asserted breach

type:  The breach either (a) "increases the likelihood of default," (b) "increases the potential loss

severity," (c) both increases the likelihood of default and potential loss severity, or (d) is deemed

a material breach under the MLSAA, "thereby increasing the credit risk associated with such

---

[5] All citations to expert reports refer to the courtesy copies submitted to the Court.

loan." Ex. 3 at 226:16-227:20 (Aronoff Tr.). In every instance, the Trustees asserted that a

breach causing an "increase[] in credit risk" is "material and adverse to the value of the loan."

Ex. 3 at 225:2-230:16 (Aronoff Tr.).

In short, the Trustees made no attempt to establish that the breaches they asserted

proximately caused the Trusts' losses. As a result, the record is devoid of the evidence that

would be necessary for the Court to conclude that the Trustees are entitled to an allowed claim

greater than $2.38 billion.

### B. The Trustees Are Asking For Damages, Not Enforcement Of The Repurchase Provisions Of The MLSAAs.

There is a second, fundamental flaw in the Trustees' position: that their burden of proof

is satisfied by proof of a breach that increases the risk of loss on a loan. To justify this position,

the Trustees seemingly will rely on the decisions of a number of courts adjudicating contractual

repurchase claims.[6] But these cases are inapplicable, not just because these cases do not involve

claims against a debtor under rejected contracts in bankruptcy, but also because unlike the

plaintiffs in these cases, the Trustees are not bringing claims to enforce the repurchase provisions

of the MLSAAs.

The MLSAAs provide:

> Upon discovery by either the Bank or the Depositor of a breach of
> any of the foregoing representations and warranties that adversely
> and materially affects the value of the related Mortgage Loan, that
> does not also constitute a breach of a representation or warranty of
> a Transferor in the related Transfer Agreement, the party
> discovering such breach shall give *prompt written notice* to the other

---

[6] *See, e.g., Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96, 106 (N.Y. 1st Dep't 2015), *reargument granted*, 29 N.Y.3d 992 (2017); *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096 (DLC), 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015); *Resolution Tr. Corp. v. Key Fin. Servs., Inc.*, 280 F.3d 12, 18-19 & n.13 (1st Cir. 2002); *see also ACE Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 ex rel. HSBC Bank USA, Nat'l Ass'n v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 554 (S.D.N.Y. 2014); *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12-cv-7322 (HB), 2013 WL 4399210, at *6 (S.D.N.Y. Aug. 15, 2013).

> party.  Within 60 days of the discovery of any such breach, Lehman
> Capital shall *either (a) cure such breach in all material respects, (b)
> repurchase such Mortgage Loan or any property acquired in
> respect thereof from the Depositor at the applicable Purchase Price
> or (c) within the two year period following the Closing Date,
> substitute a Qualifying Substitute Mortgage Loan for the affected
> Mortgage Loan*.

Ex. 7 at § 104(b) (MLSAA, dated Feb. 1, 2003) (emphasis added).  As is plain, the repurchase

provisions require notice to trigger their remedial mechanisms, which are limited to cure of the

breach, repurchase of the loan, or substitution of the loan.  The Trustees' claims for damages do

not track these provisions.

First, by their own admission, the Trustees did not follow the notice requirement, which

is a condition precedent to suit in a repurchase case like those addressed in the cases on which

they rely.  Ex. 4 at 58:2-17 (Dec. 10, 2014 Hr'g. Tr.); *see ACE Sec. Corp., Home Equity Loan*

*Tr., Series 2006-SL2 v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 591 (2015); *U.S. Bank, Nat'l*

*Ass'n v. GreenPoint Mortg. Funding, Inc.*, 147 A.D.3d 79, 87 (N.Y. 1st Dep't 2016).  In their

Protocol submissions, the Trustees conceded that they did not give notice on any of the breach

claims prepetition.  *See, e.g.*, Ex. 8 (Excerpt of RMBS Claims Tracking Spreadsheet reflecting

breach discovery dates provided by the RMBS Trustees during the Protocol.) The Trustees

cannot simultaneously claim they are proceeding under the repurchase provisions of the

MLSAAs, and then ignore the notice requirements, which are, in the words of the Trustees' own

expert, part of the "balance" of the limited remedial provisions provided in the MLSAAs.  *See*

Ex. 3 at 233:9-235:12 (Aronoff Tr.); *see also* Ex. 9 at 75:8-25 Sept. 26, 2017 Deposition

Transcript of Karl N. Snow, PhD ("Snow Tr.")).

Second, the Trustees claim damages in the form of the Purchase Price, not the relief

provided by the repurchase provisions of the MLSAAs.  To the extent that loans are not yet

liquidated, the Trustees are not seeking to "put them back," as would be required under the

MLSAAs, but instead seek the full Purchase Price (inadequately adjusted).  *See, e.g.,* Ex. 7 at §

1.04(b) (MLSAA, dated Feb. 1, 2003); *see* June 1, 2017 Expert Report of Karl N. Snow, PhD

("Snow Report") at ¶ 15.  Indeed, when they submitted their claims in the Protocol, the Trustees

asserted they were entitled to the full Purchase Price, without any adjustment for the fact that

they were holding the mortgage loans or related assets.  Ex. 10 at 20:12-25; 25:14-26:1 (Sept. 17,

2015 Protocol Status Conference Tr.).  No case supports this novel approach.

To the extent the loans are liquidated and cannot be "put back," the Trustees also assert

they are entitled to the Purchase Price.  Based on the expert submissions, *see, e.g.*, Aug. 28, 2017

Reply Report of Fiachra T. O'Driscoll ("O'Driscoll Reply") at ¶ 20, n. 41, it seems that the

Trustees are relying on the cases that allow recovery of damages as a matter of equity in put-

back cases involving liquidated loans.[7]

In deciding to use the repurchase price as a proxy for equitable damages, these courts

stressed that if they declined to award damages, the depositor of the loans would be unfairly

rewarded for including seriously deficient loans in the loan pool that would default before the

trust's rights under the repurchase provisions could be exercised, leaving the trusts without a

meaningful remedy under the contract.  *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-

7096 (DLC), 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) ("To preclude money damages

in lieu of the equitable remedy would create a perverse incentive for an RMBS sponsor 'to fill

the Trust with junk mortgages that would expeditiously default so that they could be ...

[l]iquidated before a repurchase claim is made.'") (alteration in original and citation omitted);

*see, e.g., Resolution Tr. Corp. v. Key Fin. Servs., Inc.*, 280 F.3d 12, 18-19 & n.13 (1st Cir. 2002);

---

[7] *See, e.g., UBS*, 205 F. Supp. 3d at 468; *Bank of N.Y. Mellon,* 2015 WL 2449313, at *2; *Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.,* 133 A.D.3d 96, 106 (N.Y. 1st Dep't 2015), *reargument granted,* 29 N.Y.3d 992 (2017); *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.,* No. 12-cv-7322 (HB), 2013 WL 4399210, at *18 (S.D.N.Y. Aug. 15, 2013).

*ACE Sec. Corp. Home Equity Loan Tr., Series 2007–HE3 ex rel. HSBC Bank USA, Nat'l Ass'n v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 553-56 (S.D.N.Y. 2014); *Nomura Asset Acceptance Corp. Alt. Loan Tr. v. Nomura Credit & Capital, Inc.*, No. 653390/2012, 2014 WL 2890341 (Sup. Ct. N.Y. Cty. June 26, 2014) (collecting cases).

The equities in this bankruptcy proceeding are different.  Lehman is no more.  There is no risk that Lehman will be incentivized to intentionally include deficient loans in securitized loan pools, or that it will be unfairly rewarded.  Moreover, bankruptcy courts are courts of equity with a particular equitable mandate; they are "empowered to invoke equitable principles to achieve fairness and justice in the reorganization process."  *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994).  This Court is therefore tasked with "promot[ing] a fair distribution to creditors through a realistic assessment of uncertain claims."  *In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 544463, at *3 (Bankr. S.D.N.Y. Jan. 17, 2006).  To the extent equitable principles in this Court inform the standard for awarding damages to the Trustees, they dictate that the Trustees must demonstrate entitlement to those damages by establishing that the asserted breach had some causal relationship to the loss on the loan.  In short, the "put-back" cases on which the Trustees rely are not appropriate for determining the Trustees' burden of proof for demonstrating compensable damages in these bankruptcy proceedings.

### C.    The Trustees Have Failed To Meet Their Burden Of Proof For AMA Even Under The Repurchase Provisions Of The MLSAAs.

While they rely on what they call the "materiality" requirements of the contractual repurchase provisions to establish their extra-contractual damages claims, the Trustees' claims do not meet even those standards.  The Trustees' breach claim process simply ignored key aspects of the repurchase case law with which they disagreed.  Although these cases make clear that AMA must be determined at the time the repurchase claim is made, the Trustees used a

different standard when they submitted their claims, asserting that the relevant moment to assess AMA was "*ex ante*," meaning at the time the loan was securitized or at origination of the loan (their experts are not consistent on this point). *See* July 27, 2017 Expert Rebuttal Report of James H. Aronoff ("Aronoff Rebuttal") at ¶ 13 ("the focus of such a breach review is and has always been the *ex ante* impact of a breach on the risk of the loss on the loan at the time the loan was originated or sold."); *but see* Ex. 3 at 190:14-22 (Aronoff Tr.) (["whether AMA is measured at the time of origination or at the time of a repurchase claim] shouldn't matter."). The cases also require individualized, loan-level determinations of AMA, based on the facts and circumstances of the given loan. Instead, the Trustees mapped the loans by breach type, asserting they met the AMA standard based solely on the breach type and concluded, remarkably, that approximately 190,000 alleged breaches satisfied the AMA standard on that basis. Ex. 3 at 87:10-88:4; 230:2-16 (Aronoff Tr.); Cornell Amended Reply at Ex. C.

Separate and apart from these failures, the Trustees stretch the holdings of the repurchase cases well beyond the point of recognition in interpreting the AMA provisions of the contracts. By asserting they need prove nothing more than the fact of the breach at origination (or securitization), the Trustees essentially write the AMA provisions out of the contracts.

In an effort to preserve a theory of AMA that is both inconsistent with the bargained-for allocation of risks among the parties and applicable law, the Trustees introduce inapposite statements by LBHI or its affiliates' representatives in their own, downstream put-back litigation.[8] This reliance is misplaced. As a threshold matter, those matters were not claims against debtors in bankruptcy, and they were brought under different contracts. LBHI and its affiliates were (in the role of purchasers of whole loans intending to sell those loans to

---

[8] To the extent the Trustees seek to introduce these statements at trial, the Plan Administrator reserves the right to challenge their admissibility.

"upstream" purchasers or for securitization) pursuing make-whole payments (which the MLSAAs do not contain) under the terms of the Aurora Loan Services' Seller's Guide from sellers of mortgage loans. When a whole loan is purchased for further sale, the prices LBHI obtains from purchasers may be affected by breaches, especially in the short-term. Rebuttal Report of Daniel I. Castro, Jr. ("Castro Rebuttal") at ¶¶ 56-57; Reply Report of Daniel I. Castro, Jr. ("Castro Reply") at ¶ 49. In that transactional context, a breach meets the AMA requirement set forth in the Seller's Guide.[9] Castro Rebuttal at ¶¶ 56-57. This is particularly true in the matters cited by the Trustees, where the loans generally defaulted very early in their life cycle. By contrast, once a loan is securitized—as in this case—there is no market for the loan and it is not a tradable asset, therefore, it has no price that can be affected by a breach. *Id.*; *see also* Ex. 11 at 32:1-24 (Sept. 15, 2017 Deposition Transcript of Richard W. Ellson, PhD ("Ellson Tr.")). (confirming that there is no market for securitized loans).

1. ***The Trustees Ignored Key Aspects Of The Elements Of A Contractual Repurchase Claim.***

Under the repurchase provisions of the MLSAAs, the Trustees would be required to prove a breach of a representation or warranty that "materially and adversely *affects* the value of the mortgage loan" (or in some formulations, "materially and adversely *affects* the value of the loan or the interests therein of the certificateholders") ("AMA") (emphasis added). *See, e.g.*, Ex. 13 (MLSAA LXS 2005-6); Ex. 14 (MLSAA SASCO 2004-GEL3); Ex. 15 (MLSAA SAIL 2003-BC3). Some breach types—mostly regulatory violations—are "deemed" to materially and adversely affect the value of the loan or the interests of the certificateholders ("deemed AMA").

---

[9] The AMA provisions on those contracts are also more expansive than in the MLSAAs in this case, and provide that repurchase may be triggered when the breach "materially and adversely affects the value of the Mortgage Loans or the interest of Purchaser, or materially and adversely affects the interest of Purchaser in the related Mortgage Loan…." Ex. 12 at § 710 (Seller's Guide). Furthermore, unlike the MLSAAs, the Seller's Guide contemplates and provides a remedy for liquidated loans. *Id.*

Ex. 14 (MLSAA SASCO 2004-GEL3).  But apart from breaches that are deemed AMA, there

can be no dispute that under the repurchase provisions the Trustees would be required to prove

that every loan for which they bring a claim contains a breach of an MLSAA representation or

warranty that materially and adversely *affects* the value of the loan.  *See id.* at 30.

The cases on which the Trustees otherwise rely make clear that AMA must be determined

at the time the breach claim is made, an interpretation the Trustees unabashedly ignore.  *UBS*,

205 F. Supp. 3d at 401; *see* Expert Rebuttal Report of Fiachra O'Driscoll ("O'Driscoll Rebuttal")

at ¶ 51; Aronoff Rebuttal at ¶ 13; Rebuttal Expert Report of J.F. Morrow ("Morrow Rebuttal) at

¶ 54.  As these courts have held, because the term "affects" is in the present tense, the contract

language plainly requires the AMA element to be analyzed at the time when notice is given and

not the closing date of the Trust or the date of origination of the loan.  *UBS*, 205 F. Supp. 3d at

465.  "[T]o construe the word 'affects' as having an expansive meaning that extends back to the

Closing Date would rewrite the express terms of the PSAs."  *Id*.  "While a breach of the

representation and warranty is determined solely by reference to facts extant at the time of the

[closing date] or the [cut-off date], the determination of whether the breach 'materially and

adversely affects the interests of the Certificateholders . . .' is assessed as of the cure-repurchase

period."  *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12-

cv-7322 (PKC), 2015 WL 764665, at *10 (S.D.N.Y. Jan. 9, 2015) (citation omitted),

*reconsideration denied*, No. 12-cv-7322 (PKC), 2015 WL 797972 (S.D.N.Y. Feb. 25,

2015).  Moreover, "[a] post-closing default on a loan does not prove a breach of representation or

warranty at the time of closing.  Hindsight is not the standard."  *Id.*

Nevertheless, during the Protocol, the Trustees submitted breach claims based on the

contention that AMA was demonstrated "when the related breach finding significantly

increase[d] the risk of loss on the loan as of the time of securitization of the loan, whether or not such increased risk ever result[ed] in a loss." Ex. 3 at 197:14-198:2 (Aronoff Tr.). Having applied the wrong standard, this error infects the entirety of the Trustees' Protocol submissions, rendering them pervasively unreliable and insufficient.

Just as fundamentally, the Trustees' "mapping" of alleged breach claims to AMA by breach type violated the requirement in the repurchase provisions that those breaches that are not deemed AMA require the Trustees to make a showing of AMA beyond just the facts underlying the breach. *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2*, 2015 WL 797972, at \*2. To read otherwise would write the AMA requirement out of the contract and render the "deemed" portion meaningless. *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (A contract interpretation "that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (citation and internal quotation marks omitted).

The Trustees cannot recraft the repurchase provisions to allow them to transform breach types into deemed AMA findings. "Courts will not rewrite contracts that have been negotiated between sophisticated, counseled commercial entities." *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2*, 2015 WL 764665, at \*8 ("The best evidence of what parties to a written agreement intended is what they say in their writings.") (citations and internal quotation marks omitted). Where, as here, not all breaches trigger a cure or repurchase obligation and instead a material and adverse effect must be shown, those that are not deemed material and adverse require "proof of material adversity." *Id.* at \*10. The Trustees must "distinguish between those breaches that are material and adverse as to a particular loan and those that are not." *Id.* ("[A] failure to follow internal underwriting standards . . . may or may not significantly increase the risk of loss in a

20

particular borrower's loan."). In *UBS*, for example, for multiple exemplar loans, Judge Castel held that despite showing a breach of the trust agreement, the trustees failed to show the separate requirement that it caused AMA. *See, e.g.*, *UBS*, 205 F. Supp. 3d at 486, 495, 497, 501-02, 512.

The Trustees made no individualized assessment of materiality. The Trustees' expert Mr. Aronoff quite literally copied and pasted one of four versions of an asserted "Materiality Basis" to each of the breach claims still at issue. *See, e.g.*, Excerpt of Ex. 15 to Aronoff Report at G:2-G:11, G:15, G:17-19; *id.* G:24-25, G:2839, G:12121; *id. et al.* Moreover, Mr. Aronoff admitted that he did not view any information about the loan beyond the facts underlying the alleged breach as relevant to the AMA determination. Ex. 3 at 230:2-16 (Aronoff Tr.). This is not the individualized assessment the Trustees were obligated to perform. *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2*, 2015 WL 764665, at *10.

In short, even if the Trustees' burden were to be limited to meeting the MLSAAs' requirements for repurchase, they have failed to meet that burden in two very significant respects, taking positions for which they can find no support in the case law.

### 2. *The Trustees' Position That They Need Not Prove AMA Connected To Actual Loss Is Mistaken.*

Although for all the reasons discussed above the Court need not reach the parties' dispute over *how* to measure AMA, it is worth pointing out that the position the Trustees have taken on this issue is inconsistent with the plain language of the contracts. According to the Trustees, the AMA (what they call "materiality") standard "is met when the related Breach Finding identifies that the deviation of the actual loan characteristics from the characteristics that the loan was represented to have significantly increases the risk of loss of such loan." Aronoff Report at 39-40. The Trustees' experts seem to draw this standard—inappropriately—from case law that largely addresses repurchase claims by monoline insurers, whose claims are governed not only

by repurchase agreements, but by New York insurance law.  *See, e.g.*, *Syncora Guarantee Inc.*, 874 F. Supp. 2d 328, 339 (S.D.N.Y. 2012).  In that context, increased risk of loss may be used to prove AMA because insurers receive the benefit of New York insurance law.  *See id.* at 334 ("New York law provides that an insurer has an interest in receiving complete and accurate information before deciding whether to issue a policy.") (citing *Lin v. Metro. Life Ins. Co.*, No. 07-cv-3218, 2009 WL 806572, at *1 (S.D.N.Y. Mar. 30, 2009); N.Y. Ins. Law § 3105(a)).

It is incompatible with the language of the AMA to conclude even a "significant increased risk of loss" caused by a breach is sufficient to prove that the breach "adversely and materially affects the value of the loan and the interests of the certificateholders therein."  The result would be that *every* meaningful, adverse breach would be considered result in a significant increased risk of loss, as the Trustees asserted here.  There would be no need for a separate AMA determination, which is compelled both by the language and the structure of the provisions.  Indeed, while the Trustees claimed to be evaluating AMA based on "*ex ante*" increase in the risk of loss, and while they acknowledge that every loan has a baseline risk of loss (Ex. 3 at 46:3-11 (Aronoff Tr.)), they made no efforts to quantify either that baseline risk of loss to determine whether the alleged breach significantly increased it.  Thus, even in the non-monoline put-back context, some courts recognize that a plaintiff must prove actual loss in loan value, not just an increased risk of loss that has yet to actualize.  *See, e.g.*, *LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.*, No. 01-cv-4389 (AGS), 2002 WL 181703, at *4-5 (S.D.N.Y. Feb. 5, 2002) ("loss of the franchise was at least a partial cause of Gem's eventual default on the loan" and that the breach "contributed to the loss of the Holiday Inn franchise, . . . [and] that failure contributed to the default on the mortgage loan"); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08-cv-8426 (WHP), 2011 WL 4943341, at *1-3 (S.D.N.Y. Oct. 17, 2011) (individually

analyzing each alleged breach for AMA and finding that AMA requires a fact-specific determination as to what caused the loss, not just an opinion or argument that the breach increased the risk of loss); *W. & S. Life Ins. Co. v. Bank of N.Y. Mellon*, No. A1302490, 2017 WL 3392855, at *12 (Ohio Ct. Com. Pl. Aug. 4, 2017) (plaintiffs did not prove material and adverse effect because their expert "never determined, or sought to determine, whether any alleged breach caused or did not cause a default, or had or could have had any impact on loan performance.").

## III.    THE TRUSTEES' KEY BREACH CLAIMS CONTAIN FUNDAMENTAL AND PERVASIVE FLAWS.

To meet their burden to prove breaches of the representations and warranties under the MLSAAs, the Trustees need to show a loan defect ("Threshold Fact") that constitutes a breach of at least one representation and warranty ("Representation") in the applicable Governing Agreements for that Trust.  June 1, 2017 Expert Report of Charles H. Grice ("Grice Report") at ¶¶ 23-25.  The review of a loan file to determine whether Threshold Facts supporting a breach claim exist require a review of the whole loan file, taking into account the "total mix" of information relevant to the claim.  *UBS*, 205 F. Supp. 3d at 446, 487.  A review of a mortgage loan file for potential breaches may also involve a review of documents that are related to the original transaction or its deposit into a trust, such as the applicable underwriting guidelines. Grice Report at ¶ 24.

Importantly, the underlying Threshold Fact must actually constitute a breach of a Representation in the Governing Agreements.  In other words, it is not enough to simply show an underwriting defect; that defect must constitute a breach of a contractual provision.  This requirement is even more important in cases like this one, where many of the claims are based upon "borrower misrepresentations," rather than violations of underwriting guidelines, and

where even similar Representations across deals may have materially different permutations in

the Governing Agreements.  For example, certain "DTI" warranties in the Governing

Agreements have a 60% DTI threshold, while others have a 66% threshold.  Grice Report App'x

D at 1.  Indeed, some Representations only apply to loans in certain "pools," and not to all the

loans covered by that transaction.  Grice Report at ¶¶ 68, 128.

### A.    The Trustees' Loan Review Process Was Unreliable, Which Renders Their Estimated Claim Value Equally Unreliable.

The Protocol was designed as an attempt to allow the parties to work through, in good

faith, many thousands of claims on a loan-by-loan basis.  Ex. 4 at 351:10-20; 370:7-13 (Dec. 10,

2014 Hr'g).  The Protocol required the Trustees to gather the necessary loan files, analyze them,

and present to the Plan Administrator, among other things:

- The Mortgage Loan File, including, at a minimum, all of the loan documents the RMBS Trustees received from the applicable master servicer, primary servicer and/or any other party, or otherwise relied upon in making their claim, which may include the documentation identified in Exhibit B, to the extent such documentation is available and applicable to a particular loan file; and
- A statement describing either (i) the specific alleged defect and the representation or warranty violated by the alleged defect, together with all supporting documentation thereof, or (ii) the specific document that is allegedly missing which gives rise to the document defect claim.

Ex. 1 at Ex. A, § III.e.vi.1, 2 (Protocol Order).  The intent of this process was to generate enough

information about the claim that the Plan Administrator would be able to confirm the existence

of a valid claim.

Unfortunately, the Trustees' claims submissions rarely if ever provided the Plan

Administrator with enough information to evaluate the claim, requiring the Plan Administrator to

fully reevaluate every claim and every loan file.  The "Claim Package" and the statement of the

"Factual Basis for Breach Finding" presented by the Trustees included only the information they

believed supported their claims; they did not include or explain information in the file that might

contradict their breach assertions.  Ex. 15 of Aronoff Report.  For example, if a borrower

represented income of $5,000 per month, but, in a bankruptcy petition from several years later,

the borrower represented their income as $3,000 per month, the Trustees would assert a

Misrepresentation of Income Claim even if other documents in the file confirmed the borrower's

income was $5,000 per month.  Grice Report at ¶¶ 107-112.  Even though the Protocol required

the Trustees to provide "all of the loan documents the RMBS Trustees received from  . . . any

other party," to the extent the Trustees collected information from third-party sources that did not

support their claims, they ***purposefully*** did not provide it to the Plan Administrator.  Ex. 1 at Ex.

A, § III.e.vi.1 (Protocol Order); Ex. 3 at 83:16-85:9 (Aronoff Tr.).  And, as discussed in more

detail below, even though the Plan Administrator made clear to the Trustees that it could not

adequately evaluate their claims without certain kinds of data that should have been accessible,

the Trustees submitted tens of thousands of claims to the Protocol without the requisite

information.  Grice Report at ¶ 54.

The loan review process itself was not structured in a way that would yield reliable

results.  To conduct their loan review, the Trustees retained Duff & Phelps (D&P), with Mr.

Aronoff as "the boss," to supervise five different loan review firms in a review of 205,000 loan

files.  Ex. 3 at 63:5-12 (Aronoff Tr.); Aronoff Report at 12-14.  D&P did not provide the review

firms with a uniform set of written guidelines.  Ex. 3 at 73:8-21 (Aronoff Tr.).  The loan review

firms' mandate was to identify facts in the loan file or from certain third-party sources—often a

single document or fact—that tended to support the existence of an underwriting defect or

increase the credit risk for the lender.  Ex. 3 at 82:22-83:8 (Aronoff Tr.); Grice Reply at ¶¶ 20,

40-41.  For example, over 20% of the at-issue breach claims are based on the absence or

incompleteness of a document in the loan file—ten years after the fact.  Aronoff Report at

Exhibit 15.  The loan review firms then categorized these findings as one or more of certain

types of breaches ("Breach Types"), such as misrepresentation of income, and "mapped" these

breach types to representations and warranties on a bulk basis, based on mapping data provided

by D&P.  Ex. 3 at 87:10-88:13 (Aronoff Tr.); Ex. 6 at 88:3-10, 89:3-92:20 (Esses Tr.).

        As Mr. Charles Grice, a reunderwriting expert, will describe, the Trustees' review

contained a startling frequency of basic errors that calls into question Mr. Aronoff's ability to

rely on the results of it for proof of any of his breach claims.  For example, the Trustees provided

the claim packages required under the Protocol for hundreds of borrowers incorrectly; often

confusing borrowers with their relatives or persons with the same name or submitting claim

packages for a completely different loan for a borrower not subject to the Protocol.  Grice Report

at ¶ 89.  The Trustees also frequently failed to verify that the loan was actually in the pool that

applied to the Representation they were making the claim under, making their claim on that loan

invalid.[10]  Even after learning of the Plan Administrator's discovery of this issue, the Trustees

continued to submit claims with erroneous pool designations without correcting the flaw in their

review process.  These errors show fundamental flaws in the review and submission process that

likely infected the entire process.  Grice Report at ¶ 159.

        Perhaps the best evidence that their loan review process was flawed is that *the Trustees
have declined to pursue 40% of the breach claims they asserted during the Protocol*, which

they say were subject to the same multi-step quality control process supervised by Mr. Aronoff

as the loans that remain to be adjudicated.  Nowhere in his Opening Report does Mr. Aronoff,

who "opined" that the Trustees met their burden for each loan they are pursuing at the Estimation

---

[10] For a large portion of the Trusts with a DTI representation relied upon by the Trustees, the representation is
limited to certain loan pools. The excessive DTI representation is limited to Pool 2 loans in the following trusts:
LXS 2005-8; LXS 2005-10; LXS 2006-1; LXS 2006-3; LXS 2006-5; LXS 2006-7; LXS 2006-8; LXS 2006-11. The
excessive DTI representation is limited to Pool 3 loans in the following trusts: LXS 2005-1; LXS 2005-6.

Proceeding, mention that the Trustees simply abandoned 40% of their breach claims.[11]  Aronoff

Report at 2 ("In my opinion, for each of the loans identified on Exhibit 1 (the "Mortgage

Loans"), there are one or more breaches of the representations and warranties made by Lehman

with respect to such Mortgage Loans, and each such breach meets the Materiality Standard—

materially and adversely affected the value of the loan and/or the interests of the

certificateholders.").

        The Trustees have taken the position that the basis for the decision to withdraw these

claims from the Estimation Proceeding is privileged.  Ex. 3 at 170:17-173:16 (Aronoff Tr.).

Their witnesses have testified that they do not know why the claims were withdrawn.  Ex. 3 at

169:20-175:13 (Aronoff Tr.); Ex. 6 at 133:9-13 (Esses Tr.).  Most critically, to the extent any of

their witnesses will opine on the reliability of the Trustees' loan review process, the Trustees

have limited that testimony to the loans they argue are still at issue.  Ex. 3 at 288:20-25 (Aronoff

Tr.).  In other words, the Trustees will not present a single witness at trial who will be able to

testify about the process that led to the submission of the original claims to the Protocol, because

the Trustees have walled off 40% of their original breach claims.  Unfortunately, the Plan

Administrator had to waste significant time and limited resources reviewing and analyzing those

claims.

        Mr. Grice, on the other hand, conducted an extensive independent business process audit

of the Protocol to determine the validity of the Plan Administrator's and Trustees' loan

reviews.  Grice Report at ¶¶ 21, 27.  Mr. Grice analyzed a subset of 1,879 breach claims and

---

[11] The number of breach claims and loans at issue also has decreased due to (1) the Trustees' decision in October to drop approximately 1,150 claims based on the failure to obtain title insurance; (2) additional Trust collapses and terminations; (3) the withdrawal of one Trust from the estimation proceeding; and (4) liquidation without a loss of active loans on which claims had been submitted for the full Purchase Price.  Cornell Reply ¶ 11; Ex. 16 (Letter from M. Shuster to T. Cosenza, dated October 2, 2017).

assessed the Trustees' claims, the Plan Administrator's Responses, and the sufficiency of the evidence in the context of the whole loan file.  Grice Report at ¶ 83; Ex. 17 at 166:24-167:3 (Oct. 12, 2017 Deposition Transcript of Charles H. Grice ("Grice Tr.")).  Based on this review, Mr. Grice opined that "the Plan Administrator's process for reviewing the Disputed Breach Claims was constructed to maximize the likelihood that the Plan Administrator would reach the appropriate result on the Disputed Breach Claims."  Grice Report at ¶ 21.  Conversely, Mr. Grice observed "fundamental and significant deficiencies" in the Trustees' process, such that it would "tend to produce results that are not reliable."  Grice Report at ¶ 21.

In response to Mr. Grice, Mr. Aronoff in his Rebuttal Report reviewed the loans Mr. Grice reviewed in the Grice Report.  *See* Exhibit 1 to Aronoff Rebuttal.  Contrary to his initial "opinion" that every single one of the breach claims on the 77,000 claims then at issue was valid (Aronoff Report at 2), Mr. Aronoff concluded that he disagreed with the Trustees on approximately 99 of the 1,879 claims Mr. Grice reviewed.  Aronoff Reply at ¶ 15; Grice Report at ¶ 83.  An inspection of Mr. Aronoff's reasons to support the Trustees' position on the bulk of the claims shows he was forced to cite new evidence or theories to do so.  Grice Reply at ¶ 57.

In a related attempt to buttress the deficient breach review under the Protocol, the Trustees also conducted a thinly-veiled sampling review under the auspices of Mr. J.F. Morrow.  Although Mr. Morrow claims that his review was performed in connection with an evaluation of the Trustees' process, his review was confined to a "representative" sample of breaches drawn *only* from the claims submitted as part of Mr. Aronoff's report.  Morrow Rebuttal at ¶ 2.  In other words, Mr. Morrow's review only involved the subset of loans and breach claims that the Trustees decided not to withdraw.  Without selecting his sample from all of the breach claims submitted to the Protocol, Mr. Morrow has no basis to address the process as a whole.

Moreover, Mr. Morrow largely focuses his review on confirming the breach claim as stated by

the Trustees in the Protocol, rather than *de novo* review of the loan files.  Grice Reply at ¶ 61;

*See* Morrow Rebuttal at Ex. D.  In any event, Mr. Grice also reviewed Mr. Morrow's Breach

Findings and concluded that they suffered from the same flaws as the Trustees' original

submissions.  Grice Reply at ¶¶ 59-62.  Mr. Grice identified only 42 of Mr. Morrow's 804

Breach Findings as requiring further review by the Plan Administrator, a rate of 5.2% that

essentially matched the rate when he was conducting his audit.  Grice Reply at ¶ 63.

### B.    Each Category Of The Trustees' Claims Suffers From Fundamental Flaws.

The Trustees' breach claims fall into five major categories.  Grice Report at ¶ 82.  First

are claims that the borrower misrepresented certain facts, such as income, debt, employment, or

occupancy, on their loan application ("Misrepresentation Claims").  Second are claims that

wholly or largely depend on the absence or lack of completeness of a document in the loan files

(the "Missing Documents Claims").  Third are claims that allege a failure to disclose, under-

disclosure of fees or some other violation relating to fees and charges to the borrower (the

"Regulatory Claims").  Fourth are claims relating to defects or deficiencies in the loan

underwriting or origination process (the "Underwriting Claims").  A fifth broad category of

claims, involve differences between the information reported on the Mortgage Loan Schedule for

the RMBS deal and the information contained in the loan file ("Mortgage Loan Schedule

Claims").  As the Plan Administrator concluded in the Protocol, and will be confirmed at trial,

the claims that the Trustees submitted to the Protocol were fundamentally flawed, and they failed

to satisfy their burden on the vast majority of claims they submitted.  Grice Report at ¶ 21.

1.    ***The Evidence Supporting The Misrepresentation Claims Was Largely Unreliable And Insufficient.***

The Trustees are pursuing over 70,000 Misrepresentation and Excessive DTI Claims. September 28, 2017 Amended Reply Report of Bradford Cornell ("Cornell Amended Reply") at Ex. E.  A Misrepresentation Claim is a claim that the borrower misrepresented certain facts, typically their income, debts, occupancy, or employment status.  Although the Trustees cited a variety of representations and warranties as having been breached by the Misrepresentation Claims during the Protocol, as part of this proceeding, they principally cite two:  the No Default Representation and/or the No Fraud Representation.  Grice Report at ¶¶ 80-81.

To prove a breach of these representations, the Trustees often cited a single, uncorroborated document that suggested that there was a misstatement on the borrower's loan application.  Grice Report at ¶ 123.  Moreover, although presented as "misrepresentation claims," the Trustees did not distinguish in their claim presentations between intentional and unintentional misrepresentations, and did not require the loan reviewers to assess whether the misrepresentation being asserted was intentional.  Ex. 3 at 212:15-213:4 (Aronoff Tr.).

As Mr. Grice concluded, there are several reasons why this type of review was highly unlikely to result in conclusive evidence of borrower misrepresentations, especially given that nearly a decade has elapsed between the first time the Trustees looked at these loan files and their origination.  Grice Reply at ¶¶ 64-66.

First, many of the loan file documents and third-party sources relied upon by the Trustees suffered from general reliability problems, problems with the specific document cited by the Trustees, or both.  For example, bankruptcy documents, a source cited for 6,177 of Mr. Aronoff's Breach Findings on Misrepresentation of Income alone (Aronoff Report at 45), are usually drafted by borrowers at a point in time when they are in financial distress and either have

an incentive to minimize or downplay their income, or simply reflect circumstances subsequent

to a borrower's suffering life events that have left them in financial disarray. *UBS*, 205 F. Supp.

3d at 446, 476 (holding statements in bankruptcy documents are "properly considered as part of

the total mix of information" in assessing an alleged borrower misrepresentation only when such

statements "[are] consistent with additional relevant evidence").  As another example, the

Trustees often attempted to contact the borrower's current employer or former employer to

perform a verification of employment or income for the year of origination.  Often, the

information they received was incomplete, erroneous, or prepared by someone who would not

have access to the borrower's employment information.  Grice Report at ¶ 105.

Many documents relied upon by the Trustees did not even state income at origination, or

stated income for a borrower in a highly variable profession.  Grice Report at ¶ 104; *UBS*, 205 F.

Supp. 3d at 487, 509, 518-19 (questioning evidence of income misrepresentation where evidence

from a year other than origination or for a borrower in a job that relied on variable income

sources).  And thousands of the Trustees' claims rely on generalized salary statistics that do not

incorporate any information specific to the borrower.  *FTC v. Med. Billers Network, Inc.*, 543 F.

Supp. 2d 283, 305-06 (S.D.N.Y. 2008) ("[I]t borders on the fanciful to contend that [BLS]

statistics, which report the income of a broad category of 'Medical Records and Health

Information Technicians,'. . . provide a rational basis for estimating the earnings of freelance

home billers . . . ."); Grice Report at ¶ 104.  Although Mr. Grice would not disregard the use of

those types of sources entirely, he will testify that these sources cannot support a

misrepresentation breach without the presence of borrower-specific evidence that tends to

support the misrepresentation.  Grice Rebuttal at ¶ 42.

For many other claims reviewed by Mr. Grice, the Trustees failed to address or discuss contradictory evidence in the loan files that would have explained the inconsistency. Grice Report at ¶¶ 107-112. There are instances where the Trustees alleged that a borrower misstated their occupancy with evidence that the borrower had a different mailing address, but ignored evidence in the file where the borrower's mailing address was the same as the property underlying the loan; or where a borrower's income was alleged to be misrepresented, but the Trustees failed to acknowledge evidence in the loan file that explained the reason for this variance, such as death, medical issues, or variability in the income of certain professions, like real estate brokers or construction workers. Grice Report at ¶ 104. Mr. Grice's testimony will show why the presence of these errors indicates a review process with a low likelihood of producing valid claims. Grice Report at ¶¶ 21, 86.

### a.      *No Fraud and No Default.*

During the Protocol, the Trustees' cited violations of the No Default and No Fraud representations on nearly every Misrepresentation Claim. The No Default representation itself does not reference borrower misrepresentations:

> There is no default (other than delinquency in payment), breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and neither the Seller nor its predecessors has waived any default, breach, violation or event of acceleration."

*See, e.g.*, Ex. 18 at § 1.04(c)(vii) (SASCO 2006-S3 MLSAA). But the Trustees interpreted "default" to mean a form of default referenced in the underlying Deed of Trust, which commonly provides:

> Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially

> false, misleading, or inaccurate information or statements to Lender
> (or failed to provide Lender with material information) in
> connection with the Loan.

Ex. 36 (Deed of Trust § 8).  Courts in New York have found that the No Default representation

(and other representations and warranties in put-back cases) to be ambiguous, *Ambac Assur.*

*Corp. v. Countrywide Home Loans, Inc.*, 151 A.D.3d 83, 89 (N.Y. 1st Dep't 2017), and therefore

the Court may look to industry custom and practice to interpret it, *Last Time Beverage Corp. v.*

*F & V Distribution Co., LLC*, 98 A.D.3d 947, 951 (N.Y. 2d Dep't 2012).  Under this standard,

the Plan Administrator appropriately evaluated whether the borrower's misrepresentation was

"material"—in other words, whether it would have affected the underwriter's decision to extend

credit under the underlying guidelines, separately from the determination of AMA.  Grice

Rebuttal at ¶¶ 87-88.  *See UBS*, 205 F. Supp. 3d at 467 ("The 'Materially and Adversely Affects'

Requirement . . . Is Analyzed Separately from the Materiality Requirement Contained in

Individual Representations and Warranties.").  As part of this analysis, the Plan Administrator

examined whether the recalculated DTI was either within the DTI guidelines for the specific loan

product, or whether the recalculated DTI, along with certain "compensating factors," would have

likely resulted in the loan being issued on the same terms.  *See In re Erdheim*, 180 B.R. 42, 45

(Bankr. E.D.N.Y. 1995) ("A materially false statement is a statement that paints a substantially

untruthful picture of a financial condition by misrepresenting information of the type which

would normally effect the decision to grant credit.") (citation and internal quotation marks

omitted).  In their loan review and Protocol submissions, the Trustees conducted no separate

analysis of the materiality of the "default."  Ex. 3 at 229:15-230:16 (Aronoff Tr.).

A common form of the No Fraud Representation (which the Trustees call the "No Untrue

Statement Representation") provides:

> The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. To the best of the Seller's knowledge, no fraud was committed in connection with the origination of the Bank Originated Mortgage Loan.

*See, e.g.*, Ex. 18 at § 1.04(c)(v) (SASCO 2006-S3 MLSAA).  To demonstrate a breach of the No

Fraud Representation, the Plan Administrator required the Trustees to prove all the elements of

the representation:  an "untrue statement of material fact"; and "the Seller's knowledge."  Grice

Rebuttal at ¶ 87.  *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 47 A.D.3d 103,

105-06 (N.Y. 1st Dep't 2007) (warranty with language stating that "to the best of Seller's

knowledge" there was no misrepresentation, "Plaintiff had the burden of proving that defendants

*knew,* not merely that they *should have known* . . . .").  Mr. Aronoff  does not say if the Loan

Review Firms were instructed to, or look for, evidence of seller's knowledge.  *See, e.g.*, Aronoff

Report at 32; Aronoff Rebuttal ¶¶100-101; Aronoff Reply ¶ 37.

Instead, the Trustees assert that the seller's knowledge of the misrepresentation is not

required, because the Trustees were not attempting to prove "fraud," but only "inadvertent or

intentional" misrepresentations.  Aronoff Report at 34.  Mr. Aronoff, however, is unable to

explain the distinction.  Aronoff Rebuttal at Ex. 3 at 212:4-22 (Aronoff Tr.); *see FDIC v. U.S.

Mortg. Corp.*, 132 F. Supp. 3d 369, 382 (E.D.N.Y. 2015) ("Under New York law, a claim for

intentional misrepresentation is analytically identical to a claim for fraud.").  Furthermore, under

Mr. Aronoff's interpretation of the No Fraud Representation, it becomes largely

indistinguishable from the No Default Representation, violating the principle that each should be

construed to convey something different, if possible.  *See Bank of N.Y. Mellon v. WMC Mortg.,

LLC*, No. 12-cv-7096 (DLC), 2015 WL 4163343, at *3 (S.D.N.Y. July 10, 2015); *see also

Severstal U.S. Holdings, LLC v. RG Steel, LLC*, 865 F. Supp. 2d 430, 443 (S.D.N.Y. 2012).

34

## 2.    *The Trustees' Missing Documents Claims Should Be Valued At Zero.*

Over 20% of the Trustees' breach claims are that a document, such as an appraisal, a

HUD-1, or a credit report, was missing from the mortgage file they obtained from the servicer, or

was incomplete or unsigned.  Grice Report at ¶¶ 90-92; Cornell Amended Reply at Ex. E.  The

Trustees overwhelmingly failed to support these claims with any evidence beyond the fact that

the document was currently missing, an assertion that was repeatedly disproven by the Plan

Administrator.  Grice Report at ¶¶ 90-91, 146.  Aside from just finding the document in the file,

the Plan Administrator's review may have, for example, located a checklist showing the

document had been present at closing, or a check showing that a certain document fee was paid.

Grice Report at ¶ 91.

The Trustees also made no attempt to address the likelihood that the documents had been

discarded, lost, or misplaced over time.  Grice Report at ¶ 92.  *See Fed. Hous. Fin. Agency v.

Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 531-32 (S.D.N.Y. 2015) ("with the passage of

time, it is difficult to know how many documents were never part of the file and how many have

simply been lost.").  Despite supposedly undertaking "hundreds, if not thousands" of

communications with servicers (Ex. 6 at 183:13-20 (Esses Tr.)), there is no evidence that the

Trustees ever asked the servicers for additional information regarding their document retention

or deletion practices, whether the files were digitized post-origination,[12] made any attempt to

determine whether the file had been transferred among different servicers in the decade since

origination, or asked if the servicers maintained complete loan files for liquidated loans or

---

[12] For example, Judge Castel found that trustees may assert missing document claims upon a comprehensive record that the loan files "were digitized at the time of origination" and where the plaintiff asserted a document defect claim where a document was missing from each and every one of eight sets of loan files gathered from certificate insurers, servicers, custodians, and originators.  *UBS*, 205 F. Supp. 3d at 453; Ex. 19 at ¶¶ 6-9 (*UBS*, Baldwin Aff.).  The Trustees did nothing of the sort here.

documents that had long since exceeded statutory requirements. Grice Reply at ¶¶ 64-73.

Indeed, D&P apparently did not ask the Trustees to provide the Trustees' own copies of the loan

files (Ex. 6 at 231:24-232:10 (Esses Tr.); Ex. 3 at 99:11-20 (Aronoff Tr.)) or to provide copies of

the Initial and Final Certifications, which would have shown whether the Trustees themselves

failed to inventory many of these documents shortly after the loan files were delivered to them in

connection with the closing of the securitization. *See* Ex. 20 at 2.02(b)-(c) (TA, BNC 2006-1);

Ex. 1 at Ex. A, § III.e.vi.1. (Protocol Order); Ex. 6 at 233:3-9 (Esses Tr.).

As Mr. Grice will testify, after many years that could have involved moving the files,

accessing the files, imaging the files, etc., the mere absence of a document in the file is not

particularly probative of an argument that the item was never there. Grice Report at ¶¶ 26-27;

Grice Reply at ¶¶ 67-69, 73. Common sense suggests he is correct.

### 3.    *The Trustees' Regulatory Claims Are Unsupported.*

The Trustees press 3,001 claims that a lender under-disclosed or failed to disclose certain

fees to the borrower, the borrower was overcharged or unlawfully charged certain fees, or that

the loan violated federal or state statutory fee thresholds. Cornell Amended Reply at ¶ 46. This

category of breaches is rife with examples of the Trustees' fundamentally flawed review and

submission of claims. Grice Report at ¶¶ 140-44. One common mistake by the Trustees was to

claim that fees were improperly disclosed to the borrower where those fees were actually

permitted by the statute they cited. Grice Report at ¶ 141. The Trustees also often asserted a

Regulatory Claim merely upon discovery of facts suggesting a fee had been under-disclosed or

improperly charged. In many instances, they ignored evidence in the file that explained the

inconsistency, a highly problematic failing that was repeated across all claim types. *Id.* For

example, many Regulatory Claims were rejected by the Plan Administrator because, although the

Trustees alleged the borrowers were improperly charged certain fees, further examination of the

loan file uncovered documents confirming that the borrower had not paid, or been reimbursed for, those fees, thus rebutting the suggestion of any improper disclosure or charge. *Id.*

### 4. *The Trustees' Underwriting Claims Were Unsupported By A Review Of The Relevant Underwriting Guidelines.*

As of September 29, 2017, the Trustees maintained 3,655 claims involving allegations that the underwriting guidelines were not followed, or that the loan suffered from certain underwriting defects. Cornell Amended Reply at ¶ 49, Ex. E. (They later withdrew more than 1,000 of these claims.) For example, the Trustees alleged that the underwriter failed to verify or document the borrower's income, assets, or housing history, the LTV/CLTV ratio was too high, or the borrower's disposable income was insufficient to make payments. Grice Report at ¶ 125-33.

Notably, as Mr. Esses admitted, the Trustees failed to review these claims under the relevant underwriting guidelines. Ex. 6 at 267:25-270:25 (Esses Tr.); Grice Report at ¶¶ 126-28. This included instances where the Trustees used the wrong guidelines, did not even reference the underwriting guidelines, or a review of the correct guidelines revealed that the lender's or underwriter's conduct was proper. Grice Report at ¶ 126-28. Furthermore, many of the Underwriting Claims are premised on the absence of certain documents, for example, a document showing that the underwriter verified the borrower's assets or income, and thus fail for the same reasons as other Missing Documents Claims.

## IV. EVEN UNDER THEIR THEORY OF THEIR CLAIMS, THE TRUSTEES STILL HAVE NOT MET THEIR BURDEN TO QUANTIFY ALLEGED LOSSES.

The Trustees bear the burden of proving and quantifying their damages. *Sevenson Envtl. Servs., Inc. v. N.Y. State Thruway Auth.*, 149 Misc. 2d 268, 272 (N.Y. Ct. Cl. 1990) ("damages are not recoverable 'for loss beyond an amount that the evidence permits to be established with reasonable certainty'") (quoting Restatement (Second) of Contracts § 352); *see also Wolff &*

*Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1012 (2d Cir. 1991); *Ferro*

*Union, Inc. v. M/V TAMAMONTA*, 317 F. Supp. 2d 456, 461 (S.D.N.Y. 2004).  The Trustees

cannot discharge their burden to provide a reliable calculation of damages with respect to either

liquidated loans or non-liquidated loans.  For liquidated loans, the Trustees seek to recover

interest that is not required under the applicable agreements nor permissible under the

Bankruptcy Code, and offer the Court no evidence to determine how much of their alleged losses

are not attributable to interest.  For non-liquidated loans, the Trustees' overreach in attempting to

recover for loans that performed for years after the petition date (and in many instances continue

to perform), requires them to attempt to offset the Purchase Price by the value of each loan that

they continue to own.  However, the Trustees have not provided a reliable calculation of those

loans' value.  This failure of proof permits the Court to disallow all of their claims in full.[13]

> A.    **The Trustees' Inclusion Of Impermissible Interest In Their Calculation Of Alleged Losses On Liquidated Loans Permits Their Claim To Be Disallowed In Full.**

The Trustees intend to offer testimony from Dr. Karl Snow on the alleged losses suffered

by the Trusts.  For liquidated loans, Dr. Snow's "calculation" of damages consists of no more

than identifying the "realized loss" reported for each loan by the master servicer.  Dr. Snow does

not disentangle the components of the realized loss—which include unpaid principal balance,

*interest* and fees paid by the servicer—but identifies a single, aggregated number for all three.

The Trustees cannot recover such interest.  To the extent the claimed interest allegedly

accrued prepetition, it is not recoverable because the Trustees failed to provide the contractually

required notice of their claims.  In other words, even if a breach of a representation or warranty

giving rise to a subsequent default existed, the Trustees never sought Lehman's repurchase of the

---

[13] Mr. Esses also admitted during his deposition that the Trustees did not validate the loan servicers' calculations that comprised the claimed Purchase Price.  Ex. 6 at 217:21-220:9 (Esses Tr.).

underlying loans prior to the petition date, and no prepetition interest could be due. Further, it is well-settled that holders of claims are not entitled to receive postpetition interest on account of their claims under section 502(b)(2) of the Bankruptcy Code, except in cases that are not applicable here (such as solvent debtor cases or as oversecured creditors under section 506(b)).

Section 502(b)(2) provides in relevant part: "[T]he court, after notice and a hearing, shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . such claim is for unmatured interest." 11 U.S.C. § 502(b)(2); *see In re General Growth Props., Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011) (Judge Gropper). "[U]nmatured interest" is interest that "is not yet due and payable at the time the debtor filed its bankruptcy petition [i.e., here, the postpetition interest]." *In re Moore*, 307 B.R. 394, 397 (Bankr. S.D.N.Y. 2004) (Judge Morris). One primary purpose of the bar on postpetition interest is to avoid unfairness among competing creditors. *In re Nat'l Energy & Gas Transmission Inc. v. Liberty Elec. Power, LLC*, 492 F.3d 297, 302 (4th Cir. 2007). Thus, even when the underlying contract purports to entitle the holder of a claim to interest, unless another section of the Code permits the accrual of postpetition interest, such as section 506(b), the amount of a prepetition claim is fixed at the petition date and does not accrue interest thereafter.

For liquidated loans, the Trustees fail to identify the extent to which their claim consists of interest. At his deposition, Dr. Snow testified that he did not separate interest from the other components of the Purchase Price (Ex. 9 at 74:14-75:7; 77:19-79:17 (Snow Tr.)), although preliminary calculations by the Plan Administrator indicate that *as much as $1.8 billion of the approximately $9 billion sought by the Trustees* on liquidated loans could be attributable to interest. The Trustees' failure to provide evidence demonstrating what portion of the Purchase Price consists of impermissible interest constitutes a failure of proof that would permit their

claims on liquidated loans to be disallowed in full.  The Plan Administrator has asked the

Trustees to quantify this amount since the Snow deposition.  Despite being given the

opportunity, the Trustees have refused.

>   **B.**     **The LoanKinetics Calculation Of Estimated Market Value Of Active Loans Is Unreliable.**

To calculate the Purchase Price for non-liquidated loans, Dr. Snow again uses

information reported by the master servicer—here, broken out into its constituent parts of unpaid

principal balance, interest and fees.  However, because the trusts will keep these loans (and all

future cash flows and liquidation proceeds from them), Dr. Snow attempts to reduce the

calculated Purchase Price by an estimated value for each loan.  The estimated value of each loan

is provided by a second Trustee expert, Dr. Richard Ellson, who uses the LoanKinetics software

licensed from Andrew Davidson & Company for that calculation.

For these loans, the Trustees again seek interest on their alleged losses—here,

approximately $255 million.  This interest, which is attributable to loans that generally defaulted

well after the petition date, should be disallowed.  Moreover, the Trustees' calculation of alleged

losses on non-liquidated loans suffers from a second flaw, which renders the remainder of their

alleged damage unrecoverable: it is based on an unreliable calculation of the active loans' value.

The Trustees intend to offer evidence through Dr. Ellson, who utilizes the LoanKinetics

software, that these loans are worth on average approximately 72% of their par value.  However,

as the Court will hear at the Estimation Proceeding, Dr. Ellson cannot attest to the reliability or

accuracy of this valuation.  He played virtually no role in the modeling or testing of

LoanKinetics, has only a general understanding of how the software works, and he did not

conduct any analysis of the LoanKinetics results to determine that they were accurate.  Ex. 11 at

53:12-25; 55:10-57:15; 60:21-63:19; 64:23-65:20 (Ellson Tr.).

40

In fact, evidence of the unreliability of LoanKinetics was staring Dr. Ellson in the face

and he simply ignored it.  In April 2016, approximately fourteen months prior to the submission

of Dr. Ellson's report, the Trustees used LoanKinetics to attempt to value 20,719 non-liquidated

loans.  Between April 2016 and the issuance of Dr. Ellson's report in this case, 1,818 of those

loans liquidated.[14]  The total realized loss on those loans was only $244.7 million, whereas the

methodology employed by Drs. Snow and Ellson (substituting in the 2016 LoanKinetics results

and data on April 2016 Purchase Prices provided by the Trustees), would have yielded claimed

losses on those loans of $319.0 million.  Dr. Ellson testified at his deposition that he did not

perform this comparison—or indeed any comparison or analysis—to verify the accuracy of the

LoanKinetics results in his report.  Ex. 11 at 166:12-19 (Ellson Tr.).

The performance of the loans since the submission of Dr. Ellson's expert report also bear

out the unreliability of his calculations.  On June 1, 2017, when Dr. Ellson submitted his expert

report, there were 15,739 non-liquidated loans in the loan pool.  Since that date, 804 of those

15,739 loans have liquidated.  When Dr. Ellson's valuations on those 804 loans are translated

into Net Purchase Price calculations by Dr. Snow, it results in a calculation that exceeds actual

realized loss by 50%.  To place this in context, if the estimation hearing had taken place on June

1 and the Court had adopted the calculations of Dr. Ellson (and Dr. Snow, who relied on the data

from Dr. Ellson), the Trustees would have been allowed a claim of $144 million on loans that,

only months later, liquidated at a loss of only $94 million.  If we assume that Drs. Ellson and

Snow missed their mark by the same amount on the remainder of the non-liquidated loan pool,

the Trustees' claimed losses on the 15,754 non-liquidated loans decreases from approximately $3

---

[14] We use data reported through April 2017 because Dr. Ellson stated that April 2017 was "the latest date of the loan-level data available in [his] calculations…."  Ellson Report at ¶ 14.  We limit our analysis to loans for which the Trustees provided Purchase Prices in April 2016.

41

billion to approximately $1.5 billion.  This wide divergence from reality demonstrates that the

Trustees have failed to meet their burden to provide a reliable, non-speculative measure of loss

suffered by the Trusts on non-liquidated loans.

## V.    THE TRUSTEES FAILED TO PROVIDE REQUIRED DOCUMENTATION THE PLAN ADMINISTRATOR NEEDED TO PERFORM ITS REVIEW OF SOME OF THE DISPUTED MORTGAGE LOANS.

The evidence will show that the Trustees failed to submit critical documents required for

the Plan Administrator to evaluate 67,530 claims on 30,039 loans—the loss certification,

corporate expense log, servicing notes, and payment history, which are documents that are not

part of the origination file and documents that any prudent servicer should have.  The Trustees

have been on notice since at least 2015 that the Plan Administrator could not proceed with its

evaluation without these documents.  *See* Ex. 21 at 2 (Letter from T. Cosenza to Trustees'

Counsel, Apr. 16, 2015).  While they claimed to have made efforts to find them, it is unclear they

ever asked the servicers to generate those materials from their systems, and instead they took the

position—unsupported by the Protocol or the record—that no "specific document was required

to be produced."  Ex. 6 at 164:15-17 (Esses Tr.).

Contrary to the Trustees' assertion, the Protocol provides that the Trustees were required

to produce, to the extent available and applicable, 41 documents.  Ex. 1 at Ex. A, § III.e.vi.1, Ex.

B (Protocol Order).  After negotiations, the Plan Administrator agreed to a reasonable

compromise and offered to review the file if the Trustees produced only four categories of

documents—the loss certification, corporate expense log, servicing notes, and payment history.

Those documents were critical to evaluate AMA and damages.  In many cases, these documents

provide the only contemporaneous record of what occurred between origination and default, the

amount unpaid on the loan, and related facts.  For example, servicing notes reflect the history of

the loan, including summaries of servicer-borrower interactions reflecting life events affecting

the borrower and records of servicer action.  That history is crucial to an AMA determination, which requires consideration of the "total mix" of information relevant to a loan in order "to evaluate what was the more likely cause of any diminution in loan value."  *See* Castro Report at ¶¶ 104, 110; Grice Report at ¶ 55.  Along similar lines, the loss certification (which contains the primary servicer's final loss calculation) and corporate expense log (which reflects amounts incurred in servicing) are necessary to verify the Purchase Price that the Trustees claim as damages.  The reason is that Purchase Price is defined as (1) unpaid principal balance, (2) outstanding accrued interest, and (3) outstanding fees incurred in servicing the loan or pursuing remedies for default.  *See, e.g.* Ex. 22 at 25 (Trust Agreement for SASCO 2005-RF2) .  Without loss certifications, the Plan Administrator is unable to confirm that the Purchase Price is correct or assess whether the Trustees' damages claim includes interest that the Trustees are barred from recovering under the agreements and/or section 502(b) of the Bankruptcy Code.  *See* Ex. 23 at 187:2-11, 188:3-9 (Trumpp Tr.); Ex. 6 at 174:11-25 (Esses Tr.).

It is equally clear that the Trustees have been on notice since early 2015 that the Plan Administrator would not review files that were submitted without the Critical Documents.  Ex. 24 at (Letter from T. Cosenza to Trustees, Mar. 17, 2015); Ex. 25 at (Letter from Trustees to T. Cosenza, Mar. 25, 2015).  That point was made explicitly in the correspondence, which stated that LBHI put the Trustees on notice, and the Trustees responded that they "were in the process of providing such documentation."  *Id.*  The point was then repeated in notifications by the Plan Administrator and court conferences on September 17, 2015 and March 29, 2016.  Ex. 10 at 5:13-21, 17:22-18:4 (Sept. 17, 2015 Protocol Status Conference Tr.), Ex. 26 at 53:19-54:10 (Mar. 29, 2016 Status Conference Tr.); *see* Ex. 27 at ¶ 47 (Second Objection to Certain RMBS Trust Claims).  And the Trustees never sought relief from the Court from the obligation to

provide the Critical Documents or the Court's assistance in procuring them.  In fact, the Trustees

represented that they had "not had the need to seek the Court's assistance to compel

compliance." Ex. 25 at 4 (Letter from Trustees to T. Cosenza, Mar. 25, 2015).  The Trustees

never accepted the Plan Administrator's offers to help either.  Exs. 28, 29, 25 (Letter from T.

Cosenza to Trustees, dated March 17, 2016, Letter from T. Cosenza to RMBS Trustees, dated

July 30, 2015, Letter from Trustees to T. Cosenza, dated March 25, 2015); Ex. 4 at 340:7-9,

339:15-21, 357:21-23 (Dec. 10, 2014 Hr'g Tr.); Ex. 25 at 4 (Letter from Trustees to T. Cosenza,

Mar. 25, 2015).

## VI.    THE PLAN ADMINISTRATOR'S PROPOSED $2.38 BILLION ALLOWED CLAIM IS FAIR AND REASONABLE.

To date, the Plan Administrator has been able to approve breach claims on 1,261 loans,

with a Purchase Price of $301 million.  The Trustees complain bitterly that this corresponds to a

"breach rate" that somehow falls below "industry standards."  Aronoff Report at 24; Aronoff

Rebuttal at ¶ 75.  But calculation of a breach rate is entirely dependent on the pool from which

the rate is drawn (the denominator) and the quality of the breach claims (the numerator).  As

demonstrated above, and as will be further demonstrated at trial, the Trustees' assertions of

breach rate are purely a function of their decision to flood the Protocol with unsupported and

deficient claims.  As the RMBS Settlement Agreement permits, the Court certainly would be

justified in concluding that the Trustees have failed to establish any claims beyond those already

approved by the Plan Administrator.  Ex. 30 at § 3.02(c) (RMBS Settlement Agreement).

The Court also may conclude, for the reasons articulated by the Plan Administrator in

support of the RMBS Settlement Agreement, which the Court has already approved, that it can

estimate the Trustees' claim at $2.38 billion, consistent with LBHI's agreement to seek

estimation at that amount.  See Ex. 30 at Ex. B, § 3.02(a) (RMBS Settlement Agreement); Ex. 31

(Motion to Approve RMBS Settlement ("9019 Motion")); Ex. 32 (Order Approving RMBS

Settlement Agreement) (approving the RMBS Settlement Agreement as fair, in the best interests

of the creditors and reasonable, to eliminate future appeals and the attendant risk, cost and delay

that would be associated with appeals and achieve finality and certainty).  The Plan

Administrator will present evidence at the Estimation Proceeding of the reasonableness of an

estimation at $2.38 billion, as set forth below.

> **A.      The Settlement With The Institutional Investors.**

The reasonableness of LBHI's Proposed Allowed Claims is supported by the settlement

agreement it previously reached with the Institutional Investors.  The Plan Administrator and

Institutional Investors entered into a settlement agreement in October 2015, in which the

Covered Loan Claims and the Transferor Loan Claims would be settled for $2.44 billion.  Ex. 31

at ¶ 5 (9019 Motion).  This amount was the result of extensive negotiations between LBHI and

the Institutional Investors, a diverse group of 14 sophisticated financial institutions that own, or

are advisors to entities that own, Certificates with a face value of approximately $6.5 billion,

approximately 25% of the unpaid principal balance of the Trusts and 10% or more of the unpaid

principal balance of more than half of the 229 Trusts still at issue.  July 27, 2017 Expert Report

of Daniel R. Fischel ("Fischel Report") at ¶¶ 26, 28, 29.

Although the October 2015 settlement was not consummated, the Plan Administrator and

the Institutional Investors continued to negotiate and were able to get the Trustees to agree to the

settlement and estimation process now before the Court.  Given their large economic stake in the

Trusts, the Institutional Investors had a strong economic incentive to advocate for the best

possible outcome for the Trusts.  And, in support of the instant settlement process, the

Institutional Investors continue to "believe that the settlement sets out a fair and reasonable

method for fully and finally resolving the Trusts' RMBS claims without unnecessary cost,

expense, and delay, and therefore is in the best interest of the certificateholders in the Trusts."

Ex. 33 at ¶ 1 (Institutional Investors' Response in Support of the RMBS Settlement).  The

Institutional Investors' previous willingness to accept $2.44 billion in assessing the fairness and

reasonableness of LBHI's Proposed Allowed Claim provides significant support for the

estimation value sought by the Plan Administrator.  *Cf. In re Babcock & Wilcox Co.*, 274 B.R.

230 (Bankr. E.D. La. 2002) (considering other settlements by the Debtor).

### B.    Comparable Settlements Analysis.

Second, a comparison to recent settlements of comparable claims conducted by Professor

Daniel Fischel also supports LBHI's proposed allowed claim as reasonable, albeit at the high end

of the range of such settlements.  Professor Fischel compares two types of settlements of

comparable claims.  The first is "Large Trustee Settlements," which involve claims by trustees

that loans must be repurchased as a result of breaches of representations and warranties provided

in contracts under which the loans were sold to RMBS trusts.  Fischel Report at ¶ 35.  The Large

Trustee Settlements involve similar claims, legal issues, and macro-economic context, as well as

a large number of RMBS Trusts as in this estimation.  *Id.*  The second type of settlements

analyzed are residential mortgages or RMBS claims involving LBHI—one such settled class

action matter was located.  *Id.* at ¶ 36.

In his analysis, Professor Fischel compares the proposed allowed claim to the settlements

using the "Recovery Ratios."  *Id.* at ¶ 38.  The Recovery Ratios are determined by calculating

the ratio of the consideration of the settlements to the expected lifetime losses on the loans in the

trusts that were releasing claims.  *Id.* at n.69.  While recognizing that an exact comparison would

be difficult, Professor Fischel is able to reach certain conclusions based on the Recovery Ratios.

*Id.* at ¶¶ 42-45.

Professor Fischel finds that LBHI's proposed allowed claim is at the high end of the range of Recovery Ratios, whereas the Trustees' proposed allowed claim is far in excess of that range and has no relationship to the Recovery Ratios in the Comparable Settlements.  *Id.* at ¶ 45. LBHI's proposed allowed claim is approximately 11.2% of expected lifetime losses on the Covered Loans, which is substantially above the Recovery Ratios for the JPM (7.1%), Citigroup (8.3%) and ResCap settlements (6.9%), within the range for the Countrywide Settlement (7.9%-17.1%) and two percentage points below the ratio for the settlement relating to Washington Mutual (13.2%).  It is also substantially above the Recovery Ratio for the class action (0.6%). *Id.* To the contrary, the Trustees' damages claim here ($11.65 billion), ***is three times as high*** as the largest recovery rate implied by the settlements (55%).  *Id.* at ¶¶ 45-46.

The Court may consider Professor Fischel's analysis of comparable settlements in determining the fairness and reasonableness of LBHI's proposed allowed claims, particularly in the context of the RMBS Settlement Agreement.  *See In re Babcock & Wilcox Co.*, 274 B.R. at 256 ("the court, in determining whether [Debtor's] future estimation of tort liabilities was reasonable, can consider both settlements by [Debtor] and other case histories against other asbestos defendants as part of the grounds for its decision"); *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 93 (Bankr. W.D.N.C. 2014) ("Most prior asbestos estimations have used the debtor's pre-bankruptcy history of resolving claims through litigation and settlements to estimate claims in the subsequent bankruptcies."); *In re Specialty Prods. Holding Corp.*, No. 10-11779-JKF, 2013 WL 2177694, at *1 (Bankr. D. Del. May 20, 2013).  In fact, Exhibit G expressly allows the Court to consider this information. <u>Ex. 30</u> at Ex. G, III(ii-iii) (RMBS Settlement Agreement).  More generally, the Court has significant discretion to use whatever procedure and analytical methodology is best suited to the estimation task at hand.  *In re Chemtura Corp.*, 448

47

B.R. at 648-49.  The fact that LBHI's proposed allowed claim aligns far more closely with similar RMBS resolutions, including one of LBHI's prior settlements, than the Trustees' proposed allowed claim, is a strong indication that $2.38 billon is a fair and reasonable estimate of the allowed claim that should be fixed here.

> **C.    Rates Of Success Necessary To Prove Entitlement To Approximately $2.38 Billion.**

As further support of the reasonableness of the Plan Administrator's proposed allowed claim, Professor Bradford Cornell designed four scenarios demonstrating how often the Trustees need to succeed in order to achieve a total claim value of approximately $2.38 billion, applying the Purchase Price calculations provided by the Trustees' expert Dr. Karl Snow (the "Estimation Scenarios").  Cornell Amended Reply at ¶¶ 4-6.  Professor Cornell sorted the Trustees' breach claims into twelve claim categories, such as Misrepresentation of Income, Misrepresentation of Debt, Missing or Defective Documents, Excessive DTI, Misrepresentation of Occupancy, and Misrepresentation of Employment.  Professor Cornell then applied percentages that assumed certain levels of success by the Trustees for each type of breach claim.  *Id.* at ¶¶ 18-19.

Professor Cornell assumed that to meet their burden on an individual claim, the Trustees would have to overcome the Plan Administrator's defenses to the alleged breach, and the defense that the Trustees did not prove any alleged breach adversely and materially affects the value of the loan (the "AMA Defense").  For example, Professor Cornell assumed that 40% percent of the Trustees' Misrepresentation of Income claims would overcome breach defenses and 50% of those would overcome the AMA defense if the loan had fewer than 18 payments, but 15% if the loan had greater than 18 payments.  *Id.* at ¶ 24.  Professor Cornell also varied his Estimation Scenarios based on two dimensions—whether the Trustees could recover on non-liquidated loans and whether they could recover on loans unable to be reviewed during the Protocol because of

48

insufficient documentation.  Professor Cornell determined that under all but one scenario, the

Trustees' aggregate claim value would be under $2.38 billion, with only one slightly higher at

$2.5 billion.  *Id.* at Ex. I.

    **D.**    **Settlements of Collapsed Trusts**

    An additional, telling piece of evidence supporting the appropriateness of LBHI's

proposed allowed claim is that *the RMBS Trustees themselves* accept that value when they are

collapsing the Trusts in the course of the Trustees' ordinary business affairs.  As background, the

Trust agreements allow for specific procedures under which a master servicer can purchase the

underlying mortgage loans and terminate the relevant Trusts when the principal balance of the

mortgage loans in the Trusts is less than a specified amount.  Ex. 34 at ¶ 11 (Motion for

Approval of Stipulation and Agreed Order with NRZ Regarding Claims Settlement).  One

procedure is called a "clean-up call option," pursuant to which the master servicer may seek to

acquire from the Trust, *inter alia*, (i) the remaining unpaid principal balance plus unpaid interest

of the active mortgages in the Trust; and (ii) any other property in the Trust at the fair market

value determined by an independent appraiser mutually agreed upon by the master servicer and

the Trustee.  *Id.*  In this case, the "other property" held by the Trusts was the applicable Trustee's

claim for damages that is subject of this proceeding.

    The master servicers identified an appraiser, which the applicable Trustees approved, to

opine on the fair value of the subject trusts' claims.  *Id.* at ¶¶ 11-12.  The appraiser opined that

the value of the trusts' claims were either equal to or substantially less than the amounts (based

on what would have been their allocable share of the $2.38 billion) that the Plan Administrator

would request allowance for at the Estimation Hearing.  The applicable Trustees sold the trusts'

claims[15] to New Residential Investment Corp. ("NRZ"), using those values. *Id.* at ¶ 12. Since the "clean-up" calls were consummated, the Plan Administrator and NRZ have reached an agreement regarding the resolution of their disputes regarding those claims and specific Trusts, which the Court has approved. <u>Ex. 35</u> at 4-5 (Order Approving NRZ Settlement Agreement).

The Trustees' acceptance of these claims at or below what would have been their allocable share of the amount at which LBHI is seeking to estimate the claims here confirms that the Plan Administrator's proposed allowed claim of $2.38 billion is appropriate. Indeed, having signed off on the sale of these claims at the $2.38 billion level, one is hard pressed to understand how the Trustees would now argue here that a claim at that level is inadequate.

## CONCLUSION

WHEREFORE, the Plan Administrator submits that, if the Disputed Mortgage Loans were to be litigated, they would result in an Allowed Claim significantly lower than $2.38 billion (potentially less than $300 million). However, the Plan Administrator requests estimation in the amount of $2.38 billion given the Plan Administrator's belief that acceptance at this amount is in the best interests of its creditors. Wherefore, the Plan Administrator respectfully requests entry of an order estimating the Covered Loan Claims at an amount of $2.38 billion.

---

[15] The values were set, as follows: SARM 2004-5 Claims: $1,492,218.00; SASC 2003-17A Claims: $558,410.00; and SASC 2004-15 Claims: $97,484.00.

Dated: New York, New York
October 19, 2017

/s/ Benjamin P. McCallen
Todd G. Cosenza
Joseph G. Davis (*pro hac vice*)
Benjamin P. McCallen
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111

Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)
ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Telephone: (303) 945-7415
Facsimile: (303) 945-7468

*Attorneys for Debtors Lehman Brothers Holdings
Inc. and Certain of its Affiliates*