**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                              :
**In re**                                     :    **Chapter 11 Case. No.**
                                              :
                                              :
**LEHMAN BROTHERS HOLDINGS INC., et al., :**    **08-13555 (SCC)**
                                              :
                                              :
                          **Debtors.**        :    **(Jointly Administered)**
                                              :
---------------------------------------------------------------x


**RMBS TRUSTEES' PRE-TRIAL BRIEF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

EXHIBITS CITED ............................................................................................................... v

STATEMENT OF THE CASE ............................................................................................. 1

DISCUSSION ....................................................................................................................... 6

I.  LEHMAN MADE SWEEPING REPRESENTATIONS AND WARRANTIES .............. 6

    A.  Background .................................................................................................... 6

    B.  Three Representations and Warranties Underlie Tens of
        Thousands of Breach Findings ........................................................................ 8

        1.  The NUS and No Default Representations and Warranties ...................... 8

        2.  The DTI Representation and Warranty ................................................... 11

    C.  The Other Representations and Warranties ...................................................... 11

II.  THE TRUSTEES WILL PROVE WIDESPREAD BREACHES OF
    LEHMAN'S REPRESENTATIONS AND WARRANTIES ......................................... 12

    A.  The Trustees Provided Lehman Evidence of Breach that Went
        Largely Unrebutted ........................................................................................ 12

        3.  The Big Four: Income, Debt, Occupancy and DTI Breaches ..................... 12

        4.  The Trustees' Breach-by-Breach Proof .................................................. 13

        5.  Trustees' Proof of Income, Debt, DTI and Occupancy Breaches ............... 20

            (a) Income Misrepresentations ............................................................ 20

            (b) Misrepresentations of Debt .......................................................... 24

            (c) DTI Breaches ............................................................................. 27

            (d) Misrepresentations of Occupancy ................................................. 27

        6.  Other Breaches ..................................................................................... 29

    B.  Lehman Cannot Avoid the Trustees' Loan-Specific Evidence by
        Attacking the Trustees' Loan Review Process ................................................... 29

    C.  Lehman and Aurora Internal Documents Belie Lehman's and
        Mr. Grice's Miniscule Breach Acceptance Rates .............................................. 33

    D.  Mr. Morrow's Findings Corroborate Mr. Aronoff's Conclusions ...................... 34

III.  THE BREACHES MATERIALLY AND ADVERSELY AFFECT
    THE VALUE OF THE LOANS ................................................................................. 35

    A.  A Breach Materially and Adversely Affects the Value of a Loan
        if It Increases the Risk of Loss on that Loan ..................................................... 35

1.  Courts Are Clear that the Standard Is "Increased Risk of Loss" and
    that Loss Causation Is Not Required ............................................................... 35

2.  Lehman Has Consistently Applied this Standard When Pursuing
    Its Own Claims ............................................................................................... 37

3.  Loss Causation Is Not Required; In Fact, A Default Is
    Not Required at All .......................................................................................... 39

B.  Each of the Breaches Here Had a Material and Adverse Effect ........................... 41

IV. THE COURT SHOULD REJECT LEHMAN'S ARGUMENTS THAT
    ARE NOT BASED ON THE LOAN-BY-LOAN EVIDENCE ...................................... 42

V.  QUANTUM OF THE CLAIM .......................................................................................... 44

VI. THE TRUSTEES ARE ENTITLED TO RECOVER FOR
    THE "ON HOLD" LOANS ............................................................................................. 47

CONCLUSION ...................................................................................................................... 50

# TABLE OF AUTHORITIES

*Assured Guar. Mun. Corp. v. DB Structured Prod., Inc.*,
  44 Misc. 3d 1206(A) (Sup. Ct. N.Y. Cty. 2014).................................................................. 7

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
  892 F. Supp. 2d 596 (S.D.N.Y. 2012) ...................................................... 36, 37, 39

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
  920 F. Supp. 2d 475 (S.D.N.Y. 2013) .............................................................. *passim*

*Aurora Commercial Corp. v. Lenox Fin. Mortg. Corp.*,
  No. 1:13-CV-01489-AWI,2014 WL 4678285 (E.D. Cal. Sept. 19, 2014) ........................ 37, 38

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) ............................................................................. 32

*Boyce v. Soundview Tech. Grp., Inc.*,
  464 F.3d 376 (2d Cir. 2006) ............................................................................. 46

*Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prod., Inc.*,
  958 F. Supp. 2d 488 (S.D.N.Y. 2013) ............................................................... 45

*Deutsche Bank Nat'l Tr. Co. v. WMC Mortg., LLC*,
  No. 3:12-CV-1699 CSH, 2015 WL 1650835 (D. Conn. Apr. 14, 2015)................................... 6

*Deutsche Bank Nat'l Tr. Co. v. WMC Mortg.*, LLC,
  No. 12-CV-1699-CSH, 2015 WL 11237310 (D. Conn. July 6, 2015) ...................................... 6

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  104 F. Supp. 3d 441 (S.D.N.Y. 2015) ............................................................... 15, 34

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  No. 15-1872-CV, 2017 WL 4293322 (2nd Cir. Sept. 28, 2017) ........................................ 6, 15

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
  298 F.R.D. 116 (S.D.N.Y 2014) ............................................................................. 36

*In re 4Kids Entm't, Inc.*,
  463 B.R. 610, 681 (Bankr. S.D.N.Y. 2011)................................................................ 10

*In re Adelphia Recovery Tr.*, 634 F.3d 678, (2d Cir. 2011)............................................ 39

*In re Chateaugay Corp.*,
  944 F.2d 997 (2nd Cir. 1991) ............................................................................. 46

*Mapssy Int'l, Inc. v. Marc Gardner, Cinq, Ltd.*,
  No. 09-CV-8185 ALC, 2013 WL 395109 (S.D.N.Y. Feb. 1, 2013)........................................ 49

*MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Securities Inc.*,
  No. 12-cv-7322, 2015 WL797972 (S.D.N.Y. Feb. 25, 2015) ................................................ 36

*MASTR Adjustable Rate Mortgage Trust 2006-OA2 v. UBS Real Estate Securities Inc.*,
  No. 12-cv-7322, 2015 WL764665 (S.D.N.Y. Jan. 9, 2015) ................................................ 39

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
105 A.D. 3d 412 (1st Dep't 2013) ...................................................................... 39

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc., et al.*,
2012 WL 8024558 (N.Y. Sup.)........................................................................... 14

*Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*,
133 A.D.3d 96 (1st Dep't 2015) ................................................................ 7, 44, 45

*Resolution Trust Corp. v. Key Fin. Servs.*,
280 F.3d 12 (1st Cir. 2002)................................................................................. 36

*Syncora Guar. Inc. v. EMC Mortg. Corp.*,
874 F.Supp.2d 328 (S.D.N.Y. 2012) .............................................................. 36, 39

*U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*,
205 F. Supp. 3d 386 (S.D.N.Y. 2016) ......................................................... *passim*

*Wells Fargo Bank, N.A. v. Bank of Am., N.A.*,
No. 10 CIV. 9584 JPO, 2013 WL 1285289 (S.D.N.Y. Mar. 28, 2013)..................... 7

*Wells Fargo Bank, N.A. v. Bank of Am., N.A.*,
No. 10 CIV. 9584 JPO, 2013 WL 1285289, 627 F. App'x 27 (2d Cir. 2015)............ 7

*Wells Fargo Bank, N.A. v. JP Morgan Chase Bank, N.A.*,
No. 12 civ. 6168, 2014 WL1259630 (S.D.N.Y. Mar. 27, 2014) ............................ 36

*Wight v. BankAmerica Corp.*,
219 F.3d 79 (2d Cir. 2000) ................................................................................ 39

# EXHIBITS CITED

TRX 201, LXS 2006-15, Trust Agreement (Sept. 1, 2006).................................................. 6, 7, 49

TRX 202, SAS 2006-S3 TA (Aug. 1, 2006)............................................................... 40

TRX 231, LXS 2006-15 MLSAA (Sept. 1, 2006)............................................... *passim*

TRX 232, SAS 2006-S3 MLSAA (June 1, 2007)......................................................... 10

TRX 253, LXS 2007-11 (June 1, 2007)..................................................................... 10

TRX 254, SAS 2006-S4 MLSAA (Dec. 1, 2006)........................................................ 44

TRX 362, Deed of Trust, Loan XXXX1643............................................................... 10

TRX 366, Claim File, Loan XXXX6207................................................................ 23, 24

TRX 396, Occupancy Affidavit, Loan XXXX3408 .................................................. 27, 28

TRX 397, Mortgage, Loan XXXX7452 ................................................................... 26

TRX 450, Loan File, Loan XXXX1955 .................................................................... 22

TRX 563, App'x E, Expert Report of Charles H. Grice (June 1, 2017) ...................................... 33

TRX 570, App'x D, Expert Rebuttal of Charles H. Grice (July 27, 2017)...................... 23, 25, 28

TRX 579, Expert Report of Daniel R. Fischel (July 27, 2017) ............................................. 43

TRX 601, Expert Report of James H. Aronoff (June 1, 2017) ........................................... *passim*

TRX 619, Ex. 15, Expert Report of James H. Aronoff (June 1, 2017).............................. *passim*

TRX 625, Expert Rebuttal Report of James H. Aronoff (July 27, 2017) ....................... 15, 33, 48

TRX 631, Expert Reply Report of James H. Aronoff (Aug. 28, 2017) ...................................... 28

TRX 636 Rebuttal Expert Report of John Burnett (July 27, 2017) ............................................ 48

TRX 640, Expert Report of Richard W. Ellson, Ph. D. (June 1, 2017)...................................... 45

TRX 646, Reply Expert Report of Richard W. Ellson PhD (Aug. 28, 2017)............................... 46

TRX 648, App'x B, Reply Expert Report of
  Richard W. Ellson, Ph.D (Aug. 28, 2017) .............................................................. 40

TRX 653, Rebuttal Expert Report of J.F. Morrow (July 27, 2017)................................. 34, 35, 48

TRX 657, Ex. D, Rebuttal Expert Report of J.F. Morrow (July 27, 2017)................................... 35

TRX 662, Report of Fiachra T. O'Driscoll, (June 1, 2017)............................................... 41

TRX 666, Rebuttal Report of Fiachra T. O'Driscoll (July 27, 2017)........................................ 40

TRX 670, Rebuttal Report of G. William Schwert, Ph.D. (July 27, 2017) ................................ 35

TRX 678, Expert Report of Robert S. Smith (Aug. 28, 2017) ............................................ 43

TRX 682, Expert Report of Karl N. Snow, PhD. (June 1, 2017) ............................... 44, 45, 47, 48

TRX 691, Expert Rebuttal Report of Karl N. Snow (July 27, 2017)...................................... 47, 48

TRX 701, Aurora, Master Servicing, Asset Risk Management,
Due Diligence Process Policy (May 11, 2012) ................................................... 48

TRX 703, Aurora, Master Servicing, Asset Risk Mgmt.,
Representations and Warranties Process (May 11, 2012) ................................... 7, 41

TRX 712, Decl. of Jeffrey Heston Gray,
*LBHI v. IZT Mortg., Inc.*, No. 09-4060, Dkt. 98-3, Ex. E (N.D. Cal. Mar. 21, 2011) ........ 16, 38

TRX 713, Decl. of Laura McCann, *Aurora Commercial Corp. v.*
*Lenox Financial Mortgage Corp.*, 1:13-cv-01489, Dkt. 54 (E.D. Cal. Feb. 3, 2014) ............. 38

TRX 715, Decl. of Robin Akell, *Lehman Bros. Holdings, Inc. v.*
*National Bank of Arkansa*s, 4:10-cv-02012, Dkt. 26-3 (E.D. Ark. Oct. 24, 2011) ................. 38

TRX 716, Decl. of Zachary Trumpp,
*LBHI v. Key Financial Corp.*, No. 8:09-cv-623, Dkt. 39 (M.D. Fla. March 12, 2010)............ 16

TRX 717, Decl. of John Baker, *Lehman Bros. Holdings, Inc. v. PMC Bancorp*,
2:10-cv-07207, Dkt. 76-1 (C.D. Cal. Jan. 13, 2012).................................................... 38

TRX 726, Decl. of Zachary Trumpp, Dkt. 24255 (Jan. 12, 2012)............................................... 34

TRX 734, Decl. of Zachary Trumpp, *LBHI v. Ires Co.*,
No. 09-cv-00135, Dkt. 15-12 (C.D. Cal. June 29, 2009)............................................... 16, 18, 19

TRX 738, Decl. of Zachary Trumpp, *LBHI v. Inter Mountain Mortg.*,
No. 09-3255, Dkt. 25-8, Ex. F (C.D. Cal. Nov. 13, 2009)........................................... 17

TRX 740, Am. Decl. of Zachary Trumpp, *LBHI v.*
*Home Capital Funding*, No. 09-0859, Dkt. 11-8, Ex. F (S.D. Cal. Jan. 19, 2010)................. 17

TRX 752, Resp. to Def.'s Mot. in Limine to Exclude Evidence of
Daniel McDowell's 2006 Tax Returns and Evidence not Provided in Discovery,
*LBHI v. CMG Mortg.*, No. 10-00402, Dkt. 68 (N.D. Cal. Mar. 11, 2011) .............................. 16

TRX 757, Decl. of John Baker, *LBHI v. IZT Mortg., Inc.*, No. 09-4060,
Dkt. 60-2, Ex. E (N.D. Cal. Mar. 21, 2011)); ............................................................... 16

TRX 758, Decl. of John Baker, *LBHI v.Evergreen Moneysource Mortg. Co.*,
No. 10-cv-0172, Dkt. 29 (W.D. Wash. Mar. 31, 2011) ............................................ 16

TRX 767, Email from D. Kritikos to J. Goodman (Jan. 30, 2007)............................................... 33

TRX 768, Email from R. McKinney to T. Wind (Feb. 12, 2007) ................................................ 33

TRX 769, Lehman Brothers, "Risk Review *Aurora and BNC*" (Feb. 2007)................................ 34

TRX 771, Aurora Loan Services, Presentation to U.S. S.E.C. (Feb. 6–7, 2007) ........................ 12

TRX 807, Ex. G, Settlement Agreement, Dkt. 55232 (Apr. 27, 2017) ..................................... 14, 43

TRX 831, Protocol Order, Dkt. 47569 (Dec. 29, 2014)........................................................... 13, 49

TRX 841, Protocol Hr'g Tr., Dkt. 49007 (Dec. 10, 2014)....................................................... 49, 50

TRX 842, Hr'g Tr. Dkt. 18251 (Jun. 30, 2011) ...................................................................... 41

TRX 856, Aff. of Allen Pfeiffer, Dkt. 53731 (Sept. 29, 2016)............................................... 48, 50

TRX 857, Response of the RMBS Trustees to Leman Brothers Holdings Inc.'s
Second Objection to Certain RMBS Trust Claims and Motion
to Disallow and Expunge Certain RMBS Trust Claims for Insufficient
Documentation, Dkt. 53730 (Sept. 29, 2016) ............................................ 47, 49, 50

TRX 862, Aff. of Edmond Esses, Dkt. 53732 (Sept. 29, 2016) ............................. 49, 50

TRX 863, The RMBS Trustees' Estimation Motion, Dkt. 46078 (Aug. 22, 2014)..................... 34

TRX 872, Decl. of Craig Pino, Dkt. 47187 (Dec. 3, 2014) ..................................... 30, 34

TRX 876, Lehman Cross-Motion, Dkt. 46526 (Oct. 15, 2014) ............................... 41, 43

TRX 878, Protocol Mot., Ex C, Dkt. 46526-3 ............................................................ 49

TRX 884, Decl. of Zachary Trumpp, Dkt. 55692 (June 30, 2017)............................... 43

TRX 896, Letter from T. Cosenza to M. Shuster (Aug. 15, 2017) ............................ 46

TRX 921, Expert Report of Daniel I. Castro (June 1, 2017) ................................. 40, 48

TRX 922, Rebuttal Report of Daniel I. Castro Jr. (July 27, 2017) ................................. 40–41, 46

TRX 927, Decl. of Zachary Trumpp, *Aurora Loan Servs., LLC v.
Dream House Mortg. Corp.*, C.A. No. 07-441-ML, Dkt. 37-3 (D.R.I. Oct. 30, 2009) ........... 38

TRX 929, Decl. of Zachary Trumpp, *Lehman Brothers Holdings, Inc. v.
Mortg. Partners, Inc.*, No. 09-01233, Dkt. 23 (S.D. Cal. Sept. 13, 2010).............................. 38

TRX 931, Attach. to Mot. to Dismiss Pl.'s Second Compl., *Aurora Comm. Corp. v.
Std. Pac. Mortg., Inc.*, No. 12-cv-03138, Dkt. 32-2 (D. Colo. July 15, 2013) ........................ 16

TRX 934, Decl. of Zachary Trumpp, *LBHI v. Belvidere Networking Enter.*,
No. 09-9531, Dkt. 11-9, Ex. F (C.D. Cal. Mar. 26, 2010) ....................................... 17

TRX 939, Expert Report of Bradford Cornell (June 1, 2017) ............................... 45, 47

TRX 945, Expert Report of Charles H. Grice (June 1, 2017)............................... *passim*

TRX 948, Expert Rebuttal of Charles H. Grice (July 27, 2017)........................... 11, 33

TRX 950, App'x D, Updated Reply Report of Charles H. Grice (Sept. 1, 2017) ................ 21, 22

TRX 971, Dep. of Zachary Trumpp (Oct. 5, 2017) ................................... 15, 33, 41, 49

TRX 973, Dep. of Bradford Cornell (Oct. 8, 2017)............................................... 43, 48

TRX 974, Dep. of Justin McCrary (Oct. 9, 2017) ..................................................... 30

TRX 976, Dep. of Charles Grice (Oct. 12, 2017)............................................... *passim*

TRX 1003, Decl. of John Baker, *LBHI v. Universal Am. Mortg. Co.*,
No. 11-20859, Dkt. 61-12, Ex. 46 (S.D. Fla. Oct. 15, 2012)................................. 16

TRX 1008, Aff. of Scot Osborn, *LBHI v. Residential Plus Mort. Corp.*,
No. 1:12-cv-05185, Dkt. 12-1 (N.D. Ill. Dec. 14, 2012) ..................................... 16

TRX 1009, Aff. of Scot Osborn, *LBHI v. Residential Plus Mort. Corp.*,
No. 1:12-cv-05185, Dkt. 12-5, Ex. D (N.D. Ill. Dec. 14, 2012)............................... 16

TRX, 1011, Complaint, *LBHI v. Seattle Mortg. Co.*,
  No. 13-00725, Dkt. 3 (D. Colo. Mar. 20, 2013) ...................................................................... 17

TRX 1020, Aff. of Zachary Trumpp, *LBHI v. Wausau Mortg. Co.*,
  No. 10-00924, Dkt. 21-7, Ex. F (N.D. Cal. July 13, 2010)....................................................... 16

TRX 1021, Ex. B, Decl. of Zachary Trumpp, *LBHI v. Key Financial Corp.*,
  No. 8:09-cv-623, Dkt. 39-2 (M.D. Fla. March 12, 2010) ......................................................... 10

TRX 1182, United States, *The Financial Crisis Inquiry Report* (January 2011) ....................... 34

TRX 1254, Mortg. Asset Research Inst., "Eighth Periodic Mortgage Fraud Case
  Report to Mortgage Bankers Association" (Apr. 2006) ............................................................ 37

## STATEMENT OF THE CASE

The Trustees' claims arise out of straightforward breaches of contract.  From 2002 to 2007 Lehman securitized hundreds of thousands of loans into residential mortgage-backed securities ("RMBS").  The Trustees allege Lehman breached representations and warranties that it made concerning the quality and characteristics of tens of thousands of those loans.  The evidence of these breaches is overwhelming and largely unrebutted.  The Trustees are entitled to the monetary equivalent of their contractual remedy.

Lehman's representations and warranties were broad.  Lehman warranted, as to each mortgage loan it securitized, that the documents submitted for loan underwriting "contain no untrue statement of material fact or omit to state a material fact," that the Borrower did not give "materially false, misleading or inaccurate statements to Lender" or "fail[] to provide Lender with material information," and that a key credit metric—the borrower's ratio of debt to income ("DTI")—did not exceed a critical threshold.  In short, Lehman warranted that borrowers on mortgages it securitized did not make material misstatements.  Lehman made those representations so it could market RMBS to investors; RMBS could not be sold without them.

The Trustees have amassed hard, granular proof that Lehman breached these representations over and over again.  For tens of thousands of loans, the borrowers made critical misstatements and omissions.  When trying to obtain a mortgage, borrowers misstated their income, failed to disclose their debts, and misstated whether they would even live in the house they were buying.  When borrowers misstated their income, they inflated their earnings, on average, by over 100%, claiming they made over twice as much as they actually did.  And many borrowers did not tell the lender that they had an average of $225,000 in undisclosed mortgages and other debts.  The misstatements and omissions made the loans substantially riskier.

Under the agreements, Lehman's breaches must have an adverse and material effect on the value of the loan, which is a standard the Trustees readily meet. The Trustees have carefully avoided litigating minor breaches. The breaches here were material and caused a significant increase in risk of loss on the loans. Higher risk equals lower value, whether via a lower price or otherwise. If a borrower has lower income, higher debt, or a different job than the borrower said he or she had, or does not live in what is supposed to be his or her primary residence, then the borrower is less likely to be willing and able to repay the loan, and therefore the loan is worth less. These are fundamental precepts that every court to look at the issue has accepted, and that experts in the industry take as gospel.

The loan-by-loan evidence substantiating these breaches consists of the same types of documents that Lehman and its mortgage bank affiliate Aurora relied upon in the pursuit of their own putback claims. It includes borrower tax returns, W-2s, bankruptcy filings and hardship letters, and third-party sources such as credit reports, Bureau of Labor Statistics ("BLS") data, data from the Mortgage Electronic Registration System ("MERS") and information from other services. These evidentiary sources can be and are routinely relied upon to verify information provided by borrowers, both before and after loans are made. They are commonly used in the industry both when making and when putting back loans, and courts consider them reliable.

The Trustees' claims to be estimated total approximately $11.4 billion. $8.8 billion of that sum consists of breaches based on borrower misrepresentations of income, omissions of debt or failure to use the mortgaged property in accordance with the borrower's commitments under the application and mortgage. An additional roughly $370 million consists of DTI breaches. Those four categories are based on just three representations and warranties—no untrue statement in the underwriting documents, no default under the mortgage (which encompasses borrower's untrue

2

statements and omissions), and maximum DTI. The remaining roughly $2.3 billion of the Trustees' claim consists of breaches of several additional representations and warranties, as set forth in the reports of the Trustees' underwriting experts Jim Aronoff and Chip Morrow.

These numbers are not surprising. The excesses of the pre-2008 mortgage market are now part of the public—and this Court's—record. Lehman's own documents show it was aware of the widespread problems and deteriorating performance of the loans it had securitized, even as compared to the rest of the industry. A Lehman review of loans from one of the securitization "shelves" at issue here found that "50% of the loans contained material misrepresentations." And the findings by the Trustees are entirely consistent with the findings of courts in this District that have examined breaches in loans originated during the same period.

And yet, Lehman disputes nearly every breach that the evidence proves. Lehman typically does not attempt to show that the borrowers' statements to lenders were accurate, for it could not do this. Instead, Lehman attempts to avoid the Trustees' proof wholesale, but none of Lehman's attempts to elide the Trustees' proof works. *First*, there is no merit to Lehman's generic challenges to the types of evidence put forward by the Trustees. Lehman asserts, for example, that the Court should categorically ignore tax returns when assessing whether a borrower misstated his or her income. Lehman asserts without basis that an "origination year tax return does not prove origination income," but Lehman (1) fails to address as to any particular loan why the return is not probative of the borrower's income or (2) fails to provide evidence that would tend to contradict or refute what the return shows. Rejecting tax returns as a category is a *position*, not a refutation of evidence in a specific instance. That position is indefensible: reliance on tax returns is industry-standard, as the courts recognize, and Lehman itself relies on exactly the same evidence in the

3

same context.  Lehman repeats the same pattern for every other type of proof.  And for the vast majority of the loans Lehman reviewed, this is Lehman's only response.

*Second*, Lehman fares no better in attempting to challenge the Trustees' review process as unreliable via its "business process" expert, Charles Grice.  The Trustees will show at trial that, among other things, (1) Mr. Grice lacks anything approaching the expertise of Messrs. Aronoff and Morrow, (2) his so-called "independent" "audit" was neither independent nor an audit at all, and (3) his criticism that Mr. Aronoff is not "independent," because Mr. Aronoff actually participated in the design and execution of the Trustees' loan review, is contrary to established industry practice.  On the "independence" issue, in addition to Mr. Aronoff's opinions, the Trustees have also proffered an underwriting report from Mr. Morrow, who had no role in the Trustees' Protocol review and was brought in after the fact, like Mr. Grice.  Unlike Mr. Grice, however, Mr. Morrow reviewed a truly random sample of 600 loans (selected by a statistician and econometrician, Dr. Schwert); he agreed with the Trustees' breach findings on over 90% of them.

*Third*, Lehman's position here, advanced through its expert Daniel Castro—that a breach meets the adverse and material effect standard only if the claimant can show loss causation, that the breach caused the loan to default—is inconsistent with industry custom and practice, has been uniformly rejected by the state and federal courts in New York, and is contrary to positions taken by Lehman and Aurora in sworn declarations and complaints filed by its counsel in this contested matter.

*Finally*, Lehman cannot avoid liability for the so-called "on hold" loans, which Lehman refused even to review on the ground the files were supposedly missing "critical" documents.  Lehman's refusal is both procedurally and substantively indefensible.  Even if unavailable, the documents are not "critical" to any issue properly before the Court.  Rather, the documents are

either irrelevant, or other information provided by the Trustees is more probative to establish the matters in question. And if Lehman believed otherwise, it, like any responsible defendant, should have reviewed and addressed the evidence put forward by the claimants, explaining specifically why a "missing" document makes the proof submitted insufficient to make out a claim or to establish damages. Lehman's failure to do so leaves it with no defense to the claims.

In sum, the Trustees' proof, which is unrebutted for all but a tiny fraction of the loans at issue, will demonstrate by a preponderance of the evidence that Lehman breached the representations and warranties and that it did so repeatedly for tens of thousands of loans.

The Trustees currently expect to present the following witnesses at trial:

| **Expert Witnesses** | **Topics** |
| --- | --- |
| **Mr. James H. Aronoff** | Breaches; underwriting standards; materiality |
| **Mr. John Burnett** | Servicing practices, in response to Mr. Grice |
| **Dr. Richard W. Ellson** | Valuation of non-liquidated loans |
| **Mr. James K. Finkel** | Valuation of other RMBS settlements, in response to Mr. Fischel |
| **Mr. Fiachra O'Driscoll** | Securitization practices, materiality |
| **Mr. J. F. Morrow** | Breaches; underwriting standards; loan review standards in response to Mr. Grice |
| **Dr. G. William Schwert** | Statistical reliability of Mr. Morrow's review |
| **Hon. Robert S. Smith (Ret.)** | Relevance of other RMBS settlements in valuing the Trustees' claims, in response to Mr. Fischel |
| **Dr. Karl N. Snow** | Purchase Price calculation |
| **Fact Witnesses** | **Topics** |
| **Mr. Edmond Esses** | Trustees' loan review and the Protocol process[1] |

---

[1] The Trustees reserve the right to call Lehman employee, Mr. Zachary Trumpp should Lehman not do so. "Trustees" or "RMBS Trustees" refer to U.S. Bank National Association, Law Debenture Trust Company of New York, Wilmington Trust Company, Wilmington Trust, National Association, and Deutsche Bank National Trust Company, not individually but solely in their respective capacities as trustees or separate trustees for certain RMBS trusts. "Lehman" refers to Lehman Brothers Holdings, Inc. and the Plan Administrator.

## DISCUSSION

### I.    LEHMAN MADE SWEEPING REPRESENTATIONS AND WARRANTIES

#### A.  Background

It is fundamental that the value of the certificates issued in a residential mortgage backed securitization are "only as good as their underlying mortgage loans." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 15-1872-CV, 2017 WL 4293322, at *8 (2nd Cir. Sept. 28, 2017) ("*Nomura II*") (citations omitted).  In order to sell certificates in mortgage-backed securitizations, Lehman provided extensive representations and warranties as to the quality and credit characteristics of each loan in the pool to be securitized.

The Governing Agreements for Lehman's deals include a simple yet effective remedy for any loan that breached a representation and warranty:  Lehman is obligated to repurchase the loan at a contractually defined Purchase Price provided that the breach "materially and adversely affects the value" of the loan.[2]  *See, e.g.,* LXS 2006-15 TA[3] § 2.04.  This remedy applies equally to

---

[2] Lehman at times suggests that the Trustees must prove that they provided Lehman "prompt notice;" but that provision is not a "condition precedent" for recovery and in any event only obligates the Trustees to provide notice once they are informed of the breach.  They have no corresponding obligation to search for breaches.  *See, e.g.,* TRX 201, LXS 2006-15, Trust Agreement § 6.01 (Sept. 1, 2006) ("LXS 2006-15 TA").  There is no evidence that the Trustees did not provide prompt notice, and "the only legal consequence of [the timing of notice] is a possible reduction of recoverable damages, on the theory of a failure to mitigate." *Deutsche Bank Nat'l Tr. Co. v. WMC Mortg., LLC*, No. 3:12-CV-1699 CSH, 2015 WL 1650835, at *39 (D. Conn. Apr. 14, 2015), *modified on clarification sub nom. Deutsche Bank Nat'l Tr. Co. v. WMC Mortg.*, LLC, No. 12-CV-1699-CSH, 2015 WL 11237310 (D. Conn. July 6, 2015).  Lehman has not suggested, let alone met its burden to show, that it was prejudiced by any delay in notice.

[3] In a typical RMBS securitization, the sponsor (here, Lehman) acquires mortgage loans that it transfers to an affiliated special purpose entity, called a "depositor," that in turn transfers them to the trustee of the trust that ultimately holds the mortgage loans for the benefit of investors.  The first transfer, from the sponsor to the depositor, is made pursuant to an agreement that in the securitizations here is called a Mortgage Loan Sale and Assignment Agreement ("MLSAA").  *See, e.g.,* TRX 231, LXS 2006-15 MLSAA § 1.04(d) (Sept. 1, 2006) ("LXS 2006-15 MLSAA").  That document sets forth the sponsor's representations and warranties concerning the loans, and provides that they are made for the benefit of the trustee, to which the depositor assigns the representations and warranties and the associated repurchase remedy.  The Trust Agreement, which is entered into among various parties to the securitization—e.g., the trustee, the depositor, and the master servicer—expressly incorporates for the benefit of the trustee the sponsor's

6

"active" and to "liquidated" loans. *U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, 205 F.

Supp. 3d 386, 414 (S.D.N.Y. 2016) ("*MARM III*"); *Nomura Home Equity Loan, Inc. v. Nomura*

*Credit & Capital, Inc.*, 133 A.D.3d 96, 105–06 (1st Dep't 2015).

    The repurchase remedy reflects the allocation of economic risk built into every RMBS: the

sponsors accept the risk that loans do not conform to the sponsor's warranties, and investors

assume the performance risk on loans that do.  But investors do not assume the risk on loans that

do not conform to the sponsor's representations and warranties; those loans should not have been

in the trust at all.  And so long as the breach of a representation and warranty is not trivial, the

investors were entitled to have the sponsor buy the loan back or make an equivalent payment that

makes them whole (by returning outstanding principal and unpaid interest to the trust).[4]  *See*

*Assured Guar. Mun. Corp. v. DB Structured Prod., Inc.*, 44 Misc. 3d 1206(A) (Sup. Ct. N.Y. Cty.

2014) ("for every non-conforming loan, the investor or monoline is entitled to a refund"); *see also*

*Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 10 CIV. 9584 JPO, 2013 WL 1285289, at *10–

*11 (S.D.N.Y. Mar. 28, 2013), *vacated on other grounds*, 627 F. App'x 27 (2d Cir. 2015).

    Absent Lehman's representations and warranties, and absent the allocation of risk that they

(and the repurchase remedy) reflect, Lehman would not have been able to market, or earn revenue

from, the securitizations.  *See Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d

475, 483–84 (S.D.N.Y. 2013) ("*Flagstar II*") (investors would not have entered the market had

they "not received the representations and warranties in the Transaction Documents" because they

---

representations and warranties and the repurchase remedy.  *See, e.g.*, LXS 2006-15 TA §§ 2.03(b), 2.04. "Governing Agreements" refers to the agreements related to the transactions at issue at the hearing. References to "TRX __" refer to the Trustees' Exhibits to be used at trial.

[4] Aurora's internal policies refer to payments for put back of liquidated loans as "make whole" payments, and payments for put back of active loans as "repurchase."  TRX 703, Aurora, Master Servicing, Asset Risk Mgmt., Representations and Warranties Process § 4.0 (May 11, 2012) ("Aurora R&W Process").

were "unable to appropriately price the transaction's risk level if [they] could not rely on the quality of the underwriting of the underlying loans" (citations omitted)).

   B.   Three Representations and Warranties Underlie Tens of Thousands of Breach Findings

   The lion's share of the Trustees' claim arises under just two of Lehman's representations and warranties, and much of the hearing will revolve around them.  These are the "No Untrue Statement" ("NUS") and "No Default" Representations, both of which, among other things affirm the accuracy of the borrower's financial data submitted at origination.  A third representation and warranty, the "DTI Representation," warrants the maximum DTI of each loan.  The Trustees will place their focus at trial on the misstatements of income, the nondisclosures of debt, and the occupancy breaches that violate the NUS and No Default Representations, as well as on the DTI breaches that frequently result from income and debt breaches.[5]

   1.   *The NUS and No Default Representations and Warranties*

   The NUS and No Default Representations, standard provisions in hundreds of agreements, are clear:  Lehman represented that the borrowers did not make any misstatement (or omit a material fact) when obtaining the loans.  Representations that loan information is free from misstatements "impose[] a form of strict or absolute liability for a materially untrue or incorrect statement."  *MARM III*, 205 F. Supp. 3d at 429.  "While at first blush this may appear harsh, . . . there is some symmetry between the absolute nature of the warranty and the limited nature of the remedies in the event of breach."  *Id.*  "If the information . . . provided to the Trusts was wrong, [the sponsor] was only exposed to the possibility of cure, replacement or repurchase."  *Id.*  In other words, if the sponsor performs its obligations to cure or repurchase, the sponsor cannot be sued—

---

[5] DTI representations and warranties are not present in all of the deals, and such claims are only asserted under deals that include them.

it simply buys back the offending loan; and "[s]ymmetrical or not, harsh or not, this is the bargain to which [the sponsor], a sophisticated financial institution, agreed." *Id.*

Lehman represented that the documents submitted by the borrower during the origination of the loan contained "no untrue statement of material fact or omit to state a material fact":

> The Mortgage Note and the Mortgage are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms. All parties to the Mortgage Note and the Mortgage and any other related agreement had legal capacity to enter into the Bank Originated Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage and any other related agreement, and the Mortgage Note and the Mortgage have been duly and properly executed by such parties. *The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading.* To the best of Seller's knowledge, no fraud was committed in connection with the origination of the Bank Originated Mortgage Loan.

LXS 2006-15 MLSAA at § 1.04(c)(v) (emphasis added). The import of this provision is clear: If the documents submitted by the borrower contained an untrue statement of, or omitted, a material fact, Lehman's representation was breached. Here, that occurred on tens of thousands of loans.

Improperly seeking to limit the plain sweep of this representation, Lehman fastens on a separate representation regarding the absence of fraud—a representation that, by its terms, applies only to known instances of fraud—and contends that the Trustees must prove that Lehman knew of a borrower's misstatement or omission for there to be a breach of the NUS Representation. But the contracts contain two independent representations, each of which must stand on its own and be given independent meaning. If anything, the representation regarding the absence of fraud actually disproves Lehman's argument; had Lehman wanted to limit the NUS Representation to instances where it possessed knowledge of a misrepresentation, as it did in the case of fraud, it

would have done so here as well.[6]  It did not do so, and the Court should reject Lehman's invitation

to read into the NUS Representation a condition that does not exist.  *In re 4Kids Entm't, Inc.*, 463

B.R. 610, 681 (Bankr. S.D.N.Y. 2011) (Under New York law, "[a] contract must be enforced

according to its terms." (citations and internal quotations omitted)).

Lehman separately represented that "[t]here is no default, . . . breach, violation or event of

acceleration existing under the Mortgage or the Mortgage Note and no event which, with the

passage of time . . ., would constitute a default."  LXS 2006-15 MLSAA § 1.04(c)(vii).  The

mortgage (or deed of trust) in each loan in the Trusts provides:

> Borrower shall be in default if, during the Loan application process, Borrower or
> any persons or entities acting at the direction of Borrower or with Borrower's
> knowledge or consent gave materially false, misleading, or inaccurate information
> or statements to Lender (or failed to provide Lender with material information) in
> connection with the Loan.  Material representations include, but are not limited to,
> representations concerning Borrower's occupancy of the Property as Borrower's
> principal residence.

*See, e.g.*, TRX 362, Deed of Trust at 7, Loan XXXX1643 (USBANK4_012888381, at 87); *see*

*also* TRX 601, Expert Report of James H. Aronoff at 31 (June 1, 2017) ("Aronoff Rep.")

(mortgages and deeds of trust are "industry standard").  These provisions make the sponsor

responsible for the information the borrower provides or fails to provide.  A misstatement or

---

[6] Many of the MLSAAs contain language identical to the last, "no fraud," sentence but do not contain the
key "no untrue statement" sentence, highlighting that these two representations and warranties are
independent of each other.  *Compare* TRX 253, LXS 2007-11 MLSAA § 1.04(c)(v) (June 1, 2007) *with*
TRX 232, SAS 2006-S3 MLSAA § 1.04(c)(v) (June 1, 2007).  Moreover, in Section 703(12) of Lehman's
"Seller's Guide"—its agreement with originators from which it bought loans—originators represented and
warranted that the underwriting documents "were not falsified and contain no untrue statement of material
fact or omit to state a material fact required to be stated therein or necessary to make the information and
statements therein not misleading.  No fraud was committed in connection with the origination of the
Mortgage Loan."  TRX 1021, Decl. of Zachary Trumpp, *LBHI v. Key Financial Corp.*, No. 8:09-cv-623,
Dkt. 39-2 at Ex. B §703(12) (M.D. Fla. March 12, 2010) ("Trumpp *Key Fin.* Decl.").  Here Lehman chose
not to insert a Seller's knowledge limitation, again evidencing their understanding of how to broaden or
narrower a specific representation.

omission of material information is a borrower default; a borrower default is a breach of the No Default Representation; that breach requires repurchase of the loan.

Lehman attempts to limit the No Default Representation by arguing, through its expert, that the representation addresses only occurrences that would "impede with the enforceability of the Mortgage or Mortgage Note." TRX 945, Expert Report of Charles H. Grice at ¶ 80 (June 1, 2017) ("Grice Rep."). This opinion is of course irrelevant and inadmissible to alter the terms of an unambiguous writing. Regardless, Lehman's position finds no home in the contract language, which plainly assures investors that the loans are not in default at the outset of the securitization. Mr. Grice also argues that the mortgage covenant is violated only if the Trustees can show that the misstatement or omission would have altered the underwriting decision. TRX 948, Expert Rebuttal of Charles H. Grice at ¶ 87 (July 27, 2017) ("Grice Reb."). In fact, the plain terms of the mortgage covenant are violated when the misstatement or omission relates to "material" information, which unquestionably includes information about income, debts or occupancy.

### 2. *The DTI Representation and Warranty*

The DTI representation and warranty is equally clear: no loan in the securitized pool has a DTI exceeding the stated maximum. For example, "[e]ach of the Mortgage Loans will have a debt-to-income ratio, as of the Closing Date, less than or equal to 60%." *E.g.*, LXS 2006-15 MLSAA at § 1.04(b)(xvii). To the extent the borrower's true debt or income result in a DTI ratio that exceeds that threshold, the DTI representation and warranty is breached.

### C. The Other Representations and Warranties

Lehman made numerous additional representations and warranties—detailed in the Trustees' expert reports—that the Trustees determined were breached. The additional representations and warranties at issue include representations that the information disclosed by Lehman on the mortgage loan schedule was "true and correct," that the mortgage loans "complied

in all material respects with applicable local, state and federal laws," that the origination file contained the necessary qualified appraisal, and others. *E.g.*, LXS 2006-15 MLSAA §§ 1.04(b)(xii), 1.04(c)(xviii); Aronoff Rep. at 75–90.

## II.    THE TRUSTEES WILL PROVE WIDESPREAD BREACHES OF LEHMAN'S REPRESENTATIONS AND WARRANTIES

In order to simplify the issues for hearing, the Trustees limited the Claims to be estimated to 32 categories of breaches. But the heart of the case, approximately 80% of the value of the claims, centers on just four categories of breaches: (1) borrower misstatements of income, (2) borrower omissions of debt, (3) borrower failures to occupy the property, and (4) excessive borrower DTI ratios. The first three breaches violate the NUS and No Default Representations, the fourth violates the DTI representation.[7]

### A.   The Trustees Provided Lehman Evidence of Breach that Went Largely Unrebutted

### 3.   *The Big Four: Income, Debt, Occupancy and DTI Breaches*

Each of these categories of breach goes directly to the credit risk of the affected loan—the borrower's ability to repay the loan and the strength of his or her commitment to do so.[8] An

---

[7] Lehman attempts to make hay of the fact that the Trustees are not asking this Court to consider 72,000 breach claims (a decision made in July of this year), which brought the total number of loans at issue down from approximately 92,000 to 73,000 and which reduced the number of breach claims on many of the loans that remain at issue. The simple fact is that continuing to assert those claims, which involved an additional 24 different breach categories, would have rendered the hearing hopelessly complex and cumbersome. The Trustees continue to believe these claims are valid, but it is simply not practical to prove up every breach under every applicable representation and warranty in the format and guidelines for the hearing. Even with their remaining claims, which involve approximately 110,000 breaches of 32 different breach categories affecting approximately 73,000 loans, the Trustees have concluded that they will emphasize four core breaches—income, debt, occupancy and DTI—that account for 80% of the Trustees' damages. This will make for a more focused and manageable hearing while protecting certificateholders' interests.

[8] Loan underwriters talk of the three or sometimes four "Cs" of underwriting: borrower *capacity* risk; borrower *credit/commitment* risk; *collateral* risk; and legal *compliance* risk. *See, e.g.*, Aronoff Rep. at 24–29; Grice Rep. ¶ 37 (lender "evaluates the borrower's ability and willingness to repay a loan"); TRX 771, Aurora Loan Services, Presentation to U.S. S.E.C. at 36 (Feb. 6–7, 2007) (LBEX-DOCID 357348).

income or debt misrepresentation breach, the two most common breaches here, occurs when a borrower provides incorrect or misleading information to the lender regarding his or her income or debt—i.e., overstates income or understates debt.  Misrepresentations of occupancy are the third most common breach found here; they occur when the borrower misrepresents the use of the property being purchased.  The intended use of a property—primary residence, second home, or investment property—is a critical element in assessing credit/commitment risk of the loan. It is uniformly understood in the home mortgage lending industry—and it comports with common sense—that a borrower will try much harder to avoid losing the roof over his or her head than an investment property.[9]  Aronoff Rep. at 65–66.  Finally, while income and debt breaches stand on their own, for deals that have DTI representations and warranties, an income or debt breach frequently leads to a DTI that exceeds the permitted limit.

4. *The Trustees' Breach-by-Breach Proof*

With respect to each breach identified, the Trustees provided in accordance with the Protocol[10] concrete, breach-specific proof: a description of the breach, the evidence supporting the breach, and copies of that evidence.  The description was set forth on a claims form; that information was rolled up into a "Claims Tracking Spreadsheet," which identified the loan, the breach, the representation and warranty relied on, Lehman's position, and the Trustees' response. The hard proof consisted of the "Claim Package" or "Claim File"—that is, the documents evidencing the breach—and the loan file itself.  Aronoff Rep. at 10–23.  All of these materials are admissible into evidence by agreement.  *See* TRX 807, Ex. G, Settlement Agreement, Dkt. 55232,

---

[9] Even if the borrower did not misstate his intent to occupy, the mortgage is violated if the borrower does not actually occupy within 60 days and continue to occupy for 12 months thereafter absent lender consent or extenuating circumstances.  Aronoff Rep. at 32–33.

[10] TRX 831, Protocol Order, Dkt. 47569 (Dec. 29, 2014) (the "Protocol").

§ VII (Apr. 27, 2017) ("Exhibit G").  They would be admissible in any event under Rule 1006 of the Federal Rules of Evidence.[11]

That this proof has been provided, and that it is summarized on a loan-by-loan, breach-by-breach basis is critical for two reasons.  *First*, it means that there can be no assertion that the Trustees have failed to provide proof of breaches.  They have, in minute detail.  *Second*, Lehman has failed in almost all cases even to attempt to refute the proof, as explained in greater detail below.  This is a key deficiency in Lehman's defense of the claims.

The Trustees compiled their proof of breaches through a rigorous review process generally used in the industry and that has been approved by courts in this District hearing putback claims.  A team at Duff & Phelps, led by Mr. Aronoff, supervised five independent review firms who reviewed each of the loans in accordance with well-accepted industry practices.  Aronoff Rep. at 13–17.[12]  Mr. Aronoff, who has extensive experience in originating, securitizing and the forensic review of mortgage loans, was the Trustees' primary expert on the integrity of the review process and was directly involved as a senior manager in structuring it.  Mr. Grice criticizes the Trustees for putting forward as their testifying expert the industry expert who actually designed the review, but that is in fact the industry standard and the better practice.  *Id.*

Employing a multistage review and quality-control process, the review firms analyzed approximately 171,000 loans.  *No* breach claims were asserted with respect to 77,000 loans.  This fact alone underscores that the Trustees conducted a careful review designed to put forward only

---

[11] *See, e.g.*, *MARM III*, 205 F. Supp. 3d at 403 ("[The] databases summarized . . . the results of reviews performed by UBS and its vendors in the course of due diligence, surveillance, and assessing loans for potential repurchase.  The Court received these summaries pursuant to Federal Rule of Evidence 1006.").

[12] Three of the five firms' work has been considered favorable by other courts.  *MARM III*, 205 F. Supp. 3d at 403 (Opus and Digital Risk); *Flagstar II*, 920 F. Supp. 2d at 488 (Digital Risk); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc., et al.*, 2012 WL 8024558 (N.Y. Sup.) (EdgeMac).  The other two firms have not had their work publicly addressed by courts.

actual supportable breaches. The breach findings were then provided to Duff & Phelps, which employed an additional multistage review and quality-control process. Aronoff Rep. at 22–23. In reviewing the Claim Files, particularly the income, debt, and occupancy information in the loan applications, the review firms commonly verified the information provided at origination with third-party data sources used by other professionals in the loan review industry and accepted by courts approving similar reviews.[13] Often, third party information was not necessary—the information in the loan file was enough because the servicers in the course of evaluating borrower modification requests obtained tax returns or bankruptcy filings showing the borrower's actual income, debts or primary residences.

These same sources now impugned by Lehman were used by Lehman and Aurora in pursuing their own repurchase claims, admissions that foreclose Lehman taking a contrary position here.[14] For example:

- While Lehman rejects the Trustees' claims by asserting that "income stated in origination year tax return does not prove origination income" (TRX 619, Aronoff Rep. Ex. 15, Row 9,296 ("Aronoff Rep. Ex. 15") (Debtor's Position, Loan XXXX2979)), Lehman uses such tax returns to support its own misrepresentation of income claims: "As part of the loss mitigation process, Borrower . . . provided her . . . [unsigned] 2006 tax returns, which revealed that during the entire 2006 tax year, Borrower Speer earned $26,673 from real estate sales," (TRX 1008, Aff. of Scot Osborn, *LBHI v. Residential*

---

[13] *See, e.g.*, *MARM III*, 205 F. Supp. 3d at 443, 445, 485–86 (tax documents and paystubs); *id.* at 446–46 (bankruptcy filings); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 529–30 (S.D.N.Y. 2015) ("*Nomura I*"), *aff'd Nomura II*, 2017 WL 4293322 (same); *MARM III*, 205 F. Supp. 3d at 441 (S.D.N.Y. 2016) (Accurint); *Nomura I*, 104 F. Supp. 3d at 529 (same); *MARM III*, 205 F. Supp. 3d at 441 (MERS); *id.* at 442 (Lexis-Nexis); *Nomura I*, 104 F. Supp. 3d at 529 (same); *MARM III*, 205 F. Supp. 3d at 444 (BLS data); *Nomura I*, 104 F. Supp. 3d at 527–28 (same); *MARM III*, 205 F. Supp. 3d at 444–45 (salary.com); *Flagstar II*, 920 F. Supp. 2d at 506 (same); *MARM III*, 205 F. Supp. 3d at 445 (The Work Number); *id.* at 441–42 (DataVerify); *id.* at 441–42 (SiteX); *id.* at 442–43 (credit reports); *Nomura I*, 104 F. Supp. 3d at 529–30 (same); *see also* TRX 625, Expert Rebuttal Report of James H. Aronoff ¶¶ 32–55 (July 27, 2017) ("Aronoff Reb.") (collecting sources).

[14] *See, e.g.*, TRX 971, Dep. of Zachary Trumpp at 100:7–103:11 (Oct. 5, 2017) ("Trumpp Dep.") (Lehman relied on DataVerify, Accurint, The Work Number, SiteX, and credit reports; Aurora may have relied on these sources as well as bankruptcy documents, tax returns, W-2s, MERS, and salary.com); TRX 976, Dep. of Charles Grice at 146:17–149:11 (Oct. 12, 2017) (listing commonly used sources).

*Plus Mort. Corp.*, No. 1:12-cv-05185, Dkt. 12-1 ¶ 14 (N.D. Ill. Dec. 14, 2012) (citing TRX 1009, *id.* Dkt. 12-5 at Ex. D));[15]

- While Lehman rejects the Trustees' claims by asserting that bankruptcy documents are "unreliable and insufficient because origination year income stated in a bankruptcy petition does not prove origination income" (Aronoff Rep. Ex. 15, Row 20,844 (Debtor's Position, Loan XXXX2523)), Lehman uses such petitions to support its own misrepresentation of income claims: "The borrower's bankruptcy filing reflects the borrower making $3,370 per month," (TRX 734, Decl. of Zachary Trumpp, *LBHI v. Ires Co.*, No. 09-cv-00135, Dkt. 15-12 at Ex. F (C.D. Cal. June 29, 2009) ("Trumpp *Ires* Decl.");[16]

- While Lehman rejects the Trustees' claims by asserting that The Work Number is "unreliable and insufficient because [it] does not prove origination income" (Aronoff Rep. Ex. 15, Row 16,251 (Debtor's Position, Loan XXXX6907)), Lehman uses this source to support its own misrepresentation of income claims: "The borrower's employment was verified through The Work Number . . . The total income reported, . . . for 2006 was $24,820 and the income reported for 2005 totaled $23,755" (TRX 757, Decl. of John Baker, *LBHI v. IZT Mortg., Inc.*, No. 09-4060, Dkt. 60-2 at Ex. E (N.D. Cal. Mar. 21, 2011));[17]

- While Lehman rejects the Trustees' claims by asserting that later-obtained ("audit") verifications of employment are "unreliable and insufficient, because an inadmissible, uncorroborated verbal verification of employment prepared by a third party years after origination does not prove employment at origination" (Aronoff Rep. Ex. 15, Row 30,463 (Debtor's Position, Loan XXXX5483)), Lehman uses these verifications to support its own misrepresentation claims: "The borrower's employment information was re-verified on 9-20-2007," (TRX 1020, Aff. of Zachary Trumpp, *LBHI v. Wausau Mortg. Co.*, No. 10-00924, Dkt. 21-7 at Ex. F (N.D. Cal. July 13, 2010));[18]

- While Lehman rejects the Trustees' claims by asserting that Accurint is "unreliable and insufficient because it relies on information obtained outside of the origination loan

---

[15] *See also* TRX 716, Trumpp *Key Fin.* Decl., Dkt. 39 ¶ 45 (W-2 and tax records); TRX 752, Resp. to Def.'s Mot. in Limine to Exclude Evidence of Daniel McDowell's 2006 Tax Returns and Evidence not Provided in Discovery, *LBHI v. CMG Mortg.*, No. 10-00402, Dkt. 68 at 2 (N.D. Cal. Mar. 11, 2011) ("One key piece of evidence supporting that [misrepresentation of income] claim is [the borrower's] income reported in his tax returns for 2005 and 2006, the years immediately before the year he applied for loan . . . ."); TRX 1003, Decl. of John Baker, *LBHI v. Universal Am. Mortg. Co.*, No. 11-20859, Dkt. 61-12 at Ex. 46 (S.D. Fla. Oct. 15, 2012) (same); TRX 931, Attach. to Mot. to Dismiss Pl.'s Second Compl., *Aurora Comm. Corp. v. Std. Pac. Mortg., Inc.*, No. 12-cv-03138, Dkt. 32-2 (D. Colo. July 15, 2013) ("Aurora Std. Pac. Mot.") (same).

[16] *See also* TRX 758, Decl. of John Baker, *LBHI v. Evergreen Moneysource Mortg. Co.*, No. 10-cv-0172, Dkt. 29 ¶ 10 (W.D. Wash. Mar. 31, 2011).

[17] *See also* Aurora Std. Pac. Mot. (same).

[18] *See also* TRX 712, Decl. of Jeffrey Heston Gray, *LBHI v. IZT Mortg., Inc.*, No. 09-4060, Dkt. 98-3, Ex. E (N.D. Cal. Mar. 21, 2011) ("Gray Decl."))

file" (Aronoff Rep. Ex. 15, Row 103,032 (Debtor's Position, Loan XXXX0848)), Lehman uses Accurint to support its own misrepresentation claims: "An Accurint People Search report was pulled on the borrower . . . which shows that she still resides at the rental address listed on her loan application," (TRX 934, Decl. of Zachary Trumpp, *LBHI v. Belvidere Networking Enter.*, No. 09-9531, Dkt. 11-9 at Ex. F (C.D. Cal. Mar. 26, 2010));[19]

- While Lehman rejects the Trustees' claims by asserting that audit credit reports are "unreliable and insufficient" to record a borrower's debts (Aronoff Rep. Ex. 15, Row 6,412 (Debtor's Position, Loan XXXX1249)), Lehman uses credit reports to support its own misrepresentation of debt claims: "The auditor obtained an updated credit report and revealed 3 mortgage loans that were not disclosed on the original loan application," (TRX 738, Decl. of Zachary Trumpp, *LBHI v. Inter Mountain Mortg.*, No. 09-3255, Dkt. 25-8 at Ex. F (C.D. Cal. Nov. 13, 2009)); and

- While Lehman rejects the Trustees' claims by asserting that BLS is "unreliable and insufficient because generic statistical salary information does not prove origination income" (Aronoff Rep. Ex. 15, Row 27,369 (Debtor's Position, Loan XXXX8407)), Lehman uses BLS to support its own income misrepresentation claims: "The Bureau of Labor Statistics (bls.gov) reports that the pay for dental laboratory technicians in 2010 was between $20,490 and $58,560 annually, which is grossly inconsistent with the income used in the lender's qualification analysis," (TRX 1011, Complaint, *LBHI v. Seattle Mortg. Co.*, No. 13-00725, Dkt. 3 ¶ 29 (D. Colo. Mar. 20, 2013)).

The Trustees have provided detailed evidence on each of the roughly 73,000 mortgage loans at issue. Almost 55,000 of those have income, debt, DTI and/or occupancy breaches. In virtually every instance, Lehman did not dispute the content or accuracy of the evidence the Trustees provided, did not identify any overlooked or newly procured evidence that contravened the Trustees' proof, but merely generically asserted that the evidence is insufficient.[20] Thus, for example, when the Trustees provided a tax return showing the borrower's income was well below what it was represented to be on the loan application, Lehman did not dispute that the tax return

---

[19] *See also* TRX 738, Decl. of Zachary Trumpp, *LBHI v. Inter Mountain Mortg.*, No. 09-3255, Dkt. 25-8 at Ex. F (C.D. Cal. Nov. 13, 2009) (Accurint, and credit report and "online resources"); TRX 740, Am. Decl. of Zachary Trumpp, *LBHI v. Home Capital Funding*, No. 09-0859, Dkt. 11-8, Ex. F (S.D. Cal. Jan. 19, 2010) (Accurint, Lexis Nexis, and "online records").

[20] Where Lehman stated a particularized objection, the Trustees considered these responses, conducted an additional review, and rescinded breach findings where Lehman's responses stated a valid rebuttal. In total the Trustees rescinded claims related to approximately 1,520 loans during the Protocol process based on their good faith review of particularized objections made by Lehman.

said what it did, and did not point to other evidence tending to rebut the Trustees' evidence, but instead simply asserted the position that a borrower's tax returns do not prove income. The same is true for bankruptcy filings, BLS data, credit reports, and many other categories of evidence. Yet when Lehman and Aurora demanded repurchase of loans from their counterparties, they relied on the same types of evidence and required the counterparty to "provide evidence to refute" their findings or repurchase the loan. *See, e.g.*, Trumpp *Ires* Decl. Ex. F.

Lehman asked for the Protocol and got it. In compliance with that Order, the Trustees reviewed loans, identified breaches, provided specifically-identified evidence to support those breaches and described why the evidence showed a breach that met the materiality standard. Lehman's response was simply to reject the claims, stating *positions* but seldom showing for any specific borrower why the evidence fails to show an overstatement of income, understatement of debt, or the actual occupancy of *that* borrower. When Lehman provided documents, those citations rarely showed why the borrower's income, debt or occupancy was not misrepresented as the evidence suggested. Instead, Lehman cited to the same documents the Trustees cited, or to the entire loan file, without pointing to any specific evidence tending to refute the Trustees' breach findings, thus failing to rebut the Trustees' evidence or claim.

Lehman's approach is exemplified by the back and forth on Loan XXXX0277. In their narrative description, the Trustees stated: "The [2004] application in file indicates the borrower earned $8,100 per month. However, according to a Statement of Financial Affairs filed as part of a Chapter 7 bankruptcy case dated 10/14/2005, the Borrower indicated earnings of $37,000 or $3,083 per month" for 2004. Aronoff Rep. Ex. 15, Row 1,177, Column F. Lehman responded with three generic arguments that it repeated for virtually every income misrepresentation breach: (1) a generic denial, "The evidence does not support a breach of the No Fraud or No Event of

18

Default representations"; (2) a recitation of its "Seller knowledge" argument, that "[t]he No Fraud representation requires Seller knowledge" and (3) a recitation of its materiality argument, "the evidence does not support a finding that the alleged breach had a material and adverse effect." *Id.* at Row 1,177, Column H. The only remotely evidence-specific statement was a generic assertion that "[t]he evidence is unreliable and insufficient because origination year income stated in a bankruptcy petition . . . does not prove origination income." *Id.* But as already discussed, Lehman itself relied on bankruptcy filings to prove income. *See* Trumpp *Ires* Decl. Ex. F.

Moreover, Lehman failed on this loan, as it did on virtually every other, to explain why, for *this* borrower, the evidence was insufficiently probative. Did it have *evidence* that the borrower materially understated his income in the bankruptcy filing? Was there other evidence, either in the file or obtained by Lehman, contradicting the income number in the bankruptcy filing? And, if not, why exactly was Lehman rejecting the evidence? This was not how the Protocol was supposed to work—Lehman rejecting evidence of breach without good reason. It is certainly not how the putback process was designed or how it operates in the industry. It is not what Lehman expects when it makes its own putback claims. Yet Lehman repeats this approach for virtually every breach without challenging what the evidence cited by the Trustees says or refuting the breach finding with evidence of its own.

As another example, when the Trustees offered a tax return as proof of a borrower's misrepresentation of income, e.g., Loan XXXX2979, or a MERS report as proof of a failure by the borrower to disclose his/her other mortgage debt, e.g., Loan XXXX8455, Lehman did not offer evidence to disprove the information in the tax return or the MERS report. *See* Aronoff Rep. Ex. 15, Row 9,296 (Debtor's Position, Loan XXXX2979) & Row 269 (Debtor's Position, Loan XXXX8455). Instead, Lehman typically responded with arguments that the tax returns or MERS

19

reports are "insufficient," or "unreliable" and asserted a legal defense (such as Lehman's lack of knowledge of the misrepresentation). *Id.* And while Lehman impugns the Trustees' evidence of breach, it relies on the same evidence—and the same inferences—to establish its own repurchase claims against third-party originators. *See supra* at 15–18. It is not surprising that Lehman has relied on such evidence when asserting—and prevailing—on its own claims, as such evidence is widely relied upon in the underwriting and re-underwriting industry; but Lehman has no basis to dismiss the probative value of that evidence now.

5. *Trustees' Proof of Income, Debt, DTI and Occupancy Breaches*

The "rebuttals" or analysis provided by Lehman's experts (none of which were provided during the Protocol by Lehman) do not withstand scrutiny—particularly with respect to the income, debt, DTI and occupancy breaches.

(a)    Income Misrepresentations

The review team identified misrepresentations of income through examining borrowers' tax returns, standard W-2 forms, pay stubs, statements by the borrower made in bankruptcy filings or in connection with requests for modification of the loan, third-party services like The Work Number, information from the employer, and, for salaried employees, BLS data. More often than not, the evidence of the borrower's actual income was from the same year as the loan origination. When "same year" evidence was unavailable, the Trustees relied on "near year" income evidence within one or two years of origination, but only where the borrower had the same job type with the same employer as she had at origination (for salaried borrowers) or where the income derived from the same source as at origination (for self-employed borrowers). [21] Aronoff Rep. at 44.

---

[21] To be more conservative for "near year" evidence, where the loan originated in or after 2007, the Trustees include income breaches only where the variances were at least 30% for salaried borrowers and 50% for self-employed borrowers. Aronoff Rep. at 44.

For example, the Trustees identified an income breach with respect to Loan XXXX1955, a $440,000 loan that closed in July 2006.  The borrower stated on her loan application that she was a GAIN service worker for a California county earning $129,000 per year ($10,750 per month).  But her tax returns for 2006 reported an income of only $48,602 ($4,050 per month).   In other words, her stated income was more than two and a half times her actual income.   During the Protocol, Lehman did not provide any evidence that the borrower's income was greater than $48,602 at origination.   Rather, Lehman asserted the three boilerplate arguments.   The only "factual" rebuttal was that "income stated in an origination year tax return does not prove origination income," and, presumably referencing the BLS data in the file, that "generic statistical salary information does not prove origination income." Aronoff Rep. Ex. 15, Row 43,157, Column H.

This loan was one of the limited number that Mr. Grice reviewed.  Mr. Grice "agreed with the Plan Administrator's conclusion" (as he did over 99% of the time), but fails to identify any evidence negating the Trustees' finding.  Rather, Mr. Grice notes that the borrower had "many responsibilities" with her employer, argues that the tax returns were unsigned and thus that there was "no indication that they represented the final tax returns filed with the IRS," and speculates that the borrower may have had part time employment or periods of unpaid leave in 2006 (TRX 950, App'x D, Updated Reply Report of Charles H. Grice at Row 556, Column M (Sept. 1, 2017)). None of these responses disprove the breach.

As already noted, Lehman has itself used unsigned tax returns to prove misrepresentations of income in its own residential mortgage repurchase claims and categorically stated that such income misrepresentations are material.  *See supra* at 15.   Moreover, the loan file contains numerous documents backing up the income figures on the tax returns: (1) the borrower's 2006

W-2 (TRX 450 at USBANK4_012975611 (Loan XXXX1955)), (2) the borrower's 2007 income tax return, reflecting total income of $54,596 ($4,549.67 per month) (*id.* at USBANK4_012975605), (3) the borrower's 2008 income tax return, reflecting total income of $57,894 ($4,824.50 per month) (*id.* at USBANK4_012975714), (4) the borrower's 2009 W-2, reflecting yearly income of $57,991.94 ($4,832.66 per month) and the associated 2009 tax return (*id.* at USBANK4_012975507, USBANK4_012975509), (5) a 2009 letter from the borrower to the servicer (a "hardship letter") in which the borrower admits she thought she was going to be able to refinance (*id.* at USBANK4_012975624), (6) a loss mitigation document from the servicer reflecting the borrower's income as of November 2010 as $5,484 per month (*id.* at USBANK4_012975423; USBANK4_012975427), (7) the borrower's March 2010 financial statement showing monthly gross income of $4,500 (*id.* USBANK4_012975556), and (8) a servicer document with paystubs showing income of $4,682.60 per month (*id.* at USBANK4_012975436, USBANK4_012975457-012975459).  The conclusion is inescapable: the borrower misstated her income.  Yet Lehman ignored this evidence, using either speculation (in Mr. Grice's case) or outright rejection of tax return evidence (in Lehman's), and improperly rejected the breach.  *See, e.g.*, *MARM III*, 205 F. Supp. 3d at 481–84 (using same-year tax returns to find misrepresented income).

As an example of "near year" evidence, the Trustees submitted a misrepresentation of income breach with respect to Loan XXXX6207, a $124,000 loan that closed in December 2006. The borrower stated on her loan application that she was an "Admin Supervisor" at a university earning $90,000 ($7,500 per month).  The review team determined from The Work Number that her income in 2007, the year after origination, was only $52,387.  As corroboration, the review team pulled data from BLS for Executive Secretaries and Administrative Assistants in the relevant

22

metropolitan area in 2006 showing that the average salary at the 90th percentile was only $66,444 ($5,537 per month).  Aronoff Rep. Ex. 15, Row 63084, Column F.  During the Protocol Lehman provided no countervailing evidence that the borrower's income was greater than $52,386 at the time of origination.  In addition to the standard three boilerplate responses quoted above, Lehman recited its general objection to the use of BLS data and The Work Number: "[t]he evidence is unreliable and insufficient because a generic statistical salary information does not prove origination income and an inadmissible and uncorroborated audit verification of employment does not prove origination income."  *Id.*, at Column H.  Yet both of those sources of information are commonly relied on in the industry and relied on by Lehman and Aurora.  *See supra* at 15–18.

This breach was also one of the few Mr. Grice reviewed, and again he did not point to any evidence tending to negate the Trustee's proof.  Instead, he asserts that the Trustees' sources were "insufficient" to prove a misstatement.  In his narrative, Mr. Grice goes on to say that The Work Number is a "post-origination Verbal VOE" (verification of employment), that "does not provide any specific detail as to the breakdown of the borrower's compensation, i.e., overtime, bonus or other incentive which would detail the borrower's earnings capacity."  TRX 570, App'x D, Grice Reb. at Row 37, Column J ("Grice Reb. App'x D").  In fact, The Work Number (again a source used by Lehman itself) is *not* a "verbal VOE"—the information is "originated directly from the employer's payroll system"—and in fact *does* provide a breakdown of the borrower's compensation in overtime, commission bonus and other compensation.  TRX 366, Claim File, at USBANK3_00673225, -27, Loan XXXX6207.  Mr. Grice further argues that the income information from The Work Number was not persuasive because the borrower's income for 2006, the year the loan was originated, was not available.  Grice Reb. App'x D at Row 37, Column J.  But The Work Number information shows the borrower's income steadily increased each year,

from 2007 to 2014, going from $52,386.80 in 2007 to $73,381.67 in 2014.  TRX 366, Loan XXXX6207 Claim File, at USBANK3_00673225, -27.  Yet the borrower listed her 2006 income as $90,000.  Based on the evidence the Trustees uncovered, and in the absence of any contrary evidence offered by Lehman, Trustees submit it is far more likely than not that the borrower's 2006 income was below her 2007 income, and was in all events not $90,000 or anywhere close. *Cf. MARM III*, 205 F. Supp. 3d at 445 (concluding that The Work Number "is the type of material that an expert in underwriting relies upon in the ordinary course of his work as an underwriter and thus may form the basis for the expert witness's opinion").

The foregoing are merely two examples of the breach findings and evidence put forward by the Trustees and Lehman's responses.  The larger point is that the Trustees' loan review teams searched for, discovered and documented concrete evidence on a loan-by-loan basis that identified individual borrowers who misstated their income in roughly 33,000 loan applications.  They did so using evidence that is standard in the industry and that Lehman itself had used in like circumstances.  The misstatements were substantial, not marginal.  The median overstatement on income was 129%—that is, the borrower provided a stated income more than twice that of his or her actual income.  Approximately 90% of the income breaches are based on borrowers' overstatements of income by 30% or more.  The value of the Trustees' claims predicated on income breaches is $5.9 billion, or 52.2% of their total claim.

      (b)    Misrepresentations of Debt

The review team identified misrepresentations of debt by comparing information disclosed on the loan application with information in the borrower's credit report or third-party sources widely used in the industry (including databases tracking mortgage and property ownership information such as MERS, DataVerify, SiteX, Accurint, or CLEAR).  *See also supra* 15–18.

24

For example, Loan XXXX8455 was a $145,400 loan that closed in June 2004 for a property in Las Vegas. On the associated loan application, the borrower disclosed only a debt associated with her then-current residence. However, a MERS report showed that the borrower obtained two mortgages on another property in May 2004, for $148,000 and $37,000, one month before the closing of the subject mortgage. The MERS evidence was corroborated by a credit report at origination and an "audit" credit report—that is, a credit report obtained during the Protocol review process. Presented with this information, Lehman did not provide any countervailing evidence, stating (again after reciting its boilerplate positions) that MERS reports are "unreliable and insufficient." Aronoff Rep. Ex. 15, Row 269, Column H.

That the MERS report in fact shows an "undisclosed debt at origination" (as Mr. Grice subsequently acknowledged, Grice Reb. App'x D, at Row 8, Column J) is beyond dispute. That is enough to make out a breach of the NUS and No Default Representations. Lehman asserts, albeit inconsistently, that an income or debt misrepresentation cannot constitute a breach unless it also results in a DTI that violates the originator's underwriting guidelines. This is reading into the Governing Agreements requirements that they do not contain. Whether the misrepresentation of debt violates a DTI guideline, or a DTI representation and warranty, has no bearing on the question of whether the misstatement or omission violated the NUS or No Default Representations. What is left after Lehman's untenable legal defenses is straightforward, uncontroverted proof of undisclosed mortgage debt by the borrower in question. That is a breach, plain and simple. *See MARM III*, 205 F. Supp. 3d at 498 (using MERS to find an undisclosed mortgage).

The Trustees' loan review also revealed that many borrowers were simultaneously arranging loans from other lenders at the time that they obtained the loans that are the subject of this hearing. Approximately 4,800 borrowers closed on additional debt within two months of the

closing of the subject loans. This means that it is a virtual certainty that these borrowers had parallel loan applications pending when the subject loans were funded. The failure to disclose that information contravenes the No Default Representation—the standard Mortgage Note states that a borrower will be in default if the borrower "failed to provide Lender with material information" "in connection with the Loan." *See, e.g.*, TRX 397, Mortgage § 8, Loan XXXX7452, at USBANK4_007656931; Aronoff Rep. at n. 40. The omission also violates the NUS Representation that the materials submitted for underwriting do not "omit to state a material fact . . . necessary to make the information and statements therein not misleading." *See, e.g.*, LXS 2006-15 MLSAA at § 1.04(c)(v); s*ee also MARM III*, 205 F. Supp. 3d at 521 (finding breach where borrower opened a $462,673 loan for the purchase of another property a month after the funding of the subject loan); *Flagstar II*, 920 F. Supp. 2d at 494, 510 (materially breaching loans included loans that "were made to borrowers who failed to disclose significant debt obligations (including loans that had closed after the closing of the subject loan)").[22]

The Trustees discovered and documented concrete evidence of roughly 22,500 borrowers who failed to disclose pre- or post-closing debts in their mortgage applications. The median understatement of debt was approximately $225,000. The value of the Trustees' claims relating to debt breaches, excluding loans with income breaches, is approximately $2.3 billion, or 20.58% of their total claim.

---

[22] Lehman argues that the terms of the loan application don't expressly call for information about intended future debt. But even if that were true, the claim is based on the plain terms of the NUS and No Default Representations, and is not limited to what the application calls for. The no misstatement covenant in the Mortgage that serves as the basis for No Default Representation breaches is an independent commitment by the borrower that she did not fail to disclose "material information." An intended new mortgage is undoubtedly material. Similarly, under the NUS language, if such information is not disclosed and is necessary to make the information disclosed not misleading, the representation and warranty is breached.

(c)    DTI Breaches

Breaches of the DTI representation and warranty largely turned on the same types of evidence used to support income and debt breaches and were identified where the review team determined that a borrower's recalculated DTI, using the borrower's actual income or debt load, exceeded the applicable threshold.  DTI breaches, excluding loans with income, debt or occupancy breaches, account for roughly $370 million, or 3.3% of the Trustees' total claim.

(d)    Misrepresentations of Occupancy

The review team identified occupancy breaches by comparing the subject property's address to the borrower's stated residence address contained in documents such as tax returns, W-2s, and bank statements, as well as public records, reports from various fraud detection services, and correspondence from the borrowers themselves.  Again, the method and evidence relied upon here were standard for the industry (Lehman included) and accepted by courts.

For example, the Trustees asserted a misrepresentation of occupancy breach with respect to Loan XXXX3408, a $66,000 loan that closed in June 2006.  Aronoff Rep. Ex. 15, Row 33777. The borrower stated that the mortgaged property was to be the borrower's primary residence; and in both the mortgage and an occupancy affidavit executed at closing the borrower committed that he would occupy the property within "within sixty days . . . and at all times thereafter for a minimum of one year."  *See* TRX 396, Occupancy Affidavit, Loan XXXX3408, at WILMINGTON4_009782159.  Both the borrower's 2006 and 2007 tax returns listed as the borrower's address the departure property—that is, the borrower's existing residence—and identified the subject property as a rental property—a property the borrower was not occupying. Again, Lehman did not offer any countervailing evidence during the Protocol that the borrower in fact lived at the subject property, instead relying on (in addition to its boilerplate) its assertion that the address on the tax returns does not support an inference that the borrower did not occupy (or

27

intend to occupy) the subject property or that the borrower misrepresented the status of the mortgaged premises.  Aronoff Rep. Ex. 15, Row 33777, Column H.

The tax returns in fact belie an intent to use the property as a primary residence.  Lehman's argument that the evidence of occupancy found in borrower's tax returns is "unreliable and insufficient" blinks reality: this is precisely the type of evidence relied upon by Lehman in pressing its own repurchase demands based on breaches of an occupancy representation.  *See supra* at 15.  Such evidence, unless countered, supports the inference that the borrower misrepresented his intent to occupy, thereby breaching Lehman's NUS and No Default Representations.  *See MARM III*, 205 F. Supp. 3d at 485–86 (using tax returns to find a misrepresentation of occupancy).

Further, the evidence shows that the borrower never actually occupied the subject property regardless of whether he intended to or not at origination.  TRX 631, Expert Reply Report of James H. Aronoff ¶ 43, 44 (Aug. 28, 2017).  As noted, for borrowers who purchased the mortgaged property as a primary residence, the standard mortgage includes a requirement that the borrower occupy the premises within 60 days of closing of the loan and continue to occupy the property for 12 months thereafter absent lender consent or extenuating circumstances.  Thus, the evidence that he or she did not in fact occupy the subject premises established a default and is an independent breach of the No Default Representation.[23]

---

[23] Mr. Grice offers nothing but speculation in response to the Trustees' evidence of breach on this loan: he states that the borrower "may" have occupied the property for three months in 2006, and that the borrower "may" have experienced extenuating circumstances, given that the subject property was larger than the borrower's residence.  Grice Reb. App'x D at Row 45, Column J (Loan XXXX3408).  Beyond the fact that these speculative comments do not rebut hard evidence, Mr. Grice entirely ignores the terms of the borrower's occupancy affidavit included with the loan file, which contains an unequivocal commitment to occupy for 12 months without any allowance for extenuating circumstances and which expressly provides that a violation of this commitment constituted a default under the mortgage—in other words, triggered a violation of the No Default Representation. *See* TRX 396, Occupancy Affidavit, Loan XXXX3408, at WILMINGTON4_009782159.

28

The loan review teams discovered and documented borrowers who misstated their intent to occupy, and that did not in fact occupy, the homes that they had affirmed would be their primary residences for over 6,000 loans.  Occupancy breaches comprise approximately $515 million in damages, excluding loans that have income or debt breaches, or 4.5% of the Trustees' claims.

6.  *Other Breaches*

Other breaches include borrower misrepresentations regarding employment and failure of originators to include various required documents in the loan file such as the HUD-1, TILA and right of rescission notice, which disclose key information to borrowers.[24]  The absence of these documents increases the risk of loss on loans as it may result in significant penalties, and it hamstrings lenders or servicers in exercising their rights against defaulting borrowers.  Aronoff Rep. at 76.  Indeed, in many cases these breaches are deemed material by the Governing Agreements.  These document breaches affect approximately 7,700 loans (HUD-1), 7,600 loans (TILA), and 3,200 loans (right of rescission); they account for nonduplicative damages of approximately $680 million, $500 million, and $116 million respectively.  The employment representation breaches account for roughly 5,600 loans and damages of about $124 million.

B.  <u>Lehman Cannot Avoid the Trustees' Loan-Specific Evidence by Attacking the Trustees' Loan Review Process</u>

Having failed to address the Trustees' evidence on a loan-by-loan basis during the Protocol process, and with no basis to do so now, Lehman offers Mr. Grice's opinion that Lehman's loan

---

[24] The HUD-1 is used by the settlement agent to itemize all charges for the specific real estate transaction. It gives each party a complete list of incoming and outgoing funds.  Aronoff Rep. at 76.  The TILA form discloses the fees the borrower pays in cash at settlement. As set forth below, TILA requires this disclosure to be accurate within statutorily determined ranges.  *Id.*  Under TILA, the borrower has the right to rescind certain transactions.  The right of rescission notice evidences that the borrower was notified of that right, and the document is utilized in refinancing transactions.  *Id.*

review was a model of perfection whose sole purpose was to arrive at the correct result whereas the Trustees' process was riven with errors and unreliable.

But Mr. Grice admits that one cannot extrapolate an error rate across the entire loan population at issue based on his review. TRX 976, Dep. of Charles Grice at 162:13–165:22 (Oct. 12, 2017) ("Grice Dep."). Indeed, Mr. Grice did not pull a random, representative sample of loans, as both he and Lehman's statistician, Dr. McCrary, readily admit. TRX 974, Dep. of Justin McCrary 85:4–86:13 (Oct. 9, 2017). Rather, Mr. Grice's error findings are anecdotal, and biased. In failing to pull a truly representative sample of loans for his review, Mr. Grice fails to provide the Court with any basis to apply his error findings to the breach claims asserted in the Protocol and to the evidence submitted in support. By contrast, Mr. Morrow, who even by Mr. Grice's standard is independent, reviewed a truly representative, random sample of loans; he agreed with Mr. Aronoff over 90% of the time.

Indeed, the problem with Mr. Grice's opinion is that it will always be possible to identify errors in a forensic loan review, as Lehman itself presciently recognized. TRX 872, Decl. of Craig Pino, Dkt. 47187 at 4 (Dec. 3, 2014) ("Pino Decl."). And so, the fact that Mr. Grice was able to point to a handful of errors in loans not selected at random is not probative of anything. Indeed, in acknowledging that he too made errors, Mr. Grice pointed out that he and his team were faced with the daunting task of getting through 900 loans a month—for a total of about 1,800 over two months in April–May of this year. Grice Dep. 166:6–20. In contrast, the Trustees reviewed between 10,000 and 17,000 loans a month over a nine-month period. Judge Rakoff observed, *in the context of a review of only 800 loans*, that "given the volume of loans" "it seems inevitable that occasional errors would slip by." *Flagstar II*, 920 F. Supp. 2d at 486, 507. Judge Castel also

noted errors on both the plaintiff's and the defendant's side, but he did not reject out of hand the entirety of either's loan reviews. *MARM III*, 205 F. Supp. 3d at 404–05.

Beyond that, many of the supposed "errors" that Mr. Grice identified are nothing of the kind. For example, he points out on a different loan that while the qualified appraisal is indeed missing, the HUD-1 that is in the file refers to a fee for an appraisal, from which fact he infers that the qualified appraisal was indeed once in the file. Grice Rep. ¶ 91. But that is an inference, not a fact, and it is not unreasonable, and certainly not an "error" in the sense that Mr. Grice uses that word, to assert a missing appraisal claim where the appraisal in fact is missing. Mr. Grice's inference does not address the requirement of the underlying representation—that there be a qualified appraisal which conforms to certain standards (and where the appraisal is absent compliance with those requirements cannot be presumed). Even if the Trustees fail to prevail on this particular breach claim, that means that they failed to establish that it is more likely than not that the document was missing, not that they made an "error."

More fundamentally, a review of Mr. Grice's late-produced breach narratives readily reveals that the breaches as to which he even asserts an error—that is, an inaccuracy in the Trustees' description of their proof—are few and far between.[25] Far more prevalent are instances where Mr. Grice simply disagrees that the Trustees' proof is sufficient to make out a breach. It is not an overstatement to say that Mr. Grice *never* accepts a breach, and *never* accepts that any evidence, no matter its strength, is sufficient to make out a breach. He rejects it all—tax returns, W-2s, bankruptcy filings, credit reports, hardship letters, BLS data, MERS reports, and everything else the Trustees put forward. And he does so on the basis of nothing more than speculation: He says the borrower may have understated her income on her tax returns, or may have lied about her

---

[25] Mr. Grice has no estimate of actual errors rather than disagreements. Grice Dep. 165:5–22.

circumstances in a hardship letter, or may have had a dramatic fall-off in income between the loan origination date and year-end for purposes of calculating income for tax purposes, or maybe the borrower lost his job, or lied in a sworn bankruptcy filing (as opposed to the loan application), or maybe he continued to receive his mail at the departure address but actually moved into and occupied the subject property, or maybe he made dramatically more money in the year of loan origination than in any near year even though he was in the same job with the same company throughout, or maybe the borrower made vastly more than the 90th percentile of earners in her occupation in her geographic region, or maybe the person at the borrower's employer who responded to an income verification request just filled in a random number because he was too busy to do it right.  We could go on and on.  In Mr. Grice's nihilistic view of evidence, nothing is probative, nothing is good enough, there are no likelihoods, there are no evidentiary standards, there are only an infinite number of possibilities, none of them consistent with the Trustees' theory of breach on any loan.  Such speculation is not a basis to reject a breach.  *See Flagstar II*, 920 F. Supp. 2d at 511 ("disregarding [defendant's expert's] speculative assumption of potential rental income" in an effort to reject a material breach based on misrepresentation of debt); *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) (disapproving of "expert testimony based on speculative assumptions.").  If Mr. Grice's approach were the standard, no one, ever, could prove a putback claim, or any other claim, for that matter.

The above is not an exaggeration of Mr. Grice's positions.  That he postures himself as an "independent" "auditor" only renders his opinions the more untenable.  Mr. Grice blesses as state of the art a review process wherein Recovco, a firm whose regular business is to conduct loan reviews, had no authority whatsoever to conclude there was a breach, but instead could only either reject breach findings or elevate the claim up to Rollin Braswell Fisher ("RBF"), *Lehman's*

*litigation counsel*, for a final decision on the claim.  Trumpp Dep. 97:8–14; Grice Dep. 172:15–173:9.  Having the defendant's trial lawyers make the final call on loan breaches is about as far removed from best practice as it gets, and the idea that such a set-up is calculated to lead to an appropriate result, as Mr. Grice found in his "audit," is untenable.  *See* Aronoff Reb. ¶¶ 66–72.

Equally untenable are Mr. Grice's assertions that Mr. Aronoff is not "independent"—but he, Grice, is—or that Mr. Aronoff is "personally invested" in defending the Trustees' loan review or that the Trustees' loan reviewers suffered from hindsight "bias."  Grice Reb. ¶¶ 13–14; Grice Dep. 83:23–84:3; Grice Rep. ¶¶ 33–34.  These are "opinions," to be sure, but they are lay, not expert, opinions, and amount to little more than armchair psychology or junk science.

C.  Lehman and Aurora Internal Documents Belie Lehman's and Mr. Grice's Miniscule Breach Acceptance Rates

Lehman accepted a mere one percent of the Trustees' breach findings.  Mr. Grice, meanwhile, concludes that the Trustees have asserted *zero* valid breach findings.  *See* TRX 563, App'x E, Grice Rep.  Yet the discovery concerning Lehman's, Aurora's and BNC's loan underwriting and securitization practices, although limited, reveals that those entities had major problems in those areas:

- In a January 2007 internal email, a Lehman banker explained that in "[t]he last 4 months Aurora [Lehman's originator subsidiary] has originated the riskiest loans ever, with every month been [sic] riskier than the one before – the industry meanwhile has pulled back during that time."  TRX 767, Email from D. Kritikos to J. Goodman (Jan. 30, 2007) (LBEX-DOCID 380035).

- In a February 2007 internal email, Lehman bankers noted that Lehman's deals underperformed Countrywide deals and observed that "[o]ur aggregate LXS (mostly MortgageMaker) performance has worsened vs. largest competitor on '06 production" and "we are creating worse performance than subprime, while the rating agencies assume our performance should be substantially better."  TRX 768, Email from R. McKinney to T. Wind (Feb. 12, 2007) (LBEX-DOCID 1369758–59).

- A February 2007 Lehman Brothers presentation titled "Risk Review *Aurora and BNC*" informed that "The deterioration in BNC performance starting with late 2005

33

originations continues."  TRX 769, Lehman Brothers, "Risk Review *Aurora and BNC*" at 10 (LBEX-DOCID 188325) (Feb. 2007).

- That same presentation stated, "Special Investigations completed the review of 240 LXS loans which resulted in 50% of the loans contained material misrepresentations." *Id.* at 11.

Lehman's and Mr. Grice's findings that Lehman's securitization pools were virtually defect-free are also at odds with other cases concerning similar loans,[26] other publicly available information regarding Lehman's loan pools,[27] and Lehman's own submissions to the Court about these very loans.[28]  The Trustees do not rely on these information sources to prove their claims.  But these documents are a useful sanity check given the huge disparity between the roughly 54% breach rate the Trustees found and the one percent rate Lehman claims exists.[29]

    D.  Mr. Morrow's Findings Corroborate Mr. Aronoff's Conclusions

The Trustees retained Mr. Morrow, an independent expert, to perform a review, assisted by a team of experienced reviewers, of a 600-loan random sample of the Trustees' breach findings. TRX 653, Rebuttal Expert Report of J.F. Morrow ¶ 39 (July 27, 2017) ("Morrow Reb."); Aronoff

---

[26] Lehman's one percent acceptance rate is orders of magnitude lower than breach rates established at trial with respect to other contemporaneous securitizations.  In other cases, courts have found breach rates of at least 45% and up to 85% of the entire securitizations at issue.  *Flagstar II*, 920 F. Supp. 2d at 487, 511 (crediting findings of defective loan rates of 66.5% and 85% and fraud rates of 14% and 19.75% of the securitizations); *Nomura I*, 104 F. Supp. 3d at 559 (finding 45% to 59% of loans in securitizations were not, as represented, originated in accordance with guidelines).

[27] For example, Clayton Holdings, a large due diligence firm, found a defect rate of 26% of the Lehman loans that it reviewed and confirmed widespread issues with loans securitized during this period, including those of Lehman. *See* TRX 1182, United States, *The Financial Crisis Inquiry Report*, at 167 (January 2011).

[28] Mr. Pino, CEO of Recovco, assumed that the Trustees would present claims on 57% of the loans reviewed and that Lehman would "agree[] with 50% of the claims presented by the RMBS Trustees."—a stark inconsistency with Lehman's actual practice.  Pino Decl. at 3–4; *see also* TRX 726, Decl. of Zachary Trumpp, Dkt. 24255 ¶¶ 19, 21 (Jan. 12, 2012) (estimating that roughly 30% to 35% of the losses on loans that LBHI securitized were caused by representation and warranty breaches).

[29] As noted, the Trustees reviewed 171,000 loans and found 92,000 to be in breach, for a breach rate of 54%, which is near the 57% breach rate the Trustees found on their 5,000 loan sample.  TRX 863, The RMBS Trustees' Estimation Motion, Dkt. 46078 at ¶ 4 (Aug. 22, 2014).

Rep. at 13. Mr. Morrow agrees with the Trustees' breach findings on over 90% of the 600-loan sample—a result statistically robust enough to generalize to the entire population of mortgage loans at issue and that strongly supports the reliability of the Trustees' loan review process.[30] Morrow Reb. ¶ 7. Mr. Morrow's disagreements with the Trustees' findings mostly concerned breaches based on missing or incomplete documents, where another set of eyes was able to locate the document. Mr. Morrow's "agree rate" is highest with respect to the Trustees' core income, debt and occupancy misrepresentation claims, each over 95%, and confirms that the Trustees' review process did not contain systemic problems of the kind Mr. Grice asserts. Morrow Reb. ¶¶ 63, 66, 70.

## III.  THE BREACHES MATERIALLY AND ADVERSELY AFFECT THE VALUE OF THE LOANS

The breaches identified by the Trustees clearly meet the materiality standard in the Governing Agreements: the breaches adversely and materially affect the value of the subject loans. The positions taken by Lehman during the Protocol and by its experts in this proceeding do not comport with the terms of the Governing Agreements, the controlling law, industry understanding, or Lehman's own practice.

### A.  A Breach Materially and Adversely Affects the Value of a Loan if It Increases the Risk of Loss on that Loan

#### 1.  *Courts Are Clear that the Standard Is "Increased Risk of Loss" and that Loss Causation Is Not Required*

The well-established standard for determining whether a breach of a representation and warranty has a material and adverse effect on the value of the loan is whether the breach

---

[30] *See also* TRX 657, Morrow Reb., Ex. D (containing loan-by-loan results of Mr. Morrow's review). The Trustees' sampling expert Prof. Schwert designed Mr. Morrow's 600-loan sample and concludes that this agreement rate is applicable to the entire loan population. In particular, Mr. Schwert states with 95% confidence that the agreement rate for the entire loan population is above 90%. TRX 670, Rebuttal Report of G. William Schwert, Ph.D. ¶ 11 (July 27, 2017).

significantly increases the risk of loss associated with the loan or decreases the price that a purchaser would be willing to pay for it. "'Materially affects' means that the breach at issue would have altered the price that a willing purchaser would pay for the loan or otherwise changed the risk of loss on the loan. 'Adversely affects' means that the impact would be detrimental to the financial interests of the Certificateholders; in other words, the alteration in price would mean a lower price, or the change in risk would be an increased risk." *MARM III*, 205 F. Supp. 3d at 464; *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 892 F. Supp. 2d 596, 602 (S.D.N.Y. 2012) ("*Flagstar I*") (an effect is "material" if it "would affect a person's decision-making," and it is "adverse" if it is "opposed to one's interests").

The "risk of loss" standard reflects the consensus of federal and state courts in New York. *See id.* at 603 ("plaintiff must only show that the breaches materially increased its risk of loss"); *MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Securities Inc.*, No. 12-cv-7322, 2015 WL797972, at *3 (S.D.N.Y. Feb. 25, 2015) (material and adverse effect requirement does not require "proof of an actual loss or default"; "it does require proof of a significant increase in the risk of a loan's default"); *Wells Fargo Bank, N.A. v. JP Morgan Chase Bank, N.A.*, No. 12 Civ. 6168, 2014 WL1259630, at *4 (S.D.N.Y. Mar. 27, 2014) ("A growing consensus among New York courts holds that MAE repurchase conditions are triggered when the plaintiff's risk of loss increases and not just when that risk actualizes."); *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 131 (S.D.N.Y 2014) (breaches had "a material and adverse effect" "by creating an increased credit risk."); *see also Syncora Guar. Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 335 (S.D.N.Y. 2012); *Resolution Trust Corp. v. Key Fin. Servs.*, 280 F.3d 12, 18 & n.14 (1st Cir. 2002).

Proof of an intentional misrepresentation by a borrower, while not required, necessarily establishes a material and adverse effect. *MARM III*, 205 F. Supp. 3d at 470. The facts here support the inference that the vast majority of the misrepresentations in the Trustees' core claims were intentional. A borrower does not mistakenly overstate her income by 20% or more; and a full 90% of the misrepresentation of income claims involves overstatements of that amount or greater. Nor does a borrower just happen to forget the existence of mortgage on a property the borrower didn't bother to mention in his loan application. Whatever the motivations and concerns behind them, these sorts of misstatements are intentional, not innocent.[31]

> 2.  *Lehman Has Consistently Applied this Standard When Pursuing Its Own Claims*

Lehman applied the same materiality standard when it asserted putback claims against originators. In its numerous actions, brought while in bankruptcy, Lehman repeatedly advocated that originators were required to repurchase loans because Lehman proved that certain breaches "caused [Lehman] to incur an increased risk of loss," citing the authority the Trustees rely on here. *See, e.g.*, *Aurora Commercial Corp. v. Lenox Fin. Mortg. Corp.*, No. 1:13-CV-01489-AWI, 2014 WL 4678285, at *7 (E.D. Cal. Sept. 19, 2014) (citing *Wells Fargo Bank, N.A.*, 2014 WL 1259630, *4; *Flagstar II*, 920 F. Supp. 2d at 509; *Flagstar I*, 892 F. Supp. 2d at 603).

Indeed, for each of the three primary categories of misrepresentations, income, debt and occupancy, Lehman has time and again taken the position that such misrepresentations have adverse and material effects on the value of the loan as a matter of law. With respect to income breaches, Lehman (via Mr. Trumpp) swore to this position:

> If a borrower misrepresents his income on his loan application and/or employment position, those misrepresentations have a material and adverse effect on the value

---

[31] Some borrowers were concerned about being priced out of a rising housing market. Others sought to take advantage of the opportunity to buy and flip. *See, e.g.*, TRX 1254, Mortg. Asset Research Inst., "Eighth Periodic Mortgage Fraud Case Report to Mortgage Bankers Association," at 5–6 (Apr. 2006).

of the loan because the loan cannot be sold at full value to another purchaser or to a securitization once a misrepresentation is known; a substantial discount will be applied given the misrepresentation.

TRX 929, Decl. of Zachary Trumpp, *Lehman Brothers Holdings, Inc. v. Mortg. Partners, Inc.*, No. 09-01233, Dkt. 23 ¶ 16 (S.D. Cal. Sept. 13, 2010).[32]

Lehman (again, through Mr. Trumpp) made a virtually identical statement with respect to misrepresentations of debt:

If a borrower misrepresents his or her mortgage debts, that misrepresentation has a material and adverse effect on the value of the loan because the loan cannot be sold at full value to another purchaser or to a securitization once the misrepresentation is known; a substantial discount will be applied given the misrepresentation.

TRX 927, Decl. of Zachary Trumpp, *Aurora Loan Servs., LLC v. Dream House Mortg. Corp.*, C.A. No. 07-441-ML, Dkt. 37-3 ¶ 32 (D.R.I. Oct. 30, 2009).[33]

And Lehman unequivocally stated, in court filings submitted by Mr. Rollin, its current litigation counsel, the same point for occupancy misrepresentations: "If a borrower misrepresents his or her intention to . . . occupy the property securing the mortgage loan, that misrepresentation has a material and adverse effect on the loan because the loan cannot be sold at full value." *Baker PMC* Decl. ¶ 30.[34] That Lehman tries to take a contrary position defies belief. Yet Lehman does.

Courts relied on Lehman's prior positions. *See, e.g., Aurora Commercial Corp.*, 2014 WL 4678285 at *7 (accepting Lehman's assertions that occupancy misrepresentations are inherently material because a borrower is more likely to default and holding that those breaches "caused

---

[32] *See also* Gray Decl. ¶ 38 (making a virtually identical statement).

[33] *See also* TRX 715, Decl. of Robin Akell, *Lehman Bros. Holdings, Inc. v. National Bank of Arkansa*s, 4:10-cv-02012, Dkt. 26-3 ¶ 19 (E.D. Ark. Oct. 24, 2011); TRX 717, Decl. of John Baker, *Lehman Bros. Holdings, Inc. v. PMC Bancorp*, 2:10-cv-07207, Dkt. 76-1, ¶ 25 (C.D. Cal. Jan. 13, 2012) ("Baker *PMC* Decl.") (making similar statement).

[34] *See also* Gray Decl. ¶ 38 (stating similar proposition); Baker *PMC* Decl. ¶ 30 (same); TRX 713, Decl. of Laura McCann *Aurora Commercial Corp. v. Lenox Financial Mortg. Corp.*, 1:13-cv-01489, Dkt. 54 ¶ 17 (E.D. Cal. Feb. 3, 2014) (same, noting "[a]n occupancy misrepresentation is inherently material").

[P]laintiff[s] to incur an increased risk of loss."). Because Lehman's position here "is clearly inconsistent with its earlier position," its former position was "adopted in some way" by the courts requiring originators to repurchase loans from Lehman, and Lehman would "derive an unfair advantage" if it were permitted to take contrary positions, Lehman is judicially estopped from "deliberate[ly] adopt[ing an] inconsistent position[]" here. *See Wight v. BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000); *In re Adelphia Recovery Tr.*, 634 F.3d 678, 695–696 (2d Cir. 2011).

3. *Loss Causation Is Not Required; In Fact, A Default Is Not Required at All*

Lehman nonetheless argues that a breach only has a material and adverse effect if it causes the loan to default or otherwise to suffer a loss. In addition to flatly contradicting its prior positions, this argument defies the contractual provision and established case law. The Appellate Division has held, analyzing identical language, that "the loan need not be in default to trigger defendants' obligation to repurchase it. There is simply nothing in the contractual language which limits defendants' repurchase obligations in such a manner." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 105 A.D. 3d 412, 413 (1st Dep't 2013) (quoting *Syncora Guar. Inc.*, 874 F. Supp. 2d 328); *see also MASTR Adjustable Rate Mortg. Trust 2006-OA2 v. UBS Real Estate Securities Inc.*, No. 12-cv-7322, 2015 WL764665, at *15 (S.D.N.Y. Jan. 9, 2015) (collecting cases).

Similarly, Judge Rakoff explained in applying the adverse and material effect standard that there is no basis to require a showing of any loss:

> [T]he Transaction Documents do not mention "cause," "loss" or "default" with respect to the defendants' repurchase obligations. If the sophisticated parties had intended that the plaintiff be required to show direct loss causation, they could have included that in the contract, but they did not do so, and the Court will not include that language now under the guise of interpreting the writing.

*Flagstar I*, 892 F. Supp. 2d, at 602–03 (footnote and internal quotation marks omitted).

And Judge Rakoff explicitly rejected the proposition that post-securitization "life events" of the type Lehman's materiality expert Daniel Castro refers to (TRX 921, Expert Report of Daniel

I. Castro ¶ 51 (June 1, 2017) ("Castro Rep.")), *i.e.*, loans as to which "a life event unrelated to any underwriting deficiencies significantly changed the borrower's circumstances, such as divorce, unexpected medical expenses and loss of income," *Flagstar II*, 920 F. Supp. 2d at 493, are relevant:

> [G]iven the Court's prior ruling that the causation that must here be shown is that the alleged breaches caused plaintiff to incur an increased risk of loss, it is irrelevant to the Court's determination of material breach what Flagstar believes ultimately caused the loans to default, whether it is a life event or if the underwriting defects could be deemed "immaterial" based on twelve months of payment. Risk of loss can be realized or not; it is the fact that Assured faced a greater risk than was warranted that is at issue for the question of [material] breach.

*Id*. at 511 (internal quotation marks and citation omitted). When the parties to these securitizations agreed to require loss causation as a predicate for a claim, they did so expressly.[35] There is simply nothing in the Governing Agreements that requires loss causation for a repurchase based on a breach of Lehman's representations and warranties.

Accordingly, that a loan is still performing and has not gone into default does not excuse Lehman from its repurchase obligation. In fact, "performing" is often a misnomer. Over 11,000 of the over 15,000 loans that have not yet been liquidated have been modified—meaning the Trusts already suffered a loss on the loans. TRX 648, App'x B, Reply Expert Report of Richard W. Ellson, Ph.D, (Aug. 28, 2017). In arguing repurchase is not required for these nonliquidated loans, Lehman's expert Mr. Castro is far afield from the industry, the case law and Lehman itself. *E.g.*, TRX 922, Rebuttal Report of Daniel I. Castro Jr. ¶¶ 15, 68–69 (July 27, 2017) ("Castro Reb."). Judge Rakoff explicitly rejected just that position in *Flagstar*, and this Court should do the same.

---

[35] The Governing Agreements require that any loan delivered without a complete set of documents defined as the "Mortgage File" must be repurchased, but only if the depositor failed to cure the deficiency and the trust suffered a loss on the loan that was "attributable to the failure of the Depositor to cure" the defect; and a loss was attributable to the failure to cure if "absent such Material Defect [defined as, a missing or damaged document], such loss would not have been incurred." *See, e.g.*, TRX 202, SAS 2006-S3 TA § 2.02(c) (Aug. 1 2006); *see also* TRX 666, Rebuttal Report of Fiachra T. O'Driscoll at 9–10 n. 16 (July 27, 2017).

*See Flagstar II,* 920 F. Supp. 2d at 511 ("loans that had paid in full or were still performing" "remain relevant to the Courts' determination of material breach"). The case law is consistent with industry practice: market participants routinely make, and honor, repurchase requests on active loans. *See, e.g.*, TRX 662, Report of Fiachra T. O'Driscoll ¶ 37 (June 1, 2017).

The further answer to Lehman's default and loss causation arguments, if one is required, is that Lehman routinely demanded repurchase of performing loans. Trumpp Dep. 159:19–160:10. Lehman referred to putback claims on active loans as repurchase claims and putback claims on liquidated loans as "make whole" claims. Aurora R&W Process § 4.0. And Lehman's position does not merely contradict the positions it has taken elsewhere. It is also contrary to Lehman's statement in the Protocol Motion that the "Purchase Price equation can be applied to a loan at any point in its life-cycle (performing, non-performing, pre-liquidation, post-liquidation)." TRX 876, Lehman Cross-Motion, Dkt. 46526 ¶ 84 (Oct. 15, 2014) ("Protocol Mot.").[36] Lehman can't have it both ways.

## B. Each of the Breaches Here Had a Material and Adverse Effect

The identified breaches increased the risk of loss on the loans and thus materially and adversely affected their value. A plaintiff may rely on the "methodology underwriters apply in the field" and need not apply "mechanical standards for defining all the circumstances that might create a material breach." *Flagstar II*, 920 F. Supp. 2d at 505; *MARM III*, 205 F. Supp. 3d at 469–70 ("There is no mechanical formula that can reliably be applied."). And trustees "need not quantify the amount of ongoing economic impact" to prove materiality. *Id.* at 468.

---

[36] TRX 842, Hr'g Tr. Dkt. 18251, at 35:5–6 (Jun. 30, 2011) (as Lehman's counsel stated, "a default isn't necessary to have breach").

Here, as the evidence will show, Mr. Aronoff determined that the identified breaches increased the risk of loss. These findings are in accordance with industry understandings (Aronoff Rep. at 39-40), relevant precedent (*see supra* at 36–37) and Lehman's own assessments. Indeed, the point is indisputable with respect to the four core breaches. *See supra* III.A.1 & 3.

As Judge Castel recognized in *MARM III*, the material and adverse effect resulting from representation and warranty breaches at the time of a securitization's closing typically carry on indefinitely. *MARM III*, 205 F. Supp. 3d at 466–68. Those include intentional misrepresentations of income; breaches that result in loan interest rates lower than they should have been; and breaches that effectively result in the Certificateholders not receiving what they bargained for. *Id.* With limited exceptions not applicable here, the effects of breaches at securitization become baked into the securitization itself. That the material and adverse effect created by material breaches at the time representations and warranties are breached—at the Cut-Off Date—continues indefinitely is also implicit in Judge Rakoff's holding in *Flagstar II* that life events and the continued performance of breaching loans are irrelevant to the materiality analysis. *Flagstar II*, 920 F. Supp. 2d at 511.

## IV.    THE COURT SHOULD REJECT LEHMAN'S ARGUMENTS THAT ARE NOT BASED ON THE LOAN-BY-LOAN EVIDENCE

Lehman also attempts to avoid the Court's scrutiny of the unrebutted evidence of Lehman's breaches by inviting it to look instead at other settlements and the "behavior" of certain investors. Not even Lehman's expert finds that approach persuasive. He twice notes in his report that "[a]n analysis of settlements should be interpreted with caution in this context because the purpose of the Estimation Proceeding is not to determine whether a particular settlement is within the range of comparable settlements, but rather analysis of Lehman's and Trustees' Proposed Allowed

Claims."  TRX 579, Expert Report of Daniel R. Fischel ¶ 34 (July 27, 2017).  Lehman's own statements in its Rule 9019 motion are to the same effect.[37]

Likewise, "the behavior of the Institutional Investors" is also irrelevant.  As Judge Smith will testify, the analysis of Institutional Investors' behavior ignores the behavior of other actors, such as the Trustees which demanded the revised Settlement Agreement, and other factors that could influence the Institutional Investors to settle.  TRX 678, Expert Report of Robert S. Smith ¶¶ 12–23 (Aug. 28, 2017) ("Smith Reply").  Adopting Lehman's eleventh-hour suggestion would deprive the Trustees of a key component of the consideration provided in the Settlement Agreement—a fair procedure for an accurate valuation of the Claims even as it mitigated their downside financial risk.

Lehman also suggests that the Court could just apply various discounts to reach its proposed $2.3 billion estimate.  But the "success assumptions" used by Professor Cornell in generating his matrix are not based on any actual analysis—they were "provided to [him] by counsel" and he "did not do anything to determine whether [they] were a reasonable assumption."  TRX 973, Dep. of Bradford Cornell at 22:4-24:13 (Oct. 8, 2017) ("Cornell Dep.").  Lehman assumes that the Trustees are successful *at most 20%* of the time for any breach category and are successful only *one percent* of the time for numerous breach categories.  A claims estimate applying those percentages would be contrary to the evidence adduced during the Protocol and would fail to allow for the rigorous, principled outcome the parties negotiated for.[38]

---

[37] Exhibit G at 93 ("the Court can make a realistic assessment of the outcome of the RMBS Trustees' claims"); TRX 884, Decl. of Zachary Trumpp, Dkt. 55692 at ¶ 3 (June 30, 2017) ("[T]he RMBS Settlement Agreement establishes a streamlined process to determine and resolve certain loan-level repurchase claims asserted by certain trusts against LBHI.")

[38] Lehman's alternatives also fly in the face of its prior insistence on a "full loan-level claims reconciliation" it demanded in seeking the Protocol.  Protocol Mot. at 6.

## V.    QUANTUM OF THE CLAIM

The remedy for an adverse and material breach of Lehman's representations and warranties is payment of the contractually defined Purchase Price for the breaching loans.  Although the Governing Agreements contemplate "repurchase" by Lehman, "a court may award the money damage equivalent of the repurchase remedy"—i.e., an amount equivalent to the contractual Purchase Price, "where a court sitting in equity may not award specific performance." *MARM III*, 205 F. Supp. 3d at 414; *Nomura Home Equity Loan, Inc.*, 133 A.D.3d at 106.

The parties appear to agree that the value of a valid RMBS Claim is the Purchase Price that Lehman is contractually obligated to pay for a breaching loan.  The Purchase Price is specified by a formula in the Governing Agreements that generally is the sum of: (a) the unpaid principal balance of the Mortgage Loan; plus (b) unpaid and accrued interest at the applicable Mortgage Loan note rate; plus (c) unreimbursed servicer advances, including principal, interest and servicer advances.  TRX 682, Expert Report of Karl N. Snow, PhD. ¶ 21 (June 1, 2017) ("Snow Rep."); *see, e.g.*, TRX 254, SAS 2006-S4 MLSAA § 1.01.  These amounts are easily obtainable from the detailed, loan-by-loan month-by-month publicly available remittance reports used to generate the monthly disbursements to investors, and where losses have been suffered, to write down the certificate balances of investors.

Dr. Karl N. Snow will testify as to the Purchase Price of each of the Breaching Loans identified by Mr. Aronoff.  In sum, the Purchase Amount is approximately $14.3 billion—consisting of $9 billion for liquidated loans and $5.3 billion for non-liquidated or "active" (mostly

on a modified basis) loans. Snow Rep. ¶ 19.[39]  Lehman does not dispute Dr. Snow's methodology or calculations. The details of Dr. Snow's methodology are set forth in his affirmative report.[40]

Because the Court may determine that the estate is entitled to get a credit for the current value of the performing (but breaching and mostly modified) loans, the Trustees will also present a Purchase Amount net of that value. Dr. Ellson uses LoanKinetics developed by Andrew Davidson & Co. ("ADCo."), a sophisticated statistical and analytical whole loan residential mortgage system. TRX 640, Expert Report of Richard W. Ellson, Ph.D. (June 1, 2017). After netting the current value of the nonliquidated loans, the total net Purchase Amount is approximately $11.4 billion.

According to Lehman, however, the Trusts should not recover at all on the non-liquidated loans.[41]  *See, e.g.*, TRX 939, Expert Report of Bradford Cornell ¶¶ 26–36 (June 1, 2017) ("Cornell Rep."). In short, Lehman argues that any credit cannot be estimated and that Trustees should therefore recover nothing. But Lehman's expert on this point, Mr. Castro, is wrong and provides neither his own model to value the loans nor demonstrates that the Trustees' model is unreliable.

---

[39] The numbers included here and elsewhere have been adjusted in accordance with changes to the population of loans which will be presented for estimation.

[40] At the deposition of Lehman's witnesses, Lehman for the first time suggested that the Trustees' calculation of Purchase Price was improper because it included post-petition interest. Lehman's argument ignores the controlling bankruptcy law and Lehman's own statements to the court about the repurchase protocol. The argument is also completely off the mark. The Purchase Price for virtually every one of the liquidated loans is entirely unpaid principal. Snow Rep. ¶ 26. And interest is only a minimal portion of the Net Purchase Price of the non-liquidated loans.

[41] Lehman has suggested (although its experts have not) that the Trusts are not entitled to damages for liquidated loans or that their Purchase Price is $0, although it has not articulated its position clearly. Such a position has in any event been rejected by New York courts. *Nomura Home Equity Loan, Inc.*, 133 A.D.3d at 105; *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prod., Inc.*, 958 F. Supp. 2d 488, 504 (S.D.N.Y. 2013).

Lehman is also wrong as a matter of law. "Simply put, it is always the breaching party (read: 'wrongdoer') who must shoulder the burden of the uncertainty regarding the amount of damages." *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 392 (2d Cir. 2006). Moreover, in an estimation hearing, precision is not required: estimation hearings provide for the "speedy and rough estimation" of claims. *In re Chateaugay Corp.*, 944 F.2d 997, 1006 (2nd Cir. 1991). And regardless, Lehman's arguments against the use of the ADCo. model are specious at best. As Dr. Ellson will explain, the criticisms amount to flyspecking that, if accepted as fatal, would lead to the absurd conclusion that valuation models are never permitted. TRX 646, Reply Expert Report of Richard W. Ellson PhD ¶¶ 10–14 (Aug. 28, 2017).[42]

Finally, Mr. Castro's assertion that the Trusts could receive a "windfall" if the loans liquidate without a loss is wrong and misses the point. The reason why the Trusts offered to provide a credit to Lehman for the value of the nonliquidated loans is because Lehman stated that the estate could or would not repurchase the loan with "real dollars," only "bankruptcy dollars." This would result in a windfall to *Lehman*; it would get the full present value of the loan and pay only the discounted claim value of the Purchase Price. The Trustee's plan mimics the economics of an actual repurchase given the constraints of bankruptcy. The opposite of Mr. Castro's hypothetical is likewise true—the loans could liquidate with a greater loss than predicted by the model, resulting in a loss to the Trusts and a windfall to Lehman.

---

[42] Particularly galling is Mr. Castro's claim that Lehman and he were not provided sufficient information regarding the model or that Dr. Ellson did not sufficiently explain its workings. Castro Reb. ¶¶ 59-64. The Trustees offered to provide (at the Trustees' expense) Lehman and Mr. Castro a license to use the ADCo model—Lehman elected not to take the license. On the other hand, Lehman's expert Dr. Fischel relied on a component of the ADCo model to propose a counter-estimate. TRX 896, Letter from T. Cosenza to M. Shuster at 2 (Aug. 15, 2017).

## VI.    THE TRUSTEES ARE ENTITLED TO RECOVER FOR THE "ON HOLD" LOANS

Lehman also contends it should get off scot-free for almost 25,000 loans for which the Trustees identified almost 40,000 breaches on the sole ground that the loan files are missing one of four documents it unilaterally deemed "critical": (1) borrower payment histories, (2) servicing notes, (3) corporate expense logs and (4) final loss certifications.  Cornell Rep. ¶¶ 22, 28; Grice Rep. ¶ 54.  Lehman contends these documents are either necessary for its loss causation/materiality analysis or to "audit" the Trustee's Purchase Price calculation.  During the Protocol, in an effort to resolve these (in the Trustees' view baseless) objections the parties agreed to temporarily set aside these loans pending the resolution of the other loans.  Certainly, the Trustees never waived their right to present these claims during the Protocol or at an estimation hearing.  Moreover, for the reasons below and in the Trustees' opposition to Lehman's Expungement Motion, not one of the four documents is necessary to prove liability or damages on any of the on hold loans.[43]

*First*, Lehman's claim that it needs the expense logs and the final loss certifications to calculate, evaluate or "audit" the contractually defined Purchase Price is spurious: the evidence the Trustees rely on is more accurate.  Snow Rep. ¶ 15–16; TRX 691, Expert Rebuttal Report of Karl N. Snow ¶ 19–22 (July 27, 2017) ("Snow Reb."); Expungement Opp. ¶¶ 19, 27.  In his calculations, Mr. Snow "relied on monthly transaction and loan-level data as reported by the Master Servicers and other information providers."  Snow Rep. ¶ 15–16.  This data is generated by the Master Servicer's system of record and is used by trustees or securities administrators to publish the monthly remittance reports required under the Trust Agreements and relied upon by

---

[43] TRX 857, Response of the RMBS Trustees to Leman Brothers Holdings Inc.'s Second Objection to Certain RMBS Trust Claims and Motion to Disallow and Expunge Certain RMBS Trust Claims for Insufficient Documentation, Dkt. 53730 (Sept. 29, 2016) ("Expungement Opp.").  Roughly 12,000 of the 25,000 loans are subject to the portion of Lehman's Expungement Motion seeking to expunge loans missing the corporate expense log and final loss certification.

investors, other third parties and experts in the field. Snow Rep. ¶ 18; Snow Reb. ¶¶ 16–26; TRX 636 Rebuttal Expert Report of John Burnett ¶ 41 (July 27, 2017) ("Burnett Reb."). In contrast, final loss certifications and corporate expense logs are not reliable, as they often fail to account for trailing losses or recoveries and often have manual data entry errors or require other revisions. Snow Reb. ¶ 22; Burnett Reb. ¶ 33–41. Tellingly, Dr. Cornell never used either (and did not even know what a corporate expense log was). Cornell Dep. 93:1994:18. Mr. Snow compared the differences in the loss amounts as determined by the reported data with that in the loss certificates and corporate expense logs and found the differences to be either non-existent, explained by omissions in the servicing documents, or negligible. Snow Reb. ¶¶ 24–25. And notwithstanding its review of tens of thousands of claims throughout the Protocol process, and acceptance of hundreds of loans for repurchase, Lehman did not identify a single instance where the Trustees' Purchase Price was proved incorrect by reference to a loss certification or corporate expense log. *See also* TRX 856, Aff. of Allen Pfeiffer, Dkt. 53731 ¶ 35 (Sept. 29, 2016) ("Pfeiffer Aff.").

*Second*, the documents are not needed to evaluate whether the loans breached Lehman's representations and warranties, and Mr. Grice has not suggested they were. Grice Rep. ¶ 75–76; Grice Dep. 280:2–9 ("I am not disputing that one could review a loan file that is missing documents."); Morrow Reb. ¶ 28; Aronoff Reb. ¶ 55.[44] Lehman argues it needs to review "servicing notes and payment history information relevant to the borrower's circumstances after origination" as part of asserting Lehman's loss causation defense. Grice Rep. ¶ 75; Castro Rep. ¶ 102. But as established above, as a matter of law, the Trustees need not show loss causation. *See*

---

[44] Furthermore, Aurora's due diligence policy lists the "minimum" documents required for a "full review" and does not include any of the "critical" documents identified by Lehman. TRX 701, Aurora, Master Servicing, Asset Risk Management, Due Diligence Process Policy § 3.1 (May 11, 2012) LBHIT7_00004236 at 4239–40. The policy only states that "if available" servicing notes should be "review[ed] for reason for default". *Id.*

*supra* III.A.  And even if the documents were relevant to a breach analysis, the absence of one piece of evidence does not preclude a party from making the required showing using the evidence that is available.  *Mapssy Int'l, Inc. v. Marc Gardner, Cinq, Ltd.*, No. 09-CV-8185 ALC, 2013 WL 395109, at *2 (S.D.N.Y. Feb. 1, 2013) ("The law makes no distinction between direct and circumstantial evidence.").  Having not reviewed the loans, Lehman is unable to "have a position on those loans."  Trumpp Dep. 182:2–11.

*Third*, the documents are not required under either the contracts or the Protocol.  While the Governing Agreements require loan-specific evidence (which the Trustees have provided), they do not require any particular documents to advance a repurchase claim nor is the servicer required to certify the Purchase Price calculation.  *See, e.g.*, LXS 2006-15 TA; LXS 2006-15 MLSAA.  And under the Protocol, the RMBS Claim File to be supplied by the Trustees "may" include the documents listed in Exhibit B to the Protocol "to the extent such documentation is available".[45] (Notably, final loss certifications are not included in Exhibit B at all.[46]  Protocol, Exhibit B.)  With respect to the "supporting documentation" required to be provided with the Purchase Price, the Protocol again does not require any specific documents.  *Id.*; *see also* Expungement Opp. ¶ 18.

---

[45] The Protocol states that "[a] RMBS Claim File shall include . . . (1) The Mortgage Loan File, including, at a minimum, all of the loan documents the RMBS Trustees received from the applicable master servicer, primary servicer and/or any other party, or otherwise relied upon in making their claim, which *may* include the documentation identified in Exhibit B, to the extent such documentation is available and applicable to a particular loan file. . . . (4) A calculation of the Purchase Price (as defined in the governing agreement), together with all supporting documentation."  Protocol § III(e)(vi)(1) (4) (emphasis added).  Lehman previously wanted Exhibit B to constitute a minimum requirement, but that was rejected.  *See* TRX 878, Protocol Mot., Ex C, Dkt. 46526-3 at I.a.v.1; TRX 841, Protocol Hr'g Tr., Dkt. 49007 at 75:18-25 (Dec. 10, 2014) ("Protocol Hr'g Tr.").  At the Hearing on December 10, 2014, Lehman's counsel ultimately conceded that they did not need all documents listed in Exhibit B.  Protocol Hr'g Tr. 338:23–339:13.

[46] The direction letters, edited and approved by Lehman, required by the Protocol also do not request either the logs or certifications.  Expungement Opp. ¶ 21; TRX 862, Aff. of Edmond Esses, Dkt. 53732 ¶ 6 (Sept. 29, 2016) ("Esses Aff.").

Nonetheless, as Duff and Phelps's Mr. Esses will testify, the Trustees diligently sought to obtain these documents in an effort to limit the issues to be put before the Court. As detailed above and in their opposition to the Expungement Motion, the Trustees requested all loan file documents from the servicers and specifically followed up regarding the servicing information requested by Lehman. Pfeiffer Aff. ¶ 21; Esses Aff. ¶ 59, 62-67. The servicers either promptly provided the documents or represented that everything had already been provided. *Id.*

*Finally*, many of the Aurora loan files that were to serve as the "template" for a Complete File under the Protocol (§ II.a) do not contain final loss certifications or corporate expense logs. These were the loan files that Lehman's counsel represented to the Court were "ready to go." Protocol Hr'g Tr. 327:6-10. Out of "500 randomly-selected Aurora loan files," Duff & Phelps "found that 305 (or 61.0%) of them did not have loss certifications" and "that 328 of the 500 (or 65.8%) of them did not have a corporate expense log." Expungement Opp. ¶ 24. This demonstrates files can be considered complete without these documents.

## CONCLUSION

The Trustees' Claims are straightforward breach of contract claims. Lehman sold the Trusts thousands of loans that breached its representations and warranties, leaving investors with riskier loans than they agreed to invest in. The remedy for Lehman's breaches is contractually mandated: repurchase at the approximately $11.4 billion Purchase Price.

Dated:   October 19, 2017


HOLWELL SHUSTER & GOLDBERG LLP

By: /s/ Michael S. Shuster
    Michael S. Shuster
    Dwight A. Healy
    Benjamin F. Heidlage
    Timothy Grinsell
    750 Seventh Avenue, 26th Floor
    New York, New York 10019
    Telephone: (646) 837-5151


*Counsel for RMBS Trustees*

CHAPMAN AND CUTLER LLP

    Franklin H. Top III (admitted *pro hac vice*)
    Scott A. Lewis (admitted *pro hac vice*)
    111 West Monroe Street
    Chicago, Illinois 60603
    Telephone: (312) 845-3000

*Counsel for U.S. Bank National Association,*
*solely in its capacity as Indenture Trustee for*
*Certain Mortgage-Backed Securities Trusts*

ALSTON & BIRD LLP

    John C. Weitnauer (admitted *pro hac vice*)
    Jason Solomon (admitted *pro hac vice*)
    1201 West Peachtree Street
    Atlanta, Georgia 30309
    Telephone: (404) 881-7000

*Counsel for Wilmington Trust Company and*
*Wilmington Trust, National Association, each*
*solely in its capacity as Trustee for Certain*
*Mortgage-Backed Securities Trusts*

SEWARD & KISSEL LLP

    M. William Munno
    One Battery Park Plaza
    New York, New York 10004
    Telephone: (212) 574-1587

*Counsel for Law Debenture Trust Company*
*of New York, solely in its capacity as Separate*
*Trustee for Certain Mortgage-Backed*
*Securities Trusts*

NIXON PEABODY LLP

    Richard C. Pedone (admitted *pro hac vice*)
    Christopher Desiderio
    437 Madison Avenue
    New York, New York 10022
    Telephone: (212) 940-3085

*Counsel for Deutsche Bank National Trust*
*Company, solely in its capacity as Trustee for*
*Certain Mortgage-Backed Securities Trusts*