Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9           Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  October 23, 2017

17                  2:02 PM

18

19

20   B E F O R E :

21   HON SHELLEY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24   ECRO:  SHEA

25

1    HEARING re Status Conference re Claim No. 29606

2

3    HEARING re Lehman/RMBS Pretrial Conference

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1    A P P E A R A N C E S :

 2

 3    WEIL, GOTSHAL & MANGES LLP

 4         Attorneys for the Debtors

 5         767 Fifth Avenue

 6         New York, NY 10153

 7

 8    BY:  RICHARD L. LEVINE

 9         GARRETT FAIL

10         SCOTT BOWLING

11

12    WHITE & CASE

13         Attorneys for Ad Hoc Group of Creditors

14         1221 6th Avenue

15         New York, NY 10020

16

17    BY:  GREGORY M. STARNER

18

19    ALSTON & BIRD LLP

20         Attorneys for Wilmington Trust as Trustee

21         One Atlantic Center

22         1201 West Peachtree Street

23         Atlanta, GA 30309

24

25    BY:  KIT WEITNAUER
```

Page 4

1   HOLWELL SHUSTER & GOLDBERG LLP

2       RMBS Trustees

3       750 Seventh Avenue, 26th Floor

4       New York, NY 10019

5

6   BY:  DORIT UNGAR BLACK

7       MICHAEL SHUSTER

8       DANIEL P. GOLDBERG

9       NEIL R. LIEBERMAN

10      DWIGHT HEALY

11      LANI A. PERLMAN

12

13  SEWARD & KISSEL LLP

14      Attorneys for TMI Trust Company in its Capacity as

15      Separate Trustee

16      One Battery Park Plaza

17      New York, NY 10004

18

19  BY:  M. WILLIAM MUNNO

20

21

22

23

24

25

Page 5

1   CHAPMAN and CUTLER LLP

2        Attorneys for U.S. Bank National Assn as Trustee

3        111 West Monroe Street

4        Chicago, IL 60603

5

6   BY:  FRANKLIN H. TOP III

7

8   WILLKIE FARR & GALLAGHER LLP

9        Attorneys for the Debtor

10       787 Seventh Avenue

11       New York, NY 10019

12

13  BY:  BENJAMIN P. MCCALLEN

14       JOSEPH G. DAVIS

15       TODD G. COSENZA

16       JONATHAN D. WAISNOR

17

18  ROLLIN BRASWELL FISHER LLC

19       Attorneys for the Debtors

20       8350 E. Crescent Parkway, Suite 100

21       Greenwood Village, CO 80111

22

23  BY:  MICHAEL ROLLIN

24

25

1                    P R O C E E D I N G S

2            THE COURT:  So now we're back together.  We had

3    extensive argument on this and then there was a decision

4    issued with respect to claims asserted by the Maverick Funds

5    that, at least in my mind, had some bearing or similarity to

6    the claims here.  I'm not sure if the Maverick decision,

7    what the time line was with respect to when that came down

8    and when your mediation was, but then there was some

9    correspondence basically saying mediation had failed, could

10   we have a ruling.

11           So ever being the optimist that things can be

12   settled short of a ruling, I thought I would have you come

13   back in and talk some more.

14           MR. LEVINE:  Okay, Your Honor.

15           THE COURT:  All right?  And maybe we talk about

16   Maverick, and maybe we revisit the mediation.  Maverick is

17   up on appeal and your guess is as good as mine as to how

18   long that will take.

19           MR. LEVINE:  Right.  As we were discussing, it's

20   been fully briefed --

21           THE COURT:  Yeah.

22           MR. LEVINE:  -- but we haven't heard from Judge

23   Abrams --

24           THE COURT:  Yeah.

25           MR. LEVINE:  -- about anything, so.

1              THE COURT:  Well, they're busy up there, so

2    sometimes it's takes a while.

3              MR. LEVINE:  Yes.

4              THE COURT:  So, how should we start?  I don't mean

5    to be so open-ended about it, but --

6              MR. LEVINE:  Well, I mean, I get -- since the

7    email from chambers asked us to, at least in part, be

8    prepared to address Maverick --

9              THE COURT:  Yeah.

10             MR. LEVINE:  -- we are prepared to do that.  Given

11   I was taught by my mom never to come empty-handed, I, like

12   usual, have a hand up.

13             THE COURT:  That's fine.

14             MR. LEVINE:  So if Your Honor wants me to start,

15   we can talk about --

16             THE COURT:  Yeah, why don't you do that.

17             MR. LEVINE:  Okay.

18             THE COURT:  And you can respond.  And --

19             MR. STARNER:  Certainly.

20             MR. LEVINE:  I also have a copy of the chart that

21   we handed up last time, just with the number --

22             THE COURT:  Yeah, that would be -- I have --

23             MR. LEVINE:  -- with the numbers.

24             THE COURT:  -- looked at that, but that would be

25   helpful and I can go back to that as well.

Page 8

```
 1              MR. LEVINE:  So this is -- the numbers chart is

 2    exactly the same as the one we, you know, (indiscernible).

 3              THE COURT:  Thank you.

 4              MR. LEVINE:  So apologies of the font.

 5              THE COURT:  That's okay.

 6              MR. LEVINE:  We had --

 7              THE COURT:  I've seen worse.

 8              MR. LEVINE:  -- I had a debate with my --

 9              MR. FAIL:  Group.

10              MR. LEVINE:  Thank you, Garrett.  A debate with my

11    colleagues of younger eyes and I lost the debate, so.

12              THE COURT:  It's okay.

13              MR. LEVINE:  Okay.  So we obviously had a number

14    of arguments that Maverick had nothing to do with.

15              THE COURT:  Right.

16              MR. LEVINE:  Principally, being Maverick had an

17    expressed written guarantee.  SRM is relying on the

18    corporate resolution --

19              THE COURT:  Right.

20              MR. LEVINE:  -- and we hear the old argument about

21    the non-reliance clause.

22              THE COURT:  Under -- right.

23              MR. LEVINE:  That obviously did not come up in

24    Maverick, because they had a --

25              THE COURT:  Right.
```

Page 9

1          MR. LEVINE:  -- written guarantee.

2          THE COURT:  Understood.

3          MR. LEVINE:  So we have five arguments that we

4    think are outcome determinative based on the Maverick rule.

5    And I -- if you want, I can just go -- walk through these?

6          THE COURT:  Please.

7          MR. LEVINE:  The first one is that Your Honor held

8    in the Maverick transcript, that where the primary claim is

9    satisfied in full, there's no guarantee claimed.  Here, the

10   -- with respect to the segregated assets claim, the amount

11   in the proof of claim is 97.7 million and they got 220

12   million from LBIE.  So as far as we're concerned, that

13   aspect of the Maverick ruling precludes them recovering on

14   the segregated assets claim.

15          The -- if you look at the proof of claim, the 97.7

16   million is added to an $8.9 million cash claim in the

17   summary paragraph to come up with the total.  But the 8.9

18   million cash claim they agree was fully satisfied, so it's

19   only the 97.7 million segregated assets claim of those two

20   that's still outstanding.  I'm not even sure I understand

21   where the 97.7 comes from, but it's --

22          THE COURT:  Yeah.

23          MR. LEVINE:  -- the amount on the face of the

24   claim.  And they got 220 million.

25          The second principle we take from the SRM ruling

1    that we think is applicable here is that SRM, at this late

2    date, should not be allowed to amend its claim either to

3    increase the amount of the segregated assets claim to 264

4    million, which they say is the value as of their settlement

5    date, or to try to bolster the lost opportunities claim.

6    Lost opportunities claim in the proof of claim just talks

7    about how because of the confusion and incorrect margin

8    notices that LBIE was sending to SRM in the months after

9    LBIE filed for administration, they were unable to devote

10   resources looking for new investments.  And if they had had

11   the opportunity to look for new investments they would have

12   earned $100 million.  So there's obviously -- we've argued

13   that that's an inadequate pleading for a lost opportunities

14   claim.  They would like to amend, we don't think they should

15   be allowed to amend, based on the Maverick ruling, to either

16   increase the amount of the segregated assets claim or to try

17   to bolster a lost opportunities claim.

18          We don't think they could bolster it anyway, in

19   terms of the lost opportunities, but --

20          THE COURT:  Under -- whether I apply New York law

21   or English law?

22          MR. LEVINE:  That's correct.  If we want to talk

23   about that briefly on the side, the main case that they rely

24   on, under English law, for the right to recover lost

25   opportunity damages is the Aerospace Publishing decision,

Page 11

1    referenced by their expert.  But the Aerospace Publishing is

2    a decision which I think went through five or six prior

3    examples under English law, dealing with lost opportunities.

4    They were inconsistent, the Judge tried to pull them

5    together, disagreed with some other judge who was said they

6    were inconsistent.  But the key thing is in each one of

7    those cases the issue was whether the claimant would be

8    entitled to the wages they paid their workers during the

9    period they were trying to fix.

10           So Aerospace Publishing is a flood, and part -- in

11   addition to the damage to -- or the library of photographs

12   and similar things, one was aerospace, I forget what the

13   other one was, but they were a specialized publisher and

14   they had all these vaults and (indiscernible).  They had

15   tables with all these valuable aerospace drawings and

16   pictures and charts, and they were ruined in a flood.  And

17   in addition to the value that was lost by the damage to the

18   property, the claimant they wanted the wages they paid their

19   workers for the period of time that they were mopping up and

20   cleaning up and trying to assess what happened.

21           And that's -- and each of the other lost

22   opportunity cases that are discussed by the judge in

23   Aerospace Publishing, that's the issue, do you get the

24   workers' wages as part of your claim.  And as, I guess a

25   proxy, that's my word, not theirs, for lost profits.  But

Page 12

1    obviously the crucial thing there is that's easily capable

2    of proof, how much you pay your workers totally dispenses

3    with the issue of how do you prove how much you would have

4    earned if you had made some speculative investments.  They

5    haven't cited a single case, and I'm not aware of any, where

6    an English Court gave what I would call speculative profits.

7             THE COURT:  Right.  And so there I think the issue

8    that we talked about last time is this is a sufficiency

9    hearing.

10            MR. LEVINE:  Right.

11            THE COURT:  Right?  So the notion coming back at

12   you is, you know, at a sufficiency hearing it would be

13   inappropriate to resolve that.

14            MR. LEVINE:  Well, except they have to plead

15   something, right?

16            THE COURT:  Except for -- to which you say, except

17   for they have to plead something.

18            MR. LEVINE:  And even their expert agreed that

19   pleading is an issue of U.S.  Law, not English law, even

20   though this is an English law governed contract.  And I

21   think our point is that under both New York law as a matter

22   of pleading, and under the English law as a matter of

23   substance, they couldn't plead anything which would allow

24   them to be able to get lost opportunities.  Because their

25   theory is that they were so distracted by what was happening

Page 13

```
1    with LBIE --

2              THE COURT:  Right.

3              MR. LEVINE:  -- that they couldn't find the

4    investments.  So given that pleading, we don't think they

5    could ever plead -- and we also cite a bunch of cases in our

6    objection where New York Courts and federal Courts applying

7    New York law have dismissed law opportunity -- lost

8    opportunity, lost profit types claims at the motion to

9    dismiss stage.  So it's not a unique argument we're making.

10             THE COURT:  Okay.  All right.

11             MR. LEVINE:  Okay.  So the second point on our

12   list in Maverick principles is that they shouldn't be

13   allowed to amend at this point.

14             The third principle we take from Maverick is the

15   application of Section 562.  In Maverick the settlement

16   agreement between Maverick and LBIE is what terminated the

17   PBA and everything else.

18             THE COURT:  Right.

19             MR. LEVINE:  Here we have an expressed letter from

20   SRM to LBIE, in November of 2008, terminating the PBA.  On

21   that date the lost opportunities claim was worth about 34

22   million.

23             MAN:  Segregated assets.

24             THE COURT:  Segregated.

25             MR. LEVINE:  Sorry, segregated assets.
```

Page 14

1                    THE COURT:  Segregated assets.

2                    MR. LEVINE:  Thank you.  Segregated assets claim

3      is worth 34 million, they recovered 220.  So if we're -- if

4      5, 6 and 2(a) applies, and we think it does, and I mean

5      there's -- can be no doubt, Your Honor ruled in Maverick

6      that a PBA is a securities contract, you ruled that a

7      guarantee of a PBA --

8                    THE COURT:  That it is --

9                    MR. LEVINE:  -- is a securities contract, you

10     ruled that the termination date is what governs the

11     measurement of damages.  What we're talking about here is

12     the value of publicly traded stock.  In their objection to

13     the estimation motion, in Paragraph 29 they actually assert,

14     "SRM's damages resulting from LBIE's failure to return the

15     segregated assets are liquidated because the value of such

16     assets can be readily measured by reference to share price

17     quotations and multiplying them by the number of shares

18     owned by SRM that were to be segregated." So that's their

19     objection to the estimation motion.  I think it's Tab 10 of

20     the binder, Paragraph 29, Page 13.

21                   So we don't think there's any -- I mean, it's --

22     we haven't disputed our arithmetic.  They admit that that's

23     how you would calculate their damages.  Their damages, on

24     the termination date were, according to our chart and -- the

25     34 million, and they got 220 million.  So we think the third

Page 15

1   principle we draw from Maverick is that 562(a) precludes

2   their segregated assets claim.

3           Something we were just talking about, the fourth

4   principle is lost opportunities claim.  Your Honor ruled in

5   Maverick that damages based on the investments you would

6   have made, if you had had the opportunity, are not

7   recoverable.  And you dismissed that at the pleading stage.

8   And, you know, here, as we talked about at the sufficiency

9   hearing, their claim is in the round amount of 100 million.

10          Now we understand from -- as they argued last

11  time, that was used as a placeholder, and they should have

12  the right to prove the actual damages.  But from our

13  perspective, that 100 million number is completely telling.

14  It shows just -- they're speculating.  It's a round number

15  that -- you know, I know they don't like this, but from my

16  perspective was pulled from thin air.  It's a good number to

17  throw in.  And as Your Honor pointed out last time, that's

18  not how a proof of claim is supposed to be submitted.  So we

19  think that the Maverick ruling on the lost opportunities

20  claim also applies equally here.

21          And finally, in terms of the -- all three of the

22  claims that we're objecting to, the segregated assets, the

23  forced sales and the lost opportunities are claim, are all

24  barred by the exculpation provisions in the PB agreement,

25  which we think actually are broader in the SRM agreement

Page 16

1    than they were in the Maverick agreement.

2            And just to burden Your Honor a little more, we

3    actually just did a chart which puts them side by side.

4            THE COURT:  Okay.  That's useful.  Thank you.

5            MR. LEVINE:  And there is a whole -- you know, we

6    made arguments based on multiple pieces of language both

7    from 14 -- sorry 16.3(a), I'm looking at the wrong one.  Did

8    I -- I think I handed up the wrong document, Your Honor.

9            THE COURT:  Yeah, I was just --

10           MR. LEVINE:  I'm sorry.

11           THE COURT:  I thought it was me.

12           MR. LEVINE:  Well, it's nothing special though.  I

13   apologize for that.

14           THE COURT:  Thank you.

15           MR. LEVINE:  So the various pieces of 14.3 and

16   14.4 of the SRM LBIE PBA, which we think preclude all of

17   their three claims that we're challenging.  Number one, both

18   14.3 and 14.4 expressly preclude consequential damages.

19           THE COURT:  They say on the -- on this argument,

20   though, they say you're not a third party beneficiary.

21           MR. LEVINE:  Well, and of course we talked about

22   that last time.

23           THE COURT:  Right.

24           MR. LEVINE:  Number one -- there's two arguments

25   there.  Number one, the third party beneficiary clause in

Page 17

1   the PBA says except for affiliates of LBIE, no one can

2   enforce this.  So we think that obviously makes us a third

3   party beneficiary.  Moreover, there's another kind of

4   interesting argument, which I didn't make last time, but

5   under the PBA, first of all, "LBIE enters it for itself and

6   as agent and trustee for and on behalf of the Lehman

7   companies." So agent and trustee.  Then -- that's just in

8   the preamble, Paragraph 1.

9           In Paragraph 2.2 of the PBA, the term "parties" is

10  defined to include the Lehman companies.  If we go to the

11  defined term "Lehman companies," that means any affiliate

12  which is a party to a customer agreement.  And if we go to

13  the definition of "customer agreement," it includes an ISDA,

14  and obviously as we know, on a claim that we're not

15  challenging, LBHI was a -- was the credit support providers,

16  and it's actually called the guarantee, but the guarantee

17  actually says this is, as the credit support provider under

18  the ISDA agreement.  So we think that there's a very strong

19  argument, based on these -- tracking through these

20  definitions, that in fact LBHI is a party.

21          But beyond that, as Your Honor knows, because we

22  spent some time on it last time, the main point is that

23  we're a guarantor.  So if LBIE cannot have liability, we

24  can't have liability as a guarantor.  So if LBIE doesn't

25  have liability because Your Honor finds that these damages

Page 18

1    that they're seeking result directly or indirectly from the

2    general risks of investing, which is language Your Honor

3    adopted, it's very similar language, and Judge Glenn

4    obviously ruled on in MF Global.

5              THE COURT:  Just a general principle that the

6    guarantor cannot have greater obligation than the --

7              MR. LEVINE:  Right.  Right.

8              THE COURT:  -- primary obligor.

9              MR. LEVINE:  But we think that when Your Honor

10   applies MF Global and Maverick to the language in these

11   exculpation provisions, Your Honor will similarly find that

12   these exculpation --

13             THE COURT:  So and I think we went over this last

14   time, but to make it a little more generic --

15             MR. LEVINE:  Um hmm.

16             THE COURT:  -- to the extent that there is an

17   allowed claim against LBIE, right, and it doesn't get paid

18   in hundred percent dollars, right?  A million dollar allowed

19   claim --

20             MR. LEVINE:  Um hmm.

21             THE COURT:  -- against LBIE and the recovery,

22   putting aside issues having to do with timing of

23   distributions, which are very vexing, they're like special

24   relativity problems, right?  But certain point in time, it's

25   time to pay up on the guarantee claim, assuming for the

Page 19

1    moment there's a guarantee claim.  And oh look, the

2    distribution from LBIE, all said and done, is 50 cents on

3    the dollar.  No question that they're entitled to present

4    their claim on the guarantee for the other 50 cents --

5              MR. LEVINE:  Right.

6              THE COURT:  -- right?  But that's not this

7    situation?

8              MR. LEVINE:  That's correct.

9              THE COURT:  Right?  Okay.

10             MR. LEVINE:  All right.  Among other things we

11   dispute that they can enforce the guarantee.

12             THE COURT:  Right.

13             MR. LEVINE:  But everything else --

14             THE COURT:  Right.

15             MR. LEVINE:  -- we don't think this -- that's this

16   situation.

17             THE COURT:  But they have -- they were paid in

18   full the allowed amount of the claim, by LBIE.

19             MR. LEVINE:  That's are argument on the segregated

20   assets claim --

21             THE COURT:  right.

22             MR. LEVINE:  -- among other things.  On the --

23             THE COURT:  For sales and the loss --

24             MR. LEVINE:  For sales we say it's just precluded

25   by the exculpation provisions.

Page 20

1          THE COURT:  Right.

2          MR. LEVINE:  It's clearly a consequential damage.

3   What they're saying is that because we could not access our

4   assets that we had provided to LBIE as collateral, we --

5   when we got margin calls from other broker/dealers, we had

6   to sell certain assets and instead we -- if we had had

7   access to what we had had with LBIE, we would have used

8   those to satisfy the margin calls, not the assets we

9   actually had to sell.

10          And if we still had those assets that we had to

11  sell, they'd be worth a lot more today than what we got for

12  them at the time.  To me, given that is a damages not

13  arising from the contract between LBIE and SRM, but rather

14  damages that arise because of margin calls with third

15  parties, it's clearly indirect or consequential damages and

16  therefore it's precluded.

17          There's also language in 14.3 and 14.4 which

18  expressly says that the only damages, even in the case --

19  and all of this requires them to plead fraud, gross

20  negligence or willful conduct, and they haven't done that.

21  But even assuming they had an alleged fraud, or willful

22  breach or gross negligence, their damages are expressly

23  limited to the value of the securities at the time of

24  breach, which certainly does not open up a claim for either

25  the for sales or the consequential damages.

Page 21

```
 1              So we think we have lots of arguments.  But these
 2    five that are listed here we think are really addressed by
 3    Your Honor's ruling in Maverick and they alone require the
 4    expungement of all three claims that we've challenged.
 5              THE COURT:  Okay.
 6              MR. LEVINE:  Thank you, Your Honor.
 7              THE COURT:  All right.  Thank you.
 8              All right.  Mr. Starner?
 9              MR. STARNER:  Thank you, Your Honor.  What I
10    thought I would do is first address kind of the question of
11    what our position is on Maverick does --
12              THE COURT:  Sure.
13              MR. STARNER:  -- indeed apply.  And I'll try to
14    address some of the issues --
15              THE COURT:  Okay.  That's great.
16              MR. STARNER:  -- kind of in the order that -- Mr.
17    Levine reviewed it.
18              So I think as a general matter, take a step back,
19    the biggest difference I think is very clear between where
20    SRM is and where Maverick was.  The PBAs are different,
21    they're -- it's a different agreement governed by different
22    law.  So the Maverick agreement is a PBA with LBI, LBIE and
23    LBHI.  Whereas SRM's PBA was an English law governed
24    document, a different form of PBA with just LBIE.  So,
25    Judge, I mean that, I think, as a starting point, is a very
```

Page 22

1    distinct difference between the two --

2              THE COURT:  Okay.  Well, that's --

3              MR. STARNER:  -- creditors.

4              THE COURT:  -- factually accurate, but what

5    difference does that really make?

6              MR. STARNER:  Right.  So getting to the, well what

7    does that mean.  You know, in terms of the valuation, and I

8    think one of the key points that Your Honor made with

9    respect to the Maverick claim, and it came up just now, is

10   what was Maverick trying to do, versus what's SRM claiming?

11   And it's basically SRM's claim is they had a claim against

12   LBIE, a claim was then valued at a certain date against

13   LBIE, they settled that claim, and they're seeking to

14   recover the difference between what the claim was and what

15   they received from LBIE as of when that claim was valued

16   under U.K. law.  Whereas, with Maverick, they effectively

17   were asking the Court --

18             THE COURT:  Okay.  Well, but --

19             MR. STARNER:  Yeah?

20             THE COURT:  -- if that's all you wanted, right,

21   then why wouldn't you be looking at the delta on the

22   termination date?

23             MR. STARNER:  Well, I think the termination date

24   did not act to effect -- to value the claim as of the

25   termination date, which because frankly if -- one, if it

Page 23

1    did, this idea it was valued --

2            THE COURT:  But wouldn't there -- but if -- what

3    if the Lehman -- the LBHI plan were ready to roll right

4    about then?  I mean, how is it that you get to these

5    hypothetical investments that you would have made?

6    Hypothetically they're still -- I mean we're in a boom, boom

7    economy now, right?  So your number's just going to -- if I

8    were to say, you're right let's go to trial, you're going to

9    bring in evidence and you're going to show that now the

10   number's not $264 million, it's $400 million?  That's --

11   that is literally your position.

12           MR. STARNER:  Not exactly.  If I can --

13           THE COURT:  Yeah.

14           MR. STARNER:  --I'd like to distinguish between

15   the claims we're talking about.  You have the segregated

16   assets claim.

17           THE COURT:  Right.

18           MR. STARNER:  You have the lost opportunities

19   claim, and you have the for sale claim.  And if I could just

20   start with the segregated assets claim?

21           THE COURT:  Right.

22           MR. STARNER:  That is a claim for property, for

23   (indiscernible).  They sought to recover the actual shares

24   that LBIE was holding or supposed to be holding at that

25   time.  Which we understand the shares were still being held

Page 24

1     by LBIE or someone affiliated with them when the claims

2     settled, so they wanted those shares to be returned to them.

3              So that's the segregated assets claim.

4              On the lost opportunities claim, your point is,

5     well how is that you can then put forward evidence to

6     establish what they could have made?  Well, that's just a

7     matter of evidence.  I mean --

8              THE COURT:  But you -- in the proof of claim on

9     the segregated assets claim, you said the number was $97

10    million.

11             MR. STARNER:  We did have that number in there,

12    Your Honor, but that's -- that was the number valued --

13    those shares --

14             THE COURT:  Yeah.

15             MR. STARNER:  -- the property valued as of the day

16    that the proof of claim was filed as opposed to just putting

17    in nothing, it was basically a value of those claims at that

18    time.  But the claim was clearly for the recovery of those -

19    - of the property, of those shares.

20             So, in other words --

21             THE COURT:  Okay.  But so you --

22             MR. STARNER:  -- if the value of the shares had

23    gone down --

24             THE COURT:  -- you just -- you don't think that

25    562 is applicable?

1          MR. STARNER:  So on that, on 562 I think for the

2   primary reason that this is a U.K. governed instrument that

3   LBHI is not a party to, we believe that 562 does not apply.

4   And there are additional arguments that obviously Maverick

5   raised with the Court, and that's on appeal.  I think there

6   are some additional questions of the (indiscernible)

7   application of 562 and whether or not they would apply here.

8   But I think the primary or principal argument we're making

9   and how we're distinguished from Maverick is we have an

10  English law governed document, that LBHI is not a party to,

11  the Debtor here who is seeking to obtain the benefit of 562.

12          And what I thought was kind of interesting, too,

13  Your Honor, with Maverick the Debtor was saying, well, you

14  don't get the petition date, because it's a 562 date.  Now

15  with us they're saying, well, you do get the petition date,

16  or 562 date and they're also kind of cherry-picking dates

17  themselves for the evaluation.  Whereas I think SRM has been

18  consistent throughout.  They're asking for the property of

19  the shares to be returned to them, and then the additional

20  lost opportunity --

21          THE COURT:  But that -- but forget about the lost

22  opportunities, I mean, in all these cases everybody said,

23  well, we want our shares back, right?  You don't get your --

24  you don't get the shares back, you get -- you have to value

25  the shares at a certain point.  You don't get to keep

Page 26

1    rolling that number forward.

2              MR. STARNER:  And Your Honor, under U.K. law, you

3    value that -- you value the shares as of the time, you're

4    not going to get them back.  So in other words, the Debtor,

5    LBIE under U.K. law --

6              THE COURT:  Right.

7              MR. STARNER:  -- had the option to pay back those

8    shares in kind, and it had -- so they didn't have to -- they

9    could get back the shares themselves --

10             THE COURT:  Yeah.

11             MR. STARNER:  -- in the --

12             THE COURT:  So then what's the -- you've got $220

13   million from LBIE and the value of the shares on the day was

14   $264 million.

15             MR. STARNER:  Correct.

16             THE COURT:  Okay.  So why is it -- so then if you

17   -- if life were going to end on the next day, you would be

18   making a claim for $44 million.

19             MR. STARNER:  The day after we said it -- okay.

20             THE COURT:  Yeah.

21             MR. STARNER:  Yes.

22             THE COURT:  All right.  So why do you get to have

23   a larger claim now?

24             MR. STARNER:  So the claim is not larger.  We're -

25   - we are only seeking that amount, the difference between

Page 27

1    220 and 264, so that was the value as of that date.  We are

2    not seeking any increase in value since that time.

3              THE COURT:  I'm sorry, I'm confused.  The amount

4    asserted in the proof of claim on -- with respect to

5    segregated assets is $97 million.

6              MR. STARNER:  So that was the number that was

7    included in our proof of claim filed in 2009.  And that was

8    only a number, kind of a placeholder saying, oh by the way,

9    we're seeking a recovery of our shares, which are valued, as

10   of today, X, but we want the return of our shares.

11             So in other words, if a month --

12             THE COURT:  Okay.  I'm sorry --

13             MR. STARNER:  Yeah.

14             THE COURT:  -- I'm just really not following.  If

15   you -- if I were to say to you today, the only thing you're

16   going to get is the delta between what you recovered from

17   LBIE and a claim on LBHI, I'm not saying -- I'm just

18   hypothetical, and a claim on the guarantee, that number

19   would be 264 minus 220.

20             MR. STARNER:  Correct.

21             THE COURT:  Okay.  Then what's the 97?

22             MR. STARNER:  So that number was a number that was

23   included in the proof of claim, a number of years ago, as a

24   placeholder to say look, we are seeking the return of our

25   assets, and as of today they're valued at X.  If that value

Page 28

```
 1    had gone down, and we'd still be seeking the recovery of

 2    those assets, we would have been fine, give us back the

 3    assets.  And I assume --

 4              THE COURT:  Okay.  You're not getting the shares

 5    back, okay?  So if you're not getting the shares back, and

 6    the value were lower today, what would your claim be?

 7              MR. STARNER:  If the value was lower as of the day

 8    we settle with LBIE, we wouldn't be -- we would not be

 9    standing in front of you asking for the number we're asking

10    for.  The only thing we're asking for now -

11              THE COURT:  Okay.  I'm going to try it one more

12    time and then we're going to have to move on.  Why are you

13    asking for more, putting aside interest, why are you asking,

14    on account of the segregated assets claim, more than $44

15    million?  Are you or are you not?  Today?

16              MR. STARNER:  We are not asking for more than the

17    $44 million.  So -- and maybe the confusion is as of the

18    proof of claim date, I think we put a number of 96 total

19    value on that claim.

20              THE COURT:  Okay.

21              MR. STARNER:  So fast forward seven years later

22    when we settled with -- or six years later when we settled

23    with LBIE, at that time the segregated assets claim, valued

24    under U.K. law was $264 million.

25              THE COURT:  Okay.
```

Page 29

1              MR. STARNER:  We got paid 220 on that.

2              THE COURT:  Okay.

3              MR. STARNER:  So the $96 million is not a relevant

4    number for us.  And so today in front of this Court, we're

5    asking for the difference between what the value -- what the

6    claim was against LBIE and what LBIE paid us, on that date.

7    So we're not picking and choosing --

8              THE COURT:  On that date?

9              MR. STARNER:  -- value dates.  Yeah.  Which is

10   different than what Maverick was doing.  Maverick was saying

11   to the Court, look, we settled with LBIE on this date, and

12   we're asking this Court to apply U.S. law and give us this

13   other date for the value of our claims.  We're not doing

14   that.  All we're saying is we came to LBIE, our claim is

15   valued under U.K. law, we got paid 220 on a $264 million

16   claim, and we're asking to be made whole for the difference.

17             THE COURT:  You're asking for $44 million in

18   hundred cent dollars, or you're asking for a $44 million

19   claim against LGHI?

20             MR. STARNER:  As my understanding of how the

21   administration would work is, under the Ivanhoe principle,

22   you seek to recover the entire amount of your claim then you

23   basically have to take into account what you've been paid,

24   so we'd have a claim for $44 million against the estate, and

25   that would be subject to whatever the payout is for that

1    class at this point.

2              THE COURT:  So the answer is a $44 million allowed

3    claim against LBHI?

4              MR. STARNER:  Right.  But actually that would not

5    be paid a hundred percent under -- by this estate.

6              THE COURT:  No, it would not be paid a hundred

7    percent by this estate.

8              MR. STARNER:  Correct.

9              THE COURT:  Okay.  All right.  I think I

10   understand what you're trying to say.  And then with respect

11   to the for sales claim and the lost opportunity claim --

12             MR. STARNER:  Yes.

13             THE COURT:  -- and the other claims that are not

14   subject to objection, what's the ultimate resolution of how

15   the $57 million is going to be allocated?  How are we going

16   to deal with that?

17             MR. STARNER:  That's good question, Your Honor.

18   And that's been, I think, an area of debate amongst the

19   parties.

20             The situation was when we settled with LBIE --

21             THE COURT:  Yeah.

22             MR. STARNER:  -- the money was not allocated

23   amongst the claims.

24             THE COURT:  Right.

25             MR. STARNER:  As you can imagine, SRM asserted

1   their claims against LBIE, advocated on behalf of the

2   claims.  LBIE said, look, okay, segregated assets we're

3   going to pay you X, for everything else we're going to pay

4   you Y, which is the 57 million you referred to.

5          THE COURT:  Yeah.  Right.

6          MR. STARNER:  But -- is he essentially with you

7   guys?

8          MR. LEVINE:  Yeah.  I don't know who just came in.

9          THE COURT:  He's for the next Lehman matter.

10          MR. STARNER:  Okay.

11          THE COURT:  Do you -- are you about to get into

12   something confidential?

13          MR. STARNER:  No, we're just talking about numbers

14   that are confidential technically.

15          THE COURT:  Okay.  All right.  We can go up to a

16   generic level.

17          MR. STARNER:  Okay.

18          THE COURT:  Okay.  So it wasn't allocated in the

19   settlement agreement.

20          MR. STARNER:  Correct.

21          THE COURT:  Okay.

22          MR. STARNER:  And so they're -- look, I think

23   there's a few ways to deal with that.

24          THE COURT:  Right.  So -- right.

25          MR. STARNER:  And that's something that the

Page 32

1    parties can certainly talk about.

2               THE COURT:  Right.

3               MR. STARNER:  You know, either pro rata or, you

4    know, if they'd want to argue that if this Court considers

5    certain claims to be (indiscernible) than others, and then

6    of course we'd argue, well, it should be looked at under

7    U.K. law, how a U.K. Court would look at it.  So that's an

8    area I think would be up to debate, but the bottom line,

9    that was not allocated amongst the claims.

10              And on that point, I think if you -- the Court may

11   recall, at least with respect to the ISDA claim, the Debtors

12   wanted access to certain without prejudice materials --

13              THE COURT:  Right.

14              MR. STARNER:  -- which they believe could inform

15   them --

16              THE COURT:  Yeah.

17              MR. STARNER:  -- in their position on that claim

18   and other claims.  We initially said, look, under U.K. law

19   that's privileged, but to avoid a dispute we've now produced

20   all that, we produced that months ago.

21              THE COURT:  Well --

22              MR. STARNER:  So it's something we did to

23   hopefully move the ball.

24              THE COURT:  Right.  I appreciate that.  But does

25   that material shed light on how to allocate the $57 million?

```
 1                  MR. STARNER:  No.  It confirms that there was not

 2      a specific allocation.

 3                  THE COURT:  That -- right, I don't think that

 4      everybody --

 5                  MR. STARNER:  But there was some suggestion we

 6      were somehow hiding the ball.

 7                  THE COURT:  So is the -- has the estate agreed to

 8      the $49 million ISDA claim, or is it just haven't gotten

 9      there yet in light of everything else?

10                  MR. LEVINE:  Your Honor, the last time we were

11      here we hadn't gotten there.  I think at this point we don't

12      think it's an outrageous number, so I think likely our

13      argument is going to be --

14                  THE COURT:  Okay.

15                  MR. LEVINE:  -- that in fact it was fully paid by

16      the 57 million, and so that raises the issue of burden.

17      Who's -- and I don't know the answer to that --

18                  THE COURT:  Yeah.

19                  MR. LEVINE:  -- I'm afraid to say.  That where we

20      say they got 57 million for the for sales, lost

21      opportunities and ISDA claims, which is 8 million more than

22      they say they're entitled to on the ISDA claim, and we think

23      the for sales claims and lost opportunities claims are

24      expressly precluded by the terms of the PBA, we're going --

25      our client certainly believes that --
```

```
 1              THE COURT:  Okay.

 2              MR. LEVINE:  -- the answer is they were fully paid

 3    on the ISDA claim.

 4              THE COURT:  Yeah.  Yeah.

 5              MR. LEVINE:  Just a couple of things I wanted to -

 6    - were you done, or?  Okay.

 7              MR. STARNER:  Well, I mean, if I may, Your Honor?

 8              THE COURT:  Yeah.

 9              MR. STARNER:  Do you have any other points?

10              THE COURT:  Sure.

11              MR. STARNER:  I can kind of try to go through some

12    of the things he raise?

13              THE COURT:  Sure.

14              MR. STARNER:  Maybe I -- if you tell me, of those

15    things he raised, any that you want me particularly to focus

16    on?

17              THE COURT:  Well --

18              MR. STARNER:  I know you raised a few different --

19              THE COURT:  -- I mean, you know, a couple things.

20              MR. STARNER:  Sure.

21              THE COURT:  I mean, one I focused on what I view

22    as similar issues, if not identical issues in Maverick, and

23    that is what it is, the District Court will say whether they

24    agree or not.  As I've thought about it more and re-read it

25    in preparation for today, I have to say I looked back at the
```

Page 35

1    original transcript and some of the arguments -- I think my

2    thinking has evolved on some of the arguments, including the

3    exculpation, including the issue of a third party

4    beneficiary and including the limitations of -- on

5    consequential damages.  And my thinking has evolved in ways

6    that I think are not beneficial to your position.

7             MR. STARNER:  Let me take that on, if I may?

8             THE COURT:  Sure.  I mean, you know, I come at

9    these sufficiency hearings very much disinclined to dismiss,

10   which I think is the appropriate way to look at it, so you

11   kind of have to convince me to, you know, knock the claimant

12   out of the box at the earliest stages, but as time has gone

13   by my thinking has evolved a little bit.  So go ahead.

14            MR. STARNER:  I would appreciate that.

15            THE COURT:  Yeah.

16            MR. STARNER:  You know, I guess just to highlight

17   I think something I already covered, you know, the two

18   critical pieces of how we're distinguishable from Maverick,

19   of course U.K. government contract LBHI's not a party to,

20   and in terms of the actual language, the exculpatory

21   language that's in the Maverick contract, it is different.

22   And obviously we'd have to look specifically at our

23   language, and I think we did weigh in on that in our papers.

24            THE COURT:  Um hmm.

25            MR. STARNER:  I don't recall whether we got into

Page 36

1    the details of that during our argument, but it's our, you

2    know, our argument or it's our position that, you know, at

3    this stage we're asserting a breach, they seek to assert

4    certain contract damage -- contract defenses and those, by

5    their plain meaning, don't apply here.  And I think we've

6    weighed in with respect to our English law expert that under

7    U.K. law interpreting the agreement, there are certain

8    standards and principles of contract interpretation that

9    would apply here and that under -- applying those

10   principles, reading the language they talk about here in our

11   contract, it's not -- it doesn't really apply in the same

12   way I think the Court looked to apply the Maverick contract.

13            And if I may, you know, there's kind of just two

14   general principles or provisions they seek to rely upon.

15   You know one is a discussion of general risk of investing

16   and another piece was about market conditions affecting the

17   value of the assets as to a particular country.  So this was

18   language, I think in our papers, we articulated to the Court

19   why we didn't feel like, just on their face, didn't apply

20   here.  And the language is much different than the language

21   of extraordinary events and other things that that were at

22   issue in the Maverick case.

23            And in any event, I think taking a step back to

24   the U.K. contract principles here, our expert, Lord Collins,

25   made very clear that to the extent that the parties intended

Page 37

```
 1    to release or limit recovery, it had to be very express and

 2    clear.  So if there's any kind of gray area in these

 3    contractual provisions then the Court would need to

 4    interpret it in the way that did not, you know, expressly

 5    limit or preclude our claims.  So I think at the minimum

 6    we'd say the language is ambiguous and not something that

 7    would be a basis to dismiss our claims.

 8              THE COURT:  But I don't even -- if I give effect

 9    to the non-reliance language, I don't even get to that

10    question, right?

11              MR. STARNER:  That's right.  We -- that's another

12    argument and I think we spent a lot of time on that in the

13    hearing.  I went back and looked at that transcript and I

14    think it was a little bit choppy --

15              THE COURT:  It was a little choppy.

16              MR. STARNER:  -- and I apologize.

17              THE COURT:  It shows you we were having a good

18    time.

19              MR. STARNER:  It was an active -- a very active

20    hearing, and hopefully I think we made a lot of ground

21    there, we covered a lot of issues.  But on the non-reliance

22    piece, that was something we spent some time on and I feel

23    like we articulated, fairly well, what our position was

24    under U.K. law, and we also relied upon our English law

25    expert in that regard.  And I thought we kind of made our
```

Page 38

1    point there.

2              Let me just maybe touch on one or two other

3    things.

4              THE COURT:  How many days did you spend mediating

5    this with Judge (indiscernible)?

6              MR. STARNER:  Your Honor, we're not going to get

7    into the details of that, but it was somewhat of a short

8    mediation.  Our client was somewhat frustrated.  They came

9    from the U.K. for that and didn't feel like there was a lot

10   of engagement, and that's -- you know, that's something --

11   that's as much as I'll say.

12             THE COURT:  All right.  You know what, the forces

13   are gathering for my 3 o'clock, which is going to be a

14   number of people coming, I think it would be useful for us

15   to take a break and to chat.  Are you comfortable with that?

16             MR. STARNER:  Certainly, Your Honor.

17             THE COURT:  Okay.  Why don't we go off the record.

18   If you could stay in place.  If you could meet me in the

19   conference room.

20        (Recess)

21             MR. COSENZA:  Good morning, Your Honor.

22             THE COURT:  Hello, Mr. Cosenza, congratulations.

23             MR. COSENZA:  Thank you so much, thank you.

24             THE COURT:  Mazel tov.  Everybody's well?

25             MR. COSENZA:  Everyone's well.  My wife's coming

Page 39

1    home, as we speak, from the hospital.

2              THE COURT:  And you're here?

3              MR. COSENZA:  And I'm here.

4              THE COURT:  Oh.

5              MR. COSENZA:  We delayed this -- I appreciated the

6    Court allowing us to postpone for this hearing today.

7              THE COURT:  Have a seat, have a seat, but

8    meanwhile, dare I say out loud, you're really doing this

9    trial starting on Monday?

10             MR. COSENZA:  Well, we'll have a few of issues we

11   need to raise with the Court on that point.  So we have a

12   series of issues, Your Honor.

13             THE COURT:  Okay.  I mean, I was just speaking in

14   terms of a new father being able to be here for trial.  But

15   --

16             MR. COSENZA:  I thank you for your concern, it's a

17   valid concern.  I think it is something I would

18   (indiscernible) to raise.

19             THE COURT:  Not that your colleagues aren't

20   capable, but it is what it is.

21             MR. COSENZA:  Yes.

22             THE COURT:  And I just have a bias against these

23   cases taking an inordinate toll on people's lives, but

24   that's just me, so.

25             MR. COSENZA:  I appreciate that, Your Honor, and I

Page 40

1    agree with the sentiment, but there also are a series of

2    issues I'd like to raise with the Court.

3             THE COURT:  Okay, so I know -- so obviously I got

4    your briefs, thank you.  I've gone through them once, not as

5    thoroughly as I will before you arrive on Monday, but I have

6    gone through them once.

7             And then there were some letters around the issue

8    relating to Mr. Aronoff, and then there was an additional

9    letter that came in today relating to some additional legal

10   argument that Mr. Shuster said that the trustees would like

11   to make.  So that's what I have.

12            MR. COSENZA:  Sure.

13            THE COURT:  I'm perfectly prepared to turn it over

14   to you.

15            MR. COSENZA:  Sure, so Your Honor, we have those

16   two issues, in addition we have a few other issues we want

17   to raise for the Court.

18            THE COURT:  Okay, sure.

19            MR. COSENZA:  The first issue is on the -- I'm

20   going to take down, what I thin the first issue is, a letter

21   that came in this morning.  Frankly, this is the trustees

22   trying to get another redo of Exhibit G.  There's been a

23   history of us having agreements with the parties, and --

24            THE COURT:  Is this the letter to me, this

25   morning?

1          MR. COSENZA:  Yeah, the letter on the proximate

2     cause issue that was detailed and briefed?

3          THE COURT:  Oh, okay, yeah.

4          MR. COSENZA:  So there was an Exhibit G.  It

5     states rather expressly --

6          THE COURT:  Right.

7          MR. COSENZA:  There's one brief, 50 pages for each

8     side, that's the only pre-hearing brief or submission

9     submitted by the parties that was extensively negotiated.

10    This is basically a redo of that provision.  We respectfully

11    request that the Court sort of move, take that letter, and

12    to the extent it's necessary, disregard it.  And we can move

13    on to the substantive issues.

14          I also want to note that this issue that they're

15    raising in this letter today has been front and center in

16    this litigation for over two years, beginning back in

17    December of 2014, when we had our hearing about their being

18    a nexus being required between the breach and the actual

19    damages that they're seeking here.

20          THE COURT:  Right, so, but the issue of whether

21    there's a nexus between the breach and the actual damages is

22    -- has been a real issue from the beginning.

23          MR. COSENZA:  Yes.

24          THE COURT:  The additional layer here seems to be

25    this issue having to do with the extent to which that rests

Page 42

1   on, or is tied to whether or not these are rejected

2   executory contracts, right?

3            MR. COSENZA:  I think that's part of it, Your

4   Honor, but what the issue that's come front and center

5   through the briefs is that there are -- these contracts are

6   governed under New York law.

7            THE COURT:  Right.

8            MR. COSENZA:  The trustees have stated expressly

9   that they're bringing breach of contract claims.

10           THE COURT:  Right.

11           MR. COSENZA:  And for breach of contract claims,

12   as we've laid out in our brief, there needs to be some level

13   of proximate causation between the breach and the damages

14   that are being (indiscernible).

15           THE COURT:  Right, that is absolutely your

16   position.

17           MR. COSENZA:  Yes.

18           THE COURT:  Okay, so again, I'm struggling with

19   what the executory contract provision has to do with

20   anything.

21           MR. COSENZA:  Well, Your Honor, I think it just

22   goes to the fact that these were executory contracts, that

23   they were rejected.  I think it's a bit of a red herring.

24   It's just sort of how we lay out the foundation of the

25   history of these contracts, and the fact that they're

Page 43

1    seeking, you know --

2              THE COURT:  All right, but there is -- but

3    rejected executory contracts, you know, rejection of an

4    executory contract is deemed a prepetition breach of a

5    contract.  It doesn't matter here nor there.  It doesn't

6    change -- it doesn't change the legal standard of

7    establishment of a claim for damages.

8              MR. COSENZA:  Correct, but it goes to, that's just

9    a predicate for explaining under breach of contract the

10   types of damages that they're associated.  So the issues

11   before the Court is what needs to be shown between the

12   breach -- this is standard under New York contract law.

13             THE COURT:  Right.

14             MR. COSENZA:  I agree with you, the executory

15   contract is (indiscernible).

16             THE COURT:  Well, let me put it this way.

17             MR. COSENZA:  Yes.

18             THE COURT:  The trustees say, in the trustee's

19   view of the world, and I didn't want to get into it in

20   tremendous detail today, because frankly, I'm not thoroughly

21   prepared, but I'm going to wade in, subject to the caveat

22   that I may say something different or better later.  The

23   trustee's view of the world is that on day one, when a loan

24   was booked, if there was a material misrepresentation, that

25   they can prove now existed as of that time, right?  Simple

1    example --

2             MR. COSENZA:  Yeah.

3             THE COURT:  Borrower says they have a million

4    dollars in income, turns out they have ten dollars in

5    income, right?  I think what the trustees are saying is,

6    they win on that contract.

7             MR. COSENZA:  I think it's not only that they win,

8    but they're then able to go from the breach on day one

9    automatically to the purchase price calculation, whenever

10   there's a default.  So --

11            THE COURT:  Exactly, yes, exactly right.  That's

12   what I think the trustees are saying.

13            MR. COSENZA:  So, so --

14            THE COURT:  And you say, not so fast?

15            MR. COSENZA:  Yeah, so theoretically, just to play

16   this hypo out --

17            THE COURT:  Yeah.

18            MR. COSENZA:  Day one, you have a misrep of

19   income, after a year of payment, someone gets a promotion,

20   and their income now exceeds what they've misstated as the

21   income.

22            THE COURT:  Yes, right.

23            MR. COSENZA:  They pay for six more years.

24            THE COURT:  Right.

25            MR. COSENZA:  They then get hit by a car, and I

Page 45

1    hate to be so gruesome in this, so after seven --

2           THE COURT:  No, they work for Lehman Brothers, and

3    they lost their job.

4           MR. COSENZA:  Yeah, so after seven years, they've

5    paid.  The trustees, well, their position is, they don't

6    have to prove any nexus between the breach and their loss.

7           THE COURT:  Yes, that's the trustee's position.

8           MR. COSENZA:  And aren't you legally under

9    contract, because this is a breach of contract, they need to

10   show some level of proximate cause.  And this is their

11   burden, because they're bringing the claims between the

12   breach and the actual loss that's been suffered.

13          THE COURT:  Right.

14          MR. COSENZA:  You can't just simply go

15   (indiscernible) performance remedy under --

16          THE COURT:  So that's eth way I'm viewing the

17   difference in the two sides' positions, and I don't see that

18   that's related at all whether or not something is a rejected

19   executory contract.  That's the fundamental difference in

20   the way each side has seen this.  And it's the element of

21   causation.  Am I missing something?

22          MR. SHUSTER:  No, Your Honor, if that's how the

23   Court is seeing it, we're comfortable with that.  The reason

24   we submitted our letter --

25          THE COURT:  Mm hmm.

Page 46

1              MR. SHUSTER:  Is because it is true that the plan

2     administrator has taken the position all along, or for some

3     time, that the trustees have to show that the breach caused

4     the default on the loan, but they were arguing that, the way

5     we understood it, they were arguing that under the contract,

6     under the material and adverse effect language in the

7     contract.  What we saw for the first time in their pretrial

8     brief was an argument that was predicated not on the express

9     contractual language, but on the common law breach of

10    contract standard.

11             And the contract itself has a standard for what

12    constitutes a material breach, a breach that has a material

13    and adverse effect on the loan, and then what happens if

14    that's the case, which is that the purchase price formula

15    kicks in.  So the reason we sought leave to address the

16    argument that was made now is because arguing that --

17             THE COURT:  But what you're saying -- but here's,

18    I don't want to have opening argument today, and this is

19    what this is devolving into.  But what you're saying is that

20    if there's a material breach, it does have a material

21    adverse effect on the value of the loan.

22             MR. SHUSTER:  Yes.

23             THE COURT:  You're looking -- right, that watch --

24    that's what you're saying.

25             MR. SHUSTER:  Yep, that's fair.

Page 47

1              THE COURT:  And what they're saying is, while that

2     may be the case vis-à-vis the repurchase obligations, this

3     is not a repurchase case, this is a damages case.  So

4     whether or not -- lock's going to turn on whether or not I

5     agree with you, or I agree with them.  But I still don't

6     think it has anything to do with the fact -- with whether

7     nor not these are executory contracts.

8              MR. SHUSTER:  And neither did we, but we saw the

9     argument in their brief, and that's why we wanted -- we

10    wanted to address it.  We agree, that issue --

11             THE COURT:  Okay, there's not going to be any more

12    briefing.  To the extent that you think that they've somehow

13    raised something out there, or however, you can tell me

14    about it in your opening statement, all right?  So can we --

15             MR. COSENZA:  Yeah, can I just arise one comment,

16    Your Honor?

17             THE COURT:  Yeah.

18             MR. COSENZA:  And I don't (indiscernible) many

19    more comments.  But they're not proceeding under the

20    contract, because they never provided us with notice, as we

21    explained.  Sot that's why we've -- that's why it made the

22    argument.

23             THE COURT:  Right, right, you are making that

24    argument.

25             MR. COSENZA:  Sure.  So Your Honor, on to the

Page 48

1    second issue for today.

2              THE COURT:  Sure.

3              MR. COSENZA:  Mr. Aronoff's deposition?

4              THE COURT:  Yeah.

5              MR. COSENZA:  We've asked for another day of Mr.

6    Aronoff's deposition.  Frankly, during the deposition of Mr.

7    Esses from Duff & Phelps, it became very clear to us that

8    Mr. Aronoff is playing sort of a hybrid role.  He made all

9    the relevant decisions, I'm going to overstate it, but it's

10   basically mostly accurate, he made all the decisions, in

11   terms of adverse material effect in the protocol.  He made

12   all the decision about which loans could be compromised in

13   step three of the protocol.  He sort was the overseer of

14   all, to basically everything that was done to sort of

15   structure the protocol.

16             So he's serving as basically essential fact

17   witness in this case, in addition to serving in his expert

18   role.  We ask, in light of Mr. Esses's testimony prior to

19   Mr. Aronoff's deposition, we ask the trustees for an extra

20   day, given that he's playing this very unique sort of fact

21   expert role.  They basically said, we're not going to give

22   you the extra day, but take his deposition, and we'll sort

23   of see what happens.

24             We took his deposition, which went on for the full

25   seven hours.  There were lots of issues that we were not

Page 49

```
1    able to explore, including exemplar -- we weren't able to
2    question him on exemplar loans that are central to this
3    case, given a lot of his expert testimony.  So we went back
4    and asked for an additional day, that request has mostly
5    been rejected by the trustees.  They want some proffer of
6    all the different topics we would cover with him.  We just
7    felt we were entitled to the extra day, and we raised this
8    issue with Your Honor.
9            And we really think this is very unique.  The
10   parties are entitled to take both expert and fact
11   depositions, a limited number of fact depositions, and we
12   are wiling to use one of our fact deposition to take Mr.
13   Aronoff's deposition, so it wouldn't count, and we've
14   basically been rebuffed at every turn.  And we're obviously
15   very sensitive, at this point, to his health issues, and you
16   know, given --
17           THE COURT:  So what's the overall status, with
18   respect to his availability to testify?
19           MR. SHUSTER:  Well, Your Honor, as to Mr.
20   Aronoff's health, can we either do that portion of it off
21   the record, or can we --
22           THE COURT:  Sure, yeah.  Okay --
23           MR. SHUSTER:  Or we can seal it, and agree to seal
24   this --
25           THE COURT:  Well --
```

```
 1              MR. SHUSTER:  Whatever's easiest for the Court,
 2      and agreeable to --
 3              MR. COSENZA:  We have no objections to that, Your
 4      Honor.
 5              THE COURT:  Hold on one second.  Can you look
 6      around the room and let me know if you folks know everybody
 7      who's here?  Including the gentlemen when the pencil behind
 8      his ear?
 9              MAN:  Don't know that individual.
10              THE COURT:  Sir?
11              MAN:  (indiscernible) a giveaway?
12              THE COURT:  I don't know it was slightly a
13      giveaway.  I don't know, the lack of a jacket, that might be
14      a giveaway, too.  I assume you're with the press, or
15      something like that.  Could I ask you to step outside for a
16      few minutes?
17              MAN:  Yeah.
18              THE COURT:  All right, and we're going to mute the
19      line as well.  And someone will peek outside and get you,
20      all right?
21              MAN:  Okay, sure, thank you.
22              THE COURT:  Pause it.
23              (Recess)
24              THE COURT:  Okay, next.
25              MR. COSENZA:  So Your Honor, the next issue which
```

Page 51

1    arises, and I apologize for not getting a letter brief into

2    the Court on this, but I raised based on Footnote 7 that's

3    in the trustee's brief.  Your Honor, just to give you

4    background on this, the trustees are now trying to explain

5    their decision not to pursue certain claims that

6    (indiscernible) the protocol.  And I want to give you just

7    some history to this, and make a request for relief on the

8    record.

9            Your Honor, the trustee submitted 94,000 loans,

10   and almost 200,000 claims across about 50 different

11   categories through the protocol process.  The plan

12   administrator spent a lot of money reviewing all of those

13   claims, going through the meet and confer process with the

14   trustees.  As you know, late 2016, early 2017, the parties

15   entered into the settlement, that results in this

16   proceeding.  There's no discussion here with the trustees as

17   to what claim remain in the case, and which ones didn't.

18           We got, in the first round of expert reports, we

19   got a report from Mr. Aronoff, indicating that the trustees

20   dropped a little over 15,000 loans.  We sort of had -- we

21   didn't have any notice of that before the reports were

22   submitted, but we made various requests to the trustees, to

23   try to understand their decisions, in terms of dropping

24   these loans.  As a follow-up, we then came to find out that

25   the trustee's not only dropped 15,000 loans, but also 40

Page 52

1    percent of the claims on those loans.

2           We again asked for a follow-up to explain, to get

3    an explanation as to the trustees, how they did this,

4    because there really is a full indictment of their process

5    that 40 percent of the loans that went through the protocol

6    are now seemingly not part of the proceeding, although Mr.

7    Aronoff opines that those are all valid and good claims.

8           Moving forward, we asked the trustees for an

9    explanation as to why they did this, asking for a

10   deposition, to just sort of understand the process, and how

11   they dropped 40 percent of their claims that were put

12   through the protocol, that we went thorough this

13   extraordinary expense trying to respond to.  The trustees

14   refused to provide any information on this, said it was

15   their decision, cloaked it with attorney work product

16   protection, would not provide us with any detail on this.

17          We took them at in essence, as best we could,

18   because we were trying to move through this process as

19   quickly as we could, at face value, that they were simply

20   assuming attorney work product and protections on this

21   claims.  We again made repeated requests, and that's

22   basically the response we received.  We are now in a

23   position where we received this footnote from the trustees,

24   which at best is inaccurate, and I would say is very, very

25   misleading.  Plus, we really don't understand how they did

Page 53

1    this.

2            But as best we can tell, Your Honor, the trustees,

3    despite what they say in Footnote 7, about how they're

4    trying to streamline the claim -- streamline their

5    proceedings by limiting the number of misrepresentations

6    they're proceeding under, you know in their brief, they

7    mentioned the big four that they were relying on.

8            THE COURT:  Yeah.

9            MR. COSENZA:  But if you actually go through the

10   claims that were dropped, there were over 5000 claims that

11   are part of the big four that are still part of these

12   proceedings, that they dropped in early June.  So their

13   explanation that they dropped these claims to streamline the

14   proceedings really, facially, doesn't make any sense.  These

15   are just claims that obviously, their process yielded, that

16   are problematic, and sort of highlights the problems with

17   their process.

18           And the fact that they've now disclosed this in

19   some sort of inaccurate way to the Court, that they've made

20   this decision to just drop claims without sort of being able

21   to test it, and understand their rationale behind this

22   really puts us in an awkward position, because we just had

23   assumed that they were just going to blanket assume attorney

24   worked product protections on this,.  Now that they've sort

25   of opened the door and waived this, we believe that we're

Page 54

1    entitled to explore the decisions that the trustees made to

2    pull back these claims that were put through the protocol.

3              And it's really a haphazard -- I have a list of

4    the claims that were pulled out.  There's really no basis

5    for how they did this, and they try to say in their

6    footnotes, because they're streamlining it.  And again, we

7    really don't have this, any visibility into this, and it

8    shows how haphazard their process was, and how it was

9    riddled with errors.

10             So as part of that, we would like to make a

11   request of the Court to get some discovery into the process

12   that the trustees used to cut back on these claims, so we

13   can understand how --

14             THE COURT:  So, but state it differently, then

15   we're not starting a trial on Monday.

16             MR. COSENZA:  If Your Honor granted this request,

17   that would be correct.

18             THE COURT:  Okay.  All right, Mr. Shuster?

19             MR. SHUSTER:  So, Mr. Aronoff's --

20             THE COURT:  It seems to me that you're between a

21   rock and a hard place on this one, that there aren't -- and

22   obviously, I'm hearing this for the firs time, so maybe I'll

23   get smarter as the afternoon goes on.

24             But to the extent that you're saying that all

25   claims are created equal, and that in order to make this

Page 55

1  doable, you are on a even-handed basis, taking out 72,000

2  claims that are no different from the remaining claims,

3  right, and in each of the buckets, you're taking out, you

4  know, redundant claims.  Okay.  But what Mr. Cosenza is

5  saying is that they have no way of knowing that.

6          And then that's where the rock and a hard place

7  comes in, because to the extent that when the claims went

8  through the protocol, the claims were not -- how can I say

9  this?  To the extent when the claims went through the

10  protocol, they should have not survived the protocol, and

11  yet they did, so that's not a great fact.  But to the extent

12  that the claims did survive the protocol, it does seem to me

13  that they're entitled to know why some claims now are making

14  it ton trial, and some claims are not.  Because as --

15  because the process is part of the issue that's performing,

16  right?  So --

17          MR. SHUSTER:  Well, the plan administrator is

18  trying to make it an issue.

19          THE COURT:  But why is it not an issue?

20          MR. SHUSTER:  Well, the -- I mean, the trustees

21  are, yeah, we're proving our claims with the evidence we

22  have a breach.  And we're saying that we arrived at that

23  evidence through a process that was in conformance with yes,

24  best practices and so forth.  That's fair.

25          THE COURT:  Right, right.  But then what Mr.

Page 56

1    Cosenza is saying, in essence is that of the pool you've now

2    taken out 72,000, and you want a -- you want me to assume

3    that what's left -- that the removal of those claims is not

4    probative of the methodology.  I mean, stated in its worst

5    case, you plucked out the 72,000 claims that were the

6    weakest, and now look at what's left.  So why wouldn't they

7    be able to explore this?

8            MR. SHUSTER:  Well, first because there is a big

9    attorney-client privilege issue there.  Second, I don't

10   think in pulling --

11           THE COURT:  But you can't -- you have an at-issue

12   whatever problem.  You --

13           MR. SHUSTER:  We haven't waived anything.  We made

14   a very, very generous --

15           THE COURT:  But the process is part of the issue.

16   So you can't do something that prevents inquiry into the

17   process based on attorney-client privilege.

18           MR. SHUSTER:  They were free to ask all the

19   questions they wanted about these claims, why these claims

20   were in the protocol, what these claims consisted of.  They

21   were free to ask any questions they wanted.  The only thing

22   they're not free to do is to inquire into legal strategy

23   reasons why we're not presenting evidence on these claims at

24   trial.  They had devote a lot of time, and a lot of expert

25   time to it.  The claims were in the protocol.  They have the

1    evidence.

2           They have for every one of these claims, and every

3    one of these breaches, they have the claim they know what

4    rep and warrant we were relying on, they know what our

5    evidence was.  They were free to address all of these claims

6    in any way that they wanted in the discovery process.  They

7    didn't.  But asking why a decision was made before trial to

8    drop claims, plaintiffs drop claims all the time.  That's

9    usually involves the advice of counsel.

10          THE COURT:  But plaintiffs drop claims, but in the

11   context in which the process around the making of claims is

12   itself at issues in the case.

13          MR. SHUSTER:  They've been free from day one,

14   without limitation to --

15          THE COURT:  There's a difference between we're

16   going to trial on six counts, and a couple of weeks before

17   trial, plaintiff says, "I'm not going to trial on the sixth

18   count."  Okay, so what?  But their decision-making process

19   is not at issue.  Here, it's the claims process.  It's the

20   part of the issue before me, is how good the trustee's

21   process itself was.

22          MR. SHUSTER:  That's been open season.  This is --

23   hang on, they have not been in any way, shape or form,

24   precluded or foreclosed from taking whatever discovery they

25   wanted about the trustee's claims process.  They took the

Page 58

1    deposition, in fact, they won a second day with Mr. Aronoff,

2    they can ask him about these 72,000 claims all they want.

3              They have the deposition of Edmond Esses, who was

4    one of the Duff & Phelps people who was involved in the

5    trustee's process.  They could have asked him about this.

6    They have the deposition coming up this week of Alan

7    Pfeiffer.  He's the other lead Duff & Phelps guy who was

8    involved in this.  They could have asked him about this.

9    What they don't get to do is to ask why, what was the advice

10   of counsel that led to the non-pursuit of the claims.

11             But they haven't been foreclosed from taking

12   discovery, and they could have put in an expert report that

13   addressed all of these categories of claims to their heart's

14   content.  They don't lack for any information on these

15   claims.

16             MR. COSENZA:  Your Honor, can I just interject,

17   just a couple of points.

18             THE COURT:  Yeah, we're going to have to keep

19   going on this for a while, yeah.

20             MR. COSENZA:  Just a couple of points, just on

21   clarification.

22             THE COURT:  Yep, yep.

23             MR. COSENZA:  Mr. Schuster's statement on the

24   record, actually, I hate to say this, but a number of them

25   are inaccurate.  We did probe Mr. Esses about the loans that

Page 59

1    were part of the case, and what was dropped.  He said in his

2    view, all of the claims are valid.  We then asked him to

3    explain about what was dropped.  Counsel from Holwell

4    Shuster repeatedly instructed Mr. Esses not to answer the

5    questions on that, on either attorney-client, or work

6    product grounds.  Same issue for Mr. Aronoff.  And in fact,

7    we did ask Mr. Aronoff further questions, and he said he

8    couldn't -- he didn't know why they were dropped.

9            So you know, this is an empty way of sort of

10   proceeding, to say there's all this stuff, we had an

11   opportunity to ask all these questions.  In fact, we made a

12   series of -- when this issue first came up, we had a number

13   of discussions with Mr. Shuster and his team, raised this

14   exact point, they cloaked it in attorney work product and

15   privilege.  They've now, in essence, waived it by giving

16   this explanation which is at best inaccurate, in the

17   footnote.

18          And this has now become a major issue in the case,

19   because as Your Honor has mentioned, this is all about

20   process, and the fact that their fact witness thinks all

21   these claims are the same, and there's no idea as to how

22   they dropped them, whether they were weak or strong, really

23   is an indictment of the process, and something we need to

24   test.  And frankly, the hypothetical, or the analogy Your

25   Honor raised was a hypothetical analogy I raised during my

Page 60

1    meet and confers with Holwell Shuster, before they decided

2    to cloak everything in attorney work product.

3            So we've pressed for this repeatedly, we've been -

4    - we have not been able to get any explanation on this,

5    there's now been what I would view as a waiver, based on

6    what's in Footnote 7, which is inaccurate, on its face, and

7    I think we need some discovery on this, as well as we still

8    have additional fact depositions we can take, based on

9    Exhibit G, and a deposition on someone who could explain

10   this decision-making from the trustees.

11           THE COURT:  So what is the answer in the

12   deposition?  So right now what you're telling me is that one

13   witness didn't know, and one witness was not permitted to

14   answer.

15           MR. HEALY:  Your Honor, I don't think that's an

16   accurate description of what took place.  Every witness who

17   has been asked a question -- I apologize Your Honor, Dwight

18   Healy of Holwell Shuster.

19           THE COURT:  Yeah.

20           MR. HEALY:  Every witness who has been asked a

21   question, Esses for sure, Mr. Morrow, who was expert,

22   testified last week, he was asked, and he answered the

23   question, do you know why these claims were dropped?  And

24   the answer was no.  I invoked the attorney-client privilege

25   during those depositions to prohibit inquiry in the

Page 61

1    discussions that those individuals may have had with

2    counsel, but each one of them said that they did not --

3              THE COURT:  So wait, they did not know.

4              MR. HEALY:  They did not know why the plans were

5    dropped.

6              THE COURT:  So okay, so let's continue along these

7    lines.  So these individuals that you're naming are experts

8    on --

9              MR. HEALY:  No, I'm sorry, Your Honor.

10             THE COURT:  No, what are --

11             MR. HEALY:  Mr. Esses is a fact witness.  He was

12   the project manager, effectively, on the loan review process

13   during the protocol.

14             THE COURT:  Okay, and --

15             MR. HEALY:  Mr. Pfeiffer, who will testify on

16   Thursday of this week, was the senior managing director at

17   Duff responsible for the protocol engagement.

18             THE COURT:  Okay.

19             MR. HEALY:  And Mr. Aronoff had been retained as

20   the expert who would opine upon the outcome of the protocol

21   process in terms of breach findings, and in fact is the

22   person that has been retained to (indiscernible).

23             THE COURT:  Does he know why these claims were

24   dropped?

25             MR. HEALY:  I believe that Mr. Aronoff testified

Page 62

1   that he did not.

2          THE COURT:  Okay, so we have the people who were

3   there at the time, who would have knowledge of, I'll say the

4   merits of these, the strength of these claims, right?  It's

5   a question, the two individuals you identified, they have

6   knowledge of the strength of the claims?

7          MR. HEALY:  They would be familiar with the

8   process that resulted in the claims being put forward in the

9   protocol, and they were -- they answered questions, to the

10  extent those, they were asked questions about that,

11  (indiscernible).

12         THE COURT:  But if Mr. Aronoff now is the expert

13  that you're offering, how can it be that he does not know

14  how the pool that he is looking at came to be composed?

15         MR. HEALY:  Well, he has been asked to opine upon,

16  in this proceeding, a pool of what was originally 76,000

17  loans.  That has been diminished somewhat because one of the

18  trusts opted out.  Several of the trusts terminated.

19         THE COURT:  Right.

20         MR. HEALY:  And in connection with the back and

21  forth between the expert, a handful of loans were identified

22  as involving mistakes, and have been taken off the table.

23  But Mr. Aronoff has been --

24         THE COURT:  Okay, I'm confused.  What's the

25  relationship -- you're going to have to help me out.

1              MR. HEALY:  Sure, Your Honor, and --

2              THE COURT:  The number of loans and the number of

3     breach claims is now lower, as a result of the decision made

4     by the trustees, right?

5              MR. HEALY:  Yes, Your Honor, correct.

6              THE COURT:  Okay.  And what you're saying is you

7     don't have to explain what went into that decision.   In

8     other words, you could have taken out of the pool,

9     hypothetically, in the world that Mr. Cosenza thinks he's

10    in, the weakest claims.  And if that's the case, then the

11    pool is all of a sudden made to look very different.

12    There's no way to vet the pool without -- there's no way to

13    vet the process without understanding the methodology by

14    which the pool was comprised.

15             This gets back to where we started years ago, when

16    we had the battel over estimation, and sampling, and

17    protocol, when what you pick as what you're going to work

18    off of is determinative of the answer that you get.  So how

19    can your expert not understand the changes that were made to

20    the pool, and the process on which he's being asked to

21    opine?

22             MR. HEALY:  The expert, as well as the project

23    managers have been free to answer questions about what the

24    process was, how breaches were identified, how they were

25    supported, in terms of a materiality assessment, and how

Page 64

1   they were put forward.  And they had not been instructed not

2   to answer those questions.  They had testified openly about

3   their understanding and recollection of the process.

4          THE COURT:  The expert doesn't know -- the expert

5   said he doesn't know.

6          MR. COSENZA:  That's correct, Your Honor.

7          MR. HEALY:  The expert -- I'm sorry, the expert

8   has been asked, in this proceeding, to focus on a pool of

9   76,000 loans, and to apply --

10         THE COURT:  But you're stating that as if that's

11  been true from the beginning of time.  The problem is that

12  it's not true from the beginning of time.  So that there's

13  no way to connect up the new, lower number to the previously

14  larger number.  And that -- I'm sorry, maybe this is me.

15         MR. COSENZA:  Your Honor, can I add one additional

16  factoid?  We took Mr. Morrow's deposition on Friday, and he

17  still --

18         THE COURT:  And he is?

19         MR. COSENZA:  He is their other expert on, and he

20  still believes all the loans that have been put through the

21  protocol are still part of the case.  So I mean, this is

22  like, we're trying to get to understand the decision-making.

23  And I think it's not really about the weak, or great, good

24  claims, or weak claims.  This is really about their entire

25  process.  There's no explanation as what was pulled out, it

Page 65

1    was pulled out across categories.

2             It's just a confusing black box, and they're

3    having their witnesses respond in inconsistent ways, but

4    ways that we cannot get to what was, what they initially

5    said was privileged, and work product, the decision that was

6    made to pull back and release -- and get rid of these claims

7    and loans.  40 percent -- by the way, we went through the

8    protocol, went to a significant expense to go through.

9             Plus, they weren't even -- even though we have

10   indications they knew about this for months before the

11   exchange of expert reports, they only told us in June, and

12   frankly it wasn't even clear from their initial reports in

13   June what was at issue.  So we have a history here of 40

14   percent of the claims just being dropped form a supposedly

15   robust process that we now understand is collapsing upon

16   scrutiny.

17            THE COURT:  I mean, that's the part to focus on,

18   right?  The argument is, we had a great process.  Okay,

19   notwithstanding that we had a great process, we're taking 40

20   percent of the loans out.  Not going to tell you why, okay,

21   but there has to be visibility into that.  Otherwise,

22   there's no way for me to decide whether or not you had a

23   great process.  Is that not an issue in the case?

24            MR. SHUSTER:  Your Honor, we -- first of all, it's

25   40,00 breaches about -- 18,000 loans were pulled.  That was

Page 66

1    a lawyer's decision.  We're not having our witnesses answer

2    anyway.  They're actually answering truthfully.  They know

3    what they know.

4              THE COURT:  But how do I know that you -- but

5    you're asking me, take my word for it.

6              MR. SHUSTER:  No --

7              THE COURT:  You're asking me to take your word for

8    it, that the decision to pull those loans and those breach

9    claims is not probative of, on the issue of how good the

10   process was.

11             MR. SHUSTER:  Judge, they have -- they have our

12   evidence.  If they want to take the pulled breaches, right,

13   they know watch they are, because they were all submitted

14   through the protocol process with proof, with claims

15   packages.  If they want to come forward to the Court and

16   say, "Look at all these crappy claims --"

17             THE COURT:  But now you're going to have to help

18   me out, because how do -- I still, having read your briefs,

19   I still don't understand, to be blunt, what you're doing.  I

20   don't understand what this is going to look like.  Because

21   if we're not talking about this issue, it was certainly not

22   my impression that we were going to have hour after hour,

23   and day after day of testimony, claim by claim, loan by

24   loan, breach by breach.  Right?

25             MR. SHUSTER:  Well, we can't, in the item that we

1    have available, and given the number of breach claims.  But

2    that's why --

3            THE COURT:  But that's the whole point is that --

4    so that in order to get to what we're going to look at, it

5    needs to be -- I need to be able to have an understanding

6    about how this subset was picked.

7            MR. SHUSTER:  And you're going to, because -- all

8    of the evidence was put in.  I don't care to make proof on

9    the breach claims that we've dropped.  If they want to, they

10   have the proof.

11           THE COURT:  But how do I know that you have --

12   let's assume you've selected the weakest claims, right?

13           MR. SHUSTER:  Even if that were true, even if that

14   were true, in any case, some claims are stronger than other

15   claims.  Even if it were true, we drop the weakest claims.

16   The fact is, we're coming forward with claims on --

17           THE COURT:  That's fine, but ignores the fact that

18   hat you're trying to get me to issue a decision on is how

19   good your process was.

20           MR. SHUSTER:  Ultimately, I'm looking for a

21   valuation of the claims that we're presenting.

22           THE COURT:  We are just -- you know, this is just

23   getting worse by the minute.  Is the issue of your process

24   in the case or not?

25           MR. SHUSTER:  Your Honor, the process is part of

Page 68

1    what led to the evidence and leads to the claims, but

2    ultimately, it's the claims, it's the proof of breach.  It's

3    the categories of proof that we're relying upon.

4            THE COURT:  But since we're not doing this claim

5    by claim, breach by breach, then I need to understand what

6    your process was.

7            MR. SHUSTER:  And you're going to understand.

8            THE COURT:  But how can I understand what your

9    process was if you're not going to tell me -- we had a

10   process, we put 94,000, or however many claims there were

11   that you put through the protocol, right?  Now you're taking

12   a bunch of those out.  Not randomly, not there's 10

13   different categories, and we're taking out 10 from each

14   category.  We just took out a bunch, and I'm supposed to

15   just assume that that doesn't reflect on anything.

16           MR. SHUSTER:  No, they can make whatever arguments

17   they want.  They put in expert reports.  Mr. Gries draws all

18   kinds of inferences, he draws inferences --

19           THE COURT:  Okay, why don't you stop for a second,

20   because I'm -- it's, we've been at this for an hour, and I'm

21   behind where I, in my knowledge, in my understanding on

22   what's happening from where we started.  So, Mr. Cosenza,

23   you want to take a shot?

24           MR. COSENZA:  Yeah, so Your Honor, I think where

25   we are, and I just want to also give history and context to

1    this.  We had many status conferences before the Court

2    during the protocol, and if you remember, there were many

3    sentences where I raised with the Court the fact that the

4    trustees were putting frivolous claims through the protocol

5    process, and that they were frauding it, it was not

6    functioning.

7                THE COURT:  Right, so that's from the beginning of

8    time, in this case, that's bene the mantra of the estate.

9    That the reason the protocol couldn't succeed was because

10   the trustees were putting claims that weren't good through

11   the protocol.  So then you engage in this process, and we

12   have a settlement, and the settlement comes up with this

13   floor and this ceiling, this range, and we have the -- no?

14                MR. GOLDBERG:  I don't think there's a ceiling.

15                THE COURT:  There's a range.

16                MR. COSENZA:  Yes.

17                THE COURT:  Okay, there's a range.  I withdraw the

18   characterization as a ceiling.  There's a range, right,

19   right?

20                MR. COSENZA:  Correct, Your Honor.

21                THE COURT:  Okay, but that was based on a pool of

22   claims, which is now, you're telling me there's a different

23   pool of claims, right?

24                MR. COSENZA:  Your Honor, I --

25                THE COURT:  Help, just help me out here.  When you

Page 70

1    entre into the settlement, these claims were still in the

2    pool, right?

3            MR. COSENZA:  These claims were still in the pool,

4    yes, Your Honor.

5            THE COURT:  Okay, so now you've changed the

6    predicate facts.  We're going to trial on a case, based on a

7    settlement, of a pool of claims that's now a different pool

8    of claims than the one that was settled.

9            MR. SHUSTER:  It's still a --

10           THE COURT:  It's a subset of them.

11           MR. SHUSTER:  It's still a pool of claims that is

12   vastly in excess of the reserve.  The pool of claims, it's

13   shrunk from (indiscernible).

14           THE COURT:  But maybe if you had reduced the pool,

15   they wouldn't have agreed to the settlement.

16           MR. COSENZA:  That's correct, Your Honor.

17           THE COURT:  Maybe if you had reduced the pool,

18   they would have said, "Oh, well."

19           MR. SHUSTER:  Your Honor, we could have -- I mean,

20   even now, going --

21           THE COURT:  But you need to answer my question.

22   They've settled, based on the trustee's assertion of, or

23   proffer, or putting forward of X number of loans.  Now it's

24   less.  Maybe they don't want to do the settlement anymore.

25           MR. SHUSTER:  That's their decision.  I don't know

1    what --

2            THE COURT:  Well, but --

3            MR. SHUSTER:  I don't know what to say about that,

4    I really don't.  Because the claim is still --

5            THE COURT:  But that's like saying you enter into

6    -- you go back to my hypothetical, you know, somebody's

7    asserting hundreds of millions of dollars of claims, and

8    then agree in principal to a settlement, and then at the

9    last, the 11th hour, you say, "Just kidding, we're going to

10   reduce our number by 100 million."

11           MR. SHUSTER:  I, all I know is that the claims

12   that remain -- we took 40,000 breaches, that's $2 billion in

13   claims, the claims that remain are $11.6 billion.  The

14   reserve is about $4.75 billion.  The --

15           THE COURT:  What does the reserve have to do with

16   anything?

17           MR. SHUSTER:  Because the claim is more than --

18   the claim is still, you know, five times is big as the

19   number that they're arguing to the Court for.

20           THE COURT:  You know what, item out.  Sir with the

21   pencil that's no longer there, I'm going to ask you to step

22   outside.  Sorry, I know this is getting really interesting,

23   but we'll let you know if you can come back.

24           MAN:  Is there a reason (indiscernible)?

25           THE COURT:  Is there a reason?  Because I'm going

Page 72

1    into a closed session.  Excuse me, I'm happy to have you in

2    here.  It's a public hearing, it's a public hearing until I

3    say it's not, and I need you to show a little more respect.

4            MAN:  I apologize, I just wanted to know why

5    (indiscernible).

6            THE COURT:  Mute the phone?  You can stay here,

7    but we're not recording anymore.

8            (Recess)

9            THE COURT:  Okay, the hour is growing late, so

10    unless we can quickly resolve the issues, we're going to

11    have to resume again tomorrow.  So we're back on the record

12    now.

13            MR. SHUSTER:  Your Honor, I don't know now how to

14    resolve this issue.  This is an 11th hour issue that's

15    honestly been sprung on us by way of an oral presentation to

16    the Court.  If the issue -- if I had known after our June 1

17    reports that the plan administrator was so upset that we

18    were dropping claims, we would have put them back in.  We're

19    still happy to put them back in, if that's going to simplify

20    matters.  I'm happy to put the claims back in.

21            THE COURT:  But there seems to be a fundamental

22    disconnect over what it is that we're doing, whether or not

23    the process is at issue or not.  I certainly came in today

24    that thinking at least part of, not entirely, because then

25    it would be much simpler, at least part of the issue was the

1    process, and the process includes what happened during the

2    protocol, no?

3              MR. SHUSTER:  That's not the way we're approaching

4    it, the way we're approaching it is Judge, we have 5000

5    income breaches that are a billion dollars, that have

6    predicated us --

7              THE COURT:  Stop right there, stop right there.

8    You have 5000 income breaches that are worth a billion

9    dollars, right.  But you used to have 5500 income breaches

10   that are worth a billion dollars.  And what you're saying to

11   me is same difference, right?

12             MR. SHUSTER:  No, I'm saying that I have proof of

13   5000 breaches, evidence of breaches, using -- let's say it's

14   a salaried employee, and I'm using same-year tax returns.

15   And then I will establish, by expert testimony, that same-

16   year tax returns are commonly relied --

17             THE COURT:  That's a different issue.  The issue

18   of whether a particular breach is material, and the issue of

19   whether or not that breach, or others like it in one or more

20   loans gives rise to a claim for damages, that that, you

21   definitely don't agree on that latter piece.  But whether or

22   not you can extrapolate, I'm using that word, from a

23   category of breaches, and get to a number, to me has to be

24   related to the number of claims.

25             MR. SHUSTER:  We're giving you the actual number.

Page 74

1    We're not -- I mean, neither side is giving the Court any

2    kind of systematic extrapolation methodology.  We're not

3    doing that.  That was rejected.  We wanted to do a sample,

4    and do a breach rate, and that approach was rejected.  So

5    what we're left with is actually somehow satisfying the

6    Court that we have evidence of breaches.

7              And the way that I think about that is, we will

8    show the Court the kinds of evidence we have, among other

9    things, the buckets of evidence we have, what the numbers

10   are that are attached to that evidence, satisfy the Court

11   that we actually did provide that evidence --

12             THE COURT:  Then why aren't you seeking -- but if

13   you're not including thousands of claims, thousands of

14   loans, how can that math add up?

15             MR. SHUSTER:  It's going to add up to 11.6

16   billion, or something short of that, if the Court doesn't

17   agree with us, on the 11.6 --

18             THE COURT:  But if you put in the rest of the

19   claims, it'd be a higher number.

20             MR. SHUSTER:  But we're not going to put in the

21   claims we drop.  Those are out of the case.  And the --

22             THE COURT:  But they weren't out of the case when

23   --

24             MR. SHUSTER:  But they weren't then, but they are

25   now, and the number now is 11.6 billion, and the question

Page 75

1   is, how do we build up to that number?

2           THE COURT:  So are you taking Footnote 7 out or

3   not?

4           MR. SHUSTER:  Our problem is at this point,

5   candidly, and just based on the oral arguments of counsel, I

6   don't know what that's going to mean.

7           THE COURT:  Well, I'm going to tell you right now,

8   leaving it in, okay, I'm not going to make a finding of fact

9   in any way that any of the statements in Footnote 7 are

10  facts, including that the trustees continue to believe these

11  claims are valid, and that even with their remaining claims,

12  which involve 110,000 breaches of two different breach

13  categories, the trustees have concluded that they will

14  emphasize four core breaches that account for 80 percent of

15  the trustee's damages.  How do I get to -- how do, I can't

16  agree with that math unless I'm making some kind of a

17  finding about whether or not the claims that you've pulled

18  are valid nor not.

19          MR. SHUSTER:  Those claims are entirely out of the

20  math that is set forth in Footnote 7.  The 110,000 breaches

21  is based on the breaches, on the 74,000 loans that are still

22  at issue, or 73,000 loans.  There's 30 --

23          THE COURT:  Well, maybe the thing -- we're just,

24  we're re-treading the ground again, maybe we just need to

25  come back tomorrow.  I'm just at a loss to know what to do.

1          MR. COSENZA:  Your Honor, can I raise for

2    tomorrow? I agree, look, if Footnote 7 remains in, given the

3    positions that have been taken by Mr. Shuster for the last

4    three months, at both the deposition and upon repeated

5    requests, both orally and in writing, for an explanation as

6    to how they withdrew the loans, and a blanket claim of

7    attorney work product and attorney-client privilege, which

8    he's still asserting to this moment, he now discloses this

9    information in this footnote, either the footnote has to go,

10   or we have to get discovery on this, which we've denied for

11   three months, based on the wall he's erected around the

12   decisions, because he knows how fundamental this is to the

13   process.

14          Everything about this case is about the process,

15   the trustee's bringing claims forward, how they decide to

16   elect to bring claims.  We've raised, numerous times, Your

17   Honor, if you can recall during our status updates, I raised

18   expressly there were issues with the quality of the claims

19   being put forward by the trustees.  They repeatedly made

20   assurances that they had this high quality control program

21   in place.

22          THE COURT:  But see, now you're getting to the nub

23   of it, because what Mr. Shuster is saying, none of that

24   matters, that none -- the protocol process is irrelevant to

25   what we're doing.

1          MR. SHUSTER:  I don't -- that is not our view.

2     That is not our view.  That's not our view.  We think the

3     protocol process -- we're going to show the evidence that we

4     have, we developed and presented to the plan administrator

5     during the protocol process.

6          THE COURT:  But I can't marry those two

7     statements.  If the protocol process is relevant, and every

8     one of the claims that you presented was valid, and you're

9     now taking out these claims, and they're still valid, it

10    just doesn't make sense to me.

11         MR. SHUSTER:  I'm not trying to prove the validity

12    of the claims as to which we're not presenting evidence.

13    I'm not trying to prove the validity of those claims.  That

14    has not been our intention, to present evidence on the

15    validity of those claims.  What I'm going to do is present

16    evidence on the evidence we've provided to the plan

17    administrator, the plan administrator's rejection of 99

18    percent of that evidence.  The plan administrator's since

19    accepted 225 loans.  They haven't explained to us why, that

20    was a lawyer's decision.

21         THE COURT:  Okay, we need to stop.  This is -- I

22    mean, I'm tempted to send you away for six months, because

23    this is going to be -- this is going to be impossible, just

24    impossible.

25         MR. SHUSTER:  You know, we believe that we're

Page 78

1    going to present neat, clean, streamlined proof.

2              THE COURT:  Well, then you're going to -- then

3    you're just going to take your chances that if you begin to

4    provide explanations that have to do with this, and they

5    have not been given discovery on it, I'm going to preclude

6    that testimony.

7              MR. SHUSTER:  But they --

8              THE COURT:  That's just a statement, flat-out, of

9    the way it works at trial.

10             MR. SHUSTER:  They have made that showing.  They,

11   you know, Mr. --

12             THE COURT:  You haven't put on any evidence yet.

13             MR. SHUSTER:  No, no, but they haven't -- there's

14   a suggestion now we might be precluded from doing something,

15   based on oral argument, no written submission, no --

16             THE COURT:  No, no, no, you're mis-, maybe I'm not

17   speaking clearly because it's getting so late, and we really

18   are going to have to come back tomorrow.  I'm telling you,

19   you're not going to get a finding from me that is anything

20   remotely like the claims that aren't in the pool are valid,

21   okay?  You're not going to, and I don't understand how the

22   math is going to work, that's part on what you're going to

23   have to prove.

24             To the extent that you put on any evidence having

25   to do with what's in the pool at this point and what's out

Page 79

1    of the pool at this point, and they haven't had a chance to

2    inquire about that, and they say that testimony should not

3    be allowed, I'm going to have to agree with them.  Because

4    you're saying here, it's all valid, take my word for it.

5          MR. SHUSTER:  I'm not, and I will say also, they

6    have the evidence of those breaches.  If they want to show -

7    -

8          THE COURT:  Mr. Shuster, are you changing -- do

9    you want to revise the footnote?  Do you want to not include

10   that they're all valid?

11         MR. SHUSTER:  No, I said that the trustees

12   continue to believe these claims are valid, but we're not

13   pursuing them.

14         THE COURT:  But I'm not going to -- but I'm not

15   going to make, you're not -- you cannot ask me to make a

16   finding on claims that aren't before me, right?

17         MR. SHUSTER:  It's not our intention to seek a

18   finding on claims that we're not presenting evidence on.

19         THE COURT:  And you're not going to ask me to make

20   a finding based on -- an ultimate fact, based on an

21   predicate fact that as to do with those claims are in the

22   pool or out of the pool, right?

23         MR. SHUSTER:  The plan administrator is the one

24   that's looking for a finding on that issue.  I'm going to

25   have to respond to that.  They're the ones that are looking

Page 80

1    for a finding on that issue.  I'm not looking -- I'm looking

2    for findings based on the evidence I'm presenting at the

3    hearing.

4              MR. COSENZA:  Your Honor, that's the fundamental

5    disconnect.  This is now -- he's going to selectively waive,

6    as he did in the footnote during the hearing, to abut

7    arguments we have about claims that have been withdrawn, or

8    about their process, and about withdrawing the process.

9              You can't have it both ways.  You can't say it's

10   attorney work product, you can't say its attorney-client

11   privilege.  You then can't selectively disclose it, you

12   can't just say at the hearing, "I'm going to respond as I

13   need to respond," without us understanding the facts -- and

14   we understand these facts are facially inaccurate, so it

15   sort of puts us in a real box.  And on to tomorrow, Your

16   Honor, there are two other issues, so I can raise them with

17   you in advance.

18             THE COURT:  All right, go ahead.

19             MR. COSENZA:  One is, an issue arose late Thursday

20   evening, going into Friday morning at Mr. Morrow's

21   deposition, where he basically, and I'll have -- Mr. Davis,

22   I was not at the deposition, Mr. Davis took the deposition,

23   where there were additional disclosures of responses to Mr.

24   Gries's work.  Basically, it's the role reverse of what we

25   did with Mr. Gries a month ago, except they did it the night

Page 81

1   before Mr. Morrow's deposition, and that is, that really

2   prejudiced our right to take Mr. Morrow's deposition, so

3   that's an issue we're going to raise tomorrow.

4          The last issue is going to be, and is in our

5   brief, there's an issue about the trustee's attempt to

6   recover impermissibly, under Section 502 of the Bankruptcy

7   Code, what I would describe as -- I've been told not to

8   describe it this way, but I guess it's un-matured interest

9   under the Bankruptcy Code.  We have asked the trustees

10  repeatedly to explain to us their calculations as to how

11  they did this, and they've refused to provide any response

12  to us, and they're basically saying, "Well, we do our

13  calculations as we do our calculations."

14         We have, now have an expert, Professor Cornell,

15  look at this, and we understand it's in the magnitude of $2

16  billion, roughly in the neighborhood of $2 billion of their

17  current claim is potentially impermissible interest that

18  they're trying to recover here.  And they really haven't

19  given us the details, even though they have the burden as

20  the plaintiff to prove up their damages, and their expert

21  testified that he can disaggregate the different payments

22  streams, and how they came in.  We're now in a position,

23  because we have trial coming next week, where Mr. Cornell is

24  rushing to put together a report.  So at least there's

25  evidence that we can help guide the Court, to the best of my

Page 82

1     --

2              THE COURT:  I don't see any scenario where we're

3     starting on Monday.  I just don't see any scenario where

4     we're starting on Monday.

5              MR. SHUSTER:  That was going to be my question, is

6     whether we're starting on Monday.  I mean, we should know,

7     if we're coming here tomorrow, and we don't have that many

8     days until Monday.

9              THE COURT:  Well, look at all the issues that we

10    have.  I mean, this -- we have a $2 billion issue that's

11    relating to potential embedded claim for unallowable, un-

12    matured interest?

13             MR. COSENZA:  That's correct, Your Honor.

14             THE COURT:  It's kind of a big one.

15             MR. SHUSTER:  I agree, it's a big number.  I think

16    we can address the issue substantively, if the plan

17    administrator wants to raise it.

18             THE COURT:  What do you mean, if the plan

19    administrator wants to raise it?

20             MR. SHUSTER:  We'll address --

21             THE COURT:  If there --

22             MR. COSENZA:  Your Honor, the context is we've

23    raised this several times in letters and correspondence,

24    after Dr. Snow's deposition, and in the last couple of

25    weeks, and we've basically been told that the calculations

Page 83

1   are the calculations, and you're the defendant --

2           THE COURT:  Well, here's the thing, Mr. Cosenza, I

3   really would like you to go home to see your new child, all

4   right?

5           MR. COSENZA:  I appreciate that, Your Honor.

6           THE COURT:  So with your permission, I'm going to

7   end the hearing, okay, and I'm going to order you to go

8   home, all right?

9           MR. COSENZA:  Yes.

10          THE COURT:  Let's pick a time to come back

11  tomorrow, but I want a smaller group to stay and talk to me

12  a little bit longer.  All right?

13          MR. COSENZA:  Sure.

14          THE COURT:  So, and if they feel that they are,

15  have -- I'm asking things, or we're discussing things that

16  they need you for, then they're just going to tell me that

17  they can't proceed without me.

18          MR. COSENZA:  Sure.

19          THE COURT:  But I want to let you go, I'm going to

20  close to record.  What time do you want to come back

21  tomorrow.

22          MR. COSENZA:  Whenever --

23          THE COURT:  Do you want to have the morning to

24  talk to each other?  Don't you think?

25          MR. SHUSTER:  That would make sense, I think.

Page 84

1              THE COURT:  Okay, Mr. Canter, you seem like you

2       have a view.

3              MR. CANTER:  I think it's important that we get

4       together, to at least have time here to get together

5       tomorrow.

6              THE COURT:  You want not get together here?

7              MR. CANTER:  Here, so we can (indiscernible), as

8       you know, the goal here, from the estate's perspective, is

9       to have the plan resolved before the spring distribution.

10      And while the issue has been (indiscernible) into this,

11      because the trustees, while this is going on, have objected

12      the estate's attempt to move the 1.7 billion out of the

13      estate --

14             THE COURT:  Okay, now I understand what you're

15      talking about.  I didn't understand, because I approved the

16      settlement, and okay.

17             MR. CANTER:  So we have moved for an interim

18      distribution.  We have received once objection, that's from

19      these folks.

20             THE COURT:  Okay.

21             MR. CANTER:  Alleging that there's $11

22      (indiscernible) million claim that they're not protected of.

23      And we're going, originally, it was (indiscernible) hearing

24      to see if there was an objection (indiscernible) to asking

25      Your Honor for a hearing date.  But there's another current

Page 85

1    (indiscernible), we're just trying to get money out.

2              THE COURT:  Understood.

3              MR. CANTER:  And I just, (indiscernible) process,

4    if the trial's going to be delayed, I will just respectfully

5    request that it be delayed (indiscernible).

6              THE COURT:  Sure, as for --

7              MR. CANTER:  As small of a time as humanly

8    possible.

9              THE COURT:  Right.

10             MR. CANTER:  Because now dealing with the 1.7

11   billion-plus.

12             THE COURT:  Okay, all right.  I was unaware of

13   that, but now --

14             MR. COSENZA:  I'm sorry for not being clear

15   before, Your Honor.

16             THE COURT:  So why don't you come back -- are you

17   amenable to coming back in here tomorrow?  I'd rather you

18   folks be in the same room, than talking on the phone, all

19   right?

20             MR. SHUSTER:  Yes, sure.  Well, we can go over to

21   Willkie, our offices are a block away from each other.  But

22   I'm happy to come in, I'm happy to --

23             THE COURT:  If you're here, then we can engage in

24   an iterative process to try to resolve --

25             MR. SHUSTER:  Sure, yes, absolutely.

1          THE COURT:  To try to work together to resolve

2     this.

3          MR. SHUSTER:  Absolutely.

4          THE COURT:  With the goal being, I'm trying to be

5     completely even-handed, not prejudice either side.  It's

6     very hard to really, definitively understand everything

7     that's going on.  But that's my goal, obviously.  So do you

8     want to come down here at 11:00?

9          MR. COSENZA:  That would be great.

10          THE COURT:  You're not going to sleep tonight

11     anyway, so.

12          MR. COSENZA:  11:00 is fine, Your Honor.

13          THE COURT:  Would 11:00 be okay?

14          MR. SHUSTER:  Yes, Your Honor, thank you.

15          THE COURT:  We can take a break for lunch if we're

16     not resolved by then.  I don't have anything in the

17     courtroom, so we can spread out here, or we can use the

18     conference room.  All right?

19          MR. SHUSTER:  Thank you.

20          THE COURT:  All right, thank you.

21          MR. COSENZA:  Thank you, Your Honor, thank you.

22          THE COURT:  All right, see you tomorrow.  Can I

23     just ask maybe your second in command, or maybe someone from

24     your side, and maybe someone from your side, and Mr. Canter,

25     one or more of the trustees to join me in the conference

Page 87

```
 1    room?

 2            MR. SHUSTER:  Not me, and not because -- yes, I

 3    got it.

 4            THE COURT:  No, you can come.  I mean --

 5            MAN:  (indiscernible) she doesn't want

 6    (indiscernible).

 7            MR. SHUSTER:  (indiscernible) one or two others,

 8    yes.  Thank you.

 9            (Whereupon these proceedings were concluded at

10    5:16 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 88

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya
     Ledanski Hyde

     Digitally signed by Sonya
     Ledanski Hyde
     DN: cn=Sonya Ledanski Hyde, o,
     ou, email=digital1@veritext.com,
     c=US
7    Date: 2017.10.25 16:32:57 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 25, 2017