# WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel:  212 728 8000
Fax:  212 728 8111

November 7, 2017

**VIA EMAIL AND ECF**

The Honorable Shelley C. Chapman
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

Re:    *In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)*

Dear Judge Chapman:

I write respectfully to seek the Court's resolution of a dispute presented at the conference on October 23 concerning the Trustees' decision to drop 40% of the breach claims unresolved in the Protocol.  Despite good faith efforts and several meet and confers over the past two weeks, this one issue from the conference remains unresolved and has morphed from a dispute over a footnote in the Trustees' pre-trial brief to a more remarkable shift in the Trustees' position that requires the Court's intervention.  The Plan Administrator respectfully requests a telephonic conference with the Court to resolve this issue.

As background, during the Protocol process, the Plan Administrator stated its position on various occasions that the Trustees' process for submitting claims was flawed.  In response, the Trustees made repeated representations (both to the Plan Administrator and the Court) that their process was robust and had a number of "quality control" parameters.  Now that the Trustees are being forced to defend their process in this Estimation Proceeding, however, they have shifted their approach.  In particular, the Plan Administrator understands that the Trustees made a calculated decision months before expert reports were exchanged on June 1, 2017 to withdraw *all* breach claims on 15,107 disputed mortgage loans, *plus* an additional 56,981 breach claims on other disputed mortgage loans, for a total of 72,088 breach claims withdrawn — **40% of all claims unresolved in the Protocol**.  As a result, it is now undisputed that the Plan Administrator was forced to waste massive estate resources responding to an enormous number of claims generated by the Trustees' "process" that the Trustees removed from the case without notice, much less explanation.  Moreover, when they submitted their expert reports, the Trustees did not advise the Plan Administrator that they were dropping these loans and breach claims; they left the Plan Administrator to figure it out for itself.  (*See* Ex. A (2017.06.16 Letter from McCallen to Lieberman); Ex. B (2017.07.24 Letter from Shuster to Cosenza) at 1-2.)

The Plan Administrator repeatedly requested from the Trustees the rationale and basis for the withdrawal of the claims.  (*See, e.g.,* Ex. C (2017.07.21 Letter from Cosenza to Shuster) at 1 ("The Plan Administrator is therefore entitled to understand: (i) The date the Trustees first decided to withdraw their claims on the Withdrawn Loans; (ii) the rationale for withdrawing

NEW YORK   WASHINGTON   PARIS   LONDON   MILAN   ROME   FRANKFURT   BRUSSELS
in alliance with Dickson Minto W.S., London and Edinburgh

these claims; and (iii) who was involved in these decisions….").)  The Trustees refused to provide any information, cloaking their decision with confidentiality and privilege and responding that "the RMBS Trustees are under no obligation, whether pursuant to Exhibit G, the Protocol, or any other authority, to provide information **concerning confidential and privileged discussions**" and that they would not allow the Plan Administrator to "**seek such privileged information** through fact depositions."  (Ex. B at 1-2 (emphasis added).)

True to their word, the Trustees blocked any discovery into the rationale and methodology for their withdrawal of loans and claims.  Their experts testified both that they did not know why the claims were withdrawn, and that any analysis of such claims was outside the scope of their opinions.  (*See, e.g.*, Ex. D (Morrow Tr. 163:19-22) (he "would be speculating" if he were to provide an "understanding as to why the claims were withdrawn"); Ex. E (Aronoff Tr. 173:7-16) (when asked to confirm that he was not involved in the decision-making process to not pursue certain breach claims, counsel stated "[h]e's advised you that he does not know, and you are now asking him to testify as to discussions that he may have had with the trustees' counsel, consulting experts or others.  And he's instructed not to answer that question.").)  Their other fact witness, Mr. Esses, either said that he did not know why the claims were withdrawn, or was prevented from testifying on the subject by assertions of privilege.  (*See, e.g.*, Ex. F (Esses Tr. 133:9-21).)

Remarkably, without any evidentiary basis in the record (and, indeed, having denied the Plan Administrator the opportunity to develop such a record), the Trustees purported to explain their decision to withdraw claims in footnote 7 of their pretrial brief.  (*See* RMBS Trustees' Pre-Trial Brief at 12 n.7 (Dkt. No. 56843).)  When the Plan Administrator challenged those explanations at the October 23 hearing, the Trustees asserted that the Plan Administrator was "free to address all of these [withdrawn] claims in any way that they wanted in the discovery process" but "[t]hey didn't" and that "they have not been in any way, shape or form, precluded or foreclosed from taking whatever discovery they wanted about the trustee's [sic] claims process."  (*See* Ex. G (2017.10.23 Hr'g Tr. 57:5-25).)  As noted above, the discovery record belies those assertions.

Changing course yet again, during meet and confers on this issue since the Court conference, the Trustees offered a "compromise," which consists of the production of a "schedule" of information (picked by the Trustees) about the dropped claims, along with further deposition time with Mr. Esses (who the Trustees previously prevented from testifying on the subject) and Mr. Aronoff (who previously said he knew nothing about the decision to drop claims and that the withdrawn claims were outside the scope of his expert opinion).[1]  The Trustees' proposal is too little and, more importantly, too late: Having blocked any discovery into their methodology and rationale for withdrawing 40% of their claims for the entire discovery period, the Trustees cannot cure the effects of that decision days before trial.  Had this been a live issue during discovery, the Plan Administrator would have been entitled to thoroughly explore the issue with multiple witnesses and other forms of discovery.

Allowing the Trustees to present evidence at trial on such an important subject, which they previously claimed was privileged, would severely prejudice the Plan Administrator.  The Plan Administrator's ability to conclude this estimation proceeding in time to reflect the results in the March distribution was an important consideration in structuring and assenting to the RMBS Settlement that gives rise to this proceeding.  There is no way to meet that goal and also re-open

---

[1] At the same time, the Trustees are "declin[ing] to waive the attorney-client privilege or work product protections." (*See* Ex. H (2017.11.06 Letter from Shuster to Cosenza) at 1.)

full discovery on the Trustees' rationale and methodology for withdrawing so many breach claims.  For all of these reasons, the Plan Administrator respectfully requests that Footnote 7 to the Trustees pre-trial brief be stricken and that the Trustees be precluded from offering any evidence in the estimation proceeding regarding the methodology and rationale for their decision to withdraw these breach claims and loans from the estimation proceeding, based on their long-standing position that such information was protected by attorney-client privilege and confidentiality.

Respectfully submitted,

Todd G. Cosenza

cc: All counsel (*via* email)

(Enclosures)

# EXHIBIT A

# WILLKIE FARR & GALLAGHER llp

BENJAMIN P. McCALLEN
212 728 8182
bmccallen@willkie.com

787 Seventh Avenue
New York, NY 10019-6099
Tel:   212 728 8000
Fax:   212 728 8111

June 16, 2017

**<u>VIA EMAIL</u>**

Neil Lieberman
Holwell Shuster & Goldberg
750 Seventh Avenue, 26th Floor
New York, NY 10019

Re:   <u>In re Lehman Brothers Holdings Inc., et al.</u>, Ch. 11 Case No. 08-13555 (SCC)

Dear Neil,

As you know, we represent Lehman Brothers Holdings Inc. ("Lehman," or the "Plan Administrator") in the above-referenced bankruptcy proceeding.  We are in receipt of the expert reports of James H. Aronoff ("Aronoff Report") and Karl N. Snow ("Snow Report"), dated June 1, 2017.

This letter serves to memorialize our call on Tuesday, June 13th, during which you stated that the Trustees no longer intend to submit evidence at the estimation hearing regarding 15,107[1] out of the 91,151 Disputed Mortgage Loans in the Protocol.  Exhibit 1 to the Aronoff and Snow Reports omitted any reference to those loans but failed to explain that omission.

Given that the date for the exchange of rebuttal expert reports is July 14, please confirm in writing by close of business, Monday, June 19, that the Trustees are no longer pursuing claims on these loans.

The Plan Administrator continues to reserve all its rights.

Sincerely,

Benjamin P. McCallen

cc: All counsel (*via* email)

---

[1] It is our understanding that these 15,107 Disputed Mortgage Loans include all the Disputed Mortgage Loans in the Protocol for six trusts: ARC 2002-BC9, SASCO 2004-18H, SASCO 2005-RF4, SASCO 2005-RF5, SASCO 2005-RF6, and SASCO 2006-RF4.

# EXHIBIT B

# HOLWELL SHUSTER & GOLDBERG LLP

*750 Seventh Avenue, 26th Floor*
*New York, New York 10019*
*Tel: (646) 837-5151*
*Fax: (646) 837-5150*
*www.hsgllp.com*

*Michael S. Shuster*
*646-837-5153*
*mshuster@hsgllp.com*

July 24, 2017

**VIA EMAIL**

Todd Cosenza
Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY 10019

*Re:    In re Lehman Brothers Holdings Inc. RMBS Claims Estimation Hearing*

Dear Todd:

We write on behalf of the RMBS Trustees in response to your letters dated July 21, 2017 regarding (1) the loans that were not included in the Trustees' affirmative expert reports, (2) your clients' approval of 156 Claim Files that they initially rejected, and (3) your clients' deficient disclosures regarding their experts' sampling methodologies.

With respect to the loans that are not addressed in the RMBS Trustees' expert reports, your letter contains significant mischaracterizations of our discussions on the subject to date. As an initial matter, as we made clear in our letter dated July 10, 2017, and had previously advised you (June 13, June 22, July 7, July 8), the Trustees will not submit evidence or otherwise pursue claims with respect to those loans at the Estimation Hearing. Therefore, there is no basis for your assertion that the Trustees "failed to follow the well-established process for communicating decisions regarding allowance or withdrawal of claims …." (July 21, 2017 Letter from T. Cosenza to M. Shuster at 1.)  I note that you advised me by letter dated July 21, 2017 that your clients were accepting breach claims they previously rejected. There is no difference in principle between your clients advising ours via a letter from counsel of breaches they will no longer challenge and our clients advising yours by the same means of breaches as to which they will not present evidence at the Estimation Hearing.

Your clients' demand for information concerning the timing and rationale of the RMBS Trustees' decision not to include these loans and breaches in their expert reports are unfounded. As we advised you by email dated July 8 in response to the initial request for the same information, the RMBS Trustees are under no obligation, whether pursuant to Exhibit G, the Protocol, or any other authority, to provide information concerning confidential and privileged discussions. They will not do so. Nor is the Plan Administrator entitled to seek such privileged

information through fact depositions, as you suggest.  The RMBS Trustees will not identify deponents for that purpose.

It is as you well know common practice for plaintiffs to pare down their claims in preparation for trial.  Forcing plaintiffs to disclose their confidential and privileged communications concerning the strategy for the presentation of their claims at trial would only disincentivize them to do so and create inefficiencies and increased costs for all participants.  It would be bad law and bad policy.  And that, in addition to straightforward application of the principles of attorney-client privilege and the work product doctrine, is why it is not required.

In addition to information protected from disclosure concerning the RMBS Trustees' and their lawyers' deliberations and thought processes, your letter requests additional detail regarding breach claims that are not included in Aronoff Report.  The RMBS Trustees have provided considerable and detailed information concerning the claims that are the subject of their expert reports.  The Plan Administrator is fully capable of identifying the breach claims that are *not* included.  Whether the Plan Administrator should expend the resources of the estate in that effort is for it and its lawyers to decide.  The exercise of actually doing so should be straightforward.  As the Plan Administrator is fully aware, the Trustees submitted 193,148 claims on 94,566 loans into the Protocol, and rescinded 6,508 claims on 3,495 loans through Step 3, leaving a total of 186,640 claims on 91,071 loans on which there were breach claims.  (See the January 2017 Notice of Monthly Delivery.)  The Trustees have now identified all loans for which they will submit evidence at the Estimation Hearing.  (See Exhibits 1 and 15 to the initial Aronoff Report.) The Plan Administrator can identify the loans as to which claims will not be the subject of the Trustees' presentation at the Estimation Hearing by comparing Aronoff Exhibit 1 to the January 2017 Notice of Monthly Delivery.  Indeed, the Plan Administrator seems to have already carried out this work.  The RMBS Trustees are not obligated to devote additional resources, which come out of the trust funds available to certificateholders, to identify claims that they will not present at the Estimation Hearing.  That would be a waste of resources already diminished by Lehman's securitization of tens of thousands of breaching loans and its unjustified refusal to accept breach claims whose validity is manifest.  Nonetheless, as a courtesy, we have performed the work that we believe the Plan Administrator could or did itself perform.  Exhibit A at your request identifies the breach claims that were submitted into the Protocol but were not included in the Aronoff Report.

The Plan Administrator's complaints of prejudice and waste as a result of certain loans and claims not being the subject of the RMBS Trustees' expert reports are hollow.  The Plan Administrator argued, over the RMBS Trustees' objections, for a process that required review of every single one of over 200,000 mortgage loans, at great expense to the estate and to certificateholders.  That exercise, not the fact that some portion of the RMBS Claims are not included in the Aronoff Report, is where the lion's share of costs has been incurred.  The RMBS Trustees' decision regarding the analysis and presentation of certain of their claims in light of the pending, circumscribed, Estimation Hearing has not visited additional costs on the estate.

I note that your clients have now accepted that 156 loans have "Valid Claims" that they previously rejected, under the guise of continuing to review loans pursuant to the Protocol.  First, the Protocol process has been suspended at your clients' request.  (Settlement Agreement at § 3.02.)  Second, the fact that your clients have now accepted breaches they previously rejected

shows that, with the benefit of further review, and with a trial on the immediate horizon, parties can re-evaluate positions.  The RMBS Trustees assert no prejudice from the fact that your clients have reversed themselves on 156 loans, though they note that if the Plan Administrator were truly continuing to review loans in good faith, the number of reversals would be orders of magnitude higher.

Finally, your attempt to paper over your clients' deficient and untimely disclosures of the materials their experts relied upon, by equating the selection of loans for analysis by Messrs. Grice and Castro to the exemplar loans used by the Trustees' expert James H. Aronoff, is without merit.  The exemplar loans detailed in Mr. Aronoff's report are there to illustrate different types of breaches and sources of evidence pertinent to the Claims.  Unlike Messrs. Grice and Castro, Mr. Aronoff did not purport to review a "sample" of loans, nor did he attempt to extrapolate a breach rate or other population-wide conclusions based on any such sample that he reviewed.  I note that, in addition to purporting to review a sample set of loans from which they draw broad inferences, Messrs. Grice and Castro also present exemplar loans to illustrate their points and the Plan Administrator has also listed additional exemplars not discussed by Messrs. Grice and Castro.  In any event, we are available to meet-and-confer at a convenient time regarding these matters.

We continue to await production of the policies and procedures that your clients agreed to provide on July 14.  Please provide those materials forthwith.

The Trustees reserve all rights.

Very Truly Yours,

Michael S. Shuster

cc:     All counsel (via email)

3

# EXHIBIT C

# WILLKIE FARR & GALLAGHER LLP

TODD G. COSENZA
212 728 8677
tcosenza@willkie.com

787 Seventh Avenue
New York, NY 10019-6099
Tel:  212 728 8000
Fax:  212 728 8111

July 21, 2017

**VIA EMAIL**

Michael S. Shuster
Holwell Shuster & Goldberg
750 Seventh Avenue, 26th Floor
New York, NY 10019

Re: In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)

Dear Michael,

We write on behalf of the Plan Administrator in the above-referenced bankruptcy proceeding. After repeated requests, you finally confirmed, in an email dated July 8, 2017, that the Trustees do not intend to pursue claims ("Breach Claims") on 15,107 Disputed Mortgage Loans (the "Withdrawn Loans") submitted into the Protocol, representing nearly 17% of the loans submitted into the Protocol. Although the Trustees represented that they had submitted the claims on these loans in good faith during the Protocol process, they were excluded from the loans listed in Exhibit 1 to the expert reports of James H. Aronoff (the "Aronoff Report") and Karl N. Snow (the "Snow Report"), both dated June 1, 2017, which prompted our inquiry about their status. The Trustees failed to follow the well-established process for communicating about decisions regarding the allowance or withdrawal of claims and instead left it to the Plan Administrator to uncover this highly material and prejudicial decision. Moreover, as discussed below, you still refuse to disclose anything else about the circumstances or timing of this decision.

As you well know, significant estate resources were expended in litigating, on a loan-by-loan and claim-by-claim basis, whether the Trustees had established the elements of a valid repurchase claim as to the Withdrawn Loans. The Plan Administrator is therefore entitled to understand: (i) The date the Trustees first decided to withdraw their claims on the Withdrawn Loans; (ii) the rationale for withdrawing these claims; and (iii) who was involved in these decisions (the "Requested Information"). We have requested this information on numerous occasions, including on June 13, June 16, July 7, and July 9. You have refused to provide this information, refused to voluntarily withdraw and agree to expungement of these claims and have stated that the Trustees will view any motion to disallow and expunge the claims on the Withdrawn Loans as in violation of the RMBS Settlement Agreement. This position is impossible to reconcile with the fact that you are no longer submitting claims on these loans at the estimation proceeding.

If the Trustees are unwilling to provide the Requested Information, then the Plan Administrator is entitled to seek it through fact depositions. Accordingly, please provide by July 24, 2017 the Requested Information or the names and identities of two persons most knowledgeable about the Trustees' decision to forego claims on the Withdrawn Loans.

Although we have been discussing the Withdrawn Loans with you for well over a month, and you are fully aware that the Plan Administrator is now preparing its defenses to the Trustees' claims in the estimation proceeding, you neglected to inform us that in addition to the Withdrawn Loans, the Trustees also apparently have withdrawn thousands of individual Breach Claims ("Withdrawn Claims") on the remaining roughly 73,000 Disputed Mortgage Loans. The Plan Administrator only recently uncovered the Withdrawn Claims through its independent analysis of the exhibits to the Aronoff Report.

We are entitled to understand immediately the full extent of the Withdrawn Claims. During the Protocol, each individual Breach Claim on a Reviewed Loan was assigned a "Breach ID." Please provide us with an Excel spreadsheet listing the Breach IDs for the Withdrawn Claims by close of business today. Alternatively, please provide a list of Withdrawn Claims that identifies each claim that was withdrawn and the Disputed Mortgage Loan on which the claim was made. If the Trustees fail to provide this information promptly, the Plan Administrator will seek relief from the Court.

The Plan Administrator continues to reserve all its rights.

Sincerely,

Todd G. Cosenza

cc: All Counsel (*via* email)

# EXHIBIT D

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Chapter 11

5    Case No. 08-13555(SCC)

6    -----------------------------------x

7

     IN RE

8

     LEHMAN BROTHERS HOLDINGS INC., et al.,

9

                    Debtors.

10

11   -----------------------------------x

                    October 20, 2017

12                  9:36 a.m.

13

14

15       Videotaped Deposition of J.F. MORROW

16   taken by Plan Administrator, pursuant to

17   Notice, held at the offices of Willkie Farr

18   & Gallagher LLP, 787 Seventh Avenue, New

19   York, New York, before Todd DeSimone, a

20   Registered Professional Reporter and Notary

21   Public of the State of New York.

22

23

24

25

Page 161

| | |
|---|---|
| 1 | MORROW |
| 2 | are also Sheshunoff, out of Texas, puts out |
| 3 | a manual for financial institutions, |
| 4 | mortgage institutions, to provide quality |
| 5 | control.  There are sources for samples of |
| 6 | what is the standards for doing that kind |
| 7 | of thing. |
| 8 | Specific to reunderwriting for |
| 9 | putbacks, I've never seen any.  It is the |
| 10 | same as quality control in financial |
| 11 | institutions. |
| 12 | Q.    Okay.  So the repurchase |
| 13 | standards are the same as the quality |
| 14 | control standards for financial |
| 15 | institutions? |
| 16 | MR. HEALY:  Objection to form, |
| 17 | mischaracterizes his testimony. |
| 18 | A.    A bad loan is a bad loan. |
| 19 | Q.    What is the population of loans |
| 20 | from which your sample of 600 was drawn? |
| 21 | A.    90,000 or thereabouts, I don't |
| 22 | remember exactly what Dr. Schwert. |
| 23 | Q.    How many loans are at issue in |
| 24 | this case; do you know? |
| 25 | MR. HEALY:  In the estimation |

Page 162

1              MORROW
2    proceeding, Mr. Davis?
3         Q.     How many loans are at issue in
4    the estimation proceeding?
5         A.     I believe somewhere around
6    71,000 now.
7         Q.     And were the 600 loans drawn
8    from approximately 71,000?
9         A.     No, at that time the total, my
10   understanding, the total part was 90,000,
11   so it was drawn from the 90.
12        Q.     Are you aware that the trustees
13   are not pursuing, then, a significant
14   portion of the loans they submitted to the
15   protocol?
16        A.     I am aware of that.
17             MR. HEALY:  Objection to form,
18   mischaracterizes his report.
19        Q.     Do you know what claims the
20   trustees are no longer pursuing?
21        A.     I believe the only one I know
22   about is the title insurance.
23        Q.     Other than those claims, have
24   you seen any kind of a list of the claims
25   they are not pursuing?

Page 163

1                            MORROW

2          A.        No.

3          Q.        Have you done anything to

4   analyze the claims that the trustees are no

5   longer pursuing?

6          A.        Yes, if they were included in

7   my pool of 600, they were still part of the

8   600 loans.

9          Q.        Assume for a moment that they

10  were not included in the pool of 600 loans,

11  have you done anything to -- different

12  question.

13                   Aside from your loan review,

14  have you done anything to analyze the

15  claims that are no longer being pursued by

16  the trustees?

17         A.        Other than the ones that are in

18  the 600, no.

19         Q.        Do you have any understanding

20  as to why the claims were withdrawn by the

21  trustees?

22         A.        I would be speculating.

23         Q.        Was it important to your

24  opinion in this case to understand the

25  basis for the decision not to pursue

Page 164

1                    MORROW
2   certain number of breach claims?
3        A.     No.
4        Q.     Does the withdrawal of the
5   breach claims at all affect your opinion
6   that the trustees' loan review process was
7   sound and reliable?
8        A.     No.
9        Q.     Why not?
10            MR. HEALY:  Objection to form,
11   argumentative.
12        A.     Because the ones that were
13   with -- for example, the trust ones that
14   were removed, we still found 50 percent
15   errors.  Why they removed them, I don't
16   know, our 50 percent agree rate.  So I
17   don't know why they removed them, but they
18   removed them.  It doesn't change anything.
19        Q.     I'm not sure what 50 percent
20   agree rate you are referring to.
21        A.     If you look at the page 6,
22   under Failure to Obtain Title Insurance --
23   oh, I'm sorry, it would have decreased --
24   well, this is the old -- is this the old
25   report?  This is the old one.

Page 165

1                    MORROW
2       Q.      No, that is updated, I believe.
3       A.      Is this the updated one?  Okay.
4               So we found two -- two that we
5  disagreed with and eight we agreed with.
6  So why they were removed, I don't know.
7       Q.      What about the other categories
8  of the claims, does the withdrawal of those
9  claims at all affect your opinion that the
10 trustees' loan review process was sound and
11 reliable?
12              MR. HEALY:  Objection, asked
13 and answered twice I think now.
14      A.      No.
15      Q.      Why not?
16              MR. HEALY:  Objection, asked
17 and answered.  You asked this three
18 questions ago, one; and, two, you
19 demonstrated that there is no foundation
20 for the question.
21      A.      Since we only reviewed the 32
22 from Aronoff's report that he put forward
23 to arrive at the random sampling, it
24 doesn't matter.
25              We have a random sampling of

# EXHIBIT E

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

    SOUTHERN DISTRICT OF NEW YORK

3

    Case No. 08-13555 (SCC)

4   -----------------------------------x

5   IN RE

6   LEHMAN BROTHERS HOLDING, INC., et al.,

7                       Debtors.

8   -----------------------------------x

9                       787 Seventh Avenue

                        New York, New York

10

                        October 6, 2017

11                      9:36 a.m.

12

13          VIDEOTAPED DEPOSITION of JAMES H.

14   ARONOFF, taken by the Debtors, held at the

15   aforementioned time and place, before Sherri

16   Flagg, a Registered Professional Reporter,

17   Certified LiveNote Reporter, and Notary Public.

18

                    *    *    *

19

20

21

22

23

24

25

Page 171

```
 1                   James H. Aronoff
 2        communications that the expert may have
 3        had with consulting experts, counsel or
 4        various other parties.  And so I think
 5        you may be straying into that area.
 6             I think you may be able to ask an
 7        appropriate predicate question to which I
 8        would not interpose an objection or at
 9        least not interpose an objection subject
10        to a nonwaiver agreement.  But I don't
11        think the question you've asked is the
12        right question.
13             MR. DAVIS:  Okay.  Let me ask a
14        different question then.  We'll try it.
15   BY MR. DAVIS (continuing):
16        Q.    Just yes or no:  Do you know why
17   the trustees rescinded certain breach claims?
18             MR. HEALY:  Objection.  You've now
19        changed the description to which I object
20        on the grounds of its inaccuracy.  So I'd
21        ask you to reframe that.
22             MR. DAVIS:  I'm sorry, what's
23        inaccurate about this question?
24             MR. HEALY:  Rescinded.  I don't
25        think they've rescinded claims.
```

Page 172

1                    James H. Aronoff

2                    MR. DAVIS:  The trustees haven't

3          rescinded breach claims?

4                    MR. HEALY:  I think they've

5          advised you that they are not pursuing

6          claims at the estimation hearing.

7                    MR. DAVIS:  Is there a difference?

8          I don't understand the difference.

9                    MR. HEALY:  I'm not going to argue

10         with you.  I'm just telling you the

11         language which was used to communicate it

12         to you.  You're conducting the

13         examination.  I'm interposing an

14         objection on the grounds that your

15         question is inaccurate as framed.

16    BY MR. DAVIS (continuing):

17         Q.    Okay, let me ask the question

18    then.

19               Just yes/no:  Do you know why the

20    trustees have advised the Plan Administrator

21    that they are not pursuing certain breach

22    claims at the estimation hearing?

23                    MR. HEALY:  I'm prepared to let

24         him answer that question subject to an

25         agreement that his answering the question

Page 173

1              James H. Aronoff

2        will not be asserted to be a waiver of

3        any applicable privilege or protection

4        under Exhibit G.

5              MR. DAVIS:   That's fine.

6        A.    No.

7        Q.    So you were not involved in the

8   decision-making process concerning the

9   trustees' decision to not pursue certain breach

10  claims at the estimation hearing?

11             MR. HEALY:   He's advised you that

12        he does not know, and you are now asking

13        him to testify as to discussions that he

14        may have had with the trustees' counsel,

15        consulting experts or others.   And he's

16        instructed not to answer that question.

17       Q.    Was it important to the opinion

18  that you're giving in this case to understand

19  the basis for the trustees' decision not to

20  pursue certain of the breach claims in this

21  case?

22       A.    No.

23             MR. HEALY:   You beat me to it.

24             THE WITNESS:   Sorry.

25             MR. HEALY:   That's okay, go ahead.

Page 174

```
1              James H. Aronoff
2         I was going to instruct you not to
3         disclose the content of any
4         communications with counsel in answering
5         the question.  You have obviated that
6         because you haven't, so thank you.
7         Q.      And why was it not important to
8    your opinion in this case to understand the
9    basis for the trustees' decision not to pursue
10   certain of the breach claims?
11             MR. HEALY:  I'm going to give you
12        the same instruction that I would have
13        given you to the last question.
14             And I object to the question as
15        argumentative and irrelevant and --
16        that's it.
17             THE WITNESS:  So can I answer?
18             MR. HEALY:  You can answer subject
19        to the stricture that I've given you.
20        A.      Because I believe that the ask was
21   to provide the summary and the two opinions we
22   just discussed with respect to a discrete
23   population of loans.  And my examination went
24   to inquiries and questions about those specific
25   loans, the information contained in the
```

Page 175

1                    James H. Aronoff
2    narratives and the claim files, the supporting
3    documentation and data used to support those
4    claims, the types of breach findings that were
5    put forth.
6                    And I viewed my opinions as
7    limited to the information that was available
8    to me with respect to these pools.  And I felt
9    I had more than sufficient information and more
10   than sufficient data and insights into what was
11   done, how it was done.  And I had the results
12   in front of me to render and offer the opinions
13   that I offered here.
14       Q.      So your opinions at trial, then,
15   are going to be limited to the claims, breach
16   claims, that are still at issue in the
17   estimation proceeding?
18                    MR. HEALY:  Objection to form.
19            His reports expressly reserve the right
20            to respond to arguments advanced by other
21            experts.  And I don't -- I'm sure Mr.
22            Aronoff -- you're not asking Mr. Aronoff
23            to waive any right to do so.
24                    MR. DAVIS:  He can answer.
25       A.      I guess I'll do what I'm asked to

# EXHIBIT F

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Chapter 11

5   Case No. 08-13555(SCC)

6   -----------------------------------x

7

    IN RE

8

    LEHMAN BROTHERS HOLDINGS INC., et al.,

9

                  Debtors.

10

11  -----------------------------------x

                  September 28, 2017

12                9:36 a.m.

13

14

15       Videotaped Deposition of EDMOND

16  ESSES, taken by Debtors, pursuant to

17  Notice, held at the offices of Willkie Farr

18  & Gallagher LLP, 787 Seventh Avenue, New

19  York, New York, before Todd DeSimone, a

20  Registered Professional Reporter and Notary

21  Public of the State of New York.

22

23

24

25

Page 131

1                      E. ESSES

2    reports?

3                      MR. ROLLIN:  I am only trying

4    to follow and be consistent with the

5    instruction that you gave him.

6                      I just want to know if he knows

7    from a non-privileged, non-confidential

8    source whether claims that were made

9    against the Lehman estate in the protocol

10   are no longer the subject of this

11   estimation proceeding.

12                     MR. HEALY:  So I'm going to

13   re-interpose my objection to form.  I'm

14   going to instruct the witness that he can

15   answer that question yes or no.

16        A.      Yes.

17        Q.      How do you know that?

18        A.      I am generally aware of the

19   claims that are subject to Mr. Aronoff's

20   report.

21        Q.      And so you know that

22   Mr. Aronoff's report includes fewer claims

23   than those that were submitted against the

24   Lehman estate in the protocol?

25        A.      Yes.

Page 132

                        E. ESSES

1         Q.      Do you know why?  Just yes or
2   no.
3                 MR. HEALY:  I don't think you
4   are entitled to inquire as to what his
5   knowledge is on the subject.
6                 MR. ROLLIN:  I'm not asking
7   what his knowledge is.  I just want to know
8   if he knows why.
9                 MR. HEALY:  We have an
10  agreement that this does not constitute a
11  waiver of any privilege or protection, his
12  answering yes or no?
13                MR. ROLLIN:  Yeah, I don't
14  believe that is intended to invade a
15  privilege or protection.
16                MR. HEALY:  Okay.  So we have
17  such a stipulation, not be asserted to be a
18  waiver of any privilege or protection?
19                MR. ROLLIN:  Yes, this answer,
20  no, I won't assert that.
21                MR. HEALY:  All right, yes or
22  no answer.
23        A.      Can you repeat the question,
24  please?

Page 133

                        E. ESSES

1
2       Q.      I would be happy to.

3               Do you know why?

4       A.      Was that the end of the

5   question?

6       Q.      Yes.

7       A.      Do I know why, what?  I'm

8   sorry, just please repeat the question.

9       Q.      Do you know why Mr. Aronoff's

10  report includes fewer claims than those

11  that were submitted against the Lehman

12  estate in the protocol?

13      A.      I do not.

14      Q.      Do you have any information

15  about who does?

16              MR. HEALY:  I think you've

17  strayed too far.  He is instructed not to

18  answer that question.

19      Q.      You are going to follow that

20  instruction?

21      A.      Yes.

22      Q.      In the quality control process

23  performed at Duff & Phelps, did the QCers

24  do anything to verify the underlying facts

25  of any particular claim?

Page 134

1              E. ESSES

2              MR. HEALY:  Objection to the

3    form of the question, vague and ambiguous.

4         A.      They did, yes.

5         Q.      What did they do?

6         A.      To the extent necessary, they

7    reviewed the packet of supporting evidence.

8         Q.      I mean reverify the facts that

9    the review firms offered in support of the

10   breach findings.

11             MR. HEALY:  Objection to the

12   form of the question.  I'm not sure what

13   that means.  Vague and ambiguous.

14        A.      I thought I answered that

15   question.

16        Q.      Did they -- let's take, for an

17   example, a review firm contacts -- runs a

18   BLS report; do you know what I'm talking

19   about?

20        A.      I do, yes.

21        Q.      Did the QC process rerun, just

22   for purposes of this example, a BLS report?

23        A.      No, we didn't think that was

24   necessary.

25        Q.      And now expanding it beyond

Page 135

1                  E. ESSES

2    just BLS, using that as an example of a

3    reverification, did the QC process at Duff

4    & Phelps perform any other factual

5    reverifications?

6         A.      As I've described that level of

7    review, they confirmed the facts and that

8    the description -- the description

9    accurately described -- described the facts

10   of the breach, and, to the extent

11   necessary, verified the support -- that the

12   supporting documents supported that breach.

13        Q.      What do you mean by "confirmed

14   the facts," when you say "they confirmed

15   the facts"?

16        A.      So in the context of my prior

17   answer, that the finding articulated a

18   clear basis for the breach finding, and, to

19   the extent necessary, reviewed the

20   underlying supporting documentation.

21        Q.      But did not go to the outside

22   source that the loan review firm may have

23   gone to to double-check that work?

24        A.      That was not part of the scope

25   of their review.

# EXHIBIT G

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS INC.,

8

9         Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                United States Bankruptcy Court

13                One Bowling Green

14                New York, NY  10004

15

16                October 23, 2017

17                2:02 PM

18

19

20  B E F O R E :

21  HON SHELLEY C. CHAPMAN

22  U.S. BANKRUPTCY JUDGE

23

24  ECRO:  SHEA

25

Page 55

1   doable, you are on a even-handed basis, taking out 72,000

2   claims that are no different from the remaining claims,

3   right, and in each of the buckets, you're taking out, you

4   know, redundant claims.  Okay.  But what Mr. Cosenza is

5   saying is that they have no way of knowing that.

6           And then that's where the rock and a hard place

7   comes in, because to the extent that when the claims went

8   through the protocol, the claims were not -- how can I say

9   this?  To the extent when the claims went through the

10  protocol, they should have not survived the protocol, and

11  yet they did, so that's not a great fact.  But to the extent

12  that the claims did survive the protocol, it does seem to me

13  that they're entitled to know why some claims now are making

14  it ton trial, and some claims are not.  Because as --

15  because the process is part of the issue that's performing,

16  right?  So --

17          MR. SHUSTER:  Well, the plan administrator is

18  trying to make it an issue.

19          THE COURT:  But why is it not an issue?

20          MR. SHUSTER:  Well, the -- I mean, the trustees

21  are, yeah, we're proving our claims with the evidence we

22  have a breach.  And we're saying that we arrived at that

23  evidence through a process that was in conformance with yes,

24  best practices and so forth.  That's fair.

25          THE COURT:  Right, right.  But then what Mr.

```
 1    Cosenza is saying, in essence is that of the pool you've now
 2    taken out 72,000, and you want a -- you want me to assume
 3    that what's left -- that the removal of those claims is not
 4    probative of the methodology.  I mean, stated in its worst
 5    case, you plucked out the 72,000 claims that were the
 6    weakest, and now look at what's left.  So why wouldn't they
 7    be able to explore this?
 8              MR. SHUSTER:  Well, first because there is a big
 9    attorney-client privilege issue there.  Second, I don't
10    think in pulling --
11              THE COURT:  But you can't -- you have an at-issue
12    whatever problem.  You --
13              MR. SHUSTER:  We haven't waived anything.  We made
14    a very, very generous --
15              THE COURT:  But the process is part of the issue.
16    So you can't do something that prevents inquiry into the
17    process based on attorney-client privilege.
18              MR. SHUSTER:  They were free to ask all the
19    questions they wanted about these claims, why these claims
20    were in the protocol, what these claims consisted of.  They
21    were free to ask any questions they wanted.  The only thing
22    they're not free to do is to inquire into legal strategy
23    reasons why we're not presenting evidence on these claims at
24    trial.  They had devote a lot of time, and a lot of expert
25    time to it.  The claims were in the protocol.  They have the
```

1    evidence.

2         They have for every one of these claims, and every

3    one of these breaches, they have the claim they know what

4    rep and warrant we were relying on, they know what our

5    evidence was.  They were free to address all of these claims

6    in any way that they wanted in the discovery process.  They

7    didn't.  But asking why a decision was made before trial to

8    drop claims, plaintiffs drop claims all the time.  That's

9    usually involves the advice of counsel.

10         THE COURT:  But plaintiffs drop claims, but in the

11    context in which the process around the making of claims is

12    itself at issues in the case.

13         MR. SHUSTER:  They've been free from day one,

14    without limitation to --

15         THE COURT:  There's a difference between we're

16    going to trial on six counts, and a couple of weeks before

17    trial, plaintiff says, "I'm not going to trial on the sixth

18    count."  Okay, so what?  But their decision-making process

19    is not at issue.  Here, it's the claims process.  It's the

20    part of the issue before me, is how good the trustee's

21    process itself was.

22         MR. SHUSTER:  That's been open season.  This is --

23    hang on, they have not been in any way, shape or form,

24    precluded or foreclosed from taking whatever discovery they

25    wanted about the trustee's claims process.  They took the

1    deposition, in fact, they won a second day with Mr. Aronoff,

2    they can ask him about these 72,000 claims all they want.

3           They have the deposition of Edmond Esses, who was

4    one of the Duff & Phelps people who was involved in the

5    trustee's process.  They could have asked him about this.

6    They have the deposition coming up this week of Alan

7    Pfeiffer.  He's the other lead Duff & Phelps guy who was

8    involved in this.  They could have asked him about this.

9    What they don't get to do is to ask why, what was the advice

10   of counsel that led to the non-pursuit of the claims.

11          But they haven't been foreclosed from taking

12   discovery, and they could have put in an expert report that

13   addressed all of these categories of claims to their heart's

14   content.  They don't lack for any information on these

15   claims.

16          MR. COSENZA:  Your Honor, can I just interject,

17   just a couple of points.

18          THE COURT:  Yeah, we're going to have to keep

19   going on this for a while, yeah.

20          MR. COSENZA:  Just a couple of points, just on

21   clarification.

22          THE COURT:  Yep, yep.

23          MR. COSENZA:  Mr. Schuster's statement on the

24   record, actually, I hate to say this, but a number of them

25   are inaccurate.  We did probe Mr. Esses about the loans that

Page 59

1    were part of the case, and what was dropped.  He said in his

2    view, all of the claims are valid.  We then asked him to

3    explain about what was dropped.  Counsel from Holwell

4    Shuster repeatedly instructed Mr. Esses not to answer the

5    questions on that, on either attorney-client, or work

6    product grounds.  Same issue for Mr. Aronoff.  And in fact,

7    we did ask Mr. Aronoff further questions, and he said he

8    couldn't -- he didn't know why they were dropped.

9            So you know, this is an empty way of sort of

10   proceeding, to say there's all this stuff, we had an

11   opportunity to ask all these questions.  In fact, we made a

12   series of -- when this issue first came up, we had a number

13   of discussions with Mr. Shuster and his team, raised this

14   exact point, they cloaked it in attorney work product and

15   privilege.  They've now, in essence, waived it by giving

16   this explanation which is at best inaccurate, in the

17   footnote.

18           And this has now become a major issue in the case,

19   because as Your Honor has mentioned, this is all about

20   process, and the fact that their fact witness thinks all

21   these claims are the same, and there's no idea as to how

22   they dropped them, whether they were weak or strong, really

23   is an indictment of the process, and something we need to

24   test.  And frankly, the hypothetical, or the analogy Your

25   Honor raised was a hypothetical analogy I raised during my

# EXHIBIT H

# HOLWELL SHUSTER & GOLDBERG LLP

*750 Seventh Avenue, 26th Floor*
*New York, New York 10019*
*Tel:  (646) 837-5151*
*Fax: (646) 837-5150*
*www.hsgllp.com*

*Michael S. Shuster*
*(646) 837-5153*
*mshuster@hsgllp.com*

November 6, 2017

Todd Cosenza
Wilkie, Farr & Gallagher
787 Seventh Avenue
New York, New York  10019

Re:    *In re Lehman Brothers Holdings Inc. RMBS Claims Estimation Proceeding*

Dear Todd:

At the pretrial conference on October 23, 2017 you made a request to the Court to receive "some discovery" of the process used by the Trustees to cut back on the claims they intended to present at the estimation hearing, so that the Plan Administrator could understand "how" the claims were withdrawn.  (Tr. at 54).  The next day, the Court adjourned the estimation hearing to November 20, 2017 and directed the parties to negotiate the scope of any further discovery on this issue.

The parties have now had several meet and confers on the scope of discovery and it is safe to say that the parties are at an impasse.  We understand the Plan Administrator's position to be that the Trustees must waive the attorney-client privilege and work product protections and that their trial counsel should then testify about their discussions and recommendations to their clients regarding withdrawn claims.  The Trustees decline to waive the attorney-client privilege or work product protections but will make (and have made) one of their experts and one of their fact witnesses available to the Plan Administrator for questioning about "how" claims were withdrawn.

As you know, Trustee's underwriting expert, Mr. Aronoff, is being deposed for again on November 16 and 17 on the basis that he is viewed by the Plan Administrator as a fact witness as well as an expert witness.  Accordingly, Mr. Aronoff will be available on November 16 and 17 to testify as to his knowledge of the criteria used and screens employed by Duff and Phelps and the

loan review firms to identify breaching loans under the Protocol.  Mr. Aronoff will also be available to testify as to his knowledge of the criteria used and the screens employed for selecting the smaller pool of loans that the Trustees will present to the Court for estimation at the hearing.  Thereby (and without a waiver of any applicable privilege or protection) the Plan Administrator will have visibility – to the extent it claims not to – into the process used to select breaching loans under the Protocol and the more restrictive process used to identify breaching loans that Trustees will submit for estimation.  We invite the Plan Administrator to depose Mr. Aronoff on these issues if it wishes to.[1]

We also note that the Plan Administrator initially noticed the deposition of Mr. Pfeiffer of Duff and Phelps but have now withdrawn that notice.  Mr. Pfeiffer would also be in a position to testify as to his knowledge the foregoing processes adopted by the Trustees.  Mr. Esses was and is available to testify as to his knowledge of the criteria and screens employed as well.  Please advise us if the Plan Administrator wishes to renotify Mr. Pfeiffer's deposition or to continue Mr. Esses deposition.

Should the Plan Administrator decide not to take the foregoing discovery and instead seek to preclude the Trustees from referring to this evidence and making arguments based on the evidence in response to any contentions the Plan Administrator may raise, we request that any such motion be made on notice with an expedited briefing schedule.  We are available to confer on that schedule.

Very truly yours,

Michael S. Shuster

---

[1] During the meet and confers, the Trustees also offered to provide the PA with a schedule setting forth the criteria/screening employed.  Trustees remain willing to do so.

2