**HOLWELL SHUSTER & GOLDBERG** LLP

*750 Seventh Avenue, 26th Floor*
*New York, New York 10019*
*Tel: (646) 837-5151*
*Fax: (646) 837-5150*
*www.hsgllp.com*

*Michael S. Shuster*
*646-837-5153*
*mshuster@hsgllp.com*

November 8, 2017

**VIA EMAIL AND ECF**

The Honorable Shelley C. Chapman
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

Re:   In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)

Dear Judge Chapman:

We write in response to the Plan Administrator's ("PA") request for a telephonic conference regarding its request to preclude the Trustees from responding to the PA's arguments regarding the claims on 15,107 loans the Trustees elected not to present for estimation. The Trustees oppose the request on both procedural and substantive grounds.

As to procedure, we respectfully request that the Court order the Plan Administrator seek relief by motion on notice, as required by Fed. R. Bankr. P. 9014(a), and set an expedited schedule for briefing and hearing on the issue. "[P]reclusion of evidence is a 'harsh' remedy that 'should be imposed only in rare situations' … and a court 'should proceed cautiously before imposing such severe sanctions.'" *Tangoree v. Mako's, Inc.*, 2002 WL 206988, at *6 (S.D.N.Y. Feb. 8, 2002) (quoting *Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988), and *Wetstein v. West Terrace Const. Co.*, 1999 WL 504910, at *5 (S.D.N.Y. July 16, 1999)). For this reason, as the Trustees twice notified the PA after its attempts to resolve the issue were rebuffed, resolution of this application by letter (without any citation to relevant authority) and telephonic hearing is an attempt to railroad the Trustees – and the Court – and lacks due process.

As to substance, as will be more fully addressed in the Trustees' motion papers, the PA has been aware that the Trustees had decided on the advice of counsel to narrow their claims for the estimation hearing since June of 2017. The PA's letter seriously distorts the record as to what evidence it sought regarding the withdrawn loans and as to what evidence the Trustees have provided and are prepared to provide.

On June 1, 2017, the Trustees served the Expert Report of James A. Aronoff, Exhibit 15 of which detailed the claims on the 76,044 loans for which the Trustees seek estimation at the hearing. Removing the 15,107 loans dropped the Trustees' overall claim amount from approximately $13.6 billion to $11.6 billion (contrary to the PA's contention that we dropped

40% of our claims).  Thereafter, the Trustees confirmed in writing (and oral communications) on June 13, June 22, July 7, July 8 and July 10 that the Trustees planned to pursue only the claims set forth on Exhibit 15, and later that Trustees' made the decision on the advice of counsel based on a desire to "pare down their claims in preparation for trial." (Correspondence at Ex. A.) Additionally, on August 16, 2017, the Trustees provided a chart showing each loan and breach (by breach number) that was impacted by their decision.  Between the information provided during the Protocol, the Trustees' June 1 reunderwriting expert report, the August 16 chart, and the correspondence and oral communications between the parties, the PA has access to every single relevant fact regarding the nature and characteristics of every loan and every breach the Trustees were foregoing.  Indeed, the PA's reunderwriting expert, Charles Grice, addressed the claims at length in his reply report.  (See Grice Reply Report Ex. 2.)

The Trustees fully understand that the PA wants to make the argument that the withdrawal of certain claims shows that the Trustees' entire loan review process was unreliable. Fair enough.  But the fact of the matter is that the PA has never been denied discovery on the facts that show how loans were selected during the Trustees' initial loan review and how the loans were thereafter selected for presentation at the estimation hearing (i.e., the methodology by which the loans were dropped).  Simply put, criteria and screens were employed to identify breaching loans during the Protocol, and additional criteria and screens were imposed to narrow the claims for the hearing.  Many of those criteria and screens have already been identified in Mr. Aronoff's reports and the PA has been invited to question Mr. Aronoff on his factual knowledge of the use of these criteria and screens at the upcoming additional deposition scheduled for November 16 and 17.  I also invited the PA to depose Mr. Pfeiffer on these topics at his scheduled deposition during the last hearing; PA's counsel cancelled that deposition within a few hours after the hearing concluded.  As a simple example, the PA could ask Messrs. Aronoff or Pfeiffer the process by which the last 22 categories of withdrawn claims were eliminated.  As PA's counsel already knows, a screen was applied that eliminated all breach categories with less than 50 loans.  But PA's counsel does not want to ask these types of questions and insists that only communications as to why counsel may have recommended to the Trustees to apply this screen will satisfy their demand.  Such privileged information is not necessary for the PA to make whatever arguments it wishes to make about the criteria and screens used at the time of the Procotol and subsequently in preparation for the hearing.

Notwithstanding that the PA has access to all the evidence it needs to make its argument, after the October 23 and 24 conferences and mindful of the Court's request to resolve the issue between the parties, the Trustees went further:

1. The PA's complaint stemmed from the Trustees' removal of the loans, so we offered to put them back in the case and let the PA reopen discovery on them.  The PA refused because it did not want the Trustees to increase the amount of their claim.
2. The Trustees offered to put the loans back in, let the PA reopen discovery on them, and agreed that the value of the dropped loans would not be included in estimating the value of the Trustees' claim to alleviate any concern about increasing the amount of the Trustees' claim.  The PA refused without explanation.
3. The Trustees offered to provide yet another detailed schedule showing precisely the screens that were employed to identify the loans to be dropped based on set criteria,

2

and offered to give the PA follow-up explanations if it had questions. The PA refused without explanation.
4. The Trustees offered to provide the detailed schedule showing exactly how the screens were employed, and offered witnesses for deposition to testify about the schedule or anything else the PA wanted to know about the removed loans. The PA refused without explanation.

Having obtained at the October 23 conference an adjournment expressly to take discovery (Tr. 54:10-15 at Ex. B.) it is now clear that the PA does not want discovery. The PA's position remains that the Trustees are precluded from responding to the PA's charge that the Trustees' process was not reliable because the 15,000 loans were dropped or to explain the methodology for how the loans were dropped (i.e., what screens were used to drop loans). These arguments have no basis in fact or applicable law.

The Trustees respectfully request full briefing on an expedited schedule and an order on the record resolving this issue. With respect to the hearing scheduled today, the Trustees respectfully request that the hearing be held on the record.

Respectfully Submitted,

Michael S. Shuster

cc:     All counsel (via email)

# EXHIBIT A

# WILLKIE FARR & GALLAGHER LLP

BENJAMIN P. MCCALLEN
212 728 8182
bmccallen@willkie.com

787 Seventh Avenue
New York, NY 10019-6099
Tel:  212 728 8000
Fax:  212 728 8111

June 16, 2017

**VIA EMAIL**

Neil Lieberman
Holwell Shuster & Goldberg
750 Seventh Avenue, 26th Floor
New York, NY 10019

Re:  In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)

Dear Neil,

As you know, we represent Lehman Brothers Holdings Inc. ("Lehman," or the "Plan Administrator") in the above-referenced bankruptcy proceeding. We are in receipt of the expert reports of James H. Aronoff ("Aronoff Report") and Karl N. Snow ("Snow Report"), dated June 1, 2017.

This letter serves to memorialize our call on Tuesday, June 13th, during which you stated that the Trustees no longer intend to submit evidence at the estimation hearing regarding 15,107[1] out of the 91,151 Disputed Mortgage Loans in the Protocol. Exhibit 1 to the Aronoff and Snow Reports omitted any reference to those loans but failed to explain that omission.

Given that the date for the exchange of rebuttal expert reports is July 14, please confirm in writing by close of business, Monday, June 19, that the Trustees are no longer pursuing claims on these loans.

The Plan Administrator continues to reserve all its rights.

Sincerely,

*Benjamin P. McCallen*

Benjamin P. McCallen

cc: All counsel (*via* email)

---

[1] It is our understanding that these 15,107 Disputed Mortgage Loans include all the Disputed Mortgage Loans in the Protocol for six trusts: ARC 2002-BC9, SASCO 2004-18H, SASCO 2005-RF4, SASCO 2005-RF5, SASCO 2005-RF6, and SASCO 2006-RF4.

# HOLWELL SHUSTER & GOLDBERG LLP

750 Seventh Avenue, 26th Floor
New York, New York 10019
Tel: (646) 837-5151
Fax: (646) 837-5150
www.hsgllp.com

*Michael S. Shuster*
*646-837-5153*
*mshuster@hsgllp.com*

July 10, 2017

**VIA EMAIL**
Todd Cosenza
Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY 10019

Re:   *In re Lehman Brothers Holdings Inc. RMBS Claims Estimation Hearing*

Dear Todd:

We write on behalf of the RMBS Trustees regarding the approximately 15,000 loans for which the RMBS Trustees submitted claims pursuant to the Protocol, but which were not included in Exhibit 1 of the expert report of James H. Aronoff, dated June 1, 2017. That Exhibit, as you know, identifies all loans on which the RMBS Trustees intend to pursue claims at the Estimation Hearing. As we have repeatedly advised you (first on a call on June 13, then on a call and via email on June 22, again on a call on July 7 and on calls and via email on July 8), the RMBS Trustees will not submit evidence or otherwise pursue claims at the Estimation Hearing regarding loans not identified on Aronoff Exhibit 1 (or Exhibit 1 of the RMBS Trustees' damages expert, Karl Snow, which sets forth the identical list of loans for purposes of presenting purchase price calculations).[1]

The RMBS Trustees reserve all rights.

Very Truly Yours,

Michael S. Shuster

---

[1] As you are aware, and we discussed on July 8, Structured Asset Securities Corporation Mortgage Loan Trust 2006-S4 has opted out of the Settlement Agreement, and claims regarding loans in that trust will be pursued outside of the Estimation Hearing. On behalf of that trust we expressly reserve the right to assert all claims identified and asserted during the Protocol process with respect to loans in that trust outside of the Estimation Hearing. Accordingly, any statements, positions, evidence, or any other materials regarding the RMBS Trustee's claims provided or exchanged pursuant to Exhibit G exclude and have no bearing on the claims associated with that trust. As you agreed on our July 8th call, those claims "are in a different bucket."

cc:   All counsel (via email)

# WILLKIE FARR & GALLAGHER LLP

TODD G. COSENZA
212 728 8677
tcosenza@willkie.com

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

July 21, 2017

**VIA EMAIL**

Michael S. Shuster
Holwell Shuster & Goldberg
750 Seventh Avenue, 26th Floor
New York, NY 10019

Re: In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)

Dear Michael,

    We write on behalf of the Plan Administrator in the above-referenced bankruptcy proceeding. After repeated requests, you finally confirmed, in an email dated July 8, 2017, that the Trustees do not intend to pursue claims ("Breach Claims") on 15,107 Disputed Mortgage Loans (the "Withdrawn Loans") submitted into the Protocol, representing nearly 17% of the loans submitted into the Protocol. Although the Trustees represented that they had submitted the claims on these loans in good faith during the Protocol process, they were excluded from the loans listed in Exhibit 1 to the expert reports of James H. Aronoff (the "Aronoff Report") and Karl N. Snow (the "Snow Report"), both dated June 1, 2017, which prompted our inquiry about their status. The Trustees failed to follow the well-established process for communicating about decisions regarding the allowance or withdrawal of claims and instead left it to the Plan Administrator to uncover this highly material and prejudicial decision. Moreover, as discussed below, you still refuse to disclose anything else about the circumstances or timing of this decision.

    As you well know, significant estate resources were expended in litigating, on a loan-by-loan and claim-by-claim basis, whether the Trustees had established the elements of a valid repurchase claim as to the Withdrawn Loans. The Plan Administrator is therefore entitled to understand: (i) The date the Trustees first decided to withdraw their claims on the Withdrawn Loans; (ii) the rationale for withdrawing these claims; and (iii) who was involved in these decisions (the "Requested Information"). We have requested this information on numerous occasions, including on June 13, June 16, July 7, and July 9. You have refused to provide this information, refused to voluntarily withdraw and agree to expungement of these claims and have stated that the Trustees will view any motion to disallow and expunge the claims on the Withdrawn Loans as in violation of the RMBS Settlement Agreement. This position is impossible to reconcile with the fact that you are no longer submitting claims on these loans at the estimation proceeding.

If the Trustees are unwilling to provide the Requested Information, then the Plan Administrator is entitled to seek it through fact depositions. Accordingly, please provide by July 24, 2017 the Requested Information or the names and identities of two persons most knowledgeable about the Trustees' decision to forego claims on the Withdrawn Loans.

Although we have been discussing the Withdrawn Loans with you for well over a month, and you are fully aware that the Plan Administrator is now preparing its defenses to the Trustees' claims in the estimation proceeding, you neglected to inform us that in addition to the Withdrawn Loans, the Trustees also apparently have withdrawn thousands of individual Breach Claims ("Withdrawn Claims") on the remaining roughly 73,000 Disputed Mortgage Loans. The Plan Administrator only recently uncovered the Withdrawn Claims through its independent analysis of the exhibits to the Aronoff Report.

We are entitled to understand immediately the full extent of the Withdrawn Claims. During the Protocol, each individual Breach Claim on a Reviewed Loan was assigned a "Breach ID." Please provide us with an Excel spreadsheet listing the Breach IDs for the Withdrawn Claims by close of business today. Alternatively, please provide a list of Withdrawn Claims that identifies each claim that was withdrawn and the Disputed Mortgage Loan on which the claim was made. If the Trustees fail to provide this information promptly, the Plan Administrator will seek relief from the Court.

The Plan Administrator continues to reserve all its rights.

Sincerely,

*[signature]*

Todd G. Cosenza

cc: All Counsel (*via* email)

# HOLWELL SHUSTER & GOLDBERG LLP

*750 Seventh Avenue, 26th Floor*
*New York, New York 10019*
*Tel: (646) 837-5151*
*Fax: (646) 837-5150*
*www.hsgllp.com*

*Michael S. Shuster*
*646-837-5153*
*mshuster@hsgllp.com*

July 24, 2017

**VIA EMAIL**

Todd Cosenza
Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY 10019

Re:  In re Lehman Brothers Holdings Inc. RMBS Claims Estimation Hearing

Dear Todd:

We write on behalf of the RMBS Trustees in response to your letters dated July 21, 2017 regarding (1) the loans that were not included in the Trustees' affirmative expert reports, (2) your clients' approval of 156 Claim Files that they initially rejected, and (3) your clients' deficient disclosures regarding their experts' sampling methodologies.

With respect to the loans that are not addressed in the RMBS Trustees' expert reports, your letter contains significant mischaracterizations of our discussions on the subject to date. As an initial matter, as we made clear in our letter dated July 10, 2017, and had previously advised you (June 13, June 22, July 7, July 8), the Trustees will not submit evidence or otherwise pursue claims with respect to those loans at the Estimation Hearing. Therefore, there is no basis for your assertion that the Trustees "failed to follow the well-established process for communicating decisions regarding allowance or withdrawal of claims …." (July 21, 2017 Letter from T. Cosenza to M. Shuster at 1.)  I note that you advised me by letter dated July 21, 2017 that your clients were accepting breach claims they previously rejected. There is no difference in principle between your clients advising ours via a letter from counsel of breaches they will no longer challenge and our clients advising yours by the same means of breaches as to which they will not present evidence at the Estimation Hearing.

Your clients' demand for information concerning the timing and rationale of the RMBS Trustees' decision not to include these loans and breaches in their expert reports are unfounded. As we advised you by email dated July 8 in response to the initial request for the same information, the RMBS Trustees are under no obligation, whether pursuant to Exhibit G, the Protocol, or any other authority, to provide information concerning confidential and privileged discussions. They will not do so. Nor is the Plan Administrator entitled to seek such privileged

information through fact depositions, as you suggest. The RMBS Trustees will not identify deponents for that purpose.

It is as you well know common practice for plaintiffs to pare down their claims in preparation for trial. Forcing plaintiffs to disclose their confidential and privileged communications concerning the strategy for the presentation of their claims at trial would only disincentivize them to do so and create inefficiencies and increased costs for all participants. It would be bad law and bad policy. And that, in addition to straightforward application of the principles of attorney-client privilege and the work product doctrine, is why it is not required.

In addition to information protected from disclosure concerning the RMBS Trustees' and their lawyers' deliberations and thought processes, your letter requests additional detail regarding breach claims that are not included in Aronoff Report. The RMBS Trustees have provided considerable and detailed information concerning the claims that are the subject of their expert reports. The Plan Administrator is fully capable of identifying the breach claims that are *not* included. Whether the Plan Administrator should expend the resources of the estate in that effort is for it and its lawyers to decide. The exercise of actually doing so should be straightforward. As the Plan Administrator is fully aware, the Trustees submitted 193,148 claims on 94,566 loans into the Protocol, and rescinded 6,508 claims on 3,495 loans through Step 3, leaving a total of 186,640 claims on 91,071 loans on which there were breach claims. (See the January 2017 Notice of Monthly Delivery.) The Trustees have now identified all loans for which they will submit evidence at the Estimation Hearing. (See Exhibits 1 and 15 to the initial Aronoff Report.) The Plan Administrator can identify the loans as to which claims will not be the subject of the Trustees' presentation at the Estimation Hearing by comparing Aronoff Exhibit 1 to the January 2017 Notice of Monthly Delivery. Indeed, the Plan Administrator seems to have already carried out this work. The RMBS Trustees are not obligated to devote additional resources, which come out of the trust funds available to certificateholders, to identify claims that they will not present at the Estimation Hearing. That would be a waste of resources already diminished by Lehman's securitization of tens of thousands of breaching loans and its unjustified refusal to accept breach claims whose validity is manifest. Nonetheless, as a courtesy, we have performed the work that we believe the Plan Administrator could or did itself perform. Exhibit A at your request identifies the breach claims that were submitted into the Protocol but were not included in the Aronoff Report.

The Plan Administrator's complaints of prejudice and waste as a result of certain loans and claims not being the subject of the RMBS Trustees' expert reports are hollow. The Plan Administrator argued, over the RMBS Trustees' objections, for a process that required review of every single one of over 200,000 mortgage loans, at great expense to the estate and to certificateholders. That exercise, not the fact that some portion of the RMBS Claims are not included in the Aronoff Report, is where the lion's share of costs has been incurred. The RMBS Trustees' decision regarding the analysis and presentation of certain of their claims in light of the pending, circumscribed, Estimation Hearing has not visited additional costs on the estate.

I note that your clients have now accepted that 156 loans have "Valid Claims" that they previously rejected, under the guise of continuing to review loans pursuant to the Protocol. First, the Protocol process has been suspended at your clients' request. (Settlement Agreement at § 3.02.) Second, the fact that your clients have now accepted breaches they previously rejected

2

shows that, with the benefit of further review, and with a trial on the immediate horizon, parties can re-evaluate positions. The RMBS Trustees assert no prejudice from the fact that your clients have reversed themselves on 156 loans, though they note that if the Plan Administrator were truly continuing to review loans in good faith, the number of reversals would be orders of magnitude higher.

Finally, your attempt to paper over your clients' deficient and untimely disclosures of the materials their experts relied upon, by equating the selection of loans for analysis by Messrs. Grice and Castro to the exemplar loans used by the Trustees' expert James H. Aronoff, is without merit. The exemplar loans detailed in Mr. Aronoff's report are there to illustrate different types of breaches and sources of evidence pertinent to the Claims. Unlike Messrs. Grice and Castro, Mr. Aronoff did not purport to review a "sample" of loans, nor did he attempt to extrapolate a breach rate or other population-wide conclusions based on any such sample that he reviewed. I note that, in addition to purporting to review a sample set of loans from which they draw broad inferences, Messrs. Grice and Castro also present exemplar loans to illustrate their points and the Plan Administrator has also listed additional exemplars not discussed by Messrs. Grice and Castro. In any event, we are available to meet-and-confer at a convenient time regarding these matters.

We continue to await production of the policies and procedures that your clients agreed to provide on July 14. Please provide those materials forthwith.

The Trustees reserve all rights.

Very Truly Yours,

Michael S. Shuster

cc:    All counsel (via email)

3

# HOLWELL SHUSTER & GOLDBERG LLP

750 Seventh Avenue, 26th Floor
New York, New York 10019
Tel: (646) 837-5151
Fax: (646) 837-5150
www.hsgllp.com

*Michael S. Shuster*
*646-837-5153*
*mshuster@hsgllp.com*

August 16, 2017

**VIA EMAIL**

Todd Cosenza
Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY 10019

Re: *In re Lehman Brothers Holdings Inc. RMBS Claims Estimation Hearing*

Dear Todd:

We write on behalf of the RMBS Trustees to provide an updated claims spreadsheet in response to your request, and to address the issues raised in your letter dated August 15, 2017 and requests by the Trustees to which the Plan Administrator has yet to respond.

**Updated Claims Spreadsheet**

As discussed, attached please find an updated claims spreadsheet that identifies the loans and breaches that have been modified from those submitted by the Trustees during the Protocol. Contrary to your accusations, the Trustees have not "played a game of 'hide the ball' on what loans and claims remain at issue in the case as your letter suggests. (2017-8-15 Letter from T. Cosenza to M. Shuster at 2.) Indeed, the Trustees "inform[ed] the Plan Administrator which claims the Trustees intend to pursue at the estimation hearing" (*id.*) in schedules served along with the Aronoff Report on June 1, 2017, as required by Exhibit G, and as your letter concedes. The Plan Administrator's decision to expend resources to focus on the claims that the Trustees do not plan on pursuing was the Plan Administrator's own decision, and nothing in Exhibit G required the Trustees to provide information regarding those loans and claims. Nor are the Trustees in any way responsible for the attendant costs associated with the Plan Administrator's diversion. I also note that the Plan Administrator could have derived the information in the updated claims spreadsheet for itself. Nevertheless, as a courtesy, we are identifying in the attached spreadsheet: (i) loans that are not being pursued; (ii) breaches that are not being pursued on loans that remain at issue; and (iii) modifications to the cited representations and warranties.

### The Trustees' Ellson Report Disclosures Comply with Exhibit G

Your letter also mischaracterizes the Trustees' objection to the Plan Administrator's continued request for data embedded in the ADCo. LoanKinetics model. As we made clear in our letter dated August 9, 2017, and as I am sure the Plan Administrator can confirm with its own expert, Daniel Fischel, the probability-weighted scenarios and tuning information are provided for in the model itself. The Trustees provided access to the model, along with both the input and output data Dr. Ellson employed, several months ago. Had the Plan Administrator timely obtained a license to the model when it was offered by the Trustees before Dr. Ellson's report was submitted, the Plan Administrator could have "reproduce[d Dr. Ellson's] quantitative calculations" by inputting the data into the model. That is all that is required by Exhibit G. The time to "evaluate and respond to Dr. Ellson's report" has passed. (2017-8-15 Letter from T. Cosenza to M. Shuster at 1.) The Plan Administrator sat on both the report and the opportunity to access the model while the deadline to file a rebuttal report elapsed. The Trustees are under no obligation to cure that oversight.

### The Plan Administrator's Fischel Report Disclosures Are Late and Deficient

The Plan Administrator's response to our request for information that Mr. Fischel relied upon is untimely and incomplete. Although the Plan Administrator identified that Mr. Fischel used an ADCo. model to calculate lifetime losses for the Covered Loans, the Plan Administrator has not provided the models that Mr. Fischel used in his other reports to calculate the lifetime losses associated with other global settlements, nor has the Plan Administrator provided the data that was used to perform those calculations. The lifetime loss figures that Mr. Fischel reports for the other global settlements are the lynchpin to his report, and the Trustees are entitled to test them. I note that in stark contrast to the Plan Administrator's disclosures with respect to Mr. Fischel's use of an ADCo. model, the Trustees were completely transparent regarding Dr. Ellson's use of the LoanKinetics model, and provided all of the necessary information and access to software necessary to reproduce his calculations at the time his report was served. The Trustees are unable to do the same with Mr. Fischel's calculations, nearly three weeks after his report was served. The Trustees reserve the right to respond to Mr. Fischel's report a reasonable period of time after the Plan Administrator produces the required information.

### The Plan Administrator's Grice Report Disclosures Remain Outstanding

On August 8, 2017, the Plan Administrator finally agreed to provide additional information necessary to identify documents that Mr. Grice relied upon for his *affirmative report*, notwithstanding that Exhibit G expressly called for this information to be produced on June 1, 2017. The Trustees have been requesting that information for over two months. Please provide a revised Appendix E immediately. The Trustees reserve the right to respond to this information a reasonable period of time after the Plan Administrator finally provides it.

### The Plan Adminstrator has Breached Its Agreement to Produce Policies and Procedures

As I noted in my letter dated August 10, after delaying nearly a month to produce the policies and procedures that it agreed to provide, the Plan Administrator merely produced

2

multiple revisions of the same five policy and procedure documents in what appears to be a blatant attempt to hide the insufficient scope of its production. The Plan Administrator has not yet responded. Please produce immediately all available repurchase policies and procedures (including those from the Quality Control and Special Investigations departments) for the period 2003 to 2009. If the Plan Administrator fails to do so, the Trustees will seek relief from the Court.

### The Morrow and Schwert Rebuttal Reports are Proper

Your letter states without basis that the Morrow and Schwert rebuttal reports are improper rebuttal reports "because they engage in inappropriate sampling and extrapolation of an entirely new sample of loans that have essentially no overlap with the 1,880 loans or claims that Mr. Grice reviewed. (2017-8-15 Letter from T. Cosenza to M. Shuster at 4.) You cite no authority for this proposition and for good reason. That the Plan Administrator does not approve of the methodology Mr. Morrow and Dr. Schwert used to rebut Messrs. Grice and Castro is not a basis to strike their reports under either Exhibit G or any rule or theory of evidence.

We have been standing ready for a meet and confer for weeks now, with no response from you.

The Trustees reserve all rights.

Very Truly Yours,

*[signature]*

Michael S. Shuster

cc:     All counsel (via email)

3

# EXHIBIT B

```
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   Case No. 08-13555-scc

 4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5   In the Matter of:

 6

 7   LEHMAN BROTHERS HOLDINGS INC.,

 8

 9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                United States Bankruptcy Court

13                One Bowling Green

14                New York, NY  10004

15

16                October 23, 2017

17                2:02 PM

18

19

20   B E F O R E :

21   HON SHELLEY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24   ECRO:   SHEA

25
```

Page 54

```
 1   entitled to explore the decisions that the trustees made to
 2   pull back these claims that were put through the protocol.
 3           And it's really a haphazard -- I have a list of
 4   the claims that were pulled out.  There's really no basis
 5   for how they did this, and they try to say in their
 6   footnotes, because they're streamlining it.  And again, we
 7   really don't have this, any visibility into this, and it
 8   shows how haphazard their process was, and how it was
 9   riddled with errors.
10           So as part of that, we would like to make a
11   request of the Court to get some discovery into the process
12   that the trustees used to cut back on these claims, so we
13   can understand how --
14           THE COURT:  So, but state it differently, then
15   we're not starting a trial on Monday.
16           MR. COSENZA:  If Your Honor granted this request,
17   that would be correct.
18           THE COURT:  Okay.  All right, Mr. Shuster?
19           MR. SHUSTER:  So, Mr. Aronoff's --
20           THE COURT:  It seems to me that you're between a
21   rock and a hard place on this one, that there aren't -- and
22   obviously, I'm hearing this for the firs time, so maybe I'll
23   get smarter as the afternoon goes on.
24           But to the extent that you're saying that all
25   claims are created equal, and that in order to make this
```