# WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel:  212 728 8000
Fax:  212 728 8111

November 15, 2017

**VIA ECF AND EMAIL**

The Honorable Shelley C. Chapman
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

Re:    In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)

Dear Judge Chapman:

I write respectfully on behalf of the Plan Administrator to address two issues that have arisen concerning the Trustees' submission of expert reports.  Given the Court's limited availability, the Plan Administrator will make itself available at any time convenient for the Court in advance of Monday's hearing.

First, this past Friday evening, November 10, the Trustees disclosed a "Reply" expert report of James K. Finkel (the "November 10 Finkel Report") (attached as Exhibit 1).[1]  The November 10 Finkel Report purports to respond to the Reply Expert Report of Dr. Bradford Cornell ("Cornell Reply Report") (attached as Exhibit 2), which was served on August 28, **over ten weeks ago**. Notwithstanding numerous meet and confer sessions and several discovery hearings before the Court, including as recently as last week, the Trustees never mentioned that they intended to serve another report from Mr. Finkel.  To make matters worse, the November 10 Finkel Report is a sampling exercise in which Mr. Finkel purports to calculate an "Aggregate Claim Value" based on the work of two of the Trustees' other experts.  Unfortunately, the Plan Administrator must seek assistance from the Court in resolving this violation of the Trustees' obligations under Exhibit G.  The Plan Administrator requests that the November 10 Finkel Report be stricken as untimely and highly prejudicial to the Plan Administrator, and that Mr. Finkel be precluded from expressing the opinions therein.  Second, as explained more fully below, the Plan Administrator asks the Court to order the Trustees to provide their long-overdue calculation of interest that is included as part of Dr. Snow's purported calculation of their damages in this case.

**The November 10 Finkel Report**

The Plan Administrator negotiated extensively for an expert discovery schedule that contemplated the submission of three rounds of expert reports.  The last deadline to submit expert reports was August 28, 2017.  On August 28, Mr. Finkel submitted a "Reply Report" in response to the rebuttal report of Professor Daniel Fischel.  Mr. Finkel's opinion was limited to

---

[1] Courtesy copies of Exhibits 1 and 2 will be delivered to the Court.

reproducing Professor Fischel's calculations and using his methodology to calculate certain ratios of settlements to losses; indeed, Mr. Finkel affirmed at his deposition that he was not seeking to express any opinions beyond those calculations. (Finkel Tr. at 67:15-70:14, attached as Exhibit 3.) Although Mr. Finkel said counsel "may" ask him to perform "sensitivity analysis around the numbers" in the Cornell Reply Report, he testified he did not know if that was the case, and that he was not giving an opinion on statistical sampling. (Finkel Tr. at 71:2-9, 83:4-7.) Mr. Finkel was deposed on October 18, 2017—almost a full month ago—and never once did the Trustees inform the Plan Administrator or the Court of the forthcoming analysis.

Although the November 10 Finkel Report is styled by the Trustees as a "reply" to the Cornell Reply Report, it goes well beyond this report or anything contained in Mr. Finkel's prior opinions. Notably, Mr. Finkel attempts to calculate damages by extrapolating the "Agreement Rate" from the Trustees' re-underwriting expert, J.F. Morrow, based upon the sample of loans drawn by Dr. G William Schwert, to the loans still at-issue in the estimation proceeding. (November 10 Finkel Report at ¶ 22.) The use of a supposedly representative set of loans to extrapolate damages to a broader population of loans is, of course, "sampling." This flies in the face of the Trustees' many prior representations to the Court that they will not seek to prove their claims through sampling, including at the October 23 conference, where they stated, "I mean, neither side is giving the Court any kind of systematic extrapolation methodology. We're not doing that. That was rejected. We wanted to do a sample, and do a breach rate, and that approach was rejected. So what we're left with is actually somehow satisfying the Court that we have evidence of breaches." (Transcript of October 23, 2017 Conference at 73:25-74:6, attached as Exhibit 4.) To further demonstrate why Mr. Finkel's report is not a reply, Mr. Finkel purports to generate a damages calculation based upon "percentages of losses" derived from a 2012 declaration filed by Mr. Zachary Trumpp in connection with establishing the reserve for these claims (November 10 Finkel Report at ¶ 4)—yet another entirely new opinion offered two and a half months after he already replied to Professor Fischel's report.

It is too late for the Plan Administrator to respond to the opinions expressed in the November 10 Finkel Report and to re-address the numerous underlying opinions on which Mr. Finkel relies as the basis for a sampling exercise. Were the report permitted, the Plan Administrator would not only need to respond to Mr. Finkel's report, but depose Mr. Finkel and perhaps any Trustee witness whose opinions touch on the analysis in his report, all prior to opening statements in this case. The Trustees' approach eviscerates the heavily negotiated expert schedule in Exhibit G, would delay the trial for months and ensure that the proceedings will not conclude before the March distribution date—a material element of the RMBS Settlement Agreement. Trial is less than a week away. The Plan Administrator submits that there is no way to cure the prejudice occasioned by the Trustees' conduct. We therefore respectfully asks that the Court strike the November 10 Finkel Report and for any other relief that is appropriate under the circumstances.

**The Trustees' Interest Calculation**

In addition, to date, the Trustees have failed to provide the Plan Administrator with an updated calculation of their purported damages attributable to interest. As the Court knows, in its pretrial brief, the Plan Administrator explained that the Trustees' damages expert, Dr. Snow, set forth a calculation of the Trustees' alleged damages that included amounts that are unrecoverable interest under the Bankruptcy Code, thus failing to discharge the Trustees' burden to quantify

their damages. (*See* LBHI's Pretrial Brief at pp. 37-40.) On the basis of this issue, among others, the parties agreed to adjourn the initial hearing and agreed to a revised schedule. During meet and confer sessions after the Court conferences on October 23 and 24, the Trustees agreed to provide an updated damages calculation quantifying the interest embedded in their Purchase Price calculation, with the parties agreeing that the Plan Administrator would have an opportunity to respond and the Trustees could reply, if necessary. However, even though the hearing will begin in five days, the Trustees still have not provided that calculation. We respectfully request that the Trustees be ordered to do so immediately.

Sincerely,

Todd G. Cosenza

cc: All counsel (*via* email)

# Exhibit 1

Exhibit Provided to the Court

# Exhibit 2

Exhibit Provided to the Court

Exhibit 3

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Chapter 11

5   Case No. 08-13555(SCC)

6   -----------------------------------x

7

    IN RE

8

    LEHMAN BROTHERS HOLDINGS INC., et al.,

9

                    Debtors.

10

11  -----------------------------------x

                    October 18, 2017

12                  10:20 a.m.

13

14

15      Videotaped Deposition of JAMES

16  FINKEL, taken by Debtors, pursuant to

17  Notice, held at the offices of Willkie Farr

18  & Gallagher LLP, 787 Seventh Avenue, New

19  York, New York, before Todd DeSimone, a

20  Registered Professional Reporter and Notary

21  Public of the State of New York.

22

23

24

25

Page 65

```
 1                    J. FINKEL
 2    purposes of effectively granting, a, quote,
 3    "credit" against the repurchase price since
 4    those loans would not ultimately be
 5    transferred out of the trusts and be
 6    actually repurchased.
 7         Q.      How do you have that
 8    understanding of his report?
 9         A.      I reviewed a draft of his
10    report and his final report and people at
11    my firm worked on some quantitative
12    analysis in support of his conclusions.
13         Q.      Your firm being Duff & Phelps,
14    correct?
15         A.      Correct.
16         Q.      Did you rely upon his report in
17    preparing your expert report in this case?
18               MR. LIEBERMAN:  Asked and
19    answered, objection.
20         A.      No.
21         Q.      Did you use his expert report
22    to inform yourself about how Andrew
23    Davidson LoanDynamics worked?
24         A.      In reviewing his report, I
25    learned more than I had previously known
```

Page 66

1                     J. FINKEL

2     about how Andrew Davidson worked, but I

3     didn't expressly review his report to

4     inform myself for the purposes of my

5     report.

6          Q.     What did you know prior to

7     reviewing Dr. Ellson's report about how

8     Andrew Davidson worked?

9          A.     Well, again, based on

10    confidential consulting assignments in the

11    past I had familiarity with the Andrew

12    Davidson models, so I already knew -- I was

13    aware of what Andrew Davidson models did,

14    their functions and their capabilities.

15         Q.     Prior to reviewing Dr. Ellson's

16    report, did you know anything about how the

17    Andrew Davidson LoanDynamics model worked?

18         A.     Generally, yes.

19                (Plan Administrator Exhibit 81

20    marked for identification.)

21         Q.     I will put in front of you here

22    Plan Administrator Exhibit 81, which has

23    been premarked.  This is your expert report

24    that you submitted on August 28th.

25         A.     Thank you.

Page 67

J. FINKEL

1

2      Q.      Is this a copy of the expert

3   report you submitted in this case?

4      A.      Yes, it looks to be that.

5   There appear to be a couple of pages at the

6   end that may have come from some of the

7   other production that wasn't explicitly

8   part of the report.

9      Q.      Oh, okay.

10      A.      But this appears to be, without

11   turning every page, yes, my report.

12      Q.      If you turn to page 11, that's

13   your signature, right?

14      A.      Correct.

15      Q.      Are the opinions that are

16   expressed in this report your own?

17      A.      Yes.  I review the work in this

18   report largely as calculations as opposed

19   to opinions, but yes, these are

20   calculations which I stand behind.

21      Q.      What's the difference between a

22   calculation and an opinion?

23      A.      I'm not sure I can

24   appropriately define that.  I feel like the

25   calculations I performed were largely,

Page 68

1                    J. FINKEL
2  although complex, straightforward, and
3  didn't involve elements of subjectivity or
4  qualitative analysis that might normally go
5  into an expert opinion.
6       Q.      So what was your opinion in
7  this case, or what is your opinion?
8       A.      Well, my conclusions, you know,
9  I have several conclusions that I make to
10 these computations.  One is that I agree,
11 within a small difference, with Professor
12 Fischel's calculated lifetime losses.  In
13 fact, using my own methodology I come up
14 with a slightly lower number lifetime
15 losses.
16            I set out a comparison, and
17 using the same methodology, I estimated
18 lifetime losses in five of the six
19 presented other RMBS trusts and, you know,
20 applying the settlements to those lifetime
21 losses derived percentages.
22            I think, as I said before,
23 today, applied those percentages to my
24 expected lifetime losses and made a
25 conclusion as to the difference between

Page 69

```
 1                    J. FINKEL
 2   those estimated amounts and Professor
 3   Fischel's settlement percentage or
 4   calculation to his lifetime losses.
 5        Q.      So let me try to break that
 6   down so I can understand.
 7                One conclusion you reached was
 8   that you agree with Professor Fischel's
 9   calculated lifetime losses, correct?
10        A.      Within a small difference, very
11   small difference.
12        Q.      The second conclusion you
13   reached is that you applied certain
14   percentages to calculations of expected
15   lifetime losses and concluded -- sorry,
16   made a conclusion about the differences
17   between those estimated amounts and
18   Professor Fischel's settlement percentage
19   or calculation to his lifetime losses,
20   correct?
21                MR. LIEBERMAN:  Objection,
22   vague.
23        A.      That sounds generally correct.
24        Q.      Are there any other conclusions
25   that you expressed in your report?
```

Page 70

1                        J. FINKEL

2        A.        Well, I reach a computational

3   conclusion on the lifetime losses in the

4   five other settlements I presented, of the

5   total six settlements that I presented, the

6   recovery ratios I reach a computation

7   conclusion on those.  As I said, I reach

8   another computational conclusion on

9   applying those -- that range of percentages

10  to my estimated lifetime losses.

11       Q.        Are these conclusions that

12  we've just talked about part of the

13  opinions you are going to be offering at

14  trial?

15       A.        Yes.

16       Q.        Are there any other opinions

17  that you plan to offer at trial?

18       A.        I may be asked by counsel to

19  offer other calculations at trial, but at

20  this time I'm not sure what those might be.

21       Q.        But right now, sitting here

22  today, you haven't formed any other

23  opinions that you plan to offer at trial,

24  correct?

25       A.        Correct.

Page 71

                        J. FINKEL

1

2        Q.        What are the other calculations

3   that counsel might ask you to offer?

4        A.        Counsel asked me to review

5   Mr. Cornell's report, reply report, that I

6   mentioned earlier that I reviewed, and they

7   may ask me to perform some sensitivity

8   analysis around the numbers he's come up

9   with.

10       Q.        His reply report, correct?

11       A.        His reply report.

12       Q.        Which numbers in his reply

13   report did you review?

14       A.        It's been a couple of weeks

15   since I've looked at that.  I can't recall

16   all of them specifically.  There were

17   various discount percentages in his effort

18   to calculate some, you know, numbers around

19   potential settlement amounts.

20       Q.        Did you review any exhibits to

21   Dr. Cornell's report?

22       A.        No, I don't think the numbers I

23   reviewed at one point -- I think they were

24   in the body of the report.

25       Q.        Did you analyze any data that

Page 72

1                    J. FINKEL
2    he provided in connection with his reply
3    report?
4         A.     No.
5         Q.     What do you mean by sensitivity
6    analysis?
7         A.     Sensitivity analysis is
8    altering assumptions, input assumptions,
9    and seeing the range of difference in
10   outputs.
11        Q.     What do you call -- sorry, what
12   do you recall Dr. Cornell's opinion in his
13   reply report being?
14        A.     I don't really recall
15   Dr. Cornell, again, I didn't review it for
16   the purpose of this report, I didn't rely
17   on it at all, so my review is limited, but
18   I don't review him -- I don't recall him
19   actually -- again, I don't recall opinions.
20   I recall more calculations he performed.
21        Q.     Do you have any opinions about
22   his calculations?
23        A.     I haven't been asked to form
24   opinions on his calculations at this time.
25        Q.     Did you have any reactions to

Page 83

1                      J. FINKEL

2         Q.      Sure.  So -- well, I'll hold

3    off on that.

4                  Are you giving an opinion on

5    statistical sampling as used in residential

6    mortgage-backed securities cases?

7         A.      No.

8         Q.      Have you given an opinion

9    regarding the use of statistical sampling

10   in other cases involving RMBS?

11        A.      I've given an opinion relating

12   to the commercial understanding of the sole

13   remedy clause in support of an effort to

14   use statistical sampling.  I was rebutting

15   another expert who was asserting that

16   statistical sampling could not be used

17   because of the commercial understanding as

18   he interpreted it of the sole remedy

19   clause.

20        Q.      And you are not giving an

21   opinion in this proceeding regarding the

22   sole remedy clause, correct?

23        A.      No, I'm not.

24        Q.      You are not giving -- are you

25   giving an opinion about any other

# Exhibit 4

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   One Bowling Green

14                   New York, NY  10004

15

16                   October 23, 2017

17                   2:02 PM

18

19

20   B E F O R E :

21   HON SHELLEY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24   ECRO:  SHEA

25

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

1    HEARING re Status Conference re Claim No. 29606

2

3    HEARING re Lehman/RMBS Pretrial Conference

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 73

1    process, and the process includes what happened during the

2    protocol, no?

3              MR. SHUSTER:  That's not the way we're approaching

4    it, the way we're approaching it is Judge, we have 5000

5    income breaches that are a billion dollars, that have

6    predicated us --

7              THE COURT:  Stop right there, stop right there.

8    You have 5000 income breaches that are worth a billion

9    dollars, right.  But you used to have 5500 income breaches

10   that are worth a billion dollars.  And what you're saying to

11   me is same difference, right?

12             MR. SHUSTER:  No, I'm saying that I have proof of

13   5000 breaches, evidence of breaches, using -- let's say it's

14   a salaried employee, and I'm using same-year tax returns.

15   And then I will establish, by expert testimony, that same-

16   year tax returns are commonly relied --

17             THE COURT:  That's a different issue.  The issue

18   of whether a particular breach is material, and the issue of

19   whether or not that breach, or others like it in one or more

20   loans gives rise to a claim for damages, that that, you

21   definitely don't agree on that latter piece.  But whether or

22   not you can extrapolate, I'm using that word, from a

23   category of breaches, and get to a number, to me has to be

24   related to the number of claims.

25             MR. SHUSTER:  We're giving you the actual number.

Page 74

```
 1    We're not -- I mean, neither side is giving the Court any

 2    kind of systematic extrapolation methodology.  We're not

 3    doing that.  That was rejected.  We wanted to do a sample,

 4    and do a breach rate, and that approach was rejected.  So

 5    what we're left with is actually somehow satisfying the

 6    Court that we have evidence of breaches.

 7              And the way that I think about that is, we will

 8    show the Court the kinds of evidence we have, among other

 9    things, the buckets of evidence we have, what the numbers

10    are that are attached to that evidence, satisfy the Court

11    that we actually did provide that evidence --

12              THE COURT:  Then why aren't you seeking -- but if

13    you're not including thousands of claims, thousands of

14    loans, how can that math add up?

15              MR. SHUSTER:  It's going to add up to 11.6

16    billion, or something short of that, if the Court doesn't

17    agree with us, on the 11.6 --

18              THE COURT:  But if you put in the rest of the

19    claims, it'd be a higher number.

20              MR. SHUSTER:  But we're not going to put in the

21    claims we drop.  Those are out of the case.  And the --

22              THE COURT:  But they weren't out of the case when

23    --

24              MR. SHUSTER:  But they weren't then, but they are

25    now, and the number now is 11.6 billion, and the question
```