# HOLWELL SHUSTER & GOLDBERG LLP

*750 Seventh Avenue, 26th Floor*
*New York, New York 10019*
*Tel: (646) 837-5151*
*Fax: (646) 837-5150*
*www.hsgllp.com*

*Michael S. Shuster*
*646-837-5153*
*mshuster@hsgllp.com*

November 16, 2017

**VIA EMAIL AND ECF**

The Honorable Shelley C. Chapman
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

Re:   In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)

Dear Judge Chapman:

    We write in response to the Plan Administrator's ("PA") request that the Court strike the Reply Report of James A. Finkel (the "Finkel Reply Report") and preclude him from testifying in response to the Reply Expert Report of Bradford Cornell (the "Cornell Reply Report"). Mr. Finkel is responding to a Cornell Reply Report that is not in fact a reply. Dr. Cornell's affirmative report was a calculation of the Purchase Price amount for claims the PA had accepted and he did not file a rebuttal report. His affirmative report did not set forth any analysis of the sort contained in his reply (e.g., "Success Assumptions" necessary to obtain an estimation figure of $2.38 billion), and none of the Trustees' experts provided any such analysis in rebuttal to Dr. Cornell's affirmative report. Thus, in his "reply" Dr. Cornell offered an opinion on an entirely new subject. Rather than seek to strike this report on the basis that it is not a true reply but an untimely affirmative report, the Trustees have submitted what is in effect a rebuttal to Dr. Cornell's late-filed new affirmative opinion. The PA held Dr. Cornell's analysis until the reply reports were due, but it should not be able to shield Dr. Cornell's analysis from a response, which would be the effect of the relief the PA seeks. Even if the Cornell Reply Report is properly considered a reply, there can be no dispute that parties may respond to opinions offered on reply.[1]

    Nor is there any prejudice to the PA. As the PA concedes in its letter, it has known for several weeks that Mr. Finkel might be asked to offer an opinion <u>at trial</u> responding to the Cornell Reply Report, and at no time prior to this week did the PA object to Mr. Finkel doing so. Indeed, the PA asked several questions of Mr. Finkel regarding the proposed trial testimony,

---

[1] Furthermore, the Trustees did not receive the information necessary to replicate Dr. Cornell's "Success Assumption" model (disclosure that was required by Exhibit G) until the eve of his deposition. Therefore, Mr. Finkel did not possess the information necessary to prepare a rebuttal to Dr. Cornell until that time. (Email from J. Waisnor to N. Lieberman dated October 7, 2017 at Ex. A.) The Plan Administrator should not be permitted to benefit from its failure to comply with Exhibit G.

including "when counsel might ask you to offer any opinions on Dr. Cornell's calculations at trial?" (Tr. 73:23-25 at Ex. B.) Accordingly, had Mr. Finkel offered the opinions expressed in his reply report at trial, the PA would have no basis to object to a response to its newly-offered reply opinion. Nevertheless, the Trustees provided the PA with a report and have offered to produce Mr. Finkel for a deposition regarding that report. The PA did not respond to that offer before seeking resolution by the Court.

And notwithstanding the PA's assertions to the contrary, a short deposition of Mr. Finkel is all that is necessary to test the Finkel Reply Report. The Trustees deposed Dr. Cornell regarding both his affirmative report and the Cornell Reply Report in less than three-and-a-half hours. The PA has already deposed Mr. Finkel for a full day. Surely an additional, short deposition should be sufficient. The fact that one of the scenarios Mr. Finkel ran involved the "agree rates" developed by Mr. Morrow does not change that calculus. The Plan Administrator has spent over ten hours deposing Mr. Morrow about his report – there is nothing about the use of the results of that work that requires additional discovery of Mr. Morrow. Certainly nothing that would cause any delay in the hearing as currently scheduled.

Nor is Mr. Finkel's use of Mr. Morrow's agree rate "sampling" to calculate the value of the Trustees' claims. Dr. Snow has calculated those amounts on a loan-by-loan basis as set forth in the Protocol. Mr. Finkel, on the other hand, like Dr. Cornell, presents different "success assumptions" to show what estimation amounts might be derived if the Trustees prevail on certain percentages of their claims. One such scenario assumes that the Trustees prevail on their claims at the rate that Mr. Morrow agreed with Mr. Aronoff. The Trustees are not seeking damages on that basis – Mr. Finkel is rebutting Dr. Cornell's analysis by providing different assumptions (not those provided by the PA's counsel) for the Court to consider. He should be permitted to do so.

With respect to Dr. Snow's supplemental report, the Trustees will provide it today, so the PA's request was premature.[2]

The Trustees look forward to addressing these issues with the Court later today.

Respectfully Submitted,

*/s/ Michael S. Shuster*

Michael S. Shuster

cc:    All counsel (via email)

---

[2] The Trustees note that the PA's position on supplemental reports from Drs. Snow and Cornell regarding purchase price calculations seriously undermines its arguments regarding the prejudice and delay that would attend to allowing Mr. Finkel to testify in response to the Cornell Reply Report.

2

# EXHIBIT A

| | |
|---|---|
| **From:** | Waisnor, Jonathan D. |
| **To:** | Neil R. Lieberman; Michael Shuster; Franklin H. Top III; Scott A. Lewis; Weitnauer, Kit; Solomon, Jason; Sigler, Sage; Munno, M. William; Guzman, Daniel; JPM.Kraut, Michael; Moore, James O.; anna.goldenhersh@morganlewis.com; Dorit Ungar Black; Daniel P. Goldberg; Dwight Healy; Lani A. Perlman; Drebsky, Dennis |
| **Cc:** | Yanez, Antonio; McCallen, Benjamin; Davis, Joseph; Watson, Leah; Glasner, Evan; Cosenza, Todd; Neskovic, Gorana |
| **Subject:** | RE: In re Lehman Brothers - RMBS Estimation Proceeding |
| **Date:** | Saturday, October 7, 2017 7:46:58 PM |
| **Attachments:** | BREACH_LEVEL_DATA_7OCT2017.XLSX |

Neil,

All of the data, formulae, macros, and other information necessary to replicate Dr. Cornell's figures in Exhibit I, as amended on September 29, are contained within his report or in the data that was produced to you in connection with his reports. In response to your question about how to identify breaches that Dr. Cornell was asked to assume do not have the AMA defense, information sufficient to explain these calculations may be found in paragraph 17 and footnotes 39, 40 and 41 to Dr. Cornell's reply report. Given this, the Plan Administrator sees no basis for your reservation of rights.

Nevertheless, the Plan Administrator will explain below how to identify breaches without the AMA defense.

- As explained in paragraph 17 and Note 39, the only Breach Claims that do not have an AMA defense are those deemed AMA.

- As explained in Note 40: For loans not reviewed by RBF, Dr. Cornell determined whether breaches of Representations and Warranties were deemed AMA using the information in the Cont_Provision_Breached column of the Breach_Level_Data file. This column reflects information provided by the Trustees during the Protocol. The Trustees can identify the loans reviewed by RBF using the Review_By field of the Breach_Level_Data file, which was produced on June 1, 2017. As the Trustees erred in identifying claims that were deemed AMA during the Protocol, for loans reviewed by Recovco, Dr. Cornell also removed the claims identified in the file labeled Deemed_AMA.XLSX from the population of deemed AMA claims.

- As further explained in Note 40: For the loans reviewed by RBF, Dr. Cornell used the deemed AMA data contained in columns AMA_1 – AMA_5 of the file labeled Suppl_Breach_Level_Data.XLSX.

- As explained in Note 41: none of the Breach Claims in the following categories: Excessive DTI, Straw Purchaser, Underwriting, and Misrepresentation of Income, Debt, Occupancy, Employment and Assets Claims (as defined below in Exhibit D to the Cornell Reply) were considered deemed AMA.

Attached is a revised Breach_Level_Data.XLSX file, which is being produced to you to correct certain loans that were mistakenly identified as being reviewed by either RBF or Recovco. As relevant to the

figures in Exhibit I, loan 15065733, with a deemed AMA claim 2295460, was erroneously identified as reviewed by Recovco in the Review_By field.

**Jonathan D. Waisnor**
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue | New York, NY 10019-6099
Direct: +1 212 728 8597 | Fax: +1 212 728 9597
jwaisnor@willkie.com | vCard | www.willkie.com bio

**From:** Neil R. Lieberman [mailto:nlieberman@hsgllp.com]
**Sent:** Friday, October 06, 2017 9:12 AM
**To:** Waisnor, Jonathan D. <JWaisnor@willkie.com>; Michael Shuster <mshuster@hsgllp.com>; Franklin H. Top III <top@chapman.com>; Scott A. Lewis <slewis@chapman.com>; Weitnauer, Kit <kit.weitnauer@alston.com>; Solomon, Jason <jason.solomon@alston.com>; Sigler, Sage <sage.sigler@alston.com>; Munno, M. William <munno@sewkis.com>; Guzman, Daniel <guzman@sewkis.com>; .JPM.Kraut, Michael <mkraut@morganlewis.com>; Moore, James O. <james.moore@morganlewis.com>; anna.goldenhersh@morganlewis.com; Dorit Ungar Black <dblack@hsgllp.com>; Daniel P. Goldberg <dgoldberg@hsgllp.com>; Dwight Healy <dhealy@hsgllp.com>; Lani A. Perlman <lperlman@hsgllp.com>; Drebsky, Dennis <ddrebsky@nixonpeabody.com>
**Cc:** Yanez, Antonio <ayanez@willkie.com>; McCallen, Benjamin <BMcCallen@willkie.com>; Davis, Joseph <JDavis@WILLKIE.COM>; Watson, Leah <LWatson@willkie.com>; Glasner, Evan <EGlasner@willkie.com>; Cosenza, Todd <TCosenza@willkie.com>; Neskovic, Gorana <GNeskovic@willkie.com>
**Subject:** RE: In re Lehman Brothers - RMBS Estimation Proceeding


Counsel –

In our 10/3 letter, we requested materials relied upon by Dr. Cornell in formulating his amended reply report, including the "all data, formulae, macros and any other information necessary to replicate Dr. Cornell's amended Exhibit I, including information sufficient to identify which breaches Dr. Cornell treated as having no AMA Defense." Those materials are clearly called for by Exhibit G.

If the Plan Administrator does not provide the materials by close of business today, the Trustees reserve the right to recall Dr. Cornell at a later date for further testimony regarding his calculations.

Regards,

Neil

Neil R. Lieberman
Holwell Shuster & Goldberg LLP
750 Seventh Avenue, 26th Floor
New York, NY 10019
(646) 837-5168 (office)
(347) 834-5057 (mobile)
www.hsgllp.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**From:** Neil R. Lieberman
**Sent:** Tuesday, October 3, 2017 11:43 AM
**To:** 'Waisnor, Jonathan D.' <JWaisnor@willkie.com>; Michael Shuster <mshuster@hsgllp.com>; Franklin H. Top III <top@chapman.com>; Scott A. Lewis <slewis@chapman.com>; Weitnauer, Kit <kit.weitnauer@alston.com>; Solomon, Jason <jason.solomon@alston.com>; Sigler, Sage <sage.sigler@alston.com>; Munno, M. William <munno@sewkis.com>; Guzman, Daniel <guzman@sewkis.com>; .JPM.Kraut, Michael <mkraut@morganlewis.com>; Moore, James O. <james.moore@morganlewis.com>; anna.goldenhersh@morganlewis.com; Dorit Ungar Black <dblack@hsgllp.com>; Daniel P. Goldberg <dgoldberg@hsgllp.com>; Dwight Healy <dhealy@hsgllp.com>; Lani A. Perlman <lperlman@hsgllp.com>; Drebsky, Dennis <ddrebsky@nixonpeabody.com>
**Cc:** Yanez, Antonio <ayanez@willkie.com>; McCallen, Benjamin <BMcCallen@willkie.com>; Davis, Joseph <JDavis@WILLKIE.COM>; Watson, Leah <LWatson@willkie.com>; Glasner, Evan <EGlasner@willkie.com>; Cosenza, Todd <TCosenza@willkie.com>; Neskovic, Gorana <GNeskovic@willkie.com>
**Subject:** RE: In re Lehman Brothers - RMBS Estimation Proceeding

Counsel –

Please find attached the Trustees' response.

Regards,

Neil

**From:** Waisnor, Jonathan D. [mailto:JWaisnor@willkie.com]
**Sent:** Friday, September 29, 2017 11:59 AM
**To:** Michael Shuster <mshuster@hsgllp.com>; Franklin H. Top III <top@chapman.com>; Scott A. Lewis <slewis@chapman.com>; Weitnauer, Kit <kit.weitnauer@alston.com>; Solomon, Jason <jason.solomon@alston.com>; Sigler, Sage <sage.sigler@alston.com>; Munno, M. William <munno@sewkis.com>; Guzman, Daniel <guzman@sewkis.com>; .JPM.Kraut, Michael <mkraut@morganlewis.com>; Moore, James O. <james.moore@morganlewis.com>; anna.goldenhersh@morganlewis.com; Dorit Ungar Black <dblack@hsgllp.com>; Daniel P. Goldberg

<dgoldberg@hsgllp.com>; Dwight Healy <dhealy@hsgllp.com>; Lani A. Perlman <lperlman@hsgllp.com>; Drebsky, Dennis <ddrebsky@nixonpeabody.com>; Neil R. Lieberman <nlieberman@hsgllp.com>
**Cc:** Yanez, Antonio <ayanez@willkie.com>; McCallen, Benjamin <BMcCallen@willkie.com>; Davis, Joseph <JDavis@WILLKIE.COM>; Watson, Leah <LWatson@willkie.com>; Glasner, Evan <EGlasner@willkie.com>; Cosenza, Todd <TCosenza@willkie.com>; Neskovic, Gorana <GNeskovic@willkie.com>
**Subject:** In re Lehman Brothers - RMBS Estimation Proceeding

Counsel,

Please see attached correspondence from Todd G. Cosenza.

**Jonathan D. Waisnor**
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue | New York, NY 10019-6099
Direct: +1 212 728 8597 | Fax: +1 212 728 9597
jwaisnor@willkie.com | vCard | www.willkie.com bio

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

# EXHIBIT B

Page 1

1
2  UNITED STATES BANKRUPTCY COURT
3  SOUTHERN DISTRICT OF NEW YORK
4  Chapter 11
5  Case No. 08-13555(SCC)
6  ------------------------------------x
7
   IN RE
8
   LEHMAN BROTHERS HOLDINGS INC., et al.,
9
              Debtors.
10
11 ------------------------------------x
              October 18, 2017
12            10:20 a.m.
13
14
15     Videotaped Deposition of JAMES
16  FINKEL, taken by Debtors, pursuant to
17  Notice, held at the offices of Willkie Farr
18  & Gallagher LLP, 787 Seventh Avenue, New
19  York, New York, before Todd DeSimone, a
20  Registered Professional Reporter and Notary
21  Public of the State of New York.
22
23
24
25

Page 70

J. FINKEL

2  A.  Well, I reach a computational
3  conclusion on the lifetime losses in the
4  five other settlements I presented, of the
5  total six settlements that I presented, the
6  recovery ratios I reach a computation
7  conclusion on those. As I said, I reach
8  another computational conclusion on
9  applying those -- that range of percentages
10 to my estimated lifetime losses.
11    Q.  Are these conclusions that
12 we've just talked about part of the
13 opinions you are going to be offering at
14 trial?
15    A.  Yes.
16    Q.  Are there any other opinions
17 that you plan to offer at trial?
18    A.  I may be asked by counsel to
19 offer other calculations at trial, but at
20 this time I'm not sure what those might be.
21    Q.  But right now, sitting here
22 today, you haven't formed any other
23 opinions that you plan to offer at trial,
24 correct?
25    A.  Correct.

Page 71

J. FINKEL

2  Q.  What are the other calculations
3  that counsel might ask you to offer?
4     A.  Counsel asked me to review
5  Mr. Cornell's report, reply report, that I
6  mentioned earlier that I reviewed, and they
7  may ask me to perform some sensitivity
8  analysis around the numbers he's come up
9  with.
10    Q.  His reply report, correct?
11    A.  His reply report.
12    Q.  Which numbers in his reply
13 report did you review?
14    A.  It's been a couple of weeks
15 since I've looked at that. I can't recall
16 all of them specifically. There were
17 various discount percentages in his effort
18 to calculate some, you know, numbers around
19 potential settlement amounts.
20    Q.  Did you review any exhibits to
21 Dr. Cornell's report?
22    A.  No, I don't think the numbers I
23 reviewed at one point -- I think they were
24 in the body of the report.
25    Q.  Did you analyze any data that

Page 72

J. FINKEL

2  he provided in connection with his reply
3  report?
4     A.  No.
5     Q.  What do you mean by sensitivity
6  analysis?
7     A.  Sensitivity analysis is
8  altering assumptions, input assumptions,
9  and seeing the range of difference in
10 outputs.
11    Q.  What do you call -- sorry, what
12 do you recall Dr. Cornell's opinion in his
13 reply report being?
14    A.  I don't really recall
15 Dr. Cornell, again, I didn't review it for
16 the purpose of this report, I didn't rely
17 on it at all, so my review is limited, but
18 I don't review him -- I don't recall him
19 actually -- again, I don't recall opinions.
20 I recall more calculations he performed.
21    Q.  Do you have any opinions about
22 his calculations?
23    A.  I haven't been asked to form
24 opinions on his calculations at this time.
25    Q.  Did you have any reactions to

Page 73

J. FINKEL

2  his calculations?
3     A.  Not specifically. I would say
4  my reactions were -- no, I think I just had
5  observations. I just tried to understand
6  them.
7     Q.  What did you try to understand?
8     A.  I tried to understand laying
9  out his numbers what the purpose of the
10 numbers was and just what he was doing,
11 very basic understanding of what his report
12 was attempting to calculate.
13    Q.  Did you try to find the purpose
14 of what he was doing within the body of his
15 report?
16    A.  Not in any detail. Again, I
17 was shown that report for potential other
18 work and I didn't review it in the context
19 of this report.
20    Q.  Did you try to recreate
21 Dr. Cornell's calculations at all?
22    A.  I did not.
23    Q.  Do you know when counsel might
24 ask you to offer any opinions on
25 Dr. Cornell's calculations at trial?

19 (Pages 70 - 73)

Page 74

1        J. FINKEL
2    A.    Not at this time, no.
3    Q.    Any other opinions you are
4 going to offer at trial beyond those
5 contained in the report in front of you or
6 opinions that you may offer in response to
7 Dr. Cornell's reply report?
8    A.    Not that I know of sitting
9 here.
10   Q.    So there were certain
11 colleagues of yours at Duff & Phelps that
12 assisted you in preparing PA 81, correct?
13   A.    Correct.
14   Q.    Who were those colleagues?
15   A.    Adam Klausner, that is
16 K-l-a-u-s-n-e-r, David McKnight, Jennifer
17 Press, Edmond Esses might have helped me a
18 little bit, and Sumit Sablok, S-a-b-l-o-k,
19 may have helped me a little bit as well.
20   Q.    Did any of the people you just
21 listed come over with you from Dynamic
22 Credit Partners?
23   A.    Sumit was at Dynamic Credit
24 Partners and then spent a few years back in
25 India with his family business, so he

Page 75

1        J. FINKEL
2 didn't really come over with us, and then I
3 rehired him a couple of years ago. And
4 Jennifer Press, same story, she was at
5 Dynamic Credit Partners, she had left
6 already, we went to Duff & Phelps, but we
7 hired her back in subsequently at Duff.
8    Q.    What is Ms. Press' title at
9 Duff & Phelps?
10   A.    She is a managing director.
11   Q.    What is Mr. Sablok's title?
12   A.    He is a senior associate.
13   Q.    Can you turn to page 1 of your
14 report. So paragraph 1, under the first
15 bullet point, you state that one of your
16 assignments was to reconcile the lifetime
17 losses of the residential mortgage loans in
18 this proceeding as of April 2017, correct?
19   A.    That's what it says, yes.
20   Q.    Whose lifetime losses were you
21 reconciling?
22   A.    The ones derived by Professor
23 Fischel.
24   Q.    If you go to paragraph 16 of
25 your report, please. It is on page 4. You

Page 76

1        J. FINKEL
2 state that you noted in your examination of
3 Mr. Fischel's approach that while his --
4 sorry, are you there?
5    A.    Yeah.
6    Q.    That while his loss projections
7 for the active Lehman loans were as of
8 April 2017, he appears to have used certain
9 of ADCo's default tuning settings for May
10 2017, correct?
11   A.    Correct.
12   Q.    What was the basis for your
13 belief that Professor Fischel used ADCo's
14 default tuning settings for May 2017?
15   A.    Well, when we ran -- we
16 received in Dr. Fischel's production, we
17 received files that showed that he used
18 ADCo in his inputs and we verified the
19 default setting, that he used the default
20 settings in the ADCo model, and he stated
21 that he ran them as of April 2017, so the
22 first thing we did was run everything in
23 the same way that we could infer from his
24 production, and we didn't get quite the
25 same number.

Page 77

1        J. FINKEL
2        We then just took the
3 tunings -- the tuning settings for March
4 and May, we went one month different
5 thinking possibly he was using the model as
6 of a slightly different month, and we found
7 that in fact the numbers came remarkably
8 close when we ran it with the May tuning
9 settings. So that's what we believe he may
10 have done. If he ran the model, or someone
11 for him, ran the model for him, in May,
12 they would have just, without going and
13 employing an earlier set of tuning
14 settings, they would have, as a default,
15 been using the May settings. That's what I
16 suspect happened.
17   Q.    So ADCo has something called
18 default tuning settings, correct?
19   A.    Yes.
20   Q.    And it's your understanding
21 that those tuning settings are updated on a
22 regular basis?
23   A.    Yes.
24   Q.    Do you know if it's monthly?
25   A.    It is generally monthly. They

20 (Pages 74 - 77)