# WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

November 19, 2017

**VIA ECF AND EMAIL**

The Honorable Shelley C. Chapman
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

Re:     In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)


Dear Judge Chapman:

We apologize in advance for inconveniencing Your Honor on a Sunday. However, we unfortunately are compelled to write to the Court on the eve of trial concerning another recent abuse by the Trustees of the disclosure process contemplated by Exhibit G, which is likely to impact the proceedings commencing before Your Honor tomorrow morning. On Friday afternoon, after the conclusion of the Plan Administrator's deposition examination of Mr. James Aronoff, the Trustees elicited scripted "re-direct" testimony from Mr. Aronoff concerning the approximately 15,000 loans and 77,000 claims that had been submitted to the Protocol, but which the Trustees withdrew during the course of this estimation proceeding. As with the belated "reply" expert report of Mr. Finkel served by the Trustees last week, the testimony elicited from Mr. Aronoff constitutes a last-minute expansion of the subject matter of his expert testimony, this time into areas that (i) Mr. Aronoff explicitly disclaimed knowledge of at his prior deposition (and was never discussed in his expert reports), and (ii) which the Trustees previously shielded from discovery by the Plan Administrator on the basis of attorney-client privilege and attorney work product.[1] Because we anticipate that the Trustees will seek to rely on this improperly obtained purported evidence in their opening statement tomorrow, we write to seek relief from the Court, and to prevent the Trustees from making this last-minute amendment to Mr. Aronoff's opinion, which would be highly prejudicial to the Plan Administrator.

Although we understand the Court is aware of the background on this issue, we briefly set forth here the relevant facts for the Court's convenience. On June 1, 2017, the Trustees submitted Mr. Aronoff's opening report in this matter, which offered opinions on only 76,000 loans, even though almost 95,000 had been submitted by the Trustees into the Protocol. This was the first time the Plan Administrator learned the Trustees were abandoning their claims on approximately 15,000 of the loans the Plan Administrator reviewed as part of the Protocol. It was not until weeks later, after careful review of the

---

[1] Although the Court had ordered the Trustees on October 23, 2017 to make Mr. Aronoff available for an additional deposition, the Plan Administrator agreed to postpone that deposition until the week before trial as an accommodation given Mr. Aronoff's personal circumstances. It is particularly egregious that the Trustees would not disclose his purported new "opinion" until that deposition on Friday afternoon.

loan level data submitted with Mr. Aronoff's report, that the Plan Administrator was able to appreciate that the Trustees had also withdrawn more than 77,000 additional breach claims on loans that remained in the case. The Plan Administrator promptly requested additional information on the basis for the withdrawal of these loans and claims so that the Plan Administrator could understand, among other things, what this significant abandonment of claims meant for the reliability of the Trustees' loan review process during the Protocol. (*See, e.g.*, Ex. A (2017.07.21 Letter from Cosenza to Shuster).) The Trustees refused to provide that information or a deposition witness to speak to these issues, claiming the information to be privileged and attorney work product. (Ex. B (2017.07.24 Letter from Shuster to Cosenza).)

On July 27, 2017, the Plan Administrator submitted the Grice Rebuttal Report. Unlike Mr. Aronoff, who had limited his opinion to those loans and claims that remained in the case, Mr. Grice addressed the withdrawn loans and breach claims, noting that the claims that were abandoned "tend[ ] to confirm that the process that led to the submission of those claims suffers from flaws that have produced unreliable results." (Grice Rebuttal at ¶¶ 67-68, 97.) Although Mr. Aronoff was afforded an opportunity to respond to Mr. Grice, Mr. Aronoff's reply report was **silent** on this issue.

During his initial deposition on October 6, Mr. Aronoff confirmed he did not know why these claims were withdrawn, and that such analysis was outside the scope of his opinions. (Ex. C, Aronoff Tr. 169:20-170:9; 172:19-173:22; 174:7-176:5 ("the focus of the report, the rebuttal and the reply, from my perspective, were the 76,044 loans"); 284:6-12.) The Trustees also blocked Mr. Aronoff from providing any information he had on the decision making process regarding the withdrawn loans. (*Id.* at 173:7-16.) Another Trustee witness, Edmund Esses, similarly testified that he did not know why the loans were withdrawn, after having been given an instruction not to provide information about who might have this information. (*See, e.g.*, Ex. D (Esses Tr. 133:9-21).)

Having been blocked from obtaining this information during discovery, the Plan Administrator understood from the Trustees' privilege objections that the Trustees would not seek to offer evidence on a topic that was outside the scope of every one of their expert witnesses' opinions, and otherwise had been shielded from discovery. That suddenly changed on October 19, when the Trustees submitted their pretrial brief and, in a 180 degree reversal, sought to explain the decision to withdraw 40% of all claims previously asserted as merely a means to make the hearing more "focused and manageable." (RMBS Trustees' Pretrial Brief at 12 n. 7).

After the Plan Administrator challenged footnote 7 both as a reversal of the Trustees' prior discovery position and as factually inaccurate, the Trustees apparently recognized they had placed themselves in an untenable position—albeit entirely of their own making. As a result, only days after attempting to belatedly supplement the opinion of another one of their experts, Mr. Finkel, the Trustees attempted to do the same thing again—only this time by eliciting a scripted examination from Mr. Aronoff at the close of his deposition. This "re-direct" examination, which was clearly outside of the scope of the cross examination that preceded it, revealed for the first time new opinions on the withdrawn loans from Mr. Aronoff. For example, Mr. Aronoff testified about the different parameters applied to the population of loans still at issue here versus what was submitted in the Protocol, topics that appear nowhere in Mr. Aronoff's reports, and which he had previously testified at his deposition were outside the scope of his opinion. (The entirety of Mr. Aronoff's "redirect" examination at the November 17,

2017 deposition appears at Exhibit E.) The Plan Administrator immediately recognized what the Trustees were attempting to do, and objected to the testimony. But the Trustees persisted, and refused to offer a basis on the record for the validity of their examination. (Ex. E at 620:8-20 and 631:21-632:2.)

The reasons the Trustees should not be permitted to rely on Mr. Aronoff's 11th hour "redirect" testimony at trial are legion: the elicited testimony is outside the scope of the cross examination at his deposition on November 17; it's outside the scope of all three of his expert reports and his expert opinion in this matter; Mr. Aronoff's prior deposition testimony makes clear that he did not know why the loans were withdrawn and was not offering any opinions about the withdrawn loans; and the Plan Administrator was denied, on the grounds of purported attorney-client privilege and work product, from obtaining discovery (including from the Trustees' counsel) that would have allowed it to test the accuracy of Mr. Aronoff's statements.[2]

At this late stage—after multiple rounds of expert reports, almost twenty depositions, and literally the last business day before trial—there is no amount of disclosure by the Trustees concerning this new opinion by Mr. Aronoff that would remedy the prejudice to the Plan Administrator were the Trustees permitted to rely on Mr. Aronoff's new opinion. Accordingly, we respectfully request that the Trustees be prohibited from referencing Mr. Aronoff's new testimony during opening statements tomorrow, and from being permitted to amend the scope of his expert testimony at trial.

Respectfully submitted,

/s/ Todd G. Cosenza

Todd G. Cosenza

cc: All counsel (*via* email)

---

[2] The new testimony elicited from Mr. Aronoff, which addresses almost exclusively claims withdrawn from the Trustees' so-called "big four" breach categories (income, debt, occupancy and DTI), is inconsistent with the breezy explanation in footnote 7 that the Trustees merely withdrew 24 different breach categories so that they could focus on the four categories of their choosing. The facial inconsistency between this explanation and the evidence the Trustees themselves adduced from Mr. Aronoff highlights why the Plan Administrator's prior requests for discovery on the withdrawn loans was appropriate, and the prejudice that would result if the Trustees were permitted now to offer one-sided explanations of their review process.

# EXHIBIT A

# WILLKIE FARR & GALLAGHER LLP

TODD G. COSENZA
212 728 8677
tcosenza@willkie.com

787 Seventh Avenue
New York, NY 10019-6099
Tel:  212 728 8000
Fax:  212 728 8111

July 21, 2017

**VIA EMAIL**

Michael S. Shuster
Holwell Shuster & Goldberg
750 Seventh Avenue, 26th Floor
New York, NY 10019

Re: <u>In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)</u>

Dear Michael,

We write on behalf of the Plan Administrator in the above-referenced bankruptcy proceeding.  After repeated requests, you finally confirmed, in an email dated July 8, 2017, that the Trustees do not intend to pursue claims ("Breach Claims") on 15,107 Disputed Mortgage Loans (the "Withdrawn Loans") submitted into the Protocol, representing nearly 17% of the loans submitted into the Protocol.  Although the Trustees represented that they had submitted the claims on these loans in good faith during the Protocol process, they were excluded from the loans listed in Exhibit 1 to the expert reports of James H. Aronoff (the "Aronoff Report") and Karl N. Snow (the "Snow Report"), both dated June 1, 2017, which prompted our inquiry about their status.  The Trustees failed to follow the well-established process for communicating about decisions regarding the allowance or withdrawal of claims and instead left it to the Plan Administrator to uncover this highly material and prejudicial decision.  Moreover, as discussed below, you still refuse to disclose anything else about the circumstances or timing of this decision.

As you well know, significant estate resources were expended in litigating, on a loan-by-loan and claim-by-claim basis, whether the Trustees had established the elements of a valid repurchase claim as to the Withdrawn Loans.  The Plan Administrator is therefore entitled to understand: (i) The date the Trustees first decided to withdraw their claims on the Withdrawn Loans; (ii) the rationale for withdrawing these claims; and (iii) who was involved in these decisions (the "Requested Information").  We have requested this information on numerous occasions, including on June 13, June 16, July 7, and July 9.  You have refused to provide this information, refused to voluntarily withdraw and agree to expungement of these claims and have stated that the Trustees will view any motion to disallow and expunge the claims on the Withdrawn Loans as in violation of the RMBS Settlement Agreement.  This position is impossible to reconcile with the fact that you are no longer submitting claims on these loans at the estimation proceeding.

If the Trustees are unwilling to provide the Requested Information, then the Plan Administrator is entitled to seek it through fact depositions. Accordingly, please provide by July 24, 2017 the Requested Information or the names and identities of two persons most knowledgeable about the Trustees' decision to forego claims on the Withdrawn Loans.

Although we have been discussing the Withdrawn Loans with you for well over a month, and you are fully aware that the Plan Administrator is now preparing its defenses to the Trustees' claims in the estimation proceeding, you neglected to inform us that in addition to the Withdrawn Loans, the Trustees also apparently have withdrawn thousands of individual Breach Claims ("Withdrawn Claims") on the remaining roughly 73,000 Disputed Mortgage Loans. The Plan Administrator only recently uncovered the Withdrawn Claims through its independent analysis of the exhibits to the Aronoff Report.

We are entitled to understand immediately the full extent of the Withdrawn Claims. During the Protocol, each individual Breach Claim on a Reviewed Loan was assigned a "Breach ID." Please provide us with an Excel spreadsheet listing the Breach IDs for the Withdrawn Claims by close of business today. Alternatively, please provide a list of Withdrawn Claims that identifies each claim that was withdrawn and the Disputed Mortgage Loan on which the claim was made. If the Trustees fail to provide this information promptly, the Plan Administrator will seek relief from the Court.

The Plan Administrator continues to reserve all its rights.

Sincerely,

Todd G. Cosenza

cc: All Counsel (*via* email)

# EXHIBIT B

# HOLWELL SHUSTER & GOLDBERG LLP

750 Seventh Avenue, 26th Floor
New York, New York 10019
Tel: (646) 837-5151
Fax: (646) 837-5150
www.hsgllp.com

*Michael S. Shuster*
*646-837-5153*
*mshuster@hsgllp.com*

July 24, 2017

**VIA EMAIL**

Todd Cosenza
Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY 10019

*Re:    In re Lehman Brothers Holdings Inc. RMBS Claims Estimation Hearing*

Dear Todd:

We write on behalf of the RMBS Trustees in response to your letters dated July 21, 2017 regarding (1) the loans that were not included in the Trustees' affirmative expert reports, (2) your clients' approval of 156 Claim Files that they initially rejected, and (3) your clients' deficient disclosures regarding their experts' sampling methodologies.

With respect to the loans that are not addressed in the RMBS Trustees' expert reports, your letter contains significant mischaracterizations of our discussions on the subject to date.  As an initial matter, as we made clear in our letter dated July 10, 2017, and had previously advised you (June 13, June 22, July 7, July 8), the Trustees will not submit evidence or otherwise pursue claims with respect to those loans at the Estimation Hearing.  Therefore, there is no basis for your assertion that the Trustees "failed to follow the well-established process for communicating decisions regarding allowance or withdrawal of claims …."  (July 21, 2017 Letter from T. Cosenza to M. Shuster at 1.)   I note that you advised me by letter dated July 21, 2017 that your clients were accepting breach claims they previously rejected.  There is no difference in principle between your clients advising ours via a letter from counsel of breaches they will no longer challenge and our clients advising yours by the same means of breaches as to which they will not present evidence at the Estimation Hearing.

Your clients' demand for information concerning the timing and rationale of the RMBS Trustees' decision not to include these loans and breaches in their expert reports are unfounded.  As we advised you by email dated July 8 in response to the initial request for the same information, the RMBS Trustees are under no obligation, whether pursuant to Exhibit G, the Protocol, or any other authority, to provide information concerning confidential and privileged discussions.  They will not do so.  Nor is the Plan Administrator entitled to seek such privileged

information through fact depositions, as you suggest.  The RMBS Trustees will not identify deponents for that purpose.

It is as you well know common practice for plaintiffs to pare down their claims in preparation for trial.  Forcing plaintiffs to disclose their confidential and privileged communications concerning the strategy for the presentation of their claims at trial would only disincentivize them to do so and create inefficiencies and increased costs for all participants.  It would be bad law and bad policy.  And that, in addition to straightforward application of the principles of attorney-client privilege and the work product doctrine, is why it is not required.

In addition to information protected from disclosure concerning the RMBS Trustees' and their lawyers' deliberations and thought processes, your letter requests additional detail regarding breach claims that are not included in Aronoff Report.  The RMBS Trustees have provided considerable and detailed information concerning the claims that are the subject of their expert reports.  The Plan Administrator is fully capable of identifying the breach claims that are *not* included.  Whether the Plan Administrator should expend the resources of the estate in that effort is for it and its lawyers to decide.  The exercise of actually doing so should be straightforward. As the Plan Administrator is fully aware, the Trustees submitted 193,148 claims on 94,566 loans into the Protocol, and rescinded 6,508 claims on 3,495 loans through Step 3, leaving a total of 186,640 claims on 91,071 loans on which there were breach claims.  (See the January 2017 Notice of Monthly Delivery.)  The Trustees have now identified all loans for which they will submit evidence at the Estimation Hearing.  (See Exhibits 1 and 15 to the initial Aronoff Report.) The Plan Administrator can identify the loans as to which claims will not be the subject of the Trustees' presentation at the Estimation Hearing by comparing Aronoff Exhibit 1 to the January 2017 Notice of Monthly Delivery.  Indeed, the Plan Administrator seems to have already carried out this work.  The RMBS Trustees are not obligated to devote additional resources, which come out of the trust funds available to certificateholders, to identify claims that they will not present at the Estimation Hearing.  That would be a waste of resources already diminished by Lehman's securitization of tens of thousands of breaching loans and its unjustified refusal to accept breach claims whose validity is manifest.  Nonetheless, as a courtesy, we have performed the work that we believe the Plan Administrator could or did itself perform.  Exhibit A at your request identifies the breach claims that were submitted into the Protocol but were not included in the Aronoff Report.

The Plan Administrator's complaints of prejudice and waste as a result of certain loans and claims not being the subject of the RMBS Trustees' expert reports are hollow.  The Plan Administrator argued, over the RMBS Trustees' objections, for a process that required review of every single one of over 200,000 mortgage loans, at great expense to the estate and to certificateholders.  That exercise, not the fact that some portion of the RMBS Claims are not included in the Aronoff Report, is where the lion's share of costs has been incurred.  The RMBS Trustees' decision regarding the analysis and presentation of certain of their claims in light of the pending, circumscribed, Estimation Hearing has not visited additional costs on the estate.

I note that your clients have now accepted that 156 loans have "Valid Claims" that they previously rejected, under the guise of continuing to review loans pursuant to the Protocol.  First, the Protocol process has been suspended at your clients' request.  (Settlement Agreement at § 3.02.)  Second, the fact that your clients have now accepted breaches they previously rejected

shows that, with the benefit of further review, and with a trial on the immediate horizon, parties can re-evaluate positions. The RMBS Trustees assert no prejudice from the fact that your clients have reversed themselves on 156 loans, though they note that if the Plan Administrator were truly continuing to review loans in good faith, the number of reversals would be orders of magnitude higher.

Finally, your attempt to paper over your clients' deficient and untimely disclosures of the materials their experts relied upon, by equating the selection of loans for analysis by Messrs. Grice and Castro to the exemplar loans used by the Trustees' expert James H. Aronoff, is without merit. The exemplar loans detailed in Mr. Aronoff's report are there to illustrate different types of breaches and sources of evidence pertinent to the Claims. Unlike Messrs. Grice and Castro, Mr. Aronoff did not purport to review a "sample" of loans, nor did he attempt to extrapolate a breach rate or other population-wide conclusions based on any such sample that he reviewed. I note that, in addition to purporting to review a sample set of loans from which they draw broad inferences, Messrs. Grice and Castro also present exemplar loans to illustrate their points and the Plan Administrator has also listed additional exemplars not discussed by Messrs. Grice and Castro. In any event, we are available to meet-and-confer at a convenient time regarding these matters.

We continue to await production of the policies and procedures that your clients agreed to provide on July 14. Please provide those materials forthwith.

The Trustees reserve all rights.

Very Truly Yours,

Michael S. Shuster

cc:     All counsel (via email)

# EXHIBIT C

1

2 UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

3

Case No. 08-13555 (SCC)

4 -----------------------------------x

5 IN RE

6 LEHMAN BROTHERS HOLDING, INC., et al.,

7                          Debtors.

8 -----------------------------------x

9                          787 Seventh Avenue

                         New York, New York

10

                         October 6, 2017

11                       9:36 a.m.

12

13          VIDEOTAPED DEPOSITION of JAMES H.

14 ARONOFF, taken by the Debtors, held at the

15 aforementioned time and place, before Sherri

16 Flagg, a Registered Professional Reporter,

17 Certified LiveNote Reporter, and Notary Public.

18

                    *    *    *

19

20

21

22

23

24

25

1        James H. Aronoff
2 policies had been removed, which constitutes, I
3 don't recall, 1100 or so I think. I'm not
4 sure. That's a guess.
5    Q.   1100 or so claims?
6    A.   Loans.
7    Q.   Loans?
8    A.   So the title policy claim breach
9 findings were removed; but to the extent a loan
10 with that breach finding had another breach
11 finding, it's still in the pool.
12    Q.   Right.
13    A.   So I think there are only 1100
14 that were standalone. But forget that number,
15 it's about that.
16    And then I think there are 30,
17 about 30, 34 or so, that, during the exchange
18 of expert reports, we have withdrawn based on
19 specific rebuttal comments and reviews that we
20 concurred with. And, similarly, I think there
21 are about 200 loans that have been accepted by
22 the Plan Administrator since we started the
23 exchange of expert reports.
24    So whatever those numbers are less
25 Exhibit 1 should be the number still in

1        James H. Aronoff
2 dispute.
3    Q.   Okay. So at the time you issued
4 this report, though -- if you go back to your
5 summary of opinions in your report, please, for
6 me.
7    A.   Yes.
8    Q.   You said in the second paragraph
9 that, in your opinion, that (as read):
10    Each of the loans identified on
11    Exhibit 1, there are one or more breaches
12    of the representations and warranties
13    made by Lehman with respect to such
14    mortgage loans and each such breach meets
15    the materiality standard, materially and
16    adversely affected the value of the loan
17    and/or the interests of the
18    certificateholders in the loan.
19    So was it your opinion, when you
20 issued this report, that each breach claim
21 asserted on all the loans listed on Exhibit 1
22 constituted a breach of an applicable
23 representation or warranty under the
24 corresponding mortgage loan sale and assignment
25 agreement?

1        James H. Aronoff
2    A.   Is that the question?
3    Q.   Yes, sir.
4    MR. HEALY: Objection, form.
5    A.   Yes, whether or not they'd been
6 accepted, that -- yes, that's my opinion.
7    Q.   And was it your opinion that each
8 breach claim asserted on all the loans listed
9 on Exhibit 1 met the applicable materiality
10 standard, as you call it, under the
11 corresponding MLSAA?
12    A.   The breach findings that were
13 submitted met that standard, yes.
14    Q.   And by the way, you understand
15 what I mean when I say MLSAA?
16    A.   Oh, one of the governing
17 documents.
18    Q.   Okay. Thank you.
19    And you've just -- I think you
20 just told me you've revised your opinions
21 slightly with respect to a number of loans
22 that, through the back-and-forth of this
23 process, have been rescinded, I suppose is the
24 best way to put it?
25    MR. HEALY: Objection to form,

1        James H. Aronoff
2 mischaracterizes the record. And, two, I
3 don't know that he said that he revised
4 his opinion with respect to the number of
5 loans.
6    A.   All I said is they're no longer in
7 dispute. My opinion with respect to those
8 loans hasn't changed.
9    Q.   So which loans were you referring
10 to when you referenced the 30 to 34 loans that,
11 through the exchange of expert reports, have
12 been withdrawn?
13    A.   Those were loans that I opined on
14 in the context of this report and it's been
15 demonstrated that the basis of my opinion with
16 respect to any particular loan was in error.
17 And to the extent there was a factual error
18 identified and it changed my -- and it changed
19 my opinion, it was withdrawn.
20    Q.   Now, you understand that the
21 trustees have withdrawn a significant number of
22 the breach claims they asserted during the
23 protocol, right?
24    MR. HEALY: Objection to form,
25 mischaracterizes the record.

43 (Pages 166 - 169)

1          James H. Aronoff
2     A.    What's the question, please?
3     (Requested portion read.)
4     A.    I don't know if it's significant
5 or not.  I know there are loans that have been
6 withdrawn even between the status report I
7 cited and Exhibit 1.  It went from 90 to 76,
8 but I don't know if there were other iterations
9 of that.
10    Q.    That's loans, correct?
11    A.    That's loans.
12    Q.    Okay.  Do you know how many claims
13 have been withdrawn by the trustees?
14         MR. HEALY:  Objection to form,
15 vague, ambiguous and confusing.
16    A.    I still don't.
17    Q.    Do you have any explanation you
18 can offer me here today for the withdrawal of
19 those claims?
20         THE WITNESS:  Are you going to say
21 something?
22         MR. HEALY:  I am going to say
23 something.
24         As you know, Mr. Davis, the
25 Exhibit G prohibits inquiry into any

1          James H. Aronoff
2 communications that the expert may have
3 had with consulting experts, counsel or
4 various other parties.  And so I think
5 you may be straying into that area.
6         I think you may be able to ask an
7 appropriate predicate question to which I
8 would not interpose an objection or at
9 least not interpose an objection subject
10 to a nonwaiver agreement.  But I don't
11 think the question you've asked is the
12 right question.
13         MR. DAVIS:  Okay.  Let me ask a
14 different question then.  We'll try it.
15 BY MR. DAVIS (continuing):
16    Q.    Just yes or no:  Do you know why
17 the trustees rescinded certain breach claims?
18         MR. HEALY:  Objection.  You've now
19 changed the description to which I object
20 on the grounds of its inaccuracy.  So I'd
21 ask you to reframe that.
22         MR. DAVIS:  I'm sorry, what's
23 inaccurate about this question?
24         MR. HEALY:  Rescinded.  I don't
25 think they've rescinded claims.

1          James H. Aronoff
2         MR. DAVIS:  The trustees haven't
3 rescinded breach claims?
4         MR. HEALY:  I think they've
5 advised you that they are not pursuing
6 claims at the estimation hearing.
7         MR. DAVIS:  Is there a difference?
8 I don't understand the difference.
9         MR. HEALY:  I'm not going to argue
10 with you.  I'm just telling you the
11 language which was used to communicate it
12 to you.  You're conducting the
13 examination.  I'm interposing an
14 objection on the grounds that your
15 question is inaccurate as framed.
16 BY MR. DAVIS (continuing):
17    Q.    Okay, let me ask the question
18 then.
19         Just yes/no:  Do you know why the
20 trustees have advised the Plan Administrator
21 that they are not pursuing certain breach
22 claims at the estimation hearing?
23         MR. HEALY:  I'm prepared to let
24 him answer that question subject to an
25 agreement that his answering the question

1          James H. Aronoff
2 will not be asserted to be a waiver of
3 any applicable privilege or protection
4 under Exhibit G.
5         MR. DAVIS:  That's fine.
6    A.    No.
7    Q.    So you were not involved in the
8 decision-making process concerning the
9 trustees' decision to not pursue certain breach
10 claims at the estimation hearing?
11         MR. HEALY:  He's advised you that
12 he does not know, and you are now asking
13 him to testify as to discussions that he
14 may have had with the trustees' counsel,
15 consulting experts or others.  And he's
16 instructed not to answer that question.
17    Q.    Was it important to the attorney
18 that you're giving in this case to understand
19 the basis for the trustees' decision not to
20 pursue certain of the breach claims in this
21 case?
22    A.    No.
23         MR. HEALY:  You beat me to it.
24         THE WITNESS:  Sorry.
25         MR. HEALY:  That's okay, go ahead.

44 (Pages 170 - 173)

James H. Aronoff

1
2    I was going to instruct you not to
3    disclose the content of any
4    communications with counsel in answering
5    the question. You have obviated that
6    because you haven't, so thank you.
7    Q.    And why was it not important to
8    your opinion in this case to understand the
9    basis for the trustees' decision not to pursue
10   certain of the breach claims?
11          MR. HEALY: I'm going to give you
12   the same instruction that I would have
13   given you to the last question.
14          And I object to the question as
15   argumentative and irrelevant and --
16   that's it.
17          THE WITNESS: So can I answer?
18          MR. HEALY: You can answer subject
19   to the stricture that I've given you.
20   A.    Because I believe that the ask was
21   to provide the summary and the two opinions we
22   just discussed with respect to a discrete
23   population of loans. And my examination went
24   to inquiries and questions about those specific
25   loans, the information contained in the

James H. Aronoff

1
2    narratives and the claim files, the supporting
3    documentation and data used to support those
4    claims, the types of breach findings that were
5    put forth.
6          And I viewed my opinions as
7    limited to the information that was available
8    to me with respect to these pools. And I felt
9    I had more than sufficient information and more
10   than sufficient data and insights into what was
11   done, how it was done. And I had the results
12   in front of me to render and offer the opinions
13   that I offered here.
14   Q.    So your opinions at trial, then,
15   are going to be limited to the claims, breach
16   claims, that are still at issue in the
17   estimation proceeding?
18          MR. HEALY: Objection to form.
19   His reports expressly reserve the right
20   to respond to arguments advanced by other
21   experts. And I don't -- I'm sure Mr.
22   Aronoff -- you're not asking Mr. Aronoff
23   to waive any right to do so.
24          MR. DAVIS: He can answer.
25   A.    I guess I'll do what I'm asked to

James H. Aronoff

1
2    do when I'm asked to do it. That wasn't -- the
3    focus of the report, the rebuttal and the
4    reply, from my perspective, were the 76,044
5    loans on Exhibit A.
6    Q.    Are you going to opine --
7    A.    Exhibit 1. I said A.
8    Q.    Are you going to opine at trial on
9    the process by which the trustees submitted
10   breach claims to the protocol?
11          MR. HEALY: Objection to the form
12   of the question. Vague, ambiguous. The
13   reports obviously recite the process. I
14   think it's vague, ambiguous and confusing
15   in light of that and other things.
16   A.    I've been asked to make myself
17   available to testify at the hearing in
18   connection with the subject matter of my
19   reports. And to the extent that changes, I'm
20   sure I'll be notified and you will as well.
21   Q.    Are the breach claims that are no
22   longer being pursued important to -- strike
23   that.
24          Let's look at Table 1, which is on
25   the next page, please.

James H. Aronoff

1
2    A.    I'm sorry, what page are we on?
3    Q.    Page 3. Now, just a quick
4    question: The third column here, Purchase
5    Price of Affected Loans, do you see that?
6    A.    Yes.
7    Q.    There's a footnote, Footnote 6. I
8    think that references the information in that
9    column, at least in part. Is that right?
10   A.    Yes.
11   Q.    Now, what does the term "purchase
12   price" refer to?
13   A.    I assumed -- since I didn't
14   independently, as I noted, verify or it was
15   provided to me to put in this chart, I assumed
16   it meant the aggregate of the purchase price in
17   connection with these breach findings as
18   described in the claims that have been
19   submitted.
20   Q.    Have you updated this chart at all
21   since you issued this report?
22   A.    No.
23   Q.    Do you intend to do that for
24   trial?
25   A.    I hadn't really thought about it.

45 (Pages 174 - 177)

James H. Aronoff

1         James H. Aronoff
2 I don't think so.
3    Q.    Would you take a look at Footnote
4 No. 7. It says (as read):
5       Many of the mortgage loans have
6     multiple breach findings and therefore
7     the sum of the number of the affected
8     loans and the related purchase price
9     columns will be greater than the number
10    of mortgage loans and the total purchase
11    price for the claims.
12       Do you see that?
13    A.    I do.
14    Q.    Can you explain to me, what is the
15 difference between the Purchase Price column
16 and the Total Purchase Price?
17    A.    Sure, I can do that.
18    Q.    Please do, thank you.
19    A.    If you read across, everything's
20 fine. So take the first column, there's 34,
21 323, 34,323 affected loans with a purchase
22 price of that number. But if you add them up
23 like we normally do and try to come up with a
24 number at the bottom, it's a nonsense number.
25       The total purchase price, if you

1         James H. Aronoff
2 added those up, would be way overstated because
3 of -- because it wasn't controlled for if a
4 loan was in here more than once.
5      So if the loan appeared in three
6 of these columns, its purchase price would
7 appear in three of those columns and would
8 overstate the total. Similarly, with the
9 number of affected loans. You're going to get
10 a number, as you can see, well in excess of
11 76044.
12    Q.    Let's look at pages 11 and 12 of
13 your report. So at the top of page 12
14 actually, you list some steps that Duff &
15 Phelps undertook on behalf of the trustees. Do
16 you see that?
17    A.    Yes.
18    Q.    And one of them is confirm the
19 materiality of the breaches identified. Do you
20 see that?
21    A.    Yes.
22    Q.    How did Duff & Phelps confirm the
23 materiality of those breaches?
24    A.    As we discussed earlier, I
25 ascertained whether or not any particular

1         James H. Aronoff
2 breach finding that is a defect that was
3 identified that purported to reach a
4 representation and warranty, was, in fact,
5 material and adverse to the value of the loan
6 or the interest of certificateholders by
7 ascertaining whether or not that defect
8 increased the risk of loss to the investor.
9    Q.    Did Duff & Phelps ever determine
10 that a valid breach identified by the loan
11 review firms did not materially and adversely
12 affect the value of the loan or the interests
13 of the certificateholders?
14    A.    Yes.
15    Q.    Are any examples of that decision
16 reflected anywhere in your expert reports?
17    A.    No, because they didn't result in
18 claims to the trustee.
19    Q.    Can you give me an example of such
20 a determination?
21    A.    Yes, I can. For example, there
22 was instituted, with respect to a
23 misrepresentation of income, a 5 percent
24 tolerance rule so that to the extent it was
25 discovered in the course of reviewing a loan

1         James H. Aronoff
2 file, the income that was stated by the
3 borrower was overstated by less than 5 percent
4 of what was determined to be their actual
5 income, the unmisrepresented income. And those
6 made it through the screens, and the loan
7 review firm submitted that.
8      There had been a determination
9 made at Duff that, in order to avoid
10 discussions about a one dollar difference in
11 income and whether that theoretically increases
12 the risk of loss or not, a determination was
13 made to only identify those that were
14 meaningful or significant. So 5 percent was
15 the tolerance. And there were other rules that
16 were engaged along the way that I discuss in my
17 report.
18      Similarly, there could have
19 been -- particularly with respect to the three
20 pools that had underwriting guideline breaches,
21 there may have been the identification of, in
22 the opinion of the due diligence firm, a
23 violation of the guidelines that, upon our
24 review, we viewed as technical and not
25 necessarily of the magnitude that would have

46 (Pages 178 - 181)

1          James H. Aronoff
2     minutes.  It will take 30 seconds.
3          MR. HEALY:  Okay.
4          VIDEO TECHNICIAN:  The time is 7
5     p.m.  We're off the record.
6          (Recess taken.)
7          VIDEO TECHNICIAN:  The time is 7
8     p.m.  We're on the record.
9     EXAMINATION BY
10    MR. HEALY:
11    Q.    Mr. Aronoff, would you look at
12    your initial report, please.  It's been marked
13    as Exhibit 67.  In particular, look at page 9
14    of that.
15    A.    Okay.
16    Q.    Do you see that, and the
17    discussion under the heading Materials Relied
18    On?
19    A.    Yes.
20    Q.    I think you were asked questions
21    before on whether you -- what listed materials
22    you relied on in Appendix C.  Do you recall
23    that questioning?
24    A.    Yes.
25    Q.    Okay.  Did you also rely on the

1          James H. Aronoff
2     exhibits that are attached to your report?
3     A.    Yes.
4     Q.    You were asked some questions
5     about whether the number of loans that you
6     expect to opine upon at the hearing has been
7     reduced from the 76,044 that are referenced in
8     your report.  Do you recall those questions?
9     A.    Yes.
10    Q.    And you identified some factors
11    which had reduced the number of loans.  Do you
12    recall that?
13    A.    Yes.
14    Q.    Okay.  Are you also aware that
15    there was one trust that has opted out of the
16    proceeding?
17    A.    Yes.
18    Q.    Okay.  And so you would expect
19    that that has reduced the number of loans
20    somewhat?
21    A.    Yes.
22    Q.    Okay.  And are you also aware that
23    there are one or two trusts that have
24    terminated since your report was issued?
25    A.    I'm -- yes.

1          James H. Aronoff
2     Q.    Okay.  And do you expect that that
3     may also reduce the number of loans you will
4     address at the hearing?
5     A.    I would expect that.
6     Q.    You were asked some questions
7     about loans that had been -- as to which claims
8     have been asserted during the protocol process
9     but which are not the subject of your reports.
10         Have you been asked to offer an
11    opinion with respect to any of those loans?
12    A.    I have not.
13    Q.    Okay.  You were asked some
14    questions about the repurchase protocol and I
15    think you were asked a question as to -- strike
16    that.
17         Do you have a view, sir, as to
18    whether or not the repurchase provisions
19    provide for a windfall to investors?
20         MR. DAVIS:  Object to the form.
21    A.    They don't provide any exception
22    to the repurchase provisions based on a
23    windfall.
24    Q.    Okay.  But if the provisions in
25    the repurchase protocol are carried out, does

1          James H. Aronoff
2     that result in a windfall to investors, in your
3     view?
4          MR. DAVIS:  Same objection.
5     A.    No.
6     Q.    You were asked some questions
7     about mortgage debt -- strike that.
8          You were asked some questions
9     about debt that had been incurred after the
10    closing of a loan and breaches that were based
11    upon the nondisclosure of such debt.  Do you
12    recall that?
13    A.    Yes.
14    Q.    Okay.  I'd like to focus on -- I
15    think you addressed installment debt.  I'd like
16    to focus on post-closing mortgage debt.
17    A.    Okay.
18    Q.    Was there any requirement for such
19    a claim that there had been preclosing credit
20    inquiries in order to cite a post-closing
21    mortgage debt as the basis for a breach?
22         MR. DAVIS:  Object to the form.
23    A.    No.  No, there isn't.
24    Q.    Okay.
25    A.    The only limitation would be that

1          James H. Aronoff
2  the mortgage debt is evident in the month
3  following -- no later than the month following
4  the month after the subject closed.
5      Q.    Okay.  You were asked some
6  questions about whether the process was the
7  subject of opinion, and I wanted to just
8  clarify what you were referring to.
9          As part of your expert opinion,
10 are you addressing the loan review process that
11 resulted in breach findings that may have been
12 submitted during the protocol process?
13         MR. DAVIS:  Object to the form,
14     leading.
15     A.    Yes.
16         MR. HEALY:  That's all I had.
17 FURTHER EXAMINATION
18 BY MR. DAVIS:
19     Q.    Mr. Aronoff, when I asked you
20 whether you were going to offer an opinion on
21 the loan review process that was conducted in
22 connection with the protocol, you told me no;
23 is that right?
24         MR. HEALY:  Objection to form.  I
25     think that misstates his testimony.

1          James H. Aronoff
2      A.    And I'm not sure if that's the
3  specific question you asked.  There was some
4  confusion in my mind about, when you referred
5  to process, whether you were using "process" as
6  a synonym for the protocol or whether you were
7  referring simply to the loan review process
8  part of the protocol.
9      Q.    I don't understand the difference
10 between the two.  I'm sorry, can you help me?
11     A.    I'm not offering an opinion, nor
12 do I have information beyond the loan review
13 process, with respect to the protocol.  To the
14 extent the reviewing of loans and the
15 determination that breach findings were
16 material and adverse was a necessary part of
17 the protocol procedures that the parties agreed
18 to undertake, those are part of my opinion to
19 the extent they relate to the loans that are
20 the subject of my opinion.
21         I have not been asked to offer an
22 opinion, nor do I expect to, with respect to
23 any other aspect of the protocol, what happened
24 under the protocol or anything else.
25     Q.    Okay.  So you said that (as read):

1          James H. Aronoff
2          To the extent the reviewing of
3  loans and the determination that breach
4  findings were material and adverse was a
5  necessary part of the protocol procedures
6  that the parties agreed to undertake,
7  those are part of my opinion to the
8  extent they relate to loans that are the
9  subject of my opinion.
10         Is that correct?
11         MR. HEALY:  Objection to form.
12     A.    That sounds like what I said.  I
13 don't have the benefit of the reader in front
14 of me.
15     Q.    What about to the extent they
16 relate to loans that are not the subject of
17 your opinion?
18         MR. HEALY:  Objection, vague,
19     ambiguous and confusing.
20     Q.    Are you going to opine on the
21 protocol process, the process of loan review
22 under the protocol, to the extent it relates to
23 loans that are not part of your opinion here in
24 these reports?
25     A.    I have not been asked to.

1          James H. Aronoff
2          MR. DAVIS:  Okay.  I'm just going
3  to say here before we conclude that after
4  seven hours of testimony, I believe the
5  witness has given an answer that's
6  somewhat different than what he gave me
7  prior.  I believe that's another
8  indication that we should have some
9  additional time with him.
10         MR. HEALY:  Well, Mr. Davis, I
11 don't think it's surprising that late on
12 a Friday afternoon or early on a Friday
13 evening, as it turns out, that we would
14 disagree on that, as among other issues.
15 So I think on that note, we should
16 conclude.
17         MR. DAVIS:  We can agree to
18 disagree.  Have a good evening.
19         MR. HEALY:  You, too.
20         VIDEO TECHNICIAN:  The time is
21 7:08 p.m.  We're concluded and off the
22 record.
23
24
25

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Chapter 11

Case No. 08-13555(SCC)

-----------------------------------x

IN RE

LEHMAN BROTHERS HOLDINGS INC., et al.,

                    Debtors.

-----------------------------------x

                September 28, 2017

                9:36 a.m.




        Videotaped Deposition of EDMOND

ESSES, taken by Debtors, pursuant to

Notice, held at the offices of Willkie Farr

& Gallagher LLP, 787 Seventh Avenue, New

York, New York, before Todd DeSimone, a

Registered Professional Reporter and Notary

Public of the State of New York.

1          E. ESSES
2  vague, confusing and inaccurate.
3          But you can answer that yes or
4  no.
5     A.   I do know the answer to that,
6  and the answer is no, they were not
7  withdrawn.
8          MR. HEALY:  Mr. Esses, let me
9  be clear about this.  You are not to
10 testify about any information you have
11 about claims that may or may not be being
12 pursued -- or may not be being pursued in
13 the estimation hearing that was derived
14 either through your communications with
15 Mr. Aronoff or any other expert or counsel.
16        THE WITNESS:  Okay.
17    Q.   Do you know from a source other
18 than counsel or Mr. Aronoff whether
19 loans -- whether claims that were made
20 against the Lehman estate in the course of
21 the protocol are no longer the subject of
22 this estimation proceeding?
23        MR. HEALY:  I'll object to the
24 form of the question.  Are you excluding
25 whatever may have been said in other expert

1          E. ESSES
2  reports?
3          MR. ROLLIN:  I am only trying
4  to follow and be consistent with the
5  instruction that you gave him.
6          I just want to know if he knows
7  from a non-privileged, non-confidential
8  source whether claims that were made
9  against the Lehman estate in the protocol
10 are no longer the subject of this
11 estimation proceeding.
12        MR. HEALY:  So I'm going to
13 re-interpose my objection to form.  I'm
14 going to instruct the witness that he can
15 answer that question yes or no.
16    A.   Yes.
17    Q.   How do you know that?
18    A.   I am generally aware of the
19 claims that are subject to Mr. Aronoff's
20 report.
21    Q.   And so you know that
22 Mr. Aronoff's report includes fewer claims
23 than those that were submitted against the
24 Lehman estate in the protocol?
25    A.   Yes.

1          E. ESSES
2     Q.   Do you know why?  Just yes or
3  no.
4          MR. HEALY:  I don't think you
5  are entitled to inquire as to what his
6  knowledge is on the subject.
7          MR. ROLLIN:  I'm not asking
8  what his knowledge is.  I just want to know
9  if he knows why.
10        MR. HEALY:  We have an
11 agreement that this does not constitute a
12 waiver of any privilege or protection, his
13 answering yes or no?
14        MR. ROLLIN:  Yeah, I don't
15 believe that is intended to invade a
16 privilege or protection.
17        MR. HEALY:  Okay.  So we have
18 such a stipulation, not be asserted to be a
19 waiver of any privilege or protection?
20        MR. ROLLIN:  Yes, this answer,
21 no, I won't assert that.
22        MR. HEALY:  All right, yes or
23 no answer.
24    A.   Can you repeat the question,
25 please?

1          E. ESSES
2     Q.   I would be happy to.
3          Do you know why?
4     A.   Was that the end of the
5  question?
6     Q.   Yes.
7     A.   Do I know why, what?  I'm
8  sorry, just please repeat the question.
9     Q.   Do you know why Mr. Aronoff's
10 report includes fewer claims than those
11 that were submitted against the Lehman
12 estate in the protocol?
13    A.   I do not.
14    Q.   Do you have any information
15 about who does?
16        MR. HEALY:  I think you've
17 strayed too far.  He is instructed not to
18 answer that question.
19    Q.   You are going to follow that
20 instruction?
21    A.   Yes.
22    Q.   In the quality control process
23 performed at Duff & Phelps, did the QCers
24 do anything to verify the underlying facts
25 of any particular claim?

34 (Pages 130 - 133)

E. ESSES

1  E. ESSES
2      MR. HEALY: Objection to the
3  form of the question, vague and ambiguous.
4      A.   They did, yes.
5      Q.   What did they do?
6      A.   To the extent necessary, they
7  reviewed the packet of supporting evidence.
8      Q.   I mean reverify the facts that
9  the review firms offered in support of the
10 breach findings.
11     MR. HEALY: Objection to the
12 form of the question. I'm not sure what
13 that means. Vague and ambiguous.
14     A.   I thought I answered that
15 question.
16     Q.   Did they -- let's take, for an
17 example, a review firm contacts -- runs a
18 BLS report; do you know what I'm talking
19 about?
20     A.   I do, yes.
21     Q.   Did the QC process rerun, just
22 for purposes of this example, a BLS report?
23     A.   No, we didn't think that was
24 necessary.
25     Q.   And now expanding it beyond

1  E. ESSES
2  just BLS, using that as an example of a
3  reverification, did the QC process at Duff
4  & Phelps perform any other factual
5  reverifications?
6      A.   As I've described that level of
7  review, they confirmed the facts and that
8  the description -- the description
9  accurately described -- described the facts
10 of the breach, and, to the extent
11 necessary, verified the support -- that the
12 supporting documents supported that breach.
13     Q.   What do you mean by "confirmed
14 the facts," when you say "they confirmed
15 the facts"?
16     A.   So in the context of my prior
17 answer, that the finding articulated a
18 clear basis for the breach finding, and, to
19 the extent necessary, reviewed the
20 underlying supporting documentation.
21     Q.   But did not go to the outside
22 source that the loan review firm may have
23 gone to to double-check that work?
24     A.   That was not part of the scope
25 of their review.

1  E. ESSES
2      Q.   So that's not something they
3  did, right?
4      A.   It's possible they did that on
5  occasion, but that was not part of the
6  scope of that quality control level of
7  review.
8      Q.   And it wasn't in the scope of
9  the work above that quality control level
10 of review at Duff & Phelps either, was it?
11     A.   To the extent Mr. Campbell and
12 Mr. Aronoff felt it was necessary to
13 confirm, but there was a process -- there
14 was a -- there was a back and forth between
15 the review firms, or if they had questions,
16 Mr. Campbell discussed those questions with
17 the review firms.
18     Q.   No, I understand that. I'm
19 trying to understand whether once it got
20 past those two levels of Duff & Phelps
21 review, whether there was any process to
22 reconfirm the facts.
23     A.   Well, the original facts were
24 produced by a review firm, who these
25 particular review firms had significant

1  E. ESSES
2  experience and understanding of the review
3  firm. So no, we didn't deem that
4  necessary.
5      Q.   Did anybody at Duff & Phelps do
6  any recalculation of DTIs?
7      A.   It's possible. I'm not,
8  sitting here, I'm not exactly sure.
9      Q.   But it wasn't something that
10 was done in the ordinary course of Duff &
11 Phelps' work in this case, correct?
12     MR. HEALY: Objection to form.
13     A.   You know, it may, depending on
14 the breach finding, it may have been
15 warranted. I'm not, you know, I'm not
16 specifically sure that -- there weren't
17 instructions to recalculate it in every
18 single instance.
19     Q.   When you say "they," you mean
20 the QC reviewers at Duff & Phelps?
21     A.   QC 1 and QC 2.
22     Q.   And they weren't
23 specifically -- you said there weren't
24 instructions to recalculate it in every
25 single instance. There weren't

35 (Pages 134 - 137)

# EXHIBIT E

** C O N F I D E N T I A L **

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Chapter 11

Case No. 08-13555(SCC)

-----------------------------------x

IN RE

LEHMAN BROTHERS HOLDINGS INC., et al.,

                Debtors.

-----------------------------------x
                    November 17, 2017
                    9:37 a.m.

VOLUME III

      Continued Videotaped Deposition of

JAMES H. ARONOFF, taken by Plan

Administrator, pursuant to Notice, held at

the offices of Willkie Farr & Gallagher

LLP, 787 Seventh Avenue, New York, New

York, before Todd DeSimone, a Registered

Professional Reporter and Notary Public of

the State of New York.

ARONOFF

1
2     A.    I don't know what the trustees'
3  view would be.  I haven't thought about
4  whether or not I think this borrower lied
5  or not.
6          MR. DAVIS:  Okay, I appear to
7  be out of time.
8          MR. HEALY:  I have a few
9  questions, Mr. Aronoff.  Do you need a
10  break before we continue?
11          MR. DAVIS:  I do actually.
12          MR. HEALY:  Okay.
13          THE VIDEOGRAPHER:  The time is
14  2:23.  We are going off the record.
15          (Recess taken.)
16          THE VIDEOGRAPHER:  The time is
17  2:36.  We are back on the record.
18  EXAMINATION BY MR. HEALY:
19     Q.    Mr. Aronoff, I'm going to refer
20  you to the last line of questioning by
21  Mr. Davis before we finished.
22          Do you have a view as to
23  whether the facts that support the breach
24  findings for misrepresentation claims that
25  are the subject of your report in many

ARONOFF

1
2  instances support the conclusion that the
3  borrower was in fact intentionally making a
4  misstatement?
5          MR. DAVIS:  Objection, leading.
6     A.    Yes.
7     Q.    What is your view?
8          MR. DAVIS:  Leading.
9     A.    That although a showing of
10  intention is not required to support a
11  misrepresentation breach finding, given the
12  nature of the misstatements or the enormous
13  difference between, in many cases, the
14  statements that were made in order to
15  secure the loan and the actual facts that
16  were uncovered or identified in the
17  forensic review, I believe that in the vast
18  majority of cases the statements made by
19  the borrowers were intentional.
20     Q.    Would you turn to Exhibit 67,
21  that is PA Exhibit 67.  Is that a copy of
22  your affirmative expert report in this
23  case?
24     A.    Yes.
25     Q.    Would you turn to page 43 of

ARONOFF

1
2  that report.  Now, on pages 43 and 44, do
3  you describe certain criteria that apply to
4  the misrepresentation of income breach
5  findings that are the subject of your
6  report?
7          MR. DAVIS:  Objection, vague.
8     A.    Yes.
9     Q.    Let's start on page 43.  You
10  see that it says that the review firms were
11  instructed to use a 5 percent variance
12  between the misstated income and verified
13  income as a threshold for determining the
14  significance of an income
15  misrepresentation?
16     A.    I see that.
17     Q.    Was that a criteria that was
18  used during the course of the loan review
19  process conducted during the protocol
20  process?
21     A.    Yes, that's correct.
22     Q.    Do you have a view as to
23  whether a misrepresentation of income that
24  was less than 5 percent would still be a
25  valid breach?

ARONOFF

1
2          MR. DAVIS:  Leading.
3     A.    Yes.
4     Q.    What's your view?
5     A.    It still is a valid breach
6  claim because it would -- to the extent
7  there was a misstatement of income that was
8  material and adverse to the interests of
9  investors, that would provide a claim.
10  There is no variance in the rep or there is
11  no variance in fact, in custom and
12  practice.
13     Q.    To the extent that a
14  misrepresentation of income breach finding
15  was submitted during the protocol that had
16  associated with it a less than 5 percent
17  variance and that breach finding is not a
18  subject of your report, does that indicate
19  that there was some deficiency in the
20  process, that was conducted during the
21  protocol process?
22          MR. DAVIS:  Objection, leading,
23  incomplete hypothetical.
24     A.    No, not in any way.
25     Q.    Would you go to page 44.  Now,

```
1                  ARONOFF
2    in the first paragraph on page 44, you
3    discuss the difference between same-year
4    and near-year evidence.  Do you see that?
5        A.    Yes.
6        Q.    And do you see that you
7    describe certain criteria that apply to the
8    loans within -- that are the subject of
9    your report that are based upon near-year
10   evidence, do you see that?
11       A.    Yes.
12       Q.    Now, towards the bottom of that
13   paragraph it states "The breach findings
14   supported by near-year evidence for
15   salaried borrowers are based only on
16   evidence showing variances of at least 30
17   percent between the represented and
18   verified income, if the loan was originated
19   in 2007 and later."
20           Do you see that?
21           MR. DAVIS:  I'm going to
22   object.  This is outside the scope of my
23   examination, it is not proper cross, and it
24   is leading.
25       Q.    You can answer the question,
```

```
1                  ARONOFF
2    Mr. Aronoff.
3        A.    I do see that.
4        Q.    Was that a criteria or a screen
5    that was applied during the protocol
6    process?
7            MR. DAVIS:  Same objections.
8        A.    No.
9        Q.    Do you have a view as to
10   whether breach findings that did not
11   satisfy that criteria that were put forth
12   during the protocol process were valid
13   breach findings?
14           MR. DAVIS:  Same objections.
15       A.    Yes, they were valid breach
16   findings.
17       Q.    Does the fact that that
18   category of breach findings is not included
19   in the loans that are the subject of your
20   report cause you any concerns about the
21   reliability of the loan review process that
22   was conducted during the protocol process
23   on behalf of the trustees?
24           MR. DAVIS:  Counsel, at this
25   point I'm going to object.  This line of
```

```
1                  ARONOFF
2    examination is improper, it is outside the
3    scope of my examination, and if you are
4    going where I think you are going, it is
5    too late to introduce evidence in this case
6    on a subject that the trustees have taken
7    the position is protected as privileged.
8            If you keep down this road, you
9    proceed at your own peril and in the Plan
10   Administrator's view you will be waiving
11   attorney-client privileges and work product
12   protections on this subject.
13       Q.    To be clear, Mr. Aronoff, I'm
14   not asking you for any information that you
15   have that you received from counsel or that
16   was derived from communications with
17   counsel.  Do you understand that
18   instruction?
19           MR. DAVIS:  And to be clear,
20   Mr. Healy, that does not cure the issue, in
21   our view.  Proceed if you wish.
22       Q.    Mr. Aronoff, do you understand
23   the instruction?
24           THE WITNESS:  Can I hear the
25   instruction again, please?
```

```
1                  ARONOFF
2            (The record was read.)
3            MR. DAVIS:  Same objections.
4    Outside the scope of my examination.
5            MR. HEALY:  Can you now reread
6    the question that I asked Mr. Aronoff to
7    which Mr. Davis objected.
8            (The record was read.)
9            MR. DAVIS:  And vague.
10       A.    No.
11       Q.    Now, the next paragraph on page
12   44 talks about the use of near-year
13   evidence for misrepresentation of income
14   claims asserted with respect to
15   self-employed borrowers.  Do you see that?
16           MR. DAVIS:  Leading.  Same
17   objections.
18       A.    Yes.
19       Q.    And in the second sentence it
20   says that "The breach findings supported by
21   near-year evidence for self-employed
22   borrowers are based only on evidence
23   showing variances of at least 100 percent
24   between the misstated and verified income
25   if the evidence was at least two years from
```

1        ARONOFF
2   origination and at least 50 percent for
3   loans originated in 2007 and later."
4        Do you see that?
5        MR. DAVIS:  Same objection.
6   A.   I do.
7   Q.    Were the criteria that are set
8   forth in that sentence applied during the
9   course of the protocol process?
10        MR. DAVIS:  Same objections.
11   A.   No.
12   Q.    Does the fact that breach
13   findings that did not satisfy those
14   criteria are not included in the scope of
15   your report suggest to you that there was
16   some deficiency or unreliability in the
17   loan review process conducted during the
18   protocol on behalf of the trustees?
19        MR. DAVIS:  Same objections,
20   leading, outside the scope.
21   A.   No, it does not.
22   Q.    With respect to the last two
23   answers that you have given me with respect
24   to these two criteria and the prior
25   criteria with respect to salaried

1        ARONOFF
2   borrowers, can you explain why you don't
3   think the omission of those categories from
4   the scope of your report creates any
5   uncertainty about the reliability of the
6   process?
7        MR. DAVIS:  Compound, leading,
8   outside the scope of my examination,
9   improper cross, or direct.
10        THE WITNESS:  Can I hear the
11   question, please.
12        (The record was read.)
13        MR. DAVIS:  Also lacks
14   foundation.
15        MR. HEALY:  I'm going to break
16   it down actually.
17   Q.    Let's go to page 44 and look at
18   the last sentence in the first paragraph of
19   page 44.  Are you with me?
20   A.    The last sentence in the first
21   paragraph, yes.
22   Q.    Can you explain why you do not
23   think that the omission of breach findings
24   that do not satisfy that criteria does not
25   render -- raise any concern about the

1        ARONOFF
2   reliability of the loan review process
3   conducted during the protocol process on
4   behalf of the trustees?
5        MR. DAVIS:  Objection, vague,
6   leading, outside the scope of my opinion,
7   and this appears to be counsel's attempt to
8   elicit new opinions three days before the
9   beginning of trial from this witness,
10   entirely inappropriate.
11   Q.    You can answer the question,
12   Mr. Aronoff.
13   A.    The reason is that, as I stated
14   previously, the way in which the breach
15   findings were ascertained under the
16   protocol with a 5 percent variance was
17   appropriate, thoughtful, reasonable and
18   well within industry custom and practice.
19   So to the extent a more stringent or
20   conservative subset of that universe, using
21   a 30 percent in certain instances,
22   certainly would not in any way affect my
23   view that what was submitted under the
24   protocol was valid and reasonable.
25   Q.    Let me ask you to look at the

1        ARONOFF
2   second to last sentence in the final
3   paragraph on page 44.
4   A.    Okay.
5   Q.    Can you explain why the
6   omission of loans that do not satisfy
7   either one of those criteria from the loans
8   that are the subject of your report does
9   not cause you any concern about the
10   reliability of the loan review process
11   conducted during the protocol on behalf of
12   the trustees?
13        MR. DAVIS:  Same objections,
14   vague, leading, outside the scope of my
15   direct -- or my cross, sorry.
16   A.    The same answer.  This is a --
17   this is a subset of the claims that were
18   made under the protocol, which I believe
19   were reasonable and valid, and so to the
20   extent this is simply more conservative
21   standards as to which -- as to which claims
22   will be pursued doesn't affect the --
23   doesn't affect that in any way.
24   Q.    Could I ask you to turn to
25   Exhibit 68, please.  Would you look at

ARONOFF

1        ARONOFF
2  paragraph 38, please. I'm sorry, is this a
3  copy of your rebuttal report?
4     A.   Yes.
5     Q.   Would you look at paragraph 38,
6  please. Just take a moment and look at
7  that.
8        (Witness perusing document.)
9     A.   Okay.
10    Q.   Now, this paragraph discusses
11  the use of BLS; is that correct?
12    A.   Yes.
13    Q.   And do you see that it says
14  that BLS was used to provide information
15  regarding income for employed wage earners,
16  do you see that?
17    A.   Yes.
18    Q.   Are there instances where it
19  may be appropriate to use BLS for wage
20  earners -- strike that.
21      Are there instances where it
22  may be appropriate to use BLS to evaluate
23  the income for wage earners who are
24  formerly self-employed but have the
25  characteristics of salaried borrowers?

1        ARONOFF
2     MR. DAVIS:  Leading.
3    A.   Yes.
4    Q.   Can you explain that?
5     MR. DAVIS:  Same objection.
6    A.   For purposes of the protocol,
7  there were some instances, although not
8  many, where the nature of the income -- the
9  nature of the job performed by the
10  borrower, despite the fact that they were
11  technically self-employed as an independent
12  contractor, for example, would allow the
13  use of BLS as an appropriate reference
14  point for their income, primarily because
15  they would be performing a function and
16  engaged in a job that was almost identical
17  to a job a wage earner would have been
18  involved in.
19      And an example that comes to
20  mind, a couple of examples that come to
21  mind are a barber who generally gets paid
22  the same amount whether they happen to be a
23  W-2 employee of a barbershop or whether
24  they are an independent contractor who
25  rents a chair in a barbershop, or a limo

1        ARONOFF
2  driver who may work for a limo company as a
3  W-2 employee or who may be a 1099 employee
4  of that same company.
5    Q.   If breach findings using BLS
6  relating to self-employed borrowers of the
7  type that you described were omitted from
8  your loans, that is the loans that are the
9  subject of your report, does that cause you
10  to have concerns about the reliability of
11  the loan review process that was used
12  during the protocol on behalf of the
13  trustees?
14    A.   Not at all.
15     MR. DAVIS:  Same objections,
16  vague, leading, outside the scope of my
17  examination.
18    Q.   Can you tell us why you hold
19  that view?
20     MR. DAVIS:  Same objections.
21    A.   Because the use of BLS in the
22  fashion I described for those particular
23  types of jobs is perfectly consistent with
24  industry custom and practice in terms of a
25  valid -- valid support for a breach of rep

1        ARONOFF
2  and warranty, and so the fact that those
3  loans weren't -- don't happen to be the
4  subject of my report, if that's what your
5  question is saying, doesn't in any way
6  speak to the validity of those claims made
7  under the protocol.
8    Q.   Does the effect of the criteria
9  that we've discussed that apply to the
10  loans that are the subject of your report
11  and that are described in your report serve
12  to render the breach findings that you do
13  address more conservative?
14     MR. DAVIS:  Same objections,
15  vague, leading, outside the scope.
16    A.   I believe they do, yes.
17    Q.   But they don't undermine the
18  reliability of the process that was used to
19  identify breach findings that may have been
20  omitted from your report?
21     MR. DAVIS:  Same objections,
22  outside the scope of my examination,
23  leading, vague.
24    Q.   Is that correct?
25     MR. DAVIS:  Same objections.

1        ARONOFF
2     A.    That's correct.
3     Q.    Do you understand that
4  arguments have been advanced that the
5  omission of breach claims from the scope of
6  your report undermines the reliability of
7  the process?
8        MR. DAVIS:  Mr. Healy, all of
9  this is outside the scope of my
10  examination, so on what basis do you think
11  you can examine this witness on these
12  subjects?
13        MR. HEALY:  I believe that this
14  is appropriate cross-examination and
15  redirect based upon your examination during
16  the course of your deposition of
17  Mr. Aronoff.  I'm sure if you don't think
18  so you will make an appropriate objection
19  to the extent that we ever have occasion to
20  try to introduce this into evidence.
21        MR. DAVIS:  How long do you
22  intend to continue this line of
23  examination?
24        MR. HEALY:  Just a few more
25  minutes.

1        ARONOFF
2        MR. DAVIS:  Because otherwise I
3  would like to get the judge on the phone
4  and have her rule on this.
5        MR. HEALY:  We will be done in
6  a few minutes.
7        THE WITNESS:  Can I hear the
8  question again, please.
9        (The record was read.)
10        MR. DAVIS:  Same objections.
11     A.    Yes, Mr. Grice asserts that.
12     Q.    Do you know how many breach
13  findings -- strike that -- loans have been
14  identified as breaching loans at the end of
15  the protocol process?
16        MR. DAVIS:  Same objections.
17     A.    Approximately 92,000.
18     Q.    Does 94,000 sound as if that is
19  the correct number?
20        MR. DAVIS:  Leading, same
21  objections.
22     A.    I think 94,000 loans is the
23  number of loans that was actually submitted
24  during the protocol process.
25     Q.    And do you recall how many of

1        ARONOFF
2  those remained at the end of the protocol
3  process?
4        MR. DAVIS:  Same objections.
5     A.    About 92,000.
6     Q.    Do you have any understanding
7  as to why the number was reduced?
8        MR. DAVIS:  Same objections.
9     A.    I think based on a status
10  report I reviewed, the difference would
11  have been loans that were submitted that
12  had paid off or were the subject of trusts
13  that terminated, or loans that were
14  withdrawn.
15     Q.    Does the fact that loans may
16  have been -- claims may have been withdrawn
17  during the course of the protocol process
18  cause you any concerns about the
19  reliability of the process?
20        MR. DAVIS:  Same objections.
21     A.    No.
22     Q.    Does the fact that categories
23  of breach claims are omitted from your
24  report, that is -- strike that.
25        Does the fact that categories

1        ARONOFF
2  of breach claims that were asserted during
3  the protocol were omitted from your report
4  suggest to you that there were systemic
5  problems with the loan review process?
6        MR. DAVIS:  Same objections.
7     A.    No.
8     Q.    Can you explain that?
9        MR. DAVIS:  Same objections.
10     A.    I was -- I reviewed the
11  protocol process was appropriate and
12  reasonable to produce the results that it
13  produced and I reviewed the breach claims
14  that were the subject of my report and I
15  don't see what a difference in the number
16  of breach claims under my report that
17  happened to go through the protocol process
18  have anything to say about the validity of
19  loans that were submitted under the
20  protocol.
21     Q.    Do you have any other bases for
22  your view?
23        MR. DAVIS:  Same objection,
24  vague.
25     A.    No bases for my view in this

ARONOFF

1
2 case. However, I will note that in my
3 experience it is fairly common and not
4 unusual at all for the number of valid
5 claims that come out of a forensic loan
6 review to be a larger universe of loans
7 than are ultimately the subject matter of
8 the related action. So the fact that that
9 happened here causes me no pause at all.
10    Q.    Does the fact that some of the
11 categories of breach findings that you do
12 address in your report not -- strike that.
13       Does the fact that not all of
14 the loans or claims that were identified
15 during the protocol process are included
16 within the categories of breach findings
17 that you do address create any concern on
18 your part about the reliability of the loan
19 review process?
20       MR. DAVIS:  Objection, outside
21 the scope, leading, and vague.
22    A.    No.
23    Q.    Do you have an understanding
24 that the -- strike that.
25       Let's turn back to the

ARONOFF

1
2 misrepresentation breach claims that we
3 talked about a few minutes ago. I know
4 that you told me in your testimony that
5 there were various reasons why those --
6 certain claims within those categories may
7 have been dropped, but let me -- let me ask
8 you to assume that all of the breach
9 findings for misrepresentation of income
10 that are not being pursued in this
11 proceeding were dropped because they were
12 the result of errors, and let me further
13 ask you to assume that out of a total of
14 some 37,000 breach claims that were put
15 forward in the protocol, approximately
16 2,895 were not being pursued at the
17 estimation hearing.
18    A.    How many?
19    Q.    2,895 out of 37,313. And let
20 me ask you to assume that that represents
21 about a 7.8 percent.
22       Does that fact cause you to
23 conclude that there was a systemic
24 deficiency in the loan review process that
25 was conducted on behalf of the trustees

ARONOFF

1
2 during the protocol?
3       MR. DAVIS:  Objection.
4    A.    No.
5       MR. DAVIS:  Hold on. You are
6 leading this witness obviously by the nose.
7 You are asking him about topics that I did
8 not cover over the last two days of
9 deposition, and, as I said before, you are
10 proceeding at your own peril.
11    Q.    Can you explain the reason for
12 your response?
13       MR. DAVIS:  Same objections.
14    A.    Even assuming that there was an
15 error rate of 7 percent with respect to a
16 particular category of breach finding,
17 which I don't think there was, that's not
18 to say there might not have been errors,
19 the fact that there is an error on an
20 individual loan or a small group of loans,
21 given that the analysis was done on a
22 loan-by-loan basis based on specific
23 information as it related to each specific
24 loan that was the subject of the review,
25 there's no correlation or relationship

ARONOFF

1
2 between an error in one loan and a
3 potential error in the loans for which
4 there is no error, particularly if the
5 opportunity exists to review the 93 percent
6 that in your hypothetical don't contain
7 errors.
8    Q.    Did the Plan Administrator have
9 the opportunity to review the 93 percent of
10 misrepresentation of income loans that I've
11 asked about in my hypothetical?
12       MR. DAVIS:  Same objections.
13    Q.    Let me ask it another way.
14       Did the Plan Administrator have
15 the opportunity to review and respond to
16 each of the breach claim submissions made
17 by the trustees during the course of the
18 protocol?
19       MR. DAVIS:  Same objections.
20    A.    That was my understanding.
21    Q.    And in your reports have you
22 described the nature of the Plan
23 Administrator's responses submitted during
24 the protocol process?
25       MR. DAVIS:  Same objections.

```
1           ARONOFF
2     A.    Yes.
3     Q.    And is it your view that for
4  the vast majority of instances the Plan
5  Administrator offered no particularized
6  objection --
7           MR. DAVIS:  Same objections.
8     Q.    -- to the breach claims
9  submitted by the trustees?
10          MR. DAVIS:  Same objections.
11          THE WITNESS:  Can I hear the
12 question again, please.
13          (The record was read.)
14    A.    Yes.
15    Q.    And I just talked to you about
16 misrepresentation of income.
17          Let me talk to you about
18 misrepresentation of occupancy.  Let me ask
19 you to assume that of the claims submitted
20 with a misrepresentation of occupancy
21 breach finding during the protocol,
22 approximately 1.3 percent of those are not
23 the subject of your report.
24          MR. DAVIS:  Same objections.
25    Q.    And let me ask you to assume
```

```
1           ARONOFF
2  that the 1.3 percent were all withdrawn on
3  the basis that there was some error in the
4  breach finding that was submitted during
5  the protocol process.
6           MR. DAVIS:  Same objections.
7     Q.    Does that give you any concern
8  that there are some systemic deficiencies
9  in the loan review process that was
10 conducted during the protocol on behalf of
11 the trustees?
12          MR. DAVIS:  Same objections.
13    A.    No.  I mean, that means 99
14 percent of the claims were correct.
15    Q.    Let me ask you about
16 misrepresentation of debt obligations, and
17 let me ask you to assume that 3.7 percent
18 of the misrepresentation of debt obligation
19 breach findings submitted during the
20 protocol process are not the subject of
21 your report.
22          MR. DAVIS:  Same continuing
23 objections.
24    Q.    Let me further ask you to
25 assume that all of the breach findings
```

```
1           ARONOFF
2  represented in that 3.7 percent had some
3  error associated with the breach finding.
4           Do you have a view as to
5  whether that fact indicates a systemic
6  deficiency in the loan review process that
7  was conducted on behalf of the trustees
8  during the protocol?
9           MR. DAVIS:  Same objections,
10 and I would add, Mr. Healy, that the judge
11 just told you yesterday that it was too
12 late to put in additional expert opinions,
13 and effectively what you are doing is
14 eliciting an improper sur-reply.
15    Q.    Could you answer my question,
16 please?
17          THE WITNESS:  I need to hear
18 the question again, please.
19          (The record was read.)
20    A.    I don't think those -- the
21 facts in your hypothetical that you asked
22 me to assume reflect a deficiency in the
23 process for the same reasons I stated with
24 respect to the misrepresentation of income
25 hypothetical.
```

```
1           ARONOFF
2     Q.    And let me ask you, finally,
3  about excessive DTI breach findings.  Let
4  me ask you to assume that approximately 6
5  percent of the excessive DTI breach
6  findings that were submitted during the
7  protocol process are not included in the
8  excessive DTI breach findings that are the
9  subject of your report.
10          MR. DAVIS:  Same objections.
11 Mr. Healy, may I ask you, are you reading
12 from one of our expert reports?
13          MR. HEALY:  I am not reading
14 from the body of one of your expert
15 reports.
16          MR. DAVIS:  Are you referring
17 to one of our expert reports as you ask
18 these questions?
19          MR. HEALY:  I'm asking the
20 witness hypotheticals.
21          MR. DAVIS:  You are not going
22 to answer my question whether you are
23 referring to one of our expert reports?
24          MR. HEALY:  I don't think I
25 have an obligation to respond to that.  I'm
```

1          ARONOFF
2 asking the witness a hypothetical.
3          MR. DAVIS:  That is fine.  The
4 judge can ask you that question.  Same
5 objections.
6          THE WITNESS:  I need to hear
7 the question again, I'm sorry.
8      Q.    Let me start again.
9          So we are talking about
10 excessive DTI breach findings.  Are you
11 with me?
12     A.    Yes.
13     Q.    So let me ask you to assume
14 that 6 percent of the excessive DTI breach
15 findings identified during the protocol
16 process are not the subject of your expert
17 opinion, and let me ask you to assume for
18 purposes of this question that all of the
19 breach findings represented by that 6
20 percent contain some error with respect to
21 the breach finding.
22         Does that fact cause you to
23 believe that the loan review process
24 conducted during the protocol on behalf of
25 the trustees suffered from some systemic

1          ARONOFF
2 deficiency?
3          MR. DAVIS:  Same objections,
4 and vague.
5      A.    No, for the same reasons as
6 I've stated with respect to the prior
7 hypotheticals.
8          MR. HEALY:  I pass the witness.
9          MR. DAVIS:  I need to take a
10 break.
11         THE VIDEOGRAPHER:  The time is
12 3:13.  We are going off the record.
13         (Recess taken.)
14         THE VIDEOGRAPHER:  The time is
15 3:36.  We are back on the record.  This
16 will be the start of media unit number
17 four.
18 EXAMINATION BY MR. DAVIS:
19     Q.    Mr. Aronoff, when did you first
20 form the opinions you just offered in
21 response to Mr. Healy's questions?
22     A.    The answers that I gave to the
23 questions were based on understandings and
24 beliefs that I have had probably since I
25 offered my affirmative report.  But the

1          ARONOFF
2 ones with respect to Mr. Grice's comments
3 about the impact of a mistake on any
4 individual loan may have on the process or
5 the loans that were the subject of my
6 report we discussed yesterday and is
7 discussed in my reply report.
8      Q.    Why didn't you provide all of
9 the opinions you just offered in response
10 to Mr. Healy's questions in your reply
11 report?
12         MR. HEALY:  Objection, overly
13 broad, vague and ambiguous, argumentative,
14 assumes facts.
15     A.    I provided the same opinions in
16 my reply report as I just offered now in
17 different contexts.  The specific context
18 and specific hypotheticals that I addressed
19 just now I was not asked to opine on in my
20 reports.
21     Q.    Okay.  So you are telling me
22 that you provided the opinions you just
23 gave in response to Mr. Healy's questions
24 in your reply report; is that right?
25         MR. HEALY:  Objection to form,

1          ARONOFF
2 misstates his testimony.
3      A.    That's not what I said.
4      Q.    Okay.  So that's not correct?
5      A.    That's not correct.
6      Q.    Okay.  Why didn't you provide
7 those opinions that you just gave in
8 response to Mr. Healy's questions in your
9 reply report?
10         MR. HEALY:  Objection, assumes
11 that Mr. Grice had submitted his reply
12 report before Mr. Aronoff submitted his
13 reply report.
14         MR. DAVIS:  That's an improper
15 speaking objection.
16         MR. HEALY:  It is a totally
17 confusing and misleading question.
18         THE WITNESS:  Could I hear the
19 question that is standing, please.
20         (The record was read.)
21     A.    Because I didn't just give any
22 opinions.  I answered questions that were
23 asked of me.
24     Q.    So you didn't give any opinions
25 in response to Mr. Healy's questions just

ARONOFF

1
2  now?
3      A.   That's correct.  I provided
4  answers to questions regarding
5  hypotheticals.  I was asked my impressions.
6  I was asked to elaborate on answers I gave.
7  I didn't offer any new opinions in the
8  questions that I was just asked.  I
9  answered questions I was asked.  If you
10  want to characterize everything I say as an
11  opinion, then I guess little low opinion,
12  we agree to disagree.
13        THE WITNESS:  Are we still on
14  the record?
15        MR. DAVIS:  Yes.  We will be
16  right back.
17        MR. HEALY:  Objection.  You are
18  leaving the room.  We're on the record.
19        MS. SEABURY:  Please keep the
20  tape running.  Please note for the
21  record --
22        MR. HEALY:  So let us note for
23  the record that Mr. Davis, together with
24  his colleagues on the other side of the
25  table, have exited the room and declined to

ARONOFF

1
2  go off the record while doing so.
3        (Pause.)
4  BY MR. DAVIS:
5      Q.   Mr. Aronoff, are you saying
6  that the loans that remain in the case are
7  a more conservative set than the loans that
8  were submitted to the protocol, is that the
9  opinion I heard you provide a few moments
10  ago?
11      A.   Again, I didn't offer an
12  opinion in response to any questions that
13  were asked, and, second, no, that's not
14  what I'm saying.  That's not how I answered
15  the question.
16        MR. DAVIS:  Okay, no further
17  questions.
18  EXAMINATION BY MR. HEALY:
19      Q.   Mr. Aronoff, are the criteria
20  that apply to the loans that you looked at
21  that we discussed during my cross of you
22  this afternoon reflected in your earlier
23  reports?
24        MR. DAVIS:  Objection, leading.
25  Same objections as before.

ARONOFF

1
2      A.   Yes.
3      Q.   Did you identify any new
4  screens or criteria that apply to the loans
5  that were the subject of your report in
6  your testimony today?
7        MR. DAVIS:  Same objections,
8  and it's outside the scope of my recross.
9      A.   No.
10      Q.   I wanted to clarify one
11  question that I asked you before.  I asked
12  you a hypothetical about misrepresentation
13  of occupancy and I had intended to ask you
14  whether the fact that -- strike that.
15        I had intended to ask you to
16  assume that 1.3 percent of the breach
17  findings in the misrepresentation of
18  occupancy category that had been asserted
19  during the protocol had been withdrawn and
20  to further assume that all of those
21  withdrawn breach findings had errors
22  associated with them.  Is that how you
23  understood my hypothetical?
24        MR. DAVIS:  Wow, let's see,
25  this is outside the scope of my recross, it

ARONOFF

1
2  is outside the scope of my cross, so I
3  guess it is doubly outside the scope.  You
4  passed the witness and now you are going
5  back to your examination.  That is totally
6  improper.  And I will lodge the same
7  objections to this line of questioning as
8  to the prior.
9      Q.   Can you answer my question,
10  please?
11      A.   I understood -- I understand
12  the question as you phrased it now, and
13  that was how I understood the question to
14  have been posed previously.
15      Q.   And that's how you answered the
16  question?
17        MR. DAVIS:  Same objections.
18      A.   I answered it consistently with
19  that understanding.
20        MR. HEALY:  I have nothing
21  further.
22        MR. DAVIS:  No further
23  questions.
24        THE VIDEOGRAPHER:  This
25  concludes today's testimony given by James

## Page 640

```
 1              ARONOFF
 2   Aronoff.  The total number of media units
 3   used was four.  They will be retained by
 4   Veritext Legal Solutions.  And we are off
 5   the record at 3:48.
 6
 7        [TIME NOTED:  3:48 p.m.]
 8
 9
         _____
10          JAMES H. ARONOFF
11
     _____
12   Subscribed and sworn to
     before me this _____
13   day of _____, 2017.
14   _____
       Notary Public
15
16
17
18
19
20
21
22
23
24
25
```

## Page 641

```
 1
 2          I N D E X
 3
     WITNESS    EXAMINATION BY      PAGE
 4
     ARONOFF   DAVIS      468, 633
 5      HEALY       604, 637
 6
 7          E X H I B I T S
     PLAN ADMINISTRATOR   DESCRIPTION   PAGE
 8   Exhibit 146 USBANK3_001075786-    502
       001075798
 9   Exhibit 147 Expert Report of James  520
       H. Aronoff, Exhibit 16
10   Exhibit 148 LAWDEB4_001210933-    534
       001210935
11   Exhibit 149 USBANK3_000737522-    536
       00737549
12   Exhibit 150 USBANK4_019043568     540
     Exhibit 151 USBANK4_019043555     545
13   Exhibit 152 USBANK4_019043313-    545
       019043320
14   Exhibit 153 Expert Rebuttal Report  548
       of James H. Aronoff,
15      Exhibit 1
     Exhibit 154 WILMINGTON3_000444502-  555
16     000444589
     Exhibit 155 WILMINGTON4_011618217  573
17   Exhibit 156 WILMINGTON4_011618105-  573
       011618109
18   Exhibit 157 WILMINGTON4_011617953-  583
       011617955
19   Exhibit 158 WILMINGTON4_011618147-  584
       011618165
20   Exhibit 159 WILMINGTON3000307601-  587
       000307619
21   Exhibit 160 WILMINGTON4_009094297  594
     Exhibit 161 USBANK3_00534376-     595
22     00534405
     Exhibit 162 Expert Reply Report of  595
23     James H. Aronoff,
       Exhibit 1
24
25
```

## Page 642

```
 1
 2   DIRECTIONS NOT TO ANSWER
 3   Page    Line
         (NONE)
 4
 5
 6   REQUESTS
 7   Page    Line
         (NONE)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 643

```
 1
 2          CERTIFICATION
 3
 4      I, TODD DeSIMONE, a Notary Public for and
 5   within the State of New York, do hereby
 6   certify:
 7      That the witness whose testimony as
 8   herein set forth, was duly sworn by me; and
 9   that the within transcript is a true record
10   of the testimony given by said witness.
11      I further certify that I am not related
12   to any of the parties to this action by
13   blood or marriage, and that I am in no way
14   interested in the outcome of this matter.
15      IN WITNESS WHEREOF, I have hereunto set
16   my hand this 17th day of November, 2017.
17
18
         _____
19          TODD DESIMONE
20
21       *   *   *
22
23
24
25
```

1
2         ERRATA SHEET
        VERITEXT/NEW YORK REPORTING, LLC
3
    CASE NAME: IN RE LEHMAN BROTHERS
4   DATE OF DEPOSITION: 11/17/17
    WITNESS' NAME: JAMES H. ARONOFF
5
    PAGE/LINE(S)/   CHANGE     REASON
6   ___/___/___/_____/_____
   ___/___/___/_____/_____
7   ___/___/___/_____/_____
   ___/___/___/_____/_____
8   ___/___/___/_____/_____
   ___/___/___/_____/_____
9   ___/___/___/_____/_____
   ___/___/___/_____/_____
10  ___/___/___/_____/_____
   ___/___/___/_____/_____
11  ___/___/___/_____/_____
   ___/___/___/_____/_____
12  ___/___/___/_____/_____
   ___/___/___/_____/_____
13  ___/___/___/_____/_____
   ___/___/___/_____/_____
14  ___/___/___/_____/_____
   ___/___/___/_____/_____
15  ___/___/___/_____/_____
   ___/___/___/_____/_____
16  ___/___/___/_____/_____
   ___/___/___/_____/_____
17  ___/___/___/_____/_____
   ___/___/___/_____/_____
18  ___/___/___/_____/_____
   ___/___/___/_____/_____
19  ___/___/___/_____/_____
20
    _____
21     JAMES H. ARONOFF
22  SUBSCRIBED AND SWORN TO
   BEFORE ME THIS_____DAY
23  OF_____, 2017.
24  _____
   NOTARY PUBLIC
25  MY COMMISSION EXPIRES_____