# HOLWELL SHUSTER & GOLDBERG LLP

*750 Seventh Avenue, 26th Floor*
*New York, New York 10019*
*Tel: (646) 837-5151*
*Fax: (646) 837-5150*
*www.hsgllp.com*

November 19, 2017

**VIA EMAIL AND ECF**

The Honorable Shelley C. Chapman
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

*Re:    In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)*

Dear Judge Chapman:

We write on behalf of the RMBS Trustees in response to the Plan Administrator's letter asking this Court to preclude the Trustees from relying on redirect testimony properly elicited from Mr. James Aronoff on Friday.  As an initial matter, we reiterate our request that the Court order the Plan Administrator to seek relief by motion on notice as required by Fed. R. Bankr. P. 9014(a).  "[P]reclusion of evidence is a 'harsh' remedy that 'should be imposed only in rare situations,'" *Tangoree v. Mako's, Inc.*, 2002 WL 206988, at *6 (S.D.N.Y. Feb. 8, 2002) (quoting *Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67, 71 (2d Cir.1988), and certainly not on the basis of a two-page letter, devoid of any applicable legal authority, submitted to Your Honor on a Sunday morning.   As the Trustees will not cite or rely on any of Mr. Aronoff's redirect testimony during opening arguments, the Trustees do not believe that abiding by the rules and setting an expedited briefing schedule on a proper motion on notice would delay the hearing in any way.  The matter certainly does not have to be addressed tomorrow.

The need for a full record is apparent from the Plan Administrator's letter and exhibits, which distort the testimony elicited from Mr. Aronoff, both at his first deposition and during his continued examination last week, as well as the contents of his expert reports.  It also misstates the discrete issues over which the Trustees have asserted attorney-client privilege and work product protection, namely: "*why* the trustees . . . are not pursuing certain breach claims at the estimation hearing" and Mr. Aronoff's involvement in the decision-making process.  (Ex. 1, Aronoff Tr. 172:19-173:16) (emphasis added).  The criteria used to streamline the pool of claims for which the Trustees are seeking estimation is an entirely separate issue – and one based on facts to which the Plan Administrator has been privy since the Protocol and which the Plan Administrator has been free to explore with the Trustees' witnesses.  Nor has the Plan Administrator been precluded from exploring with Mr. Aronoff his view as to the reliability of the loan review process conducted on behalf of the Trustees during the Protocol.  Indeed, the premise on which the Plan Administrator sought – and was granted – an additional deposition day with Mr. Aronoff was that "Mr. Aronoff was involved in the Trustees loan review under the Protocol" and that he "'designed and implemented'" "the Protocol claim submission process."

(Ex. 2, Oct. 16, 2017 Letter from T. Cosenza to Chapman, J. at 1 (quoting Aronoff Tr. at 62:12-14, 73:23-74:17).)  Simply put, as the full record shows, all of the bases on which the Plan Administrator seeks to preclude Mr. Aronoff's redirect testimony are meritless and should be rejected.

*First*, the Plan Administrator's argument that Mr. Aronoff's redirect was "outside the scope of the cross examination at his deposition" or his reports is baseless.[1]  To the contrary, the Trustees' redirect was directed to the same topics and exhibits that the Plan Administrator chose to address during its continued examination.  The whole purpose of the Plan Administrator's additional deposition of Mr. Aronoff was to test his "personal involvement in the loan review process during the Protocol" and counsel for the Plan Administrator questioned Mr. Aronoff at length regarding that involvement and whether he thought that process was reliable based on his participation.  (Ex. 3, Aronoff Tr. at 317:8-24.)  These questions elicited testimony from Mr. Aronoff that the Trustees' process was reliable.  For example:

> To the extent I have in my report opined as to the reasonable, thoughtful, careful nature by which the trustees went about analyzing the loan files and reaching a decision as to whether or not there was a valid claim to be submitted under the protocol, I was there and I was involved in that decision-making process and can speak from personal experience as to the types of questions that were asked and the type of care and thought that went in to making those decisions with respect to the trustees' process.

(Ex. 3, Aronoff Tr. 318:4-12.) Addressing the opinions of the Plan Administrator's expert, Mr. Grice, in response to questions from the Plan Administrator's counsel, Mr. Aronoff testified:

> What was done, as required by the protocol, was to look at every single loan for which the trustee thought they were entitled to pursue a breach claim and determine whether there were sufficient – there was sufficient information in the files, and attendant documentation, to submit a valid claim under the protocol.  And to the extent there are categories of breaches that are discussed or groupings made, he doesn't seem to be able to understand that all of that information and all of that grouping and all of that summarizing was rolled up from the actual results that were discovered on a loan-by-loan review and that the information and facts for each loan and each claim are laid out specifically.

(*Id.* at 391:2-19.)

---

[1]  Redirect examinations at deposition are not limited to the subject of direct examination. *Smith v. Logansport Community School Corp.*, 139 F.R.D. 637, 641-642 (N.D. Ind. 1991).  Rather, "the examiner may ask about anything relevant to the subject matter of the action, regardless of whether it was raised on direct examination." *Id.* (quoting 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2113, at 420).

But given the enormity of the undertaking and the time that was permitted to pursue claims or lose the right to pursue those claims, there was a real attempt made to identify and put forth the clearest – the clearest, most well-supported claims, and that was – that approach was further examined and verified when I looked at the population that was the subject of my report.

Q. And when you say – when you say "looked at the population that was the subject of my report," what do you mean by that?

A. I mean that as contrasted with – that was true for all of the claims that were presented through the protocol process, to the extent I was there, that that overriding attempt to submit only the clearest and most easily understood claims, and then to the extent I wanted to assure myself that that was true for the smaller number of loans and claims that were the subject matter of my report, I was confident that that was the case as well, that the claims that were the subject matter of my report also reflected, if you think of – if you think of the reasonable, valid claims as an archery target and you're permitted under the governing documents and custom and practice and the protocol to submit everything that is on that target, and you shouldn't be submitting anything outside the target, the attempt wasn't made to use the whole target, the attempt was made to stick with the 7, 8, 9s and 10s in the middle of that target, and to the extent something was a valid, reasonable, thoughtful claim, given the time and expense that was involved here, we tried to avoid the close calls and not waste time or jam up the process with close calls and stick with the strongest, most clearly evidenced breach findings.  That was the goal.

(*Id.* at 398:4-399:24.)

The Plan Administrator's counsel also elicited testimony about criteria used to determine categories of breaches during the Protocol and to the extent applicable any additional criteria (or screens) applicable to those breach findings that are the subject of Mr. Aronoff's report.  For example, the Plan Administrator's counsel questioned Mr. Aronoff about the basis for determining so-called "missing document" breaches, as counsel had done in the initial day of Mr. Aronoff's deposition; and further examined Mr. Aronoff about additional criteria – set forth in Mr. Aronoff's report – that applied to such breach claims that were the subject of Mr. Aronoff's report. The redirect examined Mr. Aronoff about the content of his report and "certain criteria that apply to the misrepresentation of income breach findings that are the subject of [his affirmative] report."  (*See* Ex. 4, Aronoff Tr. 605:25-615:23.)  Not only were these criteria disclosed in Mr. Aronoff's affirmative report, but the Plan Administrator chose to begin its examination by presenting Mr. Aronoff with a copy of his affirmative report and asking about the misrepresentation Breach Findings on Table 1.  (*See* Ex. 3, Aronoff Tr. at 301:7-303:6.)  Later, the Plan Administrator presented Mr. Aronoff with Exhibit 4 to his affirmative report (PA 143) and elicited testimony about the "monthly percentage difference" (*i.e.*, variance) "between the misrepresented income and the actual income" used by the Trustees to support

misrepresentation of income breach findings.  In short, an inspection of Mr. Aronoff's deposition transcript reveals that the Trustees' redirect was both limited to opinions disclosed by Mr. Aronoff during expert discovery and the same subject matter as explored by counsel for the Plan Administrator in his examination.

Likewise, counsel for the Plan Administrator questioned whether Mr. Aronoff was "aware of a case in which a judge specifically made a finding about a claimant's loan review process?", and Mr. Aronoff testified: "I think it is clear by Castel in MARM, that simply because a mistake is demonstrated on an individual loan or handful of loans, he is not going to read that to mean that in any way the process by which the other breach findings have been asserted and analyzed are any way infected or undermined . . . look, we know there are a handful of mistakes but that doesn't mean that there were any systemic errors." (*See* Ex. 3, Aronoff Tr. at 375:13-376:15.)  In the context of that line of questioning opened up by counsel for the Plan Administrator, the Trustees' redirect presented Mr. Aronoff with a series of hypotheticals, asked him to assume various error rates, and sought testimony on whether such error rates would affect his opinion that the loan review process for Breach Findings subject to Mr. Aronoff's affirmative report was reliable. (*See* Ex. 4, Aronoff Tr. at 624:13-633:8.)  Thus, here too, redirect on the impact of hypothetical error rates is entirely proper and within the contours of the direct examination.

*Second*, the Plan Administrator's claims that Mr. Aronoff's redirect testimony discussed evidence that the Plan Administrator had been previously denied is simply wrong.  The Plan Administrator has long had the *facts* regarding the characteristics of the 15,000 dropped loans, and could have done any analysis that it needed to do to support its argument that the dropped claims reflected some sort of weakness in the Trustees' process.  Indeed, the Plan Administrator concedes that Mr. Grice did just that.  Moreover, the Plan Administrator has had every opportunity to question the Trustees' witnesses regarding those facts.  For example, contrary to the Plan Administrator's cherry-picked, out-of-context quote from Mr. Esses, Mr. Esses actually was questioned and testified, without any instruction from counsel, about the basis for his belief that *all* of the claims submitted during the protocol were valid.  (Ex. 5, Esses Tr. at 298:9-303:25.)  During that line of questioning, Mr. Esses was specifically asked whether he "understand[s] that 15,000 loans that were submitted during the Protocol are now no longer at issue in the estimation proceeding" and he responds "yes" and that he "believe[s] they are all valid claims." (Ex. 5, Esses Tr. 303:8-20.)  The Plan Administrator's counsel chose to drop that line of questioning for some reason.  Later, when the issue of the dropped loans re-emerged, Mr. Esses testified that he had a non-privileged understanding that the loans were dropped because "Duff & Phelps was involved in the preparation of exhibits to Mr. Aronoff's expert report" and he "learned *which claims were included and not included*." (Ex. 5, Esses Tr. 349:19-23 (emphasis added).)  Again, the Plan Administrator's counsel dropped the line of questioning, but what is clear from these passages is that (1) Mr. Esses had non-privileged information regarding the nature of the claims that were not included in Mr. Aronoff's report and the claims that remained in the case and (2) he believed that both sets of claims were valid.

Similarly, the only subject regarding the dropped loans that "Mr. Aronoff explicitly disclaimed knowledge of at his prior deposition" was *why* the Trustees' chose not to pursue certain breach claims at the estimation hearing and the number of breach claims (as opposed to the number of loans) not being pursued. (*See, e.g.*, Ex. 1, Aronoff Tr. at 169:20-170:16; 172:19-

173:6.)  As is made clear from the copious direct testimony that the Plan Administrator elicited from Mr. Aronoff regarding his involvement in the Protocol process, Mr. Aronoff was well aware of the nature of the claims that were put forward during that process and had a long-held view concerning the reliability of the Trustees' loan review process and the breach findings generated through that review.  Again, the Plan Administrator, throughout this dispute, seems laser-focused on understanding *why* the claims were dropped, rather than gathering the freely available facts regarding the claims that were dropped and the non-attorneys' views of those claims.

A ruling that will preclude the Trustees from providing this and related testimony at trial because the Plan Administrator decided that it did not want to know the basis for Messrs. Esses's and Aronoff's knowledge and beliefs would prejudice the Trustees, not the Plan Administrator.

Respectfully Submitted,

/s/ Daniel P. Goldberg

Daniel P. Goldberg

cc:    All counsel (via email)

5

# EXHIBIT 1

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

    SOUTHERN DISTRICT OF NEW YORK

3

    Case No. 08-13555 (SCC)

4   -----------------------------------x

5   IN RE

6   LEHMAN BROTHERS HOLDING, INC., et al.,

7                          Debtors.

8   -----------------------------------x

9                          787 Seventh Avenue

                           New York, New York

10

                           October 6, 2017

11                         9:36 a.m.

12

13          VIDEOTAPED DEPOSITION of JAMES H.

14  ARONOFF, taken by the Debtors, held at the

15  aforementioned time and place, before Sherri

16  Flagg, a Registered Professional Reporter,

17  Certified LiveNote Reporter, and Notary Public.

18

19                    *    *    *

20

21

22

23

24

25

Page 169

1              James H. Aronoff

2         mischaracterizes the record.  And, two, I

3         don't know that he said that he revised

4         his opinion with respect to the number of

5         loans.

6         A.     All I said is they're no longer in

7    dispute.  My opinion with respect to those

8    loans hasn't changed.

9         Q.     So which loans were you referring

10   to when you referenced the 30 to 34 loans that,

11   through the exchange of expert reports, have

12   been withdrawn?

13        A.     Those were loans that I opined on

14   in the context of this report and it's been

15   demonstrated that the basis of my opinion with

16   respect to any particular loan was in error.

17   And to the extent there was a factual error

18   identified and it changed my -- and it changed

19   my opinion, it was withdrawn.

20        Q.     Now, you understand that the

21   trustees have withdrawn a significant number of

22   the breach claims they asserted during the

23   protocol, right?

24             MR. HEALY:  Objection to form,

25         mischaracterizes the record.

Page 170

```
 1                      James H. Aronoff
 2        A.       What's the question, please?
 3                 (Requested portion read.)
 4        A.       I don't know if it's significant
 5   or not.  I know there are loans that have been
 6   withdrawn even between the status report I
 7   cited and Exhibit 1.  It went from 90 to 76,
 8   but I don't know if there were other iterations
 9   of that.
10        Q.       That's loans, correct?
11        A.       That's loans.
12        Q.       Okay.  Do you know how many claims
13   have been withdrawn by the trustees?
14                 MR. HEALY:  Objection to form,
15          vague, ambiguous and confusing.
16        A.       I still don't.
17        Q.       Do you have any explanation you
18   can offer me here today for the withdrawal of
19   those claims?
20                 THE WITNESS:  Are you going to say
21          something?
22                 MR. HEALY:  I am going to say
23          something.
24                 As you know, Mr. Davis, the
25          Exhibit G prohibits inquiry into any
```

Page 172

```
 1                    James H. Aronoff
 2             MR. DAVIS:  The trustees haven't
 3        rescinded breach claims?
 4             MR. HEALY:  I think they've
 5        advised you that they are not pursuing
 6        claims at the estimation hearing.
 7             MR. DAVIS:  Is there a difference?
 8        I don't understand the difference.
 9             MR. HEALY:  I'm not going to argue
10        with you.  I'm just telling you the
11        language which was used to communicate it
12        to you.  You're conducting the
13        examination.  I'm interposing an
14        objection on the grounds that your
15        question is inaccurate as framed.
16   BY MR. DAVIS (continuing):
17        Q.    Okay, let me ask the question
18   then.
19             Just yes/no:  Do you know why the
20   trustees have advised the Plan Administrator
21   that they are not pursuing certain breach
22   claims at the estimation hearing?
23             MR. HEALY:  I'm prepared to let
24        him answer that question subject to an
25        agreement that his answering the question
```

Page 173

                    James H. Aronoff

1

2         will not be asserted to be a waiver of

3         any applicable privilege or protection

4         under Exhibit G.

5              MR. DAVIS:  That's fine.

6         A.    No.

7         Q.    So you were not involved in the

8  decision-making process concerning the

9  trustees' decision to not pursue certain breach

10 claims at the estimation hearing?

11             MR. HEALY:  He's advised you that

12        he does not know, and you are now asking

13        him to testify as to discussions that he

14        may have had with the trustees' counsel,

15        consulting experts or others.  And he's

16        instructed not to answer that question.

17        Q.    Was it important to the opinion

18 that you're giving in this case to understand

19 the basis for the trustees' decision not to

20 pursue certain of the breach claims in this

21 case?

22        A.    No.

23             MR. HEALY:  You beat me to it.

24             THE WITNESS:  Sorry.

25             MR. HEALY:  That's okay, go ahead.

# EXHIBIT 2

**WILLKIE FARR & GALLAGHER** LLP

TODD G. COSENZA

212 728 8677
tcosenza@willkie.com

787 Seventh Avenue
New York, NY 10019-6099
Tel:  212 728 8000
Fax:  212 728 8111

October 16, 2017

**VIA EMAIL AND ECF**

The Honorable Shelley C. Chapman
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10014

Re:  *In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)*

Dear Judge Chapman:

     I am counsel to Lehman Brothers Holdings Inc. ("Lehman" or the "Plan Administrator").
I write to respectfully seek the Court's resolution of a dispute arising from the Trustees' refusal
to make their primary expert and fact witness, Mr. James Aronoff, available for more than a
single day of deposition.  The Trustees have designated Mr. Aronoff as an expert witness who
will opine on most aspects of their case, including the validity of the breach claims that the
Trustees submitted through the Protocol process.  At the same time, Mr. Aronoff has asserted
that he was the "boss" of the "team that directed and oversaw the [Trustees'] forensic loan
review" during the Protocol.  (Deposition of James Aronoff, Tr. at 63:5-12 (selections attached
as Exhibit A); Aronoff Opening Report at 2.)  In short, while the Trustees have elected to select
Mr. Aronoff as an expert witness in connection with the upcoming Estimation Proceeding, he is
also a key fact witness on the subject of the Proceeding -- the validity and valuation of the breach
claims that the Trustees submitted to the Protocol.  Because Mr. Aronoff is both a fact and expert
witness, the Plan Administrator is entitled to two days of deposition.  The Trustees disagree.
(*See* Exhibits B, C.)

     The Trustees first retained Mr. Aronoff and Duff & Phelps in May 2013 to manage the
review of a sample of loans.  (Aronoff Opening Report at 11; Aronoff Tr. at 59:25-60:14.)  After
testifying at the hearing that led to the establishment of the Protocol, Mr. Aronoff was involved
in the Trustees loan review under the Protocol.  (Aronoff Tr. at 60:15-30.)  Although Mr.
Aronoff left Duff & Phelps in December 2015, after this estimation proceeding began, the
Trustees reengaged him in February 2017 to review and opine on the very Protocol claim
submission process that he "designed and implemented." (Aronoff Tr. at 62:12-14, 73:23-74:17.)

In his report, Mr. Aronoff disclosed that he was "a member of the team that directed and oversaw the forensic loan review" during the Protocol. (Aronoff Opening Report at 2.) He explained that his role was to provide "input into the identification of the Loan Review Firms . . . and the policies to be used to identify and support the Breach Findings during the review process. . . ." (Aronoff Opening Report at 3.) Mr. Esses testified that Mr. Aronoff was the person who, among other things, determined whether the breaches found by the Loan Review Firms retained by the Trustees had a material and adverse effect on the value of the loans, and made the final decision on whether to submit Breach Claims to the Plan Administrator. (Deposition of Edmund Esses (attached as Exhibit D), Tr. at 69:24-70:5, 114:19-24; 249:25-250:12, 262:23-263:2.) Mr. Aronoff testified that he was "responsible for the scope [of the protocol] and was responsible for making sure that there was an understanding among the loan review firms and Duff & Phelps with [respect to] the [loan review] exercise." (Aronoff Tr. at 86:24-87:9.) He also "provide[d] . . . oversight and guidance as to . . . whether or not a particular fact pattern was, in fact, a breach finding . . . ." (Aronoff Tr. at 85:10-22.)

In advance of the first day of Mr. Aronoff's deposition, the Plan Administrator requested additional time to depose Mr. Aronoff as a fact witness, based on the testimony of Mr. Esses discussed above. The Trustees denied this request. (See Exhibit D.) As expected, given that the Plan Administrator was limited to seven hours of tape time for Mr. Aronoff on October 6, it was unable to cover both the substance of the nearly 200 pages of Mr. Aronoff's expert reports and the full extent of his central role in the Protocol process that led to those expert reports. Therefore, the Plan Administrator requested that the Trustees make Mr. Aronoff available for a second day of deposition. (Aronoff Tr. at 279:11-280:21.) After first suggesting on the day of Mr. Aronoff's deposition that the Trustees might be willing to entertain the possibility of additional time, the following business day, the Trustees conditioned any further consideration of the request on the Plan Administrator's willingness to identify the topics that would be covered in any potential further deposition. (See Exhibit C.)

As I discussed, Mr. Aronoff is both a critical fact witness and an expert witness. Under Exhibit G, the Plan Administrator is entitled to take a deposition of each witness the Trustees intend to call at the hearing and additional fact depositions of the Trustees' witnesses, and there is no requirement that the Plan Administrator provide an outline of its questioning in advance of such depositions. The Trustees' decision to retain Mr. Aronoff as an expert in this case does not insulate him from being deposed as a fact witness regarding matters that are highly relevant to the matters to be tried at the Estimation Proceeding. The Plan Administrator therefore is entitled to a second day of deposition testimony from Mr. Aronoff.

The Plan Administrator respectfully requests that the Court order the Trustees to produce Mr. Aronoff for an additional day of deposition.

Sincerely,

Todd G. Cosenza

cc: All counsel (via email)

2

# EXHIBIT A

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

3

Case No. 08-13555 (SCC)

4    ----------------------------------x

5    IN RE

6    LEHMAN BROTHERS HOLDING, INC., et al.,

7                            Debtors.

8    ----------------------------------x

9                            787 Seventh Avenue

New York, New York

10

October 6, 2017

11                            9:36 a.m.

12

13          VIDEOTAPED DEPOSITION of JAMES H.

14    ARONOFF, taken by the Debtors, held at the

15    aforementioned time and place, before Sherri

16    Flagg, a Registered Professional Reporter,

17    Certified LiveNote Reporter, and Notary Public.

18

                    *    *    *

19

20

21

22

23

24

25

Page 58

1          James H. Aronoff
2 of certain issuers of residential mortgage-
3 backed securities.
4     Q.    Okay.  Is it all right if we refer
5 to that as "the protocol"?
6          MR. HEALY:  Objection to form.
7     The order is an order.  Do you mean it
8     would include both the order and the
9     document attached with it --
10          MR. DAVIS:  Fair enough.
11          MR. HEALY:  -- when you use the
12     term "protocol"?
13          MR. DAVIS:  Fair enough.
14 BY MR. DAVIS (continuing):
15     Q.    If you turn back to page, I guess,
16 7 of 24, there is an attachment to this order.
17 Do you see that?
18     A.    I do.
19     Q.    And the attachment is labeled RMBS
20 Claim Protocol.  Do you see that?
21     A.    Yes.
22     Q.    Is this attachment a document you
23 have seen before?
24     A.    It appears to be something I
25 reviewed in advance of my report, yes.

Page 59

1          James H. Aronoff
2     Q.    Okay.  Now, you mentioned you
3 reviewed drafts of this as well?
4     A.    Way back, way back when, when I
5 was in the early stages of the development of
6 this document.  I thought that's what you were
7 referring to.  I've seen the final protocol.
8     Q.    Okay.  For what purpose were you
9 reviewing drafts of this?
10          MR. HEALY:  I'm going to just
11     caution Mr. Aronoff that to the extent
12     that you are being asked to disclose the
13     content of privileged communications with
14     the trustee counsel, you should not
15     respond to the question.  And if we need
16     to, we'll step out and discuss the
17     issues.
18          THE WITNESS:  Can I hear the
19     question again, please.
20          (Requested portion read.)
21     A.    As part of the team at Duff
22 working on this engagement, I was engaged by
23 counsel for the trustees to review the
24 document.
25     Q.    Okay.  So the final protocol was

Page 60

1          James H. Aronoff
2 entered in late December of 2014; is that
3 right?
4     A.    That appears to jibe with the
5 entered date at the top of the page I'm looking
6 at.
7     Q.    And the trustees retained Duff &
8 Phelps to manage the trustees' loan review
9 under the protocol; is that right?
10     A.    Yes.
11     Q.    At that time in December of 2014,
12 you were a managing director at Duff & Phelps;
13 is that right?
14     A.    That's correct.
15     Q.    And you remained at Duff & Phelps
16 through December of 2015; is that correct?
17     A.    Yes.
18     Q.    Did you join Baker Tilly
19 immediately after leaving Duff & Phelps?
20     A.    January 4th, 2016.
21     Q.    Did you continue to work on the
22 protocol when you joined Baker Tilly?
23     A.    I'm not sure I understand the
24 question.
25     Q.    Did you continue to work on

Page 61

1          James H. Aronoff
2 supervision or -- strike that.
3          Did you continue to work on
4 managing the trustees' loan review under the
5 protocol when you moved to Baker Tilly in
6 January of 2016?
7     A.    No.
8     Q.    Why did you leave Duff & Phelps?
9          MR. HEALY:  Objection to form.
10     A.    Because I had an opportunity to be
11 a partner at Baker Tilly and I wanted to be
12 part of a professional partnership.
13     Q.    Did anyone else, any of your
14 colleagues from Duff & Phelps, move to Baker
15 Tilly at or around that time with you?
16     A.    No.
17     Q.    Did anyone else from Duff & Phelps
18 move to Baker Tilly later on?
19     A.    Yes.
20     Q.    And which of your colleagues moved
21 from Duff & Phelps to Baker Tilly?
22     A.    Richard Sauerwein.
23     Q.    How do you spell that last name?
24     A.    S-A-U-E-R-W-E-I-N.
25     Q.    Anyone else?

16 (Pages 58 - 61)

Page 62

James H. Aronoff

1
2    A.    Charlie Campbell, C-A-M-P-B-E-L-L.
3    Q.    Anyone else?
4    A.    Not that I'm aware of.
5    Q.    Were -- was Mr. Sauerwein working
6  on the engagement connected with the protocol
7  review while with you at Duff & Phelps?
8    A.    Yes.
9    Q.    Was Mr. Campbell working on that
10  engagement with you at Duff & Phelps?
11    A.    Yes.
12    Q.    At some point after you joined
13  Baker Tilly, were you engaged by the lawyers
14  for the trustees in connection with this
15  estimation proceeding?
16    A.    Yes.
17    Q.    When were you engaged?
18    A.    I believe somewhere around
19  February of 2017.
20    Q.    And what was the scope of the
21  engagement when you were engaged in February
22  2017?
23    A.    It was to provide the opinions
24  that appear in my affirmative report.
25    Q.    Between January of 2016 and

Page 63

James H. Aronoff

1
2  February of 2017, did you do any work in
3  connection with the Lehman bankruptcy?
4    A.    No.
5    Q.    Okay.  Now, back to December of
6  2014 after the protocol was issued, at that
7  time you were a senior member of the team
8  responsible for managing the trustees' loan
9  review; is that right?
10    A.    Yes.
11    Q.    What do you mean by senior member?
12    A.    I was the boss.
13    Q.    Who was on the team?
14    A.    I call my lieutenants -- my senior
15  professionals were Mr. Sauerwein and
16  Mr. Campbell, who I just -- and then there were
17  a number of other people that would be involved
18  in my work stream as well as other work
19  streams, like Mr. Esses, some analysts, some
20  other people that were part of the team.
21            But to the -- and to the extent --
22  to the extent the subject -- to the extent they
23  were working on matters or activities related
24  to the subject matter I was responsible for, I
25  considered them to be on my team.

Page 64

James H. Aronoff

1
2    Q.    What was the subject matter you
3  were responsible for?
4    A.    It was the substance and -- the
5  substantive aspects of the forensic loan
6  reviews that were to be conducted under the
7  protocol.
8    Q.    And that included both the breach
9  findings and the determination whether those
10  breach findings adversely and materially
11  affected the value of the loan?
12            MR. HEALY:  Objection to form.
13    A.    Yes, among other things.
14    Q.    Okay.  What were the other things?
15    A.    Well, one that comes to mind is
16  the sufficiency or the use, the appropriate use
17  of any particular form of supporting
18  information or documentation as a basis for the
19  identification of a breach finding, as well as
20  getting involved in the interpretation of
21  various information sources, breach findings,
22  scope of the reps and warranties that were
23  mapped to those breach findings and the like.
24    Q.    Can I just ask you to take a quick
25  look at your rebuttal report, which is marked

Page 65

James H. Aronoff

1
2  as Exhibit 68, on page 35, paragraph 57.
3    A.    I'm sorry, what paragraph?
4    Q.    It's paragraph 57.  It's a long
5  paragraph.  It actually begins on page 34.
6    A.    Paragraph 57?
7    Q.    Yeah.  This paragraph, in kind of
8  the middle on page 35, it references two senior
9  Duff & Phelps professionals responsible for the
10  final review and submission of claims during
11  the protocol.  Do you see that?
12    A.    I don't yet.
13    Q.    Okay.
14    A.    I see that.
15    Q.    All right.  And I just want to
16  confirm:  Who are those two senior Duff &
17  Phelps professionals you were referring to?
18    A.    I was referring to Campbell and
19  Sauerwein on there.
20    Q.    And they were working under your
21  direction at the time?
22    A.    I'm sorry, what time?
23    Q.    Up until you left Duff & Phelps.
24    A.    That's correct.
25    Q.    Now, if you look at your opening

17 (Pages 62 - 65)

Page 66

1        James H. Aronoff
2   report again?
3        A.   In this hearing?
4        Q.   In Exhibit 67.  Exhibit 67, page
5   8.  This section is entitled Familiarity and
6   Role in the Trustees' Review and Analysis
7   Pursuant to the Protocol.  Do you see that?
8        A.   Yes.
9        Q.   Okay.  And right in the beginning
10  there, in the second sentence, you say that you
11  (as read):
12            ...had input into the
13       identification of the loan review firms
14       retained to conduct the initial loan file
15       review and the policies to be used to
16       identify and support the breach findings
17       during the review process, such as the
18       evidentiary sources to be used to
19       determine whether breaches existed.
20            Do you see that?
21       A.   Yes.
22       Q.   Okay.  What do you mean by
23  "input"?
24       A.   I was part of the team that
25  determined if the loan review firms that were

Page 67

1        James H. Aronoff
2   going to be engaged and on which, at that time,
3   I believed I was going to use their information
4   and their findings to offer opinions.  So I was
5   part of the team that determined the
6   suitability and the appropriateness of
7   retaining the specific firms that were
8   retained, from my perspective.
9        For example, others might look at
10  their technological capabilities in terms of
11  producing reports or might analyze the systems
12  they used.  But in terms of the quality and
13  experience of the personnel, their familiarity
14  and understanding of what this exercise was,
15  and just a basic understanding that they saw
16  the world the same way I did in terms of having
17  a common understanding of what the exercise
18  [sic] were and what a breach is, I was part of
19  the team that identified the loan review firms.
20       Q.   Okay.  Other than Duff & Phelps
21  employees, who else was on that team?
22       MR. HEALY:  Objection to form.
23       A.   The trustees and trustees'
24  counsel.  As I note in here, some of the
25  initial recommendations for firms to retain

Page 68

1        James H. Aronoff
2   came out of relationships that one or more
3   trustees might have had with a firm, in
4   addition to relationships and information about
5   those firms we might have had internally at
6   Duff & Phelps.
7        Q.   Do you know who made the final
8   decision about which firms to select?
9        A.   I don't.
10       Q.   So we've been talking about the
11  first half of that sentence.  There's a second
12  half of the sentence, too, which speaks to the
13  policies to be used to identify and support the
14  breach findings during the review process.  Do
15  you see that?
16       MR. HEALY:  Objection to form.
17       A.   Yes.
18       Q.   And did you also have input into
19  those policies?
20       A.   To the extent those policies were
21  Duff-generated or information that Duff was
22  providing to the firms, yes.  And to the extent
23  we were evaluating--we, Duff--were evaluating
24  the policies in place at the existing firm, I
25  would have been involved in evaluating whether

Page 69

1        James H. Aronoff
2   they were doing things in a way that we felt
3   was consistent with our view of industry custom
4   and practice.
5        Q.   Did Duff & Phelps provide the loan
6   review firms with the policies they were to use
7   in order to identify and support the breach
8   findings?
9        A.   In part.
10       Q.   Okay.  Which part did they
11  provide?  Sorry, which part did Duff & Phelps
12  provide?
13       A.   Duff & Phelps provided guidance
14  and input during the process to the extent
15  there was any--"concern's" too strong a
16  word--to the extent there was any indication
17  that there may have been a misunderstanding or
18  a miscommunication between what was being
19  submitted to Duff & Phelps and what the firm
20  intended to communicate to Duff & Phelps.
21       So there was a constant iterative
22  process where certain definitions about the way
23  certain things should be treated was going on.
24       But in terms of -- the firms that
25  were hired were all very experienced forensic

18 (Pages 66 - 69)

Page 70

1          James H. Aronoff
2  loan review firms and, for the most part, the
3  due diligence that was conducted around these
4  firms assured us, assured me as -- from my
5  perspective--I can't speak for anyone else--
6  that they knew what they were doing and they
7  knew how to conduct loan reviews.
8          And so it wasn't as if Duff &
9  Phelps gave them a policies and procedures or
10  instruction manual and told me how to run their
11  loan reviews.
12      Q.    Okay.  So Duff & Phelps did not
13  give them a written set of policies and
14  procedures pursuant to which they would
15  identify and support the breach findings?
16          MR. HEALY:  Objection, form,
17      foundation.
18      A.    What was the last part of the
19  question?  I'm sorry.
20      Q.    Let me restate the question.
21          So Duff & Phelps did not provide
22  the loan review firms with a written set of
23  policies and procedures pursuant to which those
24  firms would identify and support the breach
25  findings under the protocol, correct?

Page 71

1          James H. Aronoff
2          MR. HEALY:  Same objection.
3      A.    From a substantive standpoint, not
4  to my knowledge.  The distinction I'm making is
5  there was a great deal of information that was
6  exchanged with the firms to drive conformity of
7  results.
8          So in terms of forms of reports,
9  forms of narratives, agreement about labels of
10  how certain things would be described, there
11  was a great deal of specific instruction, and
12  chastising to those that didn't follow it, to
13  make sure that the information was provided in
14  a form that would allow us to do -- engage in
15  the next step of the process.
16      Q.    But just to make sure I
17  understand, what do you mean from a substantive
18  standpoint they were not provided with written
19  policies?
20      A.    I didn't feel the need to
21  communicate to any of the firms what a
22  misrepresentation of income was, how to read a
23  1003.  We didn't hire firms that didn't have a
24  very high level of experience and expertise in
25  understanding how to conduct a forensic loan

Page 72

1          James H. Aronoff
2  review.
3      Q.    So what were you referencing in
4  this paragraph on page 8 of your opening report
5  when you used the term "policies to be used to
6  identify and support the breach findings"?
7      A.    That's in connection with the
8  identification of the loan review firms.  As I
9  said, the firms that were ultimately selected,
10  we had a high comfort level with.
11          But before that determination was
12  made, we needed to make sure that they, in
13  fact, did have their own understanding.  And
14  we -- to the extent they had written policies
15  and work flows or a system that captured data,
16  we analyzed that to make sure that, in fact,
17  they -- as I said, they were looking at the
18  world in the same way that we understood these
19  reviews would be conducted.  And if we had
20  3,000 people, we'd conduct them ourselves.
21      Q.    So the policies you're referring
22  to here are the policies of each of the
23  individual loan review firms?
24          MR. HEALY:  Objection, misstates
25      his testimony, form.

Page 73

1          James H. Aronoff
2      A.    Yes, but not exclusively.  As I
3  said before, there was -- there were what I
4  would call policy or subject matter discussions
5  that were conducted with the firms on an
6  ongoing basis.  So I'm referring to both of
7  those things in this sentence.
8      Q.    Okay.  But there was no
9  standardized set of written guidelines issued
10  to the loan review firms?
11      A.    No.
12          MR. HEALY:  Objection to form.
13          MR. DAVIS:  Let me just finish the
14      question.
15      Q.    There was no standardized set of
16  written guidelines issued to the loan review
17  firms by which they would be instructed to
18  identify and support the breach findings; is
19  that right?
20          MR. HEALY:  Objection to form.
21      A.    Not that I recall.
22      Q.    Is it fair to say that you had
23  significant input into the design and
24  implementation of the trustees' loan review
25  during the protocol?

19 (Pages 70 - 73)

Page 74

1          James H. Aronoff
2     A.    More earlier on than later on.  I
3   think it was always significant.  It's just --
4   if you mean significant by the amount of time I
5   spent, the amount of time I was called in, as
6   opposed to issues being handled by my
7   lieutenants, decreased as we started to get
8   into a rhythm with -- and an understanding with
9   the loan review firms of how this process would
10  be undertaken.
11    Q.    Okay.  But right now I'm focusing
12  on design and implementation of the trustees'
13  loan review during the protocol.  So at least
14  with respect to the design of the trustees'
15  loan review during the protocol, is it fair to
16  say you had significant input into that?
17    A.    Yes.
18    Q.    Okay.  If you'd turn to page 12 of
19  your opening report, at the top of the page it
20  says "After the protocol was established, Duff
21  & Phelps, on behalf of the trustees, worked
22  to" -- and then there's a list of items.  Do
23  you see that?
24    A.    Yes.
25    Q.    Okay.  The first is collect the

Page 75

1          James H. Aronoff
2   loan files.  How many loan files were
3   collected; do you know?
4     A.    No.
5     Q.    Do you have any idea of order of
6   magnitude?
7     A.    No.
8     Q.    Were you -- you were supervising
9   this process?
10    A.    No.
11    Q.    Okay.  Who was supervising the
12  process of collection of the loan files?
13    A.    I believe it was Edmond Esses and
14  one of the attorneys for the trustees.
15    Q.    Do you have any sense of the
16  volume of records that was ultimately
17  assembled?
18    A.    Massive.
19    Q.    And how were the files maintained?
20        MR. HEALY:  Objection to form,
21    vague and ambiguous.
22    Q.    How were the loan files
23  maintained?
24    A.    I don't know how to answer that
25  question.  I don't know by who or when or...

Page 76

1          James H. Aronoff
2     Q.    Okay.  Do you know by whom they
3   were maintained?
4     A.    No.
5         MR. HEALY:  Objection to form,
6     vague and ambiguous.
7     Q.    Sitting here today, do you have
8   access personally to all of the loan files at
9   issue in the case?
10        MR. HEALY:  Sitting in the witness
11    chair in this conference room?
12    Q.    Do you understand what I mean?
13    A.    I thought that's -- that's how I
14  understood it.
15    Q.    Fair enough, okay.
16        When you go back to your office or
17  at any point in time today, would you have
18  access to all of the loan files that are at
19  issue in this case?
20        MR. HEALY:  Objection to form,
21    vague and ambiguous.
22        MR. DAVIS:  I'll withdraw it.
23    Q.    While you were working on your
24  reports in this case, did you have access to
25  all of the loan files that are at issue in this

Page 77

1          James H. Aronoff
2   case?
3         MR. HEALY:  Same objection.
4     A.    I had access to the loan files for
5   the mortgage loans that were the subject of my
6   opinion.
7     Q.    And how did you have access to
8   them?
9     A.    Through a database system.
10    Q.    What database system is that?
11    A.    I believe we called it Relativity.
12    Q.    And who maintained -- who
13  maintains the Relativity database system?
14    A.    I believe it's Relativity.
15    Q.    Okay.  What do you need to do if
16  you need to search Relativity for a loan file?
17    A.    You asked if I had access.  You
18  log in and review.
19    Q.    Have you logged in and reviewed
20  loan files on Relativity yourself?
21    A.    Infrequently.
22    Q.    Okay.  But you understand how to
23  log into Relativity?
24    A.    My team does.
25    Q.    Okay.  So you don't personally log

20 (Pages 74 - 77)

Page 82

    James H. Aronoff
1
2 frequently, if at all, in terms of the -- in
3 terms of the loans or that -- that did
4 essentially the same thing as one of these
5 better-known companies, though the example that
6 comes to mind is, I think, in maybe one or two
7 breach findings, Salary.com was used instead of
8 BLS. But it was such a small incident of
9 occurrences across the 76,000 breach findings
10 that it wasn't -- it didn't rise to the level
11 of being included in this section.
12        But if that source was used, it
13 would have been described in the related breach
14 narrative and would have given the Plan
15 Administrator the opportunity to appropriately
16 question or rebut that claim based on that
17 included-but-not-limited-to source.
18    Q.    Okay. But did Duff & Phelps
19 provide the loan review firms with a list of
20 third-party sources they were permitted to use?
21    A.    Not to my knowledge.
22    Q.    Okay. What determined when a
23 third-party source would be consulted in
24 connection with a loan review?
25        MR. HEALY: Objection to form.

Page 83

    James H. Aronoff
1
2    A.    To the extent an underwriter at
3 the loan review firm was trying to establish
4 whether or not there was a deficiency or defect
5 of a certain type, they would rely on other
6 information outside of the file to verify
7 whether or not the information retained in the
8 file was accurate.
9    Q.    Did the loan review firms review
10 third-party sources for every loan file?
11    A.    I don't know.
12    Q.    What did the loan review -- what
13 did the loan review firms do with information
14 they collected from third-party loan sources?
15 Excuse me.
16        What did the loan review firms do
17 with third-party information they collected
18 from third-party sources?
19        MR. HEALY: Objection to form.
20    Q.    If you know?
21        MR. HEALY: Vague, assumes facts,
22 ambiguous.
23    A.    The only time I would know what
24 they did with it is if they used that
25 information to support a breach claim. What

Page 84

    James H. Aronoff
1
2 they did with it in those cases where the
3 information in the file was accurate or they
4 didn't feel the third-party tool provided them
5 with a necessary clarity of decisioning that
6 they needed, I don't know what they did with
7 those.
8    Q.    So there wasn't any policy or
9 procedure in place that required the loan
10 review firms to give Duff & Phelps all of the
11 information they gathered from third-party
12 sources in connection with any given loan; is
13 that right?
14    A.    That's my recollection, yes.
15    Q.    Did Duff & Phelps ever collect
16 information itself from third-party sources in
17 connection with this loan review process?
18        MR. HEALY: Objection, overbroad.
19    A.    I don't believe so.
20    Q.    So can you tell me whether all of
21 the third-party materials collected by the loan
22 review firms for a loan with a breach finding
23 was included in the loan file that was
24 transmitted to the Plan Administrator in the
25 protocol?

Page 85

    James H. Aronoff
1
2        MR. HEALY: Objection to form,
3    compound, vague and ambiguous, may
4    misassume facts.
5    A.    Can I hear the question again,
6 please.
7        (Requested portion read.)
8    A.    I can't. But it shouldn't have
9 been that way.
10    Q.    What was your role in determining
11 which claims would be sent to the Plan
12 Administrator under the protocol?
13    A.    Are we running into tape -- okay.
14        My role would primarily have been
15 to provide kind of oversight and guidance as to
16 the necessary support and whether or not a
17 particular fact pattern was, in fact, a breach
18 finding of the type that we intended to submit.
19        In the very rare case, either
20 Charlie or Rich and I would sit down and talk
21 about a particular loan or groups of loans with
22 similar issues.
23    Q.    Who made the final decision on
24 whether a particular breach finding materially
25 and adversely affected the value of the loan?

22 (Pages 82 - 85)

Page 86

1          James H. Aronoff
2     A.    I did, up until the time I left.
3     Q.    And I was going to ask you:  Do
4  you know who took over that responsibility
5  after you left?
6     A.    I believe -- my understanding is
7  is that there was a sufficiently large number
8  of every type of breach finding, and that the
9  materiality statements that I had used for
10 those types of findings and fact patterns were
11 used.  As to what individual took ownership of
12 that decision or not, I'm not sure.  I have an
13 idea but I'd be speculating.
14          MR. DAVIS:  Okay.  I think we have
15    to break for a minute to change the tape.
16          VIDEO TECHNICIAN:  The time is
17    11:46 a.m.  This is the end of Video 1.
18    We're off the record.
19          (Recess taken.)
20          VIDEO TECHNICIAN:  The time is
21    11:58 a.m.  We're back on the record.
22    This is Video 2.
23 BY MR. DAVIS (continuing):
24    Q.    So, Mr. Aronoff, as we've already
25 discussed, you were involved in designing the

Page 87

1          James H. Aronoff
2  trustees' review during the protocol; is that
3  right?
4          MR. HEALY:  Objection to form,
5    asked and answered.
6     A.    I was responsible for the scope
7  and was responsible for making sure that there
8  was an understanding among the loan review
9  firms and Duff & Phelps with the exercise.
10    Q.    And were you involved in the
11 mapping of representations and warranties?
12    A.    From a substantive standpoint,
13 yes.
14    Q.    And what do you understand mapping
15 of representations and warranties to be?
16    A.    When I talk about mapping of
17 representation and warranties, you talk about
18 certain deficiencies or defects that would
19 result in a breach of a particular rep and
20 warranty and would typically be identified as
21 one of a certain kind of breach finding.
22          So for every rep and warranty,
23 there were -- there could be certain fact
24 patterns, defects, deficiencies with respect to
25 a loan; and those types of deficiencies were

Page 88

1  described as breach findings.  And in that
2  respect, every breach finding would be mapped
3  or related to one or more reps and warranties.
4     Q.    And is there a document that you
5  maintain that constitutes this map?
6     A.    I am fairly certain that --
7  there's no one map but I'm fairly certain that
8  with respect to the loans that were being
9  reviewed by any individual loan review firm,
10 they were provided with the appropriate maps
11 relating to the trusts in which the loans they
12 were reviewing were contained.
13          (Exhibit 75:  Excerpt from
14          transcript of testimony of Mr. Aronoff
15          December 10, 2014, was marked for
16          identification.)
17 BY MR. DAVIS (continuing):
18    Q.    So, Mr. Aronoff, the court
19 reporter has marked as Exhibit 75 a transcript,
20 an excerpt from a transcript of testimony dated
21 December 12th, 2014.  And I would ask you to
22 turn to page 196.
23    A.    Well, that's the first page.
24    Q.    The first page.

Page 89

1          James H. Aronoff
2          This, I believe, is a transcript
3  of your testimony in the Bankruptcy Court back
4  in March of 2015 concerning the subject of your
5  declarations from 2014 that we spoke about
6  earlier.  Is that right?
7          MR. HEALY:  Objection.
8     Q.    Excuse me, that's true.  I'm
9  sorry.  This testimony was from December of
10 2014, actually, December 10th, 2014 --
11          MR. HEALY:  Is there a question?
12    Q.    -- if you look at the front.  Do
13 you recall testifying in December of 2014 in
14 Bankruptcy Court?
15    A.    Yes.
16    Q.    Okay.  Would you turn to page 213.
17 Do you remember who was examining you at this
18 time in Bankruptcy Court?
19    A.    No.
20    Q.    I believe it was Mr. Munno.  Does
21 that refresh your recollection?
22    A.    Is there a question?
23    Q.    Yeah.  Do you recall whether it
24 was Mr. Munno who was examining you in
25 Bankruptcy Court?

23 (Pages 86 - 89)

Page 278

1        James H. Aronoff
2    Q.    How about a borrower whose title
3 on the application was psychiatrist assistant
4 but whose actual title was medical assistant.
5    A.    What about that?
6    Q.    Again, would that be sufficient to
7 support a breach claim for misstatement of
8 employment?
9        MR. HEALY:  Objection, incomplete
10      hypothetical.
11    Q.    Again, assuming that there were no
12 other problems with the recitation of the
13 borrower's employment besides that?
14        MR. HEALY:  Same objection.
15    A.    But it's not always a matter of
16 whether there are other problems; it's a matter
17 of looking at who the borrower might be based
18 on other information they provided on the
19 application to determine, one, whether that's a
20 difference that makes a difference and, two, to
21 look at other things, other facts regarding the
22 borrower that may lead to a reasonable
23 conclusion that the job title they stated is
24 overstating what their title really is.
25        Personally, based just on hearing

Page 279

1        James H. Aronoff
2 those two titles, I don't know what a
3 meaningful distinction would be.  But that's
4 not to say, given the rest of the file, I
5 couldn't find an explanation as to why it was
6 not only a fact that they weren't in the job
7 they said they were but that the
8 misrepresentation of that job title in this
9 case was material and adverse to the interests
10 of the loan.
11        MR. HEALY:  Mr. Davis, I'm
12      informed that you have now run over the
13      seven-hour limit, which we have been
14      abiding by in our depositions.
15        MR. DAVIS:  And as you know,
16      Mr. Healy, we've made our position known
17      that we feel we're entitled to a second
18      day of deposition because Mr. Aronoff is
19      a fact witness in this case, as has been
20      made abundantly clear by this deposition;
21      and therefore, in order to understand
22      what he might testify to at trial, we
23      need to understand both what his expert
24      opinion is and what his fact testimony
25      may be.

Page 280

1        James H. Aronoff
2    And we are entitled to depose fact
3 witnesses under our Exhibit G and the
4 process by which we've been abiding.  And
5 so it's our position that we should have
6 a second day with Mr. Aronoff so that I
7 can finish this examination.
8        MR. HEALY:  Our position is that
9 the deposition that was scheduled and
10 agreed to, which was for a day, has been
11 concluded.
12    I've told you that we're willing
13 to discuss your request for more time,
14 but the deposition that we had set is
15 done and you've had your seven hours.
16 And, you know, if you feel you're in the
17 middle of something and you need five
18 minutes to ask two questions to complete
19 it, I'm, you know, happy to entertain
20 that.  But I think otherwise this
21 deposition is ended.
22    I have a handful of cross-
23 examination questions that I intend to
24 ask so that we're finished.  And I think
25 that's where we are and we can pick up a

Page 281

1        James H. Aronoff
2 discussion about your request for a
3 second Aronoff deposition on Monday.
4        MR. DAVIS:  Well, I was about to
5 move to another line of questioning, so I
6 can't represent that I have only a few
7 more questions --
8        MR. HEALY:  Okay.
9        MR. DAVIS:  -- to give at this
10 time.  So I don't think it's really
11 appropriate for you to cross-examine the
12 witness at this time because I don't
13 believe the deposition is concluded.
14        MR. HEALY:  Well, we disagree
15 about that.
16        MR. DAVIS:  If that's what you
17 choose to do, I can't stop you,
18 obviously.
19        MR. HEALY:  Okay.
20        VIDEO TECHNICIAN:  Counsel, may we
21 change the media before you start?  We're
22 pretty close to the end of it.
23        MR. HEALY:  How much time do you
24 have?
25        VIDEO TECHNICIAN:  About five

71 (Pages 278 - 281)

# EXHIBIT B

# WILLKIE FARR & GALLAGHER LLP

TODD G. COSENZA

212 728 8677

tcosenza@willkie.com

787 Seventh Avenue
New York, NY 10019-6099
Tel:  212 728 8000
Fax:  212 728 8111

October 2, 2017

**VIA EMAIL**

Michael S. Shuster
Holwell Shuster & Goldberg LLP
750 Seventh Avenue, 26th Floor
New York, NY 10019

Re:  *In re Lehman Brothers Holdings Inc., et al., Ch. 11 Case No. 08-13555 (SCC)*

Dear Michael:

    We write on behalf of the Plan Administrator.

    On September 22, 2017, the Trustees disclosed that they would be calling James H. Aronoff as an "expert" witness at the upcoming estimation proceeding.  Mr. Aronoff has submitted a series of expert reports in this matter.  In these expert reports, he has disclosed that he was involved in designing and structuring the Trustees' process for reviewing and submitting Breach Claims to the Plan Administrator.  On several occasions, we have expressed to you that Mr. Aronoff's role in the process makes him a fact witness in this case.

    At his deposition on Thursday, September 28, Edmond Esses explained that Mr. Aronoff's role in the Trustees' Protocol process was even broader than what had been indicated in his expert reports.  Indeed, for example, Mr. Esses testified that Mr. Aronoff::

- made the final decisions over which Breach Claims were actually submitted to the Plan Administrator.  (Esses, 69:24-70:5 ("the decisions about whether or not to send claims to the Plan Administrator"));

- was responsible for "mapping" the representations and warranties to the governing agreements for the Trustees' breach findings.  (Esses, 87:13-20); and

- "made a final AMA determination" on the claims that were submitted to
  the Plan Administrator.  (Esses, 114:19-24 *see also* 249:25-250:12,
  262:23-263:2).

Mr. Esses' testimony has confirmed that —in addition to his purported role as an "expert"— Mr. Aronoff is an essential fact witness.  Therefore, the Plan Administrator requests that the Trustees make Mr. Aronoff available for an additional day of deposition during the week of October 9.

The Plan Administrator continues to reserve all of its rights.

Sincerely,

Todd G. Cosenza

cc: All counsel (via email)

2

# HOLWELL SHUSTER & GOLDBERG LLP

*750 Seventh Avenue, 26th Floor*
*New York, New York 10019*
*Tel: (646) 837-5151*
*Fax: (646) 837-5150*
*www.hsgllp.com*

*Michael S. Shuster*
*646-837-5153*
*mshuster@hsgllp.com*

October 3, 2017

**VIA EMAIL**

Todd Cosenza
Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY 10019

Re:    *In re Lehman Brothers Holdings Inc. RMBS Claims Estimation Hearing*

Dear Todd:

  We write on behalf of the RMBS Trustees in response to your letter dated October 2, 2017 regarding the Plan Administrator's request to make Mr. Aronoff available for a second day of deposition testimony.  The Trustees will not do so.  Mr. Aronoff is properly designated as an expert opining on the Trustee's loan review process during the Protocol, and his involvement in that process, which the Plan Administrator has been aware of for several years now, is consistent with his expert role.  Indeed, each of the tasks you raise in your letter—designing the Trustees' review, including participating in the "mapping" of representations and warranties, as well as making decisions regarding breach claims and materiality determinations—are similar to the tasks typically undertaken by experts evaluating RMBS putback claims for litigation purposes. That the loan review here took place during the Protocol does not transform Mr. Aronoff into a fact witness nor permit the Plan Administrator additional deposition time.

Very Truly Yours,

Michael S. Shuster

cc:    All counsel (via email)

# EXHIBIT C

| From: | Dwight Healy <dhealy@hsgllp.com> |
|---|---|
| Sent: | Wednesday, October 11, 2017 10:59 AM |
| To: | Davis, Joseph; Neil R. Lieberman; Waisnor, Jonathan D.; Michael Shuster; Franklin H. Top III; Scott A. Lewis; Weitnauer, Kit; Solomon, Jason; Sigler, Sage; Munno, M. William; Guzman, Daniel; .JPM.Kraut, Michael; Moore, James O.; anna.goldenhersh@morganlewis.com; Dorit Ungar Black; Daniel P. Goldberg; Lani A. Perlman; Drebsky, Dennis |
| Cc: | Yanez, Antonio; McCallen, Benjamin; Watson, Leah; Glasner, Evan; Cosenza, Todd; Neskovic, Gorana |
| Subject: | RE: In re Lehman Brothers - RMBS Estimation Proceeding:  Aronoff |

Joe:

You seem to be unfamiliar with the role of an expert in RMBS putback litigation.  Mr. Aronoff role in designing and overseeing the loan review process was in the context of his role as the expert who would opine on the results of the loan review. An expert always testifies as to the basis of his/her opinion, and indeed courts in the RMBS context have required the expert to have knowledge regarding the process by which loans were reviewed and the standards used to evaluate breaches and assess materiality. That reality does not transform the expert into a fact witness. And it certainly does not mean that you are somehow entitled to two days with Mr. Aronoff. If it did, then Mr. Grice would be both a fact witness – as to the "audit" he allegedly conducted of the Trustees' loan review process – and an expert – as to his opinions supported by his "audit."

Although we have been prepared to discuss with you some additional time with Mr. Aronoff your reluctance to identifying any topics that you did not have an opportunity to cover with Mr. Aronoff during the seven hours of examination last Friday makes clear that in fact you have adequate time already. We nonetheless remain willing to engage in such discussions.

Dwight

---

**From:** Davis, Joseph [mailto:JDavis@WILLKIE.COM]
**Sent:** Tuesday, October 10, 2017 9:36 PM
**To:** Dwight Healy <dhealy@hsgllp.com>; Neil R. Lieberman <nlieberman@hsgllp.com>; Waisnor, Jonathan D. <JWaisnor@willkie.com>; Michael Shuster <mshuster@hsgllp.com>; Franklin H. Top III <top@chapman.com>; Scott A. Lewis <slewis@chapman.com>; Weitnauer, Kit <kit.weitnauer@alston.com>; Solomon, Jason <jason.solomon@alston.com>; Sigler, Sage <sage.sigler@alston.com>; Munno, M. William <munno@sewkis.com>; Guzman, Daniel <guzman@sewkis.com>; .JPM.Kraut, Michael <mkraut@morganlewis.com>; Moore, James O. <james.moore@morganlewis.com>; anna.goldenhersh@morganlewis.com; Dorit Ungar Black <dblack@hsgllp.com>; Daniel P. Goldberg <dgoldberg@hsgllp.com>; Lani A. Perlman <lperlman@hsgllp.com>; Drebsky, Dennis <ddrebsky@nixonpeabody.com>
**Cc:** Yanez, Antonio <ayanez@willkie.com>; McCallen, Benjamin <BMcCallen@willkie.com>; Watson, Leah <LWatson@willkie.com>; Glasner, Evan <EGlasner@willkie.com>; Cosenza, Todd <TCosenza@willkie.com>; Neskovic, Gorana <GNeskovic@willkie.com>
**Subject:** RE: In re Lehman Brothers - RMBS Estimation Proceeding: Aronoff

Dwight,

Thanks for the response.  As you know, our position is that Mr. Aronoff is both a fact and expert witness, and that we are entitled to depose him in each capacity, for a total of two days.  Your email seems to suggest the Trustees agree that Mr. Aronoff has factual knowledge about the protocol process about which we are entitled to depose him.  Mr. Aronoff is no less a fact witness than Mr. Esses or Mr. Pfeifer.  In fact, Mr. Aronoff testified he was the "boss" of the Trustees' loan review process, and Mr. Esses testified that "Mr. Aronoff and his team" made the decision whether to send a claim to the Plan Administrator in the Protocol.  We don't agree that by choosing to call Mr. Aronoff as an expert witness you can immunize him from testifying as a fact witness.  Moreover, Mr. Aronoff repeatedly relies on the fact that he was "involved in the forensic loan review conducted under the protocol and the decisions made by the Trustees" to support his expert opinions, creating a direct link between his role as fact witness and his role as expert witness.

I did not conclude my examination of Mr. Aronoff in either capacity.  I can assure you that the continued examination will cover his role in the protocol process and his expert opinions.  We are under no obligation to provide an outline of the remainder of the examination, and we will not do so.  Please let us know the Trustees' position.

Joe

Joseph G. Davis
Willkie Farr & Gallagher LLP
1875 K Street, N.W. | Washington, DC 20006-1238
Direct: +1 202 303 1131 | Fax: +1 202 303 2131
jdavis@willkie.com | vCard | www.willkie.com bio

**From:** Dwight Healy [mailto:dhealy@hsgllp.com]
**Sent:** Tuesday, October 10, 2017 4:19 PM
**To:** Davis, Joseph <JDavis@WILLKIE.COM>; Neil R. Lieberman <nlieberman@hsgllp.com>; Waisnor, Jonathan D. <JWaisnor@willkie.com>; Michael Shuster <mshuster@hsgllp.com>; Franklin H. Top III <top@chapman.com>; Scott A. Lewis <slewis@chapman.com>; Weitnauer, Kit <kit.weitnauer@alston.com>; Solomon, Jason <jason.solomon@alston.com>; Sigler, Sage <sage.sigler@alston.com>; Munno, M. William <munno@sewkis.com>; Guzman, Daniel <guzman@sewkis.com>; .JPM.Kraut, Michael <mkraut@morganlewis.com>; Moore, James O. <james.moore@morganlewis.com>; anna.goldenhersh@morganlewis.com; Dorit Ungar Black <dblack@hsgllp.com>; Daniel P. Goldberg <dgoldberg@hsgllp.com>; Lani A. Perlman <lperlman@hsgllp.com>; Drebsky, Dennis <ddrebsky@nixonpeabody.com>
**Cc:** Yanez, Antonio <ayanez@willkie.com>; McCallen, Benjamin <BMcCallen@willkie.com>; Watson, Leah <LWatson@willkie.com>; Glasner, Evan <EGlasner@willkie.com>; Cosenza, Todd <TCosenza@willkie.com>; Neskovic, Gorana <GNeskovic@willkie.com>
**Subject:** RE: In re Lehman Brothers - RMBS Estimation Proceeding: Aronoff

Joe:

 On Friday I said that I was prepared to continue the discussion of your request for more time on Monday, and this is the first I have heard from you. As you know, we don't share your view that Mr. Aronoff is a fact witness. He is an expert testifying to the same topics typically covered by a reunderwriting/forensic review expert. The fact that such an expert designs or addresses the review process that was used to identify breaches hardly makes him a fact witness.

Having attended the deposition and based on the transcript, it appears to us that you were able to question Mr. Aronoff regarding both his involvement in the loan review process and his opinions, so we do not see a basis for your request for additional time.

2

Nevertheless, if you feel that there were topics that you were unable to cover in the time allotted for every other witness in this case, please identify them so that we can engage in a meaningful and informed discussion of your request for more time.

Dwight

Dwight Healy
Holwell Shuster & Goldberg LLP
750 Seventh Avenue, 26th Floor
New York, NY 10019
(646) 837-8406 (office)
(917) 848-9777 (mobile)
www.hsgllp.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---

**From:** Davis, Joseph [mailto:JDavis@WILLKIE.COM]
**Sent:** Tuesday, October 10, 2017 12:58 PM
**To:** Neil R. Lieberman <nlieberman@hsgllp.com>; Waisnor, Jonathan D. <JWaisnor@willkie.com>; Michael Shuster <mshuster@hsgllp.com>; Franklin H. Top III <top@chapman.com>; Scott A. Lewis <slewis@chapman.com>; Weitnauer, Kit <kit.weitnauer@alston.com>; Solomon, Jason <jason.solomon@alston.com>; Sigler, Sage <sage.sigler@alston.com>; Munno, M. William <munno@sewkis.com>; Guzman, Daniel <guzman@sewkis.com>; .JPM.Kraut, Michael <mkraut@morganlewis.com>; Moore, James O. <james.moore@morganlewis.com>; anna.goldenhersh@morganlewis.com; Dorit Ungar Black <dblack@hsgllp.com>; Daniel P. Goldberg <dgoldberg@hsgllp.com>; Dwight Healy <dhealy@hsgllp.com>; Lani A. Perlman <lperlman@hsgllp.com>; Drebsky, Dennis <ddrebsky@nixonpeabody.com>
**Cc:** Yanez, Antonio <ayanez@willkie.com>; McCallen, Benjamin <BMcCallen@willkie.com>; Watson, Leah <LWatson@willkie.com>; Glasner, Evan <EGlasner@willkie.com>; Cosenza, Todd <TCosenza@willkie.com>; Neskovic, Gorana <GNeskovic@willkie.com>
**Subject:** RE: In re Lehman Brothers - RMBS Estimation Proceeding: Aronoff

Dwight,

You mentioned on Friday that we would hear from you about scheduling another day to continue Mr. Aronoff's deposition.  Please let us know the Trustees' position and what dates might work.

Thanks.

Joe

**Joseph G. Davis**
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. | Washington, DC 20006-1238
Direct: +1 202 303 1131 | Fax: +1 202 303 2131
jdavis@willkie.com | vCard | www.willkie.com bio

---

**Important Notice:**  This email message is intended to be received only by persons entitled to receive the confidential information it may contain.  Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged.  Please do not read, copy, forward or store this message unless you are an intended recipient of it.  If you have received this message in error, please forward it back.  Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

**Important Notice:**  This email message is intended to be received only by persons entitled to receive the confidential information it may contain.  Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged.  Please do not read, copy, forward or store this message unless you are an intended recipient of it.  If you have received this message in error, please forward it back.  Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

# EXHIBIT D

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Chapter 11

5    Case No. 08-13555(SCC)

6    -----------------------------------x

7

     IN RE

8

     LEHMAN BROTHERS HOLDINGS INC., et al.,

9

                    Debtors.

10

11   -----------------------------------x

                    September 28, 2017

12                  9:36 a.m.

13

14

15        Videotaped Deposition of EDMOND

16   ESSES, taken by Debtors, pursuant to

17   Notice, held at the offices of Willkie Farr

18   & Gallagher LLP, 787 Seventh Avenue, New

19   York, New York, before Todd DeSimone, a

20   Registered Professional Reporter and Notary

21   Public of the State of New York.

22

23

24

25

Page 66

1        E. ESSES
2        Charlie and Rich, Mr. Campbell
3   and Mr. Sauerwein, worked under the
4   direction of Mr. Aronoff in, among other
5   things, reviewing and approving claims for
6   submission.
7        Q.   Did you not review and approve
8   claims for submission?
9        A.   It wasn't my -- it wasn't my
10  primary responsibility.
11       Q.   How much of your time did you
12  spend doing that?
13       A.   A really rough estimate, when I
14  say a really rough estimate, it would be 10
15  to 20 percent of my time, if anything.
16  Again, I was not primarily responsible for
17  that part of the review.
18       Q.   Were there certain types of
19  loans or claims or some other delineation
20  that routed loan-level review to you?
21       A.   No.
22       Q.   It could have been any of the
23  same types of loans or claims that would
24  have been reviewed by Mr. Campbell or
25  Mr. Sauerwein?

Page 67

1        E. ESSES
2        MR. HEALY:  Objection, calls
3   for speculation.
4        A.   Would you mind asking that
5   question again?
6        Q.   The loans that you reviewed
7   could have been the exact same kind that
8   either Mr. Campbell or Mr. Sauerwein might
9   have reviewed, there was no distinction?
10       A.   I don't believe I testified
11  that I reviewed loans.  I may have -- we
12  can read back my testimony, but that wasn't
13  my intention.
14       Q.   Fair enough.  You said you -- I
15  believe you said you reviewed and approved
16  claims?
17       A.   Can we read back?  Because I
18  may have -- I may have -- that wasn't my
19  intention.
20       Q.   Why don't we cut through it.
21  Why don't you tell me what you did do.
22       A.   Again, primarily responsible
23  for the logistical issues.
24       Q.   And other than that -- I asked
25  whether -- well, you said that you spent 10

Page 68

1        E. ESSES
2   to 20 percent of your time doing something
3   with respect to claims?
4        A.   I reviewed them for consistency
5   and to ensure that under, you know, these
6   were Charlie's main responsibility, but to
7   ensure that the work product was up to Duff
8   & Phelps' standards, I guess is a way of
9   saying it.
10       Q.   Was that a quality control
11  function?
12       A.   Not specifically, no.
13       Q.   And was the 10 to 20 percent of
14  your time reviewing -- performing that
15  function, was that based on a sampling of
16  claims that had been reviewed by somebody
17  else?
18       A.   No.
19       Q.   How were those 10 to 20 percent
20  of your time performing that function, how
21  was it decided that you would perform that
22  function?
23       A.   It was my decision.  It was my
24  choice.
25       Q.   And how did you get those --

Page 69

1        E. ESSES
2   well, what is it that you did in that 10 to
3   20 percent of the time to make sure that
4   the claims were up to Duff & Phelps
5   standards?
6        MR. HEALY:  Objection to the
7   extent that that mischaracterizes his
8   testimony.
9        A.   Sure.  To say that a little bit
10  differently, I just wanted to stay in the
11  loop and know what was going on at a
12  detailed level.
13       Q.   What specifically did you do to
14  do that?
15       A.   Okay.  I reviewed the breach
16  submissions, the breach findings.
17       Q.   Are those the breach findings
18  that are found in the claims tracking
19  spreadsheet?
20       A.   It is, yes.
21       Q.   Did you ever make any changes
22  to them?
23       A.   Not that I specifically recall.
24  If I had a question or a suggestion, I
25  would have took it to Charlie.

18 (Pages 66 - 69)

Page 70

1          E. ESSES
2    Q.    Were these all claims that
3    were -- had been decided would be made to
4    the Plan Administrator?
5    A.    Not necessarily.
6    Q.    There could be somewhere a
7    review was performed and a decision was
8    made not to submit it it to the Plan
9    Administrator?
10   A.    It's possible.  Not that I
11   specifically recall.
12   Q.    Did you make the decision about
13   whether or not to send claims to the Plan
14   Administrator?
15   A.    No.
16   Q.    Who did?
17   A.    Mr. Aronoff and his team.
18   Q.    Well, specifically the names of
19   the people in addition to Mr. Aronoff who
20   decided to submit claims to the Plan
21   Administrator.
22   A.    Sure.  Mainly Mr. Campbell.
23   Q.    Did Mr. Aronoff review
24   Mr. Campbell's work or did they sort of
25   split up the burden?

Page 71

1          E. ESSES
2    A.    I'm not sure.
3    Q.    Is Mr. Campbell the person who
4    was the first person to make a decision
5    with respect to any claim whether or not he
6    thought it should be -- form the basis of a
7    claim submitted to the Plan Administrator?
8    A.    There was a significant --
9    significant, you know, several layers of
10   review in place with each, you know,
11   quality control, you know, at several
12   levels.
13          Mr. Aronoff was ultimately
14   responsible for making that -- making that
15   determination.
16   Q.    Did he review all the claims?
17   A.    I'm not sure.
18   Q.    What do you think?
19   A.    I don't want to speculate.
20   Q.    Well, do you have a basis on
21   which to believe that Mr. Aronoff reviewed
22   all the claims?
23   A.    I don't have a basis to think
24   one way or the other.
25   Q.    Do you believe Mr. Campbell

Page 72

1          E. ESSES
2    would have reviewed all the claims?
3    A.    I do.
4    Q.    Do you believe Mr. Sauerwein
5    would have reviewed all the claims?
6    A.    I don't -- I'm not sure one way
7    or the other.
8    Q.    Did Mr. Sauerwein report to
9    Mr. Campbell?
10   A.    Charlie and Rich shared
11   responsibilities in reporting to Jim.
12   Q.    By Jim, you mean Mr. Aronoff?
13   A.    Mr. Aronoff, yes.
14   Q.    In the course of the review
15   that you performed, did you look at
16   anything other than the breach findings?
17   A.    Yes.
18   Q.    What did you look at?
19   A.    We also had these packets of
20   documents that were the supporting
21   evidence.  I may have looked at those.
22   Q.    Are you referring to what you
23   call the claim file?
24   A.    Not the RMBS claim file as
25   defined by the protocol, but the claim

Page 73

1          E. ESSES
2    package I think was one of the terms we've
3    used to refer to it, the claim package; the
4    claim package, potentially the loan file.
5    Q.    Did you make a judgment on a
6    claim-by-claim basis what documents to look
7    at?
8    A.    I'm sorry, I don't understand
9    the question.
10   Q.    When you were performing the
11   review that you're describing, did you look
12   at all of the documents in the claim
13   package?
14   A.    I may have.
15   Q.    Did you look at all the claims
16   in the loan file -- I'm sorry, all the
17   documents in the loan file?
18   A.    I may have.
19   Q.    On what basis would you decide
20   to look at documents as contrasted with
21   just looking at the breach findings?
22          MR. HEALY:  Objection to the
23   form of the question.
24   A.    I'm not sure that I had a
25   specific basis for making that

19 (Pages 70 - 73)

Page 114

```
1          E. ESSES
2  as may be applicable in a particular
3  agreement?
4          MR. HEALY:  Objection to form,
5  asked and answered.
6      A.   I hope I'm not
7  mischaracterizing my earlier testimony, but
8  we can refer to that, but I believe -- my
9  understanding was that there was a mapping
10 between the breach categories and the
11 representations and warranties, and that
12 Jim's team made a final determination of
13 materiality of AMA and whether to submit
14 that claim to the Plan Administrator.
15     Q.   In what form is that mapping?
16     A.   The spreadsheet form.
17     Q.   And who are the members of the
18 team that were responsible for that?
19     A.   As I've testified earlier --
20 can we refer to my earlier testimony?  I
21 believe I answered this specific question.
22     Q.   I don't think you did.  I want
23 to know -- I'm asking specifically about
24 the materiality determination, as you
25 referred to it, or the AMA determination as
```

Page 115

```
1          E. ESSES
2  we referred to it, who made that -- who
3  were the members of the team that made that
4  determination?
5          MR. HEALY:  Objection.  That's
6  not the question you just asked him, so
7  that sounds like a new question.
8          I will object on the grounds
9  that I think it is vague and ambiguous and
10 repetitive and may misstate his testimony,
11 or may misassume facts.
12     Q.   Did Mr. Aronoff make that final
13 AMA determination?
14     A.   My understanding was that
15 Mr. Aronoff made a final AMA determination
16 with the assistance of the members of his
17 team.
18     Q.   And did Mr. Aronoff review and
19 make that determination with respect to
20 every loan-level claim, a specific
21 determination on a specific set of facts
22 applicable to a specific borrower?  That's
23 what I would like to know.
24     A.   You will have to ask
25 Mr. Aronoff.
```

Page 116

```
1          E. ESSES
2      Q.   Is that because you don't know?
3      A.   That's because I don't know.
4      Q.   Do you have a belief?
5      A.   As I've testified, my
6  understanding of the process was that
7  breach findings were submitted through the
8  Duff & Phelps quality control process, with
9  an ultimate determination made by
10 Mr. Campbell under the direction and
11 oversight of Mr. Aronoff.
12     Q.   Did Mr. Campbell make a
13 recommendation one way or the other to
14 Mr. Aronoff about whether or not he
15 believed the particular breach findings
16 adversely and materially affected the value
17 of the loan or the interest of the
18 depositor therein as may be applicable?
19     A.   I don't know.
20     Q.   And on the loans that you
21 reviewed, did you make a recommendation
22 with respect to whether you thought the
23 breach findings were AMA?
24     A.   Absolutely not.
25     Q.   Why do you say "absolutely
```

Page 117

```
1          E. ESSES
2  not"?
3      A.   It was not my role.  I'm not --
4  I'm not sure that I'm qualified to do that.
5      Q.   Do you believe Mr. Campbell is
6  qualified to do that?
7      A.   Under the direction and
8  oversight of Mr. Aronoff.
9      Q.   Mr. Campbell is qualified to do
10 it under the direction and management of
11 Mr. Aronoff; is that what you believe?
12     A.   I believe Mr. Aronoff is the
13 expert in this case and Mr. Aronoff is
14 qualified to do so.  Whether he felt, you
15 know, you will have to ask him about that
16 detail.
17     Q.   And what do you believe makes
18 Mr. Aronoff qualified to do so?
19     A.   I don't have a -- I don't have
20 a specific belief one way or -- I mean, you
21 know, we can refer to his report on his
22 background and his experience, but I'm not
23 sure I'm one to judge whether he is, you
24 know, experienced and qualified.
25     Q.   Is there anybody else at Duff &
```

30 (Pages 114 - 117)

Page 246

```
1            E. ESSES
2    Q.    Did it happen?
3    A.    I don't have a specific
4  recollection, but I can say with certainty
5  that it did happen.
6    Q.    And who made that decision?
7    A.    Well, Mr. Campbell under the
8  direction of Mr. Aronoff.
9    Q.    Based on what considerations?
10   A.    I'm not sure.
11   Q.    What do you -- what's the best
12 of your knowledge?
13   A.    That Mr. Aronoff made a
14 determination to the materiality on a
15 claim-by-claim basis.
16   Q.    Looking at each and every
17 claim?
18   A.    Either him or his team, yes.
19   Q.    How was the information about
20 the claim communicated to Mr. Aronoff for
21 purposes of him being able to make that
22 determination?
23        MR. HEALY:  Objection to the
24 extent it misstates his testimony.
25   A.    The information reviewed
```

Page 247

```
1            E. ESSES
2  through the several-layer -- multiple-layer
3  QC, quality control, process was, you know,
4  as I testified, was captured into a
5  database and made its way through each
6  level of the quality control process.
7    Q.    And did Mr. Aronoff then access
8  that database in order to make those
9  determinations?
10        MR. HEALY:  Same objection.
11   A.    I don't know.
12   Q.    What are the range of
13 possibilities of the different ways where
14 Mr. Aronoff was able to review the claims
15 in order to make a determination about
16 whether the breach adversely and materially
17 affected the value of the loan or the
18 interests of the depositor?
19        MR. HEALY:  Same objection, and
20 calls for speculation.
21   A.    My understanding of the process
22 was that Jim, Mr. Aronoff, worked closely
23 with and oversaw and directed Mr. Campbell
24 in the making of that determination.
25   Q.    I'm asking more about the
```

Page 248

```
1            E. ESSES
2  mechanics of how Mr. Aronoff saw the claims
3  at the time that he was making the AMA
4  determination.
5        MR. HEALY:  Same objection I've
6  made, and I'll also note that I think you
7  have just misstated his testimony, or
8  ignored it, I'm not sure which.
9    A.    I don't know.
10   Q.    What about Mr. Campbell, do you
11 know how Mr. Campbell saw the claims in
12 order to help Mr. Aronoff make the AMA
13 determination?
14   A.    I do know that.
15   Q.    How?
16   A.    I worked closely with
17 Mr. Campbell.
18   Q.    How did he see the claims in
19 order to make the AMA determination?
20   A.    The data was loaded into a
21 database and the claim packages were made
22 available and he reviewed them on the
23 screen.
24        I wasn't with him, you know,
25 all day, every day, but I understood that's
```

Page 249

```
1            E. ESSES
2  what he was doing, editing on the screen
3  and making that determination on, you know,
4  on each and every claim.
5    Q.    Each and every one of the
6  92,000 or so claims that were submitted to
7  the Plan Administrator?
8    A.    It's possible -- I think the
9  answer is yes, subject to my earlier
10 testimony.
11   Q.    And I want to clarify something
12 I said.  I said approximately 92,000
13 claims.  I believe there were claims, any
14 number of claims on about 92,000 loans.
15 Does that sound correct to you?
16   A.    Originally 94,000,
17 approximately 94,000 loans.
18   Q.    So subject to your prior
19 testimony, your understanding is that
20 Mr. Campbell made an AMA determination with
21 respect to each claim asserted in
22 connection with each of the approximately
23 92,000 loans that were submitted to the
24 Plan Administrator?
25   A.    I said 94,000, but yes.
```

63 (Pages 246 - 249)

Page 250

```
1           E. ESSES
2      Q.   How many times did it occur
3  that a breach was reviewed but a finding of
4  AMA was not satisfied?
5      A.   I don't know.
6      Q.   Did it happen every day?
7      A.   I don't know.
8      Q.   Can you give me any sense of
9  dimension about how many times that
10 happened?
11     A.   I cannot.
12     Q.   What about were there specific
13 claim types in which a breach would not
14 satisfy the requirement to establish AMA?
15     A.   I don't believe so.
16     Q.   It was a loan-by-loan
17 determination?
18     A.   Breach-by-breach determination,
19 yes.
20     Q.   So really it could be multiple
21 determinations within each loan, correct?
22     A.   Correct.
23     Q.   Depending upon the facts and
24 circumstances of each particular loan?
25     A.   Okay.
```

Page 251

```
1           E. ESSES
2      Q.   Does that sound right?
3      A.   Yeah.
4      Q.   And what were the facts and
5  circumstances about each particular loan
6  that one would consider in making that AMA
7  determination from the perspective of the
8  trustees' review process?
9      A.   I don't know.
10     Q.   Because you never did that?
11     A.   It wasn't my responsibility.
12     Q.   But you observed it?
13     A.   Yes, I observed it.
14     Q.   Did you keep track of every
15 time you found a breach but didn't find
16 AMA?
17          MR. HEALY:  Him personally?
18          MR. ROLLIN:  No, in the
19 trustees' review process.
20     A.   That would have -- yes, that's
21 something that we would have information
22 on.
23     Q.   Would Mr. Aronoff know about
24 that?
25     A.   I don't know.
```

Page 252

```
1           E. ESSES
2      Q.   Mr. Aronoff was the final
3  decision-maker, wasn't he?
4      A.   I believe so, yes.
5      Q.   So if there was a determination
6  about whether AMA had been satisfied with
7  respect to any particular loan, that would
8  ultimately be Mr. Aronoff's decision,
9  correct?
10          MR. HEALY:  Objection.  I think
11 that misstates his testimony.
12     A.   Right.  It was delegated to his
13 very competent and qualified staff.
14     Q.   When you said "right," were you
15 responding to the objection or were you
16 responding to my question?
17     A.   I was responding to your
18 question with the rest of my sentence.
19     Q.   So in response to my question,
20 your answer was "Right.  It was delegated
21 to his very competent and qualified staff"?
22     A.   To the extent you are reading
23 me back my testimony, that sounds like what
24 I said.
25     Q.   Do you have any sense of how
```

Page 253

```
1           E. ESSES
2  many determinations on the question of AMA
3  were made by Mr. Aronoff personally as
4  contrasted with members of his staff?
5      A.   I don't know.
6      Q.   And who were the members of his
7  staff that were involved in the AMA
8  determination?
9      A.   Mr. Campbell.
10     Q.   Is that the only person?
11     A.   Mr. Sauerwein was involved as
12 well.
13     Q.   Going back to the question of
14 proof, I asked you what was the proof that
15 the trustees used to establish whether or
16 not the question of AMA had been satisfied,
17 and I don't believe I have an answer to
18 that.
19          What is the proof that the
20 trustees used to answer that question?
21          MR. HEALY:  Objection.  I think
22 it has been asked and answered.
23     A.   I don't understand the
24 question.
25     Q.   What things did the trustees
```

64 (Pages 250 - 253)

Page 254

```
1          E. ESSES
2  consider in making the determination of
3  whether or not a breach adversely and
4  materially affected the value of the loan
5  or the interest of the depositor therein?
6      A.    At a minimum, they considered
7  the breach finding description narrative,
8  at a minimum.  There may have been other
9  things that I'm not specifically aware of.
10     Q.    Anything else that you can
11 think of?  You said at a minimum.  I just
12 want to make sure I've exhausted your
13 knowledge.
14     A.    I think Mr. Aronoff and his
15 team took into account whether the breach
16 finding fit the definition of AMA, which I
17 generally understand to be an increased
18 risk of loss on an ex-ante basis.
19     Q.    And how was an increase in the
20 risk of loss measured?
21     MR. HEALY:  Objection.
22 Objection to form.
23     A.    I don't specifically know, and
24 respectfully, I don't believe I'm here to
25 testify to that.  I'm not the expert in
```

Page 255

```
1          E. ESSES
2  this matter.
3      Q.    You are not an expert at all,
4  you are a fact witness, and I'm asking you
5  what you know.
6      A.    As I answered, I don't know.
7      Q.    Was there anything in the
8  process that was done that was intended to
9  measure the increase in risk of loss on any
10 particular loan?
11     A.    There was.
12     Q.    What was that?
13     A.    There was specific instructions
14 to the review firms.
15     Q.    What were those instructions?
16     A.    It varied on a breach category
17 by breach category.
18     Q.    Please proceed.
19     A.    Sure.  We gave them
20 instructions on which breach findings to
21 collar.  We made it clear that -- they had
22 some general understanding with their
23 experience in review, forensic reviews, and
24 we gave them instructions not to send up
25 certain claims.
```

Page 256

```
1          E. ESSES
2      Q.    I want to go back to my
3  question, because I think you misunderstood
4  it.
5          My question was, what in the
6  process was done that was intended to
7  measure the increased risk of loss on any
8  particular loan, measure the amount of the
9  increase?
10     MR. HEALY:  I'm just going to
11 object on the grounds that contains
12 assumptions that are unwarranted.
13     Q.    You can answer.
14     A.    As I've previously answered,
15 the instructions and thresholds provided to
16 the review firms, in the first instance,
17 were meant to, at a first level, weed out
18 any findings that Mr. Aronoff would not
19 have believed to be -- fit the standard of
20 AMA.
21     Q.    You understand that when
22 there's an increase in something, that
23 something starts in a place, and then it
24 goes up in some measured way; does that
25 make sense to you?
```

Page 257

```
1          E. ESSES
2      MR. HEALY:  Objection,
3  argumentative, misassumes facts.
4      A.    That makes sense to me.
5      Q.    So I would like to know what it
6  was that you did in the trustees' side of
7  the protocol process that measured that
8  increase in the risk of loss on the loans.
9      A.    As I've answered, we had
10 procedures, policies and procedures,
11 instructions in place, to, for example,
12 filter out findings that decreased the risk
13 of loss as opposed to increased.
14     Q.    So what findings decreased the
15 risk of loss?
16     A.    Sure.  So, for example, you
17 know, our description, misrep of occupancy,
18 applied to primary home and second home,
19 not if the, you know, to the extent of the
20 review firm found a stated investor
21 property that turned out to be a primary
22 owner-occupied home, that was not a finding
23 we were interested in seeing.
24     Q.    Any others?
25     A.    And, you know, to take any
```

65 (Pages 254 - 257)

Page 258

```
1            E. ESSES
2  example, and this would be applicable
3  across the board, if there was certain
4  misstatements or omissions of material
5  facts that decreased the risk of loss with
6  regard to any of the various categories.
7       Q.   And I would like to know what
8  those are.
9       A.   Sure.  I mean, these are, you
10 know, the occupancy one stands out as --
11 not as the most likely, but the most
12 obvious to me, but it is possible that
13 there was a mortgage loan schedule that had
14 an LTV listed that was lower -- higher,
15 sorry, excuse me, higher than the actual
16 LTV.
17      Q.   Other than those instances in
18 which you found that a certain breach
19 actually decreased the risk of loss, what
20 other breach findings did you weed out
21 because they did not meet the standard of
22 AMA?
23      A.   There were other instructions
24 to the review firms where I believe, my
25 understanding was Mr. Aronoff would not
```

Page 259

```
1            E. ESSES
2  deem that to be AMA, so, you know, we
3  instructed the review firms not to cite
4  those instances.
5       Q.   And what were those instances?
6       A.   So I can give you another
7  example.
8       Q.   Just to be clear, I'm not
9  asking for an example.  I'm asking for you
10 to tell me everything that you know.
11      A.   Okay.  I think of it in terms
12 of specific instructions, so for me it is
13 helpful to describe it in terms of -- we
14 can go, you know, example by example to the
15 extent -- to the best of my recollection,
16 but to start with one instruction that
17 fits, I think fits this category, is we had
18 a threshold for variance in
19 misrepresentation of income that was 5
20 percent.
21      Q.   So if you had a 5 percent or
22 less misrepresentation of income, that
23 would not be AMA?
24           MR. HEALY:  Objection.  I think
25 that slightly misstates his testimony, but
```

Page 260

```
1            E. ESSES
2  he can certainly answer.
3       A.   We instructed the review firms
4  not to cite those -- that as a breach
5  finding.
6            I can't tell you whether -- I
7  cannot tell you whether that would have or
8  not have been deemed AMA, but, you know, we
9  are talking about thousands of loans,
10 hundreds of -- tens of thousands of claims,
11 and this was the instruction determined as
12 sort of like a filter for this AMA
13 determination to be made by Mr. Aronoff and
14 his team.
15      Q.   Okay.  Next.  You gave me the
16 example of 5 percent or less on misrep
17 income.
18      A.   Okay.  Owner occupancy, as we
19 previously discussed, that is binary or
20 trinary.  Misrepresentation of debt, so
21 there are certain instructions with regard
22 to post-close debt that we had that cutoff
23 after a certain period of time.
24           So, for example, you know, for
25 mortgage debt, that was the month following
```

Page 261

```
1            E. ESSES
2  the origination of the loan, and for
3  installment debt, you know, we asked the
4  review firms to only cite to a post-close
5  installment debt in the month following the
6  month of close if there were inquiries on
7  the credit report.
8       Q.   So that one, if you have a
9  post-closing debt, and by post-closing, I
10 mean after the closing of the subject loan
11 that occurred 29 days after closing of the
12 subject loan, that is AMA, and if you've
13 got one that is 32 days after the closing
14 of the subject loan, that's not AMA?
15           MR. HEALY:  Objection to form.
16 I think that misstates his testimony.
17      A.   What I testified is that the
18 instruction to the review firm was to flag
19 that as a defect for Mr. Aronoff to make
20 the ultimate determination.
21           But, in your example, which was
22 not exactly accurate, if it was in the
23 following -- following the month of close,
24 then that wouldn't have even come to our
25 attention at all.  We just told the review
```

66 (Pages 258 - 261)

Page 262

```
1            E. ESSES
2  firms we don't even want to see those.
3      Q.    Other examples?
4      A.    With regard to a
5  misrepresentation of employment, the review
6  firms were instructed certainly to flag
7  where they found a misstatement or omission
8  of a job title, and to the extent that the
9  job title was similar enough or not
10 material, have a significant enough
11 difference, we asked the review firms not
12 to flag those even if it was slightly --
13 slightly different.
14     Q.    That goes back to the question
15 that I asked earlier, and that has to do
16 with measurement.
17           Was there any point in the
18 process for the trustees in which they
19 established a baseline risk of loss on a
20 loan?
21           MR. HEALY:  Objection to form,
22 vague and ambiguous.
23     A.    I understood that to be part of
24 the AMA determination to the extent, you
25 know, the way you've described it would fit
```

Page 263

```
1            E. ESSES
2  in with Mr. Aronoff's opinion.
3      Q.    Do you believe that Mr. Aronoff
4  established a baseline risk of loss for
5  every loan that was ultimately made as part
6  of a claim back to the Plan Administrator?
7           MR. HEALY:  Objection, vague
8  and ambiguous.
9      A.    To the extent that's -- I don't
10 know.
11     Q.    It's true, isn't it, that the
12 trustee -- the trustees never performed any
13 calculations to establish what the baseline
14 risk of loss was on any particular loan in
15 the protocol, right?
16           MR. HEALY:  Objection, vague
17 and ambiguous.
18     A.    That wasn't my testimony.  I'm
19 not sure.
20     Q.    There was no point in the
21 protocol where the trustees, for example,
22 ran the loans through some sort of a model
23 that measured or quantified a risk of loss,
24 correct?
25           MR. HEALY:  Objection,
```

Page 264

```
1            E. ESSES
2  argumentative and vague and ambiguous.
3      A.    Not for the purpose of -- I
4  don't believe for the purpose of
5  determining AMA.
6      Q.    Not to establish a baseline
7  risk of loss and not to establish a new
8  risk of loss in light of the alleged
9  breach, correct?
10           MR. HEALY:  Objection to form,
11 vague and ambiguous.
12     A.    I don't know how Mr. Aronoff
13 would define baseline and increased in his
14 opinion, so I'm not sure I can -- I can
15 answer that question.
16     Q.    Well, I'm talking about what
17 happened in the protocol, not in connection
18 with his expert opinion.
19           Was there ever a time where the
20 trustees established a baseline risk of
21 loss on the loans and then established a
22 new revised risk of loss on the loans based
23 on the allegations of breach?
24           MR. HEALY:  Same objection, and
25 asked and answered.
```

Page 265

```
1            E. ESSES
2      A.    I believe Mr. Aronoff made
3  that -- made that determination of AMA,
4  which to the extent, as I've testified that
5  it includes an increased risk of loss, I
6  believe he made that determination.
7      Q.    How?
8      A.    You'll have to ask Mr. Aronoff.
9      Q.    Do you know?
10     A.    I don't know.
11     Q.    Did he perform any kind of a
12 quantitative analysis?
13     A.    I testified earlier that I
14 don't believe we ran a model for that
15 purpose, as you've described, but I don't
16 know -- I don't know -- I don't know.
17     Q.    Did you perform any analysis
18 around the pricing of the loan, that is
19 what their price was upon securitization
20 and what their price would be now that you
21 have allegations of breach?
22     A.    I don't believe so.
23     Q.    Do you not believe so, or you
24 know that that didn't happen?
25     A.    I can pretty certainly say that
```

67 (Pages 262 - 265)

# EXHIBIT 3

Page 295

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Chapter 11

5    Case No. 08-13555(SCC)

6    -----------------------------------x

7

     IN RE

8

     LEHMAN BROTHERS HOLDINGS INC., et al.,

9

                    Debtors.

10

11   -----------------------------------x
                    November 16, 2017

12                  10:07 a.m.

13

     VOLUME II

14

15       Continued Videotaped Deposition of

16   JAMES H. ARONOFF, taken by Plan

17   Administrator, pursuant to Notice, held at

18   the offices of Willkie Farr & Gallagher

19   LLP, 787 Seventh Avenue, New York, New

20   York, before Todd DeSimone, a Registered

21   Professional Reporter and Notary Public of

22   the State of New York.

23

24

25

Page 301

```
 1                  ARONOFF
 2   bag?
 3              THE WITNESS:  Yeah, if someone
 4   could just grab them.
 5         A.     Thank you, sorry about that.
 6   Page 3, I can get through.
 7         Q.     Okay.  And this is the document
 8   that has previously been marked as PA 67 I
 9   believe.  I'm just looking at the table.  I
10   don't know, is that something -- can you
11   make out the numbers on the table?
12         A.     Yeah.
13         Q.     So this is a chart of the
14   breach claims that you analyzed for your
15   expert report organized by breach type,
16   right?
17         A.     Yes.
18         Q.     And there are four categories
19   of misrepresentation claims on this chart,
20   right?
21              MR. HEALY:  I'm just going to
22   object to the prior description and
23   question.  I don't think that's a complete
24   list of the breach findings that he is
25   addressing in the report, but it obviously
```

Page 302

1                         ARONOFF

2    is, by the terms of the page, a listing of

3    the more prevalent types.

4         Q.       So the pending question is are

5    there four categories of misrepresentation

6    claims on this chart?

7         A.       Yes.

8         Q.       And am I right that there are

9    about 70,000 total breach claims based on

10   misrepresentations reflected on this chart?

11             MR. HEALY:  Objection to the

12   form of the question.

13        A.       I don't know.  The chart speaks

14   for itself.  I could add them up if you

15   want me to.

16        Q.       Okay.  Would you take a minute

17   and do that.

18             MR. HEALY:  Mr. Davis, just to

19   avoid confusion, by breach claims you are

20   referring to breach findings as Mr. Aronoff

21   has defined them in his report, or are you

22   referring to something else?

23             You are not going to respond to

24   my question for clarification?  I object to

25   the form of the question.  I believe it is

Page 303

1                    ARONOFF

2    vague, ambiguous, and confusing.

3         A.    I've got about -- I've got

4    about 70,000.  Is that what you said?

5         Q.    Yes.  Okay.

6         A.    70,000 breach findings.

7         Q.    So is it your opinion that the

8    facts of these 70,000 misrepresentation

9    breach findings listed on Table 1 here

10   support the inference that the vast

11   majority of those alleged

12   misrepresentations were intentional?

13        A.    No.  We discussed this in my

14   prior deposition.

15        Q.    Not exactly this question, but

16   I understand.  Okay.  Let's mark a

17   document, please.

18              (Plan Administrator Exhibit 139

19   marked for identification.)

20        Q.    So the court reporter has

21   marked as PA 139 a document entitled

22   Uniform Residential Loan Application.

23              Mr. Aronoff, do you recognize

24   the form of this document?

25              MR. HEALY:  Objection to form,

Page 317

```
 1                    ARONOFF
 2  decisions made by the Trustees, which I
 3  evaluated in connection with the issuance
 4  of the Aronoff Affirmative Report."
 5              Do you see that?
 6      A.    Yes.
 7      Q.    So is it your opinion that your
 8  personal involvement in the loan review
 9  process during the protocol should lead the
10  Court to believe that you are better
11  positioned to evaluate the trustees'
12  forensic loan review process than Mr. Grice
13  or Mr. Castro?
14              THE WITNESS:  Can I hear the
15  question again, please.
16      Q.    Let me reask it, actually.  I
17  will say it more slowly.
18              So is it your opinion that your
19  personal involvement in the loan review
20  process during the protocol should lead the
21  Court to believe that you are better
22  positioned to evaluate the trustees' loan
23  review process than Mr. Grice or
24  Mr. Castro?
25      A.    Yes.
```

Page 318

                    ARONOFF

1

2       Q.      And what's the basis for that
3   opinion?

4       A.      To the extent I have in my
5   report opined as to the reasonable,
6   thoughtful, careful nature by which the
7   trustees went about analyzing the loan
8   files and reaching a decision as to whether
9   or not there was a valid claim to be
10  submitted under the protocol, I was there
11  and I was involved in that decision-making
12  process and can speak from personal
13  experience as to the types of questions
14  that were asked and the type of care and
15  thought that went in to making those
16  decisions with respect to the trustees'
17  process.

18              Mr. Grice and Mr. Castro know
19  nothing about that process other than what
20  they read in my reports and what they infer
21  from the claims that were made and the data
22  surrounding those claims.  So that's why I
23  think that my involvement has put me in a
24  better position to evaluate and guide the
25  Court as to the trustees' process than

Page 375

1              ARONOFF

2    evidence used to support those

3    deficiencies, the mapping of those

4    deficiencies into reps and warranties, and

5    the determination of the materiality of

6    those breaches of reps and warranties were

7    all done in a manner that was consistent

8    with industry custom and practice and

9    reasonable given the common understanding

10   upon -- among market participants at the

11   time the deal was issued as to what those

12   promises meant to investors.

13        Q.    Are you aware of a case in

14   which a judge specifically made a finding

15   about a claimant's loan review process?

16        A.    I think both in Nomura, and I

17   note this in one of my reports somewhere,

18   it has been a while now, and definitely in

19   MARM, both judges are faced with and

20   discuss the issues of mistakes that were

21   made.

22             A mistake, in my view, was you

23   said that you did something and it is

24   identified that you didn't do it, you

25   misinterpreted evidence, you used the wrong

Page 376

1                      ARONOFF
2    evidence, and in both those cases the
3    judges say, I think it is clear by Castel
4    in MARM, that simply because a mistake is
5    demonstrated on an individual loan or
6    handful of loans, he is not going to read
7    that to mean that in any way the process by
8    which the other breach findings have been
9    asserted and analyzed are any way infected
10   or undermined.
11              So implicitly, I think they do
12   discuss the process in saying, look, we
13   know there are a handful of mistakes, but
14   that doesn't mean that there were any
15   systemic errors, necessarily, given the
16   types of errors that were identified in
17   those cases.
18              So yeah, I think that is a
19   discussion process.
20        Q.    Do you have any understanding
21   of whether the judge in this case is likely
22   to make a finding on the trustees' loan
23   review process, the quality of it?
24              MR. HEALY:  Objection,
25   foundation, calls for speculation, and to

Page 391

1              ARONOFF

2              What was done, as required by

3    the protocol, was to look at every single

4    loan for which the trustee thought they

5    were entitled to pursue a breach claim and

6    determine whether there were sufficient --

7    there was sufficient information in the

8    files, and attendant documentation, to

9    submit a valid claim under the protocol.

10             And to the extent there are

11   categories of breaches that are discussed

12   or groupings made, he doesn't seem to be

13   able to understand that all of that

14   information and all of that grouping and

15   all of that summarizing was rolled up from

16   the actual results that were discovered on

17   a loan-by-loan review and that the

18   information and facts for each loan and

19   each claim are laid out specifically.

20             So this was the polar opposite

21   of a one size fits all, given the

22   requirements imposed upon both parties

23   under the protocol, and that's the point of

24   this paragraph, and that's the point of

25   this section.

Page 398

1                    ARONOFF
2    been some where they were closer to that
3    line than others.
4              But given the enormity of the
5    undertaking and the time that was permitted
6    to pursue claims or lose the right to
7    pursue those claims, there was a real
8    attempt made to identify and put forth the
9    clearest -- the clearest, most
10   well-supported claims, and that was -- that
11   approach was further examined and verified
12   when I looked at the population that was
13   the subject of my report.
14        Q.      And when you say -- when you
15   say "looked at the population that was the
16   subject of my report," what do you mean by
17   that?
18        A.      I mean that as contrasted
19   with -- that was true for all of the claims
20   that were presented through the protocol
21   process, to the extent I was there, that
22   that overriding attempt to submit only the
23   clearest and most easily understood claims,
24   and then to the extent I wanted to assure
25   myself that that was true for the smaller

Page 399

```
 1              ARONOFF
 2  number of loans and claims that were the
 3  subject matter of my report, I was
 4  confident that that was the case as well,
 5  that the claims that were the subject
 6  matter of my report also reflected, if you
 7  think of -- if you think of the reasonable,
 8  valid claims as an archery target and
 9  you're permitted under the governing
10  documents and custom and practice and the
11  protocol to submit everything that is on
12  that target, and you shouldn't be
13  submitting anything outside the target, the
14  attempt wasn't made to use the whole
15  target, the attempt was made to stick with
16  the 7, 8, 9s and 10s in the middle of that
17  target, and to the extent something was a
18  valid, reasonable, thoughtful claim, given
19  the time and expense that was involved
20  here, we tried to avoid the close calls and
21  not waste time or jam up the process with
22  close calls and stick with the strongest,
23  most clearly evidenced breach findings.
24  That was the goal.
25              (Plan Administrator Exhibit 143
```

# EXHIBIT 4

464

```
 1
 2   ** C O N F I D E N T I A L **
 3   UNITED STATES BANKRUPTCY COURT
 4   SOUTHERN DISTRICT OF NEW YORK
 5   Chapter 11
 6   Case No. 08-13555(SCC)
 7   ----------------------------------x
 8
 9   IN RE
10   LEHMAN BROTHERS HOLDINGS INC., et al.,
                    Debtors.
11
12   ----------------------------------x
13                 November 17, 2017
                    9:37 a.m.
14
15   VOLUME III
16       Continued Videotaped Deposition of
17   JAMES H. ARONOFF, taken by Plan
18   Administrator, pursuant to Notice, held at
19   the offices of Willkie Farr & Gallagher
20   LLP, 787 Seventh Avenue, New York, New
21   York, before Todd DeSimone, a Registered
22   Professional Reporter and Notary Public of
23   the State of New York.
24
25
```

466

```
 2   A P P E A R A N C E S: (Continued)
 3   SEWARD & KISSEL LLP
     One Battery Park Plaza
 4   New York, New York 10004
          Attorneys for TMI Trust Company
 5   BY:   M. WILLIAM MUNNO, ESQ.
          munno@sewkis.com
 6
 7
 8   CHAPMAN and CUTLER LLP
     111 West Monroe Street
 9   Chicago, Illinois 60603-4080
          Attorneys for U.S. Bank National
10        Association
     BY:   FRANKLIN H. TOP, III, ESQ.
11        top@chapman.com
12
13
14
15   ALSO PRESENT:
16    WILLIAM OLSHAN, Lehman Brothers
17    ZACHARY TRUMPP, Lehman Brothers
      (Via Phone)
18
19    SUSAN H. SEABURY, Baker Tilly
20    SHANTE GEORGE, Baker Tilly
21    MARC FRIEDMAN, Videographer
22
23
24
25
```

465

```
 1
 2   A P P E A R A N C E S:
 3   WILLKIE FARR & GALLAGHER LLP
     1875 K Street, NW
 4   Washington, D.C. 20006
          Attorneys for Plan Administrator
 5   BY:  JOSEPH G. DAVIS, ESQ.
          jdavis@willkie.com
 6    GENEVIEVE DISPIRITO, ESQ.
          gdispirito@willkie.com
 7
          - and -
 8
     WILLKIE FARR & GALLAGHER LLP
 9   787 Seventh Avenue
     New York, New York 10019
10        Attorneys for Plan Administrator
     BY:   JONATHAN D. WAISNOR, ESQ.
11        jwaisnor@willkie.com
12
13   ROLLIN BRASWELL FISHER LLC
     8350 E. Crescent Parkway, Suite 100
14   Greenwood Village, Colorado 80111
          Attorneys for Plan Administrator
15   BY:   MICHAEL ROLLIN, ESQ.
          mrollin@rbf.law
16
17   HOLWELL SHUSTER & GOLDBERG LLP
18   750 Seventh Avenue
     New York, New York 10019
19        Attorneys for RMBS Trustees
     BY:   DWIGHT A. HEALY, ESQ.
20        dhealy@hsgllp.com
      LANI PERLMAN, ESQ.
21        lperlman@hsgllp.com
      KAREN SEBASKI, ESQ.
22        ksebaski@hsgllp.com
23
24
25
```

467

```
 1                 ARONOFF
 2          THE VIDEOGRAPHER: Good morning.
 3   We are going on the record at 9:37 a.m. on
 4   Friday, November 17th, 2017.
 5          Please note the microphones are
 6   sensitive and may pick up whisperings,
 7   private conversations and cellular
 8   interference.  Please turn off all cell
 9   phones or place them away from the
10   microphones as they can interfere with
11   deposition audio.  Audio and video
12   recording will continue to take place
13   unless all parties agree to go off the
14   record.
15          This is media unit number one
16   of the video-recorded deposition of James
17   H. Aronoff in the matter of Lehman Brothers
18   Holdings, et al.  This case is filed in
19   United States Bankruptcy Court, Southern
20   District of New York, Chapter 11, case
21   number 08-13555.
22          This deposition is being held
23   at the office of Willkie Farr & Gallagher
24   located at 787 Seventh Avenue, New York,
25   New York.  My name is Marc Friedman.  I'm
```

604

ARONOFF

2     A.     I don't know what the trustees'
3 view would be. I haven't thought about
4 whether or not I think this borrower lied
5 or not.
6     MR. DAVIS: Okay, I appear to
7 be out of time.
8     MR. HEALY: I have a few
9 questions, Mr. Aronoff. Do you need a
10 break before we continue?
11     MR. DAVIS: I do actually.
12     MR. HEALY: Okay.
13     THE VIDEOGRAPHER: The time is
14 2:23. We are going off the record.
15     (Recess taken.)
16     THE VIDEOGRAPHER: The time is
17 2:36. We are back on the record.
18 EXAMINATION BY MR. HEALY:
19     Q.     Mr. Aronoff, I'm going to refer
20 you to the last line of questioning by
21 Mr. Davis before we finished.
22     Do you have a view as to
23 whether the facts that support the breach
24 findings for misrepresentation claims that
25 are the subject of your report in many

605

ARONOFF

2 instances support the conclusion that the
3 borrower was in fact intentionally making a
4 misstatement?
5     MR. DAVIS: Objection, leading.
6     A.     Yes.
7     Q.     What is your view?
8     MR. DAVIS: Leading.
9     A.     That although a showing of
10 intention is not required to support a
11 misrepresentation breach finding, given the
12 nature of the misstatements or the enormous
13 difference between, in many cases, the
14 statements that were made in order to
15 secure the loan and the actual facts that
16 were uncovered or identified in the
17 forensic review, I believe that in the vast
18 majority of cases the statements made by
19 the borrowers were intentional.
20     Q.     Would you turn to Exhibit 67,
21 that is PA Exhibit 67. Is that a copy of
22 your affirmative expert report in this
23 case?
24     A.     Yes.
25     Q.     Would you turn to page 43 of

606

ARONOFF

2 that report. Now, on pages 43 and 44, do
3 you describe certain criteria that apply to
4 the misrepresentation of income breach
5 findings that are the subject of your
6 report?
7     MR. DAVIS: Objection, vague.
8     A.     Yes.
9     Q.     Let's start on page 43. You
10 see that it says that the review firms were
11 instructed to use a 5 percent variance
12 between the misstated income and verified
13 income as a threshold for determining the
14 significance of an income
15 misrepresentation?
16     A.     I see that.
17     Q.     Was that a criteria that was
18 used during the course of the loan review
19 process conducted during the protocol
20 process?
21     A.     Yes, that's correct.
22     Q.     Do you have a view as to
23 whether a misrepresentation of income that
24 was less than 5 percent would still be a
25 valid breach?

607

ARONOFF

2     MR. DAVIS: Leading.
3     A.     Yes.
4     Q.     What's your view?
5     A.     It still is a valid breach
6 claim because it would -- to the extent
7 there was a misstatement of income that was
8 material and adverse to the interests of
9 investors, that would provide a claim.
10 There is no variance in the rep or there is
11 no variance in fact, in custom and
12 practice.
13     Q.     To the extent that a
14 misrepresentation of income breach finding
15 was submitted during the protocol that had
16 associated with it a less than 5 percent
17 variance and that breach finding is not a
18 subject of your report, does that indicate
19 that there was some deficiency in the
20 process, that was conducted during the
21 protocol process?
22     MR. DAVIS: Objection, leading,
23 incomplete hypothetical.
24     A.     No, not in any way.
25     Q.     Would you go to page 44. Now,

608

ARONOFF

1  in the first paragraph on page 44, you
2  discuss the difference between same-year
3  and near-year evidence.  Do you see that?
4  **A.     Yes.**
5  **Q.** And do you see that you
6  describe certain criteria that apply to the
7  loans within -- that are the subject of
8  your report that are based upon near-year
9  evidence, do you see that?
10 **A.     Yes.**
11 **Q.** Now, towards the bottom of that
12 paragraph it states "The breach findings
13 supported by near-year evidence for
14 salaried borrowers are based only on
15 evidence showing variances of at least 30
16 percent between the represented and
17 verified income, if the loan was originated
18 in 2007 and later."
19     Do you see that?
20     MR. DAVIS:  I'm going to
21 object.  This is outside the scope of my
22 examination, it is not proper cross, and it
23 is leading.
24 **Q.** You can answer the question,

609

ARONOFF

1  Mr. Aronoff.
2  **A.     I do see that.**
3  **Q.** Was that a criteria or a screen
4  that was applied during the protocol
5  process?
6      MR. DAVIS:  Same objections.
7  **A.     No.**
8  **Q.** Do you have a view as to
9  whether breach findings that did not
10 satisfy that criteria that were put forth
11 during the protocol process were valid
12 breach findings?
13     MR. DAVIS:  Same objections.
14 **A.     Yes, they were valid breach**
15 **findings.**
16 **Q.** Does the fact that that
17 category of breach findings is not included
18 in the loans that are the subject of your
19 report cause you any concerns about the
20 reliability of the loan review process that
21 was conducted during the protocol process
22 on behalf of the trustees?
23     MR. DAVIS:  Counsel, at this
24 point I'm going to object.  This line of

610

ARONOFF

1  examination is improper, it is outside the
2  scope of my examination, and if you are
3  going where I think you are going, it is
4  too late to introduce evidence in this case
5  on a subject that the trustees have taken
6  the position is protected as privileged.
7      If you keep down this road, you
8  proceed at your own peril and in the Plan
9  Administrator's view you will be waiving
10 attorney-client privileges and work product
11 protections this subject.
12 **Q.** To be clear, Mr. Aronoff, I'm
13 not asking you for any information that you
14 have that you received from counsel or that
15 was derived from communications with
16 counsel.  Do you understand that
17 instruction?
18     MR. DAVIS:  And to be clear,
19 Mr. Healy, that does not cure the issue, in
20 our view.  Proceed if you wish.
21 **Q.** Mr. Aronoff, do you understand
22 the instruction?
23     THE WITNESS:  Can I hear the
24 instruction again, please?

611

ARONOFF

1      (The record was read.)
2      MR. DAVIS:  Same objections.
3  Outside the scope of my examination.
4      MR. HEALY:  Can you now reread
5  the question that I asked Mr. Aronoff to
6  which Mr. Davis objected.
7      (The record was read.)
8      MR. DAVIS:  And vague.
9  **A.     No.**
10 **Q.** Now, the next paragraph on page
11 44 talks about the use of near-year
12 evidence for misrepresentation of income
13 claims asserted with respect to
14 self-employed borrowers.  Do you see that?
15     MR. DAVIS:  Leading.  Same
16 objections.
17 **A.     Yes.**
18 **Q.** And in the second sentence it
19 says that "The breach findings supported by
20 near-year evidence for self-employed
21 borrowers are based only on evidence
22 showing variances of at least 100 percent
23 between the misstated and verified income
24 if the evidence was at least two years from

612

ARONOFF

1  origination and at least 50 percent for
2  loans originated in 2007 and later."
3          Do you see that?
4          MR. DAVIS:  Same objection.
5      A.  I do.
6      Q.  Were the criteria that are set
7  forth in that sentence applied during the
8  course of the protocol process?
9          MR. DAVIS:  Same objections.
10     A.  No.
11     Q.  Does the fact that breach
12 findings that did not satisfy those
13 criteria are not included in the scope of
14 your report suggest to you that there was
15 some deficiency or unreliability in the
16 loan review process conducted during the
17 protocol on behalf of the trustees?
18         MR. DAVIS:  Same objections,
19 leading, outside the scope.
20     A.  No, it does not.
21     Q.  With respect to the last two
22 answers that you have given me with respect
23 to these two criteria and the prior
24 criteria with respect to salaried

613

ARONOFF

1  borrowers, can you explain why you don't
2  think the omission of those categories from
3  the scope of your report creates any
4  uncertainty about the reliability of the
5  process?
6          MR. DAVIS:  Compound, leading,
7  outside the scope of my examination,
8  improper cross, or direct.
9          THE WITNESS:  Can I hear the
10 question, please.
11         (The record was read.)
12         MR. DAVIS:  Also lacks
13 foundation.
14         MR. HEALY:  I'm going to break
15 it down actually.
16     Q.  Let's go to page 44 and look at
17 the last sentence in the first paragraph of
18 page 44.  Are you with me?
19     A.  The last sentence in the first
20 paragraph, yes.
21     Q.  Can you explain why you do not
22 think that the omission of breach findings
23 that do not satisfy that criteria does not
24 render -- raise any concern about the

614

ARONOFF

1  reliability of the loan review process
2  conducted during the protocol process on
3  behalf of the trustees?
4          MR. DAVIS:  Objection, vague,
5  leading, outside the scope of my opinion,
6  and this appears to be counsel's attempt to
7  elicit new opinions three days before the
8  beginning of trial from this witness,
9  entirely inappropriate.
10     Q.  You can answer the question,
11 Mr. Aronoff.
12     A.  The reason is that, as I stated
13 previously, the way in which the breach
14 findings were ascertained under the
15 protocol with a 5 percent variance was
16 appropriate, thoughtful, reasonable and
17 well within industry custom and practice.
18 So to the extent a more stringent or
19 conservative subset of that universe, using
20 a 30 percent in certain instances,
21 certainly would not in any way affect my
22 view that what was submitted under the
23 protocol was valid and reasonable.
24     Q.  Let me ask you to look at the

615

ARONOFF

1  second to last sentence in the final
2  paragraph on page 44.
3      A.  Okay.
4      Q.  Can you explain why the
5  omission of loans that do not satisfy
6  either one of those criteria from the loans
7  that are the subject of your report does
8  not cause you any concern about the
9  reliability of the loan review process
10 conducted during the protocol on behalf of
11 the trustees?
12         MR. DAVIS:  Same objections,
13 vague, leading, outside the scope of my
14 direct -- or my cross, sorry.
15     A.  The same answer.  This is a --
16 this is a subset of the claims that were
17 made under the protocol, which I believe
18 were reasonable and valid, and so to the
19 extent this is simply more conservative
20 standards as to which -- as to which claims
21 will be pursued doesn't affect the --
22 doesn't affect that in any way.
23     Q.  Could I ask you to turn to
24 Exhibit 68, please.  Would you look at

624

ARONOFF

1  case.  However, I will note that in my
2  experience it is fairly common and not
3  unusual at all for the number of valid
4  claims that come out of a forensic loan
5  review to be a larger universe of loans
6  than are ultimately the subject matter of
7  the related action.  So the fact that that
8  happened here causes me no pause at all.
9
10     Q.      Does the fact that some of the
11  categories of breach findings that you do
12  address in your report not -- strike that.
13          Does the fact that not all of
14  the loans or claims that were identified
15  during the protocol process are included
16  within the categories of breach findings
17  that you do address create any concern on
18  your part about the reliability of the loan
19  review process?
20          MR. DAVIS:  Objection, outside
21  the scope, leading, and vague.
22     A.      No.
23     Q.      Do you have an understanding
24  that the -- strike that.
25          Let's turn back to the

625

ARONOFF

1
2  misrepresentation breach claims that we
3  talked about a few minutes ago.  I know
4  that you told me in your testimony that
5  there were various reasons why those --
6  certain claims within those categories may
7  have been dropped, but let me -- let me ask
8  you to assume that all of the breach
9  findings for misrepresentation of income
10  that are not being pursued in this
11  proceeding were dropped because they were
12  the result of errors, and let me further
13  ask you to assume that out of a total of
14  some 37,000 breach claims that were put
15  forward in the protocol, approximately
16  2,895 were not being pursued at the
17  estimation hearing.
18     A.      How many?
19     Q.      2,895 out of 37,313.  And let
20  me ask you to assume that that represents
21  about a 7.8 percent.
22          Does that fact cause you to
23  conclude that there was a systemic
24  deficiency in the loan review process that
25  was conducted on behalf of the trustees

626

ARONOFF

1  during the protocol?
2
3          MR. DAVIS:  Objection.
4     A.      No.
5          MR. DAVIS:  Hold on.  You are
6  leading this witness obviously by the nose.
7  You are asking him about topics that I did
8  not cover over the last two days of
9  deposition, and, as I said before, you are
10  proceeding at your own peril.
11     Q.      Can you explain the reason for
12  your response?
13          MR. DAVIS:  Same objections.
14     A.      Even assuming that there was an
15  error rate of 7 percent with respect to a
16  particular category of breach finding,
17  which I don't think there was, that's not
18  to say there might not have been errors,
19  the fact that there is an error on an
20  individual loan or a small group of loans,
21  given that the analysis was done on a
22  loan-by-loan basis based on specific
23  information as it related to each specific
24  loan that was the subject of the review,
25  there's no correlation or relationship

627

ARONOFF

1
2  between an error in one loan and a
3  potential error in the loans for which
4  there is no error, particularly if the
5  opportunity exists to review the 93 percent
6  that in your hypothetical don't contain
7  errors.
8     Q.      Did the Plan Administrator have
9  the opportunity to review the 93 percent of
10  misrepresentation of income loans that I've
11  asked about in my hypothetical?
12          MR. DAVIS:  Same objections.
13     Q.      Let me ask it another way.
14          Did the Plan Administrator have
15  the opportunity to review and respond to
16  each of the breach claim submissions made
17  by the trustees during the course of the
18  protocol?
19          MR. DAVIS:  Same objections.
20     A.      That was my understanding.
21     Q.      And in your reports have you
22  described the nature of the Plan
23  Administrator's responses submitted during
24  the protocol process?
25          MR. DAVIS:  Same objections.

628

ARONOFF

1
2    **A.    Yes.**
3    **Q.**    And is it your view that for
4    the vast majority of instances the Plan
5    Administrator offered no particularized
6    objection --
7        MR. DAVIS:  Same objections.
8    **Q.**    -- to the breach claims
9    submitted by the trustees?
10       MR. DAVIS:  Same objections.
11       THE WITNESS:  Can I hear the
12   question again, please.
13       (The record was read.)
14   **A.    Yes.**
15   **Q.**    And I just talked to you about
16   misrepresentation of income.
17       Let me talk to you about
18   misrepresentation of occupancy.  Let me ask
19   you to assume that of the claims submitted
20   with a misrepresentation of occupancy
21   breach finding during the protocol,
22   approximately 1.3 percent of those are not
23   the subject of your report.
24       MR. DAVIS:  Same objections.
25   **Q.**    And let me ask you to assume

630

ARONOFF

1
2    represented in that 3.7 percent had some
3    error associated with the breach finding.
4        Do you have a view as to
5    whether that fact indicates a systemic
6    deficiency in the loan review process that
7    was conducted on behalf of the trustees
8    during the protocol?
9        MR. DAVIS:  Same objections,
10   and I would add, Mr. Healy, that the judge
11   just told you yesterday that it was too
12   late to put in additional expert opinions,
13   and effectively what you are doing is
14   eliciting an improper sur-reply.
15   **Q.**    Could you answer my question,
16   please?
17       THE WITNESS:  I need to hear
18   the question again, please.
19       (The record was read.)
20   **A.    I don't think those -- the**
21   **facts in your hypothetical that you asked**
22   **me to assume reflect a deficiency in the**
23   **process for the same reasons I stated with**
24   **respect to the misrepresentation of income**
25   **hypothetical.**

629

ARONOFF

1
2    that the 1.3 percent were all withdrawn on
3    the basis that there was some error in the
4    breach finding that was submitted during
5    the protocol process.
6        MR. DAVIS:  Same objections.
7    **Q.**    Does that give you any concern
8    that there are some systemic deficiencies
9    in the loan review process that was
10   conducted during the protocol on behalf of
11   the trustees?
12       MR. DAVIS:  Same objections.
13   **A.    No.  I mean, that means 99**
14   **percent of the claims were correct.**
15   **Q.**    Let me ask you about
16   misrepresentation of debt obligations, and
17   let me ask you to assume that 3.7 percent
18   of the misrepresentation of debt obligation
19   breach findings submitted during the
20   protocol process are not the subject of
21   your report.
22       MR. DAVIS:  Same continuing
23   objections.
24   **Q.**    Let me further ask you to
25   assume that all of the breach findings

631

ARONOFF

1
2    **Q.**    And let me ask you, finally,
3    about excessive DTI breach findings.  Let
4    me ask you to assume that approximately 6
5    percent of the excessive DTI breach
6    findings that were submitted during the
7    protocol process are not included in the
8    excessive DTI breach findings that are the
9    subject of your report.
10       MR. DAVIS:  Same objections.
11   Mr. Healy, may I ask you, are you reading
12   from one of our expert reports?
13       MR. HEALY:  I am not reading
14   from the body of one of your expert
15   reports.
16       MR. DAVIS:  Are you referring
17   to one of our expert reports as you ask
18   these questions?
19       MR. HEALY:  I'm asking the
20   witness hypotheticals.
21       MR. DAVIS:  You are not going
22   to answer my question whether you are
23   referring to one of our expert reports?
24       MR. HEALY:  I don't think I
25   have an obligation to respond to that.  I'm

632

ARONOFF

2 asking the witness a hypothetical.
3        MR. DAVIS:  That is fine.  The
4 judge can ask you that question.  Same
5 objections.
6        THE WITNESS:  I need to hear
7 the question again, I'm sorry.
8    Q.    Let me start again.
9        So we are talking about
10 excessive DTI breach findings.  Are you
11 with me?
12    A.    Yes.
13    Q.    So let me ask you to assume
14 that 6 percent of the excessive DTI breach
15 findings identified during the protocol
16 process are not the subject of your expert
17 opinion, and let me ask you to assume for
18 purposes of this question that all of the
19 breach findings represented by that 6
20 percent contain some error with respect to
21 the breach finding.
22        Does that fact cause you to
23 believe that the loan review process
24 conducted during the protocol on behalf of
25 the trustees suffered from some systemic

633

ARONOFF

2 deficiency?
3        MR. DAVIS:  Same objections,
4 and vague.
5    A.    No, for the same reasons as
6 I've stated with respect to the prior
7 hypotheticals.
8        MR. HEALY:  I pass the witness.
9        MR. DAVIS:  I need to take a
10 break.
11        THE VIDEOGRAPHER:  The time is
12 3:13.  We are going off the record.
13        (Recess taken.)
14        THE VIDEOGRAPHER:  The time is
15 3:36.  We are back on the record.  This
16 will be the start of media unit number
17 four.
18 EXAMINATION BY MR. DAVIS:
19    Q.    Mr. Aronoff, when did you first
20 form the opinions you just offered in
21 response to Mr. Healy's questions?
22    A.    The answers that I gave to the
23 questions were based on understandings and
24 beliefs that I have had probably since I
25 offered my affirmative report.  But the

634

ARONOFF

2 ones with respect to Mr. Grice's comments
3 about the impact of a mistake on any
4 individual loan may have on the process or
5 the loans that were the subject of my
6 report we discussed yesterday and is
7 discussed in my reply report.
8    Q.    Why didn't you provide all of
9 the opinions you just offered in response
10 to Mr. Healy's questions in your reply
11 report?
12        MR. HEALY:  Objection, overly
13 broad, vague and ambiguous, argumentative,
14 assumes facts.
15    A.    I provided the same opinions in
16 my reply report as I just offered now in
17 different contexts.  The specific context
18 and specific hypotheticals that I addressed
19 just now I was not asked to opine on in my
20 reports.
21    Q.    Okay.  So you are telling me
22 that you provided the opinions you just
23 gave in response to Mr. Healy's questions
24 in your reply report; is that right?
25        MR. HEALY:  Objection to form,

635

ARONOFF

2 misstates his testimony.
3    A.    That's not what I said.
4    Q.    Okay.  So that's not correct?
5    A.    That's not correct.
6    Q.    Okay.  Why didn't you provide
7 those opinions that you just gave in
8 response to Mr. Healy's questions in your
9 reply report?
10        MR. HEALY:  Objection, assumes
11 that Mr. Grice had submitted his reply
12 report before Mr. Aronoff submitted his
13 reply report.
14        MR. DAVIS:  That's an improper
15 speaking objection.
16        MR. HEALY:  It is a totally
17 confusing and misleading question.
18        THE WITNESS:  Could I hear the
19 question that is standing, please.
20        (The record was read.)
21    A.    Because I didn't just give any
22 opinions.  I answered questions that were
23 asked of me.
24    Q.    So you didn't give any opinions
25 in response to Mr. Healy's questions just

# EXHIBIT 5

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Chapter 11

5    Case No. 08-13555(SCC)

6    ------------------------------------x

7

     IN RE

8

     LEHMAN BROTHERS HOLDINGS INC., et al.,

9

                    Debtors.

10

11   ------------------------------------x

                    September 28, 2017

12                  9:36 a.m.

13

14

15        Videotaped Deposition of EDMOND

16   ESSES, taken by Debtors, pursuant to

17   Notice, held at the offices of Willkie Farr

18   & Gallagher LLP, 787 Seventh Avenue, New

19   York, New York, before Todd DeSimone, a

20   Registered Professional Reporter and Notary

21   Public of the State of New York.

22

23

24

25

Page 298

```
 1                      E. ESSES
 2   including sort of the loan load files, and
 3   we believe that was sufficient.  We didn't
 4   require, because we had those load files,
 5   we didn't believe it was necessary, and we
 6   had the other supplemental sources,
 7   necessary to, you know, go through that
 8   process of getting the monthly loan tapes.
 9        Q.     You believe in the trustees'
10   protocol process, don't you?
11        A.     Very much so, yes.
12        Q.     You believe that the trustees
13   hired all the right professionals?
14        A.     I do, yes.
15        Q.     And they represent all of the
16   applicable disciplines?
17        A.     I do, yes.
18        Q.     They followed the right
19   process?
20        A.     I very much do, yes.
21        Q.     It was well-designed?
22        A.     Very well-designed.
23        Q.     The trustees and their
24   professionals collected all of the
25   documents they believed were appropriate
```

Page 299

                        E. ESSES

1   for this project?

2         A.      I believe -- I believe so, yes.

3         Q.      They collected all the evidence

4   they believed was necessary and appropriate

5   for this project?

6         A.      Yes.

7         Q.      Duff & Phelps did due diligence

8   on every single loan?

9         A.      To the extent, as I've

10  testified earlier, yes.

11        Q.      And you believe you found all

12  the claims on each loan?

13        A.      I can't -- I can't say that

14  with certainty, sitting here today.

15        Q.      You believe that you instituted

16  a process, applied a process that should

17  have found every claim on every loan, don't

18  you think?

19                MR. HEALY:  Objection to form.

20  I think that misstates his testimony

21  actually.

22        A.      I think the process was robust

23  and sufficient to -- well, again, you know,

24  I think there was an understanding that

Page 300

1                    E. ESSES
2    every valid claim -- every claim that was
3    submitted was valid is my testimony.
4         Q.       Every one of the approximately
5    94,000 -- every one of the claims on the
6    approximately 94,000 loans was valid?
7         A.       Well, we withdrew approximately
8    2,000 of those, leaving 92,000.  Yes, I
9    believe the ones that were not withdrawn
10   were valid.
11        Q.       So you believe that every one
12   of the claims on 92,000-plus loans was
13   valid?
14        A.       I believe we followed our
15   procedures and policies, which were
16   sufficient and robust, and that -- and that
17   every claim was submitted in accordance
18   with those policies and procedures.
19        Q.       I asked you whether or not you
20   believed they were valid, and you told me
21   you believed you followed your policies and
22   procedures and that every claim was
23   submitted in accordance with those policies
24   and procedures.  So I would like to go back
25   to my question.

Page 301

1                         E. ESSES

2                   Do you believe that every one

3      of the claims on the 92,000-plus loans was

4      valid?

5                   MR. HEALY:  Objection, asked

6      and answered.

7            A.      Sitting here today, I don't

8      know that I can testify to that.

9            Q.      Do you believe that you

10     submitted invalid claims to the Plan

11     Administrator?

12           A.      I wouldn't think so, but it's

13     possible.  For example, you know, you're

14     aware of certain step two withdrawals, so

15     that happened, there wasn't a very great

16     number, it was a very small number of

17     those, and not always -- the claim

18     withdrawals do not result in a loan being

19     withdrawn, there are multiple breaches per

20     loan.

21                   But to the extent we followed

22     our policies and procedures, I think

23     it's -- it's a strong indication that all

24     the submitted claims were valid.

25           Q.      A strong indication that all of

Page 302

E. ESSES

1
2   the claims were valid, but you're not sure
3   whether all the claims were valid?
4        A.      I can't, sitting here today, I
5   can't tell you that we didn't make, you
6   know, a small -- a minute amount of
7   mistakes would not surprise me.
8        Q.      At most, at most, you made a
9   minute amount of mistakes?
10       A.      I think the process was
11  extremely robust, including, you know, the
12  experienced and qualified review firms and
13  several layers of quality control at Duff &
14  Phelps, with extensive experience with
15  these types of reviews, so yes.
16              MR. HEALY:  Mr. Rollin, I don't
17  want to interrupt your line here, but we
18  have been going for something like an hour
19  and 20.  It is late in the afternoon.  I
20  would suggest a break.
21              MR. ROLLIN:  I'm fine with
22  that.
23              THE VIDEOGRAPHER:  The time is
24  now 4:59.  We are going off the record.
25  This is the end of media file number five.

Page 303

1                      E. ESSES

2                  (Recess taken.)

3                  THE VIDEOGRAPHER:  We are now

4    back on the record.  The time is 5:25.

5    This is the beginning of media file number

6    six.

7    BY MR. ROLLIN:

8        Q.    Mr. Esses, you understand that

9    15,000 loans that were submitted to the

10   Plan Administrator under the protocol are

11   now no longer at issue in the estimation

12   proceeding, right?

13       A.    I have a general understanding

14   of that, yes.

15       Q.    Do you believe that those

16   15,000 loans are not valid claims?

17       A.    As I testified earlier with

18   regard to the 92,000 claims submitted

19   through the protocol, I do believe they are

20   all valid claims.

21       Q.    So you believe the trustee

22   withdrew valid claims from the estimation

23   proceeding?

24       A.    I didn't understand the

25   question.

Page 349

```
  1                    E. ESSES
  2    not sure what you're doing.
  3         Q.    Let me ask you this question:
  4              When did you first learn that
  5    these claims would not be pursued in the
  6    estimation proceeding?
  7              MR. HEALY:  Mr. Esses, if that
  8    information, answering that question, would
  9    cause you to disclose the content of any
 10    communication with counsel, you're
 11    instructed not to answer the question.
 12              MR. ROLLIN:  That is not the
 13    attorney-client privilege.  That is not a
 14    correct statement of the law.  When he
 15    learned a fact is not privileged.
 16              MR. HEALY:  I've given him my
 17    instruction, we can disagree about it, but
 18    he has the instruction.
 19         A.    Duff & Phelps was involved in
 20    the preparation of exhibits to
 21    Mr. Aronoff's expert report, and to that
 22    extent I learned which claims were included
 23    and not included.
 24         Q.    And my question specifically
 25    was when.
```