**<u>Exhibit F</u>**

LB UK III Prospectus

# LEHMAN BROTHERS UK CAPITAL FUNDING III LP

*(a limited partnership organised under the laws of England and Wales)*

## €500,000,000

## Fixed/Floating Rate Enhanced Capital Advantaged Preferred Securities ("Euro ECAPS")

having the benefit of a subordinated guarantee of

# LEHMAN BROTHERS HOLDINGS PLC

*(incorporated with limited liability in England and Wales with registered number 1854685)*

### Issue Price: €49,717.50 per Preferred Security

The €500,000,000 Fixed/Floating Rate Enhanced Capital Advantaged Preferred Securities (the "Euro ECAPS" or the *"Preferred Securities"*), each with a liquidation preference of €50,000 will comprise limited partnership interests in Lehman Brothers UK Capital Funding III LP (the "Issuer").

Holders of the Preferred Securities will receive (subject as described herein under *"Description of the Preferred Securities"*) non-cumulative preferential cash distributions ("Distributions") payable annually in arrear on 22nd February in each year at the rate of 3.875 per cent. per annum on the amount of the Liquidation Preference in respect of the period from and including the Closing Date to but excluding 22nd February, 2011 and thereafter quarterly in arrear at three month EURIBOR plus 1.60 per cent. per annum on the amount of the Liquidation Preference, all subject as more fully described herein under *"Description of the Preferred Securities"*.

See "Risk Factors" for a discussion of certain factors that should be considered by prospective investors.

As an English limited partnership, the Issuer will not be a legal entity separate from its partners. The Preferred Securities will benefit from a subordinated guarantee to be dated the Closing Date (the "Subordinated Guarantee") entered into by Lehman Brothers Holdings plc (the "Guarantor" or "UK Holding") of declared dividends and redemption amounts, all as more fully described herein under *"Subordinated Guarantee"*.

Application has been made to the Financial Services Authority in its capacity as competent authority under the Financial Services and Markets Act 2000 (the "UK Listing Authority") for the Preferred Securities to be admitted to the Official List of the UK Listing Authority (the "Official List") and to the London Stock Exchange plc for the Preferred Securities to be admitted to trading on the London Stock Exchange plc's Gilt Edged and Fixed Interest Market. The London Stock Exchange plc's Gilt Edged and Fixed Interest Market is a regulated market for the purposes of Directive 93/22/EEC (the "Investment Services Directive").

This document has been approved by the UK Listing Authority as a prospectus within the meaning of Directive 03/71/EC (the "Prospectus Directive").

Lead Manager

## LEHMAN BROTHERS

Co-Lead Managers

| | |
|---|---|
| Bancaja | Banco Bilbao Vizcaya Argentaria, S.A. |
| ES Investment | ING Wholesale Banking |
| IXIS Corporate & Investment Bank | Lloyds TSB |
| Standard Chartered Bank | |

The date of this Prospectus is 20th February, 2006

"ECAPS " is a service mark of Lehman Brothers

LB GP No. 1 Ltd. in its capacity as the General Partner (the "**General Partner**") and the Guarantor together (the "**Responsible Persons**") accept responsibility for the information contained in this Prospectus. To the best of the knowledge and belief of the General Partner and the Guarantor (each having taken all reasonable care to ensure that such is the case) the information contained in this Prospectus is in accordance with the facts and does not omit anything likely to affect the import of such information.

No person is or has been authorised to give any information or to make any representation not contained or incorporated in or consistent with this Prospectus and, if given or made, such information or representation must not be relied upon as having been authorised by the Issuer, the General Partner, Chase Nominees Limited ("**CNL**"), the Guarantor or the Managers (as defined under "*Subscription and Sale*" below). Neither the delivery of this Prospectus nor any subscription, sale or purchase made in connection herewith shall, in any circumstances, create any implication that there has been no change in the affairs of the Issuer, the General Partner, the Guarantor or the Guarantor Group (as defined in the Terms and Conditions of the Preferred Securities) since the date hereof.

Neither this Prospectus nor any other information supplied in connection with the Preferred Securities (i) is intended to provide the basis of any credit or other evaluation or (ii) should be considered as a recommendation by the Issuer, the General Partner, the Guarantor, CNL, the Guarantor Group or the Managers that any recipient of this Prospectus or any other information supplied in connection with the Preferred Securities should purchase the Preferred Securities. Each prospective investor contemplating purchasing Preferred Securities should make its own independent investigation of the financial condition and affairs, and its own appraisal of the creditworthiness, of the Issuer and the Guarantor.

Prospective investors should inform themselves as to the legal requirements and tax consequences within the countries of their residence and domicile for the acquisition, holding or disposal of Preferred Securities and any foreign exchange restrictions that might be relevant to them. This Prospectus does not constitute an offer of, or an invitation by or on behalf of, the Issuer or any of its partners, the General Partner, CNL, the Guarantor or the Managers to subscribe for or purchase any of the Preferred Securities.

Prospective investors should satisfy themselves that they understand all of the risks associated with making investments in the Preferred Securities. If a prospective investor is in any doubt whatsoever as to the risks involved in investing in the Preferred Securities, he should consult his professional advisers.

The distribution of this Prospectus and the offering of the Preferred Securities in certain jurisdictions may be restricted by law. Persons into whose possession this Prospectus comes are required by the Issuer, the General Partner, the Guarantor and the Managers to inform themselves about, and to observe, any such restrictions.

In respect of the United Kingdom, this Prospectus is directed only at (a) investment professionals falling within article 14(5) of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001 (the "**Promotion of CIS Order**") and article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 (the "**Financial Promotion Order**"), who have professional experience of participating in unregulated schemes and of matters relating to investments; and/or (b) persons falling within article 22(2) of the Promotion of CIS Order and article 49(2) of the Financial Promotion Order; and/or (c) any other persons to whom this Prospectus may be communicated lawfully. Preferred Securities are only available to such persons. Persons who (i) do not have such professional experience in participating in unregulated schemes and in matters relating to investments and/or (ii) do not fall within said article 22(2) and 49(2) and/or (iii) are not persons to whom this Prospectus may be communicated lawfully should not rely on this Prospectus.

The Preferred Securities may not be offered or sold, directly or indirectly, and neither this Prospectus nor any advertisement or other offering material may be distributed or published in any jurisdiction, except in accordance with the legal requirements applicable in that jurisdiction. In particular, the Preferred Securities have not been, and will not be, registered under the United States Securities Act of 1933, as amended (the "**Securities Act**"). The Preferred Securities may not be offered, sold or delivered within the United States or to, or for the account or benefit of, U.S. persons. A further description of certain restrictions on the offering

and sale of the Preferred Securities and on the distribution of this Prospectus is given under *"Subscription and Sale"* below.

**IN CONNECTION WITH THE ISSUE OF THE PREFERRED SECURITIES, LEHMAN BROTHERS INTERNATIONAL (EUROPE) OR ANY PERSON ACTING FOR IT MAY OVER-ALLOT (PROVIDED THAT THE AGGREGATE PRINCIPAL AMOUNT OF THE PREFERRED SECURITIES DOES NOT EXCEED 105 PER CENT. OF THE AGGREGATE PRINCIPAL AMOUNT OF THE PREFERRED SECURITIES). HOWEVER, THERE IS NO ASSURANCE THAT LEHMAN BROTHERS INTERNATIONAL (EUROPE) (OR PERSONS ACTING ON BEHALF OF LEHMAN BROTHERS INTERNATIONAL (EUROPE)) WILL UNDERTAKE STABILISATION ACTION. ANY STABILISATION ACTION MAY BEGIN ON OR AFTER THE DATE ON WHICH ADEQUATE PUBLIC DISCLOSURE OF THE TERMS OF THE OFFER OF THE PREFERRED SECURITIES IS MADE AND, IF BEGUN, MAY BE ENDED AT ANY TIME, BUT IT MUST END NO LATER THAN THE EARLIER OF 30 DAYS AFTER THE CLOSING DATE AND 60 DAYS AFTER THE DATE OF THE ALLOTMENT OF THE PREFERRED SECURITIES.**

All references in this Prospectus to "**EUR**", "**€**", "**Euro**" and "**euro**" are to the single currency introduced at the start of the third stage of European economic and monetary union pursuant to the Treaty establishing the European Community, as amended from time to time. All references in this Prospectus to "**US$**" and "**$**" are to United States dollars. All references in this Prospectus to "**£**" are to pounds sterling.

# TABLE OF CONTENTS

*Page*

| | |
|---|---|
| Summary | 5 |
| Risk Factors | 12 |
| Description of the Preferred Securities | 16 |
| Summary of Provisions Relating to the Preferred Securities in Global Form | 30 |
| Subordinated Guarantee | 31 |
| Use of Proceeds | 36 |
| Lehman Brothers UK Capital Funding III LP | 37 |
| Lehman Brothers Holdings plc | 39 |
| Summary Financial Information of the Guarantor | 41 |
| Lehman Brothers Holdings Inc. | 42 |
| Consolidated Capitalisation and Indebtedness of LBHI | 45 |
| Summary Financial Information of LBHI | 46 |
| Taxation | 48 |
| Subscription and Sale | 50 |
| General Information | 52 |
| Financial Statements of the Guarantor | F-1 |

# SUMMARY

**This Summary must be read as an introduction to this Prospectus and any decision to invest in any Preferred Securities should be based on a consideration of this Prospectus as a whole.**

*Capitalised terms used but not defined in this summary shall bear the respective meanings ascribed to them under "Description of the Preferred Securities".*

| | |
|---|---|
| **Issuer:** | Lehman Brothers UK Capital Funding III LP (the "**Issuer**"), an English limited partnership formed and registered under the Limited Partnerships Act 1907 (the "**Act**"). |

The business of the partnership, as administered by, or on behalf of, the General Partner, will include the following:

- raising and providing finance and financial support to the Guarantor;

- acquiring and holding for investment purposes the Issuer's assets;

- monitoring the Issuer's assets and determining whether they continue to be suitable; and

- functions necessary or incidental thereto.

On the Closing Date, approximately 97 per cent. of the proceeds from the issue of the Preferred Securities together with a capital contribution from the Preferential Limited Partner will be used to acquire debt instruments issued by UK Holding (the "**Subordinated Notes**") with the remaining approximate 3 per cent. being used to acquire Third Party Assets.

The Subordinated Notes will have, in all material commercial respects, pricing terms which are equivalent to the Preferred Securities.

| | |
|---|---|
| **General Partner:** | LB GP No.1 Ltd. (incorporated with limited liability in England and Wales with registered number 5355491) a wholly owned Subsidiary of Lehman Brothers Holding Inc. ("**LBHI**") which is the ultimate holding company of the Guarantor. |
| **Preferential Limited Partner:** | LB Investment Holdings Ltd (incorporated with limited liability in England and Wales with registered number 4385277), a wholly owned Subsidiary of LBHI or any other Subsidiary of LBHI within the charge to UK corporation tax. |

Subject to the payment of the Further Distribution, the Preferential Limited Partner shall be entitled to receive amounts received by the Issuer from its investment in the Partnership Assets in excess of those required to make payments in respect of the Preferred Securities.

| | |
|---|---|
| **Guarantor:** | Lehman Brothers Holdings plc (incorporated with limited liability in England and Wales with registered number 1854685). |

The Guarantor is a wholly-owned subsidiary of LBHI which is the parent company of the Lehman Brothers group of companies. The Guarantor's principal activity is to hold fixed

5

asset investments in both subsidiary undertakings and non-subsidiary undertakings.

**Issue:**

Euro Fixed/Floating Rate Enhanced Capital Advantaged Preferred Securities (Euro ECAPS℠), each with a liquidation preference of €50,000 (the "**Liquidation Preference**"), comprising interests in a limited partnership share in the Issuer.

**Subordinated Guarantee:**

The Guarantor will provide a subordinated guarantee to be executed by the Guarantor on the Closing Date as a deed poll (the "**Subordinated Guarantee**") in respect of:

- any due Distributions;

- payments on redemption of the Preferred Securities; and

- any Additional Amounts,

which will be in favour of the Holders.

The Subordinated Guarantee will rank *pari passu* with the non-cumulative perpetual preferred securities or preference shares of the Guarantor (whether or not in issue).

The Subordinated Guarantee will not cover payments on liquidation of the Issuer. See "*Rights upon Liquidation*" below.

**Distribution Rate:**

The Preferred Securities will entitle Holders to receive (subject as described below) non-cumulative preferential cash distributions (the "**Distributions**").

Distributions will be payable out of the Issuer's own legally available resources annually in arrear on 22nd February in each year until 22nd February 2011 and thereafter quarterly in arrear on 22nd May, 22nd August, 22nd November and 22nd February in each year subject to adjustment in accordance with the modified following business day convention.

Distributions will accrue at a rate of 3.875 per cent. per annum until 22nd February 2011 and thereafter at three month EURIBOR plus 1.60 per cent. per annum.

The Holders will receive Distributions from the Issuer only if the Issuer has received sufficient funds from its assets.

In addition the Holders may receive a Further Distribution on redemption.

**Optional Waiver:**

Furthermore, notwithstanding the existence of such resources legally available for distribution by the Issuer, the Holders will not be entitled to receive Distributions if the General Partner has published a No Payment Notice in respect of such Distribution, in which case there will be no payment due under the Preferred Securities.

The General Partner will have full discretion to publish the No Payment Notice in respect of any Distribution at any time and for any reason.

6

**Mandatory Waiver:**  In addition, without limiting the discretion detailed above, the General Partner will deliver a No Payment Notice if:

- such payment will cause a Trigger Event; or

- in respect of the relevant Distribution Payment Date Distributions that would be payable on such date exceed the New Capital Amount if on the Calculation Date relative to such Distribution Payment Date:

  (x)  the Trailing Two Quarters Consolidated Net Income Amount of LBHI is not a positive amount for the two-fiscal quarter period ending on the last day of the fiscal quarter that is two fiscal quarters prior to the most recently completed fiscal quarter before that Calculation Date; and

  (y)  the Tangible Common Stockholders' Equity Amount of LBHI as of the end of the most recently completed fiscal quarter before that Calculation Date and as of the end of the fiscal quarter that is two quarters before that fiscal quarter has declined in each case by 10 per cent. or more as compared to the Tangible Common Stockholders' Equity Amount of LBHI at the end of the "benchmark fiscal quarter" for that Distribution Payment Date, which is the sixth fiscal quarter preceding the most recently completed fiscal quarter before that Calculation Date.

**Distributions non-cumulative:**  Save as described above, Holders will have no right to participate in the profits of the Issuer or the Guarantor and in particular will have no right to receive from the Issuer amounts paid under Partnership Assets or otherwise amounts in excess of Distributions due and payable under the Preferred Securities. In the event that any amounts received by the Issuer on the Partnership Assets, which would otherwise have been used by the Issuer (being the holder thereof) to fund such Distribution, exceed the amount (if any) then due by way of Distribution under the Preferred Securities, the amount of such excess will be allocated, subject to payment of the Further Distribution, to the Preferential Limited Partner as and when they are received. Holders will have no rights in respect of such excess.

**Distribution and Capital Stopper:**  In the event that Distributions are not paid on the Preferred Securities, LBHI has undertaken that, in the event that any Distribution is not paid in full, it will not:

  (a)  declare or pay any dividend on its shares of common stock; or

  (b)  repurchase or redeem any of its non-cumulative preferred stock or common stock at its option,

until the earlier of (i) such time as Distributions on the Preferred Securities have been paid in full for one year and (ii) such time as an amount out of the proceeds of an issue and sale of preferred stock and/or common stock of LBHI equal to the

amount of Distributions not paid on such Distribution Payment Date is paid to the Holders.

**Trigger Event and Substituted Preferred Stock:**

If a Trigger Event occurs and is continuing, then, provided that (if required at such time) any relevant Supervisory Authority has not objected, the General Partner shall take all reasonable steps to cause the substitution of the Preferred Securities by depositary shares representing Substituted Preferred Stock.

On the substitution date, each Preferred Security of €50,000 in nominal amount will be substituted for one depositary share representing Substituted Preferred Stock which will have a nominal amount of €50,000 (or its equivalent in US$).

The General Partner will notify Holders if a Trigger Event occurs. In the notice, the General Partner will include information on the procedures for effecting the substitution.

**Optional Redemption:**

If the Subordinated Notes or the Replacement Affiliate Investments, as the case may be, are redeemed at the option of the Guarantor (or the issuer of the Replacement Affiliate Investments, as the case may be) pursuant to their terms, then to the extent that the redemption proceeds in respect thereof are not used to acquire Replacement Affiliate Investments, the Preferred Securities will also be redeemed by the General Partner, on the same date, each to be redeemed at the Optional Redemption Price.

Any redemption of the Preferred Securities, the Subordinated Notes or Replacement Affiliate Investments is subject to the consent of the relevant Supervisory Authority (if required at such time).

As a result, the relevant Supervisory Authority when granting such a consent for the redemption of the Subordinated Notes or the Replacement Affiliate Investments will also be granting a consent for any redemption of the Preferred Securities.

A Further Distribution may be payable on Optional Redemption.

**Capital Disqualification Event:**

If a Capital Disqualification Event occurs and is continuing, the General Partner may substitute all of the Preferred Securities for Qualifying Regulatory Capital Securities or vary the terms of the Preferred Securities so that they become Qualifying Regulatory Capital Securities in accordance with applicable laws and regulations.

**Tax Event:**

If a Tax Event occurs and is continuing, the effect of which cannot be avoided by the Issuer, the Guarantor or the issuer of the Replacement Affiliate Investments, as the case may be, taking reasonable measures available to it or if the Subordinated Notes or the Replacement Affiliate Investments, as the case may be, are redeemed pursuant to their terms for tax reasons at any time, then, if they are not replaced by Replacement Affiliate Investments, the General Partner at its option may either (i) redeem the Preferred Securities in whole, but not in part, on the same date, each to be redeemed at the Optional Redemption Price or (ii) substitute all of the Preferred Securities for

Qualifying Regulatory Capital Securities or vary the terms of the Preferred Securities provided that such Preferred Securities will remain as Qualifying Regulatory Capital Securities.

Any redemption of the Preferred Securities, the Subordinated Notes or Replacement Affiliate Investments is subject to the consent of the relevant Supervisory Authority (if required at such time).

**Ranking of the Preferred Securities:**   The Preferred Securities, together with the Subordinated Guarantee, are intended to provide Holders, with respect to the Issuer, with rights on liquidation of the Issuer equivalent to non-cumulative preference shares of the Guarantor, whether or not issued.

Claims under the Preferred Securities in respect of any Liquidation Distributions will rank:

(i)     senior to the rights of the General Partner and the Preferential Limited Partner; and

(ii)    junior to the claims of creditors of the Issuer (if any).

**Rights upon Liquidation:**   In the event of the dissolution of the Issuer, Holders will be entitled to receive, subject as set out below, for each Preferred Security a Liquidation Distribution out of the assets of the Issuer legally available for distribution.

LBHI has undertaken that, so long as any of the Preferred Securities is outstanding:

(a)     unless a Trigger Event occurs or LBHI is being wound up, LBHI will not take any action that would or might cause the liquidation, dissolution or winding-up of the General Partner or the Issuer otherwise than with the prior written approval of any relevant Supervisory Authority (if required at such time); and

(b)     the General Partner will at all times be a directly or indirectly wholly owned Subsidiary of LBHI unless (I) otherwise approved by Holders in accordance with the procedure set out in the Limited Partnership Agreement or (II) after a substitution of the Preferred Securities for depositary shares representing Substituted Preferred Stock has occurred.

**Withholding Tax and Additional Amounts:**   The Issuer will pay such additional amounts ("**Additional Amounts**") as may be necessary in order that the net payment received by each Holder in respect of the Preferred Securities, after deduction or withholding of or on account of any taxes imposed by tax authorities in the United Kingdom upon payments made by or on behalf of the Issuer, will equal the amount which would have been received in the absence of any such deduction or withholding of or on account of taxes, subject to customary exceptions.

The Subordinated Guarantee will contain a similar provision.

9

**Administrator:**

The Issuer will appoint an administrator to perform those operational matters in relation to the Issuer required under the Financial Services and Markets Act 2000 to be performed by a person authorised by the United Kingdom Financial Services Authority to establish, operate and wind-up collective investment schemes.

**Partnership Assets:**

The proceeds raised by the issue of the Preferred Securities together with the Preferential Limited Partner's capital contribution will be used by the Issuer to purchase the Subordinated Notes.

The Subordinated Notes will represent approximately 97 per cent. of the Partnership Assets. The Subordinated Notes will be issued by UK Holding, will have a maturity of 30 years and will be redeemable by UK Holding on the interest payment date falling on 2036 or any interest payment date thereafter, subject to there being no objection from any relevant Supervisory Authority.

Unless the Preferred Securities are redeemed prior to or simultaneously with the maturity of the Subordinated Notes, then on maturity of the Subordinated Notes or any Replacement Affiliate Investments, the General Partner will, subject to prior consent of the relevant Supervisory Authority (if required at such time), reinvest the proceeds of redemption of the Subordinated Notes or Replacement Affiliate Investments in Replacement Affiliate Investments (or further Replacement Affiliate Investments) that will contain the same terms as the Subordinated Notes in respect of tenor, principal amount, interest payment dates and redemption (including redemption for tax reasons) and will be callable on any interest payment date. However, upon issuance of such Replacement Affiliate Investments, the Distribution Rate will be the rate per annum determined by the then prevailing market conditions for instruments of similar risk and 30 year maturity.

Approximately 3 per cent. of the proceeds raised by the issue of the Preferred Securities will be used by the Issuer together with the Preferential Limited Partner's capital contribution to acquire the Third Party Assets.

**Voting Rights:**

Except as described in "*Description of the Preferred Securities – Meetings*" and as provided in the Act, Holders will not be entitled to receive notice of, or attend or vote at, any meeting of partners in the Issuer or participate in the management of the Issuer.

**Form of the Preferred Securities:**

The Preferred Securities will be in registered form.

On or about the Closing Date, a single global certificate (the "**Global Certificate**") in respect of the Preferred Securities will be deposited with JPMorgan Chase Bank, N.A., London Branch (the "**Common Depositary**") as common depositary for Euroclear Bank SA./N.V., as operator of the Euroclear System ("**Euroclear**") and Clearstream Banking, société anonyme ("**Clearstream, Luxembourg**"). The Global Certificate will be

issued, and the Preferred Securities will be registered, in the name of, Chase Nominees Limited (the "**Initial Limited Partner**") as nominee of the Common Depositary.

For so long as the Preferred Securities are deposited and registered as described above, book-entry interests in the Preferred Securities will be shown on, and transfers thereof will be effected only through, records maintained by Euroclear and Clearstream, Luxembourg.

Definitive certificates will not be made available to Holders other than in certain limited circumstances. See *"Summary of Provisions Relating to the Preferred Securities in Global Form"*.

**Listings:**

Application has been made to the UK Listing Authority for the Preferred Securities to be admitted to the Official List and to the London Stock Exchange plc for the Preferred Securities to be admitted to trading on the London Stock Exchange plc's Gilt Edged and Fixed Interest Market which is a regulated market for the purposes of the Investment Services Directive.

**Ratings:**

The Preferred Securities are expected to be assigned, on issue ratings from Standard & Poor's Ratings Group of A-, Moody's Investors Service of A3 and Fitch Ratings of A-. A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the relevant rating organisation.

**Governing Law:**

The Limited Partnership Agreement establishing the Issuer, the Preferred Securities and the Subordinated Guarantee will be governed by, and construed in accordance with, English law.

## RISK FACTORS

*Prospective investors should carefully consider the following information in conjunction with the other information contained in this Prospectus. Capitalised terms used but not defined in this section shall bear the respective meanings ascribed to them under the "Description of the Preferred Securities".*

### Risk Factors relating to the Guarantor Group

*Certain Factors Affecting the Guarantor Group's Results of Operations*

The financial condition and results of operations of the Guarantor Group may be affected by uncertain or unfavourable economic, market, legal and other conditions. These conditions include but are not limited to:

*Market Risk*

Changes in interest and foreign exchange rates, financial instruments and real estate valuations and increases in volatility can increase credit and market risks and may also affect customer-flow-related revenues and proprietary trading revenues as well as affect the volume of debt and equity underwritings and merger and acquisition transactions. The Guarantor Group uses derivatives and other financial contracts to hedge many of these market risks.

*Competitive Environment*

All aspects of the Guarantor Group's business are highly competitive. The Guarantor Group's competitive ability depends on many factors, including its reputation, the quality of its services and advice, intellectual capital, product innovation, execution ability, pricing, and sales efforts and the talent of its personnel.

*Investor Sentiment*

Accounting and corporate governance scandals in recent years have had a significant effect on investor confidence. In addition, concerns about geopolitical developments and oil prices, among other things, can affect the global financial markets.

*Liquidity*

Liquidity and liquidity management are of critical importance in the Guarantor Group's industry. Liquidity could be affected by the inability to access the long-term or short-term debt, repurchase or securities-lending markets or to draw under credit facilities, whether due to factors specific to the Guarantor Group or to general market conditions. In addition, the amount and timing of uncertain events, such as unfunded commitments and contingencies, could adversely affect cash requirements and liquidity. To mitigate these risks, the liquidity and funding policies of the Guarantor Group have been conservatively designed to maintain sufficient liquid financial resources to fund continually its balance sheet and to meet all expected cash outflows, for one year in a stressed liquidity environment.

*Credit Ratings*

The Guarantor Group's access to the unsecured funding markets is dependent on its credit ratings. A reduction in credit ratings could adversely affect the Guarantor Group's access to liquidity alternatives and its competitive position, and could increase the cost of funding or trigger additional collateral requirements.

*Credit Exposure*

Credit exposure represents the possibility a counterparty will be unable to honour its contractual obligations. Although the Guarantor Group actively manages credit exposure daily as part of its risk management framework, counterparty default risk may arise from unforeseen events or circumstances.

12

*Operational Risk*

Operational risk is the risk of loss resulting from inadequate or failed internal or outsourced processes, people, infrastructure and technology, or from external events. The Guarantor Group minimises these risks through a strong internal control environment.

*Legal and Regulatory*

The securities and financial services industries are subject to extensive regulation in the jurisdictions in which the Guarantor Group does business. Violation of applicable regulations could result in legal and/or administrative proceedings, which may impose censures, fines, cease-and-desist orders or suspension of a firm, its officers or employees. The scrutiny of the financial services industry has increased, which has led to increased regulatory investigations and litigation against financial services firms.

Legislation and rules around the world have imposed substantial new or more stringent regulations, internal practices, procedures and controls and disclosure requirements in such areas as financial reporting, corporate governance, auditor independence, equity compensation plans, restrictions on the interaction between equity research analysts and investment banking personnel and money laundering. The trend and scope of increased compliance requirements may require the Guarantor Group to invest in additional resources to ensure compliance.

**Risk Factors relating to the Preferred Securities**

*Risks Associated with the Guarantor's Financial Condition*

The Issuer is a newly established limited partnership with no previous operating history or revenues. It is expected that the Issuer's sole source of funds to pay Distributions on the Preferred Securities will be payments which it receives from its investments in Subordinated Notes (issued by UK Holding), in Third Party Assets or any Replacement Affiliate Investments replacing the Subordinated Notes and/or the Third Party Assets.

The rights of Holders shall be represented solely by the Preferred Securities and the Subordinated Guarantee, and under no circumstances will the rights of Holders be represented by the Subordinated Notes and/or the Third Party Assets or any Replacement Affiliate Investments replacing the Subordinated Notes and/or the Third Party Assets nor shall Holders be entitled to receive or hold the Subordinated Notes and/or the Third Party Assets or any Replacement Affiliate Investments replacing the Subordinated Notes or any payments due in respect of the Subordinated Notes and/or the Third Party Assets or any Replacement Affiliate Investments replacing the Subordinated Notes and/or the Third Party Assets.

The Preferred Securities are guaranteed on a limited and subordinated basis by the Guarantor pursuant to the terms of the Subordinated Guarantee. Accordingly, if the Guarantor's financial condition were to deteriorate, the Holders may suffer direct and materially adverse consequences, including non-payment of Distributions on the Preferred Securities or of payments under the Subordinated Guarantee.

*Limitations to Remedies of Holders under the Subordinated Guarantee*

In the event that the Guarantor is in breach of its payment obligations under the Subordinated Guarantee, the terms of the Subordinated Guarantee do not confer rights in favour of the Holders to petition for the winding-up of the Guarantor.

*Distributions are Discretionary and Not Cumulative*

Distributions on the Preferred Securities are not cumulative. The discretion of the General Partner to resolve that a Distribution should not be paid is unfettered. As set out in "*Description of the Preferred Securities*", Distributions on the Preferred Securities will be paid on each Distribution Payment Date out of interest received by the Issuer from its investment in the Partnership Assets and from other resources legally available, if any, and only if the General Partner has not published a No Payment Notice. If a No Payment

Notice is published, the Holders will not be entitled to receive such Distributions (or any payment under the Subordinated Guarantee in respect of such Distributions) or have any claim in respect thereof. In certain circumstances the General Partner must publish a No Payment Notice.

### *Perpetual Nature of the Preferred Securities*

The Preferred Securities have no fixed final redemption date and Holders have no right to call for the redemption of the Preferred Securities. Although the General Partner may redeem the Preferred Securities in whole but not in part in certain circumstances, in each case at the Optional Redemption Price, there are limitations on the General Partner's ability to do so. Therefore, Holders should be aware that they may be required to bear the financial risks of an investment in the Preferred Securities for an indefinite period of time.

### *Substitution*

If a Trigger Event occurs and is continuing, the General Partner will, provided that (if required at such time) no relevant Supervisory Authority has objected, take all reasonable steps to cause the substitution of the Preferred Securities with depositary shares representing fully paid non-cumulative preferred stock issued directly by Lehman Brothers Holding Inc. ("**LBHI**"). A Trigger Event shall occur (i) if LBHI is placed into bankruptcy, reorganisation, conservatorship or receivership, (ii) if following any time when LBHI becomes subject to Relevant Rules, LBHI has capital adequacy levels which are less than the minimum capital adequacy levels which are imposed by the relevant Supervisory Authority or (iii) if, following any time when LBHI become subject to Relevant Rules, the relevant Supervisory Authority in its sole discretion, informs LBHI that it will not meet its minimum capital requirement in the near term.

Although LBHI has undertaken that, in the event that the Preferred Securities are substituted by depositary shares representing Substituted Preferred Stock, LBHI will apply for admission to trading of the Substituted Preferred Stock on a regulated market for the purposes of the Investment Services Directive (outside the United States) there can be no assurance that a competent authority will agree to such admission of Substituted Preferred Stock. In addition, the tax treatment for holders of Substituted Preferred Stock may be different from that for Holders of the Preferred Securities.

### *No Limitation on Senior Debt*

The obligations of the Guarantor under the Subordinated Guarantee will rank junior as to payments to all liabilities to creditors of the Guarantor (including without limitation depositors, general creditors and subordinated debt holders) and claims of holders of senior ranking securities. In the event that the Guarantor is wound-up, liquidated or dissolved, the assets of the Guarantor would be available to pay obligations under the Subordinated Guarantee only after all payments have been made on such senior liabilities and claims. The Guarantor is not prohibited from issuing, guaranteeing or otherwise incurring further debt ranking *pari passu* with, or senior to, its obligations under the Subordinated Guarantee. The issue of any such debt may reduce the amount recoverable by Holders of the Preferred Securities under the Subordinated Guarantee. Accordingly, on the winding-up of the Guarantor and after payment of senior creditors, there may not be a sufficient amount to satisfy the amounts owing to the Holders of the Preferred Securities.

### *Distribution and Capital Stopper*

In the event that any Distribution is not made, LBHI has undertaken not to:

(a)    declare or pay any dividend on its shares of common stock; or

(b)    repurchase or redeem any of its non-cumulative preferred stock or common stock at its option,

until the earlier of (i) such time as Distributions on the Preferred Securities have been paid in full for one year and (ii) such time as an amount arising out of the proceeds of an issue and sale of preferred stock and/or common stock of LBHI equal to the Distributions not paid on such Distribution Payment Date is paid to the Holders of the Preferred Securities.

Although the Guarantor does not make an equivalent agreement, LBHI is the ultimate holding company of the Lehman Brothers' group of companies.

### Absence of Prior Public Markets

The Preferred Securities constitute a new issue of securities by the Issuer. Prior to this issue, there will have been no public market for the Preferred Securities. Although application has been made for the Preferred Securities to be admitted to trading on the London Stock Exchange plc's Gilt Edged and Fixed Interest Market, there can be no assurance that an active public market for the Preferred Securities will develop and, if such a market were to develop, the Managers are under no obligation to maintain such a market. The liquidity and the market prices for the Preferred Securities can be expected to vary with changes in market and economic conditions, the financial condition and prospects of the Guarantor and other factors that generally influence the market prices of securities.

## DESCRIPTION OF THE PREFERRED SECURITIES

*The Preferred Securities are limited partnership interests in the Issuer. The following description should be read in conjunction with, and is subject to the terms of, the Limited Partnership Agreement (as defined below), a copy of which is available for inspection as described under "General Information".*

### 1.    Definitions and Interpretation

In this description of the Preferred Securities, except to the extent that the context otherwise requires:

"**Act**" means the Limited Partnerships Act 1907, as amended and/or restated from time to time;

"**Additional Amounts**" means the additional amounts which may be payable by the Issuer in respect of the Preferred Securities as a result of the imposition of UK withholding taxes as described in paragraph 6;

"**Adverse Tax Effect**" means the reduction, limitation or denial of any deduction, credit, partnership allocation, deferral, exemption or other relief granted or allowable (including for the avoidance of doubt the ability to surrender any of the foregoing under any consolidation or group relief provisions) under US or UK tax principles, as the case may be;

"**Agency Agreement**" means the agency agreement dated the Closing Date relating to the Preferred Securities between, *inter alios*, the Guarantor, the Registrar and the Paying and Transfer Agents;

"**Business Day**" means a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealing in foreign exchange and foreign currency deposits) in London and on which the TARGET System, or any successor thereto, is operating;

"**Calculation Agent**" means Lehman Brothers International (Europe);

"**Calculation Date**", in respect of any Distribution Payment Date, means the 20th Business Day before such Distribution Payment Date;

A "**Capital Disqualification Event**" shall occur if:

(a)    the Preferred Securities do not qualify as regulatory capital pursuant to the Relevant Rules upon either LBHI or the Guarantor becoming subject to supervision by a relevant Supervisory Authority; or

(b)    following any such person becoming subject to the Relevant Rules, a change of such Relevant Rules results in the Preferred Securities no longer so qualifying;

"**Clearstream, Luxembourg**" means Clearstream Banking, société anonyme or its successor;

"**Closing Date**" means 22nd February, 2006;

"**Distribution Payment Date**" means 22nd February in each year until (and including) the First Call Date and thereafter means 22nd February, 22nd May, 22nd August and 22nd November in each year (with the first Distribution Payment Date after the First Call Date being 22nd May, 2011), provided that if any such date falling after the First Call Date would otherwise fall on a day which is not a Business Day, payment shall be postponed to the next day which is a Business Day unless it would then fall into the next calendar month in which event it shall be brought forward to the immediately preceding Business Day;

"**Distribution Period**" means the period from, and including, the Closing Date to, but excluding, the first Distribution Payment Date and each period thereafter from, and including, one Distribution Payment Date to, but excluding, the next following Distribution Payment Date;

16

**"Distributions"** means the non-cumulative distributions in respect of the Preferred Securities as described under paragraph 2;

**"Euroclear"** means Euroclear Bank S.A./N.V. as operator of the Euroclear system or its successor;

**"Euro-zone"** means the region comprised of the member states of the European Union that have adopted the single currency in accordance with the Treaty establishing the European Community (signed in Rome on 25th March, 1957) as amended;

**"First Call Date"** means 22nd February, 2011;

**"Further Distribution"** means, if upon redemption of the Preferred Securities the Partnership Assets exceed €518,500,000 in value, being approximately 101 per cent. of the aggregate of the Preferred Capital Contribution and the capital contribution of the Preferential Limited Partner, in respect of each Preferred Security an amount calculated by the General Partner representing a *pro rata* share of 50 per cent. of any such excess, subject always to a maximum of €500 per Preferred Security. For the avoidance of doubt there is no obligation on the General Partner or any other person to invest the Partnership Assets in such a way as would guarantee the generation of a Further Distribution.

"**GAAP**" means, at any date or for any period, U.S. generally accepted accounting principles as in effect on such date or for such period;

**"General Partner"** means LB GP No.1 Ltd. (incorporated in England and Wales with registered number 5355491), a wholly owned Subsidiary of LBHI;

**"Group"** means LBHI and its Subsidiaries;

**"Guarantor"** means Lehman Brothers Holding plc (incorporated in England and Wales with registered number 1854685) and its successors and assignees;

**"Guarantor Group"** means the Issuer, the General Partner, the Guarantor and its Subsidiaries;

**"Holder"** means, in respect of each Preferred Security, each person registered on the Register as the limited partner holding such Preferred Security at the relevant time;

**"Initial Limited Partner"** means Chase Nominees Limited (incorporated in England and Wales with registered number 00248239);

"**Invested Partnership Assets**" means the Subordinated Notes or any Replacement Affiliate Investments and the Third Party Assets;

**"Issuer"** means Lehman Brothers UK Capital Funding III LP;

**"Junior Share Capital"** means the Guarantor's ordinary shares, together with any other securities or obligations of the Guarantor expressed to rank junior to the Subordinated Guarantee and the Parity Securities;

**"LBHI"** means Lehman Brothers Holdings Inc.;

**"Limited Partnership Agreement"** means an agreement dated 17th February, 2006 between, *inter alios*, the General Partner and the Preferential Limited Partner establishing the Issuer, as the same may be amended from time to time;

**"Liquidation Distribution"** means the Liquidation Preference plus (a) any due and accrued but unpaid Distributions calculated from (and including) the immediately preceding Distribution Payment Date (or, if none, the Closing Date) to (but excluding) the date of payment, and (b) any Additional Amounts, in each case in cash only;

**"Liquidation Preference"** means the liquidation preference of €50,000 per Preferred Security;

"**Margin**" means 1.60 per cent. per annum;

"**New Capital Amount**" means, at any date, the net proceeds received from new issuances of LBHI common stock or perpetual deferrable preferred stock (whether in one or more public offerings or private placements) during the period commencing on the 90th day prior to such date and designated by LBHI's board of directors at or before the time of issuance as relevant for the purposes of the above financial tests in respect of the Preferred Securities;

"**No Payment Notice**" means a notice which is published pursuant to paragraph 2.5;

"**Optional Redemption Price**" means, in respect of each Preferred Security, the Liquidation Preference plus (a) any due and accrued but unpaid Distributions calculated from (and including) the immediately preceding Distribution Payment Date (or, if none, the Closing Date) to (but excluding) the date of payment and (b) any Additional Amounts payable, in each case in cash only;

"**Parity Securities**" means any non-cumulative preference shares, non-cumulative preferred securities (other than the Preferred Securities) or other securities either (a) issued directly by the Guarantor and ranking *pari passu* with the Guarantor's obligations under the Subordinated Guarantee and includes the sterling and US dollar non-cumulative preference shares of the Guarantor outstanding or (b) issued by the Issuer or any Subsidiary or other entity and entitled to the benefit of the Subordinated Guarantee or benefiting from any other guarantee or support agreement from the Guarantor ranking *pari passu* with the Subordinated Guarantee which on the date hereof includes the outstanding €175,810,000 Fixed Rate to CMS-Linked Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities of Lehman Brothers UK Capital Funding LP and the outstanding €250,000,000 Euro Fixed Rate Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities of Lehman Brothers UK Capital Funding II LP;

"**Partnership Assets**" means the assets of the Issuer including the Subordinated Notes or Replacement Affiliate Investments and the Third Party Assets;

"**Paying and Transfer Agents**" means the Principal Paying and Transfer Agent, J.P. Morgan Bank Luxembourg S.A. and/or such other entities as are appointed by the General Partner on behalf of the Issuer and notified to the Holders as described under paragraph 10;

"**Permitted Reorganisation**" means a solvent reconstruction, amalgamation, reorganisation, merger or consolidation whereby all or substantially all of the business, undertaking and assets of the Guarantor are transferred to a successor entity which assumes all of the Guarantor's obligation under the Subordinated Guarantee;

"**Preferential Limited Partner**" means, on the Closing Date, LB Investment Holdings Ltd (incorporated in England and Wales with registered number 4385277), a wholly owned Subsidiary of LBHI or any other Subsidiary of LBHI within the charge to UK corporation tax;

"**Preferential Limited Partner Return**" means, subject to payment of any Further Distribution, the excess received by the Issuer from Partnership Assets, over any amounts payable to the Holders;

"**Preferred Capital Contribution**" means, in relation to the Preferred Securities, the aggregate contribution to the assets of the Issuer (being a whole multiple of €50,000) paid in cash by the Holders and the Preferential Limited Partner;

"**Preferred Securities**" means the outstanding Fixed/Floating Rate Enhanced Capital Advantaged Preferred Securities ("Euro ECAPS℠") of the Issuer, originally issued on the Closing Date, each such security representing an interest of a Holder in the Issuer attributable to the whole of each €50,000 of the Preferred Capital Contribution and including any further Preferred Securities of the Issuer of the same series issued after the Closing Date and ranking *pari passu* with the Preferred Securities as regards participation in the profits and assets of the Issuer and "**Preferred Security**" shall be construed accordingly;

"**Principal Paying and Transfer Agent**" means JPMorgan Chase Bank, N.A., London Branch or such other entity as is appointed by the General Partner on behalf of the Issuer and notified to the Holders as described in paragraph 10;

**"Qualifying Regulatory Capital Securities"** means securities which (a) qualify as regulatory capital for the purposes of the UK or US Regulator and (b) would be economically equivalent in all material aspects to the Preferred Securities;

**"Redemption Date"** means the date fixed for redemption under a notice given under paragraph 4.2 or 4.3;

**"Reference Banks"** means any four major banks in the euro-zone interbank market selected by agreement between the Principal Paying and Transfer Agent and the General Partner;

**"Register"** means the register of Holders maintained outside the United Kingdom on behalf of the Issuer;

**"Registrar"** means J.P. Morgan Bank Luxembourg S.A. or such other entity appointed by the Issuer and notified to the Holders as described under paragraph 10;

**"Regulator"** means such national or supranational regulatory authority as may at the relevant time have responsibility for the regulation and supervision of the Guarantor;

**"Relevant Rules"** means at any time the regulations, requirements, guidelines and policies of any relevant Supervisory Authority relating to capital adequacy of financial institutions in the jurisdiction of such Supervisory Authority;

**"Relevant Screen Page"** means Bridge's Telerate Service Page 248 (or such replacement page on that service which displays the information);

**"Replacement Affiliate Investments"** means

(a)  subordinated debt securities (other than the Subordinated Notes) that are issued or guaranteed by a member of the Group other than UK Holding (but of a comparable rating to UK Holding at the relevant time), or

(b)  provided that (if required) the relevant Supervisory Authority has not objected, such other instruments issued by a member of the Group other than UK Holding (but of a comparable rating to UK Holding at the relevant time),

*provided that* in both cases:

(i)  for the avoidance of doubt, if the Replacement Affiliate Investments are securities of a UK company, the Replacement Affiliate Investments shall, in the event of their issuance, be the subject of an application for listing on a recognised stock exchange in accordance with section 841 of the Income and Corporation Taxes Act 1988; and

(ii)  the Preferential Limited Partner shall not be the principal obligor of the Replacement Affiliate Investments;

**"Stock Exchanges"** means the London Stock Exchange plc and/or such other stock exchange approved by the General Partner on which the Preferred Securities may be listed from time to time;

**"Subordinated Guarantee"** means the subordinated guarantee in respect of the Preferred Securities executed by the Guarantor on the Closing Date as a deed poll;

**"Subordinated Notes"** means the Fixed/Floating Rate Subordinated Notes, originally issued on the Closing Date in the principal amount equal to approximately 97 per cent. of the aggregate nominal amount of the Preferred Securities, by UK Holding and held by the Issuer together with the Third Party Assets as initial partnership assets, or any Replacement Affiliate Investments which are held by the Issuer as part of the partnership assets thereafter;

**"Subsidiary"** means, in relation to any entity, any company (i) in which that entity holds a majority of the voting rights or (ii) of which that entity is a member and has the right to appoint or remove a

majority of the board of directors or (iii) of which that entity is a member and controls a majority of the voting rights. and includes any company which is a Subsidiary of a Subsidiary of that entity;

**"Substituted Preferred Stock"** means fully-paid non-cumulative preferred stock issued directly by LBHI bearing a right to dividends calculated in the same manner as the Preferred Securities, having no voting rights (except as required by law) and being subject to optional redemption in the same manner as the Preferred Securities;

**"Supervisory Authority"** means in respect of any jurisdiction, any organisation or authority having supervisory responsibility for the prudential supervision of financial institutions engaged in regulated activities carried on by LBHI or its affiliates in such jurisdiction;

**"Tangible Common Stockholders' Equity Amount"** means, as of any quarter end and subject to adjustments described below, LBHI's common stockholders' equity minus identifiable intangible assets and goodwill. in each case as reflected on LBHI's consolidated GAAP balance sheet as of such quarter end and such that all financial terms used in this definition will be determined in accordance with GAAP as applied to and reflected in LBHI's consolidated financial statements as of the relevant dates or for the relevant periods, except (i) that LBHI's common stockholders' equity at any date will be adjusted to exclude extraordinary items, unusual items and infrequently occurring items as defined in APB 30, goodwill impairment as defined in Financial Accounting Standards Board Statements of Financial Accounting Standards ("SFAS") No. 142 and amounts relating to discontinued operations as defined in SFAS No. 1244 and (ii) as provided in the next sentence. If because of a change in GAAP that results in a cumulative effect of a change in accounting principle or a restatement, Tangible Common Stockholders; Equity Amount as of a fiscal quarter end is higher or lower than it would have been in the absence of such change, then, for purposes of the calculations described in paragraph 2.5, Tangible Common Stockholders Equity Amount will be calculated on a pro forma basis as if such change had not occurred;

**"TARGET"** means the Trans European Real-Time Gross Settlement Express Transfer (TARGET) System;

**"TARGET Business Day"** means a day on which TARGET is operating;

**"Tax"** means any present or future taxes or duties of whatsoever nature imposed or levied by or on behalf of the United Kingdom or any political subdivision of or by any authority therein or thereof having power to tax;

**"Tax Event"** means a UK Tax Event or a US Tax Event;

**"Third Party Assets"** means (i) cash or (ii) debt securities of entities not affiliated with LBHI represented by instruments which (a) have a remaining maturity of at least 4 years from their date of acquisition; (b) fall to be regarded as exempt loan capital within section 79(4) of the Finance Act 1986; (c) have a rating from Standard & Poor's and/or Moody's Investors Services or an internationally recognised rating agency that signifies investment grade; and (d) in respect of any payment of interest and/or repayment of principal to a holder of such an instrument are not subject to any withholding or deduction for or on account of any tax;

**"Tier 1 Capital"** has the meaning ascribed to it in the Financial Services Authority's Guide to Banking Supervisory Policy or any successor publication replacing such guide;

**"Trailing Two Quarters Consolidated Net Income Amount"** means, for any fiscal quarter and subject to adjustments described below, the sum of LBHI's consolidated net income for the two fiscal quarters ending as of the last day of such fiscal quarter. Financial terms used in this definition will be determined in accordance with GAAP as applied to and reflected in LBHI's consolidated financial statements for the relevant periods, except (i) that LBHI's consolidated net income for any period will be adjusted to exclude extraordinary items, unusual items and infrequently occurring items as defined in APB 30, goodwill impairment as defined in Financial Accounting Standards Board Statements of Financial Accounting Standards ("SFAS") No. 142 and amounts relating to discontinued operations

as defined in SFAS No. 1244 and (ii) as provided in the next sentence. If because of a change in GAAP that results in a cumulative effect of a change in accounting principle or a restatement, consolidated net income is higher or lower than it would have been in the absence of such change, then, for purposes of calculating the calculations described in paragraph 2.5, commencing with the fiscal quarter for which such change in GAAP becomes effective, such consolidated net income will be calculated on a pro forma basis as if such change had not occurred;

"**Trigger Event**" shall occur (i) if LBHI is placed into bankruptcy, reorganisation, conservatorship or receivership, (ii) if following any time when LBHI becomes subject to Relevant Rules, LBHI has capital adequacy levels which are less than the minimum capital adequacy levels which are imposed by the relevant Supervisory Authority or (iii) if, following any time when LBHI become subject to Relevant Rules, the relevant Supervisory Authority, in its sole discretion, informs LBHI that it will not meet its minimum capital requirement in the near term;

"**UK Holding**" means Lehman Brothers Holdings plc (incorporated in England and Wales with registered number 1854685) and its successors and assignees;

"**UK Tax Event**" means that, as a result of any change (each a "**Relevant Change**") in, or prospective or actual amendment to, the laws of the United Kingdom or any political subdivision or authority thereof having power to tax, or any change in the application of such laws, or in the official or generally published interpretation of such laws (including the enactment of any legislation, any judicial decision or any regulatory determination in the UK), or any interpretation or pronouncement by any relevant tax authority that provides for a position with respect to such laws or regulations that differs from the previously generally accepted position in relation to similar transactions or which differs from any specific written confirmation given by a tax authority in respect of the Preferred Securities and/or the Subordinated Notes, which change or amendment becomes effective or is to take effect, on or after the Closing Date, there is more than an insubstantial risk that:

(i)     the Issuer or the General Partner would be subject to more than a *de minimis* amount of tax in respect of the Subordinated Notes or the Preferred Securities in the UK (except, in the case of the General Partner only, for any such tax that would arise as a result of (a) profits arising to it as a result of payments received by it from the Issuer or (b) activities (if any) carried on by it other than those permitted or contemplated in the Limited Partnership Agreement in respect of the Subordinated Notes and the Preferred Securities);

(ii)    payments to Holders (including payments in respect of the Preferred Securities and the Subordinated Guarantee) would be subject to deduction or to withholding of or on account of tax in the UK or would give rise to any obligation to account for any tax in the UK;

(iii)   payments in respect of the Subordinated Notes would be subject to deduction or to withholding of or on account of tax in the UK or would give rise to any obligation to account for any tax in the UK; or

(iv)    the Subordinated Notes, Replacement Affiliate Investments or the Preferred Securities have, or will have, an Adverse Tax Effect on the Issuer, LBHI, the General Partner, the Guarantor or any other company with which the Guarantor is grouped for UK tax purposes;

"**US Tax Event**" means that, as a result of (a) any amendment to, change in or announced proposed change in the laws (or any regulations thereunder whether in proposed, temporary or final form) of the United States or any political subdivision or taxing authority thereof or therein, (b) a judicial decision interpreting, applying, or clarifying such laws or regulations, (c) an administrative pronouncement or action that represents an official position (including a clarification of an official position) of the governmental authority or regulatory body making such administrative pronouncement or taking such action, or (d) a threatened challenge asserted in connection with an audit of the Issuer, LBHI, the Guarantor or the General Partner, or a threatened challenge asserted in writing against any other taxpayer that has raised capital through the issuance of securities similar to the Subordinated Notes, Replacement Affiliate Investments or the Preferred Securities, which

amendment or change is adopted or which decision, pronouncement or proposed change is announced or which action, clarification or challenge occurs on or after the date of the issuance of the Preferred Securities, there is more than an insubstantial risk that:

(i)    the Issuer is or would be subject to more than a *de minimis* amount of tax or similar assessments in the United States;

(ii)    payments to holders are or would be subject to deduction or to withholding of or on account of tax imposed by a governmental authority in the United States; or

(iii)    the Subordinated Notes, Replacement Affiliate Investments or the Preferred Securities have, or will have, an Adverse Tax Effect on the Issuer, the Guarantor, the General Partner, LBHI or any other company with which LBHI is affiliated for US tax purposes.

In this description of the Preferred Securities any reference to a particular time shall, unless otherwise specified, be to Central European time.

## 2.   Distributions

2.1    Subject as provided in paragraphs 2.4 and 2.5, non-cumulative distributions (the **"Distributions"**) on the Preferred Securities will accrue from the Closing Date (or, in the case of any further preferred securities issued pursuant to paragraph 8.4, from their respective dates of issue) and shall be payable out of the Issuer's own legally available resources annually in arrear on each Distribution Payment Date to (and including) the First Call Date and thereafter quarterly in arrear on each Distribution Payment Date.

2.2    Distributions will be payable at the rate of 3.875 per cent. per annum in respect of each Distribution Period during the period from and including the Closing Date to but excluding the First Call Date. Where Distributions are to be calculated in respect of any period ending prior to the First Call Date, the applicable day count fraction will be the number of days in the relevant period from and including the date from which Distributions begin to accrue to but excluding the date on which they are payable divided by the number of days in the Distribution Period comprising the relevant period or in which the relevant period falls.

2.3    In relation to a Distribution Period commencing on the First Call Date or any Distribution Payment Date thereafter, the rate of Distribution shall be the sum of Three Month EURIBOR and the Margin.

For these purposes, **"Three Month EURIBOR"** means the rate for deposits in euro for a period of three months which appears on the Relevant Screen Page as of 11.00 a.m., Brussels time, (or such other time as may be customary for the daily reset of such rate) on the day that is two TARGET Business Days preceding the first day of the relevant Distribution Period.

If such rate does not appear on the Relevant Screen Page on the day that is two TARGET Business Days preceding the first day of the relevant Distribution Period, then Three Month EURIBOR for the relevant Distribution Period will be determined on the basis of the rates at which deposits in euro are offered by the Reference Banks at approximately 11.00 a.m., Brussels time, on the day that is two TARGET Business Days preceding the first day of the relevant Distribution Period to leading banks in the euro-zone interbank market for a period of three months commencing on the first day of the relevant Distribution Period and in an amount that is representative for a single transaction in the relevant market at the relevant time. The Principal Paying and Transfer Agent shall request the principal euro-zone office of each of the Reference Banks to provide a quotation of its rate. If at least two quotations are provided, the rate shall be the arithmetic mean of such quotations.

If fewer than two quotations are provided as requested, Three Month EURIBOR in respect of such Distribution Period shall be the arithmetic mean of the rates quoted by major banks in the euro-zone selected by the Principal Paying and Transfer Agent, at approximately 11.00 a.m., Brussels time, on the day that is two TARGET Business Days preceding the first day of the relevant Distribution Period for loans in euro to leading banks in the euro-zone interbank market for a period of three months

commencing on the first day of such Distribution Period and in an amount that is representative for a single transaction in the relevant market at the relevant time, except that, if the banks so selected by the Principal Paying and Transfer Agent are not quoting as mentioned above, the rate of distribution for such Distribution Period shall be either (i) the rate of distribution in effect for the last preceding Distribution period to which one of the preceding paragraphs of this definition of Three Month EURIBOR shall have applied or (ii) if none, 3.875 per cent. per annum.

Whenever it is necessary to calculate the amount of any Distribution in respect of a Preferred Security for each period beginning on or after the First Call Date, the amount of such Distribution shall be calculated by multiplying the applicable rate by the Liquidation Preference and the actual number of days in the relevant Distribution Period divided by 360 and rounding the resultant figure to the nearest cent (half a cent being rounded upwards).

The Principal Paying and Transfer Agent shall, as soon as practicable after 11.00 a.m., Brussels time, on the day which is two TARGET Business Days prior to the first day of each Distribution Period, calculate the Distribution payable on the relevant Distribution Payment Date for the Preferred Securities for the relevant Distribution Period.

2.4    Subject to clause 2.5, Holders will be entitled to receive Distributions from the Issuer if it has received sufficient funds under the Partnership Assets.

2.5    Furthermore, notwithstanding the existence of such resources legally available for distribution by the Issuer, the Holders will not be entitled to receive Distributions if the General Partner has published a No Payment Notice in respect of such Distribution, in which case there will be no payment due under the Preferred Securities.

The General Partner will have the full discretion to publish the No Payment Notice in respect of any Distribution at any time and for any reason.

In addition, without limiting the discretion detailed above, the General Partner will deliver a No Payment Notice if:

- such payment will cause a Trigger Event;

- the Partnership Assets will not be sufficient to allow the Issuer to pay a full distribution when due; or

- in respect of the relevant Distribution Payment Date Distributions that would be payable on such date exceed the New Capital Amount if on the Calculation Date relative to such Distribution Payment Date:

    (x)    the Trailing Two Quarters Consolidated Net Income Amount is not a positive amount for the two-fiscal quarter period ending on the last day of the fiscal quarter that is two fiscal quarters prior to the most recently completed fiscal quarter before that Calculation Date; and

    (y)    the Tangible Common Stockholders' Equity Amount as of the end of the most recently completed fiscal quarter before that Calculation Date and as of the end of the fiscal quarter that is two quarters before that fiscal quarter has declined in each case by 10 per cent. or more as compared to the Tangible Common Stockholders' Equity Amount at the end of the "benchmark fiscal quarter" for that Distribution Payment Date, which is the sixth fiscal quarter preceding the most recently completed fiscal quarter before that Calculation Date.

2.6    No Holder shall have any claim in respect of any Distribution or part thereof not payable as a result of the limitation set out in paragraph 2.5. Accordingly, such amounts will not cumulate for the benefit of Holders or entitle the Holders to any claim in respect thereof against the Issuer or against the Guarantor under the Subordinated Guarantee.

2.7   Save as described above and in respect of a Further Distribution, Holders will have no right to participate in the profits of the Issuer or the Guarantor and in particular will have no rights to receive from the Issuer, amounts paid to the Issuer amounts paid under the Partnership Assets or otherwise amounts in excess of Distributions due and payable under the Preferred Securities. In the event that any amounts received by the Issuer on the Partnership Assets, exceed the amount (if any) then due by way of Distribution under the Preferred Securities, the amount of such excess will be paid to the Preferential Limited Partner as and when they are received. Holders will have no rights in respect of such excess.

*LBHI has undertaken that, in the event that any Distribution is not paid in full, it will not:*

*(a)    declare or pay any dividend on its shares of common stock; or*

*(b)    repurchase or redeem any of its non-cumulative preferred stock or common stock at its option,*

*until the earlier of (i) such time as Distributions on the Preferred Securities have been paid in full for one year and (ii) such time as an amount out of the proceeds of an issue and sale of preferred stock or common stock of LBHI equal to Distributions not paid on such Distribution Payment Date is paid to the Holders.*

### 3.    Liquidation Distributions

3.1   In the event of the dissolution of the Issuer, the Holders will be entitled to receive the Liquidation Distribution, in respect of each Preferred Security held, out of the assets of the Issuer available for distribution to such Holders under the Act. Such entitlement will arise (a) before any payments due to the General Partner and the Preferential Limited Partner and (b) before any distribution of assets is made to the General Partner, but such entitlement will rank equally with the entitlement of the holders of all other preferred securities issued by the Issuer which rank *pari passu* with the Preferred Securities, if any.

3.2   After payment of all Liquidation Distributions, or the relevant proportion thereof if applicable, the General Partner will be entitled to any remaining assets of the Issuer representing proceeds of the sale or redemption of the Issuer's partnership assets and the Holders will have no right or claim to any of the remaining assets of the Issuer or the Guarantor. For the avoidance of doubt, Holders will have no right to receive the Partnership Assets.

*LBHI has undertaken that, as long as any of the Preferred Securities is outstanding:*

*(a)    unless LBHI is being wound-up, LBHI will not take any action that would or might cause the liquidation, dissolution or winding-up of the General Partner or the Issuer otherwise than with the prior written approval of any relevant Supervisory Authority (if required at such time); and*

*(b)    the General Partner will at all times be a directly or indirectly wholly owned Subsidiary of LBHI unless (I) otherwise approved by the Holders in accordance with the procedure set out in the Limited Partnership Agreement or (II) after a substitution of the Preferred Securities for depositary shares representing Substituted Preferred Stock has occurred.*

3.3   Subject to the Act, other than in the events referred to in paragraphs 4.2, 4.3, 4.8 and 5, unless (if required at such time) the UK Regulator has not objected, the General Partner will not permit, or take any action that would or might cause, the liquidation or dissolution of the Issuer. No Holder shall have any claim (whether against the Issuer or the Guarantor) in respect of any Liquidation Distribution or part thereof not paid when it would, but for the operation of this paragraph 3.3, otherwise have become due.

### 4.    Redemption, Purchases, Substitution and Variation

4.1   The Preferred Securities have no fixed final redemption date and Holders have no right to call for the redemption of the Preferred Securities. Any redemption is subject to the provisions of the Act.

4.2    If the Subordinated Notes or the Replacement Affiliate Investments, as the case may be, are redeemed at the option of the Guarantor (or the issuer of the Replacement Affiliate Investments, as the case may be) pursuant to their terms, then if the redemption proceeds in respect thereof are not used to acquire Replacement Affiliate Investments, the Preferred Securities will also be redeemed, in whole but not in part, by the General Partner on the same date, each to be redeemed at the Optional Redemption Price.

4.3    If a Tax Event occurs and is continuing, the effect of which cannot be avoided by the Issuer, the Guarantor or the issuer of the Replacement Affiliate Investments. as the case may be, taking reasonable measures available to it or if the Subordinated Notes or the Replacement Affiliate Investments, as the case may be, are redeemed pursuant to their terms for tax reasons, then if they are not replaced by Replacement Affiliate Investments, the General Partner on the same date at its option may either (i) redeem the Preferred Securities in whole, but not in part, on the same date, each to be redeemed at the Optional Redemption Price or (ii) substitute all of the Preferred Securities for Qualifying Regulatory Capital Securities or vary the terms of the Preferred Securities provided that such Preferred Securities will be Qualifying Regulatory Capital Securities.

4.4    Prior to the publication of any notice of redemption pursuant to paragraph 4.3, the General Partner shall deliver to the Registrar a certificate signed by two members of the board of directors of the Guarantor stating that the Issuer is entitled to effect such redemption and an opinion of counsel to the Guarantor experienced in such matters to the effect that a Tax Event has occurred and specifying which of the clauses as set out in the definition of "Tax Event" is applicable. Upon the expiry of such notice, the General Partner shall be bound to redeem each of the Preferred Securities accordingly.

4.5    Any redemption of the Preferred Securities, the Subordinated Notes or Replacement Affiliate Investments is subject to the consent of the relevant Supervisory Authority (if required at such time). As a result, the relevant Supervisory Authority when granting such a consent for the redemption of the Subordinated Notes and/or Replacement Affiliate Investments will also be granting their consent for any redemption of the Preferred Securities. The relevant Supervisory Authority may impose conditions on any such redemption.

4.6    All Preferred Securities which are redeemed will forthwith be cancelled and accordingly may not be reissued or resold.

4.8    If a Capital Disqualification Event occurs and is continuing, the General Partner may substitute all of the Preferred Securities for Qualifying Regulatory Capital Securities or vary the terms of the Preferred Securities so that they become Qualifying Regulatory Capital Securities in accordance with applicable laws and regulations.

## 5.    Substitution for Preferred Stock

5.1    If a Trigger Event occurs, then, provided that (if required at such time) no relevant Supervisory Authority has objected, the General Partner shall take all reasonable steps to cause the substitution of the Preferred Securities by depositary shares representing Substituted Preferred Stock (the "**Preferred Securities Substitution**") on the Substitution Date, as defined below.

As soon as reasonably practicable following the occurrence of a Trigger Event, the General Partner shall cause notice (the "**Trigger Event Notice**") to be given to the Holders (in accordance with paragraph 10) and to the Stock Exchanges that the depositary shares representing Substituted Preferred Stock will be available from the date (the "**Substitution Date**") specified in the Trigger Event Notice for the purpose.

Until such time as the Trigger Event Notice is given by the General Partner (in accordance with paragraph 10), Holders will continue to be entitled to receive Distributions and/or a Liquidation Distribution in respect of the Preferred Securities but thereafter Holders will have no further rights, title or interest in or to their Preferred Securities except to have them substituted in the manner and to the persons described below.

25

The Trigger Event Notice will contain a form of substitution confirmation (the "**Preferred Securities Substitution Confirmation**") to be completed by each Holder (or, for so long as the Preferred Securities are registered in the name of a nominee of a common depositary for Euroclear and Clearstream, Luxembourg, by each accountholder named in the records of Euroclear and Clearstream, Luxembourg as the holder of an interest in the Preferred Securities). The form of Preferred Securities Substitution Confirmation shall also be made available at the offices of each Paying and Transfer Agent. To receive Substituted Preferred Stock in respect of its holding of Preferred Securities, a Paying and Transfer Agent must receive from the Holder (or such accountholder, as the case may be) a Preferred Securities Substitution Confirmation together with the certificate representing the relative holding of Preferred Securities or other evidence of entitlement satisfactory to the General Partner.

Each share of Substituted Preferred Stock allotted will rank for any dividend from the immediately preceding Distribution Payment Date but otherwise will have no entitlement to any accrued Distributions or any other payment in respect of the Preferred Securities.

Upon a Preferred Securities Substitution, each Holder (or, as the case may be, accountholder) shall receive in respect of each €50,000 Liquidation Preference of Preferred Securities, one depositary share representing Substituted Preferred Stock with a nominal amount of €50,000 (or its equivalent in US$).

No Preferred Securities Substitution will take place and the Holders will continue to hold their Preferred Securities and all their rights thereunder if prior to the Substitution Date, a winding-up of LBHI occurs.

*LBHI has undertaken that it will pay any taxes or capital duties or stamp duties payable in the UK arising on the allotment and issue of the depositary shares representing Substituted Preferred Stock. LBHI will not be obliged to pay, and each Holder (or, as the case may be, accountholder) delivering Preferred Securities and a duly completed Preferred Securities Substitution Confirmation to a Paying and Transfer Agent must pay, any other taxes, stamp duty reserves taxes and capital, stamp, issue and registration duties arising on the relevant Preferred Securities Substitution. LBHI will not be obliged to pay and each recipient must pay all, if any, taxes arising by reference to any disposal or deemed disposal of a Preferred Security in connection with such Preferred Securities Substitution.*

5.2    The General Partner will use all reasonable endeavours to procure that certificates (if any) for depositary shares representing Substituted Preferred Stock issued on a Preferred Securities Substitution will be despatched by mail free of charge (but uninsured and at the risk of the person entitled thereto) within one month after receipt of a duly completed Preferred Securities Substitution Confirmation.

## 6.    Additional Amounts

All payments in respect of the Preferred Securities by the Issuer will be made without withholding or deduction for, or on account of, any Tax, unless the withholding or deduction of such Tax is required by law. In that event, each Holder will be entitled to receive, as further distributions, such additional amounts (the "**Additional Amounts**") as may be necessary in order that the net amounts received by the Holders after such withholding or deduction shall equal the amounts which would have been receivable in respect of the Preferred Securities in the absence of such withholding or deduction; except that no such Additional Amounts will be payable to a Holder (or to a third party on his behalf) with respect to any Preferred Security:

(a)    to the extent that such Tax is imposed or levied by virtue of such Holder (or the beneficial owner) of such Preferred Security having some connection with the United Kingdom, other than merely being a Holder (or beneficial owner) of such Preferred Security; or

(b)    where such withholding or deduction is imposed on a payment to or on behalf of an individual and is required to be made pursuant to European Union Directive 2003/48/EC on the taxation of savings or any law implementing or complying with, or introduced in order to conform to, such Directive; or

(c)   where the Holder would have been able to avoid such withholding or deduction by presenting the Preferred Securities to another Paying and Transfer Agent in a Member State of the European Union, insofar as presentation for payment is required,

and except that the Issuer's obligation to make any such payments is subject to the limitations provided in paragraphs 2 and 3.

## 7.   Payments

7.1   Distributions will be payable in accordance with the Act on the relevant Distribution Payment Date (or where any Distribution Payment Date is not a TARGET Business Day on the next TARGET Business Day (without interest in respect of such delay)) to the Holders of record as they appear on the Register on the relevant record date, which will be five TARGET Business Days prior to the relevant Distribution Payment Date.

If the General Partner gives a notice of redemption pursuant to paragraph 4.2 or 4.3 or in respect of the Preferred Securities, then on the relevant Redemption Date the General Partner shall procure that the Optional Redemption Price will be paid by the Registrar or by the Paying and Transfer Agents on behalf of the Issuer to the Holders. To the extent that a Further Distribution falls to be paid on redemption of the Preferred Securities it shall be paid together with the Optional Redemption Price. Upon such payment, all rights of Holders to participate in the assets of the Issuer or to be returned any amount in respect of the Preferred Securities (including the Preferred Capital Contribution (or any part thereof) made by or on behalf of the Holders) will be extinguished and the Holders shall thereupon cease to be limited partners of the Issuer provided their holding of Preferred Securities is redeemed in accordance with the foregoing, and the Preferred Capital Contribution will, on payment of the Optional Redemption Price, be deemed repaid.

7.2   Subject to all applicable fiscal or other laws and regulations:

7.2.1   each payment in respect of Distributions will be made by cheque and mailed to the Holder of record at such Holder's address as it appears on the Register on the relevant record date for the Preferred Securities; and

7.2.2   any payment in respect of the Optional Redemption Price or the Liquidation Distribution in respect of any Preferred Security will be made by cheque against presentation and surrender of the relevant certificate of entitlement at the office of the Registrar or a Paying and Transfer Agent,

provided, however, that a Holder may receive such payment by direct transfer if appropriate direct transfer instructions have been received by the Registrar in sufficient time prior to the relevant date of payment. Holders will not be entitled to any interest or other payment for any delay after the due date in receiving the amount due if the due date is not a TARGET Business Day, if the Holder is late in surrendering certificates (if required to do so) or if a cheque mailed in accordance with this paragraph arrives after the due date for payment.

In the event that payment of the Optional Redemption Price in respect of any Preferred Security is improperly withheld or refused and not paid by the Issuer, Distributions on such Preferred Security, subject as described in paragraphs 2.3 and 2.5, will continue to accrue, from the relevant Redemption Date to the date of actual payment of such Optional Redemption Price.

7.3   The General Partner will, and the Guarantor has undertaken in the Subordinated Guarantee that it will procure that the General Partner will, maintain at all times whilst the Preferred Securities are outstanding (a) whilst the Preferred Securities are admitted to trading on the regulated market of any Stock Exchange, a Paying and Transfer Agent in such location as is required to maintain such admission, (b) a Registrar having its office outside the United Kingdom and (c) a Paying and Transfer Agent having a specified office in a European Union Member State other than the United Kingdom that will not be obliged to withhold or deduct tax pursuant to European Union Directive 2003/48/EC

on the taxation of savings or any law implementing or complying with, or introduced in order to conform to, such Directive.

## 8.    Meetings

8.1    Except as described below and provided for in the Act, Holders will not be entitled to receive notice of, or attend or vote at, any meeting of partners in the Issuer or participate in the management of the Issuer.

8.2    The consent in writing of the Holders of at least a simple majority in Liquidation Preference of the outstanding Preferred Securities or the sanction of a resolution, passed by Holders of at least a simple majority in Liquidation Preference of the Preferred Securities present or represented at a separate meeting at which the quorum shall be Holders present or represented holding at least one-third in Liquidation Preference of the outstanding Preferred Securities, shall be required in order to give effect to any variation or abrogation of the rights, preferences and privileges of the Preferred Securities by way of amendment of the Limited Partnership Agreement or otherwise (unless otherwise provided in the terms of the Preferred Securities or as required by applicable law).

8.3    No such sanction shall be required if, as determined by the General Partner, the change is solely of a formal, minor or technical nature or is to correct an error or cure an ambiguity or which does not adversely affect the rights of Holders (provided that the change does not reduce the amounts payable to Holders, impose any obligation on the Holders or any modification of the terms of the Preferred Securities) in which case the General Partner shall be authorised to approve and implement such change.

8.4    Notwithstanding the foregoing, the General Partner may, without the consent or sanction of the Holders, take such action as is required in order to amend the Limited Partnership Agreement:

8.4.1    to allow an increase in the level of the Preferred Capital Contributions and the corresponding number of Preferred Securities; or

8.4.2    to authorise, create and issue one or more other series of securities or partnership interests in the Issuer ranking junior, as regards participation in the profits and assets of the Issuer, to the Preferred Securities and to admit, if relevant, new holders in respect thereof.

Thereafter the Issuer may, provided that the circumstances for non-payment of Distributions in paragraph 2.5 are not subsisting, without the consent of the Holders issue any such further securities either having the same terms and conditions as the Preferred Securities in all respects (or in all respects except for the first payment of Distributions on them) and so that such further issue shall be consolidated and form a single series with the Preferred Securities or upon such other terms as aforesaid. References herein to the Preferred Securities include (unless the context requires otherwise) any other securities issued pursuant to this paragraph and forming a single series with the Preferred Securities.

8.5    Notwithstanding the foregoing, no vote of the Holders will be required for the redemption, cancellation or substitution of the Preferred Securities or withdrawal of a Holder in accordance with the Limited Partnership Agreement.

8.6    The General Partner will cause a notice of any meeting at which Holders are entitled to vote and any voting forms to be mailed to each Holder. Each such notice will include a statement setting forth (a) the date, time and place of such meeting, (b) a description of any resolution to be proposed for adoption at such meeting on which such Holders are entitled to vote and (c) instructions for the delivery of proxies.

## 9.    Covenant of the General Partner

The General Partner undertakes not to incur any indebtedness in the name of the Issuer other than the costs and expenses incidental to creating the Preferred Securities and the Issuer and any other partnership interests

in the Issuer, performing its obligations in respect of the Limited Partnership Agreement, maintaining the listing of the Preferred Securities and any other partnership interests in the Issuer (where applicable). the Register, the Registrar, the Paying and Transfer Agents and a listing agent in respect of the Preferred Securities and corresponding agents (where applicable) with respect to any other partnership interests in the Issuer, the Issuer's holding of the partnership assets and any securities acquired with any other capital contributions to the Issuer or substitutions therefor and the maintenance of a custodian therefor, the exercise of the Issuer's rights in respect of the partnership assets and any securities acquired with any other capital contributions to the Issuer or substitutions therefor and the administration of the Issuer.

## 10.    Notices

All notices to the Holders will be mailed to the Holder of record and in addition, if and for so long as the Preferred Securities are admitted to trading on the regulated market of a Stock Exchange, notices will be given in accordance with regulations relating to such admission. Any mailed notice shall be deemed to have been given one clear day after the date on which it was posted and any notice published in a newspaper shall be deemed to have been given on the date of publication or, if so published more than once or on different dates, on the date of the first publication.

## 11.    Transfers and Form

The Preferred Securities will be in registered form each with a Liquidation Preference of €50,000 and multiples thereof.

If definitive certificates are made available in respect of Preferred Securities they will be available from the Registrar and from each of the Paying and Transfer Agents, and will be posted to the relevant Holders at the address shown in the Register or, as applicable, in the relevant instrument of transfer within three Business Days in London of issue, by uninsured post at the risk of such Holders. Transfers of Preferred Securities if represented by definitive certificates may be effected by presentation of the relevant certificate (with the transfer certificate attached thereto duly completed on behalf of the transferor and transferee) at the specified office of the Registrar or any Paying and Transfer Agent. Where a Holder transfers some only of the Preferred Securities represented by any such certificate he shall be entitled to a certificate for the balance without charge at the specified office of the Registrar or any Paying and Transfer Agent. All transfers of Preferred Securities by Holders must be effected in accordance with the Act and subject to the provisions of the Limited Partnership Agreement.

## 12.    Replacement of Certificates

If a certificate is damaged or defaced or alleged to have been lost, stolen or destroyed, a new certificate representing the same Preferred Securities may be issued on payment of such fee and on such terms (if any) as to evidence and indemnity and the payment of out-of-pocket expenses as the General Partner may think fit and on payment of the costs of the General Partner incidental to its investigation of the evidence and, if damaged or defaced, on delivery up of the old certificate at the office of the Registrar or any Paying and Transfer Agent.

## 13.    Prescription

Claims against the Issuer for payment of Distributions and sums in respect of the Optional Redemption Price or Liquidation Distribution of the Preferred Securities will be prescribed in accordance with English law unless made within 10 years from the date on which such payment becomes due or, if later, the date on which the Issuer makes such payment available to Holders.

## 14.    Governing Law

The Limited Partnership Agreement and the Preferred Securities shall be governed by, and construed in accordance with, English law.

## SUMMARY OF PROVISIONS RELATING TO THE PREFERRED SECURITIES
## IN GLOBAL FORM

### Initial Issue of Preferred Securities

The Preferred Securities will be issued in registered form and will be initially represented by interests in a Global Certificate which will be deposited with JPMorgan Chase Bank, N.A., London Branch (the "**Common Depositary**") as common depositary for Euroclear and Clearstream, Luxembourg. The Preferred Securities will be registered in the name of the Initial Limited Partner, as nominee for the Common Depositary. For so long as the Preferred Securities are deposited and registered as described above, book-entry interests in the Preferred Securities will be shown on, and transfers of such interests will be effected only through, records maintained by Euroclear and Clearstream, Luxembourg.

### Exchange

If either or both of Euroclear and Clearstream, Luxembourg is or are closed for business for a continuous period of 14 days (other than for the purposes of a public holiday) or announces an intention permanently to cease business, then a number of Preferred Securities corresponding to its book-entry interest in the Preferred Securities represented by the Global Certificate held by the Common Depositary referred to above will, subject to such reasonable requirements as the General Partner may require, be transferred to each holder of an interest in the Preferred Securities whose name is notified by the Common Depositary to the Registrar. Each such holder will be registered as a Holder in the Register and registered with the Registrar at Companies House in Cardiff on the Limited Partnerships Register in accordance with the Act and will receive a certificate made out in its name. Other than in the circumstances referred to in this paragraph, definitive certificates will not be available to Holders.

### Accountholders

So long as the Preferred Securities are registered in the name of a nominee for a common depositary for Euroclear and Clearstream, Luxembourg, the nominee for Euroclear and Clearstream, Luxembourg will be the sole registered owner or holder of the Preferred Securities represented by the Global Certificate for all purposes under the Limited Partnership Agreement. Except as set forth under *"Description of Preferred Securities – Transfers and Form"* and under *"Transfers of Interests"* below, the persons shown in the records of Euroclear, Clearstream, Luxembourg or any other clearing system as the holders of the Preferred Securities evidenced by the Global Certificate (each an "**Accountholder**") will not be entitled to have Preferred Securities registered in their names, will not receive or be entitled to receive physical delivery of definitive certificates evidencing interests in the Preferred Securities and will not be considered registered owners or holders thereof under the Limited Partnership Agreement. Accordingly, each Accountholder must rely on the rules and procedures of Euroclear and Clearstream, Luxembourg, as the case may be, to exercise any rights and obligations of an investor in Preferred Securities.

### Payment

Each Accountholder must look solely to Euroclear or Clearstream, Luxembourg, as the case may be, for its share of each payment made by the Issuer to the registered holder of the Preferred Securities and in relation to all other rights arising under the Global Certificate, subject to and in accordance with the respective rules and procedures of Euroclear or Clearstream, Luxembourg, as the case may be. Such persons shall have no claim directly against the Issuer in respect of payments due on the Preferred Securities for so long as the Preferred Securities are represented by the Global Certificate and such obligations of the Issuer will be discharged by payment to the registered holder of the Preferred Securities in respect of each amount so paid.

### Transfers of Interests

Accountholders will only be able to transfer their beneficial interests in the Preferred Securities in accordance with the restrictions described under *"Description of Preferred Securities – Transfers and Form"* and the rules and procedures of Euroclear or Clearstream, Luxembourg, as the case may be.

## SUBORDINATED GUARANTEE

*The following is the Subordinated Guarantee substantially in the form to be executed by the Guarantor.*

THIS DEED OF GUARANTEE (the "**Subordinated Guarantee**"), dated 22nd February, 2006, is executed and delivered by Lehman Brothers Holdings plc (the "**Guarantor**") for the benefit of the Holders (as defined below).

WHEREAS the Guarantor desires to issue this Subordinated Guarantee for the benefit of the Holders, as provided herein.

NOW, THEREFORE the Guarantor executes and delivers this Subordinated Guarantee as a deed poll for the benefit of the Holders.

### 1. Definitions

As used in this Subordinated Guarantee, capitalised terms not defined herein shall have the meanings ascribed to them in the Limited Partnership Agreement and otherwise the following terms shall, unless the context otherwise requires, have the following meanings:

"**Guaranteed Payments**" means (without duplication) collectively payments by the Guarantor in respect of an amount equal to (i) all Distributions due on the Preferred Securities, (ii) the Optional Redemption Price and (iii) any Additional Amounts;

"**Holder**" means, in respect of each Preferred Security, each person registered on the Register as the limited partner holding such Preferred Security at the relevant time, save that for as long as the Preferred Securities are registered in the name of a common depositary (or of a nominee for a common depositary) for Euroclear and Clearstream, Luxembourg, each person (other than Euroclear and Clearstream, Luxembourg) who is for the time being shown in the records of Euroclear and Clearstream, Luxembourg as the holder of an interest in any Preferred Securities (in which regard any certificate or other document issued by Euroclear or Clearstream, Luxembourg as to the number of Preferred Securities standing to the account of any person shall be conclusive and binding for all purposes) shall be treated by the Issuer, the Guarantor and any Paying and Transfer Agent as the holder of Preferred Securities in a nominal amount equal to such interest for all purposes other than with respect to payments, the right to which shall be vested in the name of the person appearing as the relative limited partner in the Register;

"**Junior Share Capital**" means the Guarantor's ordinary shares, together with any other securities or obligations of the Guarantor expressed to rank junior to this Subordinated Guarantee and the Parity Securities;

"**Limited Partnership Agreement**" means the Limited Partnership Agreement dated 17th February, 2006 establishing the Issuer, as amended from time to time;

"**Optional Redemption Price**" means, in respect of each Preferred Security, the Liquidation Preference plus (a) any due and accrued but unpaid Distributions calculated from (and including) the immediately preceding Distribution Payment Date (or, if none, the Closing Date) to (but excluding) the date of payment and (b) any Additional Amounts payable, in each case in cash only;

"**Parity Securities**" means any non-cumulative preference shares, non-cumulative preferred securities (other than the Preferred Securities) or other securities either (a) issued directly by the Guarantor and ranking *pari passu* with the Guarantor's obligations under this Subordinated Guarantee including the Sterling and US dollar non-cumulative preference shares of the Guarantor outstanding or (b) issued by the Issuer or any Subsidiary or other entity and entitled to the benefit of this Subordinated Guarantee or benefiting from any other guarantee or support agreement from the Guarantor ranking *pari passu* with this Subordinated Guarantee which on the date hereof includes the outstanding €175,810,000 Fixed Rate to CMS-Linked Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities of Lehman Brothers UK Capital Funding LP and the outstanding €250,000,000 Euro Fixed Rate Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities of Lehman Brothers UK Capital Funding II LP;

31

"**Preferred Securities**" means the outstanding Fixed/Floating Rate Enhanced Capital Advantaged Preferred Securities (Euro ECAPS<sup>SM</sup>) of the Issuer, originally issued on the Closing Date, together with any further such preferred securities issued after the date of this Subordinated Guarantee, the Holders of which are entitled to the benefits of this Subordinated Guarantee as evidenced by the execution of this Subordinated Guarantee and "**Preferred Security**" shall be construed accordingly;

"**Tax**" means any present or future taxes or duties of whatsoever nature imposed or levied by or on behalf of the United Kingdom or any subdivision of or by any authority therein or thereof having power to tax;

"**Tier 1 Capital**" has the meaning ascribed to it in the Financial Services Authority's Guide to Banking Supervisor Policy or any successor publication replacing such guide; and

"**Tier 1 Securities**" mean any obligation of the Guarantor or, as the case may be, a Subsidiary or other entity which is treated, or is capable of being treated, as Tier 1 Capital of the Guarantor.

2.    **Guarantee**

2.1    Subject to the exceptions and limitations contained in the following provisions of this clause 2, the Guarantor irrevocably agrees to pay in full to the Holders the Guaranteed Payments, as and when due, to the extent that such payments shall not have been paid when due and payable by the Issuer regardless of any defence, right of set-off or counterclaim which the Issuer may have or assert. This Guarantee is continuing, irrevocable and absolute. The rights and claims of the Holders against the Guarantor under this Guarantee are subordinated as described in paragraph 2.9.

2.2    All Guaranteed Payments made hereunder will be made without withholding or deduction for or on account of any Tax, unless the withholding or deduction of such taxes, duties, assessments or governmental charges is required by law. In that event, the Guarantor will, provided that (if required at such time) the UK Regulator has not objected, pay such additional amounts (the "**Guarantor Additional Amounts**") as may be necessary in order that the net amounts received by the Holders after such withholding or deduction shall equal the amounts which would have been receivable under this Subordinated Guarantee in the absence of such withholding or deduction; except that no such Guarantor Additional Amounts will be payable to a Holder (or a third party on his behalf):

(a)    to the extent that such Tax is imposed or levied by virtue of such Holder (or the beneficial owner) of such Preferred Security having some connection with the United Kingdom, other than merely being a Holder (or beneficial owner) of such Preferred Security; or

(b)    where such withholding or deduction is imposed on a payment to or on behalf of an individual and is required to be made pursuant to European Union Directive 2003/48/EC on the taxation of savings or any law implementing or complying with, or introduced in order to conform to, such Directive; or

(c)    where the Holder would have been able to avoid such withholding or deduction by presenting the Preferred Securities to another Paying and Transfer Agent in a Member State of the European Union, insofar as presentation for payment is required.

2.3    The Guarantor hereby waives notice of acceptance of this Subordinated Guarantee and of any liability to which it applies or may apply, presentment, demand for payment, protest, notice of non-payment, notice of dishonour, notice of redemption and all other notices and demands.

2.4    The obligations, covenants, agreements and duties of the Guarantor under this Subordinated Guarantee shall in no way be affected or impaired by reason of the happening from time to time of any of the following:

(a)    the release or waiver, by operation of law or otherwise, of the performance or observance by the Issuer of any express or implied agreement, covenant, term or condition relating to the Preferred Securities to be performed or observed by or on behalf of the Issuer;

(b)    the extension of time for the payment by or on behalf of the Issuer of all or any portion of any Distribution, the Optional Redemption Price, the Liquidation Distribution or any other sums payable under the terms of the Preferred Securities or the extension of time for the performance of any other obligation under, arising out of, or in connection with, the Preferred Securities;

(c)    any failure, omission, delay or lack of diligence on the part of Holders to enforce, assert or exercise any right, privilege, power or remedy conferred on the Holders pursuant to the terms of the Preferred Securities, or any action on the part of the Issuer granting indulgence or extension of any kind;

(d)    the voluntary or involuntary winding-up, dissolution, amalgamation, reconstruction, sale of any collateral, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganisation, arrangement, composition or readjustment of debt of, or other similar proceedings affecting, the Issuer or any of the assets of the Issuer;

(e)    any invalidity of, or defect or deficiency in, the Preferred Securities; or

(f)    the settlement or compromise of any obligation guaranteed hereby or hereby incurred.

There shall be no obligation on the Holders to give notice to, or obtain consent of, the Guarantor with respect to the occurrence of any of the foregoing.

2.5    This Subordinated Guarantee shall be deposited with and held by the Registrar until all the obligations of the Guarantor have been discharged in full. The Guarantor hereby acknowledges the right of every Holder to the production of, and the right of every Holder to obtain a copy of, this Subordinated Guarantee from the Registrar.

2.6    A Holder may enforce this Subordinated Guarantee directly against the Guarantor, and the Guarantor waives any right or remedy to require that any action be brought against the Issuer or any other person or entity before proceeding against the Guarantor. All waivers contained in this Subordinated Guarantee shall be without prejudice to the right to proceed against the Issuer and the General Partner as permitted by the terms of the Preferred Securities. The Guarantor agrees that this Subordinated Guarantee shall not be discharged except by complete performance of all obligations of the Guarantor under this Subordinated Guarantee.

2.7    The Guarantor shall be subrogated to any and all rights of the Holders against the assets of the Issuer in respect of any amounts paid to the Holders by the Guarantor under this Subordinated Guarantee. The Guarantor shall not (except to the extent required by mandatory provisions of law) exercise any rights which it may acquire by way of subrogation or any indemnity, reimbursement or other agreement, in all cases as a result of a payment under this Subordinated Guarantee, if, at the time of any such payment, any amounts are due and unpaid under this Subordinated Guarantee. If the Guarantor shall receive or be paid any amount with respect to the Preferred Securities in violation of the preceding sentence, the Guarantor agrees to pay over such amount to the Holders.

2.8    The Guarantor acknowledges that its obligations hereunder are several and independent of the obligations of the Issuer with respect to the Preferred Securities and that the Guarantor shall be liable as principal and sole obligor hereunder to make Guaranteed Payments pursuant to the terms of this Subordinated Guarantee, notwithstanding the occurrence of any event referred to in clause 2.4.

2.9    Subject to applicable law, the Guarantor agrees that its obligations hereunder constitute unsecured obligations of the Guarantor subordinated in right of payment to Senior Creditors and will at all times rank:

(a)    junior to all liabilities of the Guarantor including subordinated liabilities (in each case other than any liability of the Guarantor which constitutes or would, but for any applicable limitation on the amount of such capital, constitute Tier 1 Capital or which is referred to in (b) or (c) below and any other liability expressed to rank *pari passu* with or junior to this Subordinated Guarantee) (the "**Senior Creditors**");

(b)     *pari passu* with Parity Securities, if any, issued by the Guarantor and any guarantee or support agreement of the Guarantor ranking *pari passu* with this Subordinated Guarantee and issued in respect of Parity Securities issued by the Issuer or any Subsidiary; and

(c)     senior to the Junior Share Capital of the Guarantor.

2.10    No Holder shall following any breach by the Guarantor of any of its obligations under this Subordinated Guarantee be entitled to exercise any right of set-off or counterclaim which may be available to it against amounts owing by the Guarantor to such Holder. Notwithstanding the provisions of the foregoing sentence, if any of the said rights and claims of any Holder against the Guarantor is discharged by set-off, such Holder will immediately pay an amount equal to the amount of such discharge to the Guarantor or, in the event of its winding-up, the liquidator of the Guarantor and until such time as payment is made will hold a sum equal to such amount in trust for the Guarantor, or the liquidator of the Guarantor, and accordingly any such discharge will be deemed not to have taken place.

2.11    In the event of the winding-up of the Guarantor if any payment or distribution of assets of the Guarantor of any kind or character, whether in cash, property or securities, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness of the Guarantor being subordinated to the payment of amounts owing under this Subordinated Guarantee, shall be received by any Holders, before the claims of Senior Creditors have been paid in full, such payment or distribution shall be held in trust by the Holder, as applicable, and shall be immediately returned by it to the liquidator of the Guarantor and in that event the receipt by the liquidator shall be a good discharge to the relevant Holder. Thereupon, such payment or distribution will be deemed not to have been made or received.

## 3.     Undertaking of the Guarantor

The Guarantor will procure that it will maintain, at all times whilst the Preferred Securities are outstanding and whilst the Preferred Securities are admitted to trading on the regulated market of any Stock Exchange, a Paying and Transfer Agent in such location as is required to maintain such admission to trading.

## 4.     Termination

With respect to the Preferred Securities, this Subordinated Guarantee shall terminate and be of no further force and effect upon the earliest of:

4.1     full payment of the Optional Redemption Price;

4.2     purchase and cancellation of all Preferred Securities;

4.3     dissolution of the Issuer; or

4.4     if the Issuer pays to the Holders all amounts which could be claimed by them under the Subordinated Guarantee,

provided however that this Subordinated Guarantee will continue to be effective or will be reinstated, as the case may be, if at any time payment of any sums paid in respect of the Preferred Securities or under this Subordinated Guarantee must be restored to a Holder for any reason whatsoever.

## 5.     Transfer; Amendment; Notices

5.1     Subject to operation of law, all guarantees and agreements contained in this Subordinated Guarantee shall bind the successors, assigns, receivers, trustees and representatives of the Guarantor and shall inure to the benefit of the Holders. The Guarantor shall not transfer its obligations hereunder without (i) the prior approval of the Holders of not less than a simple majority in Liquidation Preference of the outstanding Preferred Securities (excluding any Preferred Securities held by the Guarantor or any Subsidiary of the Guarantor), or (ii) the sanction of a resolution, passed by Holders representing at

least a simple majority in Liquidation Preference of the Preferred Securities present or represented at a separate meeting at which the quorum shall be Holders present or represented holding at least one-third in Liquidation Preference of the outstanding Preferred Securities and otherwise convened and held in accordance with procedures contained in Schedule 2 to the Limited Partnership Agreement and applicable law.

5.2    Except for those changes (a) required by clause 3.1 hereof; or (b) which do not adversely affect the rights of Holders (in any of which cases no agreement will be required), this Subordinated Guarantee shall be changed only by agreement in writing signed or sealed by the Guarantor with the prior approval of the Holders of not less than a simple majority in Liquidation Preference of the outstanding Preferred Securities (excluding any Preferred Securities held by the Guarantor or any Subsidiary of the Guarantor), or the sanction of a resolution, passed by Holders of at least a simple majority in Liquidation Preference of the Preferred Securities present or represented at a separate meeting at which the quorum shall be Holders present or represented holding at least one-third in Liquidation Preference of the outstanding Preferred Securities.

5.3    Any notice, request or other communication required or permitted to be given hereunder to the Guarantor shall be given in writing by delivering the same against receipt therefor or be addressed to the Guarantor, as follows, to:

Lehman Brothers Holdings plc

Address:    25 Bank Street
            London E14 5LE
            England

Attention:    Head of Legal Department

Facsimile:    +44 20 7102 2999

The address of the Guarantor may be changed at any time and from time to time and shall be the most recent such address furnished in writing by the Guarantor to the Registrar.

Any notice, request or other communication required or permitted to be given hereunder to the Holders shall be given by the Guarantor in the same manner as notices sent on behalf of the Issuer to Holders.

5.4    This Subordinated Guarantee is solely for the benefit of the Holders and is not separately transferable from their interests in respect of the Preferred Securities.

## 6.    Governing Law

This Subordinated Guarantee is governed by, and shall be construed in accordance with, English law.

IN WITNESS WHEREOF this Subordinated Guarantee has been executed as a deed poll on behalf of the Guarantor.

EXECUTED as a DEED by

LEHMAN BROTHERS HOLDINGS PLC

acting by

and

## USE OF PROCEEDS

The net proceeds of the issue of the Preferred Securities will be approximately €492,175,000 and will augment the capital base of LBHI and the Guarantor. The Issuer will use the net proceeds of the issue of the Preferred Securities to subscribe for the Partnership Assets.

## LEHMAN BROTHERS UK CAPITAL FUNDING III LP

**Introduction**

The Issuer was registered in England and Wales on 17th February, 2006 under the Limited Partnerships Act 1907, with LB GP No. 1 Ltd. as the general partner (in such capacity, the "**General Partner**") and LB Investment Holdings Ltd as the preferential limited partner (the "**Preferential Limited Partner**"). The General Partner, the Preferential Limited Partner and CNL have, *inter alios*, entered into a limited partnership agreement on 17th February, 2006 (the "**Limited Partnership Agreement**") for the purpose of establishing the Issuer. Pursuant to the Limited Partnership Agreement, it is intended that CNL, as the nominee company of the common depositary for Euroclear and Clearstream, Luxembourg will become a limited partner (i.e. the Initial Limited Partner) of the Issuer with effect from the Closing Date. The Issuer is not a legal entity separate from its partners and has no subsidiaries. The Limited Partnership Agreement does not create a trust relationship between any of the partners. The Issuer will be dissolved upon redemption of the Preferred Securities. The Issuer's registered office is 25 Bank Street, London E14 5LE. It has no telephone number.

The General Partner, incorporated with limited liability in England and Wales with registered number 5355491 is a wholly owned subsidiary of LBHI and is the sole general partner of the Issuer. The General Partner's registered office is 25 Bank Street, London E14 5LE. As such, the General Partner solely manages the Issuer (subject to the appointment by the Issuer of the Administrator as described below). The Issuer is a wholly controlled subsidiary undertaking of the General Partner. The General Partner fulfils a similar function for Lehman Brothers UK Capital Funding I LP and Lehman Brothers UK Capital Funding II LP. The duties to and functions of the General Partner are contained in the Limited Partnership Agreement. None of such duties or functions give rise to any potential conflict of interest between duties owed to the Issuer and any other interests of the General Partner. The Guarantor will undertake in the Subordinated Guarantee to ensure that, unless otherwise approved by a simple majority of the Holders, the General Partner will at all times be either the Guarantor itself or a directly or indirectly wholly-owned subsidiary of the Guarantor.

The board of Directors of the General Partner comprises:

| Name | Function | Principal outside activites |
|------|----------|------------------------------|
| Paolo Tonucci | Director | Director of Lehman Brothers Holdings plc |
| Dave Rushton | Director | Director of Lehman Brothers Holdings plc |
| Antony Rush | Director | |

For the purposes of this document, the business address of each of the Directors of the General Partner is 25 Bank Street, London E14 5LE. There are no potential conflicts of interest between the duties of the Directors of the General Partner to the Issuer and their private interests and/or other duties.

The Preferential Limited Partner, incorporated with limited liability in England and Wales with registered number 4385277 is a wholly owned Subsidiary of LBHI. The Preferential Limited Partner shall be entitled to receive all amounts received by the Issuer from its investment in the Subordinated Notes or Replacement Affiliate Investments (each as defined herein under "*Description of the Preferred Securities*"), as the case may be, in excess of those required to make payments in respect of the Preferred Securities.

Provided that they do not become involved with the administration of the limited partnership, and subject to compliance with the provisions of the Act, the liability of persons registered as limited partners of the Issuer pursuant to the Act for the debts or obligations of the limited partnership will be limited to the amount of partnership capital which they have contributed or agreed to contribute to the partnership, i.e. €50,000 per Preferred Security.

No financial statements of the Issuer have yet been prepared. The first financial statements of the Issuer are expected to be prepared for the period ending 30th November, 2006. Thereafter, it is intended that the Issuer will prepare audited annual financial statements. It is not intended that the Issuer will publish interim financial statements.

## Activity

The business of the Issuer is generally to raise finance for the Group and is more particularly described in the Limited Partnership Agreement. The Issuer has carried out no operations since its registration other than in relation to the creation of the Preferred Securities. The capital contributions to be made by the partners will be used by the Issuer to subscribe for the Subordinated Notes and the Third Party Assets.

## Administration

For UK regulatory purposes, the Issuer will be operated by the General Partner or, insofar as the General Partner is not so authorised, by an administrator (the "**Administrator**") authorised by the Financial Services Authority under the Financial Services and Markets Act 2000 (the "**FSMA**") to establish, operate and wind-up collective investment schemes. The registered office of the Issuer and the General Partner is 25 Bank Street, London E14 5LE. Neither the Initial Limited Partner nor any Holder may participate in the administration of the Issuer.

The General Partner has agreed to contribute capital from time to time to the extent required for the Issuer to meet any operating expenses which it may have. The General Partner has also agreed that it will at all times maintain sole ownership, whether directly or indirectly, of its general partner interest in the Issuer, subject to the terms of the Limited Partnership Agreement. The Limited Partnership Agreement provides that all of the Issuer's business and affairs will be conducted by the General Partner save for those operational matters required to be performed by an Administrator under the FSMA. The General Partner will have unlimited liability for the debts and obligations of the Issuer to the extent that these cannot be satisfied out of partnership assets.

If the Issuer is dissolved, the Limited Partnership Agreement provides that the General Partner will only be entitled to any assets of the Issuer remaining after (i) all debts and other liabilities of the Issuer have been satisfied in full and (ii) the full Liquidation Preference to which the Holders are entitled and all other amounts to which the holders of any other partnership interests are entitled have been paid to, or irrevocably set aside for, such holders.

## Capitalisation

In addition to the initial capital contribution by the General Partner of €1, the initial capital contribution of €15,000,000 of the Preferential Limited Partner and the preferred capital contribution equating to the aggregate nominal amount of the Preferred Securities to be made by the Initial Limited Partner in relation to the Preferred Securities on the date of issue of the Preferred Securities and such other capital contributions as may be made by the General Partner from time to time to meet certain operating expenses of the partnership, the General Partner may accept additional limited partners and additional capital contributions to the Issuer in accordance with the provisions of the Limited Partnership Agreement. Limited partnerships do not have share capital.

## Indebtedness

Since the date of its registration, the Issuer has not had any loan capital outstanding, has not incurred any borrowings, has had no contingent liabilities, has not granted any guarantees and does not intend to have outstanding any such loan capital, incur any such borrowings, have any such contingent liabilities or grant any such guarantees other than in connection with the issue of the Preferred Securities and other partnership interests in the Issuer. The General Partner has undertaken in the Limited Partnership Agreement not to incur any indebtedness in the name of the Issuer other than the costs and expenses incidental to creating the Preferred Securities and the Issuer and any other partnership interests in the Issuer, performing its obligations in respect of the Limited Partnership Agreement, maintaining the listings of the Preferred Securities, the Register, the Registrar, the Paying and Transfer Agents and listing agents in respect of the Preferred Securities and corresponding agents (where applicable) with respect to any other partnership interests in the Issuer, the Issuer's holding of the partnership assets and any other securities acquired with any other capital contributions to the Issuer or substitutions therefor and the maintenance of any custodian therefor, the exercise of the Issuer's rights in respect of the partnership assets and any other securities acquired with any other capital contributions to the Issuer or substitutions therefor and the administration of the Issuer.

# LEHMAN BROTHERS HOLDINGS PLC

## General

The Guarantor was incorporated in England on 11th October, 1984 (with registration number 1854685) as a private limited company for an unlimited duration under the Companies Act 1948-81 and was re-registered as a public limited company under the Companies Act 1985 on 6th August, 1986. The Guarantor is an indirectly wholly-owned subsidiary of LBHI which is the parent company of the Lehman Brothers group of companies.

The Guarantor's memorandum of association permits it to carry out any business. It was originally organised to act as a UK holding company of LBHI's UK incorporated businesses, but since 1986 its principal activity has been to hold fixed asset investments in both subsidiary undertakings and non-subsidiary undertakings. Pursuant to the Guarantor's memorandum of association, the Guarantor's objects include, but are not limited to, borrowing and raising money and guaranteeing the performance of obligations of any person associated with the Guarantor.

The Guarantor has a number of subsidiary undertakings including wholly-owned subsidiaries, on which it depends for its operating income, Lehman Brothers International (Europe), Lehman Brothers Europe Ltd and Lehman Brothers Limited. The average number of persons employed by the Guarantor during 2004 was 7 and, as at the date of this Prospectus, is 7.

The Guarantor has not made any significant investments since 30th November, 2004, being the date of its last audited accounts.

The registered office and principal place of business of the Guarantor is at 25 Bank Street, London, E14 5LE, telephone (44) 207 102 1000.

## Directors of the Guarantor and corporate governance

The board of directors of the Guarantor are Ian Lowitt, Paolo R. Tonucci, Richard J.A. Amat, Ian Jameson, Antony J Rush, Marcus Jackson and Justin van Wijngaarden. The business address of each of the above is 25 Bank Street, London, E14 5LE.

All of the directors of the Guarantor are executive directors. Each of the directors are also employees of other members of the Lehman Brothers group of companies. None have business interests outside the Lehman Brothers group of companies which are significant with respect to the Guarantor.

There are no potential conflicts of interest between any duties to the Guarantor of the directors and their private interests and/or other duties.

The Guarantor does not have a separate audit committee.

The Guarantor complies with English corporate governance rules to the full extent applicable to it.

## Share capital of the Guarantor

As of the date of this Prospectus, the share capital of the Guarantor is comprised as follows:

- Ordinary Shares, £1.00 par value; 79,750,000 authorised: 40,021,100 allotted, called up and fully-paid

- Ordinary Shares $1.00 par value; 1,000,000,000 authorised: 773,800,000 allotted, called up and fully-paid

- Ordinary B Shares, £1.00 par value; 250,000 authorised; zero called up and fully-paid

- Preference Shares, non-cumulative, redeemable, £1.00 par value; 20,000,000 authorised: 20,000,000 allotted, called up and fully-paid

- Preference Shares, non-cumulative, redeemable, $1.00 par value; $3,000,000,000 authorised: 2,160,000,000 allotted, called up and fully-paid

The Guarantor entered into subordinated guarantees (in terms substantially identical to the Subordinated Guarantee) in respect of the €175,810,000 Fixed Rate to CMS-Linked Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities of Lehman Brothers UK Capital Funding LP on 30th March, 2005 and in respect of the €250,000,000 Euro Fixed Rate Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities of Lehman Brothers UK Capital Funding II LP on 21st September, 2005.

### Preference Shares of the Guarantor

The Preference Shares of the Guarantor confer the following rights upon the holders thereof (as extracted from the Articles of Association of the Guarantor) – as referred to below, "Company" means the Guarantor.

"(A)  As regards the income and capital:

(a)  the right to receive out of the profits of the Company available for dividend a fixed non-cumulative preferential dividend of £100 per annum; and

(b)  the right in a winding up or other return of capital to receive out of the assets of the Company available for distribution among the Members an amount equal to the capital paid up or credited as paid up together with a sum equal to any arrears of the fixed non-cumulative preferential dividend referred to in (a) above, provided that the same shall have been declared

in priority to any payment to the holders of any other class of shares but shall confer no further right to participate in the profits or assets of the Company.

(B)  As regards voting:

The Preference Shares shall not entitle the holders to receive notice of, or to attend and vote at, any general meeting of the Company.

(C)  As regards redemption:

The Preference Shares may be redeemed upon, and subject to, the following terms and conditions:-

(a)  The Company may at any time, subject to the provisions of the Companies Acts, redeem the Preference Shares upon giving to the holders of the Preference Shares not less than one month's previous notice in writing.

(b)  Any notice of redemption shall specify the date fixed for redemption and the place at which the certificates for the Preference Shares are to be presented for redemption and upon such date each of the holders of the Preference Shares shall be bound to deliver to the Company at such place the certificates for such of the Preference Shares as are held by him in order that the same may be cancelled. Upon such delivery the Company shall pay to such holder the amount due to him in respect of such redemption.

(c)  There shall be paid on each Preference Share redeemed the amount paid up or credited as paid up thereon together with an amount equal to any arrears of the fixed non-cumulative preferential dividend thereon (together with a certificate for the related tax credit) to be calculated up to and including the date fixed for redemption and to be payable provided such dividend has been declared.

(d)  The receipt of the registered holder for the time being of any Preference Shares or in the case of joint registered holders the receipt of any of them for the moneys payable on redemption thereof shall constitute an absolute discharge to the Company in respect thereof.

## SUMMARY FINANCIAL INFORMATION OF THE GUARANTOR

The following table sets forth selected non-consolidated financial information on the Guarantor as of the dates and for the periods indicated. The selected non-consolidated financial information set out are below is extracted without material adjustment from the audited non-consolidated financial statements of the Guarantor for the year ended 30th November, 2004.

### Profit and Loss Account Data

| | Year ended 30th November, 2004 | Year ended 30th November, 2003 |
|---|---|---|
| | $000's | $000's |
| **Operating (Loss)/Income** ......................................... | (67,115) | 322,255 |
| Administrative Expenses ............................................. | (2,788) | (2,883) |
| **Operating (Loss)/Profit** ......................................... | (69,903) | 319,372 |
| Interest receivable and similar income.......................... | 58,162 | 11,692 |
| Interest payable and similar charges ........................... | (119,302) | (182,706) |
| **Profit/(Loss) on Ordinary Activities before Taxation** ...... | (131,043) | 148,358 |
| Tax on profit on ordinary activities ............................ | – | – |
| **Profit/(Loss) on Ordinary Activities after Taxation** ...... | (131,043) | 148,358 |
| Dividend paid ......................................................... | – | – |
| **Profit/(Loss) Retained for the Year**........................... | (131,043) | 148,358 |

### Balance Sheet Data

| | Year ended 30th November, 2004 | Year ended 30th November, 2003 |
|---|---|---|
| | $000's | $000's |
| Total assets ........................................................... | 8,106,443 | 5,897,981 |
| Total current liabilities[1]............................................ | 5,813,594 | 4,535,948 |
| Long-term liabilities[1] ............................................... | 0 | 3,041 |
| Total shareholders' funds .......................................... | 2,292,849 | 1,358,992 |
| Total capital (shareholders' funds and long-term liabilities) ................. | 2,292,849 | 1,362,033 |

Note:

1.  For the years ended 30th November, 2004 and 30th November, 2003, the total liabilities of the Guarantor consist of the sum of the Total current liabilities and the Long-term liabilities

## LEHMAN BROTHERS HOLDINGS INC.

LBHI, together with its subsidiaries (collectively, "**Lehman Brothers**" or the "**Group**"), is an innovator in global finance, serving the financial needs of corporations, governments and municipalities, institutional clients and high-net-worth individuals worldwide. Lehman Brothers provides a full array of equities and fixed income sales, trading and research, investment banking services and investment management and advisory services. Its worldwide headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in North America, Europe, the Middle East, Latin America and the Asia Pacific region. The Group, through predecessor entities, was founded in 1850.

Lehman Brothers is a global market-maker in all major equity and fixed income products. To facilitate Lehman Brothers' market-making activities, it is a member of all principal securities and commodities exchanges in the United States, as well as NASD, Inc., and it holds memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and Australian stock exchanges.

Lehman Brothers' principal business activities are investment banking, capital markets and investment management. Through its investment banking, trading, research, structuring and distribution capabilities in equity and fixed income products, Lehman Brothers continues to build on its client-flow business model which is based on Lehman Brothers' principal focus of facilitating client transactions in all major global capital markets products and services. Lehman Brothers generates customer flow revenues from institutional, corporate, government and high-net-worth clients by (i) advising on and structuring transactions specifically suited to meet client needs; (ii) serving as a market maker and/or intermediary in the global marketplace, including having securities and other financial instrument products available to allow clients to adjust their portfolios and risks across different market cycles; (iii) providing investment management and advisory services; and (iv) acting as an underwriter to clients. As part of Lehman Brothers' client-flow activities, Lehman Brothers maintains inventory positions of varying amounts across a broad range of financial instruments. In addition, it also takes proprietary trading and investment positions. The financial services industry is significantly influenced by worldwide economic conditions as well as other factors inherent in the global financial markets. As a result, revenues and earnings may vary from quarter to quarter and from year to year. Lehman Brothers believes its client-flow orientation and the diversity of our business helps to mitigate overall revenue volatility.

Lehman Brothers operates in three business segments: Investment Banking, Capital Markets and Investment Management.

LBHI was incorporated with limited liability for an unlimited duration in the State of Delaware on 29th December, 1983. LBHI's principal executive offices are located at 745 Seventh Avenue, New York, New York 10019, U.S.A.

Several of LBHI's principal subsidiaries are subject to various capital adequacy requirements promulgated by the regulatory, banking and exchange authorities of the countries in which they operate and/or to capital targets established by various ratings agencies. The regulatory rules referred to above, and certain covenants contained in various debt agreements, may restrict LBHI's ability to withdraw capital from certain subsidiaries. Further information about these requirements and restrictions is contained in Management's Discussion and Analysis of Financial Condition and Results of Operations - Liquidity, Funding and Capital Resources" and in Note 12 of the Consolidated Financial Statements in LBHI's 2005 Annual Report, on Form 10-K.) Additionally, the ability of LBHI to participate as an equity holder in any distribution of assets of any subsidiary is generally subordinate to the claims of creditors of the subsidiary.

**Management**

**Board of Directors of LBHI**

Set forth below are the names, the principal occupations and principal outside activities of the current members of the board of directors of LBHI, each of whose business address in their capacity as a director is at LBHI's principal place of business:

| Name | Principal Occupation | Principal Outside Activities |
| --- | --- | --- |
| Richard S. Fuld, Jr | Chairman and Chief Executive Officer of LBHI | Serves on the Board of Directors of the Federal Reserve Bank of New York, Trustee of the Mount Sinai Medical Center and is on the Board of Directors of The Mount Sinai Children's Center Foundation, member of the Executive Committee of the Partnership for New York City, Business Roundtable and The Business Council, serves on the Board of Trustees of Middlebury College. |
| Michael L. Ainslie | Private Investor and Former President and Chief Executive Officer of Sotheby's Holdings | Director of St. Joe Company and Lehman Brothers Bank, FSB, Trustee of Vanderbilt University, Chairman of the Posse Foundation, Inc. and Director of the U.S. Tennis Association Foundation. |
| John F. Akers | Retired Chairman of International Business Machines Corporation | Director of W. R. Grace & Co., The New York Times Company and PepsiCo, Inc. |

Roger S. Berlind    Theatrical Producer

Theatrical producer and principal of Berlind Productions and Governor of the League of American Theatres and Producers.

| | | |
| --- | --- | --- |
| Thomas H. Cruikshank | Retired Chairman and Chief Executive Officer of Halliburton Company | Director of Lehman Brothers Inc. |
| Sir Christopher Gent | Non-Executive Chairman of GlaxoSmithKline plc | Director of Ferrari SpA and a Senior Advisor to Bain & Company, Inc. |
| Marsha Johnson Evans | Rear Admiral, U.S. Navy (Retired) | Director of Weight Watchers International Inc. and Huntsman Corporation, member of the Advisory Board of the Pew Partnership for Civic Change, a project of the Pew Charitable Trusts, Director of the Naval Academy Foundation and a Presidential Appointee to the Board of Visitors of the United States Military Academy at West Point. |
| Roland A. Hernandez | Retired chairman and Chief Executive officer of Telemundo Group, Inc. | Director of MGM Mirage, The Ryland Group, Inc., Vail Resorts, Inc. and Wal-Mart Stores, Inc. Serves on advisory boards for Harvard University's David Rockefeller Center for Latin American Studies and Harvard Law School, as well as the board of Yale University's President's Council on International Activities. Dean's advisory board member for the University of Southern |

| | | |
|---|---|---|
| | | California's Annenberg School for Communication. |
| Henry Kaufman | President of Henry Kaufman & Company, Inc. | Member (and the Chairman Emeritus) of the Board of Trustees of the Institute of International Education, a Member of the Board of Trustees of New York University, a Member (and the Chairman Emeritus) of the Board of Overseers of the Stern School of Business of New York University, a Member of the Board of Trustees of the Animal Medical Center, a Member of the International Advisory Committee of the Federal Reserve Bank of New York, a Member of the Advisory Committee to the Investment Committee of the International Monetary Fund Staff Retirement Plan, a Member of the Board of Governors of Tel-Aviv University and Treasurer (and former Trustee) of The Economic Club of New York. |
| John D. Macomber | Principal of JDM Investment Group | Director of AEA Investors Inc., Mettler-Toledo International, Warren Pharmaceutical Co, Chairman of the Council for Excellence in Government and Vice Chairman of the Atlantic Council, Director of the National Campaign to Prevent Teen Pregnancy and a Trustee of the Carnegie Institution of Washington and the Folger Library. |
| Dina Merrill | Director and Vice Chairman of RKO Pictures, Inc. and Actress | Vice President of the New York City Mission Society, Trustee of the Eugene O'Neill Theater Foundation, Director of Orbis International, the Juvenile Diabetes Foundation and the Museum of Television and Radio. |

**Executive Officers of LBHI**

| | |
|---|---|
| Richard S. Fuld, Jr. | Chairman and Chief Executive Officer |
| Jonathan E. Beyman | Chief of Operations and Technology |
| David Goldfarb | Chief Administrative Officer |
| Joseph M. Gregory | President and Chief Operating Officer |
| Christopher M. O'Meara | Chief Financial Officer |
| Thomas A. Russo | Chief Legal Officer |

**Employees**

As of 30th November, 2005, Lehman Brothers employed approximately 22,900 persons. Lehman Brothers considers its relationship with its employees to be good.

## CONSOLIDATED CAPITALISATION AND INDEBTEDNESS OF LBHI

All of the financial information below is extracted without material adjustment from the audited consolidated financial statements of LBHI included in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2005 filed with the SEC. The following table sets forth the audited consolidated capitalisation and indebtedness of LBHI and its subsidiaries as of 30th November, 2005 and 30th November, 2004[1]:

| | At 30th November, 2005 | At 30th November, 2004 |
|---|---|---|
| | *(U.S.$ millions)* | |
| **Commercial paper and short-term debt** | 2,941 | 2,857 |
| **Long-term indebtedness:** | | |
| Senior notes | 58,599 | 53,561 |
| Subordinated notes | 1,684 | 1,925 |
| Junior subordinated notes | 2,026 | 1,000 |
| Total long-term indebtedness | 62,309 | 56,486 |
| Total commercial paper, short- and long-term indebtedness | 65,250 | 59,343 |
| **Stockholders' equity:** | | |
| Preferred Stock: | 1,095 | 1,345 |
| Common Stock: $0.10 par value: 600,000,000 shares authorised: | | |
| Shares issued: 302,668,973 in 2005 and 297,796,197 in 2004; | | |
| Shares outstanding: 271,437,103 in 2005 and 274,159,411 in 2004 | 30 | 30 |
| Additional paid-in capital | 6,314 | 5,865 |
| Accumulated other comprehensive income (net of tax) | (16) | (19) |
| Retained earnings | 12,198 | 9,240 |
| Other stockholders' equity, net | 765 | 741 |
| Common Stock in treasury, at cost: 31,231,870 shares in 2005 and 23,636,786 shares in 2004 | (3,592) | (2,282) |
| Total stockholders' equity | 16,794 | 14,920 |
| Total commercial paper, short- and long-term indebtedness, trust preferred securities and stockholders' equity | 82,044 | 74,263 |

Notes

1.    The long term indebtedness of LBHI has increased by US$2,786 million since 30th November, 2005

2     Save as disclosed above, there has been no material change in the capitalisation, indebtedness and contingent liabilities of LBHI since 30th November, 2005. For more information about LBHI's common stock, preferred stock, short-term financings, long-term debt and contingent liabilities, see the Notes to Consolidated Financial Statements included in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2005, though please note that neither this nor any other document is incorporated by reference or otherwise into this Prospectus.

## SUMMARY CONSOLIDATED FINANCIAL INFORMATION OF LBHI

The following table sets forth selected consolidated financial information on LBHI as of the dates and for the periods indicated. The selected consolidated financial information as of and for the twelve month periods ended 30th November, 2001, 2002, 2003, 2004 and 2005 are extracted without material adjustment from the audited consolidated financial statements of LBHI included or incorporated by reference in LBHI's Annual Report on Form 10-K for the twelve month period ended 30th November, 2005, 2004, 2003, 2002 or 2001 filed with the SEC.

### Statement of Income Data

| | Year ended 30th November, 2005 | Year ended 30th November, 2004 | Year ended 30th November, 2003 | Year ended 30th November, 2002 | Year ended 30th November, 2001 |
|---|---|---|---|---|---|
| | | | *(in U.S.$ millions)* | | |
| **Revenues**: | | | | | |
| Principal transactions............................ | 7,811 | 5,699 | 4,272 | 1,951 | 2,779 |
| Investment banking ................................ | 2,894 | 2,188 | 1,722 | 1,771 | 2,000 |
| Commissions ......................................... | 1,728 | 1,537 | 1,210 | 1,286 | 1,091 |
| Interest and dividends ............................ | 19,043 | 11,032 | 9,942 | 11,728 | 16,470 |
| Other .................................................... | 944 | 794 | 141 | 45 | 52 |
| Total revenues ........................................ | 32,420 | 21,250 | 17,287 | 16,781 | 22,392 |
| Interest expense ...................................... | 17,790 | 9,674 | 8,640 | 10,626 | 15,656 |
| Net revenues .......................................... | 14,630 | 11,576 | 8,647 | 6,155 | 6,736 |
| **Non-Interest Expenses**: | | | | | |
| Compensation and benefits .................... | 7,213 | 5,730 | 4,318 | 3,139 | 3,437 |
| Other expenses...................................... | 2,588 | 2,328 | 1,793 | 1,617 | 1,551 |
| **Total non-interest expenses**................. | 9,801 | 8,058 | 6,111 | 4,756 | 4,988 |
| Income before taxes and dividends on trust preferred securities .................... | 4,829 | 3,518 | 2,536 | 1,399 | 1,748 |
| Provision for income taxes .................... | 1,569 | 1,125 | 765 | 368 | 437 |
| Dividends on trust preferred securities .. | 0 | 24 | 72 | 56 | 56 |
| Net income............................................. | 3,260 | 2,369 | 1,699 | 975 | 1,255 |
| Net income applicable to common stock | 3,191 | 2,297 | 1,649 | 906 | 1,161 |
| **Earnings per common share (diluted)**: | 10.87 | 7.90 | 6.35 | 3.47 | 4.38 |

**Balance Sheet Data**

| | At 30th November, 2005 | At 30th November, 2004 | At 30th November, 2003 | At 30th November, 2002 | At 30th November, 2001 |
|---|---|---|---|---|---|
| | | | (in U.S.$ millions) | | |
| Total assets............................................. | 410,063 | 357,168 | 312,061 | 260,336 | 247,816 |
| Net assets[1] ............................................. | 211,424 | 175,221 | 163,182 | 140,488 | 141,354 |
| Commercial paper and short-term debt.. | 2,941 | 2,857 | 2,331 | 2,369 | 3,992 |
| Long-term debt[2] ..................................... | 62,309 | 56,486 | 43,529 | 38,678 | 38,301 |
| Total liabilities....................................... | 393,269 | 342,248 | 297,577 | 250,684 | 238,647 |
| Total stockholders' equity ...................... | 16,794 | 14,920 | 13,174 | 8,942 | 8,459 |
| Total capital[3] .......................................... | 79,103 | 71,406 | 58,013 | 48,330 | 47,470 |

Notes:

1.  Net assets represent total assets excluding: (1) cash and securities segregated and on deposit for regulatory and other purposes, (2) securities received as collateral, (3) securities purchased under agreements to resell, (4) securities borrowed and (5) identifiable intangible assets and goodwill. LBHI believes net assets is a measure more useful to investors than total assets when comparing companies in the securities industry because it excludes certain assets considered to have a low-risk profile and identifiable intangible assets and goodwill. Net assets as presented are not necessarily comparable to similarly-titled measures provided by other companies in the securities industry because of different methods of calculation.

2.  Long-term debt includes senior notes and subordinated debt and includes $2.0 billion and $1 0 billion of junior subordinated debentures at 30th November, 2005 and 30th November, 2004 respectively. Subordinated indebtedness includes junior subordinated debentures that at 30th November, 2003 and prior period ends were classified as Preferred securities subject to mandatory redemption See Accounting and Regulatory Developments and Note 9 in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2004.

3.  Total capital includes long-term borrowings (including junior subordinated notes) and total stockholders' equity and, at 30th November, 2003 and prior year-ends, preferred securities subject to mandatory redemption. LBHI believes total capital is useful to investors as a measure of its financial strength.

# TAXATION

*The following is a summary of certain UK taxation considerations relevant to persons who purchase, own and dispose of Preferred Securities. This summary addresses only the taxation consequences to holders that acquire Preferred Securities pursuant to the offering at the initial offering price and does not apply to certain classes of holders such as dealers, financial traders and certain persons who are exempt from UK taxation on their income.*

*This summary does not address the position of persons who are resident in the UK or have some connection with the UK beyond the holding of Preferred Securities.*

***This summary is for general information only based on law and practice at the date hereof in the UK and is not exhaustive. Prospective investors are advised to consult with their own taxation advisers as to the taxation consequences of the purchase, ownership and disposition of Preferred Securities, including the effect of tax laws in countries other than the UK.***

## United Kingdom

(a)    **UK Taxation Treatment for Non-UK Residents**

Non-UK tax-resident corporate or individual Holders which hold their interest in Preferred Securities as an investment should be liable to UK taxation only to the extent that UK taxation is deducted at source from any payment to such a Holder made in respect of the Preferred Securities.

The same treatment should apply to a non-UK tax-resident corporate or individual Holder which holds its interest in the Preferred Securities as a trading asset, provided that the Issuer is not carrying on its business as a trade or a venture in the nature of a trade and the Holder does not otherwise carry on a trade in the UK through a branch or agency through or from which the Preferred Securities are held or the income from them arises (or, where that Holder is a company, that Holder does not carry on a trade in the United Kingdom through a permanent establishment through or from which the Preferred Securities are held or the income from them arises).

(b)    **Distributions on the Preferred Securities**

The Guarantor understands that the Issuer should be classified as a partnership for UK taxation purposes and should not constitute a "unit trust scheme" for the purposes of UK taxation. On the basis that the Issuer is treated for the purposes of UK taxation as a partnership, payments of Distributions on Preferred Securities may be made without withholding for or on account of UK taxation.

(c)    **Stamp Duty and Stamp Duty Reserve Tax ("SDRT")**

No UK stamp duty will be chargeable in respect of the issue of Preferred Securities to a Holder. Transfers of the Preferred Securities within a clearing system will not be chargeable to UK stamp duty. In practice, UK stamp duty is not likely to be chargeable in respect of a transfer of the Preferred Securities either because such a transfer is effected within a clearing system or, if the transfer is outside a clearing system, because the Issuer will invest in exempt loan capital for UK stamp duty purposes.    The Guarantor understands that no liability to SDRT should arise in respect of the issue or subsequent transfer of the Preferred Securities.

## EU Directive on the Taxation of Savings Income

Under EC Council Directive 2003/48/EC on the taxation of savings income, Member States are required, from 1st July, 2005, to provide to the tax authorities of another Member State details of payments of interest (or similar income) paid by a person within its jurisdiction to an individual resident in that other Member State. However, for a transitional period, Belgium, Luxembourg and Austria are instead required (unless during that period they elect otherwise) to operate a withholding system in relation to such payments (the ending of such transitional period being dependent upon the conclusion of certain other agreements relating

48

to information exchange with certain other countries). A number of non-EU countries and territories including Switzerland have agreed to adopt similar measures (a withholding system in the case of Switzerland) with effect from the same date.

## SUBSCRIPTION AND SALE

Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, Banco Bilbao Vizcaya Argentaria, S.A., Banco Espírito Santo de Investimento, Caja de Ahorros de Valencia, Castellón y Alicante, Bancaja, IXIS Corporate & Investment Bank, ING Belgium SA/NV, Lloyds TSB Bank plc and Standard Chartered Bank (together, the "**Managers**") have jointly and severally agreed to subscribe for the entire issued amount of the Preferred Securities pursuant to a Subscription Agreement (the "**Subscription Agreement**") dated 20th February, 2006 at a price of €49,717.50 per Preferred Security. In addition, the Managers shall be reimbursed for certain of their expenses in connection with the issue of the Preferred Securities. The total estimated expenses of the issue of the Preferred Securities are £3,500,000 (including the managing and underwriting commission of the Managers). The Managers will be entitled to terminate the Subscription Agreement in certain circumstances before the issue of the Preferred Securities.

At the Closing Date, the yield on the Bonds will be 4.002 per cent. per annum. The yield is calculated at the Closing Date on the basis of the issue price. It is not an indication of future yield.

The Managers will agree in the Subscription Agreement that they will only offer the Preferred Securities in accordance with the following restrictions:

### United States

The Preferred Securities have not been and will not be registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons. Terms used in this paragraph have the meanings given to them by Regulation S under the Securities Act ("**Regulation S**").

Each Manager has agreed that, except as permitted by the Subscription Agreement, it will not offer, sell or deliver the Preferred Securities (i) as part of their distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the offering and the Closing Date within the United States or to, or for the account or benefit of, U.S. persons and that it will have sent to each distributor, dealer or person receiving a selling concession, fee or other remuneration that purchases Preferred Securities from it during the distribution compliance period a confirmation or other notice setting forth the restrictions on offers and sales of the Preferred Securities within the United States or to, or for the account or benefit of, U.S. persons. Terms used in this paragraph have the meanings given to them by Regulation S.

In addition, until 40 days after the commencement of the offering, an offer or sale of Preferred Securities within the United States by any dealer that is not participating in the offering may violate the registration requirements of the Securities Act.

### United Kingdom

Each Manager has represented and agreed that, except as permitted by the Subscription Agreement:

(a)   it has only offered or sold and will only offer or sell Preferred Securities to (a) investment professionals falling within article 14(5) of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001 (the "**Promotion of CIS Order**") and article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 (the "**Financial Promotion Order**"), who have professional experience of participating in unregulated schemes and of matters relating to investments; and/or (b) persons falling within article 22(2) of the Promotion of CIS Order and article 49(2) of the Financial Promotion Order; and/or (c) any other persons to whom this Prospectus may be communicated lawfully;

(b)   it has in place and will have in place proper systems and procedures to prevent any person other than those persons described in (a) above from participating in the Preferred Securities;

(c)   it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue of the Preferred Securities in circumstances in which Section 21(1) of the FSMA does not apply to the Guarantor; and

(d)    it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Preferred Securities in, from or otherwise involving the United Kingdom.

**General**

Persons into whose hands this Prospectus comes are required by the Issuer, the Guarantor and the Managers to comply with all applicable laws and regulations in each country or jurisdiction in or from which they purchase, offer, sell or deliver Preferred Securities or have in their possession or distribute such offering material, in all cases at their own expense.

# GENERAL INFORMATION

**Authorisations**

The Limited Partnership Agreement to establish the Issuer was duly authorised by a resolution of the board of directors of the General Partner passed on 14th February, 2006.

The entering into of the Limited Partnership Agreement, the Agency Agreement, the Administration Agreement, the Subscription Agreement and the Subordinated Guarantee by the Guarantor was authorised by a resolution of the board of directors of the Guarantor passed on 15th February, 2006.

All consents, approvals, authorisations or other orders of all regulatory authorities required by the Issuer and/or the Guarantor under the laws of England and Wales have been, or will prior to the Closing Date be, given for the issue of the Preferred Securities and for the Issuer, the General Partner and the Guarantor, as the case may be, to undertake and perform their respective obligations as appropriate under the Limited Partnership Agreement, the Subscription Agreement, the Agency Agreement, the Preferred Securities and the Subordinated Guarantee.

**Listing**

Application has been made to UK Listing Authority for the Preferred Securities to be admitted to the Official List of the UK Listing Authority and to the London Stock Exchange plc for the Preferred Securities to be admitted to trading on the London Stock Exchange plc's Gilt Edged and Fixed Interest Market. The London Stock Exchange plc's Gilt Edged and Fixed Interest Market is a regulated market for the purposes of Directive 93/22/EEC (the Investment Service Directive).

It is expected that listing and admission to trading will take place on or about the Closing Date, subject to issue of the Global Certificate.

**Clearing Systems**

The Preferred Securities have been accepted for clearance through Euroclear and Clearstream, Luxembourg. The ISIN for this issue is XS0243852562 and the Common Code is 024385256. The address of Euroclear is 1 Boulevard du Roi Albert III, B-1210 Belgium and the address of Clearstream, Luxembourg is 42 Avenue JF Kennedy, L-1855 Luxembourg.

**No significant change or material adverse change**

There has been no significant change in the financial or trading position of the Issuer since its date of establishment.

There has been no material adverse change in the prospects of the Issuer since its date of establishment.

There has been no significant change in the financial or trading position of the Guarantor and the Guarantor Group since 30th November, 2004 (being the date of the most recent accounts of the Gurarantor and the Guarantor Group).

There has been no material adverse change in the prospects of the Guarantor or the Guarantor Group since 30th November, 2004.

**Litigation**

There are no governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which the Issuer is aware) during the previous 12 months which may have, or have had in the recent past, significant effects on the financial position or profitability of the Issuer.

There are no governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which the Guarantor or any subsidiary of the Guarantor Group is aware) during the

previous 12 months which may have, or have had in the recent past, significant effects on the financial position or profitability of the Guarantor or any subsidiary of the Guarantor Group.

**Accounts and Auditors**

The auditors of the Issuer and the Guarantor are Ernst & Young LLP, Chartered Accountants and Registered Auditors, of 1 More London Place, London SE1 2AF.

Ernst & Young LLP have made reports under Section 235 of the Companies Act 1985 on statutory accounts in respect of the Guarantor for the years ended 30th November, 2004, 2003 and 2002 which were not qualified within the meaning of Section 262 of the Companies Act 1985 and did not contain any statements made under Section 237(2) or (3) of the Companies Act 1985. The report of the Guarantor's auditors stated that to the fullest extent permitted by law, the auditors do not accept or assume responsibility to anyone other than the Issuer and the Issuer's members as a body, for their audit work, for the audit report, or for the opinions the Guarantor's auditors have formed.

The inclusion of such a statement was recommended in recent guidance issued by the Institute of Chartered Accountants in England and Wales for inclusion in all Section 235 audit reports produced by audit firms.

The Issuer is newly established and does not currently have any financial statements (see also "*Documents*" below.

**Documents**

Copies of the following financial statements will be available free of charge from the specified offices of the Paying and Transfer Agents for so long as any of the Preferred Securities remains outstanding:

(a) the annual reports (including the audited non-consolidated financial statements) of the Guarantor in respect of the financial years ended 30th November, 2004, 2003 and 2002; including the audit reports on such financial statements;

(b) the most recently published (annual reports including the audited annual non-consolidated financial statements) of the Guarantor and the most recently published unaudited interim non-consolidated financial statements of the Guarantor (if any).

The Guarantor currently prepares audited non-consolidated financial statements on an annual basis. The Guarantor does not currently publish consolidated financial statements or interim financial statements.

The Issuer is newly established as a limited partnership and has not traded or operated as at the date of this Prospectus. The first financial statements of the Issuer are expected to be prepared for the period ending on 30th November, 2006. Thereafter, it is intended that the Issuer will prepare audited annual financial statements.

Copies of the Issuer's most recently published annual reports (if any) and audited annual financial statements of the Issuer will be available free of charge at the offices of the Paying and Transfer Agents. It is not intended that the Issuer will publish interim financial statements.

In addition, the following documents are available for inspection at the specified offices of the Paying and Transfer Agents for so long as any of the Preferred Securities remains outstanding:

(a) the Subscription Agreement;

(b) the Subordinated Guarantee;

(c) the Limited Partnership Agreement;

(d) the Administration Agreement;

(e) the Agency Agreement; and

(f)    the Memorandum and Articles of Association of the Guarantor.

**Capital Replacement Intent**

If the Preferred Securities are redeemed, it is the intention of the General Partner that they will be redeemed only to the extent the aggregate redemption price is equal to or less than the net proceeds, if any, received by LBHI or any of its subsidiaries from new issuances to purchasers other than affiliates during the period commencing on the 180th calendar day prior to the date of redemption of any securities that have equal or greater equity characteristics as the Preferred Securities.

## FINANCIAL STATEMENTS OF THE GUARANTOR

Set out below are the audited non-consolidated financial statements of the Guarantor as of, and for the years ended, 30th November, 2004 and 2003 and the audited report for each such set of financial statements.

# Lehman Brothers Holdings PLC

**Report and Financial Statements**

30 November 2003

ERNST & YOUNG

## Lehman Brothers Holdings PLC

Registered No.  1854685

### Directors
R J Amat
P A Gamester
I T Lowitt
R L O'Connell
I Jameson
K J P Hayes
J Van Wijngaarden

### Secretary
M E Smith

### Auditors
Ernst & Young LLP
1 More London Place
London SE1 2AF

### Registered Office
25 Bank Street
Canary Wharf
London E14 5LE

Lehman Brothers Holdings PLC

# Directors' report

The directors present their report and financial statements for the year ended 30 November 2003.

## Results and dividends

The profit for the year of $148,357,718 (2002 - $15,996,942 profit) has been taken to reserves.  No dividend has been paid during the year and none is proposed (2002 - $nil).

## Principal activities

The principal activity of the company is to hold fixed asset investments in both subsidiary undertakings and non subsidiary undertakings.

## Review of business and future developments

The profit and loss account for the year is set out on page 5.  Both the level of business during the year and the financial position at the end of the year were satisfactory.  The company acquired a 100% investment in Preferred Holdings Ltd for an amount of $133m on 12 December 2003.

## Fixed assets

The changes in fixed assets are set out in note 7 to the financial statements.

## Charitable contributions

During the year the company made no charitable contributions (2003 - $nil).

## Creditor payment policy and practice

Payments are made to suppliers through a group company which provides administration services.  It is the policy of that company to make payments to suppliers in accordance with those terms and conditions agreed between the company and its suppliers, provided that all trading terms and conditions have been complied with.  This company has no trade creditors at 30 November 2003.

## Directors and their interests

The directors during the year and at the date of this report were:

| | |
|---|---|
| R A Amat | (alternate to K J P Hayes) |
| P A Gamester | |
| I T Lowitt | |
| R L O'Connell | |
| I Jameson | |
| K J P Hayes | (appointed 18 January 2002) |
| N Schnadt | (resigned 19 March 2004) |
| J Van Wijngaarden | (appointed 8 June 2004) |

There are no directors' interests requiring disclosure under the Companies Act 1985.

## Auditors

Ernst & Young LLP will be re-appointed as the company's auditor in accordance with the elective resolution passed by the company under section 386 Companies Act 1985.

On behalf of the board

Director    _signature_

Lehman Brothers Holdings PLC

# Statement of directors' responsibilities in respect of the financial statements

Company law requires the directors to prepare financial statements for each financial year which give a true and fair view of the state of affairs of the company and of the profit or loss of the company for that period.  In preparing those financial statements, the directors are required to:

- select suitable accounting policies and then apply them consistently;

- make judgements and estimates that are reasonable and prudent; and

- prepare the financial statements on the going concern basis unless it is inappropriate to presume that the company will continue in business.

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the financial statements comply with the Companies Act 1985.  They are also responsible for safeguarding the assets of the company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

ERNST & YOUNG

≣ ERNST & YOUNG

# Independent auditors' report
## to the members of Lehman Brothers Holdings PLC

We have audited the company's financial statements for the year ended 30 November 2003 which comprise the Profit and Loss Account, Statement of Total Recognised Gains and Losses, Balance Sheet and the related notes 1 to 17. These financial statements have been prepared on the basis of the accounting policies set out therein.

This report is made solely to the company's members, as a body, in accordance with Section 235 of the Companies Act 1985. Our audit work has been undertaken so that we might state to the company's members those matters we are required to state to them in an auditors' report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company and the company's members as a body, for our audit work, for this report, or for the opinions we have formed.

### Respective responsibilities of directors and auditors

As described in the Statement of Directors' Responsibilities the company's directors are responsible for the preparation of the financial statements in accordance with applicable United Kingdom law and accounting standards.

Our responsibility is to audit the financial statements in accordance with relevant legal and regulatory requirements and United Kingdom Auditing Standards.

We report to you our opinion as to whether the financial statements give a true and fair view and are properly prepared in accordance with the Companies Act 1985. We also report to you if, in our opinion, the Directors' Report is not consistent with the financial statements, if the company has not kept proper accounting records, if we have not received all the information and explanations we require for our audit, or if information specified by law regarding directors' remuneration and transactions with the company is not disclosed.

We read the Directors' Report and consider the implications for our report if we become aware of any apparent misstatements within it.

### Basis of audit opinion

We conducted our audit in accordance with United Kingdom Auditing Standards issued by the Auditing Practices Board. An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements. It also includes an assessment of the significant estimates and judgements made by the directors in the preparation of the financial statements, and of whether the accounting policies are appropriate to the company's circumstances, consistently applied and adequately disclosed.

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error. In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements.

### Opinion

In our opinion the financial statements give a true and fair view of the state of affairs of the company as at 30 November 2003 and of its profit for the year then ended and have been properly prepared in accordance with the Companies Act 1985.

*Ernst & Young LLP*

Ernst & Young LLP
Registered Auditor
London

29 JUN 2004

Lehman Brothers Holdings PLC

# Profit and loss account
**for the year ended 30 November 2003**

| | *Notes* | *2003*<br>*$000* | *2002*<br>*$000* |
|---|---|---|---|
| *Operating income* | 2 | 322,255 | 162,942 |
| Administrative expenses | | (2,883) | (1,561) |
| *Operating profit* | | 319,372 | 161,381 |
| Interest receivable and similar income | 3 | 11,692 | 12,687 |
| Interest payable and similar charges | 4 | (182,706) | (158,071) |
| *Profit on ordinary activities before taxation* | | 148,358 | 15,997 |
| Tax on profit on ordinary activities | 6 | – | – |
| *Profit transferred to reserves for the financial year* | 12 | 148,358 | 15,997 |

ERNST & YOUNG

Lehman Brothers Holdings PLC

## Statement of total recognised gains and losses
**for the year ended 30 November 2003**

|  | 2003 $000 | 2002 $000 |
|---|---|---|
| Profit attributable to shareholders of the company | 148,358 | 15,997 |
| Revaluation of fixed asset investment | 138,393 | (220,967) |
| Total gains and losses recognised in the year | 286,751 | (204,970) |

*ERNST & YOUNG*

Lehman Brothers Holdings PLC

## Balance sheet
**at 30 November 2003**

| | Notes | 2003 $000 | 2002 $000 |
|---|---|---|---|
| **Fixed assets** | | | |
| Investments | 7 | 2,991,687 | 2,654,804 |
| **Current assets** | | | |
| Debtors | 8 | 2,906,294 | 2,475,398 |
| | | 2,906,294 | 2,475,398 |
| *Creditors:* amounts falling due within one year | 9 | (4,535,948) | (4,173,993) |
| **Net current liabilities** | | (1,629,654) | (1,698,595) |
| **Total assets less current liabilities** | | 1,362,033 | 956,209 |
| *Creditors:* amounts falling due after more than one year | 10 | (3,041) | (8,968) |
| | | 1,358,992 | 947,241 |
| **Capital and reserves** | | | |
| Called up share capital | 11 | 978,182 | 853,182 |
| Share premium account | | 3,312 | 3,312 |
| Profit and loss account | 13 | 157,707 | 9,349 |
| Other reserves | 14 | 219,791 | 81,398 |
| **Shareholders' funds** | | | |
| Equity | | 1,100,876 | 814,125 |
| Non-equity | | 258,116 | 133,116 |
| | | 1,358,992 | 947,241 |

Director

**2 9 JUN 2004**

F-9

Lehman Brothers Holdings PLC

# Notes to the financial statements
### at 30 November 2003

1. ## Accounting policies

### Basis of preparation

The financial statements have been prepared under the historical cost convention and in accordance with applicable accounting standards except as set out below.

The financial statements present information for the company as an individual entity and not about its group. Group financial statements have not been prepared as the company is a subsidiary of Lehman Brothers UK Spain Holdings Limited, a company registered in England and Wales which prepares group financial statements.

### Statement of cash flows

The directors have taken advantage of the exemption in paragraph 5(a) of Financial Reporting Standard 1 (revised) from producing a cashflow statement.

### Functional currency

The company's functional currency is US dollars as the directors consider this to be the most appropriate currency for the company's business.

### Investments in subsidiary undertakings

Investments in subsidiary undertakings are stated at underlying net asset value. Any permanent diminution in the net asset value of an investment as compared to historical cost is charged to the profit and loss account. In all other cases the difference between net asset value and historical cost is charged or credited to a revaluation reserve.

For investments in subsidiary undertakings denominated in currencies other than the functional currency of the company, historical cost and net asset value are determined with reference to the historical exchange rate at acquisition and the prevailing year end exchange rate respectively.

### Other fixed asset investments

Other unlisted fixed asset investments are stated at cost unless, in the opinion of the directors there has been a permanent diminution in value, in which case an appropriate adjustment is made. Listed investments are stated at market value.

### Deferred taxation

Deferred tax is recognised in respect of all timing differences, at the rates of taxation anticipated to apply when these differences crystallise, arising from the inclusion of items of income and expenditure in taxation computations in periods different from those for which they are included in the financial statements.

Deferred tax assets are recognised only to the extent that the directors consider that it is more likely than not that there will be suitable taxable profits from which the future reversal of the underlying timing differences can be deducted.

Provision is made for tax on gains arising from the revaluation (and similar fair value adjustments) of fixed assets, and gains on disposal of fixed assets that have been rolled over into replacement assets, only to the extent that, at the balance sheet date, there is a binding agreement to dispose of the assets concerned. However, no provision is made where, on the basis of all available evidence at the balance sheet date, it is more likely than not that the taxable gain will be rolled over into replacement assets and charged to tax only where the replacement assets are sold.

Provision is made for deferred tax that would arise on remittance of the retained earnings of overseas subsidiaries, associates and joint ventures only to the extent that, at the balance sheet date, dividends have been accrued as receivable.

Lehman Brothers Holdings PLC

# Notes to the financial statements
### at 30 November 2003

### 1.  Accounting policies (continued)

**Deferred taxation (continued)**

Deferred tax is measured on an undiscounted basis at the tax rates that are expected to apply in the periods in which timing differences reverse, based on tax rates and laws enacted or substantively enacted at the balance sheet date.

**Valuation of securities sold not yet purchased**

Securities sold not yet purchased are stated at market value with all gains and losses reflected in the profit and loss account.

**Foreign currency translation**

Assets and liabilities denominated in foreign currencies are translated into US dollars at rates of exchange ruling at the balance sheet date.  Transactions in foreign currencies are translated into US dollars at the rate of exchange ruling at the end of the month in which the transaction occurs.  Any differences arising from translation are taken to the profit and loss account.  Exchange differences arising on translation of the company's net equity interest in subsidiaries with a functional currency other than US dollar are shown as movements on reserves.

**Dividends**

Dividends are accrued when declared by subsidiaries.

### 2.  Operating income

Operating income, which excludes value added tax, has been disclosed instead of turnover as this reflects more accurately the results of the company's activities.  The analysis of income by geographical area has been omitted as the directors consider that it would be seriously prejudicial to disclose this information.  All the company's operating income arises from continuing activities.  Operating income comprises:

|  | 2003 $000 | 2002 $000 |
|---|---|---|
| Income from Investments | 14,923 | 21,514 |
| Profit on disposal of fixed asset investments | – | 65,913 |
| Income from shares in group undertakings | 318,570 | 87,908 |
| Management service fees | – | (20) |
| Other operating losses | (11,238) | (12,373) |
|  | 322,255 | 162,942 |

### 3.  Interest receivable and similar income

|  | 2003 $000 | 2002 $000 |
|---|---|---|
| Group undertakings | 11,692 | 12,586 |
| Third party | – | 101 |
|  | 11,692 | 12,687 |

F-11

Lehman Brothers Holdings PLC

# Notes to the financial statements
### at 30 November 2003

4. **Interest payable and similar charges**

|  | 2003 $000 | 2002 $000 |
|---|---|---|
| Group undertakings | (182,706) | (154,961) |
| Third party | – | (3,110) |
|  | (182,706) | (158,071) |

5. **Information regarding directors and employees**

The company has no employees. All personnel, including directors, who perform services for the company are employed and remunerated by Lehman Brothers Limited. The company is recharged employee costs incurred by Lehman Brothers Limited for services attributable to the company.

Directors' emoluments (including pension contributions) for management services to the company were $nil (2001 - $nil).

6. **Tax on profit on ordinary activities**

|  | 2003 $000 | 2002 $000 |
|---|---|---|
| Profit on ordinary activities before taxation | 148,358 | 15,997 |
| Corporation tax at standard rate 30% | 44,507 | 4,799 |
| Effects of: |  |  |
| Expenses not deductible for tax purposes | 5,027 | 1,177 |
| Group dividend not taxable | (95,571) | (23,280) |
| Capital losses brought forward and indexation | – | (17,416) |
| Capital allowances | (3) | (4) |
| Losses available for group relief | 46,040 | 34,724 |
| Current tax charge for the period | – | – |

7. **Fixed asset investments**

|  | 2003 $000 | 2002 $000 |
|---|---|---|
| Net asset value: |  |  |
| Investments in subsidiary undertakings | 2,912,853 | 2,576,698 |
| Other fixed asset investments | 78,834 | 78,106 |
|  | 2,991,687 | 2,654,804 |

ERNST & YOUNG

Lehman Brothers Holdings PLC

# Notes to the financial statements
**at 30 November 2003**

### 7. Fixed asset investments (continued)

In the opinion of the directors, the aggregate value of the fixed asset investments is not less than the amount at which they are stated in the financial statements.

| | Subsidiary undertakings $000 | Listed Investments $000 | Unlisted investments $000 | Total $000 |
|---|---|---|---|---|
| **Cost:** | | | | |
| At 30 November 2002 | 2,668,550 | 54 | 78,052 | 2,746,656 |
| Additions | 197,776 | – | 24,828 | 222,604 |
| Disposals | (14) | – | (10,323) | (10,337) |
| Permanent diminution in value | – | 27 | (13,804) | (13,777) |
| At 30 November 2003 | 2,866,312 | 81 | 78,753 | 2,945,146 |
| **Revaluation gains:** | | | | |
| At 30 November 2002 | (91,852) | – | – | (91,852) |
| Revaluation of fixed asset investments | 119,050 | – | – | 119,050 |
| Foreign exchange movement | 19,343 | – | – | 19,343 |
| At 30 November 2003 | 46,541 | – | – | 46,541 |
| **Net book value:** | | | | |
| At 30 November 2003 | 2,912,853 | 81 | 78,753 | 2,991,687 |
| At 30 November 2002 | 2,576,698 | 54 | 78,052 | 2,654,804 |

ERNST & YOUNG

Lehman Brothers Holdings PLC

# Notes to the financial statements
**at 30 November 2003**

### 7.  Fixed asset investments (continued)

The following information as at 30 November 2003 relates to the principal subsidiaries of Lehman Brothers Holdings PLC, all of which are registered in England and Wales and held by the company unless indicated.

| Name of company | Description of shares held by company | Proportion of nominal value and voting rights of shares held | Principal business |
|---|---|---|---|
| Lehman Brothers Limited | Ordinary | 100% | Service company |
| Lehman Brothers International (Europe) | Ordinary | 100% | Fixed income, equities, broking and trading |
| Lehman Brothers Europe Limited | Ordinary | 100% | Investment banking |
| Lehman Brothers EBS Limited | Ordinary and Preference | 100% | Holding company |
| Lehman Brothers Global Finance Limited | Ordinary | 100% | Inactive |
| Storm Funding Limited | Ordinary | 100% | Asset backed financing |
| Platform Investments | Ordinary | 100% | Investment company |
| Lehman Brothers (Indonesia) Limited | Ordinary | 100% | Investment banking |
| LB Cayman Finance Limited[a] | Ordinary | 100% | Equity financing |
| LBQ Funding (UK) Limited | Ordinary and Preference | 100% | Investment company |
| OCI Holdings Plc | Ordinary | 90% | Holding company |
| Lehman Brothers Redditch No. 1 Limited | Ordinary | 100% | Equity partnership |
| Lehman Brothers Redditch No. 2 Limited | Ordinary | 100% | Equity partnership |
| Lehman Brothers Commodities Limited[b] | Ordinary | 100% | Inactive |
| Seebreeze Funding Limited[d] | Ordinary | 49% | Investment company |
| LBO Investments Ltd | Ordinary | 100% | Investment company |
| Resetfan Ltd | Ordinary | 100% | Holding company |

Lehman Brothers Holdings PLC

# Notes to the financial statements
### at 30 November 2003

7. **Fixed asset investments (continued)**

| Name of company | Description of shares held by company | Proportion of nominal value and voting rights of shares held | Principal business |
|---|---|---|---|
| Southern Pacific Mortgage Limited[b] | Ordinary | 100% | Residential mortgage lending |
| Pageant Properties Limited[c] | Ordinary and Preference | 65% | Property development |
| LB Equity (Nominees Number 7) Limited | Ordinary | 100% | Financing |
| Edgeworth Capital LLP | Ordinary | 100% | Fund management |

[a]  10% held by a subsidiary undertaking
[b]  100% held by a subsidiary undertaking
[c]  65% of ordinary shares and 85% of preference shares
[d]  This company is controlled through a power of attorney to appoint and remove directors of the company.

8. **Debtors**

| | 2003 $000 | 2002 $000 |
|---|---|---|
| Amounts due from: | | |
| Subsidiary undertakings | 2,648,846 | 2,022,597 |
| Parent and fellow subsidiary undertakings | 254,927 | 448,992 |
| Other debtors | 2,521 | 3,809 |
| | 2,906,294 | 2,475,398 |

Included in amounts due from subsidiary undertakings and fellow subsidiary undertakings are subordinated loans of $2,304,478,608 (2002 - $2,004,056,951) and $nil (2002 - $136,694,843) respectively which are repayable at five days' notice by the borrower. For the amounts due from subsidiary undertakings regulated by the Financial Services Authority, five days' notice must be given to the Financial Services Authority, which has the right to refuse consent to repayment.

ERNST & YOUNG

Lehman Brothers Holdings PLC

# Notes to the financial statements
### at 30 November 2003

9. **Creditors:** amounts falling due within one year

| | 2003 | 2002 |
|---|---|---|
| | $000 | $000 |
| Marketable securities sold not yet purchased | 1,838,879 | 1,731,189 |
| Amounts due to: | | |
| Subsidiary undertakings | 1,695 | 2,239 |
| Parent and fellow subsidiary undertakings | 2,685,570 | 2,430,723 |
| Other creditors | 9,804 | 7,721 |
| Accruals and deferred income | – | 2,121 |
| | 4,535,948 | 4,173,993 |

Included in amounts due to parent and fellow subsidiary undertakings are subordinated loans of $2,129,000,000 (2001 - $1,709,000,000) which are repayable at one day's notice.

10. **Creditors:** amounts falling due after more than one year

| | 2003 | 2002 |
|---|---|---|
| | $000 | $000 |
| Other creditors | 3,041 | 8,968 |
| | 3,041 | 8,968 |

11. **Share capital**

| | 2003 | 2002 |
|---|---|---|
| | £000 | £000 |
| Authorised: | | |
| 79,750,000 Ordinary shares of £1 each | 79,750 | 79,750 |
| 250,000 'B' Ordinary shares of £1 each | 250 | 250 |
| 20,000,000 Non Cumulative Redeemable Preference shares of £1 each | 20,000 | 20,000 |
| | 100,000 | 100,000 |

| | 2003 | 2002 |
|---|---|---|
| | $000 | $000 |
| 1,000,000,000 Ordinary shares of $1 each | 1,000,000 | 1,000,000 |
| 100,000 Non Cumulative Redeemable Preference shares of $1 each | 100,000 | 100,000 |
| 900,000 Non Cumulative Redeemable Preference shares of $1 each | 900,000 | – |
| | 2,000,000 | 1,100,000 |

Lehman Brothers Holdings PLC

# Notes to the financial statements
### at 30 November 2003

### 11. Share capital (continued)

| | 2003 $000 | 2002 $000 |
|---|---|---|
| Allotted, called up and fully paid: | | |
| 40,021,100 Ordinary shares of £1 each | 66,266 | 66,266 |
| 20,000,000 Non Cumulative Redeemable Preference shares of £1 each | 33,116 | 33,116 |
| 100,000,000 Non Cumulative Redeemable Preference shares of $1 each | 100,000 | 100,000 |
| 125,000,000 Non Cumulative Redeemable Preference shares of $1 each | 125,000 | – |
| 653,800,000 Ordinary shares of $1 each | 653,800 | 653,800 |
| | 978,182 | 853,182 |

The Non Cumulative Redeemable Preference shares may be redeemed at any time by the company by giving the holders of the preference shares not less than one month's notice in writing.

The Preference shares carry a fixed non cumulative preferential dividend of £100 per annum.

The rights of the Preference shares on redemption or a winding up are the amount of capital paid up together with a sum equal to any arrears of the fixed non cumulative preferential dividend provided they have been declared.

The Preference shares shall not entitle the holders to receive notice of, or to attend and vote at, any general meeting of the company.

During the year the company has authorised 900,000,000 and issued 125,000,000 non cumulative redeemable preference shares of $1 each.

### 12. Reconciliation of movements in shareholders' funds

| | 2003 $000 | 2002 $000 |
|---|---|---|
| Profit attributable to shareholders of the company | 148,358 | 15,997 |
| Additional preference shares | 125,000 | 100,000 |
| Additional ordinary shares | – | 43,800 |
| Revaluation of fixed asset investment | 138,393 | (220,967) |
| Net movement in shareholders' funds | 411,751 | (61,170) |
| Opening shareholders' funds | 947,241 | 1,008,411 |
| Closing shareholders' funds | 1,358,992 | 947,241 |

### 13. Profit and loss account

| | $000 |
|---|---|
| Accumulated profit at 30 November 2002 | 9,349 |
| Retained profit for the year | 148,358 |
| Accumulated profit at 30 November 2003 | 157,707 |

Lehman Brothers Holdings PLC

# Notes to the financial statements
### at 30 November 2003

### 14. Other reserves

| | Revaluation reserve $000 | Capital reserve $000 | Total $000 |
|---|---|---|---|
| At 30 November 2002 | (91,852) | 173,250 | 81,398 |
| Revaluation of fixed asset investments | 138,393 | – | 138,393 |
| At 30 November 2003 | 46,541 | 173,250 | 219,791 |

There is no corporation tax liability in respect of items taken to the revaluation reserve.

### 15. Commitments

(a)  The company enters into interest rate swaps in the normal course of business with affiliated companies.

(b)  Investment in EBS partnership

The group is committed to invest further capital of $500,000 in EBS partnership if required.

### 16. Contingent liabilities

The company is registered with HM Customs & Excise as a member of the Lehman Brothers Limited group for VAT purposes and, as a result, is jointly and severally liable on a continuing basis for amounts owing by other members of the group in respect of unpaid VAT.

Lehman Brothers Holdings PLC has received US Government Securities as collateral against put options it holds over its preference share investment in LBQ Funding (UK) Limited. The value of the US Government Securities received at 30 November was $1,838,878,618 (2002 - 1,731,189,335).

### 17. Ultimate parent company

The ultimate parent company of Lehman Brothers Holdings PLC is Lehman Brothers Holdings Inc. which is incorporated in the State of Delaware in the United States of America.

The company has taken advantage of the exemption from disclosing transactions with related parties that are part of the Lehman Brothers Holdings Inc group.

The largest group in which the results of the company are consolidated is that headed by Lehman Brothers Holdings Inc incorporated in the United States of America. The smallest group in which they are consolidated is that headed by Lehman Brothers Spain Holdings Limited, registered in England and Wales. The consolidated financial statements of these groups are available to the public from 745 Seventh Avenue, New York, USA and from 25 Bank Street, Canary Wharf, London respectively.

LEHMAN BROTHERS HOLDINGS PLC

Report and Financial Statements

30 November 2004

ERNST & YOUNG

## Lehman Brothers Holdings PLC

Registered No. 1854685

**DIRECTORS**
R J Amat
I T Lowitt
I Jameson
J Van Wijngaarden
M Jackson
A J Rush
P R  Tonucci

**SECRETARY**
M E Smith
E S Upton

**AUDITORS**
Ernst & Young LLP
1 More London Place
London SE1 2AF

**REGISTERED OFFICE**
25 Bank Street
Canary Wharf
London E14 5LE

## Lehman Brothers Holdings PLC

DIRECTORS' REPORT

The directors present their report and financial statements for the year ended 30 November 2004.

**RESULTS AND DIVIDENDS**
The loss for the year of $131,043,042 (2003 - $148,357,718 profit) has been taken to reserves. No dividend has been paid during the year and none is proposed (2003 - $nil)

**PRINCIPAL ACTIVITIES**
The principal activity of the company is to hold fixed asset investments in both subsidiary undertakings and non subsidiary undertakings.

**REVIEW OF BUSINESS AND FUTURE DEVELOPMENTS**
The profit and loss account for the year is set out on page 6. Both the level of business during the year and the financial position at the end of the year were as expected. The fluctuation in the company's results is due to the partial write down of its investment in Mable Commercial Funding Ltd., an investment company, to reflect its net asset value.

The company issued 985,000,000 non-cumulative preference shares of $1 each during the year to fund further acquisitions and its investments in subsidiaries.

**FIXED ASSETS**
The changes in fixed assets are set out in note 7 to the accounts.

**CHARITABLE CONTRIBUTIONS**
During the year the company made no charitable contributions (2003 - $nil).

**CREDITOR PAYMENT POLICY AND PRACTICE**
Payments are made to suppliers through a group company which provides administration services. It is the policy of that company to make payments to suppliers in accordance with those terms and conditions agreed between the company and its suppliers, provided that all trading terms and conditions have been complied with. This company has no trade creditors at 30 November 2004.

**DIRECTORS AND THEIR INTERESTS**
The directors during the year and at the date of this report were:

R A Amat
P A Gamester          (resigned  Feb 2, 2005)
I T Lowitt
R L O'Connell         (resigned  Feb 2, 2005)
I Jameson
K J P Hayes           (resigned  May 10, 2005)
J Van Wijngaarden
P R Tonucci      .    (appointed Feb 2, 2005)
A J Rush              (appointed Apr 12, 2005)
M Jackson             (appointed  Apr 12, 2005)

There are no directors' interests requiring disclosure under the Companies Act 1985.

## Lehman Brothers Holdings PLC

DIRECTORS' REPORT

**EVENTS SINCE THE BALANCE SHEET DATE**
Since the year end the company has issued shares as follows:

- 50,000,000 Non-Cumulative Preference shares of $1 each on 2 February 2005.

- 150,000,000 Non-Cumulative Preference shares of $1 each on 28 April 2005,

- 150,000,000 Non-Cumulative Preference shares of $1 each on 12 May 2005;

- 250,000,000 Non-Cumulative Preference shares of $1 each on 16 June 2005.

The proceeds of the share issues have been used to inject capital in to Lehman Brothers International (Europe).

On 23 March 2005 the company agreed to guarantee the issuance of €225,000,000 Fixed Rate to CMS linked subordinated notes by partnership Lehman Brothers UK Capital Funding UK LP.

On 18 May 2005, the company acquired 100% share capital of MBAM Investor Limited.

**AUDITORS**
Ernst & Young LLP will be re-appointed as the company's auditor in accordance with the elective resolution passed by the company under section 386 of the Companies Act 1985.

On behalf of the board

Director

**2 8 JUN 2005**

≣‖ *ERNST & YOUNG*

Lehman Brothers Holdings PLC

## STATEMENT OF DIRECTORS' RESPONSIBILITIES IN RESPECT OF THE FINANCIAL STATEMENTS

Company law requires the directors to prepare financial statements for each financial year which give a true and fair view of the state of affairs of the company and of the profit or loss of the company for that period. In preparing those accounts, the directors are required to:

- select suitable accounting policies and then apply them consistently;

- make judgements and estimates that are reasonable and prudent;

- State whether the applicable accounting standards have been followed subject to any material departures disclosed and explained in the financials statements, and ;

- prepare the accounts on the going concern basis unless it is inappropriate to presume that the company will continue in business.

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the financial statements comply with the Companies Act 1985. They are also responsible for safeguarding the assets of the company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

*ᴎ ERNST & YOUNG*

⊒Ⅱ ERNST & YOUNG

## INDEPENDENT AUDITORS' REPORT TO THE MEMBERS OF LEHMAN BROTHERS HOLDINGS PLC

We have audited the company's financial statements for the year ended 30 November 2004 which comprise the Profit and Loss Account, Statement of Total Recognised Gains and Losses, Balance Sheet and the related notes 1 to 18. These financial statements have been prepared on the basis of the accounting policies set out therein.

This report is made solely to the company's members, as a body, in accordance with Section 235 of the Companies Act 1985. Our audit work has been undertaken so that we might state to the company's members those matters we are required to state to them in an auditors' report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company and the company's members as a body, for our audit work, for this report, or for the opinions we have formed.

**Respective responsibilities of directors and auditors**

As described in the Statement of Directors' Responsibilities the company's directors are responsible for the preparation of the financial statements in accordance with applicable United Kingdom law and accounting standards.

Our responsibility is to audit the financial statements in accordance with relevant legal and regulatory requirements and United Kingdom Auditing Standards.

We report to you our opinion as to whether the financial statements give a true and fair view and are properly prepared in accordance with the Companies Act 1985. We also report to you if, in our opinion, the Directors' Report is not consistent with the financial statements, if the company has not kept proper accounting records, if we have not received all the information and explanations we require for our audit, or if information specified by law regarding directors' remuneration and transactions with the company is not disclosed.

We read the Directors' Report and consider the implications for our report if we become aware of any apparent misstatements within it.

**Basis of audit opinion**

We conducted our audit in accordance with United Kingdom Auditing Standards issued by the Auditing Practices Board. An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements. It also includes an assessment of the significant estimates and judgements made by the directors in the preparation of the financial statements, and of whether the accounting policies are appropriate to the company's circumstances, consistently applied and adequately disclosed.

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error. In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements.

**Opinion**

In our opinion the financial statements give a true and fair view of the state of affairs of the company as at 30 November 2004 and of its loss for the year then ended and have been properly prepared in accordance with the Companies Act 1985.

*Ernst + Young LLP.*

Ernst & Young LLP
Registered Auditor, London

## Lehman Brothers Holdings PLC

PROFIT AND LOSS ACCOUNT
for the year ended 30 November 2004

| | Notes | 2004 $000 | 2003 $000 |
|---|---|---|---|
| **OPERATING (LOSS)/ INCOME** | 2 | (67,115) | 322,255 |
| Administrative expenses | | (2,788) | (2,883) |
| **OPERATING (LOSS)/PROFIT** | | (69,903) | 319,372 |
| Interest receivable and similar income | 3 | 58,162 | 11,692 |
| Interest payable and similar charges | 4 | (119,302) | (182,706) |
| **(LOSS)/PROFIT ON ORDINARY ACTIVITIES BEFORE TAXATION** | | (131,043) | 148,358 |
| Tax on profit on ordinary activities | 6 | -- | -- |
| **(LOSS )/PROFIT TRANSFERRED TO RESERVES FOR THE FINANCIAL YEAR** | 12 | (131,043) | 148,358 |

ERNST & YOUNG

## Lehman Brothers Holdings PLC

STATEMENT OF TOTAL RECOGNISED GAINS AND LOSSES
for the year ended 30 November 2004

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| (Loss)/ Profit attributable to shareholders of the company | (131,043) | 148,358 |
| Revaluation of fixed asset investment | 79,900 | 138,393 |
| Total (losses)/gains recognised in the year | (51,143) | 286,751 |

*ERNST & YOUNG*

## Lehman Brothers Holdings PLC

**BALANCE SHEET**
at 30 November 2004

|  | Notes | 2004 $000 | 2003 $000 |
|---|---|---|---|
| **FIXED ASSETS** | | | |
| Investments | 7 | 3,935,854 | 2,991,687 |
| **CURRENT ASSETS** | | | |
| Debtors | 8 | 4,170,589 | 2,906,294 |
| | | 4,170,589 | 2,906,294 |
| **CREDITORS:** amounts falling due within one year | 9 | (5,813,594) | (4,535,948) |
| **NET CURRENT LIABILITIES** | | (1,643,005) | (1,629,654) |
| **TOTAL ASSETS LESS CURRENT LIABILITIES** | | 2,292,849 | 1,362,033 |
| **CREDITORS:** amounts falling due after more than one year | 10 | – | (3,041) |
| | | 2,292,849 | 1,358,992 |
| **CAPITAL AND RESERVES** | | | |
| Called up share capital | 11 | 1,963,182 | 978,182 |
| Share premium account | | 3,312 | 3,312 |
| Profit and loss account | 13 | 26,664 | 157,707 |
| Other reserves | 14 | 299,691 | 219,791 |
| **SHAREHOLDERS' FUNDS** | | | |
| Equity | | 1,049,733 | 1,100,876 |
| Non-equity | | 1,243,116 | 258,116 |
| | | 2,292,849 | 1,358,992 |

Director

**2 8 JUN 2005**

ERNST & YOUNG

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

1.    **ACCOUNTING POLICIES**

*Basis of preparation*
The financial statements have been prepared under the historical cost convention and in accordance with applicable accounting standards except as set out below.

The accounts present information for the company as an individual entity and not about its group. Group accounts have not been prepared as the company is a subsidiary of Lehman Brothers UK Spain Holdings Ltd, a company registered in England and Wales which prepares group accounts.

*Statement of cash flows*
The directors have taken advantage of the exemption in paragraph 5(a) of Financial Reporting Standard 1 (revised) from producing a cashflow statement.

*Functional currency*
The company's functional currency is US dollars as the directors consider this to be the most appropriate currency for the company's business.

*Investments in subsidiary undertakings*
Investments in subsidiary undertakings are stated at underlying net asset value. Any permanent diminution in the net asset value of an investment as compared to historical cost is charged to the profit and loss account. In all other cases the difference between net asset value and historical cost is charged or credited to a revaluation reserve.

For investments in subsidiary undertakings denominated in currencies other than the functional currency of the company, historical cost and net asset value are determined with reference to the historical exchange rate at acquisition and the prevailing year end exchange rate respectively.

*Other fixed asset investments*
Other unlisted fixed asset investments are stated at cost unless, in the opinion of the directors there has been a permanent diminution in value, in which case an appropriate adjustment is made. Listed investments are stated at market value.

*Deferred taxation*
Deferred tax is recognised in respect of all timing differences, at the rates of taxation anticipated to apply when these differences crystallise, arising from the inclusion of items of income and expenditure in taxation computations in periods different from those for which they are included in the financial statements.

Deferred tax assets are recognised only to the extent that the directors consider that it is more likely than not that there will be suitable taxable profits from which the future reversal of the underlying timing differences can be deducted.

Provision is made for tax on gains arising from the revaluation (and similar fair value adjustments) of fixed assets, and gains on disposal of fixed assets that have been rolled over into replacement assets, only to the extent that, at the balance sheet date, there is a binding agreement to dispose of the assets concerned. However, no provision is made where, on the basis of all available evidence at the balance sheet date, it is more likely than not that the taxable gain will be rolled over into replacement assets and charged to tax only where the replacement assets are sold.

Provision is made for deferred tax that would arise on remittance of the retained earnings of overseas subsidiaries, associates and joint ventures only to the extent that, at the balance sheet date, dividends have been accrued as receivable.

Deferred tax is measured on an undiscounted basis at the tax rates that are expected to apply in the periods in which timing differences reverse, based on tax rates and laws enacted or substantively enacted at the balance sheet date.

## Lehman Brothers Holdings PLC

### NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

**ACCOUNTING POLICIES (continued)**

*Valuation of securities sold not yet purchased*
Securities sold not yet purchased are stated at market value with all gains and losses reflected in the profit and loss account.

*Foreign currency translation*
Assets and liabilities denominated in foreign currencies are translated into US dollars at rates of exchange ruling at the balance sheet date. Transactions in foreign currencies are translated into US dollars at the rate of exchange ruling at the end of the month in which the transaction occurs. Any differences arising from translation are taken to the profit and loss account. Exchange differences arising on translation of the company's net equity interest in subsidiaries with a functional currency other than US dollar are shown as movements on reserves.

*Dividends*
Dividends are accrued when declared by subsidiaries.

2.  **OPERATING LOSS/ INCOME**
    Operating loss/income, which excludes value added tax, has been disclosed instead of turnover as this reflects more accurately the results of the company's activities. The analysis of losses/income by geographical area has been omitted as the directors consider that it would be seriously prejudicial to disclose this information. All the company's operating losses/income arises from continuing activities. Operating loss/income comprises:

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| (Loss)/Income from Investments | (270,406) | 14,923 |
| Profit on disposal of fixed asset investments | 22,489 | – |
| Income from shares in group undertakings | 192,767 | 318,570 |
| Other operating losses | (11,965) | (11,238) |
|  | (67,115) | 322,255 |

3.  **INTEREST RECEIVABLE AND SIMILAR INCOME**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Group undertakings | 58,162 | 11,692 |
|  | 58,162 | 11,692 |

4.  **INTEREST PAYABLE AND SIMILAR CHARGES**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Group undertakings | (119,302) | (182,706) |
|  | (119,302) | (182,706) |

ERNST & YOUNG

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

5.  **INFORMATION REGARDING DIRECTORS AND EMPLOYEES**
The company has no employees. All personnel, including directors, who perform services for the company are employed and remunerated by Lehman Brothers Limited. The company is recharged employee costs incurred by Lehman Brothers Limited for services attributable to the company.

Directors' emoluments (including pension contributions) for management services to the company were $nil (2003 - $nil).

6.  **TAX ON PROFIT ON ORDINARY ACTIVITIES**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| (Loss)/Profit on ordinary activities before taxation | (131,043) | 148,358 |
| Corporation tax at standard rate 30% | (39,312) | 44,507 |
| Effects of: |  |  |
| Expenses not deductible for tax purposes | 88,704 | 5,027 |
| Group dividend not taxable | (57,830) | (95,571) |
| Non group dividend receivable | (4,678) |  |
| Capital allowances | – | (3) |
| Brought forward losses utilised | (5,225) |  |
| Group relief surrendered free of charge | 18,341 | 46,040 |
| Current tax charge for the period | – | – |

A deferred tax asset of $32,313,089 (2003:$539,294) relating to losses available for taxation purposes and in respect of timing differences carried forward has not been recognised on the grounds that future profits against which to utilise the assets are not sufficiently guaranteed. The majority of the movement from 2003 to 2004 is explained by losses brought forward from 2003. These were not included in the asset for 2004 as they had been included as group relief surrendered free of charge. Subsequently, they were not surrendered.

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

7.  **FIXED ASSET INVESTMENTS**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Net asset value: |  |  |
| Investments in subsidiary undertakings | 3,887,109 | 2,912.853 |
| Other fixed asset investments | 48,745 | 78,834 |
|  | 3,935,854 | 2,991,687 |

In the opinion of the directors, the aggregate value of the fixed asset investments is not less than the amount at which they are stated in the accounts.

| | Subsidiary undertakings $000 | Listed Investments $000 | Unlisted investments $000 | Total $000 |
|---|---|---|---|---|
| Cost: | | | | |
| At 30 November 2003 | 2,866,312 | 81 | 78,753 | 2,945,146 |
| Additions | 1,162,203 | | 7,066 | 1,169,269 |
| Disposals | (5,125) | (81) | (19,043) | (24,249) |
| Permanent diminution in value | (262,722) | | (18,031) | (280,753) |
| At 30 November 2004 | 3,760,668 | - | 48,745 | 3,809,413 |
| Revaluation gains: | | | | |
| At 30 November 2003 | 46,541 | – | – | 46,541 |
| Revaluation of fixed asset investments | 32,153 | – | – | 32,153 |
| Foreign exchange movement | 47,747 | – | – | 47,747 |
| At 30 November 2004 | 126,441 | – | – | 126,441 |
| Net book value: | | | | |
| At 30 November 2004 | 3,887,109 | - | 48,745 | 3,935,854 |
| At 30 November 2003 | 2,912,853 | 81 | 78,753 | 2.991,687 |

Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

7.    **FIXED ASSET INVESTMENTS (continued)**

The following information as at 30 November 2004 relates to the principal subsidiaries of Lehman Brothers Holdings PLC, all of which are registered in England and Wales and held by the company unless indicated.

| Name of company | Description of shares held by company | Proportion of nominal value and voting rights of shares held | Principal business |
|---|---|---|---|
| Lehman Brothers Limited | Ordinary | 100% | Service company |
| Lehman Brothers International (Europe) | Ordinary | 100% | Fixed income, equities, broking and trading |
| Lehman Brothers Europe Limited | Ordinary | 100% | Investment banking |
| Lehman Brothers Global Finance Limited | Ordinary | 100% | Inactive |
| Storm Funding Limited | Ordinary | 100% | Asset backed financing |
| Platform Investments | Ordinary | 100% | Investment company |
| Lehman Brothers (Indonesia) Limited | Ordinary | 100% | Investment banking |
| LB Cayman Finance Limited[a] | Ordinary | 100% | Equity financing |
| LBQ Funding (UK) Limited | Class A Preference | 57% | Investment company |
| OCI Holdings Plc | Ordinary | 90% | Holding company |
| Lehman Brothers Redditch No. 1 Limited | Ordinary | 100% | Equity partnership |
| Lehman Brothers Redditch No. 2 Limited | Ordinary | 100% | Equity partnership |
| Lehman Brothers Commodities Limited[b] | Ordinary | 100% | Inactive |
| Seebreeze Funding Limited[b] | Ordinary | 49% | Investment company |
| LBO Investments Ltd | Ordinary | 100% | Investment company |
| ResetFan Ltd | Ordinary | 100% | Holding company |

ERNST & YOUNG

Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

7.    **FIXED ASSET INVESTMENTS (continued)**

| Name of company | Description of shares held by company | Proportion of nominal value and voting rights of shares held | Principal business |
|---|---|---|---|
| Southern Pacific Mortgage Limited[b] | Ordinary | 100% | Residential Mortgage Lending |
| Pageant Properties Limited[c] | Ordinary and Preference | 65% | Property development |
| LB Equity (Nominees Number 7) Limited | Ordinary | 100% | Financing |

**New acquisitions during the financial year ended 30 November 2004**

| | | | |
|---|---|---|---|
| Furno & Del Castaño Capital Partners LLP (formerly Edgeworth Capital) | Ordinary | 51% | Fund management |
| Preferred Mortgages Limited | Ordinary | 100% | Mortgage Origination |
| ELQ Hypothekan NV | Ordinary | 100% | Mortgage Origination |
| Mable Commercial Funding Ltd. | Ordinary | 100% | Investment Company |

[a]    10% held by a subsidiary undertaking
[b]    PLC controls this company through power of attorney to appoint and remove directors
[c]    65% of ordinary shares and 85% of preference shares

ERNST & YOUNG

Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

8.  **DEBTORS**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Amounts due from: | | |
| Subsidiary undertakings | 3,678,880 | 2,648,846 |
| Parent and fellow subsidiary undertakings | 488,888 | 254,927 |
| Other debtors | 2,821 | 2,521 |
| | 4,170,589 | 2,906,294 |

Included in amounts due from subsidiary undertakings and fellow subsidiary undertakings are subordinated loans of $3,554,948,205 (2003 - $2,304,478,608) which are repayable at five days' notice by the borrower. For the amounts due from subsidiary undertakings regulated by the Financial Services Authority, five days' notice must be given to the Financial Services Authority, which has the right to refuse consent to repayment.

9.  **CREDITORS: amounts falling due within one year**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Marketable securities sold not yet purchased | 1,987,368 | 1,838,879 |
| Amounts due to: | | |
| Subsidiary undertakings | 2,275 | 1,695 |
| Parent and fellow subsidiary undertakings | 3,818,685 | 2,685,570 |
| Other creditors | 5,266 | 9,804 |
| | 5,813,594 | 4,535,948 |

Included in amounts due to parent and fellow subsidiary undertakings are subordinated loans of $3,149,000,000 (2003 - $2,129,000,000) which are repayable at one day's notice.

10. **CREDITORS: amounts falling due after more than one year**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Other creditors | - | 3,041 |
| | - | 3,041 |

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

11. **SHARE CAPITAL**

|  | 2004 £000 | 2003 £000 |
|---|---|---|
| Authorised: |  |  |
| 79,750,000 Ordinary shares of £1 each | 79,750 | 79,750 |
| 250,000 'B' Ordinary shares of £1 each | 250 | 250 |
| 20,000,000 Non Cumulative Redeemable Preference shares of £1 each | 20,000 | 20,000 |
|  | 100,000 | 100,000 |

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| 1,000,000,000 Ordinary shares of $1 each | 1,000,000 | 1,000,000 |
| 2,000,000,000 Non Cumulative Redeemable Preference shares of $1 each | 2,000,000 | 1,000,000 |
|  | 3,000,000 | 2,000,000 |

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Allotted, called up and fully paid: |  |  |
| 40,021,100 Ordinary shares of £1 each | 66,266 | 66,266 |
| 653,800,000 Ordinary shares of $1 each | 653,800 | 653,800 |
| 20,000,000 Non Cumulative Redeemable Preference shares of £1 each | 33,116 | 33,116 |
| 225,000,000 Non Cumulative Redeemable Preference shares of $1 each | 225,000 | 225,000 |
| 985,000,000 Non Cumulative Redeemable Preference shares of $1 each | 985,000 | - |
|  | 1,963,182 | 978,182 |

The Non Cumulative Redeemable Preference shares may be redeemed at any time by the company by giving the holders of the preference shares not less than one month's notice in writing.

The Preference shares carry a fixed non cumulative preferential dividend of £100 per annum.

The rights of the Preference shares on redemption or a winding up are the amount of capital paid up together with a sum equal to any arrears of the fixed non cumulative preferential dividend provided they have been declared.

The Preference shares shall not entitle the holders to receive notice of, or to attend and vote at, any general meeting of the company.

During the year the company has authorised 1,000,000,000 non cumulative redeemable preference shares of $1 and issued 985,000,000 non cumulative redeemable preference shares of $1 each .

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

### 12. RECONCILIATION OF MOVEMENTS IN SHAREHOLDERS' FUNDS

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| (Loss) / Profit attributable to shareholders of the company | (131,043) | 148,358 |
| Additional preference shares | 985,000 | 125,000 |
| Revaluation of fixed asset investment | 79,900 | 138,393 |
| Net movement in shareholders' funds | 933,857 | 411,751 |
| Opening shareholders' funds | 1,358,992 | 947,241 |
| Closing shareholders' funds | 2,292,849 | 1,358,992 |

### 13. PROFIT AND LOSS ACCOUNT

|  | $000 |
|---|---|
| Accumulated profit at 30 November 2003 | 157,707 |
| Retained loss for the year | (131,043) |
| Accumulated profit at 30 November 2004 | 26,664 |

### 14. OTHER RESERVES

|  | Revaluation reserve $000 | Capital reserve $000 | Total $000 |
|---|---|---|---|
| At 30 November 2003 | 46,541 | 173,250 | 219,791 |
| Revaluation of fixed asset investments | 79,900 | – | 79,900 |
| At 30 November 2004 | 126,441 | 173,250 | 299,691 |

There is no corporation tax liability in respect of items taken to the revaluation reserve.

The balance shown as capital reserve is non-distributable.

### 15. COMMITMENTS

(a)    The company enters into interest rate swaps in the normal course of business with affiliated companies.

(b)    On 23 March 2005 the company agreed to guarantee the issuance of €225,000,000 Fixed Rate to CMS linked subordinated notes by partnership Lehman Brothers UK Capital Funding UK LP.

(c)    The company has issued letters of support for several of its subsidiaries.

## Lehman Brothers Holdings PLC

### NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

**16.    CONTINGENT LIABILITIES**

The company is registered with HM Customs & Excise as a member of the Lehman Brothers Limited group for VAT purposes and, as a result, is jointly and severally liable on a continuing basis for amounts owing by other members of the group in respect of unpaid VAT.

Lehman Brothers Holdings PLC has received US Government Securities as collateral against put options it holds over its preference share investment in LBQ Funding (UK) Limited. The value of the US Government Securities received at 30 November was $1,987,368,269 (2003 - $1,838,878,618).

**17.    ULTIMATE PARENT COMPANY**

The ultimate parent company of Lehman Brothers Holdings PLC is Lehman Brothers Holdings Inc. which is incorporated in the State of Delaware in the United States of America.

The company has taken advantage of the FRS 8 exemption from disclosing transactions with related parties that are part of the Lehman Brothers Holdings Inc group.

The largest group in which the results of the company are consolidated is that headed by Lehman Brothers Holdings Inc incorporated in the United States of America. The smallest group in which they are consolidated is that headed by Lehman Brothers Spain Holdings Ltd, registered in England and Wales. The consolidated accounts of these groups are available to the public from 745 Seventh Avenue, New York, USA and from 25 Bank Street, Canary Wharf London respectively.

**18.    POST BALANCE SHEET EVENTS**

Since the year end the company has issued shares as follows:

- 50,000,000 Non-Cumulative Preference shares of $1 each on 2 February 2005,

- 150,000,000 Non-Cumulative Preference shares of $1 each on 28 April 2005,

- 150,000,000 Non-Cumulative Preference shares of $1 each on 12 May 2005;

- 250,000,000 Non-Cumulative Preference shares of $1 each on 16 June 2005.

The proceeds of the share issues have been used to inject capital in to Lehman Brothers International (Europe).

On 23 March 2005 the company agreed to guarantee the issuance of €225,000,000 Fixed Rate to CMS linked subordinated notes by partnership Lehman Brothers UK Capital Funding UK LP.

On 18 May 2005, the company acquired 100% share capital of MBAM Investor Limited.

ERNST & YOUNG

| **ISSUER** | **GUARANTOR** |
|---|---|
| **Lehman Brothers UK Capital Funding III LP** | **Lehman Brothers Holdings plc** |
| 25 Bank Street | 25 Bank Street |
| London E14 5LE | London E14 5LE |
| England | England |

## PRINCIPAL PAYING AND TRANSFER AGENT

**JPMorgan Chase Bank, N.A., London Branch**
Trinity Tower
9 Thomas More Street
London E1W 1YT
England

## PAYING AND TRANSFER AGENT and REGISTRAR

**J.P. Morgan Bank Luxembourg S.A.**
6, route de Trèves
L-2633 Senningerberg
Luxembourg

## LEGAL ADVISERS

*as to English and New York law*
**Allen & Overy LLP**
One New Change
London EC4M 9QQ
England

## AUDITORS

**Ernst & Young LLP**
1 More London Place
London SE1 2AF
England

printed by **eprint*financial*.com**
tel  + 44 (0) 20 7613 1800   document number 3328