Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 08-13555-scc

4  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5  In the Matter of:

6

7  LEHMAN BROTHERS HOLDINGS, INC.,

8

9          Debtor.

10 - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  November 27, 2017

17                  10:06 AM

18

19

20

21 B E F O R E :

22 HON SHELLEY C. CHAPMAN

23 U.S. BANKRUPTCY JUDGE

24

25 ECRO:  TIMOTHY

1    HEARING re RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   HOLWELL  SHUSTER  &  GOLDBERG  LLP

 4        RMBS  Trustees

 5        750  Seventh  Avenue,  26th  Floor

 6        New  York,  NY  10019

 7

 8   BY:   NEIL  R.  LIEBERMAN

 9        DWIGHT  A.  HEALY

10        DANIEL  P.  GOLDBERG

11        MICHAEL  S.  SHUSTER

12

13   ROLLIN  BRASWELL  FISHER  LLC

14        Attorneys  for  the  Debtor

15        8350  E.  Crescent  Parkway,  Suite  100

16        Greenwood  Village,  CO  80111

17

18   BY:   MARITZA  DOMINGUEZ-BRASWELL

19        MICHAEL  ROLLIN

20

21

22

23

24

25
```

Page 4

1   WILLKIE FARR & GALLAGHER LLP

2        Attorneys for the Debtor

3        787 Seventh Avenue

4        New York, NY 10019

5

6   BY:  TODD G. COSENZA

7        BENJAMIN P. MCCALLEN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                        P R O C E E D I N G S

 2              THE COURT:  Please have a seat everyone.  I hope

 3     everyone had a nice holiday.  Unfortunately, it's warm in

 4     here today.  We're working on it.  We're trying to get them

 5     to do whatever they do.  It's unlikely to work, so we have

 6     the window open in the back.  We're not going to open the

 7     middle window because then there's too much competition

 8     between the noise.  But if you are warm, please take your

 9     jacket off.  I know that none of you will, but you are most

10     welcome to take your jacket off; in particular, for the

11     witnesses if the witness is warm.  I have ordered people to

12     take their jackets off.

13              Any housekeeping matters we need to discuss before

14     we get started?

15              MR. COSENZA:  I don't believe so, Your Honor.

16              THE COURT:  Okay.  All right.  Ready when you are

17     then, Mr. Cosenza.

18              MR. COSENZA:  I think we're ready to start with

19     Mr. Trumpp.  Miss Braswell is going to conduct the

20     examination of Mr. Zachary Trumpp, so I'm going to hand it

21     over to her.

22              THE COURT:  Very good.  Hello.  Do you have

23     binders for us?

24              MS. DOMINGUEZ-BRASWELL:  I do.

25              THE COURT:  Okay.
```

Page 6

1          MS. DOMINGUEZ-BRASWELL:  And I was actually going

2    to ask you.  Can I just distribute them now before we even

3    start?

4          THE COURT:  Please, yes.

5          MS. DOMINGUEZ-BRASWELL:  Your Honor, may I

6    approach?

7          THE COURT:  Yes.  Thank you.

8          MS. DOMINGUEZ-BRASWELL:  Who else needs one?

9          THE COURT:  Well, it would be lovely if each of

10   the clerks could get one.  But if you're stressed, then

11   we'll make do.

12          MS. DOMINGUEZ-BRASWELL:  Your Honor, we also have

13   the PowerPoint deck and we have it bound, so I'd like to

14   distribute copies of that well.

15          THE COURT:  Sure.  Ready when you are.

16          MS. DOMINGUEZ-BRASWELL:  Your Honor, the plan

17   administrator calls its first witness, Mr. Zachary Trumpp.

18          THE COURT:  Very good.  Good morning, Mr. Trumpp.

19   Please step up.  Would you raise your right hand, please?

20   Would you please stand and raise your right hand?  Do you

21   solemnly swear or affirm that all of the testimony you are

22   about to give before the Court shall be the truth, the whole

23   truth, or nothing but the truth?

24          MR. TRUMPP:  I do.

25          THE COURT:  All right.  Please take a seat, make

Page 7

1   yourself comfortable.  As I said, it is warm in here.  If

2   you'd like to take your jacket off to be more comfortable,

3   you're most welcome to.  Does Mr. Trumpp have water?

4           MS. DOMINGUEZ-BRASWELL:  He does not.  Thank you,

5   Your Honor.

6           THE COURT:  And if you need to take a break at any

7   time, just let us know.  You don't have to wait for any of

8   the lawyers to ask.  All right?

9           MR. TRUMPP:  Thank you.

10          THE COURT:  I like to see you putting Mr. Cosenza

11  to work.

12          MS. DOMINGUEZ-BRASWELL:  Thank you.  May I

13  proceed?

14          THE COURT:  Yes.

15            DIRECT EXAMINATION OF ZACHARY D. TRUMPP

16  BY MS. DOMINGUEZ-BRASWELL:

17  Q    Will you please state your name for the record?

18  A    Zachary David Trumpp.

19  Q    And, Mr. Trumpp, where are you employed by?

20  A    Lehman Brothers Holdings, Inc.

21  Q    And how long have you worked for Lehman Brothers

22  Holdings?

23  A    Since February of 2009, so almost nine years.

24  Q    And what's your current position?

25  A    Senior Vice President, Managing Claims.

Page 8

1    Q    And how long have you been in that position?

2    A    Since early 2013, so almost five years.

3    Q    Can you generally describe your responsibilities of the

4    estate?

5    A    Yes.  I'm responsible for managing all residential

6    mortgage-related claims.  So I am responsible for reviewing

7    and assessing all of the proofs of claims that were

8    residential mortgage related filed against the estate, as

9    well as the pursuit and resolution of claims against

10   downstream sellers.

11   Q    Okay.

12            MS. DOMINGUEZ-BRASWELL:  Is the sound okay; can

13   you hear okay?

14            THE COURT:  I think if you keep your voice up a

15   bit.  Maybe pull the microphone a little bit more towards

16   you, we'd be good.  Okay, thank you.

17            MS. DOMINGUEZ-BRASWELL:  Okay.

18   Q    Let's talk a little bit about your background.  Can you

19   describe your education since high school?

20   A    Yes.  I have an undergraduate degree in business

21   administration from Colorado State University, where I

22   graduated in 1998.  I have a master's degree in finance from

23   the University of Colorado at Denver, where I graduated in

24   2001.

25   Q    And can you describe your employment since graduating

Page 9

1    from college?

2    A    Yeah.  After graduating from undergrad, I had a brief

3    six-month sting working for a mutual fund company called

4    American Century Mutual Funds.  I started working for Aurora

5    Loan Services in January of 1999, and I worked there as a

6    financial analyst until 2001.  After graduating from

7    graduate school, I went to go work as a financial analyst

8    for an energy firm called Aquila.

9            In late 2002, I came back to Aurora Loan Services,

10   and I worked in their secondary marketing operations.

11   Worked there for a few years in their pricing and mini vault

12   trading function.  Then I had a role at Aurora Loan Services

13   in their contract administration department, where I was

14   responsible for enforcing contracts back to Aurora's

15   correspondence and brokers.

16           In 2005, I made the switch to loss management,

17   which was a new department that Aurora created in their

18   master servicing group, which was responsible for enforcing

19   contractual representations and warranties on behalf of LBHI

20   as whole loan owner for their whole loan portfolio, as well

21   as enforcing contractual representations and warranties on

22   behalf of the loans that Aurora was the master servicer for.

23   And Aurora was the master services for the majority of the

24   privately label issued securities from Lehman Brothers

25   Holdings, Inc.

Page 10

1          In 2008, I transferred and worked for their loan

2     administration department, which was for both their primary

3     and master servicing operations in an operational controls

4     function, which was responsible for oversight and risk

5     management of the entire loan operation at Aurora Loan

6     Services.  But during that time, I retained responsibilities

7     for certain repurchase-related matters.

8          And then shortly after Lehman Brothers bankruptcy

9     in February of 2009, I made the transition from Aurora to

10    Lehman Brothers Holdings, and I've been employed by Lehman

11    Brothers Holdings ever since.

12    Q    Okay.  And I'd like to break that down a little bit and

13    focus on two of the positions that you described.  The first

14    was with contract administration, and you said at contract

15    administration, you were responsible for enforcing

16    contracts.  What kind of contracts were you enforcing?

17    A    So those were the contracts that governed the purchase

18    and sale of whole loans from correspondence to Aurora Loan

19    Services, or broker agreements between Aurora Loan Services

20    and their brokers.

21    Q    What do you mean when you say whole loan?

22    A    What I mean by that is an individually traded asset,

23    and individual loan; not a pool of loans and not a loan in a

24    securitization.

25    Q    Okay.  And when you were enforcing contracts in

Page 11

```
 1   contract administration, what types of provisions were you
 2   enforcing?
 3   A    So in contract administration, we were looking at early
 4   payoff provisions; we were looking at early payment default
 5   provisions; we were looking at representations and
 6   warranties in the purchase and sale agreements between the
 7   entities that sold the loans already funds to Aurora Loan
 8   Services.
 9   Q    When you were with contract administration, were you --
10   did you have the opportunity to conduct loan reviews?
11   A    We did, yes.
12   Q    What type of loan reviews were you -- either yourself
13   conducting or your team conducting?
14   A    So in contract administration, another department at
15   Aurora, quality control, would review loans and identify
16   defects.  Contract administration would assess those defects
17   relative to the appropriate contracts and determine which
18   defects rose to the level of a breach or pursuit.
19   Q    And can you describe for the Court your role in that
20   process in the review of loans and determining whether they
21   were breaches of representations and warranties?
22   A    So the way it worked at Aurora was that there was a
23   quality control department that was responsible for
24   identifying potential defects -- underwriting defects,
25   issues with the documentation, those types of things.  But
```

Page 12

```
 1    they weren't looking at those defects in relation to the

 2    underlying agreements; they were just looking at them from a

 3    pure underwriting perspective.

 4            In contract administration, we took those defects

 5    and looked at them and then assessed them relative to the

 6    applicable contracts; and made determinations of whether

 7    those defects rose to the level of a breach that could be

 8    pursued back against the sellers, or whether it was just a

 9    defect that wasn't covered by a rep or maybe not material

10    enough.

11    Q    In contract administration, were you ever involved in

12    any litigation related to the enforcement of these

13    contracts?

14    A    In contract administration, I was not.

15    Q    Okay.  Let's talk about loss management.  Can you just

16    generally describe what you did in loss management?

17    A    Yes.  So in 2005 when I made the transition to loss

18    management, I mentioned it was the creation of a new

19    department.  It was an evolution at Aurora Loan Services and

20    how we were looking at the enforcement of our contracts.

21    And so, we wanted to make sure that there was a distinction

22    between the work that Aurora was doing on behalf of its own

23    portfolio of loans versus the portfolio of loans in LBHI's

24    whole loan inventory or in LBHI's securitizations.  And so

25    they separated the contract administration department into
```

Page 13

1    contract administration and loss management.

2            And what I created in loss management was -- it's

3    a separate loan review team that reviewed loans on behalf of

4    the loans in the securitizations that was separate and apart

5    from Aurora's original quality control functions.  And

6    there, we had a team that did due diligence reviews, and we

7    also had a team that assessed those loan defects identified

8    by the loan reviewers against the appropriate agreements.

9            So in loss management, we had our own self-

10   contained quality control due diligence loan review

11   function, and a function to pursue representations and

12   warranties.  And so, in that function, we were pursuing

13   repurchase demands on behalf of the securitizations.  And

14   one of the entities that we would actually pursue repurchase

15   demands against was Lehman Brothers, and we would issue

16   repurchase demands to Lehman Brothers on behalf of these

17   securitizations.

18   Q    Were there differences in the way that you pursued

19   breaches of representation and warranty claims?  As compared

20   -- comparing contract administration and loss management,

21   were there differences between the way you'd perform that

22   function?

23   A    Yes.  So you had to look at the relevant agreements.

24   And in contract administration, the relevant agreements were

25   the agreements that governed the purchase and sale between

Page 14

1    Aurora's correspondence or brokers to Aurora.  In loss

2    management, we were looking at separate agreements.  We were

3    looking at securitization agreements, which would be the

4    MLSAAs and the trust agreements and those agreements that

5    governed the loans in the securitizations; or we also did

6    work on behalf of Lehman's bulk purchases agreements, which

7    were separate and apart from Aurora's agreements.

8            So you had to always look at the defects in

9    relation to the appropriate agreement.  But also, you had to

10    look at, were we dealing with whole loans, i.e., the Aurora

11    side on contract administration; or were you dealing with

12    loans and securitizations, i.e., loans in LBHI's privately

13    issued securitizations.

14    Q    And when you were in loss management, at what level

15    were you operating?  You said there were a team of

16    reviewers.  Were you part of the team reviewing the loan

17    files; were you in an oversight role?  What was your role in

18    relation to the team?

19    A    So I managed the entire loss management department, and

20    I was responsible for a team of people that did loan

21    reviews.  I had repurchase underwriters on -- in that

22    department.  I had another team of people that were

23    responsible for reviewing the contracts and pursuing the

24    claims.  And then I had another team of people at that time

25    who worked with outside vendors to perform due diligence

1    reviews.  We had an in-house team, and we also used outside

2    parties.

3    Q    Okay.  And how did you determine when you needed to

4    keep something in-house versus when you needed to go to an

5    outside party?

6    A    It really was a management of resources of volume

7    issue.  So as we had additional loans to review that we

8    didn't have capacity in-house, we used outside parties.

9    Q    Were there ever times were a particular potential claim

10   to you and you decided not to pursue that claim?

11   A    Yes.  As I mentioned earlier, you had to look at the

12   defects in relation to the agreements.  Sometimes the

13   defects just weren't covered by a breach or rep -- or

14   weren't covered by a representation or warranty, so you had

15   to look at that.  But then you also had to make assessments

16   around materiality of the breach, and you had to make

17   assessments around adverse and material effect on the value

18   of the loan.

19   Q    Now let's talk about your transition to the estate.

20   When was that?  I think you said --

21   A    It was February of 2009, shortly after Lehman's

22   bankruptcy.

23   Q    And how, if at all, did your role change when you

24   transitioned from loss management to the estate?

25   A    One of the key differences, and one of the things that

1    took a little bit of a mindset change, was the idea and

2    concept that when I was working on behalf of the plan

3    administrator, you weren't necessarily pursuing on behalf of

4    your employer directly and for their direct benefit.  You're

5    really looking at claims on behalf of all creditors, so

6    that's a little bit different mindset than what I had been

7    historically used to.  And so, we were wanting to make sure

8    that the review of claims that we were doing was fair to all

9    creditors.

10   Q    Can you give me a specific -- can you think of a

11   specific example of how your approach to claims changed when

12   you were at the estate?

13   A    Yeah.  So, I mean, when we were reviewing and assessing

14   the proofs of claims filed against the estate, you know, we

15   wanted to make sure that we were assessing the merits and

16   the validity of the various claims versus seeking any and

17   all potential defenses that we could to try and say these

18   claims were worth nothing, and that we've tried to hold that

19   concept through all the various claims that we resolved.

20   Q    I want to go back to something you said a little bit

21   ago.  You said you sometimes decided to outsource the loan

22   reviews.  Who were you -- what do you mean by that?  When

23   you say outsourced the loan reviews, what does that mean?

24   A    So there are third parties that perform loan reviews

25   and try and identify those potential defects.  There's

Page 17

1    several of them in the industry.  You know, we use them in

2    our protocol review process.  We used a firm by the Recovco;

3    the Trustees used multiple firms.  And in my loss management

4    days from a cost management standpoint and from a volume

5    management standpoint, we chose to use outside parties.  And

6    in particular in loss management, there were three different

7    outside vendors that I used for due diligence reviews.

8    Q    Do you recall those?

9    A    Yes.  One was Clayton, one was Interthinx, and the

10   third one has gone by several different names.  It was

11   Mortgage Ramp, and then Office Tiger; and I think they've

12   even got a third name now, and I'm not sure what they're

13   called.  But all that to say, it was not uncommon to have to

14   use outside parties to do due diligence reviews.  It just

15   wasn't economical to have dozens of people on staff for that

16   type of work.

17   Q    And in your role hiring these vendors, and I assume

18   overseeing these vendors, did you have an opportunity to

19   compare and contrast the quality of the different vendors?

20   A    That really was one of the key aspects of having to

21   deal with an outside party, is you are always looking at

22   consistency and quality.  You know, I had -- essentially had

23   four different loan review groups that I was using in loss

24   management, my own in-house team, and then the three outside

25   parties.  And keeping all four parties looking at loans the

Page 18

1   same way and providing the same consistent type of output

2   and saying this type of a claim is always a claim or this

3   particular type of evidence is sufficient, was a task that a

4   constant juggle.

5   Q    Let's talk about the protocol.  Are you familiar with

6   the protocol, Mr. Trumpp?

7   A    Yes, very.

8   Q    And when you refer to the protocol, is there a document

9   that comes to mind for you?

10  A    Yes, the protocol order.

11  Q    Okay.  The protocol order for your reference is plan

12  administrator 74, Exhibit 74 in your binder?  And we'll have

13  it up on the screen as we talk about it.  Who drafted the

14  protocol?

15  A    Do I get a binder?

16  Q    I'm sorry?

17  A    Do I get a binder?

18  Q    I'm sorry.  Do you not have a binder?  Yes, you get a

19  binder.  Who drafted the protocol, Mr. Trumpp?

20  A    It was initially drafted by the plan administrator.

21  But, ultimately, it ended up being a collaboratively

22  negotiated document.

23  Q    What do you mean by collaboratively negotiated

24  document?

25  A    The plan administrator and the Trustees both provided

Page 19

1    input and gave our opinion.

2    Q    Were you involved in that process?

3    A    I was.

4    Q    And do you remember when the protocol was entered?

5    A    In December of 2014.

6    Q    I'm going to put up a screen, and it highlights the

7    various steps.  But I'd like you to walk the Court at a high

8    level through each of those steps of the protocol, starting

9    with step zero.

10   A    So starting with step zero, which was the receipt of

11   the loan files from the servicers.  One of the first things

12   that Trustees were responsible to do was to reach out to the

13   master servicers and the primary servicers and gather the

14   appropriate loan files for the review.  Those loan files

15   were made up of both origination and servicing documents.

16   One of the things that the plan administration did is they

17   worked with Lehman's sub, Aurora Loan Services, to gather

18   the appropriate documentation that they had from their loan

19   files, and provided that to the Trustees.

20   Q    Okay.  And when did step zero start approximately?

21   A    Essentially, the minute the order was entered.

22   Q    Okay.  What about step one; can you describe step one?

23   A    So step one was the process by which the Trustees took

24   those servicing loan files, reviewed them, and made

25   submissions of claims at the loan level to the plan

1   administrator.

2   Q    So when it says claim submission on the screen, that's

3   the Trustee's submission to the plan administrator.

4   A    That's correct.

5   Q    Okay.  What's step two?

6   A    Step two was the process by which the plan

7   administrator received those claims, reviewed the

8   information in the loan file supporting those claims, and

9   made a determination whether or not the information in the

10  loan file was sufficient for us to complete our review.  And

11  then assuming that the loans were complete and able to be

12  reviewed, then we performed a review of those loans, did our

13  own independent assessment of the claims, the evidence, the

14  loan file, looked at additional third-party documents; and

15  then ultimately responded back to the Trustees and said,

16  here are the loans that we approve and pass, or here are the

17  loans that we reject and here's our basis for rejecting

18  those claims.

19  Q    And we'll get into the details of step two in a little

20  bit.  Can you describe step three?

21  A    Step three was loan level negotiations that were

22  undergone by myself and my team and members of the Duff &

23  Phelps team, where we literally got on the phone and talked

24  loan by loan with representatives from the other side and

25  discussed the merits of their claims versus our defenses to

Page 21

1    those.  And, ultimately, tried to seek resolution by us

2    seeing that yes, they do have a valid claim and accepting it

3    and passing it; or them seeing that no, they really don't

4    have a valid claim, our defenses were sufficient, and then

5    rescinding the claims.

6              Or if that was not possible, then ultimately the

7    loans were moved on to step four, where -- you know, so

8    essentially, we couldn't agree in step three one way or the

9    other and the loans were moved to step four, which was going

10   to be the nonbinding dispute resolution.

11   Q    And before we move on to step four, approximately when

12   did step three take place?

13   A    Step three started in the early summer of 2016 when

14   step two ended, and we had numerous conference calls and

15   discussions about loans.  We ultimately ended up talking

16   about approximately 3000 loans by my team and their team.

17   Q    And when you say talking about 3000 loans, is that loan

18   by loan or was it in bulk; how did that occur?

19   A    It was loan by loan, claim by claim.

20   Q    And who -- you mentioned Duff & Phelps was involved on

21   the other side.  Who from Duff & Phelps was on the other

22   side of that?

23   A    There were several members of their team led by Alan

24   Pfeiffer, Edmund Esses, and Charlie Campbell.

25   Q    And we'll also talk about step three a little bit more

Page 22

1    later.  But step four; can you describe step four at a high

2    level?

3    A    Yes.  We ultimately didn't get to step four, but step

4    four was intended to be a nonbinding dispute resolution

5    process, where both sides would have an opportunity to make

6    their case pro or con against the claims and loans, and

7    there would be additional dialogue at that point in time

8    about the merits of each.

9    Q    Okay.  And step five?

10   A    Step five was intended to be for the loans which

11   couldn't get decided in step four; but, ultimately, they

12   would be brought to a court and decided.

13   Q    Okay.  And since we're going to focus today in large

14   part on step two in the review that actually occurred, can

15   you describe for the Court what your role was in step two of

16   the process?

17   A    So my role in step two was to manage and oversee the

18   process.  It was a voluminous undertaking from an

19   operational perspective, from a quality control perspective,

20   from a making sure that we were making the right reasoned

21   arguments.  So it was quite an undertaking, and my

22   responsibility was to manage the entire process.

23   Q    And what do you mean by manage; what was involved in

24   managing the process?

25   A    So I was responsible for bringing in other parties to

Page 23

1    help facilitate the process.  So we brought in Recovco from

2    a loan review perspective.  We brought in Rollins Braswell

3    and Fisher from a legal claim assessment perspective.  We

4    used my team heavily from an operations management

5    perspective, as well as providing our experience from all of

6    the downstream work that we had done at the loan level

7    pursuing claims.  So, ultimately, my responsibility was to

8    bring all the parties together necessary to complete this

9    type of review, which was fairly broad in scale in scope,

10   and make sure that we got it done right.

11   Q    And how did you oversee this process?

12   A    So throughout step two, I had weekly formal scheduled

13   calls with members of Recovco and RBF, where we discussed

14   operational issues, we discussed quality issues, we

15   discussed quantity issues.  I had continual dialogue with

16   those parties, even throughout the week when we weren't

17   having those formal meetings.  As issues popped up, we

18   raised them.

19          One of the things that I made sure that we had

20   early on was data to make sure that I could manage the

21   process from an analytical perspective.  We set up where we

22   could receive data and results from the reviews that were

23   taking place at both Recovco and RBF on a daily basis.  And

24   we set up the analytics, so I could manage each day what was

25   going on in the pipeline to make sure that we met the

Page 24

1   appropriate milestone, and also gauge the types of claims

2   that were being made and the results of those findings.

3   Q    During step two, did you ever have an opportunity to

4   look at loan files yourself?

5   A    I did.  So while I was not in a direct line of

6   reviewing files in step two, I mentioned there were weekly

7   formal calls and other ad hoc items.  So as loans went

8   through the process, we had set up up front kind of how we

9   intended to handle things as they came through.  But

10   obviously, you know, certain things arise, and you can't

11   plan for every situation.

12          So as particular types of loans arose, either as

13   identified by Recovco or RBF, I had plenty of opportunity to

14   dig into the loan files myself and see the types of claims

15   that were being made and the results of the reviews that we

16   were doing.

17   Q    Okay.  Did you communicate with the other side at all

18   during step two with the Trustees?

19   A    Yes.  We had, again, regularly scheduled calls with the

20   Trustees throughout that entire -- and really, they're

21   representatives Duff & Phelps, I should say -- to make sure

22   that we were managing things from an operational

23   perspective.

24   Q    What was your intent with respect to the outcome of the

25   protocol?

1    A    I really had two main goals.  One was to make sure that

2    we had the appropriate team and process in place to manage

3    this.  The Trustees ultimately submitted nearly 200,000

4    individual claims on 90-plus thousand individual loans.

5    From an operational perspective, that was fairly voluminous

6    and large.  And so, I wanted to make sure that we had

7    everything right operationally; but, most importantly, I

8    wanted to make sure that we were assessing claims accurately

9    and fairly and making sure that we were reaching the right

10   outcome for all creditors.  And so, I wanted to make sure

11   that there was precision, and we could keep things

12   consistent, and we were coming to the right answer at the

13   end of the day.

14   Q    What do you mean when you say for all creditors?

15   A    Similarly to what I mentioned earlier in the questions.

16   I wasn't trying to think of or come up with any and all

17   possible defenses to these claims.  We really wanted to

18   assess the claims on their merits relative to the loan files

19   and make fair assessments.

20   Q    I'd like to take a step back for a moment and talk

21   about the proofs of claims that were filed for these -- with

22   respect to these loans.  And if I use the term POCs, will

23   you know what I'm talking about?

24   A    Yes, I will.

25   Q    Okay.  When were the Trustees' POCs filed for the

Page 26

1    claims at issue in this case?

2    A    They were filed on or before the bar date in September

3    of '09.

4    Q    And what did the Trustees claim when they submitted

5    those POCs?

6    A    You know, quite frankly, it's hard to tell what they

7    claimed.  They filed several hundred individual proofs of

8    claims against two different debtors, LBHI and SASCO.  But

9    based upon the information that was contained in their

10   claims, it was really hard to decipher, and they were very

11   inconsistent.

12          And what I mean by that is sometimes they filed a

13   proof of claim for one trust; sometimes they filed a proof

14   of claim for multiple trusts; sometimes they filed a proof

15   of claim for entire shelves of Trustees.  Sometimes they

16   filed a claim essentially as a placeholder claim and just

17   said the claim is for zero dollars; other times, they filed

18   a claim and said the claim amount should be the entire

19   unpaid principal balance of the deal that was outstanding at

20   that time.

21          And they generally mentioned that they were for

22   breaches of representations and warranties; but in the

23   proofs of claims themselves, there was no real understanding

24   of what loans they were claiming breached the

25   representations and warranties.  So based upon the proofs of

Page 27

1    claims themselves, we really had no idea what the issue was.

2    Q    So what did you do in response when those POCs were

3    filed?

4    A    So as I mentioned, my experience at Aurora and

5    everything I had done to date was at the loan level.  We

6    always wanted to see what were the loan-level issues and how

7    did they breach the representations and warranties.  And so

8    in 2010, members of my team reached out to these Trustees

9    and sought additional information with which to assess these

10   claims.  We sent them a spreadsheet, and that spreadsheet

11   had multiple columns just asking for loan-level data.  In

12   2010, hey Trustees, do you know of any breaches of

13   representations and warranties in these deals?  And if so,

14   please let us know so we can assess your claim.

15   Q    Can you describe that spreadsheet just a little bit

16   more?  The spreadsheet that you said you sent to the

17   Trustees.

18   A    Yeah.  So it was a simple Excel spreadsheet with

19   multiple columns seeking loan-specific data.  So the

20   expectation was that the Trustees would tell us, for these

21   specific loans at a loan level: here's the issues with the

22   loans; here's the damage we're seeking; here's the defect

23   that we found; here's the representation and warranty that

24   we breached; here's the debtor that we're asserting the

25   claim against, because keep in mind, they asserted a claim

Page 28

1   against two different debtors.  What was your bases for the

2   claim; what was your factual support for your defect?  So

3   those types of things were what we were seeking in 2010.

4   Q    Did the Trustees that are part of this proceeding ever

5   provide you that information?

6   A    They did not.

7   Q    And approximately when did you say you were sending

8   these spreadsheets over?

9   A    In 2010.

10  Q    At any time before 2014 when the protocol was entered,

11  did the Trustees in this proceeding ever give you enough

12  loan-level information, whether it was in this template or

13  otherwise, for you to evaluate any of their claims?

14  A    We ultimately did not get sufficient information to

15  really assess and weigh their claims.

16  Q    I'd like to talk a little bit about your expectations

17  for the protocol before you went into the protocol.  But

18  first, can we put up an excerpt from the protocol order?

19  PA-74 at Page 10.  Mr. Trumpp, do you see -- this is Page

20  10, Section E3 of the protocol.  Can you read that first

21  sentence?

22  A    All such claims shall be submitted on a rolling basis

23  promptly upon the applicable RFBs Trustees good faith

24  determination that the relevant claim file contains a

25  material breach, as defined in Section 4(c) below.

Page 29

1    Q    What's your understanding of that?

2    A    My understanding is simply that the Trustees needed to

3    make good claims that were valid, well thought out claims.

4    Q    And was that your expectation for the protocol?

5    A    Yes, it was.

6    Q    Was that expectation met?

7    A    No.  And what I mean by that is, I had spent the last

8    several years dealing with loan-level repurchase claims,

9    both in contract administration and especially at my time at

10   loss management.  So I had a pretty good understanding on

11   the loans and these particular securitizations, and I had a

12   really good understanding of what it meant to support and

13   prove claims given the litigation that had gone on.  And so,

14   I had a pretty good understanding of what it took to make a

15   good claim and a claim that stuck.

16        And ultimately, the claims that the Trustees made

17   are not the types of claims that I anticipated seeing.  So,

18   for example, claims on active loans that are still

19   performing 10 years post-securitization are not types of

20   claims that I anticipated seeing.  Claims for missing

21   documentation; those are not the types of claims that we

22   would have historically pursued because we understood that

23   information degrades over time in a servicing file.  And

24   even if it was missing, the vast majority of the documents

25   aren't necessarily documents that would lead to an adverse

Page 30

1    in material effect on the value of the loan.

2              Claims for the types of regulatory issues that we

3    saw are not the types of claims we would have historically

4    pursued, based upon the tolerance levels that they were

5    using.  They were using a $35.00 tolerance level for

6    violations, and we understood the standard to be a $100

7    tolerance.  We also saw where they were making regulatory

8    type claims that were not appropriate given the federal

9    charter of the bank that originated many of the loans.  We

10   also saw claims for misrepresentations of debts, where the

11   additional debt was taken out post-origination of the

12   subject loan.

13             So those are all just some high-level examples of

14   types of types of claims that I did not anticipate seeing in

15   this process given my experience of pursuing those types of

16   claims downstream.

17   Q    Let's talk about what you anticipated.  Do you remember

18   the plan administrator filing a motion to set the reserve

19   back in 2012?

20   A    I do.

21   Q    And do you recall that you filed a declaration in

22   support of that?

23   A    I do.

24   Q    I'd like to show you that declaration.  It's in your

25   binder, TRX-726.

1              THE COURT:  What was the exhibit number again?

2              MS. DOMINGUEZ-BRASWELL:  TRX-726.

3              THE COURT:  I see.  Thank you.

4    Q    Mr. Trumpp, is that the declaration that you filed in

5    support of the plan administrator's motion to set the

6    reserve?

7    A    It is.

8    Q    I'll point you to some specific sections in a minute,

9    but what was the purpose of this declaration?

10   A    So as I mentioned briefly earlier, we received proofs

11   of claims from the Trustees that were all over the board.

12   And if you added up the filed claim amounts for those proofs

13   of claims, it was like $37 billion, and we knew that we

14   couldn't establish a reserve to get the plan confirmed at

15   $37 billion.

16              And so, in light of the fact that we had

17   absolutely no information from the Trustees with respect to

18   their claims and how to value them, I used my experience at

19   that time in 2012 to estimate the range of potential claims

20   that could be in these securitizations.  And so, I leveraged

21   my experience in loss management and reviewing loans in

22   these very same deals to come up with a methodology for

23   estimating the potential range of claims, assuming that at

24   some point in time in the future, the Trustees actually

25   proved the claims at the loan level.

1          So our assumption all along was that the Trustees

2     would eventually have to prove loans at the loan level, so

3     we came up with a range of potential outcomes, listed here

4     as the highest scenario or the lowest scenario, purely for

5     setting a reserve purpose.  And so this document says that

6     we thought the claims should be worth at that point in time

7     somewhere between $1.1 and $2.4 billion, depending upon

8     several variables.  And so, that was what we thought was an

9     appropriate reserve on the high end of 2.4 billion.  And

10    then ultimately, that reserve was set at $5 billion, but the

11    intent was to come up with an estimate of claims for reserve

12    purposes.

13    Q    Okay.  And you said you used a methodology, and I'd

14    like to talk about that methodology.  I think you started at

15    Page 6 of the declaration beginning with step one, and going

16    to Page 8 of the declaration ending with step seven.  Can

17    you describe those steps at a very high level?

18    A    Yeah.  So there's essentially three elements, even

19    though there are seven steps.  And the first five steps are

20    really coming up with a way in 2012 to look at actual losses

21    that had been incurred to date in these particular

22    securitizations and estimating any potential future losses.

23          So our starting point for the first element was,

24    what are the actual and estimated losses in these particular

25    securitizations and for the relevant loans.  Because, again,

Page 33

1    not all loans with losses in these deals were either (a)

2    covered by a representation or warranty made by LBHI, some

3    were the transferor loans; or (b) not all of the loans with

4    losses would ultimately have a breach as asserted by the

5    Trustees or would be valid.

6            So the next two steps, and it's specifically step

7    six in the declaration is, you had to assess what proportion

8    of the actual and estimated losses in these securitizations

9    were the result of a breach as made by the Trustees, and

10   that's one of the key parts here.  So not all losses on

11   loans are the result of a breach of a representation and

12   warranty.

13           And so, we looked at my experience from reviewing

14   loans in these very same securitizations pre-bankruptcy, and

15   we looked at what was that defect rate done by our in-house

16   teams in loss management.  And we said, on the high side

17   that defect rate is approximately 35 percent.  So let's use

18   that as an assumption for how many times would the Trustees

19   allege proofs of -- allege breaches of representations and

20   warranties against the plan administrator.

21           So we came up with the breach rate.  And we said

22   on the low side, it was 38 percent; and on the high side, it

23   was 35 percent.  And that was to represent what loans with

24   losses would be presented to the plan administrator as

25   potential breaches of representations and warranties.

1         The seventh step, or the third real element, is

2    determining what percentage of the claims that the Trustees

3    brought forth, via the percentage of loans with breaches

4    that they would allege, where the plan administrator

5    ultimately agree with.  And based upon our experience in our

6    downstream claims, I knew full well that I wouldn't be

7    pursuing claims downstream where 100 percent of the time, I

8    would find I was right.  It would ultimately be a process

9    and a dialogue between the downstream parties where they

10   would say, hey, you know what, you said X; but really, did

11   you think about Y.  And we'd have to take that into

12   consideration to determine well, is that really a breach of

13   a representation or warranty or not that was valid.

14        And so step seven was coming up with the

15   validation rate to assess what proportion of the claims that

16   the Trustee was ultimately submitting against the estate,

17   would we agree are valid, well proven, substantiated

18   documented claims.  And so, on the low side in step seven,

19   we looked at a 30 percent validation rate; and on the high

20   side, we set it at a 40 percent validation rate.  And,

21   again, the validation rate was essentially an approval rate

22   back in 2012 that we came up with to say, given the lack of

23   information presented by the Trustees, let's rely on my

24   experience and come up with some methodology for estimating

25   what the potential range of claims could be for reserve

1    purposes.

2    Q    Okay.  And I'd like to break that up into two pieces.

3    First, focusing on step six, what you called the defect rate

4    or, as I think as you described it, the percentage of --

5    from the losses, right?  The percentage from the losses that

6    would be alleged as a breach of a representation and

7    warranty, so the allegations made by the Trustees.  You

8    estimated 30 percent in your -- or 35 percent in your

9    declaration on the high end, right?

10   A    That's correct.

11   Q    And how does that compare to the breach rate or the

12   allegations made by the Trustees under the protocol?

13   A    So using their numbers of the loans that they reviewed

14   and ultimately submitted claims on?  They would say the

15   breach rate was 55 percent.  So ultimately, they made more

16   claims on a percentage basis than what I would have

17   anticipated back in 2012.  And that makes sense, given the

18   additional types of claims that I would never have

19   anticipated them making.

20            So, you know, while on the one hand, I am not

21   surprised with the outcome, I'm not surprised by the

22   starting point either.  Because the 55 percent breach rate

23   that they assert is made up of many types of claims that I

24   would have never anticipated ever seeing in the process or

25   what I have ever pursued myself.

Page 36

1   Q    Okay.

2            THE COURT:  Can I ask a clarifying question?  A

3   rate implies a -- there's a numerator and a denominator,

4   right?

5            MR. TRUMPP:  Yes.

6            THE COURT:  Could you explain -- it's unclear to

7   me what the rate; rate of what?

8            MR. TRUMPP:  Yup, okay.  So the 35 percent --

9            THE COURT:  I'm sorry?

10           MR. TRUMPP:  The 35 percent breach rate that I

11  used in step six of my declaration was the -- intended the

12  percentage of loans reviewed that ultimately would be

13  asserted by the Trustees with a breach of a representation

14  or warranty.  And so what I mean by that is, they reviewed

15  many loans in the protocol process that I never saw as a

16  claim.  So we're looking at what proportion of the loans

17  that they reviewed ultimately became a claim and submitted

18  to the estate.

19           THE COURT:  So let's use 33 percent is an easy

20  number because it's a third.

21           MR. TRUMPP:  Yup.  So they would have found 33

22  loans in a population of 100 that they believed had a breach

23  of a representation and warranty; the other 67 would not

24  have.  They would just be loans that has liquidated with a

25  loss for some other reason.

Page 37

```
 1              THE COURT:  So is it one or more breach?

 2              MR. TRUMPP:  Well, so I --

 3              THE COURT:  Because where I'm going with this is

 4      that in this case, there's talk about breach claims and

 5      there's talk about loans.

 6              MR. TRUMPP:  Yes.

 7              THE COURT:  So a loan, hypothetically, can have

 8      more than one breach claim associated with this.

 9              MR. TRUMPP:  Yes.

10              THE COURT:  So when you're talking about a breach

11      rate, you're talking about the percentage of loans as to

12      which there is one or more breach claim asserted.

13              MR. TRUMPP:  Correct.  This analysis is done at

14      the loan level.

15              THE COURT:  Thank you.  Okay.

16      Q    And to make sur we're clear on this.  How does that 35

17      percent that you estimated in your declaration compare to

18      what actually happened in the protocol?

19      A    So based upon the information we'd received from the

20      Trustees on what they reviewed, they had a 55 percent breach

21      rate; meaning 55 out of every 100 loans, they found a

22      breach, according to their definition, and sent it over to

23      us as a claim.

24      Q    Okay.

25      A    And let's just -- let's think about that, right?  On a
```

Page 38

1    percentage basis, they're saying more than one out of every

2    two loans that defaulted and took a loss, or they reviewed,

3    had a breach in it.  Just intuitively, that's pretty high.

4    Q    Let's talk about the step after that, the validation

5    rate is what you called it.  And that's in step seven of

6    your declaration on Paragraph 20.  You estimated

7    approximately 40 percent for the high rate, in terms of the

8    number of alleged breaches that the plan administrator would

9    ultimately approve.  How does that compare to what happened

10   under the protocol?

11   A    So ultimately, our approval rate was much less.  The

12   plan administrator likes to highlight the fact or state that

13   it was --

14   Q    Trustees?

15   A    Sorry.  The Trustees like to highlight the fact that it

16   was a 1 percent approval rate.  But you really have to look

17   at the right denominator and the right numerator to come up

18   with the appropriate math on that.  So the way they do it is

19   they say, I submitted 94,566 loans, and you approved 1,260

20   loans; therefore, it's 1 percent.  But you can't necessarily

21   do that because 30,000 of the 90,000 loans that they

22   submitted, we never even looked at because there wasn't

23   sufficient documentation in the loan file.  So we would

24   argue, you really got to take that out of the denominator.

25            THE COURT:  Hold on one second.  Is something

Page 39

1    happening over there?  Did you lose your copy?

2            MR. SHUSTER:  No, I'm having a real-time issue.

3    It's nothing.  We have multiple screens, we're good.

4            THE COURT:  You sure, because we can --

5            MR. SHUSTER:  Yes, but thank you.  Thank you.

6            THE COURT:  Okay.

7            MR. SHUSTER:  Sorry to interrupt.

8            MS. DOMINGUEZ-BRASWELL:  I'm okay pausing if you

9    need to.

10           MR. SHUSTER:  No, we're good.  Thank you.

11           THE COURT:  Thank you, Mr. Shuster.  Okay, go

12   ahead.

13   A    So we think you should be able to do some adjustments

14   to the denominator to take into account the loans that

15   weren't reviewed; the loans that were ultimately withdrawn

16   by the Trustees; the loans that are no longer a part of this

17   case because the loans either opted out via the trust, that

18   opted out or the trust terminated and collapsed.  So when

19   you take all of that into account, the denominator changes

20   from 94,000 loans to 47,000 loans, so you got to make sure

21   you have the right denominator.

22   Q    I'd like to show you --

23           THE COURT:  Can I -- I want to drill down on this

24   because I really want to understand this.  Are -- you

25   mentioned a number of minutes ago loans in which there were

Page 40

1    no payment defaults and loans -- impliedly -- loans in which

2    there were.  In this defect rate, where does that come in?

3            MR. TRUMPP:  So the breach rate or defect rate in

4    this analysis was intended to represent the amount of claims

5    that Trustees would find and make against the plan

6    administrator.  And so, the defect rate is essentially in

7    that breach rate, that 35 percent.  It's, again, how many

8    loans would they review and decide were sufficient to make a

9    claim against the estate.  And so, I thought at the time, it

10   would be 35 percent on the high side.  Based upon the

11   results of their review, they made the determination that

12   really it should be much higher at a rate of 55 percent.  So

13   more than one out of every two loans that they reviewed they

14   said had a breach on it.

15           THE COURT:  So this is not -- this is just

16   ballpark estimates.  This is not reality based.

17           MR. TRUMPP:  Correct.  This was in 2012 --

18           THE COURT:  Okay.

19           MR. TRUMPP:  -- purely for estimation purposes in

20   setting the reserve.  So this is just an opportunity for us

21   to walk through what I anticipated occurring versus what

22   actually occurred.

23           THE COURT:  But did your estimate at that point

24   take into account any determination or review of the

25   percentage of the loans that were in the denominator as to

1   whether or not they were what I would call performing loans

2   or not?

3           MR. TRUMPP:  So in my analysis --

4           THE COURT:  In other words, loans in which there

5   were no extant payment defaults.

6           MR. TRUMPP:  So when I mentioned three elements,

7   the first element of this analysis was starting with actual

8   and estimated future losses.  So by definition, a loan

9   that's performing and a loan that's not anticipated ever

10  incurring a loss would be excluded from that analysis.

11          THE COURT:  Okay, go ahead.

12          MS. DOMINGUEZ-BRASWELL:  And, Your Honor, I just

13  want to make sure that Mr. Trumpp's point around -- because

14  you asked whether this was what happened before or what

15  happened now.  And one of the things that Mr. Trumpp

16  testified to was what happened now, and I want to make sure

17  we don't lose that piece.

18          THE COURT:  Okay.  You need to do whatever you

19  need to do through testimony.

20          MS. DOMINGUEZ-BRASWELL:  Okay, okay.

21          THE COURT:  Okay?

22          MS. DOMINGUEZ-BRASWELL:  Thank you.

23  Q    So, Mr. Trumpp, the 35 percent in terms of what you

24  thought the Trustees would actually submit to the plan

25  administrator, how does that compare to what happened under

Page 42

1   the protocol?

2   A   So under the protocol, they ultimately made claims at a

3   much higher rate than I anticipated, and that is evidenced

4   by the types of claims that they made.  Because they made

5   types of claims I would have never anticipated, the ultimate

6   breach rate, as asserted by the Trustees in the protocol,

7   was much higher than what I would have assumed back in 2012.

8   Q   Okay.  And, Mr. Trumpp, you testified to the 1 percent

9   calculation and then described how you would do that

10  calculation differently.  And I'm going to show you a screen

11  with some numbers on it, and I'd like you to explain that to

12  the Court.

13  A   So I mentioned you really need to adjust the

14  denominator to make sure that you're doing the math

15  appropriately.  So if you start with the entire population

16  of loans submitted in the protocol -- and, again, this is

17  loans, not claims -- of 94,566 loans, and you back out the

18  loans that were placed on hold for missing critical

19  documents and you back out the loans from withdrawn trusts

20  or the loans in the opt-out trust or the loans where the

21  Trustees ultimately withdrew their own claims, it's 47,775

22  loans for an adjusted denominator.  And similarly, you also

23  would need to adjust the numerator.

24  Q   Okay.  Can we see the next part of this equation; can

25  you explain that?

Page 43

1    A    And what I mean by that is, based upon the protocol

2    results for the remaining loans, the plan administrator

3    passed 1,260 loans.  But there were 3,079 additional loans

4    where the loan passed at the breach level, but ultimately

5    failed at the AMA level.  So if you really want to look at

6    how many loans at the end of the day did the trust -- excuse

7    me -- did the plan administrator pass at the breach level,

8    it's really 4,339 loans.  And so, if you look at that new

9    numerator over the new denominator, it's not 1 percent --

10   the headline number that the Trustees like to hold out; but,

11   really, it's 9 percent.

12   Q    Okay.  Let's talk about the protocol process, starting

13   with step zero.  What did step zero entail?

14   A    So, again, step zero was primarily the aggregation of

15   the information used in the loan files for the reviews by

16   the Trustees.  And so, from the plan administrator's

17   perspective, we reach out to Aurora Loan Services, who was a

18   primary servicer for many of the loans at issue, and worked

19   with them to aggregate the loan files that they had in their

20   possession, used their electronic documentation and/or got

21   additional documents scanned, and sent them to the Trustees.

22   Q    And what was the plan administrator's role in step

23   zero?

24   A    Again, the plan administrator's role was really just

25   gathering the documentation from Aurora and sending it on.

Page 44

1   Q    And the documentation from Aurora, what does that mean;

2   what are you referring to?

3   A    The loan file made up of the types of documents that

4   are listed in Exhibit B to the protocol.  But that's

5   origination documents and servicing documents, not just --

6   so it wasn't just the original loan file; it also included

7   all the secondary servicing information that occurred post-

8   origination of the loan.

9   Q    And approximately how many Aurora loans were collected?

10  A    About 51,000.

11  Q    And were you involved in that process?

12  A    I was.

13  Q    And are you generally familiar with the state of those

14  50,000 files?

15  A    I am.  So I mentioned earlier in my work history, I had

16  for a period of time oversight in the loan administration

17  functions at Aurora, which included both their primary

18  servicing and their master servicing operations.  And so, I

19  had reason to understand and know from an Aurora perspective

20  what they had in their loan files and kind of how that

21  worked, but I also had an understanding about how that

22  worked from my loss management days.

23          So I mentioned the work that I did in loss

24  management on behalf of the master servicer.  So the way

25  Lehman's deals are structured and the reason they have a

Page 45

1    master servicer, since there are typically more than one

2    primary servicer underneath each securitization.  And so, if

3    I was reviewing loans on behalf of the entire

4    securitization, I had to reach out to those other services.

5    So I had experience reaching out to other servicers and

6    obtaining loan files and putting them through reviews,

7    either with my in-house team or with the three parties that

8    I talked about earlier from an outside perspective.

9            And so, gathering loan files was something I had

10   quite a bit of experience with, and it does not surprise me

11   at all that documentation in the loan files may not

12   necessarily or always be there.  Over the course of time,

13   servicers were either reliant on what the originators gave

14   them, or they had varying scanning policies.  Because keep

15   in mind, we're talking about 2002 to 2008 for the relevant

16   period; different servicers had different scanning policies

17   on what they would scan in the loan file.

18           From a servicing perspective, you don't

19   necessarily need to have all of the original documents

20   scanned.  From a servicing perspective, they don't

21   necessarily need the origination appraisal; that wasn't

22   something that they needed to scan.  So scanning policies,

23   especially at Aurora, evolved over the course of time.

24   Eventually, later on -- 2007-2008 -- it got to where they

25   would scan the majority of the loan file, but that didn't

1    necessarily happen.

2            And so, again, whether it was Aurora or me dealing

3    with other services, when we got loan files, we knew you

4    wouldn't always get everything that you needed from an

5    origination perspective.  But we did typically expect, and

6    we understood that you should be able to get all of the

7    servicing documents.  They're servicing the loan; you should

8    be able to get that information.  So I had quite a bit of

9    experience gathering documents, and I relied on that

10   experience when I gathered the Aurora documents.

11   Q    And let's see what the protocol order says about the

12   Aurora files.  Can we look at Page 7 of the protocol,

13   section 2A?  Mr. Trumpp, do you see the beginning of that

14   section?  It references the 51,109 Aurora files, and it

15   calls them substantially complete origination files.  What

16   does substantially complete mean?

17   A    Yeah, so this is taken from a section of the protocol

18   where we're talking about the assumptions regarding the loan

19   file reviews that were to take place in step one and step

20   two.  And Aurora provided over 51,000 substantially complete

21   loan files, but it's substantially complete for purposes of

22   loan reviews.  It wasn't intended to be an assertion that

23   100 percent of the documents at origination were in these

24   loan files.

25   Q    Let's move on to step one of the protocol, which you

Page 47

1    testified earlier was the submissions phase.  How were the

2    claims submitted to the plan administrator?

3    A    So the Trustees had certain requirements on how many

4    loans they had to review in any given month.  And as those

5    reviews were completed, on a rolling basis, they were

6    submitted to the plan administrator.  So starting in March

7    of 2015 on a twice-a-month basis, typically the 1st and the

8    15th of every month, they would submit to us their claims,

9    and we would begin our document inventory process and,

10   ultimately, our loan review process.

11   Q    And who typically submitted these claims to the plan

12   administrator?

13   A    Duff & Phelps did.

14   Q    Who on behalf of Duff & Phelps?

15   A    It varied over the course of time.  Primarily, it was

16   Edmond Esses.

17   Q    Okay.  And who at the plan administrator received them?

18   A    So I received them, other members of my team received

19   them, and our counsel.

20   Q    Okay.  Mr. Trumpp, I'd like to show you an exhibit

21   marked Plan Administrator's (indiscernible) 9.  And can we

22   start with the -- I think it's the eighth page in this

23   document or maybe it's the -- there we go.  Mr. Trumpp, can

24   you tell the Court what this is?

25   A    This is an example of an excerpt from what's called the

1    claims tracking spreadsheet.  So when the Trustees submitted

2    their claims to us, we essentially got three things.  We got

3    one, the claims tracking spreadsheet, which is an Excel

4    spreadsheet with a list of all of the loans and claims that

5    the Trustees were making.  And that claims tracking

6    spreadsheet came in two different formats.  One was like you

7    see here, columns, and then rows were each individual claim

8    as asserted by the Trustees, so these could be multiple

9    claims per loan.  And there were numerous columns, not just

10   these four here, but other columns of data that they

11   submitted to us.

12   Q    And, Mr. Trumpp, if you scroll or flip through in your

13   binder the next few pages, are those the columns you're

14   referring to?

15   A    Yes, all the key data points for each individual loan

16   and claim.

17   Q    And you said you received this in what format?

18   A    In an Excel format.

19   Q    Let's go to the beginning of this document, Page 1.

20   What is this portion of the document?

21   A    So this is essentially the same data in the claims

22   tracking spreadsheet, but in the other format they gave it

23   in.  So there was one, there was a giant table of all the

24   loans and claims.  And this is where they gave us a

25   different layout and tab of information per loan.  So all of

Page 49

1   this information here vertically in these columns is for one

2   loan.

3   Q    And just to orient the Court a little bit, can you

4   describe some of the key pieces of information in this

5   claims tracking spreadsheet for each claim?

6   A    Yeah.  So starting at the top, you know, they would

7   identify for us the specific proof of claim number that they

8   were asserting this loan matched up against.  They would

9   tell us who the claimant was, which trust it was in, who the

10  debtor was.  This is where they would assert whether it was

11  an LBHI claim or a SASCO claim.  They would tell us what our

12  loan number was, what that particular servicer's loan number

13  was, who the servicer was, when the loan was acquired -- the

14  purchase date, whether it was a first lien or a second lien,

15  the status of the loan.

16          So, for example, this one here they say is non-

17  liquidated.  That's a term that I would use to equal an

18  active loan.  So it just means it hasn't liquidated with a

19  loss.  It's performing today, it very well could be current.

20  Who the borrower's name is, the city/state/zip, the purchase

21  price, so what are they claiming from a damage perspective.

22  Q    And before we go the next page, can you -- what other

23  default statuses are there besides non-liquidated?

24          THE COURT:  Can I ask a follow-up question?  So

25  non-liquidated means it's still an active loan.

1          MR. TRUMPP:  Correct.

2          THE COURT:  Okay.  But can you tell from that verb

3    whether or not the borrower is in default, in payment

4    default, as of --

5          MR. TRUMPP:  You cannot.  They could be in

6    foreclosure and the loan hasn't liquidated yet.  It could

7    be--

8          THE COURT:  So it could be anywhere between

9    current --

10         MR. TRUMPP:  Correct.

11         THE COURT:  -- and in foreclosure.

12         MR. TRUMPP:  Yes.

13         THE COURT:  Thank you.

14   A    And so these -- the default status was one of two

15   options; either the loan was liquidated, or it was non-

16   liquidated.  And so, if you want to dig further to determine

17   where on the spectrum the non-liquidated loan is, we'd have

18   to do that separately, and we often did.

19   Q    Okay.  Let's go to the next page, and keep walking

20   through these data points.

21   A    So the breakout of the purchase price is at the top of

22   the page.  The next, due date on the loan.  But this is

23   fixed as of the time of this, so you didn't always

24   necessarily know because the loans due date potentially

25   change every month.  Which particular agreement it is that

Page 51

1    they're asserting was breached, and so this typically would

2    say the mortgage loan sale and assignment agreement.  The

3    date of that particular agreement.  The date of the

4    discovery of that particular defect.  So keep in mind, you

5    know, many of these loans were originated in the relevant

6    period of 2002 to 2008; and here, we're talking about dates

7    of discovery in 2015 and beyond.

8              And this is where -- the next is where they would

9    talk about their alleged defects per loan, right.  So in

10   this particular claims tracking spreadsheet, they were

11   asserting that the final HUD-1 was not a part of the

12   documentation available for review.  They were citing the

13   particular contractual provision necessary for that breach,

14   and the materiality basis.  This was essentially their AMA

15   statements for each loan.

16             And then if there were multiple claims per loan,

17   they would have an alleged defect #1, alleged defect #2;

18   and, ultimately, you know, that could be up to five or six

19   different alleged defects on any given loan.

20   Q    Okay.  And can we keep scrolling through to the next

21   page?  And one more just so we see the end of it.  How many

22   total claims on this particular loan are there, Mr. Trumpp?

23   A    So this particular loan in this particular claims

24   tracking spreadsheet cites three different alleged defects

25   or three claims.

Page 52

1    Q    And how do you know that?

2    A    Based on the number one alleged defect, number two, and

3    the number three.

4    Q    Okay.  And going to the materiality basis for defect,

5    you said that was essentially their AMA statement.  What do

6    you mean by that?

7    A    So one of the requirements on the protocol -- under the

8    protocol, excuse me -- was for them to state why they

9    believed that particular breach of a representation and

10   warranty in that defect had a material and adverse effect on

11   the value of the loan.  And so this was their opportunity to

12   do that.

13   Q    I'd like to show you a slide from the plan

14   administrator's opening.  Can we go to Slide 11?  Do you

15   remember this slide?

16   A    I do.

17   Q    What are the statements that you see here?

18   A    So, these are essentially the boilerplate AMA

19   assertions that the Trustees made, and this is, you know,

20   essentially the examples that they put into that cell of the

21   claims tracking spreadsheet every time.

22   Q    Can we go back to the claims tracking spreadsheet,

23   please?  When you say "that cell", are you referring to the

24   materiality basis cell?

25   A    I am.

Page 53

1          MS. DOMINGUEZ-BRASWELL:  Your Honor, I'd like to

2     move this document into evidence but I don't know what your

3     preference is.  Whether you want us to do it...

4          THE COURT:  Well, the way that I think we're going

5     to do this so that we don't interrupt the flow is that --

6     and I thought I had communicated this before but if I

7     didn't, I apologize.  Each of you -- all sides should keep

8     track of all the documents and then at the end you'll just -

9     - we'll put them all in.  And that way we don't have any

10    interruptions.  All right?

11          MS. DOMINGUEZ-BRASWELL:  Okay, thank you.

12          THE COURT:  We've been at it for about an hour and

13    15 minutes, so any time you're at a stopping point I think

14    would be good to give Mr. Trumpp a break.

15          MS. DOMINGUEZ-BRASWELL:  I can take a break now.

16          THE COURT:  Okay, why don't we do that?

17          MR. COSENZA:  Can I raise one administerial issue?

18          THE COURT:  Yes.

19          MR. COSENZA:  I should've raised this earlier.

20    But just in terms of keeping time.

21          THE COURT:  Yes.

22          MR. COSENZA:  I think Ms. Braswell and Mr. Trumpp

23    have been going since 10:10, and I thought just going

24    forward -- because of the nature of these proceedings with

25    the time limits, we can just put on the record when we start

Page 54

1    and when we stop so we can keep track of all that.

2              THE COURT:  That's fine with me.

3              MR. COSENZA:  Oh, good.  Okay.

4              THE COURT:  All right, so it's 11:17.  We're going

5    to take a break.  Mr. Trumpp, the rules are that during the

6    breaks and until your testimony is complete, you're not to

7    discuss the case or your testimony with anyone or be in

8    anyone's presence while they're doing either of those

9    things.

10             MR. TRUMPP:  Okay.

11             THE COURT:  All right?  We'll come back in -- why

12   don't we come back at 11:30 on the dot, all right?  Thank

13   you.

14             MR. COSENZA:  Thank you, Your Honor.

15        (Recess)

16             THE COURT:  All right, it's 11:34.  Go ahead.

17             MS. DOMINGUEZ-BRASWELL:  Thank you.

18        CONTINUED DIRECT EXAMINATION OF ZACHARY D. TRUMPP

19   BY MS. DOMINGUEZ-BRASWELL:

20   Q    Mr. Trumpp, right before the break we were talking

21   about the materiality basis statement.  Do you see that on

22   the screen in front of you?

23   A    I do.

24   Q    And before the break you said these were boilerplate.

25   What do you mean by that?

Page 55

1    A    I mean they're very consistent.  We saw them over and

2    over again with all of the claims, with just very subtle

3    changes.

4    Q    And were these statements during the protocol, from the

5    plan administrator's perspective, sufficient to satisfy the

6    AMA requirement?

7    A    No, because there was nothing individual about them.

8    And what I mean by that is there was no way for us to take

9    what they said on the materiality basis for any particular

10   defect and apply it to the loan in question.  So, there

11   wasn't anything specific to the loan and the history on that

12   loan, the borrower on that loan -- there wasn't anything

13   specific in those materiality statements that we could use

14   to really assess the facts and circumstances associated with

15   their basis for saying that that particular breach adversely

16   and materially affected the value of the loan.

17   Q    Did the Trustees point to any evidence in the file

18   related to the AMA issue?

19   A    No, they did not.

20   Q    And was that relevant to the plan administrator's

21   analysis one way or the other?

22   A    Absolutely.  We were always looking for the evidence in

23   the loan file and additional third party sources to assess

24   all aspects of the claim, which included the AMA

25   determination.

Page 56

1    Q    And what was the plan administrator's approach to the

2    AMA issue under the protocol?

3    A    So our approach was to weigh the evidence that was

4    available in the file or through third party sources to

5    assess and make determinations on whether that particular

6    loan and that particular breach in question adversely and

7    materially affected the value.  We didn't make the

8    assumption that if there was a breach, it automatically made

9    an adverse and material effect on the value of the loans.

10   We were also looking for evidence in the loan file that

11   would point back to was there a relationship between the

12   breach and an adverse effect on the value of the loan?

13   Q    Was the AMA analysis separate from the breach analysis?

14   A    Yes, absolutely.

15   Q    In what way?

16   A    Meaning, it was a separate and distinct analysis.

17   First, we would look at the breach and the various

18   components of the breach and assess whether there was one or

19   not.  But then once that was determined, then we would turn

20   our attention and look -- did that breach, assuming there

21   was one, have an adverse and material effect on the value of

22   the loan?  Because it's entirely possible to have an adverse

23   -- or, excuse me, a breach that doesn't have an adverse and

24   material effect on the loan.  And so it was our position

25   that in order to be a valid and approved pass under the

Page 57

```
 1    protocol it needed to have both.

 2    Q    And when the plan administrator was performing this

 3    analysis, was it looking to prove AMA on every loan?

 4    A    It was looking for a sufficient basis from the evidence

 5    in the loan file or potentially third party sources to

 6    assess whether there was or not.  We weren't necessarily

 7    looking for proof but we were looking for an inference.

 8    Q    If a particular loan did have a valid breach claim, if

 9    the plan administrator determined that in fact there was a

10    breach of a representation warranty, and the plan

11    administrator determined that there was AMA on that

12    particular loan, what was that called?

13    A    We refer to it as a pass.

14    Q    And if one of those components was missing, what was

15    that called?

16    A    We refer to it as a fail.

17    Q    Okay.

18         MS. DOMINGUEZ-BRASWELL:  I'm going to put up a

19    board and, Your Honor, I would use a regular whiteboard just

20    as a placeholder but my handwriting's bad so I thought I'd

21    use a fancier version of that.

22    Q    And I'm going to put up the two components that you

23    just described, Mr. Trumpp.  The breach...

24         THE COURT:  This is very exciting.

25    Q    ...and the AMA component.  Is that an accurate
```

1    depiction of the two components you just described?

2    A    It is.

3    Q    And you said that was a...?

4    A    Pass.

5            THE COURT:  Not to steal your demonstrative

6    thunder, but another option that you have is the Elmo, where

7    you can put things up on the Elmo and have it project up on

8    the screen.  But this is lovely.

9            MS. DOMINGUEZ-BRASWELL:  If this falls apart I'll

10   go with the Elmo.  And I'm hoping it doesn't.  It's a little

11   unstable.  Thank you.

12   Q    Now, besides these two elements -- so we just talked

13   about the breach element and the AMA element.  Are there

14   other elements to the assessment of a claim?

15   A    Yes.  There's an assessment of the damages.

16   Q    Okay.

17   A    And notice.

18   Q    And what do you mean by notice?

19   A    Well, under the agreements, it was required that there

20   was prompt notice given.  And I'll defer to counsel and the

21   attorneys on how best to interpret that but, again, we're

22   talking about loans that were originated in the 2002-2008

23   timeframe, and we're talking about breaches that occurred by

24   definition at origination or at securitization.  And so

25   these particular breaches, as alleged, were discovered and

Page 59

1   noticed not until 2015 or 2016.

2   Q    And when you were pursuing claims downstream, were you

3   held to that standard?

4   A    So, yes.  We had to give prompt notice, and that's

5   really one of the things that goes into being able to find

6   sufficient evidence or proof, or documentation to support

7   your claim.  It's much more difficult to assess the merits

8   of a claim for what a borrower may or may not have done or

9   said ten years after the fact versus upfront.  Similarly, it

10  also gives the other side a better opportunity under the

11  contract to cure the defect, if possible, replace the loan

12  in the securitization if that's still available under the

13  securitization agreements; or if they were to repurchase the

14  loan, allow them to mitigate their damages as they see fit.

15  Q    And did the Trustees give prompt notice here?

16  A    Again, I'll defer to counsel on the definition of

17  prompt notice in the agreement, but in my opinion, no.

18  Q    Now, other than this claims tracking spreadsheet that

19  we've been discussing, did the Trustees provide anything

20  else to the plan administrator when submitting their claims?

21  A    Yeah, so there were essentially three things that they

22  provided us on a rolling basis:  One was the claims tracking

23  spreadsheet, like we've been discussing.  They submitted to

24  us what was referred to as the claim package, which was a

25  collection of documents either from the loan file itself or

Page 60

1    third party documentation and the evidence potentially that

2    the Trustees were relying on to support their claims. So we

3    call that the claims package. And then the third component

4    was the loan file itself. And, again, that was outlined

5    from a documents perspective in Exhibit B to the protocol,

6    but it was all of the origination and servicing information

7    available from the servicers for that particular loan.

8    Q    Did the claim package that the Trustees provided match

9    the claims statement as we saw it here?

10   A    Sometimes it did, sometimes it didn't. Sometimes they

11   would refer to documents in the claims statements on the

12   claims tracking spreadsheet that weren't necessarily in the

13   claim package or the loan file.

14   Q    Okay. And you just mentioned the loan file. That's

15   also something the Trustees provided?

16   A    Yes.

17   Q    And is the loan file separate from the claim package?

18   A    It was.

19   Q    And what was the plan administrator's practice during

20   the protocol as it concerns the loan file?

21   A    So, from our perspective, the loan file was essential

22   to our review, and it was a key component of all aspects of

23   the review. We were always looking for the information in

24   the Trustees' claim package, and we were always looking to

25   assess what they were saying in relation to all of the facts

Page 61

1    and circumstances for each particular borrower and loan.

2    And so we had to look at the entire loan file and all of the

3    documentation in the loan file.  We couldn't just look at

4    the claim package as asserted by the Trustees.  And so we

5    were always looking back, spending time in the loan file to

6    try and get a holistic view of that particular loan and

7    borrower.

8    Q    Mr. Trumpp, I'm going to hand you a copy of one of the

9    loan files that we're going to be discussing today.  You

10   don't have to look at it right now.  Just take a minute, put

11   it next to you.  And then I'm also going to hand you a copy

12   of the claim package.  Oh, you've got it in your binder.

13   A    It's in the box.

14   Q    Oh, it's in the box.  Great.  A copy of the claim

15   package for this particular loan.

16          THE COURT:  Does that correspond to something in

17   the book?

18          MS. DOMINGUEZ-BRASWELL:  Yes.  The claim package

19   is Plan Administrator 689.  And, Your Honor, we don't have

20   that entire loan file.  It's almost 3,000 pages so we don't

21   have that in your binder; we just have select documents from

22   there.

23   Q    But, Mr. Trumpp, that loan file that I just handed you,

24   as compared to that claim package, is that typical in terms

25   of the volume difference between the claim package and the

Page 62

1    loan file?

2    A    It is.  So, the claim packages varied in size but they

3    were generally 50 pages or less.  And the loan files

4    themselves were -- they started in several hundred pages,

5    three, four, 500 pages upwards to four or 5,000 pages.  And

6    the loan in question that we'll be talking about later today

7    is 2,900 pages of documents in the loan file itself.  So

8    we're talking about an immense volume of documents when

9    we're talking about 94,000 loans.

10   Q    And do you remember in a deposition Mr. Shuster asked

11   you to focus on a fraction of the evidence in the response

12   to a claim?  Do you think it's appropriate to focus on just

13   a fraction of it?

14            MR. SHUSTER:  Objection to form.

15            THE COURT:  You can answer the question.  Go

16   ahead.

17   Q    Yeah.  And as we'll demonstrate, that whole loan file

18   itself was essential to our review.  We wanted to take a

19   holistic assessment of all facts, and circumstances, and

20   evidence available.

21            MS. DOMINGUEZ-BRASWELL:  And, Your Honor, I think

22   I might've told you 689, and it's actually 663.  I apologize

23   for that.

24            THE COURT:  Okay.

25            MS. DOMINGUEZ-BRASWELL:  The claim package is

Page 63

1    PA663.

2    Q    Mr. Trumpp, when the plan administrator was performing

3    its analysis, did it ever find anything in the loan file

4    that was relevant to its analysis but that was not included

5    in the claim package?

6    A    Yeah.  So, again, the intent behind the claim package

7    was the Trustees' bases and their assertion of the evidence

8    necessary to establish a claim and a breach.  We obviously

9    took a look at the whole file, and it was not uncommon to

10   find information in the loan file which contradicted the

11   information in the claim package.  And, hence, why the

12   ultimate part of our review was weighing available

13   information in evidence to make a valid assessment.

14   Q    Now, Mr. Trumpp, you didn't personally conduct every

15   single loan file review in this case?

16   A    No, I did not.

17   Q    So, how do you know that?  How do you know that there

18   were times where there was contrary information in the loan

19   file?

20   A    So, I mentioned earlier there was constant dialogue and

21   communication between both Recovco and RBF and the plan

22   administrator.  And that dialogue was ongoing throughout the

23   entire process.  And I had constant feedback from the

24   parties involved telling me what they're seeing and what's

25   going on.  I had continual reporting and analytics that I

Page 64

1    was looking at to manage the process.  And they gave me

2    constant updates and communications on what they were

3    finding and what they were seeing.  Also, coupled with the

4    fact that from time to time, I cracked open loan files and

5    looked at the results of the reviews.

6    Q    Okay.  Let's keep going through the process that the

7    plan administrator engaged in during the protocol.  After

8    the plan administrator received the claims tracking

9    spreadsheet, the claim package, and the loan file, what did

10   it do with that information?

11   A    So, the first step inceptu for us was assessing the

12   completeness of the loan file.  In what I refer to as the

13   document inventory process we literally took each one of

14   those loan files and put them through a document scanner and

15   a manual process to identify each and every document

16   associated with every loan and recorded.  And the reason for

17   that is we wanted to make sure we understood what was in the

18   loan files, and we also wanted to understand what wasn't in

19   the loan files.

20          And we ultimately came to the conclusion that

21   there were four key documents in the servicing portion of

22   the loan file that we felt were critical to our review.  And

23   those four key documents -- if any one of those were

24   missing, we put the loan on hold and reported back to the

25   Trustees and said, "Hey, we can't do our review yet because

Page 65

1    it would be incomplete to do a review now.  So, please go

2    get us this additional document.  It's at the servicer.  We

3    know they should have it.  So, please go get it.  And then

4    once you get that information for us, we'll take the loan

5    off hold and do the review."

6    Q    And approximately how many loans did you put on hold

7    during the protocol?

8    A    Approximately, 30,000 of the 94,000 loans that were

9    submitted in the protocol were put on hold for missing one

10   of those four key documents.

11   Q    And what are those four key documents?

12   A    So, those key documents are the servicing notes, the

13   payment histories on the loans, the loss certifications, and

14   the corporate expense logs.

15   Q    And if you look in your binder, that's going to be Plan

16   Administrator Exhibit 659 for the servicing notes, Plan

17   Administrator 660, Plan Administrator 661 -- I'm sorry, 660

18   for the payment history, 661 for the loss certifications,

19   and 662 for the expense logs.  Are those exhibits that I

20   just referenced examples of the documents you just

21   described?

22   A    Yes, they are.

23   Q    Now, let's take each in turn.  What do you mean when

24   you say servicing notes?  What is a servicing note document?

25   A    A servicing note is a history and a record of what the

Page 66

1    servicer did on any one particular loan.  And it records the

2    actions that they may or may not have done on the loan, but

3    it also records communications with the borrowers.

4             And so one of the things that servicers often did

5    when they were seeking collection from borrowers and talking

6    to the borrowers themselves was -- they would seek what's

7    the reason for default on the loan?  And that was something

8    that the servicers recorded, and that was something that I

9    wanted us to focus on and see, you know, what was the

10   borrower telling us?  Why did they default on the loan?

11   That is something that I felt would be critical in our

12   review in assessing AMA on the loan, but also you have to

13   look at information in the servicing notes for assessing

14   breach.

15            For example, the borrower could tell the servicer

16   "You know, I just can't find a renter for that property, so

17   that's why I can't make my payment because I can't find a

18   renter." Well, if that was told at origination that that was

19   an owner-occupied property and there's evidence of breach in

20   the servicing notes, that's something that we would want to

21   look at.  So we felt servicing notes were critical to our

22   review from both a breach and AMA perspective.  And, again,

23   this is something that was routinely kept by the servicer in

24   their records.

25            THE COURT:  So, hypothetically, if there's a

Page 67

1    borrower who is not in default, there would be no servicer

2    notes?

3             MR. TRUMPP:  No, not necessarily.  The servicer

4    notes go on regardless of the status of the loan, and it

5    just shows their actions.  So, when they may have sent out a

6    letter, when they may have sent out a billing statement, any

7    type of campaign that the servicer may have done -- it's a

8    record and a history of what the servicer did on the loan.

9             THE COURT:  Thank you.

10   Q    And, Mr. Trumpp, what is your understanding as it

11   concerns servicing notes in whether or not they're required

12   under the protocol?

13   A    So, those are one of the key documents listed on

14   Exhibit B.

15   Q    What's Exhibit B?

16   A    Sorry.  Exhibit B is an exhibit to the protocol that

17   lists the potential documents in the mortgage loans file and

18   states what was required.

19   Q    And how many documents are listed on Exhibit B?

20   A    There's 41 different documents associated with the

21   mortgage file.

22   Q    Did the plan administrator require that the Trustees

23   provide those 41 documents?

24   A    Absolutely not.  So, as I mentioned earlier, it was our

25   understanding and expectation that there wouldn't always be

Page 68

1   all of the documents associated with the file.  So, while

2   there may be particular documents that should've been or

3   could've been in the loan file that weren't there, we didn't

4   always place the loan on hold for that.  We did, however,

5   place the loan on hold for missing any one of these four key

6   documents that any prudent servicer would have in their

7   systems or available.

8   Q    Let's talk about payment history.  Can you describe for

9   the Court what payment history documents are?

10  A    Yeah, so the payment history is really an accounting

11  that tells us when the borrowers make their payments, both

12  from a date and time perspective but also from how those

13  payments were allocated.  Whether the servicer accrued any

14  late fees on a particular loan, whether the servicer had any

15  additional expenses or things charged to the loan.  So it

16  was really a history of the borrower's payments.

17  Q    Okay.

18  A    And this was used, from our perspective, to assess AMA,

19  right?  We wanted to know did the loan go into distress

20  early on, which could be indicative of a breach, or did the

21  loan perform for years?

22  Q    Okay.  And what is your understanding as it concerns

23  payment history and whether those are required under the

24  protocol?

25  A    Those also are required under the protocol.  They're

Page 69

```
 1    also listed in Exhibit B.

 2    Q    And was the plan administrator strict in its

 3    requirement on payment history, or was it willing to accept

 4    other forms of the same information?

 5    A    So, one of the things that we were able to

 6    collaboratively achieve with the Trustees was from time to

 7    time they were able to come up with other formats of

 8    information from other sources in lieu of the four key

 9    documents.

10         So, for example, there was a third party vendor by

11    the name of Black Box that was able to provide payment

12    history or payment stream data for many of the loans in

13    these securitizations, and we worked collaboratively with

14    Duff & Phelps to use that information in lieu of the

15    specific payment histories for these loans.  But it gave us

16    the same general information that was included in the

17    payment history, so that was sufficient for us.  So, we

18    worked collaboratively for other potential ways to solve the

19    problem.

20    Q    When you say that was sufficient for you, what do you

21    mean by that?

22    A    Meaning, so in certain instances they didn't

23    necessarily give us a payment history per loan that looked

24    like this but they gave us a giant table of information from

25    this third party vendor that satisfied the requirements in
```

Page 70

 1    my mind of providing those payment histories.

 2    Q    And when you say "satisfied the requirements" does that

 3    mean you took the loan off hold and then reviewed it/

 4    A    If that was the only thing missing and that was what

 5    was provided, yes, we took the loan off hold and would

 6    review it.

 7    Q    Okay.  Let's talk about the loss certifications.  Can

 8    you explain what a Loss Certification Form is?

 9    A    So, a Loss Certification Form is something, again,

10    that's fairly common in the industry, something that

11    servicers maintain.  It's a document that just walks through

12    the math of the loan losses.  And what I mean by that is, it

13    starts with the unpaid principal balance at the time of the

14    liquidation, it calculates how much accrued interest there

15    was on the loan, it has deductions for the various expenses

16    associated with the default process for the loan, and at the

17    end of the day it gets down to the math that says here's the

18    final loss amount on any given loans.  And it was important

19    for us to see that accounting to understand how you would

20    get from an unpaid balance of X to a loss amount of Z and

21    understand from an audit perspective all the various

22    components to make sure that the loss amount that the

23    Trustees were claiming was accurate.

24    Q    Did you strictly require that information in this form?

25    A    Again, no, we didn't require it specifically in this

Page 71

```
 1    form.  We wanted the elements and the information contained

 2    in it but it didn't have to look like this.  So, for

 3    example, we put some of these loans on hold and we worked

 4    collaboratively with Duff & Phelps, who also then worked

 5    with the master servicer Nationstar at the time to provide

 6    this level of detail and information just in a different

 7    format.  And they provided that to us for many loans, and we

 8    were able to take those loans off hold if that was the only

 9    thing that was missing.

10    Q    Okay.  And so we have a common point of reference, what

11    do you call that?  What was that information they provided

12    you?

13    A    It was essentially a giant Excel Spreadsheet that just

14    had the same data that was in a loss certification.  So it

15    was just a different format of a loss certification.

16    Q    Who did that come from?

17    A    Nationstar, the master servicer.

18    Q    Okay.

19              THE COURT:  So, can I just ask a follow-up

20    question?  So, in the absence of the loss certification,

21    what was it that the Trustees were telling you with respect

22    to the amount of loss or claim attributable to a particular

23    loan?

24              MR. TRUMPP:  So, as you saw in the claims tracking

25    spreadsheet, there was a section in there for the purchase
```

Page 72

1    price and it would have some limited detail there around the

2    amounts that they were alleging as damages, but it didn't

3    necessarily go to the level of detail that would be found in

4    a loss certification for us to really assess and look at the

5    math and make sure that it made sense, and that what the

6    servicer did throughout the default process was appropriate.

7              THE COURT:  Could you just give me a hypothetical

8    example of what a variation would look like from what was on

9    the spreadsheet to what you might find via getting the loss

10   certification or information that tracked the information in

11   the loss certification?  Just hypothetically.

12             MR. TRUMPP:  So, the claims tracking spreadsheet

13   that we were looking at was for a non-liquidated loan.

14             THE COURT:  Right.

15             MR. TRUMPP:  So, it had the unpaid principal

16   balance and a few different elements in it.

17             THE COURT:  Right.

18             MR. TRUMPP:  If I had one to show you for a

19   liquidated loan...

20             THE COURT:  Oh, do you want to...?

21             MR. TRUMPP:  Yeah, it would just have the loss

22   amount that they were claiming.  It wouldn't necessarily

23   show me the math.

24             THE COURT:  Okay, so my question is, it has a loss

25   amount -- say, it's $100,000.  What is it that a loss

Page 73

1    certification or a comparable document would show?

2              MR. TRUMPP:  So...

3              MS. DOMINGUEZ-BRASWELL:  So there's -- just for

4    reference, you've got a liquidated one that's Plan

5    Administrator 691.

6              THE COURT:  Okay.

7              MR. TRUMPP:  So, on a liquidated loan they'd have

8    this realized loss amount of $99,940.

9              THE COURT:  And what kind -- and liquidated

10   specifically refers to what state of the world with respect

11   to this loan, if it's liquidated?

12             MR. TRUMPP:  Post-foreclosure, post-REO sale,

13   there's actual loss --

14             THE COURT:  What's REO?

15             MR. TRUMPP:  Sorry.  Real Estate-Owned, REO.  If

16   the servicer acquires the property at a foreclosure sale --

17             THE COURT:  Right.

18             MR. TRUMPP:  -- and ultimately sells the

19   properties --

20             THE COURT:  Sells...okay.

21             MR. TRUMPP:  -- that acquired property is called

22   an REO.

23             THE COURT:  Okay.

24             MR. TRUMPP:  And then when they sell that

25   property, they have essentially crystallized the loss and

Page 74

1    the loan is no more, the property is no more.  We now know

2    the math and we know exactly how much was lost.

3              THE COURT:  Okay, so hypothetically this is --

4              MR. TRUMPP:  So, hypothetically, in this

5    particular example --

6              THE COURT:  So, this means that there was an

7    outstanding amount due and owning of --

8              MR. TRUMPP:  That's just it --

9              THE COURT:  -- $399,000, and it was sold for

10   $300,000?

11             MR. TRUMPP:  Yes, but you don't know what --

12             THE COURT:  But you don't know.  Okay.

13             MR. TRUMPP:  Correct.

14             THE COURT:  So now -- so you have this number, and

15   what you're saying is that if you didn't have a loss

16   certification, this might be a loan that got put on hold?

17             MR. TRUMPP:  Yes.

18             THE COURT:  Okay.  And now my question is what

19   would the loss certification tell you that would lead you to

20   conclude something about this amount?  I'm just trying to

21   understand what is it about the loss certification that led

22   you to put a file on hold if it wasn't there?

23             MR. TRUMPP:  So, one of the things that was part

24   of our process was to assess the damage component.  And what

25   I mean by assess is was it reasonable?  Does it make sense?

Page 75

1    Does it look like the --

2              THE COURT:  Okay, so let me give you a

3    hypothetical.  I'm not trying to get us off on a detour

4    here.  So, hypothetically, you could get the backup for this

5    and you could see that a lawyer charged an unreasonable

6    amount of money and that that inflated the loss figure?  I'm

7    just trying to -- or that the math was wrong?

8              MR. TRUMPP:  Correct.  Or the servicer took five

9    years to foreclose and sell the property.  Yes, those are

10   things we were looking for.

11             THE COURT:  Okay.  Go ahead.

12   Q    Did the loss certification provide you any information

13   with respect to the interest accrued?

14   A    It did not.  Oh, I'm sorry -- the loss -- I was back on

15   this.  Yes, the loss certification would tell us how much

16   interest was accrued, it would tell us the expenses

17   associated with it.  It gave us the roadmap to how we could

18   get from an unpaid principal balance of an amount to a low

19   of an amount, and we could assess each individual step along

20   the way to make sure that it was prudent.

21   Q    Did the Trustees offer you something other than the

22   Nationstar data that you just described in lieu of the loss

23   certifications?

24   A    They did.

25   Q    What was that?

Page 76

1   A    They also offered the remittance statements, as issued

2   by the Trustees for these securitizations.

3   Q    And did that provide you the information that you

4   needed?

5   A    It told us what the final amount was, and some

6   statements had some components of the loss certification but

7   it never went into sufficient detail and it didn't have

8   things like the accrued interest broken out that we could

9   tell.

10  Q    Now, do you know, Mr. Trumpp, one way or another

11  whether servicers typically maintain this information in

12  their systems?

13  A    Yes, this is typical loan accounting information that

14  the servicers would have.  And another example of a use for

15  this particular source of information was when servicers

16  were filing claims with mortgage insurers, it was common for

17  them to have to also provide a copy of the law certification

18  to the mortgage insurer so they could assess the damages and

19  make their claims. So it was a common document that most

20  servicers would have.

21  Q    And if they didn't have this particular document in the

22  file, is it something that a servicer could create?

23  A    They should have sufficient information to recreate it

24  in a different format.  And, again, we weren't looking for

25  that particular format; it just needed to be able to show us

Page 77

1    the accounting.

2    Q    And what's your understanding with respect to whether

3    loss certifications were required under the protocol?

4    A    So, loss certifications are different.  They're not

5    part of Exhibit B in the protocol.  But the protocol does

6    require a calculation of the purchase price and all

7    supporting information.  And I think the loss certification

8    in my mind is the perfect example of what would be required

9    in that instance.

10   Q    Let's talk about corporate expense logs.  Can you

11   describe what corporate expense logs are?

12   A    So, corporate expense logs were a log of the various

13   fees and costs associated with the servicing of that

14   particular loan and especially the default process.  It

15   recorded costs for attorneys' fees, it recorded costs for

16   property preservation fees, it recorded the actual expenses

17   associated with servicing the loan.

18           And, again, this was important as from an audit

19   perspective, but also from an assessment perspective whether

20   that loss amount was attributable to the loan or negligent

21   servicing.

22   Q    Okay.  Now, if you already had the loss certifications

23   and some math there, why did you need the additional math in

24   the corporate expense logs?

25   A    Because the corporate expense logs went into even more

Page 78

1    detail than the loss certification, and it showed not just

2    the amounts and what but it told us when the costs were

3    incurred.  And, again, when we were looking at costs

4    incurred in a default timeline perspective, because we're

5    looking at were these losses attributable to the loan itself

6    or where they attributable to the servicer, looking at the

7    dates that the losses were incurred was important.

8            So, in my example earlier, if it took the servicer

9    five years to foreclose on a property that should have taken

10   one year, there was additional costs that were incurred

11   outside of that time frame -- were things that we were

12   looking for to see whether that was fair for them to pin us

13   with that particular portion of the damage.

14   Q    Okay.  I'd like to put up a loss certification and a

15   corporate expense log for the same loan side by side and

16   have you explain to the Court what you mean when you say

17   there's additional detail in the corporate expense log.  If

18   you look at -- I'm going to highlight the top two rows that

19   say Attorneys' Fees and Acquisition Costs on the Loss

20   Certification.

21   A    Yeah, so...you'll see here the foreclosure attorney

22   fees in total were $315 and the acquisition costs from the

23   foreclosure counsel was $1,375.02 in total.

24   Q    Okay.  Let's go to the corporate expense log.

25   A    And so you'll see the column right in the middle of the

Page 79

1    page where it says Attorneys' Fees and Costs, it sums to a

2    total of $1,690.02, which is also broken out by the $315 in

3    attorneys' fees and 1372.  So as I talked about, we looked

4    at this too assess when were the charges incurred?  So we've

5    got various dates in there.

6    Q    And why was that -- why was that relevant?

7    A    We just wanted to know were these costs, A, appropriate

8    from a level perspective, right?  Were the dollar amounts

9    fair given generally accepted servicing practices?  But,

10   two, were the times in which those things were incurred fair

11   relative to the servicer's timelines?

12   Q    And what part of the analysis does the loss

13   certification and the corporate expense log inform?

14   A    The damages.

15   Q    Couldn't you just review them for breach in AMA?

16   A    So, one of the things that we wanted to really focus in

17   on when we were establishing this process -- again, I had no

18   idea they were going to make 200,000 claims. We knew there

19   was going to be a significant number of claims. We were

20   looking to make sure that we had the appropriate process for

21   reviewing these loans and we wanted to make sure that we

22   were doing it in an efficient way, and we wanted to make

23   sure that we were able to meet the timelines as dictated in

24   the protocol, and we were minimizing costs where possible.

25   We weren't, you know, wasting money in the process.

Page 80

1         And so I wanted to make sure that that was

2    efficient.  So, it wouldn't be efficient if I reviewed the

3    loan and got to the point of damages and had to stop, and

4    then go back to the Trustees and say, "Hey, can you get this

5    particular piece of information?" So, it just would've been

6    very, very difficult to implement from an operational

7    perspective a sudden start and sudden stop for reviews of

8    loans that Recovco would have to touch multiple times,

9    potentially RBF would have to touch multiple times, and

10   ultimately the plan administrator would have to touch

11   multiple times.  That wasn't something that we wanted to do,

12   and so we put it on hold upfront.

13         And the expectation was that the Trustees would

14   just go get this information and provide it to us and we'd

15   take the loan off hold.  It was not intended to be a "We're

16   not going to review this loan." It was not intended to be a

17   defense but we wanted to make sure that we had sufficient

18   information to adequately do that holistic review that we

19   were talking about in an efficient manner.

20   Q    I'm going to show you Exhibit Number PA543.  By the

21   way, were there times where you had them on hold and then

22   the Trustees came back and gave you the information you

23   needed, and then you put them into the review queue?

24   A    Yes.

25   Q    Okay.  I'd like to show you PA543.  Can you describe

Page 81

1   for the Court what that document is?

2   A    So, this is a letter from Willkie Farr & Gallagher to

3   Trustees' counsel that was explaining our basis for putting

4   the loans on hold.  And as I mentioned, the first batch of

5   claims that came to us was in March of 2015 and then right

6   away in April of 2015, we submitted letters such as this to

7   say, "Hey, we're going to put these loans on hold." And we

8   identified in our letters all of the documents that were

9   missing some documentation that we would say, "Hey, you know

10  what?  Just so you guys know, Trustees, this is missing X,

11  Y, and Z but we're still going to review the loan."

12         Or if it was missing one of those four documents,

13  we would say, "Hey, Trustees, this is missing one of these

14  four documents.  Here's the document we think is missing,

15  and we're going to place this loan on hold until you're able

16  to give us that information."

17  Q    And in Paragraph Number 2, towards the bottom of the

18  page, you define -- and it goes on into the next page -- you

19  define what those critical documents are, right?

20  A    That's correct.

21  Q    And now I'd like to look at Exhibit Number 544.  What

22  is this document?

23  A    This is an example of an email between myself and Alan

24  Pfeifer, where we were discussing, again, early on in April

25  of 2015 our bases for putting these particular loans on hold

Page 82

1    and what we needed in order to take the loans off hold and

2    put them through the review process.

3    Q    I'm going to scroll up to the top email where you're

4    responding -- or I guess the second email where you're

5    responding to Mr. Pfeifer.  Can you read the sentence that

6    is at the very end of that -- I guess the second to last

7    sentence in that paragraph?

8    A    "If the Trustees are able to obtain any of the four

9    critical items that are missing from each loan, the hold

10   will be lifted and we will put the loan through our review

11   process.  If the Trustees are able to provide any of the

12   noncritical, we'd appreciate that as well."

13            And so let me just elaborate on that a little bit.

14   So, in Exhibit B there were 41 documents and we thought it

15   would be too onerous on the Trustees and the process to say,

16   "You have to provide all 41 documents, no ifs, ands, or

17   buts." But we did hold the line at four of the documents,

18   and we said, "You know, we're not going to talk to you about

19   the 37 other documents but these four we really need.  And

20   so for the noncritical documents, for those other documents,

21   the 37 other documents, it may not necessarily be in the

22   file but we're going to go ahead with it anyway." Versus

23   these four documents where we said, "Hey, guys, these are

24   critical.  Please get this for us."

25   Q    Did the Trustees at any point during the protocol

Page 83

1    approach you and ask you whether you'd be willing to join

2    them and make a request to the Court to change any of this?

3    A    No.

4    Q    Did you put any of the Aurora loan files on hold?

5    A    We did not.

6    Q    Did all of the Aurora loan files contain the four

7    critical documents?

8    A    I don't know.  But the key thing was there, if they

9    were missing one of those four critical documents, it was

10   real easy for Recovco or RBF to contact us or the plan

11   administrator to get that additional information.  So, we

12   had access to the documents and just thought that would

13   again be too onerous to put loans from our own servicer on

14   hold for that.  And so, where necessary, we went directly to

15   Aurora to get the loans -- the documents to complete our

16   review.

17   Q    I'd like to move on to Step 2 of the protocol process

18   where the plan administrator performed its review.  What did

19   you do to get everything in place for Step 2?

20   A    So, you know, we collaboratively negotiated the

21   protocol order itself so we kind of had an idea of what was

22   coming.  But from an operational perspective, it's kind of

23   like getting ready for the tidal wave that you know is

24   coming.  And so we spent a significant amount of time as

25   parties between the plan administrator, Recovco, and RBF

Page 84

1   determining operationally and procedurally how best to

2   handle the influx of claims that were coming; but also, how

3   to review the evidence that we anticipated coming, what

4   evidence would be interpreted which way, how those claims

5   were to be assessed, how we looked at things.  And so our

6   philosophy of the review was established upfront, and so

7   that was all in preparation of getting ready for the

8   onslaught of claims that started coming in March of 2015.

9           So, we actually had a little bit of additional

10  time from the time that the loan was -- the order was put in

11  in 2014 to 2015 to really get everything in place and get

12  ready for that.

13  Q    And who performed the actual loan reviews?

14  A    It was a combination of Recovco and RBF.

15  Q    And do you believe that you brought the necessarily

16  disciplines to the table in bringing those teams to the

17  review process?

18  A    Yeah, so I knew based upon our experience and my

19  experience that we were going to need somebody to do a re-

20  underwriting review assessment of the claims in relation to

21  the loan files; but I also knew from all my downstream work

22  that, you know, counsel's going to need to be involved to

23  assess those claims and defects relative to the agreements.

24  You know, we're talking about legal claims being made under

25  contracts for breach of contract.  It was entirely

Page 85

1    reasonable to have counsel brought in.

2              And so I made sure that we had the appropriate

3    elements and experience necessary to do those reviews

4    upfront and that's why we had both counsel and Recovco

5    reviewing loans in the process.

6    Q    Did the plan administrator bring its own experience to

7    the review table for the Step 2 loan review?

8    A    Absolutely.  So, the plan administrator had on their

9    team people who were experienced in downstream claims

10   litigation as well as underwriting experience.  So we had

11   members of my team who were former underwriters at Aurora

12   that were there to allow us to assess claims relative to the

13   original underwriting guidelines.

14   Q    Show Slide 19, please.  Mr. Trumpp, can you explain --

15   and I know you just did in a brief way, but can you just

16   sort of give the Court a description of the three parts of

17   this experience that you just described?

18   A    Yeah.  So, I mentioned that there are multiple parties

19   in the review process, and from my perspective that makes

20   sense because each party brought something new and different

21   to the table.  And that what they brought was critical to

22   our review of the loan files.  And so Recovco was a renowned

23   loan review firm that had done several major large-scale

24   reviews for several big banks, so we brought their

25   repurchase review and underwriting experience to the table.

Page 86

1          RBS was counsel that had done significant work in

2     our downstream claims process looking at loans and breaches

3     of representations and warranties, and the evidence

4     necessary to pursue those claims. So we brought them to the

5     table.  And we brought my team's business knowledge and

6     experience to the table.  And that's why we felt like we had

7     a well-rounded group of people ready for Step 2 of the

8     protocols.

9     Q    What was your goal for Step 2?

10    A    I really had two goals for Step 2:  One was to

11    operationally be able to handle it and make sure that we met

12    the requirements of the protocol.  If we didn't meet the

13    requirements of the protocol and met the right timeline to

14    the protocol, those claims were going to deemed approved.

15    So, I wanted to make sure that we had everything ready to go

16    from an operational perspective.

17          But, most importantly, I just wanted to make sure

18    that we got it right.  I wanted to make sure that in a

19    multi-billion dollar claim being made against the estate,

20    the estate was reviewing and assessing the claims properly.

21    Q    How did you assure yourself that your goals and

22    expectations were being met for Step 2?

23    A    Through the constant dialogue, and follow-up, and

24    management of the operation through Step 2 I felt

25    comfortable that we were meeting the operational milestones

Page 87

1    that we put in place and the types of claims and responses

2    that we were making were fair and reasonable.

3    Q    I'd like to get a sense of the plan administrator's

4    approach to the actual loan review when you're actually

5    looking at a claim.  Earlier, you testified about the

6    components.  You first look at breach and then you assess

7    AMA, and if both components are there, you determine it's a

8    pass.  And I want to focus on the breach part of the

9    equation.

10          When the plan administrator is reviewing a

11   particular claim to determine if there's a valid breach, how

12   does the plan administrator approach that analysis?

13   A    So, there's a couple of different components even

14   within the rep and warranty breach.  And so the first

15   component really was looking at the claim as asserted by the

16   Trustees and weighing the evidence available in the claims

17   package and the loan file.

18          As I talked about, in my loss management days we

19   had to assess was there sufficient evidence for the defect

20   in the first place?  And so we call that assessing the

21   threshold facts.  Just is there enough evidence as put forth

22   by the Trustees to support the claim they're making?  And

23   so, that was what we called assessing the threshold facts.

24   Q    And you said -- you used the word defect.  What do you

25   mean by defect?

Page 88

1   A     The thing that's supposedly wrong with the loan.  The

2   fact that the borrower lied about their income, the fact

3   that there was a regulatory violation.  That is the alleged

4   defect.

5   Q     Okay.  And when you're determining whether that fact is

6   established, what do you do?  What do you look at?

7   A     We look at the information it provided in the claim

8   package, we look at the information it provided in the loan

9   file, and then we used Recovco and they looked at additional

10  third party sources and documentation to assess is there

11  sufficient evidence to show and agree in our minds that the

12  threshold facts were proven?  Yes, the borrower lied about

13  their income.  Yes, there was a regulatory violation on that

14  particular loan.  Those types of things.  And so it first

15  had to be assessed at the threshold fact level.

16  Q     And you said you weighed the evidence.  What do you

17  mean by "weigh the evidence"?

18  A     Well, so based upon our review process, we treated each

19  piece of evidence as asserted by the Trustees with the

20  weight it deserved.  And what I mean by that is we looked at

21  it in relation to the other information available in the

22  loan file.  Were there other things maybe in the servicing

23  record or other things in the loan file that tended to

24  support the allegation of the claim and the evidence as

25  asserted by the Trustees?  Or were there additional things

Page 89

1    in the loan file that contradicted the information in

2    evidence as put forth by the Trustees?

3           And sometimes a piece of evidence was shown to be

4    in line with other information in the loan file and, hence,

5    it was ultimately raised up and passed the threshold fact

6    level, or sometimes there was contradictory evidence and you

7    didn't necessarily know which piece of information was

8    correct.  Right?  Do I take into account and weigh the

9    evidence that the Trustees are asserting now in 2015?  How

10   do I weigh that against what the loan officer and the

11   borrower talked about and put down on their application in

12   2006?  Right?

13          The only person in this transaction that I've seen

14   who's actually talked to the borrower is the loan officer or

15   potentially maybe the servicer and what they reported in

16   their notes.  So, we really had to make an assessment on

17   each individual claim, was the evidence there and was it

18   sufficient and reliable to pass at the threshold facts

19   level?

20   Q    Were there any evidence types that were automatically

21   deemed sufficient to prove a particular claim?

22   A    Absolutely not.  So, it depended upon the facts and

23   circumstances on the loan file to determine whether that

24   loan and claim passed at the threshold facts level.

25   Sometimes that could be a W2 or a tax return.  Sometimes it

Page 90

1    wasn't.  You couldn't necessarily say, given the unique

2    nature of each one of these claims and loans, that one piece

3    of evidence trumped all others.  And so you had to weigh the

4    evidence at the claim level and assess the threshold facts.

5            So, there were no bright line rules in this

6    process; it truly was an assessment, and why it was so

7    critical that we had the appropriate expertise on our staff

8    and our team to weigh that evidence and to make those calls.

9            THE COURT:  So, can I ask a question?  So there

10   literally were no bright line rules?  For example, the

11   borrower -- to your point that, you know, ten years out or

12   however many years out, you can't replay the conversation

13   that took place at the time of origination between the

14   borrower and the loan officer.  So you have to look to other

15   sources, right?

16           So, if the loan application reflects that somebody

17   makes a quarter of a million dollars a year -- I'm giving,

18   obviously, a very extreme example -- and the W2, and for

19   good measure let's throw in a tax return two years later

20   show $25,000, that wouldn't make it out of the starting

21   gate?

22           MR. TRUMPP:  In that example it very well could

23   make it out of the starting gate.

24           THE COURT:  But there were literally no bright

25   lines -- there were no -- every single one was looked at on

1    its own?

2              MR. TRUMPP:  Correct.

3              THE COURT:  Okay.

4              MR. TRUMPP:  When we say -- and I know it's

5    probably a little corny, but when we say each loan is a

6    snowflake, we're not kidding.

7              THE COURT:  Okay.  Thank you.  Go ahead.

8    Q    I want to ask whether the inverse is true.  Are there

9    certain evidence types that were automatically rejected by

10   the Trustees?

11   A    No.  There were -- rejected by the plan administrator?

12   Sorry.

13   Q    I'm sorry?

14   A    You said the Trustees in that last question.

15   Q    I'm sorry.  Thank you.  Yeah.  And I've only been going

16   for a couple hours.  Yes, any evidence types -- just for the

17   record, any evidence types that were automatically rejected

18   by the plan administrator?

19   A    No.

20   Q    Now, you mentioned that there were times where the plan

21   administrator might come across evidence in the file that

22   potentially contradicted what the Trustees were asserting.

23   If the plan administrator did come across a contradictory

24   piece of evidence, would it stop its review right then and

25   there and reject the claim file?

Page 92

1   A      No.

2   Q      Or the claim?

3   A      No.  We would continue on in the review.  And we

4   wouldn't complete a review until we've looked at all of the

5   information in the claim file and the loan file to look at

6   all potential documents, which would show all available

7   facts and circumstances for a particular loan.  Because we

8   wanted to make sure at the end of the day, if we had

9   competing evidence, we appropriately waived that competing

10  evidence.  We just didn't say there was competing evidence,

11  therefore it's a fail.  Right?  There could be competing

12  evidence that ultimately was determined and weighed as a

13  pass.  It just depended upon the facts and circumstances.

14  Q      Did that happen?  Did you find instances where you came

15  across a piece of evidence, it supported the Trustees'

16  claim, but the Trustees didn't cite it and you then passed

17  the loan based on what the plan administrator found?

18  A      Absolutely.  And so when I talk about our role as

19  trying to assess the loan file and all of its merits on

20  behalf of all of our creditors, you know, in my loss

21  management or Aurora days, I wouldn't have brought that up.

22  I would've just said, "Here's my case and I'm making it."

23  Right?  So we would look at all facts and circumstances.

24  And even if I found additional evidence in the loan file

25  that tended to support clear allegation that they didn't

Page 93

1    cite too in their claim package, we would take that into

2    account.

3    Q    And were there times where you passed a loan on that

4    basis?

5    A    Yes, absolutely.

6    Q    Is the threshold facts component that you just

7    described the only part of the breach analysis?

8    A    No.  So, there's another component there.  You may have

9    threshold facts that support a defect but it may not be

10   covered by a representation and warranty.  And this is,

11   again, a laborious process here when we're talking about

12   numerous securitizations and numerous different MLSEAs, and

13   numerous representations and warranties.

14            And so we had to look at the threshold facts and

15   assuming that those threshold facts were met, we had to

16   assume -- we didn't have to assume -- we had to look to see

17   is that defect covered by a breach of a representation and

18   warranty?  So, the Trustees told us in their claims tracking

19   spreadsheet "Here's the rep that we're looking to", but we

20   wanted to make sure that that was the right rep, and we

21   wanted to make sure that that was from the right

22   securitization agreement.

23            So, we also then had to assess was that threshold

24   facts applied to right breach of a representation and

25   warranty?  And then even within each representation and

Page 94

1    warranty you had to look at the language of the

2    representation and warranty and make determinations on what

3    that representation and warranty meant.  Did it have a

4    materiality qualifier?  Did it have a seller knowledge

5    qualifier?  Did it have other parameters within the

6    representation and warranty that you had to assess relative

7    to the threshold facts?

8              So, this was very involved process where we were

9    going through and making assessments, and weighing evidence,

10   and applying contracts.

11   Q    Let's talk about some of the qualifiers you just

12   mentioned starting with seller's knowledge.  What's your

13   understanding of the seller's knowledge qualifier?

14   A    So, again, I'm not an attorney and I don't want to

15   imply that I'm the ultimate resource for determining these.

16   But based on my experience in downstream litigation, when we

17   saw that qualifier it meant you had to show proof that the

18   particular seller had knowledge of the fraud or of the thing

19   that was being alleged.  And that's not something that we

20   saw here in the protocol where the Trustees were showing

21   that Lehman knew something when they made their

22   representations and warranties.

23             So, from my perspective, that would've been a

24   really hard hurdle to get over, given the fact that they

25   didn't show any proof.

Page 95

1   Q    And did the -- I think this is implied in the testimony

2   you just gave but just to be clear, did the plan

3   administrator apply that seller's knowledge qualifier during

4   the protocol as it relates to the no fraud rep?

5   A    We did.  As I mentioned, we looked for actual proof in

6   the loan file or assertions from the Trustees that the

7   seller, LBHI, knew of the defect and breach at the time and

8   we didn't see it.

9   Q    Did the Trustees agree during the protocol that there

10  was a seller's knowledge qualifier?

11  A    They agreed there was a seller's knowledge qualifier;

12  the interpretation of that they didn't agree with.

13  Q    And if the plan administrator is wrong about its

14  interpretation of the seller's knowledge qualifier, what

15  impact would that have on the outcome of the protocol?

16  A    So, if we're wrong on that, it would actually have a

17  fairly minimal impact on the overall protocol for two

18  reasons:  One, most of the claims in the process were

19  rejected at the threshold facts level, not at the

20  application of the rep and warranty factor level, and not at

21  the AMA level.  So the vast majority of claims made by the

22  Trustees were rejected at the threshold fact level.  And so

23  they never got to the application of the representation and

24  warranties portion.

25          And, similarly, every time the Trustees made an

Page 96

1    allegation of a breach of a representation and warranty that

2    contained that seller knowledge qualifier they also cited

3    the no default rep.  So it was -- there were two reps

4    essentially for each time they cited that.

5    Q    Okay.  You also mentioned when you were speaking of

6    qualifiers that came up in the application of representation

7    and warranty phase of the breach analysis -- you mentioned

8    the term materiality qualifier.  What did you mean by that?

9    A    So, the no event of default rep specifically has

10   language that says material -- the information had to be

11   material to the underwriting decision.  So, there's a

12   materiality qualifier.  And, hence, why it was really

13   important in the review process to look at the defects cited

14   and the potential change in certain characteristics of the

15   loans assuming that the breach occurred to assess would that

16   loan still have been originated under the original

17   underwriting guidelines?  And so we use that as a guide for

18   assessing materiality.

19   Q    Okay.  And when you say the plan administrator assessed

20   materiality, in the protocol did that come at the breach

21   phase or the AMA phase?

22   A    So that use of the term materiality was at the breach

23   phase because it was embedded in the actual representations

24   and warranties of the various contracts.  That's separate

25   than the AMA analysis and separate from the material and

1   adverse assessment there.  So, when I'm talking about

2   materiality of the defect, it's with respect to the breach

3   assessment.

4   Q    Okay.  And what do you mean by materiality of the

5   defect?  What is a material defect versus a nonmaterial

6   defect?

7   A    So -- and again, this is why it was so important in my

8   mind to assess the alleged defects relative to the original

9   underwriting guidelines.  Say, for example, the Trustees'

10  alleged that the borrower lied about their income and their

11  debts income ratio was originally 25 percent, and that based

12  upon their new income, assuming the breach was accurate, it

13  was 42 percent.  So, it went up significantly.

14          I would want to know, under the original

15  underwriting guidelines, assuming they're correct and had we

16  known, would that loan still have been underwritten?  And if

17  the new parameters are still within the original

18  underwriting guidelines, that in my mind isn't material.

19          So, I would be looking in my materiality

20  assessment, what does the alleged defect, assuming it is

21  true, mean in relation to the original underwriting process?

22  Q    Now, once the plan administrator is done with that

23  portion of the analysis, has analyzed whether there are

24  sufficient threshold facts, and whether those facts give

25  rise to an applicable representation of the warranty?  What

Page 98

1    does the plan administrator do next as part of his analysis?

2    A    So, the next step in our analysis was then to look at

3    AMA.  And so, we were looking for additional information in

4    the loan file, or elsewhere that was available, to assess

5    whether that breach had a material and adverse effect on the

6    value of the loan.  So, we wanted to look at information

7    specifically in the servicing file to see were there

8    instances or inferences that we could make to show that

9    relationship between the breach and -- well, the ultimate

10   default or loss on the loan.

11        And so, we didn't really have anything to go on,

12   from what the Trustees told us, and so it was up to us then

13   to make our own assessments at the AMA level to determine,

14   in our assessment, was there an adverse and material effect

15   on the value of the loan that was the result of that breach.

16   Q    And to be clear, when you say adverse and material

17   effect, that's different from the materiality description

18   you gave at the breach level?

19   A    Correct.  There's materiality used twice, but at two

20   separate instances.

21   Q    And did the plan administrator analyze those

22   (indiscernible)?

23   A    They did.

24   Q    Who performed that part of the analysis, the AMA

25   analysis for the loans in Recovco?

Page 99

1    A     So, the way we designed our process was that Recovco

2    would do the initial review of the loan and they would do an

3    assessment at the threshold facts level, which was right in

4    their wheelhouse, to determine, you know, does the

5    information and evidence, you know, show that there was a

6    defect on the loan.  And so, they were empowered to reject

7    claims at that level, assuming that wasn't the case.

8              If there was reason based upon the Recovco review

9    to weigh evidence, that would be more complex.  Or if you

10   applied the representations of the warranties or to do that

11   potential AMA assessment, then it got referred, post-Recovco

12   review, to RBF.  And this again, in my mind, made perfect

13   sense then because I'm interpreting the application of the

14   representations and the warranties, and making that adverse

15   and material effect assessment to have counsel involved at

16   that point in time.

17             And so, the loan then transferred, assuming that

18   it passed at the threshold facts level, for that application

19   of representations and warranties in AMA over to RBF for

20   their review.  And then they are the ones to answer your

21   initial question, who performed the AMA review.

22   Q    So, the loans that moved on to RBF after receiving the

23   Recovco review, how many layers -- by the time it got to

24   RBF, how many layers of review had that loan undergone?

25   A     So, numerous.  So, Recovco had the frontline review.

Page 100

```
 1    They had 100 percent quality control review.  So, at the

 2    Recovco level, all loans, regardless of what we found, went

 3    through two layers of review.  Assuming that it passed to

 4    RBF, then RBF looked at it.  So, now we're talking a third

 5    layer of review.  And RBF also had a quality control review

 6    process, so there were potentially four different levels of

 7    review of the loans up until the point where it was

 8    determined to be a pass.

 9    Q    And then each step of the review, what did the review

10    teams have access to?

11    A    All of the documentation available for that particular

12    loan.  So, they had access to the entire loan file.  They

13    had access to the entire claim package.  They had access to

14    the third-party sources that were Recovco pooled.  So, they

15    had access to all available information so we could assess

16    the complete facts and circumstances of that borrower and

17    that loan and those claims.

18    Q    What about the contracts?  Did the teams have access to

19    the individual agreements at issue?

20    A    They did.

21    Q    Let's talk about each of the review teams, starting

22    with Recovco.  And I know you've described them at a high

23    level, but can you give the Court some more detail about who

24    Recovco is?

25    A    So, Recovco is a loan review firm.  I've mentioned
```

Page 101

1      there's several different shops that do this type of work.

2      Recovco is well known in the industry.  They've done

3      diligence reviews of loans for several of the major banks.

4      They've done several large-scale reviews.  And importantly,

5      I had used them in a couple of other reviews for the estate,

6      and so I was familiar with their operations, their

7      processes, and the quality of their work.  And so, that was

8      why we chose Recovco, coupled with the fact that based upon

9      my prior experience in loss management and the difficulty I

10     was aware of in juggling multiple review firms and trying to

11     keep that quality consistent, I didn't want that in my

12     process.  So, I really looked for one loan review firm that

13     had the experience and the ability to handle a review of

14     this scale.

15     Q    And was Recovco able to house their review under one

16     roof?

17     A    Yes.  So, they did review every single one of the loans

18     that were submitted at the documentary process, and they

19     reviewed every single one of the loans that passed the

20     documentary process and did a complete loan review on them.

21     Q    What was the scope of Recovco's engagement?

22     A    The scope of their engagement was to accurately assess

23     the threshold facts and evidence that was put forth by the

24     Trustees in their claims to make a determination at that

25     level.  And again, they were allowed to -- or they were

Page 102

1   empowered to, excuse me, reject claims that didn't meet that

2   threshold fact level.  And then if there were reason to

3   believe that it potentially passed through the threshold

4   facts level and rose to the level of needing to apply the

5   representations and warranties or do an AMA assessment, then

6   the loan and claim passed over to RBF.

7   Q     Who supervised Recovco's work?

8   A     So, Recovco was supervised by the plan administrator,

9   but also, they were overseen by my counsel, RBF, in the

10  process.  And so, it was a dual oversight role.  We were

11  working hand-in-hand, but we were also giving instruction to

12  Recovco in that process.

13  Q     How often did you communicate with Recovco during the

14  protocol?

15  A     So, as I mentioned, I got data daily from Recovco.  And

16  at a minimum, I had formal meetings set up with the key

17  people at Recovco on a weekly basis and, you know, we had

18  numerous emails and calls throughout the weeks of the

19  protocol.

20  Q     And who was your point of contact at Recovco?

21  A     I dealt primarily with two individuals, Craig Pino and

22  Dan DeMonte.

23  Q     Let's talk about RBF.  Whose decision was it to retain

24  RBF?

25  A     It was my decision.

Page 103

1    Q     And why did you retain RBF?

2    A     I retained them because I thought they had a crucial

3    role to play in the process.  But also, I retained them

4    because I knew the quality of their work and their ability

5    to review loans at the loan level, which I knew was going to

6    be an important aspect of this process.  And I'd worked with

7    Mike Rollin for over 10 years, and so he and I thought alike

8    and knew how to approach this.

9    Q     And what was the scope of RBF's engagement as it

10   concerns the loan review protocol?

11   A     So, RBF's engagement in the protocol was for the loans

12   that Recovco wasn't able to reject at the threshold facts

13   level, they were passed to RBF for their assessment and

14   review.

15            And I want to make sure that it's clear that they

16   didn't just apply the representations and warranties and do

17   an AMA assessment.  They started over and looked at the

18   information Recovco provided and did their own assessment of

19   the threshold facts and the evidence in the application of

20   the rep and warranty in the AMA.  So, they looked at all of

21   that information.

22   Q     Who supervised RBF's work?

23   A     I did.

24   Q     How often did you communicate with RBF during the

25   protocol?

Page 104

1    A    Similarly, on a weekly basis had formal meetings.  Had

2    numerous emails and phone calls throughout the week.  I was

3    in constant dialogue with Mike Rollin and you throughout the

4    entire process.

5    Q    Mr. Trumpp, are you aware that the Trustees have

6    criticized the plan administrator for hiring lawyers to

7    review loans and the protocol?

8    A    I am.

9    Q    And do you have a response to that?

10   A    Quite frankly, I don't understand the critical

11   allegations.  It makes perfect sense to me to have counsel

12   involved in looking at allegations of breaches of

13   representations and warranties in a multibillion-dollar

14   case.

15          The application of the reps and warrants is

16   clearly a role suited for counsel, and the AMA assessment

17   was also something that I thought was crucial for counsel to

18   take a look at.  So, the fact that I'm critiqued for

19   including counsel in a multibillion-dollar claim against the

20   estate surprises me.

21   Q    Let's talk briefly about the flow of loans that you've

22   described at a high level from Recovco to RBF.  Who decided

23   which loans stayed at the Recovco level and which ones went

24   on for further review to RBF?

25   A    So, I talked about the process we had set up at the

Page 105

1    beginning.  We set up certain parameters in certain

2    processes for determining which claims stayed at Recovco and

3    were ultimately rejected, versus what was passed through to

4    RBF.  And I was continually monitored and assessed

5    throughout the protocol process.

6    Q    What were those parameters based on?

7    A    Based upon the types of claims that we anticipated

8    receiving, and then based upon the types of claims that we

9    ultimately received.  And again, looking at, with advice and

10   counsel from Recovco and RBF in the plan administrator's

11   experience, how best to assess that evidence at the

12   threshold facts level.

13   Q    And what did you do to ensure that loans were properly

14   moving through the process that you set up?

15   A    So, that's where my data and analytics came in.  As a

16   finance background, that's really one of the operational

17   things I focused in on was looking at this from an

18   operational perspective.  What are the types of claims being

19   made, what are the results of our reviews looking like, are

20   the appropriate loans being referred over to RBF, are we

21   rejecting not enough, are we rejecting too many?

22           It just depended upon that whole process and how I

23   looked at that.  And literally, I got new fresh reports

24   based upon the data on a daily basis.  And we looked at the

25   process as a whole to make sure we were getting it right.

Page 106

1    Q     Mr. Trumpp, when a loan went through this process and

2    the plan administrator determined there were threshold facts

3    evidenced by the events in the file, and that there was an

4    applicable representation and warranty that was breached,

5    and there was AMA, and the plan demonstrator designated that

6    it passed, what would the plan administrator do with those

7    loans, the passed loans?

8    A     So, similar to the Trustees -- they had a process for

9    submitting claims to us on a rolling basis -- we had a

10   process for responding back to the Trustees on a rolling

11   basis.  And so, under the timelines submitted and required

12   under the protocol, we would issue reporting back to the

13   Trustees.  And we had a letter that we would send, we would

14   have an exhibit that said here's our past loans, and we

15   would summarize that at the Trustee level and at the loan

16   level.

17          And then we would also have rejected loans

18   exhibits.  And so, we would have a reporting that said

19   here's all of the claims that we're rejecting and why.  And

20   so, we also had our formal responses there.

21          But in addition to that, we would also give a loan

22   file back to the Trustees.  And so, as I mentioned, we would

23   occasionally pull our own third-party information to assess

24   our claims.  And so, we would give that back to the Trustees

25   with the entire loan file and claim file that they gave us.

Page 107

1          And one of the things that I didn't mention that

2     was in our process is -- we're talking tons and tons paper

3     here, electronically -- but we Bates referenced and cited

4     every single document that came to us.  And we gave that

5     back to them.  And so, we gave them third-party

6     documentation we used in our review file.  We gave them the

7     loan file back.  We gave them the exhibits here that said

8     here's our basis for approving or rejecting your claim.

9          And then after some initial dialogue in the

10    process, we started giving the Trustees another exhibit that

11    listed out for each loan the particular Bates citations that

12    we thought they should take a look at in relation to their

13    review of the loan file to see what we're saying in our

14    formal response and our basis for rejecting the claims.  And

15    so, all of that information went back to the Trustees on a

16    rolling basis.

17          THE COURT:  So, can I just -- just to make sure I

18    understand this on a simplified hypothetical basis, you

19    reject a loan and you send back the loan file that's got

20    documents 1-100, and then you in addition send them 101-110,

21    and you would cite to examples from 101-110, that illustrate

22    why, not withstanding documents 1-100, you are not passing

23    the loan?

24          MR. TRUMPP:  So, we gave them back --

25          THE COURT:  You gave them back what they gave you?

Page 108

1              MR. TRUMPP:  Yes.

2              THE COURT:  And you gave them back additional

3    documents that they hadn't given you that you deemed, viewed

4    as, exculpatory, in other words?

5              MR. TRUMPP:  Yes.

6              THE COURT:  Or that supported your rejection of

7    the loan, notwithstanding the documents they had given you?

8              MR. TRUMPP:  But let me be clear.

9              THE COURT:  Please.

10             MR. TRUMPP:  The Bates references --

11             THE COURT:  Yes.

12             MR. TRUMPP:  -- that I'm talking about in our

13   exhibit could be from third-party evidence or could also be

14   from the loan file itself.

15             THE COURT:  That the Trustees had given you?

16             MR. TRUMPP:  Yes.

17             THE COURT:  Okay.  Thank you.

18   Q    And what you just described, was that for the loans

19   that were failed?

20   A    Yes.

21   Q    That were rejected?

22   A    Correct.

23   Q    Now, you mentioned a formal response associated with

24   that.  What did you mean by that?

25   A    So, again, under the protocol order, this was all

Page 109

1    spelled out, the process by which we needed to respond to

2    their claims in Step 2.  And in the protocol, it outlines a

3    formal response of 250 words or less per claim.  And so,

4    it's that formal response that I'm referring to.  And that

5    was done at the claim level for each loan that was rejected.

6              MS. DOMINGUEZ-BRASWELL:  Can we see Plan

7    Administrator Exhibit 620, please?

8    Q    Mr. Trumpp, is this an example of the letter you

9    described that went back to the Trustees with the plan

10   administrator's responses?

11   A    It appears to be what -- what document exhibit number

12   was it?

13   Q    It's plan administrator's 620 in your binder.

14   A    Yes, it is.

15   Q    Okay.  And can we -- flip to Exhibit B in this

16   document, which is just a few pages ahead in your binder,

17   Mr. Trumpp.

18             MS. DOMINGUEZ-BRASWELL:  Can you go to the next

19   page, please?

20   Q    What is this on the screen, attached as Exhibit B to

21   that letter?

22   A    This is an example of the spreadsheet and exhibit that

23   contained our formal responses at the claim level.

24   Q    Okay.

25             MS. DOMINGUEZ-BRASWELL:  And if we can scroll to

Page 110

1    the highlighted Column F, just to put that in the middle.

2    Q    Is that what you're referring to as an example of a

3    formal response?

4    A    Yes.

5    Q    Okay.  Did the Trustees have any reaction to the plan

6    administrator's formal responses during the protocol?

7    A    So, this is the kind of formatting standard that we

8    gave back to the Trustees early on in the protocol.  Alan

9    and Edmond form Duff & Phelps let me know that they were

10   seeking additional information and clarification for our

11   basis for rejecting the claims, in addition to the formal

12   responses themselves.  And so, that was when we decided it

13   would be helpful to provide the additional exhibit of the

14   Bates references.

15           So, that isn't something that was necessarily

16   called for under the protocol, but something that we did in

17   a manner to help facilitate the review.  And again, the

18   formal responses were something that were required under the

19   protocol, but it was always anticipated that there would be

20   additional dialogue in Step 3, and additional information

21   communicated between the parties on why certain claims were

22   rejected or going to ultimately be accepted.

23           And so, it was anticipated that additional

24   information and clarification would be shared in Step 3.

25   And then there were specific requirements even in Step 4

Page 111

1    around what would be presented to the mediator around

2    supporting our basis for rejecting claims.  So, this was

3    just one of the many instances where we were following the

4    protocol and sharing our basis for rejecting these claims.

5    Q    Do you think that Trustees had enough information to

6    understand the plan administrator's position on each of

7    these claims?

8    A    I do.  And the reason for that is, presumably, the

9    Trustees were intimately aware of the loan file and the

10   claim from the start.  They were the ones who reviewed the

11   loan and made the claim, so there's that body of work there.

12          And then when we responded back, we gave them our

13   formal response, the additional third-party documentation in

14   the loan file, our particular Bates references, and you

15   should be able to weight the information that you already

16   knew and assumed from your original review, and have that in

17   mind and in concert with the information that we were

18   showing in our formal responses and the information

19   available in the loan file.  So, from my perspective, it

20   makes perfect sense and there was sufficient information.

21   Q    Were the plan administrator's responses, an example of

22   which you see here, templated in any way?

23   A    So, it's really, really, really hard to come up with

24   templates for the number of types of claims here.  But yes,

25   they started as a template, but then based upon the facts

Page 112

1     and circumstances of that particular claim, the reviewers

2     were able to change those templates to tailor the formal

3     response to the facts and circumstances of that particular

4     loan.

5     Q    Okay.  Did the plan administrator list every single

6     piece of evidence associated with their analysis of the

7     claim in the formal responses?

8     A    We did not.

9     Q    Why not?

10    A    This was intended to be the formal response that gave

11    the basis for our rejection of the claim.  We gave that

12    information back, but we didn't necessarily list every

13    single piece of evidence or every single of -- or every

14    single defense that we were going to assert on that

15    particular loan there, because we knew that that potentially

16    could come up in Step 4 or in Step 5.  And so, this was just

17    really our -- here's our basis for rejecting the claim.

18    Does that make sense?

19    Q    Did the plan administrator list its evidence associated

20    with its AMA analysis?

21    A    No, it didn't.  And again, this is really hard to look

22    at how to respond to an AMA claim for a review that really

23    wasn't made.  So, they didn't allege anything, so it's

24    really hard to allege something different.

25              But as I had mentioned, this is kind of the start

Page 113

1    of a dialogue.  We said, here, Trustees, are our basis for

2    rejecting your claims.  But ultimately, we talked about

3    these claims at the loan level in Step 3, and we had loan

4    level dialogue that was well outside what was found in the

5    Trustees' original claim assertion or what was in the formal

6    responses, based upon the facts and circumstances and

7    information in the loan file.

8    Q    When the plan administrator was reviewing the Trustees'

9    claims and preparing its formal responses, with trying to

10   disprove each of the Trustees' claims?

11   A    So, again, our mindset wasn't to come up with every

12   possible defense or look for ways to prove it.  We were

13   really trying to assess have they proven it.  We weren't

14   looking to reject claims.  We were trying to assess claims

15   and pass where necessary.

16   Q    So, you've just described the fails, and I want to

17   switch gears and talk about the passes.  Can you look at

18   Plan Administrator Exhibit 625, please?

19         MS. DOMINGUEZ-BRASWELL:  And actually, if you

20   could zoom on it and go to the second page, top of the

21   second page?

22   Q    Mr. Trumpp, do you see where it says, approved claim

23   files --

24   A    I do.

25   Q    -- at the top of that letter?  What does that mean?

Page 114

1    A    So, there were parameters outlined in the protocol for

2    how we were required to respond to the Trustees on passes.

3    And the nomenclature in the protocol is to call it an

4    approved claim file.  And so, that's what that's referring

5    to.

6    Q    So, when you say passes and when you say approved claim

7    file, are those interchangeable?

8    A    Yes.

9    Q    And it references, you see in this letter, Exhibit A.

10   Do you see that?

11   A    I do.

12   Q    Let's take a look at Exhibit A.  What is Exhibit A?

13   A    Exhibit A is an example of our approved claims report.

14   And there's two tabs in there.  One is a summary tab that

15   just talks about the approvals at a Trustee level.  So, in

16   this particular instance, there were 24 loans, three from

17   Law Debenture as Trustee, and 21 from U.S. Bank NA as

18   Trustee, where we approve the claims and we walk through the

19   columns.  There's the asserted purchase price by the

20   claimants.

21        Now, as I mentioned before, we did our own review

22   of the damages and assessments, and we came up with what we

23   believed to be the debtor's purchase price, taking into

24   account any necessary adjustments.  And then we broke that

25   out by who the asserted debtor was, because again, there

Page 115

1 were in theory going to be claims asserted against LBHI and

2 SASCO.  And so, this was our reporting at a summary level on

3 those passes.

4   And then the second tab is the low-level reporting

5 around those passes that showed roughly the same

6 information, but at the loan level, not the Trustee level.

7 Q Okay.  And could we go back to the summary tab for a

8 moment?

9 A Yes.

10 Q Focusing on Column E, where it says, debtor's adjusted

11 purchase price, what do those figures reflect?

12 A So, those figures reflect any potential changes based

13 upon our damage review.  But it also shows the particular

14 caveats that are noted in Superscript 1s and 2s in the

15 footnotes down below.  But it also was intended to show the

16 starting point of our damages, subject to any potential

17 legal defenses or offset that we would have at any later

18 date.

19 Q Was there anything else that that was subject to?

20 A It was subject to final internal Lehman approval, and

21 ultimately Court approval.

22   THE COURT:  Are we getting close to a stopping

23 point?

24   MS. DOMINGUEZ-BRASWELL:  Sure.

25   MR. BRASWELL:  Okay.  While you have this up on

Page 116

1    the screen, though, I want to talk about this.  What I'm

2    seeing on the screen is not in the witness binder, correct?

3              MS. DOMINGUEZ-BRASWELL:  It is in the witness

4    binder.  So, if you're seeing a document that has a plan

5    administrator exhibit number on it, it's in the witness

6    binder.

7              THE COURT:  Can you tell me where this is in the

8    witness binder?

9              MS. DOMINGUEZ-BRASWELL:  Sure, this is 625.  It's

10   the letter we just saw.  And then a few pages over is

11   Exhibit A to the letter.

12             THE COURT:  Let me ask the question a different

13   way.  You're taking me on a tour of a native file, right?

14             MR. TRUMPP:  Correct.

15             THE COURT:  This is a native file --

16             MS. DOMINGUEZ-BRASWELL:  Yes.

17             THE COURT:  -- that's up on the screen?

18             MS. DOMINGUEZ-BRASWELL:  And then you have in the

19   binder is -- yeah, that's right.

20             THE COURT:  Okay.  All I'm trying to do is make a

21   record.  So, if everything that's on the screen in native

22   form is somehow in this binder, that's good, but the record

23   needs to reflect that.  If you're showing me a screenshot of

24   a native document that's not in this binder, it doesn't make

25   a good record because the record doesn't navigate around the

1    native file.

2              So typically, if you're going to put up a native

3    file and it's not in the binder I'd like to see a

4    demonstrative so that the record reflects the screengrab of

5    what you're showing me.  Does everyone understand what I'm

6    talking about?  I don't think so.

7              MS. DOMINGUEZ-BRASWELL:  Well, you want us --

8    basically, you want the screen to look likes what in your

9    binder.

10             THE COURT:  No, okay.

11             MS. DOMINGUEZ-BRASWELL:  Okay.

12             THE COURT:  So, if you're going to be working from

13   native files, which I think you are, okay, then if you're

14   going to put something up, it helps to have a demonstrative

15   so that I have a record, right?  You could call it DX-

16   whatever, or PA-DX, or TR-DX, so that the record has the

17   portion of the native file that I'm looking at.  Otherwise,

18   it's up there and it's not saved for posterity, what I'm

19   looking at.

20             MS. DOMINGUEZ-BRASWELL:  Okay.

21             THE COURT:  If I'm not saying this clearly, if

22   anyone understands what I'm talking about -- let me try it

23   one more time.

24             You put a native file up.  You drive around the

25   file and take me to a spot, and we park at that spot in the

Page 118

1    native file.  And what's on the screen at that parking spot

2    is not in this binder somewhere.  That's gone forever.  It's

3    not -- what I'm looking at is not saved for the purposes of

4    the record.

5             So, if what I'm looking at is in this binder,

6    great, all good.  You just need to tie what's on the screen

7    at the moment you're telling me to look at it with what's in

8    the binder.  If it's not in the binder, that's a problem for

9    the record.  I'll look at it, but then it's gone.

10             MS. DOMINGUEZ-BRASWELL:  Okay.

11             THE COURT:  Okay.

12             MS. DOMINGUEZ-BRASWELL:  So, this is in the

13   binder.  Are you okay with this format, or do you want --

14             THE COURT:  No, I'm fine -- Mr. Consenza?

15             MR. COSENZA:  And I think just for purposes going

16   forward, Your Honor, I think it just would've been clearer,

17   because I was (indiscernible) to the document, just to be a

18   clear articulation as we're examining witnesses and crossing

19   witnesses, to go exactly to the exhibit number, the tab and

20   the column they're identifying so that there's a direct tie

21   in the record --

22             THE COURT:  That -- yeah.

23             MR. COSENZA:  -- to what's in the binder.

24             THE COURT:  That --

25             MR. COSENZA:  And if there's not, there's some

Page 119

```
 1    confusion --

 2              THE COURT:  That's what I mean --

 3              MR. COSENZA:  -- as to whether there's a new

 4    document.

 5              THE COURT:  -- because I can't -- you know, as you

 6    were doing this I couldn't be sure that this was just not a

 7    momentary snapshot --

 8              MR. COSENZA:  Yep.

 9              THE COURT:  -- of a native file that wasn't

10    otherwise identified.

11              MR. COSENZA:  That's --

12              MS. DOMINGUEZ-BRASWELL:  I'll do a better job of

13    moving and making sure that I'm tying what's on the screen

14    to what's in your binder so you know exactly where you are.

15              THE COURT:  That's absolutely perfect.

16              MS. DOMINGUEZ-BRASWELL:  My apologies.

17              THE COURT:  Okay.  No worries.

18              MS. DOMINGUEZ-BRASWELL:  Okay.

19              THE COURT:  So, I think we'll leave it there.

20    It's 1:00.  Do you want a full hour for lunch?  I don't know

21    if that's something you had discussed?

22              MR. SHUSTER:  That makes sense.

23              MR. COSENZA:  We can agree with that.

24              THE COURT:  Is that okay?  You can agree with

25    that?
```

Page 120

1              MR. COSENZA:  Yes, thank you.

2              THE COURT:  Excellent.  All right.

3              MR. SHUSTER:  Thank you.

4              THE COURT:  Well, we'll call it 58 minutes and

5        come back at 2:00.  Mr. Trumpp, unfortunately, same rules

6        apply.

7           (Recess)

8              THE COURT:  Please, have a seat.  So, back to my

9        topic about native files and demonstratives, because it's so

10       -- it's still not clear, okay?  Let me explain my -- hello,

11       Mr. Trumpp.  Thank you.

12             MR. TRUMPP:  Hello.

13             THE COURT:  So, if you look at PA-625, after your

14       explanation, I remain confused.  Okay?

15             MS. DOMINGUEZ-BRASWELL:  Okay.

16             THE COURT:  The document that's behind PA-625 is

17       not in the exact form of the letter that was sent.  The

18       letter that was sent -- I'm asking -- was a letter with a

19       thumb-drive, with thumb drives, right?

20             MS. DOMINGUEZ-BRASWELL:  Right.

21             THE COURT:  Okay.  What I had thought you were

22       telling me was in the actual letter, there were these pages

23       that were -- I'm calling a demonstrative, that's a

24       screengrab.  That's not true.

25             MS. DOMINGUEZ-BRASWELL:  Right.  They were on

Page 121

1    drives.  I don't know if they were thumb drives or hard

2    drives.

3              THE COURT:  Right.

4              MS. DOMINGUEZ-BRASWELL:  But okay.

5              THE COURT:  Okay.  So, the problem is that this --

6    presenting this letter as this letter is not the letter.

7    You send the letter.  Wilkie sent a letter --

8              MS. DOMINGUEZ-BRASWELL:  Mm hmm.

9              THE COURT:  -- that had exhibits, and those

10   exhibits were on thumb drives.

11             MR. SHUSTER:  Or FTP --

12             MS. DOMINGUEZ-BRASWELL:  Right.  Or FTP --

13             MR. SHUSTER:  -- or FTP sites.

14             MS. DOMINGUEZ-BRASWELL:  Right.  FTPs.

15             THE COURT:  Right.  And this is just a portion?

16             MS. DOMINGUEZ-BRASWELL:  Correct.

17             THE COURT:  Okay.  So, we're still not there yet

18   in terms of this being presented in a way that I think is

19   entirely accurate.

20             MS. DOMINGUEZ-BRASWELL:  Okay.

21             THE COURT:  Okay?  So, either these screengrabs,

22   demonstratives, examples, whatever you want to call them,

23   should have a notation that say, excerpt, or something --

24             MS. DOMINGUEZ-BRASWELL:  Okay.

25             THE COURT:  -- like that.  Otherwise this appears

Page 122

1    to be a document that wen sent had this particular page

2    attached, and it was not.  And that fact was lost on me.

3              MS. DOMINGUEZ-BRASWELL:  Right.

4              THE COURT:  I thought what you were telling was

5    that, no worries, see the attached, this is the document.

6              MS. DOMINGUEZ-BRASWELL:  Understood.  Okay.

7              THE COURT:  Okay?

8              MS. DOMINGUEZ-BRASWELL:  And for the Court's --

9    these are very, very voluminous.

10             THE COURT:  I understand, which is why -- I

11   understand what a native file is, and I understand why in a

12   million years, I don't want -- you know, I know how that

13   works.

14             MS. DOMINGUEZ-BRASWELL:  Okay.

15             THE COURT:  But, so am I now accurately

16   describing, saying back to you what is in fact in here?

17             MS. DOMINGUEZ-BRASWELL:  Well, let me make sure I

18   understand that these exhibits --

19             THE COURT:  Mm hmm.

20             MS. DOMINGUEZ-BRASWELL:  -- hopefully, that will

21   help inform what we do next.

22             THE COURT:  Right.

23             MS. DOMINGUEZ-BRASWELL:  So, what you would like

24   to see is something that notes on the exhibits, if it's an

25   excerpt, and maybe even how it was sent and where it was

Page 123

1     sent?

2             THE COURT:  Well, right, because the point is that

3     it's being presented to me as, here are the exhibits to a

4     letter that was sent to the Trustees, and it's not.  The

5     format of what was sent to the Trustees was the letter with

6     each of the exhibits that the notation produced in native

7     format and presumably, Mr. Schuster got a shoebox full of

8     thumb drives, or someone did.

9             MS. DOMINGUEZ-BRASWELL:  Okay.

10            THE COURT:  Right?

11            MS. DOMINGUEZ-BRASWELL:  But --

12            THE COURT:  But you folks -- I mean --

13            MR. SHUSTER:  We are.  I mean --

14            THE COURT:  Okay.

15            MR. SHUSTER:  I think we understand the issue --

16            THE COURT:  Okay.

17            MR. SHUSTER:  And we'll --

18            THE COURT:  I'm not trying to make a --

19            MR. SHUSTER:  No, no.

20            THE COURT:  -- mountain out of a molehill.

21            MR. SHUSTER:  No, no, no, no.  I hear you on this

22    and, you know, hopefully we can have a consistent approach

23    in how we do this.

24            THE COURT:  Sure.  I mean, if you have a

25    consistent approach and the record is clear, that's 100

Page 124

1     percent great, okay?  So, I'm sorry for being --

2              MS. DOMINGUEZ-BRASWELL:  Oh, everybody --

3              THE COURT:  -- slow on the uptake here.

4              MS. DOMINGUEZ-BRASWELL:  No, it was --

5              THE COURT:  That was a mistake.  That was the

6     disconnect that I was experiencing.

7              MS. DOMINGUEZ-BRASWELL:  So --

8              THE COURT:  So, for today's purposes, let's just

9     keep on going.  And then, perhaps, would I would suggest is

10    you could swap back in pages that have, you know, the

11    appropriate designation.

12             MS. DOMINGUEZ-BRASWELL:  Okay.  And for today's

13    purposes, since that designation won't be on these, do you

14    want me to tell you when this a native file and this is how

15    we --

16             THE COURT:  Just tell me when I'm looking at

17    something on the screen that I can find in the book --

18             MS. DOMINGUEZ-BRASWELL:  Okay.

19             THE COURT:  -- that I can put together.

20             MS. DOMINGUEZ-BRASWELL:  Okay.

21             THE COURT:  Thank you.  All right, Mr. Trumpp,

22    you're still under oath.  Okay?

23         CONTINUED DIRECT EXAMINATION OF ZACHARY D. TRUMPP:

24    BY MS. DOMINGUEZ-BRASWELL:

25    Q    Mr. Trumpp, I'd like to walk through a loan file with

Page 125

1    you.  And I'd like to walk through it as best as we can from

2    beginning to end, starting with what the Trustee submitted

3    on the particular loan file, just the claims tracking

4    spreadsheets.  Can you please turn to Plan Administrator

5    689?  And can you just to orient us, tell us what 689 is?

6    A    Yes, 689 is a copy of the claims tracking spreadsheet

7    for a particular loan that was submitted in a protocol.  And

8    that loan ended in the numbers 8824 for the Lehman loan

9    number.  As we talked about earlier this morning, there's

10   certain fields in each claims tracking spreadsheet that gave

11   identifying characteristics about the loan in question and

12   the various allegations of claims made under the various

13   loans by the Trustees.

14   Q    And for this particular loan and this claims tracking

15   spreadsheet, how many pages do we need to look at to know

16   how many claims were made on this loan?

17   A    In this format, there are four pages.

18   Q    Okay.  So, which four pages of this document show us

19   what claims were made on the loan, and can you tell us what

20   the first claim made on this loan is?  It's starting on Page

21   2 of the document, of Exhibit 689.

22   A    So, looking down the left-hand column to where it says

23   alleged defect number 1, the first alleged defect for this

24   particular loan was -- there was a failure to provide the

25   final HUD 1.

Page 126

1    Q    Okay.  And if I refer to that as a missing document

2    claim, will you know what I'm talking about?

3    A    I will.

4    Q    Okay.  What was the second claim on this loan?

5    A    So, continuing on down the page, looking alleged defect

6    number 2, the second claim on the loan was that the borrower

7    misrepresented their debt obligations.

8    Q    Okay.  And what was the third one?

9    A    So, going onto the next page, and again scrolling down

10   on the left-hand side, there was an alleged defect number 3.

11   And the third alleged claim on this particular loan was for

12   the fact that the borrower misrepresented their income.

13   Q    Okay.  And I'd like to walk through each claim, and the

14   allegations the Trustees made on each claim, and the

15   evidence that they provided in support of the claim.

16         Starting with the missing document claim, first of

17   all, just as background, did the Trustees assert all of the

18   missing document claims in the protocol?

19   A    They did.  It was one of the largest claim categories

20   of asserted claims.

21   Q    Okay.  And this particular claim is based on a missing

22   HUD-1, or an alleged missing HUD-1, right?

23   A    Yes.

24   Q    Is that a common claim type in the protocol?

25   A    It was one of the types of documents that they asserted

Page 127

1    was missing from the loan file.

2    Q    And what did the plan administrator find as it relates

3    to the missing document claim on this loan?

4    A    So, for this particular claim, as we mentioned, we do a

5    review of the entire loan file.  And in that process, we

6    were able to determine that there was in fact a copy of the

7    HUD-1 in this particular loan file.  And so, we identified

8    that and gave it back to the Trustees.

9    Q    Okay.  And I want to look at what it is that you

10   provided back to the Trustees on this particular claim.

11          MS. DOMINGUEZ-BRASWELL:  Can you go to Plan

12   Administer Exhibit 620, and Slide 24, I think?

13   Q    What is on the screen here, Mr. Trumpp?

14   A    The copy of the HUD-1 that was found in the file.

15   Q    Okay.

16          MS. DOMINGUEZ-BRASWELL:  And Your Honor, just to

17   orient you --

18          THE COURT:  Yes.

19          MS. DOMINGUEZ-BRASWELL:  -- Plan Administrator 620

20   is the actual formal response that was provided back.  It's

21   a spreadsheet that shows individual formal responses.  And

22   on the slide, what we'll show you is a snippet of that

23   formal response so you can see it, and then the documents

24   that were provided back.  So, the screen will show something

25   different than Plan Administrator 620.  The screen is from

Page 128

1    the slide deck.

2              THE COURT:  Can you say that again?

3              MS. DOMINGUEZ-BRASWELL:  Sure.  Plan Administrator

4    620 is the formal response, the letter and the attached

5    formal responses associated with this particular loan and

6    the individual claims.

7              THE COURT:  All right.

8              MS. DOMINGUEZ-BRASWELL:  What you see on the

9    screen is from our PowerPoint presentation, and it just

10   shows you the...

11             Can you call up the formal response, please, the

12   formal response text and the documents that were provided

13   back to the Trustees.  And I'll let Mr. Trumpp explain that

14   concept of the documents --

15             THE COURT:  Okay, the formal response that's on

16   the right here, that's what was provided to the Trustees?

17             MS. DOMINGUEZ-BRASWELL:  Right.

18             THE COURT:  -- and made a format in --

19             MS. DOMINGUEZ-BRASWELL:  Right.  And attached --

20             THE COURT:  Okay, so this --

21             MS. DOMINGUEZ-BRASWELL:  -- to a letter like the

22   one you see --

23             THE COURT:  -- is a grab from that document?

24             MS. DOMINGUEZ-BRASWELL:  Exactly.

25             THE COURT:  Okay, thank you.

Page 129

1  Q    And Mr. Trumpp, what is on the screen besides the

2  formal response?

3  A    So, on the screen we have a copy and a picture of the

4  HUD-1 that was found in the file and the Bates reference for

5  that particular document.  And we have on the right-hand

6  side a picture of the formal response that was given back to

7  the Trustees for this particular claim.

8           And in yellow, those are the words from the formal

9  response itself for this particular alleged defect and claim

10  of a missing HUD-1.

11  Q    Now, in the formal response there's no Bates reference

12  to the HUD-1.  How did the Trustees know to connect the dots

13  on the Bates document which is the HUD-1 and the formal

14  response associated with that claim?

15  A    So, there would have been a separate exhibit attached

16  in the communications back and forth between the parties

17  that had for each loan number the applicable Bates documents

18  that we were referring to or looking at in our responses

19  back to our Trustees.  So, we had the Excel document with

20  the formal response and the words in yellow here.

21           But then again, as we talked about this morning,

22  we had, based on communications with the Trustees, decided

23  to provide an additional exhibit.  And that additional

24  exhibit was an Excel file with a loan number, and the Bates

25  citations and references to the key documents out of the

Page 130

1   loan file or third-party documents that we thought would be

2   relevant to the review for them.

3           So, in this particular example, we would have

4   cited to the Bates reference listed here for this HUD-1.

5   Q    Signaling to the Trustees that you identified the

6   allegedly missing document?

7   A    Correct.  To be used in conjunction with what we said

8   in our formal response.

9   Q    Okay.  Let's go back to the claims tracking spreadsheet

10  and look at the next claim alleged on this loan.  What claim

11  is that, Mr. Trumpp?

12  A    So, alleged defect number 2 is for a misrepresentation

13  of debt obligations.

14  Q    And what are the Trustees alleging with respect to this

15  particular claim?

16  A    Yes, I'll try not to read it word for word and

17  summarize it.  But basically, this particular loan closed in

18  November of '06.  They cite to a MERS report and an audit

19  credit report that they believe show that there was an

20  additional mortgage outstanding for this particular borrower

21  at the time the subject loan was closed.  And that that

22  particular loan, according to the MERS and audit credit

23  report, was opened in April of 2005, so, prior to the

24  subject loan.  And that that particular loan had a balance

25  of $164,500 and a monthly payment of $2,329.

Page 131

1           And so, because of that additional mortgage, the

2    Trustees felt that the borrower misrepresented their true

3    debt capacity at origination, and that because that debt

4    wasn't assessed by the original underwriter and put into the

5    original debt income calculation, their allegation was that

6    the true debt to income ratio for that particular loan,

7    taking into account the misrepresentation of debts and the

8    misrepresentation of income, which we'll talk about in a

9    minute, the borrower's true debt to income ratio was 133.06

10   percent.  Or said another way, more than 100 percent of that

11   borrower's monthly income had to go to all of their debt

12   obligations.

13   Q    And I'd like to take you to the documents where the

14   information that the Trustees point to here that they allege

15   supports the misrepresentation of debts claim in turn,

16   starting with the MERS report that they're citing to here.

17           Just to give us the background, can you generally

18   describe what MERS is and what MERS reports are?

19   A    So, MERS is a -- stands for Mortgage Electronic

20   Recording System, and it was a system that originators,

21   lenders and servicers had the ability to use to track

22   ownership of loans and servicing rights.  Not all loans in

23   the United States were registered in MERS, but this was used

24   as essentially a clearinghouse for information on loan

25   ownership.

Page 132

1    Q    Are you familiar with the type of data that MERS

2    stores?

3    A    So, in my past experience at Aurora, we had reason to

4    use MERS as a servicer.  And so, from time to time, I had

5    reason to see MERS reports and read and see how they were

6    used.

7    Q    Do you know how that information is input into the

8    system?

9    A    So, many different parties and entities have access to

10   input information into the system for MERS.  Generally

11   speaking, the servicers who are servicing loans on behalf of

12   MERS, if the loan ownership changes, if the servicer

13   changes, have reason to go into the system of MERS and

14   change the data.

15   Q    Do you know one way or the other whether the data that

16   goes into the MERS system is always accurate?

17   A    It depends upon the entity putting the information in

18   and making sure that its accuracy is maintained.

19   Q    Now, the other document that the Trustees are relying

20   on is an audit credit report.  Can you explain what an audit

21   credit report is?

22   A    So, an audit credit report is simply a credit report

23   that is pulled on the borrower for audit purposes.  And so,

24   in this case it would've been a credit report that was

25   pulled by one of the Trustees' diligence vendors as part of

Page 133

1    their review.

2    Q    And how did the plan administrator treat audit credit

3    reports during the protocol?

4    A    We would treat it like any piece of evidence.  We would

5    look at it, assess its merits, and weigh it appropriately.

6    Q    How about MERS reports?  How did the plan administrator

7    treat MERS reports?

8    A    Same answer.  We would look at it, we would assess it

9    relative to their claim, weigh it against any other

10   additional evidence that we found, or information in the

11   loan file, and we would weigh it appropriately.

12   Q    Okay.

13           THE COURT:  Can I ask a question?  The audit

14   credit report, that refers to a credit report from one of

15   the major credit reporting agencies?

16           MR. TRUMPP:  Yes.

17           THE COURT:  Okay.  So, that's not unlike MERS,

18   which is a -- MERS is MERS.  There's no such thing as ACR.

19   It refers to Experian or one of the others?

20           MR. TRUMPP:  Correct.  It could have been a single

21   credit report from one of them, or a tri-merge, where they

22   looked at all three.  It just depends.  But ACR really is

23   just to imply that it's a credit report that was pulled

24   later, not necessarily the credit report that was used at

25   origination.

Page 134

1           THE COURT:  Okay.  And are you familiar,

2     generally, with the data that each of the credit reporting

3     services keeps?  Does it go back -- how far back in a

4     person's life does it go?

5           MR. TRUMPP:  You know, that's a good question.  I

6     don't know the answer to that.

7           THE COURT:  Okay.

8     Q    Look at Plan Administrator Exhibit 663.  Mr. Trumpp,

9     what is this document?

10    A    So, this is the beginning of, and it's the document I

11    referred to as the claims tracking -- or excuse me, the

12    claims package that was submitted for this particular loan.

13    Q    Okay.  And approximately how many pages is this?

14    A    In this particular case, the claim package for this

15    loan was 24 pages.

16    Q    Okay.  And was this claim package that the Trustees

17    submitted supposed to contain all of the evidence that the

18    Trustees were relying on to support their claim?

19    A    Yes.

20    Q    Let's take a look at page -- we're going to just kind

21    of walk through this.  Let's take a look at the next page in

22    the claims package, Page 2 of Exhibit 663.  What is this

23    document?

24    A    So, this particular page is a page from the

25    underwriting guidelines.  And just based on my experience, I

Page 135

1    know that these are the underwriting guidelines from Aurora

2    --

3    Q    Okay.

4    A    -- which was one of the originators in question where

5    LBHI made representations and warranties.  And there's a

6    couple of pages from those underwriting guidelines submitted

7    here.  It wasn't by any means the entire list of

8    underwriting guidelines and product profiles.  And what's

9    unique here is that this particular loan was not originated

10   by Aurora.

11   Q    And what significance does that have?

12   A    Oh, the underwriting guidelines for loans from Aurora

13   isn't applicable to a loan that was originated in this case

14   by BNC.  They would've had their own separate underwriting

15   guidelines, or a separate different type of loan program.

16           So, when you're looking at underwriting

17   guidelines, you've first got to make sure that you have it

18   from the right entity.  Then you've got to make sure that

19   you have it as of the right applicable date.  Underwriting

20   guidelines changed over the course of time.  And you also

21   needed to make sure that you were looking at the right loan

22   program within the right underwriting guideline.

23           So, those were all things that you needed to look

24   at.  In this particular claim package, they submitted

25   underwriting guidelines, and a portion of the underwriting

Page 136

1   guidelines at that, from the Aurora underwriting guidelines,

2   but Aurora had nothing to do with the underwriting and

3   origination of this loan.

4   Q    And is there a difference between Aurora and BNC

5   guidelines?

6   A    Yes.  So, generally speaking, Aurora originated what

7   are called Alt-A loans, and BNC originated subprime loans.

8   So, inherently they're going to be different.

9   Q    And is this something that you saw in other instances

10  beyond this loan file on other loan files where they had the

11  wrong underwriting guidelines?

12  A    So, one of the things that was important in our review,

13  and we talked about it briefly this morning, was assessing

14  materiality and using the appropriate underwriting

15  guidelines as a benchmark for that.  We're not necessarily

16  sure, nor can we glean, what underwriting guidelines if any

17  were used by the Trustees in their review process.

18  Q    Let's take a look at the page after the underwriting

19  guidelines, page 5 of Exhibit 663.  What is this document?

20  A    So, there were a couple different versions depending up

21  on who the loan reviewer was of this, but it's referred to

22  here as a uniform underwriting and transmittal summary.  And

23  it's generally referred to in the industry as a 1008, but

24  it's really a document that the Trustees' vendors use to --

25  in their review of the loan.  So, the top half of the page

Page 137

1    is certain identifying characteristics about the particular

2    loan and then further down we start seeing some of the

3    things that they're found based upon their review of the

4    loan.  So, for example, in the middle of the page there's a

5    line for audit total obligations and income of 133.06

6    percent.  That ties back to the claims tracking spreadsheet

7    and the new DTI that the Trustees were alleging.  And up

8    above that we can see the character -- the elements -- let's

9    use that word -- the elements that went into the calculation

10   that derived at 133.06 percent.  So, up above we see changes

11   in their income that were used in that calculation.

12   Q    Let's pause on that for a minute.  Can you explain the

13   concept of DTI and how it's relevant to the analysis under

14   the protocol?

15   A    So, the debt-to-income ratio is a ratio of a borrower's

16   monthly debt obligations as a percentage of their monthly

17   gross income.  Monthly gross income is listed on their

18   application.  Their monthly debt obligations are also listed

19   on their application.  And the two are calculated -- used in

20   the calculation of a debt-to-income ratio.

21   Q    So, is there a DTI that's calculated at origination?

22   A    Yes.

23   Q    And is that relevant to the underwriting decision?

24   A    Yes.

25   Q    And then this DTI, this 133.06 you said is what the

Page 138

1    Trustees are alleging.  What does that mean?  What is that?

2    A    So, taking into account the alleged new income and

3    taking into account the alleged misrepresentation of debts,

4    they go back and recalculate the debt to income ratio based

5    on the new information and they assert that really instead

6    of the origination DTI as listed up above here of 20.184

7    percent, this borrower's true debt-to-income ratio based

8    upon this new information really was 133.06 percent.

9    Q    And is the recalculation of DTI relevant to the plan

10   administrator's analysis of a breach of claim?

11   A    It is.  It's one of the things that we're looking at

12   when we're assessing materiality relative to the

13   underwriting guidelines that were used at origination.

14   Q    And did the plan administrator take the Trustees'

15   recalculated DTI at face value?

16   A    No.

17   Q    What did the plan administrator do?

18   A    Well, first he had to check the math, right?  We wanted

19   to make sure that the math was right.  But then secondarily

20   we had to look at each component that they said was new and

21   assess whether it truly was accurate or not.  And so, we

22   would look at the income and assess the income and determine

23   whether that was accurate and we would look at the debts.

24   And so, there were a couple of layers of review that you had

25   to do to assess whether that asserted debt-to-income ratio

Page 139

1  held water.

2  Q    Now, you said it was relevant.

3           THE COURT:  Can I ask a clarifying question?  So,

4  does it vary by originator what gets included in the DTI,

5  both in terms of the income and the debt?  Is that a

6  uniform, across-the-industry thing or does it vary depending

7  upon who is originating the loan, if you know?

8           MR. TRUMPP:  Generally speaking it's a fairly

9  straightforward calculation.  However, you would have to

10  look at the underwriting guidelines for that particular

11  origination to see if there were any exceptions or things

12  that they did differently.

13           THE COURT:  Okay.  Thank you.

14  Q    And focusing on the equation that talked about earlier,

15  at what part does the Trust -- I'm sorry, the plan

16  administrator's analysis of the DTI calculation,

17  recalculation come into play?

18  A    Well, the various inputs to the new debt-to-income

19  ratio would come into -- would be assessed at the threshold

20  facts level to see whether they're appropriate or not.  But

21  the materiality portion of that new debt-to-income ratio

22  would take -- would be taken into account at the application

23  of rep and warranty levels.

24  Q    Okay.  And when you say materiality, can you explain

25  what you mean by that as it relates to the DTI calculation?

Page 140

1    A    So, it's really looking at and assessing the magnitude

2    of change of debt-to-income ratios, right?  Did it go from

3    20.184 to 25?  Did it go from 20 to 40?  Did it go to 20 to

4    50?  Or did it go from 20 to 133.06 percent?  Those are all

5    things that we were weighing when we were assessing

6    materiality.  And it was all in relation to the original

7    underwriting guidelines and what would the lenders have

8    approved had they known of the borrower's true income or

9    true debt capacity.

10   Q    And is there -- I understand you said it depends on the

11   underwriting guidelines.  Is there a typical max DTI under

12   the guidelines?

13   A    So, it would again vary by originator and loan product.

14   So, frequently it was 45 or 50 percent.

15   Q    Okay.  Now, you said earlier there were exceptions.

16   What did you mean by that?

17   A    So, what I mean by that is when underwriters underwrote

18   loans at origination, they had the underwriting guidelines

19   that said, "Here are the parameters with which you can make

20   a lending decision."  But generally speaking, underwriters

21   had the ability to go outside of those guidelines if there

22   were compensating factors.  So, maybe they could say this

23   particular debt-to-income ratio is higher than what the

24   underwriting guidelines all for, but I'm willing to make an

25   exception because there are compensating factors.  And what

1    I mean by that is maybe the borrower had larger-than-normal

2    assets to cover any potential difference.  Maybe the

3    borrower had some fundamental thing in his self-employment

4    that went into the decision somehow.  It just depended upon

5    the facts and circumstances, but they would look at is there

6    a factor of this particular borrower that offsets any

7    potential negatives in lending outside of the underwriting

8    guidelines.  So, it was possible if there were compensating

9    factors available to allow certain underwriting guideline

10   exceptions.

11   Q    And to be clear, you said earlier that typically the

12   max was between 45 and 50.  Are you saying that if it went,

13   for example, above 50 and that was the max but there were

14   compensating factors, the loan might still be underwritten?

15   A    Potentially, yes.

16   Q    And how is that relevant to the plan administrator's

17   materiality assessment of the defect?

18   A    So, it all goes back to looking at the facts and

19   circumstances at origination for that particular loan and

20   looking at what -- we're trying to put ourselves in that

21   underwriter's shoes and look at what were they thinking.

22   It's kind of hard to do ten years after the fact but we

23   would look at the guidelines, we would look at the

24   information available, and assess, you know, was this new

25   fact as alleged by the Trustees, assuming it was true,

Page 142

1  something that would have caused the original underwriter to

2  not make that loan?

3  Q    And you said you performed your own calculation of the

4  DTI.  Was it often the case that you agreed with the

5  Trustees' allegation of the recalculated DTI or disagreed

6  with the Trustees' recalculation of the DTI?

7  A    Well, so, it depends.  And in this particular example,

8  we don't agree with their calculation of the debt-to-income

9  ratio that drove their answer to get it to 133.06, not just

10 because we disagree with their allegations or

11 misrepresentation of income and misrepresentation of debts,

12 but based upon the debts that they're asserting, assuming

13 they were accurate, we don't believe they used the right

14 monthly obligation for that new loan to calculate the 133

15 percent.

16 Q    Okay.  And we'll get to that in a minute.  So, just to

17 deconstruct your answer, so the -- it's DTI, debt-to-income,

18 so you're saying the debt was wrong and the income was wrong

19 and therefore the whole calculation was wrong?  There's lots

20 of different ways that DTI can be wrong, right?

21 A    Absolutely.

22 Q    At inception and at the time of the look-see, right?

23 A    So, to answer your --

24 Q    I'm just trying to understand -- deconstruct -- you

25 know, try to put your answer in different words.

Page 143

1    A    We'll talk about it in more detail, but the short, very

2    simple answer is when the Trustees alleged in their factual

3    basis for defect number two that the monthly payment

4    associated with that new, undisclosed mortgage was $2329, we

5    have no idea where that $2329 came from.

6    Q    Thank you.  Let's keep walking through the Trustees'

7    claim package.  Going to Page 7 of Exhibit 663, can you

8    identify that document for us, Mr. Trumpp?

9    A    Yes, this is the initial page of the borrower's loan

10   application.

11   Q    Okay.  And take a look at the third page in that

12   application where it says assets on the left-hand side and

13   then liabilities on the right-hand side.  Is that where the

14   borrower's supposed to disclose his or her debt obligations?

15   A    Yes.  On the application on the right-hand side is

16   where the borrower's supposed to place all of their monthly

17   liabilities.  So, mortgages, credit cards, car loans, et

18   cetera.

19   Q    Now, here the Trustees were alleging an undisclosed

20   debt of $164,500.  Do you see that anywhere disclosed on

21   this application?

22   A    I do not.

23   Q    Would that end the inquiry for the plan administrator

24   analysis?  The Trustees' have alleged that the borrower

25   didn't disclose a debt.  It clearly does not appear on the

Page 144

1    loan application.  Does that end the inquiry?

2    A    No.  We would want to look at the evidence that was

3    asserted by the Trustees to confirm that he truly had that

4    particular mortgage, and we would want to look through the

5    rest of the loan file to see if there was anything else in

6    there that may be pertinent.

7    Q    Okay.  Let's take a look at the Trustees' alleged

8    evidence.  Going to Page 19 of the claim package, can you

9    describe for the Court what that document is?

10   A    So, this is an example of a merged report.  And this is

11   how it came to us from the Trustees.  And they highlighted

12   that box at the bottom.  And that box at the bottom is the

13   loan that they are arguing was undisclosed.

14   Q    Okay.  And what is --

15   A    So --

16   Q    -- what is the note date on that loan?

17   A    So, the note date is April of 2005.  The note amount is

18   $164,500.

19   Q    Okay.  And what's the date of origination of the loan

20   that we're looking at?

21   A    So, the date of origination of the subject loan is

22   November of 2006.

23   Q    So, based on this report it looks like in fact this

24   debt did exist before origination and the borrower did not

25   disclose it on his loan application, right?

Page 145

1   A     Based solely on this report, it would appear that way.

2   Q     Okay.  Does that end the inquiry for the plan

3   administrator?

4   A     No.

5   Q     All right.  We're going to keep looking, but before we

6   move on, what is that text at the bottom below the box that

7   looks typed in?

8   A     So, this is information that was added to the merged

9   report by the Trustees and submitted in their claim package.

10  And so, this is information that they're showing supposedly

11  for that particular mortgage.  And they say that the note

12  rate for this mortgage was 8.94 percent and that the monthly

13  debt obligation was $2329, and that $2329 ties to the amount

14  alleged in the factual basis for defect.  The issues are we

15  don't know where they got the 8.94 percent.  The subject

16  loan's note rate was 8.94 percent so it appears that they

17  just grabbed the note rate from the subject loan and applied

18  it to this undisclosed debt and said, "That must have been

19  the note rate," and the note rate obviously is key to

20  determine how much their monthly obligations are.  So, we

21  don't know their note rate.  Secondarily, they wrote on here

22  this 200 and 300 -- $2329 assuming that that's the monthly

23  debt obligations for this mortgage.  I'm not necessarily

24  sure, nor can I tell, where that came from.  I ran an

25  amortization schedule myself and at 8.94 percent it was,

Page 146

1    like, $1300 and change, so that would mean -- for principal

2    and interest.  So, that would mean there's an additional

3    $1000 on this particular mortgage for taxes and insurance

4    which seems high to me.

5              THE COURT:  Can -- on that subject, do you have

6    any indication -- you mentioned amortization.  So, you --

7    how would you know -- there are so many different types of

8    mortgage and loan products, interest-only, 15-year, 30-year,

9    is -- what would you look to to determine what the basis of

10   the calculation was?

11             MR. TRUMPP:  You're absolutely correct, Your

12   Honor.  I just created a simple 30-year, straight fixed-rate

13   mortgage obligation, but I have no idea --

14             THE COURT:  Okay.

15             MR. TRUMPP:  -- based upon this information what

16   the correct way to do it would be.

17   Q    And is there anything in the loan file that gives you

18   any insight into how the Trustees came up with that number?

19   A    I surmise that the 8.94 percent rate was taken because

20   it was the same as what the subject loan was and they said,

21   "That's reasonable."  But again, I have no idea how they

22   calculated their monthly payment amount.  And to Your

23   Honor's earlier point, it's that $2329 that went into that

24   debt-to-income calculation.  So, assuming this debt really

25   is there, which we'll talk about later why it's not, that

Page 147

1    calculation was based upon this information that we can't

2    support.

3    Q    So, we just walked through the claim package and the

4    Trustees' evidence.  The Trustees also cited to an audit

5    credit report.  Was there an audit credit report in their

6    claim package?

7    A    No.  So, this is an example of the Trustees talking

8    about a document in their allegations but it was not

9    included in a claim package and it was not included in the

10   loan file.

11   Q    Okay.  Let's go to the loan file, Plan Administrator

12   Exhibit 664.  Mr. Trumpp, can you describe what this

13   document is and where you found it?

14   A    So, this is a credit report that was found in the loan

15   file and this credit report, if you look at the upper left-

16   hand corner, was ordered in October of 2006.  So, a month

17   before the particular mortgage was originated.  So, by that

18   we're inferring that this was the origination credit report.

19   Q    And what significance does that have to you that it was

20   the origination credit report as opposed to a credit report

21   that was pulled later?

22   A    Well, this is the credit report that presumably would

23   have been in the hands of the underwriter at the time they

24   were assessing the characteristics of the loan and making a

25   lending decision.

Page 148

1    Q     And does that matter one way or the other?

2    A     Well, I want to know based upon that origination credit

3    report that they had what did it say about this particular

4    undisclosed mortgage?

5    Q     Let's take a look at the second page of this exhibit,

6    Page 2 of Exhibit 664.  Towards the bottom of the page -- if

7    you go to the second page -- towards the bottom of the page,

8    one line up, do you see where it says Homecome Finance, it

9    looks like, FIN, and it's got some information about a debt

10   and some dates?  Can you tell the Court what that is?

11   A     Yeah.  So, this is the second page of the credit report

12   looking at various trade lines for this particular borrower,

13   and the highlighted section is for a mortgage with

14   Homecoming Financial, and it seems to line up with the

15   supposed undisclosed mortgage, opened in April of '05, and

16   the balance at a high credit limit of $164,500.

17   Q     Okay.  Is there any other useful information on this

18   trade line?

19   A     So, we don't necessarily know where the words came

20   from, the sold part, but it -- we assume that the

21   underwriter wrote this information on there that it was sold

22   in July of '05.  And along with that it has a balance of $0,

23   and it says last payment was in July of '05.  So it appears,

24   based upon the origination credit report, which the lenders

25   would have used in their underwriting decision, that this

Page 149

1    particular undisclosed mortgage had paid off.

2    Q    What does that mean?

3    A    It means there was no longer a debt obligation of the

4    borrower.  So, when they filled out their application and

5    listed their liabilities, they correctly did not list this

6    as a liability because it wasn't.

7    Q    Okay.  Let's take a look at Exhibit number PA-677.  And

8    what is this document?

9    A    This is another example of a credit report that we

10   found --

11            THE COURT:  Hold on a minute.

12            MS. DOMINGUEZ-BRASSWELL:  Sure.

13            THE COURT:  Do you see what I mean?

14            MS. DOMINGUEZ-BRASSWELL:  (indiscernible)

15            THE COURT:  We cannot put it up on the screen and

16   you can ask the witness to refer to it on a generic basis.

17            MS. DOMINGUEZ-BRASSWELL:  Okay.

18   Q    Mr. Trumpp, you still have the document in front of you

19   but we're not going to put it on the screen.

20            THE COURT:  Do you want to hand -- do you have it

21   in your binder, Mr. Trumpp?

22            MR. TRUMPP:  Can you just tell me where it is in

23   my binder?  I'll find it.

24            MS. DOMINGUEZ-BRASSWELL:  Yes.

25            THE COURT:  Or you could just hand him a copy if

Page 150

1    that would make it easier.

2            MS. DOMINGUEZ-BRASSWELL:  He's got a copy.  Plan

3    administrator Exhibit 677.

4    Q    Okay.  Mr. Trumpp, can you describe this document for

5    the Court?

6    A    Yes.  So, this is another credit report that we found

7    in the loan file.  This particular credit report appears to

8    have been requested or pulled in October of 2011.  So,

9    several years after the origination of this particular loan.

10   We surmise from that that this must have been used in the

11   loss mitigation process somehow.  And so, this was another

12   document that we used in our weighing of evidence for this

13   particular claim.

14   Q    Okay.  And take a look at Page 4 of that document.

15   Five lines up from the bottom there's a GMAC Mortgage entry.

16   Do you see that?

17   A    Yeah.  So, this is GMAC Mortgage, which I believe was

18   another name for Homecomings Financial; it had changed hands

19   over time.  But this particular mortgage says again opened

20   in April of '05, high balance of $164,500, last active July

21   of '05.  So, it appears again based upon another credit

22   report that we found in the file that this particular loan

23   had been closed in July of 2005.

24   Q    And were either -- were copies of these documents in

25   the Trustees' claim package?

Page 151

1   A    No, they were not.

2   Q    And what was the plan administrator's finding with

3   respect to the misrepresentation of debts claim?

4   A    So, based upon the evidence that we saw in the loan

5   file itself, we made the determination that that loan had in

6   fact closed prior to origination and was no longer a

7   liability of the borrowers.  And so, it was rightly not

8   included in the application at origination and it was not a

9   misrepresentation of the borrower's debt obligations.

10  Q    Okay.  And let's take a look at what the plan

11  administrator provided back to the Trustees with respect to

12  this claim.

13          MS. DOMINGUEZ-BRASSWELL:  Can we put up the slide

14  that has the formal response, please?  Just go to the formal

15  response.  Thank you.

16  Q    Mr. Trumpp, do you see what's on the screen there?

17  A    I do.

18  Q    Is this the response that was provided back to the

19  Trustees with respect to the misrepresentation of debts

20  claim on this loan?

21  A    It is.

22  Q    And there's a document on the screen as well beyond the

23  formal response; what is that?

24  A    Yeah.  So, one of the documents that we cited to in our

25  Bates references that we gave back to the Trustees was the

Page 152

1    origination credit report.

2    Q    Do you believe that the Trustees had enough information

3    to understand what the plan administrator's position was

4    with respect to this particular claim on this loan?

5    A    Based upon the wording in our formal response, based

6    upon the fact that we cited to their origination credit

7    report via Bates reference, I do believe that the Trustees

8    had sufficient information to understand the Trust -- or the

9    plan administrator's position on this particular claim.

10   Q    Okay.

11           MS. DOMINGUEZ-BRASSWELL:  Can we go back to the

12   claims tracking spreadsheet?  The plan administrator 689.

13   Can we go to the screen that shows the third claim on this

14   particular loan?

15           MR. TRUMPP:  So, the third claim on this

16   particular loan was for a misrepresentation of income.  And

17   I'll try not to read it word for word but summarize what it

18   says for a factual basis.  But they state that the borrower

19   listed on his application that he was earning $6500 per

20   month as a driver when the loan closed in November of 2006.

21   To support their allegation of a misrepresentation of

22   income, the Trustees refer to a -- that particular

23   borrower's 2007 W-2, which verified the borrower was

24   employed with the same employer and employment when the

25   subject loan closed, and the post-closing W-2 said the

Page 153

1    borrower's income was $31,946 annually.  And what that means

2    is they took that amount from the W-2, divided it by 12, to

3    say that the borrower must have made $2662 a month.  They

4    also refer to a Bureau of Labor Statistics report for a

5    borrower for that particular area of the country and state

6    that a 90 -- the 90th percentile for a truck driver in

7    Jacksonville, Florida if I recall correctly was $4507 a

8    month, not the $6500 a month as given by the borrower at

9    origination.  Therefore, based upon those two things, the

10   borrower must have misrepresented his income.  And they used

11   the revised income of $2662 a month in their new debt-to-

12   income ratio when they calculated it at 133.06 percent.

13   Q    And just pausing for a moment on that ratio on the DTI

14   of 133, we've already gone through the misrepresentation of

15   debts claim, does the fact that the debt was not in

16   existence at origination affect that 133 DTI recalculation?

17   A    It would.  That quote, unquote "new debt" would have to

18   be taken out and recalculated.

19   Q    And would the DTI go up or down as a result?

20   A    The debt-to-income ratio would go down.

21   Q    Okay.  Now, the Trustees are asserting that the

22   borrower is a driver it looks like in this claims tracking

23   spreadsheet.  What do you know about this borrower and

24   whether or not he's a driver?

25   A    So, it does state on the application that the borrower

Page 154

1    was a driver.  However, we also know on the application that

2    the application was taken down over the phone so we don't

3    necessarily know what communications occurred between the

4    borrower and the person filling out the application.  What

5    we do know based upon the information in the loan file is

6    that the borrower worked for Stanley Steamer and he was a

7    carpet cleaning technician.  So, he -- whether driver fits

8    that category or not, I'm not sure, but I don't think it's

9    necessarily synonymous.

10    Q    Do you know how he was paid?

11    A    He was paid hourly and on commission -- well, sorry.

12    Let me take that back.  He was paid on a commission basis.

13    Q    Okay.  And now, the first document that the Trustees

14    cite to is a W-2 and then the second one is -- looks like

15    Bureau of Labor Statistics.  Let's take a look at the Bureau

16    of Labor Statistics document.  Can you please go to PA-663?

17    We're back at the Trustee's claim package.  Let's move to

18    Page 22 of that exhibit.  What is this document?

19    A    So, it's a reference to the Bureau of Labor Statistics'

20    website where the Trustees pulled information for truck

21    drivers in Jacksonville, Florida, and it's not necessarily

22    seen on this page but if you go to Page 23 of the claim

23    package, it shows the information that they pulled at that

24    website, again using the location of Jacksonville, Florida

25    and using the occupational title of truck drivers, heavy

Page 155

1   tractor trailers, and based upon the right-hand side where

2   you see the 90th percentile, they listed the 90th percentile

3   for truck drivers in Jacksonville, Florida as $54,000 and 90

4   -- or $54,090.  So, the first hurdle is, is a carpet

5   cleaning technician and a truck driver, heavy tractor

6   trailer, equal?  And that's something that we had to weigh

7   in our evidence.  And then the next thing that we needed to

8   look at was the fact that the Trustees took the 90th

9   percentile, divided that by 12, for this average income in

10  this database on a third-party website and said, "Okay,

11  well, you probably should have been more in line with income

12  of $4507.50," but we don't again really know what the

13  borrower made other than what he'd said at origination and

14  then what we'll talk about in a minute at the W-2.

15  Q    How did the plan administrator treat BLS data generally

16  during the protocol?

17  A    So, like I said earlier, we did not reject any one

18  piece of evidence outright.  We looked at it and weighed it

19  and gave it the appropriate weight, and what I mean by the

20  appropriate weight for a Bureau of Labor Statistics document

21  would be less.

22  Q    Okay.  And based on this BLS report, can you tell what

23  this particular borrower made in November of 2006 when the

24  loan was originated?

25  A    No.

Page 156

1   Q    Let's turn to the Trustees' next document cited in

2   support of their claim, plan administrator 663.  So, we're

3   in the exhibit already.  Let's go to Page 20.

4   A    I'm sorry.  What page?

5   Q    Twenty.  What is this document?

6   A    So, this is a copy of the borrower's 2007 W-2 which was

7   available in the loan file and presumably would have been

8   given by the borrower as part of the loss mitigation

9   process.

10  Q    Is the fact that it's the year after origination

11  relevant at all to the plan administrator analysis?

12  A    It is.  It's something that we would take into account

13  and weigh.  It's not necessarily equal to, you know, telling

14  us what the particular borrower made in '06, but it's

15  something that, you know, we looked at.

16  Q    Do you see that note that looks like it's in

17  handwriting at the top of the box?  Two -- looks like 26621

18  --

19  A    266213?

20  Q    -- yeah.  Do you know what that is?

21  A    I do not.

22  Q    What's the income stated on this W-2?

23  A    The wages, tips, and other compensation box, box 1, say

24  that the borrower in '07 for this particular employer earned

25  $31,945.57.

Page 157

1  Q    Okay.  And does anything stand out to you about that

2  figure?

3  A    That ties to the claim statement made by the Trustee in

4  their claims tracking spreadsheet.

5  Q    And how does it tie to it?

6  A    It's the amount that was used in their calculations.

7  Q    But they had a monthly calculation, right?

8  A    Yes.  So, they took $31,946, divided it by 12, and said

9  this borrower worked all 12 months and made $2662 a month

10  based upon this annual figure here.

11  Q    So, going back to that handwritten, it looks like

12  that's -- that matches the monthly income that the Trustees

13  stated on the claims tracking spreadsheet.

14  A    Why, yes it does.  It's missing a decimal, but --

15  Q    Did you see that very often where there would be sort

16  of handwritten notes on documents during the protocol?

17  A    We did and I didn't put two and two together on that

18  until now.  Thanks.

19  Q    And where did those handwritten notes come from?

20  A    Presumably they came from the Trustees' review firm.

21  Q    Okay.  Did you ever speak to any of the people actually

22  doing the reviews?

23  A    I did not.

24  Q    The people that you said you spoke to were Mr. Esses

25  and Mr. Pfeiffer?

Page 158

1   A    That's correct.

2   Q    Anybody else that you spoke to during the protocol?

3   A    In step 3 there were other members of Duff & Phelps's

4   team that we talked to.  I recall off the top of my head

5   Charlie Campbell but I know there were others that were on

6   the phones when we were doing those negotiations.

7   Q    Was there anybody other than the folks from Duff &

8   Phelps that you spoke to during the protocol?

9   A    You know, we talked to the Trustees' representatives

10  and counsel in that process but I don't recall ever speaking

11  to anybody from the due diligence providers.

12  Q    And do you know whether anybody from Duff & Phelps did

13  any of this research and calculations and note writing on

14  the claim package?

15  A    I don't know.

16          THE COURT:  Mr. Shuster?  Light is shining on you.

17          MR. SHUSTER:  What I always wanted but it's not as

18  good as I thought it would be.

19          (Laughter)

20          THE COURT:  It's a very focused light so we're

21  going to try and fix that unless you want to just bask a

22  little longer.

23          MR. SHUSTER:  No, no.  Thank you, Your Honor.

24          THE COURT:  Is that better?  No?

25          MR. SHUSTER:  Yes.

Page 159

```
 1                THE COURT:  It's still -- he still is --
 2                MR. SHUSTER:  I can -- I'm not in as much distress
 3     (indiscernible).
 4                THE COURT:  Well, I don't want to cause you any --
 5                MR. SHUSTER:  I can turn this way, look at Mr.
 6     Cosenza and --
 7                THE COURT:  I don't want to cause you unnecessary
 8     distress, so --
 9                MR. SHUSTER:  Thank you, Your Honor.
10                THE COURT:  -- give us a minute.
11                MR. SHUSTER:  Thank you.
12                THE COURT:  It's a high-tech drape closer that we
13     use, which I told you previously not to use, but -- that's
14     lovely.  It's a nice touch.
15                MR. SHUSTER:  Thank you.
16                THE COURT:  All right.
17     Q    So, Mr. Trumpp, what we've gleaned I think is that the
18     yearly income stated in this W-2 was divided by 12 to arrive
19     at what the Trustees allege is the monthly income for the
20     borrower, right?
21     A    Yes.
22     Q    Is that an appropriate calculation in the plan
23     administrator to you?
24     A    No.
25     Q    Why not?
```

Page 160

1    A    Because we don't necessarily know if the borrower

2    worked all 12 months in that year.

3    Q    Do you know one way or the other for this particular

4    borrower whether he did work 12 months in the year of 2007?

5    A    So, based upon the information in the loan file, it

6    appears to us that the borrower did not work all 12 months

7    of the year.  It appears that he worked the first five

8    months of the year and then had a medical event.  This

9    particular borrower, according to the hardship letters, had

10   major surgery and colon cancer.  And so, we don't

11   necessarily know the specific number of days and months

12   worked in the year.  Based on the information in the loan

13   file and the medical records and the application for short-

14   term disability, and long-term disability, it appears

15   putting it all together that the borrower worked for the

16   first five months of the year.

17   Q    And if in fact he did work for five months of the year

18   in 2007, would that $2662 monthly income figure be correct?

19   A    It would not.

20   Q    What would -- I don't expect you to do full-on math in

21   your head, but approximately what would be the monthly

22   income if it was only a five-month year?

23   A    So, we're looking at over $6000 a month which puts him

24   in line with the original amount that he stated on his loan

25   application.

Page 161

1  Q    Let's take a look at some of the evidence that you just

2  cited that discusses this particular borrower's

3  circumstances.  Can we look at Plan Administrator Exhibit

4  665?  What is this document?

5  A    So, this is the beginning of a couple of pages of a

6  hardship letter that was found in the loan file.

7  Q    And can we go to the second page?  And the first line

8  of that, Mr. Trumpp, is this what you were referring to when

9  you were speaking about this particular borrower's life

10 circumstances?

11 A    It was.  So, it said at the beginning, "I was sick in

12 2007 with colon cancer, had a major operation, missed work

13 and got into trouble financially."

14 Q    And taking a step back for a moment, what is a hardship

15 letter?  Can you just describe what context that arises in

16 and what it is?

17 A    So, hardship letters are things that are commonly found

18 in loan files where the loan went through some sort of loss

19 mitigation process.  And what I mean by that is, you know,

20 if this particular borrower truly had colon cancer and went

21 into financial hardship, he would have a hard time making

22 his monthly payments and so he would have reached out to his

23 servicer and explained his situation in order to try and get

24 some alleviation from his monthly debt obligations.  And

25 those could have come in multiple forms.  It could have been

1    potentially a forbearance.  It could have been a loan

2    modification.  It could have been some sort of workout plan.

3    And so, one of the things that's common for a servicer is to

4    seek information from the borrower.  They would ask for them

5    to fill out a letter and tell them what their situation is.

6    They would pull new credit reports similar to the one we

7    found.  They would do additional work to assess whether or

8    not it would be a prudent decision to allow some sort of

9    loss mitigation mechanism for this particular borrower.  So,

10   you know, this particular borrower clearly had some

11   hardships that they went through and this is just one of

12   several hardship letters that were found in the file.

13   Q    Okay.  Let's take a look at the next exhibit, plan

14   administrator 666.  And if you look at Page 3 of this

15   document, what is this?

16   A    This is where we glean the best that we can that the

17   borrower went into the hospital in May of 2007.  You'll see

18   it at the top right-hand corner.  And it talks lower down

19   below about how he was carried into the hospital on a

20   stretcher.  So, it clearly appears based on the information

21   in the loan file that he had a medical event.

22   Q    And were these medical records and the hardship letter

23   that we just saw relevant to the plan administrator's

24   analysis for this misrepresentation of income claim?

25   A    It is because it points to the fact that this

Page 163

1    particular borrower had issues and wasn't able to work for

2    the entire year of 2007.  So, taking a W-2 from 2007 and

3    dividing it by 12 to get that borrower's monthly income

4    wouldn't be appropriate.

5              THE COURT:  Can I ask you a question?  I've

6    noticed on this document and one or two of the previous

7    documents there's a fax -- there's a header across the top.

8    It appears to be a fax or something of that nature.  Do you

9    know what that refers to?  National Foreclosure?

10             MR. TRUMPP:  I don't.

11             THE COURT:  Thank you.

12   Q    Mr. Trumpp, this came from the servicer's files, right?

13   A    That is correct.

14   Q    Could that have some relationship to the faxing?

15   A    I could speculate where it came from but I --

16             THE COURT:  Don't speculate.  That's okay.  Thank

17   you.

18             MS. BRASSMAN:  Okay.

19   Q    Can we go back to the hardship letter for a moment,

20   plan administrator 665?  Page 2.  Mr. Trumpp, right after

21   the line you read, this borrower speaks to, let's see, it

22   says, "I have a great deal of money in my house."  Do you

23   see that?

24   A    I do.

25   Q    And can you read the next sentences, the next couple of

Page 164

1    sentences below that?

2    A    Yeah.  So -- so he says, "I have a great deal of money

3    in my house which I probably will never see.  My job is up

4    and down.  The economy is slow and job loss is great."

5    Q    Was that relevant?  And I know we're talking about the

6    misrepresentation of income and the breach analysis, but

7    skipping for a moment to the AMA analysis, was that relevant

8    at all to the plan administrator's AMA analysis?

9    A    It was.  So this particular borrower's situation is a

10   perfect example of a good reason for a loan modification or

11   some sort of forbearance plan, right?  The fact that he had

12   colon cancer is a good reason to work with the borrower to

13   try and keep him in his house and make sure that he's able

14   to make payments eventually.

15          And so, the fact that he's referring to the fact

16   that "this economy is difficult.  I'm working, and I am

17   trying to make up -- keep up with my payments," but he was

18   just expressing what many borrowers in this particular time

19   period were seeing based upon the results of the economic

20   downturn that was going on.

21          And so, this is just evidence that we use in our

22   AMA assessment to determine, you know, assuming that the

23   borrower lied about their debt capacity and their income

24   capacity, is that what led to this default on the loan?

25   Well, no, clearly this guy had colon cancer and major

Page 165

1   financial hardships where he wasn't able to work.  And so

2   those are the types of things that went into our analysis.

3           But we wouldn't know any of this information

4   unless you really dug into that 2,900-page loan file doc.

5   This isn't the type of stuff that was given in the claim

6   package.  You really had to dig in and look and assess and

7   look at what's in all aspects of this particular borrower's

8   life and what we know.

9   Q   Thank you.  Now the Trustee cited to the BLS report,

10  which we saw and they cited to the 2007 W-2.  Was there

11  anything else in the file that the Trustees didn't cite to

12  but that was relevant to the plan administrator's analysis?

13  A   Yes.  So there was also a 2006 W-2.

14  Q   Okay.  Let's take a look at that at Plan Administrator

15  678.

16  A   So --

17  Q   And how was this relevant?  Sorry.

18  A   So this is just an example from the same employer as

19  the last W-2 to show what the borrower made in 2006.  The

20  problems here are we know the borrower started sometime in

21  '06 for this particular company.  We don't know necessarily

22  his start date, and we don't necessarily know what type of

23  ramp up period there was.  We don't necessarily know what

24  type of training period there were.

25          We do know from some of the medical records in the

Page 166

1   file that he was commission-based, and it appeared it was

2   hours-based.  But we -- those are all things that we are

3   gleaning and surmising, but we can't definitively know about

4   the '06 W-2 because we don't know when he started.

5   Q    Ultimately, what was the plan administrator's

6   determination on this misrepresentation of income claim?

7   A    So even though there were multiple pieces of "evidence"

8   in the file, right -- they had BLS, there were multiple W-2s

9   -- we did not feel that there was sufficient information in

10  the loan file to prove that the borrower misrepresented his

11  income.  So we failed this claim.

12  Q    And at what level of the analysis did this claim fail,

13  and you were talking about earlier the different parts of

14  the equation?

15  A    So this particular claim and the other claim both

16  failed at the threshold fact level.  You know, there wasn't

17  sufficient information to establish the allegation of the

18  claim that they were making.

19  Q    And let's assume for a moment that there was a breach,

20  that there was enough evidence, that this borrower lied,

21  that he didn't make what he said he made on his loan

22  application.  Would the plan administrator have found the

23  second component of the analysis AMA on this one?

24  A    We would not have.

25  Q    Why not?

Page 167

1    A    Because the default on this particular loan was caused

2    by his colon cancer and the fact that he had a medical

3    hardship and the economy.  So it did not appear based upon

4    the information that we saw in the file any real

5    relationship between additional debts and lower income to

6    the ultimate performance of the loan.

7    Q    And speaking of the performance of the loan, how long

8    did this loan perform?  How long did this borrower pay?

9    A    So we saw on the claims tracking spreadsheet that this

10   was listed as a non-liquidated loan, meaning it's active.

11   Q    What does that mean in terms of the borrower's --

12   A    Well, so it means --

13   Q    -- payment history?

14   A    -- it means it hasn't gone through -- the borrower

15   hasn't gone through foreclosure.  It means the borrower

16   hasn't lost his house.  And actually, this particular

17   borrower is still making his payments and based upon the

18   most recent information we have from October, the borrower

19   is current.

20   Q    Okay.  We talked about this borrower's particular life

21   events and specifically the -- his survival of cancer.  Were

22   there other life events that you saw reflected in loans

23   during the protocol that caused you to make the same

24   conclusion you just described now which is something else

25   happened that caused this loan to go into default?

Page 168

```
1    A    So, you know, I -- I talked earlier about the need for

2    a review of all the information in the loan file but

3    especially the information from the servicing record.  You

4    can see in this example how important it was for us to look

5    at the hardship letter and the additional information that

6    was provided as part of the last minute process in our

7    assessment of a claim, the breach itself, and the AMA

8    assessment on the loan.

9             So we had to really look through the entire loan

10   file to make a determination on whether these were valid

11   claims are not.

12   Q    Okay.  And I want to show you a couple of other

13   hardship letters so that we can unpack that a little bit

14   more.

15             MS. DOMINGUEZ-BRASWELL:  But before I do that, can

16   we show the response that the plan administrator provided

17   back to the Trustees on this particular claim?

18   Q    Mr. Trumpp, is this the response that the plan

19   administrator provided?

20   A    Yes.

21   Q    And do you think the Trustees has enough information to

22   understand the plan administrator's position with respect to

23   the income claim?

24   A    I do.

25   Q    Okay.  Let's turn now to Plan Administrator Exhibit
```

Page 169

1    674.

2              THE COURT:  Can you -- before you take this off

3    the screen, when this refers to non-origination year tax

4    returns, is that really a reference to the W-2 or --

5    A    It really is a reference to the W-2,

6    Your Honor, and it's a reference to the 2007 W-2 that they

7    referred to.

8              THE COURT:  Thank you.

9              MS. DOMINGUEZ-BRASWELL:  Plan Administrator 674.

10   Q    What is this document, Mr. Trumpp?

11   A    This is another example of a hardship letter that was

12   found in the loan file that was used in the assessment of

13   AMA.

14   Q    Okay.  And just to be clear, this is a separate loan

15   from the one we just walked through?

16   A    Yeah.  This is, again, just another example of the

17   types of things we saw in hardship letters.  This particular

18   hardship letter references an injury on the job and

19   permanent disability.  So, you know, this is all kind of

20   frame of reference, but keeping in mind that the Trustees

21   are alleging that 55 percent of the loans that are at issue

22   here, you know, in these -- that defaulted with losses here

23   and/or are still active today that they reviewed had some

24   sort of defect.  That just seems really high to me.

25              And here's an example of a hardship letter that we

Page 170

1    found in there that just says, hey, you know what, life

2    happens.  The person got colon cancer.  A person got injured

3    on a job.  We had a financial crisis that caused high

4    unemployment.  Those are all the types of things that we had

5    looked at as we were making our AMA assessments.

6    Q    And how often did you see borrowers discussing medical

7    issues like this or like the cancer survivor in hardship

8    letters?

9    A    It varied, right?  We don't want to paint the picture

10   that every single time there was some sort of life event,

11   but it's something that was important to look at and assess

12   when you're doing your loan review.

13            MS. DOMINGUEZ-BRASWELL:  Can we take a look at

14   Plan Administration Exhibit Number 676?

15   Q    Is this another example of a hardship letter, Mr.

16   Trumpp?

17   A    It is.  And this is the hardship letter that was

18   referenced in the opening statements, but it's just another

19   example of what we found by looking through the loan file.

20   And in this particular case, the borrower passed away and

21   they weren't able to continue to work on making the payments

22   for that property and getting a tenant.  So those were just

23   examples of the types of things we found in the loan files.

24   Q    Okay.  Now other than life events, were there other

25   things that the plan administrator considered when doing its

1    -- performing its AMA analysis?

2    A    So when the plan administrator performed our AMA

3    analysis and when RBF looked at the loan files for this,

4    they were always looking at it through a framework of what

5    do we know about that's happening in the economy at this

6    particular time, what do we know about this particular

7    borrower and what can we glean from their loan file, what do

8    we know about unemployment, what are those macro factors,

9    what are the types of factors that we knew about were going

10   on at this particular time.

11          So that was the framework with which they viewed

12   these particular loans, but they were also looking for

13   performance history, right?  Did the loan go down really

14   quickly and take a loss?  Did it make two payments, three

15   payments?  Or did it perform for five or six years?  From

16   our perspective, there's definitely a correlation between

17   breach and performance.

18          And so those are the types of things that were

19   going through our minds in our assessment of AMA.

20   Q    And what if a particular breach was deemed to have AMA?

21   Would the plan administrator still consider things like life

22   events and performance history?

23   A    No, we wouldn't because that wasn't part of the

24   analysis and that was something that wouldn't have applied.

25   Q    Otherwise, would the analysis be the same on deemed AMA

Page 172

1    breaches?  In other words, if we take this part out, would

2    that be the analysis on the (indiscernible)?

3    A    Yes.

4    Q    And how did you know whether a particular

5    representation and warranty was a deemed representation of

6    warranty?

7    A    I mentioned earlier that we had to go back and look at

8    the representations and warranties that were available for

9    each particular loan and each particular securitization.

10   Some representations and warranties were deemed and others

11   weren't.  The Trustees did tell us in their claims tracking

12   spreadsheets which representations and warranties they felt

13   were applicable, but we always went back and doubled checked

14   because they weren't always right.

15   Q    Okay.  Now we walked through a loan that had the three

16   claims on it, the missing document claim, the

17   misrepresentation of debts claim or the debt was found not

18   to have existed, and the misrepresentation of income claim,

19   the gentleman who survived cancer.  Are those three claims

20   still at issue today?

21   A    So the missing HUD-1 is no longer at issue, but the

22   misrepresentation of debts and the misrepresentation of

23   income claims are both still at issue today.

24   Q    So what does that tell you about the Trustee's review

25   of that particular loan?

Page 173

1   A    I don't necessarily know everything that went into

2   their review process.  I know what we provided and gave to

3   them.  And so I believe based on the information that we

4   provided to them, it's pretty clear that neither of those

5   are valid claims.  I -- I can't tell you what they're

6   thinking.

7   Q    But they withdrew one of the claims.  The loan,

8   however, is still at issue in this proceeding?

9   A    That is correct.

10  Q    Okay.  Now you mentioned that this particular loan with

11  the gentleman who survived cancer is still current today, is

12  still paying today?

13  A    Yes.  Ultimately, he did get a modification, but he is

14  still paying today and current.

15  Q    Did the Trustees submit many loans like that where

16  borrowers continued to pay?

17  A    Yeah.  So I mentioned earlier this morning that I was

18  surprised to see claims made on active loans.  And what I

19  mean by active again is non-liquidated.  This is an example

20  of a claim on an active loan, and not only is this loan

21  active, meaning it's not liquidated, this loan's active

22  meaning it's current.

23  Q    We just walked through one loan with a handful of

24  claims.  And now I want to sort of take a step back and be

25  at a higher level and talk about the claims you saw

Page 174

1    generally during the protocol.

2              THE COURT:  It seems like that's a stopping point.

3              MS. DOMINGUEZ-BRASWELL:  It is.  It's a

4    transition.  We can take a break.

5              THE COURT:  It seems like it's a stopping point.

6    And tell me about how long you want to go for today.

7              MS. DOMINGUEZ-BRASWELL:  In terms of the overall

8    outline that I have, I think I probably still have another

9    two and a half hours, maybe -- so maybe three.

10             THE COURT:  So that -- so we're not going to

11   finish today?

12             MS. DOMINGUEZ-BRASWELL:  I don't think so.

13             THE COURT:  It's going to be a little too late.

14             MS. DOMINGUEZ-BRASWELL:  Yeah.

15             THE COURT:  So I'd like to for the purposes of

16   everyone up here, 5:30 would be a good stopping point?  All

17   right.

18             UNIDENTIFIED SPEAKER:  That would be fine, Your

19   Honor.

20             THE COURT:  I mean certainly as well go on, if

21   we're close to finishing a witness as it gets towards the

22   end of the day, we'll do that, but if not, then I'd just

23   assume we wrap at 5:30 for everybody's sake.

24             MS. DOMINGUEZ-BRASWELL:  That would be great.

25             THE COURT:  Okay?  All right.  So let's take ten

Page 175

1    minutes.  We'll come back at 25 minutes before the hour.

2        (Recess)

3            THE COURT:  Okay.

4            MS. DOMINGUEZ-BRASWELL:  Thank you.

5        CONTINUED DIRECT EXAMINATION OF ZACHARY D. TRUMPP

6    BY MS. DOMINGUEZ-BRASWELL:

7    Q    Mr. Trumpp, we saw an example of a misrepresentation of

8    debts claim where the debt existed before origination but

9    then no longer existed at origination.  Were there ever

10   instances where the Trustee submitted a misrepresentation of

11   debts claim on a debt that didn't exist at origination but

12   existed after origination?

13   A    Yes.

14   Q    And what do you refer to those types of claims as?

15   A    Post-closing debts origination claims.

16   Q    Okay.  And did the Trustee submit many of those claims?

17   A    They did.

18   Q    And what is the plan administrator's view with respect

19   to the validity of those claims?

20   A    So from our perspective, those are invalid claims and

21   they would fail at the threshold facts level.

22   Q    Why?

23   A    Because the obligations of the borrower on the loan

24   application are to list the debts they have at the time of

25   the application and at the time of closing.

Page 176

1    Q    Okay.  Let's take a look at an example of a loan

2    application.  And we'll just use the same one that we had

3    been looking at before, Plan Administrator 663, page 7.

4    That's where the loan application starts.  If we go forward

5    to page 9, that's the area that we had looked at before

6    where a borrower is supposed to list his or her debts.

7              MS. DOMINGUEZ-BRASWELL:  Can we zoom in on that

8    box above the term "liabilities"?  Thank you.

9    Q    Mr. Trumpp, what does that tell the borrower to

10   provide?

11   A    So these are the instructions on the loan obligations,

12   and it says, "Liabilities and pledge assets list the

13   creditor's name, address, and account number for all

14   outstanding debts including automobile loans, revolving

15   charge accounts, real estate loans, alimony, child support,

16   stock pledges, et cetera.  Use a continuation sheet if

17   necessary and indicate by an asterisk those liabilities

18   which will be satisfied upon the sale of the real estate

19   owned or upon the refinancing of the subject property."

20              So it's the instructions for how to fill out the

21   obligation, and it's saying list your outstanding debts.

22   Q    And what was the plan administrator's position with

23   respect to whether or not this instruction requires the

24   borrower to provide debts that may be incurred in the

25   future?

Page 177

1   A     It is our position that debts taken out post-closing

2   aren't required to be listed on the application.

3   Q     Okay.  I'd like to put up on the screen a few other

4   claim types that are at issue in this case.  And I'd like

5   you to describe for the Court what you saw with respect to

6   those claim types, starting with missing document claims.

7   Generally, can you describe for the Court what you saw in

8   the protocol with respect to missing document claims?

9   A     So these were claims for particular documents that were

10  present at origination that were no longer a part of the

11  loan file as reviewed by the Trustees.  So they were saying

12  that there may not have been a copy of the original loan

13  application.  There may not have been a copy of the

14  settlement statement.  There may not have been a copy of the

15  appraisal in the loan file.  There may not have been a copy

16  of the truth-in-lending statement.

17         So those are all documents that are there at

18  origination that they are arguing should still be there ten

19  years later and were clearly adverse and material to the

20  value of the loan by it not being in the loan file.

21  Q     And can you give the Court a general sense of how the

22  plan administration typically responded to missing document

23  claims under the protocol?

24  A     We essentially had three responses.  One is, hey,

25  Trustee, we found it.  Here it is.  Two, it was, hey,

Page 178

1    Trustee, we weren't able to find that particular document in

2    the loan file, but it appears that it was there at

3    origination.  For example, you could see the charge on the

4    settlement statement for $400 for an appraisal.  So you may

5    not have had a copy of the appraisal in the loan file, but

6    you can tell that it was there.

7            Or we would have said simply, hey, we can't find

8    it and we don't see any indication of it in the loan file.

9    But even if it wasn't there, we don't see how that would

10   have been material and adverse to the value of the loan or

11   material at all.

12   Q    Okay.  Does the fact that a missing document is missing

13   from the file eight, nine, ten years after origination tell

14   you anything about whether it was there at origination?

15   A    It does not.

16   Q    What about appraisal claims?  What did the plan

17   administrator see during the protocol with respect to

18   appraisal claims submitted by the Trustees?

19   A    So the types of appraisal claims typically submitted by

20   the Trustees were in the form of they didn't meet necessary

21   qualifications for an appraisal.  And what I mean by that

22   is, you know, there are certain USPAP guidelines that have

23   to be followed when an appraisal is done.

24           And they would argue that there were certain

25   things that should fall under those guidelines that weren't

Page 179

1    taken into account in the appraisal whether it was

2    necessarily required or not, so things such as it didn't

3    include a map of the property in the appraisal or it didn't

4    include the right type of pictures in the appraisal.  So

5    those are the types of things that they asserted for their

6    appraisal claims.

7    Q    And what was the plan administrator's position on those

8    types of claims you just described?

9    A    Well, we reviewed them in relation to the USPAP

10   guidelines where we could and we responded that, you know,

11   this particular issue wasn't covered under USPAP or this

12   particular issue really wasn't relevant.  But in general, we

13   did not see a basis for approving appraisal claims.

14   Q    What about regulatory claims?

15   A    Regulatory claims are also a very fact-intensive

16   assessment.  You got to look at what the various regulatory

17   requirements were at the state and local and federal level.

18   And you also have to know your truth-in-lending laws, et

19   cetera.  And so you had to make sure that all the necessary

20   information was in the file to assess that, and you had to

21   also understand what regulatory requirements were in play.

22         And, you know, a common type of regulatory claim

23   that we saw was for truth-in-lending violations that were

24   outside of tolerance levels.  We felt that there should be a

25   $100 tolerance level and Trustees used a different tolerance

Page 180

```
 1    level of $35.  And so there was some debate as to which

 2    tolerance level applied.  But, again, a very fact-intensive

 3    regulatory type review.  And those types of claims could be

 4    examples of where instances where we saw that they were

 5    deemed material and adverse, not left to the AMA language of

 6    the contracts.

 7    Q    Did the plan administrator pass any of the Trustees'

 8    regulatory claims?

 9    A    We did.

10    Q    And when I say pass, you know I mean approve?

11    A    Yes.

12    Q    Okay.  Going back to the missing document claims, you

13    said earlier that this was the type of claim that you saw a

14    lot of in the protocol.  Did you expect to see a large

15    amount of missing document claims in the protocol?

16    A    You know I did not.  These are a type of claim that

17    historically is not something that we would have pursued in

18    our downstream claims.  It's not something that we saw had a

19    lot of merit to it.  And I was surprised early on that they

20    were making that type of claim, let alone that many of those

21    claims.

22    Q    Okay.  Now you said that just because it was -- I asked

23    you whether if it's missing now, does it mean it was missing

24    at origination and you said "No".  What do you base that

25    one?
```

Page 181

1    A    Just my experience.  So I mentioned, you know, our

2    ability to gather files from other servicers, it was not

3    uncommon to not have the full documents that from when we

4    gathered files from services in loss management.  Similarly,

5    I knew Aurora's policies for scanning evolved over the

6    course of time.  And sometimes they would scan certain

7    documents and sometimes they wouldn't.

8              So I knew that it is entirely possible at this

9    point in time gathering loan files wasn't necessarily going

10   to be a process where a hundred percent of the documentation

11   was gathered, but it didn't necessarily mean it was missing

12   at the time the representations were made.

13   Q    Now when you say "a hundred percent of the

14   documentation gathered," are you referring to origination

15   files or servicing files?

16   A    Primarily the origination side.  Our assumption and

17   hope was that we would have gotten a hundred percent of the

18   servicing files because that was, you know, in the

19   possession of the servicer.

20   Q    And going back to the critical documents that the plan

21   administrator required, was that from the origination file

22   or from the servicing file?

23   A    All four of those documents were from the servicing

24   file.

25   Q    Okay.  Now, by the way, on the critical documents, did

Page 182

1     you expect the Trustees to provide you with enough critical

2     documents that you'd be able to eventually take those loans

3     off hold and review them?

4     A    Yeah.  I fully anticipated and expected that eventually

5     the Trustees would be able to gather that information and we

6     would review those files.

7     Q    And you testified earlier that the plan administrator

8     put approximately 30,000 loans on hold.  How many are on

9     hold today?

10    A    Twenty-four thousand, give or take.

11    Q    Is that -- does that mean that the Trustees never

12    provided those documents for those 24,000 files?

13    A    That's correct.

14    Q    I'd like to walk through a couple of more examples.

15            THE COURT:  Can I ask a follow-up question on that

16    one?

17            MS. DOMINGUEZ-BRASWELL:  Sure.

18            THE COURT:  So there are a number of possibilities

19    the documents could be supplied.  So you've indicated that

20    in certain cases they were, right, or it's implied in the

21    reduction of the number of the on-holds?

22    A    Yes.  So the reduction from 30 to 24 --

23            THE COURT:  Yeah.

24    A    -- is mostly the reduction associated with trusts that

25    have collapsed or the claims that the Trustees have

Page 183

1    withdrawn and loans that they have withdrawn --

2              THE COURT:  I see.

3    A    -- because they did withdraw certain on-hold loans.

4              THE COURT:  Okay.  So it doesn't reflect that on

5    6,000 of the 30,000, they actually supplied the

6    documentation that was identified as missing from the

7    servicer's files?

8    A    Correct.  When I refer to 30,000, I'm implying how many

9    at the end of step 2 --

10             THE COURT:  Right.

11   A    -- were still on hold.

12             THE COURT:  Okay.

13   A    And so, you know, the assumption was and the

14   expectation at least on my part was that they would continue

15   to work and gather that information so we could get it into

16   step 2.  And these are loans that never made it into step 2.

17             THE COURT:  So are you aware -- what I'm trying to

18   drill down on is the documents could be supplied or the

19   documents could not be supplied.  If the documents are not

20   supplied, theoretically, hypothetically, it's possible that

21   there would be a statement that after a diligent search,

22   they can't find the documents.

23             Was there any sort of a process around that, or

24   was it simply the PA saying, these are the documents we need

25   to take these off hold and then nothing?  I'm just trying to

Page 184

1    understand what actually happened with respect to those

2    files that were identified as lacking documentation.

3    A    So essentially we reported back to the Trustees and

4    said we're putting these loans on hold until you can get us

5    this information.  They said they would try and get this

6    information.  They said they attempted to get this

7    information and for one reason or another were unsuccessful

8    to obtain that information.

9           It is our position that this is all information

10   that the servicer should have been able to provide.  They

11   may have needed some additional help in terms of a subpoena

12   or something else to get them over the hurdle to get that

13   information.  It's our position that it's not that the

14   information didn't exist.  They just weren't able to provide

15   it to us to review.

16           THE COURT:  Thank you.

17   Q    Now, Mr. Trumpp, for a portion of the loans that you

18   put on hold, the Trustees did, in fact, go back to the

19   servicers and acquire the information you were requesting

20   and provide that to you, right?

21   A    That's correct.  So there were instances where they

22   were able to obtain the additional information or they were

23   able to come up with ulterior ways of getting us that

24   information.  So not all loans that were put on hold stayed

25   on hold.  We took loans off hold throughout the process.

Page 185

1          MS. DOMINGUEZ-BRASWELL:  Can we put up the slide

2     with the excerpt from Mr. Aronoff's report with the two

3     loans, please?

4     Q    Mr. Trumpp, what's on the screen in front of you?

5     A    This is an excerpt from Exhibit 17 of Aronoff's

6     affirmative expert report where he was comparing and

7     contrasting loans that were passed with loans that were

8     failed.

9     Q    Okay.  And I assume these are two loans, right, that

10    are being compared as you just described?

11    A    Yes.

12    Q    And one of them is a pass?

13    A    Yes.

14    Q    And one of them is a fail?

15    A    I believe the top one is the fail, and the bottom one

16    is the pass.

17    Q    I'll represent to you that it's the other way around.

18    The one in red is a pass, and the one in black at the bottom

19    is a fail.

20    A    Thank you.

21    Q    Just to orient you.  Now do you understand -- well,

22    first of all, are you familiar with Mr. Aronoff's

23    affirmative expert report?

24    A    I am.

25    Q    And do you understand what his goal was in comparing

Page 186

1    the passes to the fails?

2    A     Yes.  His goal was to say here's characteristics from a

3    pass for loans that look just like all of these other loans

4    with similar characteristics that were fails.  Therefore,

5    there must be something wrong here, and these other loans

6    must be passes, too.

7    Q     Okay.  Now what claim type is Mr. Aronoff focusing in

8    on in this comparison of a pass loan to a fail loan?

9    A     So the claim type we're looking at here is

10   misrepresentation of income.  And the evidence type for both

11   claims as asserted by the Trustees were bankruptcy

12   documents.

13   Q     And let's just kind of walk through the points of

14   comparison that Mr. Aronoff has here starting with the third

15   column in which describes the evidence type being used.  Do

16   you see that?

17   A     Yeah.  So they're saying that the evidence type shows

18   income for the same year as origination.  They're saying

19   that both borrowers were salaried borrowers.  They're then

20   showing the monthly income that was represented at

21   origination, the monthly income according to their evidence,

22   the calculated difference between those two numbers, the

23   percentage basis and difference on those two numbers, and

24   what that evidence type was.

25            So what they're saying here is, hey, we have two

Page 187

1    different loans from two different borrowers who are

2    salaried that using bankruptcy documents that listed their

3    income for the same year as origination.  You passed one

4    loan and you failed one loan.  So clearly the other fail

5    must have been a pass if you're willing -- or fail.  You

6    know, the other fail must have been a pass.  If you were

7    failing to accept one, you should accept the other.

8    Q    Okay.  Now is it the plan administrator's position that

9    a loan can be assessed on just these characteristics listed

10   on this chart?

11   A    No.

12   Q    Why not?

13   A    Because there's just not enough information here to

14   come to a conclusion.  So you would have to look at the

15   claim package in the loan file and the information contained

16   in those bankruptcy documents and make an assessment.

17   Q    Okay.  Let's take a look at these two loans, starting

18   with the loan that failed or that was rejected by the plan

19   administrator.

20            MS. DOMINGUEZ-BRASWELL:  Can we look at claims

21   tracking spreadsheet, Plan Administrator Exhibit 692, the

22   claims tracking spreadsheet for this particular loan?

23            May we look at the second page of this document?

24   Q    Now, Mr. Aronoff is comparing these two for the

25   purposes of -- these two loans for the purposes of comparing

Page 188

1     the misrepresentation of income claims on these loans.  What

2     are the Trustees alleging with respect to this

3     misrepresentation of income claim?

4     A     So for this particular loan, they're alleging a

5     misrepresentation of income.  And on this particular loan,

6     there were two borrowers.  The borrower was stated she had

7     income as a marketing director earning $7,250 a month.  The

8     co-borrower listed income of $6,800 per month as a realtor.

9     So those are the two sources of income.

10          And then what they look to is the statement of

11    financial affairs from the District of Arizona's Bankruptcy

12    Courts and their Chapter 7 bankruptcy filing.  So and that

13    bankruptcy filing occurred in 2009.  And in that bankruptcy

14    filing from 2009, they listed their 2007 full-year income as

15    -- for the borrower as $41,587 or $3,466 per month.  The co-

16    borrower showed an annual income in '07 of $3,020 a month.

17    And so they took that, divided by 12 to get to $252 a month.

18          So using their income as given in their bankruptcy

19    statement of financial affairs, they recalculated the DTI

20    and got a debt-to-income ratio of 171 percent, which

21    exceeded the loan program guidelines max of 60 percent.  So

22    that's all from their allegation of factual basis for this

23    misrepresentation of income.

24    Q     Okay.  Let's take a look at the claim package and

25    orient ourselves on who these borrowers are and when this

Page 189

1   loan originated.

2           MS. DOMINGUEZ-BRASWELL:  Can we go to Plan

3   Administrator Exhibit 667?

4   Q    And what is this document, Mr. Trumpp?

5   A    So 667 is a copy of the claims package that was given

6   for this particular loan.

7   Q    Okay.  And let's turn to page 9 of that document.  When

8   did this loan originate, and I just want to orient ourselves

9   again --

10  A    And so --

11  Q    -- because it's a lot of information.

12  A    So it wasn't necessarily clear from the information

13  given in the claim statement, so we went to the note and

14  this loan was originated on April 6th of 2007.

15  Q    Okay.  So April 6th, 2007, these co-borrowers take out

16  a loan.  And let's take a look at their loan application.

17  On page 4 of the same exhibit, 667, is this the co-

18  borrowers' application?

19  A    It's the borrower and co-borrower's application, yes.

20  Q    Okay.  And I was using the term "co-borrowers" meaning

21  plural, the two borrowers.  Tell the Court who the borrowers

22  are?  I know we don't have their full information, but just

23  describe generally who these borrowers are.

24  A    So the borrower is the wife, and she is a marketing

25  director.  The co-borrower is the husband and he is a

Page 190

1    realtor.  And this is for a property in Arizona.

2    Q    Okay.  And on the second page of the loan application

3    towards the bottom of the page, what information do you have

4    listed here for these two borrowers?

5    A    So on the monthly income, on the side, on the left it

6    says the borrower made $7,250 a month.  The co-borrower, the

7    realtor, made $6,800 a month for a total of $14,050.

8    Q    And generally speaking, what are the Trustees claiming

9    about these two borrowers?

10   A    So they don't necessarily make an allegation of

11   misrepresentation of income for the borrower.  They make a

12   misrepresentation of income allegation for the co-borrower,

13   the realtor.

14   Q    And that's the husband?

15   A    Yes.

16   Q    Right?  And you said he's a realtor.  Okay.  By the

17   way, let's go back to Mr. Aronoff's Exhibit excerpt for just

18   one second.  Do you see where it says what type of borrower

19   this is, either salaried or self-employed?

20   A    So according to this exhibit, it says they're both

21   salaried, which is not the case.

22   Q    Why do you say that?

23   A    Well, so the co-borrower husband is a realtor so that

24   wouldn't be salaried.  And then based upon the statement of

25   financial affairs, it appears the wife had income from a

Page 191

1    salaried position, but she also had income from a business.

2    Q    Okay.  All right.  Let's go back to the claims package.

3    Now what evidence did the Trustees cite in support of their

4    misrepresentation of income claim?  Do you recall or do you

5    want me to go back to the claims tracking spreadsheet?

6    A    So the evidence they cite is the bankruptcy documents,

7    and specifically they refer to the statement of financial

8    affairs included in that.

9    Q    Is there any other evidence that they're citing in

10   their claim statement?  We can go back to it if you want to

11   see it.

12          MS. DOMINGUEZ-BRASWELL:  Plan Administrator 692.

13       (Pause)

14   A    Can you repeat your question?

15   Q    Are they citing to any other evidence besides

16   bankruptcy documents to support their income claim?

17   A    They are not.

18   Q    Okay.  Let's take a look at those bankruptcy documents

19   that the Trustees are relying on.

20          MS. DOMINGUEZ-BRASWELL:  Can we turn to page 50 of

21       Exhibit

22   Number 667?

23   Q    Can you describe this document for the Court, Mr.

24   Trumpp?

25   A    This is the statement of financial affairs page from

Page 192

1    their bankruptcy filings.  And the highlighted box was their

2    -- put there by the Trustees.  And it lists three things in

3    the highlighted box: the husband's wages of $30,020, the

4    wife's wages of $41,587, and then the wife's business income

5    of $17,492.

6    Q    Now let's take a look at the text at the bottom of this

7    document that appears to be typed in.  Do you see that?

8    A    Yes.  So --

9    Q    What is that?

10   A    So this is, again, information from the Trustees.  They

11   took the wife's wages for the year divided by 12 to imply

12   that she made $3,465.58 per month.  They disregarded her

13   business income of $17,492 for the year, and then they took

14   the husband and his realtor's wages and took it for $3,020

15   divided by 12 and said you must have earned $251 a month.

16   Q    Okay.  I want to focus on the wife's income for a

17   minute, borrower 1.  It looks like the Trustees used the

18   figure $41,587 and, as you said, divided it by 12.  And you

19   noted that they disregarded the wife's business income for

20   that same year, $17,492.  Is that relevant to the plan

21   administrator's analysis when considering this document and

22   whether it supports the claim?

23   A    It is.  It definitely goes into our assessment of

24   whether or not the borrower lied about their income.

25   Q    How?

Page 193

1    A    Because, you know, we would say you got to look at both

2    pieces in relation to what she originally stated.

3    Q    Okay.  Now the Trustees have -- well, let me ask you

4    this.  Have you heard the Trustees describe the plan

5    administrator's position as disputing the sufficiency of the

6    evidence but not the accuracy of the evidence?  Have you

7    heard them say that?

8    A    I did.  Yes.

9    Q    Do you agree with that statement?

10   A    You know, I don't, and as highlighted earlier in the

11   misrepped debts claims, right, so there clearly was some

12   accuracy issues there with how they calculated their debt-

13   to-income ratio.  Similarly, here, they're, you know,

14   failing to include portions of income for the wife in their

15   analysis.  And so I would argue we are questioning the

16   accuracy of the information.

17   Q    Are you also disputing sufficiency in some instances?

18   A    Yes.

19   Q    And can you just generally describe for the Court the

20   difference between those two things, your contention with

21   respect to sufficiency and separately with respect to

22   accuracy?

23   A    Yeah.  I mean accuracy is, you know -- does the math

24   work with what they're saying or does the document -- is the

25   document used appropriately versus is it sufficient?  Is it

Page 194

1    -- when we're weighing the evidence, is it sufficient to tip

2    the scales one way or the other relative to the other

3    information in the loan file?

4    Q    Okay.  Let's take a look at page 17 of this same

5    document.  What is this document?

6    A    This is a copy of a request for a verification of

7    employment that we found.  And it was to the co-borrower's

8    prior employer, not his current employer as listed on his

9    application but the prior employer.

10   Q    Is the co-borrower the husband?

11   A    The co -- again, yes, the co-borrower is the husband.

12   Q    And what was his profession again?

13   A    He was a realtor in Arizona in '07.

14   Q    Okay.  And you said this was a verification of

15   employment for his prior employer as opposed to the employer

16   during --

17   A    Yeah.  So --

18   Q    -- origination?

19   A    -- we saw on his application his current employer and

20   his prior employer.  And from our review, it appeared that

21   this verification of employment was for his prior employer.

22   We did not find a verification of employment for his current

23   employer.

24   Q    Okay.

25         THE COURT:  Current as in current at the time of

Page 195

1   origination?

2   A    Yes.

3         THE COURT:  Thank you.

4         MS. DOMINGUEZ-BRASWELL:  Can you zoom out and take

5   a look at the bottom part of that page?

6   Q    Do you see, Mr. Trumpp, where it says "Part 3, date

7   hired and date terminated"?

8   A    Yes.

9   Q    Do those dates have any significance for you?

10  A    It's something that went into our review.  Based upon

11  this verification of employment, it appears that he only --

12  it appears he started working for this company in January of

13  2002, and he left the company in February of 2006.

14  Q    And how much money did he make during that timeframe?

15  A    Well, so this only shows a column for 2006.  So for the

16  month and a little over a week that he worked in 2006, he

17  earned $30,915.

18  Q    And do you see that text above the date --

19        THE COURT:  I'm sorry.

20        MS. BRASSDMAN:  Sure.

21        THE COURT:  For how long did he work?

22  A    Well, based upon the information in the verification of

23  employment, if you look under Part 3 --

24        THE COURT:  Yeah.

25  A    -- where it says "date terminated", that tells me he

Page 196

1    left February 9th, 2006.

2              THE COURT:  Right.

3    A    And up above, the first column where they're showing

4    base pay and commissions, et cetera --

5              THE COURT:  I see.

6    A    -- is just for 2006.  So while he worked there multiple

7    years, in the year of 2006, he only worked for them, you

8    know, the month of January and nine days in February.

9              THE COURT:  Thank you.  Thank you.

10   A    And in that very brief period in '06, he earned and

11   collected $30,915 according to this verification of

12   employment.

13             THE COURT:  Thank you.

14   Q    And do you see that text that seems to be typed above

15   that?

16   A    Yeah, so, this is again information that we believed

17   was put on there by the Trustee's review firm and they took

18   that $30,915 from the prior employer, divided it by 12, and

19   implied that this particular borrower must've made $2,576.25

20   per month.

21   Q    And is that an appropriate calculation in the plan

22   administrator's view for this particular borrower?

23   A    For a realtor who has variable monthly income, probably

24   not.

25   Q    And based on the information you see here in terms of

Page 197

1  how long this -- how long it took this particular borrow to

2  make that much money, do you think that dividing it by 12 is

3  an appropriate calculation?

4  A    No.

5  Q    Okay, let's turn to Page 45 of the claim package which

6  is the same exhibit that we're in right now, Exhibit 667.

7  What is this document?

8  A    This is Schedule I from the bankruptcy filing, and one

9  of the things we noticed in our review of the loan file was

10  that both the husband and wife have different employers.

11  They're still in the same line of employment, but they're

12  different employers than what they had listed on their

13  application, so continued to move around.  We don't

14  necessarily know the ramifications of that on their income.

15  He was, again, still working for a real estate company, so

16  we're going to infer that he was still a realtor in Arizona

17  which was definitely a difficult job in 2007, 2008, 2009.

18  Q    Okay.  And how is that relevant to the plan

19  administrator's analysis on this misrepresentation of income

20  claim for this loan?

21  A    Well, because this wasn't necessarily a salaried

22  employer as Aronoff said in his original exhibit -- or

23  excuse me, a salaried borrower -- he was a realtor.  His

24  income would've been variable.  We know that he had a track

25  record, at least in early 2006 making a significant amount

Page 198

1    of income.  What he was thinking he was planning on making

2    as a realtor when he filled out this application versus what

3    he ultimately made, we don't know.

4    Q    What was the plan administrator's finding with respect

5    to this income claim?

6    A    So we rejected this misrepresentation of income claim,

7    because we didn't feel there was sufficient reliable

8    information to assess what this particular borrower truly

9    made at the time of origination.

10   Q    Okay.  Now, I'd like to look at the loan that Mr.

11   Aronoff compares this loan to, and starting with Plan

12   Administrator Exhibit 693, this is claims tracking

13   spreadsheet (indiscernible).  Mr. Trumpp, let's go to the

14   second page of this document and can you please tell the

15   Court what the Trustees are alleging with respect to this

16   borrower?

17   A    So, for comparative purposes, we just talk about the

18   fail, we just talk about the past and it's again a

19   misrepresentation of income claim, and it's for a borrow --

20   a single borrower this time, so it's not as complicated with

21   multiple borrowers, but the borrower's stated income as an

22   administrator employed by a real estate company -- again, a

23   real estate company in Arizona -- for a period of two years

24   earning 7,250 per month on the loan application for a loan

25   that closed in February of '07.  And again, we're looking at

Page 199

1    bankruptcy documents to assess whether the information sheet

2    provided in the application was true and correct.

3    Q    Okay.  And did the Trustee cite any other evidence

4    besides the bankruptcy documents to support this

5    misrepresentation of income claim?

6    A    No, they did not.

7    Q    Okay.  Let's take a look at the bankruptcy documents

8    for this loan.  Can we go to Plan Administrator 668?  And

9    bankruptcy documents start at Page 2.  Do you recognize this

10   document?

11   A    I do.

12   Q    Now, before we discuss the document, can you scroll

13   down to the bottom of the page where it looks like -- let's

14   see.  It says page -- keep going down, I'm sorry.  It says,

15   "Page 22 of 43."  Do you see that?

16   A    I do.

17   Q    And if you flip through, it goes all the way to Page 29

18   and ends there.  Is this the full document that the Trustees

19   are relying on in terms of the bankruptcy document cited?

20   A    So, it's the full document that was provided to us, but

21   it doesn't appear to be the entire bankruptcy filing.

22   Q    Okay.  Is that relevant at all to the plan

23   administrator's analysis when you have a portion of a filing

24   and not all of it?

25   A    Well, we prefer to have the entire amount of the

Page 200

1    document to assess it and see if there would be additional

2    information.  In this particular case, you know, we

3    continued on with what we had.

4    Q    Okay.  Can you just speak up a little bit and move a

5    little closer to the mic?  And just to orient ourselves, Mr.

6    Trumpp, do you know when this loan originated?

7    A    February of '07.

8    Q    Okay.  February 2007.  And this bankruptcy filing, do

9    you know when it was created?

10   A    Based on the information at the bottom of the page, it

11   appears it was created in 2008.

12   Q    Okay.  Full year after.  And what information do you

13   see at the bottom of this page that's relevant to the plan

14   administrator's analysis, if at all?

15   A    So --

16   Q    Can we go back to the income information, please?

17   A    It says, "407."  There's income for the borrower who's

18   the wife and it says her income was $32,067.  And there's

19   also income listed for the husband who's not a borrower on

20   this loan application, and it says $15,000 -- $15,930.

21   Q    Okay.  And is there other income listed for the

22   borrower on this document?

23   A    For other years, yes.

24   Q    Where is that?

25   A    It lists there 26, information below and their 2008

Page 201

1    information as well.

2    Q    Okay.  And is the income stated for this particular

3    borrow on this document consistent with what the Trustees

4    were alleging in their claim statement?

5    A    It is.

6    Q    Okay.  Is this the only piece of evidence in the file

7    that the plan administrator looked at for this particular

8    claim?

9    A    It is.  No, I'm sorry.

10   Q    That was not fair.  It's not a memory test.  I will go

11   to another document.  Let's take a look at Plan

12   Administrator Exhibit 670.  What is this document?

13   A    It's a copy of their tax return from -- to the State of

14   Arizona from 2007.

15   Q    Okay.  And what does it say about the income associated

16   with this particular borrower?

17   A    They're joint filings.  Adjusted gross income was

18   $45,701.

19   Q    And is that information about the borrower's income

20   consistent with what the Trustees were alleging was the

21   actual income for this borrower?

22   A    It is.

23   Q    Okay.  Let's take a look at Plan Administrator Exhibit

24   671.  What is this document?

25   A    It's a copy of a W-2 for the borrower from 2007.

1    Q    Okay.  And you see income information where it says,

2    "Gross pay, 8,476"?

3    A    Yes.

4    Q    And then if we go to the next page, do you see the

5    income there?

6    A    I do.  So, this particular borrower had multiple jobs

7    and so she had multiple W-2's and the second W-2 she earned

8    $20,344.

9    Q    So approximately for the year, what did this borrower

10    appear to have earned?

11    A    Go back to the other one?

12    Q    Can we go back to the first page?

13    A    So here she made -- call it $8,500 and then the next

14    one she made about $2,100, so a little over 30,000.

15    Q    28,000, you said?

16    A    Well, it was 21,000 on the last one, roughly, and

17    here's 8,500, so call it 30.

18    Q    Okay, about 30,000.  And is that generally consistent

19    with what the Trustees were alleging this borrower made --

20    A    It is.

21    Q    -- during the year of origination?

22    A    It is.

23    Q    And what was the year of origination, again?

24    A    2007.

25    Q    And this document is from --

Page 203

```
 1    A    2007.

 2    Q    2007.  Okay.  Let's take a look at Exhibit Number 669.

 3    So, earlier we saw an Arizona state tax return.  What is

 4    this document?

 5    A    This is their federal return from 2007.

 6    Q    And when you say, "their," who are you referring to?

 7    A    The borrower and her husband.

 8    Q    Okay.  And what's the income associated with this

 9    couple?

10    A    The adjusted gross income --

11    Q    Can we scroll down a little bit more?  Thanks.

12    A    -- was $48,000.

13    Q    Okay.  And is that consistent with the Trustee's

14    allegation that this borrower made less than what she stated

15    in her loan application?

16    A    Yeah, so here we have seen multiple sources of evidence

17    that all point to the -- kind of the same amount of income

18    for the couple and the amount of income for the borrower all

19    being less than what she stated on her application.

20    Q    Okay.  And these documents that we just walked through,

21    other than the bankruptcy document, where did the plan

22    administrator find it?

23    A    It was all on the loan filing.

24    Q    Is it something that the Trustee cited to in their

25    claim statement?
```

Page 204

1    A    It is not.

2    Q    Is it something they included in their claim package?

3    A    It was not.

4    Q    And what was the plan administrator's ultimate

5    determination on this particular misrepresentation of income

6    claim for this loan?

7    A    So, we passed this loan.

8    Q    And did you base that on the bankruptcy documents alone

9    that the Trustee cited in their claim statement?

10   A    No.

11   Q    What did you base it on?

12   A    We based it on the bankruptcy documents combined with

13   all of the other additional information we found in the loan

14   file that they didn't cite to that corroborated the evidence

15   in the bankruptcy statements, the tax returns, W-2's.  They

16   all, combined, said the same thing.

17   Q    Okay.  Let's go back to Mr. Aronoff's exhibit, the

18   excerpt that you've been discussing, Mr. Trumpp.  Are these

19   two loans the same, in your view?

20   A    No, they're very different.

21   Q    Do you believe that it's appropriate to extrapolate

22   from the plan administrator's pass, which we just saw, to

23   other fails in the protocol population?

24   A    No.  The facts and circumstances matter in each and

25   every situation, and so extrapolation of one borrower's

Page 205

1    issues onto another isn't appropriate.

2    Q    Okay.  By the way, there's one more document in the

3    file for the pass loan.  Let's take a look at that, 672.

4    What is this document?

5    A    So this is a hardship letter that we found in the loan

6    file which states kind of her position on why she was unable

7    to continue making payments.  And basically her husband lost

8    his job and ultimately -- I can't remember if it was this

9    one or elsewhere, but it appeared they were going through a

10   divorce and separating and that income was going away.  So,

11   not only was the combined income less than what they

12   originally stated, the fact the husband's income was going

13   away also contributed to her inability to make the payments

14   on the loan.

15   Q    And how is that relevant to determining whether this

16   particular borrower misrepresented her income on the loan

17   application?

18   A    This just further proof and evidence that this

19   particular borrower was not able to support the payments

20   necessary and -- 'cause she didn't have the income by

21   herself as she originally stated on the loan application.

22   Q    So, is this hardship letter relevant to the plan

23   administrator's determination that this loan should be a

24   pass?

25   A    Yes.

Page 206

1    Q    And, by the way, was this hardship letter cited to by

2    the Trustees in either their statement or their claim

3    package?

4    A    No, it was not.

5    Q    When did Step 2 of the protocol end?

6    A    So, under the Protocol Order, Step 2 was supposed to

7    end in March of 2016.  Ultimately it got extended a couple

8    more months and ended in May of 2016.

9    Q    Okay.  And was that the beginning of Step 3 of the

10   protocol?

11   A    It was.

12   Q    Okay.  Did the Trustees narrow the universe of claims

13   going into Step 3 at all?

14   A    A little.  So we -- as we've talked about today -- gave

15   them back our formal responses and we gave them our bates

16   citations and I kind of assumed a significant number of the

17   claims would be withdrawn after that review in Step 2.  But

18   they only withdrew at the end of Step 2 about 1,100 loans or

19   so, so the vast majority of the loans were still at issue

20   and we ultimately were going to have a very significant

21   number of loans to go through in Step 3.  And so, you know,

22   when we started Step 3, we had an uphill climb from a volume

23   perspective.

24   Q    Okay.  Now, without disclosing the detail of the

25   negotiations that occurred in Step 3, can you just describe

1    generally for the Court what Step 3 looked like, what it

2    entailed?

3    A    Yeah, so generally speaking, it started off just to

4    kind of see how it would go, it was myself and a

5    representative from Duff and Phelps getting on the phone and

6    literally hashing out each loan and talking about our

7    positions and the evidence that we were citing and their

8    positions, and making a determination, should I pass the

9    loan or should they withdraw the loan.  And then ultimately

10   after we did that a few times to kind of get our feet wet,

11   we expanded the process to other members of Duff and Phelps'

12   team and other members of my team, and they each had set

13   loans that that they would review each week and get on the

14   phone with their counterpart at Duff and Phelps and they

15   would literally hash it out at the loan level and decide,

16   "Hey, here's what we're seeing, here's why we think this

17   claim is bad."  And they would say, "Here's why we think

18   this claim is good and the loan is bad."  So, we literally

19   did that for months from right away starting in May/June of

20   2016 through late 2016.  We got on the phone and had

21   conversations.  And we ultimately got through about 3,000

22   loans at that rate.  And after going through about 3,000

23   loans, the Trustees reviewed and withdrew about 350 loans

24   and we ultimately passed an additional 66, I think was the

25   right number.  So, the vast majority of loans as we were

Page 208

1  going though Step 3 were ultimately getting pushed on to

2  Step 4 because we were unable to come to a decision in Step

3  3.  And in Step 3, while we couldn't agree one way or the

4  other on a lot of the loans, we became intimately familiar

5  with the positions and arguments that the Trustees were

6  making and they became intimately familiar with the

7  arguments and positions that I would take on similar loans

8  and how we treated evidence, how we treated AMA, et cetera.

9  And it ultimately got to the point where I kind of knew when

10 I was reviewing my loans without getting on the phone with

11 the Trustees what exactly their arguments were going to be,

12 and so we went through the process and we had negotiations.

13 But ultimately at the end of the day, many of the loans were

14 getting pushed to Step 4.

15 Q    I think you might've answered this, but just to be

16 clear, did the parties through the Step 3 process gain an

17 understanding of each other's positions with respect to the

18 various claims submitted under the protocol?

19 A    Absolutely.  I think both sides would agree that they

20 knew what was going to come out of our mouths after

21 reviewing the loans.  So, keep in mind we would prepare for

22 these calls by going through the loans ourselves and

23 spending half hour, hour or more going through the loan

24 files, learning what Recovco said, learning what RBF said,

25 making sure that we were prepared to have a conversation

Page 209

```
 1    with the other side.  And as we were going through that

 2    process, we kind of knew after a while, here's what the

 3    Trustees are going to argue (indiscernible).  So it was an

 4    opportunity for both sides to kind of feel each other out

 5    and understand what their arguments were.  But the clear

 6    indication was at the end of the day, I understand your

 7    opinions, they understand my opinions, and there was a gulf.

 8    Q    Okay.  And approximately when did Step 3 end?

 9    A    I don't recall the exact date, but I would say it was

10    September, late 2016.

11    Q    And the Trustees having an understanding of what the

12    plan administrator's positions were generally on the various

13    claims, did they withdraw any more loans during that time or

14    after Step 3 ended?

15    A    So, when Step 3 ended and we knew that we were going to

16    go to an estimation process to try and resolve the claim

17    instead of going through Steps 3, 4, and 5, one of the key

18    things that my analytical mind said is we got to make sure

19    that we're both on the same page in terms of which loans and

20    which claims are going on to the estimation proceeding.  So

21    I made sure that was a reconciliation process between us and

22    Duff and Phelps so both sides clearly understood at the end

23    of Step 3 and the beginning of the estimation process what

24    the starting point was.  And at the end of the day, both

25    sides tied out and agreed that here's the population of
```

1    loans and claims that are going to be put forth into the

2    estimation proceeding.

3    Q    And what was that population that you understood would

4    be at issue in the estimation proceeding?

5    A    It ties to the information that was in Mr. Cornell's

6    expert report, Dr. Cornell's expert report, but basically

7    that 91,000 loan count population is what we anticipated as

8    outstanding and being a part of this process.

9    Q    And do you know how many loans are actually at issue in

10   this estimation proceeding?

11   A    So that number has changed, and it's now approximately

12   70,000 loans that are at issue today.

13   Q    And when did you first find out that it wasn't the

14   90,000 or so you thought were going to be at issue but

15   instead it was 70,000 number?

16   A    So throughout the entire process, loans pay off every

17   month, right?  So there are active loans in this population

18   where the borrower pays their loan off naturally, meaning

19   there is no loss.  So I knew that the numbers would decrease

20   every month.  Similarly, there have been loans that have --

21   or excuse me, trusts -- that have collapsed over the course

22   of time so I also knew that certain segments of the

23   population were being removed from the estimation process as

24   these trusts collapsed.  But what I didn't anticipate was a

25   mass withdrawal of claims by the Trustees and I didn't see

Page 211

1    that until their initial expert reports that were filed in

2    June of this year, and it was one of the first things that

3    jumped out at me after going through that reconciliation

4    process and knowing that loans were going to continue to be

5    withdrawn via natural payoffs or trust collapses.  When I

6    read that initial report and saw the counts and I couldn't

7    tie out to the counts, I had no idea what happened and I

8    couldn't reconcile why they were saying the population of

9    what was outstanding for the estimation motion was so

10   drastically different than what I thought it should be.

11   Q    And when did you first find out that that difference

12   was because the Trustees had withdrawn a massive amount of

13   loans?

14   A    So, after communication between the parties, it was a

15   few more weeks until I got confirmation that the Trustees

16   had removed several thousand loans.  And then that was later

17   even confirmed that it wasn't just 15,000 or so loans that

18   were removed from the process.  There was a significant

19   number of claims that were also removed from existing loans

20   in the process.

21   Q    Now, Mr. Trumpp, before I move on, I just want to go

22   back to something the Court asked earlier.  She asked you

23   whether there were any bright lines, and you explained that

24   there weren't.  Is there anything that we saw in the loans

25   that we walked through today that helps illustrate why the

Page 212

1    plan administrator doesn't draw bright lines with respect to

2    evidence types?

3    A    Because sometimes a particular piece of evidence could

4    have weight and merit and sometimes it couldn't.  It just

5    depended upon the facts and circumstances of that particular

6    loan in question.  And so because of the unique nature of

7    each loan, you really can't make bright line assessments and

8    say this particular piece of evidence is always good or that

9    particular piece of evidence is always bad.  You had to

10   weigh them in relation to the other evidence in the loan

11   file.  And so, you know, these were just a couple examples

12   today, but this was the type of in depth review that we did

13   when we weighed our evidence and made an analysis.

14   Q    Okay.  I'd like to show you a slide about evidence

15   types.  When we take a look at the slide that's excerpts

16   from Mr. Aronoff's Exhibits 4 through 7, Mr. Trumpp, can you

17   describe what's on the screen?

18   A    So this is a summary and an excerpt of information from

19   Mr. Aronoff's Exhibits 4 through 7.  And in those exhibits,

20   he lists the evidence sources for the claims and we went

21   through and looked at how many times for each of these

22   particular types of claims they referred to one type of

23   claim.  So for example, for misrepresentation of income

24   claims, if they referred to accurate and only accurate as a

25   type of claim for -- as a source for that particular

Page 213

1    misrepresentation of income claim, they did that 35 times.

2    There are other examples on Mr. Aronoff's reports where he

3    cites claims with multiple sources of information.  That's

4    excluded from this analysis.  This is a summary of just the

5    instances where he cites a claim with one evidence type.

6    And so those are the types and the counts that are there for

7    income claims and then the other three types of

8    misrepresentation of borrower information claims.  And so it

9    really gets to the heart of evidence and corroboration.  So

10   we look for, in our weighing of evidence, are there multiple

11   pieces of information of different sources that point me to

12   the same things.  Because, again, I got to counter the

13   information that was given at origination and taken down by

14   the loan officer who, for the most part, was the only person

15   who talked to the borrower in this situation.  And so we're

16   going this weighing of evidence and these are examples of

17   claims where there was only one piece of -- one evidence

18   type, excuse me, used to support their claim.

19   Q    So let's focus in on the line that says, "Bankruptcy

20   documents in support of a misrepresentation of income

21   claim."  Based on this chart, it looks like the Trustee

22   cited to bankruptcy documents, right, as the only evidence

23   type to support an income claim 5,948 times.  Can the plan

24   administrator tell just by knowing that there's a bankruptcy

25   document in support of an income claim whether or not it's a

Page 214

1    valid income claim?

2    A    No.

3    Q    Why not?

4    A    Because you got to look at the information within that

5    bankruptcy document and how it fits into the overall picture

6    of the claim and the information in the loan file, make an

7    assessment.  We can't just definitively say the bankruptcy

8    documents trump the loan application 100 percent of the

9    time.

10   Q    Okay.  Now, Mr. Trumpp, did you do some math to figure

11   out the percentage of times that only one piece of evidence

12   or one evidence type is cited by the Trustees?

13   A    I did.  So the total number of misrepresentation of

14   income claims at the top is 34,418 again from Aronoff's

15   exhibits, and we went through and counted it up and in this

16   instance for misrepresentation of income there was one

17   evidence type cited 28,636 times, and that's 83 percent of

18   the time.

19   Q    Okay.  Let's take a look at the next chart over,

20   misrepresentation of debts claims.

21   A    So similarly, 23,362 total claims, 11,981 instances of

22   a single evidence type, so a little more than half.

23   Q    Okay.  What about for misrepresentation --

24        THE COURT:  Could I ask you a question about the

25   debts one?  How could a pay stub be evidence of a debt?

1      MR. TRUMPP:  You know, that's an excellent

2   question, Your Honor, and quite frankly we'd have to go to

3   the loan file and see --

4      THE COURT:  Okay.

5      MR. TRUMPP:  -- what they asserted.

6      THE COURT:  Thank you.  What was the percentage on

7   that -- on the debts one?

8      MR. TRUMPP:  51 percent.

9      MS. DOMINGUEZ-BRASSWELL:  51 percent.

10      THE COURT:  Indeed, it is.  Thank you.

11  Q    Okay.  What about misrepresentation of employment

12  claims?

13  A    So 5,828 total claims, one evidence type cited, 3,847

14  times, so, you know, well over half and 66 percent.

15  Q    Okay.  And misrepresentation of occupancy claims?

16  A    6,918 total occupancy claims made, 3,977 instances

17  where they were referring to one evidence type.

18  Q    Now, Mr. Trumpp, you've mentioned just a couple minutes

19  ago that in the instances where you have one evidence type,

20  you're having to balance that against the information in the

21  loan application.  What do you mean by that?

22  A    Meaning the borrower said something at origination and

23  told the loan officer in their dialogue when they were

24  creating the loan application, they said one thing.  And now

25  the Trustees are saying another thing based upon some sort

Page 216

1    of evidence type.  And by definition, there's some tension

2    there and some conflict and so we have to assess which is

3    more accurate, what's the right answer, which is difficult

4    to do 10 years later.  And so we had to weigh the evidence.

5    We had to look at the entire loan file and see if there are

6    other things that we can glean to use as corroboration to

7    say, "Yeah, more likely than not we agree that this is a

8    breach of representation of warranty that adversely and

9    materially affects the value of the loan, and we'll call it

10   a pass."  So there was a lot of analysis and judgment and

11   weighing of evidence that went to reviewing these claims.

12   Q    And can that weighing of evidence occur without looking

13   at the loan file and the claim package and all the

14   supporting documentation?

15   A    I don't see how it could.

16   Q    Okay.  Mr. Trumpp, I'd like to show you Exhibit Number

17   369.  What is this document?  We can zoom out of it so we

18   can see it, please.

19   A    So this is a letter that was sent in August of this

20   year to Trustee's litigation counsel where we were putting

21   them on notice and telling them that we had approved some

22   additional loans.  As contemplated in the protocol in Steps

23   3, 4, and 5 throughout that process there would be

24   additional loans passed as additional information was

25   uncovered or as we continued to review the loan files.  And

1   so as we were continuing to go through the loan files, we

2   made the determination that there were additional loans that

3   should be passed, and in July and in August of this year we

4   sent two separate batches of approved claims and loans via

5   the same normal reporting mechanisms to the Trustees and put

6   them on notice that we were passing additional loans.

7   Q    Okay.  And approximately how many loans did you pass in

8   this fashion?

9   A    It was like 300 or so additional loans.

10  Q    Okay.  And you said you sent one in July and one in

11  August.  We're looking at the one in August.  Take a look at

12  Plan Administrator Exhibit 376.  Is that the July letter you

13  just referenced?

14  A    It is.

15  Q    Okay.  Now, Mr. Trumpp, do you remember Mr. Cosenza

16  discussing collapsed trusts during his opening statement?

17  A    I do.

18  Q    I'd like to show you a slide from the opening

19  statement.  Can we see slide 36, please?  Can you describe

20  this slide?

21       MR. SHUSTER:  Objection, Your Honor.  There's no

22  foundation laid that Mr. Trumpp has any direct personal

23  knowledge about these matters.

24       THE COURT:  All right, fair enough.

25       MS. DOMINGUEZ-BRASSWELL:  I was just going back to

Page 218

1    that.  I apologize.

2    Q    Mr. Trumpp, did you have any involvement with respect

3    to any of these underlying deals and the collapsing of these

4    trusts?

5    A    I did.

6    Q    How?  What involvement did you have?

7    A    So some of the trusts in this estimation motion and

8    some of the trusts that have collapsed, there was a

9    requirement in those trusts for the party who holds the

10   rights to collapse the trust to obtain the issuer or

11   seller's consent.  And so I was involved in the process by

12   which the master servicer came to Lehman and sought our

13   consent, and ultimately that consent was negotiated and

14   given.

15   Q    Okay.  And do you have knowledge as to whether or not

16   the figures listed on this chart are true and accurate?

17   A    I do.  I helped gather this information for the

18   original table and the left-hand column is the summary of --

19          MR. SHUSTER:  Objection.  The fact that the

20   witness gathered the information for the table was not

21   established that he had any -- that he has any direct

22   knowledge.  I think I know where this line of questioning is

23   --

24          THE COURT:  Okay, hold on.  Come on up.

25          MR. SCHUSTER:  So --

Page 219

1              THE COURT:   Come on up.

2    Q    Mr. Trump, can you continue describing your involvement

3    and your understanding about the accuracy of these figures?

4    A    Yes.  So that first column is simply the amount of

5    asserted claims based upon the protocol.  So in Step 2,

6    what's the dollar amount of claims per trust that the

7    Trustees made?  So for example, in SARM 2004-5, the Trustee

8    asserted $13.58 million worth of claims in that trust.  The

9    second column is the value of the claim as derived by the

10   appraiser of the claims used in the class of these

11   particular trusts as referred to us by Nationstar.  So they

12   shared with us the amount that that was valued at.  The last

13   column is simply the math using the 2.41 amount of the

14   estimation motion and applying the percentages in their own

15   table for how they would anticipate allocating that total

16   dollar amount across these trusts.  And so doing the math,

17   we're able to tell that that appraiser came to the same

18   conclusion that we were seeking, that in that particular

19   instance SARM '04, '05 that should be worth a claim amount

20   of $1.492 million.

21   Q    And do you know who hired the appraiser?

22   A    It's my understanding based upon the agreements that it

23   was ultimately agreed to by the Trustee and the master

24   servicer.  In terms of hiring them and paying them, I don't

25   know the answer to that.

Page 220

1    Q    And do you know if it was the same appraiser for all of

2    these deals and all of these figures?

3    A    It was.

4    Q    Okay.  What significance does this have for you, Mr.

5    Trumpp, as it relates to this proceeding?

6    A    The significance is an independent third party

7    assessed, prior to this estimation hearing, the particular

8    claims and merits and where they thought this was going, and

9    they were of the opinion that the 2.4 estimation amount was

10   fair.

11           MS. DOMINGUEZ-BRASSWELL:  Can you just give me one

12   minute?

13           THE COURT:  Sure.  If this is a breaking -- a

14   stopping point or breaking point, you can take a few

15   minutes.

16           MS. DOMINGUEZ-BRASSWELL:  Okay.  Thank you.

17           THE COURT:  Are we -- by that, I meant I was going

18   to sit here, but if you just want this to be, you know, a

19   legitimate break, I'm happy to do that as well.

20           MS. DOMINGUEZ-BRASSWELL:  Just a five minute break

21   would be great.

22           THE COURT:  Okay.  So we'll take a five minute

23   break and we'll come back.  Thank you.

24           OFF THE RECORD.

25           THE COURT:  Have a seat.  All right.  Mr. Trumpp,

Page 221

1    home stretch for today.

2            MR. TRUMPP:  All right.

3            MS. DOMINGUEZ-BRASSWELL: It is the home stretch.

4    I only have a few more questions, and really just to clarify

5    the last slide.  Can we put up the last slide that we were

6    on just a moment ago?

7    Q    Mr. Trumpp, you started to describe your involvement in

8    the underlying information or the information that led to

9    these figures on this chart.  Can you just describe that for

10   the Court to make sure we're clear about what your

11   involvement was?

12   A    Yeah, so the first column is simply the aggregation of

13   the claim amount asserted by the Trustees by trust in the

14   protocol.  The middle column is the value --

15   Q    Well, can I just pause on the first column for the

16   moment.  It's the asserted amount -- did you calculate what

17   it would be for that particular trust?  Did you perform that

18   calculation?

19   A    I did.

20   Q    Okay.  Can you go on to the second column?

21   A    So we went -- when the Trustees asserted their claims,

22   they did it for loans in particular trusts and that's all

23   the data that we had as part of their claims tracking

24   spreadsheet.  And so we simple aggregated by trust the total

25   amount of claims submitted by the Trustees during the

Page 222

1    protocol for those trusts.

2    Q    Okay.  Now, can you describe the second column and the

3    calculations and how you were involved in those

4    calculations?

5    A    So as I mentioned earlier, the Trustees ultimate --

6    sorry, the Trustees -- the master servicer, Nationstar, came

7    to us seeking consent to collapse certain trusts.  We

8    negotiated with them on providing that consent and one of

9    the things that, you know, was a question in our mind is,

10   well, if you collapse this trust what happens to the claim,

11   right?  So we're actively reviewing loans for these

12   particular trusts in our protocol process and we're going to

13   have this estimation.

14         What happens to the claims?  It was from a

15   Nationstar that I came to understand that Nationstar would

16   essentially be buying the claims and that there was a third

17   party who was appraising and assessing the value of those

18   claims because they were an asset of the trust.  And so it

19   was through those negotiations that I wanted to know what

20   that looked like and how it worked operationally and

21   ultimately when these trusts collapsed, that's what

22   happened.

23         Nationstar, as master servicer, paid a value to

24   the investors in those particular trusts for the right to

25   acquire that claim and that value was derived by a third

Page 223

```
 1    party.  And that value that had occurred not just on these

 2    trusts here, but it occurred on multiple trusts throughout

 3    the protocol and throughout Lehman's bankruptcy, we've come

 4    to find out, and there are now multiple claims that were

 5    originally filed by the Trustees in the hands of Nationstar

 6    today.

 7              So, now we're going through the process of

 8    negotiating with Nationstar, no longer the Trustees, in

 9    order to resolve those claims.  And so there are a handful

10    of claims that we've been able to come to resolution with

11    Nationstar and we've approved those claims.  But they are

12    all done via an outside appraiser assessing the value of

13    that claim, so the master servicer can pay for it and

14    acquire it from the trust.

15    Q    Okay.  So the figures in the middle column were

16    provided to you?

17    A    Yes.

18    Q    Okay.  Now, the figures in the far right-hand column?

19    A    The far right-hand column is from the estimation

20    motion, and it looks at the potential value of the

21    estimation motion at $2.4 billion prorated based upon a

22    schedule that the Trustees came up with on how they intended

23    to allocate that 3.4 billion across all of the trusts.

24    Q    And did you perform those calculations?

25    A    I did.
```

Page 224

1   Q    And can you verify the accuracy of the calculations

2   that you just described with respect to SARM 2004-05?

3   A    Yeah, so with respect to SARM 2004-5, in the protocol

4   based upon our records we showed that there $13.585 million

5   worth of claims submitted, and based upon the information we

6   gathered from Nationstar, the value that the claim was

7   valued at via the third party appraiser was $1.492 million.

8   And then we did the math assuming that this estimation did,

9   in fact, occur at $2.4 billion as originally stated in the

10  estimation motion, applied that $2.4 billion dollars to the

11  percentage in the schedule that the Trustees showed for

12  allocation and did the math, and it came up with the same

13  numbers.

14  Q    Okay.  And just for the record, I want to walk through

15  these deals and just confirm, as you just did for SARM 2004-

16  5, the accuracy of the calculation that you and your team

17  performed.  Can we do the same thing for SASCO 2003-17A?

18  A    Yes.  So claims submitted in the protocol, $1.257

19  million; value of the claim as derived by the third party

20  appraiser, $558,000; and value as allocated under the

21  settlement agreement, $558,000.

22  Q    SASCO 2004-15?

23  A    $3.364 million in claims asserted under the protocol.

24  That particular claim was valued at $97,000 by the parties,

25  and ultimately the math would've been $316,911.

Page 225

1   Q    When you say the, "the math," is this math you did?

2   A    Yes.

3   Q    SASCO 2004-2AC?

4   A    $7.851 million in claims submitted.  Value of the claim

5   at $1.020 million, and the math done here $1.020591 million.

6   Q    Okay.  LABS 2004-1?

7   A    $2.694 million in claims; 397,000 in value; and 397,964

8   based upon the math.

9   Q    Okay.  One more.  Now we're really at the home stretch.

10  SASCO 2003-28XS?

11  A    SASCO 2003-28XS, $1.181 million in claims submitted,

12  $113,455 value, and $113,455 based upon the math.

13  Q    Math that you performed?

14  A    Yes.

15        MS. DOMINGUEZ-BRASSWELL:  Okay.  No further

16  question.

17        THE COURT:  All right. Very good.  Mr. Trumpp,

18  thank you very much.  You're excused for the day, unless,

19  Mr. Shuster, you had wanted to start?

20        MR. SHUSTER:  No, I'm all for breaking for the

21  day.

22        THE COURT:  Thank you.  You can step down, Mr.

23  Trumpp.  Ms. Brasswell and Mr. Shuster, could I speak to you

24  for a moment please?  You remain under oath overnight.  Same

25  rules apply, all right?

Page 226

1          (Whereupon these proceedings were concluded at 5:06 PM)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 227

1                        C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    **Sonya**

6    **Ledanski Hyde**
        Digitally signed by Sonya Ledanski
        Hyde
        DN: cn=Sonya Ledanski Hyde, o, ou,
        email=digital@veritext.com, c=US
7       Date: 2017.11.29 15:19:43 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 29, 2017