Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS INC.,   Case No. 08-13555-scc

7              Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                        United States Bankruptcy Court

11                        One Bowling Green

12                        New York, New York 10004-1408

13

14                        November 28, 2017

15                        10:13 AM

16

17

18

19

20

21

22

23   B E F O R E:

24   HON. SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

1    IN RE:   RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Dawn South and Sherri L. Breach

Page 3

1    A P P E A R A N C E S :

2    WILKIE FARR & GALLAGHER LLP

3          Attorneys for the Plan Administrator

4          787 Seventh Avenue

5          New York, NY 10019-6099

6

7    BY:  TODD G. COSENZA, ESQ.

8          BENJAMIN P. MCCALLEN, ESQ.

9          JOSEPH G. DAVIS, ESQ.

10

11   HOLWELL SHUSTER & GOLDBERG LLP

12          Attorneys for the Trustees

13          750 Seventh Avenue, 26th Floor

14          New York, NY 10019

15

16   BY:  MICHAEL S. SHUSTER, ESQ.

17          DWIGHT A. HEALY, ESQ.

18          NEIL R. LIEBERMAN, ESQ.

19          DANIEL P. GOLDBERG, ESQ.

20

21

22

23

24

25

1    ROLLIN BRASWELL FISHER LLC/PARTNER

2         8350 E. Crescent Parkway

3         Suite 100

4         Greenwood Village, CO 80111

5

6    BY:  MICHAEL ROLLIN, ESQ.

7         MARTIZA DOMINGUEZ BRASWELL, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2              THE COURT:  Please have a seat.  Sorry for the

3    delay.

4              All right, day two.  What are we doing first?

5              MR. SHUSTER:  We're crossing Mr. Trumpp.

6              THE COURT:  Sounds right.  Mr. Trumpp, please come

7    back.  Good morning, welcome back.  You're still under oath

8    of course.  If you need something there's some water.

9              THE WITNESS:  Okay.

10             ZACHARY TRUMPP, WITNESS, PREVIOUSLY SWORN

11       (Pause)

12             MR. SHUSTER:  May I?

13             THE COURT:  Yes.

14             MR. SHUSTER:  Thank you, Your Honor.

15                    CROSS-EXAMINATION

16   BY MR. SHUSTER:

17   Q    Good morning, Mr. Trumpp.

18   A    Good morning.

19   Q    Mr. Trumpp, you mentioned that Lehman and Aurora

20   pursued downstream claims of their own, put-back claims and

21   repurchase claims?

22   A    Yes, I did.

23   Q    Did they always do so in good faith, sir, and with a

24   good faith belief that those claims were valid?

25   A    I believe so, yes.

Page 6

1    Q    Did they always succeed on those claims?

2    A    No, we did not.

3    Q    Now, you mentioned that you asserted claims against

4    Lehman's own affiliates?

5    A    Yes.

6              MR. BRASWELL:  Objection, Your Honor.

7              THE COURT:  Yes.

8              MS. BRASWELL:  Before we get too far down this

9    road we object to the introduction of the prior testimony of

10   prior cases, we don't think they're relevant.

11             Mr. Cosenza has prepared on a couple of legal

12   issues that we anticipated coming up today, this is one of

13   them, if this is a good time to talk through it Mr. Cosenza

14   will address that.

15             THE COURT:  Okay.  First let's give out those

16   books, okay?  All three of those books?

17             UNIDENTIFIED SPEAKER:  I don't --

18             THE COURT:  I think there's enough room in there

19   for all three of those books.

20             UNIDENTIFIED SPEAKER:  One at a time.

21             THE COURT:  So --

22             MR. SHUSTER:  And he doesn't need any yet, but the

23   first binder.

24             THE COURT:  Okay.  All right.  And, Mr. Trumpp,

25   I'm going to ask you to take a stroll down the hall, all

Page 7

1    right?  And someone will come and retrieve you when we're

2    ready.  All right?  Thank you.

3        (Witness leaves room)

4            THE COURT:  Mr. Cosenza, could I ask you to close

5    the open door?

6            MR. COSENZA:  Sure.

7            THE COURT:  Okay.  So --

8            MR. COSENZA:  So, can I --

9            THE COURT:  -- what's going on?

10           MR. COSENZA:  Yeah.  So, Your Honor, we object.  I

11   guess we can take it question by question, but we object --

12           THE COURT:  So take me back.  Mr. Shuster, what

13   was the question that you asked before the objection was

14   made?

15           MR. SHUSTER:  The question that I asked I think

16   was whether Lehman pursued claims against its own

17   affiliates.

18           I wasn't asking that question, but it was a

19   question and answer from yesterday, and I was asking that

20   question just to get into what Lehman knew about its own bad

21   loans, not for setting up -- laying a predicate for

22   introducing these admissions documents.  But I'm going to

23   want to examine the witness on various submissions that

24   Aurora and LBHI have made, judicial submissions,

25   declarations, and letters that bear on the issues here and

Page 8

1    on many of the matters that Mr. Trumpp testified on

2    yesterday, including types of evidence, sufficiency of

3    evidence, one piece of evidence versus two pieces of

4    evidence, what the applicable and the E standard is.  The

5    experience that he says he drew upon in which he testified

6    about liberally, that he drew upon while at Aurora and

7    Lehman in contract administration and loss management --

8              THE COURT:  Okay.

9              MR. SHUSTER:  -- these documents all go to those

10   issues.

11             THE COURT:  I have the general idea.  Mr. Cosenza?

12             MR. COSENZA:  So, Your Honor, several -- there's

13   several basis for our objection.

14             First, under 402 I don't believe the statements

15   are relevant.

16             There's many cases in the Second Circuit that talk

17   about a mini-trial within a trial, and when you're trying to

18   admit Mr. Trumpp's statements or other Lehman statements

19   from the downstream litigation in essence all those

20   statements will have to be put into context of what happened

21   in those cases.

22             As we've gone -- you know, during my opening we've

23   heard from witnesses, every loan file is unique, and to try

24   to draw from a one paragraph or one sentence from an

25   affidavit or declaration in a downstream litigation without

Page 9

1    laying a proper foundation and without looking through the

2    entire litigation file to understand different parties,

3    different standards, again, the securitization issue versus

4    the whole loan issue that I previewed in my opening.

5            And Your Honor, you know, this is something, you

6    know, just to be very candid with you, if this was a jury

7    trial Second Circuit case law is totally on point here,

8    there's Arlio v. Lively, I believe it's 47 46 -- F.3d 46,

9    where Judge McLaughlin looked at this issue, where a

10   district court judge had allowed in a prior arbitration

11   testimony and a decision from (indiscernible - 6:46) between

12   the same parties, and he said, you know, when you put that

13   information before a jury it doesn't make any sense, you

14   have the witnesses there, you should be able to sort of

15   examine them and ask them questions.

16           To try to get into evidence prior statements or

17   prior results from other litigations without having the full

18   context of what happened in those cases you then end up with

19   a mini-trial within the trial to try to understand what

20   happened in those cases.

21           For many reasons these loans are different because

22   they're securitized, the parties are different, the

23   standards that were applied in some of those cases was

24   different, the types of evidence that Mr. Trumpp relied on

25   in those cases in terms of downstream it varied depending on

1   each case, but typically there was a much more robust

2   investigation analysis done by Lehman in terms of pursuing

3   those claims downstream.

4           So in order for, you know, those statements to

5   really be put into context we'd have to look at the entire

6   litigation and look at all the various statements that were

7   made.

8           I would note that there's also Judge McLaughlin

9   decision in Abu Dhabi v. Morgan Stanley that raises the same

10  sort of point where you try to put in evidence and testimony

11  from prior cases, and she said, you know, you really have to

12  look at the people who are here before you, understand the

13  relevance.

14          Again, that was a jury trial so there was a clear

15  prejudice to putting that information before the jury, here

16  we have a bench trial so I think it's a slightly different

17  approach, but if this was a jury trial this evidence would

18  not get in without having to go through the entirety of the

19  file, and again, that would create a mini-trial.  And given

20  where we are in this --

21          THE COURT:  So you're not getting to the issue of

22  the admission issue, you say it is out on the basis of

23  relevance.

24          MR. COSENZA:  On relevance as well as the

25  prejudice to Lehman without having a proper foundation for

Page 11

1    the entirety of the case.  And I think if you look at the

2    Lively decision I mentioned from Judge McLaughlin he

3    reversed the district court judge in that case both on

4    relevance and on prejudice saying the relevance here is you

5    have the witnesses, you should ask them questions, looking

6    at snapshots of little snippets from depositions and what

7    the determine medication was by an arbitrator creates all

8    sorts of confusion.  Every case is sort of different.  And

9    those are the same parties, there's different legal claims

10   in the two proceedings, and he said putting that information

11   before the court from the prior proceeding creates

12   confusion, it's not relevant, and it also creates a shown

13   likelihood for prejudice.

14          Again, that was a jury trial --

15          THE COURT:  Right.

16          MR. COSENZA:  -- so that was -- you know, that's

17   the one distinguishing factor here, but from our perspective

18   if you are going to take one snippet from an affidavit from

19   either Mr. Trumpp or another Lehman employee it really is of

20   no relevance here and -- without putting the full context if

21   Mr. Shuster is going to go through the entire litigation

22   file for that particular case, which I think would be well

23   beyond the scope and purview of this estimation proceeding,

24   because I think it would take hours upon hours to do that,

25   we think it's totally improper.

Page 12

```
 1            THE COURT:  Okay.  Mr. Shuster?

 2            MR. SHUSTER:  Well I'll say -- I'll start again

 3   where I was, which is Lehman first of all opened the door to

 4   all of this because Mr. Trumpp testified about his

 5   experience at Aurora, his experience at Lehman, how he drew

 6   on that experience in establishing the protocol and the

 7   standards that they applied, the evidentiary standards they

 8   applied, and what surprised him and what didn't surprise

 9   him, and what the MAE standard is.  Those are all matters

10   that are addressed in these documents.  They are filed by

11   Aurora and LBHI, they bear directly on the matters that

12   Mr. Trumpp testified about.

13            THE COURT:  But are you going to go through -- I

14   accept that, I think that's fair.  But are you going -- with

15   respect to the documents are you going to go through and lay

16   a foundation with him on every single document that he had

17   some knowledge and/or participation in the creation of the

18   document?  Because we can't charge him with knowledge of

19   every single thing that Aurora or LBHI did.

20            MR. SHUSTER:  That -- well he -- they're party

21   admissions and he really is here testifying on behalf of the

22   plan administrator, they've designated him as the plan

23   administrator rep, and yesterday he testified quite

24   liberally with a voice of the plan administrator not only --

25            THE COURT:  Yes.
```

1          MR. SHUSTER:  -- based on sort of necessarily

2     here's what I said, here's what I did, it was almost all

3     that said most of these declarations that I propose to use,

4     with one or two exceptions, are his.

5          In those declarations he recites his authority to

6     make the statements that he makes.  Then those declarations

7     -- and those declarations have language about material and

8     adverse effect and certain other matters.

9          The declarations attach demand letters made by

10    Aurora in the ordinary course of business.  Some of them are

11    Mr. Trumpp's, some of them are demand letters --

12          THE COURT:  When you're talking about Aurora are

13    you now talking about pre-2008?

14          MR. SHUSTER:  I'm talking mostly -- I have to go

15    and look at the date so I don't want to represent either

16    way, but there's a lot of --

17          THE COURT:  And the reason I'm asking is because

18    isn't it a different question as to whether or not it's a

19    party admission if it's pre-2008?

20          MR. SHUSTER:  Well there might be, but there are

21    recitations in the declarations that make clear that the

22    statements are being made on behalf of Lehman.  Aurora is

23    the authorized agent servicer and master servicer for LBB

24    and LBHI, it is authorized and directed by LBB and LBHI to

25    enforce any obligations owed to them, it's the parent

Page 14

1    company.  So it's --

2            THE COURT:  Right.  But I'm asking a different

3    question.

4            MR. SHUSTER:  In addition I think principally --

5            THE COURT:  It's a pre-2008, right?  You can tell

6    me, I think there's case law on this.

7            MR. SHUSTER:  I think it's all post.

8            THE COURT:  If it's all post then it's a different

9    issue.  To the extent that their pre I think that you have

10   an issue with it being a party admission because it's a

11   different party once there's a bankruptcy filing.  I'm sure

12   you can give me case citations to the contrary --

13           MR. SHUSTER:  Yes.

14           THE COURT:  -- but that's what I believe is the

15   better answer.

16           I hear you with respect to the door having been

17   opened, I don't know how we deal with the trial within a

18   trial kind of -- you know, drive by shooting aspect of you

19   showing him documents, kind of having a reading of snippets

20   of the documents and then you keep moving on.  So --

21           MR. SHUSTER:  Okay.  The documents have been on --

22   I think they've been on our exhibit list, regardless I've

23   covered many of these documents with him in his deposition

24   months ago.  They're going to have the documents.  They can

25   redirect him on the documents.  The documents in substantial

Page 15

1    part consist of his own declarations and demand letters that

2    are expressly referenced in the declarations that are

3    submitted on behalf of -- yeah, you know, for -- and I'm not

4    -- you know, the demand letters say here's -- you know, it's

5    -- the demand letters have narratives that look virtually

6    identical to the narratives that the trustees put forward

7    here.  You know, the borrower represented his or her income

8    to be X, we looked at a tax return, the tax return suggests

9    that the borrower's income is Y, that's a misrepresentation

10   of an applicable breach.

11           I'm not really trying to establish that that

12   borrower actually misrepresented his or her income debt or

13   occupancy, I'm just trying to establish that that was said

14   and that's the evidence that was put forward, and you know,

15   other things were said about what's required to refute the

16   evidence and so forth.

17           MR. COSENZA:  Your Honor --

18           THE COURT:  Yes.

19           MR. COSENZA:  -- I think that's the starting point

20   for the analysis and I think Mr. Shuster has sort of

21   highlighted the issue that we're most concerned about, is

22   you take a snippet from the demand letter or you take a

23   snippet one sentence from a default judgment affidavit, it

24   doesn't tell you the full story as to whether or not Lehman

25   succeeded on that claim, failed on that claim, whether or

Page 16

1    not that evidence was sufficient.

2            I mean according to Mr. Shuster's theory if for

3    example Lehman relied on the bankruptcy filing and Lehman

4    lost that case solely relying on bankruptcy filings does

5    that mean their entire theory on the bankruptcy filings, you

6    know, fall away?

7            I'm just saying it highlights the confusion that

8    this is going to create and the fact that we're going to

9    have to go through the entirety of the file just to go

10   through this.

11           THE COURT:  I have to say, Mr. Cosenza, I'm not

12   going to be confused.  I think he's entitled to present him

13   with his prior statements in declarations.  I'm not so sure

14   about other documents which he may or may not have seen.  I

15   think you're going to have to lay a foundation on that.  But

16   with respect to his own declarations I think that the

17   trustees are entitled to explore that with the witness and

18   you can take it up on direct -- on redirect.

19           I don't intend to be confused.  I can separate the

20   two things in my mind, and frankly that's, you know, where

21   my questions would immediately go to, but I think they're

22   entitled to examiner the witness in that regard given how he

23   testified as to his experience and qualifications to do what

24   he's been doing on behalf of the plan administrator.

25           MR. COSENZA:  Okay.

1          THE COURT:  So, you know, this is a time trial,

2     you're going to have to do what you're going to have to do

3     and that's what we're going to do.  All right?

4          MR. COSENZA:  Sure, Your Honor.  Just one other

5     issue.

6          THE COURT:  Yeah.

7          MR. COSENZA:  Because I think it may come up later

8     on, I'm not sure if we should cover it now or when it comes

9     up, but there are also a number of documents and emails that

10    were shown to Mr. Trumpp at his deposition where he had no

11    firsthand knowledge of documents from Lehman in 2005, 2006,

12    he's not a recipient, he claimed he didn't know.

13         THE COURT:  Sure.  But that's what I mean about if

14    there are going to be any documents other than his

15    declaration there would have to be a foundation laid --

16         MR. COSENZA:  Okay.

17         THE COURT:  -- that he's ever seen them.  They're

18    not going to come in from -- I believe they're not just

19    going to come in as admissions, so.

20         MR. COSENZA:  Okay.

21         THE COURT:  All right?

22         MR. COSENZA:  Thank you, Your Honor.

23         THE COURT:  So if somebody could retrieve

24    Mr. Trumpp that would be great.

25         (Pause)

Page 18

1          THE COURT:  While we're waiting for Mr. Trumpp to

2    rejoin us I just also wanted to tell you, Mr. Shuster, I

3    need to take a conference call at noon for about 15 minutes,

4    so if that could be a break --

5          MR. SHUSTER:  Oh, sure.

6          THE COURT:  -- that would be great, and then we

7    can continue until the lunch hour.

8          MR. SHUSTER:  Thank you, Your Honor.

9       (Witness re-enters room)

10          THE COURT:  Mr. Trumpp, please rejoin us.

11          Mr. Trumpp, given you're experience you probably

12    don't need me to say this, but I'm going to say it any way,

13    when these objections arise and you're excused or you're not

14    excused the objection and the colloquy between counsel and

15    the Court have no bearing whatsoever on you, on anything

16    you've said, or on anything you haven't said, it's purely

17    lawyer stuff and I just wouldn't want you to think it has

18    any reflection on you in any way.

19          THE WITNESS:  I appreciate that.  Thank you.

20          THE COURT:  The other thing that I wanted to

21    mention, which I should have mentioned yesterday, is that

22    you may notice from time to time I'm either writing or I'm

23    typing.  I can't explain to you why I do one or the other,

24    it's all about this case, I'm not doing any cyber Monday

25    shopping online.  I just want you to understand that you

Page 19

```
 1    have my full attention even when I'm writing or even when

 2    I'm typing.

 3              MR. SHUSTER:  Thank you, Your Honor.

 4              THE COURT:  All right?

 5              THE WITNESS:  Understood, thank you.

 6              THE COURT:  Okay.  Go ahead, Mr. Shuster.

 7    BY MR. SHUSTER:

 8    Q    So the --

 9              THE COURT:  These binders are coming back.  I

10    would suggest you put them over on the -- the binder that's

11    in with you now was from yesterday, why don't you evict that

12    binder and then these new binders you can stack up right

13    next to you.

14              MR. SHUSTER:  I would give him one at a time and

15    then we can just --

16              THE COURT:  I've been overruled by Mr. Shuster.

17              MR. SHUSTER:  Sorry.

18              THE COURT:  That's fine.

19              MR. SHUSTER:  I didn't -- you know, it just seems

20    like a lot.

21              THE COURT:  Whatever you say.

22              MR. SHUSTER:  It seems like a lot is all.

23              THE COURT:  Okay.  But we need copies as well.

24              MR. SHUSTER:  I have copies for the Court.

25         (Pause)
```

Page 20

BY MR. SHUSTER:

1

2    Q    There's been a request that you and I speak into the

3    mic, sir.

4    A    I'll try and remember that.

5    Q    Me too.

6              THE COURT:  There are red tabs in mine too.

7              UNIDENTIFIED SPEAKER:  On purpose.

8              THE COURT:  On purpose.  Okay.  Just not trying to

9    appropriate your work product.

10             MR. SHUSTER:  Make it a little easier to get

11   through it is all.

12             THE COURT:  Thanks.

13             MR. SHUSTER:  Okay.

14             THE COURT:  All right.  I think we're now ready.

15             MR. SHUSTER:  Thank you, Your Honor.

16   BY MR. SHUSTER:

17   Q    So the claims that Lehman asserted against its

18   affiliates were loan put-back or repurchase claims?

19   A    Generally speaking, yes.

20   Q    Okay.  And those were claims coming out of Lehman

21   securitizations?

22   A    Or in the case of BNC or Aurora -- in the case of BNC

23   with respect to their whole loan purchase and sale

24   agreements between BNC and LBHI.

25   Q    So Lehman knew they were breaching loans in these

Page 21

1    securitizations separate and apart from any notice it may

2    have received from the trustees?

3    A    So I mentioned briefly yesterday loss management's

4    processes for reviewing loans in the securitizations, and we

5    had people reviewing loans, reviewing specific loans in

6    these securitizations, and if there were instances where we

7    found loans that we felt breached the representations and

8    warranties to that specific loan and that specific agreement

9    and that specific trust then we pursued a remedy.

10   Q    Okay.

11   A    So for those particular loans we were looking at

12   breaches of representations and warranties and we were

13   looking at the specific representations and warranties in

14   question.  So it would depend whether there was knowledge by

15   Aurora as master servicer if we were putting a loan back

16   under that representation and warranty.

17   Q    And Aurora had the special investigations unit that

18   CQ'd loans both pre and post securitization to determine if

19   there were among other things breaches of representations of

20   warranties on those loans; isn't that correct, sir?

21   A    I recall that Aurora had a quality control process and

22   that there were people within that quality control

23   department that referred to themselves as special

24   investigations and they did reviews of loans, yes.

25   Q    And they did reviews of loans using statistical

1   sampling, right?

2   A    I'm not aware of all of the methods with which special

3   investigations chose to review their loans, I wasn't a part

4   of that group.

5   Q    But that was one of the methods that they used, wasn't

6   it, Mr. Trumpp?

7   A    I believe that that is one of the methods, yes.

8   Q    And so when they were using statistical sampling to

9   identify loans to review for breach they did identify

10   certain loans to review -- that were breaching loans,

11   correct?  I just want a yes or no whether they actual

12   identified breaching loans doing pre or post securitizations

13   reviews.

14   A    Can you define for me what you mean by breaching loans?

15   Q    A loan that breached a representation and warranty.

16   A    So again --

17   Q    Did they or didn't they, Mr. Trumpp?  Either they did

18   or they didn't.

19   A    So I would like to explain to you why I think there's a

20   difference between what special investigations did.  So

21   special investigations --

22   Q    Well hang on.  When you say a difference between what

23   special investigations did I don't know what you're

24   referring to and it doesn't sound like it's going to be

25   responsive to my question.

Page 23

1          My question for you quite simply, sir, is when they

2     used statistical sampling to select loans to review for

3     potential breaches of representations and warranties they

4     did in fact find such breaches in the regular course of

5     business; isn't that the case?

6     A    So again, I wasn't part of special investigations at

7     Aurora.  It is my understanding and belief that they

8     reviewed loans from a reunderwriting perspective and from a

9     quality control perspective, but I also am under the

10    understanding and belief -- but again, I wasn't part of that

11    group -- that they didn't review the loans relative to any

12    agreements.  They didn't look at any potential defects

13    relative to the purchase and sale agreements at Aurora or

14    the purchase and sale agreements in these securitizations.

15         So they may have found defects, but I don't believe

16    they found breaches of representations and warranties

17    because they didn't have that agreement to compare it to.

18    But again, that's not my area of expertise.

19    Q    Now, Mr. Trumpp, but you do know that in quality

20    control reviews Aurora did find breaching and defective

21    loans.  You know that, right?  That's something of which you

22    do have personal knowledge, sir?

23    A    So as I've tried to clarify, quality control at Aurora,

24    which encompassed special investigations, it's my

25    understanding they did not review their defects against the

Page 24

1    purchase and sale agreements that would have been

2    applicable.  They were purely looking at it from a

3    reunderwriting perspective and assessing whether there were

4    defects.

5         So I don't believe they would have been looking at and

6    determining whether they were quote/unquote breaching loans,

7    to use your terms, in these securitizations.

8    Q    When you say breaching loans, for example, loans that

9    breached representations and warranties and therefore would

10   have given rise to repurchase claims, right?

11   A    Yes.

12   Q    Okay.  Let me show you, Mr. Trumpp, if I may TRX-769.

13   And I'm not sure if that's in one of the binders?

14        MS. BRASWELL:  Objection, Your Honor.  This is one

15   of the documents Mr. Cosenza referenced.  Mr. Trumpp was

16   asked about this document in deposition, he said he didn't

17   have any knowledge of it, there's really no foundation or

18   basis for this line of questioning.

19        THE COURT:  Okay.  Well let's see if Mr. Shuster

20   can lay a foundation.

21   BY MR. SHUSTER:

22   Q    So, Mr. --

23   A    You're going to have to point me to the document.

24        THE COURT:  Hold on a second.  Ms. Braswell and

25   Mr. Shuster, could you come up for a second?

Page 25

1        (Sidebar off the record)

2    BY MR. SHUSTER:

3    Q    So you can see, Mr. Trumpp, that this document is

4    entitled risk review Aurora and BNC, February 2007, and it's

5    on Lehman Brothers -- on a Lehman Brothers PowerPoint

6    template.  You see that, sir?

7    A    Yes, I do.

8    Q    You were at Aurora at this time?

9    A    Yes, I was.

10   Q    Would you have seen risk reviews at Aurora for Aurora

11   in this time period?  This is -- you were at Aurora in 2005

12   to 2008, would you have seen risk reviews in the ordinary

13   course of your work, Mr. Trumpp?

14   A    I don't recall seeing it and I don't believe I would

15   have seen these in the ordinary course of my work.

16   Q    You would not have seen this document?

17   A    That's correct.

18   Q    Okay.  I'm not going to -- for the moment I'm not going

19   to try to -- I'm not asking you to adopt it, but I want to

20   ask you a question about a couple of lines in the document

21   that go to the testimony you just gave, sir.

22           MS. BRASWELL:  Objection, foundation.

23           THE COURT:  Okay.  You got to help me out,

24   Mr. Shuster.  He has said that he's seen the document, why

25   are we going to use the document as a platform for

Page 26

1    questions?

2            MR. SHUSTER:  There's a reference in the document

3    to the sorts of quality control reviews that the witness

4    testified about a moment ago, and he testified that those

5    reviews were not done for purposes of determining whether

6    there were breaches of representations and warranties that

7    lead to repurchase claims.  There are statements in here

8    that suggest otherwise.  I just want to ask him about those

9    statements.  There's two at the most that I will ask him

10   about.

11           THE COURT:  Ms. Braswell?

12           MS. BRASWELL:  Your Honor, he testified he wasn't

13   part of that group.  He's also testified, as you pointed

14   out, that he hasn't seen this document, it's that same

15   testimony before.

16           If he wants to ask questions generally that's one

17   thing, but if he's asking directly off of the document that

18   Mr. Trumpp has already said he hasn't seen that's

19   objectionable.

20           THE COURT:  All right.  Mr. Shuster, I'm going to

21   give you a little leeway.

22           MR. SHUSTER:  I'll keep it short and sweet.

23           THE COURT:  Okay.  Go ahead.

24   BY MR. SHUSTER:

25   Q    So, Mr. Trumpp, permit me to direct your attention to

Page 27

1    page 7 of 13 in TRX-769.  You see under the heading Aurora

2    there, first there's Aurora contract admin received a

3    certain number of new claims.  Contract admin was the group

4    you were in at this time?

5    A    No, I was not.

6    Q    Okay.  And then the next sentence says the trading desk

7    has asked for an additional 477 loans from the LXS

8    securitization to be reviewed.  LXS is a securitizations

9    show of Aurora Lehman, correct?

10   A    Correct.

11   Q    And many of the securitizations that are at issue here

12   are LXS securitizations; isn't that right?

13   A    That is correct.

14   Q    And then it goes on to say that this was -- will result

15   in even higher repurchase volume in March.  Do you see that,

16   sir?

17   A    No, I do not.  Can you just point me --

18   Q    It's the same sentence -- it's the same bullet point,

19   second bullet point under Aurora, second sentence,

20   Mr. Trumpp.  Page 7 of 13.

21   A    Thank you, I see it.

22   Q    Okay.  I'm wondering if that refreshes your

23   recollection at all that the quality control reviews that

24   were performed at Aurora were in fact done under

25   representations and warranties for purposes of determining

Page 28

1    whether there could or would be repurchase claims?

2              MS. BRASWELL:  Objection, foundation.

3              THE WITNESS:  So --

4              THE COURT:  You can keep going, Mr. Shuster.

5              THE WITNESS:  In 2007 I was in loss management at

6    Aurora, which was working on behalf of the master servicer

7    and reviewing loans and their securitizations.  There was

8    another department within Aurora, not in master servicing

9    called quality control, and they may have done additional

10   reviews during that period of time, I don't recall us in

11   loss management doing a review -- a specific review on LXS

12   securitization, so it very well could have been other parts

13   of Aurora, I don't know.

14             And as I stated earlier, generally speaking it's

15   my understanding quality control did not necessarily review

16   loans and compare those underwriting findings,

17   reunderwriting findings, whatever you want to call them, to

18   the securitization agreements.  That was done elsewhere.

19   BY MR. SHUSTER:

20   Q    Now, you testified yesterday, Mr. Trumpp, that a breach

21   rate of 50 percent seemed to you to be intuitively high.

22   You said that more than once yesterday, remember that?

23   A    I do.

24   Q    Okay.  Let me just direct your attention -- this is the

25   last thing I'm going to ask you about in this document --

Page 29

1    but it's on page 11 of the same document, Mr. Trumpp, and

2    it's five bullet points down.  Do you see that?  Are you

3    with me?

4    A    I do.

5    Q    So this is a reference to work that was done by special

6    investigations, and I think what you're telling us today is,

7    to the extent that special investigations performed breach

8    reviews that was something in which you did not participate

9    and about which you -- and something you know nothing about.

10   Is that fair?

11   A    That is.

12   Q    Okay.  But you do see here that it does say that

13   special investigations completed the review of 240 LXS loans

14   which resulted in 50 percent of the loans containing

15   material misrepresentations.  You see that?

16   A    Yes.

17   Q    Does that cause you in any way to reevaluate the

18   statement you made multiple times yesterday that a breach

19   rate of 50 percent seems intuitively high?

20   A    No.

21   Q    Okay.  Now, it's also the case, isn't it not, Mr. -- is

22   it not, Mr. Pino, that the plan administrator -- Mr. Pino --

23   that's not the last time I'm going to do that, but I

24   apologize.

25        It's also the case, is it not, Mr. Trumpp, that the

Page 30

1    plan administrator submitted a declaration from Craig Pino

2    of RECOVCO in support of its motion for a protocol.  You

3    recall that?

4    A    I know that he did, I haven't seen that document in a

5    long time.

6    Q    But you did see it at the time?

7    A    I did.

8    Q    And you would have reviewed it at the time?

9    A    Yes.

10   Q    Okay.  So let me just direct your attention -- and I

11   don't know if this is one of the binders that you have, sir,

12   and if it's not we'll get it to you -- to TRX-A72.

13             THE COURT:  Thank you.

14      (Pause)

15   BY MR. SHUSTER:

16   Q    Do you have the document, sir?

17   A    I do.

18   Q    So you can see there that it's a declaration of Craig

19   Pino, he's the head of RECOVCO, right?

20   A    Yes.

21   Q    And he signs this thing on page 7.  And he has various

22   attachments actually going to -- which I'm not going to

23   particularly ask you about -- but going to the doability of

24   the protocol and the resources that each side could -- would

25   have to and would be able to devote to completing the

1    protocol in a timely and efficient manner, correct?

2    A    Yes.

3    Q    Okay.  But let me just focus you on page 3 initially of

4    the document, Mr. Trumpp.  And under the heading step one,

5    so it's -- I guess it's paragraph b -- paragraph 5(b) to be

6    precise, step one, and you see that the last sentence of

7    that paragraph says, "It is assumed the RMBS trustees will

8    present claims on 57 percent of their reviewed loans."  You

9    see that?

10   A    Yes, I do.

11   Q    Okay.  And then let me just also direct your attention,

12   if I might, Mr. Trumpp, to the next page of the document,

13   the second full paragraph on that page.  So for -- I guess

14   for the record it's Section 5(c) and it's the second full

15   paragraph on page 4 of TRX-A72.  So there Mr. Pino sets

16   forth another assumption does he not?  Mr. Trumpp?

17   A    I'm reading the document.

18        (Pause)

19   A    I'm sorry, can you repeat your question?

20   Q    There Mr. Pino sets forth another assumption, in fact

21   more than one?

22   A    This document has several assumptions, yes.

23   Q    Okay.  So let's focus on the first one where he is

24   doing some math about how the protocol was likely to work,

25   and he says -- and he assumes that the plan administrator

Page 32

1   agrees -- assuming the plan administrator agrees with 50

2   percent of the claims presented by the RNBS trustees the

3   plan administrator we have denied 46,113 claims.  You see

4   that, sir?

5   A    Sorry.  I do see that.

6   Q    So Mr. Pino assumed that 57 percent of the reviewed

7   loans would yield breach claims and that 50 percent of those

8   breach claims would be accepted by the plan administrator,

9   right?

10  A    Yeah.  And so what Mr. Pino was doing there --

11  Q    No.  No.  No.

12  A    -- was simply taking --

13  Q    No, Mr. Trumpp, you don't have to testify to what

14  Mr. -- you know, you'll have an opportunity on redirect, you

15  had -- you know, you had plenty time to testify yesterday,

16  please answer my question, just -- and I just want to take

17  you through this math.  So Mr. Pino made those assumptions.

18       Now in fact, Mr. Trumpp --

19           THE COURT:  Time out.  Come on up.

20       (Sidebar off the record)

21  BY MR. SHUSTER:

22  Q    Now, let me direct your attention to the next sentence,

23  Mr.  Trumpp.  It says that of the remaining claims a certain

24  number would be denied for incontestable reasons and not

25  subject to further adjudication.  You see that?  See the

Page 33

```
 1    sentence, Mr. Trumpp?

 2    A    I do.

 3    Q    Okay.  But let me just point you to the next one.  He

 4    says:

 5         "For example, for document defect claims where

 6         loan filed documents such as a HUD-1 settlement

 7         statement are allegedly missing or where an appraisal

 8         is allegedly missing it is my view based on prior

 9         experience that the plan administrator will be able to

10         locate many of the documents that are asserted

11         missing."

12         Do you see that?

13    A    Yes.

14    Q    Okay.  So Mr. Pino at least expected that certain

15    missing documents or compliance claims would be made in

16    error, that the plan administrator would be able to point

17    out the error, and those claims would be denied, correct?

18    A    Correct, and that's --

19    Q    And that's what happened?

20    A    No.  Many times in step two the trustees -- or excuse

21    me -- the plan administrator did find the documents and we

22    showed in our formal responses that we found the documents,

23    but the majority of the time in step two those claims

24    weren't rescinded in step two and we had to deal with them

25    in step three.
```

Page 34

```
 1        So these assumptions here aren't necessarily what

 2   followed in reality.

 3   Q    Okay.  Many certainly now, Mr. Trumpp, many missing

 4   documents and defective document claims have been withdrawn;

 5   isn't that correct?

 6   A    Ultimately now, yes, as the --

 7   Q    Okay.

 8   A    -- big mass withdraw prior to June of this, yes --

 9   Q    Now --

10   A    -- but there are still documents in there where we

11   believe the documents are found.

12   Q    Okay.  And the parties have a disagreement on that,

13   right?

14   A    That is correct.

15   Q    Okay.  Now, you know, Mr. Trumpp, you know again,

16   bearing in mind your comment about the 50 percent breach

17   rate seeming intuitively high to you, you know that when the

18   trustees selected loans to review that they adversely

19   selected those loans, right?

20   A    It's my understanding that they sought loan files for

21   all loans that had liquidated with a loss and loans that

22   were still performing in these securities.  Outside of that

23   I'm not necessarily sure what went into the review, because

24   I know they didn't necessarily review all of the loan files

25   they received.
```

Page 35

```
 1    Q    So are you saying that you did not know at the time

 2    that to the extent that the trustees reviewed loans that

 3    were still active, which is to say they hadn't been

 4    liquidated, that they selected those loans because they had

 5    either been materially modified or they were loans on which

 6    losses were expected?  Did you not know that at the time?

 7    A    I've seen that exchanged in the expert reports, I did

 8    not necessarily know that at the time.

 9    Q    I see.  Did you know that the trustees, based on those

10    adverse selection criteria, had initially requested 210,000

11    loan files from the servicers?

12    A    I do.

13    Q    And you know that the trustees determined that 39,000

14    of those loan files, for one reason or another, were not

15    suitable or appropriate for review, correct?

16    A    I'm not sure what went into their basis.  I know they

17    ultimately didn't review them for one reason or another.

18    Q    Right.  And you know that the trustees did review

19    171,000 loans?

20    A    Yes.

21    Q    And you know that on those 171,000 loans the trustees

22    determined on their own that there were -- there was no

23    basis to assert a breach claim on those loans and so they

24    did not do so, correct?

25    A    So in my perspective I'm not sure I would necessarily
```

Page 36

1    say that was an adverse selection.  They simply chose not to

2    review loans that had performed and paid off naturally,

3    which makes perfect sense, but they ultimately chose to

4    review every potential loan in these securitizations that

5    could possibly have a breach of representation and warranty

6    with an adverse material effect because it had a default.

7        So I'm not necessarily sure I would say that's an

8    adverse selection when you look for every possible source of

9    a claim.

10   Q    Mr. Trumpp, I have to move to strike that answer as

11   non-responsive to my question.  That was two questions ago.

12       What I just asked you was whether you were aware at the

13   time that of the 171,000 loan files that the trustees

14   reviewed they determined as to 77,000 of them that there was

15   not a -- that it would not be -- there was no basis to

16   assert a breach claim on those loan files.  You know that

17   happened, right?  That's just a yes or no.

18   A    Yes.

19             THE COURT:  Can I just -- you're specifically

20   asking the question does he know that as to 77,000 files if

21   there was no basis to assert a claim as opposed to they did

22   not assert a claim.

23             MR. SHUSTER:  I would rather have asked the last

24   -- the second question if that's --

25             THE COURT:  It's a different question.

Page 37

1          MR. SHUSTER:  It is.  So I --

2          THE COURT:  So --

3          MR. SHUSTER:  -- I'd rather ask the second

4    question.

5          THE COURT:  Then please go ahead.

6          MR. SHUSTER:  So thank you.

7    BY MR. SHUSTER:

8    Q    So with that, Mr. Trumpp, with that helpful correction,

9    you're aware that the trustees did not assert breach claims

10   on 77,000 of the loan files they reviewed, correct?

11   A    Yes.

12   Q    And in fact you said, you testified yesterday that the

13   trustees -- that you didn't see a breach claim on many loan

14   files that the trustees reviewed, right?  You used those

15   words yesterday.

16   A    On loans that they asserted claims on that we didn't

17   agree with?  Yes.

18   Q    No, no.

19   A    All right.

20   Q    I thought you testified yesterday that there were many

21   loan files the trustees reviewed where you never saw a claim

22   because none was presented.

23   A    I'm not sure I understand your question.

24   Q    I don't think it's important enough to go back to.

25          THE COURT:  Mr. Cosenza?

```
1                MR. COSENZA:  Can I have a side bar --

2                THE COURT:  Sure.

3                MR. COSENZA:  -- just for one minute?

4           (Sidebar off the record)

5      BY MR. SHUSTER:

6      Q    I'm going to show you now, Mr. Trumpp, your own

7      declaration, which is TRX-726.  Now, TRX-726 is your

8      declaration in support of the debtor's motion to estimate

9      the amount of claims, I'm going to paraphrase.

10               MR. SHUSTER:  Can someone please help Mr. Trumpp

11     find the document?  And let's not make him rifle through the

12     binder, so someone --

13               THE WITNESS:  I see Volume I of the binders, and

14     I'm assuming --

15               MR. SHUSTER:  I can give him my copy and look at

16     the screen if that helps.

17               MS. BRASWELL:  Do you want my copy?

18               MR. SHUSTER:  No, I'll give him mine.

19               MS. BRASWELL:  You can give him this one, I have a

20     copy.

21               THE WITNESS:  Thank you.

22     BY MR. SHUSTER:

23     Q    Okay.  Let's -- it terminates the effort to find the

24     binder in the interest of not having a disruption for the

25     witness.  Thank you.
```

Page 39

1          So this is a declaration that you signed and submitted,

2     sir?  I think it's electronically signed, but that's your

3     electronic signature?

4     A     Yes.

5     Q     As it were?  All right.  So I just want to quickly

6     direct your attention to a couple of statements that you

7     make in here.

8          Paragraph 19 -- you describe in this declaration your

9     own estimation methodology, which you testified to

10    yesterday, correct?

11    A     That's correct.

12    Q     Okay.  And in step six of your estimation methodology

13    you in the third sentence you say -- well the three

14    sentences are not all defaults and losses are the result of

15    breaches of representations and warranties.  In many cases

16    when a default occurs they're not breaches of

17    representations and warrants.  But then you go occur to say,

18    to account for such a scenario the calculation of the high

19    rate assumes that 35 percent of the losses are caused by a

20    breach of a representation or warranty, right?

21    A     Yes.

22    Q     So you're saying there -- the assumption you're making

23    there is that 35 percent of the breaches that are put

24    forward -- that 35 percent of the losses that you identify

25    in step one and in other steps will -- are caused by

Page 40

1    breaches of representations and warranties.  That's the

2    assumption that you make, correct?

3    A    That's what the words on the page say.  That's not

4    necessarily -- as I discussed yesterday, the intent behind

5    step six was to try and come up with a process and an

6    assumption for what percentage of loans would be brought

7    forth by the trustees as potential claims.

8        And so I put there caused by breach of representation

9    and warranty, and maybe in hindsight we should have

10   elaborated more on that.  But it wasn't -- wasn't by

11   definition to say those are proven.

12   Q    Mr. Trumpp, you reviewed a draft of TRX-726 before you

13   signed it, yes?

14   A    Yes.

15   Q    In fact, I'm assuming to a substantial extent you wrote

16   it since it reflects your estimation methodology, right?

17   A    Yes.

18   Q    And you had a chance to look at it and correct it and

19   get it accurate the way you wanted to?

20   A    Yes.

21   Q    Okay.  Let me -- let me direct your attention -- and

22   then in step seven you say that you -- you refer to a

23   validation rate.  So in step six you say you're assuming

24   that 35 percent of the losses are caused by a breach of

25   representation and warranty, but then you assume that only

Page 41

1    40 percent of those breaches of representations and

2    warranties that cause losses would actually be in your words

3    validated, right?  That's the assumption you're making for

4    purposes of your methodology?

5    A    Yes.

6    Q    Okay.  Now two things.  One, so you're assuming that 40

7    percent of the breaches that are put forward would be

8    validated, just so we're clear, by which you mean, I assume,

9    that they would be made out?

10   A    And let's make sure that we're talking about the

11   definition here where it talks about validated meaning they

12   meet every element required for a purchase and/or

13   indemnification under the governing agreements.  So --

14   Q    Thank you for that --

15   A    -- we were looking for a review here of the claims

16   submitted and estimating how many we thought would be

17   validated.

18   Q    So that's what validated mean.  Good.  Thank you.

19        Now let me just direct your attention while we're on

20   the documents, Mr. Trumpp, let me direct your attention to

21   paragraph 14.  In paragraph 14 you start with an aggregate

22   unpaid principal balance number, right?

23   A    Yes.

24   Q    And you've attempted to get that number right and

25   accurate, correct?

Page 42

1    A    Yes.

2    Q    Okay.  And what you relied upon to establish that

3    information was Intex and Intex is a public subscription

4    service, right --

5    A    Yes.

6    Q    -- that provides data on, among other things,

7    securitizations of loans and securitizations?

8    A    That's correct.

9    Q    Okay.  And where -- Intex did not have -- you say in

10   the last sentence, if Intex, the public service, Intex, did

11   not contain the unpaid principal balance for a particular

12   deal the debtors then look to the monthly trustee remittance

13   statements, correct?

14   A    That's correct.

15   Q    Now you -- those are the same monthly trustee

16   remittance statements that you are unwilling to look to for

17   purposes of establishing realized losses for the purchase

18   price calculations on breaching loans; is that right?

19   A    That is correct.  And --

20   Q    Okay.

21   A    -- there's a difference in the usage.  Here we were

22   looking for the total amount of losses for any one

23   particular securitization so an aggregate number versus in

24   the protocol where we're looking for loan level specific

25   information, so two different rational.  And in one instance

1    it was okay to use Intex and remittance reports and in

2    another instance it wasn't.

3    Q    And you made that decision?

4    A    Yes.

5    Q    Yes.  So -- but you did want to be precise, right?  I

6    mean, you wanted to get the numbers right because you were

7    presenting an estimation methodology to the Court the first

8    step in which was establishing an aggregate unpaid principal

9    balance, right?

10   A    Correct.  And the --

11   Q    Okay.

12   A    -- the debate isn't around the total number of losses

13   at the securitization level.  It's a question of at the loan

14   level.

15   Q    And remittance reports, in fact, have loan level data,

16   do they not, Mr. Trumpp?

17   A    They do, but it's --

18   Q    Okay.  That --

19   A    -- the level of --

20   Q    No.  No.  I don't --

21   A    -- data --

22   Q    I'll -- you --

23   A    -- available.

24            THE COURT:  So, Mr. Trumpp --

25            THE WITNESS:  It's different.

Page 44

1          THE COURT:  -- I'm going to have to intercede here.

2    Like any careful witness you're trying to very carefully

3    answer Mr. Shuster's questions which can be a little

4    frustrating to do in a yes or no format, but he's entitled

5    to try to ask you yes or no questions since it's his cross-

6    examination and counsel for the plan administrator on

7    redirect examination can -- can take you back to these

8    topics.

9          So in -- please endeavor to answer his questions to

10   the extent that you can.  If you believe that a question is

11   not capable of a yes or no answer you can tell Mr. Shuster

12   that.  But otherwise we're going to be here for a very, very

13   long time.

14          THE WITNESS:  Okay.

15   BY MR. SHUSTER:

16   Q    So just to make sure we're in sequence, sir, the

17   remittance reports do provide loan level data for each

18   individual loan, correct?

19   A    Yes.

20   Q    And one of the items of information that remittance

21   reports provide for individual loans is a realized loss

22   number, correct?

23   A    Yes.

24   Q    And remittance reports are actually -- and there --

25   remittance reports are prepared by trustees, correct?

Page 45

1    A     You know, I think it may vary sometimes by trustees,

2    sometimes by securities administrator.  I'm not a hundred

3    percent sure.

4    Q     Very good.  But you do know that the information that

5    goes into remittance reports is provided by master

6    servicers, right?

7    A     If there's a master servicer on that deal, yes.

8    Q     Okay.  And so, for example, Aurora was a master

9    servicer for many of the securitizations at issue here,

10   right, and many others?

11   A     Yes.  And later Nationstar took that role over.

12   Q     Right.  So just so we're clear and then we'll come back

13   to Aurora, Aurora's servicing business was acquired by

14   Nationstar?  That's what you're saying?

15   A     Aurora acquired -- or excuse me, Nationstar acquired

16   Aurora's primary servicing and master servicing operations.

17   Yes.

18   Q     Thank you very much.

19         So the data that goes into the remittance reports where

20   there's a master servicer is provided by the master

21   servicer, correct?

22   A     Yes.

23   Q     And those data are provided by the master servicer in

24   data tapes that they publish on a monthly basis or in some

25   other equivalent data format, correct?

Page 46

1    A    That's my understanding.

2    Q    And the information that goes into the data that the

3    master servicer aggregates and publishes is provided by the

4    primary servicers in those securitizations, correct?

5    A    Yes.

6    Q    And the remittance reports are used, among other

7    things, they're -- they're made available to investors, to

8    certificate holders, right?

9    A    Yes.

10   Q    And they're used among -- for among other purposes to

11   advise certificate holders of distributions to which they'll

12   be entitled under the waterfall provisions applicable to

13   that securitization, right?

14   A    Yes.

15   Q    They're also used to advise certificate holders of the

16   losses that they incur in whatever tier of the waterfall

17   they happen to be holding certificates, right?

18   A    Yes.

19   Q    And a remittance report, in fact, is good enough to

20   tell a certificate holder, your paper is worthless, you're

21   wiped out, right?

22   A    Yes.

23   Q    Thank you, sir.

24        Okay.  We're done with that document.

25        Now you joined Lehman in February of 2009, very shortly

```
 1    after it filed for Chapter 11?

 2    A    Yes.

 3    Q    Lehman filed in September of 2008 and you joined in

 4    February '09?

 5    A    For the previous four years you had been working at

 6    Aurora '05 to '08?

 7    A    No.  I had worked 2002 to '09 and then previous to even

 8    before that at Aurora.

 9    Q    Okay.  In 2002 to 2004 you worked principally in

10    secondary marketing?

11    A    Yes.

12    Q    And then starting in '05 you started to get involved in

13    contract administration, put backs, repurchase claims?

14    A    And loss management, yes.

15    Q    Okay.  So that started in '05.  So you had four years

16    of experience working in contact administration repurchases

17    and put backs roughly by the time you joined Lehman in

18    February of '09?

19    A    I did.  Yes.

20    Q    And you had spent some years before that also earlier

21    at -- you graduated school in -- college in '98?

22    A    From undergrad, yes.

23    Q    And then you did a masters in finance starting in '99

24    and you spent a few years doing that and working as a

25    financial analyst at Aurora and at an energy company called
```

Page 48

1    Equilan (ph)?

2    A    That is correct.

3    Q    Okay.  So coming back to '05, that four years you spent

4    at Aurora before you joined Lehman, that was the sum total

5    of your experience at that point in time in connection with

6    put back and repurchase claims?

7    A    I'm not sure I would characterize it that way.  I

8    continued working on repurchase claims when I went to Lehman

9    and worked on repurchase related claims through that period,

10   but if you're talking about just Aurora the answer would be

11   yes.

12   Q    No, I didn't -- I'm sorry.  I didn't mean to suggest

13   otherwise.  As of the time when you joined Lehman in

14   February of '09 you had spent approximately four years

15   working in the repurchase and put back field?

16   A    Yes.

17   Q    And then much of your time as you mentioned at Lehman

18   has been working on these claims, right?

19   A    Yes.

20   Q    You had no prior experience, in fact, you have no

21   experience originating loans, isn't that correct?

22   A    That is correct.

23   Q    You had -- then have no experience underwriting

24   mortgage loans?

25   A    That is also correct.

Page 49

1   Q    You're not a mortgage loan underwriter and you're not a

2   repurchase reviewer either, right?

3   A    Correct.

4   Q    And it's fair to say that you don't even know some of

5   the basics, Mr. Trumpp, about loan origination like why even

6   numbers, round numbers, for example, are a red flag when

7   there's a statement of income in round numbers?

8   A    As I've said and you just reiterated, I'm not an

9   underwriter.  I've not been involved in the loan application

10  process.  That's not my expertise.

11  Q    Similarly, you wouldn't know to the extent that -- you

12  know, you've heard the term the three C's, credit,

13  collateral, compliance, but it's not a term that you're

14  familiar with or sort of have worked with, correct?

15  A    I'm aware of them.  I've not been in a position where I

16  had to apply them.

17  Q    You made the final cut here on all breach claims by the

18  trustees, correct?

19  A    Based upon the information from our RECOVCO reviews and

20  RBF, yes.

21  Q    But you were the ultimate decision-maker, right?

22  A    That's correct.

23  Q    So as of the time that the protocol started in December

24  of 2014 you had the four years at Aurora and then you had

25  the four or five years that you were working at Lehman, the

Page 50

1    bankrupt estate, processing claims and so forth, right?

2    A    Yes.  And can I --

3    Q    Okay.

4    A    -- elaborate on that?

5    Q    You can on redirect.

6    A    Okay.

7    Q    So -- now you structured Lehman's protocol process,

8    didn't you, sir?

9    A    I helped negotiate it and set it up, yes.

10   Q    Well, I'm -- I'm talking about what you testified to

11   yesterday, the review structure that you testified to

12   yesterday where there was RECOVCO and then there was on top

13   of that RBF and then you, that's something you set up,

14   right?

15   A    So I think the diagram you're referring to talked about

16   RECOVCO, RBF and the plan administrator.  There's more

17   people than just me on my team.  But, yes.

18   Q    Okay.  And when you said earlier you negotiated that --

19   that -- the plan administrator's protocol review structure

20   and process was not a matter of negotiation with the

21   trustees, correct?

22   A    That is correct.

23   Q    That was a decision that you made?

24   A    Yes.

25   Q    You also made final material and adverse effect calls,

Page 51

1    right?

2    A    I did.

3    Q    And for both breach calls and material adverse effect

4    calls you relied on the advice of counsel?

5    A    I did.

6    Q    You hired RECOVCO.  You extolled their virtues and

7    expertise yesterday as a forensic review firm, but you did

8    not empower RECOVCO to pass breaches using your pass/fail

9    lexicon?

10   A    That is correct.  So as we --

11   Q    No.  I -- I'm just trying to establish -- make sure we

12   have clear those facts.  RECOVCO did have people with more

13   experience in the field than you had, right?

14   A    From an underwriting or purchase review perspective,

15   yes.

16   Q    Okay.  You did not empower RECOVCO to pass breaches

17   without counsel review?

18   A    That is correct.

19   Q    And, in fact, according to the plan administrator's

20   expert, Mr. Grice, you actually told RECOVOC how to review

21   loans; is that correct?

22   A    RECOVCO, as I talked about yesterday, brought certain

23   elements to the table and they had a tremendous amount of

24   experience reviewing loans.  I shared with them some of my

25   experience for pursuing claims and reviewing defects.  And

Page 52

1   so we collaborated and worked together in that process.

2   Q    Mr. Grice says, I'm sure you've read the testimony,

3   that you taught RECOVCO how to do a nuance review.  Is that

4   an accurate statement, yes or no?

5   A    I'm not necessarily sure what Mr. Grice was thinking

6   when he said that statement, but I can tell you --

7   Q    Well, I --

8   A    -- it was a collaborative --

9   Q    -- I'm --

10   A     -- process.

11   Q    -- I'm really going to that statement, sir.  So forgive

12   me for interrupting, but I'm trying to be efficient.  Mr.

13   Grice said that RECOVCO had never done a review as nuance as

14   this one because it didn't exist before.  Do you agree with

15   that statement, Mr. Trumpp, yes or no?

16   A    I agree that we did a very nuanced, thorough review.

17   Q    And do you agree that RECOVCO had never previously done

18   a review that was equivalently nuanced, yes or no?

19   A    RECOVCO had done many reviews up until that point so

20   I'm not necessarily sure to what context all those were.  I

21   can just tell you I feel and I believe we had a unique

22   process.

23   Q    Unique.  Well, Mr. Grice did say that your process had

24   never existed before.  Do you agree with that?

25   A    I am not aware of any other instances similar to this.

Page 53

1          (Pause)

2     Q    I just want to pull up, Mr. Trump, I don't think we

3     have this on the screen, but your chart of -- from your

4     binder of yesterday.  I think we made copies so we could

5     hand those out.  And I --

6               MR. SHUSTER:  Would someone be good enough to hand

7     one to Mr. Trumpp?

8               UNIDENTIFIED SPEAKER:  Is this the (indiscernible

9     1:13:22)?

10              MR. SHUSTER:  Yes.

11              UNIDENTIFIED SPEAKER:  Okay.

12              THE COURT:  What page from the deck is that?

13              MR. SHUSTER:  Page 18, Your Honor.

14              THE COURT:  Thank you.

15    BY MR. SHUSTER:

16    Q    So that chart at page 18 of the plan administrator's

17    direct examination, Zachary Trumpp, shows RECOVCO and RBF at

18    the same level of review.  But, in fact, the hierarchy was

19    RECOVCO at the bottom, then RBF, correct?

20    A    How -- I'm not sure what you mean by hierarchy.

21    Q    RBF was -- RECOVCO didn't have the power to pass breach

22    claims where it thought there was a potential for actual

23    breach claim.  It had to submit that up to RBF for further

24    review, correct?

25    A    So I think it -- when it got passed from RECOVCO to RBF

1   isn't necessarily a matter of what RECOVCO was a pass or a

2   breach claim.  Again, RECOVCO's review as at the threshold

3   fax level.  They weren't necessarily looking and applying

4   representations and warranties or AMAs.  So all they were do

5   -- doing was looking at an assessment of the threshold

6   facts.

7        And so I guess I'm not sure what you mean by hierarchy.

8   They were a part of the review.  They reviewed all claims

9   submitted by the trustees.  But I don't know what you mean

10  by hierarchy.

11  Q    Okay.  Well, let's take it in very simple terms.  Did

12  any loans that got reviewed by RBF go back down to RECOVCO

13  for review?

14  A    There were many times when RBF was reviewing a loan and

15  they had questions about what RECOVCO may have found.  They

16  went back to them for additional clarification or if they

17  wanted something calculated.  So there was communication

18  between the parties.

19  Q    There was communication.  But once RBF made a decision

20  on a loan file, Mr. Trumpp, did that loan file go back to

21  RECOVCO for further review?

22  A    No.

23  Q    Okay.  But when RECOVCO made a determination on a loan

24  file, and if it determined that there was a potential basis

25  for a defect or a potential material and adverse effect,

1   that went up to RBF for review, correct?

2          MS. BRASSWELL:  Objection.  That -- objection.

3          THE COURT:  What's the objection?

4          MS. BRASSWELL:  Misstates his testimony.  I can

5   approach the bench if you don't want me to elaborate, but it

6   misstates Mr. Trumpp's prior testimony.  He said that

7   RECOVCO wasn't making determinations about whether there was

8   a potential for a defect.  They were simply assessing

9   threshold facts.  And Mr. Shuster mischaracterized that.

10          THE COURT:  I -- I don't think there's really much

11   here to be squabbling about, frankly.  I don't know if it

12   has to do with the word "up."  I think -- we're talking

13   about a sequential process, right?  Right?  Maybe?

14          MR. SHUSTER:  That's --

15          THE COURT:  What you're trying to --

16          MR. SHUSTER:  Not --

17          THE COURT:  -- you're trying --

18          MR. SHUSTER:  Not necessarily the word I would use,

19   but yes.

20          THE COURT:  You're trying to find out --

21          MR. SHUSTER:  Yes.

22          THE COURT:  -- what the process is.

23          MR. SHUSTER:  Yeah.

24          THE COURT:  So all right.  Let's let Mr. Shuster

25   continue.

Page 56

1    BY MR. SHUSTER:

2    Q    Mr. Trumpp, isn't it correct that if RECOVCO determined

3    that there was not a factual basis for the defect then it

4    could just reject the loan itself.  But if it determined

5    that there was or might be a factual basis for the defect

6    then it referred the loan to RBF; is that accurate?

7    A    Yes.

8    Q    RBF is Lehman's trial counsel, correct?

9    A    That is correct.

10   Q    And you mentioned that you have worked with Mr. Rollin

11   for ten years as counsel for Lehman and Aurora, right?

12   A    Yes.

13   Q    You mentioned earlier that this review was unique.  Are

14   you aware of any large scale loan review for repurchase

15   purchase -- purposes where a law firm sat on -- trial

16   counsel for the plaintiff sat on top of the loan review firm

17   and made the ultimate call whether there was a breach and

18   whether there was a material adverse effect?

19   A    So as you stated --

20   Q    Are you aware of one?

21   A    As you stated earlier my career has almost exclusively

22   been at Aurora and Lehman.  I have not wandered outside of

23   the bounds of Aurora and Lehman, shall we say.  And so I

24   can't necessarily tell you what else is going on in the

25   market for  -- with great certainty.  So I can't tell you

1    what other banks, other wall street firms may have done.

2        The trustees made breach of contract claims against the

3    estate.  I thought it was entirely reasonable to have

4    attorneys reviewing those claims.

5    Q    Okay.  Now the -- RBF are not mortgage loan

6    originators, are they?

7    A    No.

8    Q    They're not mortgage loan underwriters?

9    A    No.  They have -- members of their team have legal

10   experience and mortgage legal experience.  But, no, they are

11   not underwriters and they are not originators.

12   Q    They're lawyers and that's what they're trained in,

13   right?

14   A    Yes.

15   Q    Mr. Trumpp, you relied upon the lawyers to tell you

16   what the material and adverse effect standard should be?

17   A    So we had, you know, obviously been working under these

18   contracts for the experience that I had at Lehman.  We had

19   experience putting loans back under these contracts.  And so

20   did I have conversations with counsel throughout this

21   process about definitionally what that means, yes, but it's

22   something that we had, you know, had in practice prior.

23   Q    Your lawyers told you not to apply a risk of loss

24   standard, correct?

25            MS. BRASSWELL:  Objection, Your Honor.  To the

Page 58

1   extent this is getting close to privilege I just want to

2   make sure that I asserted my objection.  And if it goes too

3   far I would like to instruct the witness appropriately.

4          THE COURT:  Okay.  I also want to -- that's fair.

5   So, Mr. Trumpp, the plan administrator has not waived

6   attorney/client privilege with respect to communications

7   that the plan administrator may have had with counsel on any

8   of the legal issues presented here.  So if you find yourself

9   getting near that subject matter you need to let us know.

10         Secondly, I just want the record to be clear.  Mr.

11  Shuster, I think you said material and adverse effect two

12  questions ago.  Material appears in two different parts of

13  this.  So I just want to be clear that we're not conflating

14  --

15         MR. SHUSTER:  Yes.  And I --

16         THE COURT:  -- that.  There is no --

17         MR. SHUSTER:  -- I'm --

18         THE COURT:  -- material breach and if you were

19  solely talking about adverse material effect, that's fine.

20  I just don't want the record to be unclear in that regard.

21         MR. SHUSTER:  Yes.

22         THE COURT:  Okay.

23         MR. SHUSTER:  No.  And I'm going to come to both

24  prongs.  I use material and adverse effect because that's

25  what I've been using for the past several years.

```
1              THE COURT:  Understood.  But when you say that --

2              MR. SHUSTER:  I mean what --

3              THE COURT:  -- then we're going to assume you mean

4      AMA.

5              MR. SHUSTER:  AMA.

6              THE COURT:  Very good.

7              MR. SHUSTER:  Yes.

8      BY MR. SHUSTER:

9      Q    Mr. Trumpp, I asked you at your deposition what your

10     basis was for your understanding that an increase in the

11     risk of loss on the loans was not the AME standard that

12     applies here, and you told me your basis was discussions

13     with counsel.  Do you recall that?

14     A    I do.

15     Q    And I asked you if you had any other basis and you said

16     no.  Do you recall that, too?

17     A    I do.

18     Q    And that's still accurate testimony?

19     A    For risk of loss.

20     Q    For material adverse effect?

21     A    I believe so.  Yes.

22     Q    The -- RECOVCO reviewed some 62,000 loans or

23     thereabout?

24     A    Yes.

25     Q    And about 20,000 of those loans went up to RBF for
```

Page 60

1    review?

2    A    Approximately.

3    Q    And about 1,000 loans made it out of there as accepted

4    breaches by the plan -- accepted breaching loans by the plan

5    administrator, correct?

6    A    I think we're a little higher than that today.  Yes.

7    Q    Twelve-hundred.

8    A    Yes.

9    Q    Something like that.  We looked at some math.  You

10   testified yesterday to some math.  The math is that

11   currently there are roughly 72,500 loans at issue, right?

12   A    I think it's even less today based upon additional

13   trust collapses and payoffs, but approximately 70,000.

14   Q    Seventy-thousand?

15   A    Yes

16   Q    Okay.  I'll take that number.  And so loan to loan,

17   sir, 70,000 loans remaining at issue, about 1,200 loans that

18   have been accepted by the trustee -- by the plan

19   administrator for the repurchase remedy, so that's still

20   under two percent, right, if you do it that way?

21   A    Yeah.  It's all a question of --

22   Q    How you do the math.

23   A    -- of how you do the math and what's in the denominator

24   and what's in the numerator.

25   Q    Yes.  So now, Mr. Trumpp, you mentioned that -- well,

Page 61

1    you testified yesterday about your experience at Aurora and

2    Lehman and how you drew on that experience in, you know,

3    structuring and arranging the plan administrator's protocol

4    review, correct, just foundationally, yes?

5    A    Yes.

6    Q    Okay.  You recall, though, when I asked you whether you

7    applied the same evidentiary standards in the protocol that

8    you did at Aurora you insisted to me in your deposition that

9    what you did at Aurora and what you were doing in the

10   protocol was apples and oranges, your term.  Do you remember

11   saying that?

12   A    I do.

13   Q    You said it was drastically different what you did at

14   Aurora and what you were doing in the protocol.  Do you

15   remember using those words?

16   A    Different context.

17   Q    Different context.  But you used the words, drastically

18   different?

19   A    I very well could have.

20   Q    And you said it was totally different scenarios, right?

21   A    That is true.

22   Q    You also said they were totally separate situations?

23   A    Yes.

24   Q    You also testified that the agreements and

25   representations were totally different, didn't you, sir?

Page 62

1    A    I think I recall saying that they were different.  I'm

2    not sure I --

3    Q    Okay.

4    A    -- said totally, but I may have.

5    Q    I want to direct your attention, Mr. Trumpp, if I may

6    to the plan administrator's motion in support of a protocol

7    -- the protocol.  I confess to not having the exhibit number

8    -- oh, I actually --

9             UNIDENTIFIED SPEAKER:  876.

10            MR. SHUSTER:  -- 876.  And now I think it's

11   actually 873, the --

12            UNIDENTIFIED SPEAKER:  That's the reply.

13            MR. SHUSTER:  But doesn't the reply have paragraphs

14   95 in it?

15            UNIDENTIFIED SPEAKER:  No.  That's --

16            MR. SHUSTER:  It's -- you've -- okay.  So -- and

17   many other things besides.  But --

18            THE COURT:  Exhaustion?

19            MR. SHUSTER:  Yes.  Well, raw intellect.  A lot of

20   things.  So --

21            THE COURT:  Are we in a binder?  Let's start this.

22            MR. SHUSTER:  We -- we are in which binder?

23            UNIDENTIFIED SPEAKER:  The second.

24            THE COURT:  The second volume?

25            UNIDENTIFIED SPEAKER:  Yes.

Page 63

1            MR. SHUSTER:  It's the supporting documents.  Are

2    their binders labeled?

3            UNIDENTIFIED SPEAKER:  No.

4            MR. SHUSTER:  Okay.  Anyway, it's 876.  Can someone

5    have -- make sure that the witness has the document and can

6    someone make sure the Court has the document?

7            THE WITNESS:  I'm sorry, you say 8 --

8            MR. SHUSTER:  The only people who seem to have it

9    are my esteemed colleagues on the other side.

10           THE COURT:  All right.  We are in -- we are in

11   binder 1 --

12           UNIDENTIFIED SPEAKER:  Is it --

13           THE COURT:  -- TRX --

14           THE WITNESS:  Is it 876?

15           THE COURT:  -- 876.  Yes.

16           MR. SHUSTER:  You have it.

17           THE COURT:  Okay.

18           MR. SHUSTER:  Thank you.

19   BY MR. SHUSTER:

20   Q    Okay.  So I think I want paragraph 95.  Okay.

21   A    95?

22   Q    So the -- in paragraph 95 part of what the plan

23   administrator, I think, is saying here is that it -- it

24   bargained for a claims reconciliation process in the

25   securitization documents that would enable it to pursue

Page 64

1    downstream claims.  That's generally was the plan

2    administrator's position, correct?

3    A    Yes.

4    Q    And then it says -- it goes on to say in the second

5    sentence that as discussed above earlier many of the

6    mortgage loans were required by LBHI from loan originators

7    that made representations and warranties about the qualities

8    of these loans, loans that LBHI then packaged and sold into

9    the RMBS trusts.  Do you see that?

10   A    Yes.

11   Q    And then it says a key component to this process was

12   that LBHI duplicated the representations and warranties made

13   by the mortgage loan originators, meaning that the

14   representations and warranties made by LBHI to the trust

15   were the same as the representations and warranties made by

16   the mortgage loan originators to LBHI.  Do you see that?

17   A    I do see that.

18   Q    Okay.  So incidentally you had policies and procedures

19   at Aurora for dealing with loan reviews as quality control

20   loan reviews and loan reviews in Aurora's capacity as a

21   master servicer?

22           THE COURT:  Yes.

23           MS. BRASSWELL:  Objection.  Mr. Shuster is

24   referencing Aurora policies and procedures.  I know this

25   issue came up in deposition and we objected on relevance

Page 65

```
1    grounds.

2            THE COURT:  Why don't you come on up for a moment?

3        (At sidebar off the record)

4    BY MR. SHUSTER:

5    Q    You --

6            MR. SHUSTER:  Did I get an answer to that question

7    if the other --

8            THE COURT:  Why don't you repeat it for all of our

9    benefit?

10           MR. SHUSTER:  If I can remember.

11           THE COURT:  If you can remember.

12   BY MR. SHUSTER:

13   Q    Did you -- Aurora had policies and procedures manuals

14   for, among other things, loan reviews for the purposes of

15   quality control and making, potentially making repurchase

16   claims?

17   A    Yes.

18   Q    And you were familiar with those when you were at

19   Aurora?

20   A    When I was at Aurora, yes.

21   Q    Okay.  You did not provide copies of those policies and

22   procedures to RECOVCO?

23   A    No, we did not.

24   Q    Or to RBF?

25   A    No.
```

Page 66

1   Q    Or to Mr. Grice?

2   A    No.

3   Q    Or to Mr. Castel?

4   A    No.

5   Q    We'll come back to those.

6        Mr. Trumpp, you testified that Lehman never put back

7   active loans?  I thought I heard you testify to that.

8   A    I don't think that was my intent if that's the way it

9   came out.  We -- by definition we were seeking repurchase of

10  loans back in the day because a lot of these loans were

11  available for repurchase then.  So they would have been

12  active, meaning not liquidated, but they would have clearly

13  had difficult payment histories or, you know, they would be

14  deep in the process of foreclosure.  So that -- to say that

15  we didn't ever pursue active claims is not the correct way

16  to look at it.

17       And what I meant by saying I was anticipate -- not

18  anticipating seeing active claims here, we're again talking

19  about ten-ish years later.  And so I would have assumed any

20  loans that had breaches of -- material breaches of

21  representations and warranties that had AMA, they would have

22  already defaulted and gone through the foreclosure process.

23  Q    Well, you used the lexicon yesterday, liquidated loans

24  and active loans, right?

25  A    I did.

Page 67

```
 1    Q    And a liquidated loan was a loan that was no more,

 2    right?

 3    A    Yes

 4    Q    And an active loan is a loan that still exists, right?

 5    A    That's correct.

 6    Q    Okay.  And Aurora, certainly, and Lehman, but asserted

 7    put back rights with respect to both liquidated and active

 8    loans, correct?

 9    A    Yes.

10    Q    Okay.  I'm not sure if I asked this and I do want it to

11    be clear for the record.  In performing its MAE analysis the

12    plan administrator did not apply a risk of loss standard,

13    correct?

14    A    So, again, I'm not necessarily an attorney as you all

15    know --

16         THE COURT:  You're actually not an attorney at

17    all.

18       (Laughter)

19         THE WITNESS:  I'm sorry.  Yes.  Yes.  Sorry.  Yes.

20         THE COURT:  Okay.

21         THE WITNESS:  Yeah.  I -- can you elaborate on

22    what you mean by risk of loss standard?

23    BY MR. SHUSTER:

24    Q    If the misrepresentation in question or omission

25    increased the risk of loss on a loan, that was not
```

Page 68

1    sufficient for the plan administrator to determine that

2    there was a material and adverse effect on the value of the

3    loan?

4    A    So we looked at our reviews in context with the

5    representations and warranties and remedies or repurchase

6    provisions for these agreements.  And it's my understanding

7    that they say adverse and material effect on the value of

8    the loan and occasionally they say to the interest of the

9    certificate holders, but they do not say risk of loss.  So I

10   think those are separate things.

11   Q    Okay.  I understand that that's your position.  But is

12   it -- to be clear it's the plan administrator's position

13   that simply showing that a misrepresentation or omission

14   leads to an increased risk of loss on a loan is not

15   sufficient to satisfy the material and adverse effect

16   standard under the governing documents, correct?

17   A    So we looked at and applied the adverse and material

18   effect standard in the agreements which is not an adverse

19   and material effect on the risk of loss.

20   Q    So --

21   A    And that's not what is there.

22   Q    So I'm correct then, am I not, just so that we have a

23   clear answer to what I think is a clear question, that it

24   was the plan administrator's position that simply

25   establishing, whether by expert opinion testimony or

Page 69

1    otherwise, that a misrepresentation or omission increases

2    the risk of loss on a loan, a mortgage loan, is in and of

3    itself insufficient to satisfy the material and adverse

4    effect standard under the governing documents, correct?

5    A    Yes.

6    Q    Now I know you're not an expert on mortgage loan

7    pricing, Mr. Trumpp, but you have heard the term risk based

8    pricing as it applies to mortgage loans?

9    A    Yes, I have.

10   Q    And at least some of the factors that bear on the

11   pricing of mortgage loans go to the riskiness of the loan?

12   A    Yes.

13   Q    All other things being equal as between mortgage loans,

14   the riskier one will have a lower price?

15   A    Or a higher interest rate.

16   Q    Well, let's focus on price.  All other things being

17   equal between mortgage loans the riskier one will have a

18   lower price?

19   A    There are numerous factors in pricing a loan.

20   Sometimes it changes to price.  Sometimes it changes to the

21   interest rate.  So I want to make sure I'm clear.

22   Q    Some change to the terms of the loan or the price of

23   the loan?

24   A    I'm sorry.  Can you repeat your question?

25   Q    Let's do it this way.  Let me direct your attention to

1    page 288 of your -- the transcript of your deposition.  I'm

2    not sure if we've blended that around yet, but if we haven't

3    we'll do so now.

4    A    Okay.

5               THE COURT:  Okay.  Do we have that?

6               UNIDENTIFIED SPEAKER:  We do.

7               THE COURT:  Can you tell us where it is?

8               UNIDENTIFIED SPEAKER:  Yes.  It is in Volume 2,

9    TRX-971.

10       (Pause)

11              THE WITNESS:  And it's in Volume --

12              UNIDENTIFIED SPEAKER:  I'm sorry.  Volume 3.

13              THE WITNESS:  Okay.

14              UNIDENTIFIED SPEAKER:  TRX-971.

15              THE COURT:  And what page are we on?

16              MR. SHUSTER:  We are on page 288.

17              THE COURT:  288.  And are we refreshing

18   recollection?

19              MR. SHUSTER:  I'm -- the witness answered the

20   question here I -- in my view differently than he did in the

21   deposition.

22              THE COURT:  Okay.

23              MR. SHUSTER:  Okay.

24              THE COURT:  Got it.

25   BY MR. SHUSTER:

Page 71

```
 1   Q    So, Mr. Trumpp --

 2   A    I'm sorry. I'm still trying to find it.

 3   Q    Page 288, Mr. Trumpp.  Oh, you're --

 4   A    Volume --

 5   Q    -- trying to find the transcript?

 6   A    In volume 3?

 7              THE COURT:  2, Volume II.

 8              UNIDENTIFIED SPEAKER:  These volumes are

 9   different.

10              THE COURT:  Oh, that would be making it even more

11   complicated.  If the witness's volumes are different than

12   ours, then --

13              THE WITNESS:  I'm trying to find it.

14              MR. SHUSTER:  Woe unto us all.

15        (Pause)

16              THE COURT:  You can have my copy.  Okay.

17              MR. SHUSTER:  He can have mine, too.

18              UNIDENTIFIED SPEAKER:  I'm looking for Volume 6.

19              MR. SHUSTER:  We're going to sharpen that up.

20              THE COURT:  I bet we are.

21        (Laughter)

22              MR. SHUSTER:  Sorry about that.

23              THE COURT:  It's all right.  Okay.

24   BY MR. SHUSTER:

25   Q    Page 288, Mr. Trumpp, I asked you at line 14, "All
```

Page 72

```
 1    other things being equal as between mortgage loans will the

 2    riskier one have a lower price, all other things being

 3    equal?"  And you said, "All other things being equal

 4    completely hypothetically, yes."  that was the answer you

 5    gave me then, right?

 6    A    Yes.

 7    Q    But you want to add now that there could also be an

 8    effect on the interest rate or other terms of the loan?

 9    A    I wasn't trying to confuse things.  I was just saying

10    that there are other potential options, so.

11    Q    Mr. Trumpp --

12              MS. BRASSWELL:  Objection.  Your Honor, I think it

13    just needs to make -- we need to make sure that if he's

14    showing him his testimony it's a complete showing.

15              THE COURT:  Right.  But I think right now the -- I

16    think now the testimony has been clarified so I think we're

17    good on that.  From my perspective we're good on this point.

18    Okay.

19              Do you have a -- you have a completeness

20    objection?

21              MS. BRASSWELL:  Yes, Your Honor.

22              THE COURT:  Okay.  Why don't you tell us what you

23    would like him to be read?

24              MS. BRASSWELL:  Well, Your Honor, what he

25    testified to earlier was that it depends on the facts and
```

Page 73

1   circumstances, and the deposition testimony that Nr. Shuster

2   showed doesn't show the following answer that Mr. Trumpp

3   gives, which is, "It depends on the facts and circumstances.

4   All other things being equal talking about the pricing as

5   you said Aurora for the pricing of whole loans."  And so he

6   clarifies in his deposition that this is with respect to

7   whole loan pricing.

8           THE COURT:  Fair enough.  Okay.

9           Mr. Shuster, I'm going to ask you to wrap up since

10  we're approaching 12:00.

11          MR. SHUSTER:  I'm happy to pause here if --

12          THE COURT:  Is that alright?

13          MR. SHUSTER:  Yes.  Thank you.

14          THE COURT:  Okay.  All right.  So do you -- do you

15  want this to be your lunch break or do you want to come back

16  at 12:15, or we can continue for another segment?

17          MR. SHUSTER:  What's the will of the group?

18          THE COURT:  How are you doing, Mr. Trumpp?

19          THE WITNESS:  I'm doing fine.

20          THE COURT:  Do you have a preference?

21          THE WITNESS:  Let's keep going.

22          MR. SHUSTER:  Happy to come back?

23          UNIDENTIFIED SPEAKER:  Yeah.  Well, we can come

24  back -- we can come back at 12:15, 12:20, Your Honor.

25          THE COURT:  Okay.  I will hop off the call at

Page 74

```
 1    12:15.  Okay.

 2              Thank you.

 3              MR. SHUSTER:  Thank you, Your Honor.

 4         (Recessed at 11:54 a.m.; reconvened at 12:23 p.m.)

 5              MR. SHUSTER:  Thank you, Your Honor.

 6    BY MR. SHUSTER:

 7    Q    I'm going to ask you, Mr. Trumpp, to turn to TRX-927

 8    which I hope is in the binder that is -- there you go.

 9              MR. SHUSTER:  Thank you, Counsel.

10         (Pause)

11    BY MR. SHUSTER:

12    Q    Mr. Trumpp, TRX-927 is a declaration that you executed

13    and signed on -- under penalty of perjury under the laws of

14    the United States on 20 -- October 29, 2009 in Denver,

15    Colorado, correct, page 7?

16    A    Yes, it is.

17    Q    That's your signature, sir?

18    A    Yes, it is.

19    Q    And you submitted this declaration in the matter of

20    Aurora Loan Services LLC f/k/a Aurora Loan Services Inc. and

21    Lehman Brothers Holdings Inc., plaintiffs, versus Dream

22    House Mortgage Corporation, correct?

23    A    Yes.

24    Q    And you stated in the first paragraph, "I'm employed by

25    the plaintiff, Lehman Brothers Holding Inc.," right?
```

Page 75

1    A    Yes.

2    Q    And then in -- and you refer to a loan purchase

3    agreement between LBB and the defendant, correct, in

4    paragraph 2?

5    A    Yes.

6    Q    And in paragraph 3 you state that you're attaching as

7    Exhibit B a true and correct copy of the seller's guide,

8    correct?

9    A    Yes.

10   Q    And that is the Aurora's seller's guide that applied to

11   loan purchase transactions between Aurora and originators?

12   A    Yes.

13   Q    The originators originated the mortgage loans and

14   Aurora or Lehman Bank underwrote the mortgage loans?

15   A    It would depend upon the transaction.

16   Q    But generally that would be the arrangement?

17   A    Under the correspondent business which this contract

18   refers to sometimes Aurora would underwrite the loans and

19   sometimes the seller would have what's called delegated

20   authority where they underwrote the loans themselves?

21   Q    Thank you.

22          THE COURT:  Mr. Trumpp, could I ask you to speak

23   up a little more?  Pull the microphone towards you a bit and

24   just kind of raise your voice.

25          Thank you.

Page 76

```
 1    BY MR. SHUSTER:

 2    Q    Now paragraph 4 refers to the fact that Dream House

 3    sold various loans to LBB.  Do you see that, sir?

 4    A    Yes, I do.

 5    Q    That was Lehman's mortgage bank, essentially, yes?

 6    A    It was -- yes.

 7    Q    And then paragraph 5 you state, Aurora's the authorized

 8    agent, servicer and/or master servicer for LBB and LBHI for

 9    certain mortgage loans in which LBB and LBHI have an

10    interest, including the loans at issue in this case.  Do you

11    see that?

12    A    I do.

13    Q    That was an accurate statement at the time?

14    A    It was.

15    Q    And you go on to say in paragraph 6 that Aurora is

16    authorized and directed by LBB and LBHI to enforce any

17    obligations owed to them by parties selling mortgage loans

18    in which LBB and L -- and/or LBHI have an interest.  Do you

19    see that?

20    A    I do.

21    Q    Also accurate?

22    A    Yes.

23    Q    And in paragraph 7 you note that LBHI is the parent

24    corporation of both LBB and Aurora, correct?

25    A    Yes.
```

1    Q     And that was accurate, too?

2    A     Yes.

3    Q     Thank you.

4          You then go on to identify various loans that the

5    plaintiffs are seeking repurchase of, correct, as a general

6    matter?

7    A     Yes.

8    Q     And if I may direct your attention, Mr. Trumpp, to

9    paragraph 31 of the declaration which is TRX-927.  You state

10   there that accurate information regarding the borrower's

11   debts and especially the borrower's mortgage debts is

12   material to LBB's decision to purchase loans from

13   correspondent lenders such as Dream House.  Do you see that?

14   A     I do.

15   Q     And that was an accurate statement when made?

16   A     Yes.

17   Q     And then you go on in paragraph 32, Mr. Trumpp, to

18   state, that:

19              "If a borrower misrepresents his or her mortgage

20              debts, that misrepresentation has a material and

21              adverse effect on the value of the loan because

22              the loan cannot be sold at full value to another

23              purchaser or to a securitization once the

24              misrepresentation is known.  A substantial

25              discount will be applied given the

Page 78

1           misrepresentation."

2           Do you see that, sir?

3    A    I do.

4    Q    And that was an accurate statement when made, was it

5    not, Mr. Trumpp?

6    A    For the whole loans that were the subject of the -- of

7    this declaration, yes.

8    Q    The statement we just read does not expressly refer to

9    or limit itself to a whole lot, does it, by its own express

10   language?

11   A    No, but this particular matter was four whole loans.

12   And when we're talking about the purchase and sale

13   agreements between Aurora and their sellers, those were for

14   whole loan transactions.

15   Q    Now you mean a whole loan -- you mean a loan that's not

16   in a securitization?

17   A    That is correct.

18   Q    Stand-alone mortgage agreement?

19   A    They were generally sold as stand-alone mortgage loans

20   individually.  Occasionally they would be pooled in what

21   were called mini-boat transactions, but for the most part

22   they were individual investments, non-securitized.

23   Q    Now whole loans were pooled as you mentioned and also

24   master serviced, right?

25   A    Aurora was the master servicer for LBB and LBHI's whole

Page 79

1   loan portfolio.

2   Q    So there was a portfolio of whole loans that LBB and

3   LBHI owned and Aurora master serviced those loans?

4   A    Yes.

5   Q    And it also master serviced loans that were pooled

6   together and placed into securitizations, correct?

7   A    Yes.

8   Q    And a whole loan is a mortgage loan, right?

9   A    Yes.

10  Q    And a loan in a securitization is a mortgage loan,

11  right?

12  A    Yes.

13  Q    And a whole loan has a borrower?

14  A    Yes.

15  Q    And a loan in a securitization has a borrower?

16  A    It does.

17  Q    And a whole loan has a collateral which is the subject

18  property, right?

19  A    Yes.

20  Q    And a loan in a securitization has collateral which is

21  the subject property, right?

22  A    Yes.

23  Q    A whole loan has a principal amount and so does a loan

24  -- a mortgage loan in a securitization, right?

25  A    Yes.

Page 80

1    Q    A whole loan has an interest rate and so does a

2    mortgage loan in a securitization, right?

3    A    Yes.

4    Q    A whole loan has a mortgage note and so does a mortgage

5    loan in a securitization, right?

6    A    Yes.

7    Q    And there are many other characteristics that whole

8    loans have that mortgage loans in securitizations also have,

9    correct?

10   A    Yes.

11   Q    Mr. Trumpp, you state that once a misrepresentation is

12   known the loan cannot be sold at full value to a

13   securitization, correct?

14   A    That's what I said.

15   Q    And you say that a substantial discount will be applied

16   given the misrepresentation, correct?

17   A    For a whole loan talking about the pricing at which it

18   could later be sold, if it was found to have a material

19   misrepresentation, yes.

20   Q    Okay.  So you're saying here that if a

21   misrepresentation was known on a whole loan it can't be put

22   into a securitization except at a lower price, right?

23   A    Yes.

24   Q    And a loan with a lower price as a result of the

25   misrepresentation is a loan with a lower value, right, Mr.

Page 81

1    Trumpp?

2    A    Yes.

3    Q    Mr. Trumpp, where whole loans have misrepresentations

4    of debts there were instances where Lehman had to sell them

5    at substantial discounts, isn't that true?

6    A    Yes.

7    Q    And a discount off the price means the loan is worth

8    less, right?

9    A    Yes.

10   Q    It has a lower value?

11   A    Yes.

12   Q    And for that matter to the best of your knowledge

13   Aurora wouldn't even have made the loan to a borrower that

14   it knew had lied about income, debt or occupancy, right?

15   A    Yes.

16   Q    When Lehman put back loans to loan originators it

17   offered as an alternative to repurchase re-pricing of the

18   loan, correct?

19   A    Yes.

20   Q    Re-pricing means you would have said to the originator

21   instead of selling it to us at once price, we ask you to

22   give us a change in value to another price, correct?

23   A    Yes.

24   Q    And that change in price would be to a lower price,

25   right?

Page 82

1   A    It would have gone through a re-pricing process based

2   upon the defect and all of the facts and circumstances for

3   that particular loan.  But, yes.

4   Q    You wouldn't be paying a higher price for a loan with a

5   known defect?

6   A    No.

7   Q    Mr. Trumpp, let me direct your attention, sir, if I may

8   to paragraph 11 of your declaration.  You state there that

9   attached hereto is Exhibit E and are true and correct copies

10  of demand letters that Aurora sent to Dream House on or

11  about the date shown on each letter.  Do you see that?

12       (Pause)

13  A    I do.

14  Q    And Aurora sent those letters consistent with and

15  pursuant to the authority that you describe in paragraphs 5

16  through 7 of the declaration?

17  A    They did.

18  Q    I'm going to ask you, Mr. Trumpp, please to turn to

19  Exhibit E which is the exhibit that you reference in your

20  declaration.

21       MR. SHUSTER:  Does the Court have the full exhibit

22  sets or a skinny down version of --

23       UNIDENTIFIED SPEAKER:  A condensed version.

24       MR. SHUSTER:  A condensed version.  So in the

25  interest of not overburdening the Court --

```
 1                THE COURT:  Okay.

 2                MR. SHUSTER:  -- with paper, we've given the Court

 3     the -- only the exhibits we intend to -- I intend to

 4     question the witness about.  We're, of course, happy to --

 5                THE COURT:  Okay.

 6                MR. SHUSTER:  -- provide --

 7                THE COURT:  Okay.  So I'm in 927.

 8                MR. SHUSTER:  Yes.  And it's Exhibit E.  Counsel

 9     has the complete exhibit and the witness has the complete

10     exhibit, 927.

11                THE COURT:  So it's in 927(b)?

12                MR. SHUSTER:  It's 927 --

13                UNIDENTIFIED SPEAKER:  This one is marked

14     differently.  It's 760, I believe.

15                MR. SHUSTER:  It's 760.

16                THE COURT:  I'm totally lost.  So --

17                MR. COSENZA:  Yeah.  Your Honor -- Your Honor, I'm

18     totally -- I'm confused.

19                THE COURT:  Yeah.  Okay.  We're --

20                MR. COSENZA:  And I think this almost highlights

21     the objection I made initially --

22                THE COURT:  Okay.  Wait.  Wait.  Wait.  Wait.

23     Time out.

24                MR. COSENZA:  Yes.

25                THE COURT:  Time out.  Time out.
```

1            First, let me get to where the --

2            MR. COSENZA:  Yes.

3            THE COURT:  -- document is and then let's figure

4    out.

5            MR. COSENZA:  Yes.

6            THE COURT:  So where am I supposed to be?

7            UNIDENTIFIED SPEAKER:  Your Honor, 760.

8            THE COURT:  760?

9            MR. SHUSTER:  Oh, because the exhibit is marked as

10   a --

11           UNIDENTIFIED SPEAKER:  It was separately marked --

12           MR. SHUSTER:  Okay.

13           UNIDENTIFIED SPEAKER:  -- earlier.  So it -- I

14   think earlier today.

15           MR. SHUSTER:  I see.  The exhibit -- yes.  The

16   exhibit that is attached to the declaration is marked as

17   TRX-760.

18           THE COURT:  Okay.  So now I'm back to here.

19           MR. SHUSTER:  That might have happened in the

20   deposition.

21       (Pause)

22           THE COURT:  Okay.  So I'm in TRX-760.  And I'm on

23   Exhibit E.  Okay.  SO --

24           MR. SHUSTER:  And I think an objection is coming.

25           THE COURT:  Okay.

 1              MR. SHUSTER:  Much to my disappointment.

 2              THE COURT:  I'm sorry.  Wait.  So where -- where

 3    was -- the screen grab that went away, where was that from,

 4    the demand letters?

 5              MR. SHUSTER:  That should have been from Exhibit

 6    760, TRX --

 7         (Pause)

 8              THE COURT:  Okay.  All right.  So I think we're

 9    looking at demand letters to Dream House by Aurora; is that

10    right?

11              MR. SHUSTER:  Yes, Your Honor.

12              THE COURT:  Okay.  Mr. Cosenza.

13              MR. COSENZA:  Yeah.  Your Honor, this highlights,

14    though, I think the problem I raised earlier.  I now

15    understand what is trying to be accomplished.  What I think

16    is trying to be accomplished is there's a declaration here -

17    - you know, we only have one exhibit to that declaration,

18    Exhibit B, that follows in the book.  There's then in a

19    separate thing Exhibit I -- Exhibit E.

20              There are all sorts of exhibits that are missing

21    from this declaration and this declaration itself is

22    attached to something or some sort of motion.  And this sort

23    of highlights, you know, what's being done here, getting one

24    snippet, one letter.  It's not in the context of a full case

25    in order to get -- this is not the full file that's before

Page 86

1   the Court and there's no convenience here because we do not

2   have the full declaration or the full document here.

3            So I don't -- it's just incomplete.  It's

4   confusing.  I think there is a -- you know, lots of

5   questions here about full --

6            THE COURT:  Well, why don't you come --

7            MR. COSENZA:  -- full loans.

8            THE COURT:  -- why don't you come on up?

9        (At sidebar off the record)

10            THE COURT:  Okay.  All right.

11   BY MR. SHUSTER:

12   Q    So, Mr. Trumpp, directing your attention to Exhibit E

13   and specifically to the page bearing production number ALS-

14   38 -- no.  That doesn't help you.  To the page at the

15   bottom, 31 of 33, TRX-760 page 31 of 33.  So this is a

16   letter that you attached to your declaration from Ms. Burke,

17   Christina Burke, correct?

18        (Pause)

19   A    Yes, it is.

20   Q    Thank you.

21        And who was Ms. Burke?

22   A    She was an employee of Aurora Loan Services.

23   Q    She's identified here as a claims analyst in contract

24   administration?

25   A    Yes.

Page 87

1    Q    Is that an accurate description of her title and

2    responsibilities?

3    A    As I recall, yes.

4    Q    So the letter is on Aurora Loan Service's letterhead

5    which identifies itself.  It says, Aurora Loan Services, a

6    Lehman Brother's company, correct?

7    A    Yes.

8    Q    Dated August 17, 2007 addressed to Dream House Mortgage

9    Corporation, right?

10   A    Yes.

11   Q    Now the letter says in the second --

12            THE COURT:  I'm sorry, Mr. Shuster, I hate to do

13   this to you.

14            MR. SHUSTER:  Yeah.  No.  I know what Your Honor

15   is going to raise and we can take it off the screen.  It was

16   already on the public docket.

17            THE COURT:  Yeah.  That doesn't --

18            MR. SHUSTER:  But I hear you.

19            THE COURT:  That doesn't --

20            MR. SHUSTER:  No.  I --

21            THE COURT:  That doesn't help me.

22            MR. SHUSTER:  That doesn't do it.

23            THE COURT:  So let's take it off the screen.

24            MR. SHUSTER:  Let's take it off the screen then.

25        (Pause)

Page 88

1          MR. SHUSTER:  It was the same thing at the same

2     time.

3          THE COURT:  Yeah.

4          MR. SHUSTER:  Okay. So --

5          THE COURT:  You have the page before you, yes, Mr.

6     Trumpp?

7          THE WITNESS:  I believe so.

8          THE COURT:  Okay.  Thank you.

9     BY MR. SHUSTER:

10    Q    So the first paragraph references the agreements

11    between the parties, correct?

12    A    Yes, it does.

13    Q    And the second paragraph says, "As part of our quality

14    control efforts we periodically review selections of loans

15    purchased by Lehman to assure compliance with its purchase

16    requirements."

17    A    Yes.

18    Q    Right?  And then it goes on to identify a

19    misrepresentation of debt claim that the letter asserts

20    violates representation and warranty in the seller's guide

21    that is incorporated, in fact, by reference into the loan

22    purchase agreements between Lehman and Dream House Mortgage,

23    correct?

24    A    Yes.

25    Q    Thank you, sir.

Page 89

1        So under the heading, Mr. Trumpp, misrepresentation

2    debts it states that:

3            "Undisclosed debt on credit report.  Credit report

4            shows six additional mortgages.  Additional

5            mortgages equal $14,811 a month. Using borrower

6            income of 45 -- 46,500 a month DTI would be 71 --

7            76.15 percent."

8        Do you see that?

9    A    I do.

10   Q    Did I read that right?

11   A    Eventually, yes.

12       (Laughter)

13   Q    Thank you, Mr. Trumpp.

14       So Aurora on behalf of Lehman was putting forward a

15   misrepresentation of debt claim predicated on a credit

16   report, correct?

17   A    Yes.

18   Q    And on that basis it was seeking repurchase of the

19   loan, correct?

20   A    Yes.

21   Q    And then it references the applicable representation

22   and warranty from the seller's guide, right?

23   A    Yes, it does.

24   Q    And the -- at the top of page 2, Mr. Trumpp, the letter

25   says:

Page 90

1          "Because the loan did not meet Lehman's purchase

2          requirements we ask that you fulfill your

3          obligations pursuant to the agreement and seller's

4          guide and repurchase the loan within 30 days of

5          the date of the letter -- of this letter."

6          Do you see that, sir?

7    A    I do.

8    Q    And it goes on to say, "In certain circumstances as a

9    special courtesy to our correspondents" -- and just pausing

10   there for a second can you just explain the term

11   "correspondent"?  You referred to it earlier.

12   A    Yes.  Aurora had essentially two main reasons or two

13   main ways they got loans.  One was through a network of

14   brokers and that was called wholesale funding, and what it

15   meant was Aurora funded the loan, underwrote the loan, et

16   cetera.  And they used brokers to find the loan -- the

17   borrowers.

18        Opposite of that they had a correspondent program and

19   the correspondent program meant they had other parties that

20   had already gone through the process of funding a mortgage

21   loan, and it's those closed loans that were then later sold

22   to Lehman Brothers Bank, technically, under the purchase and

23   sales agreement between LBB and the correspondent, and was

24   governed by the -- that purchase agreement and the seller's

25   guide.

Page 91

1      So the correspondents were selling whole closed loans

2  to LBB.

3  Q    And the loans that are in the securitizations here, the

4  Aurora loans that is to say that are in the securitizations

5  at issue here would have come through one of those two

6  channels?

7  A    Yes.  There was also, just to be clear there was a

8  third way.  It was very small in volume, but they had a

9  retail business meaning Aurora sourced their own borrowers

10 and funded their own loans and not used -- didn't use

11 brokers.  So in any one of those three ways that's how the

12 Aurora loans ultimately got up to Lehman.

13 Q    Incidentally a large number of the loans here were also

14 originated by BNC which was also a Lehman affiliated

15 company; is that right?

16 A    Yeah.  so separate and apart from Aurora Lehman had a

17 subprime mortgage company called BNC Mortgage and that was a

18 separate corporate entity.

19 Q    Thank you, Mr. Trumpp.

20     So going back to the top of page 2 it says that:

21          "Because the loan did not meet Lehman's re-

22          purchase requirements we ask that you fulfill your

23          obligations pursuant to the agreement and seller's

24          guide and re-purchase the loan within 30 days of

25          the date of this letter."

Page 92

```
 1              It goes on to say:

 2              "In certain circumstances as a special courtesy to

 3              our correspondents Lehman may permit you to pursue

 4              alternatives to re-purchase including cure within

 5              reasonable time period, indemnification or re-

 6              pricing of the loan," right?

 7  A    Yes.

 8  Q    And then it goes on to say in the next paragraph:

 9              "We ask that you review the loan along with our

10              findings to determine whether you can cure the

11              above-referenced defect or provide evidence to

12              refute our findings."

13         "Provide evidence to refute our findings," right?

14  A    Yes.

15  Q    And it says:

16              "If you are unable to cure the defect or cannot

17              provide sufficient evidence to refute our findings

18              within 30 days Lehman will require that you

19              fulfill your obligations pursuant to the agreement

20              in the seller's guide and re-purchase the loan,"

21              right?

22  A    Yes.

23  Q    Just as a point, you can't cure a misrepresentation of

24  debts, right, by the borrower?

25  A    So assuming that it is true that the borrower did, in
```

Page 93

1    fact, misrepresent their debts, no, you cannot cure that.

2    Q    Let me direct your attention if I may, Mr. Trumpp, to

3    TRX-730 -- no, no, not that one.  It's in a different

4    binder.

5             UNIDENTIFIED SPEAKER:  929?

6             MR. SHUSTER:  TRX-929.

7        (Pause)

8             THE WITNESS:  Will I need to go back to this?

9    Thank you.

10    BY MR. SHUSTER:

11    Q    And if I could ask you to verify, Mr. Trumpp, that

12    that's your signature on TRX-929 and that you stated there

13    that you declare under penalty of perjury under the laws of

14    the United States that the foregoing is true and correct,

15    yes?

16    A    Sorry.  I'm just reading the document.

17        (Pause)

18    A    Okay.  Can you repeat your question, please?

19    Q    Yes.  That's your signature on the document?

20    A    Yes, it is.

21    Q    You declared under penalty and (sic) perjury that the

22    foregoing was true and correct --

23    A    Yes.

24    Q    -- yes?

25    A    Yes.

Page 94

1   Q   And that was dated the 13th day of September 2010,

2   correct?

3   A   Yes.

4   Q   And the affidavit was submitted in Lehman Brothers

5   Holdings Inc. v Mortgage Partners Inc., right?

6   A   Yes.

7   Q   And you -- there are two law firms representing Lehman

8   there and one of them identifies my friend, Mr. Rollin, as

9   counsel?

10   A   Yes, it does.

11   Q   And then, Mr. Trumpp, if I could direct your attention,

12   please, to paragraph -- paragraphs 5 through 9 of the

13   document that has language similar to the language we saw in

14   the earlier declaration which is that -- well, let me start

15   with that general question.

16   A   I'm sorry.  Can you repeat that question, I guess?

17   Q   Let's do it this way.  Paragraph 5 says that Aurora is

18   the authorized agent/servicer and a master servicer for LBB

19   and LBHI?

20   A   Yes, it does.

21   Q   And paragraph 6 says it's authorized and directed by

22   them to enforce any obligations owed to them by parties

23   selling mortgage loans in which they have an interest?

24   A   Yes, it does.

25   Q   And paragraph 7 says that Aurora also served as the

Page 95

1    administrative agent of the conduit or correspondent program

2    for LBB?

3    A    Yes.

4    Q    That's the program you described a moment ago?

5    A    Correct.

6    Q    And paragraph 8 says that as the administrative agent

7    Aurora performed post-purchase audits of various loan files

8    in the event of a possible breach of a representation,

9    warranty or covenant, right?

10   A    Yes.

11   Q    And then it says that attached hereto as exhibit -- in

12   paragraph 12 attached hereto is Exhibit E is a true and

13   correct copy of the demand letter relating to the matters at

14   issue in your declaration, correct?

15   A    Yes.

16   Q    And all -- Exhibit E is an attachment and -- but it's

17   separately denoted as TRX-1375.

18        (Pause)

19   Q    Do you have that, sir?

20   A    I don't believe so.  I'm going to apologize in advance

21   if this falls.

22   Q    Let's take them down so they don't and we apologize to

23   you for inundating you with paper.

24            THE COURT:  I have it.

25            MR. SHUSTER:  Okay.  Oh, it's page -- well, it's

Page 96

1    the only letter as it happens in exhibit --

2            THE COURT:  Let's not put this one up on the

3    screen.

4            UNIDENTIFIED SPEAKER:  Yeah.  It's --

5            MR. SHUSTER:  Yes.  Let's not put this one up.

6    Let's not -- we don't need to put any of these on the

7    screen, I think.

8    BY MR. SHUSTER:

9    Q    So are you with me at least at the letter, sir?

10   A    Yes.  And did I understand you correctly that there's

11   only one demand letter in Exhibit E?

12   Q    Yes.  That's correct.  And I'll just note for you, so

13   you don't have to take my say so, that paragraph 12 of your

14   declaration refers to the demand letter in the singular.

15   A    Thank you.

16   Q    So this is similar to the demand letter from Ms. Burke

17   we saw a moment ago attached to a different -- oh, wait.

18   I've skipped the good part.  Let's do the demand letter,

19   then I'll go back to the declaration.

20        This is similar to the letter we saw earlier from Ms.

21   Burke, correct?

22   A    Similar in that it's a demand letter sent on behalf of

23   a loan from Aurora.

24   Q    Right.  So let me direct your attention -- well, so

25   it's -- it's got this -- it's on the same letterhead.  It's

Page 97

1    dated March 6th, 2008.  It's directed to Mortgage Partners.

2    It -- and it -- and it is identified as coming from Ms.

3    Water (ph), correct?

4    A    Yes.  And it's got a different loan --

5    Q    Yes.

6    A    -- and a different issue.

7    Q    Of course.  And the issue that it identifies is

8    misrepresentation employment and it states, "The borrower

9    indicated on the 1003 that he has been employed as a diesel

10   mechanic/supervisor for J&R Fleet Services for three years."

11   Do you see that, sir?

12   A    I do.

13   Q    And the reference to 1003 refers to the loan

14   application?

15   A    Yes.

16   Q    And then it says, "the auditor."  That would be the

17   quality control auditor at Aurora, right?

18   A    Presumably, but I don't know.

19   Q    "Verified the borrower's employment with Rubin in HR at

20   J&R Fleet Services at 909-429-1777 who verified that the

21   borrower is currently employed as a diesel mechanic.  Rubin

22   stated that the borrower was not a supervisor."  Do you see

23   that?

24   A    I do.

25   Q    And then it -- by the way, there are audit verification

Page 98

1    of employments that the trustees rely upon in whole or part

2    to certain -- to establish certain claims here?

3    A    That was one of the types of evidence we saw put forth

4    by the --

5    Q    Thank you.

6    A    -- trustees.

7    Q    and I should have asked you the same earlier with

8    respect to the credit report as a type of evidence.  That's

9    a type of evidence the trustees rely upon in whole or part

10   to attempt to establish misrepresentation of debt breaches?

11   A    Yes.  We also saw it on the credit reports.

12   Q    Thank you.

13        So it then goes on to say that the income stated on the

14   1003 is $9,852.  Research using salary.com indicates that

15   the high end salary for a diesel mechanic in Fontana,

16   California is $58,748 per year or $4,896 per month.

17        Salary.com is a database similar to the Bureau of Labor

18   statistics database?

19   A    It's an online database that has averages for positions

20   of employment and wages.

21   Q    And Aurora was relying on this in part to establish a

22   breach, correct?

23   A    In part in their initial demand letter that was one of

24   the pieces of evidence that they referred to.

25   Q    Uh-huh.  And on the -- and they use the Salary.com

1    information to recalculate DTI, correct?

2    A    They do.

3    Q    And then it has the same language that we saw earlier

4    about re-pricing the loan and evidence -- and evidence to

5    refute the findings?

6    A    Yes.

7    Q    Okay.  Let's go back, Mr. Trumpp, to the declaration.

8    At paragraph 16 of the declaration -- that's my bad for

9    making a shuffle back and forth.

10        At paragraph 16 of the declaration you state that it --

11   oh, sorry, 15:

12            "Information regarding the borrower's monthly

13            income and employment position are material to

14            LBB's decision to purchase loans from

15            correspondent lenders such as Mortgage Partners."

16        Do you see that, sir?

17   A    I do.

18   Q    That statement was true when made?

19   A    Yes.

20   Q    You go on to say:

21            "If a borrower misrepresents his income on his

22            loan application and/or employment position, those

23            misrepresentations have a material and adverse

24            effect on the value of the loan because the loan

25            cannot be sold at full value to another purchaser

Page 100

```
 1              or to a securitization once a misrepresentation is

 2              known.  A substantial discount will be applied

 3              given the misrepresentation."

 4       Do you see that?

 5  A    I do.

 6  Q    That's a nearly identical formulation to the one we saw

 7  earlier in your other declaration except this one relates to

 8  income and employment and the other one related to mortgage

 9  debt, correct?

10  A    They are similar with that exception.  Yes.

11  Q    Thank you, sir.

12              MR. SHUSTER:  Okay.

13              THE COURT:  Stopping point?

14              MR. SHUSTER:  I think so and --

15              THE COURT:  Okay.

16              MR. SHUSTER:   -- I would respectfully request a

17  little bit of a longer lunch if the Court is amenable.

18              THE COURT:  Sure.

19              MR. SHUSTER:  I -- maybe an hour and a quarter, an

20  hour and a half.

21              MR. COZENZA:  Your Honor, we have no issue with

22  that.  I just want to make sure we're on track to finish the

23  cross today with that break.

24              MR. SHUSTER:  I -- that is my --

25              THE COURT:  Is the longer break in the service of
```

Page 101

1   trying to finish earlier?

2              MR. SHUSTER:  I'm trying to be efficient.

3              MR. COSENZA:  Okay.

4              THE COURT:  Yeah.  Okay.

5              MR. SHUSTER:  So that is my --

6              MR. COSENZA:  That would be --

7              MR. SHUSTER:  I don't want to conclusively --

8              MR. COSENZA:  Yes.

9              MR. SHUSTER:  -- represent that, but it's my

10  intention --

11             MR. COSENZA:  And we're --

12             MR. SHUSTER:  -- and hope ==

13             MR. COSENZA:  And we're fine with that, Your

14  Honor.

15             MR. SHUSTER:  -- and expectation.

16             THE COURT:  Okay.  So on a -- for our part we'll

17  check to see what kind of coverage we can get for the end of

18  the day so that, if necessary, you know, we can push to a

19  little bit after 5:30, 6:00 if that does it --

20             MR. SHUSTER:  Thank you.

21             THE COURT:  -- to get us there.

22             MR. SHUSTER:  Thank you.

23             THE COURT:  Okay.  All right.  So --

24             MR. COSENZA:  Sounds good.  Thank you.

25             THE COURT:  -- why don't we -- do you want to call

Page 102

1    it -- it's five minutes after one.  Do you want to come back

2    at --

3             MR. SHUSTER:  2:30.

4             THE COURT:  -- 2:30?

5             MR. SHUSTER:  Yes.  Please.

6             THE COURT:  Okay.

7             MR. SHUSTER:  Thanks so much.

8             THE COURT:  All right.

9             MR. SHUSTER:  Thank you.

10            THE COURT:  All right, Mr. Trumpp.  Thank you.

11   We'll see you at 2:30.

12       (Recess at 12:55 p.m.; reconvened at 2:35 p.m.)

13            THE COURT:  Have a seat.  All set?

14            MR. SHUSTER:  Yes.  Thank you, Your Honor.

15            THE COURT:  You've gotten your examination down to

16   three questions now, right?

17       (Laughter)

18            MR. SHUSTER:  Okay.

19            THE COURT:  Okay, Mr. Shuster, ready when you are.

20            MR. SHUSTER:  Thank you, Your Honor.

21            THE COURT:  Okay.

22   BY MR. SHUSTER:

23   Q    Mr. Trumpp, permit me to direct your attention to

24   TRX-933.

25   A    Thank you.

Page 103

1          (Pause)

2              THE COURT:  933.

3          (Pause)

4     BY MR. SHUSTER:

5     Q    That's a declaration, sir, that you signed and swore to

6     under penalty of perjury on March 16, 2010 in Denver,

7     Colorado?

8     A    Yes.

9     Q    That's your signature on page 6 of the document?

10    A    It is.

11    Q    And this was submitted in Lehman Brothers Holdings Inc.

12    v. Belvidere Networking Enterprises?

13    A    Yes.

14    Q    Let me direct your attention, Mr. Trumpp, if I could,

15    to paragraph 11, please.

16         (Pause)

17    Q    So let me direct -- did I just direct your attention to

18    paragraph 11, sir?

19    A    You did.

20    Q    Thank you.

21         And that -- there you refer to certain repurchase

22    demand letters you sent to -- Aurora sent to Belvidere that

23    are attached as Exhibit F, correct?

24    A    That's what it says, yes.

25    Q    And would you please turn to that portion of the

Page 104

1   document, which is Exhibit 933F -- TRX-933F.  And I'm going

2   to direct your attention, there's several pages there, I'm

3   going to direct your attention to the third to last page.

4   Not that one, but the next one.  It's a two-page --

5              THE COURT:  The footer is 43 of 46.  Okay?

6              MR. SHUSTER:  So we see the -- so we have to take

7   it off the screen because we've got the borrower's name.

8   BY MR. SHUSTER:

9   Q    So, Mr. Trumpp, in this document this is a letter from

10  you to Belvidere Networking Enterprises dated October 20,

11  2009, correct?

12             THE COURT:  Sorry.  So we're on -- we should be on

13  44 of 46, right?

14             MR. SHUSTER:  I'm going to say yes, even though I

15  don't have those page numbers, but you should be -- yes,

16  because you're -- the third page --

17             THE COURT:  The date.

18             MR. SHUSTER:  October 20, 2009.

19             THE COURT:  22 or 20?

20             MR. SHUSTER:  No, 20.

21             THE COURT:  Right.  So it's --

22             MR. SHUSTER:  And it's a two-page letter from

23  Mr. Trumpp and then --

24             THE COURT:  Yes.  To Belvidere.

25             MR. SHUSTER:  Yes.

1          THE COURT:  Yes, that's the one.  So that's 44 of

2     46 in my binder.

3          MR. SHUSTER:  Yes.

4          THE WITNESS:  Thank you for clarifying, I was on

5     the wrong page.

6          THE COURT:  Okay?

7          MR. SHUSTER:  That was in mine too, I just missed

8     it.  Yep.  Thank you, Your Honor.

9          THE COURT:  Okay.  Sure.  No problem.

10          THE WITNESS:  Thank you.

11          MR. SHUSTER:  Okay.

12          THE COURT:  All right.

13     BY MR. SHUSTER:

14     Q    So that's -- we've just identified that.

15          So there there's -- you reference a misrepresentation

16     of occupancy, and what you relied on there for that

17     misrepresentation of occupancy includes an Accurint people

18     search, correct?

19     A    That was one of the sources of the claim evidence, yes.

20     Q    And if you turn to page 43, Mr. Trumpp, which is the

21     prior page, there is reference there to a schedule.  It's a

22     letter from you to Belvidere attaching a schedule.  And I

23     believe that that schedule is the last page of the exhibit.

24     You see that schedule?

25     A    Is that what's on 46?

Page 106

1   Q    Yes.

2          MR. SHUSTER:  I think that we can put up as an

3   exhibit and we can hopefully blow that up.

4          THE WITNESS:  That would be helpful, because I --

5          MR. SHUSTER:  Yeah.

6          THE WITNESS:  -- see the page.

7          MR. SHUSTER:  Yes.  I have my good glasses on so I

8   can read it, but I'm sympathetic.  So can we blow up the --

9   this column here?  The one that has text in every box?

10   Otherwise I can put it on the Elmo.  All right.  But they

11   don't all have to show it once if that helps.

12   BY MR. SHUSTER:

13   Q    So there the schedule identifies claim descriptions,

14   and the first one relies on LexisNexis, correct?  Can you

15   see that?

16   A    I'm trying.  I do see what was highlighted on the

17   screen, yes.

18   Q    And the next one relies on a credit report -- an audit

19   credit report?  Third line.

20   A    Yes, I see that too.

21   Q    And the next one, Mr. Trumpp, relies on Salary.com and

22   BLS data.  Do you see that?

23   A    I'm looking.  I do see what you've highlighted and I do

24   see that that is one of the sources cited for proof.

25   Q    Thank you, sir.

Page 107

1        And the next one down references an Accurint search

2    again, correct?

3    A    Yes.  An Accurint people search report was use as one

4    of the two sources of evidence --

5    Q    Yes.

6    A    -- citing these.

7    Q    Let me -- I'm going to go to TRX-733 -- 732, my

8    apologies.

9        (Pause)

10   Q    And that's also one of your declarations that's dated

11   March 2009, and that's your signature there?

12   A    Yes, it is.

13   Q    And that was submitted in Aurora Loan Services and

14   Lehman Brothers Holdings, the NBGI, correct?

15   A    Yes.

16   Q    So -- and that declaration, Mr. Trumpp, references --

17   well let me just direct your attention to 732E, which is at

18   tab E, which is the demand letters that are attached to the

19   declaration.

20       (Pause)

21   A    Is there a particular page in these demand letters --

22   Q    Yes.

23   A    -- that you want me to look at?

24   Q    It's page --

25   A    There's quite a few.

Page 108

```
 1    Q    -- if you go all the -- it's actually the last page in

 2    the exhibit, that's the best way to -- that's a letter from

 3    Patricia Rocker (ph) on Aurora Loan Services' letterhead to

 4    NBGI, correct?

 5    A    Yes, it is.

 6    Q    And that letter shows a misrepresentation of occupancy

 7    claims supported by an Accurint.com people search?

 8    A    Accurint was one of the two sources of evidence used in

 9    this particular demand letter.

10    Q    The other one is a (indiscernible - 12:59) to verify

11    employment, correct?

12    A    Yes.

13    Q    Okay.  Let me direct your attention, Mr. Trumpp, to

14    TRX-733.

15         (Pause)

16    Q    And that's a declaration that you swore to under

17    penalty of perjury on June 29, 2009 in Scottsbluff, Arizona?

18    A    Nebraska actually.

19    Q    Sorry.  Did I say Arizona?  Yep, Nebraska.  My bad.  My

20    apologies.  So that -- I note the law firm Fir (ph) on the

21    bottom left there, on the first page of that document, sir?

22    A    Yes.

23    Q    Again, that's my colleague, Mr. Rollin's firm, right?

24    A    At the time, yes.

25    Q    Yes.  And then -- but permit me to -- and the paragraph
```

Page 109

1    9 of the declaration refers to demand letters at Exhibit F.

2    And Exhibit F is TRX-734.  If you could go to page 17, sir,

3    of 23, please.  Once again we get no points for legibility,

4    but this is the way we got it off the public docket.  So

5    that's a letter from Sean Kilmurray, a claims analyst and

6    contract administration at Aurora Loan Services dated

7    July 28, 2007 to Irez Co. (ph).  Yes?

8    A    I'm reading the letter.  Yes, this is a demand letter

9    sent by Sean Kilmurray on Aurora letterhead.

10   Q    Thank you, sir.  So there is a reference to

11   misrepresentation of employment and income?

12   A    Yes.

13   Q    And the information that's put forward there is the

14   borrower's bankruptcy filing reflecting the borrower's

15   monthly income, correct?

16       (Pause)

17           THE COURT:  Rather interesting change of careers

18   this borrower has don't you think?

19           MR. SHUSTER:  Indeed.

20           THE WITNESS:  Yes, I see the reference to the

21   bankruptcy filing.

22   BY MR. SHUSTER:

23   Q    And no other documentary evidence at least is cited to

24   in that letter, correct?

25   A    In the initial demand letter, no.

Page 110

1    Q    Mr. Trumpp, let me direct your attention to TRX-716,

2    please.

3         (Pause)

4    Q    And TRX-716 is a declaration sworn to by you under

5    penalty of perjury dated March 11th, 2010 in Lehman Brothers

6    Holdings Inc. v. T. Financial Corporation?

7    A    It is.

8    Q    And there -- if you turn to page 6 of the declaration,

9    sir, it refers to what it describes as a breach of

10   representation and warranty loan?

11   A    I'm sorry, where on page 6 are you looking?

12   Q    The heading at the top towards --

13   A    Oh, in the big bold letters at the top?

14   Q    Yes.

15   A    Yes, I see that.

16   Q    Thank you, sir.

17        And then there's a reference in paragraph 29 for the

18   borrower's failure to disclose a significant mortgage debt;

19   isn't that right?

20        (Pause)

21   Q    You with me?

22   A    Yes, I was just taking a second to read it.  I see it.

23   Q    Okay.  Thank you.

24        And then there's a heading for another loan on page 7

25   called the -- well another loan on page 7.

Page 111

1          MR. SHUSTER:  We don't need to have that on the

2     screen.

3          THE WITNESS:  I see page 7.

4     BY MR. SHUSTER:

5     Q    And in paragraph 35 it says:

6          "Information regarding the borrower's employment

7          is material to LBB's decision to purchase loans from

8          the correspondent lenders such as Key Financial."

9          You see that?

10    A    Yes, I do.

11    Q    That statement was true when you made it?

12    A    It was.

13    Q    And on paragraph 36 says:

14         "Information regarding a borrower's income and

15         ability to repay the debt is material to LBB's decision

16         to purchase loans from correspondent lenders such as

17         Key Financial."

18         And that statement too was true when you made it,

19    correct?

20    A    It was.

21    Q    If you turn to paragraph 45 of the document you'll see

22    there's a reference to W-2s and tax transcripts, revealing

23    the borrower's employer.  You see that?

24         (Pause)

25    A    I'm sorry, can you repeat your question, please.

Page 112

1   Q    There's a reference in paragraph 45 to evidence in the

2   form of W-2s and tax transcripts relating to the borrower's

3   employment, correct?

4   A    I do.

5   Q    Now, let me direct your attention -- oh, and finally in

6   paragraph 47 there's a statement that any one of these red

7   flags was more than sufficient for LBB to decline to

8   purchase this loan.  See that?

9   A    Yeah.  So --

10  Q    No, I'm just asking if you see that it's there.

11  A    I do see that and I believe in this case this wasn't a

12  repurchase case, this was an instance where we were not

13  agreeing to purchase a loan.

14  Q    You were declining to purchase the loan?

15  A    Correct.

16  Q    The -- then if you turn, Mr. Trumpp, to Exhibit F,

17  which is Exhibit 716F.  You'll see there, Mr. Trumpp, that's

18  a letter from you dated July 10, 2009 to Key Financial

19  Corporation?

20  A    There's two letters here, so I assume we're talking

21  about the one on page 4?

22  Q    I'm talking on the one -- yes, the one on page 4.  And

23  there it refers to misrepresentation of debts and it says in

24  the third sentence, "Based on online research it has been

25  determined that the borrower had an undisclosed debt at the

Page 113

1    time of closing."  Do you see that?

2    A    I do.

3    Q    What online research were you referring to there in

4    your letter?

5    A    So you're asking me to remember the facts and

6    circumstances from a loan and demand letter that I sent in

7    2009?

8    Q    Doesn't surprise me that you can't.  What online

9    resources did Aurora use at that time to verify mortgage

10   debt?

11   A    As I sit here today I'm not sure I recall what other

12   online sources they would have used at that point in time.

13   Q    Do you know what types of online resources are

14   available for purposes of establishing mortgage debt?

15            THE COURT:  I'm going to ask for clarification.

16   Does he know now what resources were available then or does

17   he know now what resources are available now?  Your question

18   was do you know.

19            MR. SHUSTER:  Yes.  I'd actually like answers to

20   both questions.

21   BY MR. SHUSTER:

22   Q    So do you know now what was available then?

23   A    I don't recall or remember what was available then.

24   Q    Do you know what's available now by way of online

25   resources through identifying --

Page 114

1    A    I can't think of any that we're using today in any of

2    our downstream claims or reviewed in this process.

3    Q    Can I direct your attention, Mr. Trumpp, to -- thank

4    you -- to Exhibit I, which is 716I?  Do you have that before

5    you, sir?

6    A    I do.

7    Q    Can you identify that document, Mr. Trumpp, please.

8    A    This looks like a type of a form that contract admin

9    would have received when they were getting notice of loans

10   with potential defects from quality control.

11   Q    So -- and it's -- thank you.

12       It's headed special investigations repurchase referral

13   form.  Do you see that?

14   A    I do.

15   Q    And it provides investor detail, which is redacted

16   here, and it states that the loan status is current,

17   correct?

18   A    Yes.

19   Q    So was Lehman or Aurora on behalf of Lehman seeking

20   repurchase as to a current loan there?

21   A    So as things worked back then they would -- contract

22   admin would receive a repurchase request -- or I shouldn't

23   say a repurchase request -- but they called this a

24   repurchase request referral form, but it was just simply a

25   notice within Aurora to contract admin saying here's a loan

1   that we think has a potential problem and they would use

2   this form to submit it to contract admin for review.

3   Contract admin would assess the information similar to

4   what's on this page against the representations and

5   warranties in the purchase and sale agreements and then

6   determine whether there was a breach of a representation or

7   warranty and seek repurchase.

8        I don't recall today where this came from.  Obviously

9   it's part of this package, so I don't know the whole story

10  and facts and circumstances of this particular loan, nor do

11  I know the point in time that this was pulled relative to

12  the time that contract admin ultimately sought repurchase.

13       So I can infer that at the time that this form was made

14  the loan was current, but ultimately the performance prior

15  to that and the performance after that I don't know.

16  Q    Thank you.  So I have one more declaration.  It's

17  TRX-717, and it's not a Trumpp declaration.

18            THE COURT:  TRX?

19            MR. SHUSTER:  717.  717, yes.

20            MR. COSENZA:  Your Honor?

21            THE COURT:  Yes.

22            MR. COSENZA:  For a moment.  This is not a Trumpp

23  declaration.  He can start the questions on this but I want

24  to lay an objection.

25            THE COURT:  Okay.  You're going to lay some

Page 116

1    foundation?

2            MR. SHUSTER:  Yeah.  I'm going to get the

3    declaration in, I'll point to a foundation for doing so in

4    the text of it.  I'm going to put the key language I want in

5    the record, not really going to ask the witness to comment.

6            THE COURT:  Why would we do that?

7            MR. SHUSTER:  Well I want to get this declaration

8    --

9            THE COURT:  Yes, you do want to get it in, but the

10   question is on what basis should this declaration come in?

11           MR. SHUSTER:  Well the declarant says, "I am a

12   corporate representative of LBHI, and LBHI has authorized me

13   to make this declaration."  So --

14           THE COURT:  Okay.

15           MR. SHUSTER:  -- on that basis alone I think

16   it's --

17           THE COURT:  So let's just take this a piece at a

18   time.  So, Mr. Cosenza, do you have an objection?  An

19   admissibility objection?

20           MR. COSENZA:  I do, Your Honor, because I don't

21   know for what purpose this is being admitted.  This is not

22   something that Mr. Trumpp is familiar with.  I don't know

23   what purpose this is being offered.

24           You know, if there's a proffer for why -- how this

25   is admissible he can deal with it in due course we would

Page 117

1   deal with the admissibility of documents.

2           THE COURT:  Well it's a -- I mean not -- just to

3   try to move things along.  I mean it's a -- it appears to be

4   a document that was filed on a public docket, so I can take

5   judicial of it as a filed document.

6           MR. COSENZA:  Correct.

7           THE COURT:  Beyond that nothing.

8           MR. COSENZA:  I'm fine with that, Your Honor.

9           MR. SHUSTER:  Well it's --

10          THE COURT:  So --

11          MR. SHUSTER:  Your Honor, I'm hoping to improve on

12  nothing, but not necessarily via the witness.  The --

13          THE COURT:  But that's the point, that's the

14  discussion we had before, right?

15          MR. SHUSTER:  Well I would had we not had that

16  discussion.

17          THE COURT:  I'm sorry?

18          MR. SHUSTER:  I would try to explore with the

19  witness had we not had the discussion, but I understand the

20  parameters.

21          THE COURT:  Okay.  If you can lay a foundation for

22  asking the witness questions about the document by all

23  means.  So I'm happy to give you that opportunity.  If you

24  know that that's not going to yield anything then --

25          MR. SHUSTER:  I don't.  I don't think I examined

Page 118

1    on this in his deposition.

2              THE COURT:  Okay.  Well you can do what it is that

3    you think that you should do.

4              MR. SHUSTER:  Yes.  Okay.

5              THE COURT:  Okay?

6              MR. SHUSTER:  All right.

7    BY MR. SHUSTER:

8    Q    So who's John Baker?

9    A    An individual who works for the plan administrator.

10   Q    And he -- this -- was this part of the litigation

11   incidentally that you talked about yesterday that you

12   oversee?

13   A    It was.

14   Q    So would you have seen this document in the ordinary

15   course of business or been aware of it ever being filed?

16   A    Yes.

17   Q    And it was filed again by my esteemed colleague on the

18   other side, correct?

19   A    Yes.

20   Q    And as I read into the record in paragraph 2 Mr. Baker

21   says, "I'm the corporate representative of LBHI, and LBHI

22   has authorized me to make this declaration."  Right?

23   A    Yes.

24   Q    And that was a true statement?

25   A    It was.

Page 119

1    Q    I want to direct your attention to -- well and do you

2    recognize Mr. Baker's signature on page 23?

3    A    I do.

4    Q    I'm going to just ask you questions about paragraph 30

5    of the document.

6         (Pause)

7             THE COURT:  I think in fairness, Mr. Shuster,

8    Mr. Trumpp ought to begin with the proceeding paragraph,

9    because it begins with the words, "Among the reasons for

10   this," and there's no way to tell what the this is.  Don't

11   you think?

12            MR. SHUSTER:  Sure.  Yes.

13            THE COURT:  Right?  "Among the reasons for this."

14            MR. SHUSTER:  Yes.

15            THE COURT:  So we don't know what the this is.

16            MR. SHUSTER:  Yes.

17   BY MR. SHUSTER:

18   Q    So please do, Mr. Trumpp, if you would, look at

19   paragraph 29.

20        (Pause)

21   Q    And I'll have some questions for you when you're ready.

22        (Pause)

23   Q    I'm not going to ask you questions about the exhibits,

24   just so you know.

25   A    Can I look at the --

Page 120

1    Q    Oh, of course.

2    A    -- demand letters associated with this so I can know

3    what the occupancy --

4    Q    Sure.

5    A    -- breach is that they're referring to?

6         (Pause)

7    A    Okay.

8    Q    So I just want to ask you whether -- paragraph 29,

9    information regarding the borrower's intention to occupy the

10   property securing the mortgage loan is material to LBB's

11   decision to purchase loans from correspondent lenders such

12   as BMC.  That was consistent with your understanding?

13   A    Yes.

14   Q    And the next statement that one of the reasons for this

15   in paragraph 30 is that certain mortgage loans or mortgage

16   terms are available only to borrowers who intend to occupy

17   the property secured by the mortgage as their primary

18   residence.  That statement was also -- is also consistent

19   with your understanding at the time?

20   A    It is.

21   Q    And the next one that says:

22        "If a borrower misrepresents his or her intention

23        to occupy -- to so occupy the property securing the

24        mortgage loan that misrepresentation has a material and

25        adverse effect on the value of the loan because the

Page 121

```
1        loan cannot be sold at full value to another purchaser

2        or to a securitization once a misrepresentation is

3        known."

4        That was consistent with the plan administrator's

5    position at the time, correct?

6    A    That's what it says, yes.

7    Q    Done with declarations.  Move on to policies and

8    procedures.

9        I'd like to direct your attention, Mr. Trumpp, to TRX-

10   701.

11            MS. BRASWELL:  Your Honor?

12            THE COURT:  Yes.

13            MS. BRASWELL:  Before we get into this line of

14   questioning I just want to interpose the same objection I

15   made earlier with respect to policies and procedures, we

16   don't think they're relevant and we don't think Mr. Trumpp

17   should be questioned on them.

18            THE COURT:  All right.  Well I suppose it's going

19   to depend on the dates of the policies and procedures that

20   we're talking about.  I hear your objection, but I'm going

21   give Mr. Shuster some leeway on this.  All right?

22            MS. BRASWELL:  And, Your Honor, just to point to

23   the exhibit number that Mr. Shuster just pointed out, it's

24   TRX-701, and it's dated 2012.  These are Aurora policies and

25   procedures in 2012.
```

Page 122

1          THE COURT:  Well I hear you, let's see what

2     happens next.  All right?

3     BY MR. SHUSTER:

4     Q    Mr. Trumpp, TRX-701 is similar to policies and

5     procedures that were in place when you were at Aurora

6     managing loss management; is that correct?

7          (Pause)

8     A    So when I was in loss management we had policies and

9     procedures, and these look somewhat similar in concept to

10    the policies and procedures I had when I managed loss

11    management up until 2008, but like all things, you know,

12    things evolve and change over the course of time, so I've

13    not done the thorough read and comparison between what we

14    would have used in 2008 and beyond -- or earlier, excuse me

15    -- to what it says here.

16    Q    Fair enough.  So let's see how we do.  Let me direct

17    your attention, Mr. Trumpp, to the second page of the

18    document, bearing production number LBHI 4239.  Oh, I'm

19    sorry, I got ahead of myself.  Page 4327 is the second page.

20    And there's a description there of what the asset risk

21    management department does.  Is that consistent with what it

22    did at the time that you were at Aurora?

23    A    It looks fairly familiar.

24    Q    And then can I direct your attention to the -- page

25    4239 audit process, Section 3.1, full review, and it

Page 123

1    discusses -- it says:

2

3         "A full review requires at minimum the following

4         documents to be reviewed and verification obtained to

5         support the information submitted at the time that

6         application was accurate."

7         You see that?

8    A    I do.

9    Q    And then it references certain documents and items of

10   information to be reviewed, including employment and income,

11   correct?

12   A    Yes.

13   Q    And then credit report?

14   A    Yes.

15   Q    Which it says is to be compared to the due diligent

16   credit report for the undisclosed debt, right?

17   A    Yes.

18   Q    And then there's a reference to the appraisal and to

19   the HUD-1?

20   A    I'm sorry, where do you see that?

21   Q    I'm sorry, it's a few items down from the top.

22   A    Yes.

23   Q    And then there's a heading, additional documentation,

24   if available, right?

25   A    Yes.

Page 124

1    Q    And that's a reference to servicing loans?

2    A    It is.

3    Q    Now, please turn, if you would, to the page bearing

4    production number 4247, and you'll see there that certain

5    resources are identified to verify and review the

6    information on the loan file.  Do you see that?

7    A    No, where exactly are we looking?

8    Q    Under 3.5, loan application.

9    A    Oh, okay.

10   Q    On page --

11   A    Yep.

12   Q    -- 4247.  Talks about the steps that the quality

13   control auditor takes to verify the information in the loan

14   application, correct?

15   A    That's what it says, yes.

16   Q    And in step two of two it refers to checking Accurint

17   and LexisNexis for certain information?

18   A    Yes, that's what it says.

19   Q    And step three says that a comprehensive report on the

20   borrower should be pulled in Accurint?

21   A    It does.

22   Q    And in step four -- step two of step four there's a

23   reference to confirming the borrower occupancy via Accurint,

24   correct?

25   A    That was one of the sources for looking for occupancy,

Page 125

1   yes.

2   Q    And then if you could turn, Mr. Trumpp, to the next

3   page, 4249, Section 3.6, employment and income.  Do you see

4   that step one says, "Review the pay statements, tax returns,

5   and the W-2s"?

6   A    Yes, I see that.

7   Q    And then if you turn -- if you look at the next page

8   the box on the bottom, action, it refers to check certain

9   resources for more information, and that includes -- those

10  include the work number in the third bullet point there?

11  A    Yes.

12  Q    I want to direct your attention, Mr. Trumpp, if I

13  could, to Section 3.10 on page 4252.  3.10, credit report.

14  And you'll see in step two in the action box, the fourth

15  bullet it states -- it says that -- "verify the following,

16  are there inquiries from other mortgage lenders on the

17  lender's credit report resulting in additional mortgage debt

18  after the subject loan closes."  Do you see that?

19  A    I do.

20  Q    You don't have an understanding as to why that

21  particular reference is there do you?

22  A    Looks like one of the many steps of going through a

23  loan review.

24  Q    Okay.  That's it for that document.

25       I want to turn to one other policies and procedures

Page 126

1    document, sir, which is TRX-703.

2          Incidentally, were the policies and procedures that we

3    just looked and the various steps similar to what was in

4    place at Aurora during the time period when you were there?

5    A    So based upon what we've seen these appear roughly

6    similar.  I don't recall all the specifics of policies and

7    procedures from that long ago.

8    Q    Thank you.

9          So TRX-703, those are policies and procedures for the

10   asset risk management department and the master servicing

11   group at Aurora with respect to its repurchase and

12   warranties process, correct?

13   A    It's representations and warranties process, yes.

14   Q    What did I say?  Something else.

15   A    I think you said repurchase and warranties, but --

16   Q    Thank you for that clarification.

17         Can I direct your attention to the page -- the first

18   page bearing production number 4308?  There's a statement

19   at --

20              MS. BRASWELL:  Can I just interpose an objection

21   --

22              THE COURT:  Yes.

23              MS. BRASWELL:  -- just so the record is clear?

24   Same objection, relevance, foundation.  This is a 2012

25   Aurora process and procedures document.

Page 127

```
 1              THE COURT:  All right.  It's subject to the same
 2    caveat as before with respect to the question of
 3    applicability to policies that Mr. Trumpp applied.
 4    BY MR. SHUSTER:
 5    Q    Does this document resemble documents -- the policies
 6    and procedures documents that were in place at Aurora during
 7    the time period when you were there?
 8    A    I haven't had a chance to go through this and read it
 9    word for word.  It looks similar in content.
10    Q    Thank you, sir.  The Section 1.0 on page 4308,
11    Mr. Trumpp, states in the second sentence:
12         "That if adverse findings are discovered the
13         claims specialist is responsible for determining if the
14         findings represent a material breach of the reps and
15         warrants."
16         Do you see that?
17    A    I do.
18    Q    And it goes on to say that, "A material breach occurs
19    when a finding contradicts one of the reps and warranties."
20    Do you see that?
21    A    I do.
22    Q    And then if I could direct your attention, Mr. Trumpp
23    -- and there's further information on this, is there not,
24    Mr. Trumpp, in Section 3.2?
25              THE COURT:  Can I just pause on that sentence?  A
```

Page 128

1   material breach occurs when a finding contradicts one of the

2   reps and warranties.  Is that true?

3           THE WITNESS:  That's not necessarily how I would

4   have stated this statement, and I'm not sure why that you

5   used the word contradicts there.

6           THE COURT:  A material breach occurs when a

7   finding contradicts one of the reps and warrants.  Okay.

8           MR. SHUSTER:  There's additional -- I was about to

9   direct the witness to Section 3.2, which has a different

10  formulation of the language.

11          THE COURT:  Okay.

12  BY MR. SHUSTER:

13  Q    See that there in Section 3.2, Mr. Trumpp?

14  A    Yeah, I'm just taking a look at it.

15          THE COURT:  Could I ask the two of you to come up

16  for a second?

17      (Sidebar off the record)

18  BY MR. SHUSTER:

19  Q    Let me direct your attention, Mr. Trumpp, to

20  Section 4.0 on page 4311.

21  A    Okay.

22  Q    That refers to the fact that when a breach occurs

23  Aurora Bank must enforce one of the following options, and

24  it says, "A repurchase is an agreement between Aurora and

25  the client whereby the client agrees to buy back the loan at

Page 129

1    a specified future date and place on an active loan,"

2    correct?

3    A    It does.

4    Q    And it goes on to say, "This option is exercised for

5    claims on active loans," correct?

6    A    Yes.

7    Q    And then it makes a distinction and says:

8         "A make whole is an agreement between the client

9         and Aurora Bank where the client acknowledges

10        obligation to indemnify Aurora Bank or the trust for a

11        loss incurred on a liquidated loan."

12        Do you see that?

13   A    I do.

14   Q    And it goes on to say, "This option is exercised for

15   claims on loans that have been liquidated at a loss,"

16   correct?

17   A    Yes.

18   Q    And in some of the demand letters that we've looked at

19   and certainly that you've seen, some of these demand letters

20   are denoted make whole requests and others are not, correct?

21   A    Yes.

22   Q    Just quickly then going through a couple other points

23   in here.  On page 4313 there's a reference to the fact that

24   the claims specialist creates a demand letter which is to --

25   used to communicate loans which have been identified that

Page 130

1   breached the applicable reps and warranties language,

2   correct?

3   A    Yes.

4   Q    And then the form of the letter is set forth in

5   excerpted format on page 4314.

6   A    Yes, I see that.

7   Q    And then on page 4319 in Section 8.0, rebuttal of

8   claim, it states that the client is entitled to dispute a

9   claim in their supporting documentation that refutes the

10  findings.  Do you see that?

11  A    I do.

12  Q    And that's similar to the language that's in the --

13  some of the demand letters that we've looked at, correct?

14  A    Meaning that we gave the sellers an opportunity to

15  refute our findings?  Yes.

16  Q    Okay.  Thank you, Mr. Trumpp.  Thank you, and I'm done

17  with that exhibit, but not the big thank you.  It's coming.

18  A    I figured.

19       (Laughter)

20  Q    Okay.

21       THE COURT:  Let us know when you're up for a

22  break, Mr. Shuster.

23       MR. SHUSTER:  Would love a break, so any time.

24  Now would be great.

25       THE COURT:  Okay.  Why don't we take ten minutes,

Page 131

1    and we'll move on to the next topic.  All right?

2         (Recessed at 3:32 p.m.; reconvened at 3:52 p.m.)

3              THE COURT:  Please have a seat.

4    BY MR. SHUSTER:

5    Q    Mr. Trumpp, on the subject of servicing notes -- I

6    should say further to the subject of servicing notes I'm

7    going to direct your attention to TRX-2737, please.

8    A    Okay.  I'm getting a workout today.

9    Q    So what I would like to -- oh, sorry.

10             THE COURT:  It's in -- of the volumes that I have

11   it's in Volume III.

12        (Pause)

13             THE COURT:  Mr. Shuster, are we going to get to

14   what this is?

15             MR. SHUSTER:  Yes.

16             THE COURT:  Okay.

17   BY MR. SHUSTER:

18   Q    Mr. Trumpp, this is a claim form submitted by the

19   trustees, correct?

20   A    It appears that way, yes.

21   Q    For the loan number that is partially redacted on the

22   first page of the document, the loan number ending in 3935,

23   correct?

24   A    Yes.

25   Q    And then if I could direct your attention to the

Page 132

1    factual basis for defect number 1.  In the middle --

2    squarely in the middle of that breach narrative there's a

3    reference to servicing notes, indicating that the borrower

4    had not received their statement and that the subject

5    property address was the wrong mailing address.  You see

6    that?

7    A    I do.

8    Q    So the servicing notes were part of the evidence that

9    was submitted to support the claim, right?

10   A    It appears that way.  Yes.

11   Q    And the same is true for if you flip to the next page

12   for a factual basis for defect number 2?

13        (Pause)

14   Q    And then if I could direct your attention to TRX-2738.

15   Did I get that right, 2738?  That is the plan

16   administrator's response.

17   A    Okay.

18   Q    And you see that in debtor findings number one, the

19   second sentence says, "The evidence is unreliable and

20   insufficient because an inadmissible and uncorroborated

21   insurance certificate and servicing notes do not prove

22   origination income."  Do you see that?

23   A    I do.

24   Q    So the plan administrator was taking the position that

25   the servicing notes were inadmissible, yes?

Page 133

1   A    In this particular instance, yes, of which I haven't

2   seen the servicing notes so I'm not sure I can really

3   comment on what they contained.

4   Q    Okay.  And the same is said in the response to debtor

5   findings number two, "The evidence is unreliable and

6   insufficient because it relies on inadmissible notes that do

7   not prove the borrower's failure to occupy."  Do you see

8   that?

9   A    I'm looking for that right now.  Sorry.  Okay.  Yeah. I

10  see that.

11  Q    So it -- above it says the evidence is -- the servicing

12  notes are inadmissible and uncorroborated and here they're

13  saying they are unreliable and insufficient, correct?

14  A    Yes.

15  Q    Mr. Trumpp, let me just turn quickly to the subject of

16  purchase price.  On the loans that the plan administrator

17  accepted as breaching, materially breaching, the plan

18  administrator did not challenge the trustee's purchase price

19  calculations, correct?

20  A    No.

21  Q    That's not correct?

22  A    I recall their being differences in some of our

23  purchase prices, so we didn't always agree with the purchase

24  price submitted.  I believe there were deductions that were

25  made sometimes for things that came out of our review of the

Page 134

1   law certifications and the corporate expense logs and our

2   purchase price review.  So it didn't always match.  And

3   there were additional clarification of information included

4   in our approval reports back that discussed the reservation

5   of rights on behalf of Lehman for those purchase prices.

6   Q    The -- but the plan administrator had an expert -- you

7   said that you needed some of the on hold loan documents, the

8   documents that cause you to put loans on hold because you

9   had to look at whether servicers were negligent and slow in

10  foreclosing or the servicer charges were too much and so

11  forth, right?

12  A    That was part of our review, yes.

13  Q    Okay.  And you calculated a number for that on the

14  accepted loans, the aggregate purchase price on the accepted

15  loans is about $265 million and you calculated a number

16  going to the issues you've described, the $4.2 million,

17  right?

18  A    Those numbers sound in line.  Yes.

19  Q    And then you withdrew that objection to the aggregate

20  purchase price on those loans?

21  A    We ultimately did, but that doesn't mean it wasn't part

22  of our process.

23  Q    I would like to -- let me ask you about the collapsed

24  trusts that you testified to.  You testified that the

25  significance of these transactions is that an independent

Page 135

1    third party assessed the particular claims and merits of

2    where they thought it was going, right?

3    A    I --

4    Q    I'm quoting from --

5    A    I'll take that that's the quote of what I said.

6    Q    Are you aware that the appraiser specifically

7    disclaimed conducting any independent analysis of the

8    particular claims and merits of the claims in these trusts?

9         THE COURT:  Yes, Mr. Cosenza.

10        MR. COSENZA:  What -- I don't know what the basis

11   is for Mr. Shuster's statement.  There's no foundation.

12   He's testifying about something.  I don't know what facts

13   he's discussing.  There's no foundation at all as to what

14   the appraiser is, where he's getting this evidence from.

15   You know, I -- it's just all based on the -- he can take the

16   -- go into the box and testify if he wants to testify, but I

17   don't know what the basis is for -- and the foundation is

18   for this question.

19        MR. SHUSTER:  The witness testified that he has

20   knowledge of this.  I have a good faith basis for asking

21   these questions.

22        THE COURT:  Well --

23        MR. SHUSTER:  He testified.  He --

24        THE COURT:  Come --

25        MR. SHUSTER:  -- characterized --

Page 136

```
 1            THE COURT:  Come --

 2            MR. SHUSTER:  -- the appraiser --

 3            THE COURT:  Come on up.  Come on up.

 4       (At sidebar off the record.)

 5  BY MR. SHUSTER:

 6  Q    Have you seen the appraisals for the collapsed trusts?

 7  A    For some of them, yes.

 8  Q    So are you aware that they have language in them that

 9  specifically disclaims conducting any independent analysis

10  of the particular claims and merits of the claims in the

11  trusts?

12  A    Yes.

13  Q    Are you also aware the appraiser stated that it could

14  not evaluate the merits of the proposed settlement amount as

15  some materials were not made available given the private

16  nature of the transactions?

17  A    I'm not sure I recall that particular piece.

18  Q    Do you know that the trustees have no authority under

19  the trusts agreements to object to the sale?

20            THE COURT:  Mr. Cosenza.

21            MR. COSENZA:  Yeah.  Yeah.  This is calling for  a

22  legal conclusion on --

23            THE COURT:  If he --

24            MR. COSENZA:  Yeah, if he knows.

25            THE COURT:  It's just whether or not he knows.
```

Page 137

1          MR. COSENZA:  Sure.

2          THE WITNESS:  I don't know.

3     BY MR. SHUSTER:

4     Q    You know that the trustee -- do you know that they have

5     no authority to object to the sale price?

6     A    And when you say sale price you're -- I think you're

7     referring to the sale price of the claim and not the loans?

8     I -- I have not researched this in the agreements myself.  I

9     don't know.

10    Q    Let's have a look at your binder of yesterday, Mr.

11    Trumpp, your direct binder.

12         (Pause)

13    Q    Do you have it, sir?

14    A    Yes.

15    Q    This is your white binder from yesterday.

16    A    Okay.

17    Q    Thank you.

18         Okay.  You -- I want to focus on P8 -- your exemplar

19    loan 123258824.

20          THE COURT:  PA what, Mr. Shuster?

21          MR. SHUSTER:  The loan number is 123258824.  It's

22    at Tab PA-689 which is the claims package.

23         (Pause)

24    BY MR. SHUSTER:

25    Q    Now there were three claims on that loan, one of which

Page 138

1   you focused on which was a misrepresentation of income

2   claim, correct, sir?

3   A    Yes.

4   Q    This was the borrower who identified himself as a

5   driver on his loan application and who submitted a hardship

6   letter that was painful to read about experiencing colon

7   cancer.  Do you remember that?

8   A    I'm sorry.  Hold on a second.

9        (Pause)

10  A    Yes.  I do remember that.

11  Q    So the claim package contains the -- I guess the claim

12  package is at Tab 663 and it contains the loan application.

13  And the loan application is at -- starts at -- well, starts

14  at the page Law deb ending in 18.  Well, it's exhibit --

15  it's page 7 of 24 of the exhibit.  That's the easier way to

16  find it.  You with me?

17  A    Yes, I am.

18  Q    And on the next page the borrower identifies his type

19  of work as driver?

20  A    Yes.

21  Q    And then he gives an income number of $6,500, correct,

22  monthly?

23  A    Yes.

24  Q    I thought you testified, Mr. Trumpp, that the borrower

25  didn't sign this loan application; that it was taken over

Page 139

1    the phone?

2            MS. BRASSWELL:  Objection.  Mischaracterizes.

3            THE WITNESS:  I don't --

4            THE COURT:  Hold on.  Do you recall?

5            THE WITNESS:  I don't recall saying anything about

6    whether it was signed or not.

7            MR. SHUSTER:  Okay.

8            THE WITNESS:  I do recall saying that it was taken

9    over the phone and that's referenced on page 10 of 24 in the

10   lower left-hand corner.

11           MR. SHUSTER:  Oh, I see.  So it was taken over the

12   phone, but you weren't suggesting that it wasn't signed.

13           THE WITNESS:  That's correct.

14   BY MR. SHUSTER:

15   Q    And it was signed, right, the next page, strongly

16   suggest, page 11, the signature is redacted out and there's

17   a handwritten date, right?

18   A    There's -- in my copy there is a signature of the

19   borrow -- or the borrower interviewer, but there is not a

20   signature of the borrower.  So I don't know if that's

21   because it was redacted out or not or how that worked.

22   Q    Well, on page 11 -- are you looking at page 11 now?

23   A    No.  I'm looking at page 10.

24   Q    Right.  So if you look at page 11.

25   A    Okay.

Page 140

1    Q     You see there's a signature -- a handwritten date and

2    it looks like there was a signature for the borrower, but it

3    was -- it's redacted out.  Do you see that now?

4    A     That I do so.

5    Q     Okay.  Now you remember you looked at the borrower's

6    2007 W-2 and that it shows a total income of 31,945?  Do you

7    remember that from your direct testimony?

8    A     I remember it being $31,000 and something.

9    Q     Right.  So that's at page --

10   A     Yeah.  Yes.  I see that.

11   Q     -- that's at -- yeah.  That's at page 20 of 24.  And

12   you testified that the borrower only worked for the first

13   five months of the year, correct?

14   A     I think I testified that we weren't sure how many

15   months he worked in the year, but it wasn't -- we inferred

16   from the information in the file that he worked the first

17   five months of the year.

18   Q     So -- but there -- and you pointed to a disability form

19   which is at PA-666.

20   A     That was one of the medical records that we referred

21   to,.  Yes.

22   Q     Yes.  Page -- I'm looking at page 5 of 14 in the

23   plaintiff's -- PA's Exhibit 666.

24   A     Yes.

25   Q     And that shows that this was an '07 loan, right, so

Page 141

1    that shows that the disability did not commence until

2    December of 2007, December 20.  Do you see that?  That's

3    reflected in two places, the first at the top is the

4    physician's disability statement and on line one, first date

5    of disability, first date of disability 12/20/07.  Do you

6    see that?

7    A    Yes.

8    Q    And then it -- there's a Section C employer's

9    disability statement, right?  And that shows also that the

10   first date of disability was 12/20/07.  Do you see that,

11   sir?

12   A    I do.

13   Q    And it says in line 3 that prior to this disability the

14   borrower worked what appears to be a full schedule of 40 to

15   60 hours a week.

16   A    So I do see where it says that he was working 40 to 60

17   hours.  I also see down at the end of line 7 where it talks

18   about he depends on short-term disability.  So I'm not sure

19   how that factors in here.  And the reference that we used

20   for the fact that we thought his medical condition may have

21   started in May was listed on page 3.

22   Q    Yeah.  No.  No.  That was an admissions form.  But this

23   is -- this is different information that says that his

24   disability commenced in December of that year and that prior

25   to that time he worked 40 to 60 hours a week, right?

Page 142

1    A     That's what the form says.

2    Q     Okay.  And the income number that the trustees put

3    forward is -- was $31,945, right?

4    A     That's correct.

5    Q     Which is also reflected on that form, correct?

6    A     It is.

7    Q     And you testified, I think, that you looked at all the

8    information in the loan file, but we went back to the loan

9    file and we found some other information.  And so that is in

10   Exhibits TRX-2728, 2729 and 2730, which we'll hand up to you

11   now.

12        (Pause)

13            THE WITNESS:  Okay.

14   BY MR. SHUSTER:

15   Q     So 2728 is a W-2 for the next calendar year, '08,

16   correct?

17   A     Yes.

18   Q     And it shows income very much in range with the income

19   number that the trustees put forward, correct?

20   A     Based upon this W-2 for an annual year of 2008 I see a

21   similar number, but we don't know how many hours or jobs

22   that this particular person may have worked in 2008,

23   especially with his health condition.

24   Q     And then if you look in 2009 you -- sorry -- TRX-2730

25   you see an adjusted gross income number of 39,659.  It's a

Page 143

1    record of account from the IRS for the -- for that tax

2    period ending with that calendar year, right?

3    A    Yes.

4    Q    And then 2729, TRX-2729 is income information for 2010

5    which again shows income, a W-2 that shows income from the

6    same employer as in '07 and '08 and '09 in the same range,

7    39,888.10.

8    A    Yes.  And as we talked about yesterday this guy had

9    multiple modification requests throughout these years.  So

10   we don't necessarily know what was going on in his life for

11   these additional years.

12   Q    Well --

13   A    All we can glean is what we saw in those hardship

14   letters.

15   Q    -- Mr. Trumpp, you put this loan forward yesterday, a

16   handpicked loan to show that -- how careful you were in your

17   review and how sloppy the trustees were in theirs.  Why

18   didn't you provide these three pieces of corroborating

19   information which were in the loan file that the trustees

20   provided to you?

21          MS. BRASSWELL:  Objection to Mr. Shuster's

22   characterization.

23          THE WITNESS:  So I think we were trying to show

24   yesterday where based upon the information in the claim

25   package and the loan file -- I'm sorry.

Page 144

1           THE COURT:  Answer the question.  Let's stick to

2      the facts.  It's not embed argument in the facts or the

3      questions.  All right.

4           Okay.  So the question is during yesterday's

5      testimony, if you know, why did you not present the pieces

6      of paper that Mr. Shuster has now showed you today with

7      respect to the subsequent year evidence of income by this

8      borrower?

9           THE WITNESS:  So yesterday what we were trying to

10     show is based upon the evidence that we were finding in the

11     loan file it was really hard to decipher what the borrower

12     was making at the time of origination and when he filled out

13     this application.  And it was really hard to know what was

14     in his mind as to what he was anticipating making prior to

15     coming down with colon cancer, and what was going on in the

16     general market of employment at that particular time.

17          So we don't necessarily know what he thought he was

18     going to make, what he actually made in that particular

19     month when he signed this.  Based upon these W-2s we can see

20     that over those years he made less, but we also know that he

21     submitted several requests for hardship letters, received

22     modifications.  We don't know what was going on in this

23     borrower's life.

24          The question is what was he making and what did he

25     believe he was going to be making at the time he filled out

Page 145

1    that application.

2    BY MR. SHUSTER:

3    Q    It is a fact, though, is it not, sir, that the

4    corroborating evidence from 2008, 2009, 2010 that's in the

5    loan file does strongly tend to suggest that the income

6    number put forward by the trustees for 2007 was correct and

7    well within the range?

8    A    I think it begs the question that you may have to look

9    deeper to see what really happened at origination on this

10   loan.

11   Q    Mr. Trumpp, let me turn to one of your other exemplars.

12        (Pause)

13   Q    Let me look at one of your other exemplars.  This brief

14   description is contained in plan administrator 692.  And the

15   trustees refer to a bankruptcy filing, statement of

16   financial affairs.  Do you remember this one of the borrower

17   and co-borrower?

18   A    Yes.

19   Q    So if you look at the loan application which is in plan

20   administrator 667, page 5, you see that the borrower lists

21   $7,250 in base employment income.

22   A    I'm sorry.  I'm getting there.

23   Q    I'm sorry.

24        (Pause)

25   A    I'm sorry.  Can you repeat the question?

Page 146

1    Q    If you look at page 5 of the exhibit that's where the

2    borrower and co-borrower set forth their monthly income,

3    correct?

4    A    Yes.

5    Q    And the borrower lists her -- I think it's a her,

6    income at 7,250, right?

7    A    Yes.

8    Q    Doesn't list any other income for herself, correct?

9    A    Correct.

10   Q    And the co-borrower puts down a number of six -- 6,800

11   for monthly income, correct?

12   A    Yes.

13   Q    Now if we turn to page 50 of the exhibit and hold onto

14   that page 5 in case you -- if you would in case you need to

15   refer back to it.  But if we refer to page 50 of the

16   exhibit, Mr. Trumpp, you pointed out yesterday that there is

17   some business income that's identified for the wife that is

18   set forth there, right?

19   A    Yes.

20   Q    But even if you do the math and you add up the wife's

21   wages and her business income you come to roughly $59,000,

22   right?

23   A    Yes.

24   Q    Which works out to just under 5,000 a month?

25   A    Yes.

Page 147

1  Q    And the income number that she reflects on the loan

2  application is $7,250 a month, correct?

3  A    For a loan that closed in April of '07 so we don't --

4  again, don't know what happened for the remainder of '07.

5  But your math is fair.

6  Q    It looks like what happened for the remainder of '07 is

7  that she picked up some other business income, but -- which

8  she hadn't identified on the loan application, but that even

9  with that additional business income added to her wages she

10  fell well short on a monthly basis of the income number that

11  was set forth in the loan application, correct?

12  A    Can you repeat that question, please?

13  Q    I don't think so.  I'll read it to you.  It looks like

14  what happened for the remainder of 2007 is that she picked

15  up some other business income which she hadn't identified on

16  the loan application, but even with that additional business

17  income added to her wages she felt well short on a monthly

18  basis of the income number that was set forth in the loan

19  application.

20            MS. BRASSWELL:  Objection.

21  BY MR. SHUSTER:

22  Q    Isn't that right?

23            MS. BRASSWELL:  Calls for speculation.

24            THE COURT:  Well, the question does call for

25  speculation.  Your question is it looks like.  So the

Page 148

1    question should be does the witness know.

2            MR. SHUSTER:  I'm --

3            THE COURT:  I mean, I --

4            MR. SHUSTER:  I'm certainly happy to adopt that

5    question.

6            THE WITNESS:  I have no idea if she picked it up.

7    She did list business income in the years of 2007, 2008 and

8    2009, and I would also note that this application was also

9    taken over the phone so we don't know what she told --

10           MR. SHUSTER:  Okay.

11           THE WITNESS:  -- the other side.

12   BY MR. SHUSTER:

13   Q    It's reasonable to assume if she had business income

14   she would have identified it, correct, on her loan

15   application?

16           MS. BRASSWELL:  Objection.  Calls for speculation.

17           THE WITNESS:  I don't know.

18           MR. SHUSTER:  Okay.

19   BY MR. SHUSTER:

20   Q    And it is the case -- I know you've answered this but

21   I'm not sure you have, so even the combined number with the

22   additional income that you pointed out still falls well

23   short of the monthly number that is identified on the loan

24   application, right?

25   A    Assuming average payments dividing by 12 it is less.

Page 149

1    Yes.

2    Q    Mr. Trumpp, you testified that you provided Bates

3    numbers to the trustees citing to documents and to

4    supplement the plan administrator's formal responses on

5    breach claims, correct?

6    A    Yes.

7    Q    The Bates numbers that the plan administrator provided

8    were at the loan level rather than the individual breach

9    level, correct?

10    A    Yes.

11    Q    So just to be clear about that, if the three different

12    breaches were identified for a loan the trust -- the plan

13    administrator didn't identify Bates -- by Bates numbers

14    evidence going to one breach and then the other and then the

15    other.  It just gave Bates numbers going to the loan,

16    correct?

17    A    Yes.  Yes.

18    Q    And the plan administrator provided no additional

19    guidance.  For example, it didn't provide any narrative

20    describing how the Bates numbers bore upon the breach claims

21    or the plan administrator's response to the breach claims,

22    right?

23    A    We did not.

24    Q    The plan administrator had such notes, didn't it?

25    A    The plan administrator maintained their own notes on

Page 150

1    the loans.  Yes.

2    Q    And to this day the plan administrator has not provided

3    narrative descriptions that accompany the Bates numbers that

4    would explain how the Bates referenced documents bear upon

5    or refute the evidence tendered by the trustees?

6    A    So as we talked about yesterday we gave the formal

7    responses, the Bates citations and the loan files back.  Did

8    we add additional narrative outside of the formal responses,

9    no.

10   Q    Let's take a peek at the formal responses for a second

11   then.  The -- let's look at your Exhibit PA-620 which you

12   put forward yesterday.  And I'm looking at the seventh page

13   into the exhibit and I don't know a way, another way to

14   identify this.

15        (Pause)

16   A    Does it look like this?

17   Q    It does look like that.  That's not going to do much

18   for our eyesight, but here we go.

19        So you have a response there that the evidence is un --

20   sorry.  Looking at the first line which is -- the first

21   line, the content which is line 68.  Are you with me?

22   A    I believe so.

23   Q    It's -- so the -- you say the evidence does not support

24   a breach.  Then you say the, evidence is unreliable and

25   insufficient because income stated in non-origination tax

Page 151

1    returns does not prove origination income, right?

2    A    Yes.

3    Q    You don't provide any narrative for why -- narrative

4    explanation there or ever for why the specific tax return

5    information that was provided on that loan by the trustees

6    fails to establish that there was an income breach, correct?

7    A    I -- I think our formal response on that speaks for

8    itself.  We -- if you're asking was there more narrative for

9    that particular loan that we provided, no.

10   Q    You had it.  You didn't provide it?

11   A    As I think I stated a couple of questions again we

12   maintained additional records and notes and information on

13   our side.  That doesn't necessarily mean that that was

14   something that was called for to be provided under the

15   protocol.

16   Q    Duff & Phelps asked for that information, didn't they?

17   A    They did.

18   Q    And you told them you couldn't provide it because the

19   lawyer said you couldn't provide it?

20   A    I don't remember necessarily those exact words.

21   Q    But something --

22   A    Ultimately it was determined that that was not

23   something that we should turn over.

24   Q    But in substance was that your response to their

25   request?

Page 152

1   A    Ultimately it was a decision made with the advice of

2   counsel.

3   Q    You testified yesterday that you -- and I -- in

4   discussing your formal responses that:

5        "This was intended to be the formal response that

6        gave the basis for our rejection of the claim.  We

7        gave that information back, but we didn't

8        necessarily list every single piece of evidence or

9        every single defense that we were going to assert on

10       that particular loan because we knew that

11       potentially could come up in step four or step

12       five."

13       Do you remember saying that?

14  A    Yes.

15  Q    So was the plan administrator holding back information

16  because it anticipated mediation or litigation?

17  A    No.

18  Q    Other than the advice of counsel, which I don't want

19  you to disclose, can you tell me why the plan administrator

20  didn't provide its counter-narratives that more granularly

21  address the evidence, if they do, that the trustees put

22  forward?

23       MR. COSENZA:  Your Honor --

24       THE COURT:  Mr. Cosenza.

25       MR. COSENZA:  -- I have to object.  I would like to

Page 153

1    have a sidebar on this --

2              THE COURT:  Yeah.

3              MR. COSENZA:  -- quickly.

4              THE COURT:  We're going to take a break.  Maybe a

5    couple of you could join me in the conference room.

6         (Recessed at 4:36 p.m.; reconvened at 4:59 p.m.)

7              THE COURT:  All right.  Thanks, everyone, for your

8    patience.  I think Mr. Shuster is going to be in a position

9    to finish up here.

10             MR. SHUSTER:  Yes.  So I've got to reorient myself

11   here.

12        (Pause)

13   BY MR. SHUSTER:

14   Q    So on the Bates numbers, Mr. Trumpp, I want to walk you

15   through, if I could, a couple of your Bates references,

16   responses on a couple of loans.  So let's start with, it's

17   for Loan 33382979, let's start with our claims submission

18   which is TRX-2749.

19        (Pause)

20   A    Which book am I supposed to be looking in?

21             THE COURT:  You are in the binder III of III, I

22   believe, Mr. Trumpp.

23        (Pause)

24   BY MR. SHUSTER:

25   Q    So, Mr. Trumpp, you see the trustees' claim submission

Page 154

1    there, TRX-2749?

2    A    Okay.

3    Q    So there is a statement that the borrower said that he

4    earned nearly $8,000 a month.  Post-closing same year tax

5    returns show income of about half that.  And then the plan

6    administrator responded at TRX-2750 and stated that the

7    evidence is unreliable and insufficient because income

8    stated in origination year tax return does not prove

9    origination income.  Do you see that?

10   A    I do.

11   Q    And then the plan administrator provided, eventually

12   provided Bates stamped -- Bates references, correct, for

13   this loan?

14   A    Yeah.  We gave the entire loan file back Bates stamped

15   and references to particular documents.

16   Q    Okay.  So let me -- we have a demonstrative that

17   reflects the Bates references for this document, for this

18   loan.  It's TRDX-1, which is I think a screenshot from

19   Exhibit D to the plan administrator's August 2015 letter

20   providing Bates number.

21        MR. SHUSTER:  May we approach to hand it up?

22        THE COURT:  Yes.  Thank you.  Thanks.

23   BY MR. SHUSTER:

24   Q    So those are the Bates references that the plan

25   administrator provided for this loan, correct?  You can see

Page 155

1    that the loan numbers match.

2    A    Based upon the last four digits, yes.

3    Q    So you got a starting Bates range reference, an ending

4    Bates range reference and a Bates page reference.  So the

5    starting reference for the first one is a single page

6    reference.  It's 43726.  The ending Bates reference is

7    43726, and you cite to a Bates page which is 43726, right?

8    A    Yes.

9    Q    The next one is a range 4 -- 7486 to 8796.  You don't

10   provide a specific Bates page reference, correct?

11   A    That is correct.

12   Q    And the third one again is just a single page that you

13   list each time.

14   A    Okay.

15   Q    So in the first line and in the third line you list the

16   same single page Bates reference each time and on the second

17   line you identify a range of Bates number, but you don't

18   identify a page range, correct?

19   A    Yes.

20   Q    So then if we look at TRX -- the first Bates range is

21   43726 and that is TRX-2772.  And that is a citation to the

22   cover page of what document, Mr. Trumpp?

23   A    It is part of the product profile for Aurora's Alte

24   (ph) first lien products.

25   Q    So can you look at that and determine how that, citing

Page 156

1    to that page bears upon or illuminates the plan

2    administrator's formal response to the breach claim?

3    A    I would need to spend more time looking at the loan

4    file and all of the other additional information to confirm

5    that I know the intent in how this was used.  This is a loan

6    that I don't recall seeing before.

7    Q    Can you look at the second one?  So the second one is -

8    - the Bates range is LBHIT and numbers ending 7486 to 96

9    which is TRX-2773.

10   (Pause)

11   Q    So there you appear to be citing back to us the loan

12   application and the tax return evidence that we cited to

13   you.  Do you see that?

14   A    Yes.

15   Q    How does that bear upon or illuminate the plan

16   administrator's formal response?

17   A    As I just said I would need additional information to

18   make sure I understood how it was intended to be used.  I

19   would have had to look at the claim packages submitted by

20   the trustees.  I would have had to review the loan file,

21   presumably the things that the trustees did when they were

22   making this claim to make sure I fully understood the

23   attributes and everything that was going into it to better

24   understand how best to respond using this information.

25   Q    And then the third one is Document LBHIT 138449537

Page 157

1    which is TRX-2774.  And that's the origination, the loan

2    origination credit report, correct?

3    A    I can't definitively say it's the origination credit

4    report.  It looks like a credit report pulled around the

5    time of origination.

6    Q    So now looking at these three documents which you cited

7    back to the trustees, does any of this provide new

8    information that wasn't in the loan file or breach package

9    that tends to refute the breach finding evidence that the

10   trustees put forward?

11   A    As I've stated the last couple of questions related to

12   these documents, I would need to understand both claim

13   package and the loan file which presumably the trustees had

14   done when they were making these claims and our reviewers

15   had done when we were responding.  I can't take this

16   information right here and give you a complete answer.

17   Q    So what were the trustees meant to do with this

18   information, a citation to the first page of the loan

19   program description, a citation to the origination credit

20   report, and a citation to the loan application and the tax

21   return that the trustees provided to the plan administrator,

22   how were they supposed to figure out what you were saying?

23   A    So I think I have said the trustees presumably were

24   intimately familiar with the facts and circumstances around

25   this particular loan file when they made the claim.  And

Page 158

1   that would be in their foundation of knowledge as they were

2   interpreting these documents and these responses to their

3   claims from the plan administrator.

4       I clearly didn't have that body of information in my

5   head as you're asking these questions.  So I would have to

6   spend some additional time looking at this particular claim,

7   deciphering what they said, looking at the documents and

8   coming up with an answer for you.

9   Q   Did you have -- if the trust -- if the plan

10  administrator had any evidence that tended to refute the tax

11  return evidence that the trustees had put forward would it

12  have been the plan administrator's practice to provide --

13  cite to and provide that evidence?

14  A   So the plan administrator's process was to review the

15  claims as submitted by the trustees, weigh the evidence,

16  occasionally poll third party sources for evidence and

17  provide that information back.  In this particular case I

18  don't necessarily know all of the additional things that

19  were done and provided back to the trustees.

20  Q   If the plan administrator, though, had evidence that

21  refuted the information that was set forth in the same year

22  tax returns that the trustees had provided, would the plan

23  administrator have provided that evidence or provided Bates

24  citations to that evidence?

25  A   So I think our formal response goes to our rational for

Page 159

1    rejecting this particular claim and sets forth the positions

2    of the plan administrator.

3    Q    Just -- just to be clear if you had other evidence

4    would you have provided it, other evidence would you have

5    provided it?

6    A    I know there are other instances in other loans where

7    we provided additional evidence.  I don't -- as I sit here

8    today I don't know what fully transpired on this loan in our

9    particular review.

10   Q    Thanks.  Hold on just a sec if you would.

11        (Pause)

12        MR. SHUSTER:  I think we're going to leave it at

13   that, Mr. Trumpp.  So subject to doing any recross tomorrow

14   --

15        THE COURT:  Okay.

16        MR. SHUSTER:  -- I'm going to stop there.  And

17   thanks very much.

18        THE COURT:  Okay.  All right.  Very good.

19        So, Ms. Brasswell, did you -- you wanted to start

20   redirect in the morning, yes?

21        MS. BRASSWELL:  I would like to do that.  Yes, Your

22   Honor.

23        THE COURT:  Okay.  All right.  So we'll just keep

24   all the binders, I guess.  Okay.  And no one is coming in

25   before you folks come back in the morning, so you can leave

Page 160

1    everything out and about.  10:00 start, and we'll have to

2    conclude tomorrow no later than five.  All right.

3              MR. SHUSTER:  Thank you, Your Honor.

4              MS. BRASSWELL:  Thank you, Your Honor.

5              THE COURT:  Very good.  Thank you.

6              MR. COSENZA:  All right.  Thank you, Your Honor.

7              THE COURT:  Have a pleasant evening --

8              MR. COSENZA:  Have a good evening.

9              THE COURT:  -- everyone.

10         (Whereupon, these proceedings concluded at 5:14 p.m.)

11                         * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2                       T E S T I M O N Y

3     DEBTOR'S

4     WITNESS                EXAM BY                    PAGE

5     ZACHARY TRUMPP         MR. SHUSTER                  5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 162

1                    C E R T I F I C A T I O N

2

3         We, Dawn South and Sherri L. Breach certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    Dawn South

7    _____

8    Dawn South

9    Certified Electronic Transcriber

10   Sherri L. Breach

11   _____

12   Sherri L. Breach

13   AAERT Certified Electronic Reporter & Transcriber CERT*D-397

14

15

16   Date:  November 29, 2017

17

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501