Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   LEHMAN BROTHERS HOLDINGS INC.,   Case No. 08-13555-scc

7            Debtor.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                     United States Bankruptcy Court

11                     One Bowling Green

12                     New York, New York 10004-1408

13

14                     December 4, 2017

15                     10:05 AM

16

17

18

19

20

21

22

23   B E F O R E:

24   HON. SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

Page 2

1    IN RE:   RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Dawn South and Sherri L. Breach

Page 3

```
 1   A P P E A R A N C E S :

 2   WILKIE FARR & GALLAGHER LLP

 3        Attorneys for the Plan Administrator

 4        787 Seventh Avenue

 5        New York, NY 10019-6099

 6

 7   BY:  TODD G. COSENZA, ESQ.

 8        BENJAMIN P. MCCALLEN, ESQ.

 9        JOSEPH G. DAVIS, ESQ.

10

11   HOLWELL SHUSTER & GOLDBERG LLP

12        Attorneys for the Trustees

13        750 Seventh Avenue, 26th Floor

14        New York, NY 10019

15

16   BY:  MICHAEL S. SHUSTER, ESQ.

17        DWIGHT A. HEALY, ESQ.

18        NEIL R. LIEBERMAN, ESQ.

19        DANIEL P. GOLDBERG, ESQ.

20

21

22

23

24

25
```

Page 4

1   ROLLIN BRASWELL FISHER LLC/PARTNER

2        8350 E. Crescent Parkway

3        Suite 100

4        Greenwood Village, CO 80111

5

6   BY:   MICHAEL ROLLIN, ESQ.

7        MARTIZA DOMINGUEZ BRASWELL, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Thank you.  Please have a seat.

 3            MR. COSENZA:  Good morning, Your Honor.

 4            THE COURT:  How's everyone?  Good weekend?  You're

 5    confusing me, Mr. Shuster, you're in the wrong spot, either

 6    that or there was a hair swap of some kind.

 7            All right.  I'm ready when you are.

 8            MR. COSENZA:  Your Honor, so we'll move forward

 9    and call Professor Daniel Fischel at this time.

10            THE COURT:  Very good.  Please come up, Professor.

11    If you would step up and raise your right hand, please.

12            PROFESSOR DANIEL R. FISCHEL, WITNESS, SWORN

13            THE COURT:  Very good.  Have a seat and make

14    yourself comfortable.  I see someone has given you some

15    water.

16            MR. COSENZA:  Your Honor, may we approach?

17            THE COURT:  Okay.

18            MR. COSENZA:  We've handed binders.  I'm going to

19    hand one to the witness.

20            THE COURT:  We'll take a break after about an hour

21    and a half or so, but if you'd like a break before then just

22    let us know.  All right?

23            THE WITNESS:  Thank you, Your Honor.  Appreciate

24    that.

25            THE COURT:  All right.  And it is a little warm in
```

Page 6

1    here, and you're welcome to take your jacket off if that

2    would make your more comfortable.

3              THE WITNESS:  Thank you, Your Honor.

4              THE COURT:  Okay, Mr. Cosenza.

5              MR. COSENZA:  Great.  Thank you, Your Honor.

6                         DIRECT EXAMINATION

7    BY MR. COSENZA:

8    Q    So, Professor Fischel, we handed you a binder, so

9    during the course of my examination I'll refer you to

10   certain tabs in your binder.  But for current purposes you

11   can, you know, leave it to the side unless you need to refer

12   to something.

13   A    Okay.

14   Q    So, Professor Fischel, where are you employed?

15   A    I'm employed at two places.  I'm employed at the

16   University of Chicago and also by an economic consulting

17   firm by the name of Compass Lexecon.

18   Q    Professor, what is Compass Lexecon?

19   A    Compass Lexecon is an economic consulting firm that

20   specializes in the application of economics to primarily

21   legal and regulatory disputes.

22   Q    Professor, can you give the Court a sense of Compass

23   Lexicon's personnel and its clients?

24   A    Yes.  We, somewhat to my surprise, we've grown into an

25   international business and we have personnel all over the

Page 7

1    world.  Mostly economists of various levels of degrees.  And

2    we also have various affiliations with various leading

3    academics in their fields ranging from a number of Nobel

4    prize winners on down.

5        And our clients really run the gamut from private

6    firms, state and governmental agencies, investors, really

7    any party that can be involved -- either is involved or

8    potentially involved in a legal or regulatory dispute would

9    be the type of client typically through their counsel that

10   would retain us.

11   Q    And how many employees do you have approximately at

12   Compass Lexecon?

13   A    I think in terms of professionals approximately 400.

14   Q    Okay.  And what is your role at Compass Lexecon?

15   A    I have two roles.  I'm the president of the firm, so in

16   that sense I have overall responsibility for the entire

17   firm.  And I also have an active consulting practice and a

18   role as an expert witness in areas related to my fields of

19   specialization, which generally involve valuation or

20   financial markets to one degree or another.

21   Q    Do have also any academic -- currently any academic

22   positions?

23   A    I do.  I'm currently --

24   Q    Can you describe for the Court what they are?

25   A    Yeah.  I'm currently the Lee & Brenna (ph) professor of

Page 8

1   law and business emeritus at the University of Chicago Law

2   School.

3   Q     Previous prior to that have you held any other academic

4   positions?

5   A     Yeah.  Well I held the same chair before I became

6   emeritus for many years.  I also had a joint appointment at

7   the University of Chicago Graduate School of Business for a

8   number of years.  I was dean of the University of Chicago

9   Law School for a number of years.  I was head of the

10  university-wide law and economics program at the University

11  of Chicago for many years.  And also for a period of years I

12  held a position at Northwestern Law School and also again

13  had a parallel courtesy appointment at the Northwestern

14  Graduate School of Business.

15  Q     Great.  So, Professor, could you describe your

16  educational background beginning from high school going

17  forward chronologically?

18  A     Well, I'm a proud graduate of Bronx High School of

19  Science.

20  Q     That we talked about earlier.

21  A     That's what we were just talking about.  And then I

22  went to Cornell University where I had a major in history

23  and a minor in economics.  Then I went to graduate school in

24  history for a short period.  And then I went to the

25  University of Chicago Law School where I studied law

Page 9

1    obviously, but also law and economics with members of the

2    University of Chicago faculty.

3    Q    And can you describe briefly what you did after your

4    graduated from law school?

5    A    Yes.  I clerked for two years.  First for the Honorable

6    Thomas Fairchild, who was then the chief judge of the

7    Seventh Circuit Court of Appeals in Chicago.  And then I had

8    the great honor of clerking for Justice Potter Stewart of

9    the United States Supreme Court.

10        Then I practiced law for a very short time, less than a

11   year, and then I began my academic career first at

12   Northwestern and then at the University of Chicago.

13   Q    You mentioned this briefly before, but maybe you can

14   just give us -- describe, you know, briefly the courses that

15   you've taught as a professor, both at Northwestern and at

16   the University of Chicago.

17   A    I've taught again law school and the business school

18   primarily courses in business organizations, financial

19   markets, and various advanced courses in those areas.

20   Q    Okay.  Have any of the courses that you've taught dealt

21   with any of the issues that arise in this estimation

22   proceeding?

23   A    Yes.

24   Q    What are they?

25   A    I taught, for example, the economics of voting and why

Page 10

1    when the interests of participants are aligned there is a

2    logic to basing voting rights on the economic stake of the

3    participants.  You know, for example, the one share, one

4    vote rule in business law or corporate law as opposed to the

5    one citizen, one vote rule in the political arena.

6         I've also taught the economics of principal agent

7    relationships and fiduciary responsibilities in an economic

8    context.  That's been a theme through many of my courses.

9    Q    And you've also taught that in a context of trust

10   agreements as well?

11   A    Yes.

12   Q    Are you a member of any professional organizations?

13   A    Yes.  I'm a member of the American Economic Association

14   and the American Finance Association.

15   Q    Do you have any other professional affiliations?

16   A    Yes.  I'm a member of the Board of Overseers of the

17   Becker Friedman Institute at the University of Chicago.  I'm

18   a former chairman of the American Association of Law

19   School's section on law and economics.  I've been an advisor

20   to the Harvard program on corporate governance.  A former

21   member of the Center for the Economy and Estate at the

22   University of Chicago.  And I've also been a referee for a

23   number of professional and economics journals.

24   Q    Okay.  And have you authored any publications,

25   Professor Fischel?

1    A    I have.  I've written two books, one, a book entitled

2    The Economic Structure of Corporate Law, coauthored with now

3    Judge Frank Easterbrook, who's a frequent coauthor of mine.

4    And I published approximately I think about 50 articles in

5    law and economics journals.

6    Q    Okay.  And have any of your books or articles ever been

7    cited by courts?

8    A    Yes, hundreds of times.  Numerous times by the United

9    States Supreme Court and courts of all levels below the

10   Supreme Court.

11   Q    Have you been invited to lecture to various audiences?

12   A    Yes, I've lectured widely to various different types of

13   audiences ranging from conferences of federal and state

14   judges, various business groups, legal groups, the Bar

15   Association of the City of New York.

16        I've also been an invited speaker to federal regulatory

17   agencies, the Securities and Exchange Commission in

18   particular.

19        And I've also spoken at most of the major universities

20   in the country.

21   Q    And what are some of the topics that you've lectured

22   on, Professor?

23   A    Well again areas relating to my areas of

24   specialization.  So, you know, it could be anything from how

25   to calculate damages in business cases or fraud cases.  How

Page 12

1   to draw the line between public information and inside

2   information and insider trading cases.  What is a reasonable

3   takeover policy for the New York Stock Exchange.  I actually

4   left them off in my list of entities that I've spoken to.

5   So, you know, I would say subjects such as those.

6   Q    Now, have you ever served as a consultant on economic

7   issues for a government agency or a regulatory body?

8   A    Yes.

9   Q    Describe those briefly for the Court.

10   A    I've been a very frequent expert witness for the United

11   States Department of Justice in a variety of different types

12   of matters.  And I've also been a consultant advisor to many

13   of the federal regulatory agencies, the federal banking

14   agencies, the Securities and Exchange Commission, the

15   Federal Trade Commission, and also many of the self-

16   regulatory bodies.  The New York Stock Exchange, the

17   National Association of Securities Dealers, the Options and

18   Futures Exchanges, some of the regulatory exchanges in other

19   countries.  So I've done that throughout my career.

20   Q    Professor Fischel, have you previously testified as an

21   expert witness?

22   A    Many times.

23   Q    Okay.  Have you ever testified as an expert in a

24   bankruptcy court proceeding?

25   A    Yes, many times.

1   Q    Okay.  Have you done any work relating to mortgage-back

2   securities and residential mortgage loans and other

3   settlements?

4   A    Yes, extensive.

5   Q    Do you just want to describe briefly for the Court your

6   role in those settlements?  And we can go through them in

7   more detail.

8   A    Well a number of years ago there was an $8.5 billion

9   settlement that Bank of America entered into for its alleged

10  liabilities for its sale of mortgage-back securities, and as

11  a result of that settlement there was I guess known as an

12  Article 77 proceeding where the court had to approve that

13  settlement.  It was a lengthy trial that was held where I

14  was an expert witness supporting the settlement over the

15  objections of some of the claimants, and that settlement was

16  ultimately approved.

17      Then after that there was a J.P. Morgan settlement for

18  $4.5 billion, again, similar to the earlier Bank of America

19  settlement.  Similar Article 77 proceeding.  Again, a

20  hearing or trial was held over a period of time, and again,

21  I was a witness that was called to testify in support of the

22  settlement over the objections of some of the claimants.

23  Again, that settlement was ultimately approved by the court.

24      I've also submitted a lengthy report involving

25  mortgage-back securities obligations of Washington Mutual,

1   WAMU, where that settlement was approved without testimony.

2        I've also had I would say a continual course of dealing

3   with different trustees about advice about settlements,

4   whether to approve particular settlements, valuing -- or

5   what cases should be settled at.

6        So I would say I've done a lot of work in that area.

7   Q    You mentioned the Bank of America.  Is that case

8   referred to in your expert report in this matter?

9   A    Yes.

10  Q    Which matter was that for Bank of America?

11  A    Well let me see exactly how it's referred to.  It's the

12  $8.5 billion settlement.  Excuse me for one second, let me

13  just find it.  But it's -- can I refer to my expert report?

14  It's described in paragraph 5 of my expert report.

15  Q    Okay.  And who were you -- who selected you to serve as

16  an expert in that matter?

17  A    Various trustees that were primarily represented by the

18  firm of Mayer Brown.

19  Q    Okay.  And then you mentioned the subsequent settlement

20  for -- earlier I believe for J.P. Morgan.

21  A    Right.

22  Q    And who were you -- who selected you to serve as an

23  expert in that matter?

24  A    Again, various trustees in that case as well.

25  Q    And similarly I think you mentioned a J.P. Morgan and

1  Washington Mutual matter, who selected for you to serve as

2  an expert in that matter?

3  A    It's the same thing, various trustees.

4  Q    Have you done any other work relating to mortgage-back

5  securities and residential mortgage loans?

6  A    Yes.  First of all --

7  Q    Can you describe that for the Court, please.

8  A    I'm sorry, I've been involved in a number of big

9  securities fraud cases where particularly financial

10  institutions were alleged to have misled investors by not

11  accurately reporting their liabilities and potential

12  liabilities for their mortgage-back securities activities.

13      So many of the cases that I testified in as an expert

14  for the United States Department of Justice following the

15  Supreme Court's decision in United States versus Winstar

16  after the passage of FIRREA involved damage claims by

17  financial institutions that were based on their what I guess

18  I would call their but for world of what would have happened

19  if they had been allowed to invest more money in mortgage-

20  back securities.

21      So much of my testimony in those cases on behalf of the

22  Department of Justice dealt with the economics of mortgage-

23  back securities, the preference of mortgage-back securities,

24  the riskiness of mortgage-back securities.  So I would

25  include that as well.

Page 16

1    Q    Okay.  Professor Fischel, moving on from residential

2    mortgage-back securities, do you have any other experience

3    regarding settlements outside of that context?

4    A    Yes.  A number of years ago there was a settlement in a

5    securities fraud case involving AIG, and subsequent to the

6    settlement there was an objection by the New York State

7    Attorney General on the ground that one of the experts

8    involved in the litigation, whose analysis was the basis of

9    the settlement, was alleged to have committed a serious

10   error, and a claim was made for that reason the settlement

11   should be reopened.  And I was then retained by the parties

12   to do an independent analysis of what the error was, how

13   serious it was, and to what extent it likely influenced the

14   terms of the settlement.  And I performed an analysis,

15   submitted a report to the court, and again, the court

16   ultimately upheld the settlement.

17   Q    It was based on your analysis?

18   A    In part.  I mean --

19   Q    Yes.

20   A    -- there was a lot of work done, but the court cited my

21   analysis favorably in her decision to approve the

22   settlement.

23          MR. COSENZA:  So, Your Honor, pursuant to federal

24   Rules of Evidence 702 I'm going to tender Professor Fischel

25   as an expert on the economic evidence related to the

```
1    estimation of the RMBS claims at issue here.

2              THE COURT:  Mr. Goldberg?

3              MR. GOLDBERG:  No objection, Your Honor.

4              THE COURT:  Very good.

5    BY MR. COSENZA:

6    Q    So, Professor Fischel, what was your assignment -- just

7    getting on -- moving on to this matter.  What was your

8    assignment in this case?

9    A    It was primarily to analyze the competing claims

10   between Lehman and the trustees in terms of their proposed

11   allowed claims in this estimation proceeding.

12   Q    And did you summarize your analysis in a report that

13   was submitted in this matter?

14   A    I did.

15   Q    Okay.  Would it be helpful to have a copy of that

16   report with you as you testify today?

17   A    Yes, it would.

18   Q    Okay.  So I'm going to refer you to tab 1 in the binder

19   I gave you and to the Court and the trustees' counsel

20   earlier.  Tab 1 of that binder is your report.  Can you just

21   confirm that that is your report?

22   A    It is.

23   Q    Okay.  And based on your analysis and what's contained

24   in your report did you form any opinions?

25   A    I did.
```

Page 18

1    Q    Okay.  And have you prepared a demonstrative that

2    summarizes your opinions?

3    A    Yes, I have.

4         MR. COSENZA:  Can we please pull up Plan

5    Administrator Exhibit 774.

6    BY MR. COSENZA:

7    Q    Professor Fischel, is this the demonstrative that you

8    prepared that summarizes your opinion?

9    A    Yes.

10   Q    Could you walk the Court through the summary of your

11   opinions?

12   A    Yeah.  Well hopefully they're fairly self-explanatory.

13   But I have two opinions.

14        And my first opinion is that the behavior of the

15   institutional investors, particularly in connection with the

16   2015 settlement, supports the covered loan claims that

17   Lehman has advanced, and is inconsistent with the proposed

18   allowed claim of the trustees in this matter.

19        And my second opinion is that Lehman's proposed allowed

20   claim is at the higher end of the range of settlement values

21   that I've reviewed.  And again, the trustees proposed

22   allowed claim is far outside the range of comparable

23   settlements that -- the results of comparable settlements

24   that I've reviewed.

25   Q    Thank you.  For current purposes let's focus on your

Page 19

1    first opinion, and your first opinion is that the behavior

2    of institutional investors supports estimating the covered

3    loan claims at Lehman's proposed allowed claim.  Can you

4    detail that opinion for the Court and the basis for your

5    opinion?

6    A    Yeah.  Well I mean first of all when you're dealing

7    with the economics of the settlement you have to think about

8    who the parties are in terms of who's going to gain and

9    who's going to lose as a result of making either a good

10   decision or a bad decision.

11        And in this particular case, as I think I'll have a

12   chance to explain in the next few minutes, the institutional

13   investors had the largest economic stake in the proposed

14   claim.  They were the most sophisticated, the most

15   experienced, virtually all of them had been involved in

16   every prior comparable settlement negotiating an outcome,

17   and most importantly they don't have any incentive to make

18   the wrong decision because they're going to be -- they and

19   their clients are going to be poorer as a result, they're

20   going to leave money on the table if they settle at -- or if

21   they agree to settle at too low of a value.

22        And so because they are the interested party on one end

23   of the transaction, they're the ones that are going to be

24   receiving the money, they're judgment, particularly given

25   their economic stake, their sophistication, and their

Page 20

1   experience, in my opinion is entitled to significant

2   deference.

3        And under the circumstances of this case, particularly

4   in connection with the 2015 settlement and the judgment that

5   they reached in connection with the 2015 settlement, I do

6   feel that their willingness there to settle their claim for

7   approximately I think it was $2.4 billion at the time before

8   some of the trusts dropped out, as I said, I think it's

9   entitled to significant deference, which is why it's my

10   first opinion.

11   Q    Do you know why the trustees did not accept the October

12   2015 settlement that was entered between Lehman or the plan

13   administrator and the institutional investors?

14   A    I've asked that question many times based on my

15   conclusion that it should have been accepted.  I was told

16   that it wasn't accepted because of an expert report that was

17   submitted to the trustees.  I've repeatedly requested the

18   ability to get access to that expert report just to try and

19   understand the basis for why I thought a very sensible

20   outcome that was reached in 2015 wasn't pursued, and I was

21   told that that expert report was not available so I couldn't

22   get access to it.  But that's my understanding.

23   Q    Professor Fischel, moving you to -- actually moving you

24   to PA Exhibit 775, which I believe is tab 3 in your binder.

25   Did you prepare a demonstrative that shows each

Page 21

1    institutional investors stake in this case?

2    A    Yes.

3    Q    Is PA Exhibit 775, which is tab 3 in your binder, is

4    that the demonstrative that you prepared?

5    A    Yes.

6    Q    What is the source of the information in this document?

7    A    The source of the information as reflected on the -- at

8    the bottom of the exhibit is information that was submitted

9    in connection with this proceeding.

10   Q    Okay.  And can you walk us through this demonstrative?

11   A    Yes.  What this demonstrative shows is the identity of

12   the difference institutional investors and the face value of

13   their -- the amount of their investment in terms of the

14   total face value, and most importantly, the unpaid principal

15   balance of the outstanding unpaid principal balance.

16           And I think the various entries again hopefully

17   are self-explanatory, but what I think is particularly

18   significant is the last three lines going across at the

19   bottom of the exhibit where you can see that the total

20   unpaid principal balance of the institutional investors is

21   approximately $6 billion of the total unpaid principal

22   balance for all trusts of a little over $25 billon, so that

23   the percent ownership held by the institutional investors is

24   approximately 24 percent of the total, and there is no other

25   entity or collection of entities acting together that have

Page 22

1    anywhere near as large a stake as the institutional

2    investors.  And for that reason, because they have the most

3    to gain by making a good decision and the most to lose by

4    making a bad decision, they have the best incentives in some

5    sense to value the claims at the right amount to reach an

6    appropriate settlement not just on their behalf but on

7    behalf of all of the certificate holders.

8    Q    So, Professor, looking at the names of the

9    institutional investors here, and we can get to them in more

10   detail in a minute, but these are some of the more

11   sophisticated -- or most sophisticated financial players,

12   you know, frankly in the world.

13   A    Right.  And I --

14   Q    Goldman Sachs.

15   A    -- was going to mention that in connection with another

16   exhibit --

17   Q    Yes.

18   A    -- but it's Black Dot, Goldman Sachs, MetLife, PIMCO,

19   many others.  You can see PIMCO by itself has over a

20   $3 billion stake in terms of the unpaid principal balance.

21   And again, these entities have not just large stakes, but as

22   I think will be -- as clear from their names and also from

23   other exhibits, they're the shrewdest, most experienced

24   financial investors in the world, and they have no incentive

25   to reach the wrong decision about what the claims should be

Page 23

1   settled for, which is why I think -- certainly one of the

2   reasons why I think their decision to resolve the dispute in

3   2015 for approximately $2.4 billion was entitled to

4   substantial deference, and because that number, particularly

5   as adjusted as a result of the trusts -- the few trusts that

6   have dropped out, is basically the Lehman's proposed allowed

7   claim in this proceeding.

8        That's again basically my first opinion why I think the

9   institutional investors' judgment should be entitled to

10  substantial deference and why Lehman's proposed allowed

11  claim in this proceeding is far more credible than the

12  trustees', which is, you know, approximately $9 billion

13  higher than what the institutional investors were willing to

14  revolve their claim for in 2015.

15  Q    So following on from that testimony, Professor, did you

16  -- I refer you to tab 4 of your binder, it's PA Exhibit 776.

17  Is this another demonstrative that you compiled?

18  A    Yes.

19  Q    And is this demonstrative again supposed to illustrate

20  the sophistication of the institutional investors?

21  A    Yes.  And again, I think this is again somewhat obvious

22  just because of the names of the institutional investors,

23  but what this exhibit shows is that the institutional

24  investors have assets either owned or managed by them in

25  excess of $5 trillion.  And again, just showing not only

Page 24

```
 1    that they are important and sophisticated, but a lot of

 2    countless numbers of other sophisticated investors, and even

 3    unsophisticated investors, have been willing to trust their

 4    judgment by allowing these institutional investors to manage

 5    their funds in addition to the funds that the institutional

 6    investors own themselves.

 7    Q    Now, Professor, if you walk through this list of people

 8    -- entities listed on I guess the second column, the

 9    institutional investor group, this is a diverse group of

10    financial institutions.  Just want to describe briefly the

11    different categories where they fall in terms of their

12    participation in the market?

13    A    Yes.  These are a combination of insurance companies

14    and investors, financial institution investors, and just

15    investment advisors.  Just different categories of very

16    sophisticated institutional investors.

17    Q    Why is there the fact that they have these significant

18    amount of assets under management?  Why again, why is that

19    relevant for you in your analysis?

20    A    Well first of all it's a proxy for sophistication and

21    success in the marketplace that their judgment has stood the

22    test of time in terms of being validated in the marketplace.

23    But again, an implication of that is that these are assets

24    both owned and managed.  Meaning that countless other

25    entities have trusted the judgment of these institutional
```

1    investors to make prudent judgments on their behalf.  And

2    again, in the context of this case, one of the prudent

3    judgments is what to settle the claims for.  And again,

4    because of the enormous disparity between the Lehman

5    proposed allowed claim, which is basically identical to what

6    the institutional investors decided, and the trustees'

7    proposed allowed claim, which again is -- bears no

8    relationship to the judgment that the institutional

9    investors made, when their own money was at stake, their own

10   money that they owned as well as the money that they managed

11   for others, you know, that to me was highly significant.

12   Q    Changing topics slightly.  Did you put together a

13   demonstrative as part of your work here showing the

14   involvement of the institutional investors in negotiating

15   other large RMBS settlements?

16   A    Yes, I did.

17   Q    I think you testified about that earlier that these

18   institutional investors had been involved in those prior

19   settlements.  If I could just refer you to tab 5, it's Plan

20   Administrator Exhibit 777.  Is that the demonstrative that

21   you put together?

22   A    Yes.  What this shows is the involvement of the

23   institutional investors in this proceeding, but also in the

24   proceedings that -- of the settlements that I consider to be

25   the most comparable to this proceeding.  And you can see

Page 26

1    from the X's that there's substantial overlap.

2         And if you look I guess at the second to last line on

3    the bottom going across you see that there are 14 investors

4    -- 14 institutional investors involved in the institutional

5    investor group in this proceeding, and of those 14, 12 were

6    involved in the Citigroup settlement, 12 were involved in

7    the Countrywide settlement, 13 were involved in the JPM

8    settlement, and 12 were involved in the Rescap settlement.

9         So in addition to the overall sophistication and large

10   economic stake that these institutional investors held,

11   they're very experienced in negotiating settlements.

12   They've been involved in negotiating every single large RMBS

13   put-back settlement.

14        And again, to me that just makes their judgment all

15   that much more credible and the trustees' proposed allowed

16   claim that much less credible because it bears no

17   relationship to what sophisticated, experienced market

18   participants with their own money at stake and their own

19   client's money at stake made a decision in 2015 as to what

20   value their claim should be resolved at.

21   Q    Before we move on to your second opinion just to

22   summarize.  You know, I think you said this before, but why

23   was the support of the institutional investors important to

24   you in distinguishing between Lehman and the trustees'

25   proposed allowed claims?

Page 27

1    A    You know, again, I think I've tried to make this clear,

2    so I don't want to be too repetitive.  But basically it's

3    because the Lehman's proposed allowed claim completely

4    matches the judgment of the most sophisticated, experienced

5    institutional investors who have the largest economic stake,

6    the most to gain and the most to lose by making either the

7    right decision or the wrong decision, and the trustees'

8    proposed claim bears absolutely no relationship to what

9    people in the marketplace with their own wealth at stake and

10   their own client's wealth at stake decided the claim should

11   be resolved for.

12   Q    Okay.

13             MR. COSENZA:  Can we please pull back up Plan

14   Administrator Exhibit 774.

15   BY MR. COSENZA:

16   Q    This is the summary of your opinions.  We're now going

17   to move on, Professor Fischel, to your second opinion.  And

18   your second opinion is that Lehman's proposed allowed claim

19   is at the higher end of the range of recent settlements of

20   comparable claims, while the trustees' proposed allowed

21   claim is far above this range.

22        Have you analyzed settlements in prior engagements?  I

23   think you testified to this earlier.

24   A    Yeah.  I think it's routine in disputes analyzing the

25   value of settlements and even prior to disputes just to

1    reach informed judgments.

2    Q    And why is that important, Professor Fischel?

3    A    Because cases -- other cases that result in

4    settlements, particularly if they involve similar types of

5    claims, in this case put-back claims over a comparable time

6    period, in this case primarily resulting in following the

7    housing crisis, involving similar legal theories, the

8    judgment that informed parties reached in similar, even

9    though not identical matters, is typically considered and

10   considered by me to be relevant in analyzing the

11   reasonableness of any particular settlement.

12   Q    Are there any limitations to the relevance of

13   settlements of comparable claims?

14   A    Yeah, and the limitation is what I said, the comparable

15   does not mean identical.

16        So frequently I think appropriate to look to see

17   whether a particular settlement is within the range of

18   comparable settlements because it's impossible to exactly

19   quantify how one settlement should relate to another

20   settlement, because you can't quantify all the different

21   factors that distinguish one case from other cases, but what

22   you can do is identity factors which are similar or

23   comparable, and then again, analyze whether a particular

24   settlement falls within the range of previous settlements

25   that involve similar type claims over similar time periods.

1   Q    Okay.  And how did you identify in your expert report

2   here the settlements of comparable claims that you evaluated

3   in this matter?

4   A    Basically from what I just said, that I looked for,

5   based on my own experience, review of analyst reports and

6   other secondary material, I looked for other cases, again,

7   primarily involving put-back claims, involving -- claims

8   involving alleged breaches of representations and warranties

9   in the time period including and following the housing

10  crisis, and I also focused on cases involving large numbers

11  of trusts, because in any case involving a single trust or a

12  single loan group there can be idiosyncratic factors that

13  are hard to account for.  So that's why I looked at

14  settlements involving large numbers of trusts that fit the

15  other criteria that I mentioned.

16  Q    And you selected a group of prior matters that you

17  thought were comparable to the scale of the claims that are

18  at issue here?

19  A    I did.  And not just that I consider it to be

20  comparable, but others consider it to be comparable also,

21  including investment analysts and others who are involved in

22  these types of disputes.

23  Q    Okay.  Professor Fischel, have you prepared a

24  demonstrative that shows the settlements that you evaluated

25  in connection with this engagement?

Page 30

1   A     I have.

2              MR. COSENZA:  Can we please pull up Plan

3   Administrator Exhibit 778.

4   BY MR. COSENZA:

5   Q     And this is similar to what's in table 1 of your expert

6   report.  So it's at tab 6 in the binder.  Is this the

7   demonstrative that you prepared here?

8   A     Yes.

9   Q     Can you walk the Court through the different columns

10  here and the different cases that you selected?

11  A     Yeah.  I mean there's a lot of information on this

12  particular exhibit, and so --

13  Q     Maybe we can start with what's in the cash

14  consideration or allowed claim and go from there, and go

15  across.

16  A     Okay.  Actually I just want to make clear the column

17  before that, the A column --

18  Q     Uh-huh.

19  A     -- has the Lehman's proposed allowed claim, the

20  trustees' proposed allowed claim, and then the series of

21  settlements that I consider to be the most comparable.

22  Countrywide, JPM, Citigroup, Rescap, and WAMU.

23  Q     And again, why did you -- not to interrupt -- but why

24  -- these are obviously settlements you referenced earlier,

25  you served as an expert in some of those -- why did you

1    select those cases as the comparable settlements?

2    A    Because they fit the criteria that I mentioned, they're

3    cases involving large trusts where the focus was on put-back

4    claims for alleged breaches of representations and

5    warranties in a time period, including and following the

6    housing crisis.

7    Q    Okay.  So moving on here.

8    A    Yeah.  So column B is the cash consideration paid in

9    the settlements or the proposed allowed claim.  And again,

10   going down column B I think the numbers are fairly self-

11   explanatory.

12       But the first thing you see is the radical difference

13   between the Lehman's proposed allowed claim of $2.38

14   billion, which again as I've said, matches the judgment of

15   the institutional investors with their own money at stake

16   and their own client's money at stake.

17       The next line is the trustees' proposed allowed claim

18   of $11.65 billion.

19       Then comes the cash paid in the comparable settlements

20   that I've looked at, $8.5 billion in Countrywide.  Again,

21   testified in that settlement proceeding.  $4.5 billion in

22   JPM settlement.  Again, I testified in that.  And then

23   Citigroup, 1.125 billion.  Rescap, 7.3 billion allowed

24   claim, because that was a bankruptcy proceeding.  And WAMU

25   of three billion, which is a hybrid of a bankruptcy

Page 32

1    proceeding in a non-bankruptcy proceeding.

2        Then the next column is the value of the non-cash

3    consideration, to the extent that there was non-cash

4    consideration, and you can see that there's only two

5    settlements where there was non-cash consideration, and only

6    one where the non-cash consideration was material.  The

7    Countrywide settlement where the non-cash consideration was

8    valued at 2.5 billion to 3.1 billion  in addition to the

9    8.5 billion cash payment, and that was for the value of

10   primarily servicing improvements and also some document

11   improvements.

12       The next column is the expected lifetime losses.  And

13   you know, maybe I'm going to just stop reading all the

14   numbers into the record, because I think they're obvious.  I

15   will say in Countrywide there was a big disparity because

16   there were different estimates of what the expected lifetime

17   losses were, which is why the range is reported there

18   between 67.75 billion and 107.8 billion, and that dispute

19   was not resolved so the range is reported there.

20       For all the others the expected lifetime losses were

21   not in dispute -- or are not in dispute, so the number is

22   reflected there.

23       And then the next two columns are really the most

24   important ones, which is the two recovery ratios.

25       First just focusing on the recovery ratio just based on

Page 33

1    the cash that was paid or in the case of bankruptcy

2    proceeding the proposed claim.  And what you can see is that

3    Lehman is at 11.2 percent, which is column B, the cash

4    consideration divided by the expected lifetime losses.  And

5    again, you can see the radical difference between the

6    trustees' number of 55 percent and Lehman's proposed allowed

7    claim of 11.2 percent.  But then significantly if you look

8    at the other comparable settlements, JPM 7 percent,

9    Citigroup 8.3 percent, Rescap 6.9 percent, WAMU 13.2

10   percent, Lehman's proposed allowed claim of 11.2 percent --

11   I should have mentioned Countrywide 7.9 percent to 12.5

12   percent -- Lehman's proposed allowed claim is well within

13   the range of all the other comparable settlements, if

14   anything toward the high end, and the trustees' proposed

15   allowed claim is many multiples greater than any of the

16   other comparable settlements.  It's a complete outlier, it

17   cannot be justified as within the range of comparable

18   settlements.

19        And then the last column is basically the same idea but

20   now including non-cash consideration as part of the recovery

21   ratio.  And the conclusion is basically identical because

22   there isn't that much non-cash consideration except in the

23   Countrywide settlement.

24        So Lehman's proposed allowed claim of 11.2 percent is

25   again, if you just go down the last column, well within the

Page 34

1   range, toward the high end of the range of comparable

2   settlements, whereas there's no relationship whatsoever

3   between the trustees' proposed allowed claim and every case

4   that's been resolved that I consider to be comparable prior

5   to this case.

6   Q    So, Professor Fischel, I'm just going to ask you a

7   couple of questions about your approach here.  One question

8   is if you look at column D, expected lifetime losses.  Why

9   didn't you use claim damages instead of expected lifetime

10  losses as the common denominator for all of your comparable

11  settlements?

12  A    Well first of all in some of the cases there are no

13  claim damages because the settlements occur prior to the

14  time that damages are claimed or asserted.

15       But even for ongoing cases, because you don't have --

16  by definition the cases aren't resolved, so you don't know

17  what the ultimate damages are going to be so you can't

18  really use damages as a denominator because you just don't

19  have the information to do it, but lifetime losses you do

20  have the information to do it, and that's why lifetime

21  losses is typically used as a denominator for analyzing, you

22  know, comparable settlements.

23  Q    Professor, so you focused on what's in columns E and F,

24  the recovery ratios.  Has this approach been used by

25  analysts to analyze settlements?

1    A    Yes.  Because if you want to analyze a settlement, as I

2    said, it is customary and logical to analyze how a

3    settlement or proposed settlement compares with comparable

4    settlements.  And the way that's typically done is by

5    analyzing the recovery ratio of what the amount that's

6    recovered in the settlement is in comparison with some

7    denominator.  And as I said, since you can't really use

8    damages of frequently used denominator as lifetime losses.

9    Q    Have you prepared a demonstrative that shows how

10   analysts have used the same method that you do to analyze

11   settlements?

12   A    Yes.

13   Q    I just want to refer, Professor Fischel and the Court,

14   to plan Administrator Exhibit 779.  This is also tab 7 in

15   your binder, Professor Fischel.  Is this the demonstrative

16   that you compiled?

17   A    Yes.  This is just excerpts from a number of different

18   analyst reports basically analyzing settlements relative to

19   comparable settlements in exactly the way that I did, and a

20   number of them again talk about what the consideration

21   received is relative to expected lifetime losses.

22        The most detailed one is the Morgan Stanley one in the

23   bottom of the exhibit, and again, you see Citi, J.P. Morgan,

24   and Bank of America compared against each other, because

25   again, as I concluded those are comparable.  And then you

Page 36

1   see what -- a series of entries for the announcement date,

2   the number of trusts, the original collateral balance, the

3   settlement amount, the settlement amount as a percentage of

4   the original balance, and then the settlement amount as a

5   percentage of the realized and future estimated losses, and

6   a final column realized and future losses as a percentage of

7   original collateral balance.

8        So again, the methodology that I used is, you know, I

9   would say standard, widely accepted, and routinely commented

10  upon and analyzed in a similar way to the way that I do by

11  sophisticated market participants, investment analysts, et

12  cetera.

13  Q    And for the record this is -- what's reflected in this

14  demonstrative Plan Administrator Exhibit 779 are Plan

15  Administrator Exhibits 432, 433, and 444.  And again, as you

16  testified that's Credit Suisse, Deutsche Bank, and Morgan

17  Stanley using the similar approach on recovery ratios.

18  A    Correct.

19  Q    Okay.  Professor Fischel, is there a difference between

20  bankruptcy and non-bankruptcy cases in how you measure the

21  consideration received?

22  A    Yes, some difference.  Again, I eluded to it before,

23  because in bankruptcy cases what's --

24            MR. COSENZA:  You want to put up Plan

25  Administrator 778?

1              THE WITNESS:  Yeah.  In bankruptcy cases you don't

2    have a determination of the ultimate consideration, you have

3    a determination of the allowed claim, and so that

4    substitutes for the consideration received when you're

5    dealing with bankruptcy cases.

6    BY MR. COSENZA:

7    Q    Professor Fischel --

8              THE COURT:  Can I ask a clarifying question?

9              THE WITNESS:  Sure.

10             THE COURT:  Do you mean that you treat the cash

11   consideration as if it were 100 percent actual dollar money?

12   So in Rescap, for example, where you have a $7.3 million of

13   cash consideration, does that represent the actual

14   distribution or the allowed amount, the notional amount --

15   allowed amount of the claim?

16             THE WITNESS:  The latter, Your Honor, not the

17   ultimate cash received.

18             THE COURT:  The allowed amount of the claim.

19             THE WITNESS:  Correct.

20             THE COURT:  So as if it were not in bankruptcy and

21   you were getting paid in real cash dollars.

22             THE WITNESS:  Correct, but recognizing that --

23   just as in this case that that's not the case, that both the

24   allowed claim of Lehman and the trustees are disputed

25   allowed claim for Your Honor to resolve, but the amount of

1   cash will be determined at some later point in time.

2           THE COURT:  Thank you.

3   BY MR. COSENZA:

4   Q    So, Professor Fischel, moving back to column D here,

5   you talked about expected lifetime losses.  Just going

6   through how you actually calculated that.  How'd you

7   estimate lifetime losses for settlements of comparable

8   claims?

9   A    Well in the previous cases there was already a

10  determination or a calculation so we just used that.

11          You know, for this case --

12  Q    Yes, how'd you do it for this case?

13  A    Lifetime losses consist of realized losses that have

14  occurred to date as well as expected future losses, and the

15  sum of the two is -- results in expected lifetime losses,

16  and we had separate calculations for both the realized

17  losses to date and expected future losses.

18  Q    The sort of realized loss that you used, how'd you get

19  to that number for the losses in this case?

20  A    Well in this case there were detailed calculations of

21  realized losses by one of the trustees' experts, a Dr. Snow,

22  so we just used that number.  We did some checking and we

23  had no disagreement with the calculations of Dr. Snow, so we

24  just used that number.  Some minor instances where we needed

25  some additional data so we used data from a data vendor or

Page 39

1    the servicer, but primarily we used data from Dr. Snow.  And

2    for future losses we used data that we got from a data

3    vendor by the name of Andrew Davidson.

4    Q    Are you aware if there's a dispute in this estimation

5    proceeding about the reliability of Andrew Davidson?

6    A    I am.

7    Q    Okay.  Given that why did you use the Andrew Davidson's

8    software for -- to calculate future losses -- or estimate

9    future losses?

10   A    Well we have used Andrew Davidson some times in the

11   past, particularly for relatively minor disputes because

12   it's quite inexpensive as compared with the others, but

13   given the dispute we tried to avoid it in this case and we

14   contacted another data vendor that we've done a lot of

15   business with, CoreLogic, but they would not give us a

16   license.  So we wanted to avoid the dispute and use a

17   different data vendor, but we weren't able to do so.

18   Q    Why were you not able to use CoreLogic or get a license

19   from CoreLogic to use that model or their software for this

20   proceeding?

21   A    We were told they did not want to license their data in

22   a proceeding where the position that Lehman was advancing

23   was adverse to some of their major bank clients.

24   Q    In your opinion does your use of Andrew Davidson's

25   software for the purpose you used it here undermine the

Page 40

1   reliability of your results?

2   A    No.

3   Q    Why not?

4   A    Because we weren't using Andrew Davidson's software to

5   value loans, we were using it to estimate future losses in a

6   situation where the vast majority of the losses have already

7   been realized, and as I said, there was no dispute about the

8   amount of the realized losses, I think approximately 85

9   percent of the expected lifetime losses have already been

10  realized, only about 15 percent are -- consist of expected

11  future losses, and again, we're dealing with ranges of

12  settlement values.

13       So even if CoreLogic or another data vendor were more

14  precise than Andrew Davidson in one direction or another it

15  wouldn't change the qualitative nature of our results, even

16  though as I said, we would have preferred to use, given the

17  dispute, preferred to use a different data vendor if we

18  could.

19  Q    Professor Fischel, on to -- looking at the settlements

20  themselves that are referenced in Plan Administrator Exhibit

21  778, did you consider differences between the factors

22  present in this case and these other settlements that you

23  analyzed?

24  A    Yes.  As I've said, no cases are identical, and

25  therefore it was important to identify a series of factors

Page 41

1    which we tried to do that would, you know, basically cut in

2    one direction or another, that would tend to make resolution

3    in this case higher than the comparable settlements of lower

4    than the comparable settlements, depending on what the

5    factor was.

6    Q    Proffer Fischel, I'm going to direct you to tab 8 in

7    your binder, it's Plan Administrator Exhibit 788.  Is this a

8    demonstrative that you prepared?

9    A    Yes.

10   Q    Could you walk the Court through it as to the

11   illustrative factors relevant to different settlements and

12   the size of settlement payments?

13   A    Yes.  So there's three categories of factors here.

14        The first being factors likely to increase the size of

15   the settlement payment.  Meaning when those factors are

16   present all else equal the settlement payment should be

17   higher.

18        And then the second category is the reverse.  When

19   those factors are present the settlement payment should be

20   lower.

21        And the third category is factors which you can't tell

22   on their face whether they cut in one direction or another,

23   you have to analyze them.

24        And so I can walk through --

25   Q    Yeah, why don't you walk through each factor,

Page 42

1   Professor, starting with the factors that you thought were

2   likely to increase the size of the settlement payment.

3   A     Okay.  So the first is whether additional claims such

4   as servicing claims are being released.  And again, the more

5   claims that are being released typically you have to pay for

6   that because you relinquish the ability to bring an

7   additional proceeding to seek additional recovery.  So in

8   most of the comparable settlements servicing claims were

9   released.  My understanding is in the context of this

10  proceeding servicing claims have not been released.

11       Second, availability of prejudgment interest.  Again,

12  when prejudgment interest is available it increases the size

13  of any potential recovery, so therefore when it's available

14  you expect settlements to be higher as a result.

15  Q     Uh-huh.

16  A     Again, my understanding is that prejudgment interest

17  was available at least in the non-bankruptcy comparable

18  settlements, not available, at least my understanding, under

19  the relevant bankruptcy laws as would be applied in this

20  proceeding.

21       Third factor, which is quite important, the incentives

22  of the defendant to settle that go beyond avoiding the costs

23  of litigation such as avoiding adverse publicity.

24       For ongoing businesses there's frequently a concern

25  about adverse publicity, distraction of time and effort of

Page 43

1    key employees, just a general desire not to be -- not to

2    have the ongoing business compromised in any way by a major

3    collateral proceeding and therefore a desire to end it.  And

4    when there is that desire for an ongoing business with an

5    ongoing business to avoid the collateral affects of ongoing

6    litigation, again, you have to pay for that, so when that

7    factor is present you would expect settlements to be higher.

8         For a situation like Lehman, which is no longer an

9    ongoing business, that factor is less important than it

10   would be again for the non-bankruptcy comparable

11   settlements.  Again we -- in my report we reflected some of

12   the quotes, some of the considerations that existed for non-

13   bankruptcy settlements.

14        So the second category is factors likely to reduce the

15   size of the settlement payment.

16        First obviously non-cash consideration, to the extent

17   that non-cash consideration exists.  It's a substitute for

18   cash, so it would intend to reduce the cash size portion of

19   the settlement payment.

20        Second is legal impediments to pursuing the claim.

21   Actually the second and the third bullet point are quite

22   similar.  Third bullet point being statute of limitations,

23   the second bullet point is if there's an issue of whether

24   there's a significant fraction of certificate holders who

25   are willing to support and indemnify the trustee to pursue a

Page 44

1    claim to the extent there's uncertainty about whether claims

2    will be barred by the statute of limitations or whether

3    there'll be sufficient support to indemnify the trustee.

4    Again, to the extent those factors are present they would

5    tend to reduce the size of the settlement payment.

6         Those factors did exist in a number of the comparable

7    settlements.  As far as I know they do not exist in the

8    contest of this estimation proceeding, so those factors

9    would suggest all else equal that the Lehman proposed

10   allowed claim would be higher than the results of the

11   comparable settlements.

12        And again, the last factor, again, I think fairly self-

13   explanatory.  To the extent that a defendant cannot pay a

14   cash judgment, that was a big factor, for example, at

15   Countrywide, that would tend to depress the size of a

16   settlement payment.  Again, for bankruptcy cases where

17   you're dealing with allowed claims as opposed to cash

18   recovery, not so much a factor, not a factor.  And so when

19   that factor is present all else equal that would tend to

20   depress the size of a settlement relative to the Lehman

21   settlement.

22        So the first two categories sort of cut in opposite

23   directions.  Some of them suggest that the Lehman proposed

24   allowed claim should be higher than the results of the

25   comparable settlements, and other factors suggest the

Page 45

1   opposite.

2        The last category --

3            THE COURT:  Can I -- before you get to the --

4            THE WITNESS:  Sure.

5            THE COURT:  -- last category.  Is it your opinion

6   that -- is this a qualitative or impressionistic analysis or

7   is this something that I could tie in statistically

8   significant ways if I look at the comparable settlements?

9            Stated differently.  When I look at, for example,

10  Plan Administrator Exhibit 781, which is at tab 9, which

11  reflects the comparison of the percentages for these various

12  settlements, are these -- am I seeing statistically

13  significant differences say, for example, between the

14  Countrywide 12.5 and the Citigroup 8.3?  And similarly, have

15  you applied the factors in ways that you could tell me

16  reflect statistical significance?

17           THE WITNESS:  I'm --

18           THE COURT:  And if that's not a good question tell

19  me how to ask a better one.

20           THE WITNESS:  No, no, no, it's a perfectly good

21  question, and I don't want to imply --

22           THE COURT:  And to Mr. Goldberg I'll say I'm not

23  intentionally trying to or meaning to expand the scope of

24  the opinion.  So --

25           THE WITNESS:  I don't want to imply, you know, a

Page 46

1    false precision to the Court.  All the factors that I've

2    discussed so far are qualitative in nature, but they're also

3    empirically based.  Meaning that in the context of the

4    comparable settlements these factors were real, were given

5    as reasons for either increasing the size of the settlement

6    or decreasing the size of the settlement.

7            The last thing that I'm going to discuss, the

8    ambiguous factors, that was the subject of a very detailed

9    statistical analysis that's described in my report that I'll

10   describe in a minute.

11           But the first two groups, there's really no

12   quantify indication associated with those, it's just

13   balancing things that cut in different directions.

14           THE COURT:  Thank you.

15   BY MR. COSENZA:

16   Q    So, Professor Fischel, previewing for us, do you want

17   to talk about the analysis you did for the factor that has

18   an ambiguous effect, and that's the difference between --

19           THE COURT:  Mr. Cosenza, before you get into that

20   it is approaching an hour and 20 minutes.  What do you think

21   in terms of a break?

22           MR. COSENZA:  Sure.  We can take a break know,

23   Your Honor.

24           THE COURT:  Okay.

25           MR. COSENZA:  That would be perfect.

 1                THE COURT:  Why don't we do that since you're

 2      about to turn to that topic.  And why don't we say we'll

 3      resume at 11:30.

 4                Professor Fischel, while you are with us giving

 5      testimony please do not discuss your testimony or the case

 6      with anyone during these breaks, nor be in anyone's presence

 7      while they're doing the same.

 8                THE WITNESS:  I understand, Your Honor.  Thank

 9      you.

10                THE COURT:  All right.  Thank you.  We'll come

11      back at 11:30.

12                MR. COSENZA:  Thank you, Your Honor.

13          (Recessed at 11:17 a.m.; reconvened at 11:34 a.m.)

14                THE COURT:  Have a seat, please.

15                MR. COSENZA:  So, Your Honor, I may continue on?

16                THE COURT:  Yes.

17                MR. GOLDBERG:  Your Honor, may we approach?

18                THE COURT:  Yes.

19          (Sidebar off the record)

20                THE COURT:  Okay.  Mr. Goldberg?

21                MR. GOLDBERG:  Your Honor, the trustees just would

22      like to lodge their objection on the record to the testimony

23      of Professor Fischel concerning the institutional investors'

24      views as to what is a fair and reasonable settlement and in

25      order to persuade Your Honor as to the amount at which you

Page 48

1    should estimate the trustees' claims.

2              THE COURT:  Thank you.  Your objection is noted.

3              Go ahead, Mr. Cosenza.

4              MR. COSENZA:  Okay.

5    BY MR. COSENZA:

6    Q    Professor Fischel, before we left for a break we were

7    talking about I think the factors which have ambiguous

8    effects, and there was a question from the Court as to the

9    statistical analysis you had done as part of the last bullet

10   here, the difference in the underlying loans.

11        Just want to describe the analysis that was done by you

12   and your team to understand the differences in the loan

13   periods between this case and the loans at issue for Lehman

14   as opposed to the other comparable settlements that we've

15   discussed earlier?

16   A    Yes.  The third category, the factors that have

17   ambiguous effects refers to the quality of loans.  And the

18   reason why that has an ambiguous effect is unlike the other

19   factors, which as I told the Court, even though you can't

20   quantify them you know which direction they cut relative to

21   the differences between the Lehman -- the proposed allowed

22   claims in this matter and the comparable settlements.

23        With respect to the quality of the loans there are

24   really two differences.  One is you can't say just

25   identifying the factor which direction it cuts.  And the

1    second way which it's different is that it is possible to,

2    in response to the Court's question, analyze statistically

3    any differences between the quality of the loans at issue in

4    this matter versus the comparable settlements by analyzing

5    whether the loans at issue in this case were more or less

6    likely to default than the loans at issue in the comparable

7    settlements.

8        And that is a question that can be analyzed in a

9    rigorous way, in a statistical way, not just to analyze

10   whether loans are more or less likely to default, but also

11   to analyze whether the differences are large enough to be

12   statistically significant.  And that is exactly what we did.

13   It's discussed at length in my report, the results presented

14   in I think it was Exhibit G --

15   Q    Correct.

16   A    -- of my report.

17       In the answer, and again why it's listed as an

18   ambiguous effect, is that there is no clear pattern.  We

19   measured the likelihood of default of the Lehman loans

20   versus the other loans in the different comparable

21   settlements over two different time periods, through 2009 as

22   suggested by some of the academic literature that I describe

23   in my report, and through 2017 as close to the present time

24   as we could get data for.  And with respect to some of the

25   comparable settlements and some of the time periods the

Page 50

1    Lehman loans were less likely to default, therefore better,

2    you'd expect the proposed allowed claim to be lower.  And in

3    other situations -- in other comparisons in other time

4    periods they were more likely to default.

5        So the results are ambiguous, but ambiguous in a way

6    that is the result of a precise and detailed statistical

7    analysis, which as I said, it's discussed at length in my

8    report and the results are summarized in Exhibit G of my

9    original report.

10   Q    So just to be clear on the record, Professor, if you

11   look at tab 1 of the binder I handed you, I think you

12   referenced Exhibit G, which is a table that compares default

13   rates between loans and comparable settlements and covered

14   loans in the participating trust, this is the detailed

15   analysis you were referring to --

16   A    Yes.

17   Q    -- in your prior testimony?

18   A    That's right.

19   Q    Thank you.

20       So, Professor, you went through these factors, likely

21   to increase the rate, factors likely to reduce the size, and

22   factors that had ambiguous effects.  What did you conclude

23   from applying these factors to the Lehman matter or the plan

24   administrator's matter for Lehman as opposed to the

25   comparable settlements you analyzed?

Page 51

1   A    That there was no reason why the proposed claim in this

2   case should be outside the range of the outcomes of

3   comparable settlements in the what I call the non-

4   quantifiable, non-statistical factors, you have a balance of

5   factors that cut in one direction, factors that cut in the

6   opposite direction.

7        And with respect to the quality of the loans, the

8   factor that can be identified and analyzed in a precise and

9   statistically rigorous fashion you get basically the same

10  result that you can't say one way or another that the

11  proposed allowed claim -- or the ultimate allowed claim in

12  Lehman should be in any way outside the range of comparable

13  settlements.

14       So the conclusion that I reached that the Lehman's

15  proposed allowed claim was well within the range if anything

16  towards the higher end of the range of comparable

17  settlements while the trustees' allowed claim was far

18  outside the range of comparable settlements that I have even

19  more confidence in that conclusion taking into account the

20  factors that I could identify that effect whether a

21  particular outcome in this matter should be higher or lower

22  than other comparable settlements.

23  Q    Professor Fischel, did you assist in putting together a

24  demonstrative that compares Lehman's and the trustees'

25  proposed allowed claims with the recent settlements?

Page 52

1    A    Yes.

2    Q    Okay.  I just want to refer you to tab 9 in your

3    binder.  That's Plan Administrator's 7 -- Exhibit 781.  Is

4    this the demonstrative that you assisted in putting

5    together?

6    A    Yes.  This is basically a shorthand version of the more

7    detailed version that I described earlier, but it captures

8    the essence of it.  And again, it shows exactly what I've

9    said several times now, is that the Lehman proposed allowed

10   claim in this matter is well within the range if anything

11   towards the higher end of the range of comparable

12   settlements, and the trustees' proposed claim is far outside

13   the range without any basis or justification in any of the

14   comparable settlements.

15   Q    Professor Fischel, the counsel for the trustees has

16   argued that the comparison of the recovery ratios between

17   the Lehman matter and these comparable settlements is

18   invalid because here there was a loan review done that

19   justifies the trustees' higher proposed allowed claim.  Do

20   you agree with that?

21   A    No, I don't.

22   Q    Why not?

23   A    For two reasons.

24        First of all some of the comparable settlements did

25   have loan reviews, sometimes based on sampling as opposed to

Page 53

1    complete loan reviews, but they did have loan reviews.

2         But the more fundamental reason is in situations where

3    parties look at the same loan files and reach radically

4    different conclusions where one side says virtually ever

5    loan file contains a material breach and the other side says

6    a much lower percentage of files contain a material breach,

7    that difference doesn't resolve anything, and therefore

8    short of a trial, which without sampling in some cases could

9    take years, it's not clear and it wasn't clear in the

10   previous matters that I've been involved in, that loan file

11   reviews where there's such disparate opinions about the

12   results of loan file reviews because so much subjective

13   judgment is required really contribute one way or another to

14   making a settlement higher or lower.

15   Q    Just to be clear, so in the J.P. Morgan and WAMU

16   matters that you worked on previously there were loan level

17   reviews done?

18   A    Yes, there was.  Yeah, and they had the characteristics

19   that I just described, and the parties just had radically

20   different contentions about what the loan file reviews

21   showed.

22   Q    And the same thing in Citi, you also analyzed the

23   Citigroup settlement --

24   A    That's right.

25   Q    -- those were also loan level reviews?

1    A    There were loan level reviews there as well.

2    Q    Thank you.

3         Other than -- now we've gone through your two, we want

4    to go back to the initial slide, Plan Administrator Exhibit

5    774, the two summaries of your opinions.

6         Other than these two opinions that you described here,

7    is there anything else that supports your work in this

8    matter, Professor Fischel?

9    A    Yes.  Subsequent to the filing of my report but prior

10   to my deposition I learned of the outcome of what occurred

11   with certain what I think is referred to collapsed trusts

12   where claims by an outside appraiser I think in -- I think

13   there was six if I remember collectively -- in five of the

14   six the claims were valued at the level of the -- of

15   Lehman's proposed allowed claim, and in the sixth the claims

16   are valued at a much lower value, a fraction of Lehman's

17   proposed allowed claim, and obviously therefore a much lower

18   fraction of the trustees' proposed allowed claim.

19        And again, I would say this, again, it's just

20   consistent with the other evidence that I've reviewed of the

21   different pieces of data all support the Lehman's proposed

22   allowed claim in this matter and all are fundamentally

23   inconsistent with the trustees' proposed allowed claim in

24   this matter.

25             MR. COSENZA:  Your Honor, I believe I've concluded

Page 55

1    my direct of Professor Fischel.

2              THE COURT:  Okay.  Very good.  Thank you,

3    Mr. Cosenza.

4              MR. COSENZA:  Thank you.

5              Mr. Goldberg, are you ready start now or did you

6    want to take a break?

7              MR. GOLDBERG:  No, Your Honor, I have a module

8    that I could do now.

9              THE COURT:  Okay.

10             MR. GOLDBERG:  I need a moment to pass around some

11   documents.

12             THE COURT:  Please.  Should I hold onto the direct

13   binder as well?

14             MR. GOLDBERG:  Probably can't hurt.

15             THE COURT:  Okay.

16        (Pause)

17             MR. GOLDBERG:  So, Your Honor, what you should be

18   getting and the witness should be getting and counsel should

19   be getting are three binders of exhibits, plus separately we

20   have bond Professor Fischel's deposition transcript.

21             THE COURT:  Okay.  Thank you.

22        (Pause)

23             THE COURT:  You're just going to show off and out

24   do Mr. Shuster, right?

25             MR. GOLDBERG:  I think that's a common occurrence,

Page 56

1    but I'm going to do my best today to restrain myself.

2         (Pause)

3              MR. GOLDBERG:  Your Honor, may I inquire?

4              THE COURT:  Please.

5                        CROSS-EXAMINATION

6    BY MR. GOLDBERG:

7    Q    Professor Fischel, how are you today, sir?

8    A    I'm fine, sir.  How are you?

9    Q    I'm doing well, thank you.

10   A    Good.

11   Q    The judge asked if I was prepared, but are you ready to

12   go?

13              THE COURT:  Do you have the binders at your -- at

14   the ready there?

15              THE WITNESS:  Well I have my -- I think the

16   deposition transcript.  I was told by your colleague that

17   there's no room for the binders, so if they're on the floor

18   they'll be handed to me when --

19              MR. GOLDBERG:  Yes, sir.  They will.

20   BY MR. GOLDBERG:

21   Q    So, Professor Fischel, as part of your work generally

22   at Compass Lexecon you value assets, right?

23   A    Yes, sir.

24   Q    And you use models to help you in valuing your assets

25   don't you?

Page 57

1  A    Depending on the circumstances, but frequently, yes.

2  Q    Regularly you use models to value assets in your work?

3  A    Depends what kind of asset.  I think you have to be a

4  little bit more specific.

5  Q    So you were deposed in this matter, sir?

6  A    I was.

7  Q    And you took at oath to tell the truth?

8  A    I did.

9  Q    That's the same oath you took here today, right?

10  A    Correct.

11  Q    And you did that, you told the truth?

12  A    I did.

13  Q    Could you turn to page 40 of your deposition

14  transcript, sir?

15  A    I'm sorry, what page, sir?

16  Q    Forty, 4-0.

17  A    Okay, I have it.

18  Q    On page 40 at lines 2 to 7, were you asked the

19  following questions and did you give the following answers.

20  Question, "You have used models to value assets, correct?"

21  Answer, "Yes."  Question, "You've done it regularly,

22  correct?"  Answer, "Correct."

23       Were you asked those questions and did you give those

24  answers?

25  A    Yes, but why don't you read question -- lines 8 and 9,

Page 58

1   which I think is exactly what I just said.

2   Q    Sir, were you asked those questions and did you give

3   those answers?

4   A    Yes, but as I said, it's exactly what I just said,

5   particularly if you read lines 8 and 9.

6   Q    My question --

7        THE COURT:  So, Professor Fischel, you know -- I

8   know you know how this works because you've testified --

9        THE WITNESS:  Right.

10       THE COURT:  -- frequently, so Counsel is entitled

11  to attempt to impeach you, Mr. Cosenza will -- is absolutely

12  free to ask you questions on redirect.

13       THE WITNESS:  I apologize, Your Honor.

14       THE COURT:  No need to apologize.  Just in the

15  interest of being able to move this along I just thought I'd

16  make that observation.

17       THE WITNESS:  Thank you.

18       THE COURT:  Go ahead, Mr. Goldberg.

19       MR. GOLDBERG:  Thank you, Your Honor.

20  BY MR. GOLDBERG:

21  Q    Professor, I don't mean to suggest that you've never

22  done a valuation without using a model.  The point of my

23  question is, using models is something you do in the regular

24  course of your business when you value assets, correct?

25  A    Depending on the circumstances, correct.

Page 59

1   Q    And you're familiar with something called the loan

2   dynamics model?

3   A    You know, somewhat familiar, not I would say,

4   intimately familiar.

5   Q    Do you understand that it's part of what's -- what are

6   called the Andrew Davidson models?

7   A    Yes, I am familiar with that.

8   Q    Okay.  And if you hear the phrase ADCO will you

9   understand that to mean the Andrew Davidson company?

10  A    Yes, sir.

11  Q    You've heard that before?

12  A    Yes, I have.

13  Q    And so now you understand that the loan dynamics model

14  is an ADCO model, yes?

15  A    I understood that already.  Thanks.

16  Q    Okay.  And before this case you have used ADCO models,

17  right?

18  A    Yes, sir.

19  Q    And in fact your company, Compass Lexecon, has a lot of

20  experience using the ADCO models in other matters unrelated

21  to this; isn't that right, sir?

22  A    That's right.

23  Q    And you found the Andrew Davidson models to be

24  reliable, right?

25  A    Yes.

Page 60

1   Q    And you found it to be reliable for the work that you

2   did here?

3   A    Reliable enough for purposes of being confident in our

4   conclusions, correct.

5   Q    The purpose for which you used the model in this case

6   it was reliable; is that right?

7   A    Yes.

8   Q    And the purpose that you used it for was to estimate

9   future losses on non-liquidated loans; is that right?

10  A    That's right.

11  Q    Now, do you remember from your deposition we talked a

12  little bit about tuning a model?

13  A    I do.

14  Q    And you know what tuning a model means, right?

15  A    I do.

16  Q    It means that the user can alter inputs if the user so

17  desires?

18  A    That's a little bit too general a description for my

19  understanding of what it means.

20  Q    Why don't you give me your understanding as to what you

21  think it means to tune a model.

22  A    That when a model is dated one way to at least try and

23  bring it current is to alter the coefficient so that the

24  coefficients bear a closer relationship to the current

25  reality than what was originally analyzed at the time the

Page 61

1   model was created.

2   Q    And with that understanding in mind you're aware that

3   the Andrew Davidson model can be tuned by the user, correct?

4   A    Yes, I am aware of that.

5   Q    And that's for a variety of reasons, right?  Like for

6   instance in the user disagrees with the default settings

7   that are in the Andrew Davidson model, right?

8   A    I assume that's correct.  I don't really have

9   experience or expertise in the circumstances under which the

10  model can be tuned.

11  Q    So I hate to do this to you, sir, but can we go to page

12  45 of your deposition.

13  A    Okay.

14  Q    Starting on line 20, I'll let you get to the page.  Are

15  you there, sir?

16  A    Yes, I have it.

17  Q    Were you asked the following questions and did you give

18  the following answers.  Again, beginning on page 45, line

19  20.  Question, "And are you ware that with respect to Andrew

20  Davidson models the tuner can change the model settings?"

21  Answer, "I am aware of that."  Question, "That's for a

22  variety of reasons, including if for whatever reason the

23  user disagrees with the default settings, right?"  Answer,

24  "I believe that's correct."

25        You were asked those questions and you gave those

Page 62

1   answers, sir?

2   A    I did.

3   Q    Now, the flexibility or ability to tune the model,

4   that's actually a benefit to the user if the user disagrees

5   with the default settings, right?

6   A    To the extent it makes the model more accurate, yes,

7   that would be a benefit.

8   Q    Right.  So if for whatever reason the user felt that

9   the default settings would produce an inaccurate result the

10  Andrew Davidson models allow the user to change those

11  settings to make the output reliable, right?

12  A    You know, as I said, just as in my answer I believe so,

13  I'm not really an expert in the tuning of the model, but

14  certainly that would be the purpose of the tuning.

15  Q    Certainly the ability to tune the model if the user

16  disagrees with the default, that's not a detriment of the

17  model, right?

18  A    Would not be a detriment of the model.

19  Q    And if the -- a different expert from a plan

20  administrator were to testify that the ability to tune the

21  model inherently makes the model an unreliable product you

22  would disagree with that?

23  A    I think it's relative to what.  So I wouldn't

24  necessarily disagree with it, no.

25  Q    You wouldn't disagree with it.  So just a moment ago

Page 63

1    you said that it's a benefit that the user can change the

2    settings if the user believes the default settings are less

3    reliable or what you say less precise result, but if the

4    plan administrator has another expert that comes in and says

5    that exact attribute inherently makes the model unreliable

6    you wouldn't disagree with it?

7    A    Well again, I don't know what another expert would say.

8    But what I meant was making a model less accurate is not the

9    same thing as making it most accurate, and it may be that

10   having a contemporary model with more accurate coefficients

11   is a superior alternative than having an old model with

12   adjusted coefficients to try and make it more contemporary.

13   That's what I meant.

14   Q    I understand that, but I'm saying that the mere fact

15   that the concept of the model that it allows the user for

16   him or herself to make that determination, you agree with me

17   that's an attribute of the model, plus?

18   A    To the extent I understand it, yes, I would say that's

19   an attribute of the model, and if that makes it more

20   accurate than it was previously that would be a benefit.

21   Q    Now, here it was part of your work when you used the

22   Andrew Davidson models you actually did not adjust the

23   default settings, correct?

24   A    Did not.

25   Q    Because you found the default settings were

1    sufficiently accurate for what you were doing?

2    A    For our purposes, correct.

3    Q    And just to be clear, you used the loan dynamics model

4    within the Andrew Davidson models to calculate estimated

5    future losses on all liquidated loans, correct?

6    A    That's correct.

7    Q    Sir, one of your colleagues at Compass Lexecon is a

8    gentleman by the name of Gerry Lumer?

9    A    That's right.

10   Q    And Gerry Lumer is an executive vice president?

11   A    Correct.

12   Q    And Compass Lexecon employees about 500 people,

13   correct?

14   A    In total approximately, correct.

15   Q    And Dr. Lumer is a senior person at Compass Lexecon?

16   A    Yes, he is.

17   Q    And you believe he's competent?

18   A    Yes, very competent.

19   Q    And you believe he has good judgment?

20   A    Yes, I do.

21   Q    And you're aware that before you actually -- personal

22   you -- were engaged to be the testifying expert here that

23   Dr. Lumer reached out to a gentleman by the name of Dr. Rick

24   Elson to be an expert for the plan administrator, right?

25   A    I don't think that's 100 percent correct.  As I --

Page 65

1    again, I wasn't involved in that, but my understanding is he

2    was trying to arrange a meeting with the -- with counsel for

3    Lehman.  We don't hire people.

4    Q    Oh, that's the part that you felt was -- oh, okay, fair

5    enough.  The plan administrator hires the experts, that's

6    your point?

7    A    Correct.

8    Q    All right.  But you're aware that Dr. Lumer tried to --

9    reached out to Dr. Elson for the purpose of having the plan

10   administrator hire Dr. Elson as an expert in this case?  Are

11   you aware of that?

12   A    I think that's too strong.  For the purpose of having

13   the plan administrator consider hiring Dr. Elson I think

14   that's a fair statement.

15   Q    So you think the plan administrator was looking to hire

16   Dr. Elson just not as an expert; is that what you're saying?

17   A    No, I don't know who the plan administrator was

18   thinking of hiring.

19   Q    Dr. Lumer, your colleague, reached out to Dr. Elson,

20   correct?

21   A    Yes, that's true.

22   Q    And Dr. Lumer, your colleague, was trying to persuade

23   Dr. Elson to work on this matter, right?

24         MR. COSENZA:  Your Honor, objection, this is like

25   double hearsay.  He the answer the question, I just --

Page 66

1              THE COURT:  Come on up.

2         (Sidebar off the record)

3     BY MR. GOLDBERG:

4     Q    Sir, part of your opinion concerns the conduct of the

5     institutional investors?

6     A    Yes, sir.

7     Q    And you rely on the institutional investors' initial

8     assent to a settlement of a certain amount as part of your

9     opinion, right?

10    A    Correct.

11    Q    But you do understand that the institutional investors

12    when they articulated that consent -- or assent rather, the

13    trustees had not done a loan by loan review of the loans?

14             MR. COSENZA:  Your Honor --

15             THE COURT:  Yes, Mr. Cosenza, want to come back

16    up?

17             MR. COSENZA:  Yes.

18         (Sidebar off the record)

19             THE COURT:  Professor Fischel, I'm going to say

20    this to you even though undoubtedly you know it.  But when

21    we have these colloquies after you say something or don't

22    say something it's not at all a reflection on anything that

23    you have said or that you haven't said, and I wouldn't want

24    you to infer that it was.  This is as you can imagine lawyer

25    stuff.

Page 67

1           THE WITNESS:  Thank you, Your Honor.

2           THE COURT:  Okay?

3           THE WITNESS:  Appreciate that.

4           THE COURT:  Okay.  Go ahead, Mr. Goldberg.  We're

5    going to try to let you get some inertia, momentum going and

6    ask more than one question.

7           MR. GOLDBERG:  Thank you, Judge.

8    BY MR. GOLDBERG:

9    Q    Professor, the first time that the institutional

10   investors articulated assent the trustees had not yet done a

11   loan by loan review of the loan files; is that right, sir?

12   A    I don't know if that's right or wrong.

13   Q    All right.  Let's turn to page 229 of you deposition,

14   please.  Are you there, sir?

15   A    I am.

16   Q    Were you asked the following question and did you give

17   the following answer.  Page 229, beginning on line 13.

18   Question, "The first time that they -- referring to the

19   institutional investors -- articulated assent the trustees

20   had not yet done a loan by loan review of the loan files,

21   right?"  Answer, "Yes, I think by definition that's true."

22        You were asked that question, you gave that answer,

23   yes, sir?

24   A    I did.

25   Q    And you actually hadn't spoken with the institutional

Page 68

1    investors when you did your work in formulating your opinion

2    on this issue?

3    A    Correct.

4           MR. GOLDBERG:  Your Honor, I'm at a point where if

5    I start onto it it'll go a lot longer than your lunch break,

6    so maybe this is --

7           THE COURT:  All right.  So maybe this is a good

8    place to stop.  How much would you like -- time would you

9    like, Mr. Goldberg?

10          MR. GOLDBERG:  An hour is fine.

11          THE COURT:  Okay.  I'm a little concerned about

12   our progress making our own deadlines, so if we could keep

13   the lunch to an hour that would be great.

14          MR. GOLDBERG:  Sure.

15          THE COURT:  All right?  So we'll come back at ten

16   minutes after 1:00.

17          You remain under oath during the lunch break,

18   Dr. -- Professor Fischel, and we'll see you in about an

19   hour.

20          THE WITNESS:  Great.  Thank you, Your Honor.

21          THE COURT:  Thank you.

22      (Recessed at 12:09 p.m.; reconvened at 1:16 p.m.)

23          THE COURT:  Please be seated.

24          MR. GOLDBERG:  May I proceed?

25          THE COURT:  Yes, please, Mr. Goldberg.

Page 69

```
 1   BY MR. GOLDBERG:

 2   Q    Good afternoon, Professor Fischel.

 3   A    Good afternoon.

 4   Q    So you -- part of your opinion is whether or not the

 5   prior settlements are comparable to what the parties are

 6   jousting about here in terms of what the claims should be

 7   set at, right?

 8   A    That's correct.

 9   Q    But you understand that the purpose of this hearing is

10   to determine the amount of the trustee's allowed claims,

11   right?

12   A    I do understand that.

13   Q    Okay.  And could you open your expert report for me,

14   sir?  That's going to be in Binder 1 which I have already

15   put up on top for you.  Oh --

16   A    Oh.

17   Q    -- the larger one in the corner.  And if you could turn

18   to TRX-579 which is your report, sir.

19   A    Okay.  I have it.

20   Q    I'm correct in the fact that TRX-579 is your report?

21   A    Yes, sir, you are.

22   Q    Okay.  If you could turn to page 18, please,

23   specifically paragraph 34.

24        Are you there?

25   A    Yes, sir.
```

Page 70

```
 1    Q     The first sentence you wrote -- I'm waiting for the

 2    Court to get there.

 3              THE COURT:   I'm there.   Thank you.

 4    BY MR. GOLDBERG:

 5    Q     You wrote:

 6          "An analysis of settlements should be interpreted

 7          with caution in this context because the purpose of the

 8          estimation proceeding is not to determine whether a

 9          particular settlement is within the range of comparable

10          settlements, but rather analysis of Lehman's and

11          trustees' proposed allowed claims."

12          You wrote that, correct?

13    A     I did.

14    Q     Now in your -- Mr. Cosenza showed you a demonstrative.

15    Do you have that small book in front of you, sir, the one

16    that Mr. Cosenza gave you, the one that has your

17    demonstratives?

18    A     Yeah.   I have it.   Hold on.   I have it.

19    Q     If you could turn to Tab 9, sir.

20    A     Okay.

21    Q     And here putting aside the bottom red bar that address

22    the trustees and put aside the green bar that speaks about

23    Lehman Brothers, the others, those represent actual

24    settlements, right?

25    A     Correct.
```

Page 71

1    Q    And that's obviously a situation where the plaintiffs

2    and the defendants agree to compromise the amount of the

3    plaintiffs' claim and they agreed to an amount, right?

4    A    That's right.

5    Q    Right.  Do you understand that when the trustees are

6    asserting their claims here in this proceeding they're not

7    asserting an amount that the case should settle for.

8    They're asserting the amount of their claim that they intend

9    to prove with evidence.  Do you understand that?

10   A    I understand that.

11   Q    So the comparison you make here that the -- when you

12   say on Tab 9 55 percent, you understand the trustees are not

13   asking for a 55 percent of lost settlement.  The trustees in

14   this matter are asserting that they're going to prove actual

15   -- that they are entitled to have an allowed claim in a

16   certain amount, right?

17   A    I understand that.

18   Q    So comparing the trustees' 55 percent as you have on

19   this graph to what Countrywide and JPMorgan and others

20   settled for, that's a bit of an apples to orange comparison,

21   right?

22   A    I don't think so for the reasons stated in the rest of

23   the paragraph that you didn't read in my report.

24   Q    Oh, I understand you believe that other past

25   settlements could be relevant to evaluating what a fair

1    settlement might be here, right?  That's what you're saying?

2    A    I'm saying that as I think I said in my report that one

3    of the critical determinants in determining the value of the

4    settlement is what the parties believe would be the result

5    of a litigated proceeding if there were to be one, which is

6    very similar to the purpose of an estimation proceeding.

7    Q    You think the purpose of an estimation proceeding is to

8    ascertain what parties would settle for as opposed to what

9    the actual value of the claims are?

10   A    No.  I didn't say that.

11   Q    I'm -- okay.  But you understand the purpose of the

12   estimation hearing is to set the value, the actual value of

13   the actual claims based on actual evidence, right?

14   A    I understand that.

15   Q    Which I distinct from how much a party might set --

16   agree to compromise its claim for, right?

17   A    As I said -- as I said in that paragraph it's

18   different, but they're closely related.

19   Q    But you think that if someone's willing to settle for

20   X, that that sort of gives you a little window into what

21   they think their claim is worth basically?

22   A    Yes.  I think one -- again, one of the most important

23   factors in determining the value of a settlement is what the

24   results of a litigated proceeding would be.

25   Q    But you -- would you be charitable enough to agree with

Page 73

1    me that most settlements don't involve the plaintiffs

2    recovering the full amount of what they would get if they

3    went to trial?

4    A    Yes.  Well, because the defendants don't agree that the

5    plaintiffs would recover that amount if the case were to go

6    to trial.  And, again, similar to an estimation proceeding.

7    Q    Well, no, but in an estimation proceeding you do

8    understand the Court is going to be called upon to make

9    actual findings and (indiscernible 1:21:40) what the value

10   is.  The Court's not going to rule what the parties should

11   have agreed to in the absence of the hearing.  You

12   understand that, right?

13   A    You know, I hesitate to comment on what the Court is

14   going to do.  But I -- I've given you my understanding of

15   what an estimation proceeding is which is consistent with

16   your description.

17   Q    Okay.  You understand this isn't -- you're familiar

18   with Bankruptcy Rule 9019, 9019?

19   A    I might be if I saw it, but not by number.

20   Q    That's the rule speaking on when the court has to

21   approve settlements.  You've been an expert in 9019 motions,

22   I believe.  Not that you can recall or you're just not

23   familiar with the rule?

24   A    I -- I'm just not familiar with --

25   Q    Fair enough.

1    A     -- that number so I don't know.

2    Q     Fair enough.  Fair enough.  So you cannot determine

3    whether any given loan breaches a representation and

4    warranty by reference to a prior settlement, right?

5    A     I cannot.

6    Q     And you cannot determine whether any given breach of a

7    representation and warranty has a material and adverse

8    effect on the value of the loan by reference to a prior

9    settlement, right?

10   A     That's right.

11   Q     Now in your report you identify what you characterize

12   as nine factors that you use to evaluate and compare and

13   contrast settlements, right?

14   A     I don't remember the number, but I listed a number of

15   factors.

16   Q     Let's look in your report, sir.

17   A     Okay.

18   Q     Again, it's TRX-579.  And if you turn to page 21 of

19   your report.

20   A     Okay.

21   Q     And you see you have a heading, factors relevant to

22   understanding differences between the settlements and the

23   present case.  Do you see that, sir?

24   A     I do.

25   Q     And then underneath you have paragraph 40 which you

Page 75

1    wrote, "We take the following factors into consideration in

2    our analysis of the settlements."  You wrote that, right?

3    A    Yes, sir.

4    Q    And then underneath you list factors, right?

5    A    That's right.

6    Q    And you list nine of them?

7    A    Correct.

8    Q    Now on direct and in response to a question put by

9    Judge Chapman, the only one of your factors that's actually

10   lends itself to scientific and statistical analysis is your

11   evaluation as to the quality of the loans between two

12   different trusts, right?

13   A    That's correct.

14   Q    And you did that analysis here?

15   A    Correct.

16   Q    And your conclusion is that it was inconclusive?

17   A    That's right.

18   Q    So you can't use that factor to help you determine

19   whether one settlement is comparable to another in this

20   case?

21   A    No.  I wouldn't say that.  No.  I think the opposite is

22   true.

23   Q    You think the opposite is true?  You think you can use

24   that factor to evaluate and compare and contrast

25   settlements, your comparable settlements to this case; is

Page 76

1    that right?

2    A    Correct, in the way that I described.

3    Q    Sir, if you could open your deposition transcript?

4    A    Okay.

5    Q    Before I do that let me take a step back.  Let me just

6    lay a foundation on something.  That factor, the difference

7    in underlying loans, that's what you list as Factor 7 in

8    your report, right?

9    A    I've got to get it again, but --

10   Q    Yes.  You should leave that open if you would, sir.

11   A    All right.  Hold on.

12   Q    And specifically it's on page 22.

13        (Pause)

14   Q    Are you there, sir?

15   A    Yes, I have it.

16   Q    So you agree with me your Factor 7 is the differences

17   in the underlying loans?

18   A    Yes.

19   Q    Okay.  Can you look at your deposition, sir, page 109

20   beginning on line 14?  I'll let you get there before I start

21   to read.  Are you there, sir?

22   A    Yes.  I see that.

23   Q    All right.  Line 14, were you asked the following

24   question and did you give the following answer:

25        "Question:  You were unable to draw conclusions as to

Page 77

```
1         whether the settlement in this case should be higher or

2         lower or the same as the comparable settlements with

3         regard to Factor 7; is that fair?"

4         "Answer:  That is fair because the results are

5    ambiguous      depending on which loans and which settlement

6    they're   being compared to and over what time period."

7         Were you asked that question and did you give that

8    answer?

9    A    Yes.

10   Q    So let's -- let's -- I want to tick through your

11   factors a little bit.  Do you remember during your

12   deposition we talked a little bit, I was asking you if you

13   could tell me each of the factors, whether it would have a

14   direct or inverse relationship to the -- to its impact on

15   the value of the settlement?

16   A    Yes.

17   Q    So let's talk about that a little bit.  Your Factor 1

18   which is that the claim's being released.  I'm on page 21 of

19   your report which is TRX-579.  The more claims being

20   released the higher the value of the settlement; is that

21   fair?

22   A    Yes.

23   Q    Let's look at your Factor 2, the non-cash

24   consideration.  So the more non-cash consideration given the

25   higher the value of the settlement, right?
```

1    A    All else equal, correct.

2    Q    All else equal.  Yes.  For every -- thank you for that

3    clarification.

4         When we talk about the individual factors I may ask you

5    to change the parameter or factor.  I'm always intending for

6    you to hold all other facts and circumstances --

7    A    Yeah.  In other words --

8    Q    -- equal.

9    A    -- if the cash is identical and -- between settlements

10   and one has additional non-cash consideration, that makes

11   that settlement higher.

12   Q    Now your Factor 3 you actually have three subfactors in

13   there.  Do you see that?

14   A    Yes.

15   Q    And your Factor 3(a) speaks to the cost of litigation,

16   right?

17   A    Correct.

18   Q    And avoiding the cost of litigation is something that

19   generally drives the value of the settlement down, right?

20   A    You know, as I said in my deposition it's more

21   complicated than that.  Frequently yes, but not always.

22        (Pause)

23   Q    Sir, in your deposition could you turn to page 95,

24   please?

25   A    Okay.  I've got to get it again.

Page 79

1   Q     You should probably keep it --

2   A     Hold on.  I have it.

3   Q     -- handy.

4   A     Okay.

5   Q     If you could turn to page 95, please.

6   A     I have it.

7   Q     Were you asked the following question and did you give

8   the following answer, beginning on line 13:

9         "Question:  So the fact that a litigation could be

10        expensive to prosecute, avoiding that cost is something

11        that would drive the value of the settlement down,

12        correct?

13        "Answer:  Correct."

14        Were you asked that question and did you give that

15   answer?

16   A     Yes, but you keep taking things out of context and not

17   including other answers which put this answer in context,

18   like the other ones that you --

19   Q     Okay.  Well, let's --

20   A     -- quoted.

21   Q     -- look at another time you were asked a similar

22   question and see what your answer was.  Let's look at page

23   156, please, of --

24   A     Okay.

25   Q     -- your deposition.

Page 80

```
 1        (Pause)

 2   Q    Are you there, sir?

 3   A    I am.

 4   Q    Were you asked the following questions and did you give

 5   the following answers on page 156 starting on line 8:

 6        "Question:  One of your factors is the cost of

 7        litigation, correct?

 8        "Answer:  Correct.

 9        "Question:  So obviously a pre-litigation settlement

10        would incur less costs than a settlement reached at

11        trial, correct?

12        "Answer:  That's correct."

13        You were asked those questions and you gave those

14        answers, right?

15   A    Yes, with the same caveat that I just mentioned.

16   Q    And --

17             THE COURT:  Mr. Goldberg, could I ask you and Mr.

18   Cosenza to come up for a --

19             MR. COSENZA:  Yeah.

20             THE COURT:  -- second, please?

21             MR. GOLDBERG:  Sure.

22        (At sidebar off the record)

23             THE COURT:  Okay.  I'm sorry to interrupt you, Mr.

24   Goldberg.  Go ahead.

25             MR. GOLDBERG:  No problem, Your Honor.
```

Page 81

1            MR. COSENZA:  Could we -- Your Honor, in light of

2      our sidebar I want to go to page 156.  I request that the --

3      for completeness we start at line 8 on 156 and we go all the

4      way down to line 22 on this -- on the cost of litigation

5      issue.

6            THE COURT:  All right.  Mr. Goldberg, do you want

7      to read that in?

8            MR. GOLDBERG:  156, eight to 156, 22.  That ends a

9      question.

10           THE COURT:  156, eight --

11           MR. COSENZA:  Yeah, eight.

12           MR. GOLDBERG:  Eight to 22?

13           MR. COSENZA:  Yeah, eight through 22.

14           THE COURT:  Well --

15           MR. GOLDBERG:  22.  I'm saying 22 is --

16           THE COURT:  -- through 23.

17           MR. GOLDBERG:  -- a question.

18           MR. COSENZA:  23, I'm sorry.

19           THE COURT:  23 and get the answer.

20           MR. GOLDBERG:  Got it.

21           THE COURT:  Okay.

22           MR. GOLDBERG:  Okay.  So I've read eight through

23      14.  Can I -- is it acceptable if I --

24           THE COURT:  Yeah.  Go ahead.

25           MR. GOLDBERG:  -- read 15 on?

1            THE COURT:  Sure.

2    BY MR. GOLDBERG:

3    Q    Were you asked the following questions and did you give

4    the following answers, sir:

5         "Question:  So in that scenario at least for cost of

6         litigation purposes the settlement reached at trial

7         should receive more, correct?

8         "Answer:  I'm not sure that follows either because at

9         that point the costs are sunk.

10        "Question:  Do you remember earlier in the day we

11   talked   about your nine factors?

12        "Answer:  Uh-huh."

13        Were you asked those questions and did you give those

14   answers?

15   A    Yes.

16            MR. GOLDBERG:  Is that everything?

17            MR. COSENZA:  Yes, for now.  Yes.

18        (Pause)

19            BY MR. GOLDBERG:

20   Q    So if there's an early settlement that avoids

21   litigation costs there is a discount associated with that,

22   right, a cost avoidance discount to the settlement

23   generally?

24   A    Frequently, but as I discuss elsewhere in the

25   deposition not always because economizing on costs is

Page 83

1    reciprocal and it's not what you're directing me to.  But I

2    explain that at a different part of the deposition.

3         So sometimes there's no discount.  Sometimes the

4    discount can be a premium.  It just depends on the

5    circumstances even though at least in my experience

6    frequently economizing on costs is a reduction in the

7    settlement, but certainly not always and it depends on the

8    relevant facts and circumstances.

9    Q    So frequent -- frequently an early settlement that

10   avoids litigation costs will result in a discount to the

11   settlement; is that right?

12   A    Frequently, yes.  That's -- in my experience that's

13   correct.

14   Q    Now your Factor 3(b) which also appears on page 22 of

15   your report -- you should keep your deposition transcript

16   happy?

17   A    It's just not so easy because --

18   Q    You don't have enough room?

19   A    -- there's not enough room.  But I'll keep -- I'll keep

20   reaching for it.  Page 23, sir?

21   Q    Two, 22,

22   A    22.  Okay.  I have it.

23   Q    Now that's -- that goes to the delays associated with

24   recovery caused by litigation, correct?

25   A    Among other things, correct.

Page 84

1   Q      Well, that's that factor.

2   A      Oh, (b) is -- 3(b) is that, correct.

3   Q      Right.  So -- and generally speaking the more delay, if

4   you avoid the delay that's associated with litigation that

5   will result in a discount to the settlement value, right?

6   A      From the plaintiffs' perspective that's correct.

7   Q      And your Factor 3(c) on page 22 where you write,

8   "requirements that a threshold fraction of the certificate

9   holders direct and indemnify the trustee to investigate

10  claims."  Do you see that?

11  A      I do.

12  Q      As we talked about in your deposition that's the

13  requirement that trustees often impose on certificate

14  holders that the trustee requires a direction and indemnity

15  from a sufficient number of holders, right?

16  A      That's correct.

17  Q      And in some cases there are questions as to whether

18  there will be sufficient certificate holder support to be

19  able to provide the requisite direction and indemnity,

20  right?

21  A      That's correct.

22  Q      And in those cases, in those circumstances where there

23  are questions as to whether certificate holders will be able

24  to provide a direction and indemnity, that's a factor that

25  drives the value of a settlement down, right?

Page 85

1   A     Correct.

2   Q     Now your Factor 4 on page 22 where you write, legal

3   impediments to the plaintiffs' pursuit of claims, do you see

4   that?

5   A     I do.

6   Q     That's -- generally you're speaking about if there are

7   significant legal defenses, right?

8   A     Correct.

9   Q     And as is not unusual in the RMBS put back

10  circumstances there's -- sometimes there are issues of

11  statutes of limitations, right?

12  A     That's right.

13  Q     And the presence of a potentially bona fide statute of

14  limitations defense, that has the impact of driving the

15  value of a settlement down, right?

16  A     That's correct.

17  Q     Now your Factor 5, that factor is the bill --  ability

18  of the potential defendant to pay a cash judgment; is that

19  right?

20  A     Yes.

21  Q     And you agree with me that at least as applied here

22  that factor should be giving minimal or no weight because

23  we're talking about Lehman who already is in bankruptcy,

24  right?

25  A     Correct.

Page 86

1    Q    And your Factor 6, the differences in governing legal

2    issues and standards, that factor is not relevant to your --

3    well, withdrawn.  Let me take a step back.

4         You're aware that the trustees have their own expert

5    who has proffered examples of settlements that it believes

6    are comparable, right?

7    A    I'm aware of that.

8    Q    And your Factor 6, the differences in governing legal

9    standards, that factor is not relevant to your disagreement

10   with the trustees' expert, right?

11   A    I don't think that's correct.

12   Q    You don't think that's correct.

13        (Pause)

14   Q    If you could open your deposition, sir.

15   A    Okay.  I have it.

16   Q    Could you turn to page 105, please?

17   A    Okay.

18   Q    Were you asked the following question and did you give

19   the following answer, page 105, starting on line 12:

20        "Question:  So your Factor 6 is not relevant to your

21        potential disagreement with Mr. Finkel over what an

22        appropriate comparable settlement might be?

23        "Answer:  That's right."

24        Were you asked that question and did you give that

25   answer?

Page 87

```
 1              MR. COSENZA:  Your Honor, I --

 2              THE COURT:  Mr. Cosenza, why don't you folks come

 3   up again?

 4              MR. COSENZA:  Yeah.

 5         (At sidebar off the record)

 6   BY MR. GOLDBERG:

 7   Q    Professor, were you asked that question and did you

 8   give that answer?

 9   A    I did, but again it's misleading because if you look at

10   my report there's a detailed discussion of the differences

11   between legal standards that distinguish some of the cases

12   that the -- one of the trustees' experts, Mr. Aronoff has

13   cited.  So I think your question, because it's incomplete,

14   leaves a very misleading impression.

15   Q    Well, your -- you are aware that Mr. Finkel has

16   provided other settlements that he -- that the trustees

17   assert are comparable settlements, right?

18   A    My differences with Mr. Finkel are not about different

19   legal standards.  My differences with Mr. Aronoff are about

20   different legal standards and I don't want to give a

21   misleading answer by not providing the context in which my

22   report was written.

23   Q    I didn't ask you about Mr. Aronoff.  I asked you very

24   specifically that I -- and even before I went to the

25   transcript, sir, I asked you if you're aware that the
```

Page 88

1   trustees proffered an expert who provided other comparable

2   settlements. And you're aware of that, right?

3   A    There's multiple trustee experts and I was talking

4   about one in my report and apparently you're talking about

5   another one.

6   Q    You're under the impression that Mr. Aronoff has

7   provided comparable settlements in his expert report?

8   A    Mr. Aronoff criticized my choice of comparable

9   settlements by --

10  Q    I see.

11  A    -- pointing to two other examples which he thought

12  justified choosing different --

13  Q    Okay.

14  A    -- breach rates, and I pointed out that those are based

15  on completely different legal standards.  So, again, I don't

16  want my answer to be misleading because your question is

17  incomplete.

18  Q    Okay.  I'm speaking about Mr. Finkel right now.  You're

19  aware that he, as part of his report, laid out other

20  settlements that he -- that the trustees contend are

21  comparable.  You're aware of that?

22  A    I am aware of that.

23  Q    And with respect to your disagreement with Mr. Finkel

24  over which settlements are comparable and which are not,

25  your Factor 6 is not relevant to that disagreement, right?

Page 89

1    A    Not relevant to that disagreement, correct.

2    Q    And your Factor 7 on page 22 which we've already talked

3    about is that the differences in the underlying loans, you

4    view that factor, that's -- your conclusion is inconclusive

5    in terms of comparing settlements, right?

6    A    I'm sorry.  Page 22, sir?

7    Q    Page 22 of your report.

8    A    Okay.

9    Q    It's the differences in underlying loans.  It's the

10   issue we spoke about previously.

11   A    Yes.  It's inconclusive in the sense that it does not

12   establish that the Lehman loans were either consistently

13   better or consistently worse than the loans at issue in the

14   comparable settlements.

15   Q    All right.  So you can draw no conclusions as to

16   whether a reasonable settlement here would be higher, lower

17   or the same based on that factor alone?

18   A    I don't agree.  That's what you asked me before.  What

19   that suggests to me is that there's no reason because

20   there's no systematic difference between the loans at issue

21   here and the loans at issue in the comparable settlements to

22   believe that because of that factor a settlement value in

23   this case should be outside the range of the other

24   comparable settlements.

25        (Pause)

Page 90

1    Q    Sir, all I'm saying is that you were unable to draw

2    conclusions based on your Factor 7, right?  It's

3    inconclusive.

4    A    It's inconclusive in the way that I described.

5    Q    Yes.

6    A    Correct.

7    Q    Okay.  I accept that.

8         Now your Factor 8, the time period of the settlement,

9    again, you can -- you draw no conclusions here based on this

10   factor as to whether the claims in this case are worth more,

11   less or the same as the claims in your comparable

12   settlements?

13   A    That's correct.

14   Q    And your Factor 9, incentives of a defendant to settle,

15   I appreciate you say that that factor isn't present here

16   because Lehman is no longer operating, right?

17   A    Correct.

18   Q    But you did no work to actually quantify the impact of

19   that factor, right?

20   A    I didn't and I don't know how it would be possible to

21   quantify that.

22   Q    And -- but you didn't?

23   A    I did not.

24   Q    Now when you looked at -- when you're evaluating

25   comparable settlements and you look at each of the nine

1    factors that we've just talked about, you look at each of

2    those factors independently and you do basically a binary

3    analysis as to whether the factor as applied either has an

4    increasing or decreasing effect on the settlement, right?

5    A    Or you can't tell.  Correct.

6    Q    Or you can't tell.  So one of your comparables in your

7    report was a Lehman securities' class action case, right?

8    A    That's right.

9    Q    But that doesn't appear in the demonstrative that's in

10   Tab 9 that Mr. Cosenza showed you?

11   A    It does not.

12   Q    And so you're not being asked to testify here as to

13   that case as a comparable?

14   A    Unless I'm asked, correct.

15   Q    You haven't been?

16   A    Correct.

17   Q    Now as to the Rescap settlement, you actually concluded

18   that the Rescap settlement is of limited value to assessing

19   the claims here, right?

20   A    Relatively speaking, correct?

21   Q    So you agree with me that the best comparables you have

22   are Countrywide, JPM, Citigroup and WAMU, isn't that right?

23   A    Correct.

24   Q    So let's focus on those for a little bit.

25   A    Okay.

Page 92

1    Q    One of your bases for concluding that the Countrywide

2    settlement -- withdrawn.  Sorry about that.  Sorry about

3    that.

4         In Countrywide there was, in fact, non-cash

5    consideration

6    to the trustees, right?

7    A    That's correct.

8    Q    And that was above and beyond the cash payment?

9    A    That's right.

10   Q    And so that had the impact, all else being equal, you

11   would consider the non-cash factors to mean that the

12   trustees should get a little bit of a bump here because

13   they're not getting non-cash consideration, right, all else

14   being equal?

15   A    All else equal it's a reason why the Countrywide

16   settlement would be higher than the proposed allowed claim

17   in this case or the ultimate allowed claim in this case.

18   Q    Well, when you say should be higher you mean they

19   actually were paid more.  It's not --

20   A    Correct.

21   Q    -- just saying it's valued higher.

22   A    Yes.  I'm saying they were paid more.  Correct.

23   Q    And as to your -- the cost avoidance factor, your

24   factor 3(a) that we talked about, Countrywide was a pre-

25   litigation settlement, right?

Page 93

```
 1   A    Correct.

 2   Q    So Countrywide had that cost avoidance discount applied

 3   to them, right?

 4   A    Well, you know, as I said the cost avoidance issue is

 5   complicated both because you can't tell which way the cost

 6   cut in every single case and also because the costs are no

 7   longer an issue at the time of the negotiation.

 8   Q    But in Countrywide do you agree with me that there was

 9   a cost avoidance discount applied?

10   A    No, I don't.  I mean --

11   Q    You don't?

12   A    -- it's possible, but I could not say unequivocally.

13   Q    So let's put it this way.  There's no cost avoidance

14   discount in this case here because we're having this

15   hearing, right?

16   A    I guess you could say that.

17        (Pause)

18   Q    Now also in Countrywide the trustee avoided the cost of

19   having to do a loan by loan file review, right?

20   A    A complete loan by loan file review, correct.

21   Q    And that was a factor that drove down the value of the

22   settlement in that case?

23   A    You know, again, it -- it's hard to say unequivocally

24   because it would depend on what a complete loan file reveal

25   would -- loan file review would show.
```

Page 94

1   Q    Well, that's talking about the quality of the loans and

2   so forth.  I'm just saying the fact that the trustees

3   avoided having to extend the cost of doing the loan file

4   review, that's a cost avoidance is something that typically

5   from the plaintiffs' perspective drives the value of the

6   settlement down, right, typically?

7   A    From the plaintiffs' perspective, yes.  From the

8   defendants' perspective the opposite.  And how those two

9   interact, again, just depends on the relevant facts and

10  circumstances.

11  Q    As your Factor 3(b), avoiding the delay, that factor

12  was present in Countrywide, right?

13  A    Yes.

14  Q    And that drove the value of the settlement down, right?

15  A    From the plaintiffs' perspective certainly, yes.

16  Q    And obviously that's a -- that delay avoidance is not

17  at play here because we've had the -- we've incurred the

18  delay?

19  A    Correct.

20  Q    Now the concern, your Factor 3(c) the concern about

21  having sufficient certificate holders' support in order to

22  be able to maintain the litigation, that was a factor and a

23  concern in Countrywide, right?

24  A    Correct.

25  Q    And that drove the value of the settlement down?

Page 95

1    A    Yes.

2    Q    And that's not at play here?

3    A    Correct.

4    Q    Now you actually -- I know you say your Factor 7 is

5    inconclusive overall, but at least as to the Countrywide

6    settlement you actually were able to conclude that the loans

7    in Countrywide were less likely to default, right?

8    A    Based on my statistical analysis, correct.

9    Q    And because the loans were less likely to default that

10   meant that the settlement value in Countrywide would have

11   been lower?

12   A    That's right.  I mean, it's assuming that the

13   participants conducted the same analysis that I did and

14   reached the same conclusions.

15   Q    So as to -- so that's Countrywide.  As to your JPM

16   comparable that, too, was a pre-litigation settlement,

17   right?

18   A    Correct.

19        (Pause)

20   Q    And -- sorry.  So in JPM there was a cost avoidance

21   discount applied to the settlement, right, or at least the

22   settlement was subject to that cost avoidance discount?

23   A    I'm just repeating myself.  It -- whether there was a

24   cost avoidance discount is not something that you can tell

25   just because costs were avoided because there's a benefit to

Page 96

1    both plaintiffs and defendants, and how it cuts in terms of

2    the settlement value is ambiguous.

3         As I said I think frequently it results in a lower

4    settlement value.  But in any particular situation you have

5    to analyze the relevant facts and circumstances to know

6    whether a discount exists or in some cases the opposite, a

7    premium.

8    Q    But in the case of the JPM it had the effect of a

9    discount, right?

10   A    I don't know if it had the effect of a discount.

11   Q    You don't?  Let's look at your deposition, please, page

12   175.

13   A    Okay.

14   Q    Are you there, sir?

15   A    Correct.

16   Q    Were you asked the following questions and did you give

17   the following answers, beginning on page 175, line 7 --

18   well, for completeness I'll start at line 6:

19        "Question:  Sorry.  I mean, relevance to the value of

20   the  settlement.  Does it have any relevance to the value of

21        the settlement to you that the fact that the JPM

22        settlement happened before litigation was commenced?

23        "Answer:  Yes.  I mean, for the reasons that are

24        discussed in my report.

25        "Question:  All else being equal, the fact that the

Page 97

1          settlement occurred pre-litigation would give some form

2          of a discount to the settlement?

3          "Answer:  Generally speaking that's correct.

4          Were you asked those questions and did you give those

5     answers?

6     A    Yes.  And elsewhere I explained what generally speaking

7     means.

8     Q    But I didn't --

9               MR. COSENZA:  Your Honor, for completeness I think

10    we could start at page 173, line 14.

11              MR. GOLDBERG:  173?  Feel free to read it.

12              MR. COSENZA:  "Question:  So at least in that

13          respect, all else being equal, this case, because

14          essentially being tried versus JPMorgan case is settled

15          pre-litigation, that factor alone, all else being

16    equal,   will make a settlement here should be worth more

17    than a   settlement in JPM?

18          "It's hard to say --

19          "Objection.  Skip.  You can answer.

20          "Answer" -- I'm on 173, line 24 -- "It's hard to say.

21          All else being equal, given the settlement history of

22          this case it just becomes an unrealistic question.

23          "Question:  This is the hypothetical.  All else being

24          equal this case is ready for trial.  JPM settled before

25          litigation even was commenced.  That fact alone, all

1    else     being equal, that would counsel in favor of this

2    case     having a higher value than the JPM case, right?

3         "Objection.  Skipping over."

4         "Answer" -- line 13 -- "You said it's a hypothetical.

5    It   can't be a hypothetical if you were talking about this

6         case in connection with the facts and circumstances of

7         this case.  I don't think the question is realistic and

8         an accurate description of the difference between this

9         case and the JPM case or any other case.

10        "Question:  Is it a factor to be considered at all that

11        the JPM settlement happened pre-litigation or is that

12        entirely irrelevant?

13        "Answer:  I wouldn't say it's entirely irrelevant.

14        "Question:  So it has some relevance?

15        "Answer:  It has some relevance in describing the

16        relevant background and differences between the

17   different     cases."

18             MR. COSENZA:  Thank you.

19   BY MR. GOLDBERG:

20   Q    You were asked those questions and you gave those

21   answers?

22   A    I did.

23   Q    And in JPM there was a potential bona fide statute of

24   limitations defense, correct?

25   A    Correct.

Page 99

1   Q    And, in fact, that defense was applicable to about half

2   of the trusts, right?

3   A    Potentially, correct?

4   Q    And there is no statute of limitations issue in this

5   case, right?

6   A    As far as I know, correct.

7   Q    And in JPM there was a concern about whether or not the

8   certificate holders would be able to give the necessary D&I,

9   right?

10  A    I believe that's correct.

11  Q    And, again, that issue is not present here?

12  A    Correct.

13  Q    Let's talk about Citigroup.  So Citigroup was also a

14  pre-litigation settlement, right?

15  A    I believe so.  Correct.

16  Q    We don't have to repeat the cost avoidance debate you

17  and I are having right now, but we agree it was a pre-

18  litigation settlement, right?

19  A    Correct.

20  Q    And we agree that costs were, in fact, avoided,

21  litigation costs were avoided?

22  A    Yes.  I agree.

23  Q    Now there were statute of limitations defenses in

24  Citigroup, right?

25  A    Correct, potential ones.

Page 100

1    Q    Potential ones.  In fact, so Citigroup involved 206

2    trusts, right?

3    A    I believe that's right.

4    Q    And of those 206 trusts 117 of them were subject to

5    statute of limitations defenses?

6    A    Potentially.  That's my recollection.

7    Q    Did you do any independent analysis as to whether the

8    statute of limitations defense was valid or invalid?

9    A    No, I didn't.

10   Q    But the presence of that potential defense drove the

11   value of the settlement down, right?

12   A    Correct.

13   Q    And, again, there's no statute of limitations issue

14   here?

15   A    That's right.

16   Q    And, again, in Citigroup there was a concern about

17   whether the certificate holders would be able to provide a

18   direction in indemnity so as to allow a litigation to

19   proceed, right?

20   A    Correct.

21   Q    And that's not an issue here?

22   A    Correct.

23   Q    Washington Mutual, the WAMU settlement, there were

24   significant statute of limitations issues there, right?

25   A    Yes.

Page 101

```
 1   Q     There were 99 trusts bringing claims, right?

 2   A     I should remember that, but I don't remember the exact

 3   number.

 4   Q     Well, do you remember that there was 74 of them that

 5   had potential statute of limitations problems?

 6   A     I don't.  I remember there was a significant number,

 7   but I don't remember the exact number.

 8   Q     Might I show you a document that might refresh your

 9   recollection, sir.

10   A     Of course.

11         (Pause)

12   Q     Bear with me.  Apologies.

13         If you could look in the binder, if someone could help

14   the witness, please, provide him with the Volume 2 binder.

15              UNIDENTIFIED SPEAKER:  Which exhibit?

16              MR. GOLDBERG:  We are going to look at Exhibit PA-

17   395.

18              UNIDENTIFIED SPEAKER:  That's Volume 3.

19              MR. GOLDBERG:  Oh, it's Volume 3?  Sorry.

20              THE COURT:  Three?

21              MR. GOLDBERG:  Three.  Apologies.  It's in my two.

22   Sorry about that.

23         (Pause)

24              THE WITNESS:  Thank you.

25   BY MR. GOLDBERG:
```

Page 102

1    Q    Do you have Exhibit PA-395 in front of you, sir?

2    A    I do.

3    Q    And do you see this is a petition by Deutsche Bank as a

4    trustee to seek instructions from the Court about whether to

5    approve or not approve a certain settlement?

6    A    I do.

7    Q    And if you turn to page 23 of 1,517.  This is an

8    excerpt.

9    A    Okay.

10   Q    And do you see there's a paragraph 65?

11   A    I see it.

12   Q    And do you see under paragraph 65 there's a subheading

13   for statute of limitations?

14   A    Yes, sir.  I see that.

15   Q    And do you see the second sentence reads:

16        "Indeed, in its dismissal motion WMMSC and JPMC argued

17        that as a matter of law the claims for 74 of the 99

18        trusts including all of the WMMSC trusts are time-

19   barred    under the laws of either Delaware three years or

20   New York  six years as applicable."

21        Do you see that?

22   A    Yes, sir, I do.

23   Q    Does that refresh your recollection that 74 of the 99

24   trusts at issue were subject to a statute of limitations

25   defense?

Page 103

1   A    It refreshes my recollection that there was a claim to

2   that effect, but it was disputed.  I don't think it -- to

3   the best of my recollection that was never resolved one way

4   or the other.

5   Q    That's because the case settled.

6   A    Because the case settled.  Exactly.

7   Q    There are also concerns in the WAMU settlement about

8   whether there would be sufficient certificate holder support

9   in order to provide the necessary direction and indemnity to

10  maintain the case?  Yes?

11  A    I believe so.  Yes.

12  Q    And there were concerns in WAMU about delays in costs

13  if the litigation needed to be pursued?

14  A    You know, that's -- you know, by definition that's true

15  because the litigation didn't end, but that was not a pre-

16  litigation settlement.  I mean, that case was litigated for

17  years prior to the settlement so it's a little bit

18  different.

19  Q    I'm going to read you a portion of your deposition.

20  I'm just checking because I don't want to pull something out

21  of context.

22       (Pause)

23  Q    Sir, if you would turn to page 188 of your deposition?

24  A    Okay.

25  Q    Were you asked the following questions and did you give

Page 104

1    the following answers starting on line 14:

2         "Question:  In the WAMU settlement there was concern

3         about the delay associated with the litigation and the

4         intended costs?

5         "Answer:  That's right.

6         "Question:  Which is not at issue here, correct?

7         "Answer:  Correct.

8         "Question:  It would have the same effect that we

9         discussed with respect to the other settlements with

10   your     same caveats?

11        "Answer:  Correct."

12        Were you asked those questions and did you give those

13   answers?

14   A    Yes.

15   Q    And that concern about the delay in costs no longer

16   comes into play in this estimation proceeding, correct?

17   A    That's right.

18   Q    If you turn to --

19   A    You know, actually, let me just modify what I just

20   said.  It doesn't come into effect the same way, but

21   obviously this estimation proceeding is a more truncated

22   proceeding no matter how extensive it is as compared with a

23   full blown trial on the merits with all of the factual and

24   legal issues contested.

25        So I don't think it's quite right to say that there's

Page 105

```
 1    no issues of avoiding a delay in getting a more expeditious

 2    result here.

 3    Q    Well, the issues, the concerns about delay and cost

 4    that were present in WAMU, those concerns are not present

 5    here, right?

 6    A    That's correct.

 7    Q    Sir, take a look at your report if you would.  It's --

 8    depending on if you either have the plan administrator's

 9    exhibit or you'll have ours.  Ours is TRX-579.

10    A    I -- it's the same report.

11    Q    It's the same report.

12    A    This is a shorter binder, a slimmer binder --

13    Q    That's --

14    A    -- so it's easier to work with.

15    Q    -- perfectly acceptable to me.

16         Sir, if you take a look at page 29 of your report.

17    A    Okay.  I have it.

18    Q    Do you see that you have a table there?

19    A    Yes, I see that.

20    Q    And in this table you do analyses comparing realized

21    lost settlement value to come up with a recovery ratio,

22    right?

23    A    That's right.

24    Q    Now if you look second from the bottom you have the

25    WAMU settlement?
```

Page 106

1    A    Yes, I see that.

2    Q    And you calculate the recovery ratio to be 13.2

3    percent?

4    A    That's right.

5    Q    So we'll talk about this a little bit, but three --

6    three billion divided by the expected losses of 18.6 billion

7    actually doesn't come to 13.2, right?

8    A    Correct.

9    Q    That math actually translates to 16 percent?

10   A    That's right.

11   Q    Or a little above 16 percent?

12   A    That's right.

13   Q    All right.  But you have 13.2 percent because one of

14   the defendants in the WAMU settlement was insolvent in

15   receivership?

16   A    That's right.  I try to explain this calculation --

17   Q    Right.

18   A    -- in the report.

19   Q    Understood.  So you applied some discounted factor to

20   the recovery because the plaintiff wasn't going to get, as

21   Judge Chapman pointed out, wasn't going to get real dollars.

22   It was going to get what I'll characterize as bankruptcy

23   dollars?

24   A    I wouldn't say that's exactly the reason, but as I said

25   there is an explanation in the report taking into account

Page 107

1   that there was a -- both a solvent and non-solvent party at

2   issue in WAMU.

3   Q    Well, explain it to me.  What's the -- how did you do

4   the calculation?  How did you decide how to devise a

5   discount?

6   A    Just hold on for one second.

7   Q    Sure.

8   A    It's explained in a somewhat lengthy footnote, Footnote

9   102 of the report on page 30.  And what the footnote

10  attempts to do is to provide the actual cash value of the

11  claim and allocate it to the two claims, the bankrupt claim

12  and the non-bankrupt claim so they both could get either

13  recovery or a proposed allowed claim of 32.2 percent.

14  Q    So if I understand it correctly, and by all means

15  please tell me if I get it wrong, you figured out what the

16  recovery ratio was going to be in the insolvency.  You took

17  the value of the settlement.  You applied that recovery or

18  recovery ratio and then you analyzed how much of the claim

19  was attributable to the non-bankrupt entity, right, or the

20  entity was -- that wasn't --

21  A    Generally speaking --

22  Q    -- in receivership?

23  A    -- that's right and that's why the number is a little

24  different from the 16 percent number that you --

25  Q    Understood.

Page 108

1    A     -- refer to.

2    Q     And -- right.  And that's because the claims against

3    the non-bankrupt entity were getting paid in, again, what

4    I'm characterizing as bankruptcy dollars, right?

5    A     I -- you know, I guess you could call it that.  Again,

6    there's a fuller description in the footnote, but that's the

7    general idea.

8    Q     Do you understand what I mean when I say bankruptcy

9    dollars?

10   A     I think so; that you mean that there's part of the

11   calculation in the footnote is for an allowed claim for the

12   bankruptcy part of the --

13   Q     Exactly.

14   A     -- of the case.

15   Q     Exactly.  You're given the allowed claim and then you

16   apply that to the recovery ratio in the bankruptcy and

17   that's how you figure out real dollars, right?

18   A     Or backwards.  You actually know real dollars because

19   of the cash value and then you figure out how that can be

20   applied to both the bankruptcy and the non-bankruptcy part -

21   -

22   Q     Fair enough.

23   A     -- of the claim.

24   Q     Okay.  So going back to your Table 29, excuse me, your

25   table on page 29.  You actually label it Table 1.

Page 109

```
 1    A     Okay.

 2    Q     So the Countrywide settlement, that was real dollars,

 3    right?

 4    A     Yes.

 5    Q     And the JPM settlement, that was --

 6    A     Well, it was real dollars as well as --

 7    Q     Non-cash --

 8    A     -- non-cash dollars.

 9    Q     But it was valued as real dollars.

10    A     That's right.  Correct.

11    Q     And in JPM it was real dollars, right?

12    A     Correct.

13    Q     And in Citigroup it was real dollars, right?

14    A     Correct.

15    Q     All right.  I'm not talking about Rescap or Lehman

16    because we've agreed those are at least less relevant to our

17    analysis today, fair?

18    A     Rescap for sure and Lehman obviously.  Oh, you mean the

19    Lehman securities cap --

20    Q     That's what I meant.

21    A     -- yes, that's right.

22    Q     Okay.

23    A     I agree.

24    Q     But you -- and now you compare those settlements to

25    what Lehman proposes the allowed claim to be, right?
```

Page 110

1    A    Correct.

2    Q    But that allowance is in bankruptcy dollars.  It's the

3    amount of the allowed claim.  It's not the amount of actual

4    cash --

5    A    That's right.

6    Q    -- that the trustees are going to get.  So you're --

7    the Lehman proposed allowed claim amount of 11.2 percent is

8    a bankruptcy dollar and you're comparing that to real dollar

9    settlements, right?

10   A    Correct.

11   Q    So if you were going to do an apples to apples

12   comparison you would have to apply the recovery ratio here

13   in the Lehman bankruptcy to your percentages in order to

14   line it up with what would be a real dollar settlement as

15   your other comparables?

16   A    If it were possible to do, correct.

17   Q    So hypothetically if I were to tell you that the

18   recovery ratio in this bankruptcy was going to be about 40

19   percent, that would make this settlement, the -- excuse me.

20   That would make the amount that the plan administrator's

21   proposing roughly a four and a half percent real dollar

22   settlement?

23           MR. COSENZA:  I --

24           THE COURT:  Mr. Cosenza.

25           MR. COSENZA:  I object to that.  Sidebar.  I just

Page 111

1      --

2              THE COURT:  Yeah.

3          (At sidebar off the record)

4              THE COURT:  I don't remember where we left off so

5      maybe you could look at your screen --

6              MR. GOLDBERG:  We have the --

7              THE COURT:  -- Mr. Goldberg.

8              MR. GOLDBERG:  -- real time.

9      BY MR. GOLDBERG:

10     Q    I believe, sir, that the pending question to you is I

11     want you to assume for hypothetical purposes for me that the

12     recovery ratio in this bankruptcy is 40 percent.  Do you

13     understand that?

14             THE COURT:  You don't mean that.  You don't mean

15     the recovery ratio.  You mean the distribution percentage

16     that --

17             MR. GOLDBERG:  That's what I mean.

18             THE COURT:  -- an allowed claim will receive.

19             MR. GOLDBERG:  That's what I mean.  Thank you.

20         (Laughter)

21     BY MR. GOLDBERG:

22     Q    Do you understand that, sir?

23     A    I do.

24     Q    Okay.  So in that scenario if you were to make an

25     apples to apples comparison on the Lehman proposed claim

Page 112

1    amount to your other real dollar comparable settlements,

2    that would make the Lehman proposed claim amount in real

3    dollars about four and a half percent; is that right?

4    A    It would make it lower. I don't agree that would be an

5    apples to apples comparison.  But unless you're defining

6    apples to apples meaning the amount of cash that's

7    ultimately received by the creditors.

8    Q    Well, I mean, the -- at least the value in real dollars

9    given to the creditors, whether cash or cash equivalents.

10   A    Yes.  It -- to the extent that the creditors receive

11   less than a hundred cents on the dollar, then the cash that

12   they receive would be lower than the allowed claim.

13   Q    And in the WAMU settlement you did some form of that

14   analysis, right, because one of the defendants was

15   insolvent.  You applied a discount to what you characterized

16   as the recovery ratio because some of the claim was being

17   paid in not real dollars, something characterized like what

18   I call bankruptcy dollars; is that right?

19   A    Not exactly right for the reasons that I described.

20   Q    Forgive me for not understanding.  Can you describe why

21   that's not right?

22   A    Because we started with the cash value of the non-

23   bankruptcy part and then we tried to allocate that to the

24   recovery ratio for the non-bankruptcy part and also for the

25   bankruptcy part to come up with an allowed claim that would

Page 113

1    be the same for both.

2    Q    Okay.  And you did that because the value of the claim

3    against the non -- against the solvent defendants versus the

4    insolvent defendants, there's just a difference there in how

5    the plaintiff would be paid, difference in value, I mean?

6    A    Well, yes, by definition because one is an allowed

7    claim and the other is receipt of cash.

8        (Pause)

9    Q    Are you familiar with the RMBS put back case that's

10   recently been handled by Judge Castel (ph) in the Southern

11   District of New York?

12   A    I don't think so.

13   Q    No?  Have you heard of the Marm (ph) case?

14   A    I don't think so.  No.

15   Q    Are you aware that the Marm case was -- well, you know

16   nothing about the case; is that what you're telling me?

17   A    As I sit here I know nothing about the case.

18   Q    All right.  That saves some time.

19          MR. GOLDBERG:  Judge, this is not a bad time for

20   me to break from where --

21          THE COURT:  Sounds good.

22          MR. GOLDBERG:  -- I am in the outline.

23          THE COURT:  Let's see.  Why don't we try to come

24   back at about 2:30.  All right.  Thank you.

25          MR. GOLDBERG:  Thank you.

Page 114

1          (Recessed at 2:18 p.m.; reconvened at 2:39 p.m.)

2               THE COURT:  As the day grows on, when I walk

3     through that door it gets worse and worse.

4          (Laughter)

5               THE COURT:  So I apologize for the delay.

6               MR. GOLDBERG:  May I proceed, Your Honor?

7               THE COURT:  Sure.

8     BY MR. GOLDBERG:

9     Q    Professor Fischel, so I want to talk about a few

10    aspects of the Citigroup settlement --

11    A    Okay.

12    Q    -- that you say is a comparable settlement.  Compass

13    Lexicon was actually the entity that was hired to evaluate

14    that settlement for its approval before the Court, right?

15    A    That's right.

16    Q    And it was Dr. Cornell (ph) who was the specific

17    person?

18    A    Correct.

19    Q    And he'll be testifying for the plan administrator in

20    this proceeding later on as far as you know?

21    A    As far as I know, correct.

22    Q    And are you aware that Dr. Cornell did an analysis as

23    to whether certain trusts and certain loan groups within

24    trusts should accept or reject the global settlement?

25    A    Yes.  My understanding is that's exactly what he did.

Page 115

1    Q    And did you review that at all?

2    A    I looked at it.  I didn't do an independent analysis of

3    it, but I certainly looked at it.

4    Q    So are you aware that in certain circumstances, for

5    instance, if there were trusts or loan groups that did not

6    have a statute of limitations problem, that would be a

7    factor that he would use to recommend that that particular

8    trust or loan group reject the settlement?  I'm pulling one

9    out in isolation --

10   A    Yeah.

11   Q    -- or intending to.

12   A    You know, I don't remember that specifically, but that

13   would be logical.

14   Q    And one of the factors that he applied was whether he

15   thought there would be sufficient certificate holder support

16   for the loan group or trust to pursue litigation outside of

17   the global settlement?

18   A    Again, I don't recall that specifically, but those are

19   the same factors I discussed so that sounds logical.

20   Q    Are you aware, sir, that there, in fact, were opt out

21   trusts and opt out loan groups from the Citigroup

22   settlement?

23   A    You know, I'm not a hundred percent sure that I recall

24   that.  I know just based on my own experience in the

25   settlements that I analyzed that there were some trusts of

Page 116

1    that nature, so that doesn't surprise me.

2    Q    Do you remember we spoke earlier about some of the

3    features of the Citigroup settlement that might make it more

4    or less like this case just earlier today?

5    A    Yes, I do.

6    Q    Did you do any work, did you evaluate whether any of

7    the opt out trusts had attributes that would make them more

8    or less like this case or more or less like the general case

9    in Citi?

10   A    I didn't.  I didn't describe it in my testimony, but in

11   the JPM settlement there are a number of trusts, first of

12   all, that I initially recommended should reject the

13   settlement and then a series of separate discussions and

14   recommendations about those trusts, whether they ultimately

15   should accept or reject based on change in circumstances,

16   change in the terms that were being offered, et cetera.  But

17   in the Citigroup I did not.

18   Q    That's what I'm focused on, Citigroup right now.

19   A    I did not.

20   Q    You didn't do that?

21   A    I did not.

22   Q    Okay.  So if you could take a look, sir, at TRX-2837

23   which I believe is going to be in Volume 3, hopefully.

24            UNIDENTIFIED SPEAKER:  Two.

25            THE COURT:  What was the number again, Mr.

Page 117

1   Goldberg?

2          MR. GOLDBERG:  2837.

3          THE COURT:  Thank you.

4       (Pause)

5          THE WITNESS:  Okay.  I have it.

6   BY MR. GOLDBERG:

7   Q    Sir, do you know what a trust instruction proceeding

8   is?

9   A    Not by that name, no, I don't.

10  Q    Have you heard of something called a TIP proceeding?

11  A    Not that I recall.

12  Q    Well, if I were to tell you that there are

13  circumstances where a trust sometimes make an application to

14  a court to seek permission on how to behave in certain

15  circumstances, is that type of proceeding something that's

16  familiar to you?

17  A    Yes.

18  Q    All right.  You just weren't aware that it's called a

19  TIP or a trust instruction proceeding?

20  A    Well, TIP, I'm not sure I've ever heard that term.  You

21  know, trust instruction proceeding, you know, it sounds

22  consistent with the ordinary usage of the English language,

23  so.

24  Q    It does indeed.  Okay.  Well --

25          (Laughter)

Page 118

1   Q    -- let me -- well, we're looking at Exhibit 2837 and

2   what I will tell you when we're going to look at it, this is

3   the results from a TIP proceeding in connection with one of

4   the trusts for Citi.

5        Specifically, sir, can you take a look at the top of

6   the first page where it says, notice of entry of court

7   order?  Do you see that?

8   A    I do.

9   Q    And then do you see underneath it references a trust,

10  Citigroup Mortgage Loan Trust 2003-AMC3?

11  A    Yes, I see that.

12  Q    And that's one of the Citigroup trusts that was in the

13  settlement that you used as a comparable?

14  A    I assume so, but I don't know from memory.

15  Q    Do you have any reason to doubt that it is?

16  A    No, I don't.

17  Q    So if you turn to page 5 of 15, please.  Are you there?

18  A    I have it.

19  Q    Do you see the heading of the document that reads,

20  "Findings of fact, conclusions of law, directions and order

21  for judgment"?  Do you see that?

22  A    I do, sir.

23  Q    Okay.  So now if you take a look at page 7 and

24  paragraph 5 at the very bottom -- well, hold on.

25  A    I'm sorry.  Paragraph what at the very bottom?

Page 119

```
 1    Q    Let me just take one half a step back.  Sorry.

 2    Apologies for that.

 3          Do you see in paragraph 4 on page 7 --

 4    A    I don't see a paragraph 4 on page 7, period.

 5    Q    Look at the bottom page 7 of 15.  We're looking at that

 6    electronically --

 7    A    Oh, I'm sorry.

 8    Q    -- page number.  No.  That's okay.  It's not your

 9    fault.

10    A    I'm looking at the number --

11    Q    I know you are.  I should have been more specific.  I

12    apologize.  We're looking at the page number that is TRX-

13    2837 --

14    A    I have it now.  I'm sorry.

15    Q    Okay.

16    A    Yes.  I see paragraph 4.

17    Q    All right.  And do you see there's a description there

18    of how this lawsuit is from the group two mortgage loans

19    within this trust?

20    A    Yeah.  I'm not familiar with the document, so just give

21    me a second to look at it.

22    Q    Yes.  Absolutely.

23          (Pause)

24    A    Okay.  I've looked at paragraph 4.

25    Q    And do you see the reference that the case is about the
```

Page 120

1    group two loans within the subject trust?

2    A    Yes, I see that.

3    Q    And if you look at paragraph 5 do you see where it

4    reads, "The lawsuit has proceeded through the discovery

5    stage which included, among other things, the trustees'

6    service of expert reports."  And it goes on in a way that's

7    not relevant to me here.  Do you see that?

8    A    I do, sir.

9    Q    That's not unlike what's going -- what -- the stage

10   here, right?  We've had discovery.  We've had exchange of

11   expert reports.  That's happened here?

12   A    Well, I certainly agree with the second part of your

13   question.  To say it's not unlike, you know, that's more

14   complicated.

15   Q    At least in -- well, there are expert reports here,

16   right?

17   A    There are expert reports here.

18   Q    And there's been discovery here?

19   A    Correct.

20   Q    Now do you see, sir, if you go to pages 8 to 9, again,

21   we're using the 8 of 15 page numbers.

22   A    Okay.

23   Q    At the bottom of page 8 do you see there's a sentence

24   that reads:

25        "According to one of the experts retained by the RMBS

Page 121

```
 1        trustees in connection with the global RMBS settlement

 2        offer, the estimated payment amount for group two

 3        mortgage loans in this trust was approximately

 4        $19,864,960, an amount substantially less than the

 5        current offer."

 6        Do you see that?

 7  A     I do.

 8  Q     And do you see there's a footnote there at the end of -

 9  -

10  A     Yes, I see it.

11  Q     And you see the footnote references that Dr. Brad

12  Cornell was the expert referred to, right?

13  A     Yes.

14  Q     Now the next paragraph where -- you see where it reads,

15  somewhere in the one, two, three, fourth line down in the

16  middle it reads:

17        "With respect to group two mortgage loans the trustee

18  did  not accept the global RMBS settlement offer in reliance

19        upon the expert advice and the directing certificate

20        holders' direction to continue to pursue the lawsuit

21  with      respect to group two mortgage loans."

22        Do you see that?

23  A     I do.

24  Q     Now the next paragraph, paragraph 8, five lines down,

25  do you see the sentence that reads, "The new settlement
```

Page 122

1   offer provides for a cash payment of $37,500,000 by

2   Citigroup to the trustee."  And then it goes on.  Do you see

3   that?

4   A    I do.

5   Q    You agree with me that 37.5 million is more than 19.86

6   million?

7   A    Yes.

8   Q    So what's happened here basically is that this trust

9   opted out of the global settlement that you used as a

10  comparable, right?

11  A    Correct.

12  Q    And the Citigroup settlement was a pre-litigation

13  settlement?

14  A    Correct.

15  Q    But this case, the plaintiff trustee litigated for a

16  while anyway?

17  A    Correct.

18  Q    And it was able to obtain a much higher settlement,

19  right?

20  A    Correct.

21  Q    And at least with respect to this trust it did not have

22  statute of limitations problems?

23  A    I don't know that, but --

24  Q    You don't know?

25  A    -- it's logical to assume that, but I don't know it.

Page 123

1    Q    Fair enough.

2         Let's take a look at another example.  Just to -- in

3    the effort to speed things up it will look similar, but

4    let's take a look at another example.  It's the next

5    exhibit, TRX-2838.

6         (Pause)

7    A    I have it.

8    Q    All right.  And I take it before today you didn't do

9    any analysis with respect to the opt out trust that's

10   reflected in Exhibit TRX-2838, right?

11   A    No.  As I said I've done similar work in other

12   settlements, but not this one.

13   Q    Not for Citi you didn't.  Understood.  So if you take a

14   look at page 5, again, it's at the bottom, 5 of 21 do you

15   see again this is the trust seeking an instruction from the

16   court?

17   A    Yes.

18   Q    And do you see that if you look at page 9 now towards

19   the bottom of the page do you see where it reads:

20        "With respect to group three mortgage loans the trustee

21        did not accept the global RMBS settlement offer in

22        reliance upon the directing certificate holders'

23        direction to continue to pursue the lawsuit with

24   respect   to the group three mortgage loans."

25        Do you see that?

1    A    Yes, sir.  I see that.

2    Q    And that -- the expert in this matter also is Brad

3    Cornell, same expert?

4    A    Correct.

5    Q    And do you see if you look at paragraph 9 on page 8,

6    first sentence it reads, "The lawsuit has preceded through

7    the discovery stage and dispositive motions have been

8    briefed, but not yet argued."  Do you see that?

9    A    I do.

10   Q    And you understand that this matter has proceeded

11   through the discovery stage as we're here at the hearing,

12   right?

13   A    That's my understanding.

14   Q    Now do you see, sir, if you look at page 9 at the last

15   sentence in paragraph 10 do you see where it reads:

16       "According to one of the experts retained by the RMBS

17       trustees in connection with the global RMBS settlement

18       offer, the estimated payment amount for group three

19       mortgage loans in this trust was approximately

20       $20,237,190, an amount substantially less than the

21       current offer."

22       Do you see that?

23   A    I do.

24   Q    Now if you go to page 10, sir, paragraph 13 --

25   A    I see it.

Page 125

1   Q    -- fifth line down do you see the sentence that reads,

2   "The new settlement offer provides for a cash payment of

3   $38,550,000."  Do you see that?

4   A    I do.

5   Q    And obviously $38,550,000 is more than $20,237,000?

6   A    Correct.

7   Q    And so like the other opt out we just talked about this

8   trust, CMLTI 2007-AHL2, opted out of a global Citi

9   settlement, litigated for a while and got a substantially

10  higher number, right?

11  A    That is correct.

12  Q    Okay.  I have other examples, but I'm not going to

13  belabor the point.  But you appreciate that with respect to

14  the Citigroup settlement there are trusts that opted out and

15  ended up obtaining substantially more than they would have

16  obtained in the settlement had they not opted out?

17  A    Yes.  I accept that.

18  Q    You testified about the issue that you characterized --

19  I'm sorry.  I can't recall if you called it the collapsing

20  trusts or clean up trusts.  Do you remember that?

21  A    I do.

22  Q    How did you refer to that?

23          THE COURT:  Collapsing.

24          MR. GOLDBERG:  Collapsing.  Just trying to make

25  sure I was bringing up the witness on terminology.

1    BY MR. GOLDBERG:

2    Q    So you actually don't address anything about the

3    collapsing trusts in your expert report, right?

4    A    No.  I didn't know about them at that time.

5    Q    And you learned about them shortly before your

6    deposition?

7    A    Correct.

8    Q    And as I understand it in the main your view is that

9    you think the trustees agreed to the sale at an amount that

10   is comparable to what -- a value amount that is comparable

11   to what the plan administrator thinks the claim should be

12   estimated at here, and you think that's a reasonable

13   benchmark?

14   A    I think it is a valuable benchmark.  I didn't

15   characterize it the way you characterized it.  I didn't

16   characterize my view of it the way you characterized it in

17   your question.

18   Q    Why don't you characterize it in your own words?

19   A    That the fact that an outside appraiser valued the

20   claims in the collapsing trusts at either the same value as

21   the Lehman proposed allowed claim or lower was, I think,

22   highly supportive of the Lehman proposed allowed claim in

23   this case and fundamentally inconsistent with the trustees'

24   proposed allowed claim, particularly given as far as I'm

25   aware the trustees' failure to object to those results,

Page 127

1    failure to insist on a different appraiser, given the

2    trustees' duties to the certificate holders that would be

3    effected by a purchase by the master servicer at too low of

4    an amount.

5    Q    So you -- part of your -- that's a little different

6    than what you had said at your deposition.  Your testimony

7    was once that you thought that the trustees actually agreed

8    to the amount, right?

9    A    You would have to show me what, you know, I said.  I'm

10   not aware of the trustees affirmatively saying that they

11   agreed.  But I think the trustees at a minimum failure to

12   object both to the amount, to the choice of the appraisers

13   who reached those amounts, to me as I said is highly

14   probative economic evidence consistent with the Lehman's

15   proposed allowed claim and fundamentally inconsistent with

16   the trustees' proposed allowed claim.

17   Q    Have you -- did you look at the trust agreement on the

18   issue of the collapsing trust before you rendered your

19   opinion?

20   A    I looked at the various appraisal reports where the

21   appraisers reached the conclusions that they did.

22   Q    Did you look at the trust agreement before you rendered

23   your opinion?

24   A    I did not look at the trust agreement.

25   Q    Did you -- so I take it you didn't ascertain by way of

Page 128

1    the trust agreement that the way the collapsing trust

2    transactions work is that it's actually the seller who

3    agrees with the master servicer to sell the trust at issue?

4    You were -- are not aware of that obviously?

5    A    I don't think I was aware of that one way or the other,

6    but it doesn't have any --

7    Q    Answer my question, were you aware?

8    A    I was about to say I don't think I was aware of that

9    one way or another, but that's not what I based my opinions

10   on.

11   Q    So would it alter your opinion at all if it was

12   actually Lehman who agreed with the master servicer to sell

13   the assets of the trust at the given amount?  Does that --

14   A    No.

15   Q    -- impact your opinion at all?

16   A    It would not affect my opinion at all.

17   Q    Not at all?  How about the fact that the appraiser said

18   that it didn't evaluate the substance of the claims and the

19   value of the claims independently, would that affect your

20   opinion at all?

21   A    I'm not even sure that's accurate given --

22   Q    Would --

23   A    -- my own review of the appraisers' opinion.

24   Q    Would it affect your opinion?

25   A    As I said I don't believe it -- your statement is

Page 129

1    accurate given the representations made by the appraisers in

2    the valuation and opinions that they rendered.

3         (Pause)

4    Q    Are you aware that the appraiser just took the number

5    that the plan administrator is proffering here in this

6    proceeding and used that for the valuation number?  Are you

7    aware of that?

8              MR. COSENZA:  Your Honor, could I have a sidebar

9    on this?

10              THE COURT:  Sure.

11         (At sidebar off the record)

12    BY MR. GOLDBERG:

13    Q    Professor Fischel, so you did some work on what I'll

14    characterize as damages in this matter, right?  You did loss

15    calculations anyway?

16    A    In terms of calculating expected lifetime losses,

17    correct, mostly based on just accepting the numbers of

18    trustees' expert, Dr. Snow, but some independent

19    calculations as well that I -- as I understand it your

20    expert, Mr. Finkel, completely agreed with.

21    Q    My question is just you did loss calculations, yes?

22    A    Yes.

23    Q    And put them into two buckets, already realized loss

24    and estimated future loss, right?

25    A    That's right.

Page 130

1    Q    And we talked earlier today about the fact that to do

2    the estimated future loss that's when you were using the

3    Andrew Davidson models.  Do --

4    A    Correct.

5    Q    -- you remember that?  But on the realized loss

6    component, that's where you took Dr. Snow's calculations,

7    right?

8    A    That's right.

9    Q    And you didn't find his calculations to be unreliable,

10   correct?

11   A    Did not.

12   Q    You found them to be accurate?

13   A    Correct.

14   Q    Now when you did your work to calculate losses you did

15   not look at loss certificates, right?

16   A    I did not.

17   Q    And you did not look at the expense logs, right?

18   A    I did not.

19   Q    And you actually didn't look at remittance reports in

20   any detail, correct?

21   A    I did not.

22   Q    Do you remember at your deposition we were looking at

23   some native file Excel spreadsheets?

24   A    I do.

25   Q    And at the time you said you couldn't answer questions

Page 131

1    about them because you hadn't had an opportunity to review

2    those files?

3    A    Correct.

4    Q    Well, that's -- that was six weeks ago, right?

5    A    Correct.

6    Q    And so you've had an opportunity?

7    A    At least to ask a couple of questions about what they

8    were, correct.

9    Q    Well, you've had an opportunity.  I'll come to whether

10   you actually did or not --

11   A    Oh, I --

12   Q    -- in a moment.

13   A    Oh, I apologize.  Yes.  I --

14   Q    You've had an opportunity to look at those schedules?

15   A    I did.

16   Q    Did you?

17   A    Not in any detail, no, but I did do some what I would

18   call due diligence just to understand what the schedules

19   were.

20   Q    Okay.  I am going to want to look through some of those

21   schedules now and start to -- and we're going to put them up

22   on the screen and we're going to look at some native file

23   schedules, okay?

24   A    Okay.

25   Q    So let's start, and by looking at one document which is

Page 132

1      a hard copy, but we'll also display it.  It is TRX-2818.

2                  MR. GOLDBERG:  Which binder is this?

3                  UNIDENTIFIED SPEAKER:  That will be in Volume 2,

4      Your Honor.

5                  THE COURT:  Binder?

6                  MR. GOLDBERG:  Two.

7                  THE COURT:  Two.

8          (Pause)

9                  THE WITNESS:  Thank you.

10     BY MR. GOLDBERG:

11     Q    Do you see on the screen before you, sir, there's an e-

12     mail --

13                 MR. GOLDBERG:  Oh, Your Honor, I should tell you

14     we are depending on -- I don't fully know exactly which

15     direction this examination is going to turn with the native

16     files.

17                 THE COURT:  Yes.

18                 MR. GOLDBERG:  When we're done we're going to be

19     providing demonstratives of snapshots, hard copy of the

20     relevant portions of the native files that we're using.

21                 THE COURT:  Okay.  So I'm not looking because

22     there's nothing in the book except for a sheet that says

23     produced in native, right?

24                 MR. GOLDBERG:  Is that right?

25                 THE COURT:  Well --

```
 1              MR. GOLDBERG:  Yes.  That's -- no, that's fine.
 2      That's fine.
 3              THE COURT:  Right?  It actually --
 4              MR. GOLDBERG:  That's fine.
 5              THE COURT:  -- says 2818(s) --
 6              MR. GOLDBERG:  Yeah, which I think --
 7              THE COURT:  -- right?
 8              MR. GOLDBERG:  -- is the indicator that it's going
 9      to be a native file.  Yes.
10              THE COURT:  Right.
11              MR. GOLDBERG:  That's fine, Judge.
12              THE COURT:  Okay.  So we're going to get rid of
13      this and then we're going to look at the screen.  And then
14      you're going to give me screen grabs of --
15              MR. GOLDBERG:  Whatever we --
16              THE COURT:  -- wherever you go.
17              MR. GOLDBERG:  Exactly.
18              THE COURT:  Okay.
19              MR. GOLDBERG:  Exactly.
20      BY MR. GOLDBERG:
21      Q    Okay.  So, Professor Fischel, do you see it on the
22      screen before you?  We have Exhibit TRX-2818.
23      A    The e-mail?  That's --
24      Q    Yes, the e-mail.
25      A    -- an e-mail.  Yes, I see that.
```

Page 134

1    Q    Yes.  Okay.  And you see it's an e-mail from a person

2    at Wilke, Horton Nadall (ph), do you see that?

3    A    Yes.

4    Q    Okay.  And that e-mail is sent to Neil Leiberman (ph)

5    and copied to Todd Cosenza, do you see that?

6    A    Yes, I do.

7    Q    Now I want you to see -- do you see there's a PDF in

8    the e-mail?  It's entitled, "Letter from Cosenza to

9    Schuster."  Do you see that?

10   A    I do.

11   Q    Okay.  And let's open that up, please.  Now can you

12   expand that just a little bit just so it's a little easier

13   to read.  There you go.

14       So you see this is a letter from Mr. Cosenza to Mr.

15   Schuster.  Do you see that?

16   A    I do.

17   Q    You understand that Mr. Cosenza is counsel for the plan

18   administrator sitting right here?

19   A    I do understand that.

20   Q    And you understand Mr. Schuster is my partner for the

21   trustees sitting right here?

22   A    I understand that as well.

23   Q    Okay.  So if you see that Mr. Cosenza is writing about

24   a variety of matters, do you see that?

25   A    I do.

Page 135

1    Q    Let's go to the second page.  And do you see he has a

2    heading that reads, "Fischel information"?

3    A    I see that.

4    Q    And then do you see in the second bullet where Mr.

5    Cosenza writes, "You asked for certain data used in Mr.

6    Fischel's calculations."  Do you see that?

7    A    I do.

8    Q    And then Mr. Cosenza describes a few things.  Do you

9    see that?

10   A    I do.

11   Q    I want to focus on the last sentence in the paragraph

12   where it reads, "Attached as Exhibit 1 are the loan by loan

13   values for realized loss," and he's got a Bates number.  Do

14   you see that?

15   A    I do.

16   Q    Okay.  Now if we could go back to the cover e-mail,

17   please?  Do you see one of the attachments to the e-mail

18   that's part of TRX-2818 is an Excel spreadsheet entitled

19   Exhibit 1, historical losses?

20   A    Yes, sir, I see that.

21   Q    Can we open that, please?

22        (Pause)

23   Q    And do you see -- we're going to put several

24   spreadsheets on the screen at once which is why my colleague

25   is doing the split screen.  So you see on the left side of

Page 136

1    the screen here you've got the Exhibit 1 historical losses

2    spreadsheet?

3    A    Yes.

4    Q    And you see Column C says, realized losses?

5    A    Yes.

6    Q    And Column B has trust name?

7    A    Yes, I see that.

8    Q    And Column A has loan number?

9    A    I see that.

10   Q    All right.  Do you remember in your deposition you were

11   unable to identify the schedule as representing your

12   realized loss schedule because you hadn't seen it before?

13   A    Yes.

14   Q    Sitting here today now having walked through the e-mail

15   Mr. Cosenza's covering letter and opening the attachment

16   will you agree with me that this is your realized loss

17   schedule?

18   A    It appears to be.

19   Q    Great.  Okay.  So now this schedule, right, the Exhibit

20   1, historical losses represents your calculation of actually

21   realized losses for every loan that was at one point in time

22   potentially at issue, right?

23   A    The calculation that we used, correct.

24   Q    Yes.  That you agree is accurate?

25   A    Yes.  Correct.

Page 137

1    Q    Okay.  So if you -- could you scroll to the bottom,

2    please, so that we can get the last row number?

3         Now you see there's -- that means there's 415,922 rows

4    in this schedule.  Do you see that?

5    A    Yes, I see that.

6    Q    And that would indicate that your schedule covers

7    415,921 loans because the first row --

8    A    I --

9    Q    -- is the title?

10   A    Right.  I would assume so.

11   Q    Right.  Okay.  Obviously we don't have 415,000 loans at

12   issue here anymore, right?

13   A    Correct.

14   Q    Okay.  So now let's look at a different schedule.  Can

15   you go back to the e-mail, the covering e-mail and then what

16   I want to see is the PDF.

17             THE COURT:  Can I --

18             MR. GOLDBERG:  Yes.

19             THE COURT:  -- as you -- you're rolling along here

20   can I just understand exactly what -- can you flip back to

21   the Excel spreadsheet, whoever is driving?

22             What exactly is realized loss? W hat is that, what

23   kind of loss?

24             THE WITNESS:  Those are the losses on delinquent

25   loans that have been foreclosed or modified --

Page 138

```
 1              THE COURT:  Liquidated.

 2              THE WITNESS:  Liquidated loans.  Correct.

 3              THE COURT:  Thank you.

 4              MR. GOLDBERG:  Well, I have questions.  That's not

 5     actually correct, but that's okay.  I'll --

 6              THE COURT:  Okay.

 7              MR. GOLDBERG:  -- bring it up in cross-

 8     examination.

 9              THE COURT:  Well, I -- I --

10              MR. GOLDBERG:  No.  It is --

11              THE COURT:  I mean, I'm just trying to understand

12     what we're talking about.

13              MR. GOLDBERG:  As we understand it to be, and I'm

14     quite confident it is, it is a schedule of realized losses

15     that have actually been incurred by the trusts.  It's not

16     limited to liquidated loans, which is the point of the --

17              THE COURT:  Okay.

18              MR. GOLDBERG:  -- examination.

19              THE WITNESS:  No.  I --

20              THE COURT:  Okay.

21              THE WITNESS:  I agree with that.  I didn't mean to

22     suggest --

23              MR. GOLDBERG:  No.  I'm not suggesting your --

24              THE WITNESS:  I -- excuse me.

25              MR. GOLDBERG:  -- sold anything wrong.
```

Page 139

1           THE COURT:  I'm not trying to have the answer be

2     one thing or another.  I'm just trying to understand what

3     the heading, realized loss, is.

4           MR. GOLDBERG:  No.  Fair.

5           THE COURT:  So --

6           MR. GOLDBERG:  That's --

7           THE COURT:  Okay.

8           MR. GOLDBERG:  -- totally understand.

9           THE COURT:  All right.

10          MR. GOLDBERG:  Do you have that or do you need me

11    to explain it further?

12          THE COURT:  Well, I just don't -- I don't know

13    where -- I don't know what the -- I don't -- I don't know

14    what the question and the answer is to my question.  So if

15    you want to clarify it, fine.  If you don't, that's fine,

16    too.

17          MR. COSENZA:  Your Honor --

18          MR. GOLDBERG:  Why don't I put the question to the

19    witness, Your Honor, and --

20          MR. COSENZA:  -- I don't know if you want a

21    sidebar to -- I -- whatever your -- I'm just -- I'm confused

22    by this.

23          THE COURT:  I --

24          MR. GOLDBERG:  Why don't --

25          THE COURT:  -- I'm --

Page 140

1                MR. GOLDBERG:  -- we go to sidebar?

2                THE COURT:  I'm confused.  So generally speaking

3        if I'm confused you ought to clear it up.  So --

4                MR. GOLDBERG:  May we approach?

5                THE COURT:  Sure.

6            (At sidebar off the record)

7                THE COURT:  Sorry.  We're just trying to keep up

8        with you.

9                MR. GOLDBERG:  Okay.

10       BY MR. GOLDBERG:

11       Q    So if we could go back to the covering e-mail, please,

12       that's part of 2818.  My screen just -- my screen just went

13       black.

14           (Pause)

15       Q    Here you go.  Okay.

16               MR. GOLDBERG:  Apologies, Your Honor.  Oh, there

17       it is.  It just came back.  My screen went black, but it

18       just came back up.

19               THE COURT:  Oh, I'm sorry.

20               MR. GOLDBERG:  No.  That's okay.

21               THE COURT:  Okay.

22       BY MR. GOLDBERG:

23       Q    Okay.  So, Professor Fischel, that same bullet where we

24       have the highlighted language, I want to look at other

25       highlighted language.  Do you -- or other language, rather.

1    Do you see in the middle of the paragraph roughly there is a

2    sentence that's now being highlighted that reads, "The

3    output data set was also provided as

4    Lehman_covered_235_output.xlsx."  Do you see that?

5    A    I do.

6    Q    And do you see there's a reference to a Bates number?

7    A    I see that.

8    Q    And that Bates number is LBHIT7_00004877.  Do you --

9    A    I see that.

10   Q    -- see that?  Okay.  We're going to open that schedule.

11   And I understand that to be your analysis of future -- your

12   estimate of future losses on non-liquidated loans.  Can you

13   look at the schedule that my colleague is opening up now?

14   It would be on the right side of the screen and confirm for

15   me.  You can look at the title.  If you need the -- if you

16   need Mr. Lee to drive it around the screen to get you

17   comfortable, that's fine, too.

18             THE COURT:  Professor Fischel, if you want to

19   drive the screen any particular way, just let Mr. Goldberg

20   know.

21             THE WITNESS:  No.  I appreciate that, Your Honor.

22             MR. GOLDBERG:  I can show you metadata if it makes

23   it helpful to show the --

24             THE WITNESS:  You know, I -- I'll accept your

25   representation.

Page 142

1          MR. GOLDBERG:  Okay.

2          THE WITNESS:  I can't tell looking at this screen.

3    I know we had a schedule for realized losses, namely losses

4    that had been incurred to date from whatever source and for

5    whatever reason, and another schedule for expected future

6    losses and the two of them together constitute expected

7    lifetime losses.

8    BY MR. GOLDBERG:

9    Q    And the expected future loss analysis that you did,

10   that was only for non-liquidated loans, correct?

11   A    That's right.

12   Q    There would be no liquidated loans in that analysis?

13   A    There shouldn't be.  Correct.

14   Q    Okay.  So do you see the spreadsheet that's on the

15   right of the screen at the top?  Do you see it's titled

16   LBHIT7_ with the numbers that end in 4877?  Do you see that?

17   A    I do.

18   Q    And do you see how it's entitled, Lehman cover 235

19   output.xlsx?  Do you see that?

20   A    Yes, I see that.

21   Q    That matches the name of the file that Mr. Cosenza put

22   in his letter that we looked at a moment ago that was part

23   of Exhibit 2818, right?

24   A    I don't remember that, but if you tell me I'm, happy to

25   --

Page 143

1   Q    Well, do you --

2   A    -- accept that.

3   Q    -- do you need to see it again?  I want to make sure --

4   A    No.  No.  No.  I --

5   Q    -- that --

6   A    Unless you want to show it to me again, but I'm happy

7   to accept what you --

8   Q    Let's do it.

9   A    -- what you're saying.

10  Q    Let's just show it to you.  Can you -- do you see the

11  number now there in the highlighted box, sir?

12  A    Yes, I do.

13  Q    And it matches the spreadsheet?

14  A    Appears to.

15  Q    Okay.  Let's go back to that spreadsheet.  So what I

16  want to first do to confirm is that do you see the Column A

17  on the spreadsheet on the right which is your non-liquidated

18  loan analysis?  Do you see that and it's highlighted now?

19  A    Yes, I see that.

20  Q    That's the loan number, correct?

21  A    Yes.  I assume that's the loan number.

22  Q    Right.  It's got the trust name as well, but it's got

23  the loan number after the squiggly line, do you see that?

24  A    Yes, I see that.

25  Q    Okay.  I should tell you, too, that -- sorry.  The

Page 144

1    screen that's on the right of your output, we have

2    previously marked as TRX-582.  I should have said that

3    before for record purposes.  For your purposes you can look

4    at the screen.

5         Now what I would like to show you, sir, is that some of

6    the loans that are non-liquidated actually appear in your

7    schedule of realized loss.  So what I would like to do, and

8    I'm going to do this a little randomly just to kind of make

9    the point that they're all there.  Can you -- do you see how

10   we start your schedule on the right?  It starts at Row 2.

11   A    Yes, I see that.

12   Q    And could you please go all the way to the bottom?  Do

13   you see how it ends in Row 64,921?

14   A    Yes, I see that.

15   Q    Give me a number somewhere between two and 64,921.  It

16   doesn't matter.  Any number.  Pick a card, any card.

17        (Laughter)

18   A    It seems like this is a magic trick so --

19   Q    It does.

20   A    -- now you've made me suspicious.  So why don't you

21   pick?

22   Q    No.  No.  No.  I --

23        (Laughter)

24   Q    But then I'll get accused of cherry-picking.  I want

25   you to pick.  Give me any number.

Page 145

```
 1    A    27.

 2    Q    27.  Can you go to Row 27, please?  And can you

 3    highlight the loan number and search for it in the realized

 4    loss exhibit that's part -- the realized loss schedule

 5    rather?

 6         Sir, do you see that loan number from your Row 27

 7    appears in the realized loss schedule?

 8    A    Yes.

 9    Q    Let's do it one more time.  Give me another number, any

10    number.

11              MR. COSENZA:  We've already did one.

12              MR. GOLDBERG:  What's that?

13              MR. COSENZA:  Didn't we just do one?

14              MR. GOLDBERG:  I said give me another number.

15              MR. COSENZA:  Oh.

16              MR. GOLDBERG:  Let's do it again.  I want -- I

17    just want to make the point that I want -- I'm going to

18    demonstrate something for you, but I want you to see it's

19    random and putting the power in your hands to make this

20    election.

21              THE COURT:  I think the crowd can barely stand it.

22         (Laughter)

23              THE WITNESS:  86.

24              MR. GOLDBERG:  86.  You're picking easy numbers.

25    I was thinking we would go to like 30,000 or something.  Can
```

1      you go to Row 86, please?

2      BY MR. GOLDBERG:

3      Q    And do you see that loan number there?

4      A    Yes, I see that.

5      Q    Okay.  Can we search for that loan number in the

6      schedule for realized losses?  And you see that schedule is

7      there?  Excuse me.  You see --

8      A    Yes.

9      Q    -- that loan appears in your realized loss schedule?

10     A    I do.

11     Q    Okay.  Now do you remember that at your deposition we

12     had shown you a schedule that was not one of yours, that was

13     one that we created?  Do you remember that?

14     A    Vaguely.

15     Q    And I told you that we had created a schedule where we

16     took your non-liquidated loans that were on your realized

17     loss schedule that overlap with the loans in Dr. Snow's

18     report.  Do you remember that?

19     A    I don't, actually, but I'm familiar with the concept.

20     Q    Okay.  Well, that's what we did at the deposition and I

21     appreciate at the time you had difficulty answering

22     questions about the native files.  So we're going to put

23     that schedule up on here as well.

24     A    Okay.

25              THE COURT:  That schedule being?

Page 147

1           MR. GOLDBERG:  That -- so we have -- and this is -

2   - again, Judge, we're taking some witnesses out of order and

3   doing this a little backwards.  Our expert created a

4   schedule which is TRX-586.

5           THE COURT:  And that schedule purports to reflect

6   what universe?

7           MR. GOLDBERG:  A universe of non-liquidated loans

8   that appear in Professor Fischel's Schedule 5 that we've

9   marked as TRX-582.

10           THE COURT:  Of realized losses?

11           MR. GOLDBERG:  The realized losses.

12           THE COURT:  Okay.

13           MR. GOLDBERG:  No.  No.  Sorry, the non-liquidated

14   loan schedule --

15           THE COURT:  Yes.

16           MR. GOLDBERG:  -- that are also on the realized

17   loss schedule --

18           THE COURT:  Yes.

19           MR. GOLDBERG:  -- that are also in Dr. Snow's

20   report.  You know, we're not -- the trustees, you know all

21   too well --

22           THE COURT:  Dr. Snow's report being the report

23   that has expected future losses?

24           MR. GOLDBERG:  It has both.  It has expected

25   future losses and realized losses.

Page 148

1           THE COURT:  Okay.

2           MR. GOLDBERG:  Okay.  So we have -- it's -- and as

3    Your Honor knows all too well, the trustees are not pursuing

4    claims on every single loan.  We're pursuing claims on a

5    certain amount number of loans.  So we use that as our

6    universe and we --

7           THE COURT:  The 74,000.

8           MR. GOLDBERG:  Correct.

9           THE COURT:  Yes.

10          MR. GOLDBERG:  And we took that, we figured out

11   which of those loans were non-liquidated loans --

12          THE COURT:  Uh-huh.

13          MR. GOLDBERG:  -- that showed up on the --

14   Professor Fischel's realized loss schedule.

15          THE COURT:  Okay.

16          MR. GOLDBERG:  That's the universe.  That's the --

17          THE COURT:  Okay.

18          MR. GOLDBERG:  That's the spreadsheet we want to

19   look at.

20   BY MR. GOLDBERG:

21   Q    Do you see that's the spreadsheet at the top, sir?

22   Professor Fischel, you heard me give that explanation to

23   Judge Chapman?

24   A    You know, I see the schedule.  Whatever you represent

25   is fine.

Page 149

```
 1    Q     Well, did you understand what I --

 2    A     Yes.  I --

 3    Q     -- how I explained it?

 4    A     I completely understood your description.

 5    Q     Okay.  Do you have any reason to believe my description

 6    is inaccurate?

 7    A     I -- like I said no reason to believe it's either

 8    accurate or inaccurate.  Conceptually I understand the --

 9    Q     Right.

10    A     -- category of loans that you could be describing.

11    Q     Understood.

12              THE COURT:  So for the sake of the record you're

13    directing the witness to TRX-586?

14              MR. GOLDBERG:  Correct.

15              THE COURT:  Okay.

16              MR. GOLDBERG:  Which is Dr. Snow's schedule.

17              THE COURT:  Dr. Snow's schedule that purports to

18    reflect, say it again, realized --

19              MR. GOLDBERG:   Non-liquidated loans --

20              THE COURT:  Non-liquidated loans as to --

21              MR. GOLDBERG:  -- that --

22              THE COURT:  -- which there are realized losses.

23              MR. GOLDBERG:  And that also appear in Dr. Snow's

24    report that remain at issue in this estimation proceeding.

25              THE COURT:  Okay.
```

Page 150

1    BY MR. GOLDBERG:

2    Q    Okay.  You understand that?

3    A    I understood everything until the last part.  I --

4    maybe I'm getting a little confused.

5    Q    What -- the last part when I said they remain at issue

6    in the --

7    A    Yes.

8    Q    -- estimation proceeding?

9    A    Yes.

10   Q    Because they are in Dr. Snow's report.  The trustees

11   are not seeking to have their claims estimated on every loan

12   that they could.  They're seeking to have estimation on a

13   subset of those loans.  That's why it's significant to have

14   -- to match them to Dr. Snow's report.  Do you understand

15   that?

16   A    I didn't understand the last part, but I certainly

17   understand that the trustees are not seeking to recover on

18   every single loan.

19   Q    Okay.  So let's just stress test this a little bit.

20   And remember how we took -- I had you randomly pick a row

21   and we took that loan number and searched it through your

22   realized loss schedule?  Remember how we just did that a

23   moment ago and you called it a magic trick?

24   A    Yes, I remember it.

25   Q    Okay.  What I would like to do this time is do

Page 151

1   something similar, but I want to take the loan number from

2   Dr. Snow's schedule, TRX-586, and I want to search for it in

3   your other two schedules just to give you some level of

4   comfort that the loans that we have in 586, TRX-586 appear

5   in your schedules.  Do you understand that?

6   A    I understood what you just said.  I don't -- as I said

7   throughout, I'm happy to accept your representation --

8   Q    All right.  Well, that's --

9   A    -- of what's on the screen.

10  Q    -- fine.  If you're -- so if you're happy to accept my

11  representation that's -- that's fine.  We had some

12  difficulty at the deposition which is why I was doing this.

13  But if you're happy to accept my representation as to what

14  TRX-586 is, let's -- happy to proceed that way.  Fair?

15  A    Yeah, although I don't want to accept your

16  characterization about the deposition, but go ahead.

17  Q    I didn't mean to impugn you.  I just meant that I --

18  and I thought I explained --

19          THE COURT:  Okay.  Mr. Goldberg, pick one.

20          MR. GOLDBERG:  Pick one.

21          THE COURT:  Okay.  Let's try to do it through

22  example and see --

23          MR. GOLDBERG:  Excellent.

24          THE COURT:  -- if it gets any better.

25          MR. GOLDBERG:  Okay.  I hate to be the one to pick

Page 152

1    one because somebody --

2              THE COURT:  Pick one.

3              MR. GOLDBERG:  9,607.

4         (Pause)

5    BY MR. GOLDBERG:

6    Q    Professor Fischel, do you see how that search just

7    happened and that loan from Row 9,607, it was loan number

8    31408776 and it appeared in your schedule of non-liquidated

9    loans?  Did you see that?

10             MR. GOLDBERG:  You did?  Did you do the --

11             THE COURT:  Okay.

12             MR. GOLDBERG:  Stop.  Stop what --

13             THE COURT:  Whoever is driving, okay, we're

14   looking at loan 9,607 --

15             MR. GOLDBERG:  Row 9607 on the top schedule.

16             THE COURT:  Right.  So if somebody will highlight

17   that.  Right.  That's it.  That's the only one we're looking

18   at, right?

19             MR. GOLDBERG:  At the moment.  That's the one

20   we're looking at just to make this example.

21             THE COURT:  Right.

22             MR. GOLDBERG:  So --

23             THE COURT:  Now why don't you highlight it in the

24   box on the lower left?

25             MR. GOLDBERG:  So he's got --

1             THE COURT:  Lower left.  There you go.  And that's

2      in the schedule of -- that's the schedule that was provided

3      by Mr. Cosenza, right?

4             MR. GOLDBERG:  Of realized losses.

5             THE COURT:  Of realized losses.  And then on the

6      right -- lower right box we'll highlight it there as well,

7      right?

8             MR. GOLDBERG:  Correct.  And that's the schedule

9      of Professor Fischel's non-liquidated loans.

10             THE COURT:  Okay.

11             MR. GOLDBERG:  Okay.

12             THE COURT:  Okay.

13             MR. GOLDBERG:  There we go.  Are we -- you're

14      comfortable?

15             THE WITNESS:  So far.

16             MR. GOLDBERG:  Okay.

17      BY MR. GOLDBERG:

18      Q    I want to look and dig in a little deeper as to a

19      couple of the loans.  Now as part of your work, sir, you did

20      some work to analyze what modification losses might be, yes?

21      A    Some work, correct.

22      Q    So let's search, if you could search TRX-586, please,

23      for the following loan number 32960148.

24          So, Professor Fischel, do you see that loan number

25      shows up in TRX-586 which is Dr. Snow's schedule?

Page 154

1   A    I see it.

2   Q    Okay.  Let's make sure it's in the other two schedules.

3   So could you search the bottom right one which is Professor

4   Fischel's non-liquidated loans future loss estimate.

5        And, sir, do you see on the screen that loan number

6   32960148 appears on your non-liquidated loan schedule?

7   A    I do.

8   Q    So you agree with me it's a non-liquidated loan?

9   A    It could be both a non-liquidated loan and -- as well

10  as a loan where there's a realized loss if there's a loan

11  modification.

12  Q    Okay.  But right now I'm focusing on the fact that it's

13  on your schedule of non-liquidated loans, your estimate of

14  future losses for non-liquidated loans?

15  A    Yes, I see that.

16  Q    Okay.  So that means it's a non-liquidated loan, yes?

17  A    Correct.

18  Q    Okay.  Now can you search for the bottom left schedule,

19  the one that was attached to Mr. Cosenza's letter?  And do

20  you see loan 32960148 appears in that schedule, sir?

21  A    Yes.  I see that.

22  Q    And that means that loan had -- and you see there's an

23  actual number for the realized loss next to it? It's not a

24  zero.  There's a positive value.

25  A    Yes, I see that.

Page 155

1    Q    And you see that number is $147,999.99?

2    A    Yes, I see that.

3    Q    And that means that loan 32960148 is a non-liquidated

4    loan that had a realized loss in the amount of $147,999; is

5    that --

6    A    Correct.

7    Q    -- right?  Okay.  Let's look a little bit into what

8    that means.  I would like you to take a look at Exhibit

9    1283, TRX-1283.

10             MR. GOLDBERG:  That one hopefully Your Honor has

11   in a hard copy.

12             THE COURT:  What was the number again?  I'm sorry.

13             MR. GOLDBERG:  1283.

14             THE COURT:  Okay.

15        (Pause)

16             THE WITNESS:  Thank you.

17   BY MR. GOLDBERG:

18   Q    Sir, do you have Exhibit TRX-1283 in front of you?

19   A    I do.

20   Q    And do you see, sir, this is a remittance report?

21   A    I mean, I see what it's called.  It doesn't use the

22   word, remittance, but --

23   Q    Well, you said you -- as part of your work, I know you

24   said you didn't study them, but you looked at remittance

25   reports.

Page 156

1    A    Actually, I'm not sure I did.

2    Q    So you didn't look at remittance reports?

3    A    I don't think so.

4    Q    All right.  Well, I'll tell you this is a remittance

5    report.

6    A    Okay.

7    Q    And let us walk through it a little bit.  If you could

8    -- actually, sir, bear with me one moment.  We looked at

9    this during your deposition, didn't we, this very remittance

10   report?

11   A    I don't recall.

12   Q    If you could turn to page 266 of your deposition

13   transcript, please.  Let me know when you're there.

14   A    Got it.

15   Q    Do you see on page 266, line 9, I mark as an exhibit, I

16   mark TRX-1283?  Do you see that?

17   A    Yes.

18   Q    And then I ask you, "Question:  Have you ever looked at

19   a remittance report?"  "Answer:  I have seen them.  I don't

20   think I've ever really studied one."  Do you see that?

21   A    Yes.

22   Q    And then you see the next page, page 267 --

23             THE COURT:  Can I -- can we pause here?  Mr.

24   Cosenza, can you come on up?

25        (At sidebar off the record)

Page 157

```
 1              THE COURT:  Come back in about 15 minutes.  All

 2     right.

 3              THE WITNESS:  Okay.  Thank you, Your Honor.

 4         (Recessed at 3:32 p.m.; reconvened at 4:00 p.m.)

 5              THE COURT:  Please have a seat.

 6              MR. GOLDBERG:  And I'm virtually done.  I just

 7     want to point out one thing to the witness --

 8              THE COURT:  Sure.

 9              MR. GOLDBERG:  -- in the schedule and then --

10              THE COURT:  Take your time.

11              MR. GOLDBERG:  -- we're going to be --

12              THE COURT:  Okay.

13              MR. GOLDBERG:  -- done.  But I do need my screen.

14     Well, nobody has a screen.  Okay.  Here we go.  We're good.

15     Okay.

16     BY MR. GOLDBERG:

17     Q    All right.  Professor Fischel, we're right at the home

18     stretch.  The top schedule, TRX-586, that's the schedule

19     that we've showed you just -- I know we took a break.  Just

20     to refresh you that's the schedule that shows the loans that

21     are within Dr. Snow's report, that are on your non-

22     liquidated loan schedule, that are also on your realized

23     loss schedule.  Understood?

24     A    Yes.

25     Q    If you could go --
```

Page 158

1          MR. GOLDBERG:  Brian, if you could go to Column C,

2     please, and if you could go all the way to the bottom.

3     BY MR. GOLDBERG:

4     Q    So I would like you -- if you could run this --

5     Professor Fischel, have you run the -- you've used Excel?

6     You're familiar with the program?

7     A    Yes.

8     Q    You know you can add up numbers in the columns?

9     A    Yes.

10    Q    Okay.  That's what we're going to do right here.  In

11    Cell C15632 can you just run the sum formula for the Column

12    A -- Column C.  Thank you.  Sorry.  I misspoke.  Column C.

13    And can you put some commas in there so it's easier to read,

14    please, or just (indiscernible 4:01:39) currency.  Currency,

15    if you go to the left -- no, no, no, go to the left column.

16    Good enough.  Good enough.

17         Sir, do you see that the sum there is that for the non-

18    liquidated loans that are in Dr. Snow's report that have a

19    realized loss, according to your schedule the total amount,

20    the $772,355,262.02.  Do you see that?

21    A    I do.

22          MR. GOLDBERG:  Your Honor, no further questions.

23    I would pass the witness.

24          THE COURT:  All right.  Thank you, Mr. Goldberg.

25         (Pause)

Page 159

1        MR. COSENZA:  I just have a couple of questions,

2   Your Honor.

3        THE COURT:  Okay.

4                    REDIRECT EXAMINATION

5   BY MR. COSENZA:

6   Q    Professor Fischel, you just went through this whole

7   exercise of all these spreadsheets and calculating different

8   things and realized losses on loans.  In terms of

9   calculating lifetime losses and part of your recovery ratio

10  for the "what liquidated loans is described by Mr.

11  Goldberg," did you do anything beyond accepting what Dr.

12  Snow had provided in his analysis?

13  A    No, other than in just a few instances filling in gaps

14  by looking at other data sources, but I would say for all

15  practical purposes we simply accepted what the trustee

16  concluded.

17  Q    Okay.  And why did you -- why were -- why did you think

18  it made sense to accept what Dr. Snow had done in terms of

19  his calculations of realized losses, both for active and

20  liquidated loan?

21  A    Well, for two reasons.  One, you know, it obviously

22  minimized areas of disagreement.  But as I also said in my

23  testimony we also did some checking and we reached basically

24  the same conclusions and, therefore, it was logical just to

25  for the vast majority of the expected lifetime losses, the

Page 160

1  realized losses just to take Dr. Snow's numbers at face

2  value.

3  Q    And you didn't look at any remittance reports in terms

4  of doing that; is that correct?

5  A    I did not.

6  Q    And you just looked at Dr. Snow and his calculations as

7  part of this?

8  A    Correct.  And then, again, later there were other

9  experts who performed similar calculations who reached

10  exactly the same results.  So I was pretty confident that

11  what --

12  Q    And --

13  A    -- we did was reasonable.

14  Q    And for the active loans how did you calculate the

15  active loans again, the losses for the active loans?

16  A    We primarily relied on Andrew Davidson software, the

17  loan dynamics program.

18  Q    And the fact that Dr. Snow's calculations included a

19  realized loss on an active loan, in your view does that in

20  any way proximate the damages that the trustees suffered on

21  the active loans?

22  A    No.  I think damages are a completely separate

23  question.  But that's just a calculation of loss.

24  Q    Okay.

25          MR. COSENZA:  That's all I have, Your Honor.

Page 161

```
 1              THE COURT:  Okay.  Thank you.

 2              MR. GOLDBERG:  Nothing further.

 3              THE COURT:  Nothing, Mr. Goldberg?  Okay.

 4              Professor Fischel, thank you.  You're done for the

 5    day.

 6              THE WITNESS:  Thank you, Your Honor.

 7              THE COURT:  You can step down.  Have a good

 8    evening.

 9              Be careful.

10              THE WITNESS:  I'm just worried about the next

11    person.

12         (Laughter)

13              THE COURT:  We will take care of it.

14              So, Mr. Schuster, you'll let us know if tomorrow

15    at nine --

16              MR. SCHUSTER:  We're good.  I've checked.  We're

17    good.

18              THE COURT:  Okay.

19              MR. SCHUSTER:  Yeah.

20              THE COURT:  All right.  So --

21              MR. COSENZA:  We'll start tomorrow at nine --

22              THE COURT:  So we'll start tomorrow at nine.

23    Okay.  Very good.  Have a nice evening.  Thank you.

24         (A chorus of thank you)

25         (Whereupon, these proceedings concluded at 4:05 p.m.)
```

1                          I N D E X

2                      T E S T I M O N Y

3    DEBTOR'S

4    WITNESS                 EXAM BY                    PAGE

5    PROFESSOR DANIEL R.

6    FISCHEL              MR. COSENZA                     6

7                         MR. GOLDBERG                   56

8                         MR. COSENZA                   159

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 163

1                    C E R T I F I C A T I O N

2

3     We, Dawn South and Sherri L. Breach certify that the

4     foregoing transcript is a true and accurate record of the

5     proceedings.

6     Dawn South          Digitally signed by Dawn South
                          DN: cn=Dawn South, o, ou,
                          email=digital1@veritext.com, c=US
7     _____  Date: 2017.12.05 14:16:43 -05'00'

8     Dawn South

9     Certified Electronic Transcriber

10    Sherri L            Digitally signed by Sherri L Breach
                          DN: cn=Sherri L Breach, o, ou,
11    Breach              email=digital1@veritext.com,
                          c=US
                          Date: 2017.12.05 14:17:26 -05'00'
12    _____

13    Sherri L. Breach

14    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

15

16

17    Date:  December 5, 2017

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501