Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS, INC.,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  November 29, 2017

17                  10:19 AM

18

19

20

21   B E F O R E :

22   HON SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  TIMOTHY

1    HEARING re RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    HOLWELL SHUSTER & GOLDBERG LLP

4         RMBS Trustees

5         750 Seventh Avenue, 26th Floor

6         New York, NY 10019

7

8    BY:  NEIL R. LIEBERMAN

9         DWIGHT A. HEALY

10        DANIEL P. GOLDBERG

11        MICHAEL S. SHUSTER

12

13   ROLLIN BRASWELL FISHER LLC

14        Attorneys for the Debtor

15        8350 E. Crescent Parkway, Suite 100

16        Greenwood Village, CO 80111

17

18   BY:  MARITZA DOMINGUEZ-BRASWELL

19        MICHAEL ROLLIN

20

21

22

23

24

25

```
 1    WILLKIE FARR & GALLAGHER LLP

 2         Attorneys for the Debtor

 3         787 Seventh Avenue

 4         New York, NY 10019

 5

 6    BY:  TODD G. COSENZA

 7         BENJAMIN P. MCCALLEN

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

```
 1                      P R O C E E D I N G S

 2              THE COURT:  Okay.  Everybody ready?

 3              MS. BRASSWELL:  We are, Your Honor.

 4              MR. COSENZA:  Thank you, Your Honor.

 5              THE COURT:  Okay.

 6              MR. SHUSTER:  Before we call back the witness --

 7              MR. COSENZA:  Yeah.

 8              MR. SHUSTER:  -- could we just have a moment to

 9    chat?

10              THE COURT:  Yes, please.  Come on up.

11          (Bench conference)

12              THE COURT:  Okay.  Yes, Mr. Shuster?

13              MR. SHUSTER:  Yes.  I just wanted to note the

14    Trustee's objection to the addition of new exhibits for the

15    redirect examination of Mr. Trumpp, which we received over

16    the course of -- in the early morning, should we say.

17              THE COURT:  All right.  But have you discussed it

18    with Mr. Cosenza --

19              MR. COSENZA:  Yes.

20              THE COURT:  -- and Ms. Brasswell and reached a

21    resolution --

22              MR. SHUSTER:  Yes, we --

23              THE COURT:  -- of this -- on a go forward basis.

24              MR. SHUSTER:  Yeah, provided that we have

25    consistent approach and both sides are able to add
```

Page 6

1    responsive material in a redirect, both sides preserve their

2    prejudice arguments and that's the accommodation we've

3    reached.

4                THE COURT:  Okay.

5                MR. COSENZA:  That's correct, Your Honor.  And to

6    the extent there's some issue with prejudice for a

7    particular document that's added, we all preserve our

8    objections, but for current purposes that's our

9    understanding.

10               THE COURT:  All right.  That seems fair.  But

11   we're not opening the barn door, so to speak --

12               MR. COSENZA:  Yes.

13               THE COURT:  -- as a general matter for the

14   inundation with additional exhibits.

15               MR. COSENZA:  Okay.  Thank you, Your Honor.

16               THE COURT:  Okay.  All right.

17               MR. COSENZA:  Thank you, Mr. Shuster.

18               THE COURT:  Are we ready for Mr. Trumpp?

19               MS. BRASSWELL:  We are, Your Honor.

20               THE COURT:  Okay.  Welcome back, Mr. Trumpp.  Home

21   stretch.

22               MS. BRASSWELL:  I think we all keep saying that to

23   him and he keeps coming up.

24               THE COURT:  I know.  Today we really mean it.

25               MR. TRUMPP:  I'll take your word for it.

Page 7

1              THE COURT:  Okay.

2              MS. BRASSWELL:  Your Honor, before we start, can I

3    distribute binders related to the redirect examination?

4              THE COURT:  Certainly.

5              MS. BRASSWELL:  It's just one binder, but a copy

6    for everyone.

7              THE COURT:  All right.

8              MS. BRASSWELL:  Thank you.  And Your Honor, one

9    more thing with respect to these binders.  You'll see that

10   the front cover notes that these documents are not redacted.

11   Given that we've pulled together the documents last night,

12   we didn't want to create a situation where we ended up

13   misredacting something, and so we've not redacted them.  We

14   will not be displaying them on the screen --

15             THE COURT:  All right.

16             MS. BRASSWELL:  -- we'll only speak to them with

17   respect to what's in the binder.

18             THE COURT:  Okay.  So everyone -- so just keep

19   track of how many you distribute and then we'll -- you'll --

20   you can retrieve them all at the end.

21             MS. BRASSWELL:  We will do that.  Thank you.  May

22   I proceed?

23             THE COURT:  Right.  Yes.

24             MS. BRASSWELL:  Thank you.

25             REDIRECT EXAMINATION OF ZACHARY D. TRUMPP

Page 8

1    BY MS. BRASSWELL:

2    Q    Mr. Trumpp, do you remember Mr. Shuster asking you some

3    questions yesterday about prior cases filed by Lehmann and

4    Aurora?

5    A    I do.

6    Q    And do you remember that one of the cases Mr. Shuster

7    asked you questions about was the Dream House Mortgage case?

8    A    I do.

9    Q    I'd like to show you the declaration that Mr. Shuster

10   put in front of you yesterday, it's TRX-927.  And as I

11   understand it, that is in Volume 3 of the Trustees' binder.

12   A    And I don't have the Trustees' binders here.

13   Q    I think they're (indiscernible).

14        (Counsel confer)

15   Q    Are you at 927?

16   A    I am.

17   Q    Okay.  Now Mr. Shuster pointed you to Paragraphs 31 and

18   32 of your declaration.  Can you go there?

19        And what you're saying in Paragraph 32 is that,

20   "if a borrower misrepresents his or her mortgage debts, that

21   misrepresentation has a material and adverse effect on the

22   value of the loan, because the loan cannot be sold at full

23   value to another purchaser or to a securitization once the

24   misrepresentation is known."  Did I read that correctly?

25   A    Yes, you did.

Page 9

```
 1   Q    And when Mr. Shuster asked you if that was a true and
 2   accurate statement, you responded that it was, with respect
 3   to whole loans.  Do you remember that?
 4   A    I do.
 5   Q    What did you mean by that?
 6   A    What I meant by that was this was a case involving
 7   whole loans and that -- the effect on -- the effect of
 8   breaches and representations and warranties and the ability
 9   to sell those loans, once discovered, has an impact.  And
10   that's really what I was trying to clarify in my statement
11   yesterday.
12   Q    Okay.  And when Mr. Shuster was asking you questions
13   about this statement and you gave that answer that this is
14   true with respect to whole loans, he went through a series
15   of comparisons.  He said, you know, whole loans have a
16   borrower, securitized loans have a borrower.  Whole loans
17   have interest rates, securitized loans have interest rates.
18   Whole loans have collateral, securitized loans -- do you
19   remember that series of questions?
20   A    I do.
21   Q    And do you believe that the similarities between whole
22   loans and securitized loans that Mr. Shuster listed make
23   those two the same?
24   A    No.  Excuse me.  There's a key distinction he left out.
25   And the distinction is one's a tradeable asset and is not.
```

Page 10

1    Q      What do you mean by that?

2    A      Here we were talking about individual whole loans that

3    had particular defects that were not in a securitization,

4    that, you know, were impaired in value based upon the

5    misrepresentation.  That's different than loans in

6    securitizations and the role and purpose of an individual

7    loan and a pool of loans in a securitization.

8    Q     Now, when Lehman had whole loans on its books, did it

9    typically intend to keep those loans on its books?

10   A      It did not.  So Lehman was not a portfolio lender, to

11   use that term.  Lehman was in the business of acquiring

12   loans, with an exit strategy in mind for those loans,

13   meaning that they were going to sell them into

14   securitizations or to the GSEs or to other whole loan

15   buyers.  It was not intending to acquire and hold loans for

16   -- until maturity.  One of the says that Lehman has used

17   over the course of time to describe that process is that

18   Lehman was in the moving business and not the storage

19   business.

20   Q     And is that context relevant in any way to the

21   interpretation of the statement in front of you with respect

22   to that statement that you made on value of a loan?

23   A      Absolutely.  So, you know, if -- if Lehman was in the

24   process of buying loans, and after they had bought those

25   loans discovered that there was a defect on those loans that

Page 11

1    rose to the level of a breach of representation and

2    warranty, they didn't turn around and try and sell it to the

3    securitizations or the GSEs, knowing it was there, because

4    it would have had an impaired value.  What they did is they

5    turned right around and went back to the party they bought

6    the loan from and sought repurchase because they had the

7    ability then to seek repurchase at the full amount that they

8    had paid for it and essentially it would be undoing the

9    original transaction versus selling it at a -- at a  loss.

10   So here we're talking about whole loans and Lehman

11   exercising its rights under its whole loan agreements.

12   Q    Would you make the same statement with respect to the

13   value of the loan as it concerns loans in securitizations,

14   and particularly the loans under the protocol?

15   A    No, the -- that's a different value assessment.

16   Q    Okay.  Are securitized loans typically sold or traded

17   the way long whole loans are traded and sold?

18   A    No.  Once the loans are in securitizations they're

19   there until maturity or liquidation.

20   Q    So if they can't be sold, then what value do they have

21   in securitized loans?

22   A    The value to the trust is the continuing, ongoing

23   stream of cash flows from that particular asset.

24   Q    Now, you testified on Monday that things like payment

25   history and life events are relevant to the value of the

1   loan analysis for securitized loans.  Do you remember that?

2   A    I do.

3   Q    And is that an approach that you developed just for

4   purposes of the protocol?

5   A    No.  That's something that we've always had in mind.  I

6   mentioned, I think a couple of times throughout my

7   testimony, that when we were looking at loans and potential

8   defects, we had to look at the loans in relation to the

9   pertinent agreements, but also in relation to where they sat

10  and what obligations and intents were and expectations were

11  around those loans.  And the whole loans were different than

12  loans on securitizations, and they had separate agreements.

13  Q    I'd like to show you a document, Plan Administrator's

14  658.

15          MS. BRASSWELL:  In the redirect binder, Your

16  Honor.

17          THE COURT:  Thank you.

18  Q    And Mr. Trumpp, do you have a redirect binder?

19  A    Sorry.  Yes.

20  Q    It should be in front of your screen as well.  It's the

21  first document in your binder.  Do you recognize this

22  document, Mr. Trumpp?

23  A    I do.

24  Q    Okay.  And do you see that there's a Bates number at

25  the bottom of it?

Page 13

1    A    I do.

2    Q    Do you know what that Bates number references, or what

3    it's in relation to?

4    A    It's in relation to one of the documents that were

5    ultimately exchanged between the parties in this process.

6    Q    Okay.  And when you say "this process" do you mean this

7    matter, this proceeding?

8    A    Correct.

9    Q    And what was it exchanged pursuant to?  Why is it that

10   we provided this to the Trustees?

11   A    I'm not sure I'll get the legal terms right, but it's

12   pursuant to what I believe is discovery and a request from

13   the Trustees for additional information.

14   Q    Okay.  Now, I'm going to talk about the first part of

15   the document later, but I'd like to focus right now on the

16   second half of the document.  Do you see the second bullet

17   point on this document?

18   A    I do.

19   Q    It says, "Once it is determined that there is a valid

20   finding, contract admin" which I assume means contract

21   administration, you testified about that department

22   yesterday, right?

23   A    That's my understanding as well.

24   Q    "Contract admin determines where the finding is

25   material and adverse."  Do you see that sentence?

Page 14

1   A    I do.

2   Q    And below that there are some considerations for

3   contract admin.  Do you see that?

4   A    Yes, I do.

5   Q    The types of things they consider when determining

6   whether there's AMA.  Do you see that?

7   A    I do.

8   Q    It says, "Contract admin takes a holistic view of the

9   loan and the surrounding circumstances to make this

10  determination."  And then it lists some characteristics.  Do

11  you see that?

12  A    I do.

13  Q    Including LTV, CLTV, FICO, DTI, origination date and

14  one of the things it lists is loan performance, right?

15  A    Correct.

16  Q    And below that you see it also includes servicing notes

17  as being relevant to that analysis?

18  A    Yes, it does.

19  Q    And then there's a second sub bullet that says, "For

20  most issues loan performance of 18 months or greater would

21  preclude the issue from being considered material."  Do you

22  see that?

23  A    I do.

24  Q    What do you understand those statements to mean?

25  A    So at Aurora, when we were reviewing loans, when we

Page 15

1    were assessing potential defects, whether they came from

2    quality control or special investigations or the team

3    without loss management, we were always looking at the

4    breaches of representations and the warranties and the

5    requirements under the contracts and weighing whether we

6    felt those breaches were material and adverse to the value

7    of the loan.  And one of the things that we always looked at

8    in that assessment for material and adverse to the value of

9    the loan, was the performance history of that particular

10   loan.  And one of the things that we were looking at was how

11   many payments has that particular loan made.

12           And so here it's specifically saying, hey, you

13   know, you really should take a look at the loans and see

14   whether they made 18 months' worth of payments or not, and

15   that's in line with how we looked at it when I was managing

16   loss management, and that's kind of always been the

17   foundation of knowledge with which we've assessed loans and

18   securitizations.

19   Q    And when you say that's in line, are you referring to

20   the 18 month cutoff?

21   A    Yes, ma'am.

22   Q    And what does that 18 month cutoff mean?

23   A    So like everything, it depends upon the facts and the

24   circumstances of every loan.  But our thought was, and the

25   way we looked at it was the impact of a breach of a

1   representation and warranty on the loan diminishes over the

2   course of time.  And what I mean by that is the number of

3   payments the borrower is able to make.

4           And so we never put any real bright lines in the

5   sand to say if it was over this date it could never be

6   material and adverse.  With that being said, we looked more

7   critically at loans for that AMA assessment if they made

8   more than 18 months' worth of payments  And if they made

9   less than 18 months of payments, even if we couldn't see

10  some direct correlation in the file, we thought it was a

11  pretty good basis to show that, yeah, that breach, assuming

12  it was there, really did have an impact on value and

13  therefore it quite possibly could be AMA.

14  Q    And so when a loan performs more than 18 months, is the

15  inverse true, that it's just less likely that there will be

16  AMA?

17  A    Exactly.

18  Q    And did this affect how contract admin and you, when

19  you were there, considered whether or not there was a valid

20  repurchase claim on a particular loan?

21  A    Correct.  So again, it was not a bright line but it was

22  definitely something that, you know, if it was over 18

23  months there really had to be something telling or clear

24  about how that particular breach of a representation and

25  warranty directly impacted the borrower's ability to make

Page 17

1    those payments.

2    Q    Do you know where this document was pulled from?

3    A    It was pulled from Aurora's systems and it was found on

4    their network.

5    Q    Do you have any sense of the date associated with this

6    document?

7    A    It's my understanding that it was created some time in

8    2012.

9    Q    Okay.  Now, Mr. Shuster also showed you several prior

10   Lehman and Aurora cases for another reason.  Besides just

11   the value of the loan issue, he was also showing them with

12   respect to the evidence that was cited in those documents.

13   Do you remember that?

14   A    I do.

15   Q    And staying on Dream House Mortgage for a moment, which

16   is the one that we talked about just a minute ago, and

17   that's back to TRX-927 in the Trustees' binder, Volume 3.

18   Mr. Shuster pointed you to Paragraph 11.  And Paragraph 11

19   has a reference to a demand letter.  Do you see that?

20   A    Yes, it does.

21   Q    And do you remember looking at that demand letter

22   yesterday?

23   A    I do.

24   Q    Let's go to the demand letter, it's TRX-760, which is

25   unfortunately in a different binder, it's Volume 2 of the

Page 18

1  Trustees' binder.  Let me know when you're there so I can

2  ask questions.

3  A    I have it.

4  Q    Okay.  Now, Mr. Shuster pointed you to the

5  misrepresentation of debts header.  Do you see that at about

6  the middle of the page?

7  A    Do you remember which page it was and --

8  Q    Oh, yes.  I'm sorry.  It's -- of that exhibit it's Page

9  30 of 33.  So Exhibit 760, Page 30.

10  A    Yes, I see it.  Sorry.  Yes, I see that.

11  Q    And what he was pointing out to you is that here Aurora

12  Loan Services is relying on a credit report to put forward,

13  I think is the phrase he used, a misrepresentation of debts

14  claim.  Do you remember that?

15  A    I do.

16  Q    Now, before I ask any questions about this particular

17  case, just generally, how did the plan administrator treat

18  credit reports during the protocol?

19  A    We weighed them in light of -- well, sorry.  Audit

20  credit reports?

21  Q    Well, credit reports like the type that's referenced

22  here in this letter.

23  A    Okay.  So audit credit reports would have been weighed

24  like any other piece of evidence and, you know, we wouldn't

25  automatically rule it out.  We would simply look at it in

1   relation to the rest of the file and assess whether we

2   thought it was sufficient and credible and reliable.

3   Q    And could an audit credit report potentially be

4   relevant to the analysis of a misrepresentation of debts

5   claim?

6   A    Absolutely.

7   Q    And could potentially support a misrepresentation of

8   debts claim?

9   A    It could.

10  Q    Okay.  Now, in terms of these demand letters, just

11  generally, remember Mr. Shuster walked you through several

12  of these.  These demand letters, generally when Lehman or

13  Aurora sent these demand letters, what was the goal or the

14  purpose of sending these demand letters?

15  A    So the goal and the purpose was first and foremost to

16  put the other side on notice that we found a breach that we

17  felt was documented material and adverse, et cetera.  We

18  also sent them, along with these demand letters, a copy of

19  the evidence that we were citing and a copy of the loan

20  file, typically.  And we would expect, as it alludes in the

21  letter, that it would be the opening of a dialogue.  Right?

22  It would be, hey, here's what we've found.  We believe it is

23  a breach.  And we're putting you on notice and we think you

24  should repurchase the letter, cure it, et cetera, the other

25  options that you had under the agreements.

Page 20

1           And then the expectation was there would be phone

2     calls with the other side, there would be additional

3     documentation exchanged and ultimately they would agree

4     that, yes there was a problem and buy the loan back or

5     indemnify as necessary.  Or they would show us, on a B to B

6     basis, that we were wrong and here's the additional evidence

7     that we have in our records.  Because again, these were

8     typically the people that did the origination of the loans

9     themselves, so they may have had additional information to

10    refute our claims.

11          And ultimately, on a B to B basis, it was

12    anticipated that dialogue would end amicably, one way or the

13    other, with either us withdrawing the claims, if necessary,

14    or them repurchasing the loans.  But it was intended to be

15    the opening of a dialogue, and ultimately end in a

16    successful transaction one way or the other.

17    Q     And so in terms of the process that you were engaging

18    with the other side, was this the beginning, the middle or

19    the end of that?

20    A     This is the very beginning.

21    Q     And if it turned out that the other side said, this

22    isn't enough, I'm not going to repurchase this loan on this

23    evidence, it's just not enough, what would you do then?

24    A     If we were unsuccessful to resolve this on a B to B

25    basis, we would have to make a decision as to whether or not

1   we would purchase litigation, whether we thought it was --

2   the claims were strong enough, whether we thought it made

3   good economic sense to do that.  But as in all the cases

4   cited yesterday, those are typically going to be instances

5   where there were complaints, and we filed litigation to seek

6   repurchase or indemnification.

7   Q    Okay.  And when you filed litigation, like in the cases

8   that Mr. Shuster showed you yesterday, was the evidence that

9   you started the claim with in your demand letter the only

10   evidence that you gathered?

11   A    Not usually.  Throughout the discovery process we would

12   a lot more in depth review and find additional evidence or

13   seek out additional evidence that wasn't necessarily part of

14   our initial demand letters.  Things such as depositions of

15   both sides, depositions of the borrower, depositions of the

16   originators, if possible, depositions of the employers where

17   possible, or affidavits from any one of those three parties.

18         We would also try and seek certified public

19   records where possible, copies of recorded mortgages for,

20   like, to prove undisclosed debts.  We would seek certified

21   IRS transcripts.  We would seek field reviews on appraised

22   value issues -- on appraisal issues.

23         So it was just -- well let's say there were

24   numerous different ways we got additional evidence and

25   information around our claims to support our claims, through

1    the discovery process and through the litigation process.

2    Q    Why?  Why didn't you just rest on the evidence that was

3    in your demand letter?

4    A    Because it wasn't -- and again, I'm not an attorney,

5    but from a legal perspective, it's my understanding, that

6    there was additional evidence and things that needed to be

7    done to prove the allegations that we were making.

8    Q    And were there times where you would go to court with a

9    particular piece of evidence and lose on your repurchase

10   claims?

11   A    Yes.  This was by no means an instance where we won all

12   of these cases; we did lose cases on the evidence.

13   Q    And did that, in any way, inform your understanding

14   about what is sufficient and what is enough to prove a

15   particular claim?

16   A    That absolutely went into my understanding in how we

17   were setting up the protocol process.  And it was one of the

18   things that we relied on, and I relied on, when we said, you

19   know, this evidence is strong enough, or this evidence isn't

20   strong enough and we were always trying to balance that in

21   light of our experience.

22   Q    Okay.  I'd like to show you Plan Administrator 750 in

23   the redirect binder.  Do you see that, Mr. Trumpp?

24   A    Yes, I do.

25   Q    And this is a declaration of Matthew Spohn, in the same

Page 23

1   case, the Dream House case.  Do you see that?

2   A    I do.

3   Q    And who is Matthew Spohn was our counsel in that

4   particular case.

5   Q    Okay.  And did he frequently -- did you frequently

6   retain Mr. Spohn to prosecute repurchase claims --

7   A    We did.

8   Q    -- on behalf of Lehman or Aurora?

9   A    Yes, we did.

10  Q    Okay.  And you see Mr. Spohn attaches some items to his

11  declaration, starting with Exhibit A and Exhibit B, C.  I'd

12  like to start with B.  Can you turn to Plan Administrator's

13  751, which is the tab that follows immediately?  Do you see

14  what that is?

15  A    I do.

16  Q    What is that document?

17  A    It appears to be a recorded mortgage.

18  Q    Okay.  And I don't want to dwell on any particular

19  piece, but I do want to walk through each of these.  Plan

20  Administrator 752, do you see that?  It's Exhibit C to the

21  same declaration.

22  A    Yes, I see that.

23  Q    What is that document?

24  A    It also appears to be a recorded mortgage.

25  Q    Now, if you look at the MIN number at the top and the

Page 24

1    MIN Number is 1004515- and then there's multiple numbers

2    after that, and then towards the middle of the page on that

3    document you see an amount of that mortgage of 159,000.  Do

4    you see that?

5    A    Yes, I do.

6    Q    If you go back to the prior exhibit, which is Plan

7    Administrator 751, when you look at the MIN number on that

8    one, and the total amount of that particular mortgage, do

9    you see that these are two different mortgages?

10   A    Yes, I do.

11   Q    So here you've got two documents evidencing two

12   separate debt obligations for this particular borrower,

13   right?

14   A    That's correct.

15   Q    And if you go to PA-753, which is the tab that follows,

16   you see for the same borrower Mr. Spohn attaches a certified

17   copy of warranty deeds.  Do you see that?  Or warrant deed

18   records is probably the better way to say it.

19   A    I do see that.

20   Q    Okay.  And this was in addition to the initial demand

21   letter that was sent on this misrepresentation of debts

22   claim, right?

23   A    It was.

24   Q    Was that typical to start with a demand letter and then

25   get this type of evidence instead of relying just on things

Page 25

1   like the credit report?

2   A    That's correct.

3   Q    Now, Mr. Shuster also showed you a declaration from

4   Mortgage Partners; do you remember that?

5   A    Yes.

6   Q    Let's got to TRX-929, which is the Trustees' binder

7   Volume 3.  And do you see Paragraph 12, there's another

8   demand letter referenced?

9   A    Yes, I see that.

10  Q    Okay.  And Mr. Shuster showed you that demand letter,

11  right?

12  A    Yes, he did.

13  Q    That demand letter is a few tabs forward in that same

14  binder, at TRX-1375.

15  A    1375?

16  Q    Yeah, TRX-1375.  Same binder, just a few tabs forward.

17  A    I don't think so.  This binder stops at 1007.

18  Q    It should be the same -- oh, maybe it's Volume 5.  I

19  think yesterday he only had three binders and you guys had a

20  fifth one.

21       THE COURT:  We'll get there.  No one seems to have

22  the document but you.

23       MS. BRASSWELL:  Okay.  Can we put it up on the

24  screen?

25       (Counsel confer)

Page 26

1           THE COURT:  It's Volume 3 --

2           MS. BRASSWELL:  Judge, may we approach?

3           MR. SHUSTER:  I have a copy, Your Honor.

4           THE COURT:  -- of the binder --

5       (Counsel confer)

6           THE COURT:  We have it.  Does Mr. Trumpp have it?

7           MR. TRUMPP:  I think I'm close.

8           MS. BRASSWELL:  I have that for you, if you want.

9           THE COURT:  This is all Mr. Shuster's fault, of

10   course.

11          MS. BRASSWELL:  Don't look.  I have it.

12          MR. SHUSTER:  To that we can stipulate.

13          THE COURT:  Here we go.

14          MR. TRUMPP:  Thank you.  I now have it.

15          MS. BRASSWELL:  Okay.  Great.

16   Q    So Mr. Shuster pointed you to the misrepresentation of

17   employment allegation referenced in the middle of the page.

18   And if you take a look at the text there, it says, "The

19   borrower indicated on the 1003 that he has been employed as

20   a diesel mechanic/supervisor for J&R Fleet Services for

21   three years."  And then it points to a VOE and it says that,

22   "the borrower is currently employed as a diesel mechanic and

23   is not a supervisor."  Do you see that?

24   A    Yes, I do.

25   Q    So the allegation in this letter, from Aurora Loan

Page 27

1   Services, is that this borrower lied about his employment,

2   right?

3   A     That is the allegation, yes.

4   Q     That he said he was a supervisor, but in fact he was

5   just a diesel mechanic?

6   A     Correct.

7   Q     And the documentation cited in this demand letter is a

8   VOE and then there is some other information below that

9   paragraph that talks about research showing salary.com.  Do

10  you see that?

11  A     I do.

12  Q     And Mr. Shuster pointed you to those pieces of evidence

13  and asked you whether that's the kind of evidence the

14  Trustees relied on.  Do you remember that?

15  A     I do.

16  Q     And what was your answer to that question?

17  A     That yes, that was similar to the evidence that they

18  relied on.

19  Q     And how did the plan administrator treat that evidence

20  under the protocol?

21  A     We weighed it in relation to the rest of the overall

22  loan file and the facts and circumstances.

23  Q     Okay.  Now Mr. Shuster didn't show you anything other

24  than this demand letter yesterday, right?

25  A     Not that I recall.

Page 28

1    Q    So I do, I want to show you a document that's also from

2    this case.  And it's at -- I'm sorry to move you to another

3    binder, it's at Plan Administrator 754.  And do you see that

4    document, Mr. Trumpp?

5    A    Not yet.  I'm sorry.

6    Q    Oh, sorry.  Okay.

7    A    764?

8    Q    It's 7 --

9    A    754?

10   Q    -- 54, yeah.

11   A    Okay.  I have it.

12   Q    Okay.  What is this document?

13   A    It appears to be a declaration from one of our counsel

14   on that particular case.

15   Q    Okay.  Is that Mr. Balser?

16   A    Yes.

17   Q    And was he someone who you retained frequently to

18   pursue repurchase claims on your behalf?

19   A    Yes, he was.

20   Q    Okay.  Mr. Balser filed this declaration it looks like

21   in support of a motion for summary judgment.  Do you see

22   that pleading name?

23   A    Yes.

24   Q    Okay.  And if you turn to the next page, you see Mr.

25   Balser attaches several exhibits, right?

Page 29

1   A    Yeah, I see the reference to Exhibits A through E.

2   Q    Okay.  Let's take a look at Exhibit A attached to Mr.

3   Balser's declaration.  And you see that that is a deposition

4   transcript, right?  It's the next exhibit over.  So PA-755

5   is Exhibit A to Mr. Balser's declaration.

6   A    Yes, I do see that.

7   Q    And it's a deposition, right?

8   A    It looks like that way, yes.

9   Q    And in fact it's the deposition of the borrower in

10  question, right?

11  A    Yes.

12  Q    If you look at the name of the deponent and you compare

13  it to the name on the demand letter, it's the same borrower?

14  A    Yes.

15  Q    Okay.  Now, let's take a look at Page 14 of the

16  transcript, but it's -- for this exhibit number it's Page 15

17  of 53, to Plan Administrator Exhibit 755.

18  A    Page 15 of 53?

19  Q    Right.

20  A    Okay.  I'm there.

21  Q    Okay.  Do you see Line 10 is a question and Line 12 is

22  an answer?  The question is, "What was your -- at the time

23  what was your position?"  And the answer the borrower is

24  giving in this deposition is, "I was a diesel mechanic but

25  at that time we were making a lot of overtime and right now

Page 30

1    it's slow."  Do you see that?

2    A    Yes, I do.

3    Q    And what the borrower is admitting in this deposition

4    is that in fact he was a diesel mechanic?

5    A    Yes.

6    Q    Not a supervisor?

7    A    No.

8    Q    And Mr. Trumpp, did you consider this to be good

9    evidence that the borrower misrepresented his employment --

10   A    Yes, we did.

11   Q    -- on his loan application?

12   A    Yes, we did.

13   Q    And in fact it was good enough to attach to a motion

14   for summary judgment in this case, right?

15   A    That is correct.

16   Q    And if you look at the next page, there are additional

17   questions where -- and I'm not sure who the lawyer is on

18   this deposition, maybe it's Mr. Balser, maybe it's someone

19   else.  But the lawyer is asking more questions to this

20   borrower about whether or not he's ever held a supervisory

21   position.  Do you see that on Page 16 of this exhibit, Line

22   8?  Question, "Have you ever held the supervisor position?"

23   Answer, "There?"  Question, "Yes."  Answer, "No."  Do you

24   see that?

25   A    Yes, I do.

Page 31

1   Q    So he's further confirming the misrepresentation,

2   right?

3   A    Correct.

4   Q    Now, turning to plan administrator 756, which is

5   Exhibit B to the same declaration that Mr. Balser filed in

6   the Mortgage (indiscernible) case.  You see that document?

7   A    Yes, I do.

8   Q    Do you know what that document is?

9   A    These appear to be the employment records and earnings

10  records specifically for the borrower.

11  Q    And how did Lehman typically get records from the

12  employer when it was trying to verify information for a

13  borrower?

14  A    I believe we subpoenaed the employers.

15  Q    Okay.  And who had to get involved in order to get

16  subpoenas from the employers?

17  A    Counsel.

18  Q    Okay.  Now, one of the things in this employer's

19  records if you look at Page 11 of Exhibit number 756, that

20  looks like a W-2, right?

21  A    It looks like a 1099 to be correct.

22  Q    Is that a 1099?  Yeah, you're right, a 1099.  But this

23  came directly from the employer, right?

24  A    Yes, it did.

25  Q    Okay.  It's part of the same bulk of records that you

Page 32

1   said was obtained by subpoena.

2   A    Correct.

3   Q    Okay.  Now, I'm going to ask the same question Mr.

4   Shuster asked but about this evidence.  Was this the kind of

5   evidence that the Trustees secured under the protocol?

6   A    No.  We did not see this level of detail or this level

7   of evidence in the protocol.

8   Q    Did you ever see them issue subpoenas for this kind of

9   documentation?

10  A    No, they -- not that I'm aware of.

11  Q    Okay.  Mr. Shuster also asked you about LBHIV v. IRES;

12  is that how you say that?

13  A    We've always referred to it as IRES.  I'm not sure if

14  that's --

15  Q    Okay.

16  A    -- the correct way to pronounce it.

17  Q    Well, we'll call it IRES.  TRX-733.  And that's in

18  volume 2, I believe, of the Trustee's (indiscernible).  Do

19  you remember Mr. Shuster showing you this declaration?

20  A    Yes, I do.

21  Q    Okay.  And this is a declaration you filed in this

22  case?

23  A    Yes, it was.

24  Q    And he also showed you a demand letter related to this

25  one.  I'd like to look at that demand letter.  It's TRX-734,

Page 33

1    just a few tabs over.  And take a look at Page 17 of TRX-

2    734.  Do you see that?

3    A    Yes, I do.

4    Q    And this one -- this demand letter is with respect to

5    an allegation about misrepresentation of employment and

6    income, right?

7    A    Yes, it is.

8    Q    And it looks like on this one the allegation is

9    supported by a bankruptcy filing, right?

10   A    Yes.

11   Q    And Mr. Shuster asked you whether that's something that

12   you saw the Trustee submit under the protocol.  Do you

13   remember that?

14   A    I do.

15   Q    And do you remember your answer?

16   A    Yes.  It was something that they submitted.

17   Q    And how did the plan administrator treat bankruptcy

18   filings just generally when it saw them in the protocol?

19   A    We treated them as evidence and we weighed it

20   appropriately and gave it, you know, its due weight in our

21   review.

22   Q    Okay.  And similarly, when you were pursuing claims, it

23   was something that you looked at, right?

24   A    That's correct.

25   Q    Now, I'd like to show you an order from this case, from

Page 34

1  the IRES case.  It's plan administrator 774 in the direct

2  binder.

3  A    In the direct binder?

4  Q    In the direct binder.  But you know what?  It's just a

5  page so if you want to look at it on the screen --

6  A    Okay.

7  Q    -- you can do it that way, too.

8  A    I'll do that.

9  Q    Do you see what this document is?

10 A    It's an order on the plaintiff's motion for default

11 judgment.

12 Q    Okay.  And what does that mean to you?

13 A    It means that the other side didn't respond and we,

14 Lehman, obtained a default judgment against this particular

15 party.

16 Q    And did that happen from time to time where you'd file

17 a complaint or you'd make a demand and the other side just

18 never showed up?

19 A    It did happen, yes.

20 Q    In those instances, was there a reason for you to go

21 and obtain more evidence in addition to what you had cited

22 to in your demand letter?

23 A    In those instances, no, there would not be.

24 Q    Okay.  Mr. Shuster asked you about the Belvedere case

25 as well.  Do you remember that?

Page 35

1    A    I do.

2    Q    And that's TRX-933 in volume 3.

3    A    933?

4    Q    933, yes.  TRX-933.

5    A    I have it.

6    Q    Okay.  And attached to that, and something that Mr.

7    Shuster also referenced, is a demand letter.

8    A    Okay.

9    Q    Take a look at -- and that's at 933-F.  Take a look at

10   the very last page, Page 46.  Remember, this was the chart

11   that had the (indiscernible) Mr. Shuster walk you through

12   the different pieces of evidence?

13   A    I do remember this one, yes.

14   Q    Okay.  And when Mr. Shuster walked you through these

15   pieces of evidence, I think your answer was these are

16   documents that the plan administrator saw in the protocol,

17   right?

18   A    I'm sorry.  Can you repeat that, please?

19   Q    When Mr. Shuster walked you through these individual

20   pieces of evidence, I think your answer was these are

21   documents the plan administrator saw in the protocol?

22   A    Sounds familiar.

23   Q    You don't remember?  That's okay.  You don't have to

24   remember.  I'm going to skip walking through the evidence

25   because I think the point is a little bit different than

Page 36

1    with respect to the evidence.  Let's take a look at PA-761

2    in the direct binder.

3    A    Okay.

4    Q    Do you see that this is also an order for default

5    judgment?

6    A    Yes, it is.

7    Q    And take a look at Page 2 of that order.  You see in

8    Section 2, the first paragraph, it says, "On a motion for

9    default judgment, a Court must presume the truth of all

10   factual allegations in the complaint except for those

11   pertaining to damages."  Do you see that?

12   A    Yes, I do.

13   Q    And when LBHI or Aurora was filing a complaint, was the

14   evidence that it cited to different from the evidence that

15   it eventually obtained as it went all the way through

16   litigation?

17   A    Yes.

18   Q    What were the lawyers hired to do when they were hired

19   to initiate the particular case?

20   A    They were hired for us to pursue throughout the

21   litigation process the clones and claims and meet the

22   requirements of the court process.

23   Q    And was part of that process the gathering of

24   additional evidence?

25   A    It was.

Page 37

1    Q    But when a party didn't show up, was that something you

2    had to do?

3    A    No.

4    Q    Now, did it work the other way around, too?  So, if a

5    party didn't show up, obviously you didn't have to gather

6    any evidence.  But were there instances where you initiated

7    your demand and the counterparty did respond and say, "You

8    know what?  This is not a good claim," and you then withdrew

9    your claim and walked away from it and said, "I'm not going

10   to file this."?

11   A    That's correct.  I mean, it was -- there were times

12   where you were able to actually talk to the borrower and he

13   would explain his situation and it was different than what

14   we assumed or we got additional documentation to prove that

15   what we thought was the case wasn't the case.

16   Q    Were the lawyers ever involved in helping you figure

17   out what's a good claim, what's a bad claim?

18   A    Absolutely.

19   Q    What else did you take into consideration when making

20   that decision, what's a good claim, what's a bad claim?

21   A    obviously we looked at the evidence.  We looked at, you

22   know, our strengths and weaknesses around each particular

23   claim and made an assessment of whether we thought it made

24   sense to continue pursuing that claim.

25   Q    Okay.  Mr. Shuster also asked you about the NBGI case.

Page 38

1   Do you remember that?

2   A    I do.

3   Q    And that's at TRX-732, which is binder 1 of the

4   Trustee's binders.  And just like with the other cases, Mr.

5   Shuster referenced the demand letter.  Do you remember that?

6   A    I do.

7   Q    And the demand letter is the next exhibit over, 732-E.

8   And I think Mr. Shuster took you to the last two pages of

9   that document, Page 97 and 98.  You see, this letter

10  references a misrepresentation of occupancy claim and an

11  employment claim.  You see that?

12  A    I do.  It's rather hard to read, but I see it.

13  Q    I agree.  It's a little tough to read.  You'll see

14  below that -- you can probably make out the term

15  accurint.com?

16  A    Yes.

17  Q    And then below that there's a reference to a VOE.  You

18  see that?

19  A    Yes, I do.

20  Q    So, this allegation in this demand letter is supported

21  by an accurate report and a VOE, right?

22  A    Correct.

23  Q    Okay.  Let's see what else Lehman did in this case.

24  Take a look at PA-762 in the direct binder.

25  A    I have 762.

1   Q    Okay.  Now, this is -- it's kind of an odd document

2   because even though it's the first page of the filing, there

3   doesn't seem to be a caption on it.  So, I just want to make

4   sure we're all on the same page.  Do you see at the top

5   where it says the case name?  It says case 207CV06501?

6   A    I do.

7   Q    Okay.  And if you take a look at the demand letter that

8   we just saw in the previous exhibit, TRX-732-E, Page 97 --

9   A    I switched binders.

10  Q    If we could show that on the screen so he can see that?

11  You don't have the exhibit?  I'm sorry.  I want to make sure

12  the record is clear that this is the same case.

13  A    732-E?

14  Q    732-E, right.  And it's Page 97 of 98.

15  A    Yes.  This demand was sent to NBGI Inc.

16  Q    right.  And what I'm trying to compare is the case

17  caption at the top.  So, we've got two exhibits that we're

18  comparing.  We've got PA-762, and that's got a case caption

19  at the top, and then we have TRX-732-E at Page 97 with a

20  case caption at the top.  Do you see that?

21  A    I do.

22  Q    Okay.  And those two cases are the same, right?

23  A    They both have the same designation.

24  Q    Okay.  And so -- and you can see on 762 that it's

25  referencing NBGI?

Page 40

1   A    Yes.

2   Q    Okay.  And at the top of that document, it says,

3   "Plaintiff's statement of undisputed facts."  Do you see

4   that?

5   A    I do.

6   Q    And there's multiple paragraphs in this document that

7   appears to list facts that, at least according to this

8   document, are undisputed, right?

9   A    It does.

10   Q    I'd like to turn your attention to Page 38 of 44 in

11   that exhibit.  And you see the header to Paragraph 176 is

12   with respect to loan number 4572.  Do you see that?

13   A    I do.

14   Q    And so that you don't have to flip back and forth, I'll

15   represent to you that that's the same four digits on the

16   demand letter that we were just looking at.

17   A    Thank you.

18   Q    So, it's the same one.  And you see that on Paragraph

19   177, which is still with respect to that same loan, it says,

20   "NBGI," which is the defendant in this case, right?

21   A    I do.

22   Q    "Admits that there was at least one misrepresentation

23   by the borrower in connection with this loan as claimed in

24   Aurora's demand letter."  Do you see that?

25   A    Yes, I do.

Page 41

1   Q    And there's a reference right next to it to Spohn

2   declaration Exhibit A.  You see that?

3   A    Yes, I do.

4   Q    Spohn declaration Exhibit A is that PA-763, which is

5   the next exhibit over.  And you'll see on the second page of

6   his declaration there's a reference to Exhibit A.  You see

7   that?

8   A    Yes.

9   Q    And Exhibit A is described as true and correct -- or

10  I'm sorry -- true and accurate copies of selected portions

11  of the deposition of NBGI's 30(b)(6) deponent

12  (indiscernible).  Do you see that?

13  A    Yes, I do.

14  Q    Was that part of Aurora and Lehman's practice to depose

15  the defendant when available?

16  A    Yes.

17  Q    Okay.  And here it was a 30(b)(6) deposition so you

18  have a corporate witness testifying on behalf of the

19  defendant, right?

20  A    That's correct.

21  Q    Let's see what she testified to.  Take a look at Page

22  27 of Exhibit number 763.  If you look at Line 20, the

23  question is, "Can I assume then that NBGI determined that

24  there was a misrep -- at least one misrepresentation as

25  claimed in the exhibit?"  And she answers, "Based on reading

Page 42

1    my notes, I would say yes." Do you see that?

2    A    Yes, I do.

3    Q    And that's a corporate witness admission that there's a

4    misrepresentation here, right?

5    A    Yes, it is.

6    Q    And so, Lehman wasn't resting on the evidence in the

7    demand letter, was it?

8    A    No, it was not.

9    Q    Now, if you flip the page, there's another deposition

10   in this case. Do you see that? It's Exhibit 763, Page 28.

11   A    Yes, I see that.

12   Q    And was that part of Lehman and Aurora's practice to

13   take multiple depositions when necessary?

14   A    Yes.

15   Q    Now, if you look at Page 111 of the same exhibit, you

16   see there are interrogatory responses from the defendant.

17   Do you see that?

18   A    Yes, I do.

19   Q    Was that typical in the cases that -- at least that you

20   were involved in with respect to downstream claims that

21   there would be written discovery like this?

22   A    Yes, it was.

23   Q    And by the way, in terms of the volume of these cases

24   with respect to the loans, how many loans were involved in

25   those case?

Page 43

1    A     It varied by the case by case.  Some cases were as

2    little as one loan.  Some cases were 10 to 20 loans.  I

3    think we even had a few cases where there were a few hundred

4    loans.  So, I mean, it varied by case.

5    Q     And on the cases where you just had a handful of loans,

6    would you do discovery like this?

7    A     Yes.

8    Q     And how long would that take?

9    A     It varied by case, right?  We had different discovery

10   timelines and those types of things.  But I mean, it wasn't

11   overly burdensome and it was all part of the model that we

12   had which was from a business perspective something that

13   made sense to do.

14   Q     Okay.  And could discovery last months?

15   A     It could.

16   Q     Okay.  And even after months of discovery, were there

17   times where enough evidence just didn't turn up to prove a

18   particular claim?

19   A     Yeah.  So, we would for example try and depose a

20   borrower.  But we didn't always -- we weren't always

21   successful in finding the borrower.  So, you know, from time

22   to time we would not always be able to obtain all of the

23   additional evidence that we were looking for and we would

24   have to take that into account in our determination of

25   whether or not to continue pursing that claim.

Page 44

1  Q    And when you lost some of these cases, were they ever

2  on motions for summary judgment?

3  A    They were.

4  Q    And summary judgment, you understand, doesn't end the

5  case, right?  If you lose on summary judgment you still go

6  on to potentially trial?

7  A    Correct.

8  Q    And so, in those cases, when you were denied summary

9  judgment, was it because the judge still believed there was

10  some fact question to be determined?

11  A    Yes.

12  Q    And was it ever the case that even all the way through

13  trial those fact questions just didn't get resolved?

14  A    That's correct.

15  Q    With respect to the protocol, when the plan

16  administrator was denying a claim, was it because the plan

17  administrator had found unequivocal evidence that the

18  misrepresentation didn't occur?  Or was it a question of

19  inconclusiveness?

20  A    It could have been both.  We -- there were instances

21  where we were convinced that the alleged misrepresentation

22  didn't occur or we weighed the evidence and couldn't come to

23  a conclusion one way or the other.

24  Q    Now, in this particular case, in NBGI, there's a

25  declaration of Mr. Spohn, and it looks like there's another

1    declaration.  Take a look at 764 -- PA-764.  Do you see

2    that's a declaration of what appears to be a borrower?  Oh,

3    it's in Spanish.

4    A    It's in Spanish and I don't necessarily speak Spanish.

5    Q    And I can't translate for you.  So, luckily there's a

6    translation here.  You go to the next page, Page 3, and see

7    there's a translation for that declaration.  And take a look

8    at Paragraph 4.  What is he saying there?

9    A    It says, "It was never my intention or my plan to make

10   the aforementioned property my primary residence."

11   Q    And based on your understanding of these types of

12   declarations and these types of admissions, what is that

13   going to?  What is that in reference to?

14   A    That's in reference to a misrepresentation of occupancy

15   claim.

16   Q    And what is this borrower saying about that?

17   A    That he never intended to occupy the property.

18   Q    And is that good evidence that in fact he lied on his

19   application?

20   A    Yes, it would be.

21   Q    And is this the kind of evidence -- so in lieu of a

22   deposition where you can sit down with a borrower and ask a

23   whole bunch of questions, is this the kind of information

24   that you typically obtained when you were pursuing claims

25   downstream?

Page 46

1   A    That's another example, yes.

2   Q    This is just a few sentences from the borrower.

3   A    Yes.

4   Q    There's not a lot the borrower has to do to just put

5   down four sentences on a piece of paper.

6   A    No.

7   Q    Okay.  There's also at 765 -- PA-765, there's another

8   declaration in this case.  Do you see that?

9   A    I do.

10  Q    And if you look at that first paragraph on that

11  declaration, you see this is a declaration for a records'

12  custodian certifying the accuracy of certain records.  Do

13  you see that?

14  A    Yes, I do.

15  Q    And you see that at the end of that first paragraph,

16  this information is going to Mr. Spohn, right?

17  A    I'm sorry.  Where do you see that?

18  Q    So, same paragraph, Paragrasph 1, and at the very end

19  you see Matthew Spohn listed on there.

20  A    Yes.  Thank you.

21  Q    You see that?  That's -- that was your lawyer?

22  A    Yes, he was.

23  Q    And you see the next paragraph says -- there's a

24  reference there to a subpoena.  You see that?

25  A    Yes, I do.

Page 47

1    Q    Did Mr. Spohn offer to do that for you in these cases?

2    Issue subpoenas to obtain records?

3    A    Yes, he did.

4    Q    And was he successful in doing that?

5    A    Yes, he was.

6    Q    Were there other lawyers?  So, you mentioned Mr. Balser

7    and Mr. Spohn.  Were there other lawyers that you regularly

8    retained to gather this type of evidence for you?

9    A    Yes.  There were a handful of different firms that we

10   typically used on our downstream cases.

11   Q    What other lawyers can you think of that you used

12   pretty regularly?

13   A    We used another firm by the name of Foster, Graham,

14   Milstein & Calisher.  We used specifically there an

15   individual by the name of Dan Calisher.  There were a couple

16   of other attorneys that worked for him.  So, we had Akerman

17   Senterfitt.  We had Reilly Pozner.  We had Foster Graham.

18   We had Locke Lord.  And there were a few others that we used

19   from time to time.  But we had numerous firms helping us in

20   this process.

21   Q    And Mr. Shuster made a reference to his friend, Mike

22   Rollin.  Was he one of the lawyers that obtained this

23   information for you?

24   A    Yes.  How could I forget?  But yes, Mike Rollin and his

25   firm also helped us.

Page 48

1  Q   Okay.  Now, in this case there's still more evidence,

2  so I want to keep walking through it but I won't dwell on it

3  too much.  It's PA-767.

4  A   Okay.

5  Q   Do you see that's another declaration by a borrower?

6  A   Yes, it is.

7  Q   And what is he stating in Paragraphs 3 -- or sentences,

8  Line 3 and 4?

9  A   Line 3 says, "This property is not my primary

10  residence."  Line 4 says, "I never intended this property to

11  be my primary residence."

12  Q   So, you have another admission here from a borrower,

13  right?

14  A   That is correct.

15  Q   Now, Mr. Trumpp, you actually filed another declaration

16  in this case at PA-768.  You see that?

17  A   Yes.

18  Q   And in connection with this declaration, you pulled

19  additional evidence and cited to it here.  You see Paragraph

20  57 where you reference a verification of deposit?

21  A   Yes, I see that.

22  Q   And then you attach -- in addition to that you attach

23  correspondence with the bank that verified that.  In the

24  next paragraph there's a reference to that.  Do you see

25  that?

Page 49

1    A    I do.

2              MS. DOMINGUEZ-BRASSWELL:  Your Honor, is it too

3    early to take a short break?

4              THE COURT:  No.

5              MS. DOMINGUEZ-BRASSWELL:  Okay.

6              THE COURT:  Not at all.  Not at all.  How much

7    time would you like?

8              MS. DOMINGUEZ-BRASSWELL:  10 to 15 minutes?

9              THE COURT:  10, 15 minutes?

10             MS. DOMINGUEZ-BRASSWELL:  Yeah.

11             THE COURT:  Okay.  Why don't we come back at 45

12   minutes after 11 or 15 before 12?

13             MS. DOMINGUEZ-BRASSWELL:  Thank you, Your Honor.

14             THE COURT:  All right?  Mr. Trumpp, same rules

15   apply.

16             (Recess)

17             THE COURT:  I thought we had scared Mr. Shuster

18   off.

19             MR. SHUSTER:  We're not defaulting.

20             THE COURT:  No such luck.  Please have a seat.

21             REDIRECT-EXAMINATION OF ZACHARY TRUMPP (CONT.)

22   BY MS. DOMINGUEZ-BRASSWELL:

23   Q    Mr. Trumpp, Mr. Shuster asked you about one last case

24   yesterday.  It was the LBHI v. PMC case.  Do you remember

25   that?

Page 50

1   A    Yes, I do.

2   Q    I want to show you a document from that case, T -- I'm

3   sorry, PA-770 in the direct binder.  Do you see that

4   document?

5   A    Yes, I do.

6   Q    Now, this is a statement of uncontroverted facts and

7   conclusions of law in support of plaintiff's motion for

8   summary judgment, and the plaintiff here was Lehman and it

9   was pursuing claims against PMC.  Do you see that?

10  A    Yes, I do.

11  Q    This is a 30-page document with facts listed so I'm not

12  going to walk through each one but I do want to highlight a

13  couple.  Take a look at Page 11.  And when I'm referencing a

14  page, I'm referencing the exhibit page, so this would be

15  Page 11 of 259 pages in Exhibit 770.

16  A    Thank you.  I have it.

17  Q    Okay.  And if you see in the top, the first full box on

18  that page, it's Paragraph 23, it says, "The final loan

19  applications for the RA-1 and RA-2 loans," and by the way,

20  what is RA-1 and RA-2 a reference to?

21  A    I recall seeing them yesterday but I don't remember

22  what RA stands for, quite honestly.

23  Q    Was it the -- was it Lehman's practice to not include

24  the borrower's name in public filings?

25  A    Yes.

Page 51

1    Q    And so, could this be a reference to the borrower's

2    name without including the entire name?

3    A    I remember seeing it yesterday in reference to two

4    particular loans.  It very well could be in reference to

5    their borrower names.

6    Q    Okay.  Well, it's referencing the RA-1 and RA-2 loans,

7    and what it's saying is that those two loans, or borrowers

8    as it were, materially misrepresent the borrower's monthly-

9    based employment income.  Do you see that?

10    A    Yes, I do.

11    Q    So, there's a statement there that the borrower

12    misrepresented his or her income.  I'm not sure if this is a

13    female borrower or a male borrower.  Now, in support of that

14    there's a reference to Exhibit 5 Ramsay deposition

15    transcript, Page 99.  Do you see that?

16    A    Yes, I do.

17    Q    Okay.  Now, take a look at Page 217 of this exhibit.

18    A    Okay.

19    Q    Okay?  And just for reference, if you look at the page

20    -- couple pages before it, page 215, this is a deposition

21    transcript, right?

22    A    Yes, it is.

23    Q    And it appears to be a deposition of a borrower.

24    A    Yes.

25    Q    So, this is another instance, the PMC case, where

Page 52

1    Lehman went out and took a deposition of the borrower,

2    right?

3    A    Yes.

4    Q    Now, if you look at Page 217, there's a Q and A

5    beginning on Page 99 of the transcript.  So, that small box

6    at the bottom left-hand corner?  And the Q and A reads,

7    question:  "Your only income in 2005 was the $2000 every two

8    weeks paid by your company," and there's the name of a

9    company.  Answer:  "Through payroll, yes."  Question:

10   "Through payroll.  And the only income you made in 2006 was

11   $2000 every two weeks payed through payroll by," and the

12   name of the company.  Do you see that?

13   A    Yes, I do.

14   Q    And the borrower answers, "Correct."

15   A    Yes, the borrower does.

16   Q    The borrower is admitting in this deposition to the

17   income information the Lehman is seeking from him, right?

18   A    Yes.

19   Q    Now, in addition to a misrepresentation of income

20   claim, Lehman was also pursuing on this -- in this

21   particular case a misrepresentation of debts claim, and if

22   you turn to Page 9 if this exhibit, I'll show you the

23   reference to that.  I'm sorry, it's -- yeah, Page 9 of the

24   exhibit.  Paragraph 18 -- do you see Paragraph 18, second

25   box from the bottom?

Page 53

1   A    Yes, I do.

2   Q    It says, "The final application for the (indiscernible)

3   loan, executed on or about July 6, 2005, materially

4   misstated the borrower's liability in failing to disclose

5   the borrower's liabilities in connection with another loan

6   of approximately $372,000 in its associated monthly payment

7   obligations."  Did I read that correctly?

8   A    Yes, you did.

9   Q    And if you turn to Page 202 of this exhibit, that's a

10  declaration, right?  Submitted in this same case, PMC?

11  A    Yes, it is.

12  Q    And the declaration is filled out by -- look at the

13  first paragraph in here -- the loan manager that's employed

14  by this particular bank.  Do you see that?

15  A    Yes, I do.

16  Q    And just to make sure that everybody's on the same

17  page, it's Page 200 of Exhibit 770.  And this particular

18  loan manager at the bank in Paragraph 5, which starts at

19  Page 201 of the exhibit and goes on to Page 202, is

20  declaring that this borrower does in fact have this $372,000

21  debt to their name.  Do you see that?

22  A    Yes, I do.

23  Q    And this is the support that Lehman was relying on when

24  pursuing its claim for a misrepresentation of debt, right?

25  A    Yes.

Page 54

1   Q    Is this the kind of evidence that you saw the Trustee

2   submit in the protocol?

3   A    I have not seen any subpoena records or things such as

4   this in the evidence put forth by the Trustees.

5   Q    Did you see declarations from anyone?

6   A    No, I did not.  No.

7   Q    Now, this case also references another

8   misrepresentation of income claim and I'm going to point you

9   to Page 700 -- I'm sorry, Page 14 of 259 in that same

10  exhibit, Exhibit 770.

11  A    I'm sorry.  Can you say that again, please?

12  Q    Yeah.  It's Page 14 --

13  A    Okay.

14  Q    -- of Exhibit 770.  Okay?  And there's a paragraph at

15  the top, Paragraph 33, that says, "The final loan

16  application for the SA loan, executed on or about May 16,

17  2007, materially misstated that the borrower worked for

18  companies that he was never employed by, misrepresenting

19  that he earned substantial income from such employers.  Do

20  you see that?

21  A    Yes, I do.

22  Q    So, Lehman here is making an allegation about the

23  misrepresentations made by this particular borrower, right?

24  A    Correct.

25  Q    And there's a reference to some evidence.  I'm going to

1    point you to that evidence.  If you go to Page 254 of the

2    same exhibit, that's another deposition, right?

3    A    Yes, it is.

4    Q    And it appears to be the deposition of this borrower

5    that Lehman is alleging misrepresented his income?

6    A    Yes, it is.

7    Q    Now, if you take a look at the bottom of Page 30 of the

8    deposition transcript, so it's the square on the bottom

9    left-hand corner, and you look at Line 22, the Q and A

10   starts with, question:  "Do you see where it says you made

11   $8850 a month?"  Answer:  "Yes, I see it."  Question:  "Was

12   that true?"  Answer:  "No.  Never worked for that company at

13   the time."  Question:  "And at that time were you making

14   $8000?"  Answer:  "No."  Question:  "$850 a month?"  Answer:

15   "No."  Question:  "Have you ever made that much money?"

16   Answer:  "Never."  Question:  "Go down to where you see

17   bonuses.  Do you see that $600 number?"  Answer:  "Uh-huh."

18   Question:  "Were you receiving a bonus from any company for

19   $600 a month?"  Answer:  "Never."  Do you see that Mr.

20   Trumpp?

21   A    Yes, I do.

22   Q    Is this the kind of questioning that was done by your

23   lawyers on behalf of Lehman when they would go out and get

24   borrower depositions?

25   A    Yeah, this was a common type of questioning.

1    Q    Is this pretty typical of all of the lawyers that you

2    mentioned earlier going out and gathering evidence?

3    A    Yes, it was.

4    Q    And was it typical, like in the PMC case, to get more

5    than one deposition?

6    A    Yes.

7    Q    And declarations?

8    A    Yes.

9    Q    And records?  Employment records?

10   A    Yes.

11   Q    And declarations from custodians?

12   A    Correct.

13   Q    So, none of the things that we saw here today was

14   atypical or specific to one particular case?

15   A    No.  These were very common.

16   Q    So, when Mr. Shuster was asking you yesterday about

17   these demand letters and he was focusing in on the one or

18   two pieces of evidence cited in there, is that a fair

19   characterization of what Lehman and Aurora would base their

20   claims on?

21   A    Early in the process, those are examples of things that

22   we -- types of evidence that were used.  But that was

23   clearly not the end result and that is not the ultimate

24   basis for Lehman's claims when they were pursuing down-

25   stream claims in litigation.

Page 57

1    Q   I want to go back to a document that we saw earlier

2    today.  It's PA Exhibit 658 in the direct binder.  And this

3    time I want to focus on the top half.  We earlier talked

4    about the bottom half which described the approach to

5    (indiscernible) and the top half focuses on something a

6    little bit different.  Mr. Trumpp -- well, first of all, do

7    you have the document?

8    A    PA what?

9    Q    PA-658.

10   A    Thank you.  I have it.

11   Q    Okay.  So, the first bullet point says, "QC findings

12   reviewed to determine whether findings are valid."  Do you

13   see that?

14   A    Yes, I do.

15   Q    And then there's some sub-bullets underneath.  It says,

16   "Findings reviewed to determine whether a rep or warrant of

17   the applicable governing agreement has been violated."  You

18   see that?

19   A    Yes, I do.

20   Q    Then the next sentence says, "Fairly standard reps and

21   warrants are made both into our trust agreements and whole

22   loan sales."  You see that?

23   A    Yes.

24   Q    Now, the next sentence talks about what it takes to

25   show a valid breach.  Do you see that?

Page 58

1    A    Yes, I do.

2    Q    It says, "In order for finding to be deemed valid, must

3    have clear and convincing documentation to support issue."

4    You see that?

5    A    Yes, I do.

6    Q    Now, is that a reference to incoming claims where the

7    department is trying to review whether or not those claims

8    are valid or outgoing claims where the department is trying

9    to figure out if they have good enough claims to pursue?

10             MR. SHUSTER:  Objection.  I don't think there's

11   any foundation laid that this witness has seen this document

12   before or knows what it is.

13             MS. DOMINGUEZ-BRASSWELL:  He -- we walked through

14   this earlier and Mr. Trumpp did explain that he knows what

15   it is, he knows where it came from, and even the date

16   associated with it.

17             THE COURT:  I'm going to overrule your objection,

18   Mr. Shuster.  Go ahead.

19   Q    Mr. Trumpp, my question was -- and it was a long

20   question.  Let me see if I can repeat it.  Was this a

21   reference -- when it says, "In order for a finding to be

22   deemed valid, must have clear and convincing documentation

23   to support the issue," was that a reference to the -- a

24   defense associated with incoming claims or was that a

25   reference to what standards Aurora held itself to when

Page 59

```
 1   pursuing those?

 2   A    It was the standard that Aurora used when pursing

 3   claims and it -- as I mentioned yesterday, this was the

 4   framework that contract admin was looking at when they would

 5   receive information from quality control saying, "Here's a

 6   potential defect on a loan."  Again, contract admin didn't

 7   have the review of the representations and warranties.  They

 8   just did a re-underwrite of the loan.  And so, this is an

 9   example of the framework that contract admin used when they

10   were assessing the potential defects and making

11   determinations on whether or not they should pursue those

12   claims.

13   Q    Okay.  And the next bullet says, "Contract admin

14   requires a higher level of proof than the level expected by

15   QC."  Do you see that?

16   A    I do.

17   Q    Is that what you were referring to when you were saying

18   sort of the differences between contract admin and QC?

19   A    I did.

20   Q    Can you elaborate on that a little bit more?  Sort of

21   the relationship between contract admin and QC and how they

22   were different?

23   A    So quality control and the way it worked in Aurora,

24   wasn't necessarily focused on identifying loans to put back.

25   Its focus was assessing the quality of loans that it
```

Page 60

1    underwrote either for their brokers or correspondents, and

2    it was making sure and overseeing the team of underwriters

3    that they had and that they were doing good work, and it was

4    focused on essentially the quality of the mortgages that

5    they were originating from an underwriting perspective.

6         It wasn't necessarily their goals to find all the

7    potential put-backs and pursue them relative to the

8    agreements.  It just -- it's a different mindset, and so

9    when they saw things they would write them up and say,

10   "Here, contract admin, review this for repurchase."  And

11   they just had different mindset where they, again, it just

12   wasn't their focus.

13        Their idea was to try and find defects in the loan

14   and identify areas of improvement, but it wasn't necessarily

15   the same thing as finding issues that rose to the level of a

16   breach of representation and warranty that adversely

17   affected the value of the loan.  It's just a different

18   standard, and that's why contract admin said, "We have to

19   have a higher standard on this."

20   Q    Were there times when QC would identify a potential

21   claim and contract admin would say, not good enough, we're

22   not pursuing this?

23   A    There was, yes.

24   Q    Okay.  And continuing on this document, when it's

25   talking about contract admin requiring a higher level of

1   proof, it goes on to describe examples of that.  We see the

2   first line says, "For example, tax returns from year prior

3   to origination appears to be sufficient proof for QC as to

4   misrep income, but contract admin may determine that this

5   evidence alone is not proof."  Do you see that?

6   A    I do.

7   Q    And was tax returns the only thing that was treated

8   this way, or were there other pieces of evidence that were

9   similarly weighed by contract admin?

10  A    No, this was just an example.  Whether it was in

11  contract admin or loss management, we were always of the

12  mindset that our repurchase demands or our make-whole

13  demands might not necessarily be resolved business to

14  business, and it was really our level or standard of care,

15  essentially, that we were making sure that the evidence that

16  we were pursuing as, you know, as representatives of Aurora

17  and Lehman and we're making sure that we're making good

18  claims and the basis for that was simply, you know, do we

19  believe this is the type of evidence that would be able to

20  make a valid claim in court.

21          And again, we weren't attorneys, but it was kind

22  of the standard that we were trying to use in the back of

23  our mind, and as we talked about earlier there was always

24  times through the litigation process where things would go

25  one way or the other, but that was kind of the benchmark and

Page 62

1    frame-mark that we used when we were assessing our

2    determinations were going downstream.

3    Q    And earlier you testified that at some point if it

4    became necessary you'd hire lawyers and actually file a

5    case.  Do you remember that?

6    A    Yes.

7    Q    Was there another level of filtering that happened at

8    that level as well?  So, you got through the QC to contract

9    admin filter.  Is there another sort of layer of filtering

10   out that happened at the lawyer level?

11   A    Absolutely.  So prior to filing any complaint, our

12   counsel and our teams of counsel wouldn't just take our word

13   for it.  They went through and they did their diligence and

14   reviewed all of the claims and the evidence that we had

15   prior to making those claims in a complaint.

16   Q    Okay.  And I might've asked you this, but just to make

17   sure the record is clear, did they ever say no to some of

18   the claims you brought to them?

19   A    Absolutely.  They put them through their filter and

20   assessment, and if they said, "You know what, Zach," or

21   whoever else was managing the claims, "we don't think this

22   is sufficient."  They would let us know and we would drop

23   the claims.

24   Q    Now, the second bullet point after the one we just read

25   about the example of tax returns says, "Contract admin

Page 63

1   expects that documentation of claim can reasonably stand up

2   in a court of law in order to be pursued." What is your

3   understanding of that statement, just generally?

4   A    Generally that -- I mean, that's the thing that was in

5   our minds and our mindset is we were pursuing claims and

6   that was things we wanted to make sure were reasonable. And

7   we said the standard was, do we think it would be reasonably

8   held up in court.

9   Q    Okay. Now, the next bullet point says, "Unfortunately,

10  there is no industry standard as to what documentation

11  constitutes breach of rep and warrants. What may be

12  sufficient documentation for Fannie or Freddie is not always

13  agreeable for our sellers." Do you see that?

14  A    That's correct.

15  Q    And what does that statement mean?

16  A    Just I think it highlights what we've been talking

17  about the last several days in that there is no one thing

18  that you can point to in pursuing claims that says this is

19  always right. This will always work, and this is 100

20  percent proof of the claim. Sometimes is evidence in one

21  claim that is reasonable and makes sense isn't always the

22  same case in another loan, so it depends on the facts and

23  circumstances of each particular borrower and each

24  particular claim to determine what evidence works and what

25  evidence doesn't.

```
 1   Q    Yesterday we -- well, I think it was Monday actually --

 2   we talked about bright lines, and you testified there are no

 3   bright lines.  Is this statement consistent with that

 4   concept that there are no bright lines as it relates to

 5   evaluating the evidence?

 6   A    Yeah.  I think this is another way of saying the same

 7   thing that I've tried to elaborate the last several days.

 8   Q    And, again, you testified earlier this was created

 9   before the protocol, this document?

10   A    That's correct.

11   Q    And is your understanding that the policies and

12   procedures and processes that Aurora followed were in line

13   with what's in this document here?

14   A    It is.

15   Q    There's nothing in this document that's inconsistent

16   with what you understand to be the practices of Aurora?

17   A    No.  This was consistent.  This is the same mindset

18   that we had when I was working at Aurora and pursuing our

19   purchase claims.  This is not -- for us, this is not new

20   concepts.  This has been the standard in how we've looked at

21   things all along.

22   Q    What about Lehman?  Is this consistent with the way

23   Lehman approaches breaches of representations, warranties,

24   and claims of that nature?

25   A    Absolutely.  This has been the foundation of my
```

Page 65

1   experience and how we have no altered in any way the things

2   that I have learned through my experience at Aurora and how

3   we do things now at Lehman.

4   Q    Mr. Trumpp, I recall Mr. Shuster asking you some

5   questions about your statement on direct that you viewed the

6   alleged breach rate by the Trustees of this case to be less

7   than reasonable.  Do you remember Mr. Shuster asking you

8   some questions about whether you reevaluated that in any way

9   or not?

10  A    I'm sorry, can you repeat that question?

11  Q    Sure.  That was a bad question.  Mr. Shuster yesterday

12  asked you a series of questions and then asked you whether

13  or not any of his questions or examination caused you to

14  reevaluate your statement that the Trustees alleged breach

15  rate under the protocol seemed unreasonable -- intuitively

16  unreasonable.  You said, you know, 55 percent just seems

17  intuitively unreasonable.  Do you remember that?

18  A    I do remember saying that, yes.

19  Q    And Mr. Shuster was asking you whether there was

20  anything that caused you to reevaluate that.  Do you

21  remember that?

22  A    Vaguely.

23  Q    In the context of that Q and A, Mr. Shuster showed you

24  a declaration from Mr. Pino.  Do you remember that part?

25  A    That I do remember.  Yes.

Page 66

1    Q     Okay.   Bingo.   TRX-872.   Let's take a look at that

2    declaration from Mr. Pino.

3    A     I saved that one from yesterday.

4    Q     Mr. Shuster asked you some questions about the

5    statements on page 3 of this declaration, and specifically

6    he pointed you to the sentence at the end of Step 1 where

7    Mr. Pino says, "It is assumed the RMBS Trustees will present

8    claims on 57 percent of the reviewed loans."   Do you see

9    that sentence?

10   A     Yes, I do.

11   Q     And so the record is clear, Mr. Shuster didn't point

12   you to the footnote 6, and I want to make sure that you have

13   an opportunity to read that.   Do you see the footnote at the

14   bottom of that page, Mr. Trumpp?

15   A     I do see that.

16   Q     Can you read that into the record, please?

17   A     "I have conservatively applied the RMBS Trustees'

18   suggest breach rate in making our calculations.   For the

19   avoidance of doubt, I have not been asked to opine on the

20   accuracy of the RMBS Trustees' breach rate or to offer an

21   alternative breach rate."

22   Q     And what do you take that sentence to mean?

23   A     So as I recall, the sample that was used by the

24   Trustees in their reserve motion in 2014 had an alleged

25   breach rate of 57 percent, and so as Mr. Pino was drafting

Page 67

1    this declaration and talking about how a protocol could

2    work.  For conservative sake, he used their breach rate just

3    to show how, hypothetically, the protocol could work from a

4    volume standpoint.

5    Q    Okay.  And look at the next sentence point you to at

6    page 4.  It says, "Assuming the plan administrator agrees

7    with 50 percent of the claims presented by the RMBS

8    Trustees, the plan administrator would deny 46,113 claims."

9    Do you see that?

10   A    Yes, I do.

11   Q    Can you read the footnote at the bottom that page?

12   A    "I have conservatively applied the RMBS Trustees' 50

13   percent dispute rate in this calculation."

14   Q    And what do you take that sentence to mean?

15   A    Again, that we were trying to -- or, excuse me, Craig

16   Pino was using the conservative assumptions of the Trustees,

17   not necessarily opining on his expectations.

18   Q    Okay.  Mr. Shuster also asked you about the use of

19   remittance reports in connection with your 2012 declaration.

20   Do you remember that?

21   A    Yes, I do.

22   Q    And you did use or rely on remittance reports in

23   connection with that 2012 declaration, right?

24   A    Yes, I did.

25   Q    And just to orient ourselves, that 2012 declaration was

Page 68

1    in connection with a motion to set the reserve.  Do you

2    remember that?

3    A    I do.

4    Q    And Mr. Shuster asked you a series of questions

5    comparing your use of the remittance reports in connection

6    with those assumptions to the plan administrator's rejection

7    of remittance reports in connection with the plan

8    administrator's damages calculation and the identification

9    of critical documents.  Do you remember that?

10   A    I do.

11   Q    Why were remittance reports appropriate, in your mind,

12   for purposes of your 2012 declaration but not appropriate

13   for purposes of calculating the damages amount in the

14   protocol?

15   A    In those two situations, the use of remittance reports

16   served two different purposes.  In my 2012 declaration,

17   which as you said was for estimating the reserve purposes,

18   we were simply in the first five steps of that declaration,

19   we were trying to calculate actual and estimated losses in

20   aggregate for the applicable securitizations.

21          So because I was looking at it in aggregate and

22   because I didn't have access to any other better data, we

23   simply relied on Intex and where we couldn't get other data,

24   we supplemented Intex with remittance reports which was fine

25   and appropriate, because again, we were just trying to use a

Page 69

1   starting point in billions of dollars to assess -- to come

2   up with a calculation of actual and estimated losses at the

3   time.

4           That's different, in my mind, than when you're

5   looking at each individual loan and assessing damages at the

6   loan level and trying to look at all of the various

7   components that went into that loss amount that you needed

8   in order to perform that assessment.  And so it was okay to

9   use remittance reports in my estimation motion, but in my

10  mind it was not okay given their lack of detail to use them

11  to assess the damages as put forth by the Trustees in the

12  protocol.

13  Q    Thank you.  Mr. Shuster also asked you some questions

14  related to the comparison of the representations and

15  warranties here made to the trust as compared to the

16  representations and warranties under which you pursued

17  claims when going downstream.  Do you remember that?

18  A    Yes, I do.

19  Q    Where are the representations and warranties for the

20  downstream claims found?  What document?

21  A    They're found in the sellers' guide.

22  Q    Okay.  I'd like to show you a copy of the sellers'

23  guide.  It's at TRX-927B.

24  A    I've got a bunch of them here, so which one?

25          MAN 1: Three.

Page 70

1    A    Three?  Perfect.  Thank you.  I've got a stash.  I'm

2    sorry, 920 --

3    Q    927B.

4    A    Okay.

5    Q    And before we speak specifically to this one, or before

6    you speak specifically to this one, is there only one

7    version of the sellers' guide?

8    A    No.  The sellers' guide evolved over the course of

9    time.  Changes were made as necessary, and so when you were

10   looking at claims, you had to make sure you had the right

11   version of the sellers' guide.  And what I mean by "right

12   version," is it's the version that was applicable at the

13   time the loan was sold to Lehman Brothers, or excuse me,

14   Lehman Brothers Bank, so you had to make sure that you had

15   the appropriate sellers' guide for the particular claim in

16   question, because it changed over the course of time.

17   Q    And are you familiar with sellers' guides and the

18   different versions of them?  The guide?

19   A    Yeah, so we have a giant catalog of all of the versions

20   of the Aurora sellers' guide that were in place over the

21   course of time and those are the -- one of the things that

22   we refer to when we're pursuing our claims downstream to

23   make sure that we have the appropriate sellers' guide.

24   Q    And have you ever in your career had occasion to apply

25   provisions of the sellers' guide?

Page 71

1    A    Yes, I have.

2    Q    In what context?

3    A    In our pursuit of claims downstream, we use the

4    sellers' guide to see the representations and warranties

5    that were applicable and make an assessment of defects

6    relative to those representations and warranties.

7    Q    Okay.  I'd like to point your attention to page 133 of

8    this exhibit, 927B.  Are you there?

9    A    Yes, I am.

10   Q    Okay.  And --

11              MR. SHUSTER:  Page 130 --

12              MS. DOMINGUEZ-BRASSWELL:  Page 133 of 166, so it's

13   133 of the exhibit.  Are you in 927B?

14              MR. SHUSTER:  Yeah.  It's okay.  I'll find it.

15   Thank you.

16              THE COURT:  We can wait.

17              MR. SHUSTER:  Mine is not numbered the same way

18   and I don't want to slow us up.  I'll catch up.

19              MS. DOMINGUEZ-BRASSWELL:  If it helps, there's a

20   date stamp --

21              THE COURT:  Date stamp, yeah.  And then your 3780.

22              MR. SHUSTER:  Thank you.

23              MS. DOMINGUEZ-BRASSWELL:  Are you --

24              MR. SHUSTER:  Yes.  No, I'm good.  Thank you.

25              THE COURT:  Okay.

Page 72

1          MR. SHUSTER:  Thanks very much.

2     Q    Mr. Trumpp, do you see there's a heading there that

3     says, "703 Concerning Individual Mortgage Loans"?

4     A    Yes, I do.

5     Q    Are you familiar with Section 703 of the sellers' guide

6     generally?

7     A    Yes, I am.

8     Q    What is 703?

9     A    703 contains the representations and warranties that

10    sellers of loans provided to Lehman Brothers Bank.

11    Q    And have you ever had occasion to enforce

12    representations and warranties under that section of the

13    sellers' guide?

14    A    Yes, I have.

15    Q    You're smiling.  Is that because you've done it a lot?

16    A    Yes, I have.

17    Q    Okay.  Now, the first representation there says,

18    "Mortgage loans as described."  Do you see that?

19    A    Yes, I do.

20    Q    And can you read that warranty?

21    A    Yes.  "No document report or material furnished to

22    purchaser in any mortgage loan file or related to any

23    mortgage loan, including without limitation the mortgagor's

24    application for the mortgage loan executed by the mortgagor,

25    was falsified or contains any untrue statement of fact or

Page 73

1   omits to state a fact necessary to make the statements

2   contained therein not misleading."

3   Q    And I want to focus on the last part of the sentence.

4   It says that the application will not contain any untrue

5   statement of fact.  Do you see that?

6   A    I do.

7   Q    Do you see a sellers' knowledge qualifier in any of

8   that text?

9   A    No, I do not.

10  Q    Do you see a materiality qualifier?  In other words,

11  materiality of the defect?

12  A    No, I do not.

13  Q    In your experience applying this provision, did you

14  ever consider there to be that kind of qualifier, either a

15  sellers' knowledge qualifier or a materiality qualifier?

16  A    No, we did not.

17  Q    Do you consider this representation and the

18  representations generally in the sellers' guide to be the

19  same as the representations that the Trustees were enforcing

20  in this case?

21  A    No, I do not.

22  Q    Yesterday, Mr. Shuster also asked you some questions

23  about pricing of loans.  Do you remember that?

24  A    I do.

25  Q    What factors go into how -- I want to focus first on

1    whole loans -- how whole loans are priced at any given time?

2    A    There's a significant number of different factors that

3    go into valuing whole loans.  When we were pricing loans at

4    Aurora back in -- when I was doing it back in 2002, '03, and

5    '04, we looked at all of the various characteristics of the

6    loans:  debt to income ratio, loan to value, FICO score,

7    occupancy type, documentation type, loan balance, interest

8    rate.  Those are the ones I'm just recalling off the top of

9    my head.  Those were all different factors that weighed into

10   our assessment of pricing whole loans.

11   Q    And those individual factors that you just listed, are

12   those factors that go to a particular loan, an individual

13   loan?

14   A    Yes.  Each one of the loans would have those particular

15   characteristics.

16   Q    And would be priced accordingly?

17   A    Correct.

18   Q    And what about securitized loans?  Are they priced

19   individually or in bulk?

20         MR. SHUSTER:  Objection.  I don't think there's

21   any foundation laid that the witness knows how to price

22   securitized loans.

23         THE COURT:  Fair enough.  Why don't you lay some

24   foundation?

25         MS. DOMINGUEZ-BRASSWELL:  Sure.

Page 75

1    Q    Mr. Trumpp, are you familiar generally with the concept

2    of pricing loans?

3    A    Yes.

4    Q    Are you familiar with the concept of pricing whole

5    loans?

6    A    Yes.

7    Q    Do you have an understanding of how securitized loans

8    are priced?

9    A    Yes, I've seen models and factors that go into pricing

10   securitizations.  But I have not performed that.

11   Q    Okay.  And when you say you've seen factors and models,

12   in what context have you seen that?

13   A    In my work at Aurora and Lehman.

14   Q    What work?

15   A    So, we had reason to see them from time to time when I

16   was working in loss management because we were working very

17   closely with the trading desk in New York from Denver.  So,

18   we were working with them as they were determining which

19   loans to securitize.  We were working with, you know, again

20   Aurora was Lehman's whole loan servicer and master servicer,

21   so we had reason to communicate with the desk as they were

22   choosing loans to put into securitizations.  And through

23   that process, I saw some of the models and pricing that they

24   did and, you know, saw and talked to the traders about what

25   they were doing.

Page 76

1   Q    In that capacity when you were looking at models,

2   reviewing models, speaking to the folks that were modeling

3   the information, did you have an opportunity to understand,

4   generally, how securitized loans are priced?

5   A    Generally, yes.

6   Q    At a high level?

7   A    Yes.

8   Q    You're by no means a pricing expert?

9   A    Not of securitizations.  I spent several years pricing

10  individual whole loans and I have degrees in finance, but I

11  have not secured -- I have not done securitizations.

12  Q    Okay, and I only have one question with respect to it,

13  and if you can't answer it because you don't have enough

14  information, you can tell me that.  Do you know whether

15  securitized loans are sold individually or priced

16  individually or in bulk?

17          MR. SHUSTER:  Same objection.

18          THE COURT:  All right.  But the question is, "Do

19  you know," so I think Ms. Brassell's laid a foundation that

20  the witness has some familiarity with the process of pricing

21  securitized loans, and the question as asked merely asks

22  you, Mr. Trumpp, to answer the question to the extent of

23  your knowledge.  So I'm going to overrule your objection,

24  Mr. Shuster.  Go ahead.

25  A    So it's my understanding that when you're looking at

Page 77

1    loans and securitizations, you're looking at the weighted

2    average factors.  So instead of individual factors, like

3    you're pricing a whole loan, meaning all of the factors that

4    talked about earlier for an individual loan, you're looking

5    at them on a weighted average basis for all of the loans in

6    a securitization, so the weighted average FICO, the weighted

7    average coupon, the weighted average LTB.  That's my

8    understanding.

9    Q    Okay.  Now, moving to the protocol and what happened

10   under the protocol with respect to the loans in the

11   protocol, did the Trustees ever provide any evidence of

12   whether a particular loan in a securitization -- and

13   specifically one of the loans in the protocol -- could be

14   repriced?

15   A    No.

16   Q    Did they ever provide any evidence to establish how a

17   loan could be repriced?

18   A    No, they did not.

19   Q    Did they ever provide -- strike that.  did they ever

20   provide any evidence of a baseline value of any loan?

21        MR. SHUSTER:  I'm going to object to this on both

22   relevance grounds and that it goes beyond the scope of the

23   cross.

24        MS. DOMINGUEZ-BRASSWELL:  Mr. Shuster asked Mr.

25   Trumpp a series of questions about pricing of the loans.  It

1   -- I'm staying within that lane, speaking to the pricing of

2   the loans and specifically through this witness who is a

3   witness on what happened in the protocol, asking him

4   questions about what he saw and what he didn't see with

5   respect to that same concept.

6           THE COURT:  All right, I think that's fair.  Go

7   ahead.

8   Q   Mr. Trumpp, did you ever see any evidence of the

9   baseline value for any of the loans that the Trustees

10  submitted claims on in the protocol?

11  A   And let's, again, just make sure we're clear.  When you

12  say, "baseline value," what do you mean?

13  Q   Well, so, you understand that the Trustees' theory here

14  is that an increased risk associated with a particular loan

15  satisfies their BMA standard, right?

16  A   Yes.

17  Q   Did you ever see them provide what the baseline value

18  was in order to measure if there was, in fact, an increase?

19  A   I did not, no.

20  Q   My partner just corrected me.  I want to make sure the

21  record is clear.  I think I said, "increase," and I was

22  referring to increased risk, but in terms of value, I think

23  the correct question would be, in order to show there was a

24  decrease in value.  Did you ever see that type of evidence?

25  A   I didn't see that, either.

Page 79

1    Q    Now, do you remember Mr. Shuster showed you some

2    policies and procedures from Aurora yesterday?

3    A    I do.

4    Q    Okay.  And I'm going to point you to them real quick.

5    It's TRX-701, so that you have them to reference if you'd

6    like.

7    A    Thank you.

8    Q    Mr. Trumpp, is this one of the policies and procedures

9    that Mr. Shuster showed you yesterday?

10   A    It is.

11   Q    And who were these policies and procedures intended

12   for?  Who was the intended audience?

13   A    For Aurora and their master servicing group.

14   Q    Okay.  Can you explain that, the master servicing

15   group?

16   A    Yeah, so I believe when it says, "asset risk

17   management," that after I left Aurora they changed the name

18   from loss management to asset risk management, and it's for

19   that particular department in master servicing that these

20   policies and procedures were for.

21   Q    Okay.  And you said after you left these policies and

22   procedures were -- these specific policies and procedures

23   that Mr. Shuster showed you yesterday were not in place when

24   you were there?

25   A    That is correct.

Page 80

1   Q    Okay.  Now, these policies and procedures, when they

2   speak to the claims analysis and the type of information

3   necessary to gather for that claim, can you describe the

4   context for that?  What is it that the folks who were

5   gathering this information were trying to do?

6   A    Well, so 701 is for the policies and procedures for the

7   due diligence process.

8   Q    Okay.

9   A    There were additional policies and procedures for the

10  claim review and assessment process, so I want to make sure

11  --

12  Q    Yep, you're absolutely right.  Let's go to that on

13  instead, 703.  Okay, so same question for that, now with the

14  correct policies.

15  A    So looking at the table of contents for these

16  particular policies and procedures, the reviewing of the

17  claim from a timeline perspective of Section 3.2, and you'll

18  notice later down it talks about in Section 6 the demand

19  letter and the 48 hour notification, so the table of

20  contents follows linearly the process.

21          And so the claim review process is really that

22  assessment of the defect and making determinations of

23  whether or not that defect is a breach of representation

24  warranty that they should issue a demand letter on.  So, as

25  we were talking today, that particular evidence that we're

1    talking about there and that goes into that assessment, is

2    for the creation of that initial demand letter.  So it's

3    really the start of the process.

4    Q    Okay.  Now, there's a section in the table of contents

5    referenced called make whole.  Do you see that?  It's

6    Section 9.1.

7    A    Yes, I do.

8    Q    Do you understand what that term means?  Do you know

9    what that term means?

10   A    So in the pursuit of these claims, there were really

11   two resolution options.  One was the repurchase of the loan,

12   meaning the loan was active and were able to repurchase it.

13   Or if the loan was no longer active, the type of resolution

14   was a make whole meaning that the other party would

15   indemnify Lehman or the trust and make the trust whole to

16   the tune of the amount of the loss.

17   Q    Okay.  And do you have an understanding one way or the

18   others whether make whole claims were pursued under the

19   sellers' guide that we just looked at?

20   A    It was.

21   Q    Okay.  And was there a particular provision in the

22   sellers' guide that allowed Lehman to do that?

23   A    Yes.  There was an indemnification provision in the

24   sellers' guide.

25   Q    Do you know if there's a similar provision that the

Page 82

1    Trustees can avail themselves of in this case?

2            MR. SHUSTER:  Objection.  Again, that calls for a

3    legal conclusion.

4            THE COURT:  Well, the question is if he knows.

5    You can answer, Mr. Trumpp.

6    A    So in the contracts that I have seen and reviewed, I

7    see repurchase provisions, but not indemnification

8    provisions.

9            MS. DOMINGUEZ-BRASSWELL:  Should we take a lunch

10   break?

11           THE COURT:  Yeah, why don't you folks come up for

12   a second, so we can chat.

13           MR. SHUSTER:  Coming.  Sorry.

14           THE COURT:  That's okay.

15       (Bench Conference)

16           THE COURT:  All right, that was a very high-level

17   conference about how long the lunch break should be, and we

18   have arrived, we put it through the protocol, and we have

19   arrived at a 2:00 time to resume, all right?  So you are in

20   the home stretch, Mr. Trumpp.  It's just that it's a longer

21   stretch than anyone thought.

22           MR. TRUMPP:  I will take your word for that.

23           THE COURT:  All right?  All right.  So we'll see

24   you all at 2:00.  Thank you very much.

25           MR. SHUSTER:  Thank you, Your Honor.

Page 83

1          (Recess)

2              MS. BRASSWELL:  Your Honor, we took the break to

3      think through it, and in the interest of really making this

4      Mr. Trumpp's home stretch and preserving our 49 hours as

5      much as we can, I have no further questions.

6              THE COURT:  Okay.  Mr. Shuster, you were prepared

7      for this?  Great.  Okay.

8              RECROSS EXAMINATION OF ZACHARY D. TRUMPP

9      BY MR. SHUSTER:

10     Q    Good afternoon, Mr. Trumpp?

11     A    Good afternoon.

12     Q    Let's turn to the first exhibit, sir, in the redirect

13     binder, which I guess is PA-Exhibit 658.

14              So I see that this is -- appears to be the third

15     page of a document.

16     A    Yes.

17     Q    Where's the rest of the document?

18     A    I don't know.

19     Q    Who created the document?

20     A    It's our understanding that it was created by Russ

21     Brady.

22     Q    Russ Brady?

23     A    Yes.

24     Q    At?

25     A    Aurora Loan Services.

Page 84

1   Q    And how did you determine that?

2   A    Based upon the metadata attached to this particular

3   electronic file.

4   Q    And did that metadata not show you where the rest of

5   the document is?

6   A    We have been unable to find any additional pieces of

7   this, assuming there are.

8   Q    Do you know when the document was created?

9   A    Based up on the metadata, as I mentioned earlier, I

10  think it was in 2012.  I don't recall the exact date.

11  Q    Did you have a hand in its creation?

12  A    I did not.

13  Q    Do you know why it was created?

14  A    I do not.

15  Q    Contract, it says in the first line under the heading,

16  "Contract administration determines action based on our

17  contractual obligations."  What does that refer to?

18  A    I take it for what it says, that it is saying the

19  contract admin determines action based upon their

20  contractual obligations.

21  Q    You can't shed any more light on that language?

22  A    It seems relatively straightforward to me.  I don't

23  know how else I would elaborate on it.

24  Q    Well, what contractual obligations?

25  A    Well, I would take that to mean the purchase and sale

Page 85

1    agreements between Aurora and their correspondents or the

2    broker agreements between Aurora and their brokers.

3    Q    So when it says "our contractual obligations", it's

4    actually talking about contractual obligations that are owed

5    to Aurora by its downstream sellers?

6    A    Can you repeat that question, please?

7    Q    When it refers to "our contractual obligations", it's

8    actually -- it's referring to the contractual obligations of

9    its downstream sellers, the loan originators?

10   A    Again, I didn't create this document.  I'm not sure I

11   can speak to the intent of how they were using "our" in that

12   particular scenario or in that phrase.  I take it to mean

13   our contractual obligations in -- in the context of those

14   agreements that I mentioned.

15   Q    So, but if that's what you're talking about, you're

16   talking about contractual obligations, that would -- it

17   would actually say "our contractual rights under the loan

18   purchase agreements between us and the downstream sellers",

19   right?  Wouldn't that make more sense?

20   A    I -- I take it for what it says, not what it could say.

21   Q    To the extent that you are giving an understanding,

22   it's just based on reading the words that are in front of

23   you, right?

24   A    Yes.

25   Q    Your understanding isn't informed as to this document

Page 86

```
 1    by any discussions you had with the people who created it or

 2    who apply it or anything like that?

 3              MS. BRASSWELL:  Objection, mischaracterizes --

 4              THE COURT:  Ms. Brasswell?

 5              MS. BRASSWELL:  Mischaracterizes prior testimony.

 6              MR. TRUMPP:  I'm sorry.  Can you repeat that

 7    question then?  Oh, I'm sorry.

 8              THE COURT:  It was a litany of references to

 9    possible sources for informing your -- the basis of your

10    understanding.  I'm not sure as I sit here, Mr. Shuster,

11    that I can recall every aspect of the prior testimony.  So

12    maybe you could ask it again in a broken-down form.

13              MR. SHUSTER:  Sure.

14              THE COURT:  Okay?

15              MR. SHUSTER:  Of course.

16    Q    To the extent that you have an understanding of this

17    document, it's just based on what you're reading on the

18    page, right?

19    A    Yes.

20    Q    There's a reference there to industry custom, "Contract

21    admin determines action based on industry custom."  What

22    industry customs are you referring to there?

23    A    I take that to mean industry customs in the context of

24    the claim review process.

25    Q    But, again, to the extent you're saying that it's based
```

Page 87

1    on what you're reading here on the page?

2    A    Yes.

3    Q    And then it refers to the "likelihood and severity of

4    expected impact on the value of the loan".  So let's focus

5    on "likelihood".  "Likelihood" suggests, doesn't it, that

6    there's some attempt to predict or gauge whether there will

7    be an impact on the value of the loan?

8    A    I talk "likelihood" to mean something with respect to

9    the future.

10   Q    Because if there had already been an impact on the

11   value of the loan such as a loss or a default, then it would

12   be talking about -- it wouldn't be talking about likelihood,

13   right?

14   A    I take it for what it says.

15   Q    Now it says fairly standard -- sorry, sir -- under the

16   first diamond, second dash, "Fairly standard rep and

17   warrants are made both into our trust agreements and whole

18   loan sales."  Do you see that?

19   A    Yes, I do.

20   Q    So when it's referring to "fairly standard rep and

21   warrants" in our trust agreements, it's talking about the

22   trust agreements that apply to securitizations, right?

23   A    When it's talking about trust agreements and

24   specifically in the parenthesis, the MLSAs.  I take that to

25   mean representations and securitization agreements, yes.

Page 88

1    Q    And then it separately refers to -- well, it also

2    refers to rep and warrants that apply to whole loan sales,

3    right?

4    A    I do.

5    Q    So what it's saying is that there are fairly standard

6    rep and warrants are made both in the trust agreements and

7    in the whole loan sales, right?

8    A    It does.

9    Q    And, of course, no untrue statement and no default

10   representations and warranties would be among the fairly

11   standard representations and warranties that are made,

12   correct?

13   A    Yeah.  I take this, again, for what it says, fairly

14   standard reps are in both agreements.  It doesn't

15   necessarily mean they're the same, but it says that they're

16   standard in the industry.

17   Q    And there's no untrue statement and a no default rep in

18   the seller's guide that's incorporated into each of the loan

19   purchase agreements, right?

20   A    There are different representations and warranties in

21   the sellers guide.  It's a totally separate agreement than

22   what's in the securitization agreements.

23   Q    I understand that.

24   A    Okay.

25   Q    That wasn't my question.

Page 89

1    A    I'm sorry.  Then I misunderstood.

2    Q    My question is there are no default and no untrue

3    statement, representations, and warranties set forth in the

4    seller's guide that are incorporated into the loan purchase

5    agreements between Lehman and its downstream originators?

6    A    There are no untrue statement and no default statements

7    in our representations in our seller's guide.  But as we

8    talked about this morning, they're different in the actual

9    language.

10   Q    I understand that, Mr. Trumpp.

11           THE COURT:  Mr. Shuster, Ms. Brasswell, come on up

12   for a second?

13       (Bench conference)

14   Q    Sorry.  Just so we're clear, the loan purchase

15   agreements that Lehman enters into with downstream

16   originators incorporate by reference the representations and

17   warranties that are set forth in whatever seller's guide or

18   whatever seller's guide happens to be enforced at that time,

19   correct?

20   A    Yes.

21   Q    And those would include the no untrue statement and no

22   default representations that are set forth in the then

23   applicable version of the seller's guide, right?

24   A    There are separate and distinct representations and

25   warranties in the seller's guide, yes.

Page 90

1   Q    And those would be incorporated into any given loan

2   purchase agreement between Aurora and the downstream

3   originator?

4   A    Yes.

5   Q    And you remember yesterday I showed you a document

6   which was Lehman's I think motion in support of the

7   protocol, paragraph 95, that said the downstream reps and

8   warranties were replicated, duplicated by Lehman in the

9   MLSAA's for the securitizations at issue here.  Do you

10  remember that?

11  A    I remember you showing me a phrase that used the word

12  "duplicate" I think singular.  I remember a duplicate

13  somewhere around there in that yesterday.

14  Q    Now, it says here, "In order for a finding to be deemed

15  valid, it must" -- first of all a finding, that means a

16  breach finding, right?

17  A    Are we back on this document?

18  Q    Yes, please.

19  A    And I'm sorry.  Where again are you reading from?

20  Q    I'm sorry.  It's the third bullet -- the third dash

21  under the first bullet, you know, the diamond bullet points.

22  A    Yes.

23  Q    The reference there to "finding" is a breach finding,

24  correct?

25  A    Yes.  That's what it's referring to.

1    Q    Now it says "Must be clear and convincing documentation

2    to support the issue."  Do you see that?

3    A    I do.

4    Q    Is that the standard that the plan administrator

5    applied during the protocol process, "clear and convincing

6    evidence"?

7    A    When you say standard applied, you mean is that the

8    standard that we were looking for?

9    Q    You made various responses to the Trustees concerning

10    the sufficiency of the evidence, right?  Do you remember

11    that?

12    A    I do.

13    Q    Were you for that purpose applying a clear and

14    convincing standard?

15            MS. BRASSWELL:  Objection, Your Honor.  I

16    understand that he's asking about the standard that was

17    applied, but the term obviously has meaning to it, and Mr.

18    Trumpp is not a lawyer.

19            THE COURT:  Okay.  Mr. Trumpp has testified that

20    he has an understanding of the words on the page.  So Mr.

21    Shuster is not, I don't believe, asking for Mr. Trumpp to

22    interpret the words as a lawyer might interpret the words.

23    That's point number one.  Point number two is now the focus

24    is on the standard that was applied by the plan

25    administrator during the protocol.

Page 92

1          So, Mr. Shuster, why don't you repeat the

2     question, if you would, please?

3     Q    Is the standard of "clear and convincing" the standard

4     that the plan administrator applied when evaluating the

5     breach evidence that the -- the breach findings that the

6     Trustees could forward in the protocol process?

7          THE COURT:  Can I -- my concern is that the

8     question is slightly ambiguous in the following way: clear

9     and convincing as to a body of evidence or each piece of

10    evidence being clear and convincing?  Because what you're

11    referring Mr. Trumpp to says "clear and convincing

12    documentation".  Okay?

13         MR. SHUSTER:  Well, I --

14         THE COURT:  So whenever I clarify a question, you

15    usually --

16         MR. SHUSTER:  Adopt them.

17         THE COURT:  -- adopt them.  I just wanted to --

18    that created an ambiguity in my mind.  So you can ask --

19         MR. SHUSTER:  Understood.  So let me --

20         THE COURT:  -- either or both or neither.

21         MR. SHUSTER:  Yep.  I'll break it down.

22         THE COURT:  Okay.

23    Q    When evaluating -- this statement says, "In order for a

24    breach finding to be deemed valid, must have clear and

25    convincing documentation to support issue."  By "issue", I

Page 93

1     assume the reference there is to the particular breach

2     issue, such as misrepresentation of income or

3     misrepresentation of debt.  Do you understand "issue" to be

4     referring to that?

5     A    That would make sense.

6     Q    Okay.  So it says that, "In order for a finding to be

7     deemed valid, must have clear and convincing documentation

8     to support the issue."  Is that the standard that the plan

9     administrator applied in the protocol process that there had

10    to be clear and convincing documentation to support a

11    misrepresentation of income or debt or occupancy?

12    A    Throughout my testimony over the last couple of days, I

13    believe I have tried to show that the plan administrator's

14    standard was to assess the whole loan file and assess the

15    evidence put forth in relation to that whole loan file.  And

16    we weighed the evidence and came to a conclusion.  I don't

17    think I ever used the terms "clear and convincing", so I'm

18    not sure I would use that words as written on the page here

19    to describe our process.

20         I mean I truly viewed our process as making an

21    assessment of the evidence put forth by the Trustees,

22    weighing that evidence, and coming to a conclusion.  We

23    weren't necessarily looking for a definitive standard every

24    single time.  We ultimately approved over a thousand loans

25    in this process.  Had I been looking for a clear and

Page 94

1    convincing -- clear and convincing documentation similar to

2    the evidence that we talked about this morning, that number

3    would have been a lot less.

4          So I'm not sure I would say clear and convincing

5    here is the standard.  I -- I'm not sure I would use clear

6    and convincing to describe the standard we use in the

7    protocol.

8    Q    What would you use?

9    A    I haven't really thought about the words that I would

10   use to describe it other than appropriately weighed

11   evidence.

12   Q    Now, you -- in the above this, two lines above the

13   second diamond, it states "Unfortunately, there is no

14   industry standard as to what documentation constitutes

15   breach of rep and warrants."  Do you see that?

16   A    Yes, I do.

17   Q    Was that your understanding when you -- when the plan

18   administrator applied its judgment to the evidence presented

19   to the Trustees?

20   A    Yes.

21   Q    And it refers to what "may be sufficient documentation

22   for Fannie or Freddie".  Do you see that?

23   A    I do.

24   Q    Do you have an -- well, let me ask it to you this way.

25   Fannie and Freddie routinely put back loans to Aurora and

Page 95

1   Lehman based on a single piece of evidence; isn't that true,

2   Mr. Trumpp?

3   A    Fannie and Freddie put back many loans to Lehman to

4   which Aurora helped facilitate in that review process.  They

5   had varying levels of documentation they put forth as

6   support for their claims, but they had separate and distinct

7   agreements between Lehman and Fannie and Freddie that had

8   different standards.  So their evidence varied depending

9   upon the claim type.

10  Q    But it is true, is it not, Mr. Trumpp, that Freddie and

11  Fannie did put loans back to Lehman, right, on occasion from

12  time to time in the ordinary course of business based on a

13  single piece of evidence?

14  A    Yes.

15  Q    Now you referred to the dash which says -- I don't know

16  how else to refer to it -- the second -- it's the third line

17  from the bottom of the text, and it starts "for most issues

18  loan performance of 18 months or greater would preclude the

19  issue from being considered material."  Do you see that?

20  A    I do.

21  Q    Is that the standard that the plan administrator

22  applied during the protocol process?

23  A    As I've tried to communicate throughout my testimony,

24  for AMA, we looked at payment history and that was one of

25  the factors that went into our analysis and assessment of

Page 96

1    AMA, but we did not create a bright line such as 18 months

2    to say one thing or another.  But payment history was a

3    factor in that analysis.

4    Q    Okay.  There's no reference here to payment history in

5    what I've just read to you, right?  No express reference to

6    payment history?

7    A    No, I equate loan performance with payment history, but

8    it does not use those words.

9    Q    Okay.  And so the plan administrator then did not take

10   the view that if a loan was in existence, say, for 18

11   months, that alone precluded a finding of a material and

12   adverse effect?  You did not take that point view?

13   A    That is correct.  And I believe we passed loans that

14   made more than 18 months' worth of payments.

15   Q    In your view, how far could a loan go before it would

16   be ineligible for a material and adverse effect finding?

17   A    It would depend upon the facts and circumstances of

18   that particular claim and loan.

19   Q    Now this says here for most issues, loan performance of

20   18 months or greater would preclude the issue from being

21   considered material.  So there were some issues, at least by

22   dent of this document at least where loan performance of 18

23   months or greater would not preclude the issue from being

24   considered material, right?

25   A    Yes.  And as I've said, we didn't draw a line anywhere

1   and accepted loans that had made more than 18 payments.

2   Q    If we wanted to see -- if the Court wanted to see on

3   any given loan the details of the plan administrator's

4   material and adverse effect analysis, where would it look?

5            MS. BRASSWELL:  Objection, Your Honor.  Just to be

6   cautious, I want to make sure the witness understands

7   privilege issues.

8            THE COURT:  Yeah.  So, Mr. Trumpp, as we indicated

9   when you started testifying, any time that a question in

10   your mind calls for any discussion, information that you've

11   shared with counsel, please indicate as much and do not

12   answer the question on a substantive basis.  So other than

13   privileged attorney/client communications, you can answer

14   Mr. Shuster's question, if you remember it.  Could you ask

15   it again --

16            MR. TRUMPP:  I -- I would appreciate it if it was

17   repeated.  Thank you.

18            THE COURT:  -- Mr. Shuster?

19   Q    If the Court -- I'd rather read it than have to repeat

20   things.  You know, it was so exquisitely phrased.

21            THE COURT:  It is.  I --

22            MR. SHUSTER:  I wouldn't want to do any

23   (indiscernible).

24            THE COURT:  It took my breath away.

25            MR. SHUSTER:  Yes.

Page 98

1    Q    If the Court wished to see details of the plan

2    administrator's material and adverse effect analysis as to

3    any individual loan, what evidence would it look to?

4    A    I just want to make sure I understand your question.

5    You said if the Court wanted to look at that?

6    Q    Yeah.

7    A    I think they would have to seek what I understand to be

8    our privileged communications.

9    Q    Okay.  Now, you did perform an AMA analysis on each

10   individual loan or whatever loans you felt qualified for an

11   AMA analysis?

12   A    For the loan that ultimately did not get rejected at

13   the threshold facts level by Recovco and were reviewed by

14   RBF, they did undergo the -- an AMA analysis was performed.

15   Q    In doing that analysis, the plan administrator for any

16   individual loan did not establish a baseline level of risk,

17   correct?

18   A    No.

19   Q    I'm incorrect or I am correct?

20   A    Why don't you repeat your question to make sure I --

21   Q    For any individual loan as to which the plan

22   administrator performed an AMA analysis, it did not

23   establish a baseline level of risk, correct?

24   A    And, again, for all clarity's sake, can you tell me

25   what you mean by a baseline level of risk?

Page 99

1    Q    It's an expression you used in your redirect this

2    morning.  So why don't you tell me what you meant by that.

3    You were asked if the Trustees gave you baseline level of

4    risk information for individual loans, and you said the

5    Trustees did not do so.  So I'm using the words the way you

6    used them this morning.

7    A    So I take that to mean that there was a baseline level

8    of risk meaning the anticipated level of risk at

9    securitization.

10   Q    Okay.  So what's the answer to my question then?  Did

11   you -- did the plan administrator establish a baseline level

12   of risk when evaluating the effect of a breach on a loan?

13   A    That was not part of our analysis.

14   Q    Mr. Trumpp, you testified this morning about the

15   additional evidence you -- the plan -- well, Lehman obtained

16   to corroborate the breach findings that it set forth in

17   certain demand letters attached to certain of your

18   declarations.  Do you recall that?

19   A    I do.

20   Q    Okay.  So you looked at, you remember, the Dream House,

21   you know, Lehman v. Dream House where there was a credit

22   report that showed six undisclosed mortgages?

23   A    I remember a demand letter.  I don't remember looking

24   at a specific credit report.

25   Q    Okay.  So I'll pull it out.  That's entirely

Page 100

 1   understandable.

 2        (Pause)

 3   Q    Okay, so, it is TRX-760, which is Exhibit E to TRX-927.

 4   A    I'm sorry, can you repeat that?

 5   Q    Sure can.  So, let me just direct your attention to --

 6   there's no question pending, so you don't have to hold the

 7   question in mind.  I'm looking at the Dream House

 8   declaration, which is TRX-927, and Exhibit E to that is TRX-

 9   760.  It might be that TRX-760 is a separate exhibit.  So,

10   you got it now?

11   A    I'm sorry.  You said 760?

12   Q    TRX-760.

13   A    Go ahead.  TRX-760.

14   Q    Okay.  That's a start.  If you would turn, please, to

15   Page 31 of 33 -- no, 30 of 33, I should say.

16   A    Okay.

17   Q    So, the misrepresentation of debts claimed there is

18   predicated on a credit report, right?

19   A    Yes.

20   Q    And nothing else, at least there?

21   A    Correct.

22   Q    Okay.  You testified this morning that Lehman went out

23   and got additional evidence in support of this claim, right?

24   A    I did.

25   Q    And that additional evidence confirmed that what was in

Page 101

1    the credit report was accurate, right?

2    A    Yes.

3    Q    Now, we also looked at -- you also looked at your

4    declaration and exhibits in the mortgage partners deal, so

5    the exhibit there is TRX-1375, which is Exhibit E to your

6    affidavit.  Maybe we can do this without the exhibits.

7    Let's see if we can.  If you remember, you remember.  If you

8    don't, we'll look at the exhibit.  I'm simply trying to make

9    things easier, so --

10   A    And I get that.  I would rely -- would prefer to look

11   at the exhibits.

12   Q    Oh, by all means.  Please look at the documents.  So,

13   do you have it before you, sir?

14   A    I believe so.

15   Q    So, there it's a misrepresentation of employment claim

16   and even though it doesn't say so, there's also an income

17   breach claim.  But let's just focus on the employment piece.

18   The employment -- the claim of a misrepresentation of

19   employment is predicated on a verification of employment by

20   a quality control auditor at Aurora, correct?

21   A    Yes.

22   Q    And you testified that Lehman or Aurora went out and

23   got additional evidence to support the claim, correct?

24   A    I did.

25   Q    And that evidence confirmed that the audit verification

1   of employment was correct, right?

2   A    I would say that that additional information

3   corroborated this and confirmed it, yes.

4   Q    And then there were a couple where you said you got a

5   default judgment, so there was no need to get additional

6   information.  So, let's turn to the NBGI case

7   (indiscernible) NBGI, which is -- the demand letter should

8   be a TRX -- I don't mean to hold you in suspense.  I have it

9   as 732 from this morning's examination.  Is that -- 732F,

10  Mr. Trumpp.

11          MAN 1:  I'm sorry, it's 732E.

12  Q    732E.  My apologies.

13  A    Is there a particular page?

14  Q    Yes.  I'm sorry.  It's the page -- Page 97, Trumpp

15  Declaration, Exhibit E, Page 97, bottom center.  So, there

16  the -- are you with me?

17  A    Yes.

18  Q    There's a misrepresentation of occupancy claim that's

19  predicated on an accurant.com person search, right?

20  A    Yes.

21  Q    And you went out and got additional evidence, which

22  confirmed the accuracy of the accurint.com report, correct?

23  A    Presumably.  I haven't seen the accurint.com report

24  itself through this process.  But I would say it further

25  corroborated it, yes.

Page 103

1  Q     There were also, of course, many cases where Lehman and

2  Aurora pursued put-back claims where it didn't -- it wasn't

3  necessary to or it did not obtain any further corroborating

4  evidence, like borrower debt positions, right?

5  A     As I've tried to make clear, we've pursued many

6  different entities for many different types of claims, and

7  the facts and circumstances every time was potentially

8  different.  And we may have had business-to-business

9  negotiations that led to one result, and litigation that led

10  to another result, based upon the varying levels of

11  evidence.

12  Q     But even in litigation you put forward claims and

13  sought and obtained relief based only on the initial piece

14  of evidence that you put forward?

15  A     Sitting here today, I'm not sure I can necessarily

16  speak to every single loan that we ever put forth in

17  litigation and what level of evidence was there.  It varied.

18  Q     So, let's just have a quick look at PA-762, which you

19  testified about this morning.  So, it's in the redirect

20  binder, Mr. Trumpp.  And I'll direct your attention to Page

21  33.  And you can see there, if you look at -- with respect

22  to Loan Number 1508 at the bottom, Loan Number 6 on Exhibit

23  A, there's no reference to a borrower deposition, for

24  example.  Right?

25  A     For that particular loan, in Paragraph 153 it

Page 104

1    references a declaration which I don't believe I've read in

2    detail.

3    Q    Yeah, only the reference to the declaration though is

4    your declaration and a declaration from Freemont.  Fremont

5    is the originator, right?  Fremont was one of the big

6    mortgage originators?

7    A    They were, yes.

8    Q    Okay.  So, you say that the borrower did not disclose

9    two mortgages and you don't have a borrower deposition in

10   there, right?

11   A    In that particular instance, no.

12   Q    Or the next one?  Or the next one after that?

13   A    It would depend on the facts and circumstances of each

14   --

15   Q    Okay.

16   A    -- loan, what we used.

17   Q    Okay.  So, Mr. Trumpp, you say a whole loan is a

18   tradeable asset?

19   A    Yes.

20   Q    Correct?

21   A    Yes.

22   Q    But a securitized loan is not a tradeable asset?

23   A    Yes.

24   Q    So, once Lehman put that securitized loan into the

25   securitization, the securitization was stuck with that loan,

Page 105

1    right?  If it was a defective loan?

2    A    No.  The securitization had the opportunity to seek for

3    purchase on that loan.

4    Q    Okay.  So, the only recourse -- if the securitization

5    wanted to get rid of the defective loan, it's only recourse

6    was to put it back to the sponsor, correct?

7    A    Assuming it was a breaching loan that had an adverse

8    and material effect, yes.

9    Q    You mentioned that Aurora had the right to be

10   indemnified for its losses, right?

11   A    That was one of the provisions in Aurora's seller's

12   guide, yes.

13   Q    But you said the only remedy for securitization trust

14   is the repurchase (indiscernible), right?  Is that what you

15   testified to this morning?

16   A    That's my understanding, yes.

17   Q    You said that Lehman bought loans to move them, right?

18   A    I did.

19   Q    And that it had an exit strategy, in your words, right?

20   A    Yes.

21   Q    Got those loans off its books, correct?

22   A    That was the objective.

23   Q    And it exited hundreds of thousands of loans to these

24   trusts, right?

25   A    Yes.

Page 106

1    Q    And with respect to each and every one of those loans,

2    it made representations and warranties, did it not?

3    A    No.

4    Q    You're saying that Lehman did not make representations

5    and warranties?  Oh, you were talking about the transfer

6    loans, right?

7    A    Yes, I am.

8    Q    All right.  Let's leave aside the transfer loans, talk

9    about the loans at issue here.  For each one of the loans at

10   issue here, Lehman made representations and warranties?

11   A    Yes.

12   Q    Okay.  You're familiar with the concept of scratch and

13   dent securitizations?

14   A    I am.

15   Q    Scratch and dent pools?

16   A    Yes.

17             MS. BRASWELL:  Objection, Your Honor.

18             THE COURT:  Yes.

19             MS. BRASWELL:  Beyond the scope of --

20             MR. SHUSTER:  I don't think so.

21             THE COURT:  Why don't you think so?

22             MR. SHUSTER:  Because he talked about how, you

23   know, what happens to loans when they get into

24   securitizations and what happens to hold loans that have

25   defects.  And what I'm going to --

Page 107

1           THE COURT:  Come up.

2           (Bench Conference)

3    Q    And one of the things -- I'm not sure where we left

4    off, so...

5           THE COURT:  You were scratching and denting.  I

6    think you had asked an open-ended question about whether or

7    not Mr. Trumpp knows what a scratch and dent loan is, and

8    then there was an objection, which we've now resolved.

9    Q    So, actually, I asked whether you're familiar with the

10   concept of scratch and dent securitizations, and you said

11   you were.  I said scratch and dent pools and you said, yes.

12   And my next question, sir, was going to be, didn't Lehman

13   have the option to sell whole loans that had known defects

14   into scratch and dent pools?

15          I can -- let me word it simply.  Didn't Lehman

16   sell loans with known defects into scratch and dent pools?

17   A    They did.  And generally speaking, those were deals

18   that were sold at a discount.

19   Q    So, let's just look, if we could, Mr. Trumpp, at TX-

20   933G.  Is that what it would be?  TX-930 --

21          THE COURT:  TRX.

22   Q    TRX-933G.

23   A    Sorry, can you say that again?

24   Q    Yes.  I respectfully direct your attention to TRX-933G,

25   sir.  So, I wanted to direct your attention to the top line

Page 108

```
1    which is for loan 3902.  We looked at that loan.  It's a

2    loan as to which there was a misrepresentation of

3    employment.

4              THE COURT:  Mr. Shuster, let's take this off the

5    screen.

6              MR. SHUSTER:  Oh, yes.  Please take this off the

7    screen.  Thank you, Your Honor.

8    A    And I'm sorry, I don't see a 3902 loan number.

9    Q    Are you looking at Exhibit G, Mr. Trumpp?

10   A    I believe so.

11   Q    The top line?

12   A    The top line is Loan Number 9458.

13             THE COURT:  I can see by what you're looking at,

14   Mr. Shuster, that we are not looking at the same thing

15   you're looking at.

16             MR. SHUSTER:  Okay.  That's --

17             THE COURT:  Why don't you approach --

18             MR. SHUSTER:  Belvedere.

19             THE COURT:  Right.  Why don't you go look at what

20   Mr. Trumpp's looking at?

21             MR. SHUSTER:  Okay, yes.

22             THE COURT:  All right.

23             MR. SHUSTER:  I will do that.

24             THE COURT:  Takes a village.

25             MR. SHUSTER:  It takes a village.  This is -- it's
```

Page 109

1    not Belvedere, it's an (indiscernible), so I might have

2    quoted the wrong number.  That may be what our problem is.

3    I think I did.

4              MR. TRUMPP:  733?

5              MR. SHUSTER:  733G.  As usual, the fault is mine.

6              THE COURT:  That's where I am.  And I'm looking at

7    what you're looking at.

8              MR. SHUSTER:  And it's not the same.

9              THE COURT:  It's not the same thing.

10             MR. SHUSTER:  That's unfortunate.  So, let's see

11   here --

12             MS. BRASWELL:  733?

13             THE COURT:  733 or 933?

14             MR. SHUSTER:  733.

15             THE COURT:  All right.

16             MR. SHUSTER:  I misspoke --

17             THE COURT:  You did. Okay.

18             MR. SHUSTER:  I misspoke.  And I apologize for

19   that.

20   Q    Do you see now, Mr. Trumpp, that the top line refers to

21   Loan Number 3902?

22   A    I do.

23   Q    Okay.  And that loan is the same loan that is

24   referenced in a demand letter that we looked at where there

25   was a misrepresentation of employment and income claim, I

Page 110

1    will represent to you.  But if you want to flip back, you

2    can find that at TRX-733F, to the extent you wish to do so,

3    at Page 16.

4    A    I'm not trying to be --

5    Q    No, you certainly don't need to look at the document

6    for me to ask you these questions.

7    A    I'm just pointing out that my binder has 733E and 733G,

8    and there is no 733F.

9         MAN 1:  It's not 34, it's (indiscernible).

10        MR. SHUSTER:  Oh, great.

11   Q    Well, don't look at it then.  If you feel you need to -

12   - but I don't think you're going to need to. So, let's look

13   at 3902.  So, there's a column there, liquidation type,

14   charge-off/scratch and dent.  Do you see that?

15   A    I do.

16   Q    Charge-off refers to a loan that's completely written

17   off?

18   A    Yes.

19   Q    And scratch and dent refers to a loan that Lehman got

20   off its books by selling it to a scratch and dent -- into a

21   scratch and dent pool, correct?

22   A    Yes.

23   Q    And there's a column, the next column over is purchase

24   price and that reflects the original purchase price that

25   Lehman paid for the loan, correct?

Page 111

1   A    Without seeing the rest of the document, typically,

2   that was the case, yes.

3   Q    Okay.  And then if you go over four columns, you see

4   proceeds, including scratch and dent proceeds, if

5   applicable.  And that shows that the proceeds from selling

6   the loan into the scratch and dent pool were materially

7   lower than the price that Lehman paid for the loan, correct?

8   A    Yes.

9   Q    So, Lehman sustained a loss on this loan because there

10  was a known misrepresentation of employment on the loan,

11  correct?

12  A    I would like to see the demand letter on this one.

13  Q    It's TRX-

14           MAN 1:  734?

15           MR. SHUSTER:  Yes.

16  Q    TRX-734, Page 16.

17  A    Oh, the film producer.  Okay.  Can you repeat your

18  question, please?

19  Q    That Lehman sold -- I'll phrase it this way.  This was

20  a loan on which there was a known misrepresentation of

21  employment, and Lehman sold it into a scratch and dent pool

22  at a loss, correct?

23  A    I'm struggling with your use of the term "known".  We

24  believed, based upon the information in the demand letter,

25  that there was a breach of representation and warranty.  I

Page 112

1    don't necessarily know, because if I recall correctly, there

2    was additional documentation done at later date to support

3    and corroborate this particular claim.  And I'm not aware of

4    the timing around that particular issue and when it was sold

5    into a scratch and dent securitization.  So, but the use of

6    the term "known" --

7    Q    I got you.  Let me rephrase it.  Lehman sold this loan

8    into a scratch and dent securitization at a loss based at

9    least on and asserted misrepresentation of employment

10   defect?

11   A    Yes.

12   Q    And these loans that were sold into scratch and dent

13   securitizations were live loans, right?  They were active

14   loans?

15   A    Yes.

16   Q    The securitizations here are not scratch and dent

17   securitizations, correct?

18   A    I'm not sure I would agree with that statement.

19   Scratch and dent securitizations is a generic term that

20   could apply to a lot of things besides just a breach of a

21   representation and warranty.  And so, if you have a scratch

22   and dent loan, it's not necessarily synonymous with a breach

23   of representation and warranty.

24   Q    No, understood.

25   A    And similarly, I believe there are securitizations in

Page 113

1    this universe that could generically be referred to as

2    scratch and dent securitizations.  So, I'm not sure that I

3    would say that there are not scratch and dent loans in these

4    securities.

5    Q    You're talking about this universe being the universe

6    of securitizations at issue here?

7    A    So, again, scratch and dent securitizations is a term

8    that can mean many things.  And --

9              THE COURT:  Mr. Trumpp, I'm going to interrupt you

10   because I think what we're trying to clarify is reference to

11   -- it started with the use of the word here, so the question

12   is what's here, and Mr. Shuster is trying to clarify now, do

13   you mean here in this case, those securitizations that are

14   the subject of this action, versus the universe.

15             MR. SHUSTER:  Here.  The small here.

16             THE COURT:  The small --

17             MR. SHUSTER:  Yeah, this case.

18             MR. TRUMPP:  Yeah, this case.

19             THE COURT:  In this case?

20   A    There is approximately 250 securitizations still at

21   issue in this case.  Sitting here today, I don't recall each

22   and every one of them.  I believe there are certain

23   securitizations in this universe that could be generically

24   referred to as scratch and dent securitizations.  And what I

25   mean by that is they may have different or limited

Page 114

1    representations and warranties.  So, with that, I would say

2    there may be scratch and dent securitizations in this

3    particular universe of trusts.

4    Q    On the loans that went into the securitizations here,

5    the overwhelming number of loans that are at issue here, if

6    Lehman knew about breaches of -- borrower breaches, the

7    statements of income or debt or occupancy, it did not

8    disclose them before selling them into the securitizations.

9    Is that accurate?

10            MS. BRASWELL:  Objection.  Calls for speculation.

11            THE COURT:  Yeah, I don't think there's any

12   foundation for his answering that question, Mr. Shuster.

13   Try a different one, please.

14   Q    So, a moment ago you said that there may be scratch and

15   dent securitizations here that have more limited

16   representations and warranties.  Did I hear that correctly?

17   A    You did.

18   Q    The vast majority of the securitizations here do not

19   have those limited representations and warranties, correct?

20   A    I would agree with that.

21   Q    Okay.

22            MR. SHUSTER:  That's all I have.

23            THE COURT:  Thank you.

24            MS. BRASWELL:  Your Honor, can I take just five

25   minutes with my team just to make sure that I

Page 115

1   (indiscernible)?

2           THE COURT:  Sure.  So, why don't we call it nine

3   minutes.  We'll come back at 3:20.  Mr. Consenza?

4           MR. CONSENZA:  Your Honor, maybe before we break,

5   maybe Mr. Shuster and I can just have a sidebar, give you an

6   update on the schedule prospectively, while Ms. Braswell is

7   getting -- determining whether we should --

8           THE COURT:  Sure.  Then I'll take my nine minutes

9   here.  If anyone wants to go anywhere, they're welcome to do

10  that.  Come on up.

11          MAN 1:  Oh, I thought we were doing --

12          MR. SHUSTER:  Oh, no, no.  Okay.

13          MAN 1:  [UNINTEL PHRASE]

14          THE COURT:  Sure.  Hold on a second.

15      (Bench Conference)

16          THE COURT:  Yes, Ms. Braswell?

17          MS. BRASWELL:  I only have a couple of questions,

18  if that's okay, Your Honor.

19          THE COURT:  Okay.  It's okay with me.  See, Mr.

20  Trumpp?  It actually never ends.

21          MR. TRUMPP:  I'm learning that.

22          THE COURT:  It's just --

23          MR. TRUMPP:  I really am.

24          THE COURT:  Home stretch is just something we tell

25  witnesses to keep up their hope.

Page 116

1           MS. BRASWELL:  Can we show (indiscernible) for the

2      658 please?

3                REDIRECT EXAMINATION OF ZACHARY TRUMP

4      BY MS. BRASWELL:

5      Q    Mr. Trumpp, Mr. Shuster asked you a couple of questions

6      about this document.  Pacifically he asked whether your

7      understanding of it was based on anything other than the

8      reading of the page.  Do you remember that?

9      A    I do.

10     Q    Do you have an independent understanding -- aside from

11     this document, do you have an independent understanding of

12     how contract administration performs its analysis with

13     respect to the evaluation of breaches of representations and

14     warranties?

15          MR. SHUSTER:  I would just object on the grounds

16     that that goes beyond the scope of my re-cross.

17          THE COURT:  Okay.  I'm going to overrule your

18     objection.  Go ahead.  You can answer, Mr. Trumpp.

19     A    I do.  Based upon my experience working in contract

20     administration and in loss management, it's -- that

21     experience and interpretation is different.  I shouldn't say

22     it's different, but it's a different foundation, if that's

23     the right word.

24     Q    And this document also speaks to the expectations of

25     the QC Department.  Do you have an understanding independent

1    of this document about the approach that the QC Department

2    takes to the evaluation of breaches of representations and

3    warranties?

4    A    I do.  Again, based upon my experience previously at

5    Aurora.

6    Q    And independent of this document, do you have an

7    understanding of both Aurora and Lehman's approach to the

8    AMA analysis?

9    A    I do.

10   Q    And do you have an understanding independent from this

11   document about Aurora and Lehman's approach to the

12   evaluation of evidence?

13   A    I do.

14   Q    Okay.  And is Aurora and Lehman's approach, or was

15   Aurora and Lehman's approach, to the AMA analysis consistent

16   with what's in this document, and specifically in the bullet

17   point, last diamond bullet point, of this document?

18   A    I wouldn't say it was inconsistent.  As I talked about

19   this morning, we had an AMA analysis that took into account

20   loan performance in our analysis, and that was one of the

21   things that we looked at and how there wasn't a bright-line

22   rule around 18 months.  So, I would say it's similar.

23   Q    My question was that whether it was inconsistent it was

24   -- whether it was consistent?

25   A    Yes.

Page 118

1  Q    And was the approach that Lehman and Aurora took to the

2  evaluation of evidence, and specifically the weighting of

3  evidence, consistent with the descriptions that we see here

4  in this document in the first bullet point?

5  A    Yes.

6          MS. BRASWELL:  No further questions, Your Honor.

7          THE COURT:  All right.  Thank you, Ms. Braswell.

8  Mr. Shuster?

9          MR. SHUSTER:  No, no.  I'm standing just -- I

10  don't know why I'm standing.

11         MR. CONSENZA:  Instinct.

12         MR. SHUSTER:  It's something to do.  I apologize.

13         THE COURT:  Mr. Trumpp, you in fact are finished.

14  Thank you very much.  Thank you for your patience and you're

15  free to leave.

16         MR. TRUMPP:  Thank  you.

17         THE COURT:  All right.  Thank you.  Okay, so for

18  good order, why don't we put on the record what it is that

19  we're going to do.  Nothing further for today, yes?

20         MR. CONSENZA:  That's correct.

21         THE COURT:  And we're going to resume on Monday at

22  10:00, and you will be calling who, Mr. Consenza?

23         MR. CONSENZA:  Yes, I will be calling Professor

24  Dan Fischel.

25         THE COURT:  Very good.  Okay.  Anything else in

Page 119

1    the nature of housekeeping?  Okay, as I mentioned, I do have

2    a full calendar tomorrow, so if you would tidy up, we would

3    appreciate it.  You're free to store your boxes, your

4    binders, and whatnot off to the -- on the side of the

5    courtroom.  Yes, Ms. Braswell?

6              MS. BRASWELL:  Your Honor, can I raise one small

7    issue?

8              THE COURT:  Yes.

9              MS. BRASWELL:  The binders that you have, we spoke

10   about the other day and we need to have some exhibits

11   replaced.  Would you like us to take those now?

12             THE COURT:  Sure.

13             MS. BRASWELL:  Okay.

14             THE COURT:  So, that would be your opening binder,

15   the direct --

16             MS. BRASWELL:  The plan administrator -- right.

17             THE COURT:  The direct examination binder?

18             MS. BRASWELL:  Direct examination.

19             THE COURT:  But not the redirect binder?

20             MS. BRASWELL:  We can take the redirect binder as

21   well because there are some unredacted documents in there --

22             THE COURT:  Okay.

23             MS. BRASWELL:  -- and we might as well take care

24   of that now.

25             THE COURT:  So, we will -- do we have another set

Page 120

1      (indiscernible)?   I think (indiscernible) a set.

2                  Thank you very much.

3            (Whereupon these proceedings were concluded at 3:28 PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 121

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   Sonya

    Ledanski Hyde

7

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital1@veritext.com, c=US
Date: 2017.11.30 15:40:48 -05'00'

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  November 30, 2017